**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 13-53846 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN | ) | Chapter 9 |
|  | ) |  |
| Debtor | ) | Hon. Steven W. Rhodes |
|  | ) |  |

_____ )

**PRE-TRIAL BRIEF IN SUPPORT OF OBJECTIONS OF COUNTY OF
MACOMB, MICHIGAN, BY AND THROUGH ITS COUNTY AGENCY,
THE MACOMB COUNTY PUBLIC WORKS COMMISSIONER, AND
THE MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT TO
SIXTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE
<u>CITY OF DETROIT AND THE ASSUMPTION OF SEWER CONTRACTS</u>**

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iii

PRELIMINARY STATEMENT ................................................................................... 1

PROCEDURAL BACKGROUND ................................................................................ 6

STATEMENT OF FACTS ........................................................................................... 9

I.      The DWSD ....................................................................................................... 9

        A.      History of DWSD Corruption and Mismanagement ........................... 11

        B.      Current DWSD Governance ................................................................ 12

        C.      DWSD Participation in GRS. .............................................................. 13

II.     Macomb's Relationship With The Debtor ...................................................... 14

        A.      Negotiations Regarding a Regional Water Authority ......................... 16

        B.      Potential Private Transaction .............................................................. 17

III.    The Plan .......................................................................................................... 17

        A.      The Grand Bargain ............................................................................... 17

        B.      The DWSD Pension Contribution ....................................................... 19

                1.      Assumptions Underlying Alleged DWSD Pension Obligations .............. 21

        C.      Lack of DWSD Involvement In Plan Formulation ............................. 25

        D.      Plan Recoveries ................................................................................... 25

        E.      Lack of Adequate Funding for Capital Improvements ....................... 27

IV.     The MIDDD Claim ........................................................................................ 28

ARGUMENT .............................................................................................................. 29

I.      The Plan's Proposed Use of DWSD Moneys Is Illegal, Violates Wholesale Contracts, and Does Not Comply with DWSD Governance. .............................................................. 30

        A.      The Plan Violates Michigan and Detroit Law. ................................... 30

                1.      The Pension Overpayment ...................................................... 31

                2.      The DWSD CVR ...................................................................... 35

i

        3.      The Plan Provides For A Disguised Tax On Suburban Ratepayers That Has Not Been Properly Approved. ....................................................................... 37

        4.      The Plan Violates DWSD By-laws And The Wholesale Contracts. ........ 38

II.     The Plan Is Not Feasible. ............................................................................... 40

III.    The Plan Unfairly Discriminates Against Class 14 Unsecured Creditors. ....................... 43

      A.     The Plan Fails the Markell Test. ............................................................... 46

        1.      The Plan's Proposed Treatment of Classes 7, 10, and 11 Results In Material Discrimination Against Class 14. ............................................................ 46

        2.      The Plan Allocates Materially Greater Risk to Class 14 than to Classes 7, 10, and 11. ............................................................................................ 48

        3.      Class 14 Has the Same Priority As Classes 7, 10, and 11. ...................... 49

        4.      The Debtor Cannot Rebut the Presumption of Unfair Discrimination. .... 51

      B.     The Plan Fails the Aztec Test. .................................................................. 53

        1.      Alleged Potential Labor Unrest and Hardship to Pensioners Does Not Justify Unfair Discrimination. .............................................................. 53

        2.      Settlements of Litigation Do Not Justify Unfair Discrimination. ............. 56

      C.     The Debtor's Arguments Based on Case Circumstances Are Misplaced. ............. 58

IV.    The Plan Is Not in the Best Interests of Creditors. .......................................... 63

V.     The Plan Was Not Proposed In Good Faith. ................................................... 64

VI.    The Plan's Exculpation Clause Impermissibly Releases Certain Third Parties. .............. 66

# TABLE OF AUTHORITIES

**CASES**

Aetna Cas. & Surety Co. v. Clerk (In re Chateaugay Corp.),
89 F.3d 942 (2d Cir. 1996)................................................................54, 55

American United Mut. Life Ins. Co. v. City of Avon Park,
311 U.S. 138 (1940) ...........................................................46, 57, 63

Ashton v. Cameron County Water Improvement Dist.,
298 U.S. 513 (1938).......................................................................1

Blank v. Dep't of Corrs.,
222 Mich.App. 385 (Mich.App. 1997) ...............................................33

Bolt v. City of Lansing,
459Mich. 152 (1998) .......................................................................39

Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc),
622 F.2d 872 (5th Cir. 1980) ............................................................56

Butcher v. Twp. Of Grosse Ile,
387 Mich. 42 (Mich. 1972)...............................................................39

Butner v. United States ....................................................................51

Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),
280 F.3d 648 (6th Cir. 2002) ......................................................68, 69

Cnty. of Jackson v. City of Jackson,
302 Mich. App. 90 (Mich Ct. App. 2013) ..........................................39

Connector 2000 Ass'n, 447 B.R. 752, 763 (Bankr. D.S.C. 2011) ................65

DISH Network Corp. v. DBSD North America (In re DBSC North America, Inc.),
634 F.3d 79 (2d Cir. 2011)...............................................................62

Freeland v. City of Sturgis,
248 Mich. 190 (1929) ......................................................................34

In re Aleris Int'l, Inc.,
No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)...........45

In re Armstrong World Indus., Inc.,
348 B.R. 111 (D. Del. 2006)............................................................45

In re Aztec Co.,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ....................................46, 47, 54

In re Barnwell Cnty. Hosp.,
    471 B.R. 849 (Bankr. D.S.C. 2012) ....................................................................65

In re BWP Transport, Inc.,
    462 B.R. 225 (Bankr. E.D. Mich 2011) ..............................................................45

In re City of Detroit, Michigan,
    504 B.R. 97 (Bankr. E.D. Mich. 2013) ...........................................................50, 51

In re Cnty. of Orange,
    191 B.R. 1005 (Bankr. C.D. Cal. 1996)...........................................................50, 64

In re Corcoran Hosp. Dist.,
    233 B.R. 449 (Bankr. E.D. Cal. 1999)..................................................................58

In re Creekside Landing, Ltd.,
    140 B.R. 713 (Bankr. M.D. Tenn. 1992) .........................................................48, 59

In re Dembek,
    145 Mich.App. 185 (Mich.App. 1985) .................................................................33

In re Dow Corning Corp.,
    244 B.R. 696 (Bankr. E.D. Mich. 1999) ....................................................... passim

In re Graphic Commc'ns, Inc.,
    200 B.R. 143 (Bankr. E.D. Mich. 1996)................................................................55

In re Greate Bay Hotel & Casino, Inc.,
    251 B.R. 213 (Bankr. D.N.J. 2000) .....................................................................45

In re Gregory Boat Co.,
    144 B.R. 361 (Bankr. E.D. Mich. 1992)................................................................65

In re Kliegl Bros. Universal Elec. Stage Lighting Co.,
    149 B.R. 306 (Bankr. E.D.N.Y. 1992).................................................................55

In re Mount Carbon Metro. Dist.,
    242 B.R. 18 (Bankr. D. Colo. 1999) ...................................................................41

In re Multiut Corp.,
    449 B.R. 323 (Bankr. N.D. Ill. 2011) .................................................................66

In re New York City Off-Track Betting Corp.,
    434 B.R. 131 (Bankr. S.D.N.Y. 2010)................................................................30

In re Quay Corp., Inc.,
    372 B.R. 378 (Bankr. N.D. Ill. 2007) .................................................................45

iv

In re Sentry Operating Co. of Tex., Inc.,
264 B.R. 850 (Bankr. S.D. Tex. 2001) .......................................................46, 47, 63

In re Snyders Drug Stores, Inc.,
307 B.R. 889 (Bankr. N.D. Ohio 2004) ...........................................................48, 64

In re Tribune Co.,
472 B.R. 223 (Bankr. D. Del. 2012), partially vacated on other grounds, 2014 U.S.
Dist. LEXIS 82782 (D.Del June 18, 2014) ......................................................45, 64

In re Unbreakable Nation Co.,
437 B.R. 189 (Bankr. E.D. Pa. 2010) ....................................................................45

In re Washington Mut., Inc.,
442 B.R. 314 (Bankr. D. Del. 2011) ......................................................................68

In re Western Real Estate Fund, Inc.,
75 B.R. 580 (Bankr. W.D. Okla. 1987) .................................................................58

In re Worldcom, Inc.,
No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ...................62

Macomb Interceptor Drain Drainage District v. City of Detroit,
Case No. 13-1904-CZ .......................................................................................1, 29

Midland Cogeneration Venture L.P. v. Public Serv. Comm'n,
199 Mich.App. 286, 501 N.W.2d 573 (Mich. App. 1993).......................................38

Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating
LLC),
478 F.3d 452 (2d Cir. 2007)..................................................................................57

Taunt v. Lyons (In re Lyons),
1999 U.S. Dist. LEXIS 20240 (E.D. Mich. 1999) .................................................31

United States v. City of Detroit, E.D. Mich. Case No. 77-7110....................................10

United States v. Noland,
517 U.S. 535 (1996)...............................................................................................57

United States v. Security Industrial Bank,
459 U.S. 70 (1982)...................................................................................................1

## STATUTES AND CONSTITUTIONS

11 U.S.C. § 365(c)(1).....................................................................................................36

11 U.S.C. § 503(b) .........................................................................................................50

11 U.S.C. § 506 .................................................................................................50

11 U.S.C. § 507(a)(2) ........................................................................................50

11 U.S.C. § 510 .................................................................................................50

11 U.S.C. § 522(f) ...............................................................................................1

11 U.S.C. § 901(a) ...............................................................................50, 60, 65

11 U.S.C. § 943(b)(2) ........................................................................................60

11 U.S.C. § 943(b)(4) ..............................................................................4, 29, 34

11 U.S.C. § 943(b)(6) ...................................................................................29, 39

11 U.S.C. § 943(b)(7) ................................................................................ passim

11 U.S.C. § 1129(a)(1) .......................................................................................60

11 U.S.C. § 1129(a)(3) .......................................................................................65

11 U.S.C. § 1129(a)(6) .......................................................................................40

11 U.S.C. § 1129(a)(7)(ii) ..................................................................................60

11 U.S.C. § 1129(b)(1) .................................................................6, 44, 46, 60

MCL § 123.141(3) .......................................................................................31, 34

Mich. Const. art. 7, § 24 ...................................................................................10

Mich. Const. art. 7, § 25 ...................................................................................10

Charter of the City of Detroit § 7-1203 .................................................31, 34, 37

Charter of the City of Detroit § 7-1204 ............................................................36

### Other Authorities

Richard M. Hynes and Steven D. Walt, Pensions and Property Rights in Municipal
    Bankruptcy, 3 Rev. Banking & Fin. L. 609, 637-38 (2014) ....................................60

Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72 Am.
    Bankr. L.J. 227 (1998) ...........................................................................45, 46, 47, 53

Jonathan J. Spitz, Federalism, States, and the Power to Regulate Municipal Bankruptcies:
    Who May Be a Debtor Under Section 109(c), 9 Bankr. Dev. J. 621, 638 (1993) ................30

County of Macomb, Michigan, a Michigan Constitutional corporation, by and through its County Agency, Anthony V. Marrocco, the Macomb County Public Works Commissioner ("Macomb"), and the Macomb Interceptor Drain Drainage District (the "MIDDD," and together with Macomb, the "Macomb Parties"), creditors and parties in interest in the above-captioned Chapter 9 bankruptcy case, hereby submit this pre-trial brief in support of their objections to confirmation of the *Sixth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 6908] (the "Plan")[1] filed by the debtor, the City of Detroit (the "City" or "Debtor"), and, in support thereof, respectfully states as follows:

## PRELIMINARY STATEMENT

The Plan cannot be confirmed because its provisions and implementation violate applicable state and federal law, including sections 1129 and 943(b) of the Bankruptcy Code. Although Chapter 9 is highly protective of state law,[2] the Plan runs roughshod over a number of critical state-law requirements, and likewise violates the Bankruptcy Code itself. Moreover, the Plan's violations of state and federal law cannot be justified on the ground that it would serve the interests of certain constituents. Equitable considerations are especially constrained in Chapter 9 proceedings precisely to ensure respect for applicable state and federal law governing the management and affairs of a municipality and its efforts to reorganize.

---

[1]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

[2]    Chapter 9 is protective of state law out of necessity, as it otherwise would be unconstitutional. See Ashton v. Cameron County Water Improvement Dist., 298 U.S. 513 (1938) (finding earlier version of Chapter 9 unconstitutional because, due to the statute's interference with the obligations of states and their political subdivisions, "they are no longer free to manage their own affairs."). Further, courts should interpret the provisions of Chapter 9 in a manner that is especially solicitous of state law, in order to avoid questions regarding its constitutionality. See United States v. Security Industrial Bank, 459 U.S. 70, 78 (1982) (interpreting section 522(f) of the Bankruptcy Code in accordance with the "cardinal principle" that courts "first ascertain whether a construction of a statute is fairly possible by which the constitutional question may be avoided.").

1

From day one, a key feature of the City's debt restructuring strategy has been to extract value from the Detroit Water and Sewerage Department (the "<u>DWSD</u>") and transfer that value to pensioners and the City's General Fund. The majority of DWSD revenues come from customers outside of the City limits. Thus, one of the City's primary goals has been to use its suburban customers as a funding source by monetizing DWSD assets or cash flows at the expense of those customers. The City has pursued that goal single-mindedly at all stages of its attempted restructuring, even though, under state and local law, the DWSD is a non-profit municipal monopoly that exists only for the benefit of its users and cannot be treated as a profit-generating asset by the City.

The City's early efforts at monetizing the DWSD centered on negotiations with Macomb, Oakland, and Wayne Counties (collectively, the "<u>Counties</u>"), regarding the creation of a regional water and sewer authority (a "<u>Regional Authority</u>"). Attempting to exploit the Counties' dissatisfaction with the historic mismanagement of the DWSD and desire to have a greater voice in its operation and maintenance, the City proposed to lease the DWSD to a Regional Authority for an astronomical annual lease payment from the Counties. When the Counties rejected the initial proposals, the City made a less astronomical, but still absurd, lease payment demand of $47 million per year. The City's refusal to negotiate the proposed $47 million payment and failure provide sufficient information to justify it led to the breakdown of those negotiations.

The City then sought a different way to "fill the hole" in its cash projections. Thus, it devised a plan to have the DWSD make what it deemed to be "catch-up payments" for purported underfunded actuarial accrued liabilities ("<u>UAAL</u>") to the General Retirement System ("<u>GRS</u>") pension fund—a pooled fund for not only DWSD employees, but all other non-uniformed City employees. Although the GRS historically amortized its underfunding over 30 years, the City

2

determined that the DWSD payments would be made over 9 years, and that, during that period, all other City departments participating in the GRS would essentially stop paying their pension obligations altogether. In other words, the City sought to use the DWSD to fund the pension obligations of other departments of the City, all at the expense of the DWSD and its customers.

Of course, the calculation of pension obligations depends on actuarial variables. Accordingly, the City needed to employ certain assumptions to project the amount of DWSD payments, including, most importantly, a discount rate for valuing liabilities and an assumed investment rate of return on assets in the GRS fund. The discount rate and investment return assumptions bear an inverse relationship with contributions necessary to meet funding targets, and thus a low rate assumption increases the contribution amount. The City chose to use an inappropriately low 6.75% discount rate and investment return assumption. The rates were not the result of any actuarial analysis, and, in fact, are materially lower than the rates that Milliman, the City's own actuary, determined were appropriate in November 2013. Instead, the 6.75% rates were the product of the City's negotiation with the several constituencies representing pensioners' interests, including the Official Committee of Retirees.

Thus, the negotiating parties agreed to employ discount and investment return rates that would overstate the DWSD's pension liabilities and understate investment returns, thereby yielding a payment schedule based on predetermined contribution levels that would cause the DWSD to pay more than its fairly allocable pension obligations. Under the Plan, the City will not return this overpayment to DWSD, but instead intends to use it both to restore the ostensible GRS pension cuts under the Plan and to fund the pensions of non-DWSD employees. The funding for this overpayment must come from somewhere, and the funding burden will fall on squarely on ratepayers—including those from the Counties—in the form of higher rates. This

artifice built on tendentious assumptions, however, violates both state and City laws that protect ratepayers by **forbidding the use of DWSD revenues or assets for anything other than DWSD costs**. Thus, the Plan cannot meet the confirmation requirement of section 943(b)(4) of the Bankruptcy Code that "the debtor is not prohibited by law from taking any action necessary to carry out the plan."

