# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | Chapter 9 |
| CITY OF DETROIT, MICHIGAN | Case No.: 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

## CITY OF DETROIT'S OPPOSITION TO THE RETIREMENT SYSTEMS' MOTION TO EXCLUDE PORTIONS OF MARTHA KOPACZ'S TESTIMONY

The City of Detroit (the "City") opposes (1) the Motion to Exclude Portions of Martha Kopacz's Testimony (Docket # 7061) filed by the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit (the "Retirement Systems") and (2) the Amended Motion to Exclude Testimony of Martha Kopacz (Docket # 6994) filed by Oakland County (the "County"). In support of its Opposition, the City states as follows:

## ARGUMENT

1. Federal Rule of Evidence 702 governs the admission of expert testimony. Under Rule 702, courts enjoy broad discretion over whether to admit expert testimony. *See Gross v. Commissioner*, 272 F.3d 333, 339 (6th Cir. 2001). This discretion "is at its zenith during a bench trial." *United States v. Kalymon*,

541 F.3d 624, 636 (6th Cir. 2008); *United States v. Demjanjuk*, 367 F.3d 623, 633 (6th Cir. 2004) (the court's discretion "is particularly broad in a bench trial") (citation omitted). In fact, the Sixth Circuit has explained that the Court's traditional "gatekeeping" role "is *largely irrelevant* in the context of a bench trial." *Deal ex rel. Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004) (emphasis added).

2. The court's "substantial flexibility" under these circumstances allows it, for example, to admit "proffered expert testimony at the front end" and only decide later "during the course of trial whether the evidence meets the requirements of *Kumho Tire Co.* and *Daubert* and deserves to be credited." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 635 (6th Cir. 2000); *see also Fierro v. Gomez*, 865 F. Supp. 1387, 1396 n.7 (N.D. Cal. 1994), *vacated on other grounds sub nom. Fierro v. Terhune*, 147 F.3d 1158 (9th Cir. 1998) ("Under *Daubert*, the court concludes that the better approach in this bench trial is to admit the testimony of all of the recognized experts that it permitted to testify and … allow [v]igorous cross-examination, presentation of contrary evidence and careful weighing of the burden of proof to test shaky but admissible evidence." (internal citation and quotation marks omitted)).

3. The Retirement Systems and County ignore these principles entirely, but these principles confirm the absence of any reason to exclude Ms. Kopacz's

opinions before trial has even begun. Because the exclusion of expert testimony is in all cases "the exception rather than the rule," Fed. R. Evid. 702 advisory committee's notes, 2000 amend., the Court should allow Ms. Kopacz to testify and reserve its decision whether to credit her opinions until they have been offered and vetted in open court.

4.     But even if the Court were inclined to resolve the issue now, the arguments the Retirement Systems and County advance furnish no basis for excluding Ms. Kopacz's testimony.

**I.     Ms. Kopacz Is Well-Qualified To Offer The Opinions In Her Report**

5.     Neither the Retirement Systems nor County dispute that Ms. Kopacz has expertise in the area of municipal finance and restructuring, and is qualified to opine on "feasibility and cash flow projections." Ret. Sys. Mot. at 9. Instead, they claim that Ms. Kopacz lacks the necessary qualifications to offer opinions specifically on pension-related issues. *Id.*; County Mot. ¶ 15. The gravamen of their argument is that Ms. Kopacz does not have sufficient specialization in pension-related issues and thus cannot offer any observations on the subject. They note, for instance, that Ms. Kopacz was not a "pension expert," "investment manager," or actuary (Ret. Sys. Mot. at 9; County Mot. ¶¶ 6-7)—and lacked even more narrowly defined areas of expertise. *See, e.g.*, Ret. Sys. Mot. at 10 (noting

that Ms. Kopacz did not have an understanding of "actuarial smoothing methods used by other public pensions").

6.     This argument is a non-starter.   Both the Retirement Systems and County omit the fact that Ms. Kopacz *does* have experience with pensions.  *See* Report at Ex. 1 (Ex. A) (noting that Ms. Kopacz has experience with "restructuring pension obligations"); Kopacz Dep. at 450 (Ex. B) (referring to prior pension experience).  While Ms. Kopacz might not self-describe as a "pension expert" (*id.* at 431), this hardly disqualifies her from testifying on the subject.  *See Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 142–43 (S.D.N.Y. 2003) (rejecting notion that an expert witness was unqualified merely because he "d[id] not conclusively hold himself out as an expert").  Indeed, "[t]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." *United States v. Cunningham*, 679 F.3d 355, 378–79 (6th Cir. 2012) (citation omitted).  Given Ms. Kopacz's pension experience, she is qualified to offer her opinions on the subject.

7.     But even if Ms. Kopacz did not have this experience, courts regularly reject efforts to exclude an expert by narrowly defining the relevant area of expertise. *See, e.g.*, *Ulico Casualty Co. v. Clove Capital Mgmt., Inc.*, 217 F. Supp. 2d 311, 317 (N.D.N.Y. 2002) ("The law does not insist on such narrow qualifications."); *TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 174

(N.D.N.Y. 2002) (noting that even the lack of extensive experience "directly on point does not necessarily preclude [an] expert from testifying" (internal citation and quotation marks omitted)).

8.     In this case, Ms. Kopacz has extensive experience with municipal finances, restructuring, and bankruptcy issues.   This experience includes (1) reviewing municipal budgets, (2) performing departmental audits for municipalities, (3) participating in over 100 consulting and restructuring engagements, including on behalf of debtors, (4) lecturing and publishing on municipal bankruptcy and restructuring, and (5) testifying as an expert witness about (i) a variety of insolvency and restructuring issues, and (ii) the appropriateness of a forecasting methodology and its underlying assumptions.  *See* Notice Regarding Interviews of Expert Witness Applications (Docket #4068); Kopacz Dep. at 37-40, 129-30 (Ex. B).   While Ms. Kopacz might not have specializations in "actuarial smoothing methods" or "amortization periods" (Ret. Sys. Mot. at 10), her experience with distressed organizations and municipal restructuring more than qualifies her to offer the pension-related opinions in her report.  *See, e.g.*, *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 850 (6th Cir. 1981) (noting that an expert need not have complete knowledge about the field in question); *In re Texans CUSO Ins. Grp., LLC*, 426 B.R. 194, 214 (Bankr. N.D. Tex. 2010) ("[T]estimony is admissible even when the expert possesses only

general rather than specific experience with the subject matter."); *see also Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 293–94 (6th Cir. 2007) (holding that a witness could testify as an expert in "threat assessment" in a case involving a bus accident, even though the witness had no experience analyzing threats in the bus industry); *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 143 (S.D.N.Y. 2003) (qualifying as an insolvency expert a certified public accountant with seventeen years experience despite lack of prior experience in the health care industry or experience analyzing healthcare receivables).

9.     If the Retirement Systems' and County's contrary argument were correct, no expert would ever qualify to offer testimony about feasibility, because no person possesses expertise in every single sub-category that a plan of reorganization or restructuring implicates (propriety of using "7-year smoothing period[s]," for instance).  A plan's feasibility depends upon the reasonableness of its underlying financial forecasts, which in turn implicates a nearly infinite number of sub-issues.  If one must have expertise in all of them to describe the *reasons* for a feasibility conclusion, then the entire enterprise of assessing feasibility would be impossible.  But, as the case law confirms, Rule 702 does not demand hyper-specialization.   It is sufficient that a person has the kind of knowledge and experience in municipal finance and restructuring that Ms. Kopacz possesses here.

10.     To the extent the Retirement Systems and County believe otherwise, they can pursue the issue on cross-examination.  *See First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001) (holding that a lending expert's unfamiliarity with "some aspects" of lender-borrower relationships "merely affected the weight and credibility of his testimony, not its admissibility"); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the strength of [an expert's] credentials . . . go to the weight, not the admissibility, of his testimony."); *VSI Holdings, Inc. v. SPX Corp.*, No. 03-cv-70225-DT, 2005 WL 5980804, at *10 (E.D. Mich. Apr. 12, 2005) ("If the expert lacked familiarity with some aspects of banking relationships, such unfamiliarity merely affect[s] the weight and credibility of the expert's testimony, not its admissibility.").[1]

## II.     Ms. Kopacz's Appointment Covers Pension-Related Issues

11.     Having no credible grounds to challenge Ms. Kopacz's qualifications, the Retirement Systems next assert that the Court should exclude Ms. Kopacz's pension-related opinions because they lie beyond the scope of her appointment. Ret. Sys. Mot. at 3-6.  This argument is confounding.  The City has billions of dollars in unfunded actuarial accrued liabilities (*see* Report at 127-28 (Ex. A)); retirement obligations represent "the City's largest liability when combining the

---

[1] Because Ms. Kopacz is qualified as an expert, the Retirement Systems' extended discussion about the inadmissibility of *lay* testimony (Ret. Sys. Mot. at 21-22) is beside the point.

funded and unfunded liabilities" (*id.* at 124); and the City's pension-related decisions will have "a substantial impact on the City's liquidity in future years" and "be critical to Detroit's viability in the decades to come" (*id.* at 124-25). It was therefore not only helpful to consider pension-related issues, but essential. *See* Kopacz Dep. at 431 (Ex. B) ("Q. Are the pension portions of your report important to your conclusions? A. Yes.").

12. It is only by thin-slicing the issues at play and manipulating the level of generality that the Retirement Systems can contend otherwise. *See, e.g.*, Ret. Sys. Mot. at 5 ("she was [not] retained to opine on the propriety of the Retirement Systems' *actuarial and investment policies*" (emphasis added)). But the fact remains that an order to evaluate "feasibility" and the "reasonableness" of the City's assumptions entails review of pension-related issues, including historical background. Indeed, Ms. Kopacz reviewed historical information for a variety of other non-pension issues (*e.g.*, Kopacz Dep. at 147-48 (Ex. B)) and specifically noted that, for pensions meetings, learning how "things [got] in this condition" was her starting point (*id.* at 540). Thus, far from lying beyond the scope of her assignment, the information Ms. Kopacz reviewed and relied upon was an

important and entirely legitimate part of the work the Court requested Ms. Kopacz to perform.[2]

## III.   Ms. Kopacz's Opinions Are Reliable

13.     Finally, the Retirement Systems and County both assert that Ms. Kopacz's pension-related opinions should be excluded because they are not based on sufficient facts and data, and are not the product of a reliable methodology. Ret. Sys. Mot. at 11; County Mot. ¶ 16.  For its part, the Retirement Systems offer a grab-bag of specific reasons why Ms. Kopacz's pension-related opinions are allegedly unreliable: she allegedly "failed to independently verify any data, blindly relied on the opinions of others, relied on anecdotal evidence, did no testing of her own, and ignored certain key data."  Ret. Sys. Mot. at 15.  But this line of argument is both factually and legally flawed.

14.     The argument is factually flawed because it rests on an inaccurate characterization of Ms. Kopacz's work.  Ms. Kopacz did not "blindly rel[y] on the opinions of others" or simply accept "anecdotal evidence."  *Id.*  Nor did Ms. Kopacz simply "regurgitat[e] the opinions of others (Charles Moore) without any

---

[2] The Retirement Systems quote Ms. Kopacz's assertion that the "'pension risks'" did not "'negatively impact [her] assessment for feasibility.'"  Ret. Sys. Mot. at 5-6 (quoting Kopacz Dep. at 444).  Contrary to the Retirement Systems' claim, however, it does not follow that pension information was "irrelevant" and "outside the scope of her appointment."  *Id.* at 6.  After all, determining whether or not a particular piece of information would "negatively impact" feasibility is the very nature of Ms. Kopacz's assignment.

independent support." *Id.* at 20.   Rather, Ms. Kopacz conducted an investigation of her own that formed the basis of her opinions.   This investigation was extensive. Ms. Kopacz and her team together looked at the pensions' "rates of return" for the previous ten years and the "historical asset allocation mix for the system" (Kopacz Dep. at 433, 542 (Ex. B)); reviewed the Perry and Blinken reports, in addition to "underlying pension materials" (*id.* at 440, 452); considered information from the National Association of State Retirement Administrators (*id.* at 466, 564); attended "the employee new pension plan meeting" in which a variety of topics were raised (*id.* at 548); and discussed pension issues with a host of knowledgeable individuals.   *See, e.g.*, *id.* at 458 (Richard Ravitch & Robert Childree); *id.* at 465 ("various stakeholders").   Moreover, Ms. Kopacz and her team attended multiple meetings with individuals affiliated with the pension systems themselves.   These meetings included "counsel to the pension systems," pension board members, "the pensions' advisors," and lawyers.   *See, e.g.*, *id.* 443, 500, 516, 536-37, 540, 542. From these meetings, Ms. Kopacz obtained a wealth of pension-related information.   *See, e.g.*, *id.* at 536-39 (describing nature of conversation).

15.     While the Retirement Systems and County suggest that Ms. Kopacz's reliance on this information was improper, this is simply incorrect.   *Daubert* affords experts "wide latitude in choosing what data they rely on in forming their opinions."   *United States v. Seale*, 600 F.3d 473, 491 (5th Cir. 2010); *see also*

*Sudbeck v. Sunstone Hotel Props., Inc.*, No. 2:04-CV-1535, 2006 WL 2728624, at

*4 (D. Ariz. July 26, 2006) ("[S]ignificant latitude is given with respect to facts or

data upon which an expert may base an opinion."); *JMJ Enters., Inc. v. Via Veneto

Italian Ice, Inc.*, No. Civ. A. 97-CV-0562, 1998 WL 175888, at *6 (E.D. Pa. Apr.

15, 1998) ("[Experts] are granted wide latitude in determining what data is needed

to reach a conclusion.").  Given Ms. Kopacz's experience in finance, restructuring,

and pensions, Ms. Kopacz was free to rely on this information "in forming [her]

opinions."  *Seale*, 600 F.3d at 491; *In re "Agent Orange" Product Liab. Litig.*, 611

F. Supp. 1223, 1245 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (2d Cir. N.Y. 1987) (an

"expert is assumed, if he meets the test of Rule 702, to have the skill to properly

evaluate the hearsay, giving it probative force appropriate to the circumstances.").

Indeed, her reliance was particularly reasonable given the source of the

information: the pensions themselves.  *See, e.g.*, Kopacz Dep. at 544 (Ex. B) ("Q.

[W]hat else did you base your opinion on that the systems investment strategy is

questionable?   A.   The representations that were made in the meeting that I

personally had in your offices with the pension system representatives.").

       16.    To the extent the Retirement Systems identify other alleged

deficiencies—*e.g.*, failure to review "written policies" or meet with the Retirement

Systems' "independent professional investment advisors" (Ret. Sys. Mot. at 17 &

n.9)—these and similar challenges relate solely to the weight, not admissibility, of

Ms. Kopacz's opinions. *See, e.g.*, *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) ("[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." (internal citation and quotation marks omitted)); *Cummings v. Standard Register Co.*, 265 F.3d 56, 65 (1st Cir. 2001) (holding that "whatever shortcomings existed in [the expert's] calculations went to the weight, not the admissibility, of the testimony"); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practice, & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1070 (C.D. Cal. 2013) ("Plaintiff's arguments about other sources that Dr. Cassini could have consulted and alternative explanations he could have considered go to weight, not admissibility." (internal citations omitted)).[3]

---

[3] The Retirement Systems' discussion of the Moore declaration (Ret. Sys. Mot. at 19) is highly misleading. While Ms. Kopacz admitted that there was an error in her Report's *citation* to the Moore declaration, Ms. Kopacz *repeatedly* confirmed that the pertinent conclusions in her Report were based upon previous *conversations* with Mr. Moore and with representatives from the pension systems. *See, e.g.*, Kopacz Dep. at 555 (Ex. B) ("Q. So what I'm trying to get at are you really relying on the Chuck Moore declaration or are you relying on statements from people within the system? A. I'm relying on statements from within the system, right."); *id.* at 548 ("So, these -- these are -- we chose to use the verbiage that Mr. Moore had used in his declaration. But separate and apart, I and members of my team have had discussions about these facts and issues, if you will, with several other people involved."). The Retirement Systems omit this testimony entirely.

WHEREFORE, the Court should deny both the Retirement Systems' Motion to Exclude Portions Of Martha Kopacz's Testimony and the County's Amended Motion To Exclude Testimony of Martha Kopacz.

Dated:  August 27, 2014     Respectfully submitted,

    /s/ Heather Lennox          
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939

Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, Michigan  48075
Telephone:  (248) 359-7300
Facsimile:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY OF DETROIT

**Exhibit A**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                           Chapter 9

City of Detroit, Michigan,                       Case No. 13-53846

     Debtor,                                  Hon. Steven W. Rhodes

_____/


## EXPERT REPORT OF MARTHA E.M. KOPACZ
## REGARDING THE FEASIBILITY OF THE CITY OF DETROIT PLAN OF
## ADJUSTMENT

On April 22, 2014, Judge Rhodes entered an Order[1] appointing me as the
Court's expert witness. Pursuant to that Order, "(t)he Court's expert shall investigate
and a reach a conclusion on:

(a) Whether the City's plan is feasible as required by 11 U.S.C. § 943(b)(7);
and

(b) Whether the assumptions that underlie the City's cash flow projections and
forecasts regarding its revenues, expenses and plan payments are
reasonable."

I am providing this Report under Fed. R. Evid. 706(a). Should additional information
become available, I reserve the right to amend or supplement this Report.

_____

[1] Docket #4215, Order Appointing Expert Witness

## Section A – Introduction, Scope and Approach

Introduction

      I am a Senior Managing Director with Phoenix Management Services, LLC ("Phoenix"), Boston, MA and my *curriculum vitae* is attached as Exhibit 1. I have been assisted throughout this engagement by my colleagues from Phoenix. My billing rate is $595 per hour and the billing rates of my colleagues range from $100 per hour to $550 per hour. As a courtesy, we are reducing our rates by 10% in this case. I have testified previously as noted in my proposal.[2]

Scope and Approach

      The scope of my engagement is limited to providing an opinion *only* as to feasibility of the Plan of Adjustment ("POA" or "Plan") of the City of Detroit ("Detroit" or the "City"). My engagement does not include providing an opinion regarding the best interest of creditors. There is little applicable case law related to what constitutes feasibility in a chapter 9 proceeding and even less guidance on my

---

[2] Docket #4068, Notice Regarding Interviews of Expert Witness Applicants, pages 266-267

role as the Court's independent expert.  As such, I developed an approach for this assignment based upon my professional experience and taking into account the facts and circumstances of this matter that I believed to be most relevant.  In large measure, I and my team, ("we") have followed the outline contained in my proposal, which is included below.[3]

- Understand the framework and methodology used to prepare the Ten-Year Plan including reliance on historical information
  - Conduct interviews of key personnel and financial advisors
  - Review documentation used to develop the forecasts
  - Review other third party information to independently verify assumptions
- Perform a detailed analysis of the Plan's financial and cash flow forecasts to determine baseline and critical assumptions
- Critique and analyze critical assumptions - those that have significant dollar and/or timing impact and, if not achieved, could decrease cash flow significantly
  - Revenue and/or cash receipts
  - Cost cutting initiatives
  - Reinvestment initiatives and capital spending
  - Interest rate variations
  - Provisions for contingencies
- Evaluate the execution risks associated with the Ten-Year Plan
  - Availability of financial and human capital
  - Reasonableness of timing assumptions
  - Reasonableness of dollar impact (cost or benefit)
  - Adequacy of contingencies
- Perform sensitivity analysis related to the forecast and critical assumptions, as appropriate, to better assess the achievability of the projections
- Form an opinion as to the feasibility of the Ten-Year Plan, as presented

_____

[3]Docket #4068, Notice Regarding Interviews of Expert Witness Applicants, pages 256-257

- Prepare a written report supporting the opinion including additional information that facilitates communication and understanding by stakeholders of the likelihood of Plan success and the potential risks associated with Plan execution

We began with stakeholder interviews amongst the groups listed below. The "Contact Log" as directed in Judge Rhodes' Order, is included as Exhibit 3. This fact- and perception-gathering phase was important to understanding the current situation with the City, the status of bankruptcy case and how the City was approaching its restructuring.

- City of Detroit elected and appointed officials (including the Mayor, City Council President, Chief Financial Officer, Chief of Police and department heads)
- Emergency Manager
- City employees
- City of Detroit retained advisors
  - Jones Day
  - Ernst & Young
  - Conway MacKenzie
  - Miller Buckfire & Co.
- City's retirement systems (PFRS and GRS) and their advisors
- City's public safety labor unions and their advisors
- Creditor constituencies and their advisors
- Detroit Land Bank Authority
- Detroit Institute of Art and their advisors
- Charitable foundations and City benefactors

We then approached the analytical phase, which was iterative. We reviewed and analyzed documents relevant to the City's Plan and the financial projections. We reviewed other City data and third party information to provide background and

perspective on the Ten Year ("10 Yr") and Forty Year ("40 Yr") projections and the Restructuring and Reinvestment Initiatives ("RRIs"). We asked more questions of the City, its advisors and other stakeholders, requested more information, and analyzed that information. This process was repeated as necessary until our questions were answered. Some general categories of data, documents and information we reviewed and analyzed are identified below. A more complete listing is included in Exhibit 2.

- Court Documents – POA, Disclosure Statement, City Motions and Creditors' Objections, Eligibility Opinion, Court Orders, Court Docket
- May 5, 2014 and July 2, 2014 10 Yr projections, 40 Yr projections and RRIs, including working models
- Third Party Reports
  - Detroit Blight Removal Task Force Plan
  - Detroit Future City Strategic Framework Plan
  - Consulting reports – McKinsey
  - State and various task force reports on Detroit's financial condition
  - Various federal, state and regional government reports

We critiqued the methodology used to develop the financial projections, as well as the data and information used as the foundation for the assumptions. An explanation of these models is contained in Part II, Section E. We identified the assumptions used to create the June 2013 Baseline Projections and the assumptions that formed the 40 Yr projections. We identified and analyzed the assumptions contained in the RRIs and tested both projections (May 5th and July 2nd) for mathematical integrity.

My assessment focused primarily on operations that are accounted for in the City's General Fund. In addition to the City's General Fund activities, the City has numerous operations that are accounted for in Enterprise Funds. Only Enterprise Funds that have an impact on the City's General Fund were evaluated to determine their impact on the feasibility. [4]

The Report

This Report is comprised of four parts. Part I includes my opinion and the building blocks I used to formulate that opinion. This includes background and contextual information that underpin my assessment as well as the definition I and my team formulated for "feasibility" which establishes the framework for my opinion. Part I includes Sections A through D.

Part II is comprised of Sections E through H and provides insight into the quantitative factors that impact my feasibility assessment. Part III consists of

---

[4]For example the Detroit Department of Transportation (DDOT) operates primarily as an Enterprise Fund but receives a significant subsidy from the General Fund to fund negative cash flow in the Enterprise Fund; therefore, the failure of DDOT to achieve its plans directly impacts the City General Fund.

Sections I through O and include those issues that affect feasibility in a qualitative

manner.  Part IV contains the Conclusion.  A Table of Contents follows.

# Table of Contents

**PART I**                                                                                    **Page**

    **Section A**        **Introduction, Scope and Approach**    **2**

    **Section B**        **Statement of Expert's Opinion**    **9**

    **Section C**        **Feasibility Definition**    **12**

    **Section D**        **Context**    **22**

**PART II**

    **Section E**        **City of Detroit Financial Forecast Summary**    **31**

    **Section F**        **Revenue and Macro Assumptions**    **39**

    **Section G**        **Operating Expenditures**    **64**

    **Section H**        **RRIs and Non-Operating Expenditures**    **85**

**PART III**

    **Section I**        **Systems, Controls and Reporting**    **111**

    **Section J**        **Pensions**    **124**

    **Section K**        **Human Capital and Leadership**    **157**

    **Section L**        **Blight**    **167**

    **Section M**        **Post Confirmation Oversight**    **175**

    **Section N**        **Unresolved Issues**    **180**

    **Section O**        **Other Risks and Opportunities**    **192**

**Part IV**

    **Section P**        **Conclusion**    **199**

## Section B – Statement of Expert's Opinion

On April 22, 2014, Judge Rhodes entered an Order[5] appointing me as the Court's expert witness. Pursuant to that order, "(t)he Court's expert shall investigate and a reach a conclusion on:

(c) Whether the City's plan is feasible as required by 11 U.S.C. § 943(b)(7); and

(d) Whether the assumptions that underlie the City's cash flow projections and forecasts regarding its revenues, expenses and plan payments are reasonable."

This Report contains my expert opinion and the basis for that opinion. I was assisted by my colleagues at Phoenix Management Services LLC. My work has been guided by the approach that was outlined in my proposal[6] and discussed during

_____

[5] Docket # 4215, Order Appointing Expert Witness

[6] Docket # 4068, Notice Regarding Interviews of Expert Witness Applicants, pages 256 and 257

my interview on April 18, 2014[7]. I, and members of my team, have conducted more than two hundred interviews and fact gathering meetings with persons involved in this matter or with persons I believed to be helpful to me in forming my opinion.

Based on this work, I conclude that:

(a) The City's plan is feasible as required by 11 U.S.C. § 943(b)(7); and

(b) The assumptions that underlie the City's plan of adjustment projections regarding its revenues, expenses and plan payments are reasonable.

It should be noted that this opinion is rendered in an environment where there are many factors that will have influence on the City's conditions post confirmation that are unknown and unknowable. Throughout this Report, I have noted some of these factors, while other factors may not even be recognized today as potentially having an impact. My opinion is necessarily limited by these unknown factors. It should be recognized, that these factors, when known, could have a material impact on my view of feasibility.

The above statement should only be viewed in the context of this entire Report. No reliance should be made on these statements outside of the context of this Report.

---

[7] Transcript of Hearing, April 18, 2014

10

The remainder of this Report will provide my definition of feasibility, the context in which I am rendering my opinion and my assessment of the key factors affecting my feasibility assessment. While my opinion is arguably very narrowly limited to "feasibility", the assessment I and my team did to arrive at my opinion is multifaceted. This Report attempts to clearly and succinctly lay out the foundation, framework and details supporting my opinion.

The following section, Section C, addresses my definition of feasibility and relies upon numerous resources – legal and otherwise – and my own experience to establish the benchmarks against which I assessed feasibility. Section D discusses the context in which I am rendering my opinion. While there are common experiences among every restructuring and even among municipalities, the unique mix that is Detroit and this chapter 9 proceeding, necessarily impact my perspective and opinion. My intent is not to rehash every issue or pleading that has occurred in this case or even Detroit's recent history, but rather, to highlight a few aspects of the facts and circumstances of this case which have had an important impact on the formulation of my opinion. The last sections of the Report provide a more in depth review of the issues, quantitative and qualitative, I found particularly relevant to my assessment of feasibility. By no means does this Report include every factor I reviewed or considered but does include those issues that shaped my opinion to the greatest extent.

## Section C – Feasibility Definition

Defining a Feasibility Standard

Section 943(b)(7) of the Bankruptcy Code requires that before a plan of adjustment may be confirmed the Court must determine that the plan is feasible. However, the Bankruptcy Code does not define "feasible." Few chapter 9 cases address the feasibility requirement[8] and there is little in the way of authoritative writing published regarding feasibility. [9]

In assessing feasibility, I have examined available legal authority and consulted with counsel and other experienced professionals to assist in the formation of an appropriate approach to determining feasibility of the City's POA. Every

---

[8] In re *Mount Carbon Metropolitan District*, 242 B.R. 18, 31 (Bankr. D. Colo. 1999) ("The Code does not define feasibility in Chapter 9 nor does it specify what factors the Court should consider in determining whether the Plan is feasible. Due to the relative rarity of Chapter 9 cases, neither the parties nor the Court have found case law specifically addressing the issue.")

[9] Pryor, Scott C., Who Bears the Cost?  The Necessity of Taxpayer Participation in Chapter 9, (June 11, 2014) Available at SSRN, http://ssrn.com/abstract=2448997. The author referring to feasibility: "(w)hat is merely unclear in chapter 11 is an impenetrable fog in chapter 9."

restructuring professional, with some degree of experience, probably believes they understand what feasibility is and what it is not. However, in my early discussions with professionals in this case, my own research, and consultations with professionals not involved in the Detroit matter, I found a variety of nuanced points of view regarding a definition of feasibility. Therefore, while it will ultimately be up to the Court to articulate the precise legal parameters of feasibility in this Case, I, along with the Phoenix team, have developed the following feasibility definition (the "Standard"), which I believe is crucial to serving the Court's purpose for my appointment:

> *'Is it likely that the City of Detroit, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the Plan without the significant probability of a default?'*

Two Dimensions of the Standard

While I believe that there are certain imposed limitations on feasibility within this Standard, I have taken a relatively structured approach to my view of what is included in feasibility. The Standard includes both quantitative and qualitative components:

<u>Quantitative</u>

- Are the projections contained in the POA mathematically correct and materially reasonable?
- Are the assumptions that the City has used to develop its projections individually, and when taken as a group, reasonable?
- Is there an adequate contingency included in the projections?

<u>Qualitative</u>

- Does the City have the human resources, or can it likely recruit the human resources, required to meet its obligations under the POA?
- Does the City have the appropriate systems and procedures to monitor its financial performance and to provide early warning signs of variances in performance that might cause the City to fall short of the projections and be unable to meet its obligations under the POA?
- Are there appropriate structures to ensure the City's compliance with the POA and with reasonable government standards of operation?
- Will the City be able to reasonably deliver a minimum level of municipal services?
- Is the City's trajectory sustainable?

The quantitative assessment of feasibility is straightforward but exacting. As

will be more fully discussed in Part II, the projections[10] in the POA are (correctly

———————————————

[10] For purposes of this Report, "projections in the Plan" are inclusive of the 10 Yr plan, the 40 Yr plan and the RRIs. If only one of these is discussed, it will be noted. The term "forecast" is often used as a synonym for "projections". While this is not technically correct within accounting literature, the terms will be used interchangeably in this Report to provide variety. The term "model" is used in this Report to describe the one or more excel spreadsheets that together form a financial projection. A "values only model" or "flat model" is essentially a printout of the excel spreadsheets, although it may be provided in electronic format rather than in hard copy. A "working model" contains all the cell references, formulas and

so) quite detailed in many areas. Financial modeling is a highly subjective undertaking that is affected by the assumptions made and the professional biases of the analyst developing the model. Financial modeling is both a science and an art. When the analyst forecasts growing revenue, declining costs, or a change in headcount, he or she has a number of ways to write the mathematical formulas which arrive at the intended numbers. In this case, the POA projections are comprised of multiple forecasts, inclusive of hundreds of individual spreadsheets, prepared by many different individuals and then concatenated into what we all simply call the "projections"[11]. Simple questions, such as "are the salaries used to determine the cost of newly hired employees reasonable?" become detailed. For example, the salary estimates are multifaceted depending on which model and which analyst did the modeling and appear in many of the RRI projections. Because of this, the

_____

"macro" commands that are within the spreadsheets and allows a reviewer of the model to understand what the inputs and assumptions are that create the projections. It is in the working model that a reviewer can understand the "art" of the analyst's modeling.

[11] Expert Report of Charles M. Moore, CPA, CTP, CFF in re City of Detroit, Michigan. In footnote 2, Mr. Moore provides a similar explanation of modeling methodology: "Given the number and diversity of the departments my team and I examined, the specific methodology utilized was not exactly the same for each department. Notwithstanding any particular deviations that were necessary, this core methodology and approach was generally utilized across our analysis and development of the Reinvestment Initiatives." This is an example of differences that can occur within a model built by the same firm. There were also differences in modeling approach used by Conway MacKenzie, Mr. Moore's firm, and Ernst & Young, the City's other financial advisor.

quantitative assessment of "reasonableness" surrounding the individual assumptions, and assumptions taken as a group, of the POA projections was more involved than I would have expected.

The qualitative aspects of the Standard include what I have come to refer to, as "skill and will" and are as important as the quantitative assessment. Qualitative aspects also include external influences that can affect the implementation of the Plan. Part III, Section K – Leadership and Human Capital, discusses the City's need for more highly skilled employees. Another qualitative issue is the upcoming transition from the leadership of the Emergency Manager to the leadership of Mayor Duggan and his administration. When that transition occurs, there will be little more than three years remaining within which the current elected officials will have the responsibility to operate the City consistent with the POA – therefore political 'will' must be passed to future elected officials. This is not a problem limited to Detroit, but to all municipal proceedings. Section M – Post-Confirmation Oversight discusses ways to mitigate this variable.

## The Aspect of Time on the Standard

A municipal government is an entity designed to exist in perpetuity. Therefore, as we considered feasibility there is a requirement to determine the timeframe for the feasibility assessment. As we developed the feasibility Standard, we considered the following questions:

- Given the electoral system and the requirement for strong leadership, do we limit the timeframe to the next election cycle?
- Is there some other timeframe at which feasibility stops? For example, if after 5 years, visibility into the operations of the City becomes more opaque, do we only consider the first 5 years?
- Do we consider the timeframe over which financial commitments are made in the POA? That is, do we look at the restructured pension obligations of the retirees and current employees and attempt to determine whether the POA is feasible during their entire lifetimes?

Ultimately, we based our Standard on an indeterminate time period. However, I believe that the issues of feasibility must be viewed both in terms of their quantitative or qualitative impact and the time horizon over which the impacts may occur. That is, as the time horizon expands, so too does the magnitude required for an issue to impact feasibility. For example, a potential $50 million shortfall in year 1 will have a much more significant impact on the assessment of feasibility than the same shortfall in year 20.



The Standard Allows for a Range of Values

An additional aspect to my definition of feasibility is the concept that the reasonableness of the quantitative and qualitative components of the Standard can be a range of values. When looking at the reasonableness of assumptions and projections, most people understand that "reasonable" can exist along a continuum. Projections can be reasonable and favor the views of the debtor and projections can be reasonable and favor the views of creditors. Of course, at the outer edges of "reasonable", values become unreasonable, either because they are exceptionally conservative or wildly aggressive. We have evaluated the assumptions imbedded with the financial forecasts within this continuum of reasonableness.

Detroit differs from a company emerging from chapter 11 in that the City does not have to be service delivery solvent to emerge from bankruptcy. It will be on a

18

trajectory towards service delivery solvency[12] and in some areas, the current level of service is adequate. I do not need to envision that Detroit will become a best in class municipality to determine that the POA is feasible. For Detroit, emerging from essential services failure to adequate and reasonable service delivery will be a success.[13]

What Feasibility is Not

When we developed the feasibility definition, we also considered what feasibility does not include. First, and foremost, feasibility is not a guarantee. If the City were to propose a plan under which, based on reasonable assumptions, the City could not help but meet its obligations – effectively a guaranteed outcome – it is likely that while feasible, such plan would not satisfy the best interests of creditors test under section 943(b)(7) of the Bankruptcy Code.[14]

---

[12] Eligibility Opinion of Judge Rhodes

[13] Anderson, Michelle Wild "The New Minimal Cities" http://yalelawjournal.org/article/the-new-minimal-cities; March 2014

[14] The "best interest test of creditors" is specifically outside the scope of my appointment and as such, is not part of the opinion I have formed. See Docket #4215, Order Appointing Expert Witness, ¶2 and 3.

Similarly, but at the other end of the spectrum, a feasible plan should avoid visionary schemes primarily based on "mere hopes, desires and speculation"[15]. Further, the Court must determine whether there is a reasonable prospect of successful completion of the proposed plan.[16] As a point of reference, a frequently cited legal standard for feasibility in Chapter 11 is whether the factual showing at the plan confirmation hearing establishes a "reasonable assurance of success," though "success need not be guaranteed."[17]

Lastly, I do not believe the Standard entails: (1) whether the projections in the POA may generate more cash to distribute and therefore provide greater recoveries for creditors or (2) whether there may be alternative plans that could produce a better outcome for the City or its creditors. During my team's evaluation of feasibility, we have been exposed to numerous views on these subjects. Because this is outside my scope and not included in our Standard, I have not attempted to form, nor have I formed, any opinion on these matters.

_____

[15] 242 B.R. 18 (1999) in re Mount Carbon Metropolitan District.

[16] Lawall, Francis J. and Miller, J. Gregg, Debt Adjustments for Municipalities Under Chapter 9 of the Bankruptcy Code, a Collier Monograph, 2012.

[17] Case, Stephen H., Some Confirmed Chapter 11 Plans Fail, So What?, 47 B.C. L. Rev. 59 (2005), http://lawdigitalcommons.bc.edu/bclr/vol47/iss1/4.

In summary, the Standard we have defined includes both quantitative and qualitative assessments of feasibility, including a risk assessment measured against a time horizon and allows for a reasonable range of values within the projections. This Standard is the backdrop against which the remainder of this Report should be read.

**Section D - Context**

This section of the Report attempts to identify some of the contextual parameters for my expert opinion. The role as the Court's expert on feasibility is both vast and specific, and subsumed within a unique set of facts and circumstances surrounding the City of Detroit, its history and plethora of challenges. Included amongst these topics are:

- The impact of the bankruptcy process on the feasibility assessment
- An "as is" perspective of Detroit which anchors my opinion
- An explanation of what the Plan of Adjustment is and is not
- Identification of factors that affect my opinion separate and apart from the proposed POA

<u>Bankruptcy Process Impact</u>

I am humbled and honored to have been selected as the Court's expert in this matter. The speed with which this restructuring and bankruptcy case has progressed is nothing short of extraordinary. The speed has been both an advantage and a disadvantage to the feasibility of the POA.

22

The restructuring profession generally views quick trips through the bankruptcy process to be advantageous for a variety of reasons: less distraction of the management team, lower professional costs, more negotiated (vs. litigated) solutions, quicker payments to creditors, and less uncertainty for employees and vendors. This could all be true with the Detroit case.

However, I believe the speed of this proceeding has negatively impacted the level of feasibility of the POA. This bankruptcy has been largely focused on deleveraging the City, often to the exclusion of fixing the City's broken operations. The bilateral mediations between the City and the creditor groups worked well to quickly deliver settlements of key disputes. However, the lack of time available for multiparty negotiation has resulted in settlements that, taken in total, greatly reduce the contingency available in the Plan. Pain sharing is an important component of the restructuring process that helps ensure that all the stakeholders appreciate the "size of the pie" as opposed to creating the proverbial "win-lose" tug of war between the debtor and the creditor.

Detroit "As Is"

Detroit is at a tipping point. While some may consider the chapter 9 filing as the low point in this great City's history, I believe that it was the beginning of creating what can become a virtuous cycle of revitalization, improving economics and quality of life betterments for those who choose to live and work within the City. It is hard to imagine that people with such diverse political and socio-economic perspectives would have come together as they have in this process without the bankruptcy filing. Traditional political maneuverings are working to Detroit's advantage and residents have the prospect of once again living in a community that is more safe and supportive. Black, white, Republican, Democrat, poor, wealthy, educated, illiterate and everyone in between have an opportunity to contribute to the virtuous cycle of revitalization, or not.

The City of Detroit's chapter 9 filing has justifiably received extensive attention across international media and within legal and financial circles. The outcomes will be referenced extensively for years, for what was accomplished and arguably, what could have been accomplished during the proceedings. As the largest chapter 9 to date, if any municipality ever needed the protection and tools of the bankruptcy process, it is Detroit. At every level, Detroit was failing as a city – as measured by the shrinking of its population, useful infrastructure and purposeful

24

enterprises - and as a government – as measured by its inability to deliver essential services.  Having spent a large amount of time in Detroit since my appointment, my interaction with citizens, City employees and stakeholders in the bankruptcy have influenced my view of both the in-court restructuring and the out-of-court work that is equally important to Detroit's ability to effectuate its POA.


The Plan of Adjustment

Even after many years of practice with dysfunctional, insolvent, operationally troubled enterprises, I was confused by the City's projections in POA.  Section E of this Report provides detail on how the projections and RRIs are structured.  Suffice it to say that the "10 Yr projections", the "10 Yr/40 Yr projections," and the "Restructuring and Reinvestments Initiatives" form an unusual construct for a financial plan for an enterprise attempting to emerge from bankruptcy. The baseline projections ("10 Yr projection, Exhibit J to the Disclosure Statement) were prepared in June 2013 to show what would happen to the City without a restructuring, which they did very well.  The "10 Yr/40 Yr projection" (Exhibit K in the Disclosure Statement) expands the baseline, steady state projection for the 40 Yr time horizon of the POA.  Then, in order to begin to understand how the restructured Detroit might operate – delivering services and paying creditors – one must factor in the RRIs

25

contained in Exhibit J to the Disclosure Statement. This is convoluted and contributes to the feelings amongst many creditors in this case that the financial projections in the POA are a "black box" and that it was the City's intent to obfuscate important information. I choose to believe that is was simply an unfortunate result of two advisory firms sharing responsibilities[18] rather than one firm "owning" the financial projections start to finish, as is, and should be, the norm.

The City's Plan of Adjustment is primarily limited to a "balance sheet" restructuring, as chapter 11 veterans would characterize it, and it includes only some of the City's operations. This is loosely analogous to a company that files a bankruptcy for the parent company and some, but not all, of the subsidiaries. The chapter 9 proceeding has been overwhelmingly focused on deleveraging the City for the long term, reducing future obligations. That is good. However, the operational restructuring that often occurs with commercial reorganizations will be left largely to Mayor Duggan and his managers for the post confirmation period. That is

---

[18]Ernst & Young, originally retained by the City of Detroit in May 2011, and Conway MacKenzie, originally retained by the City of Detroit in January 2013, have served the City post-petition in a collaborative arrangement. Each firm has taken responsibility for certain aspects of typical debtor "financial advisory" services and the firms work well together. No comments herein should be construed as criticism of this collaboration; rather, I believe it would have been preferable for a single firm to have prepared a single, integrated financial projection for the POA.

26

unfortunate but is understandable given the speed with which this bankruptcy has occurred and the Emergency Manager's priorities during his similarly short tenure.

Readers of the POA should view the Plan projections as a "sources and uses" statement which describes cash available to fund delivery of some of the services the City provides and certain payments to creditors. As such, these projections are useful only for purposes of confirming the POA (or not, as the case may be) and directionally providing guidance for the City to plan its finances going forward for those operations that are addressed in the POA. It is important to understand that the POA projections are not a business plan for the City. They are not the City's budget. They are not the "financial plan" referenced in Public Acts 181 and 182 of 2014, also referred to as the "Grand Bargain" legislation.

The confusion about the projections in the POA and these other financial plans is evident within the City including its employees, amongst the media and the stakeholders. The projections in the POA have not been harmonized with the City's budget that was passed by the City Council on June 5, 2014. As such, any funding of the RRIs will require first identification of a funding source, and then approval by the CFO and Mayor, and finally, approval by the City Council of a budget amendment to support the appropriations. Although the City has many financial reporting priorities, it is highly advisable that the budget department amend the

27

approved June budget for the numerous anticipated changes post confirmation, harmonizing the current headcounts and spending levels with the RRIs that the City intends to execute in the coming year, and submit a new budget to the City Council for approval.

The sooner the City can divorce itself from the confusion created by the POA projections, the better. The City needs a multi-year Business Plan which can act as a single financial and operational plan, including all departments and enterprise activities (of which an amended budget would be a part) as well as capital plans that can be publicly communicated and compared to actual performance. A "bridge" should be prepared which identifies the components of the POA projections that are included in the City's Business Plan and then the POA projections can be archived.

Another confusion I believe exists in the POA is the investment plan for infrastructure and service delivery improvements that are required to revitalize the City. Those funds will necessarily come from reducing costs of existing service delivery either through efficiency improvements or elimination of activities. The media has created the impression that the City's investment of more than $1 billion over the course of the coming years is a "given". This is incorrect. There is no funding source for these investments, including blight removal, other than the Exit

Financing[19] and the projected structural surplus in the POA projections; that is: the projected revenues must exceed the projected expenses of the City for the foreseeable future. It is important that readers of the POA understand there is no cash in a bank account to fund the RRIs. The cash for the investments will come from the Mayor and the departmental leaders delivering services as economically and efficiently as the POA forecasts.

Outside Factors of Influence

I can say, unequivocally, that without the positive and capable leadership of Mayor Duggan and the constructive relationship between the City Council and the Mayor, I would be unable to opine that the plan, as currently proposed, is feasible. The near term future will require course adjustments as undoubtedly revenues and expenses will vary from projections and unforeseen events will demand changes in plans. The democratic system has put in place individuals who, at least for the next three years, can choose to continue the positive course for the City. I believe they will do so.

───────────────────

[19] The City's investment banker, Miller Buckfire & Co. has prepared solicitation materials as is the process of sourcing this financing.

29

Southeast Michiganders and Detroiters are extensively engaged in civic and charitable pursuits that benefit the revitalization of Detroit. While detractors cite crime rates and nonfunctioning public works, there are a similar group of enthusiastic, impassioned supporters of Detroit's bright future. Two tangible examples are the Detroit Future City plan and the Blight Task Force report. Each of these privately funded efforts resulted in professionally stellar frameworks that current and future elected officials should consider as components of Detroit's master plan. I find it encouraging that there are the underpinnings of business plans for the City which can be blended with financial plans to improve the prospects of success.

In addition, the level of private funds invested in Detroit annually is significant. During my interviews, one executive estimated that private foundations, collectively, spend between $150-$200 million annually on "public" works to support investments in the safety, health and welfare and economic development within the City of Detroit. This level of funding is significant to the overall revitalization efforts outlined in the POA.

## Section E - City of Detroit Financial Forecast Summary

Introduction

The City's Plan of Adjustment incorporates multiple, interrelated financial forecasts that must be individually and collectively evaluated in order to fully understand how the City intends to operate after a confirmation of the Plan of Adjustment. These forecasts, which vary in both duration and intended scope, emanated from the various City professional advisors and their original responsibilities. To fully appreciate the operating plan for the City, Phoenix has reviewed each of the financial forecasts and has worked with the City and its professionals to understand how each of these documents bridge to one another.

The Plan of Adjustment's financial forecasts are as follows:

1. Plan of Adjustment – Ten Year Financial Projections (the "10 Yr Plan"),

2. Plan of Adjustment – Forty Year Financial Projections (the "40 Yr Plan")

3. Plan of Adjustment – Restructuring and Reinvestment Initiatives (the "RRIs")

4. City of Detroit – Triennial Executive Budget ("City Budget")

<u>Plan of Adjustment – Ten Year Financial Projections</u>

The 10 Yr Plan, built and modified by Ernst & Young ("E&Y"), is the City's financial forecast for the fiscal years 2014-2023. This plan was originally developed to show how Detroit would operate exclusive of the chapter 9 bankruptcy proceeding. That is, it is effectively the baseline plan. This forecast was built on a department level basis and does not include the quantitative impacts of the restructuring initiatives, the cancellation of debt, the cash flow ramifications from the alterations in the City's pension plans and OPEB[20], and other impacts of the bankruptcy proceedings.

The City and its advisors produced, as part of the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit and the corresponding Fourth Amended Disclosure Statement (dated May 5, 2014), an updated version of the 10 Yr Plan which reflected the then most current forecast assumptions and terms of negotiated agreements. In light of the incremental negotiations, modified forecast assumptions and other changes, a newer 10 Yr Plan (in concert with an updated 40 Yr Plan and modified RRIs) has been produced by the City advisors and is dated July 2, 2014. For the purpose of this Report, Phoenix used the July 2, 2014 version

_____

[20] Other Post Employment Benefits

32

of the City's financial forecasts. The following analysis[21] identifies the quantifiable variances between the most recent iterations of the City's financial forecasts. While the net of all changes only impacted the Plan by $5.2 million, on an absolute value basis, the July 2nd version of the 10 Yr Plan contains changes that are in aggregate $491 million versus the May 5th version for the FY2014-2023 time period.

---

[21] The analysis is sourced from the 5.5.14 POA and 7.2.14 POA and figures are from the bibliography: Conway Mackenzie Models:1-54 and Ernst & Young Models 8-11

33

|  | 7.2.14 POA vs 5.5.14 POA | |
| --- | --- | --- |
|  | 10 Year Variance | Absolute Value Change |
| **Base Model Revenue** | | |
| State Revenue Sharing | $ 36.6 | $ 36.6 |
| Wagering Taxes | $ (13.1) | $ 13.1 |
| Property Taxes | $ (15.7) | $ 15.7 |
| Sales and Charges for Services | $ (0.9) | $ 0.9 |
| **Total Base Model Revenue** | **$ 6.9** | **$ 66.3** |
|  | | |
| **Base Model Operating Expenditures** | | |
| DDOT Subsidy | $ (59.7) | 59.7 |
| Delay in Payroll Processing | $ (4.4) | 4.4 |
| PLD LED Lights | $ (2.7) | 2.7 |
| **Total Base Model Operating Expenditures** | **$ (66.8)** | **$ 66.8** |
|  | | |
| **A. Total Changes to Base Model** | **$ (59.9)** | **$ 133.1** |
|  | | |
| **Reinvestment Revenue** | | |
| GSD Grant | $ 5.7 | $ 5.7 |
| **Total Reinvestment Revenue** | **$ 5.7** | **$ 5.7** |
|  | | |
| **Reinvestment Operating Expenditures** | | |
| Fire Department Labor Change | $ (49.8) | $ 50.7 |
| Police Department - Adjust Avg Salary to Act. in Base Forecast | $ 22.5 | $ 22.5 |
| Fire Department- Adjust Avg Salary to Act. in Base Forecast | $ 45.2 | $ 45.2 |
| All Other Labor | $ 1.5 | $ 2.5 |
| DPD - Increase in Annual Facility Costs of New Precincts | $ (6.2) | $ 6.2 |
| Training | $ (1.1) | $ 1.1 |
| Purchased Services | $ (0.7) | $ 0.7 |
| **Total Reinvestment Operating Expenditures** | **$ 11.4** | **$ 129.0** |
|  | | |
| **Capital Investments** | | |
| Police Fleet Spending | $ 10.0 | $ 10.0 |
| GSD Facility Maintenance and Other Capex | $ 6.1 | $ 6.1 |
| Deferral of Airport Bay Upgrades and T-Hangars | $ 5.0 | $ 5.0 |
| R&M Fire Dept Facilities | $ 3.0 | $ 3.0 |
| Rec Facilities | $ 2.5 | $ 2.5 |
| 311 System | $ 0.6 | $ 0.6 |
| **Total Capital Investments** | **$ 27.3** | **$ 27.3** |
|  | | |
| **B. Total Changes to RRI's** | **$ 44.4** | **$ 162.0** |
|  | | |
| **Potential Deals** | | |
| Public Safety 3% Bonus in FY 16 | $ (5.6) | $ 5.6 |
| OPEB now $1MM for PFRS | $ 11.7 | $ 11.7 |
| Pension now 12.25% of wages | $ (21.1) | $ 21.1 |
| **Total Potential Deals** | **$ (15.0)** | **$ 38.4** |
|  | | |
| **Non Operating** | | |
| Adjusted Note B | $ (55.0) | $ 55.0 |
| Add Note A2 | $ 6.1 | $ 6.1 |
| QOL Exit Financing P&I | $ 85.1 | $ 85.1 |
| Deferrals | $ (10.7) | $ 10.7 |
| Contingency | $ (0.2) | $ 0.2 |
| **Total Non Operating** | **$ 25.3** | **$ 157.1** |
|  | | |
| **C. Total Changes due to New Deals/Non Operating** | **$ 10.3** | **$ 195.5** |
|  | | |
| **Total Net Change (A+B+C)** | **$ (5.2)** | **$ 490.6** |

Plan of Adjustment – Forty Year Financial Projections

The 40 Yr Plan, also built and modified by E&Y, is the financial forecast for the fiscal years 2014-2053 that purports to indicate the City's performance over the next 40 years. Contrary to the 10 Yr Plan, the 40 Yr Plan includes the impact of the RRIs, the cancellation of debt, the cash flow ramifications from the alterations in the City's pension plans and OPEB, and other impacts of the bankruptcy proceedings. The 40 Yr Plan has not been built by department and is only a summary of the overall expected City performance.

Plan of Adjustment - Restructuring and Reinvestment Initiatives

The Restructuring and Reinvestment Initiatives have been constructed and amended by Conway Mackenzie ("CM") following CM's City-wide departmental review begun in January 2013. The reinvestment initiatives include funding for additional City personnel and operating requirements, targeted capital expenditures, and blight removal. In total, the RRIs assume the City will invest approximately $1.7 billion in restructuring initiatives. This $1.7 billion of investment is funded in part by $483 million of incremental revenue generated as a result of the RRIs and $358 million of anticipated costs savings from the execution of the RRIs over the FY2014-2023 period. The remaining funding source for the RRIs will be generated by operating City surpluses and the Exit Financing. The process to develop these

detailed initiatives included highly detailed inputs, risks, constraints and other factors in how the initiatives will be implemented.

City of Detroit - Triennial Executive Budget

The City annually develops a Triennial Executive Budget that forecasts the financial operations of the City for the subsequent three fiscal years. This budget historically forms the basis for how the City intends to operate on a departmental level and is developed in line with historical government reporting protocols. The Triennial Budget is developed in a manner that allows for reconciliation with the City's fund accounting[22] and only includes items for which funding has been received, approved and allocated. The City's FY2015 budget was unanimously approved by the Detroit City Council on June 5, 2014.

The timing of the City's annual budget cycle, including review and approval by the City Council, and the timing of the bankruptcy proceedings created a bit of a

---

[22] Governmental fund accounting is beyond the scope of this Report. However, the reader should appreciate that 1) government accounting standards can vary significantly from those used in the private sector, 2) fund accounting can sometimes create artificial classifications of revenues and expenses that do not resemble how the entity operates on a regular basis and 3) the City's POA projections were prepared separately from the City's Triennial Budget. In the past few weeks, the City's budget team and the financial advisors have worked to reconcile the major differences between the POA projections and the City's budget.

conundrum for the FY2015 budget. As such, the FY2015 budget does not reflect many of the POA proposals, including most of the RRIs and the revised debt service requirements. This may create a procedural bottleneck in that funding for the RRIs will require first, approval by the Emergency Manager, Mayor and Chief Financial Officer,[23] and then a budget amendment to be approved by the City Council.

Phoenix Review

Phoenix has thoroughly reviewed each of the above identified forecasts. In addition, numerous meetings have been held to discuss the forecasts with the City, E&Y, and CM. While Phoenix appreciates the inherent complexity of any financial forecast for an enterprise of this magnitude, a number of concerns regarding how the multiple forecasts impact one another warrants discussion.

First and most importantly, the City does not have a consolidated, departmental financial forecast that incorporates the baseline forecast and all of the POA proposals, specifically, the RRIs. While the respective 10 Yr, 40 Yr, and RRI forecasts have been expertly researched, constructed, and amended, the fact remains

---

[23] This group is referred to as the "Approving Parties". Procedures have been established to manage the RRI activities. The Approving Parties will assess the RRI funding requests from the various department heads for appropriateness, ensure that the City has the cash for fund the initiatives and allocate the money amongst the requested initiatives.

that the City does not have an aggregated forecast to use as a fiscal roadmap going forward. During our many meetings with City leadership and department heads, it was evident that the individuals responsible for delivering essential services did not have an adequate understanding of the POA impacts to their operations and the manner in which the RRIs would occur.

I have participated in the budget review meetings with the Mayor, the department heads and their respective teams and believe that the sooner the POA projections, in their current form, can be archived, the better. Although improving, there is still a gap in the understanding by the department heads, relating to their budgets and the impact the RRIs will play in what they will be responsible for in the future. In the next few years, the funding for the RRIs is largely, if not exclusively, dependent on the Exit Financing. At this point, we understand the Exit Financing is not committed and the amount and terms have not been determined. For purposes of my assessment and resulting opinion, I have assumed that Exit Financing will be available in an amount sufficient to implement the POA as set forth in detail later in this Report.

# Section F - Revenue and Macro Assumptions

Summary[24]

The City of Detroit's Plan of Adjustment include 10 Yr revenue projections for the fiscal years 2014-2023 and 40 Yr revenue projections for the fiscal years 2014-2053 ("40 Yr Plan"). The 10 Yr Plan revenues were forecasted including and excluding the assumed accretive impact of the proposed RRIs detailed in the Plan of Adjustment. As illustrated below, the total revenues projected in the 10 Yr Plan - exclusive of the impact of the RRIs - is $10.4 billion; alternatively, the 10 Yr Plan's cumulative revenues inclusive of the impact of the RRIs is $11.2 billion.

| General Fund Revenues | FY2014-2023 Without Reinvestment | | FY2014-2023 With Reinvestment | | FY2024-2033 With Reinvestment | | FY2034-2043 With Reinvestment | | FY2044-2053 With Reinvestment | |
|---|---|---|---|---|---|---|---|---|---|---|
| Municipal income tax | $ 2,566 | 25% | $ 2,770 | 25% | $ 3,510 | 29% | $ 4,591 | 32% | $ 6,059 | 35% |
| State revenue sharing | $ 2,000 | 19% | $ 2,000 | 18% | $ 2,121 | 18% | $ 2,307 | 16% | $ 2,533 | 15% |
| Wagering taxes | $ 1,733 | 17% | $ 1,733 | 15% | $ 1,906 | 16% | $ 2,105 | 15% | $ 2,325 | 13% |
| Sales and charges for services | $ 1,118 | 11% | $ 1,118 | 10% | $ 1,161 | 10% | $ 1,415 | 10% | $ 1,725 | 10% |
| Property taxes | $ 964 | 9% | $ 1,074 | 10% | $ 1,370 | 11% | $ 1,640 | 11% | $ 1,903 | 11% |
| Other revenue | $ 713 | 7% | $ 713 | 6% | $ 754 | 6% | $ 918 | 6% | $ 1,120 | 6% |
| General Fund reimbursements | $ 260 | 2% | $ 260 | 2% | $ 239 | 2% | $ 291 | 2% | $ 355 | 2% |
| Utility users' | $ 252 | 2% | $ 257 | 2% | $ 304 | 3% | $ 353 | 2% | $ 410 | 2% |
| Department Revenue Initiatives | $ - | 0% | $ 483 | 4% | $ 586 | 5% | $ 715 | 5% | $ 871 | 5% |
| Transfers in | $ 829 | 8% | $ 829 | 7% | $ 148 | 1% | $ 22 | 0% | $ - | 0% |
| **Total General Fund Revenues** | **$ 10,434** | **100%** | **$ 11,237** | **100%** | **$ 12,098** | **100%** | **$ 14,358** | **100%** | **$ 17,302** | **100%** |

---

[24] Unless otherwise stated the financial projections referenced in section F are sourced from the bibliography: Ernst & Young Models: 10-11

The analyses below will identify the City's individual revenue components (on an annual and cumulative basis), the estimated growth for each revenue category over the time periods of both forecasts, and the key assumptions utilized for each revenue category. The following analyses will also identify and compare, where applicable, third party assumptions for various operating metrics (e.g. wages, employment, population, etc.) as they relate to the assumptions the City used to derive these forecasts. Finally, this revenue analysis provides sensitivity scenarios designed to illustrate the variability of the revenue forecasts as underlying assumptions are changed.

Municipal Income Tax

The City of Detroit, in accordance with the Michigan Public Act 284 of 1964, has been one of 22 Michigan municipalities to impose a municipal income tax on its residents, nonresidents working in Detroit, and resident businesses. The City's municipal income tax receipts, due to declines in population and the economy, have decreased by 30% since 2002. Municipal income tax revenues are forecasted to account for 25% of General Fund revenue in the FY2014-2023 period.

As mentioned above, the City's POA projections estimate revenues for the 10 year period covering FY2014-2023 with and without the incremental revenue impact

of the RRIs. The following analysis illustrates the "without Restructuring and Reinvestment Initiatives" scenario.

10 Yr Plan - Without RRIs

The City's 10 Yr Plan forecasts annual municipal income tax through the estimation of the year-over-year ("YoY") growth in taxable income for the following subsections:

- City residents
  - Average annual YoY taxable income growth: 0.85%
  - Income tax rate: 2.4%
  - FY2014-2023 City resident income taxes: $1,561 million
- Non-residents
  - Average annual YoY taxable income growth: 1.18%
  - Income tax rate: 1.2%
  - FY2014-2023 non-resident income taxes: $761 million
- Corporations
  - Average annual YoY taxable income growth: 1.63%
  - Income tax rate: 2.0%
  - FY2014-2023 corporation income taxes: $245 million

The taxable income growth assumptions appear to be reasonably conservative relative to the recent uptick in taxable income in FY2011-2013. For Detroit residents, taxable income growth has averaged 3.4% annually for those three years. During the same period, taxable income growth has averaged 3.5% for non-residents and 2.2% for corporations. The annual taxable income growth during FY2011-2013

is likely reflective of the recovery from the 2008-2009 financial crisis, when the City's taxable income base suffered double-digit YoY percentage declines.

## 10 Year Plan – Municipal Income Tax (Without RRIs)

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | FY2014-2023 Average/Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Preliminary forecast | | | | | | |
| **City Residents (A)** | | | | | | | | | | | |
| Taxable income growth | 1.94% | 1.45% | 0.46% | 0.46% | 0.46% | 0.46% | 0.65% | 0.65% | 1.00% | 1.00% | **0.85%** |
| Taxable income | $ 6,294.0 | $ 6,385.5 | $ 6,414.7 | $ 6,444.0 | $ 6,473.5 | $ 6,503.3 | $ 6,545.8 | $ 6,588.6 | $ 6,654.5 | $ 6,721.1 | $ **65,025.1** |
| Income tax rate | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | |
| Total City Resident income taxes | 151.1 | 153.3 | 154.0 | 154.7 | 155.4 | 156.1 | 157.1 | 158.1 | 159.7 | 161.3 | **1,560.6** |
| **Non-Residents (B)** | | | | | | | | | | | |
| Taxable income growth | 2.23% | 1.70% | 0.70% | 0.70% | 0.70% | 0.69% | 0.50% | 1.19% | 1.69% | 1.69% | **1.18%** |
| Taxable income | $ 6,065.0 | $ 6,168.1 | $ 6,211.2 | $ 6,254.5 | $ 6,298.0 | $ 6,341.7 | $ 6,373.4 | $ 6,449.4 | $ 6,558.5 | $ 6,669.3 | $ **63,389.0** |
| Income tax rate | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | |
| Total Non-Resident income taxes | 72.8 | 74.0 | 74.5 | 75.1 | 75.6 | 76.1 | 76.5 | 77.4 | 78.7 | 80.0 | $ **760.7** |
| **Corporations (C)** | | | | | | | | | | | |
| Net tax collection growth | 2.34% | 2.50% | 2.00% | 2.00% | 2.00% | 1.50% | 1.00% | 1.00% | 1.00% | 1.00% | **1.63%** |
| Taxable income (implied) | $ 1,128.3 | $ 1,156.5 | $ 1,179.6 | $ 1,203.2 | $ 1,227.3 | $ 1,245.7 | $ 1,258.2 | $ 1,270.7 | $ 1,283.5 | $ 1,296.3 | $ **12,249.3** |
| Corporate tax rate | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | |
| Net tax collections | 22.6 | 23.1 | 23.6 | 24.1 | 24.5 | 24.9 | 25.2 | 25.4 | 25.7 | 25.9 | $ **245.0** |
| **Total Municipal income taxes (D) = (A+B+C)** | | | | | | | | | | | |
| Taxable income | $13,487.3 | $13,710.2 | $13,805.5 | $13,901.7 | $13,998.8 | $14,090.7 | $14,177.4 | $14,308.8 | $14,496.5 | $14,686.7 | $ **140,663.5** |
| Calculated tax rate | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | **1.8%** |
| Total Municipal income taxes | 246.4 | 250.4 | 252.1 | 253.8 | 255.5 | 257.1 | 258.7 | 260.9 | 264.1 | 267.3 | $ **2,566.3** |
| **Adjustment Municipal income taxes** | | | | | | | | | | | |
| Adjustment for actuals | - | - | - | - | - | - | - | - | - | - | $ - |
| **Total Adjusted Municipal income taxes** | **$ 246.4** | **$ 250.4** | **$ 252.1** | **$ 253.8** | **$ 255.5** | **$ 257.1** | **$ 258.7** | **$ 260.9** | **$ 264.1** | **$ 267.3** | **$ 2,566.3** |

The POA's 10 Yr projections "build up" the annual taxable income growth assumption by adding separate assumptions for annual wage growth and employment growth.

Wage Growth (Without RRIs)

The 10 Yr Plan estimates – for both the City residents and nonresident categories – an average wage growth of 1.25% for the FY2014-FY2023 period, an

estimate that appears reasonable when compared to the state and national forecasts highlighted below. The income growth forecast for corporations is 1.63% and is conservative relative to the State forecast. The Michigan Senate Fiscal Agency assumed an average 2.65% wage growth rate for Detroit which is reflective of the average state forecast of 3.65% reduced by a 1% structural adjustment for the City of Detroit.

Employment Growth (without RRIs)

The annual employment rate of City residents is forecasted to decline by 0.4% for the FY2014-FY2023 period. Non-residents' average annual employment is estimated to decrease by 0.07% for this time period. As was the case with forecasted wage growth, the employment growth assumptions seem reasonable when compared to the recent actual employment growth for the entire City of Detroit over the last three fiscal years which averaged 0.4%.

# 10 Year Plan – Municipal Income Tax (Without RRIs)
## Taxable Income Growth Metrics

| | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | FY2014-2023 Average/Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **City Residents (A)** | | | | | | | | | | | |
| Wage Growth | 2.53% | 2.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | **1.25%** |
| Employment Growth | -0.59% | -0.55% | -0.54% | -0.54% | -0.54% | -0.54% | -0.35% | -0.35% | 0.00% | 0.00% | **-0.40%** |
| **Taxable income growth** | **1.94%** | **1.45%** | **0.46%** | **0.46%** | **0.46%** | **0.46%** | **0.65%** | **0.65%** | **1.00%** | **1.00%** | **0.85%** |
| | | | | | | | | | | | |
| **Non-Residents (B)** | | | | | | | | | | | |
| Wage Growth | 2.53% | 2.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | **1.25%** |
| Employment Growth | -0.30% | -0.30% | -0.30% | -0.30% | -0.30% | -0.31% | -0.50% | 0.19% | 0.69% | 0.69% | **-0.07%** |
| **Taxable income growth** | **2.23%** | **1.70%** | **0.70%** | **0.70%** | **0.70%** | **0.69%** | **0.50%** | **1.19%** | **1.69%** | **1.69%** | **1.18%** |
| | | | | | | | | | | | |
| **Corporations (C)** | | | | | | | | | | | |
| State CIT forecast (SFA est. May 2013) | 3.80% | 5.70% | 5.00% | 4.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | **3.65%** |
| Detroit structural adjust. | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | **-1.00%** |
| **Net growth rate** | **2.80%** | **4.70%** | **4.00%** | **3.00%** | **2.00%** | **2.00%** | **2.00%** | **2.00%** | **2.00%** | **2.00%** | **2.65%** |
| | | | | | | | | | | | |
| **Assumed Forecast Growth Rate** | **2.34%** | **2.50%** | **2.00%** | **2.00%** | **2.00%** | **1.50%** | **1.00%** | **1.00%** | **1.00%** | **1.00%** | **1.63%** |

## 10 Yr Plan with RRIs

The 10 Yr projections forecast annual municipal tax income through the estimation of the year-over-year ("YoY") growth in taxable income for the following subsections:

- City residents
  - Average annual YoY taxable income growth: 2.32%
  - Income tax rate: 2.4%
  - FY2014-FY2023 City resident income taxes: $1,693 million
- Non-residents
  - Average annual YoY taxable income growth: 2.37%
  - Income tax rate: 1.2%
  - FY2014-FY2023 non-resident income taxes: $817 million
- Corporations
  - Average annual YoY taxable income growth: 2.65%
  - Income tax rate: 2.0%
  - FY2014-FY2023 corporations income taxes: $260 million

Due primarily to the more optimistic City residents' taxable income growth assumptions in the "With Reinvestment Initiatives" scenario, the latter scenario

44

assumes an additional $204 million in municipal income tax revenue in the 2014-2023 time period.  A Sensitivity Analysis is provided below to gauge the impact of the City's actual results materially deviating from the 10 Yr Plan's forecast.

## 10 Year Plan – Municipal Income Tax (With RRIs)

| | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | FY2014-2023 Average/Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **City Residents (A)** | | | | | | | | | | | |
| Taxable income growth | 2.57% | 3.17% | 2.25% | 2.19% | 2.15% | 2.16% | 2.18% | 2.18% | 2.18% | 2.18% | **2.32%** |
| Taxable income | $ 6,332.7 | $ 6,533.4 | $ 6,680.7 | $ 6,827.2 | $ 6,974.0 | $ 7,124.5 | $ 7,279.5 | $ 7,437.9 | $ 7,599.7 | $ 7,765.0 | $ 70,554.5 |
| Income tax rate | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | |
| Total City Resident income taxes | 152.0 | 156.8 | 160.3 | 163.9 | 167.4 | 171.0 | 174.7 | 178.5 | 182.4 | 186.4 | 1,693.3 |
| **Non-Residents (B)** | | | | | | | | | | | |
| Taxable income growth | 2.91% | 3.29% | 2.18% | 2.18% | 2.18% | 2.18% | 2.18% | 2.18% | 2.18% | 2.18% | **2.37%** |
| Taxable income | $ 6,105.4 | $ 6,306.5 | $ 6,444.0 | $ 6,584.5 | $ 6,728.0 | $ 6,874.7 | $ 7,024.6 | $ 7,177.7 | $ 7,334.2 | $ 7,494.1 | $ 68,073.8 |
| Income tax rate | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | 1.2% | |
| Total Non-Resident income taxes | 73.3 | 75.7 | 77.3 | 79.0 | 80.7 | 82.5 | 84.3 | 86.1 | 88.0 | 89.9 | $ 816.9 |
| **Corporations (C)** | | | | | | | | | | | |
| Net tax collection growth | 2.80% | 4.70% | 4.00% | 3.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | **2.65%** |
| Taxable income (implied) | $ 1,133.4 | $ 1,186.6 | $ 1,234.1 | $ 1,271.1 | $ 1,296.5 | $ 1,322.5 | $ 1,348.9 | $ 1,375.9 | $ 1,403.4 | $ 1,431.5 | $ 13,004.0 |
| Corporate tax rate | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | |
| Net tax collections | 22.7 | 23.7 | 24.7 | 25.4 | 25.9 | 26.4 | 27.0 | 27.5 | 28.1 | 28.6 | $ 260.1 |
| **Total Municipal income taxes (D) = (A+B+C)** | | | | | | | | | | | |
| Taxable income | $13,571.4 | $14,026.5 | $14,358.7 | $14,682.8 | $14,998.6 | $15,321.7 | $15,653.0 | $15,991.5 | $16,337.3 | $16,690.6 | $ 151,632.2 |
| Calculated tax rate | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | 1.8% | **1.8%** |
| Total Municipal income taxes | 247.9 | 256.2 | 262.3 | 268.3 | 274.0 | 279.9 | 286.0 | 292.2 | 298.5 | 304.9 | $ 2,770.3 |
| **Adjustment Municipal income taxes** | | | | | | | | | | | |
| Adjustment for actuals | - | - | - | - | - | - | - | - | - | - | $ - |
| **Total Adjusted Municipal income taxes** | **247.9** | **256.2** | **262.3** | **268.3** | **274.0** | **279.9** | **286.0** | **292.2** | **298.5** | **304.9** | **2,770.3** |

## Wage Growth (with RRIs)

The 10 Yr projections estimate – for both the City residents and nonresident categories – an average wage growth of 2.16% for the FY2014-2023 period, or

roughly 91 basis points[25] higher than the "without RRIs" scenario. The wage growth forecast for corporations is 2.65%, or equivalent to the Michigan Senate Fiscal Agency assumption.

Employment Growth (with RRIs)

The number of City residents employed is forecasted to increase 0.15% for the FY2014-2023 period, while the non-residents' average annual employment is anticipated to increase 0.21% over this time period.

## 10 Year Plan – Municipal Income Tax (With RRIs)
### Taxable Income Growth Metrics

| | 2014 | 2015 | 2016 | Preliminary forecast 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | FY2014-2023 Average/Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **City Residents (A)** | | | | | | | | | | | |
| Wage Growth | 2.53% | 3.03% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | **2.16%** |
| Employment Growth | -0.13% | 0.14% | 0.25% | 0.19% | 0.15% | 0.16% | 0.18% | 0.18% | 0.18% | 0.18% | **0.15%** |
| **Taxable income growth** | **2.57%** | **3.17%** | **2.25%** | **2.19%** | **2.15%** | **2.16%** | **2.18%** | **2.18%** | **2.18%** | **2.18%** | **2.32%** |
| | | | | | | | | | | | |
| **Non-Residents (B)** | | | | | | | | | | | |
| Wage Growth | 2.53% | 3.03% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | **2.16%** |
| Employment Growth | 0.38% | 0.26% | 0.18% | 0.18% | 0.18% | 0.18% | 0.18% | 0.18% | 0.18% | 0.18% | **0.21%** |
| **Taxable income growth** | **2.91%** | **3.29%** | **2.18%** | **2.18%** | **2.18%** | **2.18%** | **2.18%** | **2.18%** | **2.18%** | **2.18%** | **2.37%** |
| | | | | | | | | | | | |
| **Corporations (C)** | | | | | | | | | | | |
| State CIT forecast (SFA  est. May 2013) | 3.80% | 5.70% | 5.00% | 4.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | **3.65%** |
| Detroit structural adjust. | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | -1.00% | **-1.00%** |
| **Taxable income growth** | **2.80%** | **4.70%** | **4.00%** | **3.00%** | **2.00%** | **2.00%** | **2.00%** | **2.00%** | **2.00%** | **2.00%** | **2.65%** |

---

[25] A basis point is equivalent to 0.01%; therefore 100 basis equals 1%

## Comparable Assumptions

When comparing the City of Detroit's wage growth assumptions versus its state or national estimates, the POA's wage assumptions appear reasonable in light of the City's history of lagging state/national statistics.

| Comparable Metric Analysis | |
|---|---|
| **Wage Growth** | |
| 10 Year Plan - without Reinvestment | 1.25% |
| 10 Year Plan - with Reinvestment | 2.16% |
| | |
| State | |
| Michigan Dept. of Treasury - FY2014 | 3.90% |
| Michigan Dept. of Treasury - FY2015 | 3.90% |
| Michigan Dept. of Treasury - FY2016 | 3.90% |
| Michigan Senate Fiscal Agency - FY2014 | 2.30% |
| Michigan Senate Fiscal Agency - FY2015 | 2.60% |
| | |
| Federal | |
| CBO - Real Wage Growth | 2.47% |

In a similar fashion to forecasted wage growth, the City's employment growth assumptions for FY2014-2023 are more conservative relative to the applicable State of Michigan forecasts and the City's recent actual results.

47

| Comparable Metric Analysis | |
|---|---|
| **Employment Growth** | |
| 10 Year Plan - City Residents - without Reinvestmen | -0.40% |
| 10 Year Plan - Non-Residents - without Reinvestme | -0.07% |
| 10 Year Plan - City Residents - with Reinvestment | 0.15% |
| 10 Year Plan - Non-Residents - with Reinvestment | 0.21% |
| | |
| State | |
| Michigan Dept. of Treasury - FY2014 | 1.50% |
| Michigan Dept. of Treasury - FY2015 | 1.40% |
| Michigan Dept. of Treasury - FY2016 | 1.40% |
| Michigan Senate Fiscal Agency - FY2014 | 0.80% |
| Michigan Senate Fiscal Agency - FY2015 | 0.50% |

## Sensitivity Analysis

The following analysis illustrates the incremental impact to the City of Detroit's actual taxable income if there are deviations to the forecasted metrics in the 10 Yr Plan. For Municipal Income taxes, while multiple economic assumptions factor into the final estimates, the driving metric is the annual growth rate of taxable income. As such, the analysis below estimates the impact of a 1 percentage point change in the forecasted growth rate, up or down, for each category of income tax payer in both scenarios.

| ($ million) | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | FY2014-2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **For Every 1% Change in Annual Taxable Income Growth Rate** | | | | | | | | | | | |
| **Without Reinvestment** | | | | | | | | | | | |
| City Residents | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | **15.5** |
| Non-Residents | 0.7 | 0.7 | 0.7 | 0.7 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | **7.5** |
| Corporations | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | **2.4** |
| **Total** | **2.4** | **2.5** | **2.5** | **2.5** | **2.5** | **2.6** | **2.6** | **2.6** | **2.6** | **2.6** | **25.4** |
| **With Reinvestment** | | | | | | | | | | | |
| City Residents | 1.5 | 1.5 | 1.6 | 1.6 | 1.6 | 1.7 | 1.7 | 1.7 | 1.8 | 1.8 | **16.6** |
| Non-Residents | 0.7 | 0.7 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.9 | 0.9 | **8.0** |
| Corporations | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | **2.5** |
| **Total** | **2.4** | **2.5** | **2.6** | **2.6** | **2.7** | **2.7** | **2.8** | **2.9** | **2.9** | **3.0** | **27.1** |

For the Without RRIs scenario, every 1 percentage point deviation in the 10 Yr Plan's assumption will result in an approximate $25 million in collected income tax revenues variance for the FY2014-2023 period. Due to higher income tax forecast in the With Reinvestment Initiatives case, the estimated variance – as compared to the original 10 Yr Plan - increases to $27 million over that ten year period in question.

State Revenue Sharing

The City of Detroit receives aid from the State of Michigan in connection with constitutional and statutory sharing of sales tax revenue and economic vitality incentive payments ("EVIP"). Per Michigan's constitution, the State is required to distribute 15% of all state taxes imposed on retailers. The constitutional revenue sharing is a function of a municipality's population relative to the other

49

municipalities in Michigan, while the statutory revenue sharing is distributed to municipalities that comply with certain "best practices" and reporting requirements.

| | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **State Revenue Sharing Calculations** | | | | | | | | | | | |
| Constitutional Payment | 53.5 | 54.8 | 56.9 | 58.5 | 60.2 | 62.0 | 63.8 | 57.3 | 59.0 | 60.7 | $ 586.8 |
| Statutory Payment | 136.3 | 140.5 | 140.5 | 140.5 | 140.5 | 140.5 | 140.5 | 140.5 | 140.5 | 140.5 | $ 1,400.5 |
| **Estimated State Revenue Sharing** | $ 189.8 | $ 195.3 | $ 197.4 | $ 199.0 | $ 200.7 | $ 202.5 | $ 204.3 | $ 197.8 | $ 199.5 | $ 201.2 | $ 1,987.3 |
| Other shared taxes (including liquor and beer license) | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.3 | $ 13.2 |
| **Total State Revenue Sharing** | $ 191.2 | $ 196.6 | $ 198.7 | $ 200.3 | $ 202.0 | $ 203.8 | $ 205.6 | $ 199.1 | $ 200.8 | $ 202.5 | $ 2,000.5 |

## Constitutional Payments

The State of Michigan's constitutional payments emanate from the statutory sharing of sales tax revenue and are based upon the population of Detroit (as measured by the decennial Census) as a percentage of the total State's population. The constitutional payments are distributed every other month via a formula multiplying Detroit's population by defined distribution rates.

The 10 Yr projections utilize Detroit's population from the 2010 Census – 712,501 – to factor the State's constitutional payment for the fiscal years 2014-2021. For FY2022 and FY2023, the 10 Yr Plan utilized the Southeast Michigan Council of Governments ("SEMCOG") forecast which reflects a 12.3% decline in Detroit's population to 625,152.

Statutory Payments

The State's EVIP funds are appropriated annually by the State Legislature and therefore carry more inherent risk than the mandated State constitutional payments. The EVIP funds are allocated per the following categories:

- Category 1 – Accountability and Transparency
  - Each municipality is required by October 1st to produce a citizen's guide of its most recent local finances, including a recognition of unfunded liabilities, a performance dashboard, a debt service report, and a project budget report
- Category 2 – Consolidation of Services
  - Each municipality is required by February 1st to produce a service consolidation plan that is submitted to the Michigan Department of the Treasury; including details of service cooperation, consolidations, and privatizations with estimated cost savings
- Category 3 – Unfunded Accrual Liability Plan
  - Each municipality with unfunded accrual liabilities is required by June 1st to produce a plan to lower all such unfunded accrual liabilities; detailing previous actions taken and a go forward plan of existing and new initiatives

The 10 Yr projections assume that the City continues to receive 100% of its possible State allocation, or approximately $140 million annually for the entire FY2014-2023 time period.

Sensitivity Analysis

The following analysis illustrates the incremental impact to the City if State Revenue Sharing deviates from the assumptions in the 10 Yr forecast. The analysis

below estimates the impact of a 5% change in the 2020 Census forecasted population and a 5% change in the statutory payment allocation. Because the constitutional payment is based on the 2010 Census figure through FY2021, the impact of a 5% population change would only be realized in FY2022 and FY2023. For the statutory payment, a 5% change in the allocation would have a cumulative impact of $70 million to the General Fund during the FY2014-2023 period.

| | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **For Every 5% Change in Applicable State Revenue Sharing Metric** | | | | | | | | | | | |
| Constitutional Payment | - | - | - | - | - | - | - | - | 3.0 | 3.0 | $ 6.0 |
| Statutory Payment | 6.8 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | $ 70.0 |
| **Total State Revenue Sharing** | $ 6.8 | $ 7.0 | $ 7.0 | $ 7.0 | $ 7.0 | $ 7.0 | $ 7.0 | $ 7.0 | $ 10.0 | $ 10.1 | $ 76.0 |

The City of Detroit recently saw its portion of State's revenue sharing decrease significantly, from a combined annual total of $267 million in FY2009 to as low as $173 million in FY2012. While the State's revenue sharing to Detroit has increased in FY2013 and FY2014, the City remains susceptible to decreases in revenue sharing should the State's budget position change.

Wagering Taxes

The City of Detroit, per the Michigan Gaming Control and Revenue Act, is authorized to impose a 10.9% wagering tax on casinos operating within the City. In addition, the City collects other fees from the casinos in the City based on operating

agreements with each. Wagering tax revenues are forecasted to account for 17% of General Fund revenue in the FY2014-2023 period.

| | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Wagering Taxes Drivers** | | | | | | | | | | | |
| % Change in Gross Receipts | -2.5% | -1.0% | 0.5% | 0.5% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 0.3% |
| **Wagering Taxes Calculation** | | | | | | | | | | | |
| Adjusted Gross Receipts (A) | | | | | | | | | | | |
| MGM | $ 565.4 | $ 559.7 | $ 562.5 | $ 565.3 | $ 571.0 | $ 576.7 | $ 582.5 | $ 588.3 | $ 594.2 | $ 600.1 | $ 5,765.8 |
| Motority | 445.6 | 441.2 | 443.4 | 445.6 | 450.0 | 454.5 | 459.1 | 463.7 | 468.3 | 473.0 | $ 4,544.4 |
| Greektown | 331.6 | 328.3 | 329.9 | 331.6 | 334.9 | 338.2 | 341.6 | 345.0 | 348.5 | 352.0 | $ 3,381.7 |
| | $ 1,342.6 | $ 1,329.2 | $ 1,335.8 | $ 1,342.5 | $ 1,355.9 | $ 1,369.5 | $ 1,383.2 | $ 1,397.0 | $ 1,411.0 | $ 1,425.1 | $ 13,691.8 |
| **Wagering Tax Rate (B)** | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | 10.9% | |
| **Additional Payment (per 2006 operating agreement)** | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | |
| **Subtotal Wagering Tax (D) = (A)*(B+C)** | | | | | | | | | | | |
| MGM | 67.3 | 66.6 | 66.9 | 67.3 | 67.9 | 68.6 | 69.3 | 70.0 | 70.7 | 71.4 | $ 686.1 |
| Motority | 53.0 | 52.5 | 52.8 | 53.0 | 53.6 | 54.1 | 54.6 | 55.2 | 55.7 | 56.3 | $ 540.8 |
| Greektown | 39.5 | 39.1 | 39.3 | 39.5 | 39.9 | 40.3 | 40.7 | 41.1 | 41.5 | 41.9 | $ 402.4 |
| **Revenue Target Supplemental Wagering Tax (E)** | | | | | | | | | | | |
| MGM | 5.7 | 5.6 | 5.6 | 5.7 | 5.7 | 5.8 | 5.8 | 5.9 | 6.0 | 6.0 | $ 57.8 |
| Motority | 4.5 | 4.4 | 4.4 | 4.5 | 4.5 | 4.6 | 4.6 | 4.6 | 4.7 | 4.7 | $ 45.5 |
| Greektown | - | - | - | - | - | - | - | - | - | - | $ - |
| **Total Wagering Tax (F) = (D+E)** | | | | | | | | | | | |
| MGM | 72.9 | 72.2 | 72.6 | 72.9 | 73.7 | 74.4 | 75.1 | 75.9 | 76.7 | 77.4 | $ 743.9 |
| Motority | 57.5 | 56.9 | 57.2 | 57.5 | 58.1 | 58.6 | 59.2 | 59.8 | 60.4 | 61.0 | $ 586.3 |
| Greektown | 39.5 | 39.1 | 39.3 | 39.5 | 39.9 | 40.3 | 40.7 | 41.1 | 41.5 | 41.9 | $ 402.4 |
| **Total Wagering Tax** | 169.9 | 168.2 | 169.0 | 169.9 | 171.6 | 173.3 | 175.0 | 176.8 | 178.6 | 180.3 | $ 1,732.6 |

As a result of the wagering tax rate (10.9%) and the additional 2006 tax rate (1.0%) being held constant, the key assumption in the 10 Yr forecast is the annual percentage change in casino gross receipts. The Detroit casinos have experienced increasing competition recently due to the openings of casinos in Cleveland and Toledo, Ohio resulting in declining wagering tax revenues for the City. The 10 Yr projections assume a 2.5% YoY decline in FY2014, a 1.0% decline in FY2015, a 0.5% annual increase in FY2016 and FY2017, and a 1.0% annual increase in FY2018-2023.

Through the first six calendar months of 2014, Detroit's aggregate casino revenues decreased 3.6% versus the same six month period in 2013. These actual results for the first six calendar months of 2014 represent a 110 basis points negative variance to the POA's FY2014 forecast and a 260 basis points negative variance to the FY2015 forecast.

Sensitivity Analysis

The following analysis illustrates the incremental impact of the City's actual Casino Wagering tax deviating from the assumptions in the 10 Yr projections. The analysis below estimates the impact of a 1% change, up or down, in the estimated casino gross receipts. The current projections assume casino gross receipts will average annual growth of 0.3% for FY2014-2023. Every 1 percentage point change in the gross receipts assumption will result in an approximate $16 million variance in the FY2014-2023 period.

| | | | | | Preliminary forecast | | | | | | 10 Year |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
| For Every 1% Change in Gross Receipts | | | | | | | | | | | |
| Annual Impact on Total Wagering Tax | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.7 | 1.7 | 16.2 |

54

## Sales and Charges for Services

Detroit receives revenues for City delivered-services such as maintenance and construction, recreation, ambulance services, court fees, permits and licenses, etc. Nearly half of these revenues are reflected as "Non Departmental" (e.g. municipal servicing fees on gross wagering revenues, personal services IPOs). Sales and Charges for Services revenues are forecasted to account for 11% of General Fund revenue in the FY2014-2023 period.

| | | | | | Preliminary forecast | | | | | | 10 Year |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
| Non-Departmental | 51.8 | 51.7 | 52.1 | 52.6 | 53.1 | 53.6 | 54.1 | 54.7 | 55.2 | 55.7 | **534.7** |
| PLD | 41.2 | 28.7 | 26.1 | 23.5 | 20.8 | 18.1 | 15.3 | 12.3 | 10.6 | 10.7 | **207.2** |
| Fire | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | 14.9 | **149.0** |
| 36th District Court | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | **100.3** |
| Police | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 | **45.8** |
| General Services | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | **23.1** |
| Human Resources | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | **22.5** |
| Law | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | **17.3** |
| Health & Wellness | 1.0 | - | - | - | - | - | - | - | - | - | **1.0** |
| ITS | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | **5.1** |
| Other | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | **12.0** |
| **Sales and charges for services** | **$ 131.5** | **$ 118.0** | **$ 115.8** | **$ 113.6** | **$ 111.4** | **$ 109.2** | **$ 107.0** | **$ 104.4** | **$ 103.3** | **$ 104.0** | **$ 1,118.0** |
| **YoY $ Change** | **$ 7.7** | **$ (13.5)** | **$ (2.2)** | **$ (2.2)** | **$ (2.2)** | **$ (2.2)** | **$ (2.2)** | **$ (2.5)** | **$ (1.1)** | **$ 0.7** | |
| **YoY % Change** | **6.2%** | **-10.3%** | **-1.9%** | **-1.9%** | **-1.9%** | **-2.0%** | **-2.0%** | **-2.4%** | **-1.1%** | **0.6%** | |

During the ten year period, the largest change relates to transitioning responsibility for the City's street lights from the PLD to the Public Lighting Authority beginning in FY2014. When the seven year transition is complete, the City will no longer collect revenue from external customers. The balance of the revenue categories are assumed to remain relatively constant over the FY2014-2023 time period.

55

## Property Taxes

The City of Detroit levies property taxes to fund general operations and support various tax obligations. Detroit also levies additional property taxes to fund the Detroit Public Library, Detroit Public Schools, Wayne County Community College, the State of Michigan, and a number of special authorities.

### City of Detroit Millage

- Non-Departmental (General City): 19.9520 mills
- Debt Service: 9.771 mills
- Library: 4.631 mills

Property tax revenues are forecasted to account for approximately 9% of General Fund revenue in the FY2014-2023 period. As previously mentioned, the City's Plan of Adjustment estimates revenues for the 10 year period covering FY2014-2023 both with and without the incremental revenue associated with the RRIs. The following analysis illustrates the "without RRIs" scenario.

### 10 Yr Projections - Without RRIs

The City's forecasted property tax revenues, due to the relatively-constant millage rates, are largely predicated upon the assumed changes in assessed property values and the estimated collection rates going forward.

56

Assessed Property Values

The 10 Yr projections assume individualized, average annual property value growth rates for each of the City's three property classifications: real property, personal property, and the Renaissance Zone. The 10 Yr projections assume real property values will decline 4% annually during the FY2014-2023 period, and personal property values will decline 0.3% for the same time period. The Renaissance Zone forecast assumes a 4.8% annual increase – aided by the 47% forecasted growth assumption in FY2014 which is consistent with the FY2012-2013 average.

Collection Rates

The POA forecast assumes improving property tax collections over the FY2014-2023 timeframe. The 10 Yr projections assume that collections for the non-departmental property taxes improve from an assumed 78% in FY2014 to 80% in FY2015-2019 to 84% in the last four years of this ten year period. Estimated collections for debt service is projected to decrease from an assumed 82% in FY2014 to 80% in FY2015-2019 to 84% in the last four years of this ten year period. Estimated collections for library property taxes are assumed to improve from 82% in FY2014-2016 to 84% in FY 2017 to 85% in FY2018-2023.

57

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Preliminary forecast | | | | | | |
| **Change in assessed values** | | | | | | | | | | | |
| Real Property | -6.4% | -14.0% | -3.8% | -2.7% | -2.4% | -2.3% | -9.6% | -0.1% | 0.7% | 0.7% | **-4.0%** |
| Personal Property | -1.5% | -1.2% | -1.1% | -0.7% | -0.2% | -0.1% | 0.3% | 0.3% | 0.4% | 0.4% | **-0.3%** |
| Renaissance Zone | 47.3% | -11.8% | 1.0% | 1.0% | 1.0% | 1.5% | 2.0% | 2.0% | 2.0% | 2.0% | **4.8%** |
| **Values** | | | | | | | | | | | |
| Real Property | $6,200.3 | $5,335.3 | $5,134.4 | $4,993.6 | $4,874.8 | $4,762.7 | $4,307.4 | $4,303.0 | $4,333.2 | $4,363.7 | |
| Personal Property | 1,183.7 | 1,169.0 | 1,156.0 | 1,148.3 | 1,145.8 | 1,144.6 | 1,147.9 | 1,151.2 | 1,155.7 | 1,160.3 | |
| Total Valuation (for Non-Departmental & Library) | $7,384.0 | $6,504.3 | $6,290.4 | $6,141.9 | $6,020.6 | $5,907.3 | $5,455.3 | $5,454.1 | $5,488.9 | $5,524.0 | |
| Renaissance Zone | 917.2 | 809.1 | 817.2 | 825.4 | 833.7 | 846.2 | 863.1 | 880.4 | 898.0 | 915.9 | |
| Total Valuation (for Debt Service) | $8,301.2 | $7,313.4 | $7,107.6 | $6,967.4 | $6,854.3 | $6,753.5 | $6,318.4 | $6,334.5 | $6,386.9 | $6,439.9 | |
| *Millage* | | | | | | | | | | | |
| *Non-Departmental (General City)* | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | |
| *Debt Service* | 9.771 | 10.699 | 10.143 | 10.343 | 10.311 | 10.013 | 10.060 | 9.896 | 7.030 | 6.270 | |
| *Library* | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | |
| **Adjusted tax levy** | | | | | | | | | | | |
| Non-Departmental (General City) | $ 147.3 | $ 128.2 | $ 124.0 | $ 121.0 | $ 118.6 | $ 116.4 | $ 107.3 | $ 107.3 | $ 108.0 | $ 108.7 | $ **1,186.9** |
| Debt Service | 81.1 | 78.2 | 72.1 | 72.1 | 70.7 | 67.6 | 63.6 | 62.7 | 44.9 | 40.4 | **653.3** |
| Library | 34.2 | 30.1 | 29.1 | 28.4 | 27.9 | 27.4 | 25.3 | 25.3 | 25.4 | 25.6 | **278.6** |
| Total | $ 262.6 | $ 236.6 | $ 225.2 | $ 221.5 | $ 217.2 | $ 211.3 | $ 196.2 | $ 195.3 | $ 178.3 | $ 174.7 | $ **2,118.9** |
| **Collection rate** | | | | | | | | | | | |
| *Non-Departmental (General City)* | 78.0% | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% | 84.0% | 84.0% | 84.0% | 84.0% | **81.4%** |
| *Debt Service* | 82.0% | 80.0% | 80.0% | 80.0% | 80.0% | 80.0% | 84.0% | 84.0% | 84.0% | 84.0% | **81.8%** |
| *Library* | 82.0% | 82.0% | 82.0% | 84.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | **84.0%** |
| **City collections** | | | | | | | | | | | |
| Non-Departmental (General City) [A] | $ 114.9 | $ 102.6 | $ 99.2 | $ 96.8 | $ 94.9 | $ 93.1 | $ 90.2 | $ 90.1 | $ 90.7 | $ 91.3 | $ **963.8** |
| Debt Service | 66.5 | 62.6 | 57.7 | 57.6 | 56.5 | 54.1 | 53.4 | 52.7 | 37.7 | 33.9 | **532.8** |
| Library | 28.0 | 24.7 | 23.9 | 23.9 | 23.7 | 23.3 | 21.5 | 21.5 | 21.6 | 21.7 | **233.8** |
| Total | $ 209.5 | $ 189.9 | $ 180.7 | $ 178.4 | $ 175.1 | $ 170.4 | $ 165.0 | $ 164.3 | $ 150.0 | $ 147.0 | $ **1,730.3** |
| **General fund collections [A]+[B]** | $ 114.9 | $ 102.6 | $ 99.2 | $ 96.8 | $ 94.9 | $ 93.1 | $ 90.2 | $ 90.1 | $ 90.7 | $ 91.3 | $ **963.8** |

## Components of Property Tax Value

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Preliminary forecast | | | | | | |
| **Components of Property Taxable Value (non - RZ)** | | | | | | | | | | | |
| Residential Property | 3,948.1 | 3,138.7 | 2,981.7 | 2,862.5 | 2,748.0 | 2,638.0 | 2,176.4 | 2,165.5 | 2,187.2 | 2,209.0 | |
| Real Property - Commercial | 1,786.9 | 1,750.0 | 1,715.0 | 1,697.8 | 1,697.8 | 1,697.8 | 1,706.3 | 1,714.8 | 1,723.4 | 1,732.0 | |
| Real Property - Industrial | 465.4 | 446.7 | 437.7 | 433.4 | 429.0 | 426.9 | 424.7 | 422.6 | 422.6 | 422.6 | |
| **Total - Real Property** | **6,200.3** | **5,335.3** | **5,134.4** | **4,993.6** | **4,874.8** | **4,762.7** | **4,307.4** | **4,303.0** | **4,333.2** | **4,363.7** | |
| *Forecasted YoY Change - Real Property* | | | | | | | | | | | |
| *Residential Property* | -7.4% | -20.5% | -5.0% | -4.0% | -4.0% | -4.0% | -17.5% | -0.5% | 1.0% | 1.0% | **-6.1%** |
| *Real Property - Commercial* | -5.0% | -2.1% | -2.0% | -1.0% | 0.0% | 0.0% | 0.5% | 0.5% | 0.5% | 0.5% | **-0.8%** |
| *Real Property - Industrial* | -2.5% | -4.0% | -2.0% | -1.0% | -1.0% | -0.5% | -0.5% | -0.5% | 0.0% | 0.0% | **-1.2%** |
| *Total - Real Property* | *-6.4%* | *-14.0%* | *-3.8%* | *-2.7%* | *-2.4%* | *-2.3%* | *-9.6%* | *-0.1%* | *0.7%* | *0.7%* | ***-4.0%*** |
| Personal Property - Commercial | 529.5 | 524.1 | 513.6 | 508.5 | 508.5 | 508.5 | 511.0 | 513.6 | 516.2 | 518.7 | |
| Personal Property - Industrial | 290.4 | 253.7 | 251.2 | 248.7 | 246.2 | 244.9 | 243.7 | 242.5 | 242.5 | 242.5 | |
| Personal Property - Utility | 363.7 | 391.2 | 391.2 | 391.2 | 391.2 | 391.2 | 393.1 | 395.1 | 397.1 | 399.0 | |
| **Total - Personal Property** | **1,183.7** | **1,169.0** | **1,156.0** | **1,148.3** | **1,145.8** | **1,144.6** | **1,147.9** | **1,151.2** | **1,155.7** | **1,160.3** | |
| *Forecasted YoY Change - Personal Property* | | | | | | | | | | | |
| *Personal Property - Commercial* | -3.8% | -1.0% | -2.0% | -1.0% | 0.0% | 0.0% | 0.5% | 0.5% | 0.5% | 0.5% | **-0.6%** |
| *Personal Property - Industrial* | 3.2% | -12.6% | -1.0% | -1.0% | -1.0% | -0.5% | -0.5% | -0.5% | 0.0% | 0.0% | **-1.4%** |
| *Personal Property - Utility* | -1.6% | 7.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.5% | 0.5% | 0.5% | **0.8%** |
| *Total - Personal Property* | *-1.5%* | *-1.2%* | *-1.1%* | *-0.7%* | *-0.2%* | *-0.1%* | *0.3%* | *0.3%* | *0.4%* | *0.4%* | ***-0.3%*** |

<u>10 YR Projections - With RRIs</u>

<u>Assessed Property Values</u>

The 10 Yr projections – with RRIs - assumes real property values will decline 1.7% during the FY2014-2023 period, and personal property will increase by 0.9% during that same time period. The Renaissance Zone is forecasted to increase 4.8% annually during the ten year period – aided by the 47% forecasted growth assumption in FY2014.

In January 2014, the City launched a property tax assessment reform designed to make Detroit more attractive to current and prospective residents. As initial studies have indicated that significant portions of the City are over-assessed, the assessment reform is likely to result, in the near term, in reduced assessments and property tax revenues. This scenario is forecasted via an assumed 9% decline in real property assessments in FY2015 and a 3-4% drop in FY2015. The City believes that reduced assessments will result in improved property tax collection rates and, in the longer term, increased property values as Detroit becomes a more desirable location.

<u>Collection Rates</u>

The POA forecast assumes improving property tax collection over the FY2014-2023 timeframe. The 10 Yr projections assume collections for non-

59

departmental property taxes improve from a 78-82% range the 1st six years of the ten year period to 87% in the four years at the end of this period. The 10 Yr projections assume collections for debt service improve from a 78-82% range the 1st six years of the ten year period to 87% in the four years at the end of this period. Estimated collections for library property taxes are assumed to improve from 82% in FY2014-2016 to 84% in FY 2017 to 85% in FY2018-2023.

| | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Change in assessed values** | | | | | | | | | | | |
| Real Property | -6.4% | -14.0% | -2.0% | -1.3% | 0.0% | 1.2% | -4.1% | 2.8% | 3.5% | 3.5% | -1.7% |
| Personal Property | -1.5% | -1.2% | -0.3% | 1.0% | 1.0% | 1.8% | 1.8% | 2.0% | 2.2% | 2.2% | 0.9% |
| Renaissance Zone | 47.3% | -11.8% | 1.0% | 1.0% | 1.0% | 1.5% | 2.0% | 2.0% | 2.0% | 2.0% | 4.8% |
| **Values** | | | | | | | | | | | |
| Real Property | $6,200.3 | $5,335.3 | $5,228.1 | $5,158.6 | $5,158.4 | $5,218.0 | $5,005.5 | $5,146.4 | $5,328.1 | $5,516.5 | |
| Personal Property | 1,183.7 | 1,169.0 | 1,164.9 | 1,176.6 | 1,188.4 | 1,209.5 | 1,231.1 | 1,255.7 | 1,283.7 | 1,312.5 | |
| Total Valuation (for Non-Departmental & Library) | $7,384.0 | $6,504.3 | $6,393.0 | $6,335.2 | $6,346.8 | $6,427.5 | $6,236.5 | $6,402.1 | $6,611.9 | $6,828.9 | |
| Renaissance Zone | 917.2 | 809.1 | 817.2 | 825.4 | 833.7 | 846.2 | 863.1 | 880.4 | 898.0 | 915.9 | |
| Total Valuation (for Debt Service) | $8,301.2 | $7,313.4 | $7,210.3 | $7,160.6 | $7,180.4 | $7,273.6 | $7,099.6 | $7,282.4 | $7,509.9 | $7,744.9 | |
| **Millage** | | | | | | | | | | | |
| Non-Departmental (General City) | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | 19.952 | |
| Debt Service | 9.771 | 10.699 | 9.999 | 9.818 | 9.603 | 9.070 | 8.645 | 8.311 | 5.773 | 5.034 | |
| Library | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | 4.631 | |
| **Adjusted tax levy** | | | | | | | | | | | |
| Non-Departmental (General City) | $ 147.3 | $ 128.2 | $ 126.0 | $ 124.8 | $ 125.1 | $ 126.6 | $ 122.8 | $ 126.1 | $ 130.2 | $ 134.5 | $ 1,291.8 |
| Debt Service | 81.1 | 78.2 | 72.1 | 70.3 | 69.0 | 66.0 | 61.4 | 60.5 | 43.4 | 39.0 | 640.9 |
| Library | 34.2 | 30.1 | 29.6 | 29.3 | 29.4 | 29.8 | 28.9 | 29.6 | 30.6 | 31.6 | 303.2 |
| Total | $ 262.6 | $ 236.6 | $ 227.7 | $ 224.5 | $ 223.4 | $ 222.4 | $ 213.1 | $ 216.3 | $ 204.2 | $ 205.1 | $ 2,235.9 |
| **Collection rate** | | | | | | | | | | | |
| Non-Departmental (General City) | 78.0% | 80.0% | 80.0% | 82.0% | 82.0% | 82.0% | 87.0% | 87.0% | 87.0% | 87.0% | 83.2% |
| Debt Service | 82.0% | 80.0% | 80.0% | 82.0% | 82.0% | 82.0% | 87.0% | 87.0% | 87.0% | 87.0% | 83.6% |
| Library | 82.0% | 82.0% | 82.0% | 84.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 84.0% |
| **City collections** | | | | | | | | | | | |
| Non-Departmental (General City) [A] | $ 114.9 | $ 102.6 | $ 100.8 | $ 102.4 | $ 102.6 | $ 103.9 | $ 106.8 | $ 109.7 | $ 113.3 | $ 117.0 | $ 1,074.0 |
| Debt Service | 66.5 | 62.6 | 57.7 | 57.6 | 56.5 | 54.1 | 53.4 | 52.7 | 37.7 | 33.9 | 532.8 |
| Library | 28.0 | 24.7 | 24.3 | 24.6 | 25.0 | 25.3 | 24.5 | 25.2 | 26.0 | 26.9 | 254.6 |
| Total | $ 209.5 | $ 189.9 | $ 182.8 | $ 184.7 | $ 184.1 | $ 183.2 | $ 184.8 | $ 187.5 | $ 177.0 | $ 177.8 | $ 1,861.3 |
| **General fund collections [A]+[B]** | $ 114.9 | $ 102.6 | $ 100.8 | $ 102.4 | $ 102.6 | $ 103.9 | $ 106.8 | $ 109.7 | $ 113.3 | $ 117.0 | $ 1,074.0 |

# Components of Property Tax Value

| | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Components of Property Taxable Value (non - RZ)** | | | | | | | | | | | |
| Residential Property | 3,948.1 | 3,138.7 | 3,044.5 | 2,953.2 | 2,908.9 | 2,923.4 | 2,660.3 | 2,740.1 | 2,849.7 | 2,963.7 | |
| Real Property - Commercial | 1,786.9 | 1,750.0 | 1,732.5 | 1,749.8 | 1,784.8 | 1,820.5 | 1,856.9 | 1,903.3 | 1,960.4 | 2,019.2 | |
| Real Property - Industrial | 465.4 | 446.7 | 451.1 | 455.7 | 464.8 | 474.1 | 488.3 | 502.9 | 518.0 | 533.6 | |
| **Total - Real Property** | 6,200.3 | 5,335.3 | 5,228.1 | 5,158.6 | 5,158.4 | 5,218.0 | 5,005.5 | 5,146.4 | 5,328.1 | 5,516.5 | |
| ***Forecasted YoY Change - Real Property*** | | | | | | | | | | | |
| *Residential Property* | -7.4% | -20.5% | -3.0% | -3.0% | -1.5% | 0.5% | -9.0% | 3.0% | 4.0% | 4.0% | **-3.3%** |
| *Real Property - Commercial* | -5.0% | -2.1% | -1.0% | 1.0% | 2.0% | 2.0% | 2.0% | 2.5% | 3.0% | 3.0% | **0.7%** |
| *Real Property - Industrial* | -2.5% | -4.0% | 1.0% | 1.0% | 2.0% | 2.0% | 3.0% | 3.0% | 3.0% | 3.0% | **1.1%** |
| ***Total - Real Property*** | -6.4% | -14.0% | -2.0% | -1.3% | 0.0% | 1.2% | -4.1% | 2.8% | 3.5% | 3.5% | **-1.7%** |
| Personal Property - Commercial | 529.5 | 524.1 | 513.6 | 518.8 | 523.9 | 534.4 | 545.1 | 558.7 | 575.5 | 592.8 | |
| Personal Property - Industrial | 290.4 | 253.7 | 256.3 | 258.8 | 261.4 | 264.0 | 266.7 | 269.3 | 272.0 | 274.7 | |
| Personal Property - Utility | 363.7 | 391.2 | 395.1 | 399.0 | 403.0 | 411.1 | 419.3 | 427.7 | 436.2 | 445.0 | |
| **Total - Personal Property** | 1,183.7 | 1,169.0 | 1,164.9 | 1,176.6 | 1,188.4 | 1,209.5 | 1,231.1 | 1,255.7 | 1,283.7 | 1,312.5 | |
| ***Forecasted YoY Change - Personal Property*** | | | | | | | | | | | |
| *Personal Property - Commercial* | -3.8% | -1.0% | -2.0% | 1.0% | 1.0% | 2.0% | 2.0% | 2.5% | 3.0% | 3.0% | **0.8%** |
| *Personal Property - Industrial* | 3.2% | -12.6% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% | **-0.1%** |
| *Personal Property - Utility* | -1.6% | 7.5% | 1.0% | 1.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | **1.9%** |
| ***Total - Personal Property*** | -1.5% | -1.2% | -0.3% | 1.0% | 1.0% | 1.8% | 1.8% | 2.0% | 2.2% | 2.2% | **0.9%** |

## Sensitivity Analysis

The Sensitivity analysis below estimates the impact of a 1% change in the forecasted collection rate for each category of property classification in both the "with RRIs" and "without RRIs" scenarios.

| | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | FY2014-2023 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **For Every 1% Change in Annual Collection Rates** | | | | | | | | | | | |
| **Without Reinvestment** | | | | | | | | | | | |
| Real Property | 1.5 | 1.3 | 1.2 | 1.2 | 1.2 | 1.2 | 1.1 | 1.1 | 1.1 | 1.1 | **11.9** |
| Personal Property | 0.8 | 0.8 | 0.7 | 0.7 | 0.7 | 0.7 | 0.6 | 0.6 | 0.4 | 0.4 | **6.5** |
| Renaissance Zone | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | **2.8** |
| **Total** | 2.6 | 2.4 | 2.3 | 2.2 | 2.2 | 2.1 | 2.0 | 2.0 | 1.8 | 1.7 | **21.2** |
| **With Reinvestment** | | | | | | | | | | | |
| Real Property | 1.5 | 1.3 | 1.3 | 1.2 | 1.3 | 1.3 | 1.2 | 1.3 | 1.3 | 1.3 | **12.9** |
| Personal Property | 0.8 | 0.8 | 0.7 | 0.7 | 0.7 | 0.7 | 0.6 | 0.6 | 0.4 | 0.4 | **6.4** |
| Renaissance Zone | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | **3.0** |
| **Total** | 2.6 | 2.4 | 2.3 | 2.2 | 2.2 | 2.2 | 2.1 | 2.2 | 2.0 | 2.1 | **22.4** |

For the Without RRIs scenario, every 1% change in the 10 Yr assumption will result in an approximate $21 million change in collected income tax revenues in the

FY2014-2023 period. Due to higher property tax collection forecast in the With RRIs case, the estimated variance increases to $22 million over that ten year period in question.

## Utility Users' Taxes

The City of Detroit is the only city in Michigan authorized to levy a 5% utility users' excise tax. The City imposes this tax on consumers of telephone, electric, steam, and gas services. Utility users' tax revenues are forecasted to account for approximately 2% of General Fund revenue in the FY2014-2023 period.

| | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **WITHOUT REINVESTMENT** | | | | | | | | | | | |
| Utility users tax collections - Gross | $ 37.0 | $ 37.0 | $ 37.0 | $ 37.4 | $ 37.8 | $ 38.2 | $ 38.6 | $ 38.9 | $ 39.3 | $ 39.7 | $ 381.0 |
| Less: PLA transfer | (16.9) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (129.4) |
| **Utility users tax collections - Net** | $ 20.1 | $ 24.5 | $ 24.5 | $ 24.9 | $ 25.3 | $ 25.7 | $ 26.1 | $ 26.4 | $ 26.8 | $ 27.2 | $ 251.6 |
| *YoY % Change* | *-43.0%* | *22.1%* | *0.0%* | *1.5%* | *1.5%* | *1.5%* | *1.5%* | *1.5%* | *1.5%* | *1.5%* | *-1.0%* |
| **WITH REINVESTMENT** | | | | | | | | | | | |
| Utility users tax collections - Gross | $ 37.0 | $ 37.0 | $ 37.4 | $ 38.0 | $ 38.5 | $ 38.9 | $ 39.3 | $ 39.7 | $ 40.1 | $ 40.5 | $ 386.6 |
| Less: PLA transfer | (16.9) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (129.4) |
| **Utility users tax collections - Net** | $ 20.1 | $ 24.5 | $ 24.9 | $ 25.5 | $ 26.0 | $ 26.4 | $ 26.8 | $ 27.2 | $ 27.6 | $ 28.0 | $ 257.2 |
| *YoY % Change* | *-43.0%* | *22.1%* | *1.5%* | *2.3%* | *2.2%* | *1.5%* | *1.5%* | *1.5%* | *1.5%* | *1.5%* | *-0.8%* |

## Other Revenues

The City of Detroit annually generates revenues for City-services related to permits, licenses, parking fines, grant revenues, and 36th District Court fees. Grant revenue is comprised of approximately $11 million in Fire Department SAFER grants in FY2015 and 2016, $4-5 million annually in Police Department grants, with the balance related to Homeland Security, health initiatives, and the planning and

development department.   Other revenues are forecasted to account for approximately 7% of General Fund revenue in the FY2014-2023 period.

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Preliminary forecast | | | | | | |
| Parking/court fines and other revenue | $ 29.2 | $ 29.2 | $ 29.2 | $ 29.2 | $ 29.2 | $ 29.2 | $ 29.2 | $ 29.2 | $ 29.2 | $ 29.2 | $ 291.9 |
| *YoY % Change* | -7.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | **-0.7%** |
| Grant revenue | $ 27.9 | $ 27.1 | $ 25.6 | $ 14.2 | $ 14.5 | $ 14.8 | $ 15.0 | $ 15.3 | $ 15.5 | $ 15.8 | $ 185.7 |
| *YoY % Change* | -52.0% | -3.1% | -5.3% | -44.7% | 2.5% | 1.7% | 1.7% | 1.7% | 1.6% | 1.6% | **-9.4%** |
| Licenses, permits and inspection charges | $ 9.0 | $ 9.1 | $ 9.1 | $ 9.1 | $ 9.2 | $ 9.2 | $ 9.3 | $ 9.3 | $ 9.3 | $ 9.4 | $ 92.0 |
| *YoY % Change* | -15.5% | 0.4% | 0.4% | 0.4% | 0.4% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | **-1.1%** |
| Revenue from use of assets | $ 4.1 | $ 11.7 | $ 5.2 | $ 5.2 | $ 3.6 | $ 3.6 | $ 3.6 | $ 3.6 | $ 3.6 | $ 3.6 | $ 47.6 |
| *YoY % Change* | -64.3% | 185.7% | -55.4% | 0.0% | -31.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | **3.4%** |
| Other Taxes | $ 9.6 | $ 9.6 | $ 9.6 | $ 9.6 | $ 9.6 | $ 9.6 | $ 9.6 | $ 9.6 | $ 9.6 | $ 9.6 | $ 95.6 |
| *YoY % Change* | -16.7% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | **-1.7%** |
| **Total - Other Revenue** | **$ 79.8** | **$ 86.6** | **$ 78.7** | **$ 67.3** | **$ 66.0** | **$ 66.3** | **$ 66.6** | **$ 66.9** | **$ 67.2** | **$ 67.5** | **$ 712.8** |
| | **-28.6%** | **8.5%** | **-9.1%** | **-14.5%** | **-1.9%** | **0.4%** | **0.5%** | **0.4%** | **0.4%** | **0.4%** | **-4.3%** |

# Section G - Operating Expenditures

Summary[26]

The operating expenditures in the City of Detroit's POA 40 Yr Projections are summarized below:

| General Fund Operating Expenditures | FY2014-2023 | | FY2024-2033 | | FY2034-2043 | | FY2044-2053 | |
|---|---|---|---|---|---|---|---|---|
| Salaries/Overtime/Fringe | $ | 3,768 | 47.3% | $ | 4,612 | 48.8% | $ | 5,700 | 48.1% | $ | 7,121 | 47.5% |
| Health Benefits | $ | 753 | 9.4% | $ | 928 | 9.8% | $ | 1,374 | 11.6% | $ | 2,034 | 13.6% |
| Active Pension | $ | 348 | 4.4% | $ | 444 | 4.7% | $ | 548 | 4.6% | $ | 683 | 4.6% |
| OPEB Future Retirees | $ | 32 | 0.4% | $ | 37 | 0.4% | $ | 43 | 0.4% | $ | 51 | 0.3% |
| Other Operating Expenses | $ | 3,073 | 38.5% | $ | 3,437 | 36.3% | $ | 4,190 | 35.3% | $ | 5,108 | 34.1% |
| **Total General Fund Operating Expenditures** | **$** | **7,974** | **100.0%** | **$** | **9,458** | **100.0%** | **$** | **11,855** | **100.0%** | **$** | **14,997** | **100.0%** |

The City's 10 Yr projections were developed by E&Y primarily to reflect the "baseline" financial condition of the City in the summer of 2013, assuming no changes in legacy obligations. These projections were prepared in significant detail and are the initial building block for the financial forecasts that are contained in the POA. The analysis below identifies the City's individual operating expense categories, the estimated growth for each category, and the key assumptions utilized. These expenditures exclude the expenditures related to the RRIs even though the

---

[26] Unless otherwise stated the financial projections referenced section G are sourced from the bibliography: Ernst & Young Models: 10-11

64

categories are similar. Section H includes the analysis of the expenditures associated with the RRIs.

The detailed operating expenditures in the 10 Yr forecast are as follows[27]:

| General Fund Operating Expenditures | FY2014-2023 | |
|---|---|---|
| | $ | % of Costs |
| Salaries & Wages | $ 3,165 | 39.7% |
| Health Benefits | $ 753 | 9.4% |
| Overtime | $ 326 | 4.1% |
| Other Benefits | $ 278 | 3.5% |
| Active Pension | $ 348 | 4.4% |
| OPEB Future Retirees | $ 32 | 0.4% |
| Professional and contractual services | $ 559 | 7.0% |
| Risk management and insurance | $ 445 | 5.6% |
| Materials & supplies | $ 376 | 4.7% |
| Utilities | $ 296 | 3.7% |
| Purchased services | $ 230 | 2.9% |
| Other expenses | $ 359 | 4.5% |
| Maintenance capital | $ 62 | 0.8% |
| Contributions to non enterprise funds | $ 216 | 2.7% |
| DDOT subsidy | $ 530 | 6.7% |
| **Total General Fund Operating Expenditures General Fund** | **$ 7,974** | **100.0%** |
| | | |
| **Operating Surplus Prior to Legacy, Non Operating Expenses and RRI's** | **$ 2,781** | |

---

[27] The analysis shows both estimates from the base 10 Yr plan and estimates from the 40 year plan including pension and OPEB payments to future retirees. The analysis was done to estimate a run rate operating surplus prior to accounting for the RRIs.

Salaries & Wages

Salaries and wages related to the General Fund were $297.6 million in FY2013 and accounted for 40.4% of the City's estimated operating expenses. By FY2023, the City is projecting Salaries and Wages to represent 39.7% of operating expenses prior to the additional headcount from the RRIs.

Headcount

City-wide headcount in FY2013 was 10,043[28] versus the prior 5 year average of 12,610. The City projected headcount using the projected FY2013 headcount by department and assuming that headcount remained constant over the next ten years except for the following exceptions:

- Departments that are being outsourced including: DWDD, Human Services, PLD, Homeland Security and the majority of the Health and Wellness and City Council Departments. The City also adjusted some department headcount estimates higher or lower than FY2013 based on the most recent information from FY2014
- The Finance and HR department headcount reductions due to the implementation of a new payroll service in FY2017
- The Police and Fire Departments include projections for attrition and new hires beginning in FY2015

_____

[28] The 2013 headcount is from the 10 Yr base model and was the estimated headcount when the financial model was initially prepared. The assumptions are based off of the projected headcount going forward. Actual headcount by department differs by this amount. The analysis in this section will reference the 2013 headcount in the base 10 Yr plan.

66

Total employees across all departments is projected to be 9,742 in FY2023 versus 10,043 in FY2013 or a 3.1% decrease. The average headcount from FY2008-FY2012 was 12,610 and the FY2023 headcount represents a 22.7% decrease from this level. Projected headcount by department:

| Department | 2014 | 2015 | 2016 | 2017 | Preliminary Forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| Police | 2,706 | 2,747 | 2,882 | 2,895 | 2,895 | 2,895 | 2,895 | 2,895 | 2,895 | 2,895 |
| Fire | 1,183 | 1,238 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 | 1,228 |
| Transportation | 978 | 1,048 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 | 1,065 |
| Sewer | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 | 1,016 |
| Water | 873 | 873 | 873 | 873 | 873 | 873 | 873 | 873 | 873 | 873 |
| 36th District Court | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 | 362 |
| Library | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 | 335 |
| General Services | 298 | 272 | 272 | 272 | 272 | 272 | 272 | 272 | 272 | 272 |
| Waste | 265 | 265 | 265 | 265 | 265 | 265 | 265 | 265 | 265 | 265 |
| Streets | 230 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 |
| Finance | 216 | 216 | 216 | 206 | 206 | 206 | 206 | 206 | 206 | 206 |
| Recreation | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 | 202 |
| BSED | 192 | 192 | 192 | 192 | 192 | 192 | 192 | 192 | 192 | 192 |
| Planning & Development | 116 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 |
| Parking | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 |
| Law | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 |
| Elections | 80 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| Human Resources | 84 | 84 | 84 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| ITS | 35 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 |
| Mayor | 22 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 |
| Public Works | 14 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 19 |
| Non-Departmental | 21 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| Auditor General | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| Budget | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 |
| City Clerk | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 |
| Zoning | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| City Council | 9 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| Health & Wellness | 14 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |
| Ombudsperson | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| Human Rights | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| Airport | 5 | 5 | 5 | 5 | 5 | 3 | 5 | 5 | 5 | 5 |
| Administrative Hearings | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| PLD | 70 | 12 | 7 | 5 | 3 | 3 | 3 | 2 | - | - |
| **Total** | **9,578** | **9,634** | **9,770** | **9,747** | **9,745** | **9,745** | **9,745** | **9,744** | **9,742** | **9,742** |

A comparison of FY2023 with FY2013 headcount for the General Fund and Enterprise Funds is shown below:

| General Fund | Headcount | | | | Enterprise Funds | Headcount | | |
|---|---|---|---|---|---|---|---|---|
| | 2023 | 2013 | Var | | | 2023 | 2013 | Var |
| Police | 2,895 | 2,909 | (14) | | DDOT | 1,065 | 1,060 | 5 |
| Fire | 1,228 | 1,189 | 39 | | Sewer | 1,016 | 1,016 | - |
| 36th District Court | 362 | 362 | - | | Water | 873 | 873 | - |
| General Services | 272 | 298 | (26) | | Library | 335 | 335 | - |
| Waste | 265 | 265 | 0 | | Streets | 225 | 199 | 26 |
| Finance | 206 | 228 | (22) | | BSED | 192 | 192 | - |
| Recreation | 202 | 202 | - | | Parking | 90 | 90 | - |
| Planning & Development | 113 | 116 | (3) | | Airport | 5 | 5 | - |
| Law | 86 | 86 | - | | **Total Enterprise Funds** | **3,802** | **3,772** | **31** |
| Elections | 60 | 80 | (20) | | | | | |
| Human Resources | 60 | 93 | (33) | | | | | |
| ITS | 38 | 35 | 3 | | | | | |
| Mayor | 24 | 22 | 2 | | | | | |
| Public Works | 19 | 41 | (22) | | | | | |
| Non-Departmental | 17 | 21 | (4) | | | | | |
| Auditor General | 17 | 14 | 3 | | | | | |
| Budget | 16 | 16 | - | | | | | |
| City Clerk | 15 | 15 | - | | | | | |
| Zoning | 11 | 11 | - | | | | | |
| City Council | 10 | 46 | (36) | | | | | |
| Health & Wellness | 9 | 80 | (71) | | | | | |
| Ombudsperson | 6 | 6 | - | | | | | |
| Human Rights | 5 | 5 | - | | | | | |
| Administrative Hearings | 4 | 4 | - | | | | | |
| DWDD | - | 7 | (7) | | | | | |
| Homeland Security | - | 1 | (1) | | | | | |
| Human Services | - | 22 | (22) | | | | | |
| PLD | - | 99 | (99) | | | | | |
| **Total General Fund** | **5,940** | **6,271** | **(331)** | | | | | |

## Average Salary

The City calculated departmental salaries and wages by using the headcount projections above and calculating a base average salary by department. The City determined the base average salary via two methods:

- The City calculated the average departmental salary by using the total FY2013 expense for salaries and wages by department and divided that by the average headcount of the department over the course of FY2013.
- The City analyzed each department's average salary at a point in time, conducting this analysis in November of 2013.

The City's advisors reviewed both estimates with each department head and selected the average salary that was considered the most reasonable going forward based on attrition estimates and estimated future hirings.

City-wide 10% wage reductions were implemented prior to FY2014 for the majority of employees. The Fire and Police departments FY2014 average salaries were adjusted by 4.1% and 2.1% in the projections respectively to account for 10% wage reductions for the remaining employees with contracts that expired in FY2013.

It should be noted that the baseline 10 Yr model used average salaries for the Fire and Police departments even though employees leaving via attrition will be replaced by employees at lower wages and new employees will most likely be entry level employees at lower salary levels. This assumption change was made recently and adjusted in the July 2, 2014 RRIs for each respective department. The add backs can be seen in Section H. The average wages also include a 10% wage reduction to 36th District Court employees from FY2013 levels in 2014. For all employees, wage inflation is assumed with the following schedule:

| Year | YoY Change |
|------|-----------|
| 2015 | 5.0% |
| 2016 | 0.0% |
| 2017 | 2.5% |
| 2018 | 2.5% |
| 2019 | 2.5% |
| 2020 | 2.0% |
| 2021 | 2.0% |
| 2022 | 2.0% |
| 2023 | 2.0% |

Projected average salary by department by year:

| | Preliminary Forecast | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Department | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Police | $ 51,514 | $ 54,454 | $ 54,454 | $ 55,816 | $ 57,211 | $ 58,641 | $ 59,814 | $ 61,010 | $ 62,231 | $ 63,475 |
| Fire | $ 55,950 | $ 58,747 | $ 58,747 | $ 60,216 | $ 61,721 | $ 63,264 | $ 64,530 | $ 65,820 | $ 67,137 | $ 68,479 |
| Transportation | $ 30,767 | $ 32,306 | $ 32,306 | $ 33,113 | $ 33,941 | $ 34,790 | $ 35,486 | $ 36,195 | $ 36,919 | $ 37,658 |
| Sewer | $ 56,127 | $ 58,933 | $ 58,933 | $ 60,406 | $ 61,916 | $ 63,464 | $ 64,734 | $ 66,028 | $ 67,349 | $ 68,696 |
| Water | $ 40,481 | $ 42,505 | $ 42,505 | $ 43,568 | $ 44,657 | $ 45,774 | $ 46,689 | $ 47,623 | $ 48,575 | $ 49,547 |
| 36th District Court | $ 46,252 | $ 48,564 | $ 48,564 | $ 49,779 | $ 51,023 | $ 52,299 | $ 53,345 | $ 54,411 | $ 55,500 | $ 56,610 |
| Library | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| General Services | $ 33,501 | $ 35,176 | $ 35,176 | $ 36,056 | $ 36,957 | $ 37,881 | $ 38,639 | $ 39,412 | $ 40,200 | $ 41,004 |
| Waste | $ 33,188 | $ 34,847 | $ 34,847 | $ 35,718 | $ 36,611 | $ 37,527 | $ 38,277 | $ 39,043 | $ 39,823 | $ 40,620 |
| Streets | $ 33,188 | $ 34,847 | $ 34,847 | $ 35,718 | $ 36,611 | $ 37,527 | $ 38,277 | $ 39,043 | $ 39,823 | $ 40,620 |
| Finance | $ 45,415 | $ 47,685 | $ 47,685 | $ 48,878 | $ 50,099 | $ 51,352 | $ 52,379 | $ 53,427 | $ 54,495 | $ 55,585 |
| Recreation | $ 16,904 | $ 17,749 | $ 17,749 | $ 18,193 | $ 18,648 | $ 19,114 | $ 19,496 | $ 19,886 | $ 20,284 | $ 20,690 |
| BSED | $ 47,306 | $ 49,672 | $ 49,672 | $ 50,913 | $ 52,186 | $ 53,491 | $ 54,561 | $ 55,652 | $ 56,765 | $ 57,900 |
| Planning & Development | $ 53,640 | $ 56,322 | $ 56,322 | $ 57,730 | $ 59,173 | $ 60,652 | $ 61,865 | $ 63,103 | $ 64,365 | $ 65,652 |
| Parking | $ 33,594 | $ 35,274 | $ 35,274 | $ 36,156 | $ 37,060 | $ 37,986 | $ 38,746 | $ 39,521 | $ 40,312 | $ 41,118 |
| Law | $ 71,497 | $ 75,072 | $ 75,072 | $ 76,949 | $ 78,873 | $ 80,844 | $ 82,461 | $ 84,111 | $ 85,793 | $ 87,509 |
| Elections | $ 27,971 | $ 29,370 | $ 29,370 | $ 30,104 | $ 30,856 | $ 31,628 | $ 32,260 | $ 32,906 | $ 33,564 | $ 34,235 |
| Human Resources | $ 49,727 | $ 52,213 | $ 52,213 | $ 53,519 | $ 54,857 | $ 56,228 | $ 57,353 | $ 58,500 | $ 59,670 | $ 60,863 |
| ITS | $ 57,494 | $ 60,369 | $ 60,369 | $ 61,878 | $ 63,425 | $ 65,011 | $ 66,311 | $ 67,637 | $ 68,990 | $ 70,369 |
| Mayor | $ 92,861 | $ 97,504 | $ 97,504 | $ 99,942 | $ 102,440 | $ 105,001 | $ 107,101 | $ 109,243 | $ 111,428 | $ 113,657 |
| Public Works | $ 46,029 | $ 41,811 | $ 41,811 | $ 42,856 | $ 43,927 | $ 45,025 | $ 45,926 | $ 46,844 | $ 47,781 | $ 48,737 |
| Non-Departmental | $ 80,395 | $ 84,414 | $ 84,414 | $ 86,525 | $ 88,688 | $ 90,905 | $ 92,723 | $ 94,578 | $ 96,469 | $ 98,399 |
| Auditor General | $ 65,304 | $ 68,569 | $ 68,569 | $ 70,283 | $ 72,041 | $ 73,842 | $ 75,318 | $ 76,825 | $ 78,361 | $ 79,928 |
| Budget | $ 64,173 | $ 67,381 | $ 67,381 | $ 69,066 | $ 70,792 | $ 72,562 | $ 74,013 | $ 75,494 | $ 77,003 | $ 78,544 |
| City Clerk | $ 46,300 | $ 48,615 | $ 48,615 | $ 49,831 | $ 51,076 | $ 52,353 | $ 53,400 | $ 54,468 | $ 55,558 | $ 56,669 |
| Zoning | $ 25,120 | $ 26,376 | $ 26,376 | $ 27,035 | $ 27,711 | $ 28,404 | $ 28,972 | $ 29,551 | $ 30,142 | $ 30,745 |
| City Council | $ 68,378 | $ 71,500 | $ 71,500 | $ 73,288 | $ 75,120 | $ 76,998 | $ 78,538 | $ 80,108 | $ 81,711 | $ 83,345 |
| Health & Wellness | $ 60,946 | $ 73,547 | $ 73,547 | $ 75,386 | $ 77,270 | $ 79,202 | $ 80,786 | $ 82,402 | $ 84,050 | $ 85,731 |
| Ombudsperson | $ 81,064 | $ 85,117 | $ 85,117 | $ 87,245 | $ 89,426 | $ 91,662 | $ 93,495 | $ 95,365 | $ 97,272 | $ 99,217 |
| Human Rights | $ 57,093 | $ 59,948 | $ 59,948 | $ 61,447 | $ 62,983 | $ 64,558 | $ 65,849 | $ 67,166 | $ 68,509 | $ 69,879 |
| Airport | $ 64,882 | $ 68,126 | $ 68,126 | $ 69,829 | $ 71,575 | $ 73,364 | $ 74,832 | $ 76,328 | $ 77,855 | $ 79,412 |
| Administrative Hearings | $ 82,422 | $ 86,544 | $ 86,544 | $ 88,707 | $ 90,925 | $ 93,198 | $ 95,062 | $ 96,963 | $ 98,902 | $ 100,881 |
| PLD | $ 49,211 | $ 84,190 | $ 81,474 | $ 79,817 | $ 79,591 | $ 81,182 | $ 82,806 | $ 84,462 | $ - | $ - |

## Department Salaries and Wages

The Police and Fire departments represent 76.5% of total salaries and wages in the General Fund. The following charts summarize the salaries and wages by department over the 10 year period for labor costs reflected in the General Fund and the Enterprise Funds:

70

| Salaries and Wages - General Fund | | | | | Salaries and Wages - All Other Funds | | |
|---|---|---|---|---|---|---|---|
| General Fund | | FY 2014-2023 | % of Salaries | % of Revenue | All Other Funds | FY 2014-2023 | % of Salaries |
| Police | $ | 1,654 | 52.3% | 14.7% | Sewer | $ 637 | 36.1% |
| Fire | $ | 765 | 24.2% | 6.8% | Water | $ 395 | 22.4% |
| 36th District Court | $ | 187 | 5.9% | 1.7% | DDOT | $ 363 | 20.5% |
| Finance | $ | 106 | 3.3% | 0.9% | Waste | $ 98 | 5.6% |
| General Services | $ | 103 | 3.2% | 0.9% | BSED | $ 96 | 5.5% |
| Law | $ | 68 | 2.2% | 0.6% | Streets | $ 84 | 4.7% |
| Recreation | $ | 38 | 1.2% | 0.3% | Planning & Development | $ 61 | 3.5% |
| Human Resources | $ | 37 | 1.2% | 0.3% | All Other Depts. | $ 31 | 1.8% |
| Planning & Development | $ | 31 | 1.0% | 0.3% | Total Other Funds | $ 1,765 | 100.0% |
| Mayor | $ | 25 | 0.8% | 0.2% | | | |
| ITS | $ | 24 | 0.8% | 0.2% | | | |
| All Other GF Depts. | $ | 127 | 4.0% | 1.1% | | | |
| Total General Fund | $ | 3,165 | 100.0% | 28.2% | | | |

Following FY2023, the City projects total salaries and wages will increase 2% a year from FY2024-FY2033 and 2.25% a year from FY2034-FY2053.

Health Benefits

    Health benefits for active employees in the General Fund in FY2013 totaled $47.8 million or 6.5% of operating expenses. Over the next ten years the city is estimating Health Benefits to account for 9.4% of operating expenses. The City relied on their actuary, Milliman, Inc.[29], to project health care costs per active employee. Milliman's estimated FY2014 healthcare costs are based on headcount estimates provided by the City and reflect cost of healthcare plan designs offered for FY2014 enrollment:

---

[29] See Milliman Letter Re: City of Detroit Active Health Plan Projections Dated November 3, 2014.

| | FY2014 | | | | | |
|---|---|---|---|---|---|---|
| | Milliman Per Employee Estimate | | | | | |
| | Headcount | Medical | Dental | Vision | Total | 2014 Total |
| Uniform | 3,957 | $ 8,459 | $ 667 | $ 79 | $ 9,205 | $ 36 |
| General | 2,532 | $ 7,378 | $ 667 | $ 79 | $ 8,124 | $ 21 |
| DOT | 936 | $ 9,087 | $ 667 | $ 87 | $ 9,841 | $ 9 |
| Water/Sewer | 1,815 | $ 7,675 | $ 667 | $ 79 | $ 8,421 | $ 15 |
| Library | 384 | $ 6,695 | $ 667 | $ 79 | $ 7,441 | $ 3 |
| **Total** | **9,624** | | | | | **$ 84** |

Milliman projected estimates for year over year percent changes in healthcare costs per employee from FY2015 thru FY2019. After FY2019 the City projected annual healthcare increases. The City estimated 4% a year in annual inflation in healthcare costs for FY2020 through FY2023.

| | Milliman Letter Estimates | | | | | City Estimates | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Uniform | -2.1% | 6.8% | 7.0% | 7.3% | 6.0% | 4.0% | 4.0% | 4.0% | 4.0% |
| General | -4.4% | 6.8% | 7.1% | 7.3% | 6.0% | 4.0% | 4.0% | 4.0% | 4.0% |
| DOT | -11.3% | 6.7% | 7.0% | 7.3% | 6.0% | 4.0% | 4.0% | 4.0% | 4.0% |
| Water/Sewer | -1.3% | 6.8% | 7.0% | 7.3% | 6.0% | 4.0% | 4.0% | 4.0% | 4.0% |
| Library | -2.8% | 6.5% | 7.1% | 7.3% | 6.0% | 4.0% | 4.0% | 4.0% | 4.0% |
| 36th DC | -4.0% | 6.7% | 7.0% | 7.3% | 6.0% | 4.0% | 4.0% | 4.0% | 4.0% |

Health benefits in the General Fund include $142.8[30] million of OPEB payments for current retirees including $123.8 million in FY2014 and $19 million in FY2015. The City continued to pay healthcare costs for retirees after filing bankruptcy in the form of a stipend. The total amount projected to be paid was deducted when calculating total recovery for the OPEB claim via UTGO Note A.

---

[30] Total payments to current retirees in the financial model is actually $162.8 million. This amount includes $20 million considered recovered after negotiations and it is paid in cash under the sources section in the 40 Yr model along with other unsecured creditors.

The following chart shows the total projected health benefit expenses in the General Fund in FY2014-FY2023:

| General Fund Active Health Benefits | Preliminary Forecast | | | | | | | | | | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| General Fund Active Employees | $ 49.2 | $ 48.0 | $ 52.4 | $ 55.9 | $ 60.0 | $ 63.6 | $ 66.1 | $ 68.7 | $ 71.5 | $ 74.3 | $ 609.8 |
| OPEB Payments for Current Retirees | $ 123.8 | $ 19.0 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 142.8 |
| **Total General Fund** | **$ 173.0** | **$ 67.1** | **$ 52.4** | **$ 55.9** | **$ 60.0** | **$ 63.6** | **$ 66.1** | **$ 68.7** | **$ 71.5** | **$ 74.3** | **$ 752.6** |

Overtime

Overtime accounted for $29.7 million in the General Fund in FY2013 which was 4% of total operating expenditures and 10% of payroll. The City assumed that overtime in the projections as a percentage of payroll stays constant from FY2013 except for a few exceptions:

- Overtime in the Fire department increases from 7% in FY2013 to 8.5% in FY2014 and finally decreases to 6% from FY2015-FY2023. The Fire Department overtime levels were down from the FY2008-FY2012 average of 13.4% to 7% in FY2013 as the Fire Department has been successful in reducing overtime due to better staffing model. Additional overtime reductions for the department are reflected in section H.
- Overtime in the Police Department is expected to increase from 12% in FY2013 to 15% in FY2014 and FY2015 and back to 14% in FY2016-FY2023. The expected increase is a result of changing from 12 hour shifts to 8 hour shifts.
- Overtime for DDOT is projected to decrease to 40% of payroll versus 42.8% in FY2013. The overtime for DDOT in operating expenditures does not account for projected overtime decreases due to additional hires in DDOT and updates to its existing bus fleet that reduce overtime by a considerable amount. The reduction in overtime can be seen in Section H.

The chart below highlights overtime across all departments as a percentage of total department payroll:

| Department | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Preliminary Forecast | | | | | | |
| Police | 12.0% | 15.0% | 15.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% | 14.0% |
| Fire | 7.0% | 8.5% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% | 6.0% |
| Transportation | 42.8% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% |
| Sewer | 19.9% | 19.9% | 19.9% | 19.9% | 19.9% | 19.9% | 19.9% | 19.9% | 19.9% | 19.9% | 19.9% |
| Water | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% | 18.5% |
| 36th District Court | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% |
| General Services | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% | 22.9% |
| Waste | 26.0% | 26.0% | 26.0% | 26.0% | 26.0% | 26.0% | 26.0% | 26.0% | 26.0% | 26.0% | 26.0% |
| Streets | 8.6% | 8.6% | 8.6% | 8.6% | 8.6% | 8.6% | 8.6% | 8.6% | 8.6% | 8.6% | 8.6% |
| Finance | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% |
| Recreation | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% | 3.1% |
| BSED | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% | 3.9% |
| Planning & Development | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% | 1.9% |
| Parking | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| Law | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% |
| Elections | 20.8% | 22.4% | 10.6% | 10.6% | 10.6% | 10.6% | 10.6% | 10.6% | 10.6% | 10.6% | 10.6% |
| Human Resources | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% | 4.8% |
| ITS | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% | 4.3% |
| Mayor | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Public Works | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% |
| Non-Departmental | 4.7% | 4.7% | 4.7% | 4.7% | 4.7% | 4.7% | 4.7% | 4.7% | 4.7% | 4.7% | 4.7% |
| Auditor General | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% |
| Budget | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% | 2.7% |
| City Clerk | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Zoning | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| City Council | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Health & Wellness | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% |
| Ombudsperson | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Human Rights | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Airport | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% | 0.5% |
| Administrative Hearings | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| PLD | 49.8% | 29.9% | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% |

The chart below highlights General Fund overtime paid over the ten year period:

| Department | 10 Year Total | % of Overtime |
|---|---|---|
| | General Fund Overtime | |
| Police | 235 | 72% |
| Fire | 48 | 15% |
| General Services | 24 | 7% |
| Finance | 8 | 2% |
| All Other GF Depts. | 12 | 4% |
| Total Overtime | $ 326 | 100% |

The majority of overtime in the General Fund is driven by Police, Fire and General Services.  Overtime for DDOT is projected to be $145 million over the 10

74

year period. Although DDOT is not funded by the General Fund, the General Fund does provide a subsidy to DDOT as it has historically operated at a deficit. Overtime for the majority of departments has decreased from the FY2008-FY2012 average. If the current assumptions are understated and actual overtime reverts back to FY2008-FY2012 levels, the overtime costs could increase as shown below:

| Department | 2008-2012 Avg | 10 Yr Avg | Var | Additional OT Over 10 Yrs at 08-12 Avg |
|---|---|---|---|---|
| Police | 15.0% | 14.2% | 0.8% | 14 |
| Fire | 13.4% | 6.3% | 7.1% | 55 |
| DDOT | 44.6% | 40.0% | 4.6% | 17 |
| Total | | | $ | 85 |

## Other Benefits

Other benefits including social security, unemployment and life insurance totaled $34 million in the General Fund in FY2013 representing 4.6% of operating expenses and 11.4% of payroll. The City projected other benefits by calculating the FY2013 cost per employee for each benefit and multiplying it by the number of employees projected in FY2014. For the Fire and Police Departments, which have both uniform and civilian employees, the City calculated the uniform employees at the Police or Fire Department per employee cost and civilians at the General City per employee cost. The analysis below highlights the calculations the City made regarding fringe benefits:

| Benefit Per Head | Fire | Police | DOT | Gen City | BSED | 36DC | Sewer | Water | Library |
|---|---|---|---|---|---|---|---|---|---|
| As a % of Payroll | | | | | | | | | |
| Emp Benefits-Social Security | 0.00% | 0.00% | 7.65% | 7.65% | 7.65% | 7.65% | 7.65% | 7.65% | 7.65% |
| | | | | | | | | | |
| Per Head Cost | | | | | | | | | |
| Unemployment | $ - | $ - | 400 | $ 1,900 | $ 200 | $ - | 200 | 125 | 100 |
| Misc Benefits | 23 | 23 | 20 | 52 | 87 | $ - | 30 | 50 | 38 |
| Unused Sick Leave | 3,892 | 1,424 | 100 | 991 | 650 | $ - | 1,025 | 1,026 | 298 |
| Longevity | $ - | $ - | 257 | $ - | $ - | 491 | $ - | $ - | 388 |
| Group Life Insurance | 802 | 802 | 287 | 287 | 287 | 1,053 | 287 | 287 | 287 |
| Income Protection | $ - | $ - | 244 | 37 | 31 | 614 | 34 | 60 | 36 |
| DOT Sick & Accident | $ - | $ - | 802 | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Benefit Per Head | $ 4,717 | $ 2,249 | $ 2,109 | $ 3,266 | $ 1,254 | $ 2,158 | $ 1,575 | $ 1,548 | $ 1,146 |

| Total Fringe Benefits | Fire | Police | DOT | Gen City | BSED | 36DC | Sewer | Water | Library |
|---|---|---|---|---|---|---|---|---|---|
| FY13 Heads (estimated) | | | | | | | | | |
| Uniform | 917 | 2,632 | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Civilian | 271 | 277 | 1,060 | 2,107 | 192 | 362 | 1,016 | 873 | 335 |
| | | | | | | | | | |
| FY13 Payroll (estimated) | | | | | | | | | |
| Uniform | $ 53,491,447 | $138,515,971 | | | | | | | |
| Civilian | $ 15,813,821 | $ 14,577,797 | $ 30,283,777 | $ 80,289,491 | $7,844,088 | $ 18,577,833 | $ 33,315,825 | $ 34,893,517 | $ - |
| | | | | | | | | | |
| Heads x per head costs | $ 4,898,103 | $ 6,503,401 | $ 2,235,541 | $ 6,882,139 | $ 241,370 | $ 780,081 | $ 1,601,205 | $ 1,352,018 | $ 383,974 |
| Payroll x % of payroll costs | $ 1,209,757 | $ 1,115,201 | $ 2,316,709 | $ 6,142,146 | $ 600,073 | $ 1,421,204 | $ 2,548,661 | $ 2,669,354 | $ - |
| Total fringe costs | $6,421,533 | $ 7,939,065 | $4,552,250 | $13,024,285 | $ 841,443 | $2,201,285 | $4,149,865 | $4,021,372 | $383,974 |
| Fringe costs as % of payroll | 9.3% | 5.2% | 15.0% | 16.2% | 10.7% | 11.8% | 12.5% | 11.5% | n/a |

Going forward, the City assumed fringe benefits as a percent of payroll would stay constant. As a result, fringe benefits increase at the same rate as wage inflation projected in the forecast. In addition to fringe benefits, the City included a one-time 3% bonus in FY2016 to all uniformed employees and a one-time 2.5% bonus to non-uniformed employees. Below summarizes the General Fund cost for fringe benefits by year including the bonus payments:

| Fringe Benefits | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PFRS | $ 13.4 | $ 14.5 | $ 14.8 | 15.2 | 15.6 | 16.0 | 16.3 | 16.6 | 17.0 | $ 17.3 | 156.6 |
| General | 8.6 | 8.8 | 8.7 | 8.6 | 8.8 | 9.0 | 9.2 | 9.4 | 9.5 | 9.7 | 90.4 |
| 36 District Court | 2.0 | 2.1 | 2.1 | 2.1 | 2.2 | 2.2 | 2.3 | 2.3 | 2.4 | 2.4 | 22.1 |
| Total General Fund | 23.9 | 25.4 | 25.6 | 26.0 | 26.6 | 27.3 | 27.8 | 28.3 | 28.9 | 29.5 | 269.2 |
| One Time 2.5% Bonus to AFSCME | | | 1.8 | | | | | | | | 1.8 |
| One Time 3% Bonus to all Uniform | | | 6.9 | | | | | | | | 6.9 |
| Total General Fund Fringe Benefits | $ 23.9 | $ 25.4 | $ 34.3 | $ 26.0 | $ 26.6 | $ 27.3 | $ 27.8 | $ 28.3 | $ 28.9 | $ 29.5 | $ 277.9 |

# Active Pension

The city is establishing a new hybrid pension plan for its active employees. Details regarding the new pension plan are discussed in Section J. The City assumed the following contributions per employee group as a percentage of payroll based on the most recent negotiations:

| | Contribution % |
|---|---|
| Non Public Safety | 5.75% |
| Public Safety | 12.25% |
| PLSA | 12.25% |

The chart below summarizes the City's yearly estimated contributions to the pension plan:

| Active Pension | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Preliminary Forecast | | | | | |
| Non Public Safety Payroll | $ 69.8 | $ 71.9 | $ 69.8 | $ 71.3 | $ 72.9 | $ 74.7 | $ 76.2 | $ 77.7 | $ 79.1 | $ 80.6 | $ 744.1 |
| DDOT Payroll | $ 30.1 | $ 33.9 | $ 34.4 | $ 35.3 | $ 36.1 | $ 37.1 | $ 37.8 | $ 38.5 | $ 39.3 | $ 40.1 | $ 362.6 |
| Total Non Uniform Payroll | $ 99.9 | $ 105.8 | $ 104.2 | $ 106.6 | $ 109.1 | $ 111.8 | $ 114.0 | $ 116.2 | $ 118.4 | $ 120.7 | $ 1,106.7 |
| Non Public Safety Contribution | 5.75% | 5.75% | 5.75% | 5.75% | 5.75% | 5.75% | 5.75% | 5.75% | 5.75% | 5.75% | 5.75% |
| Non Public Safety Active Pension | $ 5.7 | $ 6.1 | $ 6.0 | $ 6.1 | $ 6.3 | $ 6.4 | $ 6.6 | $ 6.7 | $ 6.8 | $ 6.9 | $ 63.6 |
| Police Payroll (Excluding DPLSA) | $ 102.0 | $ 110.4 | $ 117.7 | $ 121.4 | $ 124.4 | $ 127.5 | $ 130.1 | $ 132.7 | $ 135.3 | $ 138.0 | $ 1,239.4 |
| Police Contribution | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% |
| Police Active Pension | $ 12.5 | $ 13.5 | $ 14.4 | $ 14.9 | $ 15.2 | $ 15.6 | $ 15.9 | $ 16.3 | $ 16.6 | $ 16.9 | $ 151.8 |
| Fire Payroll | $ 66.2 | $ 72.7 | $ 72.1 | $ 73.9 | $ 75.8 | $ 77.7 | $ 79.2 | $ 80.8 | $ 82.4 | $ 84.1 | $ 765.1 |
| Fire Contribution | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% |
| Fire Active Pension | $ 8.1 | $ 8.9 | $ 8.8 | $ 9.1 | $ 9.3 | $ 9.5 | $ 9.7 | $ 9.9 | $ 10.1 | $ 10.3 | $ 93.7 |
| DPLSA | $ 37.1 | $ 39.0 | $ 39.0 | $ 39.9 | $ 40.9 | $ 42.0 | $ 42.8 | $ 43.6 | $ 44.5 | $ 45.4 | $ 414.2 |
| DPLSA Contribution | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% | 12.25% |
| DPLSA Active Pension | $ 4.5 | $ 4.8 | $ 4.8 | $ 4.9 | $ 5.0 | $ 5.1 | $ 5.2 | $ 5.3 | $ 5.5 | $ 5.6 | $ 50.7 |
| Adjustment Year 1 | $ (12.1) | | | | | | | | | | $ (12.1) |
| Active Pension Contribution | $ 18.8 | $ 33.3 | $ 34.0 | $ 34.9 | $ 35.8 | $ 36.7 | $ 37.4 | $ 38.2 | $ 38.9 | $ 39.7 | $ 347.8 |

# Active OPEB

The city is establishing a Voluntary Employment Benefit Account ("VEBA") for its active employees' future healthcare costs. The City assumed a contribution

of $1 million per year to PFRS and 2% of payroll for non-uniform employees based on the most recent negotiations. Summarized below is the City's yearly estimated contribution to the VEBA:

| | | | | | | | Preliminary Forecast | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Active OPEB** | | 2014 | | 2015 | | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | 10 Year Total |
| Non Public Safety Payroll | $ | 69.8 | $ | 71.9 | $ | 71.5 | $ | 71.3 | $ | 72.9 | $ | 74.7 | $ | 76.2 | $ | 77.7 | $ | 79.1 | $ | 80.6 | $ 745.8 |
| DDOT Payroll | $ | 30.1 | $ | 33.9 | $ | 34.4 | $ | 35.3 | $ | 36.1 | $ | 37.1 | $ | 37.8 | $ | 38.5 | $ | 39.3 | $ | 40.1 | $ 362.6 |
| Total Non Uniform Payroll | $ | 99.9 | $ | 105.8 | $ | 105.9 | $ | 106.6 | $ | 109.1 | $ | 111.8 | $ | 114.0 | $ | 116.2 | $ | 118.4 | $ | 120.7 | $ 1,108.4 |
| OPEB Contribution | | 2.0% | | 2.0% | | 2.0% | | 2.0% | | 2.0% | | 2.0% | | 2.0% | | 2.0% | | 2.0% | | 2.0% | 2.0% |
| **Non Public Safety OPEB** | | **$2.0** | | **$2.1** | | **$2.1** | | **$2.1** | | **$2.2** | | **$2.2** | | **$2.3** | | **$2.3** | | **$2.4** | | **$2.4** | **$22.2** |
| | | | | | | | | | | | | | | | | | | | | | |
| PFRS (Includes DPLSA) | $ | 205.4 | $ | 222.1 | $ | 228.8 | $ | 235.2 | $ | 241.1 | $ | 247.1 | $ | 252.1 | $ | 257.1 | $ | 262.3 | $ | 267.5 | 2,418.7 |
| PFRS Contribution | | 0.5% | | 0.5% | | 0.4% | | 0.4% | | 0.4% | | 0.4% | | 0.4% | | 0.4% | | 0.4% | | 0.4% | 0.4% |
| **PFRS OPEB** | $ | **1.0** | $ | **1.0** | $ | **1.0** | $ | **1.0** | $ | **1.0** | $ | **1.0** | $ | **1.0** | $ | **1.0** | $ | **1.0** | $ **1.0** | $ **10.0** |
| | | | | | | | | | | | | | | | | | | | | | |
| **OPEB Payments** | $ | **3.0** | $ | **3.1** | $ | **3.1** | $ | **3.1** | $ | **3.2** | $ | **3.2** | $ | **3.3** | $ | **3.3** | $ | **3.4** | $ **3.4** | $ **32.2** |

## Professional and Contractual Services

Professional and Contractual Services are comprised of the following categories: Auditing, Medical, Legal, Personal Service Contracts and Other Contracts. Professional and Contractual Services are expected to account for 7% of total costs over for the 10 Yr forecast. The City assumes all Professional and Contractual Services expenses will increase by 1% a year, with a few exceptions:

- Medical costs decrease from $22.7 million in FY2013 to $1.3 million in FY2014 due to the transition of the Health and Wellness department
- Personal Service Contracts are affected by a $2 million increase in FY2014 related to City Council's outsourcing of its support staff
- Personal Service Contracts in the Mayor's department increase from $8,000 in FY2013 to $500,000 in FY2014 and to $1 million in FY2015 before decreasing to $29,000 in FY2018.
- Personal Service Contracts increase in the Public Lighting department as a number of jobs are outsourced beginning in FY2014. Those outsourced jobs are eliminated by FY2021.

- Other Contracts fluctuates due to additional resources needed in the election department during election years, resulting in an additional $3 million expense.

Below is a breakdown including year over changes by line item:

| Professional & Contracts | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Preliminary Forecast | | | | | | |
| Auditing | $ 2.2 | $ 2.2 | $ 2.2 | $ 2.2 | $ 2.3 | $ 2.3 | $ 2.3 | $ 2.3 | $ 2.3 | $ 2.4 | $ 22.7 |
| *YoY Change* | *-11.8%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *-0.3%* |
| Medical | $ 1.3 | $ 1.4 | $ 1.4 | $ 1.4 | $ 1.4 | $ 1.4 | $ 1.4 | $ 1.4 | $ 1.5 | $ 1.5 | $ 14.1 |
| *YoY Change* | *-94.1%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *-8.5%* |
| Legal | $ 2.4 | $ 2.5 | $ 2.5 | $ 2.5 | $ 2.6 | $ 2.6 | $ 2.6 | $ 2.6 | $ 2.6 | $ 2.7 | $ 25.7 |
| *YoY Change* | *0.0%* | *1.6%* | *1.4%* | *1.2%* | *0.7%* | *0.6%* | *0.7%* | *0.7%* | *0.9%* | *1.0%* | *0.9%* |
| Personal Services Contracts | $ 10.5 | $ 22.5 | $ 18.7 | $ 15.2 | $ 12.3 | $ 11.4 | $ 10.1 | $ 8.7 | $ 8.0 | $ 8.1 | $ 125.4 |
| *YoY Change* | *98.0%* | *114.4%* | *-17.0%* | *-18.5%* | *-19.2%* | *-7.3%* | *-11.2%* | *-13.5%* | *-8.9%* | *1.0%* | *11.8%* |
| Other Contracts | $ 37.1 | $ 35.1 | $ 35.4 | $ 35.7 | $ 39.3 | $ 36.4 | $ 36.7 | $ 37.0 | $ 40.7 | $ 37.7 | $ 371.0 |
| *YoY Change* | *-14.5%* | *-5.5%* | *0.9%* | *0.9%* | *10.2%* | *-7.6%* | *0.9%* | *0.9%* | *9.8%* | *-7.3%* | *-1.1%* |
| **Total Professionals & Contracts** | **$ 53.5** | **$ 63.6** | **$ 60.1** | **$ 57.1** | **$ 57.8** | **$ 54.0** | **$ 53.1** | **$ 52.2** | **$ 55.1** | **$ 52.3** | **$ 558.9** |
| | *-29.8%* | *18.7%* | *-5.4%* | *-5.1%* | *1.3%* | *-6.6%* | *-1.6%* | *-1.8%* | *5.6%* | *-5.1%* | *-3.0%* |

## Risk Management & Insurance

Risk Management and Insurance is comprised of the following categories: Litigation, Workers Comp, Other Claims and Insurance. Risk Management and Insurance is expected to account for 5.6% of total costs over the 10 Yr Plan. The global assumption is Risk Management and Insurance will increase by 1% per year except for the following assumption:

- Litigation costs increase to FY2013 levels in FY2015 as the City exits bankruptcy in FY2015.

Below is a breakdown including year over changes by line item:

| Preliminary Forecast | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| RM and Insurance | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
| Litigation | $ 18.8 | $ 26.6 | $ 26.8 | $ 27.1 | $ 27.4 | $ 27.6 | $ 27.9 | $ 28.2 | $ 28.5 | $ 28.8 | $ 267.6 |
| *YoY Change* | *-28.5%* | *41.3%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *2.1%* |
| Workers Comp | $ 4.8 | $ 4.9 | $ 4.9 | $ 4.9 | $ 5.0 | $ 5.0 | $ 5.1 | $ 5.1 | $ 5.2 | $ 5.3 | $ 50.2 |
| *YoY Change* | *0.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *0.9%* |
| Other Claims | $ 11.6 | $ 11.7 | $ 11.8 | $ 11.9 | $ 12.0 | $ 12.1 | $ 12.3 | $ 12.4 | $ 12.5 | $ 12.6 | $ 120.9 |
| *YoY Change* | *0.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *0.9%* |
| Insurance | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.7 | $ 0.7 | $ 6.3 |
| *YoY Change* | *-24.4%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *-2.4%* |
| **Total RM and Insurance** | **$ 35.2** | **$ 43.1** | **$ 43.5** | **$ 43.9** | **$ 44.4** | **$ 44.8** | **$ 45.3** | **$ 45.7** | **$ 46.2** | **$ 46.7** | **$ 438.8** |
| ***YoY Change*** | ***-17.6%*** | ***22.5%*** | ***1.0%*** | ***1.0%*** | ***1.0%*** | ***1.0%*** | ***1.0%*** | ***1.0%*** | ***1.0%*** | ***1.0%*** | ***1.3%*** |

## Materials and Supplies

Materials and Supplies are comprised of the following categories: Operating Supplies, Fuel and Lubricants, Repairs and Maintenance and Other. Materials and Supplies are expected to account for 4.7% of total costs over the ten year period. The global assumption is all materials and supplies expenses will increase by 1% per year.

- Operating Supplies decrease from FY2016-2021 due to the transition of the Public Lighting department.
- Fuel and Lubricants decrease in FY2015 due to the transition of the Public Lighting department.
- Repairs and Maintenance decrease in FY2017 due to $1.9 million in savings in the ITS department as a result of the new payroll system.

Below is a breakdown including year over changes by line item:

| Preliminary Forecast | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Materials & Supplies** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **10 Year Total** | |
| Operating supplies | $ 5.1 | $ 5.6 | $ 5.9 | $ 5.6 | $ 5.3 | $ 4.9 | $ 4.6 | $ 4.2 | $ 4.1 | $ 4.2 | $ | **49.4** |
| *YoY Change* | *18.4%* | *9.1%* | *6.2%* | *-5.1%* | *-4.8%* | *-8.3%* | *-6.7%* | *-7.6%* | *-2.1%* | *1.0%* | | *0.0%* |
| Fuel & Lubricants | $ 45.5 | $ 15.7 | $ 15.8 | $ 16.0 | $ 16.1 | $ 16.3 | $ 16.5 | $ 16.6 | $ 16.8 | $ 17.0 | $ | **192.2** |
| *YoY Change* | | *0.8%* | *-65.6%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | | *-5.7%* |
| Repairs & Maint | $ 11.9 | $ 11.0 | $ 11.4 | $ 9.8 | $ 9.6 | $ 9.3 | $ 9.1 | $ 8.8 | $ 8.8 | $ 8.9 | $ | **98.5** |
| *YoY Change* | *16.3%* | *-7.5%* | *4.1%* | *-14.3%* | *-1.8%* | *-3.4%* | *-2.4%* | *-2.7%* | *-0.3%* | *1.0%* | | *-1.1%* |
| Other - MS | $ 3.6 | $ 3.6 | $ 3.6 | $ 3.6 | $ 3.6 | $ 3.6 | $ 3.6 | $ 3.6 | $ 3.6 | $ 3.6 | $ | **35.8** |
| *YoY Change* | *-0.3%* | *0.9%* | *0.6%* | *0.3%* | *-0.4%* | *-0.6%* | *-0.4%* | *-0.5%* | *-0.2%* | *0.0%* | | *-0.1%* |
| **Total Materials & Supplies** | **$ 66.0** | **$ 35.8** | **$ 36.7** | **$ 35.0** | **$ 34.7** | **$ 34.0** | **$ 33.6** | **$ 33.2** | **$ 33.3** | **$ 33.5** | **$** | **375.9** |
| ***YoY Change*** | | ***4.5%*** | ***-45.8%*** | ***2.7%*** | ***-4.8%*** | ***-0.8%*** | ***-1.8%*** | ***-1.2%*** | ***-1.3%*** | ***0.1%*** | ***0.9%*** | ***-4.8%*** |

## Utilities

Utilities are expected to account for 3.7% of total costs over the 10 Yr forecast.

All Utilities are expected to increase by 1% per year except for the following:

- Water is projected to increase year over year by the following:

| Year | YoY Change |
|---|---|
| 2015 | 1.5% |
| 2016 | 5.7% |
| 2017 | 5.7% |
| 2018 | 2.8% |
| 2019 | 3.5% |
| 2020 | 3.5% |
| 2021 | 3.5% |
| 2022 | 3.9% |
| 2023 | 3.9% |

- Sewage is projected to increase year over year by the following:

| Year | YoY Change |
|---|---|
| 2015 | 1.4% |
| 2016 | 3.7% |
| 2017 | 2.9% |
| 2018 | 3.1% |
| 2019 | 3.7% |
| 2020 | 3.6% |
| 2021 | 3.7% |
| 2022 | 4.0% |
| 2023 | 4.0% |

- Outside purchases for electricity is expected to increase 25% in FY2015 as the City transitions to purchasing electricity from an outside vendor.

| Preliminary Forecast | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Utilities** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **10 Year Total** |
| Telecommunications | $ 9.3 | $ 9.4 | $ 9.5 | $ 9.6 | $ 9.6 | $ 9.7 | $ 9.8 | $ 9.9 | $ 10.0 | $ 10.1 | $ 97.0 |
| *YoY Change* | *134.9%* | *1.0%* | *0.9%* | *0.9%* | *0.9%* | *0.9%* | *0.9%* | *0.9%* | *1.0%* | *1.0%* | *14.3%* |
| Water | $ 1.3 | $ 1.3 | $ 1.4 | $ 1.4 | $ 1.5 | $ 1.5 | $ 1.5 | $ 1.5 | $ 1.6 | $ 1.6 | $ 14.7 |
| *YoY Change* | *12.2%* | *0.7%* | *3.5%* | *3.7%* | *1.1%* | *1.8%* | *1.9%* | *1.8%* | *3.0%* | *3.9%* | *3.4%* |
| Natural Gas | $ 2.3 | $ 1.9 | $ 1.9 | $ 1.8 | $ 1.8 | $ 1.8 | $ 1.8 | $ 1.8 | $ 1.9 | $ 1.9 | $ 18.9 |
| *YoY Change* | *-0.4%* | *-16.4%* | *-1.5%* | *-7.1%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *-1.9%* |
| Steam | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.8 | $ 0.8 | $ 0.8 | $ 0.8 | $ 0.8 | $ 0.8 | $ 7.6 |
| *YoY Change* | *15.3%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *2.4%* |
| Electricity | $ 4.3 | $ 6.4 | $ 4.3 | $ 3.9 | $ 3.9 | $ 3.8 | $ 3.8 | $ 3.8 | $ 3.9 | $ 3.9 | $ 42.1 |
| *YoY Change* | *1.1%* | *47.7%* | *-33.4%* | *-8.1%* | *-1.3%* | *-1.3%* | *-0.4%* | *0.6%* | *0.8%* | *1.0%* | *0.7%* |
| Sewage | $ 7.2 | $ 7.2 | $ 7.2 | $ 7.2 | $ 7.3 | $ 7.3 | $ 7.4 | $ 7.5 | $ 7.7 | $ 8.0 | $ 74.0 |
| *YoY Change* | *30.7%* | *0.2%* | *0.8%* | *0.2%* | *0.4%* | *1.0%* | *1.0%* | *1.0%* | *2.5%* | *4.0%* | *4.2%* |
| Utilities IPO | $ 3.3 | $ 4.1 | $ 4.1 | $ 4.1 | $ 4.2 | $ 4.2 | $ 4.3 | $ 4.3 | $ 4.4 | $ 4.4 | $ 41.4 |
| *YoY Change* | *-4.8%* | *21.5%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *2.5%* |
| Other - Utl | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 |
| *YoY Change* | *-2.2%* | *-7.2%* | *-5.3%* | *-18.8%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *-3.3%* |
| **Total Utilities** | **$ 28.5** | **$ 31.0** | **$ 29.1** | **$ 28.8** | **$ 29.0** | **$ 29.2** | **$ 29.4** | **$ 29.7** | **$ 30.2** | **$ 30.7** | **$ 295.7** |
| ***YoY Change*** | ***33.3%*** | ***8.9%*** | ***-6.2%*** | ***-1.0%*** | ***0.5%*** | ***0.7%*** | ***0.9%*** | ***1.0%*** | ***1.4%*** | ***1.9%*** | ***4.1%*** |

82

## Purchased Services

Purchased Services are expected to account for 2.9% of total costs over the ten year period. All Purchased Services are expected to increase by 1% per year except for the following:

- 17% increase in FY2016 driven by the implementation of the payroll service.

| Preliminary Forecast | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
| Purchased Services | $ 18.4 | $ 19.3 | $ 22.6 | $ 24.8 | $ 24.6 | $ 24.3 | $ 24.2 | $ 24.0 | $ 24.0 | $ 24.2 | $ 230.4 |
| *YoY Change* | *234.8%* | *4.9%* | *17.5%* | *9.4%* | *-0.5%* | *-1.2%* | *-0.7%* | *-0.8%* | *0.2%* | *0.8%* | *26.4%* |

## Other Expenses and Capital Outlays

Other Expenses and Capital Outlays are expected to account for 5.3% of total costs over the 10 Yr projections. The majority of expenses are expected to increase approximately 1%. The chart below highlights all other operating expenses in the General Fund:

| Preliminary Forecast | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Other Expenses | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
| Printing | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 7.1 |
| *YoY Change* | *46.6%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *5.6%* |
| Rental | $ 11.8 | $ 12.6 | $ 12.7 | $ 12.7 | $ 12.7 | $ 12.6 | $ 12.6 | $ 12.6 | $ 12.6 | $ 12.6 | $ 125.5 |
| *YoY Change* | *25.7%* | *7.0%* | *0.1%* | *0.1%* | *-0.1%* | *-0.1%* | *-0.1%* | *-0.1%* | *0.0%* | *0.0%* | *3.2%* |
| Employee Parking | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 4.3 |
| *YoY Change* | *-20.9%* | *2.3%* | *1.9%* | *1.5%* | *0.4%* | *0.1%* | *0.3%* | *0.3%* | *0.8%* | *1.0%* | *0.8%* |
| Private Car Reimbursement | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 2.5 |
| *YoY Change* | *-5.8%* | *1.2%* | *1.1%* | *1.1%* | *0.9%* | *0.9%* | *0.9%* | *0.9%* | *1.0%* | *1.0%* | *0.3%* |
| Travel | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 1.6 |
| *YoY Change* | *-1.1%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *0.8%* |
| Training | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 6.2 |
| *YoY Change* | *182.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *19.1%* |
| Other Operating Costs | $ 11.0 | $ 15.0 | $ 11.5 | $ 10.9 | $ 10.2 | $ 10.2 | $ 10.3 | $ 10.3 | $ 10.3 | $ 10.4 | $ 110.1 |
| *YoY Change* | *5.9%* | *36.0%* | *-22.8%* | *-5.6%* | *-6.3%* | *0.2%* | *0.3%* | *0.2%* | *0.4%* | *0.5%* | *0.9%* |
| Development Costs | $ 2.8 | $ 2.9 | $ 2.9 | $ 2.9 | $ 3.0 | $ 3.0 | $ 3.0 | $ 3.1 | $ 3.1 | $ 3.1 | $ 29.8 |
| *YoY Change* | *-6.4%* | *1.3%* | *1.2%* | *1.1%* | *0.9%* | *0.8%* | *0.9%* | *0.9%* | *1.0%* | *1.0%* | *0.3%* |
| Total Improvement Fund | $ 7.2 | $ 7.2 | $ 7.2 | $ 7.2 | $ 7.2 | $ 7.2 | $ 7.2 | $ 7.2 | $ 7.2 | $ 7.2 | $ 71.6 |
| *YoY Change* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* |
| Capital Outlays | 5.9 | 6.0 | 6.1 | 6.1 | 6.2 | 6.2 | 6.3 | 6.4 | 6.4 | 6.5 | 62.0 |
| *YoY Change* | *-57.6%* | *1.0%* | *1.0%* | *0.9%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *1.0%* | *-4.9%* |
| **Total Other and Capital Outlays** | **$ 40.8** | **$ 45.7** | **$ 42.5** | **$ 41.9** | **$ 41.3** | **$ 41.4** | **$ 41.6** | **$ 41.7** | **$ 41.8** | **$ 42.0** | **$ 420.7** |
| ***YoY Change*** | ***-10.4%*** | ***12.01%*** | ***-7.19%*** | ***-1.25%*** | ***-1.42%*** | ***0.25%*** | ***0.29%*** | ***0.29%*** | ***0.37%*** | ***0.41%*** | ***-0.7%*** |

## Section H – RRIs and Non-Operating Expenditures

Summary[31]

     The City identified restructuring and reinvestment initiatives by department that are essential to the revitalization of Detroit and the provision of essential municipal services.   The City has identified $1.7 billion of reinvestment initiatives to be undertaken during the next ten years, provided funding is available to do so. This section focuses on the underlying assumptions in the RRIs and certain other non-operating expenditures that are reflected in the POA projections.   The total RRIs and non-operating expenditures are summarized below:

---

[31] Unless otherwise stated the financial projections referenced in section H are sourced from bibliography: Conway Mackenzie Models: 28-54 and Ernst & Young Models 10-11.

| General Fund | FY2014-2023 | | FY2014-2023 | | FY2014-2023 | | FY2014-2023 |
|---|---|---|---|---|---|---|---|
| **Operating Surplus Prior to Legacy, Non Operating Expenses and RRI's** | $ | **2,781** | $ | **2,054** | $ | **1,788** | $ | **1,434** |
| | | | | | | | | |
| **Reinvestment Initiatives** | | | | | | | | |
| Department revenue initiatives | $ | 483 | $ | 586 | $ | 715 | $ | 871 |
| | | | | | | | | |
| Less: | | | | | | | | |
| Additional operating expenditures | $ | 357 | $ | 359 | $ | 438 | $ | 534 |
| Capital investments | $ | 582 | $ | 443 | $ | 501 | $ | 605 |
| Blight | $ | 420 | $ | - | $ | - | $ | - |
| Reinvestment Deferrals | $ | (30) | $ | (223) | $ | 11 | $ | 242 |
| **Total Reinvesment Expenditures** | $ | **1,330** | $ | **579** | $ | **950** | $ | **1,381** |
| **Other Non Operating Expenses** | | | | | | | | |
| Less: | | | | | | | | |
| PLD Decommission | $ | 75 | $ | - | $ | - | $ | - |
| Contributions to Income Stabilization Fund | $ | 18 | $ | 2 | $ | - | $ | - |
| Professional Fees | $ | 130 | $ | - | $ | - | $ | - |
| Working Capital | $ | 25 | $ | - | $ | - | $ | - |
| Secured Debt | $ | 391 | $ | 391 | $ | 67 | $ | - |
| Swap Interest | $ | 104 | $ | - | $ | - | $ | - |
| QOL Exit Financing | $ | 336 | $ | 110 | $ | - | $ | - |
| Contingency | $ | 101 | $ | 121 | $ | 144 | $ | 173 |
| **Total Non Operating Expenses** | $ | **1,179** | $ | **624** | $ | **211** | $ | **173** |
| **Funds Available for Unsecured Claims** | $ | **755** | $ | **1,437** | $ | **1,342** | $ | **752** |

The RRIs were developed by department by CM, and identify capital investments, additional labor and other operating expenses that are needed to ensure that each City department is providing a basic level of service for Detroit residents. In addition, the City identified revenue enhancing initiatives as part of its departmental reviews. The chart below highlights the RRIs by category:

| Revenue | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pricing/Fees | $ 0.4 | $ 10.0 | $ 15.5 | $ 16.8 | $ 21.5 | $ 23.2 | $ 27.3 | $ 26.8 | $ 30.9 | $ 31.8 | $ 204.1 |
| Faster Collections | $ 2.2 | $ 12.6 | $ 15.0 | $ 18.3 | $ 18.6 | $ 18.9 | $ 19.2 | $ 19.4 | $ 19.8 | $ 20.1 | $ 164.3 |
| Grant Revenue | $ 3.1 | $ 40.6 | $ 9.0 | $ 12.2 | $ 12.9 | $ 0.5 | $ 0.5 | $ 0.6 | $ 0.6 | $ 0.6 | $ 80.6 |
| Other | $ (0.1) | $ 19.9 | $ (0.2) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.1) | $ - | $ (0.1) | $ - | $ 19.3 |
| Past Due Collections | $ 1.5 | $ 4.9 | $ 5.7 | $ 2.5 | $ - | $ - | $ - | $ - | $ - | $ - | $ 14.7 |
| **Total Revenue** | **$ 7.2** | **$ 88.0** | **$ 45.1** | **$ 49.7** | **$ 52.9** | **$ 42.5** | **$ 46.9** | **$ 46.8** | **$ 51.3** | **$ 52.5** | **$ 482.9** |

| Operating Expenditures | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Permanent Labor | $ 2.7 | $ 24.2 | $ 20.1 | $ 22.2 | $ 21.7 | $ 19.8 | $ 19.7 | $ 19.0 | $ 18.6 | $ 17.7 | $ 185.6 |
| Professional & Contract Services | $ 0.4 | $ (1.0) | $ (1.3) | $ (1.3) | $ (1.2) | $ (1.2) | $ (1.1) | $ (1.1) | $ (1.1) | $ (1.0) | $ (10.0) |
| Active Benefits | $ 1.3 | $ 10.2 | $ 10.2 | $ 12.7 | $ 12.6 | $ 11.8 | $ 11.9 | $ 11.6 | $ 11.5 | $ 11.3 | $ 105.1 |
| Training | $ 0.3 | $ 7.3 | $ 9.2 | $ 6.3 | $ 5.4 | $ 5.2 | $ 5.1 | $ 5.2 | $ 5.3 | $ 5.0 | $ 54.4 |
| Materials and Supplies | $ 2.0 | $ 6.6 | $ 11.5 | $ 10.2 | $ 8.3 | $ 8.8 | $ 9.4 | $ 9.6 | $ 10.1 | $ 10.6 | $ 87.1 |
| Utilities | $ 0.2 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 2.6 |
| Purchased services | $ 0.4 | $ 0.8 | $ (0.8) | $ (0.5) | $ (1.0) | $ (0.5) | $ (1.0) | $ (0.5) | $ (0.9) | $ (0.4) | $ (4.5) |
| Risk management/insurance | $ (0.0) | $ (2.1) | $ (6.1) | $ (6.1) | $ (6.1) | $ (6.1) | $ (6.1) | $ (6.1) | $ (6.1) | $ (6.1) | $ (50.7) |
| Transfers In/(Out) (General Fund) | $ (0.4) | $ 4.4 | $ 0.5 | $ (2.3) | $ (2.7) | $ (3.5) | $ (3.5) | $ (3.1) | $ (3.6) | $ (3.6) | $ (17.7) |
| Grant related expenses | $ 1.2 | $ 15.6 | $ 3.5 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 20.3 |
| All Other | $ (0.1) | $ (1.7) | $ (1.7) | $ (1.6) | $ (1.6) | $ (1.6) | $ (1.6) | $ (1.5) | $ (1.6) | $ (1.6) | $ (14.8) |
| **Total Operating Expenditures** | **$ 8.0** | **$ 64.6** | **$ 45.3** | **$ 39.9** | **$ 35.6** | **$ 33.0** | **$ 33.0** | **$ 33.3** | **$ 32.5** | **$ 32.1** | **$ 357.4** |

| Reorganization/Investment | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Technology Infrastructure | $ 3.1 | $ 41.3 | $ 34.4 | $ 19.6 | $ 10.1 | $ 7.4 | $ 10.7 | $ 8.8 | $ 8.8 | $ 7.5 | $ 151.7 |
| Capital Expenditures | $ 5.9 | $ 33.5 | $ 41.7 | $ 26.1 | $ 22.4 | $ 19.5 | $ 22.7 | $ 20.0 | $ 16.7 | $ 16.8 | $ 225.4 |
| Other Infrastructure | $ 8.3 | $ 25.8 | $ 24.0 | $ 19.1 | $ 16.4 | $ 15.7 | $ 15.8 | $ 15.2 | $ 13.7 | $ 13.4 | $ 167.4 |
| Reorganization Costs | $ 3.2 | $ 18.2 | $ 6.3 | $ 0.9 | $ 1.2 | $ 1.0 | $ 2.7 | $ 2.0 | $ 1.2 | $ 1.0 | $ 37.7 |
| **Total Reorganization/Investment** | **$ 20.6** | **$ 118.9** | **$ 106.4** | **$ 65.6** | **$ 50.2** | **$ 43.6** | **$ 51.9** | **$ 46.0** | **$ 40.4** | **$ 38.6** | **$ 582.2** |

## Revenue Initiatives

The City identified $483 million in additional revenue over the 10 year period that could be available to the City if it implements the RRIs effectively. The largest sources of additional revenue include: increasing service and fares for DDOT, increasing the volume and dollar amount of parking tickets and collecting income taxes and various civil fines at a faster rate. The revenue initiatives also include $52 million from the Hardest Hit Fund and other grants that the City has identified that were not in the baseline 10 Yr projections. The chart below highlights the revenue initiatives:

| Revenue Initiative | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DDOT Expansion | $ 0.4 | $ 1.5 | $ 5.7 | $ 7.1 | $ 11.7 | $ 13.4 | $ 17.5 | $ 17.1 | $ 21.2 | $ 22.0 | $ 117.6 |
| Faster 36DC Collections | $ - | $ 3.9 | $ 5.5 | $ 8.5 | $ 8.7 | $ 9.0 | $ 9.2 | $ 9.5 | $ 9.8 | $ 10.1 | 74.1 |
| Increased Parking Tickets | $ - | $ 5.6 | $ 6.8 | $ 6.8 | $ 6.8 | $ 6.8 | $ 6.8 | $ 6.8 | $ 6.8 | $ 6.8 | 60.3 |
| Income Tax Collection Improvements | $ 1.2 | $ 4.9 | $ 4.9 | $ 5.2 | $ 5.2 | $ 5.2 | $ 5.2 | $ 5.2 | $ 5.2 | $ 5.2 | 47.4 |
| Increased Collections for New Fire Department Hires | $ 0.9 | $ 3.6 | $ 3.6 | $ 3.6 | $ 3.6 | $ 3.6 | $ 3.6 | $ 3.6 | $ 3.7 | $ 3.7 | 33.7 |
| New Billings for Services | $ - | $ 2.9 | $ 2.9 | $ 2.9 | $ 2.9 | $ 2.9 | $ 2.9 | $ 2.9 | $ 2.9 | $ 2.9 | 26.2 |
| All Other | $ 4.7 | $ 65.6 | $ 15.6 | $ 15.6 | $ 13.9 | $ 1.5 | $ 1.6 | $ 1.6 | $ 1.7 | $ 1.8 | 123.6 |
| **Total Revenue Initiatives** | **$ 7.2** | **$ 88.0** | **$ 45.1** | **$ 49.7** | **$ 52.9** | **$ 42.5** | **$ 46.9** | **$ 46.8** | **$ 51.3** | **$ 52.5** | **$ 482.9** |

DDOT is expecting to increase the number of buses in service from 282 in FY2013 to 394 in FY2023. In addition, the City is projecting total miles to increase from 12.1 million miles in FY2013 to 16.5 million miles in FY2023. The increase in mileage is expected to increase revenue by $47 million over the ten year period and is dependent on obtaining new buses, which are grant funded, and increasing the number of routes.

The City is also projecting increased revenue as a result of fare price increases. The City has not had a fare price increase in the last 8 years. The following table shows the projected fare increases for DDOT:

| Year | Fare Price | YoY Change |
|---|---|---|
| 2013 | $ 1.50 | 0.0% |
| 2014 | $ 1.50 | 0.0% |
| 2015 | $ 1.50 | 0.0% |
| 2016 | $ 1.75 | 16.7% |
| 2017 | $ 1.75 | 0.0% |
| 2018 | $ 2.00 | 14.3% |
| 2019 | $ 2.00 | 0.0% |
| 2020 | $ 2.25 | 12.5% |
| 2021 | $ 2.25 | 0.0% |
| 2022 | $ 2.50 | 11.1% |
| 2023 | $ 2.50 | 0.0% |

The City took into account decreased ridership at each fare price increase, assuming ridership would decrease 2% for every 10% increase in fares. The

increased revenue associated with the fare increases, minus the reduced ridership, results in a total revenue increase over the ten year period of $70 million.

The City is projecting it will be able to collect an additional $74 million as a result of better collections of civil fines and infractions. The City currently collects infractions at a 36% rate. The City is projecting it will increase collections from 36% in 2013 to 56.8% in 2023 leading to the additional $74 million in revenue over the ten year period. The City believes this collection rate is achievable as the regional average is currently 65% which includes Detroit's low collection rate. The City has identified a few initiatives that will help improve collections including increased access to ATM's at the Court and improved operating systems and business processes.

The Emergency Manager implemented increases to parking ticket fines on April 3, 2014[32]. The City has long lagged comparable municipalities in this regard[33]. The recent increase in the parking fines, in addition to additional parking officers, is expected to increase revenue by $60 million over the ten year period.

The Finance department has identified a number of initiatives to improve the collection of income taxes. These include additional staffing, targeting non-

---

[32] See Emergency Manager City of Detroit Order Number 24

[33] See PVB Revenue Enhancement White Paper dated December 9, 2013.

89

residents working in Detroit and using outside services. The initiatives are expected to generate an additional $47 million over the ten year period.

The Fire department is expecting to collect additional revenue as a result of 9 new ambulances, additional Fire Marshalls and cross training fire fighters to do Fire Marshall and EMS work. The initiatives are expected to generate $34 million in revenue over the ten years. The Fire department, along with the Police department, expects to increase revenues by billing services that have not been billed in the past. These new billings represent $26 million in additional revenue over the ten year period.

Operating Expenditures

The City is projecting it will incur an additional $357 million in operating expenditures in the next 10 years related to the RRIs. This does not include $420 million estimated for Blight over the next ten years. Blight is discussed separately in section L of this Report.

# Labor

The largest component of additional operating expense over the ten year period is permanent labor which totals $186 million and represents 52% of the additional operating expenditures. Below is a summary of the labor increase:

| Labor | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Ten Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New Labor due to Incremental Headcount | $ 5.5 | $ 27.6 | $ 31.7 | $ 35.6 | $ 34.4 | $ 32.2 | $ 32.2 | $ 31.1 | $ 31.2 | $ 30.7 | $ 292.2 |
| Overtime for New Employees | $ - | $ 0.0 | $ 0.2 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.4 | $ - | $ 2.0 |
| Overtime Savings from New Employees | $ - | $ 0.7 | $ (2.5) | $ (6.9) | $ (7.0) | $ (7.1) | $ (7.3) | $ (7.4) | $ (7.5) | $ (7.7) | $ (52.7) |
| Efficiency Savings | $ - | $ (0.0) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.4) | $ (1.3) | $ (1.4) | $ (1.8) | $ (2.0) | $ (7.5) |
| Add Back Overestimate Police and Fire Wages | $ (2.9) | $ (4.1) | $ (9.1) | $ (6.5) | $ (5.8) | $ (5.1) | $ (4.2) | $ (3.6) | $ (3.6) | $ (3.6) | $ (48.5) |
| **Total Labor Expense** | **$ 2.7** | **$ 24.2** | **$ 20.2** | **$ 22.3** | **$ 21.7** | **$ 19.8** | **$ 19.7** | **$ 19.0** | **$ 18.6** | **$ 17.3** | **$ 185.6** |

Additional headcount by department projections can be seen below:

| Department | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| DDOT - Transportation | - | - | 50 | 113 | 131 | 133 | 134 | 138 | 149 | 163 |
| Police | 125 | 250 | 250 | 210 | 175 | 162 | 149 | 149 | 149 | 149 |
| Fire | 161 | 97 | 84 | 182 | 193 | 165 | 153 | 135 | 129 | 117 |
| Finance/Budget | 28 | 120 | 121 | 121 | 112 | 112 | 112 | 112 | 112 | 112 |
| General Services | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 | 112 |
| Mayor's Office | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 |
| Human Resources | 4 | 19 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 |
| Ombudsperson | - | - | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |
| Law | - | 9 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| Labor Relations | - | 3 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Human Rights / Board of Ethics | - | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| Auditor General / Inspector General | - | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Airport | - | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Buildings and Safety | 2 | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) |
| City Clerk | - | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) |
| Municipal Parking | 1 | 7 | (6) | (6) | (6) | (6) | (6) | (6) | (6) | (6) |
| Non-Departmental (36D Initiatives) | - | (15) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) |
| Planning & Development | 16 | (32) | (34) | (34) | (34) | (34) | (34) | (34) | (34) | (34) |
| **Total** | **480** | **609** | **660** | **781** | **766** | **727** | **704** | **690** | **694** | **696** |

The total consolidated number of employees[34] for all departments by year including the base 10 Yr Plan and RRIs is highlighted below:

| Total Employees | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2008-2012 Average | Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Employees Reinvestment | | 480 | 609 | 660 | 781 | 766 | 727 | 704 | 690 | 694 | 696 | | |
| Total Employees Base Model | 10,043 | 9,578 | 9,634 | 9,770 | 9,747 | 9,745 | 9,745 | 9,745 | 9,744 | 9,742 | 9,742 | | |
| **Total Employees** | **10,043** | **10,058** | **10,242** | **10,431** | **10,529** | **10,512** | **10,472** | **10,449** | **10,434** | **10,436** | **10,439** | **12,395** | **-15.8%** |

| New Hires by Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Incremental Employees - Reinvestment | 480 | 129 | 52 | 121 | (15) | (40) | (23) | (14) | 4 | 2 | **696** |
| Incremental Employees - Base Model | (465) | 56 | 136 | (23) | (2) | - | - | (1) | (2) | - | **(301)** |
| **Total Additional Head Count** | **15** | **185** | **188** | **98** | **(17)** | **(40)** | **(23)** | **(15)** | **2** | **2** | **396** |

The chart below shows total employees by department from both the 10 Yr forecast and RRIs in FY2023 General Fund departments:

---

[34] The FY2008-2012 average only includes departments that will still be operating in FY2023

| 2023 Employees by Department | | | | 2023 vs. 2008-2012 Avg. | | |
|---|---|---|---|---|---|---|
| General Fund | Base | Reinvestment | Total | 2008-2012 Avg | Var | % Variance |
| Police | 2,895 | 149 | 3,044 | 3,322 | (277) | -9.1% |
| Fire | 1,228 | 117 | 1,345 | 1,358 | (14) | -1.0% |
| 36th District Court | 362 | (25) | 337 | 301 | 36 | 10.5% |
| General Services | 272 | 112 | 384 | 495 | (111) | -28.9% |
| Waste/Public Works | 284 | - | 284 | 416 | (132) | -46.5% |
| Finance/Budget/ITS | 260 | 112 | 372 | 373 | (1) | -0.3% |
| Recreation | 202 | - | 202 | 436 | (233) | NM |
| Planning & Development | 113 | (34) | 79 | 156 | (77) | -98.3% |
| Law | 86 | 17 | 103 | 112 | (10) | -9.3% |
| Elections | 60 | - | 60 | 72 | (12) | -19.5% |
| Human Resources | 60 | 33 | 93 | 159 | (66) | -71.4% |
| Mayor | 24 | 31 | 55 | 67 | (12) | -22.0% |
| Non-Departmental | 17 | - | 17 | 26 | (9) | -54.6% |
| Auditor General | 17 | 4 | 21 | 17 | 4 | 19.2% |
| City Clerk | 15 | (3) | 12 | 22 | (10) | -82.3% |
| Zoning | 11 | - | 11 | 15 | (3) | -30.9% |
| City Council | 10 | - | 10 | 75 | (65) | NM |
| Health & Wellness | 9 | - | 9 | 271 | (262) | NM |
| Ombudsperson | 6 | 20 | 26 | 9 | 17 | 64.9% |
| Human Rights | 5 | 6 | 11 | 10 | 2 | 14.4% |
| Administrative Hearings | 4 | - | 4 | 6 | (2) | -55.0% |
| **Total General Funds** | **5,940** | **539** | **6,479** | **7,718** | **(1,239)** | **-19.1%** |

After accounting for the additional employees in the reinvestment initiatives, the City is still operating with 19% fewer employees than the 5 year average from FY2008-2012.  The largest increases in employees occur in Transportation, Police, Fire, Finance and the General Services departments:

- The 163 additional employees at DDOT include 35 additional uniformed employees to increase safety on buses, and additional bus drivers for additional routes
- The Police department is estimating 250 additional civilian personnel in FY2015 which will allow the City to redeploy uniformed personnel to police activities
- The Fire department expects to hire new fire fighters to provide adequate levels of service to the City.  These fire fighters  will be cross trained to improve efficiency and reduce overtime in the department

- The Finance department expects to hire an additional 112 employees as it identifies ways to operate more efficiently, identify new grant revenue and collect taxes at a faster pace
- General Services expects to hire an additional 112 employees primarily related to facilities and park maintenance.

The City forecasts incremental labor costs by identifying the positions to be added or eliminated and estimating the salary for those positions. Going forward the City assumed the same year over year incremental salary increases per employee as were projected in the base model. Over the ten year period the City expects incremental salaries and wages to increase $292 million due to the RRIs. The chart below summarizes incremental labor costs by department:

| Incremental Salary & Wages | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Ten Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Finance/Budget | $ 0.3 | $ 5.0 | $ 6.3 | $ 6.5 | $ 6.7 | $ 6.8 | $ 7.0 | $ 7.1 | $ 7.2 | $ 7.4 | $ 60.4 |
| Police | $ 1.5 | $ 8.8 | $ 9.4 | $ 7.4 | $ 5.6 | $ 5.0 | $ 4.5 | $ 4.6 | $ 4.7 | $ 4.8 | $ 56.2 |
| Fire | $ 1.7 | $ 5.6 | $ 4.0 | $ 8.0 | $ 7.8 | $ 5.6 | $ 5.6 | $ 3.9 | $ 3.3 | $ 2.0 | $ 47.4 |
| General Services | $ 0.7 | $ 2.3 | $ 4.4 | $ 4.5 | $ 4.7 | $ 4.8 | $ 4.9 | $ 5.0 | $ 5.1 | $ 5.2 | $ 41.6 |
| DDOT - Transportation | $ 0.1 | $ 1.9 | $ 2.2 | $ 3.3 | $ 3.7 | $ 3.8 | $ 3.9 | $ 4.1 | $ 4.4 | $ 4.7 | $ 32.1 |
| Law | $ - | $ 0.7 | $ 1.5 | $ 1.5 | $ 1.5 | $ 1.6 | $ 1.6 | $ 1.6 | $ 1.7 | $ 1.7 | $ 13.4 |
| Mayor's Office | $ 0.8 | $ 1.3 | $ 1.3 | $ 1.3 | $ 1.4 | $ 1.4 | $ 1.4 | $ 1.4 | $ 1.5 | $ 1.5 | $ 13.3 |
| Human Resources | $ - | $ 0.9 | $ 1.3 | $ 1.4 | $ 1.4 | $ 1.4 | $ 1.5 | $ 1.5 | $ 1.5 | $ 1.5 | $ 12.4 |
| Planning & Development | $ 0.3 | $ 0.9 | $ 0.8 | $ 0.9 | $ 0.9 | $ 0.9 | $ 0.9 | $ 0.9 | $ 1.0 | $ 1.0 | $ 8.5 |
| Ombudsperson | $ - | $ - | $ 0.4 | $ 0.6 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 5.2 |
| Labor Relations | $ - | $ 0.1 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.5 | $ 0.5 | $ 0.5 | $ 0.5 | $ 3.7 |
| Human Rights / Board of Ethics | $ - | $ 0.2 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 3.1 |
| Auditor General / Inspector General | $ - | $ 0.2 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 2.5 |
| Airport | $ - | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 1.6 |
| Municipal Parking | $ 0.0 | $ 0.2 | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.2) |
| Buildings and Safety | $ 0.0 | $ 0.0 | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.3) |
| Elections | $ - | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.4) |
| City Clerk | $ - | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (0.2) | $ (1.5) |
| Non-Departmental (36D Initiatives) | $ - | $ (0.3) | $ (0.7) | $ (0.8) | $ (0.8) | $ (0.8) | $ (0.8) | $ (0.8) | $ (0.8) | $ (0.9) | $ (6.7) |
| **Total Incremental Salary and Wages** | **$ 5.5** | **$ 27.6** | **$ 31.7** | **$ 35.6** | **$ 34.4** | **$ 32.2** | **$ 32.2** | **$ 31.1** | **$ 31.2** | **$ 30.7** | **$ 292.2** |

In the base model, the City assumes that overtime remains at the FY 2013 level as a percentage of payroll. The City assumes that the incremental employees

94

hired as a result of the RRIs do not increase or decrease the overtime assumed in the base model with the following exceptions:

- Fire department overtime decreases by $2 million over the ten year period and further savings of $6.3 million occur due to reaching adequate staffing levels
- DDOT assumes $48.7 million in overtime savings over the 10 year period as new buses are added to the fleet, maintenance on old buses decreases, overtime is reduced considerably. In addition, new safety cameras and additional police staff should increase driver and rider safety, thereby decreasing driver absenteeism and resulting in decreased overtime

The decrease in overtime at DDOT is a key assumption over the next ten years as the City provides a subsidy to DDOT. The analysis below highlights the projected overtime in gross dollars and as a percentage of payroll for both the base model and the added employees and the decreased overtime from the RRIs:

| DDOT Consolidated Payroll and Overtime | | 2014 | | 2015 | | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Payroll Base Model | $ | 30.1 | $ | 33.9 | $ | 34.4 | $ | 35.3 | $ | 36.1 | $ | 37.1 | $ | 37.8 | $ | 38.5 | $ | 39.3 | $ | 40.1 | $ | 362.6 |
| Total Overtime Base Model | $ | 12.0 | $ | 13.5 | $ | 13.8 | $ | 14.1 | $ | 14.5 | $ | 14.8 | $ | 15.1 | $ | 15.4 | $ | 15.7 | $ | 16.0 | $ | 145.0 |
| *As a % of Payroll* | | *40.0%* | | *40.0%* | | *40.0%* | | *40.0%* | | *40.0%* | | *40.0%* | | *40.0%* | | *40.0%* | | *40.0%* | | *40.0%* | | *40.0%* |
| | | | | | | | | | | | | | | | | | | | | | | |
| New Payroll | $ | 0.1 | $ | 1.9 | $ | 2.2 | $ | 3.3 | $ | 3.7 | $ | 3.8 | $ | 3.9 | $ | 4.1 | $ | 4.4 | $ | 4.7 | $ | 32.1 |
| Overtime Savings | $ | - | $ | (1.0) | $ | (5.6) | $ | (5.6) | $ | (5.7) | $ | (5.8) | $ | (6.0) | $ | (6.1) | $ | (6.1) | $ | (6.7) | $ | (48.7) |
| | | | | | | | | | | | | | | | | | | | | | | |
| Consolidated DDOT Payroll | $ | 30.2 | $ | 35.7 | $ | 36.6 | $ | 38.6 | $ | 39.8 | $ | 40.9 | $ | 41.7 | $ | 42.6 | $ | 43.7 | $ | 44.8 | $ | 394.7 |
| Consolidated Overtime | $ | 12.0 | $ | 12.6 | $ | 8.2 | $ | 8.5 | $ | 8.7 | $ | 9.0 | $ | 9.1 | $ | 9.3 | $ | 9.6 | $ | 9.3 | $ | 96.3 |
| *As a % of Payroll* | | *39.8%* | | *35.2%* | | *22.3%* | | *21.9%* | | *21.9%* | | *22.0%* | | *21.8%* | | *21.9%* | | *22.0%* | | *20.8%* | | *24.4%* |

The City is expecting overtime for DDOT to decrease from its baseline estimate of 40% to 20.8% by FY2023. If the City is unsuccessful in decreasing overtime and overtime remains at 40% of payroll, the subsidy would be $61 million higher than currently projected over the ten years.

Prior to the July 2nd projections, the City reexamined the projections for salaries and wages for new hires in the Police and Fire departments in the baseline 10 Yr projections. In the May 5th projections the City assumed all new hires would be at the average salary of the department. In reality, the new entry level employees hired will likely be at a much lower pay scale. Recalculating the actual salaries for these new employees in the baseline model results in $48.5 million[35] in total savings for the ten year period:

| Recalc of Police and Fire Base Model Hires | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Police | $ - | $ (1.1) | $ (6.1) | $ (3.5) | $ (2.7) | $ (1.9) | $ (0.9) | $ (0.2) | $ (0.2) | $ (0.2) | $ (16.7) |
| Fire | $ (2.9) | $ (3.0) | $ (3.0) | $ (3.1) | $ (3.1) | $ (3.2) | $ (3.3) | $ (3.4) | $ (3.4) | $ (3.5) | $ (31.8) |
| Total Add Backs for Pay Difference | $ (2.9) | $ (4.1) | $ (9.1) | $ (6.5) | $ (5.8) | $ (5.1) | $ (4.2) | $ (3.6) | $ (3.6) | $ (3.6) | $ (48.5) |

## Professionals and Contractual Services

The City is projecting a $10 million decrease in professional and contractual services over the 10 Yr projections. The savings are primarily related to the Income Tax department implementing CityTax and the need for less outside employment.

---

[35] The reduced costs associated with the changes in assumptions for the Police and Fire departments in this section do not include additional add backs for benefits which are $5.8 million and $13.3 million for the Police and Fire departments, respectively, and are included in the benefits section. Total reduced costs for the recalculation including salary, overtime and benefits is $67.7 million for the two departments.

## Benefits

The City estimated benefits using the following percentage of payroll projections:

| Incremental Benefits as a % of Payroll | % of Payroll |
|---|---|
| Police | 40.5% |
| Fire | 42.0% |
| General Services | 45.0% |
| DDOT - Transportation | 49.2% |

Using the above rates, the City estimates an additional $105.1 million in benefits for employees hired as part of the RRIs:

| Incremental Benefits | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Ten Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Finance/Budget | $ 0.2 | $ 2.2 | $ 2.8 | $ 2.9 | $ 3.0 | $ 3.1 | $ 3.1 | $ 3.2 | $ 3.3 | $ 3.3 | $ 27.2 |
| Police | $ 0.6 | $ 3.1 | $ 1.3 | $ 1.6 | $ 1.2 | $ 1.3 | $ 1.4 | $ 1.8 | $ 1.8 | $ 1.9 | $ 16.0 |
| Fire | $ (0.4) | $ 1.3 | $ 0.7 | $ 1.9 | $ 1.8 | $ 0.7 | $ 0.4 | $ (0.4) | $ (0.9) | $ (1.6) | $ 3.6 |
| General Services | $ 0.3 | $ 1.1 | $ 2.0 | $ 2.0 | $ 2.1 | $ 2.2 | $ 2.2 | $ 2.2 | $ 2.3 | $ 2.3 | $ 18.7 |
| DDOT - Transportation | $ 0.1 | $ 0.7 | $ 0.9 | $ 1.6 | $ 1.8 | $ 1.9 | $ 1.9 | $ 2.0 | $ 2.2 | $ 2.4 | $ 15.6 |
| Law | $ - | $ 0.3 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.8 | $ 6.0 |
| Mayor's Office | $ 0.5 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.7 | $ 0.7 | $ 6.1 |
| Human Resources | $ - | $ 0.4 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 5.6 |
| Planning & Development | $ 0.1 | $ 0.4 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 3.3 |
| Ombudsperson | $ - | $ - | $ 0.2 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 2.4 |
| Labor Relations | $ - | $ 0.0 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 1.7 |
| Human Rights / Board of Ethics | $ - | $ 0.1 | $ 0.1 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 1.4 |
| Auditor General / Inspector General | $ - | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 1.1 |
| Airport | $ - | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.7 |
| Municipal Parking | $ 0.0 | $ 0.1 | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.1) |
| Buildings and Safety | $ 0.0 | $ 0.0 | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.1) |
| Elections | $ - | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.0) | $ (0.2) |
| City Clerk | $ - | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.1) | $ (0.7) |
| Non-Departmental (36D Initiatives) | $ - | $ (0.2) | $ (0.3) | $ (0.3) | $ (0.3) | $ (0.4) | $ (0.4) | $ (0.4) | $ (0.4) | $ (0.4) | $ (3.0) |
| **Total Incremental Benefits** | **$ 1.3** | **$ 10.2** | **$ 10.2** | **$ 12.7** | **$ 12.6** | **$ 11.8** | **$ 11.9** | **$ 11.6** | **$ 11.5** | **$ 11.3** | **$ 105.1** |

The City took a conservative approach to estimating benefits in its RRIs by using higher percentages of payroll estimates than those used in the baseline forecasts:

97

| Benefits as a % of Payroll | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|
| Police | 34.0% | 35.1% | 35.9% | 36.7% | 37.3% | 37.7% | 38.1% | 38.5% | 38.9% |
| Fire | 37.0% | 38.0% | 38.7% | 39.5% | 40.0% | 40.4% | 40.7% | 41.1% | 41.5% |
| DDOT | 44.4% | 47.3% | 49.8% | 51.4% | 52.4% | 53.0% | 53.7% | 54.5% | 55.3% |
| Non Uniform | 39.2% | 40.2% | 41.0% | 41.7% | 42.4% | 42.7% | 43.1% | 43.5% | 43.8% |

## Training

The City is projecting $54.4 million in training expenditures over the next ten years, beginning in mid FY2015. The estimate includes $2,000 per employee per year for all non-uniform City employees through FY2017 and $1,500 per employee per year after FY2017. The City also assumes $600,000 in yearly city-wide Human Resources training beginning in FY2016. Fire department training to cross train employees and meet minimum grant standards is projected to be $13.3 million during the time period. Below is a breakdown of training expenditures over the ten years:

| Training | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Ten Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee Training | $ 0.0 | $ 3.2 | $ 4.9 | $ 4.1 | $ 4.1 | $ 4.0 | $ 4.0 | $ 4.0 | $ 4.0 | $ 4.0 | $ 36.3 |
| Fire Training | $ 0.3 | $ 4.1 | $ 3.7 | $ 1.6 | $ 0.7 | $ 0.6 | $ 0.5 | $ 0.6 | $ 0.7 | $ 0.4 | $ 13.3 |
| HR Training | $ - | $ - | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 4.8 |
| **Total Training** | **$ 0.3** | **$ 7.3** | **$ 9.2** | **$ 6.3** | **$ 5.4** | **$ 5.2** | **$ 5.1** | **$ 5.2** | **$ 5.3** | **$ 5.0** | **$ 54.4** |

## Materials & Supplies

The City expects to spend $87.1 million in additional materials and supplies related to the RRIs. The largest component is an additional $65.1 million needed by the General Services department to repair city buildings and to provide adequate

levels of service to the City's operating departments.  In addition the City expects to spend $37.4 million on materials and supplies due to the additional routes projected by DDOT.  The Police department expects to spend $16.2 million on vests, improvements in technology and various other supplies.

The total additional expenditures related to materials and supplies are offset by $35.8 million of projected cost savings from consolidation of vendors, improved department staffing and process related enhancements.  Below is a breakdown of the projected increase in materials and supplies:

| Materials and Supplies | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Ten Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| M&S to Achieve Desired Service Levels | $ 1.2 | $ 5.5 | $ 7.3 | $ 7.3 | $ 7.3 | $ 7.3 | $ 7.3 | $ 7.3 | $ 7.3 | $ 7.3 | $ 65.1 |
| M&S due to Increased Miles Driven | $ 0.4 | $ 0.9 | $ 1.9 | $ 3.0 | $ 4.0 | $ 4.5 | $ 5.0 | $ 5.4 | $ 5.9 | $ 6.4 | $ 37.4 |
| Risk Management Technology | $ - | $ 0.3 | $ 2.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.7 | $ 0.6 | $ 0.6 | $ 0.6 | $ 7.2 |
| Miscellaneous Police Supplies | $ - | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.7 | $ 0.6 | $ 0.6 | $ 0.6 | $ 6.0 |
| Vest Replacement | $ 0.1 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.4 | $ 0.4 | $ 3.1 |
| Finance - Purchasing Savings | $ 0.0 | $ (2.0) | $ (2.0) | $ (2.0) | $ (5.0) | $ (5.0) | $ (5.0) | $ (5.0) | $ (5.0) | $ (5.0) | $ (35.8) |
| All Other M&S | $ 0.3 | $ 0.8 | $ 0.6 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 4.2 |
| **Total Material and Supplies** | **$ 2.0** | **$ 6.6** | **$11.5** | **$10.2** | **$ 8.3** | **$ 8.8** | **$ 9.4** | **$ 9.6** | **$10.1** | **$10.6** | **$ 87.1** |

## Risk Management & Insurance

The City is projecting $50.7 million in savings related to risk management and insurance.  The savings are projected as a result of reduced workers comp payments due to an improved risk management function and better claims processing.  In addition, the City projects $2 million of yearly savings due to a reduction in lawsuits through improved risk management.  Below is a summary:

90

| Risk Management and Insurance | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Ten Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Workers Comp Savings | $ - | $ - | $ (4.0) | $ (4.0) | $ (4.0) | $ (4.0) | $ (4.0) | $ (4.0) | $ (4.0) | $ (4.0) | $ (32.0) |
| Reduction in Lawsuits | $ - | $ (2.0) | $ (2.0) | (2.0) | $ (2.0) | $ (2.0) | $ (2.0) | $ (2.0) | $ (2.0) | $ (2.0) | (18.0) |
| All Other | $ - | $ (0.1) | $ (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.7) |
| **Total Risk Management & Insurance** | **$ -** | **$ (2.1)** | **$ (6.1)** | **(6.1)** | **$ (6.1)** | **$ (6.1)** | **$ (6.1)** | **$ (6.1)** | **$ (6.1)** | **$ (6.1)** | **$ (50.7)** |

## Other Operating Expenditures

Other operating expenditures over the ten year period include:

- Utilities: $2.6 million in additional costs projected by the General Services department
- Purchased Services:
  - $4.5 million in savings related to $6.75 million less outside legal costs due to additional labor in the Law department
  - $5.7 million in savings due to less involvement from consultants in the Finance department
  - $1.1 million in additional expenditures related to additional DDOT miles
  - $1.9 million in additional outside services in the Police department
  - $1.7 million for storage and maintenance of medical records due to the outsourcing of the Health and Wellness department
  - $1.3 million in additional actuarial and benefit consulting
  - $1.2 million in security and planning related to the Airport department.
- Grants: $20.3 million in grant related costs associated with the Hardest Hit Fund from FY2014-2016
- Other Expenses:
  - $17.4 million in other savings as a result of the Neighborhood and Lean Process Improvement Program
  - $7.1 million in costs in the Police department mostly related to new facilities

Reorganization/Investment

The City is projecting it will incur an additional $582 million in capital expenditures and infrastructure improvements in the next 10 years to improve the City's level of services. The City views these initiatives as critical components in stabilizing the City and attracting and retaining quality employees for the City of Detroit.

Technology & Infrastructure

The City's IT department has been underfunded for many years and is in need of a significant upgrade to its operating systems, software and hardware. The City expects to undertake a number of initiatives to improve the current systems in place including:

- $29 million related to a new ERP System which includes both installation and annual maintenance to improve the City's financial processes and reporting
- $11.7 million related to City wide hardware upgrades
- $10.9 million related to data backup centers
- $10.4 million related to the City-wide installation of Microsoft 365
- $5.2 million related to the implementation of CityTax

Other significant investments which will provide better services to the citizens of the Detroit include the installation and implementation of a new 311 system, implementation of an integrated public safety system and replacement of handheld Police radios. Below is a breakdown of key IT and infrastructure investments over the next ten years:

| IT and Infrastructure | Department | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Ten Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ERP System | Finance | $ - | $ 7.4 | $ 10.3 | $ 9.0 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 29.0 |
| Replacement of Radios | Police | $ - | $ 7.5 | $ 7.5 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 22.0 |
| Implementation of Integrated Public Safety System | Police | $ - | $ 4.5 | $ 2.5 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 13.8 |
| Hardware Upgrade | Finance | $ - | $ 1.5 | $ 2.0 | $ 2.0 | $ 1.2 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 11.7 |
| Data Back Up Center | Finance | $ - | $ - | $ 4.9 | $ 2.4 | $ 0.2 | $ 0.2 | $ 2.7 | $ 0.2 | $ 0.2 | $ 0.2 | $ 10.9 |
| Microsoft Application Department - 365 Cloud (Net of Savings) | Finance | $ - | $ 1.3 | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.1 | $ 10.4 |
| 311 System | Ombudsperson | $ - | $ - | $ 3.0 | $ 0.5 | $ 0.5 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 7.0 |
| Document Imaging and Management System | Finance | $ - | $ 3.0 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 5.4 |
| Implementation of City Tax | Finance | $ 0.1 | $ 1.7 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 5.2 |
| Upgrades to 36th District Court Technology | Non Departmental | $ - | $ 1.6 | $ 0.8 | $ 0.4 | $ 0.4 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 4.2 |
| Citywide Network Infrastructure | Finance | $ - | $ 2.0 | $ - | $ - | $ 1.1 | $ - | $ - | $ 1.1 | $ - | $ - | $ 4.2 |
| Security Access System to Building | Finance | $ - | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 3.8 |
| Workbrain Upgrades | Finance | $ 1.1 | $ - | $ - | $ - | $ 1.2 | $ - | $ - | $ - | $ 1.3 | $ - | $ 3.6 |
| Fire Vehicle Technology Upgrade | Fire | $ - | $ 0.7 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.7 | $ 0.1 | $ 0.1 | $ 0.1 | $ 2.2 |
| Helpdesk Software | Finance | $ - | $ 1.6 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 2.0 |
| Active Directory Service Migration | Finance | $ - | $ 1.3 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 2.0 |
| Cashiering Controls | Finance | $ - | $ 1.4 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1.4 |
| HR Learning Center and Implementation | HR | $ - | $ 0.5 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 1.3 |
| Operating System Upgrade | Finance | $ - | $ 1.0 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1.0 |
| SQL Server Update | Finance | $ - | $ 0.2 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.7 |
| All Other | Various | $ 1.9 | $ 3.6 | $ 0.5 | $ 0.5 | $ 0.5 | $ 0.5 | $ 0.6 | $ 0.7 | $ 0.5 | $ 0.5 | $ 9.8 |
| **Total IT and Infrastructure** | | **$ 3.1** | **$ 41.3** | **$ 34.4** | **$ 19.6** | **$ 10.1** | **$ 7.4** | **$ 10.7** | **$ 8.8** | **$ 8.8** | **$ 7.5** | **$ 151.7** |

## Capital Expenditures

The City has identified a number of facility-related capital expenditures including current facility repairs and new or replacement facilities, some of which are itemized below.

- $40.3 million for repairs and space consolidation across all City buildings
- $37 million for facility improvements and emergency repairs to the various parks and recreation centers

- $34.2 million for a new Police training facility, new precincts and various improvements to current buildings
- $71.3 million for Fire department improvements including $31.2 million in repairs and maintenance to current firehouses, $21 million for 7 new firehouses and $19 million in new gear and equipment
- $15.7 million in required airport upgrades by the Department of Transportation
- $10.3 million in system and equipment upgrades for DDOT that are not grant funded.

The chart below details the capital expenditures the City is projecting over the ten year period:

| Capital Expenditures | Department | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Ten Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Department City Wide Projects and Space Consolidation | GSD | 1.2 | 5.1 | 7.2 | 4.8 | 3.8 | 3.6 | 3.6 | 3.8 | 3.7 | 3.7 | 40.3 |
| Facility Improvements/Upgrades and Emergency Repairs | Recreation | 0.9 | 4.8 | 4.1 | 4.8 | 4.0 | 4.5 | 3.9 | 3.3 | 3.3 | 3.3 | 37.0 |
| Department wide improvement projects, New Training Facility and New Precincts | Police | 0.7 | 13.7 | 6.5 | 0.1 | 0.5 | 0.2 | 3.3 | 3.1 | 3.0 | 3.0 | 34.2 |
| R&M of Fire Department Facilities | Fire | 1.1 | 3.0 | 5.5 | 2.4 | 1.1 | 2.0 | 5.1 | 4.1 | 3.0 | 4.0 | 31.2 |
| New Firehouses | Fire | - | - | 3.0 | 3.0 | 3.0 | 6.0 | 3.0 | 3.0 | - | - | 21.0 |
| Gear and equipment | Fire | 2.0 | 3.0 | 1.4 | 2.1 | 1.7 | 1.7 | 1.7 | 1.5 | 2.4 | 1.5 | 19.0 |
| Executive Bay Upgrades, New Jetway, Terminal Upgrades and Other Improvements | Airport | - | 0.4 | 5.0 | 5.3 | 5.0 | - | - | - | - | - | 15.7 |
| ERP, Security, Fleet Mgt, Radio, AVL & APC System Upgrades (All Non Grant Funded) | DDOT | - | 1.6 | 2.0 | 2.3 | 2.5 | 1.0 | 1.0 | - | - | - | 10.3 |
| Herman Keifer Demolition Costs | Health and Wellness | - | - | 5.1 | - | - | - | - | - | - | - | 5.1 |
| R&M for buildings | Non Departmental | - | 1.0 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 5.0 |
| Upgrades to Caniff Impound Lot | Parking | - | 0.7 | 0.1 | 0.1 | 0.5 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 2.0 |
| Training Location | HR | - | - | 1.0 | - | - | - | - | - | - | - | 1.0 |
| All Other | Various | - | 0.4 | 0.3 | 0.6 | 0.3 | - | 0.5 | 0.5 | 0.5 | 0.5 | 3.7 |
| **Total CapEx** | | **5.9** | **33.5** | **41.7** | **26.1** | **22.4** | **19.5** | **22.7** | **20.0** | **16.7** | **16.8** | **225.4** |

<u>Fleet</u>

The City reviewed the current condition of vehicles in the Police, Fire, GSD and Parking departments. The City projected the number of vehicles needed by department to supply adequate levels of service to the City. The City then projected the cost per vehicle and projected life cycles for each vehicle to determine the yearly number of vehicles to be purchased and the related cost.

- The Police Department projects an average life cycle of 3.5 years resulting in 270 new scout cars costing $91.3 million over the next ten years
- Fleet purchases for the Fire Department include $40 million for new purchases and $18.6 million for repairs of their current fleet
- The General Services department projects spending $6.4 million over the next ten years on purchases of new vehicles and equipment and $9.7 million on upgrades to City owned parks
- The Parking Department expects to spend $1.4 million over the next ten on vehicles

The chart below outlines fleet spending over the ten year period:

| Fleet | Department | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Ten Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fleet replacement - Police | Police | $ - | $ 9.5 | $ 11.7 | $ 10.0 | $ 10.0 | $ 10.0 | $ 10.0 | $ 10.0 | $ 10.0 | $ 10.0 | $ 91.3 |
| Fleet Replacement Program and Preventive Maintenance Program | Fire | $ 6.2 | $ 11.7 | $ 9.0 | $ 5.9 | $ 5.7 | $ 4.9 | $ 5.1 | $ 4.5 | $ 3.0 | $ 2.7 | $ 58.6 |
| Upgrade Parks | GSD | $ 1.2 | $ 3.5 | $ 2.5 | $ 2.5 | $ - | $ - | $ - | $ - | $ - | $ - | $ 9.7 |
| Replacement of vehicles | GSD | $ 0.9 | $ 0.7 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 6.4 |
| Fleet replacement - Parking | Parking | $ - | $ 0.4 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 1.4 |
| **Total Fleet** | | **$ 8.3** | **$ 25.8** | **$ 24.0** | **$ 19.1** | **$ 16.4** | **$ 15.7** | **$ 15.8** | **$ 15.2** | **$ 13.7** | **$ 13.4** | **$ 167.4** |

## Reorganization

The City is expecting to incur various expenses related to implementing the RRIs. These are generally one-time expenses and include:

- $15.4 million in costs related to reassessing and revaluing all properties in the City
- $10.2 million related to outside services for strategic planning, facility consolidation and zoning activities
- $3.7 million for contract employees at the 36th District Court related to restructuring initiatives.

Reinvestment Deferrals

As the City negotiated settlements with creditors and stakeholders, proposed POA payments have taken priority over RRI spending in the near term. As a result, there has been a need to permanently or temporarily defer RRIs in order to maintain adequate levels of liquidity to fund operations and meet the obligations proposed in the POA. The updated July 2nd projections identify all but $29.8 million of the deferrals as to the individual RRI and the timing. In general, the City sought to defer RRIs that would have the least impact on future revenue and cost savings. If the City enters into additional settlements with creditors, it is likely that additional RRI deferrals will be necessary.

Non Operating Expenditures

The City projected a number of necessary non-operating expenditures in the POA projections. These include one-time costs associated with the chapter 9, decommission of the City's power plants, payments required in the POA and a 1% contingency, among other items. These expenses are detailed below:

| Other Non Operating Expenses | 10 Year Total |
|---|---|
| Professional Fees | $ 130 |
| PLD Decommission | $ 75 |
| Working Capital | $ 25 |
| Contributions to Income Stabilization Fund | $ 18 |
| Secured Debt | $ 391 |
| QOL Exit Financing | $ 336 |
| Swap Interest | $ 104 |
| Contingency | $ 101 |
| **Total Non Operating Expenses** | **$ 1,179** |

## Professional Fees

The City projected professional fees for the various constituents involved in the Chapter 9 case. The City projected $82.2 million and $47.8 million in professional fees in for FY2014 and FY2015 respectively. The City assumes at the time of emergence the professional fees for the majority of the firms projected will be discontinued. The chart below highlights the professional fees by firm:

| Professional Fees | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Ten Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **City Professional fees** | | | | | | | | | | | |
| Conway Mackenzie (Ops) | $ 14.0 | $ 6.5 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 20.5 |
| Ernst & Young (FA) | $ 13.4 | $ 4.9 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 18.3 |
| Jones Day (Counsel) | $ 35.7 | $ 10.9 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 46.6 |
| Miller Buckfire (IB) | $ 5.4 | $ 19.5 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 24.9 |
| Milliman (actuary) | $ 1.0 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1.0 |
| **Total City Professional Fees** | **$ 69.5** | **$ 41.8** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 111.3** |
| **Creditors Professional fees** | | | | | | | | | | | |
| Lazard (FA) | $ 1.8 | $ 0.7 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2.5 |
| Denton (Counsel) | $ 13.8 | $ 5.0 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 18.8 |
| Brooks Wilkins Sharkey & Turco PLLC (local | $ 0.8 | $ 0.3 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1.1 |
| Segal (actuary) | tbd | tbd | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total** | **$ 16.3** | **$ 6.0** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 22.3** |
| **Total Creditors Professional Fees** | **$ 85.8** | **$ 47.8** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 133.6** |
| Less: State reimbursements for advisor fees | $ (3.6) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (3.6) |
| **Total Professional fees** | **$ 82.2** | **$ 47.8** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 130.0** |

## PLD Decommission

Street lights will be transitioned to the Public Lighting Authority during FY2015-2023. The City estimates approximately $75 million over a ten year period in decommission expenses. The City assumed $2.4 million for each of its 31 substations. Below are expected expenditures per year:

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Ten Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PLD Decommission | $ - | $ 2.5 | $ 5.0 | $ 15.0 | $ 10.0 | $ 10.0 | $ 10.0 | $ 12.5 | $ 10.0 | $ - | $ 75.0 |

## Working Capital

The City estimates additional expenditures related to working capital in FY2014 of $39.9 million primarily related to past due vendor payments. This amount is offset by $20 million in proceeds from a bond escrow fund. The chart below identifies the working capital impact over the next 2 years.

| Identified risks and opportunities to 10-year plan | 2014 | 2015 | Total |
|---|---|---|---|
| Higher Transportation Dept (DDOT) operating subsidy in CF | $ 2.0 | $ 5.0 | $ 7.0 |
| Accounts payable vendor risk in CF | $ 30.0 | $ - | $ 30.0 |
| Cash escrow reserve requirement for self-insurance | $ 7.8 | $ - | $ 7.8 |
| Refunding bond proceeds drawn from escrow | $ - | $ (20.0) | $ (20.0) |
| **Total** | **$ 39.8** | **$ (15.0)** | **$ 24.8** |

## Income Stabilization Fund

The Income Stabilization Fund is the result of negotiations between the City and the PFRS and GRS. $20 million will be paid to pensioners that meet the following criteria:

- Eligible pensioner's total household income is equal to 130% of the federal poverty Level in 2013 or:
- The annual pension benefit payment payable to each eligible pensioner equals 100% of the annual pension benefit payment actually received by the eligible pensioner in 2013, whichever amount is lower.

The payments will be made over a 14 year period from excess funds from the UTGO property Tax Millage after accounting for UTGO Secured debt payments and Note A UTGO debt payments. Below highlights the projected payments over the ten year period:

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Ten Year Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Income Stabilization Fund | $ 2.5 | $ 2.3 | $ 2.3 | $ 2.2 | $ 2.1 | $ 2.1 | $ 2.0 | $ 1.3 | $ 1.1 | $ 17.8 |

## Secured Debt

The City projects debt payments for secured debt to continue to be paid via the same amortization schedules used prior to filing Chapter 9. Below is the detailed amortization schedule for each tranche of debt:

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Ten Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **UTGO Secured Debt** | | | | | | | | | | | |
| Beginning Principal - UTGO DSA | $ 100.0 | $ 98.4 | $ 96.5 | $ 94.4 | $ 92.2 | $ 89.8 | $ 87.2 | $ 84.5 | $ 81.6 | $ 78.4 | $ 100.0 |
| Principal | $ 1.6 | $ 2.0 | $ 2.1 | $ 2.2 | $ 2.4 | $ 2.5 | $ 2.7 | $ 2.9 | $ 3.2 | $ 3.4 | $ 25.0 |
| **Ending Balance** | **$ 98.4** | **$ 96.5** | **$ 94.4** | **$ 92.2** | **$ 89.8** | **$ 87.2** | **$ 84.5** | **$ 81.6** | **$ 78.4** | **$ 75.0** | **$ 75.0** |
| Interest | $ 8.0 | $ 7.9 | $ 7.8 | $ 7.7 | $ 7.5 | $ 7.4 | $ 7.2 | $ 7.0 | $ 6.8 | $ 6.6 | $ 73.8 |
| | | | | | | | | | | | |
| **LTGO Secured** | | | | | | | | | | | |
| Beginning Principal - LTGO DSA | $ 249.8 | $ 245.5 | $ 238.8 | $ 231.8 | $ 224.5 | $ 216.7 | $ 208.6 | $ 200.0 | $ 191.0 | $ 181.7 | $ 249.8 |
| Principal (Based on Set-Asides) | $ 4.3 | $ 6.7 | $ 7.0 | $ 7.4 | $ 7.7 | $ 8.1 | $ 8.6 | $ 9.0 | $ 9.4 | $ 9.8 | $ 78.0 |
| **Ending Balance** | **$ 245.5** | **$ 238.8** | **$ 231.8** | **$ 224.5** | **$ 216.7** | **$ 208.6** | **$ 200.0** | **$ 191.0** | **$ 181.7** | **$ 171.8** | **$ 171.8** |
| Interest (Based on Set-Asides) | $ 12.6 | $ 12.4 | $ 12.0 | $ 11.7 | $ 11.3 | $ 10.9 | $ 10.5 | $ 10.1 | $ 9.7 | $ 9.3 | $ 110.3 |
| | | | | | | | | | | | |
| **LTGO Secured - 2012 Refinancing** | | | | | | | | | | | |
| Beginning Principal (For GF, actual Debt Service different) | $ 129.5 | $ 126.6 | $ 122.2 | $ 117.6 | $ 112.7 | $ 107.6 | $ 102.3 | $ 96.7 | $ 90.9 | $ 84.7 | $ 129.5 |
| Principal | $ 2.9 | $ 4.4 | $ 4.6 | $ 4.9 | $ 5.1 | $ 5.3 | $ 5.6 | $ 5.8 | $ 6.1 | $ 6.5 | $ 51.3 |
| **Ending Balance** | **$ 126.6** | **$ 122.2** | **$ 117.6** | **$ 112.7** | **$ 107.6** | **$ 102.3** | **$ 96.7** | **$ 90.9** | **$ 84.7** | **$ 78.3** | **$ 78.3** |
| Interest | $ 6.1 | $ 6.0 | $ 5.8 | $ 5.6 | $ 5.4 | $ 5.1 | $ 4.9 | $ 4.7 | $ 4.4 | $ 4.1 | $ 52.2 |
| **Yearly Secured Debt Payments** | **$ 35.4** | **$ 39.4** | **$ 39.4** | **$ 39.4** | **$ 39.4** | **$ 39.4** | **$ 39.5** | **$ 39.5** | **$ 39.5** | **$ 39.6** | **390.5** |

## Quality of Life/Exit Financing

The City plans to draw down $292.7 million on its $300 million Exit Facility by the end of FY2016. The current quality of life loan is expected to be refinanced as part of the exit facility at the emergence of bankruptcy. The Exit Facility bears interest at 6% and matures in 2026. The City begins to make principal payments on the loan starting in 2019.

## Swap Interest

The City assumes the agreed upon settlement of the PFRS and GRS Swaps of $85 million at emergence from bankruptcy. The City has continued to make quarterly swap payments while in bankruptcy. The payments made to date will be

deducted from the final payment made at settlement. Below are the projected payments in FY2014 and FY2015 and reconciliation of the final payment assumed to occur in October 2014:

| | 2014 | 2015 | Total |
|---|---|---|---|
| **POC Swaps** | | | |
| PFRS Interest | $ 29.6 | $ 10.2 | $ 39.8 |
| GRS Interest | $ 16.3 | $ 5.5 | $ 21.9 |
| **POC Swap Payment** | **$ 45.9** | **$ 15.7** | **$ 61.6** |
| Swap Settlement | | $ 42.1 | $ 42.1 |
| **Total Swap Payments** | **$ 45.9** | **$ 57.8** | **$ 103.8** |

| Reconciliation of Final Payment | Total |
|---|---|
| Settlement | $ 85.0 |
| FY14 int. payments (Post Bankruptcy) | $ 27.2 |
| FY15 Int. payments (Prior to Emergence from Bankruptcy) | $ 15.7 |
| **Bulk payment in Oct, 2014** | **$ 42.1** |

Contingency

The City assumed a yearly contingency estimate of 1% of total revenue. Total revenue includes revenue from the base plan, revenue from the RRIs and proceeds from the Exit Facility. Total contingency is $101 million over the ten year period. Public Acts 181 and 182 of 2014, part of the so called Grand Bargain legislation requires a contingency of not less than 5% of projected expenses in each year. This difference in the amount of contingency is approximately $40 million in FY2015.

## Section I - Systems, Controls and Reporting

<u>Introduction</u>

> *"The effective use of technology is an essential foundation of a modern, efficient and effective government, and that absent a modernized IT infrastructure, a city is unable to adequately deliver government services for the public."[36]*

This quote is from Beth Niblock's Report filed in connection with the Detroit bankruptcy. Ms. Niblock, the City of Detroit's Chief Information Officer, also concludes in her report that: "The City's information technology is deficient".[37] I agree that a working technological platform allows the City to properly operate. I also believe that the City's IT infrastructure is so broken that, left unaddressed, threatens the City's ability to meet the commitments in the POA. The City's current technology infrastructure problems are the direct result of long term, systematic underfunding and lack of leadership.

---

[36] Report of Beth Niblock, Chief Information Officer for the City of Detroit; in re: City of Detroit, para 6 page 3.

[37] Report of Beth Niblock, Chief Information Officer for the City of Detroit; in re: City of Detroit, para 4.A. page 3.

Nowhere is this failure as evident as it is in the City's Finance departments. The lack of accounting and financial information systems confounds virtually every City operation and makes it difficult to perform even basic analysis or performance monitoring. The Emergency Manager's description below provides a realistic picture of the City's current systems:

> "The City's core financial, accounting and budgeting systems similarly suffer from the lack of modern IT. The City's financial reporting and budget development systems: (a) are 10 to 15 years old; (b) require a manual interface (70% of journal entries are booked manually); (c) lack reliable fail-over and back-up systems; and (d) lack a formal, documented IT governance structure, all of which impairs the reporting, efficiency and accuracy of the data and the accountability of the systems. The City's grant tracking systems are fragmented and unstandardized to the extent that the City is unable to comprehensively track citywide grant funds and status or prevent disallowed costs. Aged IT infrastructure within the City's Buildings, Safety Engineering and Environmental Department ("BSEED") and the DFD leads to bottlenecks in permit invoicing and collections...."[38]

These issues will not be addressed overnight, nor will they be easy. The funding, implementation, and management of new information and reporting systems are critical to adequately deliver government services to the public. The City has accumulated dozens of non-integrated systems which make it impossible to obtain the timely and reliable systemic information necessary for efficient operations and informed decision making. The remainder of this section will discuss some

---

[38] Declaration of Kevyn Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109 (c) of the Bankruptcy Code. Page 30, para 41.

particular challenges with accounting and financial controls and reporting and conclude with a discussion of the broader issues surrounding the investments the City must make in IT.

Accounting Controls and Processes

Of all of the measurable impacts of the City's IT, Accounting Control and Reporting problems, perhaps the most visible is the impact on the City's financial reporting, which affects the ability of City leaders and department heads to make real time, informed decisions. In the City's 2012 Independent Auditors Report, KMPG states:

> "Although the City of Detroit (City) has made incremental improvement in their financial closing and reporting processes, deficiencies still exist in the processes to evaluate accounts, and timely record entries into the general ledger in a complete and accurate manner"[39]

Historically, the City has not performed monthly closings or published monthly financial statements. The City's accounting "closing" process is so inefficient that recent attempts the City has made to implement a monthly General Ledger ("G/L") closing and financial statement preparation process have failed.

_____

[39] Independent Auditors' Report on Internal Control over Financial Reporting and on Compliance and Other Matters Based on an Audit of Financial Statements Performed in Accordance with Government Auditing Standards, KPMG, 2012, Pg 3

Going forward, I believe the City needs to prioritize monthly financial reporting against the City's budget. A monthly closing process will enable the City's leaders to make the continuous large and small adjustments needed to promote directional compliance with the Plan.

KPMG has determined the City's system of internal accounting controls and procedures are so weak that KPMG cannot rely on them when performing the year-end audit. The ineffectiveness of the current financial systems does not allow the City to internally perform essential daily tasks such as account reconciliations, bank reconciliations, and account analysis, which are the cornerstones of good accounting controls. Rather, these activities are performed once a year by outside consultants as part of preparation for the annual audit process. To that end, KPMG performs substantive testing of all accounts to its materiality threshold in order to render an opinion on the City's financial statements and explains why it takes the City about twelve months to prepare fiscal year-end financial reports.

Financial Reporting

Perhaps the only standardized financial reporting that the City undertakes is the development of the Comprehensive Annual Financial Report ("CAFR") which is promulgated by the Government Finance Officers Association. The CAFR is

essentially a comprehensive look at the City's financial position and performance. The City's CAFR for the fiscal year ended June 30, 2013 has not been released as of the date of this Report.

Another of the City's major reporting tasks is performed by Ernst & Young. E&Y prepares daily, weekly and monthly reports of cash, revenues, and expenditures. These reports track the City's available cash using bank statements and numerous other City documents that report one or more cash activities. These reports are independently generated and are not reconciled to the City's general ledger system through account reconciliations or bank reconciliations. These E&Y reports are consolidated for multiple accounting periods, as well as reported separately in other City reports including those of the Emergency Manager. The current cash management and cash reporting system has been managed by E&Y personnel since before the appointment of the Emergency Manager. It is my understanding that the City has not budgeted for E&Y continuing in this role after confirmation, nor has the City made accommodations to take over this work from E&Y. This is an unacceptable risk to the success of the POA and the City must identify and fund a solution for both the near term and longer term.

Whenever contemporaneous financial information is required, the City has no choice but to rely on the incomplete and unreliable financial data from the G/L system. As such, external reports such as the Emergency Manager's reports to Financial Advisory Board contain necessary disclaimers such as:

> "The revenues and expenditures report includes entries that have not been posted in the general ledger and encumbrances. This manner of presentation provides the most up to date data on revenues and expenditures. Unposted entries are preliminary and subject to review before they are finalized; therefore, actual results will likely be different from the preliminary results presented herein, and those differences may be material."[40]

Potential Plan Implications

Beyond financial reporting, the efficient and controlled execution of the accounting and finance functions are essential to achieving the financial initiatives set forth in the Plan. Some of the most important assumptions in the POA depend on improving the accounting and finance function within the City. For example:

- Municipal Income Taxes: the City processes and audits income tax returns, and collects income tax revenues which account for 25% of the City's revenue in FY2014-2023
- Purchasing: the City's purchasing function manages the City's contracts for all commodities and services which are forecasted to total $3 billion in the next ten years
- Property Taxes: The assessor's office creates the tax rolls used to invoice citizens and commercial customers for real estate taxes which are estimated to account for 9% of the City's revenue in FY2014-2023 and the Treasury department is responsible for the billing and collection function

---

[40] Emergency Manager's report

- <u>Grants</u>: Grant funding is expected to increase in the City going forward. In fact, there are additional opportunities for the City to acquire grants if it can responsibly manage and account for them. The City has failed to properly account for and manage grants in the past which has led to improperly spent funds. The City can benefit by tens of millions of dollars if this process is improved

The diminished capacity of these finance departments to execute their basic functions is a result of attrition and an historic failure to invest in people and systems. If the City does not build internal capacity in its finance and accounting functions in a timely fashion, it could threaten the execution of the POA.

<u>Information Technology</u>

The City, as detailed in the Plan, is addressing its system issues with a number of major initiatives funded as part of the RRIs. These IT-related initiatives include:

- $29 million related to a new Enterprise Resource Planning ("ERP") system, which includes both the installation and annual maintenance to improve the City's financial processes and reporting.
- $11.7 million related to City-wide hardware upgrades.
- $10.9 million related to Data Back Up centers.
- $10.4 million related to the City-wide installation of Microsoft 365.
- $5.2 million related to the implementation of City Tax.

While the IT department expects to spend almost $85 million on restructuring initiatives over the next 10 years, the total investment in IT related expenses by the City is upwards of $150 million. It should be noted that this figure does not include

a budget of $3 million for the implementation of a replacement payroll system, which is included in E&Y's base line financial projections. We believe the City would benefit with a more centralized control over all IT related investments. The following chart details the significant IT-related restructuring initiatives out of each of the departmental RRIs:

| IT and Infrastructure | Department | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Ten Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ERP System | Finance | $ - | $ 7.4 | $ 10.3 | $ 9.0 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 29.0 |
| Replacement of Radios | Police | $ - | $ 7.5 | $ 7.5 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 22.0 |
| Implementation of Integrated Public Safety System | Police | $ - | $ 4.5 | $ 2.5 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 13.8 |
| Hardware Upgrade | Finance | $ - | $ 1.5 | $ 2.0 | $ 2.0 | $ 1.2 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 1.0 | $ 11.7 |
| Data Back Up Center | Finance | $ - | $ - | $ 4.9 | $ 2.4 | $ 0.2 | $ 0.2 | $ 2.7 | $ 0.2 | $ 0.2 | $ 0.2 | $ 10.9 |
| Microsoft Application Department - 365 Cloud (Net of Savings) | Finance | $ - | $ 1.3 | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.1 | $ 10.4 |
| 311 System | Ombudsperson | $ - | $ - | $ 3.0 | $ 0.5 | $ 0.5 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 7.0 |
| Document Imaging and Management System | Finance | $ - | $ 3.0 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.3 | $ 5.4 |
| Implementation of City Tax | Finance | $ 0.1 | $ 1.7 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 5.2 |
| Upgrades to 36th District Court Technology | Non Departmental | $ - | $ 1.6 | $ 0.8 | $ 0.4 | $ 0.4 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 0.2 | $ 4.2 |
| Citywide Network Infrastructure | Finance | $ - | $ 2.0 | $ - | $ - | $ 1.1 | $ - | $ - | $ 1.1 | $ - | $ - | $ 4.2 |
| Security Access System to Building | Finance | $ - | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 0.4 | $ 3.8 |
| Workbrain Upgrades | Finance | $ 1.1 | $ - | $ - | $ - | $ 1.2 | $ - | $ - | $ - | $ 1.3 | $ - | $ 3.6 |
| Fire Vehicle Technology Upgrade | Fire | $ - | $ 0.7 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.7 | $ 0.1 | $ 0.1 | $ 0.1 | $ 2.2 |
| Helpdesk Software | Finance | $ - | $ 1.6 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 2.0 |
| Active Directory Service Migration | Finance | $ - | $ 1.3 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 2.0 |
| Cashiering Controls | Finance | $ - | $ 1.4 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1.4 |
| HR Learning Center and Implementation | HR | $ - | $ 0.5 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 1.3 |
| Operating System Upgrade | Finance | $ - | $ 1.0 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1.0 |
| SQL Server Update | Finance | $ - | $ 0.2 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.7 |
| All Other | Various | $ 1.9 | $ 3.6 | $ 0.5 | $ 0.5 | $ 0.5 | $ 0.5 | $ 0.6 | $ 0.7 | $ 0.5 | $ 0.5 | $ 9.8 |
| **Total IT and Infrastructure** | | **$ 3.1** | **$ 41.3** | **$ 34.4** | **$ 19.6** | **$ 10.1** | **$ 7.4** | **$ 10.7** | **$ 8.8** | **$ 8.8** | **$ 7.5** | **$ 151.7** |

These initiatives are a significant investment and present an opportunity for the City to improve services and functionality throughout its operations. However, to enhance the City's ability to execute the proposals within the POA, the City will need to manage the execution of the IT initiatives at the most senior level in the City and make sure that it reacts to any material deviations - from cost or timeline - in the implementations.

According to CFO John Hill, the City's strategy to correct this catastrophic decline in essential finance, accounting and IT services has three major components:

- Implement a new payroll system and restructure the existing payroll reporting structure
- Implement a new integrated ERP system without customization accompanied by the implementation of the ERP's "best practices" polices and business processing procedures
- Restructure the existing organization structure, processes and controls.

Replacing the payroll system is considered to be of the highest priority by everyone we spoke with. Under the existing organization structure, payroll processing reports operationally to the Human Resources department. The Payroll system technology is under the jurisdiction of the City's IT department. Under the envisioned Finance and Accounting reorganization, payroll processing would report to the CFO, as it should.

The second part of this major undertaking is to implement a new, integrated ERP system along with established "Best Practices" for policies, procedures and business processes. The City's IT department will have overall responsibility for the implementation forecasted to take approximately 2-3 years and cost approximately $29 million.[41] The objective will be to replace the existing Oracle ERP system with an updated, integrated ERP system that will:

- Replace various standalone Finance and Accounting systems
- Eliminate the manual loading of data coming from other stand-alone systems as is done with the current Oracle ERP system
- Improve efficiencies and implement strong systematic internal controls

---

[41] Per the Conway McKenzie IT restructuring budget.

- Ensure an interim closing process and preparation of interim financial statements and other reporting necessary for the City to manage its financial affairs

The City believes that it will take several years to implement a new ERP system and, in the interim, the City will have to rely on the existing systems. Although many of the inefficiencies and control weaknesses cannot be eliminated, the City believes the main ERP weaknesses can be mitigated by strengthening the organizational structure and hiring employees with enhanced skill sets at all levels and functions, but primarily mid-tier management. John Hill described the City's strategy as:

- Restructure the Organization to establish better functionality
  - Implement a flatter, functionally-orientated organization chart
  - Strengthen mid-tier managers to provide better supervision and accountability
  - Establish centralized governance of City-wide Finance and Accounting functions with the CFO or alternative centralized governing body
  - Establish centralized governance of City-wide IT functions with the CIO or alternative centralized governing body.
- Revise and upgrade job descriptions and applicant skill set requirements and qualifications
- Update the City's outdated and uncompetitive compensation structure to enable the City to attract and retain qualified employees
- Implement new recruiting processes
- Implement initiatives aimed at correcting major deficiencies in each department's existing systems and procedures

Risk of Failure

The above strategy was created to help ensure the successful implementation of the IT system initiatives. Large IT systems initiatives have historically contained an inherent risk. McKinsey & Co. notes that:

> *As IT systems become an important competitive element in many industries, technology projects are getting larger, touching more parts of the organization, and posing a risk to the company if something goes wrong. Unfortunately, things often do go wrong. Our research, conducted in collaboration with the University of Oxford, suggests that half of all large IT projects—defined as those with initial price tags exceeding $15 million—massively blow their budgets. On average, large IT projects run 45 percent over budget and 7 percent over time, while delivering 56 percent less value than predicted. Software projects run the highest risk of cost and schedule overruns*



% of IT projects with given issue (for those with budgets >$15 million in 2010 dollars)

| Project type | Average cost overrun | Average schedule overrun | Average benefits shortfall |
|---|---|---|---|
| Software | 66 | 33 | 17 |
| Nonsoftware | 43 | 3.6 | 133 |
| Total | 45 | 7 | 56 |

Source: McKinsey–Oxford study on reference-class forecasting for IT projects

The root causes of cost overruns in IT systems implementations for projects over $15 million include: unclear objectives and lack of business focus, shifting

requirements and technical complexity, unaligned teams, lack of skills, unrealistic schedule and reactive planning.[42]

Impact on Feasibility

The risks associated with the IT initiatives alone, warrant additional financial contingency beyond the general 1% assumption in the POA projections. Systems, controls and reporting concerns are high on the list of long term threats to feasibility. It is critical that the City effectively implements the IT initiatives which lay the foundation of many of the other benefits associated with the RRIs. Detroit will need strong leadership and exceptional tenacity to accomplish the initiatives on time and on budget.

I am encouraged by the City's recent decision to terminate its efforts to outsource payroll due to a poor design for the implementation. Current City leadership appropriately abandoned this project, despite having previously spent several million dollars in the pre-implementation phase, when they realized the vendor was trying to automate the City's antiquated payroll system rather than implement a new system that would meet the needs of the City going forward. This exemplifies why the most senior levels of City leadership, including the Mayor, CFO

_____

[42] McKinsey Report on the City of Detroit, May 2011

122

and CIO, must be actively involved in the strategy and implementation plans to ensure success and progress with clear measurement metrics.

## Section J - Pensions

<u>Introduction</u>

Detroit's legacy retirement obligations, combining both pensions and OPEB, are the City's largest liability when combining the funded and unfunded liabilities. Additionally, these liabilities are arguably the most visible to the City's retirees, current employees, and to its citizens, generally. Despite the relative importance, the magnitude of the City's retirement obligations and the methods for calculating them are largely unknown. Assessing the City's future pension and OPEB responsibilities involves, among other factors, forecasted health care costs, complex actuarial models[43], and assumptions for the anticipated rate of returns on the pensions' assets and the rate used to discount the plans' future liabilities. Critical decisions made today will have a substantial impact on the City's liquidity in future

---

[43] Traditional actuarial forecasts imbed assumptions related to pensioners' mortality, rates of retirement, salary increases, overtime, disability rates, interest earned on assets, and pension plan administrative expenses.

years. The magnitude and importance of these decisions will be critical to Detroit's viability in the decades to come.

Background

The City of Detroit has historically maintained two separate defined benefit plans, one for uniformed personnel and one for all other City employees. The City's existing pension plans are administered by the respective Retirement Systems, the Police & Fire Retirement System of the City of Detroit ("PFRS") and the General Retirement System of the City of Detroit ("GRS"). The bankruptcy claims related to PFRS claims are classified as Class 10, while the GRS claims are designated as Class 11 in the POA. These plans provided for a calculated amount of retirement income based on earnings and longevity of each individual employee. As typical with defined benefit plans, the benefits are fixed and are not dependent on investment returns or other outside factors.

Detroit's Plan, in an effort to mitigate the City's expanding legacy pension issues, proposes to fundamentally restructure the City's pension obligations for both its current retirees and its active employees, effective June 30, 2014. The Plan provides that, on the Effective Date, the City will assume the obligations related to already accrued benefits under the GRS and the PFRS pension plans *as those benefits will have been modified in the POA*. The POA pension proposal modifies

each plan under revised structures that impose reduced monthly pension amounts and/or reduced or eliminated COLA adjustments. The POA also proposes to restructure the accrual of pension benefits of active employees beginning on July 1, 2014, the parameters of which are detailed below.

## City of Detroit Retirees Demographics

As of June 30, 2013, the Retirement Systems for the City of Detroit had approximately 32,247 members. The demographics of the each Retirement System are detailed below:

| | PFRS | | GRS | | RS Total | |
|---|---|---|---|---|---|---|
| Active | 3,272 | 26% | 5,658 | 28% | 8,930 | 28% |
| Retirees | 9,054 | 73% | 12,118 | 61% | 21,172 | 65% |
| Other | 111 | 1% | 2,214 | 11% | 2,325 | 7% |
| | 12,437 | | 19,990 | | 32,427 | |

Of the City's estimated 21,172 retirees, roughly 7,200 (or 34%) are over the age of 75, with another 35% between the ages of 65 and 75. The average PFRS pension in FY2013 was $30,607 as compared to the average FY2013 GRS pension of $19,213.

## Pension Funding Level

126

The accounting for defined benefit plans can be very complex. The calculations used to determine the appropriate funding levels required each year are dependent upon macro-economic factors, actuarial assumptions, and other variables that can be difficult to understand and can be manipulated to bias the required funding levels.[44]

Historically, a number of different practices have contributed to a significant funding shortfall in the two pension plans. The Retirement Systems utilized unrealistic rate of return assumptions and managed the pension plans in accordance with questionable investment strategies that resulted in considerable underfunding of the respective Plans. The Retirement Systems assumed aggressive annual rates of return on investment (PFRS: 8.0%; GRS: 7.9%), allocated asset gains and losses over a seven-year period which masked potential funding shortfalls, and utilized renewing 29- (PFRS) and 30- (GRS) year amortization periods for funding the unfunded pension obligations.

The calculation of this funding shortfall, or the Unfunded Actuarial Accrued Liability ("UAAL"), is dependent upon the use of assumptions as noted above.

_____

[44] Declaration of Charles M. Moore in Support of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code; Docket No. 13; Page 5

Based on the assumption methodologies used by the retirement systems previously, the UAAL was projected, at the end of FY2012, to have been approximately $977 million.[45]  At June 30, 2013, that UAAL estimate was $1.5 billion as PFRS reported it was 89% funded with a UAAL of $415 million.  At that same time, GRS reported it was 70% funded with a UAAL of $1.1 billion.  Using what the City now believes are more accurate assumptions, the City's actuary - Milliman, Inc. - has estimated that the combined systems' UAAL, at June 30, 2013, was approximately $3.5 billion. [46]

In addition to issues involving the aggressiveness of the rate of return assumption used to determine funding levels, also contributing to the increase of the UAAL were a number of questionable activities engaged in by the retirement systems, which included:

- Utilizing GRS fund assets to pay the promised returns on the Annuity Savings Program which, upon members of GRS allocating 3%, 5% or 7% of their after-tax salaries into a discreet defined contribution plan, effectively guaranteed a minimum 7.9% annual investment return

---

[45] Declaration of Charles M. Moore in Support of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code; Docket No. 13; Page 5

[46] Declaration of Charles M. Moore in Support of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code; Docket No. 13; Page 7

regardless of the actual investment performance of the pension plans' assets;

  o Using actual market returns for crediting purposes rather than the guarantee, the City believes that over $387 million of excess investment earnings were credited to Annuity Savings Funds from 2003-2013

- GRS trustees, when the plan's actual returns were higher than the assumed rate of return, paid a portion of the positive variance between the actual investment return and the assumed rate of return in an additional pension check to already retired pensioners in what is commonly referred to as the "13th check" program
- The City periodically deferred its required year-end PFRS contributions, and then borrowed to pay those deferrals with debt priced at a rate of 8%;
- Retirement System officials have been accused and/or indicted of material fiduciary misconduct, allegedly draining the pension of necessary liquidity and contributing to the underfunding of the Retirement Systems.[47]

Pension Treatment

The City's Plan of Adjustment proposes to "freeze" the accruing of pension benefits under the terms of the City's legacy pension plans and, effective June 30, 2014, institute restructured, distinct pension plans for the City's active employees. For the current employees, their future pensions will be a combination of that which was accrued under the legacy plan through June 30, 2014, and after that date, what will be accrued under the new revised plan as detailed below. For the City's retirees,

---

[47] Declaration of Charles M. Moore in Support of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code; Docket No. 13; Page 10

129

depending on whether they are members of PFRS or GRS, the POA proposes to modify their accrued benefits under the legacy pension plans via reductions in gross pensions, cost of living adjustments, or reductions in investment earnings in the Annuity Savings Program.

Active City Employees

The Plan of Adjustment proposes a "hybrid" pension plan for the City's active employees for their accrued employment time after June 30, 2014. The adjusted pension plan – for both PFRS and GRS – endeavors to combine the features of a fixed contribution plan with the estimated investment performance of a fixed benefit plan. The City and its actuaries constructed this hybrid plan to generate accrued pension payments to its active employees upon retirement commensurate with a 6.75% estimated annual investment return.

For active PFRS employees, the updated pension formula will be equivalent to their Final Average Compensation ("FAC") – defined as the average base compensation (excluding overtime, sick leave, longevity, etc. over the last ten consecutive years) times years of service times 2.0%. For example, a theoretical PFRS employee whose FAC was $40,000 with 25 years of experience would accrue an annual pension of $20,000 ($40,000 x 25 x 2.0%). This calculation represents

the defined benefit portion of the new hybrid plan. The defined contribution portion of the new plan incorporates an annual 12.25% contribution from the City of employees' base compensation and requires an employee contribution of 6%, if the employee was hired before July 1, 2014, or 8% if hired after that date. In addition, PFRS employees will be eligible for retirement at ages 50-52, depending on their rank, with twenty-five years of service.

The revised GRS pension plan for active employees is similar to the PFRS plan, albeit adjusted for Social Security (GRS pensioners are eligible for Social Security in contrast to PFRS pensioners). The updated pension formula will be equivalent to FAC over the last ten consecutive years times years of service times 1.5%. For example, a theoretical GRS employee whose FAC was $40,000 with 30 years of experience would accrue an annual pension of $18,000 ($40,000 x 30 x 1.5%). The City will contribute 5.75% of the employee's base compensation annually, while the employee will contribute 4%. In addition, GRS employees will be eligible for retirement at age 55 with thirty years of service.

## Proposed POA Restructured Terms

|  | PFRS | GRS |
|---|---|---|
| Pension Formula | FAC x # of years x 2.0% | FAC x # of years x 1.5% |
| Investment Return | 6.75% | 6.75% |
| ER Contribution | 11-12% of base compensation | 5% of base compensation |
| EE Contribution | Hired before 7/1/14: 6%; after 7/1/14: 8% | 4% of base compensation |
| Retirement Age | Age 50-52 with 25 years experience | Age 55 with 30 years experience |
| COLA Eligibility | 0-1% compounded, variable | Variable after 4 years and 100% funded |
| Annuity Savings Fund | n/a | Interested credit at actual return (0-5%) |
| **Theoretical Annual Pension** | | |
| ($40k FAC with 25/30 years experience) | $20,000 = $40,000 x 25 x 2.0% | $18,000 = $40,000 x 30 x 1.5% |

The fundamental amendments to the future pension plans lend themselves favorably to the POA's feasibility. Redefining base compensation as an average of the last ten years' pay as opposed to last three, eliminating non-base compensation such as overtime and sick leave from the calculation, reducing the estimated rate of return, and incorporating a defined employee contribution all contribute to the increased likelihood that the City can meet the requirements of the new pension plan. A concern remains, though, that embedded within the "hybrid" nature of this pension plan, is the concept that a fixed contribution will, ***over time***, produce the required, fixed benefit. Pension plans with fixed contributions are generally just that -- defined contribution plans, not defined benefit plans. To the degree that the actual investment return underperforms the targeted levels or the employee population exhibits life expectancies in excess of the actuarial assumptions, the City has the potential to again be saddled with an underfunded pension plan.

132

<u>Current Retirees</u>

The combined UAAL for both Retirement Systems was approximately $3.5 billion as of June 30, 2013. The City's Plan of Adjustment, for the current retirees' pension plan, establishes targeted funding rates by the end of fiscal year 2023 for each Retirement System, specifically 75% for PFRS and 70% for GRS, based upon a heavily-negotiated 6.75% assumed investment rate of return. While I assume this investment rate of return as a "given" in all pension analyses to follow, further discussion with regards to the appropriateness of this assumed investment rate of return, and more particularly, its use as the assumed liability discount rate, is detailed below. These targeted funding levels, combined with the proposed benefit reductions for each pension plan, dictate the required cash contributions to the Retirement Systems during the period ending June 30, 2023. The POA proposes that the City will amortize the remaining UAAL for each Retirement System – as of June 30, 2023 – over the following thirty-year timeframe.

The following graph illustrates, per the City's actuary – Milliman, Inc. – the estimated funding levels for PFRS and GRS at ten-year intervals during the period FY2014-2053[48]. Based on the City's actuarial tables, the POA projections assume

---

[48] Both PFRS and GRS plans are forecasted to initially have decreasing funding levels; PFRS is forecasted to decrease from 87% in FY2015 to 78% in 2023; GRS is estimated to decrease from 74% in FY2015 to 65% in FY2043

that the pension plans' funding levels significantly improve in the last ten years of this forty year period in question[49].



The POA assumed investment rate of return of 6.75% was a heavily negotiated component of the POA amongst the City, its retirees, the Retirement Systems, the Retiree Committee, and the labor unions. The POA stipulates that the board of trustees of the PFRS and GRS "must" maintain a 6.75% investment return assumption through the period ending June 30, 2023; thereafter, that rate is at the discretion of the Retirement Systems. While the new, proposed rate is more conservative than the historically-used 7.9% and 8.0% rates, current debate abounds as to whether a municipal pension plan, that is not 100% funded, should use any rate for its liability discount rate other than the government risk-free rate.

---

[49] Milliman, Inc. letter, dated May 7, 2014

The following table illustrates where the City's proposed 6.75% investment rate compares to other comparable municipal pension plan assumptions[50]:

**Public Pensions - Assumed Investment Returns - Dec 2013**

| | |
|---|---|
| **City of Detroit** | **6.75%** |
| | |
| Connecticut Teachers | 8.50% |
| Houston Firefighters | 8.50% |
| Ohio Police & Fire | 8.25% |
| Ohio PERS | 8.00% |
| Michigan Municipal/SERS/Public Schools | 8.00% |
| **U.S. National Average** | **7.72%** |
| CALPERS | 7.50% |
| Indiana PERF/Teachers | 6.75% |
| DC Police & Fire/Teachers | 6.50% |

Pension Funding

In an effort to partially alleviate the City of Detroit's liquidity concerns and to fund some portion of the proposed RRIs in the first ten years, the Plan of Adjustment incorporates dedicated external funding for the Retirement Systems aimed at reducing the respective UAALs, portions of which the receipt is predicated upon Classes 10 (PFRS) and 11 (GRS) voting to accept the Plan. The following analyses illustrate the POA's proposed funding sources for the respective Retirement Systems over the 2014-2053 timeframe encompassed in the POA's 40 Yr Plan.

**Plan of Adjustment – Proposed PFRS Contributions – FY2014-2053**

---

[50] NASRA Issue Brief: "Public Pension Plan Investment Return Assumptions"; April 2014

| ($ Millions) | 2014 - 2023 | 2024 - 2033 | 2034 - 2043 | 2044 - 2053 |
|---|---|---|---|---|
| **City-specified Contributions** | | | | |
| State of Michigan | $ 96 | $ - | $ - | $ - |
| Foundations (DIA Settlement) | $ 165 | $ 201 | $ - | $ - |
| Other/City GF | $ - | $ 416 | $ 465 | $ 311 |
| Total | $ 261 | $ 618 | $ 465 | $ 311 |

### Plan of Adjustment – Proposed GRS Contributions – FY2014-2053

| ($ Millions) | 2014 - 2023 | 2024 - 2033 | 2034 - 2043 | 2044 - 2053 |
|---|---|---|---|---|
| **City-specified Contributions** | | | | |
| DWSD | $ 429 | $ - | $ - | $ - |
| UTGO | $ 32 | $ - | $ - | $ - |
| State of Michigan | $ 99 | $ - | $ - | $ - |
| DIA (DIA Settlement) | $ 45 | $ 55 | $ - | $ - |
| Other/City GF | $ 115 | $ 575 | $ 474 | $ 318 |
| Total | $ 719 | $ 630 | $ 474 | $ 318 |

In order of magnitude, the City-specified contributions in the 2nd, 3rd, and 4th decades reflect the estimated 30-year amortization payments on the respective plans' UAALs at June 2023. The DWSD is expected to contribute to GRS roughly $428 million from FY2015-2023, constituting DWSD's allocable share of the remaining GRS UAAL, after considering the pension modifications proposed in the POA. The State of Michigan has committed to contribute the present value of $350 million, approximately $194 million[51], for the benefit of pensioners. The State's contribution, signed into law by Governor Snyder on June 20, 2014, requires the approval of Classes 10 and 11, requires support from the Retirement Systems,

---

[51] The $350 million contribution is discounted at the 6.75% rate.

cessation of all bankruptcy-related litigation, and the full commitment of other external financing sources dedicated to the pension plans.

In addition to the identified pension funding sources highlighted above, the POA assumes implementation of the DIA Settlement, in which the City, DIA, and certain charitable foundations agree to irrevocably transfer the DIA art collection to the DIA Corporation. The art will be held in perpetual charitable trust within Detroit's city limits, in exchange for future payments of $366 million, pledged by the charitable foundations, and a commitment from the DIA Corporation to raise $100 million. Both DIA Settlement commitments are designated to be paid into the pension plans over the next twenty years.

The following tables illustrate the proposed funding contributions into PFRS and GRS for the fiscal years 2014-2023:

### Plan of Adjustment – Proposed PFRS Contributions – FY2014-2023

| Fiscal Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **City-specified Contributions** | | | | | | | | | | | |
| State | $ - | $ 96.0 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 96.0 |
| Foundations | $ - | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 164.7 |
| Other | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total** | $ - | $ 114.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 260.7 |

### Plan of Adjustment – Proposed GRS Contributions – FY2014-2023

| Fiscal Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **City-specified Contributions** | | | | | | | | | | | |
| DWSD | $ - | $ 65.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 45.4 | $ 428.6 |
| UTGO | $ - | $ 4.4 | $ 4.0 | $ 4.0 | $ 3.9 | $ 3.7 | $ 3.7 | $ 3.6 | $ 2.3 | $ 2.0 | $ 31.6 |
| State | $ - | $ 98.8 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 98.8 |
| DIA | $ - | $ 5.0 | $ 5.0 | $ 5.0 | $ 5.0 | $ 5.0 | $ 5.0 | $ 5.0 | $ 5.0 | $ 5.0 | $ 45.0 |
| Other/City GF | $ - | $ 14.6 | $ 22.5 | $ 22.5 | $ 22.5 | $ 22.5 | $ 2.5 | $ 2.5 | $ 2.5 | $ 2.5 | $ 114.6 |
| **Total** | $ - | $ 188.2 | $ 76.9 | $ 76.9 | $ 76.8 | $ 76.6 | $ 56.6 | $ 56.5 | $ 55.2 | $ 54.9 | $ 718.6 |

Plan of Adjustment – PFRS (Class 10)

The POA proposes two alternative restructuring scenarios of the PFRS pension, with the respective depth of the assumed pension cuts being dependent on whether **both** Classes 10 and 11 approve the Plan of Adjustment.

PFRS – Scenario A

In the event that both Classes 10 and 11 vote for the POA, with an assumed investment return of 6.75% and a targeted funding rate of 75% in 2023, the POA proposes that PFRS pensioners will receive 100% of their current/accrued pension, but will have their lifetime Cost of Living Adjustments ("COLAs") reduced by 55%. With COLAs estimated to represent approximately 18% of the total PFRS liabilities, the proposed 55% COLA elimination translates into a 9.9% reduction in estimated PFRS liabilities.

PFRS – Scenario B

138

If either Classes 10 or 11 vote against the POA, and maintaining the assumed investment return of 6.75% and a targeted funding rate of 75% in 2023, PFRS pensioners will still receive 100% of their current/accrued pension, but their lifetime COLAs will be completely eliminated.

### Police and Fire Retirement Systems of the City of Detroit
### Projection of Liabilities and Assets
### Scenario A
### Assuming 55% COLA Reduction, 75% Targeted Funded Status, and 6.75% Investment Return[52]

| Fiscal Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| City-specified Contributions | $ - | $ 114.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 18.3 | $ 260.7 |
| Market Value of Assets | $ 3,071 | $ 3,096 | $ 3,024 | $ 2,946 | $ 2,863 | $ 2,775 | $ 2,681 | $ 2,579 | $ 2,470 | $ 2,354 | |
| Actuarial Accrued Liability | $ 3,624 | $ 3,573 | $ 3,521 | $ 3,464 | $ 3,404 | $ 3,340 | $ 3,271 | $ 3,198 | $ 3,118 | $ 3,035 | |
| Unfunded Liability | $ (553) | $ (477) | $ (497) | $ (518) | $ (541) | $ (565) | $ (590) | $ (619) | $ (648) | $ (681) | |
| Funded Ratio - BOY | | 86.6% | 85.9% | 85.0% | 84.1% | 83.1% | 82.0% | 80.6% | 79.2% | 77.6% | |
| Expected FY Benefit Payments | | $ (285) | $ (283) | $ (284) | $ (284) | $ (283) | $ (283) | $ (284) | $ (285) | $ (283) | $ (2,554) |
| Expected FY Admin Expenses | | $ (7) | $ (7) | $ (7) | $ (7) | $ (7) | $ (7) | $ (8) | $ (8) | $ (8) | $ (66) |
| Expected FY Net Investment Return | | $ 201 | $ 200 | $ 195 | $ 190 | $ 184 | $ 178 | $ 172 | $ 165 | $ 157 | $ 1,642 |

---

[52] Milliman, Inc. letter, dated April 23, 2014

129

| Fiscal Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Market Value of Assets - Roll Forward** | | | | | | | | | | | |
| Market Value of Assets - BOY | | $ 3,071 | $ 3,094 | $ 3,023 | $ 2,945 | $ 2,862 | $ 2,775 | $ 2,681 | $ 2,579 | $ 2,469 | $ 3,071 |
| City-specified Contributions | | $ 114 | $ 18 | $ 18 | $ 18 | $ 18 | $ 18 | $ 18 | $ 18 | $ 18 | $ 261 |
| Expected FY Net Investment Return | | $ 201 | $ 200 | $ 195 | $ 190 | $ 184 | $ 178 | $ 172 | $ 165 | $ 157 | $ 1,642 |
| Expected FY Benefit Payments | | $ (285) | $ (283) | $ (284) | $ (284) | $ (283) | $ (283) | $ (284) | $ (285) | $ (283) | $ (2,554) |
| Expected FY Admin Expenses | | $ (7) | $ (7) | $ (7) | $ (7) | $ (7) | $ (7) | $ (8) | $ (8) | $ (8) | $ (66) |
| **Market Value of Assets - EOY** | $ 3,071 | $ 3,094 | $ 3,023 | $ 2,945 | $ 2,862 | $ 2,775 | $ 2,681 | $ 2,579 | $ 2,469 | $ 2,354 | $ 2,354 |
| | | | | | | | | | | | |
| **Actuarial Accrued Liability - Roll Forward** | | | | | | | | | | | |
| Actuarial Accrued Liability - BOY | | $ 3,624 | $ 3,573 | $ 3,521 | $ 3,464 | $ 3,404 | $ 3,340 | $ 3,271 | $ 3,198 | $ 3,118 | $ 3,624 |
| Expected FY Benefit Payments | | $ (285) | $ (283) | $ (284) | $ (284) | $ (283) | $ (283) | $ (284) | $ (285) | $ (283) | $ (2,554) |
| Add'l Accrued Liability | | $ 234 | $ 231 | $ 227 | $ 224 | $ 219 | $ 214 | $ 211 | $ 205 | $ 200 | $ 1,965 |
| **Actuarial Accrued Liability - EOY** | $ 3,624 | $ 3,573 | $ 3,521 | $ 3,464 | $ 3,404 | $ 3,340 | $ 3,271 | $ 3,198 | $ 3,118 | $ 3,035 | $ 3,035 |

## Plan of Adjustment – GRS (Class 11)

Similar to Class 10, the POA proposes two alternative restructuring scenarios of the GRS pension, with the respective depth of the assumed pension cuts being dependent on whether ***both*** Classes 10 and 11 approve the Plan of Adjustment.

## GRS – Scenario A

In the event that both Classes 10 and 11 vote for the POA, with an assumed investment return of 6.75% and a targeted funding rate of 70% in 2023, GRS pensioners will receive 95.5% of their current/accrued pension, will have their lifetime COLAs eliminated, and pensions will be subjected to a maximum of a 15.5% recoupment of their Annuity Savings Fund excess return[53]. The combined impact of these proposed changes represents an approximate 27% reduction in

---

[53] Not all GRS retirees will be subject to ASF recoupment; only those retirees who ASF annual return, for FY2004-2013, was greater than the plan assets' actual return up to a maximum recoupment of 15.5% of the pensioner's peak ASF balance

GRS's estimated liabilities comprised of 4.5% from reduced pensions, roughly 9% from the Annuity Savings Fund recoupment, and 14% from the eliminated COLAs.

GRS – Scenario B

If either Classes 10 or 11 vote against the POA, and maintaining the assumed investment return of 6.75% and a targeted funding rate of 70% in 2023, GRS pensioners will receive 73% of their current/accrued pension, will have their lifetime COLAs eliminated, and the ASF recoupment will vary from 0.01% to 100% of a retiree's pension, based upon the excess amount of the pension. The combined impact of these proposed changes represents an approximate 50% in GRS's estimated liabilities comprised of 27% from reduced pensions, roughly 9% from the Annuity Savings Fund recoupment, and 14% from the eliminated COLAs.

**General Retirement Systems of the City of Detroit**
**Projection of Liabilities and Assets**
**Scenario A**
**Assuming 4.5% Benefit Reduction, 100% COLA Reduction, 70% Funded Status, Annuity Savings Fund Recoupment, and 6.75% Investment Return[54]**

---

[54] Milliman, Inc. letter, dated April 25, 2014

| Fiscal Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| City-specified Contributions | $ - | $ 196.2 | $ 65.3 | $ 65.3 | $ 65.3 | $ 65.3 | $ 65.3 | $ 65.3 | $ 65.3 | $ 65.3 | $ 718.6 |
| Market Value of Assets | $ 2,027 | $ 2,106 | $ 2,057 | $ 2,005 | $ 1,951 | $ 1,893 | $ 1,831 | $ 1,764 | $ 1,695 | $ 1,622 | |
| Actuarial Accrued Liability | $ 2,921 | $ 2,866 | $ 2,809 | $ 2,751 | $ 2,688 | $ 2,622 | $ 2,552 | $ 2,477 | $ 2,399 | $ 2,317 | |
| Unfunded Liability | $ (894) | $ (760) | $ (752) | $ (746) | $ (737) | $ (729) | $ (721) | $ (713) | $ (704) | $ (695) | |
| Funded Ratio | | 73.5% | 73.2% | 72.9% | 72.6% | 72.2% | 71.7% | 71.2% | 70.7% | 70.0% | |
| Expected FY Benefit Payments | | $ (243) | $ (241) | $ (239) | $ (239) | $ (239) | $ (238) | $ (238) | $ (237) | $ (235) | $ (2,149) |
| Expected FY Admin Expenses | | $ (9) | $ (9) | $ (10) | $ (10) | $ (10) | $ (10) | $ (11) | $ (11) | $ (11) | $ (91) |
| Expected FY Net Investment Return | | $ 135 | $ 136 | $ 133 | $ 129 | $ 125 | $ 122 | $ 117 | $ 113 | $ 108 | $ 1,118 |

| Fiscal Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10 Year Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Market Value of Assets - Roll Forward** | | | | | | | | | | | |
| Market Value of Assets - BOY | | $ 2,027 | $ 2,106 | $ 2,058 | $ 2,007 | $ 1,952 | $ 1,893 | $ 1,833 | $ 1,766 | $ 1,696 | $ 2,027 |
| City-specified Contributions | | $ 196 | $ 65 | $ 65 | $ 65 | $ 65 | $ 65 | $ 65 | $ 65 | $ 65 | $ 719 |
| Expected FY Net Investment Return | | $ 135 | $ 136 | $ 133 | $ 129 | $ 125 | $ 122 | $ 117 | $ 113 | $ 108 | $ 1,118 |
| Expected FY Benefit Payments | | $ (243) | $ (241) | $ (239) | $ (239) | $ (239) | $ (238) | $ (238) | $ (237) | $ (235) | $ (2,149) |
| Expected FY Admin Expenses | | $ (9) | $ (9) | $ (10) | $ (10) | $ (10) | $ (10) | $ (11) | $ (11) | $ (11) | $ (91) |
| Market Value of Assets - EOY | $ 2,027 | $ 2,106 | $ 2,058 | $ 2,007 | $ 1,952 | $ 1,893 | $ 1,833 | $ 1,766 | $ 1,696 | $ 1,624 | $ 1,624 |
| **Actuarial Accrued Liability - Roll Forward** | | | | | | | | | | | |
| Actuarial Accrued Liability - BOY | | $ 2,921 | $ 2,866 | $ 2,809 | $ 2,751 | $ 2,688 | $ 2,622 | $ 2,552 | $ 2,477 | $ 2,399 | $ 2,921 |
| Expected FY Benefit Payments | | $ (243) | $ (241) | $ (239) | $ (239) | $ (239) | $ (238) | $ (238) | $ (237) | $ (235) | $ (2,149) |
| Add'l Accrued Liability | | $ 188 | $ 184 | $ 181 | $ 176 | $ 173 | $ 168 | $ 163 | $ 159 | $ 153 | $ 1,545 |
| Actuarial Accrued Liability - EOY | $ 2,921 | $ 2,866 | $ 2,809 | $ 2,751 | $ 2,688 | $ 2,622 | $ 2,552 | $ 2,477 | $ 2,399 | $ 2,317 | $ 2,317 |

## Pension Restoration

The Plan of Adjustment incorporates, for both PFRS and GRS, the potential for previously-reduced pension benefits to be restored if the funding levels of the respective Retirement Systems improve to agreed-upon restoration levels at designated timeframes, the fiscal years ending 2023, 2033, and 2043. These pension restoration payments are designed to be variable, in that, they are only distributed to

142

the pensioners if the investment performance of the pension plans is at least three percentage points above the targeted funding levels.

The pension restoration thresholds, for both PFRS and GRS, are perpetually three percentage points above each pension plan's targeted funding level throughout the FY2014-2053 time period. If the funding levels exceeds the plan's restoration targeted funding level, i.e. are more than 3 percentage points above the targeted funding level, monies will be allocated to a "restoration reserve account". Once the restoration reserve account equals at least 10% of the lifetime value of the previously-reduced COLA payments, restoration payments will commence in the following year. According to the POA, restoration payments for PFRS will be conditional until 2023, and until 2028 for GRS. If, as a result of the funds' assets subsequently underperforming the targeted investment levels, which would mean that the returns fall below the 3 percentage point threshold for restoration payments, COLA restoration payments are immediately suspended. Beginning in FY2023 for PFRS and FY2028 for GRS, to the degree the plans' funding levels are in excess of the restoration targeted levels, those specific restoration payments become fixed, or "guaranteed", going forward.

It should be clearly understood, in FY2023 (FY2028 for GRS), FY2033 and FY2043, the *maximum* funded level of the GRS and PFRS is the amount shown in the table below. As a result of the negotiations with the parties, the provisions of the

POA relative to the pension settlements ensure that the pension plans at these benchmark dates will never be funded above the restoration funding rate for either the PFRS or GRS plans. If the funding level is above this targeted amount at the benchmark dates, the excess will be swept to a permanent restoration fund such that the funding level will be reduced to the amount shown.  In the event that the funding levels at these benchmark dates are below these levels, the City is responsible for this unfunded amount and must fund it in the future.  Therefore, as the City considers the average rate of return, it must keep in mind it is "giving away" some of the upside, yet retaining all of the downside.

The following table summarizes both PFRS and GRS's targeted and pension restoration funding levels for the 2014-2043 timeframe (pension restoration payments cease in 2043)[55].

|  | PFRS | | GRS | |
| --- | --- | --- | --- | --- |
|  | Funding Target | Restoration Target | Funding Target | Restoration Target |
| 2014-2023 | 75% | 78% | 70% | 73% |
| 2024-2033 | 81% | 84% | 70% | 73% |
| 2034-2043 | 84% | 87% | 70% | 73% |

Impact on Feasibility

---

[55] Multiple Milliman, Inc. Pension reports; multiple Phoenix discussions with Jones Day attorneys re: Pension plans

144

There is considerable debate regarding the selection of the discount rate for calculating liabilities in government sponsored defined benefit (DB) plans. At one end of the debate is the thought that the discount rate of liabilities should equal the expected return on pension assets; at the other end is the thought the liabilities have a very strong contractual and legal requirement and therefore represent a certainty of payment and therefore should be discounted at, or near, the risk free rate. This seemingly academic question has real world consequences when viewing Detroit's POA and its perceived feasibility.

The Nelson A. Rockefeller Institute of Government's recent analysis on this issues - The Blinken Report - dated January 2014, notes[56]:

> *The problem begins with mismeasurement of liabilities and the cost of funding them securely, for financial reporting purposes. The proper way to value future cash flows such as pension benefit payments is with discount rates that reflect the risk of the payments. This is separate from the question of the rate pension funds will earn on their investments.*
>
> ***This bears repeating: The proper rate for valuing pension liabilities on financial statements is separate from the question of what pension funds will earn on their investments. Different rates may be appropriate for valuing liabilities than for assumed investment returns — and we recommend, later, that different rates be used. The major***

---

[56] The Blinken Report- Strengthening the Security of Public Sector Defined Benefit Plans, dated January 2014. Donald J Boyd and Peter J Kiernan. *Expert's Note: In the preface of this Report special note is made of the contribution to the analysis and work by Dick Ravitch. Mr. Ravitch is Judge Rhodes' non-testifying consultant in this chapter 9.*

*significance of valuing liabilities incorrectly is that it leads to inadequate funding policies, and encourages the mistaken belief that benefits can be greater, services can be greater, or taxes lower while still funding benefits securely. (Blinken Report Emphasis)*

*Because pensions are promises that should be kept, and have strong legal protections, they should be valued using discount rates that reflect the riskiness of expected benefit payments. Unfortunately, the longstanding practice for public pension plans in the United States, developed before modern financial theory, is to use the expected return on pension fund assets to value liabilities, even though there is no logical connection between how much is owed to workers and what assets will earn. This practice is not used by public pension plans in other countries, or by private plans in the United States, or by economists or financial analysts valuing other cash flows. Our nation's public pension plans stand virtually alone, and recent accounting rule changes by the Governmental Accounting Standards Board (GASB) have not addressed this properly. Rates that reflect the expected risk of benefit payments ordinarily are much lower than the rates public pension funds use to value liabilities, and as a result, public pension liabilities are underestimated by at least $1-2 trillion, and the annual costs of funding them securely are underestimated by at least $100-200 billion.*

The City of Detroit, in its POA, has used a rate of 6.75% to discount the liabilities of the pension plans. This rate is lower than the historical rates that PFRS and GRS have previously used and lower than recent investment returns, although recent market returns are heavily impacted by the recovery from the Great Recession. It is also low relative to peers (see previous chart on comparison of Assumed Investment Returns of comparable public plans). In fact, there are few other major government sponsored plans that use a lower rate to discount the liabilities in their pension plans. On the surface, this appears to be a conservative

assumption. However, I am not convinced that the City appreciates the opportunity it has to provide stewardship in this area. Highlighting that the City's assumptions are low relative to history, a history that got them to this place, and low relative to their peers - peers who collectively may be underfunded by $2 trillion or more, is not much consolation.[57]

We believe that the selection of a discount rate has relevance as to the feasibility of the Detroit POA, in that, in the future without the benefit to change pension obligations, pension funding requirements become a de facto first priority on cash flows. This results in crowding out other cash flow priorities. The City must be continually be mindful that a root cause of the financial troubles it now experiences is the failure to properly address future pension obligations. Below we address two main concerns regarding the selection of the discount rate for valuing future liabilities in the Plan.

The investment return at 6.75% appears to be based on future investment returns. This rate clearly reflects a rate above the current risk free rate of return and therefore indicates a level of assumed volatility and risk. The argument for using a discount rate that is related to investment returns typically states that using a rate

_____

[57] Blinken Executive Summary pg. vii.

that is higher than the risk free rate is acceptable due to the long "runway" of a municipal pension. The argument goes: a municipal entity differs from an individual in that, as an individual ages, they typically must moderate their investment behavior towards lower risk investments due to shortening time horizons and, therefore, often lock in losses in down markets. The argument continues: the long time horizon of a municipal pension plan allows it to avoid this phenomenon. Of course, pension plans are not able to defer plan payments during down markets, and therefore, in significant down markets, the loss of principal as a result of making payments to pensioners, without offsetting investment returns, can result in a plan that "locks in" losses. These "locked in" losses create underfunding.

Further, the current POA contemplates Pension Restoration provisions. These provisions essentially allow pension plan beneficiaries to have some opportunity for restoration of lost pension benefits. Post confirmation, until June 2023 for PFRS and June 2028 for GRS, if the pension plans exceed 78% for PFRS or 73% for GRS, despite still being underfunded nearly 22% and 27%, respectively, additional funds can be set aside into a pension restoration fund. The funding levels and the ability of beneficiaries to receive restoration benefits are limited to actuarial and investment return adjustments and not to additional city contributions. However, under this plan, the City can be underfunded in FY2043 and still be in the mode of restoring pension benefits to then existing retirees. Based on the settlement terms and the

148

assumptions made, there does not appear to be recognition that a pension plan, someday, will need to be 100% funded. The City appears to adopt an institutional philosophy of underfunding.

On top of the conceptual argument that funding targets should be set at no less than 100%, before additional commitments are made to increase benefits, a larger concern exists. The City's assumption of a 6.75% rate of return implicitly requires the City to accept risk and volatility. Volatility is, of course, a positive and a negative force. At times, the City should be expected to achieve returns above 6.75% and, at times, the City should expect returns below this level. Over the past 10 years, the Retirement Systems have seen significant variations in their investment returns both above and below the average return. Again, this is the argument for municipal pensions to use investment returns because over the long term, there should be smoothing. Because the City's defined benefit plans are essentially in runoff, they will inevitably experience declining asset levels. In this environment of declining assets and volatility, returns over time are not equally weighted.

Thus, order matters when returns are volatile. It is much better to receive high returns early and low returns later, even though both streams provide the same simple average growth rate. Examples of the impact of timing on returns in a given 10-year period are detailed in the Sensitivity section below. This is not a trivial

issue, even though it is quite technical. As pension funds mature and net outflows increase, asset values will be more volatile and more susceptible to the order in which returns occur. In an environment in which expected returns are low in the short term — as the current low-interest-rate, low-inflation environment may be — funds cannot simply balance low returns in the short term with high returns later; they will need much higher returns later because investible assets will be lower than they otherwise would have been.[58]

As example from the Blinken report: *Blinken Report Footnote #96*

*Consider a pension fund that has net outflows equal to 4.5 percent of assets, with benefits and contributions both growing 7 percent annually (roughly consistent with recent experience). If it earns 4 percent on investments for five years, followed by 12 percent for five years, its assets at the end of ten years will be nearly 13 percent lower than if the returns come in the opposite order, even though annual average return is 7.9 percent either way. [(1.04^10 x 1.12^10)-1 = (1.12^10 x 1.04^10)-1 = 7.93%.] If the fund earns 4 percent for ten years followed by ten years of 12 percent, its assets after twenty years would be 90 percent less than if returns had come in the opposite order. These calculations assume no change in contributions to amortize asset shortfalls in the early years. Amortization would narrow the difference between the two sequences of returns.*

_____

[58] Blinken pg 25.

Further exacerbating this issue, the City is agreeing to give up part, or maybe all, of its upside investment returns by virtue of the pension restoration benefits, but it is retaining all of the downside risk. If the funds' assets participate in a bull market in the first ten years of the POA, and the pension plans move to a funded level of 88%, the City would provide significant restoration benefits. If this bull market was then followed by a five year bear market, all of the restoration benefits paid during the bull market would serve to exacerbate the unfunded level of the pension plans and the City could be responsible for considerable funding risk.

It appears that the combination of a need to continue to invest in assets with risk and volatility in order to achieve investment returns and the restoration benefit to the pensioners, even at a level of low plan funding, acts as a one sided collar. That is, the City gives away much of the upside in investment earnings, while retaining all of the downside investment risk.

Legality of POA's Proposed Pension Cuts

Numerous parties in this bankruptcy, namely employees, retirees, Retirement Systems, and certain labor unions, have argued that the City is not legally able to

impair accrued pension benefits as they are protected under Article IX, Section 24 of the Michigan State Constitution of 1963. These same groups were granted permission to appeal the Bankruptcy Court's eligibility ruling to the U.S. Court of Appeals for the Sixth Circuit. To the degree that these parties are successful in their appeal of the Bankruptcy Court's eligibility ruling, the City's chapter 9 could be dismissed or may be unable to effectuate reductions in accrued vested pension benefits.

Sensitivity Analysis

The Society of Actuaries issued a *Report of the Blue Ribbon Panel on Public Pension Funding* in February 2014. The Blue Ribbon Panel recommended stress tests measuring the effect of investment returns over a 20-year period that are three percentage points above and below those used in calculating standardized plan contributions[59]. The panel believes that +/- 3% points represents "plausible stresses" based on its review of prior market returns[60].

---

[59] The Society of Actuaries "Report of the Blue Ribbon Panel on Public Pension Plan Funding"; February 2014

[60] The Society of Actuaries "Report of the Blue Ribbon Panel on Public Pension Plan Funding"; February 2014

In response to my request for a sensitivity analysis for the pension plans assuming various average rates of return for the FY2014-2023 period and the aforementioned scenarios of 1) a bear market 5-year period followed by a bull market 5-year period and 2) a bull market 5-year period followed by a bear market 5-year period, the City's actuary has analyzed the PFRS plan.

As illustrated below, if the PFRS plan averages a 6% rate of return (75 basis points lower than the assumed rate of return) over the nine years ending June 2023, the plan is forecasted to be only 70% funded in June 2023, resulting in an additional $236 million of unfunded liability versus the POA projections. That unfunded variance expands to $527 million if the PFRS plan averages a 5% rate of return during this time period. Finally, if PFRS is negatively impacted by a bear market/bull market cycle (as opposed to the inverse) with five years averaging 0% followed by five years averaging 10%, the pension plan would have $342 million more in unfunded liabilities during the 10-year period in question.

153

# PFRS Average Rate of Return Scenario Analysis[61]

| Average Rates of Return July 2014 - June 2023 | Estimated Funding Status June 2023 | Estimated Projected Unfunded Liability June 2023 | Estimated Projected Unfunded Liability Variance |
|---|---|---|---|
| 3.00% | 43% | $ 1,717 | $ 1,036 |
| 5.00% | 60% | $ 1,208 | $ 527 |
| 6.00% | 70% | $ 917 | $ 236 |
| **6.75%** | **78%** | **$ 681** | **$ -** |
| 8.00% | 92% | $ 252 | $ (429) |
| 0% - 1st 5 years; 10% - 2nd five years | 53% | $ 1,439 | $ 758 |
| 10% - 1st 5 years; 0% - 2nd five years | 64% | $ 1,097 | $ 416 |

We have requested sensitivity analysis for GRS consistent with the PFRS sensitivity analysis highlighted above. At the time of this Report's release, we have not been provided the GRS sensitivity analysis.

## Recommendations on Reporting Requirements

The City of Detroit will be bound by numerous reporting requirements and financial oversight when it emerges from bankruptcy. Going forward, these intended protocols are designed to assist the City in managing its cash flow and liquidity relative to its POA commitments and its future budgets. In addition, it will be important for the City to report its financial condition to various constituencies on a regular basis.

---

[61] Milliman, Inc. letter; dated July 9, 2014

154

Timely, accurate financial reporting relating to the City's pension plans will be an essential tool as the retirement systems manage the plans' assets and liabilities and make critical decisions regarding future estimated rates of returns and annual funding requirements. At the end of June 2012, the Governmental Accounting Standards Board ("GASB") issued standards intended to reform how state and local governments report the financial status of their pension funds and how they finance them. GASB 67 defines how government pension funds must report finances related to pension activities. GASB 68 pertains to state and local government reporting of activities associated with pension finances.[62] Both GASB standards are effective in FY2015 and will enhance the City's financial disclosures relating to its pension plans.

As the asset features and credit quality of the pension plans' investments evolve over time, so, too, will the reporting corresponding to those investments. The City's pension plans should establish a baseline level of financial reporting that will be accurate and illustrative of the condition of the pension plans at any point in time. The Society of Actuaries' report recommended that actuarial funding reports should contain, for at least the previous ten years, information presenting the relationship of benefit payments, funding liabilities, and assets to payroll; the relationship

---

[62] Governmental Accounting Standards Board

between the recommended contribution to payroll and to the sponsor's budget or revenue source; and the ratio of contributions made to the total recommended contribution.[63]

Additionally, to understand current risk levels, three benchmarks should be disclosed:

1) The expected standard deviation of investment returns of the asset portfolio on the report date;

2) The plan liability and normal cost calculated at the risk-free rate, which estimates the investment risk being taken in the investment earnings assumption; and

3) A standardized plan contribution for assessing the aggregate risks to the adequacy of the recommended contribution.[64]

Further, we recommend that the City disclose the gross liability and the UAAL by year on an undiscounted basis. This will allow third parties a better understanding of the changes in the liabilities from year to year.

---

[63] The Society of Actuaries "Report of the Blue Ribbon Panel on Public Pension Plan Funding"; February 2014

[64] The Society of Actuaries "Report of the Blue Ribbon Panel on Public Pension Plan Funding"; February 2014

## Section K - Human Capital and Leadership

Detroit's fifty year decline was caused by changing demographics, economics and the failure of elected officials to respond effectively. The downward spiral finally resulted in the City filing for Bankruptcy. Beyond the financial crises, the City has suffered from a deterioration of the efficiency and effectiveness of its City's workforce, as measured by the cost of service delivery versus the benefit the citizens received from those services.[65] Inadequate investment in human capital and poor leadership during the decline served to exacerbate the situation.

At its core, this chapter 9 is a fundamental change project. The City, through the guidance of its bankruptcy advisors, has fundamentally changed the City's balance sheet and reduced its long term obligations. The Emergency Manager has begun the even harder task of reshaping the operations of the City for the benefit of the taxpayers. The Mayor, and other elected and appointed officials, will need to continue this part of the change project. Human capital and leadership are two of

---

[65] Docket # 14, page 29 of 106, Memorandum in Support of Statement of Qualifications Pursuant to Section 109 (c) of the Bankruptcy Code

the most important components to any successful restructuring[66].  I believe the success, or failure, of Detroit's revitalization will hinge on the people employed by the City and the officials elected by the residents in the coming years.  The skill level, on average, of City workers is low and outdated.  Civil service requirements and historical collective bargaining agreements work against a merit or performance based employment culture in most municipalities and Detroit is no exception.  Lack of even modest technology and up-to-date systems, as is the case with the City, ensure that employees will not perform at competitive levels to their peers in the private sector or even in municipalities that are efficient.

Impact on Feasibility

As I noted in my definition of feasibility, the second assessment prong of feasibility is "will and skill".  Leadership, political and intestinal fortitude define "will" and talent and training equate to "skill".

For example, in order to arrest the downward trend of revenue, City employees must do a better job of collecting the taxes and fees that are currently due – that is skill.  Better systems and more experienced management will be required

---

[66] I have written on this topic previously.  See American Bankruptcy Journal, March 2014, "The Missing Link to Successful Company Turnarounds – Balance Sheet Management is Only Part of the Story"

to accomplish that goal. It was evident to me and my team that there are City employees who are knowledgeable, have good ideas about improving the operations and want to learn and advance. There are also employees who don't grasp that their job is to provide a service to the taxpayers versus the taxpayers owing them a job. This is a cultural malady that will have to change if Detroit is to be successful. Leadership that is focused on outcomes of service delivery and operating efficiency will be required, as will standards for personal and departmental performance.

Current Workforce Issues

The City employs more than 9,000 people and as a result of the RRIs expects add to almost 700 net new positions. After accounting for attrition, this is a significant mobilization. Further, my discussions with the leaders in the City indicate a universal understanding that increasing the average talent base of the employees is a cornerstone for success of the Plan and the City. This topic was acknowledged at the outset of the case and continues to present challenges to the City's management team. Throughout my team's discussions with City leaders and department managers, the issue of human resources has been a regular topic of discussion.

Throughout our discussion in the finance and accounting functions it has been noted:

*"Many qualified and experienced employees have left their jobs over concerns about the long term prospects of their positions; Difficulty in replacing employees with qualified personnel because salary structure is no longer reasonable and competitive. This weakness has been partially mitigated by hiring employees outside the official system using Professional Service Contracts (PSC's), consultants and contractors."*

Exacerbating the problem of historic skill level are the changes made to compensation prior to, and as a result of, the bankruptcy.  Prior to the Bankruptcy,

*"the City has also implemented a 10% reduction in the wages to majority of the workforce in the addition to furlough days of 10% to a majority of the non-uniform employees.  Medical and prescription drug plan designs have been changed to reduce the costs associated with healthcare and increase the percentage of contributions from active employees."* [67]

The POA eliminates future accrual of the defined benefit retirement plan and replaces with what is arguably a less generous hybrid pension plan. The Plan eliminates certain OPEB benefits, specifically, post-retirement healthcare and replaces with what is arguably a less generous VEBA plan.

Beth Niblock, the City's CIO, noted this concern in her Expert Report, *"(a)ttracting and maintaining a highly skilled workforce is a challenging task,*

---

[67] Declaration of Gaurav Malhotra in Support of the City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109 (c) of the Bankruptcy Code

*particularly given the current and proposed compensation rates set forth in the*
*Projections.''[68]*

There is little doubt that total compensation includes not only direct pay, but the benefits conferred to employees in the current time frame plus those that are expected to be conferred to the employee in the future. Individuals may possess differing views as to relative value of each category of pay; however, they do place some value on the deferred benefits.[69] With all of these changes to compensation, it is unclear what the impact will be on retention and recruitment. While there are studies to suggest, and perhaps some experience in Detroit to confirm, that the elimination of post-retirement healthcare may offset the impact of the pension changes as a retention tool. Current employees, when they retire, will not have the benefit of receiving healthcare benefits prior to Medicare eligibility. Therefore, employees may be more likely to stay in their positions with the City.

While the specific impact of the compensation changes on retention is unknown at this time, the impact on current employees and future employees may be different. For current City employees, the City has necessarily lowered the

_____

[68] Report of Beth Niblock, Chief Information Officer for the City of Detroit-Expert report submitted in support of the City's POA – page 15.

[69] Are Public Pensions Keeping up with the Times? Richard W. Johnson, Mathew Chingos and Grover Whitehurst page 47.''

overall economic value of City employment and changed the perception of the long term value in having worked for the City, once an employee leaves or retires. For future employees the economic and long term value analysis will be based on the individual's perception of alternative employment opportunities. The City is currently working with the consulting firm of Fox Lawson to complete a compensation review so that the City may have more than anecdotal evidence as it proceeds with the recruitment and staffing. We understand that the results of this study are not available and therefore were not considered when the City developed the POA projections.

In addition, the City has acknowledged the issue of skill development by including in the RRIs significant funding for employee training. The City has included an annual employee training budget of $2,000 for each non-uniformed employee through 2017 and $1,500 per year thereafter. The total RRI allocation to training over a 10 year period is $54.4 million. While no actual allocation of training dollars has been made, I believe that this is a strong indicator of the City's commitment to helping its current employees develop the skills they need to contribute to the success of the City and to maintain competitive skills within its employee base.

Throughout our meetings with City leaders and the advisors to the City, it has been noted that if compensation is a barrier to hiring the skilled talent required, the

City will likely adapt to this by hiring fewer but more skilled employees. I believe this approach can partially mitigate feasibility concerns regarding the City's ability to implement the Plan. Presently, the City is squeezed from both sides of the labor market: in order to do even the simplest routine task, the City has hired consultants yet maintains full time employees who should be able to manage those tasks but are not sufficiently trained to do so.

A significant challenge to acquiring the talent the City so desperately needs is the state of the Human Resources department. The Human Resources department is in need of an overhaul – recently, it has taken over six months to hire a new employee for an approved opening. As a result, department heads "work around" the department and find ways to recruit and hire employees more efficiently. The Mayor is well aware of the need for leadership in this key area.

Given the large number of recruits envisioned in the POA, a new approach to talent acquisition is needed. Consultants are in place to assess the skills needed to revamp key departments such as accounting and IT and the current leadership of those departments is experienced and capable. In fact, many of the Mayor's direct reports are experienced operational managers with successful employment histories. Overhauling the human resource function will be critical to a successful restructuring.

Leadership and Cultural Change

      If the City is to counteract the vortex of underachievement that has defined Detroit, City leadership must make a long term, concerted effort to maintain the momentum needed to ensure effective City services. The Emergency Manager has made progress on the macro changes required and I believe the Mayor is developing a culture based on performance metrics and accountability and some of the *status quo* is going by the wayside.

      I have confidence in Mayor Duggan. My opinion of feasibility is favorably influenced by my view of Mayor Duggan as a leader and an operational executive. I am encouraged by the manner in which he leads many of the City's departments given the real power is still held by the Emergency Manager. The Mayor has created simple metrics around which he can measure the performance of his department heads daily and/or weekly. This is a commendable workaround as the accounting and information systems, as noted elsewhere, are abysmal. While ultimately the City will need to address the core reporting system, the use of this simplistic metrics based approached is effective and understandable. When one is at the vortex of underachievement, having a few very simple and actionable goals can make a huge difference in the overall performance of the organizations. Having periodically attended the Mayor's Cabinet meetings, I know that if ambulance response times do

not decrease more rapidly, it will be evident to all and managers will be held accountable; this level of accountability can change the City for the better.

In the long term, the City's leadership is subject to the democratic process. There is clearly risk that future elected leaders stray from principals in the POA, but I am choosing to rely upon the combination of the electoral process and the oversight function implemented as part of the Grand Bargain legislation to keep future City leaders focused on strong stewardship.

Collective Bargaining Agreements

My team has not been privy to the negotiations between the City and its unions, or the resulting term sheets. The City's financial advisors have indicated that the economic issues addressed in the collective bargaining agreements ("CBAs") negotiated during the bankruptcy have been appropriately included in the POA projections. Based on discussions with long standing and former City officials and employees, I believe the more significant workforce issues are centered on the restrictive work rule provisions that have caused labor inefficiency, higher costs and inability to change outdated processes. I do not know if, or to what extent, any of these issues have been addressed in the recently negotiated CBAs. While I believe that the Emergency Manager's desire to negotiate 5 year contracts has been beneficial in mitigating the risk associated with adverse arbitration awards in the

future, I remain concerned that the City has missed an opportunity to make long term

changes in its business processes and ability to manage through unforeseen events.

**Section L - Blight**

<u>Detroit's Blight History</u>

The City of Detroit, due to its shrinking population[70], depressed economy, and sagging property values, has experienced a metastasizing urban blight condition over the past several decades.  Depending on which statistics are referenced, this City of approximately 139 square miles contains roughly 380,000 land parcels, of which 84,000 parcels (or 22%) have been identified as currently exhibiting blight characteristics or having indicators of future blight.[71]  These blighted parcels are geographically disbursed throughout the City, resulting in a ripple effect throughout most neighborhoods which further stretch the City's limited resources.  An expanding blight crisis within Detroit is not just a land and property issue; rather, this epidemic has an exponential impact on the City's efforts with regards to public

_____

[70]From roughly 1.8 million residents in the 1950's to the current estimate of under 700,000

[71] <u>Every Neighborhood Has A Future… And it Doesn't Include Blight</u>, Detroit Blight Removal Task Force Plan May 2014.  Page 15

safety, education, job growth, property tax revenue, and the City's efforts to attract new residents and businesses.

As recently as 2010, under Mayor Bing's administration, the City of Detroit began a coordinated effort to tackle the City's growing urban blight, with an initial goal of razing 10,000 vacant structures, roughly 13% of the vacant structures within the City, at that time. The City reached approximately 50% of its stated blight removal goal by 2013, but lacked the necessary funding to continue its targeted efforts. Demolition expense estimates for blighted residential structures have ranged between $8,500 - $12,000 per structure, depending on the size of the building and the degree of blight and neglect. In addition to the incremental costs, the City's protracted payments to the demolition contractors have resulted in reducing the number of contractors willing to provide demolition services.

Current Blight Initiatives

Mayor Duggan has made blight eradication a top priority and has attempted to coordinate Detroit's multiple public and private organizations in an effort to streamline funding and execute a strategy toward this critical effort. To that end, the Duggan administration has created the Department of Neighborhoods and

168

empowered the Detroit Land Bank Authority ("DLBA") to aggressively move forward with multiple blight initiatives, including:

- Nuisance Abatement
  - Legal process of the City taking proactive legal remedies to seize abandoned properties within Detroit via the transfer of title to the DLBA (after the owner has been given the opportunity to bring the property "up to code")
- Enhanced Intake Process
  - DLBA performs a cost-benefit analysis to assess the estimated costs to restore a property as compared the assumed demolition expense
- Disposition
  - DLBA has been initially successful in selling viable houses via open houses and online auctions

In addition to the City's blight efforts, the Detroit Blight Removal Task Force ("Task Force") recently released its Blight Removal Task Force Plan that articulated the Task Force's efforts since it was founded in September 2013 and its view on the City's blight efforts. The Task Force, in partnership with Data Driven Detroit and Michigan Nonprofit Association, created the Motor City Mapping ("MCM") project that created a database cataloging the physical condition, tax status, and other pertinent information of all 380,000 parcels of land in Detroit. Also, these partners developed the Maximizing Community Impact ("MCI") software tool designed to identify neighborhoods where targeted funding could stem blight expansion. Going forward, the Task Force's mission – as it pertains to the City's blight – is to focus on removing blighted structures and cleaning vacant parcels. The Task Force

estimates it will cost the City approximately $850 million to execute the Task Force's demolition strategy[72].

While the City's blight action plan and the Task Force's recommendation appear to be directionally aligned, the City's overall mission to stabilize neighborhoods may result in the DLBA pursuing deconstruction efforts in lieu of demolition, where it makes more sense. If the DLBA is able to resell or recycle some of the building components of the blighted structures and create valuable job opportunities in the process, that approach may make better fiscal sense than an across-the-board demolition strategy.

Plan of Adjustment – Blight Proposals

The City's POA includes a Blight Reinvestment Initiative that proposes to allocate $420 million of funding towards blight removal over the course of the next nine years. The projected funds dedicated for blight removal have changed in each iteration of the City's POA projections and funding has been allocated to other POA obligations. The forecasted annual blight RRI is as follows:

---

[72] Every Neighborhood Has A Future… And it Doesn't Include Blight, Detroit Blight Removal Task Force Plan May 2014.

| ($ millions) | City of Detroit's POA Proposed Blight Expenditures | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
| Blight Expenditures | $ 2 | $ 100 | $ 46 | $ 40 | $ 43 | $ 48 | $ 52 | $ 45 | $ 25 | $ 19 | $ 420 |

Funding for the intended blight removal efforts is forecasted to come from a variety of public and private sources, namely $52 million from the federal government's allocation of its Hardest Hit fund, $20 million from the Fire Escrow fund[73], various private sector contributions, with the balance coming from the City's annual cash flow. I have been told that the funding source for blight is flexible and is currently not necessarily dedicated only for this purpose. The Exit Financing contemplated appears to be the primary source for this funding.

Assuming the City can generate, or raise, the entire $420 million dedicated for Blight removal over the next nine years, at an average demolition expense of $11,000 per structure[74], the POA only allocates enough funding to remove about 50% of the structures designated by the Task Force blight removal.

---

[73]It is not clear how the City intends to access these funds for its general blight initiative, as we understand the funds in escrow are designated for the demolition of particular properties destroyed by fire.

[74]Phoenix assumed an average demolition expense of $11,000 per structure, within the $8,500-$12,000 range proffered in the Disclosure Statement and in Phoenix's conversations with the DLBA.

I am not troubled by this apparent discrepancy between what the Task Force believes is required to eradicate blight and what the City is proposing. At some point during the next ten year period, assuming the City can dedicate sufficient funding to the blight initiative in the next few years, I believe that blight removal can become more self-sustaining by incorporating private capital or cost neutral solutions. If the City is initially successful in its blight remediation efforts, private owners and investors will see an economic opportunity to allocate private capital to take advantage of the revitalization efforts. It should be noted that, of the 79,000 structures (excluding lots) that are included as blighted or indicating blight, almost half have the lesser designation of 'structures with indicators of future blight'.[75] It is likely that some portion of these structures might create realistic opportunity for private investors.[76]

---

[75]Every Neighborhood Has A Future… And it Doesn't Include Blight, Detroit Blight Removal Task Force Plan May 2014. Page 15

[76]Every Neighborhood Has A Future… And it Doesn't Include Blight, Detroit Blight Removal Task Force Plan May 2014. Page 224- the Blight task force estimates that 80-90% of the properties with blight indicators marked for 'further analysis' will eventually require demolition.

Blight Summary

Quantifying the near- and long-term economic impact of a successful City of Detroit blight removal initiative is difficult due to the absence of a calculable immediate return on the City's investment. The City's POA forecast, embedding the positive cash flow impact of the proposed RRIs, assumes increased income tax revenues of $204 million and property tax revenues of $110 million in the ten year period ending June 2023. While other RRIs impact the reasonableness of these incremental revenue assumptions, the relative impact of the blight removal initiative cannot be overstated.

In order to maximize the benefits of the blight removal program, the City must ensure that the funding is committed and supported in the longer term. For better or worse, blight has an emotional impact on the perception of what Detroit is and can be. I believe that the blight initiatives are immensely important to creating and sustaining a positive trajectory for the City's revitalization efforts. With substantive, long term commitments to address blight, I believe that many of the external factors, including home ownership and job creation required to abate the City's decline, can be addressed. Conversely, a start and stop approach, will likely result in ineffective investment and do little to reverse the spread of blight throughout Detroit. This trend would ultimately constrict the City's liquidity and make Detroit a less desirous

location for new residents and employers.  To effectively address blight, the City needs to achieve economies of scale.  The Task Force estimates that through economies of scale, the average cost per structure may be reduced by 17%.  Put differently, with proper planning and investment, the City's blight investment can produce 17% greater impact for the same money.[77]

Finally, continued coordination between the City, the State of Michigan, the Federal government, DLBA, and various private constituencies will be critical to the long-term success of the blight initiative.  Perpetual updating of MCM, and effective utilization of the MCI software tool to identify the neighborhoods that will benefit the most from allocation of the limited blight funding, will be important to the success of this most critical City initiative.

---

[77] Every Neighborhood Has A Future… And it Doesn't Include Blight, Detroit Blight Removal Task Force Plan May 2014.  Page 224

174

## Section M – Post Confirmation Oversight

As noted in my definition of feasibility, I believe that the determination of feasibility stretches far into the future, although to impact feasibility, issues that extend further into time must be more significant. Beyond the strictly financial issues, one of the most significant issues impacting feasibility involves post confirmation oversight and governance. Ultimately, the City of Detroit will be largely run by an elected mayor and an elected city council. There are obvious inherent limitations to understanding how the City will be run without knowing who will occupy these critical positions. In the end, the success of the POA will largely rest on the will of these elected officials and whether the will to make the fundamental change is inherited by future leaders.

While the democratic process necessarily creates this limitation, the State of Michigan has created a framework that will provide a level of consistent oversight for the City. If implemented correctly, this oversight will institute financial accountability in the City's operations and greatly improve the ability to address small problems before they become significant factors to long term viability.

175

Public Act 181 of 2014 establishes a 9 member commission, the Financial Review Commission (FRC), with fairly broad oversight power over the City. Powers to be granted to the FRC include:

- Ensure the City is complying with the POA
- Review and approve the City's consensus revenue
- Require the City to submit 4 year financial plans
- Review, approve and modify proposed and amended operational budgets of the City
- Require relevant information from the City
- Review and approve requests by the City to issue debt
- Approve the appointment and termination of the City's CFO
- Approve collective bargaining agreements
- Approve all contracts that exceed $750,000

I strongly believe that the appointment of the FRC improves the prospect of the City continuing to improve its fiscal health and therefore, provides some level of assurance to me regarding feasibility. I do note, that the FRC is populated by 9 non-compensated members. What we have learned about the City's finances, reporting and operations compels me to caution that the task the FRC is undertaking is not only challenging, but will require substantial time. Therefore, I believe that the positive prospects associated with the implementation of the FRC would be improved if the FRC hires permanent staff. My belief is that an executive director level professional with qualifications similar to a CFO would significantly improve the oversight functions associated with the FRC. I understand that the State has

appropriated funds for the operation of the FRC and these funds may in fact already be allocated to the above noted purpose.

As noted elsewhere in this Report, the pension plans are very complex. The accounting and actuarial assumptions are difficult to understand; it is even harder to understand how changes in assumptions may changes the City's future financial prospects. Therefore, I believe that it is important for the FRC to require annualized reporting from the City regarding each of the GRS and PFRS systems:

- The undiscounted liability of each of its pension plans.
- A sensitivity analysis consistent with those recommended by the Society of Actuaries Blue Ribbon Panel that provide a discount of the liability based on +/- 3% from the investment return discount rate used in the plan.

This reporting will allow outside observers to truly understand the nature of the City's continuing legacy pension obligations and insure that the City has foresight to deal with and significant deterioration of the pension UAAL during the time in which the City will not be making any direct cash payments to the pension funds, but the liability could nonetheless grow.

Public Act 182 of 2014 provides for the appointment of the City CFO, the identification of reporting requirements to the FRC and others, among other provisions. We do note that Public Act 181 and 182 requires the following:

That the City's financial plan include a general reserve fund for each fiscal year to cover potential reductions in revenues or increases in projected expenditures equal to not less than 5% of the project expenditures for the fiscal year.

I do not believe that the City's POA, as currently presented, complies with this requirement. The City has not identified how it intends to come into compliance with this provision.

As noted elsewhere in my Report, the City is unable to produce any reliable reporting in a timely manner. This will impact the FRC in their duties. At present, the City does not conduct monthly financial closes. That is, the City does not produce financial statements during the year. Further, it does not have a system to properly account for encumbrances. At present, the City relies on cash based information for what little information it does use to manage its operations. This cash based system is woefully inadequate for the purpose of running a major city long term. This will be compounded as the City begins to make large scale investments, such as blight remediation, which require the allocation of funding well in advance of the actual cash expenditure. The City has targeted an ERP system as one of its highest priorities in the RRIs. We fully support this initiative. However, it typically requires between 2-3 years, and sometimes even longer, for a full ERP implementation. During this time, the City will be required to continue to rely on ad hoc reporting. It is my observation that Mayor Duggan is using ad hoc operational

metrics to gain visibility.  Given the lack of alternative options, I applaud this and believe that this can be a reasonable proxy for the immediate term, but it cannot replace the need for quick, integrated, systematic reporting over a longer period.

I have a significant concern regarding the City's intention with regard to the ad hoc reporting currently performed.  It is my belief, the City is relying heavily on the cash team on site from E&Y.  I understand that 3 full time E&Y personnel are allocated exclusively to cash management and reporting.  I further understand that the POA does not have any direct funding allocated to retaining E&Y for this function.  Further, I do not believe the City has recruited and trained personnel for this fairly complex and critical role.  Failure to address this issue prior to confirmation could have a significant impact on the City's ability to manage cash and provide any level of reporting.

## Section N - City of Detroit Unresolved Issues

In the event that the Plan of Adjustment is confirmed, the City of Detroit will continue to be challenged with operational, legal and financial issues critical to the City's long-term viability and its ability to execute the proposed restructuring initiatives, including:

- Bankruptcy Eligibility
- 2005-2006 Certificates of Participation
- Potential Swap litigation
- Impact of Collective Bargaining Agreements negotiations
- Potential City of Detroit Asset Sales
- Exit Financing
- Professional Fees post-bankruptcy

The immediate and long-term impacts to the City if it ultimately receives negative outcomes from any of these key issues cannot be quantified at this time. It is likely, though, that these (and possibly other) issues, both individually and collectively, will consume significant City resources, with regards to both human capital and financial reserves, in the period immediately following the conclusion of these chapter 9 proceedings.

Chapter 9 Eligibility

The central issue before the Court since the beginning of this municipal bankruptcy has been the ultimate determination as to whether the City of Detroit was eligible to be a debtor under chapter 9 of the Bankruptcy Code.  At the petition date, the City filed its Statement of Qualifications and supporting memorandum demonstrating its compliance with the chapter 9 debtor requirements.  Approximately 110 objections to the City's eligibility were filed, along with the Attorney General for the State of Michigan's argument that the Pension Clause of the Michigan Constitution prohibited the City from impairing its obligations to the City's pensioners.

After three months of multiple hearings and bench trial, on December 5, 2013, the Court entered the Eligibility Order stipulating that the City was eligible to be a debtor under chapter 9 and that its bankruptcy petition was filed in good faith.  The objecting parties immediately requested an Order of Relief to the Sixth Circuit Court of Appeals.   The Bankruptcy Court subsequently issued a memorandum recommending that the Sixth Circuit deny the appeal request entirely, and, if the Sixth Circuit did grant the appeal, that the appeal should not be expedited and therefore ruled upon prior to the City's Confirmation hearing.  On February 21,

2014, the Sixth Circuit Court of Appeals granted the appeal petitions, but stated that the appeals would not be expedited.

At this juncture, the City's bankruptcy confirmation hearing and ultimate resolution is scheduled to occur prior to the Sixth Circuit's appellate hearing and decision. The potential impact of a reversal or modification of the Court's Eligibility Order is unknown at this time. It is conceivable that a reversal of the Bankruptcy Court's Eligibility ruling would completely negate the negotiated advances the City has made to date, specifically relating to employee compensation and pension/benefits reform.

Certificates of Participation

In 2005 and 2006, the City of Detroit, via its Retirement Systems and their related service corporations, issued multiple debt instruments known as certificates of participation ("COPs") totaling $1.47 billion in an effort to reduce the pension plans' combined unfunded liability. At the petition date, three series of COPs were outstanding totaling $1.473 billion:

| ($ million) COP Series | Amount Outstanding | Interest Rate |
|---|---|---|
| 2005-A | $ 517.6 | 4.5-4.95% |
| 2006-A | $ 153.7 | 5.989% |
| 2006-B | $ 801.6 | Floating |
| | $ 1,472.9 | |

Material legal debate currently exists as to whether the City of Detroit was legally able to issue the COP debt instruments. The City is bound by both the Home Rule City Act, which details the level of indebtedness a city may incur, and the Municipal Finance Act, which prohibits a city from issuing a municipal security except in accordance with provisions of the Municipal Finance Act. The 2005-2006 COP debt instruments may have been in violation of either or both of these legal statutes.

On January 31, 2014, the City filed a complaint against the Service Corporations and the Funding Trusts – the non-profit entities established to effect the COP debt issuances – stating the 2005-2006 debt issuances were in violation of state law and that the related COP claims should be disallowed in the chapter 9 proceedings. Contradictory complaints were subsequently filed by the Funding Trusts, COP holders, and the COP insurers citing multiple affirmative defenses to the City's complaint. At this time, hearings on the respective motions have been adjourned indefinitely. To the degree that such legal proceedings result in the COP

claims being fully or partially allowed, the City's POA could be materially weakened, and may result in incremental liquidity being required from future tax revenue to satisfy future obligations.


Potential Swap Litigation

As highlighted above, the City previously issued multiple COP debt issuances, the 2006-B series of which contained variable interest rates, thereby exposing the City to a rising interest rate environment. To hedge against this risk, the City entered into variable interest rate swap transactions in a notional amount of $800 million, equivalent to the 2006-B COPs series. The swap contracts were insured by FGIC and Syncora to guarantee the quarterly payments defined in the swap agreements.

In 2009, due to the downgrade of the 2006-B series credit rating, the swap counterparties had the right to declare an early swap termination event which, at the time, would have required the City to make a lump sum payment of $300-400 million to the swap counterparties. In an effort to avoid making such payment, the City pledged certain casino revenues and developer payments as collateral to the swap

counterparties. Approximately $0.5 million per day is held in a lockbox until the City makes its $4 million monthly swap payment.

The City's UTGO bond ratings were downgraded in 2012, exposing the City to a subsequent termination event and additional, costly termination payments due to the swap counterparties. In efforts to protect its interest in the collateralized Casino revenues, the City of Detroit entered into multiple mediations and litigation with both the swap counterparties and the swap insurers. The mediation with the swap counterparties resulted in reaching the Forbearance and Optional Termination Agreement that, after significant prodding from the Court, resulted in an agreement for a reduced Optional Termination Payment of $85 million, payable when the City raises the required Exit Financing or in installments within 180 days of the case's Effective Date.

The Court entered a Swap Settlement order on April 15, 2014, which was subsequently appealed by multiple swap insurers contesting the swap counterparties ability to exercise any optional right of termination of the swap contracts without the insurers' written consent (Syncora Guarantee Inc. v. UBS AG, et al., Adv. Proc. No. 13-05395)[78]. The litigation appears to essentially hinge on two primary issues: 1)

_____

[78] Quarterly Report with Respect to the Financial Condition of the City of Detroit; Office of the Emergency Manager; dated April 15, 2014.

whether the swap insurers have the right to prevent the City from gaining access to its wagering tax revenues (<u>City of Detroit, Michigan v. Syncora Guarantee Inc. et al.</u>, Adv. Proc. No. 13-04942)[79], and 2) whether the swap counterparties had the "standing" to enter into the FOTA without the swap insurers' consent.  On the first issue, the District Court – in a July 14, 2014 decision - ruled the swap insurers did not have the right to trap the City's wagering tax revenues.  That decision, as well as the ruling on the swap counterparties authority to execute the FOTA without the swap insurers' consent, will thus be decided by the Sixth Circuit Court of Appeals. To the degree the insurers' appeal is successful, any clarity of the City's financial exposure to a potential swap termination payment would be lost and would possibly result in the future restricted access to some portion of the vital Casino revenues.

Collective Bargaining Agreements

The City of Detroit, throughout this bankruptcy process, has been negotiating to reach CBAs with its various labor unions representing the City employees.   A total of 47 labor unions represent the City's employees, all of which had their CBAs

─────────────────────

[79] Quarterly Report with Respect to the Financial Condition of the City of Detroit; Office of the Emergency Manager; dated April 15, 2014.

expire as of June 30, 2013. The City's employees have been subject to City Employment Terms ("CETs") since the expiration of the respective CBAs. The City estimates that the CETs have resulted in more than $200 million of annualized labor savings.

The City has negotiated many new CBAs with the goal of having them mirror the effective terms of the CETs. Phoenix has recently received the majority of negotiated CBAs, some of which have been fully approved by the State of Michigan, and some of which have been ratified but await the State's approval. Due to the timing of when Phoenix received these CBAs relative to our Report deadline, we have not fully reviewed each of these CBAs. To the degree that the final, agreed-upon terms of the respective CBAs contain aspects that are costlier to the City than the current CETs or contemplated in the projections, the City's liquidity could be negatively impacted. I am further concerned that the newly negotiated CBAs may not have sufficiently addressed the City's historic work rule issues.[80]

---

[80] I have received assurance from City advisors that all agreed-upon CBAs are included in the projections.

187

Potential Asset Sales

Concurrent with the City's bankruptcy process, the City and its representatives have been in discussions with multiple constituencies in efforts to ascertain the optimal utilization of certain assets of the City of Detroit, whether that may be the outright sale of certain assets or the proposed leasing and/or partnership of non-core City assets.

The City has been engaged in longstanding discussions pertaining to the Detroit Water and Sewerage Department ("DWSD") with the surrounding counties with regards to the potential formation of a regional water authority. It is conceivable that a new authority could assume operating control of the majority of DWSD assets. To date, the City has not able to reach an agreement on any disposition of the DWSD assets and, as such, the discussions have migrated to bankruptcy-ordered mediation.

In addition to a possible disposition of the DWSD assets, the City has also inquired with interested parties about the possibility of a public-private partnership. Such partnership would entail the operation and management of the DWSD by qualified candidates who have demonstrated the financial and operational capabilities required to execute the DWSD's operations.

188

The City, via its Auto Parking System ("APS"), owns and manages seven parking garages containing 6,793 spaces and controls roughly 3,400 on-street metered parking spaces. At the request of the City, Miller Buckfire & Co. has been tasked with exploring the potential monetization of the City's parking assets. At this time, no definitive decisions have been made by the City regarding these assets.

Lastly, options related to the City's Coleman A. Young Airport are currently being considered, specifically a possible sale or lease transaction. As the airport is currently a cash drain on the City's budget, the transfer of this asset could be beneficial to the City's overall liquidity.

Exit Financing

The City of Detroit is seeking to enter into a $300 million financing facility ("Exit Facility"), commensurate with the City's anticipated emergence from bankruptcy. Per the POA, an estimated $120 million of the Exit Facility will be used to refinance the City's existing, previously-funded Quality of Life loan. The balance of the Exit Facility is intended to provide the City with liquidity and begin to fund the POA's restructuring initiatives.

Miller Buckfire & Co. has been engaged to solicit respective parties' interest in the proposed $300 million financing. To date, an Exit Financing introductory letter and an Exit Financing Indicative Term Sheet have been released to prospective lenders. Phoenix has no visibility into the receptiveness of the financing sources to the proposed debt offering. To the degree the City is not able to procure the anticipated Exit Financing in the amount or at a reasonable interest rate will materially impact the City's cash flow liquidity at its emergence from bankruptcy. As of the date of this Report, it appears that the assumed interest rate of 6% could be low for a high yield instrument like the proposed Exit Financing.

Professional Fees

According to the Plan, the City intends to establish and fund the Professional Fee Reserve, effectively allocating funds for the accrued expenses of professionals during the Chapter 9 bankruptcy. Those funds have been identified in the City's financial forecast.

The services provided by these professional advisors – both legal and financial – are likely to be required by the City after the bankruptcy is confirmed, whenever that occurs. In addition to various litigation matters referenced above, the City's

treasury function, as well as multiple, other financial and departmental functions, are largely performed by outside professionals at this time. This results in two primary concerns: first, many of the everyday functions performed by these outside professionals need to be transitioned to City employees, some of whom may not be hired yet; and, second, the interim, post-bankruptcy costs associated with these outside professionals is not in the City's budget at this time. While the City may be able to transition the Finance-related roles to its employees in the short or mid term, the various ongoing litigations will require a significant near-term financial commitment by the City to its retained legal counsel. The estimated, post-bankruptcy professional fees should be included in the City's near-term financial forecasts as they have the potential to be an immediate use of funds.

## Section O - Other Risks and Opportunities

The POA and the projections that support the POA have been developed by the City to provide a reasonable forecast and represent a realistic picture of the City's General Fund.[81] Based upon my team's analysis and numerous discussions with the City's advisors, I understand these projections were not developed either to: 1) account for every opportunity the City may have to generate cash flow in the future, or 2) account for every possible downside risk associated with a loss of revenue or an increase to expenses. While I do not disagree with the City's exclusion of certain items, I believe it appropriate to briefly summarize certain risks and opportunities not fully explored elsewhere in this Report.

---

[81] Report of Gaurav Malhotra in re City of Detroit, Michigan 13-53846, page 3, "These projected revenues and expenditures are reasonable forecasts and represent a realistic picture of the City's General Fund's ability to afford its expenditures and satisfy its obligations under the plan while maintaining an adequate level of municipal services."

Macro-Economic Issues

I believe the City's economic forecasts that informed the projections considered normalized economic conditions. I do not believe the City's projections accounted for any significant economic disruptions similar to those experienced recently during the Great Recession. Depending on the severity, longevity and the direct impact on urban centers, a long term and negative economic condition could cause serious concerns with meeting the Plan requirements.

State and Federal Funding

The POA relies on a number of external funding sources including the State of Michigan and to a lesser extent the Federal government. The State contributes through annual revenue sharing totaling almost $2 billion over the first 10 years of the Plan as well as $194 million as part of the Grand Bargain. Any additional support for Detroit at the State level is not committed and, in fact, revenue sharing could decrease over the life of the Plan.

There is obvious interest by the Mayor in identifying new and recurring support from the Federal government and other grant making bodies. The Plan projections have tended to apply conservative assumptions to the current grants and the availability of additional grants in the future, although it is clear that not all grants

assumed in the projections are committed at this time. Any increase in direct Federal support or grants will help to make the projections more achievable.

Impact of Private Parties

Third party funders have made significant commitments to the City. In fact, the Grand Bargain represents a huge commitment by these City benefactors and is already accounted for in the projections. However, there are a lot of small ways that third party benefactors may directly and indirectly impact the future of the City. The work of the Blight Task Force and the Future Cities Initiative are an example of this and cannot be measured in dollars. There would also be an improvement in the feasibility of the POA if a surge in private investment favorably impacts real estate values, employment and other factors that could contribute favorably to the initiatives in the Plan.

There is a downside to third party involvement as well. It can be fickle; a change in priorities or fortune could reduce the level of funding or delay it. The POA calls for $366 million from charities and foundations plus an additional $100 million to be raised by the DIA Corporation as part of the Grand Bargain which will be paid over a 20 year period. Failure of these foundations or benefactors to execute

on their commitments will result in further funding requirements from the City of Detroit.


Exit Financing and Access to Capital Markets

The POA contemplates the closing of an Exit Financing that will support the City's investment and liquidity needs. The projections assume Exit Financing will be a $300 million facility with an 11 year term, funded on October 31, 2014, with interest only payments in the first 4 years and equal principal payments made in years 5-11. The interest rate is assumed to by 6%.[82] We understand the City, through its advisors Miller Buckfire & Co., have commenced a process to solicit bids for this financing package. As of the date of this Report, the process is still underway. Mr. Buckfire believes that the Exit Financing process is likely to be successful on the terms outlined.[83] In the event that this financing is unavailable to the City on reasonable terms, is significantly lower in terms of facility amount, or is otherwise different than the assumptions in the POA, it is unlikely the City will have sufficient liquidity to operate and satisfy its obligations.

_____

[82] Report of Gaurav Malhotra in re City of Detroit, Michigan 13-53846, page 14.

[83] Expert Report of Kenneth Buckfire in Support of the City of Detroit's Plan of Adjustment in re City of Detroit, Michigan 13-53846 page 3 Section 2.

In addition, I believe it is likely that the City will desire or require access to the capital markets in the future for potentially many different reasons. Mr. Buckfire believes the significant changes as a result of the POA and the State of Michigan's steps to remedy governance will allow the City to again access the capital markets. [84] The City's inability to access the capital markets beyond the Exit Financing may limit the City's working capital flexibility and its ability to respond to future, necessary changes in delivery of essential services or capital investments.

DWSD

Detroit Water and Sewerage Department is a significant portion of the City's operations, however, it has very little impact on the General Fund. DWSD largely operates independently from other City business units. While DSWD's debt is impacted by the POA, the DWSD operations are not included in the Plan. DWSD does play a significant role in funding the City's pension obligations during the forecast period[85]. In the event of a significant disruption to the DWSD operations, significant loss of customers impairing its financial prospects, or in the event that

---

[84] Expert Report of Kenneth Buckfire in Support of the City of Detroit's Plan of Adjustment in re City of Detroit, Michigan 13-53846 pages 3-5 Sections 3-6.

[85] DWSD is expected to contribute a total of $428 million from FY2015-FY2023.

the DWSD contributions are not made according the POA, this could negatively impact on the outcome of the POA.

Sale of Assets

The POA largely excludes the sale of assets. While the sale of certain assets will have established treatment in the POA, there are significant asset sales that are not contemplated in the POA that could positively impact the projections. These assets might include parking related assets and other real estate. I have no visibility into the value of potential asset sales, but I believe they could produce cash which could improve the City's liquidity or revitalization prospects.

Tipping Point

The concept of the Tipping Point was made popular by author Malcolm Gladwell. He characterizes the tipping point as a moment of critical mass or boiling point where a group of small actions hit a threshold point and create an outsized impact. [86] A tipping point can be either positive or negative. Presently, the City has

———————————————

[86] The Tipping Point by Malcolm Gladwell, 2000 published by Little Brown.

momentum and emotional optimism that it can build upon to energize its revitalization. There is no way to stochastically identify this impact and I do not believe the City has included this optimism in its projections. But there is no doubt that it is real.

I believe the City may be experiencing a tipping point that could be either positive or negative. There is a lot of press about support for the City from external parties making significant investment in Detroit. Press accounts suggest percolating interest in real estate and low availability of market rate apartments in small sections of the City. The City is addressing in small ways the quality of life issues, including street lights and blight.

It is beginning to feel like it could be an exciting time to be in Detroit. Tipping points also work in the opposite direction. If the momentum starts to slow in lots of small ways, or if the headlines change from investors buying, to investors selling, or if blight remediation reverses direction, the City could tip backwards. It is a critical point in time for the City of Detroit. My opinion is that it is more likely to tip forward than to tip backwards.

## Section P - Conclusions

As noted in the Feasibility Section of this Report, I, along with the Phoenix team, have proffered the following Feasibility Standard for use in determining whether the City of Detroit's Plan of Adjustment is feasible:

> *'Is it likely that the City of Detroit, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the Plan without the significant probability of a default*?'

We have further qualified the Standard into two components:

Quantitative

- Are the projections contained in the POA mathematically correct and materially reasonable?
- Are the assumptions that the City has used to develop its projections individually, and when taken as a group, reasonable?
- Is there an adequate contingency included in the projections?

Qualitative

- Does the City have the human resources, or can it likely recruit the human resources, required to meet its obligations under the POA?

- Does the City have the appropriate systems and procedures to monitor its financial performance and to provide early warning signs of variances in performance that might cause the City to fall short of the projections and be unable to meet its obligations under the POA?
- Are there appropriate structures to ensure the City's compliance with the POA and with reasonable government standards of operation?
- Will the City be able to reasonably deliver a minimum level of municipal services?
- Is the City's trajectory sustainable?

<u>The Quantitative Issues</u>

It is my opinion that, except where otherwise noted in my Report, the projections are generally mathematically correct and materially reasonably and therefore fall within the Feasibility Standard I have defined.

It is my opinion that, except where otherwise noted in my Report, the individual assumptions used to build the projections fall into a reasonable range and, that when taken as a group, these assumptions are also reasonable and fall within the Feasibility Standard.

While I have noted issues with the level of contingency in the projections, and feel this must be addressed both as a practical matter and in response to Public Acts 181 and 182 of 2014 controlling law, I believe that there are enough conservative assumptions in the projections to offset what I view as an aggressive assumption

concerning the level of contingencies, particularly in the early years. While I do not believe a 1% contingency is adequate, I believe that the POA projections, taken as a whole, fall within the range of reasonableness and within my definition of the Feasibility Standard.


The Qualitative Issues

As noted in this Report, I believe that human capital and the City's leadership ability are immensely important for the success of this Plan. Current human resources are lacking and senior leadership, while generally capable is not plentiful. To meet the projections in the POA, the City will need to recruit a significant number of employees with improved skill level and continue to change the culture of performance and accountability, I believe that the City has identified human capital as an issue and is addressing this both formally and informally. I am relying on Mayor Duggan, CFO John Hill, and the other capable executives I have met at the City to execute effectively on the human capital strategy.

As noted in this Report, the City's IT systems and procedures are broken and insufficient. I believe that the City's Mayor, CFO and CIO recognize the critical importance of effective technology and systems to the City's revitalization. Each

of these executives has convinced me that correcting the City's IT systems issues is a very high priority. I believe the City has recognized these issues, has identified the magnitude of funding required, and has begun to address both the process and technology issues necessary to bring the systems up to a reasonable standard over the next few years. I do not believe that there is a reasonable alternative that would produce a better, or quicker, result for the City.

I have noted my concern and my personal preference that the CFO report to the Financial Review Commission. I believe this would have provided a greater level of confidence in the City's performance by outsiders, including the capital markets. However, I believe that the existence of the Financial Review Commission provides a reasonable level of oversight to the City and that the CFO is eminently capable and appropriately professional and independent.

The POA and the projections that support the POA are designed to allow the City to continue to improve its level of service to the citizens of Detroit. I believe that the RRIs are reasonable and well considered. If executed, they will allow the City to deliver essential services. It is my opinion that the City is beginning to emerge from the "service delivery insolvency" referenced in Judge Rhodes' opinion concerning eligibility.

By most accounts, there is forward progress being made in the City. I believe the combined efforts of the Emergency Manager and Mayor are addressing service shortfalls. Further, I believe that the expanding efforts of the private sector are also indicative of a City with a positive trajectory. The POA lays out a plan to continue to improve the City services and I believe some of the work done by the Blight Task Force and the Future Cities Initiative will continue to add additional support to the City's positive trajectory.

After extensive interviews with parties knowledgeable about the City and the POA, the review of hundreds of relevant documents and models, and significant independent research and analysis by my team and me, it is my opinion that:

> It is likely that the City of Detroit, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the Plan without the significant probability of a default.

As noted in Section C of this Report, I believe that the Feasibility Standard exist on a reasonable continuum, therefore, there are actions that can make the POA "more feasible." Throughout my Report I have noted issues that caused me some level of concern. These are issues that, if addressed, would make the POA 'more feasible.' Without any expectation that my concerns will influence the City or the Court, I will briefly summarize my larger concerns.

It should be noted that this opinion is rendered in an environment where there are many factors that will have influence on the City's conditions post confirmation that are unknown and unknowable. Throughout this Report, I have noted some of these factors, while other factors may not even be recognized today as potentially having an impact. My opinion is necessarily limited by these unknown factors. It should be recognized, that these factors, when known, could have a material impact on my view of feasibility.

Integrated Plan

As noted throughout this Report, there is not one controlling set of projections that will provide a financial road map to the City, its constituents and the Financial Review Commission. I recommend that the City immediately produce an integrated plan, which includes the expected initiatives, deferrals and other items, by department and fund. This will provide a longer term roadmap and assist the Mayor, the Financial Review Commission and other interested parties in understanding how the City is making progress towards the forecast detailed in the Plan. This business plan would also meet the requirements established in Public Acts 181 and 182 of 2014.

## Oversight

As noted, I would have preferred an oversight model that included a CFO that did not report directly to the Mayor. This is not a statement about the quality of the current Mayor or CFO but rather my view that an oversight structure should be independent of who is the elected official. Given that the structure included in the Grand Bargain legislation does not include this independent CFO, I believe it is imperative that the Financial Review Commission have some permanent staff. My experience in other similar situations allows me to understand the complexity and sheer volume of information that must be analyzed and evaluated to properly execute the oversight function. The legislation provides for the Commission to hire professionals, which it will no doubt need to do, but it will be less costly and better for the long term effectiveness of the Commission, if it has a least a small permanent staff to support the part time, unpaid oversight board.

## Pension Plan

One of the driving forces of the City financial problems was the City's, and the pension plans' trustees, failure to appropriately address the growing, unfunded pension liability. With finite resources, competing needs for dollars and the

willingness to push the problem to tomorrow, the pension UAAL continued to grow. This is not only a Detroit problem, but a general municipal finance problem throughout the United States. However, just because it is not *just* a Detroit problem does not mean that Detroit should not make some progress in addressing the macro problems. While the Plan makes progress in addressing this liability, the liability is not fixed. As noted in the Pension section of the Report, there is still risk that the liability could grow significantly. I recognize the difficulty and pain associated with the pension negotiations; and further, I understand the practical nature of the resulting settlements and the City's desire to manage its cash requirements related to pension contributions over the next 10 years. However, this does not fix the liability. The City cannot look away for 10 years and return in FY2023 to find the liability has again become an unmanageable burden. Therefore, I believe it is appropriate that the City be required to annually release the undiscounted liability of each of its pension plans. This will allow outside interested parties to independently evaluate the strength of the plans. Further, I believe that the City should provide a sensitivity analysis consistent with those recommended by the Society of Actuaries Blue Ribbon Panel on an annual basis and provide a discount of the liability based on +/- 3% from the investment return discount rate used in the plan. This level of reporting is not overly burdensome and will provide some level of sunshine into what is otherwise a very opaque process.

RRIs

      The RRIs are one of the positive outcomes of the bankruptcy process. The RRIs provide the backbone of improved services to the citizens of Detroit. I believe that the development of a scorecard to track the implementation of the RRIs is an important tracking mechanism that will enable the City and the Financial Review Commission to understand the RRIs' implementation progress.

                                    Respectfully submitted,

Dated:  July 18, 2014

                                 /s/ ___***Martha E. M. Kopacz***

                                 Martha E.M. Kopacz

# Exhibit 1

**Martha (Marti) E. M. Kopacz**
**Senior Managing Director**
**Phoenix Management Services LLC**
**Ten Post Office Square, Suite 605N**
**Boston, MA  02110**
**Mobile - (617) 840-9155**
**mkopacz@phoenixmanagement.com**

Ms. Kopacz has over 25 years' experience assisting stakeholders in analyzing business operations and reorganization possibilities. She has led or participated in over 100 consulting and restructuring engagements representing companies, debtors, investors, creditor committees, banks and Chapter 11 Trustees. Ms. Kopacz has advised in a broad range of industries including not for profit and public sector, retail, leisure and entertainment, technology and professional services.   She was one of the first financial advisors to apply turnaround principles to public sector and not for profit organizations. She has served as an Interim President, Chief Restructuring Officer, Chapter 11 Trustee, Collateral Trustee, and Examiner.

**General Experience**

Ms. Kopacz has prepared dozens of financial projections for clients and reviewed and critiqued dozens more, prepared by others.  She has previously testified as to the appropriateness of forecasting methodology, the assumptions upon which forecasts are based and the likelihood of an organization to meet its forecast.  She has a deep understanding of the importance of developing assumptions based upon a thorough analysis of relevant data, including historical and prospective information as well as third party, independent data. Ms. Kopacz understands the nuanced area of municipal budgeting. Because municipal entities lack a "standard" in budgeting, forecasting and accounting, great variations occur in the manner in which public entities report financial results and develop forecasts.  As such, preparing and evaluating projections for municipalities requires strong business acumen and deep appreciation for the challenges inherent in the forecasting methodology and approach available to the entities.

**Relevant Engagements**

Ms. Kopacz advised the **Nassau County Interim Finance Authority (NIFA)**, a New York state control board, in their oversight role.  In early 2011, NIFA imposed a control period for Nassau County based on a substantial budget deficit.  Nassau County has experienced financial difficulties for over a decade despite an annual budget that approaches $3 billion.  The structural deficit for 2012 was estimated at $300 million.   Ms. Kopacz advised NIFA on the financial requirements underpinning the control period, the nature and size of the likely budget deficit and the reasonableness of the County's forecasts.  In addition, Ms. Kopacz and her team conducted and in depth review of the business operations of the County and developed over $300 million of cost reductions and operational improvements, which if implemented would restore Nassau County to a balanced budget in the next few years.

Serving in the capacity of the Chief Restructuring Officer and Interim President, Ms. Kopacz designed, led and executed the out-of-court restructuring of the **Legal Aid Society**, a 135 year old charity with approximately $150 million in revenue serving the legal needs of the needy in New York City.

Accomplishments included:  reducing a $20 million operating deficit to better than break even; negotiating workforce reductions, compensation and benefit modifications with the UAW (lawyers' union) and the SEIU 1199 (social workers and paralegals' union) representing approximately three-fourths of the Society's 1400 employees; restructuring pension obligations; consolidating real estate, third party suppliers and infrastructure; and restructuring over $65 million of balance sheet and long term obligations with dozens of creditors and stakeholders, all of which returned the organization to solvency.  In addition, Ms. Kopacz led the Society's first ever Strategic Business Planning effort, managed day-to-day operations in conjunction with the Attorney-in-Chief, and received the Society's Pro Bono service awards for 2004 and 2005.

Ms. Kopacz represented **The Educational Resources Institute, Inc. (TERI)**, a large not for profit organization providing college access to underprivileged and underserved populations. TERI's for profit subsidiary was the largest guarantor of private student loans in the country when the securitization market for student loans evaporated.  The extensively negotiated plan of reorganization preserved the not for profit mission and return collateral to the original lenders.

Ms. Kopacz worked extensively with the **Archdiocese of Boston** during some of its darkest days.  In addition to preparing this socially significant non-profit institution for a contingent bankruptcy filing, she worked with stakeholders to develop a crisis communication plan, arranged interim financing and designed a claims facility to adjudicate tort claims.

**Prior Experience**

Prior to joining Phoenix Management, Ms. Kopacz founded Brant Point Advisors, a boutique advisory firm. Previously, Ms. Kopacz co-founded and co-lead the U.S. Corporate Advisory and Restructuring Services practice at Grant Thornton LLP and lead the group's public sector initiatives. Earlier in her career she was a Managing Director with Alvarez & Marsal, focused on public sector and not for profit clients, and a Principal with PricewaterhouseCoopers LLP until the practice was sold to FTI Consulting, as which time she was a Senior Managing Director.

**Education & Certifications**

Masters of Business Administration in Finance and Investments – Kelley School of Business – Indiana University
Bachelor of Science degree in Marketing – Kelley School of Business - Indiana University
Certified Management Accountant
Certified Insolvency and Restructuring Advisor

**Affiliations**

American College of Bankruptcy – Fellow – Twelfth Class
Turnaround Management Association
American Bankruptcy Institute
International Women's Insolvency and Restructuring Confederation,
Association of Insolvency and Restructuring Advisors
Institute of Management Accountants.

**Civic Engagement**

Boston 2024 Organizing Committee – Board Member
Legal Aid Society of New York – Board of Advisors
Kelley School of Business - Indiana University – Dean's Council
Graduate School of Business, Sunkyunkwan University – Dean's Council
Inly School – former Board of Trustees

**Speaking Engagements and Publications**

**"Municipal Insolvency and Bankruptcy Part 1:  Introduction, Overview and Key Issues"** – Rhode Island Bar Association Annual Meeting, June 2012

**"Municipal Bankruptcy"** – Association of Insolvency and Restructuring Advisors Webinar, February 2012

**"The Municipal Restructuring under Chapter 9:  Legitimate Option or Scare Tactic?"** – American Bankruptcy Institute Winter Leadership Conference, La Quinta, CA, December 2011

**"Municipal Insolvencies:  Is This the Next Wave?"** – Turnaround Management Association Northeast Chapter, Boston, MA, November 2011

**"Leadership and Political Will – Fixing States' and Cities' Fiscal Woes"** – Heyman Center Series: America's Fiscal Crisis – Depression, Recession or Recovery, Cardozo School of Law, New York, New York, October 2011

**"Today's Problems in Municipal Finance – Should Chapter 9 be Extended to States?"** – Commercial Finance Association Advocacy Conference, Washington, DC, September 2011

**"Turnaround "Apps" for the Public Sector"** – Grant Thornton white paper, July 2011

**"Chapter 9 Update"** – American Bankruptcy Institute Northeast Conference, Newport, RI, July 2011

**"Turnarounds in the Public Sector"** – Kellogg Turnaround Management Conference, Chicago, IL, May 2011

**"Too Big to Fail or Too Big to Bail (Out):  a Discussion of the Pros and Cons of Bankruptcy for States"** – Grant Thornton white paper, March 2011
　　**"That was Then, This is Now:  Financing Your Business in the Current Environment"** – Proskauer Grant Thornton Seminar, New York, New York, October 2010

**"Navigating Your Portfolio Through Turbulent Waters - Facing The Reality of Being Over Leveraged - And Practical Strategies for Restructuring in Zero Gravity"** – Association for Corporate Growth Intergrowth Conference, Miami, May 2010

　　**"Who Has $$ and What Are They Buying?"** – Caribbean Insolvency Symposium, Grand Cayman, CI, February 2009

**"Gaining Support from All of Your Constituencies"** – American Bankruptcy Institute Northeast Conference, Brewster, MA, July 2008

Previous Dates – Guest Lecturer at Harvard Business School, Massachusetts Institute of Technology, Bentley College, Northeastern University, Pennsylvania State University and Indiana University concerning various corporate recovery topics. Panelist or Moderator at industry conferences hosted by Turnaround Management Association, American Bankruptcy Institute, Massachusetts Continuing Legal Education, National Credit Managers Association, Food Manufacturers Association, Barclays Bank among others.

# Exhibit 2

**Exhibit 2**

| # | Document/Source |
|---|---|
| 1 | All documents referenced in this report |
| 2 | All dockets located within KCC (Kurtzman Carson Consultants) data room in re: City of Detroit, Michigan |
| 3 | All documents located within the RR Donnelley Venue data room, located at http://www.kccllc.net/detroit/document/list/3666 |
| 4 | All documents located within the data room constructed for Phoenix Management to catalog the Jones Day data productions, serviced by AlphaLit data room, located at www.go2edirect.com |
| 5 | All information located within the City of Detroit website, located http://www.detroitmi.gov/ |
| 6 | All communications with City of Detroit personnel |
| 7 | All communications with Advisors of the City of Detroit |
| 8 | All communications with personnel responsible for the City's pension funds |
| 9 | All communications with the advisors of the City's pension funds |
| 10 | Emergency Manager Orders |
| 11 | Emergency Manager Announcement |
| 12 | Emergency Manager Reports |
| 13 | All documents released from the state of Michigan in regards to the City of Detroit Bankruptcy |
| 14 | American Bankruptcy Journal article titled "The Missing Link to Successful Company Turnarounds – Balance Sheet Management is Only Part of the Story"(March 2014) |
| 15 | Detroit Blight Removal Task Force publication titled "Every Neighborhood Has A Future… And it Doesn't Include Blight, Detroit Blight Removal Task Force Plan"(May 2014) |
| 16 | Daily Bankruptcy News article titled "$4 Trillion In Hidden Muni Liabilities: SEC Commissioner Gallagher" (May 2014) |
| 17 | Journal of Corporate Renewal article titled "Chapter 9 May Be Tough to Swallow for Unions, Retirees" (June 2014) |
| 18 | The Society of Actuaries panel titled "Report of the Blue Ribbon Panel on Public Pension Plan Funding"(February 2014) |
| 19 | The Brookings Institution publication titled "Are Public Pensions Keeping Up With The Times?"(June 2013) |
| 20 | The Rockefeller Institute of Government publication titled "The Blinken Report: Strengthening the Security of Public Sector Defined Benefit Plans(January 2014) |
| 21 | BenefitsPro article titled "Public Pensions Hiding Trillions in Liabilities, SEC Commissioner Says"(June 2014) |
| 22 | Goodwin Proctor article titled "Visionary Schemes Need Not Apply: The Chapter 9 Plan Feasibility Requirement" (June 2013) |
| 23 | WSJ article titled "Detroit's Bankruptcy Revival " (April 2014) |
| 24 | Elizabeth Warren, U.S. Senator for Massachusetts press release titled "Rockefeller, Warren Introduce Legislation to Protect Employees and Retirees from Unfair Benefit Cuts"(June 2014) |
| 25 | Unionwatch Article titled "GASB Loopholes Created Illusions of Insolvency"(March 2013) |
| 26 | New York Times article titled "Panel Seeks Greater Disclosures on Pension Health"(February 2014) |
| 27 | The Detroit Free Press article titled "Judge Rhodes spars with Detroit fire union over bankruptcy objection"(July 2016) |
| 28 | Dow Jones Financial Information Services publication titled "Balancing Best Interests and Feasibility in Chapter 9"(March 2011) |
| 29 | The Detroit Free Press article titled "Monitor finds Detroit's 36th District Court much improved since May 2013"(May 2014) |
| 30 | The Detroit Free Press article titled "An energized Detroit Land Bank leads Duggan's blight effort"(May 2014) |
| 31 | Detroit News article titled "Clearing neighborhood blight to cost $850M, Detroit group finds"(May 2014) |
| 32 | California Policy Center article titled "How New Rules from Moody's and GASB Affect the Financial Reporting of Pensions in Seven California Countries"(March 2013) |
| 33 | Journal of Public Economics article titled "Financial incentives and retirement: evidence from federal civil service workers"(March 2008) |
| 34 | Boston College Law Review article titled "Some Confirmed Chapter 11 Plans Fail. So What?" (Vol.47)(December 2005) |
| 35 | American Education Finance Association publication titled Teacher Pension Incentives, Retirement Behavior, and Potential for Reform in Arkansas"-2010 |
| 36 | National Association of State Retirement Administrators publication titled "The 80-percent threshold: Its source as a healthy or minimum funding level for public pension plans)(January 2012) |
| 37 | C. Scott Pryor publication titled "Who Bears The Cost? The Necessity of Taxpayer Participation in Chapter 9" (June 2013) |
| 38 | C. Scott Pryor publication titled "Municipal Bankruptcy: When Doing Less Is Doing Best" (April 2014) |
| 39 | A Collier Monograph titled "Debt Adjustments for Municipalities Under Chapter 9 of the Bankruptcy Code"-2012 |
| 40 | Bankruptcy of Mount Carbon Metropolitan Dist. Bankruptcy No. 91-20215 MSK(November 1999) |
| 41 | Bankruptcy of the City of Colorado Springs Spring Creek General Improvement District. Bankruptcy No. 94-15333.(January 1995) |

**Exhibit 2**

| # | Document/Source |
|---|---|
| 42 | Detroit Blight Removal Task Force Plan titled, "Every Neighborhood Has a Future . . . And It Doesn't Include Blight," (May 2014) |
| 43 | McKinsey & Company Publication titled "Delivering large-scale IT projects on time, on budget, and on value"(October 2012) |
| 44 | City of Detroit Triennial Executive Budget 2015-2017 |
| 45 | Detroit Future City - Detroit Strategic Framework Plan(December 2012) |
| 46 | Report of Beth Niblock, Chief Information Officer for the City of Detroit; in re: City of Detroit, Michigan Case No. 13-53846 |
| 47 | Report of John Hill, Chief Financial Officer for the City of Detroit; in re: City of Detroit, Michigan Case No. 13-53846 |
| 48 | Report of Kenneth Buckfire, of Miller Buckfire & Co; in re: City of Detroit, Michigan Case No. 13-53846 |
| 49 | Report of Gaurav Malhorta, of Ernst & Young LLP; in re: City of Detroit, Michigan Case No. 13-53846 |
| 50 | Declaration of Gaurav Malhorta, of Ernst & Young LLP; in re: City of Detroit, Michigan Case No. 13-53846(July 2913) |
| 51 | Report of Robert Cline, of Ernst & Young LLP; in re: City of Detroit, Michigan Case No. 13-53846 |
| 52 | Report of Alan Perry, of Milliman; in re: City of Detroit, Michigan Case No. 13-53846 |
| 53 | Report of Caroline Sallee, of Ernst & Young LLP; in re: City of Detroit, Michigan Case No. 13-53846 |
| 54 | Report of Suzanne Taranto, of Milliman; in re: City of Detroit, Michigan Case No. 13-53846 |
| 55 | Report of Charles Moore, of Conway MacKenzie, Inc.; in re: City of Detroit, Michigan Case No. 13-53846 |
| 56 | Third Amended Plan for the Adjustment of Debts of the City of Detroit; in re: City of Detroit, Michigan Case No. 13-53846.. Doc 4271(April 2014) |
| 57 | Fourth Amended Disclosure Statement with Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit; in re: City of Detroit, Michigan Case No. 13-53846. Doc 4391 |
| 58 | Opinion Regarding Eligibility; in re: City of Detroit, Michigan Case No. 13-53846. Doc 1945. (December 2013) |
| 59 | Order to Show Cause Why Expert Witness Should Not Be Appointed; in re: City of Detroit, Michigan Case No. 13-53846. Doc 3170. (March 2014) |
| 60 | Declaration of Kevyn Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109 "C" of the Bankruptcy Code. Doc 11(July 2013) |
| 61 | City of Detroit: Proposal for Creditors. Prepared by Miller Buckfire & Co., LLC, Jones Day. (June 2013) |
| 62 | City of Detroit: Operational Restructuring Summary. Prepared by Office of the Emergency Manager. Conway MacKenzie, Inc. (November 2013) |
| 63 | Independent Auditors' Report on Internal Control. Prepared by KPMG LLP. (December 2012) |
| 64 | Quarterly Report of the Emergency Manager for the quarterly period of January 1, 2014 through March 31, 2014. (April 2014) |
| 65 | Letter from Robert Childree of AGA Financial Management Standards Board. Addressed to David Bean, Director of Research and Technical Activities of Governmental Accounting Standards Board (GASB). Comments on Pension Accounting and Financial Reporting. (July 2009) |
| 66 | Email from Mike Duggan of the City of Detroit. Plan of Adjustment Due Diligence. (May 13, 2014) |
| 67 | David Whitaker, Director of Legislative Policy Division Staff for the City of Detroit. 2013-2015 Budget Analysis.(May 2014) |
| 68 | Treasurers Report for 12/2011 Via: City of Detroit, Michigan Notice of Preliminary Financial Review Findings and Appointment of a Financial Review Team. Doc 11-3.(January 2012) |
| 69 | 2012 Financial Review Team Report, prepared by the Detroit Financial Review Team. Doc 11-4. (March 2012) |
| 70 | Treasury Report. Prepared by Andrew Dillon, Michigan State Treasurer.  Doc 11-6(December 2012) |
| 71 | 2013 Financial Review Team Report, prepared by the Detroit Financial Review Team. Doc 11-7.(February 2013) |
| 72 | Kevyn Orr, Emergency Manager for the City of Detroit. Recommendation Pursuant to Section 18(1) of PA 436. Doc 11-10(July 2013) |
| 73 | Governor Rick Snyder. Authorization to Commence Chapter 8 Bankruptcy Proceedings. Doc 11-11(July 2013) |
| 74 | City of Detroit: Alternative Plan of Adjustment Proposal. Prepared by Houlihan Lokey. (September 2013) |
| 75 | City of Detroit – Restructuring Plan; Mayor's Implementation Progress Report. (March 2013) |
| 76 | McKinsey Repot on City of Detroit. As posted on the City of Detroit website (May 2011) |
| 77 | Report prepared by: Sekely, C.(Conway MacKenzie, Inc.), Redmond, C.(Pierce Monroe & Assoc., LLC), Hutchings, C. (Municipal Parking Department). Titled "Revenue Enhancement Actions For Parking Violations Bureau"(December 2013) |
| 78 | 0% |
| 79 | Kevyn Orr, Emergency Manager, City of Detroit. "Order No. 24: Order to Amend Chapter 55 of the 1984 Detroit City Code"(April 2014) |
| 80 | Memorandum in Support of Statement of Qualifications Pursuant to Section 109 ( |
| 81 | Order Appointing Expert Witness. Docket #4215 |
| 82 | Notice Regarding Interviews of Expert Witness Applicants, Docket #4068 |

**Exhibit 2**

| # | Document/Source |
|---|---|
| 83 | Docket # 4216, Order Appointing Non-Testifying Consultant |
| 84 | Transcript of Hearing, April 18, 2014(April 18, 2014) |
| 85 | Milliman Letter Re: City of Detroit Active Health Plan Projections (November 2014) |
| 86 | NASRA Issue Brief: "Public Pension Plan Investment Return Assumptions"; April 2014; original source: U.S. Census Bureau |
| 87 | Milliman, Inc. letter(April 17, 2014) |
| 88 | Milliman, Inc. letter(April 20, 2014) |
| 89 | Milliman, Inc. letter(April 23, 2014) |
| 90 | Milliman, Inc. letter(April 25, 2014) |
| 91 | Milliman, Inc. letter(May 7, 2014) |
| 92 | Milliman, Inc. letter(July 2014) |
| 93 | Milliman, Inc. letter(November 2, 2013) |
| 94 | Milliman, Inc. letter(November 3, 2013) |
| 95 | Milliman, Inc. letter(July 9, 2014) |
| 96 | The Blinken Report- Strengthening the Security of Public Sector Defined Benefit Plans, dated January 2014. Donald J Boyd and Peter J Kiernan |
| 97 | The Society of Actuaries "Report of the Blue Ribbon Panel on Public Pension Plan Funding"; February 2014 |
| 98 | Governmental Accounting Standards Board |
| 99 | Memorandum in Support of Statement of Qualifications Pursuant to Section 109 (c) of the Bankruptcy Code. Docket No 14(July 2013) |
| 100 | State of Michigan Enrolled House Bill No. 5566 (June 2014) |
| 101 | State of Michigan Enrolled House Bill No. 5567(June 2014) |
| 102 | State of Michigan Enrolled House Bill No. 5568(June 2014) |
| 103 | State of Michigan Enrolled House Bill No. 5569(June 2014) |
| 104 | State of Michigan Enrolled House Bill No. 5570(June 2014) |
| 105 | State of Michigan Enrolled House Bill No. 5573(June 2014) |
| 106 | State of Michigan Enrolled House Bill No. 5574(June 2014) |
| 107 | State of Michigan Enrolled House Bill No. 5575(June 2014) |
| 108 | State of Michigan Enrolled House Bill No. 5576(June 2014) |
| 109 | State of Michigan Enrolled House Bill No. 5600(June 2014) |
| 110 | Deposition of Gaurav Malhorta, of Ernst & Young LLP; in re: City of Detroit, Michigan Case No. 13-53846(September 9, 2013) |
| 111 | Deposition of Gaurav Malhorta, of Ernst & Young LLP; in re: City of Detroit, Michigan Case No. 13-53846(September 20, 2013) |
| 112 | Deposition of Gaurav Malhorta, of Ernst & Young LLP; in re: City of Detroit, Michigan Case No. 13-53846(December 11, 2013) |
| 113 | Deposition of Gaurav Malhorta, of Ernst & Young LLP; in re: City of Detroit, Michigan Case No. 13-53846(March 31, 2014) |
| 114 | Comprehensive Annual Financial Report, City of Detroit FYE June 30, 2012 |
| 115 | City of Detroit, IT Optimization Discussion Document (August, 2013) |
| 116 | FAB Financial Subcommittee Meeting (January 2014) |
| 117 | ERP Needs Assessment: City of Detroit. Prepared by Plante Moran |
| 118 | ERP Cost Analysis |
| 119 | HR Technology Assessment, City of Detroit (December 2013) |
| 120 | Plan of Adjustment (May 2014) |
| 121 | Plan of Adjustment (July 2014) |
| 122 | PVB Revenue Enhancement White Paper (December 2013) |
| 123 | NASRA Issue Brief titled "Public Pension Plan Investment Return Assumptions" (April 2014) |
| 124 | "The Tipping Point" by Malcom Gladwell (2000) |
| 125 | Yale Law Journal Publication titled "The New Minimal Cities" (March 2013) |

# Exhibit 3

| Exhibit 3 | | | | |
|---|---|---|---|---|
| Date | Phoenix Attendees | Attendees | Type of Meeting | Topics |
| 4/22/2014 | Marti Kopacz | Bob Fishman - Shaw Fishman | Call | Discuss procedures |
| 4/22/2014 | Marti Kopacz | Neal Munshi - Reporter at Financial Times | Call | Discuss Phoenix's role in Detroit Bankruptcy |
| 4/22/2014 | Marti Kopacz | Tom Hals- Reporter at Reuters | Call | Discuss Phoenix's role in Detroit Bankruptcy |
| 4/22/2014 | Marti Kopacz | Chris Christoff- Reporter at Bloomberg | Call | Discuss Phoenix's role in Detroit Bankruptcy |
| 4/22/2014 | Marti Kopacz | Steve Buchanan - Reporter at NYTimes | Call | Discuss Phoenix's role in Detroit Bankruptcy |
| 4/22/2014 | Marti Kopacz | Seth Brumby - Reporter at Debt wire | Call | Discuss Phoenix's role in Detroit Bankruptcy |
| 4/22/2014 | Marti Kopacz | Pat Halligan- Reporter at The Deal | Call | Discuss Phoenix's role in Detroit Bankruptcy |
| 4/22/2014 | Marti Kopacz | Heather Lennox - Jones Day | Call | In regards to the contact info for the City's Advisors and CFO |
| 4/23/2014 | Marti Kopacz | Judge Rosen | Meeting | Case Background |
| 4/23/2014 | Marti Kopacz | Peter Hammer | Call | In regards to the city history |
| 4/23/2014 | Marti Kopacz | Eugene Drinker | Call | Schedule tour |
| 4/23/2014 | Marti Kopacz | Stephen Lerner - Squire Sanders | Call | In regards to representation |
| 4/24/2014 | Marti Kopacz | Barbara Patek - Ermann Teicher | Email | Scheduling emails for meeting with public safety unions |
| 4/25/2014 | Marti Kopacz | Gregory Clash - Municipal Credit Consultants | Email | Offer of service on project team |
| 4/25/2014 | Marti Kopacz | Arthur O'Reilley - Honigman | Email | Scheduling Meeting with DIA |
| 4/25/2014 | Marti Kopacz | Robert Gordon - Clark Hill | Email | Scheduling with Pension System |
| 4/28/2014 | Marti Kopacz | Richard Levin - Cravath | Email | In regards to the DIA meeting |
| 4/28/2014 | Marti Kopacz | Heather Lennox - Jones Day | Email | In regards to work space |
| 4/29/2014 | Marti Kopacz, Bob Childree, Brian Gleason | Rodney Sizemore, Mark Diaz, Mark Young, Jeffery Pegg, Barbara Patek, Chris Legin, Elise Osbourne, Jim Moore, Donna Lato,Stacy Carin | Meeting | General discussion of Police and Fire Union issues, positions on the POA |
| 4/29/2014 | Marti Kopacz | Sharma Liveria - Sandler | Email | Schedule meeting |
| 4/29/2014 | Marti Kopacz | Robert Duffy - FTI | Email | Schedule meeting |
| 4/29/2014 | Marti Kopacz | David Parker - Goldin & assoc. | Email | Schedule meeting |
| 4/29/2014 | Marti Kopacz | Albert Koch - Alix Partners | Email | Schedule meeting |
| 4/29/2014 | Marti Kopacz | Scott Davido - FTI | Email | Schedule meeting |
| 4/29/2014 | Marti Kopacz | Eunice Hayes - City of Detroit | Email | Schedule meeting |
| 4/30/2014 | Marti Kopacz, Al Mink, Bob Childree, Michael Gaul, Brian Gleason, Kevyn Barr | Eugene Drinker, Attorney and Jeri Stroupe, Office of Economic Development at Wayne State | Bus Tour | Tour of the city |
| 4/30/2014 | Marti Kopacz | Thomas Mayer - Kramer | Call | To get contact info for COPs and insurer contact |
| 4/30/2014 | Marti Kopacz | Vincent Marriott-Ballard Spahr | Email | Schedule Meeting |
| 4/30/2014 | Marti Kopacz | Alfredo Perez - Weil | Email | Schedule Meeting |
| 4/30/2014 | Marti Kopacz | Ryan Bennett- Kirkland & Ellis | Email | Schedule Meeting |
| 5/1/2014 | Marti Kopacz, Bob Childree | Kevyn Orr , Sonya Mays, Stacy Fox - Emergency Manager | Meeting | Discuss City, Kevyn's role, long-term risks culture, behavior |
| 5/1/2014 | Marti Kopacz | Robert Gordon, JosephTurner, Ronald King Clark Hill, Michael VanOverbeke - VanOverbeke, Michaud | Meeting | Case Background |
| 5/1/2014 | Marti Kopacz | Scott Davido - FTI | Call | Scheduling |
| 5/1/2014 | Marti Kopacz | Alfredo Perez, client and colleagues - Weil Steve Spencer and John Popehn - Houlihan | Call | Case Background |
| 5/2/2014 | Marti Kopacz | Kenneth Buckfire - Miller Buckfire | Meeting | Case Background |
| 5/2/2014 | Marti Kopacz | Heather Lennox- Jones Day | Call/email | Protocol for meeting with City employees and advisors |
| 5/2/2014 | Marti Kopacz | Stephen Lerner- Squire Sanders | Call | Jones Day request for JD attorney participation in City contacts |
| 5/5/2014 | Marti Kopacz | Michael Imber & team- Alvarez & Marsal | Call | Access to A&M insights and work product |
| 5/5/2014 | Marti Kopacz | Ryan Bennett, Steve Hackney- Kirkland & Ellis | Call | Case Background |
| 5/7/2014 | Marti Kopacz | Judge Rosen- US District Court | Call | Access to info; Counsel participation in interviews |
| 5/7/2014 | Marti Kopacz | Judge Rhodes-US Bankruptcy Court | Call | Access to info; Counsel participation in interviews |
| 5/7/2014 | Marti Kopacz | Sheila Cockrel-Former Councilwoman | Meeting | Detroit financial and operational history |
| 5/7/2014 | Marti Kopacz, Brian Gleason | Dick Ravitch-Judge's Expert | Meeting | Introductory meeting |
| 5/7/2014 | Marti Kopacz | Gene Gargaro, Graham Beal, Annemarie Erickson-DIA | Meeting | Art disposition; grand bargain feasibility |
| 5/7/2014 | Marti Kopacz | Bob and Susie Bluestein, Gerald Rosen, Kevyn Orr, Mike Duggan, Richard Ravitch, Rip Rapson, Tom Lewand, Victoria Roberts, Gene Drinker, Gene Gargaro (plus spouses)-Various | Dinner Party | Introduction to Detroit |
| 5/8/2014 | Marti Kopacz, Brian Gleason | Mike Duggan-Mayor of Detroit | Meeting | POA Due Diligence |
| 5/9/2014 | Marti Kopacz | Dan Moss-Jones Day | Call | Access to info; Counsel participation in interviews |
| 5/12/2014 | Marti Kopacz | Stephen Lerner- Squire Sanders | Call | Retention and hearing |
| 5/12/2014 | Marti Kopacz | Vince Marriott-Ballard Spahr | Meeting | Case Background |
| 5/13/2014 | Marti Kopacz, Bob Childree, Michael Gaul, Kevin Barr | Bob Kline - Ernst & Young | Call | Revenue assumptions |
| 5/13/2014 | Marti Kopacz, Bob Childree | Kurt Beckerman, Albert Koch - AlixPartners, Samuel Kohn - Chadbourne & Park LLP , Guy Neal , Sidley | Meeting | POA, projections, EM,Areas of opportunity Labor, DWSD, Discuss Alix Partners' work product and insights |
| 5/13/2014 | Marti Kopacz | David Prager, Jay Goldin-Goldin & Assoc. | Call | Case Background and their work product |
| 5/13/2014 | Marti Kopacz | Dan Moss-Jones Day | Call | Document control procedures for our requests to E&Y, CM, MB and City |
| 5/13/2014 | Marti Kopacz | Stephen Lerner- Squire Sanders | Call | Expert witness procedures |
| 5/13/2014 | Marti Kopacz | Judge Rhodes-US Bankruptcy Court | Call | Supplemental Order |

| Exhibit 3 | | | | |
|---|---|---|---|---|
| **Date** | **Phoenix Attendees** | **Attendees** | **Type of Meeting** | **Topics** |
| 5/14/2014 | Marti Kopacz, Michael Gaul, Brian Gleason, Kevin Barr | Juan Santambrogio and Gaurav Malhotra - Ernst & Young | Call | 10 year - 40 Year plan |
| 5/14/2014 | Marti Kopacz, Bob Childree, Michael Gaul, Brian Gleason, Kevin Barr | Stephen Lerner and Scott King - Squire Sanders | Call | Instructions re: document control; access to E&Y working model |
| 5/14/2014 | Marti Kopacz, Brian Gleason | Mike Duggan & staff-City of Detroit | Meeting | Attend Cabinet meeting |
| 5/14/2014 | Marti Kopacz, Brian Gleason | Rip Rapson, Laura Trudeau-Kresge Foundation | Meeting | Detroit Future Cities, Grand Bargain due diligence |
| 5/15/2014 | Marti Kopacz | Richard Ravitch-Judge's Expert | Call | Engagement Update |
| 5/19/2014 | Marti Kopacz | James Craig and Lesley Warmuth -Chief of Police and Pepper Hamilton | Meeting | Background interview re: Police Department |
| 5/19/2014 | Marti Kopacz | Richard Ravitch-Judge's Expert | Meeting | Pensions |
| 5/20/2014 | Marti Kopacz | Dan Dirks and team-DDOT Director | Meeting | Background interview re: Transportation Department |
| 5/20/2014 | Marti Kopacz | Stacy Fox-Deputy EM | Meeting | Information Requests Outstanding |
| 5/20/2014 | Marti Kopacz | Chuck Moore and Glenn Kushiner-Conway Mackenzie | Meeting | Pensions |
| 5/20/2014 | Marti Kopacz, Brian Gleason | Stephen Lerner- Squire Sanders | Call | Information Requests Outstanding |
| 5/21/2014 | Marti Kopacz, Michael Gaul, Brian Gleason | Mayor Duggan and Cabinet-City of Detroit | Meeting | General POA discussion |
| 5/22/2014 | Marti Kopacz, Brian Gleason | Stephen Lerner- Squire Sanders | Call | Information Requests Outstanding; Letter to Judge |
| 5/22/2014 | Marti Kopacz | Gaurav Malhotra -Ernst & Young | Call | Returning my emails re: Information Request Outstanding and letter to the Judge |
| 5/23/2014 | Marti Kopacz | Stephen Lerner- Squire Sanders | Call | Follow up on his conversations with Jones Day re: info requests |
| 5/27/2014 | Marti Kopacz | Stephen Lerner- Squire Sanders | Call | Prep for hearing on Wednesday |
| 5/28/2014 | Marti Kopacz, Brian Gleason | Richard Ravitch-Judge's Expert | Meeting | Report development discussion |
| 5/29/2014 | Marti Kopacz, Brian Gleason, Kevin Barr | Mike Imber, Nancy Zielke, Bill Roberti - Alvarez & Marsal, Marianna Marysheva - Martinez, Joe Nichols, David Lawrence - FTI Consulting, Ryan Bennett, Noah Ornstein - Kirkland & Ellis, Jennifer Rothschild - Rothschild, Steven Spencer, John Popehn, Michael Lin, John Pepehn, Daniel Mn - Houlihan Lokey, Alfredo Perez, Kelly DiBlasi, Dana Kaufman - Weil | Meeting | Review other financial advisors' inquiries and learnings |
| 5/29/2014 | Marti Kopacz | Erica Ward-Land Bank Authority | Call | Blight |
| 5/30/2014 | Marti Kopacz | Melissa Smiley-City of Detroit | Call | Blight |
| 6/2/2014 | Marti Kopacz, Michael Gaul, Brian Gleason | Judge Rhodes, Jones Day, and Squire Sanders | Call | Bankruptcy discovery transmission issues |
| 6/2/2014 | Marti Kopacz, Michael Gaul, Brian Gleason | Stephen Lerner - Squire Sanders | Call | Bankruptcy discovery transmission issues |
| 6/3/2014 | Marti Kopacz | Richard Ravitch - Judge's Expert | Call | Catch up on case developments |
| 6/3/2014 | Marti Kopacz | Stephen Lerner - Squire Patton Boggs | Call | Update on document requests |
| 6/3/2014 | Marti Kopacz | Erica Ward - Detroit Land Bank Authority | Call | Blight |
| 6/3/2014 | Marti Kopacz, Michael Gaul, Brian Gleason | Kevin Hand & Glenn Kushiner - Conway Mackenzie, Gaurav Malhotra, Juan Santambrogia & Dan Jerneycic - Ernst & Young, Melissa Smiley - City of Detroit, & Jones Day | Meeting | 10 yr and 40 yr projections and reinvestment initiatives |
| 6/3/2014 | Marti Kopacz | Barbara Patek - Ermann Teicher | Call | Schedule meeting with firefighters and police unions |
| 6/3/2014 | Marti Kopacz | Chris Leggio - Counsel to Firefighters | Call | Schedule meeting with firefighters |
| 6/3/2014 | Marti Kopacz | Sharon Levine - Lowenstein Sandler | Email | Schedule meeting with AFSCME |
| 6/3/2014 | Marti Kopacz, Michael Gaul, Brian Gleason | Jones Day, E&Y, CM | Call | Open Information Request list |
| 6/4/2014 | Marti Kopacz, Brian Gleason | John Hill - City of Detroit/EM | Meeting | Follow up on conversation from Mayor's Cabinet meeting |
| 6/5/2014 | Marti Kopacz, Brian Gleason | Mary Martin - City of Detroit | Meeting | Discuss Lean initiatives |
| 6/5/2014 | Marti Kopacz, Brian Gleason | Gaurav Malhotra - Ernst & Young, Chuck Moore - Conway Mackenzie | Meeting | POA Issues re: Feasibility |
| 6/5/2014 | Marti Kopacz, Michael Gaul, Brian Gleason | Representatives of Detroit Land Bank Authority, CM, and Sonya Mays | Meeting | Blight remediation |
| 6/5/2014 | Marti Kopacz, Michael Gaul, Brian Gleason | Mayor Duggan & Staff | Meeting | Reconciliation of POA and Triennial Budget |
| 6/6/2014 | Marti Kopacz | Mayor Duggan, Melissa Smiley, Trish Stein, Tom Lewand - City of Detroit, Michelle - Consultant to Planning and Development Department | Meeting | Budget review meeting for planning department and economic development |
| 6/6/2014 | Marti Kopacz | Mike Imber - Alvarez & Marsal | Call | Inquired about report deadline extension |
| 6/6/2014 | Marti Kopacz | Chris Gannon - Conway Mackenzie | Meeting | BSEED restructuring initiatives |
| 6/7/2014 | Marti Kopacz | Mayor Duggan, Gary Brown, Melissa Smiley, Pam Scales - City of Detroit, Dan Dirks and team - DDOT - City of Detroit, Beth Niblock - ITS - City of Detroit, Ron Brundidge and team - DPW - City of Detroit, Beau Taylor and team - DLP - City of Detroit, Norman White and team - Parking - City of Detroit | Meeting | Budget reviews and POA reconciliation |
| 6/9/2014 | Marti Kopacz, Brian Gleason | Judge Rhodes - US Bankruptcy Court, Stephen Lerner - Squire Patton Boggs | Call | Scheduling status |
| 6/9/2014 | Marti Kopacz, Michael Gaul, Brian Gleason | Judge Rhodes, Jones Day, E&Y, CM, and Squire Sanders | Call | Bankruptcy discovery transmission issues |

| Exhibit 3 | | | | |
|---|---|---|---|---|
| Date | Phoenix Attendees | Attendees | Type of Meeting | Topics |
| 6/10/2014 | Marti Kopacz | Mayor Duggan, Melissa Smiley, Pam Scales Law Department team - City of Detroit, Representatives of E&Y and CM | Meeting | Budget Review |
| 6/10/2014 | Marti Kopacz | Brenda Jones, Stephen Grady - City Council | Meeting | Plan of Adjustment |
| 6/11/2014 | Marti Kopacz | Mayor, Melissa Smiley, Pam Scales, Chief Craig and team - City of Detroit, Representatives of E&Y and CM | Meeting | Budget Review |
| 6/11/2014 | Marti Kopacz, Brian Gleason | Judge Rosen - US District Court, Mediators - Various, Jones Day, E&Y, CM - Advisors to the City, Richard Ravitch - Judge Rhodes' Consultant, Stephen Lerner - Squire Patton Boggs (via phone) | Meeting | Feasibility for the POA |
| 6/11/2014 | Marti Kopacz, Michael Gaul, Brian Gleason | Mayor Duggan & Staff | Meeting | Departmental meetings - DPD and DFD |
| 6/12/2014 | Marti Kopacz | Mark Diaz and team - DPOA, Barbara Patek - Counsel to DPOA, Richard Ravitch - Judge Rhodes' Consultant | Meeting | Police Department |
| 6/12/2014 | Marti Kopacz, Brian Gleason | Kevyn Orr - Emergency Manager, Stacy Fox - Office of the EM, Richard Ravitch - Judge Rhodes' Consultant | Meeting | Status of Assignment |
| 6/12/2014 | Marti Kopacz | John Hill - City of Detroit, Representatives of E&Y and CM, Leslie Warmuth - Pepper Hamilton, Richard Ravitch - Judge Rhodes' Consultant | Meeting | Review Finance, Accounting and IT issues |
| 6/14/2014 | Marti Kopacz | Heather Lennox - Jones Day, Gaurav Malhotra - Ernst & Young | Call | New POA date and projections update |
| 6/14/2014 | Marti Kopacz | Judge Rhodes - US Bankruptcy Court, Stephen Lerner - Squire Patton Boggs | Call | Status on Report completion |
| 6/16/2014 | Marti Kopacz, Brian Gleason | Richard Ravitch - Judge Rhodes' Consultant | Meeting | Work on Report sections - Pensions and Post Confirmation Issues |
| 6/17/2014 | Marti Kopacz | Sharon Levine - Lowenstein Sandler, Stephen Kreiser - AFSCME, Richard Ravitch - Judge Rhodes' consultant | Meeting | Union issues |
| 6/17/2014 | Marti Kopacz, Brian Gleason | Kenneth Buckfire, Jim Doak and team - Miller Buckfire | Meeting | Update on Asset Dispositions and Exit Financing |
| 6/18/2014 | Marti Kopacz | Stephen Lerner - Squire Patton Boggs, Geoff Stewart and others - Jones Day | Call/email | Document production; "Big Issues" Meeting; projections v.11 |
| 6/19/2014 | Marti Kopacz, Al Mink, Bob Childree, Michael Gaul, Brian Gleason, Kevin Barr | John Naglick, Glenn Kushiner, Dan Jerneycic, E&Y, Rick Drum, Accounting, Renee Shorts, budgets | Call | Round table conference call to discuss state of the monthly reporting that the City is generating, and ability to do post emergence reporting against budget. Post call with Bob Childree |
| 6/19/2014 | Marti Kopacz, Michael Gaul, Brian Gleason, Kevin Barr, Stephen Lerner | Juan Santambrogio and Gaurav Malhotra - Ernst & Young, Chuck Moore and Glenn Kushiner - Conway Mackenzie, Jones Day Team | Meeting | "Big Issues" Meeting and feasibility assessment |
| 6/19/2014 | Marti Kopacz | Noah Ornstein - Kirkland & Ellis | Call | Inquiry re: confirmation issues for creditors |
| 6/20/2014 | Marti Kopacz, Brian Gleason | Melissa Smiley - City of Detroit | Call | New projections and impact on Mayor's Budget Reviews |
| 6/24/2014 | Marti Kopacz | Mayor, Melissa Smiley, Pam Scales, Brad Dick and team - City of Detroit, Representatives of E&Y and CM | Meeting | Budget Review Meeting for GSD |
| 6/24/2014 | Marti Kopacz | Mike Imber - Alvarez & Marsal | Call | Inquiry re: contingency provisions in HB 5567 |
| 6/24/2014 | Marti Kopacz | Melissa Smiley - City of Detroit | Call | Discuss financial requirements in Grand Bargain legislation |
| 6/25/2014 | Marti Kopacz | Melissa Smiley - City of Detroit, Dan Jerneycic - Ernst & Young | Call | Utility cost estimates in POA projections |
| 6/25/2014 | Marti Kopacz | Stephen Lerner - Squire Patton Boggs | Call | Information Requests |
| 6/26/2014 | Marti Kopacz, Brian Gleason | Prof. Scott Pryor - Regent University | Call | Ch. 9 feasibility article |
| 6/27/2014 | Marti Kopacz | Melissa Smiley - City of Detroit | Call | Future utility costs |
| 6/30/2014 | Marti Kopacz | Mayor, Melissa Smiley, Pam Scales, Dan Dirks and team - City of Detroit, Representatives of E&Y and CM | Meeting | Budget Review for DDOT |
| 7/1/2014 | Marti Kopacz, Michael Gaul, Kevin Barr | Daniel Jerneycic - Ernst & Young, Chris Gannon - Conway Mackenzie | Call | 40 year revised draft projections discussion |
| 7/2/2014 | Marti Kopacz, Michael Gaul | Melissa Smiley - City of Detroit | Call | New Projections Pending |
| 7/2/2014 | Marti Kopacz, Michael Gaul, Brian Gleason | Mayor Duggan & Staff | Call | Departmental meeting - DFD |
| 7/3/2014 | Marti Kopacz | Mayor Cabinet Members - City of Detroit | Meeting | Mayor's weekly status meeting |
| 7/9/2014 | Marti Kopacz, Brian Gleason | Richard Ravitch - Judge Rhodes' Consultant, Peter Kiernan - Shiff Hardin | Meeting | Revised projections and impact on feasibility |
| 7/9/2014 | Marti Kopacz | Steven Hackney - Kirkland & Ellis | Call | District Court decision on wagering revenues |
| 7/10/2014 | Marti Kopacz | Stephen Lerner - Squire Patton Boggs, Geoff Stewart - Jones Day | Call/email | Outstanding information requests |
| 7/10/2014 | Marti Kopacz | Heather Lennox - Jones Day | Call | DWSD |
| 7/14/2014 | Marti Kopacz, Brian Gleason | Judge Rhodes - US Bankruptcy Court, Stephen Lerner - Squire Patton Boggs, Geoff Stewart - Jones Day | Call | Status call re: scheduling and report due date |
| 7/16/2014 | Marti Kopacz, Michael Gaul, Brian Gleason, Kevin Barr | Richard Ravitch - Judge Rhodes' Consultant | Meeting | Report development discussion |
| 7/17/214 | Marti Kopacz | Stacy Fox-Deputy EM | Call | Requesting draft of report |
| 7/17/214 | Marti Kopacz | Melissa Smiley - City of Detroit | Call | Requesting draft of report |

**Exhibit 3**

| Date | Phoenix Attendees | Attendees | Type of Meeting | Topics |
|---|---|---|---|---|
| 4/29/2014 | Al Mink, Bob Childree, Michael Gaul, Brian Gleason, Kevin Barr | Barbara Patek | Meeting | Debrief on meeting with Fire and Police Unions |
| 4/30/2014 | Al Mink, Bob Childree | John Hill CFO | Meeting | Discussed John Hills vision for the Finance and Accounting function and the major issues he believes the Department faces |
| 4/30/2014 | Michael Gaul, Kevin Barr | Juan Santambrogio and Daniel Jerneycic - Ernst & Young | Meeting | 10 Year Plan Development |
| 5/1/2014 | Al Mink, Bob Childree | John Naglick, Finance Director | Meeting | Issues facing the Finance department, specifically those departments reporting to John Hill. John walked us through his view of the status of each of the departments reporting to him. |
| 5/2/2014 | Michael Gaul, Kevin Barr | Kevin Hand, Chris Gannon and Glenn Kushiner - Conway Mackenzie | Meeting | General Restructuring and Reinvestment discussion/development |
| 5/5/2014 | Al Mink | Michael Jameson, Deputy Finance Director | Meeting | Meeting to discuss his views of the issues facing the departments reporting to John Hill. |
| 5/5/2014 | Al Mink | Glenn Kushiner, Conway, Chris Gannon, Conway | Meeting | Discussed finance department and begin to get into details.  Discussed more specifics on each of the departments |
| 5/5/2014 | Al Mink | Glenn Kushiner, Conway, Chris Gannon, Conway | Meeting | Discussed their views of finance department and begin to get into details.  Discussed more specifics on each of the departments |
| 5/5/2014 | Michael Gaul | Kevin Hand, Chris Gannon and Glenn Kushiner - Conway Mackenzie | Meeting | General Restructuring and Reinvestment discussion/development |
| 5/6/2014 | Al Mink, Bob Childree | Donald Settles, Risk Manager, Glenn Kushiner, Conway | Meeting | Overview and details of the Risk Management department.  Discussed the existing structure, and restructuring alternatives being investigated including potentially outsourcing the Third party administration of Workers Comp and engaging a third party insurance policy to cover auto |
| 5/6/2014 | Al Mink, Bob Childree | Gary Evanko, Glenn Kushiner | Meeting | Accepted reassessment plan, impact on forecasted revenues, and restructuring of the Assessors department |
| 5/6/2014 | Al Mink, Bob Childree | Gary Evanko, Chief Assessor | Meeting | Property tax process, organization, issues, problems |
| 5/6/2014 | Al Mink, Bob Childree | Glenn Kushiner and Chris Gannon - Conway Mackenzie | Meeting | DWSD, CFO restructuring, Plante Moran's role |
| 5/7/2014 | Michael Gaul, Kevin Barr | Kevin Hand and Emily Petrovski - Conway Mackenzie | Meeting | Fire and Rec Departments |
| 5/7/2014 | Kevin Barr | Chris Gannon and Emily Petrovski - Conway Mackenzie | Meeting | Ombudsperson and Mayors Office |
| 5/7/2014 | Al Mink, Bob Childree | Boysie Jackson, Director Purchasing and Glenn Kushiner - Conway Mackenzie | Meeting | Procurement processes, issues, contracts, personal services contracts, RFP process, people, POA,risks |
| 5/7/2014 | Al Mink, Bob Childree | Pam Scales, Budget Director and Glenn Kushiner | Meeting | Budget process, Staffing, organization, POA staffing, and issues |
| 5/8/2014 | Al Mink, Bob Childree | Boise Jackson purchase director, Glenn Kushiner | Meeting | Over view of the Purchasing department including restructuring initiatives, processing of contracts, approvals for expenditures |
| 5/8/2014 | Al Mink, Bob Childree | Glenn Kushner, Pam Scales, Budget Director | Meeting | the development of 2015 Budget submission to Council using the Budget in the plan of adjustment. Also discussed challenges in reporting against budget. |
| 5/8/2014 | Kevin Barr | Chris Gannon and Danielle Iafrate - Conway Mackenzie | Meeting | Police Department |
| 5/8/2014 | Kevin Barr | Kevin Hand and Emily Petrovski - Conway Mackenzie | Meeting | Blight |
| 5/8/2014 | Kevin Barr | Todd Eddy - Conway Mackenzie | Meeting | General Services Department |
| 5/8/2014 | Kevin Barr | Todd Eddy - Conway Mackenzie | Meeting | 36th District Court and DDOT |
| 5/8/2014 | Al Mink, Bob Childree | Glenn Kushiner - Conway Mackenzie | Meeting | Conway's role, scope of work, issues |
| 5/8/2014 | Al Mink, Bob Childree | Eric Higgs | Meeting | Financial reporting, CAFR, Reporting post bankruptcy reconciliations , staffing issues |
| 5/8/2014 | Al Mink, Bob Childree | Leighton Duncan and Glenn Kushiner | Meeting | Treasury functions, revenue collections outsourcing, organization, retention, |
| 5/8/2014 | Al Mink, Bob Childree | Mark Lockridge, Auditor General | Meeting | audits, internal controls, findings, organization , functions, issues |
| 5/8/2014 | Michael Gaul | Juan Santambrogio - Ernst & Young | Call | 10 year - 40 Year plan |
| 5/9/2014 | Al Mink, Bob Childree | Leighton Duncan, Project Manager, Treasury, and Glenn Kushner. | Meeting | Discussed status of Treasury department functions and restructuring. |
| 5/9/2014 | Al Mink, Bob Childree | Glenn Kushner | Meeting | Discussed Conway activities; restructuring activities in departments and helping to implement changes. |
| 5/9/2014 | Al Mink, Bob Childree | Eric Higgs, Chief accounting officer, Glen Kushner. | Meeting | Discuss the current activities of the Accounting department and the issues. |
| 5/9/2014 | Al Mink, Bob Childree | Mark Lockridge, Auditor General, Glenn Kushiner | Meeting | Mark is going to provide us with audit reports on the Accounting and finance functions he has conducted in recent years. |
| 5/9/2014 | Kevin Barr | Chris Gannon - Conway Mackenzie | Call | Planning & Development, City Council and Building & License |
| 5/9/2014 | Kevin Barr | Kevin Hand - Conway Mackenzie | Call | Airport |
| 5/9/2014 | Kevin Barr | Danielle Iafrate - Conway Mackenzie | Call | Law |
| 5/9/2014 | Al Mink, Bob Childree | Sonya Mays, Dan Sutton, Nakia Johnson, Chris Gannon - Conway Mackenzie | Meeting | Grants Management…projects, plans, timeframes, |
| 5/12/2014 | Al Mink | Glenn Kushiner | Meeting | Review global 10 year forecast spread sheets and then focused on the restructuring spreadsheets for each of the finance and accounting functions |

Exhibit 3

| Date | Phoenix Attendees | Attendees | Type of Meeting | Topics |
|---|---|---|---|---|
| 5/12/2014 | Al Mink | Michael Swartz, Plante Moran, Adam Rujan, Plante Moran, Laurie Zyla, Plant Moran, Glenn Kushiner, Chris Gannon, Sonya Mays, Nakia Johnson | Meeting | Discuss status of new ERP proposal. Discuss with Michael Swartz, Plante Moran's contribution to the Year End Closing process. Discuss issues with doing monthly financial statements. |
| 5/12/2014 | Al Mink | Glenn Kushiner, Beth Niblock, CIO and Charles Dodd. | Meeting | Overview of current status of Department and the vision for implementation of an integrated ERP System. |
| 5/13/2014 | Al Mink | Glenn Kushiner | Meeting | 10 year reorganization budget spreadsheets for the finance and accounting departments. |
| 5/13/2014 | Al Mink, Bob Childree | Chris Gannon, Sonya Mays, Nakia Johnson | Meeting | Development of the new Grants administration department. |
| 5/13/2014 | Al Mink | Glenn Kushiner | Meeting | Review organization Chart. |
| 5/14/2014 | Al Mink | Glenn Kushiner | Meeting | Review of Finance and Accounting pre-reorganization organization charts |
| 5/14/2014 | Bob Childree, Michael Gaul, Brian Gleason, Kevin Barr | Juan Santambrogio, Gaurav Malhotra and Daniel Jerneycic - Ernst & Young | Call | Pension and OPEB Conversation |
| 5/19/2014 | Al Mink | Glenn Kushiner | Meeting | Meeting to discuss centralization of Accounting and Finance |
| 5/19/2014 | Al Mink | Dan Jerneycic, an Juan Santambrogio E&Y | Meeting | Discuss E&Y Cash Flows and Cash flow procedures. Also discuss EM reports and discuss post emergence monthly reporting |
| 5/19/2014 | Al Mink, Kevin Barr | Juan Santambrogio, Daniel Jerneycic and Nick Bugden - Ernst & Young | Meeting | Cash Forecasting |
| 5/20/2014 | Al Mink | Glenn Kushiner | Meeting | Review Data Requests |
| 5/21/2014 | Al Mink, Bob Childree | Tanya Stoudemire, Income Tax Manager and Glenn Kushiner | Meeting | Over view of the Income Tax Department, initiatives and plans for Restructuring |
| 5/21/2014 | Al Mink | Niki Timmons | Meeting | Review process for submitting and following up on past due real real-estate submissions to Wayne County |
| 5/21/2014 | Al Mink, Bob Childree, Kevin Barr | Juan Santambrogio and Daniel Jerneycic - Ernst & Young | Meeting | Cash Forecast vs. 10 Year Plan variance |
| 5/21/2014 | Bob Childree, Michael Gaul | Executive Director of GRS/PFRS, RS legal counsel, RS actuary, and RS financial advisor | Meeting | POA treatment re: Retirement Systems |
| 5/27/2014 | Al Mink | Glenn Kushiner | Call | Conference call to discuss Payroll and Governance |
| 5/28/2014 | Al Mink | Joel Kowalski | Meeting | CAFR audit. Review with him the 2012 management letter from KPMG |
| 5/28/2014 | Michael Gaul, Kevin Barr | Juan Santambrogio and Nick Bugden - Ernst & Young | Call | Detailed 10 Year-40 Year Working Model Review |
| 5/28/2014 | Kevin Barr | Kevin Hand and Glenn Kushiner - Conway Mackenzie | Call | Deferred Reinvestments |
| 5/29/2014 | Al Mink | Glenn Kushiner | Call | Conference call to discuss payroll |
| 5/30/2014 | Michael Gaul | Jones Day personnel | Call | Bankruptcy discovery transmission issues |
| 5/31/2014 | Michael Gaul | Brian Leatherman - Jones Day | Call | Bankruptcy discovery transmission issues |
| 6/2/2014 | Al Mink, Bob Childree | Niki Timmons, Leighton Duncan, Glenn Kushiner | Meeting | Discuss Wayne County payments |
| 6/2/2014 | Al Mink, Bob Childree | Kyle Herman, Miller BuckfireKarl Sankey (not present), Leighton Duncan, Niki, Jeff Addison- Conway Mackenzie, Peter Baywold-Conway Mackenzie | Meeting | Wayne County Property tax issues, process |
| 6/3/2014 | Al Mink, Bob Childree | Ursula Holland, Michael Hall, Glenn Kushiner | Meeting | Payroll systems and procedures |
| 6/3/2014 | Al Mink | Devin Patel, Jeffrey Addison from Conway, Geoffrey Stewart, Chris DiPompeo, Jones Day, Sheshian Swarnnathan, E&Y | Meeting | Discuss Cash Reporting |
| 6/3/2014 | Al Mink, Bob Childree | Mike Hall, Ursula Holland , Glenn Kushiner Conway Mackenzie | Meeting | Payroll |
| 6/3/2014 | Al Mink, Bob Childree | Jeff Addison, Devin Patel - Conway Mackenzie, Jeff Stewart, Dan Jerneycic - E&Y | Meeting | Cash flows, reconciliations, disbursements, A/P , encumbrances |
| 6/3/2014 | Michael Gaul | Representatives of Detroit Land Bank Authority | Call | Required funding for Blight remediation |
| 6/4/2014 | Al Mink, Bob Childree | John Hill, John Naglick and Glenn Kushiner | Meeting | Finance Reorganization, CFO position, ERP, Payroll, monthly reporting |
| 6/4/2014 | Al Mink, Bob Childree | Lena Willis, Boysie's deputy | Meeting | Encumbrances, A/P |
| 6/4/2014 | Michael Gaul | Derrick Puliam - Alpha Lit | Call | Bankruptcy discovery transmission issues |
| 6/5/2014 | Al Mink | John Naglick, Glenn Kushiner | Meeting | Continue discussion on finance and accounting issues |
| 6/5/2014 | Al Mink | Larry King, Kevin Hand | Meeting | Work being performed on Accounting Organization |
| 6/5/2014 | Al Mink, Bob Childree | Larry King and Chris Gannon - Conway Mackenzie | Meeting | Finance reorganization, Job descriptions, Hr |
| 6/5/2014 | Al Mink, Bob Childree | John Naglick and Glenn Kushiner | Meeting | Financial reporting, |
| 6/6/2014 | Michael Gaul, Kevin Barr | Derrick Puliam - Alpha Lit | Call | Bankruptcy discovery transmission issues |
| 6/10/2014 | Bob Childree, Michael Gaul, Brian Gleason | Robert Gordon, Joe Turner, Michael , Ron King | Call | Retirement systems |
| 6/10/2014 | Bob Childree, Michael Gaul, Brian Gleason, Kevin Barr | Evan Miller, Alexander Blanchard - Jones Day | Call | Pensions and OPEB |
| 6/10/2014 | Michael Gaul | RS legal counsel | Call | Pension governance |
| 6/11/2014 | Kevin Barr | Kevin Hand and Emily Petrovski - Conway Mackenzie | Meeting | Fire Dept. Review |
| 6/12/2014 | Michael Gaul | Tina Tolliver - DPD | Meeting | DPD RRI's |
| 6/13/2014 | Kevin Barr | Nick Bugden and Juan Santambrogio - Ernst & Young | Call | 10 Year model |
| 6/13/2014 | Michael Gaul | Erica Raleigh - Data Driven Detroit | Meeting | Data gathering re: Detroit |

| Exhibit 3 | | | | |
|---|---|---|---|---|
| Date | Phoenix Attendees | Attendees | Type of Meeting | Topics |
| 6/17/2014 | Kevin Barr | Kevin Hand and Emily Petrovski - Conway Mackenzie | Call | Fire Dept. Review |
| 6/26/2014 | Kevin Barr | Daniel Jerneycic and Shavi Sarna - Ernst & Young | Call | Utilities |

# Exhibit 4

**Phoenix Management Services, Inc.**
**In re: City of Detroit, Michigan, Debtor**
**Case No. 13-53846**
**Open Information Requests as of July 18, 2014**

| REQUESTED PARTY | DATE REQUESTED | DATA REQUESTED | STATUS |
|---|---|---|---|
| **OUTSTANDING REQUESTS** | | | |
| Jones Day | 6/10/14 | Any stochastic or sensitivity analyses undertaken by City advisors or advisors to the Retirement Systems relevant to use of a 6.75% investment return assumption for GRS. | |
| Ernst & Young | 5/21/14 | Comparison of the Revenue and Expenditures as reported on E&Y's Actual Cash Flow reports for the fiscal years 2012 and 2013 against the completed CAFR | |
| Ernst & Young | 5/29/14 | Pension: All pension plan sensitivity analyses; including, those that look at how changes in investment returns impact unfunded level | Received for PFRS; not received for GRS |
| Ernst & Young | 5/29/14 | Pension: Sensitivities on how different pension return rates impact the pension restoration provisions in the plan<br><br>If none exist, please run Pensions UAAL calculation at 3%, 5%, 6%, and 8% assumed rate of return | Received for PFRS; not received for GRS |
| Ernst & Young | 5/30/14 | Actuary reports/analysis that provide detailed support behind yearly contributions to pensions for active employees in the 40 Year Plan | |
| Ernst & Young | 5/29/14 | Modified version of 10 Year Plan that fully integrates CM's Restructuring Initiatives within the departmental budgets – including the department-level detail of Restructuring deferrals | |

| REQUESTED PARTY | DATE REQUESTED | DATA REQUESTED | STATUS |
|---|---|---|---|
| Ernst & Young | 6/6/14 | Detail of estimated post-BK professional fees (Jones Day, E&Y, AND CM) in POA forecasts | |
| Conway MacKenzie | 5/22/14 | Reconciliation of 10 Year Plan and City's Triennial Budget | |
| Conway MacKenzie | 5/27/14 | Status of Fox Lawson review of White Book; anticipated changes to pay grades and classification post-petition; estimated Plan impact of said changes | |
| Conway MacKenzie | 5/27/14 | Total budget - by line item - for each department in Finance, Accounting and IT if Centralized Governance was approved. How much City wide the ten year plan envisions spending on IT, Accounting and Finance? | |
| Conway MacKenzie | 6/6/14 | Detail of estimated post-BK professional fees (Jones Day, E&Y, AND CM) in POA forecasts | |
| Ernst & Young/CM | 7/9/14 | City employee headcount by department– as of 6/30/14; gross payroll cost (excluding OT) for FYE 6/30/14; annualized gross payroll run rate (excl. OT) as of 6/30/14 | |

**Exhibit B**

1                  - MARTI KOPACZ - VOLUME 1-

2          Q.      So the first sentence says,

3     "Ms. Kopacz has prepared dozens of financial

4     projections for clients and reviewed and critiqued

5     dozens more prepared by others."

6               This has been in connection with your

7     work at Phoenix and elsewhere?

8          A.      Yes.

9          Q.      And by "projections," you mean

10    forecasts as well as projections as we just

11    discussed?

12         A.      Yes.

13         Q.      And just as a general matter, when

14    you, yourself, have prepared projections, what

15    kind of assignment did you have that asked you to

16    prepare projections?

17         A.      Generally, it would be in the context

18    of representing a client that was financially or

19    operationally troubled, potentially involved in a

20    formal or informal restructuring or Bankruptcy

21    Court proceeding.

22         Q.      Okay.  And then you write you

23    "critiqued dozens more prepared by others."

24               Would that be in a comparable --

25    comparable setting?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7116   Filed 08/27/14   Entered 08/27/14 18:46:41   Page 243 of 269

                    - MARTI KOPACZ - VOLUME 1-

1
2        A.      Yes.
3        Q.      Okay.  And then you write -- or this
4    exhibit says, "She has previously testified as to
5    the appropriateness of forecasting methodology,
6    the assumptions upon which forecasts are based and
7    the likelihood of an organization to meet its
8    forecast."
9            Okay.  And what engagements asked you
10   to do that work?
11       A.      That -- the first time I ever
12   testified on forecasting and assumptions was in a
13   matter called HealthCo -- HealthCo.  It was a case
14   that -- and I believe it's in, we go back to my
15   proposal to the Court, it's listed and it will
16   tell you, but it was a bankruptcy case that
17   involved a failed leverage buyout transaction that
18   the trustee believed was a fraudulent conveyance.
19       Q.      Okay.
20       A.      And my engagement, I represented the
21   Lazard Freres who had been the investment banker
22   and Coopers & Lybrand, at the time the
23   accountants, who were being sued and my job was to
24   put myself back in the position at the time that
25   that transaction was done and evaluate the

1               - MARTI KOPACZ - VOLUME 1-

2      reasonableness of the projections that were made

3      then.

4           Q.     And this leads me to ask you a

5      question.

6                I take it that a good deal of your

7      work in your career has involved entities that are

8      one way or the other involved in bankruptcy or

9      insolvency matters?

10          A.     Yes.

11          Q.     Have you, as a practice, represented

12     one side more than the other side; in other words,

13     creditors more than debtors or debtors more than

14     creditors in this work?

15          A.     I don't think -- I think it's very

16     balanced for the most part.

17          Q.     And you've also been involved in

18     municipal insolvencies?

19          A.     I have been involved in municipal --

20     troubled municipal situations.

21          Q.     Okay.  And what are some examples of

22     those?

23          A.     The one that I was involved in most

24     significantly and for the longest period of time

25     was Nassau County here in New York.

1                   - MARTI KOPACZ - VOLUME 1-

2        Q.     Okay.  But you've had others too?

3        A.     Yes.

4        Q.     Okay.  Back to Exhibit 1, further

5     down it's written, "Ms. Kopacz understands the

6     nuanced area" -- "area of municipal budgeting."

7               Do you see that -- budgeting.

8        A.     Yes.

9        Q.     Okay?  What -- what do you mean when

10    you say "nuanced area"?

11       A.     Municipal budgeting and government

12    accounting are significantly different than what

13    most of us become familiar with in the private

14    sector.  It involves fund accounting.  It involves

15    appropriations and encumbrances and concepts that

16    we don't have in the private sector.

17       Q.     When you say "incumbrances," what do

18    you mean?

19       A.     Encumbrances is a manner by which

20    government on paper sets aside funding for

21    particular projects or services or goods.

22       Q.     Okay.  And the next sentence says,

23    "Because municipal entities lack a 'standard' in

24    budgeting, forecasting and accounting, great

25    variations occur in the manner in which public

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7116   Filed 08/27/14   Entered 08/27/14 18:46:41   Page 246 of 269

1                - MARTI KOPACZ - VOLUME 1-

2        Q.     Okay.  Why did you reach that

3    conclusion?

4        A.     The RRIs, many of them, are planned

5    to return Detroit to a safer, better functioning

6    place in which people can live and work and -- and

7    go about their business.  So --

8        Q.     Well -- go ahead.

9        A.     -- you know, a lot of the RRIs

10   involved restoring public safety and

11   transportation to more acceptable levels than they

12   have been in the recent past.

13       Q.     Do some of the RRIs also -- let me

14   withdraw that.

15              Do some of the RRIs also have the

16   objective of improving quality of city management?

17       A.     Yes.

18       Q.     And, for example, tax collection by

19   the City?

20       A.     Yes.

21       Q.     And do you also believe those are

22   positive?

23       A.     I do.

24       Q.     And why?

25       A.     Because the City historically has

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7116   Filed 08/27/14   Entered 08/27/14 18:46:41   Page 247 of 269

1                    - MARTI KOPACZ - VOLUME 1-

2    done a poor job of collecting the monies that are

3    due it.

4        Q.    And what would the RRIs do, if

5    anything, to address that issue?

6        A.    In a -- in a couple of areas, the

7    RRIs are targeted towards better information

8    systems, better technology, more people to focus

9    on collection activities, the ATMs that are being

10   added to the District Court to collect the fees

11   and fines right then and there before people leave

12   the building.  You know, those sorts of things

13   are -- are advantageous to helping the City

14   collect the monies that are already due it.

15       Q.    Fair to say some of these RRIs will

16   end up cutting city costs?

17       A.    In the long-term, yes.

18       Q.    And some of the RRIs will result in

19   increasing city revenues?

20       A.    Yes.

21       Q.    Did you perform any kind of

22   cost-benefit analysis to see if the expense of

23   those particular RRIs was offset by any benefits

24   that they yielded to the City?

25       A.    I don't think so.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7116   Filed 08/27/14   Entered 08/27/14 18:46:41   Page 248 of 269
00000000-0000-0000-0000-000000000000

1                - MARTI KOPACZ - VOLUME 1-

2        Q.      Have you ever seen another

3   municipality do a comprehensive general fund

4   forecast over a 40-year period -- a gen --

5   comprehensive general fund forecast over a 40-year

6   period?

7        A.      Forty years.

8        Q.      Yeah.

9        A.      No.

10       Q.      So, the two that are in the plan, the

11  10-year and the 40-year, are the first you've ever

12  seen a municipality do, correct?

13       A.      That I've ever seen?  Yes.

14       Q.      Have you ever seen a municipality do

15  a forecast when it was undergoing this level of

16  change?

17       A.      Personally?  No.

18       Q.      Ma'am, have you ever been qualified

19  in a court of law as an expert before?

20       A.      I have.

21       Q.      Okay.  And tell me how many times

22  that's happened to you?

23       A.      We should go back and look at my

24  testimony list, right?  Probably -- I don't think

25  it's in there.  I think it's in my proposal.  I

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7116   Filed 08/27/14   Entered 08/27/14 18:46:41   Page 249 of 269

```
1                    - MARTI KOPACZ - VOLUME 1-
2      referenced it.
3                    MR. KANE:  I've got some copies of it
4          if you want it.
5      BY MR. HACKNEY:
6          Q.     Okay.  I missed that.
7          A.     Yeah.  More than two, probably less
8      than five, ten.  Something like that.
9          Q.     Okay.  So that means that's where a
10     Court has said Ms. Kopacz is an expert and I'm
11     going to allow her to testify on Subject X?
12         A.     Right.
13         Q.     And it's somewhere between two and
14     five?
15         A.     That's what I'm thinking.
16         Q.     What were the subjects of your
17     testimony?
18         A.     Generally, it's all been insolvency
19     and restructuring oriented.  So whether or not,
20     you know, an entity was solvent or insolvent.
21     Whether or not -- it's all -- I mean, my career
22     has been spent in restructuring, so it's all in
23     that context.
24         Q.     A very typical restructuring expert
25     testimonies that I come across in my practice, an
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7116   Filed 08/27/14   Entered 08/27/14 18:46:41   Page 250 of 269

1           - MARTI KOPACZ - VOLUME 1-

2           if he wants you to look for the specific

3           page.

4                   MR. HACKNEY:  Yeah, that's okay.

5                   THE WITNESS:  Yeah.  No.

6    BY MR. HACKNEY:

7           Q.    I am correct when I say that, right?

8           A.    Correct.

9           Q.    And you also did not conduct any

10   sensitivity analysis around casino gaming revenue,

11   correct?

12          A.    Whatever's in here is what we did.

13          Q.    Okay.  So if you did sensitivity

14   analysis, it's in your report, correct?

15          A.    That's correct.

16          Q.    If it's not in your report, it's

17   because you didn't do it?

18          A.    That's correct.

19          Q.    What is the utility user's tax?

20          A.    It is a tax that the City of Detroit

21   assesses on telephone, cable, utility charges to

22   residents in Detroit.

23          Q.    Now, when it came to historical data

24   about utility user tax revenues, you relied on

25   what was given to you by Ernst & Young; is that

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7116   Filed 08/27/14   Entered 08/27/14 18:46:41   Page 251 of 269

1          - MARTI KOPACZ - VOLUME 1-

2     correct?

3          A.     That's correct.

4          Q.     You did not attempt to independently

5     assess that data, correct?

6          A.     Correct.

7          Q.     And to the extent you conducted

8     sensitivity analysis around the utility user's

9     tax, it will be in your report?

10         A.     We did not.

11         Q.     You did not?  I --

12         A.     Did not.

13         Q.     It's not a memory test, but it's

14    fine.

15              Let's talk a little bit about your

16    experience -- your personal experience forecasting

17    municipal revenues -- or I'm sorry, doing

18    municipal forecasts of both revenues and expenses.

19    Okay?

20         A.     Okay.

21         Q.     So tell me about the times that

22    you've had the opportunity to do it personally.

23         A.     I have not directly worked for a

24    municipality in projecting revenues or expenses.

25         Q.     Okay.  What do you mean by

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7116   Filed 08/27/14   Entered 08/27/14 18:46:41   Page 252 of 269
00000000-0000-0000-0000-000000000000

- MARTI KOPACZ - VOLUME II-
1
2  Gleason and Bob Childree.
3       Q.    I apologize if I repeat some of
4  Mr. Hackney's questions, but am I right you have
5  no experience with actuarial issues?
6       A.    That's correct.
7       Q.    And you have no prior -- pension is
8  not your area of expertise, is it?
9       A.    I would not consider myself a pension
10  expert.
11       Q.    Are the pension portions of your
12  report important to your conclusions?
13       A.    Yes.
14       Q.    And if the pension portions of your
15  report are factually or inaccurate -- factually or
16  analytically incorrect, would you agree with me
17  that undermines the conclusions you reached in
18  your report?
19       A.    I don't think they're factually
20  incorrect or analytically incorrect.
21       Q.    Right.  But if they are, would you
22  agree with me that that undermines the conclusions
23  in your report?
24       A.    I don't know that it would.  It
25  depends which -- what would be inaccurate?

- MARTI KOPACZ - VOLUME II-
1
2       Q.    Well, we'll get to that.
3             Can you put -- take your report
4  there.  It's Exhibit 1.
5       A.    Sure.
6       Q.    Can you turn to Page 127.
7             MR. ALBERTS:  I'm sorry, Jonathan,
8       repeat the page.
9             MR. WAGNER:  127.
10             MR. ALBERTS:  And if you wouldn't
11       mind speaking up, only because this is making
12       a lot of noise.
13  BY MR. WAGNER:
14       Q.    Do you have it there?
15       A.    I do.
16       Q.    Ms. Kopacz, you see the middle
17  paragraph one, two, three, four, five lines in,
18  you state, "The retirement systems assumed
19  aggressive annual rates of return on investment
20  (PFRS 8.0 and GRS 7.9)."
21             Do you see that?
22       A.    I do.
23       Q.    What was the basis for your statement
24  that the annual rates of return assumed by the
25  retirement systems have been aggressive?

- MARTI KOPACZ - VOLUME II-
1
2       A.    They are aggressive relative to what
3  is agreed to right now in terms of the 6.7 and in
4  terms of some of the recent past in terms of rates
5  of return from year to year.
6       Q.    Did you look at the rates of return
7  over the last 25 years for those two systems?
8       A.    I'm not sure I looked at 25 years.  I
9  looked at 10.  I think, whatever -- a series of
10  data on those.
11       Q.    What did the 10-year data show?
12       A.    I would have to look at it again.
13       Q.    You don't remember?
14       A.    I know that there were -- there were
15  years in which there were losses in excess of 20
16  percent.
17       Q.    Would you agree with me that it would
18  be more appropriate to look at data over a longer
19  period of time?
20       A.    Not necessarily.
21       Q.    Did you look at any data -- look --
22  extending over a 25-year period of time?
23       A.    I don't know.
24       Q.    Did you -- you go on to say in this
25  statement, and I'll read the whole sentence --

- MARTI KOPACZ - VOLUME II-
1
2  well, you say in the first paragraph,
3  "Historically, a number of different practices
4  have contributed to a significant funding
5  shortfall in the two pension plans..."  And you
6  recite the aggressive rates of return.
7             Did you make any efforts to quantify
8  what portion of the funding shortfall was
9  attributable to the supposedly aggressive rates of
10  return?
11       A.    I did not.
12             MR. WAGNER:  Let's mark this as
13       Exhibit 4.
14             (Whereupon, Kopacz Exhibit 4 was
15       marked at this time.)
16             MR. KANE:  Do you have a copy for me?
17  BY MR. WAGNER:
18       Q.    Ms. Kopacz, have you seen Exhibit 4
19  before?
20       A.    I don't recall seeing Exhibit 4
21  before.
22       Q.    Do you know whether you took the
23  document into account in drawing the conclusions
24  in your report?
25       A.    I don't know.

- MARTI KOPACZ - VOLUME II-
1    Q.    Would you be surprised to learn that
2  in most years the two pension funds exceeded the
3  rates of return that they -- the target rates of
4  return that they set?
5    A.    What -- you're using the time series
6  of data?
7    Q.    Yes.
8    A.    Okay.  I've looked at this.  Can you
9  ask me the question again?
10       MR. WAGNER:  Can you read back the
11       question.
12       (The question requested was read back
13       by the reporter.)
14    A.    The -- first of all, I don't know who
15  prepared this.  I don't know what the basis is and
16  I don't -- it says, "actuarial assumed rate of
17  return" and "calendar year rate of return."  Okay.
18  And I don't know from whence this comes in terms
19  of how this was calculated.
20    Q.    Okay.  I want you to assume that the
21  document is accurate because others have testified
22  that it is.  Would it surprise you to learn that
23  over the last 25 years, in most years the GRS and
24  the PFRS have exceeded their targeted rates of

- MARTI KOPACZ - VOLUME II-
1  return?
2    A.    In most years?
3    Q.    Yes.
4    A.    Should we count them?  All right.
5  One, two, three, four, five, six, seven, eight,
6  nine, ten -- in ten of the years on the general
7  retirement system, they did not reach the targeted
8  assumed rates and --
9    Q.    So that means -- let me just ask --
10  so that means in 15 years they exceeded, correct?
11    A.    If there are 15 years here.  There
12  are 25 years.
13    Q.    So, in most years --
14    A.    In 15 --
15    Q.    -- the GRS exceeded the targeted
16  rate, correct?
17    A.    Yes.
18    Q.    Okay.  You can do the math for PFRS.
19    A.    Okay.  One, two -- three, four --
20  five.  In five of the PFRS years, they did not
21  reach the targeted return.
22    Q.    That's five out of how many?
23    A.    Fifteen.
24    Q.    So in most years, am I correct, the

- MARTI KOPACZ - VOLUME II-
1  PFRS and GRS exceeded their targeted rates of
2  return?
3    A.    Individually for those years, yes.  I
4  would want to look at the cumulative effects of
5  this.
6    Q.    And would it surprise you that the
7  people who have done that calculation have
8  concluded that over the 25-year period for GRS and
9  over the 15-year period for the PFRS, those two
10  pension plans have exceeded 7.9 and 8 percent
11  returns?
12    A.    If you want me to assume that is
13  correct, I will.
14    Q.    And would that surprise you?
15    A.    Like I said, this -- this is not a --
16  this is just one data point, okay, so --
17    Q.    My question is only whether it would
18  surprise you, not whether it's one data point.
19       Would it surprise you?
20    A.    No.
21    Q.    Would it surprise you to learn that
22  over the last 25 years out of the hundred-odd
23  largest pension funds in the country, their
24  average rates of return have exceeded 8 percent?

- MARTI KOPACZ - VOLUME II-
1    A.    I haven't looked at that, so I don't
2  know.
3    Q.    You haven't?
4    A.    I have not.
5       MR. WAGNER:  Let's mark this.
6       (Whereupon, Kopacz Exhibit 5 was
7       marked at this time.)
8    Q.    Have you seen this document before?
9    A.    I have seen this document, I believe,
10  before.
11    Q.    As a matter of fact, you cited it in
12  your report, correct?
13    A.    I did.  This is the one that gives
14  the investment return assumptions for various
15  plans.
16    Q.    Can you look at the last sentence on
17  Page 1 and read it out loud?
18    A.    The last sentence?
19    Q.    On Page 1.
20    A.    "As shown in Figure 1 at 9 percent
21  the median analyzed investment return for the
22  25-year period ended December 31st, 2013, it seeks
23  the average assumption of 7.72 percent in Figure 5
24  while the 10-year return is below that."

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME II-
1      Q.    And can we agree that 9 percent is
2  more than 7.9 and 8 percent?
3
4      A.    We can agree to that -- to that.
5      Q.    Are you aware of the rates of return
6  for the PFRS and the GRS in the last fiscal year?
7      A.    In the last fiscal year defined as
8  fiscal year-ended June --
9      Q.    June 30th, 2014.
10     A.    I am not.
11     Q.    So would it surprise you to learn
12 that the rates of return for both PFRS and GRS
13 have been 11 percent and 18 percent respectively?
14     A.    I have heard the 11 percent number.
15 I had not heard the 14 (sic) percent number.
16     Q.    And are you aware that 7.9 and
17 8 percent fall within the range of reasonableness
18 for returns for PFRS and GRS calculated by the
19 City's pension expert?
20     A.    Am I aware of what?
21     MR. WAGNER: Could you read it back.
22     (The question requested was read back
23 by the reporter.)
24     A.    Could you show me the letters from
25 Milliman on that? I mean, we've looked at a lot

- MARTI KOPACZ - VOLUME II-
1  of Milliman documents.
2
3      Q.    Well, you read the Perry report,
4  right?
5      A.    The Perry report?
6      Q.    The Perry expert report?
7      A.    I did not.
8      Q.    It's listed on your list of documents
9  that you reviewed.
10     A.    I didn't review it, personally.
11 Someone on my team must have.
12     Q.    Did you review any of the underlying
13 pension materials?
14     A.    I did some of them, yes.
15     Q.    Did you review the Rockefeller
16 report?
17     A.    I did.
18     Q.    Are you aware that the Rockefeller
19 report has been severely criticized?
20     A.    I would assume all reports have been
21 severely criticized.
22     Q.    That's not my question.
23     Are you aware that the Rockefeller
24 report has been severely criticized by the public
25 pension community?

- MARTI KOPACZ - VOLUME II-
1      A.    Yes.
2
3      Q.    Did you look at any of those
4  criticisms?
5      A.    Not specifically, no.
6      Q.    What have those criticisms been?
7      A.    The public pension community
8  generally believes that the -- for example, the
9  investment rate of return is also something that
10 you use for discounting.
11     Q.    And am I right that there is no
12 public pension fund that uses the riskless or the
13 risk-free rate of return to value its pension
14 obligations?
15     A.    No public pension? I don't know that
16 no public pension is generally not -- I wouldn't
17 say no, because I just don't know that there's
18 no --
19     Q.    Okay.
20     A.    -- that uses a lower rate of return.
21     Q.    We'll come back to that.
22     You mentioned Milliman. Did you have
23 any discussions with Milliman about the pension
24 issues?
25     A.    I did participate in some calls with

- MARTI KOPACZ - VOLUME II-
1  Milliman, I believe. My team had more than I did.
2
3      Q.    Are you aware that Milliman set a
4  rate of return for the pension funds based on the
5  asset -- the current asset allocations; they set a
6  rate of return of 7.2?
7      A.    I believe that's correct, yes.
8      Q.    Do you have any quarrel with that
9  number?
10     A.    Not really.
11     Q.    Did you have any discussions with
12 Gabriel Roder?
13     A.    I did not personally.
14     Q.    Did anyone from your team?
15     A.    I believe they did.
16     Q.    If it's not listed on you -- on the
17 log, would you agree that there had been no such
18 discussion?
19     A.    Not specifically. I would -- would
20 go and check the -- our time records as well. I
21 would hope that the logs for everybody else are
22 accurate, but...
23     Q.    Did you have any discussions with
24 Cynthia Thomas?
25     A.    No.

- MARTI KOPACZ - VOLUME II-

1
2    Q.    Do you know who she is?
3    A.    I don't.
4    Q.    Did anyone ever tell you she was the
5    executive director of the two pension systems?
6    A.    No.
7    Q.    Do you think that's someone you
8    should have spoken to?
9    A.    Not necessarily.
10    Q.    Why not?
11    A.    I spoke with counsel to the pension
12    systems.  I spoke with some of the people that are
13    on the board of the pension systems.
14    Q.    But you didn't speak to the executive
15    director?
16    A.    I did not.
17    Q.    You testified yesterday in response
18    to Mr. Hackney's questions that there is no need
19    to change the plan on account of potential -- the
20    potential pension risks that you cite in your
21    report.
22        Do you recall that testimony?
23    A.    Can we read it back?
24    Q.    Well --
25    A.    I don't remember specifically.

- MARTI KOPACZ - VOLUME II-

1
2    Q.    Okay.  Would you accept my
3    representation that that's what you said?
4        MR. KANE:  Objection.
5    A.    Not really.
6    Q.    Okay.  Well, is there any need to
7    change the pension plan -- strike that.
8        Is there any need to change the plan
9    of -- the plan of adjustment on account of the
10    potential pension risks that you cite?
11    A.    I have no perspective or point of
12    view or opinion on changes to the plan of
13    adjustment.  That is not in my scope.  It is not
14    my task.
15    Q.    Do any of the pension risks that you
16    cite in your report give you any pause with
17    respect to the plan?
18    A.    The long-term risks associated with
19    the City's pension obligations do not negatively
20    impact my assessment for feasibility.
21    Q.    Did you look at the asset
22    distribution for the pension funds?
23    A.    I have seen a -- I have seen a
24    schedule that looks at the distribution of assets
25    in the pension fund.

- MARTI KOPACZ - VOLUME II-

1
2    Q.    Do you have any quarrel with that
3    distribution?
4    A.    I am not an investment manager.
5    Q.    Is that another way of saying that
6    you don't have any quarrel?
7    A.    No.  It just says that I didn't -- I
8    accepted it as it was.
9    Q.    Well, I'm asking you today:  Do you
10    have any questions --
11    A.    I have not made that evaluation.
12    Q.    So the answer is no, you are not able
13    to cite any disagreement you have with the
14    distribution of assets, are you?
15    A.    I -- like I said, I have not looked
16    at that specifically to arrive at any conclusion.
17        MR. WAGNER:  Can you read back the
18    question.
19        (The question requested was read back
20    by the reporter.)
21    Q.    Can you answer the question?
22        Do you have any quarrel --
23    A.    I don't know.
24    Q.    Would you agree with me that it's
25    unreasonable to calculate the -- strike that.

- MARTI KOPACZ - VOLUME II-

1
2        There's nothing in your report that
3    addresses -- that purports to calculate the size
4    of the pension claim, correct?
5    A.    Correct.
6    Q.    Am I right that with respect to the
7    risk-free rate, that you advocate -- that you
8    cite, all you're asking for is that the -- is that
9    a calculation be made and be disclosed, correct?
10    A.    Yes.  And it's not -- it is a rate --
11    whether it's the risk-free rate of return or some
12    lower risk adjusted rate is not particularly
13    critical to me in terms of my recommendation.
14        It is that I believe that it is --
15    that the -- using the same rate of return -- using
16    the discount rate that is the same as the rate of
17    return for the investment asset assumption just --
18    does not intuitively make sense to me as a finance
19    person.
20    Q.    Let me just understand.
21        For you this is a disclosure issue,
22    correct?
23    A.    It is -- it is a recommendation that
24    I have made that it would be helpful to the City
25    long-term to measure its long-term pension

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME II-

1     - MARTI KOPACZ - VOLUME II-
2     liability at a rate other than an assumed rate of
3     return on asset investments.
4          MR. WAGNER: Can you read back the
5     answer.
6          (The answer requested was read back
7     by the reporter.)
8          THE WITNESS: It should be invested.
9     BY MR. WAGNER:
10         Q.    Am I right for you, this is a
11    disclosure issue. And I turn you to Page 156 of
12    your report.
13         A.    When you say "disclosure issue," all
14    right --
15         Q.    What I mean is that what you want is
16    for that rate to be calculated and disclosed?
17         A.    I want the -- yes. I want the risk
18    levels to be -- to have the benefit of sunshine.
19         Q.    Okay. Are you aware of any public
20    pension fund that makes that disclosure?
21         A.    As I sit here today, no.
22         Q.    Have you ever opined or given any
23    conclusions on the proper rate of return for a
24    public pension fund?
25         A.    No.

1     - MARTI KOPACZ - VOLUME II-
2          Q.    Have you ever served as an actuary
3     for a public pension fund?
4          A.    No.
5          Q.    Have you had any experience in
6     actuarial science?
7          A.    In terms of? Experience in actuarial
8     science?
9          Q.    Yes.
10         A.    No.
11         Q.    Do you have any qualification to
12    offer an opinion on the proper rate of return to
13    use for a public pension fund?
14         A.    I don't think I have offered an
15    opinion.
16         Q.    My question --
17         MR. WAGNER: Can you read back the
18    question.
19         (The question requested was read back
20    by the reporter.)
21         A.    I don't think I ever have.
22         MR. WAGNER: Can you read it back one
23    more time, I'm sorry.
24         (The question requested was read back
25    by the reporter.)

1     - MARTI KOPACZ - VOLUME II-
2          Q.    Yes or no?
3          A.    I don't think I ever have.
4          Q.    Does that mean you don't have a
5     qualification to do so?
6          A.    I don't know.
7          Q.    By the way, you're not opining
8     whether this plan discriminates unfairly or not,
9     are you?
10         A.    Absolutely not.
11         Q.    Okay. You would not be in favor of a
12    plan that unfairly discriminates against any
13    class?
14         A.    It is -- it is not something I looked
15    at. It is not part of my scope.
16         Q.    Now, explain to me why you believe
17    that the risk-free rate -- that calculation of
18    pension liabilities using the risk-free rate
19    should be disclosed?
20         A.    I'm not sure that I -- the risk-free
21    rate or a rate that is nearer a risk-free rate is
22    what I suggested. Okay.
23         This is a plan some day in the future
24    that needs to be a hundred percent funded. It is
25    frozen. There will be people, 30, 40, potentially

1     - MARTI KOPACZ - VOLUME II-
2     50 years from now that will need to be paid from
3     this plan. There is no mechanism right now that
4     assures that this plan will ever be a hundred
5     percent funded.
6          Q.    In your view, is the -- is there any
7     downside to disclosing pension liabilities based
8     on the risk-free rate?
9          A.    Any downside?
10         Q.    Yes.
11         A.    No.
12         Q.    Have you ever read anything citing
13    downsides to disclosing the risk-free rate?
14         A.    Have I read anything? Not that I
15    recall.
16         Q.    Has anyone ever discussed with you
17    what the downsides are of disclosing calculation
18    of pension liabilities based on the risk-free
19    rate?
20         A.    Not recently, no.
21         Q.    What about not recently?
22         A.    Again, the last time I dealt with
23    pension was a number of years ago with a frozen
24    terminated plan with a client, so...
25         Q.    But one thing we can agree on is that

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME II-

1  nobody does it today, do they, as far as you know?
2  A.  I don't know.
3  Q.  Okay. You can't cite any public
4  pension fund that does that, correct?
5  A.  Not -- not as I sit here today no.
6  Q.  Okay. So -- so it would be out of
7  the mainstream for the City of Detroit to do so,
8  correct?
9  A.  I don't know what you mean by
10  mainstream. It would be different from others,
11  yes.
12  Q.  And i think you cited in your report
13  that the average rate of return -- strike that --
14  the average target set by the largest pension
15  funds is 7.72.
16  Do you recall that?
17  A.  That comes from the NASRA brief.
18  Q.  Yes. So that's the rate -- that's
19  the average rate that the largest public pension
20  funds are using on average, correct?
21  A.  Yes.
22  Q.  And the plan provides for a rate of
23  6.75, correct?
24  A.  Yes, it does.

- MARTI KOPACZ - VOLUME II-

1  Q.  Okay. And that's about a hundred
2  basis -- basis points below the 7.75, right?
3  A.  It is below the average identified in
4  the NASRA recent brief.
5  Q.  Okay. And again, you want a rate
6  much, much lower than 6.75 -- strike that.
7  You want a calculation done at a rate
8  much lower than 6.75, right?
9  A.  I want it -- I think it would behoove
10  the City to calculate that obligation at a rate
11  lower than 6.75, yes.
12  MR. WAGNER: Mark this as the next
13  exhibit.
14  (Whereupon, Kopacz Exhibit 6 was
15  marked at this time.)
16  Q.  Ms. Kopacz, this is the Blinken
17  report.
18  Do you see that?
19  A.  Yes, it is.
20  Q.  Okay. And did you read it?
21  A.  I have read -- I have read a lot of
22  it.
23  Q.  Have you read it cover to cover?
24  A.  I don't know I've read it cover to

- MARTI KOPACZ - VOLUME II-

1  cover.
2  Q.  Do you know that -- that Richard
3  Ravitch is very active in the Rockefeller
4  Institute?
5  A.  I do know that.
6  Q.  Was he the one who directed you to
7  this report?
8  A.  I don't know.
9  Q.  Am I right with respect to this issue
10  of the risk-free rate that the Rockefeller -- the
11  Blinken report is an outlier?
12  A.  I don't know that it's an outlier.
13  Q.  Did you make any effort to determine
14  whether it was or not?
15  A.  I did not.
16  Q.  Can you turn to Page X-11?
17  A.  X-11, okay.
18  Q.  If you look at the -- see
19  "Recommendations"? Do you see that?
20  A.  Yes, I do.
21  Q.  Okay. It says, "We offer the
22  following recommendations: Pension funds and
23  governments should value liabilities and expenses
24  for financial reporting purposes using a discount

- MARTI KOPACZ - VOLUME II-

1  rate that reflects the riskiness of expected
2  benefit payments."
3  Do you see that?
4  A.  I do.
5  Q.  So all the Rockefeller report is
6  advocating, Ms. Kopacz, is disclosure of a
7  calculation based on a risk-free rate, correct?
8  A.  I don't think that says risk-free
9  rate. It says the riskiness of the expected
10  benefit payment.
11  Q.  Okay. But whatever it's saying, all
12  it's asking for is disclosure, right?
13  A.  It's -- I think it says what it says.
14  "Pension funds and governments should value
15  liabilities and expenses for financial reporting
16  purposes using a discount rate that reflects it is
17  risk necessary of expected benefit payments.
18  Funds should also disclose projected cash flows
19  used to calculate liabilities so that they can be
20  discounted at alternative rates."
21  Q.  So I don't want to get into quibble
22  over wording because there are of lots of people
23  who want to ask questions. But am I right that
24  this issue for the Blinken report is an issue of

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

1          - MARTI KOPACZ - VOLUME II-
2    disclosure?
3        A.    Similar to what I've said, yes.
4        Q.    Okay.  And you're not aware of any
5    public pension funds that -- public pension fund
6    that actually calculates the level of
7    contributions that should be made based on a
8    risk-free rate, are you?
9        A.    I'm sorry.
10            MR. WAGNER:  Can you read it back?
11       A.    Please.
12       Q.    I told you it would be difficult to
13   do pensions.
14       A.    No, it's okay.  I can do pensions.
15   Let's go.
16            (Requested question was read back by
17       the reporter.)
18       A.    I'm not aware of any as I sit here
19   today.
20       Q.    And would it surprise you if I told
21   you that there are none that calculate the level
22   of contributions that should be made based on a
23   risk-free rate?
24       A.    I -- like I said, I don't know one
25   way or another.

1          - MARTI KOPACZ - VOLUME II-
2            MR. WAGNER:  Mark this as the next
3       exhibit.
4            (Whereupon, Kopacz Exhibit 7 was
5       marked at this time.)
6            MR. ALBERTS:  Just as a courtesy,
7       when you introduce an exhibit like this that
8       we don't have a copy, just advise what it is.
9            MR. WAGNER:  That's fine.  If you
10      want, I'll get you copies after.
11   BY MR. WAGNER:
12       Q.    Ms. Kopacz, I put before you Exhibit
13   8 -- 7, which is a release by the National
14   Conference on Public Employee Retirement Systems
15   concerning the Rockefeller report that you cite, I
16   believe, your report.
17            First of all, have you ever heard of
18   this organization?
19       A.    The National Conference on Public
20   Employee Retirement -- not specifically, no.
21       Q.    And if you turn to the last page, it
22   states, "The National Conference is the largest
23   trade association for public sector pension funds,
24   representing more than 550 funds throughout the
25   United States and Canada."

1          - MARTI KOPACZ - VOLUME II-
2        Q.    Do you see that?
3        A.    I'm reading.  Just a moment.
4            Okay.
5        Q.    Are you aware of any other trade
6    associations for public pension funds?
7        A.    I don't know.
8        Q.    Okay.  I take it you didn't look at
9    this release before you issued your report?
10       A.    Not that I recall, no.
11       Q.    Okay.  And do you see in the first
12   paragraph that the trade association representing
13   the 500 -- over 550 public pension funds called
14   the recommendations off the mark and impractical.
15            Do you see that?
16       A.    The title says, "impractical and off
17   the mark."
18       Q.    You see in the second paragraph the
19   trade association representing 550 public pension
20   funds states that, "It makes no real world sense
21   to use a discount rate that is artificially low
22   and unrelated to real investment expectations."
23            Do you see that?
24       A.    Do you want me to read the paragraph?
25       Q.    My question is whether you see that

1          - MARTI KOPACZ - VOLUME II-
2    statement.
3        A.    I see the statement.
4        Q.    Okay.  And did you make any effort in
5    preparing your report to investigate these types
6    of criticisms of the Rockefeller report?
7        A.    I did not.
8        Q.    And I think you testified yesterday
9    that Mr. Ravitch was a significant influence on
10   your thinking with respect to the pension issue?
11       A.    I said Mr. Ravitch and I and my team
12   discussed this topic with him.  I also discussed
13   it extensively with Mr. Childree.
14       Q.    And did anyone present to you the
15   opposing point of view with respect to disclosure
16   of the risk-free rate?
17       A.    Yes.
18       Q.    And who was that?
19       A.    Mr. Childree.
20       Q.    And what did he tell you?
21       A.    Mr. Childree, as the former
22   comptroller of the State of Alabama, having lived
23   through these issues, adopts what most public
24   pension government workers have lived with for
25   years and years and years; and that is, that you

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7116   Filed 08/27/14   Entered 08/27/14 18:46:41   Page 259 of 269

- MARTI KOPACZ - VOLUME II-
1
2     A.     Correct.
3     Q.     And that is --
4     A.     I don't believe those provisions are
5 met in the forecast of the Detroit pension plan.
6     Q.     Well, we'll leave that to the pension
7 experts, because you are not a pension expert.
8     A.     I am not a pension expert.
9     Q.     Okay. So we'll leave that to the
10 experts.
11     But the standard is under those
12 conditions use of a single rate, correct?
13     A.     Or, B, a yield or index rate on tax
14 exempt 20-year AA or higher municipal rated bonds
15 to the extent that the conditions for use of the
16 long-term expected rate of return are not met."
17     Q.     Am I right that if those conditions
18 are met, GASB recommends using a single rate?
19     A.     Or a yield on the index of municipal
20 AA or higher bonds.
21     MR. WAGNER: Let's mark this as the
22 next exhibit. This is Exhibit 9.
23     (Whereupon, Kopacz Exhibit 9 was
24 marked at this time.)
25 BY MR. WAGNER:

- MARTI KOPACZ - VOLUME II-
1
2     Q.     Have you -- seen Exhibit 9 is the
3 GASB Statement Number 67.
4     Do you see that?
5     A.     It is.
6     Q.     Have you seen it before?
7     A.     I have not seen the full standard,
8 no.
9     Q.     Okay. Can you turn to Page 19.
10     And can you read 40, and can you
11 agree with me that sets out the same standard we
12 saw in the release?
13     A.     Yes. What this basically says is
14 that under the assumption that you have a funded
15 pension plan, then the rate of return on the
16 pension plan investments is the rate to use or the
17 yield on the 20-year tax exempt muni bonds.
18     Q.     Okay. We can put that aside for now.
19     A.     Well, I mean it's really important.
20     Q.     Well, I'm not -- there's no question
21 pending.
22     A.     Between whether it's a funded or
23 unfunded plan.
24     Q.     Okay. We will leave that to the
25 pension experts.

- MARTI KOPACZ - VOLUME II-
1
2     Did anyone ever tell you that one of
3 the downsides to disclosing the risk-free rate is
4 it could lead to liability-driven investing?
5     A.     I don't understand that phrase.
6     Q.     So that was not something you came
7 across in your work on this case?
8     A.     No.
9     Q.     Did anyone ever tell you that
10 disclosing the risk-free rate could lead to
11 improperly -- could lead to over burdening current
12 taxpayers?
13     A.     I don't -- no.
14     Q.     Did anyone ever tell you that using
15 or disclosing the risk-free rate could lead to
16 cutbacks with respect to pension benefits?
17     A.     No.
18     Q.     Now, you state in your report that
19 the 6.75 rate was heavily negotiated.
20     Do you recall that?
21     A.     Yes.
22     Q.     What's the basis for that statement?
23     A.     Conversations with various
24 stakeholders in this case.
25     Q.     What did they tell you?

- MARTI KOPACZ - VOLUME II-
1
2     A.     That the 6.75 was a heavily
3 negotiated rate.
4     Q.     You agree that it's lower than
5 historical rates that the PFRS and GRS have used,
6 right?
7     A.     Yes.
8     Q.     And it's lower than recent investment
9 runs?
10     A.     That's correct.
11     Q.     Would you have -- and you agree it's
12 lower relative to peers?
13     A.     Yes.
14     Q.     I think you cite in your report that
15 peers are setting rates at 7.72, right?
16     A.     That's what the NASRA report says.
17     Q.     Okay. And the NASRA report also
18 reports that rates over the -- returns over the
19 last 25 years have exceeded 9 percent, right?
20     A.     I don't know. I'd have to go back
21 and look at it again.
22     Q.     That was the point I -- the note I
23 pointed out this morning.
24     A.     Do you want to look at it again?
25     Q.     It's up to you. You can look at it

12 (Pages 463 to 466)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7116   Filed 08/27/14   Entered 08/27/14 18:46:41   Page 260 of 269

- MARTI KOPACZ - VOLUME II-

1
2    A.    No.
3    Q.    Do you have any view or opinion with
4  respect to the impairment of the bonds as it
5  relates to interest rate and call protection?
6    A.    No.
7    Q.    So, is it accurate to say there's
8  nothing in your expert report that goes to whether
9  or not the plan would be feasible or not if the
10 DWSD bonds interest rates are reset and the call
11 protection stripped?
12   A.    I believe that's correct in that
13 the -- the treatment of the DWSD bonds in the plan
14 of arrangement does not impact my feasibility
15 assessment of the plan.  Does that --
16   Q.    Yes.  So it makes no difference with
17 respect to your opinion whether or not those bonds
18 are impaired --
19   A.    That's correct.
20   Q.    -- correct?
21        Do you know how much or the amount of
22 the purported savings that the DWSD would achieve
23 if the bonds are impaired as contemplated under
24 the plan of adjustment?
25   A.    I don't.

- MARTI KOPACZ - VOLUME II-

1
2    Q.    That number is not material to you?
3    A.    I don't know what the number is.
4    Q.    Whether that number is 300 million or
5  600 million, it has no impact on the opinion that
6  you are rendering in this case, correct?
7    A.    That's correct.
8    Q.    Let's turn to that, to use your
9  terminology, Ms. Kopacz, the linkage.  And that
10 linkage is the 428.5 million pension contribution
11 that is to go from DWSD to the City, correct?
12   A.    Correct.
13   Q.    And what did you do to analyze the
14 amount and the proposed payments under the plan
15 with respect to that amount?
16   A.    There's a chart in my report that
17 identifies how that money comes into the City.  I
18 had conversations with Ernst & Young as it relates
19 to those monies.
20        I had -- and I had other
21 conversations with -- it was a topic that I --
22 when I met with the retirement systems and their
23 counsels, talked about -- I can find it -- it
24 comes in over ten years.
25   Q.    Yes.  Please take a moment to find

- MARTI KOPACZ - VOLUME II-

1
2  it.
3    A.    I'll find it.
4    Q.    If I had a page number, I would give
5  it to you.
6    A.    Yes.  It is -- it's on 136 and it's
7  on 137.
8    Q.    With respect to the UAAL amount, did
9  you or your team do anything to verify that the
10 428.5 million is an accurate calculation of DWSD's
11 share of the UAAL?
12   A.    No.  My assumption is that that
13 number was a given.
14   Q.    A given in what sense?
15   A.    In that it -- I have assumed that the
16 $428 million is correct for purposes of funding
17 the pension treatment that is provided for in the
18 plan.
19   Q.    Did anyone affiliated with the City
20 tell you why they were structuring the
21 transaction -- "the transaction" being the DWSD
22 pension contribution -- the way that they
23 structured it in the plan?
24   A.    Again, because it -- it is a source
25 of funds that the City believed it could use to

- MARTI KOPACZ - VOLUME II-

1
2  fund the pension obligation going forward.
3    Q.    Would it change your opinion at all
4  in terms of feasibility whether that amount was
5  paid out over nine years or ten years or a longer
6  period of time?
7    A.    It could.
8    Q.    Did you run any -- perform any
9  analysis over the impact that paying that money
10 out over a longer period of time would have on the
11 plan's feasibility?
12   A.    I did not.
13   Q.    So whether it's paid out over 30
14 years or nine years, you don't have a view as to
15 whether or not that would impact the feasibility
16 of the plan?
17   A.    It's not paid in -- it's paid more in
18 the first year than and then equally over the
19 subsequent years.  So depending on if that was
20 spread over a 30 years, right, that could be --
21 that could be meaningful.  I don't know.
22   Q.    Do you know historically, let's just
23 say going back five years, how much was paid in
24 terms of DWSD's share of the UAAL?
25   A.    I don't.

- MARTI KOPACZ - VOLUME II-

1   Q.   In reviewing the transcript from
2   yesterday, I believe Mr. Stewart asked you at the
3   start if you had any misgivings or any conclusions
4   that you weren't confident about in your report.
5        Given the past day and a half of
6   questioning, do you have anything?
7   A.   I'm still -- no, I'm still really
8   comfortable with what we did, given the scope of
9   our assignment, given the best information
10  available.  And I really haven't changed any of my
11  thoughts in the last day and a half.
12       MR. WAGNER:  Very good.  I have no
13  further questions.  I yield to others.
14       MR. BRILLIANT:  I'm not going to have
15  very much time.  Do you want to take a
16  few-minute break and we'll switch seats.
17       THE VIDEOGRAPHER:  The time is
18  11:16 a.m.  We're going off the record.
19       (Whereupon, there was a brief recess
20  in the proceedings.)
21       THE VIDEOGRAPHER:  The time is
22  11:26 a.m.  We're back on the record.
23
24  EXAMINATION BY MR. BRILLIANT:
25


- MARTI KOPACZ - VOLUME II-

1        Q.   In reviewing the transcript from
2   yesterday, I believe Mr. Stewart asked you at the
3   start if you had any misgivings or any conclusions
4   that you weren't confident about in your report.
5             Given the past day and a half of
6   questioning, do you have anything?
7        A.   I'm still -- no, I'm still really
8   comfortable with what we did, given the scope of
9   our assignment, given the best information
10  available.  And I really haven't changed any of my
11  thoughts in the last day and a half.
12            MR. WAGNER:  Very good.  I have no
13  further questions.  I yield to others.
14            MR. BRILLIANT:  I'm not going to have
15  very much time.  Do you want to take a
16  few-minute break and we'll switch seats.
17            THE VIDEOGRAPHER:  The time is
18  11:16 a.m.  We're going off the record.
19            (Whereupon, there was a brief recess
20  in the proceedings.)
21            THE VIDEOGRAPHER:  The time is
22  11:26 a.m.  We're back on the record.
23
24
25  EXAMINATION BY MR. BRILLIANT:

- MARTI KOPACZ - VOLUME II-

1        Q.   And you didn't do anything to analyze
2   whether DWSD would have the financial capability
3   to make the payments; you just relied on the
4   assumption they could make the payments?
5        A.   Yes.
6        Q.   And you -- and because you didn't
7   review any DWSD financial projections, you have no
8   opinion as to whether any financial projections
9   are reasonable; isn't that right?
10       A.   That's correct.
11       Q.   And you have no opinion as to whether
12  or not DWSD is viable after confirmation of the
13  plan, do you?
14       A.   Like I said, I don't have any
15  perspective or point of view on DWSD.
16       Q.   Okay.  So when you say in your report
17  that the plan is feasible, you mean this the plan
18  as relates to the general fund is feasible based
19  on the assumptions contained in your report, but
20  you have no opinion as to whether the DWSD portion
21  of the plan is feasibility; is that correct?
22       A.   That's correct.
23       Q.   Mr. Neal had asked you about
24  conversations that you had with respect to

- MARTI KOPACZ - VOLUME II-

1        Q.   Ms. Kopacz --
2             THE VIDEOGRAPHER:  Your microphone,
3   sir.
4        Q.   I'm going to try to just fill in some
5   gaps and try not to repeat things and I hope we
6   can do this pretty quickly.
7             So the first thing I wanted to ask
8   you about is with respect to the DWSD, in
9   answering some questions from Mr. Neal you said
10  that the only thing that you looked at in
11  connection with DWSD was in connection with the --
12  the pension payments; is that right?
13       A.   That's correct.
14       Q.   And what did you do in connection
15  with that?  You just assumed that DWSD would make
16  the payments?
17       A.   I had conversations with the City and
18  the City's professionals and conversations with --
19  I know counsel to the retirement systems and to
20  some of the people that were involved in that.
21       Q.   And basically you just made the
22  assumption that DWSD would be able to make those
23  payments?
24       A.   I did.
25

- MARTI KOPACZ - VOLUME II-

1   monetization of DWSD.
2        A.   Yes.
3        Q.   And he'd asked you about
4   conversations with Miller Buckfire.
5        A.   Yes.
6        Q.   And he asked you about conversations
7   with Conway and Mackenzie.
8        A.   Yes.
9        Q.   Were there conversations that you had
10  about the monetizations of DWSD with anybody else?
11       A.   Not to my recollection.
12       Q.   When was it that you decided that the
13  feasibility analysis would only be limited to the
14  general fund and -- and not to the enterprise
15  funds?
16       A.   Because the plan of adjustment
17  projections only relate to the general fund.
18       Q.   Okay.  But when -- so when was the
19  decision that you would only -- 'cause in the
20  disclosure statement, right, there's -- there's
21  the 10- and 40-year projections for the general
22  fund, correct?
23       A.   Right.  Yes.
24       Q.   And then -- and then there are also

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7116   Filed 08/27/14   Entered 08/27/14 18:46:41   Page 262 of 269

- MARTI KOPACZ - VOLUME II-

1   represent the two retirement systems for the City
2   of Detroit. We met very briefly at your interview
3   months ago and I don't believe we've spoken since,
4   but I'll be brief.
5       A lot of my questions actually were
6   asked this morning by Jonathan Wagner. So I
7   apologize, I may have to jump around a little bit
8   because I'm going to try not to repeat the same
9   questions that he had.
10      If we go to Exhibit 1 which is a copy
11  of your report, Page 127.
12      A.   Page 127. Uh-huh. Okay.
13      Q.   There is a paragraph in the middle --
14      A.   Uh-huh.
15      Q.   -- where you state that, "A number of
16  different practices have contributed to a
17  significant funding shortfalls in the two pension
18  plans. The retirement systems utilized
19  unrealistic rate of return assumptions and manage
20  the pension plans in accordance with questionable
21  investment strategies that result in a
22  considerable underfunding of their respective
23  plans."
24      Do you see that?

- MARTI KOPACZ - VOLUME II-

1       A.   I do.
2       Q.   With respect to your contention that
3   the systems used questionable investment
4   strategies that resulted in considerable
5   underfunding, you don't cite any particular third
6   party in a footnote as you have in other sections.
7       Do you see that?
8       A.   There is no footnote related to that
9   paragraph.
10      Q.   Okay. So what did you rely on in
11  reaching this conclusion?
12      A.   This -- a lot what -- the
13  conversation that I had with Mr. Clark -- we can
14  go back to my log and I -- I am sorry to say I
15  have forgotten all of the people were -- that were
16  at that meeting, but I was at a meeting with both
17  retirement systems, their counsel and their
18  lawyers at Clark Hill, very shortly after I was
19  retained in this matter.
20      And it was during that -- here it is
21  -- Robert Gordon, Joseph Turner, Ronald King,
22  Michael VanOverbeke, those individuals, I had a
23  meeting with them.
24      And then subsequently I know people

- MARTI KOPACZ - VOLUME II-

1   in my firm met with a similar group of people of
2   -- that represented the pension funds and we
3   talked about -- they shared with me a history of
4   the investments around the retirement systems, the
5   investments that were made, and I believe it was
6   during the during the Kwame administration into
7   alternative -- what you would call alternative
8   investment vehicles; the -- the smoothing that had
9   occurred and the stretching out of the unfunded
10  obligations over a relatively 30-year period. But
11  the -- this really comes from that conversation.
12      Q.   Okay. So, it is your testimony that
13  the retirement systems themselves told you that
14  they utilized an unrealistic rate of return
15  assumption?
16      A.   The people that I met with, I believe
17  it's in your offices at -- across the street from
18  the KMAK.
19      Q.   And who --
20      A.   Shared with me.
21      Q.   Someone specifically on behalf of
22  retirement system opined to you that they --
23      A.   Mr. Overbeke (sic) and Mr. -- and I
24  think it was -- the gentleman who was a lawyer,

- MARTI KOPACZ - VOLUME II-

1   but is also general counsel now for the funds.
2       Q.   Michael VanOverbeke?
3       A.   He's one of them --
4       Q.   Or Joe Turner?
5       A.   I think it's Joe Turner.
6       Q.   What I'm trying to get at, your
7   testimony is that during that meeting they
8   specifically told you --
9       A.   About --
10      Q.   -- that they believed --
11      MR. KANE: Wait for her to finish.
12      Q.   Let me finish the question.
13      -- that there was an unrealistic rate
14  of return assumption that was utilized by the
15  system? Or is that your extrapolation based on
16  what was said at the meeting?
17      A.   The -- we talked very specifically
18  about the recent history of losses, investment
19  losses at the retirement system; how they had used
20  a seven-year smoothing period to make the
21  shortfalls less obvious; how they had implied
22  amortization periods that were extended for
23  funding the unfundeds; and how all of that ended
24  up creating, you know, again, a perception or a

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME II-

1    - MARTI KOPACZ - VOLUME II-
2    reality of the underfunding of the plans. As well
3    as the 13 checks and those sorts of things. We
4    talked about all of that.
5         Q.    Do you have any understanding of what
6    would be a typical smoothing period utilized by
7    other public pension plans?
8         A.    I don't.
9         Q.    So if someone from the retirement
10   systems told you that a seven-year smoothing
11   period was used, you would have no basis to
12   compare that with other plans to know if that was
13   typical?
14        A.    I would -- I would have to undertake
15   to research that. I wouldn't have my own
16   independent knowledge of what that was.
17        Q.    Same with amortization period
18   utilized by public pension systems. Would you
19   have any basis to know whether a 20-year
20   amortization period versus a 30-year amortization
21   period.
22        A.    Or a ten or a five. No, I would not.
23        Q.    Okay. So just to narrow it down, we
24   told you certain facts -- when I say "we," the
25   retirement systems gave you certain facts about

1    - MARTI KOPACZ - VOLUME II-
2    the smoothing period used and amortization period
3    used. And then you extrapolated an opinion that
4    based on that there were unrealistic rate of
5    return assumptions and questionable investment
6    strategy?
7         A.    No. What my question in the meeting,
8    right, to start, one of my basic questions would
9    be, okay, how did these things get in this
10   condition. Right.
11        Q.    Who else from your team attended this
12   meeting?
13        A.    At that meeting, just myself.
14        Q.    In the second meeting?
15        A.    Then there were -- there were --
16   second meeting, there were some calls that would
17   have involved Michael Gaul, Bob Childree, maybe
18   Brian Gleason. I don't know. I would think they
19   would be in the log.
20        Q.    What are Mr. Gaul and Mr. Childree's
21   particular experience as relates to pensions,
22   public pensions?
23        A.    I don't know that Michael has any
24   specific experience. Mr. Childree is very
25   experienced with public pensions, having been the

1    - MARTI KOPACZ - VOLUME II-
2    comptroller of the State of Alabama for 23 years
3    and the former president of the Government Finance
4    Officers Association for a number of years. And I
5    believe he's -- he is a current advisor or recent
6    past advisor to the GASB, the Government
7    Accounting Standards Board on these matters.
8         Q.    Do you know -- I'm sorry -- do you
9    know if either one has any actuarial experience?
10        A.    I don't believe either has actuarial
11   experience.
12        Q.    Do you know if either has sat on a
13   board for a public pension system?
14        A.    I believe Mr. Childree has.
15        Q.    Do you know how long the meeting
16   between Mr. Gaul, Mr. Childree and the retirement
17   systems lasted?
18        A.    I don't.
19        Q.    In reaching your conclusion on Page
20   127, I believe you testified this morning that you
21   never looked at the investment policies for the
22   system.
23        A.    I did not.
24        Q.    Do you know if your team looked at
25   those?

1    - MARTI KOPACZ - VOLUME II-
2         A.    I don't know.
3         Q.    Do you or your team -- do you know if
4    you or your team looked at the historical asset
5    allocation mix for the system?
6         A.    I believe someone did, yes.
7         Q.    Okay. Do you know where those are
8    listed on the chart of documents that you looked
9    at?
10        A.    I don't.
11        Q.    The underfunding issue that is spoken
12   about in this paragraph, was that discussed only
13   at the meeting with you and a representative of
14   the retirement systems or was it discussed at the
15   meeting with Mr. Gaul and Mr. Childree as well?
16        A.    I'm sure it was discussed at all of
17   the meetings.
18        Q.    Did you or your team consult with any
19   of the systems investment consultants in reaching
20   this conclusion?
21        A.    I -- I believe that Mr. Gaul and/or
22   Mr. Childree participated in meetings or calls
23   with the pensions' advisors, the pension systems'
24   advisors.
25        Q.    Do you know who NEPC is?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7116   Filed 08/27/14   Entered 08/27/14 18:46:41   Page 264 of 269

- MARTI KOPACZ - VOLUME II-
1
2      A.   I don't.
3      Q.   Do you know who Wilshire Investments
4  is?
5      A.   Only just -- I don't know them
6  specifically.
7      Q.   Do you know their role within the
8  system --
9      A.   I know --
10         MR. KANE:  Wait for her to finish.
11     We're getting close to the goal line, if you
12     want to get out.  We're still going to get
13     their steadily.
14         THE WITNESS:  We're still going to
15     get there.
16 BY MS. GREEN:
17     Q.   Do you know if those are the
18 investment consultants that your team would have
19 met with?
20     A.   I don't know.
21     Q.   Do you know if anyone from your team
22 met with the chief investment officer for the
23 retirement systems?
24     A.   I don't know.
25     Q.   Does the name Ryan Bigelow ring a

- MARTI KOPACZ - VOLUME II-
1
2  bell?
3      A.   It does not.
4      Q.   Would it be fair to say if I didn't
5  see his name on any of the meeting lists or
6  communications logs, that you did not consult with
7  Mr. Bigelow prior to reaching a conclusions about
8  the investment practices of the system?
9      A.   That's probably correct.
10     Q.   You testified earlier under
11 questioning from Mr. Wagner that you had no
12 particular quarrel with the asset mix and that you
13 did not actually analyze the asset mix?
14     A.   That's correct.
15     Q.   Okay.  So if you didn't look at the
16 asset mix, what else did you base your opinion on
17 that the systems investment strategy is
18 questionable?
19     A.   The representations that were made in
20 the meeting that I personally had in your offices
21 with the pension system representatives.
22         MR. KANE:  Can I interject something
23     similar to what I did yesterday.  I don't
24     quarrel with the term "opinion" as long as
25     it's little O, recognizing her opinions are

- MARTI KOPACZ - VOLUME II-
1
2  specific ones that are set forth at the
3  beginning of the report.
4         THE WITNESS:  Right.
5  BY MS. GREEN:
6      Q.   I guess what I'm trying to ask is,
7  they told you certain facts about amortization
8  periods, smoothing, things of that nature.  You
9  just stated you have no basis to compare those to
10 anything.  So my question --
11     A.   I relied --
12     Q.   -- is, how do you know they're
13 questionable practices?
14     A.   I relied on what the general counsel
15 of the two systems told me.
16     Q.   Your testimony is that he used the
17 word "questionable practices" about his own
18 client?
19     A.   They are talking about the systems
20 prior to when those people got involved.
21     Q.   You're saying before they had any
22 personal knowledge they were speaking of prior
23 history?
24     A.   My question was, how did the system
25 get to this point?  Okay?  But I believe Mr.

- MARTI KOPACZ - VOLUME II-
1
2  Turner and Mr. Overbeke are new to the systems in
3  their role as both lawyers and general counsel.
4  Okay?
5         I am not talking about the systems
6  today moving forward.  I am talking about how did
7  the systems get in this underfunded predicament.
8      Q.   Do you understand generally that
9  retirement systems were fully funded as of 2007?
10     A.   I don't know when they were last
11 fully funded.
12     Q.   Did you know that according to, for
13 instance, the general retirement system's annual
14 actuarial report from June 30th, 2008, that it was
15 101 percent funded?
16     A.   I don't know that.
17     Q.   In 2008?
18     A.   I don't care about that.
19     Q.   Okay.  Why wouldn't you care about
20 when the time of underfunding occurred?
21     A.   I care about the impact the
22 underfunded systems have on the plan of adjustment
23 and the City's obligations to fund pensions going
24 forward.
25     Q.   If you flip to the next page of your

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

```
1            - MARTI KOPACZ - VOLUME II-
2    report, Page 128.
3        A.   Uh-huh.
4        Q.   There is a statement, "In addition to
5    issues involving the aggressiveness of the rave
6    return assumption used to determine funding
7    levels, also contributing to the increase of the
8    UAAL were a number of questionable activities
9    engaged in by the retirement system."
10           Do you see that part?
11       A.   I do.
12       Q.   At the -- there's several bullet
13   points.
14       A.   Uh-huh.
15       Q.   At the bottom, there's a footnote.
16       A.   Yes.
17       Q.   And it appears to be referring to the
18   Charles Moore declaration that was filed as docket
19   number 13 on the docket in the bankruptcy case.
20           Do you see that?
21       A.   Yes.
22       Q.   Did everything in this paragraph, the
23   breakdown of bullet points, come from the Chuck
24   Moore declaration?
25       A.   I believe it did.
```

```
1            - MARTI KOPACZ - VOLUME II-
2        Q.   So you wouldn't have any personal
3    knowledge or you didn't do any investigation into
4    the facts that are listed in bullet point fashion
5    from Pages 128 to 129?
6        A.   No, that's not correct.
7        Q.   You do have personal knowledge?
8        A.   I -- I talked with -- at my initial
9    meeting with the systems, the pension systems, we
10   talked about all of these issues. I've talked
11   about them on a conference call with Mr. Miller
12   from Jones Day. Okay? I've talked to Mr. Moore
13   about these issues. I attended the employee new
14   pension plan meeting in which these topics got
15   raised in terms of the 13 check program and the
16   ASF.
17           So, these -- these are -- we chose to
18   use the verbiage that Mr. Moore had used in his
19   declaration. But separate and apart, I and
20   members of my team have had discussions about
21   these facts and issues, if you will, with several
22   other people involved.
23       Q.   Let's go through them one by one.
24       A.   Sure.
25       Q.   The first bullet point, do you know
```

```
1            - MARTI KOPACZ - VOLUME II-
2    where you got that information? Is that from the
3    Moore declaration or is that from conversations?
4        A.   Okay. Let me clarify this. The
5    information that is in the first bullet is
6    information that I got from my initial meeting
7    with the systems -- with the pension systems.
8    Okay? It is the same information that my team
9    generally got from their meetings, conversations
10   and diligence. Okay?
11           What we chose to do in the report is
12   to use the precise verbiage that Mr. Moore used.
13   Okay?
14       Q.   Okay. And the next sub bullet point,
15   that begins with "using actual market returns..."
16       A.   Yes.
17       Q.   Is that also from the Chuck Moore --
18       A.   This is all from the Chuck Moore.
19       Q.   Okay. And the next paragraph that
20   begins "GRS trustees..."
21       A.   Yes.
22       Q.   That's also from Moore?
23       A.   Yes.
24       Q.   And the next bullet point which
25   begins, "The City periodically deferred..."
```

```
1            - MARTI KOPACZ - VOLUME II-
2    that's from Chuck Moore as well?
3        A.   Yes.
4        Q.   And the last paragraph that says,
5    "Retirement system officials have been accused or
6    indicted of material fiduciary misconducts
7    allegedly during the pension of necessary
8    liquidity and contributing to the underfunding of
9    the retirement systems."
10           Was that also from the Chuck Moore
11   Affidavit?
12       A.   Yes.
13       Q.   Okay. Let's take a look at the --
14           MS. GREEN: I think it will be
15   Exhibit 10, I could be way off. Exhibit 10.
16           (Whereupon, Kopacz Exhibit 10 was
17   marked at this time.)
18       Q.   Okay. Footnote 47 states that the --
19           MR. BLANCHARD: What document is
20   that?
21           MS. GREEN: The Chuck Moore
22   declaration.
23           MR. BLANCHARD: Thanks.
24   BY MS. GREEN:
25       Q.   Footnote 47 states that the Chuck
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME II-

1     - MARTI KOPACZ - VOLUME II-
2  declaration which has been incorrectly cited.
3       Q.    So what I'm trying to get at are you
4  really relying on the Chuck Moore declaration or
5  are you relying on statements from people within
6  the system?
7       A.    I'm relying on statements from within
8  the system, right.  And I believe my intent was to
9  have -- to use verbiage that was already part of
10  the proceedings.
11      Q.    Okay.  Did you take notes,
12  handwritten notes at this meeting?
13      A.    I don't recall.
14      Q.    If the attendees from the retirement
15  systems disagreed with your characterization that
16  they ever told you that these activities led to
17  draining of pension fund liquidity or contributing
18  to the underfunding, would you have specific
19  recollection to be able to refute that?
20      A.    I -- like I said, I don't know.  I
21  have -- I don't know what I -- I haven't looked at
22  this for a long time.  I'm sorry.
23      Q.    Okay.  Did you attempt to quantify
24  the actual economic impact that you attribute to
25  this misconduct?

1     - MARTI KOPACZ - VOLUME II-
2       A.    I did not.
3       Q.    Did you ever speak to Chuck Moore
4  about this portion of his declaration, the larger
5  one, I suppose?
6       A.    I have talked to Chuck Moore and
7  members of my team have talked to Chuck Moore
8  extensively about pensions and all of these
9  issues.
10      Q.    Did you independently verify the four
11  or five bullet points that are here?
12      A.    Okay.  I've just explained to you
13  that my instructions to my team were to cite
14  information that already existed on the record.
15  Okay.  This is an error.  I don't know how many
16  times I have to say this.  Okay?
17      Q.    So it's a no?
18      A.    The answer is, I -- when I read this
19  I said, I want this cited.  Right?  Because I
20  would -- I'm sure I would have written it
21  differently.  I probably wouldn't have put it in a
22  bullet format.  Okay?
23      Q.    So if it is an error and it's not in
24  the Chuck Moore declaration and it may be in the
25  other one and you don't have independent specific

1     - MARTI KOPACZ - VOLUME II-
2  recollection, is it something you feel comfortable
3  leaving in your report as part of your conclusion?
4       A.    I don't know until I can figure out
5  why a document is cited in error.  I can't answer
6  that question.
7       Q.    You stated earlier that you didn't
8  think it was important to know the timing of the
9  underfunding.
10      A.    I don't.
11      Q.    And why is that?  Can you explain
12  that a little more?
13      A.    I am only tasked with looking at the
14  feasibility of the plan going forward.
15      Q.    So if your testimony was that any
16  sort of alleged misconduct with regard to
17  questionable investment strategies occurred during
18  the Kwame Kilpatrick administration, do you
19  understand what time period that would be from?
20      A.    It would be -- yes, it would be back
21  before the Bing administration.
22      Q.    So after the Kwame Kilpatrick
23  administration, you do understand the systems were
24  then fully funded, correct?
25      A.    I don't know that.

1     - MARTI KOPACZ - VOLUME II-
2       Q.    Okay.  In your report you seem to
3  opine on the cause of the underfunding as you seem
4  to be attributing it to certain questionable
5  investment strategies.  That's why I'm asking
6  about the timing of when we became underfunded.
7            So I just want to clarify, you have
8  no idea when the systems became underfunded,
9  correct?
10      A.    As I sit here today, I do not know
11  the specific date when the funds -- the pension
12  systems became underfunded.
13      Q.    And I believe there was some
14  testimony yesterday in your deposition regarding
15  the Great Recession and it's impact on the City of
16  Detroit.  And if I used the phrase the Great
17  Recession, do you understand I generally mean the
18  economic downturn from 2008 to 2009?
19      A.    Yes.
20      Q.    Do you know who Tom Terry is?
21      A.    I don't.
22      Q.    I believe that Mr. Neal asked you
23  during questioning whether you intended to review
24  the expert reports that were issued by all of the
25  experts in this case?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME II-

2  A.  I did not.

3  Q.  Do you think that that would be
4  relevant to your conclusion that questionable
5  investment strategies were utilized by the
6  systems, would that cause their underfunding?

7  A.  I am -- as I said, before I am
8  reciting information that I received from pension
9  system people.  Okay.  And what is important to me
10  is the level of underfunding in the pension
11  systems as of the filings and today and how that
12  is going to be dealt with in the future.

13  Q.  And you understand that the
14  underfunding as of the filing, if we look at this
15  document --

16  A.  Which document?

17  Q.  Exhibit 4.

18  A.  This doesn't give anything on
19  underfunding.

20  Q.  I understand that.  You already
21  stated you didn't know that it was fully funded in
22  2000 -- the end of 2007, correct?

23  A.  I don't know one way or another.
24  Okay?

25  Q.  Okay.  Did you review any data from

- MARTI KOPACZ - VOLUME II-

2  the United States Census Bureau related to public
3  pensions?

4  A.  I did not personally, no.

5  Q.  You testified earlier that you were
6  not familiar with NCPERS -- it was used earlier,
7  it's N-C-P-E-R-S.  Mr. Wagner showed you a
8  document I believe from NCPERS.

9  A.  He did.

10  Q.  Are you familiar with the
11  organization NASRA?

12  A.  I am -- yes, I am familiar with that
13  trade association because we used some of their
14  information.

15  Q.  Did you happen to consult the public
16  funding survey for fiscal year 2008 published by
17  NASRA?

18  A.  I would have no need to do that.

19  MS. GREEN:  Okay.  I'm going to mark
20  this as Exhibit 11.

21  (Whereupon, Kopacz Exhibit 11 was
22  marked at this time.)

23  BY MS. GREEN:

24  Q.  So you stated you may have looked at
25  some NASRA publications.  But this one -- is this

- MARTI KOPACZ - VOLUME II-

2  one that you recall looking at?

3  A.  I -- I have not looked at this.

4  Q.  Okay.  The title of the document is
5  Public Funds Survey Summary of Findings for Fiscal
6  Year 2008.  It was released in 2009.

7  If you go to Page 2 on the left-hand
8  column, in the second paragraph it states:  "The
9  market decline in 2008 resulted in a median
10  investment return for public pension funds of
11  negative 25.3 percent for the year."

12  Do you see that portion?

13  A.  I do, it's highlighted.

14  Q.  And in comparison to the investment
15  losses that were incurred by the Detroit
16  retirement systems in 2008, if you compare those
17  to Exhibit 4, does it appear that our investment
18  losses were actually in line with the median
19  investment losses for other public pensions?

20  A.  The numbers appear to be similar,
21  yes.

22  Q.  If the systems fared in line with
23  what other public pension -- how other public
24  pension systems performed, does that change your
25  opinion at all as to whether questionable

- MARTI KOPACZ - VOLUME II-

2  investment strategies are what caused their
3  underfunding?

4  A.  Ms. Green, with all due respect,
5  okay, I really don't, at the end of the day, care
6  about how they got underfunded.  Okay?  They are
7  underfunded.  There is treatment in the Plan of
8  Reorganization -- Plan of Adjustment that I have
9  to assess relative to feasibility.

10  I understand you and your client
11  really don't like the verbiage that's in my
12  report.  Okay?  I get that.  But I simply don't
13  care about how they got there.  I only care about
14  where they are today and what's going -- what
15  their treatment is in the Plan of Adjustment.

16  So I am not going to have any
17  opinion, any point of view, any perspective on
18  anything that happened in 2008, 2007, 1997 or
19  whatever.

20  Q.  So would you agree with me that the
21  portion of your report on pages 127 and 128 is
22  largely irrelevant?

23  MR. KANE:  Objection.  You can
24  answer.

25  A.  It is a recitation of what I believed

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) ) ) Chapter 9 |
| CITY OF DETROIT, MICHIGAN | ) ) Case No.: 13-53846 |
| Debtor. | ) ) Hon. Steven W. Rhodes ) ) |
| _____ | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2014, I electronically filed the City's Opposition to Motions to Exclude Portions Of Martha Kopacz's Testimony with the Clerk of the Court, which sends notice by operation of the Court's electronic filing service to all ECF participants registered to receive notice in this case.

Dated:      August 27, 2014          /s/  Heather Lennox
                                                   Heather Lennox

HUI-172796v2