# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) ) ) Chapter 9 |
| CITY OF DETROIT, MICHIGAN | ) ) Case No.: 13-53846 |
| Debtor. | ) ) Hon. Steven W. Rhodes ) ) ) |

## OPPOSITION OF THE CITY OF DETROIT TO MOTIONS OF SYNCORA AND FGIC TO EXCLUDE TESTIMONY OF KENNETH BUCKFIRE

The City of Detroit, Michigan (the "City") hereby opposes the motions filed by Syncora Guarantee Inc. and Syncora Capital Assurance Inc. ("Syncora") and Financial Guaranty Insurance Company ("FGIC") to exclude certain of the testimony of Kenneth Buckfire with respect to the City's plan of adjustment. ECF # 6787 and 6826. In support of this opposition, the City states as follows:

## INTRODUCTION

1.     In support of confirmation of its plan of adjustment, the City anticipates eliciting testimony from its lead investment banker, Kenneth Buckfire, regarding the plan's satisfaction of the Bankruptcy Code section 943's best interests of creditors requirement. Syncora and FGIC seek to block the Court from receiving this testimony by mischaracterizing his deposition testimony and advancing an incorrect interpretation of the chapter 9 best interests requirement.

As explained below, the City believes that there is no basis to exclude Mr. Buckfire's testimony from consideration and that such testimony will, indeed, assist the Court as the trier of fact in passing on the City's plan of adjustment. Accordingly, the City respectfully requests that the motions to exclude be denied.

2.     The movants **do not** challenge Mr. Buckfire's expertise—they readily concede that "Mr. Buckfire is a well-recognized and respected restructuring finance expert" and that he is "perfectly capable" of providing a best interests opinion.   Syncora Mot. at 4.   Instead movants cloak their disagreement with the opinion as to "best interests" by arguing that it (1) fails to meet some arbitrary, unsupported chapter 9-best-interests-opinion-test that the movants invented and that has never been employed in any case, and (2) contains factual assumptions that the movants contest, which they cannot do for *Daubert* motion purposes. Neither of these arguments is a basis for excluding Mr. Buckfire's testimony.

3.     The movants' views as to what a chapter 9 best interests opinion should look like are irrelevant and, in any event, wrong.  The test imagined by Syncora and FGIC misarticulates the best interests standard, is contrary to the applicable precedents, and disregards the special nature of municipal bankruptcies. In addition, the assumptions employed by Mr. Buckfire in rendering his opinions on best interests, including his assumption that the City will not be able to raise taxes in a dismissal scenario, are reasonable, amply supported by the record, and in

many instances beyond doubt or reasonable dispute.  Therefore, no basis exists to exclude Mr. Buckfire's testimony.

## BACKGROUND

4.      Kenneth Buckfire is the President, Managing Director and co-founder of the industry-leading investment banking firm Miller Buckfire.  He has over thirty years of experience as a restructuring expert and has played a leading role in numerous restructurings, including Standard Pacific Corp., Calpine Corporation, Level 3 Communications, Exide Technologies, McLeodUSA, ICG Communications, PSINet Inc., Sirius Satellite Radio, BTI Telecom, CMS Energy, CenterPoint Energy, General Growth Properties, Mirant Corporation (Creditors' Committee), Horizon Natural Resources (named Most Outstanding Transaction of 2005 by the Turnaround Management Association), Oakwood Homes, TECO Energy, Centennial Communications, Allegheny International, Foamex, Van Camp Seafood, Walter Industries, Burnham Broadcasting, EUA Power Corporation, Dialog Corporation, Imperial Sugar, CRIIMI MAE and Cajun Electric.

5.      Mr. Buckfire is intimately familiar with the City's financial distress and is a core member of the City's restructuring team.  Since January 2013, Mr. Buckfire has worked every day on the City's efforts to rehabilitate itself and has devoted the majority of his professional time in furtherance of these efforts. Buckfire Dep. Tr. 79:19-25.  Through his work, Mr. Buckfire has played an

extensive and critical role in numerous aspects of the City's restructuring and has already been qualified as an expert by this Court in this case. *In re City of Detroit, Mich.*, Case No. 13-53846, Dec. 17, 2013, Hr'g Tr. 132:20-21. Simply put, Mr. Buckfire's qualifications and expertise are beyond dispute. *See* Syncora Mot. at 4.

6.     Movants Syncora and FGIC nonetheless seek to exclude Mr. Buckfire's expert opinion concerning the best interests of creditors test by advancing a flawed legal theory and a disputed version of the facts.[1] These assertions, which go to the merits of the underlying dispute, are not a basis for a pre-trial motion of this nature. The City, therefore, opposes the motions to exclude as an improper attempt to litigate the merits that is, in any event, erroneous and without support.

## ARGUMENT

## I.   THE COURT'S DISCRETION TO ADMIT EXPERT EVIDENCE IS AT ITS ZENITH IN A BENCH TRIAL

7.     Under Federal Rule of Evidence 702, "[i]f scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the

---

[1] The movants do not challenge the admissibility of the other opinions in Mr. Buckfire's expert report.

testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

8. As a general matter, expert testimony is admissible. Indeed, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's notes, 2000 amend. *quoted in In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (cited in FGIC Mot. at 3-5)). Accordingly, the Rule 702 standard for admissibility is broad. *See Gross v. Commissioner*, 272 F.3d 333, 339 (6th Cir. 2001) (noting that courts have "stopped short of turning the *Daubert* test into a straightjacket" and holding that courts have broad discretion to decide whether to admit expert testimony).

9. The admissibility standard is even broader in bench trials. While "district courts must act as 'gatekeepers' to protect juries from misleading or unreliable expert testimony by assessing the reliability of the expert's principles and methodologies used to reach the expert opinion or conclusion," *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 851 (6th Cir. 2004) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993)), the Sixth Circuit has emphasized, "[t]he 'gatekeeper' doctrine was designed to protect juries and is ***largely irrelevant in the context of a bench trial.***" *Id.* at 852 (emphasis added); *see Ambrose v. Booker*, Case No. 06-13361, 2014 U.S. Dist. LEXIS 75023, at *33 n.8 (E.D. Mich. June 3, 2014) ("Of course, the 'gatekeeper' doctrine envisioned by

*Daubert* 'was designed to protect juries and is largely irrelevant in the context of a bench trial' or an evidentiary hearing."); *McGuire v. Metro. Life Ins. Co.*, Case No. 12-10797, 2014 U.S. Dist. LEXIS 109584, at *44 (E.D. Mich. Aug. 8, 2014) ("the usual concerns of *Daubert* and the Federal Rules of Evidence—keeping unreliable expert testimony from the jury—are not present in a bench trial setting") (citing *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) and *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 635 (6th Cir. 2000)).

10. Accordingly, the court's discretion in the matter of the admission or exclusion of expert evidence "is particularly broad in a bench trial." *U.S. v. Demjanjuk*, 367 F.3d 623, 633 (6th Cir. 2004) (citation omitted). Indeed, the trial court's flexibility to admit or exclude expert testimony "is at its zenith during a bench trial." *U.S. v. Kalymon*, 541 F.3d 624, 636 (6th Cir. 2008); *MACTEC, Inc. v. Bechtel Jacobs Co., LLC*, 346 Fed. Appx. 59, 76 (6th Cir. Tenn. 2009) (same).

11. As a result, the court's actions will be upheld unless "manifestly erroneous." *Demjanjuk*, 367 F.3d at 633. Courts have discretion and "substantial flexibility" to admit "proffered expert testimony at the front end" because the courts conducting bench trials can then "decide for themselves during the course of trial whether the evidence meets the requirements of *Kumho Tire Co.* and *Daubert* and deserves to be credited." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d

620, 635 (6th Cir. 2000).[2] Courts have also acknowledged, in the specific context of bankruptcy bench trials, that their gatekeeper function is "necessarily different" than in jury trials. For example, the Seventh Circuit, in affirming the district court, which in turn affirmed the bankruptcy court's admission of expert evidence, explained:

> Where the gatekeeper and the factfinder are one and the same-that is, the judge—the need to make such decisions prior to hearing the testimony is lessened. . . . [T]he court can hear the evidence and make its reliability determination during, rather than in advance of, trial. Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.

