## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) |
|  | ) |
| CITY OF DETROIT, MICHIGAN | ) |
|  | ) |
| Debtor. | ) |

Chapter 9

Case No.: 13-53846

Hon. Steven W. Rhodes

## CITY OF DETROIT'S OPPOSITION TO FGIC'S MOTION TO EXCLUDE THE EXPERT OPINION OF MICHAEL PLUMMER REGARDING DISCOUNT FACTORS

The City of Detroit, Michigan (the "City") opposes the Motion to Exclude The Expert Opinion Of Michael Plummer Regarding Discount Factors (the "Motion") (Doc. # 6983) filed by Financial Guarantee Insurance Company ("FGIC"). In support of its Opposition, the City states as follows:

### INTRODUCTION

1. The collection at the Detroit Institute of Arts ("DIA") comprises over 60,000 works, covers every major sector of the art market from antiquity to the present era, and includes numerous recognized masterworks. The DIA and the City retained Michael Plummer to form an opinion on the "indicative value of the works in the DIA Collection" and the "feasibility and likely effects on the market and value realization of a sale of the DIA collection under a variety of market and

sale conditions." Artvest Rep. ¶ 2 (Ex. A).  Mr. Plummer is well-qualified to opine on these issues: he has "extensive experience in the field of analyzing art market economics, valuations, patterns and behavior" over the past 35 years.  *Id.* ¶ 10.

2.     Mr. Plummer computed an undiscounted gross "indicative value" for the DIA collection, but emphasized that—due to the unprecedented complexities, sheer size, and market forces inherent in any sale of the 60,000 works—such a computation does not yield the "real, net liquid value of the DIA collection should it be required to be sold."  *Id.* ¶ 34.  He therefore constructed a model on real-world realization of revenues from a sale of the DIA collection.  *See id.* ¶ 2.

3.     As part of his model, Mr. Plummer analyzed "the discount factors" that would affect "various sale scenarios" and cause the steep decrease from the gross indicative value to the "real, net liquid value" that could actually be realized from a sale of the entire collection.  *Id.* ¶¶ 34, 39.  These factors include the price-depressing effects of an "immediate liquidation," unsold works, the potential unwillingness of Christie's and Sotheby's to participate in such a sale due to business or reputational concerns, limits on market capacity for high-end works of art, and possible litigation delays or market controversy.  *See id.* ¶¶ 41–51.

4.     No other expert in the case has even *attempted* to undertake a discount-factor analysis, even though other witnesses, including Syncora's putative expert Elizabeth von Habsburg, have agreed that such an analysis is appropriate.

In fact, those witnesses have validated Mr. Plummer's discount-factor analysis and confirmed that his identification and application of the discount factors is reliable.

5.     FGIC does not challenge Mr. Plummer's gross, undiscounted valuation of the DIA collection, but instead seeks to exclude only his discount-factor analysis. *See* Mot. ¶ 1. The reason FGIC seeks to exclude this analysis is plain: FGIC's putative expert, Victor Wiener, performed an inflated (and unreliable) valuation of the DIA collection and *failed* to conduct a discount-factor analysis. As a result, Mr. Wiener's valuation is *more than nine and a half times larger* than the lowest "real, net liquid value" Mr. Plummer calculates. FGIC thus seeks to cover up the gaping hole in Mr. Wiener's opinion and to make his conclusion appear like less of an outlier by asking the Court to open up a similar hole in Mr. Plummer's analysis and to limit his testimony to a gross value that he does not believe represents the actual saleable value of the DIA collection.

6.     FGIC, however, misstates the law, gives short shrift to Mr. Plummer's vast experience, and fails to mention that his discount-factor analysis rests on his experience, professionally accepted standards and practices, data regarding prior art collection sales, and industry and legal precedents. The Court should deny the Motion and admit Mr. Plummer's appropriate and reliable discount-factor analysis.

## BACKGROUND

7.     Mr. Plummer is an art market and valuation consultant, whose focus

over much of the past 35 years has been working with and advising major auction houses, private collectors, corporations, and art professionals on the purchase and sale of fine art and investment in fine art.  *See* Artvest Rep. ¶ 12.

8.     Mr. Plummer co-founded and currently serves as Chief Executive Officer of Artvest Partners LLC, a consulting firm specializing in fine art transactions and investments, including the valuation of artwork and analysis of the micro and macro art markets.  Plummer Dep. 74:24–75:4 (Ex. B).  Mr. Plummer regularly advises clients on the proper venues for art sales and acts as a broker for art loans, matching the right lending institution to a borrower's needs and qualifications.  *Id.* at 75:5–9, 81:25–83:6. Artvest also maintains relationships with art dealers and communicates with them regularly to obtain additional information about the state of the art market.  *Id.* at 85:2–7.

