# Exhibit A



EXPERT WITNESS REPORT OF
Michael Plummer

July 8, 2014


Presented in:
CITY OF DETROIT, MICHIGAN, Debtor
Chapter 9
Case No. 13-53846

In the United States Bankruptcy Court
Eastern District of Michigan
Southern Division

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-763-8654 | Fax: 212-763-8304 | www.artvest.com



## Table of Contents

I. Scope of Opinion and Disclosures Required Under Rule 26(a)(2)(B)

II. Qualifications

III. General Art Market Issues

IV. Evaluation of the Collection of the Detroit Institute of Arts

V. DIA-Specific Market Issues Affecting Selling Strategy and Value

VI. Potential Factors That May Affect the Liquidation of the DIA Collection

VII. Critique of Houlihan Lokey Analysis and Indications of Interest

VIII. Critique of the Christie's Recommendations for Monetization

IX. Cultural Impact

X. Conclusion

XI. Assumptions and Limiting Conditions

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: ~~13-53846-tji~~ Fax: ~~Doc 7121-1~~ ~~Filed 08/27/14~~



Exhibits

---

Exhibit A…………………………………………………List of Documents Relied Upon

Exhibit B……………………………………………………. Plummer Curriculum Vitae

Exhibit C……………………………List of Consulting Specialists & Curriculum Vitae

Exhibit D………………………………………………………………………Other Sources

Exhibit E…………………...Sotheby's and Christie's Unsold Rates by Sector – 2013

Exhibit F…………………………Present Value Calculation of an Orderly Liquidation

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-written-rrr-rrr | Fax: 212-rrr-rrr | www.artvestpartners.com



## I. Scope of Opinion and Disclosures Required Under Rule 26(A)(2)(B)

1. I have been retained by Cravath Swaine & Moore LLP on behalf of its client The Detroit Institute of Arts ("DIA") and by Jones Day LLP on behalf of its client The City of Detroit, Michigan (together "Counsel"), in connection to the matter that is the title of this report.

2. Counsel has asked me to form an opinion with respect to the following:

   a) The indicative value of the works in the DIA Collection
   b) The feasibility and likely effects on the market and value realization of a sale of the DIA collection under a variety of market and sale conditions
   c) Creditor-proposed sales of the DIA's collection, including analysis of certain third-party indications of interest
   d) Monetization alternatives described in Christie's report to the City of Detroit
   e) Infirmities in any rebuttal expert reports, which I will address in any supplemental report as necessary

3. In addition, this report contains a summary of the information that I relied upon in the development of my opinions and a statement of qualifications. My opinions, detailed herein, are based upon the data and other information available to me as summarized in this report.

4. A detailed list of the sources of information relied upon is presented in Exhibit A.

5. My curriculum vitae and lists of recent testimony, publications and relevant presentations are presented in Exhibit B.

6. Exhibits D through F are additional sources, tables and calculations that I have relied upon.

7. Artvest Partners LLC is compensated at a fixed fee of $112,500 for preparation of this report, and $6,000 per day (or $3,500 per half day) for expert witness testimony at deposition or trial.

8. I reserve the right to supplement and/or revise my report if additional information becomes available and to prepare and present an additional report in reply to any expert report proffered in response to this report. I also may be asked to testify at deposition and trial.

9. I reserve the right to use any charts, tables or graphs contained in this report as demonstrative exhibits to support my testimony at deposition or trial.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.500.9000 | Fax: 212.500.3636 | www.artvestpartners.com



## II.    Qualifications

10. I have extensive experience in the field of analyzing art market economics, valuations, patterns and behavior. My advisory experience encompasses a broad range of constituents in the art market: clients (including buyers and sellers of fine art), auction houses, dealers, collectors and investors.

11. I am a Principal of Artvest Partners LLC.

12. Artvest Partners LLC is an advisory firm in the art market that advises private clients, art professionals, and Fortune 500 corporations on art values, projections of market performance, art acquisitions and dispositions, as well as best business practices. Additionally, we broker art loans for clients.

13. I received a Bachelor of Science Degree in Economics at The Wharton School of the University of Pennsylvania.

14. I was employed for fifteen years at Sotheby's, my final position was Vice-President, Head of Marketing for North and South America and Asia.

15. I was employed from 2007 through 2009 at Christie's as Senior Vice President and Chief Operating Officer of Christie's Financial Services to launch a new business entity to provide art loans and art investment funds to its clients.

16. I have published *Artvest Partners, Market Analysis, September 2010; Artvest Partners Market Analysis, Winter-Spring 2012 With a Special Focus on Asian Art; Artvest Partners Market Analysis, Fall 2011; Citi Research Equities Report, Sotheby's,* 18 October 2011*; and Citi Research Equities Report, OC's Hammer time: Art Auction Primer 101,* 24 April, 2013.

17. I am a co-founder of the Art Investment Council, a section 501(c)(3) not-for-profit corporation formed to promote best practices and greater transparency in the Art Market.

18. In addition to being quoted in and advising on numerous articles in the *New York Times, The Wall Street Journal,* and *The Art Newspaper,* as well as providing on-air commentary on *Fox Business,* I have lectured and been on panels for continuing education courses and graduate-degree programs at NYU, The Appraisers Association of America, Sotheby's Institute and Christie's Education on the subjects of art market performance, trends, economic factors, investment practices and structures, as well as liquidity and valuation in an opaque market.

19. With the aforementioned education, training, and experience, I am well qualified to offer opinions regarding the disputes identified in this matter.

20. My Curriculum Vitae is located in Exhibit B to this report.



## III.  General Art Market Issues

**21.  In this section, I will provide context by describing issues and dynamics currently at work in the art market in general, outline trends and patterns that will affect any decision to sell into the current marketplace and the estimate of values placed on the works before they are sold, as well as conditions for the evaluation of a selling strategy that is undertaken either to maximize value or to find quick liquidity. Much of the information below is based on my own research, as well as the *TEFAF Art Market Report 2014,* prepared by Clare McAndrew, an analysis issued annually by The European Fine Art Foundation ("TEFAF") that tracks global art activity. For the sake of consistency, values in that report have been converted into dollars for the purposes of this report.**

**22.  Value in the art market, in museum and private collections, as well as in annual turnover in fine and decorative art sales, is concentrated in a small number of rare, high-quality items, whereas the vast majority of items in circulation in the art market are low in value. At the higher end of the market, works over $14 million account for only 0.02% of items sold, yet these are the prices one hears of regularly in press reports. Works sold for over $1.4 million account for 43.8% of the value but only 0.42% of market volume.**

    a.  50.4% of transactions are below $4,100 and 92.5% of transactions are below $69,000

CHART 1



*Source:  Arts Economics (2014) with data from Artnet and AMMA (All values converted from Euros to Dollars)*

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 13-53846-tjt    Doc 7121-1    Filed 08/27/14    Entered 08/27/14 19:26:07    Page 7 of 204



**23. Four sectors of the fine art market constitute 98% of the value of the fine art market: European Modern Art, Impressionist and Post-Impressionist Art, European Old Master Paintings, and Post-War and Contemporary Art. Of these four sectors, three have declined in value since 2011.**

a. Market Share by Sector of the Fine Art Auction Market

CHART 2



© Arts Economics (2014) with data from Artnet

b. The European Modern Art Auction Sales 2003 to 2013

CHART 3



© Arts Economics (2014) with data from Artnet



CHART 4



Impressionist and Post-Impressionist Auction Sales 2003-2013

© Arts Economics (2014) with data from Artnet

d. European Old Master Painting Sales 2003 to 2013 *(Primarily referred to in the DIA collection as European Paintings)*

CHART 5



Old Master Painting Sales 2003-2013

© Arts Economics (2014) with data from Artnet

**24. While record prices have been set and growth has been significant in the Post War and Contemporary ("PWC") sector, other sectors of the art market have been stagnant, and, as mentioned above, some have posted declines in turnover in the last two years.**

a. The differences can be seen in the two most recent evening auctions at Christie's this past May. Both the Impressionist & Modern Paintings and PWC sale had significant and


desirable works of art with many that had not been on the market for decades, yet the Impressionist & Modern paintings sale still performed below expectations and estimates, while the PWC sale exceeded its estimate and had a meaningfully lower rate of unsold items. European Old Master Paintings, 19th Century Art, American Art and pre-20[th] Century Art are currently manifesting the same pattern of unevenness as this recent Impressionist & Modern Art at Christie's *(refer to Paragraph 37. below)*.

CHART 6



*Source: Artvest Partners based on Christie's Auction Data*

**25. With the exception of the PWC sector, the remainder of the art market has plateaued and will rise and fall from year to year within a range of 10% or so, continuing along the lines of its performance since 2011.**

a. In such a market where prices and sales volumes are not appreciating quickly, selling at or below the low estimate is more the norm, and selling at the higher end of the estimate range becomes an anomaly. In times like this, art industry professionals tend to peg their expectations on the lower range of an estimate. The example above, Chart 6, is a case in point: the PWC Evening Auction, in a sector where prices are still rising, exceeded its high estimate. The Impressionist & Modern sale, in a sector where prices are stagnant, fell below its low estimate.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-991-6060 | Fax: 212-991-6070 | www.artvest.com



b. The significant growth in the size of the art market from 2002 – 2011 is a once in a life-time event (due to the sudden addition to the global art economy of Russia, China, India and other countries that previously had not been active art collectors). This burst of growth is not likely to be repeated over the next five years. In fact, with growth now concentrated almost exclusively in the PWC sector, I estimate that excluding a price disruption in this sector (see below), growth of the art market will remain choppy over the near to mid-term in all other sectors other than PWC.

CHART 7



*Source: Arts Economics (2014) (All values converted from Euros to Dollars)*

CHART 8



*Source: Arts Economics (2014) (All values converted from Euros to Dollars)*

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-991-8100 | Fax 212-991-8111 | www.artvestpartners.com



**26. As a consequence of this heightened focus of collectors on the PWC sector, I believe the sector could soon be reaching a "breaking point," as historically it is the most volatile sector of the art market and prone to crashes, such as in 1990 and 2008/9. Its growth in value over the last ten years has been unprecedented. In the market crash of 2008, the PWC sector lost both half of its value and half its sales volume. The growth in prices and values is more concentrated at the highest end of the market, namely at Evening Auctions at Sotheby's and Christie's. Such an unsettled market would need to be taken into account in any liquidation strategy developed for the sale of the Contemporary Art given the value of its holdings relative to the size of this sector of the market.**

    a. Ten Years of Post War & Contemporary New York Evening Auction Results

CHART 9



*Source: Artvest Partners based on data from Sotheby's and Christie's*

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212....



b. Growth of the Post-War and Contemporary Art Sector, Auction and Private Sales, 2003 to 2013

CHART 10



*Source: Arts Economics (2014) with data from Artnet and AMMA (All values converted from Euros to Dollars)*

c. Yet another sign that the PWC sector has reached a peak is that a number of notable collectors, who are known for their art market savvy and access to inside information, seem to be cashing out on important works in this market, suggesting that they too feel the market may have reached a high that might not be sustainable:

"This spring, although most sellers are not revealed in catalogs, dealers familiar with their collections say David Ganek, the former hedge fund manager, is believed to be parting with a Twombly and a Warhol; Peter M. Brant, the newsprint magnate, is selling canvases by Basquiat and Haring; Steve Wynn, the casino magnate, a de Kooning; and Ronald O. Perelman, the New York investor, a Rothko ." *(The New York Times, The Rush for Deals Before Top Art Goes to Auction,* Carol Vogel, May 4, 2014.)

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-993-6490 | Fax: 212-993-6491 | www.artvest.com



**27.  When a market sector or the entire market "crashes," as it did in the Autumn Season in 2008, it creates an illiquid marketplace where values often fall by as much as 50%, and property, especially that of the highest caliber, becomes either difficult to sell, and/or sells for a fraction of its previous value. From the previous market peak in 2007, to its nadir in 2009, the fall in sales was 54.6%.**

    a.  Total Global Fine and Decorative Auction Sales 2003 to 2013

CHART 11



*Source:  Arts Economics (2014) with data from Artnet and AMMA (All values converted from Euros to Dollars)*

    b.  In November of 2008 and into early 2009, art market sales came to a hard stop until prices adjusted downward radically for the Spring Sales in 2009. Note below that the unsold rate tripled from its previous norms prior to 2007.

CHART 12



*Source: Artvest Partners based on data from Sotheby's and Christie's*

**28.  Public Auction vs. Private Sale: While the Private Sales and Dealer Activity constituted 53% of global sales volume in 2013 (*TEFAF Art Market Report 2014,* prepared by Clare**

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.



**McAndrew), this is the least transparent segment of the art market. Consequently, it is generally true that any art sale resulting from a court action is almost exclusively conducted through public auction. This is the preferred and most common method of sale for estate liquidations, criminal cases, tax liens, bankruptcies and other legally mandated sales of arts and antiques.**

**29. At the higher end of the market, Sotheby's and Christie's are the preferred venue for selling to achieve maximum sales value, as they have the greatest global reach amongst collectors and control over a third of the international auction market.**

> a. With 36% of share of Global Art Sales overall. Sotheby's and Christie's dominate the art auction market at the high-end.

CHART 13



*Source: Arts Economics (2014) with data from Artnet and AMMA*
*(All values converted from Euros to Dollars)*

> b. Examples of high-end artist by sector which are indicative of the price performance differential at Sotheby's or Christie's versus second tier auction houses such as Bonham's or Phillip's:

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-675-5400 | Fax: 212-675-5401 | www.artvestpartners.com



Example A: Top five prices for William Godward (19th Century Sector) at Sotheby's versus Bonham's, a differential ranging from 54.3% to 82.7%.

CHART 14





*Source: Artvest Partners based on data from Sotheby's and Bonham's*

Example B: Top Prices for Andy Warhol (PWC Sector) at Christie's vs. Phillips, a differential ranging from 11.7% to 67.7%.

CHART 15



*Source: Artvest Partners based on data from Christie's and Phillip's*

Example C: Top Price Comparison for Picasso (Impressionist & Modern Sector) at Sotheby's vs Bonham's: In a search on artnet of the top hundred prices by this artist's works at auction at all four houses, none appeared to have been sold at either of the

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.567.5050 | Fax: 212.567.0202 | www.artvestpartners.com



second tier houses, and Sotheby's and Christie's hold a complete duopoly on the higher priced works by this artist. In the late 1990s and early 2000s, Phillips did attempt to enter this market, but quickly pulled out, unable to compete.

c.  Implicit in any auction sale of a multi-million dollar work at Sotheby's and Christie's is a five-year guaranty on authenticity. Second tier houses offer this guaranty as well, but when a collector is buying a work in excess of $10 million or $20 million, there is added confidence in the depth of the balance sheet at the two big firms, that at that level of purchase, those firms will have the balance sheet liquidity to take back a $100 million Picasso, for example, should it in someway not be what it is reputed to be. This is an overlooked and contributing factor to their sustained dominance at the high-end.

d.  The power of the duopoly at the higher-end was fully demonstrated when in February 2009, Pierre Berge, the owner of Pierre Berge Associés, an auction house in Paris, decided to sell the collection that he and Yves St. Laurent had acquired at an auction at Christie's, rather than through his own auction house. The sale earned €373,935,500.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-written | Fax: 212-written | artvestpartners.com



**30.  I am comfortable with Christie's approach and valuation of the works with a City of Detroit ("COD") attribution and believe that it is a useful sample and window into the evaluation of the entire DIA collection and appropriate to include within my own analysis of the value of the DIA collection.**

**31.  In order for Artvest to prepare an evaluation of the entire DIA collection in such a limited time, I approached the collection as four distinct groups of property. Though I included the Christie's appraisal in my evaluation, I regrouped the COD works from their Phases 1, 2, 3 into bands of value to create a more functional grouping for my analysis:**

**Group 1:**    **High Value COD works that were appraised by Christie's for greater than $750,000 (68 items)**

**Group 2:**    **COD works appraised by Christie's of lower value, that under $750,000, including property for which they assigned limited or no value (1,654 with value, 1,038 with limited to no value, and 13 that were combined in Phase III): Total COD appraised or reviewed items by Christie's was 2773.**

a.  For both categories (except for that of minimal value), Christies' provided a low and high estimate of value determined by comparing the appraised object to marketplace comparables, or as they refer to it, "'the market data approach,' which compares the subject work to similar works and makes appropriate adjustments," for which I understand them to mean adjusting for differences in quality, size, medium, rarity, authenticity, desirability and to the extent known, condition.

b.  It is important to point out that, as they state in their letter of December 17, 2013 to Kevyn Orr, Christie's "made no assumptions about the sales process, nor did we take into consideration any commissions, buyer's premiums, or potential financial agreement between the buyer, seller and/or venue that would affect the price realized. And as we agreed, we have not assumed any volume discounts."

c.  In Sections V and VI of this report, I undertake to evaluate these key issues pertaining to the potential liquid value of the DIA collection that were not part of Christie's remit, as they are critical elements in evaluating the results of either a partial or full liquidation of the DIA.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.585.5840 | Fax: 212.585.5841 | www.artvestpartners.com



**TABLE 1**

|  | Object | Low Estimate | High Estimate | Mid Estimate |
|---|---|---|---|---|
| High Value COD Works Greater Than $750,000 | 68 | 427,200,000 | 812,600,000 | 619,900,000 |
| COD Works lower than $750,000 | 1654 | 27,077,995 | 54,397,240 | 40,737,618 |
| **Subtotal** | **1722** | **454,277,995** | **866,997,240** | **660,637,618** |
| COD Works that Christie's found to be of insignificant value to conduct an appraisal | 1038 | 0 | 0 | 0 |
| **TOTAL Christie's Appraisal** | **2760** | **$454,277,995** | **$866,997,240** | **$660,637,618** |
| Other COD property | 13 |  |  |  |
| **TOTAL COD Property** | **2773** |  |  |  |

**32.  In addition to the Christie's appraised COD works, I conducted an evaluation of the remaining items in the DIA collection in the following manner:**

**Group 3:**       **High Value, non-COD works in the DIA collection, contained on a list provided by the DIA of works that the DIA valued for insurance purposes or otherwise of $1,000,000 or more, totaling 350 works. (It should be noted that in some instances my own evaluation found some of these items to be of a value less than $1,000,000.)**

**Group 4:**       **Based on a tour of objects on view in Museum in June 2014, another 73 works I determined to be High Value, which are likely to have values in the range of $750,000 or higher. As these were discoveries late in the process, I have put an approximate valuation on these items and will provide a fuller evaluation and documentation in a supplement to this report.**

a.  For Group 3 and Group 4, I conducted an evaluation using the same methodology as Christie's, that is, looking at pricing "that compares the subject work to similar works and makes appropriate adjustments" in value based on size, shape, visual impact, subject matter, condition, medium, complexity, period in the artists or craftsman career, desirability in the marketplace, scarcity and other factors depending upon the sector or type of art.

b.  Artvest conducted the initial pricing research and created a source database of comparables and other records, then shared that with the Consulting Specialists, who then did supplemental price searches and other research. After that, the Consulting Specialists viewed the work, either in person or through a high resolution image, and set values which were then reviewed, discussed and finalized with me. The Curricula Vitae of the Consulting Specialists are attached.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-FOR-ARTS or 212-367-2787 | www.artvestpartners.com



**Group 5:** **Balance of the Collection. The balance of the DIA's collection was evaluated by sector using the sample valuation data of the COD works appraised by Christie's with a low value of at or below $750,000, and applying an average price, sector by sector, based on that data.**

c.  To the extent of this methodology has a bias, I believe that it is likely to overstate the value of the DIA collection. COD works were most likely "strategic" purchases to raise the profile of the DIA. General gifts and other museum acquisitions often involve property with little to no sales value and/or scholarly or historic value only. Also, in many instances, donors give entire collections, which include poor to mediocre property side-by-side with good property.

d.  For property with a value below $5,000 I attributed an effective value of $0, as it is my opinion that the cost of cataloguing, handling, administering and finding buyers for this property will be equal to or greater than the cost of selling it. For that reason, this is a price-level of property that Sotheby's and Christie's, under normal circumstances, try to avoid selling.

**Totals:** **Groups 1 through 5 combined by Sector for a total value of the DIA collection, without accounting for limitations or clouds on title, limitations in the market on the sale of the works, or any of the discounts described in the next section of this report, for total estimated gross sales value of the DIA holdings.**

## TABLE 2

|  | Object | Low Estimate | High Estimate | Mid Estimate |
|---|---|---|---|---|
| Artvest Evaluation, Works Greater Than $750,000 | 350 | 1,569,355,000 | 2,290,085,000 | 1,929,720,000 |
| Additional 73 | 73 | 80,415,000 | 164,130,000 | 122,272,500 |
| **Subtotal Artvest High Value** | **423** | **1,649,770,000** | **2,454,215,000** | **2,051,992,500** |
| Remaining DIA | 57,181 | 656,930,437 | 1,286,741,464 | 971,835,951 |
| **Total Artvest Evaluation** | **57,604** | **2,306,700,437** | **3,740,956,464** | **3,023,828,451** |
|  |  |  |  |  |
| **TOTAL COD Property** | **2773** | **454,277,995** | **866,997,240** | **660,637,618** |
| **TOTAL DIA Collection** | **60,377** | **$2,760,978,432** | **$4,607,953,704** | **$3,684,466,069** |

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.991.8946 | Fax: 212.991.8921 | www.artvestpartners.com



**33.  To ensure objectivity, Artvest did not interact with the Museum staff directly but rather communicated only through DIA Counsel.**

<u>Key notes to the Evaluation</u>

1) *Modigliani paintings not in Ceroni catalogue.*
   In several instances, both in the Christie's appraisal and in the Artvest evaluation, there are works that were thought to be by Modigliani which are not mentioned in the most trusted resource for authenticity. Thus I have attributed zero to minimal value.

2) *The Diego Rivera Murals.*
   While these are incredibly rare, historic and significant works of art, they are frescos applied directly to the walls, so they cannot be removed with cutting them off the wall and inflicting serious damage, and incurring significant cost. Additionally as they were recently designated a National Historic Landmark in April of this year, it is hard to imagine how such removal could done without serious backlash.

3) *Potential for Likely Re-attribution.*
   In a number of instances, particularly with the Old Masters paintings, we are assuming the Museum's attribution is correct. It is entirely possible that during the process of more in depth cataloguing for a sale, that such attributions could be challenged, significantly lowering values.

4) *"A Once-in-lifetime sale."*
   The Brueghel, the Gates of Ishtar, and a number of other objects in the DIA collection have not had comparables that have come on the market in seventy to a hundred years. We have made a good faith effort, and it appears that Christie's has as well, to provide estimates, but finding works of similar importance in these areas is not possible.

**TABLE 3**
Artvest Evaluation of DIA High Value Works

See Exhibit G

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-991-0114 | Fax: 212-202-5902 | www.artvest.com


**34.** As Christie's mentioned in its letter of December 17, 2013, in it is appraisal of COD works, it "made no assumptions about the sale process." Though instructed to evaluate the collection in this fashion, such an omission is a missing key element in any attempt to find a real, net liquid value of the DIA collection should it be required to be sold. In this and the following section, I address and quantify these matters.

**35.  In relation to the extreme value distribution in the general art market in annual sales turnover (refer to General Art Market Conditions, Opinion 1), the COD works in the DIA collection have an even greater polarization in value.**

a.  Of the 2,773 works of COD property that Christies evaluated, Christie's completed a full appraisal on 1,741 items and Christie's deemed 1,038 works, or 37.4% of the total universe of the COD, of insufficient value that they were ineligible for appraisal. (Thirteen items were grouped together in Phase III). On the other-hand Christie's Phase I and 2 appraisal, which focused on the higher value works on display in the collection, accounted for 2.5% of the works accounted for 98.8% of the value of the COD. Chart 16 below shows the entire Christie's appraisal combined into a single data set; Chart 17 shows the Christie's appraisal as originally submitted, divided into three phases.

CHART 16



*Source:  Artvest Partners based on Christie's 2013 Appraisal Data*

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-991-7245 | Fax: 212-991-7259 | www.artvestpartners.com



CHART 17



*Source: Artvest Partners based on Christie's 2013 Appraisal Data*

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-518-5955 | Fax 212-202-6377 | www.artvest.com



**36. Four sectors of the fine art market constitute the most significant block of value in the DIA collection: European Old Master Paintings, European Modern Art, Impressionist and Post-Impressionist Art, and Post-War and Contemporary Art. (Refer to Section IV.)**



DIA Property
% By Value

- Greco-Roman and Ancient European 1%
- Islamic Art 0%
- African American Art 0%
- 0%
- Asian Art 3%
- Africa, Oceania & Indigenous Americas 3%
- European Sculpture and Dec Arts 4%
- Ancient Near Eastern Art 4%
- Prints, Drawings & Photographs 2%
- Contemporary Art after 1950 16%
- American Art before 1950 15%
- European Modern Art to 1950 24%
- European Painting 28%

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-585-8090 | Fax: 212-585-8091 | www.artvestpartners.com



**37. A significant segment of DIA's collection is in areas that have fallen out of favor with collectors and that are underperforming their market peak in 2007, specifically American Art pre-1950 (14.6%), Old Master and 19th Century European Paintings (28.1%), Impressionist & Modern Art (23.8%), for a total of 66.5% of the collection. (Refer to Section IV.)**

      a. 1. Mei-Moses Art Indices of American Art pre-1950, Impressionist & Modern Art, Old Master/19th Century, and PWC.

CHART 18



*Source: www.artasanassetclass.com © Beautiful Asset Advisors LLC*

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.226.7121 | Fax: 212.226.7121 | info@artvest.com



**38. Were the DIA collection to be sold in entirety or in part, few sales would be to other museums, both because other museums are likely to boycott such sales, as well as because funding constraints limit their participation in the marketplace at today's price levels for works of art. Public Institutions, primarily art museums, purchased only 9% of property sold in 2013.**

    a. Market Share of Sales by Value by Buyer Group in 2013

CHART 19



© Arts Economics (2014)

    b. Museums are unable to compete against the formidable spending power of today's wealthy private collectors. Even the largest and most prestigious museums have limited purchasing power relative to size of the market or to the size of the liquidation of all or part of the DIA collection. "The Museum of Modern Art spent $32 million to acquire art for the fiscal year ended in June 2012; the Metropolitan Museum of Art, $39 million." (*The New York Times*, *Qatari Riches Are Buying Art World Influence*, Robin Pogrebin, July 22, 2013).

    c. A collection of the quality and range of art in the DIA would be impossible to recreate in current times. Given the fierce competition from Private Collectors and the level of today's prices, it would be impossible for the City of Detroit, or any institution in the world, to recreate the quality and scope of the DIA collection. Take for example the Getty Museum in Los Angeles. While it sits on the largest endowment ever provided to an institution in modern history, it has a collection that does not even begin to rival that of the DIA.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-991-5260 | Fax 212-991-5261 | www.artvestpartners.com



## VI.    Potential Factors That May Affect the Liquidation of the DIA Collection

**39.  In this section, I anticipate and quantify various different potential factors that, based on either current market conditions or historic precedent, are likely to have a financial effect on the sale of the art from the DIA collection. Many of these factors are not taken into account in any standard appraisal or fair market valuation. I also apply the discount factors for various sale scenarios.**

**40.  It is important to note that these discount factors apply most directly to the higher value property in the DIA collection. Low-to-mid-value property tends to be absorbed into the marketplace with less notoriety or impact on the overall market. In other words, it is the very conspicuousness of the higher value property that tends to exacerbate the conditions outlined below. <u>It is also important to note that a number of these scenarios could overlap, creating a multiple discount affect, such as if there were an immediate liquidation at a second tier auction house that does not have the client base of Sotheby's or Christie's.</u>**

<u>**Immediate Liquidation**</u>

**41.    An immediate liquidation of the art collection will result in selling the DIA collection at a fraction of its fair market value, passing the returns and the ultimate value to third parties who would be capable of providing a large block of capital for the art on relatively short notice and selling the objects in a less urgent, strategic fashion over a multi-year time frame. (Refer to Indications of Interest in Section VII).**

a.  In May of 1990, William Acquavella (Acquavella Galleries, Inc.) made a deal to partner with Sotheby's in acquiring the entire inventory of the Pierre Matisse Gallery for $153.1 million by purchasing the common stock of the gallery. The gallery assets comprised 3,500 works of fine art of the 20th Century, primarily School of Paris (Matisse, Picasso, etc.).

b.  The purpose of the transaction for the Matisse estate was to give the estate liquidity without its having to sell the collection all at once at auction, in an immediate liquidation, and potentially further devalue the auction market and the Matisse inventory in the midst of market downturn. (The market had lost half its value from 1990 to 1991 and was not expected to recover in the near to midterm.)

c.  For Sotheby's and Acquavella, it was a chance to hold the property and liquidate it over time, both at auction and at private sale.

d.  By December 31, 1993, Sotheby's had received $278.5 million in return for its share of the partnership, for which it had put up 100% of the capital. After this two-year return, another $45.7 million of inventory remained, which was liquidated at auction sales up through 2006 and beyond. (Source Sotheby's Annual Financial Statements for years ending 1996 and 2006.) In effect, not including Acquavella's share, Sotheby's bought the property at a discount to its ultimate market value of 45%.

e.  In the case of the DIA, such a sale would likely follow an accelerated due diligence process as per Houlihan Lokey proposal of anywhere from 10 to 180 days.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.



**42. Impact of an Immediate Liquidation.**

    a. There are two potential loss factors to consider in an immediate liquidation, the first being lost value due to sloppy due diligence and cataloguing and property that is not saleable in a short time period. This loss factor cannot be estimated, but it is important to acknowledge.

    b. The second loss factor can be estimated, and that is 50%. This is the standard number used in art loan valuation, as a 50% loan-to-value ratio assumes that the property will bring 50% of its low auction estimate in an immediate liquidation scenario. Real life examples such as the Pierre Matisse Gallery sale support this number.

    c. Refer to TABLES 6 and 7 below for application of an Immediate Liquidation discount.

**Blockage Discount**

**43. Given the high concentration of property in key sectors of the Art Market, the concept of a Blockage discount would apply to any liquidation scenario of the DIA collection other than an orderly, strategic, multi-year liquidation. A Blockage discount is similar to an Immediate Liquidation discount, but results from selling a large group of similar items in a short time. A Blockage discount is an alternative way of evaluating the likely results of a quick sale and would not be applied in addition to an Immediate Sale discount, but generally supports the application of an Immediate Sale discount.**

    a. A Blockage discount is defined by the Appraisers Association of America ("AAA") as "A principle applied in the valuation of large groups of similar and like items, which, if sold during a limited period of time, would result in a depression of the prices one might expect if sold separately in an ordinary market cycle. Consequently blockage discount is narrowly defined as the percentage the appraiser would apply to reduce the total valuation to compensate for this situation." An Approach to Advanced Problems in Appraising Art, Alex J. Rosenberg Sc.D. AAA, ASA.

    b. Most commonly, a Blockage discount has been applied by the IRS to calculate estate taxes on artists' estates where there is a large group of similar property. The IRS's current practice of using a discounted number has ranged from 25% to 46%, based on precedents set in cases involving the estates of David Smith, Georgia O'Keefe and Alexander Calder. (Ibid.)

**Unsold Rates**

**44. The Impact of Unsold Rates.**

    a. Standard appraisals and valuations do not take into account auction unsold rates, an economic reality of the auction business. Such rates vary by category, but tend on average to be in the range of 20% or more. In 2013 one of the highest unsold rates was in 19th Century European Paintings at 42% and one of the lowest was Chinese Paintings at 9%. (Refer to Exhibit E, Sotheby's and Christie's unsold rates by sector.)

    b. The top four sectors of the DIA Collection (82.8%) have unsold factors as follows, as applied to the mid values and low estimates of the sectors' values. Refer to Table 4 below

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.518.9680 | Fax 212.518.9684 | www.artvestpartners.com



c. For the remainder of the collection, I assume an average Unsold factor of 25%. That results in a remaining Unsold amount of $154,559,242 (at the mid estimate), for a total Unsold of $ 939,289,836.

**TABLE 4**

| SECTOR | Unsold % | Mid Estimate | ME Unsold | Low Estimate | LE Unsold |
|---|---|---|---|---|---|
| American Art before 1950 | 24% | $ 526,075,242 | $ 126,258,058 | $ 386,216,056 | $ 92,691,854 |
| Contemporary Art after 1950 | 20% | $ 586,401,219 | $ 117,280,244 | $ 460,166,040 | $ 92,033,208 |
| European Impressionist & Modern Art to 1950 | 23% | $ 856,175,955 | $ 196,920,470 | $ 695,526,352 | $ 159,971,061 |
| European (19th C and Old Master) Paintings | 34% | $ 1,012,564,184 | $ 344,271,823 | $ 760,968,931 | $ 258,729,437 |
| Subtotal Top Four Sectors | | $ 2,981,216,600 | $ 784,730,594 | $ 2,302,877,380 | $ 603,425,559 |
| Balance of Collection | 25% | $ 618,236,969 | $ 154,559,242 | $ 408,091,053 | $ 102,022,763 |
| Total / Avg. | 26% | $ 3,599,453,569 | $ 939,289,836 | $ 2,710,968,433 | $ 705,448,322 |

(Refer to TABLES 6 and 7 for application of the Unsold Discount Factor.)

d. It is important to note that much of this unsold property could and would be sold over time, but it is customary business practice to devalue a work by 20% of the low estimate after it has "Bought-In" – auction terminology for a work of art going unsold. This is particularly true for paintings and even more so for expensive ones. A work is considered "burned" if it goes unsold and is considered essentially unsellable for a period of three to five years after it first appeared at auction, if even then.

## Issues Related to Sotheby's and Christie's

**45. The effect of a sale by Christie's or Sotheby's without a financial guarantee: In a sale by either Sotheby's or Christie's, the likely size of a liquidation of the DIA collection would be beyond each of their guarantee capacities, as well as include art sectors where they are less comfortable making guarantees. Such a lack of a guaranteed auction sale exposes property to unsold risk that is described above.**

a. Both auction houses try to limit their net auction guarantee exposure to under $300 million, as a result of the problems they faced in the market downturn of 2008.

Sotheby's reported nearly $280 million in guarantees as of April 15, more than four and a half times the $60.2 million figure for the first quarter of 2013; the proportion coming from outside parties is still in flux. As a publicly traded company, Sotheby's is required to report guarantees. Christie's, which is privately owned, is not, but officials there confirmed it has about $400 million in guarantees to sellers this season, of which some $300 million is given by outside parties. *(The New York Times, Rush for Deals Before Top Art Goes to Auction,* Carol Vogel, May 4, 2014.)

b. On February 13, 2014, Sotheby's entered into a new credit agreement with a lending syndicate headed by GE Capital which renewed a $300 million cap on their net auction guarantee positions (total guarantees less third-party irrevocable bids or third-party guarantees.):

The New Credit Agreements contain certain customary affirmative and negative covenants including, but not limited to, limitations on capital expenditures, a $300 million limitation on net outstanding auction guarantees (i.e., auction guarantees less the impact of related risk and reward sharing arrangements) and limitations on the use of proceeds from borrowings under the New Credit Agreements. (Sotheby's Form 10Q Quarterly Report, filed May 7, 2014).

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.991.5300 | Fax: 212.202.6007 | www.artvestpartners.com



**46. A sale by other than Sotheby's or Christie's, the two main auction houses:** In a forced liquidation, the two optimal selling venues for maximizing the value of the collection, Sotheby's and Christie's, might refuse to sell due to the controversy surrounding a disposition and potential damage to their brand and relationships with the broader Museum community.

a.  Sotheby's parent company, Sotheby's Holdings, Inc. was a Detroit based corporation from 1983 until 2006, with offices at 28500 Woodward Avenue, Suite 100 Bloomfield Hills, Michigan and had a number of connections to the DIA and the Detroit community.

b.  Christie's received unusually strong negative feedback from both the Museum community and the art industry by merely conducting an appraisal. A very different degree of market pushback than what they are receiving from the sale of art from the Delaware Art Museum, a much more limited situation that is not affecting the viability of the Institution. It remains an open question if Christie's owner, Francois Pinault, would want to risk the brand he has so carefully nurtured in the global museum and collecting community by participating in a liquidation of all or part of the DIA's holdings, regardless of the possible financial gain to the business. Moreover, were Sotheby's first to take the position that it would not accept this business based on its history with the City of Detroit and the DIA described above, Christie's and its management would be under even greater pressure not to involve itself in any liquidation of the DIA collection.

Art critics and online commentators are blasting Christie's, the New York-based auction house, for possibly angling for a piece of the action should the Detroit Institute of Arts have to sell part of its collection to satisfy creditors in the city's bankruptcy.... Culture reporter Judith Dobrzynski on Tuesday compared Christie's behavior to a vulture. "Shame on Christie's," she wrote on her blog Real Clear Arts. "Sure, business is business, but let's remember here that it is not the Detroit Institute of Arts that has mismanaged the city and led to the bankruptcy.… Is Christie's so hard up that it will take any business, not matter how reprehensible?"

Some other art world insider, who declined to speak on the record to the *Free Press* because of the sensitivity of the situation, privately characterized Christie's actions as predatory. They noted the company was risking possibly alienating other museums, which buy and sell work through the major auction houses all the time. (Detroit Free Press, *Christie's under Fire for Visit to Detroit Art Museum,* Mark Stryker, July 25, 2013.)

c.  The Impact of Not Selling through Sotheby's or Christie's is a subjective number to calculate, as some artists such as leading Impressionist and Modern artists such as Picasso, Cezanne and Van Gogh are almost exclusively sold at Sotheby's and Christie's. Nevertheless, I estimate that the impact of selling the DIA collection through an auction venue other than these two houses would result, at a minimum, of a loss of value of 20% to 40%. (Refer back to Paragraph 29.  ).

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.381.9098 | Fax: 212.658.9121 | info@artvestpartners.com



**Effect of Market Capacity**

**47. Selling a large block of property into a market that exceeds its liquidity or capacity is a high risk strategy. Even the most liquid of the sectors, PWC and Impressionist & Modern, have capacity limitations.**

 a. Key Sectors of the DIA Collection versus 2013 Sales Totals by Sector at Sotheby's and Christie's:

**TABLE 5**

| DIA Collection Values vs. 2013 Sales Volume at Sotheby's and Christie's | | | | | | |
|---|---|---|---|---|---|---|
| Values in 000's / Units as Stated | | | | | | |
| Sector | DIA Estimated Value -- Mid Estimate | Sotheby's & Christie's Sales Value 2013 | DIA as % of 2013 Sales | DIA Collection No. of Works | Sotheby's & Christie's Sales Units | DIA as % of 2013 Sales |
| American Art Pre-1950 | $ 526,075 | $ 249,186 | 211.1% | 2,681 | 701 | 382.5% |
| Contemporary Art After 1950 (PWC) | $ 586,401 | $ 3,373,174 | 17.4% | 2,359 | 7,396 | 31.9% |
| Impressionist and Modern Art | $ 856,176 | $ 2,499,410 | 34.3% | 546 | 5,418 | 10.1% |
| European (19th C and Old Master) Paintings | $ 1,012,564 | $ 547,822 | 184.8% | 786 | 3,049 | 25.8% |
| *Source: Data from Sotheby's and Christies, Calculation by Artvest* | | | | | | |

**48. At the highest end in many subsectors, there is a small number of collectors, in some subsectors as few as one or two, who will be ready, willing and able to pay fair market value for a work of art at a given point in time. Therefore, a longer term selling plan is deemed desirable in the art market.**

 a. Though exact numbers of how small the buyer base is at both Sotheby's and Christie's is closely held proprietary information, it is a significant enough risk that Sotheby's mentions it in the Business Risk section of its Annual Financial filings with the SEC and has listed this as an important business risk since its Initial Public Offering Documents in 1989.

> *Sotheby's relies on a small number of clients who make a significant contribution to its revenues, profitability and operating cash flows.*
> Sotheby's relies on a small number of clients who make a significant contribution to its revenues, profitability, and operating cash flows. Accordingly, Sotheby's revenues, profitability, and operating cash flows are highly dependent upon its ability to develop and maintain relationships with this small group of clients, as well as the financial strength of these clients.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-991-6940 | Fax: 212-991-6941 | www.artvestpartners.com



## Effect of Longer Term Sale Process

**49. For a collection of the magnitude of the DIA's, maximizing art asset value (and preventing an Immediate Liquidation discount or Blockage discount) requires selling over a minimum of five to eight years, which would require a present value discount. (Refer to Exhibit F)**

    a. In 1974 the British Rail Pension Fund ("BRPF") decided to diversify its investment portfolio by investing in art. At the time, it was one of the largest pension funds in the UK and was looking to mitigate the effect of high inflation and poor performance in the equities market at the time. From 1974 to 1980 the fund invested a total of £40 million (US $ 68 million at current exchange rates). Initially art was purchased across fifteen categories of art as a long-term "buy and hold" investment. When the management of the Fund changed in 1987, the Fund decided "to dispose of the entire portfolio of works of art and made plans for a carefully controlled program of sales to be implemented over a period of years." The fund began liquidation in June 1987 and completed its last sale in June 1990, over a period of three years for a total return on investment of 11.2%. (Source: Fine Art and High Finance, Art Funds, Jeremy Eckstein and Randall Willette.)

    b. As the BRPF was only a fraction (less than 5%) of the value of the DIA collection, and unlike the DIA, none of the art in its categories exceeded the annual turnover in a single sector, I feel it would be a conservative to estimate that an orderly liquidation of the DIA collection would require nothing short of five to eight years.

    c. I use the following assumptions in calculating the present value discount:

        i. Eighteen months to two years to adequately catalogue, research and perform full due-diligence on the full collection and determine an appropriate selling strategy;

        ii. Sales take place through public auction over a five-year period

        iii. Sales are front-load in the first years of liquidation

        iv. Sales or brokerage fees would be captured on the buyers' side, and the DIA would be charged nothing;

        v. Annual expense to the City of $6 million, decreasing in later years as objects are sold, related to storing, insuring and administering the art collection until it was fully liquidated;

        vi. A discount rate of 12% based on the volatility of the art market

        vii. No delays imposed by court challenges to the DIA de-accessioning, which could push this liquidation out to years seven to twelve or later.

## Potential Impact of Litigation

**50. As precedent indicates, if the DIA were forced as a result of a court decision to sell its collection to settle debts that are not its own and either diminish or close the institution to pay off City debt, it is likely to face formidable legal obstacles and prolonged litigation, not unlike the 5½ year delay outlined with Fisk University outlined below.**

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.991.8946 | Fax: 212.991.9841 | info@artvest.com



a. Though the City of Detroit / DIA situation is unprecedented, the events surrounding the planned liquidation resulting from Brandeis University's January 2009 decision to close the Rose Art Museum and sell off its entire holdings have valid parallels:

i. The decision was taken to close the Museum by the University as a step to shore-up the University's, not the Museum's, finances. Like the potential outcome for the DIA, it was not a step taken voluntarily by the Museum itself as to controversy and potential legal action.

ii. The decision was denounced by the Museum's Board, its Directors and "a wide range of art experts, who warned that the university was cannibalizing its cultural heritage to pay its bills." *The New York Times, Outcry Over a Plan to Sell Museum's Holdings,* Randy Kennedy and Carol Vogel, January 28, 2009.

iii. The Massachusetts Attorney General announced an investigation of the action within two days of the University's announcement of the planned sale.

iv. Within six months of the announcement, three overseers of the Rose Art Museum filed a lawsuit in the state court in Massachusetts seeking to halt the University's plan to close the Museum and sell its art. *The New York Times, Lawsuit Seeks to Save Art Museum at Brandeis,* Randy Kennedy, July 28, 2009.

b. By June 30, 2011, Brandeis settled the lawsuit by announcing that the Rose Museum will remain a "university art museum open to the public," and that it had "no aim, plan, design, strategy or intention to sell any artwork donated to or purchased by" Brandeis for the Museum. *The New York Times, Brandeis Settles Suit Over Proposed Art Sale, Randy Kennedy, June 30, 2011.*

c. Based on other Museum de-accessions to pay debts, court challenges are likely from the Michigan Attorney General, the DIA, the DIA corporation and numerous donors or their heirs, which could last as long as five years or more, as was the case with the sale of the Fisk-Stieglitz collection. As came about in the Fisk-Stieglitz case which involved a gift from an estate adjudicated in New York but given to a University Museum in Tennessee, these court cases will not only take time, but are likely to span multiple legal jurisdictions. Even a sale of COD property is likely to be challenged by the Michigan Attorney General, based on public comments he has already made on the matter.

d. Any art transaction cannot occur unless there is evidence of clear title, and any pending, or anticipated threat of challenges to title will prevent sales transactions. Thus, if a Court decision led to an action to sell art from the DIA collection, it is extremely likely that no monies, other than a deposit, and no art, would change hands until all such clouds on title were cleared in the courts.

## Potential Impact of Controversy or Market Disfavor

**51. The combination of a weak market sector and controversy surrounding a museum divestiture can have a negative impact on a sale result.**

a. The painting sold by the Delaware Art Museum on June 17, 2014, *Isabella and the Pot of Basil*, was estimated to sell for a low estimate of nearly $8.5 million, but instead sold for $4.3 million including the Buyer's Premium, the commission that goes to the auction house.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.868.9400 | Fax: 212.202.2437 | www.artvest.com


After deducting that, the Delaware Museum will most likely have netted $4.2 million, or only 49% of the low estimate.

# CHRISTIE'S

**WILLIAM HOLMAN HUNT, O.M., R.W.S. (1827-1910)**
ISABELLA AND THE POT OF BASIL



Lot 6 / Sale 1545
**Price Realized**
£2,882,500   ($4,891,603)  Sales totals are hammer price plus buyer's premium and do not reflect costs, financing fees or application of buyer's or seller's credits.
Estimate                £5,000,000 - £8,000,000
                        ($8,495,000 - $13,592,000)

b.  Whether this poor result is a function of the unevenness of the 19th Century Paintings market, or the controversy surrounding the Museum, or both, is difficult to ascertain, though otherwise the sale did very well, and "Isabella and the Pot of Basil" was heavily promoted with a coveted spot as the cover image of the auction catalogue.

**Peter Brown and Harriet Drummond, International Heads of the department [Christie's], commented:** *"Our £10.1 million sale today far exceeded the pre-sale low estimate of £8 million and was 90% sold by value and 77% by lot. The King Street saleroom was packed tight with collectors who joined with the many telephone and online bidders to contribute to the best sell-through rate and the second highest total for a decade in this category. (Source: Christie's website.)*

c.  On the occasion of the sale of this painting (See Exhibit D–6), the Association of American Museum Directors issued a statement enacting sanctions against the Museum: "With this sale, the museum is treating works from its collection as disposable assets, rather than an irreplaceable cultural heritage that it holds in trust for people now and in the future." Further, it called on its member museums to "suspend any loans of works of art to, and any collaborations on exhibitions with, the Delaware Art Museum, until notified by us that the sanction have been suspended or removed."

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-



**52.  There is a significant difference between a DIA liquidation as a result of a court decision and others such as the Delaware Art Museum, the New York Historical Society, and Fisk University.**

a.  In all of the above examples, the Institution's Board of Directors _voluntarily_ took the decision to sell property to financially stabilize their respective institutions. In the instance of the DIA, any type of sale would weaken or cripple the existing Institution, and would be forced upon it as a result of a court decision.

b.  In the most recent sale from the Delaware Art Museum, the Institution is selling property that had been purchased by the Museum and not that which had been gifted by Museum donors.

c.  In the instance of the sale of the New York Historical Society, the Attorney General of New York intervened to ensure provisions that gave other New York State Institutions a "right of first refusal," which the Metropolitan Museum of Art exercised to keep an important Masterwork in New York.

d.  In the instance of the de-accessioning of the Stieglitz Collection by Fisk University, the Attorney General of Tennessee spent 5 ½ years litigating against a sale by Fisk, which ultimately resulted in significant constraints on the sale and a sharing arrangement with Fisk and the Crystal Bridges Museum for $30 million.

e.  Separately, there is also the case of the Albright-Knox Museum's de-accessioning in 2006. This stands out from the other examples as the funds raised from the sale of works of art were used for an endowment to pay for new works in a different sector (Contemporary). While this decision was not without some controversy still, the sale was within the guidelines of the AAMD, and there were no sanctions or litigation.

**53.  It is difficult to quantify the risk to the value of the sale of the DIA collection, in whole or in part, due a negative reaction to a forced liquidation in the marketplace. However, there is one notable example of "market backlash" where market disfavor resulted in highly negative financial results, as well as particular concern I note about the American Art.**

a.  Christie's Auction of Orientalist Paintings (exclusively romantic scenes of Arabian life, a sub-genre of 19th Century European Art) on October 30, 2001, less than two months after the 9/11 attack on New York, resulted in an unsold rate of 68.4%, or the sale of only 6 out of a total of 19 on offer that day.

b.  It is likely that a sale of the European Art in the collection will be able to find an audience of collectors and institutions in Europe, the Middle East and Asia and even some collectors in America, who might be less concerned about purchasing works that would denude a major American Museum. However, this would not be the case with the significant holdings of American Art pre-1950 in the DIA collection (13.4% of the total). American Art from this period is collected exclusively by American institutions and collectors and not at all by overseas buyers or institutions. American art collectors are older, more traditional and generally highly patriotic. Thus sales in this sector of the collection are likely to be more seriously impacted than any other by the negative publicity related to a liquidation of the DIA collection. I believe that in other sectors, there is a large

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.ERROR.000 | Fax 212.000.0000 | www.artvestpartners.com



enough proportion of non-American collectors that the controversy of the liquidation of an American Museum will have a far less significant impact.

**The Potential Impact of a PWC Market Sector Crash**

**54.  The art market is prone to "crashes." Certain sectors such as PWC are more volatile than others, and as indicated earlier, in 2008, this sector fell by as much as 50% in both value and volume. With as much as $ 586 million (at a mid estimate) in the DIA collection, were such a correction to occur in the midst of a DIA liquidation, it could have a meaningful impact on the outcome, or alternatively, delay the liquidation if a decision to wait out the downturn, were even possible.**

a.  If the DIA liquidation does transpire in an orderly fashion over a longer time period or is delayed by litigation, it is likely that at some point the Post-War and Contemporary Sector will experience another price correction given its historic volatility. Based on the market performance in 1990/91 and 2008/09, such a correction would result in a 50% drop in prices for some period of time. If such an event were to take place during a DIA liquidation, the manager of the liquidation would be forced to choose between holding work off the market until prices rebounded or accepting a drop in value in DIA holdings in this sector of $293 million. In 2008/09, prices rebounded within two years. However in the crash of 1990/91 prices did not fully rebound for over a decade.

**55.  All Scenarios in Table 6 are based on the mid estimate and in Table 7 on the low estimates.**

a.  <u>Scenario A</u>:  Application of Immediate Sales (or Blockage discount Factor). This type of event precludes and overrides any other discount factors. However, as the sale of DIA property is very likely to be delayed by litigation, even an Immediate Liquidation may not be an option for a number of years. A Present Value Calculation is not employed in this scenario. This scenario marginally provides the highest return of the four scenarios.

b.  <u>Scenario B</u>:  Application of all other discount factors other than the Immediate Sales Factor. This would be a fully loaded scenario, a less likely but possible instance, where all of the negative market factors would align, including Market Disfavor and a crash in the PWC sector, in the context of a sell-off the DIA collection. It also does not take into account the potential for a lengthy delay in a sale due to litigation, or a Present Value discount resulting from such a delay.

c.  <u>Scenario C</u>:  Scenario C, where the DIA collection is sold over a five year period to maximize value, provides the second highest returns, calculated at Present Value. It does factor in Unsold works, which then are reoffered three years later at a 20% discount (an assumption based on industry practice). This scenario is also unlikely, as it does not allow for any delay due to litigation. It is worth noting how close in value this scenario is to Scenario A, which suggests that the Immediate Sale discount, a long time art industry standard, approximates the Present Value of a longer sale over time.

d.  <u>Scenario D</u>:  Scenario D uses the same assumptions as Scenario C. However, in this scenario, I factor in the likely impact of litigation in delaying the sale of the collection by five years, similar to the Fisk-Stieglitz case. It is my opinion that this is the most likely scenario of the four, as the Fisk-Stieglitz case involved only the AG of Tennessee; in a DIA

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.786.8846 Fax: 212.786.8846 info@artvestpartners.com



case there likely would be challenges from multiple parties and possibly in multiple legal jurisdictions.

## TABLE 6, APPLICATION OF DISCOUNT FACTORS, MID ESTIMATE

| Application of Discount Factors / Mid Estimate | | Scenario A | Scenario B | Scenario C | Scenario D |
|---|---|---|---|---|---|
| | 000s | | | | |
| Gross Indicative Value of the DIA Collection | | 3,684,466 | 3,684,466 | 3,684,466 | 3,684,466 |
| *(Mid-Estimate)* | | | | | |
| Discount Factor: Immediate Sale | 50% | (1,842,233) | N/A | N/A | N/A |
| | | | | | |
| Discount Factor: Unsold Rates | | N/A | (939,290) | (Note 1) | (Note 1) |
| | | | | | |
| Discount Factor: Not Selling Through Sotheby's or Christie's | 20% | N/A | (736,893) | (Note 2) | (Note 2) |
| | | | | | |
| Discount Factor: Present Value of Selling in Orderly Liquidation | | N/A | N/A | (1,853,547) | N/A |
| *(without Litigation)* | | | | | |
| | | | | | |
| Discount Factor: Present Value of Selling in Orderly Liquidation | | N/A | N/A | N/A | (2,539,108) |
| *(with Litigation)* | | | | | |
| | | | | | |
| Net Indicative Value | | 1,842,233 | 2,008,283 | 1,830,919 | 1,145,358 |
| | | | | | |
| Other Potential Discounts More Difficult to Predict | | | | | |
| | | | | | |
| Discount Factor: Market Disfavor on American Sector of up to | 50% | | (263,038) | | |
| | | | | | |
| Discount Factor: Market Crash in PWC Sector | 50% | | (293,201) | | |
| | | | | | |
| | | 1,842,233 | 1,452,045 | 1,830,919 | 1,145,358 |
| Note 1: Unsold Rates Included in Present Value Calculation | | | | | |
| Note 2: This Fact Is Not Applied in Present Value Calculation | | | | | |

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.···.···· | Fax: 212.···.···· | www.artvestpartners.com



## TABLE 7, APPLICATION OF DISCOUNT FACTORS, LOW ESTIMATE

| Application of Discount Factors / Low Estimate | | Scenario A | Scenario B | Scenario C | Scenario D |
|---|---|---|---|---|---|
| (000's) | | | | | |
| Gross Indicative Value of the DIA Collection | | 2,760,978 | 2,760,978 | 2,760,978 | 2,760,978 |
| *(Low Estimate)* | | | | | |
| Discount Factor 1: Immediate Sale | 50% | (1,380,489) | N/A | N/A | N/A |
| Discount Factor 2: Unsold Rates | | N/A | (705,448) | (Note 1) | (Note 1) |
| Discount Factor 3: Not Selling Through Sotheby's or Christie's | 20% | N/A | (552,196) | (Note 2) | (Note 2) |
| Discount Factor 6A: Present Value of Selling in Orderly Liquidation | | N/A | N/A | (1,394,755) | N/A |
| *(without Litigation)* | | | | | |
| Discount Factor 6B: | | N/A | N/A | N/A | (1,910,943) |
| *(with Litigation)* | | | | | |
| Net Indicative Value | | 1,380,489 | 1,503,334 | 1,366,223 | 850,035 |
| Other Potential Discounts More Difficult to Predict | | | | | |
| Discount Factor 4: Market Disfavor on American Sector of up to | 50% | | (193,108) | | |
| Discount Factor 5: Market Crash in PWC Sector | 50% | | (230,083) | | |
| | | 1,380,489 | 1,080,143 | 1,366,223 | 850,035 |
| Note 1: Unsold Rates Included in Present Value Calculation | | | | | |
| Note 2: This Fact Is Not Applied in Present Value Calculation | | | | | |

**56. Based on the above application of discount factors in TABLE 6, I conclude that the range of values the DIA collection will sell for, using the mid estimate values, would be between $1.1 billion for the present value of an orderly sale after a prolonged litigation (the most likely outcome, Scenario D) to $1.8 billion for the present value of an orderly liquidation without litigation (Scenario C), a less likely outcome.**

**57. In TABLE 7, based on the above application of discount factors on the low estimate value, I conclude the range of values would be between $0.9 billion for the present value of an orderly liquidation after a prolonged litigation to $1.4 billion for the present value of an orderly liquidation without liquidation.**

## Potential Impact of a Sale of Most Valuable Works

**58. Selling the most valuable works in the DIA collection would deprive the museum of its core attraction, drastically reduce attendance and related revenues, drive away potential donors of future gifts and endowments, and in all likelihood, ultimately force the closure of the DIA due to a loss of economic sustainability, resulting in a full liquidation.**

**59. The work that is most valuable financially is that which keeps the interest of visitors as well as future donors. Rather than being a museum of national and international standing which draws over 500,000 visitors a year, should the DIA be stripped of the master works that are at the heart of its collection, it would be relegated to the status of a small regional**

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-written Fax: 212-written www.artvest.com



**museum likely to lose both its visitor and tax subsidy, and it would lose its ability to raise the endowment needed within the eight-year period to substitute for the tax subsidy it currently receives.**

"…When a donor expressly intends for an art collection to benefit the community, then conversion of that collection into cash for general operations deprives the community of the cultural enrichment provided by the collection. And when potential donors see that express instructions are not followed, then they are more likely to take their gifts to another jurisdiction, or not make a gift at all." *De-accessioning and Donor Intent – Lessons Learned From Fisk's Stieglitz Collection*, Robert Cooper, Attorney General, State of Tennessee, February 7, 2013, Charities Regulation and Oversight Project Policy Conference.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-518-5090 | Fax: 212-202-6006 | www.artvestpartners.com



## VII. Critique of Houlihan Lokey Analysis and Indication of Interest

*"In private conversations, leading art intermediaries have indicated that while some significant bequests may be subject to meaningful encumbrances restricting the ability of the City to monetize the works, it is likely that a significant portion of donated works, or works acquired with dedicated monetary donations, have no meaningful encumbrances."* -- Houlihan Lokey, *Detroit Institute of Arts Summary of Activity*, April 2014,

**60. The sale of the DIA collection faces three levels of obstacles before works can be sold:**

 a. An auction house will not accept an item for sale unless the seller can convey free and clear title. This is a standard provision of any auction house consignment contract, and thus property with the prospect of pending or future litigation clouding title will not be acceptable for sale until such issues are cleared in the courts

 b. Given comments previously made by the State of Michigan's Attorney General, it is likely that the Attorney General will take legal steps to prevent a sale of any works from the DIA collections that he has deemed to be held in "public trust."

 c. Heirs of former donors as well as current donors, many still prominent leaders in the Detroit community, and the DIA corporation itself, are likely to pursue every legal option necessary to stop or delay the sale of any of the art, potentially leading to years of litigation.

*"Indications of Interest - Process Summary"*

**61. Of 38 parties contacted to issue submissions of interest, only 4 parties (10%) did so, despite the high quality and the perceived potential value of the collection. I believe this low number of offers, and the nature and quality of the offers, is indicative of the perceived limitations and likelihood of prolonged litigation should a sale of any of the DIA collection be attempted.**

*"To the extent the Christie's sample can be viewed as representative of the broader DIA collection, the implications are that the residual 95% of the collection could be valued from $11 billion to as much as $21 billion."*

**62. This is a number derived from a simplistic calculation, which has no bearing on the nature of value distribution in the art market, art sectors, or in the museum's collection itself, but is rather only a crude extrapolation of value derived by dividing the Christie's valuation by the percentage of COD objects in the total collection (2,700 / 66,000 or 4.09%).**

*"Formal Indication of Interest Summary"*

**63. <u>Poly International Auction House</u> is a government and military owned auction house in mainland China that recently has become the number one auction house in China and frequently takes principal positions in works of art that it sells at auction.**

**64. I believe that its bid of "up to $1 billion" is purely speculative and based on the success of the Albright-Knox property de-accession in 2006. In my view, the Asian Art collection of the DIA is not up to this standard, and consequently, after Poly had**

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.969.9540 | Fax 212.202.5072 | info@artvestpartners.com


conducted their full due-diligence as stipulated in their offer, their bid would be either non-existent or a fraction of this figure.

65. <u>Yuan Capital.</u> I have been unable to find much information on this firm or their intentions with regard to a purchase of the DIA collection, but I believe it is likely that their motivation and interest is similar to that of Poly International and that their interest may wane once they became more knowledgeable about the weakness of the DIA's Asian Art collection.

66. <u>Art Capital Group.</u> As discussed at length in the borrowing option in the section on Christie's recommendations for monetization, the borrowing option is not financially tenable and thus would be in effect, the selling of the entire DIA collection to Art Capital Group for $2 billion (or less depending upon the results of their due diligence).

67. <u>Catalyst Acquisitions / Bell Capital Partners</u>.  Based on their offer of $1.75 billion, I believe that they are working on an assumption, similar to that of Art Capital Group, that the entirety of the saleable collection is $4 billion. As "value of final offer to be dependent on development of a final definitive schedule of collection assets to be acquired," this number really has little meaning but is just an assumption to get in the door and a seat at the negotiating table.

 *"Instead of continuing to burden Detroiters, a DIA de-accessioning offers the potential for asset value realization that the City might use to consensually satisfy creditor claims while liberating additional sources of capital to catalyze the City's reinvestment initiatives—including investments in a reconstituted DIA or such other arts institutions the City's leadership deems more relevant to the City's rehabilitation."*

68.  The DIA, far from being less "relevant" to the City's rehabilitation, is actually central to it.

> a.  As described below in section IX, Cultural Impact, an important art museum is a valuable, contributing asset to the economic health of the city in which it resides. It is difficult for me to imagine what midtown Detroit would have as anchor attraction for renewal and future growth without the DIA or without the status of its world-class collection still intact.

> b.  HL itself undercuts its own argument for the full or partial liquidation of the collection by further stating, "The DIA routinely ranks among the top 5 in the Unites States and is recognized globally for the high quality of the artwork in a broad spectrum of subject areas."

> c.  Far from being a burden, such world-class collections provide a significant financial return to their city in terms of tourist expenditures. For example, "Out-of-town visitors who toured the Metropolitan Museum of Art spent an estimated $5.4 billion in the year that ended June 30 2013." Agovino, Theresa. "Met Museum Cites Its Economic Impact," *Crain's: New York Business.* 7 Oct. 2013, Web, 30 June 2014.

> While the DIA is not the Met, and Detroit is not New York City, it is comparable in that its world class collection can be marketed and promoted as a cornerstone to attract visitors to the city. The Metropolitan Museum is the top-ranking tourist attraction in New York City, drawing in 6.2 million visitors a year to a city with a population of 8.37 million; it attracts a visitor base, both local and foreign, equivalent to 74% of the city's population. The DIA has



an even stronger metric; it attracts a visitor population of approximately 594,000 in a city of 701,000, a visitor base equivalent to 84.7% of the city's population.

"The Detroit Institute of Arts, which under the leadership of Graham Beal continues the good fight against a forced sale of works in its collection, just missed the top 100 museums with 594,267 visitors, up from 429,000 in 2011. It came in 102nd [in 2013]." The Art Newspaper, Special Report, [Global] Visitor Figures 2013.   April 2014.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.991.8510 | Fax: 212.991.8516 | www.artvest.com



VIII.   Critique of the Christie's Recommendations for Monetization

**69.  My review of the Christie's Recommendations for Monetization leads me to the conclusion that Christie's was, by the time they completed this section of their report, dis-incentivized to develop this line of argument fully, possibly due to market backlash from the DIA and other art market participants. Additionally, while the firm has many of the leading art specialists in the industry, for this type of unique monetization analysis, the firm no longer has the in-house intellectual capital, which would normally have provided the research and economic resources for such recommendations, having disbanded its Financial Services group in 2009 during the last market downturn.[1]**

> a.  Lacking from Christie's' recommendations are critical details, even high level assumptions, such as the amount of money that could be raised, timelines to accomplish the recommendations, upfront investments, legal, administrative and other expenses required to implement them, and very little on overall feasibility in the context of the demands of a chapter 9 restructuring.

*Christie's Recommendation 1: "Use City-Owned Works as Collateral for Loan or Line of Credit"*

**70.  This is not economically viable. It is, in effect, replacing one type of debt with another without resolving the underlying financial limitations of art as an illiquid asset or defining the revenue sources that would service the debt.**

> a.  If I were to use the example of the loan offered by Art Capital Group ("ACG") in the HL document provided by the Creditors, the financials would likely look like this:

| Art Capital Group Loan Offer for DIA (000's) | |
| --- | --- |
| Value of DIA Collateral Required | 4,000,000 |
| Loan Amount | 2,000,000 |
| Annual Interest (6 - 9%) | 9% |
| Per Annum Agent fee | 0.50% |
| Effective Annual Rate | 9.50% |
| Annual Interest Payment | 190,000 |
| Origination Fee Year One | 1.25% |
|  | 25,000 |
| Year One Fee & Interest | 215,000 |
| Subsequent Years Interest Only | 190,000 |

[1] I was a Senior Vice President and CFO of Christie's Financial Services Group until 2009. All member of the Group, including me, were terminated at that time. Immediately thereafter, I co-founded Artvest Partners with Jeff Rabin, another former member of Christie's Financial Services Division.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-518-9680 | Fax: 212-202-7808 | www.artvestpartners.com



b.  Standard loan-to-value ratios for art loans, most especially "asset-backed" loans, permit a maximum of 50% of the low estimate of what the collateral would sell for at public auction. For example, if the DIA were to take out a loan on COD only, the low estimate provided by Christie's would be the total value against which a loan could be secured: $454 million, resulting in a total potential loan of only $227 million.

c.  In order for the DIA, or the City of Detroit, to borrow the full $2 billion stipulated in the ACG indication of interest, it would require that the value of the DIA's entire collection reach a minimum amount of $4 billion Otherwise, ACG or any other type of asset-backed lender will lower the amount lent to 50% of the lowest appraised value of the collection after the lender has completed an extensive round of due diligence to determine its own sense of potential liquid value, a process, given the volume of property, that might take as long six to nine months.

d.  Though ACG has quoted an annual interest and fee range of 6.5 – 9.5%, given the fee structures of most asset-backed lenders as well as the cost of the capital that ACG is likely to have to avail itself of to fund such a large deal (one that would be of unprecedented size in the art industry) it is likely that the loan will be at the higher end of the quoted range, or 9.5%.

e.  At this higher rate, on a $2 billion loan, the DIA would need to pay interest and fees of $215 million in the first year of the loan and $190 million every year thereafter.

f.  The Christie's proposal for monetization through a loan neither contemplates the source of revenue to service the debt annually, nor where the capital would come from to ultimately pay down the loan at the end of its term. Given the dire consequences of default, discussed below, this is a significant omission in such a strategy.

g.  Most asset-backed lenders have extreme provisions for the lender in a situation of default, levying both higher interest rates and onerous "agency" fees to liquidate the property. If such a situation came to pass, the DIA would find itself in the midst of a forced liquidation of the collection on the lender's terms. In the art industry, such lenders are often referred to as "loan to own:"

> Like most things in the art (and finance) world, you have to have money to make money, and for those without significant capital to back up their art holdings, not all loans are created equal. Unless you have a collection worth $200 million, a balance sheet that goes significantly beyond that, and a good relationship with one of the private banks that are increasingly offering art loans as part of their service packages, you are unlikely to secure the kind of rate Steinhardt took advantage of. You are more likely to end up paying 44 percent to **Art Capital Group**, as photographer **Annie Leibovitz** notoriously did after using her own photographs as collateral. (*Blouin Artinfo, Navigating the Art Loan Biz, A Surging Industry Attracting Both Big Banks and "Loan-to-Own" Sharks,* Shane Ferro, April 12, 2012.)

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-



**71.  This option would have the same effect of depriving the DIA of some of its most prized works, yet for far less of the financial benefit. Based on deals made with other partner museums, Guggenheim Museum & Bilbao, Guggenheim & Abu Dhabi, and the Louvre & Abu Dhabi, such an arrangement would be unlikely to net more than $20 million to $100 million in total for a 10- to 15-year deal and would result in the removal of many high value works from the walls of the DIA.**

a.  Bilbao & Guggenheim. The Basque government agreed to pay the Guggenheim Museum $20 million (two payments of $10 million each in 1992 and 1993.); to provide a $50 million art acquisition fund; to fund the $100 million construction cost of the Museum; and to fund its annual operating budget of $12 million.

b.  The Louvre Museum & Abu Dhabi. This financial arrangement is the most lucrative on record: $512 million for the use of the Louvre brand and an additional $747 million broken out as follows: $247 million for rotating between 200 and 300 artworks through the Louvre Abu Dhabi during a 10-year period; $214.5 million for management expertise over 20 years; and $253 million for four temporary exhibitions a year for 15 years, and a direct donation of $32.5 million to the Louvre to refurbish a wing of the Pavillon de Flore for the display of international art.

c.  It is important to note that of these four buckets of revenue being paid to the Louvre, only one, providing 200 to 300 artworks, would be even a remotely viable option for the DIA. And even that would come at cost to the viability of the institution. Whereas the Louvre is able to draw objects from the thousands of masterworks in its own collection, the Musee D'Orsay's, and Versailles, the DIA would be able to draw only from its collection of Masterworks (or what we would refer to as High Value Items) of approximately 400 to 500 items, and of that, approximately 80 to 100 items of important American Art pre-1950, would be of little interest to museums outside the US. With regard to the other options, the DIA brand is not a saleable brand, particularly given the current circumstances; nor does it have the depth of administrative staff to provide management expertise to another institution at the same level as the Louvre, or the programming of temporary exhibitions for a satellite institution, which is an extremely labor intensive undertaking.

d.  Guggenheim & Abu Dhabi. It is unclear what the compensation structure is between the Guggenheim and Abu Dhabi. The government of Abu Dhabi is assuming all costs of building the Frank Gehry building, funding the new museum's annual operating budget, and providing a substantial acquisition budget similar to the arrangement for Bilbao. Thus it would not be unreasonable to expect that the Guggenheim was receiving similar compensation or slightly more than it did for Bilbao. There is no indication that the Guggenheim is receiving compensation comparable to the Louvre.

e.  Crystal Bridges. This Museum has entered into a partnering arrangement for with the Fisk-Stieglitz collection for a total of $30 million. A separate ownership entity was established to hold the collection, in which Fisk and Crystal Bridges each own a 50% stake. It is quite possible that Crystal Bridges would be interested in a similar arrangement with the DIA for its American Art pre-1950 collection and/or its collection of Post War and Contemporary Art. However, this would come with two important caveats: the first is that it would mean removing a large number of high value works from the DIA's walls for



extended periods of time, and the second is that in the category of American Art pre-1950, Crystal Bridges is the largest buyer in the marketplace and can and will use its buying leverage to negotiate a good bargain for itself, thus raising the question, just how much could the DIA get for lending its collection, $50 million, $100 million, or $200 million? It is hard to imagine Crystal Bridges providing amounts meaningful enough to significantly move the needle on creditor debt relative to what would be lost by the museum and the City of Detroit.

f.  Qatar. Based on reports in the press, all indications are that unlike Abu Dhabi, this country is working very independently on its own art and cultural projects and has expressed no interest in partnering with other institutions.

g.  None of these considerations of lending art from the DIA, either on a long or short term basis, take into the account for the risk of loss or damage. Particularly with some of the more valuable work in the collection, such as the Breughel, such a risk is important to consider.

*Christie's Recommendation 3: "Create a "Masterpiece Trust" to be Accessed by Members of a Museum Consortium"*

**72.  In the absence of specific numbers and institutions, this recommendation is a bit too "blue-sky" to be substantively helpful. Moreover, at a time when the better-funded museums are pursuing their own individual expansion and building plans, the number of museums able to participate would be few to non-existent. Moreover, this type of entity would most likely be limited to DIA's fellow American institutions, further narrowing the universe of likely participants, as overseas institutions would be even less likely to feel obliged to spend scarce funding on such a radical, untested idea, simply to save the DIA from the City of Detroit's predicament.**

**73.  This entity would require time and funding to establish and administer, and given its unprecedented nature, it would be difficult to establish reliable fund raising targets, expense projections and timelines.**

**74.  Given the financial constraints on other US Museums based on their own ambitious plans for expansion, it is not likely that this idea will ever get traction.**

a.  The Houston Museum. With one the largest endowments among American Art Museums (third behind the Getty and the Metropolitan Museum of Art), the Houston Museum is currently committed to a $250 to $350 million building project to create new galleries for art after 1900.

b.  Museum of Modern Art. This institution is about to undertake another major building expansion, which is likely to cost in the hundreds of millions of dollars. (The previous overhaul nine years ago, cost $850 million).

c.  The Metropolitan Museum. This Museum announced a gut renovation of its Modern and Contemporary Wings in time to house the $1 billion gift of Cubist art from Leonard Lauder. A budget has not been released, but it too is likely to cost in the range of hundreds of millions of dollars.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-991-5300 | Fax: 212-991-5333 | info@artvestpartners.com



d.  The Whitney. In the final stage of completing its new building on the High Line in downtown Manhattan, the Whitney projects that the new building is going to cost $422 million. At the same time, they are raising $200 million in additional funding for their endowment and $133 million to expand their arts and educational programming.

e.  San Francisco MoMA ("SFMoMA"). This institution has nearly completed raising $610 million for a new building complex and an expansion of its endowment.

f.  The Los Angeles County Museum of Art ("LACMA"). LACMA has announced that it is planning a new museum building on Wilshire Boulevard, which it estimates will cost at least $450 million, and another $200 million for contingencies and operating expenses.

g.  The Getty. This institution has committed to partnering with the Mellon foundation to contribute $10 million to the Grand Bargain. It is extremely unlikely that they would participate in any effort that would undermine or unravel that arrangement in order to share in the art more directly themselves.

<u>Christie's Recommendation 4: "Sale and Permanent Loan or Gift"</u>

**75.  This is a multi-year, major fundraising endeavor. It is in effect, the same as raising funds from philanthropists to name works on their behalf. As the purchase would be restricted in terms of future sale or loan, it could not be considered a "real" asset for purposes of inheritance, future liquidity or borrowing; thus, its appeal would be limited to a small number of philanthropists who most likely are already pre-disposed to assist the DIA or are already doing so. It is hard to imagine how this type of program would attract a new type of donor who is not already supporting the institution.**

a.  Again, refer to the examples given above. The philanthropic community in the US outside of the Detroit area is being fully tapped for high-level building projects on both the east and west coasts. There is an enormous amount of fundraising competition, a new building is far more attractive to a potential donor, and "purchasing" a painting is not really a purchase but just preserving a painting that is already owned and hanging on a wall in the DIA.

<u>Christie's Recommendation 5: "Traveling Exhibition of Select Works"</u>

**76.  By Christie's own admission, this a less than desirable alternative, as such exhibitions are "costly to mount" and raise very little relative to their total expense. Such revenues range from as little as $20,000 for small exhibitions to $600,000 for blockbuster exhibitions, with loans from an array of prominent international museums.**

a.  Such numbers were verified by Artvest in conversations with a number senior finance officers at leading New York Art Museums. A point that was repeatedly made was that such special exhibitions require an enormous up front investment of curatorial time. To reach the upper limits of revenue for a touring exhibition, it needs to be a global exhibition, with works of art borrowed from institutions around the world. Those touring exhibitions that repurpose works from a museum's permanent collection tend to garner revenues more towards the bottom of the range. Given the DIA's current limitations, it is likely that this latter scenario would be the case for its travelling exhibitions.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.clarity.com



**77.  The DIA could serve as the centerpiece and symbol of the City's restructuring, a hub for a new artist and cultural community in Midtown Detroit, one along the lines of how the Brooklyn Museum has become a focal point in that Borough's renaissance as a center for artists that has come to rival, even surpass Manhattan – in large part due to the relative cheapness of its real estate in conjunction with it affinity toward, and support of, an arts-related culture.**

a.  Take for example, the so called "Bilbao effect" with regard to the Basque's Government backing of such a "pharonic" project:

When the Guggenheim project was brought up for debate, however, the Basque Government had more than culture in mind. It argued that, after a grim 15 years in which the closing of steel plants, shipyard and port facilities had swollen unemployment, the museum would serve as both motor and symbol of economic revival and urban renewal. It also appealed to Basque nationalist pride, promising that a world-class museum showing the best of the Solomon R. Guggenheim Foundation's collection and drawing perhaps 500,000 visitors a year would put the city on the map. *The New York Times, A Gleaming New Guggenheim for Grimy Bilbao*, Alan Riding, June 24, 1997.

b.  While it is true that Bilbao was not only a Museum but also an architectural novelty, the quality of the collection was a critical factor in drawing the crowds to Bilbao; an empty museum could not.

It is evident that the Basque government, although criticized early on for gambling on the Guggenheim to revive the economy, made a wise and timely investment that yielded a huge return. A breakdown of the economic activity in Bilbao in 1997 and 1998 illuminates the extent of this return. In 1997 approximately $120 million was spent in the food service sector. In 1998 that total increased to approximately $160 million. Also in 1997, an estimated $75 million was spent on purchases in local shops, $60 million on hotels, $15 million on fuel and transportation, and $17 million in the museum itself. *Financing A Global Guggenhiem Museum, A Thesis, Submitted to the Graduate Faculty of the Louisiana State University,* By Jill Martinez, May 2006.

c.  Lastly, as a resident of New York, I cannot help but be reminded of the last cultural loss of this potential magnitude and how it changed our city forever: the destruction of the greatest urban architectural monument in New York, one of the greatest in the nation, Penn Station, in 1963. It was destroyed in an effort to rescue the perilous financial situation of the failing Pennsylvania Railroad. Several years later, the firm filed bankruptcy anyway, yet the cultural and urban landscape of New York was damaged in a way that the community still mourns and is still trying to partially restore, more than fifty years later, with the building of Moynihan Station at enormous expense.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.---.---- | Fax: 212.---.---- | www.artvestpartners.com



**78. Rather than being a source of cash to creditors or a burden on the current city, in fact the DIA is the single most important cultural asset the City currently owns for rebuilding the vitality of the city.**

**79. In this report I have formed an opinion on the following as requested by DIA Counsel and City Counsel:**

a. The indicative value of the works in the DIA Collection at a gross valuation, without any deduction for the value of works that are ultimately determined not to be subject to sale, whether for legal or other reasons, and before the application of discount factors related to general market conditions or issues specific to the DIA collection at a mid estimate of $3,684,466,069 and at a low estimate of $2,760,978,432.

b. The feasibility and likely effects of and on the market and value realization of a sale of the DIA collection under a variety of market and sale conditions: After the application of various discount factors related to these conditions, the range of value the DIA collection will sell for, without any deduction for the value of works that are ultimately determined not to be subject to sale, will be between $1.1 billion for the present value of an orderly liquidation after allowing for the likely delay of litigation to $1.8 billion in the highest value scenario, with no litigation and an orderly selling plan.

c. My review of the practicality and reasonableness of the monetization alternatives described in Christie's preliminary report to the City of Detroit: they do not have a reasonable expectation of either raising meaningful money or exceeding even the $100 million the DIA has already committed as its contribution to the Grand Bargain.

d. Creditor-proposed sales of the DIA's collection, including analysis of certain third-party indications of interest: they are either not plausible or not likely to net the dollar values quoted.

**80. Finally, it is my opinion that liquidating the DIA collection in a timely manner is unlikely, given the multiple levels of legal challenges as well as the financial risks and uncertain auction outcomes.**

Michael Plummer, Principal, Artvest Partners

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-763-8654 | Fax: 212-763-8304 | www.artvest.com



**81.** A full assessment, or sale cataloguing, of the DIA collection would require a minimum of 18 months of research for such a quantity of work and full access to DIA files and records. Though I did not have a direct dialogue with the DIA, I relied on information that the DIA provided to Artvest as well as on research of our own.

**82.** In the normal course of the examination of art to ascertain value for sale, a more rigorous physical inspection is undertaken, such as viewing paintings under blacklight or x-ray, chemical sampling of paint, taking paintings off of walls to view for re-linings and markings and documentation on backs of frames and canvases. For sculptures and ceramics, especially Chinese terra cotta and ceramics, thermoluminescence tests are often undertaken to determine age and authenticity. Additionally, during more in-depth cataloguing described here, an appraiser or specialists would check with academics and other specialists, for which sometimes there is only one such person in the world with an appropriate and highly specialized academic expertise. Given the time limitation on providing this evaluation to the Court and the disruption to the Museum and its visitors that would have resulted, those measures were not possible. But such measures were not necessary for me to form my opinions for the purpose of this report, which is not intended to provide a full cataloguing of objects for sale.

**83.** As stated elsewhere in the document, such in-depth cataloguing of the entire DIA collection I estimate would take between eighteen months and two years. Such cataloguing might in some instances raise the value of some works, for example, if there had been a misattribution, but in general, more detailed examination is likely to uncover defects, poor conditions or reattribution that would lower values.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-518-5216 | Fax: 212-208-4421 | www.artvestpartners.com



## Exhibit A: List of Documents Relied Upon

Christie's, *Fair Market Value for Financial Planning, Property Belonging to City of Detroit*
17 December 2013

Detroit Institute of Arts (List of Masterworks), February 28, 2014 (in hardcopy), May 28, 2014 (in Excel file format.)

December 3, 2013 Letter from Doug Woodham, President, Christie's Americas, to Mr. Kevyn Orr, ("Recommendations for Monetization")

Houlihan Lokey, *Detroit Institute of Arts, Summary of Activity,* April 2014

DIA Documents:

> List of objects in the DIA's collection (the "Major Works") (DIAINSP000001-DIAINSP000203).

> List of objects in the DIA's collection (DIAINSP097403 – DIAINSP114404).

> The DIA's archived object files for the Major Works (DIAINSP058666 - DIAINSP087849).

> The DIA's archived bibliographic information relating to the Major Works (DIAINSP121651 - DIAINSP122287).

> Documents that the DIA supplied to Christie's in connection with Christie's 2013 evaluation of the DIA's collection (DIAINSP005463 – DIAINSP010389).

> DIA database information for objects in the DIA's collection (DIAINSP124564).

> DIA historical condition reports for the Major Works (DIAINSP122288 – DIAINSP124563).

> Object images for selected objects in the DIA's collection (DIAINSP121617 – DIAINSP121650).

*TEFAF Art Market Report 2014,* Prepared by Dr. Clare Mc Andrew, Arts Economics

*Fine Art and High Finance,* Edited by Clare Mc Andrew, Chapter 6, *Art Funds,* Jeremy Eckstein and Randall Willette

*An Approach to Advanced Problems in Appraising Art,* Alex J. Rosenberg, Sc.D, AAA, ASA

Sotheby's Annual Financial Statements: 1993, 2006, 2013

Artprice Databases:
 artnet
 Askart
 Invaluable

See also Exhibit D for a full list of documents cited in research for this paper

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.994.0930 | Fax: 212.994.0931 | www.artvestpartners.com



Exhibit B: Curriculum Vitae of Michael Plummer

**Career**

Artvest Partners LLC, Principal and co-founder (2009-present)

Christie's Financial Services, COO and Senior Vice President, (2007-2009)

Fernwood Art Investments, President, COO (2003-2006)

ArtBase Inc. Founder & CEO (2000 – 2003)

The Carbone Smolan Agency, Director (1997 – 2000)

Accoustiguide, Head of US Division (1996 – 1997)

Sotheby's, Marketing Division Head for the Americas and Asia, (1993-1996)

Sotheby's Marketing, Vice-President, Publications and Direct Communications, (1991 – 1993)

Sotheby's International Realty, Vice-President, director of Finance, Marketing and Operations (1987-1991)

Sotheby's Business Manager for Asian Art Division, (1984 – 1987)

Sotheby's Treasury Department, Credit Department, (1980 – 1984)

**Other**

Director and a co-Founder of the Luxury Marketing Council (1993-present)

Chairman, the American Friends of the London Academy of Music and Dramatic Art (2012-present)

**Education**

BS, economics, Wharton School, University of Pennsylvania, (1977-1980)

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.343.0540 | Fax: 212.202.6036 | www.artvestpartners.com



Exhibit C-1: Curriculum Vitae of Consulting Specialist, Betty Krulik



Betty Kruik Fine Art, Ltd
50 East 72nd Street, Suite 2A
New York, NY 10021

Bkruikfineart.con
917.582.1300
bkrulikfineart@gmail.com

**Appraisers Qualifications**

Betty Krulik has 30 years of experience in the handling of American and European 19th and 20th Century art; she has sold to and on behalf of major collectors and museums around the nation. She has acted as appraiser for corporate and institutional collections as well as private collectors.

Her specialty is American Art, yet in her 8 years at Christies she handled European Old Masters and 19th Century works as well as Contemporary Art.

She began her career in 1976 as Gallery Director of Marbella Gallery, 903 Madison Avenue, New York, NY for 2 years. There she learned the business from the ground up, doing inventory control, bookkeeping, sales, and research.

In 1978 she went to Christie's where she became Head of Paintings Departments, an Assistant Vice President, Christie's East, 219 East 67th Street, New York, NY 10021 for 8 years. Responsibilities included business getting, appraisal, cataloguing of paintings, works of art on paper, and sculpture, of the 17, 18th 19th and Early 20th Centuries European and American.

In 1987, she became Director of Spanierman/Drawings, 45 East 58th Street, New York, NY 10022, where she worked for 14 years. At Spanierman Gallery, LLC she specialized in important American Works of Art of the 19th and 20th centuries and has been at the forefront of research in the field, as well as being known as one of the major outlets for American Art. During her tenure at Spanierman Gallery she curated many exhibitions including the museum quality shows of the work of William Merritt Chase, Willard Leroy Metcalf and the landmark exhibition, Arthur Wesley Dow: His Art and His Influence.

In 2001, she took the Directorship of the Department of American Art at Phillips, dePury and Luxembourg, 3 West 57th Street, New York NY 10019, where she held the auctions of the famed Glen Foster Marine Art sale, and the world renowned Thyssen Bornemizsa Collection, establishing world record prices in many sectors of American art.

In 2004 she began her business as Private Dealer, Art Advisory and Appraiser, Ms. Krulik has handled the sales of important American art, from the Hudson River school to American Modernism.

She is Certified Member of the Appraisers Association of America, and serves on its board as President. She also is on the Advisory Board of the Munson-Williams-Proctor Institute, in Utica, NY. and the Masterworks Museum of Bermudian Art. She is President of the William Merritt Chase Catalogue Raisonne committee, and on the advisory committee for the Thomas Wilmer Dewing Catalogue Raisonne. She has appeared as an appraiser on Antiques Roadshow, and has lectured at the Appraisers Association of America, New York University's Continue and Professional Studies, and for Museum groups around the nation. Recently she was nominated for membership in the prestigious Private Art Dealers Association.

**Specializations:** American Painting, Drawings, Watercolors, Pastels 1850-1950

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.



Exhibit C-2: Curriculum Vitae of Consulting Specialist, Sabine Wilson

## SABINE WILSON, PhD

**Fine Art Appraiser and Advisor** Certified Member, Appraisers Association of America
210 East 63rd Street, 12 A, New York, NY 10065  P: 212-583 9079  F: 212-583 9302
E: bine.wilson@gmail.com

**Curriculum Vitae**

**Education:**

> Ph.D., Art History, Ludwig-Maximilians-Universität, Munich, 1997
> Program in Appraisal Studies, New York University, New York, 2000
> Provenance Research Training Program, European Shoah Legacy Institute, Magdeburg, 2012

**Appraisal Practice:**

Fine Art Appraiser since 2000
> Certified Member, Appraisers Association of America (Impressionist and Modern Art)
> Uniform Standards of Professional Appraisal Practice, valid until 2016

> Specialized in the valuation of American and European paintings, sculptures and works on paper of the 19th, 20th and 21st centuries for charitable contributions, estate and gift tax; insurance, damage and loss claims; collateral loans and financial planning; appraisal review.

**Teaching:**

Adjunct Instructor, New York University, SCPS, Appraisal Studies Program
Courses:
> Introduction to Appraising Fine Art;
> The Essentials of Appraising;
> Damage and Loss Appraisals;
> The Appraisal of Modernist Paintings;
> Impressionist, Modern and Contemporary Art: The Auction Market and Appraisal Issues

**Publications:**

> *Impressionist and Modern Art: Paintings, Drawings, Sculpture* in: Appraising Art: The Definitive Guide to Appraising the Fine and Decorative Arts, Appraisers Association of America, 2013

**Lectures:**
> Topics: Madame de Pompadour; French 18th Century Art; German Expressionism; Art of the Weimar Republic, German and Austrian Art
> Venues: The National Gallery, London; Sotheby's, New York; New York University, New York; Appraisers Association of America, New York; Dartmouth College, Hanover, NH

**Languages:**

German, English, French, Italian

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-



Exhibit C-3: Curriculum Vitae of Consulting Specialist, Kristin Gary

# Kristin Gary

150 st 55ᵗʰ Street • New York, NY 10019 • Phone: 212-246-9293 • E-Mail: k@kristingaryfineart.com

Kristin Gary has been dealing in the New York and international markets since the beginning of her career in the early 1990s. She has acquired a deep knowledge of European Old Master and 19th Century painting, sculpture, and drawing and has curated exhibitions and has extensive attribution, appraisal and sales experience.

## Experience

### Kristin Gary Fine Art, New York- *Founder*                                     1999 – to present

Founded in 1999, KGFA is a private gallery specializing in the research, purchase and sales of European and American paintings, sculpture and drawings from the Old Masters through the 20th century. Extensive experience working with both American and European private clients, museums and institutions, including sales of important works to The Metropolitan Museum of Art and The Boston Museum of Fine Arts; appraisal of works of art; assist in bidding at auction; managing collections; advising on conservation.

Special Expert Consultation Projects Include:

- *Salander O'Reilly Gallery Trust - Expert Advisor*                          2010 – to present
  Contracted after Christie's to complete project by providing services for the maximization of estate assets. The SOG estate is largest gallery bankruptcy to date comprising hundreds of creditors and an inventory of over three thousand objects including paintings, sculpture and drawings from Renaissance through contemporary periods. KGFA services included private sales, organization of public sales (venue selection and auction catalogue development), appraisals, establishment of authenticity to ensure accurate valuations.
    - To date, achieved multi-million dollar sales of $15 million of paintings, sculpture and drawings

- *Ralph Esmerian Trust - Expert Advisor*                                         2011 to present
  Provided services for maximization of bankruptcy estate inventory, including sales, venue selection, auction catalogue development, appraisals and establishment of authenticity to ensure accurate valuations
    - Achieved highest total for an auction of American Folk Art at Sotheby's - $12,995,000 (2014)
    - Achieved record price for a Frank Lloyd Wright urn at Leslie Hindman - $750,000 (2011)

- *The Pool NYC - Partner*                                                              2009
  Organized and executed five separate exhibitions as a collateral event at 53rd annual Venice Biennale

- *Galerie Brame et Lorenceau, Paris France*                                   2001-2004
  Served as American representative responsible for American clients and for sales to American museums

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-992-3490 · Fax 212-202-3014 · info@artvestpartners.com



- *Behaviors*                                                                                                    2004
  Produced a solo show by artist Nicola Pucci

- Exhibits at TEFAF, Maastricht; The International Fine Arts Show, New York and The International Fine Art Fair, Palm Beach

### William Doyle Galleries, New York - *Specialist, Paintings Department*          1996 - 1999

Prepared auction catalogues for all paintings, sculpture and works on paper from Old Masters through to Modern, including responsibility for attributions and research on all works

- *Walk-in Consignment Days* – a service where the public brought in objects for appraisal; determined value, auction estimate and advised as to auction worthiness

### Colnaghi, New York                                                                           1993 – 1996

- Sales and relationship responsibilities, gallery management, research, catalogue production, show representation (TEFAF, Armory)
- In 1994, repositioned Colnaghi's older stock; conceptualized, wrote and produced, *The Art of Pleasing, European Paintings for Town and Country 1530- 1930*, an exhibition resulting in 80% sales of existing stock

## Education

### *Istituto per L'arte e il Restauro, Florence, Italy*                               1990-1992

Masters of Arts, Art History with a focus on Italian art

### *Duke University, Durham North Carolina*                                           1985-1989

Bachelor of Arts, Majored in Art History

## Other Experience

- Native fluency in Italian, working knowledge of French and Dutch
- Certified Member of the Appraisers Association of America
- Co-founder of The Trident Swim Foundation (a foundation that supports an after school academic/swim program for minority children in NYC), 2007 – present
- United States Masters Swimming:
    President of the Board of Red Tide NYC, Inc., 2006 – 2013
    World and American Record Holder
    New York Athletic Club - President of the Swimming and Water Polo Intra Club and member of the Swim Committee

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-ЕЭ Ð 846-tj t   Doc 7121-1 art Filed 08/27/14   Entered 08/27/14 19:26:07   Page 56 of 204



## Exhibit C-4: Curriculum Vitae of Consulting Specialist, Joe-Hynn Yang

CURRICULUM VITAE

JOE-HYNN YANG

121 West 72nd Street, #10C
New York, NY 10023, USA
ph/fx: +1 212 787 5875
cell: +1 917 400 4393
email: yang.joehynn@gmail.com

**Aug 2009 - current: Principal and Director, Courage & Joy, Inc.**
- Dealing in Asian antiquities, and providing art advisory services and appraisals. Select dealer member exhibiting annually during Asia Week New York from 2010 -12.
- Most recent exhibition, March 2012, "Serene Glazes, Elegant Forms: A Select Exhibition of Chinese Ceramics," received notable mention by Roberta Smith of The New York Times.

**Jan 2008 - Jun '09: Senior Vice-President, Head of Chinese Works of Art Dept, Christie's New York**
- Managed staff of six, sourced fine Chinese art internationally for twice yearly auction sales at Rockefeller Center, directed all details of appraisals, sale marketing, catalogue production, and exhibition planning, and partnered in global key-client strategy.
- Managed a major sequence of Asian art deaccessions from the Arthur M. Sackler Collection and the Sackler Foundation. Responsible for department's annual gross sales of $80 million in 2008.

**Jun 2001 - Jul '07: Vice-President, Head of Chinese Works of Art Dept, Sotheby's New York**
- Among the youngest ever dept. heads appointed, overseeing staff of five. Grew dept from $4 million annual auction sales in 2002 to a record $40 million single auction season in March 2007, coinciding with winning a major deaccession from the Albright-Knox Art Gallery, Buffalo.
- Sourced twice yearly auction sales and managed relationships with a global clientele. Directed all aspects of auction marketing, catalogues, and exhibitions, as well as departmental budget management and competitive proposals.

Dec 2000 - Jun '01: Cataloguer, Chinese Works of Art Dept, Sotheby's New York
Oct 1998 - Nov 2000: Cataloguer, Chinese Works of Art Dept, Sotheby's London

**Oct 1998: Called to the Bar of England & Wales, Gray's Inn, London.**
- Passed the Bar Examination, The General Council of the Bar, Trinity 1998 (May 1998); earning a Class II Division II grade, one of only seven candidates to do so, with no others having any higher passing grade. Member of Gray's Inn, London, 1996 - 8.

Sep 1997 - Apr '98: Asian Art Diploma: Arts of China
- Jointly administered by Sotheby's Institute, London, and the School of Oriental and African Studies (SOAS), University of London.

**Sep 1993 - Jun '96: Bachelor of Arts (Honors) in Jurisprudence, Brasenose College, University of Oxford**
- Earned a Class II Division I ("Upper Second") grade. Awarded the Martin Wronker Prize by the University for the best Finals paper in Jurisprudence (Philosophy of Laws) in 1996.
- Awarded a Varsity Half-Blue in Dancesport in 1995. President of the OUBDC (Ballroom Dancing), 1994-6; President, Brasenose Union, 1994-5; also, inter-collegiate theater and rowing.

Jan 1991 - Dec '92: GCE 'A' Levels, Raffles Junior College, Singapore (earning three 'A's, one 'B')
- Executive Committee, Student Council; Chair, Inter-Faculty Committee; RJC Plaque for Service.
- First Prize, National Students' Elocution and Public Speaking Competition, Singapore, 1992.
- National Creative Writing Mentorship program, Singapore, 1991, via portfolio of plays and poetry.

Jan 1989 - Dec '90: GCSE 'O' Levels, Raffles Institution, Singapore (earning eight 'A1's, one 'A2')
- Junior Runner-up Prize, Commonwealth Students' Essay Competition, 1988; the world's oldest and largest international essay competition, with open entries from every Commonwealth nation, administered by the Royal Commonwealth Society, London, since 1883.

Jan 1989 -Dec '92: ASEAN Scholarship, Ministry of Education, Singapore
- full pre-university scholarship, with board and lodging; only 15 - 25 places awarded annually among candidates from all nine ASEAN nations; renewed in 1991 for a further two-year period.



Exhibit D: List of Sources

## **Works Referenced - Michael Plummer**

*AAMD Statement on Detroit Institute of Arts Collection. Association of Art Museum
Directors.* 24 May 2013. Web. 30 June 2014.

Agovino, Theresa. "Met Museum Cites Its Economic Impact." *Crain's: New York
Business.* 7 Oct. 2013. Web. 30 June 2014.

Association of Art Museum Directors. *Association of Art Museum Directors' Statement
on Randolph College and Maier Museum of Art. Association of Art Museum
Directors.* 12 Mar. 2014. Web. 30 June 2014.

"Association of Art Museum Directors Sanctions Delaware Art Museum." *Association of
Art Museum Directors.* 18 June 2014. Web. 24 June 2014.

Blair, Elizabeth. "Detroit Needs Money. Can a 'Grand Bargain' Save the City's Art?"
*Nat'l Pub. Radio.* 25 Dec. 2013. Web.

Boroff, Philip. "MoMA Visitors Fall, Met Museum's Rise, Led by Blockbusters."
*Bloomberg.* 12 Jan. 2012. Web. 30 June 2014.

Boucher, Brian. "Mellon Foundation and Getty Trust Pledge $13M to Detroit "Grand
Bargain"." *Art In America.* 11 June 2014. Web. 30 June 2014.

Christie's. *Expanding Buyer Base Drives Record Year at Christie's with Art Sales of £4.5
Billion ($7.1 Billion), up 16%. Christie's.* 22 Jan. 2014. Web. 30 June 2014.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.536.5045 | Fax: 212.653.0245 | www.artvest.com



Christie's. Modern & Impressionist Art. *Impressionist and Modern Art Evening Sale including Property from the Estate of Edgar M. Bronfman*. *Christie's*. 6 May 2014. Web. 24 June 2014.

Christie's. Post War & Contemporary Art. *Results - Post-War & Contemporary Art Evening Sale*. *Christie's*. 13 May 2014. Web. 24 June 2014.

Cotter, Holland. "Detroit's Latest Model: A Retooled Museum." Rev. of *Detroit Institute of Arts*. *The New York Times* 23 Nov. 2007. Print.

"Detroit Gets $15 Million Ford Bequest." Editorial. *The Art Newspaper* 03 Jan. 2006, 167th ed., Museums sec. Print.

Ferro, Shane. "Navigating the Art Loan Biz, A Surging Industry Attracting Both Big Banks and "Loan-to-own" Sharks." *Blouin ArtInfo*. 5 Apr. 2005. Web. 30 June 2014.

*The Future Whitney: A Preview*. *The Whitney Museum of American Art*. Web. 30 June 2014.

"Guggenheim Museum Bilbao." *Wikipedia*. Web. 30 June 2014.

Guillen, Joe. "Detroit Moves to Shield Museum's Art from Creditors." *USA Today*. 5 June 2014. Web. 30 June 2014.

Hamdan, Sara. "After a Sputtering Start, the Louvre Abu Dhabi Project Gathers Pace." *The New York Times*. 26 Sept. 2012. Web. 30 June 2014.

Hawthorne, Christopher. "LACMA Draws up Ambition Plans for a $650-million New Look." *Los Angeles Times: Article Collections*. 1 May 2013. Web. 30 June 2014.

"Heckscher Museum of Art." *General-Books.net*. Web. 30 June 2014.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-514-6464 | Fax: 212-514-6066 | www.artvestpartners.com



Honan, William H. "Brandeis Plan to Sell Art Is Criticized." *The New York Times*. 19

    Oct. 1991. Web. 30 June 2014.

"Important Orientalist Paintings From A European Collection." *Auction Results*.

    Christie's, 31 Oct. 2001. Web. 30 June 2014.

    <http://www.christies.com/IMPORTANT-ORIENTALIST-PAINTINGS-

    FROM-11535.aspx>.

Jackson, Bruce. "The War Against the Albright-Knox." *Artvoice Weekly Edition* 6.8

    (2007). *ARTVOICE*. 22 Feb. 2007. Web. 30 June 2014.

Kaufman, Jason E. "Huge Bequest by Literary Agent." *The Art Newspaper* 06 Jan. 2009,

    203rd ed., Museums sec.: 16. Print.

Kennedy, Randy. "Buffalo's Pain: Giving Up Old Art to Gain New." *The New York Times*

    14 Mar. 2007. 14 Mar. 2007. Web. 30 June 2014.

Kennedy, Randy. "Delaware Art Museum Will Sell Work to Pay off Debt." *The New

    York Times*. 26 Mar. 2014. Web. 30 June 2014.

Kennedy, Randy. "Delaware Museum Faces Sanctions From Directors." *The New York

    Times*. 18 June 2014. Web. 30 June 2014.

Koek, Marjolein. "The 'Desert Louvre' - a Change in Museum Policy." Web log post. *The

    Business of Art*. 6 July 2007. Web. 30 June 2014.

"List of the Most Visited Art Museums." *Wikipedia*. Web. 30 June 2014.

"Louvre Abu Dhabi." *Wikipedia*. Web. 30 June 2014.

Martinez, Jill. "Financing a Global Guggenheim Museum." Thesis. Louisiana State

    University and Agricultural and Mechanical College, 2001. *Louisiana State

    University*. May 2006. Web. 30 June 2014.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.518.5182 | Fax: 212.202.6280 | www.artvestpartners.com



McAndrew, Clare. *TEFAF Art Market Report 2014: The Global Art Market, with a Focus on the US and China*. Rep. Helvoirt: European Fine Art Foundation (TEFAF), 2014. Print.

McGill, Douglas. "Historical Society Reshaping Itself for Survival." *The New York Times* 30 Nov. 1988. 30 Nov. 1988. Web. 30 June 2014.

McGill, Douglas. "THE REGION: Troubled Museums Try to Master the Fine Art of Survival." *The New York Times* 28 Aug. 1988. Web. 30 June 2014.

*Museum of Fine Arts, Boston: Economic Impact on the City of Boston*. *MFA BOSTON*. Web. 30 June 2014.

"Museum of Fine Arts, Houston." *Wikipedia*. Web. 30 June 2014.

Orden, Erica. "MoMA Attendance Hits Record High." *The Wall Street Journal*. 29 June 2010. Web.

Pes, Javier, and Emily Sharpe. "Visitor Figures 2013: Exhibition & Museum Attendance Survey." Editorial. *The Art Newspaper*. 24 Mar. 2014. Web. 30 June 2014.

Pogrebin, Robin. "Ambitious Redesign of MoMA Doesn't Spare a Notable Neighbor." *The New York Times*. 8 Jan. 2014. Web. 30 June 2014.

Pogrebin, Robin, and Kevin Flynn. "Does Money Grow on Art Market Trees? Not for Everyone." *The New York Times*. 30 May 2011. Web. 30 June 2014.

Pogrebin, Robin. "Met Plans a Gut Renovation of Its Modern Wing." *The New York Times*. 19 May 2014. Web. 30 June 2014.

Pogrebin, Robin. "Qatari Riches Are Buying Art World Influence." *The New York Times* 22 July 2013. Web. 30 June 2014.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-505-0908 | Fax: 212-208-4420 | www.artvestpartners.com



Rauber, Chris. "SFMOMA Close to Hitting $610 Million Fundraising Goal to Fuel Expansion." *San Francisco Business Times*. 6 May 2014. Web. 30 June 2014.

Rhodes, Anne-Marie. "VALUING ART IN AN ESTATE: NEW CONCERNS." *Cardozo Arts & Entertainment Law Journal* 31.45: 62-75. Web. 30 June 2014. <http://www.cardozoaelj.com/wp-content/uploads/2013/01/Rhodes-Valuing-Art-in-an-Estate.pdf>.

Riding, Alan. "The Louvre's Art: Priceless. The Louvre's Name: Expensive." *The New York Times*. 7 Mar. 2007. Web. 30 June 2014.

Rosenbaum, Lee. "Crystal Bridges Developments: Acquisitions, Shared Works, New Trustee (plus the Mysterious "strategic Plan")." Web log post. *CultureGrrl*. 14 Mar. 2013. Web. 30 June 2014.

Rosenbaum, Lee. "Detroit Exploits: Today's Grand Bargain Announcement (plus Detroit Institute's More Aggressive Legal Stance)." Web log post. *CultureGrrl*. 9 June 2014. Web. 30 June 2014.

Rosenberg, Alex J. "Blockage Discounts." *An Approach to Advanced Problems in Appraising Art with a Special Focus on Cuba*. New York: American Friends of the Ludwig Foundation of Cuba, 2010. 158-66. Print.

Stryker, Mark. "Christie's Under Fire for Visit to Detroit Art Museum." *Detroit Free Press*. 25 July 2013. Web. 30 June 2014.

Stryker, Mark. "DIA Grand Bargain Could Prove to Be a Work of Art, but Not a Done Deal." *Detroit Free Press*. 9 Mar. 2014. Web. 30 June 2014.

Stynes, Daniel J., Gail A. Vander, Stoep, and Ya-Yen Sun. *Economic Impacts of Michigan Museums*. Rep. East Lansing: Michigan State U, 2004. Print.



Vogel, Carol. "Asian Collectors Give Christie's a High Yield Night." *The New York Times*. 14 May 2014. Web. 30 June 2014.

Vogel, Carol. "Christie's First Spring Sale Drops Prices Back to Earth." *The New York Times*. 6 May 2014. Web. 30 June 2014.

Vogel, Carol. "Guggenheim Foundation and Abu Dhabi Plan Museum There." Editorial. *The New York Times*. 9 July 2006. Web. 30 June 2014.

Vogel, Carol. "Rush for Deals Before Top Art Goes to Auction." *The New York Times*. 4 May 2014. Web. 30 June 2014.

Von Habsburg, Elizabeth, Clare McAndrew, and Gurr Johns. "Art Appraisals, Prices, and Valuations." *Fine Art and High Finance: Expert Advice on the Economics of Ownership*. Ed. Rachel Goodman. New York: Bloomberg, 2010. 31-62. Print.

"William Holman Hunt, O.M., R.W.S. (1827-1910) | Isabella and the Pot of Basil." *Christie's*. 17 June 2014. Web. 24 June 2014.

## Works Referenced - Kristen Gary

"Advanced Search." *The Frick Collection*. N.p., n.d. Web. 1 July 2014.

"Advanced Search." *JSTOR*. N.p., n.d. Web. 1 July 2014.

"Auction Results." *Christie's*. N.p., n.d. Web. 1 July 2014.

"Auction Results." *Dorotheum: Seit 1707*. N.p., n.d. Web. 1 July 2014.

Baetjer, Katharine, and J. G. Links. *Canaletto*. New York: Metropolitan Museum of Art, 1989. Print.

Bailey, Colin B., Philip Conisbee, Thomas W. Gaehtgens, National Gallery of Canada, and National Gallery of Art (U.S.). *The Age of Watteau, Chardin, and Fragonard :*

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-991-0360 | Fax: 212-991-0361 | www.artvest.com



> *Masterpieces of French Genre Painting*. Ottawa: New Haven: Yale UP in Association with the National Gallery of Canada, 2003. Print.

Bissell, R. Ward, Andria Derstine, and Dwight Miller. *Masters of Italian Baroque Painting: The Detroit Institute of Arts*. London: D Giles, 2005. Print.

Bortolatto, Luigina Rossi. *L'Opera Completa Di Francesco Guardi*. 1st ed. Milan: Rizzoli, 1974. Print.

Brown, Beverly Louise, Royal Academy of Arts (Great Britain), and Palazzo Venezia (Rome, Italy). *The Genius of Rome, 1592-1623*. New York: Royal Academy of Arts, 2001. Print.

Brown, J. Carter. *The Age of Correggio and the Carracci: Emilian Painting of the Sixteenth and Seventeenth Centuries*. Washington: National Gallery of Art, 1986. Print.

Christiansen, Keith, and Judith W. Mann, with Essays by Keith Christiansen, Alessandro Zuccari, Livia Carloni, Mary Newcombe, Jean-Pierre Cuzin, Gabriele Finaldi, Jeremy Wood, Judith W. Mann, Elizabeth Cropper, Patrizia Cavazzini, Roberto Contini, Richard Spear, and Riccardo Lattuada. *Orazio and Artemisia Gentileschi*. New York: The Metropolitan Museum of Art, 2001. Print

"The Collection Online." *The Metropolitan Museum of Art*. N.p., n.d. Web. 1 July 2014.

De Vecchi, Daniel Arasse Pierluigi. *Botticelli E Filippino*. Milano: Skira, 2004. Print.

"European Paintings." *DIA: Detroit Institute of Arts*. N.p., n.d. Web. 1 July 2014.

Falciani, Carlo, and Antonio Natali. *Bronzino: Painter and Poet at the Court of the Medici*. Florence: Mandragora, 2010. Print.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-500-8419 Fax: 212-500-8413 www.artvest.com



Fragonard, Honore, Daniel Wildenstein, and Gabriele Mandel. *L'Opera Completa Di Fragonard*. 1st ed. Milan: Rizzoli, 1972. Print.

Franklin, David, Parmigianino, and David Ekserdjian. *The Art of Parmigianino*. New Haven: Yale UP, 2003. Print.

"Frick Art Reference Library." *The Frick Collection*. N.p., n.d. Web. 1 July 2014.

Held, Julius S. *Flemish and German Paintings of the 17th Century*. Detroit: Detroit Institute of Arts, 1982. Print.

Keyes, George S., Susan Donahue, Alex Ruger, and Arthur K. Wheelock, Jr. *Masters of Dutch Painting: The Detroit Institute of Arts*. 1st ed. London: D Giles, 2004. Print.

"Old Masters and 19th Century Artists." *The Art Wolf*. N.p., n.d. Web. 1 July 2014.

Poussin, Nicolas, and Jacques Thuillier. *L'Opera Completa Di Poussin*. 1st ed. Milan: Rizzoli, 1974. Print.

Reni, Guido, Cesare Garboli, and Edi Baccheschi. *L'Opera Completa Di Guido Reni*. Milano: Rizzoli, 1971. Print.

"Results." *Sotheby's*. N.p., n.d. Web. 1 July 2014.

"Sales Results Piasa." *Piasa*. N.p., n.d. Web. 1 July 2014.

Schianchi, Lucia Fornari, Sylvia Ferino Pagden, Parmigianino, Kunsthistorisches Museum Wien, and Galleria Nazionale Di Parma. *Parmigianino E Il Manierismo Europeo*. Milano: Silvana, 2003. Print.

"Search the Collection." *LACMA*. N.p., n.d. Web. 1 July 2014.

"Search the Collection." *National Gallery of Art*. N.p., n.d. Web. 1 July 2014.

"Search the Collection." *National Gallery of Art*. N.p., n.d. Web. 1 July 2014.

"Search." *Wikipedia*. N.p., n.d. Web. 1 July 2014.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.758.4230 | Fax: 212.758.8124 | www.artvestpartners.com



Squarzina, Silvia Danesi. *Caravaggio E I Giusiniani*. Milan: Electa, 2002. Print.

Van Der Sman, Gert Jan. *Le Siècle De Titien : Gravures Vénitiennes De La Renaissance*. Zwolle: Waanders, 2003. Print.

Wardropper, Ian, Tony Siegel, and C.D. Dickerson, III. *Bernini: Sculpting in Clay*. 1st ed. New York: Metropolitan Museum of Art, 2012. Print.

## Works Referenced - Sabine Wilson

"Artist Search." *Artprice: The World Leader in Art Market Information*. N.p., n.d. Web. 1 July 2014.

"Auction Results." *Christie's*. N.p., n.d. Web. 1 July 2014.

"Auctions." *PHILLIPS*. N.p., n.d. Web. 1 July 2014.

"Contemporary Art After 1950." *DIA: Detroit Institute of Arts*. N.p., n.d. Web. 1 July 2014.

"Price Database Decorative Art." *Artnet*. N.p., n.d. Web. 1 July 2014.

"Price Database Fine Art and Design." *Artnet*. N.p., n.d. Web. 1 July 2014.

"Results." *Sotheby's*. N.p., n.d. Web. 1 July 2014.

"Search Price Archive." *Invaluable*. N.p., n.d. Web. 1 July 2014.

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.991.9540 · Fax: 212.991.9542 · www.artvest.com



(see following three pages)

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212-536-0410 | Fax: 212-536-0424 | www.artvest.com

ARTVEST

Sotheby's & Christie's Unsold Rates by Sector - 2013

| | Christie's |
| | Sothebys |

| Department | # of sales | # of Lots | Avg % Sold | BI % | Total Revenue |
|---|---|---|---|---|---|
| 19th Century European | 9 | 685 | 59% | 41% | $30,248,611.00 |
| | 7 | 664 | 57.69% | 42.31% | $57,055,945.00 |
| Cumulative | 16 | 1349 | 58% | 42% | $87,304,556.00 |
| American Art | 3 | 307 | 72% | 28% | $129,392,375.00 |
| | 4 | 394 | 80.08% | 19.92% | $119,793,691.00 |
| Cumulative | 7 | 701 | 76% | 24% | $249,186,066.00 |
| Antiquities | 5 | 594 | 78% | 22% | $26,082,234.00 |
| | 2 | 141 | 80.38% | 19.62% | $20,078,625.00 |
| Cumulative | 7 | 735 | 79% | 21% | $46,160,859.00 |
| Arms & Armor | 3 | 452 | 81% | 19% | $2,989,717.00 |
| Cumulative | 3 | 452 | 81.00% | 19.00% | $2,989,717.00 |
| Asian Art (MIX) | 4 | 710 | 86% | 14% | $47,615,689.00 |
| | 4 | 559 | 75.05% | 24.95% | $31,926,340.00 |
| Cumulative | 8 | 1269 | 81% | 19% | $79,542,029.00 |
| Asian Contemporary | 7 | 1122 | 80% | 20% | $260,980,117.00 |
| | 7 | 643 | 79.66% | 20.34% | $332,262,560.00 |
| Cumulative | 14 | 1765 | 80% | 20% | $593,242,677.00 |
| Books & Manuscripts | 13 | 2343 | 77% | 23% | $63,144,742.00 |
| | 19 | 2780 | 73.39% | 26.61% | $70,545,130.77 |
| Cumulative | 32 | 5123 | 75% | 25% | $133,689,872.77 |
| Chinese Paintings | 6 | 1481 | 90% | 10% | $259,254,409.00 |
| | 6 | 1060 | 91.55% | 8.45% | $193,688,080.00 |
| Cumulative | 12 | 2541 | 91% | 9% | $452,942,489.00 |
| Chinese WOA | 20 | 2796 | 81% | 19% | $367,324,809.00 |
| | 16 | 2002 | 82.98% | 17.02% | $338,896,023.00 |
| Cumulative | 36 | 4798 | 82% | 18% | $706,220,832.00 |
| Decorative Arts | 78 | 20777 | 72% | 28% | $151,153,029.00 |
| | 13 | 1425 | 80.36% | 19.64% | $103,472,074.00 |
| Cumulative | 91 | 22202 | 76% | 24% | $254,625,103.00 |
| European Interiors | 38 | 8374 | 71% | 29% | $175,211,667.00 |
| | 11 | 1723 | 65.73% | 34.27% | $53,345,689.00 |
| Cumulative | 49 | 10097 | 68% | 32% | $228,557,356.00 |
| European WOA | 8 | 1381 | 75% | 25% | $29,036,027.00 |
| | 18 | 2829 | 71.20% | 28.80% | $158,710,714.24 |
| Cumulative | 26 | 4210 | 73% | 27% | $187,746,741.24 |
| Japanese WOA | 5 | 1118 | 63% | 37% | $18,901,961.00 |
| | 1 | 31 | 88.60% | 11.40% | $5,273,397.00 |
| Cumulative | 6 | 1149 | 76% | 24% | $24,175,358.00 |

| Category | | | | | |
|---|---|---|---|---|---|
| Jewelry & Watches | 31 | 7776 | 86% | 14% | $828,969,099.00 |
| | 20 | 6117 | 83.35% | 16.65% | $696,309,628.00 |
| Cumulative | 51 | 13893 | 85% | 15% | $1,525,278,727.00 |
| Latin American | 3 | 466 | 78% | 22% | $54,096,750.00 |
| | 3 | 331 | 68.64% | 31.36% | $55,521,000.00 |
| Cumulative | 6 | 797 | 73% | 27% | $109,617,750.00 |
| Judaica | 3 | 559 | 77.66% | 22.34% | $15,651,585.00 |
| Cumulative | 3 | 559 | 77.66% | 22.34% | $15,651,585.00 |
| Modern & Imp | 38 | 3439 | 76% | 24% | $1,174,515,790.00 |
| | 18 | 1979 | 78.53% | 21.47% | $1,324,894,067.06 |
| Cumulative | 56 | 5418 | 77% | 23% | $2,499,409,857.06 |
| Native American | 3 | 244 | 80.58% | 19.42% | $6,117,198.00 |
| Cumulative | 3 | 244 | 80.58% | 19.42% | $6,117,198.00 |
| Oceanic | 4 | 205 | 68% | 32% | $20,038,770.00 |
| | 6 | 526 | 60.37% | 39.63% | $42,138,682.00 |
| Cumulative | 10 | 731 | 64% | 36% | $62,177,452.00 |
| Old Masters | 17 | 1491 | 66% | 34% | $205,040,805.00 |
| | 10 | 873 | 66.59% | 33.41% | $255,475,830.00 |
| Cumulative | 27 | 2364 | 66% | 34% | $460,516,635.00 |
| Other | 2 | 70 | 57.50% | 42.50% | $63,394,755.00 |
| Cumulative | 2 | 70 | 57.50% | 42.50% | $63,394,755.00 |
| Photographs | 9 | 821 | 75% | 25% | $29,982,683.00 |
| | 5 | 590 | 70.49% | 29.51% | $17,502,472.00 |
| Cumulative | 14 | 1411 | 73% | 27% | $47,485,155.00 |
| Post war | 33 | 4459 | 84% | 16% | $1,975,866,997.00 |
| | 26 | 2937 | 76.76% | 23.24% | $1,397,307,394.00 |
| Cumulative | 59 | 7396 | 80% | 20% | $3,373,174,391.00 |
| Prints | 12 | 2427 | 78% | 22% | $55,294,400.00 |
| | 7 | 1730 | 87.24% | 12.76% | $49,689,468.00 |
| Cumulative | 19 | 4157 | 83% | 17% | $104,983,868.00 |
| Russian Art | 3 | 558 | 72% | 28% | $51,366,995.00 |
| | 7 | 533 | 61.30% | 38.70% | $65,629,426.00 |
| Cumulative | 10 | 1091 | 67% | 33% | $116,996,421.00 |
| Silver | 3 | 371 | 86% | 14% | $7,029,738.00 |
| Cumulative | 3 | 371 | 86.00% | 14.00% | $7,029,738.00 |
| South Asian Contemporary | 8 | 528 | 81% | 19% | $53,393,740.00 |
| | 4 | 308 | 77.25% | 22.75% | $28,345,901.00 |
| Cumulative | 12 | 836 | 79% | 21% | $81,739,641.00 |
| Southeast Asian | 12 | 1783 | 63% | 37% | $47,882,082.00 |
| | 4 | 403 | 58.83% | 41.17% | $20,159,105.00 |
| Cumulative | 16 | 2186 | 61% | 39% | $68,041,187.00 |
| Wine | 28 | 17985 | 90% | 10% | $73,082,304.00 |
| | 25 | 14897 | 93.74% | 6.26% | $60,314,699.50 |

A R T V E S T

| | | | | | |
|---|---|---|---|---|---|
| Cumulative | 53 | 32882 | 92% | 8% | $133,397,003.50 |
| TOTAL | 400 | 84449 | 76% | 24% | $6,194,951,485.00 |
| TOTAL | 251 | 46348 | 75.02% | 24.98% | $5,583,499,480.00 |
| Cumulative | 651 | 130797 | 75% | 25% | $11,778,450,965.00 |

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.991.0077 | Fax 212.202.7945 | www.artvest.com



# Exhibit F: Present Value of An Orderly Liquidation

**TABLE 8**

**Present Value of an Orderly Liquidation Mid Estimate**
(000's)

**Scenario A -- No Litigation**

| | Value | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Saleable Collection Value Mid Estimate | 3,684,466 | | | | | | | | | | | |
| *(Without other Discounts)* | | | | | | | | | | | | |
| Percent of Collection Sold | | | | 20% | 20% | 20% | 15% | 15% | 10% | | | |
| Gross Annual Sales | | | | 736,893 | 736,893 | 736,893 | 552,670 | 552,670 | 368,447 | | | |
| *(Assumes No Selling Cost From Agent/Auctioneer)* | | | | | | | | | | | | |
| Less Average Unsold Loss Factor | 26.20% | | | (193,066) | (193,066) | (193,066) | (144,800) | (144,800) | (96,533) | | | |
| Add Back Reoffered Unsold Property (3 yrs) | | | | | | | 154,453 | 154,453 | 154,453 | 115,840 | 115,840 | 77,226 |
| Annual Holding and Administrative Expenses | | (6,000) | (6,000) | (6,000) | (5,000) | (4,000) | (3,000) | (2,000) | (2,000) | | | |
| Net Future Value | | (6,000) | (6,000) | 537,827 | 538,827 | 539,827 | 559,323 | 560,323 | 424,366 | 115,840 | 115,840 | 77,226 |
| Discount Rate | 12% | | | | | | | | | | | |
| Present Value | 1,830,919 | | | | | | | | | | | |

**Scenario B -- Litigation (Fisk)**

| | Value | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Percent of Collection Sold | | | | | | | 20% | 20% | 20% | 20% | 15% | 15% |
| Gross Annual Sales | | | | | | | 736,893 | 736,893 | 736,893 | 736,893 | 552,670 | 552,670 |
| *(Assumes No Selling Cost From Agent/Auctioneer)* | | | | | | | | | | | | |
| Less Average Unsold Loss Factor | 26.20% | | | | | | | (193,066) | (193,066) | (193,066) | (144,800) | (144,800) |
| Add Back Reoffered Unsold Property (3 yrs) | | | | | | | | | | | 154,453 | 154,453 |
| Annual Holding and Administrative Expenses | | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (5,000) | (4,000) | (3,000) | (2,000) |
| Net Future Value | | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | 537,827 | 538,827 | 539,827 | 559,323 | 560,323 |
| Present Value | 1,145,358 | | | | | | | | | | | |

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.



**TABLE 9**

**Present Value of an Orderly Liquidation Low Estimate**
(000's)

**Scenario A -- No Litigation**

| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Saleable Collection Value Mid Estimate | 2,760,978 | | | | | | | | | | |
| *(Without other Discounts)* | | | | | | | | | | | |
| Percent of Collection Sold | | | | 20% | 20% | 20% | 15% | 15% | 10% | | |
| Gross Annual Sales | | | | 552,196 | 552,196 | 552,196 | 414,147 | 414,147 | 276,098 | | |
| *(Assumes No Selling Cost From Agent/Auctioneer)* | | | | | | | | | | | |
| Less Average Unsold Loss Factor | 26.20% | | | (144,675) | (144,675) | (144,675) | (108,506) | (108,506) | (72,338) | | |
| Add Back Reoffered Unsold Property (3 yrs) | | | | | | | 115,740 | 115,740 | 115,740 | 86,805 | 86,805 |
| Annual Holding and Administrative Expenses | | (6,000) | (6,000) | (6,000) | (5,000) | (4,000) | (3,000) | (2,000) | (2,000) | | |
| Net Future Value | | (6,000) | (6,000) | 401,520 | 402,520 | 403,520 | 418,380 | 419,380 | 317,500 | 86,805 | 86,805 |
| Discount Rate | 12% | | | | | | | | | | |
| Present Value | 1,366,223 | | | | | | | | | | |

**Scenario B -- Litigation (Fisk)**

| | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Percent of Collection Sold | | | | | | | 20% | 20% | 20% | 20% | 15% |
| Gross Annual Sales | | | | | | | 552,196 | 552,196 | 552,196 | 552,196 | 414,147 |
| *(Assumes No Selling Cost From Agent/Auctioneer)* | | | | | | | | | | | |
| Less Average Unsold Loss Factor | 26.20% | | | | | | (144,675) | (144,675) | (144,675) | (144,675) | (108,506) |
| Add Back Reoffered Unsold Property (3 yrs) | | | | | | | | | | 115,740 | 115,740 |
| Annual Holding and Administrative Expenses | | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (5,000) | (4,000) | (3,000) |
| Net Future Value | | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | 401,520 | 401,520 | 402,520 | 403,520 | 418,380 |
| Present Value | 850,035 | | | | | | | | | | |

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.written | Fax: 212.written | www.artvest.com



Exhibit G: Artvest Evaluation of DIA High Value Works

Artvest Partners LLC

1325 Avenue of the Americas | 28th Floor | New York, New York 10019

Phone: 212.518.5596 | Fax 212.518.5741 | www.artvest.com

| TYPE | DIA DEPARTMENT | LOW EST | HIGH EST | APPRAISER | DIA # | FIRST | LAST | TITLE | DATE | MATERIAL | SIZE | SUMMARY OF VALUATION SUPPORT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sculpture | African, Oceania & Indigenous Americas | $ 600,000 | $ 800,000 | JHY | DIA no. 1983.24 | | Fang | Mask; Alternate Title: ngou-ntangha | 19th Century | Wood, kaolin | Overall on mount: 14 x 10 x 12 1/4 in. (35.6 x 25.4 x 31.1 cm.); Height on Mount: 22 3/8 in. (56.8 cm.); Base dimensions: 9 x 9 in. (22.9 x 22.9 cm.) | Christie's, Paris, Dec. 13, 2011, lot 286, 931,000 EUR; Sotheby's NY, May 13, 2011, lot 262, $98,500; Sotheby's Paris, June 17, 2009, 78,750 EUR. No four-sided masks of this quality have never appeared at auction, of which this is the quintessential example. |
| Sculpture | African, Oceania & Indigenous Americas | $ 800,000 | $ 1,500,000 | JHY | DIA no. 1992.290 | | Benin | Horse and Rider | early 17th century | bronze | Overall (by sight): 18 1/2 _ 7 1/4 inches (47 _ 18.4 cm) | No other three-dimensional equestrian groups have appeared at auction. Sotheby's NY, May 17, 2007, lot 121 (Property of Albright-Knox), $4,744,000; Sotheby's Paris, June 23, 2006, lot 122, 964,000 EUR; Sotheby's Paris, Dec. 5, 2007, lot 52, 681,850 EUR |
| Sculpture | African, Oceania & Indigenous Americas | $ 800,000 | $ 1,500,000 | JHY | DIA no. 76.79 | | Kongo | Nail Figure; Alternate Title: Nkonde; Alternate Title: Nail Fetish | between 1875 and 1900 | Wood with screws, nails, blades, cowrie shell and other materials | Overall (by sight): 46 in. _ 18 1/2 in. _ 14 1/4 in. (116.8 _ 47 _ 36.2 cm) | Particularly large at 46 inches high, this is an imposing figure.Sotheby's NY, May 16, 2014, lot 52, $533,000; Sotheby's NY, Nov. 15, 2013, 1,805,000; Sotheby's NY, May 16, 2014, lot 47, estimated $700,000 to $1,000,000 but did not sell. |
| Sculpture | African, Oceania & Indigenous Americas | $ 400,000 | $ 600,000 | JHY | DIA no. 77.29 | | Fang | Head | 19th/20th Century | Wood | 12 x 6 1/2 x 4 1/2 in.; 30.5 x 16.5 x 11.4 cm | Sotheby's Paris, November 30, 2010, lot 27, $1,190,181; Sotheby's Paris, Dec. 4, 2008, lot 132, $976,686; Christie's Paris, Dec. 11, 2012, lot 51, $498,637; Christie's Paris, June 19, 2014, lot 39 |
| Sculpture | African, Oceania & Indigenous Americas | $ 300,000 | $ 500,000 | JHY | DIA no. 79.22 | | Bamileke | Maternity Figure | 1850/1950 | Wood | 23 1/8 x 11 1/8 x 9 1/4 in. (58.7 x 28.3 x 23.5 cm.) | Sotheby's NY, May 16, 2013, lot 125, $365,000; Sotheby's, Paris, June 18, 2014, lot 61, 397,500 EUR; Sotheby's NY, November 11, 2004, lot 100, $1,072,000 |
| Sculpture | African, Oceania & Indigenous Americas | $ 200,000 | $ 300,000 | JHY | DIA no. 82.49 | Bena | Lulua | Figure; Alternate Title: Mbulenga | 1875/1900 | Carved and patinated wood, shell | 19 7/8 x 5 1/4 x 5 1/2 in. ( 50.5 x 13.3 x 14 cm) | Sotheby's Paris, Dec. 5, 2006, lot 118, 482,400 EUR.; Pierre Berge & Associes, June 13, 2010, lot 368, ($86,847) |
| **Artvest Total African Art** | | **$ 3,100,000** | **$ 5,200,000** | | | | | | | | | |
| Paintings | American Art before 1950 | $ 800,000 | $ 1,200,000 | Betty Krulik | DIA no. 01.2 | John Mix | Stanley | Indian Telegraph | 1860 | Oil on canvas | Unframed: 20 _ 15 1/2 in. (50.8 _ 39.4 cm); Framed: 27 3/8 _ 23 3/8 _ 2 7/8 in. (69.5 _ 59.4 _ 7.3 cm) | This is an iconic work, by the artist, the most appropriate comp is the 24 x 20 Deerslayer selling for $932,000 in 2004, and the 2007 sale in a small local auction house in Marathon, NY, The Sentinel sold for $742,000. This work with its high keyed color would sell for $1,000,000. |
| Paintings | American Art before 1950 | $ 250,000 | $ 350,000 | Betty Krulik | DIA no. 08.7 | John Henry | Twachtman | The Pool | | Oil on canvas | 26 x 31 in.; 66.0 x 78.7 cm; Framed: 33 9/16 x 38 5/8 x 3 1/8 in. | Twachtman is always a tough sell, he is very subtle and rarely performs well in auction situations. The most appropriate comparable in period and quality is autumn mists sold in 1998 for $189,000. and again in 2001 for $248,000. it had slightly more color and was slightly larger than the subject work. |
| Paintings | American Art before 1950 | $ 1,250,000 | $ 1,500,000 | Betty Krulik | DIA no. 08.8 | Mary | Cassatt | Women Admiring a Child | 1897 | Pastel | 26 x 32 in. (66.0 x 81.3 cm); Framed: 31 7/8 x 38 1/4 x 2 1/4 in. | cassatt is currently not very popular, in particular this PASTEL has a odd coloration in the face of one of the figures. There is not a pastel that has sold for more than $900,000 since 2009, with multiple |
| Paintings | American Art before 1950 | $ 2,500,000 | $ 3,500,000 | Betty Krulik | DIA no. 08.9 | Thomas Wilmer | Dewing | The Recitation | 1891 | oil on canvas | Unframed: 30 _ 55 inches (76.2 _ 139.7 cm); Framed: 48 _ 72 _ 2 3/4 inches (121.9 _ 182.9 _ 7 cm) | One of the finest dewings. If it were to come on the market, it would make close to the record for Dewing of $3.4, but due to the down market and numerous buy in a conservative value is appropriate. As this is not current collecting taste, and most current highend american buyers already |

| Category | Collection | Low $ | High $ | Appraiser | DIA no. | Artist First | Artist Last | Title | Circa | Date | Medium | Dimensions | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | American Art before 1950 | $ 3,000,000 | $ 5,000,000 | Betty Krulik | DIA no. 10.11 | Frederic Edwin | Church | Syria by the Sea | | 1873 | Oil on canvas | 56 x 85 in. (142.2 x 215.9 cm); Framed: 80 x 108 x 5 1/2 in. | Concievably there might be intreset n this painting from western collectors. While it has a great luminosity, size is an negative issue. Years ago when Adelson galleries did a show, they had a Syrian work on the market, smaller and not as intersesting for $2,500,000. There are no comparables in the auction market. |
| Paintings | American Art before 1950 | $ 250,000 | $ 350,000 | Betty Krulik | DIA no. 10.6 | Willard Leroy | Metcalf | Unfolding Buds | | 1909 | Oil on canvas | 26 x 29 in.; 66.0 x 73.7 cm; Framed: 39 3/4 x 42 7/8 x 2 5/8 in. ( 101 x 109 x 6.7 cm) | Spring pictures of this scale by Metcalf with little contrast rarely exceed $350,000. evidenced by On the River at Christies in 2013, selling for 365K with premium and spring selling in 2006 (height of the market for 375K |
| Paintings | American Art before 1950 | $ 800,000 | $ 1,200,000 | Betty Krulik | DIA no. 15.12 | Willard Leroy | Metcalf | The White Veil | | 1909 | Oil on canvas | 36 x 36 in.; 91.4 x 91.4 cm; Framed: 49 1/2 x 49 3/8 x 1 7/8 in.; with frame: 49 1/2 x 49 3/8 x 1 in.; 125.6 x 125.4 x 2.5 cm | This represents the best of the artists work. It is comparable to the little white house sold at sothebys for $1M (the Fraad collection) In 2004. It was at the height of the market and in a celebrity sale, therefore a more conserative low end is appropriate. |
| Sculpture | American Art before 1950 | $ 60,000 | $ 80,000 | Betty Krulik | DIA no. 15.2 | Paul | Manship | Centaur and Dryad | | 1913 | Bronze | height: 29 in.; 73.7 cm; dimensions of base: 18 3/8 x 11 1/4 in.; 46.7 x 28.6 cm | There are no comparables in the auction market, as not even one cast has come up in 30 years of internet data bases. there have been several works from 1912-1914, which when on the market make in only two have come on the market, both many years ago in 1993 and 1988 makeing $90K and $110K respectively. Due to the current strengh of the western market a higher value is appropriate |
| Sculpture | American Art before 1950 | $ 100,000 | $ 150,000 | Betty Krulik | DIA no. 16.13 | Solon Hannibal | Borglum | Lassoing Wild Horses | | 1898 | Bronze | 30 x 25 x 15 in.; 76.2 x 63.5 x 38.1 cm | |
| Paintings | American Art before 1950 | $ 100,000 | $ 150,000 | Betty Krulik | DIA no. 16.16 | William Merritt | Chase | Self Portrait | c. 1914 | | Oil on canvas | Framed: 32 9/16 x 28 13/16 x 2 13/16 in. ( 82.71 x 73.18 x 7.14 cm); 24 x 20 in. (61.0 x 50.8 cm) | an almost exact comparable is the self portrait from the guild hall museum solo in 2004 for $142K. Which is slightly smaller. Therefore a $100-150,000. value is appropriate |
| Paintings | American Art before 1950 | $ 1,800,000 | $ 2,200,000 | Betty Krulik | DIA no. 16.31 | Frank Weston | Benson | My Daughter Elisabeth | c. 1914 | | Oil on canvas | 44 x 37 in. (111.8 x 94.0 cm); Framed: 55 3/8 x 44 3/8 x 4 in. | A beautiful painting, but a portrait no less. It is most comparable to the double portrait of children (always more desireable) sold in 2010 at Christies for just a bit more than $2M. Interiors / less portrait like works sell for much more. This is large and the sitter is attractive, and out of doors, so it becomes more desirable than a straight portrait |
| Paintings | American Art before 1950 | $ 25,000,000 | $ 30,000,000 | Betty Krulik | DIA no. 17.17 | George Wesley | Bellows | A Day in June | | 1913 | Oil on canvas | 36 1/2 x 48 in.; 92.7 x 121.9 cm; Framed: 43 3/4 x 56 1/16 x 3 3/8 in. | Comparable to Polo Crowd sold in 1999 for $27,000,000. and the recent sale of the Randolph Macon picture to National Gallery, London for $25.5M in February of 2014, it could not sell in the US because of the negative publicity, no museum in the US would by it. (MP note: except perhaps Crystal Bridges). |
| Paintings | American Art before 1950 | $ 300,000 | $ 500,000 | Betty Krulik | DIA no. 19.19 | Childe | Hassam | Surf and Rocks | | 1906 | Oil on canvas | 20 x 30 in. (50.8 x 76.2 cm); Framed: 31 1/4 x 41 3/8 x 2 in. | Value wise this work falls between the 2013 Christis work (half the size) selling for $150K and the larger The East Headland, Appledore-Isles of Shoals selling at Christies in 2001 for $500K. |
| Paintings | American Art before 1950 | $ 600,000 | $ 800,000 | Betty Krulik | DIA no. 19.34 | Frederick Carl | Frieseke | The Blue Gown | | 1917 | Oil on canvas | 39 x 60 in. (99.1 x 152.4 cm); Framed: 45 x 66 1/8 x 2 3/4 in. | American impressionism market is soft. This work while beautiful is an interior. The highest prices for Frieseke's are highly pattered and bright GARDEN |
| Sculpture | American Art before 1950 | $ 400,000 | $ 500,000 | Betty Krulik | DIA no. 19.43 | Paul | Manship | Dancer and Gazelles | | 1916 | Bronze | 32 x 33 x 10 in. (81.3 x 83.8 x 25.4 cm) | several of this cast have come on the market the most recent sold for $434K in 2009. |
| Sculpture | American Art before 1950 | $ 350,000 | $ 550,000 | Betty Krulik | DIA no. 19.66 | James Earle | Fraser | The End of the Trail | | 1918 | Bronze | 45 x 30 x 9 in.; 114.3 x 76.2 x 22.9 cm | Just before the 2008 recession a cast sold for a record price of $631K, since then the records have been more modest $370K and $410K in westner sales in 2012 and 2013. The size of the DIA piece is mistakenly measured, including the spear. |

| Category | Classification | | Low | | High | Appraiser | DIA no. | First Name | Last Name | Title | Date | Medium | Dimensions | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | American Art before 1950 | $ | 500,000 | $ | 750,000 | Betty Krulik | DIA no. 1983.23 | John Singleton | Copley | George Boone Roupell | 1779/1780 | Oil on canvas | Framed: 96 x 66 1/2 x 5 7/8 in. (243.84 x 168.91 x 14.92 cm); 84 1/16 x 54 in.; 213 x 137 cm | An attractive but large British picture. The retail market might be stronger but it could take years to sell for more than $1M. The 30 x 25 in. JOHN WOMBELL EIGRE sold for $92K in 2009. |
| Paintings | American Art before 1950 | $ | 1,000,000 | $ | 1,500,000 | Betty Krulik | DIA no. 1986.60 | Mary | Cassatt | Alexander J. Cassatt | c. 1880 | Oil on canvas | 25 3/4 x 36 3/8 in. (65.4 x 92.4 cm); Framed: 35 1/8 x 45 3/4 x 2 1/4 in. | no images of men have come up, some of male children. Since Cassatt has not performed well in the market recently therefore conservativism is appropriate. The work is unfinished and unsigned. |
| Paintings | American Art before 1950 | $ | 300,000 | $ | 500,000 | Betty Krulik | DIA no. 1994.88 | Thomas Worthington | Whittredge | The Baptism | | 1868 | Oil on canvas | 19 x 27 in. (48.3 x 68.6 cm); Framed: 28 1/4 x 36 1/8 x 3 in. | Aside from the Western (platte river) Whittreges,only the newport scenes make over $300,000.. Because this work has the panoramic openness that characterizes the best of Whittredge's work and the multiple figures a value of $300-500K is appropriate, using the 2011 On The Delaware 18 x 28 in (similar size) selling for $302K |
| Paintings | American Art before 1950 | $ | 700,000 | $ | 1,000,000 | Betty Krulik | DIA no. 1995.26 | Martin Johnson | Heade | Seascape: Sunset | | 1861 | Oil on canvas | 26 x 44 in. (66.0 x 111.8 cm); Framed: 39 1/4 x 57 1/4 x 4 1/2 in. | A large early shoreline picture it would be comparable to the marsh scenes of similar size. Also an almost exact comaparable (but larger sold in 1996 for $910K, while was many years ago that value would hold as this is one of very few seascapes. |
| Paintings | American Art before 1950 | $ | 500,000 | $ | 700,000 | Betty Krulik | DIA no. 2005.72 | Thomas Wilmer | Dewing | Commerce and Agriculture Bringing Wealth to Detroit | | 1900 | Oil on canvas | 91 9/16 x 171 x 1 5/8 in. | Very large, and central to Detroit, this work is a tough sell, even though the DIA paid more than $1M for it in 2005. |
| Paintings | American Art before 1950 | $ | 300,000 | $ | 500,000 | Betty Krulik | DIA no. 21.70 | William McGregor | Paxton | Woman Sewing | c. 1913 | Oil on canvas | 30 x 25 in.; 76.2 x 63.5 cm; Framed: 42 9/16 x 37 9/16 x 3 in. | the closest comp is the Letter sold in 2001 for the record price, this work the woman sewing is less attractive as the sitter is not as pretty to the contemporary buyer. The market for these interiors hovers in the $200-300K range however this would be slightly closer to The Letter and the Green Dress in date size and complexity |
| Paintings | American Art before 1950 | $ | 4,000,000 | $ | 5,000,000 | Betty Krulik | DIA no. 22.6 | Mary | Cassatt | In the Garden | 1903/1904 | Oil on canvas | 26 3/4 x 32 1/2 in. (68 x 82.6 cm); Framed: 35 3/4 x 41 7/8 x 3 in. (90.8 x 106.7 x 7.6 cm) | Cassatt is in a down market right now, however this work being a classic mother and pretty young girl and a park picture makes it more desireable than most, therfore closer to the top of the market but conservatively |
| Paintings | American Art before 1950 | $ | 300,000 | $ | 500,000 | Betty Krulik | DIA no. 23.100 | George | Inness | Apple Orchard | | 1892 | Oil on canvas | 30 x 45 1/8 in. (76.2 x 114.6 cm); Framed: 36 1/8 x 51 x 2 1/4 in. (91.8 x 129.5 x 5.6 cm) | Pending conditon, this work has the smokey ethereal quality that is sought after in Inness's late work, and has the benefit of good color in the sky |
| Paintings | American Art before 1950 | $ | 2,500,000 | $ | 3,000,000 | Betty Krulik | DIA no. 24.2 | John | Sloan | McSorley's Bar; Alternate Title: McSorley's Ale House | | 1912 | oil on canvas | Unframed: 26 x 32 inches (66 x 81.3 cm); Framed: 32 7/8 x 39 1/4 x 3 inches (83.5 x 99.7 x 7.6 cm) | comparable to the best of sloans work selling at auction, the highest 3 prices were $2.2M, 2.3M and $3M all in 2000-2003. Due to the rarity of these great early ashcan pictures the record prices apply |
| Paintings | American Art before 1950 | $ | 1,200,000 | $ | 1,800,000 | Betty Krulik | DIA no. 24.30 | Maurice Brazil | Prendergast | Landscape with Figures | c.1918/1923 | Oil on canvas | 29 3/4 x 43 in.; 75.6 x 109.2 cm; Framed: 36 1/2 x 49 3/4 x 2 7/8 in. | a nearly exact comparable is the Promenade (#19 on artnet search) sold in 2003 for $1.9M at Christies, however with a soft market for Prendergast as evidenced by the low prices in the past 5 years a conservative value is appropriate |

| Category | Collection | Low $ | High $ | Appraiser | DIA no. | Artist | Artist | Title | Date | Medium | Dimensions | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | American Art before 1950 | $ 300,000 | $ 500,000 | Betty Krulik | DIA no. 27.158 | Arthur Bowen | Davies | Dances | 1914/1915 | Oil on canvas | 84 x 138 in. (213.4 x 350.5 cm) | there are very few of these important cubist works on the market, Ed Schien paid close to or over 1M for a work, and years ago a great one Interwoven sold at spanierman gallery for $250,000. range. There are no comparables at auction |
| Paintings | American Art before 1950 | $ 125,000 | $ 175,000 | Betty Krulik | DIA no. 27.314 | Dwight William | Tryon | Autumn | | 1893 Oil on canvas | 40 1/2 x 31 1/2 in.; 102.9 x 80.0 cm; Framed: 53 7/16 x 43 15/16 x 2 1/8 in. | the high prices at auction are only $60-70K, these works are significantly larger and in stanford white frames. at spanierman galleries, I would sell these for over $175K without the original frames which in this case have value |
| Paintings | American Art before 1950 | $ 125,000 | $ 175,000 | Betty Krulik | DIA no. 27.315 | Dwight William | Tryon | Spring | | 1893 Paint on canvas | 40 1/2 x 31 1/2 in.; 102.9 x 80.0 cm; Framed: 53 7/16 x 43 7/8 x 2 in. | The high prices at auction are only $60-70K, these works are significantly larger and in stanford white frames, at spanierman galleries, I would sell these for over $175K without the original frames which in this case have value |
| Paintings | American Art before 1950 | $ 2,500,000 | $ 3,500,000 | Betty Krulik | DIA no. 27.316 | Thomas Wilmer | Dewing | Summer | | 1893 Oil on canvas | 50 1/2 x 32 1/2 in. (128.3 x 82.6 cm); Framed: 63 7/8 x 45 x 2 1/2 in. | One of the finest dewings. if it were to come to the market, it would make close to the record for Dewing of $3.4, but due to the down market, in american impressionism especially a conservative value is appropriate. |
| Paintings | American Art before 1950 | $ 800,000 | $ 1,200,000 | Betty Krulik | DIA no. 27.556 | John Singleton | Copley | Mrs. Clark Gayton | | 1779 Oil on canvas | 50 x 40 in. (127 x 101.6 cm.); Framed: 58 5/8 x 48 3/4 x 3 7/8 in. | few pretty british women come on the market, recently Hirschl and adler sold a large british woman to the Milwaukee art museum for around $4M. It took over 10 years to sell the painting. The value of this work is approx $750K based on the high price of $425K for a 30 x 25 man |
| Paintings | American Art before 1950 | $ 3,000,000 | $ 5,000,000 | Betty Krulik | DIA no. 31.27 | William Merritt | Chase | My Little Daughter Dorothy | c. 1894 | Oil on canvas | 48 x 33 in. (121.9 x 83.8 cm); Framed: 52 3/4 x 37 3/4 x 2 in. | while picutres of his children rarely come on the market, and this studio interior is very charming, and would make a near record. The studio interiors are very rare to the market and are considered highly sought after so a value close to the 2008 record is appropriate |
| Paintings | American Art before 1950 | $ 4,000,000 | $ 6,000,000 | Betty Krulik | DIA no. 34.27 | James Abbott McNeill | Whistler | Arrangement in Gray: Portrait of the Painter | c. 1872 | Oil on canvas | Framed: 39 1/2 x 31 9/16 x 2 1/4 in.; 29 1/2 x 21 in. (74.9 x 53.3 cm) | There are no comparables. This work is an icon, no similar works have come on the public market. Several large female portraits have sold privately in the $5M range. |
| Paintings | American Art before 1950 | $ 200,000 | $ 250,000 | Betty Krulik | DIA no. 35.119 | Thomas | Doughty | In Nature's Wonderland | | 1835 Oil on canvas | 24 1/2 x 30 in.; 62.2 x 76.2 cm; Framed: 31 1/8 x 37 1/8 x 2 1/8 in. | this work had brilliant color in the sky, and the market is responding to hudson river pictures with great light. the closest conaparable was sold at Sotheby;s october 2013 for $161K, it did not have the pink sky that this does, but is approximately the same size and close in date. |
| Sculpture | American Art before 1950 | $ 800,000 | $ 1,200,000 | Betty Krulik | DIA no. 37.11 | Frederic Sackrider | Remington | The Mountain Man; Alternate Title: The Mountaineer | 1903/1909 | Bronze | height: 28 in.; 71.1 cm | Presuming a lifetime cast, this is one of the most sought after casts. even in the recession a cast sold for just a touch over $1M at Sothebys May 2010. |
| Paintings | American Art before 1950 | $ 7,000,000 | $ 10,000,000 | Betty Krulik | DIA no. 38.60 | William Sydney | Mount | The Banjo Player | 1850/1855 | Oil on canvas | 25 x 30 in. (63.5 x 76.2 cm); Framed: 31 9/16 x 36 3/8 x 3 1/8 in. | this work is an icon for the artist, a musical subject and a barn scene. the highest price was at sothebys in 2008, The Ramblers, which sold for $2.2M. it is rumoured that the Power of Music, sold to Cleveland for $10,000,000. 20-25 years ago. While that work was more complex with multiple figures and color. this work is is a rare and important |

| Category | Collection | $ Low | $ High | Appraiser | DIA no. | Artist | | Title | Date | Medium | Dimensions | Summary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | American Art before 1950 | $ 400,000 | $ 600,000 | Betty Krulik | DIA no. 39.6 | Asher Brown | Durand | Monument Mountain, Berkshires | Probably 1850 | Oil on canvas | 28 x 42 in. (71.1 x 106.7 cm); Framed: 43 1/4 x 57 5/8 x 6 3/8 in. | Summary not provided |
| Paintings | American Art before 1950 | $ 3,000,000 | $ 5,000,000 | Betty Krulik | DIA no. 40.56 | Winslow | Homer | Girl and Laurel | 1879 | Oil on canvas | 22 5/8 x 15 3/4 in.; 57.5 x 40.0 cm; with frame: 28 1/4 x 21 1/4 x 1 7/8 in.; 71.6 x 53.8 x 4.8 cm | The high price for a Homer Oil, was a picture of the same size and date Peach Blossoms which sold for $2.8 M in 2010.the subject work is a more attractive subject and has wonderful finish and would be highly sought after in the market. |
| Paintings | American Art before 1950 | $ 500,000 | $ 750,000 | Betty Krulik | DIA no. 41.37 | John Singleton | Copley | Colonel John Montresor | c. 1771 | Oil on canvas | 30 x 25 in.; 76.2 x 63.5 cm; Framed: 38 x 33 x 3 1/2 in. | while it was market weary, the Bonhams in the May 2014 sale of Captain Gabriel Maturin, was the closest comparable. it did not sell because it was over exposed and had some condition issues. |
| Paintings | American Art before 1950 | $ 100,000 | $ 150,000 | Betty Krulik | DIA no. 42.59 | Asher Brown | Durand | View of Rutland, Vermont | 1840 | Oil on canvas | 29 1/8 x 42 1/8 in. (74.0 x 107.0 cm); Framed: 40 3/4 x 53 1/8 x 4 1/4 in. | like summer afternoon which sold for $68K in 2008 at sotheby's but without huge cows (which is a detriment in the market)therefore the value is closer to An Afternoon Shower sold at Christies in 2005 for $114 |
| Paintings | American Art before 1950 | $ 150,000 | $ 250,000 | Betty Krulik | DIA no. 43.486 | William Merritt | Chase | Portrait of a Lady in Black | c. 1895 | Oil on canvas | 72 x 35 in. (182.9 x 91.4 cm); Framed: 83 1/8 x 47 x 3 7/8 in. | very rarely do the large portraits sell, especially when they are women wearing BLACK in this case she is at least attractive. the most appropriate comparable is the Port of Miss D offered for sale in 2004 at Sothebys with a 250-350K estimate, and unsold- it is te same size, and is of a standing woman (his daughter) in grey. the subject work is |
| Paintings | American Art before 1950 | $ 500,000 | $ 700,000 | Betty Krulik | DIA no. 44.5 | Marsden | Hartley | Log Jam, Penobscot Bay | 1940-1941 | oil on Masonite (TM) | Unframed: 30 1/16 _ 40 7/8 inches (76.4 _ 103.8 cm); Framed: 37 3/4 _ 47 3/4 _ 2 1/4 inches (95.9 _ 121.3 _ 5.7 cm) | the most appropriate comparable is the Nova Scotia Fishermen which sold in 1997, as no other works of this size and dark quality have come up. the Gloucester Dogtown pictures and the New Mexico Recollection pictures are inappropriate. the Nova Scotia Fishermen sold for $745K but the figural aspect raises the value. |
| Paintings | American Art before 1950 | $ 2,500,000 | $ 3,000,000 | Betty Krulik | DIA no. 45.454 | Georgia | O'Keeffe | Stables | 1932 | Oil on canvas | 12 x 32 in.; 30.5 x 81.3 cm; Framed dimensions: 13 5/8 x 33 1/2 x 1 7/16 in. | a near exact comparable sold at Sothebys on May 21, 2014 it was slightly larger at 18 inches rather than 12 inches high, but same width, but the Sothebys work was a night scene, possibly more dramatic, it sold for $2.9M including buyers premium |
| Paintings | American Art before 1950 | $ 300,000 | $ 400,000 | Betty Krulik | DIA no. 45.455 | Charles | Sheeler | Home Sweet Home | 1931 | Oil on canvas | Unframed: 36 x 29 in. (91.4 x 73.7 cm); Framed: 43 1/4 x 36 1/4 x 2 in. (109.9 x 92.1 x 5.1 cm) | The subject work was done multi patterned, and hard edge, but not a precisionist picture (which is the type of work for whichSheeler is best known) The Still Life with Tulips sold in May 2012 at Christies is the closest comparable, selling for $422,000. |
| Paintings | American Art before 1950 | $ 125,000 | $ 175,000 | Betty Krulik | DIA no. 45.469 | Rembrandt | Peale | Self Portrait | 1828 | Oil on canvas | 19 x 14 1/2 in. (48.3 x 36.8 cm); Framed: 25 5/16 x 20 9/16 x 3 1/2 in. | a nearly exact comparable is a self portrait that came on the market in 1999, selling for $145,000. while it was years ago, it sets the standard for a Rembrandt Peale self portrait-- according to the photos on the DIA sight there seems to be conditon issues. |
| Paintings | American Art before 1950 | $ 6,000,000 | $ 8,000,000 | Betty Krulik | DIA no. 46.134 | Thomas | Cole | From the Top of Kaaterskill Falls | 1826 | Oil on canvas | 31 1/8 x 41 1/8 in. ( 79.06 x 104.46 cm ); Framed: 42 1/4 x 52 1/8 x 3 1/4 in. | The market for Cole's major works is rarely tested at auction. but the private market place when major works come to it, is robust. with the Warner picture selling privately in the $20million range. The Warner picture was an icon. of similar size and date. A more conservative value is appropriate because this work is somewhat less dramatic, and most of the big buyers currently high end for american paintings have already purchased their Coles. |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | American Art before 1950 | $ 700,000 | $ 1,000,000 | Betty Krulik | DIA no. 46.135 | Martin Johnson | Heade | Sunset | c. 1880 | Oil on canvas | 17 1/4 x 36 3/8 in. (43.8 x 92.4 cm); Framed: 28 1/16 x 47 3/16 x 5 in. | in the hieght of the market in a very subtle work in untouched condition sold for amost $3M. That work must be discounted as an anomoly, as it is so far from the regular trade in Heade. Most sunsets as this, that come on the market are a slightly smaller size and sell for $500-700,000. this being larger would have a higher value, but most important in Heade is CONDITION, if there is any staining from the sizing or inpaint the value can be significantly compromised. This value is pending |
| Paintings | American Art before 1950 | $ 25,000,000 | $ 45,000,000 | Betty Krulik | DIA no. 46.309 | James Abbott McNeill | Whistler | Nocturne in Black and Gold, the Falling Rocket | 1875 oil on panel | | Framed: 36 3/4 _ 30 1/4 _ 3 1/4 inches (93.3 _ 76.8 _ 8.3 cm); Unframed: 23 3/4 _ 18 3/8 inches (60.3 _ 46.7 cm) | There is not a more important Whistler. This work would transend the American Art Market, It would be sought after by any impressionist collector world wide, therefore. There are no comparables for Whistler, but one could look to Sargent as a world class artist that has sold for record prices due to his international status as an impressionist. |
| Paintings | American Art before 1950 | $ 15,000,000 | $ 20,000,000 | Betty Krulik | DIA no. 46.310 | John Singleton | Copley | Watson and the Shark | 1782 oil on canvas | | Framed: 45 3/16 _ 39 _ 2 1/2 inches (114.8 _ 99.1 _ 6.4 cm); Unframed: 36 _ 30 1/2 inches (91.4 _ 77.5 cm) | This painting is a study for the large (72 x 90 inch) work at he Museum of Fine Arts, Boston. Being a smaller scale work is a benefit. It is one of the most famous american paintings of the colonial period. There are no major history paintings which to compare this work. It could be compared to the highest priced american paintings - Cole, Church, Durand. But since this is not the final work, but a study for the Boston picture, the value would be |
| Paintings | American Art before 1950 | $ 400,000 | $ 600,000 | Betty Krulik | DIA no. 47.122 | George Benjamin | Luks | Woman with Macaws | 1907 Oil on canvas | | Unframed: 41 x 33 in. (104.1 x 83.8 cm) | Of the 200 Oils that have come on the market only 4 works sold for more than $200K. The record price for a Luks is the Lilly Williams which sold for $1.8M. The DIA painting is not in that cataogory, as the figure is not a child. The closest comparable is On the Corner which sold in 1988 for $385K, also images of children, While a great ASH CAN image, the market still likes attractive sitters. The color in this painting is an assett. there |
| Paintings | American Art before 1950 | $ 3,000,000 | $ 5,000,000 | Betty Krulik | DIA no. 47.81 | Winslow | Homer | The Dinner Horn | 1873 Oil on canvas | | 11 7/8 x 14 1/4 in. (30.2 x 36.2 cm); Framed: 20 7/8 x 23 x 3 1/2 in. | One of the great Homers of the 1870s. The Dinner Horn is more attractive than the larger Reverie picture that was unsold in 2011.The high price for a Homer Oil, was a picture slightly smaller but approximately the same date Peach Blossoms which sold for $2.8 M in 2010.the subject work is a more attractive subject and has wonderful finish and would be highly sought after in the market. |
| Paintings | American Art before 1950 | $ 20,000,000 | $ 30,000,000 | Betty Krulik | DIA no. 50.138 | George Caleb | Bingham | The Trappers' Return | 1851 oil on canvas | | Unframed: 26 1/4 _ 36 1/4 inches (66.7 _ 92.1 cm); Framed: 31 1/4 _ 41 1/16 _ 2 3/4 inches (79.4 _ 104.3 _ 7 cm) | This work is an icon by the artist, there are no comparables aside from the iconic paintings by american artists sold in the $30-40,000,000. price range. Durand, Rockwell, Cole, Church. |
| Paintings | American Art before 1950 | $ 300,000 | $ 400,000 | Betty Krulik | DIA no. 50.19 | Albert Pinkham | Ryder | The Tempest | 1892, reworked 1896/1918 | Oil on canvas | 27 3/4 x 35 in.; 70.5 x 88.9 cm; Framed: 43 5/8 x 51 x 6 1/8 in. | While an important figure in American Art, Ryder is always a difficult "sell" because of condition issues. The only other large work to come on the market in 2010, was The Lorelie, 22 x 19, which failed to sell with an estimate of $120-180,000. A rough time in the market The record is $209K for a small landscape in 2004. A more appropriate comp is At the Ford, a dark brooding work which while significantly smaller at 12 x 11 in., sold for $113K. This work being 4 times the size would have a value in the $3-400K range. Brown paintings are not at all |

| Category | Collection | Low | High | Appraiser | DIA no. | Artist First | Artist Last | Title | Date | Medium | Dimensions | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | American Art before 1950 | $ 400,000 | $ 600,000 | Betty Krulik | DIA no. 50.31 | John | Haberle | Grandma's Hearthstone | 1890 | oil on canvas | Unframed: 99 x 66 inches (251.5 x 167.6 cm); Framed: 100 1/4 x 70 5/8 x 2 3/8 inches (254.6 x 179.4 x 6 cm) | the record price of $350K achieved in 2006 for a Confederate Note, is not an appropriate comparable as the subject work is not an monetary image and certainly not a southern image as was the Confederate Note. A more appropriate comparable from which to extrapolate a value is Wife, Wine and Song, which was 30 x 25 inches sold for 286K in 1987. The subject work has several problems, first is it so large as to have a stumbling block for sale, and it is not the money pictures which are the money makers for Haberle.Due to huge size the value must be conservatively placed at $4-600K. or less |
| Paintings | American Art before 1950 | $ 150,000 | $ 250,000 | Betty Krulik | DIA no. 50.58 | Charles Willson | | James Peale; Alternate Title: The Lamplight Portrait; Alternate Title: The Lamplighter Portrait | 1822 | oil on canvas | Framed: 35 1/8 _ 43 7/8 _ 4 inches (89.2 _ 111.4 _ 10.2 cm); Unframed: 24 1/2 _ 36 inches (62.2 _ 91.4 cm) | it is the portraits of George Washington that make record prices, even though this is a wonderful portrait of the artists brother, the lack of color (predominantly brown) would hold this back in the market. For the non Washington portraits the high price is for David Rittenhouse important Philadelphia family, a work twice the size selling in 1986 for $450K when the Dietrich family was buying- they are no longer buyers since Dietrich died. a more appropriate comparables are the Depyster and Bordley portraits that sold for $104K and $265K respectively therefore a avalue of $150-250K is approriate. |
| Paintings | American Art before 1950 | $ 300,000 | $ 500,000 | Betty Krulik | DIA no. 51.331 | George | Inness | The Lonely Pine; Alternate Title: The Lonely Pine - Sunset | 1893 | oil on canvas | Unframed: 30 1/2 _ 45 inches (77.5 _ 114.3 cm); Framed: 41 3/8 _ 56 1/2 _ 3 1/8 inches (105.1 _ 143.5 _ 7.9 cm) | Pending conditon, this work has the smokey ethereal quality that is sought after in Inness's late work, and has the benefit of good color in the sky |
| Paintings | American Art before 1950 | $ 4,000,000 | $ 6,000,000 | Betty Krulik | DIA no. 51.66 | Winslow | Homer | Defiance: Inviting a Shot Before Petersburg | 1864 | Oil on panel | Unframed: 12 x 18 in. (30.5 x 45.7 cm); Framed: 19 3/4 x 25 3/4 x 2 3/4 in. (50.2 x 65.4 x 7 cm) | An important civil war picture, ti would exceed the records for the Homer "home sweet home" which sold for $2.6m in 1987 |
| Paintings | American Art before 1950 | $ 700,000 | $ 1,000,000 | Betty Krulik | DIA no. 52.118 | John Singleton | Copley | Head of a Negro | 1777/1778 | Oil on canvas | 21 x 16 1/4 in. (53.3 x 41.3 cm); Framed: 27 3/4 x 23 3/4 x 2 1/2 in. (70.5 x 60.3 x 6.4 cm) | a study for the African American man in Watson and the shark, it is a beautiful dignified portrait. There are no comparables, but the robust african american market would propel this work towards $1M. |
| Sculpture | American Art before 1950 | $ 600,000 | $ 800,000 | Betty Krulik | DIA no. 52.246 | Augustus | Saint-Gaudens | Abraham Lincoln | 1887/1912 | Bronze | 40 1/4 x 16 1/4 x 28 3/4 in. (102.2 x 41.3 x 73.0 cm) | the met purchased a version that was owned and sold by descendents of John Hay, several years ago, for this approximate price range. |
| Paintings | American Art before 1950 | $ 2,000,000 | $ 3,000,000 | Betty Krulik | DIA no. 52.27 | George Caleb | Bingham | The Checker Players | 1850 | Oil on canvas | 25 x 30 in.; 63.5 x 76.2 cm; Framed: 30 1/2 x 35 9/16 x 2 3/4 in. | An important painting but not as iconic as the trappers return, this work would far exceed the auction record of $493K which is the record for Bingham at auction. It is more in line with the values for Charles Deas, where the Winnebagos Playing Checkers sold in 2003 or $775,000 but would trade today for $2-3M. |
| Paintings | American Art before 1950 | $ 500,000 | $ 750,000 | Betty Krulik | DIA no. 54.100 | John Singer | Sargent | Judith Gautier | c. 1885 | Oil on panel | Framed: 46 1/4 x 32 5/16 x 3 5/8 in. (117.48 x 82.07 x 9.21 cm); 39 x 24 1/2 in.; 99.1 x 62.2 cm | while the sitter is not fabulously beautiful, the background and the interior are beautifully painted. many of the full scale portraits have not sold in recent sales, The closest comparable is the Elsie Wagg portrait of a woman in a white dress that sold in December of 2013 for $413K, this is more than a portrait, therefore a higher price. |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | american art before 1950 | $ | 1,500,000 | $ | 2,000,000 | Betty Krulik | DIA no. 54.118 | Charles | Demuth | Buildings Abstraction, Lancaster | 1931 | Oil on board | Board: 27 7/8 x 23 5/8 in. (70.8 x 60.0 cm); Framed: 33 3/16 x 29 x 1 1/16 in. ( 84.3 x 73.7 x 2.7 cm) | Demuth oils are rare to the market, with only 6 works coming on the public market since the mid 1980s. A cubist tempera "In a Key of Blue" 19 x 16 in.  came up and sold for $1.6M, it was not as complex and colorful as the subject work. But the DIA picture is not as cubistic. Therefore the work is worth more than the Key of Blue, but not considerably more. |
| Paintings | American Art before 1950 | $ | 400,000 | $ | 600,000 | Betty Krulik | DIA no. 55.175 | Richard Caton | Woodville | The Card Players | 1846 | Oil on canvas | 18 1/2 x 25 in. (47.0 x 63.5 cm); Framed: 27 1/8 x 33 9/16 x 2 5/8 in. | Woodville, like Charles Deas, is very rare to the market His most important painting was sold to Crystal Bridges for untold millions. However this work is more akin to Walking the Chalk, a Charles Deas of approximately the same size sold by Debra Force to the MFA, Houston, for approximately $650,000.at the high point in the market. |
| Paintings | American Art before 1950 | $ | 700,000 | $ | 1,000,000 | Betty Krulik | DIA no. 56.31 | Thomas | Cole | American Lake Scene | 1844 | oil on canvas | Framed: 27 1/8 _ 33_ 4 inches (68.9 _ 83.8 _ 10.2 cm); Unframed: 18 1/4 _ 24 1/2 inches (46.4 _ 62.2 cm) | The most appropriate comparable is the Christies 2009 work, View of Kaaterskill Clove, of similar size that sold for $1,000,000. This work does not have the dramatic sky, but it does have an native american figure, and an excellent provenance which would be appealing to the market |
| Paintings | American Art before 1950 | $ | 2,500,000 | $ | 3,500,000 | Sabine Wilson | DIA no. 59.11 | Lyonel | Feininger | Fisher off the Coast | 1941 | Oil on canvas | canvas: 19 1/2 x 36 in. (49.5 x 91.4 cm); Framed: 26 15/16 x 44 x 2 3/8 in. ( 68.4 x 111.8 x 6 cm) | Summary not provided |
| Paintings | American Art before 1950 | $ | 80,000 | $ | 120,000 | Betty Krulik | DIA no. 59.312 | John Mix | Stanley | Mountain Landscape with Indians | 1870/1875 | Oil on canvas | Canvas: 18 x 30 1/4 in. (45.7 x 76.8 cm); Framed: 29 1/4 x 41 1/4 x 3 3/8 in. ( 74.3 x 104.8 x 8.6 cm) | of the 9 landscapes that have come on the market, most sell for under $50,000. however this one with it's encampment of Native Americans, would be more appealing to the general market. |
| Paintings | American Art before 1950 | $ | 2,500,000 | $ | 3,500,000 | Betty Krulik | DIA no. 61.165 | John | Sloan | Wake of the Ferry, No. 1 | 1907 | Oil on canvas | 26 x 32 in.; 66.0 x 81.3 cm; Framed: 31 7/8 x 37 7/8 x 3 1/8 in. | An important painting, this Sloan is comparable to the record priced works by the artist, while it has little color, it is an iconic ashcan picture. of concern is condition, the photo on the DIA website shows significant crackle. |
| Paintings | American Art before 1950 | $ | 2,000,000 | $ | 3,000,000 | Betty Krulik | DIA no. 61.28 | Albert | Bierstadt | The Wolf River, Kansas | c. 1859 | Oil on canvas | 48 1/4 x 38 1/4 in. (122.6 x 97.2 cm); Framed: 61 5/16 x 51 1/2 x 5 1/8 in. | An Early work of the west with Indian Encampment, this would be sought after in the current market, where western paintings are strong due to the strength of the oil industry. While not the most iconic of works (those with sunset skys and dramatic landscape) it has the native americans and the great early date, would put it towards the top of the market. |
| Paintings | American Art before 1950 | $ | 200,000 | $ | 300,000 | Betty Krulik | DIA no. 67.254 | William Merritt | Chase | Mrs. William Merritt Chase | c. 1890 | Oil on canvas | Framed: 26 7/8 x 22 7/8 x 2 1/4 in. (67.15 x 58.10 x 5.72 cm); 20 x 16 in.; 50.8 x 40.6 cm | Most portraits of Mrs. Chase rarely make more than 250,000. howver this work is particularly attractive. In 2000, Mrs. Chase in spanish costume (32 x 25 in.)made $357,000. this is more attractive but considerably smaller, but very attractive. |
| Paintings | American Art before 1950 | $ | 3,500,000 | $ | 4,500,000 | Sabine Wilson | DIA no. 69.305 | Lyonel | Feininger | Sailboats | 1929 | Oil on canvas | 17 x 28 1/2 in.; 43.2 x 72.4 cm; Framed Dimensions: 21 3/8 x 33 1 3/16 | |
| Paintings | American Art before 1950 | $ | 2,500,000 | $ | 3,500,000 | Betty Krulik | DIA no. 70.150 | Winslow | Homer | The Four-Leaf Clover | 1873 | Oil on canvas | 14 1/4 x 20 3/8 in. (36.2 x 51.8 cm); Framed: 25 x 31 x 4 in. | akin to the high price for a homer oil, the 4 leaf clover is of similar date but slightly smaller than Peach Blossoms which sold for $2.8M. |

| Paintings | American Art before 1950 | $ | 300,000 | $ | 500,000 | betty Krulik | DIA no. 70.680 | Theodore | Robinson | Scene at Giverny; Alternate Title: Normandy Farm; Alternate Title: Farm House and Rick | 1890 | Oil on canvas | 16 x 25 3/4 in.; 40.6 x 65.4 cm; Framed: 29 7/16 x 39 3/8 x 2 3/8 in. | Most straight landscapes without figures by robinson rarely sell, while this is a classic Giverny landscape, the high price for a landscape larger was in 1988 for $330,000. a near exact comparable, but 23 x 40 inches (almost double in size). Robinson is known for the giverny landscape with figures, of attractive women. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | American Art before 1950 | $ | 200,000 | $ | 300,000 | Betty Krulik | DIA no. 70.831 | Benjamin | West | Lot Fleeing from Sodom | 1810 | Oil on panel | Framed: 54 1/2 x 85 3/8 x 2 1/2 in. ( 138.43 x 216.85 x 6.35 cm); 47 1/8 x 78 1/8 in. (119.7 x 198.4 cm) | large history paintings that have little to do with American History rarely sell well, with the exception of The Battle of La Hogue at $632,000 in 2006 a work of similar size. which sold against an estimate of 250-350K. This being oversized and a religious |
| Paintings | American Art before 1950 | $ | 2,500,000 | $ | 3,500,000 | Betty Krulik | DIA no. 70.900 | John Singleton | Copley | Hannah Loring | 1763 | Oil on canvas | 49 3/4 x 39 1/4 in. (126.4 x 99.7 cm); Framed: 58 1/4 x 49 1/4 x 4 in. | of similar date to the record price of $3.3M for the NYPublic Library work. at the height of the market, this would do well as she is attractive and an american sitter. |
| Paintings | American Art before 1950 | $ | 300,000 | $ | 500,000 | Betty Krulik | DIA no. 72.839 | Thomas Wilmer | Dewing | Classical Figures | 1898 | Oil on panel | Center panel: 65 1/8 x 24 in. (165.4 x 61.0 cm); Left panel: 65 1/8 x 24 in. (165.4 x 61.0 cm); Right panel: 65 x 23 in.(165.1 x 58.4 cm); Framed: (H at left x W foot to) 74 1/4 x 76 1/2 in. (188.6 x 194.3 cm) | This series is very large and very faint and tonal. The most appropriate comparables are the 2004 (the height of the market) pair that came up at Shannons for 100-150K each. they were in rough condition and did not sell. These are of similar size and degree of tonality, better condition, therefore a value of $300-500K is appropriate |
| Paintings | American Art before 1950 | $ | 1,500,000 | $ | 2,500,000 | Betty Krulik | DIA no. 73.41 | John Singer | Sargent | Madame Paul Poirson | 1885 | Oil on canvas | 60 x 34 in. (152.4 x 86.4 cm); Framed: 78 x 52 x 4 1/8 in. | Young women in white dresses are amongst the most saleable of Sargents portraits. in 2013 Mrs. Richard Derby sold for $1.8M, however  the most comparable work is the Mrs. Pauline Astor which sold for $1.9M in 1997. the market for Sargent portraits has held steady. The market has been cautious in the past 5 years, evidenced by Mrs. C. Endicott sellingin 2007 for $2.1M, and reselling in 2010 for $1.3M (a drop of a thrid) |
| Paintings | American Art before 1950 | $ | 40,000,000 | $ | 60,000,000 | Betty Krulik | DIA no. 76.89 | Frederic Edwin | Church | Cotopaxi | 1862 | oil on canvas | Unframed: 48 _ 85 in. (121.9 _ 215.9 cm); Framed: 66 5/8 in. _ 103 in. _ 6 1/4 in. (169.2 _ 261.6 _ 15.9 cm) | While this work is dramatic, large and iconic, the market is at the highest end is very small. This appraiser would value the top end of the american art market in the 30-50M range as that is the range in which the Icons have sold over the past 10 years, at the height of the market, and now when the highest priced works have not exceeded $50,000,000. |
| Paintings | American Art before 1950 | $ | 1,500,000 | $ | 2,500,000 | Betty Krulik | DIA no. 78.38 | Jasper Francis | Cropsey | Indian Summer | 1866 | Oil on canvas | 53 x 95 in. (134.6 x 241.3 cm); Framed: 74 5/8 x 116 1/2 x 7 1/2 in. | Super large this work would make more than the record for Cropsey in the US of 1M, and nearly as much as the Richmond Hill picture that sold at |
| Paintings | American Art before 1950 | $ | 1,200,000 | $ | 1,800,000 | Betty Krulik | DIA no. 79.143 | Childe | Hassam | Notre Dame Cathedral, Paris, 1888 | 1888 | Oil on canvas | 17 1/2 x 21 1/2 in.; 44.5 x 54.6 cm; Framed : 29 3/4 x 34 x 3 1/2 | this work is grey and tonal, it has some small figures holding flowers but it lacks the figural dominence that the market prefers in Hassams Paris views. the most appropriate comparable is the Larger (21 x 28) Quai St Michel, which sold for $2M in 2011. even before the recession a rainy street scene sold in 2007 for $1.2M. |
| Paintings | American Art before 1950 | $ | 300,000 | $ | 500,000 | Betty Krulik | DIA no. 79.33 | Benjamin | West | Death on the Pale Horse; Alternate Title: The Opening of the Four Seals | 1796 | Oil on canvas | 23 3/8 x 50 5/8 in. (59.5 x 128.5 cm); Framed: 36 1/2 x 63 1/8 x 3 1/8 in. | an important painting but difficult "sell" a value close to the Battle of La Hogue ($632000 in 2006) example is appropriate, but less as the work is significantly smaller. |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | American Art before 1950 | $ | 300,000 | $ | 500,000 | Betty Krulik | DIA no. 82.26 | John White | Alexander | Panel for Music Room | 1894 | Oil on canvas | 37 x 77 3/4 in. (94.0 x 197.5 cm); Framed: 50 1/2 x 90 3/4 x 3 in. | This work is large, while it is lovely the size is a detriment, the record price for Alexander is $500,000. in 1995., it was  just a bit larger. than the subject work. Few Alexanders and no comparables have come on the market in the last 15 years. the one that did repeat only increased in price by 10% in 15 years. |
| Sculpture | American Art before 1950 | $ | 40,000 | $ | 60,000 | Betty Krulik | DIA no. 82.3 | Paul | Manship | The Moods of Time: Evening | 1938 | Bronze | 44 x 67 in.; 111.8 x 170.2 cm | The set of two came up at bonhams in 2009 selling for $90K, therefore the individual Moods of Time, Evening would be worth half. |
| Paintings | American Art before 1950 | $ | 1,800,000 | $ | 2,200,000 | Betty Krulik | DIA no. 2011.18 | Sanford Robinson | Gifford | On the Nile | 1872 | Oil on canvas | 17 x 31 in. | A recent purchase the purchase price is the Fair Market Value |
| Paintings | European Painting | $ | 80,000 | $ | 120,000 | Betty Krulik | DIA no. 85.3 | Rembrandt | Peale | The Court of Death | 1820 | Oil on canvas | Framed: 152 x 295 x 7 inches ( 386.08 x 749.3 x 17.78 cm); 138 x 281 inches (350.5 x 713.7 cm) | this very large allegory is a difficult sell because of its huge format, and dark subject matter. It is unlikely that it would be shown by a collector or an institute due to its large size. Closest comps are not |
| **Artvest Total American Art** | | **$** | **220,235,000** | **$** | **322,205,000** | | | | | | | | | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Furniture | American Art before 1950 | $ | 800,000 | $ | 1,200,000 | JHY | DIA no. 48.274 | Nathan | Bowen | Chest on Chest | 1774 | Mahogany, white pine and brass | 90 1/2 x 45 1/2 x 23 1/2 in.; 229.9 x 115.6 x 59.7 cm | Sotheby's NY, Jan. 23, 2009, lot 174, $1,762,500; Sotheby's NY, Jan. 19, 2002, lot 189, $913,250; Christie's NY, Jan. 17, 2008, lot 461, $1,049,000 |
| Furniture | American Art before 1950 | $ | 400,000 | $ | 600,000 | JHY | DIA no. 66.131 | George | Bright | Secretary; Alternate Title: Secretary Bookcase | between 1770 and 1785 | mahogany, white pine, mirrors, gilt and brass | Overall: 102 1/2 in. _ 42 1/2 in. _ 24 in. (260.4 _ 108 _ 61 cm) | Sotheby's NY, Jan. 22, 2004, lot 1169, $430,400; Sotheby's NY, Jan 19, 2007, Lot 585, $420,000 Sotheby's NY Jan. 18, 2008, lot 186, $337,000. |
| Furniture | American Art before 1950 | $ | 1,000,000 | $ | 2,000,000 | JHY | DIA no. 73.3 | Henry Clifton and Thomas | Carteret | High Chest of Drawers; Alternate Title: High Boy | 1755/1765 | Mahogany and brass | overall height: 96 3/4 in.; 245.7 cm; top: 59 1/2 x 45 x 22 5/8 in.; 151.1 x 114.3 x 57.5 cm; bottom: 37 1/4 x 44 1/4 x 22 1/4 in.; 94.6 x 112.4 x 56.5 cm | Comparable one was a sale for $1.8 million Christie's NY auction, May 19, 2005, lot 109; comparable two was from Christie's NY auction September 25, 2008, Lot 31, $1,082,500; comparable three is a dressing table from Sotheby's NY, September 26, 2008, lot 9 for $1,142,500. |
| Timepieces | Timepieces | $ | 60,000 | $ | 80,000 | JHY | DIA no. 1997.72.A | Louis Comfort | Tiffany | Tall Case Clock | 1882/1883 | Mahoganized cherry; stained glass; silvered bronze and lacquer | Clock and base: 97 x 20 3/4 x 20 3/4 in. (246.4 x 52.7 x 52.7 cm) | Sotheby's NY, Ocotober, 13- 15, 2004, lot 712, $54,000; Sotheby's NY, October 12, 2004, lot 70, $54,000 |
| **Artvest Total American Furniture** | | **$** | **2,260,000** | **$** | **3,880,000** | | | | | | | | | |

| Category | Art Type | Low Est. | High Est. | Appraiser | DIA no. | Culture | Artist/First | Artist/Last | Title | Date | Medium | Dimensions | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sculpture | Ancient Near Eastern Art Sculpture | $ 30,000,000 | $ 70,000,000 | JHY | DIA no. 31.25 | Neo-Babylonian | | | Ishtar Gate, Dragon of Marduk; title: Ishtar Gate, Dragon of Marduk; Alternate Title: Mushhush | between 604 and 562 BCE | glazed terracotta and molded brick | Overall: 45 1/2 _ 65 3/4 inches (115.6 _ 167 cm) | No direct auction comparables. The closest would be the Diana sold by Albright-Knox, Sotheby's, June 7, 2006, for $28 million; or the Limestone figure of a Lionness, Sotheby's, December 5, 2007 for $57 million formerly from the Martin Collection. Other terracotta fragments in Museums in North America have lions, this is the only one that is a dragon. Also, this specific example came from the wall of the gate itself; the lions were along the wall flanking the way, and this could be an important differential in selling price were this to be sold at auction, hence our large spread in the estimate. |
| Sculpture | Ancient Near Eastern Art Sculpture | $ 40,000,000 | $ 80,000,000 | JHY | DIA no. 50.32 | Neo-Assyrian | | | Tiglath-Pileser III Receiving Homage | 745/727 BC | Limestone relief carving | 48 x 94 in.; 121.9 x 238.8 cm | An Assyrian relief in the Miho Museum is 110 x 183 cm. (roughly half the size of the one in DIA collection) and was purchased by them in the early 90's setting a new record price at approximately $12 million at Sotheby's NY, the last time a figurative panel from this important site was sold at auction. On December 10, 2010, lot 33 sold for $290 thousand, which was approximately 10cm. x 10 cm. |
| Sculpture | Ancient Near Eastern Art Sculpture | $ 10,000,000 | $ 30,000,000 | JHY | DIA no. 82.64 | Neo-Sumerian | | | Gudea of Lagash | 2141/2122 BC | Paragonite | 15 1/2 x 5 1/4 x 2 1/2 in. (39.37 x 13.34 x 6.35 cm) | No direct auction comparables. Figures from this culture are very rare. Three more primitive figures from an earlier (and less valuable period) were sold at auction: Sotheby's NY, June 7, lot 80, $3,176,000, An Elamite copper figure, circa 300 - 2800 BC from teh Albright-Knox Museum; Sotheby's NY June 7, 2007 lot 81, $1,720,000, A Summarian figure from the Albright-Knox Museum; and Sotheby's NY, Dec. 10, 2008, lot 59, $782,500. |
| **Artvest Total Ancient Near Eastern Art** | | $ 80,000,000 | $ 180,000,000 | | | | | | | | | | |
| Paintings | Asian Art | $ 200,000 | $ 300,000 | JHY | DIA no. 40.161 | Shen | | Zhou | Ode to the Pomegranate and Melon Vine | c. 1506/1509 | Ink and colors on paper | Image: 59 3/16 x 31 in.; Overall scroll including hanging fabric and bottom roller: 111 5/8 x 41 in.; 280.7 x 104.1 cm | Christie's Hong Kong, October 27, 2002, lot 418, $224,133; Christie's Hong Kong, March 18, 2009, lot 339, $218,500 |
| **Artvest Total Asian Art** | | $ 200,000 | $ 300,000 | | | | | | | | | | |
| Sculpture | Contemporary Art after 1950 | $ 26,000,000 | $ 28,000,000 | Sabine Wilson | DIA no. 1988.175 | Alberto | | Giacometti | Standing Woman II; Title: Grand femme debout II | 1960 | bronze | Overall: 108 1/2 inches _ 12 1/4 inches _ 23 inches (275.6 _ 31.1 _ 58.4 cm) | Summary not provided |
| Paintings | Contemporary Art after 1950 | $ 10,000,000 | $ 15,000,000 | Sabine Wilson | DIA no. 1988.177 | Willem | | de Kooning | Merritt Parkway | 1959 | Oil on canvas | Canvas: 80 x 70 1/2 in. (203.2 x 179.1 cm); Framed: 81 x 70 7/8 x 2 in. | Summary not provided |

| Type | Category | $ | | $ | | Appraiser | DIA no. | Artist First | Artist Last | Title | Date/Medium | Dimensions | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | Contemporary Art after 1950 | $ | 3,000,000 | $ | 5,000,000 | Betty Krulik | DIA no. 1988.18 | Joan | Mitchell | Before, Again II | 1985 Oil on canvas | 110 x 78 3/4 x in. ( 200.0 cm x 279.4 ); Framed: 111 3/8 x 79 7/8 x 2 1/4 in. (282.9 x 203.1 x 5.7 cm) | Mitchell prices are in flux currently, two almost exact comparable sold in December of 2013 in Sothebys Paris for $4.7M, and another at Christies Paris in May of 2013 for $2.8M. Works from the 1960s have made record prices in the past year, but the 1980s are steady. |
| Paintings | Contemporary Art after 1950 | $ | 6,000,000 | $ | 8,000,000 | Sabine Wilson | DIA no. 1992.1 | Roy | Lichtenstein | Interior with Mirrored Closet | 1991 Oil and magna on canvas | 118 1/4 x 144 1/8 x 2 5/8 in. (300.4 x 366.1 x 6.7 cm) | Summary not provided |
| Paintings | Contemporary Art after 1950 | $ | 1,500,000 | $ | 2,000,000 | Sabine Wilson | DIA no. 2010.106 | Philip | Guston | Driver | 1975 Oil on canvas | Framed: 72 1/2 x 76 1/2 in.; Unframed: 63 1/4 x 67 1/4 in. | Summary not provided |
| Paintings | Contemporary Art after 1950 | $ | 9,000,000 | $ | 12,000,000 | Sabine Wilson | DIA no. 55.353 | Francis | Bacon | Study for Crouching Nude | 1952 oil and sand on canvas | Framed: 85 3/8 _ 61 1/2 _ 3 7/8 inches (216.9 _ 156.2 _ 9.8 cm) | Summary not provided |
| Paintings | Contemporary Art after 1950 | $ | 2,500,000 | $ | 4,000,000 | Sabine Wilson | DIA no. 60.88 | Alberto | Giacometti | Annette Seated | 1958 Oil and pencil on canvas | Canvas: 45 1/2 x 35 in. (115.6 x 88.9 cm); Framed: 46 5/8 x 35 7/8 x 1 3/4 in. ( 118.4 x 91.1 x 4.4 cm) | Summary not provided |
| Paintings | Contemporary Art after 1950 | $ | 3,000,000 | $ | 4,000,000 | Betty Krulik | DIA no. 63.156 | Stuart | Davis | Standard Brand | 1961 Oil on canvas | 60 x 46 in. (152.4 x 116.8 cm); Framed: 67 5/8 x 53 3/4 x 2 5/8 in. ( 171.8 x 136.5 x 6.7 cm) | a large but LATE work, most of these late works are smaller 20 x 14 ish, and sell in the 700K range  this being significantly larger would sell for close to the records. |
| Paintings | Contemporary Art after 1950 | $ | 1,500,000 | $ | 2,000,000 | Sabine Wilson | DIA no. 64.155.A | Robert | Indiana | The Brooklyn Bridge; Alternate Title: Night 1 | 1964 Oil on canvas | 135 x 135 x 1 1/2 in.; 342.9 x 342.9 x 3.81 cm | Summary not provided |
| Paintings | Contemporary Art after 1950 | $ | 18,000,000 | $ | 24,000,000 | Sabine Wilson | DIA no. 65.310 | Clyfford | Still | Painting, 1951; title: Painting, 1951 | 1951 Oil on canvas | 93 1/2 x 82 x 1 1/2 in. ( 237 49 x 208.28 x 3.81 cm) | Summary not provided |
| Paintings | Contemporary Art after 1950 | $ | 15,000,000 | $ | 20,000,000 | Sabine Wilson | DIA no. 65.7 | Franz | Kline | Siskind | 1958 Oil on canvas | Canvas: 80 x 111 in. (203.2 x 281.9 cm); Framed: 81 1/2 x 112 1/2 x 2 3/8 in. ( 207.01 x 285.75 x 6.03 cm); Canvas: 80 x 111 in. (203.2 x 281.9 cm); Framed: 81 1/2 x 112 1/2 x 2 3/8 in. ( 207.01 x 285.75 x 6.03 cm) | Summary not provided |
| Sculpture | Contemporary Art after 1950 | $ | 3,000,000 | $ | 5,000,000 | Betty Krulik | DIA no. 65.76 | John | Chamberlain | Coo Wha Zee | 1962 Painted steel | 72 x 60 x 50 in.; 182.9 x 152.4 x 127.0 cm | a large works of excellent date. the record prices are over $4M.in recent years. |
| Paintings | Contemporary Art after 1950 | $ | 30,000,000 | $ | 40,000,000 | Sabine Wilson | DIA no. 65.8 | Mark | Rothko | Orange, Brown; Alternate Title: No. 202 (Orange, Brown) | 1963 Oil on canvas | Canvas: 89 1/2 x 70 in. (227.3 x 177.8 cm); Framed: 90 1/8 x 69 1/8 x 2 1/2 in. (228.9 x 175.6 x 6.4 cm) | Summary not provided |

| Category | Classification | Low Est. | High Est. | Appraiser | DIA no. | First Name | Last Name | Title | Year | Medium | Dimensions | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sculpture | Contemporary Art after 1950 | $ 10,000,000 | $ 20,000,000 | Betty Krulik | DIA no. 66.36 | David | Smith | Cubi I | 1963 | Stainless steel | 124 x 34 1/2 x 33 1/2 in.; 315 x 87.6 x 85 cm | Few of these great works have come on the market in 1994 a record was achieved for a similarly dated work of $4M, then in 2005 the recent record of $23M was set for another large work from the same series, with the wild upswing in the contemporary masters market an appropriate value would range from $10-20M, as this work he has the balance issues for which he is best known. |
| Paintings | Contemporary Art after 1950 | $ 2,000,000 | $ 2,500,000 | Sabine Wilson | DIA no. 66.68 | Frank | Stella | Union I | 1966 | Alkyd fluorescent and epoxy paints on canvas | 104 1/2 x 173 3/4 x 4 1/8 in. (265.4 x 441.3 x 10.5 cm) | Summary not provided |
| Sculpture | Contemporary Art after 1950 | $ 3,000,000 | $ 4,000,000 | Betty Krulik | DIA no. 67.113 | Alexander | Calder | The X and Its Tails | 1967 | Steel plate with black paint | 120 x 120 x 144 in.; 304.8 x 304.8 x 365.8 cm | Calders The Wave and The Clove sold by Christies in 2011 for $3.8M and $2.8M are the most appropriate comparables due to the size and date of execution. Also the fact that they are Stabiles, not mobiles |
| Paintings | Contemporary Art after 1950 | $ 20,000,000 | $ 25,000,000 | Sabine Wilson | DIA no. 68.292.1 | Andy | Warhol | Self Portrait; former: Double Self Portrait | 1967 | acrylic and silkscreen enamel on canvas | Framed: 72 1/4 _ 72 1/4 _ 1 3/8 in. (183.5 _ 183.5 _ 3.5 cm); Unframed: 72 _ 72 in. (182.9 _ 182.9 cm) | Summary not provided |
| Paintings | Contemporary Art after 1950 | $ 20,000,000 | $ 25,000,000 | Sabine Wilson | DIA no. 68.292.2 | Andy | Warhol | Self Portrait | 1967 | Screen print in paint on canvas | Panel: 72 x 72 in. (182.9 x 182.9 cm); Framed: 72 1/4 x 72 1/4 x 1 3/8 in. (183.5 x 183.5 x 3.5 cm) | Summary not provided |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | Contemporary Art after 1950 | $ 6,000,000 | $ 8,000,000 | Sabine Wilson | DIA no. 69.1 | Jean | Dubuffet | Le plomb dans l'aile; Alternate Title: Shot in the Wing: Alternate Title: Hard Hit | 1961 | Oil on canvas | Canvas: 74 1/2 x 98 3/4 in. (189.2 x 250.8 cm); Framed: 75 7/8 x 100 x 3 1/4 in. ( 192.7 x 254 x 8.3 cm) | Summary not provided |
| Sculpture | Contemporary Art after 1950 | $ 300,000 | $ 500,000 | Betty Krulik | DIA no. 69.361 | Ellsworth | Kelly | Black White | 1968 | Painted 1/2 inch aluminum | 100 x 146 x 40 in.; 254.0 x 370.8 x 101.6 cm | known primarily for shaped canvases and sculpture and the works that sell best are from the 1980s, this early minimal work is monumental and shows the artists direction but is not iconic.therefore a modest value is appropriate |
| Paintings | Contemporary Art after 1950 | $ 5,000,000 | $ 7,000,000 | Sabine Wilson | DIA no. 69.48 | Robert | Rauschenberg | Creek | 1964 | Screen print in oil on canvas | Canvas: 72 x 96 in. (182.9 x 243.8 cm); Framed: 72 5/8 x 96 3/4 x 1 7/8 in. ( 184.5 x 245.8 x 4.8 cm) | Summary not provided |
| Paintings | Contemporary Art after 1950 | $ 1,200,000 | $ 1,800,000 | Sabine Wilson | DIA no. 71.385.A | Richard | Artschwager | Hospital Ward | 1968/1969 | Acrylic on celotex | each panel: 68 3/4 x 45 5/8 x 1 1/2 in. ( 174.6 x 115.9 x 3.8 cm); Total tryptich: 68 3/4 x 136 7/8 x 1 1/2 in. ( 174.6 x 347.7 x 3.8 cm) | Summary not provided |
| Paintings | Contemporary Art after 1950 | $ 35,000,000 | $ 45,000,000 | Sabine Wilson | DIA no. 76.78 | Barnett | Newman | Be I (second version) | 1970 | Acrylic on canvas | 111 1/2 x 84 x 1 5/16 in. (283.2 x 213.4 x 3.3 cm) | Summary not provided |
| Sculpture | Contemporary Art after 1950 | $ 300,000 | $ 400,000 | Betty Krulik | DIA no. 76.95 | Robert | Smithson | Non Site - Site Uncertain | 1968 | cannel coal, steel and enamel | Overall: 15 _ 90 _ 90 inches (38.1 _ 228.6 _ 228.6 cm) | other non site works withthe same materials have come on the market in the last 5 to 6 years and made $385K, and slightly less prior. with the market for this rare earth artist rising a value of 3-400K is appropriate |
| Paintings | Contemporary Art after 1950 | $ 1,500,000 | $ 2,500,000 | Betty Krulik | DIA no. 77.12 | Andrew | Wyeth | Sea Boots | 1976 | Tempera on masonite | 29 x 19 3/4 in. (73.7 x 50.2 cm); Framed : 34 1/2 x 25 2/16 x 1 3/4 in. ( 87.63 x 64.29 x 4.45 cm) | The wyeth market has been flat since shortly after the artis died in 2009. we saw a short spike up in prices then most of the major temperas have failed to sell. This work while small is of the great date, and has the air of mystery for which Wyeth is well known. |
| Sculpture | Contemporary Art after 1950 | $ 6,000,000 | $ 8,000,000 | Betty Krulik | DIA no. 79.34 | Eva | Hesse | Accession II | 1969 | galvanized steel and vinyl | Overall: 30 3/4 _ 30 3/4 _ 30 3/4 inches (78.1 _ 78.1 _ 78.1 cm) | The highest price at auction is $3 to $4 million for quite different works, but nothing this complex has come up for auction. |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Artvest Contemporary Art After 1950** | | $ 238,800,000 | $ 318,700,000 | | | | | | | | | |
| Paintings | European Modern Art to 1950 | $ 15,000,000 | $ 20,000,000 | Sabine Wilson | DIA no. 1988.176 | Pablo | Picasso | Seated Woman | | 1960 | Oil on canvas | Canvas: 57 1/2 x 45 in. (146.1 x 114.3 cm); Framed: 58 5/8 x 46 1/4 x 2 in. ( 148.9 x 117.5 x 5.08 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | 2,000,000 | $ 3,000,000 | Sabine Wilson | DIA no. 1988.178 | Pablo | Picasso | Fruit, Carafe and Glass | | 1938 | Oil on canvas | 25 5/8 x 32 in.; 65.1 x 81.3 cm | Summary not provided |
| Paintings | European Modern Art to 1950 | 1,000,000 | $ 3,000,000 | Sabine Wilson | DIA no. 1999.119.A | Raoul | Dufy | The Allegory of Electricity | 1936/1937 | Watercolor, gouache on paper mounted on canvas | Overall: 38 1/2 x 235 in. (97.8 x 596.9 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | 18,000,000 | $ 22,000,000 | Sabine Wilson | DIA no. 2005.60 | Pablo | Picasso | Girl Reading | | 1938 | Oil on canvas | Framed: 35 1/2 x 30 in.; Unframed: 27 1/4 x 21 3/4 inches | Summary not provided |
| Paintings | European Modern Art to 1950 | 4,500,000 | $ 6,500,000 | Sabine Wilson | DIA no. 2005.62 | Henri | Matisse | Anemones and Peach Blossoms | | 1944 | Oil on canvas | Unframed: 21 3/4 _ 25 1/2 in. (55.2 _ 64.8 cm); Framed: 31 1/8 _ 35 1/2 _ 3 3/4 in. (79.1 _ 90.2 _ 9.5 cm) | Summary not provided |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Sculpture | European Modern Art to 1950 | $ 800,000 | $ 1,200,000 | Sabine Wilson | DIA no. 2006.153 | Raymond | Duchamp-Villon | Le Cheval Majeur (The Large Horse) | modeled 1914, cast 1966 Cast bronze | 59 x 58 1/2 x 31 1/2 in. | Summary not provided |
| Sculpture | European Modern art to 1950 | $ 25,000,000 | $ 30,000,000 | Sabine Wilson | DIA no. 22.143 | Auguste | Rodin | The Thinker | 1904 Bronze | 200.7 x 130.2 x 140.3 cm (79 x 51 1/4 x 55 1/4 in.); weight approximately 2,000 lbs; Granite base weight 12,000 lbs | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 80,000 | $ 140,000 | Sabine Wilson | DIA no. 30.291 | Max | Kaus | Man in a Fur Coat | c. 1918 Oil on canvas | Canvas: 29 1/2 x 25 3/4 in. (74.9 x 65.4 cm); Framed: 37 x 33 7/16 x 1 3/4 in. ( 94 x 84.8 x 4.4 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | Zero | value o fthe real Betty Krulik estate | | DIA no. 33.10 | Diego M. | Rivera | Detroit Industry Murals | 1932-1933 frescoes | various dimensions | the works would be destroyed if they were removed from the building, therfore the value is 0 OR the value of the real estate |
| Paintings | European Modern Art to 1950 | $ 2,000,000 | $ 3,000,000 | Sabine Wilson | DIA no. 35.110 | Oskar | Kokoschka | View of Jerusalem | 1929-1930 oil on canvas | Unframed: 31 1/2 _ 50 1/2 inches (80 _ 128.3 cm); Framed: 42 7/8 _ 61 13/16 _ 4 1/2 inches (108.9 _ 157 _ 11.4 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 700,000 | $ 1,000,000 | Sabine Wilson | DIA no. 37.2 | Karl | Schmidt-Rottluff | Rain Clouds, Lago di Garda | 1927 Oil on canvas | Framed: 43 x 52 7/8 x 2 7/8 in. (109.2 x 134.3 x 7.3); Canvas: 34 1/2 x 44 1/4 in. (87.6 x 112.4 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 5,000,000 | $ 7,000,000 | Sabine Wilson | DIA no. 40.58 | Ernst Ludwig | Kirchner | Winter Landscape in Moonlight; Alternate Title: Mountain Landscape | 1919 Oil on canvas | Unframed: 47 1/2 x 47 1/2 in. (120.7 x 120.7 cm); Framed: 50 1/2 x 50 1/2 x 2 5/8 in. (128.3 x 128.3 x 6.7 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 1,500,000 | $ 2,500,000 | Sabine Wilson | DIA no. 44.271 | Heinrich | Campendonk | In the Forest; Alternate Title: Im Wald | ca 1919 Oil on canvas | Canvas: 33 x 39 in. (83.8 x 99.1 cm); Framed: 38 1/4 x 44 3/16 x 2 in. ( 97.2 x 112.2 x 5.1 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 1,500,000 | $ 2,500,000 | Sabine Wilson | DIA no. 50.20 | Max | Beckmann | Still Life with Lilies | 1949 Oil on canvas | Canvas: 37 1/4 x 24 in. (94.6 x 61.0 cm); Framed: 43 1/2 x 31 7/8 x 2 5/8 in | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 3,000,000 | $ 5,000,000 | Sabine Wilson | DIA no. 51.65 | Otto | Dix | Self Portrait | 1912 Oil on paper mounted on poplar panel | Panel: 29 x 19 1/2 in. (73.7 x 49.5 cm); Framed: 34 5/8 x 25 1/2 x 3 1/2 in. (87.95 x 64.8 x 8.89 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 200,000 | $ 300,000 | Sabine Wilson | DIA no. 53.470 | Oskar | Kokoschka | The Cat | 1926 Oil on canvas | Framed: 47 7/16 x 61 1/4 x 3 3/8 in. (120.5 x 155.6 x 8.6 cm); Canvas: 35 3/4 x 49 1/2 in. (90.8 x 125.7 cm) | Summary not provided |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Modern Art to 1950 | $ 2,000,000 | $ 3,000,000 | Sabine Wilson | DIA no. 54.460 | Emil | Nolde | Sunflowers; Alternate Title: Reife Sonnenblumen | | 1932 Oil on canvas | Canvas: 29 x 35 in. (73.7 x 88.9 cm); Framed: 35 1/2 x 42 3/4 x 3 in. ( 90.17 x 108.59 x 7.62 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 18,000,000 | $ 24,000,000 | Sabine Wilson | DIA no. 55.410 | Max | Beckmann | Self Portrait in Olive and Brown | | 1945 Oil on canvas | Canvas: 23 3/4 x 19 5/8 in. (60.3 x 49.8 cm); Framed: 31 5/8 x 27 1/4 x 2 3/8 in. (80.3 x 69.2 x 6.0 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 25,000,000 | $ 40,000,000 | Sabine Wilson | DIA no. 56.144 | Franz | Marc | Animals in a Landscape | | 1914 Oil on canvas | Canvas: 43 3/8 x 39 1/4 in. (110.2 x 99.7 cm); Framed: 46 7/8 x 43 x 2 1/4 in. (119 x 109.2 x 5.7 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 1,500,000 | $ 2,500,000 | Sabine Wilson | DIA no. 57.182 | Otto | Mueller | Gypsy Encampment; Alternate Title: Zigeuner vor Zelt | c. 1925 | Oil on canvas (see notes) | Canvas: 41 1/2 x 57 in. (105.4 x 144.8 cm); Framed: 43 1/2 x 59 5/16 x 2 3/4 in. ( 110.5 x 150.6 x 7 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 20,000,000 | $ 30,000,000 | Sabine Wilson | DIA no. 57.234 | Wassily | Kandinsky | Study for Painting with White Form | | 1913 oil on canvas | Framed: 41 3/8 _ 36 1/2 _ 1 1/2 inches (105.1 _ 92.7 _ 3.8 cm); Unframed: 39 1/4 _ 34 3/4 inches (99.7 _ 88.3 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 1,500,000 | $ 2,500,000 | Sabine Wilson | DIA no. 58.385 | Paula | Modersohn-Becker | Old Peasant Woman | c. 1905 | Oil on canvas | Canvas: 29 3/4 x 22 3/4 in. (75.6 x 57.8 cm); Framed: 36 x 29 x 2 1/4 in. ( 91.4 x 73.7 x 5.7 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 800,000 | $ 1,200,000 | Sabine Wilson | DIA no. 59.443 | Pierre | Bonnard | Woman with Dog | | 1924 Oil on canvas | 31 x 15 5/8 in. ( 78.7 x 39.7 cm); Framed: 37 1/2 x 22 1/2 x 2 5/8 in. (95.3 x 57.2 x 6.7 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 1,200,000 | $ 1,600,000 | Sabine Wilson | DIA no. 59.450 | Ernst Ludwig | Kirchner | Cafe | | 1928 Oil on canvas | Canvas: 31 1/2 x 27 1/2 in. (80.0 x 69.8 cm); Framed: 37 1/2 x 33 1/2 x 1 1/2 in. | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 1,000,000 | $ 1,500,000 | Sabine Wilson | DIA no. 61.48 | Joan | Miró | Women and Bird in the Night; Alternate Title: Femmes et Oiseau dans la Nuit | | 1944 Oil on canvas | 15 x 18 in.; 38.1 x 45.7 cm; Framed dimensions: 22 1/2 x 25 3/4 x 2 1/2 | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 12,000,000 | $ 15,000,000 | Sabine Wilson | DIA no. 62.126 | Pablo | Picasso | Portrait of Manuel Pallares | | 1909 Oil on canvas | 26 3/4 x 19 1/2 in. (67.9 x 49.5 cm); Framed: 37 1/4 x 30 3/4 x 3 3/8 in. ( 94.6 x 78.1 x 8.6 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 3,000,000 | $ 4,500,000 | Sabine Wilson | DIA no. 62.141 | Pablo | Picasso | Sylvette | | 1954 Oil on canvas | Unframed: 39 1/4 x 32 in. (99.7 x 81.3 cm); Framed: 48 5/8 x 41 x 1 3/4 in. (123.5 x 104.1 x 4.4 cm) | Summary not provided |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sculpture | European Modern Art to 1950 | $ 600,000 | $ 800,000 | Sabine Wilson | DIA no. 62.97 | Henry | Moore | Reclining Figure | | 1930 Ancaster stone | 13 x 20 1/4 x 7 3/4 in.; 33 x 51.4 x 19.7 cm | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 700,000 | $ 1,000,000 | Sabine Wilson | DIA no. 63.133 | Oskar | Kokoschka | Girl with Doll | c. 1921 | Oil on canvas | Canvas: 36 x 32 in. (91.4 x 81.3 cm); Framed: 43 1/4 x 39 3/8 x 2 1/2 in. (109.9 x 100.0 x 6.4 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 800,000 | $ 1,200,000 | Sabine Wilson | DIA no. 63.134 | Karl | Schmidt-Rottluff | Man with a Green Beard | c. 1920 | Oil on canvas | Framed: 42 5/16 x 36 3/4 x 2 1/8 in. (107.5 x 93.4 x 5.4 cm); Canvas: 35 1/2 x 30 1/4 in. (90.2 x 76.8 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 1,500,000 | $ 2,500,000 | Sabine Wilson | DIA no. 63.135 | Karl | Schmidt-Rottluff | Evening by the Sea | | 1919 Oil on canvas | Canvas: 34 x 39 3/4 in. (86.4 x 101.0 cm); Framed: 38 3/4 x 44 1/4 x 1 5/8 in. (98.4 x 112.4 x 4.1 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 700,000 | $ 1,000,000 | Sabine Wilson | DIA no. 64.218 | Karl | Hofer | Wind | | 1937 Oil on canvas | Canvas: 48 x 38 3/4 in. (121.9 x 98.4 cm); Framed: 53 3/8 x 44 3/16 x | Summary not provided |
| Sculpture | European Modern Art to 1950 | $ 800,000 | $ 1,500,000 | Sabine Wilson | DIA no. 64.264 | Jean | Arp | Torso of a Giant | | 1964 Bronze | 49 x 34 x 35 in.; 124.5 x 86.4 x 88.9 cm | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 6,000,000 | $ 8,000,000 | Sabine Wilson | DIA no. 64.84 | Juan | Gris | Still Life | | 1916 Oil on canvas | Canvas: 31 3/4 x 23 1/2 in. (80.6 x 59.7 cm); Framed: 40 3/8 x 32 1/2 x 2 1/8 in. ( 102.55 x 81.44 x 5.08 cm) | Summary not provided |
| Sculpture | European Modern Art to 1950 | $ 2,500,000 | $ 5,000,000 | Sabine Wilson | DIA no. 65.108 | Henry | Moore | Reclining Figure | | 1939 elmwood | Overall: 37 _ 79 _ 30 in. (94 _ 200.7 _ 76.2 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 12,000,000 | $ 14,000,000 | Sabine Wilson | DIA no. 66.66 | Joan | Miró | Self Portrait II; translated: Autoportrait II | | 1938 oil on burlap | Framed: 52 3/8 _ 78 1/16 _ 2 1/2 in. (133 _ 198.3 _ 6.4 cm); Unframed: 51 _ 77 in. (129.5 _ 195.6 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 8,000,000 | $ 12,000,000 | Sabine Wilson | DIA no. 70.158 | Vincent Willem | van Gogh | The Diggers; Alternate Title: Les Becheurs | | 1889 Oil on paper lined onto canvas | 25 5/8 x 19 3/4 in. (65.1 x 50.2 cm); Framed: 35 5/8 x 29 3/4 x 2 1/2 in. (90.5 x 75.6 x 6.4 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 18,000,000 | $ 22,000,000 | Sabine Wilson | DIA no. 70.161 | Paul | Cézanne | Mont Sainte-Victoire | c. 1904/1906 | Oil on canvas | 21 7/8 x 18 1/8 in.; 55.6 x 46.0 cm; Framed: 28 1/2 x 24 3/4 x 2 3/4 in.; 72.4 x 62.9 x 7.0 cm | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 22,000,000 | $ 26,000,000 | Sabine Wilson | DIA no. 70.175 | Henri | Matisse | Poppies | c. 1919 | Oil on canvas | 39 5/8 x 32 in. (100.6 x 81.3 cm); Framed: 47 5/8 x 40 1/4 x 3 5/8 in. ( 121.0 x 102.2 x 9.2 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 1,500,000 | $ 2,500,000 | Sabine Wilson | DIA no. 70.185 | Amedeo | Modigliani | Young Man with a Cap | 20th Century | Oil on canvas | Canvas: 24 x 14 7/8 in. (61.0 x 37.8 cm); Framed: 30 15/16 x 21 15/16 x 2 3/8 in. ( 78.6 x 55.7 x 6.1 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 4,000,000 | $ 8,000,000 | Sabine Wilson | DIA no. 70.186 | Amedeo | Modigliani | A Man | | 1916 Oil on canvas | Framed: 28 3/8 x 24 13/16 x 3 3/4 in. (72.1 x 63 x 9.5 cm); Canvas: 18 1/8 x 15 | Summary not provided |

| Type | Classification | Low $ | High $ | Appraiser | DIA no. | Artist First | Artist Last | Title | Date | Medium | Dimensions | Summary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Modern Art to 1950 | $ 60,000,000 | $ 80,000,000 | Sabine Wilson | DIA no. 70.190 | Pablo | Picasso | Melancholy Woman; Alternate Title: La melancolie | 1902 | Oil on canvas | Canvas: 39 3/8 x 27 1/4 in. (100.0 x 69.2 cm); Framed: 46 5/8 x 34 3/4 x 1 3/4 in. (118.4 x 88.3 x 4.4 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 20,000,000 | $ 30,000,000 | Sabine Wilson | DIA no. 70.191 | Pablo | Picasso | Head of a Harlequin; Alternate Title: Tete d'arlequin | 1905 | Oil on canvas | 16 x 13 in. (40.6 x 33.0 cm); Framed: 26 7/8 x 23 3/4 x 2 in. (68.3 x 60.3 x 5.1 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 3,000,000 | $ 5,000,000 | Sabine Wilson | DIA no. 70.192 | Pablo | Picasso | Bottle of Anis del Mono; Alternate Title: Bouteille d'anis del Mono et carte a jouer sur un gueridon | 1915 | Oil on canvas | Canvas: 18 1/8 x 21 1/2 in. (46.0 x 54.6 cm); Framed: 24 1/4 x 27 5/8 x 3 1/8 in. (61.6 x 70.2 x 7.9 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 40,000,000 | $ 60,000,000 | Sabine Wilson | DIA no. 70.193 | Pablo | Picasso | Woman Seated in an Armchair; Alternate Title: Femme assise dans un fauteuil | 1923 | Oil on canvas | Canvas: 51 1/4 x 38 1/4 in. (130.2 x 97.2 cm); Framed: 60 x 46 3/4 x 4 in. (152.4 x 118. 7 x 10.2 cm) | Summary not provided |
| Sculpture | European Modern Art to 1950 | $ 1,000,000 | $ 1,200,000 | Sabine Wilson | DIA no. 70.229 | Constantin | Brancusi | Sleeping Child | c. 1906-1908 | Bronze | 5 3/4 x 4 1/4 x 5 1/2 in.; 14.6 x 10.8 x 14.0 cm | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 800,000 | $ 1,000,000 | Sabine Wilson | DIA no. 74.122 | Yves | Tanguy | Shadow Country; Alternate Title: Terre d'ombre | 1927 | Oil on canvas | Canvas: 39 x 31 5/8 in. ( 99.1 x 80.3 cm); Framed: 42 1/2 x 35 1/8 x 2 3/8 in. (108.0 x 89.2 x 6.0 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 500,000 | $ 700,000 | Sabine Wilson | DIA no. 74.123 | Chaim | Soutine | Red Gladioli; Alternate Title: Les Glaieuls rouges | c. 1919 | Oil on canvas | 21 1/2 x 18 in. (54.6 x 45.7 cm); Framed: 29 5/8 x 25 5/8 x 3 5/8 in. ( 75.3 x 65.1 x 9.2 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 600,000 | $ 800,000 | Sabine Wilson | DIA no. 75.59 | Felix | Vallotton | Standing Nude Holding Gown on Her Knee | 1904 | Oil on canvas | 51 1/4 x 38 1/4 in. (130.2 x 97.2 cm); Framed: 52 3/4 x 39 7/8 x 1 5/8 in. (134.0 x 101.3 x 4.1 cm) | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 400,000 | $ 600,000 | Sabine Wilson | DIA no. 76.159 | Lovis | Corinth | Still Life with Lilacs; Alternate Title: Fliederstrauss | 1917 | Oil on canvas | canvas: 21 3/4 x 17 3/4 in. (55.2 x 45.1 cm); Framed: 22 7/8 x 18 15/16 x 1 1/4 in. | Summary not provided |
| Paintings | European Modern Art to 1950 | $ 200,000 | $ 400,000 | Betty Krulik | DIA no. 77.5 | Diego M. | Rivera | Edsel B. Ford | 1932 | Oil on canvas, mounted on masonite | Unframed: 38 1/2 x 49 1/4 in. (97.8 x 125.1 cm) | most male portraits (except the self portrait that sold for $1M, do not sell well, they is more like the similar sized Barbara portrait which sold in 2011 for $242K. But due to the importance of the sitter a wider estimate on the upside is appropriate |
| Paintings | European Painting | $ 8,000,000 | $ 12,000,000 | Sabine Wilson | DIA no. 1985.24 | Pierre Auguste | Renoir | Woman in an Armchair; Alternate Title: Femme Assise dans un Fauteuil; Alternate Title: Lise | 1874 | Oil on canvas | 24 x 19 7/8 in.; 61.0 x 50.5 cm; Framed: 35 x 29 1/2 x 3 7/8 in.; 88.9 x 74.9 x 9.8 cm | Summary not provided |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Painting | $ | 300,000 | $ | 500,000 | Sabine Wilson | DIA no. 1985.25 | Pierre Auguste | Renoir | Clearing in the Woods; Alternate Title: La Foret de Fontainebleau | 1865 | Oil on canvas | Framed: 29 5/8 x 40 1/8 x 3 9/16 in. (75.3 x 101.9 x 9.1 cm); Canvas: 22 1/2 x 32 1/2 in. (57.2 x 82.6 cm) | Summary not provided |
| Paintings | European Painting | $ | 600,000 | $ | 800,000 | Sabine Wilson | DIA no. 1988.9 | Jean-Frederic | Bazille | Still Life with Fish; Alternate Title: Poissons | 1866 | Oil on canvas | 25 x 32 1/4 in. (63.5 x 81.9 cm); FrameD: 32 x 39 3/4 x 3 1/2 | Summary not provided |
| Paintings | European Painting | $ | 5,000,000 | $ | 7,000,000 | Sabine Wilson | DIA no. 1994.57 | Pierre Auguste | Renoir | The Spanish Guitarist; Alternate Title: Le Guitariste espagnol | 1894 | Oil on canvas | 25 3/4 x 21 1/2 in. (65.4 x 54.6 cm); Framed dimensions: 32 3/4 x 28 3/8 x 3 1/4 in. | Summary not provided |
| Paintings | European Painting | $ | 300,000 | $ | 500,000 | Sabine Wilson | DIA no. 1992.8 | Henri | Gervex | Cafe Scene in Paris | 1877 | Oil on canvas | 39 5/8 x 53 1/2 in. (100.5 x 136 cm.); Framed: 48 x 64 3/4 x4 1/8 in. (121.9 x164.5 x10.5) | Summary not provided |
| Paintings | European Painting | $ | 80,000,000 | $ | 120,000,000 | Sabine Wilson | DIA no. 1996.25 | Vincent Willem | van Gogh | Portrait of Postman Roulin | 1888 | Oil on canvas | Canvas: 25 1/4 x 18 7/8 in. (64.1 x 47.9 cm); Framed: 34 3/4 x 28 3/4 x 3 1/4 in. (88.3 x 73.0 x 8.3 cm) | Summary not provided |
| Paintings | European Painting | $ | 5,000,000 | $ | 7,000,000 | Sabine Wilson | DIA no. 1998.65 | Edgar | Degas | Jockeys on Horseback before Distant Hills; Alternate Title: Riders Before Hilly Country | 1884 | Oil on canvas | Unframed: 17 11/16 x 21 5/8 in. (44.9 x 54.9 cm); Framed: 25 1/2 x 30 x 3 in. (64.8 x 76.2 x 7.6 cm) | Summary not provided |
| Paintings | European Painting | $ | 800,000 | $ | 1,200,000 | Sabine Wilson | DIA no. 21.8 | Edgar | Degas | Portrait of a Woman; Alternate Title: Portrait de Femme; Alternate Title: Mademoiselle Malot(?) | 1877 | Oil on canvas | Framed: 34 x 30 1/4 x 2 7/8 in. (86.36 x 76.84 x 7.30 cm); 25 1/2 x 21 in. (64.77 x 53.34 cm) | Summary not provided |
| Paintings | European Painting | $ | 600,000 | $ | 800,000 | Sabine Wilson | DIA no. 44.90 | Paul | Klee | Reclining; Alternate Title: Liegen; Lying Down | c. 1937 | Oil on burlap | Framed: 18 7/8 x 29 7/8 x 1 1/2 in. ( 48.2 x 76.1 x 3.8 cm); Canvas: 13 1/2 x 24 in. (34.3 x 61.0 cm) | Summary not provided |
| Paintings | European Painting | $ | 800,000 | $ | 1,200,000 | Sabine Wilson | DIA no. 48.279 | Edgar | Degas | Morning Ride | c. 1866 | Oil on canvas | 33 1/2 x 25 1/2 in.; 85.1 x 64.8 cm; with frame: 40 7/8 x 34 3/4 x 3 3/4 in | Summary not provided |
| Paintings | European Painting | $ | 7,000,000 | $ | 10,000,000 | Sabine Wilson | DIA no. 69.306 | Paul | Gauguin | Self Portrait | c. 1893 | Oil on canvas | 18 1/8 x 15 in.; 46.2 x 38.1 cm; Framed: 25 x 21 3/4 x 1-7/16 in. (depth without the more recently added extension on the verso); sight: 17-1/2 x 14 1/4 in.; 79.7 x 70.5 x 7.6 cm | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Painting | $ | 40,000,000 | $ | 50,000,000 | Sabine Wilson | DIA no. 70.159 | Vincent Willem | van Gogh | Bank of the Oise at Auvers | | 1890 | Oil on canvas | Framed: 37 x 44 1/4 x 3 1/2 in. (94 x112.4 x8.9 cm.); Unframed: 28 7/8 x 36 7/8 in. (73.3 x 93.7 cm.) | Summary not provided |
| Paintings | European Painting | $ | 30,000,000 | $ | 40,000,000 | Sabine Wilson | DIA no. 70.160 | Paul | Cézanne | Madame Cezanne | c. 1886 | Oil on canvas | 39 5/8 x 32 in.; 100.6 x 81.3 cm; Framed: 49 3/8 x 41 1/2 x 4 5/8 in.; 126.4 x | Summary not provided |
| Paintings | European Painting | $ | 15,000,000 | $ | 20,000,000 | Sabine Wilson | DIA no. 70.162 | Paul | Cézanne | Bathers | c. 1880 | Oil on canvas | Unframed: 13 5/8 x 15 in. (34.6 x 38.1 cm); Framed: 22 5/8 x 24 1/4 x 3 11/16 in. (57.5 x 61.6 x 9.4 cm) | Summary not provided |
| Paintings | European Painting | $ | 12,000,000 | $ | 15,000,000 | Sabine Wilson | DIA no. 70.163 | Paul | Cézanne | The Three Skulls | c. 1900 | Oil on canvas | Unframed: 13 3/4 _ 24 in. (34.9 _ 61 cm); Framed: 19 3/4 in. _ 29 7/8 in. _ 3 in. (50.2 _ 75.9 _ 7.6 cm) | Summary not provided |
| Paintings | European Painting | $ | 1,500,000 | $ | 2,000,000 | Sabine Wilson | DIA no. 70.167 | Edgar | Degas | Violinist and Young Woman; Alternate Title: Violiniste et jeune femme tenant un cahier de musique | c. 1871 | Oil and crayon on canvas | 18 1/4 x 22 in.; 46.4 x 55.9 cm; Framed: 26 1/4 x 30 3/8 x 3 1/2 in.; 66.7 x 77.2 x 8.9 cm | Summary not provided |
| Paintings | European Painting | $ | 600,000 | $ | 1,000,000 | Sabine Wilson | DIA no. 70.168 | Edgar | Degas | Woman with a Bandage; Alternate Title: La femme au bandeau | 1872/1873 | Oil on canvas | Framed: 21 3/4 x 18 1/2 x 2 5/8 in. (55.25 x 46.99 x 6.67 cm); 13 x 9 3/4 in.; 33.0 x 24.8 cm | Summary not provided |
| Paintings | European Painting | $ | 800,000 | $ | 1,000,000 | Sabine Wilson | DIA no. 70.173 | Edouard | Manet | On the Beach; Alternate Title: Sur la plage | c. 1868 | Oil on canvas | 40.0 x 48.3 cm; with frame: 23 3/8 x 26 1/2 x 2 1/8 in.; 59.4 x 67.3 x 5.4 | Summary not provided |
| Paintings | European Painting | $ | 6,000,000 | $ | 12,000,000 | Sabine Wilson | DIA no. 70.174 | Henri | Matisse | Coffee; Alternate Title: Le cafe | | 1916 | Oil on canvas | Canvas: 39 5/8 x 25 3/4 in. (100.6 x 65.4 cm); Framed: 50 3/8 x 36 5/8 x 3 3/4 in. (128.0 x 93.0 x 9.5 cm) | Summary not provided |
| Paintings | European Painting | $ | 10,000,000 | $ | 12,000,000 | Sabine Wilson | DIA no. 70.177 | Pierre Auguste | Renoir | Seated Bather; Alternate Title: Baigneuse assise | 1903/1906 | Oil on canvas | 45 3/4 x 35 in.; 116.2 x 88.9 cm; Framed: 57 3/8 x 46 7/8 x 3 7/8 in.; 145.7 x | Summary not provided |
| Paintings | European Painting | $ | 7,000,000 | $ | 10,000,000 | Sabine Wilson | DIA no. 70.178 | Pierre Auguste | Renoir | The White Pierrot; Alternate Title: Pierrot blanc | 1901/1902 | Oil on canvas | 31 1/8 x 24 3/8 (79.1 x 61.9); Frame: 40 1/2 x 33 1/4 x 3 1/2 in. (105.4 x 87.9 x 12.1 cm) | Summary not provided |
| Paintings | European Painting | $ | 20,000,000 | $ | 40,000,000 | Sabine Wilson | DIA no. 70.183 | Georges Pierre | Seurat | View of Le Crotoy from Upstream; creator: Vue de Crotoy, amont | | 1889 | oil on canvas | Unframed: 27 3/4 _ 34 1/8 in. (70.5 _ 86.7 cm); Framed: 38 7/8 _ 45 1/8 _ 1 5/8 in. (98.7 _ 114.6 _ 4.1 cm) | Summary not provided |

| Category | Type | Low $ | High $ | Attribution | DIA no. | Artist First | Artist Last | Title | Date | Medium | Dimensions | Summary |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Painting | $ 600,000 | $ 800,000 | Sabine Wilson | DIA no. 75.31 | Camille | Pissarro | The Kitchen at Piette's, Montfoucault; Alternate Title: La cuisine chez Piette, Montfoucault | 1874 | Oil on canvas | 18 1/4 x 22 in. (46.4 x 55.9 cm); Frame: 26 1/8 x 29 3/8 x 2 1/4 (66.4 x 74.6 x 5.7) | Summary not provided |
| Sculpture | European Sculpture and Dec Arts | $ 1,500,000 | $ 3,000,000 | Sabine Wilson | DIA no. 53.145 | Auguste | Rodin | Eve | 1881 | bronze | Overall: 68 1/2 _ 21 _ 24 inches (174 _ 53.3 _ 61 cm) | Summary not provided |
| **Artvest Total European Impressionist & Modern Paintings** | | $ 625,280,000 | $ 885,940,000 | | | | | | | | | |
| Paintings | European Painting | $ 200,000 | $ 300,000 | KGFA | DIA no. 1998.1 | Richard | Wilson | Caernarvon Castle | 1744/1745 | Oil on canvas | 32 1/2 x 45 (82.6 x 114.3); Frame: 40 x 52 3/4 x 2 5/8 in. (101.6 x 134.0 x 6.7 cm) | Comp: Christies London 7/7/10 lot 165 $83,000 Early in career, pre Italy, which work is the prime version? This or the Yale picture. Wilson's notoreity increased after his trip to Italy and Grand Tour. He returned with a lusher, denser palate and more dramatic sense of color. |
| Paintings | European Painting | $ 600,000 | $ 800,000 | KGFA | DIA no. 23.31 | Lucas | Cranach the Elder | Madonna and Child with Infant Saint John the Baptist and Angels | 1536 | Oil on wood panel | 46 x 31 5/8 in.; 116.8 x 80.3 cm | Comp: Virgin and Child, Sotheby's London: Wednesday, July 7, 2010 [Lot 00006] $730,000, Madonna and Child, Dorotheum: Thursday, March 30, 2000 [Lot 00462] $216,000. Large ungracious composition. Cranach can sell for millions of dollars but those works are tightly painted, smaller and usually of provocative subject matter (i.e.naked women) This is a large crowded religious suject. |

| | | Low $ | High $ | | DIA no. | Artist | | Title | Date | Medium | Dimensions | Comp/Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Painting | $ 2,000,000 | $ 4,000,000 | KGFA | DIA no. 25.207 | Giovanni Domenico | Tiepolo | The Women of Darius Invoking the Clemency of Alexander | 1750/1753 | Oil on canvas | 118.2 x 98.5 cm; Framed: 58 3/4 x 50 1/4 x 5 1/4 in.; 149.2 x 127.6 x 13.3 cm | Comp: Angelica and Medoro, Christie's London:July 7, 2009 [Lot 00063], $1.0 mill, Stoning of St. Stephen Christie's London: December 7, 2006 [Lot 00068], $900,000, 6 Panel Decorative Cycle Sotheby's London:  July 3, 2013 [Lot 00042], $4.5 mill.  This is a beautifully conserved, example of GD Tiepolos work from the period when he collaborated with his father at Wurzburg.  The subject matter is entirely more appleaing than works that have come on the market and in far better condition than the work that sold for $1.0 in 2009.  Lively brush stroke, Tiepolo's perfect example of beautiful women and color. |
| Paintings | European Painting | $ 2,000,000 | $ 3,000,000 | KGFA | DIA no. 25.35 | Carlo | Crivelli | The Deposition of Christ; Alternate Title: Lamentation; Alternate Title: Imago Pietatis | c. 1470 | Tempera and gold on wood panel | Lunette panel (semi-circular): 16 1/2 x 45 in. (41.9 x 114.3 cm); Framed: 25 7/8 x 54 5/8 x 3 9/16 in. ( 65.72 x 138.74 x 9.05 cm) | Lunette of the Politico di San Giorgio, Ascoli Piceno, Zeri # 20019, no comps on open market, good condition, fond'oro in good condition.  Wonderful incised lines, incredible details in the hair and tears streaming down the face.  Crivelli is a rare and strang artist.  Although his best works are more convoluted and colored, the DIA work has gravitas and is quite moving. |
| Paintings | European Painting | $ 300,000 | $ 500,000 | KGFA | DIA no. 26.22 | Jan Baptist | Weenix | Still Life with a Dead Swan | c. 1651 | Oil on canvas | Framed: 72 5/8 x 73 3/4 x 4 15/16 in. (184.5 x 187.3 x 12.5 cm); Canvas: 60 x 60 1/2 in. (152.4 x 153.7 cm) | Comp:  Christies London 12/3/13 lot 17 est. 400,000 - 550,000 Bl, similar provenance.  Highest ever at auction is $370,000  The subject matter, dead birds, is difficult to sell.  The value of such works is considerably lower than other sebjects (genre pictures, portraits etc)  Although BEAUTIFULLY painted, this is quite out of fashion today. |
| Paintings | European Painting | $ 7,000,000 | $ 9,000,000 | KGFA | DIA no. 26.3 | Jacob Isaaksz | van Ruisdael | The Jewish Cemetery; Alternate Title: The Cemetery | 1654 or 1655 | oil on canvas | Unframed: 56 _ 74 1/2 inches (142.2 _ 189.2 cm); Framed: 67 3/4 _ 85 1/8 _ 5 1/2 inches (172.1 _ 216.2 _ 14 cm) | Most expensive Ruisdael at auction is $4.7 million.  This exceeds this work in beauty, size and importance.  It's an arresting dramatic image prefiguring the Romantic landscapes of the 19th century.  One of the best Ruisdael's I've ever seen. |
| Paintings | European Painting | $ 6,000,000 | $ 9,000,000 | KGFA | DIA no. 26.385 | Peter Paul | Rubens | Philippe Rubens, the Artist's Brother.; Alternate Title: Philip Rubens | 1610/1611 | Oil on oak panel | Panel: 27 x 21 1/8 in. (68.5 x 53.5 cm); Framed: 36 9/16 x 30 11/16 x 3 1/8 in. ( 92.9 x 78.0 x 7.9 cm) | Comp: 6/4/09 Sotheys NY, lot 19, Bearded Man $845,000, 1/28/2000 Sotheby's NY lot 51m Man as Mars, $8 mill, 12/6/07 Sotheby's lot #7 Studies of Men on panel $7.7 mill, 12/4/13 Sothebys London, lot 6, Portrait of a Man on canvas, $5.2 mill.  Sensitive portrayal of family member with both porcelain and sketch like qualities.  Good condition, not a studio work - full attribution to the artist. |

| Paintings | European Painting | $ | 3,000,000 | $ | 5,000,000 | KGFA | DIA no. 26.387 | | Master of the St. Lucy Legend | Virgin of the Rose Garden; Alternate Title: Mystic Marriage of St. Catherine | 1475/1480 | Oil on oak panel | 31 1/8 x 23 5/8 in. (79.1 x 60.0 cm); Framed: 38 1/8 x 31 5/8 x 3 1/2 in. ( 97 x 80.3 x 8.9 cm) | Dynamite early Flemish work. Arresting image, some issues with overcleaning in the glazes in the flesh tones, craquelure throughout  7/12/01 Sotheby's London lot 12, $1mill, comparative artists such as Van der Goes = nothing, Memling 1/31/13, Sotheby's New York, lot 10, $4.1 Head of Christ (dirty and in excellent condition)  This works is more beautiful (beautiufl women, gardens, flowers, hortus conclusus, elaborate costurmes.  Van Eyck at Christies - $4 - 8 mill |
| Paintings | European Painting | $ | 500,000 | $ | 700,000 | KGFA | DIA no. 26.43 | Willem | Kalf | Still Life with Columbine Goblet | c. 1660 | Oil on canvas | 22 7/8 x 19 1/2 in. (57.7 x 49.2 cm); Frame: 32 3/4 x 29 5/8 x 3 1/8 in. (83.2 x 75.2 x 7.9 cm) | Comp: 1/10/91 Sothebys New York lot 73, $700,000 - 900,000 BI, 1/28/10, Sotheby's New York, lot 192, BI (bad condition), 12/4/2000, Sotheby's London, lot 31, $525,000  Quite a rare artist.  Good picture but not best example by the |
| Paintings | European Painting | $ | 1,000,000 | $ | 2,000,000 | KGFA | DIA no. 26.94 | | Correggio | The Mystic Marriage of Saint Catherine | 1510/1514 | Paint on wood panel | Framed: 66 x 61 1/8 x 3 3/4 in. ( 167.64 x 155.26 x 9.53 cm); 53 5/8 x 48 1/2 in. (136.2 x 123.2 cm) | Con:  Not in good condition, very skinned with grounds showing through. Awkward expressions which could be due to the fact that this is a very early work by the artist.  Pro:  DIA could be the earliest surviving altarpiece.  Correggio is such a rare and important artist - no direct comps exists.There was a Dosso Dossi that sold for $1,800,000 last summer at Sotheby's.  Dossi is an artist from geographically similar area and time period however he is not as important. |
| Paintings | European Painting | $ | 1,000,000 | $ | 1,500,000 | KGFA | DIA no. 27.3 | Sandro | Botticelli | The Resurrected Christ | c. 1480 | Paint on wood panel (transferred) | Unframed: 18 x 11 3/4 in. (45.7 x 29.8 cm); Framed: 30 1/8 x 22 7/8 x 4 1/4 in. (76.5 x 58.1 x 10.8 cm) | Comp:  St. John the Baptist 7/5/11 Christie's lot 4 $542,000.  Good example of artist + workshop.  This is definitely a master and studio work.  Subject is not what one looks for in Botticelli, however, he is a first tier artist. |
| Paintings | European Painting | $ | 200,000 | $ | 300,000 | KGFA | DIA no. 27.385 | | Titian | Man Holding a Flute | c. 1560-1565 | Oil on canvas | 38 1/2 x 30 in.; 97.8 x 76.2 cm; Framed: 48 1/8 x 39 1/2 x 3 1/8 in.; 122.2 x 100.3 x 7.8 cm | Comp: Portrait of Filiberto, Dorotheum: Thursday, March 22, 2001 [Lot 00074], $140,000, Portrait of Titian, Bonhams London: Wednesday, December 4, 2013 [Lot 00008], $131,000 Poor condition, rubbed, sunken |
| Paintings | European Painting | $ | 4,000,000 | $ | 7,000,000 | KGFA | DIA no. 29.264 | Diego Rodriguez de Silva | Velazquez | A Man; Alternate Title: Don Juan de Fonseca? | 1623/1630 | Oil on canvas | 20 1/4 x 15 3/4 in.; 51.4 x 40.0 cm; with frame: 33 x 28 1/4 x 2 7/8 in.; 83.8 x 71.8 x 7.3 cm | Strange example of his work. Comp on retail market.  Velasquez bought at Bonham's London in 2010 for $4.9 mill by dealer Otto Nauman. Discovered by Peter Cherry.  Asking 14 million at TEFAF.  $12 mill is highest auction price ever paid for St. Rufina.  Condition is thin around the head and in the background.  Strange drape in front in primo piano. In addition, the sitter is an older gentleman with perhaps a wandering eye. |
| Paintings | European Painting | $ | 20,000,000 | $ | 25,000,000 | KGFA | DIA no. 30.295 | | Parmigianino | The Circumcision | c. 1523 | Oil on panel | 16 1/2 x 12 3/8 in.; 41.9 x 31.4 cm; Framed dimensions: 22 7/8 in. x 19 1/4 in. x 2 in. | Magical rare night scene by one of the Renaissance's most important artists.  In beautiful condition.  Unique subject, very early work, Royal provenance.  Can use the Madonna and Pinks by Rahpael as the basis.  No possibility of others |

| | | | | | | | | | | | Dimensions | Comp/Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Painting | $ 200,000 | $ 300,000 | KGFA | DIA no. 30.370 | | Rembrandt Harmensz van Rijn | Christ | c. 1648/1650 | Oil on oak panel | Unframed: 11 _ 9 1/8 in. (27.9 _ 23.2 cm); Framed: 23 in. _ 21 1/16 in. _ 2 3/4 in. (58.4 _ 53.5 _ 7 cm) | Comp: Portrait of a Man, Christie's London: Thursday, December 6, 2007 [Lot 00005], $200,000, Risen Christ, Christie's London: Friday, April 27, 2007 [Lot 00047], $500,000  Rembrandt had an extensive studio production with many of his assistants going on to successful careers on their own.  This work, however, is good but not individual enough to recognize either the masters hand or the hand of another artist |
| Paintings | European Painting | $ 3,000,000 | $ 5,000,000 | KGFA | DIA no. 34.188 | Frans Jansz | Post | View of the Jesuit Church at Olinda, Brazil | 1665 | Oil on canvas | 22 1/8 x 32 7/8 in. (56.2 x 83.5 cm); FrameD: 28 1/4 x 39 1/8 x 2 1/2 | Large format, late work many years after he returned from Brazil to produce a pastiche/invented narrative.  A bit formulaic but in beautiful condition and clear pristine light and detail.  A small Brazil period is for sale for 2 mill Euro, 6/14/09, Sotheby's New York, lot 44 $1.7 |
| Paintings | European Painting | $ 80,000 | $ 100,000 | KGFA | DIA no. 34.191 | | Bacchiacca (Francesco Ubertini Verdi) | Saint John the Baptist in the Wilderness | 16th Century | Oil on canvas, transferred from panel | 41 x 30 in.; 104.1 x 76.2 cm | Transfer from panel to canvas.  Not effective.  Leaves the primary figure flat and lifeless.  There are no comps for transfers but average price for his works are $80 - 100,000 |
| Paintings | European Painting | $ 6,000,000 | $ 8,000,000 | KGFA | DIA no. 35.10 | | Titian | Judith with the Head of Holofernes | c. 1570 | oil on canvas | Framed: 55 _ 47 1/4 _ 2 3/4 inches (139.7 _ 120 _ 7 cm); Unframed: 44 1/2 _ 37 1/2 inches (113 _ 95.3 cm) | Comp: Sotheby's New York 1/24/08, lot 117, $4.5  In good condition, impasto, lively brushwork...vivace.  Late work by the master. |
| Paintings | European Painting | $ 600,000 | $ 800,000 | KGFA | DIA no. 36.10 | Il Pensionante del Saraceni | Italian | The Fruit Vendor; Title: Man Selling Melons | c. 1615/1620 | Oil on canvas | 130.2 x 97.8 cm; Framed:57 1/4 x 44 1/8 x 2 5/8 in.; 145.4 x 111.9 x 6.7 cm | Comp: Piasa 12/2/2000 lot 11 $321,000  Not a widely quoted or sold artist.  Rare on market and rare subject.  In good condition.  Attribution issues exist as there is not a general consensus about the artist. |
| Paintings | European Painting | $ 25,000,000 | $ 35,000,000 | KGFA | DIA no. 36.11 | Nicolas | Poussin | Selene and Endymion; Alternate Title: Diana and Endymion | c. 1630 | oil on canvas | Unframed: 48 _ 66 1/2 inches (121.9 _ 168.9 cm); Framed: 59 _ 77 1/4 _ 3 1/2 inches (149.9 _ 196.2 _ 8.9 cm) | Incredible provenance, masterpiece in good condition.  Nothing like it available on the market.  Sacrament of the Ordination was sold to the Kimbell for $24 million after Bling at Christie's at $23 - 31 million.  The DIA work is in better condition and a more desireable subject matter. |
| Paintings | European Painting | $ 200,000 | $ 300,000 | KGFA | DIA no. 36.30 | Paolo | Veronese | The Muse of Painting | 16th Century | Oil on canvas | 11 x 7 1/4 in. (27.9 x 18.4 cm); Framed: 15 1/4 x 11 3/8 x 1 in. ( 38.74 x 28.89 x 2.54 cm) | Comp: Cupid holding the Reigns, Christie's London: Wednesday, July 11, 2001 [Lot 00091], $175,000.  There are no real comparable for this kind of work.  It was conceputalized as a Spalliera and there are two other examples in museums in St. Petersburg and Moscow.  This is a delicious little painting by the Venetian master but it was most likely conceived as a decorative panel. |
| Paintings | European Painting | $ 500,000 | $ 700,000 | KGFA | DIA no. 37.1 | Emanuel | de Witte | Interior of the Oude Kerk in Amsterdam | 1686 | Oil on canvas | 47 x 39 5/8 (119.4 x 100.6); Frame: 56 1/8 x 48 3/4 x 4 1/2 in. (142.6 x 123.8 x 11.4 cm) | Comp: 12/8/10 Sotheby's London, lot 21 $532,000, Christie's London 7/3/02 lot 15 $1,020,000  Late large format - not intimate view, missing the clear light that you want in a church interior. |

| | | | | | DIA no. | Artist | | Title | Date | Medium | Dimensions | Comp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Painting | $ 200,000 | $ 300,000 KGFA | | DIA no. 37.73 | Job Adriaensz | Berckheyde | Interior of the Grote Kerk, Haarlem | 1676 | Oil on canvas | Canvas: 40 1/2 x 34 3/8 in. (102.87 x 87.3 cm); Framed: 53 5/8 x 46 5/8 x 3 in. ( 136.2 x 118.4 x 7.6 cm) | Comp: Church Interior, Christie's London 4/25/01 lot 20 $155,000 on canvas and is large. In good but not great condition. The paint layer is thin enough to notice compositional changes in the foreground where figures were removed (pentimenti)  - Nicer, larger and more visual interest than the comp. In addition, it is 15 years later and a stronger market. |
| Paintings | European Painting | $ 800,000 | $ 1,200,000 KGFA | | DIA no. 38.56 | Giovanni Battista | Piazzetta | Madonna and Child with an Adoring Figure; title: Fragment of the Sagredo Altarpiece | 1715/1718 | Oil on canvas | 187.9 x 146.1 cm; Framed: 88 1/2 x 72 3/4 x 4 1/4 in. (224.8 x 184.8 x 10.8 cm) | Comp: David and Goliath Sotheby's London: December 8, 2010 [Lot 00034], $645,000. Full scale altar pieces have not come on the market. However, this work is in mediocre condition and has lost much of its volume. The colors have oxidized and sunken creating less volume. |
| Paintings | European Painting | $ 6,000,000 | $ 8,000,000 KGFA | | DIA no. 40.166 | Bernardo | Bellotto | View of the Tiber in Rome with the Castel Sant'Angelo | 1743 or 1744 | oil on canvas | Framed: 45 1/2 _ 69 3/4 _ 4 inches (115.6 _ 177.2 _ 10.2 cm); Unframed: 34 3/8 _ 58 3/8 inches (87.3 _ 148.3 cm) | Comp: 2 Views of Rome Christie's London: Thursday, December 7, 2006 [Lot 00072], $12.7, Verona, Christie's London: Friday, July 7, 2007 [Lot 00084], $2.0 mill, Grand Canal, Christie's New York: Thursday, April 19, 2007 [Lot 00113] $11. mill Important picture from Roman period, in good condition, however the sky is rubbed. |
| Paintings | European Painting | $ 3,000,000 | $ 5,000,000 KGFA | | DIA no. 40.50 | Michel | Sittow | Catherine of Aragon as the Magdalene | 15th/16th Century | Oil on oak panel | 12 5/8 x 9 7/8 in.; 32.1 x 25.1 cm; Framed: 18 1/2 x 16 x 2 1/2 in. ( 47 x 40.6 x 6.5 cm) | Comp: Christie's NY 1/26/11 lot 118, $866,000 Catherine of Aragon as the Magdalene - very interesting presumptive sitter.  Is this Catherine of Aragon before she marries Henry VIII?  Seems possible as it is very close to the portrait of her in Vienna.  This comparable is of an ugly old man therefore a lovely portrait of a famous historical figure as the Madonna has much more value.  This delicate and finely painted work is also in lovely |
| Paintings | European Painting | $ 1,200,000 | $ 1,800,000 KGFA | | DIA no. 41.10 | Claude | Gellée | Sunrise | 1631 | Oil on canvas | 30 5/8 x 46 1/8 in. (77.8 x 117.2 cm); Frame: 38 1/4 x 53 5/8 x 3 1/8 in. | Comp: Sotheby's NY 1/26/06, lot 51, 2 - 3 mill Bl, Christies London 12/7/10, lot 51, $3,200,000  in moderate condition.  This was in the conservation studio on my visit and I saw it in its stripped state. With Claude works, one looks for the layer upon layer of transparent glazes that create the paint layer and give the work its inner glow.  Because this has been stripped, it results in a decrease in value. |
| Paintings | European Painting | $ 4,000,000 | $ 6,000,000 KGFA | | DIA no. 41.126 | | Master of the Tiburtine Sibyl | Crucifixion | c. 1485 | Oil on oak panel | Framed: 64 3/4 x 48 3/4 x 2 3/4 in. ( 164.5 x 123.8 x 7 cm); 56 1/2 x 40 3/8 in. (143.7 x 102.6 cm) | Comp: Virgin and Child in Landscape, Sotheby's New York: Thursday, May 29, 2003 [Lot 00128], $433,000.  There are only two works that have come up for public sale.  The work quoted above is a delicate, small Virgin and Child.  The DIA work more detailed, in beautiful condition, much larger in scale, and more complex in landscape and prospective.  The size of this work indicates that it was not for private devotional use but was more |
| Paintings | European Painting | $ 8,000,000 | $ 10,000,000 KGFA | | DIA no. 41.80 | Francisco | Goya | Dona Amalia Bonells de Costa | c. 1805 | Oil on canvas | 34 3/8 x 25 3/4 in.; 87.3 x 65.4 cm; Framed: 43 x 34 x 2 7/8 in.; 109.2 x 86.4 x 7.3 cm | Comp: Portrait of Don Juan López de Robredo, Christie's London: Tuesday, December 6, 2011 [Lot 00027] est. 6 - 9.0 mill Bl,  Portrait of Mariano Goya, Sotheby's New York: Thursday, January 31, 2013 [Lot 00103] est. $6 - 8 Bl.  The DIA work is more fluidly handled and in better condition than either of these works.  Good provenance and universally valued |
| Paintings | European Painting | $ 500,000 | $ 700,000 KGFA | | DIA no. 42.127 | Claude | Gellée | A Seaport at Sunset | 1643 | Oil on copper panel | 16 x 21 (40.6 x 53.3); Frame:22 3/8 x 27 x 2 in. (56.8 x 68.6 x 5.1 cm) | Comp: La tempete, Christie's London: Tuesday, December 4, 2012 [Lot 00048], $244,000, Landscape Sotheby's London: Wednesday, July 7, 2010 [Lot 00036], 600 - 900,000 Bl  Nice little picture but clumsily painted and the colors are a bit muddy - not as crisp as you would want to see. Great provenance. |

| Paintings | European Painting | $ | 15,000,000 | $ | 20,000,000 | KGFA | DIA no. 42.57 | Agnolo | Bronzino | Eleonora of Toledo and Her Son | between 1545 and 1550 | oil on panel | Framed: 66 _ 57 1/2 _ 5 1/2 inches (167.6 _ 146.1 _ 14 cm); Unframed: 47 7/8 _ 39 3/8 inches (121.6 _ 100 cm) | Florentine High Renaissance Masterpiece. The Kimbell paid $6.5 for a Michelangelo that is a juvenile work and not universally accepted. The Getty bought a Titian for $70 million. The Frick bought the Potormo portrait in 1989 for $35 mill ($65 mill for adjusted price). The DIA Bronzino falls within these parameters of importance. The work is less poetic and original that the Titan and Pontormo therefore the slightly lower value. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Painting | $ | 3,000,000 | $ | 5,000,000 | KGFA | DIA no. 43.38 | | Canaletto | The Piazza San Marco | c. 1739 | oil on canvas | Unframed: 29 13/16 _ 46 15/16 inches (75.8 _ 119.3 cm); Framed: 44 5/8 _ 57 3/4 _ 4 inches (113.3 _ 146.7 _ 10.2 cm) | Comp: Venice, View of the Piazetta Sotheby's London: Wednesday, December 8, 2010 [Lot 00039] $3.5 mill, Venice View of the Piazetta, Sotheby's London: Wednesday, July 5, 2006 [Lot 00058] $2.5 mill. A classic, desirable view of Venice by the best known Venetian vedutista of the 18th century. Canaletto was intensely collected by the English aristocracy purchasing works on their Grand Tours. If this had been a water view, with boats, it would have a higher evaluation. |
| Paintings | European Painting | $ | 300,000 | $ | 500,000 | KGFA | DIA no. 43.418 | Jacob | Jordaens | Job | c. 1620 | Oil on oak panel | Panel: 26 3/8 x 20 1/2 in. (67.0 x 52.0 cm); Framed: 42 1/8 x 36 3/16 x 3 1/4 in. ( 107.0 x 92.0 x 8.3 cm) | Comp: Sotheby's New York: January 27, 2011 Lot 120, $278,000, Christie's London: July 7, 2000 Lot 38, $321,000, Lempertz: May 17, 2014 Lot 1143, $150,000 Lively work with interesting story as to the sitter. In good condition. |
| Paintings | European Painting | $ | 3,000,000 | $ | 5,000,000 | KGFA | DIA no. 44.213 | Giovanni Battista | Tiepolo | Saint Joseph and the Christ Child | 1767/1769 | Oil on canvas | Framed: 69 x 52 3/4 x 3 1/4 in. ( 175.3 x 134 x 8.3 cm); 60 1/2 x 43 3/4 in. (154 x 111.3 cm) | Comp: Highest price for a Tiepolo at auction Arrival of Henry III at Villa Contarini Christie's New York: January 25, 2012 [Lot 00038] $5.9 mill., Portrait of a Lady Christie's London: December 2, 2008 [Lot 00040] $4.2 mill. The subject matter, because it is religious is less deribable, however, the commission is important and it is unique that an altarpiece of such importance appears on the market. Royal Provenance, one of 7 altarpieces for San Pasqual Baylon. Fragment. Good condition. |
| Paintings | European Painting | $ | 5,000,000 | $ | 7,000,000 | KGFA | DIA no. 44.266 | Peter Paul | Rubens | Hygeia, Goddess of Health; Alternate Title: Hygieia | c. 1615 | Oil on oak panel | Framed: 55 3/8 x 43 3/4 x 43/8 in. (140.6 x 111.1 x 11.1 cm); Panel: 41 3/4 x 29 1/4 in. (106.2 x 74.3 | Comp: Sotheby's New York:January 23, 2003 Lot 32, $2 - 3 mill BI, Sotheby's London: July 10, 2002 Lot 52, $6.8 mill, Sotheby's New York:January 24, 2002 Lot 236, $2.1 mill Backgourd abraded around |
| Paintings | European Painting | $ | 5,000,000 | $ | 7,000,000 | KGFA | DIA no. 45.420 | Joos | van der Beke van Cleve | Adoration of the Magi | c. 1525 | Oil on oak panels | Center panel: 35 x 25 1/2 in. (88.9 x 64.8 cm); Each wing: 35 x 11 in. (88.9 x 27.9 cm) | Very little on open market - those works that come up repeat over the years. This a rare example of his work as there has never been a tryptch on the market. Virgin and Child Sotheby's New York: January 30, 2014 Lot 11, Portrait of a Man Sotheby's London: July 9, 2008 Lot 5, $1.4 The DIA work is Cleve's only signed work, was a fundamental touchstone to identifying the hand of the artist and masterpiece of his mature period. Generally accepted as Cleve and Workshop. If it had been a full attribution the valuatioin would have been almost double. |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Painting | $ | 300,000 | $ | 500,000 KGFA | DIA no. 46.359 | Rogier | van der Weyden | Saint Jerome in the Desert | 1450/1465 | Oil on oak panel | Framed: 15 7/8 in. x 13 3/8 in. x 2 in. ( 40.34 x 34 x 4.60 cm); 12 1/8 x 9 15/16 in. (30.8 x 25.2 cm) | Comp: St. Lucas, Koller Auktionen Zürich: Friday, March 30, 2012 [Lot 03009], $200,000. Workshop pictures can make anywhere from 20,000 - 1,500,000. The DIA picture is in lovely condition and is unique, not a copy after the artist. The Lion is particulary wonderful and it is painted tightly and has the pristine quality that one looks for in early Flemish works. |
| Paintings | European Painting | $ | 4,000,000 | $ | 6,000,000 KGFA | DIA no. 46.56 | | Sassetta | The Betrayal of Christ | 1437/1444 | Tempera on poplar panel | Panel: 14 3/4 x 23 1/4 x 1 1/8 in. ( 37.47 x 59.06 x 2.86 cm); Frame: 28 x 32 5/8 x 4 in. ( 71.12 x 82.87 x 10.16 cm) | Comp: St. Augustine, Christie's New York: Thursday, April 6, 2006 [Lot 00031], $1,200,000. A very rare artist on the market with only 3 known results. The DIA works are multi figural as compared to the single figure of a saint that sold at Christie's. They have been included in numerous essays and are known to be from the San Seplcro altarpiece. |
| Paintings | European Painting | $ | 400,000 | $ | 600,000 KGFA | DIA no. 47.398 | John | Zoffany | Scene from Love in a Village | 1767 | Oil on canvas | 40 1/2 x 50 1/2 (102.9 x 128.3); Frame:48 1/8 x 57 3/4 x 2 5/8 in. (122.2 x 146.7 x 6.7 cm) | Comp: Scene in Tavern, Christie's London: Thursday, June 8, 2006 [Lot 00062], $90,000. Garrick with Burton and Palmer in the Alchymist, Sotheby's London: Thursday, November 29, 2001 [Lot 00011], $ 1,217,839. Large British genre picture in good condition. Not chic aristocratic subject matter - refers to popular play at time. |
| Paintings | European Painting | $ | 2,000,000 | $ | 3,000,000 KGFA | DIA no. 47.58 | Peter Paul | Rubens | Archduke Ferdinand, Cardinal-Infante of Spain, at the Battle of Nordlingen | 1635 | oil on oak-veneered Masonite panel | Unframed: 48 1/8 _ 36 5/8 inches (122.2 _ 93 cm); Framed: 59 3/4 _ 48 3/16 _ 5 5/8 inches (151.8 _ 122.4 _ 14.3 cm) | Comp: Cavalry Sketch, Christie's South Kensington: April 11, 2013 Lot 141 $192,000, St. Michael Subduing Lucifer, Christie's London: December 7, 2006 Lot 10 $3.5. Sketch for work in the Prado, remained in his studio at death, was transfered to masonite panel which is not a good for the work. Has been subjected to various restorations over the years. |
| Paintings | European Painting | $ | 500,000 | $ | 700,000 KGFA | DIA no. 47.92 | Salvator | Rosa | The Finding of Moses | c. 1660/1665 | Oil on canvas | Framed: 62 x 92 3/8 x 4 1/2 in. ( 157.5 x 234.6 x 11.4 cm); 48 1/2 x 79 3/4 in. (123 x 202 cm) | Comp: St. in a Landscape, Dorotheum: Tuesday, October 15, 2013 [Lot 00551], $200,000, Great provenance, in good condition, large format. Rosa's single figure studies or philosopher studies make more money at auction. The DIA work however, has a very fancy provenance which increases its value. |
| Paintings | European Painting | $ | 8,000,000 | $ | 10,000,000 KGFA | DIA no. 48.96 | Bartolome Esteban | Murillo | The Flight into Egypt | c. 1647/1650 | Oil on canvas | 82 1/2 x 65 1/2 in. (209.55 x 166.37 cm); Framed: 125 x 87 x 6 in. (317.5 x 220.98 x 15.24 cm); Strip Frame for Travel: 84 1/2 x 67 3/4 x 2 1/2 in. (214.6 x 171.5 x 5.7 cm) | Comp: St. Joseph and the Christ Child Christie's London: Friday, December 14, 1990 [Lot 00031] $4.7 mil. 8 years later it wold for $2.7. Enormous volotility of market at the moment - something that has not been on the market for a long time. In present market there are no comparables, a number of instututions who want to buy first class things - Qatar - conveievable that they pay strong prices. The work is in good condition, taking into consideration the oxidation of the blues and the reworking of the sky. |
| Paintings | European Painting | $ | 800,000 | $ | 1,200,000 KGFA | DIA no. 49.337 | Antoine Jean | Gros | Murat Defeating the Turkish Army at Aboukir | c. 1805 | Oil on canvas, mounted on board | 34 3/4 x 54 1/2 in.; 88.3 x 138.4 cm; Framed: 44 3/4 x 64 3/4 x 3 3/8 in.; 113.7 x 164.5 x 8.6 cm | No exact market comps available. A work by Girodet, Head of a Turk, Damien Leclere: Saturday, December 17, 2011 [Lot 00010], $970,000. Excellent bozzetto for important final work in Louvre Large scale historical sketch. Important historical reference and nothing similar on market. Artist is the most important student of Jacques Louis David. |

| | | Low | | | DIA no. | First | Last | Title | Date | Medium | Dimensions | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Painting | $ 100,000 | $ 150,000 | KGFA | DIA no. 51.13 | Bernardo | Strozzi | Street Musicians | c. 1630 | Oil on canvas | 109.8 x 156.5 cm; Frame: 51 3/4 x 71 x 3 in. | Comp: Christ In Front of the Kalif, Porro & C.: Saturday, November 15, 2003 [Lot 00242] $120,000 Charity of St Lawrence, Christie's London: Thursday, December 8, 2005 Lot 00048 $200,000. Do not love this Strozzi. Mushy composition,workshop?? I doubt the full attribution |
| Paintings | European Painting | $ 20,000,000 | $ 25,000,000 | KGFA | DIA no. 52.253 | Artemisia | Gentileschi | Judith and Her Maidservant with the Head of Holofernes | c. 1623/1625 | Oil on canvas | 72 3/8 x 55 3/4 in. (184 x 141.6 cm); Original frame: 90 1/2 x 73 3/8 x 5 in.; Framed: 85 x 68 1/2 x 3 1/2 in. ( 215.9 x 174 x 8.9 cm) | Masterpiece by the artist. Comparable Caravaggio is estimated at 60 - 90 million. Feigen has a beautiful Danae by Orazio Gentileschi which he reputedly turned down 15 million. |
| Paintings | European Painting | $ 4,000,000 | $ 6,000,000 | KGFA | DIA no. 53.270 | | Sassetta | The Agony in the Garden | 1437/1444 | Tempera on poplar panel | 19 1/4 x 25 1/4 x 3 in.; 48.9 x 64.1 cm | See other Sassetta above. |
| Paintings | European Painting | $ 5,000,000 | $ 7,000,000 | KGFA | DIA no. 53.356 | Peter Paul | Rubens | Briseis Given Back to Achilles | 1630/1631 | Oil on oak panel | 17 7/8 x 26 5/8 in. (45.4 x 67.6 cm); Framed dimensions: 22 5/8 x 31 3/8 x 2 3/8 | Comp: Meleager and Atalanta Hunting Boar Christie's London: December 8, 2005 Lot 20, $5.4 mill, St. Michael Subduing Lucifer, Christie's London: December 7, 2006 Lot 10 $3.5. Beautiful lush oil skech for Achilles Tapestry Series. These types of works, small, densely pained with loose brushwork and exactly what private collectors are looking for. They make high prices at auction. |
| Paintings | European Painting | $ 800,000 | $ 1,500,000 | KGFA | DIA no. 53.359 | Francesco | Guardi | View of Dolo on the Brenta | 1774/1776 | Oil on canvas | 48.2 x 66.2 cm; Framed: 24 9/16 x 31 3/4 x 3 in. (62.4 x 80.7 x 7.6 cm) | Comp: Porta del Dolo, Christie's London: Friday, December 8, 2006 [Lot 00135] $325,000 The DIA work is not a Venetian scene which are the most coveted. However, it is a well composed and fluid depiction of Dolo. High visual interest Not Villa Loredon with Elegant figures which sold for 8 mill. The Dolo is a lively port scene and not an elegant fete galant ish work. |
| Paintings | European Painting | $ 500,000 | $ 700,000 | KGFA | DIA no. 53.468 | Domenico | Ghirlandaio | Young Man | 15th Century | Oil on panel | Framed: 20 1/2 x 16 1/2 x 1 3/4 inches.; 13 x 9 in. (33.0 x 22.9 cm) | Most likely Davide Ghirlandaio, less famous brother to Domenico Ghirlandaio (as per Christiansen) Changing attribution but whatever the case, a good example of Florentine 15th century portraiture. Awkward use of hand. One work sold for almost a million dollars but that was purchased as a young Michelangelo and was sold to the Kimbell for $6.5 million (some dissenting opinions as to authenticity) Otherwise decent works range from $75,000 - 200,000 |
| Paintings | European Painting | $ 2,000,000 | $ 3,000,000 | KGFA | DIA no. 54.2 | Nicolas | Poussin | The Holy Family; Alternate Title: The Roccatagliata Madonna | 1641 | Oil on canvas | Unframed: 28 _ 22 1/8 in. (71.1 _ 56.2 cm); Framed: 34 in. _ 28 in. _ 2 1/2 in. (86.4 _ 71.1 _ 6.4 cm) | Not in good condition. Very skinned. Fantastic provenance Comp: Holy Family with St. John the Baptist, Christie's London: Wednesday, December 10, 2003 [Lot 00066] $966,000, Rest on the Flight to Egypt Sotheby's Monaco: Friday, July 2, 1993 [Lot 00104], $640,000 (not current market value for this work but similar in size and subject) |
| Paintings | European Painting | $ 3,000,000 | $ 4,000,000 | KGFA | DIA no. 55.5.A | Henry | Fuseli | The Nightmare | 1781 | oil on canvas | Unframed: 40 _ 49 7/8 inches (101.6 _ 126.7 cm); Framed: 47 5/8 _ 58 _ 3 1/2 inches (121 _ 147.3 _ 8.9 cm) | Comp: The Vision of the Deluge Christie's London: Wednesday, July 9, 2008 [Lot 00209], $990,000. Highest price ever paid at aution for the artist. For this artist the stranger the subject, the more interesting and valuable the work. The DIA picture fits this bill nicely. A beautiful women spralled on a bed, goblins, blind horse. A work filled with syboltism and mystery. Exactly what one would look for by Fuseli. Iconic painting |
| Paintings | European Painting | $ 4,000,000 | $ 8,000,000 | KGFA | DIA no. 56.32 | Fra | Angelico | Madonna and Child with Angels | 1425/1430 | Tempera and gold on panel | 6 3/8 x 3 7/8 in.; 16.2 x 9.7 cm; Framed: 7 5/8 x 5 1/8 x 1 in. ( 19.4 x 13 x 2.5 cm) | More important than the single angel yet not as lyrical as the Annunciation Angel in the collection. A fully conceptualized private devotional image. There was a Giovanni di Paolo (less important artist) of similar size on the market for 2.5 million |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Painting | $ | 1,500,000 | $ | 2,500,000 | KGFA | DIA no. 56.43 | Giovanni Paolo | Panini | Interior of St. Peter's, Rome | 1750 | Oil on canvas | 132.7 x 145.6 cm FRAME: 64 x 68 1/4 x 5 in. | Comp: Interior of St. Peters and S. Giovanni Fuori Le Mura (a pair of paintings) Christie's London: Wednesday, July 7, 2004 [Lot 00106] $4.3. The DIA work is a later version of a very successful composition. Original comp dates from the 1730s. Similar work in Hanover, Germany dating to 1750. The DIA work is a good but late example of the composition. |
| Paintings | European Painting | $ | 6,000,000 | $ | 8,000,000 | KGFA | DIA no. 57.180 | Giovanni Battista | Tiepolo | Woman with a Mandolin | c. 1755/1760 | Oil on canvas | 93.7 x 75 cm; Frame: 45 5/8 x 39 5/8 x 4 in. | Comp: Portrait of a Lady as Flora, Christie's London: December 2, 2008 [Lot 00040], $4.2 mill, The comparable work is slightly smaller and was sold during a low point in the market. The DIA painting is larger, and a bit showier. Paintings of bare breasted beautiful women always have a strong market presence. |
| Paintings | European Painting | $ | 200,000 | $ | 400,000 | KGFA | DIA no. 58.383 | Michel | Sittow | A Young Man in a Red Cap | c. 1512 | Oil on oak panel | 6 7/16 x 5 1/8 x 11/16 in. (16.4 x 13 x 1.8 cm); Frame: 9 3/4 x 8 5/16 x 1 11/16 in. (24.8 x 21.1 x 4.3 cm) | Comp: Christie's New York: January 26, 2011 Lot 118 $866,000  The DIA work is not in great condition, quite rubbed.  Loss of glazes and texture.  Museum picture is smaller and less intricate |
| Paintings | European Painting | $ | 3,000,000 | $ | 5,000,000 | KGFA | DIA no. 59.444 | | Sodoma | The Holy Family and St. John | 15th/16th Century | Oil on wood panel | Framed: 51 3/4 x 44 1/4 x 3 in. ( 131.4 x 112.4 x 7.6 cm); 40 1/4 x 32 1/2 in. (102.2 x 82.6 cm) | Not many results for Il Sodoma.  A comp artist is the Siennese artist Beccafumi.  Comps for his sales. Virgin and Child Sotheby's London:December 6, 2006 [Lot 00032] $2.6 mill. Holy Family Sotheby's London: December 5, 2007 [Lot 00055], $2.3 mill. The DIA picture is more lively, with more intense color and complicated composition.  It is also in lovely condition. |
| Paintings | European Painting | $ | 6,000,000 | $ | 8,000,000 | KGFA | DIA no. 60.61 | | Master of the Osservanza | The Resurrection | c. 1440/1445 | Tempera on wood panel | Framed: 18 1/4 x 24 x 2 1/2 in. ( 46.4 x 61 x 6.4 cm); 14 3/16 x 17 7/16 in. (36 x 44.3 cm) | Very rare artist.  Similar work found in the NGA, Washington DC.  Highest price paid at auction was $1.6 in 2008 for not nearly as interesting and complicated work.  Pietro Lorenzetti a couple of years ago made $5.7 mill |
| Paintings | European Painting | $ | 3,000,000 | $ | 5,000,000 | KGFA | DIA no. 61.397 | Lucas | Cranach the Elder | Saint Christopher | 1518/1520 | Oil on linden panel | 17 1/2 x 11 3/4 x 1 5/8 in. ( 44.45 x 29.85 x 4.14 cm); 16 1/2 x 11 in. (41.9 x 27.9 cm) | Comp: David and Bathsheba, Sotheby's London: July 9, 2008 Lot 62, $4.1  Even thought the subject is religous, the painting has a lively, sexy quality to it in tone and subject (neriad), beautiful conditon, beautiful foliage - all the precision you want to find with the artist. |
| Paintings | European Painting | $ | 2,000,000 | $ | 3,000,000 | KGFA | DIA no. 64.117 | John | Constable | The Glebe Farm | 1827 | Oil on canvas | 18 1/4 x 23 1/2 (46.4 x 59.7); Frame: 26 3/8 x 30 3/4 x 2 in. (67.0 x 78.1 x 5.1 cm) | Comp: White Horse, Christie's London: November 30, 2000 [Lot 00003], $1.0 mill, View of the City of London, Christie's London: Wednesday, November 26, 2003 [Lot 00008] $966,000  Glebe Farm is a more cohesive and dense work than either of the comps listed here.  However, the only other comp is The Lock which sold for $35,000,000.  It is similar in feel and execution but not nearly as monumental in scale. |
| Paintings | European Painting | $ | 400,000 | $ | 600,000 | KGFA | DIA no. 64.459 | Peter Paul | Rubens | Saint Ives of Treguier, Patron of Lawyers, Defender of  Widows and Orphans | 1615/1616 | Oil on canvas | 113 x 87 in. (287.0 x 221.0 cm); Framed: 125 x 99 3/4 x 5 1/2 in. (317.5 x 253.4 x 14 cm) | Comp: Holy Family with St. Anne, Dorotheum: April 9, 2014 Lot 528 $694,000, Hercules and Omphale, Christie's London:  December 3, 2013 Lot 8 $654,000. |
| Paintings | European Painting | $ | 1,000,000 | $ | 2,0000,000 | KGFA | DIA no. 65.10 | Gerard | Ter Borch | Lady at Her Toilette | c. 1660 | oil on canvas | Unframed: 30 _ 23 1/2 inches (76.2 _ 59.7 cm); Framed: 43 7/8 _ 37 5/8 _ 3 1/4 inches (111.4 _ 95.6 _ 8.3 cm) | Comp: The Card Players, Sotheby's New York: Thursday, June 4, 2009 [Lot 00020], $1,590,000. Although appearing skinned in the background, the DIA work is a very elegant composition with a rich, lavish depiction of silks, finery, carpets etc. Most of the works by this artist a singular portraits and do not depict the refined Dutch upper class in an interior setting. |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Painting | $ | 1,500,000 | $ | 2,500,000 | KGFA | DIA no. 65.347 | Niccolo | dell' Abbate | Eros and Psyche | 16th Century | Oil on canvas | Framed: 50 1/4 x 48 7/8 x 2 1/2 in. ( 127.6 x 124.2 x 6.4 cm); 39 1/4 x 36 1/2 in. (99.7 x 92.7 cm) | Comp: School of Fontainebleau Lady at Her Bath, Christies 2013 $450,000. Portrait of a Nobleman, Sotheby's London: July 8, 2009 [Lot 00016] - This work is by similar artist Primaticcio and was Attributed to, not full authorship was given. $1.2 mill. Sexy subject, not great condition, uncommon to find school of Fontainebleau work, large image. Highest price paid at auction for dell'Abate is $350,000 however it is a portrait of a man, not a mythological scene. |
| Paintings | European Painting | $ | 2,000,000 | $ | 4,000,000 | KGFA | DIA no. 66.15 | Giovanni | di Paolo | Saint Catherine of Siena Dictating Her Dialogues | c. 1447/1449 | Tempera on wood panel | 14 x 14 1/8 x 1 3/4 in.; 11 3/8 x 11 3/8 in.; 28.9 x 28.9 cm | Gold Ground on retail market in 09 for $2.0 mill at Moretti. The DIA picture probably relates more closely to the works in the Met and was a predella panel for an altarpiece commissioned in 1447. The only fully attributed work on the open market was bought in possibly due to its poor state. |
| Paintings | European Painting | $ | 1,000,000 | $ | 1,500,000 | KGFA | DIA no. 68.298 | Jacob Isaaksz | van Ruisdael | Wooded Landscape with a Stream | 1665/1668 | Oil on canvas | 21 1/8 x 24 1/2 (53.02 x 62.2); Frame: 28 1/2 x 32 1/2 x 3 1/2 in. (72.4 x 82.6 x 8.9 cm) | Comp: Wooded Landscape Sotheby's New York: January 30, 2014 Lot 31, $665,000, Christie's New York:January 29, 1999 Lot 182, $1.1 This is a fine example of the artist's work. Well balanced composition, good condition and good detail. |
| Paintings | European Painting | $ | 10,000,000 | $ | 15,000,000 | KGFA | DIA no. 68.47 | Orazio | Gentileschi | Young Woman with a Violin (Saint Cecilia); Alternate Title: Artemisia Gentileschi as Saint Cecilia | c. 1612 | Oil on canvas | 83.5 x 97.8 cm; Framed: 41 x 47 x 4 in .( 104.1 x 119.4 x 10.2 cm) | Madonna and Child, Christie's London:December 6, 2007 [Lot 00071], $4.1 mill, Holy Family, Sotheby's London: Thursday, July 6, 2000 [Lot 00028] $3.6 mill Neither of these works come close to the beauty or importance of the DIA Young Woman with a Violin Artist of Similar stature, Guercino, King David Christie's London: Tuesday, July 6, 2010 [Lot 00007] $7.8 mill The value is higher because of |
| Paintings | European Painting | $ | 6,000,000 | $ | 8,000,000 | KGFA | DIA no. 69.6 | Guido | Reni | The Angel Appearing to St. Jerome | c. 1638 | Oil on canvas | Framed: 91 1/4 x 71 x 4 1/2 in. ( 231.8 x 180.3 x 11.4 cm); 199.7 x 147.9 cm | Highest price paid is $3.6 which was small and on copper. This is a large scale painting and these are rare on the market |
| Paintings | European Painting | $ | 3,000,000 | $ | 4,000,000 | KGFA | DIA no. 70.164 | Jean Siméon | Chardin | Still Life; Alternate Title: Kitchen Still Life | c. 1732 | Oil on panel | 6 3/4 x 8 1/4 in. (17.1 x 20.96 cm); FrameD: 11 1/2 x 13 x 2 1/4 | Comp: Sotheby's New York, 1/26/06, lot 56 $665,000 Sotheby's New York, 1/24/02 lot 196A $1,250,000 - 1,700,000 BI Small panel beautifully preserved, fantastic provenance, early work |
| Paintings | European Painting | $ | 1,000,000 | $ | 1,500,000 | KGFA | DIA no. 70.170 | Jean Auguste Dominique | Ingres | Perseus and Andromeda; Alternate Title: Study for Roger and Angelica | c. 1819 | Oil on canvas | 7 3/4 x 6 3/8 in. (19.7 x 16.2 cm); Framed: 12 7/8 x 11 1/4 x 2 1/2 in. (32.7 x 28.6 x 6.4 cm) | Comp: Jupiter and Thetis, Christie's Monaco: Saturday, December 2, 1989 [Lot 00068], $2.4 mill. There is not one work that has come up on the public market that comes close to the little jewel of a work. The color, the composition the grace. Inges is the 2nd most important painter behind David of the early 19th century. The LACMA just purchased a small version of the Grand Odalisque, perhaps 2 or 3 months ago for $750,000. |
| Paintings | European Painting | $ | 5,000,000 | $ | 7,000,000 | KGFA | DIA no. 71.1 | | Guercino (Giovanni Francesco Barbieri) | Assumption of the Virgin | 1650 | Oil on canvas | Framed: 133 1/2 x 99 1/4 x 4 in. ( 339.1 x 252.1 x 10.2 cm); 121 1/4 x 86 1/2 in. (308.0 x 219.7 cm) ; | Comp: King David Christie's London: Tuesday, July 6, 2010 [Lot 00007] $7.8 mill This is a lesser work by the artist. Although larger, it has a more formulaic quality to it. Not as inspried as other |
| Paintings | European Painting | $ | 3,000,000 | $ | 5,000,000 | KGFA | DIA no. 71.169 | Thomas | Gainsborough | The Honorable Richard Savage Nassau de Zuylestein, M.P. | c. 1778/1780 | Oil on canvas | 94 1/8 x 61 3/4 in. (239.1 x 156.8 cm); FrameD: 102 3/8 x 68 3/8 x 4 3/4 | Comp: Portrait of Philip Stanhope Christie's London: Tuesday, December 6, 2011 [Lot 00036] $3.3 mill. Very similar in feel, size and composition |

| Type | Category | Low Est. | High Est. | | DIA no. | Artist First | Artist Last | Title | Date | Medium | Dimensions | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Painting | $ 4,000,000 | $ 6,000,000 | KGFA | DIA no. 71.170 | Thomas | Gainsborough | Lady Anne Hamilton; Alternate Title: Lady Anne Hamilton, later Duchess of... | c. 1778 | oil on canvas | Framed: 101 7/8 _ 68 1/2 _ 4 3/4 in. (258.8 _ 174 _ 12.1 cm); Unframed: 93... | See above – female sitter and more loosely painted. |
| Paintings | European Painting | $ 10,000,000 | $ 15,000,000 | KGFA | DIA no. 71.390.A | Jean Honore | Fragonard | The Shepherdess | 1754/1755 | Oil on canvas | 58 1/2 x 36 7/8 in. (148.6 x 93.7 cm),shaped canvas; FrameD: 64 3/4 x 42 5/8 x 4 | Comp: Aurora, Sotheby's New York: Thursday, January 31, 2013,$3.8 mill. To be sold as together. Important commission and provenance |
| Paintings | European Painting | n/a part of 4 | n/a part of 4 | KGFA | DIA no. 71.390.B | Jean Honore | Fragonard | The Grape Gatherer; Alternate Title: Scenes of Country Life (#2 of 4) | 1754/1755 | Oil on canvas | 59 1/8 x 33 3/4 in. (150.2 x 85.7 cm),shaped canvas; FrameD: 64 5/8 x 39 1/2 x 3 3/4 | |
| Paintings | European Painting | n/a part of 4 | n/a part of 4 | KGFA | DIA no. 71.390.C | Jean Honore | Fragonard | The Reaper; Alternate Title: Scenes of Country Life (#3 of 4) | 1754/1755 | Oil on canvas | 59 x 34 in. (149.9 x 86.4 cm), shaped canvas; FrameD: 64 5/8 x 39 5/8 x 3 3/4 | |
| Paintings | European Painting | n/a part of 4 | n/a part of 4 | KGFA | DIA no. 71.390.D | Jean Honore | Fragonard | The Gardener; Alternate Title: Scenes of Country Life (#4 of 4) | 1754/1755 | Oil on canvas | 58 3/4 x 36 3/4 in. (149.2 x 93.3 cm), shaped canvas; FrameD: 64 5/8 x 43 x 3 3/4 | |
| Paintings | European Painting | $ 700,000 | $ 900,000 | KGFA | DIA no. 72.201 | | Rembrandt Harmensz van Rijn | Man Wearing a Plumed Beret and Gorget | mid 1630's | Oil on oak panel | 27 1/8 x 20 3/8 (68.9 x 51.8); Frame: 34 3/4 x 28 x 4 in. (88.3 x 71.1 x 10.2 cm) | Comp: Portrait of a Young Man, Sotheby's Amsterdam:November 11, 2008 Lot 36, $161,000, Govaert Flinck Portrait of an Old Man, Sotheby's London: April 27, 2006 Lot 42. This is a first rate studio work by Rembrandt and has been proposed to be by Govaert Flinck, his pupil. It's in good condition, on panel and from the 1630s. |
| Paintings | European Painting | $ 1,500,000 | $ 2,500,000 | KGFA | DIA no. 73.1 | Charles | Le Brun | The Presentation of Christ in the Temple; Alternate Title: The Purification of the Virgin | 1645 | Oil on canvas | Framed: 122 x 92 7/8 x 4 1/2 in. (309.9 x 235.9 x 11.4 cm) 231LPs; Stretcher: 107 x 78 7/8 in. (267.0 x 194.3 cm); Framed Weight 230 LBs (date 1-07); Canvas: 105 | Comp: Le sacrifice de Polyxène,Christie's Paris: Monday, April 15, 2013 [Lot 00036], $1.885 Suzanne devant ses juges, Beaussant & Lefèvre: Friday, December 4, 1998 [Lot 00056] $639,829 The DIA picture is larger but of similar quality to the Christie's work. |
| Paintings | European Painting | $ 30,000,000 | $ 40,000,000 | KGFA | DIA no. 73.268 | Michelangelo Merisi da | Caravaggio | The Conversion of the Magdalen; Title: The Conversion of the Magdalen; Alternate Title: The Alzaga Caravaggio | c. 1598 | oil and tempera on canvas | Unframed: 39 3/8 x 52 15/16 in. (100 x 134.5 cm); Framed: 51 x 64 3/4 x 3 3/4 in. (129.5 x 164.5 x 9.5 cm) | There are 4 works in private hands by Caravaggio - 2 versions of the Lute Player, Portrait of Maffeo Barberini and Sacrifice of Isaac - all of which have been valued between 60 - 100 million dollars. Because the condition of this work is quite skinned, it should be placed at the lower end of the spectrum. This evaluation assumes full authorship. |
| Paintings | European Painting | $ 10,000,000 | $ 15,000,000 | KGFA | DIA no. 77.1.1 | Fra | Angelico | Annunciatory Angel; former: Angel Annunciate | between 1450 and 1455 | gold leaf and tempera on wood panel | Unframed: 13 _ 10 5/8 inches (33 _ 27 cm); Framed: 19 3/8 inches _ 17 1/4 inches _ 2 inches (49.2 _ 43.8 _ 5.1 cm) | Early renaissance masterpiece, icon. No market comparables are available other than the Duccio di Buonisegna which was sold to the Met for $45 mill. The Met work is a private devotional work and not a fragment as the DIA piece is. In good condition. |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Painting | $ | 3,000,000 | $ | 5,000,000 | KGFA | DIA no. 77.1.2 | Fra | Angelico | Virgin Annunciate | between 1450 and 1455 | gold leaf and tempera on wood panel | Framed: 19 1/2 inches _ 17 3/8 inches _ 2 inches (49.5 _ 44.1 _ 5.1 cm); Unframed: 13 _ 10 5/8 inches (33 _ 27 cm) | Condition issues.  Not nearly as much hand of the artist remains.  See explanation above.  This angel, while lovely, does not possess any of the detail of the Annunciatory Angel above. |
| Paintings | European Painting | $ | 4,000,000 | $ | 6,000,000 | KGFA | DIA no. 77.2 | Benozzo | Gozzoli | Virgin and Child with Angels | c. 1460 | Gold leaf and tempera on wood panel | Framed: 41 x 32 1/4 x 4 5/8 in. ( 104.1 x 81.9 x 11.8 cm); 25 3/4 x 19 7/8 in. (65.4 x 50.5 cm) | A very rare early Florentine Renaissance artist. Think Medici Palace frescoes.  Assuming good condition, this work is in the same general range as the Fra Angelico and more important than the Sassetta.  No good market comparables are available. |
| Paintings | European Painting | $ | 10,000,000 | $ | 12,000,000 | KGFA | DIA no. 77.3 | Pietro | Perugino | Madonna and Child | c. 1500 | tempera on panel | Framed: 50 1/8 _ 42 1/2 _ 5 1/4 inches (127.3 _ 108 _ 13.3 cm); Unframed: 31 3/4 _ 25 1/2 inches (80.6 _ 64.8 cm) | Italian Renaissance masterpiece and prefigures Raphael.  One in terrible condition sold for $600,000 in 2013.  It was a shell of its former self.  The DIA work is in fine condition with its beautiful glazes in tact.  There are 2 Raphaels on in private hands which would be more expensive but are comparable.  Bridgewater Madonna and the Holy Family.  The Madonna of the Pinks sold for @ $50mill in 2004 and recently a Raphael drawing sold for $48 mill in 2009.  Perugino is not Raphael but one cannot dispute his importance |
| Paintings | European Painting | $ | 30,000 | $ | 50,000 | KGFA | DIA no. 77.72 | Jean Francois | de Troy | Luncheon with Figures in Masquerade Dress | 1725 | Oil on canvas | 88 1/4 x 65 in.; 224.2 x 165.1 cm; Frame: 100 3/4 x 79 3/8 x 4 1/2 (255.9 x 201.6 x 11.4) | Comp:  Workshop paintings for this artist generally come in well below $100,000.  This is a large, well painted work in decent condition. |
| Paintings | European Painting | $ | 4,000,000 | $ | 6,000,000 | KGFA | DIA no. 77.81 | Hans | Holbein the Younger | A Woman | 1532/1534 | Tempera and oil on oak panel | Framed: 15 5/8 x 13 5/8 x 1 1/2 in. ( 39.7 x 34.6 x 3.8 cm); 9 1/8 x 7 1/2 in. (23.2 x 19.1 cm) | Comp:  Large Circle of H, Henry the VIII, Christie's London:July 5, 2011 Lot 6, $1.0 mill  "The Madonna With the Family of Mayor Meyer", Holbein masterpiece sold for $70 million in Germany.  Might have been worth more but no export license. |
| Paintings | European Painting | $ | 2,500,000 | $ | 3,500,00 | | DIA no. 78.59 | John Everett | Millais | Leisure Hours | 1864 | Oil on canvas | 35 x 46 1/2 (88.9 x 118.1); 44 x 55 5/8 x 2 3/8 in. (111.8 x 141.3 x 6.0 cm) | Christie's London, July 11, 2013, lot 9, $3,481,359; Sotheby's London, July 1, 2004, lot 21, $2,036,179; Christie's London, June 11, 2003, lot 9, $2,062,083 |
| Paintings | European Painting | $ | 1,000,000 | $ | 2,000,000 | KGFA | DIA no. 79.30 | Bartolomeo | Manfredi | The Fortune Teller | c. 1616/1617 | Oil on canvas | 122.2 x 154 cm; Frame: 62 1/2 x 75 x 4 in. | Comp: Men Drinking in a Tavern, Sotheby's New York: Friday, January 28, 2000 [Lot 00061], $1 - 1.5 mill BI  Excellent Baroque Caravaggesque subject. Condition is an issue |
| Paintings | European Painting | $ | 2,000,000 | $ | 3,000,000 | KGFA | DIA no. 89.11 | Giovanni Battista | Cima | Madonna and Child | late15th/early 16th Century | Paint on wood panel | 25 3/8 x 18 7/8 inches (64.5 x 47.9 cm); Framed: 33 1/8 x 26 7/8 x 2 3/8 (84.1 x 68.3 x 6.0) | Comp:  Madonna and Child in a Landscape, Christie's New York: Thursday, April 19, 2007 [Lot 00064], $3.4 mill.  The painting sold at auction has a more complicated background and more animated subjects.  Earliest picture in the collection?  1889? |
| Paintings | European Painting | $ | 600,000 | $ | 800,000 | KGFA | DIA no. 89.23 | Guido | Reni | Head of Christ Crowned with Thorns | early 1630's | Oil on copper panel | Panel: 19 1/2 x 16 inches (49.5 x 40.6 cm); Framed: 33 x 29 5/8 x 2 inches (83.8 x 75.3 x 5.1 cm) | Comp:  Ecce Homo Sotheby's London: Wednesday, December 6, 2006 [Lot 00039] $636,000  Christ Crowned with Thorns Christie's London: Tuesday, July 8, 2008 [Lot 00009] $240,000.  Lovely work by the artist, on copper and therefore in good condition as it retains its colors and support more effectively. |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paintings | European Painting | $ 400,000 | $ 600,000 KGFA | DIA no. 89.30 | Gerrit Adriaensz. | Berckheyde | View of the Grote Kerk in Haarlem | 1695 | Oil on canvas | Canvas: 19 5/8 x 16 3/4 inches (49.8 x 42.5 cm); FrameD: 26 3/4 x 23 5/8 x 2 1/2 | Comp: Grote Markt, Christie's New York:January 29, 2014 Lot 25, $245,000, Haarlem, St. Bavo's Church Christie's Amsterdam: November 1, 2011 Lot 22 $100,000 - 160,000BI, The Hague, Sotheby's New York:January 26, 2011 Lot 3 $660,000 Varying prices - This is an interesting view, in good condition and on canvas. It is more intriguing that the 2014 sale but less so than the 1/26/11 sale. |
| Paintings | European Painting | $ 6,000,000 | $ 8,000,000 KGFA | DIA no. 89.35 | Jan | Provost | The Last Judgment | c. 1525 | Oil on oak panel | Framed: 29 5/8 x 30 9/16 x 3 inches ( 75.25 x 77.63 x 7.62 cm); 22 3/4 x 23 7/8 inches (57.8 x 60.6 cm) | Comp: Annunciation, Christie's New York:January 29, 2014 Lot 156, $3.6 This is the only comp on file for Provost. The DIA pictures is larger and much more complicated. It is very rare to find this artist, with a large scale work for sale. |
| Paintings | European Painting | $ 400,000 | $ 600,000 KGFA | DIA no. 89.39 | Pieter | de Hooch | Mother Nursing Her Child | c. 1674/1676 | Oil on canvas | Canvas: 31 3/8 x 23 1/2 inches (79.7 x 59.7 cm); FrameD: 40 3/8 x 32 1/4 x 3 3/8 | Comp: Mother and Child Sweeping Christie's New York: Wednesday, January 26, 2011 Lot 00028, 200 - 300,000 BI, Lady Nursing in an Interior, Christie's London: Tuesday, July 8, 2008 [Lot 00035] 400 - 600,000 BI. DIA is very similar to the 2008 picture, perhaps in slightly better condition. |
| Paintings | European Painting | $ 200,000 | $ 300,000 KGFA | DIA no. 89.44 | | Rembrandt Harmensz van Rijn | The Death of Lucretia (?) | mid 1640's | Oil on canvas | Unframed: 68 1/2 _ 86 1/2 inches (174 _ 219.7 cm); Framed: 81 1/2 _ 100 3/4 _ 5 3/4 inches (207 _ 255.9 _ 14.6 cm) | Comp: Adoration of the Magi, Sotheby's London: Thursday, December 9, 2010 [Lot 00125], $153,000, Large format subject from unknown hand. Discreet quality, but by no means exceptional. Has passages of mediocre conservation. Clumsy handling of various pictorial elements. |
| Paintings | European Painting | $ 800,000 | $ 1,200,000 KGFA | DIA no. 89.46 | Jan Havicksz | Steen | Gamblers Quarreling | c. 1665 | Oil on canvas | Canvas: 27 3/4 x 35 inches (70.5 x 88.9 cm); FrameD: 36 1/2 x 44 1/4 x 2 3/4 | Comp: Village Wedding, Christie's New York: Wednesday, January 27, 2010 [Lot 00022], $362,000, Tavern with Cock Fighting, Christie's London: Thursday, July 5, 2007 [Lot 00029], $150 - 260,000 BI, The 12th Night, Sotheby's New York: Thursday, June 4, 2009 [Lot 00018] $675,000 DIA picture is identical in size, tone and handling to the 12th Night. Taking into account that they are in analagous condition, and this picture sold for $675,000 in the height of the last recession, I belive that there is a notable increase in value from the last sale. |
| Paintings | European Painting | $ 8,000,000 | $ 10,000,000 KGFA | DIA no. 89.63 | Peter Paul | Rubens | The Meeting of David and Abigail | 1625/1628 | Oil on canvas | 70 1/4 x 98 inches; 178.5 x 249.0 cm; Framed: 86 3/4 x 114 1/2 x 6 1/2 inches; 220.3 x 290.8 x 16.5 cm | Very fancy French provenance. Large scale, includes somewhat clumsy passages. Some question as to whether it is fully autograph or not. Massacre of the Innocents sold for $76,000,000, Single figure Portrait of a Commander sold for $13,000,000 |
| Paintings | European Painting | $ 100,000 | $ 150,000 KGFA | DIA no. 89.70 | Bartolome Esteban | Murillo | The Immaculate Conception | 17th Century | Oil on canvas | Unframed: 78 x 53 inches (198.1 x 134.6 cm); Framed: 93 1/2 x 62 1/4 x 4 1/2 inches (237.5 x 158.1 x 11.4 cm) | Comp: Immaculate Conception, Christie's London: Thursday, July 6, 2006 [Lot 00046] $430,000 Studio versions sell for less than $100,000. This is a particularly well painted workshop piece. |
| Paintings | European Painting | $ 1,200,000 | $ 1,800,000 KGFA | DIA no. 37.21 | Jacob Isaaksz | van Ruisdael | Farm and Hayrick on a River | late 1640's | Oil on oak panel | 15 1/2 x 20 3/8 (39 x 51.2); Frame: 24 3/4 x 29 1/2 x 2 3/8 in. (62.9 x 74.9 x 6.0 cm) | Comp: Sotheby's 1/26/12, lot 23 $782,000, Christies's NY, 6/4/14 lot 38, $1,800,000, Lush rich example on panel with water. The $1.8 mill sale is a more poetic and romantic image and less formulaic that 37.21. This was not on view so therefore I cannot judge the condition. I am assuming that it is in a well preserved state as it is on panel. |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Artvest Total 19th Century & Old Master Ptgs** | | $ | 349,810,000 | $ | 496,550,000 | | | | | |

| Sculpture | European Sculpture and Dec Arts | $ | 100,000 | $ | 200,000 | | DIA no. 1987.75 | Louis Francois | Roubiliac | Bust of Isaac Ware | c. 1741 | marble | Overall: 25 3/4 inches _ 18 inches _ 9 5/8 inches (65.4 _ 45.7 _ 24.4 cm); Mount (pedestal): 49 7/16 _ 16 3/4 _ 16 3/4 inches (125.6 _ 42.5 _ 42.5 cm) | Summary not provided |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ceramic | European Sculpture and Dec Arts | $ | 200,000 | $ | 400,000 JHY | DIA no. 1990.245 | | Doccia Porcelain Factory | Apollo in his Chariot; translated: Vaso | between 1748 and 1750 | hard paste porcelain | Including base: 23 5/8 _ 13 1/2 _ 8 1/4 inches (60 _ 34.3 _ 21 cm) | Bonham's London, Dec 7, 2011, lot 30, 657,250 EUR; Christie's Paris, Nov. 26, 2005, lot 292, $218,271; Sotheby's Milan, April 18, 2007, lot 246, 174,000 EUR. |
| Sculpture | European Sculpture and Dec Arts | $ | 100,000 | $ | 200,000 JHY | DIA no. 1997.1 | Jean-Léon | Gérôme | Seated Woman | c. 1890/1895 | Marble with original wax and polychromy | 17 x 13 3/4 x 13 3/4 in.; 43.2 x 34.9 x 34.9 cm | Summary not provided |
| Sculpture | European Sculpture and Dec Arts | $ | 150,000 | $ | 300,000 JHY | DIA no. 2001.67 | Francois | Rude | Departure of the Volunteers of 1792 (The Marseillaise) | c. 1835 | original plaster model | Unframed: 42 inches _ 24 1/2 inches _ 7 inches (106.7 _ 62.2 _ 17.8 cm); Framed: 51 1/2 inches _ 36 1/2 inches _ 7 inches (130.8 _ 92.7 _ 17.8 cm) Including base (depth | Based on the unique nature of this plaster model, direct comparables are difficult. A comparison is made to terracotta maquettes by Rodin for the large scale Gates of Paradise. Christie's Pareis, November 28, 2012, lot 21, $373,808. |
| Sculpture | European Sculpture and Dec Arts | $ | 4,000,000 | $ | 6,000,000 JHY | DIA no. 22.3 | Michel | Erhardt | Virgin and Child; Alternate Title: Virgin and Child on the Crescent Moon; Alternate Title: | c. 1480 | linden wood with traces of polychromy and gesso | Overall: 64 _ 17 1/2 _ 13 inches (162.6 _ 44.5 _ 33 cm) | Sotheby's NY, Jan 24, 2008, lot 31, $6,313,000; Sotheby's NY, May 22, 2001, lot 32, $2,9975,750; Sotheby's London, July 2, 2013, lot 26, 458,500 GBP |
| Sculpture | European Sculpture and Dec Arts | $ | 6,000,000 | $ | 8,000,000 | DIA no. 27.150 | Nino | Pisano | Madonna and Child | between 1350 and 1360 | fine grained white marble with traces of polychromy | Overall (with pedestal): 46 1/2 _ 29 _ 25 inches (118.1 _ 73.7 _ 63.5 cm); | Summary not provided |
| Sculpture | European Sculpture and Dec Arts | $ | 3,000,000 | $ | 4,000,000 | DIA no. 37.147 | | Pollaiuolo | Judith | c. 1470 | Bronze with traces of gilding | Overall (without pedestal): 20 x 9 x 4 in. ( 50.8 x 22.9 x 10.2 cm)-sight | |
| Ceramic | European Sculpture and Dec Arts | $ | 400,000 | $ | 600,000 JHY | DIA no. 37.74 | | Unknown | Vase | c. 1470 | Tin-glazed earthenware with polychrome decoration | 15 1/4 x 11 1/8 x 8 1/4 in. ( 38.74 x 28.26 x 21 cm) | Extremely, its importance is based on its historical association with the court of Lorenzo de Medici not on its aesthetic quality. Also, it has restoration to the foot. Christie's London, July 9, 1999, lot 140, $478,055; Christie's Paris, Dec. 17, 2009, lot 50, $1,707,918; Sotheby's London, Dec. 8, 2009, Lot 1, 481,250 GBP |

| | | Low | High | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sculpture | European Sculpture and Dec Arts | $ 6,000,000 | $ 8,000,000 | DIA no. 40.19 | | Donatello | Madonna and Child | 1410/1420 | Gilt terracotta with polychrome decoration | 26 5/8 x 14 7/8 x 13 1/8 in. (67.6 x 37.8 x 33.3 cm) | Summary not provided |
| Sculpture | European Sculpture and Dec Arts | $ 100,000 | $ 150,000 | DIA no. 41.124 | | Donatello | Coat of Arms of the Boni Family | c. 1457 | sandstone (Pietra serena) | Overall: 85 _ 29 1/4 inches (215.9 _ 74.3 cm) | Summary not provided |
| Sculpture | European Sculpture and Dec Arts | $ 2,000,000 | $ 3,000,000 | DIA no. 49.23 | Jean Antoine | Houdon | Robert Fulton | c. 1804 | Marble | Includes socle: 28 3/4 x 20 x 12 3/4 in. ( 73 x 50.8 x 32.4 cm) | Summary not provided |
| Sculpture | European Sculpture and Dec Arts | $ 1,000,000 | $ 1,500,000 | DIA no. 49.417 | Danese | Cattaneo | Neptune: Allegory of Winter and Water | c. 1545 | bronze, cast after wax model, black patina | Overall: 48 _ 23 1/2 _ 23 inches (121.9 _ 59.7 _ 58.4 cm) | Summary not provided |
| Sculpture | European Sculpture and Dec Arts | $ 1,000,000 | $ 1,500,000 | DIA no. 49.418 | Danese | Cattaneo | Mars: Allegory of Summer and Fire | c. 1545 | bronze, cast after wax model, black patina | Overall: 47 _ 18 _ 14 inches (119.4 _ 45.7 _ 35.6 cm) | Summary not provided |
| Sculpture | European Sculpture and Dec Arts | $ 2,000,000 | $ 3,000,000 | DIA no. 52.218 | Giovanni Lorenzo | Bernini | Triton with a Sea Serpent | c. 1630s - before 1642 | Terracotta | 11 x 6 3/4 x 7 1/4 in. ( 27.9 x 17.1 x 18.4 cm) | Summary not provided |
| Sculpture | European Sculpture and Dec Arts | $ 2,000,000 | $ 3,000,000 | DIA no. 52.219 | Giovanni Lorenzo | Bernini | Triton with a Shell | c. 1630 - before 1642 | Terracotta | 12 1/8 x 8 3/8 x 7 1/8 in. ( 30.8 x 21.3 x 18.1 cm) | Summary not provided |
| Sculpture | European Sculpture and Dec Arts | $ 3,000,000 | $ 5,000,000 | DIA no. 52.220 | Giovanni Lorenzo | Bernini | Chair of St. Peter | 1658 | terracotta | Overall: 23 _ 11 1/2 _ 11 inches (58.4 _ 29.2 _ 27.9 cm) | |
| Furniture Accessory | European Sculpture and Dec Arts | $ 500,000 | $ 800,000 JHY | DIA no. 53.177 | Etienne | Pollet | Large Jewelry Box; Alternate Title: Large Jewelry Box | 1738/1739 | Silver | 4 1/2 x 10 3/4 x 8 5/8 in. (11.4 x 27.3 x 21.9 cm) | Needs to be sold as a set along with DIA numbers 53.178 through 53.186 as a complete toilet set. Christie's Paris, Oct. 3, 2012, lot 39, $125,258; Christie's London, June 7, 2011, lot 206, 265,250 GBP; Christie's NY, October 21, 2003, lot 425, estimated $450,000 - $550,000, unsold (BI). |
| Furniture Accessory | European Sculpture and Dec Arts | $ - | $ - JHY | DIA no. 53.178 | Etienne | Pollet | Large Jewelry Box; Alternate Title: Large Jewelry Box | 1738/1739 | Silver | 4 3/4 x 11 x 9 in. | Needs to be sold together with DIA 53.177 and is valued above as if it would be sold as a set. |
| Furniture Accessory | European Sculpture and Dec Arts | $ - | $ - JHY | DIA no. 53.183 | Antoine | LeBrun | Ewer; Alternate Title: Ewer | 1738/1739 | Silver | Ewer: 10 1/8 x 6 1/8 x 5 1/8 in. ( 25.7 x 15.6 x 13 cm) | Needs to be sold together with DIA 53.177 and is valued above as if it would be sold as a set. |
| Furniture Accessory | European Sculpture and Dec Arts | $ - | $ - JHY | DIA no. 53.184 | Antoine | LeBrun | Basin; Alternate Title: Basin | 1738/1739 | Silver | 2 5/8 x 13 3/8 x 9 15/16 in. ( 6.7 x 34 x 25.2 cm) | Needs to be sold together with DIA 53.177 and is valued above as if it would be sold as a set. |

| Category | Collection | Low Est. | High Est. | Appraiser | DIA no. | First | Last | Title | Date | Material | Dimensions | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Furniture Accessory | European Sculpture and Dec Arts | $ - | $ - | JHY | DIA no. 53.185 | Antoine | LeBrun | Table Mirror; Alternate Title: Table Mirror | 1738/1739 | Silver | 26 1/2 x 23 7/8 x 2 1/2 in. (67.3 x 60.6 x 6.4 cm); Display dims.: 25 3/8 x 23 7/8 x 11 1/8 in. (64.4 x 60.6 x 28.3 cm) | Needs to be sold together with DIA 53.177 and is valued above as if it would be sold as a set. |
| Furniture Accessory | European Sculpture and Dec Arts | $ - | $ - | JHY | DIA no. 53.186 | Antoine | LeBrun | Pair of Cosmetic Pots with Stand; Alternate Title: Pair of Cosmetic Pots with Stand | 1738/1739 | Silver | Cosmetic Pots: 4 x 2 3/4 in. diam. ea.; Stand: 1 1/2 x 9 1/2 x 6 3/4 in. | Needs to be sold together with DIA 53.177 and is valued above as if it would be sold as a set. |
| Arms and Armor | European Sculpture and Dec Arts | $ 500,000 | $ 1,000,000 | JHY | DIA no. 53.193 | Lorenz | Helmschmied | Armor in the Gothic Style | c. 1485 and later | Steel, copper alloy, leather | As displayed: 71 x 28 1/2 x 26 1/4 in. (180.34 x 72.39 x 66.68 cm) | Complete, period (most are 19th century reproductions or are composites from different sets) garnitures of armor have not shown up at auction in a long period of time, there are no real comparables on which to base an estimate. Given the quality, and Hearst Collection provenance, and its known maker, we estimate it could sell for $500,000 to a million. Only reasonable comp is from Pierre Berge & Associes, Paris, December 13, 2011, lot 179, 270,000 Euros. |
| Arms and Armor | European Sculpture and Dec Arts | $ 150,000 | $ 300,000 | JHY | DIA no. 53.196 | | Unknown | Jousting Armor; Title: Jousting Armor | c. 1580 | Steel, copper alloy, leather, paint | As displayed: 69 x 27 1/4 x 20 5/8 in. (175.26 x 69.22 x 52.37 cm) | A lesser piece than DIA 53.193, it would be at the lower end of the comp referred to above. |
| Arms and Armor | European Sculpture and Dec Arts | $ 150,000 | $ 300,000 | JHY | DIA no. 53.197 | | Unknown | Armor for the Tilt in the Saxon Fashion | c. 1590 | Steel, leather | As displayed: 70 1/2 x 30 x 17 7/8 in. (179.07 x 76.2 x 45.39 cm) | A lesser piece than DIA 53.193, it would be at the lower end of the comp referred to above. |
| Arms and Armor | European Sculpture and Dec Arts | $ 150,000 | $ 300,000 | | DIA no. 53.198 | | Unknown | Half-Armor; Alternate Title: Corsaletto | c. 1550 | steel , gilding | Overall (top of helmet to tip of tassel): 47 1/2 inches (120.7 cm) | A lesser piece than DIA 53.193, it would be at the lower end of the comp referred to above. |
| Arms and Armor | European Sculpture and Dec Arts | $ 150,000 | $ 300,000 | | DIA no. 53.200 | | Unknown | Corsaletto; Title: Half Armor of Corsaletto | c. 1605 | Steel, blued, etched and gilded | 30 1/2 x 23 3/4 x 13 1/2 in. ( 77.47 x 60.33 x 34.29 cm); Pedestal: 36 3/8 x 17 3/4 x 14 1/2 in. ( 92.4 x 45.1 x 36.8 cm); Top base: 5 1/8 x 9 1/2 x 8 3/4 in. ( 13 x 24.1 x 22.2 cm) | A lesser piece than DIA 53.193, it would be at the far lower end of the comp referred to above. |
| Silver | European Sculpture and Dec Arts | $ 400,000 | $ 600,000 | JHY | DIA no. 55.183.A | Thomas | Germain | Tureen with Lid and Stand | 1729/1730 | Silver, cast, applied, chased, and sculpted. | 8 1/2 x 17 1/6 x 13 7/8 in. (21.6 x 43.6 x 35.2 cm) | Sotheby's Paris, April 18, 2012, lot 89, $709,645; Christie's London, July 5, 2000, lot 10, $471,054; Christie's Paris, November 8, 2013, lot 135, $2,374,115; Sotheby's Nov. 20, 2003, lot 196, 688,800 GBP |
| Tapestry | European Sculpture and Dec Arts | $ 150,000 | $ 250,000 | JHY | DIA no. 55.519 | | Unknown | Pride; Alternate Title: Superbia | c. 1500/1510 | Wool, silk | 148 x 264 in. (375.9 x 670.6 cm) | Sotheby's London, Oct. 29, 2008, lot 46, 229,250 GBP; Christie's NY, April 20, 2007, lot 121 $144,000; Christie's London, Dec. 14-15, 2005, lot 79, $330,970 |
| Tapestry | European Sculpture and Dec Arts | $ 150,000 | $ 250,000 | JHY | DIA no. 55.520 | | Unknown | Charity; Alternate Title: Caritas | c. 1500/1510 | Wool, silk | 152 x 250 in. (386 x 635 cm) | See note for DIA 55.519 |
| Tapestry | European Sculpture and Dec Arts | $ 150,000 | $ 250,000 | JHY | DIA no. 55.521 | | Unknown | Fortitude; Alternate Title: Fortitudo | c. 1500/1510 | Wool, silk | 152 x 260 in. (386.1 x 660.4 cm) | See note for DIA 55.519 |

| Category | Collection | Low $ | High $ | | DIA no. | First | Maker/Origin | Title | Date | Material | Dimensions | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tapestry | European Sculpture and Dec Arts | $ 150,000 | $ 250,000 | JHY | DIA no. 55.522 | | Unknown | Wrath; Alternate Title: Ira | c. 1500/1510 | Wool, silk | 150 x 264 in. (381.0 x 670.6 cm) | See note for DIA 55.519 |
| Silver | European Sculpture and Dec Arts | $ 200,000 | $ 400,000 | JHY | DIA no. 56.85.1 | Thomas | Germain | Candelabrum | 1732/1734 | Silver | Sight: 17.0 x 8.0 x 9.0 in. (43.18 x 20.3 x 22.8 cm) | Sotheby's NY, April 8, 2014, lot 229, $197,000; Christie's NY, October 21, 2003, lot 335, $298,700; Sotheby's Paris, April 18, 2012, lot 71, $67,125. |
| Sculpture | European Sculpture and Dec Arts | $ 600,000 | $ 800,000 | | DIA no. 59.123 | Hubert | Gerhard | Hebe | c. 1590 | bronze | Overall (without base or marble socle): 24 7/16 _ 12 3/8 _ 8 1/16 inches (62.1 _ 31.4 _ 20.5 cm); Overall (including base): 30 inches _ 12 3/8 inches 8 1/16 inches (76.2 | |
| Ceramic | European Sculpture and Dec Arts | $ 200,000 | $ 400,000 | JHY | DIA no. 59.124.A | | Fontana Workshop | Footed Bowl; Title: Footed Bowl; Alternate Title: Broth Bowl; Alternate Title: Scodella | c. 1560/1570 | Tin-glazed earthenware with enamel decoration | Cup : 4 x 5 1/2 in. diameter (10.2 x 14.0 cm); Cup and Cover : 4 1/2 x 6 7/8 in. diam. (11.4 x 17.5 cm); Overall: 5 x 8 3/8 in. diam. | Christie's London, June 4, 2013, lot 4, $296,435; Christie's London, July 5, 2012, lot 92, $151,710; Christie's London, July 5, 2012, lot 76, $713,310) |
| Silver | European Sculpture and Dec Arts | $ 600,000 | $ 800,000 | JHY | DIA no. 59.18 | Thomas | Germain | Tureen with Lid, Liner, and Stand | 1733 or 1734 | silver with cast, chased, and applied decoration | Overall: 10 _ 21 1/2 _ 16 1/4 inches (25.4 _ 54.6 _ 41.3 cm) | Same comparables as DIA 55.183.A. This is more complete and has more elements. Sotheby's Paris, April 18, 2012, lot 89, $709,645; Christie's London, July 5, 2000, lot 10, $471,054; |
| Ceramic | European Sculpture and Dec Arts | $ 1,500,000 | $ 3,500,000 | JHY | DIA no. 59.295 | Johann Gottlieb | Kirchner | Joseph Froehlich, Court Jester of Augustus the Strong | 1729 or 1730 | glazed hard paste porcelain | Overall: 20 _ 15 1/2 _ 12 inches (50.8 _ 39.4 _ 30.5 cm) | This is unique within the corpus of Meissen, so direct comparisons are difficult. Christie's London, Dec. 18, 2006, lot 51, $5,495,256; Christie's London, June 13-14, lot 351, $1,224,189); Sotheby's London, May 1, 2013, lot 78, 818,500. |
| Ceramic | European Sculpture and Dec Arts | $ 2,500,000 | $ 5,000,000 | JHY | DIA no. 59.296 | Johann Joachim | Kaendler | Postmaster Baron Schmiedel | 1739 | glazed hard paste porcelain | Overall: 18 _ 14 1/2 _ 10 inches (45.7 _ 36.8 _ 25.4 cm) | As with DIA 59.295, this also is unique within the corpus of Meissen, so direct comparisons are difficult. Christie's London, Dec. 18, 2006, lot 51, $5,495,256; Christie's London, June 13-14, lot 351, $1,224,189); Sotheby's London, May 1, 2013, lot 78, 818,500. |
| Sculpture | European Sculpture and Dec Arts | $ 400,000 | $ 600,000 | | DIA no. 61.164 | | Master of the Arenberg Lamentation | The Lamentation; Alternate Title: The Arenberg Lamentation | between 1470 and 1480 | oak with traces of polychromy | Overall (image): 34 3/4 _ 54 3/4 _ 9 3/4 inches (88.3 _ 139.1 _ 24.8 cm); Overall (pedestal (to | |
| Ceramic | European Sculpture and Dec Arts | $ 800,000 | $ 1,500,000 | | DIA no. 66.17 | | Meissen Porcelain Manufactory | Crane; Alternate Title: Granige, Kraniche mit dem Steine; Alternate Title: Grus grus | 1735 | Hard-paste porcelain | Overall (by sight): 32 3/4 x 19 1/2 x 7 in. ( 83.2 x 49.5 x 17.8 cm) | Christie's Paris, June 22, 2005, lot 119, $6,847,465; Christie's London, June 13-14, 2002, lot 350, $1,548,029; Sotheby's London, May 1, 2013, lot 195, 554,500. |
| Furniture | European Sculpture and Dec Arts | $ 1,500,000 | $ 2,500,000 | JHY | DIA no. 71.196 | Martin | Carlin | Jewel Coffer | c. 1774 | oak carcass, veneered with tulipwood, holly, ebony, | Overall: 37 3/8 _ 20 5/8 _ 13 5/8 in. (94.9 _ 52.4 _ 34.6 cm) | Christie's New York, Nov. 2, 2000, lot 200, $1,546,000; Christie's London, June 13, 2002, lot 310, $2,158,406; Christie's London, July 6, lot 60, $2,971,830 |
| Furniture | European Sculpture and Dec Arts | $ 500,000 | $ 800,000 | JHY | DIA no. 73.167 | Pietro | Piffetti | Secretary; Alternate Title: Secretary Bookcase | c. 1770 | kingwood, ivory, and ebony on wood carcass, mirrors | Overall (by sight): 88 in. _ 33 3/4 in. _ 18 in. (223.5 _ 85.7 _ 45.7 cm) | Christie's London, Dec. 8, 2004, lot 19, $437,818; Christie's London, Dec. 14, 2000, lot 325, $404,188; Christie's London, June 13, 2002, lot 472, $300,836. |

| Category | Department | Low $ | High $ | Initials | DIA no. | Artist First | Artist Last | Title | Date | Medium | Dimensions | Comparables/Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sculpture | European Sculpture and Dec Arts | $ 100,000 | $ 200,000 | | DIA no. 73.254 | Antonio | Montauti | The Return of the Prodigal Son | 1724 | bronze | Overall: 24 7/8 in. _ 19 1/2 in. _ 14 in. (63.2 _ 49.5 _ 35.6 cm) | |
| Sculpture | European Sculpture and Dec Arts | $ 150,000 | $ 250,000 | JHY | DIA no. 79.21 | Pierre | Puget | Le ravissement d'Helene; Alternate Title: The Abduction of Helen of Troy; translated: The Abduction of Helen | 1683-1686 | bronze | Overall: 38 1/4 inches _ 19 inches _ 16 15/16 inches (97.2 _ 48.3 _ 43 cm); Mount (pedestal): 38 1/8 _ 19 13/16 _ 19 13/16 inches (96.8 _ 50.3 _ 50.3 cm) | Christie's London, July 4, 2013, lot 7, $642,938; Christie's NY, June 11, 2010, lot 174, $506,500; both of these comparables are from much earlier periods and are of much greater value. |
| Sculpture | European Sculpture and Dec Arts | $ 1,000,000 | $ 1,500,000 | | DIA no. 81.695 | Giovanni Battista | Foggini | Cupid and Psyche; Alternate Title: Amore e Psiche | c. 1710/1720 | Bronze with brown patina and red-gold lacquer | 13 3/8 x 14 5/8 x 9 1/4 in.; 34.0 x 37.0 x 23.5 cm | Summary not provided |
| Sculpture | European Sculpture and Dec Arts | $ 800,000 | $ 1,000,000 | | DIA no. 82.27 | Giovanni Franceso | Susini | Bacchus and a Young Satyr | c. 1640 | Bronze | 19 3/4 x 9 x 8 in.; 50.2 x 22.9 x 20.3 cm; base: 2 1/2 x 8 1/8 x 6 1/8 in.; 6.4 x 20.6 x 15.6 cm | Summary not provided |
| Sculpture | European Sculpture and Dec Arts | $ 150,000 | $ 300,000 | JHY | DIA no. F76.92 | | Donatello | The Nativity (Ford Nativity) | c. 1420/1430 | Terracotta with traces of polychromy (vermillion, malachite, azurite, lead and white) | unframed: 18 1/2 x 14 x 3 1/4 in.; 47.0 x 35.6 x 8.3 cm; Framed: 32 1/2 x 19 x 3 1/4 in.; 82.6 x 48.3 x 8.3 cm | As this is "Workshop" of Donatello, it is compared to the Workshop of Rosselino: Sotheby's London, July 7, 2006, lot 30; $175,545. As opposed to an fully attributed Donatello at Sotheby's NY, Jan 26, 2006, lot 74, $4,440,000 |
| Silver | European Sculpture and Dec Arts | | | | DIA no. 56.85.2 | Thomas | Germain | Candelabrum | 1732/1734 | Silver | Sight: 17.0 x 8.0 x 9.0 in. ( 43.18 x 20.3 x 22.8 cm) | Part of a set with 56.85.1, value information included there. |

| | | $ - | $ - | JHY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Artvest Total European Decorative Art & Sculpture** | | | | | | | | | | | | |
| | | $ 44,650,000 | $ 69,000,000 | | | | | | | | | |
| Rug | Islamic Art Sculpture | $ 80,000 | $ 150,000 | JHY | DIA no. 48.137 | | Islamic | Summer Floor Covering (nihale) | 1650/1700 | Cut and voided velvet; silk with metal threads (silver wrapped silk core); compound satin and velvet. Registrar's Card: Polychrome | 193 x 105 1/2 in.; 490.2 x 268.0 cm | Sotheby's London, April 5, 2006, lot 51, GBP 66,000; Sotheby's Doha, March 19, 2009, Lot 315, $206,500; Sotheby's London, April 24, 2012, lot 125, GBP 325,250. Although this textile is large,(193 x 105 1/2 inches) it is not as visually compelling as the latter two comparables. |

| **Artvest Total Islamic Art** | | $ 80,000 | $ 150,000 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Drawing | Prints, Drawings & Photographs | $ | 1,000,000 | $ | 1,500,000 | Sabine Wilson | DIA no. 1991.1015 | Paul | Klee | Translucencies, Orange-Blue; Alternate Title: Durchleuchtungen, Orange-Blau | 1915 | Watercolor on off-white wove paper fully attached to a heavy paperboard support | Sheet: 7 3/8 x 9 1/8 in. (18.7 x 23.2 cm); Framed: 16 1/2 x 20 7/16 x 1 3/8 in. (41.9 x 51.9 x 3.5 cm) | Summary not provided |
| Drawing | Prints, Drawings & Photographs | $ | 1,500,000 | $ | 2,000,000 | Sabine Wilson | DIA no. 65.139 | Paul | Cézanne | Skull and Book; Alternate Title: Vanitas; Alternate Title: Un crane | c. 1885 | Watercolor over black chalk on laid paper | Sheet: 9 1/4 x 12 3/16 in. (23.5 x 31 cm.); Frame: 18 3/8 in x 24 3/8 in x 1 5/16 in. | Summary not provided |
| Drawing | Prints, Drawings & Photographs | $ | 40,000 | $ | 60,000 | Sabine Wilson | DIA no. 65.140 | Paul | Cézanne | Slave | | Graphite pencil on dark cream laid paper | Sheet: 17 3/4 x 11 1/2 in. (45.1 x 29.2 cm); Frame: 27 1/2 x 21 x 1 1/2 in. (69.9 x 53.3 x 3.8 cm) | Summary not provided |
| Drawing | Prints, Drawings & Photographs | $ | 200,000 | $ | 300,000 | Sabine Wilson | DIA no. 65.162 | Henri | Matisse | Plumed Hat | 1919 | Graphite pencil on wove paper | Sheet: 20 7/8 x 14 3/8 in. (53 x 36.5 cm); Frame: 34 1/4 x 28 3/8 x 2 3/8 in. (87 x 72.1 x 6 cm) | Summary not provided |
| Drawing | Prints, Drawings & Photographs | $ | 200,000 | $ | 300,000 | Betty Krulik | DIA no. 70.253 | Charles | Demuth | Still Life with Apples and Bananas | 1925 | Watercolor and graphite pencil on wove paper | Sheet: 11 7/8 x 18 in. (30.2 x 45.7 cm); Frame: 23 x 29 1/4 x 1 3/8 in. (58.4 x 74.3 x 3.5 cm) | comparable of Squash sold in 2009 for $218K but this one more colorful and full, therefore a wider up side. |
| Drawing | Prints, Drawings & Photographs | $ | 2,000,000 | $ | 4,000,000 | Sabine Wilson | DIA no. 72.441 | Edgar | Degas | Dancers in Repose | c. 1898 | Pastel and charcoal on thin wove paper fully attached to a thin supporting sheet | Sight: 22 1/2 x 16 7/8 in in. (57.1 x 42.8 cm); Mount: 26 1/2 x 20 3/4 in. (66.7 x 52.8 cm); Frame: 34 x 27 3/4 x 2 in. (86.4 x 70.5 x 5.1 cm) | Summary not provided |

| | | | |
|---|---|---|---|
| **Artvest Total Prints, Drawings & Photographs** | $ | 4,940,000 | $ | 8,160,000 |

| | | | |
|---|---|---|---|
| **Artvest Total High Value Works, All Categories** | $ | 1,569,355,000 | $ | 2,290,085,000 |

## Exhibit B

Michael Plummer

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

In Re:                    ) Chapter 9


CITY of DETROIT, MICHIGAN, ) Case No. 13-53846

      Debtor.     )  Hon. Steven Rhodes

--------------------------x


Videotaped Deposition of MICHAEL PLUMMER
Taken at:  Weil, Gotshal & Manges, LLP
      767 Fifth Avenue
      New York, New York
Commencing at 9:03 a.m.
Friday August 1, 2014
Before Roberta Caiola

```
 1               Michael Plummer
 2   A P P E A R A N C E S :
 3
     EDWARD SOTO, ESQ.
 4   DEBORA A. HOEHNE, ESQ. (New York Office)
     Weil, Gotshal & Manges, LLP
 5   1395 Brickell Avenue, Suite 1200
     Miami, Florida 33131
 6       Appearing on behalf of Financial
         Guaranty Insurance Company
 7
 8   GEOFFREY S. IRWIN, ESQ.
     Jones Day
 9   51 Louisiana Avenue, N.W.
     Washington, D.C. 20001
10       Appearing on behalf of the Debtor
11       - and -
12   LAUREN BUONOME, ESQ.
     Jones Day
13       222 East 41st Street
         New York, New York 10017-6702
14       (Present Telephonically)
15       - and -
16   RICHARD LEVIN, ESQ.
     Cravath, Swaine & Moore LLP
17       Worldwide Plaza
         825 Eighth Avenue
18       New York, New York 10019-7475
         Appearing on behalf of the
19       DIA Corp.
20
     ARTHUR T. O'REILLY, ESQ.
21   Honigman Miller Schwartz and Cohn LLP
     2290 First National Building
22   660 Woodward Avenue
     Detroit, Michigan 48226-3506
23       Appearing on behalf of the
         Detroit Institute of Arts
24
25
```

```
 1               Michael Plummer
 2   A P P E A R A N C E S :
 3
     ARTHUR H. RUEGGER, ESQ.
 4   Dentons US, LLP
     1301 K Street, N.W.
 5   Suite 600, East Tower
     Washington, D.C. 20005
 6       Appearing on behalf of the
         Retiree Committee
 7
 8   MICHAEL J. PATTWELL, ESQ.
     Clark Hill, PLC
 9   212 East Grand River
     Lansing, Michigan 48906
10       Appearing on behalf of the Retirement
         Systems for the City of Detroit
11       (Present Telephonically)
12
     HIRAM ARNAUD, ESQ.
13   Chadbourne & Parke, LLP
     30 Rockefeller Plaza
14   New York, New York 10112
         Appearing on behalf of Assured
15       Guaranty Municipal Corporation
         (Present Telephonically)
16
17   ALSO PRESENT:
     JOSE RIVERA - Video Technician
18
19
20
21
22
23
24
25
```

```
 1               INDEX
 2
     Witness      Examination By      Page
 3   Michael
     Plummer       Mr. Soto        7
 4
 5       E X H I B I T S
 6   Plummer     Description      Page
 7   Exhibit 1  Notice of Deposition     7
 8   Exhibit 2  Expert Witness Report of  96
         Michael Plummer
 9   Exhibit 3  Victor Wiener's Expert Report 214
         in this Chapter 9 proceeding
10   Exhibit 4  Article prepared by Zhang Yi 228
         entitled "Review of Expert
11       Witness Report of Michael
         Plummer, Artvest Partners,
12       Dated July 8, 2014"
13   Exhibit 5  Article by Katherine Boyle  236
         from the Washington Post,
13       dated October 6, 2013,
14       entitled "Poor Detroit: What
         money giveth, It can taketh
15       away"
16
     (Original exhibits retained by the Court
17   Reporter to accompany the transcript)
18
19   (*r)  DOCUMENTS REQUESTED:
20       Page:  81   Line:  18
         Page: 164   Line:  7
         Page: 169   Line:  5
21
22
23
24
25
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Michael Plummer

THE VIDEOGRAPHER:  This is media unit number 1 in the video deposition of Michael Plummer, in the matter of In Re:  City of Detroit Michigan, Debtor, in the United States Bankruptcy Court for the Eastern District of Michigan, Case Number 13-53846.

This deposition is being held at Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York on August 1, 2014 at approximately 9:03 a.m.

My name is Jose Rivera from the firm of Elisa Dreier Reporting Corp., and I am the legal video specialist.  The court reporter is Roberta Caiola, in association with Elisa Dreier Reporting Corp., located at 950 Third Avenue, New York, New York.  For the record, will counsel please introduce themselves.

MR. IRWIN:  Geoff Irwin, with Jones Day, on behalf of the City of Detroit and the witness.

MR. O'REILLY:  Arthur O'Reilly, on behalf of the Detroit Institute of Arts.

MR. RUEGGER:  Arthur Ruegger, from Dentons, on behalf of the Retirees Committee.

Michael Plummer

MR. SOTO:  I'm Ed Soto and this is Debora Hoehne, we're here from Weil Gotshal & Manges on behalf of FGIC.

THE VIDEOGRAPHER:  On the phone?

MR. SOTO:  Does anyone on the phone want to make an appearance?

MR. PATTWELL:  Michael Pattwell, Clark Hill, on behalf of the Detroit Retirement Systems.

MS. BUONOME:  Lauren Buonome, of Jones Day, on behalf of the City.

MR. ARNAUD:  Hiram Arnaud, from Chadbourne & Parke, on behalf of Assured Guaranty Municipal Corporation.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

THE COURT REPORTER:  Raise your right hand please.  Do you swear the testimony that you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes, I do.

MICHAEL PLUMMER, having been duly sworn by the Notary Public, Roberta Caiola, was examined and testified as follows:

Michael Plummer

EXAMINATION BY MR. SOTO:

Q.    Mr. Plummer, my name is Ed Soto.  Could you please state your full name for the record?

A.    Michael John Plummer.

Q.    Now I'm going to hand you what has been marked as Exhibit 1.

(Plummer Exhibit 1, Notice of Deposition, marked for identification.)

Q.    Which is a copy of the Notice of Deposition that you were served with in this matter.  Have you seen this before?

A.    Yes, I have.

Q.    Actually, I'm only giving it to you because these exhibits were pre-marked, and if I don't give it to you then one is out of sequence and we have to re-mark them all.  You might want to take a quick look at it and make sure it's the same notice that you received?

A.    It looks to be the one.

Q.    Mr. Plummer, have you ever been deposed before?

A.    No, I have not.

Q.    Typically the way it works is I

Michael Plummer

will ask you a question, the court reporter will take it down, transcribe it in a magical way, and then we'll wait for your answer, and she'll also transcribe your answer.  It has to be done verbally and linear so that if I am talking I have to stop, then you get a chance to talk, then when you stop I get a chance to talk.

If I cut you off let me know, tell me.  I try to overcome that habit and I've done a good job of it, but sometimes not, she can't take two people down at the same time.

A.    I understand.

Q.    The other thing is I tend to be a nodder, sort of a grunter and a nodder and a huh guy, that's the way I naturally talk, but in transcription you have to speak verbally, you have to say yes, no, otherwise they won't take the nod.

Sometimes good reporters will actually say he nodded yes, at which point I will say that looked like a no to me and that creates the controversy, we don't want that, we want a straight clean record.

If at any time I ask you a question

2 (Pages 5 to 8)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 116 of 204

Michael Plummer

1 that you don't understand tell me. I am not an
2 expert in this area, you will soon see that, and
3 you are, or certainly purport to be. So there
4 may be some things that I am saying that you're
5 not understanding, say so, I will try to
6 rephrase it, we'll try to work at it. My goal
7 here today is to get a deeper understanding of
8 your expert report and your expert
9 qualifications and then move on from there.
10         If at any time you feel you want a
11 break you have a right to do that, just say so
12 and we'll be able to take a break, it's not a
13 marathon hopefully. It may be a marathon but it
14 certainly doesn't require no breaks. If you at
15 any time want to talk to your counsel you have a
16 right to do that as well.
17         Generally, I will ask you to finish
18 the question that's pending, but not always, so
19 just tell me if you have the urge to do that.
20 Finally, if there is anything that you find an
21 hour into the deposition well, you know, I
22 forgot a guy's name that I should have told you
23 before, feel free to say I thought about the
24 question you asked me an hour ago.

Michael Plummer

1         I will assume that you're answering
2 the questions based on your personal knowledge,
3 unless you tell me so. If you do tell me it's
4 not my personal knowledge I may choose to go on
5 on that basis; otherwise we'll be assuming that
6 you're answering questions based on your
7 personal knowledge.
8         Is there any reason that you can
9 think of that you wouldn't be able to give a
10 full and complete and truthful deposition here
11 today?
12     A.    No.
13     Q.    So throughout the deposition I'll
14 use certain terms, and I want to make sure that
15 we have sort of the same understanding of those
16 terms because some of them are fairly general,
17 and you wouldn't have that same understanding
18 unless you were embedded in this litigation like
19 some of us.
20         When I refer to the "City" I'm
21 probably going to be referring to the City of
22 Detroit. If I'm not I'll let you know I'm
23 referring to another city. In the questioning
24 when I talk about the City or the Debtor it will

Michael Plummer

1 be Detroit.
2         When I refer to the DIA or the
3 museum, I'll be referring to the Detroit
4 Institute of Art Museum that's owned by the City
5 of Detroit. When I refer to the DIA Corp.,
6 which I'm not sure I will, but if I do it's the
7 nonprofit DIA Corp. that runs the Detroit
8 Institute of Art.
9         Sometimes I'll refer to the art or
10 the art collection, and I know in your world
11 there are many arts and art collections, today
12 I'll be referring to the art and the art
13 collection that's stored at the DIA museum.
14         Do those make sense to you?
15     A.    Yes.
16     Q.    Let me get started with some
17 background on you. Where did you go to school,
18 college?
19     A.    The Wharton School at the
20 University of Pennsylvania.
21     Q.    That was for what degree?
22     A.    A B.S. in economics.
23     Q.    Did you have any other majors,
24 other than economics?

Michael Plummer

1     A.    I had a minor in English literature
2 concentration.
3     Q.    When did you get your degree from
4 Wharton?
5     A.    1980.
6     Q.    Did you receive any postgraduate
7 education?
8     A.    No, I did not.
9     Q.    Do you have any formal art
10 training?
11     A.    I studied art at Penn, but I do not
12 have no other formal training.
13     Q.    Do you have any formal art
14 appraisal training?
15     A.    No, I do not.
16     Q.    Are you a licensed or certified
17 appraiser?
18     A.    I am not.
19     Q.    Are there such things, licensed and
20 certified appraisers?
21     A.    There are; not licensed but
22 certified.
23     Q.    Do you have any other professional
24 licenses or certifications?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

Michael Plummer

A.   I actually have a real estate salesperson's license.

Q.   Are you a member of any professional organization?

A.   I am a founder of the Art Investment Council.

Q.   What is the Art Investment Council?

A.   The Art Investment Council is a not-for-profit group that promotes best practices in the art investment industry in art investment.

Q.   When did you start?

A.   In 2010 I believe, some time in that time frame.

Q.   Why did you start it?

A.   My business partner and I started it because we felt that there was a need for this because there was a lot of misinformation about art investment, and we started it to create a place to exchange knowledge and raise the standard of practices and discussion about art investment.

Q.   How many members does the art investment council have?

Michael Plummer

A.   I don't remember exactly.  It may be about 20 something.

Q.   Are these scattered around the country?

A.   No, it's focused here in New York City.

Q.   How often does the Art Investment Council meet?

A.   We have not had meetings for about a year because my partner and I have had other obligations.

Q.   When you refer to your partner who are you referring to?

A.   His name is Jeff Rabin who co-founded Artvest Partners with me.

Q.   Have you through the Art Investment Council promulgated any standards for art investment?

A.   Promulgated standards, no; but we have discussed issues like transparency and art investment fund practices and other things.

Q.   Have you published anything through the Art Investment Council?

A.   I don't believe so.

Michael Plummer

Q.   Do you have a site online or anything like that?

A.   We do have a website.

Q.   What's that website?

A.   I think it is the ArtInvestmentCouncil.com.

Q.   Do you believe that any of your work with the Art Investment Council is relevant in connection with your proposed testimony in this action, the Detroit bankruptcy proceedings that we're here on for this deposition?

A.   I think the experience that led to my founding the Council is relevant.

Q.   In what way?

A.   In my knowledge of art investment and my understanding of the art world and my understanding of practices around that.

Q.   I think we'll get to that during this deposition, if we don't we can come back to it.

A.   Okay.

Q.   What about your employment history. After college, where did you first work?

A.   I started at Sotheby's in the

Michael Plummer

treasury department.

Q.   What does the treasury department at Sotheby's do?

A.   The treasury department extended credit and approved buyers.  My job was an account manager and I managed relationships with dealers, meaning members of the trade and clearing them for trade credit, collecting money from them.

Q.   How long --

A.   Sorry, also managing an art loan.

Q.   That's interesting.  How does one manage an art loan?

A.   You make interest calculations, you manage the inventory, you make sure that insurance payments are made by the dealers, you manage sales of property to pay down principal, you do inventories of the collection that are held in-house.

Q.   How does it work, does a person get a loan based on the art as collateral, is that essentially it?

A.   Yes, correct.

Q.   Who holds the collateral?

Michael Plummer

A. Generally speaking, in this case it is the auction house or the lender.

Q. So how long were you employed in Sotheby's treasury department?

A. I think probably about 3-1/2 years.

Q. What department did you move on to after that?

A. I moved on to become being the business manager for the Asian Art division.

Q. What were your duties as the business manager of the Asian Art division?

A. Basically, there were many duties, but the most important one was doing financial forecasts for the company, for that area of the company. So I would work with the specialists and get their estimates for upcoming sales, and then work with them to set the values of those sales on which the business would make its decisions for operating expenditures and financial forecasts. It was not dissimilar to working with a group of experts on an appraisal.

Q. In connection with your work as the business manager did you perform appraisals?

A. No, I did not.

Michael Plummer

Q. Did you work with people who performed appraisals?

A. I did.

Q. Did you manage them?

A. I did manage them, yes.

Q. Was that your first experience working with art appraisers?

A. Well, as an account manager in the treasury department I also had a close relationship with the experts. So I did work with them in that capacity as well.

So, for instance, with that art loan that was reliant on appraisal of that art, and those appraisals had to be updated and I had to get those appraisals from the experts.

Q. The experts are the appraisers?

A. Yes.

Q. You call them the experts. Is that what they're called in the industry?

A. Well, they used to be called that and I still hold on to that old terminology; they now call them specialists.

Q. That's interesting, the experts. Nobody calls me that. Let's see, where were we.

Michael Plummer

Q. So you were the business manager overseeing the Asian Art for how long?

A. I believe it was around three years.

Q. After your term as the business manager of Asian Art what was your next job at I guess Sotheby's?

A. I moved over to the real estate division and worked closely with the CEO and CFO of Sotheby's to restructure the real estate company.

Q. What was the year you moved over to the real estate division?

A. I haven't looked at my resume for a while, but I think it was maybe '88, somewhere around there.

Q. So working backwards, it would have been about '85 that you began at Asian Art?

A. Yeah. Asian Art was not just Asian Art, it was also books and manuscripts and other departments, but it was called the Asian Art division; it was a catchall for various categories.

Q. Those categories included what

Michael Plummer

forms of art?

A. They included Asian Art, Ancient Art, African Art, what was then called Arcade, books and manuscripts, prints, photographs; so it was a rather large part of the company.

Q. What does Arcade include?

A. Arcade was the low end sales area of the business.

Q. What does that mean, the low end sales area?

A. It was, you know, estate property that was a catchall. It was stuff that was not put in dedicated specialist sales.

Q. So then it would have been about '82 when you were starting at the treasury department?

A. No, it was 1980.

Q. So it was '80?

A. The fall of 1980.

Q. If that was '80, then it would have been about '83 that you started in the Asian Art division?

A. Maybe towards the end of '83.

Q. Okay. Then you were there three

5 (Pages 17 to 20)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 119 of 204

Michael Plummer

1  years so it could have been '87, '88 that you
2  started at Sotheby's?
3     A.   Yeah, that sounds about right.
4     Q.   What did you do in '87, '88 for the
5  real estate division?
6     A.   It was actually up through '91.  I
7  worked, as I said closely, with the CFO and the
8  CEO of Sotheby's to restructure the real estate
9  company in preparation for Sotheby's going
10  public.  It was critical that it be turned into
11  a profit-making company after many years of not
12  being successful.
13        So we were a small team that turned
14  it around and made it into a profitable venture,
15  and created the business model under which it
16  still operates today.
17     Q.   What is that business model?
18     A.   Well, I don't want to get into
19  revealing too much proprietary information, but
20  it was a restructuring of its licensing model
21  and its local brokerage operations and how they
22  function.
23     Q.   When you were with the real estate
24  division of Sotheby's from 1987 or '88 through

Michael Plummer

1  1991, did you work with art appraisers?
2     A.   During that period, no.
3     Q.   Did you do any art appraisal
4  yourself during that period?
5     A.   No.
6     Q.   So after 1991 and your work with
7  the real estate division of Sotheby's, what did
8  you do next?
9     A.   I then was recruited back to the
10  auction company to help them get control of
11  their expenses in marketing in light of the
12  recession that we were in, and I was ultimately
13  put in charge of marketing.
14     Q.   Did you call it the auction
15  division?
16     A.   Well, it was the auction company,
17  the auction subsidiary.
18     Q.   What was the role of the auction
19  subsidiary?
20     A.   To sell art.  I was managing the
21  marketing department, initially certain aspects
22  of it and ultimately the entire department which
23  promoted the sales, the auction sales.
24     Q.   What were your duties when you went

Michael Plummer

1  back to the auction subsidiary in connection
2  with the marketing; what marketing functions did
3  you do?
4     A.   Managing sales, I'm sorry, managing
5  advertising, managing the production of
6  catalogs, managing the subscriptions, managing
7  promotion, managing marketing relationships with
8  all of the specialists and their plans for their
9  various auctions.
10     Q.   In connection with tasks that you
11  just described, the advertising, the catalogs,
12  the subscriptions, the promotion and the
13  marketing relationships with specialists; which
14  of those tasks would you say put you in closest
15  contact with appraisal of artwork?
16     A.   I did not -- that was -- appraising
17  was not part of my career at that point.
18     Q.   When you went back to the auction
19  company in '91, how long did you stay in the
20  management of the marketing of that department?
21     A.   Until the end 'of 95.
22     Q.   So from '91 to '95 you managed the
23  marketing department of the auction subsidiary?
24     A.   As I said, initially in '91 I

Michael Plummer

1  managed certain departments in marketing.  By
2  '93 or so I was in charge of the division.
3     Q.   During that entire period of time,
4  those four years, you were not involved in any
5  art appraising, is that correct?
6     A.   No, I was not.
7     Q.   You didn't oversee any art
8  appraisers at that time?
9     A.   No, I did not.
10     Q.   During that period -- well, let's
11  keep going.  What did you do next?
12     A.   Well, I mean what I did do was
13  oversee budgets related to the marketing and the
14  sales, and worked with the business managers of
15  which I was one, which was a critical part of
16  the cost control.  It was very critical to that,
17  that I was on top of what the sales were and the
18  sales forecasting, because the marketing
19  expenses were closely related to the anticipated
20  sales results, which goes back to the forecasts
21  done with the experts.  So I was working closely
22  with the experts and their valuations.
23     Q.   Their overarching evaluations?
24     A.   They are both overarching and also

Michael Plummer

1
2 on an individual basis, because individual works
3 of art can have a significant impact on the
4 sale.
5         You get one or two objects or a
6 certain collection and then you have to do
7 marketing around those collections based on the
8 values that are put on them.
9     Q.    Did you ever get involved in
10 directing a specialist, and again I'll use the
11 same terms you're using; but for the purposes of
12 this record whenever we use specialist or
13 sometimes experts we'll be referring to
14 appraisers, correct?
15        That works for me if that works for
16 you.
17     A.    I don't know.  Even at an auction
18 house I wouldn't refer to a specialist as an
19 appraiser.  They do appraisal work, but their
20 primary job is as a specialist filling sales.
21 So I'm not sure if that does work.
22     Q.    Okay.  Then maybe you can explain
23 it to me.  Are there below the specialists who
24 or working with the specialists, and I don't
25 know why I said below, it could be sideways,

Michael Plummer

1
2 upwards, I don't care.
3        Are there people who work with
4 specialists whose main job is the appraisal of
5 art?
6     A.    Both Sotheby's and Christie's have
7 appraisal departments that manage the
8 appraisals, and they often have generalists in
9 those departments that do preliminary appraisal
10 work, and then they take that work to the
11 specialists in the various departments and get
12 them to opine and final size valuations.
13     Q.    So, if I'm misunderstanding you let
14 me know.  So there would be a specialist in a
15 given genre of art, correct?
16     A.    Yes.
17     Q.    That specialist could go to someone
18 at Sotheby's, since we're working through your
19 period at Sotheby's so let's use that as an
20 example, someone at the Sotheby's appraisal
21 group?
22     A.    Right.
23     Q.    And say we're looking at a certain
24 piece of art in this genre, do you have a person
25 whose area of specialty in this genre to

Michael Plummer

1
2 appraise this art, is that how it would work?
3     A.    Take for example an antiquity
4 collection, there would be a generalist who
5 would have done some preliminary work in the
6 appraisals department, and then they would go to
7 the specialist in antiquities and then walk
8 those numbers, those items, item by item or
9 leave it on their desk and pick it up later,
10 depending on the situation and the relationship
11 with that specialist.
12     Q.    Would the generalist in your mind
13 be considered an appraiser?
14     A.    Yes, sometimes; sometimes not.
15     Q.    When would he be considered an
16 appraiser?
17     A.    Well, if he had done other
18 appraisals and had been hired for that purpose.
19 There might also be a junior person who might be
20 in training.
21     Q.    So if you went to the appraisal
22 department at Sotheby's and talked to a
23 generalist, would you consider that person an
24 appraiser?
25     A.    Possibly.

Michael Plummer

1
2     Q.    Again, what would the possibilities
3 be?
4        Sometimes they wouldn't be an
5 appraiser?
6     A.    Depending on who you're talking to
7 in the department it could be -- you have a
8 department that has different staffs so there
9 could be an administrator there, there could be
10 a secretary.
11     Q.    The specialists that you referred
12 to in your description, your example, so the
13 generalist may or may not be an appraiser and
14 then he goes and he talks to a specialist.  Is
15 that specialist an appraiser?
16     A.    Again, I think that I would refer
17 to them as a specialist, not an appraiser,
18 because their primary job is not doing
19 appraisals, it's filling a sale, but they do do
20 appraisal work.
21     Q.    The reason why you go to that
22 specialist is because they have specialized
23 knowledge about the value of that art?
24     A.    Correct.
25     Q.    The specialized knowledge of the

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Michael Plummer

1  value of that art would be used in forming the
2  appraisal, correct?
3      A.    Correct.
4      Q.    So you were in marketing and had
5  the relationships that you just described in
6  your marketing period of '91 to '95. What
7  happened next?
8      A.    I left Sotheby's to run the U.S. --
9  the sales area of the U.S. division of
10  Acoustiguide, which was at the time the leading
11  audio tour provider to museums like the
12  Metropolitan Museum of Art, MoMA, the Boston
13  Museum of Fine Arts.
14          All were clients of mine and I
15  developed relationships with all of those
16  museums and worked with them on their
17  exhibitions, their temporary exhibitions and
18  their tours for their permanent collections.
19      Q.    That was called Acoustiguide?
20      A.    Acoustiguide, yeah.
21      Q.    Can you spell that for the record?
22      A.    A-c-o-u-s-t-i-g-u-i-d-e.
23      Q.    So you worked with Acoustiguide for
24  how long, from '95 to '96?

Michael Plummer

1      A.    For one year.
2      Q.    During that year with Acoustiguide
3  did you do any art appraisal?
4      A.    No.
5      Q.    Did you work with any art
6  appraisers?
7      A.    No.
8      Q.    You mentioned that you had gotten
9  to know people at various museums.
10          Did you get to know anybody at the
11  Detroit Institute of Art?
12      A.    No, they were not a client.
13      Q.    So after '96 what did you do?
14      A.    I went to work with a group called
15  Carbone Smolan Agency that we did the -- they
16  had worked with -- I had hired them to do the
17  re-branding of Sotheby's, when I was running
18  marketing at Sotheby's, and I worked with them
19  on a number of branding projects for financial
20  firms, as well as re-branded Christie's.
21      Q.    Can you spell the name of that
22  company for the record he were?
23      A.    Carbone, C-a-r-b-o-n-e; Smolan,
24  S-o-m, sorry, S-m-o-l-a-n Agency.

Michael Plummer

1      Q.    How would you describe the work
2  that they do, are they just re-branding
3  specialists?
4      A.    Re-branding marketing and design
5  communications.
6      Q.    How long were you with them?
7      A.    Approximately three years.
8      Q.    So until about '99?
9      A.    Yeah, that sounds right.
10      Q.    During that period from '96 to '99,
11  or those three years, did you work on any art
12  appraisal projects?
13      A.    I did not, but I did work closely
14  with Christie's and Christie's senior
15  management.
16      Q.    What was your work with Christie's?
17      A.    I was working with them to help
18  them determine what identity they wanted for the
19  company and how they were re-envisioning the
20  company for the future. So I worked closely
21  with the CEO and president, and even at one
22  point the new owner, Mr. Pinault.
23      Q.    Can you spell his name for the
24  record?

Michael Plummer

1      A.    Pinault, P-i-n-a-u-l-t.
2      Q.    You mentioned the CEO and the
3  president. Who was the CEO?
4      A.    Christopher Davidge.
5      Q.    Who was the president?
6      A.    Patty Hambrecht.
7      Q.    Your work with them, did it involve
8  any art appraisals?
9      A.    No, it did not.
10      Q.    So we're now up to '99?
11      A.    Um-hum.
12      Q.    Where did you go after that?
13      A.    I became -- I was self-employed. I
14  founded a company to create an online trading
15  platform.
16      Q.    What was the name of that company?
17      A.    It was called -- ultimately it was
18  called Art Base, Inc.
19      Q.    How long did you do that?
20      A.    For about three years.
21      Q.    So until about 2002?
22      A.    2003.
23      Q.    2003. During your period of time
24  with Art Base, Inc. were you involved in any art

Michael Plummer

1 Michael Plummer
2 appraisal projects?
3     A.    Well, I did do due diligence on an
4 appraisal company to buy it.  It was actually
5 founded by a member of the triple A and was
6 designed to create online appraisal businesses,
7 do online appraisals.  It was in financial
8 distress and it was brought to me as something
9 to buy.  So I got -- you know, did a lot of due
10 diligence on the appraisal industry at the time,
11 as well as that company in particular.
12     Q.    The name of that company was?
13     A.    Eppraisals.
14     Q.    E dash praisals?
15     A.    I can't remember, it's been a
16 while.
17     Q.    Eppraisals was a company that you
18 said was founded by a member of the triple A?
19     A.    I believe so.
20     Q.    And what's the triple A?
21     A.    The Appraisals Association of
22 America -- Appraisers Association of America.
23     Q.    The Appraisers Association of
24 America, is that involved in the appraisal of
25 art?

1 Michael Plummer
2     A.    Yes.
3     Q.    Is that strictly involved in the
4 appraisal of art?
5     A.    I believe so.
6     Q.    Did you end up buying Eppraisals?
7     A.    No, I did not.
8     Q.    How long did you do the due
9 diligence on that?
10     A.    Several months.
11     Q.    Would you say three to four months?
12     A.    Possibly.
13     Q.    Any more?
14     A.    I don't remember, it's a long time
15 ago.
16     Q.    So other than that three or
17 four-month due diligence with Eppraisals, did
18 you have anything to do with art appraisals in
19 connection with Art Base, Inc.?
20     A.    I do not have -- I did not work on
21 any appraisals, but I had a number of clients at
22 Art Base, Inc. who were collectors and dealers
23 with whom I was very involved in their
24 collections and their inventories.
25     Q.    So what was Art Base, Inc.; would

1 Michael Plummer
2 you try to sell art online, buy art online; what
3 would you do?
4     A.    That was its ultimate ambition.  It
5 was a software program that collectors and
6 dealers used, as well as a database of art
7 prices which was used by appraisers, which is
8 why the Eppraisals company was a logical fit, it
9 made sense logically.
10     Q.    Did you develop the software
11 program?
12     A.    No, I did not.
13     Q.    Who did?
14     A.    I don't remember.
15     Q.    When you formed the company did you
16 acquire the software program?
17     A.    Which software program are you
18 referring to?
19     Q.    I asked you what Art Base, Inc.
20 does and you said its goal was to buy and sell
21 art, but initially it was a software program?
22     A.    Yes.  Okay.  You're referring to
23 the Art Base software, I was not sure if you
24 were referring to that or Eppraisals.  I did not
25 write that software though.

1 Michael Plummer
2     Q.    Did Art Base, Inc. own the
3 software?
4     A.    It did, yeah.
5     Q.    What ultimately -- you said you
6 worked with collectors and dealers.  In your
7 work with collectors and dealers did you do any
8 appraisals for them?
9     A.    No, I did not.
10     Q.    Did you work on any appraisal
11 projects for them?
12     A.    No, I did not.
13     Q.    Did you ultimately sell Art Base,
14 Inc. or did it just close down?
15     A.    We made a deal with the founders to
16 return it back to them.
17     Q.    The founders of Art Base, Inc., was
18 that a company?
19     A.    Yes, it was a company.
20     Q.    What was that company, the
21 founders?
22     A.    Their company was originally called
23 Art Base without the ink.
24     Q.    Were they based here in New York?
25     A.    Yes.

Michael Plummer

1  Q.   Are they still in business?
2
3  A.   Yes, they are.
4  Q.   Do they have a website?
5  A.   Yes, they do.
6  Q.   Do you know the site?
7  A.   I think it's Art Base.  I don't
8  know, I haven't been there for years.
9  Q.   ArtBase.com?
10  A.   Probably, possibly.
11  Q.   After 2003 what did you do?
12  A.   In 2003 I joined a company called
13  Fernwood Art Investments as the chief operating
14  officer and president.
15  Q.   That's F-e-r-n-w-o-o-d.  So Exhibit
16  B to your report, your CV says that you were
17  there from 2003 to 2006?
18  A.   That sounds right, yes.
19  Q.   Were you the CEO?
20  A.   I was the president and COO.
21  Q.   Who was the CEO?
22  A.   A man by the name of Bruce Taub.
23  Q.   In your work as the president and
24  COO of Fernwood did you do any work in art
25  appraisals?

Michael Plummer

1
2  A.   No, we did not do art appraisals,
3  but we did some of the most I would say
4  pioneering work in analysis of the art sectors
5  and their behavior over the previous 25 years,
6  which was considered groundbreaking at the time.
7  Q.   By the way, just so you know, this
8  is her typing so I get to read it if I can't
9  remember exactly what you said.  There's no
10  special tool here other than her typing.
11  So when you refer to your
12  pioneering work and analysis in the art sectors,
13  what are you referring to?
14  A.   I'm referring to a report that we
15  issued with our in-house economist which
16  described the performance of the different
17  sectors of the art market, which I refer to in
18  my expert report, such as the American Art
19  sector, the Impressionist and Modern Art sector,
20  those various sectors, and their behavior over
21  time, their growth in value, their decrease in
22  value, their investment attributes, their
23  volatility, their performance against the stock,
24  the equity markets, the S&P, other such things,
25  and their viability as investments and their

Michael Plummer

1
2  volatility.
3  Q.   So in connection with that study,
4  the report that you just referred to in your
5  testimony, did you determine that there were
6  certain genres of art that were more volatile in
7  terms of --
8  A.   We did.
9  Q.   In terms of the nature of the
10  investment?
11  MR. IRWIN:  Let him finish his
12  question.
13  Q.   In doing that study or making that
14  determination, did you work with art appraisers?
15  A.   We worked with art specialists who
16  did appraisal work from time to time.
17  Q.   Those art specialists that did
18  appraisal work from time to time, what
19  information did they give you that was
20  ultimately used in your report?
21  A.   They helped us choose the artists
22  who are used as part of the indices that we
23  created; they validated the results of the
24  report; they were a sounding board and quality
25  check to the process.

Michael Plummer

1
2  Q.   In validating the results, what are
3  you referring to?
4  A.   Well, for example, we had signed up
5  as our expert team some of the leading dealers
6  in the industry.  Take for example David Nash
7  who was a -- is a leading impressionist and
8  modern dealer, we would share the information we
9  compiled and our analysis, and he had been in
10  the industry at that time, he had run the
11  department at Sotheby's for 30 some years, and
12  he would validate the conclusions that we were
13  coming to, as would various other specialists in
14  those various categories.
15  Q.   Would you consider David Nash a
16  specialist who you believe does appraisals?
17  A.   I think he has done appraisals from
18  time to time, but his core work is running his
19  gallery and selling art; but he is one of the
20  most knowledgeable people that I would turn to
21  for that sort of information.
22  Q.   In connection with your report on
23  volatility or your report in general, which
24  included some information on volatility; did you
25  update that report over the years?

Michael Plummer

1
2      A.    I did in a different form when I
3  moved to Christie's.  We used that work at
4  Christie's as the foundation for our work for
5  creating an art fund with Goldman Sachs and used
6  that work, shared that work with Goldman Sachs
7  who vetted it.
8      Q.    I'll get to that chronologically as
9  we move on.
10     A.    Sure.
11     Q.    The first report came out in what
12 year?
13     A.    Maybe 2004 or '05.
14     Q.    When did you update it?
15     A.    Probably 2007, '08.
16     Q.    So you updated it after you left
17 Fernwood?
18     A.    Yes.
19     Q.    In connection with the work you
20 just described that you did the Fernwood, you
21 created this pioneering report.  What else did
22 you do?
23     A.    We also structured two art funds
24 and I hired the specialist staff for Fernwood,
25 who were the advisors to Fernwood on -- would

Michael Plummer

1
2  have been for the purchases of art for the fund.
3      Q.    Let's break that down.  So you
4  structured two art funds?
5      A.    Right.
6      Q.    Let's just take them one at a time.
7  What was the first?
8      A.    The first was a sector fund which
9  was devised to invest across the different
10 sectors of the art market, from Old Master
11 paintings up through emerging contemporary art.
12     Q.    An art fund is essentially what, a
13 collection of funds that is intended to be
14 invested in art?
15     A.    They can take many forms, but in
16 this instance it was a fund devised to accept
17 investments at a minimum of $250,000 up to I
18 think 1 million.  That would be put into a pool,
19 that would be used to invest art and the art
20 would be held or was anticipated to be held for
21 about five to eight years.
22     Q.    And then to be sold off for profit?
23     A.    Correct.
24     Q.    How long did you say?  I should be
25 able to find it here, five to eight years?

Michael Plummer

1
2      A.    Yes.
3      Q.    Is that the typical cycle that you
4  need to hold art in order to make the kind of
5  profits you're looking for?
6      A.    Some would hold it for longer.
7  There were constraints on investor expectations
8  on getting returns, so we went out with five to
9  eight years for marketing purposes, but we had
10 the ability to extend the holding period to
11 maximize returns.
12     Q.    In your first art fund how much did
13 you raise?
14     A.    We didn't because the art fund ran
15 into trouble.
16     Q.    What was that?
17     A.    I uncovered malfeasance on the part
18 of the CEO, that he had taken investor funds
19 from the company and used them for his personal
20 means.
21     Q.    This is the company Fernwood?
22     A.    Yes.
23     Q.    So the first art fund you formed
24 didn't really get off the ground?
25     A.    No.

Michael Plummer

1
2      Q.    What about the second one?
3      A.    The company went under.  There two
4  funds at that time, we had gotten an approval
5  from Merrill Lynch and gone through due
6  diligence with them, but unfortunately I
7  uncovered the malfeasance on the part of the CEO
8  and collectively myself and the specialists
9  resigned from the company.
10     Q.    So neither of the art funds that
11 you formed really got off the ground?
12     A.    No.
13     Q.    You have to say more than nod?
14     A.    Okay.  No.
15          MR. SOTO:  We've been going about
16 an hour, do you want to take a break?
17          THE WITNESS:  Yes, sure.
18          THE VIDEOGRAPHER:  The time is 9:52
19 a.m., and we're going off the record.
20          (Off the record)
21          THE VIDEOGRAPHER:  The time is
22 10:03 a.m., and we are back on the record.
23 BY MR. SOTO:
24     Q.    Mr. Plummer, I was interested in
25 your description of the work that you had done.

Michael Plummer

1          Michael Plummer
2          Is there a way I can get a copy of
3   that report that you referred to, the pioneering
4   report?
5       A.   I don't know.  I'd have to look for
6   it, it's quite old.
7       Q.   It depends what you mean by old.
8   It should be somewhere around 2004 or 2005, so
9   it would be about a decade old maybe?
10      A.   Yeah, but a lot of the firm's stuff
11  is in storage or disappeared because it went out
12  of business.
13      Q.   So you didn't keep a copy of the
14  report?
15      A.   I may have a copy somewhere, I
16  would have to look for it.
17      Q.   If you could I would appreciate it,
18  and I'll contact Geoff to see if we can get a
19  copy of it.
20          Again, you said it was updated
21  sometime around 2008 when you were working with
22  Christie's, correct?
23      A.   Correct.
24      Q.   If you can't find the original one,
25  maybe if you can find a copy of the updated one?

1          Michael Plummer
2       A.   Well, the updated one was
3   Christie's information that was not issued
4   publicly, but used for its clients.
5       Q.   So we can probably ask someone at
6   Christie's to see if they have a copy of it,
7   correct?
8       A.   You could.  I'm not sure if they
9   kept records of that stuff.
10      Q.   Who did you work with when you were
11  at Christie's?
12      A.   I worked with Jane Chesworth who
13  was then the COO.  She has now left and Steven
14  Mendel who has also departed.
15      Q.   Did you ever work with an
16  individual named Paul Provost?
17      A.   At Christie's, yes.
18      Q.   Would he have been knowledgeable
19  about the updated report that you were referring
20  to in your testimony?
21      A.   I don't know.
22      Q.   So we will be sure to ask him.
23  Moving on.
24          So the two structured art funds
25  that didn't get off the ground were one thing

1          Michael Plummer
2   you did during your period at Fernwood.  What
3   else?
4       A.   As I said, I believe I said I hired
5   the specialist team that we were employing to
6   make the selections for the art investment, to
7   work with us.
8       Q.   That was when you started there in
9   2003 that you started to hire the team?
10      A.   Um-hum.
11      Q.   How many people were in that team?
12      A.   I believe it was around eight or
13  nine.
14      Q.   These eight or nine specialists as
15  I refer to them, were any of them appraisers?
16      A.   I think some of them did appraisal
17  work from time to time, but more importantly
18  they were transactional experts in that they
19  were deeply embedded in the industry and had a
20  lot of transactional experience, knew how to
21  establish values for investing in art.
22      Q.   When you say "establish values for
23  investing in art," what do you mean?
24      A.   I mean making sure that we were
25  purchasing art that was at the right price that

1          Michael Plummer
2   the works would appreciate and give a return to
3   investors.
4       Q.   How do you establish values for
5   investment in art, what's the first step that
6   you take?
7       A.   Well, it's very similar to the
8   appraisal process, you would look at
9   comparables.
10      Q.   So you would start by looking at
11  comparables.  Then what else would you do?
12      A.   You would, well you'd look at the
13  subject work and you would examine it closely to
14  determine if it was what it purported to be, or
15  reported to be.  Then you might have a
16  discussion, or might not depending on the
17  circumstances, with others in the industry about
18  information that might not be publicly
19  available.
20      Q.   What type of information?
21      A.   Other items that might be for sale
22  other places or on consignment, or might just
23  have been sold but not reported publicly.
24      Q.   So other sales?
25      A.   Other sales, other pending sales or

Michael Plummer

1 other consignments of similar works.
2     Q.    When you use the word consignment
3 can you tell the Court what you're referring to?
4     A.    Consignment is when a work of art
5 is given to a dealer or an auction house to be
6 sold, but the ownership of it is still retained
7 by the original owner and the title does not
8 pass until a bill of sale happens or an auction
9 occurs and the hammer falls.
10     Q.    So in connection with establishing
11 value they would look at some comparables, they
12 would validate that the work is authentic I
13 assume is what you were saying?
14     A.    Yes.
15     Q.    And then they would look at other
16 sales that might not be public or other pending
17 consignments?
18     A.    Correct.
19     Q.    That's the work of the specialists
20 that you referred to?
21     A.    Right.
22     Q.    How would you distinguish that from
23 the work of an appraiser?
24     A.    I don't know that there is much to

Michael Plummer

1 distinguish except that they're not issuing an
2 appraisal report, but they are doing a valuation
3 that is critical to making and spending money,
4 making an investment on a work of art.
5         What they're not doing is making
6 any distinctions between fair market value or
7 other such things.
8     Q.    I see the distinction.  So one of
9 the distinctions is they're not preparing an
10 actual appraisal report?
11     A.    Correct.
12     Q.    The other one would that they're
13 not making distinctions in a form of appraisal,
14 for example, a fair market value appraisal or an
15 auction estimate appraisal?
16     A.    Correct.
17     Q.    But other than that they're valuing
18 the art in similar fashion, correct?
19     A.    They are actually establishing a
20 fair market value, they're just not labeling it
21 such and they're not issuing a report labeling
22 it as such.
23     Q.    Understand.  So we are somewhere in
24 2000, we're back at Sotheby's.  Where are we, at

Michael Plummer

1 2003 maybe.  No, 2006.  You're done at Fernwood.
2 Where do we go in 2006?
3     A.    In 2006 I had a certain number of
4 months off because Fernwood collapsed
5 unexpectedly, but then I was hired by
6 Christie's.  They had been fascinated by -- the
7 CEO of Christie's had been fascinated by the
8 work I had been doing at Fernwood and they hired
9 me to bring that over to Christie's and develop
10 an art fund and an art lending business for
11 Christie's, because Christie's had not had an
12 art lending business prior to that even though
13 Sotheby's had.
14     Q.    So in 2006 or so when you went to
15 Christie's they didn't have any art funds?
16     A.    No.
17     Q.    And they didn't have any art
18 lending business?
19     A.    No.  They did have some art loans,
20 but it was one-off situations and done for
21 client relations, but they did not have an art
22 lending business.
23     Q.    So when you got to Christie's what
24 department did they put you in or what did you

Michael Plummer

1 do?
2     A.    It was a new division that I was
3 hired to create and it was called Christie's
4 Financial Services, and I was made Senior Vice
5 President and Chief Operating Officer of the new
6 division.
7     Q.    Senior VP and COO?
8     A.    Um-hum.
9     Q.    What were your responsibilities as
10 the senior VP and chief operating officer of
11 Christie's financial services?
12     A.    I had two different branches of
13 responsibilities.  One was to implement a best
14 practices for underwriting art loans, also
15 overseeing the adoption of KYC, know your client
16 practices, and developing relationships with
17 potential lending partners, other banks that
18 would provide credit to use for the loans.
19         Then on the other side I was -- the
20 other main division of responsibility was
21 developing an art fund or a series of art funds
22 for Christie's, in partnership with Goldman
23 Sachs.
24     Q.    In terms of your first area of

13 (Pages 49 to 52)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 127 of
204

Michael Plummer

1 responsibility you mentioned implementing best
2 practices.
3
4 What were those best practices?
5 A. Well, they were -- they were
6 understanding the art as collateral. Christie's
7 was used to using art for auctions, but it was
8 working with them and their appraisals
9 department and their specialists to develop the
10 right kind of approach to doing valuations for
11 art loans.
12 Because when an auction house does
13 an art loan they're doing it, what you would
14 call it's a non-recourse loan in effect; so they
15 have to be certain that they have setting the
16 right values on the property so that if they
17 have to liquidate it they won't take a loss.
18 It's a little bit different than
19 doing a general appraisal or an auction
20 estimate, because there is a higher level of
21 risk for the auction house.
22 Q. The higher level of risk is that
23 you could sell the art; you might not get the
24 value of the loan and you have no recourse
25 against the individual?

Michael Plummer

1
2 A. Correct.
3 Q. So all of the loans that you were
4 working with were non-recourse to the individual
5 borrower?
6 A. They might have recourse language
7 in them, but the effect is if they were
8 borrowing from an auction house, often the
9 reality is that it is non-recourse.
10 Q. Because they don't have resources
11 to back anything, is that your point?
12 A. Correct.
13 Q. You say you worked with the
14 appraisal department and the specialists in
15 connection with formulating these best
16 practices.
17 What input did the appraisal
18 department or specialists have with respect to
19 the best practices?
20 A. Well, we were more or less telling
21 them what we needed from them, how they needed
22 to be different. They weren't really giving
23 input back to us, except that they were worried
24 about their additional workload and staffing
25 needs, but we were telling them how we needed

Michael Plummer

1
2 them to do things for us.
3 Q. What would you need from the
4 appraisal department for an art loan that was
5 different than, for example, what the appraisal
6 department would do for an auction?
7 A. In terms of -- I think I just said
8 that it was -- they would need to consider the
9 fact that in their evaluation that they were
10 secure that they were giving a low and
11 conservative valuation in the event that if a
12 work defaulted or if the borrower defaulted that
13 Christie's would get its money back.
14 Q. So, in essence, you were telling
15 them that look, in connection with the work you
16 were doing with us on art loans, you have to be
17 very conservative in your estimates?
18 A. Correct.
19 Q. Any other differences?
20 A. Well, and if you think it won't
21 sell or it has potential to buy in we need to
22 know that, or a high potential to buy in.
23 Whereas, if Christie's is valuing property for
24 any auction house for a seller and that property
25 doesn't sell there is no risk to Sotheby's or

Michael Plummer

1
2 Christie's, it's the seller's risk. So it's --
3 Q. So the first -- finish, I'm sorry.
4 A. So it's just a different
5 consideration.
6 Q. I want to make sure I understand.
7 So one of the differences is there's a higher
8 risk, and you wanted to make sure the appraisers
9 were being conservative in their estimates
10 because of the higher risk?
11 A. Yes.
12 Q. The other difference is if
13 appraisers had some information regarding the
14 marketability or the lack of marketability of a
15 given piece of art, that they needed to share
16 that because it was important that you would be
17 able to sell the art as collateral if you needed
18 to?
19 A. Right. This is an instance where
20 BI considerations, bought-in considerations or
21 unsold considerations are taken into account,
22 when in general appraisal practices they are
23 not.
24 Q. That's an interesting phrase that
25 I'm not familiar with. BI considerations, or

Michael Plummer

1    buy-in as you put it before?
2      A.   Right.
3      Q.   What does that mean?
4      A.   It means a certain percentage of
5    property in nearly every auction remains unsold,
6    and it can vary from as little as 10 or
7    15 percent up to 35 or 40 percent.
8      Q.   What happens with that property in
9    connection with an auction that's just given
10   back to the owner, correct?
11     A.   Sometimes.  Sometimes it's marked
12   down and resold because the owner doesn't want
13   it back.
14     Q.   But sold at a lower price?
15     A.   But sold at a lower price.
16     Q.   So the phrase "buy-in" means?
17     A.   Bought in.  It technically means
18   that the auction house is buying something back
19   in the auction on behalf of the seller at a
20   preset reserved price.
21     Q.   That's new information to me.  So
22   sometimes in connection with an auction, an
23   auction house will have a preset price at which
24   it will buy some of that art?

Michael Plummer

1      A.   No, no, no, that's not what I am
2    saying.  It is a -- a reserve price is a
3    pre-agreed upon price between the auction house
4    and the seller, at which the auction house will,
5    in their language, buy it back on behalf of the
6    seller.  Meaning that they will take it back,
7    they will not sell it to somebody else below
8    that price so they will --
9     Q.   Hold it for the seller?
10     A.   Hold it for the seller.
11     Q.   And then the seller just gets it
12   back?
13     A.   Or re-offers it.
14     Q.   Or re-offers it in another sale?
15     A.   Correct.
16     Q.   So that's what you meant when you
17   talked about the BI factor?
18     A.   Correct.  It's just auction
19   terminology.  It's confusing, but that's how
20   they refer to it.
21     Q.   Again, one of the differences is
22   that in connection with an art loan, you want to
23   be sure you can sell the art if you are taking
24   it as collateral, correct?

Michael Plummer

1      A.   Yes.
2      Q.   So other than being conservative
3    and getting more information on the
4    marketability or the salability of a given art,
5    was there any other difference, any other input
6    that you would get from the appraisal
7    department?
8     A.   I don't recall.
9     Q.   What about from the specialists;
10   other than those two things, did you get any
11   other information from the specialists?
12     A.   Well, the specialists, we were
13   working to get them to promote lending to their
14   clients.  So we were looking at them as sales
15   partners in building the business for us, and we
16   would meet sometimes with their clients and them
17   to, you know, propose art loans.
18     Q.   In connection with these best
19   practices, and I don't know if this was part of
20   the practice at Christie's or part of your
21   practice; would you create a best practice
22   manual saying this is the way that we are going
23   to prepare to make an art loan and this is the
24   information we need if we're going to make an

Michael Plummer

1    art loan?
2     A.   We had a very, very extensive
3    underwriting manual.
4     Q.   That underwriting manual would
5    include what you had helped to put together in
6    terms of the best practices to make an art loan?
7     A.   As I remember it, but I haven't
8    read it for five years, seven or six years now.
9     Q.   Did you help put together that
10   underwriting manual?
11     A.   Yes, I did.
12     Q.   Was there one when you got there?
13     A.   No, there wasn't.
14     Q.   And you don't happen to have a copy
15   of that underwriting manual?
16     A.   No, I don't.
17     Q.   You also said in connection with
18   the implementation of the best practices you
19   developed relationships with lending banks.
20   What does that entail?
21     A.   I was looking for lending partners
22   who would provide additional capital for the
23   loans so we wouldn't have to use Christie's
24   balance sheet exclusively.

Michael Plummer

1    Q.    Were you able to find lending
2    banks?
3    A.    Yes.  There was one that was in
4    discussions with Christie's, deep in discussions
5    with Christie's by the time I left.
6    Q.    But before you left the
7    relationship hadn't finalized?
8    A.    It had not finalized.
9    Q.    So while you were there, to the
10   extent Christie's was making art loans it was
11   making it from its art capital?
12   A.    Yes.
13   Q.    The second thing you said you did
14   when you got to Christie's and helped from their
15   financial services department was develop a
16   series of art funds, correct?
17   A.    Yes.
18   Q.    How many art funds did you develop?
19   A.    We were working with Goldman Sachs
20   to initially develop four.  One similar to
21   the -- it was in essence an adaptation of what
22   we were doing at Fernwood.  The initial plan was
23   for four, one in the Impressionist and Modern
24   sector, one in the Post War sector and

Michael Plummer

1    Contemporary sector, and then one in the Old
2    Masters sector.
3    Then the fourth which we call the
4    Brick fund which was in emerging markets such as
5    Chinese art, Latin American Art, Russian and
6    Indian Art.
7    Q.    So you picked certain sectors of
8    art that you were going to try to create funds
9    for, correct?
10   A.    Correct.
11   Q.    Why did you pick those?  For
12   example, why would you pick Impressionist and
13   Post War and Old Masters and emerging markets?
14   A.    Well, as a selling strategy Goldman
15   was really going to be the distributor.  They
16   wanted to be able to have an array of products
17   to sell to their clients that had different risk
18   return attributes.
19   So, for instance, based on the work
20   that I had done at Fernwood we were able to
21   determine that based on that analysis of
22   volatility and risk and return we were able to
23   determine, for instance, that Old Masters were
24   less volatile than Contemporary and more stable,

Michael Plummer

1    but lower return.
2    And that Impressionist and Modern
3    fell somewhere in between Contemporary and Old
4    Masters, and that the Brick categories were much
5    higher risk, but potentially much higher return.
6    So like any kind of investment product, your
7    investor will choose which fit his investment
8    goals.
9    Q.    Did you start four art funds?
10   A.    Well, what ended up happening was
11   that that was -- the art fund projects began in
12   2007 in earnest, perhaps a little bit -- yeah,
13   in 2007.
14   As you may recall, in July of 2007
15   the financial credit market started seizing up
16   in July of 2007.
17   Q.    That would have been July of 2008,
18   and we know that date very well.
19   A.    No, no, no.  Actually, 2007 is when
20   the credit market started seizing up.  So we
21   went to -- let's see.  Then by 2008, July, of
22   course then the financial markets overall
23   started having an impact.
24   My now business partner and I who

Michael Plummer

1    were working at Christie's together on the art
2    fund went to the management of Christie's to
3    advise them to pull out of their guarantee
4    portfolio, because we predicted based on our
5    financial analysis that the market would crash
6    in the fall of 2008.
7    Unfortunately, we were disregarded
8    and Christie's had a very large guarantee
9    portfolio going into the fall of 2008.  It's a
10   matter of public record that the art market
11   crashed in the fall of 2008, along with the
12   seizing up of financial markets.
13   At that time we restructured the
14   art fund from being four funds to being one
15   fund, that would be an opportunistic fund based
16   on the realities of the current market
17   situation.
18   Q.    A very interesting period.  Again,
19   to make sure I get it right.  You began with
20   thoughts of having four art funds?
21   A.    Correct.
22   Q.    Structured along the lines of your
23   prior testimony and dealing with four different
24   genres of art based on the factors you testified

Michael Plummer

1 about earlier. You began that in 2007?
2 
3 A. Right.
4 Q. But because of credit markets and
5 later financial markets; did you actually raise
6 the funds, the four funds?
7 A. No. As I was saying, we dropped
8 the plan for the four funds and we restructured
9 it to be one fund.
10 Q. You did that in about 2008?
11 A. That would have been in January of
12 2009; December 2008, January 2009, and we went
13 to market in April -- late March, in March or
14 early April with the opportunity fund, the
15 distressed fund if you will, and we went to
16 Europe and met with leading investment firms in
17 Europe and, as you would say in the industry,
18 soft circled about a hundred million for that
19 fund.
20 Q. What does soft circled mean?
21 A. It means you have a verbal
22 expression of interest for a certain amount of
23 money without a signed agreement of funding.
24 Q. So December, January you formed the
25 one fund?

Michael Plummer

1 
2 A. Right.
3 Q. Were you still at Christie's?
4 A. Yes.
5 Q. You then went to market with that
6 one fund sometime in March or April of 2009?
7 A. Correct.
8 Q. Did you ever actually raise the
9 funds for that one fund?
10 A. No, we did not, because Christie's
11 made a decision a few weeks after that or around
12 that time that they had sufficient problems in
13 their core business based on that guarantee
14 portfolio, that they had to cut back and could
15 not make the seed investment in the art fund
16 that was required for the art fund to proceed.
17 Q. So beyond that, what else did you
18 do at Christie's Financial Services?
19 A. The funds and the lending business,
20 those are my primary responsibilities.
21 Q. Essentially, how many loans did you
22 bring to market for Christie's in the art
23 lending business?
24 A. Well, there were four loans with
25 Christie's while I was there. Then in the

Michael Plummer

1 spring of 2009, Christie's withdrew from both
2 
3 the lending business and the art fund business
4 because they contracted, as many firms did in
5 2009, and dropped many of their new initiatives.
6 Q. Those four loans, do you recall the
7 size of those four loans?
8 A. They were in the -- all in the
9 portfolio was -- you know, I think this is
10 proprietary information, I'm not sure I can
11 reveal this, but they were substantial.
12 Q. When you say "substantial" are you
13 saying seven figures?
14 A. More.
15 Q. So without naming any names, can
16 you tell me the size of these loans?
17 A. They were in the hundreds of
18 millions.
19 Q. Do you know if these loans were
20 ever paid back?
21 A. I heard that they were, yes.
22 Q. Have we completed your description
23 of your work at Christie's?
24 A. I believe so.
25 Q. So in 2009 did you leave

Michael Plummer

1 Christie's?
2 
3 A. I did.
4 Q. When in 2009?
5 A. Around that time, around
6 April 2009.
7 Q. Where did you go then?
8 A. I then founded Artvest Partners, my
9 current company.
10 Q. Since 2009 to the present, have you
11 been employed by or worked with Artvest
12 Partners?
13 A. I am a principal of Artvest
14 Partners, it is my firm.
15 Q. Have you worked with anybody else
16 during that period of time?
17 A. No.
18 Q. So your sole employment from 2009
19 to present has been with Artvest Partners?
20 A. Correct.
21 Q. Who else works with you at Artvest
22 Partners?
23 A. I have my partner, Jeff Rabin, who
24 was part of this financial services group at
25 Christie's with me working on the art fund. He

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 131 of
204

Michael Plummer

1 came with me into this venture and we founded it
2 as co-principals and partners.
3      Q.    How many people do you employ?
4      A.    At the moment we have one, a
5 full-time employee.
6      Q.    What does that person do?
7      A.    She assists us with our analysis.
8      Q.    Would you call her a specialist?
9      A.    No.  I mean she actually had worked
10 in the specialist department at Sotheby's and
11 she has a graduate degree from the NYU program,
12 but she's not -- I would say her -- she wears
13 many hats, so I'm not sure that I would call her
14 a specialist.
15      Q.    Would you call her an appraiser?
16      A.    I would not call her an appraiser.
17      Q.    Is Mr. Rabin an appraiser?
18      A.    No, he is not an appraiser.
19      Q.    The full time employee that you
20 referred to, does she have a name?
21      A.    Yes.  Anya Bemis, A-n-y-a,
22 B-e-m-i-s.
23      Q.    Has Anya ever been involved in the
24 sale of a substantial collection of art like

Michael Plummer

1 the -- say the art that was appraised by
2 Christie's for the DIA?
3      A.    You know, I don't remember all of
4 Anya's experience.  She has worked on projects
5 for us and she worked in the specialist
6 department at Sotheby's years ago, so I would
7 imagine in that capacity she did have some
8 experience on working on some collections.
9      Q.    So the collection that was
10 appraised by Christie's, you're familiar with
11 it?
12      A.    I'm sorry, are you referring to the
13 appraisal of the DIA collection?
14      Q.    The collection of art at the DIA
15 that was appraised by Christie's, are you
16 familiar with that?
17      A.    I am familiar with it.
18      Q.    Did you handle that appraisal in
19 connection with the preparation of your expert
20 report?
21      A.    We reviewed it, yes.
22      Q.    That would be about 1,700 or so
23 works of art that they appraised, correct?
24      A.    That would be.  We did not review

Michael Plummer

1 all 1,700, but we reviewed a number of the
2 objects that we felt were important and
3 relevant.
4      Q.    Have you ever been involved in the
5 sale of a collection of art the size that we
6 were just referring to, the 1,700 works of art
7 at the DIA?
8      A.    No, I have not been involved in a
9 sale of that magnitude.
10      Q.    Do you know if Anya has?
11      A.    I do not know.
12      Q.    Do you know if Jeff Rabin has?
13      A.    I do not know.  He was involved in
14 sales in Sotheby's -- in Christie's wine
15 department before he came to Artvest and worked
16 in financial services, so he may have.
17      Q.    Sales of wine?
18      A.    Sales of wine in Christie's wine
19 department.
20      Q.    Is sales of wine the same as sales
21 of art?
22      A.    They require expertise and there
23 are a lot of similarities, yes.  It involves
24 condition, it involves authenticity.  There are

Michael Plummer

1 a lot of very strong, compelling overlaps.
2      Q.    Is Mr. Rabin in his work at Artvest
3 continuing to be involved in the sale of wine?
4      A.    He is not.
5      Q.    Can you describe the business of
6 Artvest Partners for me?
7      A.    We advise clients on buying and
8 selling art; we set values for them in buying
9 and selling art; we from time to time write
10 about the art market and the performance of the
11 art market; we broker loans for clients and
12 assist them in setting the values for those
13 loans.
14           We negotiate with the auction
15 houses on behalf of clients for selling their
16 art at auction and setting values for that art.
17 We work with members of the trade and broker
18 deals and sell property directly on behalf of
19 clients.
20           Lastly, we also have an ownership
21 interest in an art fair, a significant ownership
22 interest in an art fair, and we have close
23 relationships with members of the trade who are
24 our clients and keep abreast of market

18 (Pages 69 to 72)

Michael Plummer

1 conditions through those relationships.
2
3     Q.    So the first thing you mentioned,
4 and I want to make sure I'm understanding it as
5 well, is advising the clients in the buying and
6 self art, correct?
7     A.    Um-hum.
8     Q.    How would it work?  A person would
9 be an owner of art and then would say well, I'm
10 considering selling this art, and they would
11 want to work with someone who knows more about
12 the market and about the value of the market and
13 the way it's working, and then they would come
14 to you as a consultant and an advisor, correct?
15     A.    Um-hum.
16     Q.    Do you charge by the hour or is
17 there a commission?
18     A.    It depends on the situation.  We
19 may charge a fixed fee, we may charge by the
20 hour or we may charge a transaction fee, or we
21 may just charge a combination of both.
22     Q.    So you're like a law firm there
23 then?
24     A.    I would never say that I was like a
25 law firm.

Michael Plummer

1
2     Q.    I could understand why.  Now, in
3 terms of the fees, the different types of fees
4 that you're charging, would there be one type of
5 client that you would charge by the hour,
6 another a fixed fee, another something else?
7     A.    I would say it's more defined by
8 the project and the needs of the project; every
9 project is different.
10     Q.    The advice that you give if a
11 client comes to you with a piece of art that
12 they're considering selling, do you first try to
13 determine the value of that art?
14     A.    Um-hum.  Yes, sorry.
15     Q.    Please don't be sorry, I do it all
16 the time.  When I point like that you just give
17 your verbal answer.
18         The issue of setting that value,
19 would you do it in the way you described
20 earlier, by trying to determine what maybe
21 comparables were and then trying to determine
22 what the market situation is for that particular
23 type of art?
24     A.    Yes.  I would say we do sort of a
25 macro and a microeconomic review.  So you look

Michael Plummer

1
2 at the comparables in the market and then you
3 look at market conditions overall and whether
4 it's a good time to sell, a safe time to sell.
5         Whether or not, for instance, it
6 would be best to sell at auction or to sell
7 privately, whether or not the work is good
8 enough to negotiate a guarantee with the auction
9 houses, that sort of thing.
10     Q.    So you could even work with other
11 auction houses as you just mentioned to have the
12 art sold, and you might advise somebody that
13 look, this is the type of art that would best be
14 auctioned or this is the type of art that would
15 best be sold in a different way; is that how it
16 worked?
17     A.    Correct.
18         MR. IRWIN:  Sorry, did you have a
19 question about something?
20         THE WITNESS:  I wanted to ask if I
21 could have a bathroom break.
22         MR. SOTO:  Absolutely.
23         THE VIDEOGRAPHER:  The time is
24 10:42 a.m., and we're going off the record.
25         (Short break taken)

Michael Plummer

1
2         THE VIDEOGRAPHER:  This begins
3 media unit number 2, the time is 10:48 a.m., and
4 we're back on the record.
5 BY MR. SOTO:
6     Q.    Mr. Plummer, one of the questions I
7 meant to ask but forgot to.  In connection with
8 the four loans that you testified about that
9 were made by Christie's while you were there
10 overseeing the financial services department,
11 were any of those loans made to institutions?
12     A.    I don't think so.
13     Q.    So those were loans to private
14 individuals?
15     A.    Yes.
16     Q.    So the second thing you mentioned
17 in connection with the work you do at Artvest
18 was to set values?
19     A.    Um-hum.
20     Q.    Is that any different than what you
21 just testified about in terms of advising
22 clients and determining the value of their art?
23     A.    No, I don't believe so.  I'm not
24 sure I understand your question though.
25     Q.    Let me see if I can break it down.

Michael Plummer

1
2  You mentioned that you advised clients in the
3  buying and selling of art?
4      A.  Right.
5      Q.  The second thing that you listed,
6  at least the transcript said, was you also said
7  values.  I was trying to see, is there a
8  distinction between the way you would set values
9  and advising a client on the buying and selling
10 of art, and what you referred to in your prior
11 testimony generally as setting values?
12     A.  I would say we generally follow the
13 same methodology for advising clients on buying
14 and selling art and for setting values on art
15 when we set values.
16     Q.  That's what you just testified
17 about, correct?
18     A.  Yeah.
19     Q.  You said that you write regarding
20 the performance of art?
21     A.  Yes.
22     Q.  What would that include, would that
23 include published articles?
24     A.  It includes a piece written and
25 published in The Art Newspaper.  We use to issue

Michael Plummer

1
2  periodic market analysis which we sent out to
3  our distribution lists which were widely
4  acclaimed and much sought after, reviewing each
5  season and the outlook for the current season.
6          We did a special analysis of the
7  Asian market.  At one point we did a special
8  analysis of the Chinese market, much of which
9  became the foundation of the front page article
10 of The New York Times by Malcolm Bowley.  We
11 wrote on the Contemporary market; yeah, things
12 like that.
13     Q.  Malcolm Bowley, is that B-o-w-l-y?
14     A.  B-o-w-l-e-y.
15     Q.  Would we be able to find the
16 article that appeared in you called it The Art
17 Newspaper?
18     A.  Yeah, it was an editorial in The
19 Art Newspaper.
20     Q.  It would have your name attached to
21 it?
22     A.  Yes.  It has Jeff's and my name
23 attached to it.
24     Q.  What was that editorial about?
25     A.  It was -- let me make sure I get

Michael Plummer

1
2  the time right.  It was about the state of the
3  art market in I think it was 2009 and the
4  prospects for its recovery based on the
5  financial crisis.
6      Q.  Since that editorial five years ago
7  have you done any other publishing?
8      A.  Well, as I said, those reports that
9  I was talking about were done after that.
10     Q.  The periodic reports?
11     A.  Yeah.
12     Q.  The periodic market analysis that
13 you did, was that published publicly or is it
14 something privately?
15     A.  It was something that we at Artvest
16 published and distributed to our clients.
17     Q.  How often did you publish it?
18     A.  We published them about every six
19 months for an 18-month period; an 18-month to
20 2-year period.
21     Q.  You stopped publishing it now?
22     A.  Yes.
23     Q.  Why did you stop?
24     A.  We stopped because it was an
25 expensive undertaking.  We had many fans who

Michael Plummer

1
2  sought it out, but we found it to be -- we had
3  also made our mark in the industry, we were now
4  being sought out by clients and reporters to
5  express our opinion and we felt we didn't need
6  to continue making an investment; and it was a
7  costly endeavor.
8      Q.  The periodic analysis would include
9  your view of the values, again, of different
10 genres of art --
11     A.  Yes.
12         MR. IRWIN:  You should let him
13 finish his question.
14     Q.  -- and the volatility of different
15 values of art?
16     A.  Yes.
17     Q.  As well as the salability of
18 different genres of art, correct?
19     A.  Yes.  We would even get into
20 analyzing certain artists like Picasso and the
21 growth in value of certain works of art that
22 were coming back up at auction, and some
23 in-depth analysis of individual works.
24     Q.  Did you utilize any of that
25 information in arriving at any of the opinions

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 134 of 204

Michael Plummer

1 that you state in your expert report that you
2 are giving here in connection with the Chapter 9
3 proceedings of Detroit?
4     MR. IRWIN: It's a little vague,
5 you can answer the question.
6     A.   No. I would say though that some
7 of the opinions and things that we expressed
8 then would be consistent with things that we
9 have expressed in this report, that certain
10 conditions perhaps remained the same or haven't
11 changed.
12     Q.   If I wanted to determine how
13 accurate your analysis was in connection with
14 these periodic market analyses that you
15 published, where can I obtain copies of them?
16     A.   I have copies.
17 (*r)     MR. SOTO: Geoff, I would
18 appreciate it if we can get copies of those so
19 that I can look at them in connection with our
20 analysis of this expert.
21     MR. IRWIN: Send me a note tallying
22 all this stuff up at the end and we'll talk to
23 you then.
24     Q.   So the next thing that is listed

Michael Plummer

1 here is that you brokered loans?
2     A.   Yes.
3     Q.   What does that mean?
4     A.   It means that clients come to us
5 looking for art loans and we would take them to
6 a bank or a lending institution to get the loan,
7 and we would match the right lender to the needs
8 of the borrower and the borrower's
9 qualifications.
10     Q.   In connection with your brokering
11 of loans, did you ever broker any loans for an
12 institution?
13     A.   You mean on behalf of an
14 institution as a client?
15     Q.   Yes, on behalf of an institution.
16     A.   No.
17     Q.   So for the most part, when you were
18 brokering loans it's on behalf of individual
19 clients?
20     A.   Yes.
21     Q.   The next thing you listed was set
22 value for loans?
23     A.   Yes.
24     Q.   What did you mean by that?

Michael Plummer

1     A.   It means we would establish the
2 value of the art and what the client was likely
3 to get as a loan for that art. Then sometimes
4 even work with the lender in agreeing to the
5 values the lender was going to put on the art.
6     Q.   The next thing you mentioned was
7 you assisted clients in connection with their
8 work with auction houses, correct?
9     A.   Yes.
10     Q.   What would that entail?
11     A.   That would entail arranging the
12 deal with the auction house in terms of what the
13 financial terms were, what the marketing terms
14 were, and what the value that the auction house
15 was putting on the property.
16     Q.   You would help set the value?
17     A.   We would be engaged in the
18 discussion of the value with the auction house,
19 which would be usually a three-party discussion,
20 the auction house, the client and us.
21     Q.   In connection with -- let me finish
22 the list. The next thing you said is you sold
23 property directly for clients?
24     A.   Yes.

Michael Plummer

1     Q.   What does that mean?
2     A.   Well, I would say directly we would
3 sell property, not so much that we would sell it
4 ourselves but we would sell -- instead of
5 selling through auction we would sell it through
6 a dealer.
7     Q.   So that would be a situation where
8 a client came to you, you felt it was best not
9 to go through an auction with this particular
10 client, but to go through a dealer directly?
11     A.   Yes.
12     Q.   You mentioned that Artvest has an
13 ownership interest in an art fair, correct?
14     A.   Correct.
15     Q.   What is that art fair?
16     A.   It's called Spring Masters New
17 York.
18     Q.   Where is it?
19     A.   It is held in May at the Park
20 Avenue Armory.
21     Q.   In connection with your ownership
22 of that interest in the art fair, do you perform
23 any appraisal services of any type in connection
24 with that work?

Michael Plummer

1
2      A.    No, in that capacity we do none.
3  We do have nearly weekly conversations with
4  dealers who are our clients about the state of
5  the art market and the state of their
6  businesses, so it's an important resource for
7  information.
8      Q.    So having an interest in the art
9  fair enables you to maintain contact with a
10 number of dealers, and a number of people who
11 will give you information that they have about
12 the market and about various genres of art,
13 correct?
14     A.    Or confirm information that we
15 already have.
16     Q.    So it helps you to keep up to
17 breast?
18     A.    Exactly.
19     Q.    That's what you meant when you said
20 that, to keep up to breast with market
21 conditions?
22     A.    Right.
23     Q.    In connection with the work that
24 you have described of Artvest for example, let's
25 just take the first one, advising clients.

Michael Plummer

1
2      Does Artvest ever hire or retain
3  the services of an appraiser in connection with
4  its work with its clients when it's advising
5  clients regarding buying and selling?
6      A.    We hired appraisers to work on the
7  DIA project.
8      Q.    Is that the only project that you
9  can recall that you hired appraisers for?
10     A.    I believe so.
11     Q.    Who were you retained by in
12 connection with your work on the DIA project?
13     A.    By Cravath and Jones Day.
14     Q.    Do you know who they represented in
15 connection with that project?
16     A.    Yes.
17     Q.    Who is that?
18     A.    Jones Day for the City and Cravath
19 for the DIA.
20     Q.    So ultimately your work was for the
21 City, and you were hired by Mr. Irwin's firm;
22 and also by the DIA you were hired by
23 Mr. Levin's firm?
24     A.    Correct.
25     Q.    In connection with your work under

Michael Plummer

1
2  Artvest, or as co-owner of Artvest, do you ever
3  advise clients on alternate forms of monetizing
4  art separate and apart from sales?
5      A.    We have advised clients on art
6  loans, which is a type of liquidation other than
7  selling.  We have never been hired to, but we
8  were engaged -- we were approached about setting
9  up a system for art loans for a fee, in terms of
10 lending works of art, but we found that to be
11 a -- not a viable option to pursue.
12     Q.    So I understand it.  The
13 distinction you're making between art loans that
14 you've been advised on, that you testified about
15 already, and art loans for a fee; what's the
16 difference?
17     A.    Well, I mean lending a work of art
18 to someone to hang on their wall; renting a work
19 of art is what I mean.
20     Q.    What has your experience been in
21 connection with, as you put it, renting a work
22 of art?
23     A.    As I said, we've been approached
24 more than once about this and we have declined
25 to pursue that because we feel it's not a viable

Michael Plummer

1
2  line of business or option.
3      Q.    It's not viable because it's
4  difficult to get a fee for it?
5      A.    There's really no audience for it.
6      Q.    The times that you were approached
7  for renting a work of art, was that by
8  individuals?
9      A.    It was by individuals who had
10 collections, who were looking to do it as a tax
11 strategy.
12     Q.    Other than those two forms of
13 monetization or alternatives to sale, has
14 Artvest worked with any other alternatives?
15     A.    Not that I can recall.
16     Q.    So you spent 16 years at Sotheby's,
17 correct?
18     A.    Correct.
19     Q.    And two years at Christie's,
20 correct?
21     A.    Correct.
22     Q.    During that time did you personally
23 conduct any appraisals?
24     A.    No.
25     Q.    During that time did you obtain any

Michael Plummer

1 training in conducting an appraisal?
3     A.    No.
4     Q.    During that time did you
5 participate in auctioning artworks?
6     A.    How do you mean that question?
7     Q.    Actually in its broadest sense.
8 Did you participate in any way or were you
9 involved in any way of the auctioning of
10 artworks?
11     A.    Well, as a business manager I was
12 involved in the department's creation of a sale
13 and managing that sale and putting that sale on;
14 so yes, if you mean it in the broadest sense.
15     Q.    That would be in connection with
16 your work in marketing, correct, that you headed
17 the marketing department for Sotheby's and you
18 would have to know something about the auction
19 that was going to be held in order to market it,
20 correct?
21     A.    Well, that too; but I was referring
22 to my experience before that as a business
23 manager where I actually sat in the expert
24 department and worked with them as they were
25 putting the sale together for auction.

Michael Plummer

2     Q.    So that would have been your
3 initial work at Sotheby's, correct?
4     A.    That would have been my second job
5 at Sotheby's.
6     Q.    As the business manager, I see.
7 What was your first job at Sotheby's?
8     A.    Account manager.
9     Q.    Account manager, okay.    In
10 connection with your work as a business
11 manager -- well, I think we got that on
12 testimony already so I won't go over it again.
13     Other than that work that you just
14 described, your work as a business manager, and
15 also the marketing work that you described; was
16 there any other work that you did, again in its
17 broadest sense, that would put you in
18 participation with the auctioning of artworks?
19     A.    The business manager job, yes, and
20 the marketing position; and then I left
21 Sotheby's after that.    Then at Christie's I was
22 not involved in the auctioning of works of art.
23     Q.    The experience you did have at
24 Sotheby's that you just referred to, did it ever
25 involve the auctioning of an entire collection

Michael Plummer

1 of a museum, for example?
3     A.    No, I don't believe that such an
4 event has ever happened.
5     Q.    Did it ever involve the auctioning
6 of a portion of a collection say the size of the
7 1,700 works of art that Christie's appraised for
8 the DIA?
9     A.    There were various large
10 collections, I can't remember now what they
11 were, but some very large ones that came
12 through.    For example, I was involved in the
13 Jackie Onassis sale.
14     Q.    How many works of art did that
15 involve?
16     A.    I can't remember, but it was a
17 large collection and I wrote the marketing plan
18 for that and also designed the catalog cover for
19 it.
20     Q.    Have you ever prior to this
21 occasion where you have been retained as an
22 expert, have you ever been retained as an expert
23 witness in any other case?
24     A.    No.
25     Q.    Other than the expert report that

Michael Plummer

2 you prepared in connection with this Chapter 9
3 proceeding that we're here on today, have you
4 ever prepared an expert report for any other
5 case?
6     A.    No.
7     Q.    Other than the testimony you're
8 giving here today, have you ever given testimony
9 or proposed to give testimony as an expert in
10 any other case?
11     A.    No.    I was engaged about the time
12 of this engagement to be an expert witness, but
13 that has not taken place yet.
14     Q.    That's in another litigation?
15     A.    Another litigation unrelated to
16 this.
17     Q.    What is the subject matter of that
18 case?
19     A.    It's a tax-related estate issue.
20     Q.    And you haven't prepared a report
21 in that case yet?
22     A.    Nothing has happened yet.
23     Q.    In connection with this matter have
24 you been told that you will be requested to act
25 as a witness in connection with the planned

1          Michael Plummer
2   confirmation trial that's currently set to take
3   place in Detroit, I believe it's starting now
4   around August 21st?
5          A.    Yes.
6          Q.    We'll go through that in a
7   different fashion to see if we can get it
8   quicker.
9              Who have you spoken to regarding
10  your potential testimony in this matter, this
11  Chapter 9 proceeding?
12         A.    What do you mean by spoken to about
13  my potential testimony?
14         Q.    Who have you spoken to about the
15  fact that you're acting as an expert, or hoping
16  to act as an expert, and that you might be
17  testifying in this matter?
18         A.    Well, I guess numerous people
19  because it's a matter of public record now and
20  I've been asked about it, but I don't comment on
21  it.
22         Q.    So the numerous people who have
23  approached you, who have you spoken to?
24         A.    Well, they have asked me questions
25  and I don't talk about it, I just refer them to

1          Michael Plummer
2   my report.
3          Q.    You're talking about like
4   journalists or somebody who are calling you up
5   and asking you about --
6          A.    Or friends, family, that sort of
7   thing.
8          Q.    So you've certainly spoken with
9   Mr. Irwin, correct?
10         A.    Yes.
11         Q.    And with counsel in his office?
12         A.    Yes.
13         Q.    With Mr. Levin and maybe his
14  colleagues?
15         A.    Correct.
16         Q.    Have you spoken with Mr. O'Reilly?
17         A.    Yes.
18         Q.    Have you spoken with anyone at the
19  DIA?
20         A.    No.
21         Q.    Other than the counsel that I've
22  already mentioned, the attorneys that I've
23  already mentioned; have you spoken with anybody
24  else?
25         A.    No.

1          Michael Plummer
2          Q.    Can you tell me when you were
3   retained as an expert witness?
4          A.    It was around May 20th something.
5          Q.    Of 2014?
6          A.    2014, yeah.
7          Q.    Who initially contacted you
8   regarding your retention as an expert?
9          A.    Rich Levin.
10         Q.    Have you had previous dealings with
11  Mr. Levin?
12         A.    Well, we had spoken about this at
13  some period before that as a possibility for it,
14  but nothing had materialized until May.
15         Q.    What was the nature of your
16  assignment as explained to you by either the
17  City or the DIA?
18         A.    It's listed in my report, there are
19  four main bullets.  I wouldn't want to do it
20  from memory since it's actually in the report.
21         Q.    You can actually have a copy of
22  that report.  I think it's actually going to be
23  our next exhibit so why don't we go ahead and
24  mark it.  We give nothing but open book exams
25  here.

1          Michael Plummer
2          A.    That's good.  While we're doing
3   that may I have another quick break?
4          Q.    Absolutely.
5              THE VIDEOGRAPHER:  The time is
6   11:14 a.m., and we're going off the record.
7              (Off the record)
8              (Plummer Exhibit 2, Expert Witness
9   Report of Michael Plummer, marked for
10  identification.)
11             THE VIDEOGRAPHER:  The time is
12  11:26 a.m., and we're back on the record.
13  BY MR. SOTO:
14         Q.    Mr. Plummer, I have handed you what
15  we have marked as Exhibit 2 to this deposition.
16         A.    Yes.
17         Q.    Are you familiar with that?
18         A.    Yes, I am.
19         Q.    Take a moment to review it.  I will
20  ask you is this the report that you have
21  submitted as an expert witness in the City of
22  Detroit Chapter 9 proceeding?
23         A.    Yes, it is.
24         Q.    Now, we were just about to ask
25  about it and I told you it would be open book.

Michael Plummer

1  You mentioned -- when I asked you what the
2  nature of your assignment was as it was
3  explained to you, you were referring to
4  something in your report, what was that?
5      A.    That was the list on page 4, number
6  2, that counsel had asked me to form an opinion
7  with respect to the following:
8          "The indicative value of the works
9  in the DIA collection. The feasibility and
10 likely effects on the market and value
11 realization of a sale of the DIA collection
12 under a variety of market and sale conditions.
13 Creditor-proposed sales of the DIA's collection,
14 including analysis of certain third-party
15 indications of interest.
16         "Monetization alternatives
17 described in Christie's report to the City of
18 Detroit, and infirmities in any rebuttal expert
19 reports, which I will address in any
20 supplemental report as necessary."
21     Q.    What is your compensation
22 arrangement for providing testimony of those
23 topics?
24     A.    It was $112,500 for the report and

Michael Plummer

1  6,000 per day for testimony and deposition, or
2  $3,500 for a half day.
3      Q.    We're not going to have to worry
4  about the half day, so we'll just keep going.
5  I'll try to get it done today, I think I'm under
6  a 17-hour limit again.
7          Do you know of anyone else from
8  Artvest who's going to be asked to testify?
9      A.    No.
10     Q.    Let me ask you then to look at page
11 48 of Exhibit 2. It starts at the top of the
12 page with "Conclusion," do you see that?
13     A.    Um-hum.
14     Q.    So we're on the same page. Is that
15 your signature at the bottom of that page?
16     A.    It is.
17     Q.    Can you tell me how long it took
18 you to put together this expert report. You
19 said you were retained in May, when did you
20 start working on the report?
21     A.    We probably started doing
22 preparatory work in I would say the middle of
23 May.
24     Q.    From the middle of May through

Michael Plummer

1  July 8th when this report is dated, is that the
2  amount of time it took?
3      A.    Yes.
4      Q.    You completed it just at the nick
5  of time and handed it in on July 8th?
6      A.    Yeah, we handed it in on July 8th
7  and we worked pretty much around the clock to
8  get it done.
9      Q.    Right up to the deadline?
10     A.    Yeah.
11     Q.    So on page 48, paragraph 79 A, you
12 state, I'll read it for you slowly:
13         "The indicative value of the works
14 in the DIA Collection at a gross valuation,
15 without any deduction for the value of the works
16 that are ultimately determined not to be subject
17 to sale, whether for legal or other reasons, and
18 before the application of discount factors
19 related to general market conditions or issues
20 specific to the DIA collection as a mid estimate
21 of $3,684,466,069 and a low estimate of
22 $2,760,978,432."
23         Did I read that correctly?
24     A.    Yes.

Michael Plummer

1      Q.    What was the high estimate?
2      A.    The high estimate is in the report.
3  The high estimate was $4,607,953,704 on page 19
4  of the report.
5      Q.    Page 19?
6      A.    Page 19.
7      Q.    Let me turn there and catch up to
8  you. So under Table 2, under "Total DIA
9  Collection" at the bottom, the column high
10 estimate, the final number going down the column
11 is $4,607,953,704. That's the highest of it,
12 correct?
13     A.    Correct.
14     Q.    Have you done all the required work
15 that you think was required to reach the
16 opinions you reached in this case?
17     A.    Yes.
18     Q.    Or, asked another way, you have no
19 more work you think you need to do in order to
20 support these opinions, correct?
21     A.    Correct.
22     Q.    Is there any work that you wanted
23 to do, but you were unable to do before
24 rendering these opinions?

Michael Plummer

1        Michael Plummer
2    A.   No.
3    Q.   On page 48, in paragraph 79 B, you
4 state:
5       "The feasibility and likely effects
6 of and on the market and value realization of a
7 sale of the DIA collection under a variety of
8 market and sale conditions:  After the
9 application of various discount factors related
10 to these conditions, the range of value the DIA
11 collection will sell for, without any deduction
12 for the value of the works that are ultimately
13 determined not to be subject to sale, will be
14 between $1.1 billion for the present value of an
15 orderly liquidation after allowing" is that of?
16    A.   Of.
17    Q.   "Of an orderly liquidation after
18 allowing for the likely delay of litigation to
19 $1.8 billion in the highest value scenario, with
20 no litigation and an orderly selling plan."  Do
21 you see that?
22    A.   Yes.
23    Q.   Have you done all the work required
24 to reach this opinion in this case?
25    A.   Yes.

Michael Plummer

1        Michael Plummer
2    Q.   Is there any work that remains
3 undone or that you think is necessary to support
4 that opinion?
5    A.   No.
6    Q.   On page 48, this time paragraph 79
7 C, we'll take a look at that.  You state, and I
8 quote:
9       "My review of the practicality and
10 reasonableness of the monetization alternatives
11 described in Christie's preliminary report to
12 the City of Detroit:  They do not have a
13 reasonable expectation of either raising
14 meaningful money or exceeding even the $100
15 million the DIA has already committed as its
16 contribution to the Grand Bargain."  Do you see
17 that?
18    A.   Yes.
19    Q.   Again, have you done all the work
20 required, as far as you are concerned, to reach
21 this opinion in this case?
22    A.   Yes.
23    Q.   Is there any other work that you
24 think you would need to do in order to support
25 that opinion?

Michael Plummer

1        Michael Plummer
2    A.   I don't believe so.
3    Q.   The same page, 48 this time,
4 paragraph 79 D.  Do you see it there?
5    A.   Yes.
6    Q.   You state, and I'm quoting you:
7       "Creditor-proposed sales of the
8 DIA's collection, including analysis of certain
9 third-party indications of interest:  They are
10 either not plausible or not likely to net the
11 dollar values quoted."
12       Do you see that?
13    A.   Yes.
14    Q.   Have you done all the work
15 required, at least that you think is required,
16 to reach this opinion in this case?
17    A.   Yes.
18    Q.   Is there any other work that
19 remains undone or that you think is necessary to
20 support that opinion?
21    A.   No.
22    Q.   Let's begin by discussing the
23 appraisal process that you went through in order
24 to arrive at these opinions.
25       When did your team begin appraising

Michael Plummer

1        Michael Plummer
2 the art at the DIA that is the subject of this
3 expert opinion?
4    A.   We began pulling comparables in
5 May, so the process began in May.
6    Q.   How long did it take to complete
7 the appraisal?
8    A.   Up until the week before, the first
9 week -- up through the first week of July.
10       Wait.  Excuse me, you referred to
11 it as an appraisal, we referred to it as a
12 valuation.
13    Q.   Let's go back and ask the first
14 question again that I asked when you began
15 appraising the art; that would still be in May?
16    A.   We began evaluating the collection
17 in May.
18    Q.   You don't refer to it as an
19 appraisal?
20    A.   No.
21    Q.   Why not?
22    A.   Because we consider it an
23 evaluation of the value of the collection.
24    Q.   How do you distinguish that from an
25 appraisal of the value of the collection?

26 (Pages 101 to 104)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 140 of
204

Michael Plummer

1
2      A.    Because we consider factors that
3  are typically not considered in an appraisal,
4  such as market conditions, which we think are
5  critical to setting a value for this collection.
6      Q.    Will you tell the Court what
7  factors you are considering in an evaluation
8  that you believe are not considered in an
9  appraisal?
10      A.    We are considering the impact of
11  unsold rates.  We are considering the
12  overheatedness of the Contemporary market.  We
13  are considering the malaise, for lack of a
14  better word, in the American Art sector.  We are
15  considering the issues in the Old Masters sector
16  which is not a malaise, it's a cooler sector.
17            We are considering the differences
18  between the activity in the Impressionist and
19  Modern sector versus the Contemporary sector.
20  We're also considering the impact of litigation
21  and the delays based on other examples of that
22  litigation in terms of liquidating the property,
23  because it can't be sold with clear title.
24  We're considering the impact of taint which we
25  consider to be significant, most especially in

Michael Plummer

1
2  the American sector.
3            We think all of these are critical
4  considerations in establishing a value for the
5  liquidation, if there were to be a liquidation,
6  of the DIA collection.
7      Q.    So these are all factors that you
8  believe you considered that would not be
9  considered in an appraisal of the art, correct?
10      A.    Correct.
11      Q.    So unsold rates, what does that
12  mean?
13      A.    Unsold rate was what I was
14  referring to earlier as BI property, which is
15  property that does not sell.  In certain of the
16  sectors where, and particularly Old Masters
17  where the DIA has a very high concentration of
18  property, our subject are very high BI rates,
19  unsold rates.
20      Q.    That's what you were referring to
21  earlier in terms of unsold rates?
22      A.    Yes.
23      Q.    The next factor you mentioned was
24  overheatedness in contemporary art?
25      A.    Yes.

Michael Plummer

1
2      Q.    What are you referring to there?
3      A.    That market has become very hot and
4  is showing -- a number of people active in the
5  market such as myself are beginning to have
6  concerns about the stability of this market when
7  it is so heated as it is, and given its
8  volatility and the fact that it has crashed in
9  the past, as recently as 2008.
10      Q.    So in connection with your concern
11  or application of factors of unsold rates, did
12  you have a particular source that you were
13  referring to that you utilized in determining
14  how that unsold rate factor would apply to the
15  collection that you analyzed at the DIA?
16      A.    We used publicly available
17  information based on Sotheby's and Christie's
18  sales, on their unsold rates.
19      Q.    Anything else?
20      A.    No.
21      Q.    In connection with the
22  overheatedness, which you particularly mentioned
23  the Contemporary Art sector?
24      A.    Right.
25      Q.    What did you rely on in coming to

Michael Plummer

1
2  those conclusions and making that analysis?
3      A.    Our own internal analysis over the
4  last several years of --
5            MR. O'REILLY:  Why don't we break
6  for a moment?
7            MR. SOTO:  I don't need to.
8  They're going to finish that and they will be
9  out of here in 5 minutes.
10            MR. O'REILLY:  That's fine, you're
11  going to have a lot of noise on the video.  If
12  you're okay with that.
13  BY MR. SOTO:
14      Q.    It's up to you, are you being
15  distracted or are you okay?
16      A.    Okay.
17      Q.    Let's go.
18      A.    We used our own internal data
19  generally comparing and our own watching of the
20  sales which we do, sales results on a regular
21  basis, and in particular comparing how sales are
22  doing, auction sales are doing relative to their
23  estimates, and the sell-through rates or unsold
24  rates in that area as well.
25            As well as follow various press

27 (Pages 105 to 108)

Michael Plummer

1           Michael Plummer
2 accounts and anecdotal accounts that we have and
3 discussions with dealers that represent the
4 trade and their art specialties.
5     Q.    The overheatedness unsold rates,
6 would those be the same kinds of publicly
7 available unsold information that you referred
8 to earlier?
9     A.    Yes.
10     Q.    So it would be the publicly
11 available unsold information listed on the
12 Contemporary Art sector, correct?
13     A.    Yes.
14     Q.    What about the malaise in American
15 Art, what are you referring to there?
16     A.    I'm referring to the fact that the
17 American Art sector has not recovered from the
18 2008 crash, it's at its highs in the spring of
19 2008. Let me add also that in the American Art
20 sector, as well as in the other sectors, we look
21 at art indices as well.
22     Q.    Anything else?
23     A.    At the moment I can't think of
24 anything else.
25     MR. SOTO: They're going to bring

Michael Plummer

1           Michael Plummer
2 the food in, let's take a break.
3     THE VIDEOGRAPHER: The time is
4 11:45 a.m., we're going off the record.
5     (Off the record)
6     THE VIDEOGRAPHER: The time is
7 11:52 a.m., and we're back on the record.
8 BY MR. SOTO:
9     Q.    Thank you for your patience here.
10 I think you had discussed the third factor that
11 you mentioned that you took into account which
12 was the malaise and American Art, correct?
13     A.    Correct.
14     Q.    Anything more on that issue?
15     A.    Yes, there's one more thing is that
16 in all of these sectors we have business
17 dealings and clients and firsthand experience of
18 sales, sales that are easy, sales that are hard,
19 so that's also important in our reading of the
20 market.
21     Q.    The next thing you mentioned,
22 factor 4, was the issues in the Old Masters
23 sector which you mentioned the DIA has a large
24 collection of, is that correct?
25     A.    Yes.

Michael Plummer

1           Michael Plummer
2     Q.    What did you mean by that?
3     A.    By issues I meant that there is --
4 that that market is losing collectors, that it
5 has a high unsold rate and it has a problem with
6 supply.
7     Q.    What is that problem?
8     A.    It's had an uneven supply of good
9 property over the years, and there is a lot of
10 mediocre material in the market. That, in
11 addition to the fact that collectors are
12 defecting to -- and this affects the American
13 market as well and to some extent the
14 Impressionist and Modern market, collectors are
15 defecting en mass to the Contemporary sectors.
16     Or, in other words, young
17 collectors are going into Contemporary. Very
18 few young collectors are moving into these other
19 sectors, so they're dying out.
20     Q.    So when you say "uneven supply"
21 that would mean not enough or too many?
22     A.    It means that it's not enough
23 quality. But even if you were to have good
24 quality you still have the problem of not enough
25 collectors, so it's a two-sided problem.

Michael Plummer

1           Michael Plummer
2     Q.    So that even if the work of the Old
3 Masters that is part of the collection at the
4 DIA is good quality, your point is --
5     A.    There aren't enough collectors out
6 there to absorb that volume of property.
7     Q.    The next one you mentioned was
8 different Impressionist -- the differences
9 between the Impressionist and Modern sector
10 versus the Contemporary sector?
11     A.    Correct.
12     Q.    What did you mean by that?
13     A.    I have some examples in my report.
14 The Impressionist sector, there have been good
15 quality paintings that have come on the market
16 that have disappointed in their results.
17     Whereas, if the same caliber of
18 work had come on the market in the Post War --
19 or when the same caliber of art has come on the
20 market in the Post War sector it does far better
21 and it sometimes even exceeds the estimates.
22 Whereas, the others tend to fall short of the
23 estimates.
24     Q.    When you say Contemporary you also
25 used the phrase Post War, do you mean the same

28 (Pages 109 to 112)

Michael Plummer

in both?

A. They are often used interchangeably. Sotheby's uses only the term Contemporary, Christie's uses Post War and Contemporary. I've fallen into the habit of referring to them somewhat interchangeably because I've worked at both houses.

Q. In connection with your analysis of the malaise of the American Art that you referred to earlier, I believe you mentioned all of the factors that you relied on, but you didn't with respect to issues on Old Masters.

Is there anything that you relied on for your analysis?

A. The same for all the others. I relied on the same factors for all of the sectors.

Q. Those would be your knowledge through conversations with people in the art industry, correct?

A. Right.

Q. Would they also be your knowledge of comparable sales?

A. Yes.

Michael Plummer

Q. Would it also be your knowledge of more recent sales that you get through private knowledge?

A. Yes. Indices, auctions performance against their estimates; all of the things that I've listed previously for all the other sectors.

Q. The indices and the auction performance, those are publicly available information, correct?

A. Well, the indices you have to pay to use, but if you paid money you can use them. So I guess in essence they are the same.

Q. The same with respect to the public information regarding the results of auctions?

A. Yes. However, we compile a lot of information manually and have to because there is a manner in which the auction houses report their information which distorts it. So we often compile and manually arrange it ourselves so that we can decipher it more accurately than how the auction houses report it.

Q. How do the auction houses report it that distorts it?

Michael Plummer

A. Well, this is an issue we've gone on record with the auction houses with in the past. Beginning in the downturn of the '90s, Sotheby's took a policy and Christie's soon followed, that because the sales results were looking anemic they decided to start posting the sales results with the buyer's premium and comparing them to the estimates, low and high estimates for the sale which don't include buyer's premium. So in essence they're goosing up their results.

So when we do our analysis we go back and manually extract the buyer's premium when making comparisons against low and high estimates so that we gather more accurate results.

There are many sales that in the press look like they've come in between the low and high estimates, when in reality they will have fallen short of the low estimate because that buyer's premium is creating this distortion.

Q. What is the buyer's premium? I had about an hour conversation about this in our

Michael Plummer

last deposition and I still don't understand it.

A. The buyer's premium, I will try to make it straightforward and simple. The buyer's premium is a commission added on by the auction house, and it's a tiered commission, and they've now muddled with it so much that I don't have it as part of my memory anymore.

Up to X number it's say 20 or 25 percent; up to X number it's the next increment, it drops down to the next thing like 15 percent or something, and then after that over 2 million or some such number it drops down to I believe 12 percent.

So it can make a differential depending on the value of the works of somewhere around an average of 13 percent to up as high as 25 percent in the return.

Q. In a real-life hypothetical example using round numbers, let's assume there was a piece of art or even a collection of art that was valued at $100 million and it was sold at auction, and assuming there was some tiered commission; there would be commissions as you had described for different tiers. That

29 (Pages 113 to 116)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 143 of 204

Michael Plummer

1  commission is paid by whom?
2
3      A.   It's paid by the buyer as part of
4  the purchase price.
5      Q.   So if the purchase price was 100
6  million, and just for rounding numbers that are
7  simple, and there was going to be a 10 percent
8  total commission would the buyer have to pay 110
9  million?
10     A.   Correct.
11     Q.   So your point is that the auction
12 houses started including that additional 10
13 million as part of the sale of the value of the
14 art, correct?
15     A.   Which is legitimate, except that
16 when they compare it to the pre-sale estimate
17 which doesn't include it that's buyer's premium.
18 So to use your example, if we said that the
19 estimate was 80 to, let's say the estimate was
20 100 to 120 million and it sold for 100 million
21 and they put on the buyer's premium, it really
22 sold at the low estimate, but once they put the
23 buyer's premium on they would say it sold in
24 between the low and high estimate, which is a
25 distortion of the health of the market.

Michael Plummer

1
2      Q.   Understood, and actually very
3  clear, thank you.  Just so the Court is aware of
4  the process.  Part of the process in an auction,
5  and using our hypothetical round numbers, would
6  be the buyer's premium, the buyer pays that.
7      So then there is this hundred
8  million.  From that hundred million, would that
9  go to the seller or would there be other costs
10 deducted before it goes back to the seller?
11     A.   If it were indeed a $100 million
12 item nothing would go back to the house from the
13 seller because they would have a fantastic deal.
14 But if it were an average item of lower value
15 then there would be a seller's commission
16 charged as well, again in the 20 percent range
17 or higher.
18     Q.   So the auction house is getting a
19 buyer's premium commission from the buyers and
20 at the same time would be getting a seller's
21 commission from the seller?
22     A.   Right.
23     Q.   That could be the equivalent of the
24 buyer's commission?
25     A.   It could be.

Michael Plummer

1
2      Q.   Is it typical in the industry that
3  it is?
4      A.   It depends on the sector, the
5  desirability of the property, the clout of the
6  client, the power of the client's negotiator or
7  agent.  There are instances when in highly
8  desirable situations, and we've written about
9  this, a seller gets back part of the buyer's
10 premium as a rebate.
11     Q.   So that the seller's commission is
12 lower then, or at least it gets a rebate on
13 that, correct?
14     A.   Well, no.  I'm saying that the
15 seller's commission might be zero or they might
16 get part of the buyer's premium.
17     Q.   As well?
18     A.   As well.
19     Q.   So it would increase the ultimate
20 return on the sale?
21     A.   Correct.
22     Q.   You mentioned the impact of the
23 litigation as another factor you took into
24 account?
25     A.   Yes.

Michael Plummer

1
2      Q.   What resources did you use as the
3  basis for that opinion?
4      A.   I used research into various other
5  examples that are mentioned in my report.  One
6  of the most relevant cases was the Fisk
7  Stieglitz collection, which was tied up in Court
8  for five years by the Attorney General of the
9  state of Tennessee.
10     Q.   Anything else?
11     A.   There were some other examples I
12 use in the report.  I can't remember right now
13 what they are, but they're outlined in the
14 report.
15     Q.   Other than the examples in the
16 report, was there anything else that you relied
17 on?
18     A.   I don't believe so, other than what
19 is in the report and what materials are
20 referenced in the report.
21     Q.   Have you had personal experience in
22 being part of a sale of a collection of art that
23 was held up in litigation?
24     A.   No, but I am familiar with the
25 importance of clear title in the selling of art

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 144 of
204

Michael Plummer

1 Michael Plummer
2 at auction and the problems that result. I am
3 very sensitive to that issue and aware of its
4 relevance.
5 Q. In connection with applying this
6 factor, did you do any research regarding the
7 title of the art at the DIA?
8 A. It was in the data that was given
9 to me by the DIA which is outlined in the
10 report, the donors were listed with the items.
11 Q. In addition to the donors being
12 listed, was there any information regarding the
13 transferability and alienability of the art?
14 A. I did not research that.
15 Q. So in connection with your opinion
16 regarding the impact of that litigation, you
17 were assuming, for purposes of this opinion,
18 that there might be some concern regarding the
19 alienation of this art or the transferability of
20 this art, and as such you're applying that
21 factor, correct?
22 A. I would say that it's more than an
23 assumption. I am fairly, certain based on my
24 experience in the art market, that there will be
25 litigation to stop the sale of art that has been

1 Michael Plummer
2 gifted to the museum.
3 I should add in addition, I also in
4 the course of researching this report did speak
5 to various museum professionals on other matters
6 such as the art lending and that sort of thing,
7 and such issues came up in those conversations
8 as well.
9 Q. When you say the museum
10 professionals, you're talking about
11 professionals at the DIA?
12 A. No, at other museums.
13 Q. In connection with your certainty
14 that there would be litigation regarding the
15 transfer of any of this art, did you talk to
16 anybody at the DIA?
17 A. No.
18 Q. The next thing you mentioned was
19 the impact of taint in the American sector.
20 What does that mean?
21 A. I think that the sale of -- and I
22 address this in several locations in my report,
23 the sale of the collection of the DIA will be
24 highly criticized and create an aura around
25 works from the DIA and their sale that will

1 Michael Plummer
2 lower their value and/or lower their ability to
3 be sold, and that a number of collectors will
4 boycott sales.
5 There's a practical matter that
6 most collectors in America or around the world,
7 but particularly in America, are on boards of
8 directors -- are on the boards of other
9 institutions, and it is hard to imagine many of
10 those people bidding publicly or having agents
11 bid on their behalf for works of art from the
12 DIA, and not then have backlash within the
13 institutions which they are supporting.
14 Q. Did you do any formal analysis in
15 the form of any kind of a survey or attempt to
16 do something of a -- some type of analysis of a
17 review of various institutions or collectors to
18 come to this conclusion?
19 A. No, I did not do a survey; but I
20 certainly had many collectors and others who
21 serve as collectors expressing those comments
22 and those feelings.
23 Q. How many anecdotal expressions
24 would you --
25 A. Well --

1 Michael Plummer
2 Q. Excuse me. How many anecdotal
3 expressions like that would you say you
4 obtained?
5 A. 20 to 30.
6 Q. Go on, you were going to say
7 something.
8 A. What was I going to say.
9 MR. IRWIN: That's why you started
10 your question.
11 MR. SOTO: I did not.
12 MR. IRWIN: You were talking about
13 conversations you had.
14 A. Oh, yes. Also, one of my
15 consulting specialists worked on the Larry
16 Salander bankruptcy and she is responsible for
17 liquidating that collection. Her own experience
18 with the Larry Salander property is that it has
19 a taint about it, and particularly around the
20 high end it's difficult to sell.
21 There is a general problem in the
22 art market when there is -- when something sort
23 of has a bad aura around, it can actually affect
24 price and salability.
25 Q. I'm not familiar with the Larry

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt    Doc 7121-1    Filed 08/27/14    Entered 08/27/14 19:26:07    Page 145 of 204

Michael Plummer

1  Salander situation that you're referring to.
2  What was the bad aura there?
3
4       A.    Larry Salander is a bankruptcy case
5  of which there is a lot of public information
6  on.  He had a large collection of property, I
7  think about 4,000 items, in most of the Old
8  Masters and 19th Century sectors.
9            Larry had enormous amounts of
10 property on consignment and he went bankrupt,
11 and he owed a lot of consigners money and it was
12 a very messy case.  He I believe is in jail
13 because of it, there were criminal proceedings
14 against him.
15      Q.    You don't expect that anyone in the
16 DIA is going to go to jail in connection with
17 this bankruptcy, do you?
18      A.    I was not expecting that.
19      Q.    Nobody at the DIA has put their art
20 on consignment as far as you know, have they?
21      A.    I don't know.
22      Q.    In connection with these seven
23 factors that we've gone through, do you start
24 with a basic appraised value and then apply
25 these seven factors as an additional factor in

Michael Plummer

1  what you're referring to as an evaluation
2  instead of an appraisal?
3       A.    Could you ask that question again,
4  please?
5       Q.    I had asked you if you had done an
6  appraisal and you said no, we did an evaluation?
7       A.    Right.
8       Q.    You gave me the seven factors as
9  factors that you think are part of an evaluation
10 that are not typically part of an appraisal,
11 right?
12      A.    Correct.
13      Q.    What I'm asking is -- I understand
14 your view on those seven factors.  My next
15 question is do you also do an appraisal to begin
16 to understand the value of a piece of art and
17 then apply these additional factors?
18      A.    I want to be careful about
19 terminology here because I think it can trip us
20 up.  I created a fair market value by using
21 comparables, which is the industry standard
22 practice, on the -- which is outlined in the
23 report on the top 400 some works of art.
24           Then I combined that with the
25

Michael Plummer

1  Christie's appraisal and then did a calculation
2  to estimate the value of the remainder of the
3  collection, and added those numbers together to
4  come to an indicative value of the collection on
5  which I based the other rest of the analysis.
6       Q.    I think that might answer my
7  question indirectly, but let me make sure.  So
8  you certainly created, as your report says, what
9  you termed the fair market value analysis of the
10 top 400 works of art, and you did that by
11 looking to see if there were any comparables,
12 correct?
13      A.    Right.
14      Q.    You were looking for public data
15 that would otherwise tell you something about
16 the value?
17      A.    Right.
18      Q.    Then after you came to some sense
19 of that value you also then applied these seven
20 factors that you just referred to?
21      A.    Yes, but we also looked at the art.
22 We visited the museum and looked at the art
23 which was an important factor.
24      Q.    For all 400 pieces?
25

Michael Plummer

1       A.    For most of the 400 pieces.  There
2  were some that were not available to be seen,
3  but as many as we could.
4       Q.    About 390 plus?
5       A.    I don't remember the exact number,
6  but a substantial percentage of them.
7       Q.    Would it be over half of it?
8       A.    Well over half of it.
9       Q.    So would it be close to maybe
10 75 percent of it?
11      A.    I would say 75 percent is a fair
12 guesstimate.
13      Q.    Let's assume you looked at
14 300 pieces of art, you did the comparables; in
15 addition to that you got other publicly
16 available data regarding the value of the art?
17      A.    Right.
18      Q.    You got publicly available data
19 regarding the market for that art?
20      A.    Right.
21      Q.    That's the beginning step.  You
22 would then apply these additional seven factors
23 if they applied in coming to your valuation?
24      A.    On a sector-by-sector basis, yes.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 146 of
204

Michael Plummer

Q. And that's why the information that you got on those 400, you could also use the information that Christie's did on its 1,700 works of art, correct? Because it was a fair market value analysis that included comparables and public data, correct?
A. Correct.
Q. And you relied on that data?
A. Yes, I did.
Q. And then having taken Christie's 1,700 pieces of art and your additional 400 pieces, or was it an additional 400 or was it part and parcel of the same?
A. There were some -- we didn't do the same pieces Christie's did, we did not overlap with them.
Q. For example, Christie's did Bruegel?
A. We did not do the Bruegel.
Q. The next thing you did was you took that body of information, 1,700 or 2,100 works of art, and you extrapolate in some way to come to an estimate of the remaining 61,000 pieces of art, correct?



Michael Plummer

A. Correct. But there's an important bit of data that we haven't discussed which is of the universe of works that Christie's looked at, about a third of it had no value. That's an important data point in extrapolating any kind of value on the collection, that there is a significant part of it that doesn't have value.
Q. Let's again make sure we're comparing apples and apples here. The 1,700 that it did appraise had value?
A. Um-hum.
Q. It was asked to appraise some additional art that it determined with the assistance of the DIA had no value?
MR. O'REILLY: Objection to form.
A. No. I would say that Christie's was given a list of City of Detroit property which was about 3,000 items. Christie's determined that of that list about a third of it had no value.
Q. So about a third of it had no value which left you with 1,700 or so, correct?
A. Correct. The fact that a third of it had no value was irrelevant to extrapolate on



Michael Plummer

the rest of the collection that a large part of it had no value.
Q. So you assumed in your estimates that about a third of the remaining 61,000 had no value?
A. We extrapolated that yes, a portion of the remaining collection had no value.
Q. That proportion was consistent with the proportion that Christie's did?
A. Because we felt that the City of Detroit property was a reasonable representative sample of the entire collection.
Q. So in a macro analysis if the City of Detroit collection, if the collection at the DIA has 62,000 pieces, your estimate is that about a third of that or maybe 20 or 21,000 pieces have no value, and that the remaining 40 or 41,000 pieces have value, correct?
A. Roughly. I'll have to defer to my report, to the actual numbers in the report. The proportions are approximately correct.
Q. So that's one of the factors that you used in your extrapolation. That is to say that which was determined to have no value,



Michael Plummer

correct?
A. Correct.
Q. What other factors did you use in your extrapolation?
A. In the extrapolation we used the Christie's data and broke it down by sector, and then used the profile of the property in each Christie's sector and applied that to each of the DIA sectors.
Q. In essence, and again I want to make sure I'm understanding what you're saying; if you looked at the Christie's appraisal of what you call City of Detroit collection, that would include all 3,300 that they were originally asked to look at, correct?
A. Correct.
Q. So you would extrapolate a third of them that had no value. Then you would look at okay, the remaining 1,700, of that remaining 1,700 what was the value of each sector?
A. Right.
Q. And then you would extrapolate that the remaining art in that sector would have that same extrapolation, correct?

Michael Plummer

1
2    A.    Correct.
3    Q.    So that's another factor.  You have
4  the no value factor, you have the value factor
5  that you just gave.  What other factors?
6    A.    At the moment I can't recall if I
7  did use other factors.
8         MR. SOTO:  It's about 12:20, why
9  don't we break, let everybody have some lunch,
10  then maybe you can think of those other factors
11  and then we'll buzz on from here.
12    A.    Can I add on to the record
13  something you asked me about.  When you asked me
14  about other people that I spoke to about the DIA
15  and the testimony and the project, it would of
16  course have been internally within my own team
17  and my consulting specialists.  I just want to
18  make sure that was on the record.
19    Q.    Of course, the specialists that you
20  referred to in your report?
21    A.    Right, right.
22    Q.    Absolutely.  I understood that.
23  Thank you for correcting that.
24         THE VIDEOGRAPHER:  The time is
25  12:19 p.m., and we're going off the record.

Michael Plummer

1
2         (Lunch recess taken)
3         THE VIDEOGRAPHER:  This begins
4  media unit number 3, the time is 1:20 p.m., and
5  we're back on the record.
6  BY MR. SOTO:
7    Q.    Mr. Plummer, how are you?
8    A.    I'm fine, thank you.
9    Q.    So just before the break I had
10  asked -- we had begun a series of questions
11  about the appraisal process and you corrected me
12  and said that you didn't do an appraisal, you
13  did an evaluation, correct?
14    A.    Correct.
15    Q.    So in connection with the
16  evaluation that was done by Artvest that is the
17  basis of your -- or at least one of the bases of
18  your expert report in the Chapter 9 proceeding
19  in Detroit, did Artvest do any appraisals of any
20  art at the DIA?
21    A.    We established a fair market
22  valuation, as I mentioned earlier, several
23  hundred, I think it was around 400 or so items
24  using comparable pricing, and it was done by
25  people who are trained as appraisers, but we

Michael Plummer

1
2  called it a fair market valuation.
3    Q.    Was there anything that you as an
4  expert in the industry would consider a step
5  that is typical to an appraisal that Artvest or
6  its consultants and specialists didn't do on
7  those 400 or so pieces that you just testified
8  about?
9    A.    You're asking me if I feel that
10  there was something that an appraisal would have
11  that we didn't do?
12    Q.    With respect to those 400 pieces?
13    A.    I would say that we used industry
14  best practices for setting a fair market value
15  on those pieces.
16    Q.    Just to make it clear to the Court.
17  As I understood from some prior depositions I've
18  been in that you've probably read, there are a
19  number of types of appraisals?
20    A.    Correct.
21    Q.    In the art industry?
22    A.    Correct.
23    Q.    One of them is in fact called the
24  fair market value appraisal?
25    A.    Correct.

Michael Plummer

1
2    Q.    The other one is the auction
3  estimate appraisal?
4    A.    Correct.
5    Q.    In connection with the 400 pieces
6  of art that you were referring to just moments
7  ago that Artvest analyzed, is it your testimony
8  that on those 400 pieces of art, Artvest
9  completed a fair market value appraisal?
10    A.    We completed a fair market
11  valuation.
12    Q.    So not an appraisal?
13    A.    We called it a valuation.
14    Q.    I'm not even concerned about what
15  you call it.  I'm concerned about whether or not
16  we're comparing apples to apples, and when we
17  take your 400 pieces of art that you at Artvest
18  reviewed and add them to the 1,700 pieces of art
19  that Christie's reviewed, which you rely on in
20  your report, Christie's described its analysis
21  of those 1,700 pieces of art as a fair market
22  value appraisal; do you agree with that?
23    A.    Yes.
24    Q.    And you reviewed that?
25    A.    Correct.

Michael Plummer

1
2     Q.    You are talking about the
3  400 pieces of art that are being evaluated by
4  Artvest.
5          Is there something that Artvest
6  didn't do with those 400 pieces of art that
7  would mean that it is not a fair market
8  appraisal of those 400 pieces of art?
9     A.    There's nothing that we didn't do
10 that was different from Christie's that would
11 make it difficult or impossible to combine those
12 two items as similar numbers derived at with
13 similar methodologies.
14    Q.    Then maybe another way of me asking
15 this would be so if someone from Christie's
16 looked at what you did on those 400 pieces of
17 art and looked at what they did on their 1,700
18 pieces of art they'd say yeah, that's a fair
19 market value appraisal of those 400?
20       MR. IRWIN:  Form.
21    A.    I don't know what they would say, I
22 can't speculate.  I think that they would see
23 the logic behind it and say that we used the
24 right logic to come up with a fair market value
25 on those pieces.

Michael Plummer

1
2     Q.    In Christie's report, Christie's
3  lists the factors that they considered in coming
4  up with their appraisal, correct?
5     A.    Yeah.
6     Q.    Are there any factors that they
7  considered that you did not consider at Artvest
8  in coming up with a valuation for the 400 pieces
9  of art?
10    A.    I don't have that list in front of
11 me so I can't recall what is exactly on that
12 list.  To the best of my knowledge, I don't
13 believe there is any.
14    Q.    So who conducted the evaluations as
15 you put it, using your term, let's stick with it
16 for now.
17       Who conducted the evaluations of
18 the 400 pieces of art that Artvest did?
19    A.    Betty Krulik who is President of
20 the Appraisals Association and a dealer in
21 American Art, who I have a high opinion of and
22 most in the industry have a high opinion of.
23 Sabine Wilson, who is also a member of the
24 Appraisers Association of America and is a very
25 talented appraiser.

Michael Plummer

1
2          Betty was American Art.  Sabine was
3  Impressionist and Modern Art, Sabine Wilson, and
4  Kristin Gary who did Old Master paintings, who's
5  also a member of the Appraisers Association of
6  America, had worked previously at Colnaghi
7  Gallery years ago and is an active dealer and so
8  is very aware of current values, as is Sabine as
9  well; not a dealer, but very much involved in
10 the market.
11       Then Joe-Hynn Yang was an expert in
12 Asian Art at Sotheby's and Christie's, but also
13 has extensive knowledge of the decorative arts
14 and three dimensional objects and ancient art,
15 and he did the other objects, other
16 non-paintings.
17    Q.    Are any of those individuals, the
18 four individuals you've mentioned, Betty, Sabine
19 Kristin and Joe-Hynn?
20    A.    Yes.
21    Q.    Are they employees of Artvest?
22    A.    No.
23    Q.    So they were retained by Artvest to
24 do these services?
25    A.    Correct.

Michael Plummer

1
2     Q.    I don't know if you mentioned it as
3  to the last one.  I know as to Ms. Krulik, Ms.
4  Wilson, is it Ms. Gary?
5     A.    Yes.
6     Q.    They are members of the American
7  Association of Appraisers Or Appraisal
8  Association of America, correct?
9     A.    Correct.
10    Q.    So they're qualified to do
11 appraisals, correct?
12    A.    Yes.
13    Q.    Is Joe-Hynn Yang an appraiser?
14    A.    He is not an appraiser by
15 profession, but he has 15 years experience and
16 has worked on numerous appraisals for Sotheby's
17 and Christie's, and actually worked on the --
18 was a critical participant in the driver of the
19 Albright-Knox appraisal, which was a museum sale
20 that is relevant to this, or irrelevant
21 depending on how the circumstances play out.
22    Q.    You said Albright-Knox?
23    A.    Albright-Knox, yeah.
24    Q.    Albright being one name with a
25 hyphen?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 149 of
204

Michael Plummer

A.    Yeah, it's referenced in the
report.
Q.    Why do you say that it's relevant
here?
A.    Well, it's relevant in the
differences in that sale for the sale of works
in the DIA collection, because that was a sale
which was for the replenishment of the
acquisition funds.  So, basically, property was
being sold to move the museum from one area into
another and it did very well, versus a sale
which was done to satisfy debt, such as the
Delaware Museum which has evidence of not doing
well; so they're very different examples.  Both
examples are in the report.
Q.    So on the Delaware, the distinction
you're making is in one it was a de -- is it
de-accession?
A.    Deaccession.
Q.    The one you're talking about in the
Albright-Knox, that was a deaccession?
A.    Albright-Knox was a deaccession,
yes.
Q.    And the other one was not a

Michael Plummer

deaccession?
A.    The other was a deaccession, but it
was a sale for the purpose of paying down debt,
rather than replenishing the collection of the
fund, the collection of the museum.
Q.    I thought deaccession meant you are
selling it in order to replenish the collection
with some other form of collection, or something
like that?
A.    It's my understanding deaccession
is part of the process of removing a work of art
from a collection, after which then steps are
taken to sell it.
Q.    So that can be sold for any number
of reasons, correct?
A.    It can be sold for any number of
reasons.
Q.    It's your theory that in the art
world if it's sold to retire debt, people don't
like those sales?
A.    It's not only my theory, it
actually runs into some real practical
obstacles, such as there are various sanctions
that are imposed against museums for doing that.

Michael Plummer

So it's not like frowned upon, but there are
sanctions in Russia now for what it's doing.
It's public approbation and there
are organizational approbations for doing such
things and the museum could lose its
certification as a museum.
Q.    How many museums are you aware of
that are owned by a city?
A.    I don't know.
Q.    In the process of being an expert
for this particular matter, did you take time to
determine how many museums in America are owned
by a city?
A.    I did not.
Q.    It is your understanding that the
DIA is owned by the City of Detroit, correct?
A.    It is my understanding.
Q.    Was the Delaware museum that you
are talking about owned by the City of Delaware?
A.    I don't believe that it is.
Q.    Or even the State of Delaware?  You
don't know?
A.    I don't believe it is.
Q.    Do you have any other examples

Michael Plummer

other than those two that you think are
relevant?
A.    I think there are some other
examples on my report.
Q.    That's why I asked that last part
that you think are relevant to this issue that
we're discussing today?
A.    I think those two and some other
examples in my report are relevant.
Q.    The four individuals that you
mentioned, I guess you already mentioned that
Mr. Yang is not a certified appraiser.  Are the
other three certified appraisers?
A.    The other three are certified
appraisers, but Mr. Yang has the equivalence of
what the Appraisers Association considers
certification.  He has significant auction house
experience similar to the experts at Christie's
who worked on the Christie's appraisal.
Q.    Did you personally conduct any
appraisals in connection with this expert
report?
A.    I did not personally.  I worked
with the specialists on their appraisals and

Michael Plummer

1 reviewed all of their numbers.
2 Q. When you say you worked with, what
3 does that mean?
4 A. I discussed it with them, I
5 reviewed it.
6 Q. Did you change any of their
7 opinions?
8 A. No, I did not change them and any
9 changes that were made, they made. I did not
10 change their numbers.
11 Q. Did you think any of their work was
12 incorrect?
13 A. To the extent that it was we had a
14 discussion about it and then any changes were
15 made.
16 Q. Can you recall any such instances?
17 A. There were some small adjustments
18 that were made. It wasn't a matter of
19 correction but more a matter of opinion, should
20 it be this much higher or that much lower, that
21 sort of thing, based on comps and different
22 things.
23 Q. Did anyone else other than the four
24 individuals you mentioned and yourself, did

Michael Plummer

1 anyone else assist in the appraisal process?
2 A. No.
3 Q. You mentioned different areas of
4 specialty with respect to the specialists that
5 you had referred to?
6 A. Right.
7 Q. How did you divide the appraisals,
8 or evaluations as you called them, among these
9 consultants?
10 A. Based on their expertise.
11 Q. After the specialists came up with
12 their valuations, I think you just testified
13 that you reviewed them?
14 A. Right.
15 Q. Did anyone else review them?
16 A. Well, we worked in a fashion that
17 we all worked off of a common document on Google
18 Documents, so they were open for review by the
19 others on the team.
20 Q. So that each person could comment
21 on the other person's work?
22 A. Yes, and in some instances there
23 were comments made and some consultations.
24 There are a couple of instances where there was

Michael Plummer

1 overlap, just like there might be a contemporary
2 piece that Betty might have expertise on, even
3 though she was dealing with America pre-1950,
4 and Sabine and Betty might confer on pieces.
5 Q. Other than the five of you, was
6 anyone else involved in that process?
7 A. No.
8 Q. How did you ensure quality control
9 of the process?
10 A. Well, we did the first round of
11 comps, first checks for them. We had a process
12 in place that we thought was sound. We did the
13 first round of comps for them. We then -- they
14 then either visited the museum or used high res
15 images or the website images enhanced, in most
16 cases did both.
17 Actually, all of our appraisers
18 visited the museum which we felt was rather
19 important to the process, except for one of
20 them, Betty, who actually had -- knew the
21 collection well and had visited the museum many
22 times previously, so she was already very
23 familiar with the paintings in the collection.
24 But Sabine, myself, Joe-Hynn Yang

Michael Plummer

1 and Kristin all visited the museum, and we feel
2 actually that our visit actually explains why
3 there are some discrepancies between our
4 appraisals and the other appraisals, because
5 those visits in the first-hand inspection
6 actually made a difference, and that was one of
7 the ways we ensured quality control.
8 Q. As I understand your testimony, the
9 way you ensured quality control is that you
10 visited the museum?
11 A. That was one way.
12 Q. What was the other way?
13 A. The other way was that we did the
14 first round of comps, then the specialists did
15 their own additional comps, and then they -- we
16 reviewed -- they put their logic in of how they
17 came to their conclusions and then we reviewed
18 those and came up with final numbers.
19 Q. When you say "we did the first
20 round of comps" who's the "we"?
21 A. Artvest, my team.
22 Q. That was you?
23 A. And Anya, and another woman who was
24 working for us on a temporary basis.

Michael Plummer

2 Q. Who was that?

3 A. Her name was Perry Silverman.

4 Q. Perry?

5 A. Perry.

6 Q. P-e-r-r-y?

7 A. Yes; and she had had experience in
8 searching for comps at Christie's.

9 Q. Were you aware of the fact that
10 Christie's didn't -- not all of the specialists
11 who worked for Christie's analysis of the 1,700
12 visited the museum?

13 A. No, I know all of them didn't, but
14 a number of them did.

15 Q. So were you concerned in relying on
16 Christie's analysis that some of their
17 specialists didn't visit the museum?

18 A. No, because I think the important
19 fact was that a core group of Christie's did.
20 It's not that each expert has to see each piece,
21 it's just that they are a representative from
22 the body doing the appraisal, visiting the
23 museum and seeing it. They can then compare
24 notes, they can take a photograph and they can
25 talk to the other.

Michael Plummer

2 Q. So is it your understanding that
3 the Christie's individuals who were doing the
4 Old Masters works visited the museum and reviewed the
5 other works?

6 A. I don't remember which individual
7 experts visited the museum and which didn't, but
8 I know that a core group of Christie's
9 specialists did go to the museum and did examine
10 the works.

11 Q. Right. I heard you say that
12 before. What I'm asking is different. What I'm
13 asking is that core group, wouldn't they have
14 been involved in only reviewing the area of art
15 that they were interested in?

16 MR. IRWIN: Form.

17 A. No, not necessarily.

18 Q. Do you know whether or not they
19 were or weren't?

20 A. At this point I don't remember who
21 did which set of appraisals and who did not.

22 Q. You don't know whether a person who
23 did a set of appraisals for American Art, for
24 example, also took the time to review the Old
25 Masters, do you?

Michael Plummer

2 A. No, I don't. I don't remember.

3 Q. So when you say it's important to
4 have a core group but not all go, if not all
5 went it may be that some of the sectors were
6 simply not seen personally, correct?

7 A. I don't remember which sectors were
8 seen. I would be surprised if an important
9 sector such as Old Masters or American had not
10 been viewed, in particular because those sectors
11 are the largest sectors.

12 Q. So visiting the museum you say is
13 important, correct?

14 A. Seeing the subject work is
15 important.

16 Q. Why is that?

17 A. Because you see the physical nature
18 of the object. You can miss things in
19 photographs. Like, for instance, we put a much
20 higher value on a Daga that when you see it up
21 close -- than Winston did -- that when you see
22 it up close it's smudged and it's incomplete and
23 unfinished it's just a sketch; where Winston
24 didn't see it and they gave it a much higher
25 value because they thought it was a more

Michael Plummer

2 complete and finished picture.

3 Q. Any other reason?

4 A. Another reason would be size. You
5 get a sense of a picture, its power on the wall,
6 and you're imagining something based on a
7 dimension. But to actually see the picture and
8 see how it works on a wall is completely
9 different from just looking at it as a picture
10 on a piece of paper.

11 Q. Anything else?

12 A. Condition, you get a better sense
13 of condition. Now, there may be good condition
14 notes that can offset that, but sometimes you
15 can see things that may not be captured by
16 another person who might have given the
17 condition report.

18 Q. Anything else?

19 A. There are other subjective
20 components that an expert would give you, just a
21 feeling about it subjectively by seeing it in
22 person that you can't convey in a photograph.

23 Q. What would those be?

24 A. You know, a feeling for whether
25 something was -- the shape of it, the look of it

Michael Plummer

1 in the third dimension, what it was,
2 particularly a sculpture, whether it was real or
3 fake, for example. That it looked better in
4 person than it did in the photograph.
5 One of the arts of the auction
6 business is to make things look better in the
7 catalog than they actually do in real life, and
8 so that's one of the major talents. Having run
9 marketing at Sotheby's I can tell you that we
10 had trained photographers who made things look
11 better than they really did, so a photograph can
12 do that.
13 Q. These subjective elements as you
14 called them and these personal reviews that you
15 are referring to, they can cut both ways.
16 Somebody can look at a piece of art as you did
17 and say wow, that's more valuable than it looks
18 in the photo and somebody can look at it and say
19 that's less valuable, is that correct?
20 A. Correct.
21 Q. So in connection with the work that
22 you were doing you reviewed or your people
23 reviewed personally 400 works of art, correct?
24 A. Correct.

Michael Plummer

1 Q. You don't know how many works of
2 art were personally reviewed by Christie's you
3 testified about earlier?
4 A. I don't.
5 Q. You understand that even added
6 together, the Christie's and your art, you're
7 looking at maybe less than 5 percent or around
8 5 percent of the entire collection of the DIA,
9 correct?
10 A. In terms of numbers, raw numbers,
11 yes.
12 Q. Does it concern you that somebody
13 who looked at some significantly smaller
14 percentage of 5 percent is extrapolating to the
15 value of the entire collection of 62,000 pieces
16 of art.
17 Did you want those people to look
18 at more art?
19 MR. IRWIN: Vague, form.
20 A. I would not use the word
21 extrapolate. We used a formula based by sector
22 using the Christie's sample to develop a value,
23 and we thought what we had was adequate for our
24 purposes.

Michael Plummer

1 Q. What word would you use if you
2 didn't use extrapolate, what do you call what
3 you're doing?
4 A. We made an analysis of the
5 collection and made a projection based on the
6 data by sector that Christie's had done, that
7 was a reasonable universe of sampling of the DIA
8 collection.
9 Q. So in other words, you relied on
10 Christie's review, you looked at that percentage
11 for each sector, and then you applied the
12 formula that you just referred to to the entire
13 rest of the collection in that sector, correct?
14 A. Right.
15 Q. So that if indeed of the original
16 1/3 of the works of art that were deemed of too
17 little value to be appraised, if 10 percent of
18 those were Old Masters, then you apply that same
19 10 percent figure in your Old Masters as to what
20 was too little value to be appraised, correct?
21 A. Correct.
22 Q. You don't think that's an
23 extrapolation?
24 A. You can use extrapolation, I use my

Michael Plummer

1 language. I prefer to say that we made a
2 calculation or an analysis.
3 Q. Do you have a word for that besides
4 what you just described?
5 MR. O'REILLY: Form.
6 A. The words I used.
7 Q. All right. On page 20 of your
8 report. As you're turning to page 20, did you
9 have someone on your staff who was doing the
10 statistical analysis, running the sampling
11 analysis that you used for the process that you
12 described earlier?
13 A. Yes.
14 Q. Who was that?
15 A. That would be Mr. Anya Bemis.
16 Q. Is Anya Bemis a statistician so
17 that she would know what is an appropriate
18 sample of a given body of art to extrapolate
19 from?
20 A. Anya Bemis is not a statistician.
21 Q. Did you have a statistician so that
22 you could appropriately opine that looking at
23 some segment of 5 percent of the art at the DIA
24 enables you to extrapolate or to apply the

Michael Plummer

1                  Michael Plummer
2   process that you described in the way that you
3   described to the rest of the art?
4       A.  We do not have a statistician.  It
5   was our opinion that that was -- our methodology
6   was sound.
7       Q.  You based that opinion on what?
8       A.  On my own professional experience
9   in the art market.
10      Q.  Again, are you a statistician?
11      A.  No, I am not a statistician.
12      Q.  Are you a sampler?
13      A.  I am not a sampler.
14      Q.  You are not an appraisers either,
15  correct?
16      A.  I am not an appraiser.
17      Q.  You mention on page 20 of your
18  report that you did not interact with the museum
19  staff directly, but rather communicated only
20  through DIA counsel in conducting the appraisal,
21  correct?
22      A.  Correct.
23      Q.  Would you normally communicate with
24  the museum staff when you were conducting an
25  appraisal or an evaluation, as you put it?

Michael Plummer

1                  Michael Plummer
2       MR. O'REILLY:  Form.
3       A.  It depends on the circumstances.
4   Perhaps in a different circumstance I might, but
5   in this situation it did not feel appropriate.
6       Q.  Did this hinder your evaluation of
7   the art?
8       A.  No, it did not.
9       Q.  There wasn't anything you wanted to
10  ask the folks at the DIA about a given piece of
11  art, about maybe some of the subjective factors
12  that you mentioned earlier that you couldn't get
13  from your lawyers?
14      A.  There was nothing that we needed
15  that we couldn't get.
16      Q.  How many times have your lawyers
17  visited the DIA?
18      A.  I don't know.
19      Q.  You didn't ask?
20      A.  How many times did our lawyers
21  visit the DIA?
22      Q.  Yes.
23      A.  I don't understand its relevance.
24      Q.  Didn't you just say it's important
25  in assessing art that they should see it

Michael Plummer

1                  Michael Plummer
2   personally?
3       A.  But our lawyers weren't involved in
4   the assessing of the art.
5       Q.  You didn't communicate with anybody
6   at the DIA who was involved in the art, did you?
7   You only communicated with your lawyers,
8   correct?
9       A.  Right; and any information that we
10  used in terms of the subjective issues of the
11  art we garnered ourselves from visiting the
12  museum.
13      Q.  That instance where you didn't
14  visit the museum, for example, the one person
15  who you said didn't, what did you rely on there?
16      A.  Betty Krulik.
17      Q.  Yes.
18      A.  Well, Betty had been to the museum
19  multiple times and was exceptionally familiar
20  with the collection and all the pieces that were
21  in it.  So she didn't need to because she had
22  already done so multiple times.
23      Q.  When you went to the museum were
24  you allowed to handle the art?
25      A.  No.

Michael Plummer

1                  Michael Plummer
2       Q.  Is it customary to handle art in
3   connection with an appraisal?
4       A.  It is desirable to do so if you
5   can, but that would have been disruptive to the
6   museum and we did not do it.
7       Q.  Turning to page 17 of your report?
8       A.  Sure.
9       Q.  I'm looking at what's under the
10  label Group 1?
11      A.  Yes.
12      Q.  "High value COD works that were
13  appraised by Christie's for greater than
14  $750,000 (68 items)."
15      A.  Right.
16      Q.  Did you rely exclusively on
17  Christie's valuation of those high value pieces
18  of art?
19      A.  I'm not sure what you mean by that,
20  relied exclusively on them.
21      Q.  I guess what I'm trying to figure
22  out is did Artvest do an independent analysis of
23  any form in connection with the high value City
24  of Detroit works that were appraised by
25  Christie's as being greater than $750,000?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 154 of
204

Michael Plummer

1
2      A.    We looked at their valuations and
3   reviewed them, but we did not separately set
4   values for them.  We reviewed them, we found
5   them to be accurate and reasonable and relied
6   upon them.
7      Q.    You didn't change them at all?
8      A.    We did not change them.
9      Q.    Did you find the wide range of
10  values that were provided by Christie's at all
11  unusual?
12     A.    It was not their normal practice.
13     Q.    So the answer is it was a little
14  bit out of the ordinary?
15     A.    It was a little bit out of the
16  ordinary, but it did not make them unusable.
17     Q.    Did you -- looking at page 17,
18  Group 2.  It includes City of Detroit or
19  actually "COD works" they call them City of
20  Detroit works, "appraised by Christie's of lower
21  value, that under $750,000 including property
22  for which they assigned limited or no value" and
23  the number is 1,654 with a value and 1,038 with
24  limited to no value, and 13 that were combined
25  in Phase III?

Michael Plummer

1
2      A.    Right.
3      Q.    That was the total COD appraised,
4   reviewed items by Christie's was 2,773, correct?
5      A.    Correct.
6      Q.    In this instance did you rely
7   exclusively on Christie's valuation for these
8   pieces?
9      A.    Yes, we did.
10     Q.    Were you satisfied with Christie's
11  valuation?
12     A.    Yes, we were.
13     Q.    Did you conduct any additional
14  analysis or appraisal of these pieces?
15     A.    We did not.
16     Q.    Looking on page 18, Group 3.
17  Includes "high value, non-COD works in the DIA
18  collection."  Do you see that?
19     A.    Yeah.
20     Q.    "Contained on a list provided by
21  the DIA of works that the DIA valued for
22  insurance purposes or otherwise of 1 million or
23  more, totaling 350 works."  Do you see that?
24     A.    Yes.
25     Q.    Specifically, what information did

Michael Plummer

1
2   the DIA provide you or Artvest with?
3      A.    They provided us with a report
4   which is mentioned in here which had an image,
5   the description, the provenance, the methodology
6   that it was -- sorry, what funds were used to
7   purchase it, and there was some other
8   information which I can't quite remember right
9   now.  Then we of course did additional research
10  to supplement what was given to us.
11     Q.    What's the provenance?
12     A.    Provenance is the ownership history
13  of a work of art.  So if it comes out of an
14  important family or a sequence of owners who are
15  prominent, it can raise the value of a work of
16  art.
17     Q.    What additional resources did you
18  look at to supplement what you got from the DIA?
19     A.    The DIA's own website, some of the
20  DIA's own publications and other publications
21  and catalog resumes, most of which are referred
22  to in this document.
23     Q.    In your report?
24     A.    Yeah.
25     Q.    Anything other than what's referred

Michael Plummer

1
2   to in your report?
3      A.    I subsequently found six other
4   books that were referred to that were
5   inadvertently excluded, and I can supply that
6   list.
7  (*r)      MR. SOTO:  So when you supply me
8   with some of the other things like the
9   pioneering report and some other things like
10  that, I would love to have that list.
11     A.    Sure.
12     Q.    Who provided you the materials that
13  you got from the DIA?
14     A.    Counsel.
15     Q.    Did the DIA provide you with any
16  documentation as to appraisals that they had
17  conducted previously on any of the art that you
18  were interested in?
19     A.    Later on in the process we received
20  a document that had values in it which we
21  thought might have been insurance values.  They
22  were, however, so whacky, for lack of a better
23  word, that we had trouble figuring out really
24  what they were because they didn't have, except
25  in a couple of instances, they didn't bear much

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Michael Plummer

1  Michael Plummer
2  on reality.
3       I wouldn't say a couple of
4  instances, there were more than a couple of
5  instances; but in too many instances they were
6  unreliable and way off.
7       Q.   They were way off in which
8  direction, too valuable or too little?
9       A.   Every way; too little, too high.
10      Q.   Did you ever ask anyone at the DIA
11 what is this, who prepared this?
12      A.   No.  It was -- it seemed not to
13 matter.  We came to our opinions as to how it
14 might have happened but it didn't matter, it was
15 not usable.
16      Q.   What was your own opinion that you
17 arrived at?
18      A.   That curators were sticking numbers
19 on things for various reasons and they didn't
20 have the market experience to do that.  They
21 were just sort of randomly assigning numbers
22 either based on personal bias or a lack of
23 either underestimating or overestimating.
24      Q.   Have you produced that information,
25 the whacky numbers that you got, in connection

Michael Plummer

1  Michael Plummer
2  with that report?
3       A.   Have I produced it?
4       Q.   Yes.
5       A.   No.  It's listed here.
6       Q.   It's one of the items listed?
7       A.   I believe so.
8       Q.   If it's one of the items listed
9  it's produced with your report.
10           Did you know that, if it's listed
11 it was produced to me?
12      A.   I didn't know that.
13      MR. SOTO:  That's right, Geoff?
14      MR. IRWIN:  Yes, that specific item
15 was produced.
16      MR. SOTO:  I'm assuming that if
17 it's listed as something that you based your
18 report on, we received it in a plethora of
19 materials that we received from the City and
20 DIA.
21      MR. IRWIN:  So the answer to that
22 is yes, as far as I know.
23 BY MR. SOTO:
24      Q.   Did the DIA, as far as you know,
25 provide you with any documentation as to the

Michael Plummer

1  Michael Plummer
2  insurance values of the works of art?
3       A.   No.  I mean other than that report
4  I told you which may have been insurance values
5  or may not, but there is no supplemental
6  information.
7       Q.   But you don't know whether it was
8  or wasn't?
9       A.   I don't know whether it was or
10 wasn't.
11      Q.   Got it.  Did you obtain any
12 documents from the City of Detroit regarding the
13 value of the art?
14      A.   No.  Wait, I don't think so.  Let
15 me think for a moment.  I don't.
16      Q.   So that it's clear, and I think you
17 may have said this earlier.  Was each of these
18 350 items individually evaluated or appraised by
19 your team?
20      A.   Yes.
21      Q.   Each of them, appraisals or
22 evaluations as you call them, they may be
23 evaluations, documented in Exhibit G of your
24 report?
25      A.   I'm sorry, ask me that again.

Michael Plummer

1  Michael Plummer
2       Q.   Was each of these evaluations or
3  appraisals, however up want to say that
4  document, in Exhibit G of your report on page
5  72?
6       A.   Yes, but there are some additional
7  work notes that were not summarized here that
8  are available and can be supplied.
9       Q.   Turning to page 72.  I see a blank
10 page that says "Exhibit G" there?
11      A.   Right.
12      Q.   Then it goes on actually from there
13 on, Exhibit G?
14      A.   Right.
15      Q.   In addition to what's there in your
16 report, which is the vast majority of the pages
17 in your report; in addition to that there are
18 some additional work pages that you have?
19      A.   Yes.
20      Q.   How many of those exist?
21      A.   It's a large file.  One of my
22 appraisers did -- was uncomfortable putting the
23 appraisal logic into this report and she
24 compiled separate documents for each one because
25 that's how she prefers to work, so I have a file

Michael Plummer

1 for all those.
2     Q.     Which appraiser is that?
3     A.     Sabine Wilson.
4 (*r)     MR. SOTO:  Again counsel when we
5 make our request we will request that file,
6 we'll make copies and obviously give you back
7 the originals.
8     A.     We have it in electronic form.
9     Q.     That's even better.  Thanks.  What
10 is this Exhibit G, in your own description?
11     A.     This is our reasoning to come up
12 with a fair market valuation of these items.
13     Q.     Who prepared this Exhibit G?
14     A.     The appraisers that were described
15 to you earlier, as reviewed by me.
16     Q.     So they took the data that they had
17 collected and they input it on a form that you
18 guys had all agreed to use?
19     A.     A Google document, yeah.
20     Q.     A Google document, and that became
21 Exhibit G, is that correct?
22     A.     Yes.
23     Q.     With the exception of one person
24 who had additional information?

Michael Plummer

1     A.     Correct.
2     Q.     That additional information by
3 Sabine Wilson, did she also input at least some
4 of the information that's here in Exhibit G?
5     A.     The values were input, but the
6 summarization she did not.
7     Q.     So this spreadsheet identifies
8 specific works of art that includes high and low
9 estimated values for each, correct?
10     A.     Correct.
11     Q.     Recognizing that there are some
12 descriptions that may be missing that you're
13 going to supply in this additional
14 documentation, was every piece of art listed in
15 Exhibit G individually appraised?
16     A.     Yes.  It was individually reviewed
17 to arrive at a fair market valuation.
18     Q.     Were other pieces that are not
19 listed -- pieces of art at the DIA that are not
20 listed in your Exhibit G, were other pieces
21 appraised by folks at Artvest or who were
22 working for Artvest?
23     A.     We evaluated other pieces, they are
24 mentioned in that page as a sub group that we

Michael Plummer

1 identified 73 other pieces that we thought had
2 been missed in the list that we had been given
3 by the DIA.
4     It was our sort of double-check on
5 making sure that we were including and weren't
6 undercounting what we were reviewing.
7     Q.     You were reviewing pieces of art
8 worth?
9     A.     Over 750,000.  We photographed
10 those items while in the DIA and then went back
11 and researched them.  I put an estimate in here
12 at the time because that was rather late in the
13 process that we thought it might come in between
14 80 and 160 million, and that I would provide
15 supplemental information after the fact.
16     We have now finished that
17 evaluation and it has come in to 70 million to
18 122 million, so it's lower than -- a little bit
19 lower than the low and a good bit lower than the
20 high.
21     Q.     So of these 73 additional pieces of
22 art you're saying they came in at a low value of
23 70 million and a high value of 122 million?
24     A.     Correct.

Michael Plummer

1     Q.     Let me see if I understand the
2 process that you started with again.  So you got
3 a list of 350 or so pieces of art, correct?
4     A.     Right.
5     Q.     You got that from the DIA, correct?
6     A.     Well, actually it was a larger list
7 and the overlap -- there was an overlap with
8 Christie's, so that ended up netting down to
9 350.
10     Q.     This large list was supposed to be
11 works of art worth more than 750,000, correct?
12     A.     Correct.
13     Q.     Once you deducted the overlap you
14 had 350,000?
15     A.     350, Right.
16     Q.     How did you find the other 73?
17 What did you do to find the other 73?
18     A.     Walking through the museum and
19 selecting objects that we thought might possibly
20 be of higher value, and then coming back and
21 researching, and knowing that they weren't on
22 the list, cross-checking against the list then
23 assigning values to them.
24     Q.     Separate and apart from that

43 (Pages 169 to 172)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 157 of
204

Michael Plummer

walk-through, did anyone at Artvest actually
look at the list of 62,9000 items of art, the
data that was given to you about that art,
including the images and the valuations and
everything else, to determine if the list that
the DIA had given you was incomplete in any
other way?
    You did the walk-through, you found
out that it was incomplete, at least for 73
items. Did you then look at the list to find
out well look, there's a lot of pieces of art
here that are in storage, maybe there's more
pieces of art that are more valuable that we
should be considering as well?
    MR. O'REILLY: Objection to form.
    A.   We looked at the list, but we
determined that going to the museum was the best
process because the information on the list
didn't seem to be helpful enough for that
purpose.
    Q.   Do you know if there are any pieces
of art that are being stored that are not in the
museum that are worth more than $750,000 at the
DIA, as you sit here today?

Michael Plummer

    A.   Can you ask the question?
    Q.   Do you know as you sit here today
whether or not there are any additional pieces
of art that are worth more than 750,000 that are
stored by the DIA, not being shown at the DIA
right now?
    A.   I do not know whether there are or
not.
    Q.   Does anyone else at Artvest know
that?
    A.   No.
    Q.   So looking at page 13 of your
spreadsheet. I think it's what you described to
me earlier but I want to make sure. It's a
column that doesn't have information in it so I
want to make sure that's what you were referring
to earlier.
    MR. IRWIN: Is it the 13th page in
this document?
    MR. SOTO: Yes.
    MR. IRWIN: Okay. So we'll all get
to that.
    Q.   It starts on the top with
paintings, Contemporary Art after 1950, and it

Michael Plummer

has Betty Krulik's name on it. Then going
across it talks about a 1985 oil on canvas,
Mitchell pieces are in, do you see that?
    A.   I'm not sure where you are.
    MR. IRWIN: Me neither.
    Q.   It looks like this (indicating).
    MR. IRWIN: Here, take mine, we'll
swap.
    A.   Okay.
    Q.   Do you see where it says "Summary
Not Provided"?
    A.   Right.
    Q.   It has several of them going down
the page and a few after that on the next page?
    A.   Right.
    Q.   Is that the instances that you were
referring to earlier where Sabine Wilson didn't
provide the information?
    A.   Right.
    Q.   And that's the information you're
going to provide to us later?
    A.   Correct.
    Q.   I just want to make sure. Turn to
page 18 of your report, that's 18 of 72. Do you

Michael Plummer

see Group 4, that's the additional?
    A.   That's the additional 73 we
discussed previously.
    Q.   Did you participate in that review,
the personal review at the museum?
    A.   Yes.
    Q.   You found some of those 73?
    A.   Together with Joe-Hynn Yang, yes.
    Q.   Was there anybody else with you?
    A.   Just Joe and me.
    Q.   When you were there, I think you
might have testified about this before, you
didn't talk to anybody at the museum to say hey,
what about these?
    A.   No.
    Q.   Had you ever visited the museum
before then?
    A.   No, I never had.
    Q.   Did anyone at the DIA escort you on
the visit?
    A.   No.
    Q.   Was it done during public opening
hours?
    A.   Yes.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 158 of 204

Michael Plummer

1
2     Q.    Did you ever ask anybody why these
3  73 works were not included in the original list
4  that you got?
5     A.    No.
6     Q.    Did you ask your counsel to ask?
7     A.    No.  To address that I would say
8  that we assumed, or concluded, or felt that it
9  was probably because of the randomness of the
10 numbers in some of their insurance lists that
11 these may have been similarly disregarded.
12    Q.    Did you ask anyone if you could
13 visit the museum's collection of stored art?
14    A.    No, we did not.
15    Q.    You didn't document or appraise any
16 of the stored art?
17    A.    We did not.
18    Q.    You mentioned the supplement.
19 Hadn't you supplemented your report yet?
20    A.    I did not.
21    Q.    Do you plan to?
22    A.    With that list, yes.
23    Q.    In any other way?
24    A.    At the moment I don't have plans
25 to, but that could change.

Michael Plummer

1
2     Q.    What would make that change?
3     A.    I haven't heard the deposition from
4  Mr. Wiener, certain things could arise with that
5  that would cause me to change.
6     Q.    Have you reviewed Mr. Wiener's
7  report?
8     A.    I have.
9     Q.    Does anything in his report lead
10 you to want to change your analysis or
11 supplement it in any way?
12    A.    He does not make me want to change
13 my analysis, no.
14    Q.    What about supplementing it?
15    A.    I'm not sure.  I take issue with
16 various things in his report and his
17 methodology.
18    Q.    We may get to that.  Group 5 on
19 page 19.  "Balance of the collection.  The
20 balance of the DIA's collection was evaluated by
21 sector using the sample valuation data of the
22 COD works appraised by Christie's with a low
23 value of at or below $750,000, and applying an
24 average price, sector by sector, based on that
25 data."  Do you see that?

Michael Plummer

1
2     A.    Yes.
3     Q.    So you didn't evaluate each of the
4  remaining items of the museum, correct?
5     A.    Correct.
6     Q.    When you say you applied an average
7  price, I just want to understand and I want the
8  Court to understand what you did, correct me if
9  I'm wrong.
10       So, for example, I'm just using a
11 hypothetical, assuming there was a value that
12 Christie's gave for the Old Masters of, just
13 using round numbers, 100 million, and that was
14 for so many pieces of art, you would find the
15 average value of those so many pieces of art,
16 correct?
17    A.    Yes.
18    Q.    And that's the average value you
19 would use on all the other pieces of art that
20 you didn't evaluate that were in that sector,
21 correct?
22    A.    Correct.
23    Q.    I use the word extrapolate.  You
24 extrapolated that out to the rest of the sector,
25 correct?

Michael Plummer

1
2     A.    We applied those values to the rest
3  of the sector.
4     Q.    Let's go back to page 17.  We
5  discussed earlier that there are different
6  methods of appraisal; for example, fair market
7  value, auction estimate, correct?
8     A.    Correct.
9     Q.    What method of appraisal did
10 Artvest utilize in analyzing Groups 1 and 2,
11 which are the works that Christie's previously
12 valued?
13    A.    We did not appraise these, I
14 thought we had established that.  We had -- we
15 reviewed their appraisal and concluded that
16 their numbers were good.
17    Q.    So, as you know, Christie's
18 conducted a fair market value appraisal,
19 correct?
20    A.    Yes.
21    Q.    In your words, what is a fair
22 market value appraisal?
23    A.    A fair market appraisal is an
24 appraisal arrived at where a ready, willing and
25 able seller reaches a price with a ready,

Michael Plummer

1
2  willing and able buyer where there is no duress
3  or urgency to sell.
4      Q.    Are there particular projects in
5  which a fair market appraisal is best to use?
6  For example, this project that you're involved
7  in, is that the best method to use to appraise
8  this type of art?
9      A.    It is our opinion that a fair
10  market value, whether it's an appraisal or a
11  valuation, is the right approach for this
12  project, yes.
13      Q.    Why is that?
14      A.    Because you're determining --
15  you're trying to establish a value of the
16  collection to the City of Detroit in the
17  evaluation of this Court case, and to do that
18  one were to start with the fair market value of
19  the collection.
20      Q.    You are aware that Christie's
21  relied on the market data method in arriving at
22  its fair market valuation, correct?
23      A.    Correct.
24      Q.    What is the market data method?
25      A.    It's looking at comparable prices,

Michael Plummer

1
2  which is the same methodology we did.
3      Q.    Anything else?
4      A.    That's pretty much essentially it.
5      Q.    Is that a standard methodology
6  that's used in coming up with a fair market
7  value?
8      A.    That's pretty standard, yes.
9      Q.    Moving on to Groups 3 and 4 on page
10  18?
11      A.    Sir, can I have a quick bathroom
12  break?
13      Q.    Absolutely.
14          THE VIDEOGRAPHER:  The time is
15  2:16 p.m., and we're going off the record.
16          (Short break taken)
17          THE VIDEOGRAPHER:  The time is 2:27
18  p.m., and we are back on the record.
19  BY MR. SOTO:
20      Q.    We're going to try to go through
21  some of the stuff that will be different and
22  hopefully won't be repetitive.
23          Your prior testimony was that, in
24  fact, the evaluation done by Artvest was to come
25  up with a fair market value, correct?

Michael Plummer

1
2      A.    Correct.
3      Q.    Why did you choose that form of
4  valuation, a fair market value?
5      A.    Because we thought it was the most
6  appropriate for the circumstance.
7      Q.    Did you consider using an auction
8  appraisal value?
9      A.    No, because auction values are
10  designed to entice bidders to bid on something,
11  as I like to say, the low estimate appeals to
12  the greed of the buyer and the high estimate
13  appeals to the greed of the seller.  It's a
14  psychological estimate track that's not relevant
15  to this situation.
16      Q.    Very interesting, another added bit
17  of information.  So, for example, if I were
18  trying to put on an auction I would want
19  estimates to make people think boy, I'm going to
20  get a good value for that?
21      A.    Um-hum.
22      Q.    So there would be lower estimates?
23      A.    Um-hum.
24      Q.    I got it.  I'm not that
25  knowledgeable about this, but did you consider

Michael Plummer

1
2  applying the market cash value appraisal method?
3      A.    It did not seem appropriate either.
4      Q.    What is the market cash value
5  appraisal?
6      A.    It's deducting the seller's
7  commission and any other fees that would be
8  related to selling the art.  It's often used for
9  art loans and other things where you want to see
10  what your net cash is going to be for selling
11  something.
12      Q.    When would the market cash value
13  appraisal be used?
14      A.    You would use it for an art loan,
15  would be one example.
16      Q.    Because you would want to know
17  after netting it out this is what you have as
18  collateral?
19      A.    Yeah, but it's interestingly, as a
20  matter of common practice, the low estimate for
21  the auction house would work as well.  That's
22  often used by lenders rather than net cash
23  value.
24      Q.    So now what's the difference then
25  between the market cash value and the fair

Michael Plummer

1
2 market value?
3     A.    The fair market value is higher, it
4 includes the buyer's premium as well.
5     Q.    The fair market value?
6     A.    Yeah.  The net cash market value is
7 not only missing the seller's commission, but
8 it's also missing the buyer's premium.
9     Q.    So it cuts out commissions and it
10 leaves what you're going to net out?
11     A.    Exactly.
12     Q.    We've mentioned a number of types
13 of appraisals.  Are there any other types of
14 appraisals that you are aware of that we haven't
15 spoken of yet?
16         We've talked about insurance
17 appraisals, we've talked about auction
18 estimates, we've talked about market cash values
19 and we've talked about fair market values; is
20 there anything else?
21     A.    There's a replacement value.
22     Q.    Would that be different than the
23 insurance value?
24     A.    It can be, but it's often used
25 interchangeably, but a replacement value is a

Michael Plummer

1
2 higher value, some people use it as -- some use
3 it as a retail value.  It presumes that there is
4 a time requirement involved in replacing
5 something so that a buyer would pay a premium to
6 replace it.
7     Q.    So it gives, generally speaking, a
8 higher value?
9     A.    Correct.
10     Q.    Are you familiar with the Uniform
11 Standards of Professional Appraisal Practice?
12     A.    I am.
13     Q.    What are they?
14     A.    Generally referred to as USPAP,
15 they're guidelines for conducting appraisals.
16     Q.    Did you review the USPAP at any
17 time while preparing the DIA evaluation that you
18 rely on in your expert report?
19     A.    I reviewed it and my appraisers are
20 USPAP-compliant appraisers, but as it's not --
21 USPAP is not required by law or any regulatory
22 body and is often not used by many appraisers, I
23 didn't think it was critical to this appraisal,
24 or this evaluation I should say.
25     Q.    Separate and apart from valuations

Michael Plummer

1
2 and appraisals, we talked about the market data
3 method of leading to an appraisal?
4     A.    Right.
5     Q.    Are there any other methods that
6 you're aware of, other than generally getting
7 market data that you described earlier?
8     A.    Well, I think that, you know,
9 market data can also mean data that's not
10 publicly available.  It can also be particularly
11 when you're dealing with primary market property
12 that you might need to call around to the
13 galleries that handle the artists because
14 they're not yet traded at auction or that the
15 highest prices are traded at auction.
16     Q.    Looking at page 18 again of your
17 report, paragraph B.  It says:
18         "Artvest conducted the initial
19 pricing research and created a source database
20 of comparables and other records, then shared
21 that with the consulting specialists who then
22 did supplemental price searches and other
23 research."
24     A.    Um-hum.
25     Q.    You've described earlier that you

Michael Plummer

1
2 used market data comparables and some additional
3 private information in coming up with what
4 Artvest called its source database, correct?
5     A.    Um-hum.
6     Q.    Do you know --
7     A.    Well that's not how I mean source
8 database.  No.  Okay.  You're correct, you're
9 correct.  Let's go back.
10     Q.    In what you're calling the source
11 database of comparables and other records, I
12 believe you testified earlier that included
13 market data that was available publicly about
14 the art?
15     A.    Right.
16     Q.    Comparables that you were aware of
17 both publicly, and some private comparables that
18 you were knowledgeable of?
19     A.    Right, right.
20     Q.    You mentioned some other indices
21 and other data that you received on this art.
22 That was the database that you prepared at
23 Artvest?
24     A.    Yeah, right.
25     Q.    You shared that with your

47 (Pages 185 to 188)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 161 of
204

Michael Plummer

1 consultant specialist, correct?
2
3     A.    Correct.
4     Q.    But then you go on to say who then
5 supplemented price searches and other research.
6 Do you know what they did to supplement that
7 database?
8     A.    Yeah, they then did their own
9 searches on Artvest, on Asguard, on Sotheby's
10 and on Christie's websites in addition to what
11 we gave them, they sort of did their own
12 double-check.
13     Q.    Do you know if they came up with
14 additional information?
15     A.    They did, yes.
16     Q.    Did you include that additional
17 information in the information that you produced
18 as supporting?
19     A.    Those comparables are in the work
20 file that I have available to share, that
21 electronic document that I referred to earlier.
22     Q.    That you are going to send us
23 later?
24     A.    Yes.
25     Q.    Okay.  You mentioned on page 20 --

Michael Plummer

1
2 am I accurate in my assessment that not every
3 piece of work at the DIA had a comparable?
4     A.    Yes.
5     Q.    There are some that did not?
6     A.    Correct.
7     Q.    How did you value those?
8     A.    You would look at things that sold
9 in related categories.
10     Q.    You refer to them as once in a
11 lifetime pieces of art?
12     A.    Yeah.
13     Q.    How many works are sort of once in
14 a lifetime?
15     A.    In the DIA collection?
16     Q.    Yeah.
17     A.    I don't know that it's fair to put
18 a number off the top of my head on there.  Is it
19 eight, is it ten, is it five, I don't know.
20     Q.    Do you recall how many had no
21 comparables?
22     A.    I don't remember how many had none,
23 but the non-comparables isn't just to once in a
24 lifetime pieces, they're also smaller, less
25 expensive works that might not have comparables.

Michael Plummer

1
2     Q.    So for those where you didn't have
3 a comparable you tried to look at to create a
4 comparable of some form?
5     A.    Yes, the closest in another sector.
6     Q.    In connection with your evaluation,
7 is there a specific time period for which a
8 comparable is relevant?
9     A.    That's an interesting question.
10 The problem with the art market is that
11 sometimes you have to go back many years, even a
12 decade or so to find a comparable.  So when you
13 do that then you have to make an adjustment that
14 you think is suitable for the difference in
15 time, and the difference in the market then to
16 the difference in the market now.
17         In some instances actually the
18 price could have gone down because the market
19 might have been hotter for certain things a
20 decade or two ago.
21     Q.    Let's turn to page 19.  In Group 5
22 you state that the balance of the DIA's art
23 collection was evaluated by sector using the
24 sample valuation data of the City of Detroit
25 works appraised by Christie's with the low value

Michael Plummer

1
2 of at or below 750, and applying an average
3 price sector by sector based on the data,
4 correct?
5     A.    Um-hum.
6     Q.    So here again, just so it's clear
7 to the Court, for this lower value, if there was
8 ten pieces this lower value from the Christie's
9 collection that were in the Old Masters, you
10 took the average of those ten and that's the
11 average you applied for the remainder of that
12 sector, correct?
13     A.    Correct.
14     Q.    Is your entire analysis of the
15 Group 5 works contained here in this table 2?
16     A.    What do you mean my entire, do you
17 mean the results of the analysis?
18     Q.    Yes?
19     A.    Yes.
20     Q.    Again, the sectors that you
21 testified about earlier, those are all the
22 sectors that you have identified, correct?
23         When you say you did it sector by
24 sector you identified the Old Masters, the
25 Impressionist, Modernists, the Post War?

Michael Plummer

1
2     A.    There are other sectors.  There was
3  the prints and drawings, decorative arts,
4  silver, arms and armor.  The fact that there
5  were so many sectors gave us the feeling that it
6  was an appropriate approach to this correction.
7     Q.    Where can we find the most complete
8  list of the sectors that you divided them into?
9     A.    This is the listing of the sectors.
10    Q.    So indeed the separations in
11 Exhibit G are the sectors?
12    A.    Correct, correct.  I think there
13 are maybe eight, nine, ten, something like that.
14 Just to clarify, the DIA and Christie's
15 differentiate in how they classify things in
16 terms of sector.
17        It's really a commercial
18 distinction versus a curatorial distinction, and
19 where we needed to we made the juxtaposition
20 from one to the other so that they matched up.
21    Q.    Did you record the average prices
22 in each sector somewhere?
23    A.    Yes.
24    Q.    In the report?
25    A.    In this report, no.  It was part of

Michael Plummer

1
2  the calculation.
3     Q.    I'm trying to figure out how I'm
4  going to find the average prices in each sector.
5  Will it be in that thing you send me
6  electronically?
7     A.    I could put it in that thing that I
8  send you electronically.
9     Q.    That would be helpful in trying to
10 figure out what averages you used in making your
11 calculation.
12    A.    Sure.
13    Q.    Thank you.  Stepping back in a
14 hypothetical situation.  Aside from evaluating
15 each of the 62,000 pieces and coming up with a
16 number or applying the method that you did
17 apply, because I've heard about those two, you
18 testified about what you applied and obviously
19 the other one will take quite a while.
20        Is there any other way that you can
21 think of doing this kind of a valuation of this
22 large collection?
23    A.    Yes, there was a methodology that
24 we examined and we rejected within about an
25 hour, which was using the average prices of

Michael Plummer

1
2  sales results of Sotheby's and Christie's.  We
3  had accumulated that data and we used it for
4  calculation of BIs.
5        Then we discarded using it for the
6  DIA collection because we felt there was no way
7  to make a logical connection between sales of
8  Sotheby's and Christie's and average prices, and
9  then using -- and the DIA's average price;
10 whereas we felt that using a sample of DIA's own
11 data would be relevant.
12        So I was surprised to see that
13 Wiener used the average prices from the
14 Sotheby's and Christie's data that we had
15 collected to use his valuation on the
16 collection.
17    Q.    So that's one of the things that
18 you disagree with what Mr. Wiener did, correct?
19    A.    Correct.
20    Q.    You mentioned that there were
21 others, what are they?
22    A.    I don't have his report in front of
23 me.  There are some ways in which he matched up
24 some different methodologies to come to a total
25 number that concerned me, and various other

Michael Plummer

1
2  things that I would have to have his report in
3  front of me and my notes to go into.
4     Q.    You state that to the extent this
5  methodology has a bias, this is again back on
6  your page 19, it is likely to overstate the
7  value of the DIA collection?
8     A.    Correct.
9     Q.    How?
10    A.    Because when we did the average
11 value by sector we got some large average values
12 in different sectors like African and others,
13 and drawings; then we just used an average value
14 based on a total average of the Christie's data.
15 We actually did an alternate cut and it dropped
16 it down from valuing that part of the collection
17 from 600 million to 1 something billion,
18 1.2 billion, to about I think it's 130 million
19 to 300 million or something hike that.
20        So we felt going into it that it
21 was a bias, and also because we considered the
22 DIA property to have been purchased
23 strategically and that it was property bought by
24 the City of Detroit for the museum to raise the
25 profile of the museum.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

Michael Plummer

So it was more likely to be a
higher concentration of quality property, a
balance of property that was given to the
museum, which would include dregs along with
high quality of stuff, which often comes in
collections that are donated.

Q.    On page 19 you also state that for
property value "below 5,000 I attributed an
effective value of zero"?

A.    Yes.

Q.    Why?

A.    Because we felt that the cost of
handling that, and unlike the other property
where no commission would have been charged, we
felt that there would have been a commission
charged for the handling of that property
because it has a high nuisance value, and
Sotheby's and Christie's try not to sell or
value a property in that price range.

In fact, Sotheby's just went into a
new venture with eBay to try and find a way to
solve that problem.  So we felt that the cost of
handling it would net out to zero for the value
of it.

Michael Plummer

Q.    If you know, if someone were to
approach Sotheby's or Christie's, given your
experience with both enterprises, with a project
like the monetization of the art collection at
the DIA, well, let's ask that later.  Let me ask
the first question.  Strike that.

If someone were to approach
Sotheby's or Christie's, both enterprises that
you're familiar with, with a project to sell the
collection at the DIA, would that be the kind of
project that would be a pretty exciting project
to both entities, a very valuable collection,
well thought of?

A.    It's a valuable collection, it's
well thought of.  My business opinion after
being in this industry for 35 years and worked
at both houses, is that I don't think either
house would touch it with a 10-foot barge pole
because they -- both houses, just to explain,
have museum departments that cultivate
relationships with the museums.

Museum sales are important to their
business, curator's opinions are important to
their business, relationship with the museum

Michael Plummer

directors are important.  They spend a lot of
money making donations to museums and
cultivating those relationships.

If they were to sell this art they
would destroy their relationship with the museum
community in America and that is a high price to
pay, and it would do serious damage to their
brand.  I think that the fallout that Christie's
received after just doing the appraisal was
indicative of how much more magnified it would
be if they were to actually handle the sale of
the DIA property.

Q.    Did you speak with anyone at
Sotheby's about this to determine whether they
would --

A.    Hum, I did not --

Q.    That they would not touch it with a
10-foot barge pole.  Was it a 10-foot barge
pole?  I just want to be sure.

A.    A 10-foot barge pole.  I avoided
speaking to people at the auction houses about
this project that I'm working on.  I did hear
someone senior at one of the auction houses say
such a thing.  I am very aware of Sotheby's

Michael Plummer

long-standing commitment to the City of Detroit,
it used to be headquartered in Detroit.

Its largest shareholder for many
years was a donor to the museum and ran a
building fund.  He still has a close
relationship to the senior management of
Sotheby's.  He has a wing named after him in the
DIA.  I find it hard to imagine, knowing what I
know of the management of Sotheby's, that they
would do it.

Q.    So it's your view that if someone
were to agree to handle the sale of a collection
like that, that they would exclude from that
works of art that are below 5,000 for which you
attribute an effective value of zero?

A.    I'm sorry, I'm not following the
collection.

Q.    What I'm trying to figure out is
you say they may be worth 5,000 or less, you
attributed zero, and when you testified about it
you said it's because it costs a lot of money to
handle that art and get it ready.

But in the context of an
overarching sale of an entire collection like

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Michael Plummer

1 the City's collection at the DIA, would that
2 still be true, would they still be of no value
3 in your mind?
4     A.    Yes, I think it's going to be a
5 difficult property to get rid of because it's
6 thousands upon thousands upon thousands of items
7 which would require years to be sold.
8     Q.    How many works of art fall in this
9 category at the DIA, this below 5,000?
10     A.    I don't remember.
11     Q.    Do you have anything you can refer
12 to in your report that would refresh your
13 recollection?
14     A.    I don't have numbers, but I have
15 that 45.98 percent were between 1,000 and 5,000
16 in value.
17     Q.    45.89 percent of the overall DIA
18 collection?
19     A.    Right.
20     Q.    Did you review the publicly
21 available information for sales at Sotheby's and
22 Christie's to determine how many sales they've
23 had in the last year or so, two years or so of
24 art that's valued below $5,000?


1 the City's collection at the DIA, would that
2 still be true, would they still be of no value
3 in your mind?
4     A.    Yes, I think it's going to be a
5 difficult property to get rid of because it's
6 thousands upon thousands upon thousands of items
7 which would require years to be sold.
8     Q.    How many works of art fall in this
9 category at the DIA, this below 5,000?
10     A.    I don't remember.
11     Q.    Do you have anything you can refer
12 to in your report that would refresh your
13 recollection?
14     A.    I don't have numbers, but I have
15 that 45.98 percent were between 1,000 and 5,000
16 in value.
17     Q.    45.89 percent of the overall DIA
18 collection?
19     A.    Right.
20     Q.    Did you review the publicly
21 available information for sales at Sotheby's and
22 Christie's to determine how many sales they've
23 had in the last year or so, two years or so of
24 art that's valued below $5,000?

Michael Plummer

1
2     A.    I did not, but I have been
3 involved -- I have not.
4     Q.    Moving on to Table 1 on page 18.
5 The figures in this table come from Christie's
6 evaluation, correct?
7     A.    Yes.
8     Q.    Are you aware that Christie's did
9 not actually appraise all 2,760 pieces?
10     A.    Yes, I am aware of that.
11     Q.    They didn't appraise 1,038 items,
12 correct?
13     A.    I believe that's -- well, what they
14 did was they decided that they were not of
15 sufficient value to appraise.
16     Q.    So they didn't appraise them,
17 correct?
18     A.    They did not appraise them, but
19 they did essentially assign them a value of
20 zero.
21     Q.    In your table you attribute no
22 value to them at all, correct?
23     A.    Correct.
24     Q.    Did you review any of those 1038
25 items to see if you agreed with Christie's that

Michael Plummer

1 they were of insignificant value?
2     A.    We had the data and we did look at
3 it, yes.
4     Q.    And you agreed with their
5 assessment?
6     A.    Yes.
7     Q.    Turning to Table 2. The figures on
8 this table include Christie's valuations and
9 Artvest's additional valuations, correct?
10     A.    Yes, correct.
11     Q.    And you come to the conclusion that
12 the entire museum should have appraised or
13 evaluated the collection at between 2.7 billion
14 and $4.6 billion, correct?
15     A.    Correct.
16     Q.    In coming to this conclusion you
17 didn't inspect or value any of the remaining
18 57,181 works of art, did you?
19     A.    We did not. We valued them by
20 virtue of the calculation we made, but we did
21 not inspect them.
22     Q.    On page 20 you exclude some works
23 thought to be by?
24     A.    Modigliani.

Michael Plummer

1
2     Q.    The G is silent?
3     A.    Yes.
4         MR. SOTO: Every day I work as a
5 lawyer I learn something I didn't know the day
6 before.
7     Q.    Modigliani?
8     A.    Modigliani.
9     Q.    Why are you insinuating that the
10 works of art at the museum are not authentic?
11     A.    Because they are not in the Ceroni
12 catalogue resume, and there is a lot of
13 controversy in that market right now, and there
14 is a number of fakes around, and there is
15 alternate catalog resume out there that has
16 fakes in it.
17         So it's a hot controversial topic
18 and Christie's should stop selling works that
19 are not in Ceroni, and Sotheby's is reluctant to
20 do so as well. So the common practice is to
21 give it a value of zero or a minimal value;
22 certainly not to value it as a real Modigliani.
23     Q.    How many works of art does a museum
24 have that are Modiglianis?
25     A.    I don't remember the total amount.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 165 of
204

Michael Plummer

1 I think that Christie's did value one and I
2 believe there were two which we had took issue
3 with, if I remember correctly.
4      Q.   So they did one?
5      A.   And we had two.
6      Q.   You took issue with them both?
7      A.   I believe so, but I can't remember
8 for certain.
9      Q.   Do you know if the museum insured
10 those pieces?
11     A.   I don't remember.
12     Q.   Do you know if there was an
13 insurance value for any of those pieces?
14     A.   I don't remember.
15     Q.   You also excluded the Diego Rivera?
16     A.   Yes.
17     Q.   Why was that?
18     A.   It is -- according to the standards
19 of the Appraisers Association of America, and
20 Liz von Habsburg agreed with this analysis as
21 well, so it's two of us who came to the same
22 conclusion that if an important -- if a mural is
23 a part of a building and it would damage it to
24 remove it, it should be valued as part of the

Michael Plummer

1 real estate of the building and not separately
2 as a work of art, because it really is not
3 removable.
4          This is really particularly true of
5 the Diego Rivera murals because they are so
6 large that they would have to be sliced up in
7 the middle of the imagery in order to move them,
8 and that would cause one set of damage, plus the
9 active removal would cause another set of damage
10 so then they would require heavy restoration.
11 The damage would be an injury to the work and it
12 would -- it just -- it can't be valued as a
13 salable work of art.
14     Q.   Do you know how the DIA initially
15 acquired this work of art?
16     A.   It's my understanding that they
17 were a gift from Ansel Ford, if Ansel is
18 correct, and that they were painted by Diego
19 while he camped out there for a period of time
20 to complete them, and that actually just after
21 completing those he rushed up to New York to
22 paint the ones at Rockefeller Center that were
23 then subsequently painted over by Nelson
24 Rockefeller.  This is a masterpiece.

Michael Plummer

1      Q.   Did they have to remove the works
2 from Ansel Ford's site to the DIA?
3      A.   No, I was not aware of that.
4      Q.   So they were painted at the DIA?
5      A.   They were painted at the DIA.
6      Q.   That's what I'm trying to ask.  Is
7 it possible, do you know of murals of this type
8 that have been moved?
9      A.   There have been some smaller murals
10 moved from churches and things.
11     Q.   Did you consider the possibility of
12 doing that when you valued the Diego Rivera?
13     A.   As I said, we did consider it, and
14 we talked to a Diego Rivera expert as well.
15 It's as I said for the reasons I mentioned,
16 breaking them up and giving that kind of risk.
17     Q.   Looking at what has been called the
18 market issues affecting sales, we're going to go
19 to page 24.  Your report attempts to address
20 some market issues that may affect the value of
21 the collection, correct?
22     A.   Um-hum.
23     Q.   On page 24.
24         MR. O'REILLY:  Just verbal answers.

Michael Plummer

1      Q.   Whenever anybody wants to take
2 another break some time in the middle of the
3 afternoon to get some coffee or something,
4 whatever you want.
5      A.   Okay.  Thank you.
6      Q.   Paragraph 37 on page 24 says, "A
7 significant segment of DIA's collection is in
8 areas that have fallen out of favor with
9 collectors."  Correct?
10     A.   Correct.
11     Q.   The performing sectors that you
12 identify that have fallen out of favor, and you
13 mentioned some of them earlier, were American
14 Art pre-1950, Old Masters and 19th Century
15 European paintings?
16     A.   Um-hum.
17     Q.   And then also Impressionist and
18 Modern Art, correct?
19     A.   Correct.
20     Q.   What is the basis for this opinion?
21 How did you determine that these were
22 underperforming sectors?
23     A.   Well, I think the index here from
24 Mei-Moses points this out on page 24.  I think

Michael Plummer

1
2  that's a factual representation. I would say
3  also every day of my business both with Artvest
4  and also with Spring Masters, working with
5  dealers and collectors in these areas, and just
6  this past week I had the same conversation with
7  five different dealers in these areas that said
8  the same thing that I'm saying here.
9        So this is borne out in everything
10  I experience. So I would, you know, challenge
11  you to find a dealer out there who would
12  disagree with this, or an auction house expert.
13     Q.    Did you do any research to
14  determine what was the basis of this chart 18
15  that you have here, the 2003 index?
16     A.    I know how the Mei-Moses index is
17  completed. I've known Michael Moses for ten
18  years, I've been studying indexes in the art
19  industry. I actually helped construct one that
20  we used for a period of time several years ago.
21     I know he uses repeat sales index.
22  I know some people don't like that, I'm
23  perfectly fine with it because I think his
24  database is now complete enough to be
25  representative of the art market. Ten years ago

Michael Plummer

1
2  I would have said not, but I think it is
3  absolutely fine now.
4     Q.    Ten years ago the difference would
5  have been what?
6     A.    Because he didn't have enough
7  samples in his database, but he's flushed it out
8  fully enough that when I compare it to other
9  indices it actually is comparable.
10     Q.    When you say he uses repeat sales
11  what does that mean?
12     A.    It means he gets -- he's gone back
13  to the 19th Century to get data from a property
14  that comes back up to auction and then he
15  measures the price of the same piece each time
16  it's auctioned and uses that as a data point.
17  The merits are that he's using a bucket of data
18  that is actually using identical pieces.
19     Q.    Did you consider using any
20  additional indices to support your conclusion
21  here, besides the Chart 18, Mei-Moses?
22     A.    I did, and I know they show very
23  similar thing. Art Market Research has the
24  similar results, but I did not feel it necessary
25  to apply it here.

Michael Plummer

1
2     Q.    That is because?
3     A.    I thought this made the case in and
4  of itself. Mei-Moses, except for a few people,
5  he is well regarded.
6     Q.    You're not concerned with the fact
7  that he uses repeat sales limits?
8     A.    No --
9     Q.    Excuse me, limits the database that
10  he's using?
11     A.    No, because I tracked it over ten
12  years and compared it to other indices I'm
13  perfectly comfortable with this.
14     Q.    The other indices that you referred
15  to earlier, are they consistent with this one in
16  the analysis of the value of these sectors?
17     A.    Yes.
18     Q.    Looking at your chart, it appears
19  as though all sectors declined in 2008, correct?
20     A.    Yes, 2008 was a bleak time for
21  everybody.
22     Q.    This was as you testified about
23  earlier, the financial crisis that you referred
24  to?
25     A.    Yes.

Michael Plummer

1
2     Q.    Isn't it also true that in a down
3  market that turnover falls because collectors
4  are less willing to sell at a depressed rate,
5  they would rather just hold on to it and sell
6  later?
7     A.    Yes, we had commented on that.
8     Q.    As the nation recovers would you
9  expect that the interest in those sectors would
10  also increase?
11     A.    Not necessarily, for a couple of
12  reasons. One is that the art market is driven
13  by a global collector base, and if you're asking
14  about less recovers I don't think it's
15  necessarily a linear connection.
16     I also say perhaps more importantly
17  that the problem with these sectors is that
18  young collectors, new buyers are moving almost
19  exclusively into Post War, not into these other
20  sectors, so they're not getting the new blood
21  that they need.
22     Q.    Looking at your chart, it appears
23  that the Impressionist and Modern Art sector is
24  on the rise again, correct?
25     A.    From this Mei-Moses index?

53 (Pages 209 to 212)

Michael Plummer

2    Q.   Yes.
3    A.   No.  I wouldn't say that.  I would
4 say that the Modern sector is doing better than
5 the Impressionist part of the sector, and
6 benefits a little bit from spillover from the
7 Post War and Contemporary since it's the sector
8 just before that; but that sector is pretty
9 flat.
10    Q.   So these green lines here?
11    A.   The green lines, you can see it
12 came back in 2010, but it hasn't shown
13 noticeable appreciation between 2011 and 2013.
14 In fact, there have been some disappointing
15 sales in that area which are mentioned in this
16 document.
17    Q.   Are you familiar with Zhang Yi, an
18 author of the TEFAF?
19    A.   TEFAF.
20    Q.   T-E-F-A-F, TEFAF Art Market Report?
21    A.   I am familiar that he's contributed
22 to that report as a freelancer, but I actually
23 have a very close relationship with the woman
24 who actually writes the full report, Clare
25 McAndrew, that's who I tend to correspond with

Michael Plummer

2 and communicate with.
3    Q.   Looking at your report, tab 4?
4    A.   Table 4 you mean?
5    Q.   Let me hand you as Exhibit 3.
6        (Plummer Exhibit 3, Victor Wiener's
7 Expert Report in this Chapter 9 proceeding,
8 marked for identification.)
9 BY MR. SOTO:
10    Q.   As Exhibit 3 let me hand you a copy
11 of Victor Wiener's report.  Exhibit 3 is marked
12 here, it's Victor Wiener's Expert Report in this
13 Chapter 9 proceeding.
14        You testified earlier that you
15 reviewed that, correct?
16    A.   Correct.
17    Q.   You mentioned that there were a
18 number of things that you disagreed with,
19 correct?
20    A.   Correct.
21    Q.   You've mentioned a few of them
22 already, correct?
23    A.   Correct.
24    Q.   Take a few moments to take a look
25 at it and see if there are any other areas you

Michael Plummer

2 find particularly disturbing to you?
3        MR. O'REILLY:  Objection to the
4 form.
5    A.   I would say at the start that I
6 have my own notes and thoughts on this that I
7 can't summarize this fully in this exchange with
8 you.
9    Q.   You don't have to summarize them
10 fully, just things that are of major disturbance
11 to you that you find that are particularly in
12 error?
13    A.   I would say that the value of the
14 collection is in error.
15    Q.   Why is that?
16    A.   Because I think that it's grossly
17 overvalued.
18    Q.   Why?
19    A.   Because in his methodology, if you
20 look at his methodology step-by-step chart,
21 number 3, he's chosen 387 units, which we don't
22 know why he's chosen those that he's put a value
23 on, where he has put in a supplement based on
24 his assumption that the DIA sale is going to be,
25 as he puts it, a sale of the century.

Michael Plummer

2        He has not revealed what that
3 supplement is, but it appears to be a multiple
4 of three or four or many times, and there
5 doesn't seem to be a clearly understandable
6 basis for that calculation.
7        Then he uses Christie's and my
8 appraisal values which he has criticized, but
9 yet he uses them.  I don't think he criticized
10 Winston's, but he uses theirs as well.  Then in
11 step 3 he has used the DIA values, insurance
12 values which we have already mentioned.  We did
13 an analysis of and found them to be irrelevant.
14    Q.   Are those the ones you described as
15 whacky?
16    A.   Yes.
17    Q.   So you're assuming those are the
18 insurance values?
19    A.   Yes.  Most likely, to the extent if
20 they are insurance values they would be
21 replacement values which, as I said, would be
22 the highest value.  Victor did a net cash
23 valuation for step 1.  He used our numbers,
24 Christie's, Artvest and Winston's which are fair
25 market value.

Michael Plummer

He then used a replacement value methodology for step 3. Then he went back to what would be the equivalent of fair market value because he used Christie's and Sotheby's data.

For step 4 he used my data to basically get an average value based on sales of Sotheby's and Christie's, which I told you we rejected that methodology as being unsound, as there not being any logical connection between the property sold at Sotheby's and Christie's from what's in the DIA. So he uses all of these different methodologies and all of these different values to arrive at 8 million 552.

Q. Anything else that comes to mind as you look at it?

A. Well, he makes claims about my process which he had no knowledge of, which are untrue. There are other things.

Q. Let me walk you through some that you might have mentioned that I had while everyone was eating?

A. Sure.

Q. Turn to page 21 of the report. I'm

Michael Plummer

pointing these out to you because you may have mentioned something about it and I would be interested on what your view is about this, correct?

A. Yes.

Q. On page 21, the paragraph under "Museum provenance" under "The Effects of Selling Museum and Celebrity Art":

"It is apparent that works of fine and decorative art, and other collectibles from museums and other significant collections perform much better at auctions than similar objects lacking notable provenance."

Do you agree with that?

A. In many instances, but not all.

Q. How about in the context of the collection at the DIA?

A. I don't think it would apply to the collection of the DIA, and I have reasons for believing that.

Q. And why is that?

A. If the collection were sold it would have the taint that I described. If the -- now I'm wearing my hat as former head of

Michael Plummer

marketing at Sotheby's. He mentions the celebratory effect of the Jackie O sale, as I mentioned earlier. I worked at Sotheby's on that sale so I have real world insight on that kind of thinking and marketing.

To put on a show if you will, to put on a promotional effort that we did at Sotheby's for Jackie O, or that was even done for the Albright-Knox property, there has to be a positive feeling behind the celebrity or the institution.

If there is taint you can't market it that way, you can't do a big celebratory sale, it works against you, it actually backfires. So you couldn't do a big, splashy, this is the DIA sale, that's not possible.

In fact, what is comparable to the DIA sale is the Klimt paintings that were sold in 2006 at Christie's, where they were Nazi property that had been given to the Vienna Museum and then restituted. Those paintings did well, but they did well not because they were property from the museum. In fact, the museum provenance was hidden in the marketing. The

Michael Plummer

story that was told was about their restitution to the owner.

So yes, it's true in certain circumstances, museum provenance can be meaningful and important, but it has to be the right circumstance otherwise it can work against you.

I take the case that I use in my paper about the Delaware Museum. They went out thinking they had $30 million worth of art to sell, that has not gone well, they've been sanctioned. They are now expecting that art to bring in $19 million worth and they've had to lower their expectations of what they will be able to pay down.

MR. O'REILLY: Ed, I don't want to interrupt your flow, do you mind if I take a break?

MR. SOTO: Sure.

THE VIDEOGRAPHER: The time is 3:16 p.m., we're going off the record.

(Short break taken)

THE VIDEOGRAPHER: This begins media unit number 4, the time is 3:27 p.m., and

55 (Pages 217 to 220)

1          Michael Plummer
2    we're back on the record.
3    BY MR. SOTO:
4          Q.    Mr. Plummer, looking at the report
5    before you, Exhibit 3, at page 44.  Mr. Wiener
6    is commenting on your report there?
7          A.    Okay.
8          Q.    The paragraph you see:
9               "In brief, Dr. Barth opines that
10    most, if not all, the discounts applied by the
11    Artvest Report are unsustainable because of
12    reliance upon unsupported data.  The Barth
13    Report goes through each discount the Artvest
14    Report applies and shows that the data is either
15    lacking or inconsistent with the conclusions
16    reached.  As such, the Barth report concludes
17    that the Artvest Report is unreliable."
18               Do you see that?
19          A.    I see that.
20          Q.    Did you have a chance to review the
21    Barth report?
22          A.    I did.
23          Q.    What were your conclusions on that
24    report?
25          A.    I felt it was -- I disagreed with

1          Michael Plummer
2    her conclusions.  She -- her experience and
3    education in the art world is a certificate at
4    Sotheby's works of art program, which actually I
5    used to oversee as part of my role at Sotheby's.
6               I think that she's speaking from a
7    place of not real art world experience and I am,
8    and I think that actually the conclusions are
9    supported, the data is supported, and I stand by
10    it.
11          Q.    Anything more than that?
12          A.    I probably have more, but I would
13    have to, you know, prepare for it.
14          Q.    In connection with the next
15    paragraph that starts:
16               "The Artvest Report also dismisses
17    all expressions of interest by three potential
18    purchasers," do you see that?
19          A.    Yes.
20          Q.    Did you read that purchase of it?
21          A.    Yes, I did.
22          Q.    Did you read the next paragraphs
23    that address those potential purchases?
24          A.    Which paragraph are you referring
25    to?

1          Michael Plummer
2          Q.    The first one is the first
3    paragraph on the potential "See Artvest Report,
4    39 to 40," do you see that?  "The Artvest Report
5    also dismisses all expressions of interest"?
6          A.    Yes.
7          Q.    What is your opinion on that
8    conclusion?
9          A.    I reviewed the expressions of
10    interest and I stand by what I say in my report.
11    In fact, I'm not sure why they can disagree with
12    what I've said because it's pretty
13    straightforward.
14          Q.    The next paragraph talks about,
15    well, let's see:
16               While VWA did not have direct
17    access to the three potential purchasers,
18    according to Houlihan, Poly International
19    Auction House, who expressed interest in
20    purchasing all Chinese works for up to $1
21    billion, Yuan Capital, who also expressed
22    interest in purchasing 116 pieces for $895
23    million to $1.4 billion, and Catalyst
24    Acquisitions/Bell Capital Partners, who
25    expressed interest in purchasing the entire

1          Michael Plummer
2    collection for $1.7 billion."
3               Did you try to contact any of those
4    individuals in connection with the preparation
5    of your report?
6          A.    I did not.  I am familiar with
7    Poly.  I expressed in my report that I was
8    unfamiliar with the others.  And, as I recall in
9    my report, I believe that I was talking about
10    whether or not the value of the collection would
11    measure up to what these people were interested
12    in buying, and as I read the documents
13    subsequently of what they offered as their
14    indications of interest, there is no binding
15    commitment there, and all of them allow an out
16    to provide a lower value offer if the collection
17    is lower or the section of the collection is
18    lower than what they're asking for.  That's
19    pretty much all I said, except for with regard
20    to Ian Peck which is a different issue, and the
21    loan.
22          Q.    I was about to go to Ian Peck, but
23    before I do.  Did you try to contact these
24    individuals or any other potential monetization
25    entities?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 170 of
204

Michael Plummer

1
2     A.    I did not.
3     Q.    You were not asked to either?
4     A.    I was not asked to.
5     Q.    Now you were going on to Ian Peck.
6  What more did you have to say about his view?
7     A.    Well, it's interesting.  He says
8  that my expense calculations are inaccurate, yet
9  they are what is in his offer, not only in the
10 Houlihan Lokey document, but I read the details
11 of his indication of interest that he submitted
12 to Houlihan Lokey, and the numbers that I used
13 are the numbers that he has in his offering
14 documents.
15        So I'm surprised -- I'm not
16 surprised.  I am perplexed that he would say
17 that they are inaccurate, when actually the
18 documentation submitted supports what I said.
19    Q.    Anything else?
20    A.    With regard to the report?
21    Q.    Yes.
22    A.    We could go through it page by
23 page.  I have numerous objections to it, but I'm
24 not sure that's the best use of your time today.
25    Q.    We can certainly come back and do

Michael Plummer

1
2  that, but what I'm asking is a little bit
3  different.  I appreciate your willingness to do
4  that.
5        As you sit here today, are there
6  any things that you find particularly egregious
7  or inaccurate that you haven't testified about
8  already?
9     A.    I mentioned the ones that are top
10 of mind.  There are others, but I would have to
11 go through the report to find them.
12    Q.    Going back to -- we were talking
13 about your report page 6 of 72 in your report,
14 paragraph 23 which is actually on page 7,
15 paragraph 23 is on page 7.
16    A.    Okay.
17    Q.    You state that:
18        "Four sectors of the art market
19 constitute 98% of the value of the fine art
20 market:  European, Modern Art, Impressionist and
21 Post-Impressionist Art, European Old Master
22 Paintings, and Post War and Contemporary Art.
23 Of those four sections, three have declined in
24 value since 2011."
25        Do you see that?

Michael Plummer

1
2     A.    Right.
3     Q.    Other than what you've already
4  testified about today, I know you've mentioned
5  this before, why do you believe those sectors
6  have declined?
7     A.    For the reason I stated, that
8  collectors are migrating into Contemporary Art
9  to the exclusion of other sectors.
10    Q.    Did you notice that the volume and
11 sales of those same three sectors in 2012 and
12 2013 exceeded previous session models?
13    A.    Yes.
14    Q.    Is it possible that the
15 Impressionist and Modern paintings sectors
16 declined because there were few high quality
17 works on the market during the depressed period?
18    A.    I think some people believed that,
19 but I think that it's a function of the reason
20 that I stated.  That, as I said, comes from not
21 only looking at the data but actually talking to
22 the dealers in the field, which I indicated
23 earlier, dealers and auction house specialists.
24    Q.    Going to paragraph 25 of your
25 report which is on page 9, looking at

Michael Plummer

1
2  subparagraph A.  You state that:
3        "Selling at or below the low
4  estimate is more the norm, and selling at the
5  higher end of the estimate range becomes an
6  anomaly."
7        Do you see that?
8     A.    Yes.
9     Q.    You point to the example from
10 Christie's evening auction as support for that,
11 right?
12    A.    Right.
13        (Plummer Exhibit 4, Article
14 prepared by Zhang Yi entitled "Review of Expert
15 Witness Report of Michael Plummer, Artvest
16 Partners, Dated July 8, 2014", marked for
17 identification.)
18    Q.    Let me hand you Exhibit 4.
19        MR. SOTO:  For the record,
20 Exhibit 4 is an article prepared by Zhang Yi,
21 which is Z-h-a-n-g, Yi, Y-i, two separate words
22 entitled "Review of Expert Witness Report of
23 Michael Plummer, Artvest Partners, Dated July 8,
24 2014."
25    Q.    Have you seen this before?

57 (Pages 225 to 228)

Michael Plummer

A. I have, yes.

Q. It's one of the supplements or one of the exhibits to Mr. Wiener's report, correct?

A. Correct.

Q. Did you review this?

A. I did.

Q. Will you take a look at that report in paragraphs 7 through 8?

A. Yes.

Q. He states that your analysis as to Christie's evening sales was incorrect, I'm quoting him:

"The Artvest Report is incorrect about Christie's auction data for the evening sales of Impressionist and Modern Art. The turnover of that section on May 6th was $285.9 million, and the estimate was between $244.5 million to $360.4 million." Do you see that?

A. Right.

Q. Did you check this man's data to determine whether you were right or he was right?

A. I did.

Michael Plummer

Q. What was the result?

A. I was right. What's curious is that I have here the 172 is the hammer price, and we say that that's the hammer price, and he seems to be disregarding that because he's using the price plus the buyer's premium which, as I told you, distorts the market. So he seems not to be adjusting, making the proper adjustments we are which shows the real activity in the marketplace.

Q. So the difference between the 285.9 number that Mr. Yi refers to you believe that it includes the buyer's premium?

A. It includes the buyer's premium, but it looks like it includes something else. I checked the 172 million and that is the correct price, or the hammer price.

Q. Looking at paragraph 25 B in your report, page 10. Your analysis assumes that the increase in international art purchases, and I'm quoting you, is not likely to be repeated over the next five years. In fact, with growth now concentrated almost exclusively in the Post War Contemporary sector, I estimate that

Michael Plummer

excluding a price disruption in this sector, growth of the art market will remain choppy over the near to mid-term in all other sectors other than Post War and Contemporary?

A. Um-hum.

Q. What's the basis for that opinion?

A. The basis for that is, as I said, all of the data that I talked to you before, all of the conversations I talked to you about, everything that I've mentioned up to now as to my sources of information.

I should add that I used this in my analysis for Citibank last year in the problems that Christie's was facing going into the future, and the activist investors, Dan Loeb and the others, based their activity with Sotheby's based on my analysis with Christie's.

So I would say that my theory is not just something that I pulled out of the air, but something that is grounded in real world experience that others have taken action on, financial action on.

Q. Turn again to Mr. Yi's analysis in your report, Exhibit 4. Exhibit 4, page 6 of

Michael Plummer

that exhibit?

MR. IRWIN: Did you say paragraph 6 or page 6?

MR. SOTO: Page 6, paragraph 21.

Q. Take a moment to read that. I assume you have read it before?

A. Yes. He's saying the opposite of what I say. As I said, he may not have evidence, but he's not active in the art world the way I am on a day-to-day basis.

Actually, and let me add that I have actually had this conversation with Clare McAndrew who writes the report that he's purporting to actually represent, and she actually has agreed with me.

Q. Looking then back on the TEFAF report that you rely on in your report. It states that:

"Emerging markets are increasing their importance in the global wealth hierarchy and have been growing at faster rates than more developed markets, a trend that is expected to continue."

Did you disagree with the TEFAF

58 (Pages 229 to 232)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 172 of 204

Michael Plummer

1  report?
2      A.  No, I don't agree with that -- I
3  don't disagree with that.
4      Q.  Where is the disconnect then
5  between your view that this -- are they talking
6  about two different sectors of art, is that what
7  I'm missing here?
8          The TEAF report says that emerging
9  markets will continue to grow, correct?
10     A.  They will continue to grow, but it
11 doesn't say by how much and at what pace.
12     Q.  It says at faster rates than
13 developed market?
14     A.  Still, it's not saying what that
15 impact will be on the larger art market and what
16 percentage.  All I'm saying is it's not going to
17 be the kind of growth that happened from 2003 to
18 2012, some years will be up, some years will be
19 down.  I'm not denying that there won't be
20 growth at all.
21     Q.  So your analysis is that there
22 won't be growth, it just might not be as fast as
23 it was before?
24     A.  It might not be as fast as it was

Michael Plummer

1  in the past.
2      Q.  Turning to page 25 of your report.
3  Under museum purchases you state that:
4          "Few sales would be to other
5  museums, both because other museums are likely
6  to boycott such sales, as well as because
7  funding constraints limit their participation in
8  the marketplace."  Correct?
9      A.  Correct.
10     Q.  What is the basis for your
11 statement that museums are likely to boycott the
12 sale?
13     A.  Comments made by other museum
14 professionals to me.
15     Q.  Those were again not at the DIA,
16 but at other museums?
17     A.  At other museums.
18     Q.  I think you testified earlier you
19 spoke to about 20 people?
20     A.  People either in museums or
21 associated with museums.
22     Q.  Can you recall which museums you
23 spoke with about the potential sale of art at
24 the DIA?

Michael Plummer

1      A.  I promised the people that I talked
2  to that I would not reveal who they were.
3      Q.  Assuming for the moment that the
4  DIA did sell its collection, is it your opinion
5  that museums would refuse to bid on the, I think
6  you described it as once in a lifetime sale
7  artworks that you described earlier?
8      A.  I think there are a number of
9  obstacles in the bidding.  I think that they
10 would be reluctant to, some of them would
11 boycott, some of them would have difficulty --
12 most of them would have difficulty coming up
13 with the funding of the magnitude of some of the
14 master works.
15     Q.  Let's take the example of "The
16 Wedding Dance"?
17         MR. IRWIN:  Sorry, are you done?
18     Q.  I'm sorry.
19     A.  I'm not sure.  For the moment I'm
20 done.
21     Q.  Take the example of "The Wedding
22 Dance" by Peter Bruegel.  Is it your testimony
23 here that museums would -- if it was going to be
24 sold as a City work of art by the DIA, is it

Michael Plummer

1  your opinion that there would be no museums that
2  would bid on that once in a lifetime sale of
3  art?
4      A.  No, I didn't use any -- I never
5  used no or all or anything; I just said that it
6  would not be the solution that people might
7  think it is.  I can't sit here and say that no
8  one would bid on anything, but I can sit here
9  and say that if you're liquidating 100 master
10 works that are worth, you know, a billion
11 dollars or $800 million, whatever it works out
12 to be, that the museum community is going to
13 come up with $800 million to be able to buy
14 those works of art.
15         (Plummer Exhibit 5, Article by
16 Katherine Boyle from the Washington Post, dated
17 October 6, 2013, entitled "Poor Detroit:  What
18 money giveth, It can taketh away", marked for
19 identification.)
20 BY MR. SOTO:
21     Q.  Let me hand you Exhibit 5.
22 Exhibit 5 is an article by Katherine Boyle,
23 B-o-y-l-e, from the Washington Post, dated
24 October 6, 2013, it's entitled "Poor Detroit:

Michael Plummer

1    Michael Plummer
2    What money giveth, It can taketh away."  Do you
3    see that?
4        A.    Yes.
5        Q.    Have you reviewed this article
6    before?
7        A.    I have, yes.
8        Q.    What occasioned your review of this
9    article?
10       A.    I read it when it came out.
11       Q.    The article discusses the potential
12   sale at the DIA, correct?
13       A.    Right.
14       Q.    Certainly read all of it.  If you
15   read it already I'm going to ask you some
16   questions on the second page where you're
17   quoted?
18       A.    Um-hum.
19       Q.    As saying:
20           "In situations where a museum is
21   deaccessioning important pieces, boycotts are
22   rare.  It's a market driven by opportunism, and
23   this would be an opportunity.  While one
24   collector sits on their hands, another won't."
25   Do you see that?

Michael Plummer

1    Michael Plummer
2        A.    Aha.
3        Q.    Did you still agree with that
4    statement?
5        A.    This is part of a much fuller
6    conversation which got distilled down into two
7    sound bites in this piece.  What I said was much
8    more nuanced, and I think is reflected in my
9    report which is, when I said that the taint
10   would happen in this collection I was
11   referring -- in terms of my numeric approach I
12   only applied it to the American sector, and the
13   reason for doing that is reflected -- this
14   comment reflects that.
15           I think outside of America the
16   buyers will be less impacted, they'll be less
17   concerned about whether it's from the Detroit
18   collection.  That kind of nuance gets lost in an
19   article in the Washington Post, they're just
20   trying to get a couple of sound bites out of
21   you, but I think it's better reflected in my
22   report.
23       Q.    In the Washington Post you were
24   essentially stating in your opinion that in a
25   more global market one collector might sit on

Michael Plummer

1    Michael Plummer
2    their hands, but another won't?
3        A.    Right.
4        Q.    You still agree with that, correct?
5        A.    And that applies to the
6    Impressionist sector and the Contemporary
7    sectors where I did not factor in a discount.
8    But in the American market, for reasons stated
9    in the report, I do think people would sit on
10   their hands and they would not be opportunistic.
11       Q.    Is it your view that people in the
12   global market are not interested in American
13   Art?
14       A.    Yes.  American Art is collected
15   almost exclusively by -- no, not almost, it is
16   collected exclusively by Americans.
17       Q.    You further state in this article:
18           "There's an enormous amount of
19   wealth in this country, and we have some of the
20   most active buyers at auction.  We shouldn't
21   immediately come to the conclusion that someone
22   from overseas would buy these works."
23           Do you remember making that
24   statement?
25       A.    I do.

Michael Plummer

1    Michael Plummer
2        Q.    There you're talking about the
3    wealth in America, correct?
4        A.    Right.  I was specifically refer to
5    the Post War and Contemporary sector where I did
6    not take a discount because, unlike the American
7    sector, I don't think the collectors in that
8    sector care much about the DIA and would be
9    quite -- could be voracious in going after some
10   of the works in that collection.
11       Q.    So the paragraph above the quote I
12   just read you says:
13           "It's also possible American Art
14   collectors would respond to keep the works in
15   this country.  Some of the most expensive works
16   purchased at auction have been sold to American
17   collectors:  Hedge fund manager Steven Cohen
18   bought Picasso's "Le Reve" for $155 million.
19   Billionaire financier Leon Black bought one of
20   Edward Munch's "The Scream" for $120 million.
21   It's possible that major museums could partner
22   with wealthy buyers to keep the most expensive
23   works in the United States."  Correct?
24       A.    I didn't say this, this is the
25   author's language.

Michael Plummer

1
2    Q.    Do you think that's correct?
3    A.    I don't know.  I don't know
4  because -- I don't want to speculate on these
5  individuals and the logic of this because I
6  don't necessarily agree with it.
7    Q.    There would be wealthy Americans
8  who might want to keep American Art in America,
9  correct?
10    A.    Well, American Art wouldn't --
11  there are no buyers for American Art outside of
12  America.  I'm saying American Art will be
13  difficult to sell at all because the collector
14  base would find the collection tainted.
15    Q.    Even private individuals, like
16  these wealthy hedge fund owners?
17    A.    Well, these hedge fund owners don't
18  buy American Art.
19    Q.    Is that your statement?
20    A.    Let me clarify.  We're talking
21  about American Art pre-1950; all of the examples
22  here are Contemporary Art or Modern Art.  Steve
23  Cohen does not buy American Art pre-1950, Leon
24  Black, to my knowledge, doesn't buy American Art
25  pre-1950, so I don't think that this is really

Michael Plummer

1
2  relevant to the point I'm making.
3        They do buy Contemporary Art, which
4  I mentioned earlier was a sector that I do think
5  that this logic -- the logic that buyers would
6  bid in that area.
7    Q.    Let's go to page 26 of your report.
8  Paragraph 39 you state:
9        "In this section, I anticipate and
10  quantify various different potential factors
11  that, based on either current market conditions
12  or historic precedent, are likely to have a
13  financial effect on the sale of the art from the
14  DIA collection.  Many of these factors are not
15  taken into account in any standard appraisal or
16  fair market situation.  I also apply the
17  discount factors for various sale scenarios."
18        Do you see that?
19    A.    Um-hum.
20    Q.    Now we've discussed some of these
21  issues before, correct?
22    A.    Um-hum.
23    Q.    Didn't you say that you conducted a
24  fair market value evaluation, correct?
25    A.    Correct.

Michael Plummer

1
2    Q.    So in addition to the fair market
3  value evaluation, you added additional elements
4  that you refer to as factors that are not taken
5  into account in the standard appraisal, correct?
6    A.    Correct.
7    Q.    Is there a reason why you wouldn't
8  have included those factors in your appraisal to
9  begin with, why those factors wouldn't be
10  included if you're really trying to get a fair
11  market value?
12        Doesn't that mean when you said
13  earlier what a willing seller would sell at and
14  what a willing buyer would buy at?
15        MR. IRWIN: Form.
16    A.    I felt that the way to get the most
17  transparent and accurate -- the most transparent
18  and logical approach was to apply it en mass so
19  that the reasoning could be understood.  I'll
20  give you a counter-example which is that Wiener
21  approach provided a supplement, he did it piece
22  by piece, but it's not transparent.  So it's not
23  understandable what methodology he used and how
24  he applied it.  Here you can see my logic, you
25  can understand it and you can debate it.

Michael Plummer

1
2    Q.    Would you agree with me that some
3  appraisers, like even some you're familiar with,
4  would include some of the factors you used in
5  coming at an appraisal value?
6    A.    They might consider some of them
7  for certain pieces but not for others, some of
8  these they wouldn't consider the all.
9    Q.    Let me go through your opinions and
10  get some information on the basis other than
11  what might be here.  So on paragraph 41 which is
12  on page 26 you say:
13        "An immediate liquidation of the
14  art collection will result in selling the DIA
15  collection at a fraction of its fair market
16  value."
17        Do you see that?
18    A.    Um-hum.
19    Q.    What's the basis of that
20  conclusion?
21    A.    Well, I give examples below, or the
22  example below, the Matisse collection, which is
23  a classic example of that.  I think that you
24  could even look at the offers on the table for
25  that Houlihan Lokey brought forward as actually

61 (Pages 241 to 244)

Michael Plummer

examples of exactly that, that they are offers
to get a block of property below value and at a
serious discount.

Q.   So the reason why an immediate sale
would bring a fraction of it, other than the
examples you've given would be what, there's too
much art on the market at one time; is that it?

A.   There are actually various points
to support this.  One is this real-life example
of Acquavella.  Two is that if you put too much
of a certain thing on the market you will
depress prices, which is a blockage discount.
Three, there is the fact that I use as a rule of
thumb -- I mean, in the art market it is
standard practice that the loan to value ratio
for an art loan is 50 percent.

And the reason behind that, and this
is something that I -- when I mentioned to you
that I was setting up lending capacities with
banks at Christie's, this is a philosophy I got
into with great complexity with the underwriters
at various banks that the -- this is a
long-standing tradition in the art market,
because 50 percent is felt to be a -- the most

Michael Plummer

valid number for a fast sale of a work of art
which is why it is used in lending.

That is supported by the fact that
nearly every lender uses that number.  Now,
notwithstanding that, Art Capital Group used
20 percent in its offer to the DIA, but that's
an exceptional circumstance and an exceptional
offer.

Q.   So beyond your experience with
Citibank, were there any other studies that you
relied on for the 50 percent number?

A.   No.  I'm saying that there were no
studies.  I'm saying that with my experience
with all the art -- I have a relationship with
all of the art lenders in the art industry and
do business with most of them.  I'm saying that
the practices amongst all of them, and including
Sotheby's and Christie's, and in developing the
art lending program at Christie's where we use
the same practice, it is 50 percent.

It is 50 percent because that has
been a long-standing custom, business custom in
the art world, that that is a value you can
expect to get from a work of art or a group of

Michael Plummer

works of art if they have sold quickly.  So I
didn't need to do a survey, this is based on
real world experience.

Q.   So in your experience, how many
loans have you participated in to date?

A.   I don't know, but many.

Q.   More than 10?

A.   More than 10.

Q.   More than 20?

A.   Possibly.  I haven't kept count.

Q.   More than 30?

A.   Possibly.  I don't remember.

Q.   What would be your outside number?

A.   I don't know.  There are not just
loans that have gone through, there are loans
that have been negotiated that have not gone
through.  There are multiple discussions for
things that don't come to fruition.

Q.   I'm trying to understand the basis
for your opinion.  Based on the experience that
you have just described, possibly more than 30
as you put it; you're saying that those loans
take the art as collateral under the assumption
that on a quick sale it would only get

Michael Plummer

50 percent of whatever the value is?

A.   Right.

Q.   So for collateral purposes, if they
had to have a quick sale then they would assume
they would only get 50 percent; and that's the
point you're making, correct?

A.   Yes.

Q.   Then you extend that analysis and
say so, if there had to be a quick sale of the
DIA art, you would expect that the most you
would get is 50 percent of what its value is; is
that what you're saying?

A.   That is what I'm saying.  I'm
saying that it's based on not just that loan
criteria, but also the real world experience of
Acquavella, and also the current offers on the
table for the DIA collection from Houlihan
Lokey.  I think that they reflect that kind of
thinking and valuation.

Q.   Why do you assume that there would
have to be a quick sale of the loan to the DIA
for its art?

A.   I'm not assuming there has to be.
I'm assuming that if this route were taken this

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 176 of
204

Michael Plummer

1 would be the outcome.
2 Q. If there were a quick sale?
3 A. If there were a quick sale. Which
4 is one of the reasons why I laid this out in
5 this manner, so that we could debate which
6 scenarios might take place. I'm not assuming
7 that one scenario or another would take place,
8 that's for the Court to decide, or the DIA to
9 decide, or the City of Detroit to decide; I'm
10 just describing what would happen in various
11 scenarios.
12 Q. So then following your logic, if
13 there wasn't a quick sale then this factor
14 wouldn't apply; if there was a sale over time,
15 over a long period of time?
16 A. I outlined that scenario later on
17 and I do not use a blockage discount in that
18 scenario.
19 Q. In the Matisse example that you
20 provided, that you were referring to earlier, do
21 you know what the loss factor was there?
22 A. I don't. That data wasn't
23 available to me.
24 Q. Did you do the analysis?

Michael Plummer

1 A. I count the numbers from Sotheby's
2 report. That data is internal Sotheby's data
3 and it's not available.
4 Q. Let's turn to the blockage discount
5 again, page 27 of your report. You state that a
6 blockage discount is similar to an immediate
7 liquidation discount, correct?
8 A. Correct.
9 Q. But results from selling a large
10 group of similar items in a short time, correct?
11 A. Correct.
12 Q. That's what you describe as a
13 blockage discount?
14 A. Right.
15 Q. Is there anything else you would
16 describe as a blockage discount?
17 MR. IRWIN: Form.
18 A. I don't know what you're really
19 asking me. I think this is sufficient for the
20 purposes here.
21 Q. So this assumes that the pieces
22 would be sold in a short period of time again,
23 correct?
24 A. Yes, it is.

Michael Plummer

1 Q. What do you qualify as a short
2 period of time?
3 A. I don't think I specified here, but
4 I would say anything other than an orderly
5 liquidation which is given, and the other
6 example would be a short period of time.
7 Q. I have no idea what that means.
8 What would you say is an ordinary liquidation?
9 A. Further on I do say what an orderly
10 liquidation is, five to eight years is what I
11 say.
12 Q. So anything other than a five to
13 eight year sale would be a short period of time?
14 A. Yes. I mean, I hadn't thought
15 about three, five years or whatnot; but I would
16 say if you sold it in a one to two-year period
17 you would be facing a liquidation issue.
18 Q. Let me see if I get this right. A
19 one to two-year period you clearly would be
20 facing a blockage discount, correct?
21 A. Or a liquidation discount.
22 Q. Or a liquidation discount, but
23 maybe beyond that it would depend?
24 A. Correct, it would depend.

Michael Plummer

1 Q. So if the items were not sold in
2 the short period of time, then again this
3 blockage discount might not apply, correct?
4 A. Correct.
5 Q. What is the blockage discount that
6 you applied?
7 A. In this instance I -- well, I
8 really treat it as liquidation discount, which
9 is 50 percent.
10 Q. So you used that same 50 percent
11 number?
12 A. Yeah, in the charts I didn't
13 differentiate, I only applied one discount, a
14 liquidation discount. I didn't differentiate
15 between blockage and liquidation.
16 Q. Again, do you have any studies to
17 support the application of this discount rate
18 and the blockage discount?
19 A. No. I rely on the data that I just
20 gave you on the liquidation discount.
21 MR. IRWIN: For clarification
22 purposes. When you're asking these questions do
23 you mean other than what's stated in the report?
24 MR. SOTO: No. He gives me the

63 (Pages 249 to 252)

Michael Plummer

1    data in his report, I've looked at that and I'm
2    asking him if there's anything other than that,
3    because in his report he doesn't have any
4    studies, so I'm asking him if there are any
5    studies.
6
7        A.    I think studies are irrelevant.  I
8    have real-life experience and I've given you the
9    examples.
10       Q.    So you have real-life experience
11   for a number of the loans?
12       A.    No, I have real-life experience for
13   the number of lenders.  It is common policy
14   amongst all art lenders to use 50 percent.  It's
15   not just my experience with my loans, it's my
16   experience with knowing what Citibank does, what
17   JPMorgan does; and having conversations on a
18   regular basis with Citibank, with JPMorgan, with
19   Chase and HSBC, with Barclays, with all of these
20   institutions.
21       Q.    Do you think as an expert that that
22   makes it a more reliable factor, that a lender
23   which would want to have collateral for their
24   loan requires a 50 percent valuation of an item
25   they're taking in as collateral, that somehow

Michael Plummer

1    that's indicative of what the market would be?
2        A.    That is their view of a liquidation
3    value, and having worked through liquidations at
4    Sotheby's and Christie's that has turned out to
5    be generally a fair number to use in real life.
6        Q.    So that's what I was asking.  I'm
7    asking you for real-life examples; not what a
8    banker that wants to make a loan might want for
9    his collateral, but in fact what an immediate
10   sale brings in.
11            In your experience, how many
12   immediate sales did you work on at Sotheby's?
13       A.    At Sotheby's and Christie's, I
14   don't remember because that's a long time ago;
15   but there were a number of them that I either
16   worked on or reviewed in the prospect of setting
17   up the program at Christie's, and 50 percent was
18   a valid number to use.
19       Q.    So what you're saying is that in
20   your experience and this unknown number of
21   immediate sales, that what you would expect to
22   get for a valued piece of art is about
23   50 percent of whatever its value was?
24       A.    Correct.  I'm working on a

Michael Plummer

1    liquidation issue right now with a client who's
2    defaulted, and we are expecting 50 percent.
3        Q.    Is there any publicly available
4    data that we can review to determine the
5    validity of your opinion?
6        A.    No, but I would suggest if you
7    wanted to speak to some of the banks that I've
8    referenced, they would probably support my
9    opinion.
10       Q.    Right.  Again, the banks are
11   looking for collateral.  I'm asking for publicly
12   available data on sales?
13       A.    I think if you would ask some of
14   the banks about some of their liquidations you
15   might find data.
16            MR. IRWIN:  Outside of the report?
17   Outside of the example, the Acquavella example
18   that he gives in the report?
19            MR. SOTO:  Right.
20            MR. IRWIN:  So other than
21   Acquavella.
22            MR. SOTO:  We've already seen
23   Acquavella.  Acquavella doesn't come to
24   50 percent by the way, but that's a different

Michael Plummer

1    issue.
2    BY MR. SOTO:
3        Q.    Is there any privately available
4    data that you could point me to that in
5    immediate sales sellers realize, generally
6    speaking, 50 percent of the value of their art?
7        A.    I don't know what else I can point
8    you to.
9        Q.    You state that the IRS for tax
10   purposes uses a discount range between
11   25 percent and 46 percent?
12       A.    Yes.
13       Q.    That's a pretty wide range,
14   correct?
15       A.    Correct.
16       Q.    What is that rate based on?
17       A.    It's based on the precedence set in
18   the case in the estates of David Smith and
19   Georgia O'Keeffe, as I outlined here.
20       Q.    Would you agree with me that the
21   blockage discount applied for tax purposes is
22   different than that applied in a sale itself?
23       A.    Yes.
24       Q.    Looking at page 27 of your opinion.

Michael Plummer

1  Michael Plummer
2  We're on paragraph 44 where you talk about
3  unsold rates.  Your report states, "Standard
4  appraisals and valuations do not take into
5  account auction unsold rates."
6          Do you see that?
7      A.   Yes.
8      Q.    Again, when you refer to "unsold
9  rates" are you referring to what you testified
10  about earlier, which is items that would have
11  been offered for sale at an auction, but didn't
12  actually sell?
13      A.   Correct.
14      Q.    Then those auctions would be --
15  those items would be then either given back to
16  the original owner or offered again at a lower
17  rate?
18      A.   Correct.
19      Q.   Is that it?
20      A.   Correct.
21      Q.   That's the unsold rate.  Is it
22  possible, I mean I see your statement, but I'm
23  wondering is it even possible to factor this in
24  advance of a sale?
25          How do you know what's not going to

1  Michael Plummer
2  sell in advance of a sale?
3      A.    Well, you don't, but you can say
4  you're going to sell 100 percent of the property
5  is the point I'm making.  So to take the full
6  valuation and expect that you're going to get
7  that valuation, and not account for unsold, is
8  an incorrect way to determine your value,
9  because you have a rather substantial amount
10  that's going to remain unsold.  I think it's
11  particularly misleading in a situation like this
12  where decisions are being made on the ultimate
13  value.
14      Q.   Why is that?
15      A.   Well, because I think if you don't
16  include it, it overstates the value and
17  liquidity.
18      Q.   I see what you mean.  Let me see if
19  I see what you mean.  You mean it overstates the
20  value of the overall collection because there
21  will be some that won't be sold?
22      A.    And it also overstates the
23  liquidity, and the liquidity is something that
24  we write and talk about in the market a lot,
25  because the market is an extremely illiquid

1  Michael Plummer
2  market and the unsold rates are part of that
3  illiquidity problem.
4          So if you have an appraisal that
5  says that you have $100 million worth of
6  property, and you're expecting to get $100
7  million worth of cash when $20 million of that
8  isn't go to sell, you have a illiquid value of
9  $80 million, and that's a big variance.
10      Q.   You don't think you're taking the
11  unsold rate and discount it and factor it in
12  twice?
13          In other words, what you're saying
14  is the unsold rate is if you don't take it into
15  account you're distorting the overall value of
16  the collection because there's going to be
17  something that isn't sold.
18          Then you're also saying that in
19  addition to that, you're overstating the
20  liquidity and another factor has to be taken in?
21      A.   No.
22      Q.   It's that same factor?
23      A.   It's the same factor.
24      Q.    Okay.  I just want to make sure.
25  You state that the average unsold rate is

1  Michael Plummer
2  20 percent, correct?
3          Again, let me ask you, what's the
4  source of those rates?
5      A.   It's in the back, it's an exhibit
6  in the back.  It's the Christie's and Sotheby's
7  data actually which Wiener used for his own
8  estimates of the collection.
9      Q.    Your chart also lists the average
10  unsold rates for different sectors, correct?
11      A.   Yes.
12      Q.    That's because you're taking it
13  from the Christie's and Sotheby's data for
14  different sectors?
15      A.   Yes.
16      Q.   Why did you apply an average unsold
17  rate of 20 percent when the data that you
18  supplied you used an average rate of 20 percent?
19      A.   I'm sorry?
20      Q.   You applied an average unsold rate
21  of 25 percent for the DIA.  Look at page 28,
22  Table 4?
23      A.   What page are you on?
24      Q.   Page 28 of your report, it's got a
25  table.  Correct me if I'm reading this wrong.

65 (Pages 257 to 260)

Michael Plummer

1
2 You have your top four sectors listed, correct?
3     A.    Right.
4     Q.    Then you have a balance of
5 collection 20 percent, 25 percent.  So the
6 average you used, if I'm understanding it right,
7 it says here in D:
8         "It is important to note that much
9 of this unsold property could and would be sold
10 over time, but it is customary business practice
11 to devalue a work by 20% of the low estimate
12 after it has bought in."
13        So you're saying here's going to be
14 the average?
15     A.    Right.
16     Q.    I thought you were saying the
17 average unsold was 20 percent, so you do a
18 discount of 20 percent for the unsold.  You do a
19 discount of the entire valuation because
20 20 percent of it is going to be unsold, correct?
21     A.    I'm not discounting the collection
22 here, I'm just showing what the potential of the
23 BIs could be.  I actually do it differently in
24 the present value calculation, where I actually
25 do a more thorough analysis where I discount the

Michael Plummer

1
2 unsold and then I add them back in a few years
3 later after -- at a 20 percent valuation.
4        So that's more reflective of my
5 thinking on this.  This was just an illustrative
6 of the potential for unsold in different
7 categories.
8     Q.    So this is just illustrating the
9 potential into categories, but when you did the
10 calculation you did use a 20 percent discount
11 value?
12     A.    I did use the 20 percent discount
13 value.
14     Q.    That's what I'm trying to get at.
15 Page 28, paragraph 45.  In your report you state
16 that:
17         "The size of a liquidation of the
18 DIA collection would be beyond Christie's and
19 Sotheby's guarantee capacities.
20        What's the basis of that
21 conclusion?
22     A.    The basis of that is the Sotheby's
23 financial statement with their loan limitations,
24 which I dictate below.  I also, having been
25 inside Christie's and knowing their balance

Michael Plummer

1
2 sheet, and knowing their balance sheet
3 limitations, I know what they have to spend on
4 guarantees and what their limitations are.
5     Q.    So it's your assumption then that
6 if they wanted to participate in something like
7 this, they couldn't get any other financing to
8 be able to participate in it?
9     A.    I think that this would be a very
10 large level of risk, and in the past when
11 Sotheby's and Christie's were presented with
12 collections of this size they have chosen not to
13 go out and get a financing partner for it.  So
14 based on past experience I would say so.
15     Q.    But you don't know if that's a set
16 policy, correct?
17     A.    I don't know if it's a set policy.
18     Q.    It's been a while since you worked
19 for either Sotheby's or Christie's?
20     A.    It's been a while since I worked
21 for either Sotheby's or Christie's.
22     Q.    You state that on page 29,
23 paragraph 46 --
24     A.    We're assuming that Sotheby's and
25 Christie's would be wanting to sell them in the

Michael Plummer

1
2 first place.
3     Q.    I'm just asking the questions, I'm
4 not assuming what they would do.  Do you?
5     A.    No.
6     Q.    Paragraph 46, page 29.  You state
7 in your report that the auction houses may,
8 "refuse to sell due to the controversy
9 surrounding a disposition and potential damage
10 to their brand and relationships with the
11 broader Museum community"?
12     A.    Yes.
13     Q.    You testified about this earlier?
14     A.    Correct.
15     Q.    Do you have anything more to add to
16 that testimony that you recollect, now that
17 you're looking at your opinion here?
18     A.    No, I think I covered this, I
19 covered this earlier.
20     Q.    I didn't ask you earlier.  Did you
21 speak to anyone at Christie's about this
22 opinion?
23     A.    Someone at Christie's expressed
24 their opinion to me in a social setting.
25     Q.    Off the record?

66 (Pages 261 to 264)

Michael Plummer

1
2      A.     Off the record.
3      Q.     And you couldn't give me their name
4  because you promised not to?
5      A.     Yes.
6      Q.     What about Sotheby's?
7      A.     I did not have a conversation with
8  Sotheby's about it.
9      Q.     Christie's did complete and submit
10  their report that you relied on in your opinion,
11  correct?
12     A.     Um-hum.
13     Q.     So despite what you described
14  earlier as bad press they didn't back out of it,
15  they finished the work and they got it done,
16  correct?
17     A.     Correct.
18     Q.     You also note that the impact of
19  not selling through Sotheby's or Christie's
20  would reduce the sale value by 20 to 40 percent?
21     A.     Right.
22     Q.     Other than your subjective belief
23  that it would reduce it by 20 to 40 percent not
24  to sell it through Sotheby's and Christie's,
25  what is the basis of this discount factor?

Michael Plummer

1
2      MR. IRWIN:  Form.  Go ahead.
3      A.     The basis is I have samples of
4  others earlier in the report where the valuation
5  ranges in works of art by various artists are
6  off by a larger percentage than that.  So I felt
7  this was a conservative approach based on those
8  examples I gave, and my own personal experience
9  of buying in the marketplace on behalf of the
10  buyers and selling.
11     Q.     The examples you're referring to
12  are the examples in the report?
13     A.     In the report.
14     Q.     Any others?
15     A.     No.
16     Q.     Given the volume of the artworks at
17  the DIA, wouldn't it be wise to sell that many
18  artworks to a variety of sources, including
19  maybe a variety of auction houses?
20     A.     You could do it, I just believe
21  that if you sell other than at Sotheby's and
22  Christie's you won't get the prices.
23     Q.     Let me ask you to turn to page 31.
24  We're just flying through this thing, paragraph
25  49.  You state that:

Michael Plummer

1
2      "For a collection of the magnitude
3  of the DIA's, maximizing art asset value
4  requires selling over a minimum of five to eight
5  years."  Correct?
6      A.     Um-hum.
7      Q.     That's what you testified about
8  just a moment ago, correct?
9      A.     Correct.
10     Q.     What is that estimated time period
11  based on?
12     A.     Well, I mentioned much earlier in
13  the testimony that that is essentially the plan
14  of almost any art investment structure out
15  there, that it would be a six to eight year
16  period.  That's just a commonly held belief and
17  practice that the market can only absorb so much
18  material at a time, and if you're going to
19  maximize value you need to have a lengthy, a
20  long enough ramp time so that you can pick and
21  choose your seasons and your periods and put the
22  property in the right auctions.
23     Q.     I'm glad you clarified that,
24  because I thought when you were testifying
25  earlier, that what you were saying is if you

Michael Plummer

1
2  were going to set up an investment fund you have
3  to hold the art for five to eight years before
4  you begin the process of selling, so that it has
5  some ability to increase in value; but you were
6  saying something different now?
7      A.     No, I'm not.  I'm saying the same
8  thing.  I'm saying that you would hold the art
9  for a couple -- you would sell the art from a
10  fund over a five to eight year period as well,
11  so I'm saying it's consistent.
12     Q.     You don't have to hold it for a
13  five to eight year period then begin to sell it,
14  just sell it over a five to eight year period?
15     A.     Sell it over a five to eight year
16  period.
17     Q.     Thank you.  Do you have any
18  reliable sources or studies to support this?
19     MR. IRWIN:  Form.
20     A.     I do not have anything other than
21  common art investment fund practice.  However, I
22  would say if you wanted to look at the offering
23  documents of most of the art investment funds
24  out there you would find that strategy
25  articulated.

Michael Plummer

1
2      Q.    Paragraph 32 -- page 32, paragraph
3  50.  Looking at number C.  You say, "Based on
4  other museum deaccessions to pay debts."  Do you
5  see that?
6      A.    Yes.
7      Q.    What other art museums do you know
8  that have had deaccessions to pay debts?
9      A.    The de Valera Museum.
10      Q.    Any others?
11      A.    Well, the Fisk was one that was
12  attempted but blocked, and then it went through,
13  but under the agreement of the Attorney General.
14      Q.    So you have Delaware and Fisk in
15  Tennessee, correct?
16      A.    Yes.
17      Q.    Anywhere else?
18      A.    Then there is also the attempted
19  sale of the Rose Museum by Brandeis, but that
20  sort of got stopped dead in its tracks.  It
21  didn't even make it to the point of sale because
22  of the public outcry.
23      Q.    The rose Museum by Brandeis
24  University?
25      A.    Yes.

Michael Plummer

1
2      Q.    Any others?
3      A.    Those are the only ones that I
4  report and those are the only ones that I am
5  aware of at the moment.
6      Q.    You say, "Court challenges are
7  likely from the Michigan Attorney General."  Do
8  you see that?
9      A.    Um-hum.
10      Q.    What is the basis of that?  Have
11  you spoken to somebody at the Michigan Attorney
12  General's office?
13      A.    No.  Based on what has happened to
14  various sales in New York and other places, I
15  would expect that the Attorney General and also
16  the Attorney General has come out, yes, the
17  Attorney General has come out as a matter of
18  record and says that he opposes the sale.  So it
19  would be logical to assume that he would bring
20  action as Attorney General, as other states
21  have.
22      Q.    When you say the Attorney General
23  has come out and said he opposes the sale, are
24  you basing that on the Attorney General's
25  opinion that the art is held in trust?

Michael Plummer

1
2      A.    Yes.
3      Q.    Is there anything else that you're
4  basing it on?
5      A.    And basing it on the activities of
6  the New York Attorney General of various sales,
7  and the Attorney General of the State of
8  Tennessee.
9      Q.    So assuming the situations in
10  Tennessee and New York are not the same because
11  they weren't dealing with a city-owned museum, a
12  publicly-owned museum; do you have any other
13  reason to think that a Michigan State Attorney
14  General would oppose the sale?
15      MR. IRWIN:    Form.
16      A.    That's not entirely true because
17  the Fisk example and the New York Attorney
18  General issues on other instances pertained to
19  the sale of property that was gifted; and we're
20  not just talking about the City of Detroit
21  purchase property, we're talking about gifted
22  property that was bequested and has
23  restrictions.
24      So it is not an assumption, or
25  illogical to assume, that the Attorney General

Michael Plummer

1
2  of Michigan would step in and block the sale of
3  property that had been gifted to as a bequest or
4  whatever.
5      Q.    Did you or anyone else at Artvest
6  do an analysis of the legal structure that
7  existed in Tennessee with respect to the Fisk
8  Museum?
9      A.    That was beyond the scope of our
10  job.
11      Q.    The answer is no then, correct?
12      A.    No.
13      Q.    Did you or anyone else at Artvest
14  do a legal analysis of the structure of the
15  legal position that was involved in the New York
16  example that you are giving?
17      A.    No.
18      Q.    Did you or anyone else at Artvest
19  do an analysis of the legal structure involved
20  in the Delaware Museum?
21      A.    No, we did not.
22      Q.    Did you retain anyone else to do
23  it?
24      A.    We did not.  May we take a break?
25      MR. SOTO:    Absolutely.

68 (Pages 269 to 272)

Michael Plummer

1
2      THE VIDEOGRAPHER:  The time is
3  4:26 p.m., and we're going off the record.
4      (Short break taken)
5      THE VIDEOGRAPHER:  The time is
6  4:40 p.m., and we're back on the record.
7  BY MR. SOTO:
8      Q.    Looking at page 32, paragraph 50 C.
9  Beyond what you've testified about already
10 regarding why you think litigation challenges
11 are possible, and what you have in your report;
12 beyond those two things, is there anything else
13 that you rely on to support that opinion?
14     A.    No.
15     Q.    So in your statement such as those
16 on page 39 of your report where you say, make
17 sure I'm quoting it right, "Heirs of former
18 donors as well as current donors are likely
19 to" --
20     MR. IRWIN:  Are you in the middle
21 of the page?
22     MR. SOTO:  Yes.  I'm trying to find
23 it myself.
24     A.    What page are you on?
25     MR. IRWIN:  He's on 39.

Michael Plummer

1
2      MR. SOTO:  I thought I was on 39.
3      MR. IRWIN:  You are, you were a
4  third of the way down.
5      MR. SOTO:  Paragraph C.
6      Q.    Where you say:
7      "Heirs of former donors, as well as
8  current donors, many still prominent leaders in
9  the Detroit community, and the DIA corporation
10 itself, are likely to pursue every legal option
11 necessary to stop or delay the sale of any of
12 the art potentially, leading to years of
13 litigation."
14     Do you see that?
15     A.    Um-hum.
16     Q.    You didn't talk to anyone else
17 about that other than -- did you talk to anybody
18 about it?
19     A.    No.
20     Q.    You didn't, okay.  Looking at your
21 table.  Is it your assumption that any
22 litigation would be a five-year litigation?
23     A.    Based on the Fisk, yes.
24     Q.    So you're basing it on the Fisk
25 litigation?

Michael Plummer

1
2      A.    Yes.
3      Q.    Again, you didn't do any analysis
4  of the Fisk litigation?
5      A.    No.
6      Q.    You don't know what was involved
7  this?
8      A.    No.
9      Q.    You know it didn't involve a
10 City-owned museum, correct?
11     A.    I know it did involve the intention
12 of the bequester, and that was at the heart of
13 the matter.
14     Q.    Did you do an analysis of the
15 intentions?  I think I asked you about this
16 earlier, but if I didn't I should ask it now,
17 and if I did let me know.
18     Did you do an analysis of any of
19 the restrictions that might exist on the
20 transfer of any of the art that's now part of
21 the DIA collection?
22     A.    I think you did ask it but I'll
23 answer it again, I did not.
24     Q.    Thanks for being patient with me.
25 In paragraph -- well it's page 36 of your

Michael Plummer

1
2  report, Table 6.
3      Here you apply the litigation
4  discount factor and reduce the value by an
5  additional 2 million, I think it's 2,539,108, do
6  you see that?
7      A.    Right.
8      Q.    Where did you come up with this
9  figure?
10     A.    It's in the table in the back, the
11 calculation is either 70 or 71.  I hopes this
12 matches the right table with the right
13 calculation.  So this would match to page 70.
14     Q.    So page 70 is Exhibit F, Table 8?
15     A.    Right.
16     Q.    The present value of orderly
17 liquidation?
18     A.    Right.
19     Q.    Where does the number come from?
20     A.    Which number are you asking where
21 does that number come from?
22     Q.    I was asking earlier where did you
23 come up with the 2,539,108 as a count for
24 litigation?
25     A.    That is the net effects of these

Michael Plummer

1 column-by-column calculations of no income until
2 year six, only the expense of carrying the
3 collection. Then starting in year seven you
4 would sell 20 percent of the collection; year
5 eight, 20 percent; year 9, 20 percent; 15 in
6 year 10; 15 in year 11.
7         Taking out -- adding back the
8 unsold property we offer three years later, the
9 administrative expenses, and then bringing it
10 back to a discounted net present value.
11    Q.    So this table reflects under
12 scenario B, litigation Fisk, correct?
13    A.    Yes.
14    Q.    Under less average unsold loss
15 factor?
16    A.    Yes.
17    Q.    You reflect a 26.20 percent loss
18 factor, correct?
19    A.    Right. Then it's added back.
20    Q.    Where is it added back?
21    A.    It's added back in year 10 and year
22 11.
23    Q.    So this is the add-back re-offered
24 unsold property?

Michael Plummer

1    A.    This table is cut off because this
2 goes out for another couple of years, it's just
3 cut off here.
4    Q.    So it goes beyond year 11?
5    A.    Yeah, it must go on to year 12. I
6 don't remember because I don't have it front of
7 me.
8    Q.    Take a look and see if you're
9 looking at the same thing I'm looking at?
10    A.    Yeah. I'm doing this from memory,
11 but I think it might go beyond year 11.
12    Q.    The one I got in the mail didn't.
13 So if you have one that does that might be
14 helpful?
15    A.    I could be wrong about this, I'm
16 doing this from memory.
17    Q.    Remember, there's no closed-book
18 test here, you can look at everything. So now
19 looking at application of discount fees, page
20 37, paragraph 56. You state:
21         "I conclude that the range of
22 values the DIA collection will sell for, using
23 the mid estimate value, values, would be between
24 1.1 billion for the present value of an orderly

Michael Plummer

1 sale after a prolonged litigation (the most
2 likely outcome, Scenario D) to $1.8 billion for
3 the present value of an orderly liquidation
4 without litigation, a less likely outcome." Do
5 you see that?
6    A.    Yes.
7    Q.    In paragraph 56 you state that:
8         "Using the low estimate value of
9 about $2.7 billion, and assuming all of the
10 worst factors, including issues with extended
11 litigation and a discount for unsold items, the
12 value of the collection would sell for between
13 0.9 billion to 1.4 billion," correct?
14    A.    Correct.
15    Q.    And your analysis is documented on
16 Table 7, well I guess Table 6 and 7 on pages 36
17 and 37, correct?
18    A.    Correct.
19    Q.    You only apply the discount factors
20 to the low and mid estimates, correct?
21    A.    Correct.
22    Q.    Why didn't you apply them to the
23 high estimate?
24    A.    Because I don't think that the high

Michael Plummer

1 estimate is relevant to this case.
2    Q.    So you created a high estimate
3 though, didn't you?
4    A.    I did create a high estimate, yes.
5    Q.    You say it's not relevant for what
6 reason?
7    A.    Because of the fact of the areas
8 where the property is in, the controversy around
9 the collection, disagreeing with Wiener on the
10 ability to market it and promote it. The high
11 estimate really is something that is reserved
12 for things that are really sort of untainted,
13 that is just stellar property in a hot area, and
14 a lot of the DIA property is not in a hot area
15 either. So for all of the reasons that I've
16 outlined previously.
17    Q.    Let me see if your methodology is
18 what I think it is. You first said you did a
19 valuation, correct?
20    A.    Um-hum.
21    Q.    And then you said separate and
22 apart from that valuation you applied factors to
23 what you valued that appraisers might not apply.
24 You gave all specific areas of them and we

Page 281

1          Michael Plummer
2   testified at length about them today, or you
3   did, correct?
4       A.   Yes.
5       Q.   So even though you did an
6   evaluation that had a low range, a mid range and
7   a high range, you didn't apply any of those
8   seven factors to the high range, did you?
9       A.   No.
10      Q.   So in addition to taking discounts
11  for the seven factors that you say you took into
12  account that maybe an appraisal wouldn't, you
13  were also adding another factor, which is your
14  subjective view that gee, this high rate just
15  doesn't apply here?
16          MR. IRWIN:  Form.
17      Q.   This high evaluation just shouldn't
18  even be applied here, correct?
19      A.   I said in this particular instance
20  I didn't think that it applied.
21      Q.   So why -- how did you set the high
22  valuation to begin with?  What did you do to set
23  the high valuation to begin with?  You looked at
24  comparables, correct?
25      A.   Right.

Page 282

1          Michael Plummer
2       Q.   You looked at all the market data
3   that was publicly available, correct?
4       A.   Right.
5       Q.   You looked at the indices that you
6   paid for from some other not publicly available
7   sources, correct?
8       A.   Right.
9       Q.   You talked to people that you knew
10  within Sotheby's and Christie's and others about
11  sales that others might not even know about,
12  correct?
13      A.   Right.
14      Q.   And you contacted individuals in
15  the industry that you have contact with on a
16  daily basis because of your position in the
17  industry, and because of your position as an art
18  fair owner and participant that other people
19  don't, correct?
20      A.   Right.
21      Q.   You took all that information into
22  account in deciding I think a low estimate would
23  be this, I think a high estimate would be this,
24  and I think a middle estimate would be this,
25  correct?

Page 283

1          Michael Plummer
2          MR. IRWIN:  Form.
3       A.   The middle estimate is calculated
4   based off of a high estimate.  If I were to use
5   the high estimate I would be saying that of the
6   56,000 items, or whatever number it is, they
7   would all be selling for the high estimate.
8   That the average selling price of the entire
9   collection would be selling at the high
10  estimate.
11          What I've done is I've used the mid
12  estimate, because that assumes that you will be
13  getting halfway between the low and the high.
14  So I'm accounting for the high by a mid
15  estimate, that takes into account the high and
16  the low.  So the idea that the entire collection
17  would sell for at the high level is to me
18  inconceivable.
19      Q.   Let me see if I'm understanding
20  that.  You did a high estimate and a low
21  estimate?
22      A.   Right.
23      Q.   And the mid is just literally the
24  middle range?
25      A.   Correct.

Page 284

1          Michael Plummer
2       Q.   So what you're doing in your
3   analysis, if I'm understanding it now, I may be,
4   is saying look, in calculating what discounts
5   I'm going to take after I do my evaluations,
6   I'll take the mid range valuation because in
7   your mind, having put together the valuations,
8   that's the most likely one.  Is that correct to
9   say?
10      A.   I'd say it is -- it and the low
11  estimate are likely scenarios.  I do not think
12  that the high estimate is the likely scenario
13  because that presupposes that everything would
14  come up a high estimate, or higher.
15      Q.   So your charts show the discounts
16  off the low estimates and the discounts off the
17  middle estimates, but they don't show the
18  discounts off the high estimates?
19      A.   Correct.
20      Q.   So with respect to your ultimate
21  conclusion, you've simply eradicated the high
22  estimate for purposes of coming to your
23  conclusion.
24          You have a conclusion as to the low
25  estimate with discounts and you have a

Michael Plummer

1    conclusion as to the mid range with discounts?
2         MR. IRWIN: Form.
3         A.    I don't think that's an accurate
4    portrayal because the mid estimate is factored
5    by using the high estimate. All I am saying is
6    I don't think it is possible to sell everything
7    in this collection at an average value of the
8    high estimate.
9         Q.    And you think that it's more likely
10   that everything will sell at the low estimate?
11        A.    I think that it is possible that it
12   could sell at the low estimate. Oftentimes
13   things sell below the low estimate.
14        Q.    Wouldn't you agree with me that if
15   you took your discounts off the high estimate
16   your conclusion would be a higher sale value,
17   correct?
18        MR. IRWIN: Form.
19        A.    If I took my conclusions off of the
20   high estimate?
21        Q.    Your discounts?
22        A.    My discounts, yes, it would be a
23   higher valuation.
24        Q.    And you didn't do that?

Michael Plummer

1         A.    I did not do that.
2         Q.    You didn't want to do that?
3         MR. IRWIN: Form.
4         MR. O'REILLY: Form.
5         A.    I didn't think it was relevant to
6    do so.
7         Q.    But it was relevant to value them,
8    as you suggested in your expert report you
9    valued them, correct?
10        It was relevant to get all that
11   information that we just went through, correct?
12        A.    Correct.
13        Q.    Based on all of that information
14   that was relevant to you, you do have a high
15   range, correct?
16        A.    I do have a high range, yes. I
17   would also add that in the art industry, it is
18   generally common practice to base most decisions
19   off of low estimates; not mid or not high, but
20   low.
21        Q.    What you're doing here is simply
22   basing your analysis on the mid and low.
23   There's no business decision here, it's just
24   your analysis, correct?

Michael Plummer

1         A.    My analysis is based on my business
2    practices and the way I conduct my business.
3         Q.    So when you did your valuations and
4    you did your comparables, and you did what all
5    that information was and you got information on
6    high valued estimates, didn't that take some of
7    the market factors into account for those
8    estimates?
9         A.    I don't understand your question.
10        Q.    So when you do comparables you come
11   up with some comparables that are higher and
12   some that are lower, correct?
13        A.    Right.
14        Q.    That's how you get the high
15   estimates and the low estimates, correct?
16        A.    Right.
17        Q.    That takes into account market data
18   and market information, right?
19        A.    Right.
20        Q.    So there must be some market data
21   that supports your high estimate, correct?
22        A.    I'm not arguing that a high
23   estimate for a work is wrong. I'm arguing that
24   making an assumption that the entirety of the

Michael Plummer

1    collection would sell at the high estimate is
2    not a solid premise for doing this analysis.
3         Q.    You don't have to do that to show
4    the actual discounts off the high estimate. You
5    can just have them there, then you can come to
6    whatever conclusion you think is appropriate to
7    apply to that.
8         You could, in fact, have submitted
9    a report to the Court that allowed the Court to
10   say I see what the discounts are on the high
11   estimate, I see what the discounts are on the
12   mid-estimate, and I see what the discounts are
13   on the low estimate. I'll say let's assume that
14   only half of it sells for the high and only half
15   of it sells for the low.
16        But you didn't do that in your
17   report. You didn't give the estimates for the
18   high one, did you?
19        MR. O'REILLY: Form.
20        A.    No, I do not.
21        Q.    So your calculation makes several
22   conclusions, doesn't it? Let's look back on
23   page 31.
24        First of all, on page 31, paragraph

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

Michael Plummer

1 Michael Plummer
2 49 C, right, you assume that it would take 18
3 months to two years to adequately catalog the
4 collection in the first place, correct?
5    A.    Yes.
6    Q.    What's the basis of that
7 assumption?
8    A.    Based on the preparations that went
9 into Albright-Knox and other sales.  That you
10 have such a quantity of property that in order
11 to do the proper amount of research on its
12 salability, and how you want to sell it and plan
13 for the sale of it, plan for the marketing of
14 it, all of that would take an extended period of
15 time.
16    Q.    Are you aware of the fact that the
17 DIA has had on other occasions other people look
18 at its collection, that may indeed have done
19 some of the cataloguing that you're talking
20 about here?
21    A.    I know they've done the
22 cataloguing, that's not the same as the
23 cataloguing for sale.  The cataloguing that's
24 already done would be used, but whoever was
25 selling it would want to evaluate it from the

1 Michael Plummer
2 lens of selling it, and look for various
3 information that may not be included in the
4 museum cataloguing.
5    Q.    So is it your --
6    A.    And additional scholarship.
7    Q.    Sorry, I didn't mean to interrupt.
8    A.    No, just an additional scholarship.
9    Q.    So is it your assumption then that
10 the DIA has not done prior cataloging for sale?
11    A.    They haven't done sale cataloging
12 which is different.
13    Q.    That's your assumption, correct?
14    A.    No, it's my -- I've seen some of
15 their cataloguing and I don't think it's the
16 same as cataloguing it for sale.
17    Q.    Did you speak to anyone at the DIA
18 about whether or not they had done other
19 cataloguing for sale prior to this?
20    A.    No, I have not talked to them about
21 that.
22    Q.    So you don't know that for a fact,
23 you are assuming that?
24         MR. IRWIN:  Form.
25    A.    I am assuming that, and I actually

1 Michael Plummer
2 say that it was an assumption.
3    Q.    That assumption is based on, again,
4 your review of whatever materials you had,
5 correct?
6    A.    Correct.
7    Q.    Because you haven't spoken to
8 anyone at the DIA, correct?
9    A.    Correct.
10    Q.    Your next one is you assume that
11 the sales would take place through a public
12 rather than private auction?
13    A.    Correct.
14    Q.    What's the basis of that
15 assumption?
16    A.    As I outlined elsewhere in the
17 report that most legal, court related, other
18 transactions or transparencies required are more
19 often than not done by auction, because if you
20 sell things privately there is a degree of
21 confidentiality involved that can allow for a
22 conflict of interest or a lack of transparency
23 on value.
24         If you sell something privately
25 your client is buying it privately because they

1 Michael Plummer
2 don't want the price disclosed.  It's hard for
3 me to imagine that you could sell works from the
4 DIA privately, without disclosing the prices,
5 how that could be accomplished with City-owned
6 property.
7    Q.    You assume an annual expense of 6
8 million related to the storing and the
9 administering of the art collection, correct?
10    A.    Yes.
11    Q.    What's the basis of that
12 assumption?
13    A.    That's my assumption based on the
14 size of the museum, the size of the collection,
15 insurance costs, heat, humidity control, all of
16 that; and it decreases over time as the
17 collection is sold off.
18    Q.    Did you speak with anybody who's
19 currently involved in the storing and
20 administering of the art collection as to what
21 it's costing them to do it now?
22    A.    I did not, no.
23    Q.    Did you look at the publicly
24 available information on what those storage
25 costs are now?

Michael Plummer

1        Michael Plummer
2    A.   I did not.
3    Q.   You assume a discount rate of
4 12 percent based on the volatility of the
5 market, correct?
6    A.   Correct.
7    Q.   What's the basis of that
8 assumption?
9    A.   Going back to the art investment
10 topic and the art investment funds, generally
11 the 12 percent or higher number is expected by
12 investors in the art market to compensate for
13 the volatility of the market.
14    Q.   You reviewed the Barth report
15 previously, correct?
16    A.   Yes.
17    Q.   Did you dispute what she suggests
18 the closer percentage rate would be here for the
19 discount rate based on the volatility?
20    A.   I completely dispute it. I don't
21 think she has sufficient experience to weigh in
22 on that matter.
23    Q.   Turn back to page 36 of your
24 report.
25    A.   Okay. I would like to take a quick

Michael Plummer

1 break.
2    MR. SOTO: Sure.
3    THE VIDEOGRAPHER: The time is
4 5:01 p.m., and we're going off the record.
5    (Short break taken)
6    THE VIDEOGRAPHER: This begins
7 media unit number 5, the time is 5:09 p.m., and
8 we're back on the record.
9 BY MR. SOTO:
10    A.   In your one of your last lines of
11 questioning I had forgotten and misspoke. The
12 $6 million number was a number that I had gotten
13 from Rich that was done at the DIA, the cost of
14 holding the collection and storing it.
15    Q.   So $6 million was indeed something
16 that the DIA has estimated that would cost?
17    A.   Yes. I made a mistake.
18    Q.   That's perfectly appropriate to
19 correct. I think we were going to page 36. Do
20 you see that, Footnote 1?
21    A.   Um-hum.
22    Q.   It says, "Unsold rates included in
23 present value calculation"?
24    A.   Um-hum.

Michael Plummer

1        Michael Plummer
2    Q.   On page 31, which contains your
3 present value calculation, if you go back to
4 that and take a look at it.
5    I don't see where it includes -- I
6 don't see where your present value calculation
7 mentions the unsold rates. I'm trying to figure
8 out what unsold rates apply?
9    MR. IRWIN: Form.
10    MR. O'REILLY: Objection to the
11 form.
12    A.   I'm confused with what you're
13 asking me.
14    Q.   I'll start again. The footnote
15 says, "Unsold rates are included in the present
16 value calculation"?
17    A.   Right.
18    Q.   Turn to page 31. I'm trying to
19 understand it.
20    A.   Okay. Page 31.
21    Q.   It contains your present value
22 calculation, correct?
23    A.   Right.
24    MR. IRWIN: At page 31,
25 assumptions.

Michael Plummer

1        Michael Plummer
2    A.   49 C?
3    Q.   No, I'm beyond the assumptions.
4 Maybe I'm using the wrong page.
5    A.   If you're looking for the present
6 value charts they're in the back. It's 70 or
7 71.
8    Q.   70 is the one you used before and
9 you have present value. It should be 71 I think
10 for this one. So again, it's Table 9, page 71
11 of 72. I see a present value of 1 million?
12    A.   366?
13    Q.   Yes.
14    A.   And 850.
15    Q.   At the bottom. So where is the --
16 I guess it's the?
17    A.   The unsold rate is the deduction
18 144, 144, 144 and then the add-back is 115,740,
19 115,740, so they're two different rows.
20    Q.   I see. So the deductions are the
21 ones over here on the right, 7, 8, 9 and 10?
22    A.   Right.
23    Q.   And then the add-back is 010?
24    A.   Right.
25    Q.   So that explains that. Thank you.

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

Michael Plummer

1  Going back to your assumptions on page 31.
2
3       Your calculations assume a discount
4  rate of 20 percent for not selling through
5  Christie's and Sotheby's, correct?
6       A.   Um-hum.
7       Q.   You testified about that earlier,
8  correct?
9       A.   Um-hum.
10      Q.   Then your calculations also assume
11  a discount rate of 50 percent for the market
12  disfavor of the American sector, correct?
13      MR. IRWIN:  Are we supposed to be
14  following somewhere in the document?
15      MR. SOTO:  Well yes, I was going
16  through the assumptions that start on page 31,
17  then I added to that the other assumptions that
18  he testified about earlier.
19      MR. IRWIN:  The impression was that
20  we were following along on the page and it's not
21  tracking.
22      MR. SOTO:  I'm sorry.  Let me start
23  again.
24      Q.   So in addition to the assumptions
25  that you list here in your chart, which is C:

Michael Plummer

1
2       "I use the following assumptions in
3  calculating present value discount."  You used
4  those, correct?
5       A.   Um-hum.
6       Q.   Beyond those present value discount
7  assumptions you also apply other discounts,
8  correct?
9       One that you testified about at
10  length was the fact that look, there's a
11  disfavor for the American sector, correct?
12      A.   I do not apply that in the present
13  value scenario.
14      Q.   You just applied that in general?
15      A.   No.  I applied that only in
16  scenario B, which is sort of just a straight
17  illustrative, illustration of application of
18  things; but I do not apply that in scenario C or
19  D.
20      Q.   In determining the present value
21  you did not apply the other discounts?
22      A.   No.
23      Q.   So you did not apply the discount
24  for the Sotheby's or Christie's --
25      A.   No.

Michael Plummer

1
2       Q.   You did not apply the discount for
3  the American sector disfavor?
4       A.   Correct.
5       Q.   You did not apply the discount for
6  the market crash?
7       A.   Correct.
8       Q.   Are you familiar with what has been
9  referred to as the grand bargain?
10      A.   Yes.
11      Q.   Are you aware that the DIA has
12  pledged a $100 million contribution to the
13  museum?
14      A.   Yes.
15      Q.   Maybe I should say the DIA Corp.
16  has pledged a $100 million contribution to the
17  museum?
18      A.   Yes.
19      Q.   Would you agree that your
20  valuation, without applying any discount
21  factors, far exceeds the 100 million
22  contribution?
23      MR. IRWIN:  Form.
24      A.   I don't know.  I am not following
25  your logic, nor do I understand what you're

Michael Plummer

1  asking.
2       Q.   The valuation you have, if you
3  don't apply your discounts to it; the valuation
4  you have of the art exceeds the $100 million
5  contribution that's being pledged by the DIA
6  Corp., correct?
7       A.   Yes.
8       Q.   Would you agree that even in the
9  worst-case scenario that you present, the value
10  of the DIA collection far exceeds the $100
11  million pledged by the DIA Corp.?
12      MR. O'REILLY:  Form.
13      A.   Yes.
14      Q.   Let's look at pages 39 and 40 of
15  your report.  On pages 39 and 40 you critique
16  the bids that were received by Houlihan for the
17  collection, correct?
18      A.   Correct.
19      Q.   What's the basis for your critique?
20      MR. O'REILLY:  Form.
21      A.   Looking at the -- what was in the
22  Houlihan Lokey materials in terms of what was on
23  offer.
24      Q.   I might have asked you this about
25

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 189 of
204

Michael Plummer

1 Michael Plummer
2 some of them, but let me ask you about all. Did
3 you contact any of the proposed bidders that
4 were included in the Houlihan report?
5    A.    No, I did not.
6    Q.    Let's turn to your critique of
7 Christie's recommendations that are on page 42.
8 Do you see that?
9    A.    Um-hum.
10    Q.    You say that Christie's was, by the
11 time they completed this section of their
12 report, dis-incentivized to develop this line of
13 argument fully, possibly due to market backlash
14 from the DIA and other market participants. Do
15 you see that?
16    A.    Um-hum.
17    Q.    What's the basis for that
18 statement?
19    A.    As I said, the comment by someone
20 at Christie's who was off the record.
21    Q.    That's it?
22    A.    Well, and also my own reading of
23 those proposals and how flimsy they were and
24 un-flushed out, as I say here. They didn't
25 really seem like they were given anything other

Michael Plummer

1 Michael Plummer
2 than a passing thought. There were no expenses,
3 no revenues, no timelines; it was just really a
4 cursory examination.
5    Q.    Did you speak with the person who
6 put that analysis together at Christie's to
7 discuss --
8    A.    I did not.
9       MR. IRWIN:  Let him finish.
10    Q.    -- to discuss with that person what
11 he was intending to do with these potential
12 alternatives?
13    A.    I did not.
14    Q.    Have you since you read their
15 report?
16    A.    I have not.
17    Q.    On page 42, paragraph 69, you state
18 further that Christie's "no longer has in-house
19 intellectual capital to conduct their
20 monetization analysis." Do you see that?
21    A.    Um-hum.
22    Q.    What's the basis of that statement?
23    A.    I was an in-house at Intellectual
24 Capital and I am no longer with the firm, and my
25 business partner Jeff as well.

Michael Plummer

1 Michael Plummer
2    Q.    So it's your position that in its
3 current iteration, Christie's does not have the
4 capability to do this analysis?
5    A.    Yes.
6    Q.    Did you talk to anybody at
7 Christie's about that opinion?
8       MR. O'REILLY:  Form.
9    A.    Let's just say I am aware of their
10 searches for staff and whatnot and know that
11 they are -- they do not have that capital,
12 intellectual capital.
13    Q.    Would you be surprised to find out
14 that they disagree with that statement?
15    A.    No, I'm not surprised at all.
16    Q.    You mentioned that Christie's
17 Financial Services Group was terminated in 2009,
18 correct?
19    A.    Correct.
20    Q.    And that's who you worked for,
21 correct?
22    A.    Correct.
23    Q.    Is there no one else at Christie's
24 capable of conducting an assessment of
25 monetization alternatives for a museum, in your

Michael Plummer

1 Michael Plummer
2 opinion?
3    A.    I don't think that -- if there is,
4 they certainly didn't do it in this exercise.
5    Q.    So in terms of the alternative to
6 monetization schemes that you referred to, your
7 evaluation assumes they will be sold, correct?
8    A.    I'm sorry, can you ask that again,
9 please?
10    Q.    Your evaluation and all of your
11 values and your charts assume the art is going
12 to be sold, correct?
13       MR. IRWIN:  Form.
14    A.    I am not sure. I can't answer that
15 question in that way that you asked it because
16 what I do is value the collection if it were to
17 be sold. I'm not assuming that it's being sold.
18    Q.    Let me ask it differently then.
19 Your valuations are based on a proposed sale of
20 the art, correct?
21    A.    These are results that would be the
22 result of a sale, but I'm not assuming it will
23 be sold.
24    Q.    But they're based on a proposed
25 sale, correct?

Michael Plummer

A. Correct.

Q. Did you consider, aside from critiquing Christie's alternatives to a sale; did you consider alternatives to a sale ways to monetize the art collection at the DIA, other than a sale?

A. I did not.

Q. Have you or Artvest ever participated in the collateralization of artworks?

A. What do you mean by that?

Q. You talked about being involved in loans before, art loans you called them?

A. Right.

Q. To me that means the art is being used as collateral for a loan, correct?

A. Correct.

Q. So have you or Artvest ever participated in the collateralization of any artwork in any form, whether it's in a loan or some other way?

A. Are you asking me if I played a role in art being used as collateral in a loan?

Q. Yes.

Michael Plummer

A. Yes, many times.

Q. You've testified about -- you guesstimated at a number, but you testified about your work with art lenders during your testimony today, correct?

MR. O'REILLY: Form.

Q. Correct?

A. Correct.

Q. How much would you advise the City of Detroit it could get as a loan using the DIA's entire collection as collateral?

A. Well, I think that presupposes I would advise them to do that.

Q. No, it doesn't, I'm just asking you the question. Assuming there was going to be a loan, how much would you advise the City of Detroit it could get as a loan if it used the DIA's collection as collateral?

A. I can't answer that without knowing where the funds would come from and how they would be paid back.

Q. You have the valuations that you went through, correct?

A. I understand that.

Michael Plummer

Q. Is it your testimony that based on those valuations, you think the most they could get is 50 percent of those valuations because it's a loan?

MR. O'REILLY: Objection to the form.

A. Under standard lending practices they would only be able to get 50 percent. According to the offer from Art Capital Group he's offering 20 percent, which is a really low number in our practices.

Whenever a loan is discussed the issue that I keep coming back to is who is going to service the debt, which is substantial, and who's going to pay off the loan, because I'm working through a bankruptcy situation right now with a client, if the loan isn't paid off the lender gets to sell the art.

So, in effect, if you have a loan for let's say half of the value of the collection and you can't pay that back, basically you have sold that collection to the lender for half of the value of its worth.

Q. Let me see if I'm understanding

Michael Plummer

your testimony here. So what you're saying then is if you were going to take a loan against the art of the DIA, it's your view that you would probably be limited to 50 percent of the valuations that you gave, correct?

MR. IRWIN: Asked and answered.

Q. That's one of the parts of the answer, correct?

A. Correct.

Q. The other part of the answer is you would have to be able to put together some sort of a plan to pay for the cost of that loan, correct?

A. Correct.

Q. Both the interest on the loan and ultimately to pay the loan back, correct?

A. Correct.

Q. So, in essence, if there were a Plan of Adjustment that were put together for the City of Detroit in connection with a Chapter 9 proceeding, that indeed took into account whatever the cost of the loan would be, and the repayment of the loan over whatever is the appropriate period of time negotiated by the

Michael Plummer

1 parties, you would expect that they could then
2 possibly get a loan for 50 percent of the value
3 of the art as you've valued it, correct?
4      MR. IRWIN:  Form.
5      A.    Yeah, if they have a strategy that
6 accomplishes all of those things.
7      Q.    Give me a second because I think
8 you've answered a lot of this.  This is
9 something that I don't know that you testified
10 about but I'm not understanding, maybe you have.
11 On page 43, paragraph 71 G?
12      A.    70 G.
13      Q.    Oh, yeah, sorry.  It says, it seems
14 to say:
15          "Most asset-backed lenders have
16 extreme provisions for the lender in a situation
17 of default, levying both higher interest rates
18 and onerous "agency" fees to liquidate the
19 property."
20          So here all you're saying is look,
21 if there were a default, the typical asset-based
22 lender or art lender has these kinds of
23 provisions; that's all you're saying?
24      A.    Well, yes; but I perhaps could have

Michael Plummer

1 gone on to say more, which is that oftentimes
2 those default terms are vaguely written and
3 clients end up in default unknowingly or
4 unwillingly.
5      Q.    If there is going to be some kind
6 of a monetization of the art, like through a
7 loan or something like that, you should get
8 lawyers like the ones you have here for the DIA
9 to help them make sure that that doesn't happen,
10 correct?
11      A.    Or ones like you.
12      Q.    Have you or anyone else at Artvest
13 ever participated in the creation of a
14 masterpiece trust?
15      A.    No, I haven't.
16      Q.    On page 45 of your report you say
17 the creation of a Masterpiece Trust to be
18 accessed by members of a museum consortium is
19 too blue-sky.
20          Am I reading that right?  It says
21 too blue-sky to be substantively helpful?
22      A.    Yes.
23      Q.    What is the basis of that opinion?
24      A.    Well, because they did not describe

Michael Plummer

1 how long it would take, where the money would
2 come from.  The fact that most other
3 institutions having already very aggressive and
4 ambitious development plans which are outlined
5 below.
6          It was my opinion that this was an
7 idea that was not substantiated in any way,
8 shape or form and that also would take an
9 enormous amount of time to implement, and it
10 wasn't discussed how it could be done in an
11 expeditious way.
12      Q.    But you recognize that there are
13 many very young museums that have just been
14 created throughout the country, correct?
15      A.    Yes, but that doesn't mean they're
16 funded well enough to come up with the kinds of
17 moneys that you're talking about.
18      Q.    And also throughout the world, I
19 don't know why I limit it to the country --
20 we've board them, that's all right, I'm still
21 interested.
22      A.    There are.  But again, I think it's
23 an idea that is not flushed out well enough to
24 be taken seriously.

Michael Plummer

1      Q.    Are you aware of any meaningful
2 masterpiece trusts that have been put in place
3 by other museums?
4      A.    I am not.  That doesn't mean they
5 may not exist, but I am not.
6      Q.    Did you do any studies to determine
7 whether there were any other masterpiece trusts
8 being used by museums in the world to monetize
9 their art?
10      A.    I did not.
11      Q.    Have you or Artvest ever
12 participated in structuring long-term leases of
13 artwork?
14      A.    No.
15      Q.    What experience do you or Artvest
16 have in connection with structuring long-term
17 leases of artwork at all?
18      A.    We haven't, that's not in our line
19 of business.
20      Q.    On page 44, paragraph 71, you
21 state:
22          "This option would have the same
23 effect of depriving the DIA of some of its most
24 prized works, yet for far less of a financial

Michael Plummer

1 benefit. Based on deals made with other partner
2 museums, Guggenheim Museum & Bilbao, Guggenheim
3 & Abu Dhabi and the Louvre & Abu Dhabi, such an
4 arrangement would be unlikely to net more than
5 20 million to 100 million in total for a 10 to
6 15 year deal and would result in the removal of
7 many high value works from the walls of the
8 DIA."
9         Do you see that?
10    A.   Yes.
11    Q.   What is the basis of that opinion?
12    A.   The situations I lay out below, A
13 through E.
14    Q.   Other than what you lay out in A
15 through E, is there anything else that you base
16 that opinion on?
17    A.   F through G.
18    Q.   Okay.  Other than A through G, is
19 there anything else?
20    A.   No.
21    Q.   So I read A through G, and I'm
22 wondering where did the calculations come from
23 that you used to come up with the numbers that
24 you have here, were they in some public

Michael Plummer

1 documents?
2    A.    They were in the documents
3 referenced here.  They're in several of the
4 press reports.
5    Q.    So other than what you sent us and
6 what you referenced, the press reports, that's
7 what you relied on?
8    A.    That's what I relied upon.
9    Q.    Have you or Artvest ever
10 participated in the sale and permanent loan of
11 artwork?
12    A.    That's a confusing question.  The
13 sale and permanent loan, are you meaning to
14 combine both as to one question?
15    Q.    I think what I'm referring to here
16 on page 46, Christie's recommendation 4?
17    A.    Yes.  I see what you're asking.
18 No, we have not.  I have not.
19    Q.    Did you conduct any analysis before
20 you arrived at the conclusion that you state in
21 paragraph 75?  And I'm reading it:
22         "It is hard to imagine how this
23 type of program would attract a new type of
24 donor who is not already supporting the

Michael Plummer

1 institution."
2    A.   Did I prepare any?
3    Q.   Did you do any analysis to support
4 that conclusion?
5    A.   I did not.
6    Q.   Did you speak to any donors --
7    A.   Let me correct that.  You threw me
8 off with the question.  As I said, I did talk to
9 several museum people, which I cannot divulge
10 because they were off-the-record conversations.
11    Q.   Did you speak to any donors
12 regarding their interest in a sale and permanent
13 loan program?
14    A.   I did not speak to any donors, but
15 I did speak to an expert on donors who was
16 responsible for many of the major gifts at
17 various museums and has a tremendous insight
18 into donor mentality.
19    Q.   Who was that?
20    A.   Again, it was an off-the-record
21 conversation.
22    Q.   So other than the off-the-record
23 conversation that you're referring to, did you
24 do any additional analysis?

Michael Plummer

1    A.   No, I did not.
2    Q.   Have you or Artvest ever
3 participated in coordinating, and you may have
4 because you worked with the fair, in
5 coordinating a traveling exhibition?
6    A.   In coordinating a traveling
7 exhibition?
8    Q.   Yes.
9    A.   No, we have not.
10    Q.   On page 46 of paragraph 76.  You
11 state:
12         "By Christie's own admission, this
13 a less than desirable alternative, as such
14 expositions are "costly to mount" and raise very
15 little relative to their total expense."  Do you
16 see that?
17    A.   Yes.
18    Q.   And it goes on to state "Such
19 revenues range from as little as 20,000 for
20 small exhibitions to 600,000 for blockbuster
21 exhibitions."
22         What is the basis of that
23 statement?
24    A.   The museum administrative officials

79 (Pages 313 to 316)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 193 of
204

Michael Plummer

1  that I referred to previously have handled the
2  budgets for such exhibits.
3  Q.    Is that someone that you can't
4  divulge at this point?
5  A.    It's in that same group of people I
6  mentioned before.
7  Q.    So you state that you have -- other
8  than that statement, you've had no experience
9  with any of these traveling, whatever they call
10 it, traveling exhibitions, correct?
11 A.    Back in my Acoustiguide days I
12 actually was dealing with the financial -- I was
13 working with the museums and their setting up of
14 those exhibitions, and their profits that they
15 expected to get from their audio tours and other
16 things, and their attendance numbers based on
17 the exhibition and that sort of thing. So I did
18 have experience back in that part of my career.
19 Q.    That would have been a long time
20 ago, correct?
21 A.    That would have been a long time
22 ago.
23 Q.    Counting for inflation and other
24 expenses, you're not aware of what they cost

Michael Plummer

1  now, are you?
2  A.    Yes, I am, because these numbers
3  came from talking to museum people this year,
4  just recently.
5  Q.    Is there any either publicly
6  available or privately available study or data
7  that you can refer to for the basis of your
8  calculation?
9  A.    No.
10 Q.    Other than the conversation you
11 had, correct?
12 A.    Correct.
13 Q.    Do you know what that person was
14 basing it on?
15 A.    They were basing it on their own
16 in-house experience of exhibitions.
17 Q.    So on page 48 of your report.
18 Looking at paragraph C:
19       "My review of the practicality and
20 the reasonableness of the monetization
21 alternatives described in Christie's preliminary
22 report to the City of Detroit: They do not have
23 a reasonable expectation of either raising
24 meaningful money or exceeding even the $100

Michael Plummer

1  million the DIA has already committed as its
2  contribution to the grand bargain." Do you see
3  that?
4  A.    Um-hum.
5  Q.    What's the basis for that
6  statement?
7  A.    What I've laid out in the report
8  thus far.
9  Q.    Other than what you've testified
10 about today and what you've laid out in your
11 report; is there any other source or information
12 you're relying on for that opinion?
13 A.    I have nothing supplemental to
14 provide here today.
15 Q.    Other than what you've testified
16 about today and what you referred to in your
17 report, you haven't done any additional
18 analysis?
19 A.    Not other than what is here and
20 I've testified to.
21 Q.    Were you asked to render an opinion
22 regarding the cultural impact of the museum, the
23 DIA, on the City of Detroit?
24 A.    No.

Michael Plummer

1  Q.    Looking at page 48, paragraph 78.
2  It says as I'm reading it:
3       "Rather than being a source of cash
4  to creditors or a burden on the current city, in
5  fact, the DIA is the single, most important
6  cultural asset the City currently owns for
7  rebuilding the vitality of the City." Do you
8  see that?
9  A.    I do.
10 Q.    Did you write that statement?
11 A.    I did.
12 Q.    What is the basis of that
13 statement?
14 A.    My opinion.
15 Q.    Your personal opinion?
16 A.    My personal opinion based on my
17 years of experience in the art industry.
18 Q.    That opinion isn't dealing with
19 anything to do with the art industry, it's
20 dealing with the cultural impact of the museum
21 on the City of Detroit, correct?
22 A.    It's dealing with the DIA as an art
23 institution and the impact of art institutions
24 in the city.

80 (Pages 317 to 320)

Michael Plummer
1
2     Q.    What experience do you have in
3  valuing cultural assets like the statement you
4  made there?
5     A.    I don't have experience.
6          MR. SOTO: I don't have any other
7  questions.  I thank you very much Mr. Plummer
8  for your patience with me.  Any other questions
9  from anyone?
10          MR. O'REILLY:  No questions.
11          MR. SOTO:  Anyone on the phone?  In
12  which case this concludes our deposition.  You
13  have a right to review the testimony, and in
14  reviewing it you can certainly fix grammatical
15  errors, things that you see as misspellings or
16  things like that, things that you think might
17  have been taken down wrong.
18          You don't get to substantively
19  change your testimony, unless of course you say
20  no I meant not, and there's no not in there,
21  then that's a different issue.  So you'll get a
22  chance to do that and you can coordinate that
23  with your counsel.
24          THE WITNESS:  Okay.
25          THE VIDEOGRAPHER:  The time is 5:45

Michael Plummer
1
2  p.m. August 1, 2014, this completes today's
3  video deposition of Michael Plummer.
4          (Time Noted:  5:45 p.m.)
5
6          ---------------------------
7          MICHAEL PLUMMER
8
9  Subscribed and sworn to before me
10  this     day of     , 2014.
11
12  ---------------------------------
13          Notary Public
14
15
16
17
18
19
20
21
22
23
24
25

1          ERRATA
2     I, MICHAEL PLUMMER, wish to make the
   following changes, for the following reasons:
3
4  PAGE LINE
5  ____ ____  CHANGE: _____
6          REASON: _____
7  ____ ____  CHANGE: _____
8          REASON: _____
9  ____ ____  CHANGE: _____
10          REASON: _____
11  ____ ____  CHANGE: _____
12          REASON: _____
13  ____ ____  CHANGE: _____
14          REASON: _____
15  ____ ____  CHANGE: _____
16          REASON: _____
17  ____ ____  CHANGE: _____
18          REASON: _____
19
20  _____  _____
21  WITNESS' SIGNATURE          DATE
22
23
24
25

1          C E R T I F I C A T E
2
3          I, Roberta Caiola, a Shorthand
4  Reporter and Notary Public within and
5  for the State of New York, do hereby
6  certify:
7
8          That the statements, colloquy
9  and testimony contained herein is a
10  true record of the proceedings in this
11  matter.
12
13          I further certify that I am
14  not related to any of the parties
15  involved in this proceeding, and that
16  I am in no way interested in the
17  outcome of this matter.
18
19
20          ---------------------------
21          ROBERTA CAIOLA
22  Dated:  August 3, 2014
23
24
25

81 (Pages 321 to 324)

# **Exhibit C**

<pre>
 1              UNITED STATES BANKRUPTCY COURT
               EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3

 4   In re:                        )
     CITY OF DETROIT, MICHIGAN,    )
 5                                 ) Chapter 9
            Debtor.                )
 6                                 ) Case No. 13-53846
              vs.                  )
 7                                 ) Hon. Steven W. Rhodes
     ----------------------------- )
 8

 9

10

11

12

13     VIDEOTAPED DEPOSITION OF ELIZABETH VON HABSBURG

14                   New York, New York

15                 Thursday, July 31, 2014

16

17

18

19

20

21

22

23

24   Reported by:
     MICHELLE COX
25   JOB NO. 215820
</pre>

1    A    Correct.
2         Although one would have to take into
3    account whether there is duress in a time
4    period.  But it's outside of the scope of
5    opinion.  So I didn't -- I don't have a good
6    opinion on that.
7         MR. O'REILLY:  Let's take a break.
8    Let's go off the record.
9         THE VIDEOGRAPHER:  This concludes Tape
10   No. 1.  The time is 11:12 a.m.  We're off the
11   record.
12        (Recess taken.)
13        THE VIDEOGRAPHER:  This begins Tape No. 2.
14   The time is 11:19 a.m.  We're back on the
15   record.
16   BY MR. O'REILLY:
17   Q    You said that marketable cash value
18   requires a reduction to make it net to seller,
19   correct?
20   A    That's correct.
21   Q    What are those items that would have to be
22   considered to make it net to seller?
23   A    The buyer's premium that the auction house
24   puts on the hammer price, would be taken off.
25   Any selling commissions on the part of the

1    seller, insurance charges, shipping charges,
2    illustration fees, and any other costs that are
3    associated with selling a Work of Art.
4    Q    In a typical fine art transaction, are you
5    able to give me a percentage of how much of a
6    reduction that would be to the seller from, I
7    guess, the sale price to what the seller
8    actually nets?
9    A    It depends on the level of value.  The
10   higher the value, the lower the percentage
11   reduction.  The lower the value the higher the
12   percentage reduction.
13        So in the case of a work that is, say,
14   over $2 million, the buyer's premium, if you're
15   going to a Sotheby's or a Christie's type
16   auction house or a Phillips, or any of the
17   major auction houses, the buyer's premium would
18   be approximately 12 percent.  The seller's
19   commission, at that high level, may be zero,
20   but it could be up to, say, 5 percent,
21   approximately.  I'm giving approximates.
22        There's an insurance charge, which at the
23   higher level would probably be waived.  So that
24   would not come off.  That would not be charged.
25        There would be illustration fees.  But at

1    the higher level, those may be waived.  So
2    there's nothing there.
3         Shipping fees, which may have been charged
4    at a lower value would probably not be charged
5    at a higher value.
6         So you're basically talking around, the
7    high level works, around 12, 13 percent that
8    would come off.  At the lower value you are
9    talking somewhere in -- by "lower value," it
10   could be all the way down to $500, $200 or
11   $100; you're talking about probably a buyer's
12   premium of up to 25 percent or so, that would
13   come off.
14        A seller's commission, that could be up to
15   25 percent, and other fees:  Insurance, might
16   be one and a half percent; shipping charges;
17   illustration fees, those would all come off.
18        So you can't give a precise one.  For
19   every value, it changes depending on value.
20   Q    You aren't here to give an opinion on the
21   amount of reductions there would be to get to
22   net -- net to seller price or marketable cash
23   value, correct?
24   A    That's correct.
25   Q    But you said that for works that are high

1    value you can have, for example, a buyer's
2    premium -- I'm sorry.
3         Is it the buyer's premium or the seller's
4    commission that is 12 percent?
5    A    Buyer's premium.
6    Q    So the seller would have to consider
7    reducing its expectations, if you will, from
8    fair market value from at least that 12 percent
9    to understand what their net would be, correct?
10   A    Yes, in a hypothetical manner.
11   Q    You've never been involved with a sale of
12   $1.7 billion of art, have you?
13   A    No.
14   Q    Do you have any reason to know what the --
15   whether there would be a buyer's premium or a
16   seller's charge -- strike that question.
17        I think you said that -- you were offering
18   me examples of buyer's premiums by Christie's;
19   is that right?
20   A    Christie's or Sotheby's.  These are
21   approximate.
22   Q    Approximately 10 percent, or for the high
23   value.
24        It could be higher for low value, right?
25   A    Yes.  Approximately 12 percent, highest

1  level, at Christie's and Sotheby's, and I
2  believe Phillips as well.  And higher for a
3  lower value, generally.
4  Q    If you applied that 12 percent discount to
5  1.75 billion, what's the number?
6  A    I would need my calculator to give you
7  that number.
8  Q    Does 200 million sound about right?
9  A    Give me a calculator and I'll tell you.
10  Q    Okay.  You have no reason to dispute that
11  that would be charged in a transaction for a
12  sale of 1.75 billion dollars of art, right?
13  A    Well, there are probably exceptions.
14  Q    You personally have no factual information
15  to dispute that, correct?
16  A    There are exceptions for high level Works
17  of Art where the seller gets a rebate part of
18  the buyer's premium.
19  Q    That's negotiated between the parties who
20  are selling and the auction house, correct?
21  A    Correct.
22  Q    So you wouldn't know one way or the other
23  whether it could be included or not, correct?
24  A    That's correct.
25  Q    It would have to be worked out between the

1  two, correct?
2  A    Yes.
3  Q    When you listed the factors that you would
4  have to consider to get to the marketable cash
5  value, you didn't mention blockage discount,
6  right?
7  A    Right.
8  Q    Under USPAP, are there circumstances where
9  you would have to consider blockage discount?
10  A    Under USPAP and under the IRS regulations,
11  yes.
12  Q    Are you here in this case to form any
13  opinion on whether or not a blockage discount
14  applies to a sale of art at the DIA?
15  A    Sorry.  Can you rephrase that question?  I
16  lost track.
17  Q    You're being offered as an expert.  I'm
18  just trying to figure out if you are going to
19  provide an opinion as an expert on whether a
20  blockage discount should be applied to a sale
21  of art at the DIA.
22  A    I'm not here to do that.
23  Q    Under USPAP, would you be required to
24  disclose if you're applying a blockage discount
25  to your marketable cash value assessment?

1  A    Yes.
2  Q    In your experience, would you have to
3  consider whether a blockage discount is
4  appropriate if you tried to sell 594 works at
5  the museum -- sorry, 582?
6  A    Selling is different from appraisals.
7       So if you're appraising Works of Art, you
8  do decide whether blockage discount is
9  appropriate or not.
10  Q    Right.
11       But you haven't formed an opinion on that,
12  correct, for the 582 that you appraised?
13  A    We did not use blockage discount.
14  Q    Okay.  Would you apply blockage discount
15  to get the marketable cash value for 60,000
16  works in a collection?
17  A    It depends on what was in the collection.
18  Q    What about the DIA collection?
19  A    I haven't looked at the whole collection.
20  But generally blockage discounts are used when
21  there are Works of Art by the same artist of
22  the same type in an artist's estate.
23       That's the primary use for blockage
24  discount.
25  Q    In your experience, would it be

1  appropriate to consider it if you were doing a
2  marketable cash value assessment for a
3  collection of 60,000?
4  A    It would be appropriate to look into it.
5  Q    Would a sale of 100 master works
6  potentially depress the market?
7  A    Broad question.
8       But I can say that if they were 100
9  individually fantastic Works of Art, probably
10  not, depending on how long you had to sell them
11  and what that group consisted of.
12  Q    If you tried to sell them all at once and
13  they were high quality, would it have the
14  potential to depress the market?
15  A    If you had to sell them all in one day,
16  you would want to consider various options for
17  those works:  Auction, private sale, regional
18  sales.
19       So it really depends on what those Works
20  of Art are before I can make that
21  determination.
22  Q    Do you know Todd Levin at the Levin Art
23  Group?
24  A    I don't.
25  Q    So you said it depends.

1    Am I correct that you don't have an
2  opinion, sitting here today, whether a sale of
3  100 high value works at the museum would
4  depress the market?
5  A   I don't have an opinion on that.
6  Q   You said that you don't do liquidation
7  value, right?
8  A   Correct.
9  Q   Do you have a sense of when a liquidation
10 value is appropriate?
11 A   I don't.  We don't use it.
12 Q   Okay.  Do you know what factors would have
13 to be considered in a liquidation value
14 appraisal?
15 A   No.
16 Q   So you have no opinion one way or the
17 other about what factors might have to be
18 considered to understand what the liquidation
19 value of a collection would be?
20 A   Correct.
21 Q   And you don't have the expertise to do it
22 either, correct?
23 A   We were never asked to do it.  If we were
24 asked to do it it might investigate it and see
25 if we have the expertise to do it.

1  Q   But sitting here today you don't have
2  those expertise, correct?
3  A   I don't know.  I've never been asked to do
4  it.
5  Q   Well, now I'm a little confused.
6      So you've never done it before.  And
7  you've told me you can't opine about it.  But
8  you're saying that if you were asked to do it
9  you might learn enough to do it?
10 A   We'd investigate what factors are called
11 into a liquidation value appraisal, and then
12 see if we were able to do it.
13 Q   Have you been asked to do such an
14 appraisal?
15 A   No.
16 Q   Sitting here today, do you expect to do
17 such an appraisal?
18 A   Not that I know of.
19 Q   And this is your final report, correct?
20 A   That's correct.
21 Q   You used a market comparison approach in
22 doing your FMV, correct?
23 A   Comparable market data approach, yes.
24 Q   Sorry.
25      Can use such an approach when you

1      don't use comparables?
2      Yeah.
3      So -- so in your report, which you used a
4  comparable market value approach, you mentioned
5  that some of them didn't have comparables.
6      I may be misreading or misremembering.
7      MR. RUEGGER:  Page 7.
8      MR. O'REILLY:  Page 7, my colleague says.
9  A   Page 7.  Oh, this is the report you're
10 talking about?
11 BY MR. O'REILLY:
12 Q   Yeah.  Your expert report --
13 A   My expert report.
14 Q   -- which you signed --
15 A   Yes.
16 Q   -- on Page 7.
17     At the bottom of the top paragraph, says:
18 Due to rarity, there are some items for which
19 no comparables exist.  In these cases our
20 specialists offered their reasoning as to
21 valuation.  In the occasional case items were
22 not valued for reasons stated in the document."
23     So you'd agree with me, then, that you
24 performed a comparable market value approach,
25 but where you didn't have comparables, you

1  relied upon your professional judgment?
2  A   That's correct.  There were no direct
3  comparables, yes.
4  Q   What's the distinction there?
5      You said "direct comparables"?
6  A   Normally, every Work of Art has something
7  by that artist or by that work master that can
8  be very closely compared.  But sometimes
9  something is so much better than other works on
10 the market or so rare that you have to use
11 comparables that are outside those direct
12 comparables and go to your market knowledge of
13 other artists who have crafted or painted or
14 made works that are similar, or what you
15 presume to be the market for something that is
16 so outside the norm.
17 Q   When you say "outside the norm" -- well,
18 first of all, do you know which objects didn't
19 have comparables?
20 A   They all had some kind of comparable.
21 They may not have had an auction comparable or
22 a direct artist comparable.  But they wouldn't
23 have -- there was reasoning behind what the
24 appraisers did to compare it to other objects
25 or other Works of Art --

## **Exhibit D**

1               Vanessa Fusco

2   IN THE UNITED STATES BANKRUPTCY COURT

3   FOR THE EASTERN DISTRICT OF MICHIGAN

4

5

6   In Re:          ) Chapter 9

7

8

9   CITY of DETROIT, MICHIGAN, ) Case No. 13-53846

10

11       Debtor.     ) Hon. Steven Rhodes

12

13   --------------------------x

14

15

16   Videotaped Deposition of VANESSA FUSCO

17   Taken at 919 Third Avenue

18   New York, New York

19   Commencing at 9:13 a.m.

20   Friday July 25, 2014

21   Before Roberta Caiola

22

23

24

25

1              Vanessa Fusco

2   A P P E A R A N C E S :

3

ERICH O. GROSZ, ESQ.

4   SARAH K. GARVEY-POTVIN, ESQ.
    WILLIAM H. TAFT, V, ESQ.

5   DEBEVOISE & PLIMPTON, LLP
    919 Third Avenue

6   New York, New York 10022
       Attorneys for Christie's

7

8   GEOFFREY S. IRWIN, ESQ.
    ALEXANDER E. BLANCHARD, ESQ.

9   Jones Day
    51 Louisiana Avenue, N.W.

10   Washington, D.C. 20001
      Appearing on behalf of the

11      Debtor and The Witness

12

EDWARD SOTO, ESQ.

13   Weil, Gotshal & Manges, LLP
    1395 Brickell Avenue - Suite 1200

14   Miami, Florida 33131-3368
      Appearing on behalf of Financial

15      Guaranty Insurance Company

16

ARTHUR T. O'REILLY, ESQ.

17   SCOTT KITEI, ESQ. (Telephonic Appearance)
    Honigman Miller Schwartz & Cohn LLP

18   2290 First National Building
    660 Woodward Avenue

19   Detroit, Michigan 48226-3506
      Appearing on behalf of the

20      Detroit Institute of Arts

21

ARTHUR H. RUEGGER, ESQ.

22   JOHN BYRNES, Intern
    Dentons US, LLP

23   1221 Avenue of the Americas
    New York, New York 10020-1089

24       Appearing on behalf of the
     Retiree Committee

25

1              Vanessa Fusco

2   A P P E A R A N C E S :

3

MICHAEL J. PATTWELL, ESQ.

4   Clark Hill, PLC
    212 East Grand River

5   Lansing, Michigan 48906
      Appearing on behalf of the Retirement

6      Systems for the City of Detroit
(Telephonic Appearance)

7

8   ALSO PRESENT:
    CAROLINE MOUSTAKIS, Christie's

9   Vice President, Senior Counsel
    Dispute Resolution

10   MICHAEL GOCKSCH
    JOSE RIVERA - Video Technician

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              Vanessa Fusco

2       THE VIDEOGRAPHER: This is media

3   unit number 1 in the video deposition of Vanessa

4   Fusco, in the matter of In Re: City of Detroit

5   Michigan, Debtor, in the United States

6   Bankruptcy Court for the Eastern District of

7   Michigan, case number 13-53846.

8       This deposition is being held at

9   Debevoise & Plimpton LLP, 919 Third Avenue, New

10   York, New York, on July 25, 2014 at

11   approximately 9:13 a.m.

12       My name is Jose Rivera from the

13   firm of Elisa Dreier Reporting Corp. and I am

14   the legal video specialist. The court reporter

15   is Roberta Caiola, in association with Elisa

16   Dreier Reporting Corp. located at 950 Third

17   Avenue, New York, New York.

18       Will the court reporter please

19   swear in the witness.

20       THE COURT REPORTER: Raise your

21   right hand please. Do you swear the testimony

22   that you are about to give will be the truth,

23   the whole truth, and nothing but the truth?

24       THE WITNESS: Yes.

25   VANESSA FUSCO, having been duly sworn by the

Vanessa Fusco

1
2      Q.    I was going to go back and ask you.
3  Were any of them for the purpose of sale?
4      A.    Yes.
5      Q.    Would that be one of the ones that
6  you did from 2010 through 2011-2014, correct?
7      A.    Yes.
8      Q.    In connection with the collection
9  that you valued for purposes of sale, how large
10  a collection in terms of the number of works of
11  art was that?
12          MR. IRWIN:  Do you mean among them?
13          MR. SOTO:  Yes.
14          MR. IRWIN:  His prior examples.
15      A.    Of those six prior examples three
16  were for the purposes of sale.
17      Q.    And?
18      A.    And how many objects were included?
19      Q.    Yes.
20      A.    Again, I don't have the data at my
21  fingertips, but from my memory the smallest was
22  6 or 700 objects and the largest between 1,500
23  and 2,000.
24          MR. GROSZ:  Would you like to take
25  a break?

Vanessa Fusco

1
2      THE WITNESS:  Yes.
3      MR. GROSZ:  Now?
4      MR. SOTO:  Absolutely.
5      THE VIDEOGRAPHER:  The time is 2:25
6  p.m. and we're going off the record.
7      (Short recess taken)
8      THE VIDEOGRAPHER:  This begins
9  media unit number 4, the time is 2:42 p.m. and
10  we're back on the record.
11  BY MR. SOTO:
12      Q.    Ms. Fusco, before the break you had
13  mentioned something about analyzing art in
14  isolation as opposed to analyzing art as a whole
15  group of art.
16      I think you said, correct me if I'm
17  wrong, that the work you did in connection with
18  your valuation for the DIA for the City, of the
19  DIA art owned by the City was done for each
20  isolated value of art, correct?
21      A.    That's correct.
22      Q.    Explain to the Court what that
23  means.  You looked at one piece of art and
24  valued that piece of art by itself, correct?
25      A.    Yes, that's what that means.

Vanessa Fusco

1
2      Q.    Does it make a difference if you're
3  valuating each piece of art in isolation, as you
4  just mentioned earlier, as opposed to as the
5  whole group; does that make a difference in the
6  valuation?
7      A.    It can make a difference, yes.
8      Q.    And how, how can it make a
9  difference?
10      A.    One must be conscious of presenting
11  too many works at once that are similar in
12  nature or that only have a limited pool of
13  buyers, essentially flooding the market.
14      Q.    So in general terms, if you're
15  looking at a group of art like the 1,700 or so
16  pieces that you valued in the DIA collection,
17  would a valuation of the entire group for fair
18  market value purposes as you were asked to do
19  here, would it be greater or lesser if it was
20  done for the whole group as opposed to each
21  individual piece?
22          MR. IRWIN:  There's a
23  mischaracterization here, a disconnect; maybe
24  the witness can clarify.
25      A.    Can you repeat that?

Vanessa Fusco

1
2      Q.    What I'm trying to figure out is
3  you have a valuation that you've given to the
4  City of Detroit and the Court is going to be
5  looking at it in connection with 1,700 pieces,
6  correct?
7          MR. O'REILLY:  Objection,
8  mischaracterizes.
9      A.    Christie's did a formal appraisal
10  of 1,700 pieces in the COD collection.
11      Q.    And you valued each of those
12  pieces, you gave a value to each of those
13  pieces, correct?
14      A.    Of those 1,700 pieces, yes.
15      Q.    If I'm understanding you, and I
16  want to know if there is a disconnect you tell
17  me, you did that in isolation for each piece as
18  you just described it, correct?
19      A.    That's correct.
20      Q.    Would that value or would the value
21  for those pieces differ if you did it as a
22  group?  That's the question.
23          MR. O'REILLY:  Objection to form.
24      A.    If we were to consider -- there are
25  segments of the collection that if we were to

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 203 of
204

1     Vanessa Fusco
2 consider putting on the market and were
3 instructed to do so all at once, we would
4 generally in that case apply a discount.
5     Q.    For each piece?
6     A.    Because -- yes, for each piece,
7 because there's only a limited pool of buyers
8 for certain categories of art, and if you put
9 works on the market all at once and flood that
10 capacity of those buyers you might net a lower
11 value than if a single work were to go on the
12 market at once.
13     Q.    Looking at paragraph 21, the second
14 sentence says:
15         "Christie's valuation provided fair
16 market values using an industry standard
17 appraisal methodology the market data approach.
18 We decided that specialists should provide a
19 range of fair market values."
20         That's consistent with what you
21 testified about earlier, correct?
22     A.    Yes.
23     Q.    It says here:
24         "Christie's made no assumptions
25 about the hypothetical sale process, nor did we

1     Vanessa Fusco
2 take into account any commissions, buyers
3 premiums or potential financial agreements
4 between the buyer, seller and/or venue that
5 could affect the final price realized."
6         Do you see that sentence?
7     A.    Um-hum.
8     Q.    It then goes on and says:
9         "We also did not assume any
10 discounts that might apply, if for example
11 numerous COD works were to be sold at one time."
12         So this last sentence is what you
13 were just referring to, correct?
14     A.    Correct.
15     Q.    What about the sentence before
16 where it says:
17         "Christie's made no assumptions
18 about the hypothetical sale process, nor did we
19 take into account any commissions, buyers
20 premiums or potential financial agreements."
21         Do you see that?
22     A.    Yes.
23     Q.    What was that referring to?
24     A.    The fair market values provided --
25 the range of fair market values provided are

1     Vanessa Fusco
2 what we refer to in the industry as hammer
3 prices, meaning what the work sells for in the
4 room and not with the addition of a commission
5 that Christie's collects for providing -- for
6 putting that work on the market.
7     Q.    So now I'm switching to something I
8 might understand.  If you have the value of a
9 home, for example, and you gave someone the fair
10 market value of the home; am I right that what
11 this means is we're just giving you the value of
12 the home.  We're not telling you what you might
13 have to pay a broker if you have to pay a
14 commission to get it sold, is that what you mean
15 by that?
16         MR. IRWIN:  Form.
17     A.    Please say that again.
18     Q.    So if you own a home and you have a
19 fair market value that's been determined for
20 that home, as you determine the fair market
21 value for the 700 pieces.
22         Is that sentence meaning we did not
23 include in our valuation any additional money
24 that might have to be paid for a broker in order
25 to get a sale accomplished; is that what you

1 mean by that?
2     A.
3         MR. IRWIN:  Form.
4     A.    What I mean is that we did not
5 include a commission that Christie's would
6 normally take for a sale of values of this
7 works -- sorry, for a sale of these works at
8 this value range.
9     Q.    So what you're simply saying in
10 your expert report that you didn't say in your
11 valuation is here is the fair market value as
12 you defined it, which is consistent with the
13 IRS's fair market value; but if you want to sell
14 those you might have to pay a commission.  So
15 you may not net out the fair market value, you
16 may have to pay a commission; is that what
17 you're saying?
18         MR. IRWIN:  I would also object.
19 Your representation is that it was not -- it's
20 here but it's not elsewhere, was that the
21 beginning of your question?
22         MR. SOTO:  No.  Strike that.  I'll
23 start again.
24 BY MR. SOTO:
25     Q.    You put together a fair market

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7121-1   Filed 08/27/14   Entered 08/27/14 19:26:07   Page 204 of 204