# Exhibit E

- PAUL PROVOST - VOLUME I -

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

In Re:                    ) Chapter 9

CITY of DETROIT, MICHIGAN, ) Case No. 13-53846

        Debtor.    ) Hon. Steven Rhodes

DATE: August 6, 2014
TIME: 2:40 p.m.

VOLUME I
        VIDEOTAPED DEPOSITION OF PAUL PROVOST,
held at the offices of Debevoise & Plimpton LLP,
919 Third Avenue, New York, New York, pursuant
to Order, before Nicole Cannistraci, a
Shorthand Reporter and Notary Public of the
State of New York.

1           - PAUL PROVOST - VOLUME I -
2     A P P E A R A N C E S:
3     ELIZABETH G. HENDEE, ESQ.
4     Weil, Gotshal & Manges, LLP
5     767 Fifth Avenue
6     New York, New York 10153
7         Appearing on behalf of Financial Guaranty
8         Insurance Company
9
10    EDWARD R. McCARTHY, ESQ.
11    Weil, Gotshal & Manges, LLP
12    1395 Brickell Avenue, Suite 1200
13    Miami, Florida 33131
14        Appearing on behalf of Financial Guaranty
15        Insurance Company
16
17    ERICH O. GROSZ, ESQ.
18    WILLIAM H. TAFT, V, ESQ.
19    SARAH K. GARVEY-POTVIN, ESQ.
20    Debevoise & Plimpton LLP
21    919 Third Avenue
22    New York, New York 10022
23        Appearing on behalf of Christie's
24
25

1           - PAUL PROVOST - VOLUME I -
2     A P P E A R A N C E S: (Cont'd)
3     SANDRA L. COBDEN, ESQ.
4     20 Rockefeller Plaza
5     New York, New York 10020
6         Appearing on behalf of Christie's
7
8     GEOFFREY S. IRWIN, ESQ.
9     Jones Day
10    51 Louisiana Avenue, N.W.
11    Washington, D.C. 20001
12        Appearing on behalf of the City of Detroit
13
14    PAUL C. GUNTHER, ESQ.
15    Dentons US, LLP
16    1221 Avenue of the Americas
17    New York, New York 10020
18        Appearing on behalf of the Retiree Committee
19
20    LAUREN BUONOME, ESQ. (Via telephone)
21    Jones Day
22    222 East 41st Street
23    New York, New York  10017-6702
24        Appearing on behalf of the City of Detroit
25

1           - PAUL PROVOST - VOLUME I -
2     A P P E A R A N C E S: (Cont'd)
3     ALSO PRESENT:
4     Joe Darrion, Videographer
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

- PAUL PROVOST - VOLUME I -
1
2  other parties and it was -- and, again, the
3  scope of what some type of loan might be, we had
4  no idea what the scope of what any type of loan
5  or line of credit might be, so it would be
6  difficult to model something if you don't have
7  basic information.
8       Q.   Did Christie's -- and to your
9  knowledge again -- have any further
10 conversations about this alternative?
11           MR. GROSZ:  After the
12      submission --
13      Q.   After the submission of the
14 December 3rd letter?
15      A.   With whom?
16      Q.   Let's start with the City.
17      A.   To my knowledge, no.
18      Q.   How about with the DIA?
19      A.   To my knowledge, no.
20      Q.   And did you consider to discuss
21 this internally after December 3rd?
22      A.   After this was submitted, there
23 may have been subsequent -- some discussions
24 about what happened after the submission, but
25 there was no substantive discussion about the

- PAUL PROVOST - VOLUME I -
1
2  alternatives --
3       Q.   Okay.
4       A.   -- internally at Christie's.
5       Q.   The analysis included in your
6  December 3rd or the December 3rd, 2013 letter
7  about using city-owned works as collateral for a
8  loan or line of credit, is that the -- was any
9  further analysis done on this?
10      A.   No, not to my knowledge.
11      Q.   In doing this analysis was any
12 research done?
13      A.   Can you define "research"?
14      Q.   Did -- did you or your colleagues
15 who were working on this work stream do anything
16 to look into or analyze this alternative beyond
17 simply talk and brainstorm?
18      A.   No.
19      Q.   Okay.  So you didn't look into
20 past situations in which works had been used as
21 collateral beyond what you already know?
22      A.   I don't believe so.
23      Q.   In a typical situation in which
24 art is used as collateral for a loan, how do the
25 parties involved come up with the amount of loan

- PAUL PROVOST - VOLUME I -
1
2  that can be taken out against the art?  I'm
3  saying "art" broadly here to include, as we
4  discussed, it could be a work of art, it could
5  be a collection of art.
6           MR. GROSZ:  I'm sorry, I'm just
7      not sure I understand the question.
8       Q.   Did you understand these
9  questions, Mr. Provost?
10      A.   Not precisely.
11      Q.   Let me reread it and see if I can
12 break it down for you.
13           So in a typical situation or --
14 based on your experience when parties are
15 considering using art -- and by "art" I mean a
16 piece of work or possibly a collection as
17 collateral for a loan -- how would the parties
18 determine what the maximum amount of that loan
19 could be using that collateral?
20           MR. GROSZ:  I'm going to object to
21      the term "parties," which I think is
22      vague.
23      Q.   I simply mean the participants in
24 that analysis who are determining what the terms
25 of the loan would be?

- PAUL PROVOST - VOLUME I -
1
2           MR. GROSZ:  I think we need to go
3      off the record for a minute to get some
4      clarification on what we're talking
5      about here.
6           MR. McCARTHY:  All right, let's go
7      off the record.
8           THE VIDEOGRAPHER:  We're going off
9      the record.  The time is 4:46.
10          (A recess was taken.)
11          THE VIDEOGRAPHER:  We are now back
12     on the record.  The time is 4:54.
13          MR. GROSZ:  Before we went off the
14     record I think there was a question
15     pending.  Am I correct that that
16     question is withdrawn and you have a new
17     question?
18          MS. HENDEE:  Yes.
19          MR. GROSZ:  Okay.
20 BY MS. HENDEE:
21      Q.   To your knowledge, what is the
22 industry standard for setting the value of the
23 loan to be taken out against a piece of artwork,
24 collection of art?  So what is the relationship
25 between the value of the art and the value of

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

- PAUL PROVOST - VOLUME I -

1    the loan?
2
3    A.   To my knowledge, an industry
4    standard for loan-to-value for -- in the art
5    world and art market is 50 percent, although I
6    will add that that can vary tremendously
7    depending on a whole host of factors, which
8    would include some -- and those are going to be
9    assessments of risk and something along the
10   lines of, for example, it's riskier to lend
11   against one work of art than to lend against a
12   whole collection.  Because if at the time when
13   things come for sale if everything -- all your
14   eggs are in the basket of that one work and it
15   fails to sell, then it's difficult to get the
16   collateral to be repaid.
17       If one is lending against an
18   entire collection and that collection is sold,
19   either voluntarily or for other reasons, one is
20   in a better position of spreading the risk
21   across a whole group of works of art to repay
22   the loan as opposed to having all the
23   collateral -- all the loan tied up in one
24   object.
25       The other issue which would

- PAUL PROVOST - VOLUME I -

1
2    mitigate around the loan-to-value issue around
3    risk issues is what market sector are we talking
4    about.  To understand the art market, one needs
5    to understand that it is not this monolithic
6    marketplace, but actually the art market is made
7    up of a whole group of smaller market sectors
8    which are often considered collecting areas.
9        So that's to say, for example,
10   that the impressionist and modern art market
11   sector, which includes impressionist painters
12   like Monet and Renoir and Sisley as well as
13   Picasso and Braque and Muro, the way that market
14   functions, that market sector functions, is
15   vastly different than something, for example,
16   like the Old Masters paintings market or is
17   going to be vastly different than a market
18   sector such as the jewelry market.
19       Jewelry market, the way values are
20   determined in that marketplace and how that
21   marketplace works, that market sector is all
22   considered within the larger rubric of the art
23   market, but the dynamic of that particular
24   market sector is very different from the dynamic
25   from the impressionist and modern art market.

- PAUL PROVOST - VOLUME I -

1
2    So therefore if one's considering lending
3    against works of art that are in certain market
4    sectors, one needs to take into account what
5    those market sectors are in assessing the risk.
6        Q.   So you identified market sector as
7    one consideration when determining the risk and
8    whether it's a collection or single work.  Any
9    other considerations?
10       A.   A lot of those risk assessments
11   are going to be the typical risk assessments
12   that one might undertake when looking at any
13   lending, what's the term of the loan, look if
14   there is any other collateral one would be
15   looking to besides the collateral that's being
16   pledged for the particular loan.  I would say
17   there are similar types of concerns that one
18   would have in assessing the risk that are
19   similar to other types of loans.
20       Q.   Would one assess the risk
21   differently if the loan involved a collection of
22   works that touched on multiple market sectors?
23       A.   Yes, you'd assess it differently
24   because there would be multiple things to
25   assess.

- PAUL PROVOST - VOLUME I -

1
2    Q.   Now, we're turning back to the --
3    your work for the City in connection with the
4    DIA, in connection with exploring as a potential
5    non-sale options using city-owned works as
6    collateral for a loan, had you considered any of
7    these factors?
8        A.   Again, this was purely
9    hypothetical in terms of our putting this
10   together as a -- as a -- something for further
11   investigation.  There was no analysis done --
12   there was no analysis done around those risk
13   factors for this alternative.
14       Q.   Did you discuss whether in this
15   hypothetical -- and I know it was -- seemed like
16   it was a very high level discussion -- but did
17   you discuss whether a potential loan would
18   include all of the COD works, a portion of them,
19   a single work?
20       A.   That was not considered -- we
21   considered it was just a hypothetical loan of
22   works of art from the DIA.
23       Q.   Okay.  Did you discuss whether or
24   not it would be riskier to explore such a
25   transaction using a group of works versus an

**<u>Exhibit F</u>**

**VICTOR WIENER ASSOCIATES,** LLC.
FINE ART CONSULTANTS AND APPRAISERS

201 WEST 89TH STREET, 11 D
NEW YORK, NY 10024
TEL: 646-206-3992

*In re City of Detroit, Michigan*, Case No. 13-53846 (SWR)

**Expert Report**

**Prepared by Victor Wiener,**
**Director of Victor Wiener Associates, LLC**

**July 25, 2014**[1]

---

[1] This Report has been corrected as of August 20, 2014 to account for certain typographical and transcription errors, as explained in greater detail in the Addendum attached hereto.

## EXPERT WITNESS DISCLOSURE BY VICTOR WIENER, DIRECTOR OF VICTOR WIENER ASSOCIATES, LLC

The following expert report (**REPORT**) has been prepared by Victor Wiener of the firm Victor Wiener Associates, LLC (**VWA**) an art appraisal and consultancy firm located in New York City with associates and affiliates worldwide.

The Report contains:

- The issues to be addressed

- The opinions reached in addressing these issues

- The data which was relied upon in forming these opinions

- Certain attachments, which support the opinions stated in the body of the Report

- The qualifications of the expert witness

- A list of all publications authored by the witness during the previous 10 years as stipulated

- A list of all cases in which the witness has testified as a witness within and beyond the stipulated 4 years required in this disclosure

Compensation to the witness has been agreed at $300 per hour for the preparation of this and supplemental reports if necessary: $400 per hour for preparation for all testimony including depositions; $5,000 per day for deposition and court testimony; reimbursement for all out-of-pocket expenses, including travel, associated with the expert witness testimony.

## SUBJECT PROPERTY

The subject property to be appraised is approximately 60,000 works of art (**SUBJECT PROPERTY**) comprising the entire art collection of the Detroit Institute of Arts (**DIA**) located in Detroit, Michigan.

## VALUATION CONCLUSIONS

In fulfillment of the appraisal assignment VWA reached the following valuation conclusion:

That the total value of the collection is **$8,149,232,354** and probably more than that.

The appraised total has been determined as of July 25th, 2014.

## METHODOLOGY DETERMINING VALUE CONCLUSIONS

| Methodology Step by Step Chart | | | |
|---|---|---|---|
| Step 1 | Valuation of High-Value Works by VWA | | |
| | | | |
| **# of Units** | **Low Value** | **High Value** | **Average Value** |
| 387 | 3,092,419,700 | 4,040,303,800 | 3,566,631,750 |
| Step 2 | Valuation of High-Value Works performed by Christie's, Artvest and Winston | | |
| | | | |
| **# of Units** | | | **Average Value** |
| 596 | | | 311,370,325 |
| Step 3 | Projected valuation of works on DIA Insurance List (estimated for appreciation) | | |
| | | | |
| **# of Units** | **DIA Insurance Value** | **% Appreciation** | **Projected Value** |
| 16,388 | 468,449,537 | 62.0% | 758,888,249 |
| Step 4 | Pricing matrix of remaining works based on Christie's and Southeby's 2013 sales price by department | | |
| | | | |
| **# of Units** | | | **Average Value** |
| 42,854 | | | 3,512,612,030 |
| Step 5 | Combined Value | | |
| | | | |
| **# of Units** | | | **Average Value** |
| **60,225** | | | **8,149,232,354** |

## ASSIGNMENT

The following section discusses:

- The background of the assignment, in which specifics of the appraisal assignment are discussed

- The decision to accept the assignment

- The specific qualifications of VWA in fulfilling the assignment

- Time restrictions dictating the nature of the Appraisal Report

## Background of the assignment

In May 2014 Victor Wiener was contacted by Ian Peck of Art Capital Group (***ACG***), an art financing company to see if VWA would be interested in appraising the entire collection of the DIA constituting the Subject Property cited above with a view to producing an appraisal report which could be used in the process of generating a loan to the City of Detroit (***DETROIT***).

After considerable discussion, VWA committed to perform the appraisal report and ACG committed to retain the services of VWA.

At that point, AGC submitted a non-disclosure agreement in order to send Mr. Wiener confidential documents to review in order for Mr. Wiener to determine the scope of work required to fulfill the assignment.


## The decision to accept the assignment

Mr. Wiener had an initial hesitation in accepting the assignment; considerable attention within the media had been devoted to press stories of Detroit's bankruptcy and the possibility that the holdings of the DIA would be sold to cover Detroit's obligations.

As discussed in this report and disclosed in Mr. Wiener's CV (*see* Attachment A), Mr. Wiener has had extensive museum experience.  As such, he felt that the DIA holdings should be maintained.

However, once Mr. Wiener had a chance to review the Catalogue of Information Concerning Artwork Housed at the Detroit Institute of Arts, prepared by Houlihan Lokey Capital, Inc. (***HOULIHAN CATALOGUE***), Mr. Wiener was convinced that a loan was a viable plan for the DIA collection, including the loan proposed by ACG.

In order for the loan to take place, a credible appraisal report of the DIA holdings was required.

Mr. Wiener had informed ACG that any report VWA would submit would be in conformity with the Uniform Standards of Professional Appraisal Practice (***USPAP***), the universally accepted appraisal standards within the United States and abroad for all classes of property which require appraisals.

The USPAP stresses that the USPAP have been written to contribute to "public trust" of the appraisal practice (*see e.g.* Attachment D: Select Slides from Uniform Standards of Professional Appraisal Standards course material written by the Appraisal Foundation [emphasis added by Appraisal Foundation]).

In keeping with this requirement appraisers are given the option of refusing an assignment (see EG USPAP U-8 Management).

Taking all the facts into consideration, Mr. Wiener concluded that the public trust would indeed be served if indeed VWA conducted the appraisal assignment.

Sometime after VWA had committed its services to ACG, Mr. Wiener was informed that, in keeping with confidentiality requirements and the fact that court testimony would be required, VWA would be retained by the law firm Weil, Gotshal & Manges, LLP (**WEIL**), working on behalf of Financial Guaranty Insurance Company (**CLIENT**). However, the assignment would also have the stipulation that ACG would be named as an intended user of the report and the appraisal report could also be used by any additional funders ACG may require to help in putting together the funding necessary to advance a loan to keep the DIA collection in place.

## Specific qualifications of VWA in fulfilling the assignment

In accepting the assignment, VWA felt extremely well qualified. Two of the principals in the appraisal process have extensive museum experience.

Victor Wiener received a certificate in Museum Training given jointly by the Institute of Fine Arts of New York University and the Metropolitan Museum of Art. In addition to having instructors from the Institute of Fine Arts and the Metropolitan Museum of Art, his instructors also included Pierre Verlet, head of the department of furniture at the Louvre, and Charles Sterling, curator emeritus of paintings at the Louvre. In addition, Mr. Wiener received a two-year fellowship from the Ford Foundation providing for internship at the Department of Prints, Drawings, and Photographs at the Metropolitan Museum of Art and the Victoria and Albert Museum in London under direct supervision of the Museum's director, Sir John Pope-Hennessy. Upon returning from London to New York, Mr. Wiener was awarded a Chester Dale Fellowship from the Metropolitan Museum of Art, providing for another year of work at the Department of Prints, Drawings, and Photographs where he curated an exhibition, "Eighteenth Century Italian Prints." In addition, prior to assuming the position of executive director of the Appraisers Association of America, Mr. Wiener worked directly for the Philadelphia Museum of Art on loan agreements and appraisals for loan exhibitions. He has also lectured on several occasions for the American Association of Museums. Further discussion of Mr. Wiener's credentials and his complete curriculum vitae are appended to this report. (*See* Attachment A.)

David Shapiro has also had direct relationships with museums in a variety of capacities. He has taught courses of art history at the Museum of Modern Art (MoMA), and he has worked as an in-gallery museum educator at MoMA PS1, the Dahesh Museum of Art, and the Bronx Museum of the Arts, interpreting collections and special exhibitions for diverse audiences, largely school groups. Mr. Shapiro's proposal to create the Rockaway Museum of Contemporary Art was featured in MoMA PS1's exhibition "EXPO 1" as a

response to a Call for Proposals to revitalize the Rockaways after the damage of Superstorm Sandy. Shapiro's writing has also been published in a catalogue by MoMA to accompany a major retrospective exhibition. Mr. Shapiro has also worked extensively with museums in external roles. At the Fashion Institute of Technology (FIT), he taught "Art in New York," an on-site course that takes place entirely in the city's museums and galleries. Presently, he works indirectly with museum collections as an editor of higher-education art history textbooks. Mr. Shapiro's academic and appraisal credentials are discussed in greater detail below.

## Time restrictions dictating the nature of the Appraisal Report

The retention agreement was not finalized and signed until July 11th, 2014; since all expert reports were required by the Court to be filed by July 25th, 2014, VWA had less than two weeks to finalize a report for more than 60,000 works of art.

Under these circumstances it was decided that a preliminary appraisal report would be written which would be of a summary nature; however the document to be filed would be in compliance with the USPAP in which all requirements for such a report would be fulfilled. Complete discussion of the format of the report is given below.

There were further complications impeding the timely production of the Report.

It is our understanding that the DIA was requested to produce in a timely fashion a searchable inventory of the museum collection.

Among the documents supplied to us was a 17,000-page image inventory with about 40% of the photographs of objects in the collection missing. (*See* Attachment E: DIA Inventory Page, Missing Photograph Example)

In addition, all inventory entries were in PDF format and not within a searchable or sortable format.

Furthermore, instead of giving the name of the artist or creator of specific objects all objects were named "Unknown, American." In other words, a painting by Italian Renaissance artist, Benozzo Gozzoli created ca. 1460 was labeled on the PDF, "Unknown, American," before America was discovered by Columbus; or the paintings by Van Gogh who never even visited America were called "Unknown, American." (*See* Attachment F: DIA Inventory Page, Mislabeled "Unknown, American" Examples.)

One presumes that the DIA has a searchable database since a partial database is available online on the DIA website. This database was useful for thumbnail photographs for a selection of the works, but VWA was unable to get an electronic count of how many objects were in each of the DIA's curatorial departments.

VWA made numerous requests before our official retention to be supplied with digital data that we could use, but we were not provided with the information.

It was only on July 18th, 2014, just about one week before the report was due, that we received some of the electronic data we had requested, but it was still incomplete, which presented substantial challenges.

For these reasons the current report is labeled "preliminary."


## QUALIFICATIONS OF APPRAISERS

The above valuation was formulated by VWA.

VWA has brought together a select team of the most qualified expert appraisers and consultants offering its clients specialized services and highly personalized attention coupled with utmost confidentiality.

This team has been assembled by Victor Wiener, who for over twenty years served as Executive Director of the Appraisers Association of America. During his tenure and afterwards, Mr. Wiener identified and worked with those experts now employed by VWA.

Those appraisers who worked on this Report are:

### Victor Wiener:  Principal author and signatory

Currently an appraiser in private practice, Victor Wiener served as executive director of the Appraisers Association of America for 21 years. Prior to that he worked for several auction houses in Rome, London, and New York, including Sotheby's and Christie's, where he was Director of the fine arts department in Rome. A trained art historian, Mr. Wiener has worked at several museums including the Metropolitan Museum of Art in New York and the Victoria and Albert Museum in London. He has published extensively, and is co-editor and a principal contributor to *All About Appraising: The Definitive Appraisal Handbook* (2003)*,* and a co-author of *An Underwriter's Guide to the Valuation of Art, Antiques & Collectibles* published by the Inland Marine Underwriters Association, 2001. He has also taught the appraisal of fine and decorative arts at The New School, Baruch College, and New York University (NYU), where, for over twenty years, he has been an adjunct assistant professor on the faculty of the Appraisal Studies Program. At NYU, he teaches courses on the Legal and Ethical Responsibilities for Appraisers and on the USPAP; he previously taught IRS Rules and Regulations. Mr. Wiener is one of the few instructors of the USPAP with a specialty in personal property to be certified by the Appraisal Standards Board of the Appraisal Foundation, the organization "authorized by Congress as the source of appraisal standards and appraiser qualifications" (*cf.* text on Appraisal Foundation's logo).

Mr. Wiener has served as an expert witness in several high-profile art cases including matters concerning the estates of Andy Warhol and Louise Nevelson, and litigation concerning two of the most important works by Damien Hirst. He has been employed by several agencies of the Canadian government; by the Department of Justice as an expert witness in the litigation, *Charles Malette v. H.M. the Queen*; by the Canadian Cultural Property Export Review Board (CCPERB) in the determination of value of property seeking certification as culturally relevant to Canada; and by the Canadian Revenue Agency (CRA) in the review of donated items to Canadian cultural institutions. Mr. Wiener has written extensively on the application of blockage discount and other tax-related matters.

His work in valuing highly valuable property is extensive. He has served as an expert witness in *Stephen and Elaine Wynn v. Those Certain Underwriters at Lloyds, London et al.*, in which the value of the damaged painting *Le Rêve* by Picasso was the matter at issue; at the time *Le Rêve* the most expensive painting ever to have been sold ($139 million). Subsequent to the settlement of the Wynn case, he published an extensive article on the determination of loss in value for highly valuable works of art. This article is cited in Mr. Wiener's CV, which has been appended to this document. (*See* Attachment A.)

## David Shapiro: Valuation and report preparation

David Shapiro brings to his appraisals a significant background as an art historian with specific expertise in contemporary art. The founding editor of the online contemporary art publication *Museo* and founding owner of Museo Publications, a business providing expert editorial solutions for art historical publications, Mr. Shapiro has played critical editorial roles in recent editions of a number of industry-leading higher education art history titles including Janson's *History of Art* and Marilyn Stokstad and Michael Cothren's *Art History*. His interview with Jeff Wall was published in the Museum of Modern Art's book *Jeff Wall: Selected Essays and Interviews* (MoMA).

An Associate Member of the Appraisers Association of America, Mr. Shapiro's appraisals are compliant with the USPAP. He holds a BA in Art History from Columbia University and a certificate in Appraisal Studies in Fine and Decorative Arts from New York University. He studied Modern Art in the PhD program in Art History at the Graduate Center of the City University of New York and has taught courses of Art History at the Fashion Institute of Technology, Pratt Institute, Parsons The New School for Design, and The Museum of Modern Art.

Mr. Shapiro has worked with VWA on several significant donation, damage and loss, and collateral loan appraisals.

## Shaun Cooper: Appraisal coordination and financial review

Shortly after receiving his Master of Arts degree from L'Université Libre de Bruxelles in 1993, Shaun Cooper began working for a private Manhattan art dealer before opening a gallery specializing in twentieth-century decorative arts. As a dealer, Mr. Cooper has participated in international art fairs, bought and sold works privately and at public auction, and has developed a deep understanding of the market. His studies include a Bachelor of Arts degree from McGill University in Montreal, a certificate in French Language and Civilization from L'Université de Paris IV, and a certificate in Appraisal Studies in Fine and Decorative Arts from New York University. He is certified in the USPAP and is an Associate Member of the Appraisers Association of America.

### Charles Wong, LL.M.: Review and compliance

Charles Wong, LL.M. provided technical and administrative review and assistance for the methodology used in this report. He has had over 20 years' commercial legal experience working as in-house counsel for listed corporations both in Australia and in the United Kingdom. He has co-authored, with Victor Wiener, an article on "The Role of Appraisers in the Process of Authentication and in Other Related Valuation Issues" and another article that has been published on the Chubb Collectors website concerning "Why Auction Estimates are not Appraised Values." Mr. Wong is certified in the USPAP.

### Robert Leeds: CEO Silar Advisors, LP.: Technical, statistical, and financial analysis

Robert Leeds has over 25 years of investment experience largely focused on all aspects of large pools of underlying assets. His responsibilities included capital commitments, asset valuations, asset pricing, and advising clients on multi-billion dollar asset transactions. Prior to forming Silar Advisors in 2006, he spent 13 years at Goldman Sachs & Co in institutional sales and mortgage trading, 3 years at Nomura Securities responsible for the firm's residential whole loan trading platform, where he built a profitable conduit that acquired and securitized over $20 billion in loans, and approximately 2 years at Fortress Investment Group as a Managing Director and partner in the Drawbridge Special Opportunities Fund, LP. Mr. Leeds is a 1985 graduate from Hamilton College.

### Zhang Yi: Art market analysis

Zhang Yi began his career in the financial industry from 2006 to 2014 in HSBC and Goldman Sachs. Meanwhile, he headed the Research Department of HIHEY.COM, an e-commerce company specializing in art from 2011 to 2014. From 2012 to 2014, he was also the head of the Art & Finance Department in the China Art Market Research Center, where he was in charge of art economic research, art and finance research, and art wealth management.

Zhang Yi was a visiting lecturer at the Central Academy of Fine Arts in 2013 for "Art and Finance." He co-authored "China Art Market Research Report" and "China Art

Market Annual Report" from 2011 to 2013. Since 2013, he has been a consultant on the Chinese art market for the annual "TEFAF Art Market Report." His writings and interviews on contemporary art and economics have appeared in *China Culture Daily, Bazaar Art, China Auction,* and *Bloomberg Weekly*.

Zhang Yi received an MA from the Art Administration Department of the Central Academy of Fine Arts in 2013 and BAs in Finance from Wuhan University and International Economics and Trade from Huazhong Agriculture University.

## Jannette Barth, Ph.D.: Discount analysis

Jannette Barth, Ph.D. is the principal of J.M. Barth & Associates, Inc. Holding degrees from The Johns Hopkins University and the University of Maryland, Inc., Dr. Barth has worked in the field of economic research, demand analysis, and econometrics for over 30 years. She has held positions as Chief Economist, New York Metropolitan Transportation Authority, and as Consultant and Account Manager, Chase Econometrics/Interactive Data Corporation.

Dr. Barth has extensive experience in the economic analysis of the art market. As a practicing economist with a Certificate in Appraisal Studies in Fine and Decorative Art from New York University and a Certificate in American Art from Sotheby's Institute of Art, Dr. Barth's work in the art market ranges from the analysis of particular segments of the art market for litigation support to the analysis and calculation of blockage discount for galleries and artists' estates.

Dr. Barth has taught economics courses at both the graduate and undergraduate levels and was a Senior Lecturer in the MA in Art Business program at Sotheby's Institute of Art. She regularly lectures on art as investment and blockage discount, including seminars at appraisal conferences and for staff of Internal Revenue Service Art Appraisal Services.

## James Callahan: Valuation, Asian art

James Callahan is Director of Asian Art for the auction house James D. Julia, Inc. He has expertise on wide-ranging aspects of Asian art, including Chinese, Japanese, Korean, Vietnamese, Khmer, Thai, Burmese, Ottoman Turkish, Armenian, Arabic, Persian, and Indian objects. He is also an appraiser of arms and armor, nineteenth-century European and American furniture and decorative arts, and eighteenth- to twentieth-century fine silver. A frequent lecturer and consultant to museums, historical societies, and independent art groups nationwide, Mr. Callahan has worked with the Brooklyn Museum to bring to auction over 200 important pieces of Southeast Asian art from the collection of Samuel Eilenberg.

**Jason Christian: Valuation, photography**

Jason Christian is a photography specialist and founding principal of the appraisal firm Christian | Reilly. Since 2004, he has appraised photographs for insurance, donation, and estate purposes for clients including the estates of Ansel Adams, Brett Weston, Cole Weston, Ernst Haas, and Yousuf Karsh and institutions including the San Francisco Museum of Modern Art; the Museum of Fine Arts, Boston; and the Los Angeles County Museum of Art. Mr. Christian holds an M.A. from Dartmouth College and a B.A. from the University of California, Santa Cruz. He maintains a current USPAP certification.

**Sarah Cox: Valuation, ancient art**

Sarah Cox has worked as a researcher of ancient art at the New York gallery Fortuna Fine Arts, Ltd. since 1999. A Romanist with specialist expertise in numismatics and mosaics, she has published and lectured extensively on a range of subjects in these areas. Dr. Cox holds a Ph.D. in Classical Studies from Columbia University and a certificate in Appraisal Studies from New York University. Her professional affiliations include membership in the Appraisers Association of America, the Archaeological Institute of America, the Society for Classical Studies, L'Association Internationale pour l'Etude de la Mosaïque Antique, and the Society of Architectural Historians.

**Louise Devenish: Valuation, furniture and decorative arts**

Louise Devenish is an appraiser and dealer specializing in American and European decorative art from the sixteenth century to the present. She is a consulting appraiser for the online marketplace 1stdibs as well as the founding principal of the professional arts community Devenish Group LLC.

Ms. Devenish has taught for over twenty years at both New York University, in the Appraisal Studies program, and at Parsons The New School for Design. She lectures widely at museums and historical societies and has served as the keynote speaker at the International Antiques Fair in Chicago. As an antiques dealer, she has participated in the International Confederation of Dealers at the Metropolitan Museum of Art. Ms. Devenish is recognized by the Appraisers Association of America as a Certified Appraiser in American and European decorative art. Her appraisals are compliant with the USPAP. She is also a member of the LAPADA: The Association of Art & Antique Dealers.

**Marina Whitman: Valuation, Islamic art**

Marina Whitman is an independent appraiser specializing in Islamic art. She has taught art history at Pennsylvania State University and John Carroll University and has curated for the Lowe Art Museum, University of Miami. She has published articles on Islamic ceramics. Dr. Whitman holds a Ph.D. from New York University's Institute of Fine Art

with a certificate in Museum Studies. She is an Accredited Property Appraiser from the International Society of Appraisers.

## THIS REPORT

### Content of this report

In conjunction with the steps taken in fulfillment of the assignment as listed and discussed below, VWA determined and settled with the Client the appropriate type of appraisal report in keeping with the USPAP.

As part of this process and in fulfillment of this assignment VWA also determined:
- the type and definition of value to be used;
- the appropriate marketplace(s) in which this value should be determined; and
- the valuation approach most appropriate for this report.

These are discussed in this report.

In conformity with the USPAP as discussed below, this Report is subject to extraordinary assumptions, hypothetical conditions, and limiting conditions as set out below.

### USPAP conformity

As cited above, this Report has been prepared in accordance with the USPAP. USPAP comprises standards promulgated by the Appraisal Foundation in Washington, D.C. as the major codification of appraisal standards for all appraisal disciplines. USPAP is both recognized by Congress (as stated on the Appraisal Foundation logo) and generally accepted in the United States and abroad.

All significant information affecting the valuation conclusions has been disclosed within the body of the report. Other, secondary, information to which the report may refer is retained in a work file for reference purposes.

The methodology VWA has employed to support its valuation conclusions is in conformity with a USPAP Appraisal Report as discussed below.

## SCOPE OF WORK

### Inspection and research

***Inspection***

Normally one would hope to have a physical inspection of the Subject Property, although USPAP does not preclude production of an appraisal report without physical inspection. [NB the Internal Revenue Service frequently performs audits of appraisal reports without performing physical inspections].

Due to the time constraints for the production of this report, a formal inspection of the Subject Property was not possible.

However, in late April 2014, Mr. Wiener made a trip to Detroit especially to view the collection.

### Research

In the process of preparing this report, VWA conducted extensive research:

- VWA reviewed numerous database records for auction sales.

- Within a short amount of time, VWA consulted numerous books concerning sections of the Subject Property. Due to the time restrictions of producing the Report, VWA is continuing to work on the bibliography and will continue to update the production of documents upon which VWA relied to form the opinions in this Report, as necessary.

- VWA consulted dealers of material similar to works of art contained in the Subject Property.

- Of significant importance, VWA reviewed reports submitted by others. These include:

  o Expert Report of Vanessa Fusco of Christie's Inc., dated July 8th, 2014 (***CHRISTIE'S REPORT***)

  o Expert Witness Report of Michael Plummer of Artvest Partners, dated July 8th, 2014 (***ARTVEST REPORT***)

  o Fair Market Value Appraisal written by the Winston Art Group, dated March 25th, 2014 (***WINSTON REPORT***)

- VWA also reviewed an undated listing of insurance values prepared by the Detroit Institute of Arts (***DIA INSURANCE LIST***) and the Houlihan Catalogue.

  These documents are discussed in detail below.

## EXTRAORDINARY ASSUMPTIONS, HYPOTHETICAL AND LIMITING CONDITIONS

Most appraisal assignments are subject to extraordinary assumptions, hypothetical conditions, and limiting conditions.

An extraordinary assumption is defined in USPAP, 2014-15 edition, substantively as an assumption which the appraiser has every reason to believe is true at the time the report is written, but if subsequently this is proven not to be the case, then the valuation conclusions reached by the appraiser should be reviewed and may be subject to change (see USPAP, 2014-15 edition definitions).

A hypothetical condition as defined in USPAP, 2014-15 edition, is:

> That which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

A limiting condition is a factor that defines and limits the type of work an appraiser is able to do within the agreed-upon appraisal assignment and scope of work deemed necessary for fulfillment of the assignment.

Extraordinary assumptions, hypothetical conditions, and limiting conditions are frequently interlinked.

The specific extraordinary assumptions, hypothetical conditions, and limiting conditions associated with this assignment are listed and discussed below.

### *Extraordinary assumptions*

The extraordinary assumptions that VWA has taken in fulfillment of this assignment are as follows:

1. That the Subject Property has been accurately described within the DIA catalogue and that it will be recognized as such within the marketplace determined to be most appropriate within the context of this report.

2. That the Subject Property is in relatively good condition unless otherwise noted by the DIA or by other reliable sources.

3. That the Diego Rivera mural, *Detroit Industry*, can be removed successfully and that if necessary it would be removed by highly trained technicians with specialization in the removal of wall paintings.

4. That the charts given in Exhibit E of the Artvest Report are accurate.

5. In addition, VWA was told to assume that the Subject Property was not the subject of any encumbrances.

### Hypothetical conditions

There are no hypothetical conditions connected with this report.

### Limiting conditions

There are numerous limiting conditions connected with the production of this report. Among the most important ones are:

1. That VWA had less than two weeks to produce an appraisal report for approximately 60,000 works of art.

2. That VWA was provided unsearchable data by the DIA. Instead of providing a searchable database, similar to the type to be found on the DIA website, we were provided with 17,000 pages of a partially catalogued inventory of images, which could not be sorted, and each file was labeled "Unknown, American" instead of the true author and origin of the work of art.

3. That no file entries in the records provided note whether a work of art is signed or not. This in turn compromises an independent determination, based on the records, of whether an attribution is tenable or not. As such, VWA has taken an extraordinary assumption that the attributions in the files are indeed tenable since these attributions were made by the DIA's highly qualified curatorial staff.

4. In addition, the catalogue entries provided contain incomplete entries concerning dates or other inscriptions, significant publications and exhibitions, all of which can influence value. Thus the lack of time to research these matters ourselves constitutes a limiting condition.

## VALUATION

## TYPE OF VALUE USED FOR THIS REPORT: MARKETABLE CASH VALUE

The type of value deemed most appropriate for this report is Marketable Cash Value which is defined as:

> The value realized, <u>net of expenses</u>, by a willing seller disposing of property in a competitive and open market to a willing buyer, both reasonably knowledgeable of all relevant facts, and neither being under constraint to buy or sell." (*All About Appraising: The Definitive Appraisal Handbook* [Appraisal Institute of America

and The Educational Foundation of the Appraisers Association of America, 2003], p. 219)

The reason for the selection of this value is that this Report was originally commissioned by ACG whose purpose was to have proper appraisal documentation to generate a loan for the DIA collection.

Under such circumstances a value which is net of transaction costs is appropriate since, if the borrower were to forfeit on loan payments, a lender would confiscate the collateral (art in this case) and sell part or all of the property used as collateral to satisfy the debt. Consequently an appropriate value is one which reflects how much the lender would actually receive net of commissions rather than how much the sales agent for the lender, such as an auction house, would receive inclusive of commissions.

It should be noted that other values are used in other reports.

The Winston Report states that they used "fair market value" (**FMV**) which is defined in the body of the report as:

> …the price that property would sell for on the open market between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts. Note that in this case fair market values are inclusive of buyer's premiums.  (Winston Report p. 3)

Presumably within the Winston Report definition, commissions due to the sales agent such as the auction house are also included as is commonly the case in the definition of fair market value.

The Christie's Report states that they have used fair market value, but they do not provide a definition of this value. In addition, they do not consider any buyer's premium, which is an essential important part of fair market value. (Christie's Report, p. 6)

The Artvest Report does not define which value was used.

The DIA Insurance List does not state which value has been used. Presumably it used Retail Replacement Value (**RRV**), which is the most common value used when art is scheduled on an insurance policy.

Retail Replacement Value is generally defined as:

> "A property's highest value, usually for insurance purposes, that is defined as the highest amount in terms of U.S. dollars that would be required to replace the property with another of similar age, quality, origin, appearance, provenance, and condition within a reasonable length of time in an appropriate and relevant market. When applicable, sales and/or import tax, commissions, and or premiums are included in this amount." (*Appraising Art: The Definitive* Guide [New York: Appraisers Association of America, p. 438])

## APPROACH SELECTED FOR THIS REPORT: THE MARKET COMPARISON APPROACH

USPAP requires appraisers to determine which valuation approach is necessary:

The three standard approaches to valuation cited in USPAP are the Market Comparison Approach, the Cost Approach, and the Income Approach. (See USPAP 2014-15, Standards Rule 7-4)

VWA has selected, as the most appropriate approach for this type of valuation, the Market Comparison Approach (***MARKET COMPARISON APPROACH***), in which the Subject Property has been compared to other similar and like objects which have sold or have been offered for sale as closely as possible to the Effective Date of Valuation stated above, in the marketplace designated as most appropriate.

## THE OTHER APPROACHES CONSIDERED

VWA has also considered the other two traditional approaches to valuation, the Cost Approach (***COST APPROACH***) and the Income Approach (***INCOME APPROACH***).

The Cost Approach obliges the appraiser to take into consideration the amount of money required to re-fabricate the Subject Property if the Subject Property is of a type that lends itself to re-fabrication. The Subject Property could not be re-fabricated if for no other reason than the fact that there are numerous artists, many of whom are no longer living.

The Income Approach for the valuation of the Subject Property has been rejected as inappropriate to this assignment because the Subject Property, to the best of our knowledge, has no history of having been used primarily to generate income.

## THE MOST APPROPRIATE MARKET FOR VALUATION

Works of art can be sold in a variety of marketplaces. The two most prominent marketplaces are the public auction marketplace and the private gallery marketplace. For the purposes of this appraisal, VWA believes the auction marketplace to be the primary venue for valuation purposes of the Subject Property.

With this in mind, VWA has examined both marketplaces extensively. However, it should be noted that dealer representations are often anecdotal and are frequently hard to verify since such sales are confidential, and even redacted versions of sales receipts are difficult to obtain unless by court order. In addition, private dealers in the United States feel confined by the confidentiality provisions of the Gramm-Leach-Bliley Act of 1999.

In addition, of primary consideration is the fact that in a loan situation, if the borrower such as the City were to default on loan payments, a lender would most likely want to sell the collateral as quickly and efficiently as possible. While consignment to private dealers may be an option for some of the works constituting the public property, the vast majority of the works would most likely fetch higher prices at public auction in a prominent sale highlighting the curatorial excellence of the DIA collection. Consequently, the most appropriate marketplace, without doubt, would be a public auction where large market exposure and competitive bidding would take place.

## VALUATION METHODOLOGY

In this section the general methodology followed by VWA is set forth and observations are made by contrasting the valuation methodology perceived to have taken place in the other reports.

### General methodology followed by VWA in determining value as reflected in the Report

As previously stated, VWA is comprised of a number of specialists, each highly qualified in the sector of valuation to which they are assigned primary responsibility (see credentials of appraisers given above).

While each specialist performed initial valuations for specific sectors, these valuations were only a point of departure. After the valuations were submitted to VWA they were reviewed by the team; in some cases further research was performed after review. In brief, the methodology for determining value by VWA is organic taking into consideration points made by specialists and comments made by colleagues. Final valuation figures are arrived at after intense review.

By nature of the assignment, the VWA appraisal has set about to value the entire collection of the DIA operating under highly limiting conditions as stated above and specified further below.

As stated above, the VWA team did not have the opportunity to view the Subject Property physically although the DIA collection was viewed by Mr. Wiener in situ before he was offered the opportunity to appraise the collection.

As such the team had to work with whatever resources were available including:

- Compromised data submitted by the DIA as discussed above.

- For the most, part thumbnail photographs taken from the DIA website. Although some additional photographs were supplied electronically by the DIA, the order in which they were supplied was so chaotic as to make them virtually unusable. The quality of the images used was not uniformly high resolution.

- VWA did not have the opportunity to discuss the collection with curators.

- VWA was not given access to the DIA files. As a result, information about significant publications and exhibitions, both of which can influence value was not shared by the DIA.

As a result of these limitations our report is classified as "preliminary." However, VWA feels secure in setting forth the values in this report in keeping with the nature of a preliminary report and in keeping with the requirements of USPAP.

## General methodology followed by Christie's in determining value as reflected in the Christie's Report

As is common with Christie's, the Christie's Report was done by a team of appraisers, each member coordinated by Vanessa Fusco of the Appraisal Department.

As stated in the Christie's Report, team members visited Detroit on numerous occasions, reflected in a billing of $65,000 for expenses.

The appraisal, as stated in the Christie's Report, used fair market value, but since no commissions were included in the range of values ascribed, the ultimate values are more in keeping with marketable cash values – although no accommodation was made to the fact that a seller's commission would normally be due to the auction house, this latter point may be moot since auction houses frequently do not charge important consignors, such as the DIA, a seller's commission.

However, what should be noted is that while using a range in value, as is common in auction estimates, Christie's assigned an extremely wide range, often as wide as over 100% between the low and the high value. While this may be understandable for objects where a value may require substantive analysis and the appraiser is not willing or able to perform such a task, it is hardly the norm in appraisal reports. As such, this factor places the Christie's Report in a position in which its credibility is called into question.

At no point does Christie's state that the Christie's Report is compliant with USPAP. While USPAP does allow for a range in value, such a wide range is definitely outside the norm.

## General methodology followed by Michael Plummer of Artvest in determining value as reflected in the Artvest Report

The Artvest Report was written by Michael Plummer, who signed it.

Mr. Plummer is not an appraiser. The Artvest Report is labeled an "Expert Witness Report" but since he states values which he formulated for the major part of the report, this would qualify as an appraisal under USPAP (see USPAP definitions, 2014).

Although the Artvest Report relied upon the input of experts, some of whom are known to VWA to be of high quality, the nature of many of the DIA pieces required the benefit of consultation by a committee for quality control.

While Mr. Plummer uses appraisers as consultants, the use of the data they have supplied is entirely his. As such the Artvest Report lends itself to uncertainty as an appraisal report.

The Artvest Report is not compliant with USPAP, nor does it state that it is. Some of the consultants are USPAP certified but they only supplied undefined values for Mr. Plummer to use as he saw fit. Unlike VWA, the values stated in the Artvest Report are not the products of team consensus since each value carries the name of the consultant who supplied it. (See documents appended to the Artvest Report).

It is not the intention of this Report to serve as an "Appraisal Review" as defined in Standard 3 in USPAP; as such a full description of how the Artvest Report is not compliant with USPAP is not given here but can be supplied if requested by the court.

VWA has mentioned the methodology the Artvest Report used determining individual or unit values – i.e. using individual consultants to make those determinations on their own.

The major part of the Artvest Report discusses general valuation considerations Plummer feels one should take into consideration in determining the total value of the DIA collection. It is VWA's intention to address these considerations as they appear within the methodological framework VWA uses to make its own determination of the total value of the DIA collection.

It should be mentioned at this point that the only appraisal reports VWA has seen so far in which the total value of the DIA collection is discussed are this Report and the Artvest Report. The other reports reviewed just address individual objects in the DIA collection but not the whole collection.


**THE IMPORTANCE OF THE DIA COLLECTION**

The DIA is one of the largest and most significant art museums in the country, comprised of approximately 60,000 works of art from a range of cultures throughout the globe. It is one of the country's few encyclopedic art museums, representing the art of most major cultures from early ancient history to the present. The collection includes works of ancient Greek, Roman, Mesopotamian, and Egyptian art, as well as Islamic, African, Chinese, and Oceanic art and major collections of American art, European art, Modern art, and decorative art. It contains masterpieces by such artists as Pieter Bruegel,

Caravaggio, Pablo Picasso, Auguste Rodin, Mark Rothko, Jacob van Ruisdael, Vincent van Gogh, and Andy Warhol. DIA also houses the armor collection of newspaper baron William Randolph Hearst.

As noted, the scope and breadth of the collection is extraordinary. Although it may hold fewer objects than other museums, the refined curatorial selection is unparalleled for a museum of its size.

The collection was assembled at a time when Detroit had funds beyond what most museums had and was able to attract curators of worldwide renown. A review of the holdings invites comparison with the holdings of the best of other museums anywhere in the world. This is an overwhelming valuation factor which serves as the proper orientation for this appraisal report.

The museum was established in 1885 as a result of the initiatives of another newspaper magnate, James Scripps, and his manager William H. Brearly. Among the institution's numerous prominent donors have been many leaders of the automobile, including the Ford family, particularly Edsel Ford, the Dodges, and the Firestones. Other important donors include Governor and U.S. Senator Russell A. Alger, U.S. Senators James McMillan and Thomas W. Palmer, businessman Dexter Ferry, distiller Hiram Walker (Canadian Club Whiskey), industrialists Christian Buhl, Charles Lang Freer, and John Stoughton Newberry, and department store magnates C.R. Mabley, Cyerenius A. Newcomb, Sr., and Robert Hudson Tannahill of the Hudson's Department Store fortune, who, upon his death, bequeathed a particularly large and important collection of European art, including Modern masters Paul Cézanne, Edgar Degas, Paul Gauguin, Pablo Picasso, and Georges Seurat. A pioneer in collecting taste, DIA was the first public collection in the United States to include works by Van Gogh and Henri Matisse.

The DIA collection is housed in 658,000 square feet of gallery space in over 100 galleries in a 1927 Beaux-Arts building designed by Paul Philippe Cret, with a portion of the collection kept in storage. Among the most celebrated rooms in the building is the Rivera Court, which contains Mexican painter Diego Rivera's monumental frescoes *Detroit Industry*, a cycle that commemorates the work that fueled the ascendency of a great American city.


## THE EFFECTS OF SELLING MUSEUM AND CELEBRITY ART

### Museum provenance

It is apparent that works of fine and decorative art, and other collectibles from museums and other significant collections perform much better at auctions than similar objects lacking notable provenance. This tendency manifests itself in the sales of objects that differ greatly in kind and value, similarly in major auctions of international importance, and small regionally scaled auctions.

An indication of the substantial potential premium that would be given to the collection of the DIA collection, were it to be auctioned, can be found in the Cleveland Museum of Art's January 2011 sale of two dozen European old master paintings. In an article in that city's paper, *The Plain Dealer*, Steven Litt wrote of this sale, the largest sell-off from its collection in more than a half-century (…):

> From a market perspective, **collectors love things with a museum provenance** and hopefully, [the sale] will do well for the museum," said Christopher Apostle, a Sotheby's senior vice president and director for old master paintings in New York. (Steven Litt, "Cleveland Museum of Art to auction 32 old master paintings at Sotheby's," *The Plain Dealer*)

In fact, the sale performed 45% better than expectations, earning $450,000 more than the high estimate. (Steven Litt, "Cleveland Museum of Art earns more than expected from Sotheby's sale of selected old master paintings," Feb. 1st, 2011). The very strong performance of the sales from the Cleveland Museum of Art, no less at a moment when the art market was still in recovery from the financial crash of 2008-09, attests to the premium that buyers are willing to pay for works from great collections such as major museums.

In a 2007 article "Christie's is Cagey about Maier Museum Provenance, Discloses the Rose," Lee Rosenbaum identifies the same tendency:

> **Auction houses always tout museum consignments** in their presale press releases, because of the **cachet and higher market value that distinguished provenance confers**. (Lee Rosenbaum, "Christie's is Cagey about Maier Museum Provenance, Discloses the Rose," *CultureGrrl*, November 1st, 2007)

In a report for Christie's Features, Joshua Glazer and Alexis Glashot discuss this tendency as well:

> Deaccessioning sales, which occur infrequently and tend to be part of a carefully tailored collection-management strategy, **provide private clients with a unique opportunity to acquire works with impeccable museum provenance and often a substantial history of research and publication**, from some of the most hallowed and prestigious collections in the world. (…) **Our June New York Sale saw the successful sale of 11 works from the Metropolitan Museum of Art**, sold to benefit the acquisitions fund of the European Paintings department. The group, which was 100% sold, was led by Hubert Robert's The Ruins and The Old Bridge, which realized $1,874,500 (£1,219,310). (Joshua Glazer and Alexis Glashot, *Market Barometer: Old Master Paintings*, spring 2012)

Jesse Hamlin identifies the same tendency in a discussion of a sale of works from the M.H. de Young Memorial Museum:

> A couple of thousand objects were put up for auction after being culled from the collections at the M.H. de Young Memorial Museum in Golden Gate Park and the California Palace of the Legion of Honor. About 95 percent of them were snapped up at Butterfields in San Francisco and online yesterday and Monday in auctions that included objects from the Art Institute of Chicago and other institutions. Most sold for more than their estimated value.

> "That's very good news," said museums Director Harry Parker. "**I think there was a premium paid for objects that have a museum provenance. That gives them a cachet.**" (Jesse Hamlim, "Museum pieces auctioned / De Young, Legion items get top dollar," San Francisco Chronicler, June 27th, 2011)

The premium paid for a museum provenance can also be seen in the sale of Rafino Tamayo's *Watermelon Slices*. In an article for *Blouin Art Info*, Judith H. Dobrzynski predicted the effect of the MoMA provenance, which proved true; the painting sold for $2,200,000, which was $200,000 above the high estimate. Dobrzynski wrote:

> Give Sotheby's credit for salesmanship: today, announcing **the sale of a painting by Rufino Tamayo, which is being deaccessioned by the Museum of Modern Art**, the auction house called Watermelon Slices "a major work…depicting one of his signature themes."

> Estimated at $1.5 million to $2 million, it will be in the Nov. 16 auction of Latin American Art. Carmen Melian, the Latin American expert at Sotheby's, said "This is one of the most important Tamayo watermelon paintings to appear on the market for several years. **Collectors are sure to gravitate towards a work of this iconic subject matter from an important period that also boasts such distinguished provenance**." (Judith H. Dobrzynski, "MoMA To Sell Tamayo, With Acquisition Policy Implications," *Blouin ArtInfo*, October 19th, 2011)

In a 2011 article for *The New York Times*, Carol Vogel notes the tendency of museum provenance to be used as a sales tool:

> It is clear from the Impressionist and modern art catalogs that a number of museums, eager to clean house, are willing to take a gamble on the market, hoping some of today's new buyers — predominately from Asia, Russia and the Middle East — **will be impressed by a museum provenance**. **For auction house experts, that's a compelling sales tool**. (Carol Vogel, "A Bouquet of Offerings to Test Uncertain Waters," *The New York Times*, October 28th, 2011.)

Vogel made a similar point seven years earlier, addressing the impact of MoMA provenance:

> The top seller was Pollock's "No. 12, 1949," one of his classic drip paintings. Five bidders fought over the oil on paper, which sold to a telephone bidder for $11.6 million, **well above its $7 million high estimate and a record for the artist**. Practically no drip paintings are available**; this one came with an exceptional provenance: the Museum of Modern Art had owned it for 52 years**. (Carol Vogel, "Contemporary-Art Bidding Tops $102 Million in Sales," *The New York Times*, May 12th, 2004)

Suzanne Muchnic noted the same tendency in an article the same year, identifying the capacity of museum provenance to have a significant effect.

> "Ultimately a painting sells based on its merits -- the quality of the work, whether it stems from the artist's greatest period, the condition of the work, whether it has been on the market recently," Eykyn says. "**But clients like to feel vindication of their taste. To be able to say a work has been in the collection of the Museum of Modern Art the last 40 or 50 years achieves that**."

> Amy Cappellazzo, Christie's chief of Post-War and Contemporary art, also has MoMA consignments -- a small drip painting by Jackson Pollock, valued at $5 million to $7 million, and a painting of a cow by Jean Dubuffet, expected to fetch $2.5 million to $3.5 million.

> "**The MoMA provenance adds cachet for sure**," she says. **The relatively obscure Anderson Fine Arts Center in Anderson, Ind**. -- which hopes to reap $1.8 million to $2.5 million from the sale of Edward Ruscha's 1964 painting "Damage," donated to the center in 1972-- **doesn't have the same effect. But the Anderson name can't hurt**, even though some of the proceeds are likely to fund operations not condoned by the American Assn. of Museums' code of ethics. (Suzanne Muchnic, "Art; Banking on big names; More than $500 million worth of art is up for auction in New York. Quality is important, but illustrious ownership can add real value to the sale price," *Los Angeles Times*, May 2nd 2004)

The effect of museum provenance on the market is known to be so significant that some dealers take great measures to ensure that works that they market have it. Joy Lo Dico wrote of this phenomenon in a recent article for the *London Evening Standard*:

> This February Olyvia Kwok was in the sales room at Sotheby's for its Contemporary Art Auction. Two other Basquiats had sold well above their estimates already but, when it came to the Water-Worshipper canvas, the

bidding was pedestrian. The auctioneer's hammer was falling when Kwok, dubbed the Chinese It-girl of the art market, put in one last bid for £2.49 million. She got her Basquiat, and below the expected price. "I think it was a bargain," she told a journalist as she left the salesroom, and reckoned it would double in value over the next 18 months (…)

As for the Basquiat and the Twombly, Kwok has a plan. "I got the Basquiat for $4 million. It is now insured for $12 million. **We are going to place the painting in a museum so it will have a better provenance, because everyone likes things with more academic value**. Once placed we will talk to Basquiat experts, find out some more information, someone will write about it, and **we will put it back on the market for different collectors**." (Joy Lo Dico, "I look at artists like a commodity balance sheet: art dealer Olyvia Kwok on picking paintings and being sued by Sotheby's," *London Evening Standard*, July ³ʳᵈ, 2014)

The tendency for museum provenance to elevate value can be found in art of diverse type. A 2012 article for BBC News, "Vase used as doorstop raises $1.3m at auction," demonstrates the phenomenon to take place in the sale of Chinese art:

Dr. Tao Wang, who was recently appointed head of the Chinese Works of Art Department at Sotheby's New York, said he was "thrilled" with the result of the first auction he has attended there. "We saw exceptional demand across the sale which drove the total to such heights," said Wang. **"Collectors from around the world were drawn to high-quality pieces with distinguished provenance, particularly that of museums."** ("Vase used as doorstop raises $1.3m at auction," BBC News, September 14ᵗʰ, 2012)

In a *Washington Post* article "Museum Quality," Jane Friedman notes that the Baltimore Museum of Art provenance will benefit the sale of pre-Columbian works:

Museums, like homeowners, occasionally need to winnow their possessions. But **when a museum's goods are put back on the market, their value usually is increased**.

Weschler Auctioneers and Appraisers, the Washington-based auction house, this weekend will sell more than 130 lots of pre-Columbian as well as African and Native American objects, most of which were in the collections of the Baltimore Museum of Art.

**"These works have been authenticated, and what we call provenance always affects the value**," says Frederick Lamp, the museum's curator of the arts of Africa, Asia, the Americas and Oceania. (Jane Friedman, "Museum Quality," *The Washington Post*, October 1ˢᵗ, 1998)

The same effect can be seen in the sale of Western antiquities, as addressed in Elspeth Moncrieff's 2006 article "Antiquities Sold to Pay New Art Bonanza in *The Daily Telegraph*:

> The ongoing high-profile trial in Rome of Marion True, former antiquities curator at the Getty, on suspicion of conspiring to buy illegally excavated works of art for the museum, has uncovered a labyrinth of dealers, curators and collectors allegedly involved in handling illicitly excavated antiquities.
>
> The trial has put the wind up everybody, and curators can no longer turn a blind eye to provenance. **Buying publicly at a vetted auction in which each item has a published museum provenance gives the buyer complete security - so these works are particularly desirable**. (Elspeth Moncrieff, "Antiquities Sold to Pay New Art Bonanza," *The Daily Telegraph*, November, 28th, 2006)

The elevating effect of museum provenance is not even particular to high-value fine art. In an article for *Forbes*, Missy Sullivan addresses this point:

> You don't have to be in the market for a Monet or a Manet to benefit. If you look closely, you'll find museum property sprinkled among sales of almost every category (…) Bonus: When you buy a museum piece at auction, it comes free of sales tax.
>
> **A museum provenance can exercise a halo effect on mediocre work, giving it a higher hammer price**. You can safely assume a museum piece has been well cared for and researched. (Missy Sullivan, "Yard Sale of the Gods," *Forbes*, December 24th, 2001)

The tendency of museum provenance can be seen in the sale of historical memorabilia. Steve Campbell discusses the museum provenance effect in a sale of Robert E. Lee memorabilia:

> In 1867, Lee donated the items to help out an orphanage in Baltimore, Quinn said. The items were eventually bought by Civil War collector William Beverly Bristor Jr. of Baltimore, who died in 1999. That year, his heirs loaned the items to the National Park Service's Arlington House, Lee's former family home that became the Arlington National Cemetery. But an illness in the owners' family owners forced them to put the items up for auction.
>
> When Kathy Huxhold of Muncie, Ind., first contacted Quinn about selling the items collected by her uncle, he told her they held enormous potential. "**It was Robert E. Lee and we had museum provenance – this had the power to create a perfect storm at auction**," Quinn said, noting that 1,500 bidders signed up for the bidding. "We had estimated it at about $20,000 but the bidding started at $25,000. When it ended at $55,000, it

was a tear-jerking moment to do something for a client," he said. (Steve Campbell, "Prolific Fort Worth Civil War collector scoops up rare Robert E. Lee items," *The Star Telegram*, February 2nd, 2014)


## Celebrity sales

The effect of museum provenance is not unlike that of celebrity provenance, which tends to augment value dramatically.

The Elizabeth Taylor sale at Christie's New York on December 3rd to 17th, 2011 made $156,756,576. Every item that was offered sold. The evening sale of Taylor's jewelry alone achieved $115,932,000, becoming the most valuable jewelry auction in history. Seven new world auction records were established during the sale including price per carat for a colorless diamond and for a ruby. These record prices owed in large part to the golden provenance of having been part of Taylor's collection.

This provenance contributed to unexpectedly high achieved prices for the fine art in Taylor's collection as well.

For example, Vincent van Gogh's landscape painting *Vue de l'Asile et de la Chapelle de Saint-Rémy* illustrates the celebrity effect. Relatively modest in scale, bland in color, and prosaic in composition, this painting was offered with an ambitious estimate of £5,000,000 - £7,000,000 ($7,885,000 - $11,039,000) at Christie's London in February 2012. It sold for £10,121,250 ($15,991,575), more than doubling the low estimate, despite its relative deficiencies; this high realized price was in large part determined by the provenance. The celebrity factor can be discerned when comparing this painting to other relatively minor van Gogh oil paintings of landscapes that sold in the same general time period. For example, the slightly inferior painting by van Gogh *Pont de Clichy* sold for vastly less money ($6,130,919) at Koller in Zurich in June 2013. And the superior painting by van Gogh *Parc de l'hôpital* sold for less ($13,302, 947) in June 2010.

The collection of Yves Saint Laurent and Pierre Berge was also incredibly successful, setting numerous records including the biggest auction ever held in Europe. The auction made 374.4 million euros ($477 million with fees), dramatically surpassing the estimate of 200 million euros to 300 million euros. Nearly 96% of the lots sold, an extremely high sale rate. That success of this auction, which was the largest-grossing auction of a private collection, particularly in relation to its estimates, attests to the premium that collectors are willing to pay for work that has impressive provenance.

The capacity for celebrity provenance to draw extremely high prices at auction is perhaps most evident in the auction of Jacqueline Kennedy's personal memorabilia, which fetched astronomical prices in the 1990s. Collectors paid $772,500 for her golf clubs, and $211,500 for her fake pearls, among numerous other such prices, all of which attest to the premiums that collectors will pay for provenance. (*See* James Barron, "Reporter's Notebook; Oohs, Aahs and Millions in Frenzy to Buy Camelot," April 26th, 1996.)

Damien Hirst sold 100% of his lots on September 16th, 2008 at Sotheby's London, setting the record for a one-artist auction the day after Lehman Brothers collapsed. The sale, which made $200.7 million, soaring past the high estimate of $177.6 million is another example of the power of celebrity status. (*See* "Maev Kennedy, £111 Damien Hirst Total Sets Record for One-Artist Auction," *The Guardian*, September 16th, 2008.)

The Christie's Report is silent on the importance of the museum provenance which is related to the celebrity provenance factor discussed above.

## Sale of any century

As art appraiser Elizabeth Gaidos says:

> I was Assistant Curator of American Art at the DIA many years ago. The collection is a world treasure, not just the subject of a regional dispute. A museum collection of this stature is a compilation of the curatorial expertise and donor contributions of decades. It has a life and character developed over time and is not merely an assemblage of individual properties." (posted on Linkedin July 18th, 2014)

The sale of the entire contents of the DIA would be unprecedented in scope. Given the extremely high quality and curatorial consistency of the DIA collection, even an auction sale of selected masterpieces from the museum would perform better than any sale in history, including major sales centuries ago, such as the dispersal of royal treasures of the French Revolution or the Walpole sale to Catherine the Great in the eighteenth century.

In view of this extensive evidence, it is instructive to contrast the comments of the Artvest Report on this issue. Not only does the Artvest Report appear not to take into consideration the exalted factor of provenance but it belittles it.

The Artvest Report says:

> General gifts and other museum acquisitions often involve property with little or no sales value and/or scholarly or historic value only. Also in many instances donors give entire collections, which include poor to mediocre property side-by-side with good property. (Artvest Report p. 19)

While this may or may not be the case, what the Artvest Report ignores is that when and if museums receive gifts of low value, they more frequently than not sell unwanted objects soon after receiving them.

Such sales are condoned by the American Association of Museums provided that the proceeds of such sales are given to an acquisitions fund and are not dispersed for other purposes.

This is a fact that the Artvest Report ignores when discussing the recent sale by the Delaware Museum of Art of a William Homan Hunt painting, illustrated in the Artvest Report. (See Artvest Report, pp. 32-34)

There is also a major valuation flaw in the analysis of works under $5,000 in both the Artvest Report and the Christie's Report.

The Artvest Report states:

> For property with a value below $5,000 I attributed an effective value of $0, as is my opinion that the cost of cataloguing, handling, administering and finding buyers for this property will be equal or greater than the cost of selling it. For that reason this is a price level of property that Sotheby's and Christie's, under normal circumstances try to avoid selling. (Artvest Report p. 19)

The Artvest Report accepts without question Christie's classification of these works. However, Christie's did not provide a list of the works under $5,000 with illustrations, and so, the user of their appraisal report has no way of verifying whether these works are indeed under $5,000. In light of the fact that Christie's has not valued these objects, the total number of objects valued in their report may be closer to 1,500 rather than approximately 2,700, which they say they have valued. Yet, the Artvest Report accepts these numbers without question and incorporates them, and in so doing, skews the results.

Not only is this point fallacious for its refusal to account for the major cumulative value of works under $5,000 in the DIA collection, but it is untrue in regard to the business practices of Sotheby's and Christie's, both of which sell works under $5,000. Many of these works, such as his Polaroid photographs offered in Christie's online "Eye Candy" sale have estimates as low as $1,000-$2,000.

Sotheby's is also working in the lower end of the art market, having recently announced a partnership with eBay for online sales. (op cit. Carol Vogel and Mike Isaac, "A Warhol with Your Moose Head? Sotheby's Team with EBay," *New York Times*)

The Artvest Report also implies that selling museum works which are not condoned by professional associations result in lower realized prices, as evidenced by the Delaware Museum sale which took place in London, referenced above, which most likely was due to an aggressive estimate by Christie's. (*See* Artvest Report, p. 33).

Ironically, on July 14th, 2014, a few weeks after the Delaware Museum sale, the *New York Times* published a story of how an Egyptian statue de-accessioned from the Northampton Museum in England made approximately $27 million in London above its estimate of $7-11 million, despite the fact that both the Egyptian government, local residents and British museum officials tried to block the sale on "moral grounds" (using the terminology of the *New York Times*).

One of the most egregious errors in the Artvest Report is the treatment of Diego Rivera's *Detroit Industry* frescoes. The Artvest Report says that the frescoes "cannot be removed with cutting them off the wall and inflicting serious damage, and incurring significant cost." [*sic* – he presumably means "without cutting them…"]. While of course there would be costs associated with moving the frescoes, it is certainly possible, and it is fully in keeping with the regulations of National Park Service, which organization has named the murals a national hallmark and explicitly noted that this designation "does not shield the property from ownership changes or prevent an owner from making any other changes they wish"; a review process is in fact only needed if federal funding is to continue (See "Iconic Diego Rivera mural at DIA named National Historic Landmark," *Detroit Free Press*, Apr. 24th, 2014)

In fact, frescoes are commonly moved from their original sites to museums. There is currently an exhibition in Ravenna, Italy titled *L'incanto dell'affresco* ("The Charm of the Fresco: Detached Masterpieces from Pompeii to Giotto, from Correggio to Tiepolo"). The show is comprised of 110 detached frescoes from antiquity to the nineteenth century. (*See* Attachment G: Article on *L'incanto dell'affresco esco*)

It is common for museums to display detached frescoes in this country as well. One prominent example of this is Domenico Ghirlandaio's detached fresco *Saint Christopher and the Infant Christ* in the Metropolitan Museum of Art. At the same institution, one can see several entire rooms of detached frescoes from villas such as Boscoreale and Boscotrecase; these paintings, buried under the lava of Mount Vesuvius, suffered a fate far worse than surgical modern processes that necessarily attend the transport of major frescoes, and yet, they are in very good condition and set up in situations that approximate the original rooms. The removal of frescoes in a setting such as a major museum today would be performed with state-of-the-art technology that would leave the works in essentially perfect condition in a new location.



Domenico Ghirlandaio, *Saint Christopher and the Infant Christ*

The relocation of room-scaled works is not particular to frescoes. Entire rooms are regularly moved without damaging effect. Consider Whistler's Peacock Room, which was moved from Freer's Detroit mansion to the Freer Gallery of Art in Washington, DC. Consider, similarly, Louis Comfort Tiffany's Tiffany Chapel at the Morse Museum in Winter Park, Florida, which was moved three or four times prior to its current installation. Museums sometimes move entire buildings to great distances; consider the Temple of Dendur, which was moved from Egypt to the Metropolitan Museum of Art. With such examples in mind, the reconstruction of Rivera's masterful frescoes in a comparable museum is entirely plausible.

Later in the Artvest Report, in the section for individual valuations, Betty Krulik says "the works would be destroyed if they were removed from the building, therefore the value is 0 OR the value of the real estate." As discussed above, there is no indication that the works would be destroyed or even damaged if they were to be moved, and therefore these works, major masterpieces by the most important Mexican artist in history, have a value far in excess of zero. And since, as discussed above, the Rivera murals are of a class of property that can be relocated with relative ease, their value is not the value of the real estate.

**STATE OF THE CURRENT ART MARKET**

The time constraints of producing this preliminary and summary report preclude a detailed analysis of the state of the art market at present. However, a few general comments are in order.

At the moment, as in the past, the art market tends to be strong for works of art of significant quality. The curatorial care which the DIA has exhibited over during the last century in particular has produced an extraordinary collection of world renown as stated by Elizabeth Galdos above.

Among the masterpieces in the DIA collection are:



Pieter Bruegel, *The Wedding Dance*

This major painting by Bruegel depicts a wedding festivity from his typical bird's-eye vantage point with a characteristic plethora of detail. It is among the best surviving examples of later Northern Renaissance painting and among this master's most important paintings.



Vincent van Gogh, *Self-Portrait with Straw Hat*

This self-portrait typifies one of the most important genres for the legendary Post-Impressionist. The self-portrait has a three-quarters pose, psychologically expressive gaze, pungent saturated color, and long dappled bushstrokes, all of which are characteristic of the artist's self-portraits.



Rembrandt van Rijn, *The Visitation*

This is a major religious painting by Rembrandt van Rijn, the most important Dutch painter of the seventeenth century. The architecture is similar to that of Rembrandt's masterpiece, *The Nightwatch*, painted around the same time but cut and altered in the nineteenth century. *The Visitation* remains unaltered, a very important consideration in valuing.



Frederic Church, *Cotopaxi*

This painting exemplifies the representation of the sublime in nineteenth-century American landscape painting. It epitomizes the artist's signature panoramic vantage

point, and stands out even from comparably well-painted Church paintings in its brilliant color.



Caravaggio, *The Conversion of the Magdalen*

The painting was made for Caravaggio's first major patron, Cardinal del Monte. Its realistic portrayal of ordinary people as models, dramatic approach to storytelling and strong value contrasts embody what a collector would expect in Baroque painting. The brilliantly painted elliptical mirror and its reflection served as an important point of departure for Baroque still life painting, and the gestures influenced many Baroque artists such as Georges de La Tour.



Mark Rothko, *Orange Brown*

This work is a classic example of Mark Rothko's style, in which large minimally modulated rectangular shapes float in an abstract space. This style of painting, called color-field painting, is a sub-style of Abstract Expressionism, and Rothko was its most prominent practitioner.



Henri Matisse, *The Window*

This painting features a classic subject for Matisse, namely an interior with a window. Characteristic of his painting style, flat planes of color are emphasized. The DIA was the first public collection in the United States to include a Matisse.



Pablo Picasso, *Melancholy Woman*

This is a significant Blue-Period painting by Pablo Picasso. The works for this series, his first mature body of work, feature cool colors, melancholy subjects, and significant attention to linear elements, all of which are present in this painting. As such, this is one of the most important paintings of Picasso's Blue Period.



Snake-dragon, symbol of Marduk, patron God of Babylon panel from the Ishtar Gate

This extremely rare glazed-brick relief is from the Ishtar Gate, a major Neo-Babylonian structure built by King Nebuchadnezzar II in honor of the Babylonian gate Ishtar. This relief depicts the god Marduk in the guise of a chimerical mixed creature. Only two other museums in the world have dragons from the Ishtar Gate; this is the only dragon in the United States.



Andy Warhol, *Double Self Portrait*

This large-scale self-portrait treats central themes in Warhol's Pop art oeuvre, namely celebrity, repetition, and the visual language of popular culture. The two-part format and the heightened color palette are signature for the artist.



Edgar Degas, *Danseuses au foyer (Dancers in the Green Room)*

This painting features ballerinas, the most important subject for Impressionist painter Edgar Degas. The asymmetrical composition of this early painting reflects his newfound interest in Japanese prints. The subject is accessible to contemporary collectors.



Henry Fuseli, *The Nightmare*

This painting is, by far, Fuseli's most important work. It is a defining monument of Romanticism, embodying the concept of the irrational and its connection to imaginative forces. It is a precocious painting, looking forward to themes that would occupy many artists in the nineteenth and twentieth centuries. It anticipates Surrealism, an important painting style for contemporary collectors. It has a place in psychology textbooks and art history textbooks alike.



James Abbott McNeill Whistler, *Nocturne in Black and Gold – The Falling Rocket*

This painting is the most important of Whistler's Nocturnes, a series of muted landscapes painted with limited palettes. This work, which closely looks forward to modern abstraction more than any other work in the series, was the subject of a major controversy and libel suit involving a foremost critic of the day, John Ruskin, who accused Whistler of "flinging a pot of paint in the public's face."

With a collection of masterpieces such as the twelve examples cited above, it is clear that any DIA sale would excite world attention no matter what generalized statements one could make about market performance within any one particular sector. A sale of such extraordinary works of art would transcend any generalized comments one might make because in point of fact there will has never been a sale comparable to that of the Subject Property.

Notwithstanding this more obvious observation, the Christie's Report did not comment on the state of the art market.

The Artvest Report mentions the topic, but it does not discuss in depth the prominence of the DIA collection.

Instead, the first part of the Artvest Report details observation on the current art market; a major source cited in the Artvest Report is the TEFAF Art Market Report prepared by art economist Clare McAndrew. (***TEFAF REPORT***)

Chinese art economist, Zhang Yi also worked on the TEFAF Report and is credited with this in the report. Mr. Zhang who also works with VWA was asked to comment on the observations made in the Artvest Report regarding the TEFAF Report. The Review of Expert Witness Report of Michael Plummer, Artvest Partners, dated July 8th, 2014, Submitted to VWA on July 25th, 2014, Prepared by Zhang Yi (***ZHANG REPORT***) is appended to this report. (*See* Attachment B.)

The Zhang Report states that the Artvest Report misstates or obscures the points raised and conclusions of the TEFAF Report.

Generally speaking, the conclusions that the TEFAF Report makes are based on heterogeneous mixed consignor sales which in many cases suffered by a paucity of excellent objects; in other words, sales which have profiles significantly different than what would be the case if there were a sale of the excellent holdings of the DIA.

Consequently, while the general observations made in the Artvest Report may or may not apply to mixed consignor sales of objects of uneven quality, a DIA sale would not fit such a profile and, as such, it is inappropriate to compare such a sale with what has taken place during the past sale season.

## THE ISSUES OF SUPPLEMENTS AND DISCOUNTS WITHIN THE CONTEXT OF MASS APPRAISALS

In the event that a valuation is predicated on the premise that a large group of similar and like items were to valued at one time in a hypothetical sales construct, USPAP Standard 6, under Mass Appraisals, instructs the appraiser to consider whether the value of the whole mass may be different than the sum of its parts.

Taking into consideration this valuation instruction, one should determine whether a supplement or a discount to a normal value would be appropriate.

## SUPPLEMENTS

Based on our discussion above, one would be justified in determining that an increase in value would be appropriate due to the extraordinary quality of works of art in the DIA collection.

In point of fact, such a sale would be the sale of any century.

VWA has taken a conservative view and have added conservative supplements to various sector of the DIA collection, which are discussed below. VWA feels justified in doing this because the "sale of any century" would consist of consistently superior items which

are distinctly different from the items which would be found in a mixed-consigner sale such as the ones in the TEFAF report cited by the Artvest Report.

The reason VWA has not applied an across-the-board supplement is because such supplements are hard to quantify.

However, it should be mentioned that Mr. Wiener was required to quantify a glamor supplement in the DeBekessy case, cited in the attached CV, in which Christie's sold a distinguished collection of eighteenth-century French furniture and decorative arts without citing provenance, publication and exhibition history, resulting in lower prices realized for the consignor than if such important factors had been cited.

Neither the Christie's Report nor the Artvest Report address the possibility of including a valuation supplement due to the DIA provenance.


## DISCOUNTS

VWA has not applied a valuation discount factor to the DIA collection, which one would normally do when valuing such a large collection of similar and like items, albeit in many diverse collecting categories, to be sold at one time. Given the nature of the DIA collection, it is unlikely that the entire collection would be sold at one time. Instead, a more likely hypothetical sale scenario would be one that takes place over time.

Alternatively, under the loan scenario presented by ACG and discussed in the Houlihan Catalogue, the DIA collection would not be sold at all, providing, of course, that the debtor would be able to repay the loan. The only way any of the works of art would be removed or sold would be if there were to be a loan default. Consequently the collection would not be valued as an organic whole or "mass" to use the terminology in USPAP Standard 6.

The Christie's Report does not address the issue of the appraisal of a mass.

The Artvest Report addresses the issue of applying a blockage discount, although it would appear that the Artvest Report ultimately rejects this, presumably because it is a draconian solution (although this point, in our opinion, is not entirely clear in the Artvest Report narrative). (*See* Artvest Report, pp. 27 ff).

The Artvest Report offers a number of different scenarii for calculating discounts which could be applied to value all 60,000 plus art holdings of the City.

These scenarii are articulated in a variety of tables. (See Artvest Report Tables 4, 5, 6, 7 pp. 28 – 7)

Economist Jannette Barth, Ph.D was asked to opine on the Artvest Report's view of blockage discount as it applied to the DIA and the supporting data use for the conclusions in the tables set forth in the Artvest Report.

Dr. Barth's conclusions are stated below and elaborated upon in the attached The Review of Expert Witness Report of Michael Plummer, Artvest Partners, dated July 8th, 2014, Submitted to VWA on July 24th, 2014, Prepared by Jannette M. Barth, Ph.D., Pepacton Institute LLC (**BARTH REPORT**) is appended to this report. (*See* Attachment C.).

In brief, Dr. Barth opines that most, if not all, of the discounts applied in the Artvest Report are unsustainable because of reliance upon unsupported data. The Barth Report goes through each discount that the Artvest Report applies and shows that the data is either lacking or inconsistent with the conclusions reached. As such, the Barth Report concludes that the Artvest Report is unreliable.

With this in mind, one can see that the Artvest Report puts forth its own discount calculations stated in the conclusion, resulting in a discount scenario in which the DIA collection would fetch between $1.1 and $1.8 billion "in the highest value scenario." (See Artvest Report, p. 48).

The Artvest Report also dismisses all expressions of interest by three potential purchasers and one potential lender as reported by Houlihan (See Artvest Report pp. 39-40).

While VWA did not have direct access to the three potential purchasers, according to Houlihan, Poly International Auction House expressed interest in purchasing all Chinese works for up to $1 billion, Yuan Capital expressed interest in purchasing 116 pieces for $895 million to $1.473 billion, and Catalyst Acquisitions/Bell Capital Partners expressed interest in purchasing the entire collection for $1.75 billion. VWA did have access to ACG, who offered to provide a $2 billion loan.

VWA asked Ian Peck of ACG to comment on the way the Artvest Report characterized his offer to which he replied:

> The Artvest Report, and more specifically the sections referencing ACG and its proposal to monetize the art collection of the DIA, is predictably skewed and misleading. Our proposal, which was submitted April 9, 2014, laid out interest rate ranges and loan proceed estimates in hopes of having collaborative discussions with the DIA and bankruptcy administrators. All relevant estimates were bracketed within the proposal to signify that we were open to discussion and analysis. ACG is confident that any loan against the collection for the purposes of enhanced relief to creditors will price at the lower end of the aforementioned interest rate range thereby rendering Mr. Plummer's cost estimates in Section 70 a. inaccurate. In section 70 e. Mr. Plummer again utilizes his inflated numbers to calculate debt service amounts. ACG is prepared to look at all options to provide non burdensome terms in the early years of the loan i.e. interest taken out of loan proceeds, PIK structures, etc. To be clear, ACG's proposal has no language

included that requires sales of any of the DIA collection. Further, the absence of any fees in the proposal that would reward ACG if any sales did occur should mitigate any offensive claims asserted by Mr. Plummer in section 70 g. The spirit of our proposal was and continues to be a willingness to work with all sides to find a mutually agreeable solution, thereby protecting a national treasure and allowing it to remain in Detroit whilst effecting enhanced recovery to creditors.

## VALUATION DETERMINATION:  METHODOLOGY

1. VWA valued 387 items with a low value of $3,092,419,700, high value of $4,040,303,800 and an average value of $3,566,361,750.

2. The Christie's Report, the Artvest Report, and the Winston Report valued 596 works that VWA did not value.

3. VWA believes the values of the 596 works valued by the third parties stated above are generally too low.

4. The total of the average values of the 596 works arrived at by the third parties above was $311,370,325.

5. Combined, VWA and other third parties valued 983 works for a total average value of $3,877,732,075 (*See* Attachment J:  Step 2 Attachment).

6. Of 17,178 DIA insurance values, 16,388 works were not valued by any of the third parties.

7. Many of the DIA insurance values were arrived at during the last decade or prior (see table "Overview of Age of DIA Insurance Value For Those Works that Have DIA Insurance Value and No Third Party Values")

8. VWA determined that a market percentage appreciation is appropriate for 16,338 of the DIA insurance values because the average weighted age of the values is 13.0 years (see chart "Overview of Age of Insurance Value For Those Works That Have DIA Insurance Values and No Third Party Values").

9. In order to determine a market appreciation rate, VWA first cross-referenced DIA insurance values to works that VWA valued and compared results. There were 317 works that had insurance values that VWA had valued.

10. With respect to the 317 pieces that had both insurance values and VWA values, VWA calculated the weighted value to be $3,566,361,750 and calculated the average age of the DIA's insurance value to be 5.9 years old with an initial DIA insurance value of $2,200,811,839. (*See* Attachment L: Step 3 Attachment).

11.   VWA calculated the percentage change between the VWA values and the initial DIA insurance values and used that percentage as the market appreciation rate to be applied to the 16,388 works to arrive at current market value for the 16,388 works.

12.   The current market value for the 16,388 works is $758,888,249. (*See* Attachment L: Step 3 Attachment)

13.   For the remaining works, VWA developed a pricing matrix based on average sales price of artworks by Sotheby's and Christie's by sales department for 2013 by using the chart from Exhibit E in the Artvest Report, "Sotheby's and Christie's Unsold Rates by Sector – 2013."

14.   For reasons previously discussed in this report, particularly the unparalleled provenance of the DIA works, and the examples of recent celebrity sales, VWA believes that if the DIA collection ever were to be offered for sale at public auction, the buy-in rate for unsold lots in the categories would be essentially zero.

15.   A premium or discount was applied to most of the DIA categories.

16.   When appropriate, premiums were applied to categories within the pricing matrix to compensate for factors including the strength of many individual market sectors and the high collectability and rarity of the DIA works in those sectors.

17.   When appropriate, discounts were applied to categories in the pricing matrix to compensate for less collectible works of art.

18.   The values of the remaining 42,854 DIA works were calculated by taking the average sales price described above (see above) and also applying the premium or discount where applicable.

19.   The total value of the remaining 42,854 DIA works was determined to be $3,512,612,030.

20.   VWA has considered that an error rate in the DIA data would affect results. Until VWA can consult with the DIA on quality control issues, VWA is unable to adjust for such errors.

21.   The preliminary MCV grand total for the works in the DIA collection is $8,149,232,354 and was determined by adding (1) the total value of works in the DIA collection valued individually by VWA, (2) the total value of works in the DIA collection valued individually by independent third parties (not including VWA), (3) the projected value of works not covered by clauses 1

and 2 in this paragraph but have aged DIA insurance values which VWA subsequently estimated for market appreciation, and (4) the total values of remaining works which were valued using the pricing matrix. (*See* Attachment H: Methodology Step by Step Chart)

22.    All values were reviewed and adjusted by internal committee.


## <u>CONCLUSION</u>

In arriving at a determination of the value by VWA of the entire holdings (approximately 60,000 works of art) of the DIA, the following points should be stressed:

1.    The above appraisal report is to be considered as a preliminary report of a summary nature. All notes included in the work file may or may not have been included in the report. Clearly only when they are of truly determinative importance have such notes been cited, in keeping with the report's definition as both preliminary and summary.

2.    There have been at least three other appraisal reports reviewed by VWA which have been produced in conjunction with the above cited litigation. Two of these reports, the Winston report and the Christie's report, take into consideration only a small segment of the DIA collection. The Report and the Artvest Report are the only two reports that attempt to value the entire DIA collection.

3.    Of these two reports, the Report is the only report issued in compliance with the Uniform Standards of Professional Appraisal Practice.

4.    Of these two reports, this Report is the only report issued by qualified appraisers. While the Artvest Report may have used qualified appraisal consultants that report was issued by Michael Plummer who is not an appraiser.

5.    Furthermore, as evidenced by the CVs attached to the Artvest Report, neither Mr. Plummer nor his appraisal consultants show any significant museum training.

6.    At least two of the leading appraisers responsible for the Report have significant museum training – i.e. Victor Wiener who holds a Certificate in Museum Training issued jointly by the Metropolitan Museum of Art and the Institute of Fine Arts, NYU and David Shapiro, who has worked in and with museums in a variety of capacities.

7.    This Report is the only report that takes into consideration in a prominent way the great importance of the art holdings of the DIA. This is an important

valuation factor, which has been almost totally ignored in the other appraisal reports. In fact Artvest appears to denigrate the DIA holdings by saying it contains many items of low value, which may have been dumped into the museum collection by donors.

8.     VWA has had only two weeks in which to issue the preliminary report.

9.     Because the data supplied was compromised we were obliged to engage Silar Advisors to attempt to sort the data and assist in calculations. This is an on-going process but enough progress has been made at this point to render credible results.

10.    Because much of the analysis of the Artvest Report is dependent on work done by Clare McAndrew and her associates for the TEFAF Report, as well as economic projections. VWA consulted with Zhang Yi, a co-author of the TEFAF Report; we also consulted with Janette Barth, a noted economist to comment on these sections. The Zhang Report and the Barth Report are appended to the Report. In sum, both these authorities take issue with statements made in the Artvest Report.

11.    While the Report does make a number of economic projections, the methodology employed and the limitations under the time constraints are disclosed fully within the body of this report. Such full disclosure is not obvious to us within the text of the Artvest Report.

12.    Under the limitations cited above and within the Report and within the nature of the type of preliminary report delivered, with all its disclosures, it is VWA's opinion that the Report has arrived at credible results. Such is the overriding principle of USPAP which stresses that appraisers must strive to maintain "public trust" and perform assignments with "objectivity, independence and without bias." VWA strives to maintain those principles.

Executed this 25th day of July, 2014, in New York, New York.

Victor Wiener

**<u>USPAP Appraisal Certification:</u>**

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and are the impartial and unbiased professional analyses, opinions and conclusions of the appraiser.

- The appraiser has no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- The appraiser has no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- The appraiser's engagement in this assignment was not contingent upon developing or reporting predetermined results.

- The appraiser's compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- The appraiser's analyses, opinions, and conclusions were developed and this report has been prepared in conformity with the *Uniform Standards of Professional Appraisal Practice.*

- Any person who has provided significant personal property appraisal assistance to the person signing this certification is listed in the body of the report.

- The appraiser has the appropriate experience and level of competence to appraise the property which is the subject of this report and the qualifications of all who have worked on this report are stated both within the body of the report and in the *curriculum vitae* of the principal appraiser which is appended to the report.

- While the appraiser attests to the descriptions of property contained in this report, this appraisal report is not to be considered to be a statement of authenticity or a warranty of the subject property, and is limited by the extraordinary assumptions stated with inches. However, careful review of all scholarly and market sources have not revealed any doubt about the authenticity of the subject property as of the date of this report, unless specifically stated.

_____
Victor Wiener for
Victor Wiener Associates, LLC
July 25th, 2014

**ADDENDUM**

**CORRECTIONS TO REPORT AS OF AUGUST 20, 2014**

The Report has been corrected to account for the following errors noted as of the above date:

- Obvious typographical errors of spelling and syntax.

- The following transcription errors:

  o VWA identified 20 works that should not have been included in Step 2. VWA deleted each of these works from the Step 2 Attachment (Attachment J), and those with DIA insurance values were included in Step 3 (*see* Attachment L) and the others were added to the pricing matrix in Step 4 (*see* Attachment M). The Methodology Step by Step Chart (Attachment H, and reproduced on page 3), the Step 2 Attachment Supplement (Attachment K), the explanation of the valuation methodology on pages 45-47 and the valuation conclusions on page 3 have been updated to reflect the corrected number of units and average values.

  o The DIA Insurance List includes an Asian manuscript, *Perfection of Transcendent Wisdom in Eight Thousand Verses* consisting of 501 pages. The DIA Insurance list gave each of the 501 pages a different accession number, and the insurance value of $300,000 for each page of the manuscript. This is an obvious error, as $300,000 is an appropriate insurance value for the whole manuscript, but not for each page. Thus, the $300,000 insurance value for this work should have been listed only once on the DIA Insurance List, but was instead repeated 501 times. The Step 3 Attachment (Attachment L), the Methodology Step by Step Chart (Attachment H, and reproduced on page 3), the explanation of the valuation methodology on pages 45-47 and the valuation conclusions on page 3 have been updated to reflect the corrected number of units and average value, accounting for $300,000 as the value of this work, only once.

  o It is VWA's opinion that the DIA Insurance List may include additional instances of the same mistake of listing the insurance value for one object multiple times. This would be impossible to verify without a detailed physical inspection of each work in the DIA Collection; however, in order to account for this possibility, VWA applied an additional discount of 3.5% to calculate the Grand Total, Projected Sum of Average DIA Insurance Value listed on the Step 3 Attachment (Attachment L), and updated the Methodology Step by Step Chart (Attachment H, and reproduced on page 3), the explanation of the valuation methodology on pages 45-47 and the valuation conclusions on page 3 to reflect the

corrected, discounted value.

- o As a result of these and other mistakes identified on the DIA Insurance List, VWA corrected the total amount of DIA insurance values in paragraph 6 of the explanation of the valuation methodology on page 45.

- The definitions of Christie's Report, Artvest Report and Winston Report in Attachment K were corrected to conform to the definitions in the Report.

- The formatting of Attachments H – M was fixed to make those attachments more readable.

## INDEX OF ATTACHMENTS

A:  Curriculum Vitae of Victor Wiener

B:  Zhang Report

C:  Barth Report

D:  Select Slides from Uniform Standards of Professional Appraisal Standards course material written by the Appraisal Foundation

E:  DIA Inventory Page, Missing Photograph Example

F:  DIA Inventory Page, Mislabeled "Unknown, American" Examples

G:  Article on *L'incanto dell'affresco*

H:  Methodology Step by Step Chart

I:  Step 1 Attachment

J:  Step 2 Attachment

K:  Step 2 Attachment Supplement

L:  Step 3 Attachment

M:  Step 4 Attachment

**Attachment A**

**Curriculum Vitae of Victor Wiener**

**VICTOR WIENER**
**201 W. 89TH St., 11D**
**New York, N.Y. 10024**
**(646) 206 3992 PHONE**
**(212) 873-5218 FAX**
**victorwiener@aol.com**

**Independent Appraiser and Art Consultant**,  2004-present:

CEO and director of Victor Wiener Associates, LLC the successor company to Wiener Wolf Associates, LLC, an international firm of independent specialist appraisers and art advisors drawn from professional associations, specializing in insurance appraisals, damage and loss appraisals, tax appraisals, equitable distribution appraisals, appraisals for collateralized transactions, and art market advice for private collectors and financial institutions.  The firm's diverse group of expert appraisers specializes in all aspects of fine arts and decorative arts and has an additional specialty in the appraisal of photography, photo archives and audio visual related material.

Appraisers Association of America, Inc., New York, N.Y.
**Executive Director**,  1982- 2004:

CEO of international organization of 1200 members engaged in the profession of appraising art. Responsible for implementation of all Association programs including:  monthly newsletter and journal as editor:  government liaison as listed below; analyses and monitoring of art market to report to members and professional and general public; design and supervision of computerized appraisal referral service; implementation and management of Association's educational program including monthly seminars, national conferences, professional travel program, and ad hoc lecture series on the art market under the auspices of the AAA's parallel educational foundation, the Appraisal Institute of America; implementation and administration of Association's public relations program, including preparation of all press releases; design and supervision of criteria for prospective members; review of member's appraisals and source of advice to members on appraisal problems; general liaison with art community:  i.e. collectors, dealers, auction houses and appraisers.

Sotheby's Appraisal Company:  New York, N.Y.
**Consultant**, 1981-1982:

Responsible for preparation of appraisals for old master and 19th century paintings for clients requesting insurance appraisals, estate appraisals and appraisals for donation purposes.

New York, NY
**Art Broker**, 1981-1982:

Specializing in the sale of fine art, including old masters and 19th and 20th century paintings and sculpture.

La Cassa di Risparmio:  Rome, Italy
**Consultant,** 1978-1980:

Resident consultant for old master, 19th and 20th century paintings.  Responsibilities included: supervision of monthly auction sales; advisor to consignors and collectors; development of new client base; recommendations to bank officers on the purchase of works of art for the bank.

Rome, Italy
**Private dealer and art broker**, 1978-1980:

Specializing in the sale and acquisition of fine and decorative arts.

Christie's: Rome, Italy
**Director, Fine Arts Department** 1974-1978:

Responsible for 10-12 sales annually of paintings, drawings and prints. Advisor to consignors and collectors in Italy and throughout Europe. Preparation of all fine art catalogues, verifying attribution and prices of all works offered. Liaison with branch offices throughout Italy and with general office in London.

Colnaghi, Rome, Italy
**Research Assistant to the Director,** 1973-74.

## University Teaching Positions:

1990 – present: Adjunct Assistant Professor New York University Appraisal Studies Program, School of Professional and Continuing Studies. Courses include: Art Law; IRS Rules and Regulations and Uniform Standards of Professional Appraisal Practice.

1987: Instructor, Art Dept, Baruch College, New York. Course on Basic Appraisal Methodology.

1985: Instructor, Baruch College, New York, School of Continuing Education. Course on Basic Appraisal Methodology.

1985: Instructor, The New School, New York. Course on the Art Market and Appraising.

1970-1973: Instructor, Art History, Finch College International Study Program: Rome, Italy

Development of a curriculum utilizing the resources of Rome as a point of departure for the study of the connoisseurship of paintings and sculpture and the basic principles of architectural history.

## Governmental Research, Development, and Testimony:

2009: Member of working group of 5 experts retained to develop and recommend new standards for donation appraisal reports concerning audio, visual and related photographic material to be considered by the Canadian Cultural Properties Export Review Board for potential Canadian tax deductions.

1990: Established with the Resolution Trust Corporation a national database of appraisers to help in the liquidation of assets of failed Savings & Loan Institutions.

1986: Testimony submitted to the House Ways and Means Committee, Subcommittee on Oversight, concerning the IRS Art Advisory Panel. Testimony published by the Government Printing Office with the proceedings of the Hearing.

1985: Testimony before the IRS and Treasury on the new IRS regulations for donations of personal property to charitable institutions.

**Governmental Research, Development, and Testimony (cont'd) :**

1985.  Expert witness for the Treasury Dept. in the United States of America v. Jarelco, Inc..  As a result of this action, the Treasury Dept. was able to reclaim more than $50 million in lost revenue.

1984:  Participant at the meeting of IRS and Treasury officials and invited representatives of the appraisal profession to discuss the ramifications of the new legislation and rules regarding donations of personal property to charitable institutions.

1983:  Testimony on appraising before the House Government Activities Subcommittee, chaired by Rep. Cardiss Collins.  Testimony published in "Revision of IRS Tax Deductions for the Arts", the proceedings of the Hearing published by the Government Printing Office.  (The results of the Hearing and the

subsequent data collected by the House Government Activities Subcommittee were influential in leading to the current legislative revision and IRS rulings issued in 1984).

**Testimony as Expert Witness and Legal Consultation:**

2012-2014:  Ronald Appleby v. Her Majesty the Queen.  Retention by the Justice Department of Canada and Canadian Revenue.  Case concerning the donation of a monumental sculpture by Gerome to the Art Gallery of Hamilton Ontario.  Issues concerning re-fabrication of significant parts, use of undocumented ivory in the restoration and issues concerning the sculpture's Cuban provenance and its nationalization and subsequent sale by the Castro government.

2011-2013: Marguerite Hoffman v. L&M Arts, David Martinez and Studio Capital, Inc.  The case involving a commercial transaction and valuation issues concerning a major Mark Rothko painting.

2011-2014: Cin-Con Heating v. Shapiro and Weigner:  The case involving claimed damage to a fixture and interior attributed to Frank Lloyd Wright.

2011-2013:  The Dorothy G. Bender Foundation, Inc. and John McEnroe  v.  Joseph P. Carroll and Joseph P. Carroll Limited:  The case involving the valuation of an Arshile Gorky painting and two other works of art connected with the settlement of the Lawrence Salander assets.

2011-2012: American International Ins. Co., as subrogee of Theodore Forstmann, v. Acquavella Galleries, Inc. The case involving the damaged Picasso Portrait of Dora Maar.

2010-2012: Glacier Gallery and I.S.O. Art Ltd. v. Fedex Ground Package System, Inc, Art Capital Group and ACG Galleries.  The case involving a painting by Thomas Hart Benton damaged in shipping.

2010-2011: AXA Art Insurance Corp. as subrogee of Gagosian Gallery International, LLC v. Art Courier, et. al.  The case involving a highly important painting by Brice Marden, owned by Sotheby's which had been damaged when in custody of the Courier while it was being transported by the Gagosian Gallery.

2010-2011: AXA Art  Insurance Corporation as subrogee of Steven A. Cohen v. Arenson Office Furnishings Inc.  The case involving a damaged important sculpture by Jeff Koons owned by collector Steven Cohen.

2009-2012 (ongoing):  Atlantic Specialty Insurance Co. v. AE Outfitters.  The case involving fire damage to an important sculpture by Jeff Koons owned by collector, Peter Brant.

**Testimony as Expert Witness and Legal Consultation (cont'd):**

2010- 2011:  Friedman Benda Gallery v. Museum of Modern Art et al.  The case involving the claimed damage to pieces of furniture by 20th century artist, Ron Arad.

2009-2011: Richard Green (Fine Paintings) v. Doyle McClendon and Mary Alice McClendon.  The case involving the current valuation of one of the most expensive Bonnard painting ever to have been sold.

2009:  Cincinatti Art Gallery and Travelers v.  Covenant: The case involving a damaged painting by William Glackens.

2009: Expert Witness in Venetia Kapernekas v. Udo Fritz-Hermann Brandhorst.  The case involving the valuation of large scale sculpture by Damian Hirst.

2009:  Expert Witness in  775 Park Avenue Corp, a/k/a Anton deBekessy v. Marguerite deBekessy.  The case involving the role of provenance in the auction sales of fine and decorative art.

2008:  Expert Witness testimony in Christie's, Inc v. SWCA, Inc et al**.**  The case concerning authentication procedures for a Picasso bronze.

2006-2009:  Expert witness in P&E entertainment v. Chubb Insurance.  The case involving a loss claim for audio-visual and photographic sports entertainment material.

2007:  Expert witness in Trimount Foundation v. Dexter House Development, Boston.  The case involved the valuation and assessment of damages to a major Tiffany mosaic room decoration located in the Ayer Mansion, Boston.  The case was settled out of court, although a deposition was taken and a video-taped testimony to be played in court in the event of a trial was made.

2007:  Designated expert witness in Stephen and Elaine Wynn v Those Certain Underwriters at Lloyds, London et al.  Retained to determine the diminution in value to the painting *Le Reve* by Pablo Picasso due to a puncture of the canvas; and to determine the market value of the painting prior to the accident. [n.b. *Le Reve* was to be sold, prior to the damage, for $139 million which would have made it at the time the most expensive work of art ever to be sold.]

2006:  Expert witness in Those Certain Underwriters at Lloyds, London et al v Nancy Cooperman.  Civil case in which Nancy Cooperman was sued for $22 million by the above insurance companies.  The case was decided in her favor based, in part, on the valuation submitted by Wiener Wolf Associates, LLC and my testimony.  In addition, the Court accepted our stated valuation concept that a substantial appraisal discount was mandated by the events of September 11, 2001.  (This may be the only case in which this concept was presented to a jurisdictional authority).

2005:  Expert witness in United States v. Rocco de Simone: Criminal case involving representation of French impressionist and modern paintings, consignment agreements and related art world practices.  De Simone, who risked going to prison for approximately seven years, was exonerated based, in large part, on expert witness testimony.

2005:  Expert witness in Levin v. Harned:  Case involving art world practices and representation of 19th century Italian sculpture sold by Gallery 63, New York

2005:  Expert witness in Levin v. Harned:  Case involving art world practices and representation of French furniture and decorative arts sold by Ed Hardy, Inc. San Francisco.

2005:  Expert witness in Levin v. Harned:  Case involving art world practices and representation of French furniture and decorative arts sold by Foster Gwin, Inc. San Francisco.

**Testimony as Expert Witness and Legal Consultation (cont'd):**

2005:  Expert witness in Levin v. Harned:  Case involving art world practices and representation of French furniture and decorative arts sold by John J. Nelson Antiques, Inc,.Los Angeles.

2004:  Expert witness in Levin v. Harned:  Case involving art world practices and representation of French furniture sold by Dalva Brothers, Inc., New York.  Testified for Dalva Brothers who won on all counts.

2004:  Expert witness in Cathers v. Barnes.  Case involving allegation of non-payment of bill.  Testified for defendant on art market practices and representation of objects by dealers. Victor Wiener—

2003:  Legal consultation in "Phoenix Art Gallery  v.  Kimbell Museum."  Case involving non-fulfillment of purchase and the interrelationship of provenance concerns.

2003:  Expert witness in "Charles Malette v. Her Majesty The Queen," Vancouver, Canada.  Retained by the Department of Justice, Canada as an expert witness in appraisal methodology and blockage discount in a dispute concerning the donation of 981 works on paper by the Canadian artist, Harold Feist.  The government's position was upheld by the Court of Appeals with reliance upon my expert report as part of the justification for the decision.

2002—present:  Consultant and expert witness for the City of New York in the settlement of an insurance claim for artist Wen-Ying Tsai.   Valuation considerations include issue of blockage discount.

2001—2002:  Expert witness testimony in "Thomas Colville Fine Arts, LLC v. Kent Gilyard et al."  Testimony concerning art sales practices, issues of authenticity and auction house sales practices and guarantees.

2002:  Legal consultation in "Gay Culverhouse v. Centrifugal/ Mechanical Associates, Inc. et al." Case involving insurance damage and loss claim.

2002:  Expert witness testimony in "Estate of Louise Nevelson et al v. Carro, Spanbock et al."  Testimony concerning the valuation of over 3,000 works of art by Louise Nevelson and issues of blockage discount.

2002:  Legal consultation in "Nares et al v. M&W Waterproofing, Inc."  Case involving insurance damage and loss claim for art work created by artist, James Nares.

1999—2001:  Expert witness for testimony to the Philadelphia Arts Commission re:  *Dream Garden* Mosaic in the Curtis Office Building.  It was anticipated that litigation in this case would be heard in the U.S. Supreme Court since constitutional issues are involved.

1993:  Expert Witness in "The Matter of the Definition of Legal Fees Payable to the Estate of Andy Warhol."  Expert Witness on appraisal methodology and blockage discount.  At issue was the valuation of an estate claimed to be in excess of $900. million.  This was probably the most important art valuation case ever to be tried in the U.S.

1992:  Expert Witness in "Goldman v. Barnett"

1985:  Expert Witness for the Treasury Department in the United States of America v. Jarelco, Inc.  As a result of this action, the Treasury Department was able to reclaim more than $50 million in lost revenue.

**Lectures and Conference Participation**:

March, 2013:  Panelist, Art Governance and Financial Planning Conference, Stephenson Harwood, London.

May, 2012: Speaker and panelist at the Art Investment Conference of the London Business School of London University.  The panel concerning contemporary art as an asset class in a volatile marketplace.

April, 2012: "Art Appraisal and Litigation". Seminar organized by the Art History Faculty of Stanford, University, Palo Alto, CA.

April, 2012: "Valuing Art in the Time of Chaos". Speaker and panelist at the seminar hosted and organized by the New York Law School.

March, 2012 "What is art worth NOW?":  Panel discussion presented by the New York Armory Show.

March, 2012:  "Best Practices in Art Valuation", lecture presented for financial advisors as part of a seminar series hosted by Fine Art Wealth Management, London, England.

November, 2011:  "Art Valuation Concerns for High Net Worth Clients", lecture presented for financial advisors and clients as part of a seminar series hosted by BNY Mellon, London, England.

August 2011:  "Legal Liability Exposure When Conforming to USPAP" lecture presented for the American Society of Appraisers in Washington, DC at their annual national conference.

March, 2011:  "The Importance of a Properly Prepared Art Valuation", lecture presented for financial advisors as part of a seminar series hosted by Fine Art Wealth Management, London, England.

June, 2010:  "Valuation Parameters for Fine Art in a Volatile Marketplace" for the Monterey Historical Society, Monterey, California.

May, 2010: Speaker and panelist at the Art Investment Conference of the London Business School of London University.  The seminar concerning art as an asset class in a volatile marketplace.

April, 2010:  Series of lectures for the University of Southern California, Los Angeles, on the "Valuation of Mondrian's Furniture and its Relation to his Body of Work".

November, 2009:  "Appraising Works of Art in a Selective Marketplace", for Chubb Insurance underwriters and brokers as part of Chubb's continuing education program.

May, 2009: Speaker and panelist at the Art Investment Conference of the London Business School of London University.  The seminar concerning art as an asset class in general and the current market for contemporary art in particular.

February, 2009,  Moderator of Panel on works of art seized during the Holocaust,  panel organized by Withers Bergman, LLC.

November, 2008:  "The Appraisal of Photography, Photographic Archives and Audio Visual Material" and "Serving as an Expert Witness"  for the Picture Archive Council of America.

July, 2008:  "The Dynamics of Fair Market Value"  for *Jewelry Camp*, an international conference for appraisers of gems and jewelry and for gemologists held at Hofstra University, Garden City, New York.

**Lectures and Conference Participation   (cont'd)**:

May, 2008:  "The Current Market for Contemporary Art and Other Property of High Value", for Chubb Insurance underwriters and brokers as part of Chubb's continuing education program.

December, 2006:  "Appraising and the Cotemporary Art Market", for Sotheby's Masters Degree program in the Business of Art, given in Miami Beach, Florida in conjunction with Art Basel Miami.

April, 2006:  "The Legal Responsibilities of Appraisers for their Clients" for national conference of the International Society of Appraisers," Santa Fe, NM.

October, 2005:  "Appraising for Insurance Purposes", for Chubb Insurance underwriters and brokers as part of Chubb's continuing education program.

April, 2005:  "Recent Legal Developments and Expert Witness Testimony" for national conference of the International Society of Appraisers," Chicago, IL.

December, 2004:  "Appraising for Insurance Purposes", for Chubb Insurance underwriters.

March, 2004:  "Authenticity Considerations for Appraisers of Fine Art," for national conference of the International Society of Appraisers," Atlanta, GA.

March, 2004:  "The Balancing Act:  Professional Responsibilities and Legal Expectations," for national conference of the International Society of Appraisers," Atlanta, Georgia

March, 2004:  "Appraising and Underwriting Government Collections," for the Association of Government Risk Insurance Pools, Santa Barbara, CA.

October, 2003:  "Appraising for Insurance Purposes" Special seminar of the Inland Marine Underwriters Association, given in Chicago and New York.

April, 2003:  "The Dream Garden Mosaic, The Masterpiece of Louis Comfort Tiffany," for national conference of International Society of Appraisers, Philadelphia, PA.

April, 2003:  "From Bauhaus to Art Deco:  German Ceramics of the 1920s and 1930s," The Cleveland Museum of Art, Cleveland, OH.

November, 2002:  "Blockage Discount," lecture and Art Law section of New York City Bar Association.

January, 2002:  "Do it Now:  Workshop on Emergency Preparedness," National Association of Corporate Art Managers, Sotheby's New York, NY.

November, 2001:  "From Bauhaus to Art Deco:  German Ceramics of the 1920s and 1930s," Sotheby's Institute of Art, New York, NY.

June, 2001:  "Fine Arts Appraisals and Valuations," Inland Marine Underwriters Association National Conference, Keystone, CO.

April, 2001:  "Appraisal Standards for the Insurance Profession," Mariners Club, New York City.

October, 2001:  "Fine Arts Appraisals and Valuations,"Inland Marine Underwriters Association, Minneapolis, MN.

**Lectures and Conference Participation   (cont'd)**

May, 2000:  Chair and speaker of session on "Museum Loan Shows:  The Valuation Process," American Association of Museums Conference, Baltimore, MD.

June, 1997 and June, 1999:  Program Coordinator and Moderator for all day seminar on "How to Establish and Conduct an Appraisal Practice" offered by New York University Appraisal Studies Program and the Appraisers Association of America.

November, 1998:  Lecture on "Art Theft Forgery and Illicit Traffic:  The Appraiser's Perspectives" paper delivered at a symposium on Art Theft organized by Rutgers University, New Brunswick, NJ.  This paper will soon be published by Rutgers.

November, 1997:  Lecture on "Art Fraud and Forgeries" for International Art Theft Symposium organized by the FBI.

June, 1997:  Lecture on "Object ID and the Appraiser" at a symposium on "Protecting Cultural Objects in the Global Information Society;" an international symposium in Amsterdam organized by the Getty Information Institute.

June, 1995:  Program Coordinator and Moderator for all day seminar on "How to Choose an Appraiser" offered by New York University Appraisal Studies Program and the Appraisers Association of America.

June, 1993:  June, 1994, June 1996 and June 1998.  Program Coordinator and Moderator for all day seminar on "Professional and Legal Liability Concerns for Personal Property Appraisers" offered by New York University Appraisal Studies Program and the Appraisers Association of America.

October, 1990:  Lecture to patrons of the Metropolitan Museum of Art on "The Art of Appraising for Insurance, Estate and Donation."

March, 1990:  Moderator of panel discussion on appraising and insurance for Conference of National Association of Corporate Art Managers.

April, 1989:  Moderator and participant in panel discussion on appraising and the art market as part of the 1989 ARTnews World Art Market Conference.

May, 1985:  Discussant at all-day seminar on "The Economics of Art" organized jointly by the New York University Graduate School of Business and The Art Economist.

March, 1984:  One of four panel participants on "The Tax Exempt Gift", a seminar organized by the International Foundation for Art Research.

1983-1984:  Participant and organizer of public service seminars on appraising and the art market held in New York, Los Angeles, San Francisco and Chicago, sponsored jointly by the Appraisers Association of America and "Dewar's White Label."

November, 1983:  Lecture on principles of appraising before the American Society of Picture Professionals, New York (Photo researchers and editors).

October, 1983:  Crocker Museum of Art, Sacramento, California.  Lecture on appraising and the art market.

1983-2001:  Organizer and participant in sixteen National Conferences of the Appraisers Association of America.

**Exhibitions:**

"Now Playing; Italian Film Posters from the Lawrence Auriana Collection", New York University, Casa Italiana Zerilli Marimo, 2005.

Series of Exhibitions of Paintings, Drawings and Prints for La Cassa di Risparmio, Rome, 1978-1980.

Series of Exhibitions of Paintings, Drawings and Prints for Christie's Rome, 1974-1978.

"Eighteenth Century Italian Prints" for the Metropolitan Museum of Art, 1971.

**Publications:**

*Overview of the Current State of the Art Market* 2012, prepared by IMUA (Inland Marine Underwriters Association) Arts and Records Committee, co-author.

*Why Auction Estimates are not Insurance Appraisals*, (co-authored with Charles Wong), 2011, for Chubb Collectors (website and printed copy)

*Valuing Art Investment Funds: An Appraisers Viewpoint*, 2011, published by Fine Arts Wealth Management.

*The Role of Appraisers in the Process of Authentication and in Other Related Valuation Issues*, (co-authored with Charles Wong), 2011, included in Appraisal Studies Journal of the International Society of Appraisers.

*Overview of the Current State of the Art Market* 2010, prepared by IMUA (Inland Marine Underwriters Association) Arts and Records Committee, co-author.

*The Unique Aspects of Appraising Large Scale Works of Art, 2009*, included in Appraisal Studies Journal of the International Society of Appraisers

*Appraising Art in the Stratosphere: The Dynamics of Steve Wynn's Elbow and Other Valuation Situations:* 2008, included in Appraisal Studies Journal of the International Society of Appraisers.

*Visual Artists Rights Act [VARA]*, 2005, prepared by IMUA (Inland Marine Underwriters Association) Arts and Records Committee, co-author.

*Collections Management Systems for Collectors and Institutions,* 2004, prepared by IMUA (Inland Marine Underwriters Association) Arts and Records Committee, co-author.

*All About Appraising: The Definitive Appraisal Handbook,* 2003, published by Appraisal Institute of America, co-editor and principal contributor.

"The Pleasures and Perils of Buying in the Glamour Marketplace: Gianni Versace, Jacqueline Onassis, Pamela Harriman, Andy Warhol and Others," *The Appraiser*, First Issue, 2002.

"Art Theft Forgery and Illicit Traffic: The Appraiser's Perspectives" Rutgers University Press, New Brunswick, NJ – forthcoming.

"Appraisal Standards for the Insurance Profession," co-author, published by the Inland Marine Underwriters Association, June, 2001 and distributed to insurance professionals.

**Publications (Cont'd):**

"German Ceramics of the 1920s—1930s," *The Appraiser*, First Issue, 2000.

"All About Appraising, Elements of a Correctly Prepared Appraisal:  Clear Title," *Antiques and the Arts Weekly—The Newtown Bee*, January 31, 1997.

"All About Appraising, Elements of a Correctly Prepared Appraisal:  Market Analysis," *Antiques and the Arts Weekly—The Newtown Bee*, October 18, 1996.

"All About Appraising, Elements of a Correctly Prepared Appraisal:  Determining Authenticity," *Antiques and the Arts Weekly—The Newtown Bee*, September 20, 1996.

"All About Appraising, Elements of a Correctly Prepared Appraisal:  A Practical Example of Blockage Discount," *Antiques and the Arts Weekly—The Newtown Bee*, May 24, 1996.

"All About Appraising, Elements of a Correctly Prepared Appraisal:  The Chagall Sale," *Antiques and the Arts Weekly—The Newtown Bee,* May 24, 1996.

"All About Appraising, Elements of a Correctly Prepared Appraisal:  Liquidation Value," *Antiques and the Arts Weekly—The Newtown Bee*, March 15, 1996.

"All About Appraising, Elements of a Correctly Prepared Appraisal:  Marketable Cash Value," *Antiques and the Arts Weekly—The Newtown Bee*, December 22, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal:  Marketable Cash Value" *Antiques and the Arts Weekly—The Newtown Bee*, November 17, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal, Part VII:  Fair Market Value" *Antiques and the Arts Weekly—The Newtown Bee*, November 17, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal, Part VI:  Definition of Value", *Antiques and the Arts Weekly—The Newtown Bee*, September 8, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal, Part V:  Choosing the Most Appropriate Market for Valuation", *Antiques and the Arts Weekly—The Newtown Bee*, July 21, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal, Part IV:  The Comparative Market Data Approach to Valuation", *Antiques and the Arts Weekly—The Newtown Bee*, June 16, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal, Part III:  The Income Approach to Valuation", *Antiques and the Arts Weekly—The Newtown Bee*, April 28, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal, Part II:  The Cost Approach to Valuation", *Antiques and the Arts Weekly—The Newtown Bee*, April 7, 1995.

"All About Appraising, Elements of a Correctly Prepared Appraisal, Part I", *Antiques and the Arts Weekly—The Newtown Bee*, February 10, 1995.

"All About Appraising, How to Find an Appraiser", *Antiques and the Arts Weekly—The Newtown Bee*, January 13, 1995.

**Publications (Cont'd)**:

"All About Appraising, What is an Appraisal", *Antiques and the Arts Weekly—The Newtown Bee*, December 9, 1994.

"Volatile Art World Increases Pressure On Appraiser's Job", *New York Law Journal*, March 21, 1994.

"Be Accurate, Not Sorry Standards Set for Fraud Liability of Dealers, Appraisers", *New York Law Journal*, November 8, 1993.

"Napoleon Takes Memphis", *The Appraiser*, Summer, 1993.

"The 'Flea Market' Phenomenon—An Overview", *The Appraiser*, November-December, 1992.

"Sotheby's Sells the Friedman Collection", *The Appraiser*, November-December, 1992.

"Using An Appraiser: What Lawyers Need To Know" *New York Law Journal*, March, 1991, (subsequently reprinted in the national <u>Law</u> <u>Journal</u>.)

"Artful Marketing: Sporting Art," *Spur Magazine*, September/October, 1988.

"Investing in Equine Art," *Horse Digest,* January, 1986.

Bimonthly articles on the New York art scenes for *Fine Arts*, an Italian magazine, 1981-1983.

Series of auction catalogues for Christie's Rome, 1974-1978.

Editor, *The Appraiser*, a monthly publication of the Appraisers Association of America on developments within the profession, 1982-2004.

"Eighteenth century Italian Prints," *Metropolitan Museum of Art Bulletin*, January, 1971.


**Education:**

Completion of all course requirements for Ph.D., New York University, Institute of Fine Arts.

M.A. New York University, Institute of Fine Arts.

Certificate in Museum Training, New York University, Institute of Fine Arts, offered in conjunction with the Metropolitan Museum of Art, New York (including a 6 month internship at the Victoria and Albert Museum, London).

B.A. City College of New York.

**Fellowships:**

Chester Dale Fellowship, Metropolitan Museum of Art, for preparation of the Print Department exhibition, "Eighteenth Century Italian Prints," 1971. A one year grant.

Ford Foundation Fellowship in Museum Training. A two year grant which provided for course work at the Institute of Fine Arts and internships in the Print Department of the Metropolitan Museum of Art and in the Print Department of the Victoria and Albert Museum, London, as well as extensive European travel for two summers.

Fellowship, Institute of Fine Arts, New York University for Ph.D studies. A one year grant.

Graduate Faculty Fellowship, New York University. A one semester grant.

New York State Regents Scholarship. A four year grant

**Professional Recognition:**

2005: Member Vetting Committee for the San Francisco Antiques Fair.

2003: Certified Instructor of *Uniform Standards of Professional Appraisal Practice*, designation given by the Appraisal Foundation, Washington, D.C. (recertified 2005, 2010, 2012).

1988: Certified Association Executive. Designation awarded by the American Society of Association Executives after an all day examination and evaluation of professional achievements.

1979: Accepted for membership, Appraisers Association of America. While Executive Director, served on the by-laws committee, responsible for current revisions; and wrote the methodological section and Old Masters Paintings section of the certification examination as well as taught the course on "How to Prepare for the Certification Examination."

1978: Designated Art Expert for the Italian Courts in Rome and elsewhere in Italy. ("Perito del Tribunale in Arte" by the Tribunale di Roma).

Quoted frequently in *The New York Times*, *International Herald Tribune*, *The Wall Street Journal*, *Art & Auction*, *The Economist*, *The Financial Times* et al. Press clippings available upon request.

Interviewed on CNN, The Today Show, ABC News with Peter Jennings, NPR, ABC News, New York et al.

**Attachment B**

**Zhang Report**

**REVIEW OF EXPERT WITNESS REPORT OF MICHAEL PLUMMER, ARVEST PARTNERS, dated July 8, 2014**

SUBMITTED TO VICTOR WIENER, VICTOR WIENER ASSOCIATES, LLC on July 25, 2014

PREPARED BY ZHANG YI

1. This report outlines the ways in which the Expert Witness Report of Michael Plummer of Artvest Partners, dated July 8, 2014 (**ARTVEST REPORT**) misinterprets Clare McAndrew's TEFAF Art Market Report 2014, to which I contributed as a co-author.

2. The Artvest Report identifies four major sectors of the fine art market: European Modern Art, Impressionist and Post-Impressionist Art, European Old Master Paintings, and Post-War and Contemporary Art. The Artvest Report compares the successes of these categories:

> Of these four sectors, three have declined in value since 2011"; "While record prices have been set and growth has been significant in the Post War and Contemporary ("PWC") sector, other sectors of the art market have been stagnant, and, as mentioned above, some have posted declines in turnover in the last two years." (Michael Plummer's Artvest report, pp. 7-8)

3. The art market is a supply-driven market. The reason for which Impressionist & Modern paintings failed to meet expectations is the lack of high-quality works on the market.

4. The charts on pp. 7-8 of the Artvest Report show that a sector's turnover depends on the volume of work in the sector. More works in a sale will likely bring more turnover. The lack of works to sell explains the decline of Old Master works, Impressionist & Post-Impressionist works, and works of Modern Art.

5. In the TEFAF Art Market Report 2014, McAndrew explains differences in the performance of Impressionist and Post-Impressionist sector relative to other sectors:

> The Impressionist and Post-Impressionist sector is now much smaller relative to Post War and Contemporary and Modern art, and its share of the fine art market was less than half that of Modern art in 2013 at 13%. Works by 15,300 artists were sold at auction in this sector, less than half that of the Post War and Contemporary sector and 10% less than the Modern sector. This can be explained to an extent by the increasing scarcity of Impressionist and Post Impressionist works: **for example, in 2013 just eight paintings by Paul Cezanne were sold at auction and only 25 by Claude Monet whereas hundreds of paintings by**

1

**artists such as Andy Warhol or Pablo Picasso were sold during the year.**
(Clare McAndrew, *TEFAF Art Market Report 2014*, p. 51)

6. In the TEFAF Art Market Report 2014, McAndrew explains differences in the performance of the Old Master sector relative to other sectors:

> Old Masters is the smallest sector of fine art, with just 10% of the total value of sales. In 2013, like the Impressionist sector, it suffered from a scarcity of major works with the highest quality works appearing on the market less frequently. (Clare McAndrew, TEFAF Art Market Report 2014, p. 53)

7. The Artvest Report is incorrect about Christie's auction data for the Evening Sales of Impressionist & Modern art. The turnover of that section on May 6th was $285.9 million, and the estimate was between $244.5 million to $360.4 million.

8. Among four evening sales of Impressionist & Modern in 2014 (Chart 1), three of them were above their low estimate. Only one sold below its estimate, owing to the low quality of works offered. Art journalist Carol Vogel noted: "Top-flight Impressionist and Modern works are far harder to come by than choice contemporary works. And as was true at the sales last month in New York, both Christie's and its arch rival, Sotheby's, had to struggle to find material." Furthering the point, Vogel quoted prominent New York art dealer Dominique Lévy on the quality of the works in the sale: "'It was day-sale material,' referring to the less-expensive daytime auctions." (Carol Vogel, "At Christie's London Auction, Little Action", New York Times, June 24th)

CHART 1 Four Evening Sales of Impressionist & Modern in 2014



Source: VWA based on Christie's & Sotheby's Auction Data

9. On June 24th, 2014, Sotheby's Sale of Old Master & 19th Century Paintings & Drawings made $11.1 million, the highest total for a sale in this category in France in the last 20 years. In their press release for this sale, Sotheby's said that the sale contained "a refined choice of rare artists and powerful, high-quality images," demonstrating that great works in this sector command strong prices. The performance of this sector depends not only on the quality of works, but also on verifiable authenticity and provenance, among other factors.

10. On July 9th, 2014, Sotheby held an Old Master & British Paintings Evening Sale In London. The sale made $117.13 million, above its high estimate of $116.79, the highest total the company has earned for the category in London, while a day before Christie's faced what art dealer Richard Feigen called "bloodbath" in the same category. The reasons for this contrast are evident in Scott Reyburn's explanations in a *New York Times* article.

    A. Brand-name artists are an issue:

        "There is an issue of branding here," said Andreas Pampoulides, head of fine arts and business development at the Mayfair branch of the Spanish dealers Coll & Cortés. "There aren't so many brand artists in Old Masters, but when they do appear, they can sell for stratospheric prices." （Scott Reyburn, "For Old Masters, It's All About the Name," New York Times, July 11th, 2014）

    B. Issues of quality and provenance are important:

        Sotheby's had the edge on this occasion thanks to quality paintings from four prestigious private collections, including the English aristocratic families of the Earl of Warwick and the Duke of Northumberland. (Scott Reyburn, "For Old Masters, It's All About the Name," New York Times, July 11th, 2014)

    C. The subject and quality relative to expectations for a certain artist are relevant:

        […] Christie's included a painting [*Saint Praxedis*] catalogued as the work of Johannes Vermeer, 17th-century Holland's most coveted painter, despite debate over its authorship. […] At the sale, the painting attracted little competition and was bought for $10.6 million; including fees by an unidentified Asian bidder in the room, and the painting's low estimate is $10.26 million "Collectors remained skeptical," the London dealer Charles Beddington said. "It wasn't a subject you want from Vermeer." (Scott Reyburn, "For Old Masters, It's All About the Name," New York Times, July 11th, 2014)

3

11. The Artvest Report states: "Both the Impressionist & Modern Paintings and PWC sale had significant and desirable works of art with many that had not been on the market for decades, yet the Impressionist & Modern paintings sale still performed below expectations and estimates" (Artvest Report p. 8, #24 a.)

12. There is no evidence showing that significant and desirable works from the Impressionist & Modern sector performed below expectations or estimates. On the contrary, when a significant and desirable work appears, it is much more likely to perform above expectations, and at least above its low estimate.

13. In June 2014, at Sotheby's Impressionist & Modern Evening Sale in London, Monet's painting *Nympheas* made $54 million, well above its high estimate of $50.4 million. This painting failed to sell in 2010 because of a very high estimate of $44.3 million to $59.1 million. According to our experience, if a work has been bought in, it is unlikely to appear on auction for the next five years. This painting appeared on auction again after four years and achieved a price above its high estimate, even exceeding the low estimate four years earlier and showing clearly that if a work is highly desirable and significant, collectors will pay for it. This also shows that high-quality work is scarce in this sector.

14. The Artvest Report identifies the emergence of new art markets as an exceptional occurrence:

> The significant growth in the size of the art market from 2002 – 2011 is a once in a lifetime event (due to the sudden addition to the global art economy of Russia, China, India and other countries that previously had not been active art collectors). This burst of growth is not likely to be repeated over the next five years. In fact, with growth now concentrated almost exclusively in the PWC sector, I estimate that excluding a price disruption in this sector (see below), growth of the art market will remain choppy over the near to mid-term in all other sectors other than PWC." (Michael Plummer's Artvest Report p. 10, # 25, b)

15. We cannot conclude that the growth of the art market from 2002 to 2011 is a once in a lifetime event. Another art market boom driven by the Japanese economic boom took place less than 30 years ago, from 1985 to 1990, during which period the size of art market tripled.

16. The size of art market depends highly on wealthy people. From 2001 to 2013, there was a continuous growth of the number of high-net-worth individuals (HNWI) and world wealth. There is considerable reason to expect global wealth to grow at an accelerated pace in the coming years.

17. McAndrew discusses emerging markets in the TEFAF Art Market Report 2014:

Each year, emerging markets are increasing their importance in the global wealth hierarchy and have been growing at faster rates than more developed markets, a trend that is expected to continue. Between 2000 and 2013, emerging markets nearly doubled their share of global wealth from 12% to 21%." (Clare McAndrew, TEFAF Art Market Report 2014, p. 81)

18. In an economy that is facing easy monetary policy, people intend to allocate a great share of their wealth into tangible assets, such as real estate, art etc., to caution against uncertainty or further inflation. Indeed, the size of the art market has benefited heavily from the economic boom of Russia, India, and especially China. However, considering that the Chinese art market is largely a domestic market with very little Western artwork traded in Mainland China, its art taste should be further separated from that of the Western world. Before 2013, Chinese collectors were not very interested in Western artworks. Also, Asian artworks comprise only 3% of DIA's collection. Taking that into account, we should remove the turnover of the Chinese art market from the global art market (CHART 2). Doing this, we can see that the size of the global art market was far from its second highest peak in 2008, even further from 2007, its highest peak. From this, we can see great potential strength in the future. Since 2013, Chinese collectors have shown great interest in Western artworks. Experts estimate that there are currently only about thirty major collectors of Western art in Mainland China. Serious Chinese collectors of Western art spend considerable amounts of money. For example, Chinese collector Zhang Lan spent $29.145 million on Andy Warhol's Little Electric Chair and Martin Kippenberger's Untitled on May 12th, 2014 at Christie's auction "If I Live I'll See You Tuesday: Contemporary Art Auction."

19. McAndrew also notes the recent increase in Chinese collecting interest in Western art:

Sotheby's reported that since 2010, the number of Chinese clients bidding for non-Chinese works of art has increased 54%, with about 530 collectors from Mainland China spending $378 million on Western works during the year. At Christie's, registrations to bid at auction in London and Hong Kong from Mainland Chinese buyers have doubled.72 In November 2013, Wanda Group, one of China's biggest property developers, attracted much public attention when it bought a Picasso work, Claude et Paloma, for $28 million at Christie's in new York. Various media sources also reported that a Chinese collector bid for the record-breaking Francis Bacon triptych up to $120 million." (Clare McAndrew, TEFAF Art Market Report 2014, p. 201)

Chinese collectors have entered the Western market slowly and with caution to date. However of the galleries interviewed, 80% felt that Chinese collectors were becoming more interested in foreign art." (Clare McAndrew, TEFAF Art Market

Report 2014, p. 201)

20. The recent increase in Chinese collecting interest in Western art has also been reported in the mainstream press. Chris Michaud has written about it for Reuters:

> Asian buyers nabbed at least two of the sale's top 10 lots, including "Nymphéas," in a category that was once the near-exclusive purview of U.S. and European collectors. (Chris Michaud, "Christie's NY has its best Impressionist, modern sale since 2010 Reuters, May 6th)

> Lampley said growing interest from Asians reflected "a growth in the Asian (art) market generally," as well as the auction house's relatively new presence in Mainland China. (Chris Michaud, "Christie's NY has its best Impressionist, modern sale since 2010," Reuters, May 6th)

21. There is no evidence to validate the Artvest Report's suggestion that the "growth of the art market will remain choppy over the near to mid-term in all other sectors other than PWC." Nor is there any sign of validity to the Artvest Report's point: "As a consequence of this heightened focus of collectors on the PWC sector, I believe the sector could soon be reaching a "breaking point," (Artvest Report, p. 11, 26.)

22. From CHART 3, we can see that the average price of PWC has not had a dramatic boom from 2011 to 2013. The increase of its average price was mild. Also, the average price of the PWC sector was lower than that of the Modern Art sector and the Old Master sector. Except for Impressionism & Post-Impressionism, all other sectors have had mild increases.

23. Financially, a market can be called "over-heated" or "in a bubble" simply because the growth in high-quality assets of the market can dramatically affect the low-quality assets and, in this case, push up the price. In the PWC scenario, these trends were not evident. Even blue-chip artists breaking their records repeatedly did not affect second- or third-tier artists notably.



Source: VWA with data from Arts Economics



Source: VWA with data from Arts Economics

24. The Artvest Report discuss the impact of the financial crisis of 2008-09 on the art market:

> When a market sector or the entire market "crashes," as it did in the Autumn Season in 2008, it creates an illiquid marketplace where values often fall by as much as 50%, and property, especially that of the highest caliber, becomes either difficult to sell, and/or sells for a fraction of its previous value. From the previous market peak in 2007, to its nadir in 2009, the fall in sales was 54.6%." (Michael Plummer's Artvest Report p. 10)

25. When facing systematic economic risk, the art market will definitely be affected. However there is no evidence showing that the value will fall sharply. The turnover of the entire art market was falling deeply simply because collectors did not want to sell their collections in a decreasing market, and there were less volumes for trade.

Total Global Art Sales and Volumes 2003 to 2013

CHART 4



Source: VWA with data from Art Economics

26. CHART 12 in the Artvest Report shows that the buy-in rate nearly doubled in Nov. 2008. However, the high buy-in rate owed in large part to the collapse of the Emerging Asian Market and some "superstar" living artists.

27. Artprice Art Market Trends 2008 identifies buy-in rates for that year:

In 2008, the bought-in rate for works estimated above $100,000 was 37.75% compared with 40.87% for those valued at between $10,000 and $100,000. At the Christie's and Sotheby's October / November sales of Modern and Contemporary Asian art in Hong-Kong 35% of the works remained unsold. On 30 November, Christie's Asian art sale, there are 44% of the works had to be bought in. (Artprice Art Market Trends 2008)

28. Artprice Art Market Trends 2009 shows the effects in the following year:

Gupta, a figure-head of the Indian avant-garde, posted an annual total down 95% (from $15.1m to $627,000). Takashi Murakami, guru of the new Japanese art scene, saw his auction revenue divided by ten ($3m in 2009 vs. $32m in 2008). Damien Hirst's revenue total was only 1/14th of its 2008 total. The big winner of the last manifestation of the acquisitive fever that consumed the market during its

8

speculative ascent - with no less than 65 results above the $1m line in 2008 - signed only 2 seven-figure results in 2009. The year was also quiet for Jeff Koons, an- other major star of the Contemporary scene, whose revenue total dropped from $89m to $28m and whose prices contracted by 39% (2007-2009). (Artprice Art Market Trends 2009)

29. Artprice Art Market Trends 2009 discusses the Chinese art market that same year:

Likewise, the revenue totals of Chinese contemporary artists who shot to the top of the market in record times, were also substantially impacted by the crisis: Wang Guangyi's total shrank by 75% and Zhou Chunya's by 57%. Liu Ye's total contracted by 65%, Yan Pei-Ming's by 80%, Yue Minjun's by 84%, Zhang Xiaogang's by 86% and Liu Xiaodong's by 88%. (Artprice Art Market Trends 2009)

30. In 2009, we can see that the buy-in rate went back to normal, mostly because the auction houses were very cautious in selecting lots, and collectors did not want to sell their works during a recession.

31. Even in a recession, we can see that there were high-quality works from the Old Master sector, Impressionism & Post-Impressionism, and even the Modern sector and Post-War sector to sell. This trend is detailed in Artprice Art Market Trends 2009:

In the first quarter of 2009 there were 80 results above the $1m line (half the number posted in the 1st quarter of 2008) of which 30 came from the Pierre Bergé/ Yves Saint Laurent sale, suggesting an exceptionally dynamic market for museum quality works. This happened just as Wall Street was posting its lowest level for 12 years (S&P 500 at 743.33 points). (Artprice Art Market Trends 2009)

The first big event in 2009 was Sotheby's Old Masters sale in New York. The catalogue was still large (289 lots) but demand had become very selective. The result was an unsold rate of 45%. The millionaire collectors were however still in the game and they bid a particularly rare work to above $10m: the best result of the 29 January sale was $11.5m for Joseph Mallord William Turner's The Temple of Jupiter Panellenius restored ($500,000 short of its low estimate). (Artprice Art Market Trends 2009)

32. The 41% buy-in rate in November 2008 was the consequence of the financial crisis, which was possibly a once-in-a-lifetime event. The last financial crisis of such a magnitude was in 1929, and it is unlikely to happen in the next five years.

33. The Artvest Report identifies the role of Sotheby's and Christie's in the market:

At the higher end of the market, Sotheby's and Christie's are the preferred venue

for selling to achieve maximum sales value, as they have the greatest global reach amongst collectors and control over a third of the international auction market." (Michael Plummer's Artvest report, p. 14)

34. While it is true that Sotheby's and Christie's dominate the high end of the art market, the art market is a very diverse market, with numerous venues unique advantages. For example, Phillip's is strong for emerging artists, and Poly Auction and Guardian Auction are strong for traditional Chinese paintings.

35. Artprice Art Market Trends 2010 shows Phillip's strengths relative to any auction house:

> The auctioneer (Phillips) also posted seven new records on the same day - all above the million-dollar line – for Felix Gonzalez-Torres, Cindy Sherman, Daniel Buren, Lee Lozano, Robert Morris, Rudolf Stingel and Thomas Schütte. (Artprice Art Market Trends 2010)

36. Considering the market capacity, it is wise to use multiple auction channels to deal with different sectors of works.

37. The Artvest Report attempts to demonstrate collecting disinterest in certain collecting categories:

> A significant segment of DIA's collection is in areas that have fallen out of favor with collectors and that are underperforming their market peak in 2007, specifically American Art pre-1950 (14.6%), Old Master and 19th Century European Paintings (28.1%), Impressionist & Modern Art (23.8%), for a total of 66.5% of the collection." (Refer to Section IV.) (Artvest Report, p. 24)

38. There is no evidence showing that the sectors identified by the Artvest Report "have fallen out of favor with collectors."

39. The Artvest Report quotes a line chart by Mei Moses Art Index in an effort to proved his conclusion. However this data does not prove the conclusion, because it is based on a very limited data sample. The Mei Moses Art Index is based on data from works that have repeat sales records in Christie's and Sotheby's, and so, there are only a few thousand samples that qualify for its indices. Every year tens of thousands of works are sold through auctions and private dealers, so this is a very narrow sample for the art market, and it cannot represent greater art market trends. For example, from 1990 to 1991, the art market retracted significantly, but the Mei Moses Art Index still shows a mild increase for that period. Also, the methodology of the Mei Moses Art Index does not accurately reflect the importance of individual artists or the quality of individual artworks, which are critical matters for sales. Also, the line chart does not show negative returns on each sector; we can only see positive returns on all sectors.

40. The Artvest Report discusses the effects of offering a large volume of work:

> Selling a large block of property into a market that exceeds its liquidity or capacity is a high risk strategy. Even the most liquid of the sectors, PWC and Impressionist & Modern, have capacity limitations." (Artvest Report, p. 30)

41. While capacity limitations may apply, such limitations are based on the amount of wealth held by HNWI and the number of collectors in those areas. Using sales values based on Christie's and Sotheby's to calculate that limitation is speculative and narrow.

Submitted By:    Zhang Yi

**<u>Attachment C</u>**

**Barth Report**

**REVIEW OF EXPERT WITNESS REORT OF MICHAEL PLUMMER, ARTVEST PARTNERS LLC, dated July 8, 2014**

SUBMITTED TO VICTOR WIENER, VICTOR WIENER ASSOCIATES, LLC on July 24, 2014

PREPARED BY JANNETTE M. BARTH, PH.D., PEPACTON INSTITUTE LLC

BACKGROUND:

Pepacton Institute LLC (the "Company") was retained by Weil, Gotshal & Manges LLP ("Counsel") in connection with Counsel's representation of Financial Guaranty Insurance Company ("the Client") to assist Victor Wiener Associates, LLC (VWA) in the preparation of an appraisal report of works of art in the collection of the Detroit Institute of Arts (DIA). I am an Economist and Managing Director at the Company. I have extensive experience concerning economic issues related to art valuation. In addition to having multiple degrees (B.A., M.A. and Ph.D.) in economics, I have a Certificate in Personal Property Appraising from New York University and a Certificate in Fine and Decorative Art from Sotheby's Institute of Art. I have consulted on many art appraisals and have served as an expert witness on numerous art valuation cases. I have taught both undergraduate and graduate courses in economics at several colleges and universities, and was a senior faculty member, teaching art economics and finance, in the graduate art business program at Sotheby's Institute of Art. I have authored articles on blockage discount and regularly lecture on the topic. In addition to specific work in the art market, I have over 35 years of experience conducting economic analysis in various sectors. A full CV is attached. The Company is being compensated at the rate of $300 per hour for my time.

In connection with the Company's engagement, I prepared this written review of a valuation conducted by Artvest Partners LLC.

Neither I nor the Company has a financial interest in the DIA works of art; neither is affiliated with an auction house, art dealer, or art investment fund; and neither is an adviser regarding investments of any kind.

In connection with this review, I was provided with copies of the following documents:

   (1) Artvest Partners LLC, Expert Witness Report of Michael Plummer, July 8, 2014, with Exhibits A through G.

(2) Houlihan Lokey, Catalog of Information Concerning Artwork Housed at
    Detroit Institute of Arts, with Christie's Appraisal attached as an Appendix.

In addition, the following document was reviewed:

    TEFAF 2014 Art Market Report

This review report does not value any of the works in the DIA collection. The
appraisal firm, VWA, is solely responsible for final valuation figures. This report
provides only a review of Artvest's methodology applied in the valuation of works in
the DIA collection, with particular attention paid to the economic assumptions
Artvest uses in arriving at its conclusions. This report is intended to assist VWA in
its own valuation of the works.

SUMMARY OF FINDINGS:

- While it is recognized that this valuation assignment is challenging due to its
  size, complexity and short deadline, there are a number of elements in the
  Artvest report that indicate that the valuation presented by Artvest is
  inaccurate.
- Artvest discusses a number of economic factors in the report, and the
  presumed relevance of these economic factors is unsubstantiated.
- Artvest has used questionable valuation methodology and unsupported
  assumptions in its valuation.
- It appears that the valuation conclusions stated by Artvest are unrealistically
  low.
- While the Artvest report frequently references the TEFAF 2014 Art Market
  Report, it omits relevant findings in the TEFAF report and misinterprets
  other findings.
- Artvest accepts and relies on Christie's valuations for a small portion of the
  entire collection, but there are concerns regarding Christie's valuations.
- The Artvest report does not provide sufficient information or justification for
  its valuation methodology or many of its assumptions.
- Artvest appears to be unclear about the concept and application of blockage
  discount.
- Artvest applies discounts to the final valuation, without offering sufficient
  supporting evidence that such discounts should be applied.

This review of the Artvest valuation report is organized into the following five
sections:

Use of the TEFAF report
Reliance on Christie's Valuation
Valuation Methodology

Analysis and Application of Discounts
Impacts of Artvest's Assumptions on Valuation

USE OF THE TEFAF REPORT:

While the Artvest report frequently references the TEFAF report, it disregards several key findings.  In fact, in some instances, the conclusions drawn by Artvest appear to be counter to those of the TEFAF report.

(a) Performance of the Art Market by Sector as Interpreted by Artvest

Artvest's paragraph no. 23, Page 7, states,

> *Four sectors of the art market constitute 98% of the value of the fine art market: European Modern Art, Impressionist and Post-Impressionist Art, European Old Masters Paintings, and Post-War and Contemporary Art.  Of these four sectors, three have declined in value since 2011.*

This statement is somewhat misleading.  It is clear from the charts in TEFAF and reproduced in the Artvest report, that value and volume both peaked in 2011.  The fact is that 2011 appears to be an outlier.  Artvest does not point out that the charts show that for all three sectors referenced, European Modern Art, Impressionist and Post-Impressionist Art, and European Old Masters, the 2012 and 2013 estimates of volume and sales exceed pre-recession levels.

While it is widely recognized that the Post-War and Contemporary Art Sector has been the most celebrated in the marketplace of late, this does not mean that the others have been in decline.

In paragraph no. 24, Artvest cites two recent evening auctions to support its conclusion regarding the Post-War and Contemporary Sector relative to other sectors. It is highly suspect to rely on only one or two observations when estimating or forecasting.

In paragraph no. 37, Artvest applies the discussion of the market performance of the major sectors to the DIA collection.  Artvest states,

> *"A significant segment of DIA's collection is in areas that have 'fallen out of favor' with collectors and that are underperforming their market peak in 2007, specifically American Art pre-1950 (14.6%), Old Master and 19th Century European Paintings (28.1%), Impressionist & Modern Art (23.8%), for a total of 66.5% of the collection."*

And yet, the TEFAF report states on Page 37 that the Modern Art sector "has more than doubled in value since the low point in 2009, and has grown by over four times in ten years."

Regarding Impressionist and Post-Impressionist, the TEFAF report states on Page 38,

> *This sector peaked in 2011 when total sales reached € 1.7 billion, an increase of over 140% form their low point in 2009. However, both values and volumes dropped in 2012 (by 26% and 14%, respectively), before returning to growth in 2013. Sales grew 9% in value year-on-year reaching € 1.4 euro billion, below the peak of 2011, but above any level previously recorded since 2000.*

And regarding Old Masters, the TEFAF report states,

> *Old Masters is the smallest sector of fine art, with just 10% of the total value of sales. In 2013, like the Impressionist sector, it suffered from a scarcity of major works with the highest quality works appearing less frequently on the market.*

If some major works of the highest quality, with impeccable provenance from a highly regarded collection such as DIA, appeared on the market, it is quite likely that there would be great interest. It is suspect to claim that these major sectors have "fallen out of favor."

Regarding the large, very popular and sales record holding Post-War and Contemporary Art Sector, Artvest suggests that this Sector has reached a peak. With the general economy improving, the continually increasing wealth at the high end of the income distribution worldwide, and continuing increased interest in art as investment by financial experts such as hedge fund managers, it is far from clear that the Post-War and Contemporary Sector has reached its peak.

(b) Key findings of TEFAF Report More Optimistic than Artvest

Several important findings listed in the TEFAF report, even included in its list of Key Findings featured at the beginning of the TEFAF report, are not mentioned in the Artvest report. These TEFAF findings give a much more favorable impression of the condition of the general art market than is implied in the Artvest report.

The first three key findings listed in the TEFAF "Key Findings" are the following:

Key Finding 1: "The international art market reached € 47.4 billion in total sales of art and antiques in 2013, close to its highest ever recorded total, and advancing 8% year-on-year."

Key Finding 2: "The volume of transactions in the global market also increased in 2013, but by less than the growth of value, indicating that a significant part of the uplift of the market was due to higher priced works, rather than simply more works sold."

Key Finding 3: Sales in the US in 2013 increased by 25% in value year-on-year, confirming its position as the key center worldwide for sales of the highest priced art.

(c) Relevance of TEFAF findings to DIA Valuation

Artvest's references to the TEFAF report are included in this review only because the Artvest report appears to rely heavily on the TEFAF report.

The reality is that basing an appraisal on general art market trends can result in inaccurate valuations.

The DIA collection is noted to be exceptional. It is highly unusual for such a collection to be offered on the market, and the general art market trends that are analyzed in the TEFAF report and are reflected in various price indices, such as Mei-Moses (also referenced by Artvest), are not at all applicable to valuing such a unique and highly regarded collection.

As Artvest focused on such general analyses, a few words on their accuracy and usefulness should be mentioned.

Many sales are not reflected in such indices or reports. Even the TEFAF report states on Page 24,

> The transparency of prices and the public nature of sales data in the auction sector have made it the basis for much of the analysis and research into the art market. However even auction houses now increasingly involve themselves in private sales and online selling, both of which are often not in the public domain.

It goes on to state that "in 2013 private sales at Christie's increased 18% year-on-year to $1.2 billion or 17% of their total sales in 2013. Sotheby's private sales grew 30% to $1.2 billion, also representing 17% of total sales."

Articles in the press that compare art price indices to other more traditional investments can be interesting, however, art price indices are generally not helpful in appraising art. They are calculated on the basis of repeat sales at auction. Of course, other price indices, such as the Consumer Price Index or the S&P 500, etc., are also based on volume and price over time, but each share of common stock in a given corporation, say for example Microsoft, has identical value. Each work of art, even by the same artist, is likely to have a unique value. In the case of artworks, the

value depends on many factors, including provenance, style, rarity, condition, medium, size, frame, etc., and these are not reflected in the art price indices.

In addition, it is likely that any index of art prices based on repeat sales has an upward bias because many works that are sold at auction will return to the marketplace only if the value has increased.  It is likely that, if at all possible, an owner of a highly valued work of art will attempt to wait out a down market. An art price index, thus, may not reflect the works that drop in value or even become unsalable.

RELIANCE ON CHRISTIE'S VALUATION

While the methodological approach to valuing the large quantity of works is not explained clearly in the Artvest report (more on this below), it is clear that much of the valuation is based on Christie's appraisal.  Christie's had been retained to value 2,773 works in the collection, which Christie's was told represented the works purchased by the City of Detroit (COD).   Artvest has accepted Christie's valuation for these works.  In addition, Artvest applied average values by sector from the Christie's valuation to assign values to a large quantity of remaining works (57,181 works).

Christie's valuation of the 2,773 COD works was given as a range, from $454 million to $867 million.

It is a concern, but not surprising, that Christie's valuation of fair market value reads more like an auction catalog than a qualified appraisal.  Normally, a qualified appraisal discusses and compares comparables, especially for the high value works. I did not see a discussion of comparables associated with the Christie's appraisal.  In addition, the wide range of values given is highly unusual in a qualified appraisal.

It is not unusual to have a wide range of estimates for certain individual works in an auction catalog, but in the end there is one hammer price.

The value range presented by Christie's where the upper end of the range is almost double the lower end, is highly imprecise. And the fact that Artvest relies on this wide range of values to apply averages to the bulk of the works, causes the total valuation of the works by Artvest to be highly suspect.

VALUATION METHODOLOGY

It is impossible to review in detail the valuation methodology used by Artvest because there is insufficient support given for the value determinations.

Tables 1 and 2 of the Artvest report appear to be intended to summarize the methodology used by Artvest in valuing the works.  However, there are few details provided.

As discussed above, Artvest relied on the Christie's valuation for the works purchased by COD. The Christie's valuation is straightforward, rather like an auction catalog with high and low estimates. (Again, there is no discussion of comparables by Christies.)

The following is my understanding of Artvest's approach to the valuation.

Artvest grouped COD works valued by Christie's into two groups:
**Group 1.** High value COD works that were appraised by Christie's for greater than $750,000 (68 items); and **Group 2.** COD works appraised by Christie's of lower value, that under $750,000, including property for which they assigned limited or no value (1,654 with value, 1,038 with limited to no value, and 13 that were combined in Phase III.)

Artvest then created three additional groups as follows: **Group 3.** High value Non-COD works in the DIA works (of works insured for greater than $1 million) totaling 350 works; **Group 4.** Another 73 works based on a personal tour of the museum; and **Group 5.** Balance of the Collection.

The 350 works in Group 3 are listed, in spreadsheet form, attached as Exhibit G to the Artvest report. It appears that each value is based on a range of estimates from an auction catalog and not the hammer price, as is normally the case. In addition, while there is a column titled "summary of valuation support," in many cases what appears in this column is, "Summary not provided." Based on Exhibit G, approximately 50% of the works in this section were valued on the basis of comparables. Comparables are omitted for the other 50% of the works.

There are no comparables at all for the items in Group 4. The author states, "Based on a tour of objects on view in Museum in June 2014, another 73 works I determined to be High Value, which are likely to have values in the range of $750,000 or higher." The author simply states, "As these were discoveries late in the process, I have put an approximate valuation on these items and will provide a fuller evaluation and documentation in a supplement to this report." [Note that I have not received a supplement, so this portion of the valuation cannot be reviewed, other than to say that the value assigned here is arbitrary.]

Values for the works in Group 5, the balance of the works, or 57,181 works, were based on Christie's valuation. The valuation of Group 5 is impossible to review due to the fact that insufficient details are provided. It is stated that "the balance of the DIA's collection was evaluated by sector using the sample valuation data of the COD works appraised by Christie's with a low value of at or below $750,000, and applying an average price, sector by sector, based on that data."

The details, however, are not provided, so the reader does not know what are the average prices, sector by sector, that were applied. The reader further does not know the number of items in each sector. If a series of calculations was performed, a summary of such calculations should be provided, perhaps in the form of a spreadsheet, so the reader can fully understand and assess the methodology. It is worrisome that almost $1 billion of value, representing 57,181 works, is based on non-transparent methodology.

On Page 19, the Artvest report states that for works with a value below $5,000, a value of zero is attributed. This seems shortsighted in light of the large number of works in the collection (60,000). Obviously, if there are even 1000 works with a value of $5,000, the cumulative value is five million dollars, not an insignificant value. While the author claims that neither Sotheby's nor Christie's would want to sell these works, there are many other market places for works of this value. And even Sotheby's recently announced the formation of a partnership with Ebay to sell more works online. This may result in far more sales by Sotheby's at the less than $5,000 level.

Discussion of online sales in the TEFAF report states (page 28),

> *The main focus of online companies has been on the middle market for authentic, original works worth between a few hundred euros to a maximum of around € 100,000…While worries over provenance and authenticity have tended to keep the online market focused on lower price points, this ceiling is gradually shifting upwards.*

The TEFAF report estimates that "online sales in the art market could grow at a rate of at least 25% per annum, meaning that they could exceed 10 billion euros by 2020."

An effort should be made to determine how many works are valued at $5,000 and below before simply assigning a value of zero. Again, many works sold at the $5,000 level may result in significant revenue. There is no evidence that either Christie's or Artvest attempted to inventory these works.

Using non-transparent methodology, omitting comparables, and making arbitrary unsupported assumptions to support valuation conclusions for such a large and important collection cause the reader to lack confidence in the Artvest valuation.

ANALYSIS AND APPLICATION OF DISCOUNTS

Perhaps the most curious statement in the entire document is paragraph no. 39 on page 26.

*In this section, I anticipate and quantify various different potential factors that, based on either current market conditions or historic precedent, are likely to have a financial effect on the sale of the art from the DIA collection. Many of these factors are not taken into account in any standard appraisal or fair market valuation. I also apply the discount factors for various sale scenarios.*

I have been consulted as an economist on art appraisals for the past 20 years, representing well over one hundred appraisals and hundreds of thousands of individual works of art making up these appraisals. I have never heard such a statement from a qualified appraiser.

A well documented, thorough valuation, whether is it based on marketable cash value, fair market value, or other, considers each and every factor that may influence a value conclusion.

In fact, in a fair market valuation of a large group of works, it is imperative that the application of a blockage discount be considered. There is no question that the appraisal assignment at hand involves a large group of works. There are over 66,000 works in the DIA collection.

The Artvest report discusses various separate discounts as follows:

1.  Immediate liquidation discount
2.  Blockage discount
3.  Discount for unsold rates
4.  Discount for not selling through Sotheby's or Christies
5.  Discount for market capacity
6.  Discount for a longer term sale process
7.  Discount for a market backlash
8.  Discount due to a PWC market crash

I maintain that at least four of these discounts would be encompassed by a properly executed blockage discount analysis.

The author references a narrow definition of the concept of blockage discount, and states that "the IRS's current practice of using a discounted number has ranged from 25% to 46%." The author has referenced dated tax cases and appears to be behind the times with respect to the application and determination of an appropriate level of a blockage discount.

I have been involved in valuation cases in which the percentage discount has been as low as 5% and as great as 99%. I have been consulted on blockage discount analysis for IRS appraisals, both for estate and for gift tax purposes, for insurance damages claims, for litigation involving injured parties, for gallery valuations, and more.

A blockage discount would be applied if immediate liquidation were required of a relatively large block of works.  So, a liquidation discount would be covered by a proper blockage discount analysis.

The concept of blockage discount theoretically refers to the discount resulting from a large block of similar items being put on the market at one time, thus depressing the value. The concept, originally used in valuing securities, is relevant to valuation in the art market when a large block of similar works of art is put on the market at one time, or must be valued as of one point in time. Blockage discount must be considered whenever a mass appraisal (as defined by Standard 6 of the Uniform Standards of Professional Appraisal Practice) is conducted. It is especially relevant in valuing the estate of an artist or collector where the estate is comprised of many similar works. However, it is applicable in many other cases as well, as shown above.

If it is determined that a blockage discount should apply, then various factors must be considered.  Wherever possible, the following factors are considered in the determination of blockage discount and/or the base valuation before a discount is applied:

- The reputation of the artist and the market's acceptance of the artist's work.
- The likelihood of future markets for the artist's work
- The date of the work relative to the artist's most popular style.
- The quality, size and condition of the work relative to the artist's best work.
- The location of the works relative to the location of the best marketplace for the works.
- The stability or permanence of the artist's reputation and the related expectation of appreciation or risk of depreciation of the works until they are likely to be sold.
- The length of time necessary for the market to absorb all of the work
- The determination that the works are part or all of a series by the artist
- The expected health of the art market and the general economy, especially the expected rate of price increase during the period of time it would take to sell the works.
- The carrying costs associated with selling the works over a long period of time, such as storage, insurance, maintenance, display and marketing.
- The opportunity cost of bulk purchase and long term resale of the works, or the relative returns that can be expected from alternative investments.
- The provenance and specifically, whether the artwork is currently the property of the artist or the artist's estate.
- Whether there are known collectors of these works who may be willing to buy a large block of these items at a non-discounted value.
- Sales before and after the date of valuation.

In determining an appropriate level of blockage discount, one would consider the impacts of an immediate liquidation, the impacts of the time value of money and thus a present value concept, and the impacts of the ability of the market to absorb the works given market capacity (or how many similar works can typically sell at a given time).

Artvest considers a separate discount for market capacity. Clearly, a blockage discount encompasses this consideration by taking account of how long it would take for the market to absorb the works.

In the case of the DIA collection, the application of a blockage discount does not seem appropriate. Even with limited marketing and far less than full information, I understand that there are indications of interest pending for the purchase of the full collection. In addition, as Artvest has astutely pointed out, the collection is highly important, describing it as "world class."

On Page 25, Artvest affirms the importance of the collection by stating, "A collection of the quality and range of the art in the DIA would be impossible to recreate in current times." And VWA has identified that there is general agreement among experts that the collection is extraordinary and one of a kind.

It is possible, upon a detailed inventory and valuation of the works, that some individual categories of works may be identified for which the application of a blockage discount would be appropriate. However, there is insufficient time to do this for the expansive collection, and in light of the importance of the overall collection, I would not recommend that a blockage discount be applied.

Again, four of the discounts suggested by Artvest (immediate liquidation discount, blockage discount, discount for market capacity, discount for a longer-term sale process) are encompassed by the concept of blockage discount, and it seems that the application of a blockage discount would not be appropriate in this case.

Turning to the remaining discounts suggested by Artvest, they include a discount for unsold rates, discount for not selling through Sotheby's or Christie's, discount for a market backlash, and discount due to a Post War and Contemporary Sector market crash.

Artvest applies a discount for "unsold rates." In some cases, works are unsold simply because the auction estimate was too high. One must be cautious in making assumptions based on unsold rates. A comprehensive appraisal would consider unsold rates if the type of work being valued had significant unsold works. In fact, in calculating blockage discount, I often consider works that actually sell as opposed to being offered for sale and remain unsold. Again, however, in the case of this collection, the assumptions should be that any works to be sold at auction are given the correct estimate, and that they are likely to sell.

Artvest points out that the likely marketplaces for works are Sotheby's and Christie's. They point out that the highest valued works are most successfully sold at these two major auction houses. As far as a discount for not selling through Sotheby's or Christie's, in my opinion the collection is so large that if it were to be sold, it would be most appropriate to distribute it among many auction houses, of which Sotheby's and Christie's are only two. Of course, the works should be consigned to the various auction houses on the basis of each house's experience and success in selling each type of work. The logical way to sell the works is to distribute the sales across various auction houses, and time the sales well, as a successful high profile sale from an important collection can encourage a higher price for a lower valued piece from the same collection.

I also think that a discount for a market backlash is inappropriate. Again, the collection is highly important and visible, and any potential buyer would know the reason for the sale. The DIA potential sale is beyond the control of the DIA, and potential buyers will know this. VWA has compiled many examples of public collections selling works without Artvest's so-called backlash discount. In some cases, the provenance of having been part of an important public collection may increase the value.

Regarding a discount for an impending Post-War and Contemporary Art market crash, a qualified appraisal values the collection as of a single date, the date of valuation. There has not been a Post-War and Contemporary art market crash as of the date of valuation. And there is no evidence that such a crash is likely in the near future.

In my opinion, no discounts should be applied to the valuation of works of art in the DIA collection.

IMPACT OF ARTVEST'S ASSUMPTIONS ON VALUATION

Many of the various unsupported assumptions and value adjustments made by Artvest have the effect of decreasing the valuation of the collection.

For example, in Tables 6 and 7, where Artvest applies various discounts (discounts that I think should not be taken at all), the calculations were done for only the low estimate and the mid estimate from Table 2, not for the high estimate. No explanation is given for omitting the high estimate in these calculations.

Regarding its Unsold Discount Factor, in the narrative (page 28), Artvest states

> *It is customary business practice to devalue a work by 20% of the low estimate after it has been 'bought in' – auction terminology for a work of art going unsold.*

And then in the Tables 6 and 7, the Unsold Discount Factor is not printed, but based on the quantity of the discount, it can be determined that Artvest applied a discount closer to 25%, without giving further explanation.

Some of the discount factors used by Artvest are entirely arbitrary. For example, on Page 29, it is stated,

> *The Impact of Not Selling through Sotheby's or Christie's is a subjective number to calculate…Nevertheless, I estimate that the impact of selling the DIA collection through an auction venue other than these two houses would result, at a minimum, of a loss value of 20% to 40%.*

Artvest did indeed apply the arbitrary discount of 20% in this case.

In the discussion about the Effect of Longer Term Sale Process (which, as explained above, should be encompassed into a proper blockage discount analysis, if relevant to the valuation assignment), Artvest bases its estimate of the number of years to sell on the experience of the British Rail Pension Fund, and then approximately doubles it. The British Rail Pension Fund situation is not comparable to the DIA situation. The works in the Pension Fund were purely for investment, quite unlike the collection of a renowned museum. And the sale experience of the Pension Fund's works is dated. It would be more accurate to base it on an analysis of similar works (and numbers of them) that have appeared on the market in recent years. Also, Artvest used a discount rate of 12% for the discounted present value calculation, which seems a bit high in light of the currently low level of interest rates. The choice of an appropriate discount rate in present value calculations is always subject to controversy. A relatively high discount rate will decrease the present value, and a low discount rate will increase the present value. Frequently in a blockage discount analysis, as in business valuation, the long-term Treasury security rate is viewed as a risk free rate of return, the minimum to which upward adjustments are made to reflect different elements of risk. With long-term Treasury security rates currently in the 3% to 4% range, a discount rate of 12% seems high even in light of the increased risk associated with holding art.


CONCLUSION:

This valuation assignment is difficult due to the vast number of varied works, the quality of the collection, its provenance and its notoriety. Such a complex appraisal requires significant due diligence and a logical, transparent, and defensible methodological approach. Any assumptions used must be justified, using support well beyond any one individual's personal opinion.

In the case of any collection, I always recommend that a well-supported, defensible appraisal be the goal. There are many cases where incomplete information and/or time constraints cause a valuation to be rushed and short cuts to be taken.

However, there are logical analytical approaches to sampling that should be applied to achieve the most accurate valuation.

As evidenced by the comments throughout this review, the Artvest valuation report is flawed and thus does not provide a reliable, well-supported valuation of the DIA collection of works.  Statements of value and of underlying economic constructs are often stated as the opinion of one individual who is neither a qualified appraiser nor an economist with economic education beyond the undergraduate level.  Unless and until support can be produced for the claims made in this report, the valuations cannot be considered reliable.

Finally, the application of a variety of discounts, arbitrarily selected without solid justification, suggests that Artvest or the author of the report may be purposefully valuing the collection conservatively rather than objectively and accurately.

Submitted By:      Jannette M. Barth, Ph.D.
                   Economist and Managing Director
                   Pepacton Institute LLC

**<u>Attachment D</u>**

**Select Slides from Uniform Standards of Professional Appraisal Standards course material written by the Appraisal Foundation**







**Attachment E**

**DIA Inventory Page, Missing Photograph Example**


Unknown, American
<u>Walt Whitman</u>
United States
Half tone print
*Gift of Mr. and Mrs. Charles E. Feinberg*

PROVENANCE
*not documented*

DIA no. **F78.125**

---

Unknown, American
<u>(Untitled)</u>
1977
Color lithograph
*Gift of Marshall Schuster*

PROVENANCE
*not documented*

DIA no. **F78.130.1**

---

Unknown, American
<u>(Untitled)</u>
1977
Color lithograph
*Gift of Marshall Schuster*

**<u>Attachment F</u>**

**DIA Inventory Page, Mislabeled "Unknown, American" Examples**



**Unknown, American**
<u>Fragment of Tiraz Textile</u>
Egypt, Fatimid, 12th Century
Weft faced plain weave with eccentric and discontinuous wefts (tapestry); one
end hemmed with linen in whip stitch
2 3/4 x 5 in. ( 6.99 x 12.70 cm)
Pressure-mounted with 29.393.
*City of Detroit Purchase*

**PROVENANCE**
*Formerly in the collection of:*
*Dorothea Russell*

DIA no. **29.40**1



**Unknown, American**
<u>Fragment of Tiraz Textile</u>
Egypt, Fatimid, 12th Century
Balanced plain weave (tabby); weft faced plain weave with discontinuous wefts
(tapestry)
8 3/8 x 4 5/8 in.
21.4 x 11.6 cm
*City of Detroit Purchase*

**PROVENANCE**
*Formerly in the collection of:*
*Dorothea Russell*

DIA no. **29.402**



**Unknown, American**

<u>Transylvanian-Church-style 'Lotto' Rug</u>

Ushak, Western Anatolia, Turkey, Ottoman, 17th Century

Wool

67 1/2 x 46 in.

*Gift of Mr. and Mrs. Harold J. Quilhot*

PROVENANCE
*Ex coll.*
*Vincent D. Cliff (Detroit)*
*Mary Cliff (Mrs. J. F. Brandmier), daughter of V.D. Cliff*
*Harold J. Qilhot*

DIA no. **70.926**



**Unknown, American**

<u>"Lotto" Rug with Arabesque Design</u>

Ushak, Western Turkey, Turkey, Ottoman, c. 1550/1600

Wool pile on a wool foundation

135 x 77 in.

342 x 195 cm

*Gift of Dr. Eva Cassirer, 2000*

**PROVENANCE**
*From the collection of Alfred Cassirer, lent to \the DIA by his daughter, Eva Cassirer from 1948-2002. In 2002, most of the Cassirer carpets went back to Berlin, but this one was left as a gift to the DIA.*

DIA no. **F49.7**

**Attachment G**

**Article on *L'incanto dell'affresco***

# Italy: The charm of the frescoes

6-06-2014
Filed under [News](#), [The Church in the world](#)



Under the title *"L'incanto dell'affresco"* (the charm of the fresco), the Museum of Art in Ravenna is displaying 110 frescos: "detached masterpieces from Pompeii to Giotto, from Correggio to Tiepolo". The exhibition, which will run until June 15, 2014, was organized by **Claudio Spadoni**, artistic director of the Museum, and **Lucia Ciancabilla**. It is divided into six sections, arranged in chronological order of their detachment, thus tracing the history and the popularity of the practice of detaching wall paintings. This display of paintings that have been wrested from walls and partitions of public, religious or private monuments, reviews the three chief methods of cutting out frescoes, their restoration, and also the conservation of the ancient heritage of Italian painting, with extremely valuable loans from places in Italy and abroad.

The first stages of detachment go back to Vitruvius and Pliny, where the removal of frescoes is done together with part of the supporting wall, as was the case with the *Face of Christ* by Fra Angelico or Melozzo de Forli'a music-making *Angels*. Until the late 19th century, a large number of masterpieces of Italian painting were snatched from the vaulted ceilings of churches and chapels, from the walls of public and private buildings that had housed them for centuries, in order to transport them to safer places.… Behind the evident needs for conservation there were often hidden motives of the collectors.

On this occasion, the Museum of Art in Ravenna, housed in a 16th-century building, is displaying several of the most beautiful paintings of Pompeii and Herculanum, as well as others by Giotto, Buffamalco, Altichiero, Vitale da Bologna, Pisanello, Signorelli, Pontormo, and Tiepolo, to mention only a few.

On the Adriatic coast, in Emilia-Romagna, the city of Ravenna had as its first bishop Saint **Apollinaris**, who had come from Antioch to Rome with Saint **Peter** and died a martyr on July 23, 87 A.D.; he was buried in Classe, the port of Ravenna. The capital of the Roman Empire in the 5th century, and then of Byzantine Italy until the 8th century, Ravenna has a set of early Christian mosaics and monuments unlike any other in the world. Eight buildings—the Mausoleum of Galla Placidia, the Neonian Baptistry, the Basilica of Sant'Apollinare Nuovo, the Baptistry of the Arians, the Archiepiscopal Chapel, the Mausoleum of Theodoric, the Church of San Vitale, and the Basilica of Sant'Apollinare in Classe—were built in the 5th and 6th centuries and testify to a great artistic mastery that marvelously combines the Greco-Roman tradition, Christian iconography and the styles of East and West.

Museum of Art of Ravenna (MAR) – Via di Roma, 13 – 48100 Ravenna.

Until June 15, 2014;  open from 9:00 to 18:00 Tuesday through Friday, until 19:00 on Saturday and Sunday;  closed Monday;  admission:  9 Euros;  teachers, students, pupils:  4 Euros

*(Sources:  MAR/Unesco/Osservatore Romano – DICI no. 296 dated June 06, 2014)*

**<u>Attachment H</u>**

**Methodology Step by Step Chart**

**Methodology Step by Step Chart**

| Step 1 | Valuation of High-Value Works by VWA | | | |
|--------|--------|--------|--------|--------|
| | # of Units | Low Value | High Value | Average Value |
| | 387 | 3,092,419,700 | 4,040,303,800 | 3,566,631,750 |
| Step 2 | Valuation of High-Value Works performed by Christie's, Artvest and Winston | | | |
| | # of Units | | | Average Value |
| | 596 | | | 311,370,325 |
| Step 3 | Projected valuation of works on DIA Insurance List (estimated for appreciation) | | | |
| | # of Units | DIA Insurance Value | % Appreciation | Projected Value |
| | 16,388 | 468,449,537 | 62.0% | 758,888,249 |
| Step 4 | Pricing matrix of remaining works based on Christie's and Southeby's 2013 sales price by department | | | |
| | # of Units | | | Average Value |
| | 42,854 | | | 3,512,612,030 |
| Step 5 | Combined Value | | | |
| | **# of Units** | | | **Average Value** |
| | **60,225** | | | **8,149,232,354** |

**Attachment I**

**Step 1 Attachment**

| DIA Accession No. | Artist | Title | VWA Low Value | VWA High Value | VWA Average Value |
|---|---|---|---|---|---|
| 30.374 | Pieter Bruegel the Elder | The Wedding Dance | 150,000,000 | 200,000,000 | 175,000,000 |
| 22.13 | Vincent Willem van Gogh | Self Portrait | 120,000,000 | 150,000,000 | 135,000,000 |
| 1996.25 | Vincent Willem van Gogh | Portrait of Postman Roulin | 90,000,000 | 130,000,000 | 110,000,000 |
| 27.200 | Rembrandt Harmensz van Rijn | The Visitation | 90,000,000 | 110,000,000 | 100,000,000 |
| 70.190 | Pablo Picasso | Melancholy Woman | 75,000,000 | 100,000,000 | 87,500,000 |
| 76.89 | Frederic Edwin Church | Cotopaxi | 60,000,000 | 90,000,000 | 75,000,000 |
| 1988.175 | Alberto Giacometti | Standing Woman II | 60,000,000 | 80,000,000 | 70,000,000 |
| 22.14 | Henri Matisse | The Window | 60,000,000 | 80,000,000 | 70,000,000 |
| 65.8 | Mark Rothko | Orange, Brown | 60,000,000 | 80,000,000 | 70,000,000 |
| 73.268 | Michelangelo Merisi da Caravaggio | Martha and Mary Magdalene | 60,000,000 | 80,000,000 | 70,000,000 |
| 70.160 | Paul Cezanne | Madame Cezanne | 55,000,000 | 75,000,000 | 65,000,000 |
| 70.193 | Pablo Picasso | Woman Seated in an Armchair | 60,000,000 | 70,000,000 | 65,000,000 |
| 70.159 | Vincent Willem van Gogh | Bank of the Oise at Auvers | 50,000,000 | 70,000,000 | 60,000,000 |
| 76.78 | Barnett Newman | Be I (second version) | 50,000,000 | 70,000,000 | 60,000,000 |
| 31.25 | Neo-Babylonian | Snake-Dragon, Symbol of Marduk, the Patron God of Babylon; Panel from the Ishtar Gate | 50,000,000 | 60,000,000 | 55,000,000 |
| 65.310 | Clyfford Still | Untitled 1951-T, No. 2 | 50,000,000 | 60,000,000 | 55,000,000 |
| 68.292.1 | Andy Warhol | Self Portrait: Former Double Self Portrait | 50,000,000 | 60,000,000 | 55,000,000 |
| 70.175 | Henri Matisse | Poppies | 50,000,000 | 60,000,000 | 55,000,000 |

| | | | | | |
|---|---|---|---|---|---|
| 27.2.A | Michelangelo | Scheme for the Decoration of the Ceiling of the Sistine Chapel | 45,000,000 | 60,000,000 | 52,500,000 |
| 46.309 | James Abbott McNeill Whistler | Nocturne in Black and Gold, the Falling Rocket | 40,000,000 | 60,000,000 | 50,000,000 |
| 55.353 | Francis Bacon | Study for Crouching Nude | 45,000,000 | 55,000,000 | 50,000,000 |
| 50.32 | Neo-Assyrian | Tiglath-Pileser III Receiving Homage | 40,000,000 | 50,000,000 | 45,000,000 |
| 2005.60 | Pablo Picasso | Girl Reading | 35,000,000 | 45,000,000 | 40,000,000 |
| 21.5 | Edgar Degas | Dancers in the Green Room | 30,000,000 | 50,000,000 | 40,000,000 |
| 22.143 | Auguste Rodin | The Thinker | 35,000,000 | 40,000,000 | 37,500,000 |
| 70.174 | Henri Matisse | Coffee | 35,000,000 | 40,000,000 | 37,500,000 |
| 78.37 | Henri Matisse | The Wild Poppies | 35,000,000 | 40,000,000 | 37,500,000 |
| 66.66 | Joan Miró | Self Portrait II | 30,000,000 | 40,000,000 | 35,000,000 |
| 70.183 | Georges Pierre Seurat | View of Le Crotoy from Upstream | 30,000,000 | 40,000,000 | 35,000,000 |
| 36.11 | Nicolas Poussin | Selene and Endymion | 30,000,000 | 38,000,000 | 34,000,000 |
| 64.117 | John Constable | The Glebe Farm | 30,000,000 | 35,000,000 | 32,500,000 |
| 78.31 | Henri Matisse | The Wild Poppies | 30,000,000 | 35,000,000 | 32,500,000 |
| 56.144 | Franz Marc | Animals in a Landscape | 28,000,000 | 36,000,000 | 32,000,000 |
| 89.63 | Peter Paul Rubens | The Meeting of David and Abigail | 25,000,000 | 35,000,000 | 30,000,000 |
| 65.7 | Franz Kline | Siskind | 28,000,000 | 30,000,000 | 29,000,000 |
| 64.84 | Juan Gris | Still Life | 25,000,000 | 30,000,000 | 27,500,000 |
| 17.17 | George Wesley Bellows | A Day in June | 20,000,000 | 30,000,000 | 25,000,000 |

| | | | | | |
|---|---|---|---|---|---|
| 50.138 | George Caleb Bingham | The Trappers' Return | 20,000,000 | 30,000,000 | 25,000,000 |
| 57.234 | Wassily Kandinsky | Study for Painting with White Form | 22,000,000 | 28,000,000 | 25,000,000 |
| 70.177 | Pierre Auguste Renoir | Seated Bather | 20,000,000 | 30,000,000 | 25,000,000 |
| 1985.24 | Pierre Auguste Renoir | Woman in an Armchair | 20,000,000 | 25,000,000 | 22,500,000 |
| 21.71 | Claude Monet | Gladioli | 20,000,000 | 25,000,000 | 22,500,000 |
| 26.3 | Jacob Isaaksz van Ruisdael | The Jewish Cemetery | 20,000,000 | 25,000,000 | 22,500,000 |
| 35.10 | Titian | Judith with the Head of Holofernes | 20,000,000 | 25,000,000 | 22,500,000 |
| 40.166 | Bernardo Bellotto | View of the Tiber in Rome with the Castel Sant'Angelo | 20,000,000 | 25,000,000 | 22,500,000 |
| 42.57 | Agnolo Bronzino | Eleonora of Toledo and Her Son | 20,000,000 | 25,000,000 | 22,500,000 |
| 46.310 | John Singleton Copley | Watson and the Shark | 20,000,000 | 25,000,000 | 22,500,000 |
| 55.410 | Max Beckmann | Self Portrait in Olive and Brown | 20,000,000 | 25,000,000 | 22,500,000 |
| 70.161 | Paul Cezanne | Mont Sainte-Victoire | 20,000,000 | 25,000,000 | 22,500,000 |
| 70.163 | Paul Cezanne | The Three Skulls | 20,000,000 | 25,000,000 | 22,500,000 |
| 1988.176 | Pablo Picasso | Seated Woman | 18,000,000 | 22,000,000 | 20,000,000 |
| 53.145 | Auguste Rodin | Eve | 18,000,000 | 22,000,000 | 20,000,000 |
| 55.5.A | Henry Fuseli | The Nightmare | 18,000,000 | 22,000,000 | 20,000,000 |
| 60.88 | Alberto Giacometti | Annette Seated | 18,000,000 | 22,000,000 | 20,000,000 |
| 62.126 | Pablo Picasso | Portrait of Manuel Pallares | 18,000,000 | 22,000,000 | 20,000,000 |
| 70.162 | Paul Cezanne | Bathers | 18,000,000 | 22,000,000 | 20,000,000 |

3

| | | | | | |
|---|---|---|---|---|---|
| 77.81 | Hans Holbein the Younger | A Woman | 18,000,000 | 22,000,000 | 20,000,000 |
| 1988.177 | Willem de Kooning | Merritt Parkway | 16,000,000 | 20,000,000 | 18,000,000 |
| 69.306 | Paul Gauguin | Self Portrait | 15,000,000 | 20,000,000 | 17,500,000 |
| 70.191 | Pablo Picasso | Head of a Harlequin | 15,000,000 | 20,000,000 | 17,500,000 |
| 89.35 | Jan Provost | The Last Judgment | 15,000,000 | 20,000,000 | 17,500,000 |
| 66.36 | David Smith | Cubi I | 15,000,000 | 18,000,000 | 16,500,000 |
| 70.192 | Pablo Picasso | Bottle of Anis del Mono | 15,000,000 | 18,000,000 | 16,500,000 |
| 26.114 | Neri di Bicci | Tobias and Three Archangels | 12,000,000 | 16,000,000 | 14,000,000 |
| 30.297 | Michael Sweerts | In the Studio | 12,000,000 | 16,000,000 | 14,000,000 |
| 49.347 | Frans Hals | Portrait of Hendrik Swalmius | 12,000,000 | 16,000,000 | 14,000,000 |
| 69.6 | Guido Reni | The Angel Appearing to St. Jerome | 12,000,000 | 16,000,000 | 14,000,000 |
| 1992.1 | Roy Lichtenstein | Interior with Mirrored Closet | 12,000,000 | 15,000,000 | 13,500,000 |
| 70.167 | Edgar Degas | Violinist and Young Woman | 12,000,000 | 15,000,000 | 13,500,000 |
| 77.2 | Benozzo Gozzoli | Virgin and Child with Angels | 12,000,000 | 15,000,000 | 13,500,000 |
| 89.46 | Jan Havicksz Steen | Gamblers Quarreling | 12,000,000 | 15,000,000 | 13,500,000 |
| 30.280 | Antoine Le Nain | The Village Piper | 12,000,000 | 14,000,000 | 13,000,000 |
| 52.220 | Giovanni Lorenzo Bernini | Chair of St. Peter | 10,000,000 | 15,000,000 | 12,500,000 |
| 52.253 | Artemisia Gentileschi | Judith and Her Maidservant with the Head of Holofernes | 10,000,000 | 15,000,000 | 12,500,000 |
| 70.178 | Pierre Auguste Renoir | The White Pierrot | 10,000,000 | 15,000,000 | 12,500,000 |

4

| 40.58 | Ernst Ludwig Kirchner | Winter Landscape in Moonlight | 11,000,000 | 13,000,000 | 12,000,000 |
|---|---|---|---|---|---|
| 89.70 | Bartolome Esteban Murillo | The Immaculate Conception | 11,000,000 | 13,000,000 | 12,000,000 |
| 10.11 | Frederic Edwin Church | Syria by the Sea | 10,000,000 | 12,000,000 | 11,000,000 |
| 28.115 | Giovanni Bellini | Madonna and Child | 10,000,000 | 12,000,000 | 11,000,000 |
| 44.266 | Peter Paul Rubens | Hygeia, Goddess of Health | 10,000,000 | 12,000,000 | 11,000,000 |
| 69.50 | Donald Judd | Stack | 10,000,000 | 12,000,000 | 11,000,000 |
| 71.170 | Thomas Gainsborough | Lady Anne Hamilton | 10,000,000 | 12,000,000 | 11,000,000 |
| 1993.18 | John Singer Sargent | Mosquito Nets | 8,000,000 | 12,000,000 | 10,000,000 |
| 69.48 | Robert Rauschenberg | Creek | 9,000,000 | 11,000,000 | 10,000,000 |
| 70.158 | Vincent Willem van Gogh | The Diggers | 8,000,000 | 12,000,000 | 10,000,000 |
| 71.1 | Guercino (Giovanni Francesco Barbieri) | Assumption of the Virgin | 8,000,000 | 12,000,000 | 10,000,000 |
| 70.339 | Pablo Picasso | Bather by the Sea | 8,000,000 | 11,000,000 | 9,500,000 |
| 71.169 | Thomas Gainsborough | The Honorable Richard Savage Nassau de Zuylestein, M.P. | 8,000,000 | 10,000,000 | 9,000,000 |
| 71.390 | Jean Honore Fragonard | The Shepherdess | 8,000,000 | 10,000,000 | 9,000,000 |
| 71.391 | Jean Honore Fragonard | The Grape Gatherer | 8,000,000 | 10,000,000 | 9,000,000 |
| 71.392 | Jean Honore Fragonard | The Reaper | 8,000,000 | 10,000,000 | 9,000,000 |
| 71.393 | Jean Honore Fragonard | The Gardener | 8,000,000 | 10,000,000 | 9,000,000 |
| 77.1.1 | Fra Angelico | Annunciatory Angel | 8,000,000 | 10,000,000 | 9,000,000 |
| 24.94 | Sassetta | The Procession to Calvary | 7,000,000 | 10,000,000 | 8,500,000 |

| | | | | | |
|---|---|---|---|---|---|
| 26.296 | Jean Siméon Chardin | Still Life with Dead Hare | 7,000,000 | 10,000,000 | 8,500,000 |
| 48.96 | Bartolome Esteban Murillo | The Flight into Egypt | 7,000,000 | 9,000,000 | 8,000,000 |
| 69.1 | Jean Dubuffet | Le plomb dans l'aile | 7,000,000 | 9,000,000 | 8,000,000 |
| 1998.65 | Edgar Degas | Jockeys on Horseback before Distant Hills | 7,000,000 | 8,000,000 | 7,500,000 |
| 20.111 | Pierre Auguste Renoir | Graziella | 6,000,000 | 9,000,000 | 7,500,000 |
| 26.385 | Peter Paul Rubens | Philippe Rubens, the Artist's Brother. | 6,000,000 | 9,000,000 | 7,500,000 |
| 1988.178 | Pablo Picasso | Fruit, Carafe and Glass | 6,000,000 | 8,000,000 | 7,000,000 |
| 23.27 | Frans Hals | Portrait of a Woman | 6,000,000 | 8,000,000 | 7,000,000 |
| 25.4 | Jan van Eyck | Saint Jerome in His Study | 6,000,000 | 8,000,000 | 7,000,000 |
| 26.387 | Master of the St. Lucy Legend | Virgin of the Rose Garden | 6,000,000 | 8,000,000 | 7,000,000 |
| 27.385 | Titian | Man Holding a Flute | 6,000,000 | 8,000,000 | 7,000,000 |
| 30.295 | Parmigianino | The Circumcision | 6,000,000 | 8,000,000 | 7,000,000 |
| 34.27 | James Abbott McNeill Whistler | Arrangement in Gray: Portrait of the Painter | 6,000,000 | 8,000,000 | 7,000,000 |
| 41.80 | Francisco Goya | Dona Amalia Bonells de Costa | 6,000,000 | 8,000,000 | 7,000,000 |
| 53.356 | Peter Paul Rubens | Briseis Given Back to Achilles | 6,000,000 | 8,000,000 | 7,000,000 |
| 65.10 | Gerard Ter Borch | Lady at Her Toilette | 6,000,000 | 8,000,000 | 7,000,000 |
| 68.47 | Orazio Gentileschi | Young Woman with a Violin (Saint Cecilia) | 6,000,000 | 8,000,000 | 7,000,000 |
| 21.206 | Max Pechstein | Under the Trees | 5,000,000 | 8,000,000 | 6,500,000 |
| 21.34 | Camille Pissarro | The Path | 5,000,000 | 8,000,000 | 6,500,000 |

6

| | | | | | |
|---|---|---|---|---|---|
| 27.202 | Gustave Courbet | Bather Sleeping by a Brook | 5,000,000 | 8,000,000 | 6,500,000 |
| 82.64 | Neo-Sumerian | Gudea of Lagash | 5,000,000 | 8,000,000 | 6,500,000 |
| 21.208 | Lyonel Feininger | Sidewheeler II | 5,000,000 | 7,000,000 | 6,000,000 |
| 21.6 | Edgar Degas | Dancers | 5,000,000 | 7,000,000 | 6,000,000 |
| 37.147 | Pollaiuolo | Judith | 5,000,000 | 7,000,000 | 6,000,000 |
| 46.134 | Thomas Cole | From the Top of Kaaterskill Falls | 5,000,000 | 7,000,000 | 6,000,000 |
| 51.65 | Otto Dix | Self Portrait | 5,000,000 | 7,000,000 | 6,000,000 |
| 67.113 | Alexander Calder | The X and Its Tails | 5,000,000 | 7,000,000 | 6,000,000 |
| 70.170 | Jean Auguste Dominique Ingres | Perseus and Andromeda | 5,000,000 | 7,000,000 | 6,000,000 |
| 76.77 | Aristide Maillol | La Flore, nue | 5,000,000 | 7,000,000 | 6,000,000 |
| 77.3 | Pietro Perugino | Madonna and Child | 5,000,000 | 7,000,000 | 6,000,000 |
| 1993.77.A | Joseph Cornell | Night Songs | 5,000,000 | 6,500,000 | 5,750,000 |
| 57.180 | Giovanni Battista Tiepolo | Girl with a Mandolin | 5,000,000 | 6,500,000 | 5,750,000 |
| 22.6 | Mary Cassatt | In the Garden | 5,000,000 | 6,000,000 | 5,500,000 |
| 27.3 | Sandro Botticelli | The Resurrected Christ | 5,000,000 | 6,000,000 | 5,500,000 |
| 27.201 | Gerard David | The Annunciation | 4,000,000 | 6,000,000 | 5,000,000 |
| 45.420 | Joos van der Beke van Cleve | Adoration of the Magi | 4,000,000 | 6,000,000 | 5,000,000 |
| 54.458 | William Adolphe Bouguereau | The Nut Gatherers | 4,000,000 | 6,000,000 | 5,000,000 |
| 61.48 | Joan Miró | Women and Bird in the Night | 4,000,000 | 6,000,000 | 5,000,000 |

7

| | | | | | |
|---|---|---|---|---|---|
| 66.41 | Giulio Romano | An Allegory of Immortality | 4,000,000 | 6,000,000 | 5,000,000 |
| 79.34 | Eva Hesse | Accession II | 4,000,000 | 6,000,000 | 5,000,000 |
| 25.207 | Giovanni Domenico Tiepolo | The Women of Darius Invoking the Clemency of Alexander | 4,000,000 | 5,000,000 | 4,500,000 |
| 29.260 | William Merritt Chase | The Whistling Boy | 3,500,000 | 5,500,000 | 4,500,000 |
| 52.218 | Giovanni Lorenzo Bernini | Triton with a Sea Serpent | 4,000,000 | 5,000,000 | 4,500,000 |
| 52.219 | Giovanni Lorenzo Bernini | Triton with a Shell | 4,000,000 | 5,000,000 | 4,500,000 |
| 27.159 | Maurice Brazil Prendergast | Promenade | 3,500,000 | 5,000,000 | 4,250,000 |
| 70.164 | Jean Siméon Chardin | Still Life | 3,500,000 | 5,000,000 | 4,250,000 |
| 11.5 | Childe Hassam | Place Centrale and Fort Cabanas, Havana | 3,000,000 | 5,000,000 | 4,000,000 |
| 1995.67 | Rachel Ruysch | Flowers in a Glass Vase | 3,000,000 | 5,000,000 | 4,000,000 |
| 20.114 | Alfred Sisley | Church at Moret after the Rain | 3,000,000 | 5,000,000 | 4,000,000 |
| 21.203 | Oskar Kokoschka | The Elbe Near Dresden | 3,500,000 | 4,500,000 | 4,000,000 |
| 23.11 | Tintoretto | The Dreams of Men | 3,000,000 | 5,000,000 | 4,000,000 |
| 29.256 | Gerard  Ter Borch | Young Man Reading  a Letter | 3,000,000 | 5,000,000 | 4,000,000 |
| 54.2 | Nicolas Poussin | The Holy Family | 3,000,000 | 5,000,000 | 4,000,000 |
| 62.141 | Pablo Picasso | Sylvette | 3,000,000 | 5,000,000 | 4,000,000 |
| 72.465 | Paul Cezanne | Head of a Man | 3,000,000 | 5,000,000 | 4,000,000 |
| 79.33 | Benjamin West | Death on the Pale Horse | 3,000,000 | 5,000,000 | 4,000,000 |
| 56.43 | Giovanni Paolo Panini | Interior of St. Peter's, Rome | 3,500,000 | 4,000,000 | 3,750,000 |

8

| | | | | | |
|---|---|---|---|---|---|
| 1983.23 | John Singleton Copley | George Boone Roupell | 3,000,000 | 4,000,000 | 3,500,000 |
| 1986.60 | Mary Cassatt | Alexander J. Cassatt | 3,000,000 | 4,000,000 | 3,500,000 |
| 21.204 | Ernst Ludwig Kirchner | Coastal Landscape on Fehmarn | 3,000,000 | 4,000,000 | 3,500,000 |
| 27.556 | John Singleton Copley | Mrs. Clark Gayton | 3,000,000 | 4,000,000 | 3,500,000 |
| 28.151 | Unknown | South Indian Brahma-Shiva | 3,000,000 | 4,000,000 | 3,500,000 |
| 37.21 | Jacob Isaaksz van Ruisdael | Farm and Hayrick on a River | 3,000,000 | 4,000,000 | 3,500,000 |
| 38.60 | William Sydney Mount | The Banjo Player | 3,000,000 | 4,000,000 | 3,500,000 |
| 48.279 | Edgar Degas | Morning Ride | 3,000,000 | 4,000,000 | 3,500,000 |
| 60.61 | Master of the Osservanza | The Resurrection | 3,000,000 | 4,000,000 | 3,500,000 |
| 61.164 | Master of the Arenberg Lamentation | The Lamentation | 3,000,000 | 4,000,000 | 3,500,000 |
| 61.165 | John Sloan | Wake of the Ferry, No. 1 | 3,000,000 | 4,000,000 | 3,500,000 |
| 65.139 | Paul Cezanne | Skull and Book | 3,000,000 | 4,000,000 | 3,500,000 |
| 65.76 | John Chamberlain | Coo Wha Zee | 3,000,000 | 4,000,000 | 3,500,000 |
| 68.298 | Jacob Isaaksz van Ruisdael | Wooded Landscape with a Stream | 3,000,000 | 4,000,000 | 3,500,000 |
| 72.441 | Edgar Degas | Dancers in Repose | 3,000,000 | 4,000,000 | 3,500,000 |
| 77.48 | Robert Motherwell | Elegy to the Spanish Republic #131 | 3,000,000 | 4,000,000 | 3,500,000 |
| 78.59 | John Everett Millais | Leisure Hours | 3,000,000 | 4,000,000 | 3,500,000 |
| 21.72 | John Singer Sargent | Home Fields | 2,800,000 | 4,000,000 | 3,400,000 |
| 08.8 | Mary Cassatt | Women Admiring a Child | 2,800,000 | 3,500,000 | 3,150,000 |

9

| | | | | | |
|---|---|---|---|---|---|
| 80.104 | Dan Flavin | Monument for V. Tatlin | 2,800,000 | 3,500,000 | 3,150,000 |
| 73.41 | John Singer Sargent | Madame Paul Poirson | 2,500,000 | 3,700,000 | 3,100,000 |
| 19.148 | Robert Cozad Henri | The Young Girl | 2,500,000 | 3,500,000 | 3,000,000 |
| 24.2 | John Sloan | McSorley's Bar | 2,500,000 | 3,500,000 | 3,000,000 |
| 28.102 | Giorgio de Chirico | Gladiators and Lion | 2,000,000 | 4,000,000 | 3,000,000 |
| 30.296 | Thomas Cowperthwaite Eakins | Dr. Horatio C. Wood | 2,500,000 | 3,500,000 | 3,000,000 |
| 44.5 | Marsden Hartley | Log Jam, Penobscot Bay | 2,500,000 | 3,500,000 | 3,000,000 |
| 65.60 | Helen Frankenthaler | The Bay | 2,500,000 | 3,500,000 | 3,000,000 |
| 70.560.A | John Singleton Copley | Colonel George Lewis | 2,500,000 | 3,500,000 | 3,000,000 |
| 77.5 | Diego M. Rivera | Edsel B. Ford | 2,500,000 | 3,500,000 | 3,000,000 |
| 21.210 | Otto Mueller | Bathers | 2,500,000 | 3,200,000 | 2,850,000 |
| 16.5 | William Merritt Chase | The Yield of the Waters | 2,500,000 | 3,000,000 | 2,750,000 |
| 1986.102 | Max Ernst | Moonmad | 2,500,000 | 3,000,000 | 2,750,000 |
| 43.30 | John Singleton Copley | John Gray | 2,500,000 | 3,000,000 | 2,750,000 |
| 70.900 | John Singleton Copley | Hannah Loring | 2,500,000 | 3,000,000 | 2,750,000 |
| 41.37 | John Singleton Copley | Colonel John Montresor | 2,200,000 | 3,200,000 | 2,700,000 |
| 27.150 | Nino Pisano | Madonna and Child | 2,000,000 | 3,000,000 | 2,500,000 |
| 44.213 | Giovanni Battista Tiepolo | Saint Joseph and the Christ Child | 2,000,000 | 3,000,000 | 2,500,000 |
| 71.168 | John Singleton Copley | Mrs. Benjamin Hallowell | 2,200,000 | 2,800,000 | 2,500,000 |

10

| | | | | | |
|---|---|---|---|---|---|
| 72.437 | Naum Gabo | Linear Construction No. 4 | 2,200,000 | 2,800,000 | 2,500,000 |
| 30.416 | Islamic | Bottle made for the Rasulid Sultan Hizabr al-Din in Yemen | 2,300,000 | 2,600,000 | 2,450,000 |
| 21.8 | Edgar Degas | Portrait of a Woman | 2,000,000 | 2,500,000 | 2,250,000 |
| 30.323 | Islamic | Qur'an | 2,000,000 | 2,500,000 | 2,250,000 |
| 54.460 | Emil Nolde | Sunflowers | 2,000,000 | 2,500,000 | 2,250,000 |
| 1985.25 | Pierre Auguste Renoir | Clearing in the Woods | 1,800,000 | 2,500,000 | 2,150,000 |
| 74.53 | Roman | Torso of Aphrodite, Roman copy of the Venus Genetrix type | 1,500,000 | 2,500,000 | 2,000,000 |
| 76.146 | Sebastiano Ricci | Christ at the Sea of Galilee | 1,800,000 | 2,200,000 | 2,000,000 |
| 78.47 | Iranian | Achaemenid Persian Spearman | 1,500,000 | 2,500,000 | 2,000,000 |
| 71.385.A | Richard Artschwager | Hospital Ward | 1,700,000 | 2,000,000 | 1,850,000 |
| 2000.85 | Medici Manufactory | Ewer (brocca) | 1,300,000 | 2,300,000 | 1,800,000 |
| 70.206 | Henri Matisse | Seated Nude | 1,700,000 | 1,900,000 | 1,800,000 |
| 41.126 | Master of the Tiburtine Sibyl | Crucifixion | 1,500,000 | 2,000,000 | 1,750,000 |
| 64.155.A | Robert Indiana | The Brooklyn Bridge | 1,500,000 | 2,000,000 | 1,750,000 |
| 69.304 | Auguste Rodin | The Age of Bronze | 1,500,000 | 2,000,000 | 1,750,000 |
| 1983.16 | Jean Baptiste Carpeaux | Genius of the Dance | 1,500,000 | 1,800,000 | 1,650,000 |
| 1992.223 | Jean Baptiste Carpeaux | Genius of Dance | 1,500,000 | 1,800,000 | 1,650,000 |
| 45.514 | Andrea della Robbia | Madonna and Child | 1,500,000 | 1,800,000 | 1,650,000 |
| 25.64 | Islamic | Figure of a Courtier from a Palace Frieze | 1,200,000 | 1,800,000 | 1,500,000 |

11

| | | | | | |
|---|---|---|---|---|---|
| 29.245 | Unknown | Buddha | 1,200,000 | 1,800,000 | 1,500,000 |
| 59.123 | Hubert Gerhard | Hebe | 1,400,000 | 1,600,000 | 1,500,000 |
| 59.296 | Johann Joachim Kaendler | Postmaster "Baron" Schmiedel | 1,400,000 | 1,600,000 | 1,500,000 |
| 52.118 | John Singleton Copley | Head of a Negro | 1,200,000 | 1,500,000 | 1,350,000 |
| 43.477 | Andrea della Robbia | Head of a Youth | 1,200,000 | 1,400,000 | 1,300,000 |
| 2001.67 | Francois Rude | Departure of the Volunteers of 1792 (The Marseillaise) | 1,000,000 | 1,500,000 | 1,250,000 |
| 64.82 | Jean Auguste Dominique Ingres | Mlle. Cécile-Marie Panckoucke (later Mme. Jacques-Raoul Tournouër) | 1,000,000 | 1,500,000 | 1,250,000 |
| 70.168 | Edgar Degas | Woman with a Bandage | 1,000,000 | 1,500,000 | 1,250,000 |
| 19.149 | Robert Cozad Henri | The Beach Hat | 1,000,000 | 1,400,000 | 1,200,000 |
| 71.78 | Edgar Degas | Seated Woman Wiping her Left Side | 1,000,000 | 1,200,000 | 1,100,000 |
| 54.100 | John Singer Sargent | Judith Gautier | 900,000 | 1,200,000 | 1,050,000 |
| 21.207 | Karl Schmidt-Rottluff | Still Life, Cactus | 800,000 | 1,200,000 | 1,000,000 |
| 21.73 | Henri Eugene Augustin Le Sidaner | The Tea Table | 800,000 | 1,200,000 | 1,000,000 |
| 58.360 | John Singleton Copley | Jonathan Mountfort | 800,000 | 1,200,000 | 1,000,000 |
| 21.180 | Tang Di | Landscape | 800,000 | 1,100,000 | 950,000 |
| 2005.63 | Edgar Degas | Seated Nude Woman Brushing Her Hair | 800,000 | 1,000,000 | 900,000 |
| 36.14 | Alessandro Magnasco | Satire on a Nobleman in Misery | 800,000 | 1,000,000 | 900,000 |
| 70.188 | Diego M. Rivera | Robert Tannahill | 1,500,000 | 200,000 | 850,000 |
| 72.296 | Louis Jean Francois Lagrenee | Pygmalion and Galatea | 700,000 | 1,000,000 | 850,000 |

12

| | | | | | |
|---|---|---|---|---|---|
| 70.253 | Charles Demuth | Still Life with Apples and Bananas | 750,000 | 900,000 | 825,000 |
| 1997.1 | Jean-Léon Gérôme | Seated Woman | 700,000 | 900,000 | 800,000 |
| 21.17 | Henri Baptiste Lebasque | On the Balcony | 700,000 | 900,000 | 800,000 |
| 25.63 | Unknown | Buddha's Descent from the Trayastrimsas Heaven | 700,000 | 900,000 | 800,000 |
| 47.92 | Salvator Rosa | The Finding of Moses | 700,000 | 900,000 | 800,000 |
| 29.172 | Unknown | Sakyamuni Emerging from the Mountains | 600,000 | 900,000 | 750,000 |
| 59.295 | Johann Gottlieb Kirchner | Joseph Froehlich, Court Jester of Augustus the Strong | 700,000 | 800,000 | 750,000 |
| 48.274 | Nathan Bowen | Chest on Chest | 650,000 | 800,000 | 725,000 |
| 26.128 | Unknown | Guanyin | 600,000 | 800,000 | 700,000 |
| 29.444 | Unknown | Pratyeka Buddha | 550,000 | 850,000 | 700,000 |
| 37.73 | Job Adriaensz Berckheyde | Interior of the Grote Kerk, Haarlem | 600,000 | 800,000 | 700,000 |
| 65.145 | Edgar Degas | Ballet Dancer Adjusting her Costume | 600,000 | 800,000 | 700,000 |
| 65.174 | Max Beckmann | Sacrificial Meal | 600,000 | 800,000 | 700,000 |
| 76.3 | Wen Zhengming | The First Prose Poem on the Red Cliff | 600,000 | 800,000 | 700,000 |
| 1992.212 | Enzo Cucchi | Quadro Feroce | 500,000 | 800,000 | 650,000 |
| 26.122 | Roman | Torso of Apollo, Roman copy | 500,000 | 700,000 | 600,000 |
| 65.223 | Pierre Auguste Renoir | Country Lane | 500,000 | 700,000 | 600,000 |
| 1999.59 | Paul Gauguin | La Petite Parisienne | 500,000 | 600,000 | 550,000 |
| 40.161 | Shen Zhou | Ode to the Pomegranate and Melon Vine | 500,000 | 600,000 | 550,000 |

| | | | | | |
|---|---|---|---|---|---|
| F1983.124 | Charles Sheeler | Drive Wheels | 500,000 | 600,000 | 550,000 |
| 09.1S382 | Albrecht Dürer | Adam and Eve | 450,000 | 550,000 | 500,000 |
| 2007.145 | Charles Rennie Mackintosh | Chair | 400,000 | 600,000 | 500,000 |
| 35.54 | Islamic | Folio from the Great Mongol Shahnama: Ardashir Battles Bahman, Son of Ardavan | 400,000 | 600,000 | 500,000 |
| 51.223 | James Abbott McNeill Whistler | In the Studio | 400,000 | 600,000 | 500,000 |
| 60.63 | Pieter Pietersz Lastman | King David Handing the Letter to Uriah | 400,000 | 600,000 | 500,000 |
| 1994.78.A | Greene and Greene | Blacker Dining Table | 300,000 | 600,000 | 450,000 |
| 50.58 | Charles Willson Peale | James Peale | 350,000 | 550,000 | 450,000 |
| 70.187 | Diego M. Rivera | Robert H. Tannahill | 800,000 | 100,000 | 450,000 |
| 1985.30 | Richard Estes | Welcome to 42nd Street (Victory Theatre) | 350,000 | 450,000 | 400,000 |
| 2006.87 | James Abbott McNeill Whistler | Violet and Blue: Among the Rollers | 300,000 | 500,000 | 400,000 |
| 60.1 | Auguste Rodin | Aime Jules Dalou | 375,000 | 425,000 | 400,000 |
| 66.131 | George Bright | Secretary | 350,000 | 450,000 | 400,000 |
| 69.218 | Roman | Statue of the Young Nero Wearing a Toga | 350,000 | 450,000 | 400,000 |
| 71.399 | Jean Baptiste Carpeaux | Ugolino and his Children | 350,000 | 400,000 | 375,000 |
| 2003.32 | Auguste Rodin | Vase of the Titans | 300,000 | 400,000 | 350,000 |
| 40.48 | Egyptian | Head of a Man | 300,000 | 400,000 | 350,000 |
| 45.469 | Rembrandt Peale | Self Portrait | 300,000 | 400,000 | 350,000 |
| 67.273 | Edgar Degas | Dancer Adjusting Her Slipper | 300,000 | 400,000 | 350,000 |

14

| | | | | | |
|---|---|---|---|---|---|
| 71.196 | Martin Carlin | Jewel Coffer | 300,000 | 400,000 | 350,000 |
| 1992.16 | Julian Schnabel | Cabalistic Painting | 250,000 | 400,000 | 325,000 |
| 20.42 | James Abbott McNeill Whistler | Robert Barr | 250,000 | 350,000 | 300,000 |
| 50.193.A | Asteios Group | Panathenaic Amphora | 250,000 | 350,000 | 300,000 |
| 58.359 | John Singleton Copley | Elizabeth Pitts | 250,000 | 350,000 | 300,000 |
| 59.314 | George Cochran Lambdin | At the Front | 250,000 | 350,000 | 300,000 |
| 52.27 | George Caleb Bingham | The Checker Players | 250,000 | 300,000 | 275,000 |
| 69.302 | Edgar Degas | Spanish Dancer | 250,000 | 300,000 | 275,000 |
| 1984.87 | Andre-Charles Boulle and his sons | Pedestal Clock | 200,000 | 300,000 | 250,000 |
| 40.47 | Egyptian | Head of a Man | 200,000 | 300,000 | 250,000 |
| 53.169 | Unknown | Ritual Wine Vessel | 200,000 | 300,000 | 250,000 |
| 1993.122 | Richard Estes | Blue Cadillac | 200,000 | 250,000 | 225,000 |
| 37.92 | Paul Revere II | Teapot | 200,000 | 250,000 | 225,000 |
| 29.1 | Qian Xuan | Early Autumn | 150,000 | 200,000 | 175,000 |
| 56.173 | Edgar Degas | Schoolgirl | 150,000 | 200,000 | 175,000 |
| 59.149 | Thomas Harland | Tall Case Clock | 150,000 | 200,000 | 175,000 |
| F74.36 | Diego M. Rivera | The Meal | 150,000 | 200,000 | 175,000 |
| 1994.30 | Auguste Rodin | Head of Balzac | 150,000 | 180,000 | 165,000 |
| F82.198 | Jean Baptiste Carpeaux | Neapolitan Fisherboy | 150,000 | 175,000 | 162,500 |

15

| | | | | | |
|---|---|---|---|---|---|
| 1983.25.A | Baltimore Painter | South Italian Funerary Vase | 125,000 | 175,000 | 150,000 |
| 45.369 | Rembrandt Harmensz van Rijn | Jan Lutma, Goldsmith | 125,000 | 175,000 | 150,000 |
| 65.148 | Edgar Degas | Mlle La La at the Circus Fernando | 130,000 | 150,000 | 140,000 |
| 66.391 | Hughie Lee-Smith | The Piper | 100,000 | 180,000 | 140,000 |
| 75.86 | Jean Baptiste Carpeaux | Le fumeur | 125,000 | 150,000 | 137,500 |
| 77.63 | Dong Qichang | Freehand Copy of Zhang Xu's Writing of the Stone Record | 120,000 | 150,000 | 135,000 |
| 2005.1.1 | Duncan Phyfe | Pair of Lyre Back Chairs | 100,000 | 150,000 | 125,000 |
| 41.81 | Unknown | Parvati | 100,000 | 150,000 | 125,000 |
| 80.39 | Korean | Pillow | 100,000 | 150,000 | 125,000 |
| 09.1S949 | Rembrandt Harmensz van Rijn | Christ with the Sick around Him, Receiving Little Children | 100,000 | 130,000 | 115,000 |
| 59.297 | Unknown | Crozier Head: Saint Michael and the Dragon | 113,000 | 115,000 | 114,000 |
| 25.13 | Egyptian | Head from an Anthropoid Sarcophagus | 100,000 | 125,000 | 112,500 |
| 59.185 | George Wesley Bellows | A Stag at Sharkey's | 100,000 | 120,000 | 110,000 |
| 70.209 | Pierre Auguste Renoir | La blanchisseuse | 90,000 | 120,000 | 105,000 |
| 2001.70 | George Cochran Lambdin | Roses on a Wall | 80,000 | 120,000 | 100,000 |
| 53.153 | George Caleb Bingham | John Quincy Adams | 90,000 | 110,000 | 100,000 |
| 1984.2 | Korean | Full Moon Jar | 80,000 | 100,000 | 90,000 |
| 09.1S937 | Rembrandt Harmensz van Rijn | Presentation in the Temple | 12,000 | 160,000 | 86,000 |
| 14.7 | Rembrandt Harmensz van Rijn | The Goldweigher's Field | 70,000 | 90,000 | 80,000 |

16

| 09.1S922 | Rembrandt Harmensz van Rijn | Self Portrait with Saskia | 50,000 | 100,000 | 75,000 |
|---|---|---|---|---|---|
| 1993.19 | Leonaert Bramer | The Adoration of the Magi | 60,000 | 80,000 | 70,000 |
| 38.33 | Rembrandt Harmensz van Rijn | Descent from the Cross by Torchlight | 45,000 | 85,000 | 65,000 |
| 1988.1 | Korean | Head of Buddha | 50,000 | 70,000 | 60,000 |
| 65.140 | Paul Cezanne | Slave | 50,000 | 70,000 | 60,000 |
| 09.1S928 | Rembrandt Harmensz van Rijn | Abraham and Isaac | 40,000 | 70,000 | 55,000 |
| 09.1S968 | Rembrandt Harmensz van Rijn | Landscape with a Square Tower | 50,000 | 60,000 | 55,000 |
| 1990.295 | Louis Comfort Tiffany | Jack-in-the-Pulpit Vase | 50,000 | 55,000 | 52,500 |
| 09.1S945 | Rembrandt Harmensz van Rijn | Christ and the Woman of Samaria | 40,000 | 60,000 | 50,000 |
| 09.1S972 | Rembrandt Harmensz van Rijn | Old Man Shading His Eyes with His Hand | 40,000 | 60,000 | 50,000 |
| 68.22 | Rembrandt Harmensz van Rijn | Old Man Shading His Eyes with His Hand | 40,000 | 60,000 | 50,000 |
| F77.104 | Thomas Cowperthwaite Eakins | Three Female Nudes | 40,000 | 60,000 | 50,000 |
| 09.1S959 | Rembrandt Harmensz van Rijn | Death of the Virgin | 35,000 | 55,000 | 45,000 |
| 09.1S963 | Rembrandt Harmensz van Rijn | Medea: Or the Marriage of Jason and Creusa | 30,000 | 50,000 | 40,000 |
| 09.1S963.A | Rembrandt Harmensz van Rijn | Medea: Or the Marriage of Jason and Creusa | 30,000 | 50,000 | 40,000 |
| 09.1S986 | Rembrandt Harmensz van Rijn | Three Heads of Women | 35,000 | 45,000 | 40,000 |
| 1994.97.A | Islamic | Qur'an Folio | 20,000 | 60,000 | 40,000 |
| 2006.109 | Gandhara | Bodhisattva Padmapani | 30,000 | 50,000 | 40,000 |
| 31.70 | Egyptian | Seated Scribe | 35,000 | 45,000 | 40,000 |

| | | | | | |
|---|---|---|---|---|---|
| 2003.26.1 | Lorna Simpson | Bathroom | 30,000 | 40,000 | 35,000 |
| 70.210 | Auguste Rodin | Baudelaire | 30,000 | 40,000 | 35,000 |
| 09.1S934 | Rembrandt Harmensz van Rijn | Adoration of the Shepherds | 25,000 | 40,000 | 32,500 |
| 09.1S975 | Rembrandt Harmensz van Rijn | Man in an Arbour | 30,000 | 35,000 | 32,500 |
| 09.1S923 | Rembrandt Harmensz van Rijn | Self Portrait in a Velvet Cap with Plume | 20,000 | 40,000 | 30,000 |
| 09.1S981 | Rembrandt Harmensz van Rijn | Bearded Man in a Velvet Cap with a Jewel Clasp | 20,000 | 40,000 | 30,000 |
| 27.586.1 | Nepalese | Manuscript of the "Perfection of Transcendent Wisdom in Eight Thousand Verses" Text | 20,000 | 40,000 | 30,000 |
| 35.40 | Paul Revere II | Sugar Basket | 25,000 | 35,000 | 30,000 |
| 35.41 | Paul Revere II | Creamer | 25,000 | 35,000 | 30,000 |
| 46.174 | Rembrandt Harmensz van Rijn | Self Portrait in a Velvet Cap with Plume | 20,000 | 40,000 | 30,000 |
| 2001.1 | Rembrandt Harmensz van Rijn | The Angel Appearing to the Shepherds | 24,000 | 34,000 | 29,000 |
| 09.1S974 | Rembrandt Harmensz van Rijn | Old Man with a Divided Fur Cap | 24,000 | 32,000 | 28,000 |
| 09.1S979 | Rembrandt Harmensz van Rijn | Jan Asselyn | 25,000 | 30,000 | 27,500 |
| 09.1S933 | Rembrandt Harmensz van Rijn | Angel Appearing to the Shepherds | 22,000 | 30,000 | 26,000 |
| 09.1S1044 | Peter Paul Rubens | Saint Catherine of Alexandria | 20,000 | 30,000 | 25,000 |
| 09.1S926 | Rembrandt Harmensz van Rijn | Abraham Casting Out Hagar and Ishmael | 20,000 | 30,000 | 25,000 |
| 09.1S943 | Rembrandt Harmensz van Rijn | Christ Driving the Money Changers from the Temple | 23,000 | 27,000 | 25,000 |
| 09.1S944 | Rembrandt Harmensz van Rijn | Christ Driving the Money Changers from the Temple | 23,000 | 27,000 | 25,000 |
| 2001.9 | Lorna Simpson | Coiffure | 20,000 | 30,000 | 25,000 |

18

| | | | | | |
|---|---|---|---|---|---|
| 35.103 | Coptic | Female Portrait with Halo | 20,000 | 30,000 | 25,000 |
| 45.370 | Rembrandt Harmensz van Rijn | Golf Player | 18,000 | 30,000 | 24,000 |
| 09.1S982 | Rembrandt Harmensz van Rijn | Bust of a Man Wearing a High Cap, Three-Quarters Right: The Artist's Father (? | 20,000 | 25,000 | 22,500 |
| 1989.76.A | Henry Kirke Brown | Filatrice | 20,000 | 25,000 | 22,500 |
| 09.1S921 | Rembrandt Harmensz van Rijn | Self Portrait in a Cap and Scarf with the Face Dark: Bust | 15,000 | 28,000 | 21,500 |
| 09.1S929 | Rembrandt Harmensz van Rijn | Joseph Telling His Dreams | 16,000 | 24,000 | 20,000 |
| 68.20 | Rembrandt Harmensz van Rijn | Old Man Shading His Eyes with His Hand | 15,000 | 25,000 | 20,000 |
| 2004.52 | James Abbott McNeill Whistler | The Kitchen | 18,000 | 20,000 | 19,000 |
| 79.28.1 | Suzuki Kiitsu | Reeds and Cranes | 18,000 | 20,000 | 19,000 |
| 09.1S955 | Rembrandt Harmensz van Rijn | Return of the Prodigal Son | 15,000 | 22,000 | 18,500 |
| 09.1S936 | Rembrandt Harmensz van Rijn | Presentation in the Temple | 15,000 | 21,000 | 18,000 |
| 1988.62 | Choi Sokhwan | Grapevine | 15,000 | 20,000 | 17,500 |
| 09.1S941 | Rembrandt Harmensz van Rijn | Tribute Money | 13,000 | 20,000 | 16,500 |
| 45.368 | Rembrandt Harmensz van Rijn | Triumph of Mordecai | 12,000 | 20,000 | 16,000 |
| 52.243 | Rembrandt Harmensz van Rijn | Christ Crucified between the Two Thieves | 11,000 | 21,000 | 16,000 |
| 09.1S946 | Rembrandt Harmensz van Rijn | Christ and the Woman of Samaria Among Ruins | 14,000 | 17,000 | 15,500 |
| 09.1S953 | Rembrandt Harmensz van Rijn | Christ Carried to the Tomb | 14,000 | 16,000 | 15,000 |
| 09.1S984 | Rembrandt Harmensz van Rijn | The Artist's Mother Seated, in an Oriental Headdress Half Length | 12,000 | 18,000 | 15,000 |
| 1983.3 | Unknown | Noh Theater Robe, Surihaku Type | 10,000 | 20,000 | 15,000 |

19

| | | | | | |
|---|---|---|---|---|---|
| 52.242 | Rembrandt Harmensz van Rijn | Flight into Egypt | 14,000 | 16,000 | 15,000 |
| 09.1S973 | Rembrandt Harmensz van Rijn | Old Man with Beard, Fur Cap, and Velvet Cloak | 13,000 | 16,000 | 14,500 |
| 09.1S935 | Rembrandt Harmensz van Rijn | The Circumcision | 12,500 | 16,000 | 14,250 |
| 09.1S940 | Rembrandt Harmensz van Rijn | Christ Disputing with the Doctors | 11,000 | 15,000 | 13,000 |
| 09.1S947 | Rembrandt Harmensz van Rijn | Raising of Lazarus | 11,000 | 13,000 | 12,000 |
| 09.1S939 | Rembrandt Harmensz van Rijn | Virgin and Child in the Clouds | 8,000 | 15,000 | 11,500 |
| 09.1S980 | Rembrandt Harmensz van Rijn | Old Bearded Man in a High Fur Cap | 10,000 | 13,000 | 11,500 |
| 1988.10.13 | Egyptian | The Book of the Dead of Nes-Min, Section 13 | 10,000 | 12,500 | 11,250 |
| 09.1S961 | Rembrandt Harmensz van Rijn | Saint Jerome Praying: Arched | 10,000 | 12,000 | 11,000 |
| 09.1S985 | Rembrandt Harmensz van Rijn | Studies of the Head of Saskia and Others | 8,000 | 12,000 | 10,000 |
| 59.79 | Rembrandt Harmensz van Rijn | A Peasant in a High Cap, Standing Leaning on a Stick | 9,000 | 11,000 | 10,000 |
| 46.173 | Rembrandt Harmensz van Rijn | The Rest on the Flight: A Night Piece | 6,000 | 8,000 | 7,000 |
| 59.289 | Louis Comfort Tiffany | Flower-form Vase | 6,000 | 8,000 | 7,000 |
| 64.295 | John Sloan | Night Windows | 6,000 | 7,500 | 6,750 |
| 09.1S956 | Rembrandt Harmensz van Rijn | Beheading of John the Baptist | 6,000 | 7,000 | 6,500 |
| 2002.135 | Carrie Mae Weems | Not Manet's Type | 5,000 | 7,500 | 6,250 |
| F81.57 | Robert Adamson | Elizabeth Rigby (later Lady Eastlake) | 5,000 | 7,500 | 6,250 |
| 09.1S958 | Rembrandt Harmensz van Rijn | Stoning of Saint Stephen | 4,000 | 6,000 | 5,000 |
| 09.1S965 | Rembrandt Harmensz van Rijn | Baptism of the Eunuch | 3,500 | 6,500 | 5,000 |

13-53846-tjt    Doc 7121-2    Filed 08/27/14    Entered 08/27/14 19:26:07    Page 131 of 215

| | | | | | |
|---|---|---|---|---|---|
| 09.1S964 | Rembrandt Harmensz van Rijn | Bathers | 3,000 | 5,000 | 4,000 |
| 09.1S977 | Rembrandt Harmensz van Rijn | Samuel Manesseh Ben Israel | 2,500 | 5,000 | 3,750 |
| 09.1S977.50 | Rembrandt Harmensz van Rijn | Samuel Manasseh Ben Israel | 2,500 | 5,000 | 3,750 |
| 64.285 | John Sloan | Connoisseurs of Prints | 3,500 | 4,000 | 3,750 |
| 64.279 | John Sloan | The Woman's Page | 3,200 | 3,800 | 3,500 |
| 64.304 | John Sloan | Prone Nude | 2,000 | 3,000 | 2,500 |
| F74.21 | Islamic | Jewel Box inscribed "Amir Bukhara" | 1,000 | 4,000 | 2,500 |
| 1983.21 | Maruyama Okyo | Entertainments of the Four Seasons in Kyoto | 2,000 | 2,500 | 2,250 |

21

**Attachment J**

**Step 2 Attachment**

| DIA Accession No. | Artist | Title | Third Party Average Values |
|---|---|---|---|
| 40.19 | Donatello | Madonna and Child | 5,750,000 |
| 70.186 | Amedeo Modigliani | A Man | 5,750,000 |
| 1994.57 | Pierre Auguste Renoir | The Spanish Guitarist | 5,000,000 |
| 34.188 | Frans Jansz Post | View of the Jesuit Church at Olinda, Brazil | 5,000,000 |
| 56.32 | Fra Angelico | Madonna and Child with Angels | 5,000,000 |
| 2005.62 | Henri Matisse | Anemones and Peach Blossoms | 4,750,000 |
| 65.108 | Henry Moore | Reclining Figure | 4,375,000 |
| 1988.18 | Joan Mitchell | Before, Again II | 4,000,000 |
| 46.56 | Sassetta | The Betrayal of Christ | 4,000,000 |
| 61.397 | Lucas Cranach the Elder | Saint Christopher | 4,000,000 |
| 22.3 | Michel Erhart | Virgin and Child | 3,750,000 |
| 43.38 | Canaletto | The Piazza San Marco | 3,500,000 |
| 53.270 | Sassetta | The Agony in the Garden | 3,500,000 |
| 69.305 | Lyonel Feininger | Sailboats | 3,500,000 |
| 23.31 | Lucas Cranach the Elder | Madonna and Child with Infant Saint John the Baptist and Angels | 3,350,000 |
| 26.94 | Correggio | The Mystic Marriage of Saint Catherine | 3,250,000 |
| 47.58 | Peter Paul Rubens | Archduke Ferdinand, Cardinal-Infante of Spain, at the Battle of Nordlingen | 3,250,000 |
| 63.156 | Stuart Davis | Standard Brand | 3,250,000 |

| | | | |
|---|---|---|---|
| 89.11 | Giovanni Battista Cima | Madonna and Child | 3,250,000 |
| 29.264 | Diego Rodriguez de Silva Velazquez | A Man | 3,125,000 |
| 47.81 | Winslow Homer | The Dinner Horn | 3,100,000 |
| 40.56 | Winslow Homer | Girl and Laurel | 3,000,000 |
| 59.11 | Lyonel Feininger | Fisher off the Coast | 3,000,000 |
| 74.2 | Gaetano Gandolfi | Venus Receiving the Arms from Vulcan for Aeneas | 3,000,000 |
| 77.1.2 | Fra Angelico | Virgin Annunciate | 3,000,000 |
| 74.122 | Yves Tanguy | Shadow Country | 2,950,000 |
| 64.459 | Peter Paul Rubens | Saint Ives of Treguier, Patron of Lawyers, Defender of Widows and Orphans | 2,750,000 |
| 70.150 | Winslow Homer | The Four-Leaf Clover | 2,750,000 |
| 51.66 | Winslow Homer | Defiance: Inviting a Shot Before Petersburg | 2,700,000 |
| 24.95 | Benvenuto di Giovanni di Meo del Guasta | Virgin and Child with Angels | 2,500,000 |
| 25.35 | Carlo Crivelli | The Deposition of Christ | 2,500,000 |
| 40.50 | Michel Sittow | Catherine of Aragon as the Magdalene | 2,500,000 |
| 59.444 | Sodoma | The Holy Family and St. John | 2,500,000 |
| 70.185 | Amedeo Modigliani | Young Man with a Cap | 2,500,000 |
| 72.436 | Tony Smith | Gracehoper | 2,500,000 |
| 73.1 | Charles Le Brun | The Presentation of Christ in the Temple | 2,500,000 |
| 45.454 | Georgia O'Keeffe | Stables | 2,375,000 |

2

| | | | |
|---|---|---|---|
| F76.92 | Donatello | The Nativity (Ford Nativity) | 2,362,500 |
| 59.18 | Thomas Germain | Tureen with Lid, Liner, and Stand | 2,350,000 |
| 42.127 | Claude Gellée | A Seaport at Sunset | 2,300,000 |
| 26.107 | Titian | The Appeal | 2,250,000 |
| 41.10 | Claude Gellée | Sunrise | 2,250,000 |
| 44.271 | Heinrich Campendonk | In the Forest | 2,250,000 |
| 65.347 | Niccolo dell' Abbate | Eros and Psyche | 2,250,000 |
| 66.15 | Giovanni di Paolo | Saint Catherine of Siena Dictating Her Dialogues | 2,250,000 |
| 70.173 | Edouard Manet | On the Beach | 2,200,000 |
| 31.27 | William Merritt Chase | My Little Daughter Dorothy | 2,125,000 |
| 51.13 | Bernardo Strozzi | Street Musicians | 2,062,500 |
| 49.337 | Antoine Jean Gros | Murat Defeating the Turkish Army at Aboukir | 2,000,000 |
| 57.182 | Otto Mueller | Gypsy Encampment | 2,000,000 |
| 54.118 | Charles Demuth | Buildings Abstraction, Lancaster | 1,875,000 |
| 35.110 | Oskar Kokoschka | View of Jerusalem | 1,850,000 |
| 25.2 | Egyptian | Head of a Woman | 1,800,000 |
| 38.56 | Giovanni Battista Piazzetta | Madonna and Child with an Adoring Figure | 1,750,000 |
| 55.183.A | Thomas Germain | Tureen with Lid and Stand | 1,750,000 |
| 61.28 | Albert Bierstadt | The Wolf River, Kansas | 1,750,000 |

3

| | | | |
|---|---|---|---|
| 78.38 | Jasper Francis Cropsey | Indian Summer | 1,750,000 |
| 08.9 | Thomas Wilmer Dewing | The Recitation | 1,700,000 |
| 27.316 | Thomas Wilmer Dewing | Summer | 1,700,000 |
| 73.3 | Henry Clifton and Thomas Carteret, Philadelphia | High Chest of Drawers | 1,700,000 |
| 49.23 | Jean Antoine Houdon | Robert Fulton | 1,625,000 |
| 50.20 | Max Beckmann | Still Life with Lilies | 1,600,000 |
| 77.12 | Andrew Wyeth | Sea Boots | 1,600,000 |
| 53.359 | Francesco Guardi | View of Dolo on the Brenta | 1,575,000 |
| 76.79 | Kongo | Nail Figure | 1,575,000 |
| 53.468 | Domenico Ghirlandaio | Young Man | 1,550,000 |
| 25.65 | Jan de Cock | Lot and His Daughters | 1,500,000 |
| 26.110 | Andrea Solario | Saint George and Saint Sebastian | 1,500,000 |
| 29.316 | Giovanni del Biondo | Virgin Annunciate | 1,500,000 |
| 29.322 | Max Beckmann | Still Life with Fallen Candles | 1,500,000 |
| 47.398 | John Zoffany | Scene from "Love in a Village" | 1,500,000 |
| 63.135 | Karl Schmidt-Rottluff | Evening by the Sea | 1,450,000 |
| 63.133 | Oskar Kokoschka | Girl with Doll | 1,425,000 |
| 25.6 | George Benjamin Luks | Three Top Sergeants | 1,400,000 |
| 58.385 | Paula Modersohn-Becker | Old Peasant Woman | 1,400,000 |

4

| | | | |
|---|---|---|---|
| 2010.106 | Philip Guston | Driver | 1,375,000 |
| 53.193 | Lorenz Helmschmied | Armor in the Gothic Style | 1,375,000 |
| 1999.119.A | Raoul Dufy | The Allegory of Electricity | 1,350,000 |
| 66.68 | Frank Stella | Union I | 1,350,000 |
| 66.17 | Johann Joachim Kaendler | Crane (Grus Grus) | 1,325,000 |
| 2006.153 | Raymond Duchamp-Villon | Le Cheval Majeur (The Large Horse) | 1,250,000 |
| 24.96 | Master of Città di Castello | Madonna and Child | 1,250,000 |
| 89.30 | Gerrit Adriaensz. Berckheyde | View of the Grote Kerk in Haarlem | 1,250,000 |
| 16.31 | Frank Weston Benson | My Daughter Elisabeth | 1,200,000 |
| 25.20 | Antonio Susini | Lion Attacking Horse | 1,200,000 |
| 59.450 | Ernst Ludwig Kirchner | Café | 1,200,000 |
| 79.143 | Childe Hassam | Notre Dame Cathedral, Paris, 1888 | 1,200,000 |
| 24.30 | Maurice Brazil Prendergast | Landscape with Figures | 1,175,000 |
| 2011.18 | Sanford Robinson Gifford | On the Nile | 1,150,000 |
| 29.321 | Edvard Munch | Boy in Blue | 1,150,000 |
| 29.315 | Giovanni del Biondo | Angel Annunciate | 1,125,000 |
| 79.30 | Bartolomeo Manfredi | The Fortune Teller | 1,125,000 |
| 62.97 | Henry Moore | Reclining Figure | 1,100,000 |
| 64.264 | Jean Arp | Torso of a Giant | 1,075,000 |

5

| | | | |
|---|---|---|---|
| 25.205 | Domenico Ghirlandaio | Saint Michael and the Angels at War with the Devil | 1,050,000 |
| 26.17 | Boris Grigoriev | Russian Peasant Girl | 1,050,000 |
| 70.229 | Constantin Brancusi | Sleeping Child | 1,050,000 |
| 1991.1015 | Paul Klee | Translucencies, Orange-Blue | 1,025,000 |
| 81.695 | Giovanni Battista Foggini | Cupid and Psyche | 1,025,000 |
| 77.72 | Jean Francois de Troy | Luncheon with Figures in Masquerade Dress | 1,020,000 |
| 89.39 | Pieter de Hooch | Mother Nursing Her Child | 1,000,000 |
| 25.183 | Kongo | Knife Case and Lid | 950,000 |
| 73.167 | Pietro Piffetti | Secretary | 950,000 |
| 01.2 | John Mix Stanley | Indian Telegraph | 900,000 |
| 59.443 | Pierre Bonnard | Woman with Dog | 875,000 |
| 63.134 | Karl Schmidt-Rottluff | Man with a Green Beard | 875,000 |
| 75.31 | Camille Pissarro | The Kitchen at Piette's, Montfoucault | 850,000 |
| 89.23 | Guido Reni | Head of Christ Crowned with Thorns | 850,000 |
| 37.2 | Karl Schmidt-Rottluff | Rain Clouds, Lago di Garda | 825,000 |
| 82.27 | Giovanni Franceso Susini | Bacchus and a Young Satyr | 825,000 |
| 19.34 | Frederick Carl Frieseke | The Blue Gown | 800,000 |
| 1990.10 | Gioacchino Assereto | St. Francis of Assisi in Ecstasy before a Cherub with a Violin | 800,000 |
| 22.203 | Ferdinand Hodler | A Woman | 800,000 |

6

| | | | |
|---|---|---|---|
| 49.417 | Danese Cattaneo | Neptune: Allegory of Winter and Water | 775,000 |
| 49.418 | Danese Cattaneo | Mars: Allegory of Summer and Fire | 775,000 |
| 53.177 | Etienne Pollet | Toilet Service of the Duchesse de Cadaval | 775,000 |
| 76.95 | Robert Smithson | Non Site - Site Uncertain | 775,000 |
| 21.205 | Erich Heckel | Woman | 750,000 |
| 26.113 | Cristoforo Caselli | Saint Matthew and Saint Sebastian | 750,000 |
| 44.90 | Paul Klee | Reclining | 750,000 |
| 46.135 | Martin Johnson Heade | Sunset | 750,000 |
| 56.85.2 | Thomas Germain | Candelabrum | 750,000 |
| 71.7 | Claes Oldenburg | Giant Three-Way Plug | 750,000 |
| 75.18 | Claes Oldenburg | Alphabet / Good Humor - Cloth Study | 750,000 |
| 77.14 | Claes Oldenburg | Alphabet / Good Humor | 750,000 |
| 36.10 | Il Pensionante del Saraceni | The Fruit Vendor | 725,000 |
| 15.12 | Willard Leroy Metcalf | The White Veil | 700,000 |
| 1983.24 | Fang | Mask | 700,000 |
| 37.11 | Frederic Sackrider Remington | The Mountain Man | 700,000 |
| 26.43 | Willem Kalf | Still Life with Columbine Goblet | 675,000 |
| 37.1 | Emanuel de Witte | Interior of the Oude Kerk in Amsterdam | 675,000 |
| 56.31 | Thomas Cole | American Lake Scene | 675,000 |

7

| | | | |
|---|---|---|---|
| F76.14 | Albrecht Dürer | Adam and Eve | 650,000 |
| 64.218 | Karl Hofer | Wind | 625,000 |
| 74.123 | Chaim Soutine | Red Gladioli | 625,000 |
| 1992.290 | Benin | Horse and Rider | 615,000 |
| 55.519 | Unknown | Pride | 600,000 |
| 19.150 | Robert Cozad Henri | Boy with Plaid Scarf | 550,000 |
| 1995.26 | Martin Johnson Heade | Seascape: Sunset | 550,000 |
| 26.28 | Maurice de Vlaminck | Marine | 550,000 |
| 52.246 | Augustus Saint-Gaudens | Abraham Lincoln | 550,000 |
| 77.29 | Fang | Head | 550,000 |
| 34.191 | Bacchiacca (Francesco Ubertini Verdi) | Saint John the Baptist in the Wilderness | 545,000 |
| 56.85.1 | Thomas Germain | Candelabrum | 525,000 |
| 75.59 | Felix Vallotton | Standing Nude Holding Gown on Her Knee | 525,000 |
| 26.112 | Cristoforo Caselli | Saint Paul and Saint James the Elder | 500,000 |
| 28.123 | Master of the Games | A Peasant Family | 500,000 |
| 30.322 | William James Glackens | The Promenade | 500,000 |
| 46.359 | Rogier van der Weyden | Saint Jerome in the Desert | 500,000 |
| 57.88 | Unknown | Yogini | 500,000 |
| 1988.9 | Jean-Frederic Bazille | Still Life with Fish | 475,000 |

| | | | |
|---|---|---|---|
| 79.21 | Pierre Puget | Le ravissement d'Helene | 475,000 |
| 53.197 | Unknown | Armor for the Tilt in the Saxon Fashion | 462,500 |
| 14.5 | Jonas Lie | Culebra Cut | 450,000 |
| 19.36 | Elie Nadelman | Resting Stag | 450,000 |
| 19.43 | Paul Manship | Dancer and Gazelles | 450,000 |
| 1987.75 | Louis Francois Roubiliac | Bust of Isaac Ware | 450,000 |
| 1992.8 | Henri Gervex | Cafe Scene in Paris | 450,000 |
| 21.181 | Unknown | Landscape | 450,000 |
| 29.425 | Unknown | Ceremonial Wine Vessel | 450,000 |
| 58.383 | Michel Sittow | A Young Man in a Red Cap | 450,000 |
| 72.201 | Rembrandt Harmensz van Rijn | Man Wearing a Plumed Beret and Gorget | 450,000 |
| 79.22 | Bamileke | Maternity Figure | 450,000 |
| 41.124 | Donatello | Coat of Arms of the Boni Family | 437,500 |
| 76.159 | Lovis Corinth | Still Life with Lilacs | 437,500 |
| 2005.72 | Thomas Wilmer Dewing | Commerce and Agriculture Bringing Wealth to Detroit | 425,000 |
| 22.8 | Andrea Previtali | Madonna and Child in Landscape | 425,000 |
| 22.9 | Antonio Rimpatta | Madonna and Child with the Infant Saint John the Baptist | 425,000 |
| 24.113 | Greek | Draped Female Figure | 425,000 |
| 27.160 | Augustus Edwin John | The Mumpers | 425,000 |

9

| | | | |
|---|---|---|---|
| 50.31 | John Haberle | Grandma's Hearthstone | 425,000 |
| 82.49 | Bena Lulua | Figure | 425,000 |
| 19.66 | James Earle Fraser | The End of the Trail | 400,000 |
| 25.201 | Odilon Redon | Evocation of Butterflies | 400,000 |
| 25.41 | Maso di Banco | Virgin Enthroned with Saints, Nativity and Crucifixion | 400,000 |
| 26.370 | Sawos | Ceremonial Shield | 400,000 |
| 29.331 | Georg Kolbe | Assunta | 400,000 |
| 38.80 | Bernardino dei Conti | Gentleman of the Trivulzio Family | 400,000 |
| 69.361 | Ellsworth Kelly | Black White | 400,000 |
| 82.3 | Paul Manship | The Moods of Time: Evening | 400,000 |
| 20.100 | Henry Raeburn | Henry David Erskine, Twelfth Earl of Buchan | 375,000 |
| 2001.36 | Severin Roesen | Flowers | 375,000 |
| 36.30 | Paolo Veronese | The Muse of Painting | 375,000 |
| 37.74 | Unknown | Vase | 375,000 |
| 10.6 | Willard Leroy Metcalf | Unfolding Buds | 350,000 |
| 19.19 | Childe Hassam | Surf and Rocks | 350,000 |
| 19.37 | Elie Nadelman | Wounded Stag | 350,000 |
| 1990.245 | Doccia Porcelain Factory | Apollo in his Chariot | 350,000 |
| 1996.32 | Joseph Chinard | Perseus Rescuing Andromeda | 350,000 |

10

| | | | |
|---|---|---|---|
| 25.206 | Unknown | Young Man | 350,000 |
| 44.165 | Washington Allston | The Flight of Florimell | 350,000 |
| 45.455 | Charles Sheeler | Home Sweet Home | 350,000 |
| 53.470 | Oskar Kokoschka | The Cat | 350,000 |
| 70.680 | Theodore Robinson | Scene at Giverny | 350,000 |
| 29.355 | Luca della Robbia | Madonna and Child | 340,000 |
| 1994.88 | Thomas Worthington Whittredge | The Baptism | 325,000 |
| 1998.58 | Ercole Ferrata | Portrait Bust of Ottaviano Acciaiuoli | 325,000 |
| 39.6 | Asher Brown Durand | Monument Mountain, Berkshires | 325,000 |
| 43.418 | Jacob Jordaens | Job | 325,000 |
| 72.839 | Thomas Wilmer Dewing | Classical Figures | 325,000 |
| 73.254 | Antonio Montauti | The Return of the Prodigal Son | 325,000 |
| 46.260 | Etruscan | Bronze Statuette of a Rider | 317,500 |
| 27.158 | Arthur Bowen Davies | Dances | 312,500 |
| 53.196 | Unknown | Armor for the Tilt | 312,500 |
| 1983.13 | Franz Ignaz Günther | Christ at the Column | 300,000 |
| 1998.1 | Richard Wilson | Caernarvon Castle | 300,000 |
| 21.102 | Charles Rennie Mackintosh | Petunias | 300,000 |
| 26.22 | Jan Baptist Weenix | Still Life with a Dead Swan | 300,000 |

11

| | | | |
|---|---|---|---|
| 28.95 | Nicolas Lancret | The Repast of the Hunting Party | 300,000 |
| 29.320 | Andrea di Bartolo | Christ in Benediction | 300,000 |
| 55.175 | Richard Caton Woodville | The Card Players | 300,000 |
| 21.70 | William McGregor Paxton | Woman Sewing | 290,000 |
| 47.122 | George Benjamin Luks | Woman with Macaws | 287,500 |
| 26.126 | Byzantine | Casket | 275,000 |
| 26.180 | Benin | Royal Portrait | 275,000 |
| 29.324 | Giorgio de Chirico | Horses | 275,000 |
| 29.357.A | Carl Milles | Europa and the Bull | 275,000 |
| 51.9 | Ojibwa | Bowl in the Form of a Beaver | 275,000 |
| 53.200 | Unknown | Corsaletto | 262,500 |
| 08.7 | John Henry Twachtman | The Pool | 250,000 |
| 1999.1 | Martin Puryear | Untitled, 1997 | 250,000 |
| 25.22 | Albert Pinkham Ryder | Summer Night, Moonlight | 250,000 |
| 30.370 | Rembrandt Harmensz van Rijn | Christ | 250,000 |
| 50.19 | Albert Pinkham Ryder | The Tempest | 250,000 |
| 81.698 | Easter Island | Gorget | 250,000 |
| F80.215 | Robert S. Duncanson | Ellen's Isle, Loch Katrine | 250,000 |
| 23.100 | George Inness | Apple Orchard | 240,000 |

12

| 51.331 | George Inness | The Lonely Pine | 240,000 |
|---|---|---|---|
| 26.106 | Unknown | Adoration of the Magi, St. Severus and St. Walburga, St. James and St. Philip | 225,000 |
| 26.124 | Francesco da Valdambrino | Corpus of Christ | 225,000 |
| 29.348 | Francesco Fanelli | Don Gaspar de Guzman, Duke of San Lucar, known as the Count-Duke of Olivares (1587-1645) | 225,000 |
| 30.371 | Egyptian | Relief of Peasants Driving Cattle and Fishing | 225,000 |
| 82.26 | John White Alexander | Panel for Music Room | 225,000 |
| 15.2 | Paul Manship | Centaur and Dryad | 210,000 |
| 25.145 | Domenico di Michelino | The Trinity | 210,000 |
| 28.147 | Unknown | Reliquary | 210,000 |
| 10.21 | Birge Harrison | Fifth Avenue at Twilight | 200,000 |
| 1997.80 | Olówè of Isè | Palace Door | 200,000 |
| 27.382 | Philippe Magnier | Nymph and Eros | 200,000 |
| 27.383 | Antoine Coysevox | Le Fleuve la Garonne | 200,000 |
| 28.150 | Unknown | Attendant Deity | 200,000 |
| 28.99 | Marie Laurencin | Mother and Child | 200,000 |
| 49.498 | Robert S. Duncanson | Uncle Tom and Little Eva | 200,000 |
| 55.520 | Unknown | Charity | 200,000 |
| 55.521 | Unknown | Fortitude | 200,000 |
| 55.522 | Unknown | Wrath | 200,000 |

13

| | | | |
|---|---|---|---|
| 89.44 | Rembrandt Harmensz van Rijn | The Death of Lucretia (?) | 200,000 |
| 22.10 | Francesco dai Libri | Madonna and Child | 190,000 |
| 27.211 | Roman | Head of a Man | 190,000 |
| 53.198 | Unknown | Half-Armor | 187,500 |
| 21.182 | Unknown | Virgin and Child Enthroned | 185,000 |
| 21.197 | Unknown | Altar Cross | 185,000 |
| 22.30 | Unknown | Virgin and Child with Donor | 185,000 |
| 1992.42 | Bartolomeo Bellano | Head of a Youth or Angel | 175,000 |
| 21.213 | Georg Kolbe | Resurrection | 175,000 |
| 65.162 | Henri Matisse | Plumed Hat | 175,000 |
| 70.323 | Emil Nolde | Portrait of the Artist and His Wife | 175,000 |
| 59.124.A | Fontana Workshop | Childbirth Set | 172,500 |
| 43.486 | William Merritt Chase | Portrait of a Lady in Black | 162,500 |
| 67.254 | William Merritt Chase | Mrs. William Merritt Chase | 162,500 |
| 70.831 | Benjamin West | Lot Fleeing from Sodom | 162,500 |
| 20.113 | Eugene Louis Boudin | View of Antibes | 160,000 |
| 21.209 | Erich Heckel | Sunflowers | 160,000 |
| 29.327 | James Ensor | Le Ballet Féerique (Le Jardin D'Amour) | 160,000 |
| 31.55 | Islamic | Ewer | 160,000 |

| | | | |
|---|---|---|---|
| 2004.14 | Hale Woodruff | The Art of the Negro: Artists (Study) | 150,000 |
| 25.147 | Tino di Camaino | Madonna and Child | 150,000 |
| 26.108 | Guercino (Giovanni Francesco Barbieri) | Christ and the Woman of Samaria | 150,000 |
| 27.380 | Donatello | Saint George | 150,000 |
| 27.381 | Michelangelo | Dying Slave | 150,000 |
| 28.144 | John Crome | View near Weymouth | 150,000 |
| 35.119 | Thomas Doughty | In Nature's Wonderland | 150,000 |
| 38.25 | Turone da Verona | Crucifixion | 150,000 |
| 69.452 | Henry Ossawa Tanner | Flight into Egypt | 150,000 |
| 70.328 | Karl Schmidt-Rottluff | Water Lilies | 150,000 |
| 81.644 | Meskwaki | Bear Claw Necklace | 150,000 |
| 24.73 | Aristide Maillol | Crouching Female | 140,000 |
| 25.184 | Niccolo Tribolo | Putto and Two Geese | 140,000 |
| 28.83 | Unknown | Vase | 140,000 |
| 24.98 | Egyptian | Relief of Mourners and Funeral Meats | 137,500 |
| 42.59 | Asher Brown Durand | View of Rutland, Vermont | 137,500 |
| 28.181 | Renee Sintenis | Donkey | 135,000 |
| 28.94 | Jan Fyt | Dead Game and Weasels | 135,000 |
| 25.18 | Unknown | Angel Holding Candlestick | 130,000 |

15

| | | | |
|---|---|---|---|
| 51.54 | Girolamo Campagna | Athena Armed | 130,000 |
| 16.13 | Solon Hannibal Borglum | Lassoing Wild Horses | 125,000 |
| 1983.7 | Eskimo | Winged Object | 125,000 |
| 26.7 | Riza-i 'Abbasi | Pair of Doors | 125,000 |
| 29.313 | Islamic | Double-niche rug | 125,000 |
| 29.41 | Luca Signorelli | The Resurrected Christ Appearing to St. Magdalene | 125,000 |
| 29.42 | Luca Signorelli | The Resurrected Christ Appearing to His Disciples | 125,000 |
| 44.219 | School of Florence | The Agony in the Garden | 125,000 |
| 44.220 | School of Florence | Pilate Washing his Hands | 125,000 |
| 47.397.A | Dick Price | Sisiutl | 125,000 |
| 59.312 | John Mix Stanley | Mountain Landscape with Indians | 125,000 |
| 80.25 | Unknown | Tray with Design of Cranes and Chrysanthemums | 125,000 |
| 22.12 | Andrea di Bartolo | Madonna and Child | 120,000 |
| 26.111 | Antoniazzo Romano | Christ Enthroned, the Virgin, Saint Francesca Romana, an Angel and Donor | 120,000 |
| 1994.77 | Unknown | Pietre dure Cabinet | 115,000 |
| 22.254.1 | Unknown | Console | 115,000 |
| 24.104 | Roman | Head of Bearded Man | 115,000 |
| 24.13 | Tyskiewicz Painter | Jar depicting Aphrodite, Hera and Hermes | 115,000 |
| 27.208 | Roman | Sarcophagus with Winged Victories Holding Plaque | 115,000 |

16

| | | | |
|---|---|---|---|
| 48.137 | Islamic | Summer Floor Covering (nihale) | 115,000 |
| 16.16 | William Merritt Chase | Self Portrait | 112,500 |
| 24.110 | Bonino da Campione | Madonna and Child | 110,000 |
| 27.273 | Islamic | 'Dragon' Rug | 110,000 |
| 26.138 | Unknown | Sarcophagus | 105,000 |
| 29.443 | Unknown | Buddha Triad with Mandorla | 105,000 |
| 13.8 | Robert Reid | The Miniature | 100,000 |
| 2001.74 | Islamic | Section of a Tile Panel | 100,000 |
| 25.151 | Agostino di Giovanni | Madonna and Child with Angels | 100,000 |
| 26.181 | Islamic | Bowl | 100,000 |
| 27.541 | Unknown | Scene from "The Tale of Genji": from the chapter "The Maiden" | 100,000 |
| 29.297 | Islamic | Inkwell | 100,000 |
| 30.283 | Paul Klee | Woman Reading | 100,000 |
| 34.153 | Tintoretto | Study after Michelangelo's Saint Damian | 100,000 |
| 53.273 | Irish | Lunula | 100,000 |
| 27.314 | Dwight William Tryon | Autumn | 95,000 |
| 27.315 | Dwight William Tryon | Spring | 95,000 |
| 30.421 | Islamic | Bowl Inscribed "Wealth" | 90,000 |
| 1997.72.A | Louis Comfort Tiffany | Tall Case Clock | 85,000 |

17

| | | | |
|---|---|---|---|
| 22.15 | Raoul Dufy | Still Life | 85,000 |
| 24.105 | Cypriot | Head of a Bearded Man | 85,000 |
| 25.43 | Mariotto di Nardo | Madonna and Child | 85,000 |
| 27.546 | Anonymous | Seated Nyoirin Kwannon | 85,000 |
| 29.333 | Unknown | Saint John the Evangelist | 85,000 |
| 30.291 | Max Kaus | Man in a Fur Coat | 85,000 |
| 30.432.A | Islamic | Salt Cellar inscribed with Poem about Salt | 85,000 |
| 28.186 | Edward Hopper | The Locomotive | 82,500 |
| 21.23 | Bessie Potter Vonnoh | Allegresse | 80,000 |
| 26.144 | Unknown | Transenna | 80,000 |
| 26.145 | Unknown | Transenna | 80,000 |
| 27.1 | Unknown | Tomb Effigy of a Recumbent Knight | 80,000 |
| 29.430 | Edward Hopper | Night in the Park | 80,000 |
| 76.144 | Cheyenne | Shield | 80,000 |
| 2002.216 | Claes Oldenburg | Inverted Q | 75,000 |
| 22.11 | Antoniazzo Romano | Madonna and Child | 75,000 |
| 25.114 | George Wesley Bellows | A Knockout, Second State | 75,000 |
| 25.5 | Islamic | Bottle | 75,000 |
| 26.79 | Dante Gabriel Rossetti | A fight for a Woman | 75,000 |

18

| | | | |
|---|---|---|---|
| 29.233.A | Egyptian | Portion of a Carpet | 75,000 |
| 29.356 | Carl Milles | Folke Filbyter | 75,000 |
| 57.84 | Robert S. Duncanson | Fruit Piece | 75,000 |
| 70.651 | Claes Oldenburg | Profile Airflow | 75,000 |
| 77.49 | Maya | Embracing Couple | 75,000 |
| 79.179 | Western Apache | Olla | 75,000 |
| 82.33.A | Korean | Stationery Box with Design of Lotus Blossoms and Scrolls | 75,000 |
| 85.3 | Rembrandt Peale | The Court of Death | 75,000 |
| 24.120 | Leningrad Painter | Mixing Vessel | 70,000 |
| 26.142 | Unknown | Christ and the Symbols of the Four Evangelists | 70,000 |
| 26.179 | Unknown | Transenna | 70,000 |
| 28.81.1 | Jean Hauré | Sconce | 70,000 |
| 77.78 | Nazca Huari | Ceremonial Textile | 70,000 |
| 24.108.A | St. Romauld and Camaldolse Monks | Choral Leaf Fragment: Historiated "A" with Six Monks Presenting a Book to an Enthroned Saint (?) | 67,500 |
| 1999.58 | William T. Williams | The Flute Player | 65,000 |
| 2000.44 | Howardena Pindell | Autobiography: Air/CS560 | 65,000 |
| 24.127 | Swing Painter | Storage Jar | 65,000 |
| 28.112 | Max Kaus | Young Woman Sewing | 65,000 |
| 28.67 | Unknown | Four Heads of Buddhist Divinities | 65,000 |

19

| | | | |
|---|---|---|---|
| 30.285 | Oscar Ghiglia | The Artificial Rose | 65,000 |
| 38.9 | Jacques de Gheyn II | Studies of the Heads of Two Youths and an Old Woman | 65,000 |
| 45.130 | Roman | Oscillum with Satyr and Maenad | 65,000 |
| 47.82 | Robert Crosman | Taunton Chest | 65,000 |
| 21.79 | Wilhelm Pleydenwurff | The Nuremberg Chronicle | 60,000 |
| 27.547 | Anonymous | Seated Kwannon with Two Attendants | 60,000 |
| 28.100 | Maurice Utrillo | The Country House | 60,000 |
| 70.953 | Mather Brown | Sir George Augustus Elliott, Baron Heathfield | 60,000 |
| 25.36 | Islamic | Tile | 57,500 |
| 28.88 | François-Joseph Duret | Flora | 57,500 |
| 26.90 | Thomas Sully | Mrs. Edward Hudson | 55,000 |
| 27.281 | Micali Painter | Storage Jar | 55,000 |
| 28.96 | Andre Derain | Bay of Ciotat | 55,000 |
| 28.97 | Andre Derain | Young Girl | 55,000 |
| 29.347 | Wilhelm Lehmbruck | Standing Female Figure | 55,000 |
| 30.372 | Egyptian | A Middle Kingdom Dignitary | 55,000 |
| 26.20 | Augustin Hirschvogel | Landscape with the Conversion of Saulus | 52,500 |
| 30.373 | Egyptian | Scarab | 52,500 |
| 1986.25 | Huari | Tunic | 50,000 |

| | | | |
|---|---|---|---|
| 2002.126 | Robert Colescott | Change Your Luck | 50,000 |
| 21.135 | Jean Duvet | The Martyrdom of Saint John the Evangelist | 50,000 |
| 21.192 | Unknown | The Dream of Daniel | 50,000 |
| 24.72 | Aristide Maillol | Standing Female | 50,000 |
| 26.369 | Papuan Gulf | Ceremonial Shield | 50,000 |
| 27.542 | Anonymous | Seishi, the Wisdom of Amida, Seated on Lotus Pedestal | 50,000 |
| 27.545 | Anonymous | Amida, Jizo, Seishi, Kwannon and Raikabutsu | 50,000 |
| 30.359 | Rembrandt Harmensz van Rijn | Abraham's Sacrifice | 50,000 |
| 30.362 | Rembrandt Harmensz van Rijn | Abraham Entertaining the Angels | 50,000 |
| 47.180 | Vera Cruz | Palma with Maize God Receiving a Human Sacrifice | 50,000 |
| 51.10 | Ojibwa | Scoop or Spoon | 50,000 |
| 52.207 | Robert S. Duncanson | William Berthelet | 50,000 |
| 78.87 | Hale Woodruff | Ancestral Memory | 50,000 |
| F1983.73 | Bob Thompson | The Death of Camilla | 50,000 |
| 1994.19 | Donald Sultan | Oranges on a Branch March 14, 1992 | 45,000 |
| 21.189 | School of Burgundy | Saint Paul | 45,000 |
| 22.213 | A Stone Buddhist stele | Buddha with Attendants | 45,000 |
| 22.277 | Unknown | Pieta | 45,000 |
| 26.139 | Roman | Strigilated Sarcophagus with Figures of Salus & Asclepius | 45,000 |

21

| | | | |
|---|---|---|---|
| 26.161 | Unknown | Amida Buddha | 45,000 |
| 26.35 | Auguste Herbin | Still Life | 42,500 |
| 29.301.A | The Annunciation | Antiphonary Leaf: Historiated "M" with Annunciation | 42,500 |
| 29.302.A | The Assumption | Antiphonary Leaf: Historiated "V" with Assumption | 42,500 |
| 40.49 | Egyptian | Cinerary Urn | 42,500 |
| 45.120 | Roman | Bull Statuette | 42,500 |
| 82.29 | Mangbetu | Harp | 40,770 |
| 1983.31.1 | Sam Gilliam | The Arc Maker I & II | 40,000 |
| 1985.18 | Judy Pfaff | The Italians | 40,000 |
| 22.205 | Niklaus Weckmann | Virgin and Child | 40,000 |
| 24.14 | Group E, Greek | Neck Amphora | 40,000 |
| 25.176 | Byzantine | Calendar of the Twelve Great Feasts of the Orthodox Church | 40,000 |
| 26.10 | Benin (i) | Warrior | 40,000 |
| 26.109 | Jan van Coninxloo | The Crucifixion | 40,000 |
| 26.11 | Benin (II) | Warrior | 40,000 |
| 26.116 | Mariano Andreu | Spanish Dancer | 40,000 |
| 26.117 | Mariano Andreu | The Bathers | 40,000 |
| 26.32 | Paul Signac | Port Louis | 40,000 |
| 26.33 | Paul Signac | The Seine | 40,000 |

22

| | | | |
|---|---|---|---|
| 28.103 | Gino Severini | Still Life | 40,000 |
| 29.312 | William Cripps | Epergne | 40,000 |
| 29.330 | Aristide Maillol | Venus | 40,000 |
| 60.66 | Jean-Léon Gérôme | Solitude | 40,000 |
| 22.225 | Islamic | Carpet with a Large Octagon and Four Small Octagons | 37,500 |
| 26.120 | Unknown | The Flagellation | 37,500 |
| 26.89 | Thomas Sully | Dr. Edward Hudson | 37,500 |
| 30.380 | George Grosz | Conversation | 37,500 |
| 30.446 | Islamic | Seven-wick Lamp | 37,500 |
| 30.460 | Islamic | Bowl | 37,500 |
| 1987.93 | Navajo | Wearing Blanket | 35,000 |
| 1989.50 | Alvin Loving | J.E. and the Uptown A's | 35,000 |
| 1997.8 | Sèvres Porcelain Manufactory | Napoléon I | 35,000 |
| 2001.38 | Augusta Savage | Gamin | 35,000 |
| 25.156 | Donatello | Coat of Arms of the Martelli Family | 35,000 |
| 26.223 | Unknown | Window Frame | 35,000 |
| 28.132 | Tibetan | Yamantaka and Minor Deities | 35,000 |
| 29.318 | Antonio Vivarini | Scene from the Life of a Female Saint | 35,000 |
| 29.342 | Unknown | Lady with Phoenix Headdress | 35,000 |

23

| | | | |
|---|---|---|---|
| 30.274 | Unknown | Portrait of an Artist | 35,000 |
| 53.171 | Unknown | Tiger Mask | 35,000 |
| 53.175 | Unknown | Central Asian Musician | 35,000 |
| 53.176 | Unknown | Central Asian Musician | 35,000 |
| 21.194 | Unknown | Saint Catherine | 32,500 |
| 25.61 | Ivan Mestrovic | Contemplation | 32,500 |
| 27.216 | Roman | Cinerary Urn | 32,500 |
| 22.279 | Unknown | Chandelier | 31,000 |
| 1992.214 | Beauford Delaney | Self Portrait | 30,000 |
| 21.31 | Charles Cottet | The Port of Douarnenez | 30,000 |
| 25.161 | Unknown | Candelabrum Relief | 30,000 |
| 26.129 | Unknown | Bas-relief of a Horse | 30,000 |
| 28.141 | Unknown | Gateleg Table | 30,000 |
| 28.145 | Islamic | Dish | 30,000 |
| 29.250 | William Savery | Arm Chair | 30,000 |
| 25.155 | Unknown | Relief | 29,000 |
| 1992.279 | Sèvres Porcelain Manufactory | Fénelon, from the "Great Men" Series | 27,500 |
| 22.29 | Unknown | Drawing Room | 27,500 |
| 29.259 | Alexander Helwig Wyant | Summer Landscape | 27,500 |

24

| | | | |
|---|---|---|---|
| 31.347 | Islamic | Carved Panel, possibly from a cenotaph | 27,500 |
| 26.155 | Unknown | Coat of Arms of the Neapolitan Branch of the Antinori Family | 26,500 |
| 26.193 | Unknown | Roundel with Two Lions (?) in Combat | 26,500 |
| 26.203 | Unknown | Coat of Arms of Federico da Montefeltro | 26,500 |
| 09.1S1047 | Jacob Isaaksz van Ruisdael | Cottage on the Summit of the Hill | 25,000 |
| 21.196 | Unknown | Dish | 25,000 |
| 74.44 | Richard Hunt | Field Section | 25,000 |
| 22.206 | Unknown | Saint Bridget of Sweden | 24,000 |
| 26.143 | Unknown | Coat of Arms of Pope Leo X, of the Deputy Apostolic Legate in Bologna, Archbishop Altobello Averoldi of Brisighella, and of the town of Bologna | 24,000 |
| 26.183 | Unknown | Coat of Arms | 23,500 |
| 22.246 | Unknown | Roundel with Pair of Dragons | 22,500 |
| 22.247 | Unknown | Roundel with Pair of Birds | 22,500 |
| 26.146 | Unknown | Lion | 22,500 |
| 26.192 | Unknown | Roundel with Bird Attacking a Rabbit | 22,500 |
| 27.210 | Arnolfo di Cambio | Angel | 22,500 |
| 27.573 | Unknown | Arm Chair | 22,500 |
| 26.119 | Unknown | An Apostle | 21,000 |
| 26.205 | Unknown | Coat of Arms of the Brancaccio Imbriani Family | 21,000 |
| 27.217 | Roman | Fish | 21,000 |

| | | | |
|---|---|---|---|
| 1986.66 | Sam Gilliam | Gram | 20,000 |
| 21.116 | Honore Daumier | Le ventre legislatif | 20,000 |
| 26.235 | Unknown | Lunette | 20,000 |
| 24.77 | Unknown | Lamentation over the Dead Christ | 18,500 |
| 27.241 | Unknown | Coat of Arms, Governor of Duren | 18,500 |
| 1992.43 | Meissen Porcelain Manufactory | Teapot | 17,500 |
| 26.148 | Unknown | Fragment of a Relief | 17,500 |
| 26.217 | Unknown | Coat of Arms of Niccolo Sottile (?) | 17,500 |
| 26.221 | Unknown | Coat of Arms, probably of the Suarez Family | 17,500 |
| 46.145 | Pablo Picasso | Le combat | 17,500 |
| 22.249 | Unknown | Roundel with Lion Passant | 16,000 |
| 26.219 | Unknown | Relief Panel with Birds and Lions | 16,000 |
| 28.91 | Islamic | Dish | 16,000 |
| 22.245 | Unknown | Roundel with Mermaid | 15,000 |
| 22.248 | Unknown | Roundel with Lion Attacking a Deer | 15,000 |
| 26.156 | Unknown | Roundel With a Bird Attacking a Rabbit | 15,000 |
| 26.187 | Unknown | Roundel with Bird Attacking a Rabbit | 15,000 |
| 26.188 | Unknown | Roundel with Bird Attacking a Rabbit | 15,000 |
| 26.194 | Unknown | Roundel with Horsemen in Combat with a Feline Animal | 15,000 |

26

| | | | |
|---|---|---|---|
| 26.220 | Unknown | Relief Fragment | 15,000 |
| 77.71 | Bamgboye of Odo-Owa | Epa Cult Mask | 15,000 |
| 21.184 | Unknown | Crespina Istoriato | 14,000 |
| 24.143 | Larghetto Painter | Mixing Vessel | 14,000 |
| 24.147 | Dotted Stripe Group, Greek | Fish Plate | 14,000 |
| 26.170 | Unknown | Ciborium Fragment | 14,000 |
| 26.189 | Unknown | Roundel: Two Birds Flanking a Tree | 14,000 |
| 26.190 | Unknown | Roundel with Pair of Birds | 14,000 |
| 26.197 | Unknown | Roundel with Agnes Dei | 14,000 |
| 28.79 | Jean-Baptiste-François Cronier | Mantel Clock | 14,000 |
| 31.349 | Islamic | Tile with Lotus Blossoms | 14,000 |
| 29.214 | Unknown | Standing Bowl | 13,500 |
| 26.196 | Unknown | Roundel with Fox Attacking a Sheep | 13,000 |
| 26.201 | Unknown | Roundel with Two Animals in Combat | 13,000 |
| 27.220 | Unknown | Coat of Arms of the Pasqui or possibly Bernardi Family | 13,000 |
| 2002.136.1 | Fletcher and Gardiner | Coffee Pot | 12,500 |
| 26.215 | Unknown | Coat of Arms of Federico da Montefeltro | 12,500 |
| 09.1S932 | Rembrandt Harmensz van Rijn | Angel Departing from the Family of Tobias | 12,000 |
| 47.160 | Rembrandt Harmensz van Rijn | Angel Departing from the Family of Tobias | 12,000 |

| | | | |
|---|---|---|---|
| 24.11 | Greek | Flask | 11,750 |
| 26.213 | Unknown | Coat of Arms of the Fiaschi Family | 11,500 |
| 1993.24 | C. F. A. Voysey | Arm Chair | 11,000 |
| 26.212 | Unknown | Coat of Arms of the Pucci delle Stelle Family | 11,000 |
| 27.221 | Unknown | Coat of Arms, possibly of the Gioacchini Family | 11,000 |
| 79.37 | Pende | Mask | 11,000 |
| 26.202 | Unknown | Coat of Arms, Probably of the 'Capitani del Bigallo' | 10,500 |
| 26.209 | Unknown | Coat of Arms of the Gazola Family | 10,500 |
| 26.214 | Unknown | Coat of Arms of the Courtot de Cissey Family | 10,500 |
| 1994.3.A | Boston & Sandwich Glass Company | Overlaid Glass Lamp | 10,000 |
| 52.130 | Edgar Degas | Horses in the Meadow | 10,000 |
| 24.12 | Painter of the Lowering Bulls | Bottle | 9,750 |
| 30.457 | Islamic | Jug | 9,750 |
| 27.218 | Unknown | Sarcophagus | 9,500 |
| 30.431 | Islamic | Mirror with Benedictory Inscription | 9,250 |
| 1993.49 | Robert Moskowitz | Hard Ball III | 9,000 |
| 26.191 | Unknown | Roundel with Bird Attacking a Rabbit | 9,000 |
| 26.206 | Unknown | Coat of Arms, Probably of the Nini Family | 9,000 |
| 26.208 | Unknown | Coat of Arms of the Swiss Luder Family and of the Lund Family, from Schleswig | 9,000 |

| | | | |
|---|---|---|---|
| 26.210 | Unknown | Coat of Arms, unidentified Italian or possibly of the Michault de St-Mars Family | 9,000 |
| 25.149 | Unknown | Cassone | 8,500 |
| 26.158 | Unknown | Madonna and Child with Saints and Angels | 8,500 |
| 30.447 | Islamic | Base of a Lamp Stand wwith Benedictory Inscription | 8,500 |
| 78.43 | Unknown | Capital | 8,500 |
| 70.95 | Guro | Standing Female Figure | 8,130 |
| 62.70 | Rembrandt Harmensz van Rijn | Descent from the Cross by Torchlight | 8,000 |
| 1995.5 | Allie McGhee | Night Ritual | 7,500 |
| 2011.2 | Alison Saar | Blood/Sweat/Tears | 7,500 |
| 26.207 | Unknown | Coat of Arms, Probably of the Tafuri | 7,500 |
| 29.252 | John E. Elliott | Mirror | 7,500 |
| 26.157 | Unknown | Relief Fragment with a Bird | 7,000 |
| 26.200 | Unknown | Roundel with a Feline Animal Attacking a Rabbit | 7,000 |
| 26.211 | Unknown | Coat of Arms of the Medici Family | 7,000 |
| 26.216 | Unknown | Keystone | 7,000 |
| 39.657 | Unknown | Writing Table | 7,000 |
| 26.204 | Unknown | Coat of Arms, Probably of the Della Gherardesca Family | 6,500 |
| 27.275.A | Roman | Earring | 6,500 |
| 29.308 | Alexander Rood | Tankard | 6,500 |

29

| | | | |
|---|---|---|---|
| 29.309 | David King | Two-Handled Cup | 6,500 |
| 49.288 | Joseph Anthony, Jr. | Sauceboat | 6,500 |
| 22.232 | Georg Vest | The Ascension | 5,500 |
| 26.154 | Palestinian | Ampulla | 5,500 |
| 2008.5 | Georges de Feure | Vase | 5,000 |
| F66.40 | Rembrandt Harmensz van Rijn | Adoration of the Shepherds | 5,000 |
| 27.274.A | Roman | Earring | 4,750 |
| 26.178 | Bertoldo di Giovanni | Triumph of Love | 4,500 |
| 29.386 | Islamic | Fragment of a Tiraz Textile with Multiple Inscriptions (illegible) | 4,250 |
| 30.462 | Islamic | Bowl Inscribed "Increasing Prosperity, Wealth" | 4,250 |
| 25.83 | Unknown | Capital: Sinner Fleeing from a Chimera | 4,000 |
| 25.84 | Unknown | Capital: Two Heads between Foliate Forms | 4,000 |
| 30.461 | Islamic | Bowl | 4,000 |
| 31.54 | Islamic | Dish | 4,000 |
| 24.88 | Valerio Belli | Mythological Subject | 3,250 |
| 09.1S969 | Rembrandt Harmensz van Rijn | Cottage beside a Canal: A View of Diemen | 3,000 |
| 24.86 | Valerio Belli | The Judgement of Paris | 3,000 |
| 26.218 | Unknown | Decorative Relief | 3,000 |
| 30.440 | Islamic | Pierced-work Lamp Section with Benedictory Inscription | 3,000 |

| | | | |
|---|---|---|---|
| 69.359 | Pablo Picasso | Sueño y Mentira de Franco (Planche I) | 3,000 |
| 90.1S14462 | Kongo | Male Figure | 3,000 |
| 24.78 | Jacopo Sansovino | Madonna and Child with the Young Saint John | 2,750 |
| 24.84 | Antonio Abondio | Pieta with Two Cherubs | 2,750 |
| 30.442 | Islamic | Spigot | 2,750 |
| 30.452 | Iranian | Vase | 2,100 |
| 1994.94.1A | Boston & Sandwich Glass Company | Jewel Casket | 2,000 |
| 1996.13 | Boston & Sandwich Glass Company | Lacy Compote | 2,000 |
| 26.195 | Unknown | Roundel with Bust of Christ | 2,000 |
| 48.250 | Henri Matisse | L'Avaleur de sabres | 2,000 |
| 30.433 | Islamic | Mirror Case | 1,650 |
| 30.434 | Islamic | Mortar | 1,500 |
| 30.439.A | Islamic | Ewer inscribed "Prosperity, favor" | 1,500 |
| 26.152 | Byzantine | Adoration of the Kings | 1,250 |
| 26.404 | Simon Gate | Bowl | 1,250 |
| 29.225 | Islamic | Mirror with a Harpy | 1,200 |
| 26.177 | Unknown | Relief Fragment | 1,150 |
| 09.1S976 | Rembrandt Harmensz van Rijn | Young Man in a Velvet Cap | 1,000 |
| 29.392 | Islamic | Fragment of a Tiraz Textile | 1,000 |

| | | | |
|---|---|---|---|
| 59.80 | Rembrandt Harmensz van Rijn | Bust of a Man Wearing a High Cap, Three-Quarters Right: The Artist's Father(? | 1,000 |
| 29.227 | Islamic | Mirror with Flying Phoenixes | 925 |
| 30.437 | Persian | Lamp with Benedictory Inscription | 925 |
| 30.438 | Persian | Lamp with Benedictory Inscription | 925 |
| 26.255 | Villanovan | Pin | 500 |
| 1990.19 | Asante | Soul Washers Badge | 400 |
| 29.224 | Persian | Mirror with Benedictory Inscription | 400 |
| 79.28.2 | Suzuki Kiitsu | Reeds and Cranes | - |

32

**Attachment K**

**Step 2 Attachment Supplement**

## I. CHRISTIE'S REPORT:

VWA reviewed Christie's Appraisals, Inc.'s ("Christie's") "Fair Market Value for Financial Planning" ("Christie's Report") dated December 17, 2013, attached as Exhibit 2 to the Expert Report of Vanessa Fusco, dated July 8, 2014, and considered all values Christie's ascribed to works at the DIA.

| Christie's Phase | Christie's # of Objects | Christie's Low Value | Christie's High Value | Christie's Average Value |
|---|---|---|---|---|
| 0 | 1032 | - | - | |
| 1 | 326 | 421,572,850 | 805,167,200 | 613,370,025 |
| 2 | 119 | 29,620,000 | 55,800,000 | 42,710,000 |
| 3 | 1296 | 3,085,145 | 6,030,040 | 4,557,593 |
| **Grand Total** | **2773** | **454,277,995** | **866,997,240** | **660,637,618** |

## PHASE 1:     SUMMARY OF CHRISTIE'S REPORT

| Christie's Phase 1 | Sum of Christie's Low Value | Sum of Christie's High Value | Sum of Christie's # of Objects |
|---|---|---|---|
| 19th Century European Art | 2,000,000 | 3,000,000 | 1 |
| 20th Century Decorative Art & Design | 410,500 | 824,000 | 9 |
| African & Oceanic Art | 850,000 | 1,600,000 | 2 |
| American Art | 12,220,000 | 25,870,000 | 17 |
| American Furniture & Decorative Arts | 120,000 | 218,000 | 8 |
| American Indian Art | 300,000 | 500,000 | 8 |
| Antiquities | 2,272,400 | 6,187,800 | 26 |
| Architectural Elements | 1,185,800 | 2,358,500 | 68 |
| Chinese Ceramics & Works of Art | 600,000 | 1,300,000 | 2 |
| European Furniture, Sculpture and Decorative Objects | 3,442,000 | 7,833,500 | 57 |
| Impressionist & Modern Art | 172,470,000 | 328,420,000 | 25 |
| Islamic Art | 3,021,150 | 7,378,400 | 44 |
| Old Master Paintings | 219,230,000 | 412,190,000 | 36 |
| Porcelain, European Ceramics & Glass | 1,308,000 | 3,268,000 | 9 |
| Pre-Columbian Art | 40,000 | 60,000 | 1 |
| Prints & Multiples | 15,000 | 25,000 | 1 |
| Silver & Objects of Vertu | 55,000 | 89,000 | 9 |
| Indian & Southeast Asian Art | 2,000,000 | 4,000,000 | 1 |
| Post-War & Contemporary Art | 33,000 | 45,000 | 2 |
| **Grand Total** | **421,572,850** | **805,167,200** | **326** |

# PHASE 2: SUMMARY OF CHRISTIE'S REPORT

| Christie's Phase 2 | Sum of Christie's Low Value | Sum of Christie's High Value | Sum of Christie's # of Objects |
|---|---|---|---|
| 20th Century Decorative Art & Design | 200,000 | 400,000 | 1 |
| African & Oceanic Art | 400,000 | 660,000 | 4 |
| American Art | 3,050,000 | 6,510,000 | 9 |
| American Indian Art | 40,000 | 60,000 | 1 |
| Antiquities | 290,000 | 1,165,000 | 9 |
| Books & Manuscripts | 125,000 | 300,000 | 7 |
| Chinese Ceramics & Works of Art | 2,130,000 | 5,030,000 | 13 |
| Chinese Paintings | 1,000,000 | 1,800,000 | 2 |
| European Furniture, Sculpture and Decorative Objects | 110,000 | 270,000 | 3 |
| Impressionist & Modern Art | 5,195,000 | 10,570,000 | 27 |
| Islamic Art | 175,000 | 300,000 | 3 |
| Japanese Art | 280,000 | 410,000 | 5 |
| Modern British Art | 250,000 | 600,000 | 1 |
| Old Master Drawings | 12,100,000 | 20,180,000 | 3 |
| Old Master Paintings | 2,330,000 | 4,360,000 | 19 |
| Prints & Multiples | 345,000 | 535,000 | 7 |
| Russian Art | 830,000 | 1,350,000 | 2 |
| Indian & Southeast Asian Art | 770,000 | 1,300,000 | 3 |
| **Grand Total** | **29,620,000** | **55,800,000** | **119** |

# ALL PHASES: CHRISTIE'S REPORT TOP 15 WORKS BY VALUE

| Christie's Lot Num. | Artist | Title | Christie's Low Value | Christie's High Value | Christie's Average Value |
|---|---|---|---|---|---|
| 244 | Pieter Bruegel the Elder | The Wedding Dance | 100,000,000 | 200,000,000 | 150,000,000 |
| 197 | Vincent Willem van Gogh | Self Portrait | 80,000,000 | 150,000,000 | 115,000,000 |
| 266 | Rembrandt Harmensz van Rijn | The Visitation | 50,000,000 | 90,000,000 | 70,000,000 |
| 186 | Henri Matisse | The Window | 40,000,000 | 80,000,000 | 60,000,000 |
| 176 | Edgar Degas | Dancers in the Green Room | 20,000,000 | 40,000,000 | 30,000,000 |
| 188 | Claude Monet | Gladioli | 12,000,000 | 20,000,000 | 16,000,000 |
| 376 | Michelangelo | Scheme for the Decoration of the Ce | 12,000,000 | 20,000,000 | 16,000,000 |
| 240 | Neri di Bicci | Tobias and Three Archangels | 8,000,000 | 15,000,000 | 11,500,000 |
| 256 | Frans Hals | Portrait of Hendrik Swalmius | 6,000,000 | 10,000,000 | 8,000,000 |
| 270 | Michael Sweerts | In the Studio | 5,000,000 | 10,000,000 | 7,500,000 |
| 264 | Antoine Le Nain | The Village Piper | 6,000,000 | 8,500,000 | 7,250,000 |
| 239 | Giovanni Bellini | Madonna and Child | 4,000,000 | 10,000,000 | 7,000,000 |
| 268 | Sassetta | The Procession to Calvary | 5,000,000 | 8,000,000 | 6,500,000 |
| 21 | John Singer Sargent | Mosquito Nets | 4,500,000 | 8,000,000 | 6,250,000 |
| 247 | Jean Siméon Chardin | Still Life with Dead Hare | 5,000,000 | 7,000,000 | 6,000,000 |
| 250 | Jan van Eyck | Saint Jerome in His Study | 4,000,000 | 8,000,000 | 6,000,000 |

## II.    ARTVEST REPORT:

VWA reviewed Artvest Partners LLC's ("Artvest") July 8, 2014 report "Expert Witness Report of Michael Plummer" ("Artvest Report") and considered all values Artvest ascribed to works at the DIA.

### ARTVEST REPORT'S GROUP 3:
### "HIGH VALUE, NON-COD WORKS IN THE DIA COLLECTION, THAT DIA VALUED FOR INSURANCE PURPOSES OR OTHERWISE OF $1,000,000 OR MORE."

| Artvest Category | Artvest Low Value | Artvest High Value | Artvest Average Value | Count of Objects |
|---|---|---|---|---|
| Africa, Oceania & Indigenous America | 3,100,000 | 5,200,000 | 4,150,000 | 6 |
| American Art Before 1950 | 222,355,000 | 325,885,000 | 274,120,000 | 86 |
| Ancient Near Eastern Art | 80,000,000 | 180,000,000 | 130,000,000 | 3 |
| Asian Art | 200,000 | 300,000 | 250,000 | 1 |
| Contemporary Art after 1950 | 238,800,000 | 318,700,000 | 278,750,000 | 25 |
| European Modern Art to 1950 | 371,880,000 | 518,140,000 | 445,010,000 | 51 |
| European Painting | 601,790,000 | 861,470,000 | 731,630,000 | 120 |
| European Sculpture and Decorative Arts | 46,150,000 | 72,000,000 | 59,075,000 | 49 |
| Islamic Art | 80,000 | 150,000 | 115,000 | 1 |
| Prints, Drawings & Photographs | 4,940,000 | 8,160,000 | 6,550,000 | 6 |
| Timepieces | 60,000 | 80,000 | 70,000 | 1 |
| **Grand Total** | **1,569,355,000** | **2,290,085,000** | **1,929,720,000** | **349** |

### ARTVEST REPORT'S TOP 15 WORKS BY VALUE

| Artvest OBS | Artist | Title | Artvest Low Value | Artvest High Value | Artvest Average Value |
|---|---|---|---|---|---|
| 181 | Vincent Willem van Gogh | Portrait of Postman Roulin | 80,000,000 | 120,000,000 | 100,000,000 |
| 166 | Pablo Picasso | Melancholy Woman | 60,000,000 | 80,000,000 | 70,000,000 |
| 96 | Neo-Assyrian | Tiglath-Pileser III Receiving Homag | 40,000,000 | 80,000,000 | 60,000,000 |
| 83 | Frederic Edwin Church | Cotopaxi | 40,000,000 | 60,000,000 | 50,000,000 |
| 95 | Neo-Babylonian | Snake-Dragon, Symbol of Marduk, | 30,000,000 | 70,000,000 | 50,000,000 |
| 169 | Pablo Picasso | Woman Seated in an Armchair | 40,000,000 | 60,000,000 | 50,000,000 |
| 187 | Vincent Willem van Gogh | Bank of the Oise at Auvers | 40,000,000 | 50,000,000 | 45,000,000 |
| 115/116 | Andy Warhol | Self Portrait: Former Double Self Po | 40,000,000 | 50,000,000 | 45,000,000 |
| 121 | Barnett Newman | Be I (second version) | 35,000,000 | 45,000,000 | 40,000,000 |
| 54 | James Abbott McNeill Whistler | Nocturne in Black and Gold, the Fal | 25,000,000 | 45,000,000 | 35,000,000 |
| 111 | Mark Rothko | Orange, Brown | 30,000,000 | 40,000,000 | 35,000,000 |
| 188 | Paul Cezanne | Madame Cezanne | 30,000,000 | 40,000,000 | 35,000,000 |
| 277 | Michelangelo Merisi da Caravaggio | Martha and Mary Magdalene | 30,000,000 | 40,000,000 | 35,000,000 |
| 143 | Franz Marc | Animals in a Landscape | 25,000,000 | 40,000,000 | 32,500,000 |
| 197 | Georges Pierre Seurat | View of Le Crotoy from Upstream | 20,000,000 | 40,000,000 | 30,000,000 |

## III. WINSTON REPORT

VWA reviewed Winston Art Group's ("Winston") report "Fair Market Value Appraisal" (the "Winston Report") for property in the collection of the DIA and considered all values Winston ascribed as of March 25th, 2014.

| Winston Group Categories | Winston Count of Objects | Sum of Winston Value |
|---|---|---|
| Fine Art | 483 | 1,645,631,950 |
| Furniture, Decorative Art, Silver , and Armor | 39 | 21,575,500 |
| Other | 60 | 75,038,300 |
| **Grand Total** | **582** | **1,742,245,750** |

### WINSTON REPORT BREAKDOWN BY CLASSIFICATIONS

| Winston Classifications | Winston Count of Objects | Sum of Winston Values | Percentage by Classification |
|---|---|---|---|
| African | 13 | 4,057,900 | 0.23% |
| Ancient Near East | 4 | 39,000,000 | 2.24% |
| Armor | 5 | 3,550,000 | 0.20% |
| Asian | 20 | 21,795,000 | 1.25% |
| Badge | 1 | 400 | 0.00% |
| Decorative | 6 | 1,251,500 | 0.07% |
| Easter Island | 1 | 250,000 | 0.01% |
| Egyptian | 4 | 2,355,000 | 0.14% |
| Fine Art | 483 | 1,645,631,950 | 94.45% |
| Furniture | 9 | 6,124,000 | 0.35% |
| Greco-Roman | 5 | 6,920,000 | 0.40% |
| Islamic | 4 | - | 0.00% |
| Native American | 6 | 535,000 | 0.03% |
| Pre-Columbian | 2 | 125,000 | 0.01% |
| Silver | 15 | 9,650,000 | 0.55% |
| Tapestry | 4 | 1,000,000 | 0.06% |
| **Grand Total** | **582** | **1,742,245,750** | **100.00%** |

# WINSTON REPORT'S TOP 15 WORKS BY VALUE

| Winston OBS | Artist | Title | Winston Values |
|---|---|---|---|
| 390 | Vincent Willem van Gogh | Portrait of Postman Roulin | 100,000,000 |
| 37 | Michelangelo Merisi da Caravaggio | Martha and Mary Magdalene | 50,000,000 |
| 230 | Henri Matisse | Coffee | 50,000,000 |
| 281 | Pablo Picasso | Melancholy Woman | 50,000,000 |
| 389 | Vincent Willem van Gogh | Bank of the Oise at Auvers | 40,000,000 |
| 322 | Mark Rothko | Orange, Brown | 40,000,000 |
| 318 | Auguste Rodin | The Thinker | 35,000,000 |
| 465 | Andy Warhol | Self Portrait: Former Double Self Po | 30,000,000 |
| 162 | Alberto Giacometti | Standing Woman II | 30,000,000 |
| 283 | Pablo Picasso | Woman Seated in an Armchair | 30,000,000 |
| 9 | Francis Bacon | Study for Crouching Nude | 28,000,000 |
| 50 | Paul Cezanne | Madame Cezanne | 25,000,000 |
| 391 | Vincent Willem van Gogh | The Diggers | 25,000,000 |
| 369 | Clyfford Still | Untitled 1951-T, No. 2 | 22,000,000 |
| 224 | Franz Marc | Animals in a Landscape | 22,000,000 |

## IV. OVERVIEW OF THIRD-PARTY VALUATIONS

### OVERVIEW OF VALUATION BY NUMBER OF ITEMS

| DIA Insurance Value Buckets | DIA's # of Items | Artvest's # of Items | Christie's # of Items | VWA's # of Items | Winston's # of Items |
|---|---|---|---|---|---|
| a. >= 50M | 10 | 7 | 3 | 10 | 7 |
| b. >= 25M, < 50M | 18 | 17 | 1 | 16 | 17 |
| c. >= 10M, < 25M | 53 | 50 | 3 | 42 | 51 |
| d. >= 5M, < 10M | 55 | 39 | 13 | 32 | 39 |
| e. >= 2M, < 5M | 125 | 106 | 18 | 57 | 105 |
| f. >= 750K, < 2M | 275 | 130 | 29 | 61 | 148 |
| g. >= 500K, < 750K | 157 | | 10 | 11 | 12 |
| h. >= 100K, < 500K | 1,433 | | 55 | 51 | 64 |
| i. >= 2.5K, < 100K | 5,970 | | 127 | 32 | 52 |
| j. < 2.5K | 9,082 | | 56 | 5 | 6 |
| No DIA insurance and no valuation by any party | 42,854 | | | | 3 |
| No DIA insurance and valuation by at least one party | 193 | | 130 | 70 | 78 |
| **Grand Total** | **60,225** | **349** | **445** | **387** | **582** |

## OVERVIEW OF TOTAL VALUATION BY AVERAGE VALUE

| DIA Insurance Value Buckets | DIA's Insurance Value | Artvest's Average Value | Christie's Average Value | VWA's Average Value | Winston's Average Value |
|---|---|---|---|---|---|
| a.  >= 50M | 635,000,000 | 338,000,000 | 335,000,000 | 865,000,000 | 245,000,000 |
| b.  >= 25M, < 50M | 579,000,000 | 360,125,000 | 60,000,000 | 575,000,000 | 280,250,000 |
| c.  >= 10M, < 25M | 739,000,000 | 446,900,000 | 42,250,000 | 850,350,000 | 467,775,000 |
| d.  >= 5M, < 10M | 335,000,000 | 298,625,000 | 47,740,000 | 356,000,000 | 162,650,000 |
| e.  >= 2M, < 5M | 352,800,000 | 315,430,000 | 78,950,000 | 510,750,000 | 314,255,000 |
| f.  >= 750K, < 2M | 286,060,000 | 170,640,000 | 35,455,000 | 270,489,000 | 211,430,000 |
| g.  >= 500K, < 750K | 88,298,702 | | 3,110,000 | 12,019,000 | 5,670,000 |
| h.  >= 100K, < 500K | 192,488,232 | | 18,436,500 | 97,308,750 | 47,428,770 |
| i.  >= 2.5K, < 100K | 105,254,838 | | 23,315,150 | 13,047,500 | 3,574,030 |
| j.  < 2.5K | 5,026,605 | | 1,971,625 | 77,750 | 42,750 |
| No DIA insurance and no valuation by any party | 0 | | | | 0 |
| No DIA insurance and valuation by at least one party | 0 | | 9,851,750 | 16,319,750 | 4,170,200 |
| **Grand Total** | **3,317,928,376** | **1,929,720,000** | **656,080,025** | **3,566,361,750** | **1,742,245,750** |

## OVERVIEW OF THIRD-PARTY VALUATION

| DIA Insurance Value Buckets | # of Units that were valued by third parties | Average Value of VWA and if not available, average value of independent third parties |
|---|---|---|
| a.  >= 50M | 10 | 865,000,000 |
| b.  >= 25M, < 50M | 18 | 577,937,500 |
| c.  >= 10M, < 25M | 52 | 874,000,000 |
| d.  >= 5M, < 10M | 51 | 401,715,000 |
| e.  >= 2M, < 5M | 123 | 608,440,000 |
| f.  >= 750K, < 2M | 173 | 360,911,500 |
| g.  >= 500K, < 750K | 23 | 15,404,000 |
| h.  >= 100K, < 500K | 120 | 115,663,520 |
| i.  >= 2.5K, < 100K | 165 | 33,299,680 |
| j.  < 2.5K | 55 | 2,052,375 |
| No DIA insurance and valuation by at least one party | 193 | 23,308,500 |
| **Grand Total** | **983** | **3,877,732,075** |

# OVERVIEW OF THIRD PARTY VALUATION (EXPANDED)

| DIA Insurance Value Buckets | # of Units valued by VWA | # of Units valued by Independent third parties | # of Units that were value by VWA or Independent | Total Average Value of VWA | Total Average Value of Independent third parties | Total Average Value of VWA or Independent third parties |
|---|---|---|---|---|---|---|
| a.  >= 50M | 10 | | 10 | 865,000,000 | | 865,000,000 |
| b.  >= 25M, < 50M | 16 | 2 | 18 | 575,000,000 | 2,937,500 | 577,937,500 |
| c.  >= 10M, < 25M | 42 | 10 | 52 | 850,350,000 | 23,650,000 | 874,000,000 |
| d.  >= 5M, < 10M | 32 | 19 | 51 | 356,000,000 | 45,715,000 | 401,715,000 |
| e.  >= 2M, < 5M | 57 | 66 | 123 | 510,750,000 | 97,690,000 | 608,440,000 |
| f.  >= 750K, < 2M | 61 | 112 | 173 | 270,489,000 | 90,422,500 | 360,911,500 |
| g.  >= 500K, < 750K | 11 | 12 | 23 | 12,019,000 | 3,385,000 | 15,404,000 |
| h.  >= 100K, < 500K | 51 | 69 | 120 | 97,308,750 | 18,354,770 | 115,663,520 |
| i.  >= 2.5K, < 100K | 32 | 133 | 165 | 13,047,500 | 20,252,180 | 33,299,680 |
| j.  < 2.5K | 5 | 50 | 55 | 77,750 | 1,974,625 | 2,052,375 |
| No DIA insurance and valuation by at least one party | 70 | 123 | 193 | 16,319,750 | 6,988,750 | 23,308,500 |
| **Grand Total** | **387** | **596** | **983** | **3,566,361,750** | **311,370,325** | **3,877,732,075** |

**Attachment L**

**Step 3 Attachment**

## OVERVIEW OF AGE OF DIA INSURANCE VALUE FOR ENTIRE COLLECTION

| DIA Insurance Value Buckets | DIA's # of Items | DIA's Insurance Value | Weighted Average Age |
|---|---|---|---|
| a.  >= 50M | 10 | 635,000,000 | 5.5 yrs |
| b.  >= 25M, < 50M | 18 | 579,000,000 | 3.9 yrs |
| c.  >= 10M, < 25M | 53 | 739,000,000 | 4.9 yrs |
| d.  >= 5M, < 10M | 55 | 335,000,000 | 6.4 yrs |
| e.  >= 2M, < 5M | 125 | 352,800,000 | 10.4 yrs |
| f.  >= 750K, < 2M | 275 | 286,060,000 | 10.4 yrs |
| g.  >= 500K, < 750K | 157 | 88,298,702 | 12.0 yrs |
| h.  >= 100K, < 500K | 1,433 | 192,488,232 | 13.2 yrs |
| i.  >= 2.5K, < 100K | 5,970 | 105,254,838 | 14.7 yrs |
| j.  < 2.5K | 9,082 | 5,026,605 | 15.3 yrs |
| No DIA insurance and no valuation by any party | 42,854 | 0 | |
| No DIA insurance and valuation by at least one party | 193 | 0 | |
| **Grand Total** | **60,225** | **3,317,928,376** | **7.1 yrs** |

## OVERVIEW OF AGE OF DIA INSURANCE VALUE FOR THOSE WORKS THAT HAVE DIA INSURANCE VALUES AND NO THIRD-PARTY VALUES

| DIA Insurance Value Buckets | # of Units valued by DIA Insurance only | Sum of Average DIA Insurance Value | Weighted Average Age |
|---|---|---|---|
| c.  >= 10M, < 25M | 1 | 10,000,000 | 17.8 yrs |
| d.  >= 5M, < 10M | 4 | 24,000,000 | 14.3 yrs |
| e.  >= 2M, < 5M | 2 | 5,000,000 | 8.0 yrs |
| f.  >= 750K, < 2M | 102 | 82,230,000 | 10.6 yrs |
| g.  >= 500K, < 750K | 134 | 75,423,702 | 12.0 yrs |
| h.  >= 100K, < 500K | 1,313 | 167,760,232 | 13.2 yrs |
| i.  >= 2.5K, < 100K | 5,805 | 99,072,904 | 14.6 yrs |
| j.  < 2.5K | 9,027 | 4,962,700 | 15.3 yrs |
| **Grand Total** | **16,388** | **468,449,537** | **13.0 yrs** |

## COMPARISON OF DIA INSURANCE VALUE AND VWA VALUE

| DIA Insurance Value Buckets | DIA's # of Items | DIA's Insurance Value | Weighted Average Age | VWA's Average Value | Annualized % Increase |
|---|---|---|---|---|---|
| a.  >= 50M | 10 | 635,000,000 | 5.5 yrs | 865,000,000 | 6.6% |
| b.  >= 25M, < 50M | 16 | 510,000,000 | 3.9 yrs | 575,000,000 | 3.3% |
| c.  >= 10M, < 25M | 42 | 605,000,000 | 4.8 yrs | 850,350,000 | 8.4% |
| d.  >= 5M, < 10M | 32 | 196,000,000 | 7.3 yrs | 356,000,000 | 11.1% |
| e.  >= 2M, < 5M | 57 | 166,500,000 | 12.1 yrs | 510,750,000 | 17.1% |
| f.  >= 750K, < 2M | 61 | 70,050,000 | 11.7 yrs | 270,489,000 | 24.5% |
| g.  >= 500K, < 750K | 11 | 6,175,000 | 12.2 yrs | 12,019,000 | 7.8% |
| h.  >= 100K, < 500K | 51 | 10,848,000 | 15.0 yrs | 97,308,750 | 53.2% |
| i.  >= 2.5K, < 100K | 32 | 1,234,234 | 16.6 yrs | 13,047,500 | 57.6% |
| j.  < 2.5K | 5 | 4,605 | 16.5 yrs | 77,750 | 96.3% |
| No DIA insurance and valuation by at least one party | 70 | 0 | | 16,319,750 | |
| **Grand Total** | **387** | **2,200,811,839** | **5.9 yrs** | **3,566,361,750** | **10.5%** |

## PROJECTED CURRENT MARKET VALUE OF DIA INSURANCE VALUE NOT COVERED BY THIRD PARTY VALUES

| DIA Insurance Value Buckets | # of Units valued by DIA Insurance only | Initial Sum of Average DIA Insurance Value | Market Appreciation Rate | Projected Sum of Average DIA Insurance Value |
|---|---|---|---|---|
| c.  >= 10M, < 25M | 1 | 10,000,000 | 62.0% | 16,200,000 |
| d.  >= 5M, < 10M | 4 | 24,000,000 | 62.0% | 38,880,000 |
| e.  >= 2M, < 5M | 2 | 5,000,000 | 62.0% | 8,100,000 |
| f.  >= 750K, < 2M | 102 | 82,230,000 | 62.0% | 133,212,600 |
| g.  >= 500K, < 750K | 134 | 75,423,702 | 62.0% | 122,186,397 |
| h.  >= 100K, < 500K | 1,313 | 167,760,232 | 62.0% | 271,771,575 |
| i.  >= 2.5K, < 100K | 5,805 | 99,072,904 | 62.0% | 160,498,104 |
| j.  < 2.5K | 9,027 | 4,962,700 | 62.0% | 8,039,573 |
| **Grand Total** | **16,388** | **468,449,537** | **62.0%** | **758,888,249** |

**Attachment M**

**Step 4 Attachment**

| Cat. | Department | Avg Price | Africa, Oceania & Indigenous Americas | American Art before 1950 & African American Art | Ancient Near Eastern & Greco-Roman & Ancient European | Asian & Islamic Art | Contemporary Art after 1950 | European Modern Art to 1950 | European Painting | European Sculpture and Dec Arts | Prints, Drawings & Photographs, Performing Art, & Textiles | TOTAL PORTFOLIO VALUE (ex. High Value Arts) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 5,632 | 1,566 | 1,679 | 6,877 | 1,023 | 253 | 95 | 4,962 | 20,767 | 42,854 |
| | % Premium and/or Discount | | 0.0% | 0.0% | 25.0% | 15.0% | 15.0% | 15.0% | 10.0% | 15.0% | (10.0%) | |
| 1 | 19th Century European | 110,904 | | | | | | | 3,863,140 | | | 3,863,140 |
| 2 | American Art | 464,418 | | 363,639,547 | | | | | | | | 363,639,547 |
| 3 | Antiquities | 80,049 | | | 168,003,344 | | | | | | | 168,003,344 |
| 4 | Arms & Armor | 8,166 | | | | | | | | 7,766,225 | | 7,766,225 |
| 5 | Asian Art (MIX) | 77,216 | | | | 122,132,628 | | | | | | 122,132,628 |
| 6 | Asian Contemporary | 420,795 | | | | | 165,014,781 | | | | | 165,014,781 |
| 7 | Chinese Paintings | 196,647 | | | | 311,038,220 | | | | | | 311,038,220 |
| 8 | Chinese WOA | 179,882 | | | | 284,521,390 | | | | | | 284,521,390 |
| 9 | Decorative Arts | 15,811 | | | | | | | | 15,036,800 | | 15,036,800 |
| 10 | European Interiors | 32,291 | | | | | | | | 30,710,284 | | 30,710,284 |
| 11 | European WOA | 61,556 | | | | | | | | 58,543,166 | | 58,543,166 |
| 12 | Japanese WOA | 33,035 | | | | 52,252,107 | | | | | | 52,252,107 |
| 13 | Latin American | 185,579 | | 145,308,679 | | | | | | | | 145,308,679 |
| 14 | Judaica | 36,054 | | | | | | | | 34,288,815 | | 34,288,815 |
| 15 | Modern & Imp | 599,703 | | | | | | 174,483,480 | | | | 174,483,480 |
| 16 | Native American | 31,113 | 87,612,909 | | | | | | | | | 87,612,909 |
| 17 | Oceanic | 136,072 | 383,177,943 | | | | | | | | | 383,177,943 |
| 18 | Old Masters | 294,186 | | | | | | | 10,247,492 | | | 10,247,492 |
| 19 | Photographs | 46,262 | | | | | | | | | 432,328,608 | 432,328,608 |
| 20 | Post war | 562,196 | | | | | 220,465,012 | | | | | 220,465,012 |
| 21 | Prints | 30,857 | | | | | | | | | 288,359,796 | 288,359,796 |
| 22 | Russian Art | 160,601 | | | | | | | 5,594,285 | | | 5,594,285 |
| 23 | Silver | 22,033 | | | | | | | | 20,954,154 | | 20,954,154 |
| 24 | South Asian Contemporary | 122,804 | | | | | 48,157,630 | | | | | 48,157,630 |
| 25 | Southeast Asian | 50,016 | | | | 79,111,593 | | | | | | 79,111,593 |
| | TOTAL | | 470,790,851 | 508,948,226 | 168,003,344 | 849,055,938 | 433,637,424 | 174,483,480 | 19,704,918 | 167,299,444 | 720,688,404 | 3,512,612,030 |

- Average price per department was calculated based on Christie's and Sotheby's 2013 sales figures as detailed in Exhibit E of the Artvest report;

- These prices were then applied linearly across the applicable DIA departments using averages for instances where multiple departments overlap;

- The table above illustrates this methodology and resulting compilation in the form of a pricing matrix;

- For the category of Prints, Drawings, and Photographs: Apply 10% discount to account for works by less collected artists, which may be offset by a number of works by extremely well-known and highly collected artists

- Supplements have been applied to the categories:

  o Ancient Near Eastern & Greco-Roman & Ancient European (25%): because of the verifiable provenance and the fact that in most cases the objects entered the museum prior to the UNESCO Convention on Cultural Property of 1970

  o Asian & Islamic Art (15%): because of the strong market interest in this category

  o Contemporary Art after 1950 (15%): because of the strong market interest in this category; however, the supplement has been kept low to be conservative

  o European Modern Art to 1950 (15%): because this market is very selective, and because of the strength of DIA's holdings in this category; this is conservative

  o European Painting (10%): because most of the paintings in this category have been valued individually and the remaining paintings are less important and, as such, we have ascribed a conservative supplement

  o European Sculpture and Decorative Art (15%): this is a conservative supplement because of the large variety of objects within this sector

2

## Exhibit G

1              UNITED STATES BANKRUPTCY COURT
              EASTERN DISTRICT OF MICHIGAN
2                 SOUTHERN DIVISION

3

4 In re:                 )
  CITY OF DETROIT, MICHIGAN,    )
5                     )
      Debtor.            )   Chapter 9
6                     )
        vs.              ) Case No. 13-53846
7                     )
  ----------------------------)Hon. Steven W. Rhodes
8

9

10

11

12

13       VIDEOTAPED DEPOSITION OF VICTOR WIENER

14             New York, New York

15           Monday, August 4, 2014

16

17

18

19

20

21

22

23

24 Reported by:
  MICHELLE COX
25 JOB NO.: 215823

1  Q    So you mean fingers in the air is people
2  raising their fingers into the air an pulling
3  appraisals values for?
4  A    I think it was worth this.
5  Q    You mean people raise their fingers, give
6  you an opinion of value and you take the
7  consensus of that value?
8  A    No.  I say people raise their finger and
9  give a value.  I didn't say anything about
10 consensus.
11 Q    How frequently do people utilize that
12 methodology?
13 A    Frequently.
14 Q    So it's standard in the industry for
15 people to use the fingers-in-the-air method to
16 come up with a value for a work of art?
17 A    What industry are you referring to?
18 Q    The valuation industry.
19 A    I would consider it to be a profession.
20 Q    Okay.  In the profession?
21 A    It is not appropriate standards, in my
22 opinion.
23 Q    So why do you refer to it as a methodology
24 and indicate that many people in the profession
25 utilize it?

1           MR. PEREZ:  Object to the form of the
2  question.  Assumes facts not in evidence.
3  BY MR. ABEL:
4  Q    Who uses the fingers-in-the-air
5  methodology?
6  A    Primarily auction houses.
7  Q    How many auction houses are there?
8  A    There are numerous auction houses.
9  Q    And how many people in those auction
10 houses use the fingers-in-the-air methodology
11 to value art?
12 A    Hundreds, if not thousands.
13 Q    Is that the methodology used by Christie's
14 and Sotheby's?
15 A    In many cases, I believe so.
16 Q    Have you ever heard of a methodology for
17 valuing art called the "French grid system"?
18 A    I have.
19 Q    And what is that?
20 A    The French grid system is a method that
21 was in favor, at one point or another, in which
22 a small section of a work of art was -- well, a
23 work of art was divided into sections,
24 literally a small section was valued in a
25 certain way, and then by mathematical extension

1  in the grid, it was determined this is the
2  value of the whole would be.
3  Q    And is the French grid system ever used to
4  value a collection of arts by taking the value
5  of a chunk of the collection and extrapolating
6  the full value from that chunk?
7  A    The French grid system is generally
8  applied to specific works of art and not a
9  whole collection.
10 Q    Why not?
11 A    It's common usage within those who apply
12 it to apply it that way.
13 Q    Let's look at the second page of
14 Deposition Exhibit 2 marked FGIC Wiener 000002.
15 There's a section entitled "Suggested Steps to
16 be Taken."
17      Do you see that?
18 A    That is correct.
19 Q    And under that "Suggested Steps to be
20 Taken" item you list suggested steps that you
21 suggest that should be taken in valuing the DIA
22 collection; is that right?
23 A    That's correct.
24 Q    Did you utilize this methodology that you
25 indicate on this page of Exhibit 2 before, in

1  valuing an art collection?
2  A    In valuing?
3  Q    An art collection?
4  A    An art collection?
5  Q    Yes.
6  A    Have I -- I don't understand the question.
7  Q    Let me rephrase.
8      Have you ever used these steps that you
9  detail on the second page of Exhibit 2 in
10 valuing an art collection before?
11 A    Can you repeat the question?
12 Q    Sure.
13      Have you ever used these steps that you
14 detail on Page 2 of Exhibit 2 in valuing an art
15 collection before?
16 A    I have.
17 Q    How frequently?
18 A    When one has to value an extremely large
19 collection of works of art.
20 Q    And how frequently have you valued an
21 extremely large collection of art before?
22 A    I've think one or two or three times.
23 Q    Well, let's be exact.
24 A    One very recently, and I believe in the
25 past we've used it as well.

1  Q    And when you say "one very recently," are
2  you referring to the DIA collection?
3  A    No.
4  Q    What collection are you referring to?
5  A    I cannot tell you.  That would be
6  violating confidentiality.
7  Q    Did you have a confidentiality agreement
8  with the client in that case?
9  A    I did.
10  Q    And when did that take place?
11  A    The valuation took place last year.
12  Q    And what was the type of art involved?
13  A    Fine art.
14  Q    Any specific type of fine art?
15  A    What do you mean by "specific type"?
16  Q    Sure.
17        Are we talking about contemporary art, Old
18  Masters, any more specificity you can provide
19  on that case?
20  A    Contemporary art.
21  Q    Sorry?
22  A    Contemporary art.
23  Q    Contemporary art.
24        And we're talking about paintings versus
25  sculptures or decorative art?

1  A    We're talking about two dimensional art.
2  Q    And what was the size of that collection?
3  A    What do you mean by "size"?
4  Q    Volume of works.
5  A    About 20,000.
6  Q    And what was your ultimate value
7  conclusion for those 20,000 pieces?
8  A    Is the question what value did I conclude?
9  Q    Yes.
10  A    I can't tell you that.
11  Q    Can you give me a ballpark?
12        Was it over a billion dollar?
13        MR. PEREZ:  If he can't tell you, he can't
14  tell you.
15  A    It's a possible violation of my
16  confidentiality agreement.
17  BY MR. ABEL:
18  Q    And you said you used this methodology
19  detailed on Page 2 of Exhibit 2 to perform that
20  valuation of the 20,000 works?
21  A    I did.
22  Q    Let's look at the next page of Deposition
23  Exhibit 2.
24  A    Is that Page 3?
25  Q    Yes.

1        Second paragraph you wrote:  "Recently we
2  appraised for state tax purposes the enormous
3  and varied collection of an extremely famous
4  American artist.  At this moment I'm not at
5  liberty to mention the name of the artist.  The
6  inventory consists of approximately 20,000
7  objects."
8        Is that right?
9  A    That's correct.
10  Q    Is that the project you were just
11  referring to?
12  A    Yes, it is.
13  Q    And you performed that appraisal for
14  estate tax purposes, correct?
15  A    I did.
16  Q    So you weren't asked to determine what the
17  collection would achieve in terms of actual
18  dollars to the owner of the collection if it
19  was sold?
20  A    That's not true.
21  Q    What -- do you understand if I ask you the
22  question -- sorry, let me take a step back.
23        Have you ever heard of the term
24  "definition of value before"?
25  A    Yes.

1  Q    And what do you understand definition of
2  value to mean?
3  A    Exactly what the term says, the value
4  being used is defined.
5  Q    And what definition of value did you
6  utilize in that estate tax purpose appraisal?
7  A    Fair market value.
8  Q    You didn't use marketable cash value?
9  A    I did not.
10  Q    And you had two months to perform that
11  appraisal of the 20,000 objects; is that right?
12  A    Slightly under.
13  Q    How much under?
14  A    I would say more like six or eight -- six
15  to eight weeks.
16  Q    And was the collection by the American
17  artist a collection of pieces that the artist
18  himself or herself generated or was that artist
19  collecting other people's work?
20  A    It was a collection of both.
21  Q    And what portion of the collection
22  belonged to that -- sorry.  Let me strike that.
23        What portion of that collection was
24  generated by that artist as opposed to
25  collected by the artist?

1    A    A significant portion.

2    Q    Over 50 percent?

3    A    I really think that by saying that I may

4    violate my confidentiality agreement.

5    Q    Did you provide a copy of that appraisal

6    to the IRS?

7    A    Presumably the client did.

8    Q    So you don't know -- do you know whether

9    the IRS approved your appraisal?

10   A    We -- I've heard from the client that

11   there's been absolutely, what shall we say, no

12   objection from the IRS.

13   Q    So let's go back to my question.

14         Do you know if the IRS has approved your

15   appraisal?

16   A    The IRS, I don't think, sends out letters

17   of approval.

18   Q    Let me go back to my question:  Do you

19   know whether or not the IRS approved your

20   appraisal?

21   A    And my answer is, no.

22   Q    Did you use the methodology detailed on

23   Page 2 of Exhibit 2 to value the DIA

24   collection?

25   A    I'm sorry.  We're going back to Page 2?

1    Q    Yes.

2    A    And what was your question?

3    Q    Sure.

4         Did you used this methodology that you say

5    you utilized to value the 20,000 works in this

6    undisclosed appraisal to value the DIA

7    collection?

8    A    In part, yes.

9    Q    And what parts did you use?

10   A    We -- shall we go back step by step?

11   Q    Sure.

12   A    Okay.  Each category should be divided

13   into groupings, we did.

14   Q    And how did you divide the DIA collection

15   into groupings?

16   A    We basically worked with the groupings

17   that the DIA used in its cataloging.

18   Q    You mean groupings by type of art?

19   A    Correct.

20   Q    Okay.  Not groupings by value of art?

21   A    Within those groupings we also did

22   subdivisions with a value of art, yes.

23   Q    And how did you utilize the Step 2

24   detailed in Page 2 of Exhibit 2 to value the

25   DIA collection?

1    A    We followed that fairly closely.

2    Q    Am I correct that you had four different

3    steps in your methodology for valuing the DIA

4    collection?

5    A    I had four different steps -- the answer

6    to your question is no.

7    Q    If you look at your report, am I correct

8    that you detail four steps for valuing the DIA

9    collection?

10   A    Well, if I could look at my report I could

11   answer the question properly.

12         (Deposition Exhibit 3, Expert Report,

13   marked for identification as of this date.)

14   BY MR. ABEL:

15   Q    I'm showing you a document that's been

16   marked Deposition Exhibit 5.

17         Is this your report in this matter?

18   A    It's marked Deposition Exhibit 3, I

19   believe.

20   Q    Sorry.  Deposition Exhibit 3, you're

21   correct.

22         Is that your report in this matter?

23   A    Well, without checking every page, I can

24   say that it appears to be my report.

25   Q    Take a look at Page 49 of Exhibit 3.

1         My question for you is:  Is that your

2    signature at the bottom of Page 49?

3    A    That is my signature.

4    Q    I think I misspoke earlier.  Maybe that's

5    why you're correcting me.

6         If you look at Page 3 of Exhibit 3, it

7    details five steps to your methodology; is that

8    right?

9    A    Yes, there are five steps labeled.

10   Q    Okay.  And so my question for you is,

11   looking back at Exhibit 2, any suggested steps

12   to be taken, specifically the Paragraph 2, that

13   starts off by saying, "Appropriate comparables

14   for each group should be identified."

15         What step in your report does Step 2 in

16   your proposal correspond with?

17   A    Step 1.

18   Q    Does it correspond to any of the other

19   steps in your report?

20         MR. PEREZ:  Object to the form of the

21   question.

22   BY MR. ABEL:

23   Q    You can answer.

24   A    Sure.  I'm just looking at the report.

25         It corresponds to portions of Step 3 and

Page 118

1   A    I did.
2   Q    So how were you convinced that a loan was
3   a viable plan for the DIA collection if you
4   lack the experience necessary to form that
5   opinion?
6   A    Because that's the way it was presented to
7   me by Mr. Peck, and that it was written in the
8   Houlihan Lokey report that -- or catalog, as it
9   stated, that it was included as a possible
10  option.
11  Q    And because that Mr. Peck and Houlihan
12  Lokey identified that as an option, you were
13  convinced that it was a viable plan for the DIA
14  collection?
15  A    I believed it would be a viable plan.
16  Q    Have you ever served as broker with regard
17  to loans with regard to art?
18  A    As a broker?
19  Q    Yes.
20  A    No.
21  Q    Have you ever advised a client to get a
22  loan secured by art in any capacity?
23  A    I worked for lending institutions.
24  Q    Which lending institutions?
25       THE WITNESS:  Can I reveal that without

Page 119

1   breaching confidentiality?
2        MR. PEREZ:  Is there a confidentiality
3   agreement in place?
4        THE WITNESS:  There are confidentiality
5   agreements in place with every lending
6   institution that I work with.
7   BY MR. ABEL:
8   Q    Well, how many different lending
9   institutions do you work with in conjunction
10  with valuing art to secure loans?
11  A    I think about five or six.
12  Q    An dhow many different engagements have
13  you been involved in to -- on behalf of lending
14  agencies to determine the value of art in
15  conjunction with a loan?
16  A    Numerous.
17  Q    How many, approximately?
18  A    Twenty, maybe more.
19  Q    What percentage of your practice at VWA is
20  done in conjunction with providing consulting
21  services to lending companies?
22  A    It varies from year to year, so . . .
23  Q    Well, last year, what percentage of your
24  work at VWA was done in conjunction with
25  lending agencies?

Page 120

1   A    Possibly 15 or 20 percent.  I would have
2   to review our records.
3   Q    Do you know what percentage of revenue
4   that work related to for the VWA?
5   A    I would -- you mean the billing --
6   Q    Yes.
7   A    -- is that correct?
8        No, I haven't done any analysis as far as
9   billing, as far as revenue sources go.
10  Q    Do you know on what terms a loan was
11  offered with regard to the DIA collection?
12  A    I have no idea.
13  Q    Do you know what the ability of the DIA or
14  the City of Detroit would be to service that
15  loan?
16  A    I do not.
17  Q    Do you know how the DIA would get money to
18  service that loan?
19  A    I do not.
20  Q    Did you do any analysis to determine how
21  the DIA could potentially pay off any loan from
22  ACG?
23  A    I did not.
24  Q    So how were you convinced that it was a
25  good idea for the DIA to, or the City of

Page 121

1   Detroit to borrow money secured by the DIA
2   collection?
3   A    I, as I've testified, I saw -- I believed
4   it was a viable option since it was included in
5   the Houlihan Lokey report, and then from
6   representations made to me by Mr. Peck.
7   Q    You understand that in any loan situation
8   there's a possibility for default?
9   A    I do.
10  Q    Did you ever take into consideration how
11  likely it would be that the City of Detroit
12  would default on the loan and the DIA
13  collection would be forcibly sold in that
14  context?
15  A    I did not.
16  Q    Did that play any role in your decision to
17  take on the assignment in this case?
18  A    Did what play?
19  Q    The possibility that there could be a
20  foreclosure and forced sale of the DIA
21  collection.
22  A    In any loan situation there is the
23  possibility of foreclosure.  It's inherent to
24  the assignment, of any loan assignment.
25  Q    And what happens in the context of a

1  Q   The sale of the DIA collection would be
2  unique, in your opinion?
3  A   In that context, yes.
4  Q   Am I correct that there are different
5  kinds of arts at the DIA?
6  A   There are.
7  Q   It's a mixed collection?
8  A   There are.
9  Q   Do you know whether all the works of the
10 DIA were of the same quality?
11 A   Is the question: Am I aware whether the
12 works collected by the DIA are all uniformly of
13 the same quality?
14 Q   Yes.
15 A   And the answer is, they are not.
16 Q   The DIA collection has uneven quality,
17 correct?
18 A   It has a varied quality. I don't know if
19 I'd use the word "uneven."
20 Q   Before the bankruptcy of the City of
21 Detroit and the contemplated liquidation of the
22 DIA collection, are you aware of a liquidation
23 of such a collection ever being considered in
24 any treatise or publication?
25     MR. PEREZ: Object to the form of the

1  question. Assumes facts not in evidence.
2  A   I'm not quite sure. It's a composite
3  question anyway.
4      What exactly is the question? I'm not
5  sure.
6  BY MR. ABEL:
7  Q   Sure.
8      Are you aware of any treatises or
9  publications that contemplate the methodology
10 to be used in the liquidation of a collection
11 the size of the DIA's?
12 A   I'm not aware of any.
13 Q   Are you aware of any discussions or
14 courses in which the liquidation of a DIA
15 collection was at issue?
16     MR. PEREZ: Object to the form of the
17 question.
18 BY MR. ABEL:
19 Q   Let me take a step back. Let me rephrase.
20     Are you aware of any courses or panel
21 discussions where the orderly liquidation of
22 the DIA collection was at issue?
23 A   You're talking about something in an
24 academic setting?
25 Q   Yes.

1  A   I am not.
2  Q   What's the largest collection you've ever
3  appraised by value?
4  A   About $300 million.
5  Q   And how many works of art comprised that
6  collection?
7  A   That one, 20,000.
8  Q   And what was the second largest collection
9  you've ever valued by volume?
10     MR. PEREZ: Object to the form of the
11 question. Assumes facts not in evidence.
12 A   I think we're now in the process of
13 appraising a collection that is maybe 15,
14 19,000 works of art.
15 BY MR. ABEL:
16 Q   And how long have you spent on that
17 engagement?
18 A   Well, it's something that is being done
19 over time. So we've been spending about, on
20 and off, for various reasons, about four
21 months.
22 Q   And how long do you expect to take on that
23 engagement?
24 A   That depends on a variety of factors.
25 Q   What factors?

1  A   Availability of the art; groupings of the
2  art; and other factors that I can't determine
3  at this particular point.
4  Q   What kind of valuation are you performing
5  for that 15 to 19,000 piece collection?
6  A   The value will be most likely fair market
7  value.
8  Q   And why fair market value as opposed to
9  marketable cash value?
10 A   Again, I really feel uncomfortable for a
11 variety of reasons talking about the valuation
12 specifics of this collection. And, indeed, it
13 is subject to strict confidentiality with the
14 client.
15 Q   Did you use the same methodology you
16 utilized with regard to the valuation of the
17 DIA collection for that -- to value that
18 collection 15 to 19,000 items?
19 A   It's an ongoing situation, and again I
20 feel compelled not to answer, due to the
21 confidentiality agreement.
22 Q   Prior to this engagement and the Hurst
23 engagement, have you ever performed any work
24 for ACG or Ian Peck?
25     MR. PEREZ: Objection to the form of the

Page 182

1  question.  Assumes facts not in evidence.
2      A    Directly?
3  BY MR. ABEL:
4      Q    Well, have you ever been engaged by ACG or
5  Ian Peck to perform an appraisal?
6      A    No.
7          Prior to the two engagements you cited?
8      Q    Other than those two engagements, have you
9  ever been engaged by ACG or Ian Peck to perform
10  an appraisal?
11      A    I have not.
12      Q    Are you aware of ACG's reputation in the
13  art industry?
14          MR. PEREZ:  Object to the form of the
15  question.
16  BY MR. ABEL:
17      Q    Well, let's take a step back.
18          Does ACG have a reputation in the
19  industry, that you're aware of?
20      A    Yes.
21      Q    And what is that reputation?
22      A    Very straightforward.  Relatively good
23  reputation.
24      Q    You believe that ACG is respected in the
25  art industry?

Page 183

1      A    Definitely.
2      Q    Are you aware of any lawsuits involving
3  ACG?
4      A    I am.
5      Q    What lawsuits were those?
6      A    I believe that there was -- well, I
7  already testified that in the Hurst matter I
8  was an expert witness in a lawsuit.  And that I
9  believe, I haven't examined in detail, there
10  was a lawsuit involving the foreclosure of a
11  loan to Annie Leibovitz, the photographer.
12      Q    You ever advised a client to get a loan
13  from ACG or Ian Peck?
14      A    No.
15      Q    Do you know anything about ACG's lending
16  practices, generally?
17      A    Not really.
18      Q    You ever heard of Poly International
19  Auction?
20      A    Yes.
21      Q    Does it have a reputation in the art
22  market?
23      A    I think it has a relatively new
24  reputation.
25      Q    And what is that reputation?

Page 184

1      A    That is an auction house in China.
2      Q    Anything positive or negative about its
3  reputation in the art market, that you're aware
4  of?
5      A    Nothing of great substance.  There have
6  been some aspersions in the press which may or
7  may not be true.  But basically it has a
8  reputation of being a venue of sale in China.
9      Q    Have you ever used the Poly International
10  Auction?
11      A    I have not.
12      Q    Have you ever heard of Catalyst or Cat
13  List Acquisition's LLC?
14      A    No, other than in the context of this
15  report.
16      Q    You visited the DIA in April 2014; is that
17  correct?
18      A    That is correct.
19      Q    Why?
20      A    Well, I was invited by the Chinese
21  government to lecture in China.  They were
22  paying for my way.  I wanted to fly on Delta
23  Airlines.  There was no direct flight from New
24  York to Beijing.  I had a choice of either
25  flying to Nurato in Japan or flying through

Page 185

1  Detroit.  I thought this was a great
2  opportunity to see the DIA, which I had never
3  seen before, so I paid out of my own pocket an
4  extra night in Detroit and spent a considerable
5  amount of time at the DIA.
6      Q    How long did you spend there?
7      A    About eight hours.
8      Q    Did you talk to anyone at the DIA during
9  that trip?
10      A    Other than the ticket taker in the garage,
11  and the guards and the woman who sold me lunch,
12  no.
13      Q    Did anyone else come with you on that trip
14  to the DIA?
15      A    No, I was alone.
16      Q    Did you perform your appraisal in this
17  case under what you believed to be highly
18  limiting conditions?
19      A    I set forth in the appraisal report the
20  limiting conditions.  I did not use the word
21  "highly limited."
22      Q    Let's take a look at your report.
23  Exhibit 3, Page 18.  In the middle of page, you
24  see the paragraph that starts "By nature of the
25  assignment"?

1    A    Mm-hmm.  I do.  I'm sorry.
2    Q    It goes on to say "The VWA appraisal has
3    set about to value of the entire collection of
4    the DIA operating under highly limiting
5    conditions."
6         Do you see that?
7    A    Yes, I do.
8    Q    Would you agree that you performed your
9    work appraising the DIA collection under highly
10   limiting conditions?
11   A    In that sense, yes.
12   Q    You didn't review the artwork in person at
13   the DIA except for your visit in April 2014?
14   A    Prior to the issuance of this report, no.
15   Q    After the issuance of the report did you
16   visit the DIA?
17   A    I did.
18   Q    When was that?
19   A    A few days ago.
20   Q    And why did you visit the DIA?
21   A    Because I wanted to verify and bring with
22   me those members of my team who are either
23   associated with it or would be possibly
24   associated with it in the future to review the
25   collection.

1    Q    Why didn't you review the collection in
2    person prior to your July 25, 2014 report?
3    A    We had an extremely limited amount of time
4    to do this.  I couldn't write the report, do
5    the research and visit the DIA at the same
6    time.
7    Q    You didn't visit -- you didn't decide it
8    was necessary to visit the DIA between May and
9    July of 2015 to see it in person?
10   A    Not for the purposes of issuing this
11   report.
12   Q    Do you intend for your associates who you
13   brought with you to the DIA for the visit,
14   after your July 25th report to testify in this
15   case?
16   A    No.  That would be a decision of counsel.
17   Q    Do you understand that they will be
18   testifying in this case?
19   A    I have no such understanding.
20   Q    Which associates did you bring with you to
21   Detroit?
22   A    David Shapiro and another associate who is
23   not mentioned in report named -- and I'll have
24   to spell this for you.
25        Frans, F-R-A-N-S.  Pijnenburg,

1    P-I-J-N-E-N-B-U-R-G.
2    Q    Am I correct that you refer to your report
3    as preliminary?
4    A    You are correct.
5    Q    Does USPAP provide for the issuance of
6    preliminary reports?
7    A    It does.
8    Q    What does it say about preliminary
9    reports?
10   A    It doesn't define it as such.  But the
11   appraiser, as I testified already, is given a
12   great deal of latitude in the appraisal report
13   issuance process.
14   Q    Are there any opinions that you formed
15   that are not contained in your report with
16   regard to the DIA collection?
17   A    What type of opinions are you referring
18   to?
19   Q    Have you formed any opinions with regard
20   to the value of the DIA collection that aren't
21   contained in your report?
22   A    The report contains all of our opinions of
23   value as of this moment.
24   Q    Have you been asked to provide any other
25   opinions in this case that aren't contained in

1    your report?
2    A    No.
3    Q    Have you identified all the facts that you
4    relied upon in your report?
5    A    In the -- yes.
6    Q    And have you identified all the documents
7    that you relied upon in your report?
8    A    At the moment, yes.
9    Q    Have you done all the work that you
10   believe is required to reach the opinions that
11   you've expressed in your report?
12   A    I did.
13   Q    Are all the assumptions that you made in
14   forming your opinions identified in your
15   report?
16   A    Yes.
17        MR. ABEL:  Now is probably a good time to
18   break for lunch.
19        THE VIDEOGRAPHER:  Go off the record.  The
20   time is 1:02.
21        (Luncheon Recess:  1:02 p.m.)
22        A F T E R N O O N   S E S S I O N
23        (Time noted:  1:39 p.m.)
24        THE VIDEOGRAPHER:  Go back on the record.
25   The time is 1:39.

1  V I C T O R   W I E N E R, resumed and
2       testified as follows:
3  EXAMINATION BY (Cont'd.)
4  MR. ABEL:
5       Q    Good afternoon, Mr. Wiener, hope you had a
6  good lunch.
7       A    Yes, thank you.
8       Q    Am I correct that you worked on this
9  engagement with a team of people?
10      A    You are correct.
11      Q    And what was your role in that engagement?
12      A    I was in charge of a team.
13      Q    What does that mean?
14      A    That means I selected the members of the
15  team.  I reviewed all the work.  I reviewed
16  their assignments.  I discussed with them
17  aspects of the assignment.  I accept full
18  responsibility for the appraisal report.
19      Q    And what did you tell each member of the
20  team about what the assignment involved?
21      A    I told the team members that we were --
22  that they were to appraise selected works from
23  are the DIA collection, the valuation parameter
24  was marketable cash value.  The -- we had a
25  limited amount of time in which to do it, so do

1  it as quickly as possible.
2       Q    Did you talk to any of the team members
3  regarding the methodology that you would be
4  utilizing to determine the marketable cash
5  value for the DIA collection?
6       A    All of my team members are extremely
7  experienced, and they all know what marketable
8  cash value means and they know how to apply it.
9       I don't think anyone had any questions
10  about that.
11      Q    Let's break it down.
12      Did you talk to any of your team members
13  about the methodology under Step 2 of the
14  methodology indicated in your appraisal report?
15  A    Hang on.
16      Yes.
17      Q    Who did you talk to about the methodology
18  in Step 2?
19  A    Primarily David Shapiro, and Shaun Cooper,
20  and Rob Leeds and his associates at Silar.
21      Q    And what did you talk with them about that
22  Step 2 methodology?
23      A    That we would be reviewing these works.
24  We couldn't appraise them individually, and
25  that they should be identified, put together

1  with accuracy, and that we would then be taking
2  average values.
3       Q    And who came up with the idea for the
4  methodology detailed in Step 2?
5       A    I think we -- it was -- of course, I had
6  the ultimate decision-making in it.  But
7  basically the methodology was done in
8  consultation with Silar and with David Shapiro
9  and with Shaun Cooper.
10      Q    Who came up with that idea for that
11  methodology originally?
12      A    I think we discussed -- this came out of
13  consultation.  All four of us sat down and
14  discussed how we would do -- how we would
15  handle it, possibly me.  I don't think that
16  methodology has any "author" attached to it.
17      It's, again, a team effort, as I say
18  repeatedly in the report.
19      Q    But you don't know who came up with the
20  idea?
21      A    As I told you it was a team effort.  I
22  don't know who uttered it the first time.
23      Q    How about Step 3; who came up with the
24  methodology detailed in Step 3?
25      A    Again, the answer is the same as before,

1  it was a team effort.  We all came up with it.
2  The applications went to the technical people.
3  And but the methodology involved was certainly
4  my decision and the others, together, thinking
5  that this was an appropriate thing to do.
6       Q    And did anyone on your team other than
7  David Shapiro -- who is Shaun?
8       A    Cooper.
9       Q    Shaun Cooper.
10      And who was the third person?
11      A    Rob Leeds and his associates at Silar.
12      Q    Did anyone except for David, Shaun and Rob
13  provide insight into the methodology in Step 3?
14      A    In Step 3, not that I can recall.
15      Q    What about Step 4, who came up with the
16  methodology in Step 4?
17      A    That was primarily me, I think.  But I
18  think, everybody is again -- I'm saying like a
19  broken record; everybody was part of the team
20  and we all discussed this.
21      Q    Did anyone on your team ever criticize or
22  say we can't use Step 2, 3 or 4?
23      A    Not that I recall.
24      Q    What are David's Shapiro's qualifications
25  for doing a valuation of a 60,000 piece art

1 collection?
2 A    David Shapiro, as stated in the report, is
3 an appraiser of various works of arts.  He also
4 is extremely knowledgeable about important
5 museum pieces, since he has edited numerous
6 textbooks concerning museum collections, and he
7 has taught museum collections at various
8 institutions of higher learning.
9 Q    What is the largest collection that
10 David Shapiro has ever valued?
11 A    I think this is the largest.
12 Q    And after this collection, what's the
13 second largest that he's ever valued?
14 A    Well, we're in the process of valuing
15 another collection of about, I think 25,000
16 works of art.
17 Q    Before this collection, what was the
18 largest collection he's ever valued in terms of
19 art?
20 A    He worked with us on a collection of
21 20,000 works of art.
22 Q    And did he come up with the methodology
23 there for the valuation?
24 A    No, the methodology was decided in
25 consultation by me and the client and the --

1 well, fulfillment of the -- take that back.
2       The fulfillment of the assignment was our
3 decision.  We then proposed it to the client to
4 make sure this was in keeping with their
5 expectations.  But the total methodology was
6 our decision.
7 Q    Let's break down the process again a
8 little bit in terms of determining what this
9 consultation actually involved.
10       Before you met in consultation with the
11 other people on your team, did you have them
12 perform their own analyses and come up with
13 their own conclusions?
14 A    In what sense?
15 Q    Did you ask them to come up with any
16 conclusions that they were going to present to
17 the team with regard to the valuation of any
18 piece of the DIA collection?
19 A    Well, all members of the team, not only
20 the ones who decided on the methodology, came
21 up with their suggested individual values.
22 Q    And did each member of the team come up
23 with suggested individual values for every item
24 in the DIA collection?
25 A    We started with -- well, start again.

1       With -- go back to your question.
2       With every item in the DIA collection, are
3 you referring to all 60,000 items?
4 Q    Yes.
5 A    The answer to that question is no.
6 Q    Did every member of the team come up with
7 their own opinion of value as to the 387 units
8 detailed in Step 1 of your valuation?
9 A    Various members of the team came up with
10 preliminary values, preliminary ideas, which
11 was then reviewed by the team.
12 Q    Did they present those ideas in writing?
13 A    Some did; some didn't.
14 Q    And for those that didn't, did you do
15 anything to determine whether or not the
16 information they were relying upon to form
17 their opinions of values of work was correct?
18 A    We did.
19 Q    What did you do?
20 A    We did some of -- the team did some of its
21 own review and corroboration of what was
22 transmitted to us, either in writing or
23 telephonically.
24 Q    When you were in consultation, were there
25 any examples you can point to where you made

1 adjustments to the opinions of values that were
2 presented by the independent appraisers on the
3 team to the committee?
4 A    I can't recall.  We looked and relooked
5 many times at the individual values.
6       So specifically, I'd have to go back to
7 each of the 387 items and talk about it and
8 review.
9       But ultimately everything got discussed.
10 Q    Did you form any independent valuations,
11 other than through this committee process, as
12 to the value of any specific pieces of art of
13 the DIA collection?
14 A    It was always -- I did, but it was always
15 in conjunction with the team.  That's how we
16 work.
17 Q    Well, what did you do independently in
18 conjunction with this engagement?
19 A    I -- every value, I'll repeat.
20       Every value that appears in the report was
21 looked at by me in consultation with the team.
22 Q    Were you ever the one who generated the
23 first opinion of value that was presented to
24 the team for consideration, with regard to any
25 of the pieces in the DIA collection?

Page 198

1    A    I can't recall because it's all part of a
2    team process. But I certainly was there when
3    the individual values were first determined.
4    Q    Did you doublecheck to make sure any of
5    the appraisers who were working for you did
6    a -- performed accurately or performed an
7    appraisal that was methodologically correct?
8    A    We did.
9    Q    And how did you do that?
10   A    We spot checked values. We more than spot
11   checked the individual values. We looked at
12   all the backup information and discussed it.
13   Q    For all 387 pieces?
14   A    Correct.
15   Q    What about for the other items in the
16   collection, other than the 387 --
17   A    Well, the methodology that we used for
18   these other items is detailed in the report,
19   and we had discussed it. But we can do it
20   again if you'd like.
21   Q    What's the average salary for an
22   appraiser, generally, at the VWA?
23   A    I don't know. I haven't done average
24   salaries. Everyone works on an ad hoc basis.
25   I really don't -- I can't answer that question

Page 199

1    at this point.
2        I will let you know at the end of the
3    year. But I can't do it now.
4    Q    How about last year?
5    A    I haven't -- again, I haven't reviewed it.
6    We did your taxes and it is there.
7        I mean, really, you know, different people
8    get paid for the amount of work that they've
9    done in different ways, and it's there.
10   Q    You wrote in your report that you
11   consulted dealers materials similar to works of
12   art contained in the subject property; is that
13   right?
14   A    That is correct.
15   Q    Who did you contact?
16   A    I can't tell you. It's a very sensitive
17   assignment. No dealer wanted to be identified
18   as a source for giving me values.
19   Q    Why not?
20   A    Why?
21   Because many dealers have relationship
22   with the DIA, and they would feel uncomfortable
23   having their names associated with the report.
24   Q    Why is that?
25   A    They felt that it might impact on their

Page 200

1    future dealings with the DIA.
2    Q    Do you have any sense of why that would
3    be?
4        MR. PEREZ: Object to the form of the
5    question. Asked and answered.
6    A    Do I have any sense of why it might be?
7    BY MR. ABEL:
8    Q    Yes.
9    A    The answer is yes.
10   Q    Why is that?
11   A    Like I said before, the dealers, it may
12   affect their business dealing.
13   Q    And how would it impact their business
14   dealing?
15       MR. PEREZ: Object to the form of the
16   question. Asked and answered.
17       THE WITNESS: I can answer?
18       MR. PEREZ: Yeah.
19   A    I didn't ask the dealer whether their
20   motivation was well-founded or not. If
21   somebody tells me I'll tell you what I think
22   but I don't want to be connected with this
23   report in any way where I can be identified, I
24   respect that.
25       But I certainly did consult them.

Page 201

1    BY MR. ABEL:
2    Q    Is that what they told you, these dealers?
3    A    Yes.
4    Q    AND how many dealers did you talk to?
5    A    Again, I think that's rather sensitive
6    information, so I really don't want to answer.
7    Q    You're not going to tell me how many
8    dealers you spoke to in conjunction with
9    forming the opinions in your report?
10   A    I just feel very uncomfortable about
11   talking about specific dealers, even in
12   numbers, and so on, but we did speak to a
13   number, and I think we should just leave it at
14   that.
15   Q    Well, I understand you're reticence to
16   talk about the source date for your report.
17   However, I'm entitled to find out how many
18   people you spoke to, and indeed, who you spoke
19   to.
20       MR. ABEL: If you are going to take the
21   position that he's not required under some
22   confidentiality agreement to disclose this
23   information, then that will be a different
24   story.
25       MR. PEREZ: It's the same position

Page 202

1    Mr. Plummer took with respect to every item of
2    testimony.
3         MR. ABEL:  Fundamentally different.  We're
4    not talking --
5    BY MR. ABEL:
6    Q    Let me ask you:  Did you have a
7    confidentiality agreement with any of these
8    individuals, these third parties?
9    A    It's implicit in our agreement, yes.  We
10   have oral confidentiality.
11   Q    Did you discuss that oral confidentiality
12   with them?
13   A    With whom?
14   Q    With those third-party dealers?
15   A    Yes.
16   Q    I don't really care about the names.
17        Did you have an agreement with them that
18   you wouldn't close the number of dealers you
19   had talked to?
20   A    I feel that anything I can say in
21   particular is really basically a violation of
22   the confidentiality and the trust that my long
23   established sources felt.
24   Q    How is the number of dealers that you
25   spoke to in forming your opinion in any way

Page 203

1    disclosing their identities?
2    A    There are a limted number of dealers in
3    each particular field.  And, consequently, even
4    that -- it's a very small world and people know
5    who my friends are, and even that, would be, I
6    think, a breach of confidentiality.
7    Q    Were any of your team members involved in
8    picking what definition of value you utilized
9    in this case?
10   A    I think the decision was ultimately mine,
11   but I certainly discussed it with them.
12   Q    Did you review reports submitted by other
13   experts in this case?
14   A    I certainly did.  I mean, the reports I
15   reviewed -- we had, as I testified before
16   several times, we had a number of phone
17   conversations.  I spoke to most people.  Some
18   of the other members of the core team spoke to
19   others.  We then discussed it.
20        MR. PEREZ:  I'm sorry.  I think I missed
21   the question because that answer was not to the
22   question that was asked.
23        MR. ABEL:  No.  I'm going to ask a
24   different question.
25        MR. PEREZ:  And I'm going to move to

Page 204

1    strike your answer because you didn't answer
2    the question that was asked.
3    BY MR. ABEL:
4    Q    Okay.  My question to you is:  You're
5    aware that other individuals in this case,
6    including -- or entities including Christie's,
7    Artvest and Winston filed reports?
8    A    Yes.
9    Q    Did you review those reports?
10   A    Yes, I did.
11   Q    In fact, you believe -- you wrote in your
12   report that it was of significant importance
13   that you reviewed the reports submitted by
14   others; isn't that right?
15   A    That's correct.
16   Q    Why was it of significant importance that
17   you review the Christie's, Artvest and Winston
18   reports?
19   A    Because they clearly had opinions in the
20   case with the property.  And as I testified
21   earlier, it's of significant importance to
22   review all valuations for the items under --
23   that are being considered for appraisal.
24   Q    You don't believe you'd be more objective
25   by forming your own appraisal without looking

Page 205

1    at third parties?
2    A    No.
3    Q    Have you ever worked at Christie's before?
4    A    I've worked for Christie's.
5    Q    And do you believe that Christie's is a
6    respected auction house in the profession, in
7    the industry?
8    A    Yes.
9    Q    And Christie's appraises works of art?
10   A    Yes.
11   Q    That's their core business?
12   A    No.
13   Q    That's part of their core business?
14   A    Yes and no.
15   Q    Am I correct that Christie's sells art
16   regularly?
17   A    Yes.
18   Q    And they appraise works of art in
19   conjunction with those sales?
20   A    They give what USPAP calls valuation
21   services, which is different from appraising.
22   Q    Well, they value works in conjunction with
23   those sales?
24   A    They value works that are being offered
25   for sale.

# Exhibit H

STATE OF MICHIGAN

BILL SCHUETTE, ATTORNEY GENERAL

DETROIT INSTITUTE OF ARTS:          Conveyance or transfer of Detroit
                                     Institute of Arts collection.

CITY OF DETROIT:

CHARITABLE TRUSTS:

NONPROFIT CORPORATIONS
ACT:

The art collection of the Detroit Institute of Arts is held by the City of Detroit in
charitable trust for the people of Michigan, and no piece in the collection may thus
be sold, conveyed, or transferred to satisfy City debts or obligations.

Opinion No. 7272                    June 13, 2013

Honorable Randy Richardville
State Senator
The Capitol
Lansing, MI 48909

You have asked whether the art collected and displayed at the Detroit

Institute of Arts may be sold, transferred, or otherwise disposed for the purpose of

satisfying debts or obligations of the City of Detroit (City) unrelated to the operation

or purpose of the Detroit Institute of Arts.

The Detroit Institute of Arts (museum) is an encyclopedic museum with an

expansive collection of art. "The [museum's] collection is among the top six in the

United States, comprising a multicultural and multinational survey of human

creativity from prehistory through the 21st century."[1] The museum is located in the City's Cultural Center Historic District, which is listed in the National Register of Historic Places.[2] The museum is operated by a nonprofit corporation, the Detroit Institute of Arts Founders Society (Founders Society).

The City itself is presently under the administration of an emergency manager as provided for in the Local Financial Stability and Choice Act, 2012 PA 436, MCL 141.1541 *et seq.* That act allows the emergency manager to sell, convey, or otherwise transfer assets of the City, if such is provided for in the manager's financial and operating plan,[3] or otherwise with the prior written approval of the Governor. MCL 141.1552(r).[4] As your request notes, some have suggested that the museum's art collection, to which the City has legal title, could be sold under this act in order to satisfy debts or obligations owed by the City, but unrelated to the art collection or the museum.[5]

---

[1] See www.dia.org/about/history.aspx.

[2] See http://nrhp.focus.nps.gov/natregsearchresult.do?fullresult=true&recordid=55.

[3] MCL 141.1551 requires an emergency manager to develop a written financial and operating plan addressing various issues, and to submit the plan to the State Treasurer.

[4] An emergency manager must first submit any proposed sale of assets to the local government unit's governing body for approval. MCL 141.1559(1). If the governing body disapproves the proposed sale, the governing body must present an alternative plan that yields a similar financial result. The local emergency financial assistance loan board then chooses between the options. MCL 141.1559(2).

[5] Because this opinion concludes that the art collection is held in charitable trust, it is unnecessary to address whether the collection is the type of asset that could be sold for purposes of MCL 141.1552(r). But arguably, the Legislature, in enacting the Local Financial Stability and Choice Act, did not intend that unique cultural assets of a local unit of government be sold since such a sale would not be in the best interests of the health, safety, and welfare of the citizens of this State. MCL 141.1543.

2

Before addressing your question, it is helpful to provide an overview of the museum's creation and present operations.

## I. Historical Overview of the Detroit Institute of Arts.

The museum was incorporated by its founding members as a nonprofit charitable corporation 128 years ago pursuant to legislation enacted in 1885. In that year, the Michigan Legislature enacted 1885 PA 3, an "[a]ct for the formation of corporations for the cultivation of art." The act provided that a group of individuals could "become a body corporate" for "the purpose of founding a public art institute" "in the manner and for the purposes . . . set forth" in the act. Section 1, CL 1915, § 10759. The act stated that the corporation must have articles of incorporation setting forth its purpose, Section 2, CL 1915, § 10760, and further provided that:

> Such corporations shall have power . . . to receive, acquire, collect, and own paintings, sculpture, engravings, drawings, pictures, coins, and other works of art, and to institute, maintain, or assist schools for the teaching of art.
>
> *The public exhibition of its collection of works of art shall be the duty of every such corporation,* and, as soon as it shall be prepared to do so, it shall, under reasonable regulations, and without any improper discriminations, *open its buildings and art collection to the general public.* [1885 PA 3, Sections 3 and 4, CL 1915, §§ 10761, 10762; emphasis added.]

The property of the corporation would be tax exempt, Section 18, CL 1915, § 10776, and the corporation would be managed by a board of trustees who served without compensation. Sections 6 through 11, CL 1915, §§ 10764 - 10769. The act

3

required that "all gifts, devises, or requests" be "faithfully used for the purposes" of the corporation, and "no dividend in money or property" could be made among the corporation's members. Section 15, CL 1915, § 10773. The corporation was prohibited from changing its "character and purposes," and from selling "its general art collection." Section 16, CL 1915, § 10774. And the corporation could only wind up its affairs if provided for by law. *Id.*

The museum, then known as the Detroit Museum of Art, was incorporated on April 16, 1885, pursuant to these requirements, and set forth its purpose in its articles of incorporation as "for the founding of a public art institute in the City of Detroit, which may . . . receive and use such gifts, contributions, devises and bequests as may be made for art purposes: receive, acquire, collect and own paintings, sculpture, engravings, drawings, pictures, coins and other works of art, and may do all things authorized by said Act . . . ." (1885 Articles of Incorporation, Detroit Museum of Art).[6] The museum immediately thereafter began acquiring pieces of art for its collection through purchases, gifts, donations, and bequests.

Not long after the museum's incorporation, the Legislature passed various acts empowering the City to appropriate money to support the museum, and to issue bonds for the construction of buildings. This expenditure of public money on behalf of the museum, a private nonprofit corporation, raised concerns and a lawsuit was filed. See *Detroit Museum of Art v Engel*, 187 Mich 432, 434-435; 153

---

[6] The museum's corporate documents are available at www.dleg.state.mi.us/bcs_corp/sr_corp.asp.

NW 700 (1915). During this time period, the museum had conveyed its buildings and real estate to the City. (No art was conveyed to the City given the express prohibition in the incorporating legislation). However, the museum retained control of its collection and operation. *Detroit Museum of Art*, 187 Mich at 435.

The Michigan Supreme Court ultimately concluded that these appropriations violated the 1908 Constitution's restrictions on a city's lending of credit to an entity other than a public or "municipal agency." *Id.* at 439-443. The Court agreed that the museum served a "public purpose," but did not find that fact or the fact that the museum had conveyed its buildings and real property to the City dispositive since it did "not change the museum's character as a private corporation." *Id.* at 440. Presumably, after this decision, the museum no longer received appropriations from the City, and the museum apparently began to struggle financially. In response, in 1919 the Legislature amended 1885 PA 3, as amended by 1913 PA 245, to allow corporations formed under that act to convey their property. 1919 PA 67 provided that a "corporation organized under [1885 PA 3] situated in a city empowered to maintain a public art institute . . . may convey all or any of its property to said city . . . and said property so conveyed shall . . . be faithfully used for the purposes for which such corporation was organized . . . ." Section 20. 1885 PA 3, 1913 PA 245, and 1919 PA 67 were subsequently repealed by 1921 PA 84, as part of the consolidation of corporations law, but were subject to the savings provision in that act.

5

Pursuant to this statutory authorization and the City's 1918 Charter, which authorized the City to operate an art institute and to acquire art for the institute, Charter XIX, Sections 1, 7, the museum, in its corporate capacity as the Detroit Museum of Art, conveyed its buildings and art collection to the City in 1919. With the legal transfer of the properties and art collection to the City, the City was now free to support the museum; and it did so by funding both museum operations and by purchasing new art for the collection. The nonprofit corporation, however, did not wind up its affairs but rather continued to exist to assist the museum with gifts of art and with support of museum operations and their costs. That nonprofit corporation exists today as the Founders Society, as noted above.

Over the ensuing years, the museum's structure and funding sources changed as needed based on changing circumstances. By 1955, the City began to encounter financial problems, and its acquisitions for the museum collection largely ceased. In 1973, the museum temporarily closed due to lack of funding. Shortly thereafter, in 1977, the State began granting money to the City so that the museum could continue operating. In 1983, the City claimed greater control over the museum's operations: museum employees became employees of the City. These events led to the issuance of an opinion by Attorney General Frank Kelley, which confirmed the validity of State appropriations or grants to the City for the benefit of the museum. In confirming State support for the museum, Attorney General Kelley recognized the museum's state or "public purpose" and status as a unique, cultural treasure of the people of Michigan:

6

Unquestionably, and uniquely in Michigan, the Detroit Institute of Arts, as a widely acclaimed cultural facility, is utilized by the citizens of this state without regard to residency in the city. The facility is an outstanding tourist attraction utilized by tourists and their families. Its vast displays and cultural facilities are readily and regularly available to Michigan students. Both the Governor in his Executive Budget, and the Legislature in the enactment of appropriations for the support of the Detroit Institute of Arts, have recognized its place in the cultural life of this state. [OAG, 1983-1984, No 6225, pp 303, 308 (May 7, 1984).]

Following the Attorney General's opinion, state grants for the museum continued; though by the 1990s, these grants began decreasing. From 1977 through 2011, state funding for the museum totaled roughly $300 million.

In 1997, the structure and operation of the museum changed again. Under a 1997 Operating Agreement, the City maintained its legal title to the art collection, but transferred operations – and their entire cost – back to the Founders Society. From 1997 to the present, the museum has operated under this Agreement. And despite the Founders Society's best efforts to support the museum with charitable dollars, it continued to face financial difficulties. In 2010, the Legislature enacted the Art Institute Authorities Act, 2010 PA 296, MCL 123.1201 *et seq*. This act authorized the establishment of an art institute authority for the levying of property taxes to support "art institute[s]" like the museum. MCL 123.1205.[7] In November 2012, voters of Oakland, Macomb, and Wayne Counties passed the

---

[7] The act defines "art institute" as "an encyclopedic art museum whose primary art collection and facility, at the date an authority is established, are owned by a municipality located in this state." MCL 123.1203(a).

millage to help support the museum. This millage supplements the museum's charitable endowment and regular charitable contributions.

## II.    Present Operations.

To address your question, a closer examination of the 1997 Operating Agreement is also required. Other helpful documents include the Museum's Collections Management Policy, which is referenced in the Operating Agreement; the ethical policies governing both American and international museums; and the accounting practices that apply to museum art collections.

### A.    1997 Operating Agreement.

The 1997 Operating Agreement, which expires in 2018, currently governs the relationship between the Founders Society and the City. The Operating Agreement is referenced explicitly in the City's charter: "The Arts Department shall maintain and operate the Detroit Institute of Arts directly or pursuant to an operating agreement." 2012 Charter for the City of Detroit, § 7-301.

Several sections of the Operating Agreement are relevant to the ownership and disposition of the art collection.

Section E. of the Operating Agreement specifies that the City retains ownership of the art collection, the museum properties, and any newly acquired art. And Section F.12. requires the Founders Society to use best efforts to solicit gifts and donations of works of art for the benefit of the museum.

8

Section F.2.(a) of the Operating Agreement cedes responsibility for managing the City's art collection to the Founders Society in accord with the museum's Collections Management Policy, which is discussed below. In addition, Section F.2.(b) cedes the right to acquire and dispose of the museum's works of art to the Founders Society; providing that any funds it receives from any sale must be used solely to purchase other works of art for the art collection. In consideration for exclusive right to manage the museum and control the artwork, subject to the terms of the agreement, the Founders Society assumed full responsibility for all operating expenses of the museum, as well as other obligations that had previously been the responsibility of the City, including "management of the art collections; presentation of exhibitions and other events; maintenance of the museum building, the Frederick lot . . . and the employee parking lot; collection and expenditure of income; fundraising; marketing; acquisition/disposition of works of art; and all other financial operations . . . ." Section D.3. Although the City retains legal title to the museum and its artwork, the sale of the artwork by the City is not permitted under the Operating Agreement and would seriously undermine the ability of the Founders Society to fulfill its contractual responsibilities.

B.     Collections Management Policy.

The museum's Collections Management Policy, to which Section F.2.(a) of the Operating Agreement requires the Founders Society to adhere, includes language restricting the disposition of the art collection.

9

Section V.A. states: "In considering objects or groups of objects, the Museum must be ever aware of its role as trustee of the collection for the benefit of the public." Section V.E. similarly states: "The manner of disposition should be in the best interest of the Museum, the public it serves, the public trust it represents, and the scholarly and cultural communities it serves." Section V.F. limits the use of the disposition proceeds: "Net proceeds derived from the sale of a deaccessioned object (i.e., the proceeds of the disposition less all related expenses) shall not be used as operating funds. Such net proceeds shall be placed in the selling curatorial department's Art Acquisition Fund . . . ."

## C.    Professional Codes of Ethics.

The museum's Collections Management Policy, which views museum assets as being held in "public trust"[8] and which strictly limits deacquisition of art, is in accord with the professional codes of ethics adopted by the American Alliance of Museums and the International Council of Museums.[9] Relevant sections from these ethical codes follow.

---

[8] The term "public trust" as used by museums and their associations should not be equated with the "public trust doctrine" that Michigan and other courts have applied to navigable waterways. See, e.g., *Glass v Goeckel*, 473 Mich 667, 694; 703 NW2d 58 (2005) (finding that the shores of the Great Lakes below the ordinary high water mark were held in public trust.). See also *Netweg v Wallace*, 237 Mich 14, 17; 208 NW 51 (1926) and *State v Venice of America Land Co*, 160 Mich 680, 702; 125 NW 770 (1910). While there has been debate in other states for extending this doctrine to apply to cultural resources, like museums, see Sara Tam, Note, 39 Fordham Urb L J 849, 861-863 (2012), In Museums We Trust: Analyzing the Mission of Museums, Deaccessioning Policies, and the Public Trust, research discloses no Michigan cases that have applied the public trust doctrine outside of the natural resources context.

[9] Museums and professional organizations began promulgating ethical codes regarding deaccessioning and museum practices, after the Metropolitan Museum of Art in New York planned

10

The American Alliance of Museum's Code of Ethics (adopted 1991, amended
2000) states:

> Taken as a whole, museum collections and exhibition materials
> represent the world's natural and cultural common wealth. As
> stewards of that wealth, museums are compelled to advance an
> understanding of all natural forms and of the human experience. It is
> incumbent on museums to be resources for humankind and in all their
> activities to foster an informed appreciation of the rich and diverse
> world we have inherited. It is also incumbent upon them to preserve
> that inheritance for posterity.
>
> Museums in the United States are grounded in the tradition of public
> service. They are organized as public trusts, holding their collections
> and information as a benefit for those they were established to
> serve. . . .
>
> ***
>
> [D]isposal of collections through sale, trade or research activities is
> solely for the advancement of the museum's mission. Proceeds from the
> sale of nonliving collections are to be used consistent with the
> established standards of the museum's discipline, but in no event shall
> they be used for anything other than acquisition or direct care of
> collections.[10]

The International Council of Museums' Code of Ethics (adopted 1986,
amended 2001, and revised 2004) gives similar principles:

> Principle 2: Museums that maintain collections hold them in trust for
> the benefit of society and its development.
>
> * * *
>
> Principle 2.16: Museum collections are held in public trust and may
> not be treated as a realizable asset. Money or compensation received

---

to sell several significant pieces in 1972. Tam, In Museums We Trust, 39 Fordham Urb L J at 864-
865.

[10] Available at www.aam-us.org/resources/ethics-standards-and-best-practices/code-of-ethics-for-
museums.

11

from the deaccessioning and disposal of objects and specimens from a museum collection should be used solely for the benefit of the collection and usually for acquisitions to that same collection.[11]

## D.    Accounting Practices.

In accord with the view that museum art collections are held in trust for the public and are not financial assets of the museum, neither the City nor the Founders Society have capitalized the art collection. In other words, the art collection is not considered on either the City's or the Founders Society's books as an asset with a monetary value because, though these assets have substantial monetary value, they are not assets that can simply be sold; rather, they are subject to the strict deaccessioning policies discussed above.

The decision not to capitalize the art collection accords with the American Association for State and Local History's policy against capitalization of museum collections. It also accords with the accounting principles of both the Financial Accounting Standards Board and the Governmental Accounting Standards Board, which each allow the non-capitalization of museum collections. See FASB, No. 116, ¶¶ 11-13; GASB No. 34. By contrast, the City has capitalized other City works of art that are outside the museum's collection; the City's 2012 Comprehensive Annual Financial Report lists these works of art as capital assets valued at $29.8 million.[12]

---

[11] Available at http://icom.museum/the-vision/code-of-ethics/.

[12] See City of Detroit's 2012 Comprehensive Annual Financial Report, pp 29, 95, *available at* http://www.detroitmi.gov/DepartmentsandAgencies/Finance/AccountsDivision.aspx.

It is understood that such works of art include the City's "Spirit of Detroit" statue, the Joe Louis "fist," and other works of art in City buildings.

### III. The art collection is held in charitable trust and may not be sold to satisfy City debts.

Against this backdrop, you ask whether the art collected and displayed at the museum may be sold or transferred for purposes of satisfying debts or obligations of the City unrelated to the collection or the museum. The answer to this question is no. As explained below, this question is governed by the law of charitable trusts.

### A. Michigan law favors the creation of charitable trusts.

Michigan charitable trust law is rooted in the common law. Much of that law is now codified in various statutes, such as the Supervision of Trustees for Charitable Purposes Act, 1961 PA 101, MCL 14.251 *et seq.*, the Charitable Gifts Act, 1915 PA 280, MCL 554.351 *et seq.*, the Nonprofit Corporation Act, 1982 PA 162, MCL 450.2101 *et seq.*, and the Estates and Protected Individuals Code (EPIC), 1998 PA 386, MCL 700.1101 *et seq.* Though the museum was incorporated before many of these statutes were enacted, the basic principles of charitable trust law are uniform and longstanding.

A Michigan court observed decades ago that "'[c]haritable gifts and trusts are favorites of the law and of the courts, and the courts will declare valid, and give effect to, such gifts and trusts where it is possible to do so . . . .'" *In re Rood's Estate*, 41 Mich App 405, 422; 200 NW2d 728 (1972), quoting 14 CJS, Charities, § 6, p 427.

13

The Supervision of Trustees for Charitable Purposes Act echoes this sentiment, providing that "[i]t is hereby declared to be the policy of the state that the people of the state are interested in the administration, operation and disposition of the assets of all charitable trusts in the state." MCL 14.251. That act further provides that the "act, in all of its provisions, in the interests of society and in conformity with public policy is intended to protect the rights and interest of the people of the state and the uncertain and indefinite beneficiaries of all charitable trusts . . . ." MCL 14.265.[13]

The EPIC defines the word "trust" in the following way:

> "Trust" includes, but is not limited to, an express trust, private or *charitable,* with additions to the trust, wherever and however created. Trust includes, but is not limited to, a trust created or determined by judgment or decree under which the trust is to be administered in the manner of an express trust. [MCL 700.1107(n); emphasis added.]

Case law confirms this, concluding that the term "trust" is not limited to express trusts and extends to corporations created to administer trusts. See *In re Americana Foundation,* 145 Mich App 735; 378 NW2d 586 (1985).

The EPIC defines a "charitable trust" as "a trust . . . created for a charitable purpose described in section 7405(1)." MCL 700.7103(c). Section 7405(1), MCL 700.7405(1), in turn, provides that a charitable trust "may be created for the relief of poverty, the advancement of education or religion, the promotion of health,

---

[13] The Supervision of Trustees for Charitable Purposes Act provides that "[t]he attorney general . . . shall represent the people of the state and the uncertain or indefinite beneficiaries in all charitable trusts in this state, and may enforce such trusts by proper proceedings in the courts of this state." MCL 14.254(a). See also MCL 554.352 and MCL 700.7405(3).

14

scientific, literary, benevolent, governmental, or municipal purposes, . . . or other purposes the achievement of which is beneficial to the community." See also Restatement (Third) of Trusts §§ 27-28 (2003); 15 Am Jur 2d, Charities, §§ 5 and 32. Section 2(b), MCL 14.252(b), of the Supervision of Trustees for Charitable Purposes Act similarly defines "charitable trust" as "the relationship where a trustee holds property for a charitable purpose." While neither of these Acts expressly mention art museums, the public exhibition of art is generally considered a charitable purpose. See 15 Am Jur 2d, Charities, § 49. See also *Hardman v Feinstein*, 240 Cal Rptr 483, 486 (Cal Ct App 1987) ("Art museums advance education and therefore serve a charitable purpose."). In fact, charitable trusts and nonprofit corporations "are the organizational structures generally available to private museums." Sara Tam, Note, In Museums We Trust: Analyzing the Mission of Museums, Deaccessioning Policies, and the Public Trust, 39 Fordham Urb L J 849, 855-856 (2012).

These more recent statutory iterations of the term "charitable trust" are consistent with the Michigan Supreme Court's past descriptions. In *Scarney v Clarke*, 282 Mich 56, 63-64; 275 NW 765 (1937), the Court observed:

In 2 Restatement of the Law of Trusts, p 1096, § 349, it is said:

> "A charitable trust may be created by (a) a declaration by the owner of property that he holds it upon a charitable trust; or (b) a transfer inter vivos by the owner of property to another person to hold it upon a charitable trust."

\* \* \*

15

In charitable trusts, the public is the beneficiary. A distinguishing characteristic of such a trust is that the prospective beneficiary is undetermined and unknown, and while such a trust need not be for the benefit of the entire public, yet it must be public in nature and for unascertained beneficiaries. [See also *Scudder v Security Trust Co*, 238 Mich 318; 213 NW 131 (1927) (discussing requirements for creation of charitable trust).]

Historically, to create a charitable trust, no specific words needed to be used, rather "'[i]t [was] sufficient . . . to show[ ] an intention that the property should be held subject to a legal obligation to devote it to purposes which are charitable.'" *Knights of Equity Memorial Scholarships Comm v University of Detroit*, 359 Mich 235, 242-243; 102 NW2d 463 (1960) (affirming that agreement between voluntary association and university created a charitable trust), quoting 4 Scott, Trusts (2d ed.) § 351, at 2574. See also *In re Rood's Estate*, 41 Mich App at 413 ("A determination that a charitable trust is created needs only a finding that 'some charitable purpose' exists.") and *In re Americana Foundation*, 145 Mich App at 738-739. The EPIC similarly does not require any particular words be used to create a trust, MCL 700.7401(1) and MCL 700.7402, and a trust may even be created through oral statements, MCL 700.7407.

In general, any legal entity, including a municipality, may serve as trustee of a charitable trust. Restatement (Third) of Trusts, § 33; 15 Am Jur 2d, Charities § 83. The Supervision of Trustees for Charitable Purposes Act defines "[t]rustee" to "mean[ ] any individual, group of individuals, association, foundation, trustee corporation, or *other legal entity* holding property for any charitable purpose." MCL 14.252(a) (emphasis added). See also *Hardman*, 240 Cal Rptr at 485-486 (Fine Arts

16

Museums of San Francisco is charitable trust administered by City of San Francisco as trustee). A city may thus act as trustee of a charitable trust established for the purpose of maintaining and operating an art museum.

A "trustee shall administer the trust in good faith, [ ] in accordance with its terms and purposes, for the benefit of the trust beneficiaries." MCL 700.7801. See also MCL 700.7802. With a trust, whether charitable or otherwise, the trustee holds the legal interest – or legal title – in the assets, but the beneficiary holds the equitable interest. *Apollinari v Johnson*, 104 Mich App 673, 675, 305 NW2d 565 (1981) ("The separation of legal and equitable title is one of the distinctive features of the trust relationship. Legal title vests in the trustee to be held for the benefit of the beneficiary."). See also *In re Americana Foundation*, 145 Mich App at 740 (Trustee foundation "held the legal estate whereas the public received the benefit and enjoyment."); Restatement (Third) of Trusts, § 2, comment d, see also *id.*, § 42. Thus, while a trustee has legal title to the trust assets, a trustee may not dispose of trust assets as the trustee wishes; instead, a trustee is limited to using the assets for the designated purposes of the trust. MCL 700.7801. See also *In re Friends for Long Island's Heritage*, 911 NYS2d 412 (NY App Div 2010) (nonprofit corporation could not sell assets donated for purpose of public exhibition and display to pay off corporate debts upon dissolution.).

17

**B.    The art collection is held in charitable trust for the people of Michigan and cannot be sold for purposes other than the acquisition of art.**

With its incorporation in 1885, the museum was created as a nonprofit corporation with a specific charitable purpose: "the public exhibition of its collection of works of art." 1885 PA 3, Section 4, CL 1915, § 10762. The museum's 1885 Articles of Incorporation reflect this purpose. The museum was authorized to acquire art for that specific purpose, 1885 PA 3, Section 3, CL 1915, § 10761, and was required to "faithfully use[ ]" "[a]ll gifts, devises, or bequests made to" the museum for that purpose. *Id.*, Section 15, CL 1915, § 10773. The museum could not change its "character and purposes" or sell "its general art collection" unless authorized by the Legislature. *Id.*, Section 16, CL 1915, § 10774.

Thus, as a legal entity holding assets for a charitable purpose, the museum was founded as a charitable trust. The museum's charitable purpose was the exhibition of art for the public; the art collection thereafter acquired by the museum became the res or assets of the trust. And as a the charitable trustee, the Founders Society was limited to using its assets – the art collection – for its dedicated charitable purpose.

Moreover, the Legislature's intent was plain: once an art institution like the museum incorporated and began collecting art and dutifully exhibiting its collection for the public, it was do so in perpetuity if possible. Hence, the Legislature created restrictions on a change to the character or purpose of the art institution, and the

18

disposition of its general collection; and it required that any winding up be provided for by law so as to "best promote and perpetuate" "the purposes" of the institution. 1885 PA 3, Section 10774, CL 1915, § 10774.

In 1919, in the wake of the Michigan Supreme Court's ruling in *Detroit Museum of Art v Engel,* the Legislature determined that the best method to "promote and perpetuate" "the purposes" of the museum was to authorize the conveyance of all property to a "city empowered to maintain a public art institute." 1919 PA 67, Section 20. This conveyance would allow the City directly to support the museum consistent with the Supreme Court's ruling. The law also required the City to "faithfully[ ] use[ ]" the art conveyed "for the purposes for which" the institution was organized, which was to operate a "public art institute" and exhibit art to the "general public." No provision was included for a city to change or modify the purpose, sell the art conveyed, or wind up or dissolve its public art institute.

Pursuant to these express statutory authorizations, the Founders Society transferred its art collection to the City in 1919. When the City accepted the transfer, it was bound by the language of 1919 PA 67 to perpetuate and "maintain a public art institute" that would exhibit art to the general public, and to "faithfully[ ] use[ ]" the art conveyed for that purpose. Under charitable trust law, this transfer was a transfer of the Founders Society's legal interest or legal title in its charitable assets to a new charitable trustee – the City. Under those circumstances, the equitable interest in the art collection remained with the people of Michigan, the ultimate beneficiaries of the museum's or Founders Society's charitable purpose.

19

Appollinari, 104 Mich App at 675. See also *Hardman*, 240 Cal Rptr at 486

("[A]lthough the Fine Arts Musuems [ ] is administered by City officials [as trustee],

the trust assets do not constitute public assets but rather the res of a charitable

trust.").[14]

In accepting the trust, consistent with the statute, the City agreed at its own

cost and expense to maintain and operate the trust, which by City Charter included

the mandate that the City "[s]hall acquire, collect, own and exhibit, in the name of

the city, works of art, books and other objects such as are usually incorporated in

Museums of Art." 1918 City Charter, Chapter XIX, Section 7(c).[15] Over the years,

the museum's art collection grew through charitable donations of art and direct

purchases by the City. As new pieces were added to the collection, the entire

collection continued to be dedicated towards the museum's initial charitable

purpose: the public display of its art collection. See MCL 700.1107(n) (term "trust"

"includes . . . an express trust, private or charitable, *with additions to the trust,*

*wherever and however created.*") (Emphasis added). Thus, the entire collection – to

this day – continues to be held in charitable trust for this same charitable purpose,

---

[14] While the entire art collection is held in charitable trust, the plain language of 1919 PA 67 further protects any piece of art acquired from 1885 through the 1919 transfer from sale for a non-museum related purpose because the City of Detroit can only "use[ ]" that art "for the purposes for which" the museum was organized, which was to operate a "public art institute" and display art to the "general public." 1919 PA 67, Section 20; 1885 PA 3, Sections 1, 3, and 4, CL 1915, §§ 10759, 10761, and 10762. This language precludes a sale of artwork obtained through this transfer for the purpose of satisfying City debts unrelated to the art collection or the museum. And other Michigan laws add protection to those works of art that were gifts from charitable donors. See, e.g., MCL 554.352 (gifts for charitable purposes create a charitable trust that "shall be liberally construed by the court so that the intentions of the creator thereof shall be carried out whenever possible.").

[15] Notably, while the 1918 City Charter empowered the Arts Commission, subject to the approval of the city council, to sell, convey, and lease any real property, *Id.*, Section 7(g), no express provision was made for the sale or disposal of the art work.

including the pieces acquired by the City with City money that were purchased and added to the museum collection.[16]

This conclusion is consistent with Michigan trust law, and restrictions found in the Nonprofit Corporation Act, the statute under which charitable, nonprofit corporations incorporate today. See MCL 450.2301(5) ("This act shall not be deemed to permit assets held by a corporation for charitable purposes to be used, conveyed or distributed for noncharitable purposes.") Moreover, the museum's current operations and policies under the 1997 Operating Agreement, the museum's Collections Management policies, the ethical policies of the various museum associations, and the Founders Society's and the City's accounting practices, confirm this result. Rather, these documents, discussed above, expressly state that the entire collection is held in trust for the public and strictly limit the use of the art to its public exhibition, and any disposition of art or proceeds from the disposition of art can only be used to acquire additional art for the museum's collection. Based on these facts and charitable trust law, the City, as charitable trustee, cannot sell art from the trust for the purpose of satisfying debts owed to its creditors.

---

[16] A contrary conclusion that some of the art collection is held in charitable trust and other art is not – for instance, the art purchased by the City – is neither consistent with trust law nor reasonable. If this were the case, assets held in charitable trust would necessarily reside in the same collection as non-charitable assets, despite the fact that the *whole collection* exists for the singular charitable purpose of the public exhibition of art. See MCL 700.7811(2) (A trustee shall keep trust property separate from the trustee's own property.") Moreover, under that view, as substantial charitable contributions continued to be made over the years both directly to the collection and in support of the collection, the commingling of charitable assets with non-charitable assets could be viewed as a breach of charitable trust. See MCL 700.7901. That untenable result further supports the conclusion that the entire collection existed – and continues to exist – in charitable trust.

21

# Conclusion

It is my opinion, therefore, that the art collection of the Detroit Institute of Arts is held by the City of Detroit in charitable trust for the people of Michigan, and no piece in the collection may thus be sold, conveyed, or transferred to satisfy City debts or obligations. In issuing this opinion, I recognize the serious financial hardships that face the City, the difficulties that the people who live and work in the City have endured for decades, and the many challenges facing the citizens of the City of Detroit and the State in the future. Yet, in the 128 years since the creation of the Detroit Institute of Arts, at no time have the people demanded that their most precious cultural resources be sold in order to satisfy financial obligations. To the contrary, the citizens of this State recognize that abandoning or selling the public's artwork would damage not only the City's but the State's cultural commonwealth. In Michigan, we not only appreciate our cultural treasures, we guard them zealously in charitable trust for all state residents, present and future.

BILL SCHUETTE
Attorney General