# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------x
                        :

In re                          :         Chapter 9
                        :

CITY OF DETROIT, MICHIGAN,    :         Case No. 13-53846
                        :

                Debtor.    :         Hon. Steven W. Rhodes
                        :
                        :
-------------------------------------------------------x

## OMNIBUS RESPONSE TO SYNCORA AND FGIC'S MOTIONS *IN LIMINE* TO PRECLUDE INTRODUCTION OF EVIDENCE PROTECTED BY THE MEDIATION ORDER

The City of Detroit (the "City"), debtor in the above captioned case, hereby responds to (i) Syncora Capital Assurance Inc. and Syncora Guarantee Inc.'s ("Syncora") Motion *in Limine* Barring the City from Introducing Communications Protected by the Court's Mediation Order [Docket No. 6979] (the "Syncora MIL") and (ii) Financial Guaranty Insurance Company's ("FGIC") Motion *in Limine* to Preclude the Introduction of Evidence or Testimony Regarding Matters Withheld from Discovery on the Basis of the Mediation Order [Docket No. 6985] (the "FGIC MIL" and together with the Syncora MIL, the "Mediation MILs").

      1.      This Court entered the "Mediation Order" [Docket No. 322] on August 13, 2013, which commands, as relevant here, that "[a]ll proceedings, discussions, negotiation, and writings incident to mediation shall be privileged and

confidential, and shall not be disclosed, filed or placed in evidence." Mediation Order at ¶4.

2.    The Syncora MIL seeks to preclude the City from offering evidence of any communications that are covered by the Court's Mediation Order, including "state of mind" evidence that is based in whole or in part on any such communications. *See* Syncora MIL at ¶3. The FGIC MIL similarly seeks to bar the introduction of evidence or testimony that was previously withheld on the basis of the Mediation Order, as well as any evidence of settlement negotiations. *See* FGIC MIL at ¶¶18, 19.

3.    The Mediation MILs should be denied. As both FGIC and Syncora surely know, the City is already required to comply with the Mediation Order. Indeed, this Court has already made clear that parties will be held accountable for even inadvertent violations of the terms of the Mediation Order. Any order requiring the City to comply with the Mediation Order would be duplicative and unnecessary, and any suggestion that the City intends to violate the Mediation Order in open court is simply baseless. Moreover, as both Syncora and FGIC state, the Mediation Order is not a sword and cannot be used as such. Rather, the Mediation Order protects certain communications and information and must be construed according to its terms – particularly with respect to its confidentiality provisions. To the extent the Mediation MILs seek to broaden the

reach of the Mediation Order beyond its plain and clear terms, they must be denied.

## BACKGROUND

4.    This Court entered the Mediation Order on August 13, 2013. Since that time, *all parties*, including the City, have been bound by its terms, including its provision that "[a]ll proceedings, discussions, negotiation, and writings incident to mediation shall be privileged and confidential, and shall not be disclosed, filed or placed in evidence." Mediation Order at ¶4.

5.    The City's Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (August 20, 2014) [Docket No. 6908] (the "Plan") was filed on August 20, 2014. The hearing with respect to confirmation of the Plan (the "Confirmation Hearing") is scheduled to commence on September 2, 2014.

## ARGUMENT

**I.    THE CITY IS ALREADY REQUIRED TO COMPLY WITH THE MEDIATION ORDER AND THUS RELIEF REQUESTED IN THESE MOTIONS IS DUPLICATIVE**

6.    Motions *in limine* should not seek duplicative relief. *See Clark v. Tenn. Valley Elec. Coop.*, 2002 U.S. Dist. LEXIS 28994, at *8 (W.D. Tenn. Apr. 2, 2002) (denying motion *in limine* as duplicative where it addressed documents already the subject of a court order); *Abrams v. Ciba Specialty Chems. Corp.*, No. 08-0068-WS-B, 2010 U.S. Dist. LEXIS 145755, at *14-17 (S.D. Al. Mar. 22, 2010) (denying one motion *in limine* where parties concur evidence is not properly

-3-

admissible at trial and another motion *in limine* where issue is "redundant of arguments previously presented to, and resolved by this Court via Order"); *cf. Watts v. UPS*, No. 03-00589, 2013 U.S. Dist. LEXIS 126746, at *3 (S.D. Ohio Sept. 5, 2013) (motion *in limine* moot where opposing party agreed it had no intention of introducing evidence at issue). Simply put, there is no need to exclude evidence that is already excluded.

7. The Mediation Order is clear. Neither the City, nor any participant in the mediations nor indeed any third party, may reveal the proceedings, discussions, negotiations and writings incident to that mediation. Moreover, the Mediation Order is not a privilege that a party may "invoke" or "waive" – it is an order of this Court. The City is well aware of this, hence, much to FGIC and Syncora's apparent frustration, it has endeavored over the course of discovery in connection with its Plan to fully comply with the Mediation Order's terms.[1]

---

[1] It appears this frustration was caused at least in part by the "wide range" of issues relating to which the City has invoked the Mediation Order. Syncora MIL at ¶1 ("the City and other Plan supporters have invoked the Mediation Order when questioned about (a) the terms, structure, and negotiations surrounding the DIA Settlement; (b) the calculation of the OPEB Claim amount; (c) the status of the negotiations surrounding the City's new collective bargaining agreements; (d) the status of negotiations with public safety groups; (e) the bases for differing treatment of COPs and LTGO, UTGO, retiree, and other creditors; and (f) the potential for asset monetization via the DWSD transaction"). In response, the City simply

8.      Ironically, as a result of this compliance, Syncora and FGIC now apparently seek to bar the City from introducing information related to the mediation at the Confirmation Hearing—*i.e.*, to require compliance with the Mediation Order. This is duplicative and not an appropriate use of a motion *in limine*.

9.      Regardless of the outcome of the Mediation MILs, the City will continue to comply with the Mediation Order when it presents its case at the Confirmation Hearing. The Mediation MILs, however, misrepresent the nature of this continued compliance.

## A.      The City Will Comply With the Mediation Order *Independent* Of The Fact That It Was Properly Complied With During Discovery.

10.      Syncora seeks to cast compliance with the Mediation Order as a punishment or, at a minimum, a consequence of having previously abided by its terms. *See* Syncora MIL at ¶3 ("In light of the City's extensive invocation of the

---

notes that each of those matters was referred by this Court to mediation. *See, e.g.,* First Order Referring Matters to Facilitative Mediation [Docket No. 0333] (referring treatment of claims of various creditor classes and negotiation of collective bargaining agreements to mediation); Order to Certain Parties to Appear for Continued Mediation on LTGO Matters [Docket No. 2344]; Order to Certain Parties to Appear for Continued Mediation on UTGO Matters [Docket No. 2345]; Order to Certain Parties to Appear for Continued Mediation on DWSD Matters [Docket No. 2346]; Order of Referral to Mediation [Docket No. 4156] (referring regional water authority to mediation); Order to Appear for Continued Mediation on "COPs" Matters [Docket No. 5612].

-5-

Mediation Order, the City should not be permitted to introduce evidence of any communications incident to mediation.").  Syncora requests that the City pay a price for its compliance with the Mediation Order by being *required to abide by its terms at the Confirmation Hearing*.  This is both nonsensical and unnecessary, because the City has every intention of continuing to comply with the Mediation Order in all respects.

11.     The City (and all parties) are not precluded from offering information that is incident to mediation because they have appropriately complied with the Mediation Order in the past.  Rather, they are so precluded because the Mediation Order is an order of this Court, and all parties are bound to follow it as such.  Accordingly, there is no basis to grant the Syncora MIL as it both misrepresents and re-imposes already existing obligations.

**B.     The City Has Properly Relied on the Mediation Order Throughout Discovery and Will Not Use Previously Properly Withheld Information at the Confirmation Hearing.**

12.     Both FGIC and Syncora assert variations of the "sword and shield" argument in support of the Mediation MILs.  Yet these assertions rely on cases addressing recognized privileges and the Mediation Order is not such a privilege.  Specifically, the FGIC MIL seeks to prevent the disclosure of all information previously withheld pursuant to the Mediation Order on the ground that it is "axiomatic that a party cannot use a claim of privilege or confidentiality as

a shield and a sword." FGIC MIL at ¶15. Syncora in turn asserts that "the City has used the Mediation Order to shield information relating to the states of mind of the City's agents and employees to the extent such information is based on the mediation" and that they would now be subject to "unfair surprise and prejudice" if such evidence is presented at the Confirmation Hearing. Syncora MIL at ¶¶12, 14. Syncora and FGIC claim that, having used the Mediation Order as a shield, the City must now be precluded from using it as a sword.

13.     They have both missed the mark for the simple reason that the City only "shielded" information properly subject to the Mediation Order, and the City *already cannot use such mediation-related information at the Confirmation Hearing*. The City is obliged to continue abiding by the terms of the Mediation Order—nothing more, and nothing less.

14.     The rule against using privileged information as a "sword and shield" means that a party cannot "hide behind the privilege if [it is] relying upon privileged communications to make [its] case," *In re Lott*, 424 F.3d 446, 454 (6th Cir. 2005) (*citing United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)), for example, by "disclos[ing] some selected communications for self-serving purposes," *Bilzerian*, 926 F.2d at 1292. The sword and shield reference is inapplicable here, for two reasons. First, the Mediation Order is not a privilege the City may selectively invoke even if it so wished. FGIC, in fact, appears to

recognize it: "the Court has acknowledged that the Mediation Order is a court order which cannot be waived." FGIC MIL at ¶11. Second, and more importantly, the City has never had any intention of relying on "mediation-privileged" communications to make its case and is not selectively waiving the terms of the Mediation Order to make its case. Specifically, the City will not introduce testimony at the Confirmation Hearing about the proceedings, discussions, negotiations and writings incident to mediation. To be crystal clear, information that was "previously withheld" on the basis of the Mediation Order will not be introduced at the Confirmation Hearing.

15. Likewise, the litany of cases cited in the Mediation MILs relate to assertions of the attorney-client privilege and are inapplicable here. Both *Huzjak v. United States*, 118 F.R.D. 61, 64-65 (N.D. Ohio 1987) (FGIC MIL at ¶15), and *Mariner v. Great Lakes Dredge & Dock Co.*, 202 F. Supp. 430, 434 (N.D. Ohio 1962) (FGIC MIL at ¶15), concern an alleged waiver of the physician/patient privilege. In *Int'l Tel. & Tel. Corp. v. United Tel. Co. of Fla.*, 60 F.R.D. 177, 186 (M.D. Fla. 1973) (FGIC MIL at ¶14), *Baxter Travenol Labs., Inc. v. Abbott Labs*, No. 84 C 5103, 1987 WL 10988, at *1 (N.D. Ill. May 12, 1987) (FGIC MIL at ¶14), *In re Lott*, 424 F.3d 446, 454 (6th Cir. 2005) (FGIC MIL at ¶15) and *Ross v. City of Memphis*, 423 F.3d 596, 603 (6th Cir. 2005) (FGIC MIL at ¶15), the Court addressed the fairness of an assertion of attorney-client privilege. Finally, in

*Chevron Corp. v. Stratus Consulting, Inc.,* No. 10-CV-00047, 2010 WL 3923092,
at *10 (D. Colo. Oct. 1, 2010) (FGIC MIL at ¶15), the Court addressed the waiver
of both the attorney-client privilege and the work product doctrine under the
"sword-shield doctrine." Thus none of the foregoing cases cited and relied upon
by FGIC are relevant here.

16.     *Arista Records LLC v. Lime Grp. LLC*, 06 CV 5936 KMW,
2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011)—which Syncora relies on at some
length (Syncora MIL at ¶¶7, 13)—similarly provides no support for Syncora's
argument that preclusion of certain state of mind evidence based, in whole or in
part, on events or information that are incident to mediation, is warranted here. In
that case, Defendants "repeatedly invoked privilege to block Plaintiffs' inquiry into
any facts that may have served as the basis for Defendants' alleged good faith
belief in the lawfulness of their conduct," only to then seek at trial to assert that
belief. *Arista*, 2011 WL 1642434, at *5-6. The case stands for the unremarkable
proposition that "a party may not assert that it believed its conduct was lawful, and
then simultaneously claim *privilege* to block inquiry into the basis for the party's
state of mind or belief." *Id*. at *7-8 (emphasis added); *see also United States v.
Doe (In re Grand Jury Proceedings)*, 219 F.3d 175, 182 (2d Cir. 2000) (addressing
alleged waiver of attorney-client and work product privileges) (Syncora MIL at ¶7).

17. The City is not doing—and has no intention of doing—that here. The City has, where necessary, prevented the disclosure of state of mind and other evidence that is confidential under the terms of the Mediation Order. As set forth above, the City has no intention of introducing evidence, state of mind or otherwise, that requires the disclosure of information incident to mediation at the Confirmation Hearing – nor could it, without violating the Mediation Order. Neither Syncora nor FGIC asserts in the Mediation MILs that the City's instructions at the depositions were improper or somehow incorrect interpretations of the Mediation Order. Any previously withheld information was therefore properly withheld and will properly continue to be withheld. Instead, the City can, and will, prove its case at the Confirmation Hearing using evidence that is *not* barred from disclosure by the Mediation Order and that it is not in any way precluded from introducing.

## II. THE CITY INTENDS TO PROVE ITS FACTUAL PROPOSITIONS WITHOUT VIOLATING THE MEDIATION ORDER.

18. The City's intention to abide by the Mediation Order should thus be clear, and the City concurs in the Mediation MILs to the extent they seek to reaffirm this obligation. Nonetheless, the City is compelled to respond to Syncora and FGIC's unfounded assertions that the City intends to—or somehow needs to— violate the Mediation Order at the Confirmation Hearing. *See* Syncora MIL at ¶9 ("the City has indicated that it intends to introduce evidence relating to discussions

-10-

and negotiations that occurred as part of the Court-ordered mediation"); FGIC MIL at ¶8 ("it has become clear that the City plans to use information related to mediation in the Confirmation Hearing"). The City has no such intention or need.

19. The City has identified a number of factual propositions it intends to prove at the Confirmation Hearing.[2] It still intends to do so, and it will do so without disclosing any of the information rendered confidential pursuant to paragraph 4 of the Mediation Order. The City, an active participant in months of hotly-contested mediations, will prove that the negotiated solutions reached via mediation are in the best interests of the City and its creditors and fair, equitable and reasonable. To do so, it need not—and will not—rely on "mediation-privileged" communications that went back and forth amongst the participants, and it will not selectively apply the Mediation Order to meet its burden of proof with respect to confirmation of the Plan.

20. The colloquies cited in the Mediation MILs are evidence of this admittedly fine line that the City will continue to walk. FGIC and Syncora were not blocked from obtaining discoverable information. Far from it. Instead, over the course of both one and two-day depositions, when FGIC and Syncora asked questions regarding discussions or events that did not invade the Mediation Order,

---

[2]     A copy of the Factual Propositions are attached to the Syncora MIL as Exhibit 6F and to the FGIC MIL as Exhibit 6G.

the City's witnesses answered them. Only when FGIC and Syncora decided to venture into areas they knew were governed by the Mediation Order did the City properly block their efforts.

21. The Grand Bargain provides an illustrative example. Indeed, Mr. Rapson was instructed not to answer with respect to conversations with Judge Rosen regarding the Grand Bargain.[3] Other than conversations with Judge Rosen, and other mediation participants, however, Mr. Rapson answered numerous questions with respect to the Grand Bargain, including the fact that the Kresge Foundation's "contribution is predicated on it serving three purposes: One, to help expedite the resolution of the bankruptcy; two, to soften the blow to pensioners;

---

[3] For example, the following is instructive:

MR. MCCARTHY: So to the extent I ask you about the back and forth with [Judge] Rosen or any other parties who were involved with the mediation that took place after your initial meeting with Judge Rosen regarding the Grand Bargain, which was at a dinner, as you referenced, will you be able to answer those questions here today?

MR. SHUMAKER: I would be interposing an objection to all such questions, because I believe that back and forth would be covered by the mediation order entered by Judge Rosen.

Rapson Dep. 86:14 – 86:23.

and three, to help preserve the DIA's collection." Rapson Dep. 43:9 – 43:12; *see also* Rapson Dep. 43:25 – 50:5, 79:25 – 81:6.[4]

22.     Similarly, the Mediation Order was invoked just once at Mr. Gilbert's deposition, with respect to a conversation between Mr. Beal of the DIA and Mr. Gilbert.   Gilbert Dep. 130:2 – 130:7 (MR. ARNAULT: Okay. And what did he say about donating to the Grand Bargain when you had this meeting with him? MR. SHUMAKER:  I'm going to object because I believe that any of these discussions would have been covered by the mediation order…").  Mr. Gilbert was asked, and did answer multiple questions about his motivation in donating to the Grand Bargain and his views with respect to the DIA.  *See* Gilbert Dep. 126:12 – 149:3.[5]  He did not respond only to a question asking to reveal *specifically what was said* by a participant in the mediation.  The witness' compliance with the Mediation Order was thus narrowly tailored and wholly appropriate.

23.     Mr. Orr's deposition is equally instructive.  Contrary to FGIC's assertion that "*all* substantive conversations between the City and certain parties are confidential"  (FGIC MIL at ¶16), the City did allow counsel for Syncora to explore *all* discussions and events that occurred outside of the mediation umbrella.

---

[4]     Relevant excerpts of the transcript of Mr. Rapson's deposition are attached hereto as <u>Exhibit 1</u>.

[5]     Relevant excerpts of the transcript of Mr. Gilbert's deposition are attached hereto as <u>Exhibit 2</u>.

*See* Orr Dep. 336:4 – 337:20.[6] That only one such conversation occurred, to the best of Mr. Orr's recollection, and that FGIC does not believe it was sufficiently "substantive," does not take away from the appropriateness of the City's application of the Mediation Order. *See* Orr Dep. 336:18 – 336:25 ("MR. HACKNEY: And just for the record, you didn't have any such conversations prior to the entry of the mediation order… MR. ORR: Well, let me think. I think I had one meeting with Darren Walker at Ford Foundation, but it was not about a contribution, it was just a meet and greet.").

24.     Similarly, FGIC's assertion that the City "cannot disclose to FGIC all of the reasons that Class 9 is discriminated against under the Plan" is easily dismissed. FGIC MIL at ¶16; *see also* FGIC MIL at ¶7. Mr. Orr clearly testified, to the best of his recollection, as to the numerous reasons for such discrimination. *See* Orr Dep. 203:9 – 211:9; 223:16 – 225:16; 235:23 – 237:22; 238:6 – 241:5. And finally, Counsel's inquiry into Mr. Orr's "state of mind," was blocked only where it was blatantly a backdoor attempt to discover *specific communications made by parties involved in the mediation, incident to mediation*. *See* Orr Dep. 338:17 – 339:2; *compare* Orr Dep. 274:11 – 275:13. All rhetoric aside, what Mr. Orr did not do, nor could he have done without violating the

---

[6]     Relevant excerpts of the transcript of Mr. Orr's deposition are attached hereto as <u>Exhibit 3</u>.

Mediation Order, was disclose the contents of "positions taken" in mediation, as well as "reports provided to [him] out of the mediation." *See* Orr Dep. 350:4 – 350:8.

25.     The City will walk the same line at the Confirmation Hearing. Without envisioning every possible scenario, it is clear that the City can present evidence of the reasonableness of its settlements without revealing a "he said, she said" transcript of what occurred in mediation.  Indeed, this approach is fully consistent with that proposed by the Court when Syncora first raised this issue of the City's supposed inability to prove its case without violating the mediation order. On May 28, 2014 the Court, referencing the City's proposed factual proposition that funds would not otherwise have been available for the Grand Bargain if not dedicated to pensions, stated:

> THE COURT:  We'll look at two, and would otherwise -- and would not otherwise be available to the city. The city could well prove that by calling someone from the foundations and the DIA to testify to that without breaching confidentiality of what was said in mediation.

May 28, 2014 Hrg. Tr. 184:15 – 184:18.

26.     In order to meet its burden at the Confirmation Hearing, the City can, and will, distinguish between evidence and testimony that is incident to mediation and that is not.  There is no need to preclude the City from doing what it is already barred from doing, and any suggestion that the City intends to violate the Mediation Order is baseless and contrary to the City's conduct thus far.

## III. EVIDENCE OF SETTLEMENT NEGOTIATIONS NOT OTHERWISE PRECLUDED FROM DISCLOSURE BY THE MEDIATION ORDER IS ADMISSIBLE.

27.     FGIC, in addition to reminding the City that it must continue to comply with the Mediation Order and not to disclose information previously withheld in compliance therewith, also seeks to bar the introduction of any evidence of "settlement negotiations" on the grounds that they are irrelevant. This is an overreach.

