# Exhibit 6A

# Excerpts of July 22, 2014 K. Orr Deposition Transcript

KE 32074430

## Page 162

KEVYN ORR, VOLUME 2
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

In Re: ) Chapter 9

CITY of DETROIT, MICHIGAN, ) Case No. 13-53846

Debtor. ) Hon. Steven Rhodes
_____

VOLUME 2

The Videotaped Deposition of KEVYN ORR,
in his personal capacity and as Rule 30(b)(6) witness,
Taken at 2 Woodward Avenue,
Detroit, Michigan,
Commencing at 9:10 a.m.,
Tuesday, July 22, 2014,
Before Leisa M. Pastor, CSR-3500, RPR, CRR.

## Page 163

KEVYN ORR, VOLUME 2

APPEARANCES:

GREGORY M. SHUMAKER, ESQ.,
DAN T. MOSS, ESQ.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
   Appearing on behalf of the Debtor.

ROBERT HERTZBERG, ESQ.
Pepper Hamilton, LLP
4000 Town Center, Suite 1800
Southfield, Michigan 48075
   Appearing on behalf of Debtor.

## Page 164

KEVYN ORR, VOLUME 2

STEPHEN C. HACKNEY, ESQ.
Kirkland & Ellis, LLP
300 North Lasalle Street
Chicago, Illinois 60654
   Appearing on behalf of Syncora.

JEFFREY BEELAERT, ESQ.
Sidley Austin, LLP
1501 K Street, N.W.
Washington, D.C. 20005
   Appearing on behalf of National Public Financing.

ERNEST J. ESSAD, JR., ESQ.
Williams, Williams, Rattner & Plunkett, P.C.
380 North Old Woodward Avenue, Suite 300
Birmingham, Michigan 48009
   Appearing on behalf of Financial Guaranty Insurance
   Company.

## Page 165

KEVYN ORR, VOLUME 2

ALFREDO R. PEREZ, ESQ.
Weil, Gotshal & Manges, LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
   Appearing on behalf of Financial Guaranty Insurance
   Company.

LISA SCHAPIRA, ESQ.
Chadbourne & Parke, LLP
30 Rockefeller Plaza
New York, New York 10112
   Appearing on behalf of Assured Guaranty Municipal
   Corporation.

Pages 162 to 165

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 7127-1  Filed 08/27/14  Entered 08/27/14 21:02:43  Page 2 of 5

Page 318

        KEVYN ORR, VOLUME 2
 1
 2  A.  Yes.
 3  Q.  And that's -- that number was negotiated between the
 4      City and the retiree parties, correct?
 5  A.  Yes.
 6  Q.  It was a -- it is a product of negotiation, correct?
 7  A.  Well, it's a product of negotiation, informed
 8      negotiation based upon existing rates in other
 9      municipalities.  For instance, I believe it's the
10      second lowest rate in the United States today; I
11      believe Washington, D.C., is only lower at 6.5
12      percent.
13  Q.  Yeah, it's -- if you rank pension funds, you're aware
14      that a 6.75 percent puts the City of Detroit like in
15      the bottom 5 percent of interest rates; isn't that
16      correct?
17  A.  Yeah, I think we're pretty low.
18  Q.  Let me go back and ask you about --
19          MR. SHUMAKER:  You all right?
20          THE WITNESS:  Yeah, I mean, it's -- keep
21      going.  Everybody else okay?  Does anybody need a
22      hygiene break?
23  BY MR. HACKNEY:
24  Q.  I'm going to hit a -- well, we -- you know what, we
25      can break whenever you guys want to.  I don't like to

Page 319

        KEVYN ORR, VOLUME 2
 1
 2      stretch you out on the rack.
 3  A.  No, no, let's keep going.  I'm good.
 4  Q.  Okay, here it is, sorry about that.
 5  A.  Okay.
 6  Q.  I'm sure you missed the nonstop cross-examination.
 7          MARKED FOR IDENTIFICATION:
 8          DEPOSITION EXHIBIT 22
 9          12:14 p.m.
10  BY MR. HACKNEY:
11  Q.  This is actually a -- this is, I think, a transcript
12      of your U of M speech?
13  A.  It's the first time I've seen it, but thank you.
14  Q.  Yep, you bet.  It's a good speech.  Take a look at
15      page 6, okay?  And look at the big paragraph at the
16      bottom where you're talking about the -- the Grand
17      Bargain.
18  A.  Mm-hmm.
19  Q.  Now --
20          MR. SHUMAKER:  Steve, is this the -- is
21      this the -- excuse me for interrupting.  Is this the
22      speech in March of 2014?
23          MR. HACKNEY:  I think that it is, but it's
24      like a real nuisance when it comes to, like, printing
25      these things out, it drops the date, and on and on and

