## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |

## COPS HOLDERS' PRETRIAL MEMORANDUM OF LAW IN OPPOSITION TO CONFIRMATION OF THE SIXTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I.    Introduction................................................................................................................. 1

II.   The Plan Unfairly Discriminates Against Holders Of Class 9 COP Claims ...................... 2

    1.    The Plan Fails the Markell Test .......................................................................... 3

        A.    First and Second Elements of the Markell Test: (i) Dissenting
            Class and (ii) Same Priority ...................................................................... 4

        B.    Third Element of the Markell Test: Materially Lower Percentage
            Recovery for COPs ..................................................................................... 5

    2.    The Plan Also Fails the Four-Factor Aztec Test.................................................. 10

        A.    There Is No Reasonable Basis to Discriminate Against Class 9 .............. 11

            (i)     Active Employee Relations............................................................ 11

            (ii)    Settlement of Potential Litigation ................................................. 12

            (iii)   Creditor Expectations.................................................................... 13

            (iv)    Personal Hardship ......................................................................... 14

        B.    The City Has Not Proven That It Could Not Confirm and
            Consummate a Plan Without the Discrimination..................................... 14

        C.    The City Has Not Proposed the Discrimination in Good Faith ............... 15

        D.    The Plan Does Not Offer Class 9 Anything Remotely Approaching
            a Meaningful Recovery........................................................................... 15

III.  The Pension Claims Are Overstated ................................................................................ 15

        A.    Overstatement Due to Mistaken Use of Entry Age Normal Cost
            Methodology ............................................................................................. 15

        B.    Overstatement Due to ASF Excess Interest ............................................. 18

        C.    Overstatement Due to Use of Unconventional Rate of Return on
            Assets ........................................................................................................ 19

        D.    Use of Risk-Free Rate of Return is Not Appropriate............................... 23

IV.   Other Distributions Under The Plan Should Be Taken Into Account In Calculating
    Pension Claims Recoveries................................................................................................ 24

V.    Conclusion ....................................................................................................................... 27

KL2 2861931.1

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AFT Michigan v. State*,
303 Mich. App. 651, *appeal granted*, 495 Mich. 1002 (2014)...............................................16

*In re Armstrong World Indus.*,
348 B.R. 111 (D. Del. 2006).............................................................................................3, 8

*American United Mutual Life Ins. Co. v. City of Avon Park*,
311 U.S. 138 (1940) …………………….......................................................................... 6

*In re Aztec*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...............................................................................11

*Bd. of Trs. of Policemen/Firemen Ret. Sys. of Detroit v. City of Detroit*,
2005 Mich. App. LEXIS 1387 (Mich. Ct. App. June 2, 2005).......................................23 n.13

*In re BWP Transport, Inc.*,
462 B.R. 225 (Bankr. E.D. Mich. 2011) ...............................................................................4

*In re City of Detroit, Mich.*,
504 B.R. 97 (Bankr. E.D. Mich. 2013) ...............................................................................5

*In re Corcoran Hospital District*,
233 B.R. 449 (Bankr. E.D. Cal. 1999)...............................................................................10

*CoreStates Bank, N.A. v. United Chem. Techs., Inc.*,
202 B.R. 33 (E.D. Pa. 1996) ...............................................................................4-5

*In re DBSD N. Am., Inc.*,
634 F.3d 79 (2d Cir. 2011)...............................................................................8

*In re Dow Corning*,
244 B.R. 696 (Bankr. E.D. Mich. 1999), *aff'd in relevant part*, 255 B.R. 445
(E.D. Mich. 2000), *aff'd in part and remanded Class Five Nev. Claimants v.
Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648 (6th Cir. 2002)...................3, 4

*In re Graphic Communs., Inc.*,
200 B.R. 143 (Bankr. E.D. Mich. 1996) …………………....………………….........11, 13, 14

*In re Jersey City Medical Center*,
817 F.2d 1055 (3d Cir. 1987)...............................................................................9

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds,* 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom., Kane v. Johns-Manville Corp.,* 843 F.2d 636 (2d Cir. 1988) ...................................................................3

*In re Orawsky*,
    387 B.R. 128 (Bankr. E.D. Pa. 2008) ...................................................................8

*In re Quigley Co.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007) ...............................................................10

*In re Sentry Operating Co. of Tex., Inc.*,
    264 B.R. 850 (Bankr. S.D. Tex. 2001) .................................................................3

*In re Snyders Drug Stores, Inc.,*
    307 B.R. 889 (Bankr. N.D. Ohio 2004) ........................................................11, 14

*In re 28th Legislative District Community Dev. Corp.*,
    2011 Bankr. LEXIS 4411 (Bankr. E.D. Tenn. Nov. 9, 2011) .................................9

*UMWA 1974 Plan & Trust v. Lexington Coal Co., LLC (In re HNRC Dissolution Co.),*
    396 B.R. 461 (B.A.P. 6th Cir. 2008).................................................................17

*In re Worldcom*,
    2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003) ..................................8

**Statutes and Rules**

11 U.S.C. § 1129(b)(1) ...............................................................................2, 6

Fed. R. Bankr. P. 9019.....................................................................................7

**Other Authorities**

Bruce A. Markell, <u>A New Perspective on Unfair Discrimination in Chapter 11</u>, 72
    AM. BANKR. L. J. 227 (1998) ...........................................................................3

Mich. Const. art. IX, § 24 ................................................................................16

- iii -

The parties in interest identified in footnote 1 (collectively, the "<u>Objectors</u>"), respectfully submit this Pretrial Memorandum of Law in Opposition to Confirmation of the *Sixth Amended Plan for the Adjustment of Debts of the City of Detroit* (the "<u>Plan</u>").[1]

## I. <u>Introduction</u>

The Plan unfairly discriminates against Class 9 (COP Claims) by paying holders of Classes 10 (PFRS Pension Claims) and 11 (GRS Pension Claims) up to and even in excess of 90 percent of their claims while holders of Class 9 claims – having the same priority – are nominally receiving up to 10 percent on their claims. The Objectors have found no case in which a court has confirmed a plan over the objection of a claimant facing such gross and unfair discrimination.

