## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------------x
                       :

In re                      : Chapter 9

                       :

CITY OF DETROIT, MICHIGAN,   : Case No. 13-53846

                       :

               Debtor.    : Hon. Steven W. Rhodes

                       :

                       :
-------------------------------------------------------------x

## FINANCIAL GUARANTY INSURANCE COMPANY'S OPPOSITION TO
## CITY OF DETROIT'S MOTION TO EXCLUDE TESTIMONY OF VICTOR WIENER

WEIL:\95071540\6\45259.0007

Financial Guaranty Insurance Company ("FGIC") respectfully submits this Opposition (the "Opposition") to the City of Detroit's (the "City") Motion to Exclude the Testimony of Victor Wiener (the "Motion" or "Mot.") [Docket No. 7000] and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      In the bombastic tone that the creditors have come to expect, the City has moved to exclude the testimony of FGIC's expert, Victor Wiener.  At bottom, as evidenced by the Motion, the City simply disagrees with Mr. Wiener's conclusions and the data that he used to form those conclusions. That is simply not a proper focus of a *Daubert* inquiry.

2.      Mr. Wiener is a leading authority and vastly qualified in the field of art appraisal. He is the CEO of his own independent art appraisal and art consulting company; he has taught courses in art appraising since 1985; and he has published extensively on the topic of art appraisal.  Mr. Wiener, unlike the City's experts, has been qualified as an expert in many high-profile cases involving art valuations where he has given testimony about appraisal methodology, blockage discounts, market values for insurance settlements, and valuation.  There is no question that Mr. Wiener is qualified to render his expert opinions in this case.

3.      There is also no question that Mr. Wiener's opinions are relevant to the issues in dispute.  Mr. Wiener was hired to value the entire DIA Collection,[1] the results of which would be used to demonstrate that the DIA Collection holds a large amount of value for the City of Detroit and can be monetized for the benefit of the City and the creditors.  Strikingly, the City failed to do any work to value the DIA Collection prior to agreeing to the "Grand Bargain," and now

---

[1] All capitalized terms not defined herein shall have the meaning as set forth in FGIC's Joint Pretrial Brief in Support of Objection to DIA Settlement [Docket No. 7103].

WEIL:\95071540\6\45259.0007

FGIC and other creditors have shown that the value of the DIA Collection far exceeds the small sum that the City will receive under the Grand Bargain for the entire DIA Collection.

4.      The City's only arguments in support of excluding Mr. Wiener's opinions focus on the conclusions that Mr. Wiener generated and the data upon which Mr. Wiener relied.  But neither of these arguments have a basis under the law for excluding Mr. Wiener's testimony.  Moreover, the City's Motion is full of inflammatory language regarding the "novel" and "slapdash" approach that Mr. Wiener purportedly employed in his appraisal.  However, the City fails to cite one case that excludes an expert's testimony on this basis.  Indeed, the City has merely dressed up its cross examination of Mr. Wiener in an attempt to have the Court exclude testimony that otherwise is reliable, relevant, and helpful to the Court.

5.      A close look at Mr. Wiener's expert opinion reveals that the appraisal of the DIA Collection that Mr. Wiener conducted is extraordinary and unique.  Recognizing the distinctiveness of the assignment, Mr. Wiener applied a consistent, recognized appraisal methodology across all five steps of his appraisal, using all of the data and information available to him.  In conducting the appraisal, Mr. Wiener steadfastly followed his outlined methodology and the standards set forth in the Uniform Standards of Professional Appraisal Practice ("USPAP").[2]  Moreover, Mr. Wiener appropriately relied on the expert specialists that he regularly employs to provide additional analysis and data that he relied upon in issuing his expert report. Mr. Wiener's analysis is thorough, objective, and well-grounded in both years of experience and appraisal standards.  While the City may dispute certain conclusions that Mr. Wiener developed and the data that Mr. Wiener relied on, those disputes do not provide a basis for a *Daubert* Motion.

---

[2] USPAP standards are the codification of appraisal standards for all appraisal disciplines, and are recognized by Congress and accepted around the world.  Wiener Rep. at 12.

WEIL:\95071540\6\45259.0007

<u>**ARGUMENT**</u>

**I.**     <u>**Legal Standard**</u>

6.     Federal Rule of Evidence 702 ("<u>Rule 702</u>"), which governs the admissibility of

expert testimony, provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:  (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable principles
> and methods; and (d) the expert has reliably applied the principles and methods to
> the facts of the case.

7.     Pursuant to Rule 702, the Sixth Circuit has delineated that "a proposed expert's

opinion is admissible, at the discretion of the trial court, if the opinion satisfies three

requirements." *In re Scrap Metal*, 527 F.3d 517, 528-29 (6th Cir. 2008).  First, a witness must

"establish his expertise by reference to 'knowledge, skill, experience, training, or education.'"

*Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citing Rule 702).  Second, Rule 702

"requires a proffered expert to testify to 'scientific, technical or other specialized knowledge' …

[which] serves to establish a standard of 'evidentiary reliability' or 'trustworthiness.'" *Id*. (citing

Rule 702 and *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 591 (1993)).  Finally, Rule

702 "requires that the expert's testimony assist the trier of fact." *Id*. at 578.  As discussed below,

Mr. Wiener's expert testimony satisfies all three requirements.

**II.**     **Mr. Wiener's Expert Opinion is Reliable and Trustworthy Based Upon His
Extensive Experience and Qualifications in the Field of Art Appraisal**

8.     There is no dispute that Mr. Wiener is vastly qualified in the field of art history

and art appraisal.  Indeed, the City does not challenge his expertise as an art appraiser and does

WEIL:\95071540\6\48259.0007

3

not move to exclude him on the basis of his qualifications in this area. As discussed in Mr.

Wiener's report and accompanying CV:

- Mr. Wiener's education includes a certificate in Museum Training given jointly by the Institute of Fine Arts of New York University and the Metropolitan Museum of Art, a Master of Arts from New York University, Institute of Fine Arts, and a one-year fellowship at the Metropolitan Museum of Art and the Victoria and Albert Museum in London. *See* Expert Report of Victor Wiener (the "Wiener Report"), attached as Exhibit A to the City's Motion, at 5; Wiener CV, attached as Exhibit A to the Wiener Rep., at 11.

