**Exhibit A**

**Declaration of Victor Wiener**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

```
-------------------------------------------------------------x
                                                             :
 In re                                                       :    Chapter 9
                                                             :
 CITY OF DETROIT, MICHIGAN,                                  :    Case No. 13-53846
                                                             :
                    Debtor.                                  :    Hon. Steven W. Rhodes
                                                             :
                                                             :
-------------------------------------------------------------x
```

**DECLARATION OF VICTOR WIENER IN SUPPORT OF FINANCIAL GUARANTY INSURANCE COMPANY'S OPPOSITION TO CITY OF DETROIT'S MOTION TO EXCLUDE TESTIMONY OF VICTOR WIENER**

I, Victor Wiener, declare and state as follows:

**I.     Introduction**

1.     I have been retained as an expert in this case by Weil, Gotshal & Manges LLP on behalf of Financial Guaranty Insurance Company ("FGIC"). I submit this Declaration in support of FGIC's Opposition to the City of Detroit's Motion to Exclude Testimony of Victor Wiener (the "Opposition").

2.     I am an appraiser and for the past 10 years have worked in private practice. I am the Director of Victor Wiener Associates, LLC ("VWA"), an international firm of independent specialist appraisers and art advisors drawn from professional associations. VWA specializes in insurance appraisals, damage and loss appraisals, tax appraisals, equitable distribution appraisals, appraisals for collateralized transactions, and art market advice for private collectors and financial institutions.

3.     I was the Executive Director of the Appraisers Association of America ("AAA") for 21 years. The AAA is a highly regarded, international organization of members engaged in the profession of appraising art. In my role as Executive Director, I was responsible for implementing all AAA programs, including educational programs and lectures; public relations; overseeing membership criteria; reviewing and advising members' appraisals; and editing the journal and monthly newsletter.

4.     I have worked for auction houses, such as Sotheby's and Christie's, and for museums, including three years that I spent at the Metropolitan Museum of Art (the "MMA") in New York and the Victoria and Albert Museum in London (the "V&A"). I

have also conducted appraisals for the Philadelphia Museum of Art on works that the museum intended to loan for exhibition and have lectured for the American Association of Museums about appraisals of museum collections in connection with museum loan shows.  I have also been retained in connection with disputes involving several major museums where there were insurance claims for damages to works of art in their collections.  I hold a certificate in Museum Training given jointly by the Institute of Fine Arts of New York University and the MMA.  I received the Museum Training certificate after completing a two-year course of study involving seminars with most major curatorial departments at the MMA, training in art conservation at the Conservation Center of the Institute of Fine Arts, New York University, and a full year of internships at the MMA and the V&A.  The Ford Foundation fully funded my work in the Museum Training program.

5. I have taught courses on art appraising since 1985, including at The New School, Baruch College, and New York University.  My teaching experience includes teaching a course on the Uniform Standards of Professional Appraisal Practice ("USPAP").  I am certified as a USPAP instructor by the Appraiser Qualifications Board of The Appraisal Foundation; only a small number of appraisers of personal property are certified by The Appraisal Foundation in USPAP methodology.  To obtain my certification as a USPAP instructor, I successfully completed an instructor certification course taught by members of the Appraisal Standards Board of The Appraisal Foundation and passed an exam.  The Appraisal Foundation requires that instructors complete an instructor recertification course every two years to maintain certification, and my current certification expires in 2016.

6. I have also lectured widely on art appraising, including at Stanford University, New York Law School, the University of Southern California, the London Business School of London University, and New York University.

7. I am knowledgeable about art market conditions and art market practices. I render art market advice for private collectors and financial institutions. I also analyzed, monitored, and reported about the art market during my time as Executive Director of the AAA. I stay abreast of the art market and economic conditions relevant to art sales, in keeping with USPAP requirements. *See, e.g.*, USPAP 2014-15, Standard Rules 6-1(a), 7-1(a), copies of which are attached as an Exhibit to the Opposition.

