# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |
| | | Related to Doc. No. 6982, 6990 |

**THE DETROIT RETIREMENT SYSTEMS' RESPONSE IN OPPOSITION TO SYNCORA'S MOTION IN LIMINE BARRING THE CITY AND PLAN SUPPORTERS FROM INTRODUCING EVIDENCE REGARDING THE POTENTIAL PERSONAL HARDSHIP OF PENSIONERS [DKT. NO. 6982] -AND- FGIC'S MOTION IN LIMINE TO PRECLUDE THE INTRODUCTION OF EVIDENCE OR TESTIMONY REGARDING CERTAIN MATTERS PREVIOUSLY DEEMED IRRELEVANT BY THE COURT OR THE CITY OF DETROIT [DKT. NO. 6990]**

The Police and Fire Retirement System of the City of Detroit (the "PFRS") and the General Retirement System of the City of Detroit (the "GRS") (together, the "Retirement Systems") hereby submit the following in opposition to Syncora's Motion *in Limine* Barring the City and Plan Supporters from Introducing Evidence Regarding the Potential Personal Hardship of Pensioners [Dkt. No. 6982] ("Syncora's Motion") and FGIC's Motion *in Limine* to Preclude the Introduction of Evidence or Testimony Regarding Certain Matters Previously Deemed Irrelevant by the Court or the City of Detroit [Dkt. No. 6990] ("FGIC's Motion")

(collectively, the "Motions").

<h2 align="center">Preliminary Statement</h2>

1.     Syncora and FGIC both argue in their Motions that the City (and any Plan Supporters) should be precluded from arguing that the "personal hardship" of individual pensioners is relevant to the issue of unfair discrimination.  In doing so, Syncora and FGIC cite remarks of the Court, but take them completely out of context and confuse (a) the concept of the Court not considering "personal hardship" and the impact of the Plan on retirees and active employees *as creditors vis-à-vis other* creditors, with (b) the concept of the Court considering the City's *business justification* for treating retirees and active employees differently than other creditors in light of their place within and their impact on the City's revitalization.   How the personal hardships of these individual creditors may impact the City's overall reorganization efforts *is* a relevant consideration for the City and this Court.

2.     What is missing in the analysis by Syncora and FGIC is a recognition of the "business" in which the City is engaged.  Its customers are its residents and businesses.  If residents (including retirees and active employees) are not being adequately provided for, they will leave the City for a better provider of municipal services.  If the City is losing its workforce in this manner and cannot provide effective services to residents and businesses, and if the streets are lined with

2

impoverished retirees dependent upon public welfare and unable to buy services and properly maintain residential neighborhoods, then it will lose existing businesses and will not be able to attract investment and new businesses. Under these circumstances, the "business" of the City will fail.

3.     In fact, in the very same discussion with the Court that Syncora and FGIC rely upon, this Court clearly recognized that individuals' personal hardship might be relevant in the context of the City's business justifications for disparate treatment of creditors:

> I do not want and don't think it relevant to consider a series of retirees or employees, for that matter, testifying about their individual hardship. In my view, neither fair and equitable nor unfair discrimination has ever in any bankruptcy case considered the impact of a plan on a creditor. . . ***The issue always is the business justification for the treatment from the debtor's perspective. Now, to the extent that issue <u>encompasses consideration of hardship, I would leave it to the proponents of the plan to argue and prove that,</u>*** but that's a much. . . broader and differently focused question than just plain hardship of retirees.[1]

Dkt. No. 6982-8, Hrg. Trans. 81:9-21, August 6, 2014 (emphasis added).

4.     Notably, the position of the Court stated above is precisely what undersigned counsel for the Retirement Systems articulated at that hearing as well:

> I just want to make sure that it was clear or understood by all parties that if there is information or an argument to be made as to the impact more broadly on retirees, not just as creditors but more specifically as a part of the entity that we are trying to rehabilitate, that that is

---

[1]     Both FGIC and Syncora omitted this portion of the Court's statement from the transcript citations in their Motions.

3

relevant and fair game in the context of a Chapter 9.

Dkt. No. 6982-8, Hrg. Trans. 81:25-82:6, August 6, 2014.[2]

5.      Accordingly, it should have been clear to both Syncora and FGIC at least as of August 6, 2014 that the City's consideration of the impact of the economic hardship on individuals in the aggregate upon the "business" of the City, in proposing disparate treatment of Class 10 and 11 creditors under the Plan, was indeed relevant.  If either Syncora or FGIC were confused about the parameters of the relevancy of "personal hardship" in this case, they should have raised the issue on August 6, rather than wait and file a motion *in limine* weeks later claiming prejudice.  Therefore, FGIC's Motion and Syncora's Motion must be denied.

## Standard of Review

6.      Motions *in limine* are subject to a "high standard" and are appropriate only when evidence  is "clearly inadmissible."  *Broad St. Energy Co. v. Endeavor Ohio, LLC*, 2014 U.S. Dist. LEXIS 60041, *5 (S.D. Ohio April 30, 2014).  Under the Federal Rules of Evidence, evidence is "relevant" if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Evidence must relate to a "matter or issue in dispute in the case" in order to be relevant.

---

[2]      *See also* undersigned counsel's statement regarding the relevance of "hardship on a macroscopic level to . . . the community as a whole."  Dkt. No. 6982-8, Hrg. Trans. 11:6-11, August 6, 2014.

4

*United States v. Dunn*, 805 F.2d 1275, 1281 (6th Cir. 1986). "Whether an issue is properly in dispute is, of course, determined by the applicable substantive law." Fed. R. Evid. 403 Advisory Committee's Note.

### Response

7.     Under the "applicable substantive law" relating to unfair discrimination, evidence relating to the personal hardships of thousands of the municipal debtor's citizens and active workforce—when viewed in the aggregate and from the City's perspective—is clearly relevant.

8.     By its own terms, section 1129(b)(1) "prohibits only *unfair* discrimination, not all discrimination." *In re Aztec Co.*, 107 B.R. 585, 588-89 (Bankr. M.D. Tenn. 1989) (emphasis added). Implicitly, then, some discrimination is "fair." *In re Simmons*, 288 B.R. 737, 747-48 (Bankr. N.D. Tex. 2003) (citing 7 Collier on Bankruptcy ¶ 1129.04[3]) (noting it is "necessarily inherent in the term 'unfair discrimination' . . . that there may be 'fair' discrimination in the treatment of classes of creditors.").

