UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re<br><br>CITY OF DETROIT, MICHIGAN,<br><br>                          Debtor. | Chapter 9<br><br>Case No. 13-53846<br><br>Hon. Steven W. Rhodes |

**OPPOSITION OF THE OFFICIAL COMMITTEE OF RETIREES
TO SYNCORA'S MOTION *IN LIMINE* TO PRECLUDE DEBTOR
FROM OFFERING EVIDENCE RELATING TO (A) THE RECOVERIES
OF CLASSES 10 AND 11 INDEPENDENT OF THE FUNDS FROM THE DIA
FUNDING PARTIES AND THE STATE AND (B) THE TOPICS IDENTIFIED
IN SYNCORA'S SUBPOENAS TO THE FOUNDATIONS [DKT. 6978]**

The Official Committee of Retirees of the City of Detroit, Michigan (the "Committee") files this response in opposition to the Motion *In Limine* of Syncora Capital Assurance Inc. and Syncora Guarantee Inc. (collectively, "Syncora") to Preclude Debtor From Offering Evidence Relating to (A) the Recoveries of Classes 10 and 11 Independent of the Funds From the DIA Funding Parties and the State and (B) the Topics Identified in Syncora's Subpoenas to the Foundations [Dkt. 6978] (the "Motion"), and states as follows:

**PRELIMINARY STATEMENT**

In this Motion, Syncora seeks to preclude the City from introducing evidence on two subject matters. First, Syncora argues that, in assessing whether the Plan of Adjustment ("POA") unfairly discriminates in favor of Classes 10 and 11 for purposes of Section 1129(b)(1), the City should not be allowed to introduce evidence showing the recoveries that Classes 10 and 11 will receive under the POA without including the quantum of funds to be received from the DIA Funding Parties and the State. Second, Syncora contends that, because it had previously

sought, through subpoenas, information on whether the DIA Funding Parties would have made funds available to the City other than as part of the Grand Bargain, in which the DIA-related funds are being used to help pay pensions, and because those subpoenas were quashed on relevance grounds, the City should be precluded from introducing any evidence on that subject, or on subjects covered by its subpoenas in general, at the confirmation hearing.

Syncora's arguments are both without merit. With respect to the former, under established law, the DIA-related and State funds are properly excluded from any unfair discrimination analysis because they are restricted for use in paying pensions — and thus not available for general distribution purposes — and are not property of the debtor. With respect to the latter: (a) the subject matter of whether the DIA Funding Parties would otherwise have made funds available to the City was not part of the Syncora subpoenas; (b) Syncora in fact had opportunity to take discovery on that issue; and (c) the Court's ruling on the motion to quash in all events addressed relevance as to certain, specifically-enumerated issues only, and did not purport to address relevance on any other grounds — meaning that evidence covered by the ruling on the motion to quash can still be relevant on issues other than those raised at the time by Syncora.[1]

For these and other reasons detailed below, the Motion should be denied *in toto*.

---

[1] Syncora also argues, at ¶ 28 of the Motion, that that the City should not be allowed to introduce certain evidence concerning negotiations surrounding the Grand Bargain based on the Mediation Order. That issue is the subject of separate motions *in limine* by Syncora [Dkt. 6979] and Financial Guaranty Insurance Co. [Dkt. 6985.] It will be addressed in the Committee's combined response to those separate motions, to avoid repetition, will not be referred to further herein.

## **LEGAL STANDARD**

Motions *in limine* face a particularly exacting and challenging burden of proof. First, Movants bear the burden of demonstrating that they are entitled to relief requested in their motion *in limine*. *Design Basics, L.L.C. v. DeShano Companies, Inc.*, No. 10-14419, 2012 WL 5265388, at *2 (E.D. Mich. Oct. 23, 2012). Second, courts will not grant motions *in limine* "unless the moving part meets its burden of showing that the evidence in question is clearly inadmissible." *Id.* (internal quotations omitted) (emphasis added). Anything short of movant making such a showing that the identified evidence is "clearly inadmissible," and the motion *in limine* should not be granted. *Id.* If a movant fails to make such a showing, then the court should defer until trial any evidentiary ruling. *Id.*

