UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

**OPPOSITION OF THE OFFICIAL COMMITTEE OF RETIREES TO
FINANCIAL GUARANTY INSURANCE CORPORATION'S MOTION
IN LIMINE TO PRECLUDE THE INTRODUCTION OF EVIDENCE
OR TESTIMONY REGARDING CERTAIN MATTERS [DKT 6990]**

The Official Committee of Retirees of the City of Detroit, Michigan (the "Committee") files this response in opposition to the Financial Guaranty Insurance Company's Motion *in Limine* to Preclude the Introduction of Evidence or Testimony Regarding Certain Matters [Dkt. 6990] (the "Motion"), and in support states:

**PRELIMINARY STATEMENT**

The Motion seeks to characterize three issues as "deemed irrelevant by the Court or the City of Detroit:" "(a) the validity of the COPs Claims; (b) the alleged needs and hardships of Holders of Pension Claims and (c) the terms and conditions of the settlement negotiations leading to the 'Grand Bargain.'" (Motion, at 2.) As demonstrated below, the relief requested by Financial Guaranty Insurance Company ("FGIC") is much broader than stated and attempts to bar the introduction of evidence of information that has not been precluded by the Court and that is relevant and probative to issues of confirmation of the Debtor's Plan of Adjustment (the "Plan"). For these and other reasons stated below, the Motion should be denied.

## **LEGAL STANDARD**

Motions *in limine* face a particularly exacting and challenging burden of proof. First, Movants bear the burden of demonstrating that they are entitled to the relief requested in their motion *in limine*. *Design Basics, L.L.C. v. DeShano Companies, Inc.*, No. 10-14419, 2012 WL 5265388, at *2 (E.D. Mich. Oct. 23, 2012). Second, courts will not grant motions *in limine* "unless the moving party meets its burden of showing that the evidence in question is clearly inadmissible." *Id.* (internal quotations omitted). Anything short of movant making such a showing that the identified evidence is "clearly inadmissible," and the motion *in limine* should not be granted. *See id.* If a movant fails to make such a showing, then the court should defer until trial any evidentiary ruling. *Id.*

Moreover, the Sixth Circuit has admonished that a motion *in limine* should be denied where, as here, a movant seeks a blanket exclusion of evidence. *See Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975) ("[o]rders *in limine* which exclude broad categories of evidence should rarely be employed . . . [and the] better practice is to deal with questions of admissibility of evidence as they arise.") Trial courts heed the Sixth Circuit. *See, e.g., Innotext, Inc. v. Petra Lex USA, Inc.*, No. 08-11077, 2010 WL 2560063, at *2 (E.D. Mich. Jun. 15, 2010) (denying motion on grounds that "[m]otions *in limine* are meant to deal with discrete evidentiary issues related to trial and are not substitutes for dispositive motions"); *Englar v. 41B Dist. Court*, No. 04-CV-73977, 2010 WL 5015343, at *7 (E.D. Mich. Dec. 3, 2010) ("Orders *in limine* which exclude broad categories of evidence should rarely be employed."); *Zugowitz v. Davis*, No. 2:06-CV-727, 2008 WL 619357, *1 (S.D. Ohio Mar. 03, 2008) (noting that "[c]ourts . . . are generally reluctant to grant broad exclusions of evidence *in limine*" and denying motion)

# ARGUMENT

## A. The Validity of the COP's Claims is an Open Issue in Dispute, Resolution of Which Will Effect Treatment of Class 12 Retiree Healthcare Claim Recovery.

FGIC takes the position that because the issue of whether or not the COPs Claims are valid is being addressed through separate litigation, any discussion concerning the validity of its claim is irrelevant to the Plan. While the Committee generally agrees that the issue of whether the COPs Claims are entitled to any recovery will be addressed outside of the confirmation hearing, this does not mean that its potential treatment is irrelevant to all issues at confirmation.

