# Exhibit 9

RIP RAPSON

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| In re | ) | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| Debtor. | ) | Hon. Steven W. Rhodes |

---

The Videotaped Deposition of RIP RAPSON,
Taken at 1114 Washington Boulevard,
Detroit, Michigan,
Commencing at 9:02 a.m.,
Thursday, July 31, 2014,
Before Rebecca L. Russo, CSR-2759, RMR, CRR.

00000000-0000-0000-0000-000000000000

RIP RAPSON

APPEARANCES:

GREGORY M. SHUMAKER, ESQ.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Appearing on behalf of the City of Detroit.

ROBERT S. HERTZBERG, ESQ.
Pepper Hamilton LLP
Suite 1800
4000 Town Center
Southfield, Michigan 48075
Appearing on behalf of the City of Detroit.

00000000-0000-0000-0000-000000000000

RIP RAPSON

EDWARD R. McCARTHY, ESQ.
PRAVIN R. PATEL, ESQ.
Weil Gotshal & Manges LLP
1395 Brickell Avenue
Suite 1200
Miami, Florida 33131

Appearing on behalf of the Financial Guaranty Insurance Company.

KELLEY M. HALADYNA, ESQ.
Dickinson Wright PLLC
500 Woodward Avenue
Suite 4000
Detroit, Michigan 48226

Appearing on behalf of the State of Michigan.

00000000-0000-0000-0000-000000000000

RIP RAPSON

DANIEL MORRIS, ESQ. (Via Telephone)
Dentons US LLP
1301 K Street, N.W.
Washington, D.C. 20005
Appearing on behalf of the Retiree Committee.

DIANA A. SANDERS, ESQ. (Via Telephone)
Chadbourne & Parke, LLP
30 Rockefeller Place
New York, New York 10112
Appearing on behalf of Assured Guaranty Municipal Corp.

00000000-0000-0000-0000-000000000000

RIP RAPSON

HARVEY KURZWEIL, ESQ.
DESIREE MARIE RIPO, ESQ.
Winston & Strawn LLP
200 Park Avenue
New York, New York 10166

Appearing on behalf of the Witness and the Kresge Foundation.

ALSO PRESENT:
Justin Slanec - Video Technician

00000000-0000-0000-0000-000000000000

RIP RAPSON

Q. -- thank you. And do you view a critical aspect of Detroit's revitalization to be the building of the city to have access to capital markets?

MR. SHUMAKER: Object to the form.

A. If I understand the question correctly, will the long-term health -- can I restate the question to make sure I'm understanding it?

What I think you're asking is will the long-term health of the city depend, in part, on the return of capital markets with sort of a robustness to the city? Yes.

MR. MCCARTHY: Technical difficulties. Just a moment.

Could we go off the record for a moment?

VIDEO TECHNICIAN: The time is 9:25 a.m. We are now off the record.

(Off the record at 9:25 a.m.)

(Back on the record at 9:26 a.m.)

VIDEO TECHNICIAN: The time is 9:26 a.m. We are back on record.

BY MR. MCCARTHY:

Q. What's your current position at the foundation?

A. My title is president and chief executive officer.

Q. And since your time at the foundation, have you always

00000000-0000-0000-0000-000000000000

RIP RAPSON

been the president and chief executive officer?

A. Yes.

Q. What are you responsible for at the foundation as the president and chief executive officer?

A. Quite a number of things. Maybe I can start and you can tell me where to stop.

My first layer of responsibility is to the board of directors. I have to ensure their appropriate engagement with the stewardship of the foundation. They have fiduciary and other forms of duty to the foundation under non-profit law, and I have to make sure that they have the wherewithal to be able to execute on those responsibilities.

I have the responsibility for overseeing the growth and development of the staff. When I came it was about 30. We're now about 85. So that takes a big chunk of time.

I view my responsibility as, in part, being a resource to the program areas so that I can help connect them to the best thinking and resources they need in order to be effective.

I have responsibility for internal human resources issues, internal administrative issues. I each year propose to the board a budget and a

00000000-0000-0000-0000-000000000000

strategic operating plan. That's some of the, some of the things I do.

Q. How large is the board of directors of Kresge currently?

A. Twelve. I think we may be at eleven, but we've been about twelve. We have an opening.

Q. And has it been roughly twelve since the time -- since your time at Kresge?

A. Yes.

Q. And you said the staff increased from about 30 to 85 during your time at Kresge?

A. Yes.

Q. And why was that?

A. It goes back to the answer I may have given you earlier -- I gave you earlier, about the change in the nature of the way we work. When we were, when we were doing capital challenge grants, you could do that with a smaller staff. You were essentially taking information from Harvard Medical School about how it proposed to build a building, and we would make a judgment about whether the gift structure of what they hoped to accomplish was adequate.

You could almost do that with an algorithm, frankly, and so it was a very lean staff and very

00000000-0000-0000-0000-000000000000

RIP RAPSON

BY MR. MCCARTHY:

Q. To carry out the foundation's mission, does the foundation donate money?

A. It invests money. I'm not -- yes, I think, yeah.

Q. Well, let's talk about the -- for the City of Detroit currently, as part of the, what's been called the Grand Bargain -- do you understand what the Grand Bargain is?

