In re:

CITY OF DETROIT, MICHIGAN,

Debtor.

Chapter 9

Case No. 13-53846

Hon. Steven W. Rhodes

**PRETRIAL BRIEF OF THE DETROIT INSTITUTE OF ARTS**
**IN SUPPORT OF CONFIRMATION OF THE SIXTH AMENDED PLAN**
**FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

I.    INTRODUCTION .................................................................................................3

II.   BACKGROUND ...................................................................................................6

    A.    The Museum Is a Charitable Institution that Exists for the Benefit of the Public. .........................................................................................................6

        1.    The Founders Created the Museum as a Charitable Institution. ..................6

        2.    The 1918 City Charter and 1919 Amendment Continued the Museum as a Charitable Institution. .........................................................8

        3.    Public and Private Support Continues to Support the Museum.................11

        4.    The Museum Is the Product of More than a Century of Public and Private Charitable Support. ......................................................................14

        5.    This Century of Charitable Support Has Resulted in a Museum that Is a Cornerstone of Detroit and a Key Part of the City's Future..............18

    B.    The Grand Bargain Resolves Potential Litigation Over the Museum Art Collection and Preserves the Museum...................................................................19

III.   ARGUMENT .......................................................................................................21

    A.    The City Does Not Have the Right to Sell or Monetize the Museum Assets to Satisfy Municipal Obligations. .........................................................................22

        1.    The Museum Assets, including the Entire Museum Art Collection, Are Protected. ...........................................................................................23

            a.    The Museum Assets Are Held in Charitable Trust........................23

                1.    The Museum Was Established and Continued as a Charitable Trust. .............................................................24

                2.    The DIA Corp.'s Articles and the City Charter Established a Charitable Trust..............................................28

                3.    Gifts and Bequests to a Charitable Corporation Create a Charitable Trust. .............................................................30

                4.    A Century of History Confirms that the Museum Art Collection Is Held in Charitable Trust. ..............................32

a) The Process of Donating Confirms the Museum Is Held in Trust. ......................................................33

b) Public Statements and Conduct Confirm that the Museum Is Held in Trust. ......................................35

c) The Nature of the Museum Confirms the Museum Is Held in Trust. ...................................................40

d) The Museum Is a Charitable Trust........................42

b. The Museum Art Collection Is Protected by an Implied Trust......44

c. The Museum Art Collection Is Protected by the Public Trust Doctrine...........................................................................45

d. The City Is Bound by Its Representations and Promises...............47

1. Election and Equitable Estoppel .......................................47

2. Promissory Estoppel .......................................................48

3. Dedication ......................................................................49

2. Restrictions and Limitations Provide Additional Protection for Significant Portions of the Museum Art Collection. ................................51

a. The City Cannot Monetize Property Conveyed by or Through the DIA Corp. to the Museum. ............................................51

b. The City Is Bound by Donor-Imposed Conditions, Limitations, and Requirements. ..............................................................54

1. Objects Donated through the DIA Corp. Are Restricted. ..54

2. A Substantial Portion of the Collection Bears Additional Donor Restrictions. ............................................56

c. The City Cannot Sell Objects For Which It Does Not Have Clear Legal Title....................................................................59

3. Discovery Will Further Undercut Any Claim that the City Has the Right to Sell or Monetize the Museum Art Collection. .............................61

B. Litigation Would Be Complex, Protracted, and Expensive. ....................65

C. The City Would Have Difficulty Realizing the Museum Art Collection's Value. ...................................................................................67

D.    The Grand Bargain Is In The Best Interests Of The City And Its Creditors. ...........73

1.    Preserving the Museum Will Assist in Detroit's Revival. .........................74

2.    Approval of the Grand Bargain Is Essential to the City's Prompt Emergence from Bankruptcy. ...................................................................75

3.    The City Is Not Required to Consider The Bond Insurer's Alternatives to the Grand Bargain. ...........................................................76

IV.    CONCLUSION...............................................................................................................77

# TABLE OF AUTHORITIES

**CASES**

*2000 Baum Family Trust v. Babel*,
    793 N.W.2d 633, 640 (Mich. 2010) ................................................................. 49-50

*Baldwin Manor, Inc. v. City of Birmingham*,
    67 N.W.2d 812, 815 (Mich. 1954) ......................................................................50

*Banner Health Sys. v. Long*,
    663 N.W.2d 242, 250 (S.D. 2003) ......................................................................45

*Bard v. Sicherman (In re Bard)*,
    49 F. App'x 528, 530 (6th Cir. 2002) ........................................................... 21-22

*Bd. of Trs. of Philadelphia Museums v. Trs. of Univ. of Pennsylvania*,
    96 A. 123 (Pa. 1915) ..........................................................................................50

*Blocker v. State*,
    718 S.W.2d 409, 415 (Tex. Ct. App. 1986) ......................................................31

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
    699 F.2d 599, 608 (2d Cir. 1983) ......................................................................22

*Darby v. Zimmerman (In re Popp)*,
    323 B.R. 260 (B.A.P. 9th Cir. 2005) .................................................................59

*Detroit Museum of Art v. Engel*,
    153 N.W. 700, 703 (Mich. 1915) .........................................................................8

*Digby v. Thorson*,
    30 N.W.2d 266, 272 (Mich. 1948) .....................................................................44

*Faulds v. Dillon*,
    204 N.W. 733, 735 (Mich. 1925) .......................................................................24

*Ford Motor Co. v. City of Woodhaven*,
    716 N.W.2d 247 (Mich. 2006) ...........................................................................60

*Frost v Frost*,
    131 NW 60, 61 (Mich. 1911) .............................................................................32

*Glass v. Goeckel*,
    703 N.W.2d 58, 65 (Mich. 2005) .................................................................. 46-47

*Hatheway v. Sackett*,
    32 Mich. 97, 101 (1875) ....................................................................................25

iv

*Hindelang v. Mid-State Aftermarket Body Parts, Inc. (In re MQVP, Inc.)*,
477 F. App'x. 310, 313 (6th Cir. 2012) .................................................................22

*Holzbaugh v. Detroit Bank & Trust Co.*,
124 N.W.2d 267, 268 (Mich. 1963) ......................................................................47

*Illinois Central R.R. Co. v. Illinois*,
146 U.S. 387, 452 (1892) .....................................................................................45

*In re Americana Foundation*,
378 N.W.2d 586 (Mich. Ct. App. 1985) ............................................................ 29-30

*In re Beglinger Trust*,
561 N.W.2d 130, 131-32 (Mich. Ct. App. 1997) ...................................................48

*In re Fishell*,
47 F.3d 1168, 1995 WL 66622, at *2 (6th Cir. 1995) ............................................21

*In re Harrington's Estate*,
36 N.W.2d 577, 582 (Neb. 1949) ..........................................................................31

*In re Iridium Operating LLC*,
478 F.3d 452 (2d Cir. 2007) .................................................................................75

*In re Omegas Group., Inc.*,
16 F.3d 1443 (6th Cir. 1994) ...............................................................................45

*In re Parkview Hospital*,
211 B.R. 619 (Bankr. N.D. Ohio 1997) ............................................................ 42-43

*In re Peterson's Estate*,
277 N.W. 529, 532 (Minn. 1938) ..........................................................................31

*In re Rood's Estate*,
200 N.W.2d 728, 738 (Mich. Ct. App. 1972) ...................................................23, 33

*Jackson v. Philips*,
14 Allen 539, 556 (Mass. 1867) ...........................................................................33

*Levy v. Levy*,
33 N.Y 97 (1865) .................................................................................................28

*Lysogorski v. Charter Township of Bridgeport*,
662 N.W. 2d 108, 110 (Mich. App. 2003) .............................................................27

*Maynard v. Woodard*,
36 Mich. 423, 426-27 (1877) ..........................................................................26, 28

*Michigan Paralyzed Veterans of America v. Coleman*,
    545 F. Supp. 245, 251 (E.D. Mich. 1982)............................................................................27

*Nash v. Duncan Park Commission*,
    848 N.W.2d 435, 447 (Mich. App. 2014) ........................................................................24

*Nedtweg v. Wallace*,
    208 N.W. 51, 53 (Mich. 1926)........................................................................................46

*Novak v. Nationwide Mut. Ins. Co.*,
    599 N.W.2d 546, 552 (Mich. Ct. App. 1999) ................................................................49

*Osius v. Dingell*,
    134 N.W.2d 657 (Mich. 1965)........................................................................................24

*Pacific Home v. County of Los Angeles*,
    264 P.2d 539, 543 (Cal. 1953) .......................................................................................31

*Patrick v. Young Men's Christian Ass'n of Kalamazoo*,
    79 N.W. 208, 211 (Mich. 1899).....................................................................................50

*Pierowich v. Metropolitan Life Ins. Co.*,
    275 N.W. 789, 790 (Mich. 1937)..............................................................................24, 29

*Potter v. Lindsay*,
    60 N.W.2d 133, 136 (Mich. 1953).................................................................................45

*Protective Comm. For Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968)................................................................................................21, 73

*Rood v. Gen. Dynamics Corp.*,
    507 N.W.2d 591, 606 (Mich. 1993)...............................................................................49

*Scarney v. Clarke*,
    275 N.W. 765, 767 (Mich. 1937)...................................................................................33

*State Bank of Standish v. Curry*,
    500 N.W.2d 104, 109 (Mich. 1993)...............................................................................49

*Toussaint v. Blue Cross & Blue Shield of Mich.*,
    292 N.W.2d 880, 895 (Mich. 1980)...............................................................................49

*Trs. of the First Soc'y of the Methodist Episcopal Church of Newark v. Clark*,
    3 N.W. 207, 212 (Mich. 1879).......................................................................................28

*Trs. of Rutgers College in New Jersey v. Richman*,
    125 A.2d 10, 28 (N.J. Ch. Div. 1956)............................................................................32

*Ware v. City of Fitchburg*,
    85 N.E. 951, 951-53 (Mass. 1908) ..................................................................28

*Webster v. Wiggin*,
    31 A. 824, 825-26; 828 (R.I. 1895) ..............................................................28

*Wellesley College v. Attorney General*,
    49 N.E.2d 220, 224 (Mass. 1943) ................................................................32

*White v. Rice*,
    112 Mich. 403 (1897) ..................................................................................28

*Wiersma v. Mich. Bell Tel. Co.*,
    401 N.W.2d 265, 269 (Mich. Ct. App. 1986) ..............................................48

**STATUTES**

11 U.S.C. § 903 ..........................................................................................................77

11 U.S.C. § 904 ..........................................................................................................77

MICH. COMP. LAWS §14.252(a) ..........................................................................25, 31

MICH. COMP. LAWS §14.254 .....................................................................................27

MICH. COMP. LAWS §123.871 ...................................................................................54

MICH. COMP. LAWS §141.1602 .................................................................................77

MICH. COMP. LAWS §141.1609 .................................................................................77

MICH. COMP. LAWS §554.351 ...................................................................................31

MICH. COMP. LAWS §554.352 ...................................................................................31

MICH. COMP. LAWS §700.1107(n) ............................................................................26

MICH. COMP. LAWS §700.7103(C) ............................................................................23

MICH. COMP. LAWS §700.7405(1) ............................................................................23

MICH. COMP. LAWS §700.7407 .................................................................................24

**OTHER AUTHORITIES**

BOGART'S TRUSTS AND TRUSTEES § 130 (3d. ed. 2000) ...........................................26

SCOTT AND ASCHER ON TRUSTS § 11.1.6.1 (5th ed. 2006) .......................................26

ATTORNEY GENERAL OPINION 7272 ...............................................................................19, 27, 65

RESTATEMENT (THIRD) OF TRUSTS § 33 cmt. d (2003)..................................................................26

viii

# PRELIMINARY STATEMENT

The museum commonly referred to as the Detroit Institute of Arts (the "Museum") has emerged as a central figure in the most significant municipal bankruptcy in the history of the United States. Therefore, it is not surprising that the principal financial creditors of the City of Detroit (the "City") are keenly focused on selling or otherwise monetizing the Museum and its world renowned art collection (the "Museum Art Collection" and together with certain related assets the "Museum Assets") as a means of increasing their recovery in the bankruptcy. Fortunately for the people of the City and the State of Michigan (the "Public"), the Museum Assets are held in trust for the Public and are beyond the reach of the City or its creditors.

Because of their value, the Museum Assets have become a focal point, and perhaps the focal point, of these proceedings and the City's plan to emerge from bankruptcy in significant part through the consummation of what has come to be known as the Grand Bargain. The Grand Bargain is the agreement of the State of Michigan (the "State"), the foundation community and The Detroit Institute of Arts, the Michigan not-for-profit entity that operates the Museum ("DIA Corp."), to contribute $816 million (before present value discount) for the benefit of the City's pensioners subject to the condition that the Museum Assets are conveyed to DIA Corp. to be held in perpetual charitable trust for the benefit of the Public.

There are two questions at issue related to the Museum and the Grand Bargain: (1) can the City sell Museum Assets for purposes other than the advancement of the Museum itself, specifically, to generate funds that would be used to pay the City's financial creditors or to otherwise fund the operations of the City; and (2) if the City can sell some or all of those assets, should it do so?

The DIA Corp. largely focuses on the first question here. In short, the City cannot sell or monetize the Museum Assets for its own purposes. While legal title to some of those assets may

1

reside with the City, the Museum Assets are protected by a charitable trust, implied trust, and public trust, all for the benefit of the Public and which require that those assets be held and used only in furtherance of the Museum's purposes.

The second question is one that the City must answer, as only it may propose a plan of adjustment or move to sell assets purported to be owned by the City. Nonetheless, given the importance of these matters to the Museum, the DIA supports the conclusion that even if some of the Museum Assets legally could be monetized, they should not be. To the contrary, the Museum should be safeguarded for the benefit of the Public, should be maintained so that it can anchor Midtown and the City's cultural community, and should be preserved so that the Grand Bargain, a critical element of the City's plan of adjustment, can be consummated.

# I. INTRODUCTION

The Museum is one of the premier cultural institutions in the City of Detroit and State of Michigan and is widely considered one of the top six encyclopedic art museums in the United States. The Museum Art Collection has enormous cultural and educational significance. Since its founding in 1885, the Museum has existed to serve the Public.

In 2013, the City filed for bankruptcy protection pursuant to Chapter 9 of the bankruptcy code. To help resolve its financial crisis, the City sought to generate cash that could be used to satisfy the City's debts by considering the monetization (most likely selling) of some or all of the Museum Art Collection. Certain City creditors, most prominently Financial Guaranty Insurance Company, Syncora Guarantee Inc., and Syncora Capital Assurance Inc. (collectively, the "Bond Insurers") independently argued, and continue to argue, that the City must monetize the Museum to satisfy City obligations. The DIA steadfastly contended that any such monetization would be impermissible. The Michigan Attorney General (the "Attorney General") reached the same conclusion, explaining his reasoning in Attorney General Opinion No. 7272.

Recognizing that the dispute portended years of costly, complex litigation that would have severely delayed the City's emergence from bankruptcy and destroyed the Museum, to the City's great loss, Court-appointed mediators, the Honorable Gerald Rosen, Chief Judge of the United States District Court for the Eastern District of Michigan, and Eugene Driker, initiated negotiations among the City, the DIA Corp., several charitable foundations, and numerous creditors, including Plan Classes 10 and 11 and their representatives. After months of intense multi-party negotiations, the terms of the Grand Bargain were agreed upon and, if implemented, will achieve a settlement of the disputes over the City's rights to the Museum Assets. The Grand Bargain is the product of unprecedented charity and goodwill spearheaded by over a dozen charitable foundations, the State, the DIA Corp., and other generous corporate and individual

3

donors.  Collectively, they will contribute $816 million, on the conditions (among others) that the payments are used solely for the benefit of the City's pensioners and that all Museum Assets are transferred to the DIA Corp. free of liens to be held in perpetual charitable trust for the benefit of the Public.  The DIA Corp. itself committed to contribute or cause to be contributed $100 million in funding to the Grand Bargain and to undertake forever all future costs (which amount to tens of millions of dollars per year) of the management and operations of the Museum and the preservation and conservation of the Museum Art Collection.  The State also has passed legislation pursuant to which it will fund $350 million of the Grand Bargain.

Despite the contemplated influx of more than $800 million—all of which will evaporate if the Grand Bargain is not consummated prior to the end of 2014—and the assured contribution of an additional $200 million through existing millages which would be jeopardized if any Museum Assets were sold, the Bond Insurers contest the propriety of the Grand Bargain, asserting that the City must consider alternative options for a sale, transfer, or monetization of some or all of the Museum Art Collection, which might provide increased benefits for them. Two overarching arguments dominate their objections: the City's plan of adjustment (the "Plan") unfairly favors certain creditors and interested parties with similar priority claims over the Bond Insurers; and the Grand Bargain is not a reasonable settlement of potential litigation over ownership of the Museum Assets.

The DIA Corp. addresses only the second argument, by showing that the Museum Assets cannot be sold for these purposes and that, even if some or all of these assets could in fact be sold, they should not be.  Indeed, if the Grand Bargain is not approved and if the City attempts to monetize the collection for the benefit of the Bond Insurers, the City will be in a far worse position because:

A.     The City likely will not prevail in litigation if it attempts to sell or monetize any portion of the Museum Art Collection to satisfy municipal operating debts and obligations.  The entire Museum and Museum Art Collection are held in trust, and other restrictions and conditions impose additional limitations on the City's ability to monetize substantial portions of the Museum Art Collection.

B.     Litigation would be complex, protracted, and expensive.  The City would be mired in litigation with the DIA Corp., the Attorney General, numerous donors and possibly other interested members of the Public.  This litigation would take years, involving countless millions of pages of documents, enormous costs, and multiple parties to determine the existence and scope (if any) of the City's rights to the Museum Art Collection.  The dispute would be fought on an object-by-object, donation-by-donation basis, delaying the resolution of this bankruptcy case to the incalculable detriment of the people of the City.  In the interim, the $816 million of Grand Bargain funding, and possibly the millage proceeds as well, would be lost.

C.     The City would have difficulty, even assuming it retained some rights to objects in the Museum Art Collection, matching the value it would receive as part of the Grand Bargain.  Through the Grand Bargain, the City protects the Public's right to the Museum Art Collection while also extracting monetary value with respect to it.  Any other sale or monetization option would place the Museum Art Collection at risk or require its liquidation.  Yet the value that could be received by the creditors likely would not equal the amount of value they would receive as part of the Grand Bargain, especially since the Bond Insurers likely would not prevail in litigation.

D.     The interests of the City and its creditors would be harmed if the Grand Bargain is not approved.  A sale of any portion of the Museum Art Collection would likely result in a closure of the Museum, which would immeasurably harm the City and its revitalization.

The Grand Bargain is a reasonable settlement under the standards set forth in Rule 9019 of the Federal Rules of Bankruptcy Procedure.  Although the Bond Insurers may not be satisfied, the Grand Bargain is a win for the City, the Public, and creditors.  The Court should approve the Grand Bargain and confirm the Plan.

