UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re<br><br>CITY OF DETROIT, MICHIGAN,<br><br>Debtor. | Chapter 9<br><br>Case No. 13-53846<br><br>Hon. Steven W. Rhodes |

**OPPOSITION OF THE OFFICIAL COMMITTEE OF RETIREES TO (I) SYNCORA'S MOTION *IN LIMINE* BARRING THE CITY FROM INTRODUCING COMMUNICATIONS PROTECTED BY THE COURT'S MEDIATION ORDER AND (II) FINANCIAL GUARANTY INSURANCE COMPANY'S MOTION *IN LIMINE* TO PRECLUDE THE INTRODUCTION OF EVIDENCE OR TESTIMONY REGARDING MATTERS WITHHELD FROM DISCOVERY ON THE BASIS OF THE MEDIATION ORDER (DKTS. 6979 AND 6985)**

The Official Committee of Retirees of the City of Detroit, Michigan (the "Committee") files this Opposition to (I) Motion *in Limine* Barring the City from Introducing Communications Protected By The Court's Mediation Order, filed by Syncora Capital Assurance, Inc. and Syncora Guarantee, Inc. (collectively, "Syncora") [Dkt. 6979] (the "Syncora Motion") and (II) Financial Guaranty Insurance Company's ("FGIC") Motion *in Limine* to Preclude the Introduction Of Evidence or Testimony Regarding Matters withheld from Discovery on The Basis of the Mediation Order [Dkt. 6985] (the "FGIC Motion," and referred to collectively with the Syncora Motion as the "Motions"), and in support thereof, states as follows:

**PRELIMINARY STATEMENT**

Similar to the other motions *in limine* contemporaneously filed by Syncora [Dkts. 6975, 6978, 6982] and FGIC [Dkt. 6990], the Motions here seek relief that is much broader in scope than their titles suggest and, more importantly, relief that improperly seeks to exclude the introduction of probative and otherwise admissible evidence.

In this particular context, FGIC and Syncora (the "Objectors") assert that no evidence concerning the content of mediation communications can be introduced at trial. This premise is not in serious dispute, and to the extent that the Objectors seek enforcement of the Mediation Order, the Objectors' requested relief is redundant and unnecessary. In any event, the Committee does not intend to disclose or place in evidence any privileged information during the upcoming confirmation hearing on the City's Sixth Amended Plan of Adjustment (the "Plan") [Dkt. 6908].

What is in dispute, however, is the attempt by the Objectors to preclude the introduction of ***any*** evidence of issues that may have been discussed in mediation, ***but to which discoverable facts otherwise exist***. In support, the Objectors cite selected deposition transcript excerpts of certain witnesses during whose depositions the mediation privilege was raised, and claim that allowing the admission of any evidence would cause them undue prejudice. These concerns are unfounded, unjustified and if, granted, would actually prejudice the City, supporters of the Plan and, most notably, the Court.

Of particular concern to the Committee is the Objectors' attempt to preclude introduction of evidence concerning the allowed Pension Claims (Class 10 and 11) and OPEB Claims (Class 12). (*See* Syncora Motion, at ¶¶ 1, 9 (bullets 1 and 2); FGIC Motion, at 5 (bullets 4-6), at 6 (bullet 2).) Such evidence is relevant to assess the reasonableness of the Plan settlement reached between the City and retirees—a settlement that resolves the majority (both in number and dollar amount) of claims in this case. The Objectors attempt to justify this attempt at sweeping preclusion based upon the fact that the allowed amount of these claims was resolved in mediation (true, yet unremarkable) and that they were unable to discover the basis for these pension and OPEB claims. This is untrue. For example, the Objectors deposed Howard

2

Atkinson (among many others). Mr. Atkinson issued an expert report on how the OPEB claim was and should be calculated. The Objectors do not assert—and cannot assert—that the mediation privilege was raised or otherwise prevented them from asking about how the Committee calculated the OPEB claim, how the final allowed amount of this claim was calculated and the factors and methodology that went into the claim allowance.

