# Exhibit 1

## Page 1

RIP RAPSON

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

In re ) Chapter 9
CITY OF DETROIT, MICHIGAN, ) Case No. 13-53846
Debtor.   ) Hon. Steven W. Rhodes

The Videotaped Deposition of RIP RAPSON,
Taken at 1114 Washington Boulevard,
Detroit, Michigan,
Commencing at 9:02 a.m.,
Thursday, July 31, 2014,
Before Rebecca L. Russo, CSR-2759, RMR, CRR.

## Page 2

RIP RAPSON

APPEARANCES:

GREGORY M. SHUMAKER, ESQ.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
    Appearing on behalf of the City of Detroit.


ROBERT S. HERTZBERG, ESQ.
Pepper Hamilton LLP
Suite 1800
4000 Town Center
Southfield, Michigan 48075
    Appearing on behalf of the City of Detroit.

## Page 3

RIP RAPSON
EDWARD R. McCARTHY, ESQ.
PRAVIN R. PATEL, ESQ.
Weil Gotshal & Manges LLP
1395 Brickell Avenue
Suite 1200
Miami, Florida 33131
    Appearing on behalf of the Financial Guaranty
    Insurance Company.



KELLEY M. HALADYNA, ESQ.
Dickinson Wright PLLC
500 Woodward Avenue
Suite 4000
Detroit, Michigan 48226
    Appearing on behalf of the State of Michigan.

## Page 4

RIP RAPSON
DANIEL MORRIS, ESQ. (Via Telephone)
Dentons US LLP
1301 K Street, N.W.
Washington, D.C. 20005
    Appearing on behalf of the Retiree Committee.


DIANA A. SANDERS, ESQ. (Via Telephone)
Chadbourne & Parke, LLP
30 Rockefeller Place
New York, New York 10112
    Appearing on behalf of Assured Guaranty Municipal
    Corp.

1 (Pages 1 to 4)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7144-1   Filed 08/27/14   Entered 08/27/14 23:45:14   Page 2 of 6

## Page 5

1  RIP RAPSON
2  HARVEY KURZWEIL, ESQ.
3  DESIREE MARIE RIPO, ESQ.
4  Winston & Strawn LLP
5  200 Park Avenue
6  New York, New York 10166
7    Appearing on behalf of the Witness and the Kresge
8    Foundation.
9
10
11
12
13
14  ALSO PRESENT:
15  Justin Slanec - Video Technician

## Page 6

1              TABLE OF CONTENTS
2
3  WITNESS                              PAGE
4  RIP RAPSON
5
6  EXAMINATION BY MR. MCCARTHY            9
7
8              EXHIBITS
9
10 EXHIBIT                              PAGE
11 (Exhibits attached to transcript.)
12
13 DEPOSITION EXHIBIT 1                  15
14 DEPOSITION EXHIBIT 2                  20
15 DEPOSITION EXHIBIT 3                  53
16 DEPOSITION EXHIBIT 4                  55

## Page 7

1                 RIP RAPSON
2  Detroit, Michigan
3  Thursday, July 31, 2014
4  9:02 a.m.
5
6
7           VIDEO TECHNICIAN: We are now on the
8  record. This is the videotaped deposition of Rip
9  Rapson, being taken on Thursday, July 31st, 2014. The
10 time is now 9:02 a.m.
11          We are located at the Westin, in Detroit,
12 Michigan, and we are here in the matter -- or, I'm
13 sorry, In Re City of Detroit Bankruptcy. This is Case
14 Number 13-53846.
15          This matter is being held in the United
16 States Bankruptcy Court for the Eastern District of
17 Michigan.
18          My name is Justin Slanec, video technician.
19          Would the court reporter swear in the
20 witness and the attorneys briefly identify themselves,
21 for the record, please.
22          RIP RAPSON,
23 was thereupon called as a witness herein, and after
24 having first been duly sworn to testify to the truth,
25 the whole truth and nothing but the truth, was

## Page 8

1                 RIP RAPSON
2  examined and testified as follows:
3           MR. MCCARTHY: My name's Ed McCarthy, and
4  I'm with Weil Gotshal & Manges. I'm here on behalf of
5  FGIC.
6           MR. PATEL: My name is Pravin Patel, and
7  I'm with Weil Gotshal & Manges, and I'm also on behalf
8  of FGIC.
9           MR. KURZWEIL: Harvey Kurzweil, Winston &
10 Strawn, representing Mr. Rapson and the Kresge
11 Foundation.
12          MR. SHUMAKER: Greg Shumaker, Jones Day,
13 City of Detroit.
14          MS. RIPO: Desiree Ripo, from Winston &
15 Strawn, representing the witness, Mr. Rapson, and the
16 Kresge Foundation.
17          MS. HALADYNA: Kelly Haladyna, of Dickinson
18 Wright, representing the State of Michigan.
19          MR. MCCARTHY: Could the folks on the phone
20 please introduce themselves, for the record, briefly?
21          MR. MORRIS: This is Daniel Morris, with
22 Dentons, for the Retiree Committee.
23          MS. SANDERS: Diana Sanders, with
24 Chadbourne & Parke, for Assured Guaranty Municipal
25 Corp.

