# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | Chapter 9 |
| CITY OF DETROIT, MICHIGAN | Case No.: 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

---

## CITY OF DETROIT'S RESPONSE IN OPPOSITION TO SYNCORA'S MOTION TO EXCLUDE THE TESTIMONY OF THE CITY'S FORECASTING EXPERTS UNDER FEDERAL RULE OF EVIDENCE 702

The City of Detroit, Michigan (the "City") submits this opposition to Syncora's Motion to Exclude the Testimony of the City's Forecasting Experts Under Federal Rule of Evidence 702 (the "Motion").

## INTRODUCTION

Syncora's motion to exclude the testimony of the City's forecasting experts is one of a battery of *Daubert* motions Syncora has filed, all of which turn on the single theme that the projection of financial results is so inherently unreliable that it is not capable of expert opinion.[1] That proposition, however, is belied by the decisions and practice in innumerable cases in which expert evidence of precisely

---

[1] *See* Syncora Guarantee Inc. and Syncora Capital Assurance Inc.'s Motion to Exclude the Testimony of John W. Hill [Docket No. 6997]; Motion to Exclude Certain of the Expert Opinions of Martha Kopacz Under Federal Rule of Evidence 702 [Docket No. 6999].

this nature has been received and credited, and it is difficult to see how any plan in bankruptcy—whether chapter 11 or chapter 9—ever could be confirmed if the debtor were barred from offering forecasts of its future financial health under the plan being proposed.

To support its extreme arguments, Syncora has embarked upon a systematic misrepresentation of the deposition testimony of the five witnesses in question. To simplify the process of correcting so many misstatements, the City has prepared and has annexed to this brief an appendix of Syncora's misrepresentations of the record. *See* Appendix A, Misrepresentations of the Record ("Misreps.").

In fact, and contrary to Syncora's exaggerated claims, there has been nothing unusual, improper, or different here from the countless bankruptcy cases in which experts have offered opinions about a debtor's financial future. The witnesses from Ernst & Young ("EY") are highly capable experts with years of experience; their work took months; their review of data and choice of assumptions was painstaking; their methods were ones widely accepted in their professions; the documentation of their work was extensive; and their results carefully reached and closely reviewed. Syncora's assertions to the contrary have no basis in law, fact, or common sense, and its Motion should be denied.

# BACKGROUND

Faced with dwindling cash reserves and uncertain of its ability to continue fulfilling its financial obligations, the City retained EY in May 2011 to forecast its revenues and expenses. Initially, this engagement was limited to the creation of short-term forecasts, which were designed to help the City understand its cash flows. Gaurav Malhotra, the Midwest Restructuring Leader at EY and the head of the EY team engaged by Detroit, was primarily responsible for developing these forecasts.

As the City's cash position became more dire, the City asked EY to begin developing longer-term forecasts of revenues and expenses. At that point—in the Spring of 2013—Mr. Malhotra asked Dr. Robert Cline of EY's Quantitative Economics and Statistics Practice ("QUEST") to bring his particular expertise to bear by forecasting the City's five key revenue drivers—income taxes, property taxes, wagering taxes, state revenue sharing, and utility users' taxes—over the next ten years. Dr. Cline holds a Ph.D. in economics from the University of Michigan and has over 40 years' experience forecasting tax revenues for governmental and private clients. *See* Cline Report at Ex. D. Dr. Cline, in turn, asked Caroline Sallee, a Manager in the QUEST group with almost a decade of experience forecasting tax revenues, to focus on two of these revenue drivers—property taxes and state revenue sharing—under his supervision. *See* Sallee Report at Ex. C.

Dr. Cline and Ms. Sallee then set out to develop longer-run forecasts of these revenue drivers, while Mr. Malhotra and his team focused on the expense side of the City's budget. The product, in June 2013, was a new 10-year forecast of the annual revenues and expenses the City could expect in future years.

Unable to reach an out-of-court settlement with its creditors, the City filed for bankruptcy on July 18, 2013. A hearing to determine the City's eligibility for bankruptcy was then held in October and November of 2013. The 10-year forecast prepared by Mr. Malhotra, Dr. Cline, and Ms. Sallee was one of the key pieces of evidence presented at this hearing. However, because Mr. Malhotra had not been retained to provide expert testimony regarding the City's forecasts—and, indeed, because EY's engagement letter with the City *expressly prohibited* Mr. Malhotra from doing so—the City did not seek to qualify Mr. Malhotra as an expert. Instead, the City argued that Mr. Malhotra was qualified to testify about the reliability of his forecasts because of his extensive knowledge of the City's finances, gained as a result of his more than two-year engagement with the City. The Court agreed, admitting the forecasts as evidence. *See* Opinion Regarding Eligibility at 108–09 ("Eligibility Op.") [Docket No. 1945].

Later, as the City was seeking approval of a settlement with its swap counterparties in December 2013, the City and EY determined that it would be appropriate to amend their engagement letter so that Mr. Malhotra could testify as

an expert witness about the forecasts his team was preparing for the City. Meanwhile, around that time, EY was developing a revised 10-year forecast to take account of newly acquired actual results, and was also at the beginning stages of developing a simulation that would extend the 10-year forecast for another three decades in order to illustrate potential recoveries under an eventual plan of adjustment. As they had with the 10-year forecasts developed in Spring 2013, Dr. Cline and Ms. Sallee forecasted the five key revenue drivers for the new simulation.

On July 8, 2014, the City identified Mr. Malhotra, Dr. Cline, and Ms. Sallee as expert witnesses it intended to call at the hearing on plan confirmation and filed expert reports for each. Dr. Cline was deposed on July 14; Mr. Malhotra was deposed on July 14 and July 15; and Ms. Sallee was deposed on July 24. Because of scheduling conflicts, Dr. Cline testified before the Court on July 18, subject to a reservation of the right to challenge the admissibility of his testimony. Finally, on August 22, Syncora filed the instant Motion, which challenges the qualifications and methodologies of Dr. Cline, Ms. Sallee, and Mr. Malhotra.

### A. The Methodologies Employed By The EY Experts

#### 1. Dr. Cline

Dr. Cline has already testified about the methodology he employed to forecast the City's individual income tax, corporate income tax, wagering tax, and utility users' tax revenues. As that testimony and his expert report demonstrate,

Dr. Cline employed standard forecasting procedures in calculating the annual estimates of the revenues the City can expect in future years from these sources.

### a. Individual Income Taxes

To forecast individual income taxes, Dr. Cline employed a "model approach," whereby he built up income tax revenue forecasts from their individual economic components—number of taxpayers, average wages, and applicable tax rates. Tr. of Hearing on Aug. 18, 2014, at 26 ("Cline Testimony") [Docket No. 7069].

The first step in Dr. Cline's process involved determining employment levels within the City in future years on the ground that only individuals who are employed will be paying the income tax. *See* Report of Robert Cline at 5-6 ("Cline Report"), attached hereto as Exhibit 1. However, while there are sophisticated economic models for the State of Michigan—namely, the RSQE, *see* Cline Testimony at 14–15—there is no comparable economic model for the City itself. As a result, Dr. Cline determined that the best way estimate future Detroit employment levels would be to derive them based on the historical relationship of City employment as a share of total State employment. *See* Cline Report at 5-6. In doing so, Dr. Cline determined that over the last 20 years Detroit employment has been declining as a share of total Michigan employment by a factor of -0.85%.

From this data, Dr. Cline was able to make assumptions regarding the employment growth rates the City can expect in future years, relative to the State. *Id.* at 5–7.

Having developed forecasts of Detroit employment, Dr. Cline then had to determine whether the jobs within the City were likely to be held by residents or non-residents because non-residents pay lower rates of tax on income earned in the City. *Id.* at 8–10. To develop these assumptions, Dr. Cline relied upon the population forecasts created by the Southeast Michigan Council of Governments ("SEMCOG"), an organization that has published studies on expected population levels in the City and surrounding areas. *Id.* As Dr. Cline testified, he has used SEMCOG data in the past and has found it to be very reliable. *See* Cline Testimony at 32. Based upon the population forecast produced by SEMCOG and data from the United States Census Bureau on worker flows, Dr. Cline was able to develop assumptions regarding the relative share of Detroit jobs held by residents versus non-residents in future years. Cline Report at 8–10. Finally, Dr. Cline had to determine the number of Detroit residents that work outside the City, who would not have been captured in his estimates for Detroit employment but would still be required to pay taxes to Detroit. *Id.* To do this, Dr. Cline used the statewide employment growth estimates he had already developed and applied the rate of population decline forecast by SEMCOG. *Id.*

Finally, Dr. Cline determined annual figures for the tax bases—i.e., the amount of income against which the tax rates could be applied—by combining the growth in the number of taxpayers (i.e., the employment figures) with the growth in the average wages earned by those taxpayers. *Id.* at 10–11. Dr. Cline developed his assumption that this latter figure would be 1.0% by adjusting the statewide wage growth figures downward to account for Detroit's relatively slower rate of economic growth. *Id.* at 10. Having calculated the annual amount of income available to be taxed in each income tax base, Dr. Cline then applied the 2.4% resident tax rate and the 1.2% non-resident tax rate to their respective tax bases. *Id.* at 10–11. By doing this, Dr. Cline was able to calculate annual estimates for the City's income tax revenues. *Id.*

### b. Corporate Income Taxes

Dr. Cline followed a similar methodology in forecasting the City's expected revenue from corporate income taxes. *See id.* at 18–19. First, Dr. Cline began by analyzing the forecast for State corporate income tax revenues created by the Michigan Consensus Revenue Conference. *Id.* Based on historical data and this short-term forecast, Dr. Cline was able to extrapolate the expected growth in State corporate income tax revenues out to 10 years. *Id.* Next, Dr. Cline applied a "structural adjustment" to the statewide growth rates, to account for the relatively slower growth in City corporate profits relative to the State. *Id.* Dr. Cline

developed his assumption about the extent of this structural adjustment based on an analysis of the historical relationship between Detroit corporate income tax revenues and state corporate tax revenues. *Id.* In addition, Dr. Cline factored in the fact that net operating losses from the last recession are still being applied to corporate profits, as allowed by Michigan law, which results in lower than expected revenues in the early years of the forecast. *Id.* Finally, by applying the structural adjustment developed by Dr. Cline to the estimated growth in state corporate income tax revenues, Dr. Cline was able to calculate annual estimates for corporate income tax revenues for the City.

### c. Wagering Taxes and Utility Users' Taxes

To develop his forecasts for both wagering taxes and utility users' taxes, Dr. Cline analyzed historical trends and made adjustments as necessary to account for anticipated changes. *See id.* at 22–25. For example, Dr. Cline determined that over the last decade revenues from Detroit's wagering taxes grew at an average rate of 1.8% per year. *Id.* at 22–24. However, in the five years since fiscal year 2009, that average growth rate has slowed to 0.6% per year, and the most recent wagering tax collections data shows that wagering taxes are anticipated to drop -4.3% in fiscal year 2014. *Id.* Based on these recent trends and the well-recognized fact that Detroit casinos will soon be facing increased competition from a new casino in Toledo, Ohio, Dr. Cline determined that an average rate of growth of

1.0% per year was a reasonable assumption. *Id.* Applying this average growth rate to recent collections data, Dr. Cline was able to calculate annual estimates for the City's wagering tax revenues. *Id.*

Similarly, when estimating the City's expected revenues for utility users' taxes, Dr. Cline began by analyzing historical trends. *Id.* at 24–25. Dr. Cline determined that gross utility users' tax revenues have decreased significantly since fiscal year 2008, declining by an average rate of -6.0% per year. *Id.* However, because the Detroit FY2014 Executive Budget indicates that more taxpayers have been added to the utility users' tax base through compliance activities, Dr. Cline assumed that this trend would slow. *Id.* As a result, Dr. Cline determined that it was reasonable to assume that after the Detroit economy stabilizes through fiscal years 2015 and 2016, average annual growth rates of 1.5% could be expected. *Id.* Finally, after accounting for the reduction to utility users' tax revenues due to the transfers required by the Public Lighting Authority transaction, Dr. Cline was able to calculate annual estimates for the City's utility users' tax revenues. *Id.*

### d. Restructuring Scenario and 40-Year Forecasts

Having calculated annual estimates for revenues from individual and corporate income taxes, wagering taxes, and utility users' taxes based on historical trends and relationships to statewide economic forecasts, Dr. Cline set out to estimate the effects that could be expected from improved economic conditions

within the City after a successful restructuring.   Cline Report at 16–18, 21.

Critically, Dr. Cline was not concerned with additional revenues that might result

from administrative changes, such as, for example, increased collections rates.[2]

Instead, Dr. Cline was concerned with the effect that a general improvement in

City conditions would have on the underlying economic components he had used

to estimate annual revenues.   Dr. Cline thus adjusted the various economic

assumptions underlying the income tax calculations to bring them closer to long-

term trends and statewide growth forecasts than under the baseline scenario.   *Id.*

Based on these adjusted assumptions, Dr. Cline was able to calculate the additional

income tax revenue that could be expected.   *Id.*

With economic forecasts that accounted for a general improvement in the

economic conditions of the City through fiscal year 2023, Dr. Cline next developed

a simulation of the revenues that could be expected in the following three decades.

*Id.* at 12–13 (individual income taxes), 19–20 (corporate income taxes), 23

(wagering taxes), 25 (utility users' taxes).   To do this, Dr. Cline extrapolated from

the final years of his 10-year forecasts to develop simulated long-run growth rate

assumptions for each of the revenue drivers he estimated.   *Id.*   After developing

---

[2] Indeed, because incremental revenues from those more specific initiatives had already been developed by Conway MacKenzie and were already included in the City's forecasts, Dr. Cline would have been double counting had he done so.

these assumptions, Dr. Cline was able to calculate the City's simulated revenues over each of the following three decades. *Id.*

### 2. Ms. Sallee

Ms. Sallee applied standard forecasting procedures for both the real and personal property general operating tax forecast and the state revenue sharing forecast. Sallee Report at 4. In doing so, Ms. Sallee followed the standard forecasting procedures outlined by the Congressional Budget Office ("CBO") and the State of Michigan Consensus Revenue Estimating Conference. Sallee Report at 4; CBO, The Budget and Economic Outlook: Fiscal Years 2013 to 2023 (Feb. 2013), *available at* http://www.cbo.gov/sites/default/files/cbofiles/attachments/ 43907-BudgetOutlook.pdf; Rebecca Ross, Consensus Revenue Estimating: The Process, Fiscal Forum (Apr. 2001), *available at* http://www.house.mi.gov/hfa /Archives/PDF/consens.pdf. As these standard procedures explain, there are three steps involved in revenue forecasting:

*First*, a forecaster should review historical data and quarterly trends. Ross, *supra*, at 6. As explained in her report, Ms. Sallee began her property tax analysis by "review[ing] historical data on Detroit and Michigan property taxes, economic variables, and housing indicators." Report of Caroline Sallee at 4 ("Sallee Report"), attached hereto as Exhibit 2. Specifically, Ms. Sallee collected and reviewed data from numerous sources, including the Michigan State Tax

Commission, City of Detroit, CBO, House Fiscal Agency, Case-Shiller Home Price Index for Detroit, Detroit Board of Realtors, and United States Census Bureau. *Id.* at 4–6.

*Second*, a forecaster should "develop baseline revenue estimates based on the future path of economic growth." Ross, *supra*, at 6. Of particular focus in this step is to "use[e] the information gained from comparing actual collections with target estimates and comparing revenue estimates generated from the economic forecast to estimated baseline revenues." *Id.* As outlined in her report, Ms. Sallee similarly "[d]eveloped a baseline of property tax collections for the 10-year Forecast Period" by estimating taxable value by property class, selecting a tax rate, and forecasting the tax levy. Sallee Report at 6–8.

*Third*, a forecaster must take into account "any necessary adjustments to baseline revenues (due to tax changes, lawsuits, and one-time adjustments) to arrive at actual revenues." Ross, *supra*, at 6. As she elaborates upon in her report, Ms. Sallee "[a]djust[ed] the tax levy for known legal and policy changes." Sallee Report at 8. Ms. Sallee also performed a "with restructuring" scenario that took into consideration an additional adjustment—the "improvements to the tax base and collections if the general operations and economic environment of the City improve during the 10-year period." *Id.* at 9.

It is a bedrock principle of these standard forecasting procedures to apply "the assumption that current laws generally remain unchanged," with the exception that it can also be appropriate to perform scenarios illustrating "policies that were [] in place but that were scheduled to change under []current law." CBO, *supra*, at 10, 37; *see also* Ross, *supra*, at 2 ("Forecasts are based on the assumption that current law will remain in effect for the forecast period."). Ms. Sallee followed these standard practices by selecting "the current general operating tax rate for property taxes in the City of Detroit" and by assuming "that the tax law will remain unchanged during the forecast time periods." Sallee Report at 8. For this reason, when attempting to forecast state revenue sharing payments under the State's Economic Vitality Incentive Payments (EVIP), Ms. Sallee determined that the proper course under standard forecasting procedures would be to maintain the current-law level of payments, given the uncertainty of the figure from year to year.

### 3. Mr. Malhotra

Mr. Malhotra's responsibility was to compile the various inputs into a comprehensive revenue and expense forecast for the City's general fund, as well as to forecast the City's operating expenditures and incidental revenues. On the revenue side, Mr. Malhotra began with the revenue driver forecasts created by EY's QUEST team, adding to them the City's other revenue line items. To forecast these other revenues, Mr. Malhotra analyzed historical trends reflected in

the City's Comprehensive Annual Financial Reports. From this data, Mr. Malhotra was able to develop estimated growth rates for future years in each of the revenue categories. Report of Gaurav Malhotra at 4–5 ("Malhotra Report"), attached hereto as Exhibit 3. In addition, Mr. Malhotra incorporated into the City's revenue forecasts funds from the Additional Revenue Initiatives developed by Conway MacKenzie, as well as one-time items, such as the net proceeds of Quality of Life financing in fiscal years 2014 and 2015 and the assumed proceeds from exit financing between fiscal years 2015 and 2016. *Id.* at 5.

On the expense side, Mr. Malhotra developed forecasts of the City's expected operating expenditures, legacy liabilities, and restructuring-related expenses. *Id.* at 5. To develop forecasts of the City's expected operating expenditures, Mr. Malhotra and his team both analyzed historical trends and conducted department-by-department reviews of budgets and engaged in discussions with City management regarding steady-state projections. *Id.* at 3–5. Mr. Malhotra used this review of historical and current staffing levels, payroll, and benefits in order to determine the salary, overtime, and fringe benefit costs for both Public Safety and Non-Public Safety departments. *Id.* at 5. To complete his expense-side forecast, Mr. Malhotra then incorporated the restructuring and reinvestment spending forecasted by Conway MacKenzie, accounted for the payments for debt and legacy liabilities under the terms of the plan of adjustment,

included a contingency reserve to account for unanticipated events, and made adjustments to the timing of certain reinvestment spending to ensure adequate cash liquidity. *Id.* at 3-7. Finally, because one purpose of the forecasts was to determine the amount of funds the City had available to pay unsecured creditors after providing adequate municipal services, Mr. Malhotra accounted for annual sources and uses of funds under the plan to tally the expected annual payments to creditors during the 10-year forecast period. *Id.* at 7.

In developing the 40-year forecasts, which are aimed at projecting illustrative recoveries for unsecured creditors, Mr. Malhotra extrapolated his 10-year forecasts for an additional three decades. *Id.* at 16-17. Then, as with the 10-year projections, Mr. Malhotra determined the sources and uses of funds under the terms of the plan of adjustment, applying those sources and uses to the time periods in which they were expected and tallying the surpluses and cash balances for the City's general fund in each of the next four decades. *Id.* Finally, Mr. Malhotra was able to determine illustrative recoveries over the life of the plan by calculating the present value of distributions to each unsecured creditor based on the projected uses. *Id.* He applied a discount rate of 5.0%, based on his own research and discussions with the City's financial advisors at Miller Buckfire, to calculate illustrative recoveries consistently for each creditor and divided each

recovery amount by its respective claim amount to arrive at an illustrative recovery percentage. *Id.*

## LEGAL STANDARD

Under Federal Rule of Evidence 702, witnesses may testify as experts whenever (1) their specialized "knowledge, skill, experience, training, or education" will help the trier of fact, (2) their testimony is "relevant to the task at hand," and (3) their testimony "rests on a reliable foundation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

The standard for admissibility under Rule 702 is broad, in order to give effect to its "liberal thrust." *Id.* Indeed, Rule 702 rests on the fundamental premise that "[v]igorous cross-examination, presentation of contrary evidence and careful weighing of the burden of proof"—rather than exclusion—is the best method for evaluating evidence. *Fierro v. Gomez*, 865 F. Supp. 1387, 1396 n.7 (N.D. Cal. 1994). As a result, admissibility of expert testimony is the rule, not the exception. *See* Fed. R. Evid. 702 advisory committee's notes, 2000 amend.; *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008).

Trial courts enjoy broad discretion to admit expert testimony under Federal Rule of Evidence 702. *See Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001). This discretion, moreover, "is at its zenith during a bench trial." *United States v. Kalymon*, 541 F.3d 624, 636 (6th Cir. 2008). Indeed, as the Sixth Circuit has

explained, the Court's traditional "gatekeeping" role "is *largely irrelevant* in the context of a bench trial" because there is no need "to protect juries from misleading or unreliable expert testimony." *Deal ex rel. Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 851–52 (6th Cir. 2004) (emphasis added).

Moreover, the *Daubert* factors are not talismanic, and no one factor is accorded dispositive weight. *See, e.g.*, *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) ("[T]he test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case."). Rather, a trial judge has "broad latitude to determine" whether the *Daubert* factors "are, or are not, reasonable measures of reliability in a particular case." *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001). As a result, when confronted with non-scientific expert testimony, courts often assess its reliability based on a variety of other factors, including the expert's "knowledge or experience." *Id.* .

Finally, and contrary to Syncora's intimations otherwise, the Sixth Circuit has made clear that it is improper to litigate the validity of assumptions underlying expert testimony at the *Daubert* stage of the proceedings. This is so because "[t]he purpose of a *Daubert* hearing is to determine the scientific validity—and thus the evidentiary relevance and reliability [(*i.e.*, matters of admissibility)]—of the principles that underlie a proposed submission. [T]he *Daubert* Court has

instructed the courts that they are not to be concerned with the reliability of the conclusions generated by valid methods, principles and reasoning." *See, e.g., Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) (internal quotation marks and citations omitted) (alterations in original). Because the validity of an expert's assumptions go to the weight of the opinion, not its admissibility, the proponent of expert testimony toned not prove the correctness of any facts or assumptions relied upon by the expert in order for the testimony to be admissible. *See, e.g., In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530.

## ARGUMENT

Syncora's Motion should be rejected. As their testimony will show, the City's forecasting experts are well-qualified to forecast the City's revenues and expenses. Moreover, the City's forecasting experts relied upon objective, testable, and reliable methods in making these forecasts.

## I. THE CITY'S FORECASTING EXPERTS ARE QUALIFIED BY KNOWLEDGE, SKILL, EXPERIENCE, EDUCATION, AND TRAINING

The standard for expert qualification is minimal. *See United States v. Barker*, 553 F.2d 1013, 1024 (6th Cir. 1977). Under Rule 702, an expert may testify in the form of opinion if, among other things, he or she is qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 293 (6th Cir. 2007). According to the Sixth

Circuit, this Rule "should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984). This standard does not require that an expert "have certificates of training, nor memberships in professional organizations, . . . [n]or need he be . . . an outstanding practitioner in the field in which he professes expertise." *Id.* Rather, "[t]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." *United States v. Cunningham*, 679 F.3d 355, 378–79 (6th Cir. 2012). "Whether a proposed expert's experience is sufficient to qualify the expert to offer an opinion on a particular subject depends on the nature and extent of that experience." *Id.* at 378–79.

The City's forecasting experts easily meet this test, and Syncora makes no real effort to argue otherwise. Among them, the City's experts have over 60 years of experience forecasting tax revenues and governmental expenditures for a range of public and private clients. Each has at least one advanced degree in economics, finance, or public policy. And each has extensive experience conducting forecasts in Michigan for both public and private entities.

One of these experts, Dr. Robert Cline, has spent decades forecasting tax revenues for governmental and private clients—the very subject upon which he is testifying here—including nearly every state in this country, as well as the governments of Canada, Australia, the European Union, and the Irish Department

of Finance.  *See* Cline Report, Ex. D at 1–2; *see also* Cline Dep. at 7–8.  This is in addition to serving as Tax Research Director for both the States of Minnesota and Michigan.  Likewise, Ms. Sallee—who is a member of Dr. Cline's team and worked closely with him in developing her forecasts—holds a degree in economics and an advanced degree in public policy, has dedicated the bulk of her professional career to tax forecasting, has concentrated her work almost solely on forecasting state and local tax revenues, and has worked on dozens of tax analyses, mostly in Michigan and the Midwest.  Ms. Sallee has also served as an independent consultant for the City of Flint, Michigan, projecting property tax revenues and state revenue sharing by using the same methodology she applied to Detroit.  And lastly Mr. Malhotra—who has already been qualified as an expert in financial analysis and forecasting by this Court—has over a dozen years' experience forecasting revenues, projecting expenses, and analyzing the liquidity of public and private entities, including the Detroit Public Schools.  In addition, of course, Mr. Malhotra has been forecasting the City of Detroit's revenues and expenses—the very subject of his testimony here—for almost three and one-half years.  *See* Eligibility Op. at 108–09 (holding that Mr. Malhotra was qualified by his extensive knowledge of the City of Detroit's finances to opine on future revenues and expenses).

Syncora cannot seriously dispute the expert qualifications of Dr. Cline, Ms. Sallee, and Mr. Malhotra, and instead argues that the City's experts are not qualified to create financial forecasts specifically *for municipalities*. *See* Syncora Mot. at ¶¶ 1, 11. However, Syncora, provides no basis for concluding that recognized experts in forecasting revenues and expenses for *state* governments—and, indeed, for private clients—would be unable to forecast revenues and expenses for *municipal* governments.

Nor does such a narrowly defined scope of expertise find support in the law. The Sixth Circuit has repeatedly cautioned against applying an "overly narrow test" of an expert's qualifications to offer an opinion. *Barker*, 553 F.2d at 1024. As that Court has explained, a "lack of experience in a *particular* subject matter" does not render an expert unqualified to offer an opinion, "so long as his general knowledge in the field can assist the trier of fact." *Dilts v. United Grp. Servs.*, LLC, 500 F. App'x 440, 446 (6th Cir. 2012) (emphasis added). Thus, for example, the Sixth Circuit rejected the argument that "a specialist in threat assessment" was unqualified to offer an opinion under *Daubert* because he lacked expertise "in the very specialized area of *commercial bus line* threat assessment." *Surles*, 474 F.3d at 294 (emphasis added). The import of these and many more cases is clear: the argument that *Daubert* "requires particular credentials for an expert witness" is

"radically unsound." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000).

In light of these experts' professional and academic bona fides, Syncora's allegations that Dr. Cline, Ms. Sallee, and Mr. Malhotra are unqualified to forecast the City's future revenues cannot be taken seriously. *See, e.g.*, *id.* ("Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness.").

## II. THE EXPERTS' FORECASTS ARE THE PRODUCT OF RELIABLE PRINCIPLES AND METHODOLOGY

Syncora first argues that the City's forecasts do not satisfy *Daubert*'s liberal standard of admissibility because "the City's forecasters employed no discernible methodology" and instead "merely employed a series of assumptions based on their judgment." Syncora Mot. at ¶ 33 (footnote omitted). Thus, Syncora argues, the forecasts should be excluded because "the ability to test and assess the reliability of expert opinion [is] a critical requirement of Rule 702." *Id.* at ¶¶ 32–33. But this is obviously wrong. As described above, the City's experts employed standard methodologies used in forecasting municipal revenues and expenses. And, in any event, to the extent Syncora has specific challenges to the City's assumptions, these go more to the weight to be accorded EY's forecasts than their admissibility. While each of these arguments may be appropriate topics for cross-

examination, they do not provide a legal or factual basis for exclusion under *Daubert*.

### A. Ernst & Young's Forecasts Were The Product Of Reliable, Persuasive Methodologies

As an initial matter, Syncora is wrong to claim that the City's forecasts are not the product of any "discernible methodology." Syncora Mot. at ¶ 33. As detailed at length above, *see* Background, *supra*, at Part B, and as the experts will testify, EY's forecasts were the product of standard methodologies that are generally accepted in their profession and commonly relied upon to develop forecasts of tax revenues and government expenses. Tellingly, the work of these three EY experts was reviewed by yet *another* expert, Martha Kopacz, who found that (1) EY's "projections" were "generally mathematically correct and materially reasonabl[e]"; (2) "the individual assumptions used to build the projections" were within "a reasonable range"; and (3) "when taken as a group," EY's individual "assumptions [we]re also reasonable." Expert Report of Martha E.M. Kopacz at 200–01 ("Kopacz Report"), attached hereto as Exhibit 4; *see also id.* at 10 ("The assumptions that underlie the City's plan of adjustment projections regarding its revenues, expenses and plan payments are reasonable."); *id.* at 42–43, 47.

Moreover, these forecasts were no mere academic exercise. The City retained EY over three years ago—in May 2011—to develop financial forecasts for the purpose of determining whether the City had the financial wherewithal to

continue paying its bills while maintaining basic City services. EY was not hired initially to serve as an expert witness; indeed, in the original retainer agreement with the City, EY specifically disclaimed that it would serve as an expert witness. *See* Syncora Ex. 4568 at 4 (EY Amend. No. 7 To Statement of Work (7/17/2013)), attached hereto as Exhibit 7. Both of these facts support the independence and credibility of the EY witnesses today. As the Sixth Circuit has explained, the fact that "experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation . . . provides important, objective proof that the research comports with the dictates of good science." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (internal quotation marks omitted), *abrogated on other grounds by Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 515 (6th Cir. 1998).

## B. *Daubert* Does Not Prohibit An Expert From Making Assumptions And Using Professional Judgment In Rendering An Opinion

Nor is there merit to Syncora's argument that EY's forecasts must be excluded because the experts "employed a series of assumptions based on their judgment" in creating them. Syncora Mot. at ¶ 33 (footnote omitted). Syncora's argument fails for two reasons. *First*, as already described, EY's methodology was consistent and rigorous, and, to the extent the experts employed assumptions, they were the product of sound exercises of professional judgment based on available data. *Second*, and more fundamentally, there is no deficiency in an expert's

methods if he or she must make assumptions or apply judgment in the expert analysis. In fact, one of the common hallmarks of expert testimony is that the expert is asked to render an opinion based on certain assumptions, and the expert report of Syncora's own expert witness is replete with sweeping assumptions.

Thus, it is no surprise that Syncora's argument finds no support in the law. That an expert exercised reasonable, experience-based judgment in rendering his opinions "does not mean that [expert] testimony must be excluded." *Grp. Health Plan*, 344 F.3d at 760 (quoting *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996)). Indeed, as the Sixth Circuit has recognized, admissible expert testimony often *depends* on "the use of informed, careful judgment," and "cannot be expected to yield mathematically precise results." *In re Muskegon Motor Specialties*, 366 F.2d 522, 530 (6th Cir. 1966) (business valuation). Economic forecasts are a paradigmatic example. As one court put it, the predictions of "[e]conomic experts are necessarily speculative" because "[t]here is no crystal ball for experts to divine exact future earnings." *Perez-Garcia v. Puerto Rico Ports Auth.*, 873 F. Supp. 2d 431, 434 (D.P.R. 2012); *see also Cayuga Indian Nation of N.Y. v. Pataki*, 83 F. Supp. 2d 318, 327–28 (N.D.N.Y. 2000) (rejecting the notion "that subjective analysis has no place in" making economic projections, as nearly all experts "necessarily" rely "upon a certain amount of subjectivity").

Clearly, *Daubert* does not prohibit an expert from making assumptions and using professional judgment in rendering his opinions. Instead, exclusion is justified only when the expert's methodology is "*purely*" or "*entirely* subjective." *In re TMI Litig.*, 193 F.3d 613, 703 & n.144 (3d Cir. 1999) amended, 199 F.3d 158 (3d Cir. 2000) (emphasis added). In such cases, because "the creator of the methodology" is "the *only* person capable of testing or falsifying the hypothesis," the expert's opinions are not testable through cross-examination. *Id.* (emphasis added). But where experts have used their judgment to make assumptions based on the available data, the fact that other experts may make different assumptions based on the same data is not a basis for exclusion under *Daubert*. *See Falise v. Am. Tobacco Co.*, 258 F. Supp. 2d 63, 67–68 (E.D.N.Y. 2000).

## C. Under *Daubert*, Challenges To The Validity Of Assumptions Go To The Weight, Not The Admissibility Of An Expert Opinion

Syncora challenges the individual assumptions made by the City's experts and the quality of the data underlying them. However, because the purpose of *Daubert* is to determine the technical validity of the principles underlying the expert's testimony, *Greenwell*, 184 F.3d at 497, challenges to an expert's assumptions and data bear only on the *weight* of the expert's opinion, not its admissibility, *see, e.g., McLean*, 224 F.3d at 801. Under *Daubert*, the critical focus is methodology—not the expert's conclusions and "not the quality of the data used in applying the methodology." *See, e.g.*, *Manpower, Inc. v. Ins. Co. of*

*Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). Thus, to the extent Syncora wishes to challenge the experts' methodologies and assumptions, it may attempt to do so through vigorous cross-examination and the presentation of competing expert testimony.

The assumption Syncora most vigorously attacks is Ms. Sallee's assumption that the taxable value of the City's residential property is currently overassessed and will decrease in value upon completion of the City's planned mass reappraisal study. *See* Syncora Mot. at ¶¶ 34-41. However, not only is such an argument improper in a *Daubert* setting, *see McLean*, 224 F.3d at 801, Ms. Sallee's assumption that residential property in the City is overassessed also finds extensive support in the record: Detroit housing prices have dropped over 50% from their pre-recession highs; there are a significant number of abandoned or blighted houses in the City; the City continues to lose population; earlier this year, the City dropped residential taxable value over 20% after looking at only part of the City's distressed housing; and the assessor's office is about to embark upon a thorough re-assessment of every property in the City. *See, e.g.*, Sallee Report at 14-15. In the face of this evidence, Ms. Sallee's conclusions that real property is over-assessed are hardly speculative.

Ms. Sallee's careful methodology confirms the reliability of her approach. As required by CBO and Michigan State practice, Ms. Sallee began by reviewing

the historical data on Detroit and Michigan property taxes, economic variables, and housing indicators described above. Sallee Report at 4-6. She also spoke with City and State officials to learn information available to them. Sallee Tr. at 36-37.

Ms. Sallee next forecasted the taxable value in the City by each property class, starting with historical baseline values and determining rates of growth (or loss) based upon additions and losses to the tax base, changes to assessments that happen as houses sell, and the City's planned reassessments. Sallee Report at 7. Of the steps Ms. Sallee took and factors she considered, Syncora takes issue only with her projection of the likely effect of the City's reassessment program, which is based upon information provided to her by the Assessor's Office itself. Sallee Report at 14-15.

In the end, Syncora is left only with the criticism that Ms. Sallee was "uninformed" about the mass reappraisal study when conducting her forecast. This is false. Ms. Sallee spoke with the Assessor's Office about the study and learned their plans and expectations directly. Sallee Tr. at 36-37; Sallee Report at 14-15. Although Syncora argues that "she does not know who will conduct the reappraisal or what methodology they will use," it is because—as Syncora admits later in that same paragraph—"the City has not yet retained any outside consultant." Syncora Mot. at ¶39. This criticism, too, fails.

**D.** ***Daubert*** **Does Not Require Exclusion Of Economic Forecasts Merely Because There Is No Way To "Test" The Accuracy Of The Results Until The Future**

Syncora's claim that the City's forecasts must be excluded because there is no way to fully "test" the results of future forecasts in the present day also is baseless. *See* Syncora Mot. at ¶14. Courts have acknowledged that financial forecasting is "less than an 'exact science,'" and, like valuation, forecasting entails "[e]stimations, predications, and inferences based on professional judgment and experience," *Brown v. Brewer*, 2010 WL 2472182, at *27 (C.D. Cal. June 17, 2010), that do not allow for "mathematical certitude," *Protective Comm. v. Anderson*, 390 U.S. 414, 442 (1968). But *Daubert* is not a "straightjacket," and none of its factors is universally applicable or independently dispositive. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (holding that *Daubert*'s factors are not a "definitive checklist or test"). Rather, *Daubert*'s "measures of reliability" must be determined on a case-by-case basis based on a variety of factors, including the expert's "knowledge or experience." *Barreto*, 268 F.3d at 335. However, this does not mean that the forecasts are unreliable or untestable. Indeed, predictive economic judgments can be evaluated and "confirm[ed]" by "test[ing]" the economist's "model against historical data." *Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*, 358 F. App'x 643, 654 (6th Cir. 2009); *see also Hein v. Merck & Co., Inc.*, 868 F. Supp. 230, 232 (M.D. Tenn. 1994) ("Many of the predictions or

assumptions of economists in damages testimony can be validated in retrospect, if not otherwise."). Syncora, therefore, offers no basis for excluding the City's forecasts simply because the future cannot be conclusively predicted in advance.

Everyday experience corroborates this. Financial forecasting is performed daily in government, business and other fields, yet no one seriously can claim that financial projections are necessarily misleading or speculative. Instead—accepting the uncertainties inherent in any prediction of the future—forecasting is a well-known and commonly accepted discipline that can yield useful guidance in making financial decisions. Indeed, it would be the rare bankruptcy case in which a court was asked to confirm a plan without being given forecasts of the debtor's expected future financial performance. Where, as here, experienced professionals have applied generally accepted methods and carefully reviewed the information and assumptions they are relying upon, the forecasts they produce are sufficiently reliable to meet the standards of *Daubert*.

### E. *Daubert* Does Not Require An Expert To Independently Verify The Data Upon Which He Relies For An Opinion To Be Admissible

Syncora specifically criticizes Dr. Cline for a perceived lack of "independent testing or verification of much of the material he was provided by third parties." Syncora Mot. at ¶33. But neither Rule 702 nor *Daubert* make independent testing and verification of data a requirement for admissibility. Indeed, Rule 703

expressly contemplates that experts will rely "on facts or data … that the expert has been made aware of" but not "personally observed." Fed. R. Evid. 703. As long as an expert's opinions are not based on "'mere guess or speculation'" but find "some support … in the record," the Sixth Circuit maintains that they should be admitted. *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 528–29. Rather, "any weaknesses in the factual basis of an expert witness' opinion, including unfamiliarity with standards, bear on the weight of the evidence rather than on its admissibility." *United States v. L.E. Cooke Co., Inc.*, 991 F.2d 336, 342 (6th Cir. 1993).

### F. The Fact That The Experts Projected The City's Revenues and Expenses Over 10- and 40-Year Periods Is Neither "Unprecedented" Nor A Basis For Excluding The Forecasts

Syncora next makes a broad-sided attack upon the inherent reliability of EY's 10-year forecasts and 30-year financial simulation. Syncora argues that projections of such length should not be admitted because they are "unprecedented," Syncora Mot. at ¶ 63, and because there are too many variables that can change over that amount of time to have confidence in the accuracy of their predictions. Once again, Syncora's arguments are misguided.

*First*, contrary to Syncora's assertions, long-range economic forecasts are not unprecedented. For example, both Jefferson County, Alabama, and Stockton, California, employed long-range forecasts similar to those used here. Jefferson

County, for instance, used 15-year and 40-year forecasts in its bankruptcy estimations. *See, e.g.,* Jefferson Cnty. Ex. 11, Financial Projections for Estimation Tax (2013), http://www.alnb.uscourts.gov/sites/default/files/ natinterestcases/ jca_1977_23.pdf; *see also* Jefferson Cnty. Ex. 9, Amended Financing Plan, http://www.alnb.uscourts.gov/sites/default/files/natinterestcases/ jca_1977_21.pdf. Stockton utilized a 10-year forecast, and the bankruptcy court in that case found chapter 9 relief appropriate based in part on that forecast. *See, e.g., In re City of Stockton*, 493 B.R. 772, 790 (Bankr. E.D. Cal. 2013); *see also* Steven Church, *Stockton Deficits May Total $100 Million, Forecast Shows*, Bloomberg News (Mar. 26, 2013 2:56 PM) (noting that Stockton relied on "10-year forecasts"), http://www.bloomberg.com/news/2013-03-26/stockton-deficits-may-total-100-million-forecast-shows.html.

Moreover, bankruptcy courts—including in cases under chapter 9—routinely hear and examine expert testimony involving longer-range forecasts and projections—some extending even beyond forty years. *See, e.g., In re N. Am. Refractories Co.*, 2007 Bankr. LEXIS 4721, at *37–*39 (Bankr. W.D. Pa. Nov. 13, 2007) (accepting an expert's projection of the number of claims to be asserted against the debtor between 2006 and 2050); Jefferson Cnty. Ex. 9, Amended Financing Plan, http://www.alnb.uscourts.gov/sites/default/files/natinterestcases/

jca_1977_21.pdf. In some instances, experts are called upon to estimate the "amount of claims to be paid" by the debtor to all claimants that may arise in the future. *See, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. 618, 631 (Bankr. S.D.N.Y. 1986). But the fact that such estimations cannot "be made with absolute certainty"—and must therefore simply be "reasonable"—does not mean that expert projections over a several-decade period are inadmissible, let alone unprecedented. *See id.*

*Second*, even if the projections and methodologies of the City's experts were "unprecedented," they are still reliable, sound, and admissible under *Daubert*. *See, e.g.*, *United States v. Valencia*, 600 F.3d 389, 425–29 (5th Cir. 2010); *Cayuga Indian Nation*, 83 F. Supp. 2d at 323; *Chesler v. Trinity Indus., Inc.*, 2002 WL 1822918, at *7 (N.D. Ill. Aug. 8, 2002) (admitting expert analysis that was "unusual" and "unprecedented in [the expert's] experience"); *Florists' Mut. Ins. Co. v. Lewis Taylor Farms, Inc.*, 2008 WL 875493, at *17 (M.D. Ga. Mar. 27, 2008) (noting that simply because "[t]here is . . . no standard protocol for" a specific expert calculation does not mean "the expert is using a rogue methodology").

Indeed, because opposing counsel may vigorously cross-examine an adverse expert, reliance on a purportedly "unprecedented" methodology does not render the expert's opinion "altogether unreliable" or "inadmissible." *Valencia*, 600 F.3d at

425–29.  In *Valencia*, the Fifth Circuit held that, because the case was "*res nova*" and "there ha[d] been no need in the world for anyone to do the work that [the expert] ha[d] done," "the unprecedented nature of [the expert's] work" did not affect its admissibility or reliability under *Daubert*.  *Id.* at 421, 425.  Although the uniqueness of the methodology "made it impractical, if not impossible," to apply the typical *Daubert* analysis, the testimony was still admissible because its "arithmetic underpinnings" could be used to "test [the expert's] theories and determine the rate of error."  *Id.* at 425.

In this case, the experts' creation of a 10-year forecast was not only reasonable, but necessary to determine whether that the plan is feasible—that is, whether the City can meet its obligations under the plan of adjustment and still provide necessary services.  *See* 11 U.S.C. § 943(7).  Moreover, the creation of a 30-year extension of the 10-year forecast was also reasonable.  Although Syncora devotes much time to arguing against the precision of the 30-year simulation, the City's experts never intended for the 30-year simulation to be a precise forecast of revenues and expenses over the additional three decades.  Rather, the 30-year extension of the 10-year forecast was meant to illustrate, on a pro forma basis, how the City would be expected to operate in those years assuming that the conditions known today continue to obtain.  There is nothing improper about this approach,

and Syncora is welcome to test the City's assumptions through cross-examination and contrary evidence.

Accordingly, the length of the forecast periods does not make these projections improper. Not only is the temporal scope of the experts' forecasts *not* "unprecedented," *see Johns-Manville*, 68 B.R. at 631, but also, even if the forecasts were *sui generis*, they would still be reliable and admissible under *Daubert*, *see Valencia*, 600 F.3d at 425–29; *see also Oracle Am., Inc. v. Google Inc.*, 2012 WL 850705, at *11–*12 (N.D. Cal. Mar. 13, 2012) (admitting an expert's damages calculation based on a "sui generis" mathematical equation that "will not be found in the textbooks," because it was "merely an arithmetical statement of components previously allowed").

### G. The Possibility of Potential Sources of Revenue That Could Have Been Included Is Not Relevant To The *Daubert* Analysis

Finally, Syncora asserts that the testimony of the City's experts should be excluded under *Daubert* because the experts "did not attempt to forecast all revenues and expenditures for the City." Syncora Mot. at ¶ 70 (emphasis added). Rather, Syncora contends, the City's experts "ignore[d] numerous sources of potential revenue that could be used to pay creditors. *Id.* at ¶ 7. According to Syncora, such self-serving assertions affect the admissibility of the experts' testimony. *See id.*

Syncora is wrong on several levels.  *First*, the Court has already held and the evidence at trial will establish that the City does not have the legal ability to raise its income, property, wagering, utility, or utility users taxes.  *See, e.g.*, Eligibility Op. at 23 ("The City cannot legally increase its tax revenues.").  *Second*, although the Michigan Revised Judicature Act provides an avenue for the City's *creditors* to impose an additional property tax levy upon the City's residents, that is a right creditors alone have and, as the Court has ruled, will be a matter for rebuttal expert testimony, if at all.  *See* Tr. of Hearing on Aug. 21, 2014, at 28-31 [Docket No. 7044].  *Third*, the City's experts most certainly have forecast increases in fees, fines, collection rates and other revenue-enhancing measures, and those increases are set forth in detail in the City's forecasts of its financial projections under the "restructuring" scenario.  *See, e.g.*, Sallee Report at 9, 20; *see also* Kopacz Report at 85–88 & n.31.

Moreover, Syncora's position is not the law.  The relevant analysis is not whether the experts have selected data Syncora would prefer, but instead whether "the fundamental approach taken by" the City's experts "departs from accepted practice in the field of economics."  *Ogden v. Saint Mary's Med. Ctr.*, 2007 WL 1675092, at *2 (E.D. Mich. June 11, 2007).  Nor can Syncora show that the "failure to include [hypothesized] variables" somehow renders the experts' forecasts inadmissible.  *Cf. Bazemore v. Friday*, 478 U.S. 385, 400 (1986).  To the

contrary, because "statistical evidence by its very nature deals with probabilities rather than certainties," "[a]ll that can be required of methods employed in gathering such evidence is that they assure reasonably accurate findings." *Guardians Assoc. of N.Y.*, 633 F.2d at 241. Because Dr. Cline, Ms. Sallee, and Mr. Malhotra reached their conclusions following accepted forecasting methods, their analyses satisfy the reliability criterion under *Daubert*. *See Valencia*, 600 F.3d at 427–28; *see also Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 670 (N.D. Ill. 2006) (holding that expert testimony is still admissible even if based "upon incomplete data," since "no study has perfect data").

Finally, Syncora's arguments are simply futile efforts to attack the weight of the experts' opinions. *See, e.g.*, *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 425 (7th Cir. 2000) (reiterating that *Daubert* evaluates "what [the expert] *did*, rather than hypothetical tests that he or another expert might have done" (emphasis added)). When "a causal relationship is not an essential fact of consequence, an expert need not eliminate all confounding variables or potential contributory factors in order to present an opinion that is both relevant and reliable." *Valencia*, 600 F.3d at 427 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977) (noting that the usefulness of statistics "depends on all of the surrounding facts and circumstances")); *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 814 (7th Cir. 2012) (noting that Rule 702 asks only whether the expert's "hypothesis was reliably

supported and applied to the known facts, such that it . . . becomes a presentable probability"). Indeed, as the Supreme Court has noted in the context of regression analysis, "the omission of variables" does not render inadmissible or unpersuasive "an analysis which accounts for the major factors." *Bazemore*, 478 U.S. at 400. As noted, Syncora will have the opportunity to cross-examine these witnesses and, in fact, already has done so in the case of Dr. Cline.

### H. Syncora's Misrepresentations Of The Record Do Not Change The Analysis

Finally, Syncora's effort to build up the case for exclusion of the City's forecasts through selective and creatively excerpted quotations does not alter the analysis. Rather, as a more complete review of the record will show, the experts did not make the supposed "conce[ssions]," "admi[ssions]," and "acknowledge[ments]" Syncora ascribes to them. For example, although Syncora attempts to give the impression that the City's and the Court's experts have "conceded" that the forecasts performed by EY are "subjective" and that they "didn't have sufficient time to independently verify all of the data on which the forecasts are built," Syncora Mot. at 2, 12 n.24, the experts made no such concessions. *See* Misrep. 2, 10, 11, 12. Not only did the experts inform Syncora that *all* "financial modeling" involves "some art in addition to science," given its inherently predictive nature, *see* Misrep. 2, 10, but the court-appointed expert, Ms. Kopacz, also made clear that she was "satisfied with [her team's] ability to

evaluate . . . all the information that was available and meet with the people that were available and do what [they] needed to do," Misrep. 11, 12. In addition, Syncora goes to great lengths to describe Ms. Sallee's testimony as "uninformed," by stating emphatically that "[i]t is hard to conceive how an expert tasked with determining the taxable value of a city's future tax base could fail to discuss the matter with the City's most senior property tax assessor. But that is precisely what Ms. Sallee did." Syncora Mot. at ¶ 36. As Ms. Sallee made clear at her deposition, however, she spoke City Assessor Evanko several times. *See* Misrep. 3. These are but a few examples, but the import is clear: the factual basis upon which Syncora builds much of its case for exclusion simply does not exist.

## CONCLUSION

For the reasons set forth above, Syncora's Motion to Exclude the Testimony of the City's Forecasting Experts Under Federal Rule of Evidence 702 should be denied.

Dated: August 27, 2014 Respectfully submitted,

 /s/  Heather Lennox 
Heather Lennox (OH 0059649)
David G. Heiman (OH 0038271)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, Michigan  48075
Telephone:  (248) 359-7300
Facsimile:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY OF DETROIT

# APPENDIX A

## MISREPRESENTATIONS OF THE RECORD

## MISSTATEMENT 1: MS. SALLEE

| | |
|---|---|
| "Nonetheless, as the City's experts concede, 'there is no measure of reliability' for their forecasting methods, which at bottom constitute a **fundamentally** 'subjective undertaking.'"<br><br>Syncora Mot. at 2 (citing Sallee Dep. at 292:12-16). | Q. -- Ms. Kopacz says that financial modeling is a highly subjective undertaking that is affected by the assumptions made and the professional biases of the analysts developing the model. Do you agree with that statement?<br><br>A. **I may not say highly**. I think in financial modeling, there's some **art in addition to science** to it, so...<br><br>Q. Do you agree the financial modeling is a subjective undertaking that is affected by the assumptions made and the professional biases of analysts developing the model?<br><br>A. I would agree with that.<br><br>Sallee Dep. at 292. |

## MISSTATEMENT 2: MS. KOPACZ

| | |
|---|---|
| "**Ms. Kopacz described** the Ernest & Young forecasts as 'convoluted' and 'confusing'—i.e., **a 'black box'** . . . ."<br><br>Syncora Mot. at 12 (Kopacz Report at 26). | "This is convoluted and contributes to the **feelings amongst many creditors** in this case that the financial projections in the POA are a 'black box' . . . ."<br><br>Kopacz Report at 25–26. |

## MISSTATEMENT 3: MS. SALLEE

| | |
|---|---|
| "It is hard to conceive how an expert tasked with determining the taxable value of a city's future tax base could fail to discuss the matter with the City's most senior property tax assessor."<br><br>Syncora Mot. at 24 (no citation). | Q. Were your forecasts based on assumptions or other information provided by the City of Detroit?<br><br>A. **I had conversations with the City of Detroit** about what they're planning to do on property taxes, and so I used that information to form my own assumptions for the analysis.<br><br>Q. Okay. Who did you have discussions with?<br><br>A. So **I had discussions with Gary Evanko and Alvin Horhn and Michael Jameson and Linda Beatty and Nancy Caper**, I think, is her last name. She's no longer there. Those are the people I can recall that I had conversations with.<br><br>Q. How many times did you have conversations with Gary Evanko?<br><br>A. I cannot recall the exact number. **I will say that I have been on the phone with him at least twice, and I've had e-mail exchanges with Gary**.<br><br>Sallee Dep. at 36–37. |

| | |
|---|---|
| "Moreover, [Ms. Sallee] **concedes that her uninformed judgment is 'inconsistent with'** that of the City's own assessor and that of Wayne County.'"<br><br>Syncora Mot. at 23 (no citation). | Q. Do you -- **would it be fair to say that your opinion that Detroit property is overassessed is inconsistent with** the determination of the county?<br><br>A. **I don't know inconsistent**. The county has their process by which they review and they assign an equalization factor. And using their rules, they've come up with their opinions. And I've looked at it differently, and I come up with my own opinion that it's overassessed.<br><br>Sallee Dep. at 96:8-17.<br><br>Q. The county's conclusion that property is properly assessed, though, is inconsistent with your conclusion that it's overassessed, correct?<br><br>A. The county in using the equalization factor has said that it's not under or overassessed, and my conclusion is that it's overassessed.<br><br>Q. So you've come to **inconsistent** conclusions with the county, correct?<br><br>A. **My opinion is different than the county's**.<br><br>Sallee Dep. 97:2-11. |

## MISSTATEMENT 5: DR. CLINE

| | |
|---|---|
| "He based his analysis on his **assumptions**, which in turn are based on his **experience**."<br><br>Syncora Mot. at 32–33 (citing Cline Dep. 47:24-48:2). | Q. What forecast has been done for the City that's used the methodology you used?<br><br>A. **The methodology that we have used is a fairly standard forecasting methodology that's been used extensively in the City of Detroit and for the State of Michigan and in other cities**.<br><br>Q. Have you reviewed any depositions in this case?<br><br>A. I have not, other than my own.<br><br>Q. The -- you say that the methodology used is a standard methodology that's been used before, correct?<br><br>A. **The methodology we used in constructing the forecasting model is based upon my experience as a revenue forecaster, and I believe it is fairly standard in terms of how State revenue forecasting is done**.<br><br>Cline Dep at 47-48. |

## MISSTATEMENT 6: DR. CLINE

| | |
|---|---|
| "Again, Dr. Cline **simply picked some numbers**. He similarly **'assumed'** the growth rate for the corporate income tax revenues he used because he did not 'know of any analyses or study that could have helped us determine what that specific rate is.'"<br><br>Syncora Mot. at 37 (citing Cline Dep. at 262:21-263:14). | A. As I mentioned earlier, **the corporate income tax in Michigan is a new tax**. We perhaps have three years of observations at most on how it's performing over the economic cycle. And **so, no one could fit a regression equation for the actual data**, so I do not know of any analyses or study that could have helped us determine what that specific rate is.<br><br>Q. And do you know how that 3.0 percent -- it seems pretty precise, 3.0 percent; **do you know how that number was selected**?<br><br>A. I know **we selected that number by looking at national corporate income tax growth, what limited information we had about Michigan, and that's a number that's in the realm of our very limited but actual experience in Michigan**. But I will add that we happen to -- the experience in Michigan happens to coincide with the end of the deepest recession we've had in decades. And to use that information, we would have had to determine more precisely how Michigan was coming out of the recession, **so that again, there wasn't information available for us to pick a specific number. It wasn't going to be 3.1756. It was going to be rounded off because it is an assumption about the rate of growth**.<br><br>Q. Yeah. I'm just wondering where that |

| | 3.0 number came from. |
|---|---|
| | A. **It's our estimate of what we think is likely for State corporate income tax rate -- income tax revenue to grow. I will tell you that since the recovery from the recession, across all the states, there's been no growth in the corporate income tax collections, 0.0 across all the states since the end of the recession. I don't think it would be reasonable to assume a very strong rate of growth in corporate profits going forward**. We chose 3 percent as a reasonable estimate, despite the recent experience nationally that says there will be no growth in this corporate income tax. We think Michigan, as it continues to recover, and Detroit, as it continues to recover, will enjoy a slightly higher rate of growth. |
| | Cline Dep. at 263–64. |

## MISSTATEMENT 7: MS. KOPACZ

| | |
|---|---|
| "I didn't reach a conclusion about the quality of Ernst & Young's work." | A. I -- I didn't reach a conclusion about the quality of Ernst & Young's work. **I reached a conclusion on the reasonableness of those assumptions**. |
| Syncora Mot. at 12 n.24 (Kopacz Dep. at 48:21-22). | Kopacz Deposition at 47–48. |

| | |
|---|---|
| "[Dr. Cline] then **altered those numbers using arbitrarily selected rates based on no data**, to arrive at population estimates in a restructuring scenario that were less than estimates in one of the SEMCOG scenarios he rejected in the absence of any restructuring efforts."<br><br>Syncora Mot. at 39 (citing Cline Dep. at 226:16-19, 226:20-227:33). | Q. Okay. Did you do any alteration of SEMCOG's population projections?<br><br>A. We did in forecasting the individual income tax collections.<br><br>Q. Okay. Can you tell me the mathematical formula you used to adjust or change SEMCOG's population projections?<br><br>A. **We used add factors, which could be plus or minus percentage changes, for different components of the population, which were not forecasted by SEMCOG. As you remember, in terms of our methodology, we had to look at residents who work in the City of Detroit, residents who work outside of the City of Detroit, and people who live** in the suburbs and work in Detroit. Those are all subsets or not, in one case, even in the population numbers for Detroit. **So that we had to do separate percentage change estimates for those three components of the taxpayer groups in Detroit**.<br><br>Cline Dep. at 226–27. |

| | |
|---|---|
| "Dr. Cline acknowledged, for example, that 'at the end of the day,' the assumed wagering 'growth rate that he used is **a number that he just picked**.'"<br><br>Syncora Mot. at 40 (citing Cline Dep. at 171:22-25). | A. In all of the revenue estimating that I have done, there is no precise formula that gives you the resulting revenue estimate. **There are equations that are based upon history that you use to get an initial starting point, and then economists do what we call add factors, dummy variables and adjustments**. No economic -- no revenue forecaster at the state level accepts the numbers coming out of an equation. They start there, and then they modify it.<br><br>We used what we thought was relevant, additional information to determine these growth rates. There was not a single mechanical formula that generated the .5 or the 1.0 number.<br><br>Q. I mean, at the end of the day, the wagering tax growth rate that you used is a number that you just picked, right?<br><br>A. As the City did also.<br><br>Cline Dep. at 171. |

| | |
|---|---|
| "As [Kopacz] acknowledged, **the City's** forecasts were 'highly subjective' and 'subject to the biases of the person doing the forecast.'" <br><br> Syncora Mot. at 13 ¶ 19 (Kopacz Deposition at 160: 15-21; Kopacz Report at 15). | Q. Do you agree that **forecasting** is a highly subjective area? <br><br> A. Yes. <br><br> Q. And, as such, it's subject to the biases of the person doing the forecast, correct? <br><br> A. Yes. And -- and -- but I would qualify biases as neither good nor bad. <br><br> Q. Understood. It's not a -- it's not meant to be a negative word like -- like racial bias. <br><br> A. Right. <br><br> Kopacz Deposition at 160. <br><br> "**Financial modeling** is a highly subjective undertaking that is affected by the assumptions made and the professional biases of the analyst developing the model. **Financial modeling** is both a science and an art. When the analyst forecasts growing revenue, declining costs, or a change in headcount, he or she has a number of ways to write the mathematical formulas which arrive at the intended numbers. . . . It is in the working model that a reviewer can understand the 'art' of the analyst's modeling." <br><br> Kopacz Report at 15. |

"[A]cknowledging that [Kopacz] 'didn't have sufficient time to independently verify all of the data on which the forecasts are built in order to develop [her] own assumptions.'"

Syncora Mot. at 12 n.24 ¶ 17 (Kopacz Dep. at 178:2-11).

"[O]bserving that [Kopacz] had less than 90 days to perform her work."

Syncora Mot. at 12 n.24 ¶ 17 (Kopacz Deposition at 113:19-21).

A. I -- **I wouldn't go so far as to say we didn't independently verify because we did, specifically on the revenue projections and things surrounding those, we did seek other third-party sources of data. So --**

Q. There were instances where you sought some form of corroboration?

A. **Separate and apart from the City**.

Q. But in general, you'd agree with my statement that you didn't have sufficient time to independently verify all of the data on which the forecasts are built in order to develop your own assumptions?

MR. KANE: Objection. Go ahead and answer.

A. Yes.

Q. You agree with me?

A. Yes.

Kopacz Deposition at 177–78.

Q. You had less than 90 days to do your work in this case, correct?

A. Yeah, whatever it's been.

\*\*\*

Q. **Did you have sufficient time to do**

| | |
|---|---|
| | **your work**?<br><br>A. **I feel like I did.** I mean there's still a couple of things that, as I said in to response to Mr. Stewart, questions that I intend to do going forward. **But for the most part, I am satisfied with our ability to evaluate what all the information that was available and meet with the people that were available and do what we needed to do**.<br><br>Q. With respect to the forecasts?<br><br>A. **With respect to the forecasts**.<br><br>Kopacz Deposition at 113–14. |

## MISSTATEMENT 13: MR. MALHOTRA

| | |
|---|---|
| "Before the current projection, the longest period that Ernst & Young had attempted to forecast Detroit's revenues and expenses was for a period of five years."<br><br>Syncora Mot. at 45 n.122 (citing Malhotra Dep. at 65:3-8). | Q. Well, have you created more than one forecast for the City of Detroit?<br><br>A. Well, there's the plan of adjustment. We have the financials, the 10-year financials and the 40-year financials that are there. We have the update from July 2nd, along with the bridge that's there. **There were iterations of that previously** as a part of the third plan, amended plan. And so I just want to make sure you can ask me which specific forecast.<br><br>Q. When was the first time you created any forecast for the City of Detroit?<br><br>A. Any forecast? Probably two-and-a-half-plus years ago.<br><br>Q. Okay. Were there forecasts you created for the City of Detroit that were less than 10-year forecasts?<br><br>A. I think we started looking at a five-year forecast sometime probably two-plus years ago. I don't remember exactly.<br><br>Q. What was the purpose of that forecast?<br><br>A. I would have to go back and check. This is over two years ago. I don't remember specifically when we started developing the forecast. It was, again, to look at the liabilities of the City over a |

| | |
|---|---|
| | longer term versus on a more short-term basis.

Malhotra Dep. at 64-65.

Q. When was the first time that you – what was the first time you did the 10-year and 40-year forecast?

A. Well, I do not recall. I think the 10-year 10-year forecast we had a version of in the **June 30th** -- the June 13th proposal to creditors. That seems around the time frame when we would have had the 10-year forecast sort of come together with the assumptions as of then.

Malhotra Dep at 67. |

**Certificate of Service**

I hereby certify that, on August 27, 2014, I electronically filed the *City of Detroit's Response in Opposition To Syncora's Motion To Exclude the Testimony of the City's Forecasting Experts Under Federal Rule of Evidence 702* with the Clerk of the Court which sends notice by operation of the Court's electronic filing service to all ECF participants registered to receive notice in this case.


Dated:       August 27, 2014            /s/  Heather Lennox
                                        Heather Lennox