# EXHIBIT 6

**Sallee Deposition Transcript**

```
 1              UNITED STATES BANKRUPTCY COURT

 2               EASTERN DISTRICT OF MICHIGAN

 3    In re                      )

 4                               ) Chapter 9

 5    CITY OF DETROIT, MICHIGAN, ) Case No. 13-53846

 6        Debtor.                ) Hon. Steven W. Rhodes

 7

 8              The videotaped deposition of CAROLINE

 9    SALLEE, called for examination pursuant to the

10    Rules of Civil Procedure for the United States

11    District Courts pertaining to the taking of

12    depositions, taken before GINA M. LUORDO, a notary

13    public within and for the County of Cook and State

14    of Illinois, at 77 West Wacker Drive, Suite 3500,

15    Chicago, Illinois, on the 24th day of July, 2014,

16    at the hour of 9:04 a.m.

17

18

19

20

21

22

23

24    Reported by:  Gina M. Luordo, CSR, RPR, CRR

25    License No.:  084-004143
```

APPEARANCES:

JONES DAY,
  BY:  GEOFFREY S. STEWART, ESQ.,
    CHRISTOPHER DiPOMPEO, ESQ.,
    SARAH A. HUNGER, ESQ.
  51 Louisiana Avenue, N.W.
  Washington, D.D.  20001-2113




    Representing the Debtor;

KIRKLAND & ELLIS LLP
BY:  DOUGLAS G. SMITH, ESQ.
300 North LaSalle Street
Chicago, Illinois  60654


    Representing Syncora Guarantee Inc.
    and Syncora Capital Assurance Inc.;

APPEARANCES (continued):
DENTONS US LLP
BY:  SAM J. ALBERTS, ESQ.
1301 K Street, NW
Suite 600, East Tower
Washington, D.C.  20005-3364


    Representing Official Committee of
    Retirees;

CHADBOURNE & PARKE LLP
BY:  F. NICHOLAS CHANDLER, ESQ.
  (via telephone)
30 Rockefeller Plaza
New York, New York  10112


    Representing Assured Guaranty
    Municipal Corp.;

APPEARANCES (continued):
  WILLIAMS, WILLIAMS, RATTNER & PLUNKETT,
  P.C.,
  BY:  WILLIAM E. HOSLER, ESQ. (via telephone)
  280 North Old Woodward Avenue, Suite 300
  Birmingham, Michigan  48009


    Representing Financial Guaranty
    Insurance Company.








Also Present:  Ms. Marguerette Hosbach
    General Counsel - Ernst & Young
    (via telephone)

    Mr. Thomas Scheckel - Videographer

I N D E X
WITNESS                    EXAMINATION
CAROLINE SALLEE
  By Mr. Smith              9
  By Mr. Stewart            332

E X H I B I T S
NUMBER   DESCRIPTION                      PAGE
No. 1    City of Detroit Assessing        78
         Division - Observations and
         Opportunities
No. 2    The Detroit News Article         83
No. 3    Property Tax Process Review      87
         October 19, 2012 Draft
No. 4    The Detroit News Article         87
No. 5    Excerpts of Gary Evanko          90
         Deposition
No. 6    Citizens Research Council of     110
         Michigan Report 382
No. 7    News Article                     117
No. 8    Detroit Regional Chamber Facts   121
         On Bankruptcy and Transformation
No. 9    Crain's Detroit Business Article 123
No. 10   BLS Data Viewer                  128

NUMBER   DESCRIPTION                                    PAGE
No. 11   Case-Shiller Detroit Home          134
         Price Index
No. 12   Case-Shiller Detroit Home          138
         Price Index
No. 13   City of Detroit Assessing          144
         Division Operational
         Recommendations
No. 14   Report of Caroline Sallee          145
No. 15   Data from Brookings Report         229
No. 16   City of Detroit Ten-Year           246
         Financial Projections
No. 17   Fourth Amended Disclosure          249
         Statement
No. 18   Spreadsheet                        253
No. 19   Spreadsheet                        265
No. 20   Spreadsheet                        271
No. 21   Spreadsheet                        278
No. 22   Spreadsheet                        280
No. 23   Spreadsheet                        282
No. 24   Changes to Detroit Property        283
         Tax Forecasts
No. 25   Residential Sales Statistics       288
         May 2014

NUMBER   DESCRIPTION                                    PAGE
No. 26   2014 Building Permits              291
No. 27   Expert Report of Martha E.M.       291
         Kopacz
No. 28   News Article                       297
No. 29   News Article                       301
No. 30   Ernst & Young Correspondence       314
         Dated July 3, 2014
No. 31   Case-Shiller Data                  316
No. 32   Property Tax Collection by Class   316
No. 33   Estimating Methodology Detroit     317
         Tax Forecast
No. 34   Long-Term Projections Discussion   320
         Items
No. 35   Spreadsheet                        327
No. 36   Spreadsheet                        328

1    THE VIDEOGRAPHER:  My name is Thomas Scheckel,
2  certified legal video specialist in association
3  with Elisa Dreier Reporting Corp. located at
4  950 Third Avenue, New York, New York.  I'm the
5  videographer on July 24, 2014 for the recording of
6  the deposition of Caroline Sallee being taken at
7  77 West Wacker, Chicago, Illinois at the time of
8  9:04 a.m. In re City of Detroit, debtor, filed in
9  the U.S. Bankruptcy Court, Eastern District of
10  Michigan, Case No. 13-53846
11       Will counsel please identify themselves
12  for the record beginning with plaintiff's counsel.
13     MR. SMITH:  Doug Smith for Syncora.
14     MR. STEWART:  Jeffrey Stewart, Chris DiPompeo
15  and Sarah Hunger of Jones Day for the City of
16  Detroit and for the witness.
17     MR. ALBERTS:  Sam J. Alberts from Dentons on
18  behalf of the Official Committee of Retirees.
19     THE VIDEOGRAPHER:  Will counsel on the phone
20  please identify themselves.
21     MR. HOSLER:  William E. Hosler from Williams,
22  Williams, Rattner & Plunkett on behalf of FGIC.
23     THE VIDEOGRAPHER:  Will the reporter please
24  identify herself and swear in the witness.
25     THE COURT REPORTER:  Gina Luordo.

1       (Whereupon, the witness was
2       sworn.)
3     MR. SMITH:  Good morning, Ms. Sallee.  Have you
4  ever been deposed?
5     THE WITNESS:  No.
6     MR. SMITH:  You know that I'm going to ask you
7  a series of questions today, correct?
8     THE WITNESS:  Correct.
9     MR. SMITH:  And you know that if you don't
10  understand any of my questions, you'll feel free to
11  ask me to clarify them, correct?
12     THE WITNESS:  Correct.
13       CAROLINE SALLEE,
14  having been first duly sworn, was examined and
15  testified as follows:
16       EXAMINATION
17  BY MR. SMITH:
18     Q.  Mr. Stewart said, I think, in the opening
19  that he was here on behalf of the City and on
20  behalf of you.  Do you recall that?
21     A.  Yes.
22     Q.  Do you understand that you have an
23  attorney-client relationship with Mr. Stewart?
24     A.  Yes.
25     Q.  And has Ernst & Young retained Mr. Stewart

1  on your behalf to represent you today, if you know?
2      A.  I don't know.
3      Q.  You're functioning, I guess -- there are
4  multiple Ernst & Young witnesses who have filed
5  expert reports in the case.  You're aware of that,
6  correct?
7      A.  Yes.
8      Q.  And I want to try to figure out kind of
9  your role with respect to these other witnesses,
10  okay?
11      A.  Okay.
12      Q.  You're holding yourself out as an expert,
13  I guess, in tax policy; is that correct?
14      A.  So I'm an expert in the real and personal
15  property taxes for the General Fund for the City of
16  Detroit.
17      Q.  You're not holding yourself out as an
18  expert in urban policy, correct?
19      A.  Correct.
20      Q.  You're not an expert in health benefits?
21      A.  Correct.
22      Q.  You're not an expert on government?
23      A.  Correct.
24      Q.  You're not an expert on blight reduction?
25      A.  Correct.

1      Q.  You're not an expert on property
2  assessment?
3      A.  I'm not an expert on property assessment.
4      Q.  And you've never assessed property before,
5  correct?
6      A.  That's correct.
7      Q.  You're not an expert in property tax
8  collection?
9      A.  That's correct.
10      Q.  Not an expert on real estate valuation?
11      A.  Correct.
12      Q.  Never done a real estate valuation before?
13      A.  That's correct.
14      Q.  Never been involved in property tax
15  collection before, correct?
16      A.  By understanding the mechanisms of
17  property tax collections, I understand those, but
18  in terms of an expert in how it's being collected?
19  Logistics?
20      Q.  Well, I'm asking more of a factual
21  question.  Have you ever personally been involved
22  in collecting property taxes before?
23      A.  No, I have not.
24      Q.  You're not holding yourself out as an
25  expert in real estate in general, correct?

1      A.  Correct.
2      Q.  You're not an expert on the state
3  government or the Michigan government, correct?
4      A.  Correct.
5      Q.  Not an expert on casinos or wagering
6  revenue?
7      A.  Correct.
8      Q.  Not an expert on wagering tax revenue?
9      A.  Correct.
10      Q.  Not an expert on art valuation?
11      A.  Correct.
12      Q.  Not an expert on pensions?
13      A.  Correct.
14      Q.  Not an expert on government grants?
15      A.  Correct.
16      Q.  You're not an expert on information
17  technology?
18      A.  No.
19      Q.  You're not an expert on transportation
20  systems?
21      A.  Correct.
22      Q.  And you wouldn't hold yourself out as an
23  expert in accounting?
24      A.  Correct.
25      Q.  You're not an expert in financial

1  analysis?
2      A.  Correct.
3      Q.  You are not an expert on Chapter 9
4  bankruptcy?
5      A.  Correct.
6      Q.  You're not holding yourself out as an
7  expert on state revenue sharing?
8      A.  So I am holding myself out as an expert on
9  state revenue sharing for the City of Detroit.
10      Q.  Have you ever been involved in state
11  revenue sharing before?
12      A.  What do you mean by involved?
13      Q.  I mean, has there ever been any work that
14  you've done in the area of state revenue sharing
15  before?
16      A.  Any work?  So I've analyzed how the State
17  of Michigan does their revenue sharing, and I've
18  looked at distribution to certain counties, cities,
19  townships.  So in that capacity, I understood how
20  it's done and in this case, how the revenue was
21  going to the City of Detroit.
22      Q.  Is the only work you've done on state
23  revenue sharing for purposes of this case?
24      A.  No.
25      Q.  What was the other work you've done?

1    A.  So I've done some work for the City of
2  Flint, Michigan and then looking at how revenue
3  sharing worked for past clients at my old job.
4    Q.  What was that job?
5    A.  I worked for Anderson Economic Group.
6    Q.  And did you do work on Michigan revenue
7  sharing or other states' revenue sharing?
8    A.  Just Michigan.
9    Q.  Okay.  And you understand that the state
10  has significantly cut its revenue sharing to all
11  the cities in Michigan in recent years, correct?
12    A.  I understand that Michigan revenue sharing
13  has gone down.
14    Q.  And it's gone down by hundreds of millions
15  of dollars to Detroit, correct?
16    A.  I wouldn't say hundreds of millions of
17  dollars.  So overall Michigan's revenue sharing has
18  gone down, and Detroit has had fluctuations.  So in
19  any given year, it's gone up and down.
20    Q.  Well, there have been analyses, though,
21  that have showed that the cuts in recent years have
22  cost Michigan -- I mean cost the City of Detroit
23  more than $700 million.  You're aware of that,
24  correct?
25    A.  I can't speak to that because I don't have

1  an analysis in front of me.
2    Q.  I mean, do you know how much cumulatively
3  the cuts in the last decade to revenue sharing have
4  cost the City of Detroit?
5    A.  I do not know that.
6    Q.  You know that many cities, though, are
7  under financial distress in Michigan because of the
8  cuts to revenue sharing, correct?
9    A.  I can't speak about other cities and
10  townships.
11    Q.  Well, the City of Flint, was that city
12  under financial distress?
13    A.  The City of Flint has been under financial
14  distress, yes.
15    Q.  And is one of the causes of financial
16  distress of the City of Flint the cut in state
17  revenue sharing?
18    A.  I would say it's been one of the factors.
19    Q.  And one of the factors causing Detroit's
20  fiscal distress is the cut to state revenue
21  sharing, correct?
22    A.  One of the causes --
23    Q.  Yes.
24    A.  -- you're asking?  I would say for the
25  City of Detroit, reductions to state revenue

1  sharing is a problem for them, yes.
2    Q.  And the City of Flint, when it was in
3  fiscal distress, what activities did it try to
4  engage in to improve its fiscal condition?
5    A.  I can't speak to that.
6    Q.  What specifically were you doing for the
7  City of Flint?
8    A.  So this is a public case, so I feel I can
9  talk about it.  So we were retained by the City of
10  Flint to look at their revenue forecasting for the
11  next five years.
12    Q.  And so the City of Flint did revenue
13  forecasting over a period of five years?
14    A.  That's right.
15    Q.  And why were you doing that?  Why were you
16  looking at the revenue forecasting?
17    A.  Because we were asked to.
18    Q.  I mean, why did they want you to, though?
19  What was --
20    A.  My understanding is that EY had -- was
21  hired, and I was brought in from the restructuring
22  team to look at the revenue forecasting, and they
23  were asked by the State of Michigan to look at
24  their -- both their expenses and their --
25  forecasted expenses and revenues, and the State

1  wanted them just to do one more check.
2    Q.  And was the City of Flint put under an
3  emergency manager as a result of fiscal distress?
4    A.  They have been under emergency financial
5  management, yes.
6    Q.  And do you know what actions the emergency
7  manager has taken to alleviate financial distress?
8    A.  I do not.
9    Q.  Do you know if Flint has improved its
10  fiscal situation at all?
11    A.  I do not.
12    Q.  Do you know -- as far as you know, did the
13  City of Flint ever consider going into Chapter 9 as
14  a result of fiscal distress?
15    A.  I don't know.
16    Q.  You're not aware of that ever coming up?
17    A.  I don't know if they've ever talked about
18  it.
19    Q.  During your interactions with the City of
20  Flint, though, they never suggested to you that
21  they would go into Chapter 9 to alleviate fiscal
22  distress, correct?
23    A.  So during my conversations with the City,
24  we never talked about whether or not they would go
25  into bankruptcy.

1    Q.  And why was the State of Michigan having
2  the City look at its revenues again?
3    MR. STEWART:  Objection.
4    THE WITNESS:  I don't know.
5  BY MR. SMITH:
6    Q.  Do you know if the city of -- City of
7  Flint cut costs and services in order to address
8  fiscal distress?
9    A.  I don't know.
10    Q.  Do you know if -- I mean, you were doing
11  the revenue forecasting, I guess.  Do you know if
12  the City of Flint raised taxes in order to address
13  its fiscal distress?
14    A.  So I was doing forecasting, so in terms
15  of -- I don't know what they had done in the past.
16  Going forward, we looked at the various taxes and
17  whether or not things were going to expire at
18  certain times, so it was all under current law,
19  things that had been planned so...
20    Q.  What kind of things did the City of Flint
21  plan in terms of taxes for raising revenue?
22    A.  They -- so I looked at their property and
23  income taxes and state revenue sharing.  They had
24  certain millages that were going to expire at
25  certain times, and so we just took that into

1  account in our forecast, made sure we were
2  following what was the current law.
3    Q.  Were there increases in taxes that were
4  planned or increases in tax revenues that you
5  incorporated into your Flint revenue --
6    A.  So anything that was in current law we
7  incorporated.
8    Q.  And what would that include?
9    A.  Off the top of my head, I can't remember.
10    Q.  When did you do the analysis for Flint?
11    A.  I did it in February of 2014.
12    Q.  You mentioned that you can talk about this
13  because it's public, correct?
14    A.  Correct.
15    Q.  Are there nonpublic engagements that
16  Ernst & Young has been engaged for for cities in
17  Michigan?
18    A.  Not that I'm aware of.
19    Q.  Are there other nonpublic engagements that
20  you've been engaged in by any cities?
21    A.  Nonpublic engagements, yes.
22    Q.  How many of those are there?
23    A.  I can't recall at the moment off the top
24  of my head.
25    Q.  Do those have anything to do with the

1  Detroit bankruptcy?
2    A.  No.
3    Q.  The -- did the City of Flint receive,
4  other than the revenue sharing, any special
5  assistance from the State in terms of monetary
6  payments?
7    A.  I don't know.
8    Q.  Before the City of Detroit matter, though,
9  had you ever forecast state revenue sharing
10  payments?
11    A.  Before the Detroit matter, no.
12    Q.  In Flint, are there -- other than -- one
13  difference between your projections in the City of
14  Flint and the City of Detroit matter is the length
15  of time over which the projection occurs, correct?
16    A.  There were different time periods that I
17  was asked to look at, yes.
18    Q.  And you were asked to look at a shorter
19  period for Flint, Michigan, correct?
20    A.  I was asked to look at five years.
21    Q.  Which is shorter than --
22    A.  Which is shorter than 10, yes.
23    Q.  Are there other differences in your
24  methodology for the Flint projections compared to
25  Detroit?

1    A.  No.
2    Q.  Were you asked to look at anything other
3  than property tax and state revenue sharing, or did
4  you do other sources of revenue?
5    A.  We looked at other sources of revenue.
6    Q.  Okay.  What other sources?
7    A.  So income taxes.
8    Q.  Anything else?
9    A.  So what I was responsible for was property
10  and revenue sharing, so those are the ones that I'm
11  comfortable talking about.
12    Q.  I mean, do you know if there were other
13  revenue sources?
14    A.  There are other revenue sources, yes.
15    Q.  What were the other revenue sources for
16  Flint?
17    A.  So those were the ones that I was not
18  personally involved in forecasting.
19    Q.  Well, I'm just wondering what they were,
20  not the details necessarily.
21    A.  Just like any city, they would have
22  certain grants or other things, but that was not
23  what I looked at.
24    Q.  So one significant source of revenue for a
25  city is grants from either the federal government

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-6   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 7 of 116

1  or the state government, correct?
2      MR. STEWART:  Just a second.  Objection.
3  BY MR. SMITH:
4      Q.  Now you can answer.
5      MR. STEWART:  You can answer the question.
6      THE WITNESS:  I guess I don't know what the
7  question is.
8  BY MR. SMITH:
9      Q.  One significant source of revenue for a
10  city is grants from the federal government or state
11  government, correct?
12     A.  I guess it depends on the city and what
13  you mean by significant.
14     Q.  For the City of Detroit, grant money from
15  the state and federal governments is a significant
16  source of funds, correct?
17     A.  I don't know.
18     Q.  You would agree that property tax revenue
19  is a significant sort of revenue for Detroit,
20  correct?
21     A.  What do you mean by significant?
22     Q.  Well, you've used the word significant
23  before, right?
24     A.  I don't know.  I don't think I have.
25     Q.  You're saying in your life, you've never

1  used the word significant before?
2      A.  Well, I use it, but I don't know if I
3  would use it in this context, so what do you mean
4  by significant?
5      Q.  Okay.  The property tax revenue would be
6  one of the top revenue sources for the City of
7  Detroit?
8      A.  So for the City of Detroit, when I look at
9  the various tax components, property tax revenue
10  makes up a good portion of the tax revenue that the
11  City receives.
12     Q.  Do you know what the proportion is?
13     A.  So it's around 17 percent.
14     Q.  And what's the proportion of revenue for
15  the city that the state revenue sharing makes up?
16     A.  Off the top of my head, I don't know.
17     Q.  Would it be fair that to say that state
18  revenue sharing is one of the top revenue sources
19  for the City of Detroit?
20     A.  State revenue sharing, when I look at the
21  tax revenue plus the state revenue sharing, state
22  revenue sharing is a good portion of that revenue,
23  yes.
24     Q.  Have you ever forecasted expenditures for
25  a city?

1      A.  Expenditures for a city?  No, I haven't.
2      Q.  Before -- before the Detroit matter, did
3  you ever forecast property tax revenues?
4      A.  Yes.
5      Q.  What context did you do that?
6      A.  I would do it for clients related to
7  certain projects, so for example, I would be
8  retained in my old job to look at a new facility
9  and then to forecast the property tax revenue from
10  that.
11     Q.  Okay.  But before the Detroit matter, you
12  never forecasted the total property tax revenues a
13  city received, did you?
14     A.  For -- what do you mean the total forecast
15  for a city?
16     Q.  I mean you never forecasted the amount of
17  property tax revenue a city would receive in total
18  before your retention on the Detroit matter,
19  correct?
20     A.  That's correct.
21     Q.  You've never been qualified as an expert
22  by any court; is that correct?
23     A.  That's correct.
24     Q.  Have you ever been retained to do any
25  expert work before in a litigation context?

1      A.  Yes.
2      Q.  And what context was that?
3      A.  Sorry.  Let me clarify.  Do you mean -- so
4  in my old job, my boss had been an expert on a
5  number of cases, so I would work on his cases.  I
6  was not the expert, though.
7      Q.  Okay.  So you've done litigation
8  consulting work before, but you weren't personally
9  the expert, correct?
10     A.  That's correct.
11     Q.  When did you begin your work on the City
12  of Detroit matter?
13     A.  I started work in May of 2013.
14     Q.  Have you ever forecasted municipal
15  population levels before?
16     A.  For specific projects in my old job, yes.
17     Q.  Have you ever forecasted -- have you ever
18  done a forecast for municipal revenue sharing for
19  the Detroit matter?
20     A.  No, I don't think so.
21     Q.  And have you ever forecasted what future
22  property assessments would be in a city before the
23  Detroit matter?
24     A.  So in this case, I forecasted taxable
25  value, which obviously, has some relationship with

1 assessments, and this is the first time that I did
2 that for a municipality, yes.
3    Q.   You're not a lawyer, correct?
4    A.   I am not.
5    Q.   And you're not holding yourself out as a
6 legal expert?
7    A.   What do you mean by legal expert?  I'm an
8 expert in this case.
9    Q.   Okay.  Are you offering any opinions on
10 the law like as it relates to this case?
11    MR. STEWART:  Objection.
12    THE WITNESS:  I don't think I'm offering
13 opinions on the law.  I'm offering opinions on the
14 two things that are in my report.
15 BY MR. SMITH:
16    Q.   Okay.  So other than what's in your
17 report, you're not offering any expert opinions
18 other than that, correct?
19    A.   That's correct.
20    Q.   Okay.  And is it fair to say that in your
21 report, you're not -- or anywhere else, you're not
22 trying to offer an opinion about interpreting the
23 law, correct?
24    A.   I'm not offering an interpretation of the
25 law.

1    Q.   Okay.  Have you reviewed any depositions
2 in this case?
3    A.   Yes.  No, I haven't.  Sorry.  I've
4 reviewed expert reports.  Sorry.
5    Q.   But no depositions?
6    A.   I have not reviewed depositions.
7    Q.   So you didn't review Mr. Evanko's
8 deposition?
9    A.   I have not reviewed Mr. Evanko's
10 deposition.
11    Q.   You know who Mr. Evanko is, though,
12 correct?
13    A.   I do.
14    Q.   Who is Mr. Evanko?
15    A.   Gary Evanko --
16    Q.   Yes.
17    A.   -- is the city assessor for the City of
18 Detroit.
19    Q.   Have you -- you mentioned you had reviewed
20 expert reports.  What expert reports have you
21 reviewed?
22    A.   I have read Robert Cline's expert report
23 and Gaurav Malhotra's.
24    Q.   Any other expert reports?
25    A.   Not that I'm aware of, no.

1    Q.   You didn't read Charles Moore's expert
2 report, correct?
3    A.   I have not.
4    Q.   And do you know who he is?
5    A.   I do not.
6    Q.   Do you know --
7    A.   And I read Martha -- what's her last name?
8    Q.   Ms. Kopacz?
9    A.   Yes.  Thank you.
10    Q.   You read her report?
11    A.   I did read her report.
12    Q.   And you know that Ms. Kopacz opines that
13 the forecasts Ernst & Young had presented were
14 subjective, correct?
15    MR. STEWART:  Objection.
16    THE WITNESS:  I do not recall reading that, no.
17 BY MR. SMITH:
18    Q.   Do you recall her doing an analysis where
19 she calculated the effect of a 1 percent increase
20 in property tax collections?
21    A.   I did read her report where she did do the
22 sensitivity analysis, yes.
23    Q.   She found that increasing property tax
24 collections by 1 percent could lead to more than a
25 $20 million increase in revenue, correct?

1    A.   My recollection from her report is that if
2 you assumed that -- if you were able to change the
3 parameter by 1 percent, what would that mean over
4 the long haul, and my recollection is over
5 20 million in property tax revenue.
6    Q.   Has Ernst & Young done any sensitivity
7 analysis on its forecast to understand what
8 changing the inputs would mean in terms of revenues
9 available to the city?
10    A.   Throughout the process, we would vary our
11 assumptions, change our assumptions and see what
12 the revenue impacts are.
13    Q.   And what assumptions did you change during
14 the process?
15    A.   So for property taxes, we would change the
16 important drivers, so whether it be taxable value
17 or collection rates.  Those are the key assumptions
18 that we would change.
19    Q.   And did you increase or decrease taxable
20 value over time, I mean, in changing the
21 assumptions?
22    A.   Well, so do you have a -- I mean, both.  I
23 mean, there are times when we would say we would
24 get a new piece of information, and we might adjust
25 our growth rates, and sometimes they would raise

1 taxable value. Sometimes they would lower it. So
2 it really depended on the particular situation we
3 were modeling.
4      Q.  So you used multiple values in your
5 various work as for taxable value, correct?
6      A.  Multiple values in our taxable value for
7 forecast?  So our taxable value throughout our
8 forecasts would change as we incorporated more
9 information, more data, so we've done several
10 iterations.  And so when we got -- received new
11 information, we would incorporate it.
12      Q.  And what other important drivers did you
13 change multiple times?
14      A.  Change multiple times?  So we've done -- I
15 think we're about -- I think there are five
16 forecasts, five disclosure statements, so we've
17 done the analysis, and we've updated it five times.
18 And so like I said, given new information, we would
19 look at the different components of taxable value,
20 make some adjustments to taxable value, to the
21 collection rate based on the -- whatever
22 information was at hand.
23      Q.  So one important driver of property tax
24 revenue is taxable value, correct?
25      A.  That's right.

1      Q.  Another important driver of property tax
2 revenue is the collection rate, correct?
3      A.  Uh-huh.
4      Q.  Are there any other important drivers of
5 taxable value?
6      A.  Well, so within taxable value --
7      Q.  I mean -- let me re-ask the question.
8           Are there any other important drivers of
9 property tax revenue?
10      A.  Property tax revenue?  So within property
11 taxes, we forecasted, and by we, I mean I did
12 analysis.  I also talked with Bob Cline about this.
13 So within the analysis, I would look at different
14 components of taxable value and forecast that.
15 What was your question, though?
16      Q.  What are the other important drivers of
17 property tax revenue?
18      A.  So within property -- so tax revenue is
19 dependent upon the tax levy.  The tax levy is your
20 equitable value times your tax rate and then how
21 much are you going to collect.  So those are the
22 key components.  Within taxable value, you have
23 various drivers, so that would include population
24 to the city is important.  You would need to know
25 sort of new economic activity, is there any

1 businesses started, is there new construction
2 activity.  These are all drivers of taxable value
3 which ultimately then affects your tax levy, your
4 collection and then ultimately your tax revenue.
5      Q.  And the tax rate is an important driver of
6 property tax revenue, correct?
7      A.  What do you mean by important?
8      Q.  It's a key -- tax rate is a key driver of
9 property tax revenue, correct?
10      A.  It is one of the -- it's one of the key
11 drivers.
12      Q.  And in your formula, increasing the tax
13 rate increases property tax revenue, correct?
14      A.  It depends, I guess.  So if you were to
15 hold --
16      MR. STEWART:  You answered his question.
17      MR. SMITH:  Are you telling her not to finish
18 her answer?
19      MR. STEWART:  No.  I'm just telling her to let
20 you ask your next question.
21      MR. SMITH:  I think you're telling her not to
22 finish her answer, Geoff.
23      MR. STEWART:  Finish your answer if you want to
24 finish your answer.
25      THE WITNESS:  Okay.  I was going to say it

1 depends.
2 BY MR. SMITH:
3      Q.  Okay.  You agree with me that if you hold
4 everything else constant in your forecast,
5 increasing tax rates increases property tax
6 revenue, correct?
7      A.  If you hold everything else constant and
8 you increase the tax rate, you would get more tax
9 revenue.
10      Q.  And if you hold everything else constant,
11 increasing the percent of state revenue sharing
12 increases state revenue sharing revenue, correct?
13      A.  If you hold everything constant and the
14 state decided to give Detroit more money, they
15 would have more money.
16      Q.  It's basically -- the state has the
17 discretion to improve Detroit's fiscal condition by
18 just giving more revenue sharing, correct?
19      MR. ALBERTS:  Objection.
20      THE WITNESS:  Theoretically, the state could
21 decide that they want to give more money to
22 Detroit, and Detroit would have more money.
23 BY MR. SMITH:
24      Q.  Do you know what the important -- the key
25 drivers are of the income tax revenues for the City

1  of Detroit?
2     A.  Do I know what they are?  I did not do
3  that analysis.
4     Q.  But did -- I take it you're not offering
5  any opinions on the income tax or the corporate tax
6  or the wagering tax or the utility users tax,
7  correct?
8     A.  That's correct.  I'm not offering an
9  opinion.
10     Q.  You -- one of documents you rely on is the
11  Citizens Research Council report on Detroit.  Do
12  you recall that?
13     A.  Which report?
14     Q.  The one on revenues.
15     A.  Do you know the title?
16     Q.  It's called something like revenues
17  available to the City of Detroit or something like
18  that.
19     A.  So I have looked at a Citizens Research
20  Council report.  It sort of fits that definition.
21     Q.  Well, I'm just wondering is the Citizens
22  Research Council a reliable source of information,
23  in your view, on revenues available to the City of
24  Detroit?
25     A.  I think the Citizens Research Council does

1  excellent work.
2     Q.  In general, you know that the Citizens
3  Research Council has issued multiple reports on
4  Detroit and its fiscal condition, correct?
5     A.  I am not aware of how many reports they've
6  issued.
7     Q.  You know the Citizens Research Council has
8  done significant work researching Detroit's fiscal
9  condition, though, correct?
10     A.  I don't know about significant.  I know
11  they've done that one report.
12     Q.  You mentioned -- have you done previous
13  work for the State of Michigan?
14     A.  Specifically for the state?
15     Q.  Yeah.
16     A.  So I was hired by a group and worked with
17  the governor on a state citizens guide to their --
18  it was a citizens financial guide to the state's
19  finances.
20     Q.  Was that when you were at Ernst & Young or
21  your prior job?
22     A.  That was my prior job.
23     Q.  And so have you met the governor?
24     A.  I have, yeah.
25     Q.  And did you work with the governor in

1  creating the citizens guide?
2     A.  So the governor -- I worked with his
3  office on creating the guide that was released by
4  him.
5     Q.  Were your forecasts based on assumptions
6  or other information provided by officials from the
7  City of Detroit?
8     A.  Can you say the question one more time?
9     Q.  Were your forecasts based on assumptions
10  or other information provided by the City of
11  Detroit?
12     A.  I had conversations with the City of
13  Detroit about what they're planning to do on
14  property taxes, and so I used that information to
15  form my own assumptions for the analysis.
16     Q.  Okay.  Who did you have discussions with?
17     A.  So I had discussions with Gary Evanko and
18  Alvin Horhn and Michael Jameson and Linda Beatty
19  and Nancy Caper, I think, is her last name.  She's
20  no longer there.  Those are the people I can recall
21  that I had conversations with.
22     Q.  How many times did you have conversations
23  with Gary Evanko?
24     A.  I cannot recall the exact number.  I will
25  say that I have been on the phone with him at least

1  twice, and I've had e-mail exchanges with Gary.
2     Q.  How long ago were you on the phone with
3  Gary Evanko?
4     A.  The last time I talked to him, it was on
5  my sister's birthday.  It was April 7th.
6     Q.  And before that, do you recall when you
7  spoke with him?
8     A.  I think it was January 22nd.
9     Q.  Have there been times when the City failed
10  to respond to Ernst & Young's request for
11  information for your analyses?
12     A.  There are times the City did not respond
13  to a specific request.
14     Q.  What specific request did the City fail to
15  respond to that you had made?
16     A.  So I had asked Gary Evanko for detailed
17  Renaissance Zones by property type.  I wanted
18  several years.  He provided one year.
19     Q.  Why did you want several years of
20  information about Renaissance Zones by property
21  type?
22     A.  I wanted to see how the taxable value had
23  changed from year to year.
24     Q.  And why did you want to do that?
25     A.  Just to see if there were fluctuations,

1 things that I would need to take into account for
2 my forecasting model.
3 Q. And you wanted to have multiple years'
4 data on Renaissance Zones because that would make
5 your analysis more reliable and accurate?
6 MR. STEWART: Objection.
7 BY MR. SMITH:
8 Q. Is that fair?
9 A. I would not say it would make it more
10 reliable. I had good information from the City for
11 fiscal year 2014. I actually got it then later for
12 fiscal year 2015. I always knew what the total
13 Renaissance Zone amount was, which was important
14 because I was forecasting general operating taxes.
15 So in a sense, I didn't need to know that detail,
16 but I wanted to make sure I understood what was
17 happening just as a matter of course.
18 Q. I mean, without multiple years' data, you
19 weren't able to look at fluctuations in the
20 Renaissance Zones, correct?
21 A. I did end up with two years, so I could
22 see some fluctuations.
23 Q. Okay. There's no way to do a historical
24 trend based on two years' data regarding the
25 Renaissance Zones, correct?

1 A. I was not able to do a historical trend
2 more than two years for Renaissance Zones by
3 property type.
4 Q. Did Mr. Evanko ever explain to you why he
5 didn't give you information that you requested on
6 Renaissance Zones?
7 A. He did.
8 Q. Why was that?
9 A. He was working at that point to prepare
10 the taxable values for the current tax year, and so
11 he was very busy and said he --
12 Q. Were there any other pieces of information
13 you had requested that you didn't receive from the
14 City?
15 A. Yes.
16 Q. What were those?
17 A. I requested what the taxable value of
18 property that would be subject to the small
19 business exemption starting in 2014. I asked what
20 the taxable value of those properties were in a
21 report.
22 Q. And who did you ask that?
23 A. I sent the request to our EY team who
24 forwarded it on.
25 Q. Did you get an explanation about why you

1 didn't get that information?
2 A. I did not.
3 Q. Why did you want the information on small
4 business exemptions?
5 A. So part of the analysis is looking at
6 personal property, and the -- certain personal
7 property is going to be exempt if the referendum
8 passes, and so I wanted to have a sense of what
9 property would be exempt. I had had conversations
10 with the City about the size of that, and I wanted
11 to see an actual report.
12 Q. Okay. But you were never sent the report
13 on small business exemptions for the personal
14 property tax, and you have never gotten any
15 explanation about that?
16 A. That's correct.
17 Q. Were there other pieces of information you
18 requested the City did not provide?
19 A. Not that I recall.
20 Q. Do you know if there are other people on
21 the EY team that have made requests to the City
22 that they did not fulfill in terms of information?
23 A. I don't know.
24 Q. Did you work with Katie Ballard at all on
25 your analysis?

1 A. I did.
2 Q. What was her role in your analysis?
3 A. So Katie and my analysis, we mostly talked
4 about population forecasts.
5 Q. And did Katie Ballard do some of the
6 population forecasting that's in your analysis?
7 A. She did not.
8 Q. What did she do?
9 A. So we talked about how we thought we
10 should do the analysis. We talked about places to
11 go for certain data, so she was more somebody just
12 to talk through what we were doing, and we -- me,
13 her and Bob talked about our assumptions going
14 forward.
15 Q. And so Katie Ballard, what's her
16 educational background?
17 A. She has a master's degree in public
18 policy.
19 Q. And when did she get that?
20 A. I'm not sure.
21 Q. How long has she been out of school?
22 A. I'm not certain. I think she's been out
23 for four years.
24 Q. But you wouldn't view Katie Ballard as
25 somebody qualified to do the -- any of the

1  forecasting for the City, correct?
2      A.  I wouldn't say that, no.
3      Q.  Okay.  Did Katie Ballard do any of the
4  forecasting for the City?
5      A.  She did not.
6      Q.  Has Katie Ballard ever done forecasting
7  for the City before?
8      A.  I don't know, so maybe I should say she
9  did assist me on the Flint matter.
10     Q.  Would it be fair to say that you were
11 relying on the expertise of the City of Detroit
12 people that you talked to in formulating the
13 assumptions for your forecast?
14     A.  I had conversations with the City, and I
15 used the information that they gave me in forming
16 my opinion.
17     Q.  Did you do any independent testing or
18 analysis of the information that was provided to
19 you by the City for your forecast?
20     A.  So what do you mean by independent
21 testing?
22     Q.  Did you go back and test any of the data
23 that the city provided you for your forecast to
24 ensure it was accurate?
25     A.  I checked to make sure that the ad valorem

1  taxable value information they gave me matched what
2  was in the State Tax Commission reports, and that
3  was the only check to make sure that those numbers
4  matched.
5      Q.  Was there information that the city
6  provided you that you didn't do independent testing
7  for to ensure its accuracy?
8      A.  I did not verify every piece of
9  information, go back and see if I thought it was
10 accurate.  I did not do that.
11     Q.  What were some of the pieces of
12 information you didn't do any testing to verify its
13 accuracy?
14     A.  So for the most recent tax bills, the ad
15 valorem data.  I took that information they gave me
16 since it was certified and used it.
17     Q.  Anything else?
18     A.  I had conversations with the City about
19 when they were planning to hire consultants to do
20 the reappraisal study.  I did not go back and check
21 to see when a contract was filed or things like
22 that.
23     Q.  Other information that you relied on from
24 the City you didn't verify its accuracy?
25     A.  I took information from their audited

1  financial statements.  They had been audited, so I
2  didn't go back and check.  They ran certain reports
3  from their system.  I didn't have access to those
4  systems, so I took that information.
5      Q.  And other information you received from
6  the City you didn't verify its accuracy?
7      A.  I don't think so.
8      Q.  I mean, basically on the conversations
9  with the City officials that were used to formulate
10 your assumptions, you didn't do anything to verify
11 the accuracy of what the people at the City were
12 telling you; is that fair?
13     MR. STEWART:  Objection.
14     THE WITNESS:  I don't think that's fair.
15 BY MR. SMITH:
16     Q.  Were there instances, though, where people
17 from the City gave you information verbally that
18 you used in formulating your assumptions where you
19 didn't go and try to verify the accuracy of the
20 information?
21     A.  There were times when the City would give
22 me -- would tell me something over the phone or
23 what they planned to do, and there are times that I
24 would have conversations with our ground -- our
25 team on the ground in Detroit.  I would talk to

1  multiple people about what was going on, talk to
2  the mayor.  So there were times where I was able to
3  make sure the information was consistent, and there
4  were other times where they would run a report, and
5  they'd give it to me, and I accepted it.
6      Q.  So generally when the City would run a
7  report from their system to which you didn't have
8  access, you wouldn't do anything to verify the
9  accuracy of that report, correct?
10     A.  Sometimes I was able to go back and look
11 to see if, like I said, the taxable value matched
12 what was being reported to the state or available
13 in other systems or would show up in a budget book
14 or an audited financial statement.  So there are
15 times I was able to check to make sure the numbers
16 were consistent, and then there were times where I
17 had requested collection rate information by
18 property type that they had to run a report for me.
19 I talked to the person, made sure I understood it,
20 made sure numbers added up, and then I would accept
21 it.
22     Q.  You didn't verify the accuracy of the
23 collection rate information, though, that you have
24 you were given by the City, correct?
25     A.  If you mean by -- what do you mean by

1 verify?
2    Q.   You didn't go back to actually test and
3 verify the accuracy of the collection rate
4 information that was given to you by the City,
5 correct?
6    A.   I was not able to go and, say, run the
7 report myself or look at their base data.
8    Q.   When you began work on this case, was
9 there already some sort of model in place for
10 forecasting property tax or state revenue sharing
11 revenue?
12    A.   There was a model in place for property
13 taxes.
14    Q.   Do you know who created that model?
15    A.   I do not know.
16    Q.   Did you look at the experience of any
17 other cities in developing your forecast?
18    A.   No.
19    Q.   Do you know what cities would be
20 comparable to Detroit in terms of their financial
21 situation?
22    A.   No.
23    Q.   Did you rely on data provided by the
24 assessor's office in formulating your opinions?
25    A.   I did receive data from the assessor's

1 office.
2    Q.   And you relied on that in formulating your
3 opinions?
4    A.   I did rely on some of that data.
5    Q.   Did you work with Shavi Sarna at all?
6    A.   I did.
7    Q.   What was your interaction with that
8 individual?
9    A.   Shavi and I would have conversations.  We
10 would exchange e-mails.  He would ask questions.
11    Q.   Do you know what fees the City collects?
12    A.   What do you mean by fees?
13    Q.   Well, you know the City of Detroit charges
14 fees for various services, correct?
15    A.   Correct.
16    Q.   Do you have any idea what fees the City of
17 Detroit collects?
18    A.   I don't.
19    Q.   Do you have any idea what licensing
20 revenues the City gets?
21    A.   I don't.
22    Q.   Do you have any idea what the mechanisms
23 for property tax assessment are in the City?
24    A.   What do you mean by mechanisms?
25    Q.   I mean, can you -- are you able to explain

1 the mechanism or methodology used in assessing
2 property taxes?
3    A.   I don't know what the city assessor's
4 office was doing to assess property.  I don't know.
5    Q.   Can you explain the methodology used by
6 the City in collecting property taxes?
7    A.   No.
8    Q.   Can you explain to me the methodology the
9 city used in setting property tax rates?
10    A.   No.
11    Q.   Can you explain the methodology the State
12 used in setting the revenue sharing levels?
13    A.   So there are two parts of revenue sharing.
14 So there's the constitutional portion, which has a
15 formula, and then there's the EVIP portion, the
16 Economic Vitality Incentive Program.  And in terms
17 of how exactly they decide what they're going to
18 allocate cities, villages or townships, I don't
19 know the formula for that.
20    Q.   Okay.  So it would be fair to say that you
21 don't know the formula or methodology used in
22 setting the statutory portion of the revenue
23 sharing; is that correct?
24    A.   I wouldn't say that.  The EVIP portion
25 doesn't have a formula, and so it would be

1 inaccurate to say I don't know the formula because
2 there isn't a formula.
3    Q.   Let me re-ask my question then.
4        Would it be fair to say you don't know the
5 methodology used in setting the EVIP portion of the
6 state revenue sharing?
7    A.   I personally don't know why legislators
8 decide to allocate a certain amount of money to
9 Detroit.  There is a -- there are three components
10 to EVIP.  There's supposed to be -- they're
11 supposed to meet certain things in order to get the
12 revenue, but what the legislature decides year to
13 year to allocate is their discretion, so...
14    Q.   Basically the amount of revenue sharing,
15 would you agree, is a discretionary political
16 decision by the legislature?
17    A.   For EVIP, it is the discretion of the
18 legislature.
19    Q.   And it's a political decision.  The amount
20 of money that the legislature decides to give to
21 cities is decided by people who are elected and
22 make a political decision about how much money to
23 give, correct?
24    A.   People who are elected make that decision.
25    Q.   And the decision about how much money the

1    City gets in state revenue sharing is a decision
2  that's made in the political process, correct?
3    A.   I wouldn't say that because there are two
4  components.
5    Q.   The EVIP portion of the state revenue
6  sharing is generated by political process, correct?
7    A.   In that the legislature and the
8  legislature is part of the political process, yes.
9    Q.   And the EVIP portion is the largest
10 portion of the state revenue sharing, correct?
11   A.   For the City of Detroit?
12   Q.   Yes, for the City of Detroit.
13   A.   That's correct.
14   Q.   In your view, what are the biggest sources
15 of untapped revenue for the City of Detroit?
16   A.   I don't have an opinion on that.
17   Q.   Do you have an opinion about how the City
18 of Detroit could increase property tax revenues?
19   A.   I do not.
20   Q.   The City of Detroit has never asked you or
21 anyone else at Ernst & Young to use your expertise
22 to increase property tax revenues for them,
23 correct?
24   A.   Correct.  We don't do specific tax policy
25 recommendations.

1    Q.   Okay.  So you're offering no opinion about
2  whether the City can increase tax revenues,
3  correct?
4    A.   I'm not offering an opinion about whether
5  they can increase tax revenues.
6    Q.   And you're not offering an opinion about
7  whether the City can pay the creditors more money
8  in the bankruptcy, correct?
9    A.   I'm not offering an opinion on that.
10   Q.   And you're not offering an opinion about
11 how much revenue the City would have if the
12 bankruptcy case is dismissed, correct?
13   A.   That's correct.
14   Q.   I mean -- and in fact, Ernst & Young's
15 policy would prohibit you from offering opinions
16 about how much -- whether the City can generate
17 more tax revenue or increase tax rates or do other
18 things like that, correct?
19   A.   So Ernst & Young would not want us to make
20 specific recommendations on tax policy the City of
21 Detroit should pursue.  We just do the analysis.
22   Q.   And why doesn't Ernst & Young allow its
23 staff to make recommendations about tax policy like
24 that?
25   A.   So the bulk of our business is providing

1  auditing services, accounting services.  We do,
2  obviously, tax advisory.  We prepare tax
3  statements.  Our business is not to consult in the
4  policy realm in this way.  And so I didn't make
5  those decisions, but that's what I follow.
6    Q.   Okay.  So Ernst & Young is not in the
7  business of offering tax policy advice to
8  municipalities, correct?
9    A.   So the work that I do, I do not provide
10 specific policy recommendations.  I don't know if
11 other parts of EY offer, but I know as a whole, we
12 don't make, say, specific tax policy
13 recommendations.
14   Q.   In the past, have you made tax policy
15 recommendations to government in your other jobs?
16   A.   In my other job, I would do the analysis
17 around a policy change, and so I would provide my
18 opinion sometimes about the change.
19   Q.   I mean, you know that other cities have
20 increased taxes to address fiscal distress to raise
21 revenue, correct?
22   A.   Some cities have done that, yes.
23   Q.   And you're aware that cities have cut
24 services in order to address fiscal distress and
25 improve their fiscal situation?

1    A.   Some cities have done that, yes.
2    Q.   And you know that cities have added new
3  fees for services in order to raise revenue to
4  address fiscal distress, correct?
5    A.   I don't know anything specifically.
6    Q.   Do you know that other cities have imposed
7  new taxes to raise revenue for -- to address fiscal
8  distress?
9    A.   That could be possible.  I don't know of
10 any specific instance.
11   Q.   Do you know generally that there are a
12 number of cities in the country now because of the
13 recession we've had that are experiencing fiscal
14 distress?
15   A.   Yes, I'm aware of cities experiencing
16 fiscal distress.
17   Q.   In fact, you've worked for at least one
18 other city that's experiencing fiscal distress in
19 the state of Michigan, right?
20   A.   That's right.
21   Q.   And you know in the state of Michigan,
22 there are multiple cities that are under the
23 supervision of emergency managers because of fiscal
24 distress, correct?
25   A.   Correct.

1    Q.   And what are the causes of these cities in
2  Michigan having to be under the supervision of
3  emergency managers and being in physical distress?
4    MR. STEWART:  Objection.
5    THE WITNESS:  I don't know the specifics for
6  other cities.
7    MR. ALBERTS:  Objection.  I think you mean
8  fiscal.
9    MR. SMITH:  Yes, fiscal.
10  BY MR. SMITH:
11    Q.   You know that declines in state revenue
12  sharing have -- in Michigan have adversely impacted
13  the fiscal situation of multiple cities, correct?
14    A.   I can't talk about other cities.
15    Q.   Do you know whether the City of Flint
16  undertook efforts to try to get the state
17  legislature to increase state revenue sharing?
18    A.   I don't know.
19    Q.   Do you have any opinion about the sources
20  of untapped cost savings for the City?
21    A.   I don't.
22    Q.   Does Ernst & Young ever do any kind of
23  evaluation of cities to determine how they can
24  increase revenues?
25    A.   I don't know.

1    Q.   Is the only work that you've done for the
2  City of Detroit the work leading to your expert
3  opinions in this case?
4    A.   Yes.
5    Q.   Do you know whether there are any formal
6  studies that have been conducted to ascertain
7  whether Detroit can raise taxes or increase
8  revenue?
9    A.   I don't know.
10    Q.   Do you know whether there are any formal
11  studies that have been conducted to determine
12  whether Detroit can cut costs more than half?
13    A.   I don't know.
14    Q.   Do you know of any formal studies -- can
15  you identify any studies on Detroit property taxes
16  or revenue sharing?
17    A.   Do I know of any formal studies on Detroit
18  property taxes or revenue sharing?  Other than what
19  the CRC report you mentioned earlier?
20    Q.   Yes.
21    A.   No.
22    Q.   How many people assisted you in preparing
23  your forecast?
24    A.   So I did the work and the analysis.  I had
25  discussions with Bob Cline, Katie Ballard.

1    Q.   What percent of your time is spent on the
2  Detroit matter?
3    A.   What percent of my daily just sort of work
4  time?
5    Q.   Your billable time.
6    A.   My billable time?  So I've been working on
7  this for a year or a little over a year.  My
8  billable time might be around 50 percent.
9    Q.   Do you know what proportion of your --
10  what proportion of Katie Ballard's billable time is
11  spent on the City of Detroit?
12    A.   I have no idea.
13    Q.   Can you identify any other matters other
14  than the City of Detroit that Katie Ballard works
15  on?
16    A.   What do you mean matter?  Do you just mean
17  projects or --
18    Q.   Yeah.
19    A.   Sure.  She works on our economic impact
20  studies for private clients, basically, you know,
21  just some of our thought leadership pieces.  And
22  she also worked on our council on state taxation
23  business tax burden study.
24    Q.   Have you had any interaction with anyone
25  from Conway MacKenzie?

1    A.   I've been on phone calls where Conway &
2  MacKenzie have been on the line.
3    Q.   Do you have an understanding of Conway &
4  MacKenzie's role in this matter?
5    A.   I understand a little bit, and I've
6  occasionally received things they prepared.
7    Q.   Like what kind of things?
8    A.   So when they put together some of the
9  reinvestment initiatives, I would see a copy of it.
10    Q.   And do you have any understanding of
11  Miller Buckfire's role in this case?
12    A.   I've interacted with lawyers from Miller
13  Buckfire.  I seen them as a coordinating role.  I
14  don't know any more what they're doing.
15    Q.   I mean, when you say coordinating role,
16  what exactly have you done with them?
17    A.   So Kyle Herman, who works for Miller
18  Buckfire, he would coordinate collection of
19  materials.  He would organize calls with the
20  creditors, things like that.
21    Q.   Would it be fair to say that there are
22  people who have contributed information to your
23  forecasts that you don't know who they are and
24  you've never met?
25    A.   No.

1  Q.  Like people from the City?
2  A.  So there are -- everyone at the City who
3  provided information, I have had phone calls with
4  them.
5  Q.  Do you agree that the forecast that
6  Ernst & Young has put together includes hundreds of
7  different inputs?
8  A.  Would I agree?  I don't know how many
9  inputs there are.  I can only talk about mine.
10  Q.  How many -- I mean, your piece of the
11  forecast, would it be fair to say that your piece
12  of the forecast includes numerous different inputs?
13  A.  I guess what do you mean by numerous?
14  Q.  Well, how many?  Do you know how many
15  inputs?
16  A.  I don't, no.  I mean, there are inputs.  I
17  wouldn't say -- yeah, there are inputs.  I don't
18  know how many.
19  Q.  Do you know whether there's more than
20  100 inputs in your analysis?
21  A.  There's not more than 100.
22  Q.  Okay.  I mean, would it -- do you have any
23  understanding of how your piece of the forecast is
24  put into the overall Ernst & Young forecast?
25  A.  I have been able to see where it goes into

1  the disclosure statements.
2  Q.  Okay.  But do you have an understanding of
3  how it's actually incorporated into the overall
4  forecast?
5  A.  I can see that they've taken my analysis
6  and my forecast, and they've put that into their
7  work.
8  Q.  Are there hundreds of different
9  spreadsheets that make up the Ernst & Young
10  forecast?
11  A.  I don't know how many spreadsheets.
12  Q.  Do you know how many assumptions went into
13  the Ernst & Young forecast?
14  A.  I don't.
15  Q.  Do you know how many assumptions went into
16  your forecast?
17  MR. STEWART:  Objection.
18  THE WITNESS:  I don't.
19  BY MR. SMITH:
20  Q.  Would it be fair to say that there's a
21  series of assumptions that your forecast is based
22  on?
23  A.  There are some assumptions that my
24  forecast is based on.
25  Q.  And there are multiple assumptions that

1  your forecast is based on, correct?
2  A.  There are multiple assumptions, yes.
3  Q.  And your assumptions are based on your
4  experience, correct?
5  A.  My assumptions are based on my analysis of
6  the information at hand, my conversations with the
7  City, those things.
8  Q.  Would it be fair to say your assumptions
9  are based on information you got from the City and
10  your own experience?
11  A.  If you mean -- when you say experience, I
12  would substitute that with my own data collection
13  review analysis.
14  Q.  Are your assumptions based on your
15  judgment?
16  A.  So I use my judgment in selecting what I
17  thought were good parameters for final of certain
18  assumptions.
19  THE VIDEOGRAPHER:  Off the record.  The time is
20  10:01 a.m.
21  (Whereupon, a short break was
22  taken.)
23  THE VIDEOGRAPHER:  We are back on record.  The
24  time is 10:09 a.m.
25

1  BY MR. SMITH:
2  Q.  Ms. Sallee, you mentioned that your
3  forecasts have been updated several times; is that
4  correct?
5  A.  They have been updated several times.
6  Q.  And you've -- when you've received new
7  information, you felt it was necessary to update
8  your forecasts so they would be accurate and
9  reliable, correct?
10  A.  So when new information became available
11  and when the EY restructuring team requested it, we
12  updated our forecast.
13  Q.  And is there any rule of thumb for how
14  frequently a forecast should be updated?
15  A.  Not that I'm aware of.
16  Q.  You agree that as new information comes
17  in, though, you should update the forecast to
18  incorporate the new information?
19  A.  As new information was presented, we did
20  our best to try to incorporate.
21  Q.  And if you don't incorporate new
22  information, your forecasts can be less accurate
23  and reliable than it otherwise would be, correct?
24  A.  I would not say that.
25  Q.  Okay.  So we don't have to consider new

1    information at all?  We can just let the forecasts
2    sit there, and no matter what changes, it's okay,
3    right?
4        MR. STEWART:  Objection.
5        THE WITNESS:  I don't -- what's the question?
6    BY MR. SMITH:
7        Q.  If you don't incorporate new information
8    as it becomes available, a forecast can become
9    inaccurate or unreliable, correct?
10       A.  No, I wouldn't say that.
11       Q.  Okay.  So if the property tax were
12   increased by 100 percent, your opinion is you
13   wouldn't have to update your forecast?
14       A.  So new information can sometimes confirm
15   what you've already put down, so that's why.
16       Q.  And new information can also change your
17   forecast, right?
18       A.  Yes.
19       Q.  And so it's possible that new information,
20   if you don't incorporate it, your forecasts will be
21   inaccurate or reliable.  That's possible, correct?
22       A.  So it depends on the situation.  New
23   information can improve the accuracy of the
24   forecast.  New information can confirm it.
25       Q.  And in the hall, Mr. Stewart had his

1    finger in your face, didn't he, during the break?
2        MR. STEWART:  Objection.
3        THE WITNESS:  No.
4    BY MR. SMITH:
5        Q.  Did you have a conversation with
6    Mr. Stewart during the break?
7        A.  I did.
8        Q.  What was he telling you?
9        MR. STEWART:  Objection.  It's privileged.  You
10   know that.
11       MR. SMITH:  You're directing her not to answer
12   that?
13       MR. STEWART:  Yes, that's right.  Do you want
14   me to start asking what you talk to your clients
15   about?  Do you want to waive it?  Would you like
16   to?  We can have a mutual waiver across the board.
17   I'd like to learn what you're telling Syncora.
18   BY MR. SMITH:
19       Q.  How long did you talk to Mr. Stewart for?
20       A.  Maybe 30 seconds.
21       Q.  The -- do you know whether the assessor's
22   office has been subject to any reviews by outside
23   consultants?
24       A.  I don't know.
25       Q.  So you haven't been provided with reviews

1    of the assessor's office conducted by Plante Moran?
2        A.  No.
3        Q.  Were you aware that the assessor's
4    office -- there have been a number of problems
5    identified in the assessor's office?
6        A.  I have a general sense that people have
7    said there are problems.
8        Q.  What problems are you aware of in the City
9    of Detroit Assessor Office?
10       A.  The only problem that people have talked
11   about has been overassessments.
12       Q.  That's the only problem that you're aware
13   of in the assessor's office is overassessments?
14       A.  That's the only problem that people have
15   talked to me about.
16       Q.  Would it be fair to say that you haven't
17   cited any scientific literature or anything like
18   that in performing your forecasting?
19       A.  What do you mean by scientific?
20       Q.  Well, there's no literature of any kind
21   that you've cited as the basis for your forecast,
22   correct?
23       A.  So as I noted in my report, I followed the
24   procedures laid out by the revenue -- the State of
25   Michigan's Consensus Revenue forecasting, and

1    that's in report that I think was produced.
2        Q.  Have you run any runs of your forecasts
3    that had higher revenues available to the City?
4        A.  I guess I don't understand your question.
5        Q.  Have you done any runs of your forecast
6    where you generated revenues that are higher than
7    what you're forecasting currently for the City?
8        A.  Yes.
9        Q.  And what kind of runs?
10       A.  So as you've noted, we've updated our
11   analysis, our forecasts several times, and so
12   previous earlier iterations had slightly higher
13   property taxes.
14       Q.  And are there runs that you haven't
15   submitted to the creditors or others that have
16   included higher revenues than you're forecasting?
17       A.  Everything we've done has been turned
18   over, so the creditors would have access.
19       Q.  Do you agree that you've used your
20   discretion in selecting the specific values for the
21   assumptions in your model?
22       A.  I've used my judgment in selecting the
23   assumptions.
24       Q.  Do you agree that in conducting a tax
25   forecast, you should seek to gather all evidence

1  reasonably related to the forecast?
2      A.  What's the question?
3      Q.  Do you agree in conducting a tax forecast,
4  you should collect all information reasonably
5  related to the forecast?
6      A.  So I think you need to make sure you take
7  in relevant information in doing the forecast.
8      Q.  And you should endeavor to collect all
9  relevant information in doing a forecast, correct?
10     A.  So it depends on what you mean by
11 relevant.
12     Q.  Have you ever used the word relevant
13 before?
14     A.  I have.
15     Q.  Okay.  Using your definition of relevant,
16 do you agree that you should endeavor to collect
17 all relevant information in doing a forecast?
18     A.  I did endeavor to collect relevant
19 information for the forecast.
20     Q.  That's not my question.  My question is do
21 you agree that in conducting a forecast, you should
22 endeavor to collect all relevant information?
23     A.  I would say in conducting a forecast, you
24 should collect information that's pertinent and
25 related.

1      Q.  And if you have incomplete information,
2  your forecast can be inaccurate, correct?
3      A.  Not necessarily, no.
4      Q.  But it can be inaccurate if you have
5  incomplete information, correct?
6      A.  Incomplete information can make it -- it
7  can go either way.  It depends on the situation.  I
8  mean, the nature of forecasting, you're selecting
9  data and assumptions.  It's not complete, so
10 there -- so yeah, I mean, there are situations and
11 incomplete information could make it inaccurate, or
12 it could not.  It depends.
13     Q.  Have you done any stress testing on your
14 forecast?
15     MR. STEWART:  Objection.
16     THE WITNESS:  What do you mean by stress tests?
17 BY MR. SMITH:
18     Q.  Well, I've seen reference to stress tests
19 that have been conducted on forecasts before.  Do
20 you know what that is?
21     A.  I have not done a stress test.
22     Q.  Have you ever done any kind of stress
23 testing on forecasts before?
24     A.  What is stress test in this context?
25     Q.  So you don't know what a stress test is in

1  the context of forecasting?
2      A.  I guess I don't know what you mean by
3  stress test.
4      Q.  Do you know what length of time is the
5  standard length the City uses for its forecasts?
6      A.  I don't know anything about the City's
7  forecasting.
8      Q.  Have you ever looked at the consensus
9  forecast for the City?
10     A.  I did receive one piece of information
11 that had their consensus revenue estimates for the
12 next fiscal year.
13     Q.  And do you know how many years they looked
14 at?
15     A.  I can't remember off the top of my head.
16     Q.  Have you ever done a tax forecast for as
17 long as 10 years?
18     A.  I'm not sure.
19     Q.  Have you ever -- you haven't done a
20 revenue sharing forecast for as long as 10 years,
21 correct?
22     A.  I do not think I have.
23     Q.  What are some of the factors that can
24 occur over the next 10 years that could affect the
25 actual values for property taxes or revenue

1  sharing?
2      A.  What do you mean by actual values?
3      Q.  The actual collections of property tax
4  revenue and the actual amount of money that's
5  received from revenue sharing.
6      A.  Sure.  So population rate is important,
7  employment, new economic activity.  These are all
8  things that are driving both the portion of state
9  revenue sharing and property taxes.
10     Q.  If population increases, the revenue from
11 property taxes and revenue sharing could increase,
12 correct?
13     A.  It's possible.
14     Q.  And if employment increases, the revenue
15 from property taxes and revenue sharing would
16 increase?
17     A.  It's possible.
18     Q.  And if economic activity increases,
19 revenue from revenue sharing and the property taxes
20 would increase?
21     A.  It's possible.
22     Q.  And is that -- are those -- your model,
23 though, do revenues increase if employment,
24 population or economic activity increase?
25     A.  So in our model, if there is greater

1  economic activity, we have better property tax
2  revenues.
3      Q.  If there's increased economic activity, do
4  you -- does your model generate increased revenue
5  sharing, or does it not take into account economic
6  activity for revenue sharing?
7      A.  So revenue sharing, because it is based on
8  per-capita distribution on the constitutional side
9  and for EVIP, there's no formula.  Economic
10  activity, it doesn't really affect it directly.
11      Q.  There was no formula you used for
12  calculating the revenue sharing that you projected,
13  correct?
14      A.  That's not true.
15      Q.  Well, I mean, you were just saying no
16  formula.  What did you mean?
17      A.  There's no formula in how the legislature
18  allocates the EVIP portion.
19      Q.  Does increasing population in your model
20  increase property tax revenues or revenue sharing?
21      A.  So there's no direct link between a
22  one-for-one population increase causes property tax
23  increase.  So there's no one-to-one relationship in
24  the model.
25      Q.  Does your model take into account the

1  effect of population on property tax increase at
2  all?
3      A.  So population forecasts were used to
4  inform certain growth rates in the model.
5      Q.  Okay.  So an increasing population could
6  increase growth rates which would increase property
7  tax revenues in your model; is that correct?
8      A.  That is fair.
9      Q.  In your model, does an increase in
10  employment lead to an increase in property tax
11  revenue or to revenue sharing?
12      A.  So an increase in employment doesn't
13  affect the revenue sharing in our forecast.  And
14  employment, there's no sort of direct input for
15  employment on the property tax side.  It would be
16  something that would help to inform a growth rate
17  of a tax base.
18      Q.  Okay.  So increased employment could
19  increase growth rates, which would increase
20  property tax revenues in your model, correct?
21      A.  So it depends.  Employment in Detroit
22  doesn't mean that someone is a property owner, and
23  so in that sense, we're concerned doing the
24  forecasting about the different tax bases.  So
25  employment can mean that there is additional

1  property or not.
2      Q.  In your model, does increased employment
3  in the city among residents lead to an increase in
4  property tax revenue?
5      A.  There's no direct relationship in the
6  model between employment and the tax bases.
7      Q.  Okay.  What is the relationship then in
8  the model?
9      A.  Sure.  So in the model, there are four
10  different tax bases, and so employment is something
11  that's important for -- I guess for all three, for
12  residential, commercial, industrial.  So if you
13  have improved economic activity, improved
14  employment, we could see those tax bases grow, and
15  that could translate into more tax revenue, but if
16  everything else is equal.  So there's other factors
17  that drive the model.
18      Q.  Do you agree that increased employment
19  will lead to people purchasing more goods and
20  services in the city and an increase in sales tax
21  revenue?
22      MR. STEWART:  Objection.
23      THE WITNESS:  Can you say that one more time,
24  your question?
25

1  BY MR. SMITH:
2      Q.  Increased employment will lead to an
3  increase in people purchasing goods and services in
4  the city and an increase in sales tax revenue?
5      A.  It's possible.
6      Q.  Your model does not take into account
7  increased employment having any effect on revenue
8  sharing, correct?
9      A.  That is correct.
10      Q.  Can you identify any forecast comparable
11  to the Ernst & Young forecast that's been done for
12  Detroit over a 10-year period?
13      A.  I have not seen any other forecast.
14      Q.  Can you identify -- so you've never seen
15  any forecasts like that Ernst & Young has done for
16  Detroit in any Chapter 9 bankruptcy, correct?
17      A.  I have not looked at any other Chapter 9
18  bankruptcies.
19      Q.  Have you done any investigation to find
20  out what other forecasts have been done to model
21  property tax or state revenue sharing for a
22  municipality?
23      A.  Have I -- what's your question?
24      Q.  Have you done any investigation to look at
25  other forecasts for property tax revenue or revenue

1  sharing in a municipality?
2      A.  I have not looked at other forecasts.
3      Q.  Do you agree that the longer period of
4  time a forecast covers, the less reliable it
5  becomes?
6      A.  No.
7      Q.  So your point of view is that your 40-year
8  forecast is as reliable and likely to be accurate
9  as your 10-year forecast, correct?
10     A.  My opinion is the -- we did a 10-year
11 forecast, and we did an extrapolation for 30 years,
12 and it could go either way.  That's the nature.  It
13 could be as accurate as the 10-year.  I don't know
14 yet.
15     Q.  There's no way to note -- no way to assess
16 the level of accuracy of your forecast, correct?
17     A.  The way that you could assess the accuracy
18 is to compare the forecast with actual, and the
19 actual hasn't happened yet.
20     Q.  So there's, in fact, no way to assess the
21 accuracy of your forecast, correct?
22     A.  Right, except for comparing to actual, and
23 our actuals so far have come in pretty well
24 compared to the forecast.
25     Q.  And how long has your forecast been in

1  existence?
2      A.  We did the first iteration in June of
3  2013.
4      Q.  You're aware that the City is failing to
5  collect approximately half of the property taxes
6  owed, correct?
7      A.  I am aware, sorry, half of property taxes
8  on the residential.
9      Q.  Okay.  And are you aware that the City has
10 identified more than 100,000 properties where taxes
11 have not been paid in addition to the foreclosed
12 properties?
13     A.  I don't know the number.
14     Q.  Do you know that the City has identified
15 over $504 million in unpaid property taxes that are
16 owed to it?
17     A.  I don't know the amount.
18     Q.  Your forecast doesn't take into account or
19 doesn't include any amounts for payment of property
20 taxes that are owed, but haven't gone collected
21 thus far, correct?
22     A.  That's not correct.
23     Q.  Okay.  How does your forecast take into
24 account the property taxes that are owed to the
25 City from prior years, but haven't been collected?

1      A.  So in Michigan, unpaid taxes at the
2  municipal level are turned to the county for
3  collection, and so the county will try to collect
4  on them, and then it will foreclose and has been
5  doing public auctions to sell the property.  So the
6  model takes into account net payments from the
7  county, which would be then the county paying for
8  the taxes that these properties owe.  And so that's
9  factored into the property tax collections in the
10 model.
11     Q.  Do you know what percent of the owed taxes
12 your model predicts will be actually paid from
13 prior years?
14     A.  Not in that way, no.
15     Q.  Do you know what -- is there a collection
16 or a payment rate or anything like that that is
17 incorporated into your model for the past year's
18 owed taxes?
19     A.  So the model includes a percent of the tax
20 levy that is assumed the City will receive from
21 Wayne County.
22     Q.  Okay.  And what number is that?
23     A.  It depends on the year.
24     Q.  How did you select that number?
25     A.  So Wayne County provided their prior

1  year's net revolving fund payments, and so it
2  analyzed the trends and what had been happening and
3  had some conversations about what was happening
4  with the foreclosure process and then used judgment
5  to select what was going to happen in future years.
6      Q.  Okay.  So in terms of the amount of
7  collection that will occur with respect to amounts
8  already owed from prior years, you implemented
9  different assumptions for different years based on
10 your judgment; is that fair?
11     A.  What's the question?
12     Q.  For the amount of property tax that would
13 be collected from prior years that's still owed,
14 you implemented different assumptions for different
15 years based on your judgment?
16     A.  So using my judgment, I selected payment
17 amount from Wayne County that was likely, and that
18 varied by year.
19     Q.  Okay.  And how did you go about using your
20 judgment to figure out how to vary the payment
21 amount by year?
22     A.  So using data from the past, we're able to
23 see what was happening over the last -- I guess I
24 got data for eight or nine years is my
25 recollection, and I was able to see what had

1   happened after the recession. And so we were able
2   to see the trends where there were -- what the
3   payments were doing and then getting to kind of a
4   more stable steady state going forward and was able
5   to see what was happening trend-wise and then see
6   what was reasonable, use our judgment to select
7   what's reasonable.
8     Q. I mean, you don't know what will happen in
9   future years in terms of property tax collections?
10   A. It's a forecast, yes. I don't know.
11   Q. I mean, you just don't know. You have to
12   kind of engage in a certain amount of guesswork or
13   speculation in order to choose the assumptions for
14   the model, correct?
15   MR. STEWART: Objection.
16   THE WITNESS: I wouldn't say guesswork. I think
17   performed an analysis, used the analysis to form my opinion.
18   (Document marked No. 1)
19   BY MR. SMITH:
20   Q. Why don't I hand you what's been marked as
21   Exhibit 1, and you can let me know if you've seen
22   this document before. Ever seen that document?
23   A. No, I haven't.
24   Q. Okay. I'd like to ask you about Page 5 at
25   the bottom, the last bullet point.

1   MR. ALBERTS: Could you just say what the
2   document is, please?
3   MR. SMITH: It's City of Detroit Assessing
4   Division Observation and Opportunities by Plante
5   Moran.
6   MR. STEWART: Just for the record, the control
7   numbers probably, too, for those who don't have it
8   in front of them.
9   MR. ALBERTS: Thank you.
10   BY MR. SMITH:
11   Q. At the bottom of Page 5, there's some
12   observations in the document. The last bullet says
13   a review of Tribunal opinions and judgments reveals
14   that there have been instances in which appraisers
15   were not present for hearings thereby leaving the
16   City unrepresented. Do you see that?
17   A. Uh-huh.
18   Q. Were you aware that people from the
19   appraiser's office weren't showing up for hearings
20   on property taxes that were owed?
21   A. No.
22   Q. Then if you turn over to Page 21 -- well,
23   let me ask you this first before we get to the
24   document.
25   Do you agree with me that in valuing real

1   estate, it's important to base valuations on arm's
2   length transactions?
3   A. I don't know.
4   Q. You just -- would it be fair to say you're
5   not aware of the standards for reliably valuing
6   real estate?
7   A. I was not asked in this case to evaluate
8   real estate for the City of Detroit. I took the
9   information that was given to me.
10   Q. Do you know -- and that information, was
11   that from the assessor's office?
12   A. Some of it.
13   Q. And you know that there have been many
14   foreclosures in the city of Detroit, correct?
15   A. Correct.
16   Q. Do you know whether a foreclosure is an
17   arm's length transaction?
18   A. I wouldn't think it would be.
19   Q. I mean, so a lot of the sales in Detroit
20   -- a lot of the sales or exchanges of properties in
21   Detroit have been non-arm's length transactions.
22   Are you aware of that?
23   A. I don't know.
24   Q. Page 21, you see at the bottom in
25   observations, the first bullet says valuation is

1   supposed to be determined by arm's length
2   transactions.
3   Sitting here today, you don't dispute
4   that, correct?
5   A. Correct.
6   Q. And it says one assessor estimates that of
7   the 12,000 sales included in last year's sales
8   study, only 550 were arm's length transactions. Do
9   you see that?
10   A. I do.
11   Q. Were you aware of that information before
12   you formulated your opinions?
13   A. I have not read this document, no.
14   Q. Were you aware of that information from
15   any source, though, before you formulated your
16   opinions?
17   A. The specific information, no.
18   Q. Were you aware that the vast majority of
19   transactions that form the basis for the valuations
20   you've been given for real estate are not arm's
21   length transactions before you formulated your
22   opinions?
23   A. So I knew, obviously, they were not arm's
24   length transactions, so I was aware of some of it.
25   This particular number I didn't know.

1    Q.   Were you aware that the majority of
2  transactions that form the basis for valuations
3  you've been provided were not arm's length
4  transactions before you formulated your opinions?
5    A.   I didn't know if it was the majority.
6    Q.   Did you know the percentage at all of the
7  transactions that were not arm's length that form
8  the basis for the valuation you were provided?
9    A.   I did not know what percentage were not
10  arm's length transactions.
11    Q.   Would it be fair to say you're not
12  qualified to assess the reliability of the real
13  estate valuations for property in Detroit that
14  you've been provided?
15    A.   I was not asked to assess the reliability
16  of the assessments.
17    Q.   Would you be qualified to assess the
18  reliability of the assessments you've used in your
19  forecast?
20    A.   What do you mean qualified?
21    Q.   I mean are you somebody who is qualified
22  enough to be able to tell how reliable the
23  assessment valuations that you've been given are,
24  or does that require somebody with a different
25  skill set?

1    A.   So in the work that I did, I did some
2  analysis of the assessments and came to my
3  conclusion that they were overassessed.  I did not
4  systematically look at their transactions and their
5  process of assessing.
6    Q.   Okay.  So one of the bases for your
7  forecast is your determination that property is
8  overassessed in the city, correct?
9    A.   I do think property was overassessed, yes.
10    Q.   You've never been trained in property
11  assessment, correct?
12    A.   I have not been trained to assess
13  property.
14    Q.   Do you know whether there's standards
15  governing property assessment?
16    A.   There are methods for assessing property,
17  yes.
18    Q.   And have you been trained in those methods?
19    A.   Formally trained on those methods?
20    Q.   Yes.
21    A.   I have not.
22       (Document marked No. 2)
23    Q.   Were you aware -- let me hand you what's
24  been marked as Exhibit 2.  It's a news article
25  entitled Detroit's Property System Plagued By

1  Mistakes, Waste.  Have you ever seen this article?
2    A.   I don't think so.
3    Q.   Have you seen any of the news articles
4  that have been issued on the problems with Detroit
5  property collections?
6    A.   I have seen news articles on this issue.
7    Q.   Okay.  And the first sentence says the
8  city's property tax system is riddled with errors
9  and waste and is overseen by a pair of
10  double-dipping officials who work just two days a
11  week the Detroit news investigation has found.  Do
12  you see that?
13    A.   Uh-huh.
14    Q.   Were you aware of that information before
15  you formulated your opinions?
16    A.   Was I aware of this reporter's opinion
17  that the City's tax system is riddled with errors
18  and waste?  What's the date on this?  No.
19    Q.   Were you aware of people who had come to
20  the conclusion, though, that the Detroit property
21  tax system is riddled with errors and waste before
22  you formulated your opinions?
23    A.   I don't know about waste or what the
24  definition -- I, obviously, had conversations where
25  people talked about the property being overassessed

1  or problems with the system, but no specifics were
2  told to me.
3    Q.   What problems with the Detroit property
4  tax system were you told of?
5    A.   These are just general recollections, but
6  problems with how property was assessed leading to
7  overassessments and property collection issues, but
8  these type of issues relating to the logistical
9  collection are not things that we dealt with in our
10  forecast.
11    Q.   Were you aware that Ernst & Young had done
12  its own review of the property tax system in
13  Detroit?
14    A.   What do you mean by review?
15    Q.   Well, you see there's a section in that
16  article entitled hardest job in the state?
17    A.   Okay.
18    Q.   And you see in the first paragraph it
19  talks about a Plante Moran review, correct?
20    A.   Yeah.
21    Q.   And the second paragraph, it says one
22  review by Ernst & Young concluded the two
23  departments have a prevailing culture which is
24  riddled with bureaucracy and a lack of
25  accountability.  Do you see that?

1    A.  Okay.
2    Q.  Were you aware that Ernst & Young had
3  conducted a review of the property collection
4  processes in Detroit before you worked on your
5  opinions?
6    A.  No.
7    Q.  And nobody has provided you with a copy of
8  the report in which Ernst & Young concluded that
9  departments in the city relating to property taxes
10  have a prevailing culture which is riddled with
11  bureaucracy and a lack of accountability?  Do you
12  see that?
13    A.  Uh-huh.  I did not receive a report that
14  Ernst & Young had done.
15    Q.  And you're not in a position to dispute
16  Ernst & Young's conclusions that the City's
17  departments charged with property tax collection
18  have a prevailing culture which is riddled with
19  bureaucracy and a lack of accountability, correct?
20    MR. STEWART:  Objection.
21    THE WITNESS:  I didn't work on this report, and
22  I've not seen it, so I can't comment on it.
23  BY MR. SMITH:
24    Q.  Were you even told who at Ernst & Young
25  might have done reviews of the City's property tax

1  collection processes?
2    A.  I know the team in Detroit, but I don't
3  know who did this study.
4    Q.  Okay.  So the team in Detroit you've been
5  working with daily never informed you that they had
6  done a review of the City's property tax
7  collections and found that it was riddled with
8  bureaucracy and had a lack of accountability, correct?
9    (Document marked No. 3 and No. 4)
10    A.  We never had a specific conversation about
11  a report that reached those findings, no.
12    Q.  Let me hand you what's been marked as
13  Exhibit 3. I'm just wondering if you've ever seen
14  this document before?
15    A.  No.
16    MR. STEWART:  Before you testify about it --
17    MR. SMITH:  I don't have any questions about it
18  other than whether she's seen it.
19    THE WITNESS:  No, I haven't seen it.
20  BY MR. SMITH:
21    Q.  Okay. I'm going to hand you what's been
22  marked as Exhibit 4, which is a Detroit news
23  article entitled Half of Detroit Property Owners
24  Don't Pay Taxes, and you can let me know if you've
25  ever seen this news article before.  Is that

1  something that you've seen?
2    A.  I may have seen it.  I'm not recalling
3  whether I read this or not.
4    Q.  Going back to the -- were you aware that
5  property tax bills were frequently sent to the
6  wrong address in Detroit?
7    A.  No, I wasn't aware.
8    Q.  Were you aware that homeowners exemptions
9  have been granted to people without proof of
10  eligibility in Detroit?
11    A.  No, I wasn't aware.
12    Q.  Were you aware that the City is going to
13  undertake a review because it believes that there
14  may be people that are improperly taking homeowners
15  exemptions?
16    A.  I was not aware of that.
17    Q.  Are you aware that the City has begun
18  implementing reforms of its property tax collection
19  system to improve revenues?
20    A.  I've had some conversations that note that
21  they've done some -- they're working on that.  I
22  don't know any specifics.
23    Q.  Who have you had those conversations with?
24    A.  Just conversations with the Detroit team,
25  the EY Detroit team, so I don't remember who

1  specifically, though.
2    Q.  Do you know what an equalization factor
3  is?
4    A.  I do.
5    Q.  And you know that an equalization factor
6  of 1 means that property is properly assessed in
7  the view of the county, correct?
8    A.  It means that the county believes property
9  has not systematically been over or underassessed.
10    Q.  And in fact, Detroit has always received a
11  value of 1 meaning that property is not over or
12  underassessed, correct?
13    A.  I wouldn't reach that conclusion.  The
14  county has given them an equalization factor of 1,
15  and so the processes that they're following have
16  given them an equalization factor of 1.  That
17  doesn't mean that in reality or by other measures,
18  the property is not over or underassessed.
19    Q.  You're aware that the county has always
20  given Detroit an equalization factor of 1, correct?
21    A.  I don't know always.  I know when I looked
22  at the last 10 years, they've received an
23  equalization factor of 1.
24    Q.  You're not aware of any instance where the
25  City of Detroit didn't receive an equalization

1 factor of 1, correct?
2    A.  When I looked narrowly at the last
3 10 years, they received a factor of 1.
4    MR. SMITH:  Can we take a break real quick.
5    THE VIDEOGRAPHER:  Off the record.  The time is
6 10:47 a.m.
7        (Whereupon, a short break was taken.)
8    THE VIDEOGRAPHER:  We are back on the record.
9 The time is 10:56 a.m.
10    (Document marked No. 5)
11 BY MR. SMITH:
12    Q.  Okay.  Ms. Sallee, I'm going to hand you
13 what's been marked as Exhibit 5.  It's some
14 excerpts from Mr. Evanko's deposition.  On Page 36,
15 if you open it up, 36 is the first page in here.
16 At the top, he's talking about the equalization
17 factor.  Do you see that?
18    A.  Uh-huh.
19    MR. STEWART:  Before any questions are asked or
20 answered, I'm going to interpose an objection.  The
21 judge has made it very clear, Mr. Smith, that
22 asking one witness about another witness's
23 testimony is improper.  He has barred it.  And as
24 you're aware, under Rule 30, the Federal Rules of
25 Evidence apply to depositions.  You're not allowed

1 to ask any of these questions.  It's an improper
2 line of questioning.
3    MR. SMITH:  Okay.  So your position is she's
4 not allowed to look at the Evanko deposition?
5    MR. STEWART:  No.  My position, I'd like you to
6 not interrupt me.  That's my position.
7    MR. SMITH:  You're wasting time.
8    MR. STEWART:  Wait.  You just took a
9 nine-minute bathroom break, and you're telling me
10 I'm wasting time?
11    MR. SMITH:  The witness went to the bathroom,
12 too, right?  The witness went to the bathroom at
13 the last break.
14    MR. STEWART:  Because you were sitting going
15 through your papers because were not prepared.
16    MR. SMITH:  No.  I went to the bathroom.  The
17 witness went to the bathroom, right?
18    MR. STEWART:  No.
19    MR. SMITH:  Did the witness go to the bathroom?
20    MR. STEWART:  We were both sitting here five
21 minutes while you were shuffling your papers.  Then
22 people decided to go because we weren't sure what
23 you were up to.
24        Now, let me finish my objection.  As you
25 know, under Rule 30, the Federal Rules of Evidence

1 govern depositions, and it's an improper use of a
2 witness's testimony to show it to another witness.
3 I'm not going to instruct her not to answer it, but
4 I'm going to put in a categorical objection to
5 every single question you ask of this because it's
6 improper, and the judge has already told
7 Mr. Hackney in court not to do this.
8    MR. SMITH:  Okay.  Why don't we put aside the
9 deposition for a second.  Is there any bar, in your
10 opinion, to showing the witness testimony of
11 Mr. Evanko before --
12    MR. STEWART:  Yes.  It's improper.  It's
13 inherently asking her to speculate about somebody
14 else's testimony.
15    MR. SMITH:  Okay.  But outside of the
16 deposition, your opinion is nobody can see the
17 depositions outside?
18    MR. STEWART:  No.  You're not allowed to
19 examine a witness about the testimony of another
20 witness.  That's what the evidentiary rule is, and
21 you know that very well.
22    MR. SMITH:  No, I don't know that that's the
23 rule actually.  I've never heard of that rule in my
24 life, but --
25    MR. STEWART:  Well, maybe you should share it

1 with Judge Rhodes.
2 BY MR. SMITH:
3    Q.  Has anybody communicated to you that
4 Mr. Evanko has called your forecast ridiculous?
5    MR. STEWART:  What part of this are we looking
6 at?
7    MR. SMITH:  We're not looking at the testimony.
8 I put it aside.
9    MR. STEWART:  Okay.
10    THE WITNESS:  I don't remember anyone telling
11 me that he said my -- our forecast was ridiculous.
12 BY MR. SMITH:
13    Q.  Has anybody shared with you Mr. Evanko's
14 criticisms of your forecast?
15    A.  Mr. Evanko's criticism of our forecast,
16 no.  I haven't received specific -- I haven't -- I
17 haven't been told of his criticisms of the
18 forecast.
19    Q.  If Mr. Evanko made criticisms of your
20 forecast, would you want to know that?
21    A.  Would I want to know that?  At this point,
22 they've been completed, but -- so would I want to
23 know that?  As a matter of just knowledge, sure.
24    Q.  Well, you understand you're going to
25 testify at the confirmation hearing, right?

1    A. I'm going to testify at the confirmation
2 hearing for this matter, yes.
3    Q. And before the confirmation hearing,
4 wouldn't you want to know if Mr. Evanko had
5 characterized -- had criticisms of your forecast?
6    A. I would like to know.
7    Q. And why would you like to know that?
8    A. I would find it surprising.
9    Q. You agree that equalization factor of 1
10 means the county has determined that property is
11 being properly assessed and not overassessed or
12 underassessed, correct?
13    A. Equalization factor means that the county
14 believes the process has not systematically over or
15 underassessed property.
16    Q. And currently you understand that the
17 county is giving Detroit an equalization factor of
18 1, correct?
19    A. The county is giving Detroit an
20 equalization factor of 1.
21    Q. And it would be unlawful for the City to
22 assess property in any way that was inconsistent
23 with what the county was saying, correct?
24    MR. STEWART: Objection.
25    THE WITNESS: I don't understand that question.

1 BY MR. SMITH:
2    Q. It would be unlawful for the City of
3 Detroit to assess property in any way that was
4 inconsistent with the way the county assessed
5 property, correct?
6    MR. STEWART: Objection.
7    THE WITNESS: I don't know. There are rules
8 governing how property must be assessed, and so
9 municipalities have to follow those, and the county
10 has to follow their procedures as well.
11 BY MR. SMITH:
12    Q. And if the county assessed an equalization
13 factor different than 1, Detroit would have to
14 change its assessments, correct?
15    A. The equalization factor would be applied
16 to what the City had assessed, and it would be
17 modified in those ways. In that way.
18    Q. Okay. So it would -- if the county
19 implemented a different equalization factor other
20 than 1, then as a matter of law, the assessments
21 would be changed, correct?
22    MR. STEWART: Objection.
23    THE WITNESS: I don't know if the assessments
24 would be changed. The assessment factor is
25 multiplied by what the City produces.

1 BY MR. SMITH:
2    Q. So property taxes would be changed on the
3 properties if the equalization factor were
4 different than 1, correct?
5    A. Property taxes are based on taxable value,
6 and state -- you're talking about the state
7 equalized value, which is a different concept.
8    Q. Do you -- would it be fair to say that
9 your opinion that Detroit property is overassessed
10 is inconsistent with the determination of the
11 county?
12    A. I don't know inconsistent. The county has
13 their process by which they review and they assign
14 an equalization factor. And using their rules,
15 they've come up with their opinions. And I've
16 looked at it differently, and I come up with my own
17 opinion that it's overassessed.
18    Q. Okay. So the methodology you used for
19 determining assessments whether properties are
20 properly assessed in the city is different than the
21 county's methodology, correct?
22    A. It could be. I don't know.
23    Q. You don't know what methodology the county
24 uses, correct?
25    A. I don't know specifically what they looked

1 at in determining the equalization factor.
2    Q. The county's conclusion that property is
3 properly assessed, though, is inconsistent with
4 your conclusion that it's overassessed, correct?
5    A. The county in using the equalization
6 factor has said that it's not under or
7 overassessed, and my conclusion is that it's
8 overassessed.
9    Q. So you've come to inconsistent conclusions
10 with the county, correct?
11    A. My opinion is different than the county's.
12    Q. The planned reassessment, do you know who
13 is going to be conducting that?
14    A. No.
15    Q. Do you know what method will be used for
16 the planned reassessment?
17    A. I understand generally how they go about
18 reassessing.
19    Q. But do you know -- I mean, do you know
20 what reassessment methodology the unidentified
21 contractor who is doing the reassessment is going
22 to employ?
23    A. I do not know specifically what they're
24 going to do.
25    Q. Do you know how long the planned

1 reassessment is going to take?
2 A. I was told it would take three to five
3 years.
4 Q. Who told you that?
5 A. Alvin Horhn.
6 Q. Is that somebody at the City?
7 A. It is.
8 Q. And do you know when the planned
9 reassessment will begin?
10 A. Initially I was told they wanted to have a
11 contract in place by March 2014. The last time I
12 checked to see if a contract was in place I was
13 told they were working on that, or they thought
14 they were going to have it done this month.
15 Q. Okay. So so far there's no contract, as
16 far as you're aware, that has been written for the
17 reassessment?
18 A. I don't know if a contract is in place.
19 Q. And have you also been told that the
20 reassessment could take longer than five years?
21 A. I have not been told that.
22 Q. Do you know when -- do you know whether
23 it's possible that the reassessment may not occur?
24 A. I don't know anything about the contract.
25 Q. Would it be fair to say that you just

1 can't provide us with any specifics about what the
2 planned reassessment is going to entail one way or
3 the other?
4 A. I don't know the specifics about the
5 reassessment. I know generally what they're going
6 to do.
7 Q. Has anybody informed you regarding
8 Mr. Evanko's opinion that the reassessment -- he
9 doesn't know whether it's going to increase or
10 decrease property values?
11 MR. STEWART: Objection.
12 THE WITNESS: I have not been told what
13 Mr. Evanko said during his deposition about that
14 matter.
15 BY MR. SMITH:
16 Q. Wouldn't you want to know if Mr. Evanko
17 said that he couldn't say that the property
18 reassessment would result in lower property values?
19 A. What's the question?
20 Q. Wouldn't you want to know if Mr. Evanko's
21 opinion was that the property values would not
22 necessarily change under the planned reassessment?
23 A. I guess I would want to know that. That
24 would be surprising.
25 Q. Would it be surprising to you if -- well,

1 let me ask you this. Would you want to know if
2 Mr. Evanko determined that your forecast of the
3 personal property tax was ridiculous?
4 A. Would I want to know that? That, again,
5 would be surprising.
6 Q. Is that something you would want to know?
7 A. It would be something I would be
8 interested in, sure.
9 Q. Did you ever submit your forecast to
10 anyone at the City to solicit their opinion after
11 you were done about whether your forecast was
12 reasonable?
13 A. We discussed sending the forecast to the
14 City back when we started a year ago, and I don't
15 believe we ever did that. They did review our
16 forecast. I had a conversation in January with
17 Gary Evanko, and he had seen what we put together
18 is my recollection, so we had conversations about
19 the forecast for sure.
20 Q. So Mr. Evanko's familiar with details of
21 your forecast, correct?
22 MR. STEWART: Objection.
23 THE WITNESS: I don't know if he's familiar
24 with the details. I couldn't say for him.
25

1 BY MR. SMITH:
2 Q. You didn't -- the current forecast,
3 though, the one that's been completed in July, you
4 never resubmitted that to the assessor's office to
5 determine if they thought that it was reliable and
6 accurate, correct?
7 A. I did not turn over the July forecast to
8 the City. I did not provide it to them.
9 Q. Do you agree there are -- well, we've
10 talked about how there are a lot of people that are
11 in Detroit that are delinquent on their property
12 taxes. Do you recall that?
13 MR. STEWART: Objection.
14 THE WITNESS: We talked about -- you showed me
15 some articles about that.
16 BY MR. SMITH:
17 Q. And you agree there are many reasons that
18 people don't pay their property taxes, right?
19 A. Yeah, there are many reasons.
20 Q. One reason people may not pay their
21 property taxes is if they believe that enforcement
22 efforts are lax, correct?
23 MR. STEWART: Objection.
24 THE WITNESS: I don't know specifically why
25 people are not paying their taxes.

BY MR. SMITH:

Q. So you --

A. It would be speculation. I don't know.

Q. You haven't undertaken any analysis to determine why people in Detroit aren't paying their taxes?

A. I have not undertaken an analysis other than reading articles about what people say.

Q. Okay. And you've seen then statements that people say they're not paying property taxes because city services are poor, correct?

A. I could have read something about that.

Q. And have you also seen statements that people aren't paying taxes on their property because they believe assessments may be inaccurate?

A. I have read that.

Q. Have you seen statements that people may not be paying taxes on their property because they believe the City doesn't enforce the property tax?

A. I don't recall any article about that. Maybe it's in one of them that you just showed me.

Q. Have you undertaken any investigation into what enforcement efforts the City makes on property taxes?

A. No. That was assigned to a different

group.

Q. When you say assigned to a different group, who was that assigned to?

A. My understanding is that Conway & MacKenzie and others were looking at those issues.

Q. Given the collection rates in the city, though, it's obvious that the City is not doing a good job of collecting property taxes, correct?

MR. STEWART: Objection.

THE WITNESS: I don't know what you mean by good job.

BY MR. SMITH:

Q. Okay. Well, in your view, how would you characterize the City's job in collecting the taxes?

A. I can't speak to the City's job. I know their collection rates are -- for residential property in particular, you know, is at 50 percent, so it's lower compared to, say, Flint for example.

Q. Do you know what Flint's collection rate was on property taxes?

A. Off the top of my head, I can't give you year by year. They've had lower collection rates recently with their fiscal problems, but --

Q. Is the collection rate in Flint above 70

or 80 percent?

A. I'm going off memory, and so I believe it was -- it was over 70 percent.

Q. Can you identify any city in the country that has a lower property tax collection rate than Detroit?

A. I haven't studied other municipalities' collection rates, so I don't know.

Q. And so you can't identify any?

A. I can't speak to that question. I don't know.

Q. Well, you've worked with some other cities, right?

A. I have worked on projects that involved other cities, yes.

Q. Okay. So based on your experience with other cities, you can't identify any city that has a lower property tax collection rate than Detroit, correct?

A. I haven't looked at collection rates for other cities, so I wouldn't know.

Q. Well, Flint you know?

A. Flint I know.

Q. Do you agree that there are a number of factors other than taxes that impact a person's

decision whether to live in a city?

A. I would agree with that.

Q. Do you know whether there are corporations that are exempt from the property tax in the city?

A. Do I know if there are corporations that are exempt from property tax?

Q. Yeah.

A. There are property that is exempt. I don't know the specific names of any of the companies that have exemptions.

Q. Do you have any idea of the proportion of property that is exempt from the property tax?

A. I do.

Q. Can you give me the numbers in the ballpark?

A. Yes. So in fiscal year 2015, about 11 percent of taxable value is in a Renaissance Zone and is exempt from general operating taxes.

Q. Are there other property tax exemptions that apply in Detroit?

A. There are.

Q. And how much property is exempt under other exemptions?

A. When I looked at this, a very small amount, so less than -- I would say approximately,

1    I'm going off memory, about 1 percent or so of
2    taxable value when I looked at, say, the industrial
3    facilities tax, and then there are others that I
4    was not given data, so I don't know.
5        Q.  And you know that property tax collections
6    historically have been higher in the city of
7    Detroit, correct?
8        A.  Historically meaning just what?
9        Q.  In the last few years since 2005, there
10   have been higher collection rates in the city of
11   Detroit, correct?
12       A.  There are have been higher collection
13   rates, yes.
14       Q.  And how high have the collection rates
15   have gone in prior years?
16       A.  So I can tell you from memory that in
17   2007, I know residential collection rates -- I'm
18   sorry.  Collection rates on residential property
19   was around 70 percent.  I can't recall specifically
20   industrial/commercial off the top of my head, but
21   they're already around in the 80s.
22       Q.  Do you recall that residential collection
23   rates were as high as -- they were over 76 percent
24   in 2008?
25       A.  That sounds right.

1        Q.  And do you have any explanation for why
2    collection rates have decreased in the city of
3    Detroit in the last few years?
4        A.  There are a couple of factors, I think, so
5    one is that the City was not removing blighted
6    property or abandoned property from its roll when
7    it was sending tax bills.  So if you look at the
8    tax levy and then what's collected on it, the
9    collection rate was falling for that reason.  So
10   once you start removing blighted properties and
11   others, you would see the collection rate go up,
12   but I think it contributed to its decline.
13       Q.  Anything else that contributed to the
14   decline in collection rate?
15       A.  The other issues would just be ones that I
16   read or people saying they didn't -- they thought
17   their taxes were too high and overassessed, and
18   they weren't going to pay.
19       Q.  Anything else that contributed to a
20   decline in collection rates in Detroit?
21       A.  I mean, there are sort of economic
22   factors, and people found they couldn't pay.
23       Q.  Anything else that contributed to a
24   decline in collection rates in Detroit?
25       A.  Nothing that I have specific information

1    about.
2        Q.  And you anticipate the blight reduction
3    effort should increase collection rates?
4        A.  So blight reduction will remove -- well,
5    so removal of blight properties off the tax roll
6    would mean that the tax base becomes smaller, and
7    you should see the collection rates go up.
8        Q.  Do you agree the blight reduction should
9    increase property values?
10       A.  It could.
11       Q.  And that's the City's goal, in part, in
12   blight reduction to increase the value of property
13   in the city, correct?
14       A.  I don't know the City's goal.
15       Q.  Have you done any investigation at all
16   into the City's blight reduction plans?
17       A.  The only information on blight reduction
18   I've received is what was put together in the
19   restructuring and reinvestment initiatives.
20       Q.  Have you done anything to look at other
21   cities and how they've improved property tax
22   collections?
23       A.  I have not.
24       Q.  You are aware, though, that there are
25   other cities that have improved their property tax

1    collections through a variety of mechanisms,
2    correct?
3        A.  I haven't looked at any other cities.
4        Q.  Did Flint, Michigan improve its property
5    tax collections?
6        A.  During what time frame or --
7        Q.  Well, recently have they undertaken
8    efforts to improve property tax collections?
9        A.  I don't know.
10       Q.  Are you aware of the fact that there are
11   individuals in the city of Detroit, speculators and
12   investors, who are purchasing properties, not
13   paying the taxes and then allowing them to be
14   foreclosed and repurchasing them?
15       A.  I don't have any specific information
16   related to that.  I had a conversation with an EY
17   person who -- his impression was that's -- that
18   some of that was going on.
19       Q.  And so there are people who are avoiding
20   paying property taxes by simply allowing property
21   going into foreclosure and then they repurchase the
22   property, correct?
23       A.  My conversation with this one person said
24   that he thought some of that was going on.
25       Q.  And that person was from Ernst & Young?

1    A.  Uh-huh.
2    Q.  And who was that person?
3    A.  Dan Jerneycic.
4    Q.  Do you agree that Detroit property tax
5  revenue per capita is modest compared to other
6  cities in Detroit?
7    MR. STEWART:  Objection.
8    THE WITNESS:  Do I agree that Detroit -- say
9  the question again.
10 BY MR. SMITH:
11   Q.  Detroit property tax revenue per capita is
12 low compared to other cities in Detroit?
13   A.  I don't have that analysis in front of me,
14 so I don't know.
15      (Document marked No. 6)
16   Q.  Okay.  Why don't I hand you what's been
17 marked as Exhibit 6, and you can let me know if
18 this is the CRC report that you've seen before.
19   A.  Yes.
20   Q.  And if you turn over to Page -- it's on
21 Page vi, Page 6 of the executive summary.  There's
22 a section on property taxes there.  Do you see that there?
23   A.  Uh-huh.
24   Q.  And you see that it has a chart listing
25 different cities with property tax per capita.  Do

1  you see that?
2    A.  Yeah.
3    Q.  And there are a number of cities that have
4  higher property tax per capita than Detroit does,
5  correct?
6    A.  In this chart, yes.
7    Q.  And if you look at the paragraph just
8  before the heading income taxes, do you see that?
9    A.  Okay.
10   Q.  First in the second sentence, it says
11 although the 15.8 percent decline in Detroit's
12 taxable value between 2008 and 2012 was a smaller
13 percentage than the reduction in taxable value in
14 18 of the 24 largest cities in Michigan, collection
15 rates declined from 92.64 percent in 2008 to
16 83.68 percent in 2012.  Do you see that?
17   A.  I do.
18   Q.  So first Detroit historically has suffered
19 smaller reductions in taxable value than other
20 cities in Michigan, correct?
21   A.  That's what this says.
22   Q.  And when you say this, that's the CRC
23 report that you've reviewed, correct?
24   A.  Yes.
25   Q.  And Michigan, because its collection rates

1  are -- I mean, Detroit, because its collection
2  rates are low, actually has low per-capita property
3  tax collections compared to other cities in
4  Michigan, correct?
5    A.  There are a number of factors that lead to
6  tax collections, so I don't know what the
7  collection rates are in these other cities.
8    Q.  Okay.  Do you agree that Detroit has low
9  per-capita tax revenues from property taxes
10 compared to other cities in Michigan?
11   A.  In this chart, Detroit is towards the
12 bottom in terms of city property tax revenue per
13 capita.  These aren't all the cities in Michigan,
14 though.
15   Q.  But the main cities in Michigan are listed
16 in that chart, correct?
17   A.  The main cities meaning --
18   Q.  Highest population cities.
19   A.  Highest population cities?  My scanning of
20 it is yes.
21   Q.  Do you know whether the appraisal staff in
22 Detroit is unionized?
23   A.  I don't know.
24   Q.  Do you know whether it's uncommon for
25 appraiser staff to be unionized?

1    A.  I don't know.
2    Q.  Are you aware that there have been
3  proposals for improvement in property tax
4  collections by various consultants in the past in
5  Detroit?
6    A.  I don't know about any specific proposal.
7    Q.  Have you been provided with any of the
8  reviews by consultants who have proposed
9  improvements to property tax collections in
10 Detroit?
11   A.  I don't know who has proposed certain --
12 who has put together proposals, so I don't know.
13   Q.  And so you haven't been provided those
14 proposals?
15   A.  I have not been provided those proposals
16 other than I received a memorandum from Plante
17 Moran.  No.  I'm just -- I have not received any
18 proposals.  I have read memos about property taxes.
19   Q.  Everybody recognizes that property tax
20 collections need to be improved by improving the
21 assessor's office in Detroit, correct?
22   MR. STEWART:  Objection.
23   THE WITNESS:  I don't know if everybody thinks
24 that.  I don't know.
25

BY MR. SMITH:

Q. The City of Detroit certainly thinks that it needs to improve property tax collections, correct?

A. My conversations with the people at the City in the assessor's office has been that they would like to see collections improved.

Q. And they're taking active efforts to try to do that, correct?

A. I don't know what efforts they're doing.

Q. In your report, you relied on the Case-Shiller Home Price Index for Detroit. Do you recall that?

A. It is one of the things that I looked at.

Q. And you agree the Case-Shiller Index is a standard measure of housing prices, correct?

A. It is a measure of housing prices, yes. It's widely used.

Q. And it's a reliable -- Case-Shiller is a reliable measure of housing prices, correct?

A. What do you mean by reliable?

Q. I mean, people -- a lot of people in government, business, academia rely on the Case-Shiller Index for housing prices, correct?

A. Many people rely and look at it, yes.

Q. And you've done analyses where you've utilized the Case-Shiller Housing Price Index in the past for property valuations, haven't you?

A. I have looked at the Case-Shiller Index for projects in the past.

Q. And did you use the Case-Shiller Index in your work in Flint, Michigan?

A. I don't recall. I don't think so. I don't know if Flint is one of the -- I don't think it's one of the areas that the Case-Shiller Index would cover.

Q. I mean, why do people look at the Case-Shiller Housing Price Index?

A. It's viewed as a reputable source of trends in house prices.

Q. And did the creators of the Case-Shiller Housing Price Index, have they received the Nobel Prize?

A. Yes.

Q. They're widely respected economists, right?

A. They are widely respected economists, yes, I would agree.

Q. The -- in generating your forecasted values for revenues, did you actually use numbers

from the Case-Shiller Property Index?

A. So the Case-Shiller Index was one source that I consulted in selecting my inputs.

Q. But didn't you use some different numbers for average housing selling prices in generating your forecast other than Case-Shiller?

A. I did.

Q. And what were those?

A. I used the Detroit Association of Realtors data.

Q. And did you use that updated to the present time or not?

A. I took the information through December 2013, which was the last full year, and I pulled -- I think I had through March, March or May. And so I looked at it, but in order to use it in comparison of other data, my analysis went through December 2013.

Q. Okay. And you know that the Detroit realtor information shows that housing prices continue to increase from the point you used, December 2013, to the most recent data in 2014?

A. Housing prices did go up, yes.

Q. In fact, housing prices have gone up fairly significantly in 2014 under the Detroit

realtor data you used?

A. What is significant in your opinion?

Q. Well, do you know how much they've gone up?

A. I can't remember off the top of my head.

Q. It would be more than 10 percent, wouldn't it?

A. I don't recall.

Q. In the -- do you agree that based on all the data you've seen, real estate values in the city are increased in 2014?

A. The data I've looked at have shown real estate values increasing in residential.

(Document marked No. 7)

Q. And you're aware that there are -- let me just hand you a copy of what I'm going to mark as Exhibit 7. It's an article entitled Detroit Named a Top Turnaround Town For Residential Real Estate.

Do you have that in front of you?

A. Okay.

Q. And you've seen news stories and assessments that have indicated that Detroit is one of the markets in the country that's experienced the largest increases in home prices during 2014, correct?

A. I haven't compared Detroit to other

1    cities.
2        Q.  Well, this assessment reports that, in the
3    first sentence, Detroit's housing market ranks
4    seventh overall in a realtor.com turnaround town
5    study of the national housing market in the second
6    quarter the real estate tracking firm said in a
7    report Wednesday.  Do you see that?
8        A.  I do see that.
9        Q.  And you don't dispute that, correct?
10       A.  I have no idea how realtor.com did their
11   analysis.
12       Q.  Okay.  Well, that's not my question.  I
13   mean, you don't dispute -- you haven't done the
14   work necessary to dispute the fact that Detroit is
15   one of the fastest growing markets in terms of
16   housing prices in the country, correct?
17       MR. STEWART:  Objection.
18       THE WITNESS:  So I've looked at the most recent
19   data for Detroit.  I've not compared it to other
20   cities.
21   BY MR. SMITH:
22       Q.  So you can't identify any city with more
23   rapidly growing housing prices in 2014 than Detroit
24   sitting here today, correct?
25       A.  Well, this says it's the seventh.

1        Q.  Okay.
2        A.  I haven't looked at it, though.
3        Q.  I mean, you wouldn't find that surprising
4    that it's the seventh most highest in terms of
5    housing price growth, Detroit is?
6        A.  From a very low base, it's had growth, so
7    that seems plausible, sure.
8        Q.  And in fact, you mentioned the Detroit
9    Land Bank.  Have you done any investigation into
10   its operations?
11       A.  I don't know its operations.
12       Q.  Were you aware that the City had
13   transferred 16,000 properties to the Detroit Land
14   Bank recently?
15       A.  No.
16       Q.  Do you know that the Detroit Land Bank has
17   recently had an auction of blighted properties?
18       A.  Recently when?
19       Q.  During the last year.  I mean in this
20   year.
21       A.  They have had auctions, yes.
22       Q.  And in fact, there's been high demand in
23   the Detroit Land Bank auctions for blighted
24   properties, correct?
25       A.  I don't know.

1        Q.  You haven't done any analysis to determine
2    the effect of the Detroit Land Bank on housing
3    prices in Detroit, correct?
4        A.  No.
5        Q.  And you haven't done any analysis to
6    determine the effect of the City's blight reduction
7    efforts on housing prices, correct?
8        A.  We -- in our forecast in a reinvestment
9    scenario, we take into account removal of blight
10   property as part of general economic improvement to
11   the city, and so we've -- in that scenario, we've
12   factored in removal of blight as a positive for our
13   forecast.
14       Q.  Do you actually know whether the forecasts
15   that have been done for the City attach a dollar
16   value to blight removal in terms of improved
17   revenue for the City?
18       A.  What's the question?
19       Q.  Do you actually know whether the forecasts
20   that have been done attach a dollar amount for
21   blight removal?
22       A.  There has been money put in for each year
23   for blight removal in what I've seen.
24       Q.  But do you know in terms of increased
25   revenue?

1        A.  There has not been a sort of one
2    relationship done to say this much spending on
3    blight translates into X dollars of revenue.
4        Q.  And you've done no analysis that's tried
5    to determine how much the blight removal will
6    increase revenues to the City in your analysis, correct?
7        A.  I have not.  Right.  So in my analysis, I
8    did not look at the direct relationship between
9    blight removal and property tax revenue.
10           (Document marked No. 8)
11       Q.  Let me hand you what's been marked as
12   Exhibit 8.  It's a regional commerce paper from
13   Detroit Regional Commerce.  If you go to the first
14   page entitled Detroit Facts, this document says
15   that approximately 12 billion in private
16   investments have been made in Detroit since 2006.
17           Do you have any basis to dispute that?
18       A.  I have no idea where that number is coming
19   from.
20       Q.  Have you done any investigation into how
21   much private investment has been made in Detroit in
22   the past few years?
23       A.  I've only read some articles on it.
24       Q.  Okay.  You know there's been significant
25   private investment in Detroit in the last few

1 years, correct?
2    A. I don't know if it's significant.
3    Q. Can you tell me how much in dollar terms
4 investment has been made by private companies in
5 Detroit in the last few years?
6    A. I don't know.
7    Q. Can you tell me how many jobs Detroit has
8 added in the last few years?
9    A. Well, when we've looked at government
10 data, Detroit's employment has fallen.
11    Q. Okay. What government data have you
12 looked at during what period?
13    A. So when we -- so for example, we pulled
14 BLS data and used that information in doing -- I
15 would say this is something that Bob and Katie
16 looked at, and I know -- and just having
17 conversations and reviewing that employment has
18 fallen since they've looked at it, which has been
19 in the last what? I'm going off memory. I know
20 they pulled data going back to 2006, maybe even
21 before then.
22    Q. In the last year, do you know if
23 employment has increased or decreased in the city?
24    A. In the last year, I don't think that data
25 is out, so I don't know.

1    Q. In the last period -- in the last year for
2 which there's data, do you know whether city
3 employment has increased or decreased?
4    A. I don't have it in front of me, so I don't
5 want to say. I can't remember.
6    Q. Are you aware or have you been provided
7 any of the reviews that have been done or audits on
8 the City's financial data?
9    A. I have not been provided those studies.
10    Q. Are you aware that auditors have made
11 findings saying that the financial data in the City
12 of Detroit is not reliable?
13    A. I have not been told any of that.
14    Q. Do you know who the City's auditors are?
15    A. No.
16       (Document marked No. 9)
17    Q. I'm going to hand you what's been marked
18 as Exhibit 9. It's an article entitled Will
19 Detroit Land Bank Auction Build Value For Housing
20 in Crain's Detroit. If you look at this article,
21 it talks about an auction of 33 homes. Do you see that?
22    A. Uh-huh. Yeah.
23    Q. And the bids that have been drawn in are
24 nearly $1 million. Do you see that?
25    A. I do.

1    Q. With an average price of $22,000 per
2 property. Do you see that?
3    A. I do.
4    Q. Before you did your analysis, were you
5 aware that the Detroit Land Bank had been able to
6 auction off 33 properties for a million dollars?
7    A. I was not aware of this information, no.
8    Q. Okay.
9    A. It's from what? June?
10    Q. Okay. So you haven't done any
11 investigation into the prices that the Detroit Land
12 Bank has been able to obtain for houses that it
13 sold through its auction process, correct?
14    A. I have not been told the prices they've
15 attained.
16    Q. And you've not also been told the amount
17 of revenue that Detroit Land Bank has generated by
18 selling blighted properties through auction,
19 correct?
20    A. The only information I was given on that
21 was a conversation with Dan Jerneycic where he
22 mentioned that properties had been sold, and there
23 would be some money coming back to Detroit because
24 they had paid a charge-back on the property taxes,
25 and that's all I was told.

1    Q. Okay. I mean, did you do any calculation
2 to forecast the amount of money that Detroit would
3 receive from sale of properties through the Land
4 Bank?
5    A. No. So with the information he gave me,
6 it was very minimal.
7    Q. Okay. So that's -- your forecast does not
8 attempt to forecast revenue that the City may
9 obtain from selling properties through the Detroit
10 Land Bank, including property tax revenues,
11 correct?
12    MR. STEWART: Objection.
13    THE WITNESS: So the forecast does not
14 specifically look at the activities of the Land
15 Bank.
16 BY MR. SMITH:
17    Q. Okay. So it doesn't include amounts that
18 the City will receive from back property taxes
19 through sales through the Land Bank, correct?
20    A. The only thing is the relationship between
21 the net revolving fund in Detroit. And so if the
22 properties are auctioned off as they're supposed to
23 be, then the City would receive that information in
24 a timely manner as part of their net revolving fund
25 payment, so they wouldn't pay the additional

1  chargeback.  And so that would be taken into
2  account in our forecast.
3      Q.  Okay.  You haven't -- do you know whether
4  the City of Detroit actually receives any funds
5  from the sale of properties through the Land Bank?
6      A.  So my understanding is that if the process
7  is followed and the county does sell the property,
8  the taxes are paid.  The City of Detroit then is
9  not charged back, and so it would be included as
10  part of that net revolving fund payment.
11      Q.  But the sale -- the sale price for the
12  properties, do you know whether Detroit actually
13  gets any of the sales price for the properties sold
14  through the Land Bank?
15      A.  I don't know.  I don't know what they
16  receive.
17      Q.  Okay.  So certainly you haven't forecasted
18  any sums the City might receive from sales through
19  the Land Bank for -- in terms of the sales price,
20  correct?
21      A.  I don't know what -- after all the taxes
22  are paid, etcetera, I don't know what money is left
23  over and how that's allocated.  I don't know that.
24      Q.  Would it be fair to say you're offering --
25  you haven't been asked to offer any opinion about

1  the Detroit Land Bank?
2      A.  I have not been asked about the Land Bank.
3      Q.  You can't testify about the Land Bank's
4  operations?
5      A.  I cannot testify about the operations at
6  the Land Bank.
7      Q.  You can't testify about the Land Bank's
8  effect on the economy in Detroit?
9      A.  I don't know how the Land Bank is
10  affecting the economy in Detroit.
11      Q.  You can't testify about the Land Bank's
12  effect on property tax revenues, correct?
13      A.  Outside of the normal working process with
14  the revolving fund, I don't know anything besides
15  how the process is supposed to work.
16      Q.  But you can't testify about the Detroit
17  Land Bank's effect on property taxes through
18  improved real estate values or other mechanisms,
19  correct?
20      A.  I don't see how it would affect it, but
21  you're right.  I wouldn't testify about that.
22      Q.  The Bureau of Labor Statistics is a
23  reliable source of information on employment data.
24  You would agree with that, correct?
25      A.  I would agree with that.

1      Q.  And have you relied on that as a source of
2  information about employment data in your analysis?
3      A.  It's one of the things that I looked at,
4  yes.
5      Q.  Do you know what source of information you
6  looked at for information on population levels?
7      A.  Yes.
8      Q.  What source of information?
9      A.  So the 10-year forecast uses the SEMCOG,
10  Southeast Michigan Council of Government, forecast.
11      Q.  And is that a Detroit-specific forecast or
12  is that statewide information?
13      A.  So SEMCOG did a regional, I believe,
14  seven-county forecast, and then within the
15  counties, they did specific municipalities, and
16  Detroit was one of them.
17          (Document marked No. 10)
18      Q.  I'm going to hand you what's been marked
19  as Exhibit 10.  Let me know is this the type of
20  Bureau of Labor Statistics data on employment levels
21  that you have looked at in formulating your opinions?
22      A.  This looks right.
23      Q.  And the Bureau of Labor Statistics is a
24  reliable source of information on employment data,
25  correct?

1      A.  I do think it's reliable, yes.
2      Q.  And the employment levels in the city of
3  Detroit currently are higher than they were in
4  2010, correct?
5      A.  So you're looking at which numbers?
6      Q.  The current level -- employment levels
7  compared to 2010 in the graph.
8      A.  They are higher.
9      Q.  And the employment levels in the city
10  currently are higher than in -- during many periods
11  during 2011, correct?
12      A.  I'm sorry.  You said during 2011 --
13      Q.  The employment levels in the city
14  currently are higher than during most periods in
15  2011, correct?
16      A.  So current employment is higher than in
17  most periods in 2011 is your question?
18      Q.  Yeah.
19      A.  I guess it depends on the period.
20      Q.  Okay.  During most of the months in 2011,
21  employment was lower than it is currently in
22  Detroit, correct?
23      A.  It looks that way, yes.
24      Q.  And the same is true for 2012, correct?
25      A.  It looks like yeah.

1    Q.   And there's been a recent uptick in 2014
2  in employment, correct?
3    A.   The seasonally unadjusted data is higher
4  than some of the 2010, 2011 periods.
5    Q.   And in fact, there's an inflexion point in
6  the data now that the employment is going up,
7  correct?
8    A.   Where is the inflexion point?
9    Q.   Around April of 2014, April and March.
10    A.   There was a downward trend between, it
11  looks like, December 2013 down to April 2014, and
12  then May 2014 it's slightly higher.
13    Q.   Do you know what period of time the
14  employment data that you looked at for your
15  analysis?
16    A.   So we -- so primarily Bob Cline with the
17  assistance of Katie Ballard used the employment
18  information in their forecast, and so they did --
19  they pulled the historical data, did the trend
20  analysis, so they would be the ones to better speak
21  to it.
22    Q.   I mean, did you use the trend analysis by
23  Mr. Cline and Ms. Ballard in your forecast?
24    A.   So they did the trend analysis, and then I
25  looked to see what their employment forecasts were

1  based on that analysis so that my analysis was
2  consistent with theirs.
3    Q.   And did they forecast decrease in
4  employment?
5    A.   They did.
6    Q.   Do you have any idea how they arrived at
7  their forecast of decreasing employment after
8  looking at the Bureau of Labor Statistics data?
9        MR. STEWART:  Objection.
10        THE WITNESS:  So generally I know what they
11  did.  They performed an analysis looking at the
12  historical trend and the relationship between
13  Detroit and the rest of the state, and so they used
14  that information to forecast employment trends with
15  relationship to the state forecast.
16  BY MR. SMITH:
17    Q.   Okay.  Can you explain to me how the
18  employment forecast was actually calculated that
19  you relied on?
20    A.   Other than generally saying, I was not the
21  one that did it, so no.
22    Q.   And who was the person who you understood
23  did that forecast?
24    A.   Bob Cline with the assistance of Katie
25  Ballard.

1    Q.   You know there are private entities that
2  have pledged money to assist the City and improve
3  its economy and reduce blight, correct?
4    A.   I know that private entity have pledged
5  money.  I don't know off the top of my head for
6  what purposes.
7    Q.   You've done no analysis of the impact of
8  private donations on property tax revenues in the
9  city, correct?
10    A.   The only way it would factor into the
11  analysis is private donation improving the economy
12  and stabilizing some of the negative aspects of
13  Detroit, and then that shows up in our reinvestment
14  scenario.
15    Q.   So private donation improving the economy
16  can improve property tax revenues, correct?
17    A.   It's possible.
18    Q.   And -- but as far as you're aware, nobody
19  has tried to forecast the amount of private
20  donations over the next 10 years for the City,
21  correct?
22    A.   I don't know if that's been done.
23    Q.   Okay.  As far as you're aware, there's no
24  analysis that's been done to try to show the impact
25  of private donations on City revenues, correct?

1    A.   I don't know if it's been done.
2    Q.   You certainly didn't do any analysis to
3  assess the impact of private donations on the
4  housing market or private tax revenues, correct?
5    A.   As I said before, only in that if as part
6  of reinvestment in the city, private donations
7  occur and it helps to improve the economic
8  environment, then that's been factored into the
9  reinvestment scenario.
10    Q.   But you don't know if the reinvestment
11  scenarios tried to forecast the amount of private
12  donations that will come into the city, correct?
13    A.   I don't know how private donations are
14  included in that.
15    Q.   And you don't know how the reinvestment
16  forecast was put together, correct?
17    A.   I was shown the reinvestment forecast.  I
18  don't know how it was put together.
19    Q.   And you didn't do anything to test the
20  reliability of the reinvestment forecast, correct?
21    A.   So as before, you can only test, I think,
22  reliability with actuals, and it hasn't occurred,
23  so I don't know.
24    Q.   Do you know who actually put together the
25  reinvestment forecast?

1   A.  I don't know specifically who did.
2   Q.  You used the reinvestment forecast to
3  generate some of your forecast; is that fair?
4   A.  I would not say generate.  I would say
5  that I looked to see what was put together for
6  reinvestment for further reinvestment initiatives,
7  and that helped think about how we selected our
8  growth rates in that reinvestment scenario.
9   Q.  Were numbers from the reinvestment
10  forecast plugged into your forecast?
11   A.  Were numbers for the reinvestment forecast
12  plugged into our forecast?  No.
13   Q.  Did you use the reinvestment forecast to
14  generate some of the assumptions for your forecast?
15   A.  It was something that was looked at along
16  with other things in terms -- in how we put
17  together the reinvestment scenario.
18       (Document marked No. 11)
19   Q.  I'm going to hand you a copy of what's
20  been marked as Exhibit 11, which is from the
21  Case-Shiller Detroit Home Price Index, and let me
22  know if this is the type of data that you have
23  reviewed regarding housing prices.
24   A.  Yeah.
25   Q.  And the Case-Shiller Index shows the

1  housing prices have been increasing in Detroit over
2  the last two years, correct?
3   A.  The Michigan Detroit Home Price Index is
4  going up, yes.
5   Q.  And there was an inflexion point around
6  2010; is that correct?  It's a little bit on there.
7   A.  Yeah, midway through 2010, 2011.  Yeah.
8   Q.  And increasing housing prices in your
9  model lead to increased property tax revenues,
10  correct?
11   A.  So increasing home prices is one factor in
12  our model, and it could lead to our overall
13  increase in tax revenue.  It really depends on what
14  happens to taxable value.
15   Q.  Holding all other factors constant, do
16  increased home prices have an effect in increasing
17  property tax revenues in your model?
18   A.  Holding everything constant, an increase
19  in a home price would -- well, it depends on the
20  taxable value, I guess.  It depends on what the
21  taxable value is when the property sells and it's
22  reset.  And so if the home price is higher than --
23  and the reset of the taxable value is higher than
24  what it had been, it would increase tax revenues.
25  If sort of varies house to house.

1   Q.  But overall, your model, the way it's
2  constructed, could show a decrease in property tax
3  revenue even if the Case-Shiller Home Price Index
4  shows housing prices are going up, correct?
5   A.  So the Case-Shiller Detroit Home Price
6  Index is for the Detroit metro region, and so the
7  metro region could see home price indexes go up.
8  And we show that other factors mean that taxable
9  value declines, and so tax revenues go down.
10   Q.  And there's not -- in your model, you're
11  assuming there's not necessarily a link between
12  actual home values or prices as measured in the
13  Case-Shiller Index and taxable value, correct?
14   A.  So the relationship is whether the selling
15  of the home price when it's reset -- when the
16  taxable value is reset after the sale, whether it
17  was higher or lower than what the taxable value had
18  been the year before.  That's what matters.
19   Q.  In your forecast, you're predicting a
20  large decrease in property tax revenue and assessed
21  values even though the Case-Shiller Index shows
22  that property -- home prices have been increasing
23  for the last two years, correct?
24   A.  So in our model, we have taxable value
25  continuing to decline even with some improvements

1  in home prices.
2   Q.  And in fact, you're predicting the tax
3  revenues are going to be cut in half, aren't you,
4  over the course of the 10-year period?
5   A.  Tax revenue --
6   Q.  Or taxable values are going to be cut in
7  half in the city of Detroit over the 10-year
8  period?
9   A.  So residential property is going to be cut
10  in half over the 10-year period.
11   Q.  So you're predicting that property values
12  are going to be cut in half even though the
13  Case-Shiller Home Price Index is showing an
14  increase in property home prices for the last two
15  years in Detroit, correct?
16   A.  Right.  So you can have an increase in
17  home prices, but your taxable value could still be
18  higher than what it is when the home sells.  So you
19  could see even with an increase with home prices,
20  you could see your taxable value fall.
21   Q.  And the taxable value is something -- is
22  that set by the City?
23   A.  So taxable value is put together by the
24  City, and then it goes to -- there are several
25  review processes before it's finalized.

1      (Document marked No. 12)
2      Q.  I'm going to hand you what's been marked
3   as Exhibit 12.  It's another printout from
4   Case-Shiller.  At first at the top, it describes
5   what the Home Price Index, the Case-Shiller Index
6   tries to do, which it seeks to measure changes in
7   the total value of all existing single-family
8   housing stock.
9      Is that your understanding of what it does?
10      A.  Uh-huh.
11      Q.  And if you look at the index levels below,
12   it indicates the one-year change in the index is an
13   increase of 15.37 percent for Detroit, correct?
14      A.  Yes.
15      Q.  And the three-year change for Detroit is a
16   12.86 percent increase, correct?
17      A.  Uh-huh.
18      Q.  And they also provide figures for a
19   20-year -- a 20-city composite home index as a
20   benchmark.  Do you see that?
21      A.  Yes, I do.
22      Q.  And you're familiar with that benchmark?
23      A.  I am.
24      Q.  And the benchmark of 20 cities shows
25   growth in home prices that is lower than Detroit's

1   for the one and three-year periods, correct?
2      A.  Uh-huh.  Yeah.
3      Q.  Detroit's home prices using the
4   Case-Shiller Index have increased more than other
5   cities in the benchmark index over the one and
6   three-year and five-year periods, correct?
7      A.  Correct.
8      Q.  And what are some of the reasons that
9   Detroit's home prices would have been increasing at
10   greater rates than other cities over the last one,
11   three or five years?
12      A.  I haven't looked at the other cities, but
13   when I looked at Detroit specifically, the
14   percentage increases have been so large, in part,
15   because the base is so low.
16      Q.  Right.  I mean, Detroit is starting out
17   from a low period, so it's not surprising that you
18   would see a large increase in home prices, correct?
19      A.  That is correct.  A $5,000 increase is
20   large in Detroit.
21      Q.  And you would anticipate that the
22   Case-Shiller Index would continue to increase for
23   the Detroit market over the 10-year period that you
24   forecast?
25      A.  I don't know what it's going to do for the

1   Detroit metro area.  I don't know.
2      Q.  You haven't looked at that?
3      A.  So we were charged with looking
4   specifically at the city of Detroit, not the entire
5   Detroit metro region.
6      Q.  Is it possible to forecast what the
7   Case-Shiller Home Price Index would look like for
8   Detroit over the next 10 years?
9      A.  I don't understand the question.
10      Q.  Is it possible to forecast what the
11   Case-Shiller Home Price Index will be for Detroit
12   over the next 10 years?
13      A.  So Case-Shiller is using actual data.  I
14   don't know if they do forecasts.
15      Q.  I'm asking could you forecast the
16   Case-Shiller Home Price Index over the next
17   10 years?
18      A.  I have not done that, no.
19      Q.  I know, but is it possible for you to do
20   that?  Is that something that's technically
21   possible for you to do?
22      A.  So you can forecast what is going to
23   happen to average home prices.  That's an exercise
24   that I've done, that I've engaged with.
25      Q.  Okay.  And if we were to forecast home

1   prices over the next 10 years in Detroit, those
2   home prices would increase under a reasonable
3   forecast, correct?
4      MR. STEWART:  Objection.
5      THE WITNESS:  I don't know what reasonable is.
6   When I've done this, I've had -- I've looked at
7   what would likely happen to average home prices,
8   and they have been going up in my forecast.
9   BY MR. SMITH:
10      Q.  Okay.  And those are forecasts over the
11   next how many years?
12      A.  So looking out 10 years.
13      Q.  Okay.  So you're forecasting home prices
14   to increase over the next 10 years, correct?
15      A.  I am.
16      Q.  And that would include in Detroit?
17      A.  That's just for Detroit.  I didn't look at
18   the entire area.
19      Q.  Okay.  And why were you doing that
20   forecast?  Is that part of your expert analysis?
21      A.  So as I mentioned in my report, one of the
22   things that I looked at is the uncapping of taxable
23   value when homes prices sell, and so part of the
24   exercise was thinking about what happens to home
25   prices.

1      MR. SMITH:  Okay.  Why don't we take a break
2  now.  I know there's been a request from the
3  retiree's counsel who had to leave.  He's got
4  another call, so we'll take a break for lunch.
5      MR. STEWART:  30 minutes?
6      MR. SMITH:  Why don't we take a little bit
7  longer for lunch.
8      MR. STEWART:  32 minutes?
9      MR. SMITH:  No, 45 minutes.
10     MR. STEWART:  35, 40.  That's fine.
11     THE VIDEOGRAPHER:  Off the record.  The time is
12 12:02 p.m.
13             (Whereupon, a lunch break was
14             taken.)
15     THE VIDEOGRAPHER:  We are back on the record.
16 The time is 12:44 p.m.
17 BY MR. SMITH:
18     Q.  Ms. Sallee, you're aware the City is
19 planning to spend hundreds of millions of dollars
20 in blight reduction?
21     A.  I'm aware the City is going to spend money
22 on blight reduction.
23     Q.  I mean, do you know it's in the amount of
24 hundreds of millions or not?
25     A.  I don't know the exact amount.

1      Q.  You don't know any of the details of how
2  the City is going to spend the blight reduction
3  money?
4      A.  I don't know any of the details.
5      Q.  Do you agree that many large cities suffer
6  from blight?
7      A.  I haven't looked at any other cities on
8  blight.
9      Q.  What about Flint, Michigan, is there
10 blight in Flint, Michigan?
11     A.  Yes, there is.
12     Q.  And is Flint, Michigan planning any blight
13 reduction efforts?
14     A.  Yes.
15     Q.  And do you know how much they're planning
16 to spend on blight reduction?
17     A.  I don't know off the top of my head.
18     Q.  Do you know why Flint, Michigan's planning
19 to spend money on blight reduction?
20     A.  I had some conversations with city
21 officials, and they wanted to remove properties,
22 and they basically said they thought it would help
23 the city.
24     Q.  How did Flint, Michigan officials think
25 that blight reduction would help the city?

1      A.  They were targeting certain neighborhoods
2  with blight removal.  My recollection is that it
3  was around schools or commerce areas, and they
4  thought that it would sort of improve safety and
5  existing property values is my recollection of
6  conversations about it.
7          (Document marked No. 13)
8      Q.  I'm going to hand you a copy of what's
9  been marked as Exhibit 13, which is some City of
10 Detroit Assessing Division Operational Recommendations
11 by Plante Moran.  Have you seen that document before?
12     A.  I have not.
13     Q.  If you turn over to Page 6, there's a
14 chart that has a history of the Detroit assessment
15 roll.  Do you see that?
16     A.  Okay.
17     Q.  It indicates that the assessed value of
18 property in Detroit went from 14 billion in 2008 to
19 9 billion in 2013, correct?
20     A.  That's what is says here.
21     Q.  So there was a $5 billion reduction in the
22 last five years in assessed value, correct?
23     A.  That's what it says here.
24     Q.  It's about a third of property values gone
25 away, correct?

1      A.  It looks like a reduction of 5 billion in
2  the assessed value, which is about a third.
3      Q.  And you're forecasting additional
4  reductions in the assessed value, correct?
5      A.  So I am forecasting additional reductions
6  in taxable value.
7      Q.  Okay.  And what will be the total taxable
8  value at the end of 10 years under your forecast?
9      A.  I would have to look at my report for the
10 exact number.
11         (Document marked No. 14)
12     Q.  I'll mark your report as Exhibit 14 so you
13 have it in front of you.
14         Do you know now looking at your report what
15 taxable value you're forecasting in the next 10 years?
16     A.  I was realizing that the actual forecasts
17 aren't in here, so I would need to see the
18 disclosure statement.
19     Q.  Okay.  The -- did you do anything to look
20 at historical taxable values in doing your
21 forecast?
22     A.  I did look at historical values.
23     Q.  And you know there's been a significant
24 decrease in historical assessed value already in
25 the city of Detroit, correct?

1    A.  How would you define significant?
2    Q.  Well, along the lines of that $5 billion
3  that we just looked at, correct?
4    A.  There has been a reduction in assessed and
5  taxable value in Detroit.
6    Q.  Okay.  And is that $5 billion figure from
7  2008 to 2013 reduction in assessed value roughly
8  consistent with your understanding of the reduction
9  in assessed value?
10    A.  Yes.
11    Q.  The -- and your forecasting reduction
12  assessed value, that goes beyond what's occurred in
13  the last five years, correct?
14    A.  So I'm not forecasting assessed values.
15  I'm forecasting taxable value.
16    Q.  What's the difference in your view?
17    A.  So taxable value is the lower of capped
18  value or state equalized value.  And given that the
19  county's equalization factor is 1, assessed value
20  and state equalized value are the same thing.
21    Q.  Okay.  So the taxable value is the same as
22  the assessed value in Detroit?
23    A.  No.
24    Q.  No?  Okay.  Can you explain why that is?
25    A.  I'm saying assessed value and state

1  equalized value are the same thing.  Taxable value
2  is the lower of capped value or state equalized
3  value.
4    Q.  Okay.  And what is the capped value?
5    A.  So capped value is that in the first year,
6  let's say, you purchase a house, and in the first
7  year, your state equalized value is roughly
8  50 percent of your market value and your taxable
9  value equals your state equalized value in that
10  first year.  And then going forward, your capped
11  value is the rate of inflation or 5 percent,
12  whichever is less.
13    Q.  And how do you figure out which to use in
14  your forecast, capped value or state equalized
15  value?
16    A.  So I don't use either of those.  I use
17  taxable value.
18    Q.  Which is what?
19    A.  The lower of the two.
20    Q.  Okay.  So how do you figure out what that
21  is in your forecast?
22    A.  Sure.  So in this case, I looked at capped
23  value and state equalized value and its
24  relationship to taxable value, and I did some
25  analysis to see if state equalized value was

1  potentially higher or lower than capped value.  And
2  if assessments are lowered, what would then happen
3  to state equalized value in relation to capped
4  value and what impact would that have on taxable
5  value.  And so ultimately what I was concerned with
6  was taxable value.
7    Q.  And do you -- can you identify any city
8  that's engaged in a greater blight reduction effort
9  than is planned for the city of Detroit?
10    A.  I have not looked at any other cities'
11  plans.
12    Q.  So you can't identify such a city?
13    A.  I haven't looked into the issue.
14    Q.  So you haven't examined the effects of
15  blight reduction in other cities at all?
16    A.  I have not looked at blight reduction in
17  other cities.
18    Q.  Do you agree that property taxes revenue
19  is one of the largest sources of revenue for the
20  City of Detroit?
21    A.  So property tax revenue makes up about
22  17 percent of the tax and state revenue sharing.
23    Q.  The -- you mentioned that you had read
24  Ms. Kopacz's report, correct?
25    A.  That's correct.  I read maybe half of it.

1    Q.  Do you have any understanding as to what
2  qualifications or background Ms. Kopacz has in
3  forecasting?
4    A.  I don't know particularly her expertise in
5  forecasting.
6    Q.  We discussed that she did a sensitivity
7  analysis for property tax revenues.  Do you recall
8  that?
9    A.  Yes.
10    Q.  You don't have any criticism of
11  Ms. Kopacz's sensitivity analysis for property tax
12  revenues, correct?
13    A.  I didn't try to mimic what she did.  When
14  I looked at it, her analysis seemed in line with
15  what I would expect, so it seemed okay.
16    Q.  She also does a sensitivity analysis for
17  state revenue sharing.  Do you recall that?
18    A.  Yes.
19    Q.  Do you have any criticism of Ms. Kopacz's
20  sensitivity analysis for state revenue sharing?
21    A.  I can't remember exactly what she varied
22  there, so I can't remember the specifics of her
23  report.
24    Q.  Okay.  Do you have any opinions about
25  Ms. Kopacz's report?

1    A.  Yes.
2    Q.  What are they?
3    A.  My opinion was that the first half of it I
4  read, I agreed with her conclusions.
5    Q.  Okay.  What page do you think you're about
6  up to there?
7    A.  Well, I got through my sections, so maybe
8  I read -- actually, I maybe read only 75 pages of
9  it.  It's a 200-page document.
10    Q.  And do you agree that Ms. Kopacz's
11  analyses showed that by varying certain of the
12  inputs by a small amount, you can change the
13  outcome in terms of revenue in your analysis by
14  tens of millions of dollars, correct?
15    A.  I don't know how detailed she looked at
16  changing inputs.  She was showing sort of 1 percent
17  changes and how much revenue that produces.  That
18  seemed to be the extent of the sensitivity
19  analysis.
20    Q.  There are other inputs you could change to
21  produce other additions to revenue in your model
22  that Ms. Kopacz did not look at, correct?
23    A.  So I don't know exactly what she did, but
24  you can change assumptions, and it would change the
25  results.

1    Q.  And there are assumptions that Ms. Kopacz
2  did not report on in her report that you could
3  change to increase the revenues in your model,
4  correct?
5    A.  There are assumptions that could be
6  changed that could increase -- that could increase
7  revenues.
8    Q.  And you didn't do any sensitivity analyses
9  for any of your forecasting, correct?
10    A.  What do you mean by sensitivity analyses?
11    Q.  The type of analysis Ms. Kopacz does in
12  her report which she calls an sensitivity analysis.
13    A.  So when I look at it, it looks like she
14  asked the question what happens if you increase
15  revenues by 1 percent, and what does that mean over
16  a 10-year period.  I did analysis along with Bob
17  Cline, other members of our team to say what
18  happens if we change inputs, they increase or lower
19  revenues in a given year and what's the impact of
20  that in a 10-year period.  As I've mentioned, we've
21  done, you know, different iterations, and so I feel
22  like we have done that sensitivity analysis in the
23  sense that we've changed inputs, saw what happened
24  to the revenue.
25    Q.  And your CV says you've used IMPLAN and

1  REMI to model economic impacts of capital
2  expenditures and operations.  Do you recall that?
3    A.  I have done that, yes.
4    Q.  And is IMPLAN a generally accepted measure
5  for measuring economic impacts?
6    A.  Yes.
7    Q.  And you could use IMPLAN to measure the
8  economic impacts in terms of increased economic
9  activity and revenue from the reinvestments that
10  the City is planning, correct?
11    A.  Can you restate your question?
12    Q.  You could use an IMPLAN analysis to
13  determine the economic impact and increased revenue
14  from the reinvestments that the City is planning in
15  the plan, correct?
16    A.  I wouldn't use IMPLAN for that.
17    Q.  Is that something that IMPLAN can be used
18  for, though?
19    A.  So in this case, you could -- you could
20  look at an investment, and you could say what is
21  the result of that investment and then model the
22  economic impact of that with IMPLAN, but you would
23  have to take into account, you know, substitution.
24  There would be a lot of factors that would go into
25  it.

1    Q.  Okay.  So the reinvestment expenditures
2  could be analyzed using IMPLAN to determine their
3  economic impact, but you would have to take into
4  account a number of factors; is that correct?
5    A.  So IMPLAN would be sort of an awkward way
6  to evaluate it.  You can do economic modeling where
7  you would look at a detailed, say, investment and
8  then think through the impact on the economy.
9  That's standard economic analysis.
10    Q.  Okay.  And as far as you're aware, has
11  anybody done any standard economic analysis to
12  measure the positive economic impact of the
13  reinvestment proposals?
14    A.  I'm not aware of any.
15    Q.  Do you know why that hasn't been done?
16    A.  Well, I don't know if it has been done.
17  It could have been done by someone else.  We
18  weren't charged with looking at the reinvestment
19  activities.
20    Q.  Okay.  But you would agree there's a
21  variety of standard methodologies that could be
22  used to measure the economic impact of the
23  reinvestment activities, and IMPLAN would just be
24  one of them; is that correct?
25    A.  So there's -- there's a methodology, a way

1  that you would go about looking at this, and there
2  are different software tools that can aid you, and
3  there are generally only a few accepted ways to do
4  it.
5      Q.  And what are those few accepted ones?
6      A.  So when you're doing economic impact
7  analysis, typically you're going to use one of
8  three things.  You're going to use an IMPLAN model.
9  You're going to use a government model, RIMS II, or
10  you're going to use REMI.
11      Q.  And have you used such standard economic
12  models in assessing the economic impact of
13  government projects before?
14      A.  Yes.
15      Q.  What kinds of government projects have you
16  done that for?
17      A.  So prior to joining EY, I looked at the
18  economic impact of building a new research facility
19  or sort of a specific government planned -- it
20  would be a collaboration, I guess, between
21  entities, so looking at project base, say, a new
22  facility or something and using one of those to
23  evaluate the economic impacts.
24      Q.  And is that -- do governments often try to
25  model the economic impact or see how much economic

1  improvement there will be from government projects?
2      A.  I've done these projects for governments
3  or for groups going before government, so there
4  seems to be interest in it.
5      Q.  And is modeling the economic improvement
6  of a government expenditure something that you
7  believe is like a useful project for planning
8  purposes for governments?
9      A.  In certain situations, yeah, I do think
10  it's useful.
11      Q.  And do these economic modeling that you've
12  done, does that include looking at increases in tax
13  revenues, or is it just increases in economic
14  activity that would be caused by a project?
15      A.  So typically I would look at the measures
16  of economic impact and then tax revenue.
17      Q.  And is the reason that you didn't use
18  IMPLAN or some other accepted economic modeling in
19  this case to look at the effect on tax revenues
20  just because you weren't asked to do that?
21      A.  So in this case, we were asked to forecast
22  tax revenue, which is a little different exercise
23  than for some of these projects where you're doing,
24  say, the economic and tax contribution of specific
25  facilities.  So we looked at blight and thought

1  there are no other expenditures and thought about
2  how it would improve the economy and then factored
3  that into our reinvestment scenario.
4          It wouldn't necessarily make sense to use
5  IMPLAN in that sense.  I should clarify we use
6  IMPLAN for economic analysis.  The tax analysis
7  we're usually doing we're usually not using IMPLAN
8  for.
9      Q.  Okay.  But there are other methodologies
10  that you've used that you didn't use in this case
11  to model tax revenues?
12      A.  So in the past, if you're looking at a
13  project and you forecast the labor income that's
14  associated with the project, we often use a ratio
15  of taxes to personal income because we have measure
16  now of personal income or labor income.  And so we
17  can apply that ratio to our estimated labor income,
18  and that doesn't apply here to this situation.
19      Q.  Okay.  But measuring -- somebody could
20  have used one of the standard economic modeling
21  methodologies to determine the economic impact of
22  the reinvestment scenarios or the tax revenues from
23  the reinvestment scenarios, correct?
24      A.  Yes, you could do something.
25      Q.  Okay.  I'm going to turn to your expert

1  report now.  Do you have that in front of you?
2      A.  I do.
3      Q.  On Page 6 of your report, you relied on
4  some data from the Detroit Board of Realtors
5  residential sales statistics for 1995, at the top
6  of the page, 1998, 2001 to 2013.  Do you see that?
7      A.  I do.
8      Q.  Why is it that you only used certain
9  years?
10      A.  So there's a gap in between '95 and '98
11  and '98 and 2001, so that data was not publicly
12  available on the website, and then -- so I took as
13  much information as was available, and then I did
14  it through 2013.  I looked beyond that, but the
15  analysis goes to 2013, so I could compare it to
16  other sources of data.
17      Q.  Okay.  So your analysis, you used data
18  stopping at the end of 2013 from the Detroit Board
19  of Realtors, correct?
20      A.  Correct.
21      Q.  But you know -- you've seen what the data
22  is for subsequent periods in 2014, correct?
23      A.  Right.
24      Q.  And that data from the Detroit Board of
25  Realtors is the data showing that housing prices

1  continued to increase in the city of Detroit; is
2  that correct?
3      A.  There were increases, yes.
4      Q.  The information you talk about about
5  Renaissance Zones, it's kind of down toward the
6  bottom of the page, and you mention you had the one
7  year's data from 2013.  Do you see that?
8      A.  Yes.
9      Q.  And we already talked about how that was
10  provided to you by the assessor's office, right?
11      A.  It was.
12      Q.  And the reason you need the Renaissance
13  Zone data is because there's different tax --
14  different taxes apply to Renaissance Zone than
15  elsewhere in the city; is that correct?
16      A.  So Renaissance Zones are exempt from
17  certain taxes.
18      Q.  And that includes the property tax?
19      A.  Portions of the property tax.  So if
20  you're in a Renaissance Zone, you're still paying
21  the debt millages, but you're not paying general
22  operating.  You're not paying library.
23      Q.  Page 7 of your report, it says in
24  Paragraph C use separate growth rates for real and
25  personal property by property class.  Do you see

1  that?
2      A.  Uh-huh.
3      Q.  Do you know what growth rates you used?
4      A.  So it varied by type of property within
5  real and personal.
6      Q.  Did you pick the growth rates for real and
7  personal property based on your judgment?
8      A.  So ultimately I selected those growth
9  rates based on my judgment.
10      Q.  And do those growth rates also vary over
11  year for each class of property?
12      A.  They change year to year, yes.
13      Q.  And you used your judgment to decide how
14  the growth rates for each class of property should
15  change year to year; is that correct?
16      A.  I used my judgment to see how they would
17  change year to year, yes.
18      Q.  Page 8, subsection ii(b), you say that --
19  one of your assumptions was the tax law will remain
20  unchanged during the forecast time periods.  Do you
21  see that?
22      A.  Yes.
23      Q.  And who gave you that assumption?
24      A.  So in this case, it's referring to the
25  selected tax rate, and we kept it constant

1  following standard forecasting procedures.  So as I
2  outlined earlier, I followed the Michigan State
3  Revenue Conference forecasting procedures, which is
4  also what U.S. federal agencies use.  So you follow
5  current law, and you don't assume a tax rate has
6  changed.
7      Q.  Current law does not exempt personal
8  property in the manner that the proposed
9  legislation does, correct?
10      A.  So right now in current law, it is
11  planning for -- the bills have been passed that
12  would repeal personal property.  It has to be
13  confirmed by voters.  And so in that case, the
14  third part of forecasting is to think about what
15  known changes there are, and in this case, we
16  accounted for a known change.
17      Q.  Okay.  Well, you don't know what the
18  outcome of the vote will be, correct?
19      A.  I do not know.
20      Q.  And so under current law, personal
21  property is not exempted, correct?  That's not the
22  law in the state of Michigan right now, correct?
23      MR. ALBERTS:  Objection.
24      THE WITNESS:  So currently personal property is
25  slated to be repealed assuming voters approve it in

1  August.
2  BY MR. SMITH:
3      Q.  Does current law as it exists at the date
4  of this deposition exempt personal property?
5      A.  So the laws have been passed that exempt
6  it.  It just hasn't been -- it's subject to
7  approval by voters, so I kind of feel like this is
8  gray, and I don't quite know how to answer that
9  question.
10      Q.  Okay.  Right now personal property is not
11  exempted.  You can't say oh, I'm not going to pay
12  my personal property tax, right?
13      A.  So personal property right now is -- has
14  been taxed in Michigan.
15      Q.  Okay.  And that's the current law right
16  now?
17      A.  Current law, the vote has not happened.
18  It's still taxed.  Okay.  I will say that.
19      Q.  But in your forecast, you've modeled the
20  possibility that that current law treatment of
21  personal property tax may change over time,
22  correct?  You've used a 50 percent factor to model
23  that possibility, correct?
24      A.  Right.  So we -- so I've included a
25  50 percent chance that the vote passes in my

1   analysis.
2       Q.   And so you've included in your analysis a
3   50 percent chance that personal property exemptions
4   may pass in which case personal property taxes
5   would be decreased, correct?
6       A.   So what I specifically modeled is a
7   50 percent chance that personal property taxes will
8   be reduced for commercial industrial taxpayers, and
9   so I factored in a 20 percent -- what -- we're
10  forecasting a 20 percent reduction in personal
11  property and a 50 percent chance of that happening,
12  so we've modeled a 10 percent reduction.
13      Q.   So you factored in a chance that there
14  will be a change in current law leading to a
15  reduction in personal property taxes, correct?
16      A.   Yes.
17      Q.   And the -- have you done any investigation
18  into whether there's any debate about changing tax
19  rates in the state of Michigan?
20      A.   For what?
21      Q.   Have you done any investigation into
22  whether there are any proposals to change tax rates
23  in the state of Michigan?
24      A.   In the state overall or --
25      Q.   That would impact City of Detroit.

1       A.   I have not looked into any tax rate
2   changes in the city.
3       Q.   Have you looked into any tax changes other
4   than the personal property tax change that could
5   impact Detroit's revenues and whether there are
6   proposals for those?
7       A.   I don't think I understand the question.
8       Q.   Have you looked into any -- into whether
9   there are any proposals for tax rate changes that
10  might impact Detroit's tax revenues?
11      A.   I am not aware of any proposals that would
12  change tax rates in Detroit.
13      Q.   Have you investigated the matter, though?
14      A.   No.  I have not looked into it.
15      Q.   So you're saying that the assumption that
16  you used for keeping tax rates constant came from
17  the Michigan Manual; is that correct?
18      A.   So they've published a paper about their
19  procedures for doing their consensus revenue
20  forecasting, and so that was consulted as well as
21  what do other agencies do, and those procedures
22  were followed.
23      Q.   Have you done forecasting for taxes before
24  where you did not assume current tax law applied,
25  that there might be changes?

1       A.   So I have done forecasting when a specific
2   policy change has been given and we've asked to
3   say -- to look at the revenue impacts.
4       Q.   What kind of policy change have you
5   forecasted to determine the potential impacts on
6   taxes?
7       A.   So in my old job, I participated in a
8   two-year project looking at tax policy changes at
9   the State of Michigan level.  Some of the tax
10  changes would have reduced revenues for certain
11  taxes, and some would have increased tax revenue
12  for certain taxes.
13      Q.   So when you were working with the State of
14  Michigan, you forecasted the effects of potential
15  changes in tax policy on tax revenues?
16      A.   So I wasn't working for the State of
17  Michigan.  Maybe you said with, but I was working
18  for another organization doing State of Michigan
19  taxes, and -- I've forgotten your question.
20      Q.   What was the other organization that you
21  worked on Michigan taxes with?
22      A.   I worked for a group called Business
23  Leaders for Michigan.
24      Q.   Okay.  When you were doing forecasting to
25  look at changes various policies that could be

1   adopted would have on Michigan tax revenues, you
2   did an analysis on that, correct?
3       A.   So I did an analysis of specific tax
4   changes for the state that would affect the state.
5       Q.   Okay.  And did you calculate -- forecast
6   what the changes in revenues would be if tax policy
7   changed in the state of Michigan when you did this
8   other project?
9       A.   When I did this other project, yes.
10      Q.   And were you coordinating with the state,
11  or how would you describe your relationship with
12  the state in conjunction with that project?
13      A.   So I would have -- I would go to meetings
14  with state representatives to talk about the tax
15  change and to collect data.
16      Q.   And what kind of tax changes were you
17  discussing with Michigan officials?
18      A.   Generally looking at changes to the
19  business tax and changes to the sales tax.
20      Q.   Okay.  Were they looking at increasing or
21  decreasing the business tax and the sales tax?
22      A.   They were looking at decreasing the
23  business taxes and potentially raising the sales
24  tax.
25      Q.   And raising the sales tax would increase

1  the amount of money that the state collected that
2  could be used for revenue sharing, correct?
3      A.  The specifics of the different policies
4  and models, I can't remember how revenue sharing
5  was treated in that.
6      Q.  Do you know where the city -- where the
7  state gets the money that it uses for revenue
8  sharing?
9      A.  I do.
10     Q.  Okay.  Where do they get that money?
11     A.  So -- so the constitutional piece is
12  funded through sales and use tax revenue, a part of
13  it.
14     Q.  So increasing the sales tax would increase
15  revenue sharing under the constitution of Michigan
16  to the cities, correct?
17     A.  All things equal, if you -- so -- so right
18  now how the constitutional piece is structured, you
19  have the first 4 percent, and then you have an
20  add-on 2 percent.  So the revenue sharing is -- the
21  constitutional piece is 15 percent of that
22  4 percent, and those things are written that keep
23  that 4 percent constant, and you play with that
24  additional 2 percent.
25         So proposals that I often look at was sort

1  of keeping the revenue sharing intact.  If you're
2  able to increase that revenue, if you expand the
3  sales tax base or you have more transactions or
4  things, then you can see that sales tax revenue
5  could go up, but you could play with the rate, and
6  it may not actually affect sales tax revenue.
7      Q.  Is it possible that increasing the rate of
8  the sales tax will increase state revenue sharing
9  payments to the cities?
10     A.  Typically if you were to change the rate,
11  you wouldn't be affecting, per se, the revenue
12  sharing if you're not changing that 4 percent.
13     Q.  What about the percent above 4 percent?
14     A.  Well, that part of it isn't part of the
15  sales tax formula.
16     Q.  But generally you know that the state uses
17  the sales tax as a source for its revenue sharing
18  payments to the cities, correct?
19     A.  The constitutional piece comes from the
20  sales tax.
21     Q.  Do you know if any of the statutory piece
22  comes from the sales tax?
23     A.  So right now the Economic Vitality
24  Incentive Program is being -- the funds for it are
25  coming from the General Fund, and part of the sales

1  and use tax go into the General Fund.
2      Q.  Okay.  So the more money that the state
3  collects in sales tax, the more money that is
4  available to fund revenue sharing payments,
5  correct?
6      A.  So the more sales tax revenue the state
7  collects, the more money it would have available in
8  its General Fund, and it could choose to increase
9  payments to municipalities, or it could not.
10     Q.  And so increasing the sales tax rate could
11  have the effect of -- it would have the effect of
12  making more money available for revenue sharing
13  payments.  It's just whether the legislature
14  decides to use it or not, correct?
15     A.  More money would be available.
16  Legislature could or could not decide to use it.
17     Q.  When were you doing that analysis about
18  potentially raising the sales tax rate?
19     A.  So that analysis I did back seven, eight
20  years ago.  What year is it?  2014.  So I did that
21  work, I'm remembering, but probably around 2007.
22     Q.  Okay.  And did the state raise the sales
23  tax?
24     A.  They didn't.
25     Q.  Do you know why they didn't?

1      A.  So Michigan ended up making some changes.
2  They eliminated the SBT.  They put in a new
3  business tax and decided not to make any changes to
4  the sales tax.
5      Q.  And is the state of Michigan, compared to
6  other states, a relatively low-tax state?
7      A.  It depends on what time frame you look at.
8      Q.  Currently.
9      A.  Currently Michigan's in the middle in
10  terms of tax burden.
11     Q.  Do you know if there's any other planning
12  regarding sales taxes, sales tax changes?
13     A.  I'm not aware of any planned sales tax
14  changes.
15     Q.  Have you investigated whether there are
16  any planned sales tax changes?
17     A.  Nothing has come up in my conversations
18  with anyone, so I'm not aware.
19     Q.  Have you ever heard of the Revised
20  Judicature Act of 1961?
21     A.  I don't think so.
22     Q.  Are you aware that under current law, if
23  the City has a judgment against it, that it can
24  charge -- it can raise property tax rates above
25  statutory rates to collect money to satisfy the

1 judgment?
2     A.  I'm not aware of that law.
3     Q.  Did anybody ever tell you or inform you
4 that the City has in the past raised property tax
5 rates above statutory maximums to pay judgments
6 against it?
7     A.  No one told me that.  When I looked at a
8 history of property tax millages for general
9 operating, I noticed that the rates in the past
10 were above 20 mills.
11     Q.  Okay.  And so you noticed that the rates
12 were above statutory maximums in the past.  Then
13 did you make any inquiry about why that was?
14     A.  No, because going forward, what was
15 relevant was the current tax rate.
16     Q.  Okay.  But the City -- Syncora could get a
17 judgment against the City, and the property tax
18 rate could be raised above statutory maximums,
19 correct?
20     MR. STEWART:  Objection.
21     THE WITNESS:  I don't know the likelihood of
22 that.
23 BY MR. SMITH:
24     Q.  Well, other -- you know other creditors of
25 the City in the past have been successful in

1 getting judgments and having the tax rate raised
2 above statutory maximums to pay it, correct?
3     A.  I don't know any details.
4     Q.  Well, you know that the tax rates have
5 been assessed above statutory maximums in the past,
6 correct?
7     A.  The only thing that I noticed was in the
8 past, the general operating mill was above 20, and
9 I was not sure when the 20-mills limit became
10 relevant for Detroit.
11     Q.  Nobody -- I guess since nobody has told
12 you about this possibility of property tax rates
13 being above statutory maximums, so that's correct,
14 right?
15     A.  Nobody has told me about that.
16     Q.  Okay.  So nobody has asked you to consider
17 what taxes -- property taxes could be collected at
18 rates above statutory maximums under the Revised
19 Judicature Act, correct?
20     A.  Correct.  Nobody asked me to look into
21 that.
22     Q.  And you don't have any idea why they
23 didn't ask you, correct?
24     A.  I have no idea why people did not ask me
25 to do something.

1     Q.  Okay.  You did do an adjustment for
2 changes in collection rates over time, correct?
3     A.  Correct.
4     Q.  Do you know if there's an adjustment for
5 changes in collection rates for the income tax
6 under Mr. Cline's analysis?
7     A.  I don't know.
8     Q.  You haven't done anything to ensure that
9 your methodology in terms of the treatment of
10 collection rates is consistent with Mr. Cline's
11 methodology, correct?
12     A.  Can you say that again?
13     Q.  You haven't done anything to investigate
14 or ensure that the methodology you used with
15 respect to collection rate on the property tax is
16 consistent with Mr. Cline's approach on the income
17 or other taxes, correct?
18     A.  We took pains to make sure that the inputs
19 we were using were consistent, and the way we were
20 going about -- he had a different methodology
21 because it's a different type of tax with a
22 different tax base.  He had a different methodology
23 than I did, and I don't -- given how -- I don't
24 know -- you know, there's a different collection
25 process.  I don't know how he factored in

1 collection exactly into his model.
2     Q.  You don't know whether Mr. Cline factored
3 any changes in collection rate in his model one way
4 or the other, correct?
5     A.  I don't know how his model incorporates
6 collection.  I would have to see it.
7     Q.  You agree that it's important to factor in
8 the collection rate in forecasting income tax,
9 correct?
10     A.  So there are -- collections of income is
11 important, and he -- you know, collections for
12 income taxes are different than property taxes, so
13 it's not -- it's not unusual that he would deal
14 with it differently than I would.  He's -- for
15 example, you have tax withheld from paychecks, so
16 that's a very different model than someone paying
17 their property taxes.
18     Q.  But you agree that it's important to
19 factor in in some way changes in collection rate
20 over time in forecasting the income, corporate,
21 wagering or utility user tax, correct?
22     A.  I think you said, though, that it's
23 important to factor in changes.  I think it's
24 important to think about the revenue that you're
25 going to be receiving, you're actually receiving,

1  and for each of the different taxes, we did that.
2      In property, we thought about what's the
3  collection rate. In income taxes, we thought about
4  the tax base, different tax bases, taxes withheld
5  versus taxes paid, so collection would show up in
6  that analysis. For the other taxes, we thought
7  about well, what is being actually paid by, say,
8  the casinos or utility users. So collections is
9  present, but I think they're different in each of
10  the tax bases.
11    Q.  But in the income tax analysis, you know
12  there's no change or analysis of what the
13  collection rate might be over the next 10 years,
14  correct?
15    A.  I don't know exactly what Mr. Cline did
16  there.
17    Q.  Okay. But you agree it's important to
18  take into account the collection rate in any
19  forecast of taxes and tax revenue that you do,
20  correct?
21    A.  I don't know if I would say it's important
22  to think about a collection rate. I think it's
23  important to think about what money the entity is
24  going to receive, which is what we've tried to do
25  in our forecast. We tried to think about actual

1  money in the door in a given fiscal year.
2    Q.  And would you agree that collection rate
3  is one of the key drivers of tax revenue?
4    A.  In the property taxes forecasts that I
5  did, collection rate is an important driver.
6    Q.  Yeah. For any tax revenue analysis,
7  collection rate is a key driver of tax revenue,
8  correct?
9    A.  Income taxes, like I said, I think each of
10  them collections is different, and so the
11  collection process is different, and so it's more
12  important and less important in other areas.
13    Q.  Have you ever done a tax forecast where
14  you failed to incorporate a collection rate?
15    A.  In the forecast that I prepared related to
16  property taxes, I've included a collection rate.
17    Q.  I'm asking about any tax forecast. Have
18  you ever done a tax forecast where you didn't take
19  into account potential changes in collection rates?
20    A.  I mean, I think -- I've always
21  incorporated collections, and we all think -- you
22  know, both in this project and other work what do
23  we actually think money is going to be in the door,
24  so collections are always a process of what we're
25  thinking about.

1    Q.  Because the higher your collection rate,
2  the higher your tax revenue, and the lower your
3  collection rate, the lower the revenue, correct?
4    A.  In some cases, yes. In other cases, you
5  can have a higher collection rate and a lower tax
6  levy, and you could have -- you would have a lower
7  tax revenue.
8    Q.  All other things being equal, the higher
9  the collection rate, the more tax revenue you take
10  in, correct?
11    A.  Up to a certain point.
12    Q.  And that's why it's important to consider
13  the collection rate in a tax forecast, right?
14    MR. STEWART:  You've asked this question, I
15  think I've counted, 15 times now, so she's going to
16  answer. This is going to be the last time because
17  I am going to instruct her after this.
18    MR. SMITH:  You have a pattern of obstructing
19  every deposition you've been in. By the way, I'm
20  going to ask her about deposition transcripts
21  later, so I ask that you produce this order of the
22  court because I'm informed there is no such order.
23    MR. STEWART:  No. Ask Mr. Hackney.
24    MR. SMITH:  No. I'm asking you. I'm going to
25  ask about it. Where's the order?

1    MR. STEWART:  It was a ruling that he made.
2  Your partner, Mr. Hackney was there.
3    MR. SMITH:  And there was no such ruling, so --
4    MR. STEWART:  Yes, there was.
5    MR. SMITH:  -- you're obstructing the
6  deposition.
7    MR. STEWART:  I was in court when it happened.
8    MR. SMITH:  Okay. Then I'm asking that you
9  produce it. Produce it before the deposition is
10  over. We've got like three or four hours left.
11    MR. STEWART:  No.
12    MR. SMITH:  We're at your offices. I just want
13  the order.
14    MR. STEWART:  I told you it's not an order.
15  It's a ruling that he made.
16    MR. SMITH:  Or the transcript, whatever it is.
17  I want you to show me where the court issued this
18  ruling.
19    MR. STEWART:  Why don't you ask Mr. Hackney
20  because he was the one that got in the colloquy
21  with the judge, and he is the one where the judge
22  said it. I think it was during the swaps trial,
23  but we've had thousands and thousands of pages of
24  transcript. So I'm not going to interrupt the
25  deposition to go find it. I think, though --

1    MR. SMITH: You can do it at a break.
2    MR. STEWART: -- since your firm was the one
3  that got the adverse ruling, I would think they'd
4  have no trouble, and find Mr. Hackney. He
5  remembers it well because he professed to be
6  surprised by the judge's ruling, and the judge told
7  him actually it's standard, and it is standard.
8  And that's just -- everybody knows it. Surprised
9  he didn't because he's an excellent lawyer, but
10  that was the ruling.
11    So now the question, though, is I think --
12  I don't think I'm going unfair when I say that
13  after you've asked this witness the same question
14  15 times and she's answered it 15 times, you have
15  to move on. You're just arguing with her. You're
16  wasting everybody's time, and it's an abuse of the
17  witness. So let's reread the question. Reread the
18  question. She's going to answer it, and then we're
19  going to move on.
20    (Whereupon, the record was
21    read as requested.)
22    THE WITNESS: Collections are important to
23  consider in doing any tax forecast.
24  BY MR. SMITH:
25    Q.  And Ms. Sallee, is it your understanding

1  that you're not allowed to look at any of the
2  testimony given in deposition by other witnesses in
3  this case, including Mr. Evanko?
4    MR. STEWART: You just misstated it.
5    MR. SMITH: I'm asking the question.
6    MR. STEWART: Ask her. Then I'm going to
7  correct you because you just misstated what I told
8  you.
9    MR. SMITH: You're coaching the witness.
10    MR. STEWART: Answer the question.
11    THE WITNESS: You said testimony. I'm trying
12  to -- I don't know -- I don't know legal things, so
13  I don't know.
14    MR. STEWART: Just because I think you
15  misunderstood it, Mr. Smith, but the judge's ruling
16  was --
17    MR. SMITH: Listen, your speaking objections
18  are really obstructive.
19    MR. STEWART: Well, there's no pending
20  question.
21    MR. SMITH: Then don't give a speech on the
22  record.
23    MR. STEWART: Because you just misstated
24  things, and we have to have the record corrected
25  because you can't go around misstating things.

1  What the ruling was is you cannot ask a witness to
2  comment on the testimony of another witness.
3  That's what the ruling was.
4    MR. SMITH: Okay. That's what you've been
5  telling everybody in this case, right?
6    MR. STEWART: Well, that's what the judge
7  ruled. I should add, by the way, I didn't instruct
8  her not to answer your questions. I just told you
9  I have a standing objection to them, and I cannot
10  stop you if you want to ask her what Mr. Evanko
11  said. I just told you it's improper, and the judge
12  has said not to do it.
13    MR. SMITH: You obstructed the deposition
14  already.
15    MR. STEWART: No. If you want to ask her, ask
16  all day about it.
17    MR. SMITH: I'm told the tape is running out.
18  Let's take a break.
19    THE VIDEOGRAPHER: Off the record. The time is
20  1:32 p.m.
21    (Whereupon, a short break was
22    taken.)
23    THE VIDEOGRAPHER: We're back on the record.
24  The time is 1:39 p.m.
25

1  BY MR. SMITH:
2    Q.  Hi, Ms. Sallee. Do you have Mr. Evanko's
3  testimony in front of you? Do you see the excerpts
4  there?
5    MR. STEWART: And you have my standing
6  objection, and I will not interrupt your
7  examination if it's clear my objection to this is
8  standing.
9    MR. SMITH: Okay.
10  BY MR. SMITH:
11    Q.  You've got it in front of you?
12    A.  Yes.
13    Q.  Okay. I wanted to ask you about Page 152
14  in there if you would flip through. These are just
15  excerpts from his deposition, and let me know when
16  you get to Page 152.
17    A.  Okay.
18    Q.  Okay. And actually if you go down to
19  Line 13, you see Mr. Evanko's talking about the
20  transactions they have and whether they're arm's
21  length. Do you see that?
22    A.  Yeah.
23    Q.  And you see that the data that he's
24  received was so scant of arm's length transactions.
25  There could not have been a study developed because

1  it was just absolutely insufficient data. Do you
2  see that?
3      A.  Okay.  I see that.
4      Q.  And Mr. Evanko's testimony is generally
5  consistent with the other materials we've seen from
6  the assessor's office indicating that most of the
7  transactions are not arm's length, correct?
8      MR. STEWART:  Objection.
9      THE WITNESS:  Well, I haven't seen any of the
10  data, so I don't know.
11  BY MR. SMITH:
12      Q.  Well, I mean, we saw some other documents
13  talking about how most of the transactions were not
14  arm's length.  Do you recall that?
15      A.  I don't know if most of the transactions
16  were not arm's length.
17      Q.  So you don't know what percent of the
18  transactions the City has that are arm's length
19  transactions, correct?
20      A.  I do not know a percent, no.
21      Q.  If you go over to Page 223 of the
22  document, it's like the last two pages.  Let me
23  know when you get to 223.
24      A.  Okay.
25      Q.  If you'll look at Line 18, Mr. Evanko is

1  asked but when I said you don't remember discussing
2  this with Ernst & Young, I was correct, right?
3  Right.  You don't recall discussing .5 reduction of
4  10 percent in collection in fiscal year 2015 due to
5  loss of revenue from the small business personal
6  property tax exemption?  Not only do I not -- I do
7  not recall, but this is a ridiculous estimate.  I
8  knew in December of 2013 that the small business
9  personal property tax exemption would affect the
10  City's tax base by approximately .7 of 1 percent,
11  not 10 percent.
12      Do you see that?
13      A.  Uh-huh.
14      Q.  So Mr. Evanko is characterizing your
15  forecast of the reduction in personal property tax
16  as a ridiculous estimate, correct?
17      MR. STEWART:  Objection.
18      THE WITNESS:  Well, he says this is a
19  ridiculous estimate.
20  BY MR. SMITH:
21      Q.  And you didn't have any conversation with
22  Mr. Evanko to ask him about whether it was a
23  reasonable estimate the reduction in personal
24  property tax before you put it in your report,
25  correct?

1      A.  So I had to -- I had several conversations
2  with Mr. Evanko.  I've talked with him in January
3  of 2014 and received some data from him.  He
4  answered some questions.  I also had conversations
5  with Alvin Horhn in his office.  And I had a call
6  with Alvin in February of 2014, and I ran the
7  10 percent reduction by him, and he -- he said that
8  was reasonable.
9      Q.  Did you ever run the 10 percent reduction
10  in personal property tax by Mr. Evanko before you
11  put that in your report?
12      A.  I can't remember if it came up in the
13  conversations with him in January or not.  I know I
14  did run it by, because of my notes, with Alvin
15  Horhn.
16      Q.  Do you have written notes of all of your
17  conversations with people at the City?
18      A.  No, I don't.
19      Q.  Do you have written notes of any of your
20  conversations with people at the City or others you
21  rely on?
22      A.  I do have some written notes.
23      Q.  Do you know if those have been collected
24  for production?
25      A.  They have.

1      Q.  Do you understand that under the proposed
2  legislation that there's sums that will be
3  reimbursed to cities to help offset reductions in
4  personal property taxes?
5      A.  Yes, there's a replacement mechanism.
6      Q.  Do you have an understanding that under
7  the legislation, not all property is subject to the
8  reduction in personal property tax?
9      A.  What's the question?
10      Q.  Is there some property that would be
11  exempted from the reduction in personal property
12  tax under the legislation?
13      A.  So in personal property, you have
14  commercial, industrial and utility.  Utility
15  property is not exempt, would not be subject to the
16  reduction, and there's a -- and there's different
17  phase-outs of how commercial and industrial are
18  affected.
19      Q.  Before today, you were never informed that
20  Mr. Evanko had characterized your forecast for the
21  reduction in personal property tax in the manner
22  that he did in his deposition, correct?
23      A.  So I have had some conversations with my
24  lawyers about --
25      MR. STEWART:  You can't talk about what you

1  talked to your lawyers about.
2      THE WITNESS:  Okay.
3      MR. STEWART:  He can ask -- he can tip-toe
4  around the subject, and he will do that, but
5  that's -- there's a little dance we usually do.
6  BY MR. SMITH:
7      Q.  Did you know before today that Mr. Evanko
8  characterized your personal property tax forecast
9  reduction as ridiculous?
10     MR. STEWART:  You can answer that.
11     THE WITNESS:  I did not know he said it was
12 ridiculous.
13 BY MR. SMITH:
14     Q.  Okay.  Then Mr. Evanko is asked on
15 Page 224, he's asked about this -- the reassessment
16 that's going to be completed in 2020.  Do you see
17 that?
18     A.  Uh-huh.
19     Q.  The planned reappraisal study?
20     A.  Yeah.
21     Q.  And he's asked and you could not have
22 given them an estimate of how much to reduce
23 taxable value based on this study because you,
24 yourself don't know which way it's going to come
25 out, correct?  And he answers I don't know where --

1  how it's going to come out next year.  2020 is a
2  lifetime.
3      And then he's asked okay, and he testifies
4  you know, I'll be collecting Social Security living
5  in North Carolina.  And then he's asked I know
6  you're thinking about two years.  I know where your
7  head is at, but you agree with my statement.  You
8  did not provide them with -- you didn't tell them
9  this is about what it's going to look like when the
10 reappraisal study is done, correct?  Absolutely
11 correct.
12     Do you see that testimony?
13     A.  Uh-huh.
14     Q.  Before today, were you aware of that
15 testimony by Mr. Evanko?
16     A.  I was not aware of this testimony, no.
17     Q.  Okay.  It's true that Mr. Evanko did not
18 provide you with the assumption you use in your
19 forecast regarding a reduction in assessed value as
20 a result of the planned reappraisal, correct?
21     A.  Mr. Evanko did not provide the assumption
22 that was used in our forecast.
23     Q.  And in fact, Mr. Evanko's testimony is
24 that he doesn't know what the outcome will be in
25 terms of whether property will increase or decrease

1  in value as a result of the planned reappraisal
2  study, correct?
3      MR. STEWART:  Are you asking her that's what
4  this says?
5  BY MR. SMITH:
6      Q.  That's what his testimony is, correct?
7      MR. STEWART:  Objection.
8      THE WITNESS:  Can you say that one more time?
9  BY MR. SMITH:
10     Q.  Mr. Evanko's testimony is that he doesn't
11 know what the outcome of the reappraisal study will
12 be in terms of whether property values will
13 increase or decrease, correct?
14     A.  It says here, yeah, he does not know how
15 the reappraisal study will come out, correct.
16     Q.  And in fact, nobody knows how the
17 reappraisal study is going to come out in terms of
18 effect on property values and assessments in the
19 city, correct?
20     A.  Nobody knows for certain.
21     Q.  Would you agree that Mr. Evanko would
22 certainly be one of the most knowledgeable people
23 in terms of assessed values in the City of Detroit?
24     MR. STEWART:  Objection.
25     THE WITNESS:  Mr. Evanko is knowledgeable of

1  the assessed values in Detroit.
2  BY MR. SMITH:
3      Q.  In fact, Mr. Evanko is responsible for the
4  assessed values in Detroit as the assessor,
5  correct?
6      A.  He is.
7      Q.  And in fact, Mr. Evanko would be one of
8  the most knowledgeable people about assessed values
9  in Detroit, correct?
10     MR. STEWART:  Objection.
11     THE WITNESS:  He is a knowledgeable person.
12 BY MR. SMITH:
13     Q.  Mr. Evanko has been dealing with assessed
14 values in Detroit for much longer than you have,
15 correct?
16     A.  My understanding is he joined the City in
17 January.
18     Q.  Do you know where he joined from?
19     A.  I think I was told he was at Wayne County.
20     Q.  And at Wayne County, he would be dealing
21 with assessed values in the city of Detroit,
22 correct?
23     A.  I don't know what he did.
24     Q.  I'd like to go back to your report now.
25     A.  Okay.

1    Q.   Page 9 you talk about how you had assumed
2 there would be a reduction -- well, you talk about
3 the planned reassessment at the top of Page 9,
4 correct?
5    A.   Yes.
6    Q.   And you used your judgment in order to
7 come up with the figure you used to reduce planned
8 assessment as -- assessed values as a result of the
9 planned assessment, correct?
10    A.   No.  I only looked at taxable value, so I
11 took into account the City's activities and its
12 impact on taxable value.
13    Q.   Okay.  So you used your judgment in
14 developing the assumption about what taxable value
15 would be under the reappraisal study that's
16 planned, correct?
17    A.   So after the reappraisals and the
18 reassessments, I took those into account in
19 thinking about what happens to taxable value.
20    Q.   And did the value you used to reduce
21 taxable value as a result of the reappraisal study,
22 was that based on your judgment?
23    A.   The parameter I used was based on my
24 judgment after the reappraisal study.
25    Q.   Okay.  On Page 9 down under C, you say

1 that the reinvestment scenario estimates
2 improvements to the tax base on collections of the
3 general operations and economic environment of the
4 city improved during the 10-year period.  Do you
5 see that?
6    A.   Uh-huh.
7    Q.   And the City anticipates that improved
8 economic conditions will increase property values,
9 correct?
10    A.   You said the City?
11    Q.   Yeah, the City.
12    A.   Okay.
13    Q.   Well, do you anticipate that -- do you
14 anticipate that improved economic conditions will
15 increase property values?
16    A.   So this scenario does say that if the
17 economy in Detroit improves, we would see
18 improvement to taxable values in the city.  We
19 would see improved property tax revenue.
20    Q.   And under your model, improving services
21 in the city should improve property tax revenues,
22 correct?
23    A.   We didn't look at services offered by the
24 City.
25    Q.   Okay.  So you did no analysis to determine

1 the effect on improved services on property tax
2 revenues, correct?
3    A.   Did not look at the relationship between
4 improved city services and property tax revenue.
5    Q.   Do you agree it's at least theoretically
6 possible that improving city services could
7 increase property tax revenues?
8    A.   I agree it's theoretically possible.
9    Q.   Page 9 to 10 you talk about the growth
10 rates after recessions.  Do you see that?
11    A.   Yes.
12    Q.   And you mention historical data.  What
13 historical data did you look at?
14    A.   So I pulled historical taxable value
15 information from the State Tax Commission for
16 Detroit.
17    Q.   And then did you use your judgment to set
18 the various growth rates that you assume in your
19 forecasting model?
20    A.   Yeah.  So I performed some analysis and
21 then used that analysis to select growth rates.
22    Q.   When you say analysis, what calculation
23 did you perform?
24    A.   So in this case, looking at historical
25 taxable value and trends and seeing during

1 different periods on different tax bases what's
2 happened in the city.
3    Q.   For any of the historical trends that you
4 talk about in your report, did you actually come up
5 with a mathematical formula to specify the trend,
6 or did you eyeball it?
7    MR. STEWART:  Objection.
8    THE WITNESS:  So I mean, I would type in a
9 compounded annual growth rate formula and calculate
10 the compound annual growth rate, things like that.
11 That's a formula, I guess.
12 BY MR. SMITH:
13    Q.   But in order to do the trend, I mean, how
14 did you figure out what the trend was?  Did you do
15 any mathematical analysis to determine the trend or
16 not?
17    A.   So I would calculate certain things using
18 the data.
19    Q.   What kind of things?
20    A.   Like the compounded annual growth rate
21 during certain periods.
22    Q.   Did you just take an average of certain
23 number of years or --
24    A.   So I would look at a time period, and then
25 I would calculate -- so compounded annual growth

1  rate is what is the average growth rate during that
2  time period that gets you from Point A to Point B.
3      Q.  Okay.  But then -- so you would just take
4  a compounded annual growth rate over how many
5  years?
6      A.  So I would look at a time period and then
7  calculate the compounded annual growth rate.
8      Q.  Do you know what the time period was that
9  you were using?
10     A.  So I used different periods and different
11 times, and I tried to lay that out, but normally I
12 went back as far as I could.  So the State Tax
13 Commission data goes back to 2001, I believe, and
14 then the -- then the most recent data I had was
15 through 2013.  So I looked at that period to get a
16 sense of what -- in terms of long-run trends what
17 happened to taxable value.
18     Q.  Okay.  Did you just do compounded annual
19 growth rate for all those trends?
20     A.  So I used the compounded annual growth
21 rate for the long-run trend for certain things, and
22 then if I wanted to see during, you know, periods
23 after a recession or before a recession, so I used
24 different time periods depending on what I was
25 trying to do.

1      Q.  So you used different time periods in
2  assessing historical trends -- the various
3  historical trends that you discuss in your report;
4  is that correct?
5      A.  There are different time periods in my
6  report for different things.
7      Q.  Okay.  Why did you use different periods
8  of time in looking at national trends for property
9  tax collections in D?  It's in Paragraph D(ii).
10     A.  So part of the forecasting procedure is to
11 look at past data and to understand historical
12 trends, and then throughout our forecast work, we
13 consulted forecasts when they were relevant.  And
14 in this case, the Congressional Budget Office has
15 a -- they put together a 10-year forecast, and I
16 looked to see what the Congressional Budget Office
17 had forecast.  So they have the Federal Housing
18 Finance Agency House Price Index, so I looked to
19 see what they had forecasted nationally, and their
20 forecast only goes to 2023.
21     Q.  For the growth rates after 2027, are those
22 growth rates that you essentially picked using your
23 judgment?
24     A.  So growth rates after 2027 used the
25 historical data that I mentioned before, so tax

1  years 2023, to see what the long-run change is in
2  taxable value for Detroit during the periods.  So
3  you use that, which during that period there were
4  ups and downs and used that long-run growth rate
5  for the extrapolation of property taxes post 2027.
6      Q.  But you reduced the growth rate under your
7  analysis, correct?
8      A.  So we have various growth rates during the
9  extrapolation, so in the forecast at the end of the
10 10-year, we have -- across the board, we have sort
11 of improvements in Detroit, and so we modeled
12 growth in property taxes that looked more like the
13 national.  And then we have sort of that period
14 phasing down until we get to the long-run
15 equilibrium.
16     Q.  The reductions in the growth rate, though,
17 that you put into your model, were those based on
18 your judgment?
19     A.  And so after doing the analysis, I looked
20 at the data, and then I made a judgment about what
21 growth rates I should put in there.
22     Q.  And you reduced them, correct?
23     A.  And I reduced to reach the long-run
24 equilibrium.
25     Q.  And then you used some building permit

1  data for Wayne County, correct?
2      A.  Correct.
3      Q.  And have you updated that data to the
4  present time or not?
5      A.  So I used through 2013, which would be the
6  most recent data available.
7      Q.  Well, there is data available for 2014 now
8  regarding building permits for Wayne County,
9  correct?
10     A.  So there would be a few months' worth of
11 data.  It wouldn't be for the entire year.
12     Q.  Have you looked to see what that data
13 shows?
14     A.  I did pull -- in the latest round, I
15 pulled as much data as there were last month, so I
16 would have pulled a few months more of data.
17     Q.  But did you use -- did you factor any of
18 the data from 2014 for building permits and
19 construction into your analysis?
20     A.  I did not use 2014 because I didn't have
21 an entire year.
22     Q.  Okay.  Has there been an increase in
23 construction permitting activity in terms of the
24 dollar amount of construction in 2014 so far
25 compared to prior years?

1    A.   So all years are showing there was
2    construction in Wayne County.
3    Q.   And my question is is there an increase in
4    activity in 2014 in terms of construction activity?
5    A.   My recollection going off memory was that
6    we're looking better in 2014.
7    Q.   And what purpose did you use the
8    permitting and construction data for?
9    A.   So residential taxable value, one of the
10   components of that are additions to the tax base.
11   And to get a sense of what new activity there was,
12   I looked at the permit data for Wayne County, and
13   then I apportioned that activity to Detroit based
14   on Detroit's share of taxable value in the county.
15   Q.   All other things being equal, the more
16   permitting and construction activity there is, the
17   more property tax revenue will be forecasted,
18   correct?
19   A.   It depends because you could have
20   construction activity and the City puts it in a
21   Renaissance Zone, and you don't pay taxes on it.
22   Q.   Well, I mean, how did you use the data in
23   your -- in developing your assumptions?
24   A.   So I looked at it to see what sort of
25   increases in taxable value were happening and used

1    that to inform my growth rate selection.
2    Q.   And did increasing building or
3    construction activity in your model, would that
4    lead to increase in property tax revenue?
5    A.   In my model, increases in permitting and
6    new additions to the tax base, higher taxable
7    value, all things equal, leads to more property tax
8    review.
9    Q.   Over on Page 13, you mentioned the Detroit
10   Association of Realtor data that we've discussed
11   previously.  Do you see that?
12   A.   Uh-huh.
13   Q.   And you say that according to Detroit
14   Association of Realtors data, average existing home
15   prices in Detroit fell 63 percent between 2006 and
16   2013.  Do you see that?
17   A.   Yes.
18   Q.   In fact, the data that's being reported by
19   the Detroit realtors is data for home sales,
20   correct?
21   A.   They're reporting average home sale
22   prices.
23   Q.   Right.  So it's only a subset of the
24   housing stock that's being actually sold that the
25   Detroit index is measuring, correct?

1    A.   It would be whatever the realtors in this
2    association are reporting.
3    Q.   And they would only be reporting housing
4    sale prices, correct?
5    A.   As opposed to what?
6    Q.   Most of the housing stock is not being
7    sold, correct?  There's houses that aren't sold,
8    right?
9    A.   That's right.  Like Case-Shiller or other
10   things, it's measuring -- this data is measuring
11   sales.
12   Q.   Okay.  And so this data that you've used
13   in your analysis doesn't give us a value for houses
14   that aren't being sold during the period you
15   examined, correct?
16   A.   This is just sales data.
17   Q.   Okay.  So it wouldn't give us a value for
18   the houses that aren't being sold during the period
19   you've looked at, correct?
20   A.   It would not tell me the sales price of
21   housing that has not been sold, yes.
22   Q.   And it wouldn't tell you the value of
23   housing that hasn't been sold, correct?
24   A.   It wouldn't tell me the market value of
25   homes that have not been sold.

1    Q.   Okay.
2    A.   True.
3    Q.   Why did you only -- was data available
4    before 2006?
5    A.   Yeah.  As we pointed out earlier, I had
6    1995, '98, 2001 to 2006.
7    Q.   Okay.
8    A.   I'm sorry.  2001 to 2013 and then some
9    months of 2014.
10   Q.   Okay.  Did you only use a subset of the
11   data you had reviewed in using -- in terms of
12   calculating a housing price, or what did you use
13   this data for first?
14   A.   So as part of looking at the residential
15   taxable value, an important component of that is,
16   you know, what's happening to sort of the market
17   values, how does that -- how does that impact state
18   equalized value?  What's the relationship there,
19   state equalized value, capped value?  This is part
20   of helping us think -- helping me think through
21   what's going on with the residential taxable value.
22       So I looked at Detroit Association of
23   Realtor data because it's publicly available data
24   on the market value of residential homes in the
25   city.  And things like Case-Shiller only look at

1  the metro area, not Detroit specifically, so this
2  was a chance to have some Detroit-specific data.
3      Q.  Okay.  And why didn't you look -- I mean,
4  did you use the data to -- as a number input in
5  your model?  How was it used?
6      A.  How was it used?  So again, we did the
7  analysis to see sort of where home prices were in
8  the city and compare it to the City of Detroit's
9  published state equalized value and taxable values,
10  and then I was able to use that information in
11  helping think through what was going to happen to
12  residential taxable value in the forecast, so it
13  helped me select my growth rates.
14      Q.  Okay.  And so the -- if you had looked at
15  a different period of time, your growth rate
16  assumptions would be different, correct?
17      A.  Well, I did look at different periods of
18  time.  So I looked at longer periods and shorter
19  periods, and I -- ultimately this information was
20  used to help think through, you know, what were
21  home prices -- average home prices five, 10, 15,
22  20 years ago, and what would their taxable value
23  look like today versus where would it be reset if
24  the home sold today.  And so that helped me think
25  about well, how much would taxable value have to

1  fall, how much is state equalized value likely to
2  fall and go below -- need to go below the capped
3  value and therefore, affect taxable value.
4          All of that is to say I looked at various
5  time periods and used that to think through what
6  needed to happen to taxable value in the forecast
7  for residential property.
8      Q.  Okay.  If the property values don't fall
9  below capped value, I mean, what's the effect of
10  that?
11      A.  I don't understand your question.
12      Q.  Let me ask a better question.  Down at the
13  bottom of Page 13, you say that your forecast
14  assumes a reduction in residential taxable value of
15  between negative 2 and 4 percent per year between
16  fiscal year 2016 and fiscal year 2020?
17      A.  Yes.
18      Q.  Is that assumption based on your judgment?
19      A.  I used my judgment to select those rates,
20  yes.
21      Q.  And did those rates change over each year?
22      A.  There are some years that I think have the
23  same rate, so it varied depending on -- some of
24  them are the same.  Some of them aren't.  I can't
25  remember year to year what I picked.

1      Q.  And did you use your judgment to pick
2  whether the rate would change in a given year for
3  all the years that are covered by your forecast?
4      A.  Well, so the goal here in using -- so
5  using some data to think about what's likely to
6  happen to taxable value and then looking at sort of
7  overall how much -- looking at the data, how much
8  do I think taxable value on the residential side
9  needs to drop and then spreading that out and
10  thinking through how many years is it going to
11  take, is this process going to take and then
12  applying a growth rate for -- to those years.
13      Q.  When you say figuring out how much
14  residential value needs to drop, what do you mean?
15      A.  So doing an analysis looking at -- in this
16  case -- so overassessments impact taxable value in
17  the following way.  If your house is overassessed,
18  your state equalized value is going to be higher
19  than your capped value, and you're going to be
20  paying taxable value equal to your capped value.
21  If your assessment falls and your equalized value
22  goes below your capped value, then your taxable
23  value would fall, so it would be the lesser of the
24  two.
25          And so I've now forgotten what you've

1  asked me after having gone through that.
2      Q.  Right now the county isn't -- right now
3  the county is saying that the properties are not
4  overassessed, correct?
5      MR. STEWART:  Objection.
6      THE WITNESS:  I don't know if the -- the county
7  has given it an equalization factor of 1.
8  BY MR. SMITH:
9      Q.  Okay.  And that means in the county's
10  view, the property is not overassessed, correct?
11      MR. STEWART:  Objection.
12      THE WITNESS:  Through their process, the county
13  has given them an equalization factor of 1.
14  BY MR. SMITH:
15      Q.  Okay.  And that means the county
16  determines that the property is not overassessed
17  because if it thought it was overassessed, it
18  wouldn't give them a value of 1, correct?
19      A.  So the process is that if the county
20  thinks that the property is overassessed, it would
21  not give it a factor of 1.
22      Q.  15 percent value at the bottom of the
23  page, that's the value that you assumed for the
24  effect on taxable value from the reappraisal study
25  that's planned in three -- that's going to take

1  three to five years, correct?
2    MR. STEWART:  Sorry.  Where are we again?
3    THE WITNESS:  Where are we?
4  BY MR. SMITH:
5    Q.  Bottom of Page 14.  The 15 percent drop in
6  residential taxable value is the value you assumed
7  based on that reappraisal study that's going to
8  take place in the future; is that correct?
9    A.  Yes.
10    Q.  And then over on the top of Page 15, you
11  say that your assumption of the 15 percent decline
12  would bring residential taxable value to
13  approximately half of its fiscal 2013 level.  Is
14  that accurate?
15    A.  That's accurate.
16    Q.  And so based on your assumption regarding
17  the effect of the reappraisal study, you're saying
18  that the taxable value of the property in the city
19  would be reduced in half, correct?
20    A.  No.  I said the residential value would be
21  half.
22    Q.  As a result of your assumption about the
23  reappraisal study, you're concluding that the
24  residential taxable value will be reduced in half,
25  correct?

1    A.  It will be half of its fiscal year 2013
2  level, the residential taxable value.
3    Q.  For commercial or industrial property, how
4  did you go about figuring out taxable value for
5  those?
6    A.  So taxable value, how did I go about
7  figuring out?  So commercial and industrial taxable
8  value, I pulled historic information as the
9  starting point and then applied growth rates for
10  the forecast period.
11    Q.  For commercial and industrial property,
12  you didn't factor in the potential of reappraisal
13  during the forecast period, correct?
14    A.  So during the next few years, I have
15  commercial and industrial property taxable value
16  declining.  How property is evaluated for
17  commercial industrial, I did not have a big factor
18  like I did with residential.
19    Q.  Do you know how the value of commercial
20  industrial property is set by the City?
21    A.  For personal, I understand.  For real
22  property, I know the methods they can choose from.
23  I don't know exactly what the City has been
24  selecting.
25    Q.  Do you know -- I mean, do you know what

1  the City is going to do in the future in terms of
2  evaluation of industrial or commercial property?
3  Like have you investigated its plans or not?
4    A.  I have not talked to the City about their
5  plans about how they're assessing commercial
6  industrial property.
7    Q.  And the reason you don't have the big drop
8  in taxable value for a commercial and industrial
9  property is because you're not using this
10  assumption of a reappraisal for those categories of
11  property, correct?
12    A.  So in this case, I don't have the
13  reappraisal process resulting in a huge drop in
14  commercial and industrial taxable value.
15    Q.  But you do have a huge drop in taxable
16  value for the residential property based on the
17  planned reappraisal study that's going to take
18  place over the next several years, correct?
19    MR. STEWART:  Objection.
20    THE WITNESS:  Can you say that again?
21  BY MR. SMITH:
22    Q.  You do have a huge drop in the taxable
23  value for residential property based on this
24  reappraisal study that's planned to take place in
25  the future over the next several years, correct?

1    A.  So I have a 15 percent drop in -- well, I
2  have a 15 percent drop between fiscal year 2019 and
3  2020 on the residential side because of the
4  reappraisal.
5    Q.  And that 15 percent drop results in wiping
6  out half of the taxable value of residential
7  property in the city, correct?
8    A.  When you take into account what the
9  taxable value is by 2020 compared to 2013, it's
10  going to be half of the 2013 level.
11    Q.  And that's in addition to drops in taxable
12  value that have already occurred before 2013,
13  correct?
14    A.  The drops of taxable value before 2013?
15    Q.  Yeah.  Before 2013, taxable value already
16  decreased, correct?
17    A.  Yes.
18    Q.  And so your forecasted 50 percent
19  reduction is in addition to the reduction that has
20  already occurred in taxable value in the city for
21  residential property, correct?
22    A.  There have been reductions in taxable
23  value, and we have continued reductions occurring
24  because of reassessments and reappraisals, yes.
25    Q.  And the continued reduction in taxable

1  value, that's because of actions the City is going
2  to take in the future, correct?
3      A.  So some of the reductions in the
4  residential taxable value are based on planned
5  actions of the City, and some of them are not.
6      Q.  Which ones are not?
7      A.  Well, so as detailed earlier, there are,
8  you know, things that are at -- causing taxable
9  value on the residential side to decline that
10  aren't based on the study, so population declines,
11  etcetera.
12      Q.  The greatest factor in reducing taxable
13  value in your analysis are actions the City is
14  going to take in the future, correct?
15      A.  Can you say that again?
16      Q.  The greatest factor causing a reduction in
17  taxable value in your forecast is actions that the
18  City is going to take in the future, correct?
19      A.  So the largest drop in taxable value in
20  the forecast have been -- so in fiscal year 2015,
21  the City lowered assessments, and so that created a
22  large drop in taxable value for residential, and so
23  that's an action of the City.  And then the planned
24  reappraisal study is a second large -- results in a
25  second drop in taxable value, and it is also an

1  action of the City, yes.
2      Q.  And do you have any idea what factors were
3  taken into account in assessing property in the
4  city?
5      A.  So I know theoretically what they could be
6  using.  I don't know what they are actually using.
7      Q.  So you don't know what factors the City
8  used in factoring assessments in the reappraisal it
9  has done so far, correct?
10      A.  I do not know the specifics.
11      Q.  And you do not know what factors the City
12  may use in its planned reappraisal study in the
13  future, correct?
14      A.  So the reappraisal study, they're hiring
15  an outside firm to do the reappraisal, so the City
16  will take that information.  I don't know exactly
17  how they're going to use it.
18      Q.  I mean, part of the reason the City seems
19  to be reducing assessments is basically for
20  political reasons to reduce people's property
21  taxes, correct?
22      MR. STEWART:  Objection.
23      THE WITNESS:  I have no idea.
24  BY MR. SMITH:
25      Q.  Well, do you know that -- when the

1  reassessments came out already, were you aware
2  there was a press conference where the politicians
3  all came out and said look, we're lowering your
4  property taxes?  Were you aware of that?
5      A.  I was aware there was a press conference.
6      Q.  And you're aware the politicians in the
7  city of Detroit were saying that the reappraisal
8  that they did which lowered property taxes was done
9  to benefit the residents of the city, correct?
10      A.  I haven't read anything about what city
11  officials are saying about the reassessments.
12      Q.  You agree that Detroit is planning to do a
13  reassessment even though Wayne County is saying the
14  property is properly assessed, correct?
15      A.  I don't know if Wayne County is saying the
16  properties are properly assessed.  They're giving
17  it a state equalization factor of 1.
18      Q.  Okay.  Even though -- even though Wayne
19  County is giving the property an equalization
20  factor of 1, which means it's not over or
21  underassessed, the City, nonetheless, is going to
22  go in and reappraise the property, correct?
23      MR. STEWART:  Objection.
24      THE WITNESS:  So my understanding is the City
25  is taking -- hiring a group to parcel by parcel

1  reassess the property in the city.
2  BY MR. SMITH:
3      Q.  Page 17, you note that much of the
4  industrial personal property qualifies for a
5  Renaissance Zone exemption.  Do you see that?
6      MR. STEWART:  What paragraph?
7      MR. SMITH:  Up at the top of Page 17.
8      THE WITNESS:  Uh-huh.
9  BY MR. SMITH:
10      Q.  Do you know what percent of the industrial
11  personal property is subject to a Renaissance Zone
12  exemption?
13      A.  Off the top of my head, no.  Let me see.
14  I think about two-thirds of it.  This is just
15  without my spreadsheet in front of me.
16      Q.  During the historical period that you've
17  looked at, did property tax rates change?
18      MR. STEWART:  Could I have the question reread,
19  please.
20          (Whereupon, the record was
21          read as requested.)
22      THE WITNESS:  Which specific property tax
23  rates?
24  BY MR. SMITH:
25      Q.  Well, did any of them change?

1    A.  I don't know.
2    Q.  Well, you mentioned that there were some
3  years where the rates were above 20, and I'm just
4  wondering whether there were other changes that you
5  noticed in property tax rates in the historical
6  data that you examined?
7    A.  So I don't know for the years where I
8  pulled taxable value what the property tax rates
9  were in those given years year by year.  I don't
10  know.
11    Q.  You're assuming that no property rate
12  changes will change for the next 40 years, correct?
13    A.  The analysis done as such keeps the tax
14  rate constant.
15    Q.  And it does that for 40 years, correct?
16    A.  Well, so we did a 10-year forecast where
17  we kept our tax rates at current level, current law
18  levels and then extrapolated for another 30 years,
19  and so that, in effect, we're sort of holding tax
20  rates constant.
21    Q.  And you're doing that, in effect, for
22  40 years, correct?
23    A.  For 40 years in total.
24    Q.  Have you ever done a forecast before when
25  you assumed the tax rates would remain constant for

1  as long as 40 years?
2    A.  I think this is the only time I've done a
3  40-year forecast.
4    Q.  And is it the only time you've done a
5  10-year tax forecast?
6    A.  I have done 10-year forecasts of tax
7  revenue for specific projects for individual
8  clients.
9    Q.  Okay.  But you had never done a forecast
10  for as long as 10 years trying to forecast revenues
11  for a city or other government entity, correct?
12    A.  I don't think so.  I think just Detroit.
13    Q.  And I mean, in the other -- what's the
14  longest tax forecast that you've done for a city or
15  any other governmental entity other than the
16  Detroit one?
17    A.  Well, so most of my work that I've done
18  I've forecasted tax revenues to a municipality, but
19  I wasn't working for the municipality.  So I've
20  done forecasts for -- I guess I've done forecasts
21  for projects involving taxes to the State of
22  Michigan.  You know, those have been five to
23  10 years.
24    Q.  I mean, my question is not about
25  individual projects.  I'm talking about overall tax

1  revenues.  You haven't done any forecasts of
2  overall tax revenues to a city or other government
3  entity as long as 10 years, correct?
4    A.  I can't remember if for the Business
5  Leaders for Michigan project, which was forecasting
6  State of Michigan tax revenue, how long our time
7  frame was.  That was forecasted at least five
8  years.  I don't know how much longer if I did -- if
9  I did beyond that.
10    Q.  Okay.
11    A.  So I don't know.
12    Q.  And that was just the sales -- was that
13  limited to certain taxes in Michigan, or was it all
14  taxes?
15    A.  In that case, it was limited to a few
16  taxes.
17    Q.  When you did the Flint, Michigan forecast,
18  how many years was that?
19    A.  Five years.
20    Q.  Did you assume that tax rates would all
21  stay constant for five years in Flint, Michigan?
22    A.  So I think as I said earlier, they do have
23  certain millages expiring, and so anything that was
24  in current law we took into account.  So if a
25  millage was expiring, then we would add it back in

1  for parts of the analysis where it was relevant.
2    Q.  And did you look at corporate tax at all
3  in your Flint, Michigan analysis?
4    A.  So we looked at income taxes.
5    Q.  And you know the corporate income tax
6  rates changed recently, correct?
7    A.  Corporate tax rates have changed, yes.
8    Q.  Did you factor that into your analysis, or
9  was that not during the period of your analysis?
10    A.  So anytime there were changes that had
11  been enacted, they were taken into account.  So if
12  there was something on any of the taxes, if they
13  were by law slated to expire, decrease, increase,
14  we would incorporate that.
15    Q.  And do you advise about various tax rates
16  in different states in the course of your practice?
17    A.  What do you mean by advise?
18    Q.  I mean do you give advice or do analysis
19  of tax rates in different states or what they are?
20    MR. STEWART:  Objection.
21    THE WITNESS:  So part of our practice, we will
22  look at effective tax rates that various industries
23  are facing in certain states.  We do a tax burden
24  study where we look at the tax environment for all
25  50 states.  So we don't offer specific advice about

1  whether you should lower or increase your taxes.
2  We will do an analysis of what businesses are
3  paying.
4  BY MR. SMITH:
5      Q.  But based on the surveys Ernst & Young
6  does, you know that tax rates change in states on
7  various taxes, correct?
8      A.  Yes, tax rates change from time to time.
9      Q.  And so -- well, do you update your survey
10  every year, or how often do you update that?
11     A.  We have sort of complex models, so we
12  every few years will go through, and we will update
13  our models, our state-by-state models to take into
14  account tax rate changes that have happened.
15     Q.  Okay.  And you know that tax rates
16  frequently change on various taxes in the states,
17  correct?
18     A.  I don't know about frequently, but when
19  tax rates change and have been -- gone into effect,
20  we put them in our model.
21     Q.  Okay.  Have there ever been any states
22  where tax rates didn't change for 10 or 40 years in
23  your survey that you can identify?
24     A.  I don't know off the top of my head if
25  there are states that have had the same tax rate

1  for 10 or 40 years.  I don't know.
2      Q.  You can't identify anyone sitting here
3  today?
4      A.  I don't know.  I would have to look at the
5  data and then come back and tell you.
6      Q.  You can't identify anyone sitting here,
7  any state where tax rates haven't changed for 10 or
8  40 years sitting here today, correct?
9      A.  There could be.  I just don't know off the
10  top of my head.
11     Q.  And certainly you know that tax rates have
12  changed in the last 10 years in Detroit?  I mean in
13  Michigan, correct?
14     A.  Tax rates for various taxes have changed
15  in the last 10 years, yes.
16     Q.  What kind of tax rates have changed in the
17  last 10 years in Michigan?
18     A.  So Michigan's taxes on business have
19  changed in the last 10 years.
20     Q.  And have corporate tax rates changed in
21  the last 10 years?
22     A.  Well --
23     Q.  I mean, have individual tax rates,
24  personal tax rates changed over the last 10 years
25  in Michigan?

1      A.  The state level?
2      Q.  Yeah.
3      A.  Has the state?  I can't remember if the
4  state personal income tax rate has -- I think it --
5  yes, it has changed.  I mean, so yeah, there are
6  tax rates that have changed.  New taxes have been
7  passed and old taxes eliminated.
8      Q.  What kind of taxes have been passed in
9  Michigan in the last 10 years?
10     A.  So we're going back to what, 2004, so the
11  single business tax was replaced with the Michigan
12  business tax, which then was replaced by the
13  corporate income tax.
14     Q.  Has the sales tax changed in Michigan in
15  the last 10 years, if you know?
16     A.  I don't think so.
17     Q.  Page 18 at the bottom, you've got this
18  20 percent reduction or 20 percent of the property
19  tax revenue from industrial and commercial property
20  will not be replaced by a new funding mechanism.
21  Do you see that statement?
22     A.  Yes.
23     Q.  And that was an assumption you made based
24  on your judgment?
25     MR. STEWART:  Objection.

1      THE WITNESS:  So we looked at the -- looked at
2  the set of laws that had been passed about the
3  personal property tax, and I looked at the Michigan
4  Senate Fiscal Agency memo.  And they put together
5  an estimate of how much of the lost revenue would
6  be replaced by various funding mechanisms, so that
7  was used to help me select how much revenue Detroit
8  would lose with the repeal and then to factor in
9  the likelihood that voters approve the referendum
10  next month.
11  BY MR. SMITH:
12     Q.  And was that a statewide estimate, though,
13  of how much revenue would be replaced?
14     A.  It was a statewide.
15     Q.  So there wasn't any estimate of how much
16  revenue Detroit might lose from personal property
17  tax legislation that you've ever seen, correct?
18     A.  I have not seen a Detroit-specific
19  estimate.
20     Q.  Other than what Mr. Evanko provided in his
21  deposition, correct?
22     MR. STEWART:  Objection.
23     THE WITNESS:  Did he provide a specific number?
24  BY MR. SMITH:
25     Q.  Yeah.  He was talking about .7 percent.

1     MR. STEWART: No, he did not. He said that's
2  tax base. He used the word tax base. You just
3  misquoted him. She's talking about the personal
4  property receipts reduction. He was talking about
5  the overall tax base.
6  BY MR. SMITH:
7     Q. Okay. So you've never seen any estimate
8  for personal property tax receipts reduction in
9  anything you've seen, correct?
10    A. I have not seen anything that is
11 Detroit-specific.
12    Q. How did you pick -- I think you gave it a
13 50/50 chance of passing. How did you pick that
14 number?
15    A. So doing the analysis, we started doing
16 the work, like I said, over a year ago, and the
17 referendum, the ballot was coming up a year later.
18 And you know, just like most things, there's a
19 certain probability it will go through. At that
20 point, we had to select a probability that 50/50
21 was reasonable.
22    Q. I mean, you didn't do any investigation
23 into the likelihood of passage in the legislature
24 of the personal property legislation?
25    MR. STEWART: Objection.

1     THE WITNESS: Well, by this point, the
2  legislature had already passed it, so it's whether
3  or not the voters approve it. And so you know, you
4  have to say, you know, I follow the press, and at
5  that point, some people are for it. Some people
6  are against it. So 50/50 seemed reasonable.
7     I mean, at the end of the day, we needed
8  to -- we were trying to come up with a reasonable
9  method of thinking about what personal property tax
10 revenue the City would lose, and this seemed like
11 the best method.
12 BY MR. SMITH:
13    Q. At the end of the day, nobody knows
14 whether this new legislation is going to pass about
15 personal property taxes; is that correct?
16    MR. STEWART: Objection.
17    THE WITNESS: I guess we'll know in two weeks,
18 a week and a half.
19 BY MR. SMITH:
20    Q. Right now, though, I mean, when you put
21 together your expert opinions, you had no way of
22 knowing whether the personal property tax
23 legislation would pass, correct?
24    MR. STEWART: Objection.
25    THE WITNESS: Yes. So the way of dealing with

1  that uncertainty is to assign a probability and
2  then to multiply that probability by sort of an
3  average reduction, what's a reasonable reduction in
4  property tax revenue, and so that's how we arrived
5  at our estimate.
6  BY MR. SMITH:
7     Q. You mentioned reasonable a lot of times.
8  Can you give me your definition of reasonable in
9  terms of forecasting?
10    A. In this case, reasonable is realistic or
11 likely.
12    Q. And you would agree with me there could be
13 more than one reasonable forecast for the City of
14 Detroit, correct?
15    A. I would agree with that.
16    Q. Page 18, Paragraph ix (a), you've got some
17 collection rates for residential property,
18 commercial property and industrial and utility
19 property. Were those assumptions based on your
20 judgement?
21    MR. STEWART: Which page?
22    MR. SMITH: 19.
23 BY MR. SMITH:
24    Q. On Page 19, you made -- you have some
25 numbers for the collection rates you used of

1  50 percent for residential property, 3 percent for
2  commercial property, 87 percent for industrial
3  property and 100 percent for utility property.
4     Were those assumptions you made based on
5  your judgment?
6     A. These were after looking at data provided
7  by the City on their collection rates by type of
8  property, I then selected those rates.
9     Q. So in the baseline scenario, are you
10 assuming that the City is not going to collect more
11 than 50 percent of its residential property tax?
12    A. For part of it. So I kept the current
13 situation of about 50 percent collections on
14 non-delinquent for residential. I kept that
15 assumption for the next four years of the forecast,
16 and I increased it after that.
17    Q. And why was it four years that you kept
18 that assumption rather than five or six years?
19    A. It's coinciding with the reappraisal
20 study. So when the results go on, the forecast has
21 things stabilizing on the residential side.
22    Q. So it's your belief that the reappraisal
23 study will result in the stabilization of property
24 tax, or let me ask you another question. Is it
25 your view that the reappraisal study is going to

1 increase property tax collection rates?
2     A.   So the forecast has, after the
3 reappraisal, a slight improvement to the collection
4 rate.
5     Q.   And why is that?
6     A.   So there are two things.  One, the
7 collection rate goes up because you remove certain
8 property that isn't paying off the roll, and so
9 your tax base becomes smaller, but your collection
10 rate goes up.  And the second is that if you have
11 people that have now seen their property tax bills
12 go down and they had been protesting because they
13 thought they were too high, they were ridiculous,
14 we have a small improvement in those folks' pain.
15     Q.   And those improvements, were those just
16 numbers you picked based on your judgment?
17     A.   So the improvements in those areas having
18 it -- kind of go back to times in history.  So
19 before the most recent recession, as you noted
20 earlier, residential collection rates were in the
21 70s, and so use that historic information as a
22 guide to what's reasonable, you know, what kind of
23 improvement might we see.  And so that helped me
24 select the collection rates in the forecast.
25     Q.   Okay.  On Page 20, under heading B, it

1 says Ms. Sallee forecasted the planned city
2 reinvestments would have a modest impact on tax
3 revenues.  Do you see that?
4     A.   Yes.
5     Q.   In fact, did you personally forecast the
6 effect of reinvestments on tax revenues, or was
7 that somebody else?
8     A.   So in this case, we have in the scenario
9 reinvestments improving the City's economic
10 climate, and that, in turn, improves the tax bases
11 and ultimately tax revenue.
12     Q.   How does reinvestment improve the City's
13 economic climate?
14     A.   So there are a number of different ways.
15 In this case, the City, in their reinvestment
16 scenarios that I looked at, had things for blight
17 reduction or improved safety, improved lighting,
18 things that could ultimately, you know, positively
19 impact various property tax bases on the
20 residential and commercial industrial side.  And so
21 this scenario thinks about well, what are the
22 likely magnitude of that -- you know, what's the
23 magnitude of improvements to the tax base, and then
24 we sort of modeled that in this scenario.
25     Q.   You had no study or data, though, showing

1 the relationship between reinvestment and
2 improvements in economic climate, correct?
3     A.   It would be difficult to do that, but
4 you're right.  There was no study that I looked at.
5     Q.   You just kind of picked those numbers?
6     A.   Ultimately I had to select some growth
7 rates.
8     Q.   20, down at the bottom of Page 20, you
9 have slight additions to taxable value of 1 percent
10 beginning in fiscal year 2017 for commercial and
11 industrial taxable values?
12     A.   Uh-huh.
13     Q.   Where did the 1 percent come from?
14     A.   So in terms of looking at what has
15 happened, you know, to the City sort of post
16 downturns and what are kind of the size of
17 improvements, you know, using that kind of analysis
18 to help think about well, what are reasonable
19 growth rates, and at the end of the day selected
20 1 percent is a reasonable growth rate.
21     Q.   On Page 21, you say the City's population
22 will continue to climb from 2024 until 2029.  Do
23 you see that?
24     A.   Yes.
25     Q.   And then below it talks about how you're

1 forecasting no population growth from 2029 until
2 2033.  Do you see that?
3     A.   Uh-huh.
4     Q.   Did you personally forecast the population
5 growth figures that you use, or was that Mr. Cline?
6     A.   So I prepared the forecast after
7 discussions with Mr. Cline and Katie Ballard.
8     Q.   Have you actually looked at any of the
9 data on population growth in the city of Detroit?
10     A.   For what period?
11     Q.   For any period of time.
12     A.   So I've looked at population in Detroit
13 since 2000.
14     Q.   Okay.  And that's all the data you've
15 looked at?
16     A.   The only other information I've looked
17 at -- so in one of the reports that I mentioned
18 that looked at sort of population trends between
19 1980 and 2010, so Detroit was one of those cities
20 in that information.  The year-by-year data I have
21 looked at since 2000.
22     Q.   And that's the -- is that the Brookings report?
23     A.   That's the Brookings report.
24         (Document marked No. 15)
25     Q.   I'm going to hand you what's been marked

1  as Exhibit 15, which is some information from that
2  Brookings report. Do you recall seeing this?
3      A. Uh-huh.
4      Q. And for Detroit, for example, during 1990
5  to 2000, there was actually -- it's got a number
6  here of 4.8 percent and .5 percent. Do you see
7  that?
8      A. Yeah.
9      Q. And the 10-year growth is the .5 percent
10 number. Do you see that?
11     A. Uh-huh.
12     Q. And the growth in Detroit during 1990 to
13 2000 is actually greater than other comparable
14 cities, correct?
15     MR. STEWART: Objection.
16     THE WITNESS: It's below Akron.
17 BY MR. SMITH:
18     Q. But it's above Chicago. It's above
19 Philadelphia. It's above Cleveland. It's above
20 New Orleans. It's above Scranton. It's above
21 Syracuse. It's above Toledo, right?
22     A. The Detroit metro area has been greater,
23 but Chicago and Philly are just the city only.
24     Q. And so there's been periods of time in the
25 last couple of decades where there's positive

1  population growth in Detroit, correct?
2      MR. STEWART: Objection.
3      THE WITNESS: Not in Detroit, the city, but the
4  metro area saw some growth. You had sort of a good
5  auto industry between 1990 to 2000, and so Detroit
6  metro, same population growth makes sense. I don't
7  think Detroit city gained population between 1990
8  and 2000.
9  BY MR. SMITH:
10     Q. Do you believe that there is a positive
11 relationship between the health of the auto
12 industry and the population in Detroit?
13     A. There has -- historically the entire
14 southeast region has been -- there's been a
15 relationship with the fortunes of the auto
16 industry, yes.
17     Q. And so the better the auto industry does,
18 the better the economy in Detroit; is that correct?
19     MR. STEWART: Objection.
20     THE WITNESS: I don't know about that. The
21 better the economy -- the auto industry does, the
22 better the entire southeast Michigan region does.
23 I would agree with that.
24 BY MR. SMITH:
25     Q. Do you agree that the auto industry has

1  been improving in recent years?
2      A. When you say auto industry, you mean both
3  domestic and international companies?
4      Q. Companies located in the Detroit area are
5  improving in the auto industry, correct?
6      A. Well, again, so how do you measure
7  improvement? More car sales? What?
8      Q. More revenues, more car sales, doing
9  better in general.
10     A. So there are different measures. I mean,
11 what's important more than anything for -- well, I
12 guess there are two things that are important. It
13 would be sort of cars that are being produced in
14 the region and so jobs associated with that, and
15 then like I said, jobs and employment in the
16 industry. I don't know off the top of my head what
17 employment in the auto industry has done in
18 southeast Michigan in recent years. It fell
19 dramatically the last decade, but I don't know
20 recently.
21     Q. I mean, what would you say are the drivers
22 of the economic health of the City of Detroit?
23     A. Can you be more specific with your
24 question?
25     Q. Well, I mean, what are the most -- what

1  are the most important factors contributing to the
2  economic health of Detroit?
3      A. So the economic health as measured by
4  what?
5      Q. Well, in your forecast, you used some
6  measures of the economy, right?
7      A. So a big driver in our analysis and
8  forecast is employment.
9      Q. Okay. So the higher the employment
10 levels, the more revenues you project for the City
11 all other things being equal?
12     A. Not necessarily. It depends. So all
13 other things, employment -- increased employment in
14 the city would, everything else being equal,
15 improve revenue.
16     Q. The numbers for population that you cite
17 in your report on Page 21 on population growth,
18 were those just assumptions that you made based on
19 your judgment?
20     A. Which numbers?
21     Q. The .2 percent annual population growth,
22 no population growth from 2029 to 2033, .2 percent
23 population growth from 2034 to 2043, .3 percent
24 annual population growth from 2044 until 2053.
25 Were those numbers assumptions based on your

1 judgment?
2 A. So the forecast -- so the 10-year forecast
3 we followed the SEMCOG forecast, and then for the
4 30-year extrapolation followed SEMCOG up until
5 2029. Both us and SEMCOG have in 2029-30 no
6 population growth or sort of a leveling. And then
7 in going forward, the .2 percent and the .3 percent
8 that you mentioned, I did analysis of sort of metro
9 areas that had experienced a decade of population
10 decline and what growth they had afterwards, and
11 that analysis led me to select those two growth
12 rates.
13 Q. Does SEMCOG not project population values
14 after 2029?
15 A. SEMCOG has a projection until 2050.
16 Q. Why didn't you use the SEMCOG projection
17 during the entire forecast period?
18 A. So SEMCOG, they prepared their forecast
19 before the bankruptcy, before the reinvestment
20 scenarios were put together, and so the 30-year
21 extrapolation is off of the -- with the
22 reinvestment scenario, and so SEMCOG hadn't taken
23 that into account, and so we decided that we needed
24 to deviate from it slightly going after 2029.
25 Q. Do you project higher or lower population

1 growth factors than SEMCOG for after 2029?
2 A. So in some years, our growth actually
3 matches theirs. Overall, our population forecasts
4 are slightly higher than SEMCOG.
5 Q. On Page 22, you have a rate of increase
6 for -- of 3.4 percent of taxable value in 2024 and
7 2025, and then -- I mean, what's that's based on?
8 A. So as we discussed earlier, I use the
9 Congressional Budget Office forecasts, and they go
10 out 10 years. And so I continued sort of -- looked
11 to see what overall is happening with home prices
12 and used that to help think through if Detroit, we
13 have at the end of our 10-year, picking up and
14 rebounding what's a reasonable growth rate in the
15 first part of our 30-year extrapolation.
16 Q. Okay. If you go over to Page 24, in the
17 middle of the page, you have a statement that
18 there's no set formula for EVIP payments for the
19 City of Detroit. That's a correct statement,
20 correct?
21 A. So what is meant by that is there's no --
22 there's no, you know, statutory formula or any
23 government formula for what needs to be allocated
24 to the City of Detroit. There are components of
25 EVIP, things that they are supposed to meet, but

1 unlike kind of the old statutory revenue sharing in
2 Michigan where there was a way that money was
3 supposed to be allocated, EVIP doesn't have that
4 sort of formula.
5 Q. Okay. Did you hold the rate of revenue
6 sharing constant over time in your forecast?
7 A. Only for the EVIP portion.
8 Q. And we know that the EVIP portion of state
9 revenue sharing will not be constant during the 10
10 or 40-year period you forecast, correct?
11 A. We don't know that.
12 Q. I mean, if you were sitting here today,
13 would your -- has there been any two years when the
14 EVIP portion of revenue sharing has been the same?
15 A. EVIP has been around for three years, so
16 no, they haven't been the same each year.
17 Q. Okay. We know that the EVIP portion,
18 because it's based on a number of factors, is not
19 going to be the same each year, correct?
20 A. You're right. It's not probably going to
21 be the same each year. I don't know for certain.
22 Q. You've assumed a 2 to 3 percent sales tax
23 growth rate. What was that based on?
24 A. Based on what the Michigan Department of
25 Treasury forecasts.

1 Q. Okay. Is the treasury -- do they forecast
2 it for years after 2025?
3 A. They do not.
4 Q. Okay. What period of time do they
5 forecast it for?
6 A. So the information that I used, you know,
7 started with actuals, so it probably started with
8 fiscal year 2012, and then it went all the way to
9 2025.
10 Q. The -- you know that there's a forecasted
11 increase in income tax revenues, correct?
12 MR. STEWART: Objection.
13 THE WITNESS: I don't have the disclosure
14 statement in front of me, so I don't know exactly
15 what the income tax revenues are for the 10 and
16 40-year off the top of my head.
17 BY MR. SMITH:
18 Q. I mean, do you know if they increase -- do
19 you know if Ernst & Young is forecasting an
20 increase or decrease for income tax revenues over
21 10 or 40 years?
22 A. So an increase compared to what? So year
23 on year?
24 Q. Compared to 2013. I mean, what's the
25 trend in income tax? Do you know if it's

1 increasing or decreasing under the Ernst & Young
2 forecast?
3    A.  So we have income tax -- so I'm going off
4 memory.  We have income taxes falling for a period
5 and then growing for another period.
6    Q.  Okay.  And corporate tax, is that similar
7 that the Ernst & Young forecasts have a growth in
8 corporate tax?
9    A.  I don't want to comment on it based on
10 memory.
11    Q.  Okay.  On Page 25, you note that your
12 10-year forecast includes the legislature-approved
13 fiscal year 2015 revenue sharing payments for
14 Detroit.  Do you see that?  Do you see where I'm
15 at?
16    A.  Yes, I do.
17    Q.  Your prior forecasts, you did not use the
18 fiscal year 2005 revenue sharing payments for
19 Detroit, correct?
20    MR. STEWART:  Do you mean 2015?
21    MR. SMITH:  2015.
22    THE WITNESS:  So previous iterations, we always
23 used what the most recent current law amount was,
24 so the legislature-approved fiscal year 2015 in the
25 first week and a half of June.  And so in the

1 latest version, we incorporated fiscal year 2015
2 once it had been passed.
3 BY MR. SMITH:
4    Q.  And did the incorporation of fiscal year
5 2015 revenue sharing payments materially increase
6 your forecast for the state revenue sharing?
7    A.  What do you mean by materially?
8    Q.  Well, do you know how much -- did it
9 increase it?
10    A.  So the EVIP payment to Detroit did go up
11 between 2014 and 2015.
12    Q.  And do you know how much it did?
13    A.  It went up by almost 4 million.
14    Q.  And then for periods after that, did you
15 use the 2015 rate?
16    A.  We used the higher 2015 amount.
17    Q.  And what additional amounts did using the
18 higher 2015 rate add to your forecast compared to
19 the last time you did it?
20    A.  Somewhere between 35, 40 million.
21    Q.  Okay.  So incorporating the fiscal year
22 2015 revenue sharing payment into your forecast
23 increased revenue sharing by 35 to $40 million; is
24 that correct?
25    A.  Going off the top of my head, but it's

1 around there.
2    Q.  Okay.  And so using your assumption of
3 current law remaining unchanged led you, in your
4 prior forecast, to be off by approximately 35 to
5 $40 million compared to your current forecast,
6 correct?
7    A.  So using current law, we had planned
8 for -- so we used current law, which was lower than
9 the fiscal year 2015 amount.
10    Q.  And using -- the assumption of using
11 current law led you to predict that revenue sharing
12 would be 35 to $40 million lower than you're now
13 predicting, correct?
14    A.  So using current law led us to -- so we
15 can compare what did we predict for 2015 compared
16 to -- 2015 versus actual.  And so using current
17 law, we were slightly below.  We don't know what's
18 going to happen to EVIP.  It could be eliminated
19 next year, so this is --
20    Q.  And it could be increased by 100 percent?
21    A.  It could be increased by 100 percent.  You
22 never know, so this is a good way to do it.
23    Q.  And my question is but using the
24 assumption of no change in current law led you to
25 underestimate state revenue sharing by 35 to

1 $40 million in your last projection compared to
2 this projection, correct?
3    MR. STEWART:  Objection.
4    THE WITNESS:  I wouldn't say underestimate.
5 The forecasts differ, and you're right.  So using
6 this new assumption, we are forecasting a higher
7 state sharing EVIP revenue to Detroit.  It remains
8 to be seen whether that actually happens.
9 BY MR. SMITH:
10    Q.  There's no way we know what the actual
11 revenue sharing numbers are going to be over the
12 period of your forecast?
13    A.  That's right.
14    Q.  They could be much higher, or the state
15 could completely eliminate revenue sharing,
16 correct?
17    A.  They could eliminate EVIP and do something
18 else or not do anything at all.
19    Q.  The state could -- the City of Detroit
20 could find itself in bankruptcy again within the
21 next 10 years, correct?
22    MR. STEWART:  Objection.
23    THE WITNESS:  I have no idea.
24 BY MR. SMITH:
25    Q.  Well, if the state eliminates revenue

1  sharing payments, the City could find itself in
2  bankruptcy again within the next 10 years, correct?
3      MR. STEWART: Objection.
4      THE WITNESS: I have no idea.
5  BY MR. SMITH:
6      Q. In fact, you have no idea what's going to
7  happen to the revenue streams that you measure in
8  your forecast. There's too many factors, correct?
9      MR. STEWART: Objection.
10     THE WITNESS: So what we were asked to do was
11 using reasonable assumptions, put -- reasonable
12 meaning here realistic assumptions, put together a
13 10-year forecast and then a 30-year extrapolation
14 of that, and that's what we did.
15 BY MR. SMITH:
16     Q. But there's -- your forecast can be
17 changed depending on actions by various people in
18 either the state government or the City of Detroit
19 government, correct?
20     A. So -- so you know, the forecasting
21 exercise, as any forecasting entity would tell you,
22 you know, you forecast, and your forecasts can't
23 really incorporate, you know, whimsical, random,
24 whatever changes, large changes year to year, and
25 the forecast exercise, you acknowledge that at the

1  get-go. And so you're right. Anything could
2  happen.
3      Q. And the revenues received for property
4  taxes and state revenue sharing depend on -- in the
5  future, the actual revenues depend on actions by
6  politically-elected state and city officials,
7  correct?
8      A. I don't think I understand the question.
9      Q. Okay. The state revenue sharing depends
10 on the -- in the future over the next 10 years
11 depends on the action of elected officials in
12 setting revenue sharing values, correct?
13     A. So a portion of it depends on the
14 legislature.
15     Q. And the largest portion of revenue sharing
16 depends on the actions of elected officials,
17 correct?
18     A. The largest share for Detroit, not for the
19 entire state.
20     Q. And similarly the property tax depends on
21 the action of officials in the city of Detroit in
22 terms of what they do with assessments over the
23 next 10 years, correct?
24     A. Say that again.
25     Q. The actual property tax revenues in the

1  city of Detroit over the next 10 years depends on
2  the actions of state -- city officials in terms of
3  what they do with property tax assessments over the
4  next 10 years, correct?
5      A. I would say it's one factor.
6      Q. And so right now you don't even -- nobody
7  can know the identity of the officials that are
8  going to influence revenues for the City in the
9  next 10 years, correct?
10     A. It's possible that elected officials in
11 the future that we do not know affect revenues.
12     Q. And it's impossible to know what actions
13 officials in the city or state will take over the
14 next 10 years that could materially impact the
15 revenues to the City of Detroit, correct?
16     A. There are things that can happen that can
17 impact the revenue forecasts.
18     Q. And it's impossible to know what those
19 things are sitting here today?
20     A. The forecast takes into account what we
21 know, and there could be things we don't know.
22     Q. And one of the things we don't know is
23 what officials in the state or city will do which
24 could have a material impact on the revenues that
25 you forecast, correct?

1      MR. ALBERTS: Objection.
2      THE WITNESS: Future officials could have some
3  impact on the revenues. That's a possibility.
4  BY MR. SMITH:
5      Q. I mean, they will have an impact. I mean,
6  the state officials set the revenue sharing level
7  really, right? We know for a fact that state
8  officials are going to impact the revenue available
9  to the City, correct?
10     A. We know that the legislature does set the
11 amount of EVIP for Detroit.
12     Q. And we know for a fact that city officials
13 are in charge of the assessments of property to the
14 City, correct?
15     A. City officials set the property assessment
16 rolls, yes.
17     Q. So we know as a matter of fact that
18 officials from the city and the state will take
19 unknown actions in the future that will have
20 unknown consequences for the revenues that you
21 estimate for the City of Detroit, correct?
22     A. It's possible that city officials, their
23 actions in the future affect the forecast.
24     Q. And the same as the state officials,
25 correct?

1    A. State officials can affect revenue that
2 the City receives.
3    MR. STEWART: Should we take a break? It's
4 been going about 90 minutes.
5    MR. SMITH: Sure.
6    THE VIDEOGRAPHER: Off the record. The time is
7 3:06 p.m.
8         (Whereupon, a short break was taken.)
9    THE VIDEOGRAPHER: We are back on the record.
10 The time is 3:14 p.m.
11 BY MR. SMITH:
12    (Document marked No. 16)
13    Q. Ms. Sallee, I'm going to hand you a copy
14 of what's been marked Exhibit 16. Have you seen
15 that document before?
16    A. What date is this?
17    Q. I believe this is the July one, the July
18 version of the forecast.
19    A. Then yes, I've seen it.
20    Q. I just wanted to ask you about there's a
21 disclaimer on the front of the document. Are you
22 familiar with that?
23    A. It's always on there. I don't know if
24 I've read every word of it.
25    Q. Okay. Well, I'm going to ask you about

1 it, so --
2    A. Okay. Let me read it then. Okay.
3    Q. Do you agree with all the statements in
4 the disclaimer that's on Exhibit 16 in front of
5 you?
6    A. Well, I don't know if I can agree to
7 everything because some of it I don't know, say,
8 what the attestation standards are.
9    Q. Okay. You don't know what the attestation
10 standards established by the AICPA are, correct?
11    A. I don't know what they are, no.
12    Q. Okay. With respect to your projections,
13 would it be fair to say that you express no
14 assurance of any kind on the information presented?
15    A. I do not. That would be true.
16    Q. And then the next sentence, let me know if
17 you agree with it. It is the client's
18 responsibility to make its own decision based on
19 the information available to it. Management has
20 the knowledge, experience and ability to form its
21 own conclusions relating to the client's 10-year
22 financial projections.
23    Do you agree with those statements?
24    A. I'm okay with the statements.
25    Q. Do you agree with the next statement?

1 There will usually be differences between
2 forecasted and actual results because events and
3 circumstances frequently do not occur as expected
4 and those differences may be material.
5    A. I would agree with that statement.
6    Q. Do you agree that EY -- Ernst & Young
7 takes no responsibility for the achievement of
8 forecasted results?
9    A. I think that's correct.
10    Q. Do you agree that accordingly, reliance on
11 this report is prohibited by any third party as the
12 projected financial information contained herein is
13 subject to material change and may not reflect
14 actual results?
15    A. I'm okay with that.
16    Q. I'm going to hand you -- well, you agree
17 with that statement? When you say you're okay with
18 that, you agree with it?
19    A. Well, I guess as an EY employee, I'm
20 agreeing with this.
21    Q. Okay. And those statements go -- I mean,
22 those are put together by experts at Ernst & Young;
23 is that correct?
24    MR. STEWART: Objection.
25    THE WITNESS: I didn't write this.

1 BY MR. SMITH:
2    Q. Okay.
3    A. I don't know who wrote it. I don't know
4 who wrote it.
5    (Document marked No. 17)
6    Q. Why don't I hand you what's been marked as Exhibit
7 17. Let me know if you've seen this document before.
8    A. I have not seen this.
9    Q. Okay. Do you see that it's the disclosure
10 statement by the City, its fourth-amended
11 disclosure statement?
12    A. Where does say that?
13    Q. On the front page. The title there in the
14 middle, it says --
15    A. Fourth-amended, oh, I see. Okay.
16    Q. I just want to identify the document for
17 you.
18    A. Great.
19    Q. You haven't done anything to, obviously,
20 go through the disclosure statement and ensure that
21 the statements in there are consistent with the
22 assumptions in your projections, correct?
23    A. What's the date on the fourth disclosure?
24    Q. May 5, 2014 it was filed with the court.
25    A. Okay. I have not read through this

1    disclosure statement.
2       Q.   Okay.  So you haven't done an analysis to
3    go through the fourth-amended disclosure statement
4    to make sure that all of your assumptions are
5    consistent with the disclosure statement, correct?
6       A.   So we provided forecasts that were
7    included in the previous version, and we hadn't
8    made any changes in this version.  So I had gone
9    through the previous disclosure statement to make
10   sure our numbers were accurate.  I have not gone
11   through this one.
12      Q.   Okay.  Have you actually read the text of
13   any of the disclosure statements?
14      A.   I have.
15      Q.   Okay.  Then I'd like to direct you to
16   Page 97 of 197.  It's down in the -- the pagination
17   is down in the right-hand corner --
18      A.   Oh, I see.
19      Q.   -- that I'm going to refer to.
20      A.   Okay.  So Page 97.
21      Q.   97 of 197.
22      A.   Okay.
23      Q.   Do you see the section failure to achieve
24   projected financial performance?
25      A.   Okay.

1       Q.   The disclosure statement says the
2    projections are dependent upon the successful
3    implementation of the City's budget and the
4    reliability of other estimates and assumptions
5    accompanying the projections.
6            Do you agree with that statement as it
7    relates to your projections that you've made?
8       A.   I guess I don't have an opinion about this
9    sentence.
10      Q.   Okay.  The next page at the top of the
11   page --
12      MR. STEWART:  What language?
13      MR. SMITH:  I'm waiting for the witness.
14   BY MR. SMITH:
15      Q.   The next page, are you on the next page,
16   Ms. Sallee?
17      A.   I am not yet.  Hold on.  Okay.
18      Q.   The top of the page, it says these
19   estimates and assumptions may not be realized and
20   are inherently subject to significant economic
21   uncertainties and contingencies, many of which are
22   beyond the City's control.
23           Do you agree with that statement as it
24   relates to your projections?
25      A.   I would agree with the statement.

1       Q.   The next section, unforeseen financial
2    circumstances affecting the City's future financial
3    performance, do you see that, that section?
4       A.   Okay.
5       Q.   The disclosure statement says the plan and
6    projections underlying the plan are based on
7    certain assumptions about the City's future
8    financial performance.  Unforeseen events and
9    circumstances may occur affecting the City's future
10   financial performance resulting in those
11   assumptions proving inaccurate and the City being
12   unable to fulfill its obligations under the plan.
13           Do you agree with that statement as it
14   relates to your projections?
15      MR. STEWART:  Objection.
16      THE WITNESS:  So in this case, I mean, so it's
17   talking about the entire plan.  So you know, we did
18   revenue forecasts.  And as you've -- this language
19   and other language has pointed out, there can be
20   unforeseen events and circumstances that can affect
21   them, and we don't know what they are.
22   BY MR. SMITH:
23      Q.   And so do you agree with that statement as
24   it relates to your projections?
25      A.   In that sense, the City being unable to

1    fulfill its obligations, that seems a little kind
2    of not as applicable to the stuff that I did, but
3    unforeseen events and circumstances may occur
4    affecting the City's, say, future revenue
5    collections, that applies.
6       Q.   Okay.  So you agree that there are
7    unforeseen circumstances and events that may occur
8    that affect the City's future tax revenues and
9    revenue sharing payments?
10      A.   Yes, I agree with that.
11      Q.   And then the last sentence, no guarantee
12   can be made as to the City's future financial
13   performance due to a variety of unforeseeable
14   circumstances that may affect such performance.  Do you
15   agree with that statement as it relates to your projections?
16      A.   I agree you cannot make a guarantee on the
17   revenue forecasts that I've made.
18           (Document marked No. 18)
19      Q.   I'm going to hand you what I've marked as
20   Exhibit 18, which is some of the spreadsheets from
21   the projections relating to your work.  Starting
22   with fiscal year 2015 and going to 2023, can you
23   tell me how you forecast the percent changes in the
24   assessed value of real property?
25      A.   So this is not my spreadsheet, so this is

1  prepared based on the analysis I provided.
2      Q.  Okay.  I'm just wondering how did you --
3  did you forecast the real property, personal
4  property and Renaissance Zone numbers that are
5  contained in this spreadsheet?
6      MR. STEWART:  What exhibit number is this one?
7      MR. SMITH:  It's 18.
8      THE WITNESS:  So here this says change in
9  assessed values, but it should be change in taxable
10 value because these are -- so you see values, and
11 these are taxable values, and these look like
12 they're my numbers, yes.
13 BY MR. SMITH:
14     Q.  Okay.  Are the values that are under the
15 heading change in assessed values your numbers?
16     A.  They are not how I prepared it.  They've
17 calculated those based on the taxable values, and I
18 put together the taxable values that are shown
19 here.
20     Q.  Okay.  So the numbers that are in this
21 spreadsheet are your numbers, but they're really
22 taxable values and not assessed values; is that
23 correct?
24     A.  They're taxable values, yes.
25     Q.  So somebody made an error in putting

1  together the description of this data in this
2  spreadsheet, correct?
3      A.  They labeled the change in values in a way
4  that I wouldn't have labeled it.
5      Q.  They labeled it in an inaccurate way,
6  correct?
7      A.  I would have used a different label.
8      Q.  The taxable values shown here, they change
9  from year to year, correct?
10     A.  Taxable values change from year to year,
11 yes.
12     Q.  And can you tell me are all those changes
13 numbers you picked based on your judgment?
14     A.  So as we talked about, to come to these
15 total taxable value numbers for each year, I did
16 analysis for each tax base and selected the growth
17 rates, and that modeling feeds into those total
18 values.
19     Q.  And the growth rates, all these growth
20 rates vary in each year.  Those were numbers you
21 picked based on your judgment, correct?
22     A.  After doing analysis, I selected certain
23 growth rates, and I used my judgment, yes.
24     Q.  So all these different numbers for each
25 year and each category of property are numbers you

1  picked based on your judgment for the growth rate,
2  correct?
3      A.  After doing analysis, I selected growth
4  rates for each of the tax bases, and I had to use
5  my judgment to select those growth rates.
6      Q.  And when you said you did analysis, you
7  didn't calculate any of those growth rates, did
8  you?
9      A.  What do you mean by calculate?
10     Q.  You didn't calculate any of the growth
11 rates using a mathematical formula, correct?
12     A.  Well, all of the analysis requires some
13 sort of mathematical formula.
14     Q.  But those growth rates that appear in the
15 spreadsheet, those aren't generated by a
16 mathematical formula, correct?
17     A.  I guess it depends on mathematical
18 formula.  I mean, so math is used in the analysis.
19     Q.  But you didn't -- the numbers that are
20 chosen for the growth rate are selected numbers.
21 They're not numbers that are calculated using a
22 mathematical formula, correct?
23     MR. STEWART:  Objection.
24     THE WITNESS:  Ultimately all of the numbers,
25 the growth rates, I had to select.

1  BY MR. SMITH:
2      Q.  If we look at the General Fund collection
3  rates, do you see where that is on this spreadsheet
4  down kind of towards the bottom?
5      A.  I do.
6      Q.  Did you select the General Fund collection
7  rates that vary from year to year for your
8  analysis?
9      A.  So those were built up, as we discussed
10 earlier, by looking at the non-delinquent
11 collection rates by each type of property and then
12 also the payments from Wayne County.  And so for
13 historical years, I was able to see what the total
14 collection rate was and then going forward had to
15 decide what that collection rate would be, so I had
16 to use my judgment to ultimately select the
17 collection rate going forward.
18     Q.  Okay.  So for future years, 2015 going
19 forward, you selected the collection rates for the
20 various categories based on your judgment, correct?
21     A.  Based on my analysis of the different
22 components and how they were being collected, I did
23 use my judgment to select those rates.
24     Q.  But the collection rates you used are
25 numbers you selected, and they're not numbers that

1  were generated by a calculation from a mathematical
2  formula, correct?
3      MR. STEWART:  Objection.
4      THE WITNESS:  Well, again, math is involved, so
5  for this, if you -- you know, in the model, I've
6  gone through and said what are the collection rates
7  by different types of property based on data that
8  the City provided, and I had to make an assumption
9  about what that would look like during the forecast
10  period.  And then math is used then to get to the
11  numbers that are here.  At the end of the day, I
12  had to select information that generates this
13  number.
14  BY MR. SMITH:
15      Q.  All of the collection rates are selected
16  numbers that are based on your assumption regarding
17  what the collection rates will be in the future,
18  correct?
19      MR. STEWART:  Objection.
20      THE WITNESS:  So the collection rates here are
21  a product of my analysis and my judgment.
22  BY MR. SMITH:
23      Q.  Okay.  But they're not -- but the
24  collection rates aren't rates that are calculated
25  for each year based on a mathematical formula where

1      Q.  Okay.  And my only point is the numbers
2  that were generated each year for collection rates
3  were not generated by a mathematical formula.  They
4  were based on your selection using your judgment,
5  correct?
6      MR. STEWART:  Objection.  What is this, the
7  sixth time you've asked this now?  I mean, it's
8  getting late.  How many times are you going to ask
9  this question?  She's answered it six times.  Is
10  your answer any different than any answer you've
11  given before to that question?
12      MR. SMITH:  Listen, stop coaching the witness.
13      MR. STEWART:  It's not coaching at all.
14      MR. SMITH:  You're engaged in speaking
15  objections.  What's the basis you have for making a
16  speaking objection?
17      MR. STEWART:  Because you've harassed the
18  witness by asking the same question over and over,
19  which is improper.
20      MR. SMITH:  Well, the video will show the
21  witness is smiling right now.
22      MR. STEWART:  The video is going to show -- the
23  video is going to show this abusiveness.  You're
24  arguing with the witness, and you ask the same
25  question again and again and again and again.  And

1  you plug in which year it is and then out pops a
2  number for the collection rate, correct?
3      MR. STEWART:  Objection.
4      THE WITNESS:  Well, so all of these collection
5  rates that are shown here, these were -- the
6  various assumptions that build up to this were
7  adjusted, and so in some sense, I guess they were
8  calculated.
9  BY MR. SMITH:
10      Q.  They were selected numbers, correct?
11      MR. STEWART:  Objection.
12  BY MR. SMITH:
13      Q.  That were selected after you made
14  adjustments based on your judgment, correct?
15      A.  Well, I don't know what you mean by
16  adjustments.
17      Q.  Well, you just mentioned that you were
18  making adjustments to the numbers over time, right?
19      A.  Well, I said I had to make certain
20  assumptions about what the different types of
21  property, what the collection was going to be on
22  non-delinquent and then what did the net revolving
23  fund payments from Wayne County have to be.  So
24  they're a selection of those inputs, and then that
25  informed the number that you see here.

1  it's abusive, and it's improper.  Now, she's going
2  to answer it one last time.  Then I'm going to
3  instruct her after that because you've asked it how
4  many times now?
5      MR. SMITH:  Once.
6      MR. STEWART:  No.  That's what the video is
7  going to show.  Let's have it asked the sixth time,
8  given the answer for the sixth time, and then we're
9  going to move on.  So let's reread the question.
10  BY MR. SMITH:
11      Q.  I'll just ask it so we don't have to worry
12  about finding it.
13      A.  Okay.
14      Q.  The collection rates are selected numbers.
15  They're not calculated for each year using a
16  mathematical formula, correct?
17      A.  No.  I mean, there are -- there is a
18  calculation that underpins these numbers, and so I
19  had to select inputs that -- this is true.  I had
20  to select inputs that feed into this, and then they
21  were calculated.
22      Q.  What's the mathematical formula that you
23  used to calculate the collection rates for each
24  year?
25      A.  What kind of information or detail are you

1  looking for?
2      Q.  Well, you're just said they're calculated
3  numbers.  I want to know the mathematical formula.
4  What did you add up or multiply to get to the
5  collection rate for each year?
6      A.  So each of our tax bases, residential,
7  commercial, industrial, and there's real and
8  personal property, and then there's utility
9  personal property.  So for each of those different
10  tax bases, you have taxable value, and then you
11  have -- you multiply that by the tax rate, and you
12  get the tax levy.
13          And then you have to say well, what
14  percent is going to be collected on time for each
15  of the tax bases.  So the formula is assign a
16  collection rate for each tax base and multiply the
17  collection rate times the tax levy and then add
18  those and then add in the net -- add in the Wayne
19  County net revolving fund payments, and then you
20  add that in.  And then --
21      Q.  I'm not asking --
22      MR. STEWART:  Don't interrupt her answer.
23  BY MR. SMITH:
24      Q.  I'm not asking for a calculation of the
25  property tax revenue.

1      MR. STEWART:  Finish your answer.  He's not
2  allowed to interrupt you.
3      THE WITNESS:  So you have tax revenue, and if
4  you divide tax revenue by total tax levy, that
5  gives you the collection rate that's shown here.
6  That's the mathematical formula.
7  BY MR. SMITH:
8      Q.  Who prepared this spreadsheet, do you
9  know?
10      A.  I'm not certain who did this one.
11      Q.  With the reinvestment scenario, the
12  collection rates that you used there, those were
13  not calculated values.  It looks like they're all
14  the same; is that correct?  They differ some,
15  but --
16      A.  They do differ, so General City with the
17  reinvestment scenario, the collection rate is
18  higher than the without.
19      Q.  And the values you used for collection
20  rates in the with reinvestment scenario were not
21  calculated values.  They're numbers you selected,
22  correct?
23      A.  They're calculated values in the same way
24  that the other ones were where in this case, I
25  modified the individual non-delinquent collection

1  rates for each of the tax bases, and then this is
2  the output of that same calculation I described a
3  minute ago.
4      Q.  So can you tell me why the collection rate
5  is 87 percent for, it looks like, 2020, 2021, 2022,
6  2023?
7      A.  So again, here, important sort of point
8  with forecasts is when the reappraisal study we
9  have hitting the tax bills, and that's in fiscal
10  year 2020, calendar year I guess 2019, and in this
11  case, just like in the other forecast, there's an
12  improvement to the collection rate, and it's being
13  driven where certain people who weren't paying
14  their property taxes decide to start paying them,
15  and in here, looking at the higher percentage of
16  residential taxpayers start to pay their property
17  taxes.
18      Q.  The improvement in collections you assumed
19  in the reinvestment scenario is not based on any
20  study or data, correct?
21      A.  The improvement in residential tax
22  collections after the appraisal is what you're
23  asking?
24      Q.  Yeah.  It's not based on any study or
25  data, correct?

1      A.  So I had conversations with the City to
2  help think about what might be realistic around it.
3      Q.  And nobody from the City provided you any
4  study or data supporting the improvement in the
5  collection rate you assume for the reinvestment
6  scenario, correct?
7          (Document marked No. 19)
8      A.  Nobody provided any study or data to me.
9      Q.  Let me hand you what's being marked as
10  Exhibit 2 or Exhibit 19 rather.  This is another
11  spreadsheet.  Let me know if you recognize this one.
12      A.  Yeah.
13      Q.  Do you know who prepared this spreadsheet?
14      A.  It looks like mine.
15      Q.  Do you know when you prepared that
16  spreadsheet?
17      A.  I don't know when this was from.
18      Q.  What was the purpose of the spreadsheet?
19      A.  I pulled historical taxable value, state
20  equalized value information for the City of Detroit
21  and the State of Michigan.
22      Q.  And halfway down the page, there's a line,
23  Case-Shiller change.  Do you see that?
24      A.  I do.
25      Q.  What's the -- why did you consider it

1 useful to look at the history of the Case-Shiller
2 Index?
3     A.   So the Case-Shiller Index shows what is
4 happening in the housing market for home sales, and
5 so I wanted to see what trends the Case-Shiller
6 Index was -- was showing and compare it to
7 residential state equalized value and taxable
8 value.
9     Q.   And why did you want to do that?
10     A.   I wanted to see if -- I wanted to see how
11 similar or dissimilar they were.
12     Q.   And were they similar or dissimilar?
13     A.   They do not match.
14     Q.   Which ones are higher, or how don't they
15 match?
16     A.   So if you look at the state equalized
17 value in Detroit, the growth rates that are
18 positive in certain years are higher than the
19 Case-Shiller Index in most years and -- well, not
20 every year, I guess, so for some of them.  And then
21 the Case-Shiller Index is more negative in some
22 years, less negative in others, so they're
23 different.
24     Q.   In 2012, you have a 4 percent increase for
25 the Case-Shiller Index.  Do you see that?

1     A.   I do.
2     Q.   Did you ever update any of the numbers in
3 this spreadsheet beyond 2012?
4     A.   Yes, I did.
5     Q.   Did you prepare another spreadsheet that's
6 more up-to-date than this one or not?
7     A.   I have 2013 data in the spreadsheet now,
8 and as we talked about, I pulled -- I did look at
9 Case-Shiller information part of it for 2014.
10     Q.   And Case-Shiller continues to increase in
11 2013 and 2014, correct?
12     A.   That's right.
13     Q.   And the four numbers that are in the
14 rightmost column, those percentages, what are
15 those?
16     A.   I don't know.  I mean, I calculated some
17 percentage change.  I don't know what years,
18 though.
19     Q.   I mean, what were you trying to calculate
20 there?  What are the percentage changes
21 representing?
22     A.   So I was looking at the change in state
23 equalized value during some period.
24     Q.   Okay.  Are all four of those numbers
25 changes in state equalized value?

1     A.   I would have to go check my formula.  I
2 don't know.
3     Q.   Okay.
4     A.   I mean, I could --
5     Q.   Why were you calculating those numbers?
6     A.   I'm guessing I -- so throughout the
7 analysis, I wanted to see what was happening to
8 state equalized value in Detroit, so I calculated
9 multiple percentage changes for various times.
10     Q.   Why did you want to know what was
11 happening with state equalized value in Detroit?
12     A.   So state equalized value in Detroit is
13 equal to the assessed values, and as we've talked
14 about, I wanted to see if the change in assessed
15 values, how it was mimicking what was happening in
16 the market, so I would calculate to see what change
17 was happening to assessed values and compare it to
18 market trends.
19     Q.   Okay.  And did you find that assessed
20 values generally did not track market trends or
21 that they did track market trends?
22     A.   So what you'll see, and this is
23 well-known, is that assessed values lag the market,
24 so it takes a couple years for either direction for
25 assessments to follow the market.

1     Q.   So if housing prices are increasing
2 currently, you would expect that a few years in the
3 future assessed values would increase, correct?
4     A.   Other things equal, if the home prices are
5 going up, you would -- you would -- in a normal
6 market, you would expect assessments to go up.  It
7 depends on where -- for each house how it's being
8 assessed whether the market is above or below the
9 assessment.  It really depends on --
10     Q.   But in aggregate --
11     MR. STEWART:  Did you finish your answer,
12 Ms. Sallee?
13     THE WITNESS:  I did.  Thank you.
14 BY MR. SMITH:
15     Q.   In aggregate, if the home price index like
16 the Case-Shiller Index is increasing, you would
17 expect that within a few years, that would be
18 reflected in assessed values, and assessed values
19 would increase, correct?
20     MR. ALBERTS:  Objection.
21     THE WITNESS:  The problem why I don't want to
22 say yes to that is that Detroit is in this period
23 where they're reducing assessments, so even though
24 you could -- even though you're seeing this
25 positive increase in home prices, if you have a

1  house that's overassessed, you could have the
2  situation where you're seeing this trend in the
3  home prices and yet, the assessment on the house is
4  lowered. So I don't want to say -- Detroit is an
5  unusual situation for --
6  BY MR. SMITH:
7      Q.  Historic --
8      MR. STEWART:  Did you finish your answer?
9      THE WITNESS:  I didn't.  So where home prices
10 have collapsed in such a way that you're seeing
11 this unusual situation that really the system isn't
12 designed to deal with.
13 BY MR. SMITH:
14     Q.  Typically after an increase in -- how many
15 years does it take for an increase in home prices
16 to result in an increase in assessed values?
17     A.  For Detroit, I don't know.
18     Q.  Did you look at that at all?
19     A.  What do you mean by did I look at it?
20     Q.  In the data, did you look at how long it
21 takes for an increase in home prices to translate
22 into an increase in assessed values?
23     A.  So there are general trends that can be
24 observed.  So you can see during the 2000s where
25 you can see the market will pick back up, and it

1  usually takes, you know, two to three years before
2  that's fully incorporated in assessments.  And
3  that's in a non -- you know, that's in sort of a
4  kind of normal -- I hate to say normal, but that's
5  not -- you know, the Detroit situation is kind of
6  unique, and so I have to say anything about Detroit
7  right now because it doesn't mimic what's happened
8  perfectly in the past.
9      Q.  But you've used assessed -- you've looked
10 at the data for assessed values in Detroit, correct?
11     A.  That's right.
12     Q.  And you looked at the Case-Shiller and
13 other housing price indices for Detroit, correct?
14     A.  I have.
15     Q.  And based on your review, when there's an
16 increase in the housing price index, how long does
17 it take to show up in the assessed values for the
18 data in Detroit that you've looked at?
19     MR. STEWART:  Objection.
20     THE WITNESS:  You know, as I said, typically I
21 would say a couple years, and I don't know if
22 that's -- I'll just say typically a couple years.
23 BY MR. SMITH:
24         (Document marked No. 20)
25     Q.  Let me hand you what I've marked as

1  Exhibit 20.  It's another spreadsheet, and you can
2  tell me if you created this spreadsheet.  Is that
3  something that you created?
4      A.  Yes.
5      Q.  And why did you prepare that spreadsheet?
6      A.  I wanted to see what was happening in the
7  city of Detroit with existing home sales.
8      Q.  And there's been -- for the most recent
9  period, you looked at, was there a 28.03 percent
10 year-to-year change increase in home sales?
11     A.  So the spreadsheet has a 28.03 percent
12 increase.
13     Q.  And did you ever update this with more
14 recent data?
15     A.  I did.
16     Q.  And has the increase gone up, or do you
17 know what the magnitude of the most recent data
18 shows the increase is?
19     A.  Off the top of my head, I can't tell you.
20     Q.  Okay.  You're not -- I mean, is it
21 basically comparable to what the data in this
22 spreadsheet is?
23     A.  I don't remember.
24     Q.  And this is the Detroit realtors data that
25 you relied on for your analysis that shows the

1  28.03 percent increase in home sales; is that
2  correct?
3      MR. STEWART:  Objection.
4      THE WITNESS:  So the 28.03 is the change in
5  average price of existing home sales, and this is
6  the same type of data that I updated and used in my
7  analysis.
8  BY MR. SMITH:
9      Q.  Okay.  And you said -- it says on this
10 spreadsheet used existing home sales to forecast
11 home prices and estimate uncapped TV.  Did you, in
12 fact, do that in forecasting property tax revenue?
13     A.  So one of the analyses that I did was to
14 think about the uncapping of taxable value on homes
15 sell, and so that exercise that I mentioned before
16 was looking at what would the taxable value --
17 likely the capped value be for homes that were
18 purchased five, 10, 15 years ago in Detroit and
19 what the taxable value would be if those homes sold
20 today.  And so I used this data to help do that
21 simulation and that exercise, and that informed my
22 residential taxable value -- part of the
23 residential taxable value growth rate.
24     Q.  Okay.  And did you -- how did you take
25 numbers from this spreadsheet, if at all, to do

1 that?
2    A. So this information was combined with some
3 other information, and the average price was used
4 to -- so the average price and the number of sales,
5 those two pieces of information were used to model,
6 you know, in a given year what a home purchased so
7 many -- like, I said five, 10, 15 years ago what
8 was the average price of homes sold during those
9 periods, what would be then grown at the rate of
10 inflation, what would be their taxable value and
11 then looking at today, what is the average price of
12 homes being sold in Detroit, and then what's the
13 difference in taxable value when the home sells.
14    Q. Okay. If you look at the average price in
15 2006, it was 61,444, and it dropped to 16,068 in
16 2011. Do you see that?
17    A. Yes.
18    Q. What factors explain that drop in average
19 housing during that time period?
20    A. Specifically, I mean, Detroit, like the
21 rest of the U.S. was in a recession, and so
22 you -- I can't tell you exactly why homes fell, but
23 you have sort of a poor economy. You have higher
24 unemployment, and you have all those things that
25 lead to people not buying homes.

1    Q. Do you think it's reasonable to expect
2 that the owner of a home worth 64 or 61,000 in 2006
3 would sell it for 16,000 five years later?
4    MR. STEWART: Objection.
5    THE WITNESS: I would be speculating to answer
6 that.
7 BY MR. SMITH:
8    Q. I mean, the fact of the matter is people
9 hold onto their houses if the market price
10 declines, right?
11    MR. STEWART: Objection.
12    THE WITNESS: I don't know. Some sell. Some
13 don't.
14 BY MR. SMITH:
15    Q. You haven't investigated the extent which
16 people held onto their houses in Detroit during the
17 periods of decline in prices?
18    A. So the only data that I look at is sales,
19 and you see -- you see sales in certain years
20 higher than others, but you know, 2010, 2011, the
21 number of transactions looking fairly similar to
22 non-recession years, so that's the only piece of
23 information I looked at.
24    Q. And at the bottom, you say -- you have a
25 reference thinking about losses to taxable base.

1 Do you see that?
2    A. I do.
3    Q. Did you write that?
4    A. I think this is mine, yes.
5    Q. Why were you thinking about losses to
6 taxable base?
7    A. So one of the -- the formula for
8 calculating taxable value on a home is you have
9 their taxable value from the previous year, and you
10 do any additions to the base, losses to the base,
11 and then you would multiple it by the rate of
12 inflation or 5 percent, whichever is less. And so
13 part of residential taxable value is what are their
14 new additions, what we talked about earlier, or
15 losses. And so this was -- so being part of a
16 residential tax base, I thought about it.
17    Q. Did you think about -- what are the
18 factors that would lead to gains in the taxable
19 base?
20    A. So if you put an addition on your house,
21 that would be an addition to the tax base. A new
22 house being built would be an addition to the tax
23 base.
24    Q. And where did you -- did you ever look
25 into the data on those types of additions to the

1 taxable base?
2    A. So I looked at the building permit data.
3    Q. So the increase in building permit data
4 that we saw before would show an increase to the
5 taxable base or be indicative of one?
6    A. So I used the permit data to help me think
7 about additions to the tax base, and I'll stop
8 there.
9    Q. How did you use that to think about
10 additions to the tax base?
11    A. So I pulled the construction costs in
12 Wayne County, and then I apportioned the
13 construction to Wayne County based on its share of
14 taxable value and looked to see then that -- that
15 would be a growth in the residential tax base of
16 1 percent, which would be a half percent in taxable
17 value. When I say tax base, I meant to say it
18 would be a growth of -- well, so the market value
19 would be a growth equal to 1 percent. The taxable
20 value would be half a percent, so that helped me
21 think about well, what new construction activity is
22 happening and what addition to the tax base helped
23 me think through my growth rate.
24    Q. You have an assumed reduction in
25 population in 2013 compared to 2012 and the effect

1 on residential taxable value. Do you see that? In
2 that spreadsheet, there's a couple lines on that.
3 　　A. Yeah.
4 　　Q. And you do a calculation there?
5 　　A. Uh-huh.
6 　　Q. And the calculation assumes that there's a
7 linear relationship between population decline and
8 residential taxable value; is that correct?
9 　　A. In this analysis, yes.
10 　　Q. And is that a reasonable assumption in
11 your view?
12 　　A. So is that a reasonable assumption? For
13 doing -- you know, doing multiple analyses, that
14 being one of the assumptions for analysis is, I
15 think, fine.
16 　　Q. Did you do any testing of your assumption
17 of a linear relationship between population decline
18 and taxable value?
19 　　A. I did not do any testing of that assumption.
20 　　Q. How did you get the population estimates
21 that were there on this spreadsheet?
22 　　A. They should be census numbers.
23 　　　(Document marked No. 21)
24 　　Q. Okay. I'm going to hand you what's been
25 marked as Exhibit 21. You let me know if this is a

1 spreadsheet that you prepared.
2 　　A. Yeah.
3 　　Q. And why was this spreadsheet prepared?
4 　　A. So before the City provided a breakdown of
5 Renaissance Zone property by type of property, I
6 took the information I had about the total
7 Renaissance Zone property and the non-Renaissance
8 property by property type, and I used that
9 information to make certain assumptions and come up
10 with an estimate of Renaissance Zone property by
11 property type.
12 　　Q. And did you end up -- did these -- did
13 this spreadsheet end up influencing your property
14 tax value? I mean your property tax forecast.
15 　　A. So earlier iterations used some of this
16 analysis, and ultimately the taxable value subject
17 to general operating didn't change. And so
18 property tax revenue -- well, for the first year.
19 So this helped me think about the non-Renaissance
20 Zone tax bases, and then I used some growth rates.
21 But at the end of the day, I had the total
22 Renaissance Zone property amount, which was
23 subtracted from the total taxable value.
24 　　　So what's subject to general operating
25 didn't change. So in terms of property tax

1 revenue, this didn't have really any effect.
2 　　Q. Okay. Are the notes on the side
3 assumptions that you are making in your analysis?
4 　　A. Yes. I mean, this has all been replaced
5 once I got actual data.
6 　　　(Document marked No. 22)
7 　　Q. Okay. Exhibit No. 22, another spreadsheet
8 I'm wondering if you prepared.
9 　　A. Yeah, that looks like me.
10 　　MR. STEWART: I haven't had a chance to see it yet.
11 BY MR. SMITH:
12 　　Q. And why did you prepare --
13 　　MR. STEWART: Hold on. Just a second. I just
14 got this. Don't answer any questions until I've
15 had a chance to see it. Okay. Sorry. Go ahead.
16 BY MR. SMITH:
17 　　Q. Why did you prepare this?
18 　　A. It's the building permit data we talked
19 about earlier.
20 　　Q. Okay. So this is a mechanism of
21 estimating gains to the property tax base?
22 　　A. So I used this to help think about the
23 residential property additions and helping me think
24 about the growth rate for residential property.
25 　　Q. Did you update this spreadsheet with data

1 for 2013 and 2014?
2 　　A. I did update the spreadsheet, yes.
3 　　Q. And did the data show that permits and
4 construction amounts continued to increase?
5 　　A. It did.
6 　　Q. And for 2012, there's a 41.2 percent
7 increase for single family. Is that construction
8 cost?
9 　　A. Yes.
10 　　Q. And then for -- there's a 40.5 percent
11 increase for total buildings construction costs for
12 2012, correct?
13 　　A. Correct.
14 　　Q. Would it be fair to say there's a
15 significant increase in construction in Wayne
16 County based on the data that you've analyzed?
17 　　MR. STEWART: Objection.
18 　　THE WITNESS: There is an increase in Wayne
19 County based on this data.
20 BY MR. SMITH:
21 　　Q. Why do you think there is an increase in
22 the -- in construction in Wayne County in the last
23 few years?
24 　　A. I don't know. I'd have to speculate.
25 　　Q. Well, you haven't investigated into the

1 reasons that there's increased construction activity?
2   A. So I haven't looked into the construction
3 activity in Wayne County as a whole. I haven't
4 been charged to do that, so no.
5   Q. Did you ask anybody at the City about new
6 construction in the city of Detroit?
7   A. No.
8   Q. So you didn't investigate to find out
9 whether construction is increasing in the city in
10 recent years, correct?
11   A. I did not ask the City if construction had
12 been increasing.
13   Q. You didn't ask the City for information
14 about how many permits the City had been issuing
15 for new construction?
16   A. I did not receive that data, no.
17       (Document marked No. 23)
18   Q. I'm going to hand you Exhibit No. 23. Let
19 me know if this is a spreadsheet that you created.
20   A. Yes.
21   Q. Why did you create that spreadsheet?
22   A. It's the Case-Shiller Index.
23   Q. And did that Case-Shiller Index data
24 influence your property tax revenue forecast?
25   A. I don't know what you mean by influence.

1 It was something that I looked at in forming my opinion.
2   Q. And did you ever update this spreadsheet?
3   A. Yes.
4       (Document marked No. 24)
5   Q. I'm going to hand you Exhibit 24, which
6 are some summaries that were produced regarding the
7 property tax forecast. Do you know who created
8 these?
9   A. Yes. Yes, I do.
10   Q. Who prepared these?
11   A. So for some of them, I wrote them, and
12 other ones Bob and Katie wrote them.
13   Q. Which ones did you write?
14   A. So I wrote Page 1, and I wrote the next
15 one, the next two-page document. I wrote portions
16 of the following document.
17   Q. One entitled Detroit Revenue
18 Extrapolation?
19   A. Right. I wrote some portions of that, and
20 I wrote some portions of the long-term projections
21 discussion item. And I didn't write any of the
22 estimation of individual income taxes, and I wrote
23 portions of the last two pages.
24   Q. Okay. If an owner of a property has been
25 delinquent in payment of taxes, does that mean that

1 no taxes will ever be collected from the owner or
2 subsequent owners of that property?
3   A. Are you referencing something here?
4   Q. No. I'm just asking you a question. I'm
5 done with that document for now.
6   A. Okay. Can you say your question one more
7 time?
8   Q. If the owner of a property is for some
9 period of time delinquent in paying taxes, does
10 that mean that no taxes will ever again be
11 collected from that owner or subsequent owners of
12 the property?
13   A. If you're delinquent for some time, that
14 doesn't necessarily mean that you'll never have
15 taxes on that property or from that owner.
16   Q. Do you agree that it's more likely that
17 delinquent taxpayers own parcels of lesser value
18 than those taxpayers who are actually paying their
19 taxes?
20   MR. STEWART: Objection.
21   THE WITNESS: I don't understand the question.
22 BY MR. SMITH:
23   Q. Which -- do you agree that it's more
24 likely that people who are not paying their
25 property taxes own lower-value properties than

1 those who are paying their property taxes?
2   A. I don't know.
3   Q. In the document that I had handed you, the
4 last exhibit, the first document, Changes to
5 Detroit Property Tax Forecast, you mention
6 conversations with the City. Who would you have
7 been having conversations with that are reflected
8 in this document?
9   A. So this one doesn't have a date on it, but
10 I had conversations with Alvin Horhn, Gary Evanko,
11 Michael Jameson, Linda Beatty. I think that's it.
12   Q. Do you know when this document -- the
13 first page was created?
14   A. You know, I'm not sure. It would have
15 been sometime between, you know, between the -- so
16 we did an update in February, so it would have been
17 around that February 2014 update.
18   Q. Okay. And then the next document entitled
19 Changes to Detroit Property Tax Forecast Since June
20 2013 mentions you had discussions with the COD
21 assessor's office. Do you see that?
22   A. Yes.
23   Q. Would those be the same people that you
24 were having discussions with?
25   A. Yes. So here by February, I had had a

1　couple conversations with Alvin Horhn, and I had
2　had at least one conversation with Gary, and he had
3　provided some data to me.
4　　Q.　Do you have any familiarity with the
5　methods used by municipalities to estimate the
6　revenue generated by a tax increase?
7　　A.　Do you have a specific example?
8　　Q.　Well, I'm wondering if you have any
9　knowledge about what methodology municipalities use
10　to estimate revenue from a tax increase?
11　　A.　I don't know what -- I think it would vary
12　from city to city, so I don't know what a
13　particular city would do.
14　　Q.　Okay.　But do you know -- are you familiar
15　with the method -- the various methods that cities
16　can use to estimate increases in revenue from a tax
17　increase?
18　　A.　So there are, I would say, accepted
19　methods of estimating tax changes and its revenue
20　impacts.
21　　Q.　And what would be the accepted methods of
22　estimating increased revenue from a tax increase?
23　　A.　So conceptually you would want to
24　understand how -- and you said a tax increase?
25　　Q.　Yeah.

1　　A.　So you would want to understand what is
2　the -- so what does the tax increase mean?　Is it a
3　tax rate increase?　Is it an addition to the tax
4　base?　So you would have to think through how is
5　your tax base going to change by whatever is being
6　proposed to raise revenue.　And so you could
7　have -- with the tax increase, you could have any
8　number of things.　You could have an addition to
9　the tax base making it bigger.　You could have --
10　if you increased the tax rate, you would have to
11　think about well, does that increase in the tax
12　rate, how does that affect the tax base.
13　　　There's a number of things.　You know, you
14　would want to parse out sort of changes that affect
15　your tax calculation, which would typically be your
16　rate and your tax base.
17　　Q.　And are there -- you said there are a
18　number of accepted methodologies for doing that
19　type of analysis?
20　　A.　I would say I don't know a number of, but
21　there is a way that you would go about doing it,
22　which is you could set up your analysis of here's
23　your tax change and thinking through all factors
24　that affect, you know, the tax base, and that would
25　be an accepted way of doing it.　You could use one

1　of the software tools we talked about earlier like
2　REMI to help you model changes to the tax base
3　given a tax policy change, and that would be an
4　accepted way of doing it.
5　　Q.　Would another method be IMPLAN or --
6　　A.　IMPLAN doesn't work for tax changes like
7　that.
8　　Q.　If you were asked to forecast the rate of
9　compliance with a tax, how would you go about that,
10　or what factors would you consider?
11　　A.　So for rate of compliance, thinking about
12　compliance with the tax change, you would want to
13　think about so what is the -- what is the tax base
14　being affected.　And there's literature on how
15　compliance differs across tax bases, and so I would
16　consult the literature and also the historical
17　performance to use that as a guide as to what the
18　compliance is and then what, obviously, is
19　happening in terms of whether you're raising or
20　lowering taxes.　And there's literature on that as
21　well, and you could consult that to help you think
22　through what happens with compliance whether you're
23　raising or lowering taxes.
24　　　(Document marked No. 25)
25　　Q.　Why don't I hand you what I'm going to

1　mark as Exhibit No. 25.　It's some data from the
2　Michigan Realtors Association on residential home sales.
3　　　Is this the type of data that you looked
4　at in your analysis?
5　　A.　Yes.
6　　Q.　And for Detroit Board of Realtors, they've
7　got a 14 to 13 year-to-date percent change of
8　42.13 percent in home prices.　Do you see that?
9　　A.　Yes.
10　　Q.　So home prices based on the Detroit
11　realtor data went up 42.13 percent in 2014 so far
12　compared with the prior year.　Is that accurate?
13　　A.　You said the year-to-date average price
14　changed?
15　　Q.　Yeah.
16　　A.　Yeah, that's right.
17　　Q.　And you've updated your spreadsheets with
18　data such as this; is that correct?
19　　A.　Uh-huh.
20　　Q.　Okay.　But you didn't use the updated data
21　in your actual analysis or calculations; is that
22　correct?
23　　A.　So I used the data -- every time we
24　updated, I looked to see if growth rates needed to
25　be updated, so it's one of the things that I would

1  look at in doing updates.
2     Q.  Why have home prices increase by
3  42 percent in Detroit thus far in 2014 compared to
4  2013?
5     A.  I don't know.
6     Q.  Do you know any of the factors that
7  contributed to that increase?
8     A.  I don't know why average home price sales
9  have gone up that much.  I don't know.
10    Q.  Let me ask you this.  I mean, can you
11 identify any other cities that have had comparable
12 growth in average home prices in 2014 to Detroit?
13    A.  I haven't specifically looked at other
14 cities, so I don't know.
15    Q.  Historically in Detroit, has there ever
16 been a period of time where home prices have
17 increased by as much as 40 percent?
18    A.  The period I looked at, there was not.  I
19 haven't -- I would have to speculate.  I don't know
20 before the periods I looked at.
21    Q.  What period did you look at?
22    A.  So I had consistent data from 2001 onward.
23    Q.  Okay.  So the increase that we're seeing
24 in 2014 in average home prices is greater than any
25 of the increases that occurred at least since 2001

1  in Detroit; is that correct?
2     A.  I think that's correct.
3        (Document marked No. 26)
4     Q.  Let me ask you about what I'll mark as
5  Exhibit 26.  Is this the type of data that you got
6  for your building permit spreadsheet?
7     A.  Yes.
8     Q.  Okay.  And so this has some updated
9  numbers just up to May 2014 of -- I guess there's a
10 total of $68 million in construction cost for
11 permits that have been issued so far; is that correct?
12    A.  That looks to be correct, yes.
13    Q.  And is that -- do you know if that's an
14 increase compared to prior periods or not?
15    A.  When I looked at it, the -- so the
16 year-to-year change in the last few years had been positive.
17    Q.  You have mentioned that you had reviewed
18 or at least up to about Page 75 of Kopacz's report.
19 I'm going to hand you a copy of that.  Is that a
20 copy of the report that you were talking about?
21    A.  Let me look.
22    MR. STEWART:  What exhibit number on this one?
23    MR. SMITH:  27.
24        (Document marked No. 27)
25    THE WITNESS:  Yes, this looks to be the report.

1  BY MR. SMITH:
2     Q.  On Page 15 of the report at the top --
3     A.  Okay.
4     Q.  -- Ms. Kopacz says that financial modeling
5  is a highly subjective undertaking that is affected
6  by the assumptions made and the professional biases
7  of the analysts developing the model.
8        Do you agree with that statement?
9     A.  I may not say highly.  I think in
10 financial modeling, there's some art in addition to
11 science to it, so...
12    Q.  Do you agree the financial modeling is a
13 subjective undertaking that is affected by the
14 assumptions made and the professional biases of
15 analysts developing the model?
16    A.  I would agree with that.
17    Q.  And you would agree that financial
18 modeling is both a science and an art?
19    A.  I do.  I do agree with that.
20    Q.  Over on Page 25, there's a section called
21 the plan of adjustment.
22    A.  Yeah.
23    Q.  And she says even after many years of
24 practice with dysfunctional, insolvent,
25 operationally troubled enterprises, I was confused

1  by the City's projections in POA.  Section E of
2  this report provides detail on how the projections
3  in our eyes are structured.  Suffice it to say that
4  the 10-year projections, the 10-year, 40-year
5  projections and the restructuring and reinvestment
6  initiatives form an unusual construct for a
7  financial plan for an enterprise attempting to
8  emerge from bankruptcy.  Do you see that?
9     A.  I do.
10    Q.  You haven't ever participated in
11 constructing financial projections that are similar
12 to the ones that have been constructed in the
13 Detroit case, have you?
14    A.  I have not been involved in putting
15 together -- what was the word you used?
16    Q.  Projections similar to the type that are
17 in this Detroit bankruptcy.
18    A.  I have not been responsible for putting
19 together this exact kind of format.  That's true.
20    Q.  Have you ever been involved in any
21 construction of projections where you had to rely
22 on other experts for their own projections such as
23 the reinvestment projections that were given to you
24 from Conway MacKenzie?
25    A.  So in work that I've done in looking at

1   the projections of, say, a particular project, I
2   would often rely on information provided by a third
3   party such as the planned construction costs for
4   the project. So they would forecast how that would
5   look like over that period of time, so I would have
6   to take somebody else's work and use it, which is a
7   little bit, I guess, similar to this situation
8   where we were looking at information projections
9   prepared by another group or expert.
10      Q. Page 27, the last paragraph, the second
11  sentence says the projections in the POA have not
12  been harmonized with the City's budget that was
13  passed by the City Council on June 5, 2014.
14      A. I see that.
15      Q. Were you aware that the projections that
16  Ernst & Young had done had not been harmonized with
17  the City budget?
18      A. I was not aware of that until I read this
19  part of the report.
20      Q. Have you looked at the budget's
21  projections at all in doing your work?
22      A. I looked at past City budgets. I have not
23  looked at this June 5, 2014 budget.
24      Q. On Page 52, there's an analysis here, the
25  sensitivity analysis for the revenue sharing. Do

1   change in the 10-year assumption will result in
2   approximately 21 million change in collected -- oh,
3   that's income tax revenue. Never mind.
4       MR. STEWART: Sorry. Where are we?
5       MR. SMITH: Never mind. We're in a place
6   that's not relevant for Ms. Sallee.
7   BY MR. SMITH:
8       Q. Do you have any plans to reserve -- to
9   read the rest of the Kopacz report or not?
10      A. I guess I haven't thought about it. I
11  don't know.
12      Q. Do you have any plans to do any additional
13  work before you testify?
14      A. I will probably do some preparation before
15  I testify, I'm guessing.
16      Q. But any additional changes to your
17  forecast, are you planning those before you
18  testify?
19      A. No, I'm not.
20      Q. In the historical data that you've looked
21  at, has the City always been in poor financial
22  shape?
23      A. I was not asked to look at the City's
24  financial position in the past, and so I didn't do
25  that. So I don't know.

1   you see that?
2       A. Yes.
3       Q. And she says at the end of the first
4   paragraph the statutory payment of 5 percent change
5   in the allocation would have a cumulative impact of
6   70 million to the General Fund during the fiscal
7   year 2014-2023 period. Do you see that?
8       A. Yes, I do see that.
9       Q. In your view, is this sensitivity analysis
10  that Ms. Kopacz has provided showing a 5 percent
11  change in the statutory revenue sharing allocation
12  would have a $70 million impact over the 10-year
13  period, is that reasonable?
14      A. Yeah, it is reasonable.
15      Q. Then underneath the graph or the chart she
16  says the City of Detroit reasonable saw its state's
17  revenue sharing decreased significantly from a
18  combined annual total of 267 million in fiscal year
19  2009 to as low as 173 million in fiscal year 2012.
20      Is that consistent with your
21  understanding?
22      A. I don't have my spreadsheet in front of
23  me, but that seems about right.
24      Q. Over on Page 61, at the bottom, it says
25  for the without-RRIs scenario, every 1 percent

1       (Document marked No. 28)
2       Q. I'm going to hand you what's been marked
3   as Exhibit 28, which is an article entitled How
4   Michigan's Revenue Sharing Raid Cost Communities
5   Billions for Local Services. And in the third
6   paragraph, it says over the past decade, lawmakers
7   and governors from both political parties have used
8   some 6.2 billion in sales tax collections to fill
9   state budget holes rather than fulfill a statutory
10  revenue sharing promise to local communities
11  according to the Michigan Municipal League, which
12  released a city-by-city analysis earlier this month.
13      Is that consistent with your
14  understanding?
15      A. So it is true that the state has not in
16  the past allocated what statute would say is full
17  funding to municipalities. It hasn't done that.
18      Q. And the amount for -- in total, is it a
19  reasonable to say around $6 billion over the last
20  decade?
21      A. I don't know where that number is coming
22  from or how they've calculated it, so I don't know
23  if that's reasonable.
24      Q. The last paragraph says Detroit, which
25  filed for bankruptcy protection last year, missed

1 out on 732 million between 2003 and 2013 for the
2 report.
3        Does that sound like a reasonable estimate
4 in the amount of revenue sharing that Detroit has
5 lost as a result of the state's failure to fully
6 fund revenue sharing during that period?
7     MR. STEWART: Objection.
8     THE WITNESS: So I would have to perform an
9 analysis to see and actually look at the data
10 before I would say whether that number was
11 reasonable.
12 BY MR. SMITH:
13     Q. I mean, you know it's been -- Detroit has
14 lost out on hundreds of millions of dollars over
15 the last decade as a result of the state not fully
16 funding revenue sharing, correct?
17     A. So the state I know has not fully funded,
18 and I don't know at this moment exactly what the
19 impact on Detroit is -- has been.
20     Q. Well, you know that it would be at least
21 hundreds of millions of dollars, correct?
22     MR. ALBERTS: Objection.
23     THE WITNESS: I would want to do the analysis
24 before I would say that.
25

1 BY MR. SMITH:
2     Q. I mean, just from your knowledge of what
3 the sums have been for revenue sharing, it's not --
4 all you have to do is add up the amount of the
5 cuts. Would that be fair?
6     MR. STEWART: Objection.
7     THE WITNESS: But I don't know what the
8 year-end cuts are. I would want to see the data.
9 BY MR. SMITH:
10     Q. So nobody ever -- you never tried to
11 figure out how much Detroit has lost out from the
12 state's failure to fully revenue sharing; is that
13 correct?
14     A. So in the work that I've done, I usually
15 look to see what actual revenues the City has
16 received, and so that's what I looked at, not the
17 difference between state fully funding and what
18 they received. I didn't look at that.
19     Q. The state's never changed the statute that
20 sets out the full funding level for revenue
21 sharing, correct?
22     A. My understanding is that the statute -- so
23 for statutory payments, part of it expired. I
24 think the statute still exists. I'm going off
25 memory. It's being ignored is what I've been told.

1     Q. Okay. So the lawmakers are ignoring the
2 statute that sets the full funding levels for
3 revenue sharing; is that fair?
4     A. So I know part of it is expired, the
5 formula, so I can't tell you -- I can't remember
6 right now the exact relationship. What I do know
7 is the legislature boilerplate language is
8 allocating the EVIP money, and that's done each
9 budget cycle.
10     Q. And you know that a lot of municipalities
11 are upset by the cuts to the revenue sharing
12 payments by the State of Michigan, correct?
13     A. So I've had conversations at my old job
14 and through this project with Michigan Municipal
15 League or others, and over the past decade through
16 my conversations, municipalities have been upset
17 that they've not received more revenue sharing
18 money.
19     Q. And did you work with the Municipal --
20 what is it, the Michigan Municipal League in your
21 prior job?
22     A. I -- they were -- well, so work with, yes,
23 in the sense that in certain projects, I would talk
24 with representatives from the Michigan Municipal
25 League. We never had any paid project from them or

1 anything.
2     Q. Is the Michigan Municipal League a
3 reliable source of information on payments that
4 have been made to the cities in Michigan?
5     A. I don't know.
6        (Document marked No. 29)
7     Q. Do you know Anthony Minghine? I'll just hand
8 you Exhibit 29. Do you know the author of this paper?
9     A. I do not know Anthony Minghine.
10     Q. Would it be fair to say that you don't --
11 you haven't done the work necessary to dispute the
12 calculation of the sums that have been lost to
13 Detroit or other cities as a result of not fully
14 funding revenue sharing that the Michigan Municipal
15 League has done, correct?
16     MR. STEWART: Objection.
17     THE WITNESS: I have not done an analysis of
18 full funding of the statutory payment in the past
19 and what cities have actually received in Michigan.
20 BY MR. SMITH:
21     Q. So you don't have any basis to dispute the
22 Michigan Municipal League's conclusions regarding
23 the amount that revenue sharing has been cut to
24 Detroit or the other cities, correct?
25     A. I have not done the analysis, so I would

1  have to do that before I could comment on whether
2  it was accurate.
3      Q.  And in fact, the revenue sharing cuts are
4  described as a heist in this paper, right?
5      A.  That's what the title says.
6      Q.  I mean, there's a lot of widespread
7  publicity about the problems that the cuts in
8  revenue sharing have had for Michigan cities,
9  correct?
10     A.  It is a topic in news articles and things
11 that I've read.
12     Q.  And isn't it true that the state has cut
13 the revenue sharing payments and used the money to
14 balance the state budget?
15     A.  So Michigan's financial -- fiscal
16 situation was pretty dire after the 2001 recession,
17 and so one form -- one way of achieving a balanced
18 budget was to not allocate full funding for
19 municipal revenue sharing.
20     Q.  But now Michigan has a balanced budget,
21 the state, correct?
22     A.  Well, they always have a balanced budget.
23 They're legally required to each year.
24     Q.  Well, if you look at this article, the
25 last sentence on the page or last couple sentences

1  say the state is now in an enviable position,
2  revenues that exceeded expectations.  It is posting
3  large surpluses, but has failed to take steps to
4  restore local funding.  Do you see that?
5      A.  I do.
6      Q.  And are you aware that the state in recent
7  years has been posting large surpluses?
8      A.  So large, I don't know about large, so you
9  would have to say well, what do you mean by large.
10 The state, the last two years they did have a --
11 their revenues exceeded their planned budgeted
12 expenses, so they were running a surplus in that
13 sense.
14     Q.  And do you know how much those surpluses
15 were for the last two years?
16     A.  Off the top of my head, no.
17     Q.  Would it be fair to say that the fact the
18 state is running surpluses has made the cities even
19 more upset that the state isn't increasing revenue
20 sharing payments?
21     MR. STEWART:  Objection.
22     THE WITNESS:  I wouldn't know.  I haven't
23 talked to anyone, so I don't know how they're
24 feeling.
25

1  BY MR. SMITH:
2      Q.  How about in Flint, Michigan, do you think
3  they're upset that the state is running surpluses
4  while they're not paying them the full amount of
5  revenue sharing?
6      A.  I did not ask them that question, so I
7  don't know.
8      Q.  What does the state do with all the
9  surplus money?
10     A.  I don't -- I haven't looked to see how
11 they've used the money.  I don't know.
12     Q.  Do you know why the governor's budget
13 ended up including the increase in revenue sharing
14 that you've incorporated into your most recent
15 forecast?
16     A.  I don't know why the legislature passed
17 the increase.  I don't know why.
18     Q.  Do you agree that you can't tell me what
19 the property tax rate is going to be over the next
20 10 years?
21     A.  I -- so property tax rates meaning all the
22 different types of millages, I don't know what all
23 the different types of millages are going to be
24 over the next 10 years.
25     Q.  Can you -- are you able to testify about

1  the funds that the City expects to receive from the
2  State of Michigan in the future?
3      A.  Not all funds, so the only thing that I've
4  said that I will speak about is the state revenue
5  sharing.
6      Q.  That's the only source of funds you can
7  talk about?
8      A.  That's the only source of funds I'm going
9  to talk about, yeah.
10     Q.  And in terms of what the actual amounts
11 that are going to be given to the state, not the
12 forecasts in your forecast, have you done any
13 investigation to find out what, if anything, the
14 City knows about actual sources of funds that might
15 be provided by the state over the next 10 years?
16     A.  Okay.  So I got lost in that.  What's your
17 question?
18     Q.  Do you know who from the City deals with
19 the state on revenue sharing?
20     A.  No, I don't know.
21     Q.  And so would it be fair to say that you
22 haven't talked to the people at the City to find
23 out what, you know, actually might happen with
24 state revenue sharing over the next 10 years?
25     A.  So I haven't talked with anyone at the

1  City about state revenue sharing.  I'm not sure how
2  that would mean -- how the City would be affecting
3  state revenue sharing.  I mean, there's two parts
4  of it.  The constitutional piece, I can't see how
5  City officials can affect that directly.  And the
6  EVIP portion is being decided by the legislature.
7      Q.  Well, I'm just wondering not that they can
8  affect it, but have you asked people at the City to
9  give you what information they know about what
10  might actually happen to revenue sharing over the
11  next 10 years?
12      A.  I have not had a conversation with anyone
13  at the City about what they think might happen to
14  revenue sharing in the next 10 years.
15      Q.  Have had you a conversation with anyone at
16  the state about what might happen with revenue
17  sharing over the next 10 years?
18      A.  Yes.
19      Q.  Who did you have a conversation with?
20      A.  Well, when you say state, I had a
21  conversation -- I also had a conversation with Jay
22  Wortley at Treasury, and I had a conversation --
23  several conversations with Jay Wortley, several
24  conversations with Jim Stansell at House Fiscal
25  Agency.

1      Q.  And what did they tell you?
2      A.  So Jim Stansell's pretty pessimistic about
3  EVIP, thinks it's going to be eliminated next year,
4  and there's some -- he thinks some program will be
5  put in its place, but he doesn't see it as -- I
6  asked him about our assumption keeping EVIP
7  constant in our forecast, and he agreed with that.
8  There's that -- it's very variable.
9          And then I talked to Jay Wortley when I
10  received the state forecast of revenue sharing, the
11  constitutional portion, and talked to him about
12  growth rates in sales tax revenue.  And so that's,
13  I think, what we talked about there.
14      Q.  Did he believe that sales tax revenue
15  would be increasing over the next 10 years?
16      A.  He did.
17      Q.  And did he give you any numbers about how
18  much he believes the sales tax revenue might
19  increase over the next 10 years for Michigan?
20      A.  So we used his -- the projections from his
21  office for the 10-year forecast for constitutional
22  revenue sharing.
23      Q.  Did he identify any factors that might
24  increase the sales tax revenues above what he's
25  anticipated in the written document you're

1  referring to?
2      MR. STEWART:  Could I have the question read
3  back, please.
4          (Whereupon, the record was
5          read as requested.)
6      MR. STEWART:  Objection.
7      THE WITNESS:  He only -- we only talked about
8  his projections and what he thought was reasonable
9  for the sales tax and nothing beyond that.
10  BY MR. SMITH:
11      Q.  Why is the EVIP going to be eliminated
12  potentially next year?
13      A.  In my conversation with Jim Stansell, that
14  came up, and this is just his opinion.  He's not a
15  legislator.  He thought that people in the
16  legislature were not really in favor of the program
17  and that there had been some statements about it
18  saying that they wanted to change the program for
19  something else.
20      Q.  And what is -- did he tell you what he
21  anticipates might be substituted for EVIP?
22      A.  He didn't know.
23      Q.  So right now the only person you talked to
24  suggested that the EVIP program that you assume is
25  going to continue for the next 10 years is -- may

1  be eliminated next year, correct?
2      A.  So he's responsible for understanding
3  those kinds of programs.  It's his duty at the
4  House Fiscal, and he thought that program might be
5  eliminated.  The money associated with it would
6  still be distributed in some ways to the cities,
7  villages and townships.
8      Q.  Did the state official, though, you spoke
9  with give you any idea about whether there would be
10  increases or decreases in revenue sharing at any
11  point in time?
12      A.  He didn't comment on revenue sharing as a
13  whole, increases or decreases, no.
14      Q.  Right now the information you have,
15  though, is -- I mean, the best information you have
16  is EVIP is likely to be eliminated, perhaps, within
17  about a year; is that correct?
18      A.  So that was one piece of information I
19  received, and you know, we've decided as others
20  like Michigan Treasury to hold that funding for
21  Detroit constant in our forecast given that it is
22  uncertain.  That program could be eliminated.  It
23  could be replaced with something else.  And our
24  most reasonable assumption is that that sort of
25  type -- that amount of money would likely go to

1    Detroit in our period.
2        Q.  Has anybody identified what EVIP would be
3    replaced with if it's eliminated?
4        A.  No.
5        Q.  And is one reason that EVIP is going to be
6    replaced is that people don't like jumping through
7    all the hoops and requirements that it requires the
8    cities to do in order to calculate how much money
9    they're going to get?
10       MR. STEWART:  Objection.
11       THE WITNESS:  Well, so the legislators are the
12   ones that control its destiny, and they seem to
13   like that sort of thing.
14   BY MR. SMITH:
15       Q.  I'm just trying to get an idea of why this
16   state official you talked to thinks EVIP is going
17   to be eliminated within a year.
18       A.  He said there had been some statements on
19   the record by different -- so the Speaker of the
20   House, people in the senate, and they were saying
21   they didn't care for the program.  So I think
22   that's what he was basing his decision on, and so
23   that was -- in our conversation came up.  And so he
24   thought it would be replaced.  There would be money
25   going to cities, villages and townships.  It just

1    probably wouldn't be under EVIP for much longer.
2        Q.  Is it accurate that you're not the person
3    to testify or you can't testify about the
4    population levels that will be in Detroit for each
5    year during the 10-year and 40-year forecast?
6        A.  So a clarifying question.  So population,
7    I think I was identified as the person who can
8    speak about those.
9        Q.  Yeah, but you didn't do the actual
10   forecast of population levels, though, did you for
11   the Ernst & Young forecast?
12       A.  So the population levels up until 2029 are
13   SEMCOG forecasts, and then post 2029 I put those
14   together.
15       Q.  Did you ever talk to anybody at the City
16   about what they anticipate population levels will
17   be in the city?
18       A.  Let me think.  I might have.  Some of the
19   earlier conversations we talked about things like
20   that.  I don't know if I had a -- I don't know
21   actually if I had a conversation with anyone at the
22   City.
23       Q.  So it would be fair to say you can't tell
24   me what the City's view is regarding what the
25   population levels are going to be for the next 10

1    or 40 years, correct?
2        MR. STEWART:  Objection.
3        THE WITNESS:  I don't know what the City thinks
4    they're going to be for the next 10 or 40 years.
5    BY MR. SMITH:
6        Q.  Have you ever forecasted population levels
7    before?
8        A.  Yes.
9        Q.  In what context did you do that?
10       A.  For specific projects that I worked on in
11   the past for public and private clients.
12       Q.  And did you ever -- have you ever
13   forecasted population levels for a city before?
14       A.  No, I don't think so.  Is that right?
15   Yeah I don't think I have.
16       MR. STEWART:  We've been on the record about
17   90 minutes.
18       MR. SMITH:  Okay.  Let's take a break.
19       THE VIDEOGRAPHER:  Off the record.  The time is
20   4:46 p.m.
21           (Whereupon, a short break was
22           taken.)
23       THE VIDEOGRAPHER:  We are back on the record.
24   The time is 4:55 p.m.
25

1    BY MR. SMITH:
2        Q.  Ms. Sallee, would you like to know if
3    people from the City believe that the Ernst & Young
4    projections were unrealistic?
5        A.  As a matter of just intellectual
6    curiosity, yeah, I would be interested to know
7    that.
8        Q.  Well, wouldn't you also want to know that
9    for purposes of making sure that your forecasts
10   were done in a reliable way?
11       A.  So the City's opinion doesn't mean
12   something is reliable or not.  I would be
13   interested in knowing what they thought.
14       Q.  Why would you want to know if the City
15   thought that the forecasts were unrealistic?
16       A.  As I said earlier, I would be surprised by
17   that since I've had conversations with the City for
18   the things I've looked at and received data from
19   them.
20       Q.  Are your property tax calculations
21   assuming that certain activities by the City will
22   occur over time?
23       A.  What do you mean?
24       Q.  Well, I guess collections would be one
25   activity.

1    A.   So my forecast assumes that the City does
2  collect property tax.
3    Q.   I mean, do you know how property tax
4  collection is funded in the city of Detroit?
5    A.   Do I know how property tax collections are
6  funded in the city of Detroit to the physical
7  logistical collections?  No, I don't.
8        (Document marked No. 30)
9    Q.   Let me hand you what's been marked as
10 Exhibit 30, and you can let me know if you've seen
11 this letter before.
12   A.   I don't think I have seen this letter.
13   Q.   Okay.  The first -- it's talking about the
14 projections that you've contributed to in this case, correct?
15   A.   Let me read.  Hold on.  Okay.  What's your
16 question?
17   Q.   This letter relates to the forecasting
18 project that you've been involved in for the City
19 of Detroit?
20   A.   It appears, yes.
21   Q.   And it says regarding the model, we wish
22 to make clear the following:  Number one, the model
23 was constructed pursuant to the terms of the
24 engagement.  Is that your understanding?
25   A.   So I never saw the statement of work or

1  the engagements, so I don't know the terms is what
2  I'm saying.
3    Q.   Okay.  Do you have an understanding about
4  whether the forecasting model that you've helped to
5  create is constructed pursuant to the terms of an
6  engagement agreement with the City?
7    A.   The things that I know are that we had an
8  engagement or have an engagement with the City, and
9  I was brought on to do revenue forecasting.  I
10 don't know -- I haven't seen any of the documents
11 pertaining to the engagement or the statement of
12 work.
13   Q.   Okay.  It says the terms of the engagement
14 do not require EY to update the model for events
15 occurring subsequent to the production of the final
16 version of the model which accompanies this letter.
17 Do you see that statement?
18   A.   I do.
19   Q.   Is it your understanding that Ernst &
20 Young is not going to be doing any further updating
21 of the forecasting model?
22   A.   That's what this says.  I hadn't been told
23 anything.
24   Q.   The next statement says the City provided
25 Ernst & Young with historical, projected and/or

1  forecast data.  Assumptions for inclusion in the
2  model and all such data assumptions are the
3  responsibility of the City.
4        Is that consistent with your
5  understanding?
6    A.   So in the piece that pertains to me, the
7  City did provide me with historical data, and we had
8  conversations.  And then this says it's the responsibility
9  of the City.  I don't have a comment on that.
10   Q.   It says Ernst & Young accepts no
11 responsibility to any third party in respect of the
12 model or the results it generates.  Do you agree
13 with that statement?
14   A.   It's consistent with the disclaimers
15 elsewhere you had me read.
16   Q.   And do you agree with that statement?
17   A.   I agree with that statement.
18       (Document marked No. 31)
19   Q.   Let me hand you what I've marked as
20 Exhibit 31.  Is this the Case-Shiller data that you
21 had relied on in doing your forecast?
22   A.   This looks like, yes, the Case-Shiller from FRED.
23       (Document marked No. 32)
24   Q.   I'm going to hand you what's been marked
25 as Exhibit 32.  Can you identify this document for

1  me?
2    A.   Yes.  The City provides this report of --
3  these are non-delinquent property tax collections
4  by type of property.
5    Q.   Okay.  And is it fair to say you didn't
6  verify the accuracy or reliability of this information?
7    A.   I had conversations with the City about
8  what it meant, and I took efforts to reconcile this
9  information with the collection rates that are
10 reported in the audited comprehensive annual
11 financial statement.
12   Q.   Did you find discrepancies between the
13 collection rates you were provided by the City and
14 the audited statements?
15   A.   So this is non-delinquent property tax
16 collections by property type, and what's reported
17 in the CAFR is property tax collections divided by
18 tax levy.  And so the CAFR collection rate is a
19 different -- a slightly different measure than
20 what's being presented here, and so I took steps to
21 make sure I understood why they were different.
22       (Document marked No. 33)
23   Q.   And -- okay.  I'm going to hand you what
24 I've marked as Exhibit 33, a document entitled
25 Estimating Methodology Detroit Tax Forecast.

1    A.  Okay.
2    Q.  If you look on the second page of this
3  document, at the bottom, it says Jay Wortley
4  provided updated state aid spreadsheet to be
5  consistent with any change in the state May sales
6  tax forecast.  Do you see that?
7    A.  Uh-huh.
8    Q.  And then it says Jay's estimates are about
9  30 percent lower than the MSU economists' estimates
10  by 2022.  Do you see that?
11    A.  I do.
12    Q.  Are you aware of estimates for sales tax
13  revenues that are higher than the estimates that
14  you used?
15    A.  So at the very beginning of the project,
16  we looked at forecasts put together by the MSU
17  economists that's mentioned here, and this says
18  that they are higher than what the state economist,
19  Jay Wortley had put together.  That's all I know
20  about that.
21    Q.  I mean, did you write this document?
22    A.  I wrote pieces of it.  So I wrote pieces
23  of this along with Bob Cline.
24    Q.  Have you actually seen the estimates from
25  the MSU economists on sales tax revenues that are

1  different from what you used in your analysis?
2    A.  I don't remember his -- I don't remember
3  his estimates pertaining to funding ground state
4  aid.  I can't recall what his analysis said.
5    Q.  Okay.  The relevance of the state sales
6  tax revenues is because it can affect the level of
7  state revenue sharing; is that correct?
8    A.  So sales tax revenue funds constitutional
9  revenue sharing, yes.
10    Q.  Do you think that you were provided the
11  MSU estimates, or do you just not remember?
12    A.  So we were provided the MSU estimates, and
13  we were provided those, I want to say, in May of
14  2013, so over a year ago.  And we looked at them
15  and analyzed them then, and I have not looked at
16  them in probably a year.
17    Q.  Do you know whether the MSU economists
18  updated their estimates for sales tax revenue?
19    A.  I have no idea if he's updated them.
20    Q.  Eric Scorsone, was he the MSU economist?
21    A.  He is, yes.
22    Q.  Do you know whether those sales tax
23  revenue estimates were used in the consensus
24  revenue forecasts for the City?
25    A.  I have no idea if -- so let me back up.

1  When you say consensus revenue estimates for the
2  City, what exactly are you talking about?
3    Q.  Well, do you know that there's a
4  conference where there was a consensus revenue
5  estimate put together for the City?
6    A.  When was that done?
7    Q.  Well, I don't have the exact date, but you
8  know that -- do you know that there's a process
9  where there are consensus revenue estimates for the
10  City that are put together because it's under the
11  financial supervision by the state?
12    A.  Uh-huh.  So I know there's a process.  I
13  have no idea if Eric Scorsone was involved.
14       (Document marked No. 34)
15    Q.  I'm going to hand you an exhibit marked
16  Exhibit No. 34.  It's entitled State Revenue
17  Sharing Growth Assumptions.  In the middle, it says
18  the metro areas accrue after a decade of population
19  decline and --
20    MR. STEWART:  Let me -- I got it.  Go ahead.  Sorry.
21  BY MR. SMITH:
22    Q.  And it lists Akron, Cleveland, Detroit,
23  New Orleans, Scranton, Syracuse, Toledo.  Do you
24  see that?
25    A.  I do.

1    Q.  And that's the data from that Brookings
2  study; is that correct?
3    A.  That you showed me earlier, yeah.
4    Q.  And would it be fair to say that there are
5  a number of cities that have experienced prolonged
6  periods of population decline, correct?
7    A.  What do you mean by prolonged?
8    Q.  Well, at least a decade of population
9  decline?
10    A.  And you asked about cities?
11    Q.  Yes.
12    A.  So when you looked at the last 30 years,
13  it identified two cities that have had a decade of
14  population decline followed by some growth.
15    Q.  Haven't there been more than -- it says
16  the metro areas accrue after a decade of population
17  decline, and it lists several cities here; is that
18  correct?
19    A.  So in this case, I looked at cities in
20  metro areas where they had a decade or more of
21  declining population, and then they had a decade of
22  population growth overall.  So cities that only had
23  population decline aren't identified here.
24    Q.  Okay.  But there are a number of cities
25  that have had a decade -- at least a decade of

1  population decline and then grew after that,
2  correct?
3      A.  So in the sense that there are cities that
4  have had a decade of population decline, there are
5  cities, and then they might have had one or two
6  years of growth, and they're not listed here
7  because that wasn't the criteria that I was looking
8  at.
9      Q.  What was the criteria?
10     A.  So I was looking at did a city or metro
11  area have a decade of decline, and then did they
12  have a decade where they experienced overall
13  population growth so I could think about what a
14  sort of long-run rebound in terms of population
15  might look like and used that to help me in my
16  analysis for Detroit.
17     Q.  And one of the cities that has had a
18  decade of population growth after a decade of
19  population decline is Detroit, correct?
20     MR. STEWART:  Objection.
21     THE WITNESS:  So Detroit as a metro area had a
22  decade of decline, and then they had a decade of
23  growth following it.  So the '80s, the metro area
24  declined, so not just Detroit, but suburbs as well,
25  and then it picked up in the following decade.

1  BY MR. SMITH:
2      Q.  And the Detroit metro area had a long-term
3  population growth after a decade of decline without
4  the kind of restructuring or reinvestment
5  activities that the City is proposing in this case,
6  correct?
7      A.  The Detroit metro area had a decade of
8  good growth in the '90s when the auto industry was
9  doing well.
10     Q.  Okay.  And so the Detroit metro area had a
11  period of good growth without any restructuring or
12  reinvestment expenditure by the City or anybody
13  else, correct?
14     A.  During the '90s, I don't know what
15  expenditures the various cities, villages,
16  townships, counties were doing during that period.
17  I don't know.
18     Q.  During the period of growth of the Detroit
19  metropolitan area in the decade of the '90s, you're
20  not aware of any city spending more than a billion
21  dollars in restructuring activities, correct?
22     A.  I haven't looked into it.  I don't know.
23     Q.  Would that surprise you?
24     MR. STEWART:  Objection.
25     THE WITNESS:  My understanding is that none of

1  the municipalities were in bankruptcy during that
2  period.
3  BY MR. SMITH:
4      Q.  None of the municipalities that
5  experienced a decade of population decline that
6  you've identified ever went into Chapter 9
7  bankruptcy, correct?
8      MR. STEWART:  Objection.
9      THE WITNESS:  Not that I'm aware of.
10  BY MR. SMITH:
11     Q.  And you're not aware of any city that's
12  gone into Chapter 9 bankruptcy and said oh, the
13  remedy to our problems is to spend a billion more
14  dollars that we don't have.
15     MR. STEWART:  Objection.
16     THE WITNESS:  I haven't looked at specific
17  bankruptcies elsewhere.
18  BY MR. SMITH:
19     Q.  Can you identify any other city that has
20  ever been in Chapter 9 bankruptcy?
21     A.  No.
22     Q.  Detroit, though, had this period of growth
23  that you identify in the 1990s, correct?
24     MR. STEWART:  Objection.  She said three times
25  it's the metro area, not Detroit.  You continue to

1  mischaracterize her testimony.
2      MR. SMITH:  I'm just looking at the sheet that
3  she has here.  It says Detroit.  On the document,
4  it says Detroit.
5      MR. STEWART:  It says the metro areas that
6  grew.  It says metro area.  You're the one who's
7  mischaracterized it again and again.  Now stop it.
8      MR. SMITH:  Okay.
9  BY MR. SMITH:
10     Q.  The Detroit metro areas, it grew in the
11  1990s, right?
12     A.  The Detroit metro area did grow in the
13  1990s, yes.
14     Q.  And there are a lot of people that work in
15  the city of Detroit that live in the Detroit metro
16  area, correct?
17     A.  What do you mean by a lot?
18     Q.  Well, I mean, do have any idea how many
19  people live in the Detroit metro area and work in
20  the city of Detroit?
21     A.  Off the top of my head, no.
22     Q.  Certainly there are examples that you've
23  identified of cities that have experienced a decade
24  of population decline and reversed that without any
25  restructuring or reinvestment initiative, correct?

1    A.   So the analysis here, Chicago and
2  Philadelphia, had decades of decline followed by a
3  decade or more of population growth, and I don't
4  know what activities they undertook in terms of
5  reinvestment or restructuring.  I don't know what
6  they did.
7     MR. STEWART:  Can you tell us when there's five
8  minutes left.
9  BY MR. SMITH:
10    Q.   On the second page of this document, you
11 mention conversations with Jim Stansell, correct?
12    A.   Uh-huh.
13    Q.   Did you write this document?
14    A.   I wrote portions of it.
15    Q.   Okay.  In this document, you didn't
16 disclose that Jim Stansell had told you that EVIP
17 may be eliminated within a year, correct?
18    A.   This document was written, I believe, in
19 January of 2013, and that conversation with Jim
20 Stansell was after that.
21    Q.   Have you had any conversations with
22 anybody else at the State of Michigan other than
23 Mr. Stansell and Mr. Wortley?
24    A.   I don't think so.
25    Q.   Were they individuals that you had known

1  before this case or not?
2     A.   They were.
3     Q.   And how did you know them?
4     A.   I had -- so in my previous job, I did
5  mostly work in Michigan.  In a number of projects,
6  I was either in meetings with them or obtained data
7  or information from them.
8        (Document marked No. 35)
9     Q.   Let me hand you what I'm marking as
10 Exhibit 35 and let me know if you created this document.
11    MR. STEWART:  I have two documents here.  Is
12 this also --
13    MR. SMITH:  Never mind that one.
14    MR. STEWART:  This is 35?  Okay.
15 BY MR. SMITH:
16    Q.   Did you create that document?
17    A.   Yes.
18    Q.   What's the purpose of that document?
19    A.   Well, so do you want me to talk to about
20 each of them or --
21    Q.   Are these separate spreadsheets doing
22 separate analyses?
23    A.   Yes.
24    Q.   Okay.  Got it.
25        The second page of this document has the

1  building permits data, and then the third page has
2  the realtor data, and it's not -- it's only going
3  up until 2013 it looks like.  Do you see that?
4     A.   Uh-huh.
5     Q.   Is this the most recent version of the
6  spreadsheets you've created?
7     A.   No.
8        (Document marked No. 36)
9     Q.   I'm going to hand you what I will mark as
10 Exhibit 36, and you can let me know if this is a
11 document that you created.
12    A.   This is not a document I created.
13    Q.   Do you know why this was created?
14    A.   So it says at the bottom prepared by the
15 Office of Revenue and Tax Analysis Michigan Department
16 of Treasury, so this is the analysis from Jay Wortley.
17    Q.   And do you know how more Wortley put
18 together this analysis?
19    A.   Other than just being able to look at his
20 steps here, that's all the information I have.
21    Q.   And did you rely on this analysis in your
22 revenue sharing opinion?
23    A.   I used his projections for the
24 constitutional piece in the 10-year forecast.
25    Q.   When you see for fiscal year 2013, 2014,

1  2015, he has consensus written underneath there, do
2  you know what that means?
3     A.   I do.
4     Q.   What does it mean?
5     A.   So Michigan has a consensus revenue
6  estimation process, and so these are the sales tax
7  numbers, or sales tax revenue numbers shown here
8  are the consensus estimates.
9     THE VIDEOGRAPHER:  Counsel, we're at the
10 five-minute mark.
11    MR. STEWART:  And I have a couple of questions
12 of my own.
13 BY MR. SMITH:
14    Q.   Can you explain to me what exactly are the
15 reimbursement mechanisms under the new legislation
16 or that may or may not get passed related to
17 personal property tax?
18    A.   What's your question?
19    Q.   Can you explain to me what the
20 reimbursement mechanisms are under the proposed
21 legislation or measure that would change the
22 personal property tax?
23    A.   So portions -- so there are several
24 different ways that revenue is being replaced.  One
25 is a new use tax that's being created that would

1 allow money through the use tax to then be sent to
2 municipalities that meet certain requirements, and
3 the municipalities themselves would be able to levy
4 a millage on real property. And there's rules
5 around how they can set that millage and what it
6 applies to, and they can set that rate equal to
7 raising enough revenue to cover essential service.
8 Essential services isn't the word. It's more --
9 it's the police, fire, those kinds of services.
10    Q. The amount of reimbursement that the City
11 receives under the personal property measure, is
12 that within the control of the City to some extent?
13    A. Within certain parameters, the City should
14 be able to levy a millage that replaces some of the
15 lost revenue.
16    Q. And how would it do that?
17    A. Nobody really knows how all this is going
18 to work, so I don't know how they're going to do
19 that.
20    Q. Have you had any discussions with anybody
21 at the City about what they're going to do if the
22 personal property legislation ends up going into
23 effect?
24    A. We've had conversations generally about
25 the personal property tax. They haven't told me

1 what their plan is going forward.
2    Q. Would it be fair to say that you've
3 modeled in your revenue forecasts the imposition of
4 a new tax that is not in effect yet under current
5 law?
6    A. I think the right characterization of what
7 I've done is thinking about the probability of
8 whether the law goes into effect and then what the
9 likely reduction in revenue would be, and taking
10 those two factors into account inform the
11 adjustment made for the personal property tax
12 repeal.
13    Q. And the amount of the reduction in revenue
14 depends on what the City ends up doing in the
15 future in terms of invoking mechanisms for
16 reimbursement; isn't that correct?
17    MR. STEWART: Objection.
18    THE WITNESS: My understanding is that the City
19 will be able to levy certain millages to replace
20 some of the lost revenue, and I don't know exactly
21 what that's going to look like.
22 BY MR. SMITH:
23    Q. Okay. Have we covered all the areas that
24 you plan to testify about, or are there any areas
25 that we haven't covered?

1    A. I think we've covered everything.
2    MR. STEWART: I have a couple of questions.
3            EXAMINATION
4 BY MR. STEWART:
5    Q. Ms. Sallee, you testified about population
6 estimates that you made?
7    A. Yes.
8    Q. And some came from SEMCOG --
9    MR. SMITH: Objection.
10 BY MR. STEWART:
11    Q. -- in a certain period of time?
12    A. Yes.
13    Q. And others you came up with?
14    MR. SMITH: Objection. Leading.
15    THE WITNESS: That's correct.
16 BY MR. STEWART:
17    Q. Are you in a position to testify about the
18 City's anticipated population changes by year as
19 implied in the 10 and 40-year forecast?
20    A. Yes.
21    MR. SMITH: Objection. Asked and answered.
22    MR. STEWART: Thank you. That's all I have.
23 We are we done.
24    MR. SMITH: I assume nobody on the phone has
25 anything.

1    THE VIDEOGRAPHER: Off the record. The time is
2 5:24 p.m.
3        (FURTHER DEPONENT SAITH NAUGHT.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

334

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

In re                    )
                         ) Chapter 9
CITY OF DETROIT, MICHIGAN, ) Case No. 13-53846
    Debtor.              ) Hon. Steven W. Rhodes

I, CAROLINE SALLEE, being first duly
sworn, on oath say that I am the deponent in the
aforesaid deposition taken on July 24, 2014; that I
have read the foregoing transcript of my
deposition, consisting of pages 1 through 333
inclusive, and affix my signature to same.

_____
            CAROLINE SALLEE

Subscribed and sworn to
before me this _____ day
of _____, 2014

_____
Notary Public

---

335

STATE OF ILLINOIS )
                  )  SS:
COUNTY OF C O O K )

I, GINA M. LUORDO, a notary public within
and for the County of Cook County and State of
Illinois, do hereby certify that heretofore,
to-wit, on July 24, 2014, personally appeared
before me, at 77 West Wacker Drive, Suite 3500,
Chicago, Illinois, CAROLINE SALLEE, in a cause now
pending and undetermined in the United States
Bankruptcy Court, Eastern District of Michigan, In
re CITY OF DETROIT, MICHIGAN.

I further certify that the said CAROLINE
SALLEE was first duly sworn to testify the truth,
the whole truth and nothing but the truth in the
cause aforesaid; that the testimony then given by
said witness was reported stenographically by me in
the presence of the said witness, and afterwards
reduced to typewriting by Computer-Aided
Transcription, and the foregoing is a true and
correct transcript of the testimony so given by
said witness as aforesaid.

I further certify that the signature to
the foregoing deposition was not waived by counsel
for the respective parties.

---

336

I further certify that the taking of this
deposition was pursuant to notice and that there
were present at the deposition the attorneys
hereinbefore mentioned.

I further certify that I am not counsel
for nor in any way related to the parties to this
suit, nor am I in any way interested in the outcome
thereof.

IN TESTIMONY WHEREOF:  I have hereunto set
my hand and affixed my notarial seal this 25th day
of July, 2014.

_____
        NOTARY PUBLIC, COOK COUNTY, ILLINOIS
        LIC. NO. 084-004143

---

## A

**abandoned** 107:6
**ability** 247:20
**able** 29:2 38:19 39:1
45:2,10,15 46:6
47:25 58:25 77:22
77:25 78:1,4
82:22 124:5,12
167:2 202:10
257:13 304:25
328:19 330:3,14
331:19
**above** 103:25
167:13 169:24
170:5,10,12,18
171:2,5,8,13,18
214:3 230:18,18
230:19,19,20,20
230:21 269:8
307:24
**absolutely** 182:1
187:10
**abuse** 178:16
**abusive** 261:1
**abusiveness** 260:23
**academia** 114:23
**accept** 45:20
**accepted** 45:5 152:4
154:3,5 155:18
286:18,21 287:18
287:25 288:4
**accepts** 316:10
**access** 44:3 45:8
65:18
**accompanies**
315:16
**accompanying**
251:5
**according** 199:13
297:11
**accordingly** 248:10
**account** 19:1 38:1
70:5,25 73:6
75:18,24 76:6
120:9 126:2
152:23 153:4
174:18 175:19
190:11,18 209:8
211:3 216:24
217:11 218:14
234:23 244:20
331:10
**accountability**
85:25 86:11,19
87:8
**accounted** 160:16
**accounting** 12:23
52:1

**accrue** 320:18
321:16
**accuracy** 43:7,13,24
44:6,11,19 45:9
45:22 46:3 62:23
74:16,17,21 317:6
**accurate** 38:5 42:24
43:10 61:8,22
74:8,13 101:6
206:14,15 250:10
289:12 302:2
311:2
**achieve** 250:23
**achievement** 248:7
**achieving** 302:17
**acknowledge**
242:25
**across** 63:16 196:10
288:15
**Act** 169:20 171:19
**action** 210:23 211:1
243:11,21
**actions** 17:6 210:1,5
210:13,17 242:17
243:5,16 244:2,12
245:19,23
**active** 114:8
**activities** 16:3
125:14 153:19,23
190:11 313:21
323:5,21 326:4
**activity** 31:25 32:2
69:7,18,24 70:1,3
70:6,10 72:13
152:9 155:14
197:23 198:4,4,11
198:13,16,20
199:3 277:21
282:1,3 313:25
**actual** 40:11 68:25
69:2,3,4 74:18,19
74:22 136:12
140:13 145:16
174:25 240:16
241:10 243:5,25
248:2,14 280:5
289:21 299:15
305:10,14 311:9
**actually** 38:11 46:2
59:3 76:12 92:23
112:2 115:25
120:14,19 126:4
126:12 131:18
133:24 150:8
167:6 173:25
174:7 175:23
178:7 181:18
193:4 199:24

211:6 229:8 230:5
230:13 235:2
241:8 250:12
284:18 298:9
301:19 305:23
306:10 311:21
318:24
**actuals** 74:23
133:22 237:7
**ad** 42:25 43:14
**add** 180:7 216:25
239:18 262:4,17
262:18,18,20
299:4
**added** 45:20 53:2
122:8
**addition** 75:11
209:11,19 276:20
276:21,22 277:22
287:3,8 292:10
**additional** 71:25
125:25 145:3,5
166:24 239:17
296:12,16
**additions** 150:21
198:10 199:6
228:9 276:10,14
276:25 277:7,10
280:23
**address** 18:7,12
52:20,24 53:4,7
88:6
**add-on** 166:20
**adjust** 29:24
**adjusted** 259:7
**adjustment** 172:1,4
292:21 331:11
**adjustments** 30:20
259:14,16,18
**adopted** 165:1
**adverse** 178:3
**adversely** 54:12
**advice** 52:7 217:18
217:25
**advise** 217:15,17
**advisory** 52:2
**affect** 68:24 70:10
71:13 127:20
165:4 167:6 183:9
203:3 244:11
245:23 246:1
252:20 253:8,14
287:12,14,24
306:5,8 319:6
**affected** 185:18
288:14 292:5,13
**affecting** 127:10
167:11 252:2,9

253:4 306:2
**affects** 32:3
**affix** 334:13
**affixed** 336:10
**aforesaid** 334:10
335:16,22
**after** 78:1 100:10
126:21 131:7
136:16 176:17
178:13 190:17,24
192:10 194:23
195:21,24 196:19
205:1 225:6,16
226:2 229:6
234:14,24 235:1
237:2 239:14
255:22 256:3
259:13 261:3
264:22 270:14
292:23 302:16
320:18 321:16
322:1,18 323:3
326:20
**afterwards** 234:10
335:18
**again** 18:2 100:4
110:9 172:12
202:6 206:2
208:20 210:15
232:6 241:20
242:2 243:24
258:4 260:25,25
260:25,25 264:7
284:10 325:7,7
**against** 169:23
170:6,17 223:6
**agencies** 160:4
163:21
**Agency** 195:18
221:4 306:25
**aggregate** 269:10
269:15
**ago** 37:2 100:14
168:20 202:22
222:16 264:3
273:18 274:7
319:14
**agree** 22:18 33:3
49:15 58:5,8
61:16 65:19,24
66:3,16,21 72:18
74:3 79:25 94:9
101:9,17 104:24
105:2 108:8 110:4
110:8 112:8
114:15 115:23
117:8 127:24,25
143:5 148:18

150:10 153:20
173:7,18 174:17
175:2 187:7
188:21 192:5,8
212:12 224:12,15
231:23,25 247:3,6
247:17,23,25
248:5,6,10,16,18
251:6,23,25
252:13,23 253:6
253:10,15,16
284:16,23 292:8
292:12,16,17,19
304:18 316:12,16
316:17
**agreed** 150:4 307:7
**agreeing** 248:20
**agreement** 315:6
**ahead** 280:15
320:20
**AICPA** 247:10
**aid** 154:2 318:4
319:4
**Akron** 230:16
320:22
**alberts** 3:3 8:17,17
33:19 54:7 79:1,9
160:23 245:1
269:20 298:22
**alleviate** 17:7,21
**allocate** 48:18 49:8
49:13 302:18
**allocated** 126:23
235:23 236:3
297:16
**allocates** 70:18
**allocating** 300:8
**allocation** 295:5,11
**allow** 51:22 330:1
**allowed** 90:25 91:4
92:18 179:1 263:2
**allowing** 109:13,20
**almost** 239:13
**along** 134:15 146:2
151:16 318:23
**already** 46:9 62:15
77:8 92:6 106:21
145:24 158:9
180:14 209:12,15
209:20 212:1
223:2
**although** 111:11
**Alvin** 36:18 98:5
184:5,6,14 285:10
286:1
**always** 38:12 89:10
89:19,21 175:20
175:24 238:22

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 7148-6    Filed 08/27/14    Entered 08/27/14 23:59:24    Page 87 of
116

246:23 296:21
302:22
**Amended** 6:13
**among** 72:3
**amount** 24:16 38:13
49:8,14,19 69:4
75:17 77:6,12,17
77:21 78:12
105:25 120:20
124:16 125:2
132:19 133:11
142:23,25 150:12
166:1 197:24
238:23 239:16
240:9 245:11
279:22 297:18
298:4 299:4
301:23 304:4
309:25 330:10
331:13
**amounts** 75:19 77:7
125:17 239:17
281:4 305:10
**analyses** 14:20
37:11 115:1
150:11 151:8,10
273:13 278:13
327:22
**analysts** 292:7,15
**analyzed** 13:16 77:2
153:2 281:16
319:15
**Anderson** 14:5
**and/or** 315:25
**annual** 193:9,10,20
193:25 194:4,7,18
194:20 233:21,24
295:18 317:10
**another** 31:1 90:22
92:2,19 138:3
142:4 164:18
180:2 214:18
225:24 238:5
265:10 267:5
272:1 280:7 288:5
294:9
**answer** 22:4,5 32:18
32:22,23,24 63:11
92:3 161:8 176:16
178:18 179:10
180:8 186:10
260:10,10 261:2,8
262:22 263:1
269:11 270:8
275:5 280:14
**answered** 32:16
90:20 178:14
184:4 260:9

332:21
**answers** 186:25
**Anthony** 301:7,9
**anticipate** 108:2
139:21 191:13,14
311:16
**anticipated** 307:25
332:18
**anticipates** 191:7
308:21
**anybody** 93:3,13
99:7 153:11 170:3
282:5 310:2
311:15 323:12
326:22 330:20
**anyone** 50:21 56:24
93:10 100:10
169:18 219:2,6
303:23 305:25
306:12,15 311:21
**anything** 19:6,25
21:2,8 43:17
44:10 45:8 53:5
64:17 68:6 76:16
98:24 107:13,19
107:23 108:20
127:14 133:19
145:19 172:8,13
212:10 216:23
222:9,10 232:11
241:18 243:1
249:19 271:6
301:1 305:13
315:23 332:25
**anytime** 217:10
**anywhere** 26:21
**appear** 256:14
**APPEARANCES**
2:1 3:1 4:1
**appeared** 335:7
**appears** 314:20
**applicable** 253:2
**applied** 95:15
163:24 207:9
**applies** 253:5 330:6
**apply** 90:25 105:20
156:17,18 158:14
**applying** 204:12
**apportioned** 198:13
277:12
**appraisal** 112:21
264:22
**appraiser** 112:25
**appraisers** 79:14
**appraiser's** 79:19
**approach** 172:16
**approval** 161:7
**approve** 160:25

221:9 223:3
**approximately** 75:5
105:25 121:15
183:10 206:13
240:4 296:2
**April** 37:5 130:9,9
130:11
**area** 13:14 140:1
141:18 202:1
230:22 231:4
232:4 322:11,21
322:23 323:2,7,10
323:19 324:25
325:6,12,16,19
**areas** 115:10 144:3
175:12 226:17
234:9 320:18
321:16,20 325:5
325:10 331:23,24
**arguing** 178:15
260:24
**arm's** 80:1,17 81:1
81:8,20,23 82:3,7
82:10 181:20,24
182:7,14,16,18
**around** 23:13 52:17
56:8 106:19,21
130:9 135:5 144:3
168:21 179:25
186:4 236:15
240:1 265:2
285:17 297:19
330:5
**arrived** 131:6 224:4
**art** 12:10 292:10,18
**article** 5:12,15,20
5:23 7:5,6 83:24
84:1 85:16 87:23
87:25 102:20
117:16 123:18,20
297:3 302:24
**articles** 84:3,6
101:15 102:8
121:23 302:10
**ascertain** 55:6
**aside** 92:8 93:8
**asked** 16:17,23
20:17,18,20 21:2
37:16 39:19 50:20
80:7 82:15 90:19
126:25 127:2
151:14 155:20,21
164:2 171:16,20
176:14 178:13
183:1 186:14,15
186:21 187:3,5
205:1 242:10
260:7 261:3,7

288:8 296:23
306:8 307:6
321:10 332:21
**asking** 11:20 15:24
63:14 90:22 92:13
140:15 175:17
176:24 177:8
179:5 188:3
260:18 262:21,24
264:23 284:4
**aspects** 132:12
**assess** 48:4 74:15,17
74:20 82:12,15,17
83:12 94:22 95:3
133:3
**assessed** 11:4 85:6
89:6 94:11 95:4,8
95:12,16 96:20
97:3 136:20
144:17,22 145:2,4
145:24 146:4,7,9
146:12,14,19,22
146:25 171:5
187:19 188:23
189:1,4,8,13,21
190:8 212:14,16
253:24 254:9,15
254:22 268:13,14
268:17,19,23
269:3,8,18,18
270:16,22 271:9
271:10,17
**assessing** 5:9 6:6
48:1 79:3 83:5,16
144:10 154:12
195:2 208:5 211:3
**assessment** 11:2,3
47:23 82:23 83:11
83:15 95:24 118:2
144:14 190:8,9
204:21 245:15
269:9 270:3
**assessments** 25:22
26:1 82:16,18
83:2 95:14,20,23
96:19 102:15
117:21 148:2
188:18 210:21
211:8,19 243:22
244:3 245:13
268:25 269:6,23
271:2
**assessor** 27:17 64:9
81:6 189:4
**assessor's** 46:24,25
48:3 63:21 64:1,3
64:5,13 80:11
101:4 113:21

114:6 158:10
182:6 285:21
**assign** 96:13 224:1
262:15
**assigned** 102:25
103:2,3
**assist** 42:9 132:2
**assistance** 20:5
130:17 131:24
**assisted** 55:22
**associated** 156:14
232:14 309:5
**association** 8:2
116:9 199:10,14
200:2 201:22
289:2
**assume** 160:5
163:24 192:18
216:20 265:5
308:24 332:24
**assumed** 29:2 76:20
190:1 205:23
206:6 214:25
236:22 264:18
277:24
**assumes** 203:14
278:6 314:1
**assuming** 136:11
160:25 214:11
225:10 313:21
**assumption** 159:23
163:15 187:18,21
190:14 203:18
206:11,16,22
208:10 220:23
225:15,18 240:2
240:10,24 241:6
258:8,16 278:10
278:12,16,19
296:1 307:6
309:24
**assumptions** 29:11
29:11,13,17,21
36:5,9,15 41:13
42:13 44:10,18
59:12,15,21,23,25
60:2,3,5,8,14,18
65:21,23 67:9
77:9,14 78:13
134:14 150:24
151:1,5 159:19
198:23 202:16
224:19 225:4
233:18,25 242:11
242:12 249:22
250:4 251:4,19
252:7,11 259:6,20
278:14 279:9

280:3 292:6,14
316:1,2 320:17
**assurance** 2:21
247:14
**Assured** 3:19
**attach** 120:15,20
**attained** 124:15
**attempt** 125:8
**attempting** 293:7
**attestation** 247:8,9
**attorneys** 336:3
**attorney-client** 9:23
**auction** 119:17
123:19,21 124:6
124:13,18
**auctioned** 125:22
**auctions** 76:5
119:21,23
**audited** 43:25 44:1
45:14 317:10,14
**auditing** 52:1
**auditors** 123:10,14
**audits** 123:7
**August** 161:1
**author** 301:8
**auto** 231:5,11,15,17
231:21,25 232:2,5
232:17 323:8
**available** 29:9 34:17
34:23 45:12 61:10
62:8 65:3 157:12
157:13 168:4,7,12
168:15 197:6,7
201:3,23 245:8
247:19
**Avenue** 2:6 4:5 8:4
**average** 116:5 124:1
140:23 141:7
193:22 194:1
199:14,21 202:21
224:3 273:5 274:3
274:4,8,11,14,18
289:13 290:8,12
290:24
**avoiding** 109:19
**aware** 10:5 14:23
17:16 19:18 27:25
35:5 52:23 53:15
61:15 64:3,8,12
75:4,7,9 79:18
80:5,22 81:11,14
81:18,24 82:1
83:23 84:14,16,19
85:11 86:2 88:4,7
88:8,11,12,16,17
89:19,24 90:24
98:16 108:24
109:10 113:2

117:14 119:12
123:6,10 124:5,7
132:18,23 142:18
142:21 153:10,14
163:11 169:13,18
169:22 170:2
187:14,16 212:1,4
212:5,6 294:15,18
303:6 318:12
323:20 324:9,11
**away** 144:25
**awkward** 153:5
**a.m** 1:16 8:8 60:20
60:24 90:6,9

**B**

**B** 5:7 194:2 226:25
**back** 42:22 43:9,20
44:2 45:10 46:2
60:23 88:4 90:8
100:14 122:20
124:23 125:18
126:9 142:15
168:19 180:23
189:24 194:12,13
216:25 219:5
220:10 226:18
246:9 270:25
308:3 312:23
319:25
**background** 41:16
149:2
**balance** 302:14
**balanced** 302:17,20
302:22
**Ballard** 40:24 41:5
41:15,24 42:3,6
55:25 56:14
130:17,23 131:25
229:7
**Ballard's** 56:10
**ballot** 222:17
**ballpark** 105:15
**Bank** 119:9,14,16
119:23 120:2
123:19 124:5,12
124:17 125:4,10
125:15,19 126:5
126:14,19 127:1,2
127:6,9
**bankruptcies** 73:18
324:17
**bankruptcy** 1:1
5:22 8:9 13:4
17:25 20:1 51:8
51:12 73:16
234:19 241:20
242:2 293:8,17

297:25 324:1,7,12
324:20 334:1
335:11
**Bank's** 127:3,7,11
127:17
**bar** 92:9
**barred** 90:23
**base** 46:7 71:17
80:1 108:6 119:6
139:15 154:21
167:3 172:22
174:4 183:10
191:2 198:10
199:6 222:2,2,5
226:9 227:23
255:16 262:16
275:25 276:6,10
276:10,16,19,21
276:23 277:1,5,7
277:10,15,17,22
280:21 287:4,5,9
287:12,16,24
288:2,13
**based** 30:21 36:5,9
38:24 59:21,24
60:1,3,5,19 70:7
77:9,15 96:5
104:16 117:8
131:1 159:7,9
186:23 190:22,23
196:17 198:13
203:18 206:7,16
208:16,23 210:4
210:10 218:5
220:23 224:19
225:4 226:16
233:18,25 235:7
236:18,23,24
238:9 247:18
252:6 254:1,17
255:13,21 256:1
257:20,21 258:7
258:16,25 259:14
260:4 264:19,24
271:15 277:13
281:16,19 289:10
**baseline** 225:9
**bases** 71:24 72:6,10
72:14 83:6 174:4
174:10 193:1
227:10,19 256:4
262:6,10,15 264:1
279:20 288:15
**basically** 33:16 44:8
49:14 56:20
143:22 211:19
272:21
**basing** 310:22

**basis** 64:21 81:19
82:2,8 121:17
260:15 301:21
**bathroom** 91:9,11
91:12,16,17,19
**Beatty** 36:18 285:11
**became** 61:10 171:9
**become** 62:8
**becomes** 62:8 74:5
108:6 226:9
**before** 1:12 11:4,12
11:15,22 13:11,15
20:8,11 22:23
23:1 24:2,2,11,18
24:25 25:8,15,22
37:6 42:7 66:13
67:19,23 78:22
79:23 81:11,15,21
82:4 84:14,21
86:4 87:14,16,25
90:19 92:11 94:3
110:18 111:8
122:21 124:4
133:5,21 136:18
137:25 144:11
154:13 155:3
163:23 177:9
183:24 184:10
185:19 186:7
187:14 194:23
195:25 201:4
209:12,14,15
214:24 226:19
234:19,19 246:15
249:7 260:11
271:1 273:15
277:4 279:4
290:20 296:13,14
296:17 298:10,24
302:1 312:7,13
314:11 327:1
334:16 335:8
**began** 46:8
**begin** 25:11 98:9
**beginning** 8:12
228:10 318:15
**begun** 88:17
**behalf** 8:18,22 9:19
9:20 10:1
**being** 8:6 11:18
45:12 54:3 84:25
94:11 167:24
171:13 174:7
176:8 198:15
199:18,24 200:6
200:14,18 232:13
233:11,14 252:11
252:25 257:22

264:12 265:9
269:7 274:12
276:15,22 278:14
287:5 288:14
299:25 306:6
317:20 328:19
329:24,25 334:8
**belief** 225:22
**believe** 100:15
101:21 102:15,19
104:2 128:13
155:7 194:13
231:10 246:17
307:14 313:3
326:18
**believes** 88:13 89:8
94:14 307:18
**below** 138:11 203:2
203:2,9 204:22
228:25 230:16
240:17 269:8
**benchmark** 138:20
138:22,24 139:5
**benefit** 212:9
**benefits** 10:20
**besides** 127:14
**best** 61:20 223:11
309:15
**better** 70:1 130:20
198:6 203:12
231:17,18,21,22
232:9
**between** 20:13
70:21 72:6 111:12
121:8 125:20
130:10 131:12
136:11 154:20
157:10 192:3
199:15 203:15,15
209:2 228:1
229:18 231:5,7,11
239:11,20 248:1
278:7,17 285:15
285:15 298:1
299:17 317:12
**beyond** 146:12
157:14 216:9
251:22 267:3
308:9
**biases** 292:6,14
**bids** 123:23
**big** 207:17 208:7
233:7
**bigger** 287:9
**biggest** 50:14
**billable** 56:5,6,8,10
**billion** 121:15
144:18,19,21

145:1 146:2,6
297:8,19 323:20
324:13
**Billions** 297:5
**bills** 43:14 88:5
107:7 160:11
226:11 264:9
**Birmingham** 4:6
**birthday** 37:5
**bit** 57:5 135:6 142:6
294:7
**blight** 10:24 108:2,4
108:5,8,12,16,17
120:6,9,12,16,21
120:23 121:3,5,9
132:3 142:20,22
143:2,6,8,10,12
143:16,19,25
144:2 148:8,15,16
155:25 227:16
**blighted** 107:5,10
119:17,23 124:18
**BLS** 5:24 122:14
**board** 63:16 157:4
157:18,24 196:10
289:6
**Bob** 31:12 41:13
55:25 122:15
130:16 131:24
151:16 283:12
318:23
**boilerplate** 300:7
**book** 45:13
**boss** 25:4
**both** 16:24 29:22
69:8 91:20 175:22
232:2 234:5
292:18 297:7
**bottom** 78:25 79:11
80:24 112:12
158:6 203:13
205:22 206:5
220:17 228:8
257:4 275:24
295:24 318:3
328:14
**break** 60:21 63:1,6
90:4,7 91:9,13
142:1,4,13 178:1
180:18,21 246:3,8
312:18,21
**breakdown** 279:4
**bring** 206:12
**Brookings** 6:10
229:22,23 230:2
321:1
**brought** 16:21
315:9

**Buckfire** 57:13,18
276:8
**Buckfire's** 57:11
**budget** 45:13
195:14,16 235:9
251:3 294:12,17
294:23 297:9
300:9 302:14,18
302:20,22 304:12
**budgeted** 303:11
**budgets** 294:22
**budget's** 294:20
**build** 123:19 259:6
**building** 7:2 154:18
196:25 197:8,18
199:2 277:2,3
280:18 291:6
328:1
**buildings** 281:11
**built** 257:9 276:22
**bulk** 51:25
**bullet** 78:25 79:12
80:25
**burden** 56:23
169:10 217:23
**Bureau** 127:22
128:20,23 131:8
**bureaucracy** 85:24
86:11,19 87:8
**business** 5:23 39:19
40:4,13 51:25
52:3,7 56:23
114:23 164:22
165:19,21,23
169:3 183:5,8
216:4 219:18
220:11,12
**businesses** 32:1
218:2
**busy** 39:11
**buying** 274:25

— — — — — — — —
**C**
— — — — — — — —
**C** 158:24 190:25
335:3
**CAFR** 317:17,18
**calculate** 165:5
193:9,17,25 194:7
256:7,9,10 261:23
267:19 268:16
310:8
**calculated** 28:19
131:18 254:17
256:21 258:24
259:8 261:15,21
262:2 263:13,21
263:23 267:16
268:8 297:22
**calculating** 70:12

201:12 268:5
276:8
**calculation** 125:1
192:22 258:1
261:18 262:24
264:2 278:4,6
287:15 301:12
**calculations** 289:21
313:20
**calendar** 264:10
**call** 142:4 184:5
**called** 1:9 34:16
93:4 164:22
292:20
**calls** 57:1,19 58:3
151:12
**came** 83:2 163:16
184:12 212:1,3
308:14 310:23
332:8,13
**capacity** 13:19
**Caper** 36:19
**capita** 110:5,11,25
111:4 112:13
**capital** 2:21 152:1
**capped** 146:17
147:2,4,5,10,14
147:22 148:1,3
201:19 203:2,9
204:19,20,22
273:17
**car** 232:7,8
**care** 310:21
**Carolina** 187:5
**caroline** 1:8 5:3 6:9
8:6 9:13 334:8,14
335:9,13
**cars** 232:13
**case** 1:5 8:10 10:5
13:20,23 16:8
25:24 26:8,10
27:2 46:8 51:12
55:3 57:11 80:7
147:22 152:19
155:19,21 156:10
159:24 160:13,15
162:4 179:3 180:5
192:24 195:14
204:16 208:12
216:15 224:10
227:8,15 252:16
263:24 264:11
293:13 314:14
321:19 323:5
327:1 334:5
**cases** 25:5,5 176:4,4
**Case-Shiller** 6:2,4
7:9 114:12,15,19

114:24 115:2,4,6
115:10,13,16
116:1,2,6 134:21
134:25 136:3,5,13
136:21 137:13
138:4,5 139:4,22
140:7,11,13,16
200:9 201:25
265:23 266:1,3,5
266:19,21,25
267:9,10 269:16
271:12 282:22,23
316:20,22
**casinos** 12:5 174:8
**categorical** 92:4
**categories** 208:10
257:20
**category** 255:25
**cause** 335:9,16
**caused** 155:14
**causes** 15:15,22
54:1 70:22
**causing** 15:19 210:8
210:16
**census** 278:22
**certain** 13:18 18:18
18:24,25 21:22
24:7 40:6 41:11
41:22 44:2 49:8
49:11 60:17 71:4
78:12 113:11
144:1 150:11
155:9 157:8
158:17 164:10,12
176:11 188:20
193:17,21,22
194:21 216:13,23
217:23 222:19
226:7 236:21
252:7 255:22
259:19 263:10
264:13 266:18
275:19 279:9
300:23 313:21
330:2,13 331:19
332:11
**certainly** 114:2
126:17 133:2
188:22 219:11
325:22
**certified** 8:2 43:16
**certify** 335:6,13,23
336:1,5
**CHADBOURNE**
3:12
**Chamber** 5:21
**chance** 161:25
162:3,7,11,13

202:2 222:13
280:10,15
**CHANDLER** 3:13
**change** 29:2,11,13
29:15,18 30:8,13
30:14 52:17,18
62:16 95:14 99:22
138:12,15 150:12
150:20,24,24
151:3,18 159:12
159:15,17 160:16
161:21 162:14,22
163:4,12 164:2,4
165:15 167:10
174:12 196:1
203:21 204:2
213:17,25 214:12
218:6,8,16,19,22
240:24 248:13
254:8,9,15 255:3
255:8,10 265:23
267:17,22 268:14
268:16 272:10
273:4 279:17,25
287:5,23 288:3,12
289:7 291:16
295:4,11 296:1,2
308:18 318:5
329:21
**changed** 37:23
95:21,24 96:2
151:6,23 160:6
165:7 217:6,7
219:7,12,14,16,19
219:20,24 220:5,6
220:14 242:17
289:14 299:19
**changes** 6:21 62:2
138:6 150:17
160:15 163:2,3,9
163:25 164:8,10
164:15,25 165:4,6
165:16,18,19
169:1,3,12,14,16
172:2,5 173:3,19
173:23 175:19
214:4,12 217:10
218:14 242:24,24
250:8 253:23
255:12 267:20,25
268:9 285:4,19
286:19 287:14
288:2,6 296:16
332:18
**changing** 29:8,20
150:16 162:18
167:12
**Chapter** 1:4 13:3

17:13,21 73:16,17
324:6,12,20 334:4
characterization
331:6
characterize 103:14
characterized 94:5
185:20 186:8
characterizing
183:14
charge 169:24
245:13
chargeback 126:1
charged 86:17
126:9 140:3
153:18 282:4
charges 47:13
charge-back 124:24
Charles 28:1
chart 110:24 111:6
112:11,16 144:14
295:15
check 17:1 43:3,20
44:2 45:15 268:1
checked 42:25
98:12
Chicago 1:15 2:17
8:7 230:18,23
326:1 335:9
choose 78:13 168:8
207:22
chosen 256:20
Chris 8:14
CHRISTOPHER
2:4
circumstances
248:3 252:2,9,20
253:3,7,14
cite 233:16
cited 64:17,21
cities 13:18 14:11
15:6,9 19:16,20
46:17,19 48:18
49:21 52:19,22,23
53:1,2,6,12,15,22
54:1,6,13,14,23
104:13,15,17,21
108:21,25 109:3
110:6,12,25 111:3
111:14,20 112:3,7
112:10,13,15,17
112:18,19 118:1
118:20 138:24
139:5,10,12 143:5
143:7 148:10,15
148:17 166:16
167:9,18 185:3
229:19 230:14
286:15 290:11,14

301:4,13,19,24
302:8 303:18
309:6 310:8,25
321:5,10,13,17,19
321:22,24 322:3,5
322:17 323:15
325:23
citizens 5:18 34:11
34:19,21,25 35:2
35:7,17,18 36:1
city's 68:6 84:8,17
86:16,25 87:6
103:14,16 108:11
108:14,16 120:6
123:8,14 183:10
190:11 227:9,12
228:21 251:3,22
252:2,7,9 253:4,8
253:12 293:1
294:12 296:23
311:24 313:11
332:18
city-by-city 297:12
Civil 1:10
clarify 9:11 25:3
156:5
clarifying 311:6
class 7:10 158:25
159:11,14
clear 90:21 181:7
314:22
Cleveland 230:19
320:22
clients 14:3 24:6
56:20 63:14 215:8
312:11
client's 247:17,21
climate 227:10,13
228:2
climb 228:22
Cline 31:12 55:25
130:16,23 131:24
151:17 173:2
174:15 229:5,7
318:23
Cline's 27:22 172:6
172:10,16
coaching 179:9
260:12,13
COD 285:20
coinciding 225:19
collaboration
154:20
collapsed 270:10
collect 31:21 66:4,8
66:16,18,22,24
75:5 76:3 165:15
169:25 225:10

314:2
collected 11:18
75:20,25 77:13
107:8 166:1
171:17 184:23
257:22 262:14
284:1,11 296:2
collecting 11:22
48:6 103:8,14
187:4
collections 11:17
28:20,24 69:3
76:9 78:9 84:5
87:7 106:5 108:22
109:1,5,8 112:3,6
113:4,9,20 114:3
114:7 173:10,11
174:8 175:10,21
175:24 178:22
191:2 195:9
225:13 253:5
264:18,22 297:8
313:24 314:5,7
317:3,16,17
collects 47:11,17
168:3,7
colloquy 177:20
column 267:14
combined 274:2
295:18
come 74:23 84:19
96:15,16 97:9
133:12 169:17
186:24 187:1
188:15,17 190:7
193:4 219:5 223:8
228:13 255:14
279:9
comes 61:16 167:19
167:22
comfortable 21:11
coming 17:16
121:18 124:23
167:25 222:17
297:21
comment 86:22
180:2 238:9 302:1
309:12 316:9
commerce 121:12
121:13 144:3
commercial 72:12
162:8 185:14,17
207:3,7,11,15,17
207:19 208:2,5,8
208:14 220:19
224:18 225:2
227:20 228:10
262:7

Commission 43:2
192:15 194:13
Committee 3:9 8:18
communicated 93:3
communities 297:4
297:10
companies 105:10
122:4 232:3,4
Company 4:10
comparable 46:20
73:10 230:13
272:21 290:11
compare 74:18
157:15 202:8
240:15 266:6
268:17
compared 20:24
74:24 103:19
110:5,12 112:3,10
117:25 118:19
129:7 169:5
197:25 209:9
237:22,24 239:18
240:5,15 241:1
277:25 289:12
290:3 291:14
comparing 74:22
comparison 116:17
complete 67:9
completed 93:22
101:3 186:16
completely 241:15
complex 218:11
compliance 288:9
288:11,12,15,18
288:22
component 201:15
components 23:9
30:19 31:14,22
49:9 50:4 198:10
235:24 257:22
composite 138:19
compound 193:10
compounded 193:9
193:20,25 194:4,7
194:18,20
comprehensive
317:10
Computer-Aided
335:19
concept 96:7
conceptually
286:23
concerned 71:23
148:5
concluded 85:22
86:8
concluding 206:23

conclusion 83:3
84:20 89:13 97:2
97:4,7
conclusions 86:16
97:9 150:4 247:21
301:22
condition 16:4
33:17 35:4,9
conditions 191:8,14
conducted 55:6,11
64:1 67:19 86:3
conducting 65:24
66:3,21,23 97:13
conference 160:3
212:2,5 320:4
confirm 62:14,24
confirmation 93:25
94:1,3
confirmed 160:13
confused 292:25
Congressional
195:14,16 235:9
conjunction 165:12
consensus 64:25
68:8,11 163:19
319:23 320:1,4,9
329:1,5,8
consequences
245:20
consider 17:13
61:25 171:16
176:12 178:23
265:25 288:10
consistent 45:3,16
131:2 146:8
172:10,16,19
182:5 249:21
250:5 290:22
295:20 297:13
316:4,14 318:5
consisting 334:12
constant 33:4,7,10
33:13 135:15,18
159:25 163:16
166:23 214:14,20
214:25 216:21
236:6,9 307:7
309:21
constitution 166:15
constitutional 48:14
70:8 166:11,18,21
167:19 306:4
307:11,21 319:8
328:24
construct 293:6
constructed 136:2
293:12 314:23
315:5

**constructing** 293:11
**construction** 32:1
197:19,23,24
198:2,4,8,16,20
199:3 277:11,13
277:21 281:4,7,11
281:15,22 282:1,2
282:6,9,11,15
291:10 293:21
294:3
**consult** 52:3 288:16
288:21
**consultants** 43:19
63:23 113:4,8
**consulted** 116:3
163:20 195:13
**consulting** 25:8
**contained** 248:12
254:5
**context** 23:3 24:5
24:25 25:2 67:24
68:1 312:9
**contingencies**
251:21
**continue** 116:21
139:22 228:22
308:25 324:25
**continued** 3:1 4:1
158:1 209:23,25
235:10 281:4
**continues** 267:10
**continuing** 136:25
**contract** 43:21
98:11,12,15,18,24
**contractor** 97:21
**contributed** 57:22
107:12,13,19,23
290:7 314:14
**contributing** 233:1
**contribution** 155:24
**control** 79:6 251:22
310:12 330:12
**conversation** 63:5
87:10 100:16
109:16,23 124:21
183:21 286:2
306:12,15,19,21
306:21,22 308:13
310:23 311:21
326:19
**conversations** 17:23
36:12,21,22 40:9
42:14 43:18 44:8
44:24 47:9 60:6
77:3 84:24 88:20
88:23,24 100:18
114:5 122:17
143:20 144:6

169:17 184:1,4,13
184:17,20 185:23
265:1 285:6,7,10
286:1 300:13,16
306:23,24 311:19
313:17 316:8
317:7 326:11,21
330:24
**Conway** 56:25 57:1
57:3 103:4 293:24
**cook** 1:13 335:5
336:17
**coordinate** 57:18
**coordinating** 57:13
57:15 165:10
**copy** 57:9 86:7
117:15 134:19
144:8 246:13
291:19,20
**corner** 250:17
**Corp** 3:20 8:3
**corporate** 34:5
173:20 217:2,5,7
219:20 220:13
238:6,8
**corporations** 105:3
105:5
**corrected** 179:24
**Correspondence**
7:7
**cost** 14:22,22 15:4
54:20 281:8
291:10 297:4
**costs** 18:7 55:12
277:11 281:11
294:3
**council** 5:18 34:11
34:20,22,25 35:3
35:7 56:22 128:10
294:13
**counsel** 4:23 8:11
8:12,19 142:3
329:9 335:24
336:5
**counted** 176:15
**counties** 13:18
128:15 323:16
**country** 53:12 104:4
117:22 118:16
**county** 1:13 76:2,3
76:7,7,21,25
77:17 89:7,8,14
89:19 94:10,13,17
94:19,23 95:4,9
95:12,18 96:11,12
96:23 97:5,10
126:7 189:19,20
197:1,8 198:2,12

198:14 205:2,3,6
205:12,15,19
212:13,15,19
257:12 259:23
262:19 277:12,13
281:16,19,22
282:3 335:3,5,5
336:17
**county's** 96:21 97:2
97:11 146:19
205:9
**couple** 107:4 230:25
268:24 271:21,22
278:2 286:1
302:25 329:11
332:2
**course** 38:17 137:4
217:16
**court** 1:1 8:9,25
24:22 92:7 176:22
177:7,17 249:24
334:1 335:11
**Courts** 1:11
**cover** 115:11 330:7
**covered** 204:3
331:23,25 332:1
**covers** 74:4
**Crain's** 5:23 123:20
**CRC** 55:19 110:18
111:22
**create** 282:21 315:5
327:16
**created** 46:14
210:21 272:2,3
282:19 283:7
285:13 327:10
328:6,11,12,13
329:25
**creating** 36:1,3
**creators** 115:16
**creditors** 51:7 57:20
65:15,18 170:24
**criteria** 322:7,9
**criticism** 93:15
149:10,19
**criticisms** 93:14,17
93:19 94:5
**CRR** 1:24
**CSR** 1:24
**culture** 85:23 86:10
86:18
**cumulative** 295:5
**cumulatively** 15:2
**curiosity** 313:6
**current** 18:18 19:2
19:6 39:10 101:2
129:6,16 160:5,7
160:10,20 161:3

161:15,17,20
162:14 163:24
169:22 170:15
214:17,17 216:24
225:12 238:23
240:3,5,7,8,11,14
240:16,24 331:4
**currently** 65:7
94:16 129:3,10,14
129:21 160:24
169:8,9 269:2
**cut** 14:10 15:16,20
18:7 52:23 55:12
137:3,6,9,12
301:23 302:12
**cuts** 14:21 15:3,8
299:5,8 300:11
302:3,7
**CV** 151:25
**cycle** 300:9

_____

**D**
**D** 5:1 195:9
**daily** 56:3 87:5
**Dan** 110:3 124:21
**dance** 186:5
**date** 84:18 161:3
246:16 249:23
285:9 320:7
**Dated** 7:8
**day** 1:15 2:2 8:15
180:16 223:7,13
228:19 258:11
279:21 334:16
336:10
**days** 84:10
**deal** 173:13 270:12
**dealing** 189:13,20
223:25
**deals** 305:18
**dealt** 85:9
**debate** 162:18
**debt** 158:21
**debtor** 1:6 2:12 8:8
334:6
**decade** 15:3 232:19
234:9 297:6,20
298:15 300:15
320:18 321:8,13
321:16,20,21,25
321:25 322:4,11
322:12,18,18,22
322:22,25 323:3,7
323:19 324:5
325:23 326:3
**decades** 230:25
326:2
**December** 116:13

116:18,22 130:11
183:8
**decide** 33:21 48:17
49:8 159:13
168:16 257:15
264:14
**decided** 33:14 49:21
91:22 169:3
234:23 306:6
309:19
**decides** 49:12,20
168:14
**decision** 49:16,19
49:22,24,25 50:1
105:1 247:18
310:22
**decisions** 52:5
**decline** 107:12,14
107:20,24 111:11
136:25 206:11
210:9 234:10
275:17 278:7,17
320:19 321:6,9,14
321:17,23 322:1,4
322:11,19,22
323:3 324:5
325:24 326:2
**declined** 111:15
322:24
**declines** 54:11
136:9 210:10
275:10
**declining** 207:16
321:21
**decrease** 29:19
99:10 131:3 136:2
136:20 145:24
187:25 188:13
217:13 237:20
**decreased** 107:2
122:23 123:3
162:5 209:16
295:17
**decreases** 309:10,13
**decreasing** 131:7
165:21,22 238:1
**define** 146:1
**definition** 34:20
66:15 84:24 224:8
**degree** 41:17
**delinquent** 101:11
283:25 284:9,13
284:17
**demand** 119:22
**dentons** 3:2 8:17
**Department** 236:24
328:15
**departments** 85:23

86:9,17
**depend** 243:4,5
**depended** 30:2
**dependent** 31:19
251:2
**depending** 194:24
203:23 242:17
**depends** 22:12
32:14 33:1 62:22
66:10 67:7,12
71:21 76:23
129:19 135:13,19
135:20 169:7
198:19 233:12
243:9,11,13,16,20
244:1 256:17
269:7,9 331:14
**deponent** 333:3
334:9
**deposed** 9:4
**deposition** 1:8 5:17
8:6 27:8,10 90:14
91:4 92:9,16
99:13 161:4
176:19,20 177:6,9
177:25 179:2
180:13 181:15
185:22 221:21
334:10,12 335:24
336:2,3
**depositions** 1:12
27:1,5,6 90:25
92:1,17
**describe** 165:11
**described** 264:2
302:4
**describes** 138:4
**description** 5:8 6:1
7:1 255:1
**designed** 270:12
**destiny** 310:12
**detail** 38:15 261:25
293:2
**detailed** 37:16
150:15 153:7
210:7
**details** 21:20 100:20
100:24 143:1,4
171:3
**determination** 83:7
96:10
**determine** 54:23
55:11 101:5 102:5
120:1,6 121:5
152:13 153:2
156:21 164:5
191:25 193:15
**determined** 81:1

94:10 100:2
**determines** 205:16
**determining** 96:19
97:1
**Detroit's** 15:19
33:17 35:8 83:25
111:11 118:3
122:10 138:25
139:3,9 163:5,10
198:14 202:8
**Detroit-specific**
128:11 202:2
221:18 222:11
**developed** 181:25
**developing** 46:17
190:14 198:23
292:7,15
**deviate** 234:24
**differ** 241:5 263:14
263:16
**difference** 20:13
146:16 274:13
299:17
**differences** 20:23
248:1,4
**different** 20:16
30:19 31:13 58:7
58:12 59:8 71:24
72:10 77:9,9,14
77:14 82:24 95:13
95:19 96:4,7,20
97:11 102:25
103:2 110:25
116:4 151:21
154:2 155:22
158:13,14 166:3
172:20,21,22,22
172:24 173:12,16
174:1,4,9 175:10
175:11 185:16
193:1,1 194:10,10
194:24 195:1,5,6
195:7 202:15,16
202:17 217:16,19
227:14 232:10
255:7,24 257:21
258:7 259:20
260:10 262:9
266:23 304:22,23
310:19 317:19,19
317:21 319:1
329:24
**differently** 96:16
173:14
**differs** 288:15
**difficult** 228:3
**dipompeo** 2:4 8:14
**dire** 302:16

**direct** 70:21 71:14
72:5 121:8 250:15
**directing** 63:11
**direction** 268:24
**directly** 70:10 306:5
**disclaimer** 246:21
247:4
**disclaimers** 316:14
**disclose** 326:16
**disclosure** 6:13
30:16 59:1 145:18
237:13 249:9,11
249:20,23 250:1,3
250:5,9,13 251:1
252:5
**discrepancies**
317:12
**discretion** 33:17
49:13,17 65:20
**discretionary** 49:15
**discuss** 195:3
**discussed** 100:13
149:6 199:10
235:8 257:9
**discussing** 165:17
183:1,3
**discussion** 7:13
283:21
**discussions** 36:16
36:17 55:25 229:7
285:20,24 330:20
**dismissed** 51:12
**dispute** 81:3 86:15
118:9,13,14
121:17 301:11,21
**dissimilar** 266:11
266:12
**distress** 15:7,12,14
15:16,20 16:3
17:3,7,14,22 18:8
18:13 52:20,24
53:4,8,14,16,18
53:24 54:3
**distributed** 309:6
**distribution** 13:18
70:8
**district** 1:2,11 8:9
334:2 335:11
**divide** 263:4
**divided** 317:17
**Division** 5:10 6:7
79:4 144:10
**document** 78:18,22
78:22 79:2,12,24
81:13 83:22 87:9
87:14 90:10
110:15 117:13
121:10,14 123:16

128:17 134:18
138:1 144:7,11
145:11 150:9
182:22 229:24
246:12,15,21
249:5,7,16 253:18
265:7 271:24
278:23 280:6
282:17 283:4,15
283:16 284:5
285:3,4,8,12,18
288:24 291:3,24
297:1 301:6
307:25 314:8
316:18,23,25
317:22,24 318:3
318:21 320:14
325:3 326:10,13
326:15,18 327:8
327:10,16,18,25
328:8,11,12
**documents** 34:10
182:12 315:10
327:11
**doing** 16:6,15 18:10
18:14 28:18 41:12
48:4 57:14 66:7,9
66:17 71:23 76:5
78:3 97:21 103:7
114:10 122:14
141:19 145:20
154:6 155:23
156:7 163:19
164:18,24 168:17
178:23 196:19
204:15 214:21
222:15,15 232:8
255:22 256:3
278:13,13 287:18
287:21,25 288:4
290:1 294:21
315:20 316:21
323:9,16 327:21
331:14
**dollar** 120:15,20
122:3 197:24
**dollars** 14:15,17
121:3 124:6
142:19 150:14
298:14,21 323:21
324:14
**domestic** 232:3
**donation** 132:11,15
**donations** 132:8,20
132:25 133:3,6,12
133:13
**door** 175:1,23
**double-dipping**

84:10
**Doug** 8:13
**DOUGLAS** 2:15
**down** 14:13,14,18
14:19 62:15
130:11 136:9
158:5 181:18
190:25 196:14
203:12 226:12
228:8 250:16,17
257:4 265:22
**downs** 196:4
**downturns** 228:16
**downward** 130:10
**Draft** 5:14
**dramatically**
232:19
**drawn** 123:23
**Dreier** 8:3
**drive** 1:14 72:17
335:8
**driven** 264:13
**driver** 30:23 31:1
32:5,8 175:5,7
233:7
**drivers** 29:16 30:12
31:4,8,16,23 32:2
32:11 33:25 175:3
232:21
**driving** 69:8
**drop** 204:9,14 206:5
208:7,13,15,22
209:1,2,5 210:19
210:22,25 274:18
**dropped** 274:15
**drops** 209:11,14
**due** 183:4 253:13
**duly** 9:14 334:8
335:14
**during** 17:19,23
29:13 63:1,6
99:13 109:6
117:23 119:19
122:12 129:10,11
129:12,14,20
159:20 177:22
191:4 192:25
193:21 194:1,22
196:2,3,8 200:14
200:18 207:13,14
213:16 217:9
230:4,12 234:17
236:9 258:9
267:23 270:24
274:8,19 275:16
295:6 298:6 311:5
323:14,16,18
324:1

**duty** 309:3
**dysfunctional**
  292:24
**D(ii)** 195:9
**D.C** 3:6
**D.D** 2:7

**E**

**E** 4:4 5:1,7 8:21
  293:1
**each** 120:22 159:11
  159:14 174:1,9
  175:9 203:21
  236:16,19,21
  255:15,16,20,24
  255:25 256:4
  257:11 258:25
  260:2 261:15,23
  262:5,6,9,14,16
  264:1 269:7 300:8
  302:23 311:4
  327:20
**earlier** 55:19 65:12
  160:2 201:5 210:7
  216:22 226:20
  235:8 257:10
  276:14 279:15
  280:19 288:1
  297:12 311:19
  313:16 321:3
**East** 3:5
**eastern** 1:2 8:9
  334:2 335:11
**economic** 14:5
  31:25 48:16 56:19
  69:7,18,24 70:1,3
  70:5,9 72:13
  107:21 120:10
  133:7 152:1,5,8,8
  152:13,22 153:3,6
  153:9,11,12,22
  154:6,11,12,18,23
  154:25,25 155:5
  155:11,13,16,18
  155:24 156:6,20
  156:21 167:23
  191:3,8,14 227:9
  227:13 228:2
  232:22 233:2,3
  251:20
**economist** 318:18
  319:20
**economists** 115:20
  115:22 318:9,17
  318:25 319:17
**economy** 127:8,10
  132:3,11,15 153:8
  156:2 191:17

**231**:18,21 233:6
  274:23
**educational** 41:16
**effect** 28:19 71:1
  73:7 120:2,6
  127:8,12,17
  135:16 155:19
  168:11,11 188:18
  192:1 203:9
  205:24 206:17
  214:19,21 218:19
  227:6 277:25
  280:1 330:23
  331:4,8
**effective** 217:22
**effects** 148:14
  164:14
**effort** 108:3 148:8
**efforts** 54:16 101:22
  102:23 109:8
  114:8,10 120:7
  143:13 317:8
**eight** 77:24 168:19
**either** 21:25 67:7
  74:12 147:16
  242:18 268:24
  327:6
**elected** 49:21,24
  243:11,16 244:10
**eligibility** 88:10
**eliminate** 241:15,17
**eliminated** 169:2
  220:7 240:18
  307:3 308:11
  309:1,5,16,22
  310:3,17 326:17
**eliminates** 241:25
**Elisa** 8:3
**ELLIS** 2:14
**elsewhere** 158:15
  316:15 324:17
**else's** 92:14 294:6
**emerge** 293:8
**emergency** 17:3,4,6
  53:23 54:3
**employ** 97:22
**employee** 248:19
**employment** 69:7
  69:14,23 71:10,12
  71:14,15,18,21,25
  72:2,6,10,14,18
  73:2,7 122:10,17
  122:23 123:3
  127:23 128:2,20
  128:24 129:2,6,9
  129:13,16,21
  130:2,6,14,17,25
  131:4,7,14,18

**232**:15,17 233:8,9
  233:13,13
**enacted** 217:11
**end** 38:21 145:8
  157:18 196:9
  223:7,13 228:19
  235:13 258:11
  279:12,13,21
  295:3
**endeavor** 66:8,16
  66:18,22
**ended** 169:1 304:13
**ends** 330:22 331:14
**enforce** 102:19
**enforcement** 101:21
  102:23
**engage** 16:4 78:12
**engaged** 19:16,20
  140:24 148:8
  260:14
**engagement** 314:24
  315:6,8,8,11,13
**engagements** 19:15
  19:19,21 315:1
**enough** 82:22 330:7
**ensure** 42:24 43:7
  172:8,14 249:20
**entail** 99:2
**enterprise** 293:7
**enterprises** 292:25
**entire** 140:4 141:18
  197:11,21 231:13
  231:22 234:17
  243:19 252:17
**entities** 132:1
  154:21
**entitled** 83:25 85:16
  87:23 117:16
  121:14 123:18
  283:17 285:18
  297:3 317:24
  320:16
**entity** 132:4 174:23
  215:11,15 216:3
  242:21
**enviable** 303:1
**environment** 133:8
  191:3 217:24
**equal** 72:16 166:17
  176:8 198:15
  199:7 204:20
  233:11,14 268:13
  269:4 277:19
  330:6
**equalization** 89:2,5
  89:14,16,20,23,25
  90:16 94:9,13,17
  94:20 95:12,15,19

**96**:3,14 97:1,5
  146:19 205:7,13
  212:17,19
**equalized** 96:7
  146:18,20 147:1,2
  147:7,9,14,23,25
  148:3 201:18,19
  202:9 203:1
  204:18,21 265:20
  266:7,16 267:23
  267:25 268:8,11
  268:12
**equals** 147:9
**equilibrium** 196:15
  196:24
**equitable** 31:20
**Eric** 319:20 320:13
**Ernst** 4:23 7:7 9:25
  10:4 19:16 28:13
  29:6 35:20 37:10
  50:21 51:14,19,22
  52:6 54:22 58:6
  58:24 59:9,13
  73:11,15 85:11,22
  86:2,8,14,16,24
  109:25 183:2
  218:5 237:19
  238:1,7 248:6,22
  294:16 311:11
  313:3 315:19,25
  316:10
**error** 254:25
**errors** 84:8,17,21
**ESQ** 2:3,4,5,15 3:3
  3:13 4:4
**essential** 330:7,8
**essentially** 195:22
**established** 247:10
**estate** 11:10,12,25
  80:1,6,8 81:20
  82:13 117:9,12,17
  118:6 127:18
**estimate** 183:7,16
  183:19,23 186:22
  221:5,12,15,19
  222:7 224:5
  245:21 273:11
  279:10 286:5,10
  286:16 298:3
  320:5
**estimated** 156:17
**estimates** 68:11
  81:6 191:1 251:4
  251:19 278:20
  318:8,9,12,13,24
  319:3,11,12,18,23
  320:1,9 329:8
  332:6

**estimating** 7:11
  280:21 286:19,22
  317:25
**estimation** 283:22
  329:6
**etcetera** 126:22
  210:11
**evaluate** 80:7 153:6
  154:23
**evaluated** 207:16
**evaluation** 54:23
  208:2
**Evanko** 5:16 27:11
  27:14,15 36:17,23
  37:3,16 39:4 91:4
  92:11 93:4,19
  94:4 99:13,16
  100:2,17 179:3
  180:10 182:25
  183:14,22 184:2
  184:10 185:20
  186:7,14 187:15
  187:17,21 188:21
  188:25 189:3,7,13
  221:20 285:10
**Evanko's** 27:7,9
  90:14 93:13,15
  99:8,20 100:20
  181:2,19 182:4
  187:23 188:10
**even** 86:24 122:20
  136:3,21,25
  137:12,19 212:13
  212:18,18 244:6
  269:23,24 292:23
  303:18
**events** 248:2 252:8
  252:20 253:3,7
  315:14
**ever** 9:4 11:21
  13:10,13 17:13,16
  17:17 20:9 23:24
  24:3,24 25:14,17
  25:17,21 39:4
  42:6 54:22 66:12
  67:22 68:8,16,19
  78:22 84:1 87:13
  87:25 100:9,15
  169:19 170:3
  175:13,18 184:9
  214:24 218:21
  221:17 267:2
  272:13 276:24
  283:2 284:1,10
  290:15 293:10,20
  299:10 311:15
  312:6,12,12 324:6
  324:20

every 43:8 92:5
176:19 218:10,12
246:24 266:20
289:23 295:25
everybody 113:19
113:23 178:8
180:5
everybody's 178:16
everyone 58:2
everything 33:4,7
33:10,13 65:17
72:16 135:18
233:14 247:7
332:1
evidence 65:25
90:25 91:25
evidentiary 92:20
EVIP 48:15,24 49:5
49:10,17 50:5,9
70:9,18 235:18,25
236:3,7,8,14,15
236:17 239:10
240:18 241:7,17
245:11 300:8
306:6 307:3,6
308:11,21,24
309:16 310:2,5,16
311:1 326:16
exact 36:24 142:25
145:10 293:19
300:6 320:7
exactly 48:17 57:16
149:21 150:23
173:1 174:15
207:23 211:16
237:14 274:22
298:18 320:2
329:14 331:20
examination 1:9 5:2
9:16 181:7 332:3
examine 92:19
examined 9:14
148:14 200:15
214:6
example 24:7
103:19 122:13
173:15 230:4
286:7
examples 325:22
exceeded 303:2,11
excellent 35:1 178:9
except 74:22
excerpts 5:16 90:14
181:3,15
exchange 47:10
exchanges 37:1
80:20
executive 110:21

exempt 40:7,9
105:4,6,8,12,18
105:22 158:16
160:7 161:4,5
185:15
exempted 160:21
161:11 185:11
exemption 39:19
183:6,9 213:5,12
exemptions 40:4,13
88:8,15 105:10,19
105:23 162:3
exercise 140:23
141:24 155:22
242:21,25 273:15
273:21
exhibit 78:21 83:24
87:13,22 90:13
110:17 117:16
121:12 123:18
128:19 134:20
138:3 144:9
145:12 230:1
246:14 247:4
249:6 253:20
254:6 265:10,10
272:1 278:25
280:7 282:18
283:5 285:4 289:1
291:5,22 297:3
301:8 314:10
316:20,25 317:24
320:15,16 327:10
328:10
existence 75:1
existing 138:7 144:5
199:14 272:7
273:5,10
exists 161:3 299:24
expand 167:2
expect 149:15 269:2
269:6,17 275:1
expectations 303:2
expected 248:3
expects 305:1
expenditure 155:6
323:12
expenditures 23:24
24:1 152:2 153:1
156:1 323:15
expenses 16:24,25
303:12
experience 46:16
60:4,10,11 104:16
247:20
experienced 117:22
234:9 321:5
322:12 324:5

325:23
experiencing 53:13
53:15,18
expert 7:3 10:5,12
10:14,18,20,22,24
11:1,3,7,10,18,25
12:2,5,8,10,12,14
12:16,19,23,25
13:3,7,8 24:21,25
25:4,6,9 26:6,7,8
26:17 27:4,20,20
27:22,24 28:1
55:2 141:20
156:25 223:21
294:9
expertise 42:11
50:21 149:4
experts 248:22
293:22
expire 18:17,24
217:13
expired 299:23
300:4
expiring 216:23,25
explain 39:4 47:25
48:5,8,11 131:17
146:24 274:18
329:14,19
explanation 39:25
40:15 107:1
express 247:13
extent 150:18
275:15 330:12
extrapolated
214:18
extrapolation 74:11
196:5,9 234:4,21
235:15 242:13
283:18
EY 16:20 39:23
40:21 52:11 61:11
88:25 109:16
154:17 248:6,19
315:14
eyeball 193:6
eyes 293:3
e-mail 37:1
e-mails 47:10
E.M 7:3

_____

**F**

F 3:13
face 63:1
facilities 106:3
155:25
facility 24:8 154:18
154:22
facing 217:23

fact 51:14 53:17
74:20 89:10
109:10 116:24
118:14 119:8,22
130:5 137:2
187:23 188:16
189:3,7 199:18
227:5 242:6 245:7
245:12,17 273:12
275:8 302:3
303:17
factor 89:2,5,14,16
89:20,23 90:1,3
90:17 94:9,13,17
94:20 95:13,15,19
95:24 96:3,14
97:1,6 132:10
135:11 146:19
161:22 173:7,19
173:23 197:17
205:7,13,21
207:12,17 210:12
210:16 212:17,20
217:8 221:8 244:5
factored 76:9
120:12 133:8
156:2 162:9,13
172:25 173:2
factoring 211:8
factors 15:18,19
68:23 72:16
104:25 107:4,22
112:5 135:15
136:8 152:24
153:4 211:2,7,11
233:1 235:1
236:18 242:8
274:18 276:18
287:23 288:10
290:6 307:23
331:10
Facts 5:21 121:14
factual 11:20
fail 37:14
failed 37:9 175:14
303:3
failing 75:4
failure 250:23 298:5
299:12
fair 23:17 26:20
38:8 42:10 44:12
44:14 48:20 49:4
57:21 58:11 59:20
60:8 64:16 71:8
77:10 80:4 82:11
96:8 98:25 126:24
134:3 247:13
281:14 299:5

300:3 301:10
303:17 305:21
311:23 317:5
321:4 331:2
fairly 116:25 275:21
fall 137:20 203:1,2
203:8 204:23
fallen 122:10,18
falling 107:9 238:4
falls 204:21
familiar 100:20,23
138:22 246:22
286:14
familiarity 286:4
family 281:7
far 17:12 74:23
75:21 98:15,16
132:18,23 153:10
194:12 197:24
211:9 289:11
290:3 291:11
fastest 118:15
favor 308:16
February 19:11
184:6 285:16,17
285:25
federal 21:25 22:10
22:15 90:24 91:25
160:4 195:17
feed 261:20
feeds 255:17
feel 9:10 16:8
151:21 161:7
feeling 303:24
fees 47:11,12,14,16
53:3
fell 199:15 232:18
274:22
felt 61:7
few 106:9 107:3
121:22,25 122:5,8
154:3,5 197:10,16
207:14 216:15
218:12 269:2,17
281:23 291:16
FGIC 8:22
figure 10:8 77:20
146:6 147:13,20
190:7 193:14
299:11
figures 138:18
229:5
figuring 204:13
207:4,7
filed 8:8 10:4 43:21
249:24 297:25
fill 297:8
final 60:17 315:15

**finalized** 137:25
**Finance** 195:18
**finances** 35:19
**financial** 4:9 6:12
  12:25 15:7,12,13
  15:15 17:4,7
  35:18 44:1 45:14
  46:20 123:8,11
  247:22 248:12
  250:24 252:1,2,8
  252:10 253:12
  292:4,10,12,17
  293:7,11 296:21
  296:24 302:15
  317:11 320:11
**find** 73:19 94:8
  119:3 177:25
  178:4 241:20
  242:1 268:19
  282:8 305:13,22
  317:12
**finding** 261:12
**findings** 87:11
  123:11
**fine** 142:10 278:15
**finger** 63:1
**finish** 32:17,22,23
  32:24 91:24 263:1
  269:11 270:8
**fire** 330:9
**firm** 118:6 178:2
  211:15
**first** 9:14 26:1 75:2
  79:23 80:25 84:7
  85:18 90:15
  111:10,18 118:3
  121:13 138:4
  147:5,6,10 150:3
  166:19 201:13
  235:15 238:25
  279:18 285:4,13
  295:3 314:13
  334:8 335:14
**fiscal** 15:20 16:3,4
  17:3,10,14,21
  18:8,13 33:17
  35:4,8 38:11,12
  52:20,24,25 53:4
  53:7,13,16,18,23
  54:8,9,13 68:12
  103:24 105:16
  175:1 183:4
  203:16,16 206:13
  207:1 209:2
  210:20 221:4
  228:10 237:8
  238:13,18,24
  239:1,4,21 240:9

253:22 264:9
295:6,18,19
302:15 306:24
309:4 328:25
**fits** 34:20
**five** 16:11,13 20:20
  30:15,16,17 91:20
  98:2,20 139:11
  144:22 146:13
  202:21 206:1
  215:22 216:7,19
  216:21 225:18
  273:18 274:7
  275:3 326:7
**five-minute** 329:10
**five-year** 139:6
**Flint** 14:2 15:11,13
  15:16 16:2,7,10
  16:12 17:2,9,13
  17:20 18:7,12,20
  19:5,10 20:3,12
  20:14,19,24 21:16
  42:9 54:15 103:19
  103:25 104:22,23
  109:4 115:7,9
  143:9,10,12,18,24
  216:17,21 217:3
  304:2
**Flint's** 103:20
**flip** 181:14
**fluctuations** 14:18
  37:25 38:19,22
**folks** 226:14
**follow** 52:5 95:9,10
  160:4 223:4
  268:25
**followed** 64:23
  126:7 160:2
  163:22 234:3,4
  321:14 326:2
**following** 19:2
  89:15 160:1
  204:17 283:16
  314:22 322:23,25
**follows** 9:15
**forecasted** 16:25
  23:24 24:12,16
  25:14,17,21,24
  31:11 115:24
  126:17 164:5,14
  195:19 198:17
  209:18 215:18
  216:7 227:1
  237:10 248:2,8
  312:6,13
**forecasting** 16:10
  16:13,16,22 18:11
  18:14 21:18 38:2

38:14 41:6 42:1,4
42:6 46:10 64:18
64:25 65:7,16
67:8 68:1,7 71:24
141:13 145:3,5,15
146:11,14,15
149:3,5 151:9
160:1,3,14 162:10
163:20,23 164:1
164:24 173:8,20
192:19 195:10
216:5 224:9 229:1
237:19 241:6
242:20,21 273:12
314:17 315:4,9,21
**forecasts** 6:22 28:13
30:8,16 36:5,9
41:4 57:23 61:3,8
61:22 62:1,20
65:2,11 67:19,23
68:5 71:3 73:15
73:20,25 74:2
120:14,19 130:25
140:14 141:10
145:16 175:4
195:13 215:6,20
215:20 216:1
235:3,9 236:25
238:7,17 241:5
242:22 244:17
250:6 252:18
253:17 264:8
305:12 311:13
313:9,15 318:16
319:24 331:3
**foreclose** 76:4
**foreclosed** 75:11
109:14
**foreclosure** 77:4
80:16 109:21
**foreclosures** 80:14
**foregoing** 334:11
335:20,24
**forgotten** 164:19
204:25
**form** 36:15 78:17
81:19 82:2,7
247:20 293:6
302:17
**formal** 55:5,10,14
55:17
**Formally** 83:19
**format** 293:19
**forming** 42:15
283:1
**formula** 32:12
48:15,19,21,25
49:1,2 70:9,11,16

70:17 167:15
193:5,9,11 235:18
235:22,23 236:4
256:11,13,16,18
256:22 258:2,25
260:3 261:16,22
262:3,15 263:6
268:1 276:7 300:5
**formulate** 44:9
**formulated** 81:12
81:15,21 82:4
84:15,22
**formulating** 42:12
44:18 46:24 47:2
128:21
**fortunes** 231:15
**forward** 18:16
41:14 78:4 147:10
170:14 234:7
257:14,17,19
331:1
**forwarded** 39:24
**found** 28:23 84:11
87:7 107:22
**four** 41:23 72:9
177:10 225:15,17
267:13,24
**fourth** 6:13 249:23
**fourth-amended**
249:10,15 250:3
**frame** 109:6 169:7
216:7
**FRED** 316:22
**free** 9:10
**frequently** 61:14
88:5 218:16,18
248:3
**front** 15:1 79:8
110:13 117:18
123:4 145:13
157:1 181:3,11
213:15 237:14
246:21 247:4
249:13 295:22
**fulfill** 40:22 252:12
253:1 297:9
**full** 116:14 297:16
299:20 300:2
301:18 302:18
304:4
**fully** 271:2 298:5,15
298:17 299:12,17
301:13
**functioning** 10:3
**fund** 10:15 77:1
125:21,24 126:10
127:14 167:25
168:1,4,8 257:2,6

259:23 262:19
295:6 298:6
**funded** 166:12
298:17 314:4,6
**funding** 220:20
221:6 297:17
298:16 299:17,20
300:2 301:14,18
302:18 303:4
309:20 319:3
**funds** 22:16 126:4
167:24 305:1,3,6
305:8,14 319:8
**further** 134:6
315:20 333:3
335:13,23 336:1,5
**future** 25:21 77:5
78:9 206:8 208:1
208:25 210:2,14
210:18 211:13
243:5,10 244:11
245:2,19,23 252:2
252:7,9 253:4,8
253:12 257:18
258:17 269:3
305:2 331:15

--- G ---

**G** 2:15
**gained** 231:7
**gains** 276:18 280:21
**gap** 157:10
**Gary** 5:16 27:15
36:17,23 37:1,3
37:16 100:17
285:10 286:2
**gather** 65:25
**Gaurav** 27:23
**gave** 42:15 43:1,15
44:17 125:5
159:23 222:12
**general** 4:23 10:15
11:25 35:2 38:14
64:6 85:5 105:18
120:10 158:21
167:25 168:1,8
170:8 171:8 191:3
232:9 257:2,6
263:16 270:23
279:17,24 295:6
**generally** 45:6
53:11 97:17 99:5
131:10,20 152:4
154:3 165:18
167:16 182:4
268:20 330:24
**generate** 51:16 70:4
134:3,4,14

generated 50:6 65:6 124:17 256:15 258:1 260:2,3 286:6
generates 258:12 316:12
generating 115:24 116:5
Geoff 32:22
GEOFFREY 2:3
gets 47:20 50:1 126:13 166:7 194:2
getting 78:3 171:1 260:8
get-go 243:1
gina 1:12,24 8:25 335:4
give 33:14,21 39:5 44:21 45:5 49:20 49:23 103:22 105:14 179:21 200:13,17 205:18 205:21 217:18 224:8 306:9 307:17 309:9
given 14:19 30:18 45:24 46:4 80:9 81:20 82:23 89:14 89:16,20 103:6 106:4 124:20 146:18 151:19 164:2 172:23 175:1 179:2 186:22 204:2 205:7,13 214:9 260:11 261:8 274:6 288:3 293:23 305:11 309:21 335:16,21
gives 263:5
giving 33:18 94:17 94:19 212:16,19
go 17:21,24 41:11 42:22 43:9,20 44:2,19 45:10 46:2,6 67:7 74:12 77:19 91:19,22 97:17 107:11 108:7 116:23 121:13 136:7,9 152:24 154:1 165:13 167:5 168:1 177:25 179:25 181:18 182:21 189:24 203:2,2 207:4,6 212:22 218:12

222:19 225:20 226:12,18 235:9 235:16 239:10 248:21 249:20 250:3 268:1 269:6 280:15 287:21 288:9 309:25 320:20
goal 108:11,14 204:4
goes 58:25 137:24 146:12 157:15 194:13 195:20 204:22 226:7,10 331:8
gone 14:13,14,18,19 75:20 106:15 116:24 117:3 144:24 205:1 218:19 250:8,10 258:6 272:16 290:9 324:12
good 9:3 23:10,22 38:10 60:17 103:8 103:11 231:4 240:22 323:8,11
goods 72:19 73:3
gotten 40:14
govern 92:1
governing 83:15 95:8
government 10:22 12:3,3,14 21:25 22:1,10,11 52:15 114:23 122:9,11 128:10 154:9,13 154:15,19 155:1,3 155:6 215:11 216:2 235:23 242:18,19
governmental 215:15
governments 22:15 154:24 155:2,8
governor 35:17,23 35:25 36:2
governors 297:7
governor's 304:12
grant 22:14
granted 88:9
grants 12:14 21:22 21:25 22:10
graph 129:7 295:15
gray 161:8
Great 249:18
greater 69:25 139:10 148:8 230:13,22 290:24

greatest 210:12,16
grew 322:1 325:6 325:10
ground 44:24,25 319:3
group 14:5 35:16 103:1,3 164:22 212:25 294:9
groups 155:3
grow 72:14 325:12
growing 118:15,23 238:5
grown 274:9
guarantee 2:20 253:11,16
Guaranty 3:19 4:9
guess 10:3,13 18:11 22:6,12 32:14 58:13 65:4 68:2 72:11 77:23 99:23 129:19 135:20 154:20 171:11 193:11 215:20 223:17 232:12 248:19 251:8 256:17 259:7 264:10 266:20 291:9 294:7 296:10 313:24
guessing 268:6 296:15
guesswork 78:12,16
guide 35:17,18 36:1 36:3 226:22 288:17

**H**

H 5:7
Hackney 92:7 176:23 177:2,19 178:4
half 55:12 75:5,7 87:23 137:3,7,10 137:12 148:25 150:3 206:13,19 206:21,24 207:1 209:6,10 223:18 238:25 277:16,20
halfway 265:22
hall 62:25
hand 30:22 60:6 78:20 83:23 87:12 87:21 90:12 110:16 117:15 121:11 123:17 128:18 134:19 138:2 144:8 229:25 246:13

248:16 249:6 253:19 265:9 271:25 278:24 282:18 283:5 288:25 291:19 297:2 301:7 314:9 316:19,24 317:23 320:15 327:9 328:9 336:10
handed 285:3
happen 77:5 78:8 140:23 141:7 148:2 202:11 203:6 204:6 240:18 242:7 243:2 244:16 305:23 306:10,13 306:16
happened 74:19 78:1 151:23 161:17 177:7 193:2 194:17 218:14 228:15 271:7
happening 38:17 77:2,3,23 78:5 162:11 198:25 201:16 235:11 266:4 268:7,11,15 268:17 272:6 277:22 288:19
happens 135:14 141:24 151:14,18 190:19 241:8 288:22
harassed 260:17
hardest 85:16
harmonized 294:12 294:16
hate 271:4,6
haul 29:4
having 9:14 18:1 54:2 73:7 122:16 171:1 205:1 226:17 285:7,24
head 19:9,24 23:16 68:15 103:22 106:20 117:5 132:5 143:17 187:7 213:13 218:24 219:10 232:16 237:16 239:25 272:19 303:16 325:21
heading 111:8 226:25 254:15
health 10:20 231:11 232:22 233:2,3

heard 92:23 169:19
hearing 93:25 94:2 94:3
hearings 79:15,19
heist 302:4
held 275:16
help 71:16 143:22 143:25 185:3 202:20 221:7 228:18 235:12 265:2 273:20 277:6 280:22 288:2,21 322:15
helped 134:7 202:13 202:24 226:23 277:20,22 279:19 315:4
helping 201:20,20 202:11 280:23
helps 133:7
her 28:7,10,11,18 28:21 29:1 32:17 32:18,19,21,22 36:19 41:2,13,15 63:11 92:3,13 149:4,14,22 150:4 151:2,12 176:17 176:20 178:15 179:6 180:8,10,15 188:3 261:3 262:22 325:1
hereinbefore 336:4
heretofore 335:6
hereunto 336:9
Herman 57:17
herself 8:24
Hi 181:2
high 106:14,23 107:17 119:22 226:13
higher 65:3,6,12,16 106:6,10,12 111:4 129:3,8,10,14,16 130:3,12 135:22 135:23 136:17 137:18 148:1 176:1,2,5,8 199:6 204:18 233:9 234:25 235:4 239:16,18 241:6 241:14 263:18 264:15 266:14,18 274:23 275:20 318:13,18
highest 112:18,19 119:4
highly 292:5,9
him 36:4,25 37:4,7

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt    Doc 7148-6    Filed 08/27/14    Entered 08/27/14 23:59:24    Page 97 of 116

100:24 178:7
183:22 184:2,3,7
184:13 222:3
307:6,11
**hire** 43:19
**hired** 16:21 35:16
**hiring** 211:14
212:25
**historic** 207:8
226:21 270:7
**historical** 38:23
39:1 130:19
131:12 145:20,22
145:24 192:12,13
192:14,24 193:3
195:2,3,11,25
213:16 214:5
257:13 265:19
288:16 296:20
315:25 316:7
**historically** 106:6,8
111:18 231:13
290:15
**history** 144:14
170:8 226:18
266:1
**hitting** 264:9
**hold** 12:22 32:15
33:3,7,10,13
236:5 251:17
275:9 280:13
309:20 314:15
**holding** 10:12,17
11:24 13:6,8 26:5
135:15,18 214:19
**holes** 297:9
**home** 6:2,4 114:12
117:23 134:21
135:3,11,16,19,22
136:3,5,7,12,15
136:22 137:1,13
137:14,17,18,19
138:5,19,25 139:3
139:9,18 140:7,11
140:16,23,25
141:2,7,13,24
199:14,19,21
202:7,21,21,24
235:11 266:4
269:4,15,25 270:3
270:9,15,21 272:7
272:10 273:1,5,10
273:11 274:6,13
275:2 276:8 289:2
289:8,10 290:2,8
290:12,16,24
**homeowners** 88:8
88:14

**homes** 123:21
141:23 200:25
201:24 273:14,17
273:19 274:8,12
274:22,25
**Hon** 1:6 334:6
**hoops** 310:7
**Horhn** 36:18 98:5
184:5,15 285:10
286:1
**Hosbach** 4:22
**hosler** 4:4 8:21,21
**hour** 1:16
**hours** 177:10
**house** 115:15
135:25,25 147:6
195:18 204:17
269:7 270:1,3
276:20,22 306:24
309:4 310:20
**houses** 124:12 200:7
200:13,18 275:9
275:16
**housing** 114:16,17
114:20,24 115:2
115:13,17 116:5
116:20,23,24
118:3,5,16,23
119:5 120:2,7
123:19 133:4
134:23 135:1,8
136:4 138:8
157:25 195:17
199:24 200:3,6,21
200:23 201:12
266:4 269:1
271:13,16 274:19
**huge** 208:13,15,22
**hundreds** 14:14,16
58:6 59:8 142:19
142:24 298:14,21
**hunger** 2:5 8:15

**I**

**idea** 47:16,19,22
56:12 105:11
118:10 121:18
131:6 171:22,24
211:2,23 241:23
242:4,6 309:9
310:15 319:19,25
320:13 325:18
**identified** 64:5
75:10,14 310:2
311:7 321:13,23
324:6 325:23
**identify** 8:11,20,24
55:15 56:13 73:10

73:14 104:4,9,17
118:22 148:7,12
218:23 219:2,6
249:16 290:11
307:23 316:25
324:19,23
**identity** 244:7
**ignored** 299:25
**ignoring** 300:1
**II** 154:9
**ii(b)** 159:18
**illinois** 1:14,15 2:17
8:7 335:1,6,9
336:17
**impact** 56:19
104:25 132:7,24
133:3 148:4
151:19 152:13,22
153:3,8,12,22
154:6,12,18,25
155:16 156:21
162:25 163:5,10
190:12 201:17
204:16 227:2,19
244:14,17,24
245:3,5,8 295:5
295:12 298:19
**impacted** 54:12
**impacts** 29:12 152:1
152:5,8 154:23
164:3,5 286:20
**IMPLAN** 151:25
152:4,7,12,16,17
152:22 153:2,5,23
154:8 155:18
156:5,6,7 288:5,6
**implementation**
251:3
**implemented** 77:8
77:14 95:19
**implementing**
88:18
**implied** 332:19
**important** 29:16
30:12,23 31:1,4,8
31:16,24 32:5,7
33:34 38:13 69:6
72:11 80:1 173:7
173:11,18,23,24
174:17,21,23
175:5,12,12
176:12 178:22
201:15 232:11,12
233:1 264:7
**imposed** 53:6
**imposition** 331:3
**impossible** 244:12
244:18

**impression** 109:17
**improper** 90:23
91:1 92:1,6,12
180:11 260:19
261:1
**improperly** 88:14
**improve** 16:4 33:17
52:25 62:23 88:19
109:4,8 114:3
132:2,16 133:7
144:4 156:2
191:21 227:12
233:15
**improved** 17:9
72:13,13 108:21
108:25 113:20
114:7 120:16
127:18 191:4,7,14
191:19 192:1,4
227:17,17
**improvement** 113:3
120:10 155:1,5
191:18 226:3,14
226:23 232:7
264:12,18,21
265:4
**improvements**
113:9 136:25
191:2 196:11
226:15,17 227:23
228:2,17
**improves** 191:17
227:10
**improving** 113:20
132:11,15 191:20
192:6 227:9 232:1
232:5
**inaccurate** 49:1
62:9,21 67:2,4,11
102:15 252:11
255:5
**Inc** 2:20,21
**Incentive** 48:16
167:24
**include** 19:8 31:23
75:19 125:17
141:16 155:12
**included** 65:16 81:7
126:9 133:14
161:24 162:2
175:16 250:7
**includes** 58:6,12
76:19 158:18
238:12
**including** 125:10
179:3 304:13
**inclusion** 316:1
**inclusive** 334:13

**income** 18:23 21:7
33:25 34:5 111:8
156:13,15,16,16
156:17 172:5,16
173:8,10,12,20
174:3,11 175:9
217:4,5 220:4,13
237:11,15,20,25
238:3,4 283:22
296:3
**incomplete** 67:1,5,6
67:11
**inconsistent** 94:22
95:4 96:10,12
97:3,9
**incorporate** 30:11
61:18,20,21 62:7
62:20 175:14
217:14 242:23
**incorporated** 19:5,7
30:8 59:3 76:17
175:21 239:1
271:2 304:14
**incorporates** 173:5
**incorporating**
239:21
**incorporation**
239:4
**increased** 52:20
62:12 70:3,4
71:18 72:2,18
73:2,7 117:10
120:24 122:23
123:3 135:9,16
139:4 152:8,13
164:11 225:16
233:13 239:23
240:20,21 282:1
286:22 287:10
290:17
**increases** 19:3,4
32:13 33:5,12
69:10,14,18
117:23 139:14
155:12,13 158:3
198:25 199:5
286:16 290:25
309:10,13
**increasing** 28:23
32:12 33:5,11
70:19 71:5 117:12
135:1,8,11,16
136:22 139:9
165:20 166:14
167:7 168:10
199:2 238:1 269:1
269:16 282:9,12
303:19 307:15

**independent** 42:17
42:20 43:6
**index** 6:3,5 114:12
114:15,24 115:2,4
115:6,10,13,17
116:1,2 134:21,25
135:3 136:3,6,13
136:21 137:13
138:5,5,11,12,19
139:4,5,22 140:7
140:11,16 195:18
199:25 266:2,3,6
266:19,21,25
269:15,16 271:16
282:22,23
**indexes** 136:7
**indicated** 117:21
**indicates** 138:12
144:17
**indicating** 182:6
**indicative** 277:5
**indices** 271:13
**individual** 47:8
215:7,25 219:23
263:25 283:22
**individuals** 109:11
326:25
**industrial** 72:12
106:2 162:8
185:14,17 207:3,7
207:11,15,17,20
208:2,6,8,14
213:4,10 220:19
224:18 225:2
227:20 228:11
262:7
**industrial/comme...**
106:20
**industries** 217:22
**industry** 231:5,12
231:16,17,21,25
232:2,5,16,17
323:8
**inflation** 147:11
274:10 276:12
**inflexion** 130:5,8
135:5
**influence** 244:8
282:24,25
**influencing** 279:13
**inform** 71:4,16
170:3 199:1
331:10
**informed** 87:5 99:7
176:22 185:19
259:25 273:21
**inherently** 92:13
251:20

**Initially** 98:10
**initiative** 325:25
**initiatives** 57:9
108:19 134:6
293:6
**input** 71:14 202:4
**inputs** 29:8 58:7,9
58:12,15,16,17,20
116:3 150:12,16
150:20 151:18,23
172:18 259:24
261:19,20
**inquiry** 170:13
**insolvent** 292:24
**instance** 53:10
89:24
**instances** 44:16
79:14
**instruct** 92:3 176:17
180:7 261:3
**insufficient** 182:1
**Insurance** 4:10
**intact** 167:1
**intellectual** 313:5
**interacted** 57:12
**interaction** 47:7
56:24
**interactions** 17:19
**interest** 155:4
**interested** 100:8
313:6,13 336:7
**international** 232:3
**interpose** 90:20
**interpretation**
26:24
**interpreting** 26:22
**interrupt** 91:6
177:24 181:6
262:22 263:2
**investigate** 172:13
282:8
**investigated** 163:13
169:15 208:3
275:15 281:25
**investigation** 73:19
73:24 84:11
102:22 108:15
119:9 121:20
124:11 162:17,21
222:22 305:13
**investment** 121:21
121:25 122:4
152:20,21 153:7
**investments** 121:16
**investors** 109:12
**invoking** 331:15
**involved** 11:14,21
13:10,12 21:18

104:14 258:4
293:14,20 314:18
320:13
**involving** 215:21
**issue** 84:6 148:13
**issued** 35:3,6 84:4
177:17 291:11
**issues** 85:7,8 103:5
107:15
**issuing** 282:14
**item** 283:21
**Items** 7:14
**iteration** 75:2
**iterations** 30:10
65:12 151:21
238:22 279:15
**ix** 224:16

**J**

**J** 3:3 8:17
**Jameson** 36:18
285:11
**January** 37:8
100:16 184:2,13
189:17 326:19
**Jay** 306:21,23 307:9
318:3,19 328:16
**Jay's** 318:8
**Jeffrey** 8:14
**Jerneycic** 110:3
124:21
**Jim** 306:24 307:2
308:13 326:11,16
326:19
**job** 14:3,4 24:8 25:4
25:16 35:21,22
52:16 85:16 103:8
103:11,14,16
164:7 300:13,21
327:4
**jobs** 52:15 122:7
232:14,15
**joined** 189:16,18
**joining** 154:17
**jones** 2:2 8:15
**judge** 90:21 92:6
93:1 177:21,21
178:6 180:6,11
**judgement** 224:20
**judge's** 178:6
179:15
**judgment** 60:15,16
65:22 77:4,10,15
77:16,20 78:6
159:7,9,13,16
169:23 170:1,17
190:6,13,22,24
192:17 195:23

196:18,20 203:18
203:19 204:1
220:24 225:5
226:16 233:19
234:1 255:13,21
255:23 256:1,5
257:16,20,23
258:21 259:14
260:4
**judgments** 79:13
170:5 171:1
**Judicature** 169:20
171:19
**July** 1:15 7:8 8:5
101:3,7 246:17,17
334:10 335:7
336:11
**jumping** 310:6
**June** 75:2 124:9
238:25 285:19
294:13,23
**just** 14:8 17:1 18:25
21:19,21 22:2
32:19 33:18 34:21
37:25 38:17 41:11
51:21 56:3,16,21
62:1 70:15 78:11
79:1,6 80:4 84:10
85:5 87:13 88:24
91:8 93:23 98:25
102:21 106:8
107:15 111:7
113:17 117:15
122:16 141:17
146:3 153:23
155:13,20 161:6
168:13 177:12
178:8,15 179:4,7
179:14,23 180:8
180:11 181:14
182:1 193:22
194:3,18 200:16
213:14 214:3
215:12 216:12
219:9 222:2,18
226:15 228:5
230:23 233:18
246:20 249:16
254:2 259:17
261:11 262:2
264:11 271:22
280:13,13 284:4
291:9 299:2 301:7
306:7 308:14
310:15,25 313:5
319:11 322:24
325:2 328:19

**K**

**K** 3:4 335:3
**Katie** 40:24 41:3,5
41:15,24 42:3,6
55:25 56:10,14
122:15 130:17
131:24 229:7
283:12
**keep** 166:22
**keeping** 163:16
167:1 307:6
**keeps** 214:13
**kept** 159:25 214:17
225:12,14,17
**key** 29:17 31:22
32:8,8,10 33:24
175:3,7
**kind** 10:8 18:20
54:22 57:7 64:20
65:9 67:22 78:3
78:12 158:5 161:7
164:4 165:16
193:19 219:16
220:8 226:18,22
228:5,16,17 236:1
247:14 253:1
257:4 261:25
271:4,5 293:19
323:4
**kinds** 154:15 309:3
330:9
**KIRKLAND** 2:14
**knew** 38:12 81:23
183:8
**knowing** 223:22
313:13
**knowledge** 93:23
247:20 286:9
299:2
**knowledgeable**
188:22,25 189:8
189:11
**known** 160:15,16
326:25
**knows** 178:8 188:16
188:20 223:13
305:14 330:17
**Kopacz** 7:4 28:8,12
149:2 150:22
151:1,11 292:4
295:10 296:9
**Kopacz's** 148:24
149:11,19,25
150:10 291:18
**Kyle** 57:17

**L**

**label** 255:7

labeled 255:3,4,5
labor 127:22 128:20
  128:23 131:8
  156:13,16,17
lack 85:24 86:11,19
  87:8
lag 268:23
laid 64:24
Land 119:9,13,16
  119:23 120:2
  123:19 124:5,11
  124:17 125:3,10
  125:14,19 126:5
  126:14,19 127:1,2
  127:3,6,7,9,11,17
language 251:12
  252:18,19 300:7
large 136:20 139:14
  139:18,20 143:5
  210:22,24 242:24
  303:3,7,8,8,9
largest 50:9 111:14
  117:23 148:19
  210:19 243:15,18
LaSalle 2:16
last 15:3 28:7 36:19
  37:4 77:23 78:25
  79:12 81:7 89:22
  90:2 91:13 98:11
  106:9 107:3
  116:14 119:19
  121:25 122:5,8,19
  122:22,24 123:1,1
  135:2 136:23
  137:14 139:10
  144:22 146:13
  176:16 182:22
  197:15 219:12,15
  219:17,19,21,24
  220:9,15 230:25
  232:19 239:19
  241:1 253:11
  261:2 281:22
  283:23 285:4
  291:16 294:10
  297:19,24,25
  298:15 302:25,25
  303:10,15 321:12
late 260:8
later 38:11 176:21
  222:17 275:3
latest 197:14 239:1
law 18:18 19:2,6
  26:10,13,23,25
  95:20 159:19
  160:5,7,10,20,22
  161:3,15,17,20
  162:14 163:24

169:22 170:2
214:17 216:24
217:13 238:23
240:3,7,8,11,14
240:17,24 331:5,8
lawmakers 297:6
  300:1
laws 161:5 221:2
lawyer 26:3 178:9
lawyers 57:12
  185:24 186:1
lax 101:22
lay 194:11
lead 28:24 71:10
  72:3,19 73:2
  112:5 135:9,12
  199:4 274:25
  276:18
Leaders 164:23
  216:5
leadership 56:21
leading 55:2 85:6
  162:14 332:14
leads 199:7
League 297:11
  300:15,20,25
  301:2,15
League's 301:22
learn 63:17
least 36:25 53:17
  192:5 216:7 286:2
  290:25 291:18
  298:20 321:8,25
leave 142:3
leaving 79:15
led 234:11 240:3,11
  240:14,24
left 126:22 177:10
  326:8
legal 8:2 26:6,7
  179:12
legally 302:23
legislation 160:9
  185:2,7,12 221:17
  222:24 223:14,23
  329:15,21 330:22
legislator 308:15
legislators 49:7
  310:11
legislature 49:12,16
  49:18,20 50:7,8
  54:17 70:17
  168:13,16 222:23
  223:2 243:14
  245:10 300:7
  304:16 306:6
  308:16
legislature-appro...

238:12,24
length 20:14 68:4,5
  80:2,17,21 81:1,8
  81:21,24 82:3,7
  82:10 181:21,24
  182:7,14,16,18
less 61:22 74:4
  105:25 147:12
  175:12 266:22
  276:12
lesser 204:23
  284:17
let 25:3 31:7 32:19
  49:3 62:1 78:21
  79:23 83:23 87:12
  87:24 91:24 100:1
  110:17 117:14
  121:11 128:19
  134:21 181:15
  182:22 203:12
  213:13 225:24
  247:2,16 249:7
  265:9,11 271:25
  278:25 282:18
  290:10 291:4,21
  311:18 314:9,10
  314:15 316:19
  319:25 320:20
  327:9,10 328:10
letter 314:11,12,17
  315:16
let's 147:6 178:17
  180:18 261:7,9
  312:18
level 74:16 76:2
  129:6 164:9
  206:13 207:2
  209:10 214:17
  220:1 245:6
  299:20 319:6
leveling 234:6
levels 25:15 48:12
  128:6,20 129:2,6
  129:9,13 138:11
  214:18 233:10
  300:2 311:4,10,12
  311:16,25 312:6
  312:13
levy 31:19,19 32:3
  76:20 107:8 176:6
  262:12,17 263:4
  317:18 330:3,14
  331:19
library 158:22
LIC 336:18
License 1:25
licensing 47:19
life 22:25 92:24

lifetime 187:2
light 135:6
lighting 227:17
like 21:21 26:10
  30:18 34:16,17
  43:21 45:11 51:18
  51:23 57:7,20
  58:1 63:15,17
  64:17 73:15 76:16
  78:24 91:5 94:6,7
  114:7 129:25
  130:11 140:7
  145:1 151:13,22
  155:7 161:7 175:9
  177:10 182:22
  187:9 189:24
  193:10,20 196:12
  200:9 201:25
  202:23 207:18
  208:3 222:16,18
  223:10 232:15
  250:15 254:11
  258:9 263:13
  264:5,11 265:14
  269:15 274:7,20
  280:9 288:1,6
  294:5 298:3
  309:20 310:6,13
  311:19 313:2
  316:22 322:15
  328:3 331:21
likelihood 170:21
  221:9 222:23
likely 74:8 77:17
  141:7 203:1 204:5
  224:11 227:22
  273:17 284:16,24
  309:16,25 331:9
limit 171:9
limited 216:13,15
Linda 36:18 285:11
line 57:2 91:2
  149:14 181:19
  182:25 265:22
linear 278:7,17
lines 146:2 278:2
link 70:21 136:11
listed 112:15 322:6
Listen 179:17
  260:12
listing 110:24
lists 320:22 321:17
literature 64:17,20
  288:14,16,20
litigation 24:25 25:7
little 56:7 57:5
  135:6 142:6
  155:22 186:5

253:1 294:7
live 105:1 325:15,19
living 187:4
LLP 2:14 3:2,12
local 297:5,10 303:4
located 8:3 232:4
logistical 85:8 314:7
Logistics 11:19
long 29:4 37:2
  41:21 63:19 68:17
  68:20 74:25 97:25
  215:1,10 216:3,6
  270:20 271:16
longer 36:20 74:3
  98:20 142:7
  189:14 202:18
  216:8 311:1
longest 215:14
long-run 194:16,21
  196:1,4,14,23
  322:14
long-term 7:13
  283:20 323:2
look 16:10,22,23
  18:2 20:17,18,20
  21:2 23:8,20 24:8
  30:19 31:13 38:19
  45:10 46:7,16
  73:24 83:4 91:4
  107:7 108:20
  111:7 114:25
  115:12 121:8
  123:20 125:14
  138:11 140:7
  141:17 145:9,19
  145:22 150:22
  151:13 152:20
  153:7 155:15,19
  164:3,25 166:25
  169:7 171:20
  179:1 182:25
  187:9 191:23
  192:3,13 193:24
  194:6 195:11
  201:25 202:3,17
  202:23 212:3
  217:2,22,24 219:4
  254:11 257:2
  258:9 266:1,16
  267:8 270:18,19
  270:20 274:14
  275:18 276:24
  290:1,21 291:21
  294:5 296:23
  298:9 299:15,18
  302:24 318:2
  322:15 328:19
  331:21

**looking** 14:2 16:16
40:5 93:5,7 103:5
129:5 131:8,11
140:3 141:12
145:14 153:18
154:1,21 155:12
156:12 164:8
165:18,20,22
192:24 195:8
198:6 201:14
204:6,7,15 225:6
228:14 257:10
262:1 264:15
267:22 273:16
274:11 275:21
293:25 294:8
322:7,10 325:2
**looks** 128:22 129:23
129:25 130:11
145:1 151:13
263:13 264:5
265:14 280:9
291:12,25 316:22
328:3
**lose** 221:8,16
223:10
**loss** 183:5
**losses** 275:25 276:5
276:10,15
**lost** 221:5 298:5,14
299:11 301:12
305:16 330:15
331:20
**lot** 80:19,20 101:10
114:22 152:24
224:7 300:10
302:6 325:14,17
**Louisiana** 2:6
**low** 110:12 112:2,2
112:8 119:6
139:15,17 295:19
**lower** 30:1 99:18
103:19,23 104:5
104:18 129:21
136:17 138:25
146:17 147:2,19
148:1 151:18
176:2,3,5,6 218:1
234:25 240:8,12
318:9
**lowered** 148:2
210:21 212:8
270:4
**lowering** 212:3
288:20,23
**lower-value** 284:25
**low-tax** 169:6
**lunch** 142:4,7,13

**luordo** 1:12,24 8:25
335:4

**M**

**M** 1:12,24 335:4
**MacKenzie** 56:25
57:2 103:5 293:24
**MacKenzie's** 57:4
**made** 19:1 37:15
40:21 45:19,20
50:2 52:14 90:21
93:19 121:16,21
122:4 123:10
177:1,15 196:20
220:23 224:24
225:4 233:18
250:8 251:7
253:12,17 254:25
259:13 292:6,14
301:4 303:18
331:11 332:6
**magnitude** 227:22
227:23 272:17
**main** 112:15,17
**majority** 81:18 82:1
82:5
**make** 30:20 38:4,9
38:16 42:25 43:3
45:3,15 49:22,24
51:19,23 52:4,12
59:9 66:6 67:6,11
156:4 169:3
170:13 172:18
247:18 250:4,9
253:16 258:8
259:19 279:9
314:22 317:21
**makes** 23:10,15
102:23 148:21
231:6
**making** 168:12
169:1 259:18
260:15 280:3
287:9 313:9
**Malhotra's** 27:23
**management** 17:5
247:19
**manager** 17:3,7
**managers** 53:23
54:3
**manner** 125:24
160:8 185:21
**Manual** 163:17
**many** 15:6 19:22
35:5 36:22 55:22
58:8,10,14,14,18
59:11,12,15 68:13
80:13 101:17,19

114:25 122:7
129:10 141:11
143:5 194:4
204:10 216:18
242:8 251:21
260:8 261:4
270:14 274:7
282:14 292:23
325:18
**March** 98:11
116:15,15 130:9
**Marguerette** 4:22
**mark** 117:15 145:12
289:1 291:4 328:9
329:10
**marked** 78:18,20
83:22,24 87:9,12
87:22 90:10,13
110:15,17 117:13
121:10,11 123:16
123:17 128:17,18
134:18,20 138:1,2
144:7,9 145:11
229:24,25 246:12
246:14 249:5,6
253:18,19 265:7,9
271:24,25 278:23
278:25 280:6
282:17 283:4
288:24 291:3,24
297:1,2 301:6
314:8,9 316:18,19
316:23,24 317:22
317:24 320:14,15
327:8 328:8
**market** 118:3,5
133:4 139:23
147:8 200:24
201:16,24 266:4
268:16,18,20,21
268:23,25 269:6,8
270:25 275:9
277:18
**markets** 117:22
118:15
**marking** 327:9
**Martha** 7:3 28:7
**master's** 41:17
**match** 266:13,15
**matched** 43:1,4
45:11
**matches** 235:3
**material** 244:24
248:4,13
**materially** 239:5,7
244:14
**materials** 57:19
182:5

**math** 256:18 258:4
258:10
**mathematical** 193:5
193:15 256:11,13
256:16,17,22
258:1,25 260:3
261:16,22 262:3
263:6
**matter** 20:8,11,14
24:2,11,18 25:12
25:19,23 38:17
42:9 56:2,16 57:4
62:2 93:23 94:2
95:20 99:14
163:13 245:17
275:8 313:5
**matters** 56:13
136:18
**maximums** 170:5
170:12,18 171:2,5
171:13,18
**may** 6:24 25:13
88:2,14 98:23
101:20 102:15,17
116:15 125:8
130:12 161:21
162:4 167:6
211:12 248:4,13
249:24 251:19
252:9 253:3,7,14
291:9 292:9
308:25 318:5
319:13 326:17
329:16,16
**maybe** 42:8 63:20
92:25 102:21
122:20 148:25
150:7,8 164:17
**mayor** 45:2
**meaning** 89:11
106:8 112:17
242:12 304:21
**means** 89:6,8 94:10
94:13 205:9,15
212:20 329:2
**meant** 235:21
277:17 317:8
**measure** 114:16,17
114:20 138:6
152:4,7 153:12,22
156:15 232:6
242:7 317:19
329:21 330:11
**measured** 136:12
233:3
**measures** 89:17
155:15 232:10
233:6

**measuring** 152:5
156:19 199:25
200:10,10
**mechanism** 48:1
185:5 220:20
280:20
**mechanisms** 11:16
47:22,24 109:1
127:18 221:6
329:15,20 331:15
**meet** 49:11 235:25
330:2
**meetings** 165:13
327:6
**members** 151:17
**memo** 221:4
**memorandum**
113:16
**memory** 104:2
106:1,16 122:19
198:5 238:4,10
299:25
**memos** 113:18
**mention** 158:6
192:12 285:5
326:11
**mentioned** 19:12
27:19 35:12 55:19
61:2 119:8 124:22
141:21 148:23
151:20 195:25
199:9 214:2 224:7
229:17 234:8
259:17 273:15
291:17 318:17
336:4
**mentions** 285:20
**met** 35:23 57:24
**method** 97:15 223:9
223:11 286:15
288:5
**methodologies**
153:21 156:9,21
287:18
**methodology** 7:11
20:24 48:1,5,8,11
48:21 49:5 96:18
96:21,23 97:20
153:25 172:9,11
172:14,20,22
286:9 317:25
**methods** 83:16,18
83:19 207:22
286:5,15,19,21
**metro** 136:6,7 140:1
140:5 202:1
230:22 231:4,6
234:8 320:18

321:16,20 322:10
322:21,23 323:2,7
323:10 324:25
325:5,6,10,12,15
325:19
**metropolitan**
323:19
**Michael** 36:18
285:11
**Michigan's** 14:17
64:25 143:18
169:9 219:18
297:4 302:15
**middle** 169:9
235:17 249:14
320:17
**midway** 135:7
**might** 29:24 56:8
86:25 126:18
163:10,25 174:13
221:16 226:23
265:2 305:14,23
306:10,13,16
307:18,23 308:21
309:4 311:18
322:5,15
**mill** 171:8
**millage** 216:25
330:4,5,14
**millages** 18:24
158:21 170:8
216:23 304:22,23
331:19
**Miller** 57:11,12,17
**million** 14:23 28:25
29:5 75:15 123:24
124:6 239:13,20
239:23 240:5,12
241:1 291:10
295:6,12,18,19
296:2 298:1
**millions** 14:14,16
142:19,24 150:14
298:14,21
**mills** 170:10
**mimic** 149:13 271:7
**mimicking** 268:15
**mind** 296:3,5
327:13
**mine** 58:9 265:14
276:4
**Minghine** 301:7,9
**minimal** 125:6
**minute** 264:3
**minutes** 91:21
142:5,8,9 246:4
312:17 326:8
**mischaracterize**

325:1
**mischaracterized**
325:7
**misquoted** 222:3
**missed** 297:25
**misstated** 179:4,7
179:23
**misstating** 179:25
**Mistakes** 84:1
**misunderstood**
179:15
**model** 38:2 46:9,12
46:14 65:21 69:22
69:25 70:4,19,24
70:25 71:4,7,9,20
72:2,6,8,9,17 73:6
73:20 76:6,10,12
76:17,19 78:14
135:9,12,17 136:1
136:10,24 150:21
151:3 152:1,21
154:8,9,25 156:11
161:22 173:1,3,5
173:16 191:20
192:19 196:17
199:3,5 202:5
218:20 258:5
274:5 288:2 292:7
292:15 314:21,22
315:4,14,16,21
316:2,12
**modeled** 161:19
162:6,12 196:11
227:24 331:3
**modeling** 30:3
153:6 155:5,11,18
156:20 255:17
292:4,10,12,18
**models** 154:12
166:4 218:11,13
218:13
**modest** 110:5 227:2
**modified** 95:17
263:25
**moment** 19:23
298:18
**monetary** 20:5
**money** 22:14 33:14
33:15,21,22 49:8
49:20,22,25 51:7
69:4 120:22
124:23 125:2
126:22 132:2,5
142:21 143:3,19
166:1,7,10 168:2
168:3,7,12,15
169:25 174:23
175:1,23 236:2

300:8,18 302:13
304:9,11 309:5,25
310:8,24 330:1
**month** 98:14 197:15
221:10 297:12
**months** 129:20
197:10,16 201:9
**Moore's** 28:1
**Moran** 64:1 79:5
85:19 113:17
144:11
**more** 11:20 14:23
17:1 28:24 30:8,9
33:8,14,15,18,21
33:22 36:8 38:5,9
39:2 41:11 51:7
51:17 55:12 57:14
58:19,21 72:15,19
72:23 75:10 78:4
117:6 118:22
139:4 167:3 168:2
168:3,6,7,12,15
175:11 176:9
188:8 196:12
197:16 198:15,17
199:7 224:13
225:10 232:7,8,8
232:11,23 233:10
266:21 267:6
272:13 284:6,16
284:23 300:17
303:19 321:15,20
323:20 324:13
326:3 328:17
330:8
**morning** 9:3
**most** 43:14 116:22
118:18 119:4
129:14,17,20
182:6,13,15
188:22 189:8
194:14 197:6
200:6 215:17
222:18 226:19
232:25 233:1
238:23 266:19
272:8,17 304:14
309:24 328:5
**mostly** 41:3 327:5
**move** 178:15,19
261:9
**MSU** 318:9,16,25
319:11,12,17,20
**much** 15:2 31:21
49:22,25 51:11,16
105:22 117:3
121:2,5,21 122:3
143:15 150:17

154:25 157:13
186:22 189:14
197:15 202:25
203:1 204:7,7,13
213:3 216:8 221:5
221:7,13,15 239:8
239:12 241:14
290:9,17 299:11
303:14 307:18
310:8 311:1
**multiple** 10:4 30:4,6
30:13,14 35:3
38:3,18 45:1
53:22 54:13 59:25
60:2 268:9 276:11
278:13
**multiplied** 95:25
**multiply** 224:2
262:4,11,16
**municipal** 3:20
25:14,18 76:2
297:11 300:14,19
300:20,24 301:2
301:14,22 302:19
**municipalities** 52:8
95:9 104:7 128:15
168:9 286:5,9
297:17 300:10,16
324:1,4 330:2,3
**municipality** 26:2
73:22 74:1 215:18
215:19
**must** 95:8
**mutual** 63:16
**myself** 13:8 46:7

_____
**N**
_____

**N** 5:1
**name** 8:1 28:7
36:19
**Named** 117:16
**names** 105:9
**Nancy** 36:19
**narrowly** 90:2
**national** 118:5
195:8 196:13
**nationally** 195:19
**nature** 67:8 74:12
**NAUGHT** 333:3
**nearly** 123:24
**necessarily** 21:20
67:3 99:22 136:11
156:4 233:12
284:14
**necessary** 61:7
118:14 301:11
**need** 31:24 38:1,15
66:6 113:20

145:17 158:12
203:2
**needed** 203:6 223:7
234:23 289:24
**needs** 114:3 204:9
204:14 235:23
**negative** 132:12
203:15 266:21,22
**neighborhoods**
144:1
**net** 76:6 77:1
125:21,24 126:10
259:22 262:18,19
**never** 11:4,12,14
17:20,24 22:25
24:12,16,21 40:12
40:14 50:20 57:24
73:14 83:10 87:5
87:10 92:23 101:4
185:19 215:9
222:7 240:22
284:14 296:3,5
299:10,19 300:25
314:25 327:13
**new** 3:16,16 8:4,4
24:8 29:24 30:10
30:18 31:25 32:1
53:2,7 61:6,10,16
61:18,19,21,25
62:7,14,16,19,22
62:24 69:7 154:18
154:21 169:2
198:11 199:6
220:6,20 223:14
230:20 241:6
276:14,21 277:21
282:5,15 320:23
329:15,25 331:4
**news** 5:12,15,20 7:5
7:6 83:24 84:3,6
84:11 87:22,25
117:20 302:10
**next** 16:11 32:20
68:12,24 132:20
140:8,12,16 141:1
141:11,14 145:15
174:13 187:1
207:14 208:18,25
214:12 221:10
225:15 240:19
241:21 242:2
243:10,23 244:1,4
244:9,14 247:16
247:25 251:10,15
251:15 252:1
283:14,15 285:18
304:19,24 305:15
305:24 306:11,14

306:17 307:3,15
307:19 308:12,25
309:1 311:25
312:4 315:24
**NICHOLAS** 3:13
**nine** 77:24
**nine-minute** 91:9
**Nobel** 115:17
**nobody** 86:7 92:16
132:18 171:11,11
171:15,16,20
188:16,20 223:13
244:6 265:3,8
299:10 330:17
332:24
**non** 271:3
**none** 323:25 324:4
**nonetheless** 212:21
**nonpublic** 19:15,19
19:21
**non-arm's** 80:21
**non-delinquent**
225:14 257:10
259:22 263:25
317:3,15
**non-recession**
275:22
**non-Renaissance**
279:7,19
**normal** 127:13
269:5 271:4,4
**normally** 194:11
**North** 2:16 4:5
187:5
**notarial** 336:10
**notary** 1:12 334:19
335:4 336:17
**note** 74:15 88:20
213:3 238:11
**noted** 64:23 65:10
226:19
**notes** 184:14,16,19
184:22 280:2
**nothing** 107:25
169:17 308:9
335:15
**notice** 336:2
**noticed** 170:9,11
171:7 214:5
**number** 5:8 6:1 7:1
25:5 36:24 53:12
64:4 75:13 76:22
76:24 81:25
104:24 111:3
112:5 121:18
145:10 153:4
193:23 202:4
221:23 222:14

227:14 230:5,10
236:18 254:6
258:13 259:2,25
274:4 275:21
287:8,13,18,20
291:22 297:21
298:10 314:22
321:5,24 327:5
**numbers** 43:3 45:15
45:20 79:7 105:14
115:25 116:4
129:5 134:9,11
224:25 226:16
228:5 233:16,20
233:25 241:11
250:10 254:4,12
254:15,20,21
255:13,15,20,24
255:25 256:19,20
256:21,24 257:25
257:25 258:11,16
259:10,18 260:1
261:14,18 262:3
263:21 267:2,13
267:24 268:5
273:25 278:22
291:9 307:17
329:7,7
**numerous** 58:12,13
**NW** 3:4
**N.W** 2:6

---

**O**

**O** 335:3,3
**oath** 334:9
**objection** 18:3 22:2
26:11 28:15 33:19
38:6 44:13 54:4,7
59:17 62:4 63:2,9
67:15 72:22 78:15
86:20 90:20 91:24
92:4 94:24 95:6
95:22 99:11
100:22 101:13,23
103:9 110:7
113:22 118:17
125:12 131:9
141:4 160:23
170:20 180:9
181:6,7 182:8
183:17 188:7,24
189:10 193:7
205:5,11 208:19
211:22 212:23
217:20 220:25
221:22 222:25
223:16,24 230:15
231:2,19 237:12

241:3,22 242:3,9
245:1 248:24
252:15 256:23
258:3,19 259:3,11
260:6,16 269:20
271:19 273:3
275:4,11 281:17
284:20 298:7,22
299:6 301:16
303:21 308:6
310:10 312:2
322:20 323:24
324:8,15,24
331:17 332:9,14
332:21
**objections** 179:17
260:15
**obligations** 252:12
253:1
**Observation** 79:4
**observations** 5:10
79:12 80:25
**observed** 270:24
**obstructed** 180:13
**obstructing** 176:18
177:5
**obstructive** 179:18
**obtain** 124:12 125:9
**obtained** 327:6
**obvious** 103:7
**obviously** 25:25
52:2 81:23 84:24
249:19 288:18
**occasionally** 57:6
**occur** 68:24 77:7
98:23 133:7 248:3
252:9 253:3,7
313:22
**occurred** 133:22
146:12 209:12,20
290:25
**occurring** 209:23
315:15
**occurs** 20:15
**October** 5:14
**off** 19:9,23 23:16
60:19 68:15 90:5
103:22 104:2
106:1,20 108:5
117:5 122:19
124:6 125:22
132:5 142:11
143:17 180:19
198:5 213:13
218:24 219:9
226:8 232:16
234:21 237:16
238:3 239:25

240:4 246:6
272:19 299:24
303:16 312:19
325:21 333:1
**offer** 26:22 52:11
126:25 217:25
**offered** 191:23
**offering** 26:9,12,13
26:17,24 34:4,8
51:1,4,6,9,10,15
52:7 126:24
**office** 36:3 46:24
47:1 48:4 63:22
64:1,4,5,9,13
79:19 80:11 101:4
113:21 114:6
158:10 182:6
184:5 195:14,16
235:9 285:21
307:21 328:15
**offices** 177:12
**official** 3:9 8:18
309:8 310:16
**officials** 36:6 44:9
84:10 143:21,24
165:17 212:11
243:6,11,16,21
244:2,7,10,13,23
245:2,6,8,12,15
245:18,22,24
246:1 306:5
**offset** 185:3
**often** 154:24 156:14
166:25 218:10
294:2
**oh** 161:11 249:15
250:18 296:2
324:12
**old** 4:5 14:3 24:8
25:4,16 164:7
220:7 236:1
300:13
**once** 107:10 239:2
261:5 280:5
**one** 15:15,18,19,22
17:1 20:12 21:24
22:9 23:6,18
30:23 32:10,10
34:10,14 35:11
36:8 37:18 53:17
68:10 72:23 81:6
83:6 85:21 90:22
99:2 101:3,20
102:21 107:5
109:23 114:14
115:9,10 116:2
117:21 118:15
121:1 128:3,16

131:21 135:11
139:1,5,10 141:21
148:19 153:24
154:7,22 156:20
158:6 159:19
170:7 173:3 175:3
177:20,21 178:2
188:8,22 189:7
198:9 215:16
224:13 226:6
229:17,19 244:5
244:22 246:17
250:11 256:6
261:2 263:10
265:11 267:6
273:13 276:7
277:5 278:14
283:15,17 284:6
285:9 286:2
287:25 289:25
291:22 302:17,17
309:18 310:5
313:24 314:22
322:5,17 325:6
327:13 329:24
**ones** 21:10,17
107:15 130:20
154:5 210:6
263:24 266:14
283:12,13 293:12
310:12
**one-for-one** 70:22
**one-to-one** 70:23
**one-year** 138:12
**only** 13:22 43:3
55:1 58:9 64:10
64:12,14 81:8
108:17 121:23
124:20 125:20
132:10 133:5,21
150:8 154:3 157:8
171:7 183:6
190:10 195:20
199:23 200:3
201:3,10,25 215:2
215:4 229:16
230:23 236:7
260:1 275:18,22
305:3,6,8 308:7,7
308:23 321:22
328:2
**onto** 275:9,16
**onward** 290:22
**open** 90:15
**opening** 9:18
**operating** 38:14
105:18 158:22
170:9 171:8

279:17,24
**Operational** 6:7
144:10
**operationally**
292:25
**operations** 119:10
119:11 127:4,5
152:2 191:3
**opines** 28:12
**opinion** 26:22 34:9
42:16 50:16,17
51:1,4,6,9,10
52:18 54:19 62:12
74:10 78:17 84:16
92:10,16 96:9,17
97:11 99:8,21
100:10 117:2
126:25 150:3
251:8 283:1
308:14 313:11
328:22
**opinions** 26:9,13,13
26:17 34:5 46:24
47:3 51:15 55:3
79:13 81:12,16,22
82:4 84:15,22
86:5 96:15 128:21
149:24 223:21
**Opportunities** 5:11
79:4
**opposed** 200:5
**order** 18:7,12 49:11
52:24 53:3 78:13
116:16 176:21,22
176:25 177:13,14
190:6 193:13
310:8
**organization**
164:18,20
**organize** 57:19
**Orleans** 230:20
320:23
**others** 65:15 103:5
106:3 107:11
184:20 266:22
275:20 300:15
309:19 332:13
**otherwise** 61:23
**out** 10:8,12,17
11:24 12:22 13:6
13:8 26:5 41:21
41:22 64:24 73:20
77:20 122:25
139:16 141:12
147:13,20 180:17
186:25 187:1
188:15,17 193:14
194:11 201:5

204:9,13 207:4,7
209:6 212:1,3
235:10 252:19
259:1 282:8
287:14 298:1,14
299:11,11,20
305:13,23
**outcome** 150:13
160:18 187:24
188:11 336:7
**outlined** 160:2
**output** 264:2
**outside** 63:22 92:15
92:17 127:13
211:15
**over** 16:13 20:15
29:3,4,20 44:22
56:7 65:18 68:24
73:12 75:15 77:23
79:22 89:9,11,18
94:14 101:7 104:3
106:23 110:20
126:23 132:20
135:1 137:4,7,10
139:5,10,23 140:8
140:12,16 141:1
141:10,14 144:13
151:15 159:10
161:21 172:2
173:20 174:13
177:10 182:21
194:4 199:9
203:21 206:10
208:18,25 212:20
219:24 222:16
235:16 236:6
237:20 241:11
243:10,22 244:1,3
244:13 259:18
260:18,18 292:20
294:5 295:12,24
297:6,19 298:14
300:15 304:19,24
305:15,24 306:10
306:17 307:15,19
313:22 319:14
**overall** 14:17 58:24
59:3 118:4 135:12
136:1 162:24
204:7 215:25
216:2 222:5 235:3
235:11 321:22
322:12
**overassessed** 83:3,8
83:9 84:25 94:11
96:9,17 97:4,7,8
107:17 204:17
205:4,10,16,17,20

270:1
**overassessments**
64:11,13 85:7
204:16
**overseen** 84:9
**owe** 76:8
**owed** 75:6,16,20,24
76:11,18 77:8,13
79:20
**own** 36:15 60:10,12
85:12 96:16
247:18,21 284:17
284:25 293:22
329:12
**owner** 71:22 275:2
283:24 284:1,8,11
284:15
**owners** 87:23 284:2
284:11

**P**

**page** 5:8 6:1 7:1
78:24 79:11,22
80:24 90:14,15
110:20,21,21
121:14 144:13
150:5 157:3,6
158:6,23 159:18
181:13,16 182:21
186:15 190:1,3,25
192:9 199:9
203:13 205:23
206:5,10 213:3,7
220:17 224:16,21
224:24 226:25
228:8,21 233:17
235:5,16,17
238:11 249:13
250:16,20 251:10
251:11,15,15,18
265:22 283:14
285:13 291:18
292:2,20 294:10
294:24 295:24
302:25 318:2
326:10 327:25
328:1
**pages** 150:8 177:23
182:22 283:23
334:12
**pagination** 250:16
**paid** 75:11 76:12
124:24 126:8,22
174:5,7 300:25
**pain** 226:14
**pains** 172:18
**pair** 84:9
**paper** 121:12

163:18 301:8
302:4
**papers** 91:15,21
**paragraph** 85:18,21
111:7 158:24
195:9 213:6
224:16 294:10
295:4 297:6,24
**parameter** 29:3
190:23
**parameters** 60:17
330:13
**parcel** 212:25,25
**parcels** 284:17
**PARKE** 3:12
**parse** 287:14
**part** 40:5 50:8 93:5
108:11 120:10
125:24 126:10
133:5 139:14
141:20,23 160:14
166:12 167:14,14
167:25 195:10
201:14,19 211:18
217:21 225:12
235:15 267:9
273:22 276:13,15
294:19 299:23
300:4
**participated** 164:7
293:10
**particular** 30:2
81:25 103:18
286:13 294:1
**particularly** 149:4
**parties** 297:7
335:25 336:6
**partner** 177:2
**parts** 48:13 52:11
217:1 306:3
**party** 248:11 294:3
316:11
**pass** 162:4 223:14
223:23
**passage** 222:23
**passed** 160:11 161:5
220:7,8 221:2
223:2 239:2
294:13 304:16
329:16
**passes** 40:8 161:25
**passing** 222:13
**past** 14:3 18:15
52:14 76:17 77:22
113:4 115:3,5
121:22 156:12
170:4,9,12,25
171:5,8 195:11

271:8 294:22
296:24 297:6,16
300:15 301:18
312:11
**pattern** 176:18
**pay** 51:7 87:24
101:18,20 107:18
107:22 125:25
161:11 170:5
171:2 198:21
264:16
**paychecks** 173:15
**paying** 76:7 101:25
102:5,10,14,18
109:13,20 158:20
158:21,22 173:16
204:20 218:3
226:8 264:13,14
284:9,18,24 285:1
304:4
**payment** 75:19
76:16 77:16,20
125:25 126:10
239:10,22 283:25
295:4 301:18
**payments** 20:6,10
76:6 77:1 78:3
167:9,18 168:4,9
168:13 235:18
238:13,18 239:5
242:1 253:9
257:12 259:23
262:19 299:23
300:12 301:3
302:13 303:20
**pending** 179:19
335:10
**pensions** 12:12
**people** 36:20 40:20
42:12 44:11,16
45:1 49:21,24
55:22 57:22 58:1
64:6,10,14 72:19
73:3 79:18 84:19
84:25 88:9,14
91:22 101:10,18
101:20,25 102:5,8
102:10,14,17
107:16,22 109:19
114:5,22,22,25
115:12 171:24
184:17,20 188:22
189:8 223:5,5
226:11 242:17
264:13 274:25
275:8,16 284:24
285:23 305:22
306:8 308:15

310:6,20 313:3
325:14,19
**people's** 211:20
**per** 110:5,11,25
111:4 112:12
124:1 167:11
203:15
**percentage** 82:6,9
111:13 139:14
264:15 267:17,20
268:9
**percentages** 267:14
**perfectly** 271:8
**perform** 192:23
298:8
**performance**
250:24 252:3,8,10
253:13,14 288:17
**performed** 78:17
131:11 192:20
**performing** 64:18
**perhaps** 309:16
**period** 16:13 20:19
73:12 74:3 122:12
123:1 129:19
130:13 137:4,8,10
139:17,23 151:16
151:20 191:4
193:24 194:2,6,8
194:15 196:3,13
200:14,18 202:15
207:10,13 213:16
217:9 229:10,11
234:17 236:10
237:4 238:4,5
241:12 258:10
267:23 269:22
272:9 274:19
284:9 290:16,18
290:21 294:5
295:7,13 298:6
310:1 323:11,16
323:18 324:2,22
332:11
**periods** 20:16
129:10,14,17
130:4 139:1,6
157:22 159:20
193:1,21 194:10
194:22,24 195:1,5
195:7 196:2
202:17,18,19
203:5 230:24
239:14 274:9
275:17 290:20
291:14 321:6
**permit** 196:25
198:12 277:2,3,6

**permits** 7:2 197:8
197:18 281:3
282:14 291:11
328:1
**permitting** 197:23
198:8,16 199:5
**person** 45:19
109:17,23,25
110:2 131:22
189:11 308:23
311:2,7
**personal** 10:14 40:6
40:6,13 100:3
156:15,16 158:25
159:5,7 160:7,12
160:20,24 161:4
161:10,12,13,21
162:3,4,7,10,15
163:4 183:5,9,15
183:23 184:10
185:4,8,11,13,21
186:8 207:21
213:4,11 219:24
220:4 221:3,16
222:3,8,24 223:9
223:15,22 254:3
262:8,9 329:17,22
330:11,22,25
331:11
**personally** 11:21
21:18 25:8 49:7
227:5 229:4 335:7
**person's** 104:25
**pertaining** 1:11
315:11 319:3
**pertains** 316:6
**pertinent** 66:24
**per-capita** 70:8
112:2,9
**pessimistic** 307:2
**phase-outs** 185:17
**phasing** 196:14
**Philadelphia**
230:19 326:2
**Philly** 230:23
**phone** 8:19 36:25
37:2 44:22 57:1
58:3 332:24
**physical** 54:3 314:6
**pick** 159:6 204:1
222:12,13 270:25
**picked** 195:22
203:25 226:16
228:5 255:13,21
256:1 322:25
**picking** 235:13
**piece** 29:24 43:8

58:10,11,23 68:10
166:11,18,21
167:19,21 275:22
306:4 309:18
316:6 328:24
**pieces** 39:12 40:17
43:11 56:21 274:5
318:22,22
**place** 46:9,12 98:11
98:12,18 206:8
208:18,24 296:5
307:5
**places** 41:10
**Plagued** 83:25
**plaintiff's** 8:12
**plan** 18:21 152:15
252:5,6,12,17
292:21 293:7
331:1,24
**planned** 18:19 19:4
44:23 97:12,16,25
98:8 99:2,22
148:9 154:19
169:13,16 186:19
187:20 188:1
190:3,7,9,16
205:25 208:17,24
210:4,23 211:12
227:1 240:7 294:3
303:11
**planning** 36:13
43:19 142:19
143:12,15,18
152:10,14 155:7
160:11 169:11
212:12 296:17
**plans** 108:16 148:11
208:3,5 296:8,12
**Plante** 64:1 79:4
85:19 113:16
144:11
**plausible** 119:7
**play** 166:23 167:5
**Plaza** 3:15
**please** 8:11,20,23
79:2 213:19 308:3
**pledged** 132:2,4
**plug** 259:1
**plugged** 134:10,12
**plunkett** 4:2 8:22
**plus** 23:21
**POA** 293:1 294:11
**point** 39:9 74:7
78:25 93:21
116:21 130:5,8
135:5 176:11
194:2,2 207:9
222:20 223:1,5

260:1 264:7
309:11
**pointed** 201:5
252:19
**police** 330:9
**policies** 164:25
166:3
**policy** 10:13,18
41:18 50:24 51:15
51:20,23 52:4,7
52:10,12,14,17
164:2,4,8,15
165:6 288:3
**political** 49:15,19
49:22 50:2,6,8
211:20 297:7
**politically-elected**
243:6
**politicians** 212:2,6
**poor** 102:11 274:23
296:21
**pops** 259:1
**population** 25:15
31:23 41:4,6 69:6
69:10,24 70:19,22
71:1,3,5 112:18
112:19 128:6
210:10 228:21
229:1,4,9,12,18
231:1,6,7,12
233:16,17,21,22
233:23,24 234:6,9
234:13,25 235:3
277:25 278:7,17
278:20 311:4,6,10
311:12,16,25
312:6,13 320:18
321:6,8,14,16,21
321:22,23 322:1,4
322:13,14,18,19
323:3 324:5
325:24 326:3
332:5,18
**portion** 23:10,22
48:14,15,22,24
49:5 50:5,9,10
69:8 70:18 236:7
236:8,14,17
243:13,15 306:6
307:11
**portions** 158:19
283:15,19,20,23
326:14 329:23
**position** 86:15 91:3
91:5,6 296:24
303:1 332:17
**positive** 120:12
153:12 230:25

231:10 266:18
269:25 291:16
**positively** 227:18
**possibility** 161:20
161:23 171:12
245:3
**possible** 53:9 62:19
62:21 69:13,17,21
73:5 98:23 132:17
140:6,10,19,21
167:7 192:6,8
244:10 245:22
**post** 196:5 228:15
311:13
**posting** 303:2,7
**potential** 164:5,14
175:19 207:12
**potentially** 148:1
165:23 168:18
308:12
**practice** 217:16,21
292:24
**predict** 240:11,15
**predicting** 136:19
137:2,11 240:13
**predicts** 76:12
**preparation** 296:14
**prepare** 39:9 52:2
267:5 272:5
280:12,17
**prepared** 57:6
91:15 175:15
229:6 234:18
254:1,16 263:8
265:13,15 279:1,3
280:8 283:10
294:9 328:14
**preparing** 55:22
**presence** 335:18
**present** 4:22 79:15
116:12 174:9
197:4 336:3
**presented** 28:13
61:19 247:14
317:20
**press** 212:2,5 223:4
**pretty** 74:23 302:16
307:2
**prevailing** 85:23
86:10,18
**previous** 35:12
65:12 238:22
250:7,9 276:9
327:4
**previously** 199:11
**price** 6:3,5 114:12
115:2,13,17 119:5
124:1 126:11,13

126:19 134:21
135:3,19,22 136:3
136:5,7,15 137:13
138:5 140:7,11,16
195:18 200:20
201:12 269:15
271:13,16 273:5
274:3,4,8,11,14
275:9 289:13
290:8
**prices** 114:16,17,20
114:24 115:15
116:5,20,23,24
117:23 118:16,23
120:3,7 124:11,14
134:23 135:1,8,11
135:16 136:4,12
136:22 137:1,14
137:17,19 138:25
139:3,9,18 140:23
141:1,2,7,13,23
141:25 157:25
199:15,22 200:4
202:7,21,21
235:11 269:1,4,25
270:3,9,15,21
273:11 275:17
289:8,10 290:2,12
290:16,24
**primarily** 130:16
**printout** 138:3
**prior** 35:21,22
75:25 76:13,25
77:8,13 106:15
154:17 197:25
238:17 240:4
289:12 291:14
300:21
**private** 56:20
121:15,21,25
122:4 132:1,4,8
132:11,15,19,25
133:3,4,6,11,13
312:11
**privileged** 63:9
**Prize** 115:18
**probability** 222:19
222:20 224:1,2
331:7
**probably** 79:7
168:21 236:20
237:7 296:14
311:1 319:16
**problem** 16:1 64:10
64:12,14 269:21
**problems** 64:4,7,8
84:4 85:1,3,6
103:24 302:7

324:13
**procedure** 1:10
195:10
**procedures** 64:24
95:10 160:1,3
163:19,21
**process** 5:13 29:10
29:14 50:2,6,8
77:4 83:5 94:14
96:13 124:13
126:6 127:13,15
172:25 175:11,24
204:11 205:12,19
208:13 320:8,12
329:6
**processes** 86:4 87:1
89:15 137:25
**produce** 150:21
176:21 177:9,9
**produced** 65:1
232:13 283:6
**produces** 95:25
150:17
**product** 258:21
**production** 184:24
315:15
**professed** 178:5
**professional** 292:6
292:14
**program** 48:16
167:24 307:4
308:16,18,24
309:4,22 310:21
**programs** 309:3
**prohibit** 51:15
**prohibited** 248:11
**project** 154:21
155:7,14 156:13
156:14 164:8
165:8,9,12 175:22
216:5 233:10
234:13,25 294:1,4
300:14,25 314:18
318:15
**projected** 70:12
248:12 250:24
315:25
**projection** 20:15
234:15,16 241:1,2
**projections** 6:12
7:13 20:13,24
247:12,22 249:22
251:2,5,7,24
252:6,14,24
253:15,21 283:20
293:1,2,4,5,11,16
293:21,22,23
294:1,8,11,15,21

307:20 308:8
313:4 314:14
328:23
**projects** 24:7 25:16
56:17 104:14
115:5 154:13,15
155:1,2,23 215:7
215:21,25 300:23
312:10 327:5
**prolonged** 321:5,7
**promise** 297:10
**proof** 88:9
**properly** 89:6 94:11
96:20 97:3 212:14
212:16
**properties** 39:20
75:10,12 76:8
80:20 96:3,19
107:10 108:5
109:12 119:13,17
119:24 124:6,18
124:22 125:3,9,22
126:5,12,13
143:21 205:3
212:16 284:25
**proportion** 23:12
23:14 56:9,10
105:11
**proposal** 113:6
**proposals** 113:3,12
113:14,15,18
153:13 162:22
163:6,9,11 166:25
**proposed** 113:11
160:8 185:1 287:6
329:20
**proposing** 323:5
**protection** 297:25
**protesting** 226:12
**provide** 40:18 52:9
52:17 99:1 101:8
138:18 187:8,18
187:21 221:23
316:7
**provided** 36:6,10
37:18 42:18,23
43:6 46:23 58:3
63:25 76:25 82:3
82:8,14 86:7
113:7,13,15 123:6
123:9 158:10
221:20 225:6
250:6 254:1 258:8
265:3,8 279:4
286:3 294:2
295:10 305:15
315:24 317:13
318:4 319:10,12

319:13
**provides** 293:2
317:2
**providing** 51:25
**proving** 252:11
**public** 1:13 16:8
19:13 41:17 76:5
312:11 334:19
335:4 336:17
**publicity** 302:7
**publicly** 157:11
201:23
**published** 163:18
202:9
**pull** 197:14
**pulled** 116:14
122:13,20 130:19
192:14 197:15,16
207:8 214:8
265:19 267:8
277:11
**purchase** 147:6
**purchased** 273:18
274:6
**purchasing** 72:19
73:3 109:12
**purpose** 198:7
265:18 327:18
**purposes** 13:23
132:6 155:8 313:9
**pursuant** 1:9
314:23 315:5
336:2
**pursue** 51:21
**put** 17:2 57:8 58:6
58:24 59:6 62:15
92:4,8 93:8
100:17 108:18
113:12 120:22
133:16,18,24
134:5,16 137:23
169:2 183:24
184:11 195:15
196:17,21 218:20
221:4 223:20
234:20 242:11,12
248:22 254:18
276:20 307:5
311:13 318:16,19
320:5,10 328:17
**puts** 198:20
**putting** 254:25
293:14,18
**P.C** 4:3
**p.m** 142:12,16
180:20,24 246:7
246:10 312:20,24
333:2

**Q**

**qualifications** 149:2
**qualified** 24:21
41:25 82:12,17,20
82:21
**qualifies** 213:4
**quarter** 118:6
**question** 11:21 22:5
22:7 31:7,15
32:16,20 36:8
49:3 62:5 65:4
66:2,20,20 72:24
73:23 77:11 92:5
94:25 99:19
104:10 110:9
118:12 120:18
129:17 140:9
151:14 152:11
161:9 163:7
164:19 176:14
178:11,13,17,18
179:5,10,20 185:9
198:3 203:11,12
213:18 215:24
225:24 232:24
240:23 243:8
260:9,11,18,25
261:9 284:4,6,21
304:6 305:17
308:2 311:6
314:16 329:18
**questioning** 91:2
**questions** 9:7,10
47:10 87:17 90:19
91:1 180:8 184:4
280:14 329:11
332:2
**quick** 90:4
**quite** 161:8

**R**

**Raid** 297:4
**raise** 29:25 52:20
53:3,7 55:7
168:22 169:24
287:6
**raised** 18:12 170:4
170:18 171:1
**raising** 18:21
165:23,25 168:18
288:19,23 330:7
**ran** 44:2 184:6
**random** 242:23
**ranks** 118:3
**rapidly** 118:23
**rather** 225:18
265:10 297:9
**ratio** 156:14,17

**rattner** 4:2 8:22
**re** 1:3 8:8 334:3
335:12
**reach** 89:13 196:23
**reached** 87:11
**read** 27:22 28:1,7
28:10,11,21 81:13
88:3 102:12,16
107:16 113:18
121:23 148:23,25
150:4,8,8 178:21
212:10 213:21
246:24 247:2
249:25 250:12
294:18 296:9
302:11 308:2,5
314:15 316:15
334:11
**reading** 28:16 102:8
**real** 10:14 11:10,12
11:25 79:25 80:6
80:8 81:20 82:12
90:4 117:9,11,17
118:6 127:18
158:24 159:5,6
207:21 253:24
254:3 262:7 330:4
**realistic** 224:10
242:12 265:2
**reality** 89:17
**realized** 251:19
**realizing** 145:16
**really** 30:2 70:10
135:13 179:18
242:23 245:7
254:21 269:9
270:11 280:1
308:16 330:17
**realm** 52:4
**realtor** 116:20
117:1 199:10
201:23 289:11
328:2
**realtors** 116:9 157:4
157:19,25 199:14
199:19 200:1
272:24 289:2,6
**realtor.com** 118:4
118:10
**reappraisal** 43:20
186:19 187:10,20
188:1,11,15,17
190:15,21,24
205:24 206:7,17
206:23 207:12
208:10,13,17,24
209:4 210:24
211:8,12,14,15

212:7 225:19,22
225:25 226:3
264:8
**reappraisals** 190:17
209:24
**reappraise** 212:22
**reason** 101:20 107:9
155:17 158:12
208:7 211:18
310:5
**reasonable** 78:6,7
100:12 141:2,5
183:23 184:8
222:21 223:6,8
224:3,7,8,10,13
226:22 228:18,20
235:14 242:11,11
275:1 278:10,12
295:13,14,16
297:19,23 298:3
298:11 308:8
309:24
**reasonably** 66:1,4
**reasons** 101:17,19
139:8 211:20
282:1
**reassess** 213:1
**reassessing** 97:18
**reassessment** 97:12
97:16,20,21 98:1
98:9,17,20,23
99:2,5,8,18,22
186:15 190:3
212:13
**reassessments**
190:18 209:24
212:1,11
**rebound** 322:14
**rebounding** 235:14
**recall** 9:20 19:23
28:16,18 34:12
36:20,24 37:6
40:19 101:12
102:20 106:19,22
114:13 115:8
117:7 149:7,17
152:2 182:14
183:3,7 230:2
319:4
**recalling** 88:2
**receipts** 222:4,8
**receive** 20:3 24:17
39:13 46:25 68:10
76:20 86:13 89:25
125:3,18,23
126:16,18 174:24
282:16 305:1
**received** 24:13

30:10 44:5 57:6
61:6 69:5 89:10
89:22 90:3 93:16
108:18 113:16,17
115:17 181:24
184:3 243:3
299:16,18 300:17
301:19 307:10
309:19 313:18
**receives** 23:11
126:4 246:2
330:11
**receiving** 173:25,25
**recent** 14:11,21
43:14 116:22
118:18 130:1
194:14 197:6
226:19 232:1,18
238:23 272:8,14
272:17 282:10
303:6 304:14
328:5
**recently** 103:24
109:7 119:14,17
119:18 217:6
232:20
**recession** 53:13
78:1 194:23,23
226:19 274:21
302:16
**recessions** 192:10
**recognize** 265:11
**recognizes** 113:19
**recollection** 29:1,4
77:25 100:18
144:2,5 198:5
**recollections** 85:5
**recommendations**
6:8 50:25 51:20
51:23 52:10,13,15
144:10
**reconcile** 317:8
**record** 8:12 60:19
60:23 79:6 90:5,8
142:11,15 178:20
179:22,24 180:19
180:23 213:20
246:6,9 308:4
310:19 312:16,19
312:23 333:1
**recording** 8:5
**reduce** 132:3
186:22 190:7,20
211:20
**reduced** 162:8
164:10 196:6,22
196:23 206:19,24
335:19

**reducing** 210:12
211:19 269:23
**reduction** 10:24
108:2,4,8,12,16
108:17 111:13
120:6 142:20,22
143:2,13,16,19,25
144:21 145:1
146:4,7,8,11
148:8,15,16
162:10,12,15
183:3,15,23 184:7
184:9 185:8,11,16
185:21 186:9
187:19 190:2
203:14 209:19,19
209:25 210:16
220:18 222:4,8
224:3,3 227:17
277:24 331:9,13
**reductions** 15:25
111:19 145:4,5
185:3 196:16
209:22,23 210:3
**refer** 250:19
**reference** 67:18
275:25
**referencing** 284:3
**referendum** 40:7
221:9 222:17
**referring** 159:24
308:1
**reflect** 248:13
**reflected** 269:18
285:7
**reforms** 88:16
**regarding** 38:24
99:7 134:23
169:12 187:19
197:8 206:16
258:16 283:6
301:22 311:24
314:21
**region** 136:6,7
140:5 231:14,22
232:14
**regional** 5:21
121:12,13 128:13
**reimbursed** 185:3
**reimbursement**
329:15,20 330:10
331:16
**reinvestment** 57:9
108:19 120:8
132:13 133:6,9,10
133:15,17,20,25
134:2,6,6,8,9,11
134:13,17 153:1

153:13,18,23
156:3,22,23 191:1
227:12,15 228:1
234:19,22 263:11
263:17,20 264:19
265:5 293:5,23
323:4,12 325:25
326:5
**reinvestments**
152:9,14 227:2,6
227:9
**related** 24:6 66:1,5
66:25 109:16
175:15 329:16
336:6
**relates** 26:10 251:7
251:24 252:14,24
253:15 314:17
**relating** 85:8 86:9
247:21 253:21
**relation** 148:3
**relationship** 9:23
25:25 70:23 72:5
72:7 121:2,8
125:20 131:12,15
136:14 147:24
165:11 192:3
201:18 228:1
231:11,15 278:7
278:17 300:6
**relatively** 169:6
**released** 36:3
297:12
**relevance** 319:5
**relevant** 66:7,9,11
66:12,15,17,18,22
170:15 171:10
195:13 217:1
296:6
**reliability** 82:12,15
82:18 133:20,22
251:4 317:6
**reliable** 34:22 38:5
38:10 61:9,23
62:21 74:4,8
82:22 101:5
114:19,20,21
123:12 127:23
128:24 129:1
301:3 313:10,12
**reliably** 80:5
**reliance** 248:10
**relied** 43:23 47:2
114:11 128:1
131:19 157:3
272:25 316:21
**rely** 34:10 46:23
47:4 114:23,25

184:21 293:21
294:2 328:21
**relying** 42:11
**remain** 159:19
214:25
**remaining** 240:3
**remains** 241:7
**remedy** 324:13
**remember** 19:9
68:15 88:25 93:10
117:5 123:5
149:21,22 166:4
183:1 184:12
203:25 216:4
220:3 272:23
300:5 319:2,2,11
**remembering**
168:21
**remembers** 178:5
**REMI** 152:1 154:10
288:2
**removal** 108:5
120:9,12,16,21,23
121:5,9 144:2
**remove** 108:4
143:21 226:7
**removing** 107:5,10
**Renaissance** 37:17
37:20 38:4,13,20
38:25 39:2,6
105:17 158:5,12
158:14,16,20
198:21 213:5,11
254:4 279:5,7,10
279:22
**repeal** 160:12 221:8
331:12
**repealed** 160:25
**replace** 331:19
**replaced** 220:11,12
220:20 221:6,13
280:4 309:23
310:3,6,24 329:24
**replacement** 185:5
**replaces** 330:14
**report** 5:19 6:9,10
7:3 26:14,17,21
27:22 28:2,10,11
28:21 29:1 34:11
34:13,20 35:11
39:21 40:11,12
45:4,7,9,18 46:7
55:19 64:23 65:1
86:8,13,21 87:11
110:18 111:23
114:11 118:7
141:21 145:9,12
145:14 148:24

149:23,25 151:2,2
151:12 157:1,3
158:23 183:24
184:11 189:24
193:4 195:3,6
229:22,23 230:2
233:17 248:11
291:18,20,25
292:2 293:2
294:19 296:9
298:2 317:2
**reported** 1:24 45:12
199:18 317:10,16
335:17
**reporter** 8:23,25
**reporter's** 84:16
**reporting** 8:3
199:21 200:2,3
**reports** 10:5 27:4
27:20,20,24 35:3
35:5 43:2 44:2
118:2 229:17
**represent** 10:1
**representatives**
165:14 300:24
**representing** 2:12
2:20 3:9,19 4:9
267:21
**repurchase** 109:21
**repurchasing**
109:14
**reputable** 115:14
**request** 37:10,13,14
39:23 142:2
**requested** 39:5,13
39:17 40:18 45:17
61:11 178:21
213:21 308:5
**requests** 40:21
**require** 82:24
315:14
**required** 302:23
**requirements** 310:7
330:2
**requires** 256:12
310:7
**reread** 178:17,17
213:18 261:9
**research** 5:18 34:11
34:19,22,25 35:3
35:7 154:18
**researching** 35:8
**reserve** 296:8
**reset** 135:22,23
136:15,16 202:23
**residential** 6:23
72:12 75:8 103:17
106:17,18,22

117:12,17 137:9
157:5 198:9
201:14,21,24
202:12 203:7,14
204:8,14 206:6,12
206:20,24 207:2
207:18 208:16,23
209:3,6,21 210:4
210:9,22 224:17
225:1,11,14,21
226:20 227:20
262:6 264:16,21
266:7 273:22,23
276:13,16 277:15
278:1,8 280:23,24
289:2
**residents** 72:3 212:9
**respect** 10:9 77:7
172:15 247:12
316:11
**respected** 115:20,22
**respective** 335:25
**respond** 37:10,12
37:15
**responsibility**
247:18 248:7
316:3,8,11
**responsible** 21:9
189:3 293:18
309:2
**rest** 131:13 274:21
296:9
**restate** 152:11
**restore** 303:4
**restructuring** 16:21
61:11 108:19
293:5 323:4,11,21
325:25 326:5
**resubmitted** 101:4
**result** 17:3,14 99:18
152:21 187:20
188:1 190:8,21
206:22 225:23
270:16 296:1
298:5,15 301:13
**resulting** 208:13
252:10
**results** 150:25 209:5
210:24 225:20
248:2,8,14 316:12
**retained** 9:25 16:9
24:8,24
**retention** 24:18
**Retirees** 3:10 8:18
**retiree's** 142:3
**reveals** 79:13
**revenues** 16:25 18:2
19:4 24:3,12 29:8

33:25 34:14,16,23
47:20 50:18,22
51:2,5 54:24 65:3
65:6,16 69:23
70:2,20 71:7,20
88:19 112:9
115:25 121:6
125:10 127:12
132:8,16,25 133:4
135:9,17,24 136:9
137:3 149:7,12
151:3,7,15,19
155:13,19 156:11
156:22 163:5,10
164:10,15 165:1,6
191:21 192:2,7
215:10,18 216:1,2
227:3,6 232:8
233:10 237:11,15
237:20 243:3,5,25
244:8,11,15,24
245:3,20 253:8
299:15 303:2,11
307:24 318:13,25
319:6
**reversed** 325:24
**review** 5:13 27:7
60:13 79:13 85:12
85:14,19,22 86:3
87:6 88:13 96:13
100:15 137:25
199:8 271:15
**reviewed** 27:1,4,6,9
27:19,21 111:23
134:23 201:11
291:17
**reviewing** 122:17
**reviews** 63:22,25
86:25 113:8 123:7
**Revised** 169:19
171:18
**revolving** 77:1
125:21,24 126:10
127:14 259:22
262:19
**re-ask** 31:7 49:3
**Rhodes** 1:6 93:1
334:6
**riddled** 84:8,17,21
85:24 86:10,18
87:7
**ridiculous** 93:4,11
100:3 183:7,16,19
186:9,12 226:13
**right** 16:14 22:23
30:25 53:19,20
62:3,17 63:13
74:22 91:12,17

93:25 101:18
104:13 106:25
115:21 121:7
127:21 128:22
137:16 139:16
157:23 158:10
160:10,22 161:10
161:12,13,15,24
166:17 167:23
171:14 176:13
180:5 183:2,3
199:23 200:8,9
205:2,2 223:20
228:4 230:21
233:6 236:20
241:5,13 243:1
244:6 245:7
259:18 260:21
267:12 271:7,11
275:10 283:19
289:16 295:23
300:6 302:4
308:23 309:14
312:14 325:11
331:6
**rightmost** 267:14
**right-hand** 250:17
**RIMS** 154:9
**Robert** 27:22
**Rockefeller** 3:15
**role** 10:9 41:2 57:4
57:11,13,15
**roll** 107:6 108:5
144:15 226:8
**rolls** 245:16
**roughly** 146:7 147:7
**round** 197:14
**RPR** 1:24
**rule** 61:13 90:24
91:25 92:20,23,23
**ruled** 180:7
**rules** 1:10 90:24
91:25 95:7 96:14
330:4
**ruling** 177:1,3,15,18
178:3,6,10 179:15
180:1,3
**run** 45:4,6,18 46:6
65:2 184:9,14
**running** 180:17
303:12,18 304:3
**runs** 65:2,5,9,14

**S**

**S** 2:3 5:7
**safety** 144:4 227:17
**SAITH** 333:3
**sale** 125:3 126:5,11

126:11 136:16
199:21 200:4
**sales** 6:23 72:20
73:4 80:19,20
81:7,7 125:19
126:13,18,19
157:5 165:19,21
165:23,25 166:12
166:14 167:3,4,6
167:8,15,17,20,22
167:25 168:3,6,10
168:18,22 169:4
169:12,13,16
199:19 200:11,16
200:20 216:12
220:14 232:7,8
236:22 266:4
272:7,10 273:1,5
273:10 274:4
275:18,19 289:2
290:8 297:8
307:12,14,18,24
308:9 318:5,12,25
319:5,8,18,22
329:6,7
**sallee** 1:9 5:3 6:9
8:6 9:3,13 61:2
90:12 142:18
178:25 181:2
227:1 246:13
251:16 269:12
296:6 313:2 332:5
334:8,14 335:9,14
**sam** 3:3 8:17
**same** 129:24 146:20
146:21 147:1
178:13 203:23,24
218:25 231:6
236:14,16,19,21
245:24 260:18,24
263:14,23 264:2
273:6 285:23
334:13
**sarah** 2:5 8:15
**Sarna** 47:5
**satisfy** 169:25
**savings** 54:20
**saw** 151:23 182:12
231:4 277:4
295:16 314:25
**saying** 22:25 70:15
94:23 107:16
123:11 131:20
146:25 163:15
205:3 206:17
212:7,11,13,15
308:18 310:20
315:2

**says** 79:12 80:25
81:6 84:7 85:21
111:10,21 118:25
121:14 144:20,23
151:25 158:23
183:18 188:4,14
227:1 249:14
251:1,18 252:5
254:8 273:9 292:4
292:23 294:11
295:3,16,24 297:6
297:24 302:5
314:21 315:13,22
315:24 316:8,10
318:3,8,17 320:17
321:15 325:3,4,5
325:6 328:14
**SBT** 169:2
**scanning** 112:19
**scant** 181:24
**scenario** 120:9,11
132:14 133:9
134:8,17 156:3
191:1,16 225:9
227:8,21,24
234:22 263:11,17
263:20 264:19
265:6 295:25
**scenarios** 133:11
156:22,23 227:16
234:20
**Scheckel** 4:24 8:1
**school** 41:21
**schools** 144:3
**science** 292:11,18
**scientific** 64:17,19
**Scorsone** 319:20
320:13
**Scranton** 230:20
320:23
**se** 167:11
**seal** 336:10
**seasonally** 130:3
**second** 22:2 85:21
92:9 111:10 118:5
210:24,25 226:10
280:13 294:10
318:2 326:10
327:25
**seconds** 63:20
**section** 85:15
110:22 250:23
252:1,3 292:20
293:1
**sections** 150:7
**Security** 187:4
**seeing** 192:25 230:2
269:24 270:2,10

290:23
**seek** 65:25
**seeks** 138:6
**seem** 310:12
**seemed** 149:14,15
150:18 223:6,10
**seems** 119:7 155:4
211:18 253:1
295:23
**seen** 57:13 67:18
73:13,14 78:21,22
84:1,3,6 86:22
87:13,18,19,25
88:1,2 100:17
102:9,13,17
110:18 117:9,20
120:23 144:11
157:21 182:5,9
221:17,18 222:7,9
222:10 226:11
241:8 246:14,19
249:7,8 314:10,12
315:10 318:24
**select** 76:24 77:5
78:6 192:21
202:13 203:19
221:7 222:20
226:24 228:6
234:11 256:5,25
257:6,16,23
258:12 261:19,20
**selected** 77:16 134:7
159:8,25 225:8
228:19 255:16,22
256:3,20 257:19
257:25 258:15
259:10,13 261:14
263:21
**selecting** 60:16
65:20,22 67:8
116:3 207:24
**selection** 199:1
259:24 260:4
**sell** 76:5 126:7
141:23 273:15
275:3,12
**selling** 116:5 124:18
125:9 136:14
**sells** 135:21 137:18
274:13
**SEMCOG** 128:9,13
234:3,4,5,13,15
234:16,18,22
235:1,4 311:13
332:8
**senate** 221:4 310:20
**sending** 100:13
107:7

**sense** 38:15 40:8
64:6 71:23 151:23
156:4,5 194:16
198:11 231:6
252:25 259:7
300:23 303:13
322:3
**sensitivity** 28:22
29:6 149:6,11,16
149:20 150:18
151:8,10,12,22
294:25 295:9
**sent** 39:23 40:12
88:5 330:1
**sentence** 84:7
111:10 118:3
247:16 251:9
253:11 294:11
302:25
**sentences** 302:25
**separate** 158:24
327:21,22
**series** 9:7 59:21
**service** 330:7
**services** 18:7 47:14
52:1,1,24 53:3
72:20 73:3 102:11
191:20,23 192:1,4
192:6 297:5 330:8
330:9
**set** 82:25 137:22
192:17 207:20
221:2 235:18
245:6,10,15
287:22 330:5,6
336:9
**sets** 299:20 300:2
**setting** 48:9,12,22
49:5 243:12
**seven** 168:19
**seventh** 118:4,25
119:4
**seven-county**
128:14
**several** 30:9 37:18
37:19 61:3,5
65:11 137:24
184:1 208:18,25
306:23,23 321:17
329:23
**shape** 296:22
**share** 92:25 198:14
243:18 277:13
**shared** 93:13
**Shavi** 47:5,9
**sheet** 325:2
**short** 60:21 90:7
180:21 246:8

312:21
**shorter** 20:18,21,22
202:18
**show** 45:13 92:2
132:24 136:2,8
174:5 177:17
260:20,22,23
261:7 271:17
277:4 281:3
**showed** 14:21
101:14 102:21
150:11 321:3
**showing** 79:19
92:10 137:13
150:16 157:25
198:1 227:25
266:6 295:10
**shown** 117:11
133:17 254:18
255:8 259:5 263:5
329:7
**shows** 116:20
132:13 134:25
136:4,21 138:24
197:13 266:3
272:18,25
**shuffling** 91:21
**side** 70:8 71:15
204:8 209:3 210:9
225:21 227:20
280:2
**signature** 334:13
335:23
**significant** 21:24
22:9,13,15,19,21
22:22 23:1,4 35:8
35:10 117:2
121:24 122:2
145:23 146:1
251:20 281:15
**significantly** 14:10
116:25 295:17
**similar** 238:6
266:11,12 275:21
293:11,16 294:7
**similarly** 243:20
**simply** 109:20
**simulation** 273:21
**since** 43:16 106:9
121:16 122:18
171:11 178:2
229:13,21 285:19
290:25 313:17
**single** 92:5 220:11
281:7
**single-family** 138:7
**sister's** 37:5
**sit** 62:2

sitting 81:3 91:14
91:20 118:24
219:2,6,8 236:12
244:19
situation 17:10 30:2
46:21 52:25 54:13
62:22 67:7 156:18
225:13 270:2,5,11
271:5 294:7
302:16
situations 67:10
155:9
six 225:18 260:9
sixth 260:7 261:7,8
size 40:10 228:16
skill 82:25
slated 160:25
217:13
slight 226:3 228:9
slightly 65:12
130:12 234:24
235:4 240:17
317:19
small 39:18 40:3,13
105:24 150:12
183:5,8 226:14
smaller 108:6
111:12,19 226:9
smiling 260:21
Social 187:4
software 154:2
288:1
sold 124:13,22
126:13 199:24
200:7,7,14,18,21
200:23,25 202:24
273:19 274:8,12
solicit 100:10
somebody 41:11,25
82:21,24 92:13
98:6 156:19 227:7
254:25 294:6
someone 71:22
153:17 173:16
something 34:16,17
44:22 71:16 72:10
88:1 100:6,7
102:12 122:15
134:15 137:21
140:20 152:17
154:22 155:6
156:24 171:25
217:12 241:17
272:3 283:1 284:3
308:19 309:23
313:12
sometime 285:15
sometimes 29:25

30:1 45:10 52:18
62:14
Somewhere 239:20
sorry 25:3 27:3,4
75:7 106:18
129:12 201:8
206:2 280:15
296:4 320:20
sort 22:19 31:25
34:20 46:9 56:3
71:14 107:21
121:1 135:25
144:4 150:16
153:5 154:19
166:25 196:10,13
198:24 201:16
202:7 204:6
214:19 218:11
224:2 227:24
228:15 229:18
231:4 232:13
234:6,8 235:10
236:4 256:13
264:7 271:3
274:23 287:14
309:24 310:13
322:14
sound 298:3
sounds 106:25
source 21:24 22:9
22:16 34:22 81:15
115:14 116:2
127:23 128:1,5,8
128:24 167:17
301:3 305:6,8
sources 21:4,5,6,13
21:14,15 23:6,18
50:14 54:19
148:19 157:16
305:14
southeast 128:10
231:14,22 232:18
speak 14:25 15:9
16:5 103:16
104:10 130:20
305:4 311:8
Speaker 310:19
speaking 179:17
260:14,16
special 20:4
specialist 8:2
specific 25:16 37:13
37:14 50:24 51:20
52:10,12 53:10
65:20 81:17 87:10
93:16 105:9
107:25 109:15
113:6 128:15

154:19 155:24
164:1 165:3
213:22 215:7
217:25 221:23
232:23 286:7
312:10 324:16
specifically 16:6
35:14 53:5 89:1
96:25 97:23
101:24 106:19
125:14 134:1
139:13 140:4
162:6 202:1
274:20 290:13
specifics 54:5 85:1
88:22 99:1,4
149:22 166:3
211:10
specify 193:5
speculate 92:13
281:24 290:19
speculating 275:5
speculation 78:13
102:3
speculators 109:11
speech 179:21
spend 142:19,21
143:2,16,19
324:13
spending 121:2
323:20
spent 56:1,11
spoke 37:7 309:8
spreading 204:9
spreadsheet 6:15,16
6:17,18,19,20
7:15,16 213:15
253:25 254:5,21
255:2 256:15
257:3 263:8
265:11,13,16,18
267:3,5,7 272:1,2
272:5,11,22
273:10,25 278:2
278:21 279:1,3,13
280:7,25 281:2
282:19,21 283:2
291:6 295:22
318:4
spreadsheets 59:9
59:11 253:20
289:17 327:21
328:6
SS 335:2
stabilization 225:23
stabilizing 132:12
225:21
stable 78:4

staff 51:23 112:21
112:25
standard 68:5
114:16 153:9,11
153:21 154:11
156:20 160:1
178:7,7
standards 80:5
83:14 247:8,10
standing 180:9
181:5,8
Stansell 306:24
308:13 326:11,16
326:20,23
Stansell's 307:2
start 63:14 107:10
264:14,16
started 25:13 32:1
100:14 222:15
237:7,7
starting 39:19
139:16 207:9
253:21
statement 6:14
45:14 145:18
187:7 220:21
235:17,19 237:14
247:25 248:5,17
249:10,11,20
250:1,3,5,9 251:1
251:6,23,25 252:5
252:13,23 253:15
292:8 314:25
315:11,17,24
316:13,16,17
317:11
statements 30:16
44:1 52:3 59:1
102:9,13,17 247:3
247:23,24 248:21
249:21 250:13
308:17 310:18
317:14
states 1:1,10 14:7
169:6 217:16,19
217:23,25 218:6
218:16,21,25
334:1 335:10
statewide 128:12
221:12,14
state's 35:18 295:16
298:5 299:12,19
state-by-state
218:13
statistics 6:23
127:22 128:20,23
131:8 157:5
statute 297:16

299:19,22,24
300:2
statutory 48:22
167:21 169:25
170:5,12,18 171:2
171:5,13,18
235:22 236:1
295:4,11 297:9
299:23 301:18
stay 216:21
steady 78:4
stenographically
335:17
steps 303:3 317:20
328:20
Steven 1:6 334:6
still 77:13 137:17
158:20 161:18
299:24 309:6
stock 138:8 199:24
200:6
stop 180:10 260:12
277:7 325:7
stopping 157:18
stories 117:20
streams 242:7
Street 2:16 3:4
stress 67:13,16,18
67:21,22,24,25
68:3
structured 166:18
299:3
studied 104:7
studies 55:6,11,14
55:15,17 56:20
123:9
study 43:20 56:23
81:8 87:3 118:5
181:25 186:19,23
187:10 188:2,11
188:15,17 190:15
190:21,24 205:24
206:7,17,23
208:17,24 210:10
210:24 211:12,14
217:24 225:20,23
225:25 227:25
228:4 264:8,20,24
265:4,8 321:2
stuff 253:2
subject 39:18 63:22
161:6 185:7,15
186:4 213:11
248:13 251:20
279:16,24
subjective 28:14
292:5,13
submit 100:9

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7148-6   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 110 of
116

**submitted** 65:15
**Subscribed** 334:16
**subsection** 159:18
**subsequent** 157:22
  284:2,11 315:15
**subset** 199:23
  201:10
**substitute** 60:12
**substituted** 308:21
**substitution** 152:23
**subtracted** 279:23
**suburbs** 322:24
**successful** 170:25
  251:2
**suffer** 143:5
**suffered** 111:18
**Suffice** 293:3
**suggested** 17:20
  308:24
**suit** 336:7
**Suite** 1:14 3:5 4:5
  335:8
**summaries** 283:6
**summary** 110:21
**sums** 126:18 185:2
  299:3 301:12
**supervision** 53:23
  54:2 320:11
**supporting** 265:4
**supposed** 49:10,11
  81:1 125:22
  127:15 235:25
  236:3
**sure** 19:1 38:16
  41:20 42:25 43:3
  45:3,15,19,20
  56:19 66:6 68:18
  69:6 72:9 91:22
  93:23 100:8,19
  119:7 147:22
  171:9 172:18
  246:5 250:4,10
  285:14 306:1
  313:9 317:21
**surplus** 303:12
  304:9
**surpluses** 303:3,7
  303:14,18 304:3
**surprise** 323:23
**surprised** 178:6,8
  313:16
**surprising** 94:8
  99:24,25 100:5
  119:3 139:17
**survey** 218:9,23
**surveys** 218:5
**swaps** 177:22
**swear** 8:24

**sworn** 9:2,14 334:9
  334:16 335:14
**Syncora** 2:20,21
  8:13 63:17 170:16
**Syracuse** 230:21
  320:23
**system** 44:3 45:7
  83:25 84:8,17,21
  85:1,4,12 88:19
  270:11
**systematically** 83:4
  89:9 94:14
**systems** 12:20 44:4
  45:13

---

**T**

**T** 5:7
**take** 34:4 38:1 66:6
  70:5,25 73:6
  75:18,23 90:4
  98:1,2,20 120:9
  142:1,4,6 152:23
  153:3 174:18
  175:18 176:9
  180:18 193:22
  194:3 204:11,11
  205:25 206:8
  208:17,24 209:8
  210:2,14,18
  211:16 218:13
  244:13 245:18
  246:3 270:15
  271:17 273:24
  294:6 303:3
  312:18
**taken** 1:12 8:6 17:7
  59:5 60:22 90:7
  126:1 142:14
  180:22 211:3
  217:11 234:22
  246:8 312:22
  334:10
**takes** 76:6 244:20
  248:7 268:24
  270:21 271:1
**taking** 1:11 88:14
  114:8 212:25
  331:9 336:1
**talk** 16:9 19:12
  41:12 44:25 45:1
  54:14 58:9 63:14
  63:19 158:4
  165:14 185:25
  190:1,2 192:9
  193:4 300:23
  305:7,9 311:15
  327:19
**talked** 17:17,24

**31**:12 37:4 41:3,9
  41:10,13 42:12
  45:19 64:10,15
  84:25 101:10,14
  158:9 184:2 186:1
  208:4 255:14
  267:8 268:13
  276:14 280:18
  288:1 303:23
  305:22,25 307:9
  307:11,13 308:7
  308:23 310:16
  311:19
**talking** 21:11 90:16
  96:6 181:19
  182:13 215:25
  221:25 222:3,4
  252:17 291:20
  314:13 320:2
**talks** 85:19 123:21
  228:25
**tape** 180:17
**targeting** 144:1
**taxation** 56:22
**taxed** 161:14,18
**taxpayers** 162:8
  264:16 284:17,18
**team** 16:22 39:23
  40:21 44:25 61:11
  87:2,4 88:24,25
  151:17
**technically** 140:20
**technology** 12:17
**telephone** 3:14 4:4
  4:23
**tell** 44:22 82:22
  106:16 122:3,7
  170:3 187:8
  200:20,22,24
  219:5 242:21
  253:23 255:12
  264:4 272:2,19
  274:22 300:5
  304:18 307:1
  308:20 311:23
  326:7
**telling** 32:17,19,21
  44:12 63:8,17
  91:9 93:10 180:5
**tens** 150:14
**Ten-Year** 6:11
**terms** 11:18 18:14
  18:21 20:5 29:8
  40:22 46:20 48:16
  77:6 78:9 112:12
  118:15 119:4
  120:16,24 122:3
  126:19 134:16

**150**:13 152:8
  169:10 172:9
  187:25 188:12,17
  188:23 194:16
  197:23 198:4
  201:11 208:1
  224:9 228:14
  243:22 244:2
  279:25 288:19
  305:10 314:23
  315:1,5,13 322:14
  326:4 331:15
**test** 42:22 46:2
  67:21,24,25 68:3
  133:19,21
**testified** 9:15 332:5
**testifies** 187:3
**testify** 87:16 93:25
  94:1 127:3,5,7,11
  127:16,21 296:13
  296:15,18 304:25
  311:3,3 331:24
  332:17 335:14
**testimony** 90:23
  92:2,10,14,19
  93:7 179:2,11
  180:2 181:3 182:4
  187:12,15,16,23
  188:6,10 325:1
  335:16,21 336:9
**testing** 42:17,21
  43:6,12 67:13,23
  278:16,19
**tests** 67:16,18
**text** 250:12
**Thank** 28:9 79:9
  269:13 332:22
**their** 13:17 16:10,24
  16:24,24 18:22
  35:17 43:25 44:3
  45:7 46:7,20
  49:13 52:25 59:6
  68:11 76:25 83:4
  83:4 95:10 96:13
  96:14,15 100:10
  101:11,18,20,25
  102:5,14,18
  103:17,24 107:17
  108:25 118:10
  125:24 130:18,25
  131:7 153:2
  163:18,19 173:17
  195:19 202:22
  205:12 208:4
  225:7 226:11
  227:15 234:18
  245:22 264:14,16
  274:10 275:9,16

**276**:9,13 284:18
  284:24 285:1
  293:22 303:11,11
  319:18 331:1
**theirs** 131:2 235:3
**themselves** 8:11,20
  330:3
**theoretically** 33:20
  192:5,8 211:5
**thereof** 336:8
**they'd** 45:5 178:3
**thing** 125:20 146:20
  147:1 171:7 305:3
  310:13
**things** 18:17,19,20
  21:22 26:14 38:1
  43:21 49:11 51:18
  57:6,7,20 60:7
  69:8 85:9 114:14
  128:3 134:16
  141:22 154:8
  166:17,22 167:4
  176:8 179:12,24
  179:25 193:10,17
  193:19 194:21
  195:6 198:15
  199:7 200:10
  201:25 210:8
  222:18 225:21
  226:6 227:16,18
  232:12 233:11,13
  235:25 244:16,19
  244:21,22 269:4
  274:24 287:8,13
  289:25 302:10
  311:19 313:18
  315:7
**thinking** 141:24
  175:25 187:6
  190:19 204:10
  223:9 275:25
  276:5 287:23
  288:11 331:7
**thinks** 113:23 114:2
  205:20 227:21
  307:3,4 310:16
  312:3
**third** 8:4 144:24
  145:2 160:14
  248:11 294:2
  297:5 316:11
  328:1
**Thomas** 4:24 8:1
**though** 14:20 15:6
  16:18 17:20 20:8
  25:6 27:11 31:15
  35:9 44:16 45:23
  61:17 69:23 81:15

84:20 89:1 97:3
101:3 103:7
108:24 112:14
119:2 136:21
137:12 152:18
163:13 173:22
177:25 178:11
196:16 212:13,18
212:18 221:12
223:20 227:25
267:18 269:23,24
309:8,15 311:10
324:22
**thought** 41:9 43:9
56:21 60:17 98:13
101:5 107:16
109:24 143:22
144:4 155:25
156:1 174:2,3,6
205:17 226:13
276:16 296:10
308:8,15 309:4
310:24 313:13,15
**thousands** 177:23
177:23
**three** 49:9 72:11
98:2 139:11 154:8
177:10 205:25
206:1 236:15
271:1 324:24
**three-year** 138:15
139:1,6
**through** 41:12
91:15 109:1
116:13,15,17
124:13,18 125:3,9
125:19,19 126:5
126:14,18 127:17
135:7 150:7 153:8
157:14 166:12
181:14 194:15
197:5 201:20
202:11,20 203:5
204:10 205:1,12
218:12 222:19
235:12 249:20,25
250:3,9,11 258:6
277:23 287:4,23
288:22 300:14,15
310:6 330:1
334:12
**throughout** 29:10
30:7 195:12 268:6
**thumb** 61:13
**time** 8:7 20:15,16
26:1 29:20 36:8
37:4 56:1,4,5,6,8
56:10 60:19,24

68:4 72:23 74:4
90:5,9 91:7,10
98:11 109:6
116:12 130:13
142:11,16 159:20
161:21 169:7
172:2 173:20
176:16 178:16
180:19,24 188:8
193:24 194:2,6,8
194:24 195:1,5,8
197:4 202:15,18
203:5 215:2,4
216:6 218:8,8
229:11 230:24
236:6 237:4
239:19 246:6,10
259:18 260:7
261:2,7,8 262:14
274:19 284:7,9,13
289:23 290:16
294:5 309:11
312:19,24 313:22
332:11 333:1
**timely** 125:24
**times** 18:18,25
29:23 30:13,14,17
31:20 36:22 37:9
37:12 44:21,23
45:2,4,15,16 61:3
61:5 65:11 176:15
178:14,14 194:11
224:7 226:18
260:8,9 261:4
262:17 268:9
324:24
**tip-toe** 186:3
**title** 34:15 249:13
302:5
**today** 9:7 10:1 81:3
118:24 185:19
186:7 187:14
202:23,24 219:3,8
236:12 244:19
273:20 274:11
**together** 57:8 58:6
100:17 108:18
113:12 133:16,18
133:24 134:5,17
137:23 195:15
221:4 223:21
234:20 242:12
248:22 254:18
255:1 293:15,19
311:14 318:16,19
320:5,10 328:18
**told** 85:2,4 86:24
92:6 93:17 98:2,4

98:10,13,19,21
99:12 123:13
124:14,16,25
170:7 171:11,15
177:14 178:6
179:7 180:8,11,17
189:19 299:25
315:22 326:16
330:25
**Toledo** 230:21
320:23
**tools** 154:2 288:1
**top** 19:9,23 23:6,16
23:18 68:15 90:16
103:22 106:20
117:5,17 132:5
138:4 143:17
157:5 190:3
206:10 213:7,13
218:24 219:10
232:16 237:16
239:25 251:10,18
272:19 292:2
303:16 325:21
**topic** 302:10
**total** 24:12,14,17
38:12 138:7 145:7
214:23 255:15,17
257:13 263:4
279:6,21,23
281:11 291:10
295:18 297:18
**toward** 158:5
**towards** 112:11
257:4
**Tower** 3:5
**town** 117:17 118:4
**townships** 13:19
15:10 48:18 309:7
310:25 323:16
**to-wit** 335:7
**track** 268:20,21
**tracking** 118:6
**trained** 83:10,12,18
83:19
**transaction** 80:17
**transactions** 80:2
80:21 81:2,8,19
81:21,24 82:2,4,7
82:10 83:4 167:3
181:20,24 182:7
182:13,15,18,19
275:21
**transcript** 177:16
177:24 334:11
335:21
**Transcription**
335:20

**transcripts** 176:20
**transferred** 119:13
**Transformation**
5:22
**translate** 72:15
270:21
**translates** 121:3
**transportation**
12:19
**treasury** 236:25
237:1 306:22
309:20 328:16
**treated** 166:5
**treatment** 161:20
172:9
**trend** 38:24 39:1
130:10,19,22,24
131:12 193:5,13
193:14,15 194:21
237:25 270:2
**trends** 77:2 78:2
115:15 131:14
192:25 193:3
194:16,19 195:2,3
195:8,12 229:18
266:5 268:18,20
268:21 270:23
**trend-wise** 78:5
**trial** 177:22
**Tribunal** 79:13
**tried** 121:4 132:19
133:11 174:24,25
194:11 299:10
**tries** 138:6
**trouble** 178:4
**troubled** 292:25
**true** 70:14 129:24
187:17 201:2
247:15 261:19
293:19 297:15
302:12 335:20
**truth** 335:14,15,15
**try** 10:8 16:3 44:19
54:16 61:20 76:3
114:8 132:24
149:13 154:24
**trying** 26:22 179:11
194:25 215:10
223:8 267:19
310:15
**turn** 79:22 101:7
110:20 144:13
156:25 227:10
**turnaround** 117:17
118:4
**turned** 65:17 76:2
**TV** 273:11
**twice** 37:1

**two** 26:14 38:21,24
39:2 48:13 50:3
84:10 85:22 135:2
136:23 137:14
147:19 182:22
187:6 204:24
223:17 226:6
232:12 234:11
236:13 271:1
274:5 283:23
303:10,15 306:3
321:13 322:5
327:11 331:10
**two-page** 283:15
**two-thirds** 213:14
**two-year** 164:8
**type** 37:17,21 39:3
45:18 85:8 128:19
134:22 151:11
159:4 172:21
193:8 225:7
257:11 273:6
279:5,8,11 287:19
289:3 291:5
293:16 309:25
317:4,16
**types** 258:7 259:20
276:25 304:22,23
**typewriting** 335:19
**typically** 154:7
155:15 167:10
270:14 271:20,22
287:15

---

**U**

**Uh-huh** 31:3 79:17
84:13 86:13 90:18
110:1,23 123:22
138:10,17 139:2
159:2 183:13
186:18 187:13
191:6 199:12
213:8 228:12
229:3 230:3,11
278:5 289:19
318:7 320:12
326:12 328:4
**ultimately** 32:3,4
148:5 159:8
202:19 227:11,18
228:6 256:24
257:16 279:16
**unable** 252:12,25
**unadjusted** 130:3
**uncapped** 273:11
**uncapping** 141:22
273:14
**uncertain** 309:22

**uncertainties**
251:21
**uncertainty** 224:1
**unchanged** 159:20
240:3
**uncommon** 112:24
**under** 15:7,12,13
17:2,4 18:18
53:22 54:2 90:24
91:25 97:6 99:22
105:22 116:25
141:2 145:8
160:20 166:15
169:22 171:18
172:6 185:1,6,12
190:15,25 191:20
196:6 226:25
238:1 252:12
254:14 311:1
320:10 329:15,20
330:11 331:4
**underassessed** 89:9
89:12,18 94:12,15
212:21
**underestimate**
240:25 241:4
**underlying** 252:6
**underneath** 295:15
329:1
**underpins** 261:18
**understand** 9:10,22
11:17 14:9,12
29:7 57:5 65:4
93:24 94:16,25
97:17 140:9 163:7
185:1 195:11
203:11 207:21
243:8 284:21
286:24 287:11
**understanding**
11:16 16:20 57:3
57:10 58:23 59:2
103:4 126:6 138:9
146:8 149:1
178:25 185:6
189:16 212:24
295:21 297:14
299:22 309:2
314:24 315:3,19
316:5 323:25
331:18
**understood** 13:19
38:16 45:19
131:22 317:21
**undertake** 88:13
**undertaken** 102:4,7
102:22 109:7
**undertaking** 292:5

292:13
**undertook** 54:16
326:4
**undetermined**
335:10
**unemployment**
274:24
**unfair** 178:12
**unforeseeable**
253:13
**unforeseen** 252:1,8
252:20 253:3,7
**unidentified** 97:20
**unionized** 112:22
112:25
**unique** 271:6
**united** 1:1,10 334:1
335:10
**unknown** 245:19,20
**unlawful** 94:21 95:2
**unlike** 236:1
**unpaid** 75:15 76:1
**unrealistic** 313:4,15
**unreliable** 62:9
**unrepresented**
79:16
**untapped** 50:15
54:20
**until** 196:14 228:22
229:1 233:24
234:4,15 280:14
294:18 311:12
328:3
**unusual** 173:13
270:5,11 293:6
**update** 61:7,17
62:13 218:9,10,12
267:2 272:13
280:25 281:2
283:2 285:16,17
315:14
**updated** 30:17 61:3
61:5,12,14 65:10
116:11 197:3
273:6 289:17,20
289:24,25 291:8
318:4 319:18,19
**updates** 290:1
**updating** 315:20
**ups** 196:4
**upset** 300:11,16
303:19 304:3
**uptick** 130:1
**up-to-date** 267:6
**urban** 10:18
**use** 23:2,3 50:21
60:16 78:6 92:1
115:6,25 116:4,11

116:16 130:22
134:13 147:13,16
147:16 152:7,12
152:16 154:7,8,9
154:10 155:17
156:4,5,10,14
158:24 160:4
166:12 168:1,14
168:16 187:18
192:17 195:7
196:3 197:17,20
198:7,22 201:10
201:12 202:4,10
204:1 211:12,17
226:21 229:5
234:16 235:8
238:17 239:15
256:4 257:16,23
277:9 286:9,16
287:25 288:17
289:20 294:6
329:25 330:1
**useful** 155:7,10
266:1
**user** 173:21
**users** 34:6 174:8
**uses** 68:5 96:24
128:9 166:7
167:16
**using** 66:15 77:16
77:19,22 96:14
97:5 139:3 140:13
153:2 154:22
156:7 172:19
193:17 194:9
195:22 201:11
204:4,5 208:9
211:6,6 228:17
239:17 240:2,7,10
240:10,14,16,23
241:5 242:11
256:11,21 260:4
261:15
**usually** 156:7,7
186:5 248:1 271:1
299:14
**utility** 34:6 173:21
174:8 185:14,14
224:18 225:3
262:8
**utilized** 115:2
**U.S** 8:9 160:4
274:21

— V —

**valorem** 42:25
43:15
**valuation** 11:10,12

12:10 80:25 82:8
**valuations** 80:1
81:19 82:2,13,23
115:3
**values** 30:4,6 39:10
65:20 68:25 69:2
99:10,18,21 108:9
115:25 117:9,12
127:18 136:12,21
137:6,11 144:5,24
145:20,22 146:14
188:12,18,23
189:1,4,8,14,21
190:8 191:8,15,18
201:17 202:9
203:8 228:11
234:13 243:12
254:9,10,11,14,15
254:17,18,22,22
254:24 255:3,8,10
255:18 263:13,19
263:21,23 268:13
268:15,17,20,23
269:3,18,18
270:16,22 271:10
271:17
**valuing** 79:25 80:5
**variable** 307:8
**varied** 77:18 149:21
159:4 203:23
**varies** 135:25
**variety** 109:1
153:21 253:13
**various** 18:16 23:9
30:5 31:23 47:14
113:4 164:25
192:18 195:2
196:8 203:4
217:15,22 218:7
218:16 219:14
221:6 227:19
242:17 257:20
259:6 268:9
286:15 323:15
**vary** 29:10 77:20
159:10 255:20
257:7 286:11
**varying** 150:11
**vast** 81:18
**verbally** 44:17
**verify** 43:8,12,24
44:6,10,19 45:8
45:22 46:1,3
317:6
**version** 239:1
246:18 250:7,8
315:16 328:5
**versus** 174:5 202:23

240:16
**very** 39:11 90:21
92:21 105:24
119:6 125:6
173:16 307:8
318:15
**vi** 110:21
**via** 3:14 4:4,23
**video** 8:2 260:20,22
260:23 261:6
**videographer** 4:24
8:1,5,19,23 60:19
60:23 90:5,8
142:11,15 180:19
180:23 246:6,9
312:19,23 329:9
333:1
**videotaped** 1:8
**view** 34:23 41:24
50:14 74:7 89:7
103:13 146:16
205:10 225:25
278:11 295:9
311:24
**viewed** 115:14
**Viewer** 5:24
**villages** 48:18 309:7
310:25 323:15
**Vitality** 48:16
167:23
**vote** 160:18 161:17
161:25
**voters** 160:13,25
161:7 221:9 223:3

— W —

**W** 1:6 334:6
**Wacker** 1:14 8:7
335:8
**wagering** 12:5,8
34:6 173:21
**Wait** 91:8
**waiting** 251:13
**waive** 63:15
**waived** 335:24
**waiver** 63:16
**want** 10:8 16:18
32:23 33:21 37:19
37:24 40:3 51:19
63:13,15 93:20,21
93:22 94:4 99:16
99:20,23 100:1,4
100:6 123:5
177:12,17 180:10
180:15 238:9
249:16 262:3
266:9 268:10
269:21 270:4

286:23 287:1,14
288:12 298:23
299:8 313:8,14
319:13 327:19
**wanted** 17:1 37:17
37:22 38:3,16
40:8,10 98:10
143:21 181:13
194:22 246:20
266:5,10,10 268:7
268:14 272:6
308:18
**Washington** 2:7 3:6
**wasn't** 88:7,11
164:16 215:19
221:15 322:7
**waste** 84:1,9,18,21
84:23
**wasting** 91:7,10
178:16
**way** 38:23 52:4 67:7
74:12,15,15,17,20
76:14 94:22 95:3
95:4,17 99:2
129:23 132:10
136:1 153:5,25
172:19 173:3,19
176:19 180:7
186:24 204:17
223:21,25 236:2
237:8 240:22
241:10 255:3,5
263:23 270:10
287:21,25 288:4
302:17 313:10
336:6,7
**Wayne** 76:21,25
77:17 189:19,20
197:1,8 198:2,12
212:13,15,18
257:12 259:23
262:18 277:12,13
281:15,18,22
282:3
**ways** 95:17 154:3
227:14 309:6
329:24
**website** 157:12
**Wednesday** 118:7
**week** 84:11 223:18
238:25
**weeks** 223:17
**well-known** 268:23
**went** 59:12,15 91:11
91:12,16,17
116:17 144:18
194:12 237:8
239:13 289:11

324:6
**weren't** 25:8 38:19
79:19 91:22
107:18 153:18
155:20 264:13
**West** 1:14 8:7 335:8
**we'll** 142:4 223:17
**we're** 30:15 71:23
77:22 93:7 156:7
156:7 162:9
175:24 177:12
178:18 180:23
198:6 212:3
214:19 220:10
261:8 290:23
296:5 329:9
**we've** 30:9,14,16,17
53:13 65:10,17
101:9 120:11,11
122:9 151:20,23
162:12 164:2
174:24 177:10,23
182:5 199:10
268:13 309:19
312:16 330:24
332:1
**WHEREOF** 336:9
**whichever** 147:12
276:12
**while** 91:21 304:4
**whimsical** 242:23
**whole** 52:11 282:3
309:13 335:15
**widely** 114:18
115:20,22
**widespread** 302:6
**william** 4:4 8:21
**williams** 4:2,2 8:21
8:22
**wiping** 209:5
**wish** 314:21
**withheld** 173:15
174:4
**without-RRIs**
295:25
**witnesses** 10:4,9
179:2
**witness's** 90:22 92:2
**wondering** 21:19
34:21 87:13 214:4
254:2 280:8 286:8
306:7
**Woodward** 4:5
**word** 22:22 23:1
66:12 222:2
246:24 293:15
330:8
**work** 13:13,16,22

13:25 14:1,6
24:25 25:5,8,11
25:13 30:5 35:1,8
35:13,25 40:24
46:8 47:5 52:9
55:1,2,24 56:3
59:7 83:1 84:10
86:21 115:7
118:14 127:15
168:21 175:22
195:12 215:17
222:16 253:21
288:6 293:25
294:6,21 296:13
299:14 300:19,22
301:11 314:25
315:12 325:14,19
327:5 330:18
**worked** 14:3,5
35:16 36:2 53:17
56:22 86:4 104:12
104:14 164:21,22
312:10
**working** 39:9 56:6
87:5 88:21 98:13
127:13 164:13,16
164:17 215:19
**works** 56:14,19
57:17
**worry** 261:11
**worth** 197:10 275:2
**Wortley** 306:22,23
307:9 318:3,19
326:23 328:16,17
**wouldn't** 12:22
14:16 41:24 42:2
45:8 48:24 50:3
58:17 62:10,13
78:16 80:18 89:13
94:4 99:16,20
104:21 117:6
119:3 125:25
127:21 152:16
156:4 167:11
197:11 200:17,22
200:24 205:18
241:4 255:4
303:22 311:1
313:8
**write** 248:25 276:3
283:13,21 318:21
326:13
**written** 98:16
166:22 184:16,19
184:22 307:25
326:18 329:1
**wrong** 88:6
**wrote** 249:3,4

283:11,12,14,14
283:15,19,20,22
318:22,22 326:14

___

**X**

**X** 5:1,7 121:3

___

**Y**

**yeah** 35:15,24 56:18
58:17 67:10 85:20
101:19 105:7
111:2 123:22
129:18,25 134:24
135:7,7 139:2
155:9 175:6
181:22 186:20
188:14 191:11
192:20 201:5
209:15 220:2,5
221:25 230:8
264:24 265:12
278:3 279:2 280:9
286:25 289:15,16
292:22 295:14
305:9 311:9
312:15 313:6
321:3
**year's** 76:17 77:1
81:7 158:7
**year-by-year**
229:20
**year-end** 299:8
**year-to-date** 289:7
289:13
**year-to-year** 272:10
291:16
**York** 3:16,16 8:4,4
**Young** 4:23 7:7
9:25 10:4 19:16
28:13 29:6 35:20
50:21 51:19,22
52:6 54:22 58:6
58:24 59:9,13
73:11,15 85:11,22
86:2,8,14,24
109:25 183:2
218:5 237:19
238:1,7 248:6,22
294:16 311:11
313:3 315:20,25
316:10
**Young's** 37:10
51:14 86:16

___

**Z**

**Zone** 38:13 105:18
158:13,14,20
198:21 213:5,11

254:4 279:5,7,10
279:20,22
**Zones** 37:17,20 38:4
38:20,25 39:2,6
158:5,16

___

**$**

**$1** 123:24
**$20** 28:25
**$22,000** 124:1
**$40** 239:23 240:5,12
241:1
**$5** 144:21 146:2,6
**$5,000** 139:19
**$504** 75:15
**$6** 297:19
**$68** 291:10
**$70** 295:12
**$700** 14:23

___

**0**

**084-004143** 1:25
336:18

___

**1**

**1** 5:9 28:19,24 29:3
78:18,21 89:6,11
89:14,16,20,23
90:1,3 94:9,18,20
95:13,20 96:4
106:1 146:19
150:16 151:15
183:10 205:7,13
205:18,21 212:17
212:20 228:9,13
228:20 277:16,19
283:14 295:25
334:12
**1:32** 180:20
**1:39** 180:24
**10** 5:24 20:22 68:17
68:20,24 89:22
90:3 117:6 128:17
128:19 132:20
140:8,12,17 141:1
141:12,14 145:8
145:15 162:12
174:13 183:4,11
184:7,9 192:9
202:21 215:10,23
216:3 218:22
219:1,7,12,15,17
219:19,21,24
220:9,15 235:10
236:9 237:15,21
241:21 242:2
243:10,23 244:1,4
244:9,14 273:18

274:7 304:20,24
305:15,24 306:11
306:14,17 307:15
307:19 308:25
311:25 312:4
332:19
**10-year** 73:12 74:9
74:10,13 128:9
137:4,7,10 139:23
151:16,20 191:4
195:15 196:10
214:16 215:5,6
230:9 234:2
235:13 238:12
242:13 247:21
293:4,4 295:12
296:1 307:21
311:5 328:24
**10:01** 60:20
**10:09** 60:24
**10:47** 90:6
**10:56** 90:9
**100** 58:20,21 62:12
225:3 240:20,21
**100,000** 75:10
**10112** 3:16
**11** 6:2 105:17
134:18,20
**110** 5:18
**117** 5:20
**12** 6:4 121:15 138:1
138:3
**12,000** 81:7
**12.86** 138:16
**12:02** 142:12
**12:44** 142:16
**121** 5:21
**123** 5:23
**128** 5:24
**13** 6:6 144:7,9
181:19 199:9
203:13 289:7
**13-53846** 1:5 8:10
334:5
**1301** 3:4
**134** 6:2
**138** 6:4
**14** 6:9 144:18
145:11,12 206:5
289:7
**144** 6:6
**145** 6:9
**15** 6:10 166:21
176:15 178:14,14
202:21 205:22
206:5,10,11 209:1
209:2,5 229:24
230:1 273:18

274:7 292:2
**15.37** 138:13
**15.8** 111:11
**152** 181:13,16
**16** 6:11 246:12,14
247:4
**16,000** 119:13 275:3
**16,068** 274:15
**17** 6:13 23:13
148:22 213:3,7
249:5,7
**173** 295:19
**18** 6:15 111:14
182:25 220:17
224:16 253:18,20
254:7
**19** 5:14 6:16 224:22
224:24 265:7,10
**1961** 169:20
**197** 250:16,21
**1980** 229:19
**1990** 230:4,12 231:5
231:7
**1990s** 324:23
325:11,13
**1995** 157:5 201:6
**1998** 157:6

― 2 ―

**2** 5:12 83:22,24
166:20,24 203:15
233:21,22 234:7
236:22 265:10
**20** 6:17 29:5 138:24
162:9,10 170:10
171:8 202:22
214:3 220:18,18
226:25 228:8,8
271:24 272:1
**20-city** 138:19
**20-mills** 171:9
**20-year** 138:19
**200-page** 150:9
**2000** 229:13,21
230:5,13 231:5,8
**2000s** 270:24
**20001-2113** 2:7
**20005-3364** 3:6
**2001** 157:6,11
194:13 201:6,8
290:22,25 302:16
**2003** 298:1
**2004** 220:10
**2005** 106:9 238:18
**2006** 121:16 122:20
199:15 201:4,6
274:15 275:2
**2007** 106:17 168:21

**2008** 106:24 111:12
111:15 144:18
146:7
**2009** 295:19
**2010** 129:4,7 130:4
135:6,7 229:19
275:20
**2011** 129:11,12,15
129:17,20 130:4
135:7 274:16
275:20
**2012** 5:14 111:12,16
129:24 237:8
266:24 267:3
277:25 281:6,12
295:19
**2013** 25:13 75:3
116:14,18,22
130:11 144:19
146:7 157:6,14,15
157:18 158:7
183:8 194:15
197:5 199:16
201:8 206:13
207:1 209:9,10,12
209:14,15 237:24
267:7,11 277:25
281:1 285:20
290:4 298:1
319:14 326:19
328:3,25
**2014** 1:15 6:24 7:2,8
8:5 19:11 38:11
39:19 98:11
116:22,25 117:10
117:23 118:23
130:1,9,11,12
157:22 168:20
184:3,6 197:7,18
197:20,24 198:4,6
201:9 239:11
249:24 267:9,11
281:1 285:17
289:11 290:3,12
290:24 291:9
294:13,23 328:25
334:10,17 335:7
336:11
**2014-2023** 295:7
**2015** 38:12 105:16
183:4 210:20
238:13,20,21,24
239:1,5,11,15,16
239:18,22 240:9
240:15,16 253:22
257:18 329:1
**2016** 203:16
**2017** 228:10

**2019** 209:2 264:10
**2020** 186:16 187:1
203:16 209:3,9
264:5,10
**2021** 264:5
**2022** 264:5 318:10
**2023** 195:20 196:1
253:22 264:6
**2024** 228:22 235:6
**2025** 235:7 237:2,9
**2027** 195:21,24
196:5
**2029** 228:22 229:1
233:22 234:5,14
234:24 235:1
311:12,13
**2029-30** 234:5
**2033** 229:2 233:22
**2034** 233:23
**2043** 233:23
**2044** 233:24
**2050** 234:15
**2053** 233:24
**21** 6:18 79:22 80:24
228:21 233:17
278:23,25 296:2
**22** 6:19 235:5 280:6
280:7
**22nd** 37:8
**223** 182:21,23
**224** 186:15
**229** 6:10
**23** 6:20 282:17,18
**24** 6:21 8:5 111:14
235:16 283:4,5
334:10 335:7
**24th** 1:15
**246** 6:11
**249** 6:13
**25** 6:23 238:11
288:24 289:1
292:20
**25th** 336:10
**253** 6:15
**26** 7:2 291:3,5
**265** 6:16
**267** 295:18
**27** 7:3 291:23,24
294:10
**271** 6:17
**278** 6:18
**28** 7:5 297:1,3
**28.03** 272:9,11
273:1,4
**280** 4:5 6:19
**282** 6:20
**283** 6:21
**288** 6:23

**29** 7:6 301:6,8
**291** 7:2,3
**297** 7:5

― 3 ―

**3** 5:13 7:8 87:9,13
225:1 233:23
234:7 236:22
**3.4** 235:6
**3:06** 246:7
**3:14** 246:10
**30** 3:15 7:7 63:20
74:11 90:24 91:25
142:5 214:18
314:8,10 318:9
321:12
**30-year** 234:4,20
235:15 242:13
**300** 2:16 4:5
**301** 7:6
**31** 7:9 316:18,20
**314** 7:7
**316** 7:9,10
**317** 7:11
**32** 7:10 142:8
316:23,25
**320** 7:13
**327** 7:15
**328** 7:16
**33** 7:11 123:21
124:6 317:22,24
**332** 5:5
**333** 334:12
**34** 7:13 320:14,16
**35** 7:15 142:10
239:20,23 240:4
240:12,25 327:8
327:10,14
**3500** 1:14 335:8
**36** 7:16 90:14,15
328:8,10
**382** 5:19

― 4 ―

**4** 5:15 87:9,22
166:19,22,23
167:12,13 203:15
239:13 266:24
**4.8** 230:6
**4:46** 312:20
**4:55** 312:24
**40** 142:10 214:12,15
214:22,23 215:1
218:22 219:1,8
237:21 239:20
290:17 312:1,4
**40-year** 74:7 215:3
236:10 237:16

293:4 311:5
332:19
**40.5** 281:10
**41.2** 281:6
**42** 290:3
**42.13** 289:8,11
**45** 142:9
**48009** 4:6

---
**5**

**5** 5:16 78:24 79:11
90:10,13 145:1
147:11 183:3
230:6,9 249:24
276:12 294:13,23
295:4,10
**5:24** 333:2
**50** 56:8 103:18
147:8 161:22,25
162:3,7,11 209:18
217:25 225:1,11
225:13
**50/50** 222:13,20
223:6
**51** 2:6
**52** 294:24
**550** 81:8

---
**6**

**6** 5:18 110:15,17,21
144:13 157:3
**6.2** 297:8
**600** 3:5
**60654** 2:17
**61** 295:24
**61,000** 275:2
**61,444** 274:15
**63** 199:15
**64** 275:2

---
**7**

**7** 5:20 117:13,16
158:23 183:10
221:25
**7th** 37:5
**70** 103:25 104:3
106:19 295:6
**70s** 226:21
**732** 298:1
**75** 150:8 291:18
**76** 106:23
**77** 1:14 8:7 335:8
**78** 5:9

---
**8**

**8** 5:21 121:10,12
159:18
**80** 104:1

**80s** 106:21 322:23
**83** 5:12
**83.68** 111:16
**87** 5:13,15 225:2
264:5

---
**9**

**9** 1:4 5:4,23 13:3
17:13,21 73:16,17
123:16,18 144:19
190:1,3,25 192:9
324:6,12,20 334:4
**9:04** 1:16 8:8
**90** 5:16 246:4
312:17
**90s** 323:8,14,19
**92.64** 111:15
**95** 157:10
**950** 8:4
**97** 250:16,20,21
**98** 157:10,11 201:6