# EXHIBIT 8

**Kopacz Deposition Transcript**

- MARTI KOPACZ - VOLUME 1-
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN


In Re                    ) Chapter 9

CITY of DETROIT, MICHIGAN,        ) Case No. 13-53846

        Debtor.        ) Hon. Steven Rhodes


DATE: July 31, 2014
TIME: 9:12 a.m.

                VOLUME 1
        VIDEOTAPED DEPOSITION OF MARTI
KOPACZ, held at the offices of Squire Patton
Boggs, 30 Rockefeller Plaza, New York, New York,
pursuant to Order, before Hope Menaker, a
Shorthand Reporter and Notary Public of the State
of New York.

1          - MARTI KOPACZ - VOLUME 1-
2     A P P E A R A N C E S
3     GEOFFREY S. STEWART, ESQ.
4     CHRISTOPHER DiPOMPEO, ESQ.
5     ALEXANDER BLANCHARD, ESQ.
6     Jones Day
7     51 Louisiana Avenue, N.W.
8     Washington, D.C.  20001
9        Appearing on behalf of the Debtor
10
11    STEPHEN C. HACKNEY, ESQ.
12    Kirkland & Ellis, LLP
13    300 North LaSalle Street
14    Chicago, Illinois  60654
15       Appearing on behalf of Syncora
16
17    KATHLEEN HITCHINS, ESQ.
18    Sidley Austin, LLP
19    1501 K Street, N.W.
20    Washington, D.C.  20005
21       Appearing on behalf of National Public Financing
22
23
24
25

1          - MARTI KOPACZ - VOLUME 1-
2     ALFREDO R. PEREZ, ESQ.
3     Weil, Gotshal & Manges, LLP
4     700 Louisiana Street, Suite 1700
5     Houston, Texas  77002
6        Appearing on behalf of Financial Guaranty
7        Insurance Company
8
9     LISA SCHAPIRA, ESQ.
10    Chadbourne & Parke, LLP
11    30 Rockefeller Plaza
12    New York, New York  10112
13       Appearing on behalf of Assured Guaranty
14       Municipal Corporation
15
16    SHANNON L. DEEBY, ESQ.
17    Clark Hill, PLC
18    151 South Old Woodward Avenue
19    Suite 200
20    Birmingham,  Michigan 48009
21       Appearing on behalf of the Retirement Systems
22       for the City of Detroit
23
24
25

1          - MARTI KOPACZ - VOLUME 1-
2     JENNIFER K. GREEN, ESQ. (Via Telephone)
3     Clark Hill, PLC
4     500 Woodward Avenue, Suite 3500
5     Detroit, Michigan  48226
6        Appearing on behalf of the Retirement Systems
7        for The City of Detroit
8
9     SAM J. ALBERTS, ESQ.
10    Dentons US, LLP
11    1301 K Street, N.W.
12    Suite 600, East Tower
13    Washington, D.C.  20005
14       Appearing on behalf of the Retiree Committee
15
16
17    ALLAN S. BRILLIANT, ESQ.
18    Dechert
19    1095 Avenue of the Americas
20    New York, New York 10036
21       Appearing on behalf of Macomb County
22
23
24
25

```
 1              - MARTI KOPACZ - VOLUME 1-
 2    STEPHEN D. LERNER, ESQ.
 3    Squire Patton Boggs
 4    30 Rockefeller Plaza
 5    New York, New York 10112
 6         And
 7    SCOTT A. KANE, ESQ.
 8    Squire Patton Boggs
 9    221 E. Fourth Street
10    Suite 2900
11    Cincinnati, Ohio 45202
12         Appearing on behalf of the Witness
13
14    JONATHAN M. WAGNER, ESQ.
15    Kramer Levin Naftalis & Frankel LLP
16    1177 Avenue of the Americas
17    New York, New York 10036
18         Appearing on behalf of the Ad Hoc COPS Holders
19
20    JAYE QUADROZZI, ESQ.
21    Young & Associates
22    Orchards Corporate Center
23    27725 Stansbury Blvd. Suite 125
24    Farmington Hills, Michigan 48334
25         Appearing on behalf of Oakland County
```

```
 1              - MARTI KOPACZ - VOLUME 1-
 2
 3    OLGA KOGAN, ESQ. (Via telephone)
 4    Davis Polk & Wardwell LLP
 5    450 Lexington Avenue
 6     New York, New York 10017
 7         Appearing on behalf of Merrill Lynch
 8
 9
10    HEATHER HUBBARD, ESQ. (Via telephone)
11    Waller Lansden Dortch & Davis, LLP
12    Nashville City Center
13    511 Union Street
14    Suite 2700
15    Nashville, TN 37219
16         Appearing on behalf of US Bank
17
18
19    ALSO PRESENT:
20         Jochen Schmitz, Greenhill & Co. LLC
21         Thomas Devine, Videographer
22         Brian F. Gleason, Phoenix
23
24
25
```

```
 1              - MARTI KOPACZ - VOLUME 1-
 2                     INDEX
 3    WITNESS:  MARTI KOPACZ
 4    EXAMINATION BY                    PAGE
 5    MR. STEWART                       12
 6    MR. HACKNEY                       98
 7
 8    REQUEST FOR ADDITIONAL INFORMATION       PAGE
 9
      E-mail Communications            295
10
11
      INSTRUCTED NOT TO ANSWER              PAGE
12
      MR. KANE                    344
13
14    EXHIBITS FOR IDENTIFICATION
15    NUMBER      DESCRIPTION           PAGE
16    1      Expert Report of Martha E.M.     13
             Kopacz
17
      2      4/22/14 Court Order          14
18
      3      Jones Day Spreadsheet Listing    20
19           Materials Provided by City of
             Detroit to Phoenix Management
20           Services
21
22
23
24
25
```

```
 1              - MARTI KOPACZ - VOLUME 1-
 2         THE VIDEOGRAPHER:  Good morning.
 3    We're now on the record.
 4         The date is July 31st, 2014, and the
 5    time is approximately 9:12 a.m.  We are
 6    located at the offices of Squire Patton
 7    Boggs, 30 Rockefeller Center, New York, New
 8    York.
 9         We are taking the deposition of Marti
10    Kopacz In Re: City of Detroit bankruptcy,
11    U.S. Bankruptcy Court, Eastern District of
12    Michigan, Southern Division, Chapter 9, Case
13    Number 13-53846.
14         My name is Thomas Devine and I am the
15    video specialist with Elisa Dreier Reporting.
16         The court reporter is Hope Menaker,
17    also with Elisa Dreier Reporting.
18         At this time I would like to ask the
19    attorneys to please introduce themselves for
20    the video record.  Please state your name,
21    the firm with which you are affiliated and
22    whom you represent after which the court
23    reporter will swear in the witness, then we
24    may proceed.
25         MR. STEWART:  I'll start.  Geoffrey
```

2 (Pages 5 to 8)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 3 of 146

1        - MARTI KOPACZ - VOLUME 1-
2  Stewart, Chris DiPompeo and Alex Blanchard of
3  Jones Day for the City of Detroit.
4        MR. HACKNEY:  Steve Hackney of
5  Kirkland & Ellis for Syncora.
6        MR. WAGNER:  Jonathan Wagner, Kramer
7  Levin Naftalis & Frankel representing the Ad
8  Hoc Holders
9        MR. PEREZ:  Alfredo Perez, Weil,
10 Gotshal & Manges, for Financial Guaranty
11 Insurance Company.
12       MR. BRILLIANT:  Allan Brilliant,
13 Dechert LLP, on behalf of Macomb County by
14 and through its public works commissioner --
15 Allan Brilliant, Dechert LLP, on behalf of
16 Macomb County by and through its Public Works
17 Commissioner, Anthony Marrocco, and on behalf
18 of Macomb Interceptor Grain Green District.
19       MS. DEEBY:  Shannon Deeby of Clark
20 Hill on behalf of the General Retirement
21 System of the City of Detroit and the Police
22 and Fire Retirement System of the City of
23 Detroit.
24       MR. KANE:  Scott Kane of Squire
25 Patton Boggs for the witness.

1        - MARTI KOPACZ - VOLUME 1-
2        MR. LERNER:  Peter Lerner of Squire
3  Patton Boggs for the witness.
4        MR. GLEASON:  I'm not an attorney.
5        MS. HITCHINS:  Kathleen Hitchins with
6  Sidley Austin, National Pub -- on behalf of
7  National Public Finance Guaranty Corporation.
8        MS. SCHAPIRA:  Lisa Schapira of
9  Chadbourne & Parke on behalf of Assured
10 Guaranty Muni Corp.
11       MS. QUADROZZI:  Jaye Quadrozzi of
12 Young & Associates on behalf of Oakland
13 County.
14       MR. ALBERTS:  Sam J. Alberts from
15 Dentons on behalf of the Official Committee
16 of Retirees.
17       THE VIDEOGRAPHER:  Thank you.
18       MR. STEWART:  Is there anyone on the
19 phone?  Is there anyone on the phone?
20       MR. KANE:  No.  I -- it seems --
21       MR. LERNER:  There were people who
22 indicated they were dialing in, but we
23 weren't responsible for setting up the call.
24 So whoever -- whoever set the dial in, ought
25 to organize --

1        - MARTI KOPACZ - VOLUME 1-
2        MR. STEWART:  We need to set up the
3  dialing.
4        THE VIDEOGRAPHER:  Should I go off
5  the record for a second?
6        MR. STEWART:  For one second while we
7  do that, yeah.
8        THE VIDEOGRAPHER:  Okay.  The time's
9  9:14.  We're going off the record.
10       (Whereupon, there was a brief recess
11 in the proceedings.)
12       MR. STEWART:  Back on the record.
13 Hello.  This is Marti Kopacz's deposition in
14 New York.  Is anyone on the line?
15       Hi.  This is Marti Kopacz's
16 deposition in New York.  Is anyone on the
17 telephone line?
18       MS. KOGAN:  Yes.
19       MR. STEWART:  Okay.  We're going to
20 go on the record, but why don't you just
21 state your name and spell it for the court
22 reporter?
23       MS. KOGAN:  Sure.  My name is Olga,
24 O-L-G-A, Kogan, K-O-G-A-N, and I'm from Davis
25 Polk on behalf of Merrill Lynch.

1        - MARTI KOPACZ - VOLUME 1-
2        MR. STEWART:  Anyone else on the
3  phone?
4        MS. HUBBARD:  Yes.  Heather Hubbard,
5  H-U-B-B-A-R-D, at Waller Lansden for U.S.
6  Bank.
7
8        THE VIDEOGRAPHER:  Okay.  I'm going
9  to bring us back on the record.
10       (Whereupon, a brief discussion was
11 held off record.)
12       THE VIDEOGRAPHER:  The time now is
13 9:18 a.m.  and we're back on the record.
14       MR. STEWART:  Okay.  Swear the
15 witness.
16
17       MARTI KOPACZ, called as a witness,
18 having been duly sworn on July 31, 2014, by a
19 Notary Public, was examined and testified as
20 follows:
21
22
23 EXAMINATION BY MR. STEWART:
24       Q.   Good morning, Ms. Kopacz.
25       A.   Good morning.

3 (Pages 9 to 12)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 4 of 146

- MARTI KOPACZ - VOLUME 1-

1     Q.   I'm Geoffrey Stewart of Jones Day.
We've met before, have we not?

     A.   We have.

     Q.   Good.  I've got to ask you a couple
of preliminary questions first of which is --
could you, for the record, give us your name and
address?

     A.   Martha, middle initial E, middle
initial M, Kopacz.  Address is 10 Post Office
Square, Suite N605, Boston, Massachusetts.

     MR. STEWART:  And let me mark as the
first exhibit a document entitled "Expert
Report of Martha E.M. Kopacz."

     Madam Reporter, could you mark that
as Exhibit 1?

     (Whereupon, Kopacz Exhibit 1 was
marked at this time.)

BY MR. STEWART:

     Q.   Ms. Kopacz, I'm placing before you
Exhibit 1.  Is that the expert report you
submitted in this case?

     A.   Yes, I believe so.

     Q.   Exhibit 1 to -- Exhibit 1 to
Exhibit 1 is your curriculum vitae.  It's very

- MARTI KOPACZ - VOLUME 1-

much towards the back.  We don't have tabs here.
I'm just going ask you if that is what it purports
to be.

     Is that a history of your education
and employment?

     A.   I believe it is.

     Q.   Okay.  Is it accurate as you sit here
today?

     A.   It is.

     Q.   Okay.  Now, you were engaged as an
expert in this case?

     A.   I was -- I am.

     Q.   And -- okay.  Was that pursuant to an
order of the Court?

     A.   Yes.

     MR. STEWART:  Let me mark as
Exhibit 2 the Court Order of April 22nd,
2014.

     (Whereupon, Kopacz Exhibit 2 was
marked at this time.)

BY MR. STEWART:

     Q.   Ms. Kopacz, I've placed before you
the document the reporter has marked as Exhibit 2.
Could you tell me what Exhibit 2 is?

- MARTI KOPACZ - VOLUME 1-

     A.   This appears to be the order
appointing me as the expert witness.

     Q.   Okay.  Paragraph 2 of the order
specifies what the Court has asked you to do,
correct?

     A.   Yes, it does.

     Q.   And could you tell me what it is you
were instructed by the Court or asked by the Court
to do?

     A.   I was asked to investigate and reach
a conclusion on, A, whether the city plan is
feasible as required by 11 U.S.C. Section 943(b)(7),
and, B, whether the assumptions that underlie the
City's cash flow projections and forecasts
regarding its revenues, expenses, and plans are
reasonable.

     Q.   And does your report -- and did you
do that work?

     A.   I did that work.

     Q.   And does your report contain your
conclusions as a result of having done that work?

     A.   It does.

     Q.   Okay.  So let me ask you a little bit
about the background of the report.

- MARTI KOPACZ - VOLUME 1-

     It's a fairly long document, is it
not?

     A.   It is.

     Q.   Went through a number of drafts?

     A.   Yes.

     Q.   Do you plan on issuing a second
report or a further report before the time of your
testimony in this case?

     A.   I don't know.

     Q.   Who else from Phoenix worked -- by
the way did you, within Phoenix, have name or a
moniker for this work, like Project Otto or --

     A.   No.

     Q.   -- anything, no fancy handle like
that?

     A.   No, we did not.

     Q.   Okay.  You just called it the Detroit
project or something like that?

     A.   Yes.

     Q.   Okay.  Who besides yourself from
Phoenix worked on the project?

     A.   My partner Brian Gleason.

     Q.   Okay.  What area did Mr. Gleason work
on, if any, in particular?

- MARTI KOPACZ - VOLUME 1-

1
2     A.    Brian worked on almost all areas.
3     Q.    Okay.  Who else?
4     A.    Albert Mink.
5     Q.    And tell me what Mr. -- what
6  parts of the report or the project Mr. Mink worked
7  on?
8     A.    Primarily issues related to
9  accounting and finance operations of the City and
10  IT.
11    Q.    Okay.  And who else?
12    A.    Bob Childree.
13    Q.    Who is Mr. Childree?
14    A.    Bob is -- was a subcontractor to
15  Phoenix for this project.
16    Q.    And what -- what work did Mr.
17  Childree do on the project?
18    A.    Bob worked on accounting, finance,
19  IT, and pension.
20    Q.    Okay.  Who else?
21    A.    Mike Gaul.
22    Q.    And what parts of the project did
23  Mr. Gaul handle?
24    A.    Oh, boy, a lot.  Revenue, pension,
25  blight, forecasts.  Those were his main areas of

- MARTI KOPACZ - VOLUME 1-

1
2  focus.
3     Q.    When you say light, are you referring
4  to --
5     A.    No, blight.
6     Q.    Oh, blight.
7     A.    Blight.
8     Q.    Oh, Blight, okay, that's different.
9  Who else?
10    A.    Kevin Barr.
11    Q.    Who is Mr. Barr?
12    A.    Kevin is a member of my team who
13  worked extensively on the financial models and the
14  projections.
15    Q.    Okay.  Anyone else on the team
16  besides those you've identified?
17    A.    Jack Murdoch was added to the team
18  late in the process as we were generating the
19  report.
20    Q.    Okay.  What areas did Mr. Murdoch
21  work on?
22    A.    Basically whatever Kevin and Michael
23  needed him to do.
24    Q.    Okay.  How many hours do you
25  estimate -- excuse me -- that the people from

- MARTI KOPACZ - VOLUME 1-

1
2  Phoenix spent working on the project up to today,
3  if you can estimate?
4     A.    I don't know.
5     Q.    Is there a range of numbers you would
6  be comfortable with?
7     A.    No.
8     Q.    Okay.  Do you know how much in terms
9  of dollars the billings have been to date for
10  Phoenix's work?
11    A.    We have submitted bills only through
12  May and I don't know.
13    Q.    Okay.
14    A.    There is a court record and they're
15  on the docket.
16    Q.    Okay.  Now, Exhibit 2 to your report
17  is a list of materials considered, I believe, or
18  documents and sources.  Do you have Exhibit 2 in
19  front of you?
20    A.    Yes.
21    Q.    Okay.  Maybe I should just ask you.
22          What does Exhibit 2 purport to show?
23    A.    Exhibit 2 is a list of documents or
24  information sources that either I or my team
25  members or both of us reviewed as part of our

- MARTI KOPACZ - VOLUME 1-

1
2  assignment.
3     Q.    Okay.  Were there any other materials
4  you considered above and beyond those set forth in
5  Exhibit 2?
6     A.    Not that I can think of.
7     Q.    Is it possible for you to estimate as
8  you sit here today, if it were all printed, what
9  the physical volume would be of the materials
10  listed in Exhibit 2?
11    A.    Tens of thousands, maybe hundreds of
12  thousands.
13    Q.    Of pages?
14    A.    A lot.  A lot.
15          MR. STEWART:  Let me mark as
16    Exhibit 3 this document.
17          (Whereupon, Kopacz Exhibit 3 was
18    marked at this time.)
19          (Whereupon, a brief discussion was
20    held off record.)
21  BY MR. STEWART:
22    Q.    Ms. Kopacz, I'm placing before you
23  Exhibit 3.  I represent to you this is a document
24  from Jones Day listing the materials that were
25  provided by the City of Detroit to Phoenix.  This

- MARTI KOPACZ - VOLUME 1-

1
2 is a spreadsheet that Jones Day has updated as we
3 went along.
4        Have you seen versions of Exhibit 3
5 before?
6    A.    I have not.
7    Q.    You have not.  Are you aware that
8 versions of it were given to members of your team
9 as the project went along?
10    A.    I'm not sure I understand that
11 question.
12    Q.    Do you know whether anyone from your
13 team has seen this document or versions of it?
14    A.    Not that I know of.
15    Q.    Okay.  Let's go to Exhibit 4 of
16 your -- of your report.  Do you have Exhibit 4
17 before you?
18    A.    I do.
19    Q.    And what does Exhibit 4 set forth?
20    A.    Exhibit 4 sets forth the open
21 information requests as of the date of my report.
22    Q.    Okay.  Your report was, what, the
23 25th?
24    A.    July 18th.
25    Q.    July 18th.  Have some of these

- MARTI KOPACZ - VOLUME 1-

1
2 materials since July 18th been provided to you?
3    A.    I don't think so.  I don't think so.
4    Q.    Okay.  Do you know for a fact that
5 all of these materials, in fact, exist?
6    A.    I do not know that.
7    Q.    Has the absence of these materials
8 affected your analysis in any way?
9    A.    The -- some of the requests here I
10 would still like to receive.
11    Q.    Sure.
12    A.    Because it would -- obviously, I
13 asked for it because I thought it was -- would be
14 helpful and it would be more information.
15        I reached my opinion on the
16 information I had so, you know, I don't know how
17 to answer that.  In the sense of yes, I'd still
18 like to have them, but --
19    Q.    Sure.
20    A.    -- I didn't have it and I was still
21 able to reach an opinion.
22    Q.    In other words, you were able to work
23 around the absence of these materials?
24    A.    I did.
25    Q.    Okay.  Exhibit 3 of your report

- MARTI KOPACZ - VOLUME 1-

1
2 contains a list of all the meetings that you and
3 others at Phoenix held.  Am I correct on that?
4    A.    This is the contact log that the
5 Judge asked me to keep.  I, in turn, then asked my
6 team to keep a contact log as well.
7    Q.    Okay.
8    A.    So, it's -- there really are kind of
9 two sections to it.  One is all of the contacts
10 that I was involved in and then the second part of
11 it is contacts that team members had that I wasn't
12 involved in.
13    Q.    Okay.
14    A.    And it could -- it could be phone
15 calls, it could be e-mails.  Most of them are
16 face-to-face meetings.
17    Q.    Sure.  You began your work shortly
18 after your appointment on April 22nd?
19    A.    I began my work on April 22nd, yes.
20    Q.    And certainly continued it up until
21 the time you submitted your report?
22    A.    I did.
23    Q.    And have you continued working since
24 then?
25    A.    Other than to prepare for this

- MARTI KOPACZ - VOLUME 1-

1
2 deposition, no.
3    Q.    Okay.  During the period of time
4 between April 22nd and July 25th, how many
5 meetings do you believe that you personally had in
6 connection with this project?
7    A.    More than 50.
8    Q.    And who in general -- you met with
9 the mayor, did you not?
10    A.    I met with the mayor.
11    Q.    And John Hill who is the city CFO?
12    A.    I did.
13    Q.    And the emergency manager?
14    A.    Yes.
15    Q.    And counsel for various creditors?
16    A.    Yes.
17    Q.    Okay.  And members of the City
18 Council?
19    A.    Yes.
20    Q.    Members of the city government?
21    A.    Yes.
22    Q.    And those are just some categories.
23        What other categories of person have
24 I not mentioned in summarizing the persons with
25 whom you met?

- MARTI KOPACZ - VOLUME 1-

2    A.    Financial advisors to creditors and
3  the city.
4    Q.    And by name who would those be?
5    A.    Ernst & Young, Conway MacKenzie,
6  Houlihan, Alvarez, FTI.
7    Q.    Others, too?
8    A.    Others.
9    Q.    Beyond that?
10   A.    Yes.
11   Q.    And sorry if I just asked this and
12 misstated.
13        Can you estimate the number of hours
14 you spent in meetings?
15   A.    I can't.
16   Q.    More than a hundred?
17   A.    Yes.
18   Q.    Now, members of your team also had
19 meetings, did they not?
20   A.    Yes.
21   Q.    Did they try to keep you informed of
22 the meetings they were having?
23   A.    Generally, yes.
24   Q.    Do you know how many meetings
25 individuals on your team had?

- MARTI KOPACZ - VOLUME 1-

2    A.    No.
3    Q.    Over a hundred?
4    A.    I don't know.
5    Q.    Okay.  Do you know how many hours
6  they spent?
7    A.    I don't know.
8    Q.    You listed for me the people who
9  worked with you on this project.
10        During the period from April 22nd to
11 July 25th, did you or any of them have other
12 projects you were working on besides this project
13 for the City of Detroit?
14   A.    Can I -- July 18th is when issued my
15 report.  Okay.
16   Q.    I'm sorry.  I misstated it, yes.
17   A.    And I -- did anyone have other
18 projects other than the City of Detroit?  The
19 answer is yes.
20   Q.    Okay.  What percentage of your time
21 did you spend on the Detroit project?
22   A.    99 percent.
23   Q.    And, if you can, the members of your
24 team, what percentage of their time did they
25 spend?

- MARTI KOPACZ - VOLUME 1-

2    A.    Some people were completely a hundred
3  percent dedicated to Detroit and everyone that had
4  preexisting client responsibilities really did
5  those in evenings and weekends, so a high
6  percentage of their time was spent on Detroit.
7    Q.    And I assume the work weeks during
8  the period from April 22nd to July 18 were not
9  40-hour work weeks?
10   A.    Generally, no.
11   Q.    Generally, how many hours a week did
12 you and members of your team work?
13   A.    I don't know.
14   Q.    Long hours?
15   A.    Generally, yes.
16   Q.    Weekends?
17   A.    Yes.
18   Q.    Now, do you plan to testify at trial?
19   A.    I believe the Judge is going to tell
20 us about that next Wednesday at a status hearing.
21   Q.    Okay.  Do you intend to do anymore
22 work between now and the time you testify at
23 trial?
24   A.    I do.
25   Q.    What do you intend to do?

- MARTI KOPACZ - VOLUME 1-

2    A.    I intend to read the fifth amended
3  plan.
4    Q.    Uh-huh.
5    A.    I want to review the information I
6  received on the collective bargaining agreements.
7    Q.    Uh-huh.
8    A.    And, you know, if -- if there are new
9  projections from the City, obviously, I would
10 review those before trial.
11   Q.    Okay.  As you sit here today, and I'm
12 going to get into this in greater depth, just as a
13 general question, do you have any misgivings about
14 the analysis that you've set forth in your report?
15   A.    Misgivings how?
16   Q.    Of any sort -- of any sort.
17   A.    Could you give me a different word
18 please?
19   Q.    Okay.  Is from any conclusion in the
20 report that you're not confident about?
21   A.    That I'm not comfortable with?
22   Q.    Confident about.
23   A.    I have a great deal of confidence in
24 my opinions.
25   Q.    Is there any conclusion or analysis

7 (Pages 25 to 28)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 8 of 146

- MARTI KOPACZ - VOLUME 1-

1
2  in your report you'd like to change?
3      A.   No.
4      Q.   Now, I think I'd shown you the
5  order -- Court's order, which would be I think our
6  Exhibit 1.  No, it's our Exhibit 2 appointing you
7  as the expert witness.  You'd already read into
8  the record, Ms. Kopacz, about feasibility.
9          As part of your work, you defined the
10  standard of feasibility, did you not?
11      A.   I did.
12      Q.   And it's on Page 13 of your report.
13  Let me ask you just to look at Page 13.
14      A.   Uh-huh.
15      Q.   Is that before you?
16      A.   It is.
17      Q.   Okay.  And I'm directing your
18  attention to the italicized, indented language and
19  let me just ask you, just so we have it on the
20  record, if you could read it into the record.
21  Then I'm going to ask you about it.
22      A.   Okay.  "Is it likely that the City of
23  Detroit after the confirmation of a plan of
24  adjustment will be able to sustainably provide
25  basic municipal services to the citizens of

- MARTI KOPACZ - VOLUME 1-

1
2  Detroit and to meet the obligations contemplated
3  in the plan without the significant probability of
4  a default."
5      Q.   And this was the definition you
6  worked with in analyzing the data and reaching the
7  conclusions on your project?
8      A.   This is a definition that I developed
9  along with my team against which I then assessed
10  the City's plan.
11      Q.   And it says here "sustainably
12  provide."
13          What did you mean when you said
14  "sustainably provided"?
15      A.   That the City would be able to
16  deliver basic municipal services indefinitely into
17  the future.
18      Q.   When you say "basic municipal
19  services," what services are you referring to?
20      A.   Fire, police services, road
21  maintenance, the like.
22      Q.   And you go on to say, "to meet the
23  obligations contemplated in the plan."
24          That means what the plan provides for
25  in terms of what the city must in future years

- MARTI KOPACZ - VOLUME 1-

1
2  pay, correct?
3      A.   Yes.
4      Q.   And then you go on to say, "without
5  the significant probability of default."
6          Do you see that?
7      A.   Yes.
8      Q.   And what does "significant
9  probability" mean as you used it here?
10      A.   It's my thought around, is the plan
11  structured so that there's a likelihood that the
12  City would default, so --
13      Q.   And is -- go ahead.
14      A.   Yeah.
15      Q.   So significant probability is the
16  flip side of a likelihood, right?
17      A.   Yes.
18      Q.   Okay.  Can you put a percentage
19  number on the term "significant probability"?
20      A.   I cannot.
21      Q.   Now, in your work, I think you've
22  written in your report that you looked at
23  quantitative factors, correct?
24      A.   Yes.
25      Q.   And those included the accuracy of --

- MARTI KOPACZ - VOLUME 1-

1
2  the mathematical accuracy of projections?
3      A.   Yes.
4      Q.   Correct?
5          And the reasonableness of the City's
6  assumptions, both individually and as a group?
7      A.   Yes.
8      Q.   And finally, whether there was an
9  adequate contingency as set forth in the City's
10  projections, correct?
11      A.   Yes.
12      Q.   I meant to ask you, by the way, in a
13  footnote you point out that the term "forecasts"
14  and the term "projections" are not necessarily
15  synonymous although you will treat them as such
16  for your report.
17          For the record, what is the
18  difference?
19      A.   It's -- the difference exists in
20  accounting terminology.
21      Q.   Uh-huh.
22      A.   Whereas a -- generally, the thinking
23  is that a forecast is kind of the best estimate,
24  whereas projections can include any set of
25  variables and any sort of assumptions, sensitivity

1          - MARTI KOPACZ - VOLUME 1-
2  analysis or projections, what-ifs, that sort of
3  thing, whereas a forecast is something that's a
4  little more rigorous, a best -- the best guess, if
5  you will.
6       Q.    So would it be fair to say, and I'm
7  not going to spend a lot of time on this, this
8  morning, that the base case scenario from EY is a
9  forecast, but the restructuring analysis is a
10 projection?
11      A.    I don't know that I would say that.
12      Q.    Okay.  And I'll use the terms
13 interchangeably myself.
14      A.    Thank you.
15      Q.    You raise the -- use the phrase
16 "mathematically accurate."
17           I assume that means whether the
18 calculations that were done produced the results
19 that mathematics requires?
20      A.    Yes.
21      Q.    In other words, no errors in
22 calculation?
23      A.    Correct.
24      Q.    Okay.  You used the phrase
25 "reasonableness" when you speak about assumptions.

1          - MARTI KOPACZ - VOLUME 1-
2           What do you mean when you use the
3  phrase "reasonableness"?
4       A.    That the assumption is neither too
5  conservative or too aggressive.
6       Q.    Okay.  Is reasonableness a synonym in
7  this context for reliable?
8       A.    No.
9       Q.    Okay.  In other words, that a
10 reasonable assumption is one that is in the middle
11 of the continuum of possible assumed facts?
12      A.    I think I can agree with that, yes.
13      Q.    Okay.  Did you try to place it a
14 particular place on the continuum?
15      A.    No.
16      Q.    You also listed qualitative factors
17 as well, and I'll come back to those.
18      A.    Yes.
19      Q.    And they're part of your feasibility
20 analysis too?
21      A.    They are.
22      Q.    Sometimes you've used the term
23 "material" in your report?
24      A.    Yes.
25      Q.    What does the term "material" mean as

1          - MARTI KOPACZ - VOLUME 1-
2  you've used it here?
3       A.    Material is a term that indicates
4  whatever the value or the variable is could have
5  an impact, positive or negative.  It is not --
6  it's not de minimis.
7       Q.    Okay.  Do you associate any
8  percentage level with the term "material"?
9       A.    I do not.
10      Q.    Have you heard, for example in the
11 accounting world, they sometimes speak of
12 materiality as being 1 percent of assets or
13 5 percent of income?
14      A.    I think it depends on the context.
15      Q.    But it's not how you've used it, one
16 way or another?
17      A.    Not how I've used it, no.
18      Q.    Now, I'm going to ask you about
19 forecasting now.
20      A.    Sure.
21      Q.    Let me go back to Exhibit 1 of your
22 report.  This is your -- for want of -- I'll call
23 it your CV although --
24      A.    It's not really.
25      Q.    -- it's not really a CV.  What would

1          - MARTI KOPACZ - VOLUME 1-
2  you call it?  Just a back -- description of your
3  background?
4       A.    Yes.
5       Q.    Okay.  Why don't we just call it
6  Exhibit 1?
7       A.    Exhibit 1 is good.
8       Q.    Under "General Experience," you've
9  written about your -- about your experience with
10 financial projections and I'm going to read parts
11 of this, and I'm going to ask you questions about
12 it.
13           First sentence you've written -- by
14 the way, did you write this part of your report or
15 was it written for you by others?
16      A.    No.  This is the -- this is the same
17 document that was attached to my proposal.  It's
18 just in a different format, but the --
19      Q.    Sure.
20      A.    -- the -- the information is
21 generally the same and I think there's some
22 added -- there may be some added verbiage around
23 speaking engagements, publications and the like.
24      Q.    Sure.  Is it accurate however?
25      A.    Yes, it is.

13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 10 of
146

- MARTI KOPACZ - VOLUME 1-

1
2    Q.    So the first sentence says,
3    "Ms. Kopacz has prepared dozens of financial
4    projections for clients and reviewed and critiqued
5    dozens more prepared by others."
6          This has been in connection with your
7    work at Phoenix and elsewhere?
8    A.    Yes.
9    Q.    And by "projections," you mean
10   forecasts as well as projections as we just
11   discussed?
12   A.    Yes.
13   Q.    And just as a general matter, when
14   you, yourself, have prepared projections, what
15   kind of assignment did you have that asked you to
16   prepare projections?
17   A.    Generally, it would be in the context
18   of representing a client that was financially or
19   operationally troubled, potentially involved in a
20   formal or informal restructuring or Bankruptcy
21   Court proceeding.
22   Q.    Okay. And then you write you
23   "critiqued dozens more prepared by others."
24         Would that be in a comparable --
25   comparable setting?

- MARTI KOPACZ - VOLUME 1-

1
2    A.    Yes.
3    Q.    Okay. And then you write -- or this
4    exhibit says, "She has previously testified as to
5    the appropriateness of forecasting methodology,
6    the assumptions upon which forecasts are based and
7    the likelihood of an organization to meet its
8    forecast."
9          Okay. And what engagements asked you
10   to do that work?
11   A.    That -- the first time I ever
12   testified on forecasting and assumptions was in a
13   matter called HealthCo -- HealthCo. It was a case
14   that -- and I believe it's in, we go back to my
15   proposal to the Court, it's listed and it will
16   tell you, but it was a bankruptcy case that
17   involved a failed leverage buyout transaction that
18   the trustee believed was a fraudulent conveyance.
19   Q.    Okay.
20   A.    And my engagement, I represented the
21   Lazard Freres who had been the investment banker
22   and Coopers & Lybrand, at the time the
23   accountants, who were being sued and my job was to
24   put myself back in the position at the time that
25   that transaction was done and evaluate the

- MARTI KOPACZ - VOLUME 1-

1
2    reasonableness of the projections that were made
3    then.
4    Q.    And this leads me to ask you a
5    question.
6          I take it that a good deal of your
7    work in your career has involved entities that are
8    one way or the other involved in bankruptcy or
9    insolvency matters?
10   A.    Yes.
11   Q.    Have you, as a practice, represented
12   one side more than the other side; in other words,
13   creditors more than debtors or debtors more than
14   creditors in this work?
15   A.    I don't think -- I think it's very
16   balanced for the most part.
17   Q.    And you've also been involved in
18   municipal insolvencies?
19   A.    I have been involved in municipal --
20   troubled municipal situations.
21   Q.    Okay. And what are some examples of
22   those?
23   A.    The one that I was involved in most
24   significantly and for the longest period of time
25   was Nassau County here in New York.

- MARTI KOPACZ - VOLUME 1-

1
2    Q.    Okay. But you've had others too?
3    A.    Yes.
4    Q.    Okay. Back to Exhibit 1, further
5    down it's written, "Ms. Kopacz understands the
6    nuanced area" -- "area of municipal budgeting."
7          Do you see that -- budgeting?
8    A.    Yes.
9    Q.    Okay? What -- what do you mean when
10   you say "nuanced area"?
11   A.    Municipal budgeting and government
12   accounting are significantly different than what
13   most of us become familiar with in the private
14   sector. It involves fund accounting. It involves
15   appropriations and encumbrances and concepts that
16   we don't have in the private sector.
17   Q.    When you say "incumbrances," what do
18   you mean?
19   A.    Encumbrances is a manner by which
20   government on paper sets aside funding for
21   particular projects or services or goods.
22   Q.    Okay. And the next sentence says,
23   "Because municipal entities lack a 'standard' in
24   budgeting, forecasting and accounting, great
25   variations occur in the manner in which public

- MARTI KOPACZ - VOLUME 1-

1   entities report financial results and develop
2   forecasts."
4       When you say they "lack a standard,"
5   what do you mean by that?
6       A.   They -- private entities are for the
7   most part required to adhere to generally accepted
8   accounting principles.  There are the government
9   version of accounting principles allow for a great
10  deal of variety and individual variation in terms
11  of how municipal entities report revenues,
12  expenses, capital expenditures, and the like.
13      Q.   Do municipalities typically approach
14  these issues in the same manner?
15      A.   No.
16      Q.   So how does one go about
17  understanding how any particular municipality has
18  handled its accounting?
19      A.   You have to do a detailed analysis of
20  whatever the revenue, the expense and the
21  accounting for that is.
22      Q.   You did that here in the case of the
23  City of Detroit?
24      A.   In -- in some cases, yes.
25      Q.   Okay.  You certainly got to the point

- MARTI KOPACZ - VOLUME 1-

2   where you felt you understood how Detroit did its
3   forecasting and budgeting, correct?
4       A.   Is that -- are you talking before the
5   bankruptcy or during the bankruptcy?
6       Q.   No, during -- during your -- your
7   work.
8       A.   Right.  In terms of those forecasts
9   and budgets --
10      Q.   Yes.
11      A.   -- as they relate to the plan?
12      Q.   Yes.
13      A.   Yes, I do.
14      Q.   Okay.  Now, you mentioned that you
15  met with financial advisors, including Ernst &
16  Young and Conway MacKenzie?
17      A.   Yes.
18      Q.   As between the two, how have they
19  divided up the work of being advisors to the City?
20      A.   It's my understanding that Ernst &
21  Young was responsible for the ten-year baseline
22  plan, the 40-year plan, and, at a functional level,
23  is responsible for the cash management for the
24  City.  And that Conway MacKenzie developed the
25  restructuring and reinvestment initiatives, what

- MARTI KOPACZ - VOLUME 1-

2   we call the RRIs and looked at the operational
3   aspects of the City.
4       Q.   So, when you're looking at financial
5   forecasts, for the most part, you were looking at
6   the work of Ernst & Young?
7       A.   No.  I looked at all of them
8   together.
9       Q.   Okay.
10      A.   Right.
11      Q.   The baseline forecast was just Ernst
12  & Young?
13      A.   Yes, my -- that's my recollection,
14  yes.  It was just Ernst & Young at the time.
15      Q.   Okay.  And then when the RRIs and
16  other things were involved, that's when Conway
17  MacKenzie input became part of the forecast?
18      A.   Part of the 40-year forecast, yes.
19      Q.   Now, let me just break this down so
20  that as we go down the road we can go more
21  quickly.  And I apologize for the elementary
22  approach here.
23      Could you just describe for me as a
24  series of steps how one goes about preparing a
25  forecast in your experience?

- MARTI KOPACZ - VOLUME 1-

2       A.   To prepare -- in preparing a
3   forecast?
4       Q.   Correct.
5       A.   Okay.  Generally, the -- the first
6   thing you do is estimate revenues.
7       Q.   Uh-huh.
8       A.   Then you estimate expenses.
9       Q.   Uh-huh.
10      A.   And in order to get those estimates,
11  you have to make assumptions and you have to have
12  a base -- a baseline.  You have to decide when
13  you're going to start it and when you're going to
14  end it.
15      Q.   And then when you project -- and you
16  start with known numbers, correct?
17      A.   You generally will look at actual
18  results for prior periods.
19      Q.   And is there some mathematical means
20  then of taking the actual results and, from the
21  actuals, extrapolating the numbers in the years to
22  come?
23      A.   Sometimes that makes sense.
24  Sometimes that doesn't make sense.
25      Q.   And is it -- is it possible to --

- MARTI KOPACZ - VOLUME 1-

1     would it be possible for you to tell me when it
2     does make senses and when it does not make senses?
3         A.    I can give you an example.
4         Q.    Sure.
5         A.    If you had an ongoing operation, and
6     you were selling widgets to someone, right, and
7     that customer bought, you know, a hundred dollars
8     worth of widgets every year for the past ten
9     years, unless something suggested a contrary
10    behavior, you would probably project that they're
11    going to buy a hundred dollars worth of widgets.
12    Okay?
13          On the expense side, if you're
14    manufacturing those widgets in a production plant
15    and it costs you 80 cents to make a widget, right,
16    but then you're building a new plant and all of a
17    sudden your costs are going to go down to 65, you
18    wouldn't be using the continuation of the
19    historical cost to make a going-forward
20    projection.
21        Q.    Now, is it sometimes the case as you
22    extrapolate forward, instead of having a constant
23    value, you're dealing with a value that is
24    expected to increase in some manner or decrease in

- MARTI KOPACZ - VOLUME 1-

1     some manner year to year to year; in other words,
2     either in the linear or nonlinear function?
3         A.    Yes, it is.
4         Q.    Okay. And what do you do when you're
5     faced with that type of a forecast?
6         A.    You have to look at the basis for why
7     the change is going to occur and evaluate it with
8     the information you have as to, you know, does
9     that new assumption make sense.
10        Q.    Now, when you dealt with looking at
11    the forecasts for the City of Detroit, did you
12    find that those extrapolations required
13    forecasting that was not a constant value for
14    either revenue or expense year to year in the
15    years that were coming?
16        A.    In some cases, yes.
17        Q.    So how did you determine what the
18    appropriate coefficient was year to year to
19    increase or decrease the projected amount?
20        A.    The -- the example that I can give
21    you is the baseline is -- for example, the
22    baseline projections include ongoing pension
23    expense.
24        Q.    Okay.

- MARTI KOPACZ - VOLUME 1-

1         A.    Ongoing interest expense. Obviously,
2     as the City worked through its bankruptcy and its
3     plan, it became clear that those weren't going to
4     get paid, so those numbers changed in line with
5     what the settlements were. So I didn't really
6     have to make -- it was a number that was in the
7     ten-year that didn't need to be there, so it just
8     came out.
9         Q.    So that came out.
10          Let me take the example though of a
11    revenue item. I don't -- we'll just make it
12    income tax.
13          As you looked at the forecasts of
14    income tax revenue in the years to come, it was
15    not a constant number, correct?
16        A.    Correct.
17        Q.    And it went up or down as the years
18    went on, correct?
19        A.    Yes.
20        Q.    And it went up or down for various
21    reasons, such as incomes and other factors such as
22    that, correct?
23        A.    Yes.
24        Q.    How did you determine whether a

- MARTI KOPACZ - VOLUME 1-

1     forecast of income in future years -- income tax
2     revenues in future years was or was not a
3     reasonable forecast?
4         A.    I looked at historical information.
5     I looked at the outside -- the statewide
6     information from various parties, and I and my
7     team interviewed the team at Ernst & Young who did
8     the analysis and the development of these
9     projections.
10        Q.    Fair to say you didn't simply accept
11    the credibility of the Ernst & Young assumptions?
12        A.    I did not.
13        Q.    Or the Ernst & Young calculations?
14        A.    I did not.
15        Q.    You did your own checking of them?
16        A.    I did.
17        Q.    And then used your own knowledge base
18    to reach a conclusion about the quality of Ernst &
19    Young's work?
20        A.    I -- I didn't reach a conclusion
21    about the quality of Ernst & Young's work. I
22    reached a conclusion on the reasonableness of
23    those assumptions.
24        Q.    Okay. And -- and by the way, the

1    - MARTI KOPACZ - VOLUME 1-
2  process you just described for me, we used the
3  example of income tax.
4       A.    Yes.
5       Q.    Would it -- would you give the same
6  answer if I asked about other types of taxes of
7  revenue items in terms of your general approach?
8       A.    Yes.
9       Q.    And in terms of various items of
10 expense in terms of your general approach?
11      A.    Yes.
12      Q.    Okay.  Now, let me, if I could, just
13 ask you about some of the opinions that you
14 reached.
15      A.    Uh-huh.
16      Q.    And on Page 200 of your report you
17 speak of some of the qualitative issues.
18      A.    Yes.  I have quantitative issues on
19 200.
20      Q.    I'm sorry.  Quantitative, sorry.
21 Advancing age and failing eyesight has -- has
22 undermined me.  Yeah, on quantitative issues.
23      A.    Yes.
24      Q.    The first paragraph you write, "It is
25 my opinion that except for otherwise noted in my

1    - MARTI KOPACZ - VOLUME 1-
2  report the projections are generally
3  mathematically correct and materially reasonably
4  and, therefore, fall within the feasibility
5  standard I have defined."
6           Do you see the language I read?
7       A.    Yes.
8       Q.    I notice there's a typo.  Did you
9  mean to write "materially reasonable" instead of
10 "materially reasonably"?
11      A.    Yes.  Thank you.
12      Q.    It's all right.  It's basically what
13 lawyers are trained to do is look for typos.  I
14 went to law school imagining myself in front of
15 the U.S. Supreme Court; instead I've become a
16 glorified proofreader.
17           All right.  Now, when you say the
18 generally mathematically -- the projections you're
19 speaking about are the City's 10 and 40-year
20 projections?
21      A.    That's correct.
22      Q.    And we already -- go ahead.  I'm
23 sorry.
24      A.    And the -- and the RRI projections.
25      Q.    And I've already asked you about the

1    - MARTI KOPACZ - VOLUME 1-
2  phrase "mathematically correct."
3       A.    Uh-huh.
4       Q.    What do you mean when you say
5  "materially reasonable"?
6       A.    I believe the projections taken as a
7  whole are reasonable.
8       Q.    And then the next paragraph says, "It
9  is my opinion that, except where otherwise noted
10 in my report, the individual assumptions used to
11 build the projections fall into a reasonable range
12 and that, when taken as a group, these assumptions
13 are also reasonable."
14           Can you tell me why you were able to
15 reach that conclusion?
16      A.    Because we reviewed and looked at
17 every line item, every cell of every model.
18      Q.    And how big was this model?
19      A.    The -- the E&Y model is, my
20 recollection, I think about a -- over a hundred
21 sheets -- over a hundred Excel spreadsheets.
22      Q.    Okay.
23      A.    The Conway model is actually about
24 30 models together and each of those models is
25 multiple Excel spreadsheets.  Clearly, Kevin Barr

1    - MARTI KOPACZ - VOLUME 1-
2  on my team probably knows exactly how many pages
3  there are, but it's hundreds.
4       Q.    And you looked at every one of those
5  worksheets --
6       A.    He did -- he did.  I didn't.
7       Q.    And every -- every cell of every
8  worksheet?
9       A.    He did.
10      Q.    On Page 37 of your report, you refer
11 to -- you state at the bottom, there's a carryover
12 sentence having to do with the fact that the City
13 does not have an aggregated forecast to use.
14           Can you tell me what you meant by an
15 "aggregated forecast"?
16      A.    Can you show me the sentence?
17      Q.    It's the carryover.  It says, "while
18 the respective -- "
19      A.    Ten-year 40-year.
20      Q.    Yes.  And then it carries over and
21 the language I was referring to is the top of the
22 next page.
23           It says, "The City does not have an
24 aggregated forecast to use as a fiscal road map
25 going forward."

- MARTI KOPACZ - VOLUME 1-

1     What do you mean by "an aggregated"?
2     A.    The City does not have a forecast at
3  the department level which includes all of the
4  baseline projections and the RRIs incorporated
5  into a single set of projections like you would
6  typically see for an entity.
7     Q.    Okay.  And so the City needs to
8  create such a document in order to go forward?
9     A.    I think it would be highly advisable.
10     Q.    The beginning of the sentence says,
11  pardon me, "While the respective 10-year, 40-year
12  and RRI forecasts have been expertly researched,
13  constructed and amended."
14     What do you mean when you say
15  "expertly researched, constructed"?
16     A.    The, the 10-year, the 40-year and the
17  RRIs, okay, are appropriately correct to the
18  extent of the purpose for which they were
19  intended.  Okay?  They are fit for that purpose.
20     Q.    Uh-huh.  Okay.  Now, excuse me -- you
21  mentioned that the City forecast cover a period of
22  ten years and there's also a 40-year forecast too.
23     A.    Yes.
24     Q.    Is that the customary period for

- MARTI KOPACZ - VOLUME 1-

1  forecast, at least in the municipal world?
2     A.    I'm not sure there is a customary
3  period.
4     Q.    Have you seen forecasts before of
5  such length?
6     A.    Have I in a general context, yes.  In
7  typically municipalities don't budget for that
8  long a time.
9     Q.    Do you know why it is that forecasts
10  were prepared for periods so long as those we see
11  here?
12     A.    I don't know why those projections --
13  those periods were chosen, no.
14     Q.    What's the relationship, if there is
15  one at all, between the length of a forecast and
16  its reliability?
17     A.    Generally, the longer a forecast --
18  the longer period of time a forecast covers, the
19  more variability you would expect as time goes on.
20     Q.    Would there also -- let me ask you to
21  look actually at Page 17 of your report.  At the
22  very bottom of that page --
23     A.    Uh-huh.
24     Q.    -- you've written -- I'm directing

- MARTI KOPACZ - VOLUME 1-

1  your attention to the last two sentences on that
2  page.  You wrote, "As the time horizon expands, so
3  too does the magnitude required for an issue to
4  impact feasibility.  For example, a potential
5  $50 million shortfall in Year 1 will have a much
6  more significant impact on the assessment of
7  feasibility than the same shortfall in Year 20."
8     Now, can you tell me what you meant
9  when you wrote that?
10     A.    I mean, I don't know how to say it
11  any better.  I'm sorry.  I really don't.  I think
12  that's really clear.
13     Q.    Okay.
14     A.    Okay?  I -- obviously -- the time
15  horizon to my -- to the way we've defined the
16  standard and the way I evaluated it is if there's
17  going to be an impact near-term, that is clearly
18  more significant than if it's going to occur 10 or
19  20 years down the road because 10 or 20 years down
20  the road, people have an opportunity to respond
21  and change their behavior and do different things
22  to overcome whatever that risk might be.  If it's
23  a risk in the early part of a forecast, you don't
24  have that time to respond.

- MARTI KOPACZ - VOLUME 1-

1     Q.    So you testified that one feature of
2  a long forecast is the greater chance for
3  variability as the years go on, correct?
4     A.    I would agree with that statement,
5  yes.
6     Q.    Are you also saying that in the
7  future years that, although there may be such
8  variation, it becomes less material as we sit here
9  today because the variations happen so far into
10  the future?
11     A.    The material word, I don't agree with
12  that in the sense that if it is a large risk
13  component in the out years, that could affect my
14  assessment of feasibility even though it was far
15  out into the future.  The other part, and I don't
16  mean to quibble, but the near-term forecasts are
17  going to be wrong too.  It's just will there be
18  enough variation in the forecast both plus and
19  minus that on average things will be okay.
20     Q.    Okay.  And there are such things
21  as -- as offsetting entries or offsetting
22  variations, correct?
23     A.    Correct.  Yes.
24     Q.    Is there any mathematical or

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 15 of
146

- MARTI KOPACZ - VOLUME 1-

1 forecasting rule about that?
2     A.    Not to my knowledge.
3     Q.    Let me ask about the RRIs if I could.
4     A.    Okay.
5     Q.    You've mentioned.  That's short for
6 restructuring and reinvestment initiatives?
7     A.    Yes.
8     Q.    Okay.  And fair to say that you
9 generally are complimentary of the RRIs that the
10 City has planned?
11     A.    Complimentary?
12     Q.    Let me look -- let's look at 207 of
13 your report.
14     A.    Okay.
15     Q.    At the very top, you've written, "The
16 RRIs are one of the positive outcomes of the
17 bankruptcy process.  The RRIs provide the backbone
18 of the improved services to the City of Detroit."
19         That's -- that's what I was asking
20 you about.
21     A.    Yes.  Yes.
22     Q.    So you -- you believe that on balance
23 the RRIs are a good not a bad thing?
24     A.    Yes.

- MARTI KOPACZ - VOLUME 1-

1     Q.    Okay.  Why did you reach that
2 conclusion?
3     A.    The RRIs, many of them, are planned
4 to return Detroit to a safer, better functioning
5 place in which people can live and work and -- and
6 go about their business.  So --
7     Q.    Well -- go ahead.
8     A.    -- you know, a lot of the RRIs
9 involved restoring public safety and
10 transportation to more acceptable levels than they
11 have been in the recent past.
12     Q.    Do some of the RRIs also -- let me
13 withdraw that.
14         Do some of the RRIs also have the
15 objective of improving quality of city management?
16     A.    Yes.
17     Q.    And, for example, tax collection by
18 the City?
19     A.    Yes.
20     Q.    And do you also believe those are
21 positive?
22     A.    I do.
23     Q.    And why?
24     A.    Because the City historically has

- MARTI KOPACZ - VOLUME 1-

1 done a poor job of collecting the monies that are
2 due it.
3     Q.    And what would the RRIs do, if
4 anything, to address that issue?
5     A.    In a -- in a couple of areas, the
6 RRIs are targeted towards better information
7 systems, better technology, more people to focus
8 on collection activities, the ATMs that are being
9 added to the District Court to collect the fees
10 and fines right then and there before people leave
11 the building.  You know, those sorts of things
12 are -- are advantageous to helping the City
13 collect the monies that are already due it.
14     Q.    Fair to say some of these RRIs will
15 end up cutting city costs?
16     A.    In the long-term, yes.
17     Q.    And some of the RRIs will result in
18 increasing city revenues?
19     A.    Yes.
20     Q.    Did you perform any kind of
21 cost-benefit analysis to see if the expense of
22 those particular RRIs was offset by any benefits
23 that they yielded to the City?
24     A.    I don't think so.

- MARTI KOPACZ - VOLUME 1-

1     Q.    But has anyone attempted to quantify
2 the revenue enhancement and cost reduction
3 benefits to the City of the RRIs?
4     A.    Not that I know of.
5     Q.    Who came up with the RRIs?
6     A.    The -- the Conway MacKenzie has been
7 at the forefront in developing the RRIs as they're
8 presented as part of the bankruptcy, working with
9 people in the city government.
10     Q.    Were there any RRIs that you looked
11 at that you -- in your opinion were not necessary?
12     A.    I'd have to go back and look at all
13 of them to say -- to answer that question.
14     Q.    Okay.  Any RRIs that you would have
15 liked to have seen that were not among the list of
16 restructuring and reinvestment initiatives?
17     A.    I didn't evaluate that either.  I
18 just looked at what was there.
19     Q.    Who came up with the dollar amounts
20 associated with the RRIs?
21     A.    I believe for the most part that has
22 been the work of Conway MacKenzie in collaboration
23 with the city employees by department.
24     Q.    Okay.  And who came up with the plan

1      - MARTI KOPACZ - VOLUME 1-
2  by which the RRIs were to be implemented?
3      A.    I'm not sure anyone has yet.
4      Q.    Okay.  Or the timetable for
5  implementation -- for implementation?
6      A.    I'm not sure -- I'm not sure that
7  that has been completely defined at this point.
8      Q.    In the course of your work, did you
9  look at the dollar amount of the RRIs to see if
10 those were reasonable assumptions for the each
11 RRI?
12     A.    Yes.
13     Q.    And what did you determine?
14     A.    We concluded that they were
15 reasonable estimates for what these initiatives
16 would cost.
17     Q.    Now, one of the things you looked at
18 I think you said was blight?
19     A.    Yes.
20     Q.    And specifically, I guess the removal
21 of blight?
22     A.    Yes.
23     Q.    How significant in your opinion is
24 the City's program for the removal of blight?
25     A.    Blight removal is very important to

1      - MARTI KOPACZ - VOLUME 1-
2  me.
3      Q.    And why is it important?
4      A.    Because I believe that eliminating
5  blight will stabilize the City and allow a -- the
6  revitalization for Detroit to really grab hold.
7      Q.    Do you believe the amount of money
8  budgeted for blight removal is sufficient?
9      A.    I don't know.
10     Q.    What, in your opinion, if you have
11 one, will happen to the City if it is not
12 successful in removing blight?
13     A.    I don't know.
14     Q.    You mentioned that a stop --
15 start-and-stop approach will not work and that's,
16 if you'd like, direct you to your report is on
17 Page 173.
18     A.    Yes.
19     Q.    My question was simply going to be
20 why did you conclude that.  But if you'd like to
21 look at your report, that's so much better.
22     A.    Thank you.
23     Q.    And I was -- it's towards the bottom.
24 You've written, "Conversely a start-and-stop
25 approach will likely result in ineffective

1      - MARTI KOPACZ - VOLUME 1-
2  investment and do little to reverse the spread of
3  blight through Detroit."
4      A.    My concern around blight spending all
5  along has been the availability of a steady stream
6  of funding to keep the blight removal machine
7  going.
8      Q.    Uh-huh.
9      A.    And the -- the concern I have that
10 the City has made an effort to bring contractors
11 into the blight removal program and it will be
12 important to be able to pay them timely to keep
13 them engaged in that process.
14     Q.    Let me move to something else.
15          Your report has observations about
16 shortcomings in the City's finance, treasury and
17 budgeting functions, correct?
18     A.    Yes.
19     Q.    Fair to say that historically they've
20 been very poor?
21     A.    Awful.
22     Q.    Really awful?  I'm kidding.
23          You're aware the City has a new CFO?
24     A.    Yes.
25     Q.    John Hill?

1      - MARTI KOPACZ - VOLUME 1-
2      A.    Yes.
3      Q.    And you've met with Mr. Hill?
4      A.    I have.
5      Q.    Have you determined from Mr. Hill
6  what he plans to do or is doing to reform matters
7  within that part of the city's government?
8      A.    I'm generally aware of Mr. Hill's
9  plans, yes.
10     Q.    And you understand that Mr. Hill has
11 a program to deal with these historical issues?
12     A.    Yes.
13     Q.    Do you have any -- what is your
14 opinion, let me ask you this, of the approach
15 Mr. Hill is taking?
16     A.    I -- I concur with Mr. Hill's
17 approach in terms of what he has prioritized in
18 terms of needing to get fixed and how he's going
19 to go about that.
20     Q.    Do you believe Mr. Hill will be able
21 to fix these problems?
22     A.    I have confidence that Mr. Hill has a
23 good plan to fix the problems.  I have confidence
24 that he and the mayor will be able to hire people
25 to do that.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-

1
2   Q.   Are you finished with your answer?
3   A.   Yes.  And as recently as the last
4   week or so, he's -- they've added some more
5   talents to that group and I think that's
6   encouraging.
7   Q.   To the extent your report contains
8   criticism of the finance function, is any of that
9   intended to be a criticism of Mr. Hill or his
10  staff?
11  A.   Mr. Hill, no.  There's -- there's --
12  I still would have significant criticism of some
13  of the -- the processes and procedures that the
14  City uses.
15  Q.   Okay.
16  A.   In that area.
17  Q.   You understand that Mr. Hill's
18  attempt to go address those as well?
19  A.   I do.
20  Q.   Your report mentions shortcomings in
21  the City's information technology area.
22  A.   Yes.
23  Q.   You would agree that -- that isn't
24  what it could be?
25  A.   That's awful too.

- MARTI KOPACZ - VOLUME 1-

1
2   Q.   They've hired a woman named Beth
3   Niblock to address that?
4   A.   Yes.
5   Q.   She comes to the Detroit from the
6   city of Louisville, Kentucky.
7        Did you met with Ms. Niblock?
8   A.   I did.
9   Q.   Did you form an opinion as of
10  Ms. Niblock's abilities?
11  A.   Yes.
12  Q.   What is your opinion?
13  A.   My opinion is Ms. Niblock knows what
14  she's doing and is developing a good plan for
15  fixing the City's IT systems.
16  Q.   Now, the RRIs contain line items or
17  for IT initiatives, do they not?  And those total
18  between 150 or $200 million, or somewhere in that
19  range?
20  A.   It's a little north of 150 million
21  citywide.
22  Q.   Okay.  And in your opinion, is that a
23  sufficient amount of money to spend to implement
24  IT improvements?
25  A.   It's a lot of money.  I would prefer

- MARTI KOPACZ - VOLUME 1-

1
2   to have the -- all of that spending under the IT
3   department.  Some of that is disbursed into
4   individual departments.
5   Q.   Uh-huh.
6   A.   So, I don't know.  Again, I would
7   like to see it controlled and I've written about
8   that in my report.  I'd like to see it centrally
9   controlled as opposed to disbursed.
10       But yes, it should be a sufficient
11  amount of money to upgrade and fix.  It's not
12  really fixed the systems that are in place.  It's
13  installed new systems.
14  Q.   Well, the existing systems are
15  antiquated are they not?
16  A.   They are.
17  Q.   They don't inter -- inter-operate
18  with one another?
19  A.   They do not.
20  Q.   There's no modern ERP system,
21  correct?
22  A.   Correct.
23  Q.   The budgeting software is antiquated
24  if it exists at all, correct?
25  A.   It's -- yes.

- MARTI KOPACZ - VOLUME 1-

1
2   Q.   Manual entry is required for a number
3   of financial inputs?
4   A.   The general ledger is largely done on
5   a manual basis, yes.
6   Q.   All right.
7        MR. STEWART:  We've been on the
8   record for an hour.  We can take a break or
9   keep going, whatever you'd like to do.  It's
10  up to you.
11       THE WITNESS:  I'm ready for a break.
12       MR. STEWART:  We'll go for a break.
13       THE VIDEOGRAPHER:  Thank you.  The
14  time now is 10:18 a.m.  We're going off the
15  record.  This is the end of Disk Number 1.
16       (Whereupon, there was a brief recess
17  in the proceedings.)
18       THE VIDEOGRAPHER:  Time now is
19  approximately 10:32 a.m.  We're back on the
20  record.  This is the beginning of Disk
21  Number 2.
22  BY MR. STEWART:
23  Q.   Ms. Kopacz, before the break, I'd
24  asked you a question about the language at
25  Pages 37, 38 of your report in Exhibit 1.  In

17 (Pages 65 to 68)

- MARTI KOPACZ - VOLUME 1-

1   particular that sentence that begins at the very
2   bottom of 37 and goes on to the top of 38.
3       And do you have that sentence in
4   front of you?
5       A.   I do.
6       Q.   I ask you what was the -- I think
7   you -- I'd asked you about the -- the forecasts
8   and I believe you said they were appropriate for
9   the purpose for which they were intended.  I think
10  that was your answer.
11      A.   Yes.
12      Q.   What was the purpose for which they
13  were intended?
14      A.   To support the plan of adjustment.
15      Q.   And the confirmation of the plan of
16  adjustment?
17      A.   And the confirmation of the plan of
18  adjustment, yes.
19      Q.   Okay.  Let's go if we could to
20  Page 14 of your report.  I'm going to ask you now
21  about the area of contingencies.  And under the
22  quantitative points, you mention in the third
23  bullet point at the top, you raise the question,
24  "Is there an adequate contingency included in the

- MARTI KOPACZ - VOLUME 1-

1   projections?"
2       Do you see where I've directed your
3   attention to?
4       A.   Yes.
5       Q.   What do you mean by "contingency"?
6       A.   Contingency is another -- another
7   word might be cushion.
8       Q.   Okay.
9       A.   For -- for changes down the road.
10      Q.   And is a contingency or a cushion
11  something that you would expect to see in
12  forecasts?
13      A.   Most fore -- many forecasts have
14  contingencies in them.  Some forecasts have no
15  contingencies.
16      Q.   What's the purpose of having a
17  contingency?
18      A.   Because a forecast or projection by
19  its nature is future looking --
20      Q.   Uh-huh.
21      A.   -- you cannot be assured of what is
22  going to happen.
23      Q.   Uh-huh.
24      A.   So, you keep some cushion, some

- MARTI KOPACZ - VOLUME 1-

1   contingency.  It's like why do -- you know, why do
2   we keep a savings account?
3       Q.   Right.  Okay.  And the contingency in
4   the forecast here is about 1 percent?
5       A.   The line item contingency -- the line
6   that is defined as contingency is 1 percent.
7       Q.   Is there or are there contingencies
8   above and beyond that one line item in the
9   forecast?
10      A.   I believe there are.
11      Q.   Where would those be found?
12      A.   In some of the labor estimates.
13      Q.   Okay.  Any others?
14      A.   Some of the other expense items.
15      Q.   Okay.  Are you aware of any
16  calculation that adds all of the contingencies
17  together to come up with a single contingency
18  number for any given year in the forecast?
19      A.   Not to my knowledge.
20      Q.   Did you reach any conclusion yourself
21  about what that percentage or number would be for
22  any given year if you added all these cushions
23  together?
24      A.   I have not.

- MARTI KOPACZ - VOLUME 1-

1       Q.   Now, what did you think, if you had
2   an opinion, the level of the contingency ought to
3   be?
4       A.   I did not come to a conclusion as to
5   what I thought the contingency should be.  I
6   simply assessed whether I thought there was
7   adequate contingency in the plans that I was
8   presented.
9       Q.   At Pages 177 and 178 of your report,
10  you refer to Public Act -- "Public Acts 181 and
11  182 which require a general reserve of not less
12  than 5 percent of projected expenditures."
13      Do you see the language there?
14      A.   I'm sorry.  Page number again,
15  please.
16      Q.   177 and 178.
17      A.   Yes, I do.
18      Q.   Okay.  And that's a 5 percent cushion
19  or 5 percent contingency?
20      A.   It's a little different than the
21  contingency that's in the City's plan of
22  adjustment projections.  This is a contingency --
23  a calculated contingency of 5 percent of expenses.
24  The City's plan of adjustment is 1 percent of

1      - MARTI KOPACZ - VOLUME 1-
2  revenue.  In the City's -- the City's contingency
3  is cumulative over the years, assuming you don't
4  use it, and this is a annual contingency.
5      Q.    Do the City's forecasts to your
6  knowledge contain any method by which the City
7  will come into compliance with this 5 percent
8  requirement of Public Acts 181 and 182?
9      A.    I don't have any knowledge of that.
10     Q.    Okay.  Now, in -- I'm going to direct
11  you to various parts of your report now.
12     Have you identified in your report
13  various risks to the plan?
14     A.    Yes.
15     Q.    Okay.  Let's start with Page 53.
16     A.    53?
17     Q.    Yes.  And you see towards the bottom
18  of 53 there's a reference to wagering taxes?
19     A.    Yes.
20     Q.    And actually, this continues on to 54.
21     Did you find that the projections'
22  estimate of future wagering attacks -- wagering
23  taxes appeared higher than the actuals would
24  suggest?
25     A.    When you say actuals, are you talking

1      - MARTI KOPACZ - VOLUME 1-
2  about the -- the long-term trend on wagering or
3  the first -- I refer to the first six months where
4  there has been a decrease in wagering tax.
5      Q.    Right.
6      A.    Yes.
7      Q.    We'll -- let me -- let's break this
8  down.
9      You've written that the wagering tax
10  rate and so on being -- are held constant,
11  correct?
12     A.    The wagering tax --
13     Q.    You say, "As a result of the wagering
14  tax rate, 10.9 percent, and the additional 2006
15  tax rate, 1 percent, being held constant, the key
16  assumption of the ten-year forecast is the annual
17  percentage change in casino gross receipts,"
18  correct?
19     A.    Yes.
20     Q.    Okay.  And then you write that
21  there's increasing competition from casinos in
22  Cleveland and Toledo; is that right?
23     A.    That's correct.
24     Q.    Okay.  And that the ten-year
25  projections assume a decline and you describe what

1      - MARTI KOPACZ - VOLUME 1-
2  that that's going to be, correct?
3      A.    Yes.
4      Q.    On the carryover page, though, you've
5  written that the first six months of 2014 the
6  revenues decreased 3.6 percent, correct?
7      A.    Yes.
8      Q.    And that's a decrease greater than
9  that that's contained in the forecast; is that
10  right?
11     A.    That's correct.
12     Q.    Do you have any reason to believe
13  that this, I don't know what that was, that the
14  casino revenues will change to a rate of decline
15  more consistent with what EY has projected as
16  opposed to the 3.6 percent in the first six months
17  of 2014?
18     A.    I think the -- this is one of the
19  assumptions that change between the May
20  projections and the July 2nd projections, whereby
21  the wagering taxes -- the projections for the
22  wagering taxes were decreased over the ten-year
23  period, and I am satisfied that the wagering tax
24  projections in the plan are -- are reasonable for
25  the -- for that ten-year period.

1      - MARTI KOPACZ - VOLUME 1-
2      Q.    Because they've been changed in the
3  most recent set of projections?
4      A.    The/the conversations that I and my
5  team had with E&Y with regard to this were looking
6  at the long-term trends, they have studied it.  It
7  would be -- you don't want to overreact to any
8  very short-term change.  So, I think the -- the
9  decrease in the wagering tax assumption here
10  was -- was reasonable in light of the long-term
11  nature of the projection.
12     Q.    Okay.  Just to summarize, because
13  your answer touched a few things.
14     There has been a set of projections
15  from the City and the fourth amended plan of
16  adjustment which was filed in May, correct?
17     A.    Yes.
18     Q.    And then EY came up with a revised
19  and updated set of projections on July 2nd?
20     A.    EY and Conway.
21     Q.    And Conway.
22     A.    Uh-huh.
23     Q.    And as to wagering taxes, the
24  July 2nd projections lowered the level of wagering
25  tax revenue that was forecast, correct?

- MARTI KOPACZ - VOLUME 1-
1
2     A.    Yes.
3     Q.    And you looked at that and were
4  comfortable with it as changed; is that right?
5     A.    I was.
6     Q.    Now, let's, if we could, go to Page 89.
7           At the top you've written that "The
8  City is projecting that it will be able to collect
9  an additional $74 million as a result of better
10  collections of civil fines and infractions."
11           Have I quoted that correctly?
12     A.    That's correct.
13     Q.    And this is because the City projects
14  it's going to increase its collection rate from
15  the 36 percent in 2013 to 56.8 percent in 2023,
16  correct?
17     A.    Yes.
18     Q.    Now, if the City fails to improve its
19  collection rate, what's the effect in terms of the
20  revenue it can expect from fines?
21     A.    I would have to calculate that.
22     Q.    Okay.  It would -- it would fall in
23  direct proportion to the -- to the collection
24  rate; is that correct?
25     A.    Only if you assume the same rate of

- MARTI KOPACZ - VOLUME 1-
1
2  fines imposed.
3     Q.    Uh-huh.  Have there been projections
4  about increasing the level of fines as well?
5     A.    Yes, there has been discussion.
6     Q.    So it would be a combination of
7  implementing increases and also collecting more?
8     A.    Yes.
9     Q.    I mean collecting a higher
10  percentage?
11     A.    But this -- this is collecting --
12  this is about collecting more of the fines that
13  are imposed.
14     Q.    Now, if it turns out the City just
15  doesn't deliver on that --
16     A.    Yes.
17     Q.    -- there would be a revenue shortfall
18  to that extent, correct?
19     A.    I would assume so, all other things
20  equal.
21     Q.    Okay.  And is that one of the reasons
22  forecasts usually has a cushion or a contingency?
23     A.    Could be.
24     Q.    Okay.  The -- let's go to -- let me
25  ask you about the Detroit Department of

- MARTI KOPACZ - VOLUME 1-
1
2  Transportation.  And that is the bus service in
3  Detroit, among other things?
4     A.    It is.
5     Q.    Okay.  And the City subsidizes -- I'm
6  going to call it DDOT, in which --
7     A.    DDOT.
8     Q.    Okay.
9           -- the City subsidizes DDOT, correct?
10     A.    It traditionally has subsidized DDOT,
11  yes.
12     Q.    And the/the forecasts project that
13  the amount of the subsidy is/is projected to fall
14  in the coming years?
15     A.    At the operating level, yes, but --
16     Q.    Okay.  Now, on Page 95, there's a
17  reference to overtime at DDOT.  And you've written
18  in the middle of the page, "The decrease in
19  overtime at DDOT is a key assumption over the next
20  ten years as the City provides a subsidy to DDOT."
21           Why is it a key assumption?
22     A.    Because it is a -- overtime at DDOT
23  is a significant operational and economic issue.
24     Q.    Uh-huh.
25     A.    They spend a lot of money on

- MARTI KOPACZ - VOLUME 1-
1
2  overtime.
3     Q.    Is that an issue the City has
4  attempted to remedy over the years?
5     A.    I don't know if it's attempted to
6  remedy it over the years.
7     Q.    What do you recall?
8     A.    I do know that it is a focus of the
9  mayor and of Mr. Dirks who is the DDOT head.
10     Q.    Okay.  The bottom of 95 you write,
11  "If the City is unsuccessful in decreasing
12  overtime and overtime remains at 40 percent of
13  payroll, the subsidy would be $61 million higher
14  than currently projected over the ten years,"
15  correct?
16     A.    Yes.
17     Q.    So, realizing that savings is
18  contingent upon the City successfully decreasing
19  overtime in DDOT in the years to come, correct?
20     A.    Correct.
21     Q.    Is that a reason to have a
22  contingency or a cushion, to allow for the risk
23  that may not occur?
24     A.    It's an example of a risk that you
25  would want to factor in.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-

1
2    Q.    But when you say "factor in," you
3  mean the projections have some allowance for the
4  chance this opportunity may not be realized?
5    A.    I don't know if the contingency was
6  created to address this specifically, but clearly,
7  this is a risk and you put a contingency in so
8  that you can balance off the positive and the
9  negative variances.
10    Q.    Okay.  Now, at Page -- I've asked you
11  before about improvement of the City's IT systems
12  and we talked about the amount of the spend the
13  City is thinking about for IT improvements.  Some
14  of those would be implementation of new IT systems
15  all together?
16    A.    Yes.
17    Q.    Are you familiar with the failure
18  rate of implement -- implementation of new IT
19  systems?
20    A.    We did.  I am.
21    Q.    Okay.  And what -- what is -- what
22  are the risks of a failure of implementation of a
23  new IT system?
24    A.    Time and money.
25    Q.    Okay.  How -- and what would the

- MARTI KOPACZ - VOLUME 1-

1
2  effect be of the time delay?
3    A.    It would take longer to implement the
4  system.
5    Q.    And would that impede implementation
6  of the RRIs?
7    A.    If the RRI is about the IT or if
8  there is some component of an RRI that's
9  predicated on an IT solution.
10    Q.    And to the extent that the City was
11  expecting more revenue or lower costs from a new
12  IT system, would a delay in implementation affect
13  that revenue or that cost savings?
14    A.    It could.
15    Q.    Okay.  You said it would be time and
16  money.
17         What would the money element be if a
18  failure to implement an IT system --
19    A.    It would simply cost more.
20    Q.    Cost overrun?
21    A.    Yes.
22    Q.    Okay.  And how common are such cost
23  overruns in the IT world?
24    A.    Fairly common.
25    Q.    Okay.  Now, on Page 122, under

- MARTI KOPACZ - VOLUME 1-

1
2  "Impact on Feasibility," you've written, "The
3  risks associated with the IT initiatives alone
4  warrant additional financial contingency beyond
5  the general 1 percent assumption in the POA
6  projections."
7         Do you see that?
8    A.    I do.
9    Q.    And is that because of the risk you
10  just told -- you talked to me about, about time
11  and money, that could result from a slippage?
12    A.    Yes.
13    Q.    Do you know if there's any other
14  contingency in the forecast or IT shortcomings
15  above and beyond the 1 percent contingency?
16    A.    The -- what I am aware of is that
17  some of the IT investments in terms of the cost
18  that the City has estimated those to be are --
19  appear to be, you know, have some cushion in them.
20    Q.    Uh-huh.
21    A.    The one I'm familiar with or the
22  couple that I'm familiar with are -- are what --
23  what my team and Mr. Childree in specifically
24  looked at the ERP, having done that in his career
25  at the State of Alabama and what it should cost,

- MARTI KOPACZ - VOLUME 1-

1
2  and his assessment was that they should be able to
3  do it for the money that's in there.
4    Q.    Okay.
5    A.    I know that Ms. Niblock is in the
6  process of replacing all of the laptop PCs for the
7  City and that the price they're assuming on a per
8  unit basis is reasonable with a little bit of
9  cushion in it, so I believe in that 150 is a
10  little bit of cushion.  I don't know what it is
11  specifically and I don't know what it totals to.
12  But I know they've made an attempt to be
13  reasonably conservative on what those costs are.
14    Q.    Right.  Going back to Page 122, is it
15  your opinion that the City should have -- should
16  increase its 1 percent contingency to allow for
17  the risks associated with the IT initiatives?
18         MR. KANE:  Before you answer, Geoff,
19  I just want to make a minor clarifying point.
20         MR. STEWART:  Sure.
21         MR. KANE:  I haven't quibbled with
22  the term "opinion" as a proxy for "view" --
23         MR. STEWART:  Yeah.
24         MR. KANE:  -- or "conclusion."  I
25  just want to make sure we're talking small

- MARTI KOPACZ - VOLUME 1-

1    "o" opinion.
2    MR. STEWART:  Why don't I say --
3    con -- why I don't just change the question,
4    say conclusion just to make it clear.
5    MR. KANE:  Thank you.
6    BY MR. STEWART:
7    Q.    Let me ask the question again.  Let
8    me -- let's go back to Page 122.
9    A.    Uh-huh.
10   Q.    Is it your conclusion that the risk
11   associated with the IT initiatives alone should
12   require an increase in the contingency above the
13   1 percent that's in the forecast?
14   A.    My preference would be if -- that I
15   would like to see more contingency.  I've said
16   that kind of throughout my report, and this is one
17   of the areas where I think it would be good to
18   have more contingency.
19   Q.    As a general matter, why is it good
20   to have a bigger contingency?
21   A.    Because these are -- these are big
22   projects happening in the future, things will
23   change.
24   Q.    Okay.  Now, on Page 193 of your

- MARTI KOPACZ - VOLUME 1-

1    report, you point out that -- and this is at the
2    top, under "Macroeconomic Issues," that you write that
3    "I believe the City's economic forecast that
4    informed the projections considered normalized
5    economic conditions.  I do not believe the City's
6    projections accounted for any significant economic
7    disruptions similar to those experienced recently
8    during the Great Recession."
9    Let me start by asking you, just so
10   we have it, what do you mean by "normalized
11   economic conditions"?
12   A.    Something that isn't predicated on a
13   recession or, alternatively, a boom.
14   Q.    Uh-huh.  And when we look at Detroit,
15   we saw a fiscal collapse from about 2000 to about
16   2007?
17   A.    I haven't looked back to 2000.
18   Right?
19   Q.    Uh-huh.  And then there were the
20   effects of the Great Recession on Detroit as well,
21   correct?
22   A.    Right.  The obvious.
23   Q.    Fair to say in the past 14 or
24   15 years the population of Detroit has fallen

- MARTI KOPACZ - VOLUME 1-

1    substantially?
2    A.    Yes.
3    Q.    Employment has fallen substantially?
4    A.    Yes.
5    Q.    Revenues have fallen substantially?
6    A.    Yes.
7    Q.    Industrial base has continued to
8    erode?
9    A.    Yes.
10   Q.    Okay.  Do you have any reason to
11   believe as we look at the next 40 years that
12   Detroit will not experience another economic
13   reversal?
14   A.    In terms of continuing decline or
15   reversal to continuing uptick?
16   Q.    Do you believe Detroit right now,
17   today, is experiencing normalized economic
18   conditions?
19   A.    For Detroit, yes.
20   Q.    What does it mean when you say
21   normalized economic conditions for Detroit?
22   A.    I think Detroit is stabilizing and is
23   at -- as I said before, is at a tipping point and
24   has prospects of stabilizing and growing again.

- MARTI KOPACZ - VOLUME 1-

1    Q.    Okay.  And if it does tip, what
2    happens.
3    A.    If it does tip?  Tip up or tip down?
4    Q.    Tip down.
5    A.    I don't think any of this would work.
6    Q.    Okay.  Now, as you look forward to
7    the next 10 or 40 years, what assurance is there
8    that Detroit is not going to encounter another
9    fiscal collapse?
10   A.    I don't think there are any
11   assurances.
12   Q.    What are the odds that the nation
13   will have another recession?
14   A.    I have no idea.
15   Q.    How often have recessions typically
16   occurred in recent years?
17   A.    I haven't thought about that.
18   Q.    Okay.
19   A.    Don't have an opinion.  Don't have a
20   thought.
21   Q.    Okay.  Are you aware of any reason to
22   believe Detroit is on the verge of a -- of a
23   radical economic boom?
24   A.    Radical economic boom?

22 (Pages 85 to 88)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 23 of 146

- MARTI KOPACZ - VOLUME 1-
1
2     Q.    Uh-huh.
3     A.    No.
4     Q.    Now, one of the things your report
5  dealt with at great length was pension issues,
6  correct?
7     A.    Yes.
8     Q.    Okay.  And without getting into each
9  of the pension issues, as a general matter, what
10  concern, if any, did you express -- pardon me --
11  about the City's potential future pension
12  liabilities?
13     A.    I expressed concern that the City
14  needs to -- the City would be advised to monitor
15  annually and actively its future unfunded
16  liabilities.
17     Q.    Okay.  And, pardon me -- in those
18  future unfunded liabilities -- well, let me back
19  up.
20           Why do you think the City should
21  actively monitor its -- its future unfunded
22  liabilities?
23     A.    Because the City, as part of the
24  plan, has fixed its contribution, okay, over the
25  next ten years, which for purposes of my

- MARTI KOPACZ - VOLUME 1-
1
2  feasibility assessment is a positive thing, right?
3  It gives the City certainty around what it needs
4  to spend on its old pension program.
5     Q.    Okay.  Now, if it turns out -- well,
6  let me ask about a few things.
7           First of all, are you aware that the
8  City settlement with the retirement systems
9  includes, among other things, an assumed rate of
10  investment return of 6.75 percent?
11     A.    I am aware of that.
12     Q.    Is there a risk associated with that?
13     A.    Yes.
14     Q.    What is the risk?
15     A.    The risk is that the investment
16  return over the -- the course of the time frame
17  would not equal 6.75 percent.
18     Q.    And if that occurs, what would the
19  effect be upon the City?
20     A.    If the investment return is less than
21  that, the effect on the City would be that it
22  would have a larger unfunded liability.
23     Q.    Have --
24     A.    In the future.
25     Q.    -- have you been able to reduce that

- MARTI KOPACZ - VOLUME 1-
1
2  in some analytical way in terms of what level of
3  risk that poses to the City's ability or City's
4  ability to implement its plan?
5     A.    I don't think I understand the
6  question.
7     Q.    Have you been able to quantify what
8  that risk would be to the City?
9     A.    We -- we have asked the City to do a
10  sensitivity analysis of various investment
11  returns.
12     Q.    Right.
13     A.    And that is part of the open request
14  that's still outstanding.  We did get information
15  from Milliman on the sensitivity analysis we
16  requested for the PFRS system, but not for the
17  GRS.
18     Q.    And Milliman is, for the record, is
19  the City's actuary?
20     A.    Yes.
21     Q.    Okay.  Now, if turns out that the
22  pension funds underperform in terms of their
23  investments at 6.75 percent what, if anything,
24  would the City be required to do?
25     A.    The City would eventually be required

- MARTI KOPACZ - VOLUME 1-
1
2  to put together a plan to fund that.
3     Q.    Is that risk something that should be
4  provided for in the plan as part of the
5  contingency?
6     A.    I -- I don't -- as part of the
7  contingency today?
8     Q.    Uh-huh.
9     A.    No.
10     Q.    Why not?
11     A.    Because it is a far in the future
12  obligation.
13     Q.    Uh-huh.
14     A.    And many, many things can change by
15  the time that the City is obligated to -- to
16  address that issue.
17     Q.    Okay.  Your report speaks of other
18  issues involving the pensions as well, including,
19  for example, pension restoration.
20     A.    Yes.
21     Q.    Remember the sections on that?  And
22  the operation of the pension restoration mechanism
23  also could affect how much the City might have to
24  some day pay the retirement systems, correct?
25     A.    Yes.

1     - MARTI KOPACZ - VOLUME 1-
2     Q.    Would your answer be the same if I
3  ask you whether that had to be provided for in
4  today's contingency?
5     A.    Yes.
6     Q.    And just so we don't spend all day on
7  pensions, there were other issues identified as
8  well in your report having to do with pensions,
9  correct, besides --
10    A.    Yes.
11    Q.    And your answer would be the same
12 that, although that is a potential cost to the
13 City in future years, it is not something that
14 would have to be reflected in the contingency
15 today?
16    A.    Correct.
17    Q.    Okay.  Let's look, if we could, then
18 I'll move on and almost be done, on Page 200 and
19 201?
20    A.    200 and 201.
21    Q.    The bottom --
22          (Whereupon, a brief discussion was
23    held off record.)
24 BY MR. STEWART:
25    Q.    Anyhow, 200 to 201, you've written in

1     - MARTI KOPACZ - VOLUME 1-
2  the carryover sentence, and I'm going to start in
3  the middle of it, "I believe that there are enough
4  conservative assumptions in the projections to
5  offset what I view as an aggressive assumption
6  concerning the level of contingencies particularly
7  in the early years."
8          And fair to say that the aggressive
9  assumption on contingencies is the 1 percent?
10    A.    Yes.
11    Q.    And the conservative assumptions
12 would be what?
13    A.    I think the -- I think there are
14 reasonably conservative assumptions on the revenue
15 side.
16    Q.    Uh-huh.
17    A.    I think there are -- there are some
18 reasonably conservative assumptions relative to
19 the total head count in the early years in terms
20 of the people employed by the City.
21    Q.    Anything else?
22    A.    Not off the top of my head.
23    Q.    And when you use the phrase
24 "conservative assumptions," what do you mean?
25    A.    Conservative would mean -- a

1     - MARTI KOPACZ - VOLUME 1-
2  conservative assumption would be something that
3  would either cause a reduction in the value of the
4  revenue or an increase of the value of the
5  expenses.
6     Q.    Have you attempted to quantify the
7  conservative assumptions in the City's
8  projections?
9     A.    I have not.
10    Q.    You then go on the say, "While I do
11 not believe a 1 percent contingency is adequate, I
12 believe that the POA projections taken as a whole
13 fall within the range of reasonableness and within
14 my definition of the feasibility standard."
15          Do you see that?
16    A.    That's correct.
17    Q.    And are you saying that, although the
18 1 percent contingency is not enough, the other
19 conservative assumptions offset any shortcomings?
20    A.    I'm saying taken as a whole -- the
21 projections with all of the conservative and
22 aggressive assumptions taken as -- as a whole are
23 reasonable.
24    Q.    Okay.  Let me ask you about
25 sensitivity analyses now.

1     - MARTI KOPACZ - VOLUME 1-
2     A.    Okay.
3     Q.    And you have about a half dozen of
4  them in your report, correct?
5     A.    I haven't counted them.
6     Q.    Okay.  Well, nor are we going to
7  itemize them all here, but they seem to be about
8  that many.  And let me just go to the first one,
9  which is on Page 48, 49.  And this is the
10 sensitivity analysis about income taxes.
11    A.    Okay.
12    Q.    And the analysis is described on
13 Page 48 and the table is on 49.
14    A.    Uh-huh.
15    Q.    Is it fair to say that this is the
16 mathematical exercise of the simply showing what a
17 1 percent change results in if no other constants
18 change?
19    A.    That's correct.
20    Q.    In fact, a change in taxable income
21 could affect other constants, right?
22    A.    It could.
23    Q.    And if so, the sensitivity analysis
24 would have to be altered to take into account
25 those other changes; is that right?

- MARTI KOPACZ - VOLUME 1-

1
2    A.    Generally, a sensitivity analysis is
3  done around a single variable.
4    Q.    Okay.
5    A.    Right?
6    Q.    And all of the sensitivity
7  analyses -- analyses you have done have been done
8  around a single variable, right?
9    A.    Yes.
10    Q.    And when it predicts a -- the effects
11  of a 1 percent change, it would be that absolute
12  number whether the 1 percent is up or whether the
13  1 percent is down, correct?
14    A.    Yes.  Yes.
15        MR. STEWART:  That is all I have.
16        MR. HACKNEY:  This might be a good
17  time for a break.  I'm going to move all my
18  stuff over there.
19        MR. STEWART:  Sure.
20        THE VIDEOGRAPHER:  Okay.  The time
21  now is 11:04 a.m.  We're going off the
22  record.
23        (Whereupon, there was a brief recess
24  in the proceedings.)
25        THE VIDEOGRAPHER:  Time now is

- MARTI KOPACZ - VOLUME 1-

1
2  11:12 a.m., and we're back on the record.
3  EXAMINATION BY MR. HACKNEY:
4    Q.    Ms. Kopacz, we've met before but --
5    A.    We have.
6    Q.    -- I'll introduce myself again.  My
7  name is Steve Hackney and I represent Syncora in
8  the City of Detroit bankruptcy case.  It's ice to
9  see you again.
10    A.    Nice to see you again.
11    Q.    Let me ask you some open-ended
12  questions at the start here.
13        I first want to confirm that you're
14  not intending to offer opinions other than the
15  ones that are contained in your report, correct?
16    A.    That is my intention, yes.
17    Q.    Okay.  And you have disclosed the
18  bases for your opinions as well as the facts and
19  data that you considered in your report, correct?
20    A.    Yes.
21    Q.    What are the limitations of the EY
22  forecasts in your view?  And I'm going to get some
23  terminology down here, which is to say when I
24  refer to the EY forecast at large, I mean all of
25  them.  So I mean the -- the baseline forecast

- MARTI KOPACZ - VOLUME 1-

1
2  without RRIs.  I mean the forecast with RRIs.  I
3  mean the 40-year forecast.  So when I refer to the
4  forecasts at large, I'll call them the EY
5  forecasts.  Does that work for you?
6    A.    And that includes the Conway
7  position?
8    Q.    It does.
9    A.    Okay.
10    Q.    Because you have to -- to have a name
11  for them and ultimately EY assembled them.
12    A.    Right.
13    Q.    And so -- I mean, I can call them
14  whatever you want, put it another way --
15    A.    Okay.
16    Q.    -- but if there's a time where you
17  want to say well, Steve, I need to talk about this
18  instead of this, let me know.  Okay?
19        And, as a general rule, if I ask you
20  a question that doesn't make sense, as I am wont
21  to do, will you please let me know so that I can
22  rephrase it?
23    A.    Yes.
24    Q.    If you -- do you understand that if
25  you answer my question, I'm going to assume that

- MARTI KOPACZ - VOLUME 1-

1
2  you understood my question?
3    A.    Yes.
4    Q.    So going back to it, what are the
5  limitations of the EY forecasts that are included
6  in the plan in your view?
7    A.    The limitations?  I'm struggling with
8  the word "limitations."
9    Q.    Okay.
10    A.    As I said in an answer to
11  Mr. Stewart's question, the projections in the
12  City's plan are -- were created for specific
13  purpose and they are not what we would typically
14  expect to see as a set of projections for a plan
15  of reorganization in a Chapter 11 case.  So,
16  they're just -- they're -- it takes more effort to
17  understand what they are and what they aren't.
18    Q.    Going back to that, I wanted to make
19  clear that you are specifically disclaiming any
20  opinions on whether the -- whether the plan is in
21  the best interests of creditors, correct?
22    A.    That was not in my scope.
23    Q.    And you don't have any opinions on
24  that?
25    A.    I do not have an opinion.

- MARTI KOPACZ - VOLUME 1-

Q.    And you did not attempt to -- to
determine whether the -- the City might do better
than the -- the forecasts such that there would be
more to distribute to creditors, correct?

A.    Yes.  And I -- I think at some point
in my report I said there are -- there are things
that I didn't -- that I very clearly didn't do,
and I didn't -- I didn't look at best interest of
creditors.  It was outside of my scope, and I
didn't look to see if there was a way in which the
City could generate more cash, and I didn't look
at any of the alternative plans.

Q.    And just to be clear, to the extent
the City is purporting to use the projections to
satisfy the best interests of creditors test, you
do not have an opinion that the projections are
appropriate for that purpose, correct?

A.    I don't have any opinion around best
interest at any level.

Q.    Okay.  But I have to tie it to the
forecasts as well, correct?  You're not saying
these forecasts satisfy the City's burden in
connection with the best interests of creditors?

A.    I -- no.  I don't have any -- I don't

- MARTI KOPACZ - VOLUME 1-

have anything to say about that.

Q.    Okay.  I guess -- let me go back to
the subject of limitations and give you an example
to help inform my question a little bit.

So you're aware that the City has
what I'll describe as troubled data systems with
respect to the collection of financial records?

A.    Yes.

Q.    You're also aware that the forecast
is, in some respects, based on historical
financial records?

A.    Yes.

Q.    So, an example of a limitation would
be that if the City has historical financial
records that are of questionable reliability, that
that could be a limitation on the accuracy of the
forecast.  So I'm using this as an example of
something that could be a limitation.  I'm not
saying that it is or it isn't, but I'm trying to
inform my question to you more to help put some
meat on the bones so to speak.

A.    The City has accurate financial
information once a year when it completes its --
its annual audit and gets its annual financial

- MARTI KOPACZ - VOLUME 1-

stuff, right?  And at that point in time, when
KPMG signs off and it files its CAFR, then --
CAFR, C-A-F-R, comprehensive annual financial
report, those are numbers that have been vetted,
if you will.

Q.    The negative implication of your
question is that in between CAFRs, the City does
not have reliable financial records, correct?

A.    They have ad hoc records.

Q.    They are definitely ad hoc.

A.    Yes.

Q.    Are they reliable?

A.    Some may be and some may not be.

Q.    Okay.  You did not have sufficient
time to audit the records of the City, correct?

A.    No, and it wasn't in my scope.

Q.    Okay.  So you have not made a
determination as to whether the financial
information upon which the projections are built,
to the extent that they're not derived from a
CAFR, are based on reliable financial records,
correct?  You haven't made that determination.

A.    Can you repeat the question, please?

MR. KANE:  I was distracting her with

- MARTI KOPACZ - VOLUME 1-

the microphone.

MR. HACKNEY:  That's okay.  It's a
long one, but I think it was the best way to
ask it, so it may be better to have it read
back.

(The question requested was read back
by the reporter.

THE WITNESS:  That didn't help me.
Can we try again?

BY MR. HACKNEY:

Q.    Yeah.  So, I think -- let me try and
summarize what you've said.

I believe that you have testified
that you believe the CAFRs are reliable financial
information sets, correct?

A.    Right.  I -- the CAFRs are based on
financial information that has been tested and
vetted and upon which KPMG has opined.  Okay?

I may quibble with some of the
accounting that's in there just because I have a
view of certain things.  Okay?  But at least at
that point in time, if we're looking at, for
example, the CAFR in June of '12, which was the
basis for the original baseline by E&Y, if they

- MARTI KOPACZ - VOLUME 1-

1
2 said they had 10,002 employees and they paid them
3 $386 million, I think those are probably very good
4 numbers.
5      Q.   Okay.  So, I think we're on common
6 ground when we say to one another the CAFRs are in
7 your view reliable financial information sets,
8 correct?
9      A.   Right.
10      Q.   We then talked about the -- in the
11 interim between --
12      A.   Right.
13      Q.   -- between the CAFRs, I think your
14 testimony was to the effect of some information
15 may be reliable and some may not be reliable,
16 correct?
17      A.   Yes.
18      Q.   That's part of the problem that
19 Detroit is facing now, right, it's difficulty with
20 its an assembly of financial information?
21      A.   Yes.
22      Q.   So my question is that to the extent
23 that the forecasts in the plan are based on
24 information that was developed after the 2012
25 fiscal year CAFR, you have not made an assessment

- MARTI KOPACZ - VOLUME 1-

1
2 of whether that financial information is reliable,
3 correct?
4      A.   Individually that is correct.  Yes.
5      Q.   Okay.  And isn't it true that the
6 fiscal year 2013 CAFR just came out last week?
7      A.   That is correct.
8      Q.   So that wasn't available to the
9 forecasters at EY in connection with their
10 forecast, correct?
11      A.   Parts of that -- information that is
12 contained in the CAFR is available throughout the
13 year.  So, for example, the City has a good handle
14 on cash, so it can tell you how much cash it has
15 and how much cash it has to pay, right?
16      What its future obligations may be
17 for some construction project that's going on, it
18 probably can't tell you.
19      Q.   Okay.  So there were parts of the
20 2013 CAFR that may have been available to E&Y --
21      A.   Yes.
22      Q.   -- and parts that were not?
23      A.   Correct.
24      Q.   And they -- the same parts were
25 available to you and not, correct?

- MARTI KOPACZ - VOLUME 1-

1
2      A.   Yes.
3      Q.   Okay.  Now, with respect to the
4 forecasts that are included in the plan, what is
5 the base year for those forecasts?
6      A.   The base year for the original
7 ten-year was 2012 and then it was updated for
8 information that was known in 2013 and it has been
9 subsequently updated for information that is known
10 in 2014, which is the year we just finished.
11      Q.   So let's get terminology straight,
12 because I would get this turned around.
13      But isn't it true that fiscal year
14 2013 ended on June 30th, 2013?
15      A.   Correct.
16      Q.   Okay.
17      A.   And that's the first baseline.
18      Q.   And you understand that when the
19 first baseline forecast was being built it was
20 prior to the end of fiscal year 2013?
21      A.   Yes.
22      Q.   And so, in that forecast, the base
23 year was clearly fiscal year 2012, correct?
24      A.   Up to -- yes, and updated for what
25 was discernable and knowable before that

- MARTI KOPACZ - VOLUME 1-

1
2 projection was made.
3      Q.   So I understand that the projection
4 involves updating --
5      A.   Yes.
6      Q.   -- things, but when I talk about the
7 base year, that's not something that you update,
8 correct?
9      A.   Correct.
10      Q.   The base year is the historical base,
11 correct?
12      A.   Correct.  Yes.
13      Q.   So, when we get to the forecasts that
14 are included in the instant plan, the most recent
15 set of those was dated July 2nd, correct?
16      A.   Correct.
17      Q.   And that's of 2014?
18      A.   Correct.
19      Q.   What was the historical base year for
20 the forecasts that are in the plan?
21      A.   It's -- it's still the baseline plan,
22 ten-year plan, updated for the updated RRIs,
23 updated for the new 40-year.
24      Q.   But based off of fiscal year 2012?
25      A.   The baseline was 2012.

- MARTI KOPACZ - VOLUME 1-

1
2    Q.    Right.
3    A.    Right.
4    Q.    But what about the ten-year
5 restructuring forecast?  Is that base year 2012?
6 Base year 2013?
7    A.    The ten-year restructuring forecast,
8 I think of that as the 40-year plan.  The ten-year
9 that's within the 40-year?
10   Q.    Yes.
11   A.    I think that has been largely up
12 dated for '13.
13   Q.    Okay.  So is the base year for the
14 40-year that includes the 10-year --
15   A.    Yes.
16   Q.    -- fiscal year 2013?
17   A.    It's '12 adjusted for what they knew
18 about '13.
19   Q.    Okay.  So it's --
20   A.    It's a hybrid.
21   Q.    -- it's a bit of a hybrid?
22   A.    It is.
23   Q.    Okay.  And is that typical in
24 forecasting?
25   A.    Is it typical in forecasting?  It is

- MARTI KOPACZ - VOLUME 1-

1
2 typical if forecasting goes on for a long period
3 of time as this has.  And think about it.  They've
4 been -- they've been doing these forecasts for a
5 long, long time, and so they keep updating them.
6 But originally, it started with the baseline which
7 was predicated on '12 -- of 2012.
8    Q.    Okay.  And so to the extent the
9 forecast for 2013 was superseded by actual
10 results, your testimony is that the forecast was
11 updated to take account of the actual results that
12 had already happened?
13   A.    To the -- to the extent that -- yes,
14 there are -- there are updates.  Because there
15 are -- I'm trying to think, I think there are six
16 sets of projections, right?  We only focused on
17 the May 5th and the July 2nd, but there were other
18 sets of projections before that that existed, you
19 know, from that.  So, all of those have changed
20 and incorporated both new actual results and new
21 assumptions.
22   Q.    And the new actual results
23 post-fiscal year 2012 are ones that were derived
24 from something other than the CAFR, correct?
25   A.    As the CAFR was filed last week, yes,

- MARTI KOPACZ - VOLUME 1-

1
2 had to be.
3    Q.    Yeah.  It had to be.
4    A.    By definition, had to be.
5    Q.    Are there problems with the forecasts
6 that are in the plan in your view?
7    A.    Problems?  I -- I don't -- there's
8 not problems with them in the sense of where they
9 end up, right?  I, again, have been really
10 critical of how confusing they are.
11   Q.    I was going to say that it seems to
12 me that when a forecast is confusing, and I'm one
13 of the people that shares your view that they're
14 confusing, that strikes me as a problem with the
15 forecast.  I think a forecast should not be
16 confusing, but that's me and I wanted to ask
17 whether or not the confusing nature of the
18 forecasts was a problem from your point of view?
19   A.    It -- it caused my team to spend an
20 enormous amount of time in understanding and
21 checking the model, right?  It -- it -- I think
22 the -- the word I'd use in here or a word I used
23 at one point in time was it was tedious.
24   Q.    Isn't it fair to say that it -- it
25 took an enormous amount of time just to understand

- MARTI KOPACZ - VOLUME 1-

1
2 the model?
3    A.    We -- yes.  I -- I believe that I
4 have a good understanding of all the models.  You
5 know, members of my team have a -- an incredibly
6 intimate understanding of those models.  But that
7 required a significant effort on our part, but we
8 understand them now.
9    Q.    How long would you say it took you
10 and your team to reach the point where you could
11 say, okay, I now have an understanding of the
12 model?
13   A.    About the -- by the time we got the
14 July 2nd numbers, we had a really good
15 understanding of the May 5th numbers.
16   Q.    Okay.  So, you were retained on or
17 about April 22?
18   A.    April 22nd.  We got the working
19 models on the E&Y stuff Memorial Day.
20   Q.    Which was April 30 or something like
21 that?
22   A.    May something or other, right?
23   Q.    Okay.
24   A.    And, you know, within a couple of
25 weeks of actually getting the working models, we

- MARTI KOPACZ - VOLUME 1-

1
2    were in -- in pretty good stead with understanding
3    the May 5th, and then we got the July 2nd and went
4    through a similar process with that; albeit, you
5    know, we already knew how they worked so it was
6    easier to do those.
7        Q.    So would you say by the end of May
8    that you believe your team had achieved a good
9    working understanding?
10       A.    No.  By the end of -- by the end of
11   June.
12       Q.    Oh, by the end of June?
13       A.    By the end of June.
14       Q.    And you --
15       A.    We didn't get the working models
16   until the end of May.
17       Q.    Okay.  You had less than --
18       A.    May something or other.
19       Q.    You had less than 90 days to do your
20   work in this case, correct?
21       A.    Yeah, whatever it's been.
22       Q.    So May, June, July -- April 22 to
23   May -- July 18 I think.
24       A.    Yes.
25       Q.    Did you have sufficient time to do

- MARTI KOPACZ - VOLUME 1-

1
2    your work?
3        A.    I feel like I did.  I mean there's
4    still a couple of things that, as I said in to
5    response to Mr. Stewart, questions that I intend
6    to do going forward.  But for the most part, I am
7    satisfied with our ability to evaluate what all
8    the information that was available and meet with
9    the people that were available and do what we
10   needed to do.
11       Q.    With respect to the forecasts?
12       A.    With respect to the forecasts.
13       Q.    Now, with respect to the
14   restructuring and reinvestment initiatives, you're
15   not offering the opinion that they will achieve
16   the goals that they're held out to achieve,
17   correct?
18       A.    No.  No.
19       Q.    And you haven't conducted a
20   comprehensive review of the City's department from
21   an operational standpoint to understand how the
22   restructuring and reinvestment initiatives map on
23   to needs of each department, correct?
24       A.    I have not redone -- I have not
25   redone the work that Conway has done.  That's for

- MARTI KOPACZ - VOLUME 1-

1
2    sure, right?
3        Q.    And my question was, you haven't done
4    a comprehensive review to test whether Conway is
5    correct in either the assessment of operational
6    needs or its conclusion regarding whether the RRIs
7    will solve the operational needs, correct?
8        A.    That's correct.
9        Q.    What -- what revenue streams are not
10   included in the plan forecasts?
11       A.    The Grand Bargain revenue streams.
12       Q.    Okay.  Those are not included in the
13   forecasts?
14       A.    Well, they're in the forecasts, but
15   they're not in the -- they're in the plan
16   forecast, but they're not in the City's budget
17   because those monies don't -- they don't flow
18   through the city when they come in.
19       Q.    Understood.  Okay.  So the Grand
20   Bargain forecasts are not -- not --
21       A.    So the --
22       Q.    -- in -- in the Grand Bargain proceeds
23   are not in the City's forecasts, correct?
24       A.    They're in the plan, but they're not
25   in -- I -- I may have confused myself.

- MARTI KOPACZ - VOLUME 1-

1
2        They're not in -- they're not what we
3    would consider to be part of the City's budget.
4        Q.    Understood.
5        A.    Right.  But they're in the plan as a
6    sources of funds.
7        Q.    Okay.  So, let me -- let me put --
8    let me turn the question around, which is what
9    revenue streams did you not study?
10       A.    I don't think that there was any
11   revenue stream of a recurring nature that we
12   didn't study.
13       Q.    Well, what about something like DWSD?
14   Did you undertake an analysis to determine whether
15   in the future the City's general fund might obtain
16   revenue from what is currently known as DWSD?
17       A.    We did not do that.
18       Q.    Okay.  So you have no opinions on
19   that one way or the other?
20       A.    I do not.
21       Q.    You are generally aware that there is
22   this concept that the DWSD may change the
23   structuring in which it's housed in a way that
24   yields an additional revenue stream to the general
25   fund?

1          - MARTI KOPACZ - VOLUME 1-
2          MR. KANE:  Objection.  You can
3    answer.
4    BY MR. HACKNEY:
5          Q.    Just -- are you aware of the concept?
6          A.    I'm aware that there's discussion
7    around that, yes, and that DWSD is an enterprise
8    fund.
9          Q.    Other than that, DWSD was outside
10   your scope?
11         A.    DW -- other than the pension funding
12   transfer from DWSD to the general fund, I did not
13   look at DWSD.
14         Q.    What about, did you study the
15   likelihood and magnitude of potential asset sales?
16         A.    I met with people in the City and
17   with the City's advisors to talk about potential
18   asset sales, yes.
19         Q.    Are potential asset sales included in
20   the plan forecasts as a potential source of
21   revenue?
22         A.    No.
23         Q.    Okay.  So, is it fair to say that,
24   because they're not in the forecasts, you don't
25   have an opinion on the likelihood of revenue that

1          - MARTI KOPACZ - VOLUME 1-
2    will arise from asset sales in the future?
3          A.    That's correct.
4          Q.    Okay.  What are the uncertainties
5    that exist over the next ten years that could
6    impact the forecasts?
7          A.    I think we went through them, right,
8    in the report?  The risk and opportunity.
9          Q.    So, yeah -- to the -- to the extent
10   there are uncertainties, if I want to know what
11   your view on that is, I should read your report?
12         A.    You should.  And it's the section on
13   risk and opportunity.
14         Q.    Do you agree that changes to the law
15   is an uncertainty that could impact the forecast?
16         A.    Changes to what law?
17         Q.    Any law.
18         A.    That impacts the City?  It could.
19         Q.    Changes to the tax law could
20   certainly impact the forecast?
21         A.    Yes.
22         Q.    Did you study the likelihood of
23   changes to tax law?
24         A.    Generally, no.
25         Q.    The macroeconomic condition of the

1          - MARTI KOPACZ - VOLUME 1-
2    United States could impact the City over the next
3    ten years, correct?
4          A.    It could.
5          Q.    Did you conduct a separate analysis
6    of that question?
7          A.    No.
8          Q.    What kinds of information were you
9    unable to examine regarding the forecasts?
10         A.    I -- the -- the exhibit here of what
11   the open requests I was not able, I obviously
12   haven't -- they're still open requests, so I
13   haven't looked at that.
14         Q.    Anything else other than that that
15   was something that you would have liked to have
16   had but you didn't?
17         A.    Not that I'm recalling.
18         Q.    What about information regarding
19   grants?  Did you undertake an assessment of what
20   grants the City is or is not likely to get in the
21   future?
22         A.    Only as it relates to the
23   departmental reviews, not a broad review of grants
24   that are available that it doesn't apply for, no.
25         Q.    What are the assumptions that area in

1          - MARTI KOPACZ - VOLUME 1-
2    the forecasts regarding what grants the City will
3    get?
4          A.    It -- again, there's an exhibit in
5    here that identifies the grants and the totality
6    of the grants, but they -- they're fire and
7    safety, public safety and transportation
8    primarily.
9          Q.    And did you undertake any assessment
10   of the likelihood that they would get those
11   grants?
12         A.    No, I mean in terms of -- no.  I mean
13   there -- I assumed -- I looked at the grants that
14   they're assuming they're going to get and I agreed
15   that it looks like they're going to get those
16   grants.
17         Q.    On what basis?
18         A.    On the fact that they've applied for
19   those, like the SAFER grants for the fire
20   department, those sort of things.
21         Q.    So the extent of your confirmation
22   was to confirm that they had, in fact, applied for
23   the grants?
24         A.    No.  My -- my analysis of that was to
25   get comfortable that the grants that were in the

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 31 of
146

1    - MARTI KOPACZ - VOLUME 1-
2  forecasts were likely and reasonable, not --
3  again, my job was not to look for more grants,
4  right?  That's not what I'm doing.  I'm not
5  looking for more.
6          I'm just looking to see that the
7  grant funding that's in the plan appears
8  reasonable based on where they are today and the
9  kinds of programs that they're engaged in.  That
10 was it.
11     Q.    How did you do that?
12     A.    By talking to the people involved in
13 grants.
14     Q.    Okay.  So let's say that the City has
15 applied for a grant from the federal government
16 for fire equipment.  Hypothetical, okay?  So
17 $10 million grant.
18     A.    Uh-huh.
19     Q.    Okay.  What work did you do to test
20 whether they'll get that grant or not?
21     A.    Really only discussions with fire
22 department.
23     Q.    So if the fire department said we'll
24 probably get it, that was sufficient for you to
25 conclude this is a reasonable assumption?

1    - MARTI KOPACZ - VOLUME 1-
2          MR. KANE:  Wait for him to stop
3       asking the question before you start
4       answering.
5          THE WITNESS:  Right.  Yeah.  Right.
6  BY MR. HACKNEY:
7     Q.    Okay.  And you didn't assess the
8  likelihood that the City could get incremental
9  grants, correct?
10     A.    Correct.
11     Q.    Do you know whether all the grants
12 that the City gets are in the forecasts in the
13 plan?
14     A.    I do not know that.
15     Q.    And have you taken any efforts to
16 study the City charter?
17     A.    No.
18     Q.    Ever -- okay.  I take it you haven't
19 undertaken an assessment of the extent to which
20 the current structure of the city charter will
21 impact the feasibility of the City?
22     A.    Generally, no.
23     Q.    I'm generally correct when I say
24 that?
25     A.    That's correct.

1    - MARTI KOPACZ - VOLUME 1-
2     Q.    Now, when you were retained, it was
3  about a week after there had been a lot of
4  announcements about agreements that the City had
5  struck with certain retiree associations.  I'll
6  represent to you that, I remember well, came about
7  in mid-April okay.
8          I don't -- do you generally remember
9  when you were being appointed that you were coming
10 in at a time when the City had just announced a
11 less steep cut to pensions and seemed to have some
12 level of consensus from some of the retiree
13 parties.  Do you remember as a general concept?
14     A.    I really don't --
15     Q.    Okay.
16     A.    -- because I was not -- I had very
17 little knowledge of what was going on in the
18 bankruptcy before April 15th or whatever that was.
19     Q.    No, I understand that.  I meant more
20 as you're appointed and you start to get up to
21 speed do you remember having a recognition that
22 the City had just struck certain agreements with
23 the retiree associations?
24     A.    I remember that they had -- that
25 those settlements were -- were being reached, yes.

1    - MARTI KOPACZ - VOLUME 1-
2     Q.    And you know that the plan that you
3  were studying was one that called for
4  4 1/2 percent cuts to base pensions on the GRS
5  side and zero percent cuts to pensions on the PFRS
6  side, putting COLA to one side?
7          MR. KANE:  At what point?
8          THE WITNESS:  I don't/I don't
9       specifically remember that.
10 BY MR. HACKNEY:
11     Q.    Okay.  So --
12     A.    Okay?
13     Q.    -- you don't remember -- well, you
14 agree that those are the cuts in the current plan?
15     A.    The cuts in the current plan are
16 4 1/2 percent on the base to GRS, NO cut on the
17 base to PFRS.  COLA cuts on the PFRS side and Cola
18 cuts ON the GRS side.
19     Q.    Right.  That's the plan that --
20 that's the current plan.
21     A.    That's the frozen old plan generally.
22     Q.    Do you -- do you remember studying a
23 plan that ever had different cuts?
24     A.    I don't.
25     Q.    Are you aware that the plan that was

1      - MARTI KOPACZ - VOLUME 1-
2  initially filed in February, two months before
3  your appointment, called for steeper cuts than are
4  in the current plan?
5      A.    I -- I have no recollection of that.
6      Q.    So, just as you sit here today you're
7  not generally aware of the fact that the City
8  reduced the pension cuts significantly between the
9  first -- reduced the pension cuts between the
10  first plan and the plan that's on file?
11      A.    No.  I -- when I got appointed,
12  right, the -- was the day before I went I think
13  for my interview with the Judge, the fourth plan
14  got filed and, at that point, I didn't look at
15  anything other than the fourth plan going forward.
16  So I just -- I don't have any --
17      Q.    I see.
18      A.    I don't have any recollection.
19      Q.    So -- okay.  Let me ask it then as a
20  hypothetical.  Okay?
21      A.    Okay.
22      Q.    If the prior plans included steeper
23  cuts to pensions than the current plan --
24      A.    Okay.
25      Q.    -- from your standpoint, that would

1      - MARTI KOPACZ - VOLUME 1-
2  increase the likelihood that the prior plans, all
3  things being equal, were feasible, correct?
4  Because it would make the City's ability to comply
5  with the plan a lower bar?
6      MR. ALBERTS:  Objection.
7      THE WITNESS:  More cash available
8  improves feasibility.
9  BY MR. HACKNEY:
10      Q.    If steeper cuts to pensions increases
11  the amount of cash that's available, steeper cuts
12  to pensions makes the plan more feasible.  Do you
13  agree?
14      A.    I'm not sure if it's -- that's it's
15  if P then Q, and you're saying Q therefore P.  I'm
16  not sure that -- that you can do that, right?
17      Q.    Why not?
18      A.    Well, because again, it's -- it's the
19  totality of the cash that's available.  So would I
20  like to have -- again, I have been very clear in
21  my report.  I'm being very clear today.
22      I would like to see more cash that's
23  not committed to somebody or something available
24  in this plan to provide cushion for variabilities
25  that are necessarily going to happen.  So if -- if

1      - MARTI KOPACZ - VOLUME 1-
2  any of the settlements would, would reduce the
3  amount of cash the City has to pay to somebody,
4  I'm going to think that improves the feasibility.
5      Q.    Understood.  I wasn't trying to trap
6  you into a notion where, you know, if you cut
7  pensions more, but then you give the savings and
8  more to someone else?
9      A.    Right.
10      Q.    I was saying all things being equal,
11  the steeper the cuts to the pensions, the more
12  feasible the City would become from a financial
13  standpoint?
14      A.    And again, I just have conceptually a
15  hard time isolating a single action around, you
16  know, what you're trying -- to get.  It sounds to
17  me like you're trying to get me into the best
18  interest of creditors and I'm just not going
19  there.
20      Q.    No.  I'm trying to assess your own
21  definitions of feasibility.
22      A.    Yes.
23      Q.    Which you admit is on a continuum,
24  correct?
25      A.    It is on A continuum.

1      - MARTI KOPACZ - VOLUME 1-
2      Q.    So feasibility isn't just a magical
3  point on the spectrum, right?
4      A.    Right.  It's a hurtle.
5      Q.    It's a --
6      A.    You got to get over the hurdle of
7  feasibility and then it's a continuum.
8      Q.    And the hurdle is the obligations
9  imposed on the City under the plan, right?
10      A.    Yes.
11      Q.    The lower those obligations, the
12  lower the hurdle.  Do you agree with that?
13      A.    All other things equal, yes.
14      Q.    Have you ever seen another
15  municipality do a ten-year forecast?
16      A.    I have, but, again, not -- generally,
17  it's around long-term financing in terms of -- it
18  tends not to be a full-blown revenues and
19  expenses.  It tends to look at certain kinds of
20  long-term obligations or long-term revenue
21  sources, yes.
22      Q.    Have you ever seen another
23  municipality do a comprehensive general fund
24  forecast over a ten-year period?
25      A.    I have not.

- MARTI KOPACZ - VOLUME 1-

1
2  Q.   Have you ever seen another
3  municipality do a comprehensive general fund
4  forecast over a 40-year period -- a gen --
5  comprehensive general fund forecast over a 40-year
6  period?
7  A.   Forty years.
8  Q.   Yeah.
9  A.   No.
10  Q.   So, the two that are in the plan, the
11  10-year and the 40-year, are the first you've ever
12  seen a municipality do, correct?
13  A.   That I've ever seen?  Yes.
14  Q.   Have you ever seen a municipality do
15  a forecast when it was undergoing this level of
16  change?
17  A.   Personally?  No.
18  Q.   Ma'am, have you ever been qualified
19  in a court of law as an expert before?
20  A.   I have.
21  Q.   Okay.  And tell me how many times
22  that's happened to you?
23  A.   We should go back and look at my
24  testimony list, right?  Probably -- I don't think
25  it's in there.  I think it's in my proposal.  I

- MARTI KOPACZ - VOLUME 1-

1
2  referenced it.
3  MR. KANE:  I've got some copies of it
4  if you want it.
5  BY MR. HACKNEY:
6  Q.   Okay.  I missed that.
7  A.   Yeah.  More than two, probably less
8  than five, ten.  Something like that.
9  Q.   Okay.  So that means that's where a
10  Court has said Ms. Kopacz is an expert and I'm
11  going to allow her to testify on Subject X?
12  A.   Right.
13  Q.   And it's somewhere between two and
14  five?
15  A.   That's what I'm thinking.
16  Q.   What were the subjects of your
17  testimony?
18  A.   Generally, it's all been insolvency
19  and restructuring oriented.  So whether or not,
20  you know, an entity was solvent or insolvent.
21  Whether or not -- it's all -- I mean, my career
22  has been spent in restructuring, so it's all in
23  that context.
24  Q.   A very typical restructuring expert
25  testimonies that I come across in my practice, an

- MARTI KOPACZ - VOLUME 1-

1
2  example would be valuation.  Have you been
3  qualified as an expert in valuation?
4  A.   I don't think so.  I don't think so.
5  Q.   You talked about solvency.
6  A.   Yes.
7  Q.   Have you ever been qualified as an
8  expert in whether an entity is or is not solvent?
9  A.   Yes.
10  Q.   Have you ever offered expert
11  testimony as to whether or not a plan was
12  feasible?
13  A.   I don't think so in terms of that
14  narrow definition of feasibility.
15  Q.   Okay.
16  A.   Right?
17  Q.   Have you ever offered expert
18  testimony in a Chapter 9 case?
19  A.   No.  No.
20  MR. KANE:  Other than this one?
21  BY MR. HACKNEY:
22  Q.   Other than this one -- other than
23  today?
24  A.   Yeah.
25  Q.   Have you ever offered expert

- MARTI KOPACZ - VOLUME 1-

1
2  testimony on whether a plan satisfies the best
3  interests of creditors test?
4  A.   No.
5  Q.   Other than expert testimony on
6  insolvency, do you remember any -- any other areas
7  where you testified as an expert?
8  A.   Yes.  And I have testified -- I have
9  testified on behalf of clients in a variety of
10  bankruptcy hearings and confirmation hearings and
11  I -- to be honest with you, I don't really know if
12  that's expert or fact or some sort of mix of the
13  two.  All right?  I -- very few times in my career
14  have I been hired exclusively as an expert.  I've
15  generally been the financial advisor, the chief
16  restructuring officer or had some other role
17  before I got to the witness stand.
18  Q.   And it does create some complexity
19  because sometimes an FA will be a witness to facts
20  that happen in the bankruptcy.
21  A.   Yes.
22  Q.   And then they will also have the
23  expertise to render opinions, as we lawyers think
24  of them, in connection with their testimony.  So I
25  under -- understand what I think you're alluding

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1          - MARTI KOPACZ - VOLUME 1-
2 to, which it can sometimes be hard to
3 distinguish.  Is that what you're saying?
4      A.   It is.  And -- and I've -- like I
5 said, I've testified on projections and
6 reasonableness and solvency and ordinary course
7 and -- all that.
8      Q.   Have you ever worked in connection
9 with a Chapter 9 bankruptcy other than this one?
10     A.   No.
11     Q.   Just to tie it up, have you testified
12 as an expert in a deposition or at trial in the
13 last four years?
14     A.   Live testimony?
15     Q.   Yup.
16     A.   Yup, the answer to that --
17     Q.   I don't want to dead ones.
18     A.   -- the answer is no.  Okay?  There
19 are --
20     Q.   Well, I guess you could do
21 depositions on written questions I guess, if
22 that's what you meant.
23          MR. KANE:  Are you done answering?
24          THE WITNESS:  I am done answering.
25 BY MR. HACKNEY:

1          - MARTI KOPACZ - VOLUME 1-
2      Q.   So you've not testified, to the best
3 of your recollection, as an expert in a deposition
4 or at trial in the last four years, correct?
5      A.   That's correct -- I -- that's
6 correct.  I'm thinking hard.
7      Q.   Okay.  Maybe I'll just ask to confirm
8 that the report doesn't identify any and so I
9 assumed that there weren't any, but maybe just to
10 confirm to be safe.
11          MR. KANE:  I've got the application
12      that's of record in the -- the court case
13      already that includes expert testimony
14      experience, so I can get that at a break
15      either now or later.  But it was already of
16      record.
17          MR. HACKNEY:  It's not urgent.  If --
18      I don't know if you remembered whether there
19      was one in the last four, but it --
20          MR. KANE:  To be honest, I don't
21      remember.
22          MR. HACKNEY:  -- you're saying it
23      would be there.  Yeah.
24          MR. KANE:  It would be there.
25          MR. HACKNEY:  That's fine.

1          - MARTI KOPACZ - VOLUME 1-
2          THE WITNESS:  Yes.
3 BY MR. HACKNEY:
4      Q.   So, Ms. Kopacz, you have an
5 impressive record in the restructuring industry.
6 I've spent a lot time on the Internet reading it.
7          I won't go into all of your different
8 experiences just other than to say I was impressed
9 by them; But I do want to sort of clarify the
10 boundaries of your expertise so that we know where
11 you are holding yourself out as an expert and
12 where you're not.  Okay?
13          You are not an actuary, correct?
14     A.   I am not.
15     Q.   And you don't hold yourself out as an
16 expert in actuarial science, correct?
17     A.   Correct.
18     Q.   You are not offering opinions as to
19 what the appropriate discount rate is or assets or
20 liabilities of a pension system, correct?
21     A.   That's correct.
22     Q.   Now, you are not an economist,
23 correct?
24     A.   That is correct.
25     Q.   And you are not holding yourself out

1          - MARTI KOPACZ - VOLUME 1-
2 as an expert in economics, correct?
3      A.   That's correct.
4      Q.   And you are not opining on the
5 macroeconomic factors that are or are not likely
6 to impact the City of Detroit in future years,
7 correct?
8      A.   That's correct.
9      Q.   You are not a statistician, correct?
10     A.   That's correct.
11     Q.   I think when you ask someone if
12 they're a statistician that every single person is
13 happy to say that they're not, other than
14 statisticians.
15          MR. KANE:  Other than baseball.
16          MR. HACKNEY:  Well, and we won't get
17      started on that.  Maybe now she's going to
18      say that she is.  You might be an expert on
19      baseball statistics.
20 BY MR. HACKNEY:
21     Q.   You don't hold yourself out as an
22 expert in statistics, correct?
23     A.   I do not.
24     Q.   You have not conducted statistical
25 analysis of the forecasts to determine, for

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-

1    - MARTI KOPACZ - VOLUME 1-
2 example, whether they fall outside the standard of
3 deviation for mean analysis, correct?
4       A.    I have not attempted to calculate a
5 standard deviation for the forecasts; that is
6 correct.
7       Q.    And you have not applied statistical
8 science to the forecasts?
9       A.    That's correct.
10      Q.    Now, you are not a real property
11 appraiser, correct?
12      A.    That's correct.
13      Q.    And you don't hold yourself out as an
14 expert in property appraisal, correct?
15      A.    That's correct.
16      Q.    You have not conducted any studies to
17 determine the reasonableness of the City's
18 property tax appraisals, correct?
19      A.    Correct.
20      Q.    Do you agree that the assessed value
21 of the City's property tax base is an important
22 consideration to any analysis of property tax
23 revenues?
24      A.    Repeat -- say that again.
25      Q.    You bet.

1    - MARTI KOPACZ - VOLUME 1-
2            Do you agree that the assessed value
3 of the City's property tax base is a key
4 consideration to any analysis of property tax
5 revenue?
6       A.    I -- yes, in the sense that you need
7 to know what the assessed value is.
8       Q.    And also, what it's likely to be in
9 the future, right?
10      A.    You have to make an assumption around
11 it, yes.
12      Q.    Yeah.  Because the assessed -- do you
13 understand the nomenclature difference between
14 "assessed value" and "taxable value" in Michigan?
15      A.    A little bit.
16      Q.    Okay.  There are differences between
17 the two terms.
18      A.    Yes.
19      Q.    I'd like to find a way to not get
20 caught up in them, so maybe I'll --
21      A.    Why don't we just say property
22 values?
23      Q.    Yeah.  Yeah.  At a general level, the
24 property value's actually itself is a different
25 term from assessed value.

1    - MARTI KOPACZ - VOLUME 1-
2       A.    It is.
3       Q.    So it's just a horrible thing all
4 around.  But the -- the assessed value is
5 important to forecast of property tax revenue
6 because it represents the base against which the
7 millage rate is applied against which the
8 collection rate is applied from which you get an
9 understanding of what property tax revenues may
10 be.
11      A.    That is correct.  I agree with that.
12      Q.    Okay.  Now, you interviewed
13 Mr. Evanko the City's assessor; isn't that right?
14      A.    I did not.  One of the members of my
15 team did.
16      Q.    So you have not had a chance to speak
17 with him?
18      A.    I did not.
19      Q.    Who did?
20      A.    We'd have to go back on the contact
21 log.
22      Q.    Okay.
23      A.    To know who all was present in that
24 meeting.
25      Q.    And by "speak with," I meant even on

1    - MARTI KOPACZ - VOLUME 1-
2 the phone.
3       A.    I have not spoken with him, no.
4       Q.    Did you e-mail with him?
5       A.    I did not.
6       Q.    What did your team tell you about
7 what Mr. Evanko thought?
8            MR. KANE:  About what?
9            THE WITNESS:  About what?
10 BY MR. HACKNEY:
11      Q.    Anything.  I will make a loose
12 prediction that it related to property tax
13 assessments, but I don't mean to limit my
14 question.  I'm looking for my team -- my guys
15 talked to Evanko and they came back and told me X.
16      A.    They thought he was very capable.
17      Q.    Yeah.  Okay.  Did they tell you what
18 he thought about future property tax valuation --
19 property -- future assessed property values in the
20 City?
21      A.    I'm not real -- I'm not recalling a
22 conversation that I had with my team on that
23 specifically.
24      Q.    Do you understand that property tax
25 assessed values are equalized within a

- MARTI KOPACZ - VOLUME 1-

1
2   jurisdiction?
3       A.   Yes.
4       Q.   And then do you understand that that
5   jurisdiction's property tax values are then
6   equalized with other jurisdictions?
7       A.   When you mean "other jurisdictions"?
8       Q.   Meaning other jurisdictions outside
9   that city -- that municipality.  Do you understand
10  that there are multiple levels of equalization as
11  you go up towards the state level?
12      A.   I'm not sure I'm aware of that
13  process outside of Detroit.
14      Q.   Okay.
15      A.   Okay?
16      Q.   Are you aware of that process to the
17  extent it relates to Detroit?  Meaning -- let me
18  ask it another way.
19          Do you know that the tax roll in the
20  City ultimately goes through an entity at Wayne
21  County that then looks at the City's tax roll and
22  looks at other municipalities and then determines
23  an equalization factor to determine whether the
24  City of Detroit is over or under-assessed compared
25  to other municipalities?

- MARTI KOPACZ - VOLUME 1-

1
2       A.   Generally, yes.  Specifically, no.
3       Q.   Okay.  Meaning you have a general
4   sense that that happens, but you don't have a
5   specific understanding?
6       A.   I don't know how it does it.
7           MR. KANE:  Wait for him -- wait for
8       him to stop asking a question before you
9       start answering.
10          MR. HACKNEY:  That's okay.  It's
11      mainly for her benefit, so that she can go
12      one and one.
13          MR. KANE:  And your benefit to make
14      sure you know what the question fully is.
15  BY MR. HACKNEY:
16      Q.   And do you know what an equalization
17  factor of 1.0 means?
18      A.   I do not.
19      Q.   Do you know what Detroit's
20  equalization factor was over the prior 15 years?
21      A.   I do not.
22      Q.   Okay.  You are also not trained in
23  the social science of urban planning; is that
24  correct?
25      A.   That's correct.

- MARTI KOPACZ - VOLUME 1-

1
2       Q.   And you're not holding yourself out
3   as an urban planning expert, correct?
4       A.   That's correct.
5       Q.   You're not opining on whether or not
6   the restructuring and reinvestment initiatives
7   involve the an application of urban planning
8   disciplines to the City of Detroit, correct?
9       A.   Correct.
10      Q.   What are the key variables when it
11  comes to assessing future income tax revenue for
12  the City of Detroit?
13      A.   For the City of Detroit?  It occur --
14  it occurs at three levels.  There's a rate for
15  residents, a rate for nonresidents and a rate for
16  businesses.
17      Q.   And so within those levels, what are
18  the key variables that you have to study?
19      A.   We have to look at for -- for the
20  people, for the residents and the nonresidents, we
21  have to look at the number of people employed and
22  what the wage rates are.  Okay?  For the
23  corporations, it's -- it's corporate income.
24      Q.   So you look at the number of people
25  that are working, average wage or income levels?

- MARTI KOPACZ - VOLUME 1-

1
2       A.   Correct.
3       Q.   And then the tax rate, correct?
4       A.   Correct.
5       Q.   And then you also have to assess the
6   rate of collection, correct?
7       A.   Yes.
8       Q.   Any other variables that you can
9   think of that go into forecasting future income
10  tax revenues other than those?
11      A.   No.  That just they're slightly
12  different for the corporations.
13      Q.   Understood.  Understood.
14          Now, let's take something like
15  average income data, which I think is -- is
16  presented as a -- as a different concept from wage
17  data in the forecasts, correct?
18      A.   We're going to need to --
19      Q.   Take a look?
20      A.   Yeah.
21      Q.   Okay.  Let me -- let's take a step
22  back and look -- think of the concept of income in
23  a broad way that includes salaries or wages.
24  Okay?  I might be mistaken.
25          You haven't independently assessed

- MARTI KOPACZ - VOLUME 1-

1
2  the average income data for the City of Detroit,
3  correct?
4      A.    That's correct.
5      Q.    Okay.  You relied on data that was
6  given to you by Ernst & Young?
7      A.    That's correct.
8      Q.    Okay.  And you haven't taken steps to
9  assess the accuracy of that data, correct?
10     A.    That's correct.
11     Q.    And with respect to the level of
12 unemployment in the City, you also relied on data
13 that was given to you by Ernst & Young, correct?
14     A.    Yes.
15     Q.    But you did not attempt to
16 independently verify that data --
17     A.    I'm not --
18     Q.    -- correct?
19     A.    -- sure.  I'm not sure what
20 independent information we had on employment -- on
21 unemployment.
22     Q.    Okay.  You may have.  You may not
23 have.  You just don't know?
24     A.    Yes.
25     Q.    Is it true that unemployment in the

- MARTI KOPACZ - VOLUME 1-

1
2  City of Detroit bottomed out in 2010?
3      A.    I don't know that.
4      Q.    Isn't it true that year over year
5  since 2010 unemployment has decreased?
6      A.    I don't know that.
7      Q.    Do you know how the City's current
8  unemployment rates compare to last year's
9  unemployment rates?
10     A.    I don't.
11     Q.    Let me ask you some questions about
12 the wagering revenues.
13         What is the tax rate that's applied
14 to the wagering revenues?
15     A.    It's in my report.  It's 10.95?  We
16 can look it up.
17     Q.    Did you conduct any independent
18 analysis of the gaming market in the City of
19 Detroit?
20     A.    I did not.
21     Q.    Okay.  So you didn't do an
22 independent study to understand, for example, the
23 impact that the Toledo casinos will have on the
24 casinos in the City of Detroit; is that correct?
25         MR. KANE:  He'll direct you to this

- MARTI KOPACZ - VOLUME 1-

1
2  if he wants you to look for the specific
3  page.
4         MR. HACKNEY:  Yeah, that's okay.
5         THE WITNESS:  Yeah.  No.
6  BY MR. HACKNEY:
7      Q.    I am correct when I say that, right?
8      A.    Correct.
9      Q.    And you also did not conduct any
10 sensitivity analysis around casino gaming revenue,
11 correct?
12     A.    Whatever's in here is what we did.
13     Q.    Okay.  So if you did sensitivity
14 analysis, it's in your report, correct?
15     A.    That's correct.
16     Q.    If it's not in your report, it's
17 because you didn't do it?
18     A.    That's correct.
19     Q.    What is the utility user's tax?
20     A.    It is a tax that the City of Detroit
21 assesses on telephone, cable, utility charges to
22 residents in Detroit.
23     Q.    Now, when it came to historical data
24 about utility user tax revenues, you relied on
25 what was given to you by Ernst & Young; is that

- MARTI KOPACZ - VOLUME 1-

1
2  correct?
3      A.    That's correct.
4      Q.    You did not attempt to independently
5  assess that data, correct?
6      A.    Correct.
7      Q.    And to the extent you conducted
8  sensitivity analysis around the utility user's
9  tax, it will be in your report?
10     A.    We did not.
11     Q.    You did not?  I --
12     A.    Did not.
13     Q.    It's not a memory test, but it's
14 fine.
15         Let's talk a little bit about your
16 experience -- your personal experience forecasting
17 municipal revenues -- or I'm sorry, doing
18 municipal forecasts of both revenues and expenses.
19 Okay?
20     A.    Okay.
21     Q.    So tell me about the times that
22 you've had the opportunity to do it personally.
23     A.    I have not directly worked for a
24 municipality in projecting revenues or expenses.
25     Q.    Okay.  What do you mean by

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 38 of
146

- MARTI KOPACZ - VOLUME 1-

1  
2  "directly"?  
3      A.   Well, I've -- I worked extensively  
4  for the Nassau County Interim Finance Authority,  
5  which is the state control board that oversees the  
6  finances in Nassau County here in New York.  So,  
7  the -- that -- that is -- again, it's not the  
8  county itself.  It's the control board that  
9  oversees the county.  
10     Q.   Understood.  Okay.  
11     A.   Right.  
12     Q.   Now -- so let's try and -- let's try  
13  and break it down a bit.  
14          You personally have never done a  
15  municipal forecast, correct?  
16     A.   That's correct.  
17     Q.   You have worked with municipal  
18  forecasts in connection with your work for Nassau  
19  County, correct?  
20     A.   Correct, and other entities in  
21  municipalities.  
22     Q.   Okay.  That was my next question,  
23  which is other than Nassau County, what  
24  engagements have you had where you worked with a  
25  municipal forecast understanding that you're not  

- MARTI KOPACZ - VOLUME 1-

1  the one who created it?  
2      A.   In -- I had an engagement where I've  
3  been retained by seven transit authorities.  
4      Q.   One engage meant?  
5      A.   Yes, it was interesting.  New York,  
6  Chicago, Boston, San Francisco, Minneapolis.  I'm  
7  trying to think.  Oh, Dallas was part of that  
8  group, right.  So I worked with their forecasts  
9  and their budgeting and planning system.  
10     Q.   Oh, I see.  
11     A.   Right.  
12     Q.   And that was limited to just their  
13  enterprise funds?  
14     A.   I -- I -- to be honest with you, I  
15  don't know if they were just enterprise funds or  
16  general funds, but it would have been departmental  
17  level budgeting and projecting.  
18     Q.   Can I describe your work for those --  
19  those transit authorities as looking at their  
20  operations and at the forecasts that related to  
21  them and trying to understand how they could  
22  improve operations in order to improve the  
23  forecast?  Is that a generally accurate  
24  description?  
25  

- MARTI KOPACZ - VOLUME 1-

1  
2      A.   It could be -- you could generally  
3  say that, but yes.  
4      Q.   Okay.  Is it fair to say that in --  
5  in that retention you weren't studying the  
6  accuracy of the forecasts.  You were trying to  
7  help the transit authorities improve?  
8      A.   No.  In that situation we were  
9  dealing explicitly with the revenue side of  
10  transit businesses and advertising income and, you  
11  know, pricing that.  
12     Q.   Okay.  So you were trying to  
13  understand the accuracy of the forecasts of the  
14  transit revenue?  
15     A.   And the -- and the potential to  
16  transit revenue.  
17     Q.   I see.  Okay.  So it was kind of a  
18  mixture of trying to understand, first, whether  
19  you agreed with forecast and then, second, trying  
20  to understand whether doing things like  
21  advertising might improve --  
22     A.   No.  It had to do with long-term  
23  contracts for advertising revenue to those transit  
24  authorities relative to the person who -- the  
25  entities that had contracted with them for the  

- MARTI KOPACZ - VOLUME 1-

1  advertising revenue.  
2      Q.   Okay.  So, we have NIFA, right, which  
3  is the Nassau County --  
4      A.   Yes.  
5      Q.   I learned all about NIFA.  And then  
6  we've got transit authority retention?  
7      A.   We've got the transit authority.  
8      Q.   Any other municipal retentions where  
9  you've worked with a municipal forecast?  
10     A.   In the -- in the Legal Aid Society  
11  case, because the vast majority of the Society's  
12  revenue comes from New York City or New York  
13  state, okay, in terms of we worked with those  
14  municipal entities relative to our own budgets.  
15     Q.   I see.  So because they get money  
16  from the state --  
17     A.   Right.  
18     Q.   -- you worked with --  
19     A.   And the City and has to be  
20  appropriate and legislated, yes.  
21     Q.   And does that mean that you worked  
22  with the state and city forecasts because had you  
23  to understand them in order to prepare a forecast  
24  for the Legal Aid Society?  
25  

Elisa Dreier Reporting Corp.  (212) 557-5558  
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-

1
2    A.    We had to understand what the
3  possibility of funding was from state and the
4  City, okay, and how the City's budget process
5  worked and how we got appropriated our monies.
6    Q.    But in that context, you were not
7  assessing the accuracy of either the state or city
8  forecasts?
9    A.    That's correct.
10    Q.    Okay.  And in the Nassau County
11  retention, were you assessing the accuracy of the
12  Nassau County forecast?
13    A.    Yes.
14    Q.    Okay.  So you were -- part of your
15  job was to evaluate the Nassau County forecast to
16  determine whether you agreed with it?
17    A.    Yes.
18    Q.    Okay.  That's helpful.
19          What is the methodology that a
20  municipality typically employs when preparing a
21  forecast for its general fund?
22    A.    I'm not sure there's a typical.
23    Q.    Okay.  So, I noticed in your CV that
24  you said one aspect of municipal -- I think you
25  said, we can get it out, but it was something like

- MARTI KOPACZ - VOLUME 1-

1
2  municipal accounting and budgeting is that there
3  is no standard.
4    A.    Correct.
5    Q.    Do you remember saying that in your
6  CV?
7    A.    Yes.
8    Q.    What did you mean by that?
9    A.    Well, there's no -- government
10  accounting -- there's something called the
11  Government Accounting Standards Board, okay, that
12  would like to believe that it creates standards
13  analogous to generally accepted accounting
14  principles.  But there is a great deal of
15  variability in what the GASB prescribes in terms
16  of municipal accounting procedures, right?  And
17  there is no standard for budgets.  Okay?  There is
18  no accounting standard that covers budgets.
19  Accounting covers historical recording of revenues
20  and expenses.
21    Q.    So, you're not aware, as you sit here
22  today, of any other government agencies or -- or
23  associations that have promulgated methodologies
24  for forecasting municipal revenues?
25    A.    There are.  Okay?  Either it's things

- MARTI KOPACZ - VOLUME 1-

1
2  like the Government Finance Officers Association.
3  There are trade associations.  There are
4  quasi-oversight committees that -- panels and
5  groups that are trying to promulgate a set of
6  standards for municipalities in these areas, but
7  there's nothing that is as uniform and
8  acknowledged as we have with generally accepted
9  accounting principles and the way that the SEC
10  oversees that.
11    Q.    Okay.  So have you reviewed the
12  publications of the Government Finance Officers
13  Association?
14    A.    I saw them.
15    Q.    Okay.  It's fair to say that you
16  didn't review them in connection with this case,
17  correct?
18    A.    No, that's correct.
19    Q.    Okay.  So, have you ever reviewed An
20  Elected Officials Guide to Revenue Forecasting,
21  which is a publication by the GFOA?
22    A.    I may have.
23    Q.    I'll show you what it looks like.  It
24  looks like this.
25    A.    I would probably have looked at it

- MARTI KOPACZ - VOLUME 1-

1
2  online.  I would probably not have looked at it in
3  a hard copy like that.
4    Q.    It's fair to say you didn't rely on
5  it though, correct?
6    A.    I did not.
7    Q.    Have you ever seen this book?
8  Revenue Analysis and Forecasting.  It's by Barry
9  Blom and Salomon -- Barry Blom and Salomon
10  Guajardo?
11    A.    No.  That I know I have not seen.
12    Q.    Okay.  Do you know what the different
13  types of qualitative forecasting methods are that
14  are specified by the GFOA?
15    A.    Not off the top of my head, no.
16    Q.    And do you know what the quantitative
17  methodologies are that the GFOA specifies?
18    A.    Not off the top of my head, no.
19    Q.    So, for example, do you know what
20  naive forecasting is?  I didn't make that up?
21    A.    You didn't make that up?
22    Q.    No.
23    A.    No.
24    Q.    Okay.  Do you know what Delphi
25  forecasting is?

- MARTI KOPACZ - VOLUME 1-

2  A.  No.
3  Q.  What about judgmental forecasting?
4  A.  No.
5  Q.  Consensus forecasting, do you know
6  what that is?
7  A.  Consensus generally means that
8  everybody agrees on It.  It's -- it's the way that
9  Michigan does its revenue forecasting and Detroit
10  does it.
11  Q.  That's using multiple people to check
12  one another, correct?
13  A.  Yes.
14  Q.  And then do you know what expert
15  forecasting is in the qualitative context?
16  A.  No.
17  Q.  Fair to say that you have never
18  consciously applied these methodologies in your
19  own forecasting work?
20  A.  That's correct.
21  Q.  And you did not in connection with
22  the City's forecasting?
23  A.  That's correct.
24  Q.  Now, let me ask you some questions
25  about the -- the quantitative types.

- MARTI KOPACZ - VOLUME 1-

2  Have you ever heard of econometric
3  forecasting?
4  A.  Yes.
5  Q.  Okay.  You did not perform any
6  econometric forecasting, correct?
7  A.  That's right.
8  Q.  Neither did the City, right?
9  A.  I'm not going to answer for the City.
10  Q.  Oh, you don't know whether they did
11  or they didn't?
12  A.  I'm not -- again, I didn't do any,
13  but I didn't -- I haven't seen any, so...
14  Q.  Sorry.  Maybe I'm not asking my
15  question the right way.
16  In connection with the City's
17  forecasts, you're unaware of anyone associated
18  with the City performing an econometric forecast?
19  A.  Like I said, I'm not aware of it, but
20  I don't know.
21  Q.  Okay.  So I'm not trying to -- I'm
22  not trying to sharp shoot you, but one of your
23  jobs here was to understand everything about the
24  forecasts, so --
25  A.  Yes.

- MARTI KOPACZ - VOLUME 1-

2  Q.  To -- when you say I'm not aware of
3  someone doing it, your expectation is that it
4  wasn't done?
5  A.  That's correct.
6  Q.  Okay.  And similarly, have you ever
7  heard of regression analysis?
8  A.  Yes.
9  Q.  You didn't perform any regression
10  analysis with respect to the City forecasts?
11  A.  That's correct.
12  Q.  And to the best of your knowledge,
13  neither did the City, correct?
14  A.  Not that I'm aware of.
15  Q.  Okay.  Are you aware of -- of what's
16  called a time series forecast?
17  A.  Yes.
18  Q.  You didn't perform any time series
19  analysis of the City's forecast, correct?
20  A.  That's correct.
21  Q.  And to the best of your knowledge,
22  neither did the City?
23  A.  Not that I'm aware of.
24  Q.  Okay.  And then you're aware of a
25  concept of trend analysis, correct?

- MARTI KOPACZ - VOLUME 1-

2  A.  Yes.
3  Q.  You didn't perform trend analysis
4  with respect to the City's forecasts?
5  A.  That I would say we did.
6  Q.  Okay.  That is something you would
7  say that you did do?
8  A.  Yes.
9  Q.  And did the City do that?
10  A.  I believe the City did that.
11  Q.  Okay.  Now, have you reviewed the
12  National Advisory Council on State and Local
13  Budgeting and their publications?
14  A.  I have not.
15  Q.  Do you agree that forecasting is a
16  highly subjective area?
17  A.  Yes.
18  Q.  And, as such, it's subject to the
19  biases of the person doing the forecast, correct?
20  A.  Yes.  And -- and -- but I would
21  qualify biases as neither good nor bad.
22  Q.  Understood.  It's not a -- it's not
23  meant to be a negative word like -- like racial
24  bias.
25  A.  Right.

- MARTI KOPACZ - VOLUME 1-

2      Q.    It's meant to be a word that says
3  your own personal viewpoint can have an impact on
4  your forecast?
5      A.    That's correct.  I agree with that.
6      Q.    And do you -- as a restructuring
7  professional, do you understand the idea that the
8  City here has an incentive to have a very
9  conservative forecast?
10         MR. KANE:  Objection.  You can
11      answer.
12         THE WITNESS:  I --
13  BY MR. HACKNEY:
14      Q.    Thinking about it from the stand --
15  just as a restructuring professional and drawing
16  on your experience, do you understand the general
17  concept that the City has an incentive to have a
18  conservative forecast because then it can say to
19  creditors, I have nothing more to give you, but if
20  it does better than the forecast, it will have
21  more cushion later.
22         MR. STEWART:  Objection.
23         THE WITNESS:  I'm struggling --
24         MR. STEWART:  Did you get my
25      objection to the question?

- MARTI KOPACZ - VOLUME 1-

2         THE WITNESS:  I'm not under -- I'm --
3  I'm struggling with incentive.
4  BY MR. HACKNEY:
5      Q.    Okay.  Let's turn it around then.
6         You didn't consider or analyze what
7  the biases of the City forecasters were, correct?
8      A.    Correct.
9      Q.    Okay.
10         MR. HACKNEY:  Ma'am, there is just
11      five minutes left on tape, and one of the
12      things I like to tell people is that a
13      deposition is not akin to being stretched out
14      on the rack.  So, if you would like to take a
15      lunch break, this could be a good time.
16         THE WITNESS:  I would like to take a
17      break.
18         MR. HACKNEY:  Okay.  Absolutely.
19         THE VIDEOGRAPHER:  Thank you.  The
20      time is now 12:17 p.m.  We're off the record.
21      This is the end of Disk Number 2.
22         (Whereupon, a lunch break was taken
23      from 12:17 p.m. to 1:20 p.m.)
24         THE VIDEOGRAPHER:  The time now is
25      approximately 1:20 p.m.  We're back on the

- MARTI KOPACZ - VOLUME 1-

2  record.  This is the beginning of Disk
3  Number 3.
4  BY MR. HACKNEY:
5      Q.    Ms. Kopacz, welcome back.
6      A.    Thank you.
7         THE VIDEOGRAPHER:  Do you have your
8      microphone on?
9         MR. HACKNEY:  I don't.  Neither of us
10      do.
11         MR. KANE:  Let the record reflect I
12      have mine on.
13         MR. HACKNEY:  Teacher's pet.
14      (Whereupon, a brief discussion was
15      held off record.)
16  BY MR. HACKNEY:
17      Q.    Okay.  Ms. Kopacz, so do you agree
18  that in order to minimize the impacts of
19  subjectivity, it is important for a forecaster to
20  utilize a reliable methodology?
21      A.    Never thought about it.
22      Q.    Okay.  Having thought about it for
23  the first time, do you agree?
24      A.    I don't know.  I don't know.
25      Q.    How about put it this way:  Do you

- MARTI KOPACZ - VOLUME 1-

2  agree that it's important for a forecaster to use
3  a reliable methodology?
4      A.    Yes.
5      Q.    What methodology did the City use?
6      A.    I'm not understanding the question.
7      Q.    Okay.  Methodology is one of those
8  words that's kind of hard.  It -- the more you try
9  define it, the more you can roll around in it.
10         Do you have a general understanding
11  of the concept of a methodology?
12         Let's try and get on common ground in
13  terms of what the word means and then we can try
14  and ask the questions.
15      A.    Okay.
16      Q.    So, when I talk about forecasting
17  methodology, what does that mean to you?
18      A.    Approach.
19      Q.    Okay.  Okay.  And so what approach
20  did the City utilize in compiling its forecasts?
21      A.    There's not -- I'm struggling because
22  I think the way you're using it is as if there's a
23  professional standard for methodology.  There are
24  like -- like we were talking about generally
25  accepted accounting principles.  There aren't --

- MARTI KOPACZ - VOLUME 1-

1    there's no -- there are no standards like that for
2    forecasting.  There are approaches that people
3    use, but I don't think there's any -- there's no
4    check-the-box sort of standard for forecasting.
5        Q.   Okay.  So you're not able to point to
6    a forecasting methodology that exists and say
7    whether the City employed that forecasting
8    methodology or not, correct?
9        A.   That's correct.
10       Q.   And that's because to the best of
11   your knowledge, you're not aware of a standard
12   forecasting methodology for municipal forecasts
13   like these, correct?
14       A.   Or -- yes, that's correct.
15       Q.   And you took a lot of time to learn
16   what the City did, right?
17       A.   Yes.
18       Q.   What you're not able to say is how
19   what the City did compares to what people
20   typically do when compiling a municipal forecast,
21   correct?
22       A.   Yes.
23       Q.   Because to the best of your
24   knowledge, there is no typical?

- MARTI KOPACZ - VOLUME 1-

1        A.   Every municipal forecast I've seen is
2    different.
3        Q.   Okay.  So, following on this line,
4    it's fair to say that you can't subject the City's
5    analysis to peer review, correct?
6        A.   I'm not sure I would say that.
7        Q.   You might be able to, you might not
8    be able to; you just don't know?
9        A.   I don't know who the peer would be.
10       Q.   Okay.  You can't compare it to
11   industry standards, correct?
12       A.   In -- "industry standards" being?
13       Q.   Municipal forecasting industry.
14       A.   Promulgated by whom?
15       Q.   Anyone.
16       A.   Again, I don't -- I guess the answer
17   would be no.
18       Q.   'Cause your view is that there aren't
19   any industry standards?
20       A.   That's correct.
21       Q.   So of course you can't, right?
22       A.   Yes.  Yes.
23       Q.   Did you attempt to compare the City's
24   approach to literature on the subject of municipal

- MARTI KOPACZ - VOLUME 1-

1    forecasts?
2        A.   No.
3        Q.   Could you have done that?
4        A.   I think we've got to go back and
5    decide -- define again what we're talking about.
6            I'm talking about the projections in
7    the plan of adjustment.  Okay?  There are no
8    standards that govern projections in a plan.
9    Whether that's a plan of adjustment, a plan of
10   reorganization or anything like that.  Okay?
11           The -- the quote, standards, and I --
12   and I put that in the finger quotes because I
13   think what you're trying to talk about is the City
14   budget or something -- again, like I said, I
15   don't -- there aren't standards that you would go
16   to to say how do you prepare these projections for
17   the plan of adjustment.
18       Q.   Okay.  And there's not literature
19   either?
20       A.   In the sense of?
21       Q.   Scholarly literature on the subject
22   of municipal forecasts of revenues and costs?
23       A.   I believe that there are -- there are
24   people that write on what would be good municipal

- MARTI KOPACZ - VOLUME 1-

1    finance practices; what would be good pension
2    forecasting practices; what would be good
3    actuarial -- I mean, there's lots of professional
4    literature on any topic that you want to find, but
5    that's not what we're talking about here.
6        Q.   Let's give an example.  There's
7    literature from the GF0A of which you are aware,
8    correct?
9        A.   And with all due respect none of it
10   covers a situation like a Chapter 9.
11       Q.   No, it covers municipalities, right?
12       A.   It covers municipality.
13       Q.   And for example, you didn't attempt
14   to take the City's forecasts and compare them to
15   the methodologies identified by the GFOA?
16       A.   No, no.
17       Q.   I'm correct when I say that?
18       A.   You are correct.
19           THE VIDEOGRAPHER:  Counsel, excuse
20   me.  You're rubbing against your mike.  I'm
21   sorry for the interruption.
22   BY MR. HACKNEY:
23       Q.   Are the City's forecasts amenable to
24   statistical testing?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-

1
2     A.    I don't know.
3     Q.    Okay.  Now, I think we talked about
4 earlier the fact that you haven't done any?
5     A.    That's correct.
6     Q.    Any statistical testing, correct?
7     A.    Correct.
8     Q.    Is it fair to say that the City's
9 forecasts are -- and I'm talking about the ones in
10 the plan of adjustment, you understand that,
11 right?
12     A.    Okay.
13     Q.    The City's forecasts are principally
14 the product of the judgment of the City
15 forecasters?
16     A.    I don't know who that is.
17     Q.    You don't know --
18     A.    What are -- tell me who those people
19 are.
20     Q.    Well, I was talking about the
21 forecasters that are the subject of your expert
22 opinion.
23     A.    Right.
24     Q.    So those forecasts are principally
25 the product of the judgments of the forecasters.

- MARTI KOPACZ - VOLUME 1-

1
2        Do you agree with that?
3     A.    I think so.  Yes.  The people who
4 prepare the forecast, it seems circular.  They
5 prepare the forecast, they make the assumptions
6 and the calculations, yes.
7     Q.    But the assumptions are ones that
8 they use their judgment to determine, correct?
9     A.    I believe that's correct, yes.
10     Q.    Who are the forecasters on the
11 revenue side for the City?
12     A.    Ernst & Young.
13     Q.    Yeah, I meant the people.
14     A.    Bob Kline and his team.
15     Q.    Who else?
16     A.    I -- I would -- I would have to -- we
17 could look and see who we talked about, but I
18 remember Bob.
19     Q.    Okay.
20     A.    And there are a couple of women who
21 worked with him.
22     Q.    Do you remember Caroline Sally?
23     A.    That's sounds familiar.
24     Q.    Okay.
25     A.    But, yes.

- MARTI KOPACZ - VOLUME 1-

1
2     Q.    And then Gaurav Malhotra?
3     A.    No.
4        THE REPORTER:  I'm sorry.
5        MR. HACKNEY:  Gaurav Malhotra.
6        And general spellings I can
7 definitely give them you at a break.
8     Q.    You remember Gaurav?
9     A.    Absolutely I remember Gaurav.
10     Q.    I didn't hear your answer, I'm sorry.
11     A.    I said Bob Kline and his team,
12 okay --
13        (Cell phone interruption.)
14        THE VIDEOGRAPHER:  I'm sorry that
15 shouldn't happen.
16        MR. HACKNEY:  That's okay.  That's a
17 good ringer.
18     A.    Bob Kline and his team, who are a
19 division of Ernst & Young in some way, shape or
20 form, were the professionals that worked on the
21 revenue projections.
22     Q.    On the revenue projections?
23     A.    Correct.
24     Q.    I see what you're saying.
25        Okay.  So, are you distinguishing

- MARTI KOPACZ - VOLUME 1-

1
2 Gaurav from Bob Kline's team --
3     A.    Bob --
4     Q.    Is it Bob Kline or Ron Kline?
5     A.    Bob.  Bob.  I think so.
6     Q.    Mr. Kline.
7     A.    Mr. Kline.
8     Q.    Let's get a sense of who's on
9 Mr. Kline's team and whether Gaurav is on that
10 team.
11     A.    Gaurav is the Ernst & Young partner
12 responsible for the Detroit engagement.
13     Q.    Got it.
14     A.    Okay?  Gaurav has work groups, right,
15 from various parts of Ernst & Young working for
16 him on this.
17        Bob Kline is the Ph.D. economist that
18 has a group of people also working for him that
19 worked on the revenue projections.
20     Q.    And the cost projections principally
21 came from Conway MacKenzie; is that right?
22     A.    No.  No.  It depends on which --
23     Q.    I see?
24     A.    The RRIs came from the Conway
25 MacKenzie.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 44 of
146

- MARTI KOPACZ - VOLUME 1-

Q.    The historical call cost expense came
from whom?

A.    The historical costs came from the
City. The cost projections came primarily from
Ernst & Young, a group of people that worked for
Gaurav.

Q.    I see. Okay.

So if I was thinking broadly about
the forecasts in the go-forward years, if I was
thinking about revenue forecasts, I'm thinking
about Mr. Kline's team?

A.    That's how I think of it, yes.

Q.    If I'm thinking about cost
projections that don't entail RRIs, I'm thinking
about Mr. Malhotra's team?

A.    Right. And he has specific people
that are responsible for specific parts of the
cost projections that work for him.

Q.    Understood.

Then if I'm thinking about RRIs and
their impacts on either costs or revenues, I'm
thinking about the Conway MacKenzie team?

A.    Generally that's correct.

Q.    And is this, by the way, part of the

- MARTI KOPACZ - VOLUME 1-

reason that you found the forecasts confusing is
because they were the product of actually three
different groups of forecasters?

A.    It's not that there are different
people involved. It is that they were never
harmonized and concatenated in a way that they're
all in one kind of place.

Q.    What is the experience of Mr. Kline
and his team when it comes to forecasting
municipal revenues?

A.    I don't know.

Q.    Okay. Did you make any effort to
assess that?

A.    I did not.

Q.    Was that important to you?

A.    I looked at -- I used all the
information that was available to me and all the
people that were available to me and -- got
satisfied with the projections in the plan as
being reasonable revenue projections.

Q.    Were you working under the assumption
that Mr. Kline and his team had substantial
experience forecasting municipal revenues?

A.    I did not make that assumption, no.

- MARTI KOPACZ - VOLUME 1-

Q.    You hadn't thought about it one way
or the other?

A.    No, I did not make a determination
one way or the other.

Q.    Okay. Did you ever meet them in
person?

A.    I did not.

Q.    You spoke to them on the phone?

A.    I did.

Q.    And what was the experience of Mr.
Malhotra's team when it came to forecasting
municipal expenses?

A.    I don't know.

Q.    And what was the experience of the
Conway MacKenzie team when it came to projecting
the costs or revenues associated with a municipal
restructuring?

A.    I don't know.

Q.    Now, when you were assessing the
reliability of the assumptions that are in the
forecasts, did you independently seek to develop
your own assumptions first and then compare so
that you could then compare them to the City's
assumption and see how they compared?

- MARTI KOPACZ - VOLUME 1-

A.    No.

Q.    Okay.

A.    Generally not.

Q.    So what you did, instead, was you
first understood what the City's assumption was
and then you tested the reasonableness of that
assumption, correct?

A.    Generally that's correct, yes.

Q.    Okay. Why didn't you, for example,
kind of in order to avoid just, you know, the
impact that even seeing their assumption can have
on you, why didn't you say, What do I think wages
will be year over year for the next ten years, and
do the work independently and then see how it
mapped?

A.    Generally two reasons, time. When I
was appointed I had, I think, 62 days originally
between when I was appointed and when my report
was due.

Q.    Yeah.

A.    Okay. Secondly, I learned very
quickly the condition of the historical records of
the City, and realized that in order to get done
with my assignment, I was going to have to rely on

- MARTI KOPACZ - VOLUME 1-

1    - MARTI KOPACZ - VOLUME 1-
2  the assimilation of data that the other
3  professionals had acquired.  And that included the
4  creditors' professionals, as well.
5        Being the last person at the dance,
6  so to speak, I needed to rely on not only on
7  Ernst & Young and Conway, but Alvarez and FDI --
8    Q.    Yeah.
9    A.    -- and Houlihan, to help get us to
10  the best data that was out there.
11    Q.    So let me see if I can summarize, the
12  time that you were allotted which we discussed and
13  which I've told you I'm of the view wasn't very
14  much, but it was what it was, but the time that
15  you were allotted did not allow you to either
16  independently verify the data or independently
17  generate your own assumptions?
18    A.    I -- I wouldn't go so far as to say
19  we didn't independently verify because we did,
20  specifically on the revenue projections and things
21  surrounding those, we did seek other third-party
22  sources of data.  So --
23    Q.    There were instances where you sought
24  some form of corroboration?
25    A.    Separate and apart from the City.

1    - MARTI KOPACZ - VOLUME 1-
2    Q.    But in general, you'd agree with my
3  statement that you didn't have sufficient time to
4  independently verify all of the data on which the
5  forecasts are built in order to develop your own
6  assumptions?
7        MR. KANE:  Objection.  Go ahead and
8  answer.
9    A.    Yes.
10    Q.    You agree with me?
11    A.    Yes.
12    Q.    Your reliance materials only list the
13  City's CAFR for 2012 specifically by name?
14    A.    Uh-huh.
15    Q.    Is that the only CAFR that you
16  reviewed?
17    A.    We did not get the CAFR, the '13 CAFR
18  until after my report was filed.
19    Q.    Understood.
20        So we've had a conversation about the
21  '13 CAFR and how some of the information in it may
22  have been known to you --
23    A.    Right.
24    Q.    -- and other parts of the information
25  may not have been?

1    - MARTI KOPACZ - VOLUME 1-
2    A.    Right.
3    Q.    Let's put that to one side, now let's
4  go backwards in time.
5        Did you review any CAFRs other than
6  the 2012 CAFR?
7    A.    I did not.
8    Q.    And whether your team did or not, you
9  don't know?
10    A.    I don't know.
11    Q.    Do you -- is it your opinion that
12  none of the prior year CAFRs prior to 2012 have
13  any relevance to the City's financial projections?
14    A.    Like I said, I didn't look at it.
15  Don't know if my team did or not.
16    Q.    So, do you think they are relevant or
17  not?
18    A.    I don't know.
19    Q.    You don't know.  They might be, they
20  may not be?
21    A.    They weren't part -- they weren't
22  part of the basis for my opinion.
23    Q.    Okay.  But I'm asking about the
24  relevance of them?
25    A.    I don't know.

1    - MARTI KOPACZ - VOLUME 1-
2    Q.    You don't know what the relevance is?
3    A.    Yes.
4    Q.    Would you agree -- let's go back to
5  our word methodology which you've used to describe
6  as approach.
7        Methodologies is an important word in
8  the legal setting, that's why lawyers are always
9  asking about methodology.
10        But would you agree that the City did
11  not employ a uniform approach in constructing the
12  forecasts?
13    A.    Yes.
14    Q.    Would you also agree that the City
15  didn't apply a uniform methodology in constructing
16  the forecasts?
17    A.    I don't like the word methodology.
18    Q.    Okay.  You're more comfortable with
19  approach?
20    A.    I'm more comfortable with approach.
21    Q.    But can you describe what the
22  approach was?
23    A.    It depends on -- it depends on which
24  model we're talking about.  The original baseline
25  E & Y model, the Conway models, or the E & Y

45 (Pages 177 to 180)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 46 of
146

1          - MARTI KOPACZ - VOLUME 1-
2  10-year, 40-year model.  It depends on what the
3  line item that is being projected is, okay?
4          And there are different approaches
5  used for estimating both revenues and expenses
6  depending on which one you're talking about and
7  who did it.
8      Q.    And then are there different
9  approaches even within categories like did they
10 employ a different approach to estimating
11 different types of revenue?
12     A.    Yes.  Well, revenue -- revenue in
13 terms of the E & Y models, no.  Okay.  There are
14 differences in approaches, for example, to
15 salaries and wages, depending on whether it's a
16 Conway model or whether it's an E & Y model.
17     Q.    Did you say in your expert report
18 that you found the City's model to be convoluted?
19     A.    And confusing.
20     Q.    Yeah.  Did you also say convoluted?
21     A.    Yes.
22     Q.    Okay.  I will put my hand up and
23 agree with you on that.
24         MR. KANE:  Objection.
25         MR. HACKNEY:  For now?

1          - MARTI KOPACZ - VOLUME 1-
2          MR. KANE:  What?
3  BY MR. HACKNEY:
4      Q.    So we've talked a lot about -- we've
5  talked about industry standards and -- but have
6  you ever seen another city employ the approach for
7  its forecasts that was employed here?
8      A.    No, because as we've established,
9  I've never seen another city like this doing
10 forecasts for a plan of adjustment.
11     Q.    True, but you have seen other cities
12 doing forecasts, right?
13     A.    Budgetary forecasts, yes.
14     Q.    Yeah.  Have you ever seen any of
15 those cities employ a methodology or an approach,
16 sorry, like this one?
17     A.    No.
18     Q.    When it comes to forecasting revenue,
19 do you believe that the forecasting technique that
20 you employed depends on the nature of the revenue
21 source that's being forecasted?
22     A.    Can you explain that?
23     Q.    Sure.  So do you understand that
24 there are -- certainly understand that there are
25 different types of revenue, right?  You understand

1          - MARTI KOPACZ - VOLUME 1-
2  that?
3      A.    Yes.
4      Q.    Income tax revenue is a different
5  type of revenue from wagering revenue, right?
6      A.    Yes.
7      Q.    Do you understand the idea that there
8  are -- there are -- that revenue is often divided
9  into two board categories of whether it's
10 deterministic on the one hand or volatile on the
11 other?
12     A.    I would agree there are different
13 types of revenue that have the different bases for
14 -- around which you would estimate.  But I would
15 want you to define those words before I would
16 agree or disagree with them.
17     Q.    Deterministic I use in the sense that
18 it means predictable and volatile means
19 unpredictable?
20     A.    Yes.
21     Q.    Have you ever -- do you understand
22 the idea that you can classify revenue streams as
23 being either predictable or unpredictable?
24     A.    I would think that is the analyst's
25 choice of how they want to describe them,

1          - MARTI KOPACZ - VOLUME 1-
2  generally.
3      Q.    Yes.  Right.  And did you undertake a
4  revenue portfolio analysis in this case?
5      A.    A revenue portfolio analysis?  Don't
6  know what a revenue portfolio analysis is.
7          We looked at all the revenues that
8  were presented in the plan of adjustment
9  projections.
10     Q.    So I guess can I say that to the
11 extent you undertook a revenue portfolio analysis,
12 you didn't do so consciously?
13     A.    I wouldn't -- I don't think -- that
14 sounds like a term of art, it doesn't sound like
15 something that you would think about.
16     Q.    That's -- that sounds like a term of
17 art from the world of revenue forecasting?
18     A.    It's somebody's -- it's somebody's
19 term of art, but it's not my term of art.
20     Q.    Okay.  Did you make an independent
21 assessment for yourself as to whether or not the
22 City's revenue streams can be classified as
23 either predictable or unpredictable?
24     A.    I looked at each revenue stream and
25 assessed whether I thought the City's forecast or

- MARTI KOPACZ - VOLUME 1-

1    - MARTI KOPACZ - VOLUME 1-
2    projection of that revenue was reasonable.
3        Q.    You did not otherwise attempt to
4    classify a revenue stream, correct?
5        A.    No.  It wouldn't serve my purpose.
6        Q.    Okay.  Do you agree as a general
7    matter that qualitative methods are useful for
8    forecasting new or volatile revenues sources?
9        A.    What qualitative method?
10       Q.    Qualitative methods like the naive
11   method, expert, judgmental, trend.  Any of those.
12       A.    Again, that's not the way that I
13   think about the analysis that we did of the City's
14   projections.
15       Q.    Okay.  Is it fair to say you never
16   took a step back from the City's approach and
17   tried to determine whether the approach should be
18   different for different revenue streams?
19       A.    No, that's not fair to say.
20       Q.    That's not fair?
21       A.    No.
22       Q.    Did the City employ different
23   approaches for different revenue streams or did it
24   employ the same approach?
25       A.    When you say "approach," right, we're

1    - MARTI KOPACZ - VOLUME 1-
2    talking about, they -- each revenue stream is
3    forecasted on its own set of assumptions and then
4    they're aggregated to come up with a total revenue
5    projection.  So income tax and the various types
6    of income tax are estimated differently than
7    wagering taxes.
8        Q.    How are they estimated differently?
9        A.    Well, income tax looks at the change
10   in wages, it looks at the change in employment.
11   Whereas, wagering taxes looks at the change in
12   casino revenue.
13       Q.    From my standpoint, I think of those
14   as being different data inputs but not necessarily
15   different approaches.  But in your analysis, is it
16   a different approach?
17       A.    They're -- they are definitely
18   different inputs and a different type of
19   assumption.  I don't know whether that's a
20   different approach or different methodology,
21   whatever -- right -- whatever you say is they have
22   different inputs.
23       Q.    I guess, you are an educated woman
24   and very experienced, I mean -- let me -- let me
25   quibble with you a little bit and say you have

1    - MARTI KOPACZ - VOLUME 1-
2    heard the term methodology before, right?
3        A.    Uh-huh.  Yes.
4        Q.    And you understand that that
5    different methodologies can all employ
6    assumptions, right?
7        A.    I would agree, yes.
8        Q.    And so do you understand the
9    difference between testing the assumptions that go
10   into a methodology from the idea of testing the
11   propriety of the methodology itself?
12           Do you understand that distinction,
13   right?
14       A.    I understand the distinction you're
15   making right now, yes.
16       Q.    You did not attempt to determine or
17   critique the methodology the City employed,
18   instead, you focused on the assumptions that the
19   City adopted, correct?
20       A.    Yes and no.
21       Q.    Okay.
22       A.    Okay.  Methodology in terms of what
23   we evaluated was the approach used by E & Y and
24   Conway.  Okay?  Methodology is a term, to me, that
25   is lower case, there's not a capital methodology,

1    - MARTI KOPACZ - VOLUME 1-
2    it's not a proper noun.  Okay?  It is a word that
3    describes how something is done.  Okay?  Depending
4    on what -- particularly on the cost side, what
5    costs were being estimated for the projections,
6    there were multiple methodologies used.  Okay?
7            What was important to me was to
8    assess the outcome of that estimate and whether or
9    not that was reasonable.  So, looking at the
10   assumptions, looking at the input, looking at how
11   those were mathematically manipulated and what the
12   output was and assessing whether or not that was
13   reasonable, is the approach that I used to fulfill
14   my responsibilities as part of this -- this
15   appointment.
16       Q.    So let me give you an example, see if
17   we can kind of refine our conversation a little
18   bit.  Take a single revenue stream like property
19   tax revenue.
20       A.    Okay.
21       Q.    Okay.  Do you understand that you can
22   look at historical evidence of property tax
23   revenue collections and then apply just individual
24   judgment to the different components of it in
25   order to forecast property revenue into the

- MARTI KOPACZ - VOLUME 1-

1 future?
2     A.    I agree with that, yes.
3     Q.    That's a possible approach?
4     A.    Yes.
5     Q.    Correct?
6     A.    Uh-huh.
7     Q.    But separately, you can use a
8 statistical method like a time series forecast in
9 order to forecast future property revenues,
10 correct?
11    A.    You could, yes.
12    Q.    Let's describe those for purposes of
13 my question as two different methodologies, okay?
14    A.    Okay.
15    Q.    You never attempted to look at the
16 City's approach to any of the revenue streams and
17 say, they are using the wrong methodology,
18 correct?
19    A.    That's correct.
20    Q.    Now, within their methodology, what
21 you did do is you looked at the assumptions that
22 went into the methodology the City adopted and
23 determined the reasonableness of those
24 assumptions, correct?

- MARTI KOPACZ - VOLUME 1-

1     A.    That's correct.
2     Q.    Okay. And I take it as a corollary
3 of that, you don't have an opinion as to whether
4 the City utilized the correct methodology, not
5 assumptions, in forecasting the revenue that it
6 forecasted, correct?
7     A.    I accepted the methodology, whatever
8 that may be, that the City used and evaluated the
9 result of that methodology, plus the inputs and
10 the assumptions.
11    Q.    Okay. You did not attempt to
12 critique whether they employed the correct
13 methodology, correct?
14    A.    I don't know that there is a correct
15 methodology, so --
16    Q.    Okay.
17    A.    -- the answer is I don't know.
18    Q.    So, you don't know if there is one so
19 you couldn't have critiqued it, right?
20    A.    I think that's correct.
21    Q.    Okay. Now, have you -- you know that
22 the City's forecasts in one form or another, they
23 go back to the prefiling period 2013, correct?
24    A.    In terms of their preparation?

- MARTI KOPACZ - VOLUME 1-

1     Q.    Well, so let me -- I didn't ask that
2 very well.
3           So, do you understand that there was
4 a -- that there was a ten-year forecast in the
5 June 2013 proposal to creditors?
6     A.    Yes.
7     Q.    And do you understand that that
8 proposal to creditors included a forecast both
9 with and without the RRIs?
10    A.    I don't recall.
11    Q.    Okay. Let me put it more generally.
12          Do you remember that there was a
13 forecast for what happens if there's no bankruptcy
14 and then there was a forecast for what happens if
15 there is a bankruptcy, or if there are
16 restructuring initiatives?
17    A.    My recollection of the June '13
18 projections that were provided to creditors was --
19 was this is the projection of what will happen.
20 Okay? What is going to happen to this city in
21 terms of its obligations in the future.
22          So this was -- right -- and again, I
23 don't know about --
24    Q.    You don't remember --

- MARTI KOPACZ - VOLUME 1-

1     A.    -- multiple -- I don't remember
2 multiple versions.
3     Q.    Okay. So, I'll tell you my
4 recollection of it was there was a so-called
5 steady state five-year forecast, but there was
6 also a ten-year forecast where they also presented
7 in an aggregate level the RRIs and then the delta
8 was amounts available for distribution of
9 creditors.
10          But if that doesn't ring a bell --
11    A.    My recollection of that projection
12 was that this is what's going to happen to this
13 city if nothing else changes.
14    Q.    Let's go up a level and I'll try to
15 not get bogged down in some of the specifics, but
16 let's do it this way:
17          You -- you agree that when the
18 forecasts -- that the forecasting process had
19 already begun prior to the bankruptcy, correct?
20    A.    Yes.
21    Q.    And the forecasting process that has
22 resulted in the forecasts that are in the plan has
23 continued throughout the bankruptcy, correct?
24    A.    Yes.

- MARTI KOPACZ - VOLUME 1-

1
2     Q.    And so as a result of the passage of
3   time, as we sit here today, there are now actually
4   historical results that we have that are
5   historical as of today, that can be compared to
6   what was once a forecast, correct?
7     A.    That's possible, yes.
8     Q.    I take it you have not done that?
9     A.    I have not done that.
10    Q.    So you haven't attempted to validate
11  what the prior forecasts against subsequent
12  historical information that's come in?
13    A.    No, I have not.
14    Q.    Okay.  You have not -- I want to talk
15  briefly about taxes, okay?
16          You did not include -- you did not
17  conduct analysis of whether the City can increase
18  taxes, correct?
19    A.    That's correct.
20    Q.    Both from the standpoint -- you
21  didn't analyze whether it legally can increase
22  taxes, correct?
23    A.    Correct.
24    Q.    You also didn't analyze whether
25  economically if it did increase taxes, what would

- MARTI KOPACZ - VOLUME 1-

1
2   happen to the City, correct?
3     A.    Correct.
4     Q.    And you're offering opinions on tax
5   policy in this case, correct?
6     A.    I am not.
7     Q.    Now, is it correct -- I want to talk
8   about property value, okay?
9           Is it correct that the average
10  assessed value per parcel in the City of Detroit
11  decreased by 37 percent between 2008 and 2013?
12    A.    I'm not familiar with that data
13  point.
14    Q.    Do you know -- do you agree that
15  there was a substantial decrease in the assessed
16  value per parcel in the City of Detroit between
17  2008 and 2013?
18    A.    I don't know what "substantial" means
19  but I can say, I am aware that property value
20  -- assessed property values decreased.
21    Q.    What would you define "substantial"
22  as?
23    A.    I don't know.
24    Q.    I mean, you can do whatever you want.
25    A.    Property -- assessed property value

- MARTI KOPACZ - VOLUME 1-

1
2   decreased.
3     Q.    Do you know how much it decreased?
4     A.    I don't.
5     Q.    I take it you don't know what the
6   City's assessed property values are as you sit
7   here today?
8     A.    I do not.
9     Q.    And you haven't engaged in an
10  independent effort to determine what the assessed
11  value should be, correct?
12    A.    That's correct.
13    Q.    Now, is it reasonable to assume that
14  the assessed value per parcel in the City of
15  Detroit will fall by an additional 50 percent
16  between -- over the next seven years?
17    A.    I am not --
18          MR. STEWART:  Objection.
19    A.    I have no way to know that.
20    Q.    You have no way to test that
21  assumption?
22          Let's start -- you did not test that
23  assumption, correct?
24    A.    That's correct.
25    Q.    Okay.  There is a way to test the

- MARTI KOPACZ - VOLUME 1-

1
2   assumption, though, correct?
3     A.    I don't know.
4     Q.    Okay.  Do you understand that the
5   City's forecasts include assumptions about future
6   assessed value per parcel?
7     A.    I don't know -- I know that the
8   City's projections include estimates for property
9   taxes going forward, right.
10    Q.    Yes.
11    A.    I don't know what their per parcel
12  estimates have been.
13    Q.    Okay.  I take it you made no effort
14  to validate any assumptions regarding assessed
15  value per property?
16    A.    That's correct.
17    Q.    Or in the aggregate, correct?
18    A.    Or in the aggregate?
19    Q.    Meaning to the extent the City
20  aggregated assessed values across the City and
21  made assumptions about that, you did not test
22  those assumptions, correct?
23    A.    Correct.
24    Q.    Now, do you know what Mr. -- do you
25  know that the City reassessed its properties in

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 50 of
146

- MARTI KOPACZ - VOLUME 1-

1  - MARTI KOPACZ - VOLUME 1-
2  Decem -- December of 2013?
3      A.   I believe it's in the process of
4  assessing a lot of properties, right.
5      Q.   So I want to distinguish between
6  these two concepts, so I'm going to ask you about
7  them separately, though, because you're right,
8  there is a citywide appraisal, and you're right,
9  it is ongoing.  Put that here for a second,
10  mentally, okay?
11      A.   Okay.
12      Q.   Now, are you aware there was a
13  reassessment in December of 2013?
14      A.   Vaguely, yes.
15      Q.   So "vaguely" means?
16      A.   I was aware of it --
17      Q.   You are --
18      A.   Anecdotally I am aware of it, yes.
19      Q.   Okay.  You did not -- do you know the
20  impact of that assessment on taxable value in the
21  City of Detroit?
22      A.   I don't.
23      Q.   Do you know the approximate impact of
24  it?
25      A.   I don't.

1  - MARTI KOPACZ - VOLUME 1-
2      Q.   Do you know what impact it had on the
3  forecasts?
4      A.   I know that property tax forecast --
5  property tax revenue forecasts declined between
6  the May 5th and the July 2nd projections.
7      Q.   Do you know why it declined?
8      A.   It declined as a result of --
9  Ernst & Young's view that the assessed value was
10  going down.
11      Q.   Was going to go down or had gone
12  down?
13      A.   I don't -- I don't have a precise
14  time recollection on that.
15      Q.   Do you know whether the citywide
16  reappraisal has begun?
17      A.   I don't know.
18      Q.   Do you know when it will -- it is
19  estimated to conclude?
20      A.   I don't.
21      Q.   Do you know anyone in the City of
22  Detroit who is more knowledgeable about the
23  assessed values of property in the City of Detroit
24  than Mr. Evanko, the chief assessor?
25      A.   I don't know.

1  - MARTI KOPACZ - VOLUME 1-
2      Q.   Is it fair to assume that he is the
3  most knowledgeable person in the City of Detroit?
4      A.   I don't know.
5      Q.   That's not a question you've
6  considered?
7      A.   It is not.
8      Q.   Do you believe that Mr. Evanko's
9  opinions regarding the effect of the citywide
10  reappraisal will have on property values are
11  relevant to determining future property values?
12      A.   Could you repeat that question?
13      Q.   Yeah.  So do you believe Mr. Evanko,
14  who is the City's only Level 4 assessor, right?
15      A.   Uh-huh.
16      Q.   Yes?
17      A.   Yes.
18      Q.   Sorry.  That's okay.  I do that all
19  the time.
20          Do you agree that Mr. Evanko's coast
21  views about the impact of citywide reappraisal
22  that we were just talking about, that the impact
23  that that will have on taxable value in the City
24  of Detroit is an important data point to consider?
25      A.   Yes.

1  - MARTI KOPACZ - VOLUME 1-
2      Q.   If Mr. Evanko told you that he has no
3  idea whether that citywide reappraisal will cause
4  taxable values to be lower or higher, would you
5  consider that an important data point?
6      A.   I -- I'm -- I would consider what he
7  said to be relevant.  Okay?  So I don't know what
8  he said so I can't really say whether I think I
9  agree or don't agree.  I would think that the
10  City's assessor would be an important person to
11  consider as somebody who is looking at this.
12      Q.   Understood.  So do you understand
13  that the Ernst & Young forecasts project the
14  taxable value will decrease by 9 percent as a
15  result of the citywide reappraisal?
16      A.   I understand that as part of their
17  assumption, yes.
18      Q.   What is the basis for their
19  assumption?
20          MR. DiPOMPEO:  Objection.
21      A.   Their assessment in consultation with
22  the City.
23      Q.   Okay.  But like what -- they talk to
24  people that told them that?
25      A.   That is my assumption, yes.

50 (Pages 197 to 200)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 51 of
146

1     - MARTI KOPACZ - VOLUME 1-
2     Q.    That's your assumption about their
3  assumption?
4     A.    Yes.
5     Q.    Okay.  Have you independently
6  verified the reasonableness of that particular
7  assumption?
8     A.    I have not.
9     Q.    Do you believe -- this get -- so do
10  you believe it's reasonable to assume that taxable
11  value in the City of Detroit will decrease over
12  the next -- by 9 percent, as a result of the
13  citywide reappraisal where the City's senior
14  assessor says that he doesn't know whether taxable
15  value will go up or down.
16          MR. STEWART:  Objection.
17     A.    I don't know.
18     Q.    You don't know if that's reasonable
19  or not?
20     A.    Yes, I do not know if that's
21  reasonable or not.
22     Q.    It's not something you've considered
23  before today?
24     A.    That's correct.
25     Q.    One of the interesting things about

1     - MARTI KOPACZ - VOLUME 1-
2  when you are feasibility expert is we were talking
3  earlier about the notion of there being a hurdle
4  and your job being to assess whether the City will
5  get over that hurdle, right?
6     A.    Correct.
7     Q.    Do you remember that testimony?
8     A.    Uh-huh.
9     Q.    Isn't it true that if the City adopts
10  an assumption about taxable value which is that in
11  the future it's going to go down by 9 percent, as
12  it did, right?  Correct?
13     A.    We can look at it.
14     Q.    If you want to double-check it,
15  that's totally fine.
16          Do you want to?
17          Take a look at Page 59.
18     A.    About Page 59, there is a typo on
19  Page 59 about two-thirds of the way down, there
20  are two numbers, FY 215, 2015, followed by another
21  FY 2015.  The second FY 2015 should be 2016.
22     Q.    Okay.  So what this is saying is that
23  because of the citywide reappraisal, there's going
24  to be a 9 percent drop in real property
25  assessments in fiscal year 2015 and then another

1     - MARTI KOPACZ - VOLUME 1-
2  three to four percent drop in fiscal year 2016,
3  right?
4     A.    That is --
5     Q.    What it should say?
6     A.    -- the -- yes, it should say '16.
7     Q.    That's what you meant it to say?
8     A.    That is what I meant it to say.
9     Q.    Now, if the available evidence shows
10  that -- and Ms. Kopacz, this is kind of a -- this
11  almost goes to your own methodology, so consider
12  this for a second.
13          If the available evidence shows that
14  there's unlikely to be any drop in taxable value
15  in either 2015 or 2016, would you still consider
16  this a reasonable assumption because it's
17  conservative?
18          You see the point of my question?
19  Which is I'm trying to tease out a little bit what
20  you were thinking about when you were testing
21  assumptions.
22          Consider a situation where the
23  available evidence actually suggests that there
24  will not be any drop in real property assessments,
25  okay?  But the City employs a methodology that

1     - MARTI KOPACZ - VOLUME 1-
2  says that there will be a nine percent drop in
3  2015 and a three to four percent drop in 2016,
4  okay?
5          Isn't it true that based on your task
6  as the feasibility expert, you could still find
7  that assumption to be reasonable.  Correct?
8          MR. KANE:  Hold on a second.  So
9  there's a lot in there so, one, I will object
10  on vagueness.  But I'm not trying to
11  interfere, I just want to clarify.
12          Are you asking her to assume that the
13  available evidence shows that?
14          MR. HACKNEY:  Yes.
15          MR. KANE:  Okay.  So he's asking you
16  to assume --
17          MR. HACKNEY:  It's a hypothetical?
18          MR. KANE:  That's all I want --
19     A.    It's an assuming there's evidence to
20  say that property values won't decline.
21     Q.    That's right.
22     A.    And that this forecast says they will
23  decline, right?
24     Q.    Right.
25     A.    That is a positive contributor to my

51 (Pages 201 to 204)

1      - MARTI KOPACZ - VOLUME 1-
2  assessment of feasibility.
3      Q.   Okay.  So do you understand how
4  whether or not the -- in that hypothetical, where
5  the available evidence shows -- predicts that
6  there won't be a drop in real property
7  assessments, but the forecasters project a drop,
8  do you understand that the reasonableness of that
9  assumption depends very much on how you are
10 looking at the question?
11     MR. STEWART:  Objection.
12     A.   And the question is?
13     Q.   Do you understand that the
14 reasonableness of the assumption depends on what
15 you're evaluating the forecast for?
16     MR. STEWART:  Objection.
17     A.   I only evaluate it for purposes of
18 feasibility, okay.  And therefore, if the
19 projection relative to property tax revenue is
20 conservative, right, then I consider that to be a
21 good thing relative to my feasibility assessment.
22 Okay?
23     Q.   You said exactly what I was driving
24 at.  Isn't it true the more conservative the City
25 gets, the happier you become about the

1      - MARTI KOPACZ - VOLUME 1-
2  reasonableness of their assumption, in terms of
3  evaluating feasibility?
4      MR. STEWART:  Objection.
5      A.   Consistent with the standard that I
6  laid out, okay, the reasonableness of the
7  projections, okay, are going to be influenced by
8  both assumptions that I find to be aggressive and
9  assumptions I find to be conservative.  Okay?
10 There are instances of both of that, those -- in
11 these projections.
12     Q.   If the assumptions were all
13 conservative, it would be more likely that you'd
14 find feasibility than if some were conservative
15 and some were aggressive.  Do you agree?
16     A.   I think in totality the answer is
17 yes.
18     MR. STEWART:  Objection.
19     Q.   Okay.  In fact, your test for
20 reasonableness means as long as an assumption is
21 not exceptionally conservative, it is reasonable,
22 correct?
23     MR. STEWART:  Objection.
24     A.   I'm not sure -- I'm not sure I know
25 what exceptionally conservative is.

1      - MARTI KOPACZ - VOLUME 1-
2      Q.   Okay.  So --
3      A.   Go ahead.
4      Q.   Okay.  So I'm not going to sharp
5  shoot you, so don't take this wrong way.
6      A.   That's okay.
7      Q.   I'm going to read from your report.
8  Let's take a step back, okay?
9      A.   Okay.
10     MR. KANE:  What page are you on?
11     MR. HACKNEY:  This is Page 18.
12     Q.   You're talking about reasonableness
13 here, okay?
14     A.   Reasonableness.  And we're in -- I
15 know where we are.  We're in the definition of
16 feasibility.
17     Q.   That's right.
18     A.   Yes.
19     Q.   So, of course, I'm looking here at --
20 it's like the -- sort of second, third of the big
21 paragraph.
22     "Of course at the outer edges of
23 'reasonable,' values become unreasonable either
24 because they are exceptionally conservative or
25 wildly aggressive," right?

1      - MARTI KOPACZ - VOLUME 1-
2      A.   Yes.
3      Q.   Those are the terms you used in your
4  report?
5      A.   I did.
6      Q.   What I want to establish is when we
7  think of Marti Kopacz's definition of
8  reasonableness, we should see a continuum, right?
9      A.   Correct.
10     Q.   And on one of end of the continuum we
11 should see exceptionally conservative, correct?
12     A.   Yes.
13     Q.   And on the other end of the
14 continuum, we should see wildly aggressive?
15     A.   Correct.
16     Q.   And as long as the assumption falls
17 between those two points, it fits your definition
18 of reasonable?
19     A.   Yes, as long as it's not
20 exceptionally conservative or wildly aggressive,
21 right.  In other words, it's not in -- it's in
22 that middle of those ranges, right, then I'm -- I
23 am going to accept that it's reasonable.
24     Q.   But wouldn't an exceptionally
25 conservative plan be highly feasible?

- MARTI KOPACZ - VOLUME 1-
1
2    A.    An exceptionally conservative plan,
3 if everything was conceptually -- if everything
4 was exceptionally conservative, then it would be
5 highly feasible to the point of being a slam dunk
6 or a guarantee.
7    Q.    What's wrong with that?
8    A.    Hmm?
9    Q.    What's wrong with being a guarantee,
10 from your standpoint?
11    A.    Well, I don't think it's realistic.
12    Q.    Because?
13    A.    No forecast or projection is the ever
14 going to be met the way it's laid out to be.
15    Q.    Well, will the City earn a hundred
16 dollars of revenue next year?
17    A.    Yes.
18    Q.    Okay. So we can guarantee, if the
19 budget -- let's go to the absurd, right?
20    A.    Right.
21    Q.    I mean, we know the City will have a
22 hundred dollars of revenue?
23    A.    Yes.
24    Q.    Then we can actually say, I guarantee
25 that the City will have a hundred dollars in

- MARTI KOPACZ - VOLUME 1-
1
2 revenue next year, correct?
3    A.    Yes.
4    Q.    I mean, I guess you get to the point
5 and you say, well, maybe there's a neutron bomb or
6 something and none us exist anymore. But within
7 the way people use the word guarantee, we can
8 guarantee that the City will have a hundred
9 dollars of revenue, correct?
10    A.    Yes.
11    Q.    Now as you -- then you play the old
12 game, right, as you go forward from that, at some
13 point you kind of say goodbye to the point where
14 you could guarantee?
15    A.    Yes.
16    Q.    Right?
17    A.    Yes.
18    Q.    Okay. So, I want to quibble a little
19 bit with you about this idea that -- that there
20 aren't any guarantees because if -- if the City
21 set a budget that was a hundred dollars of revenue
22 next year, and had obligations of $20, you could
23 guarantee that the City would achieve that budget,
24 right?
25    A.    On that hypothetical, yes.

- MARTI KOPACZ - VOLUME 1-
1
2    Q.    Okay. So, what my question, though,
3 is from the standpoint of gauging feasibility,
4 isn't it true as a plan becomes closer to this
5 level of being guaranteed, it becomes more and
6 more and more feasible, right?
7    A.    Yes.
8    Q.    Okay. So, I'm trying to understand
9 why would it trouble you as, let's say, you pass
10 exceptionally conservative, you're looking at it
11 in the rearview mirror, that was like 10
12 adjectives ago, okay? As a feasibility expert,
13 why would you not be able to say that those are
14 reasonable assumptions that led us to this point?
15          You see what I'm saying?
16    A.    No. I didn't -- I didn't --
17    Q.    Why have a bound dry on the
18 conservatism side where you'll stop saying that an
19 assumption is reasonable? Why would you say I
20 object to that assumption, City, it's
21 exceptionally conservative, when you're a
22 feasibility expert?
23    A.    I lost you. Okay. I've --
24    Q.    Okay.
25    A.    I've absolutely lost you. In the

- MARTI KOPACZ - VOLUME 1-
1
2 sense of --
3    Q.    Let's me ask it a better way.
4          MR. KANE: Were you done answering.
5          THE WITNESS: Yes.
6          MR. KANE: I'm saying, were you done
7 answering?
8          THE WITNESS: I'm done answering. I
9 lost him.
10          MR. HACKNEY: I didn't mean to
11 interrupt. Let's try again.
12          THE WITNESS: Try again.
13 BY MR. HACKNEY:
14    Q.    Let's say all the assumptions were
15 exceptionally conservative, would you agree that
16 you could find that plan feasible?
17    A.    Arguably, yes.
18    Q.    Would you also agree that under your
19 methodology you would find those assumptions
20 unreasonable?
21    A.    What I said relative to my definition
22 of my standard, okay, is that feasibility is a
23 range, okay.
24          And I said at the point in time, when
25 the plan is so conservative that it's a guarantee,

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 54 of 146

- MARTI KOPACZ - VOLUME 1-

1    right, I think that feasibility tips over to best
2    interest of creditors and clearly I'm not going
3    there, okay?
4         On the other hand, when -- as
5    feasibility -- as assumptions individually and
6    collectively, okay, move more to the middle or
7    more down to the, you know, less conservative,
8    more aggressive, right, the projections can be
9    feasible, right, and that I believe that the
10   test -- the definition, the standard that I've set
11   out, establishes the -- the bar over which we need
12   to get. Okay? And not how high up.
13        And I've said that, quite frankly, I
14   don't -- I didn't evaluate if there is more money
15   available or if there's an alternative plan. I
16   simply looked at this plan, assessed it
17   individually, in totality and got comfortable that
18   this is a feasible plan.
19   Q.    Okay. Going back to your continuum
20   for assumptions, don't you agree that as a
21   feasibility expert --
22   A.    Uh-huh.
23   Q.    -- you're much more concerned with
24   aggressive assumptions than you are with

(Numbering note: lines 1-25)

- MARTI KOPACZ - VOLUME 1-

1    conservative assumptions?
2    A.    I'm much more concerned with
3    aggressive assumptions than I am with conservative
4    assumptions? That isn't how I approached it.
5    Q.    Okay.
6    A.    Okay?
7    Q.    Do you remember we talked moments ago
8    about if how all the assumptions were
9    exceptionally conservative you could find the plan
10   feasible?
11   A.    You could find the plan feasible.
12   Q.    If all the assumptions were wildly
13   aggressive, could you find the plan feasible?
14   A.    I don't think so.
15   Q.    Okay. So do you see the difference
16   between the nature of assumption from the
17   standpoint of feasibility?
18        MR. KANE: Objection. You can
19   answer.
20   Q.    Aggressive assumptions threaten
21   feasibility, conservative ones don't.
22   A.    Conservative ones don't, correct.
23   Q.    Okay.
24   A.    But this plan has conservative and

- MARTI KOPACZ - VOLUME 1-

1    aggressive assumptions in it.
2    Q.    I understand that's your opinion. I
3    do.
4    A.    Okay.
5    Q.    But I'm trying to get a basic
6    understanding of your methodology in approaching
7    the question of feasibility?
8    A.    Yes.
9    Q.    Do you know anyone who is more
10   knowledgeable about the likely impact of the
11   citywide reappraisal than Mr. Evanko?
12   A.    I don't know if there's someone more
13   knowledgeable.
14   Q.    And do you know what his view is of
15   the likely impact?
16   A.    I do not know.
17   Q.    And I take it you haven't read his
18   deposition?
19   A.    I have not.
20   Q.    Whatever his view is, you don't have
21   a basis to disagree with it, correct? Or agree
22   with it?
23   A.    Yes, I don't have any basis.
24        MR. STEWART: Objection.

- MARTI KOPACZ - VOLUME 1-

1    Q.    By the way, do you know whether the
2    citywide reappraisal will even be completed by
3    fiscal year 2015?
4    A.    I'm not sure when it will be
5    completed.
6    Q.    Is it reasonable for the forecast to
7    assume that the citywide appraisal, citywide
8    reappraisal will have an impact on assessed
9    property values if it hasn't been completed?
10   A.    Say that again.
11   Q.    Is it reasonable for the City's
12   forecasts of assessed property values to be
13   impacted by a citywide reappraisal program that
14   hasn't completed?
15   A.    I -- I'm not understanding. Okay.
16   Q.    Okay. So if the citywide reappraisal
17   program won't finish until 2016 --
18   A.    Right.
19   Q.    -- is it reasonable to assume it will
20   have an impact on property values in 2015?
21   A.    There could -- there would -- the
22   appraisal, the reappraisal wouldn't have an impact
23   before it was completed or implemented, other
24   things might have an impact.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

1      - MARTI KOPACZ - VOLUME 1-
2      Q.    On assessed values?
3      A.    Could be.
4      Q.    Okay.  But you would agree that to
5  the extent you're basing your assumption, a person
6  is basing their assumption that the reappraisal
7  will have an impact on assessed values, do you
8  agree that the reappraisal has to conclude before
9  it can have the impact?
10     A.    I would agree with that.
11     Q.    And do you know when the reappraisal
12 will conclude?
13     A.    I don't.
14     Q.    Would you agree -- let's talk about
15 tax collection for a second, if we could, shift
16 gears here.
17     A.    Okay.
18     Q.    Do you agree that the -- Detroit's
19 tax collection enforcement mechanism has been
20 broken for a number of years?
21     A.    The percentage of tax that the City
22 collects relative to the amount of tax that's due
23 is poor.
24     Q.    And I want to focus on the
25 enforcement mechanism which is the tax collection

1      - MARTI KOPACZ - VOLUME 1-
2  efforts that's go into either property or income
3  taxes, okay?
4      Would you agree that that enforcement
5  mechanism has been dysfunctional for a number of
6  years --
7      A.    It has been --
8      Q.    -- in Detroit?
9      A.    It has been ineffective, yes.
10     Q.    Do you agree that fixing the
11 enforcement mechanism alone will have an
12 improvement on the level of tax delinquencies in
13 the City?
14     A.    I believe it would, yes.
15     Q.    In fact, you've expressed that
16 opinion, haven't you?
17     A.    I have expressed that opinion.  Well
18 that point of view, right.
19     Q.    Yes.
20     A.    Little O.
21     Q.    Now, I hope I didn't ask this before
22 and if I did I apologize.  But you did not attempt
23 to construct your own forecasts, correct?
24     A.    Correct.
25     Q.    Why didn't you?

1      - MARTI KOPACZ - VOLUME 1-
2      A.    Because there would never have been
3  enough time and the availability of information to
4  do that, okay, would -- again, there wouldn't have
5  been the time, the money, the anything to do that
6  so...
7      Q.    If you had had enough time -- have
8  you ever heard of like in a scientific realm when
9  they do double blind --
10     A.    Yes.
11     Q.    -- studies?  Have you ever heard of
12 that?
13     A.    I have.
14     Q.    You know that double blind study is
15 where there's the drug that is being tested and
16 then there's a placebo and the double blind is
17 that the people don't even know what they're
18 taking and then the researchers don't know who's
19 taking what, right?
20     A.    Right.
21     Q.    Do you understand that the concept of
22 using a double blind methodology is to protect
23 against the types of biases that can actually even
24 creep into things like pharmaceutical statistics?
25     A.    Yes.

1      - MARTI KOPACZ - VOLUME 1-
2      Q.    Do you agree if you'd had enough
3  time, it would have been preferable for you to be
4  able to construct your own forecast first and then
5  compare it to the City's?
6      A.    Oh, I think that's idealistic.
7      Q.    It's -- it's idealistic?
8      A.    Yeah.
9      Q.    Given my idealism, would you agree
10 that would have been preferable?
11     A.    I'm not sure it's preferable or not.
12 I mean, it would have been interesting.  It would
13 have been very interesting.
14     Q.    You didn't have enough time to do
15 that?
16     A.    I wasn't asked to do that.
17     Q.    And how much time would you have
18 needed to construct a forecast?
19     A.    I don't know.
20     Q.    How much time did Ernst & Young and
21 Conway MacKenzie need?
22     A.    I don't know.
23     Q.    Did they have adequate time?
24     A.    I don't know.
25     Q.    Would you -- do you -- is it your

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1      - MARTI KOPACZ - VOLUME 1-
2  opinion that there is a material risk that the
3  City will not achieve the forecasts set forth in
4  the plan?
5      MR. STEWART:  Objection.
6      A.    A material risk that the City will
7  not achieve the -- I don't -- again, I don't know
8  what "material" means.
9      Q.    I want to use your definition of
10  material that you discussed earlier with Mr.
11  Stewart.
12     A.    If I -- yes, if I thought there was a
13  material risk that they wouldn't meet these
14  projections, I would not have an opinion that the
15  plan is feasible.
16     Q.    Okay.  So to turn that around on you,
17  it is your opinion that there is not a material
18  risk that the City will fail to achieve its
19  projections, correct?
20     A.    I believe that the City has a
21  reasonable likelihood of meeting the commitments
22  it's laid out in the plan and delivering essential
23  services.
24     Q.    Okay.  And using your definition of
25  materiality, though, I want to confirm, you do not

1      - MARTI KOPACZ - VOLUME 1-
2  see a material risk that the City will fail to
3  live up to the plan's forecasts, correct?
4      A.    Again, I don't -- the City can meet
5  its obligation -- I believe the City can meet its
6  obligations in the plan of arrangement and deliver
7  services, okay, within the confines of the
8  projections.
9          I don't believe for a minute that the
10  projections will come in exactly as they've been
11  forecast.
12     Q.    I understand.  But in the aggregate,
13  you would not have rendered your opinion if you
14  believed a material risk of failure existed,
15  correct?
16     A.    That is correct.
17     Q.    When it comes to evaluating the
18  City's obligations, the ability to meet its
19  obligation, Ms. Kopacz, in order to get your seal
20  of approval, would you agree that you needed
21  really to confirm that the actual results would
22  not turn out to be materially worse than the
23  forecasted results; that's what you're assessing,
24  right?
25     A.    I'm not assessing future actuals.  I

1      - MARTI KOPACZ - VOLUME 1-
2  am assessing --
3      Q.    There isn't any such thing, I think,
4  but I know what you mean.
5      MR. KANE:  Sounded to me like you
6      were in the middle of a sentence.  So if you
7      were finished, if not, wait for him to --
8      Q.    That's all right.  I didn't mean to
9  be rude and interrupt.  I didn't mean to be, I
10  apologize.
11     A.    I didn't take it as that.
12     Q.    Let me put it this way; that is, in
13  order to get your seal of approval, you needed to
14  find that in your opinion the City's likely
15  results will not be materially worse than the
16  forecasted results?
17     A.    In the aggregate -- and I don't know
18  how say it any differently than I've said it
19  before or in my report, okay, I think the
20  projections are reasonable.  I think the City can
21  meet its commitments in the plan.  I think it can
22  deliver services in the future.
23     Q.    You do not perceive a material risk
24  of the City failing any of those; else you would
25  not have opined it's feasible?

1      - MARTI KOPACZ - VOLUME 1-
2      A.    If I thought the City couldn't pay
3  its commitments, couldn't meet its commitments or
4  it couldn't deliver services, I would have said --
5  I would have found -- I would have had the opinion
6  that the plan was not feasible.
7      Q.    Now, let me ask you another
8  hypothetical question which is pretend that you
9  conducted -- constructed your own forecasts.
10     A.    Okay.
11     Q.    Okay?  Same time period, same subject
12  matter as the forecasts that are in the plan.  If
13  you found that the City's forecasts were 50
14  percent more conservative than yours, would you
15  have still found the City's forecast to be
16  reasonable, using your definition of
17  reasonableness?
18     A.    I don't know.
19     Q.    Are you able to give me a percentage
20  deviation from the hypothetical forecast that you
21  constructed at which point you would say that the
22  City's forecasts were unreasonable?
23     A.    I don't think I could.
24     Q.    All right.  Let me direct you to your
25  report in Section F.

56 (Pages 221 to 224)

1           - MARTI KOPACZ - VOLUME 1-
2      A.    Section F.
3           MR. LERNER:  Section what?
4           MR. HACKNEY:  F.
5      A.    What page?
6      Q.    Let me see --
7      A.    I think it's the expenses.
8      Q.    No, these are revenues.
9      A.    These are revenues.
10     Q.    So take a look at Page 39.
11     A.    Page 39?
12          Oh, yeah, revenues.  Uh-huh.
13     Q.    Okay.
14     A.    Can we take a break?
15     Q.    Of course, absolutely.
16     A.    Thank you.
17     Q.    We can always take a break when you
18 want to.
19     A.    I need a beverage.  I need Diet Coke.
20          THE VIDEOGRAPHER:  The time now is
21 approximately 2:30 and we're going off the
22 record.  This is the end of Disk Number 3.
23          (Whereupon, there was a brief recess
24 in the proceedings.)
25          THE VIDEOGRAPHER:  The time now is

1           - MARTI KOPACZ - VOLUME 1-
2 approximately 2:44 p.m.  We're back on the
3 record.  This is the beginning of Disk Number
4 4.
5 BY MR. HACKNEY:
6      Q.    Ms. Kopacz, welcome back.
7      A.    Thank you.
8      Q.    To the extent that you relied on
9 historical data in assessing the assumptions of
10 the City in compiling its forecasts, is that
11 historical data disclosed in the body of your
12 report?
13     A.    In the body of my report?  I don't
14 believe so.
15     Q.    You don't believe so?
16     A.    Right.
17     Q.    Okay.  So there could be historical
18 data that you considered that's listed at
19 Exhibit 2 that informed your assessment of
20 reasonableness?
21     A.    Yes.
22     Q.    Okay.  So, if you could turn to Page
23 39, this is the section of the report where you
24 talk about the macro assumptions that go into
25 the City's revenue forecasts; is that correct?

1           - MARTI KOPACZ - VOLUME 1-
2      A.    Yes.
3      Q.    I'd like to direct your attention to
4 Page 40 where you begin your discussion of
5 municipal income tax revenues.
6           Do you see that?
7      A.    I do.
8      Q.    And then, generally, this is broken
9 down into an analysis of the ten-year forecast
10 without RRI and then with RRI, correct?
11     A.    Correct.
12     Q.    And then within each section are your
13 opinions regarding the assumptions that went into
14 the ten-year forecast, correct?
15     A.    I'm not sure "opinion" is right.
16 It's -- it is -- this is an analysis and a
17 summarization of what is in the projections.
18     Q.    Okay.  So that's a good way to
19 describe it.
20          If you when you're reading Section F,
21 what you generally see are two things, right?  You
22 either see your narrative description of what the
23 City did?
24     A.    Uh-huh.
25     Q.    Or your assessment of what the City

1           - MARTI KOPACZ - VOLUME 1-
2 did, correct?
3      A.    Yes.
4      Q.    Okay.  So, turn your attention, if
5 you would, ma'am, to -- well, let's actually look
6 at Page 41, okay?
7      A.    Okay.
8      Q.    Now, with respect to the ten-year
9 plan without RRIs, you first found that the City's
10 year-over-year taxable income growth was .85
11 percent for city residents, 1.18 percent for
12 non-residents, and 1.63 percent for corporations.
13          Do you see that?
14     A.    I do.
15     Q.    And that's the part where you're
16 narratively describing what the City's assumptions
17 are, right?
18     A.    Right.  What the projections -- what
19 the projections are.
20     Q.    Okay.  Now, take .85 percent as an
21 example of the year-over-year income growth for
22 city residents.
23          Do you see where I'm indicating
24 there?
25     A.    Uh-huh.

- MARTI KOPACZ - VOLUME 1-

2  Q.   Is that .85 percent in real or
3  current dollars?
4  A.   It's in nominal dollars.
5  Q.   So nominal dollars means current
6  dollars, right?
7  A.   Well, I don't -- nominal dollars
8  means dollars that have not been adjusted for the
9  time value of money.
10  Q.   Or -- or inflation?
11  A.   Or inflation.
12  Q.   Okay.  So, if I use the phrase "real
13  dollars" to refer to inflation adjusted and I use
14  "nominal dollars" to refer to percentages that are
15  not inflation adjusted, will you understand what
16  I'm talking about?
17  A.   We can -- we can set up that
18  definition, yes.
19  Q.   You understand the distinction,
20  right?
21  A.   Yes.
22  Q.   Because if I say wages are going to
23  increase two percent from this year every year for
24  the next five, in nominal dollars, you understand
25  that you would calculate that by looking at wages

- MARTI KOPACZ - VOLUME 1-

2  today and then simply applying two percent to the
3  base number for year one, two percent to the base
4  number for year two and so on and so forth,
5  correct?
6  A.   It builds from year to year.
7  Q.   Oh, so it's two percent of the prior
8  year?
9  A.   Right.  If Page 42 shows the
10  year-by-year growth assumptions.
11  Q.   Okay.  So in the nominal dollar
12  calculation, if a forecast is two percent nominal
13  dollars year over year, year one would be
14  determined by taking the arithmetical calculation
15  of two percent over the base year, correct?
16  A.   Yes.
17  Q.   Year two would be done by taking a
18  two percent increase over --
19  A.   Year one.
20  Q.   -- year one?
21  A.   Yes.
22  Q.   And so forth, correct?
23  A.   Uh-uh.
24  Q.   Now, you understand that the
25  distinction between nominal dollars and real

- MARTI KOPACZ - VOLUME 1-

2  dollars is the inclusion of an adjustment either
3  for the time value of money or for inflation as
4  the case may be, correct?
5  A.   Some adjustment, correct.
6  Q.   So if I say that there's a two
7  percent adjustment in real dollars or in inflation
8  adjusted dollars, you understand that that number
9  comes embedded with an adjustment that's already
10  been made for inflation, correct?
11      It's two percent over and above the
12  inflation?
13  A.   There are a series of -- there are
14  more than one assumption going into that number.
15  Q.   Uh-huh.  Exactly.
16  A.   Okay?
17  Q.   And if I present it as 2 percent,
18  that is the amount of noninflationary increase,
19  correct?  Or is it cumulative of inflation?
20      MR. STEWART:  Can I have that reread?
21  Do you want to just rephrase it?
22  BY MR. HACKNEY:
23  Q.   Sure.  So, the -- let's put it this
24  way.
25      If there is -- let's say that I give

- MARTI KOPACZ - VOLUME 1-

2  you an inflation adjusted year-over-year increase
3  in income of 2 percent, and a nominal dollar
4  increase of 2 percent year over year, which one
5  represents higher incomes?  Which one will produce
6  higher incomes?
7  A.   The -- they could -- they could --
8  they could end up mathematically with the same
9  number.  Okay?  There's not an inflation
10  assumption to my knowledge in here.
11  Q.   I know there's not in here.  I'm
12  trying to get our terminology straight as we begin
13  to ask questions later.
14  A.   Okay.
15  Q.   So --
16  A.   Can we just use inflation adjusted or
17  not inflation adjusted?
18  Q.   Sure.  That's fine.  And nominal
19  dollars are not inflation adjusted.
20  A.   Nominal dollars are not inflation
21  adjusted in this, right.
22  Q.   With respect to inflation adjustments
23  though, do you understand that it's not presented
24  in the percentage increase typically, that the
25  inflation adjustment is applied to the base first?

58 (Pages 229 to 232)

- MARTI KOPACZ - VOLUME 1-

1
2     A.    Yes, it can be, right.
3     Q.    Okay.  I'm talking about the typical
4  presentment by government agencies and so forth.
5     A.    I -- I'm not going to say what's
6  typical.  Okay?
7     Q.    Well, do you understand that if you
8  wanted to relate inflation adjusted dollars to
9  noninflation adjusted dollars that you -- you have
10  to add in the amount of the inflation adjustment
11  in order to get an apples to apples comparison of
12  total increase?
13     A.    If you want to compare non --
14  noninflation adjustment estimates to inflation
15  adjustment estimates, yes, you must add in the
16  inflation percentage assumption.
17     Q.    Right.  To -- yes.  So if you want to
18  take inflation adjusted percentages and compare
19  them to nominal percentages on an absolute basis,
20  you have to add in the inflation adjustment to the
21  inflation adjusted dollars so that you can see the
22  nominal dollar comparison.
23     A.    I think you just did that backwards.
24     Q.    Okay.  I think I may have, but I
25  thought that I didn't.  Because I --

- MARTI KOPACZ - VOLUME 1-

1
2     A.    You thought that you didn't.
3     Q.    -- well, I'll show you some later.
4     A.    Okay.
5     Q.    We'll try to use specifics.
6     A.    Okay.
7     Q.    But it's absolutely possible that I
8  could be getting it wrong, so we'll see.
9     A.    Okay.
10     Q.    Now, do you see here that you say
11  that "the taxable income growth assumptions appear
12  to be reasonably conservative."
13           Do you see that?
14     A.    Uh-huh.
15     Q.    And this is your opinion with respect
16  to the assump -- assumed year-over-year taxable
17  income growth I just identified, correct?
18     A.    Yes.
19     Q.    Okay.  Now, is that opinion based on
20  anything other than the recent uptick in taxable
21  income in 2011 and 2013?
22     A.    The -- I can answer this more easily
23  if we look at 42 -- Page 42 where you see the
24  year-over-year projections for each of these
25  categories.

- MARTI KOPACZ - VOLUME 1-

1
2     Q.    Uh-huh.
3     A.    Okay?  And the average are, in fact,
4  the numbers that you recited in the beginning of
5  this section --
6     Q.    Right.
7     A.    -- 0.85, but it shows, if you will,
8  a -- for each of the types of income tax,
9  resident, nonresident and corporation, it makes
10  individual assumptions for each year.
11     Q.    Correct.
12     A.    Okay?  So there's -- there's a lot
13  that goes into that.
14     Q.    Okay.
15     A.    Okay?  To get to that average.
16     Q.    But in terms of historical data that
17  you used to judge reasonableness --
18     A.    Right.
19     Q.    -- did you rely on any historical
20  data of taxable income other than fiscal years
21  2011 to '13?
22     A.    Did we -- I'm -- I'm pretty confident
23  that we looked at a much longer time frame on
24  taxable income revenues.
25     Q.    Historical?

- MARTI KOPACZ - VOLUME 1-

1
2     A.    Historical.
3     Q.    You believe that you did?
4     A.    Because if there was a down and
5  there's then beginning to tick up now.
6     Q.    Okay.  So do you know what the
7  ten-year historical taxable income was in the
8  City?
9     A.    Not off the top of my head.
10     Q.    Now, what you present here is that
11  residents' taxable income growth averaged
12  3.4 percent for that three-year period, correct?
13     A.    Right, right.
14     Q.    And that is -- that's more than
15  quadruple the assumed average, right?
16     A.    It is the estimate for fiscal '14/'15
17  is about half of that rate.  Okay?
18     Q.    Right.  So --
19     A.    But mathematically, the ten-year
20  average, right, is, what, a third of what it's
21  been the last couple of years or more?
22     Q.    Does it make sense to you that the
23  City's residents' taxable income growth tails off
24  substantially after the first two years?
25     A.    It does in the sense that I think

- MARTI KOPACZ - VOLUME 1-

1  the -- the assumption is based on the recovery in
2  income from the recession in '08 and '09, and even
3  before that, the -- the deterioration in the
4  economy in Southeast Michigan as a result of the
5  automotive thing.  So there's a period now where
6  incomes are coming back up and -- but to assume
7  that that trajectory continues for ten years would
8  be an aggressive assumption.
9      Q.    So, is it that 2011, 2012 and 2013,
10 because they come on the heels of the recession,
11 are not representative --
12     A.    As a percentage.
13     Q.    -- years when it comes to projecting
14 future income growth?
15     A.    That would be -- I believe that's the
16 assumptions that Ernst & Young made in this, and I
17 would conclude that it was -- that's a reasonable
18 assumption to make, that you're not going to
19 continue that high rate of increases ad infinitum.
20     Q.    Take -- sorry.  Take a look at fiscal
21 year 2016 for residents.  The projected taxable
22 income growth is .46 percent, right?
23     A.    Correct.
24     Q.    That's about one-ninth of the

- MARTI KOPACZ - VOLUME 1-

1  three-year trailing average, correct?
2      A.    I don't know what the -- the -- I'd
3  have to do that math, but it's a half percent
4  versus 3 1/2, right?
5      Q.    Right.  What's the basis for your
6  conclusion that that's a reasonable assumption for
7  fiscal year 2016?
8      A.    As -- as I said, I think it is --
9  it's appropriate, it's reasonable.  It's
10 reasonably conservative to make the assumption
11 that at some point the percentage of growth will
12 begin to flatten out in terms of income growth.
13     Q.    Understood that that's your general
14 opinion, but how do you specifically arrive at
15 .46 percent?
16     A.    I did not.
17     Q.    I understand.
18     A.    This is -- right.  This is what -- I
19 looked at this and said, you know, does that look
20 reasonable in the context of everything we know,
21 and -- and I concluded that I am not -- that that
22 assumption is reasonable in the context of trying
23 to project income tax over the next ten years for
24 the City.

- MARTI KOPACZ - VOLUME 1-

1      Q.    So let's break it down.
2          As to how Ernst & Young got .46
3  percent, you don't know, correct?
4      A.    I -- I don't know specifically,
5  correct.
6      Q.    But in evaluating whether,
7  irrespective of how they got it, whether that
8  number was reasonable, you came to the conclusion
9  that it was?
10     A.    I did.
11     Q.    What's the basis for that conclusion?
12     A.    The basis for that conclusion is that
13 the City has been increasing income tax over the
14 last few years.
15     Q.    Increasing income tax?
16     A.    Municipal income taxes have been
17 growing.
18     Q.    The revenues?
19     A.    The revenues have been growing.
20     Q.    Not the rate?
21     A.    Not the rate.  The rate stayed the
22 same.
23     Q.    Got it.  Sorry to interrupt.
24     A.    Okay?  They have been growing --

- MARTI KOPACZ - VOLUME 1-

1      Q.    Okay.
2      A.    -- right?  And I would expect that
3  they would continue to grow, but probably not as
4  quickly as they have in the recent past giving --
5  given that the City is coming off of a recession
6  and a prior significant decline in its major
7  industry.
8      Q.    Why not?
9      A.    Because I think this is a prudent
10 assumption that doesn't -- that it -- I mean,
11 again, you could say it could grow by 10 percent,
12 right?  You could get really bullish and say it
13 could grow at 10 percent, but is that going to be
14 reasonable?  You don't want to -- I wouldn't want
15 to have to make a commitment to pay people based
16 on an aggressive assumption.
17     Q.    What is the typical income recovery
18 period after a recession?
19     A.    I don't know.
20     Q.    What was the income recovery profile
21 after the Great Depression?
22     A.    I don't know.
23     Q.    Do you agree that the Great -- that
24 the recession we just went through is often called

60 (Pages 237 to 240)

- MARTI KOPACZ - VOLUME 1-
2 the Great Recession?
3     A.    The Great Recession, right.  Yes.
4     Q.    Yes?  And that's sort of an homage to
5 the fact that it was -- it was so serious, right?
6 It was almost like the Great Depression, right?
7     A.    I don't know where -- I don't know
8 where it comes from, but yes, it's been long.
9     Q.    So how -- how -- how can we know that
10 taxable incomes as an economic matter shouldn't be
11 expected to grow at the 3.4 percent rate for a
12 decade?
13    A.    We don't.
14    Q.    Okay.  So how do we test your finding
15 that .46 percent is reasonable?
16    A.    It's not unreasonable.
17    Q.    How do we test that?
18    A.    I don't know that we do.
19    Q.    Do you know of a way that we could
20 test that opinion?
21    A.    I don't know that we can.
22    Q.    Do you see that taxable income growth
23 for nonresidents is 3.5 percent, correct?
24    A.    3.5 -- yes, 3.4 versus -- yes, 3.5.
25    Q.    Is it true that the -- the taxable

- MARTI KOPACZ - VOLUME 1-
2 income growth is fairly consistent between
3 residents and nonresidents in the City in your
4 experience?
5     A.    It has been.  Uh-huh.
6     Q.    It has been?
7     A.    It has been.
8     Q.    And yet, in the presentation,
9 wouldn't you agree that the forecast for City
10 residents year-over-year income growth is more
11 conservative than the historical evidence suggests
12 in terms of disparity from nonresidents?
13          Let me put it to you another way.
14    A.    Yes, please.
15    Q.    Do you see that in the three prior
16 years taxable income growth for residents versus
17 nonresidents was something like 97 percent of what
18 nonresidents saw?
19    A.    Can you tell me where you're getting
20 the data --
21    Q.    Whatever 3.4 is over 3.5?
22    A.    -- where are you getting the data?
23    Q.    So if you put 3.4 over 3.5, and think
24 of 135th, okay, being about 3 percent?
25    A.    Uh-huh.

- MARTI KOPACZ - VOLUME 1-
2     Q.    Nonresident -- or I should say
3 resident taxable income growth over the prior
4 three years was about --
5     A.    Has been a little bit less.
6     Q.    -- 97 percent of nonresident growth,
7 right?
8     A.    Well, I think you're -- I think you
9 are trying to be very precise with a number that
10 is an average of a lot of other -- of a variety of
11 numbers.  So, but yes, if you want to take 3.4
12 over 3.5 it will be --
13    Q.    About 97 percent, right?
14    A.    If that's the math, yes.
15    Q.    And then -- but when you look at
16 .85 percent for City residents in the forecast on
17 average over the next ten years, and you compare
18 it to 1.18 percent, do you see that that's more on
19 the order of three-quarters?
20    A.    But that doesn't -- I mean, again,
21 that doesn't concern me.  I'm looking at '14, '15,
22 '16, I'm looking at that nonresidents, working in
23 the City of Detroit, okay, versus City residents
24 in the City of Detroit, I would expect
25 nonresidents' income to grow faster than

- MARTI KOPACZ - VOLUME 1-
2 residents --
3     Q.    Why?
4     A.    -- based on this general economic --
5 you've got so many more residents at the poverty
6 level in the City versus the suburbs.
7     Q.    Why didn't it do that in the prior
8 three years?
9     A.    Could be as a result of number of
10 people working.
11    Q.    How would the number of people
12 working impact the average growth of the income of
13 people that were working?
14    A.    No, no, no.  The -- the --
15    Q.    Let me -- let me ask it again.
16          So, you would agree that in the prior
17 three years, 2011, 2012, 2013, there was not a
18 significant differential between the
19 year-over-year income growth of residents versus
20 nonresidents?
21    A.    I would agree with that, yes.
22    Q.    In the projections, however, there is
23 a material difference that's presented.
24    A.    I'm not sure I would agree with you
25 that there's a material difference.  There is a

61 (Pages 241 to 244)

- MARTI KOPACZ - VOLUME 1-

1    - MARTI KOPACZ - VOLUME 1-
2  difference, but I'm not sure I would say it's
3  material.
4      Q.    Okay.  What is the basis for the
5  distinction between resident and nonresident
6  percentage year-over-year taxable income growth?
7      A.    What is the distinction.
8      Q.    The basis for the distinction.
9      A.    It has -- the difference is around
10 wage growth versus employment growth.  Okay?  And
11 there are each of those estimates Ernst & Young
12 made independently.  Okay?  And so there is a --
13 we have to look at each of the categories, and
14 there's some more charts back here.
15     Q.    But I mean on wage growth, I'm saying
16 this is an assumption that you said is reasonable.
17 Nonresidents' year-over-year taxable income growth
18 will grow on average 1.18 percent from fiscal year
19 2014 to '23, but resident growth will only be
20 .85 percent.
21        You've said that's a reasonable
22 assumption, correct?
23     A.    In totality, I believe all these
24 assumptions are reasonable.
25     Q.    Understood.  What's the basis for

1    - MARTI KOPACZ - VOLUME 1-
2  this one?
3      A.    The --
4      Q.    This differential.
5      A.    I feel like we're going in circles.
6  The basis for the assumptions?
7      Q.    I under -- so let me -- let me --
8      A.    Different assumptions that underlie
9  wage growth and employment growth --
10     Q.    Understood.
11     A.    -- For each of these distinct group
12 of taxpayers.
13     Q.    Understood.
14     A.    Right.
15     Q.    What is the basis for the distinction
16 between resident and nonresident income growth in
17 the forecast?
18     A.    Okay.  Different assumptions of how
19 wages grow for residents versus nonresidents and
20 differences in assumptions between income growth
21 for residents -- I mean employment growth for
22 residents and employment growth for nonresidents.
23     Q.    Okay.  So put employment growth to
24 the one side.  I'm just talking about income
25 growth.  I understand there are different

1    - MARTI KOPACZ - VOLUME 1-
2  assumptions.
3      A.    You have to have wage and employees
4  to make income.
5      Q.    Understood.  We're talking about the
6  residents' income, right?
7      A.    You want -- okay, residents.
8      Q.    Right.  I'm talking about resident
9  versus nonresident income growth on Page 41.
10     A.    Right.
11     Q.    Just so we're communicating, I'm
12 talking about .85 percent versus 1.18 percent.
13     A.    Right.
14     Q.    What's the basis for the distinction?
15     A.    The basis for the distinction is for
16 each of those, whether you're looking at residents
17 or nonresidents, okay, there are different
18 assumptions for wage growth and employment growth
19 in each of those categories of taxpayers, and it
20 is an aggregate of, in essence, four separate
21 assumptions that are blended together and compared
22 so that the math is different.
23     Q.    Right.  But with respect to the
24 different assumptions that underlie resident
25 versus nonresident income growth, what is the

1    - MARTI KOPACZ - VOLUME 1-
2  basis for them?
3      A.    Mr. Hackney, I am sorry, but I can't
4  answer it any differently than what I've answered.
5      Q.    So, let me first say that employment
6  growth is a separate assumption that's addressed
7  on Page 43 and that I'm holding constant.  I'm
8  just trying to understand --
9      A.    No.
10     Q.    -- what the basis for the --
11     A.    You can't do that.
12     Q.    Why not?
13     A.    Because to get to income growth,
14 right, you have to use both employment growth and
15 wage growth.
16     Q.    Why?
17     A.    Why?  Let me try to -- let me try to
18 construct a model for you -- for you and I.  Okay?
19 I'm trying to think -- there are, to get to income
20 tax you have two components.
21     Q.    I totally agree to get to income
22 tax --
23     A.    That's what we just talked about.
24     Q.    No.  We were talking about income
25 growth.

1        - MARTI KOPACZ - VOLUME 1-
2        A.    This is tax -- this is municipal
3   income tax.  Okay?
4              MR. KANE:  Go ahead.  Finish your
5        answer.
6   BY MR. HACKNEY:
7        Q.    Okay.  I understand -- okay.  Let me
8   take a step back.
9              Are you saying that the .85 percent
10  versus the 1.18 percent are findings of two
11  different sets of assumptions that impact taxable
12  income growth; one of those assumptions being wage
13  growth and the other assumption being employment
14  growth?
15       A.    Yes.
16       Q.    Okay.  In order to discuss this
17  differential then, are you saying that you have to
18  drop down to the level of wage growth --
19       A.    Yes.
20       Q.    -- and employment growth --
21       A.    Yes.
22       Q.    -- and talk about those things?
23       A.    Yes.
24       Q.    Okay.  Okay.  Understood.  That's
25  helpful to me.  One last question though.

1        - MARTI KOPACZ - VOLUME 1-
2              The historical taxable income growth
3   of 3 -- 3.4 percent, are those inflation adjusted
4   numbers or are they nominal dollars?
5        A.    I would say they are nominal dollars.
6   I mean, they're -- they're not -- they're not
7   adjusted -- they're -- they're actuals.
8        Q.    Do you know where that number comes
9   from?
10       A.    Do I know as I sit here today?  No.
11       Q.    Okay.  Do you know whether the
12  Michigan State Department of Treasury presents
13  income growth numbers in inflation adjusted or
14  nominal dollars?
15       A.    I don't recall.
16       Q.    Okay.  Let's drop down, like you
17  said, and talk about wage growth then.
18       A.    Okay.
19       Q.    Okay?  Do you see that average wage
20  growth on Page 42 in the ten-year plan without
21  RRIs.  Do you see that section?
22       A.    Uh-huh.  Yes.
23       Q.    Do you see that the ten-year plan
24  estimates that for both City residents and
25  nonresidents average wage growth of 1.25 percent

1        - MARTI KOPACZ - VOLUME 1-
2   for fiscal year 2014 through fiscal year 2023?
3        A.    Yes.
4        Q.    As far as I can tell, in your report,
5   you do not present a comparable historical number
6   for that.
7        A.    I don't.
8        Q.    Are you aware of one?
9        A.    Am I aware of one?  No.
10       Q.    Okay.
11       A.    Not that I recall.
12       Q.    Do you know what the basis for this
13  1.25 percent assumption is?
14       A.    No.
15       Q.    Okay.  So let's get back to kind of
16  our two step.
17             Somebody at Ernst & Young decided to
18  use 1.25 percent, correct?
19       A.    Correct.
20       Q.    You don't know why they decided that,
21  right?
22       A.    Not as I sit here today, no.
23       Q.    Okay.  Now, you do know that you have
24  found that this estimate appears reasonable,
25  correct?

1        - MARTI KOPACZ - VOLUME 1-
2        A.    Correct.
3        Q.    And let me -- let me quibble were you
4   a little bit.
5              What's the difference between when
6   something is reasonable and when something appears
7   reasonable?  Is there a difference in your
8   opinion?
9        A.    I would say is reasonable you can
10  only make after the -- after event, right?  It
11  appears reasonable.
12       Q.    Okay.
13       A.    Looking at it prospectively.
14       Q.    So what was your basis for -- your
15  conclusion that 1.25 percent average wage growth
16  between fiscal year 2014 and 2023 appears to be a
17  reasonable assumption?
18       A.    The 1.25 over a ten-year period,
19  where you had historically both a decrease in
20  taxable income and an increase in taxable income
21  appears to me to be a reasonable, long-term
22  projection of the overall average increase.
23       Q.    Are you aware of any way to test that
24  conclusion?
25       A.    To test that conclusion?

- MARTI KOPACZ - VOLUME 1-

1
2     Q.    To test the reasonableness of your
3  assumption?
4     A.    I don't know how you would test the
5  assumption until after it happens.
6     Q.    Okay.  But if the -- if the Court
7  wants to test your finding that this is a
8  reasonable assumption, you're not aware of a way
9  it can test it, correct?
10    A.    No, I am not.
11    Q.    Okay.  So what is your basis, though,
12 for finding that 1.25 percent is a good average?
13    A.    I looked at all of the information
14 that was available, okay, about all of these
15 topics, all of these assumptions, both the revenue
16 side and the expense side.  I looked at the recent
17 tax history.  I talked to the people who made the
18 assumptions, asked them questions about how they
19 came up with this assumption or that assumption or
20 what they did and, you know, how much if you
21 changed this, how much would that change.  Okay?
22 And concluded that, in totality, the estimates
23 contained in the projections provide a reasonable
24 basis for forecasting what the City is going to do
25 from an economic perspective during the life of

- MARTI KOPACZ - VOLUME 1-

1
2  this -- these projections.
3     Q.    Understood.
4     A.    And I didn't -- you know, again --
5     Q.    You didn't -- did you not consider
6  whether any individual assumption was reasonable
7  standing by itself?  You only considered them in
8  the aggregate?
9     A.    I looked at all of the individual
10 assumptions.
11    Q.    You did?
12    A.    I did.  Okay?
13    Q.    Okay.  So let's talk about this one.
14    A.    Right.
15    Q.    What's your basis for your opinion
16 that 1.25 percent appears reasonable?
17    A.    This -- it is reasonable because it
18 is not either too low or too high when you look at
19 all the surrounding data points.
20    Q.    What are those data points?
21    A.    It is the prior experience in terms
22 of what's been collected over time, all that,
23 right?  It's looking at information that comes
24 from the state.
25    Q.    Okay.

- MARTI KOPACZ - VOLUME 1-

1
2     A.    I know we looked at some federal
3  estimates, right?
4     Q.    So what was the prior experience with
5  income with average wage growth?
6     A.    I would have to go back and look at
7  the historical information that we looked at at
8  the time to be able to answer that today because I
9  don't recall.
10    Q.    But do you have like workpapers that
11 show that?
12    A.    There would be documents that we
13 looked at that showed that.  I'm sure.
14    Q.    Okay.  And they'll be -- they'll be
15 somewhere on Exhibit 2?
16    A.    Tell be somewhere on Exhibit 2 or
17 they'll be somewhere in the -- in the data room.
18    Q.    Okay.  And what did they show?  You
19 can't remember the specifics, but what time period
20 did they show?
21    A.    I can't remember.  I remember that
22 income taxes went down and income taxes have
23 started to grow back.
24    Q.    Okay.  Was it aggregate income tax
25 data that you reviewed?

- MARTI KOPACZ - VOLUME 1-

1
2     A.    I don't recall.
3     Q.    Do you remember when we were looking
4  at taxable income growth you had some historical
5  comparisons that you showed here in your text,
6  right?
7     A.    That's correct.
8     Q.    But here you didn't present any,
9  correct, in the body of your report?
10    A.    There are other data points shown on
11 Page 47.
12    Q.    Aren't those forecasted data points?
13    A.    They are forecasted data points.
14    Q.    Okay.  Did you rely on any
15 historical -- so is -- are these the data points
16 that you relied upon these forecasts?
17    A.    These are forecasts made by other
18 forecasting entities that we looked at to analyze
19 and assess the forecasts for wage growth and on
20 Page 48 for employment growth that the City used.
21    Q.    Okay.  So, for example, in the
22 ten-year without reinvestment scenario, do you see
23 that box on Page 47?
24    A.    Yes.
25    Q.    First of all, was your basis for

1      - MARTI KOPACZ - VOLUME 1-
2  analyzing this assumption -- and by "this
3  assumption," I mean the 1.25 percent assumption.
4      A.    Right.  Without reinvestment.
5      Q.    Was it the -- was it these forecasted
6  data points from other entities?
7      A.    I'm sorry.  Repeat that question,
8  please.
9      Q.    Let me turn it around.
10     A.    Yes.
11     Q.    Did you rely on any historical
12 information relating to wage growth in reaching
13 your opinion that 1.25 percent was reasonable?
14     A.    I consider -- I am sure that we
15 considered historical information in looking at
16 the totality of these assumptions, okay?
17     Q.    So it's part of the basis for your
18 opinion that it's reasonable is the historical
19 data relating to wage growth for residents and
20 nonresidents, correct?
21     A.    There is -- there is some relevance
22 to historical data relative to these current
23 estimates, okay?
24          The -- without reinvestment
25 assumptions, okay, are not particularly meaningful

1      - MARTI KOPACZ - VOLUME 1-
2  to me because I believe the City is going to make
3  reinvestment decisions, okay?
4          So, I mean we -- we analyzed this or
5  we laid out in our report the way the City had
6  laid it out, okay?  As a practical matter, the --
7  what I think is relevant is the ten-year plan with
8  the reinvestment.
9      Q.    Okay.  So is it fair to say that you
10 not focus as hard on the ten-year plan without
11 reinvestment as you did the ten-year plan with
12 reinvestment?
13     A.    That is correct.
14     Q.    Okay.  Do you know what?  Let's talk
15 about -- well, let's just first note that the --
16 do you -- I'm sorry if I reasked this.  I don't
17 mean to.
18          The -- do you see that on Page 47 you
19 produced comparable metrics from the Michigan
20 Department of Treasury, the Michigan Senate Fiscal
21 Agency and the CBO, which means the Congressional
22 Budget Office?
23     A.    The Congressional Budget Office,
24 right.
25     Q.    Do you know whether their metrics are

1      - MARTI KOPACZ - VOLUME 1-
2  real or nominal -- are inflation adjusted or
3  nominal dollars?
4      A.    I don't.
5      Q.    If they're inflation adjusted, what
6  is the relevance for them as a comparable?
7      A.    I don't know without knowing what the
8  inflation adjustment is.
9      Q.    Okay.  So you would have to change
10 these numbers some way.  Would you change them up
11 or down?
12          MR. KANE:  What numbers?
13          THE WITNESS:  What numbers?
14 BY MR. HACKNEY:
15     Q.    The -- to the extent anything -- let
16 me reask that.
17          If any of these numbers from the
18 Michigan Department of Treasury, the Michigan
19 Senate Fiscal Agency or the CBO are --
20     A.    Have inflation in them?
21     Q.    -- are inflation adjusted, what would
22 you have to do to them to make an apple to apples
23 comparison to the nominal dollars?
24     A.    I'd have to look -- I'd have to look
25 at what the inflation adjustment is.

1      - MARTI KOPACZ - VOLUME 1-
2      Q.    Okay.  And did you do that?
3      A.    I did not.  I -- I don't think I did.
4  I mean I don't think my team did.  I don't have
5  any recollection of it as I sit here today.
6      Q.    Remember when we were talking about
7  whether you'd have to add inflation or subtract
8  it?
9      A.    Uh-huh.
10     Q.    I could be wrong, but my
11 understanding of CBO real wage growth -- do you
12 see that?
13     A.    Uh-huh.
14     Q.    -- means that 2.47 percent is after
15 taking into account inflation.  Do you disagree
16 with statement?
17     A.    So it would be higher than the
18 nominal rate, right?
19     Q.    That's right.  That was -- my
20 understanding was if you wanted to know what the
21 CBO's nominal dollar wage growth estimate was.
22     A.    You would have to remove inflation.
23     Q.    No, you'd have to add it.
24     A.    You'd have to add it.
25     Q.    That's my understanding, but don't

65 (Pages 257 to 260)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 66 of 146

- MARTI KOPACZ - VOLUME 1-

1  - MARTI KOPACZ - VOLUME 1-
2  let me -- I could really be wrong. I talked to my
3  economist about this, but I'm also an idiot so I
4  could have gotten it wrong.
5      MR. STEWART: Objection.
6      MR. HACKNEY: What's that?
7      MR. STEWART: I don't think -- I
8  don't think you're an idiot.
9      MR. HACKNEY: Mr. Stewart's looking
10  out for me.
11  BY MR. HACKNEY:
12     Q.    So my understanding is that if you
13  want to know actual dollars -- if you want to know
14  what the CBO thinks about actual dollars, my
15  understanding, tell me if you disagree, is that
16  you have to take their real wage growth percentage
17  and add to it inflation assumptions so that you --
18     A.    Yes.
19     Q.    -- can get an actual to actual; is
20  that correct?
21     A.    Yes.
22     Q.    If inflation were 2 percent in the
23  CBO hypothetical, do you agree that the CBO's
24  actual wage growth in nominal dollars would be
25  4.47 percent?

1  - MARTI KOPACZ - VOLUME 1-
2      A.    Yes.
3      Q.    Okay. But I think we've established
4  you don't know whether these numbers from the
5  state and the Feds are inflation adjusted or not?
6      A.    I don't.
7      Q.    Okay. Would you -- if the CBO number
8  actual wage growth number was 4.47 percent, would
9  you still consider the 2.16 percent ten-year plan
10  with reinvestment assumption to be reasonable?
11     A.    I don't know. I'd really have to
12  look at -- I'd really have to look at the CBO
13  estimate in detail.
14     Q.    Okay. I'll stay focused on the parts
15  of this that relate to ten-year plan with RRIs.
16  Okay?
17     A.    Uh-huh.
18     Q.    Take a look at Page 45 and 46. Do
19  you see that the assumption for City resident and
20  nonresident wage growth on an average basis over
21  the time period presented is 2.16 percent?
22     A.    I do.
23     Q.    But do you see that for corporations
24  it's 2.65 percent?
25     MR. STEWART: You mean 3.65?

1  - MARTI KOPACZ - VOLUME 1-
2      THE WITNESS: No. It's 2.65.
3  BY MR. HACKNEY:
4      Q.    You do see that it's 2.65?
5      A.    I do.
6      Q.    Okay. Do you see that the forecast
7  assumptions for corporation -- corporation wage
8  growth, you know, whatever you want to call it.
9      A.    Yeah. Income growth, yeah.
10     Q.    It's equivalent to the Michigan
11  Senate Fiscal Agency's projection, correct?
12     A.    Well --
13     Q.    That's what you say. The wage growth
14  forecast for corporations is 2.65 percent or
15  equivalent to the Michigan Senate Fiscal Agency
16  assumption, correct?
17     A.    That's without -- before -- where are
18  we?
19     MR. KANE: It's okay if I tell her
20  what page you're on?
21  BY MR. HACKNEY:
22     Q.    Absolutely. I don't mean to turn you
23  around, 46.
24     A.    What page are you on?
25     MR. KANE: You're on 46?

1  - MARTI KOPACZ - VOLUME 1-
2  BY MR. HACKNEY:
3      Q.    Yeah.
4      A.    You're on 46? Okay. Thank you.
5      Q.    That's okay.
6      A.    I was on the wrong page.
7      Q.    A million numbers in here?
8      A.    Right. The wage growth forecast for
9  corporations is 2.65 or equivalent to the Michigan
10  State Fiscal Agency assumption.
11     Q.    Right. So you agree that the
12  forecast -- the City forecasters' assumption is
13  identical to the Michigan Senate Fiscal Agency's
14  assumption about corporation wage growth, right?
15     A.    Yes.
16     Q.    But the City forecasters' assumptions
17  regarding average wage growth for residents and
18  nonresidents is substantially below the Michigan
19  Senate Fiscal Agency's assumption; isn't that
20  correct?
21     A.    I am not seeing -- 2.16 is less than
22  2.65.
23     Q.    That's for corporations. Do you know
24  what the Michigan Senate Fiscal Agency's
25  assumptions for residents in the City of Detroit

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-

1     - MARTI KOPACZ - VOLUME 1-
2  were?
3     A.   I am not seeing that here.
4     Q.   Do you know separate and apart from
5  the presentation here?
6     A.   I don't.
7     Q.   Let's go down to employ -- sorry.
8  Let's go down to Employment Growth.  Do you see
9  that the number of city residents that are
10 employed is forecasted to increase .15 percent?
11    A.   Can you tell me where we are?
12    Q.   Yes.  It's on Page 46 right down
13 below "Employment Growth with RRIs.  It's in the
14 prose section, the number of city residents
15 employees forecasted to increase .15 percent.  Do
16 you see that?
17    A.   Over a ten-year period, yeah.
18    Q.   Yes.  For the fiscal year period.
19         While the nonresidents' average
20 annual employment is anticipated to increase
21 .21 percent.  Do you see that?
22    A.   Yes.
23    Q.   Now, in -- this is one of those
24 sections in your report where you are just
25 narrating what the assumptions are, correct?

1     - MARTI KOPACZ - VOLUME 1-
2     A.   That is correct.
3     Q.   You did not make a finding in your
4  report that these two assumptions were reasonable
5  specifically, correct?
6     A.   Correct.
7     Q.   Do you -- did you make a specific
8  finding that these two assumptions were
9  reasonable?
10    A.   I did not.
11    Q.   Is it -- am I correct in reading your
12 report that if there is a section that
13 describes -- like this one, that describes what
14 the City's assumptions are, but does not include
15 your specific seal of approval as to finding that
16 the specific assumption being discussed, that I
17 should infer that you did not make a specific
18 finding about that assumption?
19    A.   I did not make a specific finding
20 about 2.16 or any of that sort of thing.  What I
21 did is, as I said before, I looked at all the
22 information that was available to us, historical,
23 projections, talked with people who did this,
24 looked at other people who make projections about
25 these things.  I did the sensitivity analysis that

1     - MARTI KOPACZ - VOLUME 1-
2  said what if they're off by a percentage point one
3  way or another, what does that do?  Okay?  And in
4  totality of looking at all of that stuff, I
5  concluded that this is a reasonable assumption
6  for, in this case, municipal income tax.
7     Q.   Well, wait.  I would rephrase that
8  and see if you agree with how I rephrase it.
9         You included that in the aggregate
10 all of the assumptions were reasonable, correct?
11    A.   Correct.
12    Q.   You did not make a specific finding
13 or conclusion about whether this assumption on
14 Page 46 regarding employment growth was
15 reasonable, correct?
16    A.   That is correct.  I looked at a
17 what-if scenario, the -- the estimate was off.
18 Now, how -- if -- if that estimate is off, right,
19 by some amount, does that have a -- what kind of
20 an impact does that have on the overall projection
21 for income tax?
22    Q.   Okay.  So speaking to your expertise
23 in terms of what your training and experience
24 renders you capable of doing, you are capable of
25 assessing whether or not a forecasted increase of

1     - MARTI KOPACZ - VOLUME 1-
2  .15 percent in City resident employment is a
3  reasonable assumption, correct?
4     A.   Could I do that?  Absolutely.
5     Q.   Yeah.  You could have done it, but
6  you did not do it.
7     A.   I did not.
8     Q.   Okay.  Is that a reasonable
9  assumption?
10    A.   I believe that that assumption is
11 reasonable in light of the -- the totality of what
12 the income tax and revenue assumptions are.
13    Q.   What is the basis for EY's
14 .15 percent assumption in City resident employment
15 increase?
16    A.   You'd have to ask them.
17    Q.   What is the basis for your conclusion
18 that this assumption --
19    A.   Right.
20    Q.   -- is reasonable?
21    A.   Again, as I said, I did not -- in
22 this case, I looked at this assumption.  It did
23 not appear unreasonable to me.  Okay?  And when I
24 factored in the result of all of these estimates
25 in terms of coming up with the revenue

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 68 of
146

- MARTI KOPACZ - VOLUME 1-

1  assumptions, and I did the sensitivity analysis,
2  the result of what the city is projecting in terms
3  of municipal taxable income and all the other
4  individual revenue items is reasonable.
5
6      Q.   Do you agree that you're not able to
7  give me an opinion regarding the reasonableness of
8  this assumption on a stand-alone basis?
9      A.   That is correct.
10     Q.   Okay.  Take a look at Page 48 where
11 you have another one of your comparable metrics.
12     A.   Uh-huh.
13     Q.   Do you see that?
14     A.   I do.
15     Q.   Do you see that the -- so there are
16 comparable metrics here from the Michigan
17 Department of Treasury and the Michigan Senate
18 Fiscal Agency.  Do you see that?
19     A.   I do.
20     Q.   And do you know whether those metrics
21 are statewide metrics or City of Detroit metrics?
22     A.   My recollection and I -- I was trying
23 to find it in the report, my recollection is that
24 these are statewide estimates.
25     Q.   I see.  So these are -- are

- MARTI KOPACZ - VOLUME 1-

1
2  respective entities estimations of employment
3  growth statewide for the fiscal years denoted,
4  right?  That's your belief?
5      A.   That's my recollection.  It is not
6  the clearest recollection I have.
7      Q.   Okay.  Now, do you see that you did
8  the sensitivity analysis on Page 49?
9      A.   Yes.
10     Q.   Do you remember when you were
11 testifying with Mr. Stewart that you described
12 this as an arithmetical exercise that tells you
13 what every 1 percent change in annual taxable
14 income growth amounts to in terms of dollars?
15     A.   Yes.
16     Q.   You did not do an assessment of the
17 likelihood that taxable income would be 1 percent
18 lower or higher though, correct?
19     A.   That's correct.
20     Q.   Okay.  Did you ever -- I know that
21 you presented multiple sensitivity analyses for
22 different types of revenue and cost in this
23 opinion; isn't that right?
24     A.   Yes.
25     Q.   Did you ever take the sensitivity

- MARTI KOPACZ - VOLUME 1-

1
2  analyses and say, Now I'm going to link them all
3  together and I'm going to assume that taxable
4  income growth is down a percent, property tax is
5  down a percent, gaming revenue is down a percent,
6  and utility users' tax revenue is down a percent
7  and then step back and look to see what impact it
8  had on whether the City can achieve the forecasts?
9      A.   I did not do that analysis.
10     Q.   Okay.  So do you agree that this
11 sensitivity analysis tells you what a 1 percent
12 change is worth when it comes to municipal income
13 tax revenue?
14     A.   Yes.
15     Q.   It doesn't tell you how likely a
16 1 percent deviation is.
17     A.   Correct.
18     Q.   And you did not conduct that
19 analysis, correct?
20     A.   I did not.
21     Q.   Take a look at -- I'm going to move
22 into the state revenue sharing if I could.  Take a
23 look at Page 50.  You give a general introduction
24 into state revenue sharing on Page 49.
25     A.   Right.

- MARTI KOPACZ - VOLUME 1-

1
2      Q.   And you talk about the constitutional
3  revenue sharing function and then the
4  discretionary EVIP portion -- E-V-I-P portion.  Do
5  you remember that?
6      A.   I do.
7      Q.   And then you start with the
8  constitutional portion on Page 50.  Do you see
9  that?
10     A.   I do.
11     Q.   Do you understand that constitutional
12 state revenue sharing in Michigan is driven by a
13 municipality's percentage of the state's total
14 population?
15     A.   I do.
16     Q.   So you understand that forecasting
17 the constitutional portion of state revenue
18 sharing requires you to forecast the population of
19 the municipality, correct?
20     A.   It -- it does.
21     Q.   Now, isn't it true that in every
22 instance in your -- in the City's forecasts, the
23 City made a determination that the presence of the
24 RRIs would have an impact on the forecasts,
25 correct?  So, for example, wage growth without

- MARTI KOPACZ - VOLUME 1-

1   RRIs was lower than with RRIs, correct?
2
3        A.    That's correct.
4        Q.    Okay.  With respect to the population
5   assumptions in the forecasts, is it correct that
6   that ten-year projections assume that there will be
7   a 12.3 percent decline in Detroit's population
8   over the next ten years?
9        A.    That is the SEMCOG estimate and
10  that's what the City used.
11       Q.    So the City relied on SEMCOG,
12  correct?
13       A.    Correct.
14       Q.    Do you -- you did not make a specific
15  finding in this section as to whether that
16  population assumption was a reasonable one.  Do
17  you agree?
18       A.    I accepted that as a given.
19       Q.    Okay.  You accepted it as a given.
20  You did not otherwise test its reasonableness,
21  correct?
22       A.    I did not.
23       Q.    Okay.  Do you know -- have you read
24  SEMCOG's report?
25       A.    I did not personally read it.

- MARTI KOPACZ - VOLUME 1-

1   Someone on my team did.
2
3        Q.    Okay.  Somebody looked at it.  Do you
4   remember if they told you when it was done?
5        A.    I don't recall.
6        Q.    Do you know whether the SEMCOG
7   authors were considering the idea that there might
8   be in excess of a billion dollars pumped into the
9   City of Detroit during the very ten-year period
10  they were studying?
11       A.    I don't know one way or another.
12       Q.    Would you expect that if a city like
13  Detroit puts a billion dollars into itself in the
14  form of restructuring reinvestment that it would
15  have an impact on its population level?
16       A.    That's what everyone is hoping.
17       Q.    Okay.  Do you know whether the City
18  adjusted its population estimates with respect to
19  constitutional revenue sharing to take account of
20  the impact the RRIs might have on its population
21  estimate?
22       A.    The answer is I don't know, and they
23  would also have to estimate the change in
24  population in the state because Detroit gets --
25  it's -- if both the Detroit population and the

- MARTI KOPACZ - VOLUME 1-

1   state population are moving in the same direction,
2
3   it wouldn't necessarily change the percentage of
4   revenue sharing that Detroit gets.  If they're
5   changing in opposite directions, it would have --
6   it could have an effect.
7        Q.    Right.  Right.  Because the ratio
8   wouldn't change in the former instance.
9        A.    Correct.
10       Q.    But if putting a bunch of money into
11  Detroit pulled population from the surrounding
12  municipalities into Detroit without otherwise
13  changing the larger state's population, that could
14  have an impact on Detroit's population as a
15  percentage of state population?
16       A.    That could, yes.
17       Q.    This is not something you thought
18  about?
19       A.    No.  I mean it's not something I
20  attempted to quantify.
21       Q.    Okay.  You didn't study or evaluate
22  the assumptions regarding population?
23       A.    Correct.
24       Q.    Now, take a look at Page 51.  Now
25  you're going into statutory payments.  Okay?

- MARTI KOPACZ - VOLUME 1-

1        A.    Yes.
2
3        Q.    These are the -- this is the EVIP
4   portion of state revenue sharing, right?
5        A.    Yes.
6        Q.    Now, do you see here that the ten
7   year -- you say, "the ten-year projections assume
8   that the City continues to receive 100 percent of
9   its possible state allocation or approximately
10  140 million annually for the entire 2014 to 2023
11  time period," correct?
12       A.    Yes.
13       Q.    Now, you did this make a specific
14  finding as to the reasonableness of this
15  assumption, correct?
16       A.    No.  I relied on the fact that the
17  City has received a hundred percent of its
18  possible EVIP allocation over the recent past
19  years.
20       Q.    Has it?
21       A.    It has.
22       Q.    Over what time period?
23       A.    I'd have to -- I'd have to look at
24  that, but it's been overlooked -- over the years
25  that that EVIP has existed.

69 (Pages 273 to 276)

- MARTI KOPACZ - VOLUME 1-

2    Q.    Okay.  Because that didn't come in
until Governor Snyder?
4    A.    It was a governor Snyder thing.
5    Q.    Okay.
6    A.    Yes.
7    Q.    But did you independently assess
whether on a go-forward basis it's likely that the
City will continue to receive a hundred percent?
10   A.    My assumption is that if the state
believed that Detroit had met the requirements to
receive EVIP previously, given the change in the
administration and all of the RRIs around
accounting and systems, that it is highly likely
that it's going to get its EVIP going forward.
16   Q.    Well, for example, like in
Category 3, Unfunded Actual Liability Plan relates
to the level of your unfunded liabilities and
whether you're doing a good job to reduce them,
right?  That's a component of whether you get
EVIP?
22   A.    It is -- you are to produce a plan.
23   Q.    Okay.  Is it -- let's see if we can
summarize your testimony on this in a way
that's -- that's accurate.

- MARTI KOPACZ - VOLUME 1-

2          Is it fair to say that you basically
made a single assumption that whatever went into
getting EVIP payments that Detroit would be better
at it going forward?
6    A.    Yes.
7    Q.    And it's on the basis of that
assumption that you concluded that Detroit is
likely to receive 100 percent of its EVIP payments
going forward?
11   A.    Correct.
12   Q.    But you did this test the assumption
beyond that level?
14   A.    Correct.
15   Q.    Now, there's another sensitivity
analysis on Page 52.  Do you see that?
17   A.    Yes.
18   Q.    And do you agree that this is an
arithmetical analysis of the impact of a 5 percent
change in the E -- no, in -- in -- yes, it's the
impact of a 5 percent change in the state revenue
sharing numbers on the general fund, right?
23   A.    It's a sensitivity analysis of a
5 percent change in the -- in the -- of fact of a
population change on the statutory revenue

- MARTI KOPACZ - VOLUME 1-

2    sharing.
3    Q.    But the statutory revenue sharing is
the EVIP payments, right?
5    A.    Yes.
6    Q.    And those are independent of
population?
8    A.    It is, but it is -- statutory is an
independent of population and the constitutional
will change in 2021.
11   Q.    Let's break it down.
12        You did two different things in this
sensitivity analysis, right?
14   A.    Yes.
15   Q.    The first thing you did is you said
what's the -- what's the impact of a 5 percent
change downward in population on the
constitutional portion?
19   A.    Yes.
20   Q.    You separately said what's the impact
of just a 5 percent reduction in the statutory
portion?
23   A.    Yes.
24   Q.    And you presented it here in this
box, right?

- MARTI KOPACZ - VOLUME 1-

2    A.    That's correct.
3    Q.    Okay.  Now, you did not take
undertake an assessment of the likelihood that
there would be a 5 percent reduction in the
population in the City, correct?
7    A.    Correct.
8    Q.    And you did not undertake an
assumption of whether or not there would be a
5 percent reduction in statutory payments,
correct?
12   A.    Correct.
13   Q.    So you're not presenting the
likelihood that this will occur; you're presenting
the impact if it does occur?
16   A.    Correct.
17   Q.    And you have not considered the
likelihood that this will occur, correct?
19   A.    That is correct.
20   Q.    But isn't it true that the forecast,
when you talk about a 5 percent reduction are you
talking about -- oh, that's based on the 2010
census figure, correct?
24   A.    Yes.
25   Q.    So you're saying I'm going to

- MARTI KOPACZ - VOLUME 1-

1  evaluate what will happen if there's a 5 percent
2  reduction in the population compared to the 2010
3  census in 2022 as a result of 2020 census?
4     A.   Okay.  If the population declines --
5  how do I say this very precisely?
6     If the -- if Detroit's population
7  percentage of constitutional payments declines as
8  a result of its share of statewide population by 5
9  percent, then the constitutional payments will
10  decrease by the amount shown here.
11     Q.   Oh, I see.  So, when it says on the
12  top of Page 52, "the analysis below estimates the
13  impact of a 5 percent change in the 2020 census
14  forecasted population:  That's not quite right.
15  It means --
16     A.   Yes.
17     Q.   -- if it -- if there's a change that
18  has the net impact of being 5 percent less as a
19  percentage of the state as a whole?
20     A.   Yes.
21     Q.   Okay.  Am I right in the way I've
22  reformulated what you meant?
23     A.   I think you are.  The measurement
24  won't occur until 2021.
25

- MARTI KOPACZ - VOLUME 1-

1     Q.   Okay.
2     A.   And then there will be a new
3  percentage allocated to Detroit for state
4  constitutional revenue sharing for the next ten
5  years.
6     Q.   Okay.
7     A.   Okay?  And that is an assumption that
8  has been made and this sensitivity says what if
9  that's off.
10     Q.   Okay.
11     A.   What if that -- what if that changes
12  by 5 percent?  That's what this says.
13     Q.   So if do you know what's supposed
14  to -- what is projected by SEMCOG or others to
15  happen to the state's population around Detroit,
16  meaning excluding Detroit?
17     A.   I don't recall.
18     Q.   Now, you remember SEMCOG says that
19  Detroit's will go down by 12.3 percent --
20     A.   Right.
21     Q.   -- correct?
22     A.   Correct.
23     Q.   Do you agree that if the rest of the
24  state's population goes up at all -- well, I guess
25

- MARTI KOPACZ - VOLUME 1-

1  that doesn't follow, does it?
2     A.   No.
3     Q.   What -- what percentage as a ratio of
4  Michigan's population does a 12 percent decrease
5  in Detroit's population represent if the rest of
6  Michigan's population stays constant?
7     A.   I don't know.
8     Q.   Okay.  Let's talk about the wagering
9  taxes if we could.
10     A.   Sure.
11     Q.   And by the way, you nailed that
12  percentage right on the nail head there.  It was
13  10.9 percent.  Remember, you said that earlier?
14     A.   Plus one.
15     Q.   Okay.  And then you see here that --
16  yeah, so when you were -- when you were analyzing
17  wagering receipts, you assume that the tax rate
18  would be constant, correct?
19     A.   That's correct.
20     Q.   And so you're -- the focus then was
21  on what are the casino gross receipts against
22  which the rate is applied, right?
23     A.   Yes.
24     Q.   Now, you see that the ten-year
25

- MARTI KOPACZ - VOLUME 1-

1  projections assume two-and-a-half percent
2  year-over-year declines in fiscal year 2014, a one
3  percent decline in 2015, a half a percent increase
4  in fiscal year 2016 and '17, and a one percent
5  increase thereafter through 2023, correct?
6     A.   Yes.
7     Q.   You did not make an independent
8  finding as to that assumption, as to its
9  reasonableness, correct?
10     A.   Correct.
11     Q.   Similarly, with the sensitivity
12  analysis on Page 54, do you agree that that is an
13  arithmetical exercise that's designed as to
14  present what the impact of a one percentage point
15  change in the gross receipts assumption is?
16     A.   Yes.
17     Q.   And what it is is it's about
18  $16.3 million over the ten-year period, right?
19     A.   That's correct.
20     Q.   But you didn't undertake an
21  assumption of the likelihood that that would
22  happen, correct?
23     A.   That's right.
24     Q.   And just to save time, that's true
25

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 72 of
146

- MARTI KOPACZ - VOLUME 1-
1
2     for all the sensitivity analyses that you did,
3     correct?
4         A.    Yes.
5         Q.    You presented the arithmetical
6     equation, but you did not undertake an assessment
7     of the likelihood of the event, correct?
8         A.    That's correct.
9         Q.    Now, did you see -- on Page 55, do
10    you see that there is discussion around sales and
11    charges for services?
12        Do you see that?
13        A.    I do.
14        Q.    You note in the pros that's below the
15    table some changes that will happen around the --
16    the public lighting authority replacing the public
17    lighting department.
18        Do you see that?
19        A.    I do.
20        Q.    That's presented in the fairly
21    dramatic decrease in revenue that the PLD line
22    item observes during that ten-year period, right?
23        A.    Yes.
24        Q.    So that, you're describing why that's
25    happening there, right?

- MARTI KOPACZ - VOLUME 1-
1
2         A.    Yes.
3         Q.    Why that is forecast to happen,
4     right?
5         But with respect to the other
6     numbers, the other revenue categories other than
7     PLD, your narrative says that the balance of these
8     revenue categories are assumed to remain
9     relatively constant over the time period, correct?
10        A.    That's correct.
11        Q.    And you did not make an independent
12    assessment of whether that assumption was a
13    reasonable one, correct?
14        A.    Let's -- the -- the reason I think
15    that this is reasonable is this is the baseline.
16    Okay? There are a variety of changes, if you
17    will, that will occur pursuant to the RRIs in some
18    of these departments that you see in the revenue
19    assumptions with the RRI. And this, you know,
20    this goes to my desire to have a single set of
21    projections built by department for the City.
22        So, you know, an easy example is
23    fire. Right. These are these are ambulances
24    charges and false alarm things. Okay? Because of
25    changes in that department that are envisioned

- MARTI KOPACZ - VOLUME 1-
1
2     with the RRIs and the investment and the
3     reconfiguring of that, you will see revenue
4     enhancements in the fire department but they sit
5     over in the RRI model.
6         Q.    I see. So what you're saying is,
7     separate and apart from the benefits that the RRIs
8     drive on the sales and charges for services front,
9     which is presented separately with them, it is
10    reasonable to assume that sales and charges for
11    services will not otherwise increase.
12        So you're effectively --
13        A.    Yes.
14        Q.    -- saying, I'm going to take the
15    preliminary forecast which keeps them constant --
16        A.    Right.
17        Q.    -- but I'm comfortable with that
18    because I know in the presentation of RRIs, there
19    are revenue enhancements that include sales and
20    charges for services; is that right?
21        A.    It is. And the one --
22        Q.    Okay.
23        A.    -- thing that fundamentally changes
24    in the baseline is the transfer of the lighting,
25    okay, to the -- to the authority.

- MARTI KOPACZ - VOLUME 1-
1
2         Q.    Which we talked about.
3         A.    Right.
4         Q.    Absolutely. Sorry. I meant with
5     that caveat, I apologize.
6         A.    Yes.
7         Q.    Okay. So, the -- if we wanted to
8     test the reasonableness of the City's assumptions
9     regarding increases in sales and charges for
10    services, what we really have to do is get under
11    the hood of the RRIs and their likely impact on
12    sales and charges for services?
13        A.    You really have to combine them on a
14    departmental level basis and then look at them.
15        Q.    Right. We could build off these
16    things if we added them all together --
17        A.    Correct.
18        Q.    -- and then looked at them?
19        A.    Correct.
20        Q.    Now, you didn't make that
21    presentation, correct? In your report?
22        A.    In our report I did not, no.
23        Q.    And the City hasn't made that
24    presentation either, correct?
25        A.    That's correct.

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-

2    Q.    So it's interesting.  So in every
3  other instance, though, where -- where the EY
4  forecasters were forecasting revenue, they
5  considered the impact of the RRIs, right, to the
6  best of your knowledge?
7    A.    Clearly with income tax and property
8  tax.
9    Q.    Oh, right.  Good point.  Good point.
10    A.    They do it both ways.
11    Q.    Yes.  Fair -- fair correction.
12        But is it your understanding that
13  when -- when they were forecasting --
14    A.    Not wagering taxes.
15    Q.    Right.
16    A.    Not wagering taxes and not sales and
17  services tax.  Income, not taxes income.
18    Q.    Yes.  But is it your understanding
19  that the EY forecasters did not consider the
20  impact of restructuring reinvestment initiatives
21  on sales and charges for services?
22    A.    The Bob Kline group didn't do
23  sales -- didn't do the categories we're talking
24  about right now; sales and charges for services.
25    Q.    Okay.

- MARTI KOPACZ - VOLUME 1-

2    A.    That was done by somebody in on
3  Gaurav 's direct team.
4    Q.    Okay.  So, take a look at Page 59.
5  We're going to move on to property values here,
6  okay?
7    A.    Yes.  We did this.
8    Q.    So, yeah, we definitely touched on
9  these.  But I guess I want to confirm that you
10  didn't make any independent findings regarding
11  whether a one percent, 1.7 percent decline in real
12  property values during the period was a reasonable
13  assumption, correct?
14    A.    Correct.
15    Q.    And you didn't make any findings with
16  respect to whether the personal property increased
17  by .9 percent was a reasonable assumption during
18  that period, correct?
19    A.    That's correct.
20    Q.    And it's also correct that you didn't
21  test the assumption of a 4.8 percent renaissance
22  zone increase during that period, correct?
23    A.    That's correct.
24    Q.    We did talk about the nine percent,
25  I'm sorry, we actually skipped forward to this

- MARTI KOPACZ - VOLUME 1-

2  page, didn't we?
3        On the collection rates, do you
4  notice that the City has assumptions regarding
5  different collection rates that bleed from Page 59
6  to 60?
7    A.    I do.
8    Q.    And it's also fair to say that you
9  didn't make independent findings regarding whether
10  their property tax collection assumptions were
11  reasonable, correct?
12    A.    That's correct.
13    Q.    Then, similarly, on the utility users
14  tax on Page 62, do you see that?
15    A.    I do.
16    Q.    The forecast -- the forecasted amount
17  is forecast to be approximately two percent of
18  general fund revenue, correct?
19    A.    Yes.
20    Q.    Fair to say you did not test the
21  assumptions around the specific utility user tax
22  revenue assumptions by the City forecasters,
23  correct?
24    A.    Correct.
25    Q.    So, let me ask you a question about

- MARTI KOPACZ - VOLUME 1-

2  the feasibility of the POA, if there's no exit
3  financing.
4        In your opinion, you assumed that
5  there would be.  Do you remember that?
6    A.    I did.
7    Q.    Let's engage the hypothetical where
8  Mr. Buckfire fails to obtain exit financing.  How
9  does that impact your finding of feasibility?
10    A.    If there is no replacement source of
11  funding?
12    Q.    Yes.
13    A.    Then I would conclude that the plan
14  is not feasible.
15    Q.    Why is that?
16    A.    Because the -- going back to my
17  definition of feasibility, it is both a
18  quantitative and a qualitative assessment.  I
19  think the reinvestment initiatives, the RRIs, are
20  important to the City's ability to deliver
21  municipal services, to pay the commitments in the
22  plan and the City does not have the surplus, the
23  structural surplus in the next couple of years to
24  execute on the RRIs without the exit financing.
25    Q.    What is the basis for your assumption

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 74 of
146

1        - MARTI KOPACZ - VOLUME 1-
2    that there will be exit financing?
3        A.    Based on my discussions with
4    Mr. Buckfire.
5        Q.    What did he tell you?
6        A.    He was highly confident that he was
7    going to complete the exit financing at, you know,
8    reasonable pricing which he's estimated to be six
9    percent.
10       Q.    Is that his estimate of the
11   percentage?
12       A.    That's -- that was his estimate at
13   the point in time when I talked to him which was a
14   couple of weeks ago.
15       Q.    If the City places exit financing at
16   a high interest rate, like a junk level interest
17   rate, but it gets the exit financing, okay, so it
18   gets the money but it's got to pay eight percent,
19   then what happens to your feasibility opinion?
20       A.    The interest rate probably does not
21   affect feasibility simply because interest rates
22   are generally low.  And -- I have to look at it.
23   I'd have to analyze it.
24              But -- but my concern about exit
25   financing is much more binary; either you get it

1        - MARTI KOPACZ - VOLUME 1-
2    or you don't.
3        Q.    You want to get -- if you can get the
4    cash to fund the restructuring and reinvestment
5    initiatives, you're comfortable that it's
6    feasible?
7        A.    I am.
8        Q.    Unless it's a ridiculous interest
9    rate?
10       A.    If it's 15 percent, it might be a
11   problem --
12       Q.    Credit card --
13       A.    Yes.
14       Q.    Yeah.  Let me ask you to turn to
15   Exhibit 3 to your report which details a lot of
16   your communications.
17       A.    Okay.
18       Q.    And I note that I believe in your
19   reliance material -- your -- in Exhibit 2, I don't
20   want to characterize this, I think you talked
21   about Exhibit 2 being all the sources of
22   information that you or someone on your team
23   reviewed in connection with your opinion, correct?
24       A.    Correct.
25       Q.    And I think you listed on there

1        - MARTI KOPACZ - VOLUME 1-
2    communications with City of Detroit personnel,
3    financial advisors, creditors and so forth,
4    correct?
5        A.    Correct.
6        MR. HACKNEY:  I was wondering if I
7    could make a request of counsel to get access
8    to the e-mail communications that are listed
9    on Exhibit 3.  They are ostensibly things
10   that she reviewed and it seems to have
11   indicated they considered at some level or
12   someone did.  And I was thinking it wouldn't
13   be too burdensome because it's a relatively
14   defined time period and it's mainly what she
15   was doing and they're all logged here so...
16       MR. KANE:  Let us consider that and
17   get back to you promptly.  I think the
18   Court's Order was pretty clear about what she
19   was supposed to produce.  So I'm not saying
20   no, but we'll -- we'll talk it over outside
21   the deposition and get back to you.
22       MR. HACKNEY:  Yeah.  So the Court
23   said that -- that she should produce copies
24   of any documents cited in the report or
25   otherwise considered by the witness,

1        - MARTI KOPACZ - VOLUME 1-
2    excluding documents previously produced in
3    discovery and publicly available in
4    professional literature?
5        MR. LERNER:  Which order are you
6    referring to?
7        MR. HACKNEY:  That's the Order
8    appointing Ms. Kopacz.
9        MR. LERNER:  There's a subsequent
10   Order that changes that.
11       MR. HACKNEY:  That changes what she
12   has to produce?
13       MR. LERNER:  Yes.
14       MR. HACKNEY:  But does it take this
15   out?
16       MR. LERNER:  It's confined to what
17   she relied on, not what she considered.
18   BY MR. HACKNEY:
19       Q.    Okay.  Did you rely on these
20   communications in Exhibit 3 in reaching your
21   opinions?
22       A.    I would really have to go through
23   each one of them.
24       Q.    Okay.
25       MR. HACKNEY:  Well, I guess we would

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

```
 1            - MARTI KOPACZ - VOLUME 1-
 2    request that that occur.  Your counsel can
 3    decide for themselves.
 4            I guess my personal view is that the
 5    quickest course would be to produce them all
 6    and I can suss out which are the substantive
 7    once and which are the ones that say, I'll
 8    talk to you at 3:00.  But I leave that for
 9    you all to decide.
10        A.   I will represent to you most e-mail
11    is about --
12    BY MR. HACKNEY:
13        Q.   Scheduling?
14        A.   Scheduling.
15        Q.   Yea?
16        A.   There's very little, if any,
17    substantive dialogue.
18        Q.   That's understood.  I guess my
19    expectation would be that you probably didn't rely
20    on e-mails that say, I'll talk to you at 3:00.
21        A.   No.
22        Q.   But to the extent there is a
23    substantive e-mail in which someone says, Here's
24    some analysis or here's this, that's the type of
25    e-mail you might have been more likely to rely on
```

```
 1            - MARTI KOPACZ - VOLUME 1-
 2    and that's the type of e-mail I would want to see.
 3            Could you take a look at -- I'm
 4    sorry, these aren't numbered so we're going to
 5    have to work together with the dates a little bit.
 6            Take a look on April 23rd, your first
 7    entry for April 23rd.  That was the day after your
 8    appointment; is that right?
 9        A.   Yes.
10        Q.   And do you see that you met with
11    Judge Rosen there?
12            Do you see that?
13        A.   I did.
14        Q.   He's the Chief Judge of the Eastern
15    District of Michigan.  He's also the chief
16    mediator in this case; is that right?
17        A.   That's correct.
18        Q.   Was that an in-person meeting?
19        A.   It was.
20        Q.   Where was it?
21        A.   In his chambers.
22        Q.   Tell me what you discussed with Judge
23    Rosen?
24        A.   That meeting --
25            MR. STEWART:  I want to pose this one
```

```
 1            - MARTI KOPACZ - VOLUME 1-
 2    objection:  Only that I don't know how this
 3    effects testimony with the mediation order.
 4    It's really your call.  I just want to make
 5    sure you --
 6            MR. HACKNEY:  I just can't imagine
 7    that the independent expert who doesn't have
 8    a stake in the case is part of the mediation,
 9    but --
10            MR. STEWART:  I didn't take a
11    position.  I just want to make sure that we
12    didn't back into a problem.
13    BY MR. HACKNEY:
14        Q.   Well, let's -- I mean, you never
15    considered yourself to be part of the mediation,
16    correct?
17        A.   Correct.
18        Q.   You're not a party to the case?
19        A.   I am not.
20        Q.   So -- so, you didn't understand
21    yourself to be having communications incidental to
22    the mediation when you talked with Mr. Rosen,
23    correct?
24        A.   Correct.
25            MR. KANE:  Let me just make a
```

```
 1            - MARTI KOPACZ - VOLUME 1-
 2    statement.
 3            She doesn't know.  She -- counsel has
 4    never evaluated that on her behalf, so to the
 5    extent she asks questions, you ask questions
 6    and she answers them that are subject to some
 7    restriction or confidentiality, we're relying
 8    on all of you to say that's appropriate.
 9            MR. STEWART:  My concern would only
10    be if Judge Rosen told her something that
11    unbeknownst to me, you or her was from the
12    mediation session; so I don't know.  It's --
13    you'll have to question skillfully to avoid
14    it is all.
15            MR. HACKNEY:  I just think if Judge
16    Rosen did, we'd better know.
17            MR. KANE:  Here's what I'm saying,
18    just so the record's clear.  I'm not saying
19    you can't ask her about it.  I'm saying I
20    don't want anyone saying she shouldn't have
21    testified about that for some other reason or
22    order that neither she nor her counsel knows
23    about 'cause it's not within her or our
24    scope.
25            MR. HACKNEY:  Understood.
```

75 (Pages 297 to 300)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 76 of
146

- MARTI KOPACZ - VOLUME 1-
1    - MARTI KOPACZ - VOLUME 1-
2    And let me just respond to that,
3    counsel, by saying, I am familiar with the
4    mediation order and it is my personal
5    expectation that we're going to have a whole
6    separate set of problems if you were exposed
7    to a bunch of communications that we can't
8    examine you on, and I don't think you were,
9    by definition, because I don't think you're
10   part of the mediation.
11       I've asked you questions that
12   indicate that you don't think you were
13   either, and I don't know what more I could do
14   to establish that it's not.
15       So, okay. I just want to let you
16   know I'm not trying to trap you into telling
17   me a bunch of things you ought not to. I
18   gave this some thought and I don't see how
19   you're part of the mediation.
20       THE WITNESS: My directions and my
21   instruction from Judge Rosen, which we
22   subsequently clarified after I was allowed to
23   hire counsel, was that I don't really have
24   any protection in terms of confidentiality or
25   my discussions or any of that sort of thing.

1    - MARTI KOPACZ - VOLUME 1-
2        MR. HACKNEY: Fair enough.
3    BY MR. HACKNEY:
4        Q. So with that helpful colloquy, can
5    you tell me what you discussed with Judge Rosen in
6    this first meeting?
7        A. This meeting was at Judge Rosen's
8    request and he -- we had lunch in his chambers and
9    he welcomed me to Detroit.
10       He welcomed me to the case and he
11   gave me background information on where the case
12   was. He asked questions of me as to what I
13   thought feasibility meant and what I intended to
14   do. He offered to arrange a tour of the City for
15   my team. That's what I recall.
16       Q. How long did you meet with him did
17   you meet with him?
18       A. Probably an hour.
19       Q. Do you remember what specifically --
20       A. Lunch.
21       Q. Oh, it was over lunch?
22       A. It was lunch, he had sandwiches.
23       Q. It was lunch in his office?
24       A. It was lunch in his office.
25       Q. What do you remember he told you

1    - MARTI KOPACZ - VOLUME 1-
2    about the case background?
3        A. I -- you know, I really don't -- he
4    gave me, you know, kind of a background on who all
5    the players were, who the lawyers were, who the
6    parties were, who the mediators were.
7        Q. Do you remember any specific people
8    that he identified? Like do you remember him
9    talking about Syncora?
10       A. No.
11       Q. Do you remember him talking about
12   Mr. Stewart?
13       A. No.
14       Q. Any specific names you can remember,
15   specific creditors?
16       A. I remember it was Eugene Driker,
17   D-R-I-K-E-R. Mr. Driker is a mediator in this
18   case, but I also worked with him many, many years
19   ago on a matter and so we had a conversation about
20   how Gene and Elaine were.
21       Q. Okay. And that was kind of how are
22   they doing personally?
23       A. Yes. And, you know, it was just --
24   it was a common -- it was something we had in
25   common.

1    - MARTI KOPACZ - VOLUME 1-
2        Q. Did you talk about the grand -- it's
3    kind of hard to talk about the Detroit case
4    without talking about the grand bargain.
5        Did you discuss the grand bargain in
6    this meeting?
7        A. That was the first time I think I had
8    heard the term "grand bargain."
9        Q. What did he tell but the grand
10   bargain?
11       A. The grand bargain was -- I remember
12   him telling me I didn't name it the grand bargain.
13   But it was a -- in essence it was a public/private
14   partnership, if you will, between the City and
15   other private parties that would facilitate
16   getting monies to retirees.
17       Q. Do you remember anything else he told
18   you about the grand bargain?
19       A. I don't.
20       Q. Did he tell you that it was his idea?
21       A. I don't think he did.
22       Q. Did he tell that you Gene Driker was
23   involved in the creation of the grand bargain?
24       A. I don't recall.
25       Q. Did he tell you about his efforts --

- MARTI KOPACZ - VOLUME 1-

1
2  whether he had engaged in of efforts to obtain
3  funds from the foundations?
4      A.   I don't recall.
5      Q.   Did he tell you about how the amount
6  of the grand bargain came about?
7      A.   I don't recall.
8      Q.   And then do you see that the very
9  same day you get a call from Eugene, I think it
10 means to say Driker on here?
11     A.   It should say Driker, it's a typo.
12     Q.   Was that a short call, just
13 scheduling the tour?
14     A.   Yes.
15     Q.   What did you talk about with Mr.
16 Driker on that call?  Do you remember?
17     A.   We talked about how long it had been
18 since we had seen each other.  Right?  And that he
19 wanted to arrange a tour for me and my team.  And
20 we talked about when I would have my team in place
21 in Detroit so that we could do that.
22     Q.   Okay.  And was there anything else
23 that you can recall about that call?
24     A.   I don't.
25     Q.   Now, do you see that on April 25th

- MARTI KOPACZ - VOLUME 1-

1
2  you had a call with Arthur O'Reilly of Honigman --
3  you had an e-mail from him?
4      A.   Yes.
5      Q.   You had an e-mail with him?
6      A.   I had an -- I don't know if --
7      Q.   Is that you to him or him to you?
8      A.   Most of these e-mails were outbound
9  from me to these people.
10     Q.   Why did you want to schedule a
11 meeting with the DIA?
12     A.   I was -- I was on my listening tour
13 during those early weeks and I was trying to
14 schedule meetings with everybody that could give
15 me information and all of the various stakeholders
16 in the matter.
17     Q.   How does the DIA figure into the
18 City's feasibility, if at all, though?
19     A.   At this point it does not.  But --
20     Q.   Okay.  Why is that?
21     A.   -- at that point -- because the grand
22 bargain has -- has transferred those assets out of
23 the -- they're not in the plan, so...
24     Q.   Sorry.  Were they ever in the plan?
25     A.   No, they were never in the plan.

- MARTI KOPACZ - VOLUME 1-

1
2      Q.   So, were you just -- I guess I'm
3  trying to understand when you were thinking, I
4  need to talk to the DIA, why were you thinking
5  that you need to talk to the DIA to assess
6  feasibility?
7      A.   I needed to -- I wanted to talk with
8  everybody that could give me information that
9  would help me understand the status of the case,
10 what the plan was about, and anything that might
11 impact on my assessment of feasibility.
12     Q.   Okay.  I guess -- so let me take a
13 step back.
14          Here's a fair point which is, I guess
15 if the funding for the DIA is not going to come
16 in, that could have an impact on feasibility; is
17 that fair?
18     A.   Yes.
19     Q.   And was that one of your concerns?
20     A.   Yes.
21     Q.   And did you have communications with
22 Mr. O'Reilly or others that were aimed at
23 understanding the likelihood of the foundations to
24 make their contributions?
25     A.   Yes.

- MARTI KOPACZ - VOLUME 1-

1
2      Q.   Who did you -- and the general
3  background of why the foundations contributed and
4  the whole nine yards?
5      A.   I -- I met with the executive team
6  from the DIA.  Right?  I met with chairman of the
7  board.  I met with foundations -- I mean, I think
8  they're all detailed in here.
9      Q.   So, like when it came to the
10 executives -- let's start with the foundations.
11          What foundations did you speak to
12 specifically about the grand bargain?
13          MR. KANE:  Can I interject for a
14 minute.  Did you view this as going to her
15 opinion on feasibility or reasonableness of
16 assumptions?
17          And the only reason I'm asking that,
18 and I will, again, defer to parties who know
19 more about the issues and dynamics of the
20 case, is because the Order appointing her
21 also limits what she's supposed to testify
22 about to those two issues.
23          So, again, in my interest, limited to
24 protecting Ms. Kopacz's interest, I don't
25 want her to go outside the bounds of that

```
 1              - MARTI KOPACZ - VOLUME 1-
 2    Order as reflected in Exhibit 2.
 3         MR. HACKNEY:  Well, I guess these are
 4    all communications that the Court ordered her
 5    to log and I'm trying to make sure I
 6    understand all of the content associated with
 7    them so I can evaluate whether it did.
 8         So it's a little bit unknowable
 9    because I can imagine situations where people
10    told her fact X about why a foundation
11    contributed or whether it was good for the
12    money and that has an impact on --
13         MR. KANE:  Hold on --
14         MR. HACKNEY:  -- feasibility in terms
15    of City contributions.
16         MR. KANE:  And I don't object to that
17    and to the extent you're assessing whether it
18    relates to that, I wouldn't object to it.
19    All I'm saying is I'm making you aware of her
20    limits on her testimony here so --
21         MR. HACKNEY:  Yes.
22         MR. KANE:  Okay.
23         MR. HACKNEY:  I mean, I understand
24    people may have told her things like their
25    favorite flavor of ice cream, but -- not to
```

```
 1              - MARTI KOPACZ - VOLUME 1-
 2    be disrespectful, I'm not being --
 3         MR. KANE:  No, I --
 4         MR. HACKNEY:  But I'm saying to pick
 5    something that is clearly unrelated to her
 6    opinion, I am still trying to exhaust her
 7    knowledge on all of these subjects, even if
 8    somebody told you something is mundane, just
 9    because we tend not to decide today what is
10    and is not something that could have impacted
11    you, we just try to understand it all.
12         MR. KANE:  Fair enough.
13         MR. HACKNEY:  I appreciate the
14    interjection, but --
15         MR. STEWART:  Do you want to mark
16    this?  I don't want to get in the middle.
17    I'm just raising the same question.
18         Paragraph -- this is the Judge's
19    order of May 14th.  Maybe there are other
20    orders, you all are closer to it than me.
21    When he talks about what is disclosed,
22    Paragraph 3 of this Order says, "All
23    information that the expert witness relies
24    upon would be subject to disclosure in
25    connection with the expert witness' report,
```

```
 1              - MARTI KOPACZ - VOLUME 1-
 2    deposition and trial testimony."
 3         So, if it's something she relied on,
 4    clearly it's within this paragraph.  But if
 5    it's not something she relied on, I'm
 6    assuming it's beyond the scope of what she
 7    can be examined about.
 8         Maybe I'm wrong --
 9         MR. HACKNEY:  No, no, no.  Because
10    the standards for discovery are reasonably
11    calculated to lead to discovery of admissible
12    evidence.
13         MR. STEWART:  I'm just wondering
14    whether his order doesn't trump that.
15         MR. LERNER:  By the way, this is the
16    order to which I was referring, amends the
17    original order that limits disclosure --
18         MR. HACKNEY:  I mean, guys, this is a
19    discovery deposition.  I mean, I'm asking
20    questions about communications the witness
21    had.  You know, it's -- they're logged in a
22    report.
23         MR. KANE:  And I haven't stopped
24    you --
25         MR. HACKNEY:  I know.
```

```
 1              - MARTI KOPACZ - VOLUME 1-
 2         MR. KANE:  But once we establish what
 3    it was about -- and I'm not even trying to
 4    stop you now.
 5         MR. HACKNEY:  I understand.  I just
 6    note the second sentence here says that she
 7    may not accept any information on the -- with
 8    the promise or representation of
 9    confidentiality.  So it's sort of like don't
10    -- don't mislead people into thinking they
11    can tell you things on the sly and then you
12    won't have to testify.
13         So my personal view it's been
14    transparency across the board for Ms. Kopacz,
15    and I don't what want to have to get the
16    Judge on the phone and spend more time.  I
17    just want to go through these things and
18    understand what she was told.
19         MR. STEWART:  Let me suggest this.
20    You could ask questions for foundational
21    purposes, see if it's something she relied on
22    and then we'll --
23         MR. HACKNEY:  I actually, I don't
24    accept that limitation.
25         MR. STEWART:  Then I was going to say
```

- MARTI KOPACZ - VOLUME 1-
1  - MARTI KOPACZ - VOLUME 1-
2  you can give me a standing objection and I'm
3  not going to interrupt.
4  MR. HACKNEY: Absolutely. This
5  doesn't preclude you from objecting to that
6  on trial. Absolutely.
7  MR. KANE: Steve, I'm going to say
8  one more thing and then just to kind of tie a
9  bow around what I'm saying.
10  Exhibit 2 that we have marked, the
11  earlier Order, Paragraph 3 limits the things
12  she is to, quote, testify about.
13  So now that I've raised that, my view
14  is Ms. Kopacz's interests are addressed and
15  where that line is drawn is for the rest of
16  you with objections or otherwise to address,
17  not for me or her.
18  MR. HACKNEY: I appreciate that. And
19  I acknowledge all admissibility objections
20  are reserved. So maybe we can make that
21  clear and get through the rest of this.
22  'Cause I -- I think that if we work together
23  I can get through today and not carryover for
24  tomorrow, and I know someone sitting across
25  from me who will be glad to see the back of

1  - MARTI KOPACZ - VOLUME 1-
2  me. But when we lose time a little bit, I'm
3  not complaining. But I do want to get
4  through this.
5  BY MR. HACKNEY:
6  Q. You were saying that had you met with
7  the foundations -- certain of the foundations
8  themselves.
9  A. I met with the Kresge Foundation.
10  Q. That's Mr. Rapson?
11  A. That's Rapson. Yes. And Laura
12  Trudeau.
13  Q. What did you talk about with them?
14  A. Lots of things.
15  Q. And I know that you can also discuss
16  Detroit future city with Kresge because they're
17  involved in Detroit future city. Let's separate
18  grand bargain from Detroit future city.
19  What did you talk about on the
20  subject of the grand bargain?
21  A. On the grand bargain we talked about
22  the fund raising for the grand bargain from the
23  foundations and the various private funding
24  sources.
25  Q. What did Mr. Rapson tell you about

1  - MARTI KOPACZ - VOLUME 1-
2  that or Ms. Trudeau?
3  Rapson, R-A-P-S-O-N.
4  A. That he was very encouraged. He was
5  pleased with the earlier responses. He was -- at
6  that point in time he believed that they were
7  going to be able to raise more than the 300- or
8  $350 million that was originally projected for the
9  foundation's contribution.
10  Q. Did he tell you why the Kresge
11  Foundation decided to contribute?
12  A. I don't think so.
13  Q. Did he tell you about any of the
14  communications that he had with the other
15  foundations about what people said in terms of
16  their enthusiasm or whatnot?
17  A. Yes.
18  Q. What did he say?
19  A. I remember him telling -- we talked
20  specifically about the Ford Foundation and the
21  fact that the Ford Foundation many years ago had
22  moved to New York, but was really interested in
23  contributing again to directly into Detroit.
24  We talked about the Carnegie Mellon
25  -- one of the Carnegie Mellon type of foundations

1  - MARTI KOPACZ - VOLUME 1-
2  because of their commitment to art.
3  So it was, it was a broader outreach
4  both in terms of endowments and -- and foundations
5  that were really committed to the preservation of
6  art and those that were committed to the City of
7  Detroit.
8  Q. Did he tell you how it came to pass
9  that the money was directed to the retirees
10  instead of to the City?
11  A. No.
12  Q. Anything else that you can recall
13  discussing with Mr. Rapson?
14  A. We talked -- we had an extensive
15  conversation about future cities and we talked
16  about the level of private funding that Detroit
17  experiences, separate and apart from the things
18  that were particular to the bankruptcy.
19  Q. And private funding is germane to
20  feasibility because it impacts things that happen
21  in the City in terms of its health, correct?
22  A. It's -- it was it was factor that I
23  considered positively in that there's a lot of
24  private funding that has gone in and Mr. Rapson
25  believes will continue to come into the City that

79 (Pages 313 to 316)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 7148-8  Filed 08/27/14  Entered 08/27/14 23:59:24  Page 80 of 146

1          - MARTI KOPACZ - VOLUME 1-
2    kind of supplements what -- what the City spends.
3          So a perfect example of that is when
4    Roger Penske and Dan Gilbert bought police
5    cruisers.  That's unheard of.  The private
6    citizens write checks to governments to do things
7    that governments should do.
8          Q.    So, let me -- with these first two,
9    you get an e-mail that -- you have an e-mail
10   exchange with Mr. O'Reilly.
11         Was it merely to schedule your
12   meeting with the DIA folks?
13         A.    It was.
14         Q.    We can talk about that later when we
15   hit it on this log.  I take it you didn't have any
16   other interaction with Mr. O'Reilly?
17         A.    I don't know Mr. O'Reilly, no.
18         Q.    What did Mr. Levin write to you about
19   the --
20         A.    I actually think that I reached out
21   to Mr. Levin first.  I mean, they're all the same
22   date, so it's kind of hard.
23         Q.    These are you e-mailing people?
24         A.    Yes.  And I think, because I know
25   Mr. Levin, I reached out to him and he said really

1          - MARTI KOPACZ - VOLUME 1-
2    the person you need to talk to is Mr. O'Reilly.
3          Q.    Got it.  Take a look down on April
4    30th.  Do you see that you do a bus tour of the
5    City with Mr. Driker and Jerry Stroop?
6          A.    Yes.
7          Q.    How long did that bus tour go on for?
8          A.    About three hours, three and a half
9    hours.
10         Q.    And do you remember what Mr. Driker
11   described during that bus tour, if anything to
12   you?
13         A.    We -- on that bus tour was my team as
14   out there, there was Mr. Driker and his wife, and
15   Jerry Stroop from Wayne State and the bus we were
16   on was courtesy of the president of Wayne State.
17         And we did Mr. Driker's the good, the
18   bad, and the ugly in Detroit.
19         Q.    Can you remember what was discussed
20   on that bus tour?
21         A.    I mean, we -- we went to Bell Isle --
22         Q.    Mainly pointing out areas saying this
23   is Bell Isle, this is the art institute?
24         A.    We went to Bell Isle.  We went to the
25   art institute.  We did the midtown stuff.  We

1          - MARTI KOPACZ - VOLUME 1-
2    looked at blight.  We looked at the waterfront.
3    We looked at the old Packard building.  We looked
4    at the Michigan train station.
5          Q.    Anything else you can recall from
6    that tour?
7          A.    No, not really.
8          MR. HACKNEY:  We're about near the
9    end of this tape so it might be a good time
10   to take an afternoon restroom break and we
11   can try and push through the rest of this
12   here.
13         THE WITNESS:  Okay.
14         THE VIDEOGRAPHER:  Thank you.  The
15   time now is approximately 4:27 p.m.  We're
16   going off the record.  This is the end of
17   Disk Number 4.
18         (Whereupon, there was a brief recess
19   in the proceedings.)
20         THE VIDEOGRAPHER:  The time now is
21   4:39 p.m.  We're back on the record.  This is
22   the beginning of Disk Number 5.
23   BY MR. HACKNEY:
24         Q.    Ms. Kopacz, welcome back.
25         A.    Thank you.

1          - MARTI KOPACZ - VOLUME 1-
2          Q.    Ma'am, I'd like to save some time
3    because I questioned you fairly extensively about
4    the revenue assumptions and with respect to the
5    cost assumptions, I'm happy to go through each one
6    of them like we did before.  But I was wondering
7    if I could establish something that I thought
8    emerged fairly consistently on the revenue
9    assumption which was, to the extent a description
10   regarding a particular cost assumption doesn't
11   include a specific finding by you regarding the
12   reasonableness of that cost assumption, is it fair
13   for the Court to infer that you did not make a
14   specific finding about that cost assumption and
15   that you treated it merely as part of your
16   aggregate opinion?
17         A.    Generally, I think that is a correct
18   statement.
19         THE VIDEOGRAPHER:  Can you please put
20   your mike on and then maybe repeat your
21   answer.  Thank you.
22         THE WITNESS:  I said generally I
23   believe that is a correct statement.
24   BY MR. HACKNEY:
25         Q.    Okay.  Ma'am, are you aware that --

1      - MARTI KOPACZ - VOLUME 1-
2  you know what the COPs are, the certificates of
3  participation?
4      A.   Generally, yes.
5      Q.   Do you know that the COPs -- that the
6  City soon to invalidate the COPs?
7      A.   I'm aware of that, yes.
8      Q.   Do you know that the COPs assert that
9  if the COPs are invalidated, that the pension
10  funds have to give back the approximately
11  billion-four that was raised?
12      A.   I've heard you say that before.
13      Q.   And do you know -- I know you and I
14  have talked about this and I've tried to describe
15  sort of the general lay of the land, we've had a
16  conversation on that subject, right?
17      A.   We have.
18      Q.   I mean, separate and part from me
19  like -- do you know the fact that there have
20  actually been claims filed or that the COPs have
21  indicated that they would file these types of
22  claims in the litigation or is it just based on
23  what I told you?
24      A.   It's based on what you told me.  I
25  didn't do any independent research.

1      - MARTI KOPACZ - VOLUME 1-
2      Q.   So your kind of understanding of the
3  COPs invalidity case is based on the conversation
4  that you and I had about that subject?
5      A.   Yes.
6      Q.   Let me just ask you a freestanding
7  question, then, which is assume hypothetically
8  that at some point in the future, it could be a
9  year after the bankruptcy plan is confirmed or
10  three years, something in the order of one to five
11  years, assume that the pension systems are ordered
12  to disgorge a billion-four back to the COPs.
13  Okay?
14          Have you made a determination as to
15  whether the City would be feasible in that
16  instance?
17      A.   I have not.
18      Q.   In your opinion, you are assuming
19  that has not come to pass; is that correct?
20      A.   Correct.
21          MR. LERNER:  Let me interrupt.  Your
22      question is the City's feasible.
23          MR. HACKNEY:  Is the City's plan
24      feasible.  Fair amendment.  Is the City's
25      plan feasible.

1      - MARTI KOPACZ - VOLUME 1-
2      Q.   And I think my question was did you
3  consider whether the City's plan was feasible in
4  that circumstance?
5      A.   No.
6      Q.   Okay.  As you sit here today, do you
7  believe the City's plan would be feasible if that
8  were to come to pass; that the City had to -- that
9  the pension systems had to disgorge a
10  billion-four?
11      A.   I don't know.
12      Q.   Okay.  Do you believe that that's a
13  sufficiently material issue as it relates to the
14  City's potential pension obligations, that it
15  could impact your opinion?
16      A.   It is -- it is an issue.  I've
17  identified it in my report, along with a lot of
18  other issues that are unresolved, that, depending
19  on how they ultimately resolve themselves and what
20  position, condition the City's in, could --
21      Q.   Oh, I see.  I didn't take your -- I
22  saw the disclosure on that, but I actually read
23  the disclosure to say that if the COPs were
24  determined to be valid, it might impose higher
25  obligations on the city, not addressing the

1      - MARTI KOPACZ - VOLUME 1-
2  situation where they're determined to be invalid
3  but they get disgorgement back.
4      A.   We can read it.
5      Q.   That's okay.  It says what it says.
6          Let me try to -- let me put it this
7  way, though:  If you knew today that there was a
8  high probability that the pension systems would
9  disgorge $1.4 billion and that the City would have
10  the obligation to make up the difference, would
11  you find the plan feasible?
12      A.   I would have to talk with the City
13  about how they intended to make up that deficiency
14  or modify the plan.
15      Q.   Certainly if you modified the plan to
16  take account of it, that could be a way it could
17  become feasible.  But under this plan's forecast,
18  would the City be feasible if it had an additional
19  $1.4 billion obligation thrust upon it?
20      A.   I don't know, but probably not.
21      Q.   Okay.  And it's not something you've
22  evaluated?
23      A.   It is not.
24      Q.   Okay.  Going back to this chart
25  here.  If you look down at May 7th.

- MARTI KOPACZ - VOLUME 1-

2    A.    Uh-huh.
3    Q.    Do you have that in front of you,
4  ma'am?
5    A.    I do.
6    Q.    Do you see that you had a call with
7  Judge Rosen?  Do you see that?
8    A.    I did.
9    Q.    And what did you and Judge Rosen
10  discuss on that call?
11    A.    I called Judge Rosen because I was
12  having difficulty accessing some information and
13  that the City's counsel had requested to
14  participate in all meetings and interviews that I
15  had and I was honoring the order that the Judge
16  had entered in April appointing me not to have any
17  ex parte communication.
18        And I didn't know where to turn and I
19  called Judge Rosen and I said, this is what I'm
20  faced with and he said, you have my permission to
21  call Judge Rhodes.
22    Q.    I see.  So Judge Rosen gave you
23  permission to call Judge Rhodes?
24    A.    He said it's okay.  He said, for
25  something like this, you can call him.  And that's

- MARTI KOPACZ - VOLUME 1-

2  what I did.
3    Q.    Okay.  So did you talk about anything
4  else other than that?
5    A.    No.
6    Q.    Okay.  So -- so that went in an
7  unexpected direction for me.
8        So were you -- were you saying, I
9  want to talk to Judge Rhodes about it or did he
10  say --
11    A.    No.
12    Q.    -- you've got to talk to Judge
13  Rhodes?
14    A.    I said I -- I've got these issues, I
15  don't know how to handle them.  Right.  And he
16  said -- and I said, I know I'm not supposed to
17  talk to the Judge.  And he said, in this instance
18  you need to call the Judge and ask him what he
19  wants you to do about it.
20        And at that point -- I never, ever
21  did talk to him at that juncture, but he said
22  "send me a letter."
23    Q.    Judge Rhodes did?
24    A.    Judge Rhodes said "send me a letter."
25  So that was my first letter that I sent to the

- MARTI KOPACZ - VOLUME 1-

2  Court and --
3    Q.    Let me -- sorry.  Let me catch up to
4  you before you go ahead of me.  I'm sorry, I
5  didn't mean to interrupt you.  I didn't mean to be
6  rude.  I'm just trying to keep it organized
7  chronologically.
8        Did Judge Rosen say that he had
9  talked to Judge Rhodes and that Judge Rhodes said
10  it was okay or was Judge Rosen just saying that
11  unbidden, as far as you could tell?
12    A.    Judge Rosen said, you -- again, I
13  think you need to touch base with Judge Rhodes on
14  this.
15    Q.    Okay.
16    A.    And even though you're not supposed
17  to have ex parte communication, you need to call
18  his office, explain the situation, and get
19  direction on how he wants you to handle that.
20    Q.    Okay.  And so, then did you just say,
21  okay, I will do that?
22    A.    Yes.
23    Q.    Okay.  Did you say how do you know,
24  Judge Rosen, what Judge Rhodes wants me to do?
25    A.    He --

- MARTI KOPACZ - VOLUME 1-

2    Q.    You're in a tough spot, I'm just
3  curious --
4    A.    Judge Rosen said, If he gets mad at
5  you, tell him I said it was okay.
6    Q.    Okay.  Well, that's fair enough.  I'm
7  not making fun of you, you were in a -- what was
8  the problem you were having that militated the
9  call?
10    A.    There are really two things, we were
11  having trouble getting the working models.  Okay.
12  And counsel had requested to participate in all of
13  my interviews.
14    Q.    Was that bogging you down a bit in
15  terms of setting them up?
16    A.    It was just -- it was raising the
17  whole issue of, you know, what sort of openness I
18  would have.  And again, it wasn't going to affect
19  the questions I asked.  Right.  But it might
20  affect what people were telling me.
21    Q.    Interesting.  Okay.
22        Now, so then you -- okay, so I'm
23  assuming you got off the phone with Judge Rosen
24  and you called Judge Rhodes?
25    A.    I called Judge Rhodes.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 83 of
146

- MARTI KOPACZ - VOLUME 1-
1
2    Q.    You called his chambers?
3    A.    I did.
4    Q.    You did not speak with the man
5    himself, though?
6    A.    I did not.
7    Q.    Who did you speak with?
8    A.    I spoke to Christine.
9    Q.    Christine Secula?
10   A.    Secula.
11   Q.    Where you relayed to her and said
12   Judge Rosen told me to call Judge Rhodes about the
13   problems I'm having or words to that effect.
14   A.    Yes.
15   Q.    And what did she say?
16   A.    She said let me -- she said I will
17   make the Judge aware of it.
18   Q.    Okay.  So then -- then what happened
19   on this front?  Did she call you back?
20   A.    And she called me back and said "send
21   Judge Rhodes a letter."
22   Q.    I see.
23   A.    "And he will schedule it promptly for
24   hearing."
25   Q.    And not to sharp shoot you, I take it

- MARTI KOPACZ - VOLUME 1-
1
2    her calling you back is kind of subsumed in this
3    entry here of your call to Judge Rhodes?
4    A.    Yes.
5    Q.    That was one where it kind of went
6    bang-bang and so in your mind it was all one?
7    A.    Yes.
8    Q.    Okay.
9    A.    I -- I would, yes.  I would not have
10   entered two --
11   Q.    Yeah.
12   A.    -- call reply.
13   Q.    Okay.
14   A.    No, all I'd be doing was logging
15   stuff.
16   Q.    Yeah, it gets tiresome too.
17         So, on May 7th -- okay, then this is
18   all the same day.  Okay?  This is a big -- big
19   day.  Then Mr. Ravitch called you -- or you the
20   call him -- or you meet with him.  I'm sorry.  Do
21   you see that?
22   A.    I do.
23   Q.    Now, where did you -- first of all,
24   who initiated the meeting?
25   A.    I had reached out to Mr. Ravitch at

- MARTI KOPACZ - VOLUME 1-
1
2    some point after I had been appointed.  I actually
3    reached out to all of the other candidates that
4    had been part of the -- the short list of people
5    interviewed and I knew that obviously the Judge
6    had -- had appointed Mr. Ravitch as a
7    nontestifying expert and so this was I believe
8    Mr. Ravitch's first visit to Detroit and
9    Mr. Gleason and I met with him to give him some
10   background on what we were doing.
11   Q.    So this was -- and so where did you
12   meet with him?
13   A.    In the -- the work space we had at
14   the City building.
15   Q.    Was that the Coleman A. Young
16   administrative center that you worked in?
17   A.    Yes.
18   Q.    Okay.  I think --
19   A.    City Hall.
20   Q.    -- City Hall for lack of a better
21   term?
22   A.    Yes.
23   Q.    And how long did your meeting with
24   Mr. Ravitch go for?
25   A.    I don't know.  We could look at my

- MARTI KOPACZ - VOLUME 1-
1
2    time records.
3    Q.    Okay.  So you have time records.
4    Okay.
5          Was it more than like, Hey, how are
6    you doing?  Was it an hour?
7    A.    Like I said, I don't know.  I mean
8    it -- I'm -- I think it was more than an hour.
9    Q.    Yeah.  It was a substantive meeting?
10   A.    Yes.
11   Q.    And what did you tell him about what
12   you all were doing?
13   A.    I think we shared -- I'm -- I'm -- my
14   recollection is we talked about what we were
15   doing, what the approach was, how our team was
16   structured.  Who we had met with, who we were
17   meeting with.  Shared with him what we knew of
18   kind of the professionals and what people were
19   doing, what E&Y was doing, what Conway was doing,
20   the other professionals involved.
21   Q.    And then what did he tell about what
22   he was doing, if anything?
23         MR. KANE:  Wait a minute.  Isn't he
24   the Court's nontestifying expert?
25         MR. HACKNEY:  Yeah.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

1          - MARTI KOPACZ - VOLUME 1-
2          MR. KANE:  Then why would you be
3   entitled to discover what he said about what
4   he was doing or thinking?
5          MR. HACKNEY:  Because it was
6   communications that he had with the person
7   who is doing the testifying.  I want to know
8   what she was told.
9          MR. KANE:  Well, what he was doing
10  would not be discoverable and under 26(b)(4),
11  just because there's a communication with an
12  expert doesn't mean it's discoverable at
13  least since 2010.
14         MR. HACKNEY:  Well, it's not
15  privileged.
16         MR. KANE:  You're trying to discover
17  communications of a nontestifying expert,
18  right?
19         MR. HACKNEY:  I'm trying to discover
20  communications with a testifying expert.  If
21  he says, I'm working on this and I think it's
22  really important that whatever happens in
23  this City includes a ton of blight
24  remediation, I have to understand what he
25  said because of the impact it may have had on

1          - MARTI KOPACZ - VOLUME 1-
2   this witness.
3          MR. KANE:  Because it's communication
4   to her?
5          MR. HACKNEY:  Yes.  It's -- it's a
6   clearly potentially discoverable
7   communication.
8          MR. KANE:  On what basis?
9          MR. HACKNEY:  I want to know what
10  Mr. Ravitch said to her.
11         MR. KANE:  I know.  That's my
12  concern.
13         MR. HACKNEY:  You're not -- you're
14  not limited to asking someone about what they
15  relied on.  You're -- you're entitled to ask
16  questions that are reasonably calculated to
17  lead to the discovery of admissible evidence.
18         MR. KANE:  Within the limites of
19  26(b)(4), which would tell you that
20  communications with a party -- between a
21  party and the expert are protected by work
22  product --
23         MR. HACKNEY:  Well, not --
24         MR. KANE:  -- and specific
25  communications you're asking her about are

1          - MARTI KOPACZ - VOLUME 1-
2   Judge Rhodes' nontestifying expert.
3          MR. HACKNEY:  I don't -- I can't
4   imagine that I'm not entitled to ask her
5   about these questions where the Judge's order
6   forbids this witness from communicating with
7   him.  So to the extent that he's the party,
8   26(b)(4) wouldn't apply in this circumstance.
9   This is not your normal circumstance.  And if
10  we have to get the Court on the phone, let's
11  get him on the phone.
12         MR. KANE:  Well, look, as I told you
13  before, I guess I have both the burden and
14  luxury of being in a position of ignorance
15  about most of the issues about what's going
16  on in the case.  So, I guess if you guys are
17  going to sort it out and you're telling her
18  you want her to disclose to you what the
19  Judge's nontestifying expert said, which I
20  have no idea what it is --
21         MR. HACKNEY:  I don't either.
22         MR. KANE:  -- then I'm going to leave
23  that to you and the rest of the parties.
24         MR. HACKNEY:  I appreciate that.  I'm
25  not aware of any privilege that applies to

1          - MARTI KOPACZ - VOLUME 1-
2   it.  I don't know whether he said anything.
3   He may have said I love Snickers bars, or he
4   might have sat silently or whatever.
5   BY MR. HACKNEY:
6       Q.   I just want to know what he told you.
7   Until I know what he told you, I can't know what
8   impact it may or may not have had on you.
9          MR. KANE:  Or at least right now,
10  before, again, from my position of ignorance,
11  we should seek further guidance, go ahead and
12  answer for know now.
13         THE WITNESS:  Mr. Ravitch told me
14  that he really had no clue as to what
15  Judge Rhodes want him to do.
16  BY MR. HACKNEY:
17      Q.   Okay.  Anything other than that that
18  you remember?
19      A.   No.
20      Q.   So the information transfer in this
21  instance was mainly going from you to him.  He was
22  mainly listening and you were mainly talking?
23      A.   Yes.
24      Q.   Okay.  Now, did you tell him that
25  there was anything that he could or could not do

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 85 of
146

- MARTI KOPACZ - VOLUME 1-
1
2  with the information that commune -- you
3  communicated to him?
4      A.    I don't think so, no.
5      Q.    Okay.  And what was your expectation
6  about what he would do with the information that
7  you gave to him?
8      A.    I don't think I had any expectation.
9      Q.    Or just, I guess, help me understand
10 why you were meeting with him.
11     A.    Mr. Ravitch, the Judge had retained
12 him to be his nontestifying expert.  Mr. Ravitch
13 has had enormous amount history and experience in
14 difficult municipal situations and I think that,
15 again, with -- my desire throughout this entire
16 situation has been to absorb every bit of
17 information that I can, to -- to get as much
18 information as I can, to be a sponge, if you will.
19 And Mr. Ravitch is very knowledgeable about
20 municipal finance and a lot of things having from
21 his days of turning around the MTA here in New
22 York and being involved with the insolvency of New
23 York City and various and sundry -- being
24 lieutenant governor of the state.  So...
25     Q.    So were you mainly conveying what you

- MARTI KOPACZ - VOLUME 1-
1
2  were doing to him because you wanted to get his
3  responses as to whether he thought you were doing
4  the right types of stuff?
5      A.    I wasn't so -- I wasn't concerned
6  about whether Mr. Ravitch thought my approach
7  or -- to it was right or wrong, right?  I was -- I
8  was comfortable in knowing what we needed to do.
9  I was interested in picking -- you know, listening
10 to what he had to say and what the lessons learned
11 that he had from all of his prior experiences.
12     Q.    Okay.  Did he relay any of those to
13 you in this meeting?
14     A.    I don't know if it was in that
15 meeting or -- or a subsequent meeting, but we --
16 you know, we have talked extensively about the New
17 York situation and why they were successful in
18 saving the City from bankruptcy and turning it
19 around.  Those kinds of things.
20     Q.    And, in fact, you have had a number
21 of communications with Mr. Ravitch either in
22 person or on the phone; isn't that correct?
23     A.    That's correct.
24     Q.    Okay.  And over time, did you
25 continue to convey to him what you were doing on

- MARTI KOPACZ - VOLUME 1-
1
2  the case and what you were thinking about?
3      A.    Generally, yes.
4      Q.    And was it for the purpose of
5  obtaining his feedback about what he thought based
6  on his experience?
7      A.    There -- there were --
8      Q.    He's a pretty valuable resource,
9  so...
10     A.    He's a very valuable resource and --
11 and Mr. Ravitch knows a lot about municipal
12 budgeting.  He's got some very definite views on
13 that.  He knows a lot about public pensions and,
14 again, he is one of many resources that, you know,
15 I think I -- I have reached out to.  I reached out
16 to Peter Hammer who was also part of the short
17 list of people interviewed.
18     Q.    Now, sorry to interrupt.
19     A.    Yeah.
20     Q.    I was going to say, now, Mr. Ravitch,
21 I don't have his order appointment in front of me,
22 but he was somebody who was also I think
23 interviewed for the position of feasibility
24 expert, correct?
25     A.    Correct.

- MARTI KOPACZ - VOLUME 1-
1
2      Q.    And is it your understanding that the
3  advice he was rendering to the Court was on a
4  subject of feasibility?
5      A.    I don't know.
6      Q.    Okay.  'Cause in the first meeting he
7  told you that he had no idea what the Judge wanted
8  him to do?
9      A.    Right.
10     Q.    Did he subsequently convey to you
11 that he now understood what he was doing and tell
12 you what he was doing?
13     A.    My recollection and I -- and I
14 believe his order is the next one on the docket
15 after my order, and I think that his order was to
16 advise the Court on viability, maybe municipal
17 finance or something like that.  It was not -- it
18 was not like my order.
19     Q.    Was it -- my recollection is that
20 it -- that one of the things that was on it was
21 post-confirmation governance.
22     A.    Maybe.
23     Q.    Does that ring a bell?
24     A.    Maybe.  It could be.
25     Q.    Now, post-confirmation governance is

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-
1  definitely something that factors in to
2  feasibility, right?
3      A.   Yes.
4      Q.   That was an important part of your
5  opinion?
6      A.   Yes.
7      Q.   Did you ever discuss
8  post-confirmation governance with Mr. Ravitch?
9      A.   Yes.
10     Q.   Are you able to separate in your mind
11 your meetings with Mr. Ravitch?
12     A.   Not really.
13     Q.   So if -- I'm going to -- I can go
14 through them one by one.  People tend to remember,
15 you know, substance of communications with people
16 as opposed to like the dates and so on and so
17 forth.  I am happy to do it either way.  If it's
18 helpful to go, oh, yeah, May 30th, I remember, we
19 can do it that way.
20     A.   I can, you know, for example, if we
21 could determine when the original house bills
22 related to the Grand Bargain were drafted and
23 those came out with the post-oversight --
24 post-confirmation oversight provisions in them, it

- MARTI KOPACZ - VOLUME 1-
1  would have been around that time when I would have
2  talked to Mr. Ravitch about post-confirmation
3  oversight.
4      Q.   Okay.  Like, let me -- let me do it
5  this way.
6          My recollection -- my perusal here,
7  to me it looks like you had -- it looks like you
8  had six or seven communications with Mr. Ravitch
9  either on the phone or in person.  Does that sound
10 about correct?
11     A.   If that's what they add up to.
12     Q.   I'm going to go back to -- and I --
13 at no time did you tell Mr. Ravitch that he could
14 not disclose what you were telling him, correct?
15 You never limited who he could talk to, right?
16     A.   I -- I don't think any discussion
17 like that ever came up.
18     Q.   Okay.  Now, there are some notes here
19 about what you talked about him with.  I'm going
20 to use those as kind of a prime to see if it helps
21 you remember like what you were talking about.
22         One of the next notes on Mr. Ravitch
23 relates to pensions.
24     A.   Can you --

- MARTI KOPACZ - VOLUME 1-
1      MR. STEWART:  What day?
2      THE WITNESS:  What day are we talking
3  about?
4  BY MR. HACKNEY:
5      Q.   Oh, sure.  I'm happy to look at the
6  date.  It's May 19, 2014.
7      A.   Pension.  Okay?
8      Q.   Yes.  Do you remember what you talked
9  about on that subject?
10     A.   Not specifically.
11     Q.   Generally?
12     A.   Generally, we talked -- I talked to
13 Mr. Ravitch a lot about pensions.
14     Q.   Okay.  What have you talked about?
15     A.   We've talked about the rate of
16 return, the investment rate of return.  We've
17 talked about the appropriateness of using the rate
18 of return as a discount for future liability.
19     Q.   Anything else?
20     A.   That's probably it.
21     Q.   Now, did he convey to you what his
22 thoughts were on the subject?
23     A.   Yes.
24     Q.   And what did he tell you?

- MARTI KOPACZ - VOLUME 1-
1      MR. KANE:  Don't answer that without
2  further guidance from the Court.
3      THE WITNESS:  Okay.
4      MR. HACKNEY:  Okay.  This witness has
5  said that she was specifically talking to
6  Mr. Ravitch because he was effectively a wise
7  person and a resource on the subject of
8  things that relate to feasibility.  That's
9  why she's talking to him.
10         And he's telling her things about
11 what he thinks and he's an acknowledged
12 person that applied for the same position.
13 And we're talking about pensions and what
14 this person thought on the subject of
15 pensions and pensions in her report.
16     MR. KANE:  Okay.
17     MR. HACKNEY:  I mean, what is the
18 possible basis to instruct someone not to
19 answer the question?
20     MR. KANE:  Well, two bases.  You're
21 trying to discover opinions, as I understand
22 it, and I'm not telling you you can't ask
23 about this.  I just think you mentioned a
24 number -- a number of times getting

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 87 of
146

1          - MARTI KOPACZ - VOLUME 1-
2    instruction from the Court. I think that
3    might be a good idea in this case given
4    Mr. Ravitch's role and his, as I understand
5    it, and perhaps you all understand it better
6    than me, role as a nontestifying expert for
7    the Court.
8          Further, you keep saying that you are
9    entitled to discover all communications with
10   an expert. That's not accurate. 26(b)(4)
11   specifically limits your ability to discover
12   communications with even a testifying expert.
13         MR. HACKNEY: Well, actually, that --
14   that's interesting. I'll put it to you.
15         Are you asserting the privilege over
16   communications between Ms. -- Ms. Kopacz and
17   Mr. Ravitch?
18         MR. KANE: What I'm asserting, Steve,
19   is that there is an order specifically
20   limiting the subjects that Ms. Kopacz is
21   supposed to testify about and that you're
22   asking her to discover opinions about
23   something you've acknowledge to do me when I
24   asked is a nontestifying expert when I --
25         MR. HACKNEY: I cannot discover his

1          - MARTI KOPACZ - VOLUME 1-
2    opinions. I can't discover his opinions
3    except by deposing him. I can discover what
4    he told her. That's all I'm asking.
5          MR. KANE: Why?
6          MR. HACKNEY: I don't care what he
7    actually thought. She doesn't know what he
8    actually thought. She only knows what he
9    told her. That's all I'm asking about on a
10   subject that relates to her opinion.
11         MR. KANE: Well --
12         MR. HACKNEY: I just --
13         MR. KANE: If --
14         MR. STEWART: I don't want to slow
15   anyone down. It's been's long day.
16         I actually do concur. This is
17   probably a point that would not be a bad idea
18   to get the judge's guidance.
19         MR. HACKNEY: Let's do it then.
20   Let's get the Judge on the phone. I'm
21   surprised at the level of obstruction that
22   I'm achieving. I mean, we've had a lot of
23   colloquies. Now we're getting the Judge on
24   the phone.
25         MR. STEWART: Steve --

1          - MARTI KOPACZ - VOLUME 1-
2          MR. HACKNEY: Let's get the Judge on
3    the phone. That's what I say.
4          MR. STEWART: Let's get the Judge
5    whenever you can get him and circle back to
6    this later.
7          MR. HACKNEY: Well, I want to do it
8    now.
9          MR. PEREZ: Let's stop it and do it
10   now.
11         MR. HACKNEY: Let's get him on the
12   phone.
13         THE VIDEOGRAPHER: Off the record.
14         MR. PEREZ: Keep it on.
15         (Whereupon, a brief discussion was
16   held off record.)
17         MR. HACKNEY: Does anyone have the
18   chamber's number or should I look it up?
19         MR. LERNER: I have it.
20         MR. HACKNEY: Can you guys dial it
21   over there? I can't reach it.
22         MR. KANE: We can't dial it from that
23   phone. We're keeping the --
24         MR. STEWART: I'm asking --
25         MR. LERNER: 234-0020.

1          - MARTI KOPACZ - VOLUME 1-
2          MR. HACKNEY: Here, let's do this.
3    Let's do this. Since we're coming -- let's
4    do -- let's do non-Ravitch questions.
5          MR. STEWART: Right.
6          MR. HACKNEY: -- and see what we can
7    get done and then let's engage the Court when
8    we can and pick it up again.
9          MS. QUADROZZI: Can I make a
10   suggestion? Maybe you can call the Court's
11   chamber, let him know we have an issue since
12   it's 5:00.
13         MR. HACKNEY: Yeah. It's
14   4:00 Eastern -- yeah, you're right. It's
15   5:00. So I just want to --
16         MS. QUADROZZI: I mean, you can keep
17   on asking questions, but just say is there a
18   time that we can call in and then we're not
19   waiting around for it.
20         MR. HACKNEY: Yeah. I mean it -- I
21   don't mean to impose, but if -- if there's
22   somebody who doesn't mind stepping out in the
23   lobby and calling, I'd be obliged and maybe
24   we can keep going.
25         MS. QUADROZZI: I'm happy to call.

- MARTI KOPACZ - VOLUME 1-

1    MR. HACKNEY: Okay. So --
2    MS. QUADROZZI: I'm sorry. Can
3 somebody repeat the number for me?
4    MR. LERNER: It's 313-234-0020.
5    MS. QUADROZZI: 0020. Okay.
6 BY MR. HACKNEY:
7    Q.   Okay. So, ma'am, we're going to go
8 around the Ravitch questions --
9    A.   Okay.
10    Q.   -- because of the -- the extreme
11 controversy around those -- those questions.
12    So go back to the chart and take a
13 look at May 7th, 2014, where you speak to Gene
14 Gargaro, Graham Beal, Annemarie -- Annemarie
15 Erickson of the DIA. Do you see that?
16    A.   Yes.
17    Q.   And was this the meeting that you had
18 attempted to schedule a couple weeks earlier with
19 Mr. O'Reilly and Mr. Levin?
20    A.   Yes.
21    Q.   And this -- the subject matter is
22 "Art Disposition and Grand Bargain Feasibility."
23    Do you see that?
24    A.   Yes.

- MARTI KOPACZ - VOLUME 1-

1    Q.   So on the subject of the art
2 disposition, what do you recall being discussed?
3    A.   My area of inquiry to the DIA
4 executives and Gene, who is the board of trustees,
5 was really whether or not the art was salable.
6    Q.   And why did you want to know that?
7    A.   Because I knew that there were --
8 that it was an asset, if you will, arguably of the
9 estate. And that it may or may not factor in in
10 some way down the road into the reorganization
11 plan.
12    Q.   Okay. And what did they tell you?
13    A.   Couple of different things that were
14 important. One was the fact that the City really
15 had not funded the DIA for more than 20 years.
16 And they explained to me the history and how the
17 City came to own the Institute of Art and
18 explained to me all of the various requests and
19 bequeaths of how much of the art came to the DIA
20 over time and history and, you know, that sort of
21 thing. So I got a good history lesson in how the
22 Institute came to be and really I was surprised
23 because the City had not -- the City had not
24 funded or supported the DIA in at least about

- MARTI KOPACZ - VOLUME 1-

1 20 years.
2    Q.   Why were you surprised by that?
3    A.   It was -- I just -- you know, I
4 expected -- I don't know why, but I expected that
5 at some point I'd go to into the City budget and
6 I'd find, you know, hundreds of thousands of
7 million dollars going to support the DIA, and the
8 City never did that, right? Because it couldn't,
9 right? It never had the ability to -- to, you
10 know, fund, if you will, the art and so I thought
11 that was -- I thought that was interesting.
12    And then we really focused on the
13 hundred million that the DIA was committing to the
14 Grand Bargain and where that was going to come
15 from and why they thought they could raise it. We
16 talked a little bit about what they thought about
17 the foundation's ability to raise money. We
18 talked about the -- the last time they had done a
19 capital raise to -- to do the renovation and that
20 was -- and that was sum total of that.
21    Q.   Where was this meeting?
22    A.   At the DIA.
23    Q.   What do you remember them telling you
24 about the DIA's ability to raise money?

- MARTI KOPACZ - VOLUME 1-

1    A.   That -- that they believed that
2 Mr. Gargaro believed and Mr. Beal believed that
3 the current benefactors of the DIA would be
4 responsive and that they would be able to raise
5 the $100 million that was proposed.
6    Q.   Anything else you can recall in that?
7    A.   No.
8    Q.   And what did they say about the
9 foundation's ability to make their commitments?
10    A.   That they had -- again, they referred
11 me to Rip Rapson at Kresge and that really they --
12 there was some small overlap between some of the
13 foundation money and the DIA money in the sense
14 that there were individuals who were supportive of
15 the DIA that might be on the foundation side as
16 well.
17    Q.   Anything else that you can recall on
18 that subject?
19    A.   I can't.
20    Q.   Do you remember how long this meeting
21 lasted?
22    A.   I don't. It would probably be in my
23 time records.
24    Q.   Now, the same day, on May 7th, you --

1      - MARTI KOPACZ - VOLUME 1-
2  you have a dinner party; is that right?
3      A.    I was a guest at a dinner party, yes.
4      Q.    Yeah.  You attend a dinner party.
5  You didn't throw it.
6      A.    Yes.
7      Q.    Okay.  Who did throw it?
8      A.    Bob and Susie Bluestein.
9      Q.    And who are they?
10     A.    They are mutual friends of
11 Judge Rosen and Mr. Ravitch and Mr. Rapson and
12 Mr. Lewand and Mr. Driker.
13         MS. QUADROZZI:  When they transfer
14 the Judge, he 's going to be on this phone.
15         MR. HACKNEY:  Okay.  So we're going
16 to do it here?  Let's do it on the record.
17         MS. QUADROZZI:  Thank you.
18         (Whereupon, a brief discussion was
19 held off record.)
20         MS. QUADROZZI:  Hello?
21         JUDGE RHODES:  Hello.
22         MR. HACKNEY:  Hello, Judge Rhodes.
23 Can you --
24         JUDGE RHODES:  Hi.
25         MR. HACKNEY:  Can you hear us okay?

1      - MARTI KOPACZ - VOLUME 1-
2         JUDGE RHODES:  This is Judge Rhodes.
3         MR. HACKNEY:  Judge Rhodes, can you
4  hear me okay?
5         JUDGE RHODES:  Yes.  Who is on the
6  line, please?
7         MR. HACKNEY:  Judge Rhodes, this is
8  Steve Hackney of Kirkland & Ellis on behalf
9  of Syncora, and there are a bunch of people
10 in this room.
11         Would you like us to all identify
12 ourselves?  It's also reflected in ths
13 deposition transcript --
14         JUDGE RHODES:  Yes.
15         MR. HACKNEY:  -- for what it's worth.
16         JUDGE RHODES:  Okay.
17         MR. HACKNEY:  I expect that only me
18 and -- well, it's up to you, Judge.  Do you
19 want everyone to say who is here?
20         JUDGE RHODES:  I do.
21         MR. HACKNEY:  Okay.  I'm sorry.  Go
22 ahead.
23         MR. LERNER:  Pass the phone around.
24         MR. KANE:  So, Your Honor, this is
25 Scott Kane from Squire who is defending

1      - MARTI KOPACZ - VOLUME 1-
2  Ms. Kopacz's deposition.
3         MR. PEREZ:  Your Honor, Alfredo Perez
4  on behalf of FIGC.
5         MS. DEEBY:  Shannon Deeby on behalf
6  of the retirement systems.
7         MR. SCHMITZ:  Joe Schmitz on behalf
8  of the retirement systems.
9         MR. STEWART:  Your Honor, Geoffrey
10 Stewart, Chris DiPompeo and Alex Blanchard of
11 Jones Day on behalf of the City.
12         MR. BRILLIANT:  Allan Brilliant on
13 behalf of Macomb County.
14         MR. LERNER:  Stephen Lerner also of
15 Squire Patton Boggs for Ms. Kopacz.
16         MR. ALBERTS:  Sam Alberts from
17 Dentons on behalf of the official committee
18 of retirees.
19         MS. SCHAPIRA:  Lisa Schapira of
20 Chadbourne & Parke for Assured Guaranty
21 Municipal Corp.
22         MS. HITCHINS:  Kathleen Hitchins with
23 Sidley Austin on behalf of National Public
24 Finance Guaranty Corporation.  I also add,
25 Your Honor, that this is being recorded by

1      - MARTI KOPACZ - VOLUME 1-
2  the -- the court reporter right now.
3         MR. WAGNER:  Jonathan Wagner on
4  behalf of the COPs.
5         MS. QUADROZZI:  Jaye Quadrozzi, Young
6  & Associates, on behalf of Oakland County.
7         MS. DEEBY:  Your Honor, Jennifer
8  Green is on the phone for the retirement
9  systems as well.
10         MR. HACKNEY:  Did we get everybody?
11         MS. HUBBARD:  Heather Hubbard from
12 Waller Lansden on behalf of U.S. Bank.
13         MR. HACKNEY:  That was Heather
14 Hubbard of Waller Lansden on behalf of U.S.
15 Bank, Your Honor.
16         Your Honor, if --
17         MS. KOGAN:  Olga Kogan on behalf of
18 Merrill Lynch.
19         MR. HACKNEY:  Your Honor, if I could
20 set it up and I'll turn it over to
21 Ms. Kopacz's counsel.
22         We're at the end of day one of
23 Ms. Kopacz's deposition and I am taking
24 Ms. Kopacz through Exhibit 3 to her report,
25 which includes all of her communications with

89 (Pages 353 to 356)

- MARTI KOPACZ - VOLUME 1-
1 anyone, that you'll recall she agreed to keep
2 as a log of all of her communications, and
3 I'm basically trying to exhaust her memory
4 about what she discussed in all of these
5 conversations. I'm asking her what she said
6 to the person and what the person said to
7 her.
8 The controversy has erupted around
9 her communications with Richard Ravitch who
10 is the Court-appointed expert.
11 Ms. Kopacz met with Mr. Ravitch on a
12 number of occasions or spoke to him on the
13 phone and when I've sought to examine her on
14 what she said to him and what he said to her,
15 there has been questions interposed by her
16 counsel as to whether that's appropriate, and
17 I really appreciate you getting on the phone
18 with us because our hope is that we can get
19 it knocked out and ruled on, one way or the
20 other, and I'll turn it over to counsel to
21 refine it any.
22 MR. KANE: Yes, Your Honor. So this
23 is Scott Kane again. Here's how I would
24 frame the issue and I did for Mr. Hackney.

- MARTI KOPACZ - VOLUME 1-
1 I guess I have the burden and the
2 luxury of being ignorant about many other
3 things that are going on in this case.
4 I do know that your order appointing
5 Ms. Kopacz indicated that her testimony was
6 to be limited to her opinion on feasibility
7 and the reasonableness of projections, and I
8 understand, generally, without knowing the
9 details, that Mr. Ravitch is a
10 Court-appointed nontestifying expert.
11 So, my concern about letting
12 Ms. Kopacz testify about views held by a
13 nontestifying expert without seeking guidance
14 from the Court first is, I don't want her
15 inadvertently to waive any protection for
16 Mr. Ravitch's opinions or otherwise stray
17 beyond what is supposed to be the permissible
18 scope of this deposition.
19 MR. HACKNEY: And if I could just
20 add, and I'll let --
21 JUDGE RHODES: Let me just -- let me
22 just stop you all and -- and tell you that I
23 think that Ms. Kopacz should have -- answer
24 any -- excuse me -- any and all of your

- MARTI KOPACZ - VOLUME 1-
1 questions regarding her communications.
2 MR. KANE: He said Ms. Kopacz should
3 answer any and all questions regarding her
4 communications with Mr. Ravitch.
5 JUDGE RHODES: Yes, sir.
6 MR. HACKNEY: Good enough.
7 MR. KANE: Thank you for your
8 guidance, Your Honor.
9 MR. HACKNEY: Sorry to trouble you,
10 Your Honor.
11 MR. LERNER: Thank you, Judge.
12 JUDGE RHODES: You're welcome.
13 MR. HACKNEY: Thank you.
14 MR. LERNER: Bye-bye. Thank you.
15 JUDGE RHODES: Okay. Is that it?
16 MR. LERNER: Yeah. That's it. We're
17 going to hang up. We appreciate your time,
18 Your Honor.
19 MR. HACKNEY: Okay. That was
20 exciting. So, we're going to finish this
21 dinner party thing and then we'll go back to
22 the --
23 MR. LERNER: As long as we can have
24 cocktails.

- MARTI KOPACZ - VOLUME 1-
1 MR. PEREZ: What was served at the
2 dinner party?
3 (Whereupon, a brief discussion was
4 held off record.)
5 MR. HACKNEY: So, sorry. We got
6 interrupted -- by the way, thanks a lot,
7 Jaye, I appreciate it. She went away.
8 MS. QUADROZZI: Okay.
9 MR. HACKNEY: That was helpful.
10 Thank you.
11 BY MR. HACKNEY:
12 Q. So, I think you were saying a lot of
13 these folks knew each other. There were common
14 bonds between them?
15 A. Yes.
16 Q. So you had this dinner party and it
17 was at the Bluesteins' house?
18 A. At their house.
19 Q. And then the attendees were all
20 listed here in your entry except their spouses
21 that also attended for certain of the people that
22 came, right?
23 A. Yes.
24 Q. And I take it that everyone that's

90 (Pages 357 to 360)

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 91 of 146

- MARTI KOPACZ - VOLUME 1-

1  - MARTI KOPACZ - VOLUME 1-
2  not identified by name on here is a spouse. You
3  didn't leave any sort of principals off, so to
4  speak.
5      A.    No, I did not.
6      Q.    Okay.  And what did you talk about?
7  How long did the dinner party go and what -- what
8  did you all talk about?
9      A.    I would say the dinner party was a
10  couple of hours.  It was a -- it was really an
11  occasion for Mr. Ravitch and I to meet all of
12  these people because other than Judge Rosen and
13  Mr. Driker and I had just met Mr. Gargaro that
14  day, the rest of those people I had never met and
15  I don't think that, other than Judge Rosen and the
16  Bluesteins, I don't think Mr. Ravitch knew any of
17  these people.  So it was just a -- it was a
18  welcoming dinner, if you will.
19      Q.    So, let me ask you a question.
20            Were you concerned at all as an
21  independent expert about the informality, so to
22  speak, of kind of breaking bread with, for
23  example, Kevyn Orr?
24      A.    Not at all.
25      Q.    No?  Why not?

- MARTI KOPACZ - VOLUME 1-

1  - MARTI KOPACZ - VOLUME 1-
2      A.    Why would I be?  I mean it's not
3  going to impact my view of the plan whether or not
4  I've had a meal with these people.
5      Q.    Did you have -- did you take meals
6  with any -- anybody else other than this?  This is
7  I think one of the only dinner parties I saw.
8      A.    There were -- there were a couple of
9  different dinner parties.  I've had -- I've had
10  breakfast with people.  I've had -- I don't
11  generally do lunch.
12      Q.    Who was the other dinner party with?
13      A.    There was another -- there was
14  another -- there was another dinner party
15  somewhere.  It may be listed as a meeting, but it
16  was after that -- it was -- it was June 11th.
17      Q.    The one where it's with Judge Rosen?
18      A.    Judge Rosen and that whole group of
19  people.  Steven was on the phone.  He wasn't
20  there.  But basically this group left and went to
21  dinner.
22      Q.    On June 11th?
23      A.    On June 11th.
24      Q.    Was that a meeting that started in
25  Judge Rosen's chambers?

- MARTI KOPACZ - VOLUME 1-

1  - MARTI KOPACZ - VOLUME 1-
2      A.    Yes, it was.
3      Q.    And then after it was revolved,
4  everybody went out to dinner?
5      A.    Everyone went to the Bluesteins'
6  country club.  They hosted again.
7      Q.    Okay.  Do you remember how many
8  people were at that dinner?
9      A.    Dozen.  Maybe.
10      Q.    So, what do you remember Judge Rosen
11  talking about at the May 7th dinner party back on
12  in 2014?  He's a fairly voluble -- I won't
13  characterize him, but he's a dynamic person.  I --
14  I haven't met him in person, but I've seen his
15  press conferences --
16      A.    I'm trying to remember.
17      Q.    -- he's not somebody who I -- I view
18  as a shrinking violet, so I was wondering whether
19  he had conveyed to you his views?
20      A.    I'm not -- I'm trying to remember how
21  the seating was because there were -- like the
22  May -- at the May 7th, there were two large
23  tables, one in their dining room and one on
24  their -- on their patio or screened-in porch, and
25  I remember the mayor was on my right.  Mr. Ravitch

- MARTI KOPACZ - VOLUME 1-

1  - MARTI KOPACZ - VOLUME 1-
2  was on my left and Kevyn was across from me and
3  Tom Lewand was over there.  And to be honest with
4  you, I can't remember who was at the rest of my
5  table versus who was at the other table.
6      Q.    But you know -- was Judge Rosen at
7  the other table?
8      A.    I think he may have been at the other
9  table.  I don't know.
10      Q.    And so were people basically talking
11  about the case and how it was going and the City
12  and --
13      A.    Not really.  The -- the conversation
14  was a lot more social and informal.  I mean, I
15  learned about, you know, where Kevyn Orr went to
16  college and, you know, what Mike Duggan had done
17  with his life and how Tom Lewand got to the City.
18  I mean, that was the discussion, right?
19      Q.    Okay.  It was sort of getting to know
20  the people more than it was talking about the
21  substance of your assignment or the case?  More
22  polite sort of?
23      A.    It was -- Yes.  Yes.  You know, and I
24  think, you know, Dick was -- Dick Ravitch was --
25  was -- we were having all kinds lots -- of of

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-

1  - MARTI KOPACZ - VOLUME 1-
2  storytelling going on, my recollection.
3     Q.   Now, let's go back to the
4  communications with Mr. Ravitch and kind of run
5  through those if we could.
6     A.   Okay.
7     Q.   So the -- the next -- the next one
8  that I saw after the dinner party we were just
9  talking about on May 7th --
10    A.   Uh-huh.
11    Q.   -- was on May 15th.  Do you see that?
12    A.   Yes.
13    Q.   And what was -- what -- yeah, I'm
14 actually one before, sorry.  The engagement
15 update, do you see that?
16    A.   Yes.
17    Q.   Tell me what you can recall occurring
18 during that call.
19    A.   I don't recall that call at all.
20    Q.   Okay.  I guess at some point maybe
21 you wrote down "engagement update" like did you
22 keep to log contemporaneously or do you know if
23 you went back and --
24    A.   No.  For the most part I kept this
25 contemporaneously within a day or so, otherwise I

1  - MARTI KOPACZ - VOLUME 1-
2  don't think I would have been able to do it.
3     Q.   Do you know if engagement update
4  means that you were updating him on your
5  engagement or he was updating you on his?
6     A.   No.  Generally -- generally, the --
7  the communication that I had with Mr. Ravitch was
8  telling him what we were doing.
9     Q.   Okay.
10    A.   Okay?
11    Q.   And so, I just want to understand,
12 when you're telling him what you're doing, why
13 are -- I think I asked you this before.
14         Is it -- why are you telling him what
15 you're doing?  Is it so that he can give you
16 feedback?  Which is a fine reason to speak to
17 someone with his experience.  I just want to
18 understand your state of mind --
19    A.   Yes -- I mean, yes and no.  In the
20 sense of if there were -- you know, I -- I can
21 tell you that, you know, there are points where
22 Mr. Ravitch and I agree.  There are points where
23 Mr. Ravitch and I don't agree.  And so in those,
24 and we -- and that developed over time and over
25 discussions during this case, so --

1  - MARTI KOPACZ - VOLUME 1-
2     Q.   Were you telling him what you were
3  working on because you mainly wanted to make sure
4  he was just generally kept abreast of what you
5  were doing?  Were you like thinking I should
6  update Dick on what I'm up to?
7     A.   It's really just, I -- it's
8  professional courtesy.  It's politeness.  He,
9  again, you know, is -- is trying to do whatever it
10 is that he's doing for the Judge and he doesn't
11 have a staff, right?  So, he's not going to be
12 looking into things as deeply as we are or that
13 sort of thing.  So it was really just probably
14 whatever I was thinking about at the moment.
15    Q.   And you don't remember him updating
16 you on what he was doing?
17    A.   I don't -- I don't have knowledge of
18 what he was doing necessarily, no.  I just -- I
19 don't.
20    Q.   Okay.  The next entry for
21 Judge Ravitch -- Mr. Ravitch is May 19th, which is
22 four days later, and it just says "pensions."
23    A.   Yes.
24    Q.   Do you -- so we had gotten started on
25 that one and --

1  - MARTI KOPACZ - VOLUME 1-
2     A.   Yes.
3     Q.   -- you said that you talked about the
4  discount rate for assets and liabilities and then
5  I said --
6     A.   Yes.
7     Q.   -- what did he -- he tell you about
8  what he thought?  What did he tell you and what do
9  you remember about that?
10    A.   Well, I think, he's been --
11 Mr. Ravitch has -- has -- as part of the Bolger
12 Commission and those sorts of things, he's been
13 very outspoken on public pensions and so I --
14 we -- my team and I talked to Mr. Ravitch about
15 his views and I can, for the most part, right, in
16 addition to other people that I talked to about
17 pensions, generally, Mr. Ravitch and I are in
18 agreement on what I've written about in this
19 report as it relates to pensions.
20    Q.   And in this conversation on pensions
21 was he conveying to you some of his thoughts on
22 pensions in terms of how they're reported or --
23    A.   Yes.
24    Q.   -- you know --
25    A.   Yes.  I mean --

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 93 of
146

1       - MARTI KOPACZ - VOLUME 1-
2       Q.    -- funding levels, et cetera?
3       A.    -- Mr. Ravitch and I both
4   fundamentally agree that, you know, at some point
5   you should fund a pension plan fully.
6       Q.    So let me tell you, ma'am, I'd hoped
7   to get through, but I, for a variety of reasons,
8   I'm not going to quite get there and I'm wondering
9   given the length of the day whether it's more fair
10  to the witness to call it a day. I don't think I
11  have a ton of time, but sometimes you can keep
12  stretching people and stretching people and all of
13  a sudden you go 45 minutes past when you think.
14  And I thought if it's okay with everybody, I
15  didn't know if we could break for the day.
16      MR. LERNER:  How much -- how much
17  longer do you think you have?
18      MR. HACKNEY:  The problem is I'm not
19  sure.  It -- it -- there's part of me that
20  just wants to go for it and there's part of
21  me that doesn't want to be sitting here an
22  hour later and go, I didn't realize this was
23  going to be that long.
24      MR. LERNER:  Those who are content to
25  ask other questions, maybe just give an idea

1       - MARTI KOPACZ - VOLUME 1-
2   of how much time you think you'll take
3   knowing that it's just a guess.
4       MR. WAGNER:  I would say probably
5   45 minutes an hour.
6       MR. BRILLIANT:  You know, because Guy
7   Neal is going to go first.
8       MS. QUADROZZI:  I think that should
9   be one or two hours.
10      MR. BRILLIANT:  And then I -- I may
11  have some, you know, follow-up questions --
12  just --maybe a half hour.
13      Jaye, are you asking questions?
14      MS. QUADROZZI:  I think by the time
15  Guy goes, he's got 45 and he's got a half
16  hour, I'll--
17      MR. HACKNEY:  Make no mistake, I'll
18  push on.  I just want to give fair warning
19  that I thought that I'm not just five minutes
20  away and so I thought it is 5:30.
21      MR. KANE:  I appreciate the courtesy.
22  She said she's okay.
23      THE WITNESS:  I'm okay.
24      MR. HACKNEY:  You're good to go?
25      THE WITNESS:  I'm good to go.

1       - MARTI KOPACZ - VOLUME 1-
2       MR. HACKNEY:  Okay.  Let's see if we
3   can get done then.
4       THE WITNESS:  With all due respect
5   though, I would like not to get into the
6   detailed analysis of pensions until tomorrow.
7       MR. HACKNEY:  That's fine, just
8   because --
9       THE WITNESS:  I'm happy to talk about
10  conversations and all that sort of thing, but
11  I don't want to do numbers right now.
12      MR. HACKNEY:  Why don't we keep our
13  march going here and -- and then there may be
14  some tie-up questions and then we can --
15      THE WITNESS:  Okay.
16      MR. HACKNEY:  -- call it a day at
17  6:00.  So that's a great idea.
18  BY MR. HACKNEY:
19      Q.    So continuing on with respect to
20  Mr. Ravitch, do you see that then now on May 28th
21  is the next one that I see?
22      A.    May 28, yup.
23      Q.    Now, there it says, "report
24  development discussion."
25      Do you see that?

1       - MARTI KOPACZ - VOLUME 1-
2       A.    Yeah.
3       Q.    Do you remember what that was about?
4       A.    No.
5       Q.    This is -- this was a meeting?
6       A.    Yes.
7       Q.    And I note that the one before on
8   pensions, that was a meeting too?
9       A.    That was a meeting in Detroit.
10      Q.    Okay.  So the pensions one was a
11  meeting in Detroit?
12      A.    Right.
13      Q.    Do you remember where it was?
14      A.    I -- I'm pretty sure it would have
15  been in the CAYMC in our space.
16      Q.    What's the CAYMC stand for again?
17      A.    The Coleman A. Young Municipal
18  Center.
19      Q.    Okay.  So --
20      A.    C-A-Y-M-C.
21      Q.    -- they just put that "A" in the
22  middle of "MAC," so they don't say K-muck.  Okay.
23      A.    This was --
24      Q.    You're getting your lingo -- you're
25  Detroit lingo down.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-
1
2     A.   Yeah.  This was in New York.
3     Q.   Okay.
4     A.   And it was the evening before the
5  financial advisors' meeting.
6     Q.   Okay.
7     A.   The next big meeting on the 29th.
8     Q.   And that's where you met with a bunch
9  of creditor FAs and lawyers?
10    A.   Yes.  Yes.
11    Q.   Okay.  So does that help you remember
12  it better?
13    A.   I -- I don't remember -- I remember
14  the meeting.  Okay?
15    Q.   Like where did it take place?
16  Sometimes these they help spur the substance.
17    A.   It -- we did it over dinner at some
18  club in New York.  Don't remember what it's
19  called.
20    Q.   Okay.
21    A.   Mr. Ravitch arranged -- Mr. Ravitch
22  arranged it and --
23    Q.   Was it a like how are you coming
24  meeting?  It says report development, you're --
25    A.   It was -- we were -- at that point in

- MARTI KOPACZ - VOLUME 1-
1
2  time we had, we were starting to -- we had gotten
3  the working models, right?  And so we were pretty
4  deep in the analysis of the projections, and I'm
5  sure that at this meeting we talked about pension.
6  We talked about what he was interested in, in the
7  post-confirmation.  I probably shared with him
8  what I would be interested in in that.
9     Q.   To your knowledge, was he -- when you
10  talk about post-confirmation, you're talking about
11  what the Grand Bargain would provide with respect
12  to legislative oversight of the City?
13    A.   Yes.
14    Q.   Was he -- did he tell you that he was
15  involved in efforts to -- in efforts around that
16  legislation?
17    A.   He was -- I know that at some point
18  in time he was in Lansing to meet with
19  legislators.
20          THE VIDEOGRAPHER:  The time now is
21  5:40 p.m.  We're back on the record.
22  BY MR. HACKNEY:
23    Q.   Okay.  I don't remember where we
24  burned out, but --
25    A.   We were talking about dinner with

- MARTI KOPACZ - VOLUME 1-
1
2  Mr. Ravitch on the 28th.
3     Q.   But you couldn't remember more than
4  report development.
5     A.   I don't.
6     Q.   And we also talked about whether --
7  you told me he told you that he went -- you knew
8  that he was in Lansing?
9     A.   I knew at some point in time he was
10  in Lansing.
11    Q.   Did he tell that you?
12    A.   He did.
13    Q.   And he was telling you, here's what
14  I'm up to lately in connection with the Grand
15  Bargain or words to that effect?
16    A.   It was in the context of scheduling.
17    Q.   I see.
18    A.   Okay.  So in terms of when he was
19  coming to Detroit and --
20    Q.   I see.
21    A.   Yeah.
22    Q.   So he said, Well, I'm going to
23  Lansing for X and that could be a good time to
24  meet in Detroit?
25    A.   To meet -- yeah.

- MARTI KOPACZ - VOLUME 1-
1
2     Q.   I mean, at some point I guess what
3  I'm interested -- maybe I've asked you this, Ms.
4  Kopacz, if I did, I apologize, sometimes you ask
5  it a different way.
6          But we talked about the first time
7  you talked to him, he said he didn't know what the
8  Judge wanted him to do.  But at some point did he
9  convey to you that now he understood what he was
10  doing and tell you this is what I'm up to.
11          Like did you have the type of back
12  and forth where you say, here's what I'm finding,
13  this is what I think, here's where I'm at with my
14  work, and he said, this is what I'm up to, this is
15  what I'm up to, this is what I'm thinking about?
16    A.   No.  My communication and interaction
17  with him was virtually exclusively about what we
18  were doing and me asking him for input, thoughts,
19  sharing with him, what we were thinking, talked to
20  him as, again, just as we were developing the
21  standard for feasibility, those kinds of things.
22    Q.   So --
23    A.   But I -- he has never shared with
24  me --
25    Q.   What he's doing?

94 (Pages 373 to 376)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 95 of
146

- MARTI KOPACZ - VOLUME 1-

1   - MARTI KOPACZ - VOLUME 1-
2      A.    What he thinks his assignment is.
3          MR. GLEASON:  You need to fix your
4   microphone.
5          THE WITNESS:  Thank you.
6      Q.    So we've gone through a bunch of
7   communications with him.  Was there -- was there
8   ever a meeting or a call where he drove it, he
9   drove the call, he drove the meeting, he said,
10  Marti, I want to meet with you, or Marti I needed
11  to call you?
12         Or were all the meetings or calls
13  ones where you said, Dick, I need to talk to you?
14     A.    No, if I hadn't talked to Dick in a
15  week or so, I would usually get a call from Rita,
16  his assistant, who would say I have Mr. Ravitch
17  for you and he'd say, how are you?
18     Q.    And he would check in on how you were
19  doing?
20     A.    Yeah.  He would check in.
21     Q.    Okay.  He would definitely check in
22  with you to see how you were coming along?
23     A.    Yes.
24     Q.    So some of these meetings or calls
25  were initiated by him and some were initiated by

1   - MARTI KOPACZ - VOLUME 1-
2   you?
3      A.    Yes.
4      Q.    Okay.  So, June 3rd, 2014, you have
5   one with him where you catch up on case
6   developments.  Was that just such a call where he
7   might have called you --
8      A.    And, again, I don't know if he called
9   me or I called him.
10     Q.    Okay.  Do you remember what you
11  talked about?
12     A.    I don't.
13     Q.    Okay.  Now, take a look on the next
14  page, if you could, at June 11, 2014.  This is the
15  -- this is the meeting that then moves into the
16  dinner party that you talked about.
17         Remember that?
18     A.    Yes.
19     Q.    What was -- what was the subject --
20  what was the occasion for and the subject of the
21  meeting in Judge Rosen's chambers?
22         This is kind of like -- this is a big
23  group of people --
24     A.    It is a big group of people.
25     Q.    -- all of a sudden get together.

1   - MARTI KOPACZ - VOLUME 1-
2      A.    At some time prior to this, okay, my
3   team's relationships with Ernst & Young and Conway
4   got frayed okay?  And there were, this was
5   basically all of the parties being called to
6   chambers to be instructed to play nicely in the
7   sand box.
8      Q.    So did Judge Rosen initiate this
9   meeting?
10     A.    Judge Rosen initiated this meeting.
11     Q.    So he called you and said I want to
12  clear the air?
13     A.    Yes, you're not playing we will
14  continue sand box with the other children.
15     Q.    He said that to you?
16     A.    Yes generally that's, that's he
17  didn't, he didn't use those words but it was like
18  we need to have a conversation now.  By the time
19  we get to this meeting of which there was already
20  this kind of dinner party plan, that same with Mr.
21  Ravitch --
22     Q.    There was already the plan for the
23  dinner party?
24     A.    This was, actually, that night was to
25  be this group and E & Y and Conway didn't

1   - MARTI KOPACZ - VOLUME 1-
2   participate in the dinner.  But that was to be the
3   dinner in which I was going to -- and Mr. Ravitch
4   were meeting with Dan Gilbert.  All right.  He
5   canceled last minute.  So we all went anyway.
6          But, yes, it was -- that was -- that
7   was the way that I got on his calendar was for the
8   Blustein's to throw a dinner party.
9      Q.    So what happened at the meeting that
10  was called because there was -- whatever, tempers
11  were flaring or whatever?
12     A.    Yes.  By the time we got to the
13  meeting, we had already worked out our issues and
14  our differences.
15     Q.    And so everyone was kind of like,
16  we're good?
17     A.    We're good.  And we talked -- at that
18  point in time we talked a lot about where my
19  thinking was on the feasibility testing.
20     Q.    In this meeting with Judge Rosen?
21     A.    Uh-huh.
22     Q.    What did Judge Rosen say during this
23  meeting?
24     A.    I'm not sure that Judge Rosen said a
25  whole lot.  It was mostly a dialogue with Jones

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-

1  Day and me and the advisors about, you know, how
2  broad or narrow feas -- my assessment of
3  feasibility was and should be.
4      Q.    Was there a dispute about that?
5      A.    I think there was, yes.
6      Q.    And who was the dispute between and
7  what were the contours of it?
8      A.    I think generally the dispute was
9  between the City and me in terms of things like
10  the time frame.  Right.  And you know, where --
11  where I was coming out on my thinking about
12  certain topics.
13      Q.    Okay.  Like what topics -- so let me
14  see if I can set it up in a way that is fair and
15  accurate.
16        Were you in communications with the
17  City, communicating to them concerns that you had
18  about the plan?
19      A.    Yes.
20      Q.    And was the City, in response, saying
21  that's not your job to have those types of
22  concerns, and so we think you're -- you're
23  straying from what you are supposed to do, you're
24  just supposed to take this plan and say whether

- MARTI KOPACZ - VOLUME 1-

1  this plan is or isn't feasible, you're not
2  supposed to change this plan, or words to that
3  effect.  I wasn't there so --
4      A.    Yeah.  I don't think it was that cut
5  and dry, if you will.  Right.
6      Q.    Okay.  It was a debate about scope,
7  though, right?
8      A.    There was a debate about scope.
9  There was also debate about -- I mean, at this
10  point in time I am still very, very troubled by
11  the lack of -- this is before the July 2nd
12  projections, there's $160 million worth of RRI
13  deferrals in the May 5th projections, and nobody's
14  told me where those go.  Okay?
15        So those are -- I'm having those
16  kinds of discussions and disagreements, if you
17  will, with the City as to whether or not that is
18  an important issue for me or not an important
19  issue for me.
20      MR. KANE:  When you just said "at
21        this point in time" you're referring to his
22        questions about the meeting --
23      THE WITNESS:  I'm talking about in
24        this time --

- MARTI KOPACZ - VOLUME 1-

1      MR. HACKNEY:
2      Q.    And you're saying now you know the
3  answer to that question --
4      A.    Now, I know the answer to the
5  question because we have the July 2nd projection.
6      Q.    That answered the question.
7      A.    That got to the point where the
8  deferrals are actually -- have been pushed back
9  into the 40-year projections.
10      Q.    They have been pushed outside the
11  ten-year period into --
12      A.    No, no.  They're in the -- they're --
13  they're at a more granular level so that you can
14  look at how the RRI money is going to be spent.
15  Okay?
16        So those are the kinds of issues that
17  I was having with E & Y and Conway and the City.
18      Q.    And did those issues get discussed --
19  oh, I see.
20        So then -- okay.  So did the
21  conversation kind of morph in this meeting in
22  Judge Rosen's chambers to one that was originally
23  going to be about are remember getting along
24  well --

- MARTI KOPACZ - VOLUME 1-

1      A.    Yes.
2      Q.    -- to one that was about, What is
3  your role?
4      A.    Right.
5      Q.    And then was there a subsequent
6  conversation held on that?
7      A.    I think we worked it out.  I mean, we
8  ultimately had a -- we agreed to have a -- what we
9  refer to as the big issues meeting here in New
10  York.  We had it in this room with the City, to go
11  through what I consider to be the issues and in
12  essence it almost looks like the table of contents
13  to my report.  Right?
14      Q.    In terms of --
15      A.    Feasibility.
16      Q.    Did you go down the list of things
17  that you thought was a big issue to the findings
18  of feasibility?  Is that what you mean?
19      A.    Yes.  We talked general -- we talked
20  about what I thought was important to my
21  feasibility assessment.  And I listened to the
22  City as to whether or not they thought those were
23  big issues.
24      Q.    And so, did -- in this meeting on

- MARTI KOPACZ - VOLUME 1-

1  June 11th --
2
3      A.   Uh-huh.
4      Q.   -- did Judge Rosen play a role in
5  helping immediate, so to speak, the differences
6  between you and the City?
7      A.   It really wasn't -- I mean, at that
8  point in time we were getting along.  Right.  We
9  were getting along.  We had a better flow of
10  information.  We had worked out the -- them
11  attending interviews that I had.  And we were --
12  you know, again, the City was very interested in
13  trying to understand what it was I was thinking
14  about the projections.
15      Q.   I see.
16      A.   And we agreed to have a meeting the
17  subsequent week here in New York to hash out, you
18  know, again, I would still like to see the
19  pension sensitivity analysis, I don't have them.
20      Q.   Yeah.
21      A.   Right?
22      Q.   Do you see on June 12th which is the
23  day after the dinner, the meeting that went into a
24  dinner party --
25      A.   Yes.

- MARTI KOPACZ - VOLUME 1-

1
2      Q.   You met with the DPOA and its counsel
3  and also Dick Ravitch.
4          Do you see that?
5      A.   Dick was in town those days, yes.
6      Q.   Do you remember him being in on that
7  meeting?
8      A.   Yes.
9      Q.   Why was he in that meeting?
10     A.   Dick had specifically requested some
11  meetings with the unions and I was interested in
12  -- at that point in time there weren't settlements
13  with these -- with the union and I was interested
14  in finding out where those -- those were going to
15  come out.
16     Q.   Oh, in terms of their negotiations of
17  their collective bargaining agreement?
18     A.   Yes.
19     Q.   Did they -- did the people at that
20  meeting tell you where the union and the City
21  stood on that subject?
22     A.   They -- they shared with me what they
23  thought it was that they were seeking versus
24  what the City had suggested, yes.
25     Q.   Okay.  And -- okay.  And then, I

- MARTI KOPACZ - VOLUME 1-

1
2  mean, were -- you were just trying to understand
3  what -- where they were at for purposes of
4  interpreting the model because that ripples
5  through the model in terms of the expenses?
6      A.   The -- the projections had -- have
7  always made assumptions about what the collective
8  bargaining agreements would be.
9      Q.   In fact, at the time you issued your
10  report, you had not actually seen the collective
11  bargaining agreements, correct?
12     A.   I actually had gotten them the
13  weekend before, but have not looked at them.  I'm
14  not -- and it has been represented to me and I
15  believe what E & Y has told me, that the economics
16  of the collective bargaining are appropriately
17  modeled in the July 2nd projections.
18         What I haven't looked at is what the
19  noneconomic terms might be.
20     Q.   The work rules and so forth?
21     A.   Yes.
22     Q.   Anything else you can remember that
23  about that June 12th meeting?
24     A.   No.
25     Q.   Now, on June 16th, four days later,

- MARTI KOPACZ - VOLUME 1-

1
2  there's another meeting with Mr. Ravitch.
3      A.   Uh-huh.
4      Q.   And this one says, Work on report
5  sections pension -- pensions and post-confirmation
6  issues.
7      A.   Yes.
8      Q.   Now, this is a little more
9  substantive, at lease to my eye.
10     A.   Yes.
11     Q.   It looks like you are having a
12  working session on report issues.  But you tell
13  me.
14     A.   Yes, and I'd have to look at my time
15  records to see.  I don't remember.  I -- I -- I
16  think we were in New York I think that week.
17     Q.   Was --
18     A.   Yes, because we were here for
19  meetings with AFSCME and Miller Buckfire and the
20  big issues meeting.
21     Q.   And I note -- and do you remember
22  anything else about what you worked on on your
23  report with Mr. Ravitch?
24     A.   We -- we -- yes, I do.  I remember
25  the working through at that point in time we -- I

97 (Pages 385 to 388)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 98 of
146

- MARTI KOPACZ - VOLUME 1-

believe we had what we thought was going to be the
final legislation that may have been signed
already on the Grand Bargain. And worked
through -- talked through some of the issues
relative to post-confirmation. And we talked
through some of the analysis that we were doing on
the pensions.

Q.    By "we" you mean?

A.    Phoenix.

Q.    Phoenix?

A.    Yes.

Q.    Okay. So what was his role in that
meeting?

A.    We were -- we were sharing with Dick
what we knew about the pension settlements and the
new pension plan. Okay? Because, again, Dick has
great knowledge about public pensions in general,
but he really didn't have a lot of knowledge about
the Detroit circumstance as it was. So we were
simply talking through this is what the settlement
looks like, this is what the funding looks like,
this is how the restoration works, this is how the
new hybrid plan works, those sort of things.

Q.    I see. And then he actually goes to

- MARTI KOPACZ - VOLUME 1-

a meeting the next day with AFSCME and you?

A.    Yes.

Q.    Why did he go to that meeting and why
did you go to that meeting?

A.    Again, that meeting was to talk with
the union about both the agreements they had
reached and the -- there's many -- there are
several AFSCME locals in Detroit, some of whom at
that point in time had -- had reached agreement
and some who had not. Okay. So again, I'm just
doing my diligence around the status of the AFSCME
deals and negotiation.

Q.    In terms of, okay -- I mean, you can
find out the ones that are done, what are the
terms. Right?

A.    And the ones that need to be done.
Like, for example, the AFSCME for DDOT was not
done at this time and that was important to me to
know where that was going. I had heard from the
City side as to what that was going to be about
and I wanted to hear from the union side.

Q.    So it was kind of like what are the
issues in your negotiation --

A.    Yes.

- MARTI KOPACZ - VOLUME 1-

Q.    -- with the City?

A.    Yes.

Q.    And I take it both they and the City
told you what the issues were that were keeping
the parties apart?

A.    Generally, yes.

Q.    So, was Mr. Ravitch playing any role
here, as almost like trying to get people
together? Was he playing --

A.    No.

Q.    -- a quasi mediation role?

A.    No.

Q.    Just as a grand old man saying, look
guys, like --

A.    Great old man.

Q.    He wasn't saying, look -- I mean, was
he trying --

A.    He -- again, the concern Mr. Ravitch
had and the concern I had about post-confirmation
issues was in the legislation that ultimately was
signed. Okay? There is no oversight committee
direct involvement in negotiations. Okay?
There's an approval process.
There's also -- if, in fact, the

- MARTI KOPACZ - VOLUME 1-

unions don't have a negotiation and haven't
resolved agreement now, there is still going to be
the right to go to arbitration post-confirmation.
Some of the early draft legislation
did not have the arbitration ability in there and
that's, again -- it's -- it is one of those
qualitative sort of risk factors, that if you
don't get a deal with your unions pre-confirmation
-- right?

Q.    Yeah.

A.    Then you may be subject to
arbitration down the road and that creates more
unknown.

Q.    So, was it your understanding that
Mr. Ravitch was basically trying to understand
what the needs of the unions were so he had that
understanding as he was talking to people about
the Grand Bargain legislation?

A.    I don't know. I don't know.

Q.    Okay. It just wasn't clear to you,
then, what he was doing there; is that fair?

A.    I don't know why he sought to join me
during that meeting.

Q.    Okay. I'm not saying he's not a

- MARTI KOPACZ - VOLUME 1-
1    generally helpful guy. I'm sure he is. He has a
2    wealth of experience.
3
4         But in terms of -- you knew why you
5    were there, right?
6    A.    I knew why I was there. I think he
7    had already been to Lansing at that point.
8    Q.    Okay. But if I walked up to you and
9    said Marti, what's Dick doing here, you would have
10   said, I don't know, he came along?
11   A.    Yes.
12   Q.    Okay. I said that we would break at
13   6:00, I'm happy to push on --
14   A.    We can push. Let's try to get
15   through this.
16   Q.    Let's try to do it.
17        MR. STEWART: How much more do you
18   have?
19        MR. HACKNEY: I'm getting much
20   closer. I'll bet I don't have more than half
21   an hour and I'll try to keep it shorter than
22   that.
23        MR. LERNER: The record should
24   reflect the air just went off, too.
25        MR. HACKNEY: That's part of my plan.

- MARTI KOPACZ - VOLUME 1-
1
2    BY MR. HACKNEY:
3    Q.    Okay. And then -- take a look down
4    at July 9, you have a call with -- you have a
5    meeting with Mr. Ravitch and Mr. Kiernan of Schiff
6    Hardin.
7    A.    Yes.
8    Q.    Who is Mr. Kiernan?
9    A.    Mr. Kiernan is Mr. Ravitch's personal
10   attorney.
11   Q.    Okay.
12   A.    He is also involved in the Blinken
13   report.
14        THE VIDEOGRAPHER: I think your
15   microphone is off.
16        THE WITNESS: It fell off, yes.
17        Mr. Kiernan is -- Mr. Ravitch refers
18   to him as "my personal attorney on this
19   matter," and Mr. Kiernan was also involved
20   with Mr. Ravitch and the Blinken report.
21   Q.    Okay. And then -- and then you
22   talked about revised projections and impact on
23   feasibility?
24   A.    Yes.
25   Q.    So how did this meeting come about?

- MARTI KOPACZ - VOLUME 1-
1
2    Did you request it or did he request it,
3    Mr. Ravitch?
4    A.    I don't recall.
5    Q.    Okay. And this is just for
6    reference, Ms. Kopacz, we're talking -- this is
7    about three weeks ago.
8    A.    This was about three weeks ago. We
9    were in New York.
10   Q.    Okay.
11   A.    I know we were in New York. We had
12   lunch at an Irish pub and Dick had asked Mr.
13   Kiernan to do research on feasibility and to share
14   that with us.
15   Q.    Oh, his personal lawyer did legal
16   research on feasibility?
17   A.    Yes.
18   Q.    Okay. So what did he say?
19   A.    He told me about Mount Carbon which
20   we already knew about, the Mount Carbon decisions
21   and, you know, the kind of the -- what's the other
22   district in Colorado, the other decision that
23   references Mount Carbon? But they're all by the
24   same judge. Right. And about the fact that there
25   is very little case history on Chapter 9

- MARTI KOPACZ - VOLUME 1-
1
2    feasibility, and that was really it.
3    Q.    Okay. So --
4    A.    Mr. Ravitch was trying to be helpful.
5    Q.    Okay. So you didn't ask Mr. --
6    because you have a fine lawyer of your own, I
7    think the record will reflect --
8    A.    I do.
9    Q.    -- and presumably, I don't want to
10   get into your communications with him. But to the
11   extent that you had the need for legal advice,
12   that's one of the reasons you got a lawyer, right?
13   A.    I was allowed to retain Mr. Lerner
14   and Squire Patton Boggs to help with procedural
15   matters. Okay?
16        I -- and they have graciously helped
17   me do other things, but as a practical matter,
18   I've had no direct legal input into feasibility.
19   Q.    Okay. From Mr. Lerner?
20   A.    From Mr. Lerner.
21        They have gratuitously done some of
22   that stuff. But remember, I was deep into this
23   before I ever got to hire them.
24   Q.    Yeah. Okay. So but did you say to
25   Mr. Ravitch, can you get your lawyer to give me

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 100 of
146

- MARTI KOPACZ - VOLUME 1-

1   advice?
2   A.    No, no, no, no, no, no.
3   Q.    So this was his idea?
4   A.    Mr. Ravitch independently wanted his
5   own understanding of feasibility.  He's not a
6   bankruptcy guy at all.  Right?  In terms of really
7   deeply understanding even Chapter 11.  Most of us
8   here understand Chapter 11, right?
9       So we at least understand what we
10  think we understand about feasibility in
11  Chapter 11.
12  Q.    Okay.
13  A.    Mr. Ravitch doesn't have any
14  experience in that world so he has been asking
15  Mr. Kiernan to help him research feasibility.
16  Q.    But do you know -- did he ever tell
17  you why?
18  A.    I think because he's a curious man.
19  Q.    Okay.
20  A.    And he, you know, again, wants to
21  understand what it is that Judge Rhodes is asking
22  him.  So he said next time you're in New York,
23  let's have lunch and we'll bring my attorney and
24  he'll tell you all of the things that he knows

- MARTI KOPACZ - VOLUME 1-

1   about feasibility.
2   Q.    Okay.  And then the last conversation
3   with Mr. Ravitch is on July 16th, that's just a
4   couple of days before your report was due?
5   A.    Yes.
6   Q.    Okay.  And that was also a meeting?
7   A.    Yes.
8   Q.    Now, that one --
9   A.    That was in our office --
10  Q.    You might remember that one more
11  clearly?
12  A.    I do, I do.
13  Q.    Okay.  So what happened in that one?
14  Who was there and what did you talk about?
15  A.    That was a meeting in which
16  Mr. Ravitch came to our offices.  We were drafting
17  the report and I asked Mr. Ravitch to review the
18  section on pensions and post confirmation.
19  Q.    And give you feedback?  Or
20  not?
21  A.    Yes.
22  Q.    If he liked it, right?
23  A.    Yeah, it was.  And again, because
24  those are issues that I knew he really, really

- MARTI KOPACZ - VOLUME 1-

1   cared about, that I thought it was advisable, A,
2   to have his input; and if he was going to have a
3   different opinion, him also being a judge's
4   expert.
5   Q.    Right.
6   A.    He should know that we were going to
7   have a difference of opinion.
8   Q.    Okay.  And did you?
9   A.    We did.
10  Q.    You did?
11  A.    We do.
12  Q.    You do?
13  A.    Yes.
14  Q.    What was his different view?
15  A.    He very strongly believes that the
16  CFO of the City should report directly to review
17  commission.
18  Q.    I see.
19  A.    And he believes that the City should
20  be mandated to prepare budgets and plans according
21  to generally-accepted accounting principles.
22  Q.    That was a -- that was recommendation
23  he had successfully implemented in New York, if I
24  recall?

- MARTI KOPACZ - VOLUME 1-

1   A.    Yes.
2   Q.    And he wanted the same thing in
3   Detroit?
4   A.    Yes.
5   Q.    And was he sort of, you know,
6   encouraging you to adopt his view in the report?
7   A.    No.
8   Q.    Or did he just say --
9   A.    No.
10  Q.    -- I take a different view, this is
11  my view?
12      Because your position was it was
13  tolerable that the CFO not report directly, right?
14  A.    That's correct.
15  Q.    I think you say words that it would
16  be okay if he did, but it's not a problem if he
17  doesn't, paraphrasing.
18  A.    That's fair.
19  Q.    It's says whatever it says.
20  A.    Yes.
21  Q.    And then you didn't ultimately take a
22  position on GAAP reporting, right?
23  A.    I didn't.  It -- by definition, GAAP
24  doesn't apply to governments.  Right?

- MARTI KOPACZ - VOLUME 1-

2  Q.  Yes.
3  A.  By definition, GAAP doesn't apply to
4  budgets.  All right.  I lived through this in
5  Nassau County, okay?  Why people think GAAP
6  applies to budgets is beyond me.  GAAP applies to
7  historical accounting.
8     Now, using GAAP-type principles to
9  prepare your budgets so that they are easily
10  comparable to your actuals and so that the
11  categorization of revenues and expenses is
12  similar, is very, very good.
13  Q.  Okay.  So just a few more questions
14  here, ma'am.
15  A.  Sure.
16  Q.  Go back to May 13th at the bottom of
17  the page, you have a call with Judge -- well, it's
18  a call, looks like it's a call with Judge Rhodes.
19     But was it a call with Judge Rhodes?
20  A.  May 13th, I'm sorry.
21  Q.  It's at the very bottom of the page
22  on May 13.  It's Re: Supplemental order.
23  A.  Yes.
24  Q.  And this time did you actually have a
25  call with him or was it just a call with his

- MARTI KOPACZ - VOLUME 1-

2  chambers?
3  A.  No, this was a call with him.
4  Q.  What did you all discuss on this
5  call?
6  A.  This was when we got the supplemental
7  order on -- this -- this I know part of this was
8  the question of whether or not anything I was
9  doing was protected or privileged.
10  Q.  Okay.  So did you call him or did he
11  call you?
12  A.  I called him.
13  Q.  And you said, I'd like to talk to the
14  judge because there's a question around
15  confidentiality?
16  A.  Yes.  And this is the point in time
17  when I said to him, I need counsel.
18  Q.  This is when you said I need counsel?
19  A.  I need counsel.  I -- I asked him
20  about counsel when he called me on April 21st and
21  he said --
22  Q.  You mean when his chambers called
23  you?
24  A.  When his -- No.  When he called me to
25  ask me if I would accept the appointment --

- MARTI KOPACZ - VOLUME 1-

2  Q.  Oh, sorry.
3  A.  -- I asked him then, Do I need
4  counsel.  And he said, Of course you don't need
5  counsel.
6  Q.  Oh.  That's not how I thought of it,
7  but that's okay.
8  A.  And I -- right.  And he said of
9  course --
10  Q.  He's the Judge.
11  A.  -- you don't need counsel.  And the
12  next time I talked to him, when I sent my first
13  letter, I said do -- I think I need counsel.  No,
14  you don't need counsel.
15  Q.  And then the third time you won?
16  A.  Yes.
17  Q.  So, was the driver on this call, you
18  were calling him to basically say I need to
19  understand what confidentiality means --
20  A.  Yes.
21  Q.  -- and I need a lawyer?
22  A.  Well, I -- people that I wanted to
23  talk with, other professionals in this matter,
24  okay, were -- there's a lot of work that's been
25  done in this case by other professional beyond the

- MARTI KOPACZ - VOLUME 1-

2  City.  I wanted to have the benefit of that and
3  while most people would have trusted my
4  professionalism to take that information and do
5  something appropriate with it, not inappropriate,
6  the concern raised by counsel, appropriately, was,
7  oh, my gosh, if we give it to the expert, that
8  does that mean it's going to be discoverable to
9  somebody else?  And I'm sitting there going I have
10  no clue.
11  Q.  Yeah.  And it does.  Yeah.
12  A.  I have no clue.  And I said I
13  can't -- you know.
14  Q.  So then you said I'm going to call
15  the Judge to get clarity on this?
16  A.  Yes.
17  Q.  Okay.  Now, did you -- had
18  Judge Rosen sort of set a precedent for you a
19  little bit in terms of his admonition to you that
20  it's okay to call the Judge if you have a question
21  or did you think about --
22  A.  I don't know.  At that point in time,
23  you know, it's hard.  He's taken my calls gratis
24  and I said, what do I do Because you've got to go
25  to the Judge.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME 1-

1
2     Q.    How many times have you talked the
3  Judge?
4     A.    Three maybe.
5     Q.    So there's -- I mean
6  post-appointment.
7     A.    About I think three.
8     Q.    So we just discussed the first one,
9  right?
10    A.    The first one -- the first one I'm
11 not sure I ever talked to him.
12    Q.    No, I'm talking about this -- this
13 one --
14    A.    I think this -- yes.
15    Q.    -- with the confidentiality and the
16 counsel?
17    A.    Yes. Right. That was the first
18 time.
19    Q.    That's the first one.
20    A.    That I actually talked to him and
21 then I talked to him again --
22    Q.    I'm not talking about his chambers.
23 I know you talked talked to his chambers before.
24    A.    Right. This is the first time I
25 talked to him.

- MARTI KOPACZ - VOLUME 1-

1
2     Q.    I'm talking about him. Okay. Then
3  when's the next time you talked to him? It may be
4  on here but --
5        MR. LERNER: It is?
6        THE WITNESS: It is. I -- when I
7     asked for the extension --
8  BY MR. HACKNEY:
9     A.    -- the extension.
10    Q.    June 2nd. I think this is before the
11 extension, ma'am.
12        June 2nd, or maybe you did. Are
13 there more -- more than one extension?
14    A.    Uh-huh. I've had two.
15    Q.    Okay. So -- okay. So June 2nd you
16 think this is bankruptcy discovery transmission
17 issues is the topic.
18        Did you do a call with the Judge and
19 Jones Day where you said, words to the effect of
20 I'm not getting what I need or I'm having trouble
21 or whatever you said? Mr. Lerner's saying no.
22    A.    Uh-huh.
23    Q.    Do you remember what this was about?
24    A.    This was -- this may have been the
25 call that Judge Rhodes scheduled for all of us to

- MARTI KOPACZ - VOLUME 1-

1
2  make sure that I had gotten the --
3     Q.    Oh.
4     A.    -- information -- yes.
5     Q.    Okay.
6     A.    This is the call that followed up
7  from had I gotten the working models that I
8  wanted.
9     Q.    Do you remember Mr. Lerner sent a
10 letter --
11    A.    Yes.
12    Q.    -- and Mr. Stewart sent a letter
13 back?
14    A.    Yes.
15    Q.    Mr. Stewart sent a nasty letter, and
16 then -- and then there was a hearing on this?
17    A.    Yes.
18    Q.    And then the Judge said we're going
19 to follow up and have a call to see if we got it?
20    A.    That's what the call was.
21    Q.    And was this call basically like
22 we've got what we need, we're okay? Anything else
23 substantive on this call?
24    A.    Not that I recall.
25    Q.    Okay. Now, take a look down at

- MARTI KOPACZ - VOLUME 1-

1
2  June 9. There's two calls with Judge Rhodes. The
3  first one is just you and Mr. Lerner. The second
4  one is you and Mr. Lerner and a bunch of people
5  from the City. Do you see those two things?
6     A.    Yes.
7     Q.    Are those calls -- did you call with
8  Mr. Lerner and say we need a call?
9     A.    This is when I believe that I said I
10 don't think I can make the 24th deadline.
11    Q.    Okay. And did the Judge
12 effectively -- did you talk the Judge himself?
13    A.    Yes.
14    Q.    And then --
15    A.    Nd then he said, We need to get
16 everybody on the call.
17    Q.    And then -- then everybody, though,
18 was just the City?
19    A.    Yes.
20    Q.    Okay. Excuse me. There were never
21 any of your calls with Judge Rhodes -- there were
22 never any creditors on the call, correct? It was
23 always just you or you plus your counsel and the
24 City, right?
25    A.    That's correct.

- MARTI KOPACZ - VOLUME 1-

1    
2   Q.   Now -- and do you remember, was the
3   June 9 call just basically like when do you think
4   you can get it done type of call?
5   A.   I think this was -- again, it was all
6   part of that follow-up from the hearing where he
7   basically said we're going to have a call every
8   week to make sure you're getting what you need.
9   Q.   Okay.
10  A.   There was -- there was never any
11  substantive conversations.
12  Q.   Right.
13  A.   It was more like are you getting what
14  you need.
15  Q.   Okay.  And in general, it was either
16  yes or I need this thing, and then you would get
17  it?
18  A.   Yes.
19  Q.   That's how -- is that a fair
20  characterization, which was it was either things
21  which are fine or there was an open issue and you
22  would raise it and it would get addressed?
23  A.   Yes.
24  Q.   Other than the -- whatever didn't get
25  addressed that you noted in your report?

- MARTI KOPACZ - VOLUME 1-

1    
2   A.   Right.
3   Q.   Look at June 14th.  You see that one?
4   A.   Yes.
5   Q.   Now, was this a call?  This is
6   Mr. Lerner and you again just with the Judge.
7   A.   Uh-huh.  Yes.
8   Q.   And was it with the Judge himself?
9   A.   I think so.
10  Q.   And do you remember what you
11  discussed?  The topic is "status on report
12  completion."
13  A.   This is -- this is -- I -- my
14  recollection is this is I'm ten days way from my
15  original deadline and I'm pretty confident that
16  I'm not making it.
17  Q.   Okay.  And so now you're -- are you
18  sort of expressing to Judge Rhodes here more, you
19  know, forcefully that you're not going to be able
20  to make that deadline?
21  A.   I'm not making this deadline.
22  Q.   Okay.  And what did he say to you?
23  A.   I think he basically said, Okay,
24  what -- you know, how much more time do you need,
25  et cetera.  I remember when we were in court,

- MARTI KOPACZ - VOLUME 1-

1   we -- I told him that I -- you know, I was -- I
2   was a few weeks behind on getting the information
3   that I needed and that I was in all likelihood
4   going to be -- even if I got the information
5   post haste, I was going to need more time than was
6   originally allotted.  And I think this was the
7   call to him that said, yes, I need more time.
8    
9   Q.   And then on July 14th -- anything
10  else you can recall?
11  A.   Nothing.
12  Q.   And on July 14th, do you see that
13  there's another call with you and Mr. Lerner and
14  Mr. Stewart with Judge Rhodes re: scheduling and
15  report due date?
16  A.   Yes.
17  Q.   And was this the call where you said
18  you might need an additional -- I think your
19  report -- your --
20  A.   Isn't that the one we just talked
21  about?
22  Q.   Well, no.  Because the one we talked
23  about was from much earlier.  It was from June 14,
24  so it was a month --
25  A.   June 14th.  Oh, and you're saying

- MARTI KOPACZ - VOLUME 1-

1   July.
2    
3   Q.   Yeah.  Do you see it down there?
4   A.   Yeah.  Okay.
5   Q.   Now you're pressing up against
6   another deadline which is July 15.
7   A.   Yes.
8   Q.   And was this where you communicated
9   the Judge that you might need the extra three days
10  that I think you ended up taking?
11  A.   Yes.
12  Q.   Is that right, ma'am?
13  A.   That's correct.
14  Q.   And did you have any other
15  conversation with him on this call?
16  A.   No.
17  Q.   Did you ever have a substantive
18  conversation with Judge Rhodes about your report?
19  A.   Nothing.
20  Q.   No -- never gave him a sense of where
21  your --
22  A.   No.
23  Q.   -- conclusions were leading you?
24  A.   No.  And this is where he instruct --
25  yeah, this is -- this is when he gave me the extra

- MARTI KOPACZ - VOLUME 1-

1    - MARTI KOPACZ - VOLUME 1-
2  couple of days.
3    Q.   The only thing that I -- I didn't see
4  on here that I wanted to ask you about was I had a
5  colloquy with him at one point where he said to us
6  that he wanted to talk to you about, for lack of a
7  better word, what your report was going to say.
8    A.   Yes.
9    Q.   And we had a colloquy in court where
10 we said, yeah, okay.  It's good to know you're
11 going to do that, and -- and then he said, yeah,
12 you can ask her about what she and I discussed.  I
13 wasn't -- that's about what he said.  It was
14 something like that.
15   Did you have a -- did you have a
16 conversation with him closer to -- I mean did you
17 have another conversation with him other than was
18 listed here?
19   A.   No.  He -- the -- the -- the
20 discussions that I had with Judge Rhodes about our
21 discussions, okay -- and bear with me.  I'm going
22 to tell you.
23   On June 21st -- on April 21st when he
24 called me to ask me if I was still interested in
25 serving as his expert, right, we had a

1    - MARTI KOPACZ - VOLUME 1-
2  conversation and he said we're going to talk about
3  what we need to talk about now.  And he said, I
4  don't intend to talk to you about anything until
5  maybe ever or until much closer to when you're
6  going to issue your report.  Okay?
7    So he told me up front that we
8  weren't going to have any -- any communications,
9  substantive communications.  He said I'm going to
10 put a procedure in place where if you need help to
11 get information, right, you will -- you will
12 communicate with me you will send me a letter.  We
13 will put it on the docket and we will have a
14 hearing and I will do that very, very quickly.
15 Okay?
16   He never had another conversation
17 with me until I believe this 14th where he said, I
18 want you to send me your final report and once I
19 see your final report, I will tell you how to
20 distribute it.
21   Q.   Before you filed it?  Oh, I see.
22 Before you filed -- before you served it?
23   A.   Yes.
24   Q.   And did you do that?
25   A.   I did.

1    - MARTI KOPACZ - VOLUME 1-
2    Q.   Okay.  So -- so you sent him an
3  e-mail that had your -- what you considered your
4  final report.  It was signed?
5    A.   Yes.  I sent --
6    Q.   Or was it a draft ready to be signed
7  or --
8    A.   -- no.  No.  It was -- he did not
9  want any drafts.  He wanted the final report.  I
10 sent it to him at 3:30 on -- 3:31 on Friday and at
11 4:49 I got a call from him and his chambers
12 saying, You're authorized to distribute it, but I
13 have no idea how you do that.  So, get ahold of
14 your lawyer and get ahold of Jones Day and figure
15 out who it needs to go to, and that was it.  And
16 he said I would -- he was going to send it to
17 Mr. Ravitch.
18   MR. HACKNEY:  Ma'am, thanks for your
19 time today.  I'm going to pass the mic to
20 Mr. Levin, but I think -- it's Mr. Wagner I
21 should say from Kramer Levin, but I think
22 that it's his expectation that maybe he'll
23 pick up with you tomorrow.
24   (Whereupon, a brief discussion was
25 held off record.)

1    - MARTI KOPACZ - VOLUME 1-
2    MR. KANE:  Why don't we pick up
3  tomorrow?
4    MR. HACKNEY:  Yeah.  We'll call it a
5  day.  Thanks for your time.
6    THE WITNESS:  Thank you.
7    THE VIDEOGRAPHER:  Thank you all very
8  much.  The time now is approximately
9  6:21 p.m.  We're going off the record and
10 just finished for today to be continued
11 tomorrow.  There are five DVDs to today's
12 deposition.
13   (Whereupon, the deposition adjourned
14 at 6:21 p.m.)
15
16
17
18
19
20
21
22
23
24
25

104 (Pages 413 to 416)

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 105 of 146

```
 1          - MARTI KOPACZ - VOLUME 1-
 2        A C K N O W L E D G E M E N T
 3
 4    STATE OF NEW YORK      )
 5                           ) ss.
 6    COUNTY OF NEW YORK     )
 7
 8       I, MARTI KOPACZ, hereby certify that I have
 9    read the transcript of my testimony taken under
10    oath in my deposition of July 31, 2014; that
11    the  transcript is a true, complete and correct
12    record of my testimony, and that the answers on
13    the record as given by me are true and correct.
14
15       _____
          MARTI KOPACZ
16
17    Subscribed and sworn
      to before me on this the
18    _____ day of _____, 2014.
19
20       _____
          Notary Public, State of New York
21        My commission expires:_____
22
23
24
25
```

```
 1          - MARTI KOPACZ - VOLUME 1-
 2          C E R T I F I C A T E
 3    STATE OF NEW YORK      )
 4                           ) ss.
 5    COUNTY OF NEW YORK     )
 6
 7       I, HOPE LYNN MENAKER, a Notary Public within
 8    and for the State of New York, do hereby certify:
 9       That MARTI KOPACZ, the witness whose
10    deposition is hereinbefore set forth, was duly
11    sworn by me and that such deposition is a true
12    record of the testimony given by the witness.
13       I further certify that I am not related to
14    any of the parties to this action by blood or
15    marriage, and that I am in no way interested in
16    the outcome of this matter.
17          IN WITNESS WHEREOF, I have hereunto
18    set my hand this August 1, 2014.
19
20       _____
21        HOPE LYNN MENAKER
22
23
24
25
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 106 of 146

- MARTI KOPACZ - VOLUME II-
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

In Re                    ) Chapter 9

CITY of DETROIT, MICHIGAN,      ) Case No. 13-53846

        Debtor.    ) Hon. Steven Rhodes


DATE: August 1, 2014
TIME: 9:12 a.m.

            VOLUME II
        VIDEOTAPED DEPOSITION OF MARTI
KOPACZ, held at the offices of Squire Patton
Boggs, 30 Rockefeller Plaza, New York, New York,
pursuant to Order, before Hope Menaker, a
Shorthand Reporter and Notary Public of the State
of New York.

1       - MARTI KOPACZ - VOLUME II-
2   A P P E A R A N C E S: (Cont'd)
3   ALFREDO R. PEREZ, ESQ.
4   Weil, Gotshal & Manges, LLP
5   700 Louisiana Street, Suite 1700
6   Houston, Texas  77002
7       Appearing on behalf of Financial Guaranty
8       Insurance Company
9
10  LISA SCHAPIRA, ESQ.
11  Chadbourne & Parke, LLP
12  30 Rockefeller Plaza
13  New York, New York  10112
14      Appearing on behalf of Assured Guaranty
15      Municipal Corporation
16
17  SHANNON L. DEEBY, ESQ.
18  Clark Hill, PLC
19  151 South Old Woodward Avenue
20  Suite 200
21  Birmingham,  Michigan 48009
22      Appearing on behalf of the Retirement Systems
23      for the City of Detroit
24
25

1           - MARTI KOPACZ - VOLUME II-
2   A P P E A R A N C E S:
3   GEOFFREY S. STEWART, ESQ.
4   CHRISTOPHER DiPOMPEO, ESQ.
5   ALEXANDER BLANCHARD, ESQ.
6   Jones Day
7   51 Louisiana Avenue, N.W.
8   Washington, D.C. 20001
9       Appearing on behalf of the Debtor
10
11  STEPHEN C. HACKNEY, ESQ.
12  Kirkland & Ellis, LLP
13  300 North LaSalle Street
14  Chicago, Illinois 60654
15      Appearing on behalf of Syncora
16
17  GUY S. NEAL, ESQ.
18  Sidley Austin, LLP
19  1501 K Street, N.W.
20  Washington, D.C. 20005
21      Appearing on behalf of National Public Financing
22
23
24
25

1           - MARTI KOPACZ - VOLUME II-
2   A P P E A R A N C E S: (Cont'd)
3   JENNIFER K. GREEN, ESQ.
4   Clark Hill, PLC
5   500 Woodward Avenue, Suite 3500
6   Detroit, Michigan  48226
7       Appearing on behalf of the Retirement Systems
8       for The City of Detroit
9
10  SAM J. ALBERTS, ESQ.
11  Dentons US, LLP
12  1301 K Street, N.W.
13  Suite 600, East Tower
14  Washington, D.C. 20005
15      Appearing on behalf of the Retiree Committee
16
17  ALLAN S. BRILLIANT, ESQ.
18  Dechert LLP
19  1095 Avenue of the Americas
20  New York, New York 10036
21      Appearing on behalf of Macomb County
22
23
24
25

1 (Pages 419 to 422)

```
 1          - MARTI KOPACZ - VOLUME II-
 2   A P P E A R A N C E S: (Cont'd)
 3   STEPHEN D. LERNER, ESQ.
 4   Squire Patton Boggs
 5   30 Rockefeller Plaza
 6   New York, New York 10112
 7      and
 8   SCOTT A. KANE, ESQ.
 9   Squire Patton Boggs
10   221 E. Fourth Street, Suite 2900
11   Cincinnati, Ohio 45202
12      Appearing on behalf of the Witness
13
14   JOCHEN SCHMITZ, ESQ.
15   Greenhill & Co. LLC
16   300 Park Avenue
17   New York, New York 10022
18      Appearing on behalf of Retirement Systems
19
20   JONATHAN M. WAGNER, ESQ.
21   Kramer Levin Naftalis & Frankel LLP
22   1177 Avenue of the Americas
23   New York, New York 10036
24      Appearing on behalf of the Ad Hoc COPS
25      Holders
```

```
 1          - MARTI KOPACZ - VOLUME II-
 2   A P P E A R A N C E S: (Cont'd)
 3
 4   JAYE QUADROZZI, ESQ.
 5   Young & Associates
 6   Orchards Corporate Center
 7   27725 Stansbury Blvd. Suite 125
 8   Farmington Hills, Michigan 48334
 9      Appearing on behalf of Oakland County
10
11   OLGA KOGAN, ESQ. (Via telephone)
12   Davis Polk & Wardwell LLP
13   450 Lexington Avenue
14   New York, New York 10017
15      Appearing on behalf of Merrill Lynch
16
17   HEATHER HUBBARD, ESQ. (Via telephone)
18   Waller Lansden Dortch & Davis, LLP
19   Nashville City Center
20   511 Union Street
21   Suite 2700
22   Nashville, TN 37219
23      Appearing on behalf of US Bank
24
25
```

```
 1          - MARTI KOPACZ - VOLUME II-
 2   A P P E A R A N C E S: (Cont'd)
 3
 4   CAROL NEVILLE, ESQ. (Via telephone)
 5   Dentons US LLP
 6   1221 Avenue of the Americas
 7   New York, New York 10020
 8      Appearing on behalf of the Retiree Committee.
 9
10   EVAN MILLER, ESQ.  (Via telephone)
11   Jones Day
12   51 Louisiana Avenue, N.W.
13   Washington, D.C. 20001
14      Appearing on behalf of the City of Detroit.
15
16
17
18
19   ALSO PRESENT:
20      Thomas Devine, Videographer
21      Brian Gleason
22
23
24
25
```

```
 1          - MARTI KOPACZ - VOLUME II-
 2
 3              INDEX
 4   WITNESS:  MARTI KOPACZ
 5   EXAMINATION BY                    PAGE
 6   MR. WAGNER                430
 7   MR. NEAL                  473
 8   MR. BRILLIANT             516
 9   MS. QUADROZZI             528
10   MS. GREEN                 534
11   MR. ALBERTS               568
12   MR. KANE                  571
13   EXHIBITS FOR IDENTIFICATION
14   NUMBER   DESCRIPTION              PAGE
15   4        POA00602884        434
16   5        NASRA Issue Brief  438
17   6        Blinken Report     452
18   7        Release by the National    456
19            Conference on Public Employee
20            Retirement Systems
21   8        Government Accounting Standards  461
22            Board news release June 25,
23            2012
24   9        GASB Statement Number 67   463
25   10       Declaration of Chuck Moore   550
         11       NASRA Publication - public  564
                  Funds Survey Summary of
                  Findings for Fiscal Year 2008
```

1      - MARTI KOPACZ - VOLUME II-
2           THE VIDEOGRAPHER:  Good morning.
3      We're now on the record.  The date is August
4      1st, 2014, and the time is approximately
5      9:04 a.m.
6           We are located at the offices of
7      Squire Patton Boggs, 30 Rockefeller Center,
8      New York, New York.
9           We are taking the deposition of Marti
10     Kopacz, Volume II, second day, In Re: City of
11     Detroit Bankruptcy, U.S. Bankruptcy Court,
12     Eastern District of Michigan, Southern
13     Division, Chapter 9, Case Number 13-53846.
14          My name is Thomas Devine and I'm the
15     video specialist with Elisa Dreier Reporting.
16          The court reporter is Hope Menaker
17     also with Elisa Dreier Reporting.
18          At this time I would like to ask the
19     attorneys to please introduce themselves for
20     the video record.
21          Please state your name, the firm with
22     which you are affiliated and who you
23     represent, after which the Court reporter
24     will swear in the witness and we may proceed.
25          MR. WAGNER:  Jonathan Wagner from

1      - MARTI KOPACZ - VOLUME II-
2      Kramer Levin representing the Ad Hoc COPs
3      Holders.
4           MS. SCHAPIRA:  Lisa Schapira of
5      Chadbourne & Parke, representing Assured
6      Guaranty Municipal Corp.
7           MR. NEAL:  Guy Neal, Sidley Austin,
8      National Public Finance Guaranty.
9           MR. HACKNEY:  Stephen Hackney,
10     Kirkland & Ellis on behalf of Syncora.
11          MR. BRILLIANT:  Allan Brilliant from
12     Dechert LLP on behalf of Macomb County by and
13     through the Public Works Commissioner Anthony
14     Morrocco and the Macomb Interceptor Drainage
15     District.
16          MR. BLANCHARD:  Alex Blanchard, Jones
17     Day on behalf of the City.
18          MS. GREEN:  Jennifer Green, Clark
19     Hill, on behalf of the retirement systems.
20          MS. DEEBY:  Shannon Deeby, Clark
21     Hill, also on behalf of the retirement
22     systems.
23          MR. KANE:  Scott Kane of Squire
24     Patton Boggs on behalf of the witness.
25          MR. LERNER:  Stephen Lerner of Squire

1      - MARTI KOPACZ - VOLUME II-
2      Patton Boggs on behalf of Ms. Kopacz.
3           MS. QUADROZZI:  Jaye Quadrozzi, Young
4      & Associates, on behalf of Oakland County.
5           MR. ALBERTS:  Sam J. Alberts of
6      Dentons on behalf of the
7      Official Committee of Retirees.
8           THE VIDEOGRAPHER:  Thank you.  Hope,
9      would you please swear -- oh, and the people
10     on the phone, excuse me.
11          People on the phone.
12          MS. HUBBARD:  Heather Hubbard at
13     Waller Lansden on behalf of U.S. Bank.
14          MS. KOGAN:  Olga Kogan at Davis Polk
15     & Wardwell on behalf of Merrill Lynch.
16          MR. MILLER:  Evan Miller, Jones Day,
17     on behalf of the City of Detroit.
18          MS. NEVILLE:  Carol Neville on behalf
19     of the Retiree Committee.
20          THE VIDEOGRAPHER:  Thank you.  Hope,
21     would you please swear in the witness.
22          MARTI KOPACZ, recalled as a witness,
23     having been duly sworn on August 1st, 2014,
24     by a Notary Public, was examined and
25     testified as follows:

1          - MARTI KOPACZ - VOLUME II-
2      EXAMINATION BY MR. WAGNER:
3      Q.    Good morning, Ms. Kopacz.
4      A.    Good morning.
5      Q.    I'm sorry to disturb everyone's
6      repose this morning, but we have to talk about
7      pensions for about the next 45 minutes.
8           Did you write the pension portions of
9      your report?
10     A.    Did I write them?
11     Q.    Yes.
12     A.    I drafted them and edited them --
13     Q.    So that --
14     A.    -- but I was assisted by members of
15     my team.
16     Q.    So you did write them?
17     A.    I -- I'm taking responsibility for
18     them, yes.
19     Q.    But did you actually put pen to paper
20     with respect to those sections?
21     A.    From an editing and -- somewhere in
22     the drafting -- I didn't write the first draft of
23     that section, no.
24     Q.    Who wrote the first draft?
25     A.    Combination of Mike Gaul and Brian

3 (Pages 427 to 430)

- MARTI KOPACZ - VOLUME II-

1   - MARTI KOPACZ - VOLUME II-
2   Gleason and Bob Childree.
3       Q.    I apologize if I repeat some of
4   Mr. Hackney's questions, but am I right you have
5   no experience with actuarial issues?
6       A.    That's correct.
7       Q.    And you have no prior -- pension is
8   not your area of expertise, is it?
9       A.    I would not consider myself a pension
10  expert.
11      Q.    Are the pension portions of your
12  report important to your conclusions?
13      A.    Yes.
14      Q.    And if the pension portions of your
15  report are factually or inaccurate -- factually or
16  analytically incorrect, would you agree with me
17  that undermines the conclusions you reached in
18  your report?
19      A.    I don't think they're factually
20  incorrect or analytically incorrect.
21      Q.    Right. But if they are, would you
22  agree with me that that undermines the conclusions
23  in your report?
24      A.    I don't know that it would. It
25  depends which -- what would be inaccurate?

1   - MARTI KOPACZ - VOLUME II-
2       Q.    Well, we'll get to that.
3       Can you put -- take your report
4   there. It's Exhibit 1.
5       A.    Sure.
6       Q.    Can you turn to Page 127.
7       MR. ALBERTS: I'm sorry, Jonathan,
8   repeat the page.
9       MR. WAGNER: 127.
10      MR. ALBERTS: And if you wouldn't
11  mind speaking up, only because this is making
12  a lot of noise.
13  BY MR. WAGNER:
14      Q.    Do you have it there?
15      A.    I do.
16      Q.    Ms. Kopacz, you see the middle
17  paragraph one, two, three, four, five lines in,
18  you state, "The retirement systems assumed
19  aggressive annual rates of return on investment
20  (PFRS 8.0 and GRS 7.9)."
21      Do you see that?
22      A.    I do.
23      Q.    What was the basis for your statement
24  that the annual rates of return assumed by the
25  retirement systems have been aggressive?

1   - MARTI KOPACZ - VOLUME II-
2       A.    They are aggressive relative to what
3   is agreed to right now in terms of the 6.7 and in
4   terms of some of the recent past in terms of rates
5   of return from year to year.
6       Q.    Did you look at the rates of return
7   over the last 25 years for those two systems?
8       A.    I'm not sure I looked at 25 years. I
9   looked at 10. I think, whatever -- a series of
10  data on those.
11      Q.    What did the 10-year data show?
12      A.    I would have to look at it again.
13      Q.    You don't remember?
14      A.    I know that there were -- there were
15  years in which there were losses in excess of 20
16  percent.
17      Q.    Would you agree with me that it would
18  be more appropriate to look at data over a longer
19  period of time?
20      A.    Not necessarily.
21      Q.    Did you look at any data -- look --
22  extending over a 25-year period of time?
23      A.    I don't know.
24      Q.    Did you -- you go on to say in this
25  statement, and I'll read the whole sentence --

1   - MARTI KOPACZ - VOLUME II-
2   well, you say in the first paragraph,
3   "Historically, a number of different practices
4   have contributed to a significant funding
5   shortfall in the two pension plans..." And you
6   recite the aggressive rates of return.
7       Did you make any efforts to quantify
8   what portion of the funding shortfall was
9   attributable to the supposedly aggressive rates of
10  return?
11      A.    I did not.
12      MR. WAGNER: Let's mark this as
13  Exhibit 4.
14      (Whereupon, Kopacz Exhibit 4 was
15  marked at this time.)
16      MR. KANE: Do you have a copy for me?
17  BY MR. WAGNER:
18      Q.    Ms. Kopacz, have you seen Exhibit 4
19  before?
20      A.    I don't recall seeing Exhibit 4
21  before.
22      Q.    Do you know whether you took the
23  document into account in drawing the conclusions
24  in your report?
25      A.    I don't know.

- MARTI KOPACZ - VOLUME II-

1
2     Q.    Would you be surprised to learn that
3  in most years the two pension funds exceeded the
4  rates of return that they -- the target rates of
5  return that they set?
6     A.    What -- you're using the time series
7  of data?
8     Q.    Yes.
9     A.    Okay.  I've looked at this.  Can you
10 ask me the question again?
11          MR. WAGNER:  Can you read back the
12    question.
13          (The question requested was read back
14    by the reporter.)
15    A.    The -- first of all, I don't know who
16 prepared this.  I don't know what the basis is and
17 I don't -- it says, "actuarial assumed rate of
18 return" and "calendar year rate of return."  Okay.
19 And I don't know from whence this comes in terms
20 of how this was calculated.
21    Q.    Okay.  I want you to assume that the
22 document is accurate because others have testified
23 that it is.  Would it surprise you to learn that
24 over the last 25 years, in most years the GRS and
25 the PFRS have exceeded their targeted rates of

- MARTI KOPACZ - VOLUME II-

1
2  return?
3     A.    In most years?
4     Q.    Yes.
5     A.    Should we count them?  All right.
6  One, two, three, four, five, six, seven, eight,
7  nine, ten -- in ten of the years on the general
8  retirement system, they did not reach the targeted
9  assumed rates and --
10    Q.    So that means -- let me just ask --
11 so that means in 15 years they exceeded, correct?
12    A.    If there are 15 years here.  There
13 are 25 years.
14    Q.    So, in most years --
15    A.    In 15 --
16    Q.    -- the GRS exceeded the targeted
17 rate, correct?
18    A.    Yes.
19    Q.    Okay.  You can do the math for PFRS.
20    A.    Okay.  One, two -- three, four --
21 five.  In five of the PFRS years, they did not
22 reach the targeted return.
23    Q.    That's five out of how many?
24    A.    Fifteen.
25    Q.    So in most years, am I correct, the

- MARTI KOPACZ - VOLUME II-

1
2  PFRS and GRS exceeded their targeted rates of
3  return?
4     A.    Individually for those years, yes.  I
5  would want to look at the cumulative effects of
6  this.
7     Q.    And would it surprise you that the
8  people who have done that calculation have
9  concluded that over the 25-year period for GRS and
10 over the 15-year period for the PFRS, those two
11 pension plans have exceeded 7.9 and 8 percent
12 returns?
13    A.    If you want me to assume that is
14 correct, I will.
15    Q.    And would that surprise you?
16    A.    Like I said, this -- this is not a --
17 this is just one data point, okay, so --
18    Q.    My question is only whether it would
19 surprise you, not whether it's one data point.
20          Would it surprise you?
21    A.    No.
22    Q.    Would it surprise you to learn that
23 over the last 25 years out of the hundred-odd
24 largest pension funds in the country, their
25 average rates of return have exceeded 8 percent?

- MARTI KOPACZ - VOLUME II-

1
2     A.    I haven't looked at that, so I don't
3  know.
4     Q.    You haven't?
5     A.    I have not.
6          MR. WAGNER:  Let's mark this.
7          (Whereupon, Kopacz Exhibit 5 was
8     marked at this time.)
9     Q.    Have you seen this document before?
10    A.    I have seen this document, I believe,
11 before.
12    Q.    As a matter of fact, you cited it in
13 your report, correct?
14    A.    I did.  This is the one that gives
15 the investment return assumptions for various
16 plans.
17    Q.    Can you look at the last sentence on
18 Page 1 and read it out loud?
19    A.    The last sentence?
20    Q.    On Page 1.
21    A.    "As shown in Figure 1 at 9 percent
22 the median analyzed investment return for the
23 25-year period ended December 31st, 2013, it seeks
24 the average assumption of 7.72 percent in Figure 5
25 while the 10-year return is below that."

- MARTI KOPACZ - VOLUME II-

1           - MARTI KOPACZ - VOLUME II-
2     Q.   And can we agree that 9 percent is
3 more than 7.9 and 8 percent?
4     A.   We can agree to that -- to that.
5     Q.   Are you aware of the rates of return
6 for the PFRS and the GRS in the last fiscal year?
7     A.   In the last fiscal year defined as
8 fiscal year-ended June --
9     Q.   June 30th, 2014.
10    A.   I am not.
11    Q.   So would it surprise you to learn
12 that the rates of return for both PFRS and GRS
13 have been 11 percent and 18 percent respectively?
14    A.   I have heard the 11 percent number.
15 I had not heard the 14 (sic) percent number.
16    Q.   And are you aware that 7.9 and
17 8 percent fall within the range of reasonableness
18 for returns for PFRS and GRS calculated by the
19 City's pension expert?
20    A.   Am I aware of what?
21    MR. WAGNER:  Could you read it back.
22    (The question requested was read back
23    by the reporter.)
24    A.   Could you show me the letters from
25 Milliman on that?  I mean, we've looked at a lot

- MARTI KOPACZ - VOLUME II-

1           - MARTI KOPACZ - VOLUME II-
2 of Milliman documents.
3    Q.   Well, you read the Perry report,
4 right?
5    A.   The Perry report?
6    Q.   The Perry expert report?
7    A.   I did not.
8    Q.   It's listed on your list of documents
9 that you reviewed.
10    A.   I didn't review it, personally.
11 Someone on my team must have.
12    Q.   Did you review any of the underlying
13 pension materials?
14    A.   I did some of them, yes.
15    Q.   Did you review the Rockefeller
16 report?
17    A.   I did.
18    Q.   Are you aware that the Rockefeller
19 report has been severely criticized?
20    A.   I would assume all reports have been
21 severely criticized.
22    Q.   That's not my question.
23    Are you aware that the Rockefeller
24 report has been severely criticized by the public
25 pension community?

- MARTI KOPACZ - VOLUME II-

1           - MARTI KOPACZ - VOLUME II-
2    A.   Yes.
3    Q.   Did you look at any of those
4 criticisms?
5    A.   Not specifically, no.
6    Q.   What have those criticisms been?
7    A.   The public pension community
8 generally believes that the -- for example, the
9 investment rate of return is also something that
10 you use for discounting.
11    Q.   And am I right that there is no
12 public pension fund that uses the riskless or the
13 risk-free rate of return to value its pension
14 obligations?
15    A.   No public pension?  I don't know that
16 no public pension is generally not -- I wouldn't
17 say no, because I just don't know that there's
18 no --
19    Q.   Okay.
20    A.   -- that uses a lower rate of return.
21    Q.   We'll come back to that.
22    You mentioned Milliman.  Did you have
23 any discussions with Milliman about the pension
24 issues?
25    A.   I did participate in some calls with

- MARTI KOPACZ - VOLUME II-

1           - MARTI KOPACZ - VOLUME II-
2 Milliman, I believe.  My team had more than I did.
3    Q.   Are you aware that Milliman set a
4 rate of return for the pension funds based on the
5 asset -- the current asset allocations; they set a
6 rate of return of 7.2?
7    A.   I believe that's correct, yes.
8    Q.   Do you have any quarrel with that
9 number?
10    A.   Not really.
11    Q.   Did you have any discussions with
12 Gabriel Roder?
13    A.   I did not personally.
14    Q.   Did anyone from your team?
15    A.   I believe they did.
16    Q.   If it's not listed on you -- on the
17 log, would you agree that there had been no such
18 discussion?
19    A.   Not specifically.  I would -- would
20 go and check the -- our time records as well.  I
21 would hope that the logs for everybody else are
22 accurate, but...
23    Q.   Did you have any discussions with
24 Cynthia Thomas?
25    A.   No.

- MARTI KOPACZ - VOLUME II-

1    Q.   Do you know who she is?
2    A.   I don't.
3    Q.   Did anyone ever tell you she was the
4  executive director of the two pension systems?
5    A.   No.
6    Q.   Do you think that's someone you
7  should have spoken to?
8    A.   Not necessarily.
9    Q.   Why not?
10   A.   I spoke with counsel to the pension
11 systems.  I spoke with some of the people that are
12 on the board of the pension systems.
13   Q.   But you didn't speak to the executive
14 director?
15   A.   I did not.
16   Q.   You testified yesterday in response
17 to Mr. Hackney's questions that there is no need
18 to change the plan on account of potential -- the
19 potential pension risks that you cite in your
20 report.
21        Do you recall that testimony?
22   A.   Can we read it back?
23   Q.   Well --
24   A.   I don't remember specifically.

- MARTI KOPACZ - VOLUME II-

1    Q.   Okay.  Would you accept my
2  representation that that's what you said?
3        MR. KANE:  Objection.
4    A.   Not really.
5    Q.   Okay.  Well, is there any need to
6  change the pension plan -- strike that.
7        Is there any need to change the plan
8  of -- the plan of adjustment on account of the
9  potential pension risks that you cite?
10   A.   I have no perspective or point of
11 view or opinion on changes to the plan of
12 adjustment.  That is not in my scope.  It is not
13 my task.
14   Q.   Do any of the pension risks that you
15 cite in your report give you any pause with
16 respect to the plan?
17   A.   The long-term risks associated with
18 the City's pension obligations do not negatively
19 impact my assessment for feasibility.
20   Q.   Did you look at the asset
21 distribution for the pension funds?
22   A.   I have seen a -- I have seen a
23 schedule that looks at the distribution of assets
24 in the pension fund.

- MARTI KOPACZ - VOLUME II-

1    Q.   Do you have any quarrel with that
2  distribution?
3    A.   I am not an investment manager.
4    Q.   Is that another way of saying that
5  you don't have any quarrel?
6    A.   No.  It just says that I didn't -- I
7  accepted it as it was.
8    Q.   Well, I'm asking you today:  Do you
9  have any questions --
10   A.   I have not made that evaluation.
11   Q.   So the answer is no, you are not able
12 to cite any disagreement you have with the
13 distribution of assets, are you?
14   A.   I -- like I said, I have not looked
15 at that specifically to arrive at any conclusion.
16        MR. WAGNER:  Can you read back the
17 question.
18        (The question requested was read back
19 by the reporter.)
20   Q.   Can you answer the question?
21        Do you have any quarrel --
22   A.   I don't know.
23   Q.   Would you agree with me that it's
24 unreasonable to calculate the -- strike that.

- MARTI KOPACZ - VOLUME II-

1        There's nothing in your report that
2  addresses -- that purports to calculate the size
3  of the pension claim, correct?
4    A.   Correct.
5    Q.   Am I right that with respect to the
6  risk-free rate, that you advocate -- that you
7  cite, all you're asking for is that the -- is that
8  a calculation be made and be disclosed, correct?
9    A.   Yes.  And it's not -- it is a rate --
10 whether it's the risk-free rate of return or some
11 lower risk adjusted rate is not particularly
12 critical to me in terms of my recommendation.
13        It is that I believe that it is --
14 that the -- using the same rate of return -- using
15 the discount rate that is the same as the rate of
16 return for the investment asset assumption just --
17 does not intuitively make sense to me as a finance
18 person.
19   Q.   Let me just understand.
20        For you this is a disclosure issue,
21 correct?
22   A.   It is -- it is a recommendation that
23 I have made that it would be helpful to the City
24 long-term to measure its long-term pension

1      - MARTI KOPACZ - VOLUME II-
2  liability at a rate other than an assumed rate of
3  return on asset investments.
4            MR. WAGNER:  Can you read back the
5  answer.
6            (The answer requested was read back
7       by the reporter.)
8            THE WITNESS:  It should be invested.
9  BY MR. WAGNER:
10     Q.    Am I right for you, this is a
11 disclosure issue.  And I turn you to Page 156 of
12 your report.
13     A.    When you say "disclosure issue," all
14 right --
15     Q.    What I mean is that what you want is
16 for that rate to be calculated and disclosed?
17     A.    I want the -- yes.  I want the risk
18 levels to be -- to have the benefit of sunshine.
19     Q.    Okay.  Are you aware of any public
20 pension fund that makes that disclosure?
21     A.    As I sit here today, no.
22     Q.    Have you ever opined or given any
23 conclusions on the proper rate of return for a
24 public pension fund?
25     A.    No.

1      - MARTI KOPACZ - VOLUME II-
2      Q.    Have you ever served as an actuary
3  for a public pension fund?
4      A.    No.
5      Q.    Have you had any experience in
6  actuarial science?
7      A.    In terms of?  Experience in actuarial
8  science?
9      Q.    Yes.
10     A.    No.
11     Q.    Do you have any qualification to
12 offer an opinion on the proper rate of return to
13 use for a public pension fund?
14     A.    I don't think I have offered an
15 opinion.
16     Q.    My question --
17           MR. WAGNER:  Can you read back the
18 question.
19           (The question requested was read back
20      by the reporter.)
21     A.    I don't think I ever have.
22           MR. WAGNER:  Can you read it back one
23 more time, I'm sorry.
24           (The question requested was read back
25      by the reporter.)

1      - MARTI KOPACZ - VOLUME II-
2      Q.    Yes or no?
3      A.    I don't think I ever have.
4      Q.    Does that mean you don't have a
5  qualification to do so?
6      A.    I don't know.
7      Q.    By the way, you're not opining
8  whether this plan discriminates unfairly or not,
9  are you?
10     A.    Absolutely not.
11     Q.    Okay.  You would not be in favor of a
12 plan that unfairly discriminates against any
13 class?
14     A.    It is -- it is not something I looked
15 at.  It is not part of my scope.
16     Q.    Now, explain to me why you believe
17 that the risk-free rate -- that calculation of
18 pension liabilities using the risk-free rate
19 should be disclosed?
20     A.    I'm not sure that I -- the risk-free
21 rate or a rate that is nearer a risk-free rate is
22 what I suggested.  Okay.
23           This is a plan some day in the future
24 that needs to be a hundred percent funded.  It is
25 frozen.  There will be people, 30, 40, potentially

1      - MARTI KOPACZ - VOLUME II-
2  50 years from now that will need to be paid from
3  this plan.  There is no mechanism right now that
4  assures that this plan will ever be a hundred
5  percent funded.
6      Q.    In your view, is the -- is there any
7  downside to disclosing pension liabilities based
8  on the risk-free rate?
9      A.    Any downside?
10     Q.    Yes.
11     A.    No.
12     Q.    Have you ever read anything citing
13 downsides to disclosing the risk-free rate?
14     A.    Have I read anything?  Not that I
15 recall.
16     Q.    Has anyone ever discussed with you
17 what the downsides are of disclosing calculation
18 of pension liabilities based on the risk-free
19 rate?
20     A.    Not recently, no.
21     Q.    What about not recently?
22     A.    Again, the last time I dealt with
23 pension was a number of years ago with a frozen
24 terminated plan with a client, so...
25     Q.    But one thing we can agree on is that

- MARTI KOPACZ - VOLUME II-

1  - MARTI KOPACZ - VOLUME II-
2  nobody does it today, do they, as far as you know?
3      A.    I don't know.
4      Q.    Okay.  You can't cite any public
5  pension fund that does that, correct?
6      A.    Not -- not as I sit here today no.
7      Q.    Okay.  So -- so it would be out of
8  the mainstream for the City of Detroit to do so,
9  correct?
10      A.    I don't know what you mean by
11  mainstream.  It would be different from others,
12  yes.
13      Q.    And i think you cited in your report
14  that the average rate of return -- strike that --
15  the average target set by the largest pension
16  funds is 7.72.
17          Do you recall that?
18      A.    That comes from the NASRA brief.
19      Q.    Yes.  So that's the rate -- that's
20  the average rate that the largest public pension
21  funds are using on average, correct?
22      A.    Yes.
23      Q.    And the plan provides for a rate of
24  6.75, correct?
25      A.    Yes, it does.

1      - MARTI KOPACZ - VOLUME II-
2      Q.    Okay.  And that's about a hundred
3  basis -- basis points below the 7.75, right?
4      A.    It is below the average identified in
5  the NASRA recent brief.
6      Q.    Okay.  And again, you want a rate
7  much, much lower than 6.75 -- strike that.
8          You want a calculation done at a rate
9  much lower than 6.75, right?
10      A.    I want it -- I think it would behoove
11  the City to calculate that obligation at a rate
12  lower than 6.75, yes.
13          MR. WAGNER:  Mark this as the next
14  exhibit.
15          (Whereupon, Kopacz Exhibit 6 was
16  marked at this time.)
17      Q.    Ms. Kopacz, this is the Blinken
18  report.
19          Do you see that?
20      A.    Yes, it is.
21      Q.    Okay.  And did you read it?
22      A.    I have read -- I have read a lot of
23  it.
24      Q.    Have you read it cover to cover?
25      A.    I don't know I've read it cover to

1      - MARTI KOPACZ - VOLUME II-
2  cover.
3      Q.    Do you know that -- that Richard
4  Ravitch is very active in the Rockefeller
5  Institute?
6      A.    I do know that.
7      Q.    Was he the one who directed you to
8  this report?
9      A.    I don't know.
10      Q.    Am I right with respect to this issue
11  of the risk-free rate that the Rockefeller -- the
12  Blinken report is an outlier?
13      A.    I don't know that it's an outlier.
14      Q.    Did you make any effort to determine
15  whether it was or not?
16      A.    I did not.
17      Q.    Can you turn to Page X-11?
18      A.    X-11, okay.
19      Q.    If you look at the -- see
20  "Recommendations"?  Do you see that?
21      A.    Yes, I do.
22      Q.    Okay.  It says, "We offer the
23  following recommendations:  Pension funds and
24  governments should value liabilities and expenses
25  for financial reporting purposes using a discount

1      - MARTI KOPACZ - VOLUME II-
2  rate that reflects the riskiness of expected
3  benefit payments."
4          Do you see that?
5      A.    I do.
6      Q.    So all the Rockefeller report is
7  advocating, Ms. Kopacz, is disclosure of a
8  calculation based on a risk-free rate, correct?
9      A.    I don't think that says risk-free
10  rate.  It says the riskiness of the expected
11  benefit payment.
12      Q.    Okay.  But whatever it's saying, all
13  it's asking for is disclosure, right?
14      A.    It's -- I think it says what it says.
15  "Pension funds and governments should value
16  liabilities and expenses for financial reporting
17  purposes using a discount rate that reflects it is
18  risk necessary of expected benefit payments.
19  Funds should also disclose projected cash flows
20  used to calculate liabilities so that they can be
21  discounted at alternative rates."
22      Q.    So I don't want to get into quibble
23  over wording because there are lots of people
24  who want to ask questions.  But am I right that
25  this issue for the Blinken report is an issue of

- MARTI KOPACZ - VOLUME II-
1 disclosure?
3    A.    Similar to what I've said, yes.
4    Q.    Okay.  And you're not aware of any
5 public pension fund that -- public pension fund
6 that actually calculates the level of
7 contributions that should be made based on a
8 risk-free rate, are you?
9    A.    I'm sorry.
10        MR. WAGNER:  Can you read it back?
11    A.    Please.
12    Q.    I told you it would be difficult to
13 do pensions.
14    A.    No, it's okay.  I can do pensions.
15 Let's go.
16        (Requested question was read back by
17    the reporter.)
18    A.    I'm not aware of any as I sit here
19 today.
20    Q.    And would it surprise you if I told
21 you that there are none that calculate the level
22 of contributions that should be made based on a
23 risk-free rate?
24    A.    I -- like I said, I don't know one
25 way or another.

1        - MARTI KOPACZ - VOLUME II-
2        MR. WAGNER:  Mark this as the next
3    exhibit.
4        (Whereupon, Kopacz Exhibit 7 was
5    marked at this time.)
6        MR. ALBERTS:  Just as a courtesy,
7    when you introduce an exhibit like this that
8    we don't have a copy, just advise what it is.
9        MR. WAGNER:  That's fine.  If you
10    want, I'll get you copies after.
11 BY MR. WAGNER:
12    Q.    Ms. Kopacz, I put before you Exhibit
13 8 -- 7, which is a release by the National
14 Conference on Public Employee Retirement Systems
15 concerning the Rockefeller report that you cite, I
16 believe, your report.
17        First of all, have you ever heard of
18 this organization?
19    A.    The National Conference on Public
20 Employee Retirement -- not specifically, no.
21    Q.    And if you turn to the last page, it
22 states, "The National Conference is the largest
23 trade association for public sector pension funds,
24 representing more than 550 funds throughout the
25 United States and Canada."

1        - MARTI KOPACZ - VOLUME II-
2    Do you see that?
3    A.    I'm reading.  Just a moment.
4        Okay.
5    Q.    Are you aware of any other trade
6 associations for public pension funds?
7    A.    I don't know.
8    Q.    Okay.  I take it you didn't look at
9 this release before you issued your report?
10    A.    Not that I recall, no.
11    Q.    Okay.  And do you see in the first
12 paragraph that the trade association representing
13 the 500 -- over 550 public pension funds called
14 the recommendations off the mark and impractical.
15        Do you see that?
16    A.    The title says, "impractical and off
17 the mark."
18    Q.    You see in the second paragraph the
19 trade association representing 550 public pension
20 funds states that, "It makes no real world sense
21 to use a discount rate that is artificially low
22 and unrelated to real investment expectations."
23        Do you see that?
24    A.    Do you want me to read the paragraph?
25    Q.    My question is whether you see that

1        - MARTI KOPACZ - VOLUME II-
2 statement.
3    A.    I see the statement.
4    Q.    Okay.  And did you make any effort in
5 preparing your report to investigate these types
6 of criticisms of the Rockefeller report?
7    A.    I did not.
8    Q.    And I think you testified yesterday
9 that Mr. Ravitch was a significant influence on
10 your thinking with respect to the pension issue?
11    A.    I said Mr. Ravitch and I and my team
12 discussed this topic with him.  I also discussed
13 it extensively with Mr. Childree.
14    Q.    And did anyone present to you the
15 opposing point of view with respect to disclosure
16 of the risk-free rate?
17    A.    Yes.
18    Q.    And who was that?
19    A.    Mr. Childree.
20    Q.    And what did he tell you?
21    A.    Mr. Childree, as the former
22 comptroller of the State of Alabama, having lived
23 through these issues, adopts what most public
24 pension government workers have lived with for
25 years and years and years; and that is, that you

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 116 of
146

- MARTI KOPACZ - VOLUME II-
discount at the same level of rate of return as
the assets.

Q.   And Mr. Ravitch presented the
opposing point of view?
A.   He did.
Q.   Now, you referred yesterday to GASB?
A.   Yes.
Q.   What is GASB?
A.   The general -- the Government
Accounting Standards Board.
Q.   And is that an authoritative standard
in the field of government accounting?
A.   It is.
Q.   And is it -- is it an authoritative
standard in the field of public pension funds?
A.   That I don't know.
Q.   Did anyone ever tell that you GASB
considered and rejected the disclosure of a
risk-free rate?
A.   I know that, yes, I do.
Q.   Did you cite that in your report?
A.   I referenced the GASB -- the new GASB
reporting standards.  Yes, I did.
Q.   But you left this particular piece

- MARTI KOPACZ - VOLUME II-
out of your report; did you not?
A.   What they considered as getting to
their promulgation was not germane to my report.
Q.   But their promulgation was to use one
rate; isn't that correct?
A.   That is what they have said, yes.
Q.   And you didn't put that in your
report, did you?
A.   I didn't recite the -- I gave the
standards.  I referenced the standards.  I didn't
repeat what the standards said.
Q.   You also noted that the GASB standard
was effective in fiscal year 2015.
Do you recall that?
A.   It is effective now, as we -- for
this year.
Q.   So that was a mistake in your report,
was it not, as to when it is effective?
A.   It -- you know what, it may be an
error between fiscal and calendar.
Q.   Well, we're not in fiscal 2015, are
we?
A.   Yes.
Q.   We're in fiscal 2015?

- MARTI KOPACZ - VOLUME II-
A.   For the City of Detroit, yes.
Q.   Okay.
A.   We're in 2014 today right now, it's
July 2014.  The City's fiscal year started July
1st, 2014.
MR. WAGNER:  Let's mark this as the
next exhibit.
(Whereupon, Kopacz Exhibit 8 was
marked at this time.)
BY MR. WAGNER:
Q.   Have you seen it release before?
A.   Not for a long time.
Q.   So you've seen it before?
A.   I have.  I -- I probably saw it about
the time that it was released.
Q.   Okay.  At the bottom, the government
-- this is a Government Accounting Standards Board
news release, June 25, 2012, states at the bottom,
"The rate used to discount projected benefit
payments to their present value will be based on a
single rate that reflects, A, the long-term
expected rate of return on plan investments as
long as the plan net position is projected under
specific conditions to be sufficient to pay

- MARTI KOPACZ - VOLUME II-
pensions of current employees and retirees and the
pension plan assets are expected to be invested
using a strategy to achieve that return..."  I'll
skip the B.
But do you see that?
A.   I think the B is important.
Q.   Okay.  My only question is whether
you see this provision.
A.   I see -- I see this provision.
Q.   And am I right that under these
conditions GASB recommends using a single rate?
A.   As long as the plan net position is
projected under specific conditions -- conditions
talk sufficient to pay pensions of current
employees and retirees and the pension plan assets
are expected to be invested using a strategy to --
to achieve that return.
Q.   Okay.
A.   And B, a yield or index rate on tax
exempt 20-year AA or higher rated municipal bonds
to the extent that the conditions for use of the
long-term expected rate of return are not met."
Q.   So assuming those conditions are met,
GASB recommends using a single rate, correct?

- MARTI KOPACZ - VOLUME II-

1
2     A.    Correct.
3     Q.    And that is --
4     A.    I don't believe those provisions are
5   met in the forecast of the Detroit pension plan.
6     Q.    Well, we'll leave that to the pension
7   experts, because you are not a pension expert.
8     A.    I am not a pension expert.
9     Q.    Okay.  So we'll leave that to the
10  experts.
11          But the standard is under those
12  conditions use of a single rate, correct?
13    A.    Or, B, a yield or index rate on tax
14  exempt 20-year AA or higher municipal rated bonds
15  to the extent that the conditions for use of the
16  long-term expected rate of return are not met."
17    Q.    Am I right that if those conditions
18  are met, GASB recommends using a single rate?
19    A.    Or a yield on the index of municipal
20  AA or higher bonds.
21          MR. WAGNER:  Let's mark this as the
22  next exhibit.  This is Exhibit 9.
23          (Whereupon, Kopacz Exhibit 9 was
24  marked at this time.)
25  BY MR. WAGNER:

- MARTI KOPACZ - VOLUME II-

1
2     Q.    Have you -- seen Exhibit 9 is the
3   GASB Statement Number 67.
4          Do you see that?
5     A.    It is.
6     Q.    Have you seen it before?
7     A.    I have not seen the full standard,
8   no.
9     Q.    Okay.  Can you turn to Page 19.
10         And can you read 40, and can you
11  agree with me that sets out the same standard we
12  saw in the release?
13    A.    Yes.  What this basically says is
14  that under the assumption that you have a funded
15  pension plan, then the rate of return on the
16  pension plan investments is the rate to use or the
17  yield on the 20-year tax exempt muni bonds.
18    Q.    Okay.  We can put that aside for now.
19    A.    Well, I mean it's really important.
20    Q.    Well, I'm not -- there's no question
21  pending.
22    A.    Between whether it's a funded or
23  unfunded plan.
24    Q.    Okay.  We will leave that to the
25  pension experts.

- MARTI KOPACZ - VOLUME II-

1
2     Q.    Did anyone ever tell you that one of
3   the downsides to disclosing the risk-free rate is
4   it could lead to liability-driven investing?
5     A.    I don't understand that phrase.
6     Q.    So that was not something you came
7   across in your work on this case?
8     A.    No.
9     Q.    Did anyone ever tell you that
10  disclosing the risk-free rate could lead to
11  improperly -- could lead to over burdening current
12  taxpayers?
13    A.    I don't -- no.
14    Q.    Did anyone ever tell you that using
15  or disclosing the risk-free rate could lead to
16  cutbacks with respect to pension benefits?
17    A.    No.
18    Q.    Now, you state in your report that
19  the 6.75 rate was heavily negotiated.
20          Do you recall that?
21    A.    Yes.
22    Q.    What's the basis for that statement?
23    A.    Conversations with various
24  stakeholders in this case.
25    Q.    What did they tell you?

- MARTI KOPACZ - VOLUME II-

1
2     A.    That the 6.75 was a heavily
3   negotiated rate.
4     Q.    You agree that it's lower than
5   historical rates that the PFRS and GRS have used,
6   right?
7     A.    Yes.
8     Q.    And it's lower than recent investment
9   runs?
10    A.    That's correct.
11    Q.    Would you have -- and you agree it's
12  lower relative to peers?
13    A.    Yes.
14    Q.    I think you cite in your report that
15  peers are setting rates at 7.72, right?
16    A.    That's what the NASRA report says.
17    Q.    Okay.  And the NASRA report also
18  reports that rates over the -- returns over the
19  last 25 years have exceeded 9 percent, right?
20    A.    I don't know.  I'd have to go back
21  and look at it again.
22    Q.    That was the point I -- the note I
23  pointed out this morning.
24    A.    Do you want to look at it again?
25    Q.    It's up to you.  You can look at it

- MARTI KOPACZ - VOLUME II-

1      - MARTI KOPACZ - VOLUME II-
2  again.  The left side of the page, first page.
3      A.    Yes.  I think 10 years it's been 7;
4  20 years it's been 8.2; and 25 years it's been 9.
5      Q.    And there are few -- there are few
6  major government-sponsored pension plans that use
7  a rate lower than 6.75, correct?
8      A.    There are some, yes.
9      Q.    Well, there are few?
10     A.    Yes, on this list.
11     Q.    Well, you also note in your report
12 that there are few.
13     A.    Yes.
14     Q.    When you -- when you recommended
15 disclosure of the risk-free rate, did you believe
16 that there were any downsides to disclosing that
17 rate?
18     A.    No.
19     Q.    When you say the 6.75 was heavily
20 negotiated, would you have -- would you -- do you
21 have a view as to whether the rate should have
22 been set based on an actuarial calculation as
23 opposed to being heavily negotiated?
24     A.    I have no view on that.
25     Q.    You just accepted what was presented

1      - MARTI KOPACZ - VOLUME II-
2  to you?
3      A.    Yes.
4      Q.    Now, you stated in your report that
5  you want the City to provide stewardship on this
6  issue.
7          Do you recall that?
8      A.    I said it is an opportunity for the
9  City to provide stewardship.
10     Q.    What did you mean by that?
11     A.    Just because everybody does it a
12 certain way doesn't make it right, doesn't make it
13 prudent.  And I don't believe information is good
14 or bad, it simply is.  And I think this data
15 point, given what the City has been through with
16 its -- its underfunding of its pensions, its
17 borrowing money to fund pensions, I think
18 disclosure and sunshine would be a very good thing
19 for the City going forward so that it doesn't get
20 in these kinds of difficulties again.
21     Q.    Again, this is, for you, it's a
22 disclosure issue, right?
23     A.    It is a disclosure issue.  And the
24 reality is plans are going to be less funded over
25 the next ten years.  Now while that relates very

1      - MARTI KOPACZ - VOLUME II-
2  favorably to feasibility, okay, in my assessment,
3  it also presents a long-term risk to the City.
4      Q.    Did you -- strike that.
5          You're not saying that any of the
6  pension funds' investments are risky, are you?
7      A.    I -- in order to achieve the rates of
8  return that are projected, that either 6.7 or the
9  11, you have to have volatility which means you
10 have to have some level of risk in return.
11     Q.    Have you looked at the -- well, are
12 there specific investments that you believe the
13 pension funds have made that are risky?
14     A.    I -- at this point, I -- I don't have
15 that information in front of me.
16     Q.    Do you have anything -- do you have
17 any information reflecting negatively on the
18 pension advisors to the City?
19     A.    The current pension advisors?
20     Q.    Yes.
21     A.    That I'm not aware of.  They're
22 different than the past advisors.
23     Q.    Just a few more questions.
24          Are you aware of any information
25 indicating that the trustees of the pension funds

1      - MARTI KOPACZ - VOLUME II-
2  have breached their fiduciary duties?
3      A.    The new trustees?
4      Q.    Any trustees?
5      A.    My recollection is that there are
6  some pending legal actions against former
7  trustees.
8      Q.    What about the current trustees?
9      A.    That I'm not aware of, no.
10     Q.    You also note on Page 128 that the
11 value of UAAL is 3.5 billion.
12     A.    What page?
13     Q.    Page 128.
14     A.    Yes.
15     Q.    Okay.  Are you aware that the plan
16 sets the amount at 3.1 billion?
17     A.    I am referencing a specific point in
18 time and a specific calculation by Milliman in
19 2013.
20     Q.    I'm right -- just a few more
21 questions.
22          I'm right that most participants in
23 the pension plan have already retired.  Page 126.
24     A.    Yes.
25     Q.    Do you know what percentage of

1          - MARTI KOPACZ - VOLUME II-
2  retirees live in the City of Detroit?
3      A.    I do not.
4      Q.    Is that relevant to you?
5      A.    It is not.
6      Q.    On Page 128 and 129 you cite ASF, the
7  ASF issue.
8          Do you see that?
9      A.    I do.
10     Q.    What's your understanding of that
11 issue?
12     A.    In what sense?
13     Q.    Well, you reference 387 million of
14 excess investment earnings credited to the annual
15 savings funds.
16         Do you see that?
17     A.    This is -- this is a -- this is taken
18 from Mr. Moore's declaration.
19     Q.    Okay.  Do you understand what the ASF
20 issue is?
21     A.    I do.
22     Q.    Okay.  And you understand that this
23 387 million was -- shouldn't have been paid out?
24         MS. GREEN:  Object to form.
25         MR. ALBERTS:  Objection.

1          - MARTI KOPACZ - VOLUME II-
2  BY MR. WAGNER:
3      Q.    You can answer.
4      A.    I understand there's a dispute --
5      Q.    Okay.
6      A.    -- over the ASF.
7      Q.    Right.  And you understand that that
8  387 million shouldn't be part of the pension
9  claim?
10         MR. ALBERTS:  Objection.
11         MS. GREEN:  Objection.
12     A.    I don't know.
13         MR. WAGNER:  All right.  Why don't we
14 take a couple-minute break.  I may be done.
15         THE VIDEOGRAPHER:  Time now is
16 approximately 10:00 a.m.  We're going off the
17 record.
18         (Whereupon, there was a brief recess
19 in the proceedings.)
20         THE VIDEOGRAPHER:  The time is
21 10:11 a.m.  We're back on the record.
22 BY MR. WAGNER:
23     Q.    Ms. Kopacz, just you couple of more
24 questions.
25         I'm right that you're not -- you're

1          - MARTI KOPACZ - VOLUME II-
2  not offering any conclusion as to whether the City
3  has properly calculated the size of the pension
4  claim, correct?
5      A.    Correct.
6      Q.    And am I also right that you haven't
7  done any due diligence with respect to the pension
8  funds asset allocations?
9      A.    Correct.
10         MR. WAGNER:  Nothing further.
11
12 EXAMINATION BY MR. NEAL:
13     Q.    Good morning, Ms. Kopacz.
14     A.    Good morning, Mr. Neal.
15     Q.    I prefer to question you in a witness
16 box, like we did in April.  But this will -- this
17 will do for now.
18         At the outset, just a brief apology.
19 I was defending a deposition of my client
20 yesterday.  I had the opportunity to read the
21 draft of the transcript from yesterday and I
22 intend not to repeat anything, number one.
23         Number two, my questions are going to
24 relate almost entirely to DWSD, okay?
25     A.    Okay.

1          - MARTI KOPACZ - VOLUME II-
2      Q.    And I have a couple of preliminaries
3  that you may have covered, but these preliminaries
4  will last about five minutes' time, so if you
5  could indulge me.
6      A.    Sure.
7      Q.    So I want to confirm that the
8  documents and the sources that are listed in
9  Exhibit 2 of your report and meetings and the
10 communications that are listed in Exhibit 3,
11 reflect all the materials or interviews on which
12 you relied upon in preparing your report?
13     A.    That is the intent of Exhibit 2.  I
14 believe that is correct.
15     Q.    Is that also the intent of Exhibit 3
16 which relates to the communications?
17     A.    No.  The communications log -- and
18 again, there was some question amongst my team as
19 to whether the judge's requirement only related to
20 my communications or to my entire team's
21 communications.  In an abundance of caution, we
22 did everybody's communications.
23         So -- and I would -- I would say we
24 strived to get it as current and accurate and
25 timely as we could.

- MARTI KOPACZ - VOLUME II-

1        - MARTI KOPACZ - VOLUME II-
2    Q.    And in looking at Exhibit 2, am I
3  correct that you did not rely upon any of the
4  objections to the plan of adjustment that were
5  filed by the objectors in the case?
6    A.    That's correct.
7    Q.    And in looking at Exhibit 2, am I
8  correct in saying that you didn't rely upon any of
9  the fact or expert witness depositions, the
10  transcripts that have been taken in the past
11  several weeks?
12    A.    I've read nothing.
13    Q.    And the only depositions that are
14  reflected in Exhibit 2 were the ones that were
15  taken in -- in different disputes such as
16  eligibility or swaps; is that right?
17    A.    Correct.
18    Q.    In terms of the DWSD management and
19  consultants, so you did not read the deposition
20  transcripts of Sue McCormack, the CEO or director
21  of DWSD; Cheryl Porter, the COO or Nicolette --
22       The first name is Sue McCormack, the
23  CEO or director of DWSD; Cheryl Porter, the COO of
24  DWSD; Nicolette Bateson, CFO of DWSD; or Bart
25  Foster or any consultants of DWSD?

1        - MARTI KOPACZ - VOLUME II-
2    A.    That's correct.
3    Q.    Now, have you ever -- have you or
4  your team members ever have any communications
5  with those individuals?
6    A.    No, not to my knowledge.
7    Q.    Is there a reason why neither you nor
8  anyone from your team spoke to DWSD management?
9    A.    Yes.  The -- originally DWSD was on
10  my to-do list, okay.  I spoke with counsel to the
11  bondholders, some of the bondholders on DWSD,
12  okay, and I got an understanding of the issues.
13  Obviously I'd read the plan of adjustment and the
14  proposed treatment of the DWSD bonds.
15       I then had and my team had
16  discussions with finance people at the City on
17  DWSD in terms of the enterprise nature of the
18  fund.  I read various early on pleadings as it
19  related to DWSD.  And at the point in time where I
20  realized that the interplay between my feasibility
21  assessment and DWSD was related to the
22  $428 million of pension funding, the transfer,
23  that -- again, because the -- that's what I had to
24  focus on relative to DWSD.  And that is simply
25  a -- a source of funding for execution of the plan

1        - MARTI KOPACZ - VOLUME II-
2  of adjustment.
3    Q.    Now, when you say in your prior
4  answer you spoke to finance people at the City.
5    A.    Yes.
6    Q.    Who would those individuals include?
7  I'm not looking for an exhaustive list.
8    A.    It would be the CFO.  It would be the
9  -- Pam Scales, the budget director in terms of how
10  DSD and the City relate to one another.  Speaking
11  also with -- with people on the -- the mayor's
12  staff.
13    Q.    Okay.  So not just the emergency
14  manager and his professional advisors?
15    A.    Oh, no.  Oh, no.
16    Q.    Okay.
17    A.    Right.
18    Q.    And going back to Exhibit 2 to your
19  expert report, am I correct in observing that the
20  only expert reports upon which you relied were
21  those of the City experts.
22       And I can point you to them.  Exhibit
23  2, lines 46 through 49, 51 through 55.
24    A.    Yes.  These are in terms of -- of --
25  the reason that they're here is there are various

1        - MARTI KOPACZ - VOLUME II-
2  assumptions, for example, in Mr. Buckfire's report
3  in terms of exit financing, I'm relying on his
4  representation of obtaining exit financing.
5       For people like Beth Niblock and John
6  Hill, those are included because we have cited
7  either factual comments that they've made about
8  the state of the IT systems or in the case of John
9  Hill, what he is intending to do to fix the
10  accounting and the IT systems.
11       So... but, yes, those are -- whatever
12  is here is what's included somewhere in the
13  report.
14    Q.    Your expert report was served on July
15  18, correct?
16    A.    I believe that's correct, yeah.
17    Q.    I want to talk about relatively
18  current events.  So between July 18th and today,
19  August 1st, the objectors had their respective
20  deadline or deadlines as it relates to serving
21  their expert reports.
22       Have you had an opportunity to review
23  any of those?
24    A.    Not yet.
25    Q.    Do you intend to review them?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 121 of
146

- MARTI KOPACZ - VOLUME II-

1
2    A.    Yes.
3    Q.    If any of those reports inform or
4  alter your opinion, do you intend to supplement
5  your expert report?
6    A.    Yes.
7    Q.    To the extent you don't supplement
8  your expert report, would that be, in essence, an
9  acknowledgment that the expert reports of the
10 objectors have not altered or informed your
11 opinion?
12   A.    I don't know because I'm still --
13 remember, I'm still waiting on information from
14 the City.
15   Q.    Yes.
16   A.    Right?  So...
17   Q.    And that's reflected in Exhibit 4 of
18 your report, correct?
19   A.    Correct.
20   Q.    Now, is this -- does Exhibit 4
21 reflect information that you believe may be
22 material?  Let me phrase the question differently.
23         Is it reflective of all of your
24 outstanding requests or did you just intend to
25 provide a list of what is important to you?

- MARTI KOPACZ - VOLUME II-

1
2    A.    This is -- in terms of the -- the
3  formal process we had with the City, okay, this
4  was the open request list as of the date of my
5  report.  Okay.  There are -- there is information
6  that I received shortly before I completed my
7  report that I have not yet reviewed; the
8  collective bargaining agreements we talked about
9  yesterday.
10         So there are -- again, I did not have
11 the time to do an adequate review job on that so I
12 didn't do it.  And so there's -- there's
13 information here that I would still like to
14 receive and there is information that I have
15 received that I have not yet reviewed.
16   Q.    So at one time you had a much larger,
17 I would imagine, request list for the City and
18 you've been checking off boxes; is that right?
19   A.    Yes.
20   Q.    More or less?
21   A.    It was -- it was a dynamic list in
22 that things got added, things got taken off as
23 they got supplied.
24   Q.    And by the time it came to serve your
25 report on the 18th, you had a few open request

- MARTI KOPACZ - VOLUME II-

1
2  lists and these --
3    A.    Yes.
4    Q.    -- as reflected on Exhibit 4, are
5  those open requests?
6    A.    Yes.
7    Q.    They're not prioritized in any way?
8    A.    No.
9    Q.    Okay.
10   A.    No.
11   Q.    Do you anticipate looking at any
12 additional materials?
13         Let's just go back to July 18th,
14 starting with that point.  Do you anticipate
15 looking at additional materials as they relate to
16 the DWSD, its operations, its capital
17 expenditures, its debt, its future cash flows?
18   A.    I don't know.
19   Q.    Sitting here today, have you done
20 that in the past week and a half?
21   A.    I have not.
22   Q.    Do you intend to do it in the next
23 week and a half?
24   A.    I don't know.
25   Q.    Now, in preparing your report, there

- MARTI KOPACZ - VOLUME II-

1
2  are several instances in which you cite to either
3  information provided by or discussions you've had
4  with Miller Buckfire, in specific Ken Buckfire and
5  his investment bankers; is that right?
6    A.    Yes.
7    Q.    I don't want this to be a memory
8  test, I can give you the page numbers if it will
9  help you.  But I know in one instance and perhaps
10 more than one, I shouldn't say one, that you spoke
11 with Mr. Buckfire and his team about exit
12 financing; is that right?
13   A.    That's correct.
14   Q.    You also spoke to Mr. Buckfire and
15 his team about the City's access to capital
16 markets post -- post emergence?
17   A.    Yes.
18   Q.    And you spoke to Mr. Buckfire and his
19 team about the monetization of certain assets
20 including DWSD, right?
21   A.    Yes.
22   Q.    There was one other instance that
23 involves Wayne County property tax matters and I'm
24 not going to go into that, I promise you.
25         Let's just go and focus on exit

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022

- MARTI KOPACZ - VOLUME II-

1
2 financing, if we could.
3         First, did you have any
4 communications with Mr. Buckfire, any members of
5 his team regarding the DWSD's need or anticipated
6 need to access the capital market in the future?
7     A.    I don't recall a specific
8 conversation related to DWSD's capital market
9 access.
10     Q.    Did you speak with anybody, at any
11 time during your engagement, about DWSD's need or
12 anticipated need to access the capital markets?
13     A.    Again, I think it may have been part
14 of the general conversation, but I don't recall --
15 I don't recall a specific response.
16     Q.    Sorry.  What do you mean by
17 "response"?
18     A.    Well, the conversation that I had
19 with Mr. Buckfire and his team, with Mr. Doak and
20 a variety of associates.  We talked about a lot of
21 things in terms of exit financing and access to
22 capital markets.  We also talked about DWSD and
23 the monetization of DWSD.
24     Q.    Okay.
25     A.    And I'm not sure that those two

- MARTI KOPACZ - VOLUME II-

1
2 topics intersect because I don't remember a
3 specific conversation about it.
4     Q.    Fair enough.  Let me give you an
5 example.
6         Others have testified in this case
7 about DWSD's plan to access the capital markets
8 for about $150 million worth of new sewer
9 financing for capital improvements.
10     A.    Okay.
11     Q.    Have you been involved in that
12 process?
13     A.    I have not.
14     Q.    Have you had any conversations with
15 anyone affiliated with the City, including DWSD,
16 about that process?
17     A.    No.
18     Q.    Okay.  Going back to accessing
19 capital markets and the exit financing, can you
20 just describe generally to me your conversations
21 with the Miller Buckfire team about -- about their
22 interaction with the capital markets and their
23 effort to obtain exit financing?
24     A.    My conversation with Mr. Buckfire, we
25 talked about -- he supplied me with the

- MARTI KOPACZ - VOLUME II-

1
2 information packages that they were sending out to
3 various potential funding sources.  And that --
4 you know, he would -- he did not give me any
5 specific lenders that he was talking to.  I didn't
6 necessarily ask him for those, either.  But he
7 said there was interest, they had been working on
8 it and he was highly confident that they were
9 going to be able to place the exit finance.
10     Q.    When did you have these
11 conversations?
12     A.    It should be in my log.  It was --
13 probably sometime in July.
14     Q.    Ms. Kopacz, I'm not looking for the
15 exact date --
16     A.    It was -- it was -- it was within the
17 -- I don't think it was the week before.  I think
18 it may have been like the second week -- it was
19 after the 4th.
20     Q.    Okay.  Very good.
21         (Technical interruption.)
22         THE VIDEOGRAPHER:  The time now is
23 approximately 10:34 a.m.  We're back on the
24 record.  This is the beginning of Disk
25 Number 2.

- MARTI KOPACZ - VOLUME II-

1
2 BY MR. NEAL:
3     Q.    Ms. Kopacz, there was a small
4 technical glitch.  I'm going to repeat one
5 question or come close to repeating it.
6         And that is, I'm not looking for an
7 exact date when you had these discussions about
8 exit financing with Miller Buckfire, I'm looking
9 for the general time period.
10     A.    I had a few -- I mean, really a few,
11 two or three conversations with Ken or Jim Doak,
12 over the course of my assessment and I know there
13 was -- and like I said, I believe there was either
14 a call or e-mail exchange because it was on my
15 white board to check on exit financing and I did
16 that within a week or so of issuing my report.
17     Q.    Were any individuals involved in
18 those discussions other than you and your team,
19 and the individuals you identified at Miller
20 Buckfire?
21     A.    Not involved -- at about that time, I
22 also had -- Mr. Ravitch had met with Mr. Buckfire
23 and shared with me that he had had the same
24 conversation, in essence, that I had had; that
25 Mr. Buckfire was confident he was going to raise

1      - MARTI KOPACZ - VOLUME II-
2 the 300 million at 6 percent. And the question
3 was really whether or not that would be raised as
4 a -- as a secured type of borrowing or unsecured.
5      Q.   Now, is this a meeting that -- that
6 included Mr. Ravitch?
7      A.   Mr. Ravitch had his own meetings and
8 he just reported to me at about that same time.
9      Q.   And what did he report to you about
10 the exit financing?
11      A.   That Mr. Buckfire had represented
12 that he was going to get the exit financing and
13 that, you know, he thought -- he still thought it
14 was going to be around the 6 rate.
15      I had been watching high-yield muni
16 rates and thought it might be a little higher than
17 that and there was still an open question as to
18 whether or not you'd have to pledge whether it
19 would have to be secured with tax revenue or not.
20      Q.   Did Mr. Ravitch express any views or
21 opinions to you on this issue, the City's efforts
22 to obtain exit financing?
23      A.   No.
24      Q.   Did he express any views or opinions
25 to you as to what the anticipated or assumed

1      - MARTI KOPACZ - VOLUME II-
2 interest rate would be?
3      A.   No.
4      Q.   What exactly did you talk about with
5 Mr. Ravitch on the exit financing issue?
6      A.   We were -- we were sitting in our
7 office a couple of days before the report was
8 issued. I had asked Mr. Ravitch to please review
9 the pension section and the post-confirmation
10 issue section -- the post-confirmation oversight
11 issues. And we were sitting in my office in New
12 York which has a white board and there were the
13 open issues list of things that I needed to check
14 on and exit financing was there.
15      And he said, oh, by the way, I talked
16 to -- I had breakfast or lunch or whatever, and
17 had a conversation with Buckfire.
18      Q.   How many conversations have you had
19 with Mr. Ravitch about the exit financing?
20      A.   I think that may have been the only
21 one.
22      Q.   Did you discuss with -- let me make
23 sure I've closed the loop.
24      Did you have any conversations with
25 anyone from the State of Michigan about the City's

1      - MARTI KOPACZ - VOLUME II-
2 effort to obtain exit financing?
3      A.   No.
4      Q.   Did you discuss with anyone at the
5 Michigan Finance Authority?
6      A.   I did not.
7      Q.   There is a consultant -- I'll
8 represent to you there's a consultant engaged by
9 both the DWSD and the City -- excuse me, both the
10 DWSD and the state, his name is Lee Donner of the
11 First Southwest Company.
12      Did you speak with Mr. Donner?
13      A.   I did not.
14      Q.   Did you have any discussions with
15 Mr. Buckfire about his views of the -- of the
16 credit ratings that the City would receive
17 post-emergence from Chapter 9?
18      A.   No.
19      Q.   Any conversation as to whether the
20 City's debt or series of debt would be above
21 investment grade or below investment grade upon
22 emergence?
23      A.   No.
24      Q.   You do state, and I think you
25 repeated it accurately a few minutes ago, on Page

1      - MARTI KOPACZ - VOLUME II-
2 90, that, "As of the date of this report it
3 appears that the assumed interest rate of 6
4 percent could be low for a high-yield instrument
5 like the proposed exit financing."
6      Do you see that?
7      A.   I do.
8      Q.   And what is that based on?
9      A.   We have been monitoring just
10 high-yield muni bonds to see at what pricing
11 they're selling at. And recently, you know,
12 again, the -- the biggest issue that's come off
13 during pendency of this case are the Puerto Rico
14 bonds and they've been more in the 8 to 9 range.
15      There have been -- there have been a
16 lot of issuances around the high 5s.
17      So again, the -- what's important to
18 my assessment of feasibility is whether or not the
19 City gets the exit financing. It's less important
20 to the feasibility assessment what the interest
21 rate is. I mean, unless it's 15.
22      Q.   Sure.
23      A.   Right. So...
24      Q.   So let's play that out little a
25 little bit.

- MARTI KOPACZ - VOLUME II-

2    A.    Okay.
3    Q.    So whether it's 6.5 percent or 7
4  percent is not necessarily material to your
5  opinion in your report?
6    A.    Correct.
7    Q.    Did you speak to any underwriters,
8  anyone on the buy side, any capital market
9  participants about the City's efforts to obtain
10  exit financing?
11    A.    I did not.
12    Q.    Did you do anything other than what
13  you've already testified today to test the
14  assumptions that the City can obtain exit
15  financing at about the 6 percent interest rate?
16    A.    I did not.
17    Q.    I want to switch gears a little bit
18  and talk to you about your conversations with
19  Miller Buckfire about the City's efforts to
20  monetize the DWSD assets.
21        Can you describe those conversations
22  to me?
23    A.    Very brief.  The meeting that I had
24  with Ken and his team in June, we talked about
25  DWSD.  He was of the viewpoint then that there was

- MARTI KOPACZ - VOLUME II-

2  not going to be a transaction associated with DWSD
3  and that was kind of the sum total of the
4  conversation.
5    Q.    So a couple of short conversations
6  would be accurate?
7    A.    You know what, I'm sure when I
8  initially met with Ken at the beginning of the
9  case, and he gave me his background in terms of
10  how he got involved and what he was focused on,
11  and -- and I remember at that point in time he
12  said he did not envision something happening with
13  the DWSD assets.
14        And then, obviously, during the
15  pendency of my assignment, the judge ordered the
16  parties back to mediation on that.  And I met with
17  him, I think shortly after that happened or about
18  the same time, and he said he still didn't
19  envision anything happening.
20        And once again, you know, for me,
21  DWSD became only an issue of the pension funding.
22    Q.    I want to broaden the question to
23  include any representatives from Conway Mackenzie
24  on this issue of monetization.
25    A.    No, no conversations.

- MARTI KOPACZ - VOLUME II-

2    Q.    Did Mr. Buckfire give you are a
3  download, so to speak, of his negotiations with
4  the counties about the formation of a regional
5  authority?
6    A.    No.
7    Q.    Did you have any understanding of the
8  to'ing and fro'ing, so to speak, between the City
9  and the counties in 2013 and 2014?
10    A.    Tiny.  Tiny understanding -- tiny.
11    Q.    The issue of whether or not an
12  authority is created, I take it that's not
13  material to your opinion that the plan is feasible
14  under your definition?
15    A.    It isn't because my task was to
16  assess the plan as it stands.  So, again, as
17  people have raised the issue of DWSD, while I
18  think it is -- would be a fascinating issue to
19  look at, in the spirit of what my task is and how
20  long I had to do it, it was just not something
21  that I could -- I could consciously justify
22  spending time on.
23    Q.    Going back, I'll just briefly on the
24  issue of exit financing.
25        In your report, I think it's

- MARTI KOPACZ - VOLUME II-

Section O, Page 192, you identify that as a risk.
2        Is that fair to say?
3    A.    192.  Risks -- these are other risks
4  and opportunities section.  Right.
5    Q.    Yes.
6    A.    Yes.
7    Q.    You have a subsection called, "Access
8  to Capital Markets."  I believe that's Page 195.
9    A.    Uh-huh.
10    Q.    So that is an identified risk of
11  yours in your report, correct?
12    A.    It is.
13    Q.    Other than what you told me about
14  your conversation with Mr. Ravitch, is that --
15  well, let me rephrase the question.
16        Did you have any other conversations
17  with Mr. Ravitch about what you've identified as a
18  risk in obtaining exit financing and access to
19  capital markets?
20    A.    Not that I recall.
21    Q.    Ms. Ravitch (sic), I'm going to show
22  you what's previously been marked in a prior
23  deposition, Exhibit M.
24    A.    I'm not Mr. Ravitch.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 125 of
146

- MARTI KOPACZ - VOLUME II-

2  Q.   I'm so sorry.  Did I say that?
3       Ravitch, Kopacz.
4  A.   Well --
5  Q.   There you go.  I apologize.
6  A.   He's Russian, Polish, whatever,
7  right?
8  Q.   I apologize, Ms. Kopacz.
9  A.   This is?
10 Q.   I will identify it.  Just take a --
11 for the record, while you take a moment to look
12 over this document, this has previously been
13 marked as Porter Exhibit Number 12, Exhibit M to
14 the May 5th, 2014 disclosure statement.  It is
15 DWSD financial projections.
16      On the second page of the exhibit,
17 it's City of Detroit water and sewage disposal
18 fund 10-year projections.
19      Have you -- have you seen this
20 document before?
21 A.   I have only seen this document in --
22 in the context of having printed out the May 5th
23 plan of adjustment disclosure statement.  I have
24 not spent any time with this document.
25 Q.   Did any members of your team spend

- MARTI KOPACZ - VOLUME II-

2  any time with respect to this document being
3  10-year projections for the water and sewage
4  disposal fund?
5  A.   I don't recall specifically, but I do
6  know at some point we did have one of our team
7  members initially slotted to look at DWSD, so
8  there may have been somebody who did look at it.
9  Q.   Who was that team member?
10 A.   That would have been Mike Gaul or Al
11 Mink.
12      (Cell phone interruption.)
13 THE VIDEOGRAPHER:  I'm sorry.  That
14 shouldn't have happened.  I'm sorry.
15 BY MR. NEAL:
16 Q.   Mike Gaul or --
17 A.   Al Mink.
18 Q.   Did either of those gentlemen
19 actually look at these projections?
20 A.   Like I said -- I don't -- I don't
21 know the answer to that.  And the reason is
22 because I believe -- I mean, while it was
23 initially on the task list, I know that we took it
24 off the list at some point.  So...
25 Q.   Why did you take it off the last at

- MARTI KOPACZ - VOLUME II-

2  some point?
3  A.   Again, because I said -- DWSD relates
4  only to -- in terms of my feasibility assessment,
5  the transfer of money from DWSD relative to the
6  pension funding, okay.  So given that assumption,
7  right, I did not delve into DWSD issues.
8       Done.  Finit.
9  Q.   I take it you and your team spent
10 time reviewing the City's 10-year projections and
11 40-year projections, correct?
12 A.   Correct.
13 Q.   Now, you may have answered this in
14 your prior answer, but let me just make sure.
15      Does any part -- is there any line
16 item that you can recall in those 10-year
17 projections or 40-year projections that relate to
18 DWSD's financial performance?
19 A.   The enterprise fund that is DWSD?
20 Q.   Yes.
21 A.   No.
22 Q.   So there's nothing in the 10-year
23 projections or 40-year projections that are
24 impacted by the amount of outstanding debt service
25 that DWSD has with respect to its bondholders,

- MARTI KOPACZ - VOLUME II-

2  correct?
3  A.   Correct.
4  Q.   There are no assumptions baked into
5  the 10-year or 40-year projections as it relates
6  to the refinancing of the DWSD bonds, correct?
7  A.   No.  There is plan treatment of the
8  DWSD bonds.  Right?  But not --
9  Q.   No doubt.
10 A.   Not the -- the only general fund
11 linkage between DWSD, okay, and the City is DWSD's
12 payment over that first ten years of the pension
13 obligations.
14 Q.   Let's put the pension obligation
15 aside, I'm going to come to that.
16      Are you aware of the so-called
17 interest rate reset that is being proposed under
18 the plan with respect to the DWSD bonds?
19 A.   I am aware that the interest rate --
20 I believe the interest rate in the call provisions
21 were proposed to be changed under the fourth plan.
22 I don't know what the fifth plan does.
23 Q.   Did you or your team ever analyze
24 whether the rates that are being proposed under
25 the plan are market or not?

Q

- MARTI KOPACZ - VOLUME II-
    A.    No.
    Q.    Do you have any view or opinion with
respect to the impairment of the bonds as it
relates to interest rate and call protection?
    A.    No.
    Q.    So, is it accurate to say there's
nothing in your expert report that goes to whether
or not the plan would be feasible or not if the
DWSD bonds interest rates are reset and the call
protection stripped?
    A.    I believe that's correct in that
the -- the treatment of the DWSD bonds in the plan
of arrangement does not impact my feasibility
assessment of the plan.  Does that --
    Q.    Yes.  So it makes no difference with
respect to your opinion whether or not those bonds
are impaired --
    A.    That's correct.
    Q.    -- correct?
    Do you know how much or the amount of
the purported savings that the DWSD would achieve
if the bonds are impaired as contemplated under
the plan of adjustment?
    A.    I don't.

- MARTI KOPACZ - VOLUME II-
    Q.    That number is not material to you?
    A.    I don't know what the number is.
    Q.    Whether that number is 300 million or
600 million, it has no impact on the opinion that
you are rendering in this case, correct?
    A.    That's correct.
    Q.    Let's turn to that, to use your
terminology, Ms. Kopacz, the linkage.  And that
linkage is the 428.5 million pension contribution
that is to go from DWSD to the City, correct?
    A.    Correct.
    Q.    And what did you do to analyze the
amount and the proposed payments under the plan
with respect to that amount?
    A.    There's a chart in my report that
identifies how that money comes into the City.  I
had conversations with Ernst & Young as it relates
to those monies.
    I had -- and I had other
conversations with -- it was a topic that I --
when I met with the retirement systems and their
counsels, we talked about -- I can find it -- it
comes in over ten years.
    Q.    Yes.  Please take a moment to find

- MARTI KOPACZ - VOLUME II-
it.
    A.    I'll find it.
    Q.    If I had a page number, I would give
it to you.
    A.    Yes.  It is -- it's on 136 and it's
on 137.
    Q.    With respect to the UAAL amount, did
you or your team do anything to verify that the
428.5 million is an accurate calculation of DWSD's
share of the UAAL?
    A.    No.  My assumption is that that
number was a given.
    Q.    A given in what sense?
    A.    In that it -- I have assumed that the
$428 million is correct for purposes of funding
the pension treatment that is provided for in the
plan.
    Q.    Did anyone affiliated with the City
tell you why they were structuring the
transaction -- "the transaction" being the DWSD
pension contribution -- the way that they
structured it in the plan?
    A.    Again, because it -- it is a source
of funds that the City believed it could use to

- MARTI KOPACZ - VOLUME II-
fund the pension obligation going forward.
    Q.    Would it change your opinion at all
in terms of feasibility whether that amount was
paid out over nine years or ten years or a longer
period of time?
    A.    It could.
    Q.    Did you run any -- perform any
analysis over the impact that paying that money
out over a longer period of time would have on the
plan's feasibility?
    A.    I did not.
    Q.    So whether it's paid out over 30
years or nine years, you don't have a view as to
whether or not that would impact the feasibility
of the plan?
    A.    It's not paid in -- it's paid more in
the first year than and then equally over the
subsequent years.  So depending on if that was
spread over a 30 years, right, that could be --
that could be meaningful.  I don't know.
    Q.    Do you know historically, let's just
say going back five years, how much was paid in
terms of DWSD's share of the UAAL?
    A.    I don't.

21 (Pages 499 to 502)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 127 of
146

- MARTI KOPACZ - VOLUME II-

2    Q.    Do you know why the first year number
3 for the payment is larger than the subsequent
4 year's?
5    A.    I don't.
6    Q.    I want to go back to Porter Exhibit
7 12 just for a few moments.  And remember that
8 document is Exhibit M to the May 5th, 2014
9 disclosure statement.
10    A.    Uh-huh.
11    Q.    Do you have any knowledge as to
12 whether any DWSD employees and consultants were
13 consulted with regard to the creation of the water
14 and sewage disposal fund 10-year projections?
15    A.    I'm sorry.
16    Q.    Yes.  Do you know if any DWSD
17 employees or consultants were consulted with
18 respect to the creation of these 10-year
19 projections?
20    A.    I have no knowledge one way or
21 another.
22    Q.    Would it surprise you that several
23 members of the DWSD management have testified that
24 they had no input into the creation of this
25 Exhibit M, Porter Number 12?

- MARTI KOPACZ - VOLUME II-

2    A.    Would it surprise me?
3    Q.    Would it surprise you?
4    A.    No.
5    Q.    You touch upon this in your report,
6 correct, and that is, the -- I'm going to use this
7 word and you can correct me if you don't like it
8 -- the disconnect between the City employees and
9 the City professionals?
10    A.    Yes.
11    Q.    Would you agree that in some
12 instances there's a disconnect between the
13 projections prepared by the City's professional
14 advisors and the views, opinions and projections
15 prepared by the City's employees, correct?
16    A.    Yes.
17    Q.    Where have you seen that?
18    A.    I've seen that in the operating
19 departments within the general fund.
20    Q.    Can you give one example?
21    A.    Fire department.
22    Q.    And where would the disconnect lie
23 between the fire department and the City?
24    A.    In the -- most of it lies in the
25 RRIs, in the development of the RRIs.  And that's

- MARTI KOPACZ - VOLUME II-

2 where it became evident to me in trying to do --
3 again, trying to understand the plan, the
4 baseline, the RRIs, the long-term projections,
5 vis-a-vis the budget and the reasonableness of the
6 totality of projections for how the City's going
7 to operate.
8         And during -- and I participated in a
9 lot of what the mayor referred to as his budget
10 review meetings, but where the purpose was to meet
11 with the department heads to understand if they
12 believed they could meet the projections and the
13 plan in the POA.
14    Q.    Did you meet with department heads?
15    A.    I did.
16    Q.    And the meetings with department
17 heads that you referred to in your answer before
18 the last one, those were meetings that you were --
19 you and your team members were involved in?
20    A.    Most of them I did.  Occasionally,
21 depending on the department, others of my team
22 participated in.
23    Q.    And one of the purposes of those
24 meetings, I would imagine, is that you wanted to
25 make sure department heads and the City and its

- MARTI KOPACZ - VOLUME II-

2 professional advisors were on the same page, so to
3 speak?
4    A.    Well, the beginning of those
5 meetings, it was only the department heads and the
6 mayor's staff.  And then as those meetings
7 progressed and it became obvious that department
8 heads didn't understand how they fit into the
9 plan, that then representatives from E & Y and
10 Conway started attending.
11    Q.    Do you know if the department heads
12 at DWSD know how they fit in with the plan?
13    A.    I have no idea.
14    Q.    Are you aware that DWSD itself
15 generates its own internal projections?
16    A.    I have no knowledge one way or
17 another.
18    Q.    So you did not -- neither you nor
19 anyone on your team evaluate any DWSD internal
20 projections?
21    A.    That's correct.
22    Q.    You've not done a comparison of DWSD
23 internal projections with the 10-year projections
24 reflected in Porter 12?
25    A.    No.

- MARTI KOPACZ - VOLUME II-

1
2    Q.    Now, there's a section on DWSD in
3 your report, under Section O, other risks and
4 operations --
5    A.    Opportunities.
6    Q.    Excuse me, you're right.
7          Opportunities.  So if you could turn
8 to Page 196.
9    A.    Uh-huh.
10   Q.    So DWSD, in your view, has very
11 little impact on the general fund; is that
12 correct?
13   A.    That's correct.
14   Q.    Then you state, "DWSD does play a
15 significant role in funding the City's pension
16 obligations during the forecast period."
17         Do you see that statement?
18   A.    Yes.
19   Q.    You have a footnote and that is the
20 428 we were talking about earlier, correct?
21   A.    That's correct.
22   Q.    My questions concern the next simply
23 one sentence: "In the event of a significant
24 disruption to the DWSD operations, significant
25 loss of customers impairing its financial

- MARTI KOPACZ - VOLUME II-

1
2 prospects, or in the event that the DWSD
3 contributions are not made according to the POA,
4 this could negative impact on the outcome of the
5 POA."
6          Do you see that?
7    A.    Yes.
8    Q.    And what significant disruption to
9 the DWSD operations are you referring to there?
10   A.    If something happened at DWSD such
11 that they can't not make the contributions to the
12 pension funding, that will have a negative impact
13 on the results of the City's ability to meet the
14 obligations in the POA.
15         I don't know what they could be.  You
16 could have all the water mains blow, for all I
17 know.  I have no idea what they could be.
18         This is simply a -- this is an
19 unknown and unknowable in my perspective.  But if
20 something happens where DWSD can't contribute as
21 its envisioned, that would have -- I would have to
22 reevaluate, you know, my thoughts on whether or
23 not the POA obligations would be met.
24   Q.    But again, you've not done a
25 sensitivity analysis in that regard?

- MARTI KOPACZ - VOLUME II-

1
2    A.    I have not.
3    Q.    So whether they could only pay
4 20 million a year versus 60 million a year for
5 their UAAL contribution, how that impacts
6 feasibility is not something you've analyzed?
7    A.    Not specifically.
8    Q.    There's a reference also baked into
9 this sentence.  I want to see if it's something
10 different than what you've already disclosed.
11         "...to a significant loss of
12 customers impairing its financial prospects."
13         Is that also unknown and unknowable?
14   A.    Yes.
15   Q.    You're not aware, sitting here today,
16 of any event on the near horizon that could result
17 in a significant loss of customers?
18   A.    That's correct.
19   Q.    It could happen or it couldn't,
20 correct?
21   A.    I don't know.
22   Q.    Have you had any communications with
23 Mr. Ravitch about the DWSD pension contribution?
24   A.    No.
25   Q.    Can you tell me all of your

- MARTI KOPACZ - VOLUME II-

1
2 conversations with Mr. Ravitch as they concerned
3 the DWSD?
4    A.    I don't believe we ever talked about
5 DWSD at any level.
6    Q.    Okay.  I'll represent it's more
7 valuable than the art, but I'm not asking you to
8 respond to that.  Others have different opinions
9 in this very room, but I'll move on.
10         Did you have any conversations with
11 Mr. Ravitch about any of the expert reports that
12 were submitted by the DWSD bond insurers or the
13 U.S. Trustee as Indenture Trustee?
14   A.    My prior answer was the sum total of
15 my answer.  I don't believe Mr. Ravitch and I have
16 ever talked about DWSD.  I'm not sure he knows
17 what DWSD stands for.
18   Q.    Do you have any views or opinions
19 with respect to what the projected rate increases
20 are under the plan with respect to water and sewer
21 rates?
22   A.    I don't.  I know the cost that the
23 City's paying is going up.
24   Q.    Do you know whether there is, to
25 adopt a term in your report, a tipping point with

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 129 of
146

1          - MARTI KOPACZ - VOLUME II-
2    respect to those -- those costs?
3          A.   I don't.
4          Q.   Last exhibit I want to show you,
5    previously marked as Orr Exhibit Number 18.
6          While you're looking through it, I'm
7    going to represent to you, Ms. Kopacz, that Orr
8    Exhibit 18 has the title "Feasibility Report" and
9    we'll get to what that means in a second.
10         I'll represent to you that this is a
11   document prepared by the rate consultant for DWSD.
12   It's fairly current.  It's a July 17, 2014
13   document.
14         Now, it would surprise me if you said
15   yes, but let me ask you:  Have you seen this
16   document before?
17         A.   No.
18         Q.   Do you know what a feasibility study
19   or report is as that term terminology is used in
20   the public finance context?
21         A.   I -- I have -- I have been exposed to
22   that term before relative to public financing
23   projects.  So, generally, yes.  Specifically as it
24   relates to this, obviously not.
25         Q.   What's your general understanding of

1          - MARTI KOPACZ - VOLUME II-
2    why a feasibility report is prepared?
3          A.   To assess whether or not a project,
4    for example, you know, an industrial revenue bond
5    issue or, you know, something like that would make
6    sense whether or not it would be rate feasibility
7    around public utilities, those sorts of things.
8          Q.   If you could turn to the very last
9    page and my question for you is -- I'm very close
10   to wrapping up -- if you could just take a moment
11   and read the facts and opinions that are set forth
12   1 through 6 on this last page.
13         A.   This is A-25?
14         Q.   Yes.  My question is going to be do
15   you have any basis to disagree with any of the
16   facts and opinions set forth in 1 through 6 on
17   this page?
18         A.   Okay.  Can you tell me what the CIP
19   is?
20         Q.   That's an acronym for capital
21   improvement plan.
22         A.   Okay.  Okay, I've read it.
23         Q.   Okay.  Do you have any reason to
24   disagree with any of the facts or opinions set
25   forth here?

1          - MARTI KOPACZ - VOLUME II-
2          A.   I don't mean to be flip, but couple
3    of things.  One, it says preliminary to be
4    updated.  So I don't know if there has been any
5    changes to that.  And quite frankly, this is more
6    information than I think I can deal with in a
7    90-second review.
8          So I guess I would say I just don't
9    think it would be very professional if I said one
10   thing or another about this.
11         Q.   All right.  Well, very good.  I'm
12   going to just walk you through it.  It shouldn't
13   take very long.
14         A.   Okay.
15         Q.   The first two paragraphs deal with
16   sewage disposal rates.  Is that something that you
17   have studied as part of this engagement?
18         A.   No.  But the only thing I know about
19   sewage disposal rates is the -- the sewage rates
20   the City is paying itself, have -- are expected to
21   go up and have gone up.  Because, again, the way
22   that the City is being charged for sewer has
23   changed this year versus previously.
24         Q.   But whether or not the sewage
25   disposal rates are above or below average of those

1          - MARTI KOPACZ - VOLUME II-
2    and comparably sized cities --
3          A.   I would have no knowledge.
4          Q.   Same question as it relates to the
5    water rates.
6          A.   I have no knowledge.
7          Q.   And bullet point 3 or paragraph
8    numbered 3 as it relates to the CIP, the capital
9    improvement plan, fair to say you have not
10   reviewed DWSD's capital improvement plan?
11         A.   I have not.
12         Q.   Point number 4, the department's
13   current fiscal policies, have you reviewed the
14   department's current fiscal policies?
15         A.   I have not.
16         Q.   And in the last two points, point
17   number 5, whether or not the revenues pledged as
18   security for the DWSD bonds are projected to be
19   sufficient to comply with rate covenants,
20   et cetera, is that something you've looked at?
21         A.   I have not.
22         Q.   And the coverage requirements that
23   are referenced in Paragraph 6 with respect to the
24   bonds, is that something you've looked at?
25         A.   No.

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 130 of
146

- MARTI KOPACZ - VOLUME II-

Q.    In reviewing the transcript from
yesterday, I believe Mr. Stewart asked you at the
start if you had any misgivings or any conclusions
that you weren't confident about in your report.

Given the past day and a half of
questioning, do you have anything?

A.    I'm still -- no, I'm still really
comfortable with what we did, given the scope of
our assignment, given the best information
available.  And I really haven't changed any of my
thoughts in the last day and a half.

MR. WAGNER:  Very good.  I have no
further questions.  I yield to others.

MR. BRILLIANT:  I'm not going to have
very much time.  Do you want to take a
few-minute break and we'll switch seats.

THE VIDEOGRAPHER:  The time is
11:16 a.m.  We're going off the record.

(Whereupon, there was a brief recess
in the proceedings.)

THE VIDEOGRAPHER:  The time is
11:26 a.m.  We're back on the record.

EXAMINATION BY MR. BRILLIANT:

- MARTI KOPACZ - VOLUME II-

Q.    Ms. Kopacz --

THE VIDEOGRAPHER:  Your microphone,
sir.

Q.    I'm going to try to just fill in some
gaps and try not to repeat things and I hope we
can do this pretty quickly.

So the first thing I wanted to ask
you about is with respect to the DWSD, in
answering some questions from Mr. Neal you said
that the only thing that you looked at in
connection with DWSD was in connection with the --
the pension payments; is that right?

A.    That's correct.

Q.    And what did you do in connection
with that?  You just assumed that DWSD would make
the payments?

A.    I had conversations with the City and
the City's professionals and conversations with --
I know counsel to the retirement systems and to
some of the people that were involved in that.

Q.    And basically you just made the
assumption that DWSD would be able to make those
payments?

A.    I did.

- MARTI KOPACZ - VOLUME II-

Q.    And you didn't do anything to analyze
whether DWSD would have the financial capability
to make the payments; you just relied on the
assumption they could make the payments?

A.    Yes.

Q.    And you -- and because you didn't
review any DWSD financial projections, you have no
opinion as to whether any financial projections
are reasonable; isn't that right?

A.    That's correct.

Q.    And you have no opinion as to whether
or not DWSD is viable after confirmation of the
plan, do you?

A.    Like I said, I don't have any
perspective or point of view on DWSD.

Q.    Okay.  So when you say in your report
that the plan is feasible, you mean this the plan
as relates to the general fund is feasible based
on the assumptions contained in your report, but
you have no opinion as to whether the DWSD portion
of the plan is feasibility; is that correct?

A.    That's correct.

Q.    Mr. Neal had asked you about
conversations that you had with respect to

- MARTI KOPACZ - VOLUME II-

monetization of DWSD.

A.    Yes.

Q.    And he'd asked you about
conversations with Miller Buckfire.

A.    Yes.

Q.    And he asked you about conversations
with Conway and Mackenzie.

A.    Yes.

Q.    Were there conversations that you had
about the monetizations of DWSD with anybody else?

A.    Not to my recollection.

Q.    When was it that you decided that the
feasibility analysis would only be limited to the
general fund and -- and not to the enterprise
funds?

A.    Because the plan of adjustment
projections only relate to the general fund.

Q.    Okay.  But when -- so when was the
decision that you would only -- 'cause in the
disclosure statement, right, there's -- there's
the 10- and 40-year projections for the general
fund, correct?

A.    Right.  Yes.

Q.    And then -- and then there are also

- MARTI KOPACZ - VOLUME II-

1    - MARTI KOPACZ - VOLUME II-
2    projections for DWSD; is that right?
3        A.    I'd have to look at it again, but,
4    yes, I believe there were.
5        Q.    Okay.  So when was the decision made
6    to only review the reasonableness of the
7    projections as they related to the general fund?
8    When did you make that decision?
9        A.    I don't recall specifically.
10       Q.    Was it early on in your process?
11       A.    It was multiple times in my process.
12   I think originally, again, when I -- when I got
13   involved in April, I didn't understand enough
14   about the case, the projections.  I didn't
15   understand the projections.  And as I got more
16   involved in it, I realized that the plan really
17   only included the general fund, not so much the
18   enterprise fund.
19           And it probably was the original --
20   it was probably the first conversation with John
21   Hill when I really got a much better understanding
22   of the projections in the plan of adjustment.
23       Q.    So when you say the plan only
24   included the general fund.  When you're talking
25   about plan, are you talking about --

- MARTI KOPACZ - VOLUME II-

1    - MARTI KOPACZ - VOLUME II-
2        A.    I'm talking about the 10-year, the
3    RRIs and the 10-year, 40-year.
4            So we can identify the exhibits to
5    the disclosure statement as probably the best way
6    to do it.
7        Q.    Okay.  I was, at this point, just
8    asking you a different question.
9            You used the word "plan."  Are you
10   talking about the plan of adjustment?
11       A.    Yes.
12       Q.    So when you say the plan of
13   adjustment only includes the general fund, but
14   DWSD is part of the City, it's a department of the
15   City, correct?
16       A.    It is.
17       Q.    And its debt is being adjusted
18   pursuant to the plan of adjustment; isn't that
19   right?
20       A.    It is.
21       Q.    And its services that it provides to
22   both Detroit residents and to residents outside of
23   the City, are important, aren't they?  Water and
24   sewage?
25       A.    Yes.

- MARTI KOPACZ - VOLUME II-

1    - MARTI KOPACZ - VOLUME II-
2        Q.    Okay.  But -- but you made no
3    analysis as to whether or not DWSD, after the
4    confirmation, will be feasible or viable; isn't
5    that right?
6        A.    That is correct.
7        Q.    And so, again, I just want to
8    understand, you know, why you decided not to
9    include an analysis of DWSD.
10           Did the City ask you not to do that
11   or you just concluded you didn't have enough time?
12   Or what was -- what was the rationale for that?
13       A.    The rationale was the -- the risks,
14   if you will, in the plan of adjustment are in the
15   projections that relate to the general fund, okay.
16           DWSD had been a standalone
17   self-sufficient enterprise system for a long time,
18   okay.  Yes, it is adjusting its debt as part of
19   the plan, but it doesn't -- because it doesn't
20   require a subsidy from the City like DDOT does and
21   it doesn't impact the general fund, in terms of my
22   scope and in terms of what I believe the judge
23   wanted me to do was to look at the plan, the
24   10-year, the 10/40 years and the RRIs relative to
25   the general fund.

- MARTI KOPACZ - VOLUME II-

1    - MARTI KOPACZ - VOLUME II-
2        Q.    Okay.  And when you say that's what
3    you believe the judge wanted you to do, did
4    Judge Rhodes tell you that or is that --
5        A.    No.
6        Q.    -- just an assumption that you made?
7        A.    That's an assumption that I made.
8        Q.    Did you discuss with, you know, the
9    City or any of its counsel or advisors whether
10   DWSD should be included in your feasibility
11   analysis?
12       A.    I have talked to the City a couple of
13   times about DWSD.  I've talked to the -- some of
14   the bondholder lawyers relative to DWSD, to -- to,
15   you know, confirm my belief that DWSD's linkage to
16   the City, right, is really only through this
17   contribution of pension monies over the -- over
18   the next ten years.
19       Q.    Did you have a conversation in early
20   July with Ms. Lenox about DWSD?
21       A.    I did.
22       Q.    And do you remember who initiated
23   that conversation?
24       A.    I called -- I called Ms. Lenox and
25   she called me back.  And again, there was -- there

- MARTI KOPACZ - VOLUME II-

1  
2  was something that happened that prompted the
3  call, I don't remember what it was, but I
4  wanted -- you know, once again, to talk with her
5  about anything that was going on in the DWSD
6  mediation that could impact what I was doing.
7      Q.    And so was that call on July 10th or
8  roughly?
9      A.    That sounds about right.
10     Q.    Okay.  And how long did the call
11 last?
12     A.    Very short.  Probably five minute or
13 so less.
14     Q.    Okay.  And do you remember what you
15 asked her and what she told you?
16     A.    I remember I was sitting at the
17 Marine Air Terminal waiting on a plane when she
18 called and I said, Are there any updates on the
19 DWSD mediations, negotiations or whatever, that,
20 you know, I should be thinking about, considering,
21 that could have an impact on the plan?  She told
22 me no, and that was the end of the conversation.
23     Q.    When -- I think you testified earlier
24 that your team had done the first draft of the
25 plan as it related to pensions and then you edited

- MARTI KOPACZ - VOLUME II-

1  
2  it.  What about the rest of your -- of your
3  report, did you do the initial --
4      A.    Well, some sections, some -- we
5  divided the writing amongst the team based on the
6  areas that people had -- had worked on primarily.
7  And then whoever wrote, gave their drafts to other
8  people to edit and that's how we developed the
9  report.
10     Q.    Okay.  Did you do the initial
11 drafting on any portion of the reports?
12     A.    I did the initial drafting on
13 context, summary -- I mean, the -- the -- I think
14 we changed the title.  I think it was called
15 statement of opinion.  It started -- it originally
16 started life as the executive summary and I
17 believe we -- I think we called -- yeah, statement
18 of expert's opinion.  I did that.
19     Q.    When did -- when did you start
20 putting -- you and your team start putting I guess
21 pen to paper, but I guess the reality is nobody
22 uses a pen and paper anymore, but when did you
23 start drafting the report?
24     A.    A couple of weeks before it was due.
25     Q.    So it was due on the -- you filed it

- MARTI KOPACZ - VOLUME II-

1  
2  on the 18th.  So sometime around July 4th?
3      A.    Right after July 4th.
4      Q.    That's when people started to --
5      A.    We started -- we started writing.
6          THE REPORTER:  Just let him complete
7  the question before you respond.
8          THE WITNESS:  Thank you.  I'm sorry.
9  BY MR. BRILLIANT:
10     Q.    Then after you started writing, did
11 you share any of your preliminary opinions or
12 drafts of the report with anybody outside of your
13 team?
14     A.    We shared the original feasibility
15 definition with Jones Day.  And as I testified
16 before, I shared original drafts of the pension
17 and the post-confirmation oversight sections with
18 Mr. Ravitch.
19     Q.    And did -- after you shared the
20 original feasibility opinion with Jones Day, did
21 you make any changes to that section?
22     A.    Yes.
23          MR. LERNER:  I'm going to object, you
24 mischaracterized her statement.  She did not
25 say she shared her feasibility opinion with

- MARTI KOPACZ - VOLUME II-

1  
2  Jones Day.
3          MR. KANE:  Section.
4          MR. LERNER:  The standard, the
5  definitions is what we shared.
6          THE WITNESS:  The standard.
7  BY MR. BRILLIANT:
8      Q.    That's what I meant to say.
9          After you shared the original
10 standard section with Jones Day, did you make any
11 changes to that section?
12     A.    I'm sure we did.
13     Q.    Did you make any changes that were
14 requested by Jones Day?
15     A.    I never heard back from Jones Day.
16     Q.    So you gave it them and they never
17 commented on it?
18     A.    They did not.
19     Q.    Is it possible they commented to any
20 of the members of your team?
21     A.    They did not.
22     Q.    And then after you shared with
23 Mr. Ravitch the -- the pensions section, did you
24 discuss it with him?
25     A.    We did.

- MARTI KOPACZ - VOLUME II-

1
2      Q.     And did you make any changes after
3  you shared it with him?
4      A.     Yes.
5      Q.     Were any of the changes things that
6  he had suggested?
7      A.     No.
8      Q.     Did you share that section with
9  Mr. Kiernan?
10      A.     No.
11      Q.     Do you know if Mr. Ravitch shared it
12  with March Kiernan?
13      A.     I don't know.
14      Q.     When you met with Mr. Kiernan, had
15  you already shared the draft of the pension
16  section with Mr. Ravitch?
17      A.     No.
18      Q.     Did you have any discussions with
19  Mr. Kiernan about the pension section?
20      A.     No.
21      Q.     Prior to sharing your report with the
22  judge after you finalized it, signed it, sent it
23  to the judge in the e-mail that we -- that you
24  testified about yesterday, did you give any kind
25  of overview or indication to the City or any of

- MARTI KOPACZ - VOLUME II-

1
2  its advisors as to where you were coming out with
3  your report?
4      A.     No.
5             MR. BRILLIANT:  I don't have anything
6  further.
7             THE VIDEOGRAPHER:  We're going to go
8  off the record for a moment.  The time is
9  11:39.  We're going off the record.  This is
10  the end of Disk Number 2.
11             (Whereupon, there was a brief recess
12  in the proceedings.)
13             THE VIDEOGRAPHER:  This is still Disk
14  Number 2, the time is 11:40 and we're back on
15  the record.
16  EXAMINATION BY MS. QUADROZZI:
17      Q.     Good morning.
18      A.     Good morning.
19      Q.     We've spoken a couple of times over
20  the course of the two days that we have been here,
21  but just to be clear, I represent Oakland County
22  in connection with the case and I'm just going to
23  ask you a couple questions.  And as the other
24  lawyers have said, I'm going to try not to
25  duplicate.

- MARTI KOPACZ - VOLUME II-

1
2             In testimony that you gave really
3  just this morning with Mr. Neal, you were talking
4  a little bit about the -- a feasibility report
5  that he showed you and he asked you a couple of
6  questions about the last page of that and some of
7  the assumptions that are on it.  And during the
8  course of that interchange, you relayed some
9  information that you had about sewage rates.
10             So my question to you is, from whom
11  did you gather or learn that information about the
12  sewer rates?
13      A.     It is in the projections.  So, while
14  my team was looking at the various projections and
15  the models, okay, we saw changes in utility costs
16  and as we did diligence on those, found some of
17  that was in sewer, some of it was in water, some
18  of it was electric, okay.
19             The other point of reference that I
20  have is from my meeting with the department heads
21  for recreation.  And in their budget, they have an
22  increased cost associated with utilities that, in
23  part, was the result of being charged differently
24  for sewer than they had been charged before.
25      Q.     I believe, based on all of your

- MARTI KOPACZ - VOLUME II-

1
2  testimony, that I know the answers to this.  But
3  just to sort of tie the loop around this
4  information, despite having learned of this
5  information during the course of your report, it
6  did not form the basis for nor did it influence
7  any of the opinions in the report, correct?
8      A.     That's correct.
9      Q.     And having gained this information,
10  you did not reach out to speak to anyone in DWSD
11  to confirm it or get further information relating
12  to the rates that you've outlined?
13      A.     No.  I was simply doing diligence on
14  the City's operating cost for utilities, and those
15  prospective rates changed from the historicals.
16  And so as part of that inquiry, I learned of a
17  change in billing practices in terms of sewer and
18  I learned of changes in electric cost as it
19  relates to moving over to DTE as an energy
20  provider as opposed to the City billing itself.
21      Q.     I want to ask you just a couple of
22  questions based on the portion of your report that
23  does relate to DWSD and you went over that this
24  morning again with Mr. Neal.
25             So that's Page 196 and 197.

- MARTI KOPACZ - VOLUME II-

1    A.   Uh-huh.
2    Q.   In particular, the sentence, the
3  final sentence of that paragraph, the sort of
4  carryover sentence, you discuss with Mr. Neal the
5  phrase of that sentence talking about that a
6  significant loss of customers impairing DWSD's
7  financial projects could negatively impact the
8  outcome of the plan of adjustment.
9       And during your testimony with
10  Mr. Neal, you testified that this section,
11  particularly the one that I just pointed you to,
12  was an unknown and, in fact, was unknowable.
13       Do you remember that testimony?
14  A.   I do.
15  Q.   My question is this:  Did you -- and
16  I'm focusing on the last part of your answer; not
17  so much the unknown, but the unknowable.
18       Did you, during the course of your
19  work here, do anything to try to determine if, in
20  fact, any of those things you categorized as
21  unknowns were, in fact, unknowable?
22  A.   At this point, no.
23  Q.   And why not?
24  A.   Again, the -- the tasks that I had to

- MARTI KOPACZ - VOLUME II-

1  accomplish, the time frame that I had to do it in,
2  okay.  The importance that DWSD has to the plan of
3  adjustment projections related to the general
4  fund.  Okay.  The -- again, it goes back to the
5  linkage and it's the pension issue.  Okay.
6       Would I -- had I had more time, I
7  probably would have done more work on DWSD.  Okay.
8  But it is simply a -- the most important thing for
9  me to do was to look at the plan projections, to
10  understand what those were, to assess the
11  feasibility.
12       The linkage in to -- with DWSD is a
13  single line item of pension funding.  Okay.  So it
14  just -- it is -- I don't mean to be disrespectful
15  of DWSD, I know it's something that's very, very
16  important, I know lots of people in this case care
17  very deeply about it.  But at this juncture, I had
18  to use my best efforts to deliver my opinion and
19  my report and where DWSD fits into it, according
20  to my assumption, is in that line item relative to
21  pension funding.
22  Q.   Let me ask you one other question and
23  I'm going to apologize because it relates to an
24  area of your testimony yesterday where I was

- MARTI KOPACZ - VOLUME II-

1  stepping in and out to try to get hold of the
2  judge.
3    A.   Okay.
4    Q.   So I apologize if these questions
5  were asked.
6       But what I want to ask you about is
7  there was testimony yesterday about a couple of
8  dinner parties and the one I want to focus on,
9  because I believe that your testimony was that at
10  one of them you were sitting at a table with Tom
11  Lewand; is that correct?
12  A.   Yes.
13  Q.   And can you tell me what -- two
14  questions.  One, how did Mr. Lewand come to be a
15  party or an invitee to the dinner party; and two,
16  what did you and Mr. Lewand discuss?
17  A.   I don't know how Mr. Lewand became an
18  invitee.  I don't.  I had nothing to do -- I was
19  simply an invited guess.  So I have no idea who
20  made the guest list other than we were at the
21  Blusteins' home.
22       The conversation that I had with Tom
23  was part of the large table discussion and we
24  talked about Mr. Lewand's recent previous career

- MARTI KOPACZ - VOLUME II-

1  as an artist and that the mayor had convinced him
2  to join the administration in an economic
3  development and planning role.
4    Q.   Did you talk at all with Mr. Lewand
5  about his career before his art sojourn as a
6  special master to Judge Feikens in connection with
7  the Clean Water Act case that DWSD was a party in
8  for 30 years?
9    A.   No, never heard that.
10  MS. QUADROZZI:  Okay.  I have no
11  further questions.
12  MR. KANE:  Does anyone else have any
13  questions?
14  MS. GREEN:  Am I the only one?  Am I
15  last?
16  (Discussion held off the record.)
17  MS. GREEN:  Do you have any
18  questions?  Do you want me to go or do you
19  want to go?
20  MR. ALBERTS:  You can go.
21  THE VIDEOGRAPHER:  If I could ask you
22  to put your mike on.  Thank you.
23  EXAMINATION BY MS. GREEN:
24  Q.   My name is Jennifer Green and I

- MARTI KOPACZ - VOLUME II-

1   - MARTI KOPACZ - VOLUME II-
2  represent the two retirement systems for the City
3  of Detroit.  We met very briefly at your interview
4  months ago and I don't believe we've spoken since,
5  but I'll be brief.
6        A lot of my questions actually were
7  asked this morning by Jonathan Wagner.  So I
8  apologize, I may have to jump around a little bit
9  because I'm going to try not to repeat the same
10 questions that he had.
11       If we go to Exhibit 1 which is a copy
12 of your report, Page 127.
13    A.    Page 127.  Uh-huh.  Okay.
14    Q.    There is a paragraph in the middle --
15    A.    Uh-huh.
16    Q.    -- where you state that, "A number of
17 different practices have contributed to a
18 significant funding shortfalls in the two pension
19 plans.  The retirement systems utilized
20 unrealistic rate of return assumptions and manage
21 the pension plans in accordance with questionable
22 investment strategies that result in a
23 considerable underfunding of their respective
24 plans."
25       Do you see that?

1   - MARTI KOPACZ - VOLUME II-
2    A.    I do.
3    Q.    With respect to your contention that
4  the systems used questionable investment
5  strategies that resulted in considerable
6  underfunding, you don't cite any particular third
7  party in a footnote as you have in other sections.
8        Do you see that?
9    A.    There is no footnote related to that
10 paragraph.
11    Q.    Okay.  So what did you rely on in
12 reaching this conclusion?
13    A.    This -- a lot what -- the
14 conversation that I had with Mr. Clark -- we can
15 go back to my log and I -- I am sorry to say I
16 have forgotten all of the people were -- that were
17 at that meeting, but I was at a meeting with both
18 retirement systems, their counsel and their
19 lawyers at Clark Hill, very shortly after I was
20 retained in this matter.
21       And it was during that -- here it is
22 -- Robert Gordon, Joseph Turner, Ronald King,
23 Michael VanOverbeke, those individuals, I had a
24 meeting with them.
25       And then subsequently I know people

1   - MARTI KOPACZ - VOLUME II-
2  in my firm met with a similar group of people of
3  -- that represented the pension funds and we
4  talked about -- they shared with me a history of
5  the investments around the retirement systems, the
6  investments that were made, and I believe it was
7  during the during the Kwame administration into
8  alternative -- what you would call alternative
9  investment vehicles; the -- the smoothing that had
10 occurred and the stretching out of the unfunded
11 obligations over a relatively 30-year period.  But
12 the -- this really comes from that conversation.
13    Q.    Okay.  So, it is your testimony that
14 the retirement systems themselves told you that
15 they utilized an unrealistic rate of return
16 assumption?
17    A.    The people that I met with, I believe
18 it's in your offices at -- across the street from
19 the KMAK.
20    Q.    And who --
21    A.    Shared with me.
22    Q.    Someone specifically on behalf of
23 retirement system opined to you that they --
24    A.    Mr. Overbeke (sic) and Mr. -- and I
25 think it was -- the gentleman who was a lawyer,

1   - MARTI KOPACZ - VOLUME II-
2  but is also general counsel now for the funds.
3    Q.    Michael VanOverbeke?
4    A.    He's one of them --
5    Q.    Or Joe Turner?
6    A.    I think it's Joe Turner.
7    Q.    What I'm trying to get at, your
8  testimony is that during that meeting they
9  specifically told you --
10    A.    About --
11    Q.    -- that they believed --
12        MR. KANE:  Wait for her to finish.
13    Q.    Let me finish the question.
14        -- that there was an unrealistic rate
15 of return assumption that was utilized by the
16 system?  Or is that your extrapolation based on
17 what was said at the meeting?
18    A.    The -- we talked very specifically
19 about the recent history of losses, investment
20 losses at the retirement system; how they had used
21 a seven-year smoothing period to make the
22 shortfalls less obvious; how they had implied
23 amortization periods that were extended for
24 funding the unfundeds; and how all of that ended
25 up creating, you know, again, a perception or a

- MARTI KOPACZ - VOLUME II-

1  reality of the underfunding of the plans.  As well
2  as the 13 checks and those sorts of things.  We
3  talked about all of that.
4      Q.    Do you have any understanding of what
5  would be a typical smoothing period utilized by
6  other public pension plans?
7      A.    I don't.
8      Q.    So if someone from the retirement
9  systems told you that a seven-year smoothing
10  period was used, you would have no basis to
11  compare that with other plans to know if that was
12  typical?
13      A.    I would -- I would have to undertake
14  to research that.  I wouldn't have my own
15  independent knowledge of what that was.
16      Q.    Same with amortization period
17  utilized by public pension systems.  Would you
18  have any basis to know whether a 20-year
19  amortization period versus a 30-year amortization
20  period.
21      A.    Or a ten or a five.  No, I would not.
22      Q.    Okay.  So just to narrow it down, we
23  told you certain facts -- when I say "we," the
24  retirement systems gave you certain facts about

- MARTI KOPACZ - VOLUME II-

1  the smoothing period used and amortization period
2  used.  And then you extrapolated an opinion that
3  based on that there were unrealistic rate of
4  return assumptions and questionable investment
5  strategy?
6      A.    No.  What my question in the meeting,
7  right, to start, one of my basic questions would
8  be, okay, how did these things get in this
9  condition.  Right.
10      Q.    Who else from your team attended this
11  meeting?
12      A.    At that meeting, just myself.
13      Q.    In the second meeting?
14      A.    Then there were -- there were --
15  second meeting, there were some calls that would
16  have involved Michael Gaul, Bob Childree, maybe
17  Brian Gleason.  I don't know.  I would think they
18  would be in the log.
19      Q.    What are Mr. Gaul and Mr. Childree's
20  particular experience as relates to pensions,
21  public pensions?
22      A.    I don't know that Michael has any
23  specific experience.  Mr. Childree is very
24  experienced with public pensions, having been the

- MARTI KOPACZ - VOLUME II-

1  comptroller of the State of Alabama for 23 years
2  and the former president of the Government Finance
3  Officers Association for a number of years.  And I
4  believe he's -- he is a current advisor or recent
5  past advisor to the GASB, the Government
6  Accounting Standards Board on these matters.
7      Q.    Do you know -- I'm sorry -- do you
8  know if either one has any actuarial experience?
9      A.    I don't believe either has actuarial
10  experience.
11      Q.    Do you know if either has sat on a
12  board for a public pension system?
13      A.    I believe Mr. Childree has.
14      Q.    Do you know how long the meeting
15  between Mr. Gaul, Mr. Childree and the retirement
16  systems lasted?
17      A.    I don't.
18      Q.    In reaching your conclusion on Page
19  127, I believe you testified this morning that you
20  never looked at the investment policies for the
21  system.
22      A.    I did not.
23      Q.    Do you know if your team looked at
24  those?

- MARTI KOPACZ - VOLUME II-

1      A.    I don't know.
2      Q.    Do you or your team -- do you know if
3  you or your team looked at the historical asset
4  allocation mix for the system?
5      A.    I believe someone did, yes.
6      Q.    Okay.  Do you know where those are
7  listed on the chart of documents that you looked
8  at?
9      A.    I don't.
10      Q.    The underfunding issue that is spoken
11  about in this paragraph, was that discussed only
12  at the meeting with you and a representative of
13  the retirement systems or was it discussed at the
14  meeting with Mr. Gaul and Mr. Childree as well?
15      A.    I'm sure it was discussed at all of
16  the meetings.
17      Q.    Did you or your team consult with any
18  of the systems investment consultants in reaching
19  this conclusion?
20      A.    I -- I believe that Mr. Gaul and/or
21  Mr. Childree participated in meetings or calls
22  with the pensions' advisors, the pension systems'
23  advisors.
24      Q.    Do you know who NEPC is?

- MARTI KOPACZ - VOLUME II-

1
2    A.    I don't.
3    Q.    Do you know who Wilshire Investments
4    is?
5    A.    Only just -- I don't know them
6    specifically.
7    Q.    Do you know their role within the
8    system --
9    A.    I know --
10         MR. KANE:  Wait for her to finish.
11   We're getting close to the goal line, if you
12   want to get out.  We're still going to get
13   their steadily.
14         THE WITNESS:  We're still going to
15   get there.
16   BY MS. GREEN:
17   Q.    Do you know if those are the
18   investment consultants that your team would have
19   met with?
20   A.    I don't know.
21   Q.    Do you know if anyone from your team
22   met with the chief investment officer for the
23   retirement systems?
24   A.    I don't know.
25   Q.    Does the name Ryan Bigelow ring a

- MARTI KOPACZ - VOLUME II-

1
2    bell?
3    A.    It does not.
4    Q.    Would it be fair to say if I didn't
5    see his name on any of the meeting lists or
6    communications logs, that you did not consult with
7    Mr. Bigelow prior to reaching a conclusions about
8    the investment practices of the system?
9    A.    That's probably correct.
10   Q.    You testified earlier under
11   questioning from Mr. Wagner that you had no
12   particular quarrel with the asset mix and that you
13   did not actually analyze the asset mix?
14   A.    That's correct.
15   Q.    Okay.  So if you didn't look at the
16   asset mix, what else did you base your opinion on
17   that the systems investment strategy is
18   questionable?
19   A.    The representations that were made in
20   the meeting that I personally had in your offices
21   with the pension system representatives.
22         MR. KANE:  Can I interject something
23   similar to what I did yesterday.  I don't
24   quarrel with the term "opinion" as long as
25   it's little O, recognizing her opinions are

- MARTI KOPACZ - VOLUME II-

1
2    specific ones that are set forth at the
3    beginning of the report.
4         THE WITNESS:  Right.
5    BY MS. GREEN:
6    Q.    I guess what I'm trying to ask is,
7    they told you certain facts about amortization
8    periods, smoothing, things of that nature.  You
9    just stated you have no basis to compare those to
10   anything.  So my question --
11   A.    I relied --
12   Q.    -- is, how do you know they're
13   questionable practices?
14   A.    I relied on what the general counsel
15   of the two systems told me.
16   Q.    Your testimony is that he used the
17   word "questionable practices" about his own
18   client?
19   A.    They are talking about the systems
20   prior to when those people got involved.
21   Q.    You're saying before they had any
22   personal knowledge they were speaking of prior
23   history?
24   A.    My question was, how did the system
25   get to this point?  Okay?  But I believe Mr.

- MARTI KOPACZ - VOLUME II-

1
2    Turner and Mr. Overbeke are new to the systems in
3    their role as both lawyers and general counsel.
4    Okay?
5         I am not talking about the systems
6    today moving forward.  I am talking about how did
7    the systems get in this underfunded predicament.
8    Q.    Do you understand generally that
9    retirement systems were fully funded as of 2007?
10   A.    I don't know when they were last
11   fully funded.
12   Q.    Did you know that according to, for
13   instance, the general retirement system's annual
14   actuarial report from June 30th, 2008, that it was
15   101 percent funded?
16   A.    I don't know that.
17   Q.    In 2008?
18   A.    I don't care about that.
19   Q.    Okay.  Why wouldn't you care about
20   when the time of underfunding occurred?
21   A.    I care about the impact the
22   underfunded systems have on the plan of adjustment
23   and the City's obligations to fund pensions going
24   forward.
25   Q.    If you flip to the next page of your

32 (Pages 543 to 546)

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 138 of
146

- MARTI KOPACZ - VOLUME II-

1    report, Page 128.
2        A.    Uh-huh.
3        Q.    There is a statement, "In addition to
4    issues involving the aggressiveness of the rave
5    return assumption used to determine funding
6    levels, also contributing to the increase of the
7    UAAL were a number of questionable activities
8    engaged in by the retirement system."
9        Do you see that part?
10       A.    I do.
11       Q.    At the -- there's several bullet
12   points.
13       A.    Uh-huh.
14       Q.    At the bottom, there's a footnote.
15       A.    Yes.
16       Q.    And it appears to be referring to the
17   Charles Moore declaration that was filed as docket
18   number 13 on the docket in the bankruptcy case.
19       Do you see that?
20       A.    Yes.
21       Q.    Did everything in this paragraph, the
22   breakdown of bullet points, come from the Chuck
23   Moore declaration?
24       A.    I believe it did.

- MARTI KOPACZ - VOLUME II-

1        Q.    So you wouldn't have any personal
2    knowledge or you didn't do any investigation into
3    the facts that are listed in bullet point fashion
4    from Pages 128 to 129?
5        A.    No, that's not correct.
6        Q.    You do have personal knowledge?
7        A.    I -- I talked with -- at my initial
8    meeting with the systems, the pension systems, we
9    talked about all of these issues. I've talked
10   about them on a conference call with Mr. Miller
11   from Jones Day. Okay? I've talked to Mr. Moore
12   about these issues. I attended the employee new
13   pension plan meeting in which these topics got
14   raised in terms of the 13 check program and the
15   ASF.
16       So, these -- these are -- we chose to
17   use the verbiage that Mr. Moore had used in his
18   declaration. But separate and apart, I and
19   members of my team have had discussions about
20   these facts and issues, if you will, with several
21   other people involved.
22       Q.    Let's go through them one by one.
23       A.    Sure.
24       Q.    The first bullet point, do you know

- MARTI KOPACZ - VOLUME II-

1    where you got that information? Is that from the
2    Moore declaration or is that from conversations?
3        A.    Okay. Let me clarify this. The
4    information that is in the first bullet is
5    information that I got from my initial meeting
6    with the systems -- with the pension systems.
7    Okay? It is the same information that my team
8    generally got from their meetings, conversations
9    and diligence. Okay?
10       What we chose to do in the report is
11   to use the precise verbiage that Mr. Moore used.
12   Okay?
13       Q.    Okay. And the next sub bullet point,
14   that begins with "using actual market returns..."
15       A.    Yes.
16       Q.    Is that also from the Chuck Moore --
17       A.    This is all from the Chuck Moore.
18       Q.    Okay. And the next paragraph that
19   begins "GRS trustees..."
20       A.    Yes.
21       Q.    That's also from Moore?
22       A.    Yes.
23       Q.    And the next bullet point which
24   begins, "The City periodically deferred..."

- MARTI KOPACZ - VOLUME II-

1    that's from Chuck Moore as well?
2        A.    Yes.
3        Q.    And the last paragraph that says,
4    "Retirement system officials have been accused or
5    indicted of material fiduciary misconducts
6    allegedly during the pension of necessary
7    liquidity and contributing to the underfunding of
8    the retirement systems."
9        Was that also from the Chuck Moore
10   Affidavit?
11       A.    Yes.
12       Q.    Okay. Let's take a look at the --
13       MS. GREEN: I think it will be
14   Exhibit 10, I could be way off. Exhibit 10.
15       (Whereupon, Kopacz Exhibit 10 was
16   marked at this time.)
17       Q.    Okay. Footnote 47 states that the --
18       MR. BLANCHARD: What document is
19   that?
20       MS. GREEN: The Chuck Moore
21   declaration.
22       MR. BLANCHARD: Thanks.
23   BY MS. GREEN:
24       Q.    Footnote 47 states that the Chuck

1      - MARTI KOPACZ - VOLUME II-
2   Moore declaration, Page 10, is what is being
3   relied upon for all of those statements that we
4   just went through.
5      A.   Okay.
6      Q.   If you flip to Page 10 of his
7   declaration, take time to review it, do you see
8   anything where Chuck Moore states that retirement
9   system officials have been accused or indicted of
10  any type of fiduciary misconduct?
11     A.   I don't see anything on Page 10 of
12  this document that is in this verbiage.  This
13  looks like this is an error at some point.
14     Q.   Okay.  Do you see anything in the
15  affidavit -- in his declaration that discusses
16  alleged --
17     A.   This is -- I'll be honest with you,
18  this is not the declaration that I thought we were
19  citing.  It is a much, much thicker document from
20  Chuck Moore.
21     Q.   Do you agree that it says docket
22  number 13 at the bottom?
23     A.   I absolutely agree that's what this
24  says and that's what this looks like in terms of
25  what you've handed to me.  But I don't believe

1      - MARTI KOPACZ - VOLUME II-
2   this verbiage came from this declaration.
3      Q.   Okay.
4      A.   I think there -- again, there is a
5   very -- there is a much more -- there's a thick,
6   like -- hundred page Chuck Moore document that I
7   believe should be cited down here, must be because
8   this isn't it.
9      Q.   So you think this is an error?
10     A.   This is an error.  This is not --
11  this is -- yeah, there's something --
12     Q.   Aside from the Chuck Moore
13  declaration, assuming you find the proper
14  document, do you have any other basis or personal
15  knowledge to make the statement that is the last
16  bullet point?
17     A.   I was told that, again, during the
18  meeting with the pension systems in your office.
19     Q.   You were told --
20     A.   That --
21     Q.   -- that -- let me finish the
22  question -- that these activities actually caused
23  the underfunding to the systems?
24     A.   I'm not -- I was told that there were
25  people involved in the pension systems who were

1      - MARTI KOPACZ - VOLUME II-
2   accused of wrongdoing.  And my recollection is
3   that some of them were or were going to jail or
4   something along that way -- line.
5      Q.   Who do you contend from the systems
6   told you that these accusations or indictments
7   actually led to what you state in here was
8   draining the pension of necessary liquidity?
9      A.   Like I said, I don't -- I am
10  struggling because I believe there is a citation
11  error in this report.
12          THE VIDEOGRAPHER:  Excuse me.  You're
13  rubbing your mike, it's --
14          MS. GREEN:  Sorry, I think it's my
15  hair touching it.
16          THE VIDEOGRAPHER:  Sorry about the
17  interruption.
18     A.   Right, I apologize.  I don't believe
19  that what you showed me as docket number 13, okay,
20  does not comport with what we have cited as the
21  source of this verbiage.  Okay?
22          I have -- all of these points were
23  communicated, okay, to me by people, all right,
24  not the -- definitely not this document.  Okay.
25          So, there's a -- there is an error.

1      - MARTI KOPACZ - VOLUME II-
2   There is a -- there's some mistake here and I
3   don't know what it is, I will obviously get to the
4   bottom of it.  But the -- the verbiage that's
5   here, by and large comports with my understanding
6   of at least some of the reasons why the pension
7   systems and funds became underfunded.
8      Q.   Do you know when these indictments or
9   these breaches of fiduciary duty occurred?
10     A.   Sometime prior to the bankruptcy.
11     Q.   Do you know who or which individuals
12  are being referenced in this bullet point?
13     A.   I would -- I wouldn't have any
14  knowledge of who they were.
15     Q.   The portion of that sentence that
16  states that that activity contributed to the
17  underfunding of the retirement systems, is it your
18  testimony that someone from the retirement systems
19  actually told you that their underfunding was due
20  to the activities listed in this paragraph?
21     A.   I don't have a specific recollection
22  of the -- of this statement.  Like I said, I am
23  generally aware of all of the points that are made
24  in these bullets.  Okay.  Rather than write our
25  own language, we chose to use someone else's

- MARTI KOPACZ - VOLUME II-

1 declaration which has been incorrectly cited.
2
3      Q.    So what I'm trying to get at are you
4 really relying on the Chuck Moore declaration or
5 are you relying on statements from people within
6 the system?
7      A.    I'm relying on statements from within
8 the system, right.  And I believe my intent was to
9 have -- to use verbiage that was already part of
10 the proceedings.
11     Q.    Okay.  Did you take notes,
12 handwritten notes at this meeting?
13     A.    I don't recall.
14     Q.    If the attendees from the retirement
15 systems disagreed with your characterization that
16 they ever told you that these activities led to
17 draining of pension fund liquidity or contributing
18 to the underfunding, would you have specific
19 recollection to be able to refute that?
20     A.    I -- like I said, I don't know.  I
21 have -- I don't know what I -- I haven't looked at
22 this for a long time.  I'm sorry.
23     Q.    Okay.  Did you attempt to quantify
24 the actual economic impact that you attribute to
25 this misconduct?

- MARTI KOPACZ - VOLUME II-

1
2      A.    I did not.
3      Q.    Did you ever speak to Chuck Moore
4 about this portion of his declaration, the larger
5 one, I suppose?
6      A.    I have talked to Chuck Moore and
7 members of my team have talked to Chuck Moore
8 extensively about pensions and all of these
9 issues.
10     Q.    Did you independently verify the four
11 or five bullet points that are here?
12     A.    Okay.  I've just explained to you
13 that my instructions to my team were to cite
14 information that already existed on the record.
15 Okay.  This is an error.  I don't know how many
16 times I have to say this.  Okay?
17     Q.    So it's a no?
18     A.    The answer is, I -- when I read this
19 I said, I want this cited.  Right?  Because I
20 would -- I'm sure I would have written it
21 differently.  I probably wouldn't have put it in a
22 bullet format.  Okay?
23     Q.    So if it is an error and it's not in
24 the Chuck Moore declaration and it may be in the
25 other one and you don't have independent specific

- MARTI KOPACZ - VOLUME II-

1
2 recollection, is it something you feel comfortable
3 leaving in your report as part of your conclusion?
4      A.    I don't know until I can figure out
5 why a document is cited in error.  I can't answer
6 that question.
7      Q.    You stated earlier that you didn't
8 think it was important to know the timing of the
9 underfunding.
10     A.    I don't.
11     Q.    And why is that?  Can you explain
12 that a little more?
13     A.    I am only tasked with looking at the
14 feasibility of the plan going forward.
15     Q.    So if your testimony was that any
16 sort of alleged misconduct with regard to
17 questionable investment strategies occurred during
18 the Kwame Kilpatrick administration, do you
19 understand what time period that would be from?
20     A.    It would be -- yes, it would be back
21 before the Bing administration.
22     Q.    So after the Kwame Kilpatrick
23 administration, you do understand the systems were
24 then fully funded, correct?
25     A.    I don't know that.

- MARTI KOPACZ - VOLUME II-

1
2      Q.    Okay.  In your report you seem to
3 opine on the cause of the underfunding as you seem
4 to be attributing it to certain questionable
5 investment strategies.  That's why I'm asking
6 about the timing of when we became underfunded.
7           So I just want to clarify, you have
8 no idea when the systems became underfunded,
9 correct?
10     A.    As I sit here today, I do not know
11 the specific date when the funds -- the pension
12 systems became underfunded.
13     Q.    And I believe there was some
14 testimony yesterday in your deposition regarding
15 the Great Recession and it's impact on the City of
16 Detroit.  And if I used the phrase the Great
17 Recession, do you understand I generally mean the
18 economic downturn from 2008 to 2009?
19     A.    Yes.
20     Q.    Do you know who Tom Terry is?
21     A.    I don't.
22     Q.    I believe that Mr. Neal asked you
23 during questioning whether you intended to review
24 the expert reports that were issued by all of the
25 experts in this case?

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 141 of
146

- MARTI KOPACZ - VOLUME II-

1
2    A.    I may.
3    Q.    Okay.  Are you aware that Mr. Terry
4  has been named as an expert related to pension
5  issues in this case?
6    A.    I don't.
7    Q.    Would you have a basis to disagree
8  with Mr. Terry's conclusion that upon examination
9  it is clear that the GRS UAAL is largely
10  attributable to adverse investment experience
11  since 2007, and not due to any sort of systemic or
12  deliberate underfunding of the plan caused by the
13  actuarial funding policy?
14    A.    I have no idea.
15    Q.    Would you have a basis to disagree
16  with his statement that due in large part to the
17  actuarial losses experienced in the severe
18  economic downturn from 2008 to 2009, the GRS's
19  UAAL has since grown substantially and that this
20  increase is largely due to the unforeseen
21  investment performance in fiscal years 2008 and
22  2009?
23    A.    I have no idea.
24    Q.    Would you have a basis to disagree
25  with his conclusion that the current underfunding

- MARTI KOPACZ - VOLUME II-

1
2  liability is not the result of, as the City
3  claims, alleged systematic underfunding over the
4  last several decades, but instead, is largely due
5  to the Great Recession?
6    A.    I have no idea.
7    Q.    Would you have a basis to disagree
8  with his conclusion that GRS's experience is
9  hardly unique, pension plans and other
10  institutions across the country had similar
11  experiences?
12    A.    I don't know.
13    Q.    Are you familiar with the expert
14  report issued by Joseph Ecochinco on behalf of
15  Oakland County?
16    A.    No.
17    Q.    Would that be one of the expert
18  reports that you would perhaps review?
19    A.    Maybe.
20    Q.    Do you understand that Mr. Ecochinco
21  has been retained as a pension issues related
22  person?
23    A.    I have no knowledge of that.
24        MR. LERNER:  Excuse me.  There's
25  someone on the telephone at the deposition

- MARTI KOPACZ - VOLUME II-

1
2  that's speaking.  Can you mute your phone,
3  please.
4    Q.    If Mr. Ecochinco opines that the fact
5  is that the unpredictable severe turn down in
6  investment market returns brought about by the
7  2008, 2009 decline in global equity values is the
8  key reason for the increase in the UAAL, would you
9  have a basis to disagree with that?
10    A.    I have no idea.
11    Q.    Would you have a reason to disagree
12  with Mr. Bigelow, who we spoke about earlier, the
13  chief investment officer for the systems, if he
14  were to testify that the predominant cause of the
15  systems in underfunding was also was the Great
16  Recession?  Would you have a basis to disagree
17  with that?
18    A.    I don't know.
19    Q.    You were presented earlier with a
20  chart showing return rates.  I think it's Exhibit
21  4.  Prior to seeing this document, were you aware
22  of the year-to-year funding -- or, I'm sorry,
23  assumed rate of return -- returns achieved by the
24  systems?
25    A.    I am -- I was aware of the assumed

- MARTI KOPACZ - VOLUME II-

1
2  rate of return.
3    Q.    I'm sorry, like the year to year,
4  what was actually achieved, the actual investment
5  experience on behalf of the systems?
6    A.    I have seen information like that
7  before.
8    Q.    Okay.  Can I draw your attention to
9  the 2008 line?
10    A.    Yes, I see that.
11    Q.    For GRS it shows investment loss of
12  negative 25.65.
13        Do you see that?
14    A.    I do.
15    Q.    For PRFS, it's 24.63 loss?
16    A.    That's correct.
17    Q.    Do you have an understanding of what
18  typical losses were to other public pension
19  systems in the year 2008 due to the Great
20  Recession?
21    A.    I have not looked at that right now.
22    Q.    Did you consult any publications or
23  studies to compare how the Detroit retirement
24  systems faired compared to other public pension
25  systems?

- MARTI KOPACZ - VOLUME II-

1
2     A.    I did not.
3     Q.    Do you think that that would be
4 relevant to your conclusion that questionable
5 investment strategies were utilized by the
6 systems, would that cause their underfunding?
7     A.    I am -- as I said, before I am
8 reciting information that I received from pension
9 system people.  Okay.  And what is important to me
10 is the level of underfunding in the pension
11 systems as of the filings and today and how that
12 is going to be dealt with in the future.
13     Q.    And you understand that the
14 underfunding as of the filing, if we look at this
15 document --
16     A.    Which document?
17     Q.    Exhibit 4.
18     A.    This doesn't give anything on
19 underfunding.
20     Q.    I understand that.  You already
21 stated you didn't know that it was fully funded in
22 2000 -- the end of 2007, correct?
23     A.    I don't know one way or another.
24 Okay?
25     Q.    Okay.  Did you review any data from

- MARTI KOPACZ - VOLUME II-

1
2 the United States Census Bureau related to public
3 pensions?
4     A.    I did not personally, no.
5     Q.    You testified earlier that you were
6 not familiar with NCPERS -- it was used earlier,
7 it's N-C-P-E-R-S.  Mr. Wagner showed you a
8 document I believe from NCPERS.
9     A.    He did.
10     Q.    Are you familiar with the
11 organization NASRA?
12     A.    I am -- yes, I am familiar with that
13 trade association because we used some of their
14 information.
15     Q.    Did you happen to consult the public
16 funding survey for fiscal year 2008 published by
17 NASRA?
18     A.    I would have no need to do that.
19         MS. GREEN:  Okay.  I'm going to mark
20 this as Exhibit 11.
21         (Whereupon, Kopacz Exhibit 11 was
22     marked at this time.)
23 BY MS. GREEN:
24     Q.    So you stated you may have looked at
25 some NASRA publications.  But this one -- is this

- MARTI KOPACZ - VOLUME II-

1
2 one that you recall looking at?
3     A.    I -- I have not looked at this.
4     Q.    Okay.  The title of the document is
5 Public Funds Survey Summary of Findings for Fiscal
6 Year 2008.  It was released in 2009.
7         If you go to Page 2 on the left-hand
8 column, in the second paragraph it states:  "The
9 market decline in 2008 resulted in a median
10 investment return for public pension funds of
11 negative 25.3 percent for the year."
12         Do you see that portion?
13     A.    I do, it's highlighted.
14     Q.    And in comparison to the investment
15 losses that were incurred by the Detroit
16 retirement systems in 2008, if you compare those
17 to Exhibit 4, does it appear that our investment
18 losses were actually in line with the median
19 investment losses for other public pensions?
20     A.    The numbers appear to be similar,
21 yes.
22     Q.    If the systems fared in line with
23 what other public pension -- how other public
24 pension systems performed, does that change your
25 opinion at all as to whether questionable

- MARTI KOPACZ - VOLUME II-

1
2 investment strategies are what caused their
3 underfunding?
4     A.    Ms. Green, with all due respect,
5 okay, I really don't, at the end of the day, care
6 about how they got underfunded.  Okay?  They are
7 underfunded.  There is treatment in the Plan of
8 Reorganization -- Plan of Adjustment that I have
9 to assess relative to feasibility.
10         I understand you and your client
11 really don't like the verbiage that's in my
12 report.  Okay?  I get that.  But I simply don't
13 care about how they got there.  I only care about
14 where they are today and what's going -- what
15 their treatment is in the Plan of Adjustment.
16         So I am not going to have any
17 opinion, any point of view, any perspective on
18 anything that happened in 2008, 2007, 1997 or
19 whatever.
20     Q.    So would you agree with me that the
21 portion of your report on pages 127 and 128 is
22 largely irrelevant?
23         MR. KANE:  Objection.  You can
24 answer.
25     A.    It is a recitation of what I believed

1     - MARTI KOPACZ - VOLUME II-
2  at the time to be, arguably, facts.
3     Q.    If we looked at the facts today that
4  appear to not support what's in your report, and
5  as Mr. Neal asked you previously, will you be
6  reissuing a report or supplementing your report or
7  changing any parts of your analysis based on new
8  facts that you've learned either from --
9          MR. BLANCHARD:  Objection.
10     A.    I don't think so -- I don't believe
11 that any of the items that are cited on Page 128
12 and 129 are significantly materially incorrect.
13 Okay?  And they are simply words to help the
14 reader appreciate some of the reasons that the
15 pension funds today are underfunded.
16     Q.    Did you do an analysis of how much
17 the City owes in unpaid annual employer
18 contributions to each of the systems and how that
19 impacted the underfunding?
20     A.    I'm sorry.  Could you repeat that?
21         (The requested question was read back
22 by the reporter.)
23     A.    I don't know the answer to that.
24         THE VIDEOGRAPHER:  We have to change
25 tape.

1     - MARTI KOPACZ - VOLUME II-
2         MS. GREEN:  I think it's time to
3  change tape.
4         THE VIDEOGRAPHER:  Thank you.  The
5  time now is approximately 12:30 p.m.  We're
6  going off the record.  This is the end of
7  Disk Number 2.
8         (Whereupon, there was a brief recess
9  in the proceedings.)
10         THE VIDEOGRAPHER:  The time now is
11 approximately 12:37 p.m.  We're back on the
12 record.  This is the beginning of Disk
13 Number 3.
14
15 EXAMINATION BY MR. ALBERTS:
16     Q.    Good afternoon, Ms. Kopacz.
17     A.    Good morning.  Good afternoon.
18     Q.    I think we just passed the noon hour.
19         My name is Sam Alberts, I'm from
20 Dentons and I represent the official committee of
21 retirees.  I just have a few questions and I think
22 I may be the last one here so hopefully we can get
23 you out of here.
24     A.    Okay.
25     Q.    Ms. Kopacz, you -- when you conducted

1     - MARTI KOPACZ - VOLUME II-
2  interviews, was it your practice to take notes?
3     A.    Yes.
4     Q.    Okay.  And did you retain your notes
5  for the meetings you had?
6     A.    For the most part, yes.
7     Q.    Do you know if that was true of the
8  others in your group?
9     A.    I don't know.
10     Q.    Okay.  Very good.
11         Now, with respect to your report,
12 there is a mention -- and I will tell you I don't
13 know where it is -- of OPEB?
14         Do you understand what OPEB is?
15     A.    I do.
16     Q.    It's basically healthcare that is
17 being provided to employees and retirees; is
18 that --
19     A.    Other healthcare and other
20 insurances.
21     Q.    Okay.  Other post-employment --
22     A.    Employment benefits, right.
23     Q.    Okay.  Do you understand how the
24 fourth amended and now the fifth amended Plan of
25 Adjustment treats OPEB obligations?

1     - MARTI KOPACZ - VOLUME II-
2     A.    I haven't read the fifth.  The
3  fourth, yes.
4     Q.    Okay.
5     A.    Yes.
6     Q.    Okay.  And what is your understanding
7  of the treatment of OPEB for retirees?
8     A.    For people who are retirees,
9  generally eliminated.
10     Q.    Do you understand that there will be
11 money placed into VEBAs for those people?
12         V-E-B-A, all caps, which I believe is
13 stands for Voluntary Employment Benefits
14 Association.
15     A.    Yes.
16     Q.    Did you consider the payment of
17 towards those VEBAs in your analysis of
18 feasibility?
19     A.    I believe those payments are included
20 in the City's projections.
21     Q.    Okay.  Did you find that the amount
22 affect -- payment paying toward VEBAs affected
23 feasibility in your view?
24     A.    I don't recall that it did.
25     Q.    Okay.  All right.  If it had been a

38 (Pages 567 to 570)

1      - MARTI KOPACZ - VOLUME II-
2  concern, do you think you would have listed that
3  in your report?
4      A.   Yes.
5      Q.   Okay.  Did you speak with anybody
6  from Siegel Consulting in -- in creating your
7  report?
8      A.   I did not.
9      Q.   Okay.  Do you know who Siegel
10  Consulting is?
11      A.   I do not.
12      MR. ALBERTS:  Okay.  I have no
13  further questions.
14      MR. KANE:  I want to ask you just a
15  couple of questions for the record, just to
16  clean up a couple of things.
17  EXAMINATION BY MR. KANE:
18      Q.   So one is you were asked yesterday
19  about prior expert testimony?
20      Do you remember that?
21      A.   I was.  I do.
22      Q.   To your knowledge, is your prior
23  expert testimony was that disclosed in your
24  application that was filed with the Court?
25      A.   It was.

1      - MARTI KOPACZ - VOLUME II-
2      Q.   Okay.  You were asked yesterday about
3  not preparing your own financial projections and
4  not taking the data underlying the City's
5  projections and applying other methodologies or
6  approaches or pharmaceutical double blind issues
7  to them.
8      Do you remember that?
9      A.   I do.
10      Q.   Take out Exhibit 2 to your
11  deposition.
12      So, look at Paragraph 2B.  And what
13  is -- what is that -- Exhibit 2 is the order
14  appointing you as the Court's independent expert,
15  correct?
16      A.   Yes.
17      Q.   What does Paragraph 2B direct you to
18  do with respect to the financial projections?
19      Can you just read it?
20      A.   Yes.  "The Court's expert witness
21  shall investigate and reach a conclusion on, B,
22  whether the assumptions that underlie the City's
23  cash flow projections and forecasts regarding its
24  revenue, expenses and plan payments are
25  reasonable."

1      - MARTI KOPACZ - VOLUME II-
2      Q.   Is that what you did?
3      A.   That is what I did.
4      Q.   Paragraph 3, I'm going to paraphrase,
5  says you're not supposed to do anything else
6  unless the Court orders you to do it.
7      Do you agree with that
8  characterization?
9      A.   Yes.  Paragraph 2 above, are the only
10  matters that the Court's expert is authorized --
11  authorized to investigate, reach a conclusion on
12  or testify about.
13      Q.   Has the Court ever ordered you to
14  prepare your own financial projections for the
15  City or take the data underlying the City's
16  financial projections and apply other valuation
17  methodologies, approaches -- I should say
18  projection or forecasting methodologies or
19  approaches to it?
20      A.   No.
21      MR. KANE:  Thank you.  That's it.
22      THE VIDEOGRAPHER:  Anybody on the
23  phone have any questions?
24      Okay.  Thank you.  This concludes the
25  August 1st, 2014 videotaped deposition of

1      - MARTI KOPACZ - VOLUME II-
2  Marti Kopacz, day 2 of this deposition.
3      The time is approximately 12:43 p.m.
4  We're off the record and finished for the
5  day.  There are three DVDs to today's
6  deposition.
7      (Whereupon, the deposition concluded
8  at 12:43 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7148-8   Filed 08/27/14   Entered 08/27/14 23:59:24   Page 145 of
146

```
 1        - MARTI KOPACZ - VOLUME II-
 2           A C K N O W L E D G E M E N T
 3
 4    STATE OF NEW YORK        )
 5                            ) ss.
 6    COUNTY OF NEW YORK       )
 7
 8        I, MARTI KOPACZ, hereby certify that I have
 9    read the transcript of my testimony taken under
10    oath in my deposition of August 1, 2014; that
11    the  transcript is a true, complete and correct
12    record of my testimony, and that the answers on
13    the record as given by me are true and correct.
14
15        _____
16           MARTI KOPACZ
17
18    Subscribed and sworn
19    to before me on this the
20    _____ day of _____, 2014.
21    Notary Public, State of New York
22
23
24
25
```

```
 1        - MARTI KOPACZ - VOLUME II-
 2           C E R T I F I C A T E
 3    STATE OF NEW YORK        )
 4                            ) ss.
 5    COUNTY OF NEW YORK       )
 6
 7        I, HOPE LYNN MENAKER, a Notary Public within
 8    and for the State of New York, do hereby certify:
 9        That MARTI KOPACZ, the witness whose
10    deposition is hereinbefore set forth, was duly
11    sworn by me and that such deposition is a true
12    record of the testimony given by the witness.
13        I further certify that I am not related to
14    any of the parties to this action by blood or
15    marriage, and that I am in no way interested in
16    the outcome of this matter.
17           IN WITNESS WHEREOF, I have hereunto
18    set my hand this August 4, 2014.
19
20        _____
21           HOPE LYNN MENAKER
22
23
24
25
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022