The Plan's proposed disposition of the net proceeds of a "Qualifying DWSD Transaction," which is defined in the Plan as a transaction through which an outside party would buy, lease, or otherwise operate the DWSD in exchange for payments from that party, also would violate applicable laws. Under the Plan, 50% of any such net proceeds would be allocated among the GRS and Police and Fire Retirement System ("PFRS") pension funds through the "DWSD CVR" for a "Special Restoration" of benefit cuts under the Plan, and the other 50% would go to the City's General Fund. The DWSD would receive none of the proceeds.

As the City has long since cashed out its initial investment in the DWSD's sewer systems, all DWSD sewer assets are traceable to and derived from DWSD revenues. Accordingly, any disposition of those assets to satisfy non-DWSD obligations is a violation of state and local laws preventing misappropriation of DWSD revenues. The Plan, however, contemplates that exact unlawful misappropriation in the event the City closes a Qualifying DWSD Transaction.

The City's attempted use of DWSD assets to overpay pension obligations and fill the City's general coffers is not only illegal, but also indefensible in light of the dilapidated state of the DWSD's systems. Even after over 30 years of litigation regarding DWSD violations of the federal Clean Water Act, the DWSD is not in compliance with that act, and currently operates under a hardship exemption that may be revoked at any time. Much of the DWSD system is in

4

need of repair or replacement. While the City projects that capital improvement needs over the next 10 years total $2.9 billion, the necessary amount is materially greater.

To the extent rates are to increase for suburban customers, the resulting funds should be invested in capital improvement projects consistent with applicable law, not diverted to City pension obligations that are unrelated to the DWSD. Moreover, because the Plan does not adequately address the dire need for capital improvements to the DWSD system, it does not ensure the system's viability or capacity to provide services at an acceptable level. This flaw is exacerbated by the unreliable DWSD financial projections on which the Plan is based, which were created by the Emergency Manager's financial advisors without input from or review by DWSD senior management. Those projections, among other things, do not take into account the loss of significant customers, such as the City of Flint, which already has exited the DWSD system. Further, if rates were to continue to rise indefinitely, eventually customers in the Counties will not be able to afford DWSD services and, as the City acknowledges, those ratepayers may look to DWSD competitors, such as the new water system in Genesee County, to obtain essential services. Thus, the Plan does not meet the feasibility requirement of section 943(b)(7).

Moreover, the City's conscious decision to back into assumptions that overstate pension liabilities in order to force artificially inflated contributions from the DWSD evidences a lack of good faith, and is especially curious in light of the value of City assets available to satisfy creditors. For example, according to the City's own expert, the art collection housed at The Detroit Institute of Arts (the "DIA") may be worth as much as $4.6 billion. Nonetheless, the Plan proposes to dispose of it as part of the "Grand Bargain" in a transaction that will net less than $500 million in present value.

Adding insult to injury, the Plan unfairly discriminates against the dissenting Class 14, in which MIDDD's $26 million claim is classified, by providing materially greater recoveries to other classes of the same unsecured priority. This pernicious fact is perhaps unsurprising, as Class 14 general unsecured claimants, unlike pension claimants and financial creditors, did not have an official committee compensated by the estate or deep-pocketed bond trustees or insurers to protect their interests or ad

vance their cause. Thus, the Debtor faced no comparable pressure to negotiate more favorable treatment for Class 14. Protecting creditors with less bargaining power or resources, however, is the precise reason why the Bankruptcy Code does not allow a plan to be crammed down on a dissenting class if it discriminates unfairly. The materially disparate treatment of Class 14 as compared to other impaired unsecured classes gives rise to a presumption of unfair discrimination that the City cannot rebut. For this additional reason, the Plan does not meet the requirements of section 1129(b)(1) and cannot be confirmed.

Finally, the Plan is not in the best interests of creditors such as MIDDD. The Plan does not provide for the realization of the fair value of City assets, most notably the City-owned art collection. Accordingly, creditors such as MIDDD would be better off if the case were dismissed, as they would be able to reduce their claims to judgment and attach available assets.

## PROCEDURAL BACKGROUND

1. After filing several prior iterations of its plan of adjustment and accompanying disclosure statement, the Debtor filed the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 4392] (the "Fourth Amended Plan") and *Fourth Amended Disclosure Statement With Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 4391] (the "Disclosure Statement") on May 5, 2014. Also on that date, the Court entered an order approving the Disclosure Statement [Docket No. 4401].

6

2.	On May 12, 2014, various parties, including the Macomb Parties, filed objections to the Fourth Amended Plan.  See *Objection of County of Macomb, Michigan, by and Through its County Agency, the Macomb County Public Works Commissioner, and the Macomb Interceptor Drain Drainage District to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit and the Assumption of Sewer Contracts* [Docket No. 4636] (the "Macomb Objection").

3.	On May 26, 2014, the Debtor filed the Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Docket No. 5034] (the "Debtor Reply").

4.	On July 21, 2014, the Debtors filed the *Declaration of Michael J. Paque Regarding the Solicitation and Tabulation of Votes On, and the Results of Voting with Respect to, Fourth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 6179] (the "Voting Declaration"), which announced the results of voting on the Fourth Amended Plan. Although certain classes of impaired unsecured claims voted to approve the Fourth Amended Plan, including the pension classes (Classes 10 and 11), several impaired unsecured classes voted to reject the Plan, including Class 14.  See Stipulations from Joint Pretrial Order ("PTO Stipulations") at ¶ 16.

5.	On July 29, 2014, the Debtor filed the *Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 6379] (the "Fifth Amended Plan") which included certain amendments, such as improved treatment for the holders of Class 7 Limited Tax General Obligation Bond Claims ("LTGO Bond Claims"), reflecting the terms of an agreement (the "LTGO Agreement") with Ambac Assurance Corporation ("Ambac") and BlackRock Financial Management, as holders or insurers of certain unsecured limited tax general obligation

7

bonds (the "LTGO Bonds").  The Debtor did not file an amended Disclosure Statement with respect to the Fifth Amended Plan.

6.      As part of the LTGO Agreement, the Debtor stipulated with the settling parties to change their votes on the Plan.  See *Stipulation for an Order Authorizing Ambac Assurance Corporation and BlackRock Financial Management Inc. to Change their Votes on the City's Plan of Adjustment* [Docket No. 6260].  As a result, Class 7 converted from a rejecting class to an accepting class.

7.      On August 11, 2014, the Debtor filed the *Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections* [Docket No. 6644] (the "Tender Motion"). By the Tender Motion, the Debtor requests an order authorizing the City and the DWSD to issue new bonds in the amount of no more than $5.5 billion, secured by, among other things, DWSD net revenues, to refinance the existing DWSD Bonds (as defined in the Plan) in connection with a tender offer to the holders of those existing bonds.  The Tender Motion also requests approval of the settlement of various objections filed by holders of existing DWSD Bonds, the bond trustee, and the insurers of those bonds.

8.      On August 12, 2014, various parties, including the Macomb Parties, filed supplemental objections to the Fifth Amended Plan.  See *Supplemental Objection of County of Macomb, Michigan, by and through its County Agency, The Macomb County Public Works Commissioner, and The Macomb Interceptor Drain Drainage District to Corrected Fifth Amended Plan for The Adjustment of Debts of The City of Detroit* [Docket No. 6666].

9. On August 20, 2014, the Debtor filed the Plan, which, among other things, includes revisions to the Fifth Amended Plan based on the Tender Motion.

10. On August 25, 2014, various parties, including the Macomb Parties, filed additional supplemental objections to the Plan. See *Supplemental Objection of County of Macomb, Michigan, by and through its County Agency, The Macomb County Public Works Commissioner, and The Macomb Interceptor Drain Drainage District to Sixth Amended Plan for The Adjustment of Debts of The City of Detroit* [Docket No. 7039].

## STATEMENT OF FACTS

### I. The DWSD

11. The DWSD is a department and enterprise fund of the City. See PTO Stipulations at ¶ 42. It is a municipal monopoly that provides the water supply and wastewater control and treatment services for residential, commercial, governmental, institutional and industrial customers both in the City and 127 neighboring communities in, among others, Macomb, Wayne, and Oakland Counties. See PTO Stipulations at ¶ 41. DWSD services are used by approximately 40% of the State of Michigan's population. See id. Revenues from rates charged to customers outside the City for water and sewer services account for approximately 65% of total DWSD revenue.

12. According to its website, "[b]y Michigan statute, DWSD is a not-for-profit entity. Water and sewer rates are based on cost of service only …" and "[b]y law, DWSD can only recover the cost for provision of service—it cannot make a profit." See http://www.dwsd.org/downloads_n/about_dwsd/fact_sheet/dwsd_fact_sheet.pdf (Trial Ex. 5012); PTO Stipulations at ¶ 45.

13.     The DWSD operates its water and sewage system, and sells water and sewer services to the Counties, pursuant to authorization granted by the Michigan Constitution, which provides:

> Subject to this constitution, any city or village may acquire, own or operate, within or without its corporate limits, public service facilities for supplying water, light, heat, power, sewage disposal and transportation to the municipality and the inhabitants thereof.
>
> Any city or village . . . may sell and deliver water and provide sewage disposal services outside of its corporate limits in such amount as may be determined by the legislative body of the city or village; and may operate transportation lines outside the municipality within such limits as may be prescribed by law.

MICH. CONST. art. 7, § 24.

14.     The Michigan Constitution constrains the City's ability to sell the DWSD, stating that "[n]o city or village may sell any public utility unless the proposition shall first have been approved by a majority of the electors voting thereon, or a greater number if the charter shall so provide."  MICH. CONST. art. 7, § 25.

15.     As documents filed in <u>United States v. City of Detroit</u>, E.D. Mich. Case No. 77-7110—a case relating to the DWSD's compliance with the federal Clean Water Act commenced in 1977 (the "<u>Clean Water Act Case</u>")—reveal, in 1974 the City asserted that its initial investment from its General Fund (*i.e.* its "equity") in the DWSD sewer system was $15,278,135,[3] and demanded that the Board of Water Commissioners reimburse the General Fund for that equity.  <u>See</u> Documents filed in Clean Water Act Case at Docket No. 2376-1 (Trial Ex. 5015).  The DWSD (then called the Detroit Metro Water Department) made a series of payments from sewer rate revenues aggregating to that amount.  <u>See</u> <u>id</u>.

---

[3]     According to a 1975 internal DWSD memo, the remaining funds for the initial construction of the sewage system came from the sale of bonds ($5.075 million), and federal grants ($9 million).  <u>See</u> Clean Water Act Case, Case No. 77-71100, Docket No. 2376-1.  (Trial Ex. 5015).

16. That the City had been repaid its "equity" in the system was determined as a matter of fact by a Special Master appointed in the Clean Water Act Case. See Report and Recommendations of the Masters (Trial Ex. 5016).

17. Since that time, General Fund revenues have not been used for DWSD's operations and any services that other City departments have provided to DWSD have been billed to DWSD at full cost. Likewise, water and sewerage services supplied by DWSD to the City have been billed to the City. Thus, the City has not had a General Fund investment in the DWSD sewer system since 1975.

### A. History of DWSD Corruption and Mismanagement

18. DWSD ratepayers have historically paid higher rates than necessary due, in part, to corruption and mismanagement that has diverted capital from DWSD systems. The most recent highly-publicized example of such mismanagement occurred during the tenure of former mayor Kwame Kilpatrick. In 2001, in the Clean Water Act Case, the United States District Court for the Eastern District of Michigan (the "District Court") entered an order appointing Kilpatrick (like the two mayors that preceded him) Special Administrator of the DWSD. In 2002, Kilpatrick appointed Victor Mercado as director of the DWSD and Derrick Miller, his former Deputy Chief of Staff, as Chief Administrative Officer. As the *First Superseding Indictment* dated December 15, 2010 charges, Kilpatrick, Mercado, Miller, and Kilpatrick's father, Bernard, conspired to extort municipal contractors by coercing them to include contractor Bobby Ferguson in public contracts and/or by rigging the award of public contracts to ensure that Ferguson obtained a portion of the revenue from those contracts. See *First Superseding Indictment*, Case No. CR-10-20403-NGE (E.D. Mich. December 15, 2010) (Trial Ex. 5025); PTO Stipulations at ¶ 62. As a result, Ferguson obtained tens of millions of dollars from municipal contractors, which Ferguson shared with Kwame Kilpatrick and the other members of

11

the enterprise. After trial and conviction, Kwame Kilpatrick was sentenced to 28 years in prison, Ferguson was sentenced to 21 years, and Bernard Kilpatrick was sentenced to 15 months. <u>See</u> PTO Stipulations at ¶ 63. Mercado and Miller plead guilty to conspiracy and tax evasion counts, respectively.

### B. Current DWSD Governance

19. In September 2011, in response to the historic mismanagement of the DWSD and its inability to comply with the federal Clean Water Act, the District Court appointed a "root cause committee" consisting of certain City officials to report on the causes of DWSD's noncompliance. <u>See</u> Clean Water Act Case at Docket No. 2397 (Trial Ex. 5017). In November 2011, the root cause committee recommended certain changes to DWSD, including making DWSD more autonomous from the City. <u>See</u> Clean Water Act Case, Docket No. 2410 (attached to DWSD By-laws, Trial Ex. 5013); Transcript of Deposition of Kevyn Orr (the "<u>Orr Dep.</u>") at 16:11-15. In November 2011, the District Court entered an order implementing the root cause committee's plan, which, along with a stipulated order regarding the composition of the Board of Water Commissioners entered in February 2011 (collectively, the "<u>DWSD Governance Orders</u>"), was incorporated into the DWSD's by-laws. <u>See</u> PTO Stipulations at ¶ 56. Pursuant to the DWSD Governance Orders, among other things: (1) the Board of Water Commissioners (the "<u>Board</u>"), made up of four residents of Detroit, and one resident from each of the Counties, has sole authority for setting and approving wholesale water and sewerage rates, (2) the Director, upon authorization by the Board, has final authority to approve the DWSD budget subject to the approval of rates by the Board, and (3) Board approval must be sought for procurements that exceed specified monetary thresholds. <u>See</u> By-laws for the Detroit Water and Sewerage Department Board of Water Commissioners, Article XVIII, and orders attached thereto (Trial Ex. 5013); PTO Stipulations at ¶ 57.

20.     Despite these changes, the DWSD continues to remain noncompliant with the Clean Water Act, and currently operates under an affordability waiver under its National Pollutant Discharge Elimination System permit issued by the EPA.  See PTO Stipulations at ¶ 60; (Trial Exs. 5020, 5021); Transcript of Deposition of Kenneth Buckfire (the "Buckfire Dep.") at 344:25-345:15.  Bringing the DWSD system into compliance may cost billions of dollars.  See Buckfire Dep. at 344:25-345:15.

## C.     DWSD Participation in GRS.

21.     City departments contribute to pension funds of one of two retirement systems. The Detroit Police Department and the Detroit Fire Department contribute to the PFRS fund and all other City departments, including the DWSD, contribute to the GRS pooled fund. Contributions from DWSD to the GRS are based on, among other things, employee headcount, years of service, and various actuarial assumptions.  Historically, the DWSD has made all contributions allocated to it by the City.  See Buckfire Dep. 74:5-11.  According to the City, however, the GRS is significantly underfunded, due in part to mismanagement by members of the GRS board of trustees.  See Disclosure Statement at 106.  This mismanagement included "consuming pension fund assets to pay promised returns under the separate 'annuity savings plan,' whether or not such returns were actually realized," and the so-called "13th check program" pursuant to which the trustees paid a portion of excess investment returns over the assumed rate of return to certain pensioners, resulting in payouts greater than the pensioners' earned amount.  See Disclosure Statement at 11, 106.  Certain former members of the GRS administrative staff and board of trustees were convicted on federal charges in connection with this conduct.  Orr Dep. 323:18-324:11.

**II.     Macomb's Relationship With The Debtor**

22.     Macomb is a party to the Wastewater Disposal Services Contract (the "Macomb-OMI Agreement"), dated as of September 30, 2009, between Macomb and OMI.  OMI, in turn, is a party to the Wastewater Disposal Services Contract (the "OMI-Detroit Agreement"), dated October 22, 2009, between Oakland-Macomb Interceptor Drain Drainage District ("OMI") and the City, by its Board of Water Commissioners.  See PTO Stipulations at ¶ 49.

23.     OMI, an inter-county drainage district, was created in connection with a global settlement agreement reached in May 2009 in the Clean Water Act Case.  Pursuant to that global settlement, as well as a purchase agreement dated October 22, 2009, the Debtor transferred to OMI ownership of the interceptors, pump stations, meters, and appurtenant facilities that it owned in Macomb, commonly known as the ITC Corridor Interceptor, the Oakland Arm Interceptor, and the Avon Arm Interceptor.  See Macomb-OMI Agreement, at 1-2 (Trial Ex. 5010).  OMI operates and maintains those facilities to provide wastewater transportation services to Macomb and Oakland Counties.  OMI is run by a three-member board made up of representatives of Macomb and Oakland Counties, and the State of Michigan.

24.     Pursuant to the Macomb-OMI Agreement, OMI transports wastewater from the Macomb County Wastewater Disposal District in Macomb to Detroit for treatment and disposal by the DWSD.  See Macomb-OMI Agreement § 1 (Trial Ex. 5010).  The Macomb County Wastewater Disposal District services some 500,000 county residents, which is about 60% of Macomb's population.  The other 40% live in communities that either have their own treatment plants, contract with the City directly or through Wayne County, or have no public sewer systems.

25.     Macomb pays OMI at rates based upon the rates the DWSD charges OMI, plus costs and charges incurred by OMI.  See Macomb-OMI Agreement, § 10 (Trial Ex. 5010).  The

14

DWSD charges OMI for wastewater flow delivered to the DWSD system at rates established by the Debtor through its cost allocation and rate design processes. See OMI-Detroit Agreement, § 20.01 (Trial Ex. 5011). Accordingly, the rates charged by DWSD under the OMI-Detroit Agreement are passed through OMI to Macomb and Oakland.[4] Macomb itself pays a wholesale rate, and recovers that payment through charges to the municipalities with which it has wastewater service contracts.

26. Pursuant to the OMI-Detroit Agreement, OMI is a wholesale "First Tier Customer" of the DWSD. See OMI-Detroit Agreement § 1.01 (definition of "Customer") (Trial Ex. 5011). The phrase "First Tier Customer" is defined in the OMI-Detroit Agreement as "all directly contracted Services customers of the [wastewater disposal system owned, operated and maintained by the City acting through its Board]." Id. The OMI-Detroit Agreement also provides that: (i) "Oakland and Macomb County … shall have the status and rights of Tier 1 Customers, including but not limited to participation on the Sewer Steering Committee and all of its subcommittees and work groups," id. at § 19.08, and (ii) "Oakland County and Macomb County are intended third party beneficiaries of this Contract." Id. at § 19.07; PTO Stipulations at ¶ 49.

27. In addition to these contractual arrangements, Macomb has a role in the governance of the DWSD. Pursuant to orders entered in the Clean Water Act Case, the DWSD Board of Water Commissioners must include a nominee of the Macomb County Public Works Commissioner. See DWSD By-laws (Trial Ex. 5013).

---

[4] The Macomb-OMI Agreement confirms that this arrangement is intended "to serve the public health and welfare of the people of the State of Michigan, especially in the area affected [thereby], and to enhance the water quality of the Great Lakes and its tributaries." Macomb-OMI Agreement, § 3.

### A. Negotiations Regarding a Regional Water Authority

28. Shortly after Kevyn Orr began his term as Emergency Manager of the City on March 25, 2013, he tasked his advisors with investigating opportunities for the City to monetize DWSD. See Orr Dep. at 24:7-19; PTO Stipulations at ¶ 64. As part of this strategy, beginning in mid-to-late 2013, the City and the Counties discussed the creation of a Regional Authority to take over water and sewer service from the DWSD, which would give the Counties greater control of the operations and maintenance of the system. See PTO Stipulations at ¶ 65. In August 2013, the Emergency Manager, through his financial advisor, Miller Buckfire, submitted a draft lease and term sheet to Macomb, Oakland County, and Wayne County (the "Counties") containing its proposal for the Regional Authority. The proposal included an unreasonably high proposed lease payment, reflecting the City's strategy of attempting to extract maximum value from the DWSD's assets for the purposes unrelated to the DWSD, namely to fund non-DWSD pension liabilities and to augment the City's General Fund. See Orr Dep. 23:17-26:16. The Counties rejected the proposal as unacceptable on its face.

29. The parties, however, continued negotiating and, in January 2014, the Debtor and the Counties made progress toward a memorandum of understanding (the "MOU") that included two key elements: (1) a base lease payment from the Regional Authority to the Debtor, and (2) the assumption of the DWSD pension liabilities by the Regional Authority. The Debtor, however, proposed that the lease payment should be $47 million per year on a "take it or leave it" basis. The Counties requested certain financial due diligence relating to the peremptory $47 million demand, as well as data regarding the amount of pension liabilities. The Debtor, however, failed to produce vital information in response to diligence requests, and the Debtor and Counties fundamentally disagreed regarding the details of the lease payment and pension assumption. Thus, the Counties did not sign the MOU. See PTO Stipulations at ¶ 66.

16

### B. Potential Private Transaction

30.     On or about March 25, 2014, the Debtor distributed a Request for Information (the "RFI") to potential private operators of the DWSD's water and sewer systems, again demonstrating the City's desire to monetize the DWSD.  The RFI requests proposals from private parties for a "public-private partnership of the operation and management of the Detroit Water and Sewage Disposal Systems" in the form of an operating and management agreement.  See Request for Information for Potential Operators of DWSD (Trial Ex. 5035).  The RFI also states that the Emergency Manager will consider structures such as a long-term lease and a concession agreement or sale.  See id.; PTO Stipulations at ¶ 67.

## III.    The Plan

### A.    The Grand Bargain

31.     One of the cornerstones of the Plan is the so-called "Grand Bargain," which is a "settlement" involving the City, the State of Michigan, the DIA, and certain charitable foundations.  Pursuant to the DIA Settlement (as defined in the Plan), the charitable foundations and the DIA (the "DIA Funders") have committed to fund $366 million and $100 million, respectively, into the GRS and PFRS retirement systems over 20 years.  See Plan § IV.E, Plan Exhibit I.A.118, Plan Exhibit I.A.119.  That funding is in exchange for the transfer of all DIA Assets, including the DIA art collection, operating assets, buildings, parking lots, and other assets used primarily in servicing the DIA, to a "perpetual charitable trust for the benefit of the people of the City and State, including citizens of the [Counties], permanently free and clear of all liens, encumbrances, claims and interests of the City and its creditors."  See Plan Exhibit I.A.118.  In addition, as part of the Grand Bargain, the State of Michigan has agreed to contribute $194.8 million to the PFRS and GRS, an amount equal to the present value of $350 million over 20 years at a 6.75% discount rate (the "State Contribution").  See Plan Exhibit I.A.318, § 1.  The

State Contribution is conditioned upon the irrevocable funding commitments in the DIA Settlement and this Court's approval of that settlement. See Plan Exhibit I.A.318 at §§ 4.f.v., 4.g. Thus, the State Contribution is also conditioned on the transfer of the DIA Assets from the City's ownership to a perpetual trust. The Grand Bargain will result in an aggregate contribution to the pension funds of $816 million over 20 years, and a fraction of that on a present value basis.

32.    The Disclosure Statement describes the art collection owned by the City and housed at the DIA (the "City Art Collection") as one of the top six art collections in the United States. See Disclosure Statement at 97. The Disclosure Statement goes on to describe an appraisal performed by Christie's Inc. of the value of a 2,773 works from the City Art Collection (a small subset of the entire collection of over 65,000) finding that the aggregate fair market value of those works was between $454 million and $867 million. See id.; see also Expert Report of Vanessa Fusco, dated July 8, 2014, at 4-5, 10. Finally, the Disclosure Statement describes certain proposals from potential acquirers for some or all of the City Art Collection ranging in value from $1 billion $1.75 billion, as well as a proposal to provide $2 billion in exit financing secured by the City Art Collection. See Disclosure Statement at 157.

33.    After the Disclosure Statement was sent to potential voters, and in connection with the discovery process, the City served on various parties the expert report of Michael Plummer of Artvest Partners LLC dated July 8, 2014. According to Mr. Plummer, the City Art Collection alone (i.e. excluding the DIA real estate and other DIA-related assets) may be worth as much as $4.6 billion. See Expert Witness Report of Michael Plummer, dated July 8, 2014 ("Plummer Report"), at 19.

34.     Elizabeth Von Habsburg of Winston Art Group, an expert retained by Syncora, appraised a mere 582 works, and assigned to them a value of $1,742,245,750.  See Expert Report of Elizabeth Von Hapsburg, dated July 22, 2014, at 9.  Victor Wiener of Victor Wiener Associates, another Syncora expert, valued the entire City Art Collection at approximately $8.6 billion.  See Expert Report of Victor Wiener, dated July 25, 2014 (the "Wiener Report") at 3.

**B.     The DWSD Pension Contribution**

35.     In addition to the funding from the Grand Bargain, the Plan proposes that the DWSD will pay $386.1 million in UAAL, which the City contends is on account of accrued liabilities attributable to DWSD, over 9 years.  See Disclosure Statement at 62; Milliman Letter dated April 25, 2014, (POA00259906) (Trial Ex. 4784).  Further, the Plan requires payment of $2.5 million per year in pension-related administrative expenses over that 9 year period.  See Milliman Letter (POA00259906) (Trial Ex. 4784).  Finally, the Plan contemplates the payment by DWSD of $20 million in restructuring fees in 2015.  Transcript of Deposition of Charles Moore (the "Moore Dep.") at 327:19-328:8.  Thus, the total DWSD payment under the Plan is $428.5 million over 9 years.  No other GRS-participating City department will contribute to the GRS through 2023, although the City states that $114.6 million will be contributed to the GRS from the General Fund during that period.  See Debtor Reply at 153 n.88.  The assets contributed by the DWSD in the 9-year period will be available to satisfy obligations to both DWSD and non-DWSD retirees.  See Transcript of Deposition of Glenn Bowen (the "Bowen Dep.") at 455:12-21.

36.     The Debtor proposes that DWSD pay the $428 million in installments of $65.4 million in 2015, and $45.4 million in each of the years 2016 through 2023.  See Plan Exhibit II.B.3.r.ii.A.  Those payments would be vastly greater than the DWSD's recent total pension

contributions of: $11.6 million in 2009, $11.4 million in 2010, $19.7 million in 2011, $10.9 million in 2012, and $24.3 million in 2013. See Disclosure Statement at 92.

37.     The funding for such payments would be derived from rates charged by the DWSD to its customers, including Macomb, through June 30, 2023. See Disclosure Statement at 22. Thus, for the first ten years following the bankruptcy, the DWSD would be the sole City department contributing to the GRS system for **all** Detroit retirees and employees.

38.     Although the Plan contemplates certain cuts to the benefits of GRS pensioners, those benefits may be restored. Each year, the GRS actuaries will assess whether the market value of plan assets exceeds the 10-year funding targets, which will occur if the real rate of return on investments exceeds the Debtor's assumed rate of return of 6.75%. If so, assets will be credited to a "Restoration Reserve Account" that may be used to restore any benefit cuts. See Plan Exhibits II.B.3.q.ii.C, II.B.3.r.ii.C; Orr Dep. 297:13-298:25.

39.     The Plan also provides for the establishment of a "Restoration Trust" for the purpose of restoring PFRS and GRS benefits through a "Special Restoration" or a "General Restoration." See Plan at §§ IV.F.1, IV.F.2. The Restoration Trust would hold the "DWSD CVR," a "single series of contingent value right certificates representing the right to receive 50% of the net proceeds resulting from a 'Qualifying DWSD Transaction.'" Plan at § I.A.141. A "Qualifying DWSD Transaction" is "a potential transaction involving the transfer to a third party of a majority of the assets of, or the operation and management of, the City's water and/or sewage disposal systems currently operated by the DWSD." Plan at § I.A.273. In other words, not only would the DWSD be required, at the expense of the Counties, to fund shortfalls in the GRS pension, but the Plan expressly contemplates transactions involving the DWSD's assets or operation and management of its systems that would restore ostensibly compromised benefits of

the GRS and the PRFS. The restoration of those benefits could only come at the expense of ratepayers, including Macomb.

40. After being absent from several iterations of the plan of adjustment, the concept of a Regional Authority has returned to the Plan. It is unclear, however, whether the Plan contemplates that a transaction creating a Regional Authority would meet the definition of "Qualifying DWSD Transaction." If so, 50% of any net sale proceeds, lease payments, or payments pursuant to a management contract received by the DWSD under either a Regional Authority structure or a public-private partnership would be paid into the City's General Fund, and 50% would be allocated to the GRS pension fund and PFRS pension fund (even though no DWSD employee is a PFRS employee). Not a cent of the net proceeds would be retained by the DWSD for use in its water and sewer systems or for needed capital improvements.

1. Assumptions Underlying Alleged DWSD Pension Obligations

41. In determining the claim amounts of Class 11 GRS pension claims, the City utilized a 6.75% discount rate assumption for valuing pension liabilities, as well as a 6.75% investment return assumption for future growth of assets. See Disclosure Statement at 13. The 6.75% investment return assumption is drastically lower than the 7.9% assumption developed by the GRS plan actuary, Gabriel Roeder, and used by the GRS since 1998. See Disclosure Statement at 12; Transcript of Deposition of Cynthia Thomas (the "Thomas Dep.") at 53-54. Further, it is lower than the rate used by 122 of the 126 plans taking part in the Public Fund Survey, an online compendium of key characteristics of most of the nation's largest public retirement systems, as of July 3, 2014. See Expert Report of William B. Fornia, FSA, dated July 29, 2014 (the "Fornia Report"), at 11; see also Bowen Dep. at 98:16-21, 99:7-11 (using Milliman's capital market assumptions and the Plan's inflation assumptions, weighted average for 100 largest pension plans in the U.S. was 7.55%). It is also lower than the average assumed

21

investment return for public pensions of 7.72% found by Ms. Kopacz, the Court's appointed expert.  See Expert Report of Martha E.M. Kopacz, dated July 18, 2014, at 135.

42.     Perhaps most notably, the Plan's 6.75% rate is 45 basis points lower than the 7.2% rate developed in November 2013 by the City's own actuary, Milliman, using its capital market assumptions and methodologies.  See Milliman Letter, November 4, 2013 (POA00260255-58) (Trial Ex. 4016).  In formulating its recommendation, Milliman used, as its building block, an inflation rate assumption of 2.5%.  See id. (POA00260256).  That rate is the lowest inflation assumption used by Milliman with respect to its seven large public fund clients, and is lower than the inflation assumption used by 119 of the 126 public funds taking part in the Public Fund Survey.  See Fornia Report at 11-12.  Thus, even Milliman's 7.2% recommendation is unduly low.  Further, the City's 6.75% assumption is lower than the rate assumptions used by Milliman with respect to all seven of its large public fund clients included in the Public Fund Survey, six of which use rates of 7.5% or greater.  See Fornia Report at 12.

43.     The discrepancy between the Plan's 6.75% rate assumption and the higher rates (i) developed by the City's own actuary and (ii) used by most comparable public funds, is due to the fact that the 6.75% assumption was not developed using any actuarial analysis.   Rather, it is the product of negotiations between, among others, the Debtor and certain retiree representatives, including the Official Committee of Retirees.  See, e.g., Bowen Dep. at 350-52, 374-76, 412-13, and 483-84; Moore Dep. 345:8-14; Orr Dep. 317:23-318:17.  Moreover, the 6.75% assumption will not be revisited or re-evaluated until at least June 30, 2023.  See Disclosure Statement at 49-51 ("During the period that ends on June 30, 2023, the trustees … shall adopt and maintain an investment return assumption and discount rate for purposes of determining assets and liabilities … that shall be 6.75%").

22

44.     Further, in determining a rate of return assumption, actuaries typically reduce the rate to account for administrative and investment expenses.  <u>See</u> Bowen Dep. at 168:3-15.  The 6.75% assumption used by the City, however, is not reduced for administrative expenses.  <u>See</u> Bowen Dep. at 446:3-10.  Thus, the real investment return assumption is less than 6.75%, as it should have been reduced to account for the $2.5 million per year in administrative expenses that the DWSD is required to contribute to the GRS under the Plan.

45.     The use of a negotiated 6.75% discount rate and 6.75% investment return assumption, as opposed to higher rates that are warranted, results in the overstatement of pension claim amounts and an understatement of likely investment returns.  <u>See</u> Fornia Report at 9; Expert Report of Stephen H. Rosen, dated July 29, 2014 (the "<u>Rosen Report</u>"), at 17; Bowen Dep. at 372:3-16 (the lower the discount rate used, the higher the measure of liability).  The result is that the alleged GRS contribution amount allocated by the Debtor to the DWSD exceeds the actual amount necessary to fund any legitimate DWSD obligations.  <u>See</u> Moore Dep., 346:24-347:7 (Q. "Now, what if investment returns are greater than projected."  A. "Then we would have a situation where, all else being equal, potentially at the end of this period that we're talking about, June 30th of 2023, that the amount related to DWSD for GRS for the previously accrued benefits could be greater than 100 percent funded at that time.").  In that event, as the Debtor's financial advisor testified, it "wouldn't be likely" that the DWSD would receive any refund or rebate of the amount contributed in excess of its funding obligations.  <u>See</u> Moore Dep. 347:8-18.

46.     Further inflating the claim amounts of GRS participants, and thus the contributions of the DWSD, is the use of the Entry Age Normal funding method, which uses projections of future salary increases and years of service to calculate the present value of future

benefits. Because, however, the GRS Plan is "frozen" as of July 1, 2014, those salary increases and years of service should not be factored into a calculation of the amounts owed to pensioners. See Fornia Report at 3-5; Rosen Report at 17-21. The City also inappropriately included non-vested benefits in the calculation of pension claims.[5] See Fornia Report at 3-5; Rosen Report at 21.

47.     In addition to the inappropriately high pension contributions, the $20 million in restructuring fees allocated to the DWSD bear no relation to DWSD costs, because that amount is not based on professional services devoted to DWSD matters. Rather, it is based on an averaging methodology. See Moore Dep. 321:22-322:12, 356:21-357:15.

48.     The burden of the artificially inflated pension contributions and restructuring fees that the Plan attributes to the DWSD is foisted onto ratepayers such as Macomb in the form of increased rates. See Transcript of Deposition of Susan McCormick (the "McCormick Dep.") at 281:16-282:2 ("If what you are asking is if there are funds that do not serve an obligation of DWSD's are removed from the system assets, would that have a rate impact, the answer would be yes."). In addition, because the Plan requires the DWSD payments to be made over 9 years rather than a longer, more appropriate period of time, that impact falls disproportionately on ratepayers in the short term. This violates the important principal of intergenerational equity, which attempts to spread the costs of services over a period of time representative of the persons receiving the benefit. See Expert Report of Joseph Esuchanko, dated July 28, 2014 (the

---

[5]     The calculation of liabilities also may be based on an erroneously high employee headcount. When an employee transfers from one City department to another, the department to which the employee transfers assumes responsibility for the employee's entire accrued actuarial pension liability. See Esuchanko Report at 12. According to the Executive Director of the GRS, when employees transfer from the DWSD to another City department, it may take up to two years to account for such transfer. See Thomas Dep. at 188:19-192:13. The City made no effort to ensure that there were no inaccuracies in the headcount used to calculate GRS liabilities allocable to the DWSD. See Bowen Dep. at 392:11-393:8; Moore Dep. at 329:5-330:18. Thus, the potential improper accounting for transfers from the DWSD may have contributed to inaccurately high claim amounts.

"Esuchanko Report"), at 12-14. As with the assumed discount rate, the 9-year period is not a product of any actuarial analysis, but a negotiated assumption. See Bowen Dep. at 442:21-443:13; 451:11-22.

### C. Lack of DWSD Involvement In Plan Formulation

49. Despite the District Court-ordered governance provisions regarding DWSD budgeting and rate setting discussed above, the DWSD director testified that, other than providing data to the City's financial advisors, she was not involved in the development of the DWSD financial projections underlying the Plan. See McCormick Dep. at 67:13-68:14. In fact, although the Director had seen the projections at the time of her deposition, she had not reviewed them in detail. See McCormick Dep. at 65:18-66:15. Similarly, the Chief Financial Officer of the DWSD was not consulted with respect to any aspect of the Plan or the underlying projections, other than requests to provide source information. See Transcript of Deposition of Nicolette Bateson (the "Bateson Dep.") at 45:15-46:2; 46:14-48:23; 50:7-50:25. Moreover, the Director did not know who developed the assumption in the projections that rates for sewer service would increase by 4% annually, see McCormick Dep. at 72:10-73:10, nor was the Director familiar with the specifics of the "rate stability program" contemplated by the Plan. See McCormick Dep. at 79:20-80:5. Further, the Director did not become aware that the Plan proposes to have the DWSD pay $428.5 million over 9 years until "it was proposed in the plan of adjustment." See McCormick Dep. 218:22-219:3.

### D. Plan Recoveries

50. According to the Disclosure Statement, the estimated percentage distribution (i) to holders of PFRS pension claims in Class 10 is 59% and (ii) to holders of GRS pension claims in Class 11 is 60%. See Disclosure Statement at 37-39. In contrast, experts who adjusted for the inflated claim amounts and understated investment return assumptions have estimated recoveries

(i) for PFRS claims to be 85-115%, and (ii) for GRS to be 96-117%.  See Fornia Report at 15, Rosen Report at 26.

51.     In addition, pursuant to the LTGO Agreement, (i) the unsecured LTGO Bond Claims would be allowed in the aggregate amount of $163,544,770 and (ii) the holders of LTGO Bonds and Ambac (collectively, the "LTGO Parties"), on account of subrogation claims arising from its payment of interest on the LTGO Bonds, are to receive under the Plan (a) at the Debtor's option (x) $55 million in cash, or (y) new bonds with a principal amount of $55 million and (b) 20% of the New B Notes (as defined in the Plan) that may be distributed from the Disputed COP Claim Reserve (as defined in the Plan).  See Plan at §§ II.B.3.n., II.B.3.p.iii.B. Thus, the LTGO Parties will receive no less than 33.6% of their allowed unsecured claims, plus the potential for a greater percentage depending on the distributions from the Disputed COP Claim Reserve.

52.     In contrast, the holders of Class 14 general unsecured claims are to receive New B Notes amounting to, at most, 10-13% of their claims[6] plus 15% of the New B Notes that may be distributed from the Disputed COP Claim Reserve (compared to 20% of the New B Notes from that reserve that may be distributed to the LTGO Parties).  See Plan at §§ II.B.3.u.  The New B Notes have a maturity of 30 years, are interest-only for the first 10 years, and then amortized in equal installments over the final 20 years.  See Plan Exhibit I.A.232.  The interest on the New B Notes is 4% for the first 20 years, and 6% in years 21 through 30.  See id.  Thus, although the interest rate for the first 20 years is similar to rates paid on tax exempt notes (as distinct from

---

[6]     In fact, the percentage recovery to Class 14 is less than the 10-13% estimated recovery asserted by the Debtor in the Disclosure Statement for two reasons: the $150 million in estimated aggregate Class 14 claims does not include the $26 million MIDDD Claim, see Disclosure Statement at 41, and the New B Notes (30-year maturity, interest-only for 10 years, 4% interest rate for the first 20 years) are not worth their face amount.

taxable notes), there is no indication in the Plan or supporting documents that the interest on the New B Notes will be tax exempt.

### E. Lack of Adequate Funding for Capital Improvements

53.    The Plan is premised on projections that do not adequately account for the capital improvement needs of the DWSD systems.  The projections were prepared by Conway MacKenzie without input or review from anyone from the DWSD.  See McCormick Dep. at 94:6-11.  The projections assume, based on a report from OHM Advisors, that capital improvement spending will be $2.9 billion in the aggregate for 2014 through 2023.  See Disclosure Statement Exhibit M.  According to an analysis performed by the Counties, however, the spending necessary for capital improvements to the DWSD's water and sewer systems over the next ten years may be as much as $3.5 billion (exclusive of improvements to the Detroit retail system).  See Inter-County Technical Working Group Report (Trial Ex. 5036).

54.    Aside from drastically underestimating the costs of necessary capital improvements, the projections fail to take into account the DWSD's recent deteriorating operating performance and trends suggesting that decline will continue.   In general, the actual volumes of water and sewer services billed have eroded more rapidly than the projections assume.  See Report of Michael Nadol, dated July 25, 2014 (the "Nadol Report"), at ¶ 7(b).  For example, billed volumes for retail sewer and water in the City of Detroit fell by nearly half over the past 15 years.  See Nadol Report at ¶ 16(a).  The Plan, however, assumes significantly **increased** retail water and sewer sales in 2014 and 2015.  See Nadol Report at ¶ 24.

55.    The DWSD's actual bad debt expense and customer non-payment levels are extraordinarily high.  Among active retail accounts with recent activity, 45.4% were 60 days or more past due as of July 1, 2014.  See Nadol Report at ¶ 18(b).  Combined sewer and water bad debt expenses have increased from $33.6 million to $52.2 million over the past two years.  See

27

Nadol Report at 18(c). The projections, however, assume that bad debt expenses will decline, even though rate increases will create affordability pressures that will increase the level of nonpayment and bad debt expense. Nadol Report at ¶ 27.

56. Further, although the City of Flint exited the DWSD in April, 2014—more than two years before the date assumed in the Plan—the projections include forecasts that revenues from Flint will generate 8.5% of the DWSD's wholesale water receipts through June 30, 2016. See Nadol Report at ¶ 5, 7(a), 17, 23(a).

57. Ms. Kopacz, the Court's appointed expert, performed no analysis of the viability of the DWSD post-emergence or the feasibility of the DWSD meeting the Plan projections. See Transcript of Deposition of Martha Kopacz ("Kopacz Dep.") at 521:2-6.

## IV. The MIDDD Claim

58. Prior to the filing of this Chapter 9 case, MIDDD filed suit against the City to collect the amount of not less than $26 million (the "MIDDD Claim"). Macomb Interceptor Drain Drainage District v. City of Detroit, Case No. 13-1904-CZ. That suit concerned certain overcharges relating to the repair of the collapse of the Macomb Interceptor Sewer at 15 Mile Road in the City of Sterling Heights that MIDDD paid to the City in connection with MIDDD's acquisition of the Macomb Interceptor System. On May 2, 2014, MIDDD timely filed a proof of claim (the "MIDDD Proof of Claim") with respect to that suit prior to the bar date for governmental claims. See MIDDD Proof of Claim (Trial Ex. 5000). Under the Plan, the MIDDD Claim is classified in Class 14.

59. On July 21, 2014, the Court entered an order pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure valuing the MIDDD Claim at the full $26 million amount for purposes of voting on the Plan. See PTO Stipulations at ¶ 68-74.

## ARGUMENT

60.     A Chapter 9 plan, to be confirmed, must meet the requirements of section 1129 of the Bankruptcy Code incorporated into Chapter 9 through section 901(a).  Further, the plan must satisfy the requirements of section 943(b), including (1) that "the debtor is not prohibited by law from taking any action necessary to carry out the plan," 11 U.S.C. § 943(b)(4); (2) that the debtor either obtains "any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan" or "such provision is expressly conditioned on such approval," 11 U.S.C. § 943(b)(6); and (3) that "the plan is in the best interests of creditors and is feasible." 11 U.S.C. § 943(b)(7).  These requirements are intended to address federalism concerns that "resonate loudly in chapter 9 bankruptcies."  In re New York City Off-Track Betting Corp., 434 B.R. 131, 149 (Bankr. S.D.N.Y. 2010); see also Jonathan J. Spitz, Federalism, States, and the Power to Regulate Municipal Bankruptcies: Who May Be a Debtor Under Section 109(c), 9 Bankr. Dev. J. 621, 638 (1993) ("[I]t is widely recognized that Tenth Amendment concerns may be avoided only by cooperation between the states and the federal government, and such recognition is weaved extensively throughout the Bankruptcy Code.").  In fact, as the court observed in In re New York City Off-Track Betting Corp., there is "no instance where respect for State law is more paramount than in a municipal bankruptcy case under chapter 9 of the Bankruptcy Code."  In re New York City Off-Track Betting Corp., 434 B.R. at 149.

61.     In contravention of these transcendent and foundational provisions of federal law, the Plan violates various state and City laws.  Moreover, the Plan, as currently proposed, is infeasible and otherwise does not meet applicable confirmation criteria.  Thus, the Plan does not meet the requirements of sections 943 and 1129, and cannot be confirmed.

I.      **The Plan's Proposed Use of DWSD Moneys Is Illegal, Violates Wholesale Contracts, and Does Not Comply with DWSD Governance.**

62.     The Plan is transparently designed to enable the Debtor to force suburban users of water and sewer services to subsidize its plan of adjustment through increased water and sewerage rates.  Although the Debtor attempts to characterize the proposed $408.5 million payment from the DWSD as a mere payment of accrued UAAL and pension administration expenses, and thus an obligation of ratepayers, the Plan actually compels the DWSD to pay much more than its share of GRS UAAL.  Further, the proposed $20 million DWSD payment for restructuring fees is not properly allocable to the DWSD.  Accordingly, through artificially inflated rates, suburban ratepayers will be forced to fund City obligations that are unrelated to the DWSD.  The Debtor's attempted leveraging of its ability—through a municipal monopoly with long-term wholesale contracts with the Counties—to obtain revenue from outside the City limits is highly inequitable and violates Michigan and Detroit law, DWSD governance, and the Debtor's contracts with the Counties.

A.      **The Plan Violates Michigan and Detroit Law.**

63.     As the DWSD acknowledges in materials posted to its website, it is a not-for-profit entity and that "[b]y law … can only recover the cost for provision of its service."  See, e.g., http://www.dwsd.org/downloads_n/about_dwsd/fact_sheet/dwsd_fact_sheet.pdf.  (Trial Ex. 5012).  Section 123.141(2) of the Michigan Compiled Laws (the "MCL") provides that the price charged by a city that contracts to sell water outside of its territorial limits "shall be at a rate which is based on **the actual cost of service** determined under the utility basis of ratemaking."  MCL § 123.141(3) (emphasis added).  Moreover, section 7-1203 of the Charter of the City of Detroit (the "City Charter") provides that "[a]ll moneys paid into the city treasury from fees collected for water, drainage or sewerage services shall be **used exclusively for the payment of**

30

**expenses incurred in the provision of these services** … and shall be kept in separate funds."

City Charter § 7-1203 (emphasis added).[7]  The Plan's proposal with respect to DWSD funding of

UAAL runs afoul of these state and local laws, which are clearly intended to protect ratepayers

from the diversion of funds paid into the DWSD system to other purposes for which ratepayers

receive no benefit.

### 1. The Pension Overpayment

64.    The Debtor's contention that the proposed DWSD payments to GRS under the

Plan are no more than the DWSD's "full allocable share of the GRS UAAL," see Disclosure

Statement at 22, is simply untrue.  In fact, the Plan would cause the DWSD to pay much more

than its properly allocated pension obligations.  The payments consist of $386.1 million of GRS

UAAL and 22.5 million in pension fund administrative expenses that the Debtor contends is

allocable to the DWSD, paid in equal installments over 9 years, plus $20 million in restructuring

fees in 2015.  See Disclosure Statement at 62; Milliman Letter dated April 25, 2014,

(POA00259906) (Trial Ex. 4784).  As discussed above, the GRS UAAL amount was calculated

using an inappropriately low 6.75% discount rate for valuing pension liabilities and 6.75%

assumed investment return[8] on pension fund assets.

65.    The City settled on those rates, not on the advice of any actuarial experts, but as a

result of negotiations with pensioners' representatives.  See, e.g., Bowen Dep. at 190:22-191:5,

---

[7]    The District Court has found that the term "applicable nonbankruptcy law" in the Bankruptcy Code includes a
municipal charter.  See Taunt v. Lyons (In re Lyons), 1999 U.S. Dist. LEXIS 20240, *30-32 (E.D. Mich. 1999)
(agreeing with prior District Court ruling that a municipal charter may serve as the source of applicable
nonbankruptcy law within the meaning of section 541(c)(2)).  Section 943(b) requires that a debtor not be
prohibited "by law" from taking any action necessary to carry out the plan.  Because the phrase "by law" has no
qualifying words before it, it is necessarily broader than the term "applicable nonbankruptcy law" and thus
includes the City Charter.

[8]    The 6.75% investment return assumption is so low that Milliman's investment consultants have been tasked
with developing asset allocations to match lower returns.  See Bowen Dep. at 182:4-9.

31

350-52, 374-76, 412-13, and 483-84; Moore Dep. 345:8-14; Orr Dep. 317:23-318:17. Of course, pensioners had a strong incentive to negotiate for an unduly conservative rate assumption, because the use of a low discount rate overstates claim amounts and a low investment return assumption understates the assets that will be available for future distribution. Thus, by making it appear that pensioners are owed more than they actually are, and that future asset levels are lower than they will be, the City and the pensioners' representatives seek to ensure that the DWSD will contribute more than its allocable share to the GRS fund. As there is no mechanism for the DWSD to recover any overpayment, the additional funds would be used to restore all or a portion of the Plan's ostensible benefit cuts. In other words, the use of a low rate plus the Plan's mechanism for restoring benefits provides an enhanced, albeit disguised, return to the pensioners. Moreover, because the GRS is a pooled fund for all non-uniformed employees, and does not segregate assets based on the department that contributes them, the DWSD overpayment will be used to fund pensions of non-DWSD employees.

66. A variety of other factors contribute to improperly inflated pension claim amounts, including the use of the Entry Age Normal funding method, which uses projections of future salary increases and years of service to calculate the present value of future benefits. The use of this method is inappropriate with respect to GRS, because all pension benefits are "frozen" as of July 3, 2014, and thus cannot increase based on salary increases or additional years of service. See Fornia Report at 3-5; Rosen Report at 17-21. In addition, the City's calculation of pension claim amounts allegedly attributable to the DWSD includes pension benefits that have not vested, and may include claims for employees that are not employed by the DWSD. See Fornia Report at 3-5; Rosen Report at 21. Again, because the Plan is premised on improperly high claims estimations, it would cause the DWSD to pay more than its allocable

share of GRS pension liabilities. As that overpayment would fund the City's pension obligation to non-DWSD employees, the Plan does not comply with the City Charter's directive that moneys collected from ratepayers be used **exclusively** for payment of DWSD expenses.[9]

67.     The allocation of $20 million in restructuring expenses to DWSD also violates the City Charter. No attempt was made to ascertain the cost of professional services related to DWSD matters, and thus the $20 million is not tied to actual DWSD costs. See Moore Dep. 321:22-322:12, 356:21-357:15. Moreover, because the Plan would inevitably force the DWSD to charge ratepayers more than the actual cost of service—the cost of the DWSD's funding obligations have to come from somewhere—the Plan violates section 123.141(2) of the MCL.

68.     The inability of Michigan cities to use municipal utilities for general purposes is well-established. In Freeland v. City of Sturgis, 248 Mich. 190 (1929), plaintiff ratepayers brought suit against the city for misapplying revenues from a city-owned hydroelectric plant by using the funds for general city expenses rather than for capital improvements or debt service. The Supreme Court of Michigan ruled that the actions of the city were clearly illegal, violating a state statute that prohibited the use of a municipally owned public utility to fund the general expenses of the city, and that the plaintiffs, as large ratepayers, were threatened with substantial injury. See id. at 192-95.

69.     Like the ratepayers in Freeland, parties outside the City, which contribute 65% of the total revenues to the DWSD, will suffer substantial injury if the Debtor is allowed to overcharge DWSD ratepayers and use those funds for non-DWSD City obligations. Moreover,

---

[9]     The Debtor's characterization of the Plan's DWSD payment amount as an accrued DWSD administration expense is nothing more than a gimmick to do indirectly what it cannot do directly, *i.e.* use DWSD revenues to fund other City debts. Michigan courts have consistently ruled that governmental bodies may not do indirectly what they cannot do directly. See, e.g., Blank v. Dep't of Corrs., 222 Mich.App. 385, 397 (Mich.App. 1997); In re Dembek, 145 Mich.App. 185, 196 (Mich.App. 1985).

as in <u>Freeland</u>, applicable statutory law, *i.e.*, section 123.141(2) of the MCL and section 7-1203 of the City Charter, forbids such overcharging and misappropriation of funds. Accordingly, the Plan does not comply with applicable law, and thus does not meet the requirement for confirmation of a Chapter 9 plan under section 943(b)(4).

70. The Debtor has suggested that the Counties have no cause to complain about the Plan's proposed DWSD pension funding because the Plan also provides for the reduction of DWSD's OPEB obligations, thus offsetting increases in pension spending. <u>See</u> Debtor Reply at 115. The decrease in OPEB contributions, however, does not change applicable laws or provide the Debtor a license to utilize over-conservative assumptions to exaggerate pension liabilities and thereby cause the DWSD to fund non-DWSD expenses in violation of those laws.

71. Finally, there is no actuarial justification for the Plan's use of a 9-year payment period for UAAL attributed to the DWSD. According to the Public Plans Database assembled by the Center for Retirement Research at Boston College (available at http://crr.bc.edu/data/public-plans-database/), out of 98 plans reporting amortization periods for UAAL, the average period was 25.7 years. The effect of this arbitrarily truncated period is to place a disproportionate burden on DWSD ratepayers in the short term as compared to ratepayers after June 30, 2023, which is unfair and unnecessary. <u>See</u> Esuchanko Report at 12-14. In addition, when other City departments resume contributions to the GRS in 2023, the GRS plan will have exceeded its funding targets due to DWSD overpayments, thereby reducing the burden on other City departments at the expense of DWSD and its ratepayers.

72. The City's use of the DWSD as a pension funding source is inherently unfair. The payments are on a fixed schedule, and none of the assumptions, including the discount rate, investment rate assumption, retirement projection and mortality assumption, will be revisited

based on actual experience.  See Disclosure Statement at 49-51.  Thus, the DWSD is required to significantly over-contribute, and the benefit of that overpayment will not be recouped by the DWSD.  See Moore Dep. at 346:24-347:18.  It will go to restore benefits not just to DWSD employees, but to all GRS employees.

73.    Further, the Plan does not grant a release or novation of the DWSD's pension funding responsibility in exchange for its payments.   Thus, even if the DWSD pre-funded its full alleged allocable share of GRS UAAL, it may be required later to pay yet again if, for example, any of the parties that are to provide the Outside Funding default on their obligations, or the City lands in another bankruptcy.  Accordingly, there is only downside[10] for the DWSD and its ratepayers.  Given that the DWSD cannot recapture overpayments, and may be forced to continue paying pension contributions past 2023, the fair and prudent course of action would be to set its rate assumptions slightly higher than an actuarially determined rate, and to allow payments over a longer period of time to reduce the downside risk to DWSD ratepayers.  The City, however, did the opposite, choosing to favor pensioners over all other constituencies with its manufactured pension assumptions.

2.    The DWSD CVR

74.    An even more conspicuous misuse of DWSD revenues is the proposed use of the DWSD CVR to fund the Restoration Trust.  The Plan contemplates that the Debtor may enter into a "Qualifying DWSD Transaction"[11] pursuant to which a third party would buy, lease, or

---

[10]    Although the assumptions used to calculate the DWSD's alleged allocable pension obligations are unduly conservative, the DWSD and its ratepayers bear the risk of the slight possibility that DWSD payments are insufficient to meet targeted funding levels.  As Mr. Moore testified, "to the extent that actual performance or return on plan assets is lower and therefore the contributions that are made do not fully pay for or fund the unfunded amount, then DWSD would have an additional amount to be funded," even though it would have been the only City department making regular contributions to the GRS for 9 years.  See Moore Dep. at 346:9-23.

[11]    For several reasons, the "Public-Private Partnership" described in the Disclosure Statement and the proposed use of proceeds of it as a "Qualifying DWSD Transaction," do not comply with applicable law.  First, any

35

otherwise operate the DWSD system in exchange for payments from that third party.  Although the Plan does not specify the effect of a DWSD Transaction on ratepayers, the cost of the payments from the third party would inevitably be passed on to ratepayers in the form of increased fees.  Pursuant to the Plan, the DWSD CVR would provide the Restoration Trust with the right to receive 50% of the net proceeds of a Qualifying DWSD Transaction.  From the Restoration Trust, those net proceeds may be allocated among the GRS and PFRS pension funds.  The remaining 50% of net proceeds would be paid to the City's General Fund.  See Plan at §§ I.A.141, I.A.231, II.B.3.q., II.B.3.r.  Thus, not only would proceeds of fees charged to ratepayers be used to restore benefits to non-DWSD employees of the GRS, but they would be used to restore benefits in the PFRS fund—the financing, operations, and purposes of which are wholly unrelated to the DWSD or its employees—and for any other purpose that the City sees fit.

75.     Any private party compelled to make payments to the City in connection with a lease or management agreement would be doing so using revenues collected from ratepayers.  Thus, any payments from a private party would be, directly or indirectly, "moneys paid into the city treasury from fees collected for water, drainage, or sewerage services."  For this reason, the Debtor's Plan plainly violates the City Charter, which requires that such moneys be used "exclusively for the payment of expenses incurred in the provision of these services."  City

---

Public-Private Partnership will require the private entity to make some sort of payments to the City, in the form of a management fee, a payment of purchase price, or a lease payment.  Moreover, of course, on top of making payments to the City, any private entity that operates the DWSD system will seek to make a profit.  The cost of the private entity's payments to the City, as well as its profit-seeking activities, would be—indeed must be—passed on to ratepayers through increased rates.  As discussed above, the benefit of these increased rates would be diverted from the DWSD and into pension funds through the DWSD CVR, as well as to the general City coffers, violating State and City law.  Second, as discussed above, the increased rates would be a thinly disguised tax on ratepayers despite the requirement of the electoral vote for which the Plan does not provide.  Similarly, section 7-1204 of the City Charter would require an electoral vote to sell or lease the DWSD system or franchise it through a management agreement.  Third, the Public-Private Partnership may require the Debtor to assume and assign the OMI-Detroit Agreement to the private party, which cannot be done without the consent of Macomb pursuant to section 365(c)(1) of the Bankruptcy Code, made applicable in Chapter 9 through section 901.  Macomb does not consent to that assumption and assignment.  Thus, the Public-Private Partnership cannot be consummated.

Charter § 7-1203.  Further, in 1974, the City demanded that the DWSD return its initial

investment in the DWSD sewer systems, and the DWSD complied with that demand.  See

Report and Recommendations of the Masters (Trial Ex. 5016); Documents filed in Clean Water

Act Case at Docket No. 2376-1 (Trial Ex. 5015).  Thus, because the City has no economic

interest in the DWSD's sewer assets, all such assets have been obtained using "fees collected for

water, drainage, or sewerage services."  See Midland Cogeneration Venture L.P. v. Public Serv.

Comm'n, 199 Mich.App. 286, 318, 501 N.W.2d 573, 588 (Mich. App. 1993) ("[R]atepayers may

indeed acquire a protectable interest in the utility's capital gains received on the disposition of

utility assets where the ratepayers have been charged with the costs or burden of investment in

those assets as a rate expense.").  Accordingly, by law, any disposition of those assets must be

used exclusively for DWSD expenses.

76.     The Debtor attempts to downplay the significance of the potential

misappropriation of DWSD assets, arguing that the "DWSD CVR merely allocates and shares a

portion of any value *that might properly be paid to the General Fund* from any potential future

Qualifying DWSD Transaction."  Debtor Reply at 158 (emphasis in original).  The Debtor,

however, misses the point, because there is no situation in which the proceeds of a Qualifying

DWSD Transaction may properly or lawfully be paid to the General Fund.  Moreover, the

Debtor could have explicitly provided that the proceeds of a Qualifying DWSD Transaction

would be turned over to the pension funds and General Fund only if authorized by state law, but

chose not to do so.

3.      The Plan Provides For A Disguised Tax On Suburban Ratepayers That
        Has Not Been Properly Approved.

77.     As a matter of economic substance, the increased water and sewer rates constitute

an impermissible tax on suburban ratepayers for non-DWSD purposes.  As shown above, the

DWSD payments would be used to pay obligations that are unrelated to the DWSD, and the Debtor's acknowledged purpose with respect to the contemplated payments under a Qualifying DWSD Transaction is to contribute 50% of the net proceeds to the General Fund. Thus, both of these measures are designed to raise general revenue for the City, and the portion of those increased fees charged to ratepayers that would cover non-DWSD expenses would bear no relationship to the cost or value of the service provided. Under the rationale of cases such as Bolt v. City of Lansing, 459 Mich. 152 (1998), and Cnty. of Jackson v. City of Jackson, 302 Mich. App. 90, 98-99 (Mich Ct. App. 2013), the increased rates to be paid pursuant to this arrangement would be disguised taxes. In Michigan, a city's power to tax is only as expressly permitted by the State Constitution or State statute, see Butcher v. Twp. Of Grosse Ile, 387 Mich. 42, 77 (Mich. 1972) ("[T]he municipality has absolutely no inherent power to tax and any power of taxation must be delegated to it, either by the constitution itself of by the legislature"), and here the City has no constitutional or statutory authority to tax water and sewer services.

78.     Even if the Debtor did have such authority, under the Michigan constitution, any tax must be voted upon by qualified electors. The Debtor has not obtained the requisite electoral approval, and the Plan does not condition the consummation of a public-private partnership on the outcome of such an election. Accordingly, the Plan conflicts with section 943(b)(6) of the Bankruptcy Code and cannot be confirmed.

4.     The Plan Violates DWSD By-laws And The Wholesale Contracts.

79.     In addition to being irreconcilable with applicable nonbankruptcy law, the proposed overpayment of UAAL by the DWSD violates the DWSD Governance Orders incorporated into the DWSD By-laws, as well as the City's agreement with OMI. The article of the DWSD By-Laws implementing the DWSD Governance Orders provides that the DWSD, "acting through its Director upon authorization by the Board, shall have final authority to

38

approve … the budget for the Department," subject to the approval of wholesale rates by the Board.  See DWSD By-laws, Article XVIII (Trial Ex. 5013).  Contrary to this requirement, the DWSD Director and CFO had little or no involvement in the formulation of the Plan and the projections on which it is based, other than to provide certain information to the Debtor's financial advisors upon request.  Thus, the Plan would allow the Debtor, acting through the Emergency Manager, to usurp the authority of the DWSD Director and Board by setting, at least in part, the budget for the DWSD and dictating how rates would be set in the future.

80.    In fact, the Plan explicitly incorporates a provision regarding rate setting protocols, and states that the City may seek to implement a rate stability program for City residents.  See Plan at § IV.A.1.  Further, the Plan assumes that sewer rates will increase by 4% annually.  See Disclosure Statement at 172.  The DWSD Director, however, was not familiar with the specifics of the rate stability program, nor did she know who formulated the 4% rate increase assumption.  See McCormick Dep. at 72:10-73:10.

81.    By purporting to set rates and/or rate setting protocols without Board approval, the Plan violates the DWSD Governance Orders and section 1129(a)(6) of the Bankruptcy Code, made applicable in Chapter 9 through section 901(a), which requires either such approval or that the Plan be conditioned on such approval.  As section 1129(a)(6) makes clear, the Court does not have the authority to set rates or permit the delegation of rate-setting authority contrary to applicable nonbankruptcy law.

82.    Moreover, the increased rates charged under the OMI-Detroit Agreement would breach that agreement, which the Debtor asserts that it intends to assume under the Plan.  See Disclosure Statement at 89.  Article 20.01 of the OMI-Detroit Agreement provides that "[r]ates shall be reasonable in relation to the costs incurred by the City for the provision of the Services."

(Trial Ex. 5011). As the Plan contemplates using ratepayer funds to subsidize the pension obligations of non-DWSD City departments—which are not costs associated with providing "Services" as that term is defined in the OMI-Detroit Agreement—the Plan would result in rates that would be unreasonable in relation to the DWSD's costs. Accordingly, the Debtor's proposal for DWSD funding of the GRS UAAL would cause an immediate breach of the OMI-Detroit Agreement upon emergence.

## II.     **The Plan Is Not Feasible.**

83.     The Debtor bears the burden of proving that the Plan meets the requirements for confirmation, including the feasibility requirement of section 943(b)(7). See In re Mount Carbon Metro. Dist., 242 B.R. 18, 31 (Bankr. D. Colo. 1999). To determine whether a Chapter 9 plan is feasible, the Court must "evaluate whether it is probable that the debtor can both pay pre-petition debt and provide future public services at the level necessary to its viability as a municipality." Id. at 35.

84.     Under the Plan, the DWSD would be obligated to make a payment in 2015 of $65.4 million for GRS UAAL, a payment of approximately **$49.8 million** more than its average total pension expense over the past 5 years, and payments of $45.4 million in each of the years 2016 through 2023, or payments of **$29.8 million** greater than the recent 5-year average total pension expense. See Plan Exhibit II.B.3.r.ii.A.; Disclosure Statement at 92. Moreover, as discussed above, the Plan calls for the DWSD to substantially overpay UAAL for the benefit of non-DWSD employees. The result is that the DWSD budget would be severely strained and substantial capital would leave the DWSD system to benefit parties other than ratepayers. Moreover, the overcharging of Macomb and Oakland due to the DWSD pension overpayments would breach the OMI-Detroit Agreement, potentially causing a termination of that agreement and, in turn, a loss by the DWSD of substantial revenue. At a minimum, the DWSD payments

40

would lead to litigation over appropriate rates, which may well result in rates set a level lower than needed to meet the DWSD obligations under the Plan. Either event would cause the DWSD to have dramatically less cash flow than necessary to operate its system and provide necessary public services. Thus, the Plan is not feasible.

85. Further, the Plan is not feasible because the DWSD would not have sufficient cash flow to cover necessary capital improvements. The DWSD has underinvested in its systems for years. In fact, DWSD is currently in violation of environmental laws and operates under an affordability waiver under its National Pollutant Discharge Elimination System permit issued by the EPA. See (Trial Exs. 5020, 5021); Buckfire Dep. at 344:25-345:15.

86. According to the Inter-County Working Group Report, the spending necessary for capital improvements to the DWSD's water and sewer systems over the next ten years may be as much as $3.5 billion (exclusive of improvements to the Detroit retail system). See Trial Ex. 5036. This is over 20% higher than the forecasted ten-year capital expense of $2.9 billion (including improvements to the Detroit retail system) provided in the capital needs plan developed for the Emergency Manager by OHM Advisors. See Disclosure Statement at Exhibit M. These capital improvements identified by the Counties are needed to maintain the viability of the DWSD's system and thus its ability to continue to provide essential public services to ratepayers. Every dollar of value that leaves the system to pay UAAL for non-DWSD employees threatens that viability, and thus the feasibility of the Plan with respect to maintenance of the DWSD systems.

87. The DWSD projections on which the Plan is based also exaggerate the health of the DWSD, thereby overstating cash flow that will be available for crucial repairs and improvements. For example, the projections assume that sales to the City of Flint would

account for 8.4% of the DWSD's wholesale water receipts for 2014, and that Flint will continue as a wholesale customer until 2016.  See Nadol Report at ¶ 17.  Flint, however, terminated its relationship with the DWSD in April, 2014.[12]  Further the projections do not adequately take into account downward trends in demand at both the wholesale and retail level.  Although demand has been steadily declining, the projections assume **increased volumes** in 2014 and 2015.  See Nadol Report at ¶¶ 24, 25, 26.  The projections assume a negative growth rate in retail sales beyond 2015 based on expected population decline, but that growth rate is still unrealistically high, as it does not take into account industry change, conservation practice, or price elasticity.  See Nadol Report ¶ 26.  The projections further assume significant improvements in bad debt for retail water and sewer services, with water bad debt improving each year from 14.4% of retail water revenues in 2013 to 10% by 2018, and sewer bad debt improving from 15% in 2014 to 11% by 2018.  See Nadol Report at ¶ 27.  Again, this is inexplicable given recent trends and in light of the fact that, as rates increase, delinquency rates will also increase.  See Nadol Report at ¶ 27.

The projections are also unrealistic because capital improvement spending will be heavily dependent on financing through bond issuance at a low cost of debt.  See Disclosure Statement at Exhibit M.  The projections assume that the DWSD will be able to incur new debt at a 4.63% interest rate, which rate is comparable to A-rated bonds.  DWSD debt, however, is currently rated below investment grade, with negative outlooks by the major rating agencies.  See Expert Report of Daniel J. Hartman, dated July 24, 2014 (the "Hartman Report"), at 4.1 – 4.3; see also Nadol Report at ¶ 23(f); Expert Report of William E. Oliver, dated July 25, 2014 (the "Oliver

---

[12]    Although approximately half of Flint's water needs will continue to be sold by the DWSD under a temporary agreement with Genessee County, the other half of the requirements will no longer come from the DWSD.  See Nadol Report at ¶ 17.

Report") at 2, 5, 6. Thus, over the next several years, the DWSD either will have no access to the capital markets, or the cost of debt available to it will be prohibitively expensive, because any assumption that the DWSD may obtain an A rating in the near term is unrealistic.[13] See Hartman Report at 3.1; Oliver Report at 6. Accordingly, a major assumption underlying the City's capital improvement plan—the source of financing—is unreliable, rendering that entire plan unworkable.

88.     For all of the above reasons, the Debtor cannot meet its burden of proving feasibility by showing that the Plan would allow the DWSD to continue to provide continuous public services over the long term. Thus, the Court should find that the Plan cannot be confirmed.

### III.     The Plan Unfairly Discriminates Against Class 14 Unsecured Creditors.

89.     When one or more classes of impaired claims votes to reject a Chapter 9 plan of adjustment, the plan may be confirmed only if it meets the "cramdown" requirements of section 1129(b)(1) of the Bankruptcy Code, made applicable in Chapter 9 through section 901(a). Class 14, among others, has rejected the Plan. See Voting Declaration at ¶¶ 43-44. Thus, the Plan cannot be confirmed unless the City meets its burden of showing that "the plan does not discriminate unfairly, and is fair and equitable" with respect to Class 14. See 11 U.S.C. § 1129(b)(1); see also, In re Dow Corning Corp., 244 B.R. 696, 700 (Bankr. E.D. Mich. 1999) ("The Proponents have the burden of proving all elements of § 1129(b)(1) by a preponderance of the evidence."). The City cannot, however, meet its burden, because the Plan proposes to

---

[13]     Although S&P raised the DWSD's rating in connection with the recent tender, Moody's and Fitch still rate DWSD at "junk" levels. See Detroit Water/Sewer Ratings Raised Ahead of Bond Sale, available at http://www.reuters.com/article/2014/08/26/usa-detroit-bankruptcy-ratings-idUSL1N0QW0XX20140826

provide materially more favorable treatment to classes of claims that have the same unsecured priority as Class 14, and thus discriminates unfairly.

90.     Although the Bankruptcy Code does not provide specific criteria for determining whether a Plan discriminates unfairly, this Court, in In re Dow Corning, adopted a presumption-based standard first articulated by Professor and former United States Bankruptcy Judge Bruce A. Markell.  See In re Dow Corning, 244 B.R. at 701-03 (discussing Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72 AM. BANKR. L.J. 227 (1998)); see also In re BWP Transport, Inc., 462 B.R. 225, 230-31 (Bankr. E.D. Mich 2011) (adopting presumption-based approach from Dow Corning).  Other courts have followed suit.  See, e.g. In re Armstrong World Indus., Inc., 348 B.R. 111, 121-22 (D. Del. 2006); In re Tribune Co., 472 B.R. 223, 242 (Bankr. D. Del. 2012), partially vacated on other grounds, 2014 U.S. Dist. LEXIS 82782 (D.Del June 18, 2014); In re Aleris Int'l, Inc., No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010); In re Unbreakable Nation Co., 437 B.R. 189, 202 (Bankr. E.D. Pa. 2010); In re Quay Corp., Inc., 372 B.R. 378, 386 (Bankr. N.D. Ill. 2007); In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 228-32 (Bankr. D.N.J. 2000).  Pursuant to the "Markell test," a presumption of unfair discrimination arises where there is:

(1)     a dissenting class;

(2)     another class of the same priority; and

(3)     either (a) a materially lower percentage recovery for the dissenting class (measured in terms of new present value of all payments) or (b) regardless of the percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

In re Dow Corning, 244 B.R. at 702.

91. As discussed below, the Plan's purported treatment of Classes 7, 10, and 11, as compared to the treatment of Class 14—which indisputably is a dissenting class—triggers the presumption of unfair discrimination, and the City cannot rebut that presumption.

92. In addition to the "Markell test," courts have employed a four-factor test articulated in In re Aztec Co., 107 B.R. 585 (Bankr. M.D. Tenn. 1989). That test examines:

> (1)    whether the discrimination is supported by a reasonable basis;
>
> (2)    whether the debtor can confirm and consummate a plan without the discrimination;
>
> (3)    whether the discrimination is proposed in good faith; and
>
> (4)    the treatment of classes discriminated against.

Id. at 590.

93. At the time of this Court's adoption of the "Markell test" in Dow Corning, the Aztec test was the prevailing approach. As the Court recognized, Professor Markell's criticism of the test was "well-founded." Dow Corning, 244 B.R. at 702. In particular, the Court recognized that the Aztec test is both "untrue to the historical origins of [§ 1129(b)(1)] and duplicative of other confirmation requirements." Id. at 701 (quoting Markell, supra, at 227); see also, In re Sentry Operating Co. of Tex., Inc., 264 B.R. 850, 865 (Bankr. S.D. Tex. 2001) (adopting Markell test and recognizing that fairness was historically "expressed as equality of distribution or opportunity to participate").[14] Moreover, "tests, incorporating the necessity

---

[14] As the Supreme Court recognized in American United Mut. Life Ins. Co. v. City of Avon Park, 311 U.S. 138 (1940), "[c]ompositions under Ch. IX … envisage equality of treatment of creditors" and that "a composition would not be confirmed where one creditor was obtaining some special favor or inducement not accorded to the others, whether the consideration was from the debtor or from another." Id. at 147-48. The Supreme Court further recognized that any discrimination in favor of a creditor would only be permissible if and to the extent that it was necessary to compensate for a contribution to the reorganization. Id. ("In the absence of a finding that the aggregate emoluments receivable by the [city's agent] were reasonable, measured by the services rendered, it cannot be said that the consideration accruing to [it],

element are 'fatally flawed' and 'meaningless' because 'discrimination is never necessary' in a plan." Id. (quoting Markell, supra, at 254). In addition, the Court, in Dow Corning, recognized the flaws in the Aztec court's borrowing of the test for unfair discrimination under Chapter 13, because the unfair discrimination provisions in Chapter 13 and Chapter 11 "play different procedural roles and serve different purposes in their respective chapters." Id. at 701-02 (quoting Markell, supra, at 254).

94.     Thus, the Court should reject the application of the Aztec test in favor of the "Markell test" in any Chapter 11 case and because, as discussed below, the Chapter 11 "unfair discrimination" standard was incorporated in its entirety into Chapter 9, it should do so with respect to any Chapter 9 case as well.

95.     In any event, the Plan cannot meet the Aztec test because the City cannot show that there is a rational basis supporting the material discrimination that essentially affords higher priority to Classes 7, 10, and 11 over Class 14.

**A.      The Plan Fails the Markell Test.**

1.      <u>The Plan's Proposed Treatment of Classes 7, 10, and 11 Results In Material Discrimination Against Class 14</u>.

96.     According to the Disclosure Statement, the recoveries to Class 10 PFRS Pension Claims and Class 11 GRS Pension Claims, assuming receipt of the DIA Proceeds and the State Contribution (each as defined in the Plan), are 59% and 60%, respectively. See Disclosure Statement at 37-39. As discussed above, due to the artificially depressed rate used for discounting liabilities and estimating investment returns, the pensioners' claim amounts have been overstated and their recoveries have been understated. Thus, the actual recovery

under or as a consequence of the adoption of the plan, likewise accrued to all other creditors of the same class."). Thus, the Markell test is consistent with applicable Supreme Court Chapter IX precedent.

46

percentages for Classes 10 and 11 are likely to approach or exceed 100%. See Fornia Report at 15; Rosen Report at 26. But even if one assumed that recovery to Class 14 was at the high end of the Debtor's asserted range, or 13%, and assumed that the distribution to the pensioners was as stated in the Disclosure Statement, the difference in recovery rates as compared to Classes 10 and 11 is at least 46% and 47% on the dollar, respectively. These differences are clearly material. In fact, even assuming the Debtor's estimated recovery percentages without the Grand Bargain funding—48% for GRS and 39% for PFRS—the difference in recovery rates is still 35% and 26%, respectively, which also are material differences. See, e.g., In re Snyders Drug Stores, Inc., 307 B.R. 889, 895 (Bankr. N.D. Ohio 2004) (finding unfair discrimination where difference between relevant classes was 6-7%); In re Creekside Landing, Ltd., 140 B.R. 713, 716 (Bankr. M.D. Tenn. 1992) (finding unfair discrimination where difference in percentage recovery was 20%). Moreover, taking the flawed assumptions underlying the claim amounts and investment returns into account, the real difference in recovery rates is likely 85% or more, and the pensioners would be receiving over 8 times the percentage recovery that Class 14 would receive.

97.     Further, the Plan's purported treatment of Class 7 unsecured limited tax general obligation bond claims ("LTGO Bond Claims") discriminates materially against Class 14. Under the Plan, (i) the agreed aggregate allowed amount of the unsecured LTGO Bond Claims is $163,544,770 and (ii) the holders of LTGO Bonds and Ambac (collectively, the "LTGO Parties"), on account of subrogation claims arising from its payment of interest on the LTGO Bonds, are to receive under the Plan (a) at the Debtor's option (x) $55 million in cash, or (y) New LTGO Bonds with a principal amount of $55 million and (b) 20% of the New B Notes (as defined in the Plan) that may be distributed from the Disputed COP Claim Reserve (as defined in

the Plan).  See Plan at §§ II.B.3.n., II.B.3.p.iii.B.  Thus, the LTGO Parties will receive no less

than 33.6% of their allowed unsecured claims, plus the potential for a greater percentage

depending on the distributions from the Disputed COP Claim Reserve.  By contrast, the holders

of Class 14 general unsecured claims are to receive, at most, 10-13% of their claims.  See

Disclosure Statement at 41.  Thus, the difference in recovery percentages between Class 7 and

Class 14 is 20%, with Class 7 receiving a recovery rate that is 3 times higher than the Class 14's

recovery rate—a very material difference.

 2. The Plan Allocates Materially Greater Risk to Class 14 than to Classes 7,
 10, and 11.

98. Under the Plan, the distribution to Class 14 will be an "Unsecured Pro Rata

Share" of New B Notes, Plan § II.B.3.u., plus the opportunity to receive 15% of the New B

Notes that may be distributed from the Disputed COP Claim Reserve.  Plan § II.B.3.p.iii.B.  The

New B Notes are general unsecured obligations of the City payable from the City's General

Fund, have a maturity of 30 years, are interest-only for the first 10 years, and pay an interest rate

of 4% for the first 20 years, and 6% for years 21 through 30.  See Plan Exhibit I.A.232.  Thus,

Class 14 creditors' ability to recover the full amount of their distributions under the Plan will

depend on the financial condition of the City for the next 30 years.

99. In contrast, a significant portion of the funding of recoveries for Classes 10 and

11 are paid in the first 10 years after the City's emergence from Chapter 9, and come from

commitments from third parties, including the State of Michigan or from the DWSD.  Thus, at

least for the first 10 years, the Classes 10 and 11 have no exposure to the creditworthiness of the

City.  Accordingly, the Plan provides for treatment of Classes 10 and 11 that is materially less

risky than the proposed treatment of Class 14.

100.     Further, Class 7 will either receive cash, in which case it has no risk, or New

LTGO Bonds, which have a shorter maturity (23 years vs. 30 years), a higher interest rate

(5.65% vs. 4% for the first 20 years and 6% for the last 10 years), and begin to amortize principal

sooner (6 years vs. 10 years) than the New B Notes.  See Plan Exhibit I.A.224, Schedule 1.

Thus, even if the Debtor elects to make the distribution in New LTGO Bonds, the holders of

LTGO Bond Claims receive new notes that are significantly more valuable and less risky than

the notes given to the holders of Class 14 general unsecured claims.  Class 14 creditors' risk with

respect to the value of the New B Notes only increases in the event of rising inflation or a

significant increase in the price for other City debt.  The New LTGO Bonds will be more

resilient to such developments, and thus are materially less risky than the New B Notes.

3.     <u>Class 14 Has the Same Priority As Classes 7, 10, and 11.</u>

101.     Section 901(a) of the Bankruptcy Code makes sections 506, 507(a)(2), and 510

applicable in Chapter 9.  Thus, Chapter 9 recognizes a simple priority scheme.  The

incorporation of section 506 confirms that secured claims have priority with respect to the

collateral securing them, and the incorporation of section 507(a)(2) provides expenses allowed

under section 503(b) with administrative priority.  See 11 U.S.C. §§ 506, 507(a)(2).  The

remainder of section 507 was not incorporated into Chapter 9.  Therefore, there are no priority

unsecured claims in Chapter 9.  In other words, all unsecured claims share the same priority,

subject to agreed or equitable subordination under section 510.  The exclusion of non-

administrative unsecured priority claims does not, as Ambac has argued, incorporate state law

priorities into Chapter 9.  See, e.g., In re City of Detroit, Michigan, 504 B.R. 97, 161 (Bankr.

E.D. Mich. 2013) ("[S]tate law cannot reorder the distributional priorities of the bankruptcy

code."); In re Cnty. of Orange, 191 B.R. 1005, 1017 (Bankr. C.D. Cal. 1996) ("When state law

conflicts with federal bankruptcy law, the state law is preempted.  Therefore, to the extent that [a

49

state statute] creates a special class of creditors … in conflict with the priority scheme of the Code, it is preempted by federal law.").

102.     Moreover, as this Court has recently held, the Michigan Constitution provides no more protection for pension rights than any other contract rights.  See In re City of Detroit, Michigan, 504 B.R. at 150-155 ("[T]he slight difference between the language that protects contracts … and the language that protects pensions … does not demonstrate that pensions were given any extraordinary protection.").  Pension obligations, like other contractual obligations, may be impaired in Chapter 9.  Id. at 161 ("[I]f a state consents to a municipal bankruptcy, no state law can protect contractual pension rights from impairment in bankruptcy, just as no law could protect any other types of contract rights.").  Thus, unless pension claims or other contractual claims are secured by an interest in the Debtor's property, they are unsecured claims with the same priority as all other unsecured claims.  See, e.g., id. at 153 (finding that the Michigan constitution "could have somehow created a property interest that bankruptcy would be required to respect under Butner v. United States … Or, it could have established some sort of secured interest in the municipality's property … But it did none of those.").  Accordingly, the claims in Classes 10 and 11 are merely unsecured contract claims of equal priority with the general unsecured claims in Class 14.

103.     The same is true with respect to unsecured Class 7 LTGO Bond Claims.  The LTGO Bonds are not secured by any interest in any property of the Debtor, nor do they constitute administrative expenses.  Thus, in Chapter 9, notwithstanding special treatment, if any, they may be afforded outside of Chapter 9, the LTGO Bond Claims are mere unsecured claims with no priority over any other unsecured claim.

104. Thus it is clear that a presumption of unfair discrimination arises under the Markell test because: (1) several classes, including Class 14, have rejected the Plan, (2) Classes 7, 10, and 11 have the same priority as Class 14, and (3) the Plan proposes that (a) Class 14 will receive a materially lower percentage recovery than Classes 7, 10, and 11, and (b) the distribution to Class 14 will be materially riskier than the distribution to Classes 7, 10, and 11.

4.    The Debtor Cannot Rebut the Presumption of Unfair Discrimination.

105.    To rebut the presumption of unfair discrimination, the Debtor must show:

(1)    where there is a material difference in percentage recoveries (a) the preferred class has infused new value into the reorganization that offsets its gain or (b) the dissenting class would receive similarly less percentage recovery outside of bankruptcy; or

(3)    where there is a material difference in risk allocations under the plan, that such allocation is consistent with the risk allocation assumed by the parties before the bankruptcy.

See In re Dow Corning, 244 B.R. at 702. As the Debtor can show none of the foregoing, it cannot rebut the presumption of unfair discrimination.

106.    Neither the pension claimants nor the LTGO Parties are infusing new value into the reorganization to offset their preferred treatment. Thus, the Debtor cannot rebut the presumption on the basis of new value infusions by preferred classes.

107.    Additionally, it appears from a review of the Voting Declaration that Class 14 is made up of trade creditors, other governmental entities, and individuals. Thus, the claims classified therein likely include a mix of contract claims, tort claims, and claims based on other legal theories. As discussed above, this Court has found that the pension clause in the Michigan Constitution merely affords pension benefits the same rights as parties to contracts with the City, and that pension benefits are entitled to no greater protection than other contract claims. Thus,

outside of bankruptcy, the pension claimants in Classes 10 and 11 would have the same remedy as any Class 14 claimant with a contract-based claim—*i.e.* a claim for breach of contract—and the Class 14 claimant would have the same expectation of recovery as any pension claimant. Moreover, even if, outside of bankruptcy, the holders of LTGO Bonds have a right to be paid first out of certain sources of City revenue, it would not lead to the expectation of lesser recovery prospects on the part of Class 14 contract claimants. Rather, those claimants would simply have recourse to other revenue sources, as well as the ability to attach City assets upon reducing their claims to judgment.

108.     With respect to Class 14 claimants with claims based on tort theories and other involuntary claims, "there is every reason to believe that [they] have, if anything, a higher expectation of payment" than voluntarily-created debt for borrowed money or goods or services provided. See Markell, supra, at 260-61.

109.     Further, the risk inherent in the form of distribution to Class 14, New B Notes that pay out over 30 years, is completely inconsistent with the risk expectations of many, if not all, Class 14 claimants. For example, trade creditors provide goods or services with the expectation of payments within a short period of time, whereas holders of debt instruments have expectations of payments over the long term. Moreover, there is no evidence that any Class 14 claimant voluntarily subordinated its recovery to the claimants in Classes 7, 10, or 11. And, in the case of involuntary creditors such as tort claimants, there is no voluntary assumption of any payment risk, much less the risk of payment over 30 years.

110.     The MIDDD Claim arises from the City's fraudulent inducement of MIDDD to enter into an acquisition agreement with the goal of passing on to MIDDD the costs of a sewer repair project artificially inflated due to the criminal racketeering conspiracy perpetrated by

Kwame Kilpatrick and his cohorts. See MIDDD Proof of Claim (Trial Ex. 5000). At the time of entry into the acquisition transaction, MIDDD had no expectation that it was being defrauded, and thus no expectation that it would receive less than any other party with an unsecured claim against the City or that its potential for recovery would be materially riskier than other unsecured claimant.

111. Accordingly, the City cannot rebut the Markell presumption, and because the Plan discriminates unfairly, it cannot be confirmed.

**B.      The Plan Fails the <u>Aztec</u> Test.**

112. The City also cannot meet its burden of proving that the Plan does not discriminate unfairly under the <u>Aztec</u> test.

                1. <u>Alleged Potential Labor Unrest and Hardship to Pensioners Does Not Justify Unfair Discrimination.</u>

113. The City attempts to justify the Plan's discriminatory treatment by arguing that current employees are "concerned" about the impairment of pensions, which may have a "negative impact on the performance and morale of current City employees." Debtor Reply at 39. In doing so, it cites to two cases, see Debtor Reply at 37-38, that analyzed whether there was a business justification for classifying certain employee or labor union claims separately from other unsecured claims. In one of those cases, <u>Aetna Cas. & Surety Co. v. Clerk (In re Chateaugay Corp.)</u>, 89 F.3d 942 (2d Cir. 1996), the court found that there was a business justification for classifying claims for unpaid worker compensation benefits separately from claims of employees that were already paid on those claims and the claims of the insurer that subrogated to the employee claims. The Court reasoned (1) there was evidence that labor relations, and thus the viability of the business, would be jeopardized, and (2) the claims of workers who had already been paid, and the insurer claiming derivatively through them, were

different from claims of workers who had been paid.  Id. at 949-950.  In the other case, In re

Kliegl Bros. Universal Elec. Stage Lighting Co., 149 B.R. 306, 309 (Bankr. E.D.N.Y. 1992), the

Court found a business justification for separate classification of a union claim because there was

a suggestion that the union would strike, and any inability to continue as a union shop would

jeopardize its viability in its industry.  Id. at 309.

114.    The Macomb Parties are not challenging the separate classification of pension

claims, and the cases cited contain no analysis of unfair discrimination.  Moreover, to the extent

the cases can be viewed as bearing on the unfair discrimination issue, their rationale does not

support a finding in favor of the Debtor.  Beyond vague insinuations of a negative impact on

employee morale, the City has not shown that there would be a breakdown in its labor relations

that would threaten its ability to operate absent discrimination against non-pension unsecured

creditor classes.  Thus, the two cases cited by the Debtor are inapposite.

115.    Further, even if the favorable treatment of Classes 10 and 11 were somehow

necessary, the Debtor has not justified why the Plan "cannot provide for *more equal* treatment"

to Class 14.  See In re Graphic Commc'ns, Inc., 200 B.R. 143, 149 (Bankr. E.D. Mich. 1996)

(finding unfair discrimination based on disparate treatment of creditor and inability of debtor to

justify why plan could not provide more equal treatment) (emphasis added).

116.    In arguing that pensioner's expectation of receiving a pension justifies

discriminatory treatment, the Debtor cites a case, see Debtor Reply at 44, in which trade creditors

were favored over insiders because "trade creditors advanced goods and services to the debtor in

the ordinary course of business, frequently without any knowledge of the debtor's financially

perilous condition and without any real opportunity to protect themselves," while "the insiders

made loans to the debtor when they were in a position to know of the debtor's financial condition

and the risks involved with these loans." Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc), 622 F.2d 872, 879 (5th Cir. 1980). As discussed above, Class 14 is made up of a mix of parties including trade creditors and involuntary creditors such as tort claimants, most or all of which were in less of a position to assess the risks associated with the Debtor's financial condition than the retirement systems, the LTGO holders, or the LTGO insurer. Thus, LeBlanc actually supports the argument that Class 14 should be provided equal treatment with Classes 7, 10, and 11.

117. Moreover, since the commencement of the Chapter 9 case, the pension claimants have had several parties advocating for their interests, including unions, the retirement systems, and an Official Retiree Committee whose expenses are paid for from the estate. A deep-pocketed bond insurer asserted the interests of LTGO Bond holders. In contrast, Class 14 had no estate-compensated fiduciary committee with the sole purpose of protecting its interests.[15] Thus, the Debtor had no incentive to negotiate Class 14's treatment as it did with other classes, and the claimants in Class 14 have had less of an opportunity to protect themselves in this case than claimants in other classes.

118. Finally, the Debtor asserts that unfair discrimination is justified due to the personal hardship that may befall pensioners if pensions were cut further than as provided in the Plan. See Debtor Reply at 45. As the Court has recently stated, the unfair discrimination standard does not "consider[ ] the impact of a plan on a creditor; that is to say, the adverse impact of a plan on a creditor. The issue always is the business justification for the treatment from the debtor's perspective." Tr. Hr'g. 8/6/2014 at 81:12-17. Although potential personal

---

[15] The United States Trustee appointed a Committee of Unsecured Creditors on December 23, 2013. See [Docket No. 2290]. On February 28, 2014, however, the Court entered the *Order Granting the City's Motion to Vacate the Appointment of the Official Committee of Unsecured Creditors* [Docket No. 2784], which disbanded that committee.

hardship to pensioners is an unfortunate consequence of this bankruptcy case, it is not a sufficient business justification for unfair discrimination.

          2.          <u>Settlements of Litigation Do Not Justify Unfair Discrimination</u>.

119.     In requiring that a plan not discriminate unfairly between classes of the same priority, and that all creditors in the same class be treated the same, Congress has made equality of treatment a key requirement of Chapter 9 reorganizations. <u>See</u> <u>Avon Park</u>, 311 U.S. at 147 ("Compositions under Ch. IX … envisage equality of treatment of creditors"). That principle cannot be evaded under the guise of a settlement. Without citing a single case on point, the Debtor essentially argues that it can unfairly discriminate between "settling" (*i.e.* "consenting") and "non-consenting" creditors. <u>See</u> Debtor Reply at 40-43. Acceptance of that argument essentially would read the unfair discrimination standard out of the Chapter 9 and render meaningless over 100 years of precedent.

120.     Further, as the Supreme Court recognized in <u>United States v. Noland</u>, 517 U.S. 535 (1996), the bankruptcy court has no authority to reorder the priorities among creditors established by Congress in the Bankruptcy Code. <u>See</u> <u>id</u>. at 540 (bankruptcy court cannot make categorical rulings on claims that "modify the operation of the priority statute at the same level at which Congress operated when it made its characteristically general judgment to establish the hierarchy of claims in the first place"). This is true even when such treatment is part of a settlement. <u>See</u> <u>Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)</u>, 478 F.3d 452, 464 (2d Cir. 2007) ("[W]hether a particular settlement's distribution scheme complies with the Code's priority scheme must be the most important factor for the bankruptcy court to consider in determining whether a settlement is 'fair and equitable' under Rule 9019.").

56

121.     To support its argument, the City cites cases in which certain minor discrimination was found permissible in the context of a settlement of litigation.  None of those cases, however, involved a situation like the Plan, where the proposed treatment of "settling classes" is exponentially better than the treatment of non-settling classes, such that a "settlement" essentially elevates the priority of some classes over other classes for which the Bankruptcy Code affords the same priority.

122.     For example, in In re Corcoran Hosp. Dist., 233 B.R. 449 (Bankr. E.D. Cal. 1999), a case cited by the Debtor, see Debtor Reply at 40-41, the plan proposed to pay general unsecured claims 50% of their allowed claims over 15 years.  Id. at 454.  In return for a reduction of its claim from $2,751,388.89 to a net allowed general unsecured claim of $725,000, the settling party received the same 50% of its allowed claim over not less than 15 years, but would receive more of its distribution in the earlier years of the payment period.  Id. at 457.  Thus, unlike the settling party in Corcoran, neither Class 7 nor Classes 10 and 11 are receiving a slight advantage over other unsecured classes such as mere payment at a faster rate.[16]  Rather, they are receiving materially greater percentage recoveries at materially lower risk than classes such as Class 14.  Moreover, unlike the settling party's drastic compromise of its claim in Corcoran, the settlement of both the eligibility appeal and the LTGO declaratory litigation were not massive concessions, as both had low chances of success in light of this Court's well-reasoned eligibility opinion.  At least with respect to the pensioners, it is clear that their favorable treatment is politically motivated, and is not due to fear of expending resources or losing an appeal.  See In re

---

[16]     Although the extent of the disparity in treatment among separately classified secured creditors is unclear from the opinion in another case cited by the Debtor, In re Western Real Estate Fund, Inc., 75 B.R. 580 (Bankr. W.D. Okla. 1987), the court stated that the plans of reorganization provided for "similar treatment for the allowed claims of secured creditors."  Id. at 585.  Thus, it can be inferred that the disparity, like in Corcoran, was not material.

Creekside Landing, Ltd., 140 B.R. at 716 ("settlement" of bank's unsecured claim was not justification for discriminatory treatment of bank, where "settlement" was motivated by debtor's principals' personal liability to bank).

123. The materially disparate treatment provided to Classes 7, 10, and 11 as compared to Class 14 constitutes categorical, *de facto* priority to certain types of claims in conflict with the Bankruptcy Code's priority scheme. Thus, the Court should not countenance the Debtor's unfair discrimination against Class 14 under the guise of settlement with the favored classes.

## C. The Debtor's Arguments Based on Case Circumstances Are Misplaced.

124. The Debtor also resorts to obfuscation, arguing that the Court should apply the relevant standards differently due to the nature of the case. As the Court is well aware, however, the Bankruptcy Code provides a uniform set of confirmation standards that every Chapter 9 plan, including the Plan, must meet. Those standards provide crucial safeguards against unfair treatment of creditors. See In re Dow Corning, 244 B.R. at 702 (discussing adoption of "unfair discrimination" standard). Nothing in the Bankruptcy Code states or implies that the standards apply any differently based on the size, complexity, or importance of the case. To the Macomb Parties' knowledge, no court has ever held differently. A failure to implement those standards consistently due to "unique" circumstances would undermine the entire U.S. bankruptcy system and invite chaos in the application of the Bankruptcy Code. After all, if the size, complexity, or importance were held to justify a different application of the standards, the result could well be a judicial rewriting of the Bankruptcy Code as ad hoc judgments were made about these important subjective matters. Accordingly, the Court should reject any argument that the Bankruptcy Code's confirmation standards should be somehow modified, manipulated, or disregarded to accommodate the Debtor's agenda.

125.     Moreover, nothing in the Bankruptcy Code or applicable case law suggests that a more lenient standard of unfair discrimination should be applied to a Chapter 9 plan than to a Chapter 11 plan.  In fact, the Bankruptcy Code confirms that the standard is no different.  Section 901(a) of the Bankruptcy Code incorporates section 1129(b)(1) by reference into Chapter 9, without any modification or limitation, and thus incorporates the standard applied in Chapter 11. See Richard M. Hynes and Steven D. Walt, Pensions and Property Rights in Municipal Bankruptcy, 3 REV. BANKING & FIN. L. 609, 637-38 (2014).  On the other hand, Congress knew how to vary the application of standards between the two chapters when it wanted to.  For instance, Chapter 9 does not incorporate by reference the section 1129(a)(7)(ii) "best interests of creditors" test, which requires a comparison of the value of a creditor's distribution under a Chapter 11 plan to the value that creditor would receive in a hypothetical Chapter 7 case. Instead, section 943(b)(7) requires that the plan be "in the best interests of creditors" without reference to liquidation value.  Id.  The same is true with respect to section 1129(a)(1), which requires that a Chapter 11 plan comply with the "applicable provision of this title," compared with section 943(b)(2), which qualifies the Chapter 11 standard by requiring a Chapter 9 plan to comply with "the provisions of this title made applicable by sections 103(e) and 901 of this title."  Congress could have chosen to incorporate the 1129(a)(7) "best interests of creditors" test or the requirements of section 1129(a)(1) into Chapter 9 by reference.  By modifying those standards, however, Congress demonstrated its intent that they apply differently in Chapter 9 than they do in Chapter 11.  On the other hand, by not modifying or qualifying the 1129(b) cramdown standards, including the unfair discrimination standard, Congress demonstrated its intent that the unfair discrimination standard should apply in Chapter 9 exactly as it would in Chapter 11.  Any argument to the contrary is misplaced.

59

126.     Moreover, in an attempt to show that the percentage differences between the recoveries to pensioners and recoveries to general unsecured creditors is not material, the Debtor and the Retiree's Committee seize upon the unusual circumstances associated with the Grand Bargain.  They assert that the Court should not consider the distributions to pensioners from the funding by the parties to the Grand Bargain when comparing percentage recoveries because those distributions are not from City funds and thus are "outside the Plan."  See Debtor Reply at 30-33; Retiree Committee Memo in Support of the Plan [Docket No. 6508] at 39-41.  The Court should reject this contrivance out of hand.

127.     It is beyond dispute that the centerpiece of the DIA Settlement is the transfer of the City Art Collection, operating assets, buildings, parking lots, and other assets used primarily in servicing the DIA—assets **owned by the City**—to a charitable trust.  See Plan Exhibit I.A.118.  The State Contribution, in turn, is conditioned upon the irrevocable funding commitments in the DIA Settlement and this Court's approval of that settlement.  See Plan Exhibit I.A.318 at §§ 4.f.v., 4.g.  Id.  Thus, there are no DIA Proceeds, nor is there any State Contribution (collectively, the "Funding"), unless the City transfers its ownership interest in the DIA Assets.  The Funding is akin to a sale or secured loan for which the transfer of ownership or some other interest in property is needed to obtain funding.  In fact, the relevant agreement specifically states that the City "irrevocably **sells, transfers, conveys, assigns and delivers** to The DIA … all of the City's right, title and interest … in and to the Museum and the Museum Assets free and clear of all security interests, liens, encumbrances, claims and interests of the City and its creditors."  See Form of Settlement, Conveyance and Charitable Trust Agreement By and Between the City of Detroit and the Detroit Institute of Arts, Annex B to Docket No. 6576, at § 2.1 (emphasis added).

128.     As the Funding is clearly derived from a disposition of City assets, the Debtor's attempt to characterize it as third party contributions that are "outside the Plan" is disingenuous double-talk.  The reasoning of cases such as In re Worldcom, Inc., No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003), is simply not applicable, as the facts here are not analogous to a situation in which creditors in certain classes voluntarily agree to contribute a portion of their own plan distributions to another class to resolve plan objections.  See id. at *24-25.  Rather, the Debtor has used the transfer of its own assets to secure a funding source, but has channeled the proceeds to classes of favored creditors to the detriment of other unsecured classes such as Class 14.

129.     In any event, the Second Circuit rejected the reasoning of "gifting" cases such as Worldcom in DISH Network Corp. v. DBSD North America (In re DBSC North America, Inc.), 634 F.3d 79 (2d Cir. 2011).  There, a debtor argued that a distribution to the shareholders was permissible, even though general unsecured creditors received less than the full amount of their claims, because the share in the enterprise value was a gift from the holders of second lien debt that otherwise would have been entitled to that value.  The Second Circuit first rejected the notion that the distributions were not "under the plan," citing the language of the disclosure statement stating "the Holder of such Class 9 Existing Stockholder Interest shall receive the Existing Stockholder Shares and the Warrants."  Id. at 95.  Similarly here, the Disclosure Statement provides, for PFRS, that the "exclusive source for such contributions [to the PFRS and GRS] shall be certain DIA Proceeds and a portion of the State Contribution" and, for GRS, that the "exclusive sources for such contributions shall be certain City sources … payments received from the DWSD … a portion of the State Contribution and certain DIA Proceeds."  See Disclosure Statement at 36, 38.  Thus, the use of Grand Bargain proceeds to satisfy pension

claims is clearly "under the plan." Further, the Second Circuit found that the gift to shareholders was "on account of" their equity interests because it was aimed at ensuring their cooperation in the restructuring. Id. at 96. Here, the channeling of material value to pensioners without ensuring similar value for creditors of the same priority is clearly "on account of" the pensioners' claims. Accordingly, for purposes of analyzing the materiality of the disparity in percentage recoveries, the Court should consider, at the very least, the full percentage recovery estimates for Classes 10 and 11, including the contributions from the State and DIA Funders.[17] See Avon Park, 311 U.S. at 147 (a plan should not be confirmed "where one creditor [is] obtaining some special favor or inducement not accorded to others, **whether that consideration moved from the debtor or another**.")(emphasis added); see also, In re Sentry Operating Co. of Tex., Inc., 264 B.R. at 864-865 (applying Markell test and rejecting argument that plan does not unfairly discriminate where secured creditors contribute to recovery of one unsecured class but not another because allowing secured creditor to "decide which creditors get paid and how much those creditors get paid, is to reject the historical foundation of equity receiverships and to read the § 1129(b) requirements out of the Code.").

130.    Finally, when considering the Grand Bargain funding and the over-conservative assumptions underlying the estimated pension claim amounts, the difference in percentage recoveries between the pension classes and Class 14 approach or exceed the 50% differentials that courts have found to be "grossly disparate treatment." See, e.g., In re Tribune Co., 472 B.R. at 243 ("Courts considering the issue of unfair discrimination have roundly rejected plans proposing grossly disparate treatment (50% or more) to similarly situated creditors."). A 50%

---

[17]    Any argument that the discount rate applied to value liabilities should be 3-4% based on insurance company annuity rates, or 2.75-3.75% **lower** than the rate used under the Plan, is similarly misplaced. No major public retirement system uses anything approaching 3-4% in valuing liabilities, for good reason, as such use would not be actuarially sound.

disparity, however, is not a threshold requirement for a finding of materiality, despite the Debtor's attempt to convince the Court that 50% is a bright-line standard. Indeed, the use of the term "grossly" in describing a 50% differential makes clear that a differential of less than 50% may still be materially unfair, and courts have found unfair discrimination where difference in percentage recoveries was less than 10%. See In re Snyders, 307 B.R. at 892, 895.

## IV. The Plan Is Not in the Best Interests of Creditors.

131. According to the expert report of Michael Plummer, who was retained by law firms for the City and the Detroit Institute of Arts, the City Art Collection may be worth as much as $4.6 billion. See Plummer Report at 19. That figure is nearly $4 billion more than the total amount to be paid pursuant to the Grand Bargain over 20 years. According to Syncora's expert, the value is $8.6 billion or greater, see Wiener Report at 3, or nearly $8 billion more than the total 20-year Grand Bargain payments. In either case, it is clear that that the failure to sell some or all of the art results in significant lost value that creditors would be able to capture through reducing their claims to judgment and attaching the art assets outside of bankruptcy.

132. Accordingly, the Plan is not in the best interests of creditors, as required by section 943(b)(7) of the Bankruptcy for confirmation, because it does not afford creditors more than what they could expect to receive if the case was dismissed. See, e.g., In re Cnty. of Orange, 191 B.R. at 1020 (quoting 4 Collier on Bankruptcy ¶ 943.03(7) (15th ed. 1995)). Moreover, by not realizing the fair value of the art, or of other assets such as the DIA real estate, the Plan fails the "best interests" test, as it does not "afford[] all creditors the potential for the greatest economic return from [the] Debtor's assets." In re Barnwell Cnty. Hosp., 471 B.R. 849, 869 (Bankr. D.S.C. 2012).

**V.** **The Plan Was Not Proposed In Good Faith.**

133. Sections 1129(a)(3) of the Bankruptcy Code, made applicable in Chapter 9 cases pursuant to section 901(a), requires a debtor to prove that its plan "has been proposed in good faith." 11 U.S.C. § 1129(a)(3). To make a showing of good faith, the debtor must show (i) a fundamental fairness in dealing with its creditors, (ii) the plan was proposed with honesty and good intentions, and with a basis for expecting that a reorganization can be effected, and (iii) the proposed plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code. See In re Gregory Boat Co., 144 B.R. 361, 366 (Bankr. E.D. Mich. 1992). In a Chapter 9 case, courts also consider whether the debtor has attempted not only to restructure its debts, but also to provide the highest possible return to creditors. See Connector 2000 Ass'n, 447 B.R. 752, 763 (Bankr. D.S.C. 2011) (finding 1129(a)(3) satisfied where the debtor was "using chapter 9 to restructure its debts and provide its creditors the potential for the greatest economic return from Debtor's assets" and its plan "afford[ed] all creditors the potential for the greatest economic return from Debtor's assets").

134. As discussed above, the discount rate and investment return rate assumptions were the product of negotiation between the Debtor and the pensioners' representatives, and not of any actuarial analysis. Thus, the parties began with a predetermined funding target, and then "solved for an answer" by choosing rate assumptions that would require DWSD to contribute enough funds to significantly exceed that target by overstating the amount of pension claims allocable to DWSD and understating the value of the assets that will be available to satisfy those claims. This is inconsistent with findings of fairness in dealing with creditors and honestly and good intentions. In fact, courts have expressly considered the failure to accurately state the value of unsecured claims as indicia of bad faith. See, e.g., In re Multiut Corp., 449 B.R. 323, 341

64

(Bankr. N.D. Ill. 2011). Here, the only reasonable conclusion is that the understatement of pension claims was intentional, thus supporting a finding of bad faith. Further, the Debtor was less than candid in providing disclosure about the value of the City Art Collection. Although the Debtor provided information in the Disclosure Statement regarding an appraisal of subset of works in the collection valuing those works at between $454 million and $867 million, it did not disclose that the value of the entire City Art Collection assigned by its own expert was as much as $4.6 billion. See Plummer Report at 19. Thus, creditors were not provided with adequate disclosure of the true value of the City's assets in making their decisions regarding voting on the Plan. This lack of candor is evidence of bad faith.

135.    Moreover, the Debtor has not made an effort to provide the highest possible return to creditors. The City Art Collection is made up of over 65,000 works, **most of which are kept in storage**. Assuming the City Art Collection is worth $4.6 billion, that amounts to over $6500 worth of art per Detroit citizen. The sale of even one or two of the most valuable pieces, or a more significant amount of pieces kept in storage (*i.e.* not regularly viewed by the public) could materially increase recoveries to unsecured creditors. In either case, the City would still have a world-class art museum. Instead, the City has chosen to preserve the entire collection by selling it for, at most, 10% of its fair value, and channeling all of that value to its preferred pension creditor classes.

136.    The Macomb Parties do not question the benefit of maintaining an impressive art collection for the benefit of the City's citizens. However, there is no legitimate reason that maintaining an art collection must be an all-or-nothing proposition. Moreover, it is perplexing that the City has placed so much importance on preserving the entire City Art Collection for public's aesthetic pleasure, while at the same time seeking to extract value from the DWSD's

65

crumbling water and sewer systems and thereby exhibiting a willingness to jeopardize public health.  Viewed in that light, it is clear that, based on certain political choices, the Debtor has not sought to maximize creditor recoveries.  Thus, it has not proposed the Plan in good faith.

137.    The incorporation in the Plan of a provision regarding a potential Regional Authority is also indicia of bad faith.   The Plan states that the City may enter into a Regional Authority transaction on the condition that the Counties and their municipal affiliates or related public corporations withdraw their objections to the Plan with prejudice.  See Plan at § IV.A.4. The provision, however, has no operative effect, nor does it even explain the interplay between the creation of a Regional Authority and the operative provisions of the Plan.  Thus, it appears it has been included in the Plan to impose a condition to the creation of a Regional Authority that is properly addressed only in the context of the ongoing mediation.  Moreover, it is an attempt by the Debtor to use the potential for an agreement that may resolve Macomb's objections regarding the Plan's proposed misuse of DWSD revenues to coerce MIDDD to drop its meritorious objection to the unfair treatment of Class 14 general unsecured creditors.  The creation of a Regional Authority, however, would do nothing to redress MIDDD's $26 million injury caused by the City's conduct.  Thus, the City's opportunistic use of Regional Authority negotiations to attempt to avoid providing fair recovery to Class 14 is in bad faith and should be stricken from the Plan.

## VI.    **The Plan's Exculpation Clause Impermissibly Releases Certain Third Parties**.

138.    Article III.D.6.of the Plan provides that various parties will be exculpated from liability relating to any postpetition acts or omissions in connection with, relating to, or arising out of the Debtors' restructuring and this Chapter 9 case other than for gross negligence and willful misconduct.  See Plan at § III.D.6.  Those parties include not only the Debtor and its

66

Related Entities, but a laundry-list of non-debtor third parties. Moreover, the exculpation is not tied to acceptance of the Plan, and therefore the Plan contemplates that non-consenting parties in interest would be bound by it. The exculpation clause is impermissible and should not be approved.

139.     In In re Washington Mut., Inc., 442 B.R. 314 (Bankr. D. Del. 2011), the court explained that exculpation clauses are permissible only to exculpate estate fiduciaries from actions taken in a bankruptcy case. See id. at 350-51. In the context of a Chapter 11 case of a corporate entity, such fiduciaries include only the estate professionals, the statutory committees and their members, and the debtors' directors and officers. Id. Here, under the same reasoning, the exculpation must be similarly limited to the estate professionals, the Retiree Committee, and its members, the Retiree Professionals, and the City's decision-makers. Any effort to include parties other than those estate fiduciaries in the exculpation clause is merely an attempt to extend non-consensual releases to non-debtors. See id.

140.     Under Sixth Circuit law, enjoining a non-consenting creditor's claim against a non-debtor is considered a "dramatic measure to be used cautiously," and is allowed only in appropriate "unusual circumstances." Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 658 (6th Cir. 2002). Such "unusual circumstances" only exist where the bankruptcy court finds the following seven factors are present:

> (1)     There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;
>
> (2)     The non-debtor has contributed substantial assets to the reorganization;
>
> (3)     The injunction is essential to the reorganization, namely, the reorganization hinges on the debtor being free from

67

indirect suits against parties who would have indemnity or contribution claims against the debtor;

    (4)      The impacted class, or classes, has overwhelmingly voted to accept the plan;

    (5)      The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;

    (6)      The plan provides an opportunity for those claimants who choose not to settle to recover in full; and

    (7)      The bankruptcy court made a record of specific findings that support its conclusion.

Id.

141.    Here, the exculpation clause provides inappropriate releases to the State of Michigan and the State Related Entities, the DIA Funding Parties and their Related Entities, the CFSEM Supporting Organization and its Related Entities, the RDPFFA and its board of trustees/directors, attorneys, advisors and professionals, the DRCEA and its board of trustees/directors, attorneys, advisors and professionals, the postpetition officers of the Detroit Police Lieutenants and Sergeants Association, the postpetition officers of the Detroit Police Command Officers Association, GRS and its postpetition professional advisors, PFRS and its postpetition professional advisors, and Gabriel, Roeder, Smith & Company. Although some of those parties (the State and the DIA Funding Parties, for instance) intend to contribute assets to the reorganization, there is no evidence that, outside of the indemnity under the DIA Settlement to be entered into as part of the Plan, any of those parties have such an identity of interest with the Debtor such that a suit against them will be, in essence, a suit against the Debtor or deplete the assets of the estates. Nor is there any evidence that the reorganization hinges on those parties being free from suits. Several classes that may be impacted by the exculpation, such as Class 14, have voted to reject the Plan. The Plan does not provide for payment in full of the classes

68

affected by the proposed injunction, nor does it provide an opportunity for claimants who choose not to settle to recover in full. Accordingly, the Plan does not meet the seven-factor <u>Dow Corning</u> test for permissible non-consensual injunctions in favor of non-debtors, and thus the Plan cannot be confirmed.

*[Remainder of Page Left Intentionally Blank]*

Dated:  August 27, 2014

Respectfully submitted,

DECHERT LLP

By:____/s/ Allan S. Brilliant_____

Allan S. Brilliant
G. Eric Brunstad, Jr.
James M. McGuire
Debra D. O'Gorman
Stephen M. Wolpert
1095 Avenue of the Americas
New York, NY 10016
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
allan.brilliant@dechert.com
eric.brunstad@dechert.com
james.mcguire@dechert.com
debra.ogorman@dechert.com
stephen.wolpert@dechert.com

*Attorneys for County of Macomb, Michigan by and through its County Agency, Anthony V. Marrocco, the Macomb County Public Works Commissioner, and the Macomb Interceptor Drain Drainage District*