*In re Salem*, 465 F.3d 767 (7th Cir. Ill. 2006); *see also WFC Holdings Corp. v. U.S.*, Case No. 07-3320, 2010 U.S. Dist. LEXIS 24721 (D. Minn. 2010) (relying on *In re Salem* to affirm bankruptcy court's denial of a motion to exclude expert testimony).

12. In addition to the liberal standard for admission of expert testimony in general and, in particular, in a bench trial, experts "that require the use of

---

[2] In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1993), the Supreme Court concluded that *Daubert* "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge…. But, as the Court stated in *Daubert*, the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 141.

professional judgment . . . are less likely candidates for exclusion." *Sharp v. Chase Manhattan Bank USA, N.A. (In re Commer. Fin. Servs.)*, 350 B.R. 520, 528 (Bankr. N.D. Okla. 2005). That is because "challenges may be ultimately viewed as matters in which reasonable experts may differ in exercising their judgment as to the appropriate methodology to employ or the appropriate variable to plug into a calculation." *Id.* (quoting *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 70 (N.D. Ill. 2002) ("[a]ccounting is not an exact science. Accountants are therefore required to make judgments about how to communicate financial information. A *Daubert* hearing is not the time to fully test the validity of those assumptions.")). *Cf. U.S. v. Tarwater*, 308 F.3d 494, 513 (6th Cir. 2002) (holding that there was "an adequate basis for concluding that [an expert's] testimony was both reliable and relevant," without resorting to the *Daubert* factors, where the testimony was "the product of well-established principles" and the expert's methods "were the application of her education, training, knowledge, and experience"); *First Tenn. Bank N.A. v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) ("[T]he four specific factors utilized in *Daubert* may be of limited utility in the context of non-scientific expert testimony. . . . [W]e find the *Daubert* reliability factors unhelpful in the present case, which involves expert testimony derived largely from [the expert's] own practical experiences . . . . Opinions formed in such

a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation.").

13.     Accordingly, in bench trials, including bankruptcy trials, "[s]uch matters may be and should be explored and highlighted through cross-examination of the expert and presentation of contrary evidence, not at the preliminary admissibility stage." *Id*. The court emphasized that "[e]ven unpersuasive expert testimony is admissible if it is relevant (i.e., it will assist the fact-finder in resolving a disputed factual issue) and is a product of a reasonable and reliable methodology." *Id*. That is because "as is often the case, dueling experts will assist the trier of fact in fully understanding an issue; thus, it is not the function of a *Daubert* hearing to exclude an expert merely because her conclusion ultimately may be rejected." *Id*. (citing *Joy Recovery Technology*, 286 B.R. at 70).

## II.  MR. BUCKFIRE'S OPINION IS RELIABLE AND HELPFUL TO THE COURT AS THE TRIER OF FACT

14.     Mr. Buckfire's opinion is reliable and will be helpful to the Court as the trier of fact.  In attacking the opinion, the movants argue that the opinion lacks reliability because it fails to meet some arbitrary, unsupported chapter 9-best-interests-opinion-test that each movant invented.  Tellingly, the movants do not agree among themselves on what factors are relevant for a best interests analysis.

## A. The Chapter 9 Best Interests Test Is Not A Liquidation Analysis

15.     For its part, FGIC advances a best interests analysis that is essentially the same as a chapter 11 best interests analysis citing primarily chapter 11 cases. *See* FGIC Mot. at 6-8.[3] But the statutory text of the two tests is not the same,[4] and the law is clear that the chapter 9 best interests test is ***not*** equivalent to the chapter 11 best interest test. *See, e.g., In re City of Colorado Springs Creek Gen. Improvement Dist.*, 187 B.R. 683, 690 (Bankr. D. Colo. 1995) (the chapter 9 best interest test "is not the same requirement found in § 1129(a)(7)(A)"); *In re Sanitary & Improv. Dist. #7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989) ("Section 1129(a)(7) is not included under Chapter 9."). *See also* 6-943 Collier on Bankruptcy P 943.03[7] ("The same interpretation does not work for a chapter 9 case.").

---

[3] FGIC cites a single chapter 9 case to support its asset liquidation theory of best interests. *See* FGIC Mot. at 6 (citing *In re Barnwell County Hosp.*, 471 B.R. 849 (Bankr. D.S.C. 2012)). *Barnwell* does not support FGIC's test. *Barnwell* noted in the context of its best interests analysis the paramount importance of maintaining municipal services. Moreover, *Barnwell* observed the possibility that in the absence of the plan the hospital would have to "shut its doors and close down completely." *Id.* at 869. While hospitals may shut their doors, cities may not.

[4] *Compare* 11 U.S.C. § 943(b)(7) (requiring "the plan is in the best interests of creditors and is feasible), *with* 11 U.S.C. § 1129(a)(7) ((7) ("With respect to each impaired class of claims or interests— (A) each holder of a claim or interest of such class— (i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date…").

16.     That is because "[a] municipality cannot be liquidated, its assets sold, and the proceeds used to pay its creditors." *Id.* FGIC's asset-focused best interests test is utterly wrong in the context of a municipal bankruptcy involving a City. The City of Detroit cannot liquidate. *See In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 33 (Bankr. D. Colo. 1999) (Syncora Mot. at 7) ("unlike Chapter 11, Chapter 9 cases … cannot result in liquidation of the municipality's assets under Chapter 7"); *see also* H.R. Rep. H.R. REP. 95-595, 1978 U.S.C.C.A.N. 5963, 6221 (1977) ("A municipal unit cannot liquidate its assets to satisfy its creditors totally and finally"). Nor can creditors compel the City to sell assets. *See*, *e.g.*, *Roosevelt Park v. Norton Tp.*, 47 N.W.2d 605, 606 (Mich. 1951) (creditors may not reach public funds by execution under a judgment or by garnishment); *Payton v. City of Highland Park*, 536 N.W.2d 285, 285 (Mich. Ct. App. 1995) (same); *see*, *e.g.*, *also Parker v. Klochko Equip. Rental Co.*, 590 F.2d 649, 653 (6th Cir. 1979) (interpreting Michigan law and noting that "it was, and is, well-understood and established that it is contrary to public policy to allow private liens on public property") (quotation marks omitted); *In re Mount Carbon Metro. Dist.*, 242 B.R. at 34 ("The 'best interest' requirement of § 943(b)(7) … is often easy to establish. … [because, among other reasons,] creditors … cannot force sale of municipal assets under state law") (cited in Syncora Mot. at 7).

17.    Therefore, FGIC's asset-focused best interests test is entirely misdirected and the type of "dismissal analysis" that FGIC asserts Mr. Buckfire failed to perform is, in fact, irrelevant in the chapter 9 context.

**B.  The Chapter 9 Best Interests Test Is Not The Fastest-Creditor-Test**

18.    Syncora's fastest-creditor theory of the best interests test is equally misguided.  As an initial matter, while Mr. Buckfire's opinion does not touch upon various irrelevant factors proffered by movants, Mr. Buckfire *will* provide helpful testimony to this Court on the City's plan of adjustment, including with respect to several factors identified by Syncora (Syncora Mot. at 7-8).

19.    For example, at his deposition, Mr. Buckfire testified as to the "priority analysis" or "recovery analysis" that he participated in and that is embedded in the proposed plan of adjustment and Attachment 1 to his expert report.  Buckfire Dep. Tr. 177:5-15, 180:2-10.  He also testified and will testify at trial as to the City's ability to meet debt service under the steady-state or "no restructuring" projections.  *Id.* at 177:24-25 – 178:2-14.   These steady-state projections were and are embodied in the City's pre-bankruptcy creditor proposal and Exhibit J to the Disclosure Statement.

20.    Mr. Buckfire also has and will testify as to the consequences of a dismissal on the City's various settlements and what that will mean in terms of the best interests of creditors.  *Id.* at 270:20-21, 288:22-25 – 289:2-10.   Mr. Buckfire

already testified that his firm played a significant role in *all* of the key bankruptcy settlements and that he personally played a significant role in many of such settlements. *See id.* at 93:12-94:25. Mr. Buckfire also played a critical role in the City's post-petition financing efforts and he will testify that, upon dismissal, the City's post-petition financing debt would accelerate and trigger remedies pursuant to which the relevant lenders potentially would be entitled to receive approximately $4 million per month of the City's income tax revenues. Mr. Buckfire will offer testimony to this Court on the impact of the loss of these settlements in a dismissal scenario and how that impacts the best interests of creditors.

21. Mr. Buckfire will also offer his opinion, based on his years of experience as an investment banker, on the City's ability to access the capital markets in the event of dismissal. *Id.* at 292:19-21. The movants' premature and baseless attempt to exclude Mr. Buckfire's report and to preclude his testimony with respect to best interests neither takes account of his already offered opinion nor of his planned testimony before this Court.

22. The factors that Mr. Buckfire will not address in his testimony, which go to Syncora' fastest-creditor theory, are simply irrelevant and wrongheaded. For instance, Syncora argues Mr. Buckfire should have examined factors like "[w]hich creditors' claims have accelerated and which have not?" and "which of the City's

liabilities are in default and which are not?" Syncora Mot. at 7-8. These factors apparently go to Syncora's misguided theory that chapter 9 somehow blesses a hypothetical race to the courthouse and rewards the fastest creditor. This, of course, is completely contrary to the applicable precedents and elementary principles of the Bankruptcy Code.

23. A central policy of the Bankruptcy Code is to prohibit a race to the courthouse and promote creditor equality. *See, e.g., Union Bank v. Wolas*, 502 U.S. 151, 162 (1991) (recognizing "the policy of deterring the race to the courthouse" and noting its intertwined nature with the policy of equality of distribution); *Begier v. IRS.*, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code…"). Numerous provisions of the Bankruptcy Code reflect this fundamental policy, including, for example, the automatic stay (§ 362), the claims allowance process (§§ 501 and 502), the debtor's avoidance powers (§§ 544, 547, 549, 550 and 553(b)), the distribution provisions (§ 726) and the plan process (§ 1129). Syncora cites nothing in support of its apparent fastest-creditor theory.

24. In the context of applying the best interests test, several chapter 9 courts have expressly held that the plan satisfied the best interests of creditors requirement because dismissal would result in a race to judgment—a result clearly inimical to the Bankruptcy Code and creditors. *See*, *e.g.*, *In re Bamberg Cnty.*

*Mem'l Hosp.*, No. 11–03877, 2012 WL 1890259, at *8 (Bankr. D.S.C. May 23, 2012) (holding that a chapter 9 plan was in the best interests of creditors because (a) dismissal would allow those creditors that would be able most promptly to obtain judgments on their claims to benefit at the expense of others and (b) the plan preserved the availability of healthcare services to local citizens); *In re Barnwell Cnty. Hosp.*, 471 B.R. at 869 (FGIC Mot. at 6) (same); *Sanitary & Improvement Dist., No. 7*, 98 B.R. at 975-76 (overruling objection to confirmation on grounds that chapter 9 plan was not in the best interests of creditors because, in the event of dismissal, all members of the creditor body would seek judgments that the municipal debtor would be unable to pay and the state court system would be powerless to compromise).

25.    Syncora, nonetheless, seeks to turn the world on its head by interpreting the words "best interests of creditors" in section 943 of the Bankruptcy Code as somehow endorsing a view that the first creditor to the courthouse gets more than its fair share. In other words, in Syncora's world, creditor priorities are irrelevant[5]—it is simply who is fastest. A plan of adjustment must be denied under Syncora's fastest-creditor theory, for example, where the plan pays a long-dated

---

[5] This is convenient for Syncora. The City has not pledged its full faith and credit with respect to the COP Service Contracts, and the claims from the COP Service Contracts have recourse to nothing. Syncora's claims, therefore, have no priority over any other creditor in the case—they are indisputably the lowest priority.

secured creditor in full but not a short-dated unsecured creditor. That is nonsense.

26. The Bankruptcy Code cannot be interpreted to contain a requirement that vitiates the other protections of the Bankruptcy Code. Such a tortured interpretation of the best interests analysis exists nowhere, and Syncora cites nothing in support of it. The theory is also unworkable as a practical matter. Syncora's fastest-creditor rule seems to disregard any requirement that the City continue to provide municipal services and, therefore, Syncora creates a situation where a plan of adjustment could never be confirmed because it would always fail either the feasibility test or the best interests test. There is also no way to tell which creditor will win the race. This is particularly true with respect to debts that the City disputes and will vigorously litigate, such as the COPs obligations.

## III. MR. BUCKFIRE'S OPINION RESTS ON RELIABLE ASSUMPTIONS
### A. As Long As Experts' Opinions Rest on Some Evidentiary Support, They Cannot Be Excluded Under *Daubert*

27. The movants also attack Mr. Buckfire's opinion by contesting the validity of his factual assumptions. This argument lacks merit and misunderstands the nature of the exercise under Rule 702.

28. It is not a *Daubert* hearing's function to litigate factual assumptions underlying expert testimony; nor is it a trial on the merits. Accordingly, the proponent of such expert testimony is not required to prove the assumptions' correctness. Indeed, as the Sixth Circuit has emphasized, because "rejection of

expert testimony is the exception, rather than the rule, . . . a court must be sure not to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530 (internal quotation marks and citation omitted)).  Thus, the only requirement is that the expert's assumptions have some evidentiary support in the record. *Id.* ("[W]e will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." ); *id.* at 529-30 ("the requirement that an expert's testimony be reliable means that it must be supported by appropriate validation—i.e., good grounds, based on what is known.  The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.") (citations omitted); *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 391 (6th Cir. 2000) (explaining that if the experts had "pull[ed] their notions from thin air, the district court's use of 'guess' would [have been] appropriate, and their testimony should have been excluded as lacking a factual foundation," but reversing the district court's exclusion of the testimony because the experts "did no such thing" and instead "based their opinions on the facts with which they were presented").

29.    Disputes as to the expert's assumptions go to the weight of the opinion, not its admissibility.  *See, e.g., In re Scrap Metal Antitrust Litig.*, 527 F.3d

at 530 (where expert opinions are based on facts in the record, as opposed to mere "assumptions" or "guesses" unsupported by the record, challenges go "to the accuracy of the conclusions, not to the reliability [and thus admissibility] of the testimony"); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("mere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility") (internal quotation marks and citation omitted).

30.     Relatedly, that means that a *Daubert* hearing is not a hearing on the merits, but is for the limited purpose of determining the admissibility of expert testimony. *See, e.g., Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) ("The purpose of a *Daubert* hearing is to determine the scientific validity—and thus the evidentiary relevance and reliability [(*i.e.*, matters of admissibility)]—of the principles that underlie a proposed submission. [T]he *Daubert* Court has instructed the courts that they are *not* to be concerned with the reliability of the conclusions generated by valid methods, principles and reasoning.") (internal quotation marks and citations omitted) (alterations in original); *see also In re Commer. Fin. Servs.*, 350 B.R. at 528 ("The inquiry should not focus on the choice of facts or assumptions the expert applies to the theory…The fundamental purpose of conducting a trial is to allow opposing parties an opportunity to convince the

fact-finder to accept their version of disputed facts; thus, one party's expert will likely assume a set of facts that the other party vehemently disputes.").

31.     The cases cited by movants are not to the contrary and, indeed, also hold that an expert's assumption need only have "some" evidentiary support. *See*, *e.g.*, FGIC Mot. at 9 ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record." (quoting *McLean*, 224 F.3d at 801). Here, more than ample evidentiary support exists to support Mr. Buckfire's assumptions.[6]

### B. Mr. Buckfire's Assumptions Have Sufficient Support Either As A Matter of Law Or As A Matter Of Fact

### 1. In A Dismissal, Creditors Cannot Compel The Sale of City Assets

32.     FGIC—but not Syncora—argues that Mr. Buckfire's opinion fails because it rests on the supposedly "unsupported" assumption that creditors in a

---

[6] Syncora cites several cases for the proposition that an expert may not be the mouthpiece of a non-testifying expert, which is not the case here in any event. These cases focused on Federal Rule of Evidence 703, which allows an expert to rely on and incorporate into his or her opinion otherwise inadmissible evidence. Each of these cases stands for the proposition that it is impermissible for an expert to incorporate inadmissible evidence into their opinion if they do not attempt to verify it. At the same time, none of the cases stand for the proposition that experts must independently verify disputed factual issues that have evidentiary support. Indeed, these authorities expressly make clear that an expert is allowed to make assumptions. *See*, *e.g.*, *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613-14 (7th Cir. 2002) (Syncora Mot. at 6) ("Valkenburg could have testified that the well field was contaminated by volatile organic compounds and that *if* CTS's plastics plant was within the well field's capture zone some of the contamination may have come from that plant. It does not follow that he could testify that the plant was within the well field's capture zone.") (emphasis in original).

dismissal cannot compel the City to sell City assets. FGIC Mot. at 11. This assumption is purely a legal question and it is entirely appropriate for Mr. Buckfire to rely on the City's counsel for this assumption—indeed, it would be *in*appropriate for Mr. Buckfire to undertake an analysis of and opine on the legal point. Moreover, binding uniform case law demonstrates that this assumption is plainly correct. *See, e.g., Roosevelt Park.*, 47 N.W.2d at 606 (creditors may not reach public funds by execution under a judgment or by garnishment); *Payton*, 536 N.W.2d at 285 (Mich. Ct. App. 1995) (same); *see, e.g., also Parker*, 590 F.2d at 653 (same); *In re Mount Carbon Metro. Dist.*, 242 B.R. at 34 (same). Indeed, this is a bedrock principle of municipal law, and FGIC offers ***nothing*** to the contrary.

**2. In A Dismissal, The City Cannot Raise Tax Revenues**

33. Mr. Buckfire also assumes—quite correctly—that "in a dismissal scenario, the City would be unable and it would be impractical for the City to raise taxes without further eroding revenue." Buckfire Report (July 8, 2014), at ¶ 17. More than ample evidence exists to support this assumption.

34. Mr. Cline, formerly of Ernst & Young and a 40-year veteran of tax forecasting, has already testified in this case as to the City's revenue forecasts under current law. This testimony is unrebutted. The record also shows that the City has no ability to raise revenues beyond current law.

35.     The City is at its statutory maximum tax rates.  The City's current tax rates and the associated statutory caps are at their maximums—this information can be found in such places as the Michigan Constitution, State statutes, the City Charter, and City Ordinances.  *See*, *e.g.*, Mich. Const. Art. IX, § 31; Mich Const. Art. XII, § 21; MCL §§117.3(g),  117.5(a), 141.503, 141.1152, 432.206, 432.212, and 432.213; Det. Charter § 8-401; Det. City Code, §§ 18-10-4, 18-11-3, 18-14-3, and 18-14-4.  Numerous witnesses have already testified that the City has reached its statutory tax caps.  *See*, *e.g.*, Duggan Dep. Tr. 133:6-8; Hill Dep. Tr. 185:19-25; Cline Dep. Tr. 99:4-9.    And, indeed, the Court has already found that to be the case.  *In re City of Detroit, Mich.*, 504 B.R. 97, 121 (Bankr. E.D. Mich. 2013) (stating the City "cannot legally increase its tax revenues").   This is not a fact that is or could be reasonably subject to question or dispute, and no issue can arise from Mr. Buckfire assuming this to be the case here.

36.     In addition, the movants' invocation of the Revised Judicature Act and argument that property taxes could be further increased (FGIC Mot. at 13; Syncora Mot. at 12) is unsubstantiated and, in fact, rebutted by the fact and expert deposition testimony provided already.[7]   For example, Mayor Duggan, who is

---

[7] The City notes that it has not had the opportunity to present its case yet. The deposition testimony was elicited ***by the movants***.  The City is prepared to submit supplemental declarations on each point raised herein, if necessary.  The City fully anticipates that the testimony supporting each of these assumptions will be even more robust at trial.

intimately familiar with City's taxes and tax policy, testified that imposing additional property taxes *"doesn't make any sense"* and "**would more likely cost us.**" Duggan Dep. Tr. 133:9-25.[8] Indeed, the movants' own expert recognized that increasing property taxes correspondingly reduces property values. *See, e.g.*, Meyer Dep. Tr. 46:14-47:22. Accordingly, the City has and will show that efforts to raise revenue through increased property taxes is futile and impractical. To the extent the movants present testimony regarding the ability to raise property taxes pursuant to the Revised Judicature Act, the City intends to offer expert rebuttal testimony that property tax values and revenues would drop in response to such efforts.

37. The movants argue that Mr. Cline's expert testimony does not support Mr. Buckfire's assumption that in a dismissal scenario taxes could not be

---

[8] Q.     And have you looked into imposing a property tax?

A.     I have, but it doesn't make any sense.

Q.     Why doesn't it make any sense?

A.     Because we already have – nearly half of the residents of the City of Detroit are delinquent in their taxes. We've probably got 80,000 houses somewhere, property somewhere in foreclosure, and one mill produces for the general fund maybe $7 million.

So if we were to raise the property taxes, if we accelerate foreclosures or increase the likelihood people don't want to be here, for the $7 million it would be a drop in the buck on the revenue side and would more likely cost us. But property tax – there is not enough generated off of property taxes to make it sensible … – to approach the revenues that way.

Duggan Dep. Tr. 133:9-25.

increased. This is a strawman constructed by the movants to knock down. Mr. Cline testified at his deposition that he believed the City was at the maximum tax rates for each of the taxes he examined. Cline Dep. Tr. 99:4-9. More importantly, though, the assumption is factually true, regardless of the source. And other witnesses have and will so testify.

### 3. In A Dismissal, A Race To The Courthouse Will Ensue

38. The movants also attack Mr. Buckfire's statement that in a dismissal there will be a "race to the courthouse." The belief that a dismissal would have a chaotic and damaging impact on the City and its creditors is well-founded, has been recognized by courts in this litigation and is consistent with Movants' own representations.

39. That *the movants* challenge this proposition is particularly strange. As discussed above, Syncora's basic legal argument on the best interests test— though absurd and unprecedented—is that the COPs holders will be the *fastest* creditors to obtain judgment against the City. Thus, Syncora does not doubt that there will be a race to the courthouse. Instead, Syncora's legal position is that it will be first in line in the efforts to dismember the City.

40. There is every reason to believe that there will be an avalanche of lawsuits commenced if the City's case were dismissed. The City's list of creditors is over 3500 pages long. ECF # 1059. It lists over 100,000 creditors. *Id.*

Similarly, the Court's claims register reflects thousands of creditors that have actually filed proofs of claim against the City, which are analogous to civil lawsuits. Even if only a small number of those creditors commenced post-dismissal lawsuits, the sheer number of lawsuits would, as an administrative matter, simply overwhelm the City.

41. The chaos associated with a dismissal is further exemplified by the pre and post-bankruptcy lawsuits filed against the City or directly impacting the City's restructuring efforts. These suits, which this Court is well-aware of and may take judicial notice of, include, among others: *Webster v. State*, No. 13-734-CZ (Ingham Cnty. Cir. Ct. July 3, 2013), *Flowers v. Snyder*, No. 13-729-CZ (Ingham Cnty. Cir. Ct. July 3, 2013), *Gen. Ret. Sys. v. Orr*, No. 13-768-CZ (Ingham Cnty. Cir. Ct. Jul. 17, 2013), *Phillips v. Snyder*, No. 2:13-cv-11370 (E.D. Mich.), NAACP v. Snyder, No. 2:13-cv-12098 (E.D. Mich.), *Citizens United Against Corrupt Gov't v. Local Emergency Fin. Assistance Loan Bd.*, No. 13-281-NZ (Ingham Cnty. Cir. Ct.), *City of Detroit v. Syncora Guarantee Inc. et al.*, Adv. Proc. No. 13-04942, *Syncora Guarantee Inc. v. UBS AG et al*, Adv. Proc. No. 13-05395, *Official Committee of Retirees of the City of Detroit, Michigan et al. v. City of Detroit, Michigan et al.*, Adv. Proc. No. 14-04015, *Official Committee of Retirees of the City of Detroit, Michigan et al. v. City of Detroit, Michigan et al.*, Adv. Proc. No. 14-04015, *City of Detroit v. Detroit General Retirement System*

*Service Corporation et al.*, Adv. Proc. No. 14-04112, *National Public Finance Guarantee Corporation and Assured Guaranty Municipal Corporation v. City of Detroit, Michigan, et al.*, Adv. Proc. No. 13-05309, *Ambac Assurance Corporation v. City of Detroit, Michigan, et al.*, Adv. Proc. No. 13-05310, and *Lyda et al v. City of Detroit,* Mich., Adv. Proc. No. 14-04732.

42.     The Court has already observed that "the two post-petition state court hearings on July 18 and 19, 2013 reflect a very chaotic and disorderly 'race to judgment.'" *In re City of Detroit, Mich.*, 504 B.R. 97, 167 (Bankr. E.D. Mich. 2013).   Indeed, the Court characterized "[t]hose proceedings a[s] perfect examples of the very kind of litigation the Congressional grant of exclusive jurisdiction in bankruptcy to one court was designed to control and eliminate."   *Id.*   The Court also determined that outside of bankruptcy the City would continue to default on its financial obligations and, as a consequence, "creditor lawsuits would further deplete the City's resources."   *Id.* at 189; *see also County of Orange v. Merrill Lynch & Co. (In re County of Orange)*, 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996) (cited by Syncora Mot at 6-7; FGIC Mot. at 6) (stating that dismissal of chapter 9 case leads to "the race to obtain the mandamus remedy and to collect the proceeds"); *In re Barnwell County Hosp.*, 471 B.R. at 869 (FGIC Mot. at 6) (stating that plan satisfied best interests because, in dismissal "those creditors able to pursue litigation most quickly would benefit at the expense of others").

43.     Accordingly, Mr. Buckfire's statements that, in a dismissal scenario, there would be a race to judgment is amply supported by the facts of this case and, indeed, the movants appear to celebrate—rather than deny—this fact.

### 4.     In A Dismissal, The City Will Be Service Delivery Insolvent

44.     Syncora—but not FGIC—takes issue with Mr. Buckfire's assumption that the City is service delivery insolvent.  One need not dwell on this point long— the City is plainly service delivery insolvent.  In addition to the site visit that has already taken place, overwhelming expert and fact witness testimony has and will support this assumption, including the expert witness testimony and reports of Mr. Moore, Ms. Niblock, and the Court-appointed expert, Ms. Kopacz as well as fact testimony from key officials, such as Emergency Manager Orr, Mayor Duggan, and Police Chief Craig.

45.     In his deposition, Mr. Buckfire similarly testified that the City was both service delivery insolvent as of the filing date and remained service delivery insolvent today.  *See* Buckfire Dep. Tr. 285:24 – 286:1-6 ("Q: … One of your opinions is that the City was service delivery insolvent at the time it filed, correct? A. Correct.   Q. Now let's ask about today, is the City service delivery insolvent

today? A. Yes.").[9]   The suggestion that all of the City of Detroit's problems have already been solved is a fantasy that only Syncora indulges.

> ### 5.   In A Dismissal, The City Will Lose The Value Of The Chapter 9 Settlements, Including The Grand Bargain

46.    Mr. Buckfire correctly assumed that, in the event of dismissal, the City will not have available to it the benefits of the Grand Bargain and other settlements obtained during the case.   According to Mr. Buckfire's testimony, and the legal terms of the settlements, there is "no question" that the Grand Bargain "goes away."

> Q. Have you considered the possibility that the grand bargain might happen even if the petition were dismissed?
>
> A. Well, my understanding is that one of the principal elements of that grand bargain is that the pension retirees who have rights to sue the City would presumably then have those rights restored and they may well pursue those rights, in which case the state's funding would go away.
>
> Q. Yeah, there's no question that the grand bargain as it's currently drafted, if the plan is blown up somehow, it goes away?

---

[9] The excerpted deposition testimony in Syncora's motion is not to the contrary.   Syncora Mot. at 18.  Mr. Buckfire testified that he could not speak to each and every service that the City provided and opine on whether the City was service delivery solvent with respect to each particular service.  Buckfire Dep. Tr. 288:3-13. Thus, Syncora's statement in its brief that Mr. Buckfire did not have an understanding of whether the City was service delivery insolvent is simply wrong.

A. Correct.

Buckfire Dep. Tr. 288:22 – 289:10; *see also id.* at 270:20-21 ("To my knowledge, the only settlement which might survive [dismissal] is the swap termination settlement.").

47.     Movants ignore this unrebutted testimony and instead seek to base their case on speculation and conjecture. When counsel for the movants asked Mr. Buckfire whether the Grand Bargain might be reconstituted in a dismissal, he testified that would be "speculation." *Id.* at 289:11-14. Mr. Buckfire's testimony characterizing the movants' theory as "speculation" in no way lends support to their argument. Nor does it undermine the correctness of Mr. Buckfire's assumption that the Grand Bargain does not survive dismissal.

48.     Movants have cited ***no evidence*** in their moving papers that the Grand Bargain would or could be reconstituted in a dismissal scenario. In the absence of the automatic stay, the City would be overrun with myriad lawsuits that would pose significant obstacles to consummating a settlement until such lawsuits were resolved. In addition, in the absence of the collective process associated with a plan of adjustment, negotiations with certain parties would be impractical. The Court already determined as much in connection with the eligibility trial.

49.     For example, the Court already heard substantial testimony and made considered findings concerning the ability, or lack thereof, of parties to bind

retirees outside of the context of a chapter 9 case. *In re City of Detroit, Mich.*, 504 B.R. 97, 178 (Bankr. E.D. Mich. 2013) (noting letters from various unions stating they have "no authority" to negotiate on behalf of retirees and that "no[] [voluntary retirement associations] assert that they can bind individual retirees absent some sort of complex class action litigation"). In addition, without the preemptive reach of the Bankruptcy Code certain parties may refuse to compromise. *See id.* (noting parties would not negotiate outside of bankruptcy because they considered themselves "fully protected by state law"). Finally, no evidence exists that other parties, such as the DIA funders, would participate in the Grand Bargain without the exculpatory relief afforded them under the plan of adjustment.

50. Accordingly, Mr. Buckfire's position is amply supported by the record and movants' rank speculation should not be credited.

### 6. The Reinvestment Initiatives Are Necessary To Provide Adequate Levels Of Municipal Services.

51. Mr. Buckfire correctly assumed that the City's reinvestment initiatives are "necessary to provide adequate levels of municipal services" and in their absence the City will "further deplete the City's tax base." Buckfire Expert Report, at 10. In an effort to degrade this assumption, both Syncora and FGIC willfully mischaracterize the deposition testimony of Charles Moore.

52. Both Syncora and FGIC say that Mr. Moore testified that the initiatives "could" go forward regardless of whether the case is dismissed. Syncora

Mot. at 20. (citing Moore Dep. Tr. 92:7-19); FGIC Mot. at 17 (citing Moore Dep. Tr. 92:7-19). In fact, Mr. Moore testified that the reinvestment initiatives "***should still go forward***" in a dismissal scenario. Moore Dep. Tr. 92:19 (emphasis added). Indeed, Mr. Moore expressly testified that "obviously" the City requires money to implement the critically-necessary reinvestment initiatives.

> Q ... Outside of a Chapter 9 process, can you think of any reason why they [the reinvestment initiatives] would -- just could not be implemented?
>
> A ***Well, you have to have the money to implement these***. Obviously the core element here when you take into account the gross investment of 1.7 billion and then the 482 in revenue, the 358 in cost savings, you still wind up with a net investment of just under $900 million. 877 million.

Moore. Dep. Tr. 221:16-24(emphasis added).[10] Of course, Mr. Buckfire and others will testify that the City ***does not*** have sufficient funds to make the reinvestments in a dismissal scenario.

* * *

Each and every one of Mr. Buckfire's assumptions is true. However, all that

---

[10] Indeed, in subsequent questioning, counsel for FGIC expressly asked Mr. Moore to ***assume*** the City had sufficient funds for reinvestment in a dismissal scenario. *See* Moore Dep. Tr. 223:12 – 224:7 ("Make an assumption that the Chapter 9 proceeding either is dismissed or doesn't exist any longer, okay?... Q: Is there any reason you can think of***, assuming you had the funds to do it***, why those initiatives couldn't be implemented outside of a Chapter 9 proceeding?") (emphasis added).

is required at this stage of the proceeding is that "*some*" evidentiary support exist with respect to such assumptions. *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529-30; *McLean*, 224 F.3d at 801. That standard is easily met here. Indeed, the City believes that many, if not all, of the assumptions employed by Mr. Buckfire are beyond question.

WHEREFORE, for the foregoing reasons, the City requests that the Court deny the motions to exclude Kenneth Buckfire's best interests opinion.

Dated: August 27, 2014          Respectfully submitted,

/s/ Heather Lennox
Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, Michigan  48075
Telephone:  (248) 359-7300
Facsimile:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY OF DETROIT

# EXHIBIT 1

**Buckfire Deposition Transcript Excerpts**

1                KENNETH BUCKFIRE, VOLUME 2

2           IN THE UNITED STATES BANKRUPTCY COURT

3            FOR THE EASTERN DISTRICT OF MICHIGAN

4

5

6

7  In Re:                )     Chapter 9

8

9  CITY of DETROIT, MICHIGAN, )   Case No. 13-53846

10

11             Debtor.   )   Hon. Steven Rhodes

12  _____

13

14                   VOLUME 2

15

16     The Videotaped Deposition of KENNETH BUCKFIRE,

17     a Rule 30(b)(6) witness,

18     Taken at 1114 Washington Boulevard,

19     Detroit, Michigan,

20     Commencing at 8:09 a.m.,

21     Wednesday, July 16, 2014,

22     Before Leisa M. Pastor, CSR-3500, RPR, CRR.

23

24

25

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7119   Filed 08/27/14   Entered 08/27/14 19:13:50   Page 34 of 63

```
 1                    KENNETH BUCKFIRE, VOLUME 2

 2          you've testified about something before that I'm

 3          asking, let me know that, and maybe we can again work

 4          around that, as well, or you can refresh my

 5          recollection.

 6     A.   Thank you.

 7     Q.   Plus we have all these machines that could refresh our

 8          recollection.

 9               Can you describe for me Miller Buckfire's

10          responsibilities as the City's investment banker as it

11          relates to the COPs transactions?

12     A.   Well, let's be precise.  When you're talking about the

13          COPs transactions, are you referring to the original

14          transactions in 2005 and 2006 or the COPs transactions

15          pursuant to constructing their treatment under the

16          plan of adjustment?

17     Q.   I am talking about all of them, but let's start with

18          the original transactions --

19     A.   Okay.

20     Q.   -- with respect to 2005 and 2006 and work our way

21          through, but yes that -- that is what I'm talking

22          about.

23     A.   Okay.  So can we just break this down then --

24     Q.   Certainly.

25     A.   -- so I properly answer your question.
```

1          KENNETH BUCKFIRE, VOLUME 2

2    Q.   And so the substantial the creditors that you are

3         referring to that have a more substantial claim than

4         -- than my clients, who would be that?

5    A.   Again we're talking about a dismissal scenario where

6         you don't have the protection of Chapter 9, well

7         obviously, the LTGOs, the UTGOs, one could argue even

8         the pension and OPEB claim holders because they have

9         executory contracts with the City.  All those parties

10        which have claims in the billions certainly swamp the

11        claims of the COPs, and indeed, the question of the

12        priority of the COPs claims because you're relying on

13        the indirect credit of the City, I think would call

14        into question whether in that scenario your clients

15        would receive any value at you will.

16   Q.   And so that's the basis of your opinion with respect

17        to plans compared to treatment upon dismissal?

18   A.   That's correct..

19   Q.   Now, did you analysis the treatment under the plan and

20        justification at a post it to the treatment upon

21        dismissal which you just did here in this --

22   A.   Mm-hmm.

23   Q.   -- testimony when you came to this opinion?

24   A.   Well, I'd also refer you to our June 2013 report where

25        we showed that without intervention in this case

1                    KENNETH BUCKFIRE, VOLUME 2

2            intervention being the filing for bankruptcy

3            protection, the percentage of City revenues being

4            tasked to manage debt service obligations was growing

5            to an unsustainable level.  I believe the peak was 65

6            percent of total relevance including your clients'

7            claims would absorb over 65 percent of all tax

8            revenues, that's untenable, that's a liquidation

9            scenario and the realty was that the City's experience

10           prebankruptcy I think as a factual matter indicates

11           that that scenario was having an enormously adverse

12           consequence on the ability of the City to maintain

13           itself, provide services, attract tax base and

14           increase revenues.

15      Q.   So now your testimony that you just gave, is it based

16           on any analysis that was done by -- well, yourself,

17           Miller Buckfire, or anyone else in connection with the

18           City of what the recoveries for creditors would be

19           outside of the Chapter 9?  Did you do a full analysis

20           saying this is what we anticipate would happen?

21      A.   You mean a liquidation analyses?

22      Q.   Yeah, an analysis of -- using your terms if the case

23           were dismissed?

24      A.   Cities don't liquidate, so we did not do that

25           analysis.

1                    KENNETH BUCKFIRE, VOLUME 2

2    A.   Well, I've already testified to our work on a priority

3         analysis, a so-called recovery analysis by creditor

4         class and we came to a conclusion early on that the GO

5         creditors might in fact have a better recovery in a

6         liquidation scenario because they have the benefit of

7         a tax pledge that might under southern scenarios give

8         them a greater revenue from tax revenues albeit the

9         claim, other than other GO creditors who had no

10        specific revenue.

11   Q.   Can you recall what the results were for any other

12        class of creditors other than the GO?  And you just

13        mentioned the GO when you testified about that

14        earlier.

15   A.   Well, regrettably, I thought the recovery to COPs was

16        likely to be zero in that scenario.

17   Q.   And can you -- let me break that down a little.  So

18        the recovery to COPs you just said you thought might

19        be zero.  What factors went into that analysis?

20   A.   Just my conclusion as to the status of their claims,

21        relative to other claims against the City's revenues.

22   Q.   So and by status, you mean priority and anything else?

23   A.   Priority, lack of tax pledge, indirect nature of their

24        claim against the City, the fact that they might not

25        be classified as a general unsecured claim with other

1                    KENNETH BUCKFIRE, VOLUME 2

2    Q.   Okay, so is that informing your opinion?

3    A.   I think everybody will race to wherever they can to

4         improve their position relative to all the other

5         creditors.

6    Q.   Even people who don't have a present claim against the

7         City?

8    A.   As we have seen already in this case.

9    Q.   So do you consider that a reasonable assumption in

10        reaching your opinions that people that don't have a

11        claim against the City will race to the courthouse?

12   A.   They will invent claims.

13   Q.   I'm sorry?

14   A.   They will invent claims.

15   Q.   I take it the answer to I my question is yes?

16   A.   Yes.

17   Q.   Have you studied to the extent to which settlements

18        that have been struck in the bankruptcy will still

19        apply even if the petition is dismissed?

20   A.   To my knowledge, the only settlement which might

21        survive is the swap termination settlement.

22   Q.   Do you know if any others will survive?

23   A.   No.

24   Q.   And are you still assuming that the swap

25        counterparties would be racing to the courthouse?

1                    KENNETH BUCKFIRE, VOLUME 2

2    Q.   Is the City going to be service delivery solvent upon

3         emergence from bankruptcy under the plan?

4    A.   I would say they would approach that standard within

5         the first year of emergence.

6    Q.   So you believe within a year of emergence the City of

7         Detroit will be providing the appropriate level of

8         municipal services?

9    A.   No, I said they will approach that level.

10   Q.   Okay.

11   A.   Okay?  You have --

12   Q.   Now, I'm not sure who's the lawyer.

13   A.   Well, no, it's a very complicated question -- it's a

14        complicated question --

15   Q.   Okay.

16   A.   -- because there are so many categories of service

17        delivery the City has to fix.

18   Q.   All right, let's take a step back.

19   A.   All right.

20   Q.   Let's break it down.  One of your opinions is that the

21        City is service delivery insolvent, correct?

22   A.   It was service delivery insolvent upon the filing of

23        the bankruptcy.

24   Q.   Filing of the bankruptcy, okay.  One of your opinions

25        is that the City was service delivery insolvent at the

```
 1              KENNETH BUCKFIRE, VOLUME 2
 2         time it filed, correct?
 3    A.   Correct.
 4    Q.   Now let's ask about today, is the City service
 5         delivery insolvent today?
 6    A.   Yes.
 7    Q.   Okay.  Do you believe the City will be service
 8         delivery insolvent as of the anticipated plan
 9         confirmation date of September 30?
10    A.   You know, it's a complicated question to answer and I
11         hesitate only because you have to look at it by
12         service delivery segment, safety services being the
13         most important, followed by public lighting, followed
14         by transportation services.  The City has made
15         dramatic strides in all those areas to improve service
16         delivery, I'd have to go back and check because I'm
17         not totally up to speed on where they stand on those
18         programs.  My understanding is that by the time the
19         City emerges they will have made very dramatic
20         improvements to public safety programs, so on those --
21         programs they may well be service solvent, I don't
22         have a similar opinion on DDOT, which is the
23         Department of Transportation, and I do know that the
24         program to relight the City is ongoing and is expected
25         to be completed next year, so on that element they're
```

```
 1                    KENNETH BUCKFIRE, VOLUME 2

 2    A.   You can thank him for me.

 3    Q.   I will.  I will.  He's always glad to see me.  So do

 4         you have an opinion as you sit here today of what

 5         areas where the City is service delivery insolvent or

 6         close to it at least in your view?  I know we can ask

 7         Mr. Moore but --

 8    A.   I'm not really not current on that.

 9    Q.   So you don't know?

10    A.   It's July, I haven't looked at this issue in a number

11         of months so I am not current.

12    Q.   So you haven't studied the question?

13    A.   That's correct.

14    Q.   Now, have you evaluated the likelihood that the City

15         might choose to sell its art collection in a dismissal

16         scenario?

17    A.   No.

18    Q.   And have you -- I take it then you haven't evaluated

19         the impact such a sale would have on creditor

20         recoveries, correct?

21    A.   We have not done a dismissal analysis.

22    Q.   Okay.  Have you considered the possibility that the

23         grand bargain might happen even if the petition were

24         dismissed?

25    A.   Well, my understanding is that one of the principal
```

1                KENNETH BUCKFIRE, VOLUME 2

2          elements of that grand bargain is that the pension

3          retirees who have rights to sue the City would

4          presumably then have those rights restored and they

5          may well pursue those rights, in which case the

6          state's funding would go away.

7     Q.   Yeah, there's no question that the grand bargain as

8          it's currently drafted, if the plan is blown up

9          somehow, it goes away?

10    A.   Correct.

11    Q.   Have you evaluated the extent to which it might be

12         reconstituted in a dismissal?

13    A.   That's speculation and I've already testified we

14         haven't done a dismissal analysis.

15    Q.   Now, do you understand that two of the motivating

16         concerns of the grand bargain were to safeguard the

17         art from any future attempts to get at it by creditors

18         and to lessen the misery of pensioners in connection

19         with the cuts?

20              MR. CULLEN:  Objection, foundation.  Whose

21         motivations?

22    BY MR. HACKNEY:

23    Q.   Well, the people that are parties to the grand

24         bargain?

25    A.   Their motivations are their motivations.  The City's

## EXHIBIT 2

**Mayor Duggan Deposition Transcript Excerpts**

MAYOR MICHAEL DUGGAN

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

In re ) Chapter 9

CITY OF DETROIT, MICHIGAN, ) Case No. 13-53846

                 Debtor. ) Hon. Steven W. Rhodes

_____

      The Videotaped Deposition of MAYOR MICHAEL DUGGAN,

Taken at 2 Woodward Avenue, Suite 500,

Detroit, Michigan,

Commencing at 10:00 a.m.,

Friday, August 1, 2014,

Before Rebecca L. Russo, CSR-2759, RMR, CRR.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt Doc 7119 Filed 08/27/14 Entered 08/27/14 19:13:50 Page 45 of 63

00000000-0000-0000-0000-000000000000

1   A.   I've dealt with taxes my whole life, so I understand

2        all of them.  Under the Michigan Constitution, city

3        government cannot impose any tax without a vote of the

4        people, and even then can only impose those taxes

5        authorized by the legislature.

6               And, as far as I know, the only tax we

7        potentially could levy at the city level which

8        requires a vote would be a property tax.

9   Q.   And have you looked into imposing a property tax?

10  A.   I have, but it doesn't make any sense.

11  Q.   Why doesn't it make any sense?

12  A.   Because we already have -- nearly half of the

13       residents of the City of Detroit are delinquent in

14       their taxes.  We've probably got 80,000 houses

15       somewhere, property somewhere in foreclosure, and one

16       mill produces for the general fund maybe $7 million.

17              So if we were to raise the property taxes,

18       if we accelerate foreclosures or increase the

19       likelihood people don't want to be here, for the $7

20       million it would be a drop in the bucket on the

21       revenue side and would more likely cost us.  But

22       property tax -- there is not enough generated off of

23       property taxes to make it sensible --

24  Q.   Okay.

25  A.   -- to approach the revenues that way.

# EXHIBIT 3

**Hill Deposition Transcript Excerpts**

1                    JOHN W. HILL

2           UNITED STATES BANKRUPTCY COURT

3         FOR THE EASTERN DISTRICT OF MICHIGAN

4                    -    -    -

5   In Re:                    ) Chapter 9

6

7   City of Detroit, Michigan,  )

8

9       Debtor.               ) Hon. Steven Rhodes

10   _____

11

12

13           The Videotaped deposition of JOHN W. HILL

14           Taken at 51 Louisiana Avenue, N.W.,

15           Washington, D.C.

16           Commencing at 9:03 a.m.

17           Friday, July 18, 2014

18           Before:  Gail L. Inghram Verbano

19           Registered Diplomate Reporter,

20           Certified Realtime Reporter,

21           Certified Shorthand Reporter-CA (No. 8635)

22

23

24

25

1                    JOHN W. HILL

2      A.   -- they "transferred."

3      Q.   Well, the City didn't get any money from

4  the Land Bank for the properties it transferred to

5  it, did it?

6      A.   As I said, it depends upon -- the City

7  did not get money for that, no.  The City did not

8  get money for the transfer.

9      Q.   Do you agree that with the State's

10  cooperation, the City can increase income tax

11  rates?

12           MR. STEWART:  Objection.

13           THE WITNESS:  I don't know that.

14  BY MR. SMITH:

15      Q.   You don't know whether if the State

16  agrees to increase income tax rates and passes

17  legislation whether the City can increase the

18  income tax rates?

19      A.   That's a different question than the one

20  that you first asked me.  I'll answer the second

21  question.

22           In order for the City to increase its

23  income tax rates, there has to be legislation in

24  order for the City to do that because we're

25  already at the limits.

## EXHIBIT 4

### Cline Deposition Transcript Excerpts

```
 1        IN THE UNITED STATES BANKRUPTCY COURT

 2         FOR THE EASTERN DISTRICT OF MICHIGAN

 3

 4

 5

 6       In Re:              ) Chapter 9

 7   CITY of DETROIT, MICHIGAN, ) Case No. 13-53846

 8          Debtor.          ) Hon. Steven Rhodes

 9         _____

10

11

12    The Videotaped Deposition of ROBERT CLINE,

13              Taken at Jones Day

14            51 Louisiana Avenue, NW

15                Washington, DC

16           Commencing at 9:05 a.m.

17             Monday July 14, 2014,

18         Before Marjorie Peters, RMR, CRR

19

20

21

22

23

24

25
```

1                        R. CLINE

2       question, please.

3  (The record was read back by the reporter.)

4              THE WITNESS:  We accepted the current law

5       tax rates as what was available to Detroit.  To the

6       extent that Detroit is at the maximum, and I

7       believe it may be the case for all of those tax

8       rates, it would imply that under current law, that

9       option is not available.

10 BY MR. SMITH:

11      Q.    But current law can change, correct?

12      A.    Correct.

13      Q.    And you would agree with me that if current

14 law changes, Detroit can increase tax revenue

15 significantly by increasing tax rates, correct?

16              MR. STEWART:  Objection.

17              THE WITNESS:  It is true that an increased

18       rate, with no offsetting decrease in the base,

19       could increase revenue, but if you were going to

20       forecast the increase of a tax rate in Detroit, you

21       would also have to forecast the potential decrease

22       in the tax base with mobile people and investment.

23 BY MR. SMITH:

24      Q.    And so, sitting here today, you haven't done

25 the work that would allow you to testify that increasing

# EXHIBIT 5

**Meyer Deposition Transcript Excerpts**

```
 1              UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION
    ---------------------------------------X
 3  In re:

 4  CITY OF DETROIT, MICHIGAN,

 5              Debtor.            Chapter 9

 6                                 Case No. 13-53846

 7
    ---------------------------------------X
 8

 9         VIDEOTAPED DEPOSITION OF GLENN MEYERS,

10  taken by Respective Parties, pursuant to Notice, at

11  the offices of Jones Day, 222 East 41 Street, New

12  York, New York, on Friday, August 1, 2014,

13  commencing at 8:59 a.m., before Chandra D. Brown, a

14  Registered Professional Reporter and Notary Public

15  within and for the State of New York.

16

17

18                       o0o

19

20

21

22

23

24

25  JOB NO.:  215748
```

1  property taxes, a 10-year increase as

2  postulated here, would reduce property values

3  by an amount commensurate in Year 1, which is

4  essentially a forward looking projection of

5  what the liability is, diminishing on a pro

6  rata basis year after year until you reach Year

7  11 in which there is no effect on value

8  whatsoever.

9      So I incorporate that assumption here for

10 the sake of what you might call theoretical

11 completeness.  I am by no means sure that that

12 would actually take place, but I felt it

13 appropriate to do so.

14 Q    So just to -- I'm not sure -- I -- just

15 like you say, you don't act like a lawyer

16 because you're not one.  I know nothing about

17 economics, so I apologize for my ignorance on

18 this.

19      Just to see if I understood you, so if

20 there is a billion -- I'm just going to choose

21 a billion, it could be any number.  If there is

22 a billion dollar increase in property taxes

23 over 10 years, you would assume that would

24 reduce property values by a billion dollars?

25      MR. SMITH:  Objection.  Form.

1  A    Well, let me try to lay it out a bit more

2  carefully, and not to suggest that you're doing

3  anything wrong in your representation of it.

4  **Q    I probably am.**

5  A    To make it as clear as I can, let's assume

6  hypothetically that I have a 50,000-dollar

7  house, right?  And I am now paying on that

8  house property tax such that when all is said

9  and done amounts to $500 general fund related.

10  And now let's assume that that rate goes up to

11  a hundred -- by $100 a year to 600, right?  And

12  that there is now the obligation to pay the

13  City/County, another hundred dollars a year as

14  a consequence of that, and that obligation will

15  persist for 10 years, and now let's -- so you

16  add it all up and in Year 1, on a forward

17  looking basis or encumbrance, if you wish to

18  look at it that way, of a thousand dollars on

19  the house, I, as a buyer of that house would,

20  at least in theory, take it into consideration

21  and lower my bid commensurately.  That's the

22  logic.

23  **Q    Okay.  I understand.  And that's how an**

24  **economist would look at it.**

25       **Not just logical, but it is an approach an**

# EXHIBIT 6

**Moore Deposition Transcript Excerpts**

1              CHARLES MOORE, CPA

2        IN THE UNITED STATES BANKRUPTCY COURT

3         FOR THE EASTERN DISTRICT OF MICHIGAN

4

5   In re:                    Chapter 9

6   CITY OF DETROIT, MICHIGAN   Case No. 13-53846

7              Debtor.      Hon. Steven W. Rhodes

8   _____/

9

10  The Videotaped Deposition of CHARLES MOORE, CPA

11  Taken at 1114 Washington Boulevard,

12  Detroit, Michigan,

13  Commencing at 9:01 a.m.,

14  Wednesday, July 23, 2014,

15  Before Quentina Rochelle Snowden, CSR-5519.

16

17

18

19

20

21

22

23

24

25

1                        CHARLES MOORE, CPA

2           operating and what is necessary to get them to that

3           point, regardless of in or out of Chapter 9.  So

4           while I have been involved in the Chapter 9 process,

5           the focus of our work is without regard to Chapter

6           9.

7     Q     So if the plan -- and let me see if -- I think I

8           understood what you just said, but let me make sure,

9           and you tell me if I'm wrong here.  If the plan of

10          adjustment in this matter were dismissed, is it your

11          position that those reinvestment expenses, those

12          reinvestment initiatives, the ones that are set

13          forth in the plan of adjustment, as well as the ones

14          that you opine on in your expert report, could go

15          forward?

16                        MR. HAMILTON:  Object to form.  You

17          can answer.

18                        THE WITNESS:  They -- they should

19          still go forward.

20    BY MR. SOTO:

21    Q     Forgive me, I'm just taking some time to get rid of

22          some questions here that I think you've already

23          answered.

24    A     No problem.  Take your time.  As many as you want to

25          get rid of that's fine with me.

```
 1                    CHARLES MOORE, CPA

 2    Q   Actually I better -- I'm not sure I understand.  Let

 3        me see -- this thing is not work -- you know it was

 4        working.

 5                    What I'm trying to assess is, you've

 6        spoken in your report and today very articulately

 7        about a number of initiatives these are initiatives

 8        that vary, but, I'm asking you if you can think of

 9        any reason why those initiatives would not -- could

10        not be implemented outside of a Chapter 9?

11    A   Are you talking about historically or going forward?

12    Q   Well, I was thinking about going forward.

13        Historically probably would be just as well.  In

14        other words, because both would be outside of a

15        Chapter 9, so that's what I'm -- that's what I'm

16        asking.  Outside of a Chapter 9 process, can you

17        think of any reason why they would -- just could not

18        be implemented?

19    A   Well, you have to have the money to implement these.

20        Obviously the core element here when you take into

21        account the gross investment of 1.7 billion and then

22        the 482 in revenue, the 358 in cost savings, you

23        still wind up with a net investment of just under

24        $900 million.  877 million.

25                    So if you don't have the financial
```

                        CHARLES MOORE, CPA

1

2                        Chapter 9 aside, we've got -- the City

3          has an emergency manager in place right now.  That

4          allows for certain things to happen sometimes in a

5          more expedited manner.  So there are other factors

6          that would have to be looked at that would influence

7          the -- how things were carried out.

8    Q     I'm going to ask you to make some assumptions, and

9          we can talk about the assumptions at length if you'd

10         like.

11                       But first, I'll ask you to make an

12         assumption.  Make an assumption that the Chapter 9

13         proceeding either is dismissed or doesn't exist any

14         longer, okay?

15   A     Okay.

16   Q     Make an assumption that you've done all of the

17         initial research that you've testified at length

18         today and it's a lot of work, and that you lay out

19         in your -- your opinion.  You've done that, that's

20         the second assumption, okay?  Make an assumption

21         that you come up with the same conclusions about the

22         necessary changes that need to be implemented, the

23         necessary service levels that need to be met, the

24         necessary expenditures that have to be made in order

25         to meet those service levels.  That's the third

```
 1                    CHARLES MOORE, CPA

 2          assumption, okay?

 3     A    Yes.

 4     Q    Is there any reason you can think of, assuming you

 5          had the funds to do it, why those initiatives

 6          couldn't be implemented outside of a Chapter 9

 7          proceeding?

 8     A    Offhand, the only items that I can think of, that

 9          could potentially be impacted are savings from some

10          lease renegotiation, or rejection, that is in here.

11          There certainly are savings from those items.

12          Outside of lease renegotiation, or rejection, I'm

13          not aware of anything else that, again, provided you

14          have the financial resources, and the management

15          ability to carry these things out, why these

16          wouldn't be able to be carried out outside of a

17          Chapter 9.

18     Q    Now let's go to one of those that you mentioned,

19          because I'd love to have -- I'd love to hear your

20          opinion.

21                    So we know that even if the Chapter 9

22          is implemented, whether it's dismissed or whether

23          it's implemented, the City of Detroit has a mayor

24          that's been elected, correct?

25     A    Yes.
```

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

In re                                     )
                                          )
                                          )     Chapter 9
                                          )
CITY OF DETROIT, MICHIGAN                 )     Case No.: 13-53846
                                          )
                              Debtor.     )     Hon.  Steven W. Rhodes
                                          )
                                          )
_____ )

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2014, I electronically filed the *Opposition Of The City Of Detroit To Motions Of Syncora And FGIC To Exclude Testimony Of Kenneth Buckfire* with the Clerk of the Court, which sends notice by operation of the Court's electronic filing service to all ECF participants registered to receive notice in this case.


Dated: August 27, 2014                    /s/ Heather Lennox
                                          Heather Lennox


NYI-4608155v1