9.     In addition to client advisory work, Mr. Plummer and Artvest also publish widely-followed art market analyses, *see id.* at 77:19–80:23, and Mr. Plummer regularly lectures and serves on panels, including for graduate degree programs at New York University, the Appraisers Association of America, Sotheby's Institute, and Christie's Education, *see* Artvest Rep. ¶ 18.

10.     Mr. Plummer previously was employed as the head of Christie's Financial Services ("CFS").  Plummer Dep. 51:24–52:7.  Christie's established CFS for two principal purposes: to form sector-specific art "funds," which would

invest in portfolios of fine artwork, and to establish a fine art lending business. *Id.* at 51:4–14, 52:10–24, 61:14–66:18. While at CFS, Mr. Plummer initiated and oversaw several such loans in amounts exceeding $100 million, *see id.* at 67:6–18, and valued the art collateral as part of the lending process, *id.* at 52:25–56:23. He also helped to prepare Christie's art loan underwriting manual. *Id.* at 52:13–19.

11. Before joining CFS, Mr. Plummer led two other companies serving the art industry: Fernwood Art Investments, which issued sector-specific reports on fine art market performance, *id.* at 38:2–39:2, and ArtBase, an on-line fine art trading platform, *id.* at 32:14–19. Mr. Plummer also spent 16 years at Sotheby's, where he held such positions as Marketing Division Head for the Americas and Asia, and Business Manager for the Asian Art Division, and account manager in the treasury department (1980-84). *See id.* at 15:23–16:2, 17:7–10, 23:10–24:3.

12. DIA and the City retained Mr. Plummer to opine on the real-world value that the City could expect to realize from a sale of the DIA collection. *See* Artvest Rep. ¶ 1. To accomplish that task, Mr. Plummer and his team first calculated, based on the Christie's Report commissioned by the City and other data, the gross "indicative value of the works in the DIA collection." *Id.* ¶ 2(a). Mr. Plummer and his team followed a "market data approach," which measures the range of values each value could expect to realize without regard to factors affecting the sale process. *Id.* ¶¶ 31(a)–(b). Mr. Plummer concluded that the gross

indicative value of the DIA collection was between $2,760,978,432 and $4,607,953,704, with a mid-range estimate of $3,684,466,069. *Id.* ¶ 32, Table 2.

13.     Because gross indicative value is not the "real, net liquid value of the DIA collection should it be required to be sold," *id.* ¶ 34, Mr. Plummer also analyzed the "feasibility and likely effects on the market and value realization of a sale of the DIA collection under a variety of market and sale conditions," *id.* ¶ 2(b). To conduct that analysis, Mr. Plummer identified and estimated the impact of nine real-world "discount factors" that bear on the "real, net liquid value" that DIA would actually realize in "various sale scenarios." *Id.* ¶¶ 34, 39.

14.     First, Mr. Plummer examined an "immediate liquidation" or "immediate sale" discount, which would "result in selling the DIA collection" quickly and "at a fraction of its fair market value." *Id.* ¶ 41. Based on "the standard number used in art loan valuation" and prior industry precedent, Mr. Plummer concluded that this factor could be estimated at 50%. *Id.* ¶ 42(b).

15.     Second, Mr. Plummer considered the related concept of a "blockage discount," which "results from selling a large group of similar items in a short time." *Id.* ¶ 43. A blockage discount is an "alternative" that "would not be applied in addition to an Immediate Sale discount, but generally supports the application of an Immediate Sale discount." *Id.*

16.     Third, Mr. Plummer analyzed the effect of "auction unsold rates, an

economic reality of the auction business" reflected in the "customary business practice to devalue a work" after it has remained unsold for some time.  *Id.* ¶ 44(d).

17.    Fourth, Mr. Plummer examined the possibility that Sotheby's and Christie's "might refuse to sell" the DIA collection "due to controversy surrounding a disposition and potential damage to their brand and relationships with the broader museum community."  *Id.* ¶ 46.  Comparing sales data from Christie's and Sotheby's against data from "second tier" auction houses, Mr. Plummer concluded that selling through a second tier auction house would decrease the City's actual return by 20% to 40%.  *Id.* ¶ 46(c).

18.    Fifth, Mr. Plummer evaluated the "capacity limitations" in the market for valuable art and concluded that selling "a large block of property into a market that exceeds its liquidity or capacity is a high risk strategy" such that "a longer term selling plan is deemed desirable in the art market."  *Id.* ¶¶ 47–48.

19.    Sixth, Mr. Plummer assessed the effect of a longer-term sale on the realized value of the collection, and determined that "maximizing art asset value" from the DIA collection "requires selling over a minimum of five to eight years, which would require a present value discount."  *Id.* ¶ 49.

20.    Seventh, Mr. Plummer examined the "potential impact of litigation" and—citing prior examples of museum liquidations and the Michigan Attorney General's public statement that he would challenge any effort to liquidate the DIA

collection—concluded that the City "is likely to face formidable legal obstacles and prolonged litigation" surrounding any sale of the collection. *Id.* ¶ 50.

21.     Eighth, Mr. Plummer considered the "combination of a weak market sector" and potential "controversy surrounding a museum divestiture," which had depressed realized values of art sales in the recent past. *Id.* ¶ 51.

22.     Finally, referencing the two market crashes in the Post-War and Contemporary (PWC) Sector in the last 34 years, Mr. Plummer evaluated the potential impact of another PWC "market sector crash," which sector accounts for as much as $586 million of the DIA collection's gross indicative value. *Id.* ¶ 54.

23.     Utilizing the discount factors, Mr. Plummer then computed, on a present-value basis, high and low potential aggregate realizations for various sale scenarios. *Id.* ¶¶ 55–57. Mr. Plummer concluded that the City would realize between $1,145,358,000 and $1,842,233,000 at his mid-range estimate, and between $850,035,000 and $1,380,489,000 at his low-range estimate, of the gross indicative value. *See id.* Tables 6-7.

24.     Syncora's putative expert, Ms. von Habsburg, testified at her deposition that the Uniform Standards of Professional Appraisal Practice ("USPAP") and IRS regulations identify circumstances where an appraiser must apply a blockage discount in valuing an art collection. von Habsburg Dep. 107 (Ex. C). Ms. von Habsburg confirmed that it would be "appropriate to look into" a

blockage discount for an appraisal of a 60,000-work collection. *Id.* at 109. She also confirmed that several "factors" would be relevant to evaluating the actual realized value from an immediate sale of a collection. *Id.*

25. The City's other expert, Vanessa Fusco of Christie's, testified that Christie's would "generally . . . apply a discount" to determine the actual value to be realized from putting an entire collection "on the market . . . all at once." Fusco Dep. 188–89 (Ex. D). Paul Provost, deputy chairman at Christie's, confirmed at his deposition that the 50% discount for loan-to-value in art-based lending used by Mr. Plummer is, in fact, "industry standard." Provost Dep. 89 (Ex. E).

26. By contrast, FGIC's expert appraiser, Mr. Wiener, used a mishmash approach to value the entire DIA collection in less than two weeks. *See* Wiener Rep. 3, 45–47 (Ex. F). In his corrected report that addressed certain acknowledged "errors" in his analysis, Mr. Wiener valued the DIA collection at $8,149,232,354. *See id.* at 3. That valuation is *more than $3.5 billion or about 77% more* than Mr. Plummer's highest undiscounted gross indicative value figure, nearly four and a half times the value of Mr. Plummer's highest "real, net liquid value" computation, and *more than nine and a half times* the value of Mr. Plummer's lowest "real, net value" computation. *Compare id. with* Artvest Rep. ¶¶ 55–57. Mr. Wiener did not attempt to calculate the amount of money that a DIA liquidation would actually yield. *See* Wiener Rep. 3, 45–47.

# ARGUMENT

27.    The Court should deny FGIC's motion to exclude Mr. Plummer's expert discount-factor analysis for two reasons. *First*, Mr. Plummer's experience in the field over the past 35 years more than qualifies him to render this opinion. *Second*, Mr. Plummer's discount-factor method reflects his vast experience, industry standards, and available data and, thus, is reliable and admissible.

## I.    Mr. Plummer Is Qualified To Opine On His Discount-Factor Analysis

28.    Federal Rule of Evidence 702 permits opinion testimony from any witness "who is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. This standard is not onerous, *see Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 294 (6th Cir. 2007), reflecting that expert testimony is appropriate whenever its subject "is unlikely to be within the knowledge of an average layman," *United States v. Carson*, 702 F.2d 351, 369 (2d Cir. 1983). Moreover, "[t]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." *United States v. Cunningham*, 679 F.3d 355, 378–79 (6th Cir. 2012). "Whether a proposed expert's experience is sufficient to qualify the expert to offer an opinion on a particular subject depends on the nature and extent of that experience." *Id.* at 378–79.

29.    Here, the nature and extent of Mr. Plummer's vast experience easily qualify him to conduct and opine on his discount-factor analysis. Mr. Plummer has

"extensive experience" at every step of "art market economics, valuations, patterns and behavior."  Artvest Rep. ¶ 10.  He is knowledgeable about the process and standards by which individual pieces of art are valued in the real world, and helps Artvest "set value for [clients] in buying and selling art" both through auctions and through private purchases and sales.  Plummer Dep. 72:6–20.  He also has helped set values for artwork in the context of brokering loans, both at Christie's where he established and ran its art lending business, and now on behalf of his clients.  *Id.* 52:13–56:23, 72:6–20.

30.   Moreover, Mr. Plummer has specific experience in valuing large art collections.  During his tenure as an executive at Sotheby's, Mr. Plummer worked "closely with the [appraisal] experts and their valuations" to prepare "overarching evaluations" of collections of works.  *Id.* at 24:13–25:4.

31.   Most importantly, Mr. Plummer has gained a deep understanding of the art market as part of his consulting, advising, and lending work at Artvest and prior employers.   Plummer Dep. 42:15–21.   Mr. Plummer has also published Artvest Market Analyses and "lectured and been on panels for continuing education courses and graduate degree programs" at NYU, The Appraisers Association, Sotheby's and Christie's "on the subjects of art market performance, trends, economic factors, investment practices and structures, as well as liquidity and valuation in an opaque market."  Artvest Rep. ¶ 18.

32.     This extensive experience is more than enough to qualify Mr. Plummer to perform and opine on his discount-factor analysis.  *See Cunningham*, 679 F.3d at 378–79; *see also Surles*, 474 F.3d at 293–94 (expert qualified to opine on "threat assessment" based on experience working in threat management unit of LAPD); *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 332-33 (6th Cir. 2001) (expert with 50-year career in banking was qualified because his career had "exposed him" to all aspects of banking); *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) (noting that a beekeeper may be qualified to testify as an expert on bee flight patterns based on experience of observing bees in flight).

33.     FGIC does not so much as mention Mr. Plummer's extensive experience.  Instead, FGIC suggests that Mr. Plummer is unqualified because he has "no education, certification, training, or experience" in personally "conducting appraisals" of works of art.  Mot. ¶ 26.  Moreover, FGIC faults Mr. Plummer for not having "obtain[ed] any degrees or certifications relating to art or art lending," written articles or books on "valuations or the art lending business," or had "an art fund come to fruition."  *Id.* ¶¶ 26, 28.  FGIC thus makes no mention of the fact that Mr. Plummer helped author Christie's art loan underwriting *manual*, which Christie's used for real-world art loans.  *See* Plummer Dep. 59:19–60:14.

34.     In all events, FGIC misses the point entirely because FGIC has not challenged any opinion of Mr. Plummer regarding appraisals or "art lending."

Mot. ¶ 26. To the contrary, FGIC seeks exclusion of Mr. Plummer's opinions on the discount-factor analysis, which arises well within the purview of his extensive experience with "art market economics, valuation, patterns and behavior." Artvest Rep. ¶ 10. Moreover, FGIC's premise that appraisal experience is somehow superior to the vast experience Mr. Plummer possesses is faulty: while an appraiser may be able to calculate the fair market value of an individual piece, an appraiser often is *unable* to determine the actual value realized from a multi-work sale under real world conditions—as Mr. Wiener, FGIC's putative expert appraiser, was unable to do. *See* Wiener Rep. ¶¶ 3, 45–47.

35.     In all events, even if FGIC's attack on Mr. Plummer's qualifications were even remotely relevant to the testimony FGIC seeks to exclude, no formal training, certification, or publication is required to qualify as an expert witness. *See, e.g.*, *United States v. Winkle*, 477 F.3d 407, 415–16 (6th Cir. 2007); *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000); *United States v. Stapleton*, 2013 U.S. Dist. LEXIS 160442, at *7 (E.D. Ky. Nov. 8, 2013) ("[f]ormal training is not necessarily required" and "[r]epeated firsthand observations may provide a witness the specialized knowledge and experience he needs to testify as an expert"). Mr. Plummer's extensive experience—including his publications on the *relevant* issue of market analysis—are more than sufficient to qualify him as an expert on discount-factor analysis. The Court should deny the

Motion and admit his testimony.  *See, e.g.*, Artvest Rep. ¶¶ 16–18; *Cunningham*, 679 F.3d at 378–79; *Surles*, 474 F.3d at 293–94; *Barreto*, 268 F.3d at 333.

## II.    Mr. Plummer's Discount-Factor Analysis Is Reliable

36.    The Court's gatekeeping function requires it to ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  This inquiry is "'tied to the facts of a particular case'" and turns on "the nature of the issue, the expert's particular expertise, and the subject of his testimony."  *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 430 (6th Cir. 2007).  "The Court's focus is trained solely on the principles and methodology, not on the conclusions that they generate."  *United States v. Stafford*, 721 F.3d 380, 394 (6th Cir. 2013) (citation omitted).

37.    Opinions resting on the expert's "practical experiences . . . do not easily lend themselves to scholarly review or to traditional scientific evaluation." *Barreto*, 268 F.3d at 335.  Such non-scientific opinions still may be reliable even in the absence of studies, testability, peer review, general acceptance, or other factors *Daubert* identifies as potentially relevant to the reliability of scientific expert testimony.  *Barreto*, 268 F.3d at 335; *see also Kumho Tire*, 526 U.S. at 150 (*Daubert* factors "may or may not be pertinent in assessing reliability" in a case).

38.     *Daubert*'s gatekeeper doctrine, moreover, was "designed to protect juries" and is relaxed "in the context of a bench trial." *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004).  Accordingly, the Court's discretion in the admission or exclusion of expert evidence "is particularly broad in a bench trial." *United States v. Demjanjuk*, 367 F.3d 623, 633 (6th Cir. 2004); *see United States v. Kalymon*, 541 F.3d 624, 636 (6th Cir. 2008) (flexibility to admit or exclude expert testimony "is at its zenith during a bench trial").

39.     Mr. Plummer's careful discount-factor analysis easily satisfies these standards for admissibility.  Indeed, Syncora's putative expert, Ms. von Habsburg, has confirmed that  it would be "appropriate to look into" a blockage discount for an appraisal of a 60,000-work collection and that that several "factors" would be relevant to evaluating the actual realized value from an immediate sale of a collection.   von Habsburg Dep. 107.   The City's other expert, Ms. Fusco of Christie's, likewise confirmed that Christie's would "generally . . . apply a discount" to determine the actual value to be realized from putting an entire collection "on the market . . . all at once."  Fusco Dep. 188–89.

40.     Mr. Plummer is the *only* witness in this case who has applied such an "appropriate" discount-factor analysis.  von Habsburg Dep. 107.  FGIC, moreover, does not independently challenge Mr. Plummer's application of the market capacity, market disfavor, or PWC market crash factors.  *See* Mot. ¶¶ 12–24.  And,

as explained below, Mr. Plummer's analysis of each of the six discount factors FGIC challenges is reliable. The Court should deny the Motion.

### A. Mr. Plummer's Immediate Liquidation And "Blockage" Discounts Are Reliable

41.    Because "[a]n immediate liquidation of the art collection will result in selling" it "at a fraction of its fair market value," Mr. Plummer sought to calculate an immediate liquidation discount. Artvest Rep. ¶ 41. Mr. Plummer also considered the related concept of a blockage discount, which "results from selling a large group of similar items in a short time." *Id.* ¶ 43.

42.    To support his analysis, Mr. Plummer noted that the "standard" immediate liquidation discount used in "art loan valuation"—or, in other words, the rate lenders in real-world commercial transactions use to compute their expected actual realized value from an immediate foreclosure sale of art pledged as collateral—is 50%. *Id.* ¶ 42(b). Mr. Provost independently verified this 50% standard discount. *See* Provost Dep. 89. Mr. Plummer also recounted the experience of the Pierre Matisse Gallery, whose entire inventory was sold by the Matisse estate to Willaim Acquavella and Sotheby's in one transaction "at a discount to its ultimate market value of 45%." *Id.* ¶¶ 41(a)–(d). Mr. Plummer thus used a 50% discount factor to compute the net actual value that the City could realize from an immediate sale of the DIA collection. *See* Artvest Rep. ¶¶ 42, 55– 57. Mr. Plummer's reliance on his experience, the industry standard, and the data

from the Pierre Matisse Gallery renders his use of the immediate liquidation and blockage discounts reliable. *See Barreto*, 268 F.3d at 335; *Daubert*, 509 U.S. at 593–94 (referring to "general acceptance").

43.     FGIC *concedes* that prior cases have applied blockage discounts to determine the actual value of an art collection. *See, e.g.*, Mot. ¶ 15 n.6 (citing *Oleg Cassini, Inc. v. Electrolux Home Prods., Inc.*, No. 11 CIV 1237, 2014 WL 1468118, at \*3 (S.D.N.Y. Apr. 15, 2015). FGIC, however, contends that courts have limited such a discount to "20 percent." *Id.* FGIC simply misstates the law and overlooks cases that have applied much higher blockage discounts. *See, e.g.*, *Janis v. Comm'r*, 469 F.3d 256, 263 (2d Cir. 2006) (discussing the application of discounts between 37%-60% to the fair market valuation of artworks).

44.     FGIC thus falls back on challenging Mr. Plummer's use of the 50% discount, but it misrepresents Mr. Plummer's report and the facts. *First*, FGIC states that Mr. Plummer "assumes that a sale of the DIA collection *would involve* an immediate sale of the entire collection." Mot. ¶ 12 (emphasis added). To the contrary, Mr. Plummer considered, as *one* scenario, the effect on the City's return *if* the entire DIA collection was immediately liquidated. *See* Artvest Rep. ¶¶ 55–57. Mr. Plummer applied the immediate liquidation factor *only* to that scenario, and not to other scenarios involving a longer-term sale of the collection. *See id.*

45.     *Second*, FGIC asserts that Mr. Plummer "provides no reliable basis to

support his use of a 50 percent discount rate" because he "had no studies to support his figure," "could not identify any private or publicly available data" for it, and "[a]t best" identified only the 25% to 46% IRS blockage discount. Mot. ¶¶ 12–14. FGIC thus wholly ignores Mr. Plummer's invocation of the 50% immediate liquidation discount standard "used in art loan valuation." Artvest Rep. ¶ 42. Moreover, FGIC mischaracterizes Mr. Plummer's deposition testimony, which concerned whether he had any "other" studies or "anything else" not disclosed in his report to support the 50% immediate liquidation discount. *See* Plummer Dep. 246:10–14; 252:25253:9; 252:17–20; 255:4–16; 256:4–9 (quoted at Mot. ¶¶ 12–13). And, in all events, such "other studies" and testable data have no bearing on the admissibility of Mr. Plummer's non-scientific opinion borne of "practical experience." *Barreto*, 268 F.3d at 335; *see also Kumho Tire*, 526 U.S. at 150.

46. *Third*, to the extent that FGIC does address the 50% industry standard, it states that Mr. Plummer somehow "did not explain . . . how such art loan valuations are analogous to liquidation or blockage discounts." Mot. ¶ 15. Yet Mr. Plummer explained in the very deposition excerpt that FGIC cites that the 50% discount in art loan validation *is* an immediate liquidation discount, *see* Plummer Dep. 248:4–14 (quoted at Mot. ¶ 15); *see also* Artvest Rep. ¶ 42, as Mr. Provost also confirmed, *see* Provost Dep. 88–89.

47. *Finally*, FGIC mischaracterizes the facts when it attempts to

distinguish the 45% discount on the sale of the Pierre Matisse Gallery collection. FGIC incorrectly states that the Matisse collection "was an art loan, not a liquidation," Mot. ¶ 15, when, in fact, Mr. Aquavella and Sotheby's "acquir[ed] the entire inventory" of the Gallery in one transaction, Artvest Rep. ¶ 41. The 45% discount there is thus highly relevant here, and strongly supports Mr. Plummer's adherence to the 50% standard. *See id.*

### B. Mr. Plummer's Unsold Rates Discount Is Reliable

48. Mr. Plummer explained that "unsold rates" are "an economic reality of the auction business." Artvest Rep. ¶ 44(a). Mr. Plummer noted that such rates "vary by category, but tend on average to be in the range of 20% or more." *Id.* For example, in 2013, one of the highest unsold rates at Christie's and Sotheby's was 19th Century European Paintings at 42%. *See id.*

49. Mr. Plummer used the 2013 Christie's and Sotheby's data to determine the unsold rates for the "top four sectors of the DIA collection," which account for 82.8% of the total value of the collection. *Id.* ¶ 44(b). Those rates ranged from 20% to 34%. *See id.* ¶ 44(c) & Table 4. Mr. Plummer then applied a 25% unsold rate to the balance of the collection. *See id.* The total or average unsold rate he applied to the DIA collection was 26%. *See id.*

50. FGIC's claim that Mr. Plummer applied this 26% discount rate "without further explanation," Mot. ¶ 18, is therefore simply baffling because Mr.

Plummer explained the steps and data he utilized to arrive at that figure, *see* Artvest Rep. ¶ 44 & Table 4. And Mr. Plummer was not tethered to the "customary business practice" of using a 20% unsold rate, Mot. ¶ 18, because more specific data was available to him, Artvest Rep. ¶ 44 & Table 4.

### C. Mr. Plummer's Christie's and Sotheby's-Related Discount Is Reliable

51. Mr. Plummer explained that, as the world's two leading auction houses for fine art, Christie's and Sotheby's are "the two optimal selling venues for maximizing the value" of the DIA collection. *See* Artvest Rep. ¶¶ 45–46. This reflects the fact that Christie's and Sotheby's guarantee the art they sell and facilitate access to the wealthiest art buyers. *See id.* ¶¶ 29, 45.

52. Mr. Plummer cited news reports documenting intense public criticism of Christie's for its agreement simply to value the DIA collection in this case. *See id.* ¶ 46. To wit, at his deposition Mr. Provost confirmed that Christie's "was certainly feeling some of the negative press that was out there" regarding its valuation of the DIA collection. Provost Dep. 141. Mr. Plummer also pointed out that Sotheby's holding company was based in Detroit until 2006. *See* Artvest Rep. ¶ 46. Based on these facts, Mr. Plummer reasoned that Christie's and Sotheby's "might refuse to sell" the DIA collection "due to the controversy surrounding a disposition and potential damage to their brand and relationships with the broader Museum community," with whom they have regular business dealings. *Id.*

53.     In order to quantify the impact from such a scenario, Mr. Plummer "referred back" to a prior paragraph in his report where he had documented the difference in prices for comparable works at Christie's and Sotheby's on the one hand, and second-tier auction houses on the other.  *Id.* ¶ 46(c).  For example, the price differential for William Godward works sold at Sotheby's and Bonham's ranged from 54.3% to 82.7%, while the price differential for Andy Warhol works sold at Christie's and Phillips ranged from 11.7% to 67.7%.  *See id.* ¶ 29(b).  In fact, Mr. Plummer explained that the Christie's-Sotheby's market "duopoly" is so pronounced that one auction house owner decided to bypass his own auction house and sell his collection at Christie's in order to maximize his return.  *See id.* ¶ 29(d).

54.     Based on these facts, Mr. Plummer estimated "that the impact of selling the DIA collection through an auction venue other than" Christie's and Sotheby's "would result, at a minimum, in a loss of value of 20% to 40%."  *Id.* ¶ 46(c).   Mr. Plummer applied the more conservative 20% figure in his calculations.  *See id.* ¶ 55 & Tables 6–7.  This factor thus reflects market forces and Mr. Plummer's experience and is reliable.  *See Barreto*, 268 F.3d at 335.

55.     FGIC suggests that Mr. Plummer "plucked this discount rate out of thin air" because he "did not speak to anyone at either auction house to substantiate" it.  Mot. ¶ 19.  Yet FGIC notes that Mr. Plummer *did* talk to someone from the auction house in a social setting but declined to divulge the identity of the

individual.  *See id.*  This hardly makes Mr. Plummer's conclusions less reliable, and FGIC's expert, Mr. Wiener, repeatedly protected similar confidences at his own deposition.  *See* Wiener Dep. 30–34, 118–19, 181, 201–03 (Ex. G). Moreover, Mr. Provost's testimony that Christie's "was certainly feeling some of the negative press" regarding its involvement with the Detroit bankruptcy supports Mr. Plummer's opinion.  Provost Dep. 141.  Finally, FGIC's argument is a straw man because it is not reasonable to expect (nor required under *Daubert*) Christie's or Sotheby's to take a public position on such a sensitive question.  FGIC thus again ignores the reliable work that Mr. Plummer did—including his analysis of sales data—to arrive at this reliable discount number.  *See* Artvest Rep. ¶ 47.

### D.    Mr. Plummer's Longer Term Sale Factor Is Reliable

56.    Mr. Plummer recites the commonsense—and undisputed—fact that the market for fine art, particularly "at the highest end in many subsectors," can involve "as few as one or two" buyers.  Artvest Rep. ¶ 48.  He therefore points out that "[s]elling a large block of property into a market that exceeds its liquidity or capacity is a high risk strategy."  *Id.* ¶ 47.  Accordingly, "a longer term selling plan is deemed desirable in the art market."  *Id.* ¶ 48.

57.    To support his opinion, Mr. Plummer cites the experience of the British Rail Pension Fund (BRPF), which divested its art collection through a "carefully controlled program of sales" over a three-year period.  *Id.* ¶ 49(a).  The

BRPF collection was "less than 5%" of the value of the DIA collection, and "unlike the DIA, none of the art in its categories exceeded the annual turnover in a single sector." *Id.* ¶ 49(b).

58.   Based on the BRPF experience with a much smaller collection, Mr. Plummer "conservative[ly]" estimated "that an orderly liquidation of the DIA collection would require nothing short of five to eight years." *Id.* That estimate builds in eighteen months to two years to catalogue, research, and perform due diligence on the collection; a five-year period for sales at public auction; "[a] discount rate of 12% based on the volatility of the art market"; an absence of litigation-related delays; and other conditions. *Id.* ¶ 49(c).

59.   FGIC takes issue with Mr. Plummer's conclusion and argues that it is "unmoored from reliable data." Mot. ¶ 20. Yet as FGIC recognizes, Mr. Plummer considered data from the BRPF long-term sale. *See id.* Moreover, the deposition excerpt FGIC quotes confirms that Mr. Plummer considered "common investment fund practice" to arrive at his estimated timeline. Plummer Dep. 268:17–21 (quoted at Mot. ¶ 20). And, once again, the paucity of "studies," Mot. ¶ 20, is of no moment for Mr. Plummer's non-scientific opinion, based instead on the BRPF data and his professional experience, *see Barreto*, 268 F.3d at 335.

### E.   Mr. Plummer's Analysis Of The Potential Impact Of Litigation Is Reliable

60.   Mr. Plummer discounts the value of the collection in certain scenarios

to reflect the reality that the City "is likely to face formidable legal obstacles and prolonged litigation" if it were forced to sell the DIA collection to settle its debts. Artvest Rep. ¶ 50. Indeed, the Michigan Attorney General already has made "public comments" suggesting that he is "likely" to challenge even a sale of the City's works. *Id.* ¶ 50. In fact, the Michigan Attorney General has issued Opinion 7272, which concludes that the City holds "in a charitable trust for the people of Michigan," and may not sell, the DIA collection. *See* Mich. AG Op. 7272 at 18 (Ex. H). Mr. Plummer also notes that other court challenges could be filed by the DIA corporation and "numerous donors or their heirs." Artvest Rep. ¶ 50(c).

61.     Mr. Plummer recounts that "[i]n the instance of the de-accessioning of the Stieglitz Collection by Fisk University, the Attorney General of Tennessee spent 5 ½ years litigating against the sale." *Id.* ¶ 52(d). That litigation "ultimately resulted in significant constraints on the sale and a sharing arrangement with Fisk and the Crystal Bridges Museum." *Id.* Mr. Plummer predicts that the City could face a similar "5 ½ year delay" in any effort to sell the DIA collection. *Id.* ¶ 50.

62.     FGIC attempts to brush aside Mr. Plummer's analysis underlying this factor, and suggests that it is inadequate because Mr. Plummer did not speak to anyone at the Michigan Attorney General's office or any donors or heirs of donors. *See* Mot. ¶ 21. But such conversations were unnecessary in light of the Attorney General's public statements, Opinion 7272, the public statements and pleadings

filed by the DIA, and the Fisk University precedent. Mr. Plummer's analysis of this factor is reliable. *See Barreto*, 268 F.3d at 335.

### F. Mr. Plummer's Analysis Is Not "Litigation-Driven"

63. Finally, FGIC criticizes Mr. Plummer because his analysis was "seemingly undertaken solely for the purpose of litigation." Mot. ¶ 23. Expert witnesses are routinely retained in connection with litigation, and that is by no means disqualifying. Moreover, Mr. Plummer's testimony flows directly from his work in "art market economics, valuation, patterns and behavior" over the past 35 years. Artvest Rep. ¶ 10. It therefore is reliable and admissible. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995) (quoted at Mot. ¶ 22).

\*       \*       \*       \*       \*       \*

64. FGIC thus has failed to show *any* basis for excluding Mr. Plummer's careful, comprehensive, and reliable discount-factor analysis. If FGIC believes that any of its challenges to that analysis have merit, it can pursue them on cross-examination. But it has failed to show that the Court should invoke the "exception" to Rule 702 and exclude Mr. Plummer's testimony. *See* Fed. R. Evid. 702 advisory committee's notes, 2000 amend. ("the rejection of expert testimony is the exception rather than the rule")

WHEREFORE, the Court should deny FGIC's Motion To Exclude The Expert Opinion Of Michael Plummer On Discount Factors.

Dated:      August 27, 2014      Respectfully submitted,

 /s/ Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP

4000 Town Center, Suite 1800
Southfield, Michigan  48075
Telephone:  (248) 359-7300
Facsimile:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY OF DETROIT

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) )  Chapter 9 ) |
| CITY OF DETROIT, MICHIGAN | )  Case No.: 13-53846 ) |
| Debtor. | )  Hon.  Steven W. Rhodes ) ) |

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2014, I electronically filed the City's Opposition to FGIC's Motion To Exclude Expert Opinion Of Michael Plummer Regarding Discount Factors with the Clerk of the Court, which sends notice by operation of the Court's electronic filing service to all ECF participants registered to receive notice in this case.

Dated:     August 27, 2014          /s/  Heather Lennox
                                    Heather Lennox