28.     In order for all parties to present their cases at the Confirmation Hearing, the Mediation Order must be construed no broadly than its text allows. It precludes the introduction of evidence the Court has ruled irrelevant, specifically, any discussion of "who said what to whom during the mediation." June 26, 2014 Hrg. Tr. at 49:12 – 49:14. It does not preclude, and the Court has not deemed irrelevant, "any evidence related to the settlement negotiations," without regard to whether or not that evidence implicates matters incident to mediation.

29.     The case law offered by FGIC in support of this broad request is inapposite. Unlike in *Provident Life & Acc. Ins. Co. v. Adie*, 176 F.R.D. 246, 250 (E.D. Mich. 1997), there is no "prior ruling by the court" that this evidence ought to be excluded. What the Court has ruled, and what the City intends to follow, is that no party may introduce evidence or testimony that is subject to paragraph 4 of the Mediation Order.

-16-

30.     To the extent there is evidence of settlement negotiations that does not implicate the Mediation Order, there is simply no basis to preclude the City from introducing it at the Confirmation Hearing.  In particular, evidence of the *fact* that such negotiations occurred, as well as the *nature* of those negotiations, can and should be admissible.  The hard-fought, arms-length nature of the mediations, the sophisticated nature of the parties, their counsel and the mediators themselves and the terms of the ultimate agreements, while all may be characterized as "related to the settlement negotiations," are in no way precluded by the Mediation Order or a prior ruling of this Court, and the City fully intends to rely on this evidence at the Confirmation Hearing.

NYI-4607341v5

WHEREFORE, the City respectfully requests that this Court deny the

Mediation MILs.

Dated: August 27, 2014    Respectfully submitted,


          /s/ Heather Lennox
         Heather Lennox (OH 0059649)
         David G. Heiman (OH 0038271)
         JONES DAY
         North Point
         901 Lakeside Avenue
         Cleveland, Ohio 44114
         Telephone: (216) 586-3939
         Facsimile: (216) 579-0212
         dgheiman@jonesday.com
         hlennox@jonesday.com

         Bruce Bennett (CA 105430)
         JONES DAY
         555 South Flower Street
         Fiftieth Floor
         Los Angeles, California 90071
         Telephone: (213) 243-2382
         Facsimile: (213) 243-2539
         bbennett@jonesday.com

         Thomas F. Cullen, Jr. (DC 224733)
         Gregory M. Shumaker (DC 416537)
         JONES DAY
         51 Louisiana Ave., N.W.
         Washington, D.C. 20001
         Telephone: (202) 879-3939
         Facsimile: (202) 626-1700
         tfcullen@jonesday.com
         gshumaker@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY OF DETROIT

NYI-4607341v5

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| In re | ) |
| | ) |
| | )   Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN | )   Case No.: 13-53846 |
| | ) |
| | )   Hon.  Steven W. Rhodes |
| Debtor. | ) |
| | ) |
| | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2014, I electronically filed the City's Omnibus Response To Syncora And FGIC's Motions *In Limine* To Preclude Introduction Of Evidence Protected By The Mediation Order, which sends notice by operation of the Court's electronic filing service to all ECF participants registered to receive notice in this case.

*Dated:*      *August 27, 2014*                */s/  Heather Lennox*

                                        *Heather Lennox*

**Exhibit 1**

RIP RAPSON

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

In re                                    ) Chapter 9
CITY OF DETROIT, MICHIGAN,     ) Case No. 13-53846
          Debtor.     ) Hon. Steven W. Rhodes

_____

The Videotaped Deposition of RIP RAPSON,

Taken at 1114 Washington Boulevard,

Detroit, Michigan,

Commencing at 9:02 a.m.,

Thursday, July 31, 2014,

Before Rebecca L. Russo, CSR-2759, RMR, CRR.

1               RIP RAPSON
2    APPEARANCES:
3
4    GREGORY M. SHUMAKER, ESQ.
5    Jones Day
6    51 Louisiana Avenue, N.W.
7    Washington, D.C. 20001
8        Appearing on behalf of the City of Detroit.
9
10
11
12   ROBERT S. HERTZBERG, ESQ.
13   Pepper Hamilton LLP
14   Suite 1800
15   4000 Town Center
16   Southfield, Michigan 48075
17       Appearing on behalf of the City of Detroit.
18
19
20
21
22
23
24
25

1               RIP RAPSON
2    EDWARD R. McCARTHY, ESQ.
3    PRAVIN R. PATEL, ESQ.
4    Weil Gotshal & Manges LLP
5    1395 Brickell Avenue
6    Suite 1200
7    Miami, Florida 33131
8        Appearing on behalf of the Financial Guaranty
9        Insurance Company.
10
11
12
13
14   KELLEY M. HALADYNA, ESQ.
15   Dickinson Wright PLLC
16   500 Woodward Avenue
17   Suite 4000
18   Detroit, Michigan 48226
19       Appearing on behalf of the State of Michigan.
20
21
22
23
24
25

1               RIP RAPSON
2    DANIEL MORRIS, ESQ. (Via Telephone)
3    Dentons US LLP
4    1301 K Street, N.W.
5    Washington, D.C. 20005
6        Appearing on behalf of the Retiree Committee.
7
8
9
10   DIANA A. SANDERS, ESQ. (Via Telephone)
11   Chadbourne & Parke, LLP
12   30 Rockefeller Place
13   New York, New York 10112
14       Appearing on behalf of Assured Guaranty Municipal
15       Corp.
16
17
18
19
20
21
22
23
24
25

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr   Doc 7122   Filed 08/27/14   Entered 08/27/14 19:29:35   Page 22 of 60

RIP RAPSON

1  frame?
2  A.  I'm sorry, I just don't, I don't recall exactly when
3  it was.
4  Q.  I'm asking those time frames, because, based on my
5  knowledge, they relate to the millage bid.
6  A.  Okay.
7  Q.  But to refresh your recollection, does that at all
8  spur your memory as to when it would have been?
9  A.  Well, it would have been, it would have been prior to
10  the millage, so, again, I apologize, I don't recall
11  what the exact sequence might have been.
12  Q.  Prior to Kresge's involvement in the Grand Bargain or
13  the mediation, et al, did Kresge have any formal plans
14  to donate to the DIA moving forward?
15  A.  Yes.
16  Q.  And what were those plans?
17  A.  Kresge has developed a program shortly after I came in
18  which we provide operating support to a wide spectrum
19  of arts and cultural organizations in the southeast
20  Michigan area.  It's, I think, risen to almost 60
21  organizations.
22       We calibrate those contributions based on
23  budget size, largely.  It's a little bit formula
24  related, and the DIA is one of those.

RIP RAPSON

1       I think our, our support for them is, if I
2  recall correctly, approximately a hundred thousand
3  dollars a year in operating support.
4  Q.  And that's a continuing amount, the hundred thousand
5  dollars a year?
6  A.  Yes.
7  Q.  Is that continuing as we sit here today?
8  A.  Yes.
9  Q.  And when did that, I guess agreement of Kresge to
10  provide a hundred thousand dollars, roughly, in
11  operating support to the DIA begin?
12  A.  Boy, I want to say maybe 2007, 2008, approximately.  I
13  think that's when we developed the program.
14  Q.  How much money has Kresge agreed to contribute to the
15  Grand Bargain?
16  A.  A hundred million dollars.
17  Q.  Is that hundred million dollars more money than Kresge
18  has contributed to any one cause since your time at
19  Kresge?
20  A.  To any one cause -- you mean any one institution or
21  cause?
22  Q.  Let's start with institution.
23  A.  Yes.  I would -- could I just qualify that this
24  hundred million dollars was not a contribution to the

RIP RAPSON

1  Detroit Institute of Art.
2  Q.  How would you describe the hundred million dollars?
3  A.  It was a contribution to the effectuation of the Grand
4  Bargain.
5  Q.  And do you believe that the hundred million dollars
6  that Kresge has agreed to contribute is in any way
7  tied to the DIA?
8  A.  Our contribution is predicated on it serving three
9  purposes:  One, to help expedite the resolution of the
10  bankruptcy; two, to soften the blow to pensioners; and
11  three, to help preserve the DIA's collection.  So I
12  guess the answer would be yes.
13  Q.  A portion of the hundred million dollars would go, in
14  your opinion, to the third prong of why Kresge is
15  contributing money to the Grand Bargain?
16       MR. SHUMAKER:  Object to the form.
17       MR. MORRIS:  Object to the form.
18  A.  I was going to object to the form, as well --
19  BY MR. MCCARTHY:
20  Q.  You're entitled to.
21  A.  -- in the sense that we didn't allocate money to those
22  three prongs.  We allocated money to the totality of
23  the package.
24  Q.  You mentioned the first prong was to help expedite the

RIP RAPSON

1  resolution of the bankruptcy, correct?
2  A.  That's correct.
3  Q.  And how do you believe the Grand Bargain would help
4  expedite the resolution of the bankruptcy?
5  A.  It provides additional resources that help resolve two
6  of the major sticking points to the resolution, both
7  by helping alleviate the pressure on pensioners and by
8  safeguarding the Detroit Institute's assets.
9       I think in both of those senses if you can
10  get rid of -- not get rid of, if you can help
11  ameliorate both of those issues, then you've
12  presumably enabled the -- given, given tools to help
13  the bankruptcy move forward.
14  Q.  And I believe you've -- I've seen in some of my
15  diligence for today you talk about the three prongs
16  here you just mentioned, which is expediting the
17  resolution of the bankruptcy, softening the blow to
18  the pensioners, and preserving the collection at the
19  DIA.  Is that true?
20  A.  Have I said that or written about that?  Yes.
21  Q.  And did you develop these three prongs as you've
22  stated them?
23  A.  They -- I'm not sure that it's a thought original to
24  me, but that is the way that we've conceptualized and

RIP RAPSON

characterized why we would have been engaged in the
process.

Q. And that is what I am getting at. As you sit here
today, do you know who the thought of these three
prongs originated with? Was it inside Kresge, outside
of Kresge?

MR. SHUMAKER: Object to the form.

BY MR. MCCARTHY:

Q. When was the first time you heard of these three
prongs that you've referenced with respect to the
reasoning for becoming involved with the Grand
Bargain?

A. I'm hesitating, because this is sort of the mental
formulation that I've arrived at. If other people
have arrived at that independently of me, I guess I
have no knowledge of that, but this is the way I've
always felt I could think about why we were doing what
we were doing.

Q. And as you sit here today, is it your testimony, then,
based on your memory, you believe you came up with
these three prongs --

A. Oh, no.

Q. -- thoughts in your head?

A. Were other, lots of other people talking the same

RIP RAPSON

language? Probably. So I don't think I could
attribute to a particular source. It just, this just
seemed, the way the package was being assembled, it
permitted these three objectives to be met.

Q. How does Kresge's involvement with the Grand Bargain
help soften the blow to pensioners?

A. One of the conditions of the contribution that the
foundation's developed that's included in the plan of
adjustment is that the money needs to be applied to
the pensioners, as I understand it.

Q. And how does Kresge's involvement with the Grand
Bargain help preserve the collection of the DIA?

A. Another condition of the plan of adjustment -- of the
conditions that the foundation articulated for the
plan of adjustment was that we create an intermediary
structure that is able to receive -- let's see, how
does this work. That at the end of the day, the DIA
is transferred out of City ownership and that we've
created a -- well, let me -- I'll stop there.

That the DIA is transferred out of City
ownership into independent ownership.

Q. And how does that help preserve the collection of the
DIA?

A. Presumably, it buffers it from a claim -- the claims

RIP RAPSON

that might be lodged in bankruptcy.

Q. Have you done any independent, you or Kresge, to your
knowledge, done any independent analysis, research,
studies, regarding how the Grand Bargain preserves the
collection at the DIA?

A. I don't understand that question, I'm sorry.

Q. There's been some arguments from numerous parties on
both sides in the Detroit bankruptcy about whether the
collection at the DIA is held in trust. Are you aware
of that?

A. Yes.

Q. Have you or anyone at Kresge, to your knowledge, done
any independent analysis or research regarding whether
the collection at the DIA is currently held in trust?

A. We have not.

Q. Have you, you personally reviewed any, anyone else's
analysis or study regarding whether the DIA collection
is held in trust?

A. Only what I've read of in the newspapers.

Q. Do you intend to or would you expect that you would
provide any testimony at a trial in the bankruptcy on
whether the collection at the DIA is held in trust?

A. It depends on my lawyers, but I don't -- I'm not an
expert in public trusts or in the legal issues

RIP RAPSON

undermining -- undergirding them.

Q. Outside of the Grand Bargain, has the DIA -- has the
Kresge Foundation ever contributed funds during your
time there to help soften the blow of pensioners in
any particular municipality?

A. I'm hesitating, because much of what Kresge does is to
try to create buffers for low-income people and
opportunities for low-income people to, to enter the
economic mainstream and participate fully in civic
life.

So I think the the, the objective of our
foundation is to, as you've put the document to me
earlier, is to improve the lives of poor and
low-income children and adults.

So in some ways I think we've indirectly
helped people who are on pensions and who aren't on
pensions, but without, again, meaning to split hairs,
we have never directly invested in pensioners nor are
we -- again, nor is that the way we have designated
these funds.

We have designated these funds to be part
of a pool of money with multiple objectives.

Q. Is it fair to say that Kresge Foundation's
contribution or proposed contribution to the Grand

12 (Pages 45 to 48)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr   Doc 7122   Filed 08/27/14   Entered 08/27/14 19:29:35   Page 24 of 60

RIP RAPSON

Bargain would be the most direct way that Kresge has
ever contributed funds to soften the blow of
pensioners since the time you've been there?

A. Yes.

Q. And why is that? Why is it that, in this instance,
with the Grand Bargain, Kresge has determined to do
something it hasn't done in the past during your time
there, specifically with respect to softening the blow
to pensioners?

A. The calculus that we did in making our contribution to
the Grand Bargain was that it would accomplish three
objectives simultaneously. We've walked through
those. That was the reason for taking the action.

Q. Does the Kresge Foundation deem any one of the three
objectives that we've talked about to be more
important than the other objectives?

A. No. I would, I would answer it a slightly different
way. I would say all three are essential. I don't
think any one is more essential than the others.

Q. I'm trying to get at specifically the second objective
that you mentioned, softening the blow to the
pensioners.

A. Mmm-hmm.

Q. Are you able, as you sit here today, to answer whether

RIP RAPSON

Kresge would have agreed to potentially contribute to
the Grand Bargain, assuming softening the blow to the
pensioners was not one of the objectives?

A. It would not have.

MR. MORRIS: Objection, form.

BY MR. MCCARTHY:

Q. And why is that?

A. Because we needed to see all three objectives
satisfied.

Q. And why is it important for Kresge to soften the blow
for the pensioners in this particular instance?

MR. SHUMAKER: Objection, form --

A. I think I've answered the question.

MR. SHUMAKER: -- asked and answered.

BY MR. MCCARTHY:

Q. Outside of Kresge's desire to see all three of the
objectives we've talked about, expediting the
resolution of the bankruptcy, softening the blow to
the pensioners, and preserving the collection at the
DIA, all move forward, are there any other specific
reasons you can tell me that -- as to why Kresge deems
it important to have objective number two, softening
the blow to the pensioners, move forward as an
objective?

RIP RAPSON

MR. KURZWEIL: Object to the form of the
question.

MR. MORRIS: Objection, form.

A. These are folks who have dedicated their life to
serving the City of Detroit. If they were to be
thrown into economic duress, many of the first
principles that Kresge and others are working on in
Detroit would be made far more difficult. You have a,
you would have a series of economic hardships that
would stress the safety net. You would begin seeing
calls on both foundation, state, and local resources
that would, that would tax us all.

So it seems to me that doing the least
economic harm to individuals who have contributed
their lives to the welfare of the City is a sensible
thing to be concerned about.

BY MR. MCCARTHY:

Q. Has -- have you or the Kresge Foundation, to your
knowledge, done any independent study or analysis on
the wealth of any particular pensioner?

A. I'm not sure I -- have we studied an individual
pensioner's economic situation?

Q. Yes.

A. Studied, no. There certainly has been plenty written

RIP RAPSON

about it.

Q. Written about the current pensioners of the City of
Detroit?

A. Mmm-hmm.

Q. And written about how the current pensioners of the
City of Detroit would be in need of having their
pensions continued?

A. Would be harmed were their pensions reduced.

Q. Let's take a step back from that. Have you looked
at -- have you seen anything written, or studies or
research regarding the current financial situation of
the pensioners, notwithstanding whether their pensions
would be reduced or fulfilled at a ninety percent rate
or a hundred percent rate?

A. Again, I'm sorry, I'm not tracking the question. What
are you asking?

Q. Well, for instance, you can tell me probably for
yourself, and I'm not asking, but what is your current
financial situation, not looking into the future, but
how much money you have right now, how much debt you
have right now.

Have you seen anything written about the
current financial situation, income, assets, versus
debt of the pensioners of the City of Detroit?

RIP RAPSON

1
2  A.  I think, again, only in the popular press.  I think
3  there have been a number of profiles exactly to that
4  point.
5  Q.  And the Kresge Foundation's --
6  MR. MCCARTHY:  You know what, this is a
7  good time to go on a break.
8  THE WITNESS:  Is that okay?
9  VIDEO TECHNICIAN:  The time is 9:59 a.m.
10  We are now off the record.
11  (Off the record at 9:59 a.m.)
12  (Back on the record at 10:05 a.m.)
13  VIDEO TECHNICIAN:  The time is 10:05 a.m.
14  We are back on the record.
15  MR. HERTZBERG:  I'm Robert Hertzberg,
16  Pepper Hamilton, now appearing also on behalf of the
17  City of Detroit.
18  BY MR. MCCARTHY:
19  Q.  Mr. Rapson, I want to turn to the witness list.  This
20  is the third amended list of fact witnesses.
21  You understand that you've been listed as a
22  potential witness in the City's bankruptcy trial?
23  MARKED FOR IDENTIFICATION:
24  DEPOSITION EXHIBIT 3
25  10:06 a.m.

RIP RAPSON

1
2  A.  Yes.
3  BY MR. MCCARTHY:
4  Q.  And when did you find that out?
5  A.  I think Greg and Bob spoke with me perhaps two months
6  ago, I would guess.
7  Q.  And have you seen the document that's before you now,
8  which is Exhibit 3, the City's amended list of fact
9  witnesses?  And this is docket number 4187 in the
10  Detroit bankruptcy.
11  A.  I don't believe I've seen this document.  I don't
12  think I've seen Exhibit 3.
13  Q.  Moving away from that document just for a moment --
14  A.  Mmm-hmm.
15  Q.  -- it's my understanding that the City of Detroit --
16  and when I say the City, I mean the City of Detroit,
17  is that fair?  You'll understand that?
18  A.  Yes, yes, pardon me.
19  Q.  That the City has you listed currently as a may call
20  witness at trial, which means they may call you, they
21  may not.  Is that your understanding?
22  A.  I had understood that I would be called, but if they
23  choose not to call me, that's perfectly fine.
24  Q.  And what is your understanding as to what you would be
25  called to testify about?

RIP RAPSON

1
2  A.  My sense is that it would have to do with Kresge's
3  commitments to the City of Detroit, both in recent
4  history and going forward, and Kresge's commitment to
5  the City, both in the past and going forward.
6  Q.  Just a moment.  So to be clear, Exhibit 3 was document
7  number 5491, which was the City's third amended list
8  of fact witnesses.
9  MARKED FOR IDENTIFICATION:
10  DEPOSITION EXHIBIT 4
11  10:08 a.m.
12  BY MR. MCCARTHY:
13  Q.  Exhibit 4, which I've just marked, just to clarify the
14  record, is the City's amended list of fact witnesses,
15  which is document 4187.
16  And if you -- I take it you personally
17  haven't reviewed this Exhibit 4, the amended fact
18  witness list before, have you?
19  A.  I have not.
20  Q.  If you turn to page number 7 of Exhibit 4, it lists
21  your name under 30, Rip Rapson, president and CEO of
22  Kresge Foundation?
23  A.  Yes, it does.
24  Q.  And then to the right of that, in the column titled
25  testimony topics, it lists four bullet points, do you

RIP RAPSON

1
2  see that?
3  A.  I do.
4  Q.  Okay.  And, to be fair, this is not the current
5  witness list of the City, but it is the most current
6  list I've seen that has testimony topics listed.  But
7  I just want to walk through the testimony topics that
8  are listed.
9  The first one is plan feasibility?  Do you
10  see that?
11  A.  I do.
12  Q.  As you sit here today, do you expect to testify at any
13  trial for the City of Detroit bankruptcy on plan
14  feasibility?
15  A.  I'm not sure what plan feasibility subsumes.  It's a
16  broad construct.  I don't know what that means,
17  exactly.
18  Q.  Taking a step back, then, have you had any meetings
19  with anyone other than your lawyer about the topics
20  that you would testify about at the City of Detroit
21  bankruptcy --
22  A.  Yes.
23  Q.  -- trial?
24  A.  Yes.
25  Q.  Okay, and who were those meetings with?

RIP RAPSON

1  A.  I've had one meeting with Bob and Greg, when they
2      first raised the possibility of my testifying, and
3      they suggested areas that they felt my testimony might
4      touch on.
5  Q.  And that was with Mr. Hertzberg and Mr. Shumaker?
6  A.  Pardon me, yes.
7  Q.  And when was -- that meeting was about a month ago.
8      Where was that meeting?
9  A.  I think it was a couple of months ago.  Time flies.
10     It was in our offices at the Kresge Foundation.
11 Q.  And is that in -- your offices are in Detroit?
12 A.  They're in Troy.
13 Q.  Was anybody else present at that meeting with
14     Mr. Shumaker and Mr. Hertzberg?
15 A.  No, I think, I don't -- I think it was just the three
16     of us.
17 Q.  Outside of that meeting with Mr. Shumaker and
18     Mr. Hertzberg, have you had any other meetings about
19     the potential areas that you may testify about at the
20     upcoming trial for the City of Detroit bankruptcy?
21 A.  Only the, the meeting we had yesterday to, to think
22     about today's session.
23 Q.  And during that meeting yesterday, Mr. Shumaker and
24     Mr. Hertzberg were also present?

RIP RAPSON

1  A.  They were.
2  Q.  And what did you talk about in yesterday's meeting
3      about -- in the presence of Mr. Shumaker and
4      Mr. Hertzberg about your potential testimony at the
5      City of Detroit bankruptcy trial?
6  A.  Yesterday was more a conversation about the topics
7      that might be raised in today's deposition.
8  Q.  And to give you a sense of why I'm doing this, so you
9      don't think I'm trying to trick you in this area, what
10     I'd really like to get at is, with this line of
11     questions is to try figure out what you might
12     testify about and what you might not testify about --
13 A.  Sure.
14 Q.  -- so that we don't waste time on areas you're not
15     going to talk about.
16 A.  Sure.
17 Q.  At yesterday's meeting or at the prior meeting with
18     Mr. Shumaker, Mr. Hertzberg -- and Mr. Hertzberg, did
19     you talk about what areas you might address in your
20     testimony at an eventual trial on plan feasibility?
21 A.  Again, again, I'm sorry, I'm not trying to be
22     difficult, it really was not geared so much to the
23     testimony I might offer at trial as to what, what
24     might you inquire about and did I feel that I needed

RIP RAPSON

1  to in any way sort of give some thought to some of the
2  questions you might ask.
3  Q.  Let's take a step back to the meeting that was a
4      couple months ago, then.  At that meeting with
5      Mr. Shumaker and Mr. Hertzberg in your offices in
6      Troy, did you talk about what areas you might actually
7      provide testimony in --
8  A.  Yes, yes, that was more --
9  Q.  -- at trial?  Okay.
10 A.  That was directed more at that topic.
11 Q.  And what did you talk about with respect to that at
12     the meeting a few months ago -- let me be more direct.
13 A.  Yeah.
14 Q.  During that meeting did you, did you discuss the areas
15     that you might be able to provide testimony with
16     respect to at the upcoming trial?
17 A.  Yes.
18 Q.  And what areas did you decide, as a group or just
19     yourself, was it that you would be able to provide
20     testimony with respect to at the upcoming trial?
21 A.  Can I offer a qualification first?  I think that, that
22     meeting was in some ways a request.  I mean, they
23     wanted to know whether I would be willing to testify,
24     where I felt I might be competent to offer testimony,

RIP RAPSON

1  and one of the consequences of that meeting was to, to
2  be in touch with independent counsel to make sure that
3  what the City wanted was actually something that I
4  could provide.
5  Q.  And I don't -- to be very clear, I don't -- I'm trying
6      to avoid and don't want to get into any conversations
7      that you had independently just with your counsel or
8      Kresge's counsel, because those are privileged and I
9      do respect that.
10         So as you sit here today, is there a way
11     for you to parcel out --
12 A.  Sure, fair enough.  Yeah, I'm sorry, I do understand.
13 Q.  So with that qualification --
14 A.  Yup.
15 Q.  -- can you tell me what areas --
16 A.  Yup.
17 Q.  -- you discussed outside the presence of your own
18     personal lawyer, or in the presence of other people
19     other than your personal lawyer with respect to what
20     areas you would testify about at the upcoming trial?
21 A.  We talked a little bit about my degree of familiarity
22     with the plan of adjustment, some of its component
23     pieces in terms of the investments that are being
24     proposed for things like blight removal, transit

RIP RAPSON

1  reform, public safety, and a host of other things that
2  are included.
3          They wondered if I had a view about whether
4  those were areas that were useful to be included in a
5  plan of adjustment and how they might or might not fit
6  with the work that Kresge was doing.
7          We talked a little bit about Kresge's
8  history of commitment to the city and whether that
9  commitment was likely to endure and be extended into
10  the future post-bankruptcy. They asked if I was able
11  to have a view of the kind of work that we might do
12  going forward to help revitalize the city.
13          I think in many ways that was much of the
14  conversation. It was really very Kresge-specific, you
15  know, what is it that we have done, what is it that we
16  intend to do, what is it that we might imagine doing
17  in a post-bankruptcy world.
18  Q.  With respect to the first topic, the degree of
19  familiarity with the plan of adjustment, how familiar
20  are you with the plan of adjustment or various
21  versions of the plan of adjustment that the City has
22  submitted to the bankruptcy court?
23  A.  I have, I have not read the plan of adjustment in its
24  entirety. I have, I have looked at excerpts that

RIP RAPSON

1  relate to the investments that the emergency manager
2  is proposing be directed toward some of these major
3  community building blocks of safety, and blight, and
4  information technology, and the like.
5  Q.  With respect to any testimony you might give at the
6  plan of adjustment trial, have you been asked to be
7  called upon as an expert witness on any topic?
8  A.  No, not that I'm aware of.
9  Q.  Have you ever been designated an expert witness for
10  any legal matter?
11  A.  No.
12  Q.  Do you consider yourself, and I've seen you listed at
13  least general -- at some talking sessions and meetings
14  as an expert in urban policy. Would you consider
15  yourself as an expert in urban policy for this
16  particular bankruptcy?
17          MR. KURZWEIL: Object to the form of that
18  question.
19  A.  I apologize, I don't know how an expert is certified.
20  I would be quite sure that I would not be in that
21  category, but I would say, and this may not be
22  relevant to what you're asking, that I've spent 25
23  years working in urban affairs and feel that a
24  combination of professional and personal experience

RIP RAPSON

1  is -- over time gives me a fairly strong understanding
2  of how cities work and what some of the interventions
3  are to make them healthier.
4          But I wouldn't want to characterize that as
5  being an expert.
6  BY MR. MCCARTHY:
7  Q.  Having not read -- I don't want to put words in your
8  mouth, but having not read in totality any of the
9  various forms of the plan of adjustment, I take
10  it -- well, tell me, have you read in totality or any
11  portion of the reinvestment initiatives that the City
12  has put forth with respect to its plan of adjustment?
13  A.  I have looked at that, what I think is that section of
14  the document that -- I read it once. Most of my
15  knowledge of it, frankly, has come from public media
16  accounts.
17  Q.  Prior to the City putting its plan of adjustment
18  before the Court, did you ever talk to anyone from the
19  City about the -- their proposed plan of adjustment?
20  A.  And by the City in this case, do you mean the
21  emergency manager, the mayor, their delegees? I mean,
22  I'm trying to --
23  Q.  Let's take it -- let's break it down. I don't want to
24  try -- I'll try not to be confusing with it.

RIP RAPSON

1  A.  Yeah.
2  Q.  Did you have, did you have any input into the plan of
3  adjustment before -- as it was being formulated?
4  A.  I think I'd have to say no.
5  Q.  Prior to the filing of the first plan of adjustment,
6  did you speak with Kevyn Orr, the emergency manager,
7  about any of the details of the proposed plan of
8  adjustment?
9  A.  I had the opportunity on a couple of occasions to
10  speak with Kevyn Orr, but it was never about the
11  particulars of what would go into a plan of
12  adjustment. I've never had a conversation with him
13  about the particulars of the plan of adjustment.
14  Q.  Did Mr. -- has Mr. Orr, had he ever asked you
15  to provide any input into the proposed plan of adjustment
16  before it was filed?
17  A.  He never -- I don't recall his ever making a request
18  of that kind. He did, though, on a number of
19  occasions speak with me and others at Kresge about
20  what we were doing, where our investments were going,
21  where we felt the greatest assistance might come from
22  the City, from City government, given where our
23  investment portfolio had been and might go.
24  Q.  Do you remember if any of those meetings took place

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7122   Filed 08/27/14   Entered 08/27/14 19:29:35   Page 28 of 60

RIP RAPSON

1
2      contribute under the Detroit Future City plan in any
3      way?
4   A.  Ability to?
5   Q.  Yes.
6   A.  No.
7   Q.  Could it?
8   A.  No.
9   Q.  Why is that?
10  A.  The amount of money that we dedicated to the Grand
11      Bargain is over and above our annual what's called
12      payout.  Every year a private foundation like Kresge
13      is required to pay a certain percentage of its assets
14      according to a complicated IRS formula.
15           We set that amount at the beginning of
16      every year.  So for 2015 we would say five percent of
17      a three-and-a-half billion dollar asset base is
18      approximately 150, 60 million dollars, add to that
19      administrative expenses, that's what we're going to
20      pay.
21           What we did with the Grand Bargain is to
22      say this is an extraordinary circumstance, it has
23      never come up before, therefore our contribution to
24      the Grand Bargain will sit on top of that.  It will
25      not diminish in any way our existing commitments or

RIP RAPSON

1
2      our existing budget items.
3   Q.  To your knowledge, did anybody from the City that was
4      involved with drafting the plan of adjustment review
5      the Detroit City Future plan before they -- as part of
6      drafting the City's plan of adjustment?
7           MR. SHUMAKER:  Object to the form.
8   A.  I don't know if it was a part of, but in my
9      conversations with Kevyn Orr, when I've been in his
10      office, the Detroit Future City plan sits on his desk,
11      and he has gone out of his way a couple of times to
12      thank us for the work and to convey that he believes
13      that it is in many ways an investment blueprint for
14      the future of the City.  That he can adjust long-term
15      debt, he can even help restructure municipal services,
16      but at the end of the day, the kind of long-term
17      investment plan that the City requires in order to
18      return for health is at least, in part, provided by
19      the Detroit Future City plan.
20  BY MR. MCCARTHY:
21  Q.  Is it your opinion as you sit here today that the
22      Detroit Future City plan will work hand-in-hand with
23      the City's proposed plan of adjustment?
24  A.  Yes.
25  Q.  And has anyone from the -- and it's your opinion that

RIP RAPSON

1
2      that's the view from the City, as well, is that fair?
3   A.  Again, from the mayor or from Kevyn Orr?
4   Q.  Let's break it up.  Let's start with Mayor Bing.
5   A.  Mayor Bing, he, he initially was very supportive, and
6      for all sorts of complex political and interpersonal
7      reasons found himself distancing from the plan, was
8      one of the reasons that we took it outside of city
9      hall.  For a while it was inside city hall as his
10      Detroit Works project.  We took it out.
11           So I think his relationship to the plan was
12      somewhat complex.  I think he believed in its
13      essential principles, but some of the, some of the
14      interpersonal dynamics between his staff, and who was
15      in control, and who was making decisions, and who was
16      Toni Griffin, and why was she in such a position of
17      influence, it was a lot of complex, not entirely
18      productive interaction.
19  Q.  And has that, that relationship stayed the same up
20      through today?
21  A.  No, no, no.  Mayor Duggan has been extraordinarily
22      supportive of the plan.  His deputy, Tom Lewand, once
23      said that he -- to me that he had memorized the entire
24      economic development chapter of the plan, that he was
25      that committed to it.

RIP RAPSON

1
2   Q.  Are you aware, one way or the other, whether anyone at
3      Conway MacKenzie has reviewed the Detroit Future City
4      plan?
5   A.  I do not know.
6   Q.  I want to talk about the Grand Bargain a little bit,
7      with this caveat.  I understand there's a mediation in
8      order.  Are you aware of the mediation order?
9   A.  I have been made aware of that, yes.
10  Q.  When did you become aware of that?
11  A.  Most recently, yesterday.  I just didn't know what the
12      mediation order meant, and I still don't think I do
13      know what it means.
14  Q.  And with this entire conversation, the caveat, of
15      course, goes with what I've said before, which is to
16      the extent you and your personal lawyer, Kresge's
17      lawyers had discussions even outside of the mediation,
18      I don't want to get into the substance of those
19      conversations.
20           But prior to yesterday, did you have any
21      understanding with respect to whether or not the
22      Kresge Foundation's involvement with the Grand
23      Bargain, whether those conversations or that happened
24      during the process leading up to the Grand Bargain --
25  A.  I see.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr   Doc 7122   Filed 08/27/14   Entered 08/27/14 19:29:35   Page 29 of 60

RIP RAPSON

1
2  Q. -- were protected from disclosure?
3  A. I see, yes. A couple of months ago Judge Rosen
4     conveyed that to a group of us. Someone raised the
5     question of whether these, these conversations during
6     the mediation and during the formulation of the Grand
7     Bargain would then become a matter of public record,
8     and he at that point explained that there was a
9     mediation privilege that he felt would cover those
10    conversations.
11 Q. And I don't, I do not want to get into any of those
12    conversations that you feel as though are privileged
13    by that mediation order or Judge Rosen's instructions
14    to you. So to the extent I ask a question and that
15    objection comes up or you feel as though you'd be
16    violating that, please let me know. Is that fair?
17 A. Yes.
18 Q. Okay. Prior to any discussions with anyone who's
19    involved with the bankruptcy currently, whether it be
20    Judge Rosen, Judge Rhodes, the City, had the Kresge
21    Foundation discussed getting involved in the
22    bankruptcy in any way?
23    MR. KURZWEIL: When you say the Kresge
24    Foundation, I assume you mean Mr. Rapson, and
25    MR. MCCARTHY: I do, Mr. Rapson, and

RIP RAPSON

1
2     internal conversations within your foundation.
3  BY MR. MCCARTHY:
4  Q. Correct, I'm not asking a corporate
5     representative-type question, that's fair.
6  A. Yeah, I think I understand. I'll try not to overthink
7     the answer. One of the things that I'm reminded of is
8     that three or four years ago we were in a meeting of a
9     number of civic leaders and talking about how to be
10    helpful in the Bing administration, and I remember one
11    person in the room just sort of saying, you know, this
12    is all fine and good, but the City is going to go into
13    bankruptcy. And I remember at that time thinking,
14    "Yeah, right," you know, "that's not going to happen."
15    So that aside, I think when the bankruptcy
16    conversations began to hit the press and become more
17    visible, I think we had conversations internally about
18    how would that affect us. Would that in any way cause
19    us to change course. Were we investing in the right
20    kinds of things. Would the bankruptcy undo
21    investments we had spent so much time and money and
22    energy engaging in.
23    But there was -- that's -- it was just sort
24    of a generalized anxiety, I think, about the effects
25    of the bankruptcy and our work.

RIP RAPSON

1
2  Q. Let me be a little bit more specific with it. From
3     the time that the bankruptcy filing occurred, Detroit
4     bankruptcy occurred, and up until the time where you
5     believe your conversations regarding the mediation,
6     the mediation back and forth started --
7  A. Mmm-hmm.
8  Q. -- we're not talking about those, did you have any
9     conversations with the folks -- did you have any
10    conversations with anyone that you can remember
11    regarding whether Kresge would get involved in the
12    bankruptcy --
13 A. Oh, I see.
14 Q. -- in order to, one, preserve the collection at the
15    DIA?
16 A. No, no.
17 Q. And prior to -- after the filing of the City of
18    Detroit's bankruptcy and prior to the time that Kresge
19    became involved in conversations back and forth
20    regarding the Grand Bargain mediation, were you
21    involved with any discussions regarding Kresge
22    becoming involved in the bankruptcy to soften the blow
23    to the pensioners?
24 A. No.
25 Q. When did, when did you first become aware of what's

RIP RAPSON

1
2     now become known as the Grand Bargain or the process
3     leading towards the Grand Bargain?
4  A. I think it was at the time that Judge Rosen asked the
5     group of foundations together and hear him out on an
6     idea he had.
7  Q. So I take it that the way you and your organization
8     became involved with the Grand Bargain was by Judge
9     Rosen reaching out to you and not the opposite, you
10    actually reaching out to Judge Rosen?
11 A. That's correct.
12 Q. And when did Judge Rosen reach out to you directly to
13    get involved in the Grand Bargain?
14 A. I'm sorry, I don't recall what that date was, but it
15    was, it was right at the same time that he was
16    gathering -- I wasn't able to attend that first
17    meeting, but I think -- didn't he gather people in his
18    chambers? The foundation community in his chambers.
19    I think that was really, it was in that time slot that
20    I first became aware of it.
21 Q. And did Judge -- is the first time you considered
22    becoming involved in the Grand Bargain, was that on a
23    phone call where Judge Rosen contacted you personally?
24 A. No.
25 Q. When was it?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr   Doc 7122   Filed 08/27/14   Entered 08/27/14 19:29:35   Page 30 of 60

RIP RAPSON

A. It was in a, a dinner conversation I had with him.

Q. And during this dinner conversation, this is when Judge Rosen proposed that the Kresge Foundation become involved with the Grand Bargain, is that fair?

A. Yes.

Q. And I've reviewed on YouTube, of all places, a speech that you gave at Wayne State University -- maybe not a speech, but it certainly was a formal type speech, and do you remember that, that address?

A. I do.

Q. Okay. Do you remember when that was?

A. It was, what, I don't know, two-and-a-half months ago, I think.

Q. And during that address to the audience, you referenced your initial conversations with Mr. Rosen, is that fair, with Judge Rosen?

A. I don't recall, but if it's on YouTube, I'll take your word for it.

Q. And we thought about bringing it in and playing it for you.

A. Oh, that would have really been torture.

Q. Tell me if I'm right. When Judge -- during your first conversation with Judge Rosen, where he proposed that the Kresge Foundation become involved in the process

RIP RAPSON

for the Grand Bargain, was it Judge Rosen who brought up that the involvement of the foundation should occur because it could soften the blow to the pensioners and help preserve the collection at the DIA?

MR. SHUMAKER: Objection. This calls for communications between Judge Rosen and Mr. Rapson. I believe this falls within the construct of the mediation order, and I would ask that the witness be instructed not to answer.

If you have specific parts of the YouTube video or Mr. Rapson's statements you would want to ask him about, that's a different story. But I think when you get to the back and forth between Mr. Rapson and Judge Rosen, you are intruding into the area protected by the mediation order.

MR. KURZWEIL: Under those circumstances, I'm going to instruct the witness not to answer that specific question.

BY MR. MCCARTHY:

Q. And is it fair to assume that you will follow those instructions and not answer questions based on the mediation order with respect to your initial back-and-forth conversations with Judge Rosen at your initial meeting with him?

RIP RAPSON

A. Yes.

Q. Let me try to reframe it and see if we can do it that way. If not, I understand.

At 10 minutes and 45 seconds into the speech that you gave at Wayne State University on the topic of the bankruptcy, you noted to the audience that Judge Rosen asked you specifically to get involved within the Grand Bargain in order to, quote, soften the blow that pensioners might be forced to take.

Do you remember that?

MR. SHUMAKER: I'm going to object on the same line. You can ask whether he made that statement at Wayne State, but you cannot ask whether in fact that was something that Judge Rosen said to him.

MR. KURZWEIL: I'll instruct the witness not to answer that particular question.

BY MR. MCCARTHY:

Q. And you'll follow those instructions based on the mediation order?

A. Yes.

Q. Okay. Did you make the following statement at Wayne State in your address regarding, in part, the Detroit bankruptcy, quote: So he said, and he being Judge

RIP RAPSON

Rosen, what I want to propose is that the foundations come to the table with a solution that helps avoid having to litigate those two issues, and the solution, of course, that you all have become familiar with since then is sort of the Grand Bargain, or what he for a while was calling the art trust, in which we would try to identify an amount of money that would be sufficient to help soften the blow that the pensioners might be forced to take, and we would also try to figure out an amount that would be -- constitute sufficient consideration for the transfer of the art into a new non-profit and sort of take those issues off the table.

MR. KURZWEIL: Counsel, without asking to let me see a copy, are you representing that that's a complete recitation of the words spoken by the witness?

MR. MCCARTHY: I am, Counsel. We attempted to do our best to translate what was said at that YouTube in to this direct quote, and the direct quote was written for me from the good folks at my office.

MR. SHUMAKER: Then I would suggest that the witness can answer whether he recalls making the statement as Mr. McCarthy has articulated.

RIP RAPSON

1  A.  I don't, I don't recall word-for-word, but that
2      certainly sounds like my words.
3  BY MR. MCCARTHY:
4  Q.  What did you do to prepare for your address at Wayne
5      State, and specifically with respect to the statement
6      that I just read?  Did you do anything to prepare to
7      make that particular statement?
8  A.  If I recall correctly, I was working off of a series
9      of schematic diagrams and I was talking to the
10     diagrams.  So I, I don't believe I was working from
11     notes, and I know I was not working from a script.
12 Q.  And those diagrams that you're referencing now, are
13     those the diagrams you referenced that you reviewed in
14     preparation for today's testimony?
15 A.  Yes.
16 Q.  And you mentioned you believe those diagrams have been
17     produced in this case?
18 A.  Yes.
19 Q.  To the extent they haven't been, and I don't know,
20     I've reviewed them, we'd ask that they be produced.
21     We'll follow up with your counsel.
22         MR. SHUMAKER:  I can state that they have
23     been produced by the City.
24         MR. MCCARTHY:  Okay.

RIP RAPSON

1          MR. SHUMAKER:  At least I should say the
2      schematics from Mr. Rapson have been produced.
3      Whether they are in fact the exact same ones that he
4      had at Wayne State, I do not know.
5          THE WITNESS:  I think they are the same.
6  BY MR. MCCARTHY:
7  Q.  Mr. Rapson, so that I can maybe streamline some of the
8      additional questions I have, as you sit here today,
9      will you -- and I don't want you to answer this
10     question, I want to find out whether you believe these
11     questions, line of questions is covered by the
12     mediation privilege.
13         So to the extent I ask you about the back
14     and forth with Mr. Rosen or any other parties who were
15     involved with the mediation that took place after your
16     initial meeting with Judge Rosen regarding the Grand
17     Bargain, which was at a dinner, as you referenced,
18     will you be able to answer those questions here today?
19         MR. SHUMAKER:  I would be interposing an
20     objection to all such questions, because I believe
21     that back and forth would be covered by the mediation
22     order entered by Judge Rosen.
23         MR. KURZWEIL:  It's my intention upon
24     request of counsel to instruct the witness not to

RIP RAPSON

1      answer.
2  BY MR. MCCARTHY:
3  Q.  Is it fair to say that you will follow those
4      instructions, Mr. Rapson?
5  A.  To a tee.
6  Q.  Prior to your meeting with Mr. Rosen that you've
7      talked about here today, your initial meeting, did you
8      have any opinion one way or the other whether
9      softening the blow to the pensioners or transferring
10     the art at the DIA to a new non-profit entity were
11     issues that could tie up the bankruptcy?
12 A.  Yes.
13 Q.  And when did, when did you personally come to that
14     realization?
15 A.  There was so much writing in the, in the public press
16     about the constitutional protection of the pensions
17     and the likelihood that any diminution of their value
18     would be litigated extensively, and that there were a
19     series of issues surrounding the Detroit Institute's
20     art collection, and whether they were held in trust or
21     whether they were reachable by creditors, that whole
22     suite of issues, that in turn appeared from the
23     popular accounts to suggest that these would be issues
24     that would be litigated for quite some time.

RIP RAPSON

1          It certainly struck me at a very lay
2      person's level of understanding that those two issues
3      were going to be tough issues to mud wrestle through
4      the bankruptcy.
5  Q.  Prior to your meeting with Judge Rosen, had you had
6      any discussions with anybody regarding how the Kresge
7      Foundation might get involved in the bankruptcy at all
8      in order to help address either of those issues, that
9      being softening the blow to the pensioners or
10     preserving the collection at the DIA?
11 A.  There were, there were no serious conversations about
12     specific ideas to resolve either issue.
13 Q.  So I take it, then, the point in time where you did
14     meet with Judge Rosen regarding potentially getting
15     involved with the Grand Bargain, that was the first
16     time that you at the Kresge Foundation gave any
17     serious consideration or had a serious conversation
18     about how the Kresge Foundation might get involved
19     with the bankruptcy in order to either soften the blow
20     to the pensioners or preserve the collection at the
21     DIA?
22         MR. SHUMAKER:  Object to the form.
23 A.  Yeah, or to expedite the resolution of the bankruptcy,
24     yes, that was the first time.

```
1           RIP RAPSON
2   BY MR. MCCARTHY:
3   Q.  Prior to the Grand Bargain, are you aware of any other
4       attempts that the City made or the DIA made in order
5       to transfer part or all of the collection at the DIA
6       in order to preserve the collection?
7   A.  No.
8   Q.  And prior to the Grand Bargain, had anybody -- to your
9       knowledge, has anybody reached out to you or the folks
10      at Kresge in order to contribute money in order to
11      support a transfer of part or all of the collection at
12      the DIA?
13  A.  No.
14  Q.  I want to talk about -- moving aside from this and
15      talk a little bit about some of the essential services
16      that the City of Detroit specifically provides.
17          Does the City of Detroit need to provide
18      decent housing to its residents, in Kresge's view?
19  A.  Yes.
20  Q.  And is the City currently providing decent housing?
21  A.  It is, it is providing some decent housing.  It is
22      providing a lot of indecent housing, and the level of
23      decent housing is insufficient.
24  Q.  Is it fair to say that improving the level of decent
25      housing that the City is providing to its residents is
```

```
1           RIP RAPSON
2       an ongoing work?
3   A.  Ongoing work, what do you mean by that?
4   Q.  That the City is continuing to improve and should
5       continue to improve the level of decent housing that
6       it's providing to its residents.
7   A.  It's certainly trying.
8   Q.  And is that an essential service that the City, in
9       your view, needs to continue to work on?
10  A.  Yes.
11  Q.  Okay.  And I just want to take a step back from that.
12      I noticed that you were taking some notes, which is
13      more than fine if you'd like to.  Are you taking notes
14      on what we're doing here in the deposition or is
15      that --
16  A.  Yeah, just -- I was just going to track what your list
17      of --
18  Q.  No, no problem.
19  A.  -- questions was.
20  Q.  Just wanted to make sure what you were doing.
21          As an essential service, does the City of
22      Detroit need to provide job opportunities for its
23      residents?
24  A.  It needs to create an environment in which job
25      opportunities emerge.
```

```
1           RIP RAPSON
2           MR. KURZWEIL:  I'm assuming by these
3       questions you're not asking for a legal conclusion,
4       you're simply asking the witness' understanding?
5           MR. MCCARTHY:  Correct, I'm not asking for
6       a legal conclusion.
7   BY MR. MCCARTHY:
8   Q.  Let me just take a step back from that.  As part of
9       your work with the foundations, has Kresge done any
10      analysis or have you done any analysis, or any studies
11      or any research, with respect to what are the
12      essential services the City of Detroit should be
13      providing to its residents?
14  A.  Yes.
15  Q.  And as part of the Detroit Future City plan, was part
16      of that initiative to look at what the essential
17      services are that the City of Detroit should and is
18      providing to its residents?
19  A.  Yes.
20  Q.  And did you and your work through the Kresge
21      Foundation, whether it be through the Detroit Future
22      City project or otherwise, review the level of safe
23      public transportation that the City was providing to
24      its residents?
25  A.  Yes.
```

```
1           RIP RAPSON
2   Q.  And did you look at the level and standard of the
3       parks that were, in the city that were being provided
4       to its residents?
5   A.  Through the Detroit Future City plan, yes.  Kresge
6       itself has not had much activity around public
7       recreation.
8   Q.  What about around the area of eradicating blight in
9       the city; has the Kresge Foundation itself reviewed or
10      studied the issue of blight as it pertains to the City
11      of Detroit?
12  A.  Yes.
13  Q.  Do you yourself work on the blight task force?
14  A.  No, but Laura Trudeau and Wendy Jackson of our staff
15      do.
16          I'm sorry, I should -- I did attend the
17      first meeting, and after the first meeting of the task
18      force I asked our staff to cover the rest of the
19      meetings.
20  Q.  Does the Kresge Foundation, has it in the past
21      reviewed or researched whether and to what extent the
22      City of Detroit needs a museum in order to provide
23      essential services to its residents?
24  A.  We've not done a study of that question.
25  Q.  Have you reviewed anyone else's study of that
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr   Doc 7122   Filed 08/27/14   Entered 08/27/14 19:29:35   Page 33 of 60

RIP RAPSON

1          RIP RAPSON
2     particular question with respect to the City of
3     Detroit, specifically?
4  A.  About whether the Detroit Institute of Art is
5     essential to the city or whether museums are essential
6     to the vitality of cities?
7  Q.  Let's start with the first question, then, the
8     specific one.
9  A.  I'm not aware of a specific study of the, of the
10    different forms or magnitudes of contribution that the
11    DIA makes to the city.
12  Q.  And so I can streamline this a bit, do you take a
13    position, one way or the other, on whether the Detroit
14    Institute of Art is more important to the essential
15    services that the City of Detroit provides to its
16    residents than some of the other services we talked
17    about, whether it be decent housing, parks, blight?
18         Do you take a position whether the Detroit
19    Institute of Art is more or less important than any of
20    those other essential services we discussed?
21  A.  I do not.
22         MR. MCCARTHY:  If we could take a short
23    break, I think I might be able to cut some of the
24    remaining questions down.  Is that fair?
25         THE WITNESS:  Sure.

RIP RAPSON

1          RIP RAPSON
2         MR. MCCARTHY:  Let's go off the record.
3         VIDEO TECHNICIAN:  The time is 10:58 a.m.
4    We are now off the record.
5         (Off the record at 10:58 a.m.)
6         (Back on the record at 11:06 a.m.)
7         VIDEO TECHNICIAN:  The time is 11:06 a.m.
8    We are back on record.
9  BY MR. MCCARTHY:
10  Q.  Mr. Rapson, earlier in the day we talked about a
11    meeting you had with Mr. Shumaker and Mr. Hertzberg
12    about whether you could provide testimony on topics at
13    the upcoming plan confirmation trial, and you
14    mentioned two topics that you were asked to
15    potentially provide testimony on.  One was your degree
16    of familiarity with the plan of adjustment, is that
17    correct?
18  A.  Yes.
19  Q.  And the second was Kresge's commitment to the City,
20    past and future, is that fair?
21  A.  Yes.
22  Q.  Other than what we've already talked about today, all
23    the areas we've talked about with respect to Kresge's
24    past commitment to the City and Kresge's commitment to
25    the City moving forward with respect to the Detroit

RIP RAPSON

1          RIP RAPSON
2     City Future program and the Grand Bargain, can you
3     think of any other area that you would be able to
4     provide testimony on at the upcoming planned
5     confirmation hearing, specifically with respect to
6     Kresge's commitment to the City, past and future?
7  A.  Well, I can't prejudge what they would ask, but the
8     Kresge's commitment, past and future, is a fairly
9     expansive umbrella.  We've invested in economic
10    development.  We've invested in health initiatives.
11    We've invested in public transit in the formation of a
12    regional transit system.  We've invested in the local
13    hiring, purchasing, and living capacity of the anchor
14    institutions along the Woodward corridor.
15         We've created capital investment vehicles
16    that peel away levels of risks for private sector
17    investors.  We've invested in the reform of the
18    educational system.  We've invested in the creation of
19    a more robust arts and cultural environment, and we've
20    invested in the re-imagination of the city's land
21    form.
22         So I, I genuinely have no specific sense of
23    what in all of that they might ask about, both on a
24    look-back basis, on a go-forward basis, but it's a
25    fairly expansive portfolio.

RIP RAPSON

1          RIP RAPSON
2  Q.  Looking forward, then, certainly to substantial
3    commitments that Kresge is committed to or has
4    considered committing funds to are the Detroit Future
5    City program and the Grand Bargain, correct?
6  A.  And many others.
7  Q.  Are there any others that you can think of, any other
8    specific programs where Kresge has committed or
9    planned to commit funds or donations, contributions,
10    however you want to define it, to a program that would
11    assist Detroit moving forward where the sum of the
12    contribution, the actual monetary sum, is more than
13    $20 million, outside of the Grand Bargain or the
14    Detroit Future City program?
15  A.  Yes.
16  Q.  And what are those programs?
17  A.  We're currently trying to figure out how over the next
18    number of years we can build out a more complete and
19    effective early childhood development system.  That
20    may involve attracting other investors.  It may
21    involve federal funds, it may involve state funds, and
22    it may involve a substantial commitment of Kresge
23    funds.  I could imagine over the next number of years,
24    that number would go well north of $20 million.
25         We have recently back-stopped the light

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

## Exhibit 2

1                    DAN GILBERT

2          IN THE UNITED STATES BANKRUPTCY COURT

3            FOR THE EASTERN DISTRICT OF MICHIGAN

4

5

6    In re:                    ) Chapter 9

7    CITY OF DETROIT, MICHIGAN,  ) Case No. 13-53846

8              Debtor.          ) Hon. Steven W. Rhodes

9

10   _____

11

12

13        The Videotaped Deposition of DAN GILBERT,

14        Taken at 4000 Town Center, Suite 1800,

15        Southfield, Michigan,

16        Commencing at 9:46 a.m.,

17        Tuesday, July 29, 2014,

18        Before Cheri L. Poplin, CSR-5132, RPR, CRR.

19

20

21

22

23

24

25

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

DAN GILBERT

1  you would interact with cities on, you know, it's a
2  burdensome, cumbersome, frustrating process that has
3  not -- there's not a single point of contact.  You
4  know, there's, you know -- one department may not know
5  what the other department is doing.  There's probably
6  a lack of manpower.  There's not enough personnel.
7  Their systems are -- their technology systems are
8  wholly inadequate if they exist at all.  So just there
9  needs to be a significant investment in all that --
10 those areas.
11 Q.  And do you know how -- what's your experience with
12     Detroit's business environment versus other cities
13     that you've done business in?
14 A.  Well, the are -- as far as major cities go, I mean,
15     we're -- there's only a couple other major cities that
16     we have significant operations in, so I don't have a
17     lot of direct experience, but the -- you know, the
18     City of Detroit with its city income tax for, you
19     know, companies and people, the tax structure, you
20     know, versus even suburban cities is -- is not
21     competitive.  You know, and -- and as far as how
22     they -- how the -- how the businesses interact and how
23     they -- how they, you know, help businesses do what
24     they do -- or not help do what they do, not get in the

DAN GILBERT

1  way of what they do is -- is -- does not stand up to
2  other cities in my experience.
3 Q.  And do you know what changes the -- City of
4     Detroit is currently making or intends to make to
5     improve the business environment?
6 A.  Yeah.  I mean, I don't have -- you know, the Mayor's
7     only been in office whatever, six months, so I don't
8     have the specific changes.  I do know that he's got
9     a -- his right-hand man.  What's his name?  Lewand.
10    Tom Lewand is -- heads up -- is trying to head up
11    the -- the whole sort of recalibration of the
12    departments and the way businesses interact with those
13    departments and how things get done, so -- but I just
14    have not seen yet what his progress is.
15 Q.  Okay.  So specifically you just don't know what the --
16    the steps the City has taken to improve the business
17    culture?
18 A.  Not yet, no.
19 Q.  Oh, and sorry to go back to this.  Do you know what
20    changes the City is making to -- to improve the -- the
21    park system?
22 A.  Well, the one -- the big one we talked about, handing
23    over Belle Isle to the City on a lease.
24 Q.  Any other changes you know the City is making to the

DAN GILBERT

1  park system?
2 A.  I'm not aware of any, no.
3 Q.  Have you looked at the city services that the City
4     intends to provide after bankruptcy?
5 A.  As it -- like in this document?  No.  I have not
6     studied that yet.
7 Q.  Okay.  So you haven't looked at the level of services
8     that the City intends to provide?
9 A.  No.  I mean, I'm assuming there's experts that have
10    done that and -- you know, but I don't -- I don't know
11    yet.
12 Q.  That's just not you?
13 A.  No.
14 Q.  And you haven't talked to those experts; right?
15 A.  No.
16 Q.  Now, you recently donated to the DIA as part of the
17    Grand Bargain; is that right?
18 A.  Yes.
19 Q.  Is that the first time you've ever donated to the DIA?
20 A.  No.  I don't -- I don't think so.  I don't know if
21    there's been significant donations, contributions, but
22    it's probably not the first time, no.
23 Q.  And this -- this donation occurred a couple weeks ago;
24    is that right?

DAN GILBERT

1  A.  Yeah.  I think it was agreed to before a couple weeks
2     ago.  It may even have been formalized a couple weeks
3     ago.
4  Q.  Do you know when it was agreed to?
5  A.  Six weeks, eight weeks, something like that.  I mean,
6     I don't want to say agreed.  They just came and
7     solicited us and we said we'd participate verbally.
8  Q.  Okay.  And to the extent you can dial it in -- dial it
9     in, do you know when -- you said they came and talked
10    to you about --
11 A.  Um-hmm.
12 Q.  -- donating to the Grand Bargain.  Do you know when
13    that was?
14 A.  When that was?
15 Q.  Yeah.
16 A.  Yeah.  I said roughly six, eight weeks ago, something
17    like that.
18 Q.  Okay.  Say May, then?  Does that sound about right?
19 A.  Sounds about right.
20 Q.  And prior to May of 2014, understanding that's an
21    approximate date, did you have any discussions with
22    the DIA about the Grand Bargain?
23 A.  No.
24 Q.  Okay.  And prior to May 2014, did you have any

Pages 122 to 125

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr   Doc 7122   Filed 08/27/14   Entered 08/27/14 19:29:35   Page 37 of 60

DAN GILBERT

1
2  discussions with the mediators that have been
3  appointed in this case?
4  A.  Who are the mediators?
5  Q.  Okay.  Well, let me ask a better question.  Are you
6  aware that this -- in this bankruptcy the Court has
7  appointed mediators to help out?
8  A.  I think I've read that, yes.
9  Q.  Okay.  Have you had -- and Judge Rosen is one of those
10  mediators?
11  A.  Yeah.
12  Q.  Okay.  Have you had any conversations with Judge Rosen
13  about the Grand Bargain?
14  A.  Yeah.  He called me up.
15  Q.  Okay.
16  A.  Well, let me see was it about the Grand Bargain.  I
17  know he called me up and asked me to attend some
18  event.  I can't recall whether it was about
19  specifically -- no.  I don't -- I don't think he -- we
20  talked about the Grand Bargain actually.
21  Q.  Have you had any conversations with Judge Rosen about
22  the case in general?
23  A.  Yeah.  In general.  And that phone call when he called
24  me, how's it going, what do you think, you know, that
25  kind of thing.

DAN GILBERT

1
2  Q.  Okay.  But he didn't ask you to donate to the Grand
3  Bargain?
4  A.  I don't believe so.  No.  Because I know he didn't
5  because that was -- the person who came in was the guy
6  that runs the -- well, he's the -- he doesn't run it.
7  He's the non-paid chairman.  I don't know his name.
8  THE WITNESS:  Do you guys know his name?
9  MR. SHUMAKER:  From the DIA?
10  THE WITNESS:  Yeah.
11  A.  He came in.  If I heard his name, I'd know it.
12  BY MR. ARNAULT:
13  Q.  I don't know.  So this was --
14  MR. SHUMAKER:  Gargaro?
15  THE WITNESS:  No.  It's not him.  He
16  runs -- it's the other guy.  The guy who's -- Gene --
17  the other Gene.  Gene --
18  BY MR. ARNAULT:
19  Q.  Driker?
20  A.  No, no, no.  Maybe.  I don't know.  I've got to get --
21  I'm sorry.
22  Q.  That's all right.
23  A.  He's the -- he's like the -- he's like the chairman of
24  the board.  He doesn't work there.  He's like the
25  nonprofit chairman of the board guy.

DAN GILBERT

1
2  Q.  Okay.
3  A.  Might be Driker.  I just don't know.
4  Q.  Okay.
5  A.  I don't think it is.  I think this guy -- Driker is a
6  Wayne State guy.  I think he -- he worked at Comerica
7  before this.
8  Q.  And do you know if you've had any conversations with
9  any of the other mediators besides that one
10  conversation with Judge Rosen?
11  A.  Who's the other mediators?
12  Q.  So as far as you know, no?
13  A.  Well, yeah.  I've got to know their names so I can
14  tell you.
15  Q.  Okay.  But it was never in -- to be honest, I don't
16  have them off the top of my head either.  But as far
17  as you know, there were never any conversations with
18  mediators about the bankruptcy case:  is that right?
19  MR. SHUMAKER:  That he had?
20  MR. ARNAULT:  Yeah.  That he had.
21  A.  Yeah.  You know, until I know the names of the people
22  I don't want to go on record and say that, so I
23  don't . . .
24  BY MR. ARNAULT:
25  Q.  Sure.  That's fair.  And who were you first contacted

DAN GILBERT

1
2  by about donating to the Grand Bargain?
3  A.  Yeah.  This was Gene -- I'm going to get you his name.
4  Q.  Okay.  Yeah.  Yeah.
5  A.  Want his name?
6  Q.  Sure.
7  A.  You can ask the que -- I'll just keep talking.
8  MR. SHUMAKER:  Is it Graham?
9  BY MR. ARNAULT:
10  Q.  Was it Graham Beal?
11  A.  Yes.  That's it.
12  Q.  All right.  There we go.
13  A.  Did I say Gene?
14  Q.  Yeah.
15  A.  Graham.
16  Q.  Okay.
17  A.  Graham Beal.
18  Q.  So Graham Beal called you about May 2014 asking you
19  to donate to the Grand Bargain?
20  A.  Yeah.  He said to come into the -- he wanted to meet,
21  come to the office, and when he came to the office, he
22  talked about it, yes.
23  Q.  Okay.
24  A.  And Matt Cullen was in the meeting with me from my
25  office.

**DAN GILBERT**

1  
2  Q. Okay. And what did he say about donating to the Grand  
3  Bargain when you had this meeting with him?  
4  MR. SHUMAKER: I'm going to object because  
5  I believe that any of these discussions would have  
6  been covered by the mediation order, and, as you know,  
7  Judge Rhodes has indicated that there are not going to  
8  be communications revealed in connection with those  
9  mediations, and so I think this is off limits.  
10  MR. ARNAULT: Okay. So your position is  
11  that Mr. Gilbert was part of the -- the mediation?  
12  MR. SHUMAKER: Yes. I -- I believe that's  
13  correct.  
14  MR. ARNAULT: Okay. And you're going to  
15  instruct him not to answer any questions about what  
16  was discussed during the meeting with Mr. Beal?  
17  MR. SHUMAKER: His personal attorney can do  
18  that, but that is our position, yes.  
19  MR. ARNAULT: Okay.  
20  MR. SHUMAKER: The City's position.  
21  BY MR. ARNAULT:  
22  Q. After that meeting in May 2014, did you have any other  
23  meetings with the DIA or anyone about the Grand  
24  Bargain?  
25  A. No.

**DAN GILBERT**

1  
2  Q. Did you agree at that meeting to donate to the Grand  
3  Bargain?  
4  A. Yes.  
5  Q. And I assume you were aware of that back in November  
6  or early 2013 when the Grand Bargain was first  
7  materializing? Were you aware of that?  
8  MR. SHUMAKER: Object to the form.  
9  A. Aware -- I don't understand the question.  
10  BY MR. ARNAULT:  
11  Q. Well, did you see any -- prior to the point in time  
12  when you donated, did you see any media reports about  
13  the -- the formation of the Grand Bargain and the fact  
14  that all these foundations were contributing?  
15  A. I -- I really can't recall whether the meeting is the  
16  first time I heard it or I read it -- I'm sure it was  
17  all around the same time. I just can't recall.  
18  Q. There was never a point in time when the media reports  
19  came out and you saw that all these foundations were  
20  donating and made the decision or decided not -- not  
21  to donate?  
22  A. That -- that I made the decision not to donate?  
23  Q. Yeah. Or you just -- you decided -- you didn't see  
24  that and say, well, maybe I should donate to the Grand  
25  Bargain?

DAN GILBERT

1  
2  A. No. I don't think so. I don't think I -- I can't  
3  tell you for sure, you know, recollection of dates.  
4  But I do believe that the meeting was likely the first  
5  time that I heard the specifics about it or, you know.  
6  Q. And the first time that you were approached about it?  
7  A. Yeah.  
8  Q. Why did you decide to donate to the Grand Bargain?  
9  A. Well, we -- we're heavily invested in the City of  
10  Detroit and its well-being and, you know, they're  
11  asking us to participate along with other businesses  
12  and foundations and -- and companies that if we could,  
13  you know, have a way where the -- these pensioners  
14  could get their -- you know, most of their pensions  
15  and we could also move the DIA outside of the assets  
16  of the City, as it probably should have been done a  
17  long time ago. You know, it's hard to sort of say no  
18  to that based on our position where we're at.  
19  Q. So you understood when you agreed to donate that you  
20  would be helping to save the art in the DIA: is that  
21  right?  
22  MR. MORRIS: Objection. Form.  
23  A. First of all, my understanding reading this stuff,  
24  there may be zero legal authority, anyway, for -- for  
25  those assets to be subject to bankruptcy, so I'm not

DAN GILBERT

1  
2  sure that that's a great way to characterize it. We  
3  were saving -- the safer thing for sure would be to  
4  move it outside of the City.  
5  BY MR. ARNAULT:  
6  Q. Okay. So you understood that when you were donating,  
7  you were helping to transfer the assets in the DIA  
8  outside the City? Would that be a better way to put  
9  it?  
10  MR. MORRIS: Objection. Form.  
11  MR. SHUMAKER: Object to the form.  
12  A. Say -- say that again.  
13  BY MR. ARNAULT:  
14  Q. You understood that when you were donating money to  
15  the Grand Bargain that the money would be used to  
16  transfer the DIA assets out of the City? Would that  
17  be a fair way to put it?  
18  MR. MORRIS: Same objection.  
19  MR. SHUMAKER: Same objection.  
20  A. Yeah. I think going -- I think the way it was  
21  presented was going forward in time and as part of  
22  this agreement and all the creditors and the judge,  
23  that that would be the case and the results of this  
24  would be that the museum would then sit outside going  
25  forward. Yeah.

DAN GILBERT

1    BY MR. ARNAULT:
2    Q.  Okay.  So you understood that the art in the DIA was
3        part of the Grand Bargain: would that be fair?
4    A.  I don't understand the question, if the art was part
5        of it.
6    Q.  Or that it was one of the components of the Grand
7        Bargain?
8    A.  Still -- I don't understand the question.
9    Q.  Would you have entered into the Grand Bargain if one
10       of the terms of the Grand Bargain was that -- actually
11       strike that.
12           Would you have entered into the Grand
13       Bargain if the art was not being transferred as part
14       of the Grand Bargain?
15           MR. SHUMAKER:  Object to the form.
16           MR. MORRIS:  Object to form.
17   A.  I don't know how to answer that question.  The way it
18       was presented to us was this is how it's all going to
19       work, do you want to be in or out, and we said
20       we'll -- yeah, we'll participate, so I can't speculate
21       to possibilities of things.
22   BY MR. ARNAULT:
23   Q.  Okay.  It was essentially here's the structure, are
24       you going to agree or not agree: is that right?

DAN GILBERT

1    A.  Yeah.  I mean, they didn't say it like -- you know,
2        that way, but they said here's -- here's -- here's
3        what we want to do here, here's how it's going to all
4        work, here's who we think is going to participate,
5        would you guys participate at this level, and we said
6        yes.
7    Q.  Did you propose any changes to the structure of the
8        deal?
9    A.  No.
10   Q.  And did you understand that the money you provided
11       would go directly to the retirees?
12   A.  Yeah.  I believe it was -- it was presented that way
13       to us, that this will hel -- again, I can't recall the
14       word for word, it was a verbal thing, but this would
15       help save the majority of the -- the pensioners'
16       pensions and they were at the same time moving forward
17       forever, so if this -- you know, in the one in a
18       million chance this happened again, it would -- you
19       know, it wouldn't even be a question as to the assets
20       being outside of the City.
21   Q.  Would you have entered into the Grand Bargain if the
22       money you contributed did not go directly to the
23       retirees?
24           MR. SHUMAKER:  Object to the form.

DAN GILBERT

1            MR. MORRIS:  Object to form.
2    A.  So where would it go?  I mean, I guess I would ask the
3        question if it wasn't there, I would say, okay, well,
4        where -- where is it going to go to?
5    BY MR. ARNAULT:
6    Q.  Would you have contributed money to the Grand Bargain
7        if some of the money went to pay the debts of the
8        City's other financial creditors?
9            MR. SHUMAKER:  Object to the form.
10           MR. MORRIS:  Objection.  Form.
11   A.  I'd have to understand who the creditors were and
12       what -- I -- I guess there's thousands of creditors;
13       right?  I don't -- so I'd need to know more specifics
14       for -- to answer that question.
15   BY MR. ARNAULT:
16   Q.  Okay.  Would you have contributed money to the Grand
17       Bargain if some of the money went to pay the debts of
18       the insurers who insure the City's Certificates of
19       Participation?
20           MR. SHUMAKER:  Object to the form.
21           MR. MORRIS:  Objection.  Form.
22           MR. SHUMAKER:  Calls for hypothetical.
23           THE WITNESS:  So do you want me to answer
24       the question?

DAN GILBERT

1            MR. SHUMAKER:  Go ahead.
2    A.  No.  You know, to think that sophisticated Wall Street
3        insurance companies and investors who knew the City of
4        Detroit was in dire financial straits for decades and
5        took a risk in insuring those bonds and -- would I
6        personally have invested money into a scheme that
7        would get them part of the recovery?  No.  The answer
8        is no.
9    BY MR. ARNAULT:
10   Q.  Okay.  And you say that sophisticated Wall Street
11       banks and companies who invested in the City of
12       Detroit.
13   A.  Um-hmm.
14   Q.  Do you know what information they were provided in
15       connection with those investments?
16   A.  No.  I would assume that they were provided whatever
17       is required by the law.  I don't know.
18   Q.  But you haven't looked at exactly what was provided?
19   A.  No.  No.
20   Q.  And you don't know what representations were made by
21       the City to those financial creditors?
22   A.  No.  I'm sure they did their due diligence, though.
23   Q.  Would you have contributed money to the Grand Bargain
24       if some of the money was earmarked to demolish blight

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7122   Filed 08/27/14   Entered 08/27/14 19:29:35   Page 40 of 60

DAN GILBERT

1  in the City?
2
3          MR. SHUMAKER:  Objection to form.
4          MR. MORRIS:  Objection.  Form.
5  A.  I mean, I guess, you know, these questions I -- I -- I
6     would need to know, you know, would it -- would it
7     have pensioners, too, and -- I mean, I -- you know, I
8     don't -- I don't know what to say.  I mean, I --
9     have to think about it and understand the whole thing
10    before I would comment, you know.
11 BY MR. ARNAULT:
12 Q.  So besides the DIA aspect of the Grand Bargain and the
13    retiree -- the money going to the retirees, which
14    we've discussed, are there any other reasons that you
15    decided to donate to the Grand Bargain?
16 A.  Can you -- can you repeat the two?
17 Q.  Sure.  So we talked about the -- transfer of the
18    DIA assets, --
19 A.  Um-hmm.
20 Q.  -- the money going directly to the retirees.
21 A.  Yeah.  And if it helped end this entire bankruptcy and
22    got us out faster, quicker so Detroit can move
23    forward, that would be another reason, if it
24    accelerated the process, too, so probably those three.
25 Q.  So you believe that it's a bad thing that the City is

DAN GILBERT

1  in bankruptcy right now?
2
3  A.  No.  I actually think it's a -- it's a --
4     unfortunately, as painful as it is, I think it's a
5     good thing.
6  Q.  Why do you say that?
7  A.  Because investment doesn't come into anywhere when
8     there's uncertainty.  And while there's a potential of
9     bankruptcy looming over a city, you just don't get
10    outside investment to come in.  You don't get
11    interest.  But when -- when you file a bankruptcy in
12    sort of a -- although the bankruptcy is not completed,
13    it's the end -- when it's the end -- I mean, it's the
14    beginning of the end and there's no other shoe really
15    to drop, you start getting a little bit more certainty
16    and then more investment comes into the City and
17    people at least know where it's going.
18 Q.  So it's not a bad thing that the City entered the
19    bankruptcy, but it sounds like you believe that the
20    City needs to emerge from bankruptcy as soon as
21    possible?
22 A.  Sure.
23         MR. SHUMAKER:  Object to the form.
24 A.  Yeah.  You know, the faster -- you know, faster would
25    be better.  Sure.

DAN GILBERT

1  BY MR. ARNAULT:
2
3  Q.  And why do you think faster would be better for terms
4     of getting out of the bankruptcy?
5  A.  It's like being -- I mean, I think the faster you get
6     out of a dentist chair is probably the better too.
7     It's probably the same thing.  I don't know what --
8     sort of -- that's a prima facie sort of response.
9     Right?  It's like why would you want to be in
10    bankruptcy if you can be out of bankruptcy?
11 Q.  I take it that based on your willingness to contribute
12    to the Grand Bargain that you believe that art
13    provides certain benefits to society: would that be
14    fair?
15         MR. MORRIS:  Objection.  Form.
16 A.  Do I believe that art benefits -- yeah.  I probably
17    believe that art benefits society.
18 BY MR. ARNAULT:
19 Q.  And what types of benefits do you believe that art
20    provides to society?
21 A.  I think art is inspirational.  I think it's an
22    enhancement to the -- the culture and the destination
23    nature of a -- of a city.  I think it -- I think it
24    brings in, you know, excitement and -- and people.
25 Q.  Any other benefits that art provides to society you

DAN GILBERT

1  can think of?
2
3  A.  You know, I -- I'd have to think more about it, but
4     those are -- that's what comes to mind.
5  Q.  Okay.  And do you believe that the DIA provides these
6     benefits to the City of Detroit?
7  A.  Yeah.  I think it's, you know, one of the -- one of
8     the most, think is it, prestigious or -- or -- or top
9     art institutions in the country, if not the world, is
10    my understanding.  I'm not a -- I'm not a huge -- I
11    don't have a huge background in art, so I don't
12    really -- I don't know that much about it, but that's
13    my understanding.
14 Q.  So you think the DIA is an important museum: would
15    that be fair?
16 A.  Yeah.
17 Q.  Do you know how many people visit the DIA each year?
18 A.  I -- I guess close to half a million, but I don't
19    know.  Three, four, 500,000.  Something like that.
20 Q.  What's that guess based on?  Just a guess?
21 A.  Yeah.  I'm sure there's an accurate number you can go
22    find.
23 Q.  Yeah.  Do you know how many people from outside of
24    Detroit visit the DIA each year?
25 A.  Outside of the City?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7122   Filed 08/27/14   Entered 08/27/14 19:29:35   Page 41 of 60

DAN GILBERT

Q. Outside of the City of Detroit.

A. Like versus the 700,000 people who live in the City?

Q. Yeah.

A. No. I don't know the number.

Q. Do you believe that the DIA is a tourist attraction?

A. I don't know. I don't know what that would be consider -- I don't know what numbers you need to call it that.

Q. Do you think people visit Detroit specifically to visit the DIA?

A. I'm sure there's people that do. I just don't know the number that do.

Q. And why do you say you're sure that people do visit Detroit specifically to visit the DIA?

A. Because it's my understanding or reading it's a, you know, known art institution that's one of the -- has a prestigious collection and there's probably things in there if you're into that kind of thing that you can only go there to see. So I make an assumption that people come to see it.

Q. But you don't know specifically how many people come?

A. I don't know the numbers.

Q. Do you believe that the DIA provides economic benefits to the City of Detroit?

DAN GILBERT

A. I'm sure there's some benefits. I couldn't tell you what they were. But when you have several hundred thousand people visiting a location during the year, there's automatically going to be benefits.

Q. Okay. But you don't know exactly what those benefits were?

A. No.

Q. You haven't seen any studies analyzing the economic impact of the DIA on the City of Detroit?

A. I have not seen any, no.

Q. Are you aware that Christie's valued some of the art in the DIA?

A. I read about that, yes.

Q. Have you reviewed that valuation?

A. No.

Q. Are you aware that the Attorney General has published an opinion regarding the sale of the art in the DIA?

A. No.

Q. Have you looked at the total value of the DIA collection?

A. No.

Q. So you've never attempted to determine the total value of the DIA collection?

A. No.

DAN GILBERT

Q. And you don't know the total value of the DIA collection?

A. No.

Q. Do you know how much each of the City's creditors is set to receive under the current plan?

A. Each creditor?

Q. Yeah.

A. No, I don't.

Q. Do you know if pensioners are receiving greater recoveries than bondholders?

MR. PATTWELL: Objection. Form and foundation.

A. I -- that's my understanding reading articles, yes, that the pensioners are receiving a higher percentage of what they are owed than other creditors.

BY MR. ARNAULT:

Q. And do you believe that it's necessary for the City to provide greater recoveries to pensioners than to bondholders, for example?

MR. PATTWELL: Objection to form.

MR. MORRIS: Objection. Form.

A. Yeah. Well, I don't know that, you know, necessary is the -- the word. You know, I don't know what your definition again of necessary is. What do you mean by

DAN GILBERT

that, necessary?

BY MR. ARNAULT:

Q. Does the City need to provide greater --

A. Does it -- does it have to? Does it need to? Does it -- should it? Is that -- I'm trying to understand.

Q. Is it essential that the City provide greater recoveries to pensioners than bondholders?

A. Well, yeah. I mean, I think that when you're --

MR. MORRIS: Objection. Form.

A. When you're dealing with $25,000-a-year pensioners who relied on -- you know, working primarily blue collar jobs and relied on a promise of receiving a pension when they retired after many years of service versus sophisticated Wall Street investors who knew the risk of investing in a city like Detroit, yeah, I think, you know, overall fairness, morality, and ethical judgment, it would probably be -- yeah, I think they probably deserve to receive more than the creditors.

Q. Okay. So sounds like you believe that the pensioners deserve to receive more than the financial creditors because of their respective financial positions: --

A. No.

Q. -- would that be fair?

A. No.

DAN GILBERT

1
2    MR. PATTWELL: Objection. Form.
3    MR. MORRIS: Objection. Form.
4    MR. PATTWELL: Mischaracterizes testimony.
5  A. No. That's not what I said.
6  BY MR. ARNAULT:
7  Q. Okay.
8    MR. SHUMAKER: Objection. Form.
9  A. I said based on the -- their position in society and
10    life and their -- the expectation and the -- when
11    comparing creditors to creditors, I guess you call the
12    pensioners creditors, you know, who is in a better
13    position to analyze the risk associated with the City
14    of Detroit, I would say the pensioners are in a -- in
15    a worse position than -- by far than the sophisticated
16    Wall Street investor, yes.
17  BY MR. ARNAULT:
18  Q. And why do you say that the pensioners were in a worse
19    position to evaluate the City of Detroit?
20  A. Well, I'm not sure a guy picking up trash who is
21    promised a pension is familiar with detailed financial
22    disclosures or even gets that for when he decides in
23    his incentive to work as a -- let's say a garbage
24    pickup man.
25  Q. And what's the basis for that understanding?

DAN GILBERT

1
2  A. Prima facie.
3  Q. Okay.
4  A. Okay. And then I also -- you know, when you compare
5    that to a sophisticated Wall Street investor who's
6    analyzing various disclosure statements and
7    determining do I invest in Detroit or St. Louis or
8    Google stock or whatever it might be, I would assume
9    that the sophistication of that kind of investor is --
10    is way higher to evaluate the risks than the garbage
11    pickup man in my example.
12  Q. Sure. And --
13  A. And the policeman and fireman and whoever else.
14  Q. Sure. And have you talked to pensioners about what
15    their expectation was regarding pensions?
16  A. Have I had specific -- yeah. I have had a couple
17    talks with them.
18  Q. Okay. Who is that, then?
19  A. There's a fireman I had a talk with. There's a
20    policeman I had a talk with. I can't remember their
21    names.
22  Q. Sure. And they said that they expected to receive
23    pensions from the City of Detroit?
24  A. Yeah. Yeah. That was part of their deal.
25  Q. And did you ask them if they were aware of the City's

DAN GILBERT

1
2    financial condition when they accepted jobs with the
3    City of Detroit?
4  A. No. I didn't ask that question to them.
5  Q. And then I think we briefly touched on this earlier,
6    but you said that financial creditors were in a better
7    position to assess the City of Detroit's financial
8    condition: would that be fair?
9  A. That would be my opinion, yes.
10  Q. Okay. And that's your opinion based on your previous
11    business dealings and when you've conducted due
12    diligence for deals: is that right?
13  A. Let's put it this way. I think the fireman is in a
14    better position to put out the fire than the Wall
15    Street executive who's analyzing portfolios, so, you
16    know, it's just -- it's just what they do for a
17    living. Right? That's what they do for a living. A
18    fireman isn't, in essence, doing his pension for a
19    living. This is what -- you know, these -- these guys
20    are investing. That's what they're -- or evaluating
21    risk as part of -- that's what their primary duties
22    are of their job, so I'm going to make that assumption
23    pretty confidently.
24  Q. Sure. But, again, you're not aware of what exactly
25    the City provided to its financial creditors regarding

DAN GILBERT

1
2    its financial condition?
3  A. No, I'm not.
4    MR. MORRIS: Objection. Form.
5  BY MR. ARNAULT:
6  Q. Finally -- actually I just want to make sure that we
7    cover all this. Are there any other reasons besides
8    the ones we've talked about why you think it's
9    necessary for the City to provide pensioners with
10    greater recoveries than financial creditors?
11    MR. MORRIS: Objection. Form.
12  A. Yeah. First of all, you guys have to educate me. I'm
13    not sure -- the City doesn't decide what's right.
14    It's the bankruptcy judge who decides what's right, so
15    I don't know --
16  BY MR. ARNAULT:
17  Q. But the City initially makes the decision to determine
18    how much to pay the creditors.
19  A. So -- so one more time with the question.
20  Q. Sure. Sure. Sure. So we've talked about
21    expectations, ability to evaluate the financial
22    condition.
23  A. Um-hmm.
24  Q. And I just want to know if there are any other reasons
25    why you think it's necessary for the City to pay the

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

DAN GILBERT

1
2 pensioners more than the creditors.
3 A. No. I mean, I -- I think I --
4 MR. PATTWELL: Objection to form.
5 MR. MORRIS: Objection. Form.
6 A. I think I answered the questions already. Yeah.
7 BY MR. ARNAULT:
8 Q. Okay. I just wanted to make sure there was nothing
9 else.
10 A. Okay. Yeah.
11 Q. Finally, it's -- it's my understanding that you and
12 your companies own a number of buildings in Detroit;
13 is that right?
14 A. Yes.
15 Q. Okay. Do you know how many buildings in Detroit you
16 and your companies currently own?
17 A. Approximately 60.
18 Q. Okay. This is about eight million square feet of
19 land; is that right?
20 A. Well, it's not square feet of land. It's square feet
21 of the structures. And I think that eight million
22 figure also includes the square footage of actually
23 the garages themselves.
24 Q. And you've spent about 1.3 billion buying and
25 renovating property in Detroit?

DAN GILBERT

1
2 A. That's -- yeah. It's probably a little higher than
3 that right now, yeah.
4 Q. Okay.
5 A. Somewhere in there.
6 Q. And most of the buildings you own are located in the
7 central business district; is that right?
8 A. Correct.
9 Q. And you also own a number located along the Woodward
10 corridor; is that right?
11 A. Yeah. It's -- it's like the -- that's sort of the
12 same thing, yeah.
13 Q. Do you know how many buildings you own are located
14 along the Woodward corridor?
15 A. Vast majority of them are. I mean, there's a --
16 there's a handful that are off a block or two, but
17 it's -- it's fairly concentrated.
18 Q. Okay. Would you say about 30 of the 60 are on the
19 Woodward corridor?
20 A. I mean -- that's probably fair.
21 Q. And you also own the Greektown Casino; is that right?
22 A. Yeah. We acquired that a year ago, a little over a
23 year ago. That's not on Woodward corridor.
24 Q. Right. And then you moved Quicken's headquarters from
25 the suburbs to downtown Detroit in 2010. Does that

DAN GILBERT

1
2 sound about right?
3 A. Yeah. We started in 2010, but it probably -- I think
4 probably get to -- Richard, about 2012 probably. It's
5 probably till late 2012 before all of the team members
6 in the suburbs were downtown.
7 Q. And how many employees are currently downtown?
8 A. All the businesses, including Greektown and Quicken
9 Loans, about 12,500, 13,000, something like that.
10 Q. And in some of the articles that I've read, I've heard
11 you frame your reinvestment in Detroit as both doing
12 good and doing well.
13 A. It would actually be doing well by doing good.
14 Q. Doing well by doing good.
15 A. Yeah.
16 Q. And when you say doing good, you mean that your
17 investment in Detroit is good for the City and the
18 people?
19 A. Well, yeah. We often get that -- and I don't go out
20 just like saying that. I usually get a question --
21 Q. Sure.
22 A. -- saying are you doing this because it's just like an
23 altruistic thing and you care about the City or you're
24 just doing this to make profits, and I respond with
25 that statement saying we're doing it for both and

DAN GILBERT

1
2 there's no conflict in them, so . . .
3 Q. Okay. Because you believe that the City of Detroit is
4 currently an undervalued asset; is that right?
5 A. The City itself or -- I mean, I don't know how you --
6 I mean, investments are very indi -- I don't think you
7 can make a -- I don't think there's such a thing as
8 saying that. I think you've got to say this building,
9 this piece of land, you know, if it's -- whether it's
10 undervalued or not.
11 Q. And the buildings that you've bought in the City of
12 Detroit, would you consider them to be undervalued
13 assets?
14 A. Well, I don't know if they were undervalued at the
15 time that we bought them. I think we probably paid
16 what the market was. I think what we did is
17 enhanced the value by investing significant dollars
18 oftentimes more than we paid for the building
19 themselves and rehabilitating the buildings and by
20 leasing space in the buildings to ourselves and others
21 to -- to increase the value, so it was by our
22 engagement with it that we added the value.
23 Q. And is it your hope that through this investment that
24 you and your companies will benefit financially?
25 A. Through this investment that we made?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr  Doc 7122  Filed 08/27/14  Entered 08/27/14 19:29:35  Page 44 of 60

1          **DAN GILBERT**
2  Q. Through the investment in the City of Detroit.
3  **A.  Yeah.  Of course.  Then maybe I can contribute to more**
4     **to the blight gap.  What do you think?**
5  Q.  Fair enough.
6          MR. ARNAULT:  Can we go off the record?
7          MR. SHUMAKER:  Sure.
8          VIDEO TECHNICIAN:  The time is 12:32.  We
9     are now off the record.
10         (Recess taken at 12:32 p.m.)
11         (Back on the record at 12:41 p.m.)
12         VIDEO TECHNICIAN:  We're back on the
13    record.  The time is 12:41.
14  BY MR. ARNAULT:
15  Q.  Mr. Gilbert, just a few more questions, and apologies
16     if these have been covered, but . . .
17         Have you had any conversations with Chief
18     Craig about the state of the Detroit Police
19     Department?
20  **A.  I bumped into Chief Craig a couple times at social**
21     **functions, but not -- nothing significant, no.**
22  Q.  No in-depth conversations?
23  **A.  No.**
24  Q.  And have you -- you're aware that Commissioner Jenkins
25     is the Commissioner of the Fire Department?

1          DAN GILBERT
2  **A.  Is this -- there was a guy from LA that came.  Is**
3     **he -- he's gone; right?  There's a new guy.  So I**
4     **don't know.  No.  I -- no.  I don't think so.**
5  Q.  Okay.  So no conversations with Commissioner Jenkins,
6     then?
7  **A.  No.  No.  No.**
8          MR. ARNAULT:  That is it for questions that
9     I have.
10         MR. SHUMAKER:  Any other questions?
11         MR. PATTWELL:  No questions.
12         VIDEO TECHNICIAN:  This concludes the
13    deposition.  We're going off the record.  The time is
14    12:42 p.m.
15         (The deposition was concluded at 12:42 p.m.
16     Signature of the witness was not requested by
17     counsel for the respective parties hereto.)
18
19
20
21
22
23
24
25

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

# **Exhibit 3**

```
 1              KEVYN ORR, VOLUME 2
 2    IN THE UNITED STATES BANKRUPTCY COURT
 3     FOR THE EASTERN DISTRICT OF MICHIGAN
 4
 5
 6
 7   In Re:           )   Chapter 9
 8
 9   CITY of DETROIT, MICHIGAN, )   Case No. 13-53846
10
11        Debtor.   )   Hon. Steven Rhodes
12   _____
13
14             VOLUME 2
15
16    The Videotaped Deposition of KEVYN ORR,
17   in his personal capacity and as Rule 30(b)(6) witness,
18   Taken at 2 Woodward Avenue,
19   Detroit, Michigan,
20   Commencing at 9:10 a.m.,
21   Tuesday, July 22, 2014,
22   Before Leisa M. Pastor, CSR-3500, RPR, CRR.
23
24
25
```

```
 1              KEVYN ORR, VOLUME 2
 2   APPEARANCES:
 3
 4   GREGORY M. SHUMAKER, ESQ.,
 5   DAN T. MOSS, ESQ.
 6   Jones Day
 7   51 Louisiana Avenue, N.W.
 8   Washington, D.C. 20001
 9        Appearing on behalf of the Debtor.
10
11
12
13
14   ROBERT HERTZBERG, ESQ.
15   Pepper Hamilton, LLP
16   4000 Town Center, Suite 1800
17   Southfield, Michigan 48075
18        Appearing on behalf of Debtor.
19
20
21
22
23
24
25
```

```
 1              KEVYN ORR, VOLUME 2
 2   STEPHEN C. HACKNEY, ESQ.
 3   Kirkland & Ellis, LLP
 4   300 North Lasalle Street
 5   Chicago, Illinois 60654
 6        Appearing on behalf of Syncora.
 7
 8
 9
10   JEFFREY BEELAERT, ESQ.
11   Sidley Austin, LLP
12   1501 K Street, N.W.
13   Washington, D.C. 20005
14        Appearing on behalf of National Public Financing.
15
16
17
18   ERNEST J. ESSAD, JR., ESQ.
19   Williams, Williams, Rattner & Plunkett, P.C.
20   380 North Old Woodward Avenue, Suite 300
21   Birmingham, Michigan 48009
22        Appearing on behalf of Financial Guaranty Insurance
23        Company.
24
25
```

```
 1              KEVYN ORR, VOLUME 2
 2   ALFREDO R. PEREZ, ESQ.
 3   Weil, Gotshal & Manges, LLP
 4   700 Louisiana Street, Suite 1700
 5   Houston, Texas 77002
 6        Appearing on behalf of Financial Guaranty Insurance
 7        Company.
 8
 9
10
11   LISA SCHAPIRA, ESQ.
12   Chadbourne & Parke, LLP
13   30 Rockefeller Plaza
14   New York, New York 10112
15        Appearing on behalf of Assured Guaranty Municipal
16        Corporation.
17
18
19
20
21
22
23
24
25
```

Pages 162 to 165

KEVYN ORR, VOLUME 2

1  isn't that correct?
2
3  **A. I believe that's correct.**
4  Q. Now, you understand that one of the complexities of
5  the case has been that the retirees are -- are kind of
6  disbursed out there in the world, and as a practical
7  matter you've typically been dealing either with
8  retiree associations, retirement trusts, or the
9  official committee of retirees when it came to
10  negotiating plan treatment: is that a fair statement?
11  **A. Yes. I think it's a fair statement to say we tried to**
12  **deal with representative organizations as opposed to**
13  **individual retirees.**
14  Q. The general strategy was you deal with the
15  representative organizations and if you can strike
16  agreements with them, the hope is that they'll then
17  recommend approval of the plan and the retirees will
18  -- will vote consistently with that recommendation,
19  correct?
20  **A. Yes, I think that's fair.**
21  Q. Now, as of February 21st, 2014, you had just over
22  seven months left on your term: isn't that correct?
23  **A. Yes, I think that's fair.**
24  Q. Okay. And you said in the press at the time of the
25  first plan that it was quote/unquote crucial that the

KEVYN ORR, VOLUME 2

1  City reach an agreement with its creditors, correct?
2
3  **A. Yes, I believe I said that.**
4  Q. And in particular, you were referring to the
5  pensioners, correct?
6  **A. I was referring to everyone.**
7  Q. Okay. And you also said at that time: "We really do
8  not have time for a lot of acrimony and litigation."
9  Isn't that correct?
10  **A. Yes, I probably said that.**
11  Q. Okay. Now, you said that it was crucial that the City
12  reach agreement with its creditors in part because
13  time was short on your tenure as emergency manager,
14  correct?
15  **A. I suppose you could say in part, but it was also that**
16  **the City needed to get out of a space that it had been**
17  **in effectively for almost two years, that we needed to**
18  **get to revitalization, and I said a bunch of other**
19  **things during that time about how important it was to**
20  **get out of this space.**
21  Q. And wasn't it also crucial that the retirees agree to
22  the first plan you proposed because you knew you
23  couldn't cram down at the proposed pension cut
24  levels if they didn't agree?
25  **A. There were other reasons, not just the issue regarding**

KEVYN ORR, VOLUME 2

1  cramdown. We certainly wanted people that were going
2  to be impacted and severely affected by this process
3  to have some level of buy-in for -- for the future of
4  the City and for their interests, I don't want to give
5  the impression that we were merely looking at it from
6  a technical perspective, there is a human dimension
7  here that we were very concerned about, too.
8
9  Q. But as of the first plan the reason you were so
10  focused and in terms of saying it was crucial to reach
11  agreement, at least as we're talking about retirees,
12  it was because you knew that you couldn't cram them
13  down at the proposed plan levels, correct?
14  **A. I knew that we could not cram them down at proposed**
15  **plan levels, but I think there are plenty of**
16  **statements out there by me importuning the retirees to**
17  **support the plan for a number of other reasons, as**
18  **well.**
19  Q. And why couldn't -- why did you believe you couldn't
20  cram them down at the proposed plan levels in the
21  first plan?
22  **A. Well, I didn't know if we could get in consultant -- I**
23  **won't into discussions we had with counsel, but we**
24  **were concerned that we might not be able to meet some**
25  **of the requirements in the code but also here again,**

KEVYN ORR, VOLUME 2

1  **wanted to be sure that we addressed the human**
2  **dimension.**
3  Q. And you didn't have -- is it -- are you referring to
4  the fact that as of the first plan, you didn't even
5  have an impaired assenting class?
6  **A. I think it's fair to say that we did not have -- well,**
7  **when was the date?**
8
9  Q. Feb 21, 2014.
10  **A. I don't know if that's true because I don't recall the**
11  **dates that we may have reached agreements with the**
12  **financial creditors.**
13  Q. And when you're talking about the human dimension,
14  what are you talking about there?
15  **A. Very simply, and I think I've said this before, the --**
16  **the pensioners are people many of whom are in their**
17  **sixties, seventies, and eighties and don't have an**
18  **option. They have worked for the City, most of them**
19  **have done nothing wrong. They are -- the covenant**
20  **that the City had with its employees and retirees was**
21  **that if they perform work for the City that upon their**
22  **retirement they'd be taken care of for the rest of**
23  **their natural life, that some of this came as quite a**
24  **shock to them because they had planned their affairs**
25  **accordingly. Many of them, like my own family members**

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

KEVYN ORR, VOLUME 2

1 KEVYN ORR, VOLUME 2
2 or grandmother, wouldn't have options of going back
3 into the job market to supplement income or make up
4 for some of the cuts and that there were -- there was
5 a real-world dimension impact to the people that were
6 going to be affected by these cuts.
7 Q. Putting aside the human dimension, if you'd had an
8 impaired assenting class do you believe that you could
9 have crammed down the first plan on the pensioners?
10 MR. SHUMAKER: Object to the form.
11 A. Yeah, I don't know, I'd have to consult with my
12 attorneys.
13 BY MR. HACKNEY:
14 Q. Okay, and I mean back at the time. Did you believe
15 you could or could not?
16 A. To be honest with you Mr. Hartley (sic), I don't -- I
17 don't -- I don't really recall. I don't really recall
18 that being the crux of the discussion, but it might
19 have been true.
20 Q. Okay. You may have thought you could cram them down,
21 you may have thought you couldn't, you just don't
22 know?
23 A. I just don't remember.
24 Q. Okay. You previously called me Hartley --
25 A. Did I call you Hartley?

1 KEVYN ORR, VOLUME 2
2 Q. There is something in your brain --
3 A. No, I --
4 Q. -- that says Hartley when you see me.
5 A. This is going to be surprising, I have a friend named
6 Hartley, and he reminds me of you.
7 Q. And he's like a handsome, suave guy?
8 A. Let's not get carried away.
9 Q. Now, you did understand that the February 21st plan of
10 adjustment still discriminated in favor of retirees as
11 compared to COPs holders in terms of their respective
12 recoveries, correct?
13 A. Yes, I understand that there were -- there were a lot
14 of reports and the financial community was taking the
15 position that there was discrimination in the plan.
16 Q. But there was objectively discrimination in that first
17 plan, correct?
18 A. There was a higher percentage recovery relative to
19 some of the financial creditors.
20 Q. And you were aware of that discrimination at the time
21 you proposed that plan, correct?
22 A. Yes.
23 Q. And what was your basis for the level of
24 discrimination you proposed in the February 21st plan?
25 A. Well, I believe at that point, we were looking at some

1 KEVYN ORR, VOLUME 2
2 contribution from third parties, meaning the
3 foundations, the benefactors and others. We were
4 looking, we had been admonished I believe by the court
5 on several occasions to be compassionate in our
6 treatment of individuals and retirees. And unlike
7 financial creditors, the GRS and PFRS unlike some
8 financial creditors actually had assets in their
9 pension fund, so there was an existing basis by which
10 those assets would allow for a higher rate of recovery
11 ab initio, that is, from the start, as opposed to the
12 financial creditors to whom we owed money but did not
13 have a cache of money available to pay them.
14 Q. So there -- let me break down what I heard. You tell
15 me if I got it right.
16 A. Mm-hmm.
17 Q. I heard that the basis for the decision to
18 discriminate in the first plan was in part the
19 compassion for retirees, but it was also in part the
20 fact that there were assets in the retirement systems?
21 A. Yes.
22 Q. Okay, anything other than those two things?
23 A. No, as I said, there are a number of other factors in
24 trying to incentivize a workforce, in trying to keep
25 the covenant that the City made, a number of other

1 KEVYN ORR, VOLUME 2
2 factors, but generally those are the ones that seem to
3 be driving a sort of the treatment of those classes.
4 Q. Okay, so I heard compassion, the fact that assets
5 exist in the retirement trust, trying to incentivize
6 City workers. Anything else that justified that level
7 of discrimination?
8 A. There may have been other things that I said in terms
9 of the level of different treatment, you call
10 discrimination. That was reported out in the first
11 plan, but generally speaking, the principal driving
12 force was that the retirement systems had assets in
13 them and we were trying to bring levels down below to
14 the predictable funding level verse -- based upon the
15 unfunded actuarial liability of those funds. You
16 start with a cache of money in those funds that are
17 available conceivably to pay pensions if you are able
18 to adjust the payment levels, whereas with financial
19 creditors, we didn't have a cache of money available
20 to them. We're paying them out of existing City cash
21 flow going forward.
22 Q. But you understand that the amount of assets in the
23 pension systems, the difference between the amount of
24 assets and what is needed to fully fund pensions is
25 called the UAAL?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

KEVYN ORR, VOLUME 2

2  A.  Yes.

3  Q.  And you understand that the pension class sizes were

4      for the UAAL, correct?

5  A.  Well, the pension class sizes were for the UAAL but

6      they took into account that those funds had assets in

7      them, as well, so you're trying to determine the

8      unfunded actuarial liability, but when you try to

9      determine the pension payments you also include the

10     amount of assets in the funds.

11 Q.  So the existence of assets in the retirement systems

12     was something that you considered in your

13     discrimination analysis, in your decision to propose a

14     plan that discriminated?

15 A.  In my decision to propose a plan that provided

16     different payout levels for creditors, yes.

17 Q.  And it weighed in favor of it?

18 A.  It weighed in -- not so much in favor, I'm -- favor of

19     what?

20 Q.  Well, in favor of paying pensioners more than

21     financial creditors?

22 A.  The fact that there are assets in the funds assisted

23     us in paying them more than financial creditors, yes.

24 Q.  Okay.  What information did you base that -- that

25     decision to provide differing levels of recoveries on?

KEVYN ORR, VOLUME 2

2  A.  Well, there is a number of information.  Generally, we

3      would go through the expected debt service of the

4      City, what anticipated revenue streams would be going

5      forward, what the City would need for reinvestment and

6      revitalization, what the funding levels of the pension

7      funds were, amongst others, there was a number of

8      information and -- and it was a very dynamic and fluid

9      process as we examined a number of different potential

10     outcomes and scenarios.

11 Q.  I understand that there is an enormous amount of

12     information that implicates what the City has to give

13     to creditors at all, okay?  And I heard your answer to

14     relate to that subject, correct?

15 A.  Right.

16 Q.  I'm asking a more specific question, which is with

17     respect to your decision to pay classes 10 and 11 more

18     than financial creditors, what information did you

19     rely on in making that decision?  So this is more not

20     how much money is there but who will get what money is

21     available.

22 A.  All of the information I just mentioned.  I mean,

23     there is a number of different factors that go into

24     what we can potentially pay financial creditors, and

25     we took all that information in on a number of

KEVYN ORR, VOLUME 2

2      different scenarios and reduced.

3  Q.  But what information did you rely upon in deciding how

4      to allocate the money that could be paid in terms of

5      whether it went to pensioners or whether it went to

6      financial creditors?

7  A.  I think we're discussing the same answer.  We would

8      look at information regarding the unfunded liability

9      of the funds, the amount of anticipated revenue the

10     City could take in and could expect to take in, the

11     obligations that the City could afford, the potential

12     obligations of the City going forward for retiree

13     healthcare, for instance, as well as for current

14     employee, active employee healthcare obligations, just

15     a number of different information that we could

16     provide, we could analyze to try to get at a

17     determination of what we could pay different classes

18     of creditors.

19 Q.  But that tells you what the total size of the pie is,

20     correct?

21 A.  But it also tells us what we think we can pay.

22 Q.  Right, to creditors?

23 A.  Right, there's an analysis of the total debt load

24     which we published in the June 14th proposal, and then

25     there is analysis of the revenue streams that come

KEVYN ORR, VOLUME 2

2      into the City that we could use to service those

3      obligations, not just financial creditors but

4      pensioners, and then there's an analysis of what we

5      would need to do to take the revenue stream to address

6      the unfunded actuarial liability and other obligations

7      that we would have with financial creditors, and we

8      would run different scenarios as to how that could be

9      done --

10 Q.  Okay.

11 A.  -- in this environment.

12 Q.  I'm looking -- I don't think -- we may not be

13     communicating well, I'm sure I'm not asking my

14     questions correctly, but once you've determined how

15     much you have in theory to distribute to creditors

16     there's a separate decision that has to be made as to

17     which creditors should get what parts of that pie: do

18     you agree with that statement?

19 A.  Yes, I think that's fair.

20 Q.  And I want to focus on the process of deciding which

21     creditors get which part of the pie, and I want to

22     understand what information you relied upon in

23     deciding to give pensioners a larger slice of the pie

24     than you gave financial creditors --

25 A.  Yeah.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

KEVYN ORR, VOLUME 2

2  Q. -- in the first plan.

3  A. Yeah, let's do it this way: There are factors that
4     you're considering, and I think what you're trying to
5     get at is judgment, which is different than the
6     factors that come in to what you have and who you can
7     pay. And the judgment decisions about what we could
8     pay took into account a number of these other factors
9     regarding revenue streams, but ultimately in deciding
10    what we could pay pensioners, there were, I would say,
11    several different factors which really spurred that
12    decision.
13        One was the amount of funds that were in
14    the various pension funds. Two was the obligation to
15    try to take into account the situation of these
16    pensioners. Three was that at some point, it became
17    apparent that there was going to be additional money
18    coming in the form of the Grand Bargain from
19    third-party guarantors who were -- as a condition of
20    those grants that they be dedicated solely to pension.
21        Three was that at some point, it became
22    clear that the pension funds, themselves, were
23    performing better over the year and had experienced
24    better rate of returns than in prior years, and, in
25    fact, the asset values went up. All of those factors

KEVYN ORR, VOLUME 2

2     went into the decision to decide how much we could pay
3     pensioners.

4  Q. Any other factors than that?

5  A. Probably, but I don't recall them sitting here today.

6  Q. And when you say the obligation to take into account
7     the pensioner situation, that's referring to the human
8     dimension that we talked about earlier, correct?

9  A. Yes, I think that's fair.

10 Q. Now, let's go forward in time from the first plan
11    of -- that we've just been talking about, which is
12    February 21?

13 A. Yes, mm-hmm.

14 Q. Okay. Let's go forward in time to April 1, 2014,
15    which is about 40 days later, okay? April Fools' Day.

16 A. I wasn't going to say that but --

17 Q. You know I picked it. Now, let's -- so put yourself
18    back in your state of mind as of April 1, 2014, okay?

19 A. Right.

20 Q. As of that time, you still didn't have agreement with
21    any of the retiree associations or committees or
22    retirement systems with respect to the proposed
23    pension cuts, correct?

24 A. The reason I'm not recalling whether or not that's
25    accurate, at some point in the spring -- we did not

KEVYN ORR, VOLUME 2

2     have publicly announced agreements, I think that's
3     fair.

4  Q. You didn't have any publicly announced agreements with
5     anyone I don't believe until April 15th, 2014; is that
6     correct?

7  A. When -- you may have information regarding -- when you
8     say anyone, you mean any creditors?

9  Q. I mean any of these retiree representative --

10 A. Okay.

11 Q. -- bodies that --

12 A. Okay.

13 Q. -- or that I take to mean retiree associations,
14    pension systems official committee.

15 A. Okay. And so you're taking out the swaps, for
16    instance, you're not including --

17 Q. Oh, absolutely.

18 A. Okay.

19 Q. Yeah, I'm just talking about what the pensioners --

20 A. Okay, yes, I think that's fair.

21 Q. Okay. And just to get the record clear, as of -- your
22    recollection as you sit here today is that as of
23    April 1st, you did not have agreements with any of the
24    retiree representative parties, correct?

25 A. Yes, I don't think we have formally announced

KEVYN ORR, VOLUME 2

2     agreements as of April 1st, to the best of my
3     recollection.

4  Q. Now, on April 1st -- and the plan that was on file at
5     that time still called for the 26 percent and 6
6     percent cuts that we discussed earlier, correct?

7  A. If -- I remember we filed a revised plan, I believe,
8     in March, but I'll take you at your -- at your
9     representation because it's just not -- I just don't
10    remember it in front of me, but I think that's true.

11 Q. My recollection is that the revisions to the plan
12    changed the cut levels in the event that the plan was
13    voted down so they made it more draconian if those
14    classes rejected the plan --

15 A. Right.

16 Q. -- but that the top-level cuts, if the Grand Bargain
17    approved, stayed the same?

18 A. Yeah, I think that's accurate, but the plan will speak
19    for itself so --

20 Q. Okay.

21 A. -- I'll be bound by what the plan says.

22 Q. That's fine, I'm just trying to -- your best
23    recollection as you sit here today is that I have it
24    about right?

25 A. Yes.

Pages 210 to 213

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr   Doc 7122   Filed 08/27/14   Entered 08/27/14 19:29:35   Page 51 of 60

KEVYN ORR, VOLUME 2

1 of recovery in the plan that is currently on file,
2 classes 10 and 11 are being paid more than the COP
3 holders; isn't that correct?
4 A. Yeah, are being paid more than as proposed to the COP
5 holders, yes.
6 Q. Okay. And they're being paid substantially more,
7 correct?
8 A. I think it's a significant difference.
9 Q. Okay. Now, in fact, under the current plan, according
10 to the disclosure statement the GRS and PFRS classes
11 recover approximately 59 cents on the dollar, correct?
12 A. Yeah, I think in the plan, obviously, there's a
13 schedule that shows percentage, but if that's the
14 schedule, yes.
15 Q. I think it's actually technically 60 cents for GRS and
16 59 cents for PFRS?
17 A. Yeah, that's --
18 Q. That's about correct, right?
19 A. That's about correct, maybe a little bit lower on the
20 PFR -- but that's about correct.
21 Q. Okay, and the COPs recover at most 10 cents on the
22 dollar, correct?
23 A. Yeah, there's a range of potential recovery for the
24 certificates of participation but it's stated at 10

KEVYN ORR, VOLUME 2

1 percent.
2 Q. That's based, in part, on the fact that there is an
3 invalidity lawsuit against the certificates and the
4 potential to settle that as part of the plan, correct?
5 A. Yes, I think that's fair.
6 Q. The 10 cents that's in the disclosure statement
7 represents the best the COPs can do if they are
8 vindicated in the invalidity lawsuit, meaning that the
9 certificates are found to be valid?
10 A. Well, no, that's why I said I think there's a range.
11 The --
12 Q. I mean the 10 cents is the best they can do?
13 A. Yeah, I -- okay, 10 cent -- the 10 cents is our
14 estimate of the best they could do.
15 Q. Okay, so with respect to the plan that is on file, and
16 that you're seeking to confirm, with respect to
17 classes 10 and 11 on the one hand and the COPs holder
18 class on the other hand, why did you decide to
19 discriminate in favor of classes 10 and 11 as compared
20 to the COPs holders? And by discriminate, I mean pay
21 them more recovery than you've paid to the COPs holder
22 class?
23 A. Right. As we said earlier this morning, in addition
24 to, you know, the assets that the retirement funds had

KEVYN ORR, VOLUME 2

1 in them, which would mean we'd have less ground to
2 make up as opposed to the liability of the
3 certificates which is a -- an ongoing liability, as
4 between the concerns that the obligations, the human
5 dimension, the responsibility the City had to try to
6 keep its covenant with its employees and retirees as
7 opposed to legal arguments that have been made in the
8 papers regarding the COPs that we believe they are
9 void ab initio and that we have no obligation and
10 probably a number of other factors that I'm just not
11 recalling as I sit here today, that resulted in us
12 proposing in the plan that the GRS and PFRS
13 beneficiaries receive a higher recovery than the COPs.
14 Q. Okay. So my question is trying to drive on the
15 factors that you considered in exercising your
16 judgment to discriminate between these two classes.
17 A. Right.
18 Q. Do you understand that?
19 A. Yes.
20 Q. And you identified four, the existence of assets held
21 in the trusts --
22 A. Mm-hmm.
23 Q. -- the human dimension that we've discussed earlier,
24 the City's covenant to pay retirees their pensions --

KEVYN ORR, VOLUME 2

1 A. Mm-hmm.
2 Q. -- and the invalidity of the COPs?
3 A. Yeah, the legal position of the COPs, but there may
4 be -- there may be other factors that go into that
5 analysis. I'm just trying to give you off the top of
6 my head sitting here today some of the factors that we
7 considered in terms of proposing the plan.
8 Q. Well --
9 A. There may be --
10 Q. Oh, sorry.
11 A. There may be factors having to do with negotiated
12 positions, with a number of other issues, so I don't
13 want to give you the impression that the only thing
14 are the factors you're writing down, there may be
15 other considerations we took into account.
16 Q. Well, I guess I'll say understood, but you are the
17 decider, right?
18 A. Yes, I am.
19 Q. Okay, and so --
20 A. I am the -- the decider has a different connotation to
21 it, so I'm the emergency manager.
22 Q. You're talking what, the "W" connotation?
23 A. Yeah.
24 Q. Oh, okay.

KEVYN ORR, VOLUME 2

1  respect to their mean pensions.
2
3  A.  No, it was also with probable -- it wasn't just
4      pensions, it also -- there was aggregate data
5      regarding healthcare, there's aggregate data regarding
6      an alternative savings fund recoupment.  So I know
7      you're focusing principally on pensions, but I looked
8      at a number of data as a composite of what the impact
9      would be to these pensioners from a human dimension.
10 Q.  Okay, and evaluating the personal hardship they would
11     suffer?
12 A.  Correct.
13 Q.  Okay.  And that was -- was that one of the most
14     important things that drove you in connection with
15     this decision?  It seems like it's moved you.
16 A.  Well, I don't know if it's one of the most important,
17     but it -- all of them are important, the amount of
18     money, the Grand Bargain, the -- the grantors have
19     given us $866 million we didn't have seven months ago
20     so that's pretty important.
21         The human dimension certainly is something
22     that you have to take into account.  These are real
23     people with real consequences.  So all of it's fairly
24     important to me.
25 Q.  Okay.  Now, you -- the third thing you talked about

KEVYN ORR, VOLUME 2

1  was the City's covenant, which I understood you to
2  mean the City's promise that it would pay these people
3  their pensions?
4
5  A.  Yes.
6  Q.  And I take it from that the information you would have
7      relied upon was just the contract saying that folks
8      were entitled to these pensions?
9  A.  No, you know, we -- I also had access -- you know, I
10     talked with some City employees, for instance, who
11     currently work for the City, Gary Brown, who is a
12     retired Detroit police officer but is on a personal
13     service contract here in the City now, PSC, and I
14     talked to him about the historical commitments that
15     the City has made, he's a lifetime resident, been here
16     a long time.  Chief Craig, who was born here, for
17     instance, and his parents have been in the City, I
18     talked to him.  I talked to individuals.
19         So it's not just an analysis of, say, raw
20     data.  I mean, I have communications with people on
21     staff here in the City who will ask me if they can
22     come in and talk to me, and I'll listen to them.
23 Q.  I guess what I meant here is one of the factors you
24     identified as -- as informing your judgment with
25     respect to what to pay classes 10 and 11 versus COPs

KEVYN ORR, VOLUME 2

1  holders, you identified was the City's covenant.
2
3  A.  Yes.
4  Q.  And I took that to mean the fact that the City had a
5      contractual obligation to pay these people?
6  A.  Right, and what I'm trying to relay to you is it's not
7      just a fact that the City had a contractual
8      obligation; it is the commitment and reliance on that
9      commitment behind that contractual obligation that
10     various City employees and retirees will come and
11     express to me in very real terms what this means to
12     them.
13 Q.  I see.
14 A.  And so the covenant is not just a technical document,
15     it is also an expectation, a reliance, a commitment
16     the City has made, and employees and retirees express
17     it to me in very -- sometimes very candid terms.
18 Q.  I see.  What you're saying is you relied not only the
19     existence of the legal obligation to pay but also
20     testimonies you got from people that they had relied
21     on that?
22 A.  Yes.
23 Q.  And isn't it fair to say that this is another element
24     of the human dimension, which is the unfairness of
25     cutting the pensions of people who relied on the

KEVYN ORR, VOLUME 2

1  City's covenant in making decisions about how to
2  allocate their work time?
3
4  A.  You could say that.
5  Q.  And then the last issue that you identified was the
6      invalidity of the COPs; do you remember that?
7  A.  Yes.
8  Q.  And that was something that you factored into your
9      decision in terms of paying the COPs less than classes
10     10 and 11, correct?
11 A.  Yes.
12 Q.  And I take it you relied upon legal analysis from your
13     counsel about the potential invalidity of the COPs,
14     correct?
15 A.  Yes.
16 Q.  And I know that there had been a lawsuit filed prior
17     to the time of the current plan being filed, but I
18     assume that if I asked you questions about what your
19     attorneys had advised you with respect to the
20     invalidity of the COPs you'll invoke the
21     attorney-client privilege and decline to answer?
22 A.  Yes.
23 Q.  Okay, so I hope we can stipulate that if I ask a bunch
24     of questions about how the COPs analysis factored into
25     the decision that the attorney-client privilege will

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

KEVYN ORR, VOLUME 2

1
2  be invoked?
3       MR. SHUMAKER:  Assuming your question gets
4  to communications between counsel and Mr. Orr, yes.
5  BY MR. HACKNEY:
6  Q.  Well, I mean, did you -- did you -- in assessing the
7  invalidity of the COPs as a factor justifying the
8  level of discrimination, did you consider anything
9  other than legal advice around the invalidity of the
10  COPs?  It seems like a legal question.
11 A.  It's a legal question, but in an effort to be
12  forthcoming and fair to you, I'd have to say yes, and
13  I'll try to tell you, for instance, without discussing
14  the -- and going afield of many discussions, legal
15  opinions, analyses, meetings, written opinions, that I
16  received from counsel.
17       So for instance, in looking at the COPs, in
18  addition to those things, you know, I examined news
19  reports about that transaction, I think I've even
20  examined those -- some of those before I got here.
21  Reports, for instance, by the auditor general that it
22  questioned the propriety and validity of the COPs
23  reports at that time when -- I think it was Auditor
24  General Hart (ph.) back in 2005, City Council
25  statements that were made.  Statements made by the

KEVYN ORR, VOLUME 2

1
2  City treasurer back then that it was invalid and
3  inappropriate to enter into the COPs and that it would
4  make the City bankrupt and that the City should have
5  declared bankruptcy in 2005.
6       So there's other data that I looked at to
7  inform myself, just not the legal analyses about
8  position of the COPs, and some of that data was
9  contemporaneous with when they were initially entered
10  into and some of that was subsequent to that.
11  Q.  And you identified a number of individuals or reports
12  that you had read; I didn't hear any lawyers in any of
13  those things.  Were there?
14  A.  None of my lawyers were in those things, so there
15  was -- there's, you know, document -- documentary
16  evidence that is short of the legal opinions I got
17  from my counsel.
18  Q.  Okay, so but to tie it up, was the principal
19  information that you relied upon legal advice conveyed
20  to you by your lawyers about the invalidity of the
21  COPs?
22  A.  Yes.
23  Q.  And I -- just so I understand the way the judge -- the
24  factor plays through your judgment, you looked at the
25  potential invalidity of the COPs and viewed that as

KEVYN ORR, VOLUME 2

1
2  one reason to pay the COPs on their best day 10 cents?
3  A.  Yeah, I don't know -- I don't want to give the
4  impression that it was that binary, you know, a number
5  of issues, as I said before, went into what we could
6  afford to pay--
7  Q.  Yes.
8  A.  -- the validity of the claim, which is pretty typical
9  in bankruptcies, all that stuff, but I think that's a
10  fair statement.
11  Q.  Okay, I'm talking when you were deciding how to divide
12  the pie, the COPs best day recovery was impacted by
13  this factor of the potential invalidity of the COPs?
14  A.  Yes.
15  Q.  Now, with respect to the information in these four
16  areas that we've just talked about, the information
17  that relates to each of the four factors you
18  identified --
19  A.  Mm-hmm.
20  Q.  -- was there a material change in this body of
21  information between April 1 and April 15 of 2014?
22  A.  I don't know, you say material change, what are you --
23  what do you mean?
24  Q.  Is there anything that sticks out to you with respect
25  to any of your four factors and the information

KEVYN ORR, VOLUME 2

1
2  associated with each that changed materially between
3  April 1 and April 15?
4  A.  To be frank with you, I can't -- I can't recall if
5  there was, but I don't -- nothing jumps out at me.
6  Q.  Okay.  Now, in structuring the plan, did you take
7  advice from Miller Buckfire?
8  A.  Yes.
9  Q.  And in deciding what levels of discrimination between
10  creditors was appropriate, did you also take advice
11  from Miller Buckfire?
12  A.  Yes.
13  Q.  And did you specifically take advice from Ken
14  Buckfire?
15  A.  I -- I would have regular restructions (sic) with Ken
16  and other members of his team, so I think it's fair to
17  say yes.
18  Q.  Did Mr. Buckfire recommend to you that when it came to
19  evaluating the recovery of the retirees that the City
20  should consider the pension recoveries in combination
21  with the OPEB recoveries in making a determination as
22  to what the level of discrimination was?
23       MR. SHUMAKER:  Object to the form.
24  BY MR. HACKNEY:
25  Q.  Do you understand my question?

Pages 238 to 241

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr  Doc 7122  Filed 08/27/14  Entered 08/27/14 19:29:35  Page 54 of 60

KEVYN ORR, VOLUME 2

1  boy.
2
3          MR. HACKNEY:  I am, born and raised, but
4  I've actually lived in Chicago now --
5          THE WITNESS:  Are you coming back?  Are you
6  coming back?
7          MR. HACKNEY:  No, no, I'm a Chicagoan.
8          THE WITNESS:  Okay.
9          MR. HACKNEY:  You lost me.
10  BY MR. HACKNEY:
11  Q.  Let me see if I can tie it up this way.  You did not
12      attempt to undertake a systematic analysis of what all
13      the creditors thought that they were going to get when
14      they made their respective investment decisions to
15      decide who should get what?
16  A.  I did not poll all of the creditors regarding what
17      they thought they were going to get.
18  Q.  Okay, and you didn't factor that into your conclusion,
19      correct?
20  A.  No.  Not at least that I can say -- I can't say what
21      discussions were made in mediation, but I -- publicly
22      the answer would be no.
23  Q.  I am talking about, you know, your state of mind,
24      though.  I'm saying that you didn't go and pick
25      winners and losers based on what people's expectations

KEVYN ORR, VOLUME 2

1
2  were when they invested?
3  A.  No, I don't view it as picking winners and losers
4      because I don't think anybody here has said to me that
5      they think of themselves as winners.
6          We tried to do an analysis of what we could
7      afford to pay based upon the factors we discussed
8      before with an understanding that $866 million was
9      coming in as a gift from grantors with specific
10     condition that that money would flow to pensioners as
11     opposed to any other creditor class and that we would
12     accept that gift with that condition when those
13     discussions were made.
14  Q.  Understood, I'm just trying to say -- picking winners
15      and losers was a euphemism, I didn't mean to be
16      casual.  You didn't set respective recovery levels
17      based on the fact that you thought some creditors
18      should be paid less based on their expectations when
19      they invested as opposed to others?
20  A.  No, that really wasn't a factor.  I mean, did I
21      personally believe that there may have been creditors
22      who were more capable of doing underwriting about the
23      City's debt condition has been -- as had been reported
24      in various publications that I'd read, yes, I
25      understood that but I didn't sit down and say, you

KEVYN ORR, VOLUME 2

1
2  know, based upon your expectation of being paid, you
3  know, this is what we can pay.  We generally drove the
4  determinations based upon the revenue stream and the
5  strengths and weaknesses and negotiations with any
6  particular creditor group?
7  Q.  And I take it you did not, for example, go back and
8      review the due diligence materials that were provided
9      to the COPs creditors in the 2005 and 2006
10     transactions, correct?
11  A.  I didn't do it personally but some of my advisors did.
12  Q.  Okay.  But, I mean, you don't know what was in those
13      due diligence materials?
14  A.  No, some of those materials, I -- I did see some of
15      those materials and I saw some of the legal opinions
16      that were provided back then.
17  Q.  In fact, the legal opinions that were provided back
18      then told COPs holders that the COPs were legal,
19      correct?
20  A.  Some of them did, there was one law firm in the City
21      that refused to do the transaction because they opined
22      or at least informed people that they thought it was
23      illegal.
24  Q.  And do you recall what the COPs holders were told
25      about the nature of the remedy that would exist if the

KEVYN ORR, VOLUME 2

1
2  City failed to pay the service corps?
3  A.  No.
4  Q.  Do you know who the COPs holders were at the time of
5      the COPs offering?
6  A.  There was a list of who they were, but sitting here
7      off the top of my head, no.
8          MR. HACKNEY:  Let's mark this as our next
9      exhibit.
10          MARKED FOR IDENTIFICATION:
11          DEPOSITION EXHIBIT 21
12          11:29 a.m.
13  BY MR. HACKNEY:
14  Q.  Mr. Orr, is this the offering memorandum that was put
15      out in connection with the 2005 COPs?
16  A.  Without sitting here and reading through it, to the
17      best of my knowledge, this appears like a document
18      I've seen before as the offering document.
19  Q.  And have you read this document before?
20  A.  I have not read the document in total; I have read
21      pieces of it.
22  Q.  Okay.  You didn't just sit down and one day say, I
23      want to read the offering memorandum?
24  A.  I did not read through the whole document.
25  Q.  Now, if you look at page 8, I want to read you a

Pages 274 to 277

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr   Doc 7122   Filed 08/27/14   Entered 08/27/14 19:29:35   Page 55 of 60

KEVYN ORR, VOLUME 2

A. Yes, I think Mr. Buckfire is an expert in that area.

Q. And in this subject matter we're discussing of likely rates of return, likely levels of risk, would you tend to defer to him in terms of his view?

A. I would certainly solicit his view. His view is very informed and very capable, but having been in the City now for over a year, I certainly would want to be informed but ultimately it's -- I'd have to make a call of keeping my own counsel.

Q. Would you agree that lenders are tripping over themselves to lend the City money?

MR. SHUMAKER: Object to the form.

A. I think we've had -- you know, every time I use a literation (sic) or metaphor, you quote it back to me, so I'm going to say that I think we've had a healthy amount of interest, and some people might well characterize that as tripping over themselves.

BY MR. HACKNEY:

Q. And there's a great deal of enthusiasm that you're finding from both investors and lenders, correct?

A. That appears to be the case.

Q. And that's based on the substantial deleveraging that the City's achieving through this plan, correct?

A. I think that --

KEVYN ORR, VOLUME 2

Q. In part?

A. I think that is fair.

Q. You know, Mr. Orr, I've reached a good stopping point, I think.

MR. SHUMAKER: Sure.

MR. HACKNEY: There's a lot of people in the room, but I kind of defer to you.

THE WITNESS: No, I'm good, but if you guys think that makes sense, we have a thing that we need to do.

MR. HACKNEY: What time?

MR. HERTZBERG: At 1:15 for 5 minutes.

THE WITNESS: Okay.

MR. HACKNEY: That will be perfect then, we'll take an hour for lunch, and then I'll see you at 1:30.

THE WITNESS: Okay.

VIDEO TECHNICIAN: The time is now 12:31 p.m., we are now off the record.

(Recess taken at 12:31 p.m.)

(Back on the record at 1:36 p.m.)

VIDEO TECHNICIAN: The time is 1:36 p.m., we are back on the record.

BY MR. HACKNEY:

KEVYN ORR, VOLUME 2

Q. Mr. Orr, welcome back from lunch.

A. Thank you, Mr. Hackney.

Q. Okay. So Mr. Orr, you're aware that certain charitable foundations have agreed to contributed money to the City's pension obligations in exchange for the City conveying its art collection into a public trust; is that correct?

A. Yes.

Q. And I take it if I ask you questions about your communications with the charitable foundations in connection with their agreement to contribute this money, you will refuse to answer on the grounds of the mediation order's confidentiality provisions; is that correct?

A. Yes, generally for most of them, I think that's correct.

Q. And just for the record, you didn't have any such conversations prior to the entry of the mediation order which was at some point in September of 2013?

A. Yes, that's correct.

Q. Okay.

A. Well, let me think. I think I had one meeting with Darren Walker at Ford Foundation, but it was not about a contribution, it was just a meet and greet.

KEVYN ORR, VOLUME 2

Q. Okay.

A. Okay?

Q. Yeah, I saw that in the documents, and there were some issues about the Ford Foundation and the building that they owned or something that --

A. I didn't even get into all that.

Q. Okay.

A. It was just hi, how are you, they were helping us with some grants, helping us stand up a grants administrator.

Q. So I guess I want to make a record of something I understand from the City's position but it is the City's position that communications with the foundation are either part of or incidental to the mediation, correct?

MR. SHUMAKER: I believe that's correct. Again, I think you could fish outside the contours of those mediation talks but my understanding is that all those talks were within the context of mediation.

BY MR. HACKNEY:

Q. Yeah, I mean, I don't want to ask a hundred questions today to establish what I think is relatively well established, which is that you're not, generally speaking, going to discuss your conversations with the

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

KEVYN ORR, VOLUME 2

1
2 foundations, correct?
3 A.  That is correct.  You know, I may -- let me say this
4    generally.  I may have had meetings with foundation
5    principals outside of the confines of the mediation,
6    just hail-fellow-well-met, saw them at an event, how
7    are you.  There were no substantive conversations
8    about the contribution that did not occur outside of
9    the mediation order.
10 Q.  And that's fine, because the only ones that I really
11    want to ask you about are ones that relate to the
12    Grand Bargain?
13 A.  Right, right.
14 Q.  And those would fall under the gambit of the
15    mediation?
16 A.  Those would fall under the gambit of mediation.
17 Q.  Now, if I asked you your state of mind based on what
18    you understood the foundations to be willing to do or
19    what you thought they would be willing to do, you
20    would also invoke the mediation order to the extent
21    his state of mind was created by communications of the
22    foundation, correct?
23        MR. SHUMAKER:  I think that's right because
24    I don't see how he could give you his impressions or
25    his understanding without going into what was going on

KEVYN ORR, VOLUME 2

1
2 in the mediation.
3        MR. HACKNEY:  Right, because he lacks
4    foundation to speak to what the foundations thought.
5    If I asked him what he understood them to have
6    thought, you'll take the position that it would be
7    based on what they told him?
8        MR. SHUMAKER:  Correct, it all would have
9    been derived from the mediation discussions.
10        MR. HACKNEY:  Okay, and I'll just note
11    for the record, Mr. Shumaker, that this is the
12    position that Ms. Kofsky (ph.), a cop, took in a prior
13    deposition, and I understand the basis for it.  I will
14    let you know that I don't necessarily agree with it
15    based on comments that Judge Rhodes made about how
16    state of mind might work in the mediation context, but
17    it doesn't matter because I feel like we're not going
18    to work that out today anyway.
19        MR. SHUMAKER:  Understood.
20 BY MR. HACKNEY:
21 Q.  And I just want to understand you all's position on
22    it.  So just a couple big ones, if I ask you did you
23    ever ask the foundations to contribute money with no
24    strings attached you'll decline to ask answer that
25    question, correct?

KEVYN ORR, VOLUME 2

1
2 A.  I think I have to.
3 Q.  If I ask you did the foundations ever offer to
4    contribute money without insisting on transfer of the
5    art institute, you'll decline to answer that question,
6    correct?
7 A.  I think I have to.
8 Q.  And if I ask you hey, who is it that imposed the
9    condition on the Grand Bargain that the art institute
10    would be transferred, was it you, or was it them, or
11    was it Judge Rosen, you'll decline to answer those
12    questions, correct?
13 A.  I believe so.
14 Q.  Mr. Orr, has the Grand Bargain -- which you know what
15    I'm talking about, right?
16 A.  Yes, the money we talked about before, the 366 million
17    from the foundations, a $350 million value settlement
18    from the State, and $100 million from the DIA
19    benefactors as funneled through the Founders' Society.
20 Q.  Correct, in exchange for the art -- in connection with
21    the art being -- the DIA being conveyed into a public
22    trust, correct?
23 A.  Contributions targeted towards the two pension funds
24    with the condition that not one piece of art be sold
25    or de-assessed as a result of this process.

KEVYN ORR, VOLUME 2

1
2 Q.  And the purpose of the transfer to a public trust is
3    to ensure that the art is never sold to satisfy the
4    claims of the City's creditors, correct?
5 A.  Yes, now and forever, yes.
6 Q.  Not only current creditors but future ones, as well?
7 A.  Correct.
8 Q.  So has the Grand Bargain, Mr. Orr, helped the COPs
9    holders to achieve a higher recovery?
10 A.  I don't think so.
11 Q.  Mr. Orr, what are the principal terms of the LTGO
12    settlement?
13 A.  The LTGO settlement centers around a dedicated millage
14    that's to extend for the next approximately 13 years,
15    and the terms of a settlement that roughly 26
16    percent -- oh, the LTGO, I'm sorry --
17 Q.  Yeah.
18 A.  Okay, I'm sorry, I'm going -- I thought you were just
19    talking about -- I'm doing it temporally --
20 Q.  That's okay.
21 A.  I'm sorry.
22 Q.  I'm hopping around.
23 A.  Okay.
24 Q.  Let's start over.
25 A.  Let's start over.

KEVYN ORR, VOLUME 2

Q. So let's set the stage. The LTGO settlement has been announced in the press, and there's some information that's kind of available about it, but I actually literally don't know --

A. Right.

Q. -- what the terms are, and there's been some suggestion that it's the continued subject of negotiations, so I want to give you a fair setup.

A. Yeah, that's -- that's why I was -- I can talk about UTGO...

MR. SHUMAKER: You can discuss what's made public.

A. Okay. The mediators issued a statement on the LTGOs we did not, my office did not, recognizing that there was a settlement which, in part, dealt with a class of creditors, I think 170-some-odd-million dollars of claims, which would get an allowed claim in a certain amount. The -- I know from e-mails that I received as late as last night that some of the final details are still under discussion so I'm a little -- that was done in the mediation, so I don't want to run afoul of the mediation order as far as if you have a press release, I'll be happy to discuss about what's in the release but I don't know if I can discuss any more

KEVYN ORR, VOLUME 2

than that.

BY MR. HACKNEY:

Q. It's frankly been kind of confused on this, but I'll tell you what I know. First, it's my understanding that you do not have a final agreement with the LTGO; is that correct?

A. I think that is correct.

Q. What you have is what is loosely described as an agreement in principal on some but not all of the terms, correct?

A. I think that's fair.

Q. Now, the -- but the one thing I'm able to see, I'll tell you, in the expert reports is that Mr. Buckfire says that the $164 million of the unsecured portion of LTGO is getting $55 million in value of some form, okay? I'll represent to you you can see that in the exhibit. I'll also represent to you that somehow in Mr. Malhotra's work there is some implication that that is paid in 2015 under the forecasts, okay? I'm less sure on that one, okay?

A. Right.

Q. What I will tell you is that 55 million on 164 million of unsecured LTGO works out to a 34-cent recovery on that, okay? So -- and I'm -- this is goin on and on,

KEVYN ORR, VOLUME 2

but I asked like Heather for this, Ms. Lennox, and she actually referred me to this information.

A. Right.

Q. But then I wasn't able to confirm that that was the whole deal and so that's why you have this big involved --

A. Right.

Q. -- lead-in, okay? So let's just start with, is it your understanding that -- let's do it this way. Is it your understanding that at least part of the deal that is part of the agreement in principal that is public is that they will get approximately 34 cents on their unsecured claim?

A. Yeah. Without having any intent to directly or indirectly violate the mediation order, I do not think it is unfair based upon published reports, but I do not recall that the mediation statement included the actual amount.

Q. It didn't.

A. Yeah, so I don't -- I don't want to necessarily go beyond what was included in that statement, I think the statement was generally there was a settlement of a certain amount and recognition of a claim. I'll stick with that. There is no reason for me to believe

KEVYN ORR, VOLUME 2

that mathematically that that 55 percent of roughly 100 --

Q. No, 34 percent.

A. No, 55 million of 170-some-odd million is equally equivalent to 34 percent.

Q. But like as you -- I mean, I'm trying to tell you that it's not just, you know, me -- it's like the debtor's counsel told me to look at these things to get at least some of the terms.

A. And like I said, I have no reason to dispute what you were told or what they did; I just don't want to do it, okay?

Q. Okay.

A. So I'm -- I'm trying to stay within -- I have been admonished before about possible breaches of the mediation privilege by -- by several judges now and I don't want to run afoul of that in any way.

Q. So is it fair to say, Mr. Orr, that I think you're declining to discuss the terms of the LTGO settlement based on caution about not knowing what is and what is not public?

A. I think that's fair.

Q. Okay. I guess what I will say then is I'm going to reserve my questioning on this, this is also a

Pages 342 to 345

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-swr   Doc 7122   Filed 08/27/14   Entered 08/27/14 19:29:35   Page 58 of 60

KEVYN ORR, VOLUME 2

1 subject -- it was one of the drivers of our motion to
2 continue, but in fairness like I really may need to
3 come back and re-depose you on this when it's been
4 public for at least some period of time because it was
5 in flux.
6 A. Let me say this, like I said, whatever's public I have
7 no reason to believe whatever's been made public is
8 inaccurate, but I do know that they're continuing
9 discussions regarding details of the settlement, so I
10 just want to be very careful.
11 Q. And you're also -- fair to say you're unwilling to say
12 that the 55 million I alluded to represents the full
13 amount of what they're getting, correct?
14 A. I have no reason to believe that's not -- there is
15 anything in addition to what you may have heard
16 economically.
17 Q. Okay. But are they only getting 55 million or not?
18 A. I have no reason to believe there's anything more than
19 that.
20 Q. Okay. Well --
21 A. Based upon published reports.
22 Q. What is the basis for paying the LTGO 34 cents and
23 paying COPs holders 10 cents?
24 A. Now, I do think we are getting into the mediation

KEVYN ORR, VOLUME 2

1 order.
2 Q. Okay, so you're -- you'll decline to answer questions
3 about your basis for discriminating between those two
4 classes?
5 A. I think I have to.
6 Q. Okay.
7 MR. SHUMAKER: Well, you don't have to --
8 you don't have to reveal the terms of the settlement.
9 THE WITNESS: Right.
10 MR. SHUMAKER: But I think you could talk
11 in abstract, in the abstract about comparing the LTGO
12 settlement with the COPs holders, which I think is
13 what Mr. Hackney is getting at.
14 A. Well, let's do this, see if I can talk about it
15 generally and I'll try to just step it as we go
16 through it to see. I mean, I think it's fair to say
17 that that is a result of a negotiated solution in the
18 mediation process. I think it's fair to say there was
19 some give and take between the parties as to what
20 potential claim was. I think it's been reported that
21 there was an argument made that that particular class
22 of creditors had a different status than just general
23 unsecured, and that status should have some level
24 of recognition. I think that's about all I can say.

KEVYN ORR, VOLUME 2

1 BY MR. HACKNEY:
2 Q. Okay, you do agree that the City has classified the
3 LTGO creditors as general unsecured?
4 A. I believe that's our last classification, yes.
5 Q. Okay, and that's the same classification as the COPs
6 holders?
7 A. Yes.
8 Q. And you also agree that the LTGO bondholders are
9 financial creditors like the COPs holders?
10 A. Yes, I believe there's financial creditors as opposed
11 to pensioners, for instance, yes.
12 Q. Right, and in fact, many of them have monoline
13 insurers standing behind the bond, correct?
14 A. Yes.
15 Q. So you would agree there are a lot of similarities
16 between the COP holder and the LTGO correct?
17 A. There are a lot of perhaps superficial similarities
18 but I think the allegations that have been made
19 against the COP holders in the litigation raise other
20 dissimilarities between them.
21 Q. And you're talking about the invalidity suit?
22 A. Yes.
23 Q. Okay, and you understand that the way the plan works
24 is that the -- a reserve is set up for the COP holders

KEVYN ORR, VOLUME 2

1 that represents what their total recovery could be?
2 A. Yes.
3 Q. And that's what their total recovery could be if they
4 prevail in the invalidity suit, correct?
5 A. Yes, a reserve over a period of time as opposed to a
6 hundred-and-X-million dollars of cash, yes.
7 Q. Yeah. Well, it's actually a bunch of B notes that go
8 into the reserve.
9 A. That's what I said time, time wise, yes.
10 Q. Okay, yeah. Now, are you aware of any other basis to
11 distinguish the LTGO from the COPs other than the
12 potential invalidity of the COPs and this argument
13 that the LTGO have made that they are not an unsecured
14 creditor?
15 A. Am I aware?
16 Q. Yeah.
17 THE WITNESS: Am I aware?
18 BY MR. HACKNEY:
19 Q. Or do you have any other basis for discriminating
20 other than those two things?
21 MR. SHUMAKER: I think you can answer that.
22 A. Yes.
23 BY MR. HACKNEY:
24 Q. What is it?

Pages 346 to 349

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr Doc 7122 Filed 08/27/14 Entered 08/27/14 19:29:35 Page 59 of 60

KEVYN ORR, VOLUME 2

1
2  A.  I think that's caught up in the mediation.
3  Q.  I'm not sure how that could be.
4  A.  Well, as I think I've said, there were negotiations,
5      there were positions taken.  The awareness of what
6      those other bases could be came about typically as a
7      result of the mediation and reports provided to me out
8      of the mediation so I want to be careful about talking
9      about them, because that, I think is covered by the
10     mediation order.
11 Q.  Okay, so the two grounds that I identified, invalidity
12     and the arguable not unsecuredness of the LTGO are the
13     only two that you can publicly discuss?
14 A.  I believe so.
15 Q.  You would agree that the LTGO were not granted a lien
16     in any City property, correct?
17 A.  I would agree that I have seen no documents
18     memorializing a lien.
19 Q.  The difference between -- the difference that they
20     allege is relevant is that they are to be considered
21     quote/unquote a first budget item; isn't that correct?
22 A.  Here again, I think now we're starting to bump up
23     against the mediation.
24 Q.  So you're not able to answer that question either?
25 A.  If -- I'd be happy to validate any public statements

KEVYN ORR, VOLUME 2

1
2      that you have, but I don't think I should be the one
3      speaking to that.
4  Q.  It's the subject of a declaratory complaint and like a
5      pretty extensive motion to dismiss argument?
6  A.  Yeah, but I haven't necessarily been involved in the
7      legal aspects of that argument.  Most of my
8      information comes as a result of communications that
9      occur in the mediation.
10 Q.  Okay.  All right, so you have not followed the give
11     and take in the legal issue litigation?
12 A.  As you might imagine I have not been keeping up with
13     the over, as I understand it, almost 8,000 documents
14     filed in the bankruptcy, but I have no -- let me ask
15     answer it this way.  I have no reason to dispute the
16     allegations that are contained in the filings.
17 Q.  By whom?
18 A.  By any party, whatever their allegations are, they
19     are.
20 Q.  Other than the reasons that you've put in your own
21     filings?
22 A.  Yes, whatever -- whatever's a public record, I have no
23     reason -- in the bankruptcy case, there's no reason
24     for me to dispute that parties have taken those
25     positions, I just can't speak to it of my own

KEVYN ORR, VOLUME 2

1
2      independent knowledge once it comes as a result of the
3      mediation.
4  Q.  Understood, and you also can't say as to whether or
5      not it's been a factor in your decision?
6  A.  I -- I don't think I can other than what we've talked
7      about.
8  Q.  Mr. Orr, how did the City arrive at the calculation of
9      the size of the OPEB claim that is contained in the
10     current plan?
11 A.  As contained in the current plan?  Well, we did --
12     well, the City and our advisors in conjunction with
13     the advisors of the -- of the funds did an analysis of
14     the potential liability for retiree healthcare based
15     upon a number of factors including actuarial rates,
16     longevity, objective factors such as anticipated rates
17     of healthcare spend as published by Michigan State
18     institutions and Federal Government institutions and
19     healthcare providers, number of objective criteria as
20     calculated with the number of retirees that we have
21     and anticipate will have in the future.
22 Q.  And ultimately the ultimate number was the product
23     negotiation between the City and the retiree
24     representative parties, correct?
25 A.  Correct.

KEVYN ORR, VOLUME 2

1
2  Q.  Now, you know that in connection with the City's
3      bankruptcy petition that it stated that it had $5.7
4      billion in OPEB: do you remember that number?
5  A.  Yes, I do.
6  Q.  And do you agree that the $5.7 billion number includes
7      the present value of anticipated OPEB not only for
8      retirees but also for active employees, right?
9  A.  Active employees who will retire.
10 Q.  Right, it's sort of like it was the analog of the
11     pension UAAL --
12 A.  Right.
13 Q.  -- which is it looked not just at retirees but it also
14     looked at active employees, what their costs will be
15     when they retire?
16 A.  And yes --
17     MR. ALBERTS:  Objection to form.
18 A.  In the out-years, so for instance, someone who is an
19     active employee today but will retire in 2015 will
20     become a retiree in the out-years, yes.
21 BY MR. HACKNEY:
22 Q.  And that OPEB number was in the 5.7 billion?
23 A.  I believe so.
24 Q.  Does the City believe that its retirees have a vested
25     right to healthcare benefits?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-swr   Doc 7122   Filed 08/27/14   Entered 08/27/14 19:29:35   Page 60 of 60