Page 320

        KEVYN ORR, VOLUME 2
 1
 2      on, but my best recollection is that it is.
 3          MR. SHUMAKER:  Okay.
 4          MR. HACKNEY:  I apologize.  I can't get the
 5      dates on some of these things where it comes across
 6      all screwed up with banner ads and blah, blah, blah.
 7          MR. SHUMAKER:  Sure.
 8  BY MR. HACKNEY:
 9  Q.  Okay, so Mr. Orr, I want you to go to -- you're
10      talking about how much money's been devoted, okay, and
11      the foundations that are doing it?
12  A.  Yes.
13  Q.  And then you said -- do you see where it says "Some of
14      them did that as a profile in courage," do you see
15      that?  It's about the, like, fifth sentence.  "Some of
16      them" --
17  A.  Yes, I see that.
18  Q.  Okay, I'm going to read from there:
19          "Some of them did that as a profile in
20      courage.  Some of their own board members said
21      we do philanthropy, dollars that yield positive
22      outcomes.  We don't do charity, we don't just
23      give money away.  Some of them said we shouldn't
24      be doing this at all.  There's a moral hazard
25      here because after all, we were told in 2005 and

Page 321

        KEVYN ORR, VOLUME 2
 1
 2      2006 that the 1.44 billion was going to cure the
 3      pension underfunding problem, and if they'd
 4      taken that money and invested it in the Dow
 5      Jones Industrial Index or Standard & Poor's from
 6      2006 to 2009 when the stock market was trading
 7      at 8,500 to 9,000 it's now at 16,300, it would
 8      have almost doubled their money, and there'd be
 9      no pension underfunding.
10          "If they'd stopped some of the practices,
11      the 13th check, the declaration of self-funded
12      rates of return in 2009, one of the funds lost
13      27 percent, they declared a rate of return of
14      over 7 percent, 32 percent spread in one year,
15      true story, self-funding mandates.  So many
16      people are saying that there's a moral hazard
17      here, we shouldn't be doing it."
18      Do you see that?
19  A.  Yes.
20  Q.  Isn't it true that the City has conducted an analysis
21      of the requirement systems, correct, and determined
22      that practices of the retirement systems led to the
23      level of -- contributed to the level of underfunding
24      here today, correct?
25          MS. GREEN:  Object to form and foundation.

Pages 318 to 321

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7127-1   Filed 08/27/14   Entered 08/27/14 21:02:43   Page 3 of 5

## Page 322

1  KEVYN ORR, VOLUME 2
2  A. Yes, I think in part there have been reports for some
3     time over practices, in addition to analyses they've
4     done in this effort that have disclosed some of the
5     practices led to underfunding.
6  BY MR. HACKNEY:
7  Q. And these are also disclosed in the plan -- or in the
8     disclosure statement in the plan, I believe?
9  A. Yes.
10 Q. And it is a fact that the City believes that the
11    so-called 13th check contributed to the underfunding
12    of the retirement systems, correct?
13 A. Yes, there have been stories written about it in the
14    Free Press at length about the 13th check.
15 Q. And it's a fact that the City believes that the
16    annuity savings fund and how that was handled
17    contributed to the level of underfunding of the
18    retirement systems, correct?
19 A. Yes.
20 Q. And it's correct that the board of trustees self --
21    declarations of their rates of return at rates that
22    were different from the actual rates of return
23    contributed to the underfunding of the pension system,
24    correct?
25    MS. GREEN: Objection.

## Page 323

1  KEVYN ORR, VOLUME 2
2     COURT REPORTER: I'm sorry, who's
3  objecting?
4     MS. GREEN: Ms. Green for the retirement
5  systems.
6  A. Yes, I believe in particular related to the
7     alternative savings fund.
8  BY MR. HACKNEY:
9  Q. And it's also correct that the City has found that
10    pension trustees engaged in imprudent expense
11    practices; isn't that correct?
12    COURT REPORTER: I can't hear you.
13    MS. GREEN: Objection, form, foundation.
14    MR. KING: Objection, foundation.
15    MR. ALBERTS: They're the same person.
16 A. Yes, I believe that's true.
17 BY MR. HACKNEY:
18 Q. And it's also true that the retirement trusts have had
19    members of either their administration or their board
20    of trustees convicted of Federal bribery charges;
21    isn't that correct?
22 A. I don't recall the specific charge but there have been
23    people sent to prison, yes.
24 Q. And it was for conduct unbecoming in connection with
25    their job duties with the retirement trust, correct?

## Page 324

1  KEVYN ORR, VOLUME 2
2     MS. GREEN: Object to form and foundation.
3  A. Yes, I believe that's true.
4  BY MR. HACKNEY:
5  Q. So -- and I just want to make clear that the City
6     actually believes after it -- having investigated
7     these problems that these problems actually
8     contributed to the level of underfunding of the GRS
9     system, correct?
10    MS. GREEN: Same objection.
11 A. Yes.
12    MR. HACKNEY: What's the objection?
13    MS. GREEN: Objecting to form.
14    MR. HACKNEY: Right, but what's the form
15 objection?
16    MS. GREEN: It's --
17    MR. HACKNEY: It's just important questions
18 being asked, I'm going to object?
19    MR. KING: Well, foundation objection,
20 also.
21    MR. HACKNEY: Well, I asked them if they
22 conducted an investigation so...
23 BY MR. HACKNEY:
24 Q. How did that factor into your calculus of what
25    recoveries classes 10 and 11 should get versus COPs

## Page 325

1  KEVYN ORR, VOLUME 2
2  holders?
3  A. Well, I think as I said before, we've taken everything
4     into consideration, but recognizing some of the
5     behavior and difficulty, some of the leadership had to
6     be balanced against some of the lack of culpability,
7     if you will, for lack of a better word of the rank and
8     file membership. So while we were certainly aware
9     that people have been convicted, that some of the
10    practices were ill-advised over a number of years, we
11    also have to consider that for the average pensioner,
12    they have no culpability in those practices.
13 Q. Why do you say that?
14 A. The average pensioner wasn't making decisions that
15    required them to go to jail or, perhaps, wasn't as
16    informed as some of the other conduct that was
17    occurring.
18 Q. But they weren't getting the 13th checks?
19 A. Some were getting the 13th checks, but that was a
20    practice that many of them that I've talked to didn't
21    even recognize as inappropriate. They had been told
22    over a number of years that that was similar to the
23    private sector's Christmas bonus and, in fact, helped
24    some of them pay their heating bills during the
25    winter.

Pages 322 to 325

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 7127-1  Filed 08/27/14  Entered 08/27/14 21:02:43  Page 4 of 5

## Page 326

KEVYN ORR, VOLUME 2

Q. And you understand that the trustees, I think, are in large part elected to the board, right?

A. Yes.

Q. And they're elected by their pensioners, right?

A. Yes.

Q. Okay. So some of the wrongdoing was by people that had been put in position by the pensioners, right?

MR. KING: Form and foundation.

A. Sure, but, you know, by that logic, the entire United States was responsible for Richard Nixon's behavior.

BY MR. HACKNEY:

Q. Except for the ones that voted against him?

A. Maybe so.

Q. Now, the -- fair summary, that you didn't -- I guess you didn't hold these facts against the retirees when it came to making your decision of what they should recovery?

A. No.

Q. I'm correct?

A. You are correct.

Q. Now, you're aware that recoveries of the classes 10 and 11 are in part funded by the payments by the foundations and by the DIA Corp., correct?

A. Yes, I'm aware of that.

## Page 327

KEVYN ORR, VOLUME 2

Q. I asked Mr. Buckfire questions on this subject, I'll ask you, as well, but do you agree that the -- the riskiness of those contributions being made, and I'm talking about the charitable foundations and the DIA Corp., the relative riskiness that those folks won't come through on what they've said they'll do is very low?

A. Yes, I will agree with that.

Q. Okay. And these are very solvent charitable foundations that are going to be good to their word, correct?

A. Well, let me just answer this. There are three categories of contributors. There are the foundations which number over a dozen which have made a contribution of commitment of 366 million, and all of them are quite solvent, some of them are the largest charitable organizations in the world. There are a group of DIA benefactors affiliated with the founder's society which have made commitments of a hundred million dollars, and most of those a combination of institutions, foundations and individuals, at least to the best of my knowledge, appear to be good for it, and then there is the State settlement which has a total value of 350 million, and that amount of $194.8

## Page 328

KEVYN ORR, VOLUME 2

million is going to be funded in cash upon confirmation. So the risk that that total 350 value will not occur is almost nonexistent because that will be a cash contribution.

Q. You're right, the State -- the risk of the State contribution not being made will be zero if the plan is confirmed.

A. That is correct.

Q. The risk with respect to the charitable foundations and the DIA Corp that they will not come through on their contributions is very low?

A. That is correct.

Q. And if you were applying a discount rate to the charitable foundations and the DIA Corp. that took into account the time value of money and the risk that the payment wouldn't come in, you would apply a very low discount rate?

A. I don't know if you would apply a very low one, you would apply a reasonable discount rate so that you could account for the value of the money actually being there in the out-years, recognizing that given economic vagaries that in any seven- to ten-year span on average, markets go up and markets come down.

Q. Right. Okay, but have you attempted to determine --

## Page 329

KEVYN ORR, VOLUME 2

do you have an expectation of what the City's credit rating will be upon emergence?

A. I have a hope that the City's credit rating would be investment grade, but we won't know until we -- actually until we go to market.

Q. Have you taken any advice on this subject from anyone as to what they believe it will be?

A. Yes.

Q. Who?

A. Well, some of it from our financial advisors, and there are others that are -- some of it is caught up in the mediations.

MR. SHUMAKER: Mediation.

A. Yes.

BY MR. HACKNEY:

Q. Did you take advice on this subject from Mr. Buckfire?

A. Yes.

Q. And what advice did he give you?

A. Putting aside any discussions relating to the mediations, some of his advice is if we could drive the City's performance and ratios, you know, on debt to income, debt to service, other ratios, that there might be an opportunity for us to achieve certainly a higher credit rating on some issuances and some

Pages 326 to 329

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 7127-1  Filed 08/27/14  Entered 08/27/14 21:02:43  Page 5 of 5