On the face of the Disclosure Statement, Pension Classes 10 and 11 would respectively recover 59 and 60 percent on their Claims, while holders of COPs would nominally recover just 0 to 10 percent. The City recognizes that discrimination of this magnitude – over 50 percent – is legally barred. Consolidated Reply (the "<u>Reply</u>") 51,56, ECF No. 5034 ("generally, greater than a 50% differential" is "clearly 'grossly disparate.'"). Although on the basis of these figures alone the Plan should not be confirmed, the Plan numbers are not the end of the story. Discovery has established that the disparity in treatment is substantially greater than set out in the Disclosure Statement. Among other things, the size of the Pension Claims has been materially

---

[1] The parties in interest submitting this Supplemental Objection are Dexia Crédit Local and Dexia Holdings, Inc., Panning Capital Management, LP, on behalf of funds and accounts managed by it, Monarch Alternative Capital LP, on behalf of funds and accounts managed by it, Bronze Gable, L.L.C., Aurelius Capital Management, LP, on behalf of its managed entities, Stone Lion Capital Partners L.P., on behalf of funds and accounts managed by it, BlueMountain Capital Management, LLC, on behalf of funds and accounts managed by it, and Deutsche Bank AG, London.

Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan. All references to "Section" are to the Bankruptcy Code, 11 U.S.C. §§ 101 - 1532.

*overstated* by the City – and thus the Disclosure Statement *understates* percentage recoveries for the holders of Pension Claims as well as the unequal treatment of Class 9.

The size of Pension Claims is overstated principally because the City's calculation of those Claims:

- improperly includes benefits that were not accrued or vested as of the Petition Date and thus should not be part of the Pension Claims;

- assumes a rate of return for the pension assets that is unconventionally and artificially low, thereby increasing the size of the Pensions Claims; and

- improperly includes claims related to the Annuity Savings Fund ("ASF") – which the City has effectively admitted should not be part of the Pension Claims.

Recoveries for the holders of Pension Claims are understated because they:

- exclude property distributed to the Income Stabilization Fund; and

- exclude pension restoration payments for investment income amounts greater than 6.75 percent.

Finally, and as set forth in the report of Steven Spencer, the expert for the Financial Guaranty Insurance Company ("FGIC"), the Disclosure Statement materially overstates the recovery of holders of COP Claims because the true value of the New B-Notes is substantially less than what the City purports it to be.

The severe discrimination proposed in the Plan is unprecedented and unfair – and legally impermissible under the Bankruptcy Code.

## II.    The Plan Unfairly Discriminates Against Holders Of Class 9 COP Claims

Section 901(a) incorporates into Chapter 9 cases the requirement that a plan of adjustment comply with Section 1129(b), *i.e.*, the cram-down provision. Section 1129(b)(1) provides that a plan may not "unfairly discriminate" against a class of dissenting claimants. "Generally speaking, this standard ensures that a dissenting class will receive relative value equal

13-53846-tjt    Doc 7128    Filed 08/27/14    Entered 08/27/14 21:24:22    Page 6 of 32

to the value given to all other similarly situated classes. . . . Thus a plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes." *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (citations omitted), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom., Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988). The burden is on the City to prove that the Plan does not discriminate unfairly. *In re Armstrong World Indus. Inc.,* 348 B.R. 111, 122 (D. Del. 2006); *In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 853 (Bankr. S.D. Tex. 2001).

### 1. The Plan Fails the Markell Test

This district as well as many others have adopted the rebuttable presumption test first proposed by Professor Markell in the American Bankruptcy Law Journal (the "Markell Test"). Although the City contends that the Markell Test has been criticized (Reply 52), the City has failed to cite any case from this district criticizing Markell. As such, the Markell Test should be applied here.[2]

Under the Markell Test, a rebuttable presumption of unfair discrimination exists if under the plan of adjustment there is: (i) a dissenting class, (ii) another class of the same priority, and (iii) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class, or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution. *In re Dow Corning*, 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999) (citation omitted), *aff'd in relevant part*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd in part and remanded sub nom., Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d

---

[2] Bruce A. Markell, <u>A New Perspective on Unfair Discrimination in Chapter 11</u>, 72 AM. BANKR. L. J. 227 (1998).

648 (6th Cir. 2002). The level of discrimination between Class 9 on the one hand and Classes 10 and 11 on the other meets this test.

### A. First and Second Elements of the Markell Test: (i) Dissenting Class and (ii) Same Priority

There is no dispute between the City and the Objectors that the first two elements of the Markell Test have been met: (i) Class 9 is a dissenting class, and (ii) Class 9 as well as Classes 10 and 11 are all unsecured.[3]

In its Memorandum of Law in Support of Confirmation dated August 4, 2014, the Official Committee of Retirees' ("Retiree Committee") asserts that COP Claims and Pension Claims are not similarly situated for purposes of the Markell Test because "[s]tructurally, the claims of the COPs holders are not indebtedness of the City or direct claims against the City." Retiree Committee Memorandum of Law in Support of Confirmation 30, ECF No. 6508. The COPs' contractual structure, however, is irrelevant for purposes of the Markell Test. The second prong simply requires "another class of the same priority". *In re Dow Corning Corp*. 244 B.R. at 702. Similarly, whether the COP Claims are subject to dispute is also irrelevant to this prong of the Markell Test analysis.[4]

This straightforward application of the Markell Test is illustrated by a case cited by the Retiree Committee, *In re BWP Transport, Inc.*, 462 B.R. 225, 231 (Bankr. E.D. Mich. 2011), which found that even though different secured claim classes had distinct structures, different collateral and separate plan classifications, for purposes of analyzing unfair discrimination all categories of (secured) classes were to be considered to have the same priority. As stated by the court in *CoreStates Bank, N.A. v. United Chem. Techs. Inc.*, 202 B.R. 33, 47 (E.D. Pa. 1996),

---

[3] Class 9 voted 100 percent against the Plan. Decl. of Michael J. Paque ¶ 26, July 21, 2014, ECF No. 6179.

[4] *See also* Corrected Brief of Detroit Retirement Systems 20-21, EFC No. 6520.

"after reviewing legislative history, recognized authorities, and helpful, albeit few, cases on the subject that the comparison called for by the unfair discrimination provision of § 1129(b)(1) relates to the category of similarly situated claimants and not to the *class* of similarly situated claimants.… The appropriate inquiry focuses on discrimination among categories of creditors who hold similar legal claims against the debtor, i.e. "Administrative Claims," "Secured Claims," "Priority Claims," etc.").

Here, the Plan provides that Class 9 as well as Classes 10 and 11 are unsecured. Moreover, the Court has already ruled in its eligibility decision that pension obligations are unsecured contractual obligations not entitled to enhanced legal protections. *See In re City of Detroit, Mich.*, 504 B.R. 97, 153-54 (Bankr. E.D. Mich. 2013). Equally critical, outside of a Chapter 9 bankruptcy proceeding both the holders of the COP Claims and the Retirement Systems would have the same enforcement rights against the City. Both can obtain judgments and can place them on the tax rolls with equal priority. Accordingly, the first and second elements of the Markell Test are met.[5]

### B.     Third Element of the Markell Test: Materially Lower Percentage Recovery for COPs

With respect to the third element of the Markell Test, the parties agree that a differential percentage recovery of approximately 50 percent should be considered "material." However, the real disparity in treatment between Class 9 and Classes 10 and 11 exceeds 50 percent by a wide margin. As discussed in Sections III and IV below, the actual differential is over 90 percent.[6]

---

[5] The identical rights of the holders of the COP Claims and the Pension Systems are discussed at length by FGIC in its Pretrial Brief in Support of Objection to Plan for the Adjustment of Debts of the City of Detroit, ECF No. 7102 ("FGIC Pretrial Brief").

[6] Reply 56 (stating that "case law seems to revolve around the 50% differential mark. That is, where the difference in recovery is 50% or more, courts tend to find the treatment to be 'grossly disparate,' such that it becomes increasingly difficult for the plan proponent to demonstrate that the discrimination is 'fair.'") (citations omitted). While differential treatment of 50 percent should be sufficient to establish a presumption of unfair treatment, there

Although the City did not so assert in the Plan, in measuring the extent of discrimination the City argues in its Reply that funds received from third parties – the DIA Funding Parties and the State of Michigan – should be excluded from the Court's analysis. According to the City, these payments are "outside the Plan" in that they are not being made with City funds on account of claims against the City. Reply 30. The City also asserts that these parties would not have contributed funds to the Plan unless those funds were directed to the Pension Claims.

The City's argument is undone by the plain language of § 1129(b)(1). That provision provides that a cram-down plan shall be confirmed as long as "the **plan** does not discriminate unfairly" with respect to each impaired class. 11 U.S.C. § 1129(b)(1) (emphasis added). Section 1129(b)(1) specifically focuses on the *plan's* treatment of an impaired non-consenting class rather than the *debtor's* treatment of that class. It is thus of no moment whether distributions to a particular class originated from a third party or whether those contributions were conditioned on the third party's direction that the contributions be made solely to specific classes. All distributions to a class contemplated under a plan should be and are included in the Court's unfair discrimination analysis. And the City's Plan and Disclosure Statement make clear that payments by the DIA Funding Parties and the State are proposed to be made pursuant to the Plan. *See American United Mutual Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 147 (1940) (noting in the context of Chapter IX of the Bankruptcy Act that with respect to "the question of unfair discrimination … a composition would not be confirmed where one creditor was obtaining some special favor or inducement not accorded the others, whether that consideration moved from the debtor or from another") (citations omitted).

---

are numerous examples of courts that have found unfair discrimination on differentials much lower. *See* COPs Holders' Objection to Confirmation of the Fourth Amended Plan 9-10, ECF No. 4653 (collecting cases).

This reading of Section 1129(b)(1) accords with the Court's observation that "the issue of unfair discrimination is based upon not where money comes from but where money goes." Hr'g Tr. 40:3-5 July 26, 2014.

In assessing the Plan's unfair treatment of Class 9, the DIA Settlement and the State Contribution cannot be wished away. The City seeks approval of the DIA Settlement under the Plan pursuant to Rule 9019 and the contribution is therefore contingent upon Plan approval. The City even characterizes the DIA Settlement as a "cornerstone of the Plan" and "an essential component of the Plan." Reply 16, 21. Beyond that, the DIA Settlement is dependent on the use of the City's assets – the DIA artwork – and the proceeds of these estate assets are being utilized to pay the Pension Claims. Deeming these payments "outside of the plan" would improperly allow the City to hide behind the structure of the DIA Settlement to justify discriminating against the Class 9-COPs, using City assets solely to benefit one group of creditors at the expense of another. The DIA Proceeds need to be factored into the discrimination calculation because they are funds to be received in exchange for City assets.[7]

Similarly, the State Contribution is contingent upon Plan acceptance by the PFRS and GRS classes and the entry of a confirmation order meeting certain standards and conditions, including "[a]pproval of, and authority for the City to enter into, the DIA Settlement." Plan, Ex. I.A.318 (State Contribution Agreement) at 5. These transactions are clearly linked and comprise essential elements of the "Grand Bargain" and the Plan. Importantly, the State is receiving creditor and estate releases under the Plan in exchange for its contributions. This proviso inextricably links the State Contribution to the Plan. Without the Plan, PFRS and GRS would

---

[7] "The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the DIA Settlement pursuant to Bankruptcy Rule 9019." Plan 55.

not receive the State Contribution and the State would not receive releases. It is thus clear that the State Contribution is not "outside of a plan" as the City has mistakenly asserted.

In support of its position, the City misplaces reliance on *In re Worldcom*, 2003 Bankr. LEXIS 1401 (Bankr. S.D.N.Y. Oct. 31, 2003), and *In re Orawsky*, 387 B.R. 128 (Bankr. E.D. Pa. 2008). In *Worldcom*, the Bankruptcy Court for the Southern District of New York found that a gift between classes of creditors was not unfair discrimination because the enhanced recoveries did not result from the debtors' distribution of estate property to such creditors. *Worldcom*, 2003 Bankr. LEXIS, at *178. Here, the Plan does not contemplate gifts between classes – neither the State nor the DIA Foundations are in a class – and the third-party distributions are being provided under the Plan *in exchange for plan releases* that enure to the benefit of those third parties. Making *Worldcom* even less relevant, subsequent cases have limited the ability of parties to gift under a plan as violating the absolute priority rule notwithstanding that a third-party is voluntarily making the distribution in question. *See*, *e.g.*, *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 514 (3d Cir. 2005) (finding that the plan, which involved a transfer of bankruptcy proceeds from an unsecured creditor class to holders of equity interests over the objections of a co-equal class of unsecured creditors, violated Section 1129(b) and rejecting the "unconditional proposition that creditors are generally free to do whatever they wish with the bankruptcy proceeds they receive"); *In re DBSD N. Am., Inc.*, 634 F.3d 79, 95 (2d Cir. 2011) (invalidating plan in which a senior creditor agreed to "gift" residual value to shareholders over the objection of other creditors).

Equally irrelevant is *Orawsky*, a Chapter 13 case that analyzed a completely different section of the Bankruptcy Code, Section 1322(b)(1). In that case, the Bankruptcy Court permitted the debtor to pay more to its student loan creditors (on account of non-dischargeable

debts) than to its other unsecured creditors.  Notably, the funds in question were not required to be paid under the chapter 13 plan based on a calculation of the debtor's projected disposable income – a calculation specific to Chapter 13 and inapplicable to the current context.  *Orawsky* does not bear on our case.

The cases relied on by the Retiree Committee (Retiree Committee Memorandum 41) are similarly distinguishable.

In *In re 28th Legislative District Community Development Corporation*, 2011 Bankr. LEXIS 4411 at *32-34 (Bankr. E.D. Tenn. Nov. 9, 2011), part of the debtor's business involved using restricted grant funds that could be utilized only for certain approved projects.  Since the grant proceeds were restricted, the Court did not find unfair discrimination in paying project creditors enhanced recoveries with restricted funds.  The Court did not, however, discuss the level of discrimination that resulted from the enhanced recoveries, nor did the grantor receive releases in exchange for the funds that debtor's plan provided in exchange for paying those project creditors.

In *In re Jersey City Medical Center*, 817 F.2d 1055 (3d Cir. 1987), the plan provided dissenting classes of creditors 30 percent of their claims, but paid employed physicians 100 percent of their claims for malpractice indemnity.  The unfair discrimination challenge was brought only by a member of an accepting class and the Third Circuit Court of Appeals therefore never reached the issue.  *Id*. at 1061.  In any event, the preferred treatment of physicians appears to be nothing more than an assumption of a prepetition indemnity contract for current officers and employees, which is commonplace in bankruptcy cases.[8]

---

[8] One of the dissenting classes appeared actually to be receiving payment in full and the other dissenting class had in it a disputed claim whose ballot probably should not have been counted.

*In re Corcoran Hospital District*, 233 B.R. 449 (Bankr. E.D. Cal. 1999), confirmed a plan which paid 10 percent to one single-creditor class, 50 percent over eight years to a second single-creditor class, and 50 percent over 15 years to unsecured creditors generally, provided that general unsecured creditors could not receive more than 20 percent of their 50 percent under certain conditions. *Corcoran*'s rationale does not apply to Detroit. *Corcoran*'s preferred classes obtained what appeared to be superior recoveries only because both had settled litigations which could have rendered the first class effectively secured (through recoupment) and which could have resulted in much higher allowed claims for the second class. The preferential treatment of a creditor there was justified by that creditor's voluntary reduction of its claim by approximately 74 percent. *Id.* at 455, 457. Here, the Pension Claim amounts do not reflect significant compromises. In fact, as discussed below, given the inflated claim amounts, artificially low discount rates and the restoration features, Pension Claims are being paid in full or almost in full. And in any event, the level of discrimination in our case far exceeds that in *Corcoran*.[9]

Finally, in *In re Quigley Co.*, 377 B.R. 110 (Bankr. S.D.N.Y. 2007), the language quoted by the Retiree Committee pertained to a discussion of Section 1123(a)(4) and unequal treatment within a class, not unfair discrimination between classes under Section 1129(b).

Against this backdrop, the City cannot satisfy the Markell Test.

## 2.    The Plan Also Fails the Four-Factor *Aztec* Test

While the Markell Test is the proper test for unfair discrimination in the Eastern District of Michigan, the Plan's treatment of the COP Claims also fails the *Aztec* test.

In assessing discrimination under *Aztec*, the following factors are to be considered: (i) whether the discrimination is supported by a reasonable basis; (ii) whether the debtor can

---

[9] Additionally, as noted by FGIC in its Pretrial Brief, individual retirees may continue to object to the Plan on the basis that the Plan impairs their pension benefits. In fact, certain retiree objectors have done so.

confirm and consummate a plan without the discrimination; (iii) whether the discrimination is proposed in good faith; and (iv) the treatment of the classes discriminated against. *In re Aztec Co.*, 107 B.R. 585, 590 (Bankr. M.D. Tenn. 1989), *see also In re Graphic Communs., Inc.*, 200 B.R. 143, 148 (Bankr. E.D. Mich. 1996). The burden is on the plan proponent to provide evidence of why the discrimination is reasonable and necessary to consummate the plan. *See Snyders Drug Stores, Inc.*, 307 B.R. 889, 892 (Bankr. N.D. Ohio 2004). As set forth in greater detail in the FGIC Pretrial Brief and addressed briefly here, the City has failed to meet its burden under *Aztec*.

### A.     There Is No Reasonable Basis to Discriminate Against Class 9

In its Reply, the City cites four grounds purportedly supporting discrimination against holders of COPs: (i) the Plan's treatment of Pension Claims minimizes the impact on the treatment of Active Employees, who are vital to the City's recovery; (ii) the Plan's treatment of Pension Claims is the result of settlements, and creditors that settle may receive more favorable treatment than non-settling creditors; (iii) the Plan's discriminatory treatment is justified because the purchasers of COPs were in a better position than pensioners to know of the City's financial condition and risks involved; and (iv) pensioners will endure personal hardship if the Plan further impairs their pension benefits. Reply 36-46. Given the huge and unprecedented disparity in treatment of Class 9, none of the City's justifications can be considered "reasonable."

### (i)     Active Employee Relations

Chief among the City's justifications is the claim that discrimination is necessary to minimize the adverse impact of the Plan on Active Employees. Reply 37-40. This assertion does not hold up to scrutiny. According to the City, only 27.5 percent of Pension Claim holders are Active Employees who are continuing to provide services for the City. Disclosure Statement

11. Moreover, there is no evidence (i) that these Active Employees would strike, quit or take any other type of detrimental action absent the grossly disparate discrimination, or (ii) that treating Pension Claims *pari passu* with other unsecured claims would diminish the Active Employees' motivation and cooperation. To the contrary, Michael Hall, the City's Director of Labor Relations and Interim Director Human Relations, testified that the proposed reduced cuts to accrued pension benefits have had no impact on employee morale, productivity, attrition or the City's ability to hire new employees. Hall Dep. Tr. 160:5-18. Furthermore, Active Employees have sufficient justification to continue working for the City because, with respect to service on or after July 1, 2014, Active Employees will receive pension benefits under the New PFRS Active Pension Plan and the New GRS Active Pension Plan. When the Active Employees and future employees retire, their pension benefits will be governed by these new hybrid pension plans. Under these circumstances, it is the strength of the City's new hybrid pension plans that will motivate the Active Employees to continue working for the City – not the Plan's treatment of accrued Pension Claims.

As for retirees and their impact on the City going forward, the evidence shows that nearly two-thirds live outside Detroit. Fornia Report 3.

### (ii) Settlement of Potential Litigation

The City contends that settlements with the Retiree Committee, the Retirement Systems and certain unions and retiree associations with respect to the treatment of holders of Pension Claims justify discriminating against COPs holders. The City primarily relies on *Corcoran* for this proposition. As demonstrated above, *Corcoran* is of no help to the City because in that case the preferential recovery was justified by the preferred creditor's voluntary agreement to reduce its valid setoff claim by approximately 74 percent. Here, the purported settlement with the

retiree constituencies provide little benefit to the City other than avoiding some potential appellate-level litigation, which the Emergency Manager has already indicated was not a factor considered by the City in determining the treatment of the Pension Claims. *See* Orr Dep. Tr. 262:11; 18-25; 263:2-8. Accordingly, the purported settlement agreements do not come close to the level of benefit under *Corcoran* to justify the discriminatory treatment of Class 9.

### (iii) Creditor Expectations

According to the City, the holders of COPs were "financial institutions with the sophistication and experience necessary to appreciate the risks they were taking when they invested in or loaned money to the City," while the pensioners "were not in the same position to know of the debtor's financial condition and the risks involved." Reply 45 (citation omitted). The City bottoms its argument on the expectations of pensioners while disregarding the expectations of COPs holders. By entering into unsecured contractual relationships with the City, holders of both Pension Claims *and* COP Claims have the same legal rights and remedies – and should be treated the same. Additionally, the City's argument assumes that the City's financial and operational issues were more evident to the COPs holders than they were to the City's own employees – an assumption for which there is no evidence. In short, it would be unreasonable to discriminate against holders of COP Claims on the supposed ground that holders of Pension Claims may not have recognized that their claims could be impaired along with other unsecured creditors. Moreover, discrimination "cannot be justified on the basis of the origin of the claim." *In re Graphic Communs., Inc.*, 200 B.R. at 148 (finding that the plan was discriminatory where defendant proposed to pay only ten percent of plaintiff's claim while paying other creditors 100 percent). That holders of COPs may be financial institutions does not justify the disparate treatment compared to Classes 10 (PFRS Pension Claims) and 11 (GRS

Pension Claims) – and doubly so, in light of the fact that the COPs transaction was designed to and did fund the City's pension obligations.

### (iv)     Personal Hardship

Finally, the City contends that the personal hardship of the individual holders of Pension Claims was reason enough for the discriminatory treatment.  The Court has already ruled that the personal hardship of individual pensioners is irrelevant to an unfair discrimination analysis.  Hr'g Tr. at 104:13-19 June 26, 2014; *see also* Hr'g Tr. 81:9-15 Aug. 8, 2014.

### B.     The City Has Not Proven That It Could Not Confirm and Consummate a Plan Without the Discrimination

The City has not established why the Plan cannot provide for less discriminatory treatment of Class 9.   The City offers no evidence that without providing holders of Pension Claims nine times (or more) than Class 9, holders of Pension Claims would not have supported the Plan.  Since the negotiations with the retiree constituencies remain confidential, the City expects creditors and this Court to accept, without evidence, that it would be a practical impossibility to confirm a plan without such discrimination.  Contrary to the City's belief, the plan proponent must provide evidence that the plan cannot be confirmed absent such discrimination – and the City offers none.  *See In re Graphic Communs., Inc.*, 200 B.R. at 148 (finding unfair discrimination when, among other things, the debtor failed to justify why its plan could not provide for more equal treatment of the dissenting classes); *see also In re Snyders Drug Stores*, 307 B.R. at 895 (holding that the record did not substantiate the assertion that creditors would not have agreed to the deal absent the proposed discriminatory treatment).

C.     **The City Has Not Proposed the Discrimination in Good Faith**

As set forth in greater detail in the FGIC Pretrial Brief, the City's failure to articulate a rational or legitimate basis for or the necessity of the discrimination against Class 9 suggests that the discrimination was not proposed in good faith.

D.     **The Plan Does Not Offer Class 9 Anything Remotely Approaching a Meaningful Recovery**

The treatment of Class 9 cannot be considered a "meaningful recovery." Holders of COP Claims are nominally slated to recover 0-10 percent without any opportunity for enhanced recoveries should the City out-perform its current financial projections. That contrasts sharply with the treatment of Classes 10 and 11, who on the face of the Plan stand to recover a differential well in excess of 50 percent more than Class 9.

*     *     *

We now go on to show that because the Plan overstates the size of the Pension Claims, the disparate treatment of Class 9 is even greater than the already illegal 50 percent differential set out in the Plan and Disclosure Statement.

III.     **The Pension Claims Are Overstated**

A.     **Overstatement Due to Mistaken Use of Entry Age Normal Cost Methodology**

The Plan provides that PFRS Pension Claims are allowed at $1.250 billion and that GRS Pension Claims are allowed at $1.879 billion, or a combined total of $3.129 billion. Plan §§ II.B.3.q.i and II.B.3.r.i. As acknowledged by the City's Actuary, Glenn Bowen of Milliman & Co. ("Milliman"), the size of the City's Pension Claims is predicated on an actuarial calculation: Milliman determined the unfunded actuarially accrued liability ("UAAL") of the pension systems utilizing the Entry Age Normal Cost Method ("EAN"). (Bowen Dep. Tr. 200).

That calculation, employed a flawed methodology and does not fit the facts presented in this case.

While the EAN method is accepted for valuing *ongoing* municipal pension system liabilities, EAN is not an acceptable method to calculate the bankruptcy claim for beneficiaries of a pension plan which, like the pension plans at issue here, could legally be frozen. That is because the EAN method does not measure benefits **accrued and vested** as of a certain date such as the Petition Date. Instead, the EAN method considers the actuarial present value of each participant's ***projected*** benefits under a continuing plan between that participant's entry age into the fund and his or her assumed exit age, and levels the liability over an employee's career so that benefits accrue proportionally, year-by-year.[10]

As the City's actuary has acknowledged, there is no dispute that the EAN cost method takes into account and includes the following unearned, non-vested benefits:

- active members' future services which have not yet been performed;
- future salary increases; and
- benefits for employees who have not yet met the vesting requirements.

(Bowen Dep. Tr. 49-51, 164).

Including these non-vested, non-accrued benefits in the calculation of the Pension Claims is legally barred. The Michigan Constitution protects only "<u>accrued</u> financial benefits." Mich. Const. art. IX, § 24 (emphasis added); *see AFT Michigan v. State*, 303 Mich. App. 651, 665 ("§ 24 [of the Mich. Const.] protects only those pension benefits that have already accrued, not future benefits") *appeal granted*, 495 Mich. 1002 (2014). Claims for unearned and non-vested

---

[10] The annual amount is typically referenced as the "normal cost." Because a pensioner becomes entitled to increasing benefits later in his/her career due to future salary and service increases, the normal cost attributable to a participant during the early years of a career will contain a disproportionally larger amount of future, unearned benefits rather than accrued, vested benefits. Accordingly, when a plan is frozen, the EAN method will significantly overstate the benefit liability during most points in time because of the higher "normal cost" developed during a participant's early years. *See* Expert Report of Stephen H. Rosen 18-19.

benefits cannot be allowed under the Plan because the Michigan Constitution does not protect benefits that have not yet accrued. The Emergency Manager could have eliminated these rights without resorting to Chapter 9.

As set forth in the Expert Reports of Steven Rosen (the "Rosen Report") and William B. Fornia (the "Fornia Report"), the proper calculation of a claim as of a point in time should be the unfunded present value of vested accrued benefits ("UPVVAB"). Rosen Report 7; Fornia Report 7. Similar point-in-time pension liability determinations have been utilized in bankruptcy claim analysis contexts. *See UMWA 1974 Plan & Trust v. Lexington Coal Co., LLC (In re HNRC Dissolution Co.)*, 396 B.R. 461, 465-66 (B.A.P. 6th Cir. 2008) (noting that "[u]nfunded vested benefits … are defined under [ERISA] as the difference between the present value of vested benefits and the current value of the plan's assets"). The City's own actuary has effectively acknowledged this point. (Bowen Dep. Tr. 53-57).

Further highlighting the folly of the City's approach, if claims for future unearned benefits were allowed to be included in the calculation of the Pension Claims, the calculation would need to take into account those benefits that are being satisfied by the New GRS Active Pension Plan and the New PFRS Active Pension Plan (together, the "New Active Pension Plans") in the amounts established under the New GRS and PFRS Active Pension Plan Formulas. While the Objectors believe that the appropriate approach is to base Plan recovery calculations only on benefits accrued to date and the contributions made to satisfy those claims, if the Court were to adopt the EAN method calculations posited by the City and the Retiree Committee, then the values attributable to the New Active Pension Plans should likewise be considered in assessing the recovery by those classes. The Plan fails to provide for such an adjustment in the calculation of the Pension Claims.

As set forth in the Fornia Report, if non-vested benefits are removed from the pension claim calculations – such as the benefits based on future services or salary growth and benefits for those who have not met vesting requirements – the UPVVAB would be $2.775 billion, or $354 million **less** than the City's calculation of the Pension Claims.  This increases the real recovery percentages for GRS from 60 percent to **66 percent** and for PFRS from 59 percent to **68 percent**.

### B.    Overstatement Due to ASF Excess Interest

The City's Pension Claim for GRS also includes the value of benefits predicated on excess interest from the ASF.  Yet the City has stated that it believes that "the $387 million [of excess interest] represents money that was diverted from the general GRS asset pool during this period. . . ."  Fourth Amended Disclosure Statement 24, ECF No. 4391.  During discovery the City's actuary acknowledged that ASF in the amount of $387 million was part of the City's calculation of the GRS Pension Claim (Bowen Dep. Tr. 201-02), but the City has effectively acknowledged that it should not have been.  Fourth Amended Disclosure Statement 24, ECF No. 4391.  (*See also* Bowen Tr. 204-05).  When this $387 million is excluded from the GRS Pension Claim amount (coupled with the removal of the non-vested benefits as described above) the recovery percentage for GRS increases to **85 percent**.

The following table summarizes the impact of removing non-vested benefits and the ASF excess interest from the Pension Claim calculation:

| Scenario | Claim amounts ($millions) | | | Recovery Percentages | | |
|---|---|---|---|---|---|---|
| | **GRS** | **PFRS** | **Total** | **GRS** | **PFRS** | **Combined** |
| **City Plan – EAN Method** | $1,879 | $1,250 | $3,129 | 60% | 59% | 59% |
| **Excluding future service, future pay, and non-vested employees** | $1,698 | $1,077 | $2,775 | 66% | 68% | 67% |
| **Also excluding ASF** | $1,311 | $1,077 | $2,388 | 85% | 68% | 78% |

C.     <u>Overstatement Due to Use of Unconventional Rate of Return on Assets</u>

The Plan's overstatement of the size of the Pension Claims is further exacerbated by the City's use of an unconventionally low rate of return on assets of 6.75 percent. The assumed rate of return is one of the primary drivers of the calculation of a pension fund's liabilities, providing a discount of the estimated future benefit payments. In the context of determining the UAAL of a public pension plan, the actuarial standard is to use the pension plan's expected rate of return as the discount rate. *See* Fornia Report 2; Rosen Report 15. Using an artificially lower rate of return increases the amount of unfunded liability – and the size of the Pension Claim – and thus distorts recovery percentages.

The disparity between calculating pension liabilities based on the City's artificially low 6.75 percent rate of return instead of more conventional rates used either by the actuaries for the two retirement systems, Gabriel Roeder Smith & Company ("<u>Gabriel Roeder</u>"), or by the current actuaries for the City, Milliman, increases total unfunded liability and corollary claim amounts by as much as $800 million**.**

As more fully addressed in the Fornia Report, the City's assumed 6.75 percent rate of return is:

- materially below the rate used by the vast majority of state and municipal pension systems with asset distributions similar to those of GRS and PFRS. Only four (4) of 126 public pension funds surveyed in the Public

Fund Survey, a well-recognized survey of public pension funds, use a rate that low;

- 45 basis points (0.45 percent) below the 7.2 percent rate recommended by Milliman;

- below the rates for all large public pension funds included in the Public Fund Survey for which Milliman is the actuary;

- more than 100 basis points below that used by Gabriel Roeder; and

- more than 75 basis points below the average return for GRS and PFRS over the past 25 years.

The City's rationale for using this rate illustrates why it is lower than that conventionally used by most similar plans:

- the rate is based on an unconventionally low 2.50 percent assumed inflation rate (Report of Alan Perry (the "Perry Report") 5), .5 percent lower than the median of 3.0 percent used by large public pension funds. If the City had used a standard 3 percent inflation rate, the assumed return rate would increase to about 7.25 percent. (Bowen Dep. Tr. 212); and

- the support for the rate is based on a novel assumption that incorporates an "expectation of rising interest rates over the next five years. … [which] depress the returns on fixed income…." Perry Report 8. This assumption is inconsistent with the unconventionally low inflation rate used by the City.

*See* Fornia Report 10-11.

As noted above, based on the current distribution of plan assets in the GRS and PFRS, Milliman recommended a 7.2 percent rate of return for both Pension Funds. Milliman Letters Re: Recommended Investment Return Assumption as of June 30, 2013 for GRS and PFRS 4, November 4, 2013 [Exhibits 495 and 496]. However, the City is instead using a rate 45 basis points below the recommendation of its own actuary. Milliman specifically noted that "[o]ur understanding is that the City-specified investment return assumption of 6.75% is not reflective

of expected returns for the current portfolio" held by both GRS and PFRS. [Exhibits 1033 and 1034].

Historically, the average rates of return for GRS and PFRS have been consistent with their assumed rates of returns. Over the past 25 years, GRS' average rate of return was 7.5 percent, very close to the average assumed rate of return for the same period (7.52 percent). PFRS has had returns similar to those of GRS. Fornia Report 13. Though past average returns are not determinative for developing an actuarially assumed rate of return, they do demonstrate that long run returns have been comparable to the long run assumptions.

Additionally, the expected rate of return is affected by assumed inflation rates. Milliman assumed inflation rates that were unconventionally low – 2.50 percent – as compared with other large public pension funds, even by Milliman's own standards for other funds for which it serves as actuary. The Public Fund Survey [Exhibit 1040] reports that the median inflation rate used by large plans is 3 percent, and only seven of the 126 large plans use an inflation rate as low as 2.5 percent. Fornia Report 11. If Milliman had used 3 percent instead of 2.5 percent, its recommendation would have resulted in an investment return rate of about 7.7 percent rather than 7.2 percent. Perry Dep. Tr. 212:6-12.

In a significant admission, the City's own pension expert has acknowledged that the 6.75 percent rate of return used to calculate the size of the Pension Claims and the 2.5 percent inflation rate Milliman used are outliers, out of the mainstream, and not consistent with industry practice. (Perry Dep. Tr. 207-209, 236-238). And even the Retiree Committee has acknowledged that the 6.75 percent rate "is not based on historical practice of the Retirement System or the public pension plan practice generally." (Retiree Committee Memorandum 37).

The importance of selecting a proper rate of return is established by the following table, contained in Mr. Fornia's expert report:

| Scenario | Claim amounts ($millions) | | | Recovery Percentages | | |
|---|---|---|---|---|---|---|
| | GRS | PFRS | Total | GRS | PFRS | Combined |
| **Plan of Adjustment – Entry Age Actuarial Method – 6.75%** | $1,879 | $1,250 | $3,129 | 60% | 59% | 59% |
| **Excluding non-vested benefits (future service and salary, non-vested members and ASF excess interest) – 6.75%** | $1,311 | $1,077 | $2,338 | 85% | 68% | 78% |
| **Excluding non-vested benefits – 7.20% (Milliman initial recommended assumption)** | $1,164 | $861 | $2,025 | 96% | 85% | 92% |
| **Excluding non-vested benefits – 7.50% (conservative mainstream assumption)** | $1,073 | $735 | $1,808 | 104% | 100% | 103% |
| **Excluding non-vested benefits – 7.90% and 8.0% current plan assumption** | $957 | $571 | $1,528 | 117%[11] | 129% | 121% |

The table demonstrates that recovery percentages are nearly 100 percent if the City were to utilize the Milliman-recommended investment return rate of 7.2 percent – a conservative return rate even lower than most public pension plans utilize. This proximity to 100 percent occurs because if the City contributes to the Pension Plans based on a 6.75 percent rate of return and the Pension Plans actually earn 7.20 percent on its assets, the Plans would be overfunded – and as demonstrated below, in that instance additional benefits will be conferred to pension

---

[11] This number has been changed from the Fornia Report to correct a typographical error identified during Mr. Fornia's deposition. Fornia Dep. Tr. 157:16-158:7, August 5, 2014.

participants under the restoration provisions in the Plan.  If the City had developed its Plan using more mainstream actuarial assumptions, the contribution requirements would have been lower.

### D.  Use of Risk-Free Rate of Return Is Not Appropriate

In her expert report, Kim Nicholl on behalf of the Retiree Committee opines that the "actual" value of the Pension Claims should be calculated using a "risk-free" discount rate in a range between .10 percent to 3.29 percent.[12]  Nicholl Report 32.  According to Ms. Nicholl, use of the risk-free rate is proper because from the perspective of the claimant "the benefits prior to bankruptcy were free from payment risk."  Nicholl Report 31-32.  Ms. Nicholl concludes that by utilizing a risk-free rate, "actual" pension recoveries are 31.7 percent for GRS and 17.6 percent for PFRS, Nicholl Report 39-40, after backing out the State and DIA contributions – an approach that as demonstrated above cannot be squared with the Bankruptcy Code.

There are multiple problems with utilizing a risk-free discount rate to calculate the size of the Pension Claims:

- Ms. Nicholl's statement that pension benefits were "free from payment risk" is belied by the facts: prior to these Chapter 9 proceedings, the City defaulted on its pension obligations on numerous occasions[13] and the City's well-known troubled financial condition existed for numerous years;[14]

- No public pension plan system utilizes the risk-free rate in determining contribution requirements;[15]

---

[12]  According to Ms. Nicholl, the appropriate discount rate should be the yield on the Treasury strips of corresponding maturity dates.  Nicholl Report 32.

[13]  On June 14, 2013, Detroit missed a $39.7 million payment on debt issued to fund pensions. Declaration of Kevyn D. Orr in Support of City of Detroit Michigan's Statement of Qualifications ¶ 56.  On June 2, 2005, the Michigan Court of Appeals affirmed orders issued on December 5, 2003 and December 17, 2004 by the Wayne County Circuit Court granting motions for summary disposition mandating the City to comply with its UAAL obligations.  *See Bd. of Trs. of Policemen/Firemen Ret. Sys. of City of Detroit v. City of Detroit*, 2005 Mich. App. LEXIS 1387 (June 2, 2005) (*per curiam*).

[14] Nicholl Report 32.

[15] Fornia Report 16.

- The risk-free rate is unrelated to real investment expectations and would distort claim recovery percentages and investment policies;

- The Governmental Accounting Standards Board considered but rejected using a risk-free discount rate when, as here, plan assets are not expected to be depleted;[16] and

- The use of risk-free discount rates has been severely criticized by pension experts and industry organizations – and even by Ms. Nicholl prior to this case – and at most is appropriate for disclosure purposes only. No one uses the risk-free rate for funding or benefit level decisions.[17]

- Using the risk-free rate yields illogical results. If the risk-free rate were used, the math would confer a "claim" on the retirees even if their benefits were not reduced at all.

Significantly, not even the City advocates using the risk-free rate. And although the Court-appointed expert Martha Kopacz cited in her Report the supposed advantages of the risk-free rate, she urged only *disclosure* of the calculation of the unfunded liability using the risk-free rate, not use of that rate to calculate the size of the Pension Claims. Kopacz Dep. Tr. 446-47. And even Ms. Kopacz could not cite a single public pension fund which makes the disclosure she urges. *Id.* at 447.

## IV. Other Distributions Under The Plan Should Be Taken Into Account In Calculating Pension Claims Recoveries

In addition to the standard pension benefits provided by the Retirement Systems, certain eligible pensioners will receive an additional benefit: the Income Stabilization Benefit Plus. Plan 16. Up to $20 million in proceeds from certain bond creditor settlements will fund this annuity stabilization account. According to Mr. Fornia, this $20 million has the effect of increasing the GRS and PFRS recovery percentages by another 1 percent. Fornia Report 17.

---

[16] Governmental Accounting Standards Series, Statement No. 67, Financial Reporting for Pension Plans ¶ 40 (2012) [Exhibit 1039].

[17] *See NCPERS on Rockefeller Report: Impractical, Off the Mark*, January 16, 2014 (a "risk-free" discount rate is "the wrong analysis to use when formulating the best educated estimate on future earnings of pension plan assets and investments") [Exhibit 1037]; *See also* Perry Dep. Tr. 237-38.

The Plan also provides that if investment earnings exceed 6.75 percent and certain funding level benchmarks are attained, then there will be a restoration of benefit cuts through a restoration reserve account. According to Mr. Fornia, assuming an investment return of 7.5 percent the restoration amounts will reach $29 million for GRS and $144 million for PFRS. If that rate of return were met, the GRS recovery percentage would increase by another 2 percent and the PFRS recovery percentage by another 12 percent to 17 percent.[18]

As noted above, the City, in its Reply and the Retiree Committee, in its Memorandum in Support of Confirmation, have suggested that the State Contribution and the DIA Proceeds should not be considered in assessing the Pension Claims' recoveries. While the COPs Holders object to that sleight-of-hand, *see* pages 6-10 above, even were one to back out those contributions the unequal treatment of the COPs is still stark – and renders the Plan unconfirmable. According to Mr. Fornia, backing out the state contribution equates to a recovery decrease of 5-8 percent for GRS and 8-11 percent for PFRS. Fornia Report 17. Backing out the DIA Proceeds equates to a recovery decrease of 6-10 percent for GRS and 12-18 percent for PFRS. Fornia Report 17.

A summary of the adjusted recoveries for GRS and PFRS taking into account the Income Stabilization and restoration benefits, but hypothetically backing out the State Contribution and/or DIA Proceeds is set forth below:

---

[18] These calculations were based on the Fifth Amended Plan and may have grown with the recovery enhancements set forth in the Sixth Amended Plan.

**Recovery Percentages: Class 10 GRS**

| What Constitutes Recovery? | POA | POA without State | POA without any DIA Proceeds | POA plus 7.5% excess earnings | POA plus Income Stabilization | POA plus Income Stabilization minus State |
|---|---|---|---|---|---|---|
| Recovery Dollar Amount | $1,118 | $1,019 | $902 | $1,147 | $1,126 | $1,027 |
| **What Constitutes Claim?** | | | | | | |
| City Plan – Entry Age Actuarial Method – 6.75% ($1,879) | 60% | 54% | 48% | 61% | 60% | 55% |
| Excluding certain non-vested benefits (future service and salary, non-vested members but not ASF excess interest) – 6.75% ($1,698) | 66% | 60% | 53% | 68% | 66% | 60% |
| Excluding non-vested benefits (future service and salary, non-vested members and ASF excess interest) – 6.75% ($1,311) | 85% | 78% | 69% | 87% | 86% | 78% |
| Excluding non-vested benefits – 7.20% (Milliman recommended assumption) ($1,164) | 96% | 88% | 77% | 99% | 97% | 88% |
| Excluding non-vested benefits – 7.50% assumption ($1,073) | 104% | 95% | 84% | 107% | 105% | 96% |
| Excluding non-vested benefits – 7.90% Plan assumption ($957) | 117% | 106% | 94% | 120% | 118% | 107% |

**Recovery Percentages: Class 11 PFRS**

| What Constitutes Recovery? | Based on recovery from POA | POA without State | POA without any DIA Proceeds | POA plus 7.5% excess earnings | POA plus Income Stabilization | POA plus Income Stabilization minus State |
|---|---|---|---|---|---|---|
| Recovery Dollar Amount | $735 | $639 | $488 | $879 | $743 | $647 |
| What Constitutes Claim? | | | | | | |
| City Plan – Entry Age Actuarial Method – 6.75% ($1,250) | 59% | 51% | 39% | 70% | 59% | 52% |
| Excluding non-vested benefits (future service and salary, non-vested members) – 6.75% ($1,077) | 68% | 59% | 45% | 82% | 69% | 60% |
| Excluding non-vested benefits – 7.20% (Milliman recommended assumption) ($861) | 85% | 74% | 57% | 102% | 86% | 75% |
| Excluding non-vested benefits – 7.50% ($735) | 100% | 87% | 66% | 120% | 101% | 88% |
| Excluding non-vested benefits – 8.00% ($571) | 129% | 112% | 85% | 154% | 130% | 113% |

Thus, even were one to back out the DIA Proceeds and State contributions – and as noted above, there is no support in the law for that approach – treatment of the COPs holders is still grossly disparate, well in excess of a 50 percent differential by any proper measurement.

**V.    Conclusion**

The Plan's unequal treatment of Class 9 fails under the Markell Test used within this district because the City cannot rebut the presumption of unfair discrimination in light of the materially lower percentage afforded to holders of COP Claims.  Outside of bankruptcy, holders of COP Claims would be entitled to the same recovery as pension claims.  Yet here, they are receiving 0 to 10 percent, while the holders of Pension Claims are receiving exponentially more.  Nor does the Plan's treatment of Class 9 meet the *Aztec* test.  The City's proposed disparate treatment of Class 9 is inconsistent with one of the fundamental purposes of the Bankruptcy

Code: equality in treatment of similarly situated creditors. The Plan is profoundly unfair and should not be confirmed.

For these reasons, the Objectors request that the Court deny confirmation and grant them such other and further relief as is just and proper.

The Objectors also join in the points made by FGIC in its pre-trial briefs and supplemental objection.

Dated: August 27, 2014

/S/Deborah L. Fish
ALLARD & FISH, P.C.
Deborah L. Fish
2600 Buhl Building
535 Griswold
Detroit, MI 48226
Telephone: (313) 961-6141
Facsimile: (313) 961-6142

KRAMER LEVIN NAFTALIS
& FRANKEL LLP
Thomas Moers Mayer
Jonathan M. Wagner
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for Dexia Crédit Local and Dexia Holdings, Inc., Panning Capital Management, LP, on behalf of funds and accounts managed by it, Monarch Alternative Capital LP, on behalf of funds and accounts managed by it, Bronze Gable, L.L.C., Aurelius Capital Management, LP, on behalf of its managed entities, Stone Lion Capital Partners L.P., on behalf of funds and accounts managed by it, and BlueMountain Capital Management, LLC, on behalf of funds and accounts managed by it*

Respectfully submitted,

/S/Kenneth E. Noble
KATTEN MUCHIN ROSENMAN LLP
Kenneth E. Noble
John J. Ramirez
575 Madison Avenue
New York, NY 10022-2585
Tel: (212) 715-9393
E-mail: Kenneth.noble@kattenlaw.com
John. Ramirez@kattenlaw.com

*Counsel for Deutsche Bank AG, London*

z:\13\079\plds\pretrial_brief.docx