- Mr. Wiener is currently the Director of Victor Wiener Associates, LLC ("VWA"), an international firm of independent specialist appraisers and art advisors drawn from professional associations. Declaration of Victor Wiener, attached hereto as Exhibit A (the "Wiener Decl.") at ¶ 2; Wiener CV at 1. VWA specializes in insurance appraisals, damage and loss appraisals, tax appraisals, equitable distribution appraisals, appraisals for collateralized transactions, and art market advice for private collectors and financial institutions. Wiener Decl. at ¶ 2; Wiener CV at 1.

- Mr. Wiener has published extensively on the topic of art appraisal and is the co-author and contributor to *All About Appraising: The Definitive Appraisal Handbook* (2003), and a co-author of *Appraisal Standards for the Insurance Profession*. Wiener Rep. at 7; Wiener CV at 9-11; Wiener Decl. at ¶ 10. He has also written on the use of blockage discounts, including a chapter in *All About Appraising* entitled "Blockage Discount," and has lectured on blockage discounts for the Art Law section of the New York Bar Association. Wiener Rep. at 8; Wiener CV at 7; Wiener Decl. at ¶10.

- Mr. Wiener has taught courses on art appraising since 1985, including at The New School, Baruch College, and New York University. Wiener Rep. at 7; Wiener CV at 2; Wiener Decl. at ¶ 5. He has lectured widely on art appraising, including at Stanford University, New York Law School, the University of Southern California, the London School of Business, and New York University. Wiener CV at 6-9; Wiener Decl. at ¶ 6. Mr. Wiener's teaching experience includes teaching a course on USPAP.[3] Wiener Rep. at 7; Wiener Decl. at ¶ 5. He is certified as a USPAP instructor by the Appraiser Qualifications Board of The Appraisal Foundation; only a small number of appraisers of personal property are certified by The Appraisal Foundation in USPAP methodology. Wiener Rep. at 7; Wiener Decl. at ¶ 5. The Appraisal Foundation requires that instructors complete an instructor recertification course every two years to maintain certification, and Mr. Wiener's current certification expires in 2016. Wiener Decl. at ¶ 5.

- Mr. Wiener served as the Executive Director of the Appraisers Association of America ("AAA") for twenty-one years. Wiener Rep. at 7; Wiener Decl. at ¶ 3. The AAA is a highly regarded international organization of members engaged in the profession of

---

[3] USPAP standards are the codification of appraisal standards for all appraisal disciplines, and are recognized by Congress and accepted around the world. Wiener Rep. at 12.

WEIL:\95071540\6\48259.0007

4

appraising art. *Id.* In his role as Executive Director, Mr. Wiener was responsible for implementing all AAA programs, including educational programs and lectures, public relations, overseeing membership criteria, reviewing and advising members' appraisals, and editing the journal and monthly newsletter. *Id.*

- Mr. Wiener has also worked for several auction houses, such as Sotheby's and Christie's, and museums, including the Metropolitan Museum of Art in New York and the Victoria and Albert Museum in London. Wiener Rep. at 7; Wiener Decl. at ¶ 4. Further, Mr. Wiener conducted appraisals for the Philadelphia Museum of Art on works that the museum intended to loan for exhibition and has lectured for the American Association of Museums about appraisals of museum collections in connection with museum loan shows. Wiener Decl. at ¶ 4. He has also been retained in connection with disputes involving several major museums where there were insurance claims for damages to works of art in their collections. *Id.*

- Finally, Mr. Wiener has been qualified as an expert in many high-profile cases involving art valuations where he has given testimony about appraisal methodology, blockage discounts, market values for insurance settlements, and valuation. Wiener Rep. at 8; Wiener Decl. at ¶¶ 8-9.

9. The City acknowledges Mr. Wiener's expertise in the field of art appraisal. Yet, the City focuses on subjecting Mr. Wiener's non-scientific expert opinion to a mechanical application of the specific factors articulated in *Daubert*, which a court may – in certain cases – consider in assessing the reliability of an expert's opinion (*e.g.*, testability, peer review or publication, the known or potential rate of error, and general acceptance within the relevant community).[4] But, as the Supreme Court has articulated, "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). Critically, the Sixth Circuit has noted on several

---

[4] *See* Mot. at 7-8 (describing the *Daubert* factors as the relevant factors by which to determine reliability); *id.* at 8 (arguing that the "lack of peer review and general acceptance, coupled with the 'novelty' of Mr. Wiener's method … demonstrate the report's unreliability"); *id.* at 10-11 (arguing that step 1 of Mr. Wiener's analysis cannot be tested and "is incapable of reproduction" and is therefore unreliable); *id.* at 16-17 (arguing that step 3 of Mr. Wiener's analysis is impossible to test and has not been published, and is therefore unreliable); *id.* at 19 (arguing that Mr. Wiener has never before utilized the approach used in Step 4, and it is therefore unreliable); *id.* at 20 (arguing that step 5 of Mr. Wiener's analysis has "never before [been] used or endorsed" and is therefore unreliable).

WEIL:\95071540\6\48259.0007

occasions that the *Daubert* reliability factors may be "of limited utility in the context of non-scientific expert testimony," especially where an expert's testimony is "derived largely from [the expert's] own practical experiences throughout [decades] in [his or her] industry." *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 334-35 (6th Cir. 2001) (emphasis added); *see also Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 295-96 (6th Cir. 2009); *cf. Oxford Aviation, Inc. v. Constellation Brands, Inc.*, 2:08-CV-419-DBH, 2012 WL 313924, at *1 (D. Me. Jan. 31, 2012) ("appraisal is more an art than a science"). As the court in *First Tennessee Bank* acknowledged, "[o]pinions formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation." 268 F.3d at 335.

10. Pursuant to these principles, the Sixth Circuit has held that in the context of non-scientific expert testimony, "the relevant reliability concerns may focus upon personal knowledge or experience." *Surles*, 474 F.3d at 295 (internal citations omitted); *see also Wood v. Wal-Mart Stores East, LP*, No. 13-6128, 2014 U.S. App. Lexis 15088, at *4 (6th Cir. Aug. 4, 2014) (same). This is precisely the analysis that should occur here with respect to Mr. Wiener's non-scientific expert opinion regarding the value of the DIA Collection. An accurate appraisal of the value of the DIA Collection simply does not require peer review, general acceptance, testability, or a known rate of error. *See, e.g.*, *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 470 (6th Cir. 2004) ("an accurate assessment of a local real-estate market does not require peer review or extensive scholarly writing"); *cf. In re Ephedra Products Liab. Litig.*, 393 F. Supp. 2d 181, 188 (S.D.N.Y. 2005) ("an art appraiser testifying about a painting's authenticity might state an opinion based in part on scientific analysis, but the ultimate conclusion would come from the witness's specialized knowledge, training and experience"). Rather, as noted, Mr. Wiener's extensive personal knowledge of, and experience with, art appraisal provides a sufficient basis

WEIL:\95071540\6\48259.0007

for the reliability of his analysis. Indeed, at his deposition and in his Report, Mr. Wiener explained how the facts of the case coupled with his experience informed his opinions.[5] *See, e.g.*, Wiener Dep.[6] at 167:5-168:11; Wiener Rep. at 5, 17, 18. As such, his expert opinion is both reliable and admissible under governing law. *See Surles*, 474 F.3d at 296 (where an expert adequately "explained how their experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts," the opinion is reliable and the expert is permitted to testify).

### III. Mr. Wiener's Appraisal Is Based on a Reliable and Sound Methodology and the City's Complaints Go to the Weight, Not the Admissibility, of His Testimony

11. To determine the reliability of an expert's opinion, "the court does not determine whether the opinion is correct, but rather determines whether it rests upon a reliable foundation." *U.S. v. Stafford*, 721 F.3d 380, 393-94 (6th Cir. 2013) (internal citations omitted); *see also Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 303 (6th Cir. 1997) ("When considering reliability, the trial court must . . . not [focus on] the correctness of [the expert's] conclusions."). As the Supreme Court held in *Daubert*, the court's focus is "solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 595. "Experts are permitted a wide latitude in their opinions . . . so long as the expert's opinion has a reliable basis in the knowledge and experience of the discipline." *Jahn v. Equine Servs., PSC*, 233 F.3d 383, 388 (6th Cir. 2000).

12. Throughout the Motion, the City harps on two overarching critiques of Mr. Wiener's five-step process for valuing the DIA Collection: (i) the appraisal is unreliable because

_____

[5] Contrast this with the City's expert, Mr. Plummer, who provided vague references to his experience, which is outside of the appraisal profession, but could not adequately explain how that experience was a sufficient basis for his conclusions. *See* FGIC Motion to Exclude the Expert Opinion of Michael Plummer Regarding Discount Factors [Docket No. 6983].

[6] Deposition of Victor Wiener (the "Wiener Dep."), attached as Exhibit B to the Motion.

WEIL:\95071540\6\45259.0007

it is "novel," and (ii) the appraisal is unreliable because it was completed in "less than two weeks." *See* Mot. at 1, 2, 4, 8, 16, 17. Both of these arguments have no basis in the law. The City's preoccupation with the so-called "novelty" of Mr. Wiener's methods is misguided. *Daubert* explicitly recognized that novel theories or methodologies can be reliable, and that old theories or methodologies can be reliably applied in new ways.[7] *See Daubert*, 509 U.S. at 593 ("Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability, and in some instances well-grounded but innovative theories will not have been published…. Some propositions, moreover, are too particular, too new, or of too limited interest to be published.") (internal citations omitted).[8]

13. Simply put, the fact that an expert's methods are novel does not by any stretch automatically render those methods unreliable. As the court in *Libas Ltd. v. United States* aptly acknowledged, "[t]he lesson of the Supreme Court's rejection of 'general acceptance' as the sole standard for expert testimony, in favor of the *Daubert-Kumho* reliability standard is that 'widespread use' or 'general acceptance' is an imperfect proxy for reliability. The prevailing scientific wisdom is not always right, and, moreover, a requirement of 'general' or 'widespread' acceptance, by itself, may exclude reliable but novel or controversial methodologies." 193 F.3d 1361, 1368 (Fed. Cir. 1999). There is no doubt that Mr. Wiener's appraisal of the DIA Collection is extraordinary and unique, but the fact that this appraisal and its conclusions are

---

[7] In addition, USPAP specifically requires appraisal professionals to constantly review and revise "appraisal methods and techniques and devis[e] new methods and techniques to meet new circumstances." USPAP, Standards Rule 6-1, excerpts attached hereto as Exhibit B.

[8] *See also U.S. v. Valencia*, 600 F.3d 389, 425 (5th Cir. 2010) (recognizing that the "unprecedented nature" of the expert's work "made it impractical, if not impossible, to subject the methods to peer review and publication, and that there would be no general acceptance of the theory in the [] expert community," but that did not render the testimony inadmissible).

WEIL:\95071540\6\45259.0007

unique does not make Mr. Wiener's valuation methodology any less reliable. *See Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (finding that the court "could not exclude [expert] testimony simply because the conclusion was 'novel' if the methodology and the application of the methodology were reliable").

14.     Moreover, the City's repeated reference to the fact that Mr. Wiener conducted his analysis in "less than two weeks" is a red herring and does not bear on the reliability of Mr. Wiener's methods for purposes of *Daubert*.   As numerous courts have made clear, challenges regarding the amount of time an expert spends to investigate the facts and reach an opinion do not "raise a true *Daubert* challenge," and are instead arguments that are "more proper as challenges to the weight to be given to [the expert's] testimony, not its admissibility." *Barnthouse v. Wild Dunes Resort*, LLC, No. 2:08-CV-2546, 2010 WL 3169358, at *4-5 (D.S.C. Aug. 5, 2010) (rejecting argument that the expert's methodology was unreliable in part because she "issued her opinion after a mere 3 hours of work on the case"); *see also, e.g.*, *Harter v. Bio-Medical Applications of La., Inc.*, 2001 U.S. Dist. Lexis 26226, at *12 (W.D. La. Nov. 16, 2001) (contentions that an expert "failed to spend sufficient time in his analysis [] can be addressed by Defendants on cross-examination.  These arguments relate to the weight of the evidence rather than to the reliability or relevance of [the expert's] opinions.").

15.     In arguing that Mr. Wiener used a "mix-and-match" valuation method that is unreliable, the City appears to conflate Mr. Wiener's reliable, established *methodology* for his appraisal with the unique *data* that he used in each step of his valuation. *See* Mot. at 7-8.  As stated in his Report, Mr. Wiener used the Market Comparison Approach to determine the marketable cash value of the DIA Collection.  Wiener Rep. at 17.  The Market Comparison Approach is one of three standard approaches to valuation cited in USPAP. *Id*.  It involves,

WEIL:\95071540\6\45259.0007

among other things, selecting comparable objects "which have sold or have been offered for sale as closely as possible to the Effective Date of Valuation . . . in the marketplace designated as most appropriate." *Id*. Mr. Wiener employed this established methodology across all five steps of his appraisal of the DIA Collection.

16. Not surprisingly, the City does not challenge Mr. Wiener's use of the Market Comparison Approach methodology.[9] Instead, the City argues that Mr. Wiener's use of different data for each individual step in his appraisal somehow invalidates the reliable methodology that he applied. *See, e.g.*, Mot. at 2-3. But the City fails to cite any law in support of their argument and the Sixth Circuit has made clear that challenges regarding the validity of the data used by an expert are "unpersuasive because it fundamentally confuses the *credibility and accuracy* of [the expert's] opinion with its *reliability*." *In re Scrap Metal*, 527 F.3d at 529 (emphasis in original). The court explained that "the question of whether [the expert's] opinion is accurate in light of his use of the [challenged] data goes to the weight of the evidence, not to its admissibility." *Id.* at 532 (rejecting argument that expert's testimony was inadmissible because he "used erroneous data and necessarily produced an erroneous conclusion; in sum, 'garbage in, garbage out'").

17. Because the City's challenges are properly explored on cross-examination, the Court's inquiry can end here. Nonetheless, FGIC responds to each of the City's unfounded allegations. As discussed below, the data that Mr. Wiener employed for each of the steps in his appraisal was based upon what was available to him (including the data – or lack thereof – that was made available by the DIA Corp.), the uniqueness of this appraisal, and Mr. Wiener's

---

[9] Notably, others courts have found Mr. Wiener's appraisal methodology reliable. *See, e.g.*, *Hoffman v. L&M Arts*, No. 3:10-cv-0953, 2013 WL 432771, at *13 (N.D. Tex. Feb. 5, 2013) (finding that questions related to the sources and bases for Mr. Wiener's opinion affect the weight, not admissibility of his testimony, and "Wiener's methodology—in which he used the 'fair market value' as the type of valuation and 'market data comparison' as his valuation approach—is neither unreliable nor irrelevant").

WEIL:\95071540\6\45259.0007

professional experience. This is consistent with the appraisal standards set forth in USPAP, which do not set forth any mandate for specific data or analysis that should be employed in any appraisal. *See, e.g.*, Wiener Dep. at 220: 9-10; 256: 9-12. Despite using different data to analyze the relevant inquiry in each step of the appraisal, Mr. Wiener used the same established methodology – the Market Comparison Approach – to determine the marketable cash value of the DIA assets at each step in his appraisal. In addition to employing the Market Comparison Approach, Mr. Wiener ensured that his appraisal was prepared in accordance with USPAP. Wiener Rep. at 12.

### A. Mr. Wiener's Step 1 Valuation Is Reliable and the City Is Simply Challenging the Results

18. The City's critique of Mr. Wiener's Step 1 valuation of 387 High Value Works focuses on the City's disagreement with the valuation results – a value of over $3,000,000,000 – instead of the methodology that Mr. Wiener applied. *See* Mot. at 9 ("Many of Mr. Wiener's appraisals are outliers that diverge dramatically from the appraisals performed by other testifiers in the case . . . ."). Under *Daubert*, the court's focus is "solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 595; *see also Smelser*, 105 F.3d at 303. Cross examination "is the proper way to challenge expert testimony that is weak, rather than methodologically unsound." *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 485 (6th Cir. 2002) (rejecting argument that expert's testimony was inadmissible because it was only an "estimation," because the expert relied on his personal knowledge, review of relevant documents, and interviews of individuals with experience and therefore "[t]he estimate was not groundless").

19. Here, as detailed in his Report, Mr. Wiener independently valued 387 High-Value Works from the DIA Collection using the Market Comparison Approach, which includes looking

at sales of comparable works, taking into consideration the marketplace, demand, and provenance of the work. *See* Wiener Rep. at 17-18. The initial valuations for each of the 387 High-Value Works were performed by expert specialists employed by Mr. Wiener, which were used as a "point of departure" for further discussions and analysis. *Id.* at 18. Those initial valuations were submitted to Mr. Wiener, reviewed by a team of specialists, and subject to intense scrutiny before a final value was reached. *Id.*; *see also* Wiener Dep. at 229:6-230:5.

20. Not surprisingly, the City does not take issue with Mr. Wiener's Market Comparison Approach methodology in Step 1. Instead, the City highlights two alleged "outliers" for two pieces of art that are of relatively low value: one that Mr. Wiener valued at $32,500 and one that Mr. Wiener valued at $86,000. *See* Mot. at 19. But this is the exact type of focus on "results" that Courts have found improper for exclusion under *Daubert*. *See, e.g.*, *Daubert*, 509 U.S. at 595. The City questioned Mr. Wiener extensively at his deposition about these two pieces of art and his conclusions (Wiener Dep. at 247-252) and the City will have the opportunity to cross-examine Mr. Wiener and test the veracity of his conclusions at the Hearing. There is simply no basis in the law to exclude Mr. Wiener's testimony.

21. In addition, the City twists Mr. Wiener's deposition testimony and work files to state that he simply took a 40% discount to the fair market values of the City's experts to determine the marketable cash value for certain pieces of art in Step 1 of his appraisal. *See* Mot. at 20. This is false. The City relies on the handwritten notes from one of Mr. Wiener's expert specialist's work file that purports to discount a fair market value to determine the marketable cash value for two pieces of art. *See* Mot., Exs. E and F. But what the City fails to acknowledge is that this specialist's initial determination of value was a "point of departure" for discussion and analysis by Mr. Wiener before arriving at a final valuation. *See* Wiener Rep. at 18. When

WEIL:\95071540\6\45259.0007

asked at his deposition, Mr. Wiener made clear that he and his team "review each value on a case-by-case basis" and that there was no formulaic percentage reduction applied. Wiener Dep. at 90, 91, 93. Indeed, Mr. Wiener used the Market Comparison Approach for each piece of art that he valued in Step 1 of his appraisal and the City's disagreement rests solely with his conclusions -- a disagreement that is best resolved on cross examination.[10] *See In re Scrap Metal*, 527 F.3d at 530.

### B. Mr. Wiener's Step 2 Valuation Is More Than Simple Math and Is Reliable

22. The City attempts to isolate Mr. Wiener's valuation of 616 High Value Works in "Step 2" of his appraisal and characterize it as "simple arithmetic." *See* Mot. at 22. But this characterization conveniently ignores the fact that Mr. Wiener applied the Market Comparison Approach across *all five steps* of his appraisal in order to determine the marketable cash value of the DIA Collection. Step 2 is no exception, and is only one part of Mr. Wiener's expert opinion as a whole. Here, Mr. Wiener reviewed the valuation data from three independent parties – Christie's, Artvest, and Winston Group – and, using the Market Comparison Approach, verified the values selected by the third parties. Wiener Dep. 252:4-253:23. He then used the average values and factored them in to his valuation for the DIA Collection as a whole, recognizing that the average values would "serve as a control" when taken in conjunction with the other values. Wiener Dep. at 254. This is clearly beyond "rudimentary math" (Mot. at 22) and within the scope of proper expert testimony. *See Roberts v. Raczkowski*, No. 09-5015-JLV, 2013 WL 558274, at *8 (D.S.D. Feb. 12, 2013) ("[W]hile each step [performed by an expert in his

---

[10] The City's complaint that Mr. Wiener did not produce the comparables that he used in his valuation is without merit. *See* Mot. at 21. The comparables were produced by Mr. Wiener and a supplemental spreadsheet identified the name of the piece of art from the DIA Collection with the identifiable comparable piece of art.

WEIL:\95071540\6\45259.0007

analysis] may be analyzed as 'simple math,' the combination of these processes is certainly within the realm of expertise of a C.P.A. and would helpful to the jury.").

23.     Moreover, the City's critique of Mr. Wiener's use of the City's experts' data is unfounded.  Mot. at 11-12.  USPAP requires that Mr. Wiener take *all* relevant information into account in conducting his appraisal.  *See* USPAP Standards Rule 7-4.  Thus, his thorough review of Mr. Plummer and Ms. Fusco's reports was part of the due diligence required under USPAP.  *See* Wiener Dep. at 258:17-21.   Consistent with USPAP, Mr. Wiener first reviewed the values provided by the City's experts to determine whether they were consistent with what an appraiser cognizant of the market would conclude is within a reasonable range of values for the individual works of art.   Simply because Mr. Wiener does not agree with the City's experts' exact conclusions, particularly because neither of the City's experts is an appraiser (*see* Wiener Rep. at 19), does not mean that he cannot rely on the underlying data and independently review that data using his own expertise and knowledge.  *See, e.g.*, *United States v. McGhee*, 627 F.3d 454, 460 (1st Cir. 2010) (experts "commonly and permissibly rely in some measure on information gathered by other experts"); *McGinnis v. Am. Home Mortg. Serv. Inc.*, No. 5:11-cv-284, 2013 U.S. Dist. LEXIS 92556, at *30 (M.D. Ga. July 2, 2013) (courts regularly allow accountants, financial experts, auditors, and *appraisers* to rely on reports, documents, and other experts' opinions when rendering their own opinions") (emphasis added).  Highlighting this point, Mr. Wiener does not agree with the City's expert, Vanessa Fusco, that her values are reflective of fair market values and, instead, based on Mr. Wiener's appraisal experience, he is of the opinion that those values are more in line with marketable cash values. Wiener Rep. at 19.  Wiener Dep. at 259:14-18 ("Christie's stated that they were using fair market value, when in point of fact, they were using marketable cash value.   They called it something else, but what they did was

WEIL:\95074540\6\45259.0007

marketable cash value."). He therefore uses those values as part of his appraisal to determine a marketable cash value for the DIA Collection.

### C. Mr. Wiener's Use of Insurance Data in Step 3 Is Appropriate and Reliable

24. The City's critique of Mr. Wiener's use of "unverified" insurance data, supplied by the DIA Corp., to value a portion of the DIA Collection fails on its face. As discussed in Section III *supra*, the Sixth Circuit has rejected a similar argument that an expert's testimony is inadmissible when it is based on erroneous data and produces erroneous conclusions, "in sum, 'garbage in, garbage out.'" *See In re Scrap Metal*, 527 F.3d at 529. As the Sixth Circuit made clear, the "court must be sure not to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." *Id.* (citation omitted).

25. Here, the City argues that Mr. Wiener relied on outdated insurance values, (provided by the DIA Corp.) which he did not independently verify, as a basis for his valuation of 16,388 works of art from the DIA Collection. Mot. at 13-15. But this argument simply goes to the accuracy of Mr. Wiener's opinion – something that can be challenged on cross examination – and not the reliability of his methodology. Moreover, the fact that another expert in this case would have used different data or a different methodology to value the DIA Collection (*see* Mot. at 13) does not lead to the conclusion that Mr. Wiener's valuation conclusions are unreliable. Advocating that a different methodology is "better to use" and not that the methodology used is invalid, "go[es] to the weight of the evidence rather than its admissibility." *U.S. v. Turner*, 287 F. App'x 426, 434 (6th Cir. 2008).

26. Further, Mr. Wiener's use of the insurance values provided to him by the DIA Corp. was both appropriate and necessary. As part of his effort to appraise the entire DIA Collection, Mr. Wiener looked at all information available to him, and accepted and

acknowledged the limitations of the data that was provided. Wiener Rep. at 15, 18, 50. In applying the Market Comparison Approach to Step 3 of his appraisal, Mr. Wiener sampled the insurance data, compared the sampled values to current marketable cash values for comparable pieces of art, and determined an appropriate percentage increase to account for the age of the insurance values. Wiener Rep. at 45-46; Wiener Dep. at 266-67.

27.     Instead of challenging Mr. Wiener's methodology, the City instead focuses on perceived "errors" made by Mr. Wiener in Step 3 of his appraisal. *See* Mot. at 13. Yet such "errors" are only due to the flawed data that was provided by the DIA Corp. – listing an insurance value for each individual page of a manuscript that should have been listed only once for the *entire* manuscript – a common challenge that Mr. Wiener had to overcome at every step of his appraisal. Wiener Rep. at 50. As soon as Mr. Wiener found the error in the data, and the resulting transcription error in his appraisal, he quickly made the appropriate corrections to his Report. This type of transcription error, which was due to the DIA Corp.'s own mistakes and ultimately corrected by Mr. Wiener, does not make his methodology and opinion any less reliable. *See, e.g.*, *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1329 n.23 (N.D. Ga. 2008) ("[T]ypographical errors in expert report [do] not necessarily reduce [the] evidentiary value of [this] general testimony . . . and therefore [do] not require its exclusion."); *see also In re Scrap Metal*, 527 F.3d at 530.

28.     Moreover, seeking to be conservative given the discovered errors in the DIA Corp.'s data, Mr. Wiener subsequently determined that an overall discount should be given to the values that were calculated based upon the DIA Corp.'s insurance data to account for other possible data errors. *See* Wiener Rep. at 50. Acknowledging that a determination of the exact number of data errors would be impossible without physically inspecting the objects in the DIA

Collection, Mr. Wiener applied a 3.5% discount to his valuation in step 3. *Id.* This corrective percentage was arrived at by reviewing the DIA Corp.'s insurance values and identifying the number of individual items that could *possibly* be grouped and valued as one item after physical inspection, and dividing that number by the total number of items on the list. Wiener Decl. at ¶ 19. Thus, contrary to the City's baseless argument, the 3.5% discount is neither "arbitrary" nor "conjecture"; rather, it is based upon Mr. Wiener's careful assessment of the data that he was provided and is a conservative approach to address the potential errors in the DIA Corp.'s own data.

29.     Finally, the City's criticism that "Mr. Wiener did not perform any of the '[t]echnical, statistical, or financial analysis'" underlying his analysis of the insurance values for the DIA Collection, and therefore his valuation is somehow less reliable, is misplaced and has no basis in the law.   *See* Mot. at 15.   As discussed more fully in Section IV *infra*, Mr. Wiener provided Mr. Leeds with the appropriate data and methodology to be used in the statistical analysis, he reviewed and verified the results that Mr. Leeds provided, and he is entitled to consider and accept Mr. Leeds' analysis in forming his opinion regarding the valuation of the DIA Collection.

### D.     Mr. Wiener's Use of Third Party Sales Data in Step 4 Is Reliable

31.     In a repeated pattern, the City once again criticizes the reliability of Mr. Wiener's data and his conclusions in Step 4.  But neither argument may serve as a basis for excluding Mr. Wiener's expert testimony.  *See Daubert*, 509 U.S. at 595; *In re Scrap Metal*, 527 F.3d at 530.

32.     In Step 4 of his appraisal, Mr. Wiener "developed a pricing matrix based on average sales price of artworks by Sotheby's and Christie's …" Wiener Rep. at 46.  Based upon his experience, he then analyzed the works in the DIA Collection and applied various premiums

WEIL:\95071540\6\45259.0007

or discounts to the average sales price for individual categories, dependent upon, among other things, the (i) strength of the market for each category, (ii) high collectability and rarity of the DIA works, and (iii) categories of artwork within the DIA with less collectible pieces of art. *Id.*

33. The City's argument that Mr. Wiener failed to "assess whether any of the DIA works of art were at all comparable to the works that Christie's and Sotheby's sold in 2013" is false. Mot. at 17. At his deposition, Mr. Wiener testified that he and his team sampled a large portion of the 42,844 remaining DIA works and compared those works to the categories of art that he had identified in the sales matrix to ensure that the average sales prices were accurate. *See* Wiener Dep. at 296: 10-23; 298: 2-13.

34. Ignoring the fact that Mr. Wiener conducted a large sampling to ensure that the average sales prices were valid, the City goes on to argue that the average sales prices of Christie's and Sotheby's couldn't possibly apply to the 42,844 DIA works because those pieces of art are "the least valuable works" in the DIA Collection. Mot. at 18. In addition to being incorrect, this criticism goes squarely to Mr. Wiener's conclusions and is not a valid basis for excluding his expert testimony. *See Daubert*, 509 U.S. at 595; *Smelser*, 105 F.3d at 303. As the City is aware, they will have the opportunity to cross examine Mr. Wiener and test the basis for his conclusions at that time.

E. **Mr. Wiener's Final Marketable Cash Value for the DIA Collection in Step 5 Is Reliable**

35. Once again, the City argues that Mr. Wiener's valuation *conclusion* in Step 5 of his appraisal provides a basis for excluding his testimony. *See* Mot. at 19 ("The total value of the DIA collection that Mr. Wiener calculated at Step 5 was $8,149,232,354 – *more than $3.5 billion (or about 77%) more* than the highest estimate computed by the City's expert."). It is no surprise that Mr. Wiener's valuation conclusion was higher than the City's experts – given that one expert

WEIL:\95071540\6\45259.0007

only valued less than 5% of the DIA Collection and the other is not an appraiser – but a disagreement as to the conclusion is not a valid basis for exclusion of his testimony. *See Daubert*, 509 U.S. at 595; *Smelser*, 105 F.3d at 303. Moreover, the City's characterization of Mr. Wiener's valuation conclusion as "mixing and matching methods and measurements of value" is belied by Mr. Wiener's Report and his deposition testimony. It is clear that Mr. Wiener used the data supplied to him for each step of his appraisal and, based on his extensive knowledge and experience, used that data to calculate the marketable cash value for each set of works from the DIA Collection. *See, e.g.*, Wiener Dep. at 260: 4-17. For example, Mr. Wiener did not add "insurance values" at Step 3 to "marketable cash values" at Step 1. *See* Mot. at 19. Instead, as Mr. Wiener explained, he took the insurance values provided to him by the DIA Corp. and converted those insurance values to current marketable cash values. Wiener Rep. at 46. The City's misinterpretation of Mr. Wiener's methodology does not provide a basis for deeming his opinions unreliable. *See Jahn*, 233 F.3d at 393 (overturning exclusion of experts where the court "erred by mischaracterizing the methodology employed by [the] experts"); *see also United States v. Pacheco*, No. 08-20895, 2009 WL 383257, at *14 (S.D. Fla. Feb. 14, 2009) (rejecting argument that an expert's opinion was unreliable where the argument was based on a "misperce[ption of] the nature and basis for [the expert's] testimony and opinions as it applies to this case").

## IV.     Mr. Wiener is Permitted to Rely on Information Gathered By Other Experts

36.     While the City takes issue with Mr. Wiener's limited reliance on data gathered, and analyses performed, by other experts (specifically, Dr. Barth, Mr. Zhang and Mr. Leeds), such reliance is expressly permitted by Rule 703. As numerous courts have observed, Rule 703 permits an expert to rely on the data and analyses of other experts so long as it is of the type

reasonably relied upon by other experts in the field and the witness is ultimately giving his or her own opinion. *See, e.g.*, *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 675 (6th Cir. 2010) (citing Rule 703 and noting that "an expert may in some circumstances rely on other experts' testimony"); *McGhee*, 627 F.3d at 460 (experts "commonly and permissibly rely in some measure on information gathered by other experts"); *Dura Automative Sys. Of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) ("[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert"); *Apple Inc. v. Motorola, Inc.*, No. 2012-1548, 2014 WL 1646435, at *25 (Fed. Cir. Apr. 25, 2014) ("Experts routinely rely upon other experts … for expertise outside of their field").

37.     In its Motion, the City relies almost exclusively on *Dura*, a case involving an expert that himself was unqualified to properly assess the data and analyses he relied upon. 285 F.3d at 615 (emphasizing that the expert "himself lack[ed] the necessary expertise to determine whether the techniques were appropriately chosen and applied"). In the instant case, Mr. Wiener is eminently qualified to assess data and techniques in his field, as evidenced by the fact that "Mr. Wiener has written extensively on the application of blockage discounts and other tax related matters," the very same issues on which Dr. Barth opined. Wiener Rep. at 8; Wiener Decl. at ¶ 15. At his deposition, Mr. Wiener expounded on this expertise, explaining that he was retained by the Andy Warhol Foundation to determine whether the blockage discount employed by Christie's was proper. Wiener Dep. at 207:8-17; *see also id.* at 211:8-19 (discussing prior work experience with blockage discounts). Further, Mr. Wiener is a certified USPAP instructor, teaches courses on USPAP, and considers himself an expert on USPAP standards, which also

WEIL:\950715401645259.0007

contains blockage discount considerations. Wiener Dep. at 129:3-5; 322:23-323:18; *see generally* USPAP, Standard 6.

38. Likewise, Mr. Wiener has vast professional experience with studying the art market – a subject of Mr. Zhang's report[11] – in connection with rendering appraisals, which serves as the foundation of his expert opinion. *See* Wiener Decl. at ¶¶ 7, 16; *see also* Wiener Dep. at 172:15-18 (Q. And how did you form that opinion? A. By seeing the prices, by looking at the prices realized in the sales, and my knowledge of, generally, the art market.); *id.* at 77:1-6 (Q. So how do you test that data that you're relying upon to confirm that it's accurate? A. I review the comparables at the time. I rely upon mine and other experts' knowledge at the time of -- the market at the time it was written, and make some determination...). Not only is he qualified by his experience, but USPAP requires that Mr. Wiener stay abreast of the art market and take market considerations into account in developing appraisals. *See, e.g.*, USPAP, Standard Rule 6-2(f) (an appraiser must "identify the characteristics of the market that are relevant to the purpose and intended use of the mass appraisal including…economic attributes; time frame of market activity; and, property interests reflected in the market"); *id.* at Standard Rule 6-2(h) (an appraiser must "analyze the relevant economic conditions at the time of valuation, including market acceptability of the property and supply, demand, scarcity, or rarity"), *id.* at Standard Rule 7-1(a) ("Each appraiser must improve and update his or her skills and knowledge to remain proficient in the appraisal of personal property."); *id.* at Standard Rule

---

[11] Mr. Zhang contributed as a co-author to the TEFAF Art Market Report upon which the City's expert, Mr. Plummer, relied in discussing the state of the art market and in rendering his valuation conclusions. Mr. Zhang supplied the underlying facts necessary for Mr. Wiener to assess whether Mr. Plummer's conclusions were consistent with the TEFAF report. *See also Precision Seed Cleaners v. Country Mut. Ins. Co.*, No. 03:10-cv-01023, 2013 WL 943571, at *6 (D. Or. Mar. 11, 2013) (emphasis added) ("[C]ourts regularly allow . . . *appraisers* to rely on reports, documents, and other experts' opinions when rendering their own opinions.").

WEIL:\95071540\6\45259.0007

7-3(b) (an appraiser must "define and analyze the appropriate market consistent with the type and definition of value"); *id.* at Standard Rule 7-3(c) (an appraiser must "analyze the relevant economic conditions that exist on the effective date of the valuation…").  Thus, although Mr. Wiener was not "asked by counsel to challenge Mr. Plummer on his economic and financial analysis," Mr. Wiener is highly qualified to review Mr. Plummer's art market analysis.  Mot. at 6, 22; Wiener Rep. at 4 (describing assignment).  Further, pursuant to Rule 703, Mr. Wiener is permitted to rely on Mr. Zhang as a primary source to verify the accuracy of the information that Mr. Wiener considered in appraising the DIA Collection.  *See* Wiener Decl. at ¶ 16; Rule 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.").

39.    Contrary to the City's arguments, *Dura* does not stand for the proposition that Mr. Wiener must have a degree in economics or statistics – the same degrees as Dr. Barth, Mr. Zhang and Mr. Leeds – in order to testify regarding the facts that formed the basis for his opinion, nor do such facts need to be admitted into evidence.  *See Dura*, 285 F.3d at 613 ("If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.").  In this case, Mr. Wiener does not simply parrot his consultants' opinions and adopt them as his own; rather, he *relies* on these assessments and has the qualifications to *review* those assessments in order to inform the basis for his conclusion. Wiener Dep. at 344:13-16 (Q. Do you believe you have the expertise sufficient to opine on all of the subjects identified in your report? A. I do.).

40.    Mr. Wiener's approach stands in stark contrast to one of the City's experts, Kenneth Buckfire, who testified that he was not qualified to review the opinions of the expert he

WEIL:\95071540\6\45259.0007

purportedly relied upon with respect to an analysis of the City's revenues. *See* FGIC's Motion to Exclude the Expert Opinion of Kenneth Buckfire at 12-14 [Docket No. 6787]. The same is true of the City's art valuation experts, Vanessa Fusco and Michael Plummer, both of whom issued appraisals or valuations regarding the DIA Collection without any expertise in appraising. *See* FGIC's Motion to Exclude the Expert Opinion of Michael Plummer Regarding Discount Factors at 14 [Docket No. 6983]. Unlike the City's experts, Mr. Wiener has the experience and expertise to review and assess the underlying facts and opinions provided by Dr. Barth and Mr. Zhang.

41. Further, this type of reliance on other experts is not unusual in the field of appraisal and is therefore consistent with the mandates of *Daubert*. *See, e.g.*, Wiener Decl. at ¶ 16; *Kumho*, 526 U.S. at 152 (noting that an expert must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Precision*, 2013 WL 943571, at *5-7; *Oxford Aviation*, 2012 WL 313924, at *1 (appraiser permitted to rely on "other people in his company to gather information"). Indeed, even USPAP – the guiding standards in the field – contemplate that an appraiser may rely on other consultants in conducting the appraisal:

> Competency can be acquired in various ways, including, but not limited to, personal study by the appraiser, association with an appraiser reasonably believed to have the necessary knowledge and/or experience, *or retention of others who possess the necessary knowledge and/or experience.*
> …
> When any portion of the work involves significant personal property appraisal assistance, *the appraiser must summarize the extent of that assistance.* The name(s) of those providing the significant personal property assistance must be stated in the certification…

*See* USPAP Competency Rule, lines 370-373 (emphasis added); *id.* Standard Rule 8-2(a)(vii), lines 1772-1775 (emphasis added); *see also* Wiener Decl. at ¶ 11. Consistent with USPAP, Mr. Wiener employed a large team and relied on opinions from fellow art analysts to contribute to his

WEIL:\95071540\6\45259.0007

appraisal – areas in which Mr. Wiener is also well-versed and capable of reviewing.  Because this reliance is appropriate in the field of appraisal, exclusion of Mr. Wiener's opinion on that basis is not appropriate.[12]  *Apple*, 2014 WL 1646435, at *26 (noting that a rule which would exclude expert testimony "simply because it relies upon information from [another] expert is unreasonable and contrary to Rules 702 and 703 and controlling precedent").

42.     Similarly, Mr. Wiener's reliance on Mr. Leed's statistical analysis is appropriate under Rule 703.  *See Dura*, 285 F.3d at 612-3 ("An expert witness is permitted to use assistants in formulating his expert opinion").  As the Court noted in *Dura*, "the expert witness can be asked at his deposition whether he supervised them carefully and whether his relying on their assistance was standard practice in the field." 285 F. 3d at 613.  The City had an opportunity to question Mr. Wiener regarding his reliance on Mr. Leeds' statistical component and did so.  *See* Wiener Dep. at 59:23-60:3 (Q. And what analysis did you do of the Silar Group's results to confirm it was accurate? A. We looked at individual values transcribed. We looked at percentages arrived at, and we reviewed, quite carefully, everything that Mr. Leeds provided to us.); *id.* at 192:23-193:5 (Q. How about Step 3; who came up with the methodology detailed in Step 3? A.  Again, the answer is the same as before, it was a team effort. We all came up with it. The applications went to the technical people. And [] the methodology involved was certainly my decision and the others, together, thinking this was an appropriate thing to do.).  It appears

---

[12] The cases the City relies on are inapposite.  For example, *Sigler v. Am. Honda Motor, Co.*, 532 F.3d 469, 478-80 (6th Cir. 2008) is distinguishable because – unlike the facts of this case – the expert's testimony pertained to an area in which he *lacked* expertise.  Here, Mr. Wiener regularly relies on such assessments and is well-qualified to opine on market conditions and blockage discounts.  As another example, in *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 409 (6th Cir. 2006), the court excluded a portion of the expert's testimony as hearsay because the expert attempted to testify as to the degree of similarity between his conclusion and those of another expert.  Here, Mr. Wiener is not attempting to make comparisons; he simply used the data to render his own conclusions.

that the City was not pleased with this response.  Their discontent, however, is not a basis for exclusion, but is instead fodder for cross-examination. *See In re Scrap Metal*, 527 F.3d at 532 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

43.     Finally, it bears mentioning that the City dedicates a significant portion of their Motion to unjustifiably and scandalously smearing Mr. Leeds and his previous litigation experience, alleging that he was sanctioned in an entirely separate matter.  Mot. at 24-25.  Not only is this a red herring to redirect the focus of this Court away from the merits, as the mathematical calculations speak for themselves, but also had the City and its lawyers conducted a thorough review of the docket (or fully disclosed what they likely already knew), they could have easily ascertained (and disclosed to this Court) that all sanctions were "vacated *nunc pro tunc*" and "[t]here are no findings of wrongdoing."  *See* Order Vacating Sanctions as to Certain Persons, *In re Asset Resolution, LLC*, 09-32824 (Bankr. D. Nev. Oct. 4, 2012), attached hereto as Exhibit C.

WEIL:\950715406\5259.0007

25

WHEREFORE, FGIC respectfully requests that the Court enter an Order denying the City of Detroit's Motion to Exclude the Testimony of Victor Wiener.

DATED: August 27, 2014

/s/ Alfredo R. Pérez
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: alfredo.perez@weil.com

– and –

Edward Soto
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Telephone: (305) 577-3177
Email: edward.soto@weil.com

-and-

Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER &
PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone: (248) 642-0333
Facsimile: (248) 642-0856
Email: EJEssad@wwrplaw.com
Email: mrjames@wwrplaw.com

*Attorneys for Financial Guaranty Insurance Company*

WEIL:\95071540\6\45259.0007

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-------------------------------------------------------x
                                    :
 In re                              : Chapter 9
                                    :
CITY OF DETROIT, MICHIGAN,          : Case No. 13-53846
                                    :
                        Debtor.     : Hon. Steven W. Rhodes
                                    :
                                    :
-------------------------------------------------------x
```

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2014 the *Financial Guaranty Insurance Company's Opposition to City of Detroit's Motion to Exclude Testimony of Victor Wiener* was filed and served via the Court's electronic case filing and noticing system to all registered users that have appeared in the main Chapter 9 proceeding.

DATED:  August 27, 2014

> /s/ Alfredo R. Pérez
> Alfredo R. Pérez
> WEIL, GOTSHAL & MANGES LLP
> 700 Louisiana Street, Suite 1700
> Houston, TX  77002
> Telephone: (713) 546-5000
> Facsimile:  (713) 224-9511
> Email:  alfredo.perez@weil.com
>
> *Attorney for Financial Guaranty Insurance Company*

WEIL:\95071540\6\45259.0007
27