8. I have been qualified as an expert witness in many high-profile cases involving art valuations, including in the following representative matters:

   a) In 1993, I was an expert witness in *In re Estate of Andy Warhol* in New York Surrogate's Court. I testified about appraisal methodology and blockage discount, and rendered an opinion on the quality of work performed by Christie's in valuing approximately 96,000 works of art in Warhol's estate that were transferred to the Andy Warhol Foundation for the Visual Arts. In that case, blockage discount was a central consideration because the disputed valuation was predicated on the fact that the art was transferred from the estate to the Foundation on the artist's death and therefore was valued as if sold all at once.

   b) In 2005, I was an expert witness in the criminal case, *United States v. Rocco de Simone*, which involved the practices of art dealers in connection

3

with the sale of French impressionist and modern paintings. My expert testimony on issues of consignment and related art matters played a key role in exonerating De Simone, against whom the allegations carried a seven-year prison sentence.

c) In 2007, I was qualified as an expert witness in the case of *Stephen and Elaine Wynn v. Those Certain Underwriters at Lloyds London, et al.* I was retained by Lloyds London to determine (i) the market value for insurance settlement purposes of Pablo Picasso's painting, Le Reve, before it was damaged in an accident, and (ii) the diminution in value of the painting as a result of the accident. Prior to the accident, Wynn had arranged to sell Le Reve for a reported $139 million, including commission, which would have been the highest price paid for a work of art up to that time.

d) During 2011-2013, I was an expert witness for the plaintiff in *Marguerite Hoffman v. L&M Arts, et al.*, on valuation issues concerning a major Mark Rothko painting. In that case, the plaintiff sought damages for breach of contract—specifically, for breach of the confidentiality provisions of the private sale contract when the defendant re-sold the painting at public auction. I offered an opinion on what the value of the Rothko painting would have been if the plaintiff had sold it in a public auction rather than a private sale. At trial, the jury awarded damages to the plaintiff.

4

e) Also during 2011-2013, I opined on valuation and art market practices in *Dorothy G. Bender Foundation, Inc. v. Carroll*, a case decided in New York Supreme Court. The case involved the valuation of several works of art, including an Arshile Gorky painting, connected with the settlement of the Lawrence Salander assets.

9. In addition to my expert testimony on blockage discount in the litigation concerning Andy Warhol's estate, I have also provided expert testimony on issues of blockage discount in other cases, including the following:

a) I was an expert witness in *Estate of Louise Nevelson et al. v. Carro, Spanbock, et al.*, a 2002 case that involved the valuation of over 3,000 works of art by Louise Nevelson that were held by a corporation established by the decedent artist and her son. The valuation was relevant to the determination of what compensation, if any, the estate was entitled to on account of the artworks held by the corporation, and whether a blockage discount should be applied in valuing those assets transferred to the corporation.

b) Also in 2002, I was a consultant and expert witness for the City of New York in the settlement of an insurance claim for artist Wen-Ying Tsai. Among the issues to be determined was whether a blockage discount should be applied in valuing the artist's works that had been damaged or destroyed in an electrical fire allegedly caused by the City's negligence.

5

c) In 2003, I was retained by the Canadian Department of Justice as an expert witness in appraisal methodology and blockage discount in *Charles Malette v. Her Majesty The Queen*, in Vancouver, Canada. The case involved a dispute concerning the donation of 981 works on paper by the Canadian artist, Harold Feist. My expert report was one of the expert reports cited by and relied upon by the Court of Appeals in its application of a blockage discount to the donation of works of art.

10. I am a co-author or contributor to numerous publications on appraising, including *All About Appraising: The Definitive Appraisal Handbook*, published by the Appraisal Institute of America in 2003, and the *Appraisal Standards for the Insurance Profession*, published by the Inland Marine Underwriters Association in 2001. I have also written on the use of blockage discount, including a chapter in *All About Appraising* entitled "Blockage Discount," and have lectured on blockage discount for the Art Law section of the New York Bar Association.

11. In accordance with USPAP, the experience and credentials of the expert specialists that worked with me on the appraisal of the DIA collection and the extent of their assistance are disclosed in the expert report (the "Report") that I prepared in connection with my retention as an expert witness in this case. I regularly rely on information provided by expert specialists in formulating appraisals. This is consistent with USPAP, which provides that, to complete an assignment competently, an appraiser may associate himself with an appraiser reasonably believed to have the necessary knowledge and/or experience or retain others who possess the necessary knowledge

6

WEIL:\95071330\4\45259.0007
13-53846-tjt    Doc 7130-1    Filed 08/27/14    Entered 08/27/14 21:27:03    Page 8 of 11

and/or experience.  *See* USPAP 2014-15, Competency Rule, lines 370-73, a copy of which is attached as an Exhibit to the Opposition.

12. As detailed in my Report, I assembled the team of expert specialists that contributed to the appraisal.  The initial valuations for specific sectors that were performed by each specialist were solely a point of departure, and all values were discussed with me and with other members of the team before assigning final valuation figures.

13. In addition, in performing my appraisal in this case, I examined all relevant sources of data that were available to me, including third-party appraisals of the DIA collection.  In my standard appraisal contract, I routinely request that clients provide any and all data concerning the work of art to be valued, including any previous appraisals and insurance valuations.

14. One of the expert specialists I retained for the DIA appraisal, Mr. Robert Leeds, has technical, statistical, and financial analytical knowledge.  For example, Mr. Leeds and his associates transcribed some of the data in connection with the appraisal process and also worked with me to quantify the percentage change in value of the insurance data for the works analyzed in step 3 of the appraisal as compared to the marketable cash values that would be ascribed today.  In addition, in connection with step 4, I determined how the categories of Sotheby's and Christie's sales should correlate to the various DIA departments, and Mr. Leeds and his associates grouped the data for each sales category according to these determinations.  Mr. Leeds performed his analysis under my direction and in accordance with the methodology that I, in consultation with

7

WEIL:\95071330\4\45259.0007
13-53846-tjt    Doc 7130-1    Filed 08/27/14    Entered 08/27/14 21:27:03    Page 9 of 11

others in my team, determined most appropriate for all steps of the appraisal process.  I reviewed Mr. Leeds' work and determined that it was competently performed according to generally accepted methodology, and I used Mr. Leeds' work in forming my conclusions regarding value, including in step 3 of the appraisal.

15.  I retained Dr. Jannette Barth on account of her knowledge and experience with the analysis and calculation of discount factors, including blockage discount.  Dr. Barth and I have worked together on numerous appraisal projects over the course of twenty years.  She reviewed Artvest's application of blockage discount to the DIA collection.  Her opinions were relevant to my assessment of the validity of the data contained in the report submitted by Artvest Partners LLC (the "Artvest Report").  Based on my extensive experience with the application of blockage discounts in the art market, I have the competency to assess Dr. Barth's opinions and rely on those opinions in reaching my ultimate conclusions regarding the value of the DIA collection.

16.  Zhang Yi was retained in connection with the DIA appraisal on account of his knowledge of art market analysis.  In considering all data relevant to the appraisal, I asked Mr. Zhang, who was a co-author of the TEFAF Art Market Report 2014 (the "TEFAF Report") that was cited extensively in the Artvest Report, to comment on Artvest's market observations purportedly based on the TEFAF Report.  Because of Mr. Zhang's first-hand knowledge of the TEFAF Report, he had the necessary knowledge to assess competently whether the Artvest Report misrepresents the TEFAF Report.  I have, in the past, relied on primary sources to verify the accuracy of information that I considered in determining appraised values.

8

17. My Report was corrected as of August 20, 2014 following my identification of (i) certain works that should not have been included in step 2 of the appraisal but rather in steps 3 or 4 of the appraisal, and (ii) transcription errors in the DIA insurance list that resulted in the insurance value for one object being listed multiple times.

18. Absent a detailed inspection of each work, it would be impossible to identify whether any other object was mistakenly listed multiple times on the DIA insurance list.

19. Therefore, I applied an additional discount of 3.5% to the Grand Total, Projected Sum of Average DIA Insurance Value listed in Attachment L to my Report. This corrective percentage was arrived at by analyzing the insurance list and identifying the number of individual items that were listed separately but could possibly be grouped and valued as one item, and dividing that number by the total number of items on the list; the result of this division corresponds to 3.5%.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this 26th day of August, 2014 at New York, New York.

_____
Victor Wiener