9.     Indeed, a "bankruptcy court can permit discrimination when the facts of the case justify it." *Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc)*, 662 F.2d 872, 879 (5th Cir. 1980). A plan does not unfairly discriminate if there is "a rational or legitimate basis for discrimination" and if the discrimination is "necessary for reorganization." *In re Dow Corning Corp.*, 255

5

B.R. 455, 537-38 (E.D. Mich. 2000) (citing *In re Crosscreek Aparts., Ltd.*, 213 B.R. 521, 537 (Bankr. E.D. Tenn 1997)).  Generally, "there is great discretion left to the bankruptcy court to determine whether the discrimination is unfair."  *In re Cooper*, No. 08-20473, 2009 WL 1110648, *5 (Bankr. N.D. Tex. April 24, 2009).

10.     Examples of situations where courts have found that the "facts of the case justify" discrimination or where the discrimination is "necessary for reorganization" include cases involving union and employee relations as well as trade creditors, based upon the notion that these groups of creditors are often integral in the debtor's reorganization efforts and the debtor needs "buy-in" from these constituencies.  *See, e.g.*, *Aetna Cas & Surety Co. v. Clerk (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (finding a 60% disparity fair where debtor paid workers' compensation claims in full, while providing only a 40 percent recovery for insurance company claims of the same priority, in part, due to concerns over future labor relations); *In re Creekstone Aparts. Assocs., L.P.*, 168 B.R. 639, 644 (Bankr. M.D. Tenn. 1994) (upholding a preferential recovery of 90 percent for trade creditors because their "services and products were essential to the successful operation" of the reorganized debtor).

11.     Moreover, in the unique context of a Chapter 9 case, the special needs of the municipality *as a municipality* must be taken into account.  *See* 6 <u>Collier on Bankruptcy</u>, ¶ 900.01[2]  (Alan N. Resnick & Henry J. Somme reds., 16th ed. rev.)

201293714.2 14893/165083

("[U]nlike other Chapters, Chapter 9 does not attempt to balance the rights of the debtor and its creditors, but rather, to meet the special needs of a municipal debtor."). Thus, the overall societal impact of the debtor's plan can be considered by the Court. *See e.g.*, *In re Barnwell County Hosp.*, 471 B.R. 849, 869-70 (Bankr. D.S.C. 2012) (affirming the debtor's plan and noting "of particular importance to the Court is that the Plan preserves the availability of healthcare services to citizens and patients in the County"); *In re Corcoran Hosp. Dist.*, 233 B.R. 449, 454 (Bankr. E.D. Cal. 1999) (describing the area's economic woes and noting that the debtor/hospital "is very important to the community of Corcoran" and that it was "an essential element to the survival of Corcoran as a community").

12.     This Court has been consistent in stating that the perceived needs of the ***debtor*** (as opposed to the needs of the individual creditors) are a relevant consideration: "[I]n the case law I'm familiar with where the issue is the business justification for whatever discrimination is in the plan is determined based on the ***business needs of the debtor***, not the business or financial needs of the creditors." Dkt. No. 5697, Hrg. Tr. 104:2-6, June 26, 2014 (emphasis added); *see also* Dkt. No. 6982-8, Hrg Tr. 81:9-17, August 6, 2014 ("The issue always is the business justification for the treatment from the debtor's perspective.")

13.     In this case, the City has articulated a need for a class of its creditors—the Holders of Pension Claims—to be treated in a manner that will

7

prevent the creation of a caste of socially indigent citizens that would force the City to expend social services funds it does not have. *See, e.g.*, City's Consolidated Reply, Dkt. No. 5034 at ¶ 87 ("Preferential treatment of Pension Claims also is in recognition of the personal hardship that will befall pensioners, many of whom are also residents of the City… This hardship—if severe enough— can also strain City resources by causing City social service costs to rise.").

14.     The City has also articulated a need to attract new employees and to encourage the thousands of employees it already has to remain engaged and productive moving forward, despite drastic cuts to their wages, pensions, and health benefits. *See, e.g.*, City's Consolidated Reply, Dkt. No. 5034 at ¶ 62 ("The Plan's treatment of Pension Claims minimizes the adverse impact of the pension benefit reductions on the City's current employees, whose ongoing motivation and cooperation (as well as that of the unions that represent the employees) is vital to the City's recovery and to the health, welfare, and safety of its residents.").

15.     Keeping masses of citizens off of the poverty lines and keeping a municipal workforce "on the job" so they can continue providing essential city services is precisely the sort of "business justification," from the City's perspective, that is a relevant factor in support of the alleged preferential treatment afforded to actives and retirees.

16.     For example, as the City's Director of Human Resources and Labor

8

Relations (Michael Hall) testified, the City is concerned regarding the impact that pension and healthcare reductions will have on its active workforce. (Exhibit 1 attached hereto, Michael Hall Dep. at 133-146). Mr. Hall heard concerns from "union leadership, workers in the police, fire, employees that work in City Hall, people, employees that work in DDOT." *Id.* at 145. Others expressed "concern" about pension issues and how the changes would impact them long-term and short-term. *Id.* at 145, 149. The ASF Recoupment portion of the Plan, in particular, had a negative impact on the City's workforce and caused "frustration" amongst employees. *Id.* at 162-63. This is exactly the sort of "personal hardship" evidence that *is* relevant—on a macroscopic level, the aggregate hardship felt by an entire active workforce, which could potentially derail the City's entire reorganization effort.

17. Similarly, Mayor Duggan testified that while he did not objectively measure whether pension cuts adversely impacted employee productivity, it certainly "was a source of great anxiety. . . around all of the employment centers" and this "level of anxiety didn't help anything." (Exhibit 2 attached hereto, Duggan Dep. at 125-26). Duggan explained that what he looks at is "what motivates performance, and certainly the feeling that the employer is treating them and dealing with them fairly is a huge impact on people's performance, and I'm trying to create an environment [at the City] where people feel like they're being

9

treated fairly. Certainly a number of these things have caused them to feel they're being treated unfairly, and I see it in every forum that I go to[.]" *Id.* at 126. Duggan also specifically pointed to the fact that the pension reductions ended up being *less* drastic under the current Plan as a reason why the active workforce feels as though they are currently being treated more fairly. *Id.* at 126-127. When asked if the reduced cuts to retirees had any impact on employee morale, he answered that he's "got 9,000 employees" and while he has not officially surveyed them all, "[t]here is a sense of, I think, hope in the city now that wasn't there six months ago." *Id.* at 127-28. This is precisely the sort of permissible business justification that may be considered by the Court—and is exactly what the City was hoping to achieve. *See* City's Consolidated Reply, Dkt. No. 5034 at ¶ 65 ("by providing a relatively enhanced recovery to holders of Pension Claims, the City is helping to ensure the success of some of its most vital relationships going forward.").[3]

---

[3]     Indeed, as this Court has already acknowledged, the revitalization of the City—and in particular, correction of its "service delivery insolvency"—is of "paramount importance in this case." *See Opinion Regarding Eligibility*, Dkt. No. 1945 at 139-40 (noting the City's "services do not function properly due to inadequate funding. The City has an extraordinarily high crime rate; too many street lights do not function; EMS does not timely respond; the City's parks are neglected and disappearing; and the equipment for police, EMS and fire services are outdated and inadequate. . . in seeking chapter 9 relief, the City not only reorganizes its debt and enhances City services, but it also creates an opportunity for investments in its revitalization efforts for the good of the residents of Detroit.") This revitalization, however, is simply not attainable if thousands of retired citizens are left impoverished and if municipal employees have abandoned their posts.

10

18.     The above-cited examples are consistent with this Court's prior pronouncement that the "business justification for the treatment from the debtor's perspective" is relevant and "to the extent that issue encompasses consideration of hardship," the City can "argue and prove that" because that is a "broader and differently focused question than just plain hardship of retirees."[4] Dkt. No. 6982-8, Hrg. Trans. 81:9-21, August 6, 2014.  Therefore, *all* evidence relating to personal hardship of retirees and actives cannot be excluded at trial because these personal hardships are intertwined with other, undisputably relevant arguments that will be presented at trial. *Jonasson v. Lutheran Child & Family Servs*., 115 F.3d 436, 440 (7th Cir. Ill. 1997) (noting a motion *in limine* is proper where the court can "eliminate from further consideration evidentiary submissions that clearly ought not be presented to the jury because they clearly would be inadmissable for ***any purpose***") (emphasis added).  Accordingly, the Motions must be denied.

---

[4]     In Syncora's Motion, it argued that the Retirement Systems should not be allowed to "backdoor this issue by seeking to introduce evidence of the 'aggregate' personal hardship" because "[a]ggregate personal hardship data is just individual personal data in another guise."  Syncora's Motion at 9, n. 2.  But clearly, the aggregate impact of "personal hardship" on entire classes of citizens—when viewed from the perspective of the debtor—is relevant.  Thus, contrary to FGIC's Motion, the Retirement Systems' argument that the City is justified in considering the need to avoid "wide-scale impoverishment" of thousands of its citizens is relevant and the Court may properly consider it.  *See Corrected Brief of the Detroit Retirement Systems in Support of Proposed Treatment of Pension Claims Under "Alternative A" of the Corrected Fifth Amended Plan for Adjustment of Debts of the City of Detroit and Statement of Reservations,* Dkt. No. 6520, at 16-17.

11

Respectfully submitted,

CLARK HILL PLC


/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Jennifer K. Green (P69019)
Shannon L. Deeby (P60242)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com
jgreen@clarkhill.com
sdeeby@clarkhill.com

Dated: August 27, 2014

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

12

# Exhibit 1

MICHAEL HALL

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

In re                    ) Chapter 9

CITY OF DETROIT, MICHIGAN,     ) Case No. 13-53846

Debtor.  ) Hon. Steven W. Rhodes

_____

The Videotaped Deposition of MICHAEL HALL,

Taken at 1114 Washington Boulevard,

Detroit, Michigan,

Commencing at 8:57 a.m.,

Wednesday, July 2, 2014,

Before Kathryn L. Janes, CSR-3442, RMR, RPR.

MICHAEL HALL

APPEARANCES:

DEBORAH KOVSKY-APAP, ESQ.,

LESLEY S. WELWARTH, ESQ.

Pepper Hamilton LLP

4000 Town Center

Suite 1800

Southfield, Michigan 48075

    Appearing on behalf of the Debtor.

DAN BARNOWSKI, ESQ.

Dentons US LLP

1301 K Street, NW

Suite 600, East Tower

Washington, DC 20005-3364

    Appearing on behalf of the Retiree Committee.

MICHAEL HALL

MICHAEL J. PATTWELL, ESQ.

Clark Hill, PLC

212 East Grand River Avenue

Lansing, Michigan 48906

    Appearing on behalf of the Retirement Systems

    for the City of Detroit.

STEPHEN C. HACKNEY, ESQ.

Kirkland & Ellis LLP

300 North LaSalle

Chicago, Illinois 60654

    Appearing on behalf of Syncora Guarantee Inc.

    and Syncora Capital Assurance Inc.

MICHAEL HALL

VINCENT J. MARRIOTT, III, ESQ.

Ballard Spahr LLP

1735 Market Street

51st Floor

Philadelphia, Pennsylvania 19103

    Appearing on behalf of Hypothekenbank Frankfurt

    AG; Hypothekenbank Frankfurt International S.A.;

    and Erste Europaische Pfandbrief

    Kommunalkreditbank Aktiengelsellschaft in

    Luxemburg S.A.

MARK R. JAMES, ESQ.

Williams, Williams, Rattner & Plunkett, P.C.

380 North Old Woodward Avenue

Suite 300

Birmingham, Michigan 48009

    Appearing on behalf of the Financial Guaranty

    Insurance Company.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7133   Filed 08/27/14   Entered 08/27/14 21:41:00   Page 14 of 26

MICHAEL HALL

1
2  Q. Now, the -- the changes to retiree health care
3     and the changes to active employee health care
4     were different, correct?
5  A. Correct.
6  Q. The -- what were the differences in the health
7     care benefits going forward as you understood
8     them?
9  A. Going forward, prior to 2014, the benefit packages
10    were basically the same for retirees and active.
11    In January 2014, the retirees were going to get a
12    stipend as opposed to being covered which is a
13    tremendous cost savings for the City.
14 Q. And what were happening to actives?
15 A. Actives would still maintain their health care
16    coverage.
17 Q. Did the cost of it change for actives?
18 A. Yes.
19 Q. Did it go up or down?
20 A. It went up.
21 Q. It went up, so the actives had to bear a larger
22    portion of the cost?
23 A. That's correct.
24 Q. Did the benefits go up or down or were they the
25    same?

MICHAEL HALL

1
2  A. Benefits basically stayed the same.
3  Q. Okay.
4  A. The coverage wise.
5  Q. So active employees were bearing a larger portion
6     of the cost of their own health care?
7  A. Correct.
8  Q. And so were retirees, correct?
9  A. Retirees incur a much -- much larger share.
10 Q. Yeah, so there was a disparity between the two,
11    correct?
12 A. That's correct.
13 Q. And the retirees took the -- they had the harsher
14    change?
15 A. Correct.
16 Q. Okay. And in your judgment, this had a
17    significant negative impact on employees?
18 A. Correct.
19 Q. Because they were now concerned that they would
20    not have health care when they became a retiree?
21 A. That's correct.
22 Q. So do you know if someone retires from the City
23    in December of this year after the bankruptcy may
24    have concluded, okay, do you know what will
25    govern their health care benefits in retirement?

MICHAEL HALL

1
2     Will they be governed by what's happening to
3     retirees under the plan or will they be governed
4     by a different plan?
5  A. If you retire during this calendar year, you're
6     covered under the retiree health care plan that's
7     in place now.
8  Q. That retirees are getting under the plan?
9  A. Under the plan.
10 Q. Okay. What if you retire after this calendar
11    year?
12 A. That's not communicated yet.
13 Q. Not known?
14 A. Right.
15 Q. Do you know if that will be a function of the
16    plan in place at the time that that employee
17    retires?
18 A. Repeat the question.
19 Q. Do you know if I retire next year, I'm talking
20    about how it typically works, is it typically the
21    plan that's in place at the time I retire is the
22    plan that I get going forward in my retirement?
23        MR. BARNOWSKI: Objection, calls for a
24    legal conclusion.
25        MS. KOVSKY-APAP: Objection,

MICHAEL HALL

1
2     foundation.
3  A. The plans can change.
4  BY MR. HACKNEY:
5  Q. And if the plans change, that changes the level
6     of coverage that retirees get as well?
7        MR. BARNOWSKI: Same objection.
8  A. The plans can change.
9  BY MR. HACKNEY:
10 Q. I take it, that there's just one set of plans
11    that you're administering at any one time; is
12    that correct?
13 A. At this time, we have a retiree plan and we have
14    an active plan.
15 Q. Well, that was -- okay. So let's strike that.
16        At this time, there are two different
17    plans that you're administering, one that relates
18    to retirees and one that relates to actives,
19    correct?
20 A. Correct.
21 Q. Traditionally was it your understanding that
22    there was just one plan that related to both
23    actives and retirees?
24 A. That's correct.
25 Q. Okay. But now there are two, correct?

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7133   Filed 08/27/14   Entered 08/27/14 21:41:00   Page 15 of 26

MICHAEL HALL

1
2  A.  Correct.
3  Q.  And you're saying that you don't know how
4      employees that will retire after this calendar
5      year, you don't know whether -- which of the two
6      plans they'll be -- they'll get health care
7      benefits under?
8  A.  That's still in mediation.
9  Q.  Oh, okay.  And was it this calendar year or was
10     it June 30, 2014?
11 A.  This calendar year, this calendar year.
12 Q.  Now, with respect to retiree health care, has
13     that had an impact when it's come to hiring new
14     employees?
15         MS. KOVSKY-APAP:  Objection,
16     foundation.
17 A.  I have no way of knowing.
18 BY MR. HACKNEY:
19 Q.  Okay, have you ever seen a situation where you've
20     lost a new employee or were not able to attract a
21     new employee because of --
22 A.  It hasn't been brought to my attention.
23 Q.  Okay.  Do you know how the City's health care
24     benefits for active employees compare to
25     surrounding communities?

MICHAEL HALL

1
2  A.  No.
3  Q.  Have you ever attempted to study the question of
4      what surrounding communities are offering when it
5      comes to their health care benefits?
6  A.  No.
7  Q.  Do you know if anyone else has studied that
8      question?
9          MS. KOVSKY-APAP:  Objection, it's a
10     little broad.
11 BY MR. HACKNEY:
12 Q.  At the City or its consultants?
13 A.  I don't know what benchmarking our consultants
14     did.
15 Q.  Okay.  I take it, you've never seen a study that
16     says here's what folks around us are doing when
17     it comes to health care benefits?
18 A.  No.
19 Q.  Is that correct, you have not seen that, correct?
20 A.  I have not seen it.
21         MR. HACKNEY:  Let's mark this as Number
22     3.
23         MARKED FOR IDENTIFICATION:
24         DEPOSITION EXHIBIT 3
25         11:36 a.m.

MICHAEL HALL

1
2          MS. KOVSKY-APAP:  There is usually a
3  button you can push for print friendly copy.
4          MR. HACKNEY:  So I did, and it still
5  printed it like that, at least on the old one.
6  The problem with the print button on some of these
7  things, for whatever reason it strips the date of
8  the article on it, so I've been going with the
9  screen print.
10         MR. BARNOWSKI:  These ads are focused
11 on your browsing patterns.
12         MR. HACKNEY:  Yes, I know.  So believe
13 me, that occurred to me as we were getting ready
14 for this, I had to make sure there weren't any of
15 the other types of ads that you could see.
16         MR. BARNOWSKI:  Sorry.
17         MR. HACKNEY:  No, that's okay.  I'm in
18 the market for a trash compactor if anyone has a
19 recommendation.
20 BY MR. HACKNEY:
21 Q.  Okay.  So do you have Hall Exhibit Number 3 in
22     front of you?
23 A.  Yes.
24 Q.  This is another one of those articles which I'm
25     using to try and help you remember when certain

MICHAEL HALL

1
2  things happened.  Do you recall, and whether the
3  article says that or not, you know, your
4  recollection is obviously independent, but do you
5  recall that in November that the City announced
6  that it was going to extend the changes to the
7  retiree health care; do you recall that?
8  A.  Yes.
9  Q.  Did you have input into that decision to extend?
10 A.  No.
11 Q.  The basic gist of the extension was that retirees
12     maintained their existing health care while the
13     parties continued to negotiate, so it -- it
14     delayed when the new retiree health care rules
15     would go into effect; is that correct?
16 A.  That's correct.
17 Q.  The City did not change -- the City did not delay
18     its -- its changes to active employee health
19     care; isn't that correct?
20 A.  No, it didn't.
21 Q.  And when did the active employee changes go into
22     effect?
23 A.  January the 1st.
24 Q.  And did those, in fact, go into effect on
25     January 1st?

13-53846-tjt   Doc 7133   Filed 08/27/14   Entered 08/27/14 21:41:00   Page 16 of 26

MICHAEL HALL

1    A.  **To the best of my knowledge.**
3    Q.  Did the City's announcement here that it was
4        going to delay the implementation of its changes
5        to your retiree health care have an impact that
6        you could discern on the City's workforce?
7    A.  **Everyone was looking at it because they look that**
8        **it's going to affect them later on in life.**
9    Q.  So they were concerned that the way health care
10       was handled with respect to existing retirees
11       might indicate how it would be handled for them
12       when they retired?
13   A.  **That's correct.**
14   Q.  Was this one of the most significant concerns
15       that you heard from employees about what was
16       going on in the bankruptcy?
17   A.  **That and what was going to happen pension wise.**
18   Q.  Okay.  And tell me more about what was going --
19       we'll get into it with the pensions, but what was
20       their concern with respect to pensions?
21   A.  **You know, what was going to happen to their**
22       **pensions, you know, going forward, that was a**
23       **major concern.**
24   Q.  So they under -- people understood that there was
25       going to be a new pension plan going forward?

MICHAEL HALL

2    A.  **They thought something was going to happen, they**
3        **were concerned what, you know, what was going to**
4        **be their job security -- not job security, but**
5        **financial security going forward.**
6    Q.  Okay.
7    A.  **They worked here.  They felt as though they had**
8        **qualified for a pension, what was going to happen,**
9        **will there be a pension?  At what rate?  You know,**
10       **what's going to happen to me?**
11   Q.  And so their principal concern was about what
12       their pension would be going forward and whether
13       the City could satisfy their pension?
14   A.  **That's correct.**
15   Q.  Now, do you understand that there's a bit of a
16       tension with respect to how much you pay retirees
17       versus how much you pay actives because the more
18       money you pay to retirees, the less money that's
19       available to pay actives?
20   A.  **Okay.**
21   Q.  Do you under -- do you understand that concept?
22   A.  **Sort of.**
23   Q.  Okay.  You understand there's a limited amount of
24       money the City has?
25   A.  **That's correct.**

**MICHAEL HALL**

2    Q.  Okay.  And did employees convey to you -- did any
3        employees convey to you that they also understood
4        that?
5    A.  **No.**
6    Q.  No.  So did you notice a change in employee
7        morale or productivity or efficiency, any of the
8        things that go into having an effective workforce
9        between the time of these two announcements, did
10       it have an impact when it came to any of those
11       things?
12       MS. KOVSKY-APAP:  Objection, he has
13       already testified he hasn't studied employee
14       efficiency.
15   A.  **No.**
16   BY MR. HACKNEY:
17   Q.  You did not determine a change?
18   A.  **No.**
19   Q.  You're aware that Detroit elected a new mayor in
20       the fourth quarter of 2013, correct?
21   A.  **Correct.**
22   Q.  That's Mayor Duggan?
23   A.  **Correct.**
24   Q.  Would you agree that Mayor Duggan has infused a
25       new level of energy into this city?

MICHAEL HALL

2    A.  **Yes.**
3    Q.  And do you also agree that Mayor Duggan carries
4        with him the reputation as a reformer?
5    A.  **Yes.**
6    Q.  Has his arrival improved the morale of city
7        employees as far as you're able to tell?
8    A.  **Yes.**
9    Q.  And has his arrival also made it easier to
10       attract new employees to come work for the City?
11   A.  **I can't confirm that.**
12   Q.  By the way, going back to -- how many employees
13       would you say you spoke with that expressed
14       concerns about OPEB health care benefits going
15       forward?
16   A.  **I can't give a number to it.**
17   Q.  Less than ten, more than ten?
18   A.  **More than ten.**
19   Q.  Less than 50, more than 50?
20   A.  **Probably more than 50.**
21   Q.  And who were the people that expressed these
22       concerns to you?
23       MS. KOVSKY-APAP:  Objection, are you
24       asking for a list of names?
25   BY MR. HACKNEY:

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 7133    Filed 08/27/14    Entered 08/27/14 21:41:00    Page 17 of 26

MICHAEL HALL

1
2    Q.   Anyone that you can remember?
3    **A.   I can tell you union leadership, workers in the**
4       **police, fire, employees that work in City Hall,**
5       **people, employees that work in DDOT.**
6    Q.   Is it the same group who expressed concerns about
7       how pensions were going to be handled?
8    **A.   Just different people at different times,**
9       **different subjects.**
10   Q.   Is the -- was the principal focus of these
11      employee concerns, whether it was health care
12      benefits or pension was what does this mean for
13      me when I retire, is that the main thing that
14      they were --
15   **A.   These are general conversations with people**
16      **talking about, you know, how is this going to**
17      **affect me long-term wise, short-term as well as**
18      **long-term.**
19             MARKED FOR IDENTIFICATION:
20             DEPOSITION EXHIBIT 4
21             11:45 a.m.
22       MR. HACKNEY:  What number is this?
23       COURT REPORTER:  4.
24   BY MR. HACKNEY:
25   Q.   Okay.  So do you have Exhibit Number 4 in front

MICHAEL HALL

1
2       of you, sir?
3    **A.   Yes.**
4    Q.   And take a -- you should feel to read these, if
5       you'd like.  They're mainly designed to help with
6       dates different things happened.  Do you recall
7       that the City filed its initial Plan of
8       Adjustment on or around February 21, 2014?
9    **A.   Okay.**
10   Q.   Do you recall that?
11   **A.   I recall a plan being filed.**
12   Q.   Yeah.  What -- you probably don't the recall the
13      specific date?
14   **A.   No.**
15   Q.   Do you recall that the initial plan that the City
16      filed proposed cuts to earned pension benefits,
17      is how I'm going to describe it, of differing
18      amounts for police and fire and general retirees?
19          MS. KOVSKY-APAP:  Objection, form and
20       foundation.
21   BY MR. HACKNEY:
22   Q.   Do you recall that the plan involved cuts to
23      pensions?
24   **A.   Yes.**
25   Q.   And do you recall that the proposed cuts in this

MICHAEL HALL

1
2       initial plan were 4 percent for police and fire
3       and 26 percent for general retirees?  I know it
4       says that here, I'm --
5    **A.   It says it here.**
6    Q.   -- wondering if you remember?
7    **A.   I don't recall at that time, but I see it here.**
8    Q.   Yeah, so what I'm trying to ask you, do you
9       remember there was a time when the City was
10      proposing steeper cuts to pensions than it's
11      proposing in the plan that's currently on file?
12   **A.   Yes.**
13   Q.   Do you understand that?
14   **A.   Yes.**
15   Q.   So I want to go back to that, that time when they
16      were proposing -- I know you may not recall what
17      the specific levels of cuts were, but I'm talking
18      about the steeper levels of cuts, okay?  Do you
19      recall that time?
20   **A.   Yes.**
21   Q.   Okay.  So does -- does the plan's filing stand
22      out for you in terms of having had a material
23      impact on -- on the workforce of the City; do you
24      remember that time as being one where there was a
25      significant level of employee activity coming to

MICHAEL HALL

1
2       you and expressing concern?
3    **A.   Not coming to me to express concern.**
4    Q.   Okay.  So that was not something that generated
5       increased level of activity at your desk?
6    **A.   Not at my desk, no.**
7    Q.   What about in terms of people coming to you and
8       reporting to you?
9    **A.   Because it affected those people, it was general**
10      **conversation around the -- around the building.**
11   Q.   Were you consulted in advance of the decision to
12      file this proposed plan?
13   **A.   No.**
14   Q.   Were you consulted about the level of cuts that
15      were going to be proposed in this plan?
16   **A.   No.**
17   Q.   Okay.  So at the time this plan was proposed, you
18      were involved in negotiations with the labor
19      unions, correct?
20   **A.   Correct.**
21   Q.   We're talking February 2014, correct?
22   **A.   Correct.**
23   Q.   But no one from the City came to you to get your
24      sense of what the appropriate levels of cuts the
25      pensions could be; isn't that correct?

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7133   Filed 08/27/14   Entered 08/27/14 21:41:00   Page 18 of 26

MICHAEL HALL

1
2    A.   That's correct.
3    Q.   What impact, if any, did this proposal have on
4         the City's workforce as far as you could tell?
5    A.   Concern.
6    Q.   Okay. Same types of concerns that were expressed
7         to you that you've described previously?
8    A.   That's correct.
9    Q.   Who did you speak to that expressed concern on
10        this subject?
11   A.   Again, it was general conversation throughout the
12        buildings.
13   Q.   With the same types of groups you told me about
14        earlier.
15   A.   Same types of groups because it affected everyone.
16   Q.   Now, you understand that active employees have
17        some benefits that they've already earned that
18        are affected by the cuts to the -- the pension
19        trusts?
20   A.   Repeat that.
21             MS. KOVSKY-APAP: Objection to form.
22   BY MR. HACKNEY:
23   Q.   Yeah, do you understand that some active
24        employees have pension benefits that they've
25        already earned that are impacted by the proposed

MICHAEL HALL

1
2         cuts to pensions?
3    A.   I guess you have to explain that to me.
4    Q.   Okay, sure. So do you understand that there are
5         these pension trusts out there that have assets
6         in them from which employee -- from which retiree
7         pensions are paid?
8    A.   Correct.
9    Q.   And do you understand that active employees have
10        an interest in those pension trusts based on
11        amounts that they have earned to date --
12             MS. KOVSKY-APAP: Objection, calls for
13        a legal conclusion.
14   BY MR. HACKNEY:
15   Q.   -- in their pensions?
16             MS. KOVSKY-APAP: Objection, calls for
17        a legal conclusion.
18   A.   I'm really not following you.
19   BY MR. HACKNEY:
20   Q.   That's okay. This stuff is -- maybe I'm getting
21        it wrong. I'm trying to say the way I understand
22        it. Let me ask it another way.
23             Do you know whether active employees
24        have -- are impacted at all by these proposed
25        pension cuts under the City's plan?

MICHAEL HALL

1
2    A.   If active employees are affected by the pension
3         cuts now?
4    Q.   Yeah.
5    A.   Well, what's happening with the active employees
6         is a snapshot was taken on the 30th of June, which
7         gave them what they would have earned up until
8         that time frame, so that -- that's there. And the
9         new pension plan would go forward from that point
10        onward.
11   Q.   Okay. So you said it exactly right, which is the
12        snapshot is taken of what pension they've already
13        earned as of --
14   A.   June 30th.
15   Q.   -- June 30th, right. And then going forward
16        their pensions are going to be covered by the
17        hybrid plan?
18   A.   That's correct.
19   Q.   Correct. Do you agree that if active employees
20        had concerns about the level of cuts to the
21        pensions that they had already earned, that the
22        City could have addressed those concerns by
23        increasing the terms of the hybrid pension plan
24        going forward?
25             MS. KOVSKY-APAP: Objection, calls for

MICHAEL HALL

1
2         speculation.
3    A.   I don't know.
4    BY MR. HACKNEY:
5    Q.   You don't know?
6    A.   No.
7    Q.   Okay. Isn't it just a matter of logic that if
8         I'm concerned that you're cutting this part of my
9         pension, that the City can address that concern
10        by improving this other part of my pension?
11   A.   No.
12             MS. KOVSKY-APAP: Objection, calls for
13        speculation.
14   A.   No. You have to look at funding going forward.
15        You know, there's a reason why you were changing
16        the plan.
17   BY MR. HACKNEY:
18   Q.   Absolutely, you got to look at funding going
19        forward in terms of how much you can put into
20        that hybrid pension plan, correct?
21   A.   Correct.
22   Q.   And so the more money you have available, the
23        more that you could put into the hybrid pension
24        plan, correct?
25   A.   Correct.

13-53846-tjt   Doc 7133   Filed 08/27/14   Entered 08/27/14 21:41:00   Page 19 of 26

MICHAEL HALL

1
2  Q.  Do you have a -- what is your understanding of
3     what it is?
4  A.  It's a fund that the employees could contribute
5     to.
6  Q.  Yeah, it was -- it was extra money they could
7     save on top of their pension, right?
8  A.  Correct.
9  Q.  Now, do you know that -- have you ever heard of
10    the concept of the ASF, which is short for
11    annuity savings fund, the ASF clawback, have you
12    heard about this?
13 A.  I've heard of it.
14 Q.  What's your understanding of what the ASF
15    clawback relates to?
16 A.  There was some overpayments that are now being
17    recouped.
18 Q.  And do you understand that the period of
19    recoupment I think runs from around 2003 to 2013?
20        MS. KOVSKY-APAP:  Objection, form and
21    foundation.
22 BY MR. HACKNEY:
23 Q.  Do you know what the period of recoupment is?
24 A.  No.
25 Q.  Do you know whether the ASF clawback or the ASF

MICHAEL HALL

1
2     recoupment, however you call it, has that had an
3     impact on -- on employees as far as you can tell?
4  A.  Yes.
5  Q.  What impact has that had?
6  A.  Frustration.
7  Q.  Because they're seeing some of their savings
8     clawed back, right?
9  A.  That's correct.
10 Q.  And do you know if -- do you know about what
11    percentage of active employees were participants
12    in the annuity savings fund?
13 A.  No.
14 Q.  Do you know -- do you know whether the ASF
15    clawback disproportionally impacts actives versus
16    retirees?
17 A.  No.
18 Q.  I take it, you have never studied that question?
19 A.  By being disproportionate, no, I haven't.
20 Q.  The relative percentage of the ASF held by
21    actives versus retirees?
22 A.  No.
23 Q.  But just so I have your testimony, you agree that
24    the -- the ASF recoupment has had a negative
25    impact on employees because they're frustrated

MICHAEL HALL

1
2     about losing --
3  A.  It's money -- it's money they thought they had --
4  Q.  Yeah.
5  A.  -- that they're going to lose.
6  Q.  So that's had a negative impact --
7  A.  Correct.
8  Q.  -- in terms of their City's workforce?
9  A.  Correct.
10 Q.  Have you been able to participate or communicate
11    with anyone with respect to what the amount of
12    the ASF recoupment should be?
13 A.  Have I been able to communicate what I think it
14    should be?
15 Q.  Yeah.
16 A.  I can't -- I can't give advice on what it should
17    be.
18 Q.  Okay.  For example, you've never gone to anyone
19    and said there should be no ASF recoupment
20    because it's having a negative impact on City
21    employees, correct?
22 A.  That's correct.
23        MR. HACKNEY:  This might be a good time
24    to take a break for lunch.
25        MS. KOVSKY-APAP:  I was hoping you

MICHAEL HALL

1
2     would say that.
3        MR. HACKNEY:  You bet.
4        VIDEO TECHNICIAN:  The time is 12:01
5     p.m., we are now off the record.
6            (Recess taken at 12:01 p.m.)
7            (Back on the record at 12:56 p.m.)
8        VIDEO TECHNICIAN:  The time is 12:56
9     p.m., we are now on the record.
10 BY MR. HACKNEY:
11 Q.  Mr. Hall, since you have joined the City, have
12    there been any positions that the City has not
13    been able to fill with qualified applicants?
14        MS. KOVSKY-APAP:  Objection, form and
15    foundation.
16 A.  Not that I can acknowledge.
17 BY MR. HACKNEY:
18 Q.  In fact, you've attended job fairs in connection
19    with the City of Detroit's hiring, correct?
20 A.  Correct.
21 Q.  And those job fairs have generated a significant
22    level of interest; isn't that correct?
23 A.  That's correct.
24 Q.  In fact, I read about one in the newspaper, I
25    think, where you are quoted as saying the City

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7133   Filed 08/27/14   Entered 08/27/14 21:41:00   Page 20 of 26

# Exhibit 2

MAYOR MICHAEL DUGGAN

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

In re                    ) Chapter 9
CITY OF DETROIT, MICHIGAN,    ) Case No. 13-53846
          Debtor.    ) Hon. Steven W. Rhodes

_____

The Videotaped Deposition of MAYOR MICHAEL DUGGAN,
Taken at 2 Woodward Avenue, Suite 500,
Detroit, Michigan,
Commencing at 10:00 a.m.,
Friday, August 1, 2014,
Before Rebecca L. Russo, CSR-2759, RMR, CRR.

```
 1        MAYOR MICHAEL DUGGAN
 2  MELVIN BUTCH HOLLOWELL, ESQ.
 3  City of Detroit
 4  Law Department
 5  Coleman A. Young Municipal Center
 6  2 Woodward Avenue
 7  Suite 500
 8  Detroit, Michigan 48226
 9      Appearing on behalf of the City of Detroit.
10
11
12
13  DANIEL MORRIS, ESQ.
14  Dentons US LLP
15  1301 K Street, N.W.
16  Suite 600, East Tower
17  Washington, D.C. 20005
18      Appearing on behalf of the Retiree Committee.
19
20
21
22
23
24
25
```

```
 1        MAYOR MICHAEL DUGGAN
 2  APPEARANCES:
 3
 4  WILLIAM E. ARNAULT, ESQ.
 5  Kirkland & Ellis LLP
 6  300 North LaSalle
 7  Chicago, Illinois 60654
 8      Appearing on behalf of Syncora Guarantee Inc. and
 9      Syncora Capital Assurance Inc.
10
11
12
13  THOMAS F. CULLEN, JR., ESQ.
14  DAN T. MOSS, ESQ.
15  Jones Day
16  51 Louisiana Avenue, N.W.
17  Washington, D.C. 20001
18      Appearing on behalf of the City of Detroit.
19
20
21
22
23
24
25
```

```
 1        MAYOR MICHAEL DUGGAN
 2  COURTNEY ROGERS, ESQ. (Via Telephone)
 3  Waller Lansden Dortch & Davis LLP
 4  511 Union Street
 5  Suite 2700
 6  Nashville, Tennessee 37219
 7      Appearing on behalf of U.S. Bank National Association,
 8      as Trustee for the Water and Sewer Bonds.
 9
10
11
12  CHRISTOPHER A. GROSMAN, ESQ. (Via Telephone)
13  Carson Fischer, P.L.C.
14  4111 Andover Road West - Second Floor
15  Bloomfield Hills, Michigan 48302
16      Appearing on behalf of Oakland County.
17
18
19
20
21
22
23
24
25
```

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

BY MR. ARNAULT:

1  Q.  And do you know if the decision to cut pensions to GRS
2      and PFRS impacted employee productivity?
3  A.  Again, you know, I didn't objectively measure it.  I
4      know it was a source of great anxiety around the,
5      around all of the employment centers.
6  Q.  But you don't know whether it impacted productivity?
7  A.  Again, I didn't do any measure whether February was
8      any different than January.  It certainly didn't --
9      the level of anxiety didn't help anything.
10 Q.  Are you aware that the City intends to utilize a new
11     pension system on a go-forward basis for active
12     employees?
13 A.  Yes.
14 Q.  And this is the hybrid pension plan, is that right?
15 A.  Right.
16 Q.  And under the new pension plan, the employees are
17     going to bear some exposure to market downturns, would
18     that be fair?
19         MR. GALLAGHER:  Objection, form.
20 A.  Again, I'm not the expert in this.
21 BY MR. ARNAULT:
22 Q.  Has the City's decision to utilize a new pension
23     system had any impact on active employee morale?
24 A.  You know, I have not canvassed the employees to see,

1      of all the things that they're stressed about, whether
2      the hybrid system is the thing that bothers them the
3      most.  I don't know.
4  Q.  So you don't know if the City's decision to utilize a
5      new pension system has any effect on productivity,
6      either, would that be fair?
7  A.  Again, I haven't segmented out one thing
8      and surveyed what affect it had, no.
9  Q.  Okay.  So you haven't -- when you're looking at
10     productivity, you're not looking at what specific
11     impact certain events have on that productivity, is
12     that right?
13 A.  What I look at is what motivates performance, and
14     certainly the feeling that the employer is treating
15     them and dealing with them fairly is a huge impact on
16     people's performance, and I'm trying to create an
17     environment where people feel like they're being
18     treated fairly.
19         Certainly a number of these things have
20     caused them to feel they're being treated unfairly,
21     and I see it in every forum that I go to, but can I
22     tell you it's this slice or that slice individually?
23         Collectively, employees have felt treated
24     unfairly and I think recently feel treated less
25     unfairly, but ...

1  Q.  Why do you say recently that --
2  A.  Instead of twenty-six percent, they're looking at
3      four-and-a-half percent, so I guess there's a sense
4      they're being treated less unfairly.
5  Q.  Okay.  So you are aware that recently the City has
6      reduced the cuts to pensions?
7  A.  Yeah.
8  Q.  Okay.  And is it your understanding that the agreement
9      to reduce the cuts to pensions only applies to the
10     retirees?
11         MR. MORRIS:  Objection, form.
12 A.  I'm not knowledgeable on the ins and outs of all that.
13 BY MR. ARNAULT:
14 Q.  And so you don't know whether the decision to reduce
15     the cuts to retirees had any impact on employee
16     morale?
17         MR. MORRIS:  Objection, form.
18         Bill, could you speak up just a little
19 bit --
20         MR. ARNAULT:  Sure.
21         MR. MORRIS:  -- I'm having some trouble.
22 A.  No.  Again, I haven't segmented out -- you're asking
23     me -- I've got 9,000 employees.  I have not surveyed
24     them on which things are impacting which.  There is a
25     sense of, I think, hope in the city now that wasn't

1      there six months ago.  How much of that is pension and
2      how much of that is other things, I don't know.
3  BY MR. ARNAULT:
4  Q.  Okay.  It's not something you can testify about, is
5      that right?
6          MR. CULLEN:  Objection, foundation, form.
7      He has testified about it.  He's given you his
8      testimony.
9  A.  So I've answered as best I can.
10 BY MR. ARNAULT:
11 Q.  Okay.  Are you aware, as a general matter, how much
12     each of the City's creditors are set to receive under
13     the current plan?
14 A.  Only what I saw in the plan of adjustment.
15 Q.  Okay.  So you're aware that the City's pensioners are
16     set to receive more than, certainly, the financial
17     creditors?
18         MR. CULLEN:  Objection, foundation, form.
19         MR. MORRIS:  Objection, form.
20         MR. GALLAGHER:  Objection, foundation.
21 A.  I generally understand what the arrangements are, not
22     in any detail.
23 BY MR. ARNAULT:
24 Q.  What's your general understanding of the arrangements?
25 A.  That, that the retirees are taking in the general fund

13-53846-tjt   Doc 7133   Filed 08/27/14   Entered 08/27/14 21:41:00   Page 23 of 26

# EXHIBIT 3

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 27, 2014, The Detroit Retirement Systems' Response in Opposition to Syncora's Motion in Limine Barring the City and Plan Supporters from Introducing Evidence Regarding the Potential Personal Hardship of Pensioners [Dkt. No. 6982] and FGIC's Motion in Limine to Preclude the Introduction of Evidence or Testimony Regarding Certain Matters Previously Deemed Irrelevant by the Court or the City of Detroit [Dkt. No. 6990] was filed using the Court's CM/ECF system, which CM/ECF system will send notification of such filing to all parties of record.

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Jennifer K. Green (P69019)
151 S. Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
rgordon@clarkhill.com

*Counsel to the Police and Fire Retirement*
*System of the City of Detroit and the General*
Dated: August 27, 2014                *Retirement System of the City of Detroit*

2