Moreover, the Sixth Circuit has admonished that a motion *in limine* should be denied where, as here, a movant seeks a blanket exclusion of evidence. *See Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975) ("[o]rders *in limine* which exclude broad categories of evidence should rarely be employed . . . [and the] better practice is to deal with questions of admissibility of evidence as they arise.") Trial courts heed the Sixth Circuit. *See, e.g. Innotext, Inc. v. Petra Lex USA, Inc.*, No. 08-11077, 2010 WL 2560063, at *2 (E.D. Mich. Jun. 15, 2010) (denying motion that on grounds that "[m]otions *in limine* are meant to deal with discrete evidentiary issues related to trial and are not substitutes for dispositive motions", and denying motion); *Englar v. 41B Dist. Court*, No. 04-CV-73977, 2010 WL 5015343, at *7 (E.D. Mich. Dec. 3, 2010) ("Orders *in limine* which exclude broad categories of evidence should rarely be employed."); *Zugowitz v. Davis*, No. 2:06-CV-727, 2008 WL 619357, *1 (S.D. Ohio Mar. 03, 2008) (noting that "[c]ourts . . . are generally reluctant to grant broad exclusions of evidence *in limine*" and denying motion).

3

# ARGUMENT

**A. The City Should not be Precluded From Offering Evidence Related to Class 10 and 11 Recoveries Without Funds Received From the DIA Funding Parties or the State Because Only Assets of the Debtor are Relevant for Purposes of Section 1129(b)(1).**

In Section I of its Motion, Syncora asserts that the City should be precluded from offering, in response to Syncora's contention that the POA discriminates unfairly in favor of Classes 10 and 11 (the pension claimants), evidence relating to Class 10 and 11 percentage recoveries calculated without funds received from the DIA Funding Parties and the State. (Motion, at ¶¶ 16-23.) According to Syncora, the only thing that matters, for Section 1129(b)(1) purposes, is how much a particular class will receive — irrespective of whether such funding is subject to restriction and whether the funds are actually property of the debtor. Syncora is wrong.

In assessing whether a plan of adjustment discriminates unfairly with against a particular creditor class, a critical inquiry is whether funding for creditor recovery is restricted to another creditor class. Where funding for certain claims is restricted or dedicated to a specific class, and thus not available for general distribution, courts have held that the plan does not discriminate unfairly and the different treatment of creditor classes is justified. *See In re 28th Legislative Dist. Cmty. Dev. Corp.*, No. 10-14804, 2011 Bankr. LEXIS 4411, at *32-33 (Bankr. E.D. Tenn. Nov. 9 2011) (discrimination allowed because the funds available to settle one claim were restricted and could not be used for other similarly situated creditor classes); *In re Jersey City Med. Ctr.*, 817 F.2d 1055 (3rd Cir. 1987) (100% payment to some unsecured creditors and 30% payment to other unsecured creditors was not unfair where funds were made available to the favored class from a third party pursuant to a contract).

4

Equally important, an unfair discrimination analysis requires a distinction between assets that are property of the debtor and assets that are not. This is so because an unfair discrimination objection is limited to the distribution of assets of the **debtor** — not the distribution of property of non-debtor third parties. *See In re Jersey City Med. Ctr.*, 817 F2d 1055 (3rd Cir. 1987) (plan confirmed over objection that it violated 11 U.S.C. §1129(a)(3) and 1129(b)) when recovery for only some classes was available from third parties); *In re Quigley Co., Inc.*, 377 B.R. 110, 116-17 (Bankr. S.D.N.Y. 2007) (no unfair discrimination because, *inter alia*, "[t]he …settlement is being funded by a non-debtor and is being paid outside of the Plan."). Indeed, as stated in *In re Snyder Drug Stores, Inc.*, 307 B.R. 889, 894 (Bankr. N.D. Ohio 2004), a "preliminary question is whether the proposed distribution comes from property of the estate[.]"

The principle that an unfair discrimination analysis cannot be predicated on the receipt of non-debtor assets is further reflected in the so-called "gifting" cases cited in the City's Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Dkt. 5034] (the "Consolidated Reply"), which demonstrate that courts have routinely held that one class' receipt of greater value than another's does not constitute unfair discrimination when "[t]he greater value received … is **not** the result of the Debtors' distribution of **estate property**." *See e.g., In re Worldcom, Inc.*, No. 02-13533, 2003 WL 23861928, at *60-61 (Bankr. S.D.N.Y. Oct. 31, 2003) (emphasis added); *see also In re Parke Imperial Canton, Ltd.*, No. 93-61004, 1994 WL 842777, at *11 (Bankr. N.D. Ohio Nov. 14, 1994) (finding no unfair discrimination and confirming plan whereby debtor's principal secured creditor guaranteed a certain level of recovery to only one of two classes of unsecured creditors with the secured creditor's share of proceeds from sale of the debtor's principal asset).[2]

---

[2] None of the cases that Syncora cites holds that receipt, by a creditor, of property of a third party is properly considered as part of an unfair discrimination objection. *In re Citrowske*, 72 B.R. 613, 615 (Bankr. D. Minn. 1987),

Notwithstanding such authority, Syncora argues that, on the motion to quash asserted by certain of the DIA Funding Parties [Dkt. 5300] (the "Motion to Quash"), this Court has already ruled that the source of funding is "irrelevant" to an unfair discrimination objection and that the DIA Funding Parties and State contributions accordingly must be included when analyzing Syncora's unfair discrimination objection. But that fundamentally misstates this Court's prior ruling on the Motion to Quash.

Contrary to Syncora's assertions, neither the source of funding nor restrictions upon funding for the DIA settlement were at issue on the Motion to Quash. In its Motion to Quash, the DIA foundations expressly stated that their "role in this matter is limited to providing funding, upon the occurrence of certain conditions precedent, for the benefit of pensioners participating in the General Retirement System and the Police and Fire Retirement System, as set forth in the Plan." (Motion to Quash, at 16.) The DIA Funding Parties objected to Syncora's "questions about valuation [in that they] are entirely unrelated to the funding to be provided for the benefit of the pensioners."). (*Id.* at 17.) At the hearing on the Motion to Quash, counsel for certain of the DIA foundations argued that responsive information had in fact been provided to Syncora in the form of Exhibit I.A.91 to the City's Fourth Amended Plan of Adjustment, which

---

cited in Motion at ¶ 18, did not involve or any way concern unfair discrimination; rather, the Court there addressed only whether a transfer of property was properly considered in determining the amount of a trustee's fees. *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 618 (Bankr. D. Del. 2001), cited in Motion at ¶ 19, undercuts Syncora's position. It held that a plan did not unfairly discriminate between classes of unsecured creditors because disparate treatment of such unsecured creditors was the result of a permissible allocation by secured creditors of a portion of their plan distributions. Finally, *In re Armstrong World Indus., Inc.*, 320 B.R. 523 (D. Del. 2005) and *In re DBSD N. Am., Inc.*, 634 F.3d 79 (2d Cir. 2011), both cited in Motion at ¶¶ 19-20, were not unfair discrimination cases but pertained instead to the absolute priority rule. In fact, the *DBSD* case **affirmed** the distinction between property of the debtor and property of a non-debtor, and **affirmed** that the latter is outside the scope of the bankruptcy laws. Specifically, in distinguishing a "gifting" case, *In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993), the *DBSD* Court wrote that, whereas the property before it had never belonged to any third parties, the property in question in *In re SPM* "belonged to the secured creditor alone, and the secured creditor could do what it pleased with it." 634 F.2d at 97. Here, the funds at issue have belonged at all time to the DIA Funding Parties and the State, and have never belonged — and never will belong — to the City. (*See* pp. 7-10 below).

6

expressly sets forth both the source of payments under the DIA Settlement Agreement and the specific restriction that such payments will be used for the benefit of retirees. (*See* Ex. 1 hereto, Hr'g Tr. at 11:1-3, June 26, 2014.)[3]

Further, contrary to Syncora's representation, the Court did **not** hold that whether funds to be received by a creditor come from debtor or non-debtor assets is irrelevant to unfair discrimination for purposes of Section 1129(b)(1). Instead, in the course of colloquy with counsel, the Court noted only that "***I would have assumed*** that the issue of unfair discrimination is based upon not where money comes from but where money goes to." (Ex. 1 hereto, Hr'g Tr. at 40:3-5, June 26, 2014; [Dkt. 6978-7, at 8]) (emphasis added).[4] Moreover, the Court's comment about what it would have assumed was **not** repeated when the Court subsequently issued its ruling on the Motion to Quash. (Ex.1 hereto, Hr'g Tr. at 126:21-127:5; [Dkt. 6978-7, at 11-12.]) At best, the statement pointed to by Syncora, when accurately recited, is *dictum* that was not essential to or even part of the Court's decision on the Motion to Quash.

No doubt recognizing that, under the controlling law, funds that are not assets of the City cannot properly be included in calculating percentage recoveries, Syncora simultaneously — and inconsistently — asserts that the DIA-related funds belong to the City. (Motion, at ¶¶ 21-23.)[5] That argument is both misleading and incorrect.

Syncora relies on selective quotations from the Principal Terms of DIA Settlement, including Exhibit B thereto (formerly Ex. I.A.102 to the Corrected Fifth Amended Plan of

---

[3] The agreement, by the DIA parties, to contribute funds towards pension payments was a critical element in the Committee's decision to settle the pension and OBEP claims, thereby (assuming the POA is confirmed) giving up its argument on appeal that the retirees rights to accrued pension benefits are absolutely protected from impairment or diminishment, including impairment or diminishment through the mechanism of a Chapter 9 proceeding, under art. IX, § 24 of the Constitution of the State of Michigan, which argument the Committee believes is substantial.

[4] Syncora's repeated selective quotation of the statement made by the Court, which omits the "I would have assumed …" prefatory language (*see* Motion, at ¶¶ 3,13,17), is, we respectfully submit, something less than candid.

[5] Syncora does not contend that the funds to be contributed by the State belong, or will belong, to the City.

7

Adjustment [Dkt. 6379-1][6] and currently Ex. I.A.118 to the Sixth Amended Plan of Adjustment [Dkt. 6908-1]), for the proposition that the DIA-related funds will be paid "to the City." (Motion, at ¶ 21.) In so doing, however, Syncora omits to note that the Principal Terms of DIA Settlement also specify **how** payment "to the City" is to be made and, in particular, **expressly require** that all such payments be "placed into a segregated [City] account to be used for payments to the Pensions only." [Dkt. 6908-1, at 60, 67 ("Transfer on Initial Payment" and "Conditions to Future Funding Obligations").]

Syncora similarly cites to the recitals contained in the form of Omnibus Transaction by and among the City of Detroit, the Detroit Institute of Arts and Foundation for Detroit's Future (initially filed as Annex A to Dkt. 6576 and currently appearing as POA Ex. I.A.119 [Dkt. 6908-1, at 79]), for the proposition that the City will convey certain right, title and interest to the DIA "in exchange for fair value" (Motion, at ¶ 21), but fails to refer the Court to the actual terms of that agreement, which specify the actual terms of the "exchange". Pursuant to that agreement, all DIA-related payments are to be deposited in a designated "City Account," which is defined in Section 1.1 of the agreement as a segregated escrow account in which the funds are held by the City in trust for the sole purpose of satisfying the DIA Funding Parties' pension contribution commitments as provided for in the POA.[7] This designated City Account is to be used for all DIA-related payments. [Dkt. 6908-1, at 91 (§ 2.3(b)), 99 (§.3.2).][8]

---

[6] The Motion (at ¶ 21) erroneously cites to the Principal Terms of DIA Settlement as Ex. I.A.91 to the Corrected Fifth Amended Plan.

[7] *See* [Dkt. 6908-1, at 86-87] which provides that:

> "**City Account**" means a **segregated escrow account** titled "City of Detroit, **in Trust for Certain of Its Retirement Systems and Associated Accounts**", **established pursuant to that certain Escrow Agreement** dated as of even date herewith by and among the City, the Supporting Organization and U.S. Bank National Association (the "**Escrow Agent**") **with instructions that the amounts contributed to this escrow account** by the Supporting Organization, which except as otherwise provided in Section 6.3(e) of this Agreement and the payment of reasonable expenses of maintaining the City Account, **shall be used only for the payment of contributions to GRS**

8

Accordingly, under the terms of the operative documents, the City will have **no** ownership interest in **any** of the DIA-related funds, but will be receiving those funds in a trust capacity, for the sole purpose of applying them towards GRS and PFRS pensions as provided for in the POA. Contrary to Syncora's argument, the mechanics of the funds to be paid by the DIA-related parties thus do not show that those funds will at any point belong to the City, but rather only further demonstrate clearly that they will **not**.[9]

In short, Syncora's assertion that, for purposes of Section 1129(b)(1), the City should be precluded from referring to the percentage recoveries for Classes 10 and 11 without including the funds received from the DIA Parties and the State has no cognizable basis. As a matter of law, assets that are either (a) subject to restrictions in use, or (b) belong to and were contributed by third parties, cannot be factored into an "unfair discrimination" analysis. As a matter of fact, the funds being contributed to Classes 10 and 11 are **restricted** to use for paying pensions[10] and are **property of third parties**, not property of the City. Therefore, Syncora's argument should be

---

**and PFRS in satisfaction of the City's obligation to contribute to the Prior GRS Pension Plan (attached as Exhibit I.A.244 to the Plan of Adjustment) (the "Prior GRS Pension Plan") and the Prior PFRS Pension Plan (attached as Exhibit I.A.245 to the Plan of Adjustment) (the "Prior PFRS Pension Plan")** and which is shown separately on the City's books and records. (Emphasis added.)

[8] Syncora additionally quotes selectively from the definition of "DIA Proceeds Payment Default" set out at p. 9 of the Corrected Fifth Amended POA. (*See* Motion, at ¶21) (stating that this definition refers to "amounts scheduled to be paid to the City in accordance with the DIA Settlement"). Syncora, however, omits the remainder of the sentence, which continues: "…that the City, in turn, is required to pay to the GRS or the PFRS in accordance with the terms and conditions of the Plan." [*See* Dkt. 6379, at 9 (definition of "DIA Proceeds Payment Default").] Further, as discussed above, the DIA Settlement Documents require that the DIA-related payments be made to an escrow agreement and held in trust by the City for application towards pension payments.

[9] Along similar lines, Syncora (Motion, at ¶ 22) cites to ¶¶ 29-30 of the Consolidated Reply. The City does not, however, therein state that the DIA-related funds will be transferred to it; rather, the City states that the DIA Funding Parties "have agreed to contribute approximately $466 million to reduce the Retirement Systems' current levels of underfunding." (Consolidated Reply, at ¶ 30.)

[10] This is true with respect to both the DIA-related funds and the State contribution. Neither can be used for any purpose other than the payment of pensions. The restrictions on use of the DIA-related funds are discussed above. The State Contribution Agreement specifies that payment of State contributions will be disbursed to the GRS and PFRS and "shall only be used to fund payments to holders of GRS Pension Claims and PFRS Pension Claims." (*See* Ex.I.A.318 to the Sixth Amended Plan of Adjustment [Dkt. 6908-2, at 23 (§ 1).])

rejected and the City should be permitted to provide evidence of recovery to Classes 10 and 11 from sources other than the DIA Funding Parties and the State and exclusive of any contributions made by the DIA Funding Parties or the State.

> **B.  The City Should not be Precluded From Introducing Evidence (i) Regarding Whether the Funds Being Contributed by the DIA Funding Parties Would Have Been Available Outside of the Grand Bargain and (ii) Regarding Topics Listed in Syncora's Quashed Subpoenas.**

In Section II of its motion, Syncora seeks a separate preclusion order. As the Committee understands Syncora's argument:

(a)  Syncora wants, specifically, to preclude the City from introducing evidence as to whether the DIA Funding Parties would have made funds available to the City outside the context of the Grand Bargain, under which the funds are to be used exclusively for pensions. (Motion, at ¶ 27);

(b) as a predicate for such preclusion, Syncora asserts that this subject matter was on the list of topics covered by the subpoenas that Syncora had served on certain of the DIA Funding Parties and that were ultimately quashed. (*Id.* at ¶¶ 24-27); and

(c) therefore, Syncora argues, the City should not be allowed to present any evidence on this same subject matter now. (*Id.*)

From the Committee's perspective, Syncora's argument is unpersuasive, for the following three reasons:

First, while Syncora states that the subject matter of whether the DIA-related funds would otherwise have been made available to the City was included within the Syncora subpoenas, the deposition topics and document requests are specifically listed in ¶ 11 of the Motion. The issue of whether the DIA Funding Parties would otherwise have made funds available to the City is

10

not on either of those lists. Thus, the essential predicate for Syncora's argument on this subject appears to be lacking.

Second, while Syncora contends that, as a result of the decision on the Motion to Quash, it was unable to conduct any discovery as to whether the DIA Funding Parties would have made funds available to the City other than for the purposes specified under the Grand Bargain, the record indicates that Syncora in fact did have did have opportunity for discovery on that issue. Among other things, Syncora deposed certain funding parties to the Grand Bargain who contributed funds to the DIA Settlement Agreement and expressly asked if such parties would have contributed if funds were not specifically designated for retirees. For instance, during the deposition of Dan Gilbert, an entrepreneur who donated to the Grand Bargain, (Ex. 2 hereto, D. Gilbert Depo., 124:17-19), Syncora's counsel (Mr. Arnault) expressly asked:

> Q. Okay. Would you have contributed money to the Grand Bargain if some of the money went to pay the debts of insurers who insure the City's Certificates of Participation?
> [ … ]
> A: No. You know, to think that sophisticated Wall Street insurance companies who knew the City of Detroit was in dire financial straits for decades and took a risk in insuring those bonds and — would I personally have invested money into a scheme that would get them part of the recovery? No. The answer is no.

(Ex. 2 hereto, D. Gilbert Depo., 136:17-137:9.) Similarly, at the deposition of Roger Penske, who donated $10 million to the Grand Bargain (Ex. 3 hereto, R. Penske Depo., 137:16-21), Syncora's counsel (Mr. Arnault) asked:

> Q. Yeah, would you have contributed money to the grand bargain if some of money was earmarked to demolish blight in the city?
> A. Now you're linking blight and other things, it was, it was an initiative that I saw the state was involved, I saw other private sector people involved and I joined that group. Now, whether it was going to be for — for blight or it was going to be for — for pensions, my — my understanding was because it was tied, you

11

>know, to the arts at this point, it would be towards the pensions
>which to me was — was first and primary.

(Ex. 3 hereto, R. Penske Depo., 141:3-16; *see also* R. Penske Depo., 138:3-22, 146:20-147:8.)[11]

<u>Third</u>, independent of the foregoing, even if the subject matter of whether the DIA Funding Parties would otherwise have made funds available to the City had been part of the quashed subpoenas, and even if Syncora had had no opportunity to take discovery on that issue (neither of which appears to be the case), the requested preclusion order would still not be warranted. Specifically, in granting the Motion to Quash Syncora's subpoenas, the Court stated that the information sought by the subpoenas was not relevant to the issues of unfair discrimination, the best interests of creditors or whether the Grand Bargain protects the art of the City. (Ex. 1 hereto, Hr'g Tr. at 126:21-127:5, June 26, 2014.) In so ruling, the Court did not state that information covered by the subpoenas was irrelevant for any and all purposes (including the reasonableness of the Global Settlement with Retirees). Accordingly, to the extent that evidence on matters covered by the Syncora subpoenas is pertinent to issues other than the three specifically referred to by the Court, it would be outside the scope of the Court's ruling on the Motion to Quash and, if relevant for other reasons,[12] would be admissible.

---

[11] Similar questioning took place during the deposition of Rip Rapson, a representative of the Kresge Foundation, another Grand Bargain contributor. (Ex. 4 hereto, R. Rapson Depo., 28:23-30:13; 32:6-19; 42:15-43:13; 48:24-50:5.) It appears from the record that Syncora chose not to attend. (Ex.4 hereto, R. Rapson Depo., 2:2-5:15.)

[12] Such reasons could potentially include, without limitation, the provision of general background information, to show the reasonableness of the City's settlement with the Committee on the retiree pension claims for purposes of Bankruptcy Rule 9019 and to show the City's good faith with respect to the POA as a whole for purposes of Section 1129(a)(3).

12

## CONCLUSION

For the reasons stated above, Syncora's motion *in limine* to preclude debtor from offering evidence relating to (a) the recoveries of Classes 10 and 11 independent of the funds from the DIA funding parties and the State and (b) the topics identified in Syncora's subpoenas to the Foundations should be denied.

Dated: August 27, 2014                                                                 Respectfully submitted,

By: */s/ Claude D. Montgomery*
Claude D. Montgomery                         Sam J. Alberts
Carole Neville                                              DENTONS US LLP
DENTONS US LLP                                    1301 K Street, NW, Suite 600 East Tower
1221 Avenue of the Americas             Washington, DC 20005
New York, New York 10020                  Tel: (202) 408-6400
Tel:    (212) 768-6700                              Fax: (202) 408-6399
Fax:   (212) 768-6800                              sam.alberts@dentons.com
claude.montgomery@dentons.com
carole.neville@dentons.com

BROOKS WILKINS SHARKEY & TURCO PLLC
Matthew E. Wilkins
Paula A. Hall
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Direct: (248) 971-1711
Cell: (248) 882-8496
Fax: (248) 971-1801
wilkins@bwst-law.com
hall@bwst-law.com

*Attorneys for the Official Committee of Retirees of the City of Detroit, Michigan*

## CERTIFICATE OF SERVICE

I, Claude D. Montgomery, hereby certify that the foregoing document was filed and served via the Court's electronic case filing and noticing system on August 27, 2014.

By: */s/ Claude D. Montgomery*
Claude D. Montgomery