Among other things, the potential validity (or in the City and Committee's view, probable invalidity) of the COPs Claims is relevant to not only assessing the COPs holders' treatment under the Plan, but also the treatment of retirees. To the extent allowed, the COPs Claims (which total approximately $1.5 billion) are to be treated *pari passu* with the allowed Class 12 claim of retirees. Such treatment was significant to the Committee and others, who have argued that absent the settlement of its pension and OPEB claims under the Plan, that Class 12 (OPEB) claims would be entitled to enhanced treatment. The Committee is prepared to show that it agreed to support reduced allowance of its Class 12 claim from more than $8 billion to less than $4.4 billion based on several factors, including how retirees' pension claims would be treated under Classes 10 and 11 and that Syncora could not recover more than *pro rated* treatment of the allowed Class 12 Claim.

Further, the Committee supported such treatment on the Plan promise that Class 12 recovery would be enhanced by any reduction of the COPs Claims. (*See* Sixth Amended Plan for the Adjustment of Debts of the City of Detroit [Dkt. 6908], at § II.B.3.s.ii.A.) Under the Plan, Class 12 is enhanced at 65% for every reduction in the COPs Claims, with the balance to other

3

creditors. (*Id.* at § II.B.3.p.iii.B.) Therefore, the issue of COPs Claim validity is relevant to several issues under the Plan and the Motion should be denied.

> **B. FGIC's Contention That it Seeks to Limit Evidence of "Pensioner Hardship" is Predicated on an Incorrect Interpretation of What the Court Previously Ruled, Based on Assertions That are not Supported by the Facts.**

FGIC's second area of alleged "previously determined irrelevant testimony" concerns evidence of "pensioner hardship." Although the argument contains a kernel of accuracy—it is undisputed that this Court previously ruled that the issue of individual hardship could not be used as basis to justify "unfair discrimination"—FGIC seeks to expand that ruling to preclude much more than "pension hardship" on the issue of "unfair discrimination."[1]

Instead, FGIC seeks to expand this Court's ruling to prevent any evidence on the issue of retiree harm—including by logical extension, the fact of significant reductions of retiree benefits under the Plan—for any purpose. FGIC's proposed limitation is improper and actually contradicts this Court's ruling that such evidence could be used in relation to supporting the Debtor's business judgment. In fact, at the time this Court ruled on the issue of individual creditor harm it stated that hardship could be considered for other purposes, including business justification:

> In my view, neither fair and equitable nor unfair discrimination has ever in any bankruptcy case considered the impact of a plan on a creditor; that is to say, the adverse impact of a plan on a creditor. The issue always is the business justification for the treatment from the debtor's perspective. **Now, to the extent that issue encompasses consideration of hardship, I would leave it to the proponents of the plan to argue and prove that, but that's a much — I don't know — broader and differently focused question than just plain hardship to retirees.**

(Hr'g Tr. at 81:12-21, Aug. 6, 2014 (emphasis added)).

---

[1] If FGIC had sought such limited relief, its requests likely could have been satisfied by stipulation.

4

Here, there are at least three reasons why the treatment of retirees is relevant to issues for confirmation and support the Debtor's business rationale.

First, the reasonableness of the compromise of the Class 10, 11, and 12 claims in general as embodied in the Plan, and Class 12 in particular, depends in part on whether the Debtor could have pursued less drastic alternatives in impairing the retirees' OPEB rights. The City's treatment of retirees under the Plan is the product of significant negotiation and mediation by the City, the Committee and others. The product of those efforts are manifested in the Plan's treatment of retirees' pension (Classes 10 and 11) and other post-employment benefits ("OPEB," Class 12 claims). As the evidence will show, retirees' rights to pensions and to OPEB are significantly impaired under the Plan. In fact, the City's payment to retirees on OPEB is approximately 10%. Although FGIC seeks the exclusion of the proposed benefit reductions on retirees, doing so for any purpose other than unfair discrimination would be improper. Among other things, the City and those favoring confirmation should be allowed to offer evidence regarding whether the City could have pursued less drastic alternatives in impairing retirees' OPEB to prove that the settlement of the Class 12 claims is within the Rule 9019 range of reasonableness.[2]

Second, the City's ability to retain and recruit employees, an issue of Plan feasibility, is affected by the City's treatment of its past employees. The City discussed this key motivation for its treatment of the retiree classes in its Consolidated Reply to Certain Objections of Fourth

---

[2] As this Court is aware, the Committee (and certain retiree representatives) twice brought preliminary injunction actions during the pendency of this bankruptcy case asserting that the City's attempt to unilaterally impose draconian cuts in retiree health care violated the Contracts Clauses of the state and federal Constitutions. The City and the Committee were able to settle those claims, leading ultimately to the compromise found in the Plan's treatment of Class 12. While a full recitation of the applicable Contract Clause analysis is unnecessary here, key issues in that litigation would have been whether the retirees could demonstrate a "substantial impairment" of their contract rights, *see Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 323 (6th Cir. 1998), and whether "less drastic" options existed that would have better protected the contract rights, *see Welch v. Brown*, 551 Fed. Appx. 804, 811 (6th Cir. 2014). Thus, the determination of the reasonableness of the compromise embodied in the Plan's treatment of Class 12 depends, in part, on the hardship to retirees.

5

Amended Plan for the Adjustment of Debts of the City of Detroit [Dkt. 5034, ¶¶ 62-66] ("Moreover, current employees are understandably concerned about the extent of impairment of benefits for retired City employees, as active employees will become retirees at some point.").

Moreover, the objecting creditors explored this theme in discovery—deposing the Executive Fire Commissioner, the Chief of Police, the Board Council President, and the Mayor, among others, on the topic of whether the cuts to retirees' benefits impacted active employees' morale and productivity. (*See* Ex. 1 hereto, E. Jenkins Depo., 223:21-225:15, 230:8-231:8; Ex. 2 hereto, J. Craig Depo., 192:7-20; Ex. 3 hereto, B. Jones Depo., 100:17-104:23; Ex. 4 hereto, M. Duggan Depo., 123:21-124:15.) Counsel for FGIC attended each of these depositions. Through these depositions, the objecting creditors solicited testimony that, in fact, <u>active employees were concerned about the cuts to retirees' benefits</u> because: 1) current employees have friends or family who are retirees, and 2) current employees see the treatment of retirees as a barometer of how current employees will be treated when they retire:

> Q. And would it be fair to say that the announcement regarding the changes to the retirees did not have an impact on your active employees?
>    […]
> A. I would say yes, because eventually we're all going to be retired, so they were, see the retirees as themselves one day, so --
> Q. So --
> A. I would say yes, it did have an effect on them.
> Q. The change to the retiree healthcare had an impact on the actives, is that what you're saying?
> A. Yes, yes.
> Q. Why do you say that?
>    […]
> A. Because one day they're going to be retired and a lot of the coworkers that they worked with for years have -- because they're friends.
> Q. And did you talk to any actives about the changes to the retiree healthcare?
> A. In passing, yes, it's been a few, not everybody, but a

> few people.
> Q. What do you mean in passing?
> A. If I saw them at a retirement party or saw them at a function or an engine house visit, if it came up in the conversation.
> Q. And one or two times?
> A. I can't say how many times.
> Q. More than five?
> A. It was more than five, yes.
> Q. Less than ten?
> A. No, it was more than ten.
> Q. Less than 20?
> A. I'll say less than 40.

(Ex. 1 hereto, E. Jenkins Depo., 223:21-225:15; *see also* 230:8-231:8 (regarding concerns over cuts to retirees' pensions)). Likewise, Mayor Duggan testified that the announcement of cuts to retirees' pensions generated "lots of fear from employees, yes." (Ex. 4 hereto, M. Duggan Depo., 123:25-124:4.)

Thus, retiree circumstances—including the hardship that would be caused by cuts more severe than those imposed by the Plan—is a legitimate concern for the City and reasonably considered in the City's business rationale. Because this is a reasonable part of the City's business rationale, it is relevant, and the City and Plan proponents should be allowed to present evidence to support it.

Third, given that 73.5% of retirees live in the Detroit metro area, the hardship felt by retirees has an impact on the City that must be considered as a reasonably foreseeable consequence of the Plan. As will be introduced at trial, nearly three quarters of retirees live in the Detroit metro area. (*See* Ex. 5 hereto, "Number of City of Detroit Retirees by Home Address.") This means that retiree hardship is not just an issue of how it impacts retirees; it is also an issue of how their cumulative hardship will impact the City. As the City will bear the resulting impact of the retirees' decreased spending power, their increased dependence on social services, and the City's increased poverty levels. Any plan of adjustment, necessarily, needs to

7

13-53846-tjt    Doc 7138    Filed 08/27/14    Entered 08/27/14 22:36:19    Page 7 of 15

account for foreseeable consequences of its confirmation.  Here, that includes recognizing retiree hardship.  This does not require granular investigation of the individual circumstances, personal incomes, or particular health and family circumstances of every retiree.  As is common in urban planning, the City can reasonably rely on aggregated data to recognize, as an additional basis for the its business rationale, that more severe cuts to the retirees could endanger the City's recovery.  Readily available census demographic data—combined with the facts that PFRS pensions average less than $2,600 per month and GRS pensions average less than $1,700 per month—confirm the danger to the City of forcing the City's retirees to take on too great of a hardship.

In addition, FGIC contends that introduction of any evidence, including that of Stuart Wohl, a Committee expert on the amount and effect of changes to retiree healthcare benefits would somehow be prejudicial to it because "FGIC has not had an opportunity to take discovery or prepare its witnesses on the issue." (Motion, at ¶ 20.)  This assertion is wrong.  FGIC, in fact, had every opportunity to engage in discovery regarding Stuart Wohl's expert opinions in this matter.  Each iteration of the Committee's witness lists filed in this matter have indicated an intention to call Mr. Wohl, including June 30 [Dkt. 5688], July 8 [Dkt. 5850], August 4 [Dkt. 6490], and August 13 [Dkt. 6705].  Per the Court's order, Mr. Wohl's expert report was served on all parties on July 22 [Dkt. 6213].  By special stipulation, the objecting creditors were allowed to take Mr. Wohl's deposition after the deposition cut-off [Dkt. 6610], which extension was necessary because the objecting creditors did not file a notice of deposition until August 8 [Dkt. 6598], only three days before the scheduled deposition cut-off mandated by the Court's then-operative Seventh Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment  [Dkt. 6560].  Mr. Wohl was then deposed on August 13, and FGIC attended that deposition.

8

Given the Court's explanation of its ruling on June 26 and August 6—an explanation that FGIC quotes in part on page 10 of its motion—if FGIC chose to forego discovery of Mr. Wohl, it did so at its own risk. Any purported prejudice that FGIC has incurred by not taking the opportunity to question Mr. Wohl regarding his expert opinion is self-inflicted.

Again, the Motion is without merit and should be denied.

C. **FGIC's Attempt to Exclude Evidence "Related to the Terms and Conditions of the Settlement Negotiations that Led to the Grand Bargain" is Ambiguous in Scope and to the Extent it Seeks More Than Excluding Mediated Protected Communications is Improper and Overbroad.**

Similar to it other contentions, FGIC begins its position on the issue of exclusion of evidence of Court ordered negotiations by asserting an otherwise unremarkable and undisputed premise. "The Court has made clear to the parties that who said what to whom during mediation that led to the successful settlement is irrelevant." (Motion, at ¶ 22.) Not only does the Committee not challenge this premise, it supports it.

However, the Committee does challenge FGIC's loose wording, including what it means by "evidence relating to the terms and conditions" that "led to the Grand Bargain." This terminology is so ambiguous and broad as to swallow the issues in dispute between the City and various settling parties, and the terms and factors that were considered by such parties in resolving those disputes.

In fact, this appears to be FGIC's very goal. Among other things, FGIC seeks to preclude evidence of donative intent by the Foundations and others. (Motion, at ¶ 26.) FGIC, like Syncora, argues that, on the motion to quash asserted by certain of the DIA Funding Parties [Dkt. 5300] (the "Motion to Quash"), this Court already ruled that the source of funding is "irrelevant" to an unfair discrimination objection and that the DIA Funding Parties and State contributions

9

accordingly must be included when analyzing unfair discrimination objections. (Motion, at ¶ 22.) But that assertion fundamentally misstates this Court's prior ruling on the Motion to Quash.

Contrary to FGIC's assertions, neither the source of funding nor restrictions upon funding for the DIA settlement were at issue on the Motion to Quash. In its Motion to Quash, the DIA foundations expressly stated that their "role in this matter is limited to providing funding, upon the occurrence of certain conditions precedent, for the benefit of pensioners participating in the General Retirement System and the Police and Fire Retirement System." (Motion to Quash, at 16.) The DIA Funding Parties objected to Syncora's "questions about valuation [in that they] are entirely unrelated to the funding to be provided for the benefit of the pensioners."). (*Id.* at 17.) At the hearing on the Motion to Quash, counsel for certain of the DIA foundations argued that responsive information had in fact been provided to Syncora in the form of Exhibit I.A.91 to the City's Fourth Amended Plan of Adjustment, which expressly sets forth both the source of payments under the DIA Settlement Agreement and the specific restriction that such payments will be used for the benefit of retirees. (Ex. 6 hereto, H'rg Tr., at 11:1-3, June 26, 2014).

Further, the Court did not hold that whether funds to be received by a creditor come from debtor or non-debtor assets is irrelevant to unfair discrimination for purposes of Section 1129(b)(1). Instead, in the course of colloquy with counsel, the Court noted only that "I would have assumed that the issue of unfair discrimination is based upon not where money comes from but where money goes to." (Ex. 6 hereto, Hr'g Tr. at 40:3-5, June 26, 2014). Moreover, the Court's comment about what it would have assumed was not repeated when the Court subsequently issued its ruling on the Motion to Quash. (Ex. 6 hereto, Hr'g Tr. at 126:21-127:5.) At best, the Court's statement is *dictum* that was not essential to or even part of the Court's decision on the Motion to Quash.

Further, FGIC contends that, as a result of the decision on the Motion to Quash, it was unable to conduct any discovery as to whether the DIA Funding Parties would have made funds available to the City other than for the purposes specified under the Grand Bargain. (Motion, at ¶ 27) ("[T]he City should not be allowed to rest on the allegation that parties would not have contributed funds to the Grand Bargain had those funds not been directed solely to the Retirement Systems, when FGIC has not had any opportunity to take discovery on that issue or test its truthfulness."). This assertion is without merit. The record indicates that FGIC did have did have opportunity for discovery on that issue.

Among other things, it appears that FGIC (along with Syncora) deposed certain funding parties to the Grand Bargain who contributed funds to the DIA Settlement Agreement and expressly asked if such parties would have contributed if funds were not specifically designated for retirees. For instance, during the deposition of Dan Gilbert, an entrepreneur who donated to the Grand Bargain, (Ex. 7 hereto, D. Gilbert Depo., 124:17-19), Syncora's counsel (Mr. Arnault) directly asked:

> Q. Okay. Would you have contributed money to the Grand Bargain if some of the money went to pay the debts of insurers who insure the City's Certificates of Participation?
> [ … ]
> A: No. You know, to think that sophisticated Wall Street insurance companies who knew the City of Detroit was in dire financial straits for decades and took a risk in insuring those bonds and — would I personally have invested money into a scheme that would get them part of the recovery? No. The answer is no.

(Ex. 7 hereto, D. Gilbert Depo., 136:17-137:9). Counsel for FGIC, attending the deposition, had the opportunity to explore this subject further had they so chosen.

Similarly, at the deposition of Roger Penske, another entrepreneur who donated $10 million to the Grand Bargain (Ex. 8 hereto, R. Penske Depo., 137:16-21), Syncora's counsel (Mr. Arnault) asked:

> Q. Yeah, would you have contributed money to the grand bargain if some of money was earmarked to demolish blight in the city?
>
> A. Now you're linking blight and other things, it was, it was an initiative that I saw the state was involved, I saw other private sector people involved and I joined that group. Now, whether it was going to be for -- for blight or it was going to be for -- for pensions, my -- my understanding was because it was tied, you know, to the arts at this point, it would be towards the pensions which to me was -- was first and primary.

(Ex. 8 hereto, R. Penske Depo., 141:3-16; see also R. Penske Depo., 138:3-22, 146:20-147:8.)[3] Counsel for FGIC, again in attendance at this deposition, had the opportunity to explore the subject further had they so desired.

Third, independent of the foregoing, even if the subject matter of whether the DIA Funding Parties would otherwise have made funds available to the City had been part of the quashed subpoenas, and even if FGIC had had no opportunity to take discovery on that issue (neither of which appears to be the case), the requested preclusion order would still not be warranted. Specifically, in granting the Motion to Quash Syncora's subpoenas, the Court stated that the information sought by the subpoenas was not relevant to the issues of unfair discrimination, the best interests of creditors or whether the Grand Bargain protects the art of the City. (Ex. 6 hereto, Hr'g Tr. at 126:21-127:5, June 26, 2014.) In so ruling, the Court did not state that information covered by the subpoenas was irrelevant for any and all purposes. Accordingly, to the extent that evidence on matters covered by the FGIC subpoenas is pertinent

---

[3] Similar questioning also took place during the deposition of Rip Rapson, a representative of the Kresge Foundation, another Grand Bargain contributor, but this time the questioning was actually led by counsel for FGIC. (Ex. 9 hereto, R. Rapson Depo., 28:23-30:13, 32:6-19, 42:15-43:13, 48:24-50:5.)

13-53846-tjt    Doc 7138    Filed 08/27/14    Entered 08/27/14 22:36:19    Page 12 of 15

to issues other than the three specifically referred to by the Court, it would be outside the scope of the Court's ruling on the Motion to Quash and, if relevant for other reasons, would be admissible.

### D. FGIC's Reservation That Such Evidence Is Relevant and Admissible for Other Limited Purposes Applies to the City and Supporting Parties.

In the final section (V) of its Motion, FGIC contends that while the City and its Plan Supporters should be prevented from introducing any evidence on the above topics, it should be free from such constraints. FGIC contends "[a]s discussed, evidence bearing on the validity of the COPs Complaints, the potential hardship to creditors, and the terms of the settlement negotiations is irrelevant with respect to demonstrating that the Plan should be confirmed or that the settlements therein should be approved, and should be excluded for those purposes. ***However, the fact that the City relied on these factors in deciding to discriminate against Class 9 is highly relevant for the purposes demonstrating that the Plan is under 11 U.S.C. s 1129(b).***" (Motion, at ¶ 34 (emphasis added).) In support of this point, FGIC cites *In re Graphic Communications, Inc.*, 200 B.R. 143 (Bankr. E.D. Mich. 1996) (Rhodes, C.J.), a well reasoned but inapposite opinion where a Chapter 11 debtor's "personal animosity" towards a particular creditor was demonstrated, in part, through improper plan classification and a pattern of avoiding repaying the creditor over a span of 15 years. *Id.* at 149. This authority is unpersuasive in the instant context.

FGIC's attempt to create a one-way street is both improper and undermines the thrust of the Motion. As FGIC admits, evidence that may be precluded for one issue or in one circumstance, may be relevant for others. FGIC's efforts to limit evidence to itself is improper and should be denied.

13

## **CONCLUSION**

For the foregoing reasons, the Committee respectfully requests that the Court deny FGIC's Motion and grant it all other relief as is just and proper.

Dated: August 27, 2014

Respectfully submitted,

By: */s/ Sam J. Alberts*

| | |
|---|---|
| Claude Montgomery | Sam J. Alberts |
| Carole Neville | Dan Barnowski |
| DENTONS US LLP | Daniel Morris |
| | DENTONS US LLP |
| 1221 Avenue of the Americas | 1301 K Street, NW, Suite 600 East Tower |
| New York, New York 10020 | Washington, DC 20005 |
| Tel: (212) 768-6700 | Tel: (202) 408-6400 |
| Fax: (212) 768-6800 | Fax: (202) 408-6399 |
| claude.montgomery@dentons.com | sam.alberts@dentons.com |
| carole.neville@dentons.com | dan.barnowski@dentons.com |
| | daniel.morris@dentons.com |

BROOKS WILKINS SHARKEY & TURCO PLLC
Matthew E. Wilkins
Paula A. Hall
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Direct: (248) 971-1711
Cell: (248) 882-8496
Fax: (248) 971-1801
wilkins@bwst-law.com
hall@bwst-law.com

*Attorneys for the Official Committee of Retirees of the City of Detroit, Michigan*

# CERTIFICATE OF SERVICE

    I, Sam Alberts, hereby certify that the foregoing document was filed and served via the Court's electronic case filing and noticing system on August 27, 2014.

                                  By:   */s/ Sam Alberts*
                                           Sam Alberts