A. I do.

Q. And could you tell me what that is, briefly, so we're on the same page?

A. I'm going to tell you what the Grand Bargain is? Okay. It is a, it is an unbelievably-complicated aggregation of resources that permits the expedient resolution of the bankruptcy.

Q. And as part of the Grand Bargain, has Kresge donated or invested money?

A. Yes --

Q. Okay, and would you characterize Kresge's --

MR. KURZWEIL: Excuse me, I don't believe the witness finished his last answer.

A. I'm sorry.

BY MR. MCCARTHY:

Q. I didn't mean to cut you off, go ahead.

00000000-0000-0000-0000-000000000000

RIP RAPSON

I think our, our support for them is, if I recall correctly, approximately a hundred thousand dollars a year in operating support.

Q. And that's a continuing amount, the hundred thousand dollars a year?

A. Yes.

Q. Is that continuing as we sit here today?

A. Yes.

Q. And when did that, I guess agreement of Kresge to provide a hundred thousand dollars, roughly, in operating support to the DIA begin?

A. Boy, I want to say maybe 2007, 2008, approximately. I think that's when we developed the program.

Q. How much money has Kresge agreed to contribute to the Grand Bargain?

A. A hundred million dollars.

Q. Is that hundred million dollars more money than Kresge has contributed to any one cause since your time at Kresge?

A. To any one cause -- you mean any one institution or cause?

Q. Let's start with institution.

A. Yes. I would -- could I just qualify that this hundred million dollars was not a contribution to the

RIP RAPSON

Detroit Institute of Art.

Q. How would you describe the hundred million dollars?

A. It was a contribution to the effectuation of the Grand Bargain.

Q. And do you believe that the hundred million dollars that Kresge has agreed to contribute is in any way tied to the DIA?

A. Our contribution is predicated on it serving three purposes: One, to help expedite the resolution of the bankruptcy; two, to soften the blow to pensioners; and three, to help preserve the DIA's collection. So I guess the answer would be yes.

Q. A portion of the hundred million dollars would go, in your opinion, to the third prong of why Kresge is contributing money to the Grand Bargain?

MR. SHUMAKER: Object to the form.

MR. MORRIS: Object to the form.

A. I was going to object to the form, as well --

BY MR. MCCARTHY:

Q. You're entitled to.

A. -- in the sense that we didn't allocate money to those three prongs. We allocated money to the totality of the package.

Q. You mentioned the first prong was to help expedite the

00000000-0000-0000-0000-000000000000

RIP RAPSON

undermining -- undergirding them.

Q. Outside of the Grand Bargain, has the DIA -- has the Kresge Foundation ever contributed funds during your time there to help soften the blow of pensioners in any particular municipality?

A. I'm hesitating, because much of what Kresge does is to try to create buffers for low-income people and opportunities for low-income people to, to enter the economic mainstream and participate fully in civic life.

So I think the, the objective of our foundation is to, as you've put the document to me earlier, is to improve the lives of poor and low-income children and adults.

So in some ways I think we've indirectly helped people who are on pensions and who aren't on pensions, but without, again, meaning to split hairs, we have never directly invested in pensioners nor are we -- again, nor is that the way we have designated these funds.

We have designated these funds to be part of a pool of money with multiple objectives.

Q. Is it fair to say that Kresge Foundation's contribution or proposed contribution to the Grand

00000000-0000-0000-0000-000000000000

RIP RAPSON

Bargain would be the most direct way that Kresge has ever contributed funds to soften the blow of pensioners since the time you've been there?

A. Yes.

Q. And why is that? Why is it that, in this instance, with the Grand Bargain, Kresge has determined to do something it hasn't done in the past during your time there, specifically with respect to softening the blow to pensioners?

A. The calculus that we did in making our contribution to the Grand Bargain was that it would accomplish three objectives simultaneously. We've walked through those. That was the reason for taking the action.

Q. Does the Kresge Foundation deem any one of the three objectives that we've talked about to be more important than the other objectives?

A. No. I would, I would answer it a slightly different way. I would say all three are essential. I don't think any one is more essential than the others.

Q. I'm trying to get at specifically the second objective that you mentioned, softening the blow to the pensioners.

A. Mmm-hmm.

Q. Are you able, as you sit here today, to answer whether

00000000-0000-0000-0000-000000000000

RIP RAPSON

Kresge would have agreed to potentially contribute to the Grand Bargain, assuming softening the blow to the pensioners was not one of the objectives?

A. It would not have.

MR. MORRIS: Objection, form.

BY MR. MCCARTHY:

Q. And why is that?

A. Because we needed to see all three objectives satisfied.

Q. And why is it important for Kresge to soften the blow for the pensioners in this particular instance?

MR. SHUMAKER: Objection, form --

A. I think I've answered the question.

MR. SHUMAKER: -- asked and answered.

BY MR. MCCARTHY:

Q. Outside of Kresge's desire to see all three of the objectives we've talked about, expediting the resolution of the bankruptcy, softening the blow to the pensioners, and preserving the collection at the DIA, all move forward, are there any other specific reasons you can tell me that -- as to why Kresge deems it important to have objective number two, softening the blow to the pensioners, move forward as an objective?

00000000-0000-0000-0000-000000000000