## II.     BACKGROUND

### A.     THE MUSEUM IS A CHARITABLE INSTITUTION THAT EXISTS FOR THE BENEFIT OF THE PUBLIC.

The Museum was created and has been treated since its inception as a charitable trust for the benefit of the Public.  The evidence of this trust is found in the legislation and agreements that created and governed the Museum and its co-trustees, in the history of giving that established, enhanced, and sustained the Museum, and in the unique joint public-private partnership that has defined the Museum from its inception.

### 1.     The Founders Created the Museum as a Charitable Institution.

On April 5, 1883, U.S. Senator Thomas W. Palmer of Michigan wrote to Mr. W.H. Brearley of Detroit offering $10,000 "for the purpose of aiding in the purchase of a lot and the erection of an art gallery thereon," if $40,000 were raised from other sources by July 1, 1884. (City Exhibit 357; POA00728929-931 (1904 Annual Report of the Detroit Museum of Art, relevant pages of which are attached as Exhibit 1).)  Mr. Brearley raised the additional funds from 40 generous individuals who later became the original incorporators of the Detroit Museum of Art.  (*Id.*)

Realizing that Michigan law did not authorize incorporation "for the purpose in view," a committee of the incorporators drafted a bill and procured its introduction in the legislature. (*Id.*) The bill became Public Act 3 of 1885. The legislation they helped draft authorized the formation of the DIA Corp. and imposed on the new corporation, at the founders' request, the "duty" of "the public exhibition of [the corporation's] collection of works of art." (City Exhibit 452; POA00735002 (1885 Act, at § 4, attached as Exhibit 2).) The corporation was required to "faithfully" use "[a]ll gifts, devises, or bequests . . . for the purposes for which such corporation was organized," (*id.*; POA00735004, at § 15), and its "character and purposes shall not be changed, nor its general art collection be sold, incumbered or disposed of unless authorized by the legislature . . . ." (*Id.*, at § 16.)

After the enactment of the authorizing legislation, the incorporators met again and adopted the original Articles of Incorporation, which, by agreement of the founders, recognized the incorporators' contributions "for the purpose of founding a public art institute in the City of Detroit," formed the corporation for that purpose, and authorized the corporation to "receive and use such gifts, contributions, devises and bequests, as may be made to it, for art purposes," (POA City Exhibit 335; POA00258070 (DIA Corp. 1885 Articles of Incorporation, relevant pages of which are attached as Exhibit 3).) The DIA Corp. acted through a board of "trustees" who publicly acknowledged that "the sole existence of a museum was for the benefit of the public and not the donors or the deceased." (City Exhibit 359; POA00729035 (1916 Annual Report).) Although the language used in the DIA Corp.'s Articles was revised many times over the years, the Articles never deviated from the charitable purpose set forth in the initial Articles. (City Exhibits 336, 348, 349, 429, 430, 431, 432, 433, 340; POA00258074-085, POA00262348-349,

POA00262350-351, POA00734834-836, POA00734837-838, POA00734839-842, POA00734843-846, POA00734851-853, POA00258089 (DIA Articles and Amendments).)

### 2. The 1918 City Charter and 1919 Amendment Continued the Museum as a Charitable Institution.

The City began providing support for the Museum in 1893. (City Exhibit 357; POA00728935-936 (1904 Annual Report, at 70, *see* Exhibit 1).) But a later Michigan Supreme Court decision prohibited the City from continuing to support the Museum while in private hands. *See Detroit Museum of Art v. Engel*, 153 N.W. 700, 703 (Mich. 1915). So the DIA Corp., the City, and the State responded.

The City amended its Charter in 1918 to create a new municipal department, known as the Arts Commission, to undertake responsibility for the Museum that was about to come into the care of the City. (City Exhibit 360; POA0729085 (1918 Annual Report, relevant pages of which are attached as Exhibit 4).) Under Chapter XIX of the 1918 Charter, the Arts Commission had the same rights, duties, and obligations as the DIA Corp., including: (1) the duty to build and operate a building "for the exhibition of paintings and works of art . . . to be known as the Detroit Institute of Arts, and to which, under proper rules and regulations, the public may have access free of charge;" (2) the duty to "acquire, collect, own and exhibit, in the name of the city, works of art, books and other objects such as are usually incorporated in Museums of Art;" and (3) the right "with the approval of the common council, in the name of the city, [to] take and hold, by purchase, gift, devise, bequest or otherwise, such real and personal property as may be proper for carrying out the intents and purposes for which it is established." (City Exhibit 391; POA 00730949 (1918 City Charter, ch. 19, relevant pages of which are attached as Exhibit 5).) Like the DIA Corp.'s Articles, the 1918 Charter did not in any way give the Arts Commission the power to sell for general municipal purposes artwork entrusted to its care but instead required it

8

to exhibit such works and to use such property "for the purposes for which [the DIA Corp.] was organized." (City Exhibit 286; DIAINSP094969 (1919 Amendment, at § 20, attached as Exhibit 6).) And, although the City's charters were amended over time, the charter amendments, to this day, never contradicted the charitable purpose set forth in the initial Charter for the Arts Commission. (City Exhibit 391; POA007390948-950 (1918 City Charter, *see* Exhibit 5); City Exhibit 350; POA00262352 (2012 City Charter); FGIC Exhibit 3254 (Excerpt from 1944 Charter); FGIC Exhibit 3255 (Excerpt from 1948 Charter).)

The legislature then amended the 1885 Act in 1919 ("1919 Amendment") to authorize the DIA Corp. to convey the Museum Art Collection and lands and building to "a city empowered to maintain a public art institute like or similar to that described in this act." (City Exhibit 286; DIAINSP094969 (1919 Amendment, *see* Exhibit 6).) The legislation was enacted with the understanding that the City would assume the responsibility to care for, maintain and exhibit the Museum Art Collection for the Public. (City Exhibit 360; POA00729085-087 (1918 Annual Report, *see* Exhibit 4).) The City took on the obligation to maintain the Museum "under a charter provision establishing a department that gave promise of permanent care and maintenance of the collections." (City Exhibit 428; POA00734815 (1939 Arts Commission Annual Report, at 46, relevant pages of which are attached as Exhibit 7).) With the same purpose as the 1885 Act, the 1919 Amendment imposed an express statutory limitation that "said property so conveyed shall in the hands of said city be faithfully used for the purposes for which [the DIA Corp.] was organized." (City Exhibit 286; DIAINSP094969 (1919 Amendment, at § 20, *see* Exhibit 6).)

The DIA Corp. thereafter conveyed legal title to land on Woodward Avenue, its art collection, and certain other assets to the City (but not the DIA Corp.'s endowment), so that both

9

public and private support could continue to be used to care for, maintain, and grow an art collection for the Public—the continuing beneficial owners of the Museum and its assets. (City Exhibit 269; DIAINSP019855-859 (Jan. 27, 1920 DMA Board Minutes, attached as Exhibit 8).) The DIA Corp.'s contemporaneous board minutes reflect that the DIA Corp.'s leaders expressly relied on the 1919 Amendment to prevent the City from using the transferred property for any purpose other than the public exhibition of the Museum Art Collection for the Public's benefit. (*Id*.) The DIA Corp.'s president, Ralph H. Booth, noted in the year before the transfer that "the city in its new charter has provided for an arts commission, contemplating that you will convey the property and trusts you hold to the city, as the basis for the Detroit Institute of Arts." (City Exhibit 360; POA00729085 (DMA 1918 Annual Report, at 7, *see* Exhibit 4).) Similarly, at the time of the conveyance, Mr. Booth reiterated:

> Carrying out your intention, as expressed at our last meeting called for the purpose, steps have been taken looking to the conveyance of our property and collections to the City of Detroit with due regard for the trust we hold and of the obligations attached thereto . . . . Under such conveyance the property can only be used for such purposes as we have received it or for some kindred purpose so indicated by the Circuit Court. . . . *If you should convey the real estate and the collections to the city in conformity with the amended legislation it should be noted that the property can be used only for such purposes as this permits, and further the conveyance would be made to the Arts Commission, who would hold the property in behalf of the city for its uses in accord with the provision of the city charter* . . . .

(City Exhibit 361; POA00729135-137 (DMA Annual Report 1919, at 11, relevant pages of which are attached as Exhibit 9) (emphasis added).)

### 3. Public and Private Support Continues to Support the Museum.

With the DIA Corp. and the City acting together on behalf of the Museum, an historic period of private-public collaboration for the Public's benefit began. As announced in the first Bulletin of the Detroit Institute of Arts issued in October 1919:

> This change marks the beginning of an epoch in the history of Detroit when it shall become a civic function of the municipality to foster art, by operating and maintaining a museum for the people of the city. It is an era when art shall become in its broadest sense democratic, with the museum and its valuable collections actually belonging to the people.

(City Exhibit 382; POA00729613 (Oct. 1919 Bulletin, at 1, relevant pages of which are attached as Exhibit 10).)

The City and the DIA Corp. collaborated on the construction of a new building (the "Museum Building") to house the growing Museum Art Collection. (City Exhibit 415; POA00731536-539 (Oct. 1927 DIA Bulletin, relevant pages of which are attached as Exhibit 11).) Completed in 1927, the building's charitable purpose was affixed to its façade: "*Dedicated by the People of Detroit to the Knowledge and Enjoyment of Art*." At the dedication of the Museum Building, Mr. Booth acknowledged the charitable objects and purposes implicit in this statement of dedication:

> [T]he beauty of art and the spiritual and moral beauties which lie beyond and above the beauty of art alone, are as essential in the life of a community as are the material comforts and modern facilities and improvements which it is the pride of every prosperous, enlightened community of today to furnish its citizens. . . . And in this spirit today, in behalf of the people of Detroit, let us dedicate this building to the lofty purpose for which it was conceived: "The Knowledge and Enjoyment of Art," believing that we have seen the completion of a building that will stand for centuries to come, because of the enduring character of art; and that if we cling to our spiritual ideals we shall best advance the high destiny of generations to come.

11

(City Exhibit 297; DIAINSP144683-684 (Detroit News, "Monument to Detroit, Speakers Call New Art Institute," Oct. 8, 1927).)

The City and the DIA Corp. also collaborated on Museum operations, fundraising, and curatorial activities. The DIA Corp. and the City worked together informally and through various agreements for nearly 100 years, including most recently a 1997 Operating Agreement ("Operating Agreement"). (City Exhibit 254; DIAINSP000290-590 (Operating Agreement); City Exhibit 302; DIAINSP144745 (Legislative Hearing).) During this period, the City and the DIA Corp. held the "Detroit Institute of Arts" out to be managed by a partnership of the public and private sectors. (City Exhibit 302; DIAINSP144745-746 (Legislative Hearing).)

Not surprisingly, Museum donors and other supporters rarely made gifts or bequests to the Arts Commission or the City itself, but made their gifts to the DIA Corp., the "Detroit Institute of Arts," or other names of the Museum (both correct and incorrect). (City Exhibit 268; DIAINSP011973-975 (Minutes of Arts Commission Meeting dated Jan. 9, 1961); City Exhibit 272; DIAINSP144675 (Nov. 1, 1955 Richardson Letter, included in documents attached as Exhibit 12).) Josephine Ford's gift of the iconic work "Portrait of [a Postman] Joseph Roulin" by Vincent Van Gogh is illustrative. Ms. Ford gave the work to the DIA Corp. for the "Museum's charitable purposes" via two deeds of gift. (City Exhibit 285; DIAINSP080479, DIAINSP080565 (Josephine F. Ford Deeds of Gift dated Apr. 2, 1992 and Feb. 22, 1996, included in document attached as Exhibit 13).) Her stated intention was to "ensure[] that this museum and the treasures it houses are here for our children's children."

12



(City Exhibit 284; DIAINSP080493 (News Release, Nov. 9, 1992, attached as Exhibit 14)).)

Donors supported the Museum based, at least in substantial part, on widespread statements of Public beneficial ownership of the Museum, specific acknowledgements of trust duties and obligations, and conduct confirming this exclusive charitable purpose. *See generally* Section III(A)(1)(a) and Tables 1-4. Such trust responsibilities were acknowledged in correspondence by Museum officials, including correspondence with Mayor Frank Murphy.



(City Exhibit 298; DIAINSP144686-687 (Feb. 3, 1933 Ford Letter to Mayor, attached as Exhibit 15).) The commitment to preserve the Museum and its collection was reinforced with donors in various ways, including in statements to individual donors that objects donated to the Museum would be secure even if "the City of Detroit should go out of business."



(City Exhibit 272; DIAINSP144675 (E. P. Richardson Letter dated Nov. 1, 1955, *see* Exhibit 12).)

### 4. The Museum Is the Product of More than a Century of Public and Private Charitable Support.

The Museum is the product of nearly 130 years of charitable acts by private and public donors. Property, funds, and services have been given to cultivate and preserve the Museum Art Collection, maintain the Museum Building, and keep the Museum open for the Public's benefit.

The DIA Corp., private individuals, institutions, foundations, and non-City public and governmental sources contributed to the charitable trust. Of the approximately 60,400 objects

accessioned into the Museum Art Collection,[1] approximately 95 percent (57,600 works) were donated to the Museum by private parties or funded with donations from private parties ("Donated Objects"), with only about 5 percent (2,800 works) paid for with municipal funds ("COD Objects").  (City Exhibit 295, parts (a) and (b); DIAINSP127449-144667 (DIA List of Complete Works).)

**Graph 1: Donated vs. COD Objects in the Museum Art Collection[2]**



The Museum building rests on land donated by the DIA Corp.  (City Exhibit 269; DIAINSP019856-859 (Jan. 27, 1920 DMA Minutes, *see* Exhibit 8).)  It was recently renovated and expanded with approximately $80 million funded by private parties and $50 million funded by the State.  (City Exhibit 301; DIAINSP144742-743 (City/State Support Spreadsheet, attached as Exhibit 16); City Exhibit 256; DIAINSP003827 (Notes to DIA Corp. Financial Statement for Fiscal Year ended June 30, 2001); City Exhibit 266; DIAINSP004064-066 (Notes to DIA Corp. Financial Statement for Fiscal Year ended June 30, 2013).)  Funds have been contributed to care for, maintain and exhibit the Museum Art Collection, as well as to maintain and expand the

---

[1] "Accessioning" is the formal process of incorporating an object into a museum art collection, which entails a formal review of an object to determine if it is suitable for inclusion in the collection.  (City Exhibit 267; DIAINSP005279, 286 (Collections Management Policy).)  Many donated items are not accessioned and are either refused, sold or otherwise disposed of.  "Deaccessioning" is the formal process of removing an object from a museum art collection, which also entails a formal review of the object and the collection.  (*Id.*)

[2] Source: (City Exhibit 295, parts (a) and (b); DIAINSP127449-144667).

Museum Building.  (*Id.*)  Private and non-City funds have supported Museum operations, with 99 percent of the total $439 million operating costs from 1998 to 2013 supported by non-City funds.  (*Id.*)

**Graph 2: Private vs. Public Support**[3]



Donors have gone to great lengths to build an endowment that will help ensure that the Museum and its collection and services will be available to the Public in perpetuity.  (*Id.*)  And, most recently, the citizens of Wayne, Macomb, and Oakland Counties approved a millage, which will remit approximately $23 - $25 million in each year over the ten-year period of the millage to help support the Museum.  (City Exhibit 345; POA00261727-786 (Millage Agreements).)

The City also has contributed to the Museum and its charitable purpose.  On and off over the years, as its financial circumstances permitted, the City has supported Museum operations.  It helped finance and construct the Museum building and later provided funds to help maintain, renovate, and expand the Museum building.  (City Exhibit 415; POA00731536-538 (Oct. 1927 DIA Bulletin, at 2-4, *see* Exhibit 11).)  The City also has appropriated specific funds used to acquire works of art for the Museum Art Collection, which (unlike other municipal artwork) were accessioned into the Museum's permanent collection and commingled with objects over

---

[3] Source: (City Exhibit 301; DIAINSP144742-743).

which the City does not claim to hold title. (City Exhibits 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15; POA 00270667, POA00707437, POA00707603, POA00707775, POA00707950, POA00708122, POA00708338, POA00708563, POA00708793, 00709362, POA00664370, POA00728659 (City of Detroit CAFRs).) The City does not account for these objects as City assets, listing only $29 million in City-owned works of art on its balance sheet and including none of the works of art in the Museum Art Collection.

## CAFR Capital Asset Activity (YE June 30, 2002 Example)[4]

**7. Capital Asset Activity for the Year Ended June 30, 2002:**

| | Beginning Balance | Additions | Retirements | Ending Balance |
|---|---|---|---|---|
| | | Primary Government | | |
| **Governmental activities:** | | | | |
| Non-depreciable assets: | | | | |
| Land | $ 288,455,892 | $ 26,204,791 | $ — | $ 314,660,683 |
| Works of art | 29,845,410 | | — | 29,845,410 |
| Construction in progress | 205,088,758 | 83,129,998 | — | 288,218,756 |
| Total non-depreciable assets | 523,390,060 | 109,334,789 | — | 632,724,849 |
| Depreciable assets: | | | | |
| Buildings and improvement | 516,223,378 | — | — | 516,223,378 |
| Machinery, equipment, and vehicles | 337,716,112 | 4,396,947 | — | 342,113,059 |
| Infrastructure | 705,132,835 | 3,843,369 | — | 708,976,204 |
| Total depreciable assets | 1,559,072,325 | 8,240,316 | — | 1,567,312,641 |
| Less accumulated depreciation for: | | | | |
| Buildings and improvement | 223,437,177 | 9,644,608 | — | 233,081,785 |
| Machinery, equipment, and vehicles | 231,039,084 | 29,258,900 | — | 260,297,984 |
| Infrastructure | 584,003,247 | 13,212,869 | — | 597,216,116 |
| Total accumulated depreciation | 1,038,479,508 | 52,116,377 | — | 1,090,595,885 |
| Governmental activities capital assets, net | $ 1,043,982,877 | $ 65,458,728 | $ — | $ 1,109,441,605 |

| **Depreciation expense was charged to governmental functions as follows:** | |
|---|---|
| Public protection | $ 6,411,394 |
| Health | 344,808 |
| Education | 515,669 |
| Recreation and culture | 2,861,284 |
| Economic development | 6,369,514 |
| Housing supply and condition | 33,019 |
| Physical environment | 20,270,951 |
| Development and management | 15,309,738 |
| | $ 52,116,377 |

Under GASB 34, this accounting practice is only allowed if works of art are: (a) held for public exhibition, education, or research in furtherance of public service rather than financial gain; (b) protected, kept unencumbered, cared for, and preserved; and (c) subject to an organizational policy that requires the proceeds from sales of collection items to be used to acquire other items for collections. (FGIC Exhibit 3100; POA00225309 (Memorandum from Saied Rouhani to Finance Accounts – File).)

_____

[4] Source: (City Exhibit 4; POA00270685 (2002 CAFR).

17

5. **This Century of Charitable Support Has Resulted in a Museum that Is a Cornerstone of Detroit and a Key Part of the City's Future.**

As a result of this century of public-private collaboration, the Museum has become a world-class art institute—one of the top six encyclopedic fine arts museums in the United States—that is a source of civic pride and an irreplaceable Public institution. The Museum Art Collection comprises a multicultural and multinational survey of human creativity from prehistory through the 21st century.

The Museum is a center of arts and culture in Michigan and the anchor of the City's Cultural Center Historic District, helping to drive businesses, residents, and talented recruits to Detroit. The Museum provides the premier venue for arts education in the Detroit area. Visitors and students of all ages benefit from access to the unique and irreplaceable collection and services provided by the Museum, including innovative educational and interpretive programming and critical social services. The DIA's education programs reach approximately 150,000 participants annually with over 60,000 school children touring the Museum each year. The Museum is home to the Mosaic Youth Theater and provides programming to veterans at the Dingell Veterans Hospital, clients of Mariner's Inn, and patients at Children's Hospital of Detroit. The Museum's innovative programming takes the Museum experience outside the Museum Building into the community. The Museum is the beneficiary of a tri-county millage passed by the citizens of Macomb, Wayne, and Oakland Counties. Filling the gap vacated by City and State public support and augmenting private and foundation support, the citizens of these counties recognized the crucial role the Museum plays in this community in the most compelling way possible—by agreeing to commit tax dollars to ensure that the Museum remained open to the Public.

18

The Museum is an economic and social engine in Detroit and southeast Michigan. In the past year, the Museum drew more than 600,000 visitors, with more than 300,000 residents from Macomb, Oakland, and Wayne counties taking advantage of the free admission policy adopted following millage approval and contributing to the economic activity of Detroit. The Museum has more than 28,000 members, 700 volunteers, and 300 employees, many of whom are City residents who pay property and other taxes in addition to City income taxes. The DIA Corp. has an operating budget of approximately $32 million with a large percentage of that total budget spent in the City. The Museum is an anchor of the Midtown area, which is one of the fastest growing and most vibrant areas in the City.

**B.    THE GRAND BARGAIN RESOLVES POTENTIAL LITIGATION OVER THE MUSEUM ART COLLECTION AND PRESERVES THE MUSEUM.**

After decades of economic decline, the City found itself in a severe financial crisis and filed for bankruptcy protection pursuant to Chapter 9. To help resolve its financial crisis and to reach an agreement with its creditors, the City through the Emergency Manager explored various options to address its debts and obligations. (City Exhibit 33; POA00215882 (Proposal for Creditors).)[5] In so doing, the City raised the possibility that it might monetize some or all of the Museum Art Collection for its own purposes.

Anticipating this threat, the Attorney General issued Opinion 7272, opining that the Museum Art Collection was not a municipal asset that could be used to satisfy City operating debts and obligations because the objects were held in charitable trust for the benefit of the Public. (City Exhibit 324; POA00258054 (AG Opinion).) Likewise, the DIA Corp. advised the City that it had no right to monetize any object in the Museum Art Collection for a host of

---

[5] The emergency manager is bound by existing state law except as otherwise expressly addressed in the emergency manager statute.

19

reasons. (City Exhibit 309; POA00257802-810 (DIA Legal Memorandum).) In response to assurances that the DIA Corp. and Attorney General would vigorously oppose any sale or monetization, the City made monetary demands and threatened to fire the Museum's Director.

As the DIA Corp. and the Attorney General prepared to take action to protect the Museum and the Museum Art Collection, a remarkable idea began to take hold. Unprecedented in its scope and ambition, the Court-appointed mediators, the Honorable Gerald Rosen, Chief Judge of the United States District Court for the Eastern District of Michigan, and Eugene Driker, broached the possibility of a "Grand Bargain," which would benefit the City, the Public, creditors, and other interested parties in the bankruptcy case. After months of arms-length negotiations, the parties agreed to the terms of a settlement, commonly known as the "Grand Bargain," which would make $816 million dollars available to satisfy City obligations to certain pensioners, preserve approximately $250 million of county millage support, and confirm that the Museum Art Collection and other Museum Assets would be held in trust for the benefit of the public in perpetuity. (City Exhibit 2; Dkt. # 6576 (DIA Settlement).)

The City has referred to the Grand Bargain as an "exemplary achievement of municipal restructuring" because it preserves the Museum "as part of Detroit's public heritage, which will make a vital contribution to its recovery as a vibrant American metropolis, benefiting its residents for generations to come." [Dkt # 6845 at 18, 21.] The "cornerstone" of the Plan, the City asserts that the Grand Bargain does three things:

> First, it brings in hundreds of millions of dollars in outside contributions for the City. Second, it preserves the DIA's incalculable public benefit for the residents of Detroit by keeping the art collection in the City as a public trust instead of selling it off into private hands. And third, it settles claims from persons and entities such as the State Attorney General and the DIA Corp., who have asserted that the City was already obligated to keep the DIA in trust for the public benefit.

[*Id*. at 22.]  The Grand Bargain, which is the product of intense, complex, multiparty negotiation, requires court approval. [6]

### III.    ARGUMENT

The Bond Insurers object to the Plan and to the Grand Bargain.  [Dkt. ## 4653, 4660, 4679, 5706, 6009, 6651, and 6674.]  Among other things, the Bond Insurers contend that the Grand Bargain is not a reasonable settlement of potential litigation over ownership of the Museum Art Collection and other Museum Assets.  They assert that the century of charitable activity that produced the Museum must be ignored and the Museum Art Collection sold or monetized, including the approximately 57,000 objects donated for the benefit of the Public.

"'The law favors compromise and not litigation for its own sake . . . .'"  *In re Fishell*, 47 F.3d 1168, 1995 WL 66622, at *2 (6th Cir. 1995) (unpublished) (table) (citation omitted).  In evaluating a settlement, the bankruptcy court must examine the underlying facts to determine whether the settlement is reasonable.  *Id*. at *3.  But the court's examination should neither entail a mini-trial of the disputed matter nor lead to a decision on the underlying dispute, because a settlement's purpose is to prevent the expenditure of the time, expense, and burden of litigating disputed claims.  *Bard v. Sicherman (In re Bard)*, 49 F. App'x 528, 530 (6th Cir. 2002).  Rather, as the Supreme Court stated in *Protective Comm. For Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968), the bankruptcy court must "compare the terms of the compromise with the likely rewards of litigation."  *Id*. at 425. Critically, approval requires only

---

[6] The Grand Bargain involved the interests and participation of numerous constituencies and parties, including private foundations, the City Council, the Governor, the State Legislature, the DIA Corp., the City, certain creditor constituencies, and the county art authorities.  The Grand Bargain required extensive financial commitments, including from the DIA Corp. (which has stretched its donor base to the limit to secure large financial commitments in a short period of time), the State (which passed legislation to fund the Grand Bargain), and foundations (which sought and obtained approval from their boards and leadership).  (City Exhibit 2; Dkt. # 6576 (DIA Settlement).)

that the settlement be at or above the lowest point in the range of reasonableness. *See Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983).

The Court should approve the settlement embodied in the Grand Bargain because it is far above the lowest point in the range of reasonableness. This is so for the following reasons:

A. The City likely will not prevail in litigation against multiple parties over the City's beneficial ownership of and ability to appropriate for its own use the Museum Art Collection (or other Museum Assets) because of legal prohibitions and restrictions on the City's ability to sell or monetize the Museum or the Museum Art Collection.

B. Litigation would be both complex and expensive, involving not only the Attorney General and DIA Corp. but also numerous donors and estates and heirs of donors and over 125 years of documents relating to many of the over 60,000 works in the collection, and, even if successful, would entail substantial delay in resolving this chapter 9 case with no certainty of providing additional recoveries to creditors.

C. The City would not be able to realize anywhere near the gross indicative value of the Museum Art Collection in a sale process and would receive less value than is provided under the Grand Bargain.

D. The best interest of the City and its creditors supports the Grand Bargain as part of the protection of the City's pensioners and the revitalization of the City and its Midtown arts center.

*In re Bard*, 49 F. App'x at 530 (setting forth factors for approval of a settlement); *see also Hindelang v. Mid-State Aftermarket Body Parts, Inc. (In re MQVP, Inc.)*, 477 F. App'x. 310, 313 (6th Cir. 2012) (stating that the Sixth Circuit applies the *Bard* test, and that deference is due to a trustee's or debtor-in-possession's decision to settle).[7]

A.   THE CITY DOES NOT HAVE THE RIGHT TO SELL OR MONETIZE THE MUSEUM ASSETS TO SATISFY MUNICIPAL OBLIGATIONS.

Nearly 130 years of charitable acts for the benefit of the Museum are not just historically remarkable; they are also legally significant. Under Michigan law and the laws of virtually every

---

[7] Although certain creditors claimed that the Grand Bargain would be addressed in supplemental objections after "intensive fact discovery," [Dkt. # 4653 at 22] the creditors failed to file supplemental objections by the August 12, 2014 deadline that meaningfully addressed the issues related thereto.

jurisdiction in the United States, the nature and circumstances of these charitable acts establishes that the legal title holder to Museum Assets, whether the City, the DIA Corp. or otherwise, is prohibited from using those assets for non-Museum purposes. Indeed, the evidence obtained to date already establishes that: (1) the City is barred from selling or monetizing any portion of the Museum Art Collection or other Museum Assets; (2) restrictions and limitations provide additional protection for a large percentage of the Museum Art Collection; and (3) if the City foregoes the Grand Bargain and litigation ensues, additional discovery will almost certainly confirm that the City has no right to monetize or sell most or all of the Museum Assets, eliminating its ability to derive any financial benefit from the Museum.

> **1.    The Museum Assets, including the Entire Museum Art Collection, Are Protected.**

> **a.    The Museum Assets Are Held in Charitable Trust.**

"'Charitable gifts and trusts are favorites of the law and of the courts, and the courts will declare valid, and give effect to, such gifts and trusts where it is possible to do so consistently with established principles and rules of law.'" *In re Rood's Estate,* 200 N.W.2d 728, 738 (Mich. Ct. App. 1972) (citation omitted). Under the Estates and Protected Individuals Code ("EPIC"), a "charitable trust" is "a trust . . . created for a charitable purpose," which includes those trusts "created for the relief of poverty, the advancement of education or religion, the promotion of health, scientific, literary, benevolent, governmental, or municipal purposes . . . or other purposes the achievement of which is beneficial to the community." MICH. COMP. LAWS §§ 700.7103(C); 700.7405(1). A charitable trust exists here because: (1) the Museum was established and continued as a charitable trust; (2) the Museum co-trustees' Articles and Charters created a charitable trust; (3) gifts and bequests to the Museum created a charitable trust; and (4) more than a century of history confirms the existence of a charitable trust.

### 1. The Museum Was Established and Continued as a Charitable Trust.

The fundamental characteristics of a trust are the "existence of a fiduciary relationship and the holding of title to property by one person for the benefit of another." *Nash v. Duncan Park Commission*, 848 N.W.2d 435, 447 (Mich. App. 2014). To create a trust, there must be an "assignment of designated property to a trustee with the intention of passing title thereto, to hold for the benefit of others. There must be separation of the legal estate from the beneficial enjoyment." *Pierowich v. Metropolitan Life Ins. Co.*, 275 N.W. 789, 790 (Mich. 1937) (citation omitted). "'There is no prescribed form for the declaration of a trust; whatever evinces the intention of the party that the property of which he is the legal owner shall beneficially be another's is sufficient.'" *Faulds v. Dillon*, 204 N.W. 733, 735 (Mich. 1925) (quoting 26 R.C.L. 1182, 1183).[8]

A charitable trust was established in 1885 with the organization of the DIA Corp. through its initial Articles pursuant to the 1885 Act. The incorporators of the DIA Corp. raised funds for a specific charitable venture, drafted a bill and procured its introduction in the legislature requiring that "all gifts, devises, or bequests . . . shall be faithfully used for the purposes for which such corporation was organized," and used contributions "for the founding of a public art institute" in Detroit. (City Exhibit 452; POA00735004 (1885 Act, at § 15, *see* Exhibit 2); City

---

[8] Certain creditors seem to believe that a specific written trust agreement between parties is required. [Dkt. 4653 ¶ 56.] Not so. *See* MICH. COMP. LAWS §700.7407; *Osius v. Dingell*, 134 N.W.2d 657 (Mich. 1965) (trust does not require agreement). And in any event such a writing exists here in the form of legislation, charters, and articles. These creditors also seem to believe that use of the term "trust" or "trustee" is talismanic. [Dkt. # 4653 ¶ 56.] This is not correct either. *See Nash supra* ("Nor do charitable trusts require formulaic words: 'A charitable trust, like an express private trust, is created only if the settlor properly manifests an intention to create it. The settlor need not, however, use any particular language in showing his intention to create a charitable trust; he need not use the word 'trust' or 'trustee.' It is sufficient if he shows an intention that the property should be held subject to a legal obligation to devote it to purposes which are charitable.'" (citations omitted)). And in any event, trust terms and concepts are part of the fabric of the Museum's history and may be found in its records.

Exhibit 357; POA00728935 (1904 Annual Report, at 69, *see* Exhibit 1).) As a result of this process, the original incorporators of the DIA Corp. imposed upon themselves the responsibilities of a trustee: the DMA incorporators as settlors; the DMA as trustee, with its own "Board of Trustees" as required by the 1885 Act, with statutory obligations to care for the collection; and the Public alone as beneficiary. *See* Section II(A)(1).

As authorized by the 1919 legislation, this charitable trust was confirmed and continued with the 1919 transfer of legal title (with beneficial ownership remaining with the Public) and the creation of the Arts Commission under the 1918 Charter. In 1919, the Legislature amended the 1885 Act to allow the DIA Corp. to convey its property, including real estate and the art collection, to "a city empowered to maintain a public art institute like or similar to that described in this act" subject to the statutory requirement that "said property so conveyed shall in the hands of said city be faithfully used for the purposes for which such corporation was organized." (City Exhibit 286; DIAINSP094969 (1919 Amendment, *see* Exhibit 6).) The City took on the obligation to maintain the Museum "under a charter provision establishing a department that gave promise of permanent care and maintenance of the collections." (City Exhibit 428; POA00734815 (1939 Annual Report, at 46, *see* Exhibit 7).) The City condemned land and took other action to accomplish the objects of the Arts Commission, which was to continue to support and maintain this public art institute. As a result of this process, the City imposed upon itself the responsibilities of a co-trustee: the DIA Corp. and others as settlors; the City as co-trustee through its Arts Commission with charter duties to care for the collection; and the Public alone as beneficiary. *See* Section II(A)(2).[9]

_____

[9] Michigan cities and towns may serve as a trustee of a charitable trust. *See generally* MICH. COMP. LAWS § 14.252(a) (trustee may mean any "legal entity holding property for any charitable purpose"), and have been permitted to do so since at least 10 years before the founding of the DIA Corp. *Hatheway v. Sackett*, 32 Mich. 97,

From the moment the trust was founded in 1885 until the present, all Museum Assets were impressed with a charitable trust. Additions to the trust, including all Donated Objects, were likewise impressed with this trust as a matter of Michigan law. See MICH. COMP. LAWS § 700.1107(n) (stating that the definition of trust includes all "additions to the trust"). The 2,800 COD Objects purchased in whole or in part with municipal funds, as well as the Museum Building and other Museum assets, were also impressed with a charitable trust.[10] Indeed, the City and the DIA Corp. treated all Museum Assets and all additions of funds, property, and art as would any trustee—as property that they had the fiduciary duty to administer for the benefit of the Public and not as a source of stored wealth to be used for purposes unrelated to the Museum.

The Attorney General reached the same conclusion. After reviewing these same statutes, charters and articles, the Attorney General issued a formal opinion that the entire Museum Art Collection is held in charitable trust and that the City merely served as trustee.

> When the City accepted the transfer, it was bound by the language [of the 1919 Act] to perpetuate and "maintain a public art institute" that would exhibit art to the general public, and to "faithfully[] use[]" the art conveyed for that purpose. Under charitable trust law, this transfer was a transfer of the [DIA Corp.'s] legal interest or legal title in its charitable assets to a new charitable trustee—the City. Under those circumstances, the equitable interest in the art collection remained with the people of Michigan, the ultimate

---

101 (1875); *Maynard v. Woodard*, 36 Mich. 423, 426-27 (1877) (municipal corporation could act as trustee of charitable trust); *see also* 2 Austin Wakeman Scott *et al.*, SCOTT AND ASCHER ON TRUSTS § 11.1.6.1 (5th ed. 2006); 2 Amy Morris Hess *et al.*, BOGART'S TRUSTS AND TRUSTEES § 130 (3d. ed. 2000); RESTATEMENT (THIRD) OF TRUSTS § 33 cmt. d (2003), and the cases cited therein.

[10] COD Objects form part of the overall Museum Art Collection without distinction from the Donated Objects—they are housed together, displayed together, and covered by the same insurance policies, security arrangements, climate control system, curatorial and restoration services and collection management policy. In fact, municipal funds and private donations were aggregated to purchase certain items and to fund the Museum over time. It is noteworthy that other works of art acquired by the City which have not been accessioned into the Museum Art Collection are listed as City owned and included in the City's Comprehensive Audited Financial Reports while the accessioned works of art including the COD Objects are not so included. (City Exhibits 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15; POA 00270667, POA00707437, POA00707603, POA00707775, POA00707950, POA00708122, POA00708338, POA00708563, POA00708793, 00709362, POA00664370, POA00728659 (City of Detroit CAFRs).)

beneficiaries of the museum's or [DIA Corp.'s] charitable purpose
. . . .

In accepting the trust, consistent with the statute, the City agreed at its own cost and expense to maintain and operate the trust, which by City Charter included the mandate that the City "[s]hall acquire, collect, own and exhibit, in the name of the city, works of art, books and other objects such as are usually incorporated in Museums of Art." 1918 City Charter, Chapter XIX, Section 7(c). Over the years, the museum's art collection grew through charitable donations of art and direct purchases by the City. As new pieces were added to the collection, the entire collection continued to be dedicated towards the museum's initial charitable purpose: the public display of its art collection. . . . Thus, the entire collection—to this day—continues to be held in trust for this same charitable purpose . . . .

(City Exhibit 324; POA00258051-053 (AG Opinion 7272, at 19-21).)  (footnotes omitted).

Attorney General opinions are not binding on courts, but Michigan courts have uniformly held that they are entitled to deference.  *See*, *e.g.*, *Michigan Paralyzed Veterans of America v. Coleman*, 545 F. Supp. 245, 251 (E.D. Mich. 1982) (stating that the court will "assign 'great weight' to the opinion of the Michigan Attorney General); *Lysogorski v. Charter Township of Bridgeport*, 662 N.W. 2d 108, 110 (Mich. App. 2003) (stating that attorney general opinions can be persuasive authority).  This particular Opinion should be entitled to special deference, because Michigan law charges the Attorney General with protection of charitable trusts, the very topic of the Opinion.  *See* Mich. Comp. Laws § 14.254, Sec. 4(a) ("The attorney general shall have jurisdiction and control and shall represent the people of the state and the uncertain or indefinite beneficiaries in all charitable trusts in this state, and may enforce such trusts by proper proceedings in the courts of this state.").

The conclusion that an express charitable trust was created in 1885 and continued thereafter through legislative and private acts is not only sensible and consistent with the opinion of the Attorney General; it is also recognized as an ancient method of founding a charity and

implementing a charitable trust. *See Webster v. Wiggin*, 31 A. 824, 825-26; 828 (R.I. 1895) (noting that the organization of a "claimant corporation under a charter which he procured from the general assembly . . . was an ancient method of founding a charity" and that the donor had entrusted a fund "to the administration of a special corporation, and this is, in effect, to adopt its methods and aims"); *see Ware v. City of Fitchburg*, 85 N.E. 951, 951-53 (Mass. 1908) (confirming that a bequest for the "founding and maintaining of a hospital" resulted in the "creat[ion] of a charitable trust" where special legislation was drafted to confirm the municipality's power to "accept this legacy and execute the trust thereby created"). Indeed, even more compelling than a simple declaration of private parties to create a trust, the State, the City, and the founders of the DIA Corp., participated in the creation of this charitable trust, ensuring through legislation, charter, and articles that any Museum property was held solely for the benefit of the Public.[11]

## 2.    The DIA Corp.'s Articles and the City Charter Established a Charitable Trust.

Although the circumstances surrounding the formation of the DIA Corp. and the Arts Commission plainly show that a charitable trust was created in 1885 and added to over the years,

---

[11] Certain creditors have asserted that no charitable trust exists because Michigan law did not recognize such trusts in 1885 when the Museum was founded. This is an oversimplification. Although gifts to *indefinite* charitable beneficiaries were not allowed prior to Public Act 122 of 1907, in several cases, the Michigan courts upheld charitable gifts that were sufficiently definite in nature. *See Maynard v. Woodard*, 36 Mich. 423 (1877) (Upholding a charitable trust, finding that "[t]he property and the trusts are definite, the beneficiary is definite and the trustees or managers are definite."); *see also White v. Rice*, 112 Mich. 403 (1897) (Recognizing that, although charitable trusts did not exist under Michigan law at that time, a gift to a church could be upheld under the common law of trusts since the gift was "fully expressed and clearly defined upon the face of the instrument" and the church was legally capable of taking the gift as a beneficiary.). Moreover, nothing precluded the creation of a charitable trust by statute because the act of incorporation supplied, in every instance, a definite and ascertainable donee capable of taking the whole legal and equitable interest in the gift. *See Trs. of the First Soc'y of the Methodist Episcopal Church of Newark v. Clark*, 3 N.W. 207, 212 (Mich. 1879) ("Where there is no incorporation those who deal with the church must trust for the performance of civil obligations to the honor and good faith of the members; whereas, in the case of incorporation, they would deal with a legal body capable of binding itself."); *see also Levy v. Levy*, 33 N.Y 97 (1865)). And regardless, beginning in 1907—more than 10 years before any Museum assets were conveyed to the City—Michigan reversed its earlier course and adopted a liberal policy favoring charitable gifts and trusts. So at the very latest, from 1907 on, all gifts and bequests to the Museum were held in charitable trust.

Michigan law does not require such rigorous proceedings to create a trust.  To the contrary, Michigan law acknowledges that the articles of incorporation or another instrument creating an entity are alone sufficient to establish an express charitable trust.  As the Michigan Court of Appeals in *In re Americana Foundation*, 378 N.W.2d 586 (Mich. Ct. App. 1985), concluded:

> The only document of record which could establish that an express trust was created is the articles of incorporation of the Americana Foundation.  The articles of incorporation contain no explicit declaration of a trust.  However, the articles of incorporation do show beyond reasonable doubt that a trust was intended to be created.

*Id*. at 588-89.  Expanding upon the requisite for the creation of a trust set forth in *Pierowich v. Metropolitan Life Ins. Co*., 275 N.W. 789, 790 (Mich. 1937), the court determined the Americana Foundation's articles of incorporation created a charitable trust based on six essential facts:

1) There had been an assignment of designated property in the articles of incorporation in the form of "[c]ash and securities having a value of $473,544."

2) The assignment of property was to the Americana Foundation, which as a nonprofit corporation functioned as a "trustee" under Michigan law in "holding property for any charitable purpose."

3) The legal title to "contributions from individuals, trusts, and corporations" was passed to the Americana Foundation.

4) "[C]learly the intent, as expressed in the articles of incorporation, was for the benefit of others in that the property was to be devoted and applied 'exclusively for charitable, religious, scientific, literary or educational purposes.'"

5) The legal estate was separated from the beneficial enjoyment insofar as the "Americana Foundation held the legal estate whereas the public received the benefit and enjoyment."

6) "[T]he articles of incorporation clearly establish a charitable purpose."

*Id.* at 588-89. As a result, "the incorporation of the Americana Foundation created an 'express trust, charitable or private' to be administered by the Americana Foundation through its trustees." *Id*. at 589.

The six essential facts present in *In re Americana* are also present in in the creation of the DIA Corp. and the Arts Commission:

1) There have been assignments of art and money to the Museum, through the DIA Corp. since 1885 and subsequently to the Arts Commission since 1919.

2) The assignment of property was to the Museum, through the DIA Corp. and the Arts Commission, which qualify and function as trustees under Michigan law "holding property for any charitable purpose."

3) The legal title to the money and property was passed to the DIA Corp. and the Arts Commission.

4) Clearly the intent as expressed in the 1885 Act, the 1919 Amendment, Articles, Charter, and later 1997 Operating Agreement was for the benefit of others in that the property was to be devoted and applied for the purpose of founding and maintaining a public art institute.

5) The legal estate was separated from the beneficial enjoyment insofar as the DIA Corp. and the Arts Commission held title whereas the Public received the benefit and enjoyment of these Museum gifts.

6) The Acts, Articles, Charter, and 1997 Operating Agreement clearly establish a charitable purpose.

As described in detail above, the events surrounding the creation of the DIA Corp. and the Arts Commission reflect the logic of *In re Americana* and confirm the existence of a charitable trust. But under Michigan law the articles and charter are alone sufficient to end any dispute as to the existence of a charitable trust.

### 3. Gifts and Bequests to a Charitable Corporation Create a Charitable Trust.

Yet another basis exists for a finding of a charitable trust over the Museum Assets. Gifts and bequests to a charitable corporation are presumed made for the corporation's charitable

30

purpose and therefore are subject to a charitable trust as a matter of law. *See* Mich. Comp. Laws § 554.351 (establishing presumption of validity of any "gift, grant, bequest or devise, whether in trust or otherwise to religious, educational, charitable, or benevolent uses"); Mich. Comp. Laws § 554.352 ("Every such trust shall be liberally construed by the court so that the intentions of the creator thereof shall be carried out whenever possible."); Mich. Comp. Laws § 14.252(a) ("'Trustee' means any individual, group of individuals, association, foundation, trustee corporation, corporation, or other legal entity holding property for any charitable purpose."). The California Supreme Court stated the principle:

> [A]ll the assets of a corporation organized solely for charitable purposes must be deemed to be impressed with a charitable trust by virtue of the express declaration of the corporation's purposes, and notwithstanding the absence of any express declaration[,] . . . as effectively as though the assets had been accepted from a donor who had expressly provided in the instrument evidencing the gift that it was to be held in trust solely for such charitable purposes.

*Pacific Home v. County of Los Angeles,* 264 P.2d 539, 543 (Cal. 1953); *accord In re Harrington's Estate*, 36 N.W.2d 577, 582 (Neb. 1949) ("the bequest at bar was in effect a gift to the objects and purposes of plaintiff corporation, and not to the corporation itself. It was in legal effect a charitable donation impressed with a public trust specifically imposed by plaintiff's articles of incorporation.") (citations omitted). The Texas Court of Appeals explained the result:

> Because a charitable corporation is organized for the benefit of the public, and not for private profit or its own benefit, the public has a beneficial interest in all the property of a public benefit, non-profit corporation. Such a corporation has legal title to the property but may use it only in furtherance of its charitable purposes.

*Blocker v. State*, 718 S.W.2d 409, 415 (Tex. Ct. App. 1986) (citations omitted); *see In re Peterson's Estate*, 277 N.W. 529, 532 (Minn. 1938) ("[W]e hold, in line with many courts, that a devise or bequest, although in form an outright gift, yet when made to an institution whose sole reason for existence and whose entire activity is charitable, is in purpose and practical effect a

charitable trust."); *accord Trs. of Rutgers College in New Jersey v. Richman*, 125 A.2d 10, 28 (N.J. Ch. Div. 1956); *Wellesley College v. Attorney General*, 49 N.E.2d 220, 224 (Mass. 1943).[12]

The Arts Commission and the DIA Corp. were expressly established for a charitable purpose—the creation and perpetuation of a public art institution in Detroit. Gifts or bequests to the Museum, whether through the DIA Corp. or the Arts Commission, are subject to the charitable trust, and may be used "only in furtherance of its charitable purpose." Indeed, because most Donated Objects were given through the DIA Corp., there is no reasonable dispute that they were impressed with a charitable trust upon such transfer. Although the roles of the DIA Corp. and the City have changed over time and although the language used in the articles and charter has been amended, the conduct of donors giving to the Museum through the DIA Corp. (or even to the Arts Commission)—and not directly to the City itself—speak to the intention of the donors to provide a benefit to the Public and not to the City as a municipality. This recognized method of discerning the existence of a charitable trust cuts off any suggestion that the Museum Assets are somehow assets beneficially owned by the City.[13]

4.    A Century of History Confirms that the Museum Art Collection Is Held in Charitable Trust.

No additional proof of a charitable trust is required; but it surely exists here. Under Michigan law, the existence of a trust "may be inferred from the facts and circumstances of the case." *Frost v Frost*, 131 NW 60, 61 (Mich. 1911). The "determination that a charitable trust is

_____

[12] The Bond Insurers seem to believe that because a gift was given to the Museum without restrictions there can be no charitable trust. As these authorities show, this is not the case where the purpose of the institution is charitable. And these purportedly unrestricted gifts were almost never made to the City itself or even to its Arts Commission in any event, but were made to the Museum or the DIA Corp.

[13] It would elevate form over substance to ascribe significance to changes in the language used in charter and articles over the nearly 130 year history of the Museum. After all, unlike corporations or entities whose purpose may be in some doubt, the purpose and objects of the Museum has always been crystal clear. To the donating Public, there could be no reasonable doubt that the purpose of the Museum was wholly charitable and that their gifts could only be used for such purposes.

created needs only a finding that 'some charitable purpose' exists." *In re Rood's Estate,* 200 N.W.2d at 733 (quoting 14 C.J.S. *Charities* § 6, p. 427). Indeed, "'[a] charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons . . . .'" *Scarney v. Clarke*, 275 N.W. 765, 767 (Mich. 1937) (quoting *Jackson v. Philips,* 14 Allen 539, 556 (Mass. 1867)). Here, there is plainly a trust and it is plainly charitable. Nearly 130 years of gifts have been made for the benefit of an indefinite number of people, namely, past, present, and future generations of the Public, including 57,000 Donated Objects, countless millions of dollars of financial support, and various other forms of volunteer and other support. Although such self-evident findings are sufficient to establish a charitable trust, it is worth highlighting some of the additional evidence, which confirms that the Museum carries the hallmarks of a trust in spades and guts any claim that the City holds any beneficial interest in the Museum Art Collection.

### a) The Process of Donating Confirms the Museum Is Held in Trust.

The "Detroit Institute of Arts" is not a municipal department or legal entity capable of accepting gifts: it is the name of the Museum and its facilities. (City Exhibit 391; POA007390948-950 (1918 City Charter, *see* Exhibit 5).) Yet from 1919 to the present, the "Detroit Institute of Arts" has been held out as a separate institution to which donors could make charitable gifts and contributions. (City Exhibit 449; POA00734997 (IRS Cumulative List of Organizations).)

Donors have made bequests and gifts of funds and objects generally to the "Detroit Institute of Arts" or specifically to the DIA Corp., but almost never directly to the City or the Arts Commission as such. (City Exhibit 294; DIAINSP124604 (Rothman Gift Letter to the "permanent collection of the Institute"); City Exhibit 294; DIAINSP124608 (Rothman Bequest

33

to the "Detroit Institute of Art—Founders Society"); City Exhibit 283; DIAINSP077729 (Rothman Gift Letter to "the Founders Society of the Detroit Institute of Arts").) Donors made gifts and bequests without concern for the title holder because the City and the DIA Corp. were both committed to care for and maintain the Museum Art Collection for the benefit of the Public. (City Exhibit 268; DIAINSP011973-975 (Minutes of Arts Commission Meeting dated Jan. 9, 1961).) A prominent modern example illustrates this point.

In 1996, Josephine F. Ford gave the iconic work, "Portrait of [a Postman] Joseph Roulin" by Vincent Van Gogh, to the DIA Corp. for the "Museum's charitable purposes" to its "own charitable use and benefit forever." (City Exhibit 285; DIAINSP080479, DIAINSP080565 (Josephine F. Ford Deeds of Gift dated Apr. 2, 1992 and Feb. 22, 1996 granting fractional and remaining interests in the work, *see* Exhibit 13).) In a press statement accompanying Ms. Ford's initial grant of an undivided 50% interest in the work, the Museum reported that Mrs. Ford intended the Public to be the beneficiary of her gift to the Museum:

> In a statement accompanying this gift, Mrs. Ford stressed the importance of public participation in the DIA's partnership for Renewal fund-raising campaign. She views her gift as "not only an affirmation of the museum's importance and vitality today, but also an investment in its future. I encourage everyone to play a part—no matter the size—in ensuring that this museum and the treasures it houses are here for our children's children."
>
> . . . .
>
> In making this wonderful gift Mrs. Ford added, "I am fulfilling my mother's wish that the painting be at the DIA for all to enjoy."

(City Exhibit 284; DIAINSP080493 (News Release dated Nov. 9, 1992, *see* Exhibit 14).) The Museum thanked Mrs. Ford for giving the gift for the benefit of the Public:

> I hope you and all of your family realize that you have contributed enormously to the thousands of school children and adults who have already seen this painting and will see it in the years to come.

> Thank you again for your wonderful support and caring for the people of Detroit and for all of us here at the Detroit Institute of Arts.

(City Exhibit 285; DIAINSP080563 (Letter to Josephine F. Ford dated Feb. 22, 1996, *see* Exhibit 13).) The City purports to hold legal title to the *Postman*. Yet other than a general reference in the DIA Corp. Board's minutes to a gift of the *Postman*, there is no evidence that either the DIA Corp. or Mrs. Ford conveyed or intended to convey beneficial ownership to the City. To the contrary, it is clear that Mrs. Ford intended the Museum to hold the object for the benefit of future generations of the Public and that the Museum accepted the gift on such terms.

This unique practice of giving and receiving gifts and bequests in the name of "the Museum" or "The Detroit Institute of Arts" without apparent concern for the legal title holder is substantial evidence of a charitable trust. It is hard to imagine against the backdrop of the City's agreements, policies, and public statements that individual donors of tens of thousands of works of art and hundreds of millions of dollars would have been so generous with their funds and their possession if they had understood that they were merely feeding the City's coffers to provide a rainy day fund to pay its operating expenses when other resources ran short. As with Mrs. Ford's 1996 *Postman* gift described above, which she intended the Museum to hold for the benefit of future generations of the Public, the same trust relationship is at the core of every transaction between a donor, the City or the DIA Corp., and the Public.

### b) Public Statements and Conduct Confirm that the Museum Is Held in Trust.

Public statements and conduct over the course of nearly 130 place the charitable nature and charitable commitment of the Museum and its co-trustees, the DIA Corp. and the City, in perfect context.

35

To begin, the DIA Corp. (through its Trustees) and the City (through its Arts Commission) have made statements, which show that the Public is the beneficial owner of the Museum and the Museum Art Collection. Some of these statements are set forth in the table below.

**Table 1: Museum Statements (Examples)**

| Reference | Source |
|---|---|
| *The placing of the museum by legislative acts on a basis of other city institutions is already being felt and its influence will steadily increase, for while it has been a semi-public institution for some time, the fact that it belongs to the people has now been emphasized and donors to its collections realize that their gifts will always be available to the public.* | (City Exhibit 379; POA00729584 (July 1904 Bulletin, at 4).) |
| *This act places the Museum on a firm foundation and makes it more than ever the property of the citizens who cannot fail to look after their own.* | (City Exhibit 357; POA00728896 (1904 DMA Annual Report, at 29).) |
| *These various municipal and legislative acts have placed the museum on a firm foundation and assures to the generous donors, both past and future, that their gifts to this institution will be carefully cared for and made available to that very large number of our citizens and the teachers and pupils of the public schools at all times when the doors of the museum are open.* | (City Exhibit 357; POA00728957 (1904 DMA Annual Report, at 91).) |
| *[T]he sole existence of a museum was for the benefit of the public and not the donors or the deceased.* | (City Exhibit 359; POA00729035 (1916 Annual Report, at 9).) |
| *[It shall be] civic function of the municipality to foster art, by operating and maintaining a museum for the people of the city . . . with the museum and its valuable collections actually belonging to the people.* | (City Exhibit 382; POA00729613 (Oct. 1919 DIA Bulletin, at 1).) |
| *The Arts Commission of the City of Detroit has assumed the obligation of permanently providing for the safe-keeping and exhibition of these treasured objects of art, and the City of Detroit has provided an appropriation for the beginning of the New Detroit Institute of Arts on the Woodward Avenue site, opposite the new Public Library, to more adequately house and display these treasures. The Arts Commission hopes that the erection of a beautiful and adequate building will inspire gifts of larger significance from our citizens of wealth than any that have been given before.* | (City Exhibit 371; POA00729473-474 (Apr. 1920 DIA Bulletin, at 115-116).) |
| *The property and collections of the Detroit Institute of Arts now belong to the people of the City of Detroit . . . . The people of the city may now rightly regard the collections of the Institute as their property and should take pride in their possession. The Institute and all it contains is the heritage of their children. Standing before its recently acquired painting by Sir Joshua Reynolds, or Sir Henry Raeburn, or its splendid examples of Rubens, Murillo, or Claude, they may say, "These are mine, and I am going to possess them in the fullest sense."* | (City Exhibit 372; POA00729488 (Apr. 1921 Bulletin, at 66).) |

| Reference | Source |
|---|---|
| *Under the stimulation of the new building we look forward to a veritable new birth of art in the City of Detroit, in which the citizens of wealth and culture will do their share in building up for posterity a truly great collection. When the city has provided the new treasure house, there is no doubt that our citizens, with laudable pride of citizenship, will endow it with beautiful and enduring treasures as an inspiration to all the people. (In every large museum the actual property value of the donations has well repaid the investment in building).* | (City Exhibit 413; POA00731512 (Jan. and Feb. 1924 Bulletin, at 26).) |
| *Twenty years ago the Detroit Museum of Art, founded and developed by public-spirited generosity, was given to the people of the City of Detroit for their enjoyment and use under a charter provision establishing a department that gave promise of permanent care and maintenance of the collections.* | (City Exhibit 428; POA00734815 (Annual Report of 1939, at 46).) |
| *We are an institution created for 'the knowledge and enjoyment of art,' that is to say for public education and recreation. . . . Our primary duty is to keep the museum open and all its resources and activities as fully available to the public as is possible under any circumstances.* | (City Exhibit 377; POA00729552 (Feb. 1942 Bulletin, at 34).) |

In addition to these public statements, the City and others have affirmed that objects in the Museum Art Collection were given to the Museum in trust and that the City has the obligation to permanently maintain the Museum for the benefit of the Public. As stated by Museum leadership in a January 17, 1933 Letter to Mayor Frank Murphy:

> The art collections, estimated conservatively at two and a half millions of dollars, were largely acquired by gift and it would be a breach of trust with the donors if these collections were not made available to the public. In 1919, when the Detroit Museum of Art conveyed to the City of Detroit the bulk of these collections, it was with the understanding that the city should erect a building to house them and provide for their maintenance.

(City Exhibit 392; POA00730020-021 (Jan. 17, 1933 Secretary Letter).) This admonition was echoed by Arts Commission member Edsel Ford in a similar letter to Mayor Murphy:

> I feel quite sure that the Founders Society would be alienated, and their very generous support curtailed. Further, a great many of the art collections were acquired by gift, and we feel that it would be a breach of trust with the donors if the gifts were not made available to the public.

(City Exhibit 298; DIAINSP144686-687 (Feb. 3, 1933 Ford Letter to Mayor, *see* Exhibit 15).)

Additional statements by City representatives are set forth in the table below.

### Table 2: City Statements (Examples)

| Reference | Source |
|---|---|
| Mayor Frank Murphy statement:<br><br>*Closing of the Museum would not be fair either to the public to which its use is dedicated nor to the patrons of Art who have contributed a great many of the exhibits . . . . We must not deny them this.* | (City Exhibit 437; POA00734869 (Apr. 26, 1932 Letter).) |
| City Council resolution:<br><br>*WHEREAS, A major factor in the Art Institute's prominence is the numerous private benefactors whose contributions have added many great works of art to the Institute's collection; and*<br><br>*WHEREAS, the City has an obligation to its numerous private benefactors to make these art treasures fully available to a local, national and world-wide public[.]* | (City Exhibit 299; DIAINSP144689 (Jan. 31, 1974 City Council Resolution).) |
| Mayor Coleman Young statement:<br><br>*Opening the doors of the Detroit Art Institute to the people is, of course, the very goal we are seeking in our presentation to the State Legislature. . . . The needs of the Detroit Institute of Arts, if the museum is to continue to serve all the people of Michigan, extend far beyond the few days' reprieve won by a change in the Federal manpower rules."* | (City Exhibit 393; POA00730023 (June 25, 1975 Young Letter).) |
| Mayor David Bing statement:<br><br>*I can assure you that the City of Detroit does not intend to sell the DIA art collection. Our operating agreement with the Detroit Institute of Arts expressly prohibits that, but even more important, we are committed to holding these works in trust for the public.* | (City Exhibit 344; POA00261726 (2012 Bing Letter).) |
| City statement:<br><br>*The Detroit Institute of Arts collects and holds in trust for the people of Detroit, Michigan, and the world, examples of the highest quality of fine arts from all times and cultures throughout the world.* | (City Exhibit 419; POA00732906 (Jan. 23, 2013 Proposed Capital Agenda).) |

Consistent with these public statements by the City and its representatives, the treatment of the Museum over the years confirms that the City is not the beneficial owner of the Museum or the Museum Art Collection. Some of this conduct is set forth in the table below.

**Table 3: Confirming Conduct (Examples)**

| Conduct | Source |
|---|---|
| The City permitted commingling of city and non-city assets at the Museum; used the DIA Corp. to accept gifts and funds that were kept separate from other City assets and accounts; and accessioned all objects without regard to title holder into the Museum Art Collection, including COD Objects and Donated Objects. | (City Exhibit 295, parts (a) and (b); DIAINSP127449-144667 (List of Museum Art Collection).) |
| The City constructed the Museum Building using private and public support on land donated by the DIA Corp. and seized through eminent domain with a clear dedication: "*Dedicated by the People of Detroit to the Knowledge and Enjoyment of Art*." | (City Exhibit 269; DIAINSP019855-859 (1920 DMA Minutes, *see* Exhibit 8); City Exhibit 415; POA00731536-538 (Oct. 1927 DIA Bulletin, *see* Exhibit 11).) |
| The City registered the Detroit Institute of Arts as a separate entity to which private citizens could make tax deductible donations. | (City Exhibit 449; POA00734997 (IRS Cumulative List).) |
| The City has not accounted for the Museum Art Collection as capital or operating assets in its Combined Annual Financial Reports. | (City Exhibits 4, 12, 14; POA00270643-647; POA00708804-808; POA00664382-386 (City CAFRs).) |
| The City did not list the Museum Art Collection in its capital improvement plans, which list general bond and other obligations of the City to creditors. | (FGIC Exhibit 3102, at 63-66 (City Proposed Capital Agenda).) |
| The City required the Museum to follow state of the art museum practices, which recognize that museums hold artwork in trust. | (City Exhibit 254; DIAINSP000306 (Operating Agreement, at 10).) |
| The City represented and agreed that the management of the Museum was a unique partnership between the public sector and private sector that existed for the benefit of the Public. | (City Exhibit 281; DIAINSP046049-052 (1984 Agreement).) |

The DIA Corp., the State, the Counties, the taxpayers, foundations, institutions, and others have provided financial support (or secured financial support), in reliance on statements that the Museum existed to benefit the people of the City and State and that the Museum Art Collection was held in trust. Some of these statements are set forth in the table below.

39

**Table 4: Solicitations (Examples)**

| Reference | Source |
|---|---|
| Museum statement to the State Legislature to secure State funding:<br><br>*The museum began in 1885 by a private group of citizens and they operated the museum, they built the building, and they began a collection etc. until 1919. At that time, it was decided by the Founders Society group, that the City should take over and it should become a responsibility of the City to own and operate and run it. Therefore, it was taken over at that time and an Arts Commission was appointed, . . . and the City of Detroit took over this important public trust.* | (City Exhibit 302; DIAINSP144745 (1982 Joint Legislative Hearing Trans.).) |
| Museum statement to the State Legislature to secure funding:<br><br>*As I conclude my remarks, I will briefly discuss two final issues . . . <u>the first</u> arises from a question many have asked and that is "why don't you just sell some of the works of art in your collection to get through this crisis?"*<br><br>*The first part of the answer is that the art we own was given to the Museum directly or purchased from endowment funds whose specific instructions were to buy and display works of art for the enjoyment and education of the public. To violate those donor directions by selling their art for operating purposes would create legal issues, be a break of fiduciary trust, and certainly convince every prospective donor that giving a valuable work of art to the DIA was not a good idea."*<br><br>*The second reason for not selling the collection is spelled out clearly in the professional ethics and standards of museum associations. Since we and all art museums hold these works of art as a "public trust" for current and future generations, we would be ridiculed, criticized and ostracized from the museum community worldwide if we sold works of art to gain operating monies and would thereby guarantee that no other major museum would ever again lend us a work of art or allow us to have an exhibition."* | (City Exhibit 290; DIAINSP119274-275 (Jan. 23, 1991 Statement of Samuel Sachs II).) |
| Mayor David Bing statement in support of the 2012 millage campaign:<br><br>*I can assure you that the City of Detroit does not intend to sell the DIA art collection. Our operating agreement with the Detroit Institute of Arts expressly prohibits that, but even more important, we are committed to holding these works in trust for the public.* | (City Exhibit 344; POA00261726 (2012 Bing Letter).) |

        **c)**      **The Nature of the Museum Confirms the Museum Is Held in Trust.**

Agreements between the City and the DIA Corp. also confirm the existence of a trust and the Public's beneficial ownership of the Museum Art Collection. The 1984 Agreement between the City and the DIA Corp. stated that its "goal" was "to benefit the citizens of the City and the State by preserving for their enjoyment the treasures of the DIA." (City Exhibit 281;

DIAINSP0460051 (1984 Agmt., at 3).) The 1997 Operating Agreement between them recognized and affirmed that the Arts Commission and the DIA Corp. had worked together for the benefit of the Museum but asserted that the Operating Agreement was necessary to continue to advance the Museum's charitable purpose, including by increasing the "opportunity to secure federal, state, regional, county, City and other financial support," the "gifts of works of art to the [Museum]," and "contributions to the [DIA Corp.'s] endowment funds held on behalf of the [Museum]." (City Exhibit 254; DIAINSP000298 (Operating Agreement, Recitals ¶ 6).)

The Museum's professional practices, collection management, and deaccession policies similarly confirm that the Museum Art Collection is held in trust. The Museum's professional practices policy announces that the Museum and its collection are a public trust. (City Exhibit 292; DIAINSP120247 ("The Detroit Institute of Arts' collections, programs, and facilities are a public trust.").) The Museum's collection management policy, which the 1997 Operating Agreement affirmed, states that "the Museum must be ever aware of its role as trustee of the collection for the benefit of the public" and requires that net proceeds from deaccessioning be used only to improve the Museum Art Collection and not for operating expenses. (City Exhibit 267; DIAINSP005286, 288 (Collections Management Policy, at §§ V.A, V.F).) The Museum's prior deaccession policy, which the City Council approved, similarly restricted the use of funds acquired from art sales. (City Exhibit 289; DIAINSP144690 (May 15, 1989 Council Resolution); City Exhibit 280; DIAINSP045942 (Feb. 8, 1973 Arts Commission Minutes).)

The code of ethics that the Museum is required by the 1997 Operating Agreement to follow amplify these same well-settled trust principles and require that art sales be used solely to improve the art collections. (City Exhibit 300; DIAINSP144707 (AAMD Policy on

Deaccessioning); City Exhibit 416; POA00732887 (AAM Policy).)  The reasons for the finding

of a public trust are compelling.

> [A]rt museums hold collections in public trust and have a basic
> responsibility to preserve the integrity of their collections for the
> enjoyment and education of future generations.  A museum's
> collections, lovingly built up over many years with care, expertise,
> and dedication, are a public trust. . . .  Works of art are donated to
> art museums in order to give the public aesthetic enjoyment and
> educational enrichment.  Once accessioned they are not intended to
> be fungible assets available to be converted into cash, or used as
> collateral, to cover operating or capital costs.  Moreover, from a
> practical point of view if a museum converts accessioned works
> into operating funds, future donors are less likely to give works of
> art—or money—and are more likely to place severe restrictions on
> the disposition of whatever they do give.

(City Exhibit 273; DIAINSP034948-949 (Letter from Millicent Hall Gaudieri dated April 30,

1993).)  The sanctions for failure to comply with these public trust responsibilities are severe.

(City Exhibits 395, 397, 398, 406 434;  POA00731035, POA00731039, POA00731040,

POA00731399, POA00734862-63 (Sanctions Statements).)

### d)       The Museum Is a Charitable Trust.

The Museum has been held out as a separate charitable institution with the Museum's art

acquisitions and funds maintained by the DIA Corp. separately from the City's general fund.

Gifts of funds and artwork have been made based upon the promise of permanent care and

preservation for the benefit of the Public without any indication whatsoever that the municipality

somehow possessed a beneficial interest.  This evidentiary record provides a more than sufficient

basis to conclude that the Museum Art Collection and all other Museum assets are held in

charitable trust.

The decision of the bankruptcy court in *In re Parkview Hospital*, 211 B.R. 619 (Bankr.

N.D. Ohio 1997), is instructive.  There, the bankruptcy court considered the state attorney

general's claim that a hospital debtor's research fund was held in charitable trust and should be

excluded from the bankruptcy estate notwithstanding the trustee's position that such funds should be used to satisfy creditors. Reviewing a summary judgment record, the court observed that the case "differ[ed] from the usual charitable trust case in that the purported trust property was not donated by one settlor at one time, but rather is the accumulation of numerous donations over a period nearing twenty-five years" and further noted that there was no will or other written instrument to be construed in determining whether a charitable trust existed. *Id*. at 632. Although not held by a separate legal entity, the Court concluded that the "creation of the fund itself was a means to encourage charitable giving" and that it was treated as restricted to such charitable purposes for the entire period of the fund's existence. *Id.* at 624. Given that the fund was held out to be restricted to charitable purposes, the court found the intention of the many donors to the fund was clear and that an express charitable trust protected that fund under state law. *Id*. at 635-36. As the court held:

> In sum, this Court finds ample proof that Parkview and the other contributors consistently manifested the requisite intent that the Fund would be used for a particular charitable purpose and in a manner consistent with a charitable trust. The record, taken as a whole, supports this conclusion. The minutes of the various meetings show a prolonged attempt to raise charitable donations by holding the fund out as a restricted charitable fund whose principal would not be invaded, and whose purpose would be to further osteopathic medicine in the Toledo area. The brochures and the deposition testimony of the former president of the hospital for third-seven years also support this conclusion. Further, the notebooks which recorded the numerous contributions over twenty-five years, most of which were less than one hundred dollars, and only one of which were more than five thousand dollars, show that the donations came from numerous donors to whom the Fund was made available as a means of expressing sympathy and grief upon the loss of a loved one in a manner which was more permanent than flowers. Indeed, it was the permanency of the Fund which made it such an attractive alternative . . . .

*Id.* at 636.

Similar to the fund purportedly held by the debtor in *Parkview*, the City claims to own the Museum. Yet as in *Parkview*, the evidence shows that the Museum has been held out as a distinct charitable entity to which funds could be given to advance a purpose different from the general purposes of the City itself. Indeed, even more so than in *Parkview*, the nearly 130 year history of the Museum establishes a consistent, concerted, and prolonged intention on the part of the City, the DIA Corp. and donors alike to ensure that the Museum itself continued to exist for the benefit of the Public. Under *Parkview* as well as Michigan law, there is no reasonable dispute that the Museum is an express charitable trust and that the debtor-City has no right to use the objects in the Museum Art Collection to satisfy obligations to its creditors.[14]

### b. The Museum Art Collection Is Protected by an Implied Trust.

"'Implied trusts arise by operation of law as contradistinguished from those that arise from agreements of the parties, and are raised by law for the purpose of carrying out the presumed intent of the parties, or without regard to such intention for the purpose of asserting equitable rights or frustrating fraud. This form of trust is practically unlimited in extent and is employed whenever, in the opinion of the court, it becomes necessary to prevent a failure of justice.'" *Digby v. Thorson*, 30 N.W.2d 266, 272 (Mich. 1948) (citation omitted). A resulting trust is one form of implied trust.

> A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein and where the inference is not rebutted and the beneficial interest is not otherwise effectively disposed of. Since the person who holds the

---

[14] As the Collections Management Policy makes clear, all net proceeds from the deaccession of any object from the Museum Art Collection "shall be placed in the selling curatorial department's Art Acquisition Fund . . . [and] shall be used only for the replenishment of the art collection, consistent with the acquisition procedures of the Museum," and for no other purpose. (City Exhibit 267; DIAINSP005286, 288 (Collections Management Policy) § V.F.)

44

> property is not entitled to the beneficial interest, and since the
> beneficial interest is not otherwise disposed of, it springs back or
> results to the person who made the disposition or to his estate, and
> the person holding the property holds it upon a resulting trust for
> him or his estate.

*Potter v. Lindsay*, 60 N.W.2d 133, 136 (Mich. 1953) (citation omitted).[15]

As demonstrated within, (1) the City and the DIA Corp. constructed a building that was "Dedicated to the Knowledge and Enjoyment of Art" to house the Museum Art Collection; (2) the City repeatedly represented that works would be held in the permanent collection for use and display at the museum for the Public; (3) the City held the Museum out to be a separate institution to which charitable donations could be given for the benefit of the Public; (4) the City adopted or endorsed policies that set forth strict limitations on monetization or sales of objects; (5) the City and its officers represented to the Public that it held the Museum Art Collection in trust; and (6) the City allowed the DIA Corp. to solicit funds to support the Museum ostensibly because it benefited the Public. Even if the statutes, Articles, Charter, and other documents did not constitute an express trust, it is evident that donors to the Museum did not intend that the City "should have the beneficial interest therein" and therefore the City does not have the right to sell or otherwise monetize the Museum Art Collection for its own uses. *See generally Banner Health Sys. v. Long*, 663 N.W.2d 242, 250 (S.D. 2003) (permitting the imposition of a resulting trust).

> c. **The Museum Art Collection Is Protected by the Public Trust Doctrine.**

Under the public trust doctrine, a governmental entity has a duty to preserve and protect resources held in trust for the public. *See Illinois Central R.R. Co. v. Illinois*, 146 U.S. 387, 452

---

[15] The decision in *In re Omegas Group., Inc.*, 16 F.3d 1443 (6th Cir. 1994), does not apply because this case does not involve a claim of constructive trust and because that decision was not issued in a chapter 9 case.

(1892) (noting certain navigable waters were not held for sale but "in trust for the people of the State"). In declaring that "the public trust doctrine is alive and well in Michigan," the Michigan Supreme Court has stated:

> The State may not, by grant, surrender such public rights any more than it can adjudicate the police power or other essential power of government . . . . The State of Michigan has an undoubted right to make use of its proprietary ownership of the land in question, [subject only to the paramount right of] the public [to] enjoy the benefit of the trust.

*Glass v. Goeckel*, 703 N.W.2d 58, 65 (Mich. 2005) (quoting *Nedtweg v. Wallace*, 208 N.W. 51, 53 (Mich. 1926)).

As set forth above, the evidence shows that the Museum and the Museum Art Collection are held in public trust. Indeed, the fact of a public right in the Museum and the collection cannot be disputed, particularly where the City proposed and pursued the taking of private property by eminent domain to accomplish the objects and purposes of the Arts Commission.

> Resolved, That the Common Council of the city of Detroit has declared and does hereby declare a public improvement to be necessary in the municipality and has declared and does hereby declare that it deems it necessary to take private property described as . . . [a]s a site, with other land for Art Museum Buildings and with said other land to constitute such real estate as may be necessary and is necessary for the accomplishment of the objects of the Arts Commission of the City of Detroit, and has declared and does hereby declare that the improvement is for the use or benefit of the public.

(Common Council Journal Record, attached as Exhibit 17)

Although no Michigan court has addressed whether the public trust doctrine applies to cultural property such as art held for public exhibition, the very purpose of the Museum (as a public art institute under Michigan law) in this case is to ensure that the general public—who due to fortune or circumstance would otherwise not have the ability to access artwork and other rare objects—can benefit in a manner similar to those who can own such objects outright. (City

46

Exhibit 452; POA00735002-004 (1885 Act, *see* Exhibit 2); City Exhibit 286; DIAINSP094969 (1919 Amendment, *see* Exhibit 6).)  Here, the factual similarities to waterways and public park land are well founded and the legal theories equally applicable.  There is even greater cause to recognize a public trust where: the City purports to own the Museum for the public benefit, creating public ownership (not municipal) was the very purpose of the 1919 transfer, the Museum has been run as a public trust, and the City Charter continues to acknowledge the right of the people to "cultural enrichment, including libraries and art and historical museums," as well as "clean air and waterways."  (City Exhibit 350; POA00262362 (City Charter).)

Given the record in this case, strong consideration should be given to applying the public trust doctrine.  Therefore, any interest the City may have in the Museum Art Collection would be subject "to the paramount right of the public to enjoy the benefit of the trust." *Glass*, 703 N.W.2d at 65.  That interest stands as a barrier to monetization.

### d.  The City Is Bound by Its Representations and Promises.

Even if there were holes in the facts or loopholes in the law through which the City might escape the restrictions on its monetization of the entire Museum Art Collection (or other Museum Assets) to satisfy its own obligations, several independent doctrines close the City's escape routes: the doctrines of election and equitable estoppel, promissory estoppel, and dedication.

### 1.  Election and Equitable Estoppel

Under the doctrine of election, a party may not avail itself of the benefits of a trust relationship and then later reject it.  *See Holzbaugh v. Detroit Bank & Trust Co.*, 124 N.W.2d 267, 268 (Mich. 1963).  Likewise, equitable estoppel applies where: "(1) a party by representations, admissions, or silence, intentionally or negligently induces another party to believe facts; (2) the other party justifiably relies and acts on this belief; and (3) the other party

47

will be prejudiced if the first party is allowed to deny the existence of the facts." *In re Beglinger Trust*, 561 N.W.2d 130, 131-32 (Mich. Ct. App. 1997); *see also Wiersma v. Mich. Bell Tel. Co.*, 401 N.W.2d 265, 269 (Mich. Ct. App. 1986) (state may be estopped by its acts, conduct, silence, and acquiescence).

As described in detail above, the City has repeatedly acknowledged that it holds the Museum Art Collection in trust for the Public's benefit. It has solicited and accepted funds and property for the Museum. And individual donors, taxpayers, foundations, institutions, the DIA Corp., the Counties, the State, and others gave gifts of money, art, and other property in reliance on the City's representations and conduct. Indeed, the City has taken affirmative steps over the years to convince the Public that charitable assets would not be sold because it wished to ensure continued gifts to the Museum. Donors made gifts and bequests to or for the benefit of the Museum without concern for the title holder and with the intention that such objects be housed at the "Detroit Institute of Arts" for the benefit of the viewing Public and that such funds be used solely to benefit the Museum and its operations. There is no evidence that donors gave these gifts to the City, as a municipality, to be used in any manner it saw fit, such as to satisfy debts. In addition, the City has commingled funds from the deaccession of works that it purchased with funds subject to express donor restrictions for the purchase of art. As a result, the City has received the benefit of a world-class museum for most of the past century. The Public would be seriously harmed if the City were to sell, transfer, or convey any portion of the Museum Art Collection to satisfy municipal debts and obligations. Whether by election or estoppel, the City cannot now deny that it holds Museum assets solely in trust.

## 2. Promissory Estoppel

Similarly, under the doctrine of promissory estoppel, a promise that the promisor should reasonably have expected to induce action of a definite and substantial character that is relied on

48

is enforceable to prevent injustice. *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 552 (Mich. Ct. App. 1999). Evidence of such a promise may be taken from all the facts and circumstances. *State Bank of Standish v. Curry*, 500 N.W.2d 104, 109 (Mich. 1993). Policies and procedures may form the basis for an enforceable contract or promise. *See Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591, 606 (Mich. 1993) (noting that there is an 'intuitive recognition that such policies and procedures tend to enhance the employment relationship and encourage an 'orderly, cooperative and loyal work force' for the ultimate benefit of the employer'" (citation omitted)); *Toussaint v. Blue Cross & Blue Shield of Mich.*, 292 N.W.2d 880, 895 (Mich. 1980) ("Having announced the policy, presumably with a view to obtaining the benefit of improved employee attitudes and behavior and improved quality of the work force, the employer may not treat its promise as illusory.").

The City's promises to care for and maintain the Museum Art Collection permanently for the benefit of the Public, its continued acceptance of objects from donors into the "permanent collection," its policy acknowledging that only deaccessions "in the best interests of the museum, the public it serves, the public trust it represents, and the scholarly and cultural communities it serves" gave donors reasonable and legitimate expectations that these promises and policies would be followed and that the City would not treat the conditions contained therein as illusory. As there is no evidence to the contrary, the City may not walk away from them now.

### 3. Dedication

Under the doctrine of dedication, "if a dedication is made for a specific or defined purpose, neither the legislature, a municipality or its successor, nor the general public has any power to use the property for any other purpose than the one designated, whether such use be public or private . . . ." *2000 Baum Family Trust v. Babel*, 793 N.W.2d 633, 640 (Mich. 2010)

(quoting *Baldwin Manor, Inc. v. City of Birmingham*, 67 N.W.2d 812, 815 (Mich. 1954)).  The

Michigan Supreme Court has clearly stated the principle upon which this doctrine rests.

> [I]t would be dishonest, immoral, or indecent, and in some
> instances even sacrilegious, to reclaim at pleasure property which
> has been solemnly devoted to the use of the public, or in
> furtherance of some charitable or pious object.  The law therefore
> will not permit any one thus to break his own plighted faith; to
> disappoint honest expectations thus excited, and upon which
> reliance has been placed.  The principle is one of sound morals and
> of most obvious equity, and is in the strictest sense a part of the
> law of the land.  It is known in all courts, and may as well be
> enforced at law as in equity.

*Id*. at 641 (quoting *Patrick v. Young Men's Christian Ass'n of Kalamazoo*, 79 N.W. 208, 211

(Mich. 1899)).  In the seminal case of *Bd. of Trs. of Philadelphia Museums v. Trs. of Univ. of

Pennsylvania*, 96 A. 123 (Pa. 1915), the Supreme Court of Pennsylvania ruled that an attempt to

sell property dedicated to a museum (and for which financial and other support had been

obtained from the federal government, the State of Pennsylvania, the City of Philadelphia, and

individuals in reliance on the dedication) should be set aside as beyond the power of the city.

There, the court held:

> The ordinance of 1883 set apart the property in question for the
> purpose of being improved for the health and public welfare of the
> citizens of Philadelphia . . . .  In reliance upon such dedication the
> state of Pennsylvania made various appropriations, and the city of
> Philadelphia appropriated funds at frequent intervals for repairing,
> improving, and caring for the grounds and the museum buildings.
> There was thus not only a setting aside for public use, but acts
> done and funds expended by the city pursuant to such dedication
> followed by the use of the ground and the museum by the public.
> Such action upon the part of the municipality constitutes a
> complete dedication and acceptance for public use, and estops the
> city from interfering with or revoking the grant.

*Id*. at 125.

     Here, the City dedicated the Museum to art purposes.  Although Michigan courts have

not yet applied this doctrine to personal property, it would be "dishonest, immoral, or indecent"

for the City to attempt "to reclaim at pleasure" the right to sell any Museum Assets, including the Museum Art Collection, for its own benefit that the City dedicated and represented the Museum would hold for the Public's benefit.

> ### 2. Restrictions and Limitations Provide Additional Protection for Significant Portions of the Museum Art Collection.

> #### a. The City Cannot Monetize Property Conveyed by or Through the DIA Corp. to the Museum.

Section 15 of the 1885 Act requires that "[a]ll gifts, devises, or bequests made to any such corporation, and all of its income, shall be faithfully used for the purposes for which such corporation was organized . . . ."[16] (City Exhibit 452; POA00735004 (1885 Act, at § 15, *see* Exhibit 2).) Under this Section, the DIA Corp. could not have transferred its collection to the City. But through section 20 of the 1885 Act, as added by the 1919 Amendment, the legislature gave the DIA Corp. the power to transfer its property to the City subject to the restriction that the City be allowed to use such property only for the purposes for which the DIA Corp. was organized.

> Any corporation organized under this act situated in a city empowered to maintain a public art institute like or similar to that described in this act, may convey all or any of its property to said city upon such terms, in such manner and at such time or times as may be agreed upon by its trustees and the legislative body of said city; and said property so conveyed shall in the hands of said city

---

[16] Unlike section 15, section 16 of the 1885 Act, which prohibits the change in "character and purposes of such corporation," continues with "unless authorized by the legislature." The legislature likely had good reason for the distinction. The legislature might decide that the DIA Corp. no longer needed to be a corporation devoted solely to the establishment and operation of an art museum. It might expand the DIA Corp.'s mandate, or it might narrow it or terminate it altogether. But for works that the DIA Corp. acquired while it was chartered as an art institution, the legislature intended the limitation to be permanent. The legislature could change the limitation only for future "gifts, devises, or bequests to such corporation," such as by terminating the power to receive them or by terminating the corporation itself. But any such termination would not change the requirement that gifts made until then be permanently "used for the purposes for which such corporation was organized." The legislature might well have considered that such a promise of permanence was necessary to encourage "gifts, devises, or bequests" to the museum.

51

be faithfully used for the purposes for which such corporation was organized.

(City Exhibit 286; DIAINSP094969 (1919 Amendment, at § 20, *see* Exhibit 6); *see also* Exhibit 5 (1918 Charter).)  The DIA Corp. was organized as a "public art institute" that was required to use its property for "art purposes," was prohibited from selling, encumbering, or disposing of its general art collection, and was prohibited from changing the "character or purposes" of the corporation.  The legislative intent behind this amendment was clear: the City would continue to use all DIA Corp. property for art and museum purposes alone.  Equally clear was that section 20 provided the only authority for the DIA Corp. to transfer its property to the City.  The legislation recognized that the DIA Corp. only held legal title – the beneficial ownership was in the hands of the Public – and the DIA Corp. could only transfer to the City what it owned—the legal title.

The DIA Corp. made clear in its initial conveyance in 1919 that it was agreeing to transfer its responsibilities as trustee of the Museum and its collection subject to the restrictions in the 1919 Amendment.  Thus, all 8,633 objects conveyed by the DIA Corp. to the City in 1919 (and their proceeds) are restricted, and the City cannot use such property to satisfy non-Museum related debts and obligations.  Every conveyance by the DIA Corp. to the City since 1919 bears this same restriction.  The 1919 Amendment did nothing to ease the section 15 restriction.  In fact, section 20's restriction on the City's use of DIA Corp.-conveyed property reaffirmed it.

Section 1 of Chapter 3 of PA 84, the new 1921 Michigan general corporation law, repealed the 1885 Act, as amended by the 1919 Amendment.  (City Exhibit 454; POA00735069 (1921 P.A. 84, at Ch. 3, §1).)  However, section 2 is a savings clause that says, in relevant part:

> All such corporations, whose act of incorporation is repealed by this act . . . shall have, under its existing charter or corporate franchise, all of the powers, rights, privileges and immunities granted and conferred upon it by the law under which such corporation was incorporated, and notwithstanding [that] such law may be repealed by this act; and nothing in this act contained shall

> be taken or construed to limit, restrict, or modify any such
> corporation in the exercise of its existing powers, rights, privileges
> or franchises, or as working a change upon its manner of operating,
> or as imposing any new mode of operation upon any such existing
> corporation.

(City Exhibit 454; POA00735069 (1921 P.A. 84, ch. 3 § 2).)  Thus, despite the repeal of the

1885 Act that authorized the DIA Corp.'s formation and existence, the DIA Corp. did not need a

formal reorganization as a corporation but could proceed under the new corporation law subject

to the organizational requirements of PA 84 rather than of the prior chartering legislation.  But

the 1921 statute was intended only to codify Michigan's general corporation law, not to change

any promises that the legislature had made to the DIA's donors.  The legislative scribes who

combed the statute books to make sure that all prior legislative corporate charters were repealed

surely did not intend substantive change.  If anything, the breadth of the savings clause in section

2 suggests just the opposite.

Although Michigan consolidated and reorganized its general corporation laws several

times thereafter, nothing in those later acts undercuts this clear legislative purpose.  Nor is there

any indication that the DIA Corp. understood or intended that its conveyances of property to the

City thereafter would not be restricted in the City's hands.  In fact, the savings clauses in the acts

that consolidated and reorganized the general corporation laws and repealed the 1885 Act and

1919 Amendment (as well as later reorganizations) demonstrate the Legislature intended that the

restriction continued to apply to prior and future transfers.  (*See* City Exhibit 454; POA00735069

(1921 P.A. 84, at Ch. 3 § 2).)

Therefore, all the Donated Objects that the City received by transfer from the DIA Corp.

remain subject to the restriction that the City faithfully use the property for the purposes for

which the DIA Corp. was formed.  The City may not sell the Donated Objects to satisfy its own

obligations.

### b. The City Is Bound by Donor-Imposed Conditions, Limitations, and Requirements.

A city may accept gifts for a public purpose subject to conditions, limitations, and requirements of the donors. As set forth in MICH. COMP. LAWS § 123.871:

> [a]ny city . . . may receive, own, and enjoy any gift of real or personal property, made by grant, devise, bequest, or in any other manner, for public parks, grounds, cemeteries, public buildings, or other public purposes, whether made directly or in trust, subject to the conditions, limitations, and requirements provided in the grant, devise, bequest, or other instrument. A gift shall not be invalid because of an informality in the instrument evidencing the gift, if the intent can be determined from the instrument, or by reason of its contravening a statute or rule against perpetuities. All gifts made prior to August 14, 1913, either by grant, devise, bequest, or in any other manner, are declared valid, though they violate a statute or rule against perpetuities, the same as if this act had been in effect when made.

MICH. COMP. LAWS § 123.871. Under this section, any restrictions in gifts or bequests of Donated Objects for which the City has legal title are enforceable.

### 1. Objects Donated through the DIA Corp. Are Restricted.

All of the 57,600 Donated Objects are subject to the condition, limitation, and requirement that those gifts be used solely for the Museum and the Public it serves. This is so for three related reasons.

First, donors restricted or conditioned their gifts to Museum purposes. The Museum records show that donors rarely if ever made a gift to or for the benefit of the City itself but, rather, provided in their gifts that the object would be given to or for the benefit of the "Museum" or the "Detroit Institute of Arts." Thus, although many deeds of gift do not place restrictions on usage or display, they do require that the title holder use the gifts only to benefit the Museum and its charitable and educational purposes. (City Exhibit 285; DIAINSP080479 (Josephine F. Ford Deed of Gift dated Apr. 2, 1992, *see* Exhibit 13).) Indeed, there is little

54

evidence that donors intended to make gifts to the City or intended that the City should have any interest in the object at all. Not surprisingly, the City and its Arts Commission have admitted that it would be a breach of fiduciary duty with donors to fail to use their gifts for the benefit of the Museum and the Public it serves. (City Exhibit 298; DIAINSP144686-687 (Feb. 3, 1933 Ford Letter to Mayor, *see* Exhibit 15); City Exhibit 344; POA00261726 (Bing Letter).)

Second, nearly every gift flowed through the DIA Corp. and, as a result, bears the trust requirement that the gift be used only to benefit the Museum. From 1885 until the present, the DIA Corp. has used donated funds to purchase objects to be made a part of the Museum Art Collection or received objects from donors to be made a part of the Museum Art Collection. (*See, e.g.*, City Exhibit 268; DIAINSP011973-975 (Minutes of Arts Commission Meeting dated Jan. 9, 1961).) As a result, most of the 57,600 Donated Objects were given to the Museum by or through the DIA Corp. These gifts are subject to the condition, limitation, and requirement that the City use them for the purposes for which the DIA Corp. was founded. This restriction was fundamental to the transfer in 1919 when the City accepted the initial transfer and has been a fundamental feature of every gift thereafter by the DIA Corp. to or for the benefit of the Museum.

Third, it is self-evident that museums solicit and receive gifts to benefit the museum and the public those museums serve and not to benefit the entity or persons charged with managing the museum. Not surprisingly, the City has mandated that the Museum operate according to standards that limit the usage of such gifts, including strict limitations on the use of proceeds from deaccessions of art from the collection. (City Exhibit 267; DIAINSP005288 (Collections Management Policy, at § V.F.).) Such restrictions are implicit and understood by donors, and attach to every object in the Museum Art Collection—along with any explicit restrictions. This

underlying policy, and the requirement that a donated object or any proceeds from the deaccession thereof will remain part of a museum's collection, forms the basis of all gifts to not only this Museum, but to all museums that are members of the American Association of Museums—one of the prevailing American accrediting organizations.

### 2. A Substantial Portion of the Collection Bears Additional Donor Restrictions.

Separate and apart from the general restriction that objects be used to benefit the Museum, individual donors have, in the past, set forth specific and more detailed restrictions on their gifts. Although it has not been possible to fully review the thousands of donor files and more than 10 million pages of archival documents, which contain additional information regarding restrictions on bequests, grants, and devises of objects and funds, a few notable examples of restrictions in gifts and bequests made by some of the museum's most noteworthy contributors stand out.

Ralph Harmon Booth was one of the earliest leaders of the Museum and a foremost donor. Mr. Booth bequeathed funds to the DIA Corp. for the acquisition of artwork subject to an express requirement that the works be permanently exhibited at the Museum Building.

> I will and bequeath to the Detroit Museum of Art Founders Society the sum of Two Hundred Thousand Dollars ($200,000.00), this sum to be invested and from time to time reinvested by said Society, and *the income used to purchase works of Art to be permanently given to and exhibited in the Museum of The Detroit Institute of Arts* . . . .

(City Exhibit 275; DIAINSP039792 (emphasis added) (the "Booth Bequest").) Mr. Booth's wife, Mary Booth, also gave works of art subject to the same conditions in the Booth Bequest. The Museum Art Collection contains numerous objects, including Agnolo Bronzino's "Eleonora of Toledo and Her Son" which are subject to this Booth Fund Bequest restriction. (City Exhibit 278; DIAINSP040280-281 (Letter from Mary B. Booth dated Apr. 21, 1942).)

56

Robert Hudson Tannahill was one of the most important champions and supporters of the Museum. Mr. Tannahill bequeathed to the DIA Corp., "for the benefit of the Detroit Institute of Arts," his art collection subject to an express condition.

> I give and bequeath all of my right, title and interest in and to my collection of pictures, drawings, water colors, oil paintings, sculptures, Eighteenth Century French silver, pre-Columbian gold objects, and African and Mexican art to FOUNDERS SOCIETY DETROIT INSTITUTE OF ARTS of Detroit, Michigan, a nonprofit corporation, for the benefit of the Detroit Institute of Arts, provided, however, that *such bequest is upon the express condition that said nonprofit corporation and the Detroit Institute of Arts, an instrumentality of the City of Detroit, both shall make a written commitment, in a form acceptable to my Executors, to the effect that the said collection, in toto, will be permanently retained at the Detroit Institute of Arts, with no right or reservation on the part of said nonprofit corporation and Detroit Institute of Arts, or either of them, at any time to sell or otherwise dispose of said collection or any part thereof.*

(City Exhibit 252; DIAINSP000276 (emphasis added) (the "Tannahill Bequest").) The Arts Commission and the DIA Corp. executed the required commitment. (City Exhibit 408; POA00731413-441 (Tannahill Commitment).) The Museum Art Collection contains approximately 563 objects, including Paul Cezannne's "Madame Cezanne," Vincent van Gogh's "Bank of the Oise at Auvers," and Pablo Picasso's "Melancholy Woman," which are subject to the Tannahill Bequest restriction. (City Exhibit 295, parts (a) and (b); DIAINSP127449-144667 (List of Works).)

In addition to the Tannahill Bequest, Mr. Tannahill established a trust fund (the "Tannahill Trust Fund"), one beneficiary of which was the DIA Corp. The Tannahill Trust Fund set up one account for the DIA Corp. with the income to be used for the: purchase of "impressionistic paintings or sculpture," "American Colonial and Federal works of art," and "works of art produced before 1925." (City Exhibit 250; DIAINSP000234-235 (Tannahill Trust Agreement).) The DIA Corp.'s rights as a beneficiary of the Tannahill Trust Fund were

57

contingent upon the DIA Corp.'s acceptance of the commitment not to sell or dispose of the artwork received as part of the Tannahill Bequest, which the DIA Corp. provided. *Id*. The Museum Art Collection contains numerous objects acquired in conformity with the Tannahill Trust Fund restrictions. (City Exhibit 295, parts (a) and (b); DIAINSP127449-144667).)

The Booth Bequest, Tannahill Bequest, and Tannahill Trust Fund are a few of the largest and most famous gifts to the Museum. Other donations of collections and individual works also carry conditions, limitations, and requirements. A few examples of such lesser known gifts are included in the table below.

### Table 5: Gift Limitations, Conditions, and Requirements (Examples)

| Gifts | Source |
|---|---|
| Donor: Edward E. Rothman<br><br>Gift: Dancers in Repose, Edgar Degas, No. 72.441<br><br>Limitation: "The gift is contingent on its acceptance for the permanent collection." | City Exhibit 283; DIAINSP077729 (Letter from Edward E. Rothman dated Aug. 7, 1972) |
| Donor: Lizzie Merrill Palmer<br><br>Gift: The Merrill Fund<br><br>Limitation: "WHEREAS, the Trustees of the Detroit Museum of Art propose to purchase the block of ground in the City of Detroit, Michigan, bounded by Woodward Avenue, John R. Street, Farnsworth Avenue and Frederick Avenue, and to erect thereon a building for the purposes for which said Museum was created; and whereas, to accomplish such purpose it will be necessary to raise by subscription the sum of Two Hundred Thousand Dollars, therefore I agree, … to pay to the Treasurer of the Detroit Museum of Art, on the completion of such purchase, the sum of Ten Thousand Dollars as an endowment fund to be known as the 'Merrill Fund' the income of which shall be used for the purchase of pictures painted by artists who are, or in case of their decease, were citizens of the United States, such pictures to be selected by a majority vote of said Trustees." | City Exhibit 296; DIAINSP0143417 (Merrill Fund) |
| Donor: W. Hawkins Ferry<br><br>Gift: The W. Hawkins Ferry Fund<br><br>Limitation: "Two-elevenths (2/11) thereof to the Founders Society Detroit Institute of Arts, of Detroit, Michigan, for the purchase of modern works of art and/or for endowment for such purchases." | City Exhibit 253; DIAINSP000285-286 (Last Will and Testament of William Hawkins Ferry) |

A thorough examination of the millions of pages of the Museum's files and archives and of donors' records would surely reveal more restrictions. Indeed, the DIA Corp. continues to discover additional restrictions of this kind. Such evidence would have to be examined before any object could be considered for sale to determine whether any condition, limitation, or requirement was imposed by donors on gifts or bequests over which the City claims title.

### c. The City Cannot Sell Objects For Which It Does Not Have Clear Legal Title.

Before it could monetize the Museum Art Collection, the City must demonstrate that it holds all right, title, and interest in those objects. Aside from auction house policies that require Sellers to represent and warrant good title, buyers of multi-million dollar works of art do not readily part with the purchase price without sound assurance that they are receiving all right, title, and interest in the object. The bankruptcy court does not have authority to authorize a sale of a municipal debtor's property free and clear of a disputed ownership claim.[17]

As already noted, the Museum Art Collection currently consists of approximately 60,400 objects. Approximately 2,800 COD Objects are listed with the credit line "City of Detroit Purchase," suggesting that they were acquired using City funds. (City Exhibit 295, parts (a) and (b); DIAINSP127449-144667 (List of Works).) The remaining approximately 57,600 Donated Objects were donated to the Museum or acquired using donated funds. *Id*. Not surprisingly, COD Objects and Donated Objects accessioned into the Museum's permanent collection are treated as components of the whole collection without distinction—they are housed together,

---

[17] *See Darby v. Zimmerman (In re Popp)*, 323 B.R. 260 (B.A.P. 9th Cir. 2005); *compare with* sections 363(h), (i) (expressly authorizing sales of property subject to specified joint ownership interests), or of a third party's beneficial interest in the property, *see* section 541(d) (beneficial interest in property that the debtor holds as trustee does not become property of the estate). Though these sections do not apply in chapter 9 cases, they provide important guidance in applying section 1123(a)(5)(D) (sale under a plan "free of any lien"), which does apply in chapter 9 cases, though more limited than section 363(f) (sale "free and clear of any interest in such property of an entity other than the estate").

displayed together, covered by the same insurance policy, security arrangements, climate control system, curatorial and restoration services and collection management policy.

Given this practice, the City acknowledges that there is a dispute about whether it in fact holds clear legal title to all of the objects currently in the Museum Art Collection, let alone to the Donated Objects, which were given as charitable gifts to the Museum or acquired by the DIA Corp. over the years. (Orr Dep. at 381.) And there appears to have been historic confusion over the proper title holder of gifts to the Museum. (City Exhibit 268; DIAINSP011973-975 (Jan. 9, 1961 Arts Commission Meeting Minutes).) There are even disputes about some of the COD Objects, some of which were purchased in whole or in part with donated funds. (City Exhibit 282; DIAINSP061857-858 (Jan. 27, 1987 Booth Letter).) And even those acquired using City funds are not without express restrictions. For example, the records related to the Tintoretto ceiling (DIA Accession No. 23.11) establish that it must be displayed at the Detroit Institute of Arts or returned to Italy. (City Exhibit 322; POA00257999-POA00258000 (Tintoretto Documentation).)

There is no dispute, however, that the DIA Corp. holds legal title to at least 7,286 objects in the Museum Art Collection that are designated as DIA Corp. objects (or "F numbered") objects. (City Exhibit 255; DIAINSP002514-917 (Exhibit 5 to 1997 Operating Agreement).)[18] The vast majority of the remaining approximately 50,000 Donated Objects in the Museum Art Collection were acquired as a result of charitable gifts conveyed by, to, or through the DIA Corp.

---

[18] The Operating Agreement is a bilateral agreement that purports to define the "City art collection." Because the Operating Agreement acknowledges that the collection is held in trust, neither the DIA Corp. nor the City appears to have made a meaningful attempt in 1997 to ascertain whether the City held title to any specific objects in the Museum Art Collection or not. (*See* Operating Agreement § A5 ("*City* makes no representation as to the completeness of Exhibit 2.").) Should the City attempt to monetize the collection, title would be challenged. *See generally Ford Motor Co. v. City of Woodhaven*, 716 N.W.2d 247 (Mich. 2006) (mutual mistake of fact).

Many were donated to "The Detroit Institute of Arts," leaving the identity of the title holder uncertain if challenged by donors.

> **3.** **Discovery Will Further Undercut Any Claim that the City Has the Right to Sell or Monetize the Museum Art Collection.**

The City does not have the right to sell or monetize any portion of the Museum Assets, including the Museum Art Collection, to satisfy municipal obligations for the reasons discussed above. Although the DIA Corp. has not engaged in meaningful discovery from the City or others, the circumstances surrounding the gift of "Belshazzar's Feast" highlights the problem the City would face if it attempted to monetize any portion of the Museum Art Collection.

Washington Allston was an American painter and poet. Allston began work on "Belshazzar's Feast" in 1817. (City Exhibit 272; DIAINSP144672 (Description of Artwork, *see* Exhibit 12).) An enormous work at 18 feet by 13 feet, Allston died before its completion, leaving a "veiled" picture with portions of the sketches uncovered by paint. Thereafter, the Allston Trust took responsibility for its care and wished to give Belshazzar's Feast to a museum so that it could be "made available to the public, under the care of those who know its enduring value." (City Exhibit 272; DIAINSP144677 (Letter to E. P. Richardson dated Nov. 4, 1955, *see* Exhibit 12).)

The Allston Trust began discussions with Edgar Richardson, Director of the Museum, whose tenure with the Museum extended from 1930 until 1962, over the possible transfer of Belshazzar's Feast to the Museum. The Allston Trust initially expressed a preference for offering the painting as a permanent loan rather than a gift because of the implications of charitable trust law if the Museum were to terminate its existence. As explained by the Allston Trust's lawyer:

For the record, I would like to make a slight exegesis on the question of "permanent loan" as opposed to "gift." As I see it, the difference does not depend on what the intent of the trustee might be; in either case, he is handing the painting over to the permanent custody of the institution involved. There would be a difference, however, in the event that the Institute itself were to terminate its existence. In this event, the permanent loan would be returned to the trustee. *The gift, on the other hand, would probably be subject to the cy pres doctrine, i.e., a judicial determination of the ultimate disposition of the work might be required in order to effectuate the original charitable intent in making the gift, and this would probably mean transfer to some other similar institution.* As attorney for the Allston Trust, it seems to me preferable to place these paintings as permanent loans, and in the light of what I have said above, I would urge [DIA Director] Professor Richardson to accept the "Belshazzar" and the "Uriel" as permanent loans. If the Detroit Institute of Arts has the long life we all wish for it, no one will ever be bothered by the formal distinction between the two types of transfer.

(City Exhibit 272; DIAINSP144673 (Oct. 4, 1955 Beck Letter, *see* Exhibit 12) (emphasis added).) Director Richardson responded that Belshazzar's Feast would be better cared for and be more secure if given as a gift because, "**[i]f, owing to unforeseen circumstances, the City of Detroit should go out of business**," title to the entire collection would revert to the DIA Corp., which would continue to care for the property:

Unlike most American art museums, which are private corporations, this is a city-owned museum. Founded in 1885 as the usual private corporation, it was given to the City of Detroit in 1919, which has since provided maintenance and operating funds from the City's tax revenues. The old private corporation has remained in being, to administer our endowments, and is known as the Detroit Museum of Art Founders Society.

Mr. Leavitt tells me that Belshazzar's Feast will need some care and attention in order to prepare it for exhibition; and all pictures need care and attention for a long period of time. That is the perspective of museums. I can authorize that the picture should be cared for, from our tax money . . . . Nonetheless, over the long period, *I believe it would be most desirable that no question should ever be raised about our responsibility for the care and maintenance of this picture . . . .*

62

> It is our practice with all gifts to our collection to present them first to our sustaining society, the Detroit Museum of Art Founders Society, which acts as our financial institution. The Founders Society, however, transmits all its purchases and gifts made to it, to the Arts Commission who accept them to become the property of the City of Detroit. *If, owing to unforeseen circumstances, the City of Detroit should go out of business, title to the collection would revert to the Detroit Museum of Art Founders Society. This is probably as secure a future for a work of art as any museum can provide: at least it has never been questioned by any of our great donors here.*

(City Exhibit 272; DIAINSP144675 (Nov. 1, 1955 Richardson Letter, *see* Exhibit 12) (emphasis added).)

The Allston Trust transferred title to Belshazzar's Feast as a gift based on these assurances and with the belief that the transfer would ensure that the object would be "made available to the public under proper care."

> Thank you very much for your letter of November 1, concerning "Belshazzer's Feast", and I appreciate very much your giving me such a detailed information explaining your position …. Upon your acceptance of this gift, I relinquish all right title to and interest in said picture believing in that this transfer of title and interest is a partial fulfillment of the purposes of the trust.
>
> The more I have thought of this, the more I feel that this gift is in full accord with the spirit of the original trust and carries out the desires and intentions of my predecessor trustees and members of my family that Allston's work should be made available to the public under proper care and those who know its enduring value.

(City Exhibit 272; DIAINSP144677 (Nov. 4, 1955 deHram Letter, *see* Exhibit 12).)

A simple review of the Museum's records would suggest that the Allston Trust gave Belshazzar's Feast as an outright gift without any limitations, conditions, or requirements. Yet the evidence shows that at the time of the transfer, the Museum advised the Allston Trust that the Museum had the duty to care for the painting for the benefit of the Public and that title to the entire Museum Art Collection would revert to the DIA Corp. if the City "should go out of

63

business." The evidence further establishes that the Allston Trust believed that the transaction was governed by charitable trust law and that giving the work to the Museum as a gift, rather than a loan, provided the greatest possible security that the Public would benefit from the gift. In short, this evidence supports every argument the DIA Corp. has made above, including a finding that Belshazzar's Feast, is held in charitable trust, protected from sale under the 1919 Amendment, protected by an implied trust, held in public trust, and subject to restrictions created by promises and representations regarding the use of the gift.

Belshazzar's Feast provides a broader lesson as well. Director Richardson, who negotiated with the Allston Trust over the gift, was associated with the Museum from 1930 until 1962. During this time, nearly 16,000 objects were acquired by the Museum, including approximately 160 of the Museum's most well-known and important works. (FGIC Exhibit 3122; DIAINSP000001-000203 (Major Works List).) Director Richardson assured at least one donor that the Museum Art Collection would "revert" to the DIA Corp. if the City went "out of business" and assured at least one donor with the fiduciary responsibility of a trustee that the relationship between the City and the DIA Corp. provided "as secure a future for a work of art as any museum can provide." The interactions between donors and the Museum surely varied over time. But the theme underlying Director Richardson's statement—that the Museum would care for the Museum Art Collection for the benefit of the Public—was undoubtedly central to every transaction from 1885 to the present.

If a picture is worth a thousand words, the painting of Belshazzar's Feast is worth many times more because it illustrates the risk of litigation for the City. The DIA Corp. has not engaged in meaningful discovery because the Grand Bargain made such activity unnecessary. But if forced to do so, it would surely uncover additional information similar to that presented

64

above.  In a bankruptcy case with no precedent on a complex contested issue of fact and law, there already is significant doubt that the City would be able to prove that it has the right to sell or monetize any portion of the Museum Art Collection.  If litigation begins and full discovery commences, it is reasonable to conclude that any City claim of a beneficial ownership to the Museum Art Collection (and other assets) will weaken further.

### B.  LITIGATION WOULD BE COMPLEX, PROTRACTED, AND EXPENSIVE.

For the City to sell or otherwise monetize the Museum Art Collection, it would have to prevail in litigation over its right to do so.  Any attempt to do so would be vigorously opposed. The Attorney General has already issued a formal opinion that the City may not sell or transfer the Museum Art Collection.  (City Exhibit 324; POA00258054 (AG Op. 7272).)  As the State officer constitutionally mandated with the duty to protect charitable trusts, the Attorney General is likely to sue to prevent the City from selling the collection.  The DIA Corp. has already expressed its position that the City holds the Museum Art Collection in trust and is therefore certain to initiate or join litigation over the City's ability to sell the collection.  (City Exhibit 309; POA00257802-810 (DIA Legal Memorandum); Dkt. 5054 (Response of the DIA).)

Any such litigation would be time-consuming and contentious.  The trust questions alone involve nearly 130 years of history, tens of millions of pages of documents in the Museum's files, and untold amounts of information in files and memories of donors and their own trusts, estates, and heirs.  (City Exhibit 282; DIAINSP061857-858 (Booth Letter).)  The discovery to date has only scratched the surface of the underlying evidence, because of the limited time available and because the purpose of a settlement approval hearing is only to determine the likelihood of success on the merits, not to litigate the actual merits of the underlying issue.  Even aside from factual and legal questions that might affect the City's right to the Museum Art Collection in general, resolving ownership questions regarding individual works would likely

65

require an object-by-object examination to determine rights in the works as limitations and restrictions are uncovered regularly. (City Exhibit 322; POA00257999-8000 (Tintoretto Documentation).) Additional third-party discovery would surely uncover evidence of additional restrictions.

The expense of litigation to the City would likely run into the tens of millions of dollars. Based on the Tennessee litigation over the right of Fisk University to monetize its Stieglitz collection, which involved only legal issues yet lasted for five years, including two trips to the Tennessee Supreme Court, the duration of this action might be measured in decades.

Meanwhile, the continued operation of the Museum would be at substantial risk during any litigation. With uncertainty over whether Museum assets would be sold to pay City obligations, donors would likely suspend giving rather than fund an institution that might have no future. The three-county millage, which currently provides about two-thirds of the Museum's operating budget, might not be sufficient to sustain Museum operations without donors and itself would be at risk. (City Exhibit 345; POA00261727-786 (Millage Articles).) Moreover, it almost certainly would not be renewed upon its expiration eight years from now if litigation were still pending. The millage was enacted with the idea that the DIA Corp. could raise an endowment during the millage's ten-year life to sustain the Museum after the millage expired. Litigation over whether the City could monetize the Museum and the Museum Art Collection to satisfy its obligations would destroy any chance to raise the endowment because the Counties have publically stated that they will seek to revoke the millage if any part of the Museum Art Collection is sold. (City Exhibit 345; POA00261727-786 (Millage Articles).) As a result, the litigation would likely lead to the closure of the Museum as an operating entity at least until the litigation ended and perhaps permanently, depriving the City, the State, and their residents and

visitors of access to this premier cultural institution.  This would have a devastating effect on midtown Detroit.  In the meantime, the City would have to fund the preservation costs of the Museum Art Collection.  Whether the City wins or loses the litigation, the DIA Corp. and the Museum would lose, and the City would suffer a great financial, cultural, and civic loss—all with no certain financial benefit to the City's creditors.  And, of course, litigation would be the death knell of the Grand Bargain and a complete loss of the $816 million which it includes.

### C. THE CITY WOULD HAVE DIFFICULTY REALIZING THE MUSEUM ART COLLECTION'S VALUE.

The courts as well as common sense require that consideration of a settlement recognize any uncertainty associated with realizing the amount at stake.  Michael Plummer of Artvest, an expert with extensive experience analyzing art values and projecting art market performance and sales, with years of practical experience working in Sotheby's and Christie's auction houses, conducted a valuation of the Museum Art Collection.  (City Exhibit 460 (Plummer Report).)  He concluded that the gross indicative value of the Museum Art Collection is approximately $2.8 to $4.6 billion with a mid-estimate of $3.7 billion.  This does not reflect the amount of money that would actually be realized in a sale of the Museum Art Collection, which he concludes may be substantially lower, taking into account reductions inherent in various sales scenarios and the time it would take to realize any value, but merely is an estimate of the sum of the individual values of each of the approximately 60,400 works in the collection.

Mr. Plummer's net indicative value is based on a gross indicative value of the entire Museum Art Collection.  As he states in his Report, his valuation might "overstate the value of the DIA collection" (City Exhibit 460 (Plummer Report, at 19)), because of the methodology he used for "Group 5," the remainder of the collection, whose value he estimated at $657 million to $1.287 billion.  He based this aggregate gross indicative value estimate for Group 5 works on the

13-53846-tjt   Doc 7141   Filed 08/27/14   Entered 08/27/14 23:26:26   Page 76 of 88

Christie's Report sample valuation data for lower value works, sector by sector. As he explained:

> "COD works were most likely 'strategic' purchases to raise the profile of the DIA. General gifts and other museum acquisitions often involve property with little to no sales value and/or scholarly or historic value only. Also, in many instances, donors give entire collections, which include poor to mediocre property side-by-side with good property."

(*Id*.) The Group 5 works account for about 25% of the collection's aggregate gross indicative value. The DIA Corp. itself estimated an aggregate valuation of $122 million to $225 million for "works in storage," which overlaps substantially with Group 5 works. An adjustment to Mr. Plummer's Group 5 number could therefore reduce the gross indicative value of the entire collection by up to 20%.

Although the gross indicative value of the entire Museum Art Collection might be as high as $2.8 billion to $4.6 billion, that amount is not guaranteed, and the time to realization of the value is subject to substantial litigation uncertainty. The City would face substantial risks and difficulties, including steep discounts in realizing value from the Museum Art Collection. The reasons will be shown by Mr. Plummer, who is the only expert witness who will testify on the actual process of and market constraints on attempting to realize the value of the Museum Art Collection, rather than just the sum of the values of individual works in the collection if offered for sale individually. When actual realizable value is compared against the risk of litigation, the City's choice to enter into the Grand Bargain is well within the range of reasonable outcomes.

To determine the present value that might be available to the City if the Museum Art Collection were to be sold, a variety of sale scenarios must be considered, resulting in various discount factors that would apply. If the City did not attempt an immediate liquidation, one of the more significant discount factors for an orderly liquidation is a present value discount

resulting from the time it would take. After deducting that and other applicable discounts from the low estimate of $2.8 billion and the mid estimate of $3.7 billion, (Scenario C—orderly sale without litigation delay) would produce a net indicative value of $1.4 billion (using the low estimate as the baseline) or $1.8 billion (using the mid estimate as the baseline). Deducting the same discounts in the more likely scenario involving litigation delays (Scenario D—orderly sale after litigation delay) would produce a net indicative present value of $0.9 billion (using the low-estimate as the baseline) or $1.1 billion (using the mid-estimate as the baseline). This net indicative present value represents the likely realization from selling the Museum Art Collection.

The alternative, an immediate liquidation in bulk to a single buyer or a small group of buyers without the complete cataloguing, marketing, and sale process required to sell individual works might result in the highest net indicative value of perhaps as much as 50% of the collection's gross indicative value and would occur much sooner, reducing any present value discount. But even an "immediate" liquidation as part of a distressed sale would involve months of due diligence and marketing and, more important, litigation over restrictions on sale. A 50% estimated realization in an immediate liquidation scenario does not deduct the cost of litigation, the cost of preservation of the collection pending sale, or a present value discount resulting from any litigation delay. Nor does it take account whether a suitable buyer or small group of buyers could be found. A bulk buyer (or group of buyers) would purchase only for re-sale, not for its own use. Such a buyer would need substantial capital and the ability to re-market the collection over a substantial period, similar to the manner reflected in Mr. Plummer's orderly sale process (Scenario C). The estimated realization also did not take account of the tentative 80% discount (rather than the 50% discount typical in art loans) proposed in the indication of interest from Art

Capital Group for a loan, which suggests that an immediate liquidation discount might be materially greater than the 50% that Mr. Plummer estimates.

The net indicative value in an immediate liquidation without material due diligence or litigation delay (Scenario A) is comparable to the net present indicative value of Scenario C—orderly sale without litigation delay. The amounts are shown in the following two tables.

**Table 6: Application of Discount Factors, Mid Estimate[19]**

| Application of Discount Factors / Mid Estimate | | Scenario A | Scenario B | Scenario C | Scenario D |
|---|---|---|---|---|---|
| 000s | | | | | |
| Gross Indicative Value of the DIA Collection *(Mid-Estimate)* | | 3,684,466 | 3,684,466 | 3,684,466 | 3,684,466 |
| Discount Factor: Immediate Sale | 50% | (1,842,233) | N/A | N/A | N/A |
| Discount Factor: Unsold Rates | | N/A | (939,290) | (Note 1) | (Note 1) |
| Discount Factor: Not Selling Through Sotheby's or Christie's | 20% | N/A | (736,893) | (Note 2) | (Note 2) |
| Discount Factor: Present Value of Selling in Orderly Liquidation *(without Litigation)* | | N/A | N/A | (1,853,547) | N/A |
| Discount Factor: Present Value of Selling in Orderly Liquidation *(with Litigation)* | | N/A | N/A | N/A | (2,539,108) |
| Net Indicative Value | | 1,842,233 | 2,008,283 | 1,830,919 | 1,145,358 |
| Other Potential Discounts More Difficult to Predict | | | | | |
| Discount Factor: Market Disfavor on American Sector of up to | 50% | | (263,038) | | |
| Discount Factor: Market Crash in PWC Sector | 50% | | (293,201) | | |
| | | 1,842,233 | 1,452,045 | 1,830,919 | 1,145,358 |
| Note 1: Unsold Rates Included in Present Value Calculation | | | | | |
| Note 2: This Fact Is Not Applied in Present Value Calculation | | | | | |

---

[19] (City Exhibit 460 (Plummer Report) Table 6, at 36.)

**Table 7: Application of Discount Factors, Low Estimate[20]**

| Application of Discount Factors / Low Estimate | | Scenario A | Scenario B | Scenario C | Scenario D |
|---|---|---|---|---|---|
| (000's) | | | | | |
| Gross Indicative Value of the DIA Collection | | 2,760,978 | 2,760,978 | 2,760,978 | 2,760,978 |
| *(Low Estimate)* | | | | | |
| Discount Factor 1: Immediate Sale | 50% | (1,380,489) | N/A | N/A | N/A |
| | | | | | |
| Discount Factor 2: Unsold Rates | | N/A | (705,448) | (Note 1) | (Note 1) |
| | | | | | |
| Discount Factor 3: Not Selling Through Sotheby's or Christie's | 20% | N/A | (552,196) | (Note 2) | (Note 2) |
| | | | | | |
| Discount Factor 6A: Present Value of Selling in Orderly Liquidation | | N/A | N/A | (1,394,755) | N/A |
| *(without Litigation)* | | | | | |
| | | | | | |
| Discount Factor 6B: | | N/A | N/A | N/A | (1,910,943) |
| *(with Litigation)* | | | | | |
| | | | | | |
| Net Indicative Value | | 1,380,489 | 1,503,334 | 1,366,223 | 850,035 |
| | | | | | |
| Other Potential Discounts More Difficult to Predict | | | | | |
| | | | | | |
| Discount Factor 4: Market Disfavor on American Sector of up to | 50% | | (193,108) | | |
| | | | | | |
| Discount Factor 5: Market Crash in PWC Sector | 50% | | (230,083) | | |
| | | | | | |
| | | 1,380,489 | 1,080,143 | 1,366,223 | 850,035 |
| Note 1: Unsold Rates Included in Present Value Calculation | | | | | |
| Note 2: This Fact Is Not Applied in Present Value Calculation | | | | | |

But, of critical importance, neither Scenario A nor Scenario C is realistic in the circumstance of the current case, since neither accounts for a substantial further reduction in value that would be occasioned by litigation delays. In addition, while the net indicative value represents the likely present value of the entire Museum Art Collection (without accounting for litigation delays), this value does not fairly represent the amount at issue in this case because it does not account for reductions required for works subject to restrictions that are not reasonably subject to dispute. Some of those reductions are listed in the table below.

---

[20] (City Exhibit 460 (Plummer Report) Table 7, at 37.)

**Table 8: Reductions to Gross Indicative Values from Restrictions**

| Restriction | Works | Low Value[21] | High Value |
|---|---|---|---|
| Booth Bequest Restriction: Ralph Harmon Booth and his wife bequeathed funds and objects to the Museum that must be "permanently exhibited in the Museum of The Detroit Institute of Arts." | 14 | $81,500,000 | $142,000,000 |
| Tannahill Bequest Restriction: Robert H. Tannahill gave 563 high value objects to the Museum subject to a fully executed commitment by the City to retain permanently at the Detroit Institute of Arts with no right to reservation to sell or dispose of the collection at any time. | 25 | $327,100,000 | $459,000,000 |
| Tannahill Trust Restriction: The trust in favor of the DIA Corp. must be used for "sole purpose of acquiring works of art for the DETROIT INSTITUTE OF ARTS." [22] | 27 | $71,410,000 | $122,130,000 |
| *Postman* Restriction: Josephine F. Ford donated the work to the Museum without intending to transfer beneficial ownership to the City. | 1 | $80,000,000 | $120,000,000 |
| **Subtotal** | **67** | **$560,010,000** | **$843,130,000** |
| 1919 Transfer Restriction: The DIA Corp. transferred approximately 8,633 works to the City in 1919 pursuant to the statutory restriction in the 1919 Amendment that the City faithfully use such property for museum purposes.[23]<br><br>(Value shown includes only separately appraised works) | 8,633 | $56,140,000 | $72,800,000 |
| **Total** | **8,700** | **$616,150,000** | **$915,930,000** |

These reductions account for 23% and 21% of the low and mid gross indicative values and if deducted would reduce those values to $2.14 billion to $2.91 billion from $2.76 billion to $3.68 billion. Appropriate adjustments to the highest net present indicative value, in Scenario A

---

[21] Values listed are only for those works that received individual valuations. The totals could be higher if additional works were included.

[22] At least four works that the Museum's records show as subject to the Tannahill Trust Restriction, all of which have Accession Numbers that indicate they were acquired in the 1990's, are also listed as "City of Detroit Purchase," apparently because funds from the Tannahill Trust and from prior deaccession of COD Objects were used to purchase the works

[23] At least four works that were acquired before 1919 are shown in the Museum's records as "City of Detroit Purchase."

(Immediate Liquidation) would result in a net indicative value of $1.07 billion to $1.46 billion from $1.38 billion to $1.84 billion.

These values are all hypothetical and do not account for all the risks posed by the many challenges and limitations on the City's ability to sell or monetize the Museum Art Collection. The challenges are real and could result in the City losing any chance of deriving value from the Museum Art Collection. Given the seriousness of these legal challenges and the litigation risks, the settlement amount is more than a fair compromise. The Grand Bargain ensures that the City will receive fair value for the municipal funds it used to procure the COD objects comprising 5% of the Museum Art Collection, which Christie's valued at between $454 million and $866 million. (City Exhibit 424; POA00734212 (Christie's Report).) Thus, in every respect, the Grand Bargain is within the reasonable range of outcomes.

### D. THE GRAND BARGAIN IS IN THE BEST INTERESTS OF THE CITY AND ITS CREDITORS.

To determine whether a settlement is in the best interest of the City and its creditors, the bankruptcy court must "form an educated estimate of . . . all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Protective Comm.*, 390 U.S. at 424. In this case, three factors stand out: how the Plan's treatment of the Museum Art Collection enhances the City's ability to revitalize itself and perform its obligations under the Plan; how the delay resulting from rejection of the Grand Bargain could impair the City's ability to emerge from bankruptcy and begin the full healing process; and how the City's and the creditors' alternatives to the Plan's treatment of the Museum Art Collection would impact the outcome. These factors support approval of the DIA Settlement as part of the Plan.

73

### 1. Preserving the Museum Will Assist in Detroit's Revival.

The Museum is self-supporting and imposes no financial obligation on the City. Instead, it contributes to the City's economy and tax revenues. (City Exhibit 254; DIAINSP000290 (Operating Agreement); City Exhibit 266; DIAINSP004052 (DIA Corp. Financial Statement).) Its $32 million annual budget, much of which is spent in the City, comes primarily from sources outside the City: the millage from the three-county area, donations from Southeast Michigan, and admission fees from residents outside of Southeast Michigan. *Id.* Visitors from the region and beyond contribute to additional spending in the City, especially in Midtown. The Museum enhances the education of Detroit children, who will be the future residents, employees, and taxpayers in the City. It provides a hub for the growing Midtown arts community and the development and economic activity that it supports. It enhances the quality of life of Detroiters and enhances the ability of Detroit businesses to attract senior managers and executives from outside the area.

All of these factors support Detroit's revitalization and thus its tax base and its ability to perform under the Plan. This premier cultural institution is essential to the future of the community and a critical component of Midtown Detroit. The Museum's loss, which could not be reversed, would be devastating to the City and not in the long-term interests of the City or its creditors. As Mayor Frank Murphy stated 80 years earlier:

> Prudence dictates when many are so distressed, that sacrifices and economies must be made, but we must not be so unwise as to strip this great city altogether of its cultural life. We must make ready for the day when the arts and culture will flourish in our midst. Therefore, although they must be managed on the most economical basis, we will keep open our magnificent library and our uncommonly attractive museum, so alluring and pleasant."

(City Exhibit 380; POA00729599 (May 1932 Bulletin).) The Grand Bargain ensures that the Museum Art Collection will be held in charitable trust in the City in perpetuity so that the Museum continues to benefit the Public. The value to the City and its residents is priceless.

Preserving the Museum, and averting a sale or monetization, has broader benefits as well. Any attempt to monetize the Museum Art Collection outside of the Grand Bargain likely would have a chilling effect on charitable activity. Donors in Michigan, as well as in other parts of the country, likely will feel less secure in giving gifts of objects or money if the Museum is raided to resolve municipal debts and obligations in violation of clear donor intentions. At a minimum, donors would likely attach onerous restrictions to future donations. Schools, arts organizations, safety-net charities, and other charitable and public service organizations could see a decline in support as a result. In a community where charitable giving is crucial, the Grand Bargain helps mitigate donor insecurity and helps maintain the charitable activity that benefits the City and the Public.

> **2. Approval of the Grand Bargain Is Essential to the City's Prompt Emergence from Bankruptcy.**

In determining whether a settlement is in the interests of creditors, a court should consider whether the settlement clears the way for confirmation and implementation of a plan. *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007). The Grand Bargain does so here.

The Grand Bargain resolves potentially protracted litigation over the City's ability to sell or monetize the Museum Art Collection. It resolves already intense litigation over the City's ability under a chapter 9 plan to adjust its crushing pension obligations. Without that, the City might not be able to achieve a viable financial restructuring at all. It settles all claims against the State of Michigan that pensioners threatened to bring in the absence of a settlement and avoids lengthy litigation over the impairment of pensions. It settles other minor disputes. It enables the

75

City to plan and budget for future pension obligations, a major component of the City's budget, and thereby to satisfy chapter 9's plan feasibility requirement. Its early announcement started the momentum toward settlement of other issues in this case.

More important, the Grand Bargain is a cornerstone of the Plan. The Plan cannot proceed without the approval of the Grand Bargain. If this Court does not approve for whatever reason, then the City must start all over again in crafting a debt adjustment plan. If the reasons do not relate to the Museum Art Collection, the City might be able to renegotiate certain terms that could preserve the principal parts of the Plan and return for confirmation soon. However, if the Court disapproves the Grand Bargain because of issues relating to the Museum Art Collection, then a substantial delay is likely. New money from outside of City sources—$366 million of foundation money, $350 million of State money, and $100 million of DIA Corp. donor money— would no longer be available to fund the Plan. Any City attempt to replace those funds with proceeds from the sale of the Museum Art Collection would be met with litigation that could take years to resolve. Negotiating new deals with the creditor classes would take months or years. The constitutional issues regarding impairment of pensions would be litigated. The City's emergence from bankruptcy would be delayed, and its rebuilding efforts would likely be put on hold until it could raise the necessary new financing. As this Court has previously observed, the City's residents have waited long enough. It is against the City's interest to suffer the delay that disapproval of the Grand Bargain would certainly entail.

### 3. The City Is Not Required to Consider The Bond Insurer's Alternatives to the Grand Bargain.

The Bond Insurers have suggested that the Plan cannot be confirmed unless the City considers alternative options to the Grand Bargain, which they contend could produce a larger recovery for creditors and which do not favor one set of creditors over another. Among other

things, they suggest that the Museum Art Collection may be used as loan collateral or a portion of the Museum Art Collection may be sold to satisfy the City's obligations.

But the Bond Insurers cannot force the City to sell or monetize assets. *See* 11 U.S.C. § 904 (stating that, "unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with . . . any of the property or revenues of the debtor"). In fact, not approving the Grand Bargain would impair the power of the State to control the exercise of the political or governmental powers of the City, the purpose of which is set out in MICH. COMP. LAWS §§ 141.1602 and 141.1609 and the Contribution Agreement, in contravention of 11 U.S.C. § 903.

Nor can the Bond Insurers insist that the City pursue an alternative that potentially would require extensive litigation, saddle the city with additional debt, place the Museum Art Collection at risk of seizure as collateral for a loan, and/or destroy or severely diminish the Museum. Under the Grand Bargain, the City is receiving fair value for those objects acquired using City funds where Christie's valued this portion of the collection at between $454 million and $866 million—without any of the deductions for factors described above that would reduce the net present indicative value to be received for these works, or for restrictions and misattributions that would prevent sale or reduce sale prices, or for costs of sale—and where the City will receive $816 million as part of the Grand Bargain. (City Exhibit 424; POA00734212 (Christie's Report).) Under the Grand Bargain, the City also preserves in trust for the Public this civic treasure and cornerstone of the City's revitalization. The City has every right to choose this combination of value even if the Bond Insurers may prefer some other combination.

## IV.    CONCLUSION

The Museum has existed for nearly 130 years. During this time, the Museum has been one of the few constants, giving the people of this City and State access to a world-class

educational, cultural, and artistic experience that would be the envy of cities that are similar to what Detroit once was and can be again. Like the Museum, the City must measure time in decades and centuries, not months or years. It must weigh the needs of the moment against its duties to past, present and future generations of the Public. The City has done so in the Grand Bargain and in the Plan. The City is the beneficiary of a remarkable act of charity and goodwill that allows the City to support pensioners while keeping the Museum intact as the law demands, as the Public deserves, and as the health of the City requires. The Court should approve the Grand Bargain and confirm the Plan.

Dated: August 27, 2014          Respectfully submitted,

                                    HONIGMAN MILLER SCHWARTZ AND COHN LLP

                                    By: /s/ Arthur T. O'Reilly
                                    Arthur T. O'Reilly (P70406)
                                    Judy B. Calton (P38733)
                                    Jason R. Abel (P70408)
                                    Scott B. Kitei (P78064)
                                    2290 First National Building
                                    660 Woodward Avenue
                                    Detroit, MI 48226-3506
                                    Telephone: (313) 465-7628
                                    Facsimile: (313) 465-7629
                                    Email: aoreilly@honigman.com

                                    CRAVATH, SWAINE & MOORE LLP

                                    Richard Levin
                                    Worldwide Plaza
                                    825 Eighth Avenue
                                    New York, NY 10019-7475
                                    Telephone: (212) 474-1000

                                    Attorneys for The Detroit Institute of Arts

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was electronically filed with the Clerk of the Court using the ECF system, and will send notification of such filing to all ECF participants registered in this matter.

Dated:  August 27, 2014           HONIGMAN MILLER SCHWARTZ AND COHN LLP

By: /s/ Arthur T. O'Reilly
Arthur T. O'Reilly (P70406)
Judy B. Calton (P38733)
Jason R. Abel (P70408)
Scott B. Kitei (P78064)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Telephone: (313) 465-7628
Facsimile: (313) 465-7629
Email: aoreilly@honigman.com

CRAVATH, SWAINE & MOORE LLP

Richard Levin
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000

Attorneys for The Detroit Institute of Arts