At bottom, to allow the Objectors' position to stand would undermine the very purpose of the mediation (to resolve disputes), by preventing the introduction of independently available evidence supporting the Plan and related settlements that the mediation was intended to facilitate. It would also violate this Court's myriad statements that it can assess the reasonableness of settlements without the introduction of the back-and-forth of mediation discussions. Indeed, last year FGIC was involved in a mediation-facilitated bankruptcy settlement that was approved by the court without disclosure of the "the substance of mediation discussions." *See In Residential Capital, LLC*, 497 B.R. 720, 741 (Bankr. S.D.N.Y. 2013) (finding the settlement to be a "reasonable settlement" based upon, *inter alia*, "testimony generally regarding the process surrounding the negotiations" and the testimony of the expert financial advisors).

Therefore, this Court should deny the Motions.

## **LEGAL STANDARD**

Motions *in limine* face a particularly exacting and challenging burden of proof. First, Objectors bear the burden of demonstrating that they are entitled to relief requested in their motion *in limine*. *See, e.g.*, *Design Basics, L.L.C. v. DeShano Companies, Inc.*, Case No. 10-14419, 2012 WL 5265388, at *2 (E.D. Mich. Oct. 23, 2012). Second, courts will not grant motions *in limine* "unless the moving party meets its burden of showing that the evidence in question is *clearly inadmissible*." *Id*. (internal quotations omitted) (emphasis added). Anything

3

13-53846-tjt    Doc 7144    Filed 08/27/14    Entered 08/27/14 23:45:14    Page 3 of 17

short of movant making such a showing that the identified evidence is "clearly inadmissible," and the motion *in limine* should not be granted. *See id*. If a movant fails to make such a showing, then "evidentiary rulings should be deferred and resolved in the context of trial." *Id.*

Moreover, the Sixth Circuit has admonished that a motion *in limine* should be denied where, as here, a movant seeks a blanket exclusion of evidence. *See Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1985) ("[o]rders in limine which exclude broad categories of evidence should rarely be employed . . . [and the] better practice is to deal with questions of admissibility of evidence as they arise"). Trial courts heed the Sixth Circuit. *See, e.g. Innotext, Inc. v. Petra Lex USA, Inc.*, No. 08-11077, 2010 WL 2560063, at *2 (E.D.Mich. June 15, 2010) (denying motion on grounds that "[m]otions in limine are meant to deal with discrete evidentiary issues related to trial and are not substitutes for dispositive motions" and denying motion); *Englar v. 41B Dist. Court*, No. 04-CV-73977, 2010 WL 5015343, at *7 (E.D.Mich. Dec. 03, 2010) ("Orders in limine which exclude broad categories of evidence should rarely be employed."); *Zugowitz v. Davis*, No. 2:06-CV-727, 2008 WL 619357, *1 (S.D.Ohio Mar. 03, 2008) (noting that "[c]ourts . . . are generally reluctant to grant broad exclusions of evidence *in limine*" and denying motion).

## ARGUMENT

### A. To the Extent the Objectors Seek to Exclude Mediation Communications, They Are Raising A Red Herring Issue.

The Mediation Order entered by the Bankruptcy Court provides that "[a]ll proceedings, discussions, negotiation, and writings incident to mediation shall be privileged and confidential, and shall not be disclosed, filed or placed in evidence." (Mediation Order, dated August 13, 2013 [Dkt. No. 322.]) To the extent any clarification would be necessary, the Committee states that it does not intend to introduce as evidence in support of Plan confirmation information that

4

is protected by the Mediation Order. If the relief sought by the Objectors were so limited, that would be the end of the matter, since the Mediation Order already covers those issues.

However, at the heart of the Motions is Objectors' attempt to convert the Mediation Order into a blanket prohibition on the introduction of all evidence pertaining to a subject in connection with which a party asserted a mediation privilege during discovery, and regardless of whether there are independent sources of information that do not implicate mediation negotiations.

Since the Committee does not intend to violate the terms of the standing Mediation Order, the relief sought by the Objectors as to the Committee is purely speculative and should be denied.

**B.     The Objectors' Relief is an Improper Attempt to Prevent the Introduction of Relevant Evidence That is not Protected by the Mediation Order.**

1.     *FGIC's Requested Relief is Overbroad, Vague and Unnecessary*.

The plain language of FGIC's proposed order demonstrates FGIC's intent to block the introduction of admissible evidence. The order would prohibit "all parties" from introducing testimony or evidence (i) that is "protected by" or "previously withheld on account of" the Mediation Order, (ii) that was previously withheld on account of the Mediation Order, and (iii) is, in the opinion of FGIC, incapable of being "adequately addressed" without the introduction of such testimony or evidence. (FGIC Motion, Ex. 1, at 2.) To the extent that FGIC seeks to bar the introduction of testimony or evidence that is "protected by" or was "previously withheld" on account of the Mediation Order, then, as noted above, the requested relief is duplicative of that granted in the Mediation Order and unnecessary.

Most troubling is the Objectors' request to bar the introduction of evidence that, per FGIC's view, cannot be "adequately addressed" without the introduction of such testimony. The proposed language is not only sweeping in scope, but unnecessarily vague. *See GSI Grp., Inc. v.*

5

*Sukup Mfg. Corp.*, 641 F.Supp.2d 732, 746 (C.D. Ill. 2008) ("The [motion *in limine*] is denied because Sukup does not sufficiently identify the evidence that it seeks to bar."). Indeed, FGIC's requested relief, if granted, would permit FGIC to conceivably object to the introduction of relevant evidence, regardless of whether that evidence is independent of mediation communications, regardless of whether that information was already provided to FGIC and regardless of however tangentially related that information is to any valid assertion of privilege. FGIC's motion should be denied for this reason alone.

        2.     *Syncora's Requested Relief Is Overbroad, Vague and Unnecessary*.

Syncora, in turn, would have this Court bar the City[1] from introducing evidence of "communications that are covered by the Mediation Order." (Syncora Motion, Ex. 1, at 1.) On its face, this language would seem to merely prohibit the introduction of information that is already protected by the Mediation Order. If so, then Syncora's request for relief is, once again, duplicative of the relief granted in the Mediation Order, and unnecessary. However, Syncora reveals the true scope of its desired relief in paragraph 10 of its Motion, in which it states that it would preclude parties from "seeking to introduce, *in any form*, evidence or testimony of any proceeding, discussion, negotiation or writing that *was part of* the Court-ordered mediation." (Syncora Motion, at ¶ 10 (emphasis added).) As with FGIC, the requested relief is overbroad and vague, and should be denied. *See GSI Grp., Inc.*, 641 F.Supp.2d at 746.

Tellingly, the relevant evidence that Syncora seeks to bar relates to (i) whether the OPEB settlement is in the range of reasonableness, (ii) whether the correct discount rate was applied to the pension claims, and (iii) whether the City and Foundation contributions to the Grand Bargain

---

[1] Although text of Syncora's proposed Order refers only to the City, it is difficult to see how, under Syncora's view, the same reasoning is not equally applicable to all other parties who participated in the mediation. Thus, granting the relief requested is likely to affect not only the ability of the City, but also the ability of all parties to the mediation, to introduce evidence.

6

would not be available. (Syncora Motion, at ¶ 9.) Unsurprisingly, these are foundational issues that go to the heart of the City's ability to confirm its Plan. It would be the height of injustice and unreason to have this Court's Mediation Order transformed from an agent of settlement into an agent of obstruction by invoking it to prevent the introduction of evidence that supports the very settlements the Mediation Order was intended to facilitate. Indeed, taken to its logical extreme, the Objectors' position could conceivably prevent the introduction of a settlement agreement reached in mediation on the grounds that the agreement contains terms reflecting privileged mediation discussions.

The City and the Committee have made available fulsome information to the Objectors throughout the pendency of this Chapter 9 case regarding all of the above issues, independently of the mediation discussions. The City and Committee are entitled to introduce that evidence, as well as the testimony of their expert witnesses, regardless of whether any party asserted a mediation privilege in connection with mediation communications related to those issues. Below are just some examples of such independent information that addresses the categories raised in the Objectors' Motions, and in particular paragraph 10 of the Syncora Motion.

(i) OPEB Claims and Range of Reasonableness.

For example, with respect to the question of whether settlement reflects the reasonable exercise of business judgment, the Committee may offer Howard Atkinson, a Vice President of The Segal Company. Mr. Atkinson has made available to the Objectors an expert report estimating the present value of health benefits for the City's current OPEB health plans and makes no reference to mediation. Mr. Atkinson was deposed by the Objectors. Mr. Atkinson is prepared to testify that using a discount rate of 0%, the estimated present value of the OPEB

7

claim is $8.004 billion and that based on PBGC annuity valuation rates as of July 2013, the present value is $5.086 billion.

Similarly, the City may call Suzanne Taranto, a principal and consulting actuary at Milliman, Inc. ("Milliman"). Ms. Taranto has made available to the Objectors an expert report on behalf of the City analyzing the expected postretirement benefit obligations ("EPBO") and cash obligations of the City's retiree health plans prior to its Chapter 9 filing and the range of possible discount rates to calculate the retirees' OPEB claim.[2] More specifically, Ms. Taranto's report addresses, without citation to mediation communications:

- actuarial values for the City's pre-filing retiree health care plans averaged in excess of 90% for Medicare-eligible retirees and ranged from 83% to 90% for non-Medicare eligible retirees;

- the present value of the pre-filing retiree health plan was approximately $6.5 billion;

- the projected cash obligations of the pre-filing retiree health care plans for the fiscal years 2014-2023;

- the cost of the City's post-filing 2014 health care plan is approximately $3,000,000 per month, and the present value of such benefits, using a 4% discount rate, is $751 million; and

- the value of the retirees' OPEB claim based on a variety of discount rates, the value of which ranges from $3.59 billion to $4.49 billion.

(ii) The Pension Claims and Settlement Size.

At the confirmation hearing, the following independent evidence may be introduced by the Parties in support of the pension claims:

- The City's June 2013 Creditor Proposal [Dkt. 11, Ex. A];

- Letters and reports from the City's actuary, Milliman;

---

[2]The Committee may also rely upon the expert testimony of Stuart Wohl, a Senior Vice President of The Segal Company, who analyzed the impact on retirees of the Plan's proposed reduction of pension holders' health care benefits and the detrimental impact of any additional cuts in those benefits.

8

- the GRS and Amended PFRS retiree pension proofs of claim filed by the Committee [Proofs of Claim Numbers 1913 and 3637];

- the Fourth Amended Disclosure Statement [Dkt. 4391] (the "Disclosure Statement") and prior versions [Dkts. 2709, 3382, 4272], the Sixth Amended Plan [Dkt. 6908], and prior versions [Dkts. 2708, 3380, 4140, 4271, 4392, 6257] to demonstrate, *inter alia*, the change in the amount of the allowed pension claims of classes 10 and 11;

- pension system valuations; and

- the expert testimony of Kim Nicholl.

More specifically, Kim Nicholl may testify regarding how the allowed settlement claims for classes 10 and 11 in the Plan compare with the actual value of the claims held by those classes, and whether the settlement amounts calculated by Milliman are consistent with accepted actuarial standards. Ms. Nicholl will also testify as to the percentage of the allowed claim settlement amount that classes 10 and 11 are expected to recover under the Plan. Additionally, Ms. Nicholl will testify as to the percentage of the actual value, as opposed to the settlement value of the claim amount for those classes.

(iii) The Grand Bargain.

With respect to the terms of the Grand Bargain, the Court may rely upon, among other things, the current Disclosure Statement and Plan for evidence of the terms of the DIA Settlement and the State Contribution Agreement. (*See* Fourth Amended Disclosure Statement, (§ IV.E-F.); Sixth Amended Plan, (§ IV.D-E.)) Prior versions of the Disclosure Statement reflect the evolution of the Grand Bargain when compared to the most recent Disclosure Statement. This public information has been, of course, available to the Objectors since those documents were filed with this Court.

9

### C. The Objectors Have Conducted the Discovery to Which They are Entitled and Will not be Prejudiced by Denial of the Requested Relief.

The Objectors claim that they will be prejudiced if their requested relief is not granted because they have been denied the opportunity to conduct discovery. Not so. The Objectors participated in extensive document discovery, which generated hundreds of thousands of documents. The Objectors also collectively served deposition notices and subpoenas on more than 35 persons. They have been active litigants in all manner of discovery disputes before this Court. The assertion that they lacked a full opportunity to engage in discovery is simply without foundation.[3]

As an initial matter, it is important to observe that much of the information to which Objectors claim lack of access is contained in the various iterations of the Disclosure Statement and Plan. For example, with respect to the purported lack evidence regarding "the correct size of pension claims," (Syncora Motion, at ¶ 9), the Objectors need only have compared the various versions of the Plan for evidence of the evolution of the discount rates applied to pension claims. In the initial Disclosure Statement, dated February 21, 2014 the City applied discount rates for the GRS and PFRS of 6.25% and 6.5%, respectively. [Dkt. 2709, at 5-6.] By the time of the Fourth Amended Disclosure Statement, that rate had been revised to 6.75% for both funds. [Dkt. 4391, at 12-13.]

With respect to the purported inability to obtain discovery about the use of State and Foundation contribution funds, (Syncora Motion ¶ 9) the Objectors need once again have only looked to the terms of the Plan. The Plan specifically states that the "DIA Funding Parties . . .

---

[3] Notably, the one case cited by Syncora for the proposition that it will suffer prejudice if its requested relief is not granted involved a defendant who had claimed a good faith defense on the advice of counsel. *Arista Records LLC v. Lime Group LLC*, No. 06-cv-05936, 2011 WL 1632434 (S.D.N.Y. April 20, 2011). In that case the court barred the defendant from introducing a good faith defense predicated on advice of counsel where the defendant simultaneously refused to allow discovery into those communications. Here, in contrast, the parties supporting the Plan are not invoking a privileged communication as an element of their proof. To the contrary, they intend to introduce independent information in support of Plan confirmation.

10

have committed to assist in the funding of the City's restructured legacy pension obligations . . ." (Plan, at § IV.E.1.) The Plan further provides that "the DIA Funding Parties' participation in the DIA Settlement is conditioned upon, among other things . . . the earmarking of all funds provided by the DIA Funding Parties towards the recoveries upon Pension Claims under the Plan for Holders of Claims in Classes 10 and 11 . . . ." (Plan, § IV.E.3.) Michigan's contribution to the settlement is specifically defined with reference to the fact that the funds may only be used to fund pension obligations in explicit return for releases from pending and future litigation. Plan Ex. I.A.118, which sets forth the principal terms of the DIA Settlement, specifically provides that "[t]he Funders' obligations to continue to fund the settlement . . . are conditioned on [inter alia]: (1) all amounts paid by the Funders shall be used only to pay Pensions as provided in this Term Sheet and the confirmed Plan of Adjustment." (Plan, Ex. I.A.118, at 16.) Similar information was provided in the Disclosure Statement. (*See* Disclosure Statement, Art. IV.F) ("the DIA Funding Parties have committed to assist in the funding of the City's restructured legacy pension obligations" and "[t]he Foundations have required that their funds be applied to fund the City's restructured legacy pension obligations").

The Objectors' statements that they will suffer prejudice if their requested relief is not granted because they have been unable to sufficiently explore certain topics during depositions similarly falls flat. This assertion is unsupported by the facts, and relies upon a selective recitation and imaginative interpretation of deposition excerpts. Notably, many of the assertions of privilege referenced by the Objectors were made in response to questions specifically aimed at obtaining discovery of privileged information, notwithstanding the Mediation Order's prohibition of such discovery. Indeed, FGIC laments that the Emergency Manager "refused to

11

go into more detail about the City's *discussions* with the Foundations." (FGIC Motion, at ¶ 8 (emphasis added).)

The deposition excerpts cited by the Objectors demonstrate their repeated attempts to circumvent the Mediation Order by seeking discovery of privileged communications. Just some examples are:

- Q: … *[W]as it Judge Rosen who brought up* that the involvement of the foundation should occur because it could soften the blow to the pensioners and help preserve the collection at the DIA?; (FGIC Motion, at 4 (citing R. Rapson Depo., 81:23-83:2, July 31, 2014) (emphasis added));

- Q: If I ask you *did the foundations ever offer to contribute money* without insisting on transfer of the art institute, you'll decline to answer that question, correct? A: I think I have to.; (FGIC Motion, at 5 (citing K. Orr Depo., 340:3-7) (emphasis added));

- Q: …When did the DIA learn that it would – *that it was agreeing* to undertake a commitment to contribute $100 million to the settlement?" (FGIC Motion, at 5 (citing Erickson Depo., 183:13-184:17, July 22, 2014) (emphasis added));

- Q: *I understand that there are ongoing negotiations* with the labor unions about some of these work rules, is that right? . . . Ms. Kovsky-Apap: . . . [T]o the extent that anything is still short of the finish line, we're subject to the Court's order on mediation and can't discuss it. The Witness: Okay. Everything is a work in process right now.; (FGIC Motion, at 6 (citing E. Jenkins Depo., 80:15-81:11, July 25, 2014) (emphasis added));

- FGIC Motion, at 5 (noting that the Emergency Manager invoked the Mediation Order to protect "*communications* between the City and the Foundations regarding the Grand Bargain") (emphasis added);

- Syncora Motion, at 5 (noting that Glenn Bowen invoked the Mediation Order "regarding *discussions* by actuarial firms") (emphasis added); and

- Syncora Motion, at 6 (noting that when City witnesses were asked about the *negotiations* surrounding the DIA Settlement, the City invoked the Mediation Order) (citing Ex. 6E, Orr Depo., 444:8–25, July 22, 2014.)

The Objectors also distort the deposition record to support their position. For example, FGIC's assertion that Kevin Orr, the Emergency Manager, "refused to provide a date that terms

12

[of the Grand Bargain] were accepted because of [the] mediation privilege" is simply incorrect. (FGIC Motion, at ¶ 9 (citing Orr Depo., 378:10-379:8).) However, the unquoted portion of the attached transcript reveals that Mr. Orr did not provide a specific date because *he did not remember the* date - "it was evolving for a period of time from late 2013 until early 2014 and I just don't remember a specific date when I said this is something we'll go with." (K. Orr Depo., 379:11-14.)

As yet another example of its supposed inability to obtain discovery, FGIC argues that it was denied the opportunity to inquire into the Foundations' contribution to the Grand Bargain by citing Rip Rapson's assertion of the privilege in response to a question about his communications with Judge Rosen. (FGIC Motion, at 8.) Here again, FGIC relies upon a selective recitation of the deposition transcripts. When FGIC asked Mr. Rapson about his own foundation's view of, and conditions upon, contributing funds in supporting to the Grand Bargain, Mr. Rapson in fact testified freely:

> Q: And do you believe that the hundred million dollars that Kresge has agreed to contribute is in any way tied to the DIA?
>
> A: Our contribution is predicated on it serving three purposes: One, to help expedite the resolution of the bankruptcy; two, to soften the blow to pensioners; and three, to help preserve the DIA's collection. So I guess the answer would be yes.

(Ex. 1 hereto, R. Rapson Depo., 43:6-13, July 31, 2014.)

> Q: How does Kresge's involvement with the Grand Bargain help soften the blow to pensioners?
>
> A: One of the conditions of the contribution that the foundation's developed that's included in the plan of adjustment is that the money needs to be applied to the pensioners, as I understand it.

(Ex. 1 hereto, R. Rapson Depo., 46:6-11.)

13

> Q: Are you able, as you sit here today, to answer whether Kresge would have agreed to potentially contribute to the Grand Bargain, assuming softening the blow to the pensioners was not one of the objectives?
>
> A: It would not have.

(Ex. 1 hereto, R. Rapson Depo., 49:25-50:5.)

Furthermore, FGIC and Syncora obtained discovery concerning the motivations of other contributors funding the Grand Bargain. Specifically, both Dan Gilbert and Roger S. Penske, confirmed unequivocally that they would not have made contributions to the Grand Bargain had their contributions not been applied to pension obligations:

> Q. And did you understand that the money you provided would go directly to the retirees?
>
> A. Yeah. I believe it was - - it was presented that way to us, that this will hel -- again, I can't recall the word for word, it was a verbal thing, but this would help save the majority of the - - pensioners' pensions . . . .

(Ex. 2 hereto, D. Gilbert Depo., 135:11-21, July 29, 2014.)

> Q. Okay, would you have contributed money to the Grand Bargain if some of the money went to pay the debts of the insurers who insure the City's Certificates of Participation? . . .
>
> A. No. You know, to think that sophisticated Wall Street insurance companies and investors who knew the City of Detroit was in dire financial straits for decades and took a risk in insuring those bonds and -- would I personally have invested money into a scheme that would get them part of the recovery? No. The answer is no.

(Ex. 2 hereto, D. Gilbert Depo., 136:17-137:9.)

> Q. Sure. So you believe that the City is justified in treating the financial creditors, bondholders, differently than the pensioners and retirees because the bondholders were aware of the risks and had the opportunity to do due diligence?

> A. "Number one, I think the financial institutions understood the credit risks, there was transparency on the investment they were making, and there's no question that there's a risk for you or for me if we make those investments. And that's entirely different than someone that's worked 15 or 20 or 25 years, you know, for the City of Detroit and would have their health care and their pensions taken away. And my commitment through the grand bargain is to provide capital to keep those people viable, you know, and their families, you know, for the future, and that's the position I take today. I'll take it next week and I take it in the future.

(Ex. 3 hereto, R. Penske Depo., 114:3-115:3, July 23, 2014.)

- Q. Yeah, would you have contributed money to the grand bargain if some of [sic] money was earmarked to demolish blight in the city?

- A. Now you're linking blight and other things, it was - - it was an initiative that I saw the state was involved, I saw other private sector people involved and I joined that group. Now, whether it was going to be for - - for blight or it was going to be for - - pensioners, my - - my understanding was because it was tied, you know, to the arts at this point, it would be towards the pensioners which to me was - - was first and primary.

(Ex. 3 hereto, R. Penske Depo., 141:3-16.)

The foregoing demonstrates that FGIC and Syncora obtained the discovery sought when they did not seek disclosure of information protected by the Mediation Order. Neither of them will be prejudiced if the City, or any other party, introduces non-privileged evidence in support of the Plan, and neither of them will be prejudiced if the Court denies the requested relief.

15

## CONCLUSION

For the foregoing reasons, the relief requested by the Objectors should be denied in its entirety.

Dated:   August 27, 2014                    Respectfully submitted,

                                            By: */s/ Sam J. Alberts*

Claude Montgomery                           Sam J. Alberts
Carole Neville                              Dan Barnowski
DENTONS US LLP                              DENTONS US LLP
1221 Avenue of the Americas                 1301 K Street, NW, Suite 600 East Tower
New York, New York 10020                    Washington, DC 20005
Tel:    (212) 768-6700                      Tel: (202) 408-6400
Fax:    (212) 768-6800                      Fax: (202) 408-6399
claude.montgomery@dentons.com               sam.alberts@dentons.com
carole.neville@dentons.com                  dan.barnowski@dentons.com


BROOKS WILKINS SHARKEY & TURCO PLLC
Matthew E. Wilkins
Paula A. Hall
401 South Old Woodward, Suite 400
Birmingham, Michigan  48009
Direct:  (248) 971-1711
Cell:  (248) 882-8496
Fax:  (248) 971-1801
wilkins@bwst-law.com
hall@bwst-law.com

*Attorneys for the Official Committee of Retirees of the City of Detroit, Michigan*

**CERTIFICATE OF SERVICE**

    I, Sam Alberts, hereby certify that the foregoing document was filed and served via the Court's electronic case filing and noticing system on August 27, 2014.

                                                       By:    */s/ Sam Alberts*
                                                                     Sam Alberts