2 (Pages 5 to 8)

Elisa Dreier Reporting Corp.    (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 7144-1    Filed 08/27/14    Entered 08/27/14 23:45:14    Page 3 of 6

## Page 41

1  RIP RAPSON
2  frame?
3  A. I'm sorry, I just don't, I don't recall exactly when
4     it was.
5  Q. I'm asking those time frames, because, based on my
6     knowledge, they relate to the millage bid.
7  A. Okay.
8  Q. But to refresh your recollection, does that at all
9     spur your memory as to when it would have been?
10 A. Well, it would have been, it would have been prior to
11    the millage, so, again, I apologize, I don't recall
12    what the exact sequence might have been.
13 Q. Prior to Kresge's involvement in the Grand Bargain or
14    the mediation, et al, did Kresge have any formal plans
15    to donate to the DIA moving forward?
16 A. Yes.
17 Q. And what were those plans?
18 A. Kresge has developed a program shortly after I came in
19    which we provide operating support to a wide spectrum
20    of arts and cultural organizations in the southeast
21    Michigan area. It's, I think, risen to almost 60
22    organizations.
23        We calibrate those contributions based on
24    budget size, largely. It's a little bit formula
25    related, and the DIA is one of those.

## Page 42

1  RIP RAPSON
2     I think our, our support for them is, if I
3  recall correctly, approximately a hundred thousand
4  dollars a year in operating support.
5  Q. And that's a continuing amount, the hundred thousand
6     dollars a year?
7  A. Yes.
8  Q. Is that continuing as we sit here today?
9  A. Yes.
10 Q. And when did that, I guess agreement of Kresge to
11    provide a hundred thousand dollars, roughly, in
12    operating support to the DIA begin?
13 A. Boy, I want to say maybe 2007, 2008, approximately. I
14    think that's when we developed the program.
15 Q. How much money has Kresge agreed to contribute to the
16    Grand Bargain?
17 A. A hundred million dollars.
18 Q. Is that hundred million dollars more money than Kresge
19    has contributed to any one cause since your time at
20    Kresge?
21 A. To any one cause -- you mean any one institution or
22    cause?
23 Q. Let's start with institution.
24 A. Yes. I would -- could I just qualify that this
25    hundred million dollars was not a contribution to the

## Page 43

1  RIP RAPSON
2     Detroit Institute of Art.
3  Q. How would you describe the hundred million dollars?
4  A. It was a contribution to the effectuation of the Grand
5     Bargain.
6  Q. And do you believe that the hundred million dollars
7     that Kresge has agreed to contribute is in any way
8     tied to the DIA?
9  A. Our contribution is predicated on it serving three
10    purposes: One, to help expedite the resolution of the
11    bankruptcy; two, to soften the blow to pensioners; and
12    three, to help preserve the DIA's collection. So I
13    guess the answer would be yes.
14 Q. A portion of the hundred million dollars would go, in
15    your opinion, to the third prong of why Kresge is
16    contributing money to the Grand Bargain?
17        MR. SHUMAKER: Object to the form.
18        MR. MORRIS: Object to the form.
19 A. I was going to object to the form, as well --
20 BY MR. MCCARTHY:
21 Q. You're entitled to.
22 A. -- in the sense that we didn't allocate money to those
23    three prongs. We allocated money to the totality of
24    the package.
25 Q. You mentioned the first prong was to help expedite the

## Page 44

1  RIP RAPSON
2     resolution of the bankruptcy, correct?
3  A. That's correct.
4  Q. And how do you believe the Grand Bargain would help
5     expedite the resolution of the bankruptcy?
6  A. It provides additional resources that help resolve two
7     of the major sticking points to the resolution, both
8     by helping alleviate the pressure on pensioners and by
9     safeguarding the Detroit Institute's assets.
10        I think in both of those senses if you can
11    get rid of -- not get rid of, if you can help
12    ameliorate both of those issues, then you've
13    presumably enabled the -- given, given tools to help
14    the bankruptcy move forward.
15 Q. And I believe you've -- I've seen in some of my
16    diligence for today you talk about the three prongs
17    here you just mentioned, which is expediting the
18    resolution of the bankruptcy, softening the blow to
19    the pensioners, and preserving the collection at the
20    DIA. Is that true?
21 A. Have I said that or written about that? Yes.
22 Q. And did you develop these three prongs as you've
23    stated them?
24 A. They -- I'm not sure that it's a thought original to
25    me, but that is the way that we've conceptualized and

11 (Pages 41 to 44)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7144-1   Filed 08/27/14   Entered 08/27/14 23:45:14   Page 4 of 6

**Page 45**

1  RIP RAPSON
2  characterized why we would have been engaged in the
3  process.
4  Q. And that is what I am getting at. As you sit here
5  today, do you know who the thought of these three
6  prongs originated with? Was it inside Kresge, outside
7  of Kresge?
8      MR. SHUMAKER: Object to the form.
9  BY MR. MCCARTHY:
10 Q. When was the first time you heard of these three
11    prongs that you've referenced with respect to the
12    reasoning for becoming involved with the Grand
13    Bargain?
14 A. I'm hesitating, because this is sort of the mental
15    formulation that I've arrived at. If other people
16    have arrived at that independently of me, I guess I
17    have no knowledge of that, but this is the way I've
18    always felt I could think about why we were doing what
19    we were doing.
20 Q. And as you sit here today, is it your testimony, then,
21    based on your memory, you believe you came up with
22    these three prongs --
23 A. Oh, no.
24 Q. -- thoughts in your head?
25 A. Were other, lots of other people talking the same

**Page 46**

1  RIP RAPSON
2  language? Probably. So I don't think I could
3  attribute to a particular source. It just, this just
4  seemed, the way the package was being assembled, it
5  permitted these three objectives to be met.
6  Q. How does Kresge's involvement with the Grand Bargain
7     help soften the blow to pensioners?
8  A. One of the conditions of the contribution that the
9     foundation's developed that's included in the plan of
10    adjustment is that the money needs to be applied to
11    the pensioners, as I understand it.
12 Q. And how does Kresge's involvement with the Grand
13    Bargain help preserve the collection of the DIA?
14 A. Another condition of the plan of adjustment -- of the
15    conditions that the foundation articulated for the
16    plan of adjustment was that we create an intermediary
17    structure that is able to receive -- let's see, how
18    does this work. That at the end of the day, the DIA
19    is transferred out of City ownership and that we've
20    created a -- well, let me -- I'll stop there.
21       That the DIA is transferred out of City
22    ownership into independent ownership.
23 Q. And how does that help preserve the collection of the
24    DIA?
25 A. Presumably, it buffers it from a claim -- the claims

**Page 47**

1  RIP RAPSON
2  that might be lodged in bankruptcy.
3  Q. Have you done any independent, you or Kresge, to your
4     knowledge, done any independent analysis, research,
5     studies, regarding how the Grand Bargain preserves the
6     collection at the DIA?
7  A. I don't understand that question, I'm sorry.
8  Q. There's been some arguments from numerous parties on
9     both sides in the Detroit bankruptcy about whether the
10    collection at the DIA is held in trust. Are you aware
11    of that?
12 A. Yes.
13 Q. Have you or anyone at Kresge, to your knowledge, done
14    any independent analysis or research regarding whether
15    the collection at the DIA is currently held in trust?
16 A. We have not.
17 Q. Have you, you personally reviewed any, anyone else's
18    analysis or study regarding whether the DIA collection
19    is held in trust?
20 A. Only what I've read of in the newspapers.
21 Q. Do you intend to or would you expect that you would
22    provide any testimony at a trial in the bankruptcy on
23    whether the collection at the DIA is held in trust?
24 A. It depends on my lawyers, but I don't -- I'm not an
25    expert in public trusts or in the legal issues

**Page 48**

1  RIP RAPSON
2  undermining -- undergirding them.
3  Q. Outside of the Grand Bargain, has the DIA -- has the
4     Kresge Foundation ever contributed funds during your
5     time there to help soften the blow of pensioners in
6     any particular municipality?
7  A. I'm hesitating, because much of what Kresge does is to
8     try to create buffers for low-income people and
9     opportunities for low-income people to, to enter the
10    economic mainstream and participate fully in civic
11    life.
12       So I think the, the objective of our
13    foundation is to, as you've put the document to me
14    earlier, is to improve the lives of poor and
15    low-income children and adults.
16       So in some ways I think we've indirectly
17    helped people who are on pensions and who aren't on
18    pensions, but without, again, meaning to split hairs,
19    we have never directly invested in pensioners nor are
20    we -- again, nor is that the way we have designated
21    these funds.
22       We have designated these funds to be part
23    of a pool of money with multiple objectives.
24 Q. Is it fair to say that Kresge Foundation's
25    contribution or proposed contribution to the Grand

12 (Pages 45 to 48)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7144-1   Filed 08/27/14   Entered 08/27/14 23:45:14   Page 5 of 6

Page 49

 1  RIP RAPSON
 2  Bargain would be the most direct way that Kresge has
 3  ever contributed funds to soften the blow of
 4  pensioners since the time you've been there?
 5  A. Yes.
 6  Q. And why is that? Why is it that, in this instance,
 7  with the Grand Bargain, Kresge has determined to do
 8  something it hasn't done in the past during your time
 9  there, specifically with respect to softening the blow
10  to pensioners?
11  A. The calculus that we did in making our contribution to
12  the Grand Bargain was that it would accomplish three
13  objectives simultaneously. We've walked through
14  those. That was the reason for taking the action.
15  Q. Does the Kresge Foundation deem any one of the three
16  objectives that we've talked about to be more
17  important than the other objectives?
18  A. No. I would, I would answer it a slightly different
19  way. I would say all three are essential. I don't
20  think any one is more essential than the others.
21  Q. I'm trying to get at specifically the second objective
22  that you mentioned, softening the blow to the
23  pensioners.
24  A. Mmm-hmm.
25  Q. Are you able, as you sit here today, to answer whether

Page 50

 1  RIP RAPSON
 2  Kresge would have agreed to potentially contribute to
 3  the Grand Bargain, assuming softening the blow to the
 4  pensioners was not one of the objectives?
 5  A. It would not have.
 6      MR. MORRIS: Objection, form.
 7  BY MR. MCCARTHY:
 8  Q. And why is that?
 9  A. Because we needed to see all three objectives
10  satisfied.
11  Q. And why is it important for Kresge to soften the blow
12  for the pensioners in this particular instance?
13      MR. SHUMAKER: Objection, form --
14  A. I think I've answered the question.
15      MR. SHUMAKER: -- asked and answered.
16  BY MR. MCCARTHY:
17  Q. Outside of Kresge's desire to see all three of the
18  objectives we've talked about, expediting the
19  resolution of the bankruptcy, softening the blow to
20  the pensioners, and preserving the collection at the
21  DIA, all move forward, are there any other specific
22  reasons you can tell me that -- as to why Kresge deems
23  it important to have objective number two, softening
24  the blow to the pensioners, move forward as an
25  objective?

Page 51

 1  RIP RAPSON
 2      MR. KURZWEIL: Object to the form of the
 3  question.
 4      MR. MORRIS: Objection, form.
 5  A. These are folks who have dedicated their life to
 6  serving the City of Detroit. If they were to be
 7  thrown into economic duress, many of the first
 8  principles that Kresge and others are working on in
 9  Detroit would be made far more difficult. You have a,
10  you would have a series of economic hardships that
11  would stress the safety net. You would begin seeing
12  calls on both foundation, state, and local resources
13  that would, that would tax us all.
14      So it seems to me that doing the least
15  economic harm to individuals who have contributed
16  their lives to the welfare of the City is a sensible
17  thing to be concerned about.
18  BY MR. MCCARTHY:
19  Q. Has -- have you or the Kresge Foundation, to your
20  knowledge, done any independent study or analysis on
21  the wealth of any particular pensioner?
22  A. I'm not sure I -- have we studied an individual
23  pensioner's economic situation?
24  Q. Yes.
25  A. Studied, no. There certainly has been plenty written

Page 52

 1  RIP RAPSON
 2  about it.
 3  Q. Written about the current pensioners of the City of
 4  Detroit?
 5  A. Mmm-hmm.
 6  Q. And written about how the current pensioners of the
 7  City of Detroit would be in need of having their
 8  pensions continued?
 9  A. Would be harmed were their pensions reduced.
10  Q. Let's take a step back from that. Have you looked
11  at -- have you seen anything written, or studies or
12  research regarding the current financial situation of
13  the pensioners, notwithstanding whether their pensions
14  would be reduced or fulfilled at a ninety percent rate
15  or a hundred percent rate?
16  A. Again, I'm sorry, I'm not tracking the question. What
17  are you asking?
18  Q. Well, for instance, you can tell me probably for
19  yourself, and I'm not asking, but what is your current
20  financial situation, not looking into the future, but
21  how much money you have right now, how much debt you
22  have right now.
23      Have you seen anything written about the
24  current financial situation, income, assets, versus
25  debt of the pensioners of the City of Detroit?

13 (Pages 49 to 52)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7144-1   Filed 08/27/14   Entered 08/27/14 23:45:14   Page 6 of 6