# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## PRE-TRIAL BRIEF OF SYNCORA GUARANTEE, INC. AND SYNCORA CAPITAL ASSURANCE, INC. REGARDING PROPOSED CONFIRMATION OF THE DEBTOR'S PLAN OF ADJUSTMENT

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................. vii

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT ........................................................................................................3

I.     The Plan Cannot Satisfy the Confirmation Requirements. ............................3

     A.     It Is the Debtor's Burden to Show that the Proposed Plan Complies with All Confirmation Requirements. ...................................3

     B.     Section 904 Does Not Allow a Debtor to Avoid Compliance with the Confirmation Requirements. ....................................................4

     C.     Rule 9019 Cannot be Used as an End-Run Around the Confirmation Requirements. ..................................................................5

II.     The Plan Unfairly Discriminates Between Classes of Similar Claims. ..........6

     A.     The Plan Unfairly Discriminates Under the *Aztec* Test. .......................6

           1.     The *Aztec* Test Requires an Independent Analysis of Evidence in the Record. ..........................................................7

           2.     Political Considerations Are Legally Irrelevant to the Unfair Discrimination Analysis. .................................................7

           3.     There Is No Objectively Reasonable Basis to Justify Discriminating in Favor of Pension Claims and LTGO Claims. .....................................................................................7

                 a.     The Emergency Manager's Rationales for Discriminating in Favor of Pension Claims Are Inapplicable.....................................................................11

                 b.     Rationales in the Debtor's Reply Are Without Merit. .........................................................................15

                      i.     The Debtor's "Morale Issue" Is Fictitious. ..........15

i

|   | ii. | The Retirement Systems and Employees Are Not Analogous to Trade Creditors. | 19 |
|---|---|---|---|
|   | iii. | Settlement Cannot Justify Unfair Discrimination. | 20 |
|   | iv. | Pension Claim Holders Are Adequately Protected from Pension Mismanagement | 22 |

| 4. | There Is No Basis for Favoring LTGO Claims. | 24 |
|---|---|---|
| 5. | The Discrimination Is Not "Necessary." | 24 |
| 6. | The Discrimination Is Not Proposed in Good Faith. | 27 |
| 7. | Class 9 and Class 14 Treatment is Not Meaningful. | 29 |

B. The Plan Unfairly Discriminates Under the Markell Test. ... 30

| 1. | Classes 9 and 14 Are Dissenting Classes | 31 |
|---|---|---|
| 2. | COP Claims and Other Unsecured Claims Are of the Same Priority as Pension Claims. | 31 |
| 3. | COP Claim and Other Unsecured Claim Recoveries Are Massively Lower than Pension Claim Recoveries. | 32 |

| | a. | The Pension Claims Are Overstated. | 35 |
|---|---|---|---|
| | | i. | Pension Claims Inexplicably Exclude ASF Recoupment. | 35 |
| | | ii. | Pension Claims Inappropriately Include Unaccrued and Unvested Benefits. | 36 |
| | | iii. | Pension Claims Were Calculated With an Inappropriately Low Discount Rate. | 39 |

| | b. | The Value of the Retirement Systems' Current and Future Assets Is Understated. | 43 |
|---|---|---|---|
| | | i. | Pension Claim Recoveries Do Not Account for UTGO Settlement Proceeds | 44 |

　　　　ii.　　Pension Claim Recoveries Were Calculated
　　　　　　　Using an Inappropriate Investment Rate..............44

　　　　iii.　Pension Claim Recoveries Related to the
　　　　　　　Grand Bargain Were Calculated Using an
　　　　　　　Inappropriate Discount Rate................................46

4.　COP Claim and Other Unsecured Claim Recoveries Are
　　Materially Riskier Than Pension Claim Recoveries................49

5.　The Debtor's Counterarguments Claiming Recoveries to
　　Pension Claims Are Overstated Fall Flat..................................50

　　a.　Using a Three- or Four-Percent Discount Rate for
　　　　the Pension Claims Is Entirely Inappropriate.................50

　　b.　The Grand Bargain Proceeds Cannot Be Excluded
　　　　From the Unfair Discrimination Analysis. .....................51

　　　　i.　　The Grand Bargain Proceeds Are the
　　　　　　　Debtor's Property. ................................................52

　　　　ii.　The Grand Bargain Proceeds Are Not a
　　　　　　　"Gift." ..................................................................56

　　　　iii.　Distribution of the DIA Proceeds and State
　　　　　　　Contribution Are "Under the Plan."......................57

6.　The Debtor Cannot Rebut the Fact that the Plan Unfairly
　　Discriminates Against COP Claims and Other Unsecured
　　Claims Under the Markell Test.................................................59

　　a.　COP Claims and Other Unsecured Claims Would
　　　　Not Receive Similarly Less If the Case Were
　　　　Dismissed........................................................................60

　　b.　COP Claims and Other Unsecured Claims Did Not
　　　　Assume Additional Risk Prepetition. .............................62

　　c.　Pension Claims Provided No "New Value."..................63

iii

III.  The Plan Is Not in the Best Interests of Creditors. ........................65

    A.    The Debtor Has Done No Analysis of Creditor Recoveries If the Case Were Dismissed and Cannot Carry Its Burden to Show the Plan Is in the Best Interests of Creditors. ......................66

    B.    Basic Analysis Shows the Plan Clearly Is Not in the Best Interests of Creditors. ...........................................................70

        1.    Debtor's Projections Indicate Net Surplus Cash Available to Pay Unsecured Claims if Case Were Dismissed. .................71

        2.    COP Claims Would Receive Additional Recoveries from DWSD if the Case Were Dismissed. ........................72

        3.    Unsecured Creditors Could Receive Incremental Recoveries Through Enforcement of Their Non-bankruptcy Rights Under the Revised Judicature Act..............73

    C.    The Debtor's Arguments that the Plan Is in the Best Interests of Creditors Are Unsupported. ...............................................80

        1.    A Race to the Courthouse Is a Red Herring..............................81

        2.    Debtor's Obligation to Provide Essential Services Does Not Trump its Obligation Satisfy Confirmation Standards. ......................................................................83

IV.  The Proposed Plan Is Not Fair and Equitable. .............................83

    A.    The Proposed Plan Is Not Fair and Equitable Because It Inappropriately Shields Non-Core Assets. .........................85

        1.    Creditors Could Reasonably Expect the Debtor to Appropriately Monetize Its *Most Valuable Assets*. .................86

        2.    The Debtor Offers No Evidence To Rebut Creditors' Reasonable Expectations that the Debtor Maximize the Value of the DIA Assets. .........................................91

            a.    The Debtor Presented No Evidence That It May Not Sell the DIA Assets.................................................91

     i.  No Charitable Trust. .............................................96

     ii.  No Constructive Trust. ........................................98

    b.  The Debtor Presented No Evidence That the DIA Assets Are "Essential" to the Debtor's Revitalization. ...............................................................99

   3.  Creditors Could Reasonably Expect the Debtor to Distribute the DIA Proceeds (Meager as They May Be) Equitably Among Unsecured Creditors. ...............................100

   4.  Creditors Could Reasonably Expect the Debtor to Monetize Its Most Abundant Asset. .......................................101

   5.  Creditors Could Reasonably Expect the Debtor to Share a Portion of the Upside of the Debtor's Revitalization with Creditors. ...............................................................................102

 B.  The Proposed Plan Fails to Optimize Cost Savings and Revenue Increases and Fails to Explain the Intent and Effect of Reinvestment Initiatives. ...................................................................104

   1.  Creditors Could Reasonably Expect the Debtor to Take Further Concrete Steps to Increase Its Revenue. ....................105

   2.  The Proposed Reorganization and Reinvestment Initiatives Were Created in a Vacuum. ...................................106

   3.  The Debtor Does Not Propose Any Comprehensive Reinvestment Initiative. ..........................................................109

   4.  The Debtor Did Not Reform Labor Agreements. ...................110

V.  The Plan Is Not Proposed in Good Faith. ....................................................113

 A.  The Plan Is Not Proposed in Good Faith Because It Is Inconsistent with the Principles Underlying the Bankruptcy Code. ...............................................................................................114

 B.  The Plan Is Not Proposed in Good Faith Because It Does Not Treat Creditors in a Fundamentally Fair Manner. ..............................115

v

KE 32740828

13-53846-tjt  Doc 7150  Filed 08/28/14  Entered 08/28/14 01:05:39  Page 6 of 136

VI.   The DIA Settlement Does Not Satisfy Rule 9019..........................................117

VII.  Waiver of the 14-day Stay Is Not Justified. ...............................................119

     A.   The Requested Waiver of the 14-day Stay Is Unnecessary and
         No More than an Attempt to Equitably Moot Arguments on
         Appeal..............................................................................................119

KE 32740828

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Axle & Mfg., Inc. v. City of Hamtramck*,
604 N.W.2d 330 (Mich. 2000) ...................................................................80

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle Street P'ship*,
536 U.S. 434 (1999)...................................................................................64

*Chicago Bank of Commerce v. McPherson*,
62 F.2d 393 (6th Cir. 1932) .......................................................................96

*Fano v. Newport Heights Irrigation Dist.*,
114 F.2d 563 (9th Cir. 1940) ......................................................................86

*Hammond v. Plan*,
74 N.W. 1002 (Mich. 1898) ........................................................................80

*Hopkins v. Crossley*,
132 Mich. 612 (Mich. 1903).......................................................................96

*In re Abaunza*,
452 B.R. 866 (Bankr. S.D. Fla. 2011) ........................................................58

*In re Addison Cmty. Hosp. Auth.*,
175 B.R. 646 (Bankr. E.D. Mich.)...............................................................84

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ......................................................120

*In re Armstrong World Indus., Inc.*,
320 B.R. 523 (D. Del. 2005), *aff'd* 432 F.3d 507 (3d Cir. 2005).................56

*In re Aztec*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989)...................................... 6, 7, 24, 29

*In re Bard*,
49 Fed. App'x. 528 (6th Cir. 2002) ...........................................................117

*In re Barney & Carey Co.*,
170 B.R. 17 (Bankr. D. Mass. 1994) ...........................................................33

KE 32740828

*In re Brothby*,
    303 B.R. 177 (9th Cir. BAP 2003) ................................................................64

*In re Buttonwood Partners, Ltd.*,
    111 B.R. 57 (Bankr. S.D.N.Y. 1990) ...........................................................29

*In re Citrowske*,
    72 B.R. 613 (Bankr. D. Minn. 1987) .............................................................57

*In re City of Detroit, Mich.*,
    504 B.R. 97 (Bankr. E.D. Mich. 2013) ................................................... 5, 62

*In re City of Detroit, Mich.*,
    Case No. 14-1208 (6th Cir. 2014) ................................................................59

*In re City of San Bernardino, Cal.*,
    499 B.R. 766 (Bankr. C.D. Cal. 2013) ......................................................114

*In re City of Stockton, Cal.*,
    Case No. 12-32118-C-9 (Bankr. E.D. Cal. (May 14, 2014) .........................16

*In re City of Stockton, Cal.*,
    Case No. 2012-32118 (Bankr. E.D. Cal. Nov. 21, 2013) ...........................103

*In re Corcoran Hosp. Dist.*,
    233 B.R. 449 (Bankr. E.D. Cal. 1999) ................................................. 21, 22

*In re Creekside Landing, Ltd.*,
    140 B.R. 713 (Bankr. M.D. Tenn. 1992) .....................................................21

*In re Creekstone*,
    168 B.R. 639 (Bankr. M.D. Tenn. 2004) ................................................ 9, 19

*In re Crosscreek Apartments, Ltd.*,
    213 B.R. 521 (Bankr. E.D. Pa. 2010) .................................................. 25, 33

*In re DBSD N. Am., Inc.*,
    634 F.3d 79 (2d Cir. 2011) ...........................................................................56

*In re Dow Corning Corp.*,
    192 B.R. 415 (Bankr. E.D. Mich. 1996) ............................................ 54, 117

KE 32740828

*In re Dow Corning Corp.*,
    244 B.R. 696 (Bankr. E.D. Mich. 1999)................................................ passim

*In re Fed. Deposit Ins. Corp. v. AmFin Fin. Corp.*,
    2014 WL 3057097 at 5 (6th Cir. July 8, 2014) ...........................................98

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001)............................................................56

*In re Graphic Commc'ns, Inc.*,
    200 B.R. 143 (Bankr. E.D. Mich. 1996).................................................. 6, 20

*In re Greate Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) ............................................................32

*In re Gregory Boat Co.*,
    144 B.R. 361 (Bankr. E.D. Mich. 1992).....................................................113

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007) .........................................................................5

*In re John P. Timko et al.*,
    No. 87-09318 (unpublished) (Bankr. E.D. Mich. July 22, 1988)................114

*In re LeBlanc*,
    622 F.2d 872 (5th Cir. 1980) .................................................................. 7, 20

*In re Leonard*,
    454 B.R. 444 (Bankr. E.D. Mich. 2011).......................................................98

*In re Lightsquared Inc.*,
    Case No. 12-12080 (Bankr. S.D.N.Y. May 8, 2014) ....................................29

*In re MCorp. Fin., Inc.*,
    160 B.R. 941 (S.D. Tex. 1993).....................................................................56

*In re Mount Carbon Metro. Dist.*,
    242 B.R. 18 (Bankr. D. Colo. 1999)...................................................... passim

*In re Orawsky*,
    387 B.R. 128 (Bankr. E.D. Pa. 2008) ..........................................................58

*In re Parke Imperial Canton, Ltd.*,
      No. 93-61004, 1994 WL 842777 (Bankr. N.D. Ohio Nov. 14, 1994) ..........56

*In re Pierce Cnty. Hous. Auth.*,
      414 B.R. 702 (Bankr. W.D. Wash. 2009)..................................... 3, 4, 27, 115

*In re Quay Corp., Inc.*,
      372 B.R. 378 (Bankr. N.D. Ill. 2007) ............................................................5

*In re Sea Trail Corp.*,
      2012 WL 5247175 (Bankr. E.D.N.C. Oct. 23, 2012)............................. 7, 20

*In re Sentry Operating Co. of Texas, Inc.*,
      264 B.R. 850 (Bankr. S.D. Tex. 2001) .......................................................101

*In re Snyders Drug Stores, Inc.*,
      307 B.R. 889 (Bankr. N.D. Ohio 2004)..........................................................8

*In re Stockton, Cal.*,
      Case No. 12-32118-C-9 (Bankr. E.D. Cal. Feb. 5, 2013) ..............................5

*In re Sullivan Cnty. Reg'l Refuse Disposal Dist.*,
      165 B.R. 60 (Bankr. D.N.H. 1994)....................................................... 27, 28

*In re TCI 2 Holdings, LLC*,
      428 B.R. 117 (Bankr. D.N.J. 2010) ...............................................................5

*In re Tucson Self-Storage, Inc.*,
      166 B.R. 892 (9th Cir. BAP 1994) ...............................................................33

*In re U.S. Truck Co., Inc.*,
      800 F.2d 581 (6th Cir. 1986) .......................................................................20

*In re Unbreakable Nation Co.*,
      437 B.R. 189 (Bankr. E.D. Pa. 2010) ..........................................................32

*In re Valley Health Sys.*,
      429 B.R. 692 (Bankr. C.D. Cal. 2010) ..........................................................4

*In re W.R. Grace & Co.*,
      475 B.R. 34 (Bankr. D. Del. 2012)..............................................................115

x

*In re Worldcom, Inc.*,
  02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ...............56

*Int'l Assn. of Firefights, Local 1186 v. City of Vallejo*
  *(In re City of Vallejo)*,
  408 B.R. 280 (9th Cir. BAP 2009) ............................................................114

*Lorber v. Vista Irrigation Dist.*,
  127 F.2d 628 (9th Cir. 1942) .............................................................. 65, 83

*Mason v. Paradise Irrigation Dist.*,
  326 U.S. 536 (1946)...............................................................................63

*Palstray Corp. v. Cole*,
  324 Mich. 433 (1949) ...........................................................................54

*Polite Enter. Corp. Pty. Ltd. v. Am. Safety Prods., Inc.*,
  No. 13 C 01089, 2014 WL 321668 (N.D. Ill. Jan. 29, 3014).......................64

*Reilly v. Natwest Markets Grp. Inc.*,
  181 F.3d 253 (2d Cir. 1999) ...................................................................8

*Sabre v. First Dominion Capital, LLC*,
  2001 WL 1590544 (S.D.N.Y. Dec. 12, 2001)..............................................8

*Smith v. Royal Oak Township*,
  2013 WL 6405315 (2013) .......................................................................82

*Travelers Ins. Co. v. Bryson Props. XVIII*
  *(In re Bryson Props. XVIII)*,
  129 B.R. 440 (M.D.N.C. 1991) ................................................................58

*U.S. v. Bekins*,
  304 U.S. 27 (1938)..................................................................................84

*W. Coast Life Ins. Co. v. Merced Irrigation Dist.*,
  114 F.2d 654 (9th Cir. 1940) .............................................................. 65, 83

*XL/Datacomp, Inc. v. Wilson*
  *(In re Omegas Grp., Inc.)*, 16 F.3d 1443 (6th Cir. 1994)..............................98

**Statutes**

11 U.S.C. § 1121...................................................................................................80

11 U.S.C. § 1122...................................................................................................80

11 U.S.C. § 1123...................................................................................................80

11 U.S.C. § 1123(a)...............................................................................................58

11 U.S.C. § 1123(a)(3).........................................................................................110

11 U.S.C. § 1124...................................................................................................80

11 U.S.C. § 1125...................................................................................................80

11 U.S.C. § 1126...................................................................................................80

11 U.S.C. § 1127...................................................................................................80

11 U.S.C. § 1128...................................................................................................80

11 U.S.C. § 1129...................................................................................................80

11 U.S.C. § 1129(a)(3)............................................................................................3

11 U.S.C. § 1129(b)(1)...................................................................................... 3, 58

11 U.S.C. § 1129(b)(2)..........................................................................................80

11 U.S.C. § 502(b)................................................................................................35

11 U.S.C. § 547(a)(2)............................................................................................65

11 U.S.C. § 901.............................................................................................. 3, 80

11 U.S.C. § 904.......................................................................................................4

11 U.S.C. § 943......................................................................................................3, 4

11 U.S.C. § 943(b)(1).............................................................................................3

11 U.S.C. § 943(b)(2).............................................................................................3

11 U.S.C. § 943(b)(4).............................................................................................4

KE 32740828

11 U.S.C. § 943(b)(7)..............................................................................................4

11 U.S.C. §§ 101-1532 ...........................................................................................26

1907 Act § 1 ...........................................................................................................93

MCL § 141.1552(11)(1)(b) .....................................................................................63

MCL § 141.1552(12)(1)(j) ......................................................................................63

MCL § 141.1552(12)(m)(ii) ....................................................................................63

MCL § 141.2303(7)(b) ............................................................................................73

MCL § 141.2303(7)(c) ............................................................................................73

MCL § 600.6093 .....................................................................................................73

MCL § 600.6097 .....................................................................................................73

Mich. Comp. Laws. 600.6093 .................................................................................61

**Other Authorities**

75 CONG. REC. S8545 (daily ed. Aug. 9, 1937) ............................................... 81, 83

Bruce A. Markell,
  *A New Perspective on Unfair Discrimination in Chapter 11*,
  72 Am. Bankr. L.J. 277 (1998)............................................................... 29, 30

Collier on Bankruptcy (16th ed. 2013) ..................................................................80

Dr. Yuma Hedrick-Wong & Desmond Choong,
  *MasterCard 2014 Global Destination Cities Index* (2014)...........................96

H.R. Rep. No. 95-595 (1977).................................................................... 81, 82, 112

**Rules**

Fed. R. Bankr. P. 3020(e) .....................................................................................116

Fed. R. Evid. 30(b)(6) ............................................................................................11

**Constitutional Provisions**

Mich. Const. art. I, § 10 ...........................................................................63

Mich. Const. art. IX, § 24 ........................................................................63

U.S. Const. art. I, § 10, cl. 1....................................................................63

KE 32740828

## PRELIMINARY STATEMENT

1.      Rife with discrimination, marked by an aversion to maximizing creditor recoveries except when politically expedient, and far worse than no bankruptcy at all, the Plan cannot be confirmed.  It falls miserably short of the historic circumstances that the great city of Detroit demands and deserves. Bankruptcy law insists that the Debtor offer evidentiary proof that the proposed Plan meets all of the Bankruptcy Code's confirmation requirements.  Yet the Debtor has taken the easy way out at every opportunity.  In fact, in some cases, as with the best interest of creditors test, the Debtor performed *no* analysis whatsoever regarding whether the Plan satisfies confirmation requirements. Because the Debtor has not done the work to satisfy its burden of proof at trial, the Court must deny confirmation of the proposed Plan.  Had it done so—and it could have—the Plan would not resemble what has been laid before the Court.

2.      Chapter 9 has two goals:  permit a debtor to provide essential municipal services and minimize creditor losses in an evenhanded manner.  But the Plan embodies two goals that are inconsistent with chapter 9's goals:  preserve the DIA Assets by transferring them permanently beyond the reach of creditors and funnel proceeds from the art transfer and all other available sources—such as the UTGO Settlement and a potential DWSD transaction—solely to the Debtor's Retirement Systems and to the exclusion of other creditors.

3.    Single-minded pursuit of these goals has warped the Plan.  Indeed, the

Plan provides *de minimis* value to other unsecured creditors, including COP

Claims and Other Unsecured Claims, despite their *pari passu* status with the

Retirement Systems' Pension Claims.   As a result, the proposed Plan is

unconfirmable.

4.    The Court must deny confirmation for a number of reasons:

- The Debtor cannot satisfy its burden with respect to unfair discrimination. The proposed discrimination is extreme, giving rise to a presumption of unfair discrimination that the Debtor cannot rebut.  Additionally, the discrimination lacks any business justification, is not necessary to confirmation of the Plan, is not proposed in good faith, and results in treatment of disfavored creditors that is not "meaningful."

- The Debtor cannot satisfy its burden with respect to the best interests of creditors.  All of its key witnesses have conceded under oath that the Debtor has conducted **no analysis** of a dismissal scenario.  Instead, the Debtor relies on bald and unsupported assertions of what it speculates **might** happen post-dismissal.  Without actual proof, the Plan cannot be confirmed.

- The Plan is not fair and equitable because the Plan fails to comport with reasonable creditor expectations.  The Plan unreasonably shields valuable assets or else transfers them to third parties for a mere pittance.  The Debtor concedes it did not attempt to analyze alternative options—let alone take the next step of seeking to monetize its valuable and unique assets for anything near market value.   It made no attempt to verify any of the alleged impediments to proper monetization of its assets.  The Bankruptcy Code does not allow a debtor to bury its head in the sand and ignore—indeed refuse to explore—reasonable alternatives that would achieve superior results for all creditors.  So driven by its agenda, the Debtor went to extensive lengths to shirk its responsibilities.  The opposite of how a reasonable creditor could expect a large and sophisticated debtor to act.

- The Plan is not proposed in good faith.  The Plan negotiation process was focused on achieving the best possible outcome for Pension Claims and

preserving the art at the expense of all other unsecured claims and achieved this goal. A Plan premised on inequitable treatment of creditors cannot be said to be filed in good faith.

- The Plan fails additional confirmation requirements, as has been stated in Syncora's previous objections,[1] including but not limited to impermissible releases and exculpations of third parties, fraudulent transfer of the DIA Assets, and violation of due process. Syncora reiterates the arguments set forth in the Objections here, though this brief focuses on factual matters more than legal issues raised in the Objections.

## ARGUMENT

### I. The Plan Cannot Satisfy the Confirmation Requirements.

#### A. It Is the Debtor's Burden to Show that the Proposed Plan Complies with All Confirmation Requirements.

5. Section 943 of the Bankruptcy Code sets forth the requirements the Debtor must satisfy to obtain confirmation of its plan of adjustment.[2] A court shall confirm a plan *if and only if* each of the following is true:

- The plan complies with certain chapter 11 confirmation requirements, including, relevant to Syncora's objection, that is has been proposed in good faith and not by any means forbidden by law[3] and does not discriminate unfairly and is fair and equitable.[4]

---

[1] [Docket Nos. 4679, 5706, 6651, and 7041 (the "*Objections*").]

[2] *See* 11 U.S.C. § 943.

[3] 11 U.S.C. § 1129(a)(3); 11 U.S.C. §§ 901, 943(b)(1); *see also In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 715 (Bankr. W.D. Wash. 2009) ("Section 943(b)(1) also requires that the plan comply with certain other provisions of Title 11 made applicable by § 103(e) and § 901. Section 901 makes applicable many of the plan confirmation requirements contained in Chapter 11, including § 1129(a)(2), (a)(3), (a)(6), (a)(8), and (a)(10).")

[4] 11 U.S.C. § 1129(b)(1).

3

- The plan complies with the provisions of chapter 9.[5]

- The Debtor is not prohibited by law from taking any action necessary to carry out the Plan.[6]

- The plan is in the best interests of creditors and is feasible.[7]

6.      ***The Debtor carries the burden on confirmation*** and must offer evidence that proves that the Plan meets the forgoing standards.[8]

**B.      Section 904 Does Not Allow a Debtor to Avoid Compliance with the Confirmation Requirements.**

7.      Section 943, which sets forth the confirmation requirements a chapter 9 debtor ***must*** satisfy, makes no reference to section 904 of the Bankruptcy Code.  Section 904, which provides certain limitations on the bankruptcy court's power in a chapter 9 case, makes no reference to section 943.[9]  Section 904 ***in no way*** limits the Debtor's obligation to satisfy confirmation requirements.[10]

---

[5]      11 U.S.C. § 943(b)(2).

[6]      11 U.S.C. § 943(b)(4).

[7]      11 U.S.C. § 943(b)(7); *see also In re Valley Health Sys.*, 429 B.R. 692, 709, n.41 (Bankr. C.D. Cal. 2010) ("Section 943 sets forth seven requirements for confirmation of a plan in chapter 9.").

[8]      *See In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 31, n.35 (Bankr. D. Colo. 1999) ("[I]n Chapter 9, like Chapter 11, a proponent of a plan must prove the confirmation requirements . . . by a preponderance of the evidence.").

[9]      *See* 11 U.S.C. §§ 904, 943.

[10]      *See Pierce Cnty. Hous. Auth.*, 414 B.R. at 721 (noting that although "[t]he Court is aware that a Chapter 9 bankruptcy is somewhat unique and that its role is limited . . . by . . . § 904," the court has a "responsibility . . . to ensure that

4

## C. Rule 9019 Cannot be Used as an End-Run Around the Confirmation Requirements.

8.     The Debtor may not use Bankruptcy Rule 9019 to avoid compliance with the confirmation requirements (as this Court has already recognized).[11]  The bankruptcy court's approval of a settlement under a plan does *not* excuse the plan from meeting the confirmation requirements.[12]

9.     Even if the Court could independently approve (under Bankruptcy Rule 9019) each settlement contained within the Plan, it could *not* confirm the proposed Plan unless the Debtor could prove that the Plan, as a whole, complies

---

[the municipal debtor's plan] meets the requirements of confirmation."); *In re Stockton, Cal.*, Case No. 12-32118-C-9 (Bankr. E.D. Cal. Feb. 5, 2013) [Docket No. 685] ("the day of reckoning comes at the plan confirmation hearing").

[11]   *See In re City of Detroit, Mich.*, 504 B.R. 97, 154 (Bankr. E.D. Mich. 2013) ("Before the Court confirms any plan that the City submits, the Court must find that ***the plan fully meets the requirements of 11 U.S.C. § 943(b) and the other applicable provisions of the bankruptcy code***." (emphasis added)).

[12]   *See, e.g., In re TCI 2 Holdings, LLC*, 428 B.R. 117, 137 (Bankr. D.N.J. 2010) ("Utilizing the Rule 9019 procedure, which entitles the debtors to some deference to their business judgment, ***does not immunize the settlement provisions from meeting confirmation requirement***s, ***and cannot serve as an 'end run around the Bankruptcy Code***.'" (emphasis added)); *In re Quay Corp., Inc.*, 372 B.R. 378, 387 (Bankr. N.D. Ill. 2007) (evaluating separately plan and included settlement and stating "[t]he Plan proponents ***must, of course, still establish all statutory requirements for Plan confirmation***" (emphasis added)); *In re Iridium Operating LLC*, 478 F.3d 452, 463 (2d Cir. 2007) ("[A] settlement presented for approval as part of a plan of reorganization, because it constitutes part of the plan, may only be approved if it, too, is 'fair and equitable' in the sense of [plan confirmation standards].").

5

with all confirmation requirements. The Debtor cannot. As detailed herein and will be shown at trial, confirmation of the proposed Plan must be denied.

## II. The Plan Unfairly Discriminates Between Classes of Similar Claims.

10. The Plan unfairly discriminates against the COP Claims (Class 9) and Other Unsecured Claims (Class 14). It pays those disfavored classes a pittance while giving others a full recovery. The Debtor has provided no justification for the disparate recoveries.

11. Courts have adopted two tests for determining whether a plan discriminates unfairly: the *Aztec* Test and the Markell Test.[13] Under either test, the Plan fails.

### A. The Plan Unfairly Discriminates Under the *Aztec* Test.

12. The *Aztec* test consists of a four-factor inquiry:

    a.    whether the discrimination is supported by a reasonable basis;

    b.    whether the debtor can confirm and consummate a plan without the discrimination;

    c.    whether the discrimination is proposed in good faith; and

    d.    whether the disfavored class will receive a meaningful recovery.[14]

The Debtor must satisfy ***all four*** elements to show that the discrimination is fair.[15]

---

[13] *See In re Dow Corning Corp.*, 244 B.R. 696, 701 (Bankr. E.D. Mich. 1999); *In re Graphic Commc'ns, Inc.*, 200 B.R. 143, 148 (Bankr. E.D. Mich. 1996); *In re Aztec*, 107 B.R. 585 (Bankr. M.D. Tenn. 1989).

[14] *Aztec*, 107 B.R. at 590.

6

### 1. The *Aztec* Test Requires an Independent Analysis of Evidence in the Record.

13. The *Aztec* test is not synonymous with the business judgment standard; instead, it requires an independent analysis of the evidence in the record to determine whether there is a "reasonable basis" to support disparate treatment.[16]

### 2. Political Considerations Are Legally Irrelevant to the Unfair Discrimination Analysis.

14. As this Court ruled, considerations that may be politically appealing, such as creditors' personal hardship, are not relevant to the unfair discrimination analysis.[17]

### 3. There Is No Objectively Reasonable Basis to Justify Discriminating in Favor of Pension Claims and LTGO Claims.

15. It is the plan proponent's burden to provide evidence that the proposed discrimination is reasonable and necessary to consummate the plan.[18]

---

[15]  *Id.*

[16]  *See In re Sea Trail Corp.*, 2012 WL 5247175, at *8 (Bankr. E.D.N.C. Oct. 23, 2012) (noting that "[w]hen applying [the *Aztec*] test, a court must weigh the four factors by looking at all of the facts and circumstances of each individual case . . . whether a plan is unfairly discriminatory requires a 'totality of circumstances' type of analysis.") (internal citations omitted); *see also In re LeBlanc,* 622 F.2d 872, 879 (5th Cir. 1980) ("A bankruptcy court can permit discrimination when the facts of the case justify it.").

[17]  Hr'g Tr. 104:14-17 June 26, 2014 (THE COURT: "I'm going to say here as unequivocally as I can that as a matter of law, creditors' needs is not an issue when it comes to determining unfair discrimination.").

The Emergency Manager—as the Debtor's 30(b)(6) witness—stated only the following bases for the proposed discrimination:

- the human dimension;

- the Debtor's covenant with retirees;

- the assets in the Retirement Systems; and

- the potential illegality of COP Claims.

16.     As the Debtor's 30(b)(6) witness on the topic of what value classes 10, 11, and 12 receive under the Plan,[19] the Emergency Manager's testimony should be viewed as authoritative and exhaustive regarding the Debtor's rationales for discriminating.[20]

17.     In contrast, the Debtor's Reply listed the basis for the proposed discrimination in favor of Pension Claims as:

---

[18]   *See In re Snyders Drug Stores, Inc.*, 307 B.R. 889, 892 (Bankr. N.D. Ohio 2004) (refusing to permit enhanced distribution to trade creditors because debtor made no meaningful showing that trade creditors required preferential treatment).

[19]   *See City of Detroit's Second Amended Identification of Witnesses in Response to Syncora's Notice of Deposition Filed Pursuant to Fed. R. Civ. P. 30(b)(6).*

[20]   *See Sabre v. First Dominion Capital, LLC,* 2001 WL 1590544 (S.D.N.Y. Dec. 12, 2001) ("A 30(b)(6) witness testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity"); *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 268 (2d Cir. 1999) ("To satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make available "such number of persons as will" be able "to give complete, knowledgeable and binding answers" on its behalf.").

8

- employee morale;

- settlement of eligibility litigation;

- pensioners' inadequate ability to protect themselves; and

- personal hardship to retirees.

18.    Further, the Emergency Manager provides no reasonable basis and the Reply provides no basis whatsoever for the proposed discrimination in favor of LTGO Claims.

19.    None of the Debtor's purported rationales relate to its essential, or any, business needs.  Nor do they bear on the economic impact **on the Debtor** of lower recoveries to Pension Claims or LTGO Claims.[21]  In some cases, the Debtor provided only anecdotal evidence to support its purported rationales.  In other cases, the Debtor failed to provide even that.  Available evidence, including depositions of the Debtor's employees and experts, undermines the Debtor's rationales.

20.    Finally, the only reasons the Debtor has offered for discrimination in favor of Pension Claims relate to **individual pensioners**, but the Retirement

---

[21]    *See In re Creekstone*, 168 B.R. 639, 644 (Bankr. M.D. Tenn. 2004) (upholding discrimination in favor of trade creditors because the services and products they provided **were essential to the successful operation of the reorganized debtor**)

Systems (not individual retirees) hold the Pension Claims.[22]  To be clear, Pension Claim recoveries are not synonymous with payments to individual pensioners. Individual pensioners' payments have been set, with only minimal reductions.[23]

21.    The Retirement Systems also are faring incredibly well under the Plan.  Prior to filing, the Retirement Systems were well-funded, at or above the national average for large municipal pension plans.[24]  And underfunding by itself is not fatal to the operation of a pension system or the individuals enrolled therein as it does not prevent pension plans from meeting their obligations to retirees in full.

---

[22]   Hr'g Tr. 40:2–41:6 Nov. 8, 2013 (THE COURT: Before you go on, this question.  So is it the city's position that with regard to the pension liability underfunding, the creditors—the only creditors were the two plans and not the retirees themselves?  MR. BENNETT:  Your Honor, I think that's—at the end of the day, I think that's probably right . . . We think that's right.)

[23]   If the Outside Funding is not received, PFRS members will receive 100 percent of their current pension and no COLA while GRS members will receive 73 percent of their current pension and no COLA.  If the Outside Funding is received, PFRS members will receive 100 percent of their current pension and 45 percent of their COLA while GRS members will receive 95.5 percent of their current pension and no COLA.  As will be shown in Section II.B.3, *infra*, restoration of pension cuts is highly likely when Class 10 and 11 claims are properly measured.

[24]   Milliman 2013 Public Pension Study, attached hereto as **Exhibit 1** (100 largest public pension funds had an aggregate funding level of 72.4 percent in 2013); PFRS 72nd Annual Actuarial Valuation, attached hereto as **Exhibit 2** (PFRS was funded at 89.3 percent in 2013); GRS 72nd Annual Actuarial Valuation, attached hereto as **Exhibit 3** (GRS was funded at 70.9 percent in 2013).

10

Almost all pension plans currently operate at some level of underfunding.[25] With the proposed Pension Claim recoveries, the Retirement Systems will be overfunded.[26]

22. Because the Debtor cannot satisfy its burden of proof—indeed, has offered no proof—that the discrimination in favor of the Retirement Systems is reasonable or necessary. The Plan fails the *Aztec* test.

> **a. The Emergency Manager's Rationales for Discriminating in Favor of Pension Claims Are Inapplicable.**

23. The Emergency Manager dictated the Debtor's actions with respect to the Plan's discrimination among creditors.

> Q:  Okay, so you are the emergency manager that had to make the decision as to what level of discrimination was appropriate; don't you agree with that?
>
> A:  Yes.[27]

24. The Emergency Manager gives four reasons for discriminating in favor of the Pension Claims: (a) sympathy for retirees (the "human dimension" repeatedly noted by Mr. Orr); (b) the Debtor's covenant with retirees; (c) that there

---

[25]  Ex. 1, Milliman 2013 Public Pension Study (100 largest public pension funds had an aggregate funding level of 72.4 percent in 2013).

[26]  *See infra* Section II.B.3.

[27]  Orr Dep. 226:25–227:5, July 22, 2014, attached hereto as **Exhibit 4**.

were assets in the Retirement Systems; and (d) the potential illegality of the COP Claims.[28]   None of these rationales justifies the enormous disparity in treatment here.

25.   ***First***, sympathy for retirees is clearly legally irrelevant according to the Court's previous statements regarding creditors' needs.[29]

26.   ***Second***, the covenant rationale fails for several reasons.  As noted above, the Retirement Systems, not individual retirees, hold the Pension Claims, so a covenant with retirees is not relevant.  And this rationale is really no more than another invocation of the Debtor's "creditors' needs" rationale, inapplicable per the Court's ruling.

> Q:   I guess what I meant here is one of the factors you identified as—as informing your judgment with respect to what to pay classes 10 and 11 versus COPs holders, you identified was the City's covenant.
>
> . . .
>
> A:   Right, and what I'm trying to relay to you is it's not just a fact that the City had a contractual obligation; it is the commitment and reliance on that commitment behind the contractual obligation that various City employees and retirees will come and express to me in very real terms what this means to them.

---

[28]   Ex. 4, Orr Dep. 223:16–224:14, July 22, 2014.

[29]   *See* Hr'g Tr. 104:14–17 June 26, 2014.

12

. . .

> Q: And isn't it fair to say that this is another element of the human dimension, which is the unfairness of cutting the pensions of people who relied on the City's covenant in making decisions about how to allocate their work time?
>
> A: You could say that.[30]

27.    Finally, all creditors had the same expectation of repayment—except that those other creditors' expectations were cavalierly disregarded by the Debtor.

> Q: Now, did you—did you attempt to determine what other creditors' expectations were vis-à-vis the City?
>
> A: . . . I certainly heard from other creditors, expectations from rating agencies, from financial publications, from statements made in the press from them, as well, that their expectations was that they were going to be repaid.[31]

The City's covenant with retirees, then, does not justify superior treatment as all creditors, including COP Claims and Other Unsecured Claims, expected to be repaid.

28.    **Third**, the Emergency Manager justified discriminating in favor of Pension Claims on the basis that "the assets that the retirement funds had in them . . . would mean we'd have less ground to make up as opposed to the liability

---

[30]    Ex. 4, Orr Dep. 235:23–237:4, July 22, 2014.

[31]    Ex. 4, Orr Dep. 272:8–14, July 22, 2014.

of the certificates which is a—ongoing liability."[32]   This statement is almost

nonsensical and reveals a startling lack of understanding of the Plan and claim

recoveries.

29.      The amount of assets in the Retirement Systems relates to the *size* of

the Pension Claims, not their *recoveries*.   The Pension Claims represent the

Debtor's unfunded pension obligations, which are determined by calculating the

the pension liability and subtracting the value of the pension system's assets.[33]

The pension assets by definition do not provide the Debtor any leg up on paying

off the Pension Claims even if this were at all a relevant consideration.

30.      ***Fourth***, the potential illegality of the COP Claims is no basis for

providing diminished recoveries to COP Claims, as the Debtor asserts.   If COP

Claims are illegal, they recover nothing.[34]   Under the Plan, 10 percent is the

***maximum*** COP Claims can recover after being found valid.

> Q:      . . . the COPs best day recovery was impacted by
> this factor of the potential invalidity of the COPs?
>
> A:      Yes.[35]

---

[32]   Ex. 4, Orr Dep. 223:25–224:4, July 22, 2014.

[33]   Expert Report of S. Rosen Report 7–8 (July 29, 2014) (the "*Rosen Report*"),
attached hereto as **Exhibit 5**.

[34]   Plan Art. II.B.3.p.iii.

[35]   Ex. 4, Orr Dep. 237:5–7; 240:11–14, July 22, 2014.

14

31.    Since COP Claims will receive a recovery only if the COP Claims are held to be valid and allowed, invalidity is irrelevant to COP Claim recovery.

**b.    Rationales in the Debtor's Reply Are Without Merit.**

32.    Rationales not set out in Mr. Orr's 30(b)(6) testimony should be heavily discounted.  But even if given full weight, they still fail to justify the Plan's discrimination.

**i.    The Debtor's "Morale Issue" Is Fictitious.**

33.    The Debtor argues that a reasonable basis exists for discriminating in favor of Pension Claims because the Debtor "must have a workforce that is incentivized and motivated to provide the services the City needs to function."[36]

34.    Even assuming, *arguendo*, that individual retirees hold the Pension Claims, evidence indicates that Pension Claim recoveries will have little, if any, impact on employee morale as "neither economic principles nor empirical evidence supports the City's claim that the performance and morale of current employees and their contribution to the City's future success is linked strongly to the recovery rate of Pension Claims."[37]  The value of Pension Claim recovery will not change an employee's decision to retire or quit.[38]

---

[36]    Reply ¶ 66.

[37]    Expert Report of Kevin M. Murphy 3 (July 25, 2014), attached hereto as **Exhibit 6**.

[38]    *Id.* at 3–4.

15

35.     The Debtor provides *no evidence* that reduced Pension Claim recoveries would negatively impact its workforce.[39]   In fact, the Debtor's professionals and personnel have testified to the contrary.

36.     Charles Moore, the Debtor's operational restructuring expert, has testified on this exact issue and stated,

> there was a strong belief that if anyone tried to touch accrued benefits, especially pension benefits, that all of the employees would leave.  We have not seen that.  As has been publicly reported, [Detroit's] plan does not come up to the plate in adjustment to accrued pension benefits . . . . and we have not seen any impact from an employment standpoint.[40]

37.     The Debtor's Labor Director, Michael Hall, noted no perceptible change in morale from the announcement of the Debtor's initial plan of adjustment, which proposed reductions to pensioners of up to 26 percent, to the Debtor's current Plan, which proposes zero to four-and-a-half percent reductions.

> Q:     And what impact have the current proposed cuts had on—on the City's workforce as far as you can tell?
>
> A:     I can't.  I can't tell.
>
> Q:     You can't distinguish it—
>
> A:     No.

---

[39]    Reply ¶¶ 62–66.

[40]    Hr'g Tr. 79:4–13, *In re City of Stockton, Cal.*, Case No. 12-32118-C-9 (Bankr. E.D. Cal. May 14, 2014).

16

Q:     —from the prior levels of cuts in your mind?

A:     No.

Q:     Okay.  So it hasn't had some massive impact as far as you can tell on employee morale, correct?

. . .

A:     That's correct.

Q:     It hasn't had some massive impact on employee productivity as far as you can tell, correct?

A:     I can't tell.[41]

38.     Cynthia Thomas, Executive Director of the Retirement Systems, knows of no study of the morale of the Debtor's workforce.

Q:     Did you personally or I should say—let me—have you personally conducted any investigation into the morale of the active work force currently in Detroit?

A:     The active work force in Detroit, the morale, no.

Q:     More specifically, have you conducted any investigation into the morale of the active PFRS members in Detroit?

A:     No.

Q:     The same is true of GRS, correct?

A:     That is correct.

Q:     Are you aware of any studies that the retirement systems have done investigating the morale of the active work force with the PFRS or GRS?

---

[41]   Hall Dep. 159:19–160:12, July 2, 2014, attached hereto as **Exhibit 7**.

KE 32740828

A:     No.[42]

39.     The Debtor implemented reductions to employee healthcare in March

2014.  The Debtor has shown no evidence of a related mass exodus of employees

or a drop in morale that has impacted the Debtor's ability to provide services.

> Q:     Now, with respect to retiree health care, has that had an impact when it's come to hiring new employees?
>
> A:     I have no way of knowing.
>
> Q:     Okay, have you ever seen a situation where you've lost a new employee or were not able to attract a new employee because of —
>
> A:     It hasn't been brought to my attention.[43]

40.     The Debtor's ability to retain employees is not a real concern.

> A:     I don't view attrition as being a major problem right now, and I say that because of the state of the economy here in Detroit . . . . Because there are not a lot of options here in the city.
>
> Q:     You have a high unemployment in the city of Detroit?
>
> A:     That's correct.
>
> Q:     And when you have high unemployment, you tend to see people stay at their job?
>
> . . .
>
> A:     That's it.[44]

---

[42]     Thomas Dep. 118:10–23, July 9, 2014, attached hereto as **Exhibit 8**.

[43]     Ex. 7, Hall Dep. 137:12–22, July 2, 2014.

18

41.    The Debtor's **beliefs** about employee morale and retention—**proven false** by the facts—are no basis for discrimination here.

### ii.    The Retirement Systems and Employees Are Not Analogous to Trade Creditors.

42.    The Debtor undermines what little is left of its argument by pointing to case law where discrimination in favor of trade creditors was permitted.  Each of those cases considers the detriment **to the Debtor** that would result if trade creditors are not appeased.  Here, in contrast, the Debtor has not provided—in fact, cannot provide—any evidence that discrimination in favor of Pension Claims will avoid economic hardship—or provide economic benefit—**for the Debtor**.  As this Court has noted, with respect to unfair discrimination "[t]he issue always is the **business justification** for the treatment."[45]

43.    In chapter 11, a commercial debtor often faces a real risk that trade creditors will cease providing goods or services to the debtor absent favorable treatment, which potentially limits a debtor's ability to remain a going concern.[46] In fact, the cases the Debtor cites underscore this issue—preferential treatment for trade creditors was permitted based on the **debtors'** continued need to rely on the

---

[44]    Ex. 7, Hall Dep. 111:18–112:7, July 2, 2014.

[45]    Hr'g Tr. 81:12–17, Aug. 6, 2014 (emphasis added).

[46]    *See In re Creekstone*, 168 B.R. at 644 (upholding discrimination in favor of trade creditors because the services and products provided by trade creditors **were essential to the successful operation of the reorganized debtor**).

19

goodwill of trade creditors during the reorganization process.[47]  The benefit to trade creditors was just a necessary means to that end.

44.     The close link between the goods and services trade creditors provide and a debtor's ability to generate revenue is a central factor courts consider when approving discrimination in favor of trade creditors.[48]  No such economic justification exists or has ever been asserted in this case.  Neither the Retirement Systems nor the Debtor's current employees provide goods or services directly tied to the Debtor's ability to generate revenue.[49]

### iii.     Settlement Cannot Justify Unfair Discrimination.

45.     As discussed above in Section I.C, even if a settlement is approved under 9019, the Plan must comply with all confirmation requirements, including the requirement that a plan not discriminate unfairly.  Courts applying the *Aztec*

---

[47]  *See In re LeBlanc*, 622 F.2d at 879 (allowing discrimination in favor of trade creditors when plan proponent "needed to maintain good relations with trade creditors upon whom they would have to rely" for continued services); *In re Graphic Commc'ns*, 200 B.R. at 148 (noting that reasonable discrimination is allowed where the discrimination protects "a relationship with specific creditors that the ***debtor need[s] to reorganize successfully***" (emphasis added)).

[48]  *See*, *e.g.*, *In re Sea Trail Corp.*, No. 11-07370-8-SWH, 2012 WL 5247175 (Bankr. E.D.N.C. Oct. 23, 2012) (explaining that favorable treatment of trade creditors would "enhance the debtor's ability to successfully reorganize").

[49]  *See In re U.S. Truck Co., Inc.*, 800 F.2d 581, 583 (6th Cir. 1986) (full payment of union's claim not necessary to successful reorganization and would in fact lead to debtor's collapse).

20

test have cautioned against giving ***any*** weight to settlements in the context of unfair discrimination, noting that "consent by the debtor and a creditor to discrimination in favor of the creditor . . . reveals very little about the debtor's prospects to confirm and consummate a plan without the discrimination."[50] The Debtor cites ***no cases*** to the contrary.[51] As a result, the Court ***cannot*** consider the Retirement Systems' and individual pensioners' agreement to the Grand Bargain—which—when the Debtor's arithmetic manipulation of the Class 10 and 11 Claims is backed out—results in full payment of Pension Claims at the expense of COP Claims and Other Unsecured Claims—when determining whether the Plan unfairly discriminates.

46. The Debtor points to bankruptcy law's general preference for settlements and consensus as a basis for finding the discrimination in the Plan is fair.[52] The Debtor cites to *In re Corcoran Hosp. Dist.*, 233 B.R. 449 (Bankr. E.D. Cal. 1999) to support this position. The *Corcoran* settlement, though, provided for

---

[50] *In re Creekside Landing, Ltd.*, 140 B.R. 713, 716 (Bankr. M.D. Tenn. 1992).

[51] *See* Reply ¶ 67–70.

[52] Reply ¶ 67 ("Because settlements are fundamental to the bankruptcy process, creditors who have settled with a debtor and agreed to accept a plan or make other valuable concessions may receive more favorable treatment than non-settling creditors without running afoul of section 1129(b)(1)'s prohibition on unfair discrimination").

an agreed 74 percent **reduction** to the settling creditor's unsecured claim and complete elimination of settling creditor's administrative claim.[53]

47.     In this case, the Pension Claims remain virtually untouched, and, as Mr. Orr acknowledged, the Plan allows for the **likely restoration** of individual pensioner payments.[54]     This is a far cry from the compromise agreed to in *Corcoran*.     Pension Claim holders have made no valuable concessions and no substantial contribution to the Debtor's bankruptcy that would justify such radically disparate treatment compared to COP Claims.

### iv.     Pension Claim Holders Are Adequately Protected from Pension Mismanagement.

48.     The true Pension Claim holders—the Retirement Systems—were and are perfectly positioned to protect themselves from mismanagement of pension assets.   The Debtor's argument that individual pensioners "were not provided any choice with respect to whether and how much to invest in their pensions . . . [and] had no control over how pension assets were invested and their pension programs operated" is both irrelevant and incorrect.[55]

---

[53]   *In re Corcoran Hosp.*, 233 B.R. at 457 (specifically pointing to magnitude of compromise agreed to by favored class as a consideration weighing in favor of finding discrimination to be permissible).

[54]   Ex. 4, Orr Dep. 303:6–17, July 22, 2014.

[55]   Reply ¶ 71.

KE 32740828

49.     The Retirement Systems (not individual pensioners) hold the Pension Claims.  The Retirement Systems, as the entities tasked with managing the pension assets, have complete control over how pension assets are invested.

50.     And pensioners are informed of the trustees' investment decisions.

> Q:     And you also understand that the retirement systems publish an enormous amount of data regarding the allocation of their assets and the investment returns and the financial performance of the pension trusts?
>
> A:     Yes, they in conjunction with their advisors.[56]

If pensioners were unhappy with the trustees' decisions, they had the opportunity to vote in new trustees.

> Q:     And you understand that the trustees, I think, are in large part elected to the board, right?
>
> A:     Yes.
>
> Q:     And they're elected by their pensioners, right?
>
> A:     Yes.[57]

As a result, even if individual pensioners hold the Pension Claims—which they do not—they were adequately protected from and informed of the trustees' investment decisions.

---

[56]     Ex. 4, Orr Dep. 268:12–16, July 22, 2014.

[57]     Ex. 4, Orr Dep. 326:2–6, July 22, 2014.

KE 32740828

#### 4.     There Is No Basis for Favoring LTGO Claims.

51.     There is no legally viable basis to discriminate in favor of LTGO Claims.  The Emergency Manager attempted to justify the rich LTGO treatment based on the holders' settlement and some undefined "status."[58]

> there was some give and take between the parties as to what potential claims was . . . [and] an argument made that that particular class of creditors had a different status than just general unsecured, and that that status should have some level of recognition.[59]

As discussed in Section II.A.3.b.iii, settlement alone is not a basis for discriminating in favor of a class of claims.  And the Debtor has provided no evidence that there was any compromise in the size of the LTGO Claim.  Finally, despite LTGO Claim holder arguments that the LTGO Claims are secured, the Plan classifies LTGO Claims as unsecured claims.[60]

#### 5.     The Discrimination Is Not "Necessary."

52.     The Debtor has provided no evidence that the discrimination embodied in the Plan is necessary to confirm the Plan.[61]   To prove that the

---

[58]   "Status" refers to unsubstantiated assertion that LTGO claims are secured.  *See*, *e.g.*, Objection of Ambac Assurance Corporation to Fourth Amended Plan of Adjustment of Debtors of City of Detroit, 10 n.2 [Docket No. 4677].

[59]   Ex. 4, Orr Dep. 347:18–25, July 22, 2014.

[60]   Plan, II.B.3.n, p.

[61]   *See Aztec*, 107 B.R. at 590; Reply ¶¶ 75–78.

24

discrimination is necessary, the Debtor must show that the Plan could not be confirmed absent the discrimination.[62]

53.     The Debtor's first-filed plan provided for much larger reductions to individual pensioners payouts than are included in the proposed Plan.[63] And the Debtor even today admits it could have moved forward with that plan—in spite of the Reply's argument that the new Plan's discrimination is somehow necessary.

> Q:     And you believe that the City's statement that the first plan proposed was feasible was a true statement at the time that it was made; isn't that correct?
>
> A:     Yes.
>
> Q:     And you believe it's a true statement as you sit here today; isn't that correct?
>
> A:     I believe that the first plan was feasible when it was filed? Yes.[64]

54.     The Debtor has offered no evidence to support its argument that discrimination in favor of Pension Claims is *necessary*. Instead, the Debtor merely states that the discrimination "reflects the serious difficulties inherent in

---

[62]     *See In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 537 (Bankr. E.D. Pa. 2010) ("no explanation has been offered as to why the [favored class] cannot simply be paid the same amount as the [unfavored class]").

[63]     *Disclosure Statement with Respect to Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 2709] (contemplating Pension Claim recovery between 20.8 percent and 29.8 percent for PFRS Claims and 27.5 percent and 33.3 percent for GRS Claims).

[64]     Ex. 4, Orr Dep. 197:15–22, July 22, 2014.

KE 32740828

confirming and implementing a plan without such a preference."[65] Whatever that means. "Serious difficulties" are not "necessity," but it is not clear any "serious difficulties" even exist. To be sure, there is no legal obstacle preventing lower recoveries to Pension Claims. The Debtor can attempt to cram down a plan that includes less favorable treatment than currently proposed—in fact, the Plan expressly contemplates such a situation.[66]

55.     However, the Debtor has an alternative option. The Debtor need not reduce Pension Claim recoveries. Instead, the Debtor can increase COP Claim and Other Unsecured Claim recoveries by allowing creditors in those classes to share in the upside of the Debtor's revitalization, monetizing assets, and generating additional revenue through changes to its tax policy.

56.     The Debtor also argues that the "necessity" standard should be relaxed to "*practical* necessity."[67] There is no basis in case law for such a departure and the Debtor offers no justification for creation of a new standard.[68] But, even so,

---

[65]     Reply ¶ 47. Meanwhile, the Debtor's Reply contained no discussion at all of the necessity of discriminating in favor of LTGO Claims.

[66]     Plan Art. II.C.

[67]     Reply ¶ 75.

[68]     *See id.*

the Debtor's "necessity" likely is less practical, and more political.[69] The Bankruptcy Code does not make exceptions for political expediency.[70] The Plan fails the *Aztec* Test because the discrimination is not necessary.

### 6. The Discrimination Is Not Proposed in Good Faith.

57. The discrimination proposed in the Plan is not proposed in good faith, as reflected by the Debtor's attempt to shield value that could otherwise increase recoveries to COP Claim holders and Other Unsecured Claim holders.[71]

58. In *Sullivan County*, for instance, certain solid waste disposal districts filed for chapter 9 protection due to financial issues related to an incinerator. The districts had annual minimum revenue obligations to the incinerator.[72] A district falling short of its requirement could assess its member municipalities to provide

---

[69] *See* Reply ¶ 77 (noting that reductions to Pension Claim recovery have been a "flashpoint" between retirees and the Debtor).

[70] *See* 11 U.S.C. §§ 101-1532.

[71] *C.f. In re Sullivan Cnty. Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 78 (Bankr. D.N.H. 1994) (in the context of eligibility, "[a] commercial party can hardly 'negotiate in good faith' regarding unpaid obligations if it . . . refuses to acknowledge or throw into the negotiation equations a large and significant asset it holds"); *see also In re Pierce Cnty. Hous. Auth.*, 414 B.R. at 719 ("an attempt to cut-off potential sources of funds for payment of claims . . . raises the issue of whether the City's Amended Plan has been proposed in good faith").

[72] *In re Sullivan Cnty.*, 165 B.R. at 65.

the shortfall.[73]  For years, districts failed to meet their minimums and did not make up the shortfall through assessments.[74]  The debtors made little attempt to assess their members for the shortfall prior to filing for bankruptcy.[75]  The court held that the debtors had not negotiated in good faith because the debtors ignored their most significant asset, "their power to assess the member municipalities for the unpaid service fees and thus in effect access the borrowing or taxing powers of those municipalities to meet the debtors' obligations."[76]

59.    The Plan process has been marked by overt favoritism for the Pension Claims, coupled with hostility for and unwillingness to monetize non-core assets for the benefit of COP Claims and Other Unsecured Claims.  Indeed, even the Debtor's mediators have stated that their goal from the outset was "to accomplish the very best deal that we could do *for Detroit's retirees*."[77]

---

[73]    *Id.*

[74]    *Id.* at 66.

[75]    *Id.* at 77.

[76]    *Id.* at 78.

[77]    *See* Next Chapter Detroit, *Detroit's Chief Mediator:  Judge Gerald Rosen Speaks About the Bankruptcy Process*, http://www.nextchapterdetroit.com/detroits-chief-mediator-judge-gerald-rosen-speaks-about-the-bankruptcyprocess (last visited Aug. 9, 2014) (audio recording of Judge Rosen's remarks).

### 7. Class 9 and Class 14 Treatment is Not Meaningful.

60. The final element of the *Aztec* test considers whether the the class discriminated against is receiving a "meaningful recovery" in relation to the recovery provided to the favored class.[78]

61. COP Claims and Other Unsecured Claims receive ***almost five times less*** than Pension Claims on the face of the Plan (an unheard of disparity when trade creditors are not involved) and shockingly less when accurate calculations are used. That is not meaningful recovery.[79] The *Lightsquared* court noted,

> [I]t is difficult to imagine discrimination that could be much more unfair than that contemplate [*sic*] by the plan. Close to full payment in cash on confirmation [for the favored unsecured class], . . . versus an equity-like deeply subordinate seven-year third lien pick [*sic*] interest note for [the unfavored unsecured class], treatment that, even if possibly yielding payment of the value of the [unfavored unsecured class] claim seven years down the road, for all intents and purposes puts [the unfavored unsecured class] at the mercy of the rest of the proposed post-confirmation capital structure.[80]

---

[78] *See Aztec*, 107 B.R. at 591; *see also In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) (examining whether "the degree of discrimination is in direct proportion to its rationale").

[79] *See* Tr. of Bench Decision on Confirmation of Plan of Debtors at 146–47, *In re Lightsquared Inc.*, Case No. 12-12080 (Bankr. S.D.N.Y. May 8, 2014) (rejecting proposed treatment on basis that discrimination is neither necessary nor in proportion to its rationale).

[80] *Id.*

KE 32740828

62.     And the standard is ***not***, as the Debtor argues, whether a plan "treats other unsecured creditors as well as possible under the circumstances."[81]   The Debtor offers no support for its formulation of the fourth factor of the *Aztec* Test and could not satisfy it, as discussed in detail in Section III, regarding the best interests of creditors test.[82]   Having failed to satisfy any of the *Aztec* factors, the Plan fails the *Aztec* test.

**B.     The Plan Unfairly Discriminates Under the Markell Test.**

63.     Under the Markell Test, a rebuttable presumption of unfair discrimination exists if, under the plan of adjustment, there is:

      a.     a dissenting class;

      b.     another class of the same priority; and

      c.     a difference in the plan's treatment of the two classes that results in either

            i.     a materially lower percentage recovery for the dissenting class, or

            ii.     regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.[83]

---

[81]   Reply ¶ 81.

[82]   *See* Reply ¶ 84.

[83]   *See In re Dow Corning Corp.*, 244 B.R. at 702; Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 277, 252 (1998) (explaining that "[t]hese expectations and assumptions are typically

64.     A plan proponent can rebut the presumption of unfair discrimination by showing that, outside of bankruptcy:  (x) the dissenting class would receive similarly less than the favored class; (y) the allocation of risk of recovery under the plan of adjustment is consistent with the allocation of risk of recovery that the relevant parties assumed before the bankruptcy; or (z) that the favored class has infused new value (e.g., money) into the reorganization which exceeds the value of its plan recovery.[84]   Here, the Debtor cannot offer any evidence to rebut the Markell presumption, and so the Plan fails.

     **1.     Classes 9 and 14 Are Dissenting Classes.**

65.     Class 9 and Class 14 each voted to reject the Plan.[85]

     **2.     COP Claims and Other Unsecured Claims Are of the Same Priority as Pension Claims.**

66.     Pension Claims, COP Claims, and Other Unsecured Claims fall under the broad rubric of Unsecured Claims.[86]

---

embodied in the risk inherent in the instrument evidencing the prepetition claim or interest").

[84]   *Id.*

[85]   *See* Voting Report [Docket No. 6179].

[86]   Plan Art. II.B.3(p), (q), (r), (u); Buckfire Dep. 96:10–13, July 16, 2014, attached hereto as **<u>Exhibit 9</u>** ("it was our judgment that the status of the class 9 claims and the pension and so-called OPEB claims was basically the same, that is they were general unsecured claims of the City").

KE 32740828

### 3. COP Claim and Other Unsecured Claim Recoveries Are Massively Lower than Pension Claim Recoveries.

67.    On the Plan's face, Pension Claims are to receive recoveries **at least five times greater** than COP Claims and Other Unsecured Claims.  The disparity here is striking and unarguably "material" as used in the Markell Test.[87]

68.    "Courts which have rejected confirmation on the basis of unfair discrimination have confronted plans proposing grossly disparate treatment" to equal priority claims.[88]  Some of these decisions are set forth below.

**Figure 1.  Cases Rejecting Plans Proposing Grossly Disparate Treatment**

| Case | Percentage Recovery | Conclusion |
|---|---|---|
| *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr. D.N.J. 2000) | Favored:  80% Disfavored:  76% | Permitting discrimination because allocating all equity to disfavored class of old noteholders, which resulted in 76 percent recovery, was only way to return value. |
| *In re Unbreakable Nation Co.*, 437 B.R. 189 (Bankr. E.D. Pa. 2010) | Favored:  1.78% Disfavored:  1.25% | Permitting discrimination where each class of unsecured creditors (trade creditors and shareholders of debtor's predecessor) received the same amount of payment for distribution among class members. |

---

[87]    *See In re Dow Corning*, 244 B.R. at 702; *see also In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr. D.N.J. 2000).

[88]    *Id.* at 231.

| Case | Percentage Recovery | Conclusion |
|---|---|---|
| *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 537–38 (Bankr. E.D. Pa. 2010). | Favored: 100% Disfavored: 50% | Disapproving discrimination between trade claims and deficiency claim "in light of fact that no evidence was offered by the [debtors] that paying the trade debts in full is necessary in order to effect a reorganization." |
| *In re Barney & Carey Co.*, 170 B.R. 17, 25–26 (Bankr. D. Mass. 1994) | Favored: 100% Disfavored: 15% | Disapproving discrimination where debtor failed to offer any reason or legitimate basis for discrimination. |
| *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (9th Cir. BAP 1994) | Favored: 100% Disfavored: 10% | Disapproving discrimination against unsecured deficiency claims in favor of trade creditors where only justification offered was recognized policy of paying for actual goods and services in full. |

69.    The stated Plan recoveries for Pension Claims are 59 percent for PFRS Claims and 60 percent for GRS Claims. In contrast, stated Plan recovery is 10 percent for COP Claims and 13 percent for Other Unsecured Claims. The Plan, thus, clearly unfairly discriminates on its face—the disparity between Pension Claim recovery and COP Claim and Other Unsecured Claim recovery is as follows:

KE 32740828

**Figure 2. Stated Disparity in Recovery Percentage**

| | PFRS Claim Recovery Percentage (Difference) | GRS Claim Recovery Percentage (Difference) |
|---|---|---|
| COP Claim Recovery Percentage | 49% | 50% |
| Other Unsecured Claim Recovery Percentage | 46% | 47% |

70.     The Court has acknowledged that the discrimination proposed under the Plan is ***very significant***.[89]   The Debtor cannot (and does not) dispute this fact.

> Q:     . . . at the current proposed rates of recovery in the plan that is currently on file, classes 10 and 11 are being paid more than the COP holders; isn't that correct?
>
> A:     Yeah, are being paid more than as proposed to the COP holders, yes.
>
> Q:     Okay. And they're being paid substantially more, correct?
>
> A:     I think it's a significant difference.[90]

The recovery disparities to which the Court and Mr. Orr reference are based only on the Debtor's own stated recoveries.  The disparity is actually much greater.

71.     As discussed more fully in the Rosen Report, the Debtor manipulated the calculation of the Pension Claims and their stated recoveries in two important ways:  (a) artificially inflating the size of the Pension Claims and (b) artificially

---

[89]   Hr'g Tr. 82:7–10 Aug. 6, 2014.

[90]   Ex. 4, Orr Dep. 221:25–222:9, July 22, 2014.

decreasing the value of the Pension Claims' recoveries. With proper accounting, it is clear that the Retirement Systems will receive recoveries **in excess of 100 percent**.

### a. The Pension Claims Are Overstated.

72. The Pension Claims are overstated in three ways. *First*, the GRS Claim inappropriately excludes ASF Recoupment. *Second*, the Pension Claims include unaccrued and unvested benefits. *Third*, the Debtor calculated the present value of its future liabilities using an inappropriate discount rate. All of these valuation errors result in overstated Pension Claims.

#### i. Pension Claims Inexplicably Exclude ASF Recoupment.

73. The Plan contemplates recoupment of benefits paid out to GRS members. The recouped benefits represent amounts the Debtor deems to be in excess of what GRS members should have been paid.[91] Accounting for ASF Recoupment, the GRS Claim shrinks by approximately $390 million.

**Figure 3. Inclusion of ASF Recoupment**

| $ billions | GRS | | | PFRS | | |
|---|---|---|---|---|---|---|
| | Claim | Present Value of Contribution $ | Recovery Percentage | Claim | Present Value of Contribution $ | Recovery Percentage |
| Plan Stated | $1.879 | $1.093 | 60% | $1.250 | $0.735 | 58.8% |
| ASF Recoupment | $1.492 | $1.093 | 74.9% | $1.094 | $0.735 | 67.2% |

---

[91] Bowen Dep. 209:10–21, June 30, 2014, attached hereto as **Exhibit 10**.

### ii. Pension Claims Inappropriately Include Unaccrued and Unvested Benefits.

74. The Pension Claims should only represent the value of accrued and vested pension obligations *as of the Petition Date*.[92] The Debtor admits this.[93] However, the Debtor's claim calculation includes unaccrued and unvested benefits.

75. To calculate only those benefits accrued and vested as of a certain point in time, such as the Petition Date, the pension plan must be treated as frozen as of that time.[94] The Debtor's calculation, though, incorrectly treats the pension plans as ongoing under the "entry age normal method."

> Q: And when you performed this valuation of the actuarial accrued liability for the benefits provided by the general retirement system of the city of Detroit, this was done using the entry age normal cost method, correct?
>
> A: That is correct.

---

[92] *See* 11 U.S.C. § 502(b) ("The court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States *as of the date of the filing of the petition*." emphasis added)).

[93] Disclosure Statement at 13 (describing the Pension Claims as "the total amount of all [] pension benefits *accrued* by all City employees, former employees, retirees and survivors").

[94] *See* Ex. 5, Rosen Report 9 ("[t]he determination of a benefit earned as of a specific date (such as the petition date) is the value of the frozen benefits as of that same date"); *see also* 11 U.S.C. § 502(b) ("The court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States *as of the date of the filing of the petition*." (emphasis added)).

36

Q:     And when you performed this valuation of the actuarial accrued liability for the benefits provided by the GRS, you did not at that time contemplate this as a frozen plan scenario, correct?

A:     This request was an ongoing plan valuation.

Q:     Thank you. That's a much better question than I asked. So similarly for PFRS, when you, when you calculated—or when you valued the actuarial accrued liability for the benefits provided by PFRS, you used the entry age normal cost method, correct?

A:     That is correct.

Q:     And when you calculated the actuarial accrued liability for the benefits provided by the PFRS, you did so with the assumption that the plan would be ongoing, correct?

A:     In the April 17th letter in Exhibit 8, yes.[95]

76.     As a result, the Pension Claims include *future unvested benefits* and

*additions for projected future salary increases*.

Q:     And would entry age normal also include benefits that have not as yet vested?

A:     In the measurement of the accrued liability, you would have active participants with a liability, whether or not vested.

Q:     And that's another way of saying there were probably instances in the calculation where their benefits have not as yet vested?

A:     Yes.

---

[95]    Ex. 10, Bowen Dep. 118:13–119:10, June 30, 2014.

KE 32740828

. . .

A:   If you have an ongoing plan, the entry age [normal method] would include future salary increases, because they would be expected to occur in an ongoing plan, and their—part of their function is that they lever up the benefit based upon past service. If you have a frozen plan, you would not assume future salary increases. ***So the liability would drop***.[96]

77.   Assuming a pension plan is ongoing instead of frozen overstates pension liabilities by up to approximately $70,000 ***per person***, as shown below.

**Figure 4. Entry Age Accrued Liability versus Present Value of Accrued Benefits**[97]



_____

[96]   Ex. 10, Bowen Dep. 55:13–20; 164:17–25, June 30, 2014 (emphasis added).

[97]   Ex. 5, Rosen Report 19.

38

78.     Adjusting the Pension Claims to reflect only those benefits that actually accrued and vested as of the Petition Date would decrease the size of the Pension Claims significantly and more accurately reflect Pension Claim recoveries, which are well in excess of those set out in the Disclosure Statement:[98]

**Figure 5.  Stated Pension Claim Recovery vs. Pension Claim Recovery For Accrued and Vested Benefits Only**

| $ billions | GRS | | | PFRS | | |
|---|---|---|---|---|---|---|
| | Claim | Present Value of Contribution $ | Recovery Percentage | Claim | Present Value of Contribution $ | Recovery Percentage |
| Plan Stated | $1.879 | $1.093 | 60.0% | $1.250 | $0.735 | 59.0% |
| ASF Recoupment | $1.492 | $1.093 | 73.2% | $1.250 | $0.735 | 58.8% |
| Accrued and Vested Only | $1.258 | $1.093 | 81.8% | $1.094 | $0.735 | 67.2% |

### iii.     Pension Claims Were Calculated With an Inappropriately Low Discount Rate.

79.     To calculate the Pension Claims, the Debtor's future pension liabilities must be discounted at an appropriate risk-adjusted rate to ascertain their present value as of the Petition Date.[99]  For purposes of calculating claim amounts, the public pension industry traditionally uses a discount rate that reflects future expected investment returns on pension system assets.[100]  The discount rate accounts for asset allocation and capital market assumptions.

---

[98]   Ex. 5, Rosen Report 19.

[99]   Ex. 5, Rosen Report 9.

[100]   *Id.*

39

> Q:     . . . an investment return assumption is a function of the asset allocation that you use along with your own capital market assumptions, correct?
>
> A: That is correct.[101]

80.     However, the Pension Claims were calculated based on an arbitrary rate of 6.75 percent dictated by the Debtor.

> Q:     Now, ultimately, the city asked you to run a variety of scenarios, including scenarios that the city asked you to run in 2013, that were at a 6.75 percent discount rate, correct?
>
> A:     We ran scenarios at 6.75 percent, yes.
>
> Q: And that 6.75 percent was **not based on** and **did not reflect** the asset allocation that you were aware of, but instead was based on a suggestion that going forward the pension systems would use a more conservative asset allocation, correct?
>
> . . .
>
> A:     That's my understanding.[102]

81.     This rate is not an accurate reflection of the asset allocation of either Retirement System as of the Petition Date (or ever), and is in fact significantly lower than is appropriate.  The asset allocation of the Retirement Systems and the geometric average rate of return for each asset class therein is as follows:[103]

---

[101]  Ex. 10, Bowen Dep. 33:10–13, June 30, 2014.

[102]  Ex. 10, Bowen Dep. 106: 24–107:13, June 30, 2014.

[103]  Ex. 5, Rosen Report 10.  The average annual rate of return was determined using data over the period from 1926 to 2013 for large company stocks, small

40

**Figure 6. Pension System Asset Allocation and Asset Class Geometric Average Rate of Return**

| Asset Class | PFRS | GRS | Average ROR |
|---|---|---|---|
| Equity | 38.0% | 51.0% | 22.4% |
| Fixed Income | 25.5% | 24.0% | 11.5% |
| Cash | 1.0% | 1.0% | — |
| Private Equity | 10.0% | 6.0% | 13.4% |
| Real Estate | 15.5% | 13.0% | 4.2% |
| Energy MLP | 5.0% | 0.0% | 8.9% |
| Hedge Funds | 5.0% | 5.0% | 10.4% |
| Total | 100.0% | 100.0% | |

82.     Based on this data, discount rates of at least 8.2 percent for GRS and 7.7 percent for PFRS should be applied.[104]  Incredibly, the Debtor's professionals recognize that a discount rate of 6.75 percent is inconsistent with the historical performance—indeed, overperformance—of the Retirement Systems and are scrambling to fabricate a new asset allocation that could (artificially) back into a 6.75 percent expected rate of return.[105]

> Q:     Is Milliman out now trying to come up with an asset allocation that matches the 6.75 percent?  Is that what's going on now?

---

company stocks, long-term corporate bonds, and long-term government bonds, 1999-2013 for real estate, 1998-2013 for private equity, and 1994-2013 for hedge funds. *Id.*

[104]  Ex. 5, Rosen Report 10–11.

[105]  A new allocation would be irrelevant as the as-of-the-Petition-Date allocation is what matters for purposes of calculating the Pension Claims.

41

A: I believe our investment consultants have been tasked to look at asset allocations to match lower investment returns.

. . .

Q: So you got—in this instance you got the discount rate first, and now someone's trying to come up with the asset portfolio, correct?

A: That's the order of operations in this instance.[106]

To date, Milliman has been unable to create such an allocation.

83.     Another possibility is that post-confirmation the Debtor simply will not reallocate its assets—even if Milliman could create such a conservative allocation.  Instead, the Debtor will use its continued market-plus returns to increase Pension Claims recoveries, as discussed in Section II.B.3.b.ii.  In any case, a new allocation is irrelevant as the as-of-the-Petition-Date allocation is what matters for calculating Pension Claims.

84.     A discount rate of 7.5 percent is more appropriate for calculating the Pension Claims.  A 7.5 percent discount rate is conservative based on the current asset allocations of the Retirement Systems as of the Petition Date—which reflect discount rates of 8.2 percent for GRS and 7.7 percent for PFRS.  It also is more consistent with industry norms.[107]  Milliman's own public pension studies indicate

---

[106]  Ex. 10, Bowen Dep. 182:4–183:19, June 30, 2014.

[107]  Ex. 5, Rosen Report 11 (2013 median expected long-term rate of return on pension assets, a proxy for the discount rate, was 7.75 percent).

a median investment rate of return for large public pension funds of 7.75 percent in 2013, which informs the appropriate discount rate for those plans would be.[108]

85.     Applying a 7.5 percent discount rate to the Pension Claims decreases the size of the Pension Claims (and increases their Plan recoveries) as follows:

**Figure 7.  Stated Pension Claim Recovery vs. Pension Claim Recovery with Appropriately Discounted Liabilities**

| $ billions | GRS | | | PFRS | | |
|---|---|---|---|---|---|---|
| | Claim | Present Value of Contribution $ | Recovery Percentage | Claim | Present Value of Contribution $ | Recovery Percentage |
| Plan Stated | $1.879 | $1.093 | 60.0% | $1.250 | $0.735 | 58.8% |
| ASF Recoupment | $1.492 | $1.093 | 73.2% | $1.250 | $0.735 | 58.8% |
| Accrued and Vested Only | $1.258 | $1.093 | 81.8% | $1.094 | $0.735 | 67.2% |
| 7.5% Discount Rate | $1.018 | $1.093 | 107.3% | $0.795 | $0.735 | 92.5% |

### b.     The Value of the Retirement Systems' Current and Future Assets Is Understated.

86.     The Debtor understates the value of the Retirement Systems' current and future assets by:  (a) excluding the UTGO Settlement proceeds from future contributions to the Retirement Systems; (b) using an inappropriately low expected rate of return on assets to value the Retirement Systems' future asset levels; and (c) using an inappropriate discount rate to calculate the present value of certain future contributions to the Retirement Systems.  Each of these factors results in an understated recovery percentage.

---

[108]    *Id.*

KE 32740828

### i. Pension Claim Recoveries Do Not Account for UTGO Settlement Proceeds.

87.     Pension Claim recoveries are being funded by multiple sources, including the Debtor's general fund, the State of Michigan, the DIA Proceeds, UTGO Settlement, and DWSD contributions (GRS only).[109]   However, the Plan does not account for the UTGO Settlement money.[110]   Factoring in the UTGO Settlement proceeds, Pension Claim recoveries increase even more:[111]

**Figure 8.  Stated Pension Claim Recovery vs. Pension Claim Recovery with UTGO Settlement Proceeds**

| $ billions | GRS | | | PFRS | | |
|---|---|---|---|---|---|---|
| | Claim | Present Value of Contribution $ | Recovery Percentage | Claim | Present Value of Contribution $ | Recovery Percentage |
| Plan Stated | $1.879 | $1.093 | 60.0% | $1.250 | $0.735 | 58.8% |
| ASF Recoupment | $1.492 | $1.093 | 73.2% | $1.250 | $0.735 | 58.8% |
| PVVAB | $1.258 | $1.093 | 81.8% | $1.094 | $0.735 | 67.2% |
| 7.5% Discount Rate | $1.018 | $1.093 | 107.3% | $0.795 | $0.735 | 92.5% |
| UTGO Settlement | $1.018 | $1.126 | 110.6% | $0.795 | $0.743 | 93.5% |

### ii. Pension Claim Recoveries Were Calculated Using an Inappropriate Investment Rate.

88.     The Debtor arbitrarily selected an investment return of 6.75 percent, which does not accurately reflect the pension systems' asset allocations and

---

[109]   Ex. 5, Rosen Report 14.

[110]   *Id.*

[111]   *Id.* at 21.

44

expected returns.[112]  Investment rates are important because the greater the return on Retirement Systems' assets, the better funded the pension systems will be.[113] This is particularly relevant here as investment gains above 6.75 percent return will restore benefits otherwise reduced under by the Plan.[114]

89.    Normally, returns in excess of the investment rate would remain in the Retirement Systems, resulting in higher levels of funding—potentially even overfunding.  The better funded systems would require smaller contributions from the Debtor in future years.    The Plan, however, has established set funding contributions from 2014 through 2034.[115]  These contributions are derived largely from the Grand Bargain, UTGO Settlement, and DWSD from 2014-2023.[116]  Post-2023, the Debtor is largely responsible for funding the Retirement Systems—again, at set amounts.[117]  As a result, pre-2023 returns in excess of 6.75 percent will not decrease the Debtor's post-2023 contributions.    Instead, those excess returns will remain in the Retirement Systems and used to fund pension restoration.

---

[112]  Ex. 10, Bowen Dep. 106: 24–107:13, June 30, 2014.

[113]  Ex. 5, Rosen Report 22.

[114]  Ex. 5, Rosen Report 22; Plan, II.B.3.q.ii.C; II.B.3.r.ii.C.

[115]  Plan Ex. II.B.3.q.ii.A; Ex. II.B.3.r.ii.A.

[116]  Plan II.B.3.q.ii.A, II.B.3.r.ii.A.

[117]  *Id.*

90.    Using an appropriate investment rate of 7.5 percent increases Pension

Claim recoveries as follows:

**Figure 9.  Stated Pension Claim Recovery vs. Pension Claim with Appropriate Rate of Return on Assets**

| $ billions | GRS | | | PFRS | | |
|---|---|---|---|---|---|---|
| | Claim | Present Value of Contribution $ | Recovery Percentage | Claim | Present Value of Contribution $ | Recovery Percentage |
| Plan Stated | $1.879 | $1.093 | 60.0% | $1.250 | $0.735 | 58.8% |
| ASF Recoupment | $1.492 | $1.093 | 73.2% | $1.250 | $0.735 | 58.8% |
| Accrued and Vested Only | $1.258 | $1.093 | 81.8% | $1.094 | $0.735 | 67.2% |
| 7.5% Discount Rate | $1.018 | $1.093 | 107.3% | $0.795 | $0.735 | 92.5% |
| UTGO Settlement | $1.018 | $1.126 | 110.6% | $0.795 | $0.743 | 93.5% |
| 7.5% Return on Assets | $1.018 | $1.155 | 113.4% | $0.795 | $0.887 | 111.6% |

### iii.    Pension Claim Recoveries Related to the Grand Bargain Were Calculated Using an Inappropriate Discount Rate.

91.    The final step in calculating Pension Claim recoveries requires

calculating the present value of future contributions to the Retirement Systems.  To

do this, a discount rate that properly reflects the risk associated with the future

contributions—in this case, the Grand Bargain proceeds and the City and DWSD

contributions—must be selected.

92.    The Pension Claims' recoveries were calculated using a market

discount rate of 5 percent.  While a 5 percent discount rate may be appropriate for

City and DWSD generated contributions to the Retirement Systems, a lower

46

discount rate should be applied to the Grand Bargain proceeds.[118] Messrs. Orr and Buckfire acknowledged that the Grand Bargain proceeds are more secure payment streams and should use a discount rate lower than 5 percent.

> Q: I asked Mr. Buckfire questions on this subject, I'll ask you, as well, but do you agree that the—the riskiness of those contributions being made, and I'm talking about the charitable foundations and the DIA Corp., the relative riskiness that those folks won't come through on that they've said they'll do is very low?
>
> A: Yes, I will agree with that.[119]

93. Using an appropriate market discount rate, Pension Claim recovery would increase as follows:

---

[118] Ex. 5, Rosen Report 14.

[119] Ex. 4, Orr Dep. 327:2–9, July 22, 2014; *see also* Ex. 5, Rosen Report 14; Ex. 9, Buckfire Dep. 172:11–12, July 16, 2014 (stating the Grand Bargain proceeds should carry a discount rate between 2 to 4 percent).

Figure 10.  Stated Pension Claim Recovery vs. Pension Claim Recovery with Market Discount Rate

| $ billions | GRS | | | PFRS | | |
|---|---|---|---|---|---|---|
| | Claim | Present Value of Contribution $ | Recovery Percentage | Claim | Present Value of Contribution $ | Recovery Percentage |
| Plan Stated | $1.879 | $1.093 | 60.0% | $1.250 | $0.735 | 58.8% |
| ASF Recoupment | $1.492 | $1.093 | 73.2% | $1.250 | $0.735 | 58.8% |
| Accrued and Vested Only | $1.258 | $1.093 | 81.8% | $1.094 | $0.735 | 67.2% |
| 7.5% Discount Rate | $1.018 | $1.093 | 107.3% | $0.795 | $0.735 | 92.5% |
| UTGO Settlement | $1.018 | $1.126 | 110.6% | $0.795 | $0.743 | 93.5% |
| 7.5% Return on Assets | $1.018 | $1.155 | 113.4% | $0.795 | $0.887 | 111.6% |
| Market Discount Rate | $1.018 | $1.189 | $116.8% | $0.795 | $0.911 | 114.6% |

94.     Set forth below is a composite overview of the unbelievable disparity between COP Claim recovery and Pension Claim recovery.[120]

Figure 11.  Adjusted Pension Claim Recovery vs. COP Claim Recovery

| $ in billions | GRS | | | | PFRS | | | |
|---|---|---|---|---|---|---|---|---|
| | Claim | Present Value of Contributions | Recovery Percentage | vs. COP Claim | Claim | Present Value of Contributions | Recovery Percentage | vs. COP Claim |
| Plan Stated | $1.879 | $1.093 | 60.0% | $1.250 | $0.735 | 58.8% | Plan Stated | $1.879 |
| ASF Recoupment | $1.492 | $1.093 | 73.2% | 63.2% | $1.250 | $0.735 | 58.8% | 48.8% |
| Accrued and Vested Only | $1.258 | $1.093 | 81.8% | 71.8% | $1.094 | $0.735 | 67.2% | 57.2% |
| 7.5% Discount Rate | $1.018 | $1.093 | 107.3% | 97.3% | $0.795 | $0.735 | 92.5% | 82.5% |
| UTGO Settlement | $1.018 | $1.126 | 110.6% | 100.6% | $0.795 | $0.743 | 93.5% | 83.5% |
| 7.5% Return of Assets | $1.018 | $1.155 | 113.4% | 103.4% | $0.795 | $0.887 | 111.6% | 101.6% |
| Market Discount Rate | $1.018 | $1.189 | $116.8% | 106.8% | $0.795 | $0.911 | 114.6% | 104.6% |

---

[120]   Disparity between Other Unsecured Claims and Pension Claims is 3 percent less than disparity between COP Claims and Pension Claims.

48

95.     Notably, these adjusted recovery numbers do not reflect any additional recovery on account of the 50 percent upside of a consummated post-emergence DWSD transaction that has been dedicated to Pension Claim recoveries.[121]  The value of such a transaction remains unknown.

### 4.     COP Claim and Other Unsecured Claim Recoveries Are Materially Riskier Than Pension Claim Recoveries.

96.     By contrast, the COP Claims' and Other Unsecured Claims' source of recovery is much riskier than the Pension Claims' source of recovery.[122]  As stated above, the extremely low-risk nature of the Grand Bargain proceeds substantially reduces the risk of recovery on Pension Claims.  Indeed, as Mr. Orr stated, portions of the Grand Bargain proceeds carry almost zero risk.

> Q:     Okay.   And these are very solvent charitable foundations that are going to be good to their word, correct?
>
> A:     Well, let me just answer this.   There are three categories of contributors [to the Grand Bargain]. There are the foundations which number over a dozen which have made a contribution of commitment of 366 million, and all of them are quite solvent, some of them are the largest charitable organizations in the world.  There are a group of DIA benefactors affiliated with the founder's society which have made commitments

---

[121]  Disclosure Statement 66.

[122]  Ex. 9, Buckfire Dep. 172:11–12, July 16, 2014 (stating the Grand Bargain proceeds should carry a discount rate between 2 to 4 percent); *id.* at 206 (stating that the New B Note should carry a discount rate of 5 percent).

KE 32740828

of a hundred million dollars, and most of those a combination of institutions, foundations and individuals, at least to the best of my knowledge, appear to be good for it, and then there is the State settlement which has a total value of 350 million, and that amount of $194.8 million is going to be funded in cash upon confirmation. So the risk that the total 350 value will not occur is almost nonexistent because that will be a cash contribution.[123]

### 5. The Debtor's Counterarguments Claiming Recoveries to Pension Claims Are Overstated Fall Flat.

97. To rebut Syncora's showing of a material disparity between Pension Claim and COP Claim and Other Unsecured Claim recoveries, the Debtor invents two arguments claiming that the disparity is smaller because recoveries to Pension Claims, both as viewed by Syncora and as set forth in the Plan, are overstated. Each of these arguments—cobbled together for the first time in the Debtor's Reply and notably absent from the Disclosure Statement and all other earlier pleadings— amounts to nothing.

### a. Using a Three- or Four-Percent Discount Rate for the Pension Claims Is Entirely Inappropriate.

98. The Debtor argues that a discount rate between 3 and 4 percent could be used to calculate the size of the Pension Claims because that is the rate an insurance company would use if the Debtor were seeking to annuitize the pension

---

[123] Ex. 4, Orr Dep. 327:10–328:5, July 22, 2014.

KE 32740828

obligations through a life insurance company.[124]   However, in the Disclosure Statement, the Debtor asserts that a 6.75 percent discount rate is appropriate [125] and fails to disclose any risk that the appropriate discount rate may be lower.   The Debtor has not shown the relevance of such an exercise to the calculation of the bankruptcy claim, in which case the discount rate must reflect the risk of cash flows associated with satisfying the pension obligations as of the Petition Date. The Debtor's argument is off-point, irrelevant, and without merit.

### b.   The Grand Bargain Proceeds Cannot Be Excluded From the Unfair Discrimination Analysis.

99.   The Debtor proposes the so-called "Grand Bargain" as a cornerstone of the Plan.   The name is misleading.   The only "bargain" in the Plan is the bargain-basement price at which the Debtor is selling the DIA Assets.   The Grand Bargain will generate only $455 million on a present-value basis, to be contributed exclusively to Pension Claims.   But parties agree the DIA Assets could be used to generate many multiples of that amount.

100.   In addition to transferring the DIA Assets for below market value, the Debtor also funnels 100 percent of the Grand Bargain proceeds to the Pension

---

[124]   Reply ¶ 59.

[125]   Disclosure Statement 13.

Claims,[126] and then attempts to justify the resulting massive—and irrefutable—discrimination by arguing the Grand Bargain proceeds are "not made with City funds . . . . are 'outside the Plan' and, therefore, properly excluded from the Court's unfair discrimination analysis."[127] There is no legal or factual basis for this position.[128] The structure of the Grand Bargain, the Debtor's own admissions, and basic contract and bankruptcy law make clear that the Grand Bargain proceeds must be considered distributions in evaluating the Plan.

### i. The Grand Bargain Proceeds Are the Debtor's Property.

101. The Court has stated, and Syncora fully agrees, that "the issue of unfair discrimination is based upon not where the money comes from but where the money goes to."[129] Evidence indicates that the Grand Bargain proceeds will be

---

[126] Bankruptcy scholars have that earmarking the Grand Bargain proceeds leads to unfair discrimination. *See* David Skeel, *Detroit's flawed art-for-pensions fix*, The WASHINGTON POST, A21 (May 11, 2014), attached hereto as **Exhibit 11**.

[127] Reply ¶ 51.

[128] WDIV–Detroit, Click On Detroit: *Flashpoint 12/8/13: Detroit EM Kevyn Orr available at* http://www.clickondetroit.com/news/politics/flashpoint/flashpoint-12813-detroit-em-kevyn-orr/23382354 (responding to question of whether it is fair to treat pensioners and financial creditors similarly, stating "the only difference [between the claims] in this case, in municipal bankruptcy, is the human dimension . . . but the reality is, that is the dictate of federal law, that is fair and equitable treatment.") (video recording of K. Orr's remarks) (last visited Aug. 12, 2014).

[129] Hr'g Tr. 40:4–5 June 26, 2014.

the Debtor's property paid out to creditors **under the Plan**.  Thus, the Grand

Bargain proceeds **must** be considered in the unfair discrimination analysis.

102.   All evidence indicates that the DIA Assets are property of the Debtor

and, until (and, indeed even after) raising its Reply arguments, the Debtor certainly

considered them its own assets.[130]  As discussed in greater detail in Section IV.A.2,

the Debtor has offered no evidence—and, indeed, has done no analysis—to

indicate that the Debtor does not own the DIA Assets.

103.   Neither the Debtor, Miller Buckfire, Christie's, nor Artvest did any

work to determine who has title to the art.[131]  The Debtor's phantom title issues,

---

[130]  *See*, *e.g.*, Ex. 4, Orr Dep. 381:18–25, July 22, 2014 ("there is the Detroit Institute of Art which is an enterprise with art in it, meaning the real estate and the art that is owned generally by the City . . . [T]he art and its inventory including any—any listing of inventory belonged to the City"); Ex. 9, Buckfire Dep. 112:15–19, July 16, 2014 ("very early on in our engagement with the City, I was made aware of the fact that the Detroit Institute of Arts was effectively not a separate institution but, in fact, was owned by the City"); Reply ¶ 35.

[131]  Ex. 4, Orr Dep. 457:14–16, July 22, 2014 (noting Debtor has taken no steps to verify Attorney General's opinion that DIA Assets are restricted from sale); Ex. 9, Buckfire Dep. 140:17–24, July 16, 2014 (noting Miller Buckfire did no work to verify restrictions on sale of DIA Assets); Christie's Letter 1, attached hereto as **<u>Exhibit 12</u>** (noting that Christies' assignment was limited to valuing City of Detroit purchased works and recommending alternatives to a sale); *see generally* Expert Report of M. Plummer (July 8, 2014) (hereinafter, the "*Plummer Report*"), attached hereto as **<u>Exhibit 13</u>** (failing to note any investigation of restrictions on alienability of DIA Assets).

then, and restrictions on sale are unsupported by evidence.[132]   Indeed, it is unclear

how the Debtor could even enter into the DIA Settlement without a property

interest in the DIA Assets sufficient to transfer them to a third party.[133]

104.   In exchange for the DIA Assets, the Debtor receives the Grand

Bargain proceeds as consideration.[134]   That the DIA Assets are transferred to a

trust and not to the DIA Funding Parties—who are, after all, funding sources, not

buyers—is unsurprising and does not change that the DIA Proceeds are

consideration.[135]

---

[132] *See e.g.*, Reply ¶ 35 (citing no hard evidence but stating, "[f]or instance, in many cases, the donor agreements governing the original transfer of art from a private collection to the DIA sought to place restrictions on the ability of subsequent transferors to sell the art."); *see also* Section IV.2.A.

[133] Omnibus Transaction Agreement at 1 [Docket No. 6576, Annex A] (pursuant to the agreement, "City will convey all of its right, title and interest (including legal title it may hold as trustee and legal title and beneficial interest it otherwise holds" in the DIA Assets to the DIA Corp.).

[134] *Id.* at 1 (noting Grand Bargain proceeds are consideration for transfer of DIA Assets).

[135] *See Palstray Corp. v. Cole*, 324 Mich. 433 (1949) ("'consideration' for an agreement requires that there be a benefit on one side, or a detriment suffered or a service done on the other but the benefit rendered need not be to the party contracting but *may be to any one else at his procurement or request*." (emphasis added)).   In fact, any argument that the DIA Proceeds are not consideration for the DIA Assets would undermine the Debtor's ability to seek approval of the DIA Settlement under Rule 9019.   To be approved under Rule 9019, the DIA Settlement must meet "the low end of the range of reasonableness."   *See In re Dow Corning Corp.*, 192 B.R. 415, 421 (Bankr. E.D. Mich. 1996).   If the Debtor is not receiving the DIA Proceeds in exchange

54

105.   The terms of the Plan and the DIA Settlement reinforce the fact that the Grand Bargain proceeds become property of the Debtor, which the Debtor will then distribute under the Plan in satisfaction of its funding obligation.[136]   And the Debtor itself uses the Grand Bargain proceeds in arguing for confirmation, specifically its argument that the Plan is in the ***best interests of creditors***.   Ken Buckfire, the Debtor's investment banker, argues that the Plan is superior to dismissal of the case because

> creditor distributions under the plan of adjustment benefit from the compromises reached by the City during the chapter 9 case, including significantly the "Grand Bargain" that infuses hundreds of millions of dollars ***into the City*** from state contributions, charitable foundations and the Detroit Institute of Arts.[137]

The Debtor is behaving in a schizophrenic manner, choosing to include the Grand Bargain proceeds for purposes of the best interests of creditors test and then

---

for the DIA Assets, the Debtor would be transferring the DIA Assets for ***no value at all*** (instead of just too little value, as is the case).

[136]   *See*, *e.g.*, Plan 10 (noting that a DIA Proceeds Payment Default occurs when "amounts scheduled to be ***paid to the City*** in accordance with the DIA Settlement" are not paid (emphasis added)); Plan Ex. 1.A.118 ("the Supporting Organization . . . shall hold such payments in a segregated account pending ***payment to the City***"); *id.* at Ex. B ("this will result in ***an annual payment of $18,300,000 . . . . to the City of Detroit***"); Omnibus Transaction Agreement 18 (Grand Bargain proceeds will be used "for the payment of contributions to the GRS and PFRS . . . in satisfaction of the City's obligation to contribute" to the plans).

[137]   Expert Report of K. Buckfire at 6 (July 8, 2014) (hereafter, the "*Buckfire Report*"), attached hereto as **<u>Exhibit 14</u>** (emphasis added).

55

arguing that the same proceeds cannot be included in Pension Claim recoveries for purposes of the unfair discrimination analysis.

### ii. The Grand Bargain Proceeds Are Not a "Gift."

106. To support its argument, the Debtor incredibly relies on the concept of "gifting."[138] "Gifting" occurs when "*senior secured creditors* voluntarily offer a portion of their recovered property [under a plan] to *junior stakeholders*."[139]

107. The Debtor's argument that the Grand Bargain proceeds are a gift to be excluded from the unfair discrimination analysis is frivolous. The Grand Bargain Proceeds are not a gift: (a) the DIA Funding Parties are *not* creditors, (b) the Grand Bargain parties are *not* receiving a distribution under the Plan, and (c) necessarily, the Grand Bargain parties are *not* "gifting" a portion of that Plan

---

[138] *See* Reply ¶ 52 (citing *In re Parke Imperial Canton, Ltd.*, No. 93-61004, 1994 WL 842777 (Bankr. N.D. Ohio Nov. 14, 1994) (approving contribution pursuant to plan from secured creditor to one class of unsecured creditor); *In re MCorp. Fin., Inc.*, 160 B.R. 941 (S.D. Tex. 1993) (permitting senior unsecured bondholders to allocate part of recovery to fund settlement with junior creditor); *In re Worldcom, Inc.*, 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving plan whereby holders of trade claims received enhanced recoveries on account of contributions from senior creditors)).

[139] *In re DBSD N. Am., Inc.*, 634 F.3d 79, 97 (2d Cir. 2011) (emphasis added); *see also In re Armstrong World Indus., Inc.*, 320 B.R. 523, 538–40 (D. Del. 2005), *aff'd* 432 F.3d 507 (3d Cir. 2005) (gifting occurs when "a party secured by all or some of the assets of the estate [agrees] to allow some portion of its lien proceeds to be paid to others"); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 618 (Bankr. D. Del. 2001) (gifting is a redirection to junior creditors of proceeds distributable to senior creditors).

distribution to the Pension Claims. Instead, the Grand Bargain parties are transferring money *of their own* to the Debtor.

### iii. Distribution of the DIA Proceeds and State Contribution Are "Under the Plan."

108. The Debtor's argument that distributions of Grand Bargain proceeds are payments "outside the Plan" fails. As stated above, the proceeds are the Debtor's property and will be distributed pursuant to the terms of the Plan. As a result, they are payments "under the Plan." Also, the concept of distributions "outside the plan" has been rejected by other courts and is inapplicable here. One bankruptcy court noted that

> [o]utside the plan" is a phrase that has crept into the bankruptcy vernacular which is not only misleading but also falsely implies some substantive meaning that it does not actually have. A debtor's plan must specify how each creditor's claim will be treated and paid. Since all payments must be made according to the terms of the plan, there is really no such thing as payments being made outside the plan.[140]

Any payments here—including of Grand Bargain proceeds—are appropriately considered payments under the Plan and must be included in evaluating the Plan.

109. Nonetheless, the Debtor argues that because certain payments made by *individual chapter 13 debtors* are held to be "outside the plan," the Grand Bargain proceeds contributed to the Debtor by third parties are also "outside the

---

[140] *In re Citrowske*, 72 B.R. 613, 615 (Bankr. D. Minn. 1987).

plan."[141] The strained analogy is nonsensical. There is no similar concept in chapter 9.[142] Any distribution here must be considered payment under the Plan.

110. The Debtor also cites to *Travelers Ins. Co. v. Bryson Props. XVIII (In re Bryson Props. XVIII)*, 129 B.R. 440 (M.D.N.C. 1991), in arguing the Grand Bargain proceeds are payments "outside of the plan."[143] The court there found that payments to unsecured creditors from general partners of the debtor could be excluded from the unfair discrimination analysis because the general partners ***were independently liable for the money contributed to the favored class***.[144]

---

[141] Reply ¶ 53.

[142] The Bankruptcy Code caps the assets an individual chapter 13 debtor must distribute under the Plan (such assets referred to as projected disposable income or "PDI"). *In re Abaunza*, 452 B.R. 866, 872–73 (Bankr. S.D. Fla. 2011) ("'BAPCPA altered the calculation of 'projected disposable income' which an above-median income debtor must commit to a plan . . . . and added a requirement that a debtor pay his or her PDI to unsecured creditors'"). Assets in excess of PDI, however, need not be distributed to creditors. Any voluntary distribution to creditors of assets in excess of PDI may be excluded from the unfair discrimination analysis. *See In re Orawsky*, 387 B.R. 128, 150–51 (Bankr. E.D. Pa. 2008) (finding that chapter 13 plan did not unfairly discriminate because plan payments to unsecured creditors was derived entirely from income in excess of PDI, which debtor was not legally obligated to commit to plan).

[143] Reply ¶ 52.

[144] *In re Bryson*, 129 B.R. at 445 ("the [Bankruptcy] Code itself recognizes the enforceability of recourse debt against an insolvent partnership's general partners").

111.   Though the Grand Bargain purports to resolve pension claims against the State, absent the settlement, none of the Grand Bargain parties have any undisputed liability on Pension Claims and none are paying money on account of any independent liability.[145]

### 6.   The Debtor Cannot Rebut the Fact that the Plan Unfairly Discriminates Against COP Claims and Other Unsecured Claims Under the Markell Test.

112.   As set forth above, the vast disparity in treatment creates a powerful presumption of unfair discrimination.  To rebut that presumption, the Debtor must show that, outside of bankruptcy, the dissenting class would receive similarly less than the class of the same priority that is being favored under the plan of adjustment, and either that the dissenting class assumed prepetition a similarly greater risk of recovery or that the alleged preferred class has infused new value (e.g., money) into the reorganization which exceeds the value of its plan recovery.[146]  The Debtor can show none.

---

[145]   And, indeed, even the State has specifically disclaimed any liability.  *See* Michigan Attorney General's Appellee's Brief at 24, *In re City of Detroit, Mich.*, Case No. 14-1208 (6th Cir. 2014) [Docket No. 52] ("It is the city alone, not the state or its taxpayers, that bears this [pension] obligation"); State Contribution Agreement, Plan Ex. I.A.294 ("During the course of the Chapter 9 Case, there have been suggestions that the State of Michigan . . . may be obligated to pay all or a portion of the underfunding of pension benefits payable to retirees, a suggestion the State vigorously disputes").

[146]   *In re Dow Corning*, 244 B.R. at 702.

59

113. There is no evidence that Pension Claims would receive similarly enhanced recoveries relative to the COP Claims and Other Unsecured Claims outside of bankruptcy. Outside of bankruptcy, all claim holders can obtain and enforce a judgment against the Debtor and could require the Debtor to increase taxes pursuant to the Michigan Revised Judicature Act (the "*RJA*").[147] Judgments enforced under the RJA are *pari passu* with one another.[148] COP Claim holders, Pension Claim holders, and Other Unsecured Claim holders, then, would have *identical* enforcement rights outside of bankruptcy.

> Q: Would you agree that outside of the Chapter 9 plan of adjustment that the holders of pension claims would have the same remedy as the holders of other unsecured claims if they were coming to the City?
>
> A: That would be my understanding as a financial matter, yes.[149]

The Offering Circular used to sell the COPs (and procure insurance thereon) puts a finer point on the issue.[150]

---

[147] *See* Mich. Comp. Laws. 600.6093.

[148] Reply ¶ 141.

[149] Ex. 9, Buckfire Dep. 198:20–25, July 16, 2014.

[150] *See Offering Circular, Taxable Certificates of Participation Series 2006*, at 10, attached hereto as **Exhibit 15** (stating that the remedy available to COP holders

60

114.    Even Mr. Buckfire agrees that COP Claims, Other Unsecured Claims, and Pension Claims would be *pari passu* outside of bankruptcy.

> Q:    Okay, so the general unsecured claim holders would be recovering on a pari passu basis in the dismissal scenario, correct?
>
> A:    That would be my assumption, which is consistent with the June 2013 proposed treatment of those creditors.[151]

Identical enforcement rights and *pari passu* treatment of RJA judgments would result in **identical recoveries** for COP Claims, Other Unsecured Claims, and Pension Claims on a percentage basis.

115.    The Debtor ***cannot*** offer evidence to the contrary because it never analyzed out-of-court recovery scenarios—and so has ***no idea*** what would happen in a dismissal.

> A:    Correct, we've not done a dismissal analysis.[152]
>
> A:    We do not—we do not have a scenario of what happens if the City's bankruptcy proceedings are dismissed; that is correct.[153]

---

in the event of non-payment "is the ***same remedy that the Retirement Systems would have against the City if it failed to make its required annual payment to fund UAAL under the tradition funding mechanism***." (emphasis added)).

[151]    Ex. 9, Buckfire Dep. 278:19–23, July 16, 2014; *see also* June 14, 2013 Proposal to Creditors, attached hereto as **Exhibit 16** (proposing identical treatment of Pension Claims and COP Claims).

[152]    Ex. 9, Buckfire Dep. 276:22, July 16, 2014.

[153]    Malhotra Dep. 116:4–6, July 15, 2014, attached hereto as **Exhibit 17**.

61

As a result, the Debtor cannot show that Pension Claims would receive superior treatment outside of bankruptcy and cannot rebut the presumption of unfair discrimination.

### b. COP Claims and Other Unsecured Claims Did Not Assume Additional Risk Prepetition.

116. There is no evidence that Pension Claims, COP Claims, and Other Unsecured Claims took on different legal risks prior to the Petition Date. The Debtor funded its obligations on account of the COPs, other unsecured obligations, and the pensions from its General Fund. As a result, the COPs, other unsecured obligations, and pensions had the same exact risk regarding the strength of the source of payment.

117. Outside of bankruptcy, the COP Claims and Pension Claims are both contractual obligations of the Debtor.[154] The Debtor could impair neither outside of bankruptcy.[155]

---

[154] *See* COP Service Contract § 4.02(b), attached hereto as **Exhibit 18** ("The obligations of the City hereunder, including its obligation to make Contract Payments, are contractual obligations of the City, enforceable in the same manner as any other contractual obligation of the City."); *In re City of Detroit, Mich.*, 504 B.R. at 153–54, 161 (concluding that "pension benefits are a contractual obligation of the municipality" and "the only remedy for impairment of pensions is a claim for breach of contract").

[155] U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts"); Mich. Const. art. I, § 10 ("No . . . law impairing the obligation of contract shall be enacted."); Mich. Const. art. IX, § 24 ("The accrued financial benefits of each pension plan and retirement system of the

118.   Similarly, although an emergency manager has some authority to impair the Debtor's contractual obligations when in receivership, COP Claims and Pension Claims are both exempt.[156]   It simply cannot be said that COP Claim holders assumed greater risk than pensioners prior to the Petition Date.[157]

### c.     Pension Claims Provided No "New Value."

119.   Pension Claims have provided the Debtor no "new value" whatsoever to justify superior treatment.   Courts have not addressed the definition of "new value" in the context of the Markell Test, but the Supreme Court has found that preferred treatment in a municipal bankruptcy was not unfair discrimination where a creditor "ventured the capital necessary to effectuate the plan of composition" under review "by underwrit[ing] the whole refinancing program."[158]

---

state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.").

[156]  MCL  § 141.1552(12)(1)(j)  (providing  that  an  emergency  manager  may "[r]eject, modify, or terminate 1 or more terms and conditions of an existing contract"); *id*. at § 11(1)(b) (requiring the Emergency Manager's financial and operating plan to provide for "[t]he payment in full of the scheduled debt service requirements on all . . . contract obligations in anticipation of which bonds, notes and municipal securities are issued"); *id.* at § 12(m)(ii) ("The emergency manager shall fully comply with . . . section 24 of article IX of the state constitution of 1963.").

[157]  And, of course, neither recognized any greater risk, as both expected to be repaid.  Ex. 4, Orr Dep. 272:8–14, July 22, 2014.

[158]  *Mason v. Paradise Irrigation Dist.*, 326 U.S. 536, 541 (1946) (noting that "[i]t has long been recognized in reorganization law that those who put ***new money***

KE 32740828

120. Further, courts have addressed the meaning of "new value" in the context of exceptions to the absolute priority rule and to the avoidance of preferential transfers. In both contexts, "new value" means money or its close equivalent.[159] In none of those contexts has a court held that "sweat equity"—especially on account of *past* performance—amounts to new value.

121. Under either test, the evidence clearly will show that the Debtor cannot meet its burden to show that the Plan does not unfairly discriminate against COP Claims and Other Unsecured Claims. Under *Aztec*, the Debtor can provide no business justification for the discrimination, cannot show the discrimination is necessary or proposed in good faith, and cannot show that the Class 9 and Class 14 recoveries are meaningful. Under Markell, the Debtor cannot rebut the

---

into the distressed enterprise may be given a participation in the reorganization plan reasonably equivalent to their contribution." (emphasis added)).

[159] *See*, *e.g.*, *Polite Enter. Corp. Pty. Ltd. v. Am. Safety Prods., Inc.*, No. 13 C 01089, 2014 WL 321668, at *7 (N.D. Ill. Jan. 29, 3014) ("Courts have recognized an exception to the absolute priority rule where a pre-bankruptcy equity investor invests new capital in exchange for equity in the reorganized debtor.") (citing *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 536 U.S. 434, 442 (1999)); *In re Brothby*, 303 B.R. 177, 195 (9th Cir. BAP 2003) ("The new value exception to the absolute priority rule allows junior interest holders (e.g., shareholder of a corporate debtor) to receive a distribution of property under a plan if they offer 'value' to the reorganized debtor that is: (1) new; (2) substantial; (3) money or money's worth; (4) necessary for a successful reorganization; and (5) reasonably equivalent to the value or interest received."); 11 U.S.C. § 547(a)(2) (defining "new value" as "money or money's worth in goods, services, or new credit").

64

presumption of unfair discrimination.  On this basis alone, the Plan cannot be confirmed.

## III.    The Plan Is Not in the Best Interests of Creditors.

122.    The proposed Plan is not in the best interests of creditors and cannot be confirmed because:

- creditors would receive greater recoveries if the case were dismissed; and

- the proposed Plan does not comport with reasonable creditor expectations.

123.    There are two tests for determining whether a chapter 9 plan of adjustment is in the best interests of creditors.  The first test is whether the plan is a ***better alternative to creditors than dismissal of the case***.[160]  The second test is whether the plan affords creditors ***all they could reasonably expect in the circumstances***.[161]  The Plan passes neither test.

---

[160]    *See In re Mount Carbon Metro Dist.*, 242 B.R. at 18 ("The 'best interest' requirement of § 943(b)(7) is generally regarded as requiring that a proposed plan provide a better alternative for creditors than what they already have . . . . [and] their only alternative to a debtor's plan is dismissal.").

[161]    *See W. Coast Life Ins. Co. v. Merced Irrigation Dist.*, 114 F.2d 654, 678 (9th Cir. 1940) (noting that plan is in "the best interests of creditors," if creditors' recoveries were "all that could reasonably be expected in all the existing circumstances").  This test requires that "the amount proposed to be paid under the plan was all that creditors could reasonably expect under the circumstances" and will be discussed in Section IV.  *Lorber v. Vista Irrigation Dist.*, 127 F.2d 628, 639 (9th Cir. 1942).

65

KE 32740828

## A. The Debtor Has Done No Analysis of Creditor Recoveries If the Case Were Dismissed and Cannot Carry Its Burden to Show the Plan Is in the Best Interests of Creditors.

124. The first test is comprised of two analyses: if the case were dismissed (a) how much could the Debtor pay creditors using net surplus cash on account of past due and ordinary course obligations, and (b) what additional recovery could creditors receive through enforcement of their nonbankruptcy rights to payment. The Debtor cannot possibly carry its burden as it has done no analysis of creditor recoveries if the case were dismissed.

125. The Debtor agrees that a dismissal scenario analysis is required to determine what creditors would receive outside of bankruptcy.

> Q:     And with respect to evaluating what creditors would obtain in the dismissal scenario is it correct to say that that entails a dismissal analysis of what claims would be chasing what dollars in the dismissal scenario?
>
> A:     I think that's fair.[162]

126. The Debtor relied only on its investment banker for this analysis.

> Q:     . . . it's your understanding that Mr. Buckfire has conducted that analysis in connection with his opinion?
>
> A:     Yes.
>
> . . .

---

[162]  Ex. 4, Orr Dep. 486:20–25, July 22, 2014.

66

KE 32740828

Q:     Okay. To your knowledge, the only dismissal analysis was the one Mr. Buckfire did?

A:     Yes.

Q:     Did you actually review his dismissal analysis?

A:     Yes, I believe I did with my counsel, yes.[163]

127.   And the Debtor concluded that unsecured creditors would receive *de minimis* recoveries if the case were dismissed **based** on Mr. Buckfire's analysis.

Q:     Is it your recollection that Mr. Buckfire's dismissal analysis showed de minimis recoveries for all creditors?

. . .

A:     I think it showed relatively low levels of—of recovery for all creditors. I think the pensions and I'm without seeing the document in front of me, I think the pensions may have still fared better because they had assets but it showed relatively low recoveries, I think the concerns—and I don't know if this is in the analysis—but the concerns were that as you spread that out over years the pensions ran out of money in ten to 13 years.[164]

128.   ***But Mr. Buckfire never performed any such analysis***.

Q:     What conclusion did you reach regarding the total number of claims that would be asserted—total dollar value of claims that would be asserted against the City in a dismissal scenario?

---

[163]  Ex. 4, Orr Dep. 487:2–5; 489:15–19, July 22, 2014.

[164]  Ex. 4, Orr Dep. 490:6–21, July 22, 2014.

A: It would be the sum of all the funded debt obligations, which we've already discussed, which includes the COPs and the GO debt and the pension and OPEB claim holders, which presumably we could not satisfy on an ongoing basis.

Q: And I take it you've never sat down with a piece of paper and tried to work this out, right, in terms of what the total claim size would be, correct?

A: Correct, *we've not done a dismissal analysis*.[165]

129. The Debtor's absolute failure to do the work needed to offer evidence *required* for confirmation is shocking but true under any formulation. Mr. Buckfire did not perform an analysis of the recoveries creditors could receive from the Debtor's net operating surplus if the case were dismissed.

Q: . . . you haven't actually done the analysis, though, to see who would get any surplus revenue that exists above operating expenditures and secured debt, correct?

A: You've already asked me this, *we have not done a dismissal analysis*.[166]

130. Nor did Mr. Buckfire analyze the potential impact of monetization of assets on creditor recoveries if the case were dismissed.

Q: Now, have you evaluated the likelihood that the City might choose to sell its art collection in a dismissal scenario?

---

[165] Ex. 9, Buckfire Dep. 276:10–22, July 16, 2014 (emphasis added).

[166] Ex. 9, Buckfire Dep. 280:11–16, July 16, 2014 (emphasis added).

68

A. No.

Q: And have you—I take it then you haven't evaluated the impact such a sale would have on creditor recoveries, correct?

A: We have not done a dismissal analysis.

. . .

Q: Okay, and I take it you have not tried to factor in the privatization of DDOT to what creditor recovery should be in a dismissal scenario because you did not do a dismissal analysis, correct?

A: Yes.

Q: And I take it you would give the same answer for any other asset whether it was parking or Belle Isle or the art collection, correct?

A: Correct.[167]

131. Inexplicably, although Mr. Buckfire offered an expert opinion on whether the Plan is in the best interests of creditors, the Debtor designated Mr. Malhotra as its 30(b)(6) witness on the topic. However, neither Mr. Malhotra nor anyone else on his team ever performed such an analysis.

Q: You haven't been asked to do any analysis of the costs and revenues to the City if the bankruptcy petition is dismissed, correct?

A: We do not—we do not have a scenario of what happens if the City's bankruptcy proceedings are dismissed; that is correct.

---

[167] Ex. 9, Buckfire Dep. 288:14–21; 295:10–18, July 22, 2014.

KE 32740828

With absolutely no evidence to support its position, the Debtor cannot carry its burden to prove that the Plan is in the best interests of creditors.

**B. Basic Analysis Shows the Plan Clearly Is Not in the Best Interests of Creditors.**

132. Had the Debtor undertaken a dismissal analysis, the answer would have been clear: creditors would be better off if the case were dismissed, and the proposed Plan fails the best interest test. *First*, the Debtor could satisfy claims with net surplus cash in the General Fund. *Second*, DWSD would still pay its portion of the COPs obligations. *Third*, Class 9 and Class 14 claimants would receive additional recoveries by enforcing their rights under the RJA.

133. Outside of bankruptcy, not all unsecured claims are accelerated, allowing the Debtor to satisfy obligations over time. For instance, the amount due on account of pension obligations would be only the Debtor's annual funding obligation—not the entire Pension Claims. The Debtor knows this.

> Q: Okay, and the amount of the claim that the pension system would have upon dismissal would be the amount of the outstanding annual amounts for that year?
>
> A: Which we haven't paid.
>
> Q: Yes, which you have not paid, is that your—
>
> A: That's my understanding.[168]

---

[168] Ex. 9, Buckfire Dep. 274:13–18, July 16, 2014.

KE 32740828

134.    The same is true for OPEB Claims.

> Q:    And similarly the OPEB claimants would have
> their right to receive payment for the healthcare
> that they were entitled to that year, correct?
>
> A:    Correct.[169]

**1.    Debtor's Projections Indicate Net Surplus Cash Available to Pay Unsecured Claims if Case Were Dismissed.**

135.    If the case were dismissed, the Debtor's baseline projections indicate that the Debtor would have an annual operating surplus (before debt service) of over $300 million per year.[170]  All unsecured claims would be *pari passu* with one another.

> Q:    Okay, so the general unsecured claim holders
> would be recovering on a pari passu basis in the
> dismissal scenario, correct?
>
> A:    That would be my assumption, which is consistent
> with the June 2013 proposed treatment of those
> creditors.[171]

136.    Any net surplus cash, then, could be distributed on a *pro rata* basis. But rather than marshal those assets to maximize creditor recoveries (as the Debtor

---

[169]  Ex. 9, Buckfire Dep. 274:19–22, July 16, 2014.

[170]  Disclosure Statement, Ex. H.

[171]  Ex. 9, Buckfire Dep. 278:19–23, July 16, 2014.

71

likely would do in a dismissal scenario), the Plan proposes to slash the Debtor's manageable debt service to the extreme prejudice of creditors like COP holders.[172]

**2. COP Claims Would Receive Additional Recoveries from DWSD if the Case Were Dismissed.**

137. The COPs transaction, which funded a portion of the PFRS and GRS UAAL in 2005, benefitted both the Debtor and the DWSD. In exchange, the DWSD presently is obligated to pay a portion of COPs principal and interest.

> Q: . . . is it correct that the allocable share of the DWSD, whether it's to UAAL or to COPs interest and principal service, is approximately 11 percent?
>
> A: I don't recall the exact percentage, but I think it's in that range.[173]

138. The Plan purports to eliminate this recovery to COP Claims,[174] but DWSD would remain obligated and able to fund COPs obligations in a dismissal (absent a decision by the Debtor to alter its DWSD arrangement purely to spite the COPs).

> Q: . . . Do you agree that if the petition—the bankruptcy petition were dismissed, its likely that at a minimum, the City could continue to get from

---

[172] Disclosure Statement 30–42.

[173] Ex. 4, Orr Dep. 371:13–17, July 22, 2014; *see also* Disclosure Statement, Ex. L (showing that DWSD historically has carried approximately 12 percent of the COPs liability on its books).

[174] *See* Disclosure Statement Ex. M (DWSD financial projections showing reduced contributions for COPs principal and interest).

the DWSD its share of the COPs principal and interest service?

A:    I have no reason to believe that is not true.[175]

Because COP Claims would recover more if the case were dismissed *from DWSD*

*alone*, the Plan does not satisfy the best interests test and cannot be confirmed.

### 3.    Unsecured Creditors Could Receive Incremental Recoveries Through Enforcement of Their Non-bankruptcy Rights Under the Revised Judicature Act.

139.    Outside of bankruptcy, unsecured creditors may obtain a judgment for amounts owed and enforce it against the Debtor under the RJA. The RJA requires the Debtor to raise taxes or issue bonds sufficient to justify the judgment.[176] Amounts recovered through the RJA would represent new revenue streams independent of the Debtor's operating cash.

140.    The RJA previously has fully satisfied substantial judgments against the Debtor.

A:    I know that there have been a couple of instances where there have been judgments in which the City has increase property taxes in order to pay for

---

[175]    Ex. 4, Orr Dep. 373:17–374:7, July 22, 2014.

[176]    MCL § 600.6093, MCL § 600.6097. Even if the Debtor could not issue bonds (given its existing debt load) it would be able to raise taxes. *See* MCL § 141.2303(7)(b), MCL § 141.2303(7)(c) (prohibiting the Treasury department from approving the Debtor's request for issuance of new securities unless (a) the Debtor can show that it will be able to make payments on the new securities when due and (b) the Debtor has rectified its debt payment defaults and is no longer operating under the Emergency Manager act).

73

those judgments, but I only know of a couple
instances.

. . .

Q:     But they—the City paid them in full?

A:     Yes.

. . .

Q:     And are those the judgments—Exhibit 22 and 23,
       are those the judgments where the City ended up
       raising property tax to pay them?

A:     Yes.  I believe they are.

Q:     You see, for example, Exhibit 23 was for
       $74 million?

A:     Yes.

Q:     And how much was the other one?

A:     This was the 111 million.[177]

141.   The Debtor has presented no evidence that the RJA would be unable
to satisfy judgments in the future.  Instead, the Debtor merely argues that creditors
would be treated better under the Plan because raising taxes would be "futile." [178]
This argument is particularly unpersuasive where, as here, there is no supporting
evidence.

---

[177] Hill Dep. 174:6–175:18; 311:2–11, July 18, 2014, attached hereto as
     **Exhibit 19**.

[178] *See* Reply ¶ 132.

142.   In coming to the conclusion that raising taxes would not generate additional revenue, Mr. Orr stated that he relied on Mr. Buckfire's analysis of the Debtor's ability to raise incremental revenue through taxes.

> Q:    But with respect to an effort to engage in an expert analysis of what a tax increase—what impact a tax increase would have on the City, is it fair to say that you're relying on Mr. Buckfire for that?
>
> A:    I think I've said yes, that's fair in conjunction with my other professionals.  Yes.  I think that's fair to say.
>
> Q:    Well, let me turn it around on you, are you aware of any other professional other than Mr. Buckfire who has analyzed this question and give you advice on it?
>
> A:    No, but what I'm trying to relay to you, not to dance around and not try to run away from Mr. Buckfire's analysis, which I would support, is that part of that analysis is not just done simply in a vacuum that it's based upon other information that includes information given from our other consultants and as is compiled into what I would believe to be Mr. Buckfire's report.[179]

143.   Mr. Orr stated that he also relied on Mr. Buckfire's analysis of the cause of tax delinquencies in the City.

> Q:    Now you have not independently attempted to study the cause of tax delinquencies in the City; am I correct?
>
> A:    No, I rely on my professional [sic].

---

[179]   Ex. 4, Orr Dep. 493:23–494:15, July 22, 2014.

KE 32740828

Q: And is it your expectation that that's one of the subjects that Mr. Buckfire would have studied in connection with assessing tax increases?

A: I would assume, but I don't know sitting here today.

Q: Okay. You would assume he did, but whether he did or not, you don't know.

A: Correct.

Q: Did you actually review any work product from Mr. Buckfire that showed the impact of differing tax rates on City revenues?

A: I—I believe I reviewed work product, I don't know if it was solely from Miller Buckfire, that's why I said I rely on—on all our consultants.[180]

144. Mr. Buckfire stated in both his expert report and in deposition testimony that the Debtor could not generate additional revenue through changes to tax policy.[181]

Q: Now your opinion that creditors are doing better under the plan than they would in a dismissal scenario is based on in part on the assumption that the City would be unable and it would be impractical for the City to raise taxes without further eroding revenue; is that correct?

A: That's right.[182]

---

[180] Ex. 4, Orr Dep. 496:7–22, July 22, 2014.

[181] Ex. 14, Buckfire Report 6.

[182] Ex. 9, Buckfire Dep. 236:16–33, July 16, 2014.

KE 32740828

145.    However, Mr. Buckfire undertook *no analysis of the issue*.    Mr.

Buckfire did not analyze whether a tax increase would erode the tax base.

> Q:    You also say that one of your assumptions is that
> an increase in taxes will cause people to leave; is
> that correct?
>
> A:    Yes.
>
> Q:    Have you conducted any analysis to determine
> how many people will leave under different
> scenarios where taxes are increased?
>
> A:    No.[183]

146.    Nor did Mr. Buckfire study the effect of a tax increase on delinquency

rates.

> Q:    Okay, but this is a different question which is, did
> you ever attempt to quantify how delinquency
> rates would go up if taxes went up?
>
> A:    No.[184]

147.    Instead he relied on Ernst & Young.

> Q:    . . . I take it you did not undertake any analysis of
> the amount of tax increase that could be imposed
> via a creditor judgment against the City to
> determine whether it would yield additional
> revenue?
>
> A:    Not directly, but we did ask the tax experts at E&Y
> to do an analysis of the City's revenues and take
> into account the sensitivity of revenues to tax rates.

---

[183]  Ex. 9, Buckfire Dep. 251:6–13, July 16, 2014.

[184]  Ex. 9, Buckfire Dep. 247:23–248:2, July 16, 2014.

Q:     So you asked Mr. Klein [sic] at E&Y?

A:     I did.[185]

148.    Specifically, Mr. Buckfire stated that he relied on Mr. Cline's analysis

that increasing taxes would lead to a ***decline*** in revenue.

Q:     And what did he tell you?

A:     You know, I've reviewed his expert report and
       I've talked to him over months about these issues.
       His conclusion was that because the City already
       has very high tax rates, any further increase in
       rates would ***certainly lead to a decline in revenue***
       but that a maintenance of rates was probably
       sustainable from a revenue point of view, but that a
       decline of rates would over time have the ability to
       improve overall collections, but it would take a
       long time to demonstrate that effect.

Q:     And did you rely on Mr. Klein's [sic] opinion in
       reaching your own opinion?

A:     Yes, because his opinion underpins the revenue
       projections and therefore the cash flow projections
       of the City's plan.[186]

149.    There is just one problem with Mr. Buckfire's statements.  Mr. Cline,

on whose analysis Mr. Buckfire stated he relied, was not asked to and ***did not***

***provide any analysis*** of the Debtor's ability to increase revenue through taxes.

Q:     You weren't asked to identify potentially untapped
       sources of revenue for the City, correct?

---

[185]  Ex. 9, Buckfire Dep. 239:23–240:7, July 16, 2014.

[186]  Ex. 9, Buckfire Dep. 240:19–241:10, July 16, 2014 (emphasis added).

KE 32740828

A:    Correct.

Q:    And you weren't asked to identify ways in which the city could increase its revenues through taxes, correct?

A:    We were not asked to do that.

. . .

Q:    Okay. So, nobody from the City or the emergency manager's office has reached out to you to get your expertise to try to help increase revenues for the City to pay the creditors more, correct?

. . .

A:    No one has contacted me to ask to do that type of analysis.[187]

150.    Neither did anyone else at Ernst & Young.

Q:    And as far as you're aware, nobody has contacted anybody at Ernst & Young to do that type of analysis, correct?

A:    I don't know the answer to that.

Q:    You can't identify anybody that's been asked to do that type of analysis to increase revenues for the City through tax policy or otherwise, correct?

A:    I just don't know if EY was asked to do that.

Q:    Sitting here today, you're not aware of any such request, correct?

A:    I don't know of any such requests.[188]

---

[187]   Cline Dep. 56:6–12; 57:24–58:9, July 14, 2014, attached hereto as **Exhibit 20**.

[188]   Ex. 20, Cline Dep. 58:11–21, July 14, 2014.

79

151.   The Debtor has no idea—and has done no work to examine—whether it could generate additional revenue through tax increases.  It has presented no evidence that the RJA would not generate superior recoveries for creditors if the case were dismissed.

152.   Further, Mr. Buckfire's argument that the City cannot raise taxes because it is at its statutory limits is unpersuasive because, under the RJA, taxes may be raised in excess of the maximum rate authorized by the Michigan Constitution, the Home Rule Cities Act, and the City Charter.[189]

153.   The Debtor provides ***no evidence and has done no work to show*** that raising taxes would not yield incremental value beyond a few bald assertions in its Reply and Mr. Buckfire's unsupported opinion.   Accordingly, the Court cannot find that the Plan satisfies the best interests test.

## C.   The Debtor's Arguments that the Plan Is in the Best Interests of Creditors Are Unsupported.

154.   As previously discussed, the Debtor has performed no dismissal analysis to substantiate its claim that the Plan is in the best interests of creditors. Its argument rests on the the unsupported rationale that, if the case were dismissed,

---

[189]   *See Am. Axle & Mfg., Inc. v. City of Hamtramck*, 604 N.W.2d 330, 333–34, 336 (Mich. 2000) (finding that taxes under RJA are not subject to voter approval or statutory limits); *Hammond v. Place*, 74 N.W. 1002, 1003 (Mich. 1898) (finding that RJA provides for payment of judgments, regardless of tax limits in municipal charters).

KE 32740828

a chaotic race to the courthouse would ensue. The Debtor has failed to produce any evidence to meet its burden. In addition, the Debtor's argument that creditor recoveries should be ignored in favor of focusing solely on the Debtor's need to provide services has no basis in the Bankruptcy Code's confirmation requirements.

### 1. A Race to the Courthouse Is a Red Herring.

155. The "race to the courthouse"—the notion that the first creditors to secure a judgment walk away with a portion of a debtor's finite assets while those who secure judgments too late are left with nothing—is wholly inapplicable in the municipal context where creditors have no ability to foreclose on a debtor's property.

> Q:   And do you know—why do people typically race to the courthouse, is that within your area of expertise?
>
> A:   Yes.
>
> Q:   And why do they?
>
> . . .
>
> A:   Because they believe by being first in line they can convince a judge to give them a claim or a right to an asset or revenue stream before another creditor gets there.
>
> . . .
>
> Q:   Okay, that's where the whole concept of the race comes from, correct?
>
> A:   Correct.

Q:    But another one of your opinions is that creditors
      cannot get liens in City property, correct?

A:    Correct.[190]

156.   Instead, outside of bankruptcy, creditors would enforce judgments under the RJA for unpaid principal and interest not covered by net surplus cash (or other assets).[191]   Judgments would be added to the Debtor's next tax roll, without regard to caps or other statutory limitations.[192]

157.   As the Debtor concedes, unsecured creditors who obtain RJA judgments would be of "equal priority."[193]   As such, the judgments would share *pro rata* in any newly available proceeds resulting from the tax levy, which proceeds would supplement payments the Debtor can make from the General

---

[190]   Ex. 9, Buckfire Dep. 267:6–268:2, July 16, 2014.

[191]   *See* Expert Report of S. Spencer 52–60 (July 25, 2014) (the "*Spencer Report*"). attached hereto as **Exhibit 21**.

[192]   The RJA requires taxes to be increased sufficiently to fully satisfy a judgment from the tax roll on which it is placed.   If the Debtor so chose, it could negotiate with creditors to extend the payment period over a number of years, as other cities have done.   *See*, *e.g.*, *Smith v. Royal Oak Twp.*, 2013 WL 6405315 (2013) (reflecting parties' agreement that township would pay $90,000 judgment over six years).

[193]   Reply ¶ 141.

82

Fund.[194]  This orderly process (managed by the courts) is a far cry from the chaotic race the Debtor posits would occur.

### 2. Debtor's Obligation to Provide Essential Services Does Not Trump its Obligation Satisfy Confirmation Standards.

158.   The Debtor argues that "[t]he deplorable conditions in the City and the substantial reinvestment necessary to set the City on a path toward a brighter future for its residents dominates any analysis of whether the Plan (a) makes a reasonable effort at payment of creditors' claims and (b) provides creditors with what they reasonably should expect in the circumstances."[195]   No matter the conditions in the City, though, there is no basis in the Bankruptcy Code or case law to ignore the prescribed requirements to be confirmed.[196]   And as explained herein and in Syncora's other Objections, the Plan cannot be confirmed.

## IV. The Proposed Plan Is Not Fair and Equitable.

159.   Where a debtor desires to cram down a plan of adjustment on dissenting creditors, the debtor must prove that the plan is fair and equitable.[197]   In chapter 9, a plan is fair and equitable if "the amount proposed to be paid under the

---

[194]   Because judgments are for unpaid obligations only, any judgment would be in addition to amounts, if any, Debtor had paid on account of such obligations.

[195]   Reply ¶ 113.

[196]   11 U.S.C. §§ 1121–1129.

[197]   11 U.S.C. §§ 901, 1129(b)(2).

plan was all that the creditors could reasonably expect under the circumstances."[198]

The Plan is not fair and equitable because the amount that COP Claims and Other

Unsecured Claims receive under the Plan is enormously less than they should

reasonably expect to recover.

160.    Municipal debtors have two principal duties while in bankruptcy:

(a) provide essential services; and (b) minimize creditor losses.[199]   And the notion

that a chapter 9 debtor's obligations could be extended rather than reduced to a

minimum (because a municipality will live on in perpetuity) has been recognized

since the creation of the predecessor to chapter 9.

> SEN. BURKE:  Would the Senator have any objection to
> changing the title of the bill to read somewhat as follows:
> "A bill to permit all improvident municipalities and other
> governmental subdivisions mentioned to escape their just
> obligations by paying something less than the full
> amount they owe"?
>
> SEN. PEPPER:   I am sorry, but I do not have any
> authority to make such a change in the first instance, and
> certainly I would not consent to it because that is not an
> appropriate and apt description of the purpose of the
> bill."[200]

---

[198]   *See Lorber*, 127 F.2d at 639 (citing *W. Coast Life Ins. Co.*, 114 F.2d at 678);
*see also* 6 Collier on Bankruptcy, ¶ 943.03[1][f][i][B] (16th ed. 2013) (noting
that "fair and equitable rule has additional content in chapter 9 cases" while
quoting "reasonable expectations" standard of *Lorber*, 127 F.2d at 639.).

[199]   *See U.S. v. Bekins*, 304 U.S. 27, 51 (1938).

[200]   75 CONG. REC. S8545 (daily ed. Aug. 9, 1937).

161. Recognizing the perpetual nature of a municipality, chapter 9 provides for plans of ***adjustment*** for chapter 9 debtors, not plans of reorganization.[201]

### A. The Proposed Plan Is Not Fair and Equitable Because It Inappropriately Shields Non-Core Assets.

162. The Debtor has a duty to minimize creditor losses.[202] Creditors, then, should reasonably expect a debtor to leverage its assets, both now and into the future, to generate the greatest recoveries for creditors. The Emergency Manager has acknowledged as much (and his position as a fiduciary) with a responsibility to maximize value.

> Q:  You have described yourself as a fiduciary in your roles as emergency manager; isn't that correct?
>
> A:  Yes.
>
> . . .
>
> Q:  Wouldn't you agree that one of your duties as a fiduciary is to look at all options with respect to all of the City's assets, correct?
>
> A:  Yes.

---

[201] *See In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 650 (Bankr. E.D. Mich.) ("The purpose of chapter 9 is to allow municipalities the opportunity to remain in existence through debt adjustment and obtain ***temporary relief*** from creditors."); H.R. Rep. No. 95-595, at 263 (1977) (noting that the objective of a municipal bankruptcy is to confirm a plan of adjustment that "allow[s] the municipal unit to keep operating ***while it adjusts or refinances creditor claims with minimum (and in many cases, no) loss to its creditors***" (emphasis added)).

[202] H.R. Rep. No. 95-595, at 263 (1977).

Q:     And in fact, you have promised that the City would look at every transaction that makes sense that provides the City with greater net present value; isn't that correct?

A:     Yes, I believe I said that.

Q:     And it's a true statement, right?

A:     I believe so.[203]

163.    To that end, courts consider whether municipal debtors are ignoring or withholding assets when determining whether a plan is fair and equitable.[204]

### 1.    Creditors Could Reasonably Expect the Debtor to Appropriately Monetize Its *Most Valuable Assets*.

164.    As noted above, the Grand Bargain divests the Debtor's DIA Assets for a fraction of their value.  All experts in this case concur that the DIA Assets are worth many times more than the $455 million in present value generated by the Grand Bargain.  The Debtor's own expert placed the value of the DIA Assets between $2.8 billion and $4.6 billion.[205]  Even discounting the value of the DIA Assets to account for certain perceived risks associated with a sale of the DIA

---

[203]  Ex. 4, Orr Dep. 481:21–482:13, July 22, 2014.

[204]  *See Fano v. Newport Heights Irrigation Dist.*, 114 F.2d 563, 564–66 (9th Cir. 1940) (finding plan was not fair and equitable in part because debtor owned unencumbered, non-monetized assets that exceeded amount of its indebtedness); 75 Cong. Rec. S8545 (daily ed. Aug. 9, 1937) (statement of Sen. Pepper) (noting that "[i]f the debtors have valuable property which they are trying to withhold, the matter may be taken into consideration by the court, and I am sure that the court will act appropriately").

[205]  Ex. 13, Plummer Report 19 (July 8, 2014).

Assets, the Debtor's expert valued the DIA Assets between $1.1 billion and $1.8 billion.[206] The discount rate Artvest applied to the DIA Assets is improper because it is based on false risks—namely that a fire sale would be required and that there are actual restrictions on selling the DIA Assets.[207]

165. Syncora's expert similarly values a subset of the DIA Assets at $1.74 billion.[208] In spite of the billions of dollars of value represented by the DIA Assets, the Debtor refuses to entertain any alternatives to the Grand Bargain.

166. Selling the DIA Assets for a fraction of their value is economically irrational and at odds with reasonable expectations. Creditors could and should reasonably expect the Debtor to monetize the DIA Assets at or near a price equal to their true value.

167. Instead, the Debtor agreed to the DIA Settlement months before it even knew the DIA Assets' value—and the Debtor relied on the Christie's valuation of less than 5 percent of the DIA Assets as a basis for evaluating

---

[206] *Id.*

[207] *See* Expert Report of Victor Weiner Associates 43–45 (July 25, 2014), attached hereto as **Exhibit 22**.

[208] Expert Report of Winston Group 9 (July 25, 2014), attached hereto as **Exhibit 23**.

offers.[209] It is clear the DIA Assets are worth much more—at least a billion dollars more, or more than approximately *four times* what the DIA Settlement is proposed to generate.

168. The Debtor has taken no steps to monetize the DIA Assets outside of the Grand Bargain, including exploring alternatives to the DIA Settlement once it became clear the DIA Assets had value far in excess of the purchase price of the DIA Settlement.

> Q:    Subsequent to August 30, 2013, what steps did the City take to monetize the art?
>
> . . .
>
> A:    Putting aside any discussions we had in mediation, or the mediation process, about the art or the Grand Bargain, I think it's fair to say that we didn't take any steps to monetize the art.[210]

169. Additionally, the Debtor did not respond to indications of interest of up to $2 billion for the DIA Assets.

---

[209] Ex. 9, Buckfire Dep. 159:2–4, July 16, 2014 ("because the amount of money being offered was in the high end of the range of [the Christie's] report, I was quite comfortable, rather, that [the DIA Settlement] was fair the the City").

[210] Ex. 4, Orr Dep. 404:25–405:11, July 22, 2014; *see also* Ex. 9, Buckfire Dep. 164:6–13, July 16, 2014; Church, Steven, *et al.*, *Detroit's Orr Shoots Down Creditors' $2 Billion Art Offer*, BLOOMBERG, http://www.bloomberg.com/news/2014-04-09/detroit-bond-insurers-say-city-could-get-2-billion-for-art.html, attached hereto as **Exhibit 24** ("You sell any art and you're impacting the quality of life of the city.").

Q:    And you became aware that Houlihan Lokey had
      received a number of different indications of
      interest from certain parties with respect to the art,
      correct?

A:    I became aware that I believe there were four
      different parties or groups of parties that I—that
      Houlihan Lokey had gone out and in some fashion
      either solicited or received expression of interest
      from.

. . .

Q:    You did not contact any of those parties, correct?

A:    No.

Q:    Nor did anyone working on your behalf, right?

A:    Not to the best of my knowledge.[211]

170.  The Debtor's investment banker justified his failure to pursue such

indications of interest on the basis that the offers were "nonbinding indications of

interest."

Q:    Would you have been interested enter an alternate
      proposals [*sic*] like the ones that are being laid out
      here?

A:    Well, normally I would, but you know when you
      look at the way they were captioned as nonbinding
      indications of interest, I wouldn't put much value
      on such a proposal. That would call into question
      their ultimate willingness to close on a transaction
      and indeed their interest in the first place . . . .[212]

---

[211] Ex. 4, Orr Dep. 409:14–410:6, July 22, 2014.

[212] Ex. 9, Buckfire Dep. 164:6–13, July 16, 2014.

This position reflects complete disregard for the way any negotiation works; indeed, in a different context, Mr. Buckfire stated it was his duty to follow up on nonbinding indications of interest (related to the Debtor's postpetition and exit financing), all as part of a standard process he orchestrated.

> Q:     Got it.  And you are following a similar process to the one you did on the postpetition financing which is to say that you send out a solicitation letter and then you get back first nonbinding indications of interest from potential lenders and you evaluate them and then go to the next stage?
>
> A:     Yes.
>
> Q:     And the first round in response to the solicitation letter is where people give you, the investment banker, nonbinding indications of interest, correct?
>
> A:     That's right.
>
> Q:     And then it's your job to follow up on those and see who you can hammer into a firm commitment?
>
> A:     Correct.[213]

171.  Further, the Debtor frustrated attempts by interested third parties' to perform diligence on the DIA assets that would allow them to turn the indications of interest into firm offers.[214]  Clearly, the Debtor did not want to know whether

---

[213]  Ex. 9, Buckfire Dep. 306:20–307:10, July 16, 2014.

[214]  *See e.g.*, *Debtor's Objection to Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Directing the Debtor to Cooperate with Interested Parties Seeking to Conduct Due Diligence on the Art Collection Housed at the Detroit Institute of Arts* [Docket No. 4290].

90

90

This position reflects complete disregard for the way any negotiation works; indeed, in a different context, Mr. Buckfire stated it was his duty to follow up on nonbinding indications of interest (related to the Debtor's postpetition and exit financing), all as part of a standard process he orchestrated.

> Q:     Got it.  And you are following a similar process to the one you did on the postpetition financing which is to say that you send out a solicitation letter and then you get back first nonbinding indications of interest from potential lenders and you evaluate them and then go to the next stage?
>
> A:     Yes.
>
> Q:     And the first round in response to the solicitation letter is where people give you, the investment banker, nonbinding indications of interest, correct?
>
> A:     That's right.
>
> Q:     And then it's your job to follow up on those and see who you can hammer into a firm commitment?
>
> A:     Correct.[213]

171.  Further, the Debtor frustrated attempts by interested third parties' to perform diligence on the DIA assets that would allow them to turn the indications of interest into firm offers.[214]  Clearly, the Debtor did not want to know whether

---

[213]  Ex. 9, Buckfire Dep. 306:20–307:10, July 16, 2014.

[214]  *See e.g.*, *Debtor's Objection to Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Directing the Debtor to Cooperate with Interested Parties Seeking to Conduct Due Diligence on the Art Collection Housed at the Detroit Institute of Arts* [Docket No. 4290].

the non-binding indications of interest were real and did all they could to remain blissfully ignorant. That does not comport with reasonable creditor expectations.

**2.    The Debtor Offers No Evidence To Rebut Creditors' Reasonable Expectations that the Debtor Maximize the Value of the DIA Assets.**

172.    The Debtor justifies its disposition of the DIA Assets on the basis that there are restrictions on the Debtor's ability to sell the DIA Assets and that the DIA Assets are "essential" to the Debtor's renaissance and will be an economic driver for the Debtor's recovery.[215]    The Debtor offers no evidence to support these contentions.

**a.    The Debtor Presented No Evidence That It May Not Sell the DIA Assets.**

173.    The Debtor has provided no evidence that the DIA Assets may not be sold.[216]  The Debtor only has pointed to the Michigan Attorney General's opinion contesting the Debtor's rights—even though it disagrees with at least a portion of the opinion.

Q:    Does the City agree with the attorney general's opinion?

A:    I think the City and my office have always maintained that I believe the crux of the attorney general's opinions that is held in trust and I think we've always maintained that while we recognize

---

[215]  Reply ¶ 37.

[216]  Reply ¶¶ 29–38 (citing no evidence).

it is a valuable asset for the benefit of the City, that the issue of whether or not we own title to some of the pieces of art and, therefore, have the ability to sell or de-assess it is a position that we believe we do.

Q:   Okay.  So the City's position is that it has the right to sell at least some of the art, correct?

A:   Yes.[217]

Additionally, the Debtor has provided no evidence that it has verified the assertions in the Attorney General's opinion.

Q:   What steps has the City taken to verify the facts that are in the attorney general's opinion?

A:   I don't know if we have.[218]

174.   To the contrary, all available evidence indicates the Debtor could sell the DIA Assets to maximize value for creditors.  *First*, the Debtor has stated unequivocally that it owns the DIA Assets.[219]  *Second*, available historical minutes

---

[217]   Ex. 4, Orr Dep. 452:18-453:7, July 22, 2014.  The Court acknowledged that the AG Opinion is simply a legal brief, not evidence.  Hr'g Tr. 62, 9-14, June 26, 2014 (THE COURT:  "I have to say that to me the [AG] opinion is really nothing more than a brief that any other party in interest might submit on the merits of the issue framed").

[218]   Ex. 4, Orr Dep. 457:14–16, July 22, 2014.

[219]   Ex. 9, Buckfire Dep. 140:17–24, July 16, 2014; Christie's Appraisal Agreement, attached hereto as **Exhibit 25** ("Christie's will furnish a written appraisal of certain property . . . on behalf of [City of Detroit], who represents and warrants to Christie's that [City of Detroit] has free, clear and marketable title to the Property").

of the Arts Commission confirm the Debtor's ownership. [220] *Third*, the DIA's museum policy, stretching back to at least 1941, requires that donations be made without restrictions.[221] *Fourth*, the standard donation receipt given to donors to DIA makes clear that all donations to the DIA are "in fee simple and unrestricted, and they shall be used in such manner and place and such disposition of them shall be made as the Arts Commission may deem advisable."[222]

175.   Again, the Debtor has produced *no evidence* to the contrary and has done *no analysis* of its ability to sell the DIA Assets.

---

[220] Minutes of Arts Commission, Jan. 4, 1960 at 280, attached hereto as **Exhibit 26** ("The accession was carried on the City inventory as are all other accessions, and was *fully the property of the City of Detroit*" (emphasis added)); Minutes of Arts Commission, July 30, 1963 at 248, attached hereto as **Exhibit 27** ("The Secretary reported on his appearance before the Common Council . . . when he outlined the basis of the arrangement with William Suhr for restoration of *works of art belonging to the City in the custody of the Arts Commission*" (emphasis added)).

[221] Collections Management Policy, Feb. 13, 2012 §IV(1)(4), attached hereto as **Exhibit 28**; id. § V(1)(7) ("The acceptance of all gifts and bequests shall be without restriction . . . While it is the Museum's intention to accession for long-term use and preservation, no guarantee shall be made that the gift or bequest will be retained by the Museum in perpetuity.   There shall be no exceptions to this policy unless any such restrictions or special provisions are recommended by the [Collections Committee] and approved by the DIA Corp. Board of Directors."); Statement from the Arts Commission, Jan. 27, 1941, attached hereto as **Exhibit 29** ("The Secretary was instructed to notify [potential donor] that it was contrary to the policy of the Arts Commission to accept gifts with restriction that would be binding on its successors").

[222] Acknowledgment of Gift, attached hereto as **Exhibit 30**.

93

> Q:    . . . as of the time you entered into the Grand
>        Bargain had the City conducted an audit to
>        determine which pieces were subject to restrictions
>        on alienation that were specific to that piece?
>
> A:    I don't know if the City or its contractor [the DIA
>        Corp.] conducted an audit, I know that I had not
>        seen one.
>
> . . .
>
> Q:    And between the time you entered into the Grand
>        Bargain and the present, has the City conducted
>        such an audit?
>
> A:    Not that I know of.[223]

176.    Mr. Buckfire acknowledged that neither he nor his firm has done any

independent analysis regarding the Debtor's ability to sell the DIA Assets.

> Q:    Do you know if you or anyone at Miller Buckfire
>        took any steps to determine which of the pieces of
>        art within the DIA had some restrictions on
>        alienation or use or transfer?
>
> A:    No.[224]

177.    The only information indicating that the Debtor may not sell the DIA

Assets is statements of the DIA Corp., the DIA board, and the Founder's Society,

each of which opposes such a sale.

> Q:    And why didn't the City conduct that type of audit
>        before agreeing to enter into the Grand Bargain?

---

[223]  Ex. 4, Orr. Dep. 390:19–391:6, July 22, 2014.

[224]  Ex. 9, Buckfire Dep. 140:17–21, July 16, 2014.

94

A:   Generally speaking, it was our understanding that there was an understanding of which pieces as the museum could possibly be de-assessed without limitation.

. . .

Q:   And that understanding that the City had was based on communications made to it by the DIA Corp.?

A:   Well, communications by the DIA Corp., certainly the attorney general's litigation—excuse me, members of the DIA board, and the Founder's Society, as well. [225]

The Debtor has done no work to verify these statements.

Q:   But the City didn't undertake an effort to independently assess whether what it was being told was correct?

A:   No, in fact, the City was told that any attempt to do so might create a lawsuit regarding its ability to not only assess but have the intent to try to de-assess or to otherwise sell the art.

. . .

Q:   Any attempt to sell the art?

A:   Any attempt to assess it with an idea towards selling it or otherwise de-assessing it, that was what we were told. [226]

---

[225]   Ex. 4, Orr Dep. 391:7–23, July 22, 2014.

[226]   Ex. 4, Orr Dep. 392:3–393:16, July 22, 2014.

Yet the Debtor subsequently retained Artvest to assess the value of the DIA Assets, without the consent of all donors' heirs or the DIA Board (and no lawsuits ensued).[227]

> Q:  But such an assessment has subsequently been done, correct?
>
> A:  Right, the assessment was done.
>
> Q:  By Artvest?
>
> A:  By Artvest.
>
> Q:  Okay. Did you go get the consent of all of the heirs and the DIA board to do the Artvest report?
>
> A:  No.
>
> Q:  Okay. Did you get the consent of the DIA Corp. to do it?
>
> A:  I don't know.[228]

178.  The evidence will once again establish that the Debtor shirked its fiduciary duties and failed to do even a cursory analysis to establish what could be done to minimize creditor losses.

### i.    No Charitable Trust.

179.  The Attorney General's argument that the DIA Assets are held in trust is unpersuasive.  Charitable trusts were not recognized by Michigan law until 1907, years after the DIA precursor, the Detroit Museum of Arts ("*DMA*"), was

---

[227]  *See* Ex. 13, Plummer Report.

[228]  Ex. 4, Orr Dep. 393:17–394:3, July 22, 2014.

established in 1885.[229]  As a matter of law, then, no charitable trust could have been created when the DMA was formed.

180.  The Debtor has neither argued nor offered evidence that a charitable trust has been created subsequently (including pursuant to the 1919 transfer of the DMA collection to the City).

> Q:  And is the City aware of any evidence of a trust agreement that was created at the time of the conveyance of the collection in the—this time period in the early part of the 20th century, 1915 to 1919?
>
> A:  I don't know if there was a trust agreement created.
>
> Q:  And are you aware of any evidence of a trust agreement?
>
> A:  No.
>
> Q:  After acquiring the collection, the City never entered into a written trust agreement with respect to any of the art in the art collection; isn't that correct?
>
> A:  I'm trying to recall the period from 1919 through 1984 and I don't recall a trust agreement being in effect.

---

[229] *See* 1907 Act § 1 (recognizing charitable trusts); *Chi. Bank of Commerce v. McPherson*, 62 F.2d 393, 395 (6th Cir. 1932) ("For nearly a hundred years prior to 1907 charitable trusts were not recognized by the laws of Michigan."); *see also Hopkins v. Crossley*, 132 Mich. 612, 614–18 (Mich. 1903) (invalidating attempt by nonprofit corporation to, upon dissolution, place its remaining assets in charitable trust because charitable trusts were not recognized under Michigan law).

Q: I'm not aware of one, either. I take it the City has never found any evidence since the conveyance to the City of an intention to create a trust between the DMA and the City of Detroit?

A: The DMA and then subsequently the DIA and the City of Detroit, and I don't know of any.

Q: Okay. You're not aware of any such evidence?

A: Correct.

Q: And the City, itself, has never entered into a written trust agreement relating to the art collection of which you're aware, correct?

A: Correct.[230]

### ii. No Constructive Trust.

181. Further, the Debtor has not argued or offered evidence that the DIA Assets are held in or subject to a constructive trust, and it could not do so. A constructive trust "does not exist until a plaintiff obtains a judicial decision finding him to be entitled to a judgment 'impressing' [the] property . . . with a constructive trust."[231] There is no constructive trust here, since "no pre-petition judicial action imposed a constructive trust" on the DIA Assets.[232] The Debtor's attempts to utilize constructive trust theory to segregate the DIA Assets for the exclusive

---

[230] Ex. 4, Orr Dep. 459:13–460:10, July 22, 2014.

[231] *XL/Datacomp, Inc. v. Wilson (In re Omegas Grp., Inc.)*, 16 F.3d 1443, 1451 (6th Cir. 1994).

[232] *See id.* at 1449; *In re Leonard*, 454 B.R. 444, 454 (Bankr. E.D. Mich. 2011).

KE 32740828

benefit of the Pension Claims "circumvent[s] completely the Code's equitable system of distribution" and should not be permitted.[233]

### b. The Debtor Presented No Evidence That the DIA Assets Are "Essential" to the Debtor's Revitalization.

182.    The Debtor has offered no hard evidence to support its bald statements that retention of the DIA Assets is "essential" to the Debtor's revitalization.[234]   The only "evidence" the Debtor has provided is a reference to the value the Metropolitan Museum of Art generates for New York City.[235]

183.    The Metropolitan Museum of Art is one of the most-visited museums in the world located in a city that is one of the world's most populous and most visited.[236]   There is no evidence to support the Debtor's claims regarding the DIA's impact on Detroit.[237]

---

[233]  *See In re Omegas*, 16 F.3d 1453; *In re Fed. Deposit Ins. Corp. v. AmFin Fin. Corp.*, 2014 WL 3057097, at *5–6 (6th Cir. July 8, 2014) (reaffirming *Omegas* with respect to constructive trusts).

[234]  *See*, *e.g.*, Reply ¶ 37 ("there is significant value in maintaining the DIA Assets in the City); DIA Reply at 11 (asserting that "visitors spend millions of dollars in Detroit each year as a result of their visits" to the museum"); Ex. 4, Orr Dep. 471:6–10, July 22, 2014 (stating that museum generates hundreds of thousands of dollars for the Debtor).

[235]  *See* Ex. 13, Plummer Report 40–41.

[236]  *See* Metropolitan Museum of Art, Annual Report for the Year 2012–2013, 8, attached hereto as **Exhibit 31** ("For the second year in a row, visitors to the Metropolitan Museum . . . numbered well over 6 million, and . . . the Museum ranked second in the world for annual art museum attendance"); United Nations Statistics Division's Demographic Yearbook *available at*

99

Q:     Have you conducted an economic analysis to determine the economic contribution of the DIA to the City?

A:     I don't know if I did, but I think I—I saw an analysis of the of the value of the art institute either through philanthropy events and visitors bring to the City.

Q:     Who prepared that analysis?

A:     I don't recall.[238]

Despite a request for production, no such analysis has been produced.[239]

3.     **Creditors Could Reasonably Expect the Debtor to Distribute the DIA Proceeds (Meager as They May Be) Equitably Among Unsecured Creditors.**

184.    Unsecured creditors should reasonably expect to be treated similarly

to other unsecured creditors: "in general, the Bankruptcy Code is premised on the

---

http://unstats.un.org/unsd/demographic/products/dyb/dyb2012.htm (ranking New York City as the eleventh most populous city in the world); Dr. Yuma Hedrick-Wong & Desmond Choong, *MasterCard 2014 Global Destination Cities Index*, (2014) , attached hereto as **Exhibit 32** (listing New York as sixth top destination city by international overnight visitors and second top destination city by overnight visitor spend).

[237]   *See* The Art Newspaper, Visitor Figures 2013, 3, attached hereto as **Exhibit 33** (The DIA "just missed the top 100 museums . . . it came in 102nd"); Ex. 32, Dr. Yuma Hedrick-Wong & Desmond Choong, *MasterCard 2014 Global Destination Cities Index* (2014) (omitting Detroit from the top 20 destination cities by international overnight visitors and by number and by spend).

[238]   Ex. 4, Orr Dep. 470:7–14, July 22, 2014.

[239]   Email from G. Shumaker to S. Hackney Aug. 11, 2014 (attached hereto as **Exhibit 34**.

rule of equality of treatment. Creditors with claims of equal rank are entitled to equal distribution."[240] The Debtor's first proposal to creditors reinforced this expectation by providing that all unsecured creditors would receive identical treatment—15 percent recoveries.[241]

185. Since then, the Debtor's proposed treatment of COP Claims and Other Unsecured Claims has dropped to less than 10 percent, and the Debtor proposes distributing the DIA Proceeds to Pension Claim holders alone.

186. The Debtor has acknowledged that reordering the Bankruptcy Code's priority scheme is not allowed.[242] Still, the DIA Settlement effectuates a *de facto* reordering of the Bankruptcy Code's priority scheme and flies in the face of the Bankruptcy Code and creditors' expectations.

### 4. Creditors Could Reasonably Expect the Debtor to Monetize Its Most Abundant Asset.

187. The Debtor should monetize its real estate assets and/or provide unsecured creditors the opportunity to share in any increase in property values in the City. For instance, the land bank structure currently in use could be adjusted to

---

[240] *In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 863 (Bankr. S.D. Tex. 2001).

[241] Ex. 16, June 14th Proposal to Creditors at 106–09 (discussing treatment of unsecured claims).

[242] Reply ¶ 151 (noting that "state law cannot reorder the distributional priorities of the bankruptcy code").

allow unsecured creditors to share in the upside of the Debtor's revitalization which should result in increased property values.

> Q:   Do you expect the blight reduction or is it the City's intent that it increases property values?
>
> A:   Yes.[243]
>
> Q:   Do you agree that blight remediation will have a positive impact on property values in Detroit?
>
> A:   Yes.[244]

Instead, contrary to any reasonable expectation, the Debtor has proposed a Plan that transfers no value to unsecured creditors on account of its real estate.

>    **5.   Creditors Could Reasonably Expect the Debtor to Share a Portion of the Upside of the Debtor's Revitalization with Creditors.**

188.   Most chapter 9 debtors are not as asset-rich as the Debtor.  As a result, a tool often (and understandably) employed to improve recoveries is a sharing in the debtor's revitalization.[245]   In its June 2013 proposal to creditors, the Debtor

---

[243]  Ex. 19, Hill Dep. 213:21–24, July 18, 2014.

[244]  Ex. 9, Buckfire Dep. 254:14–20, July 16, 2014; *see also* Expert Report of Charles Moore at 14 (hereafter, the "*Moore Report*"), attached hereto as **Exhibit 35** (describing intended effects of blight remediation); Disclosure Statement, Ex. J. at 5, 7 (describing increased property tax revenues).

[245]  *See* Modified Disclosure Statement at Exhibit B, 16, 18, *In re City of Stockton, Cal.*, Case No. 12-32118 (Bankr. E.D. Cal. Nov. 21, 2013) [Docket No. 1215] (noting that certificates of participation will receive smaller haircut "if assessed values grow as projected" and providing pension obligation bond holders payments allowing such creditors to "share in some limited amount of the 'upside' revenue growth").

suggested exactly such a sharing mechanism.[246]  Now, though, the Debtor has

taken this option off the table (despite the additional value it could unlock) and has

compounded the failure by proposing to spend over $1.7 billion on reinvestment

and revitalization initiatives (funded largely by creditors in the form of diminished

recoveries).

> Q:   You understand that the restructuring or reinvestment initiatives are being funded in part with amounts of money that were formerly owed to creditors, correct?
>
> A:   I think that's fair.  We don't have a pocket of money available.[247]

189.   Debtor expert Charles Moore states that these initiatives should

increase revenue by $480 million and cut costs by $360 million.[248]  As it gives

away (in the case of the DIA Assets) or retains (in the case of all other significant

marketable assets) its valuable assets, the Debtor incredibly proposes to share none

of this upside with creditors.

---

[246]  *See* Ex. 9, Buckfire Dep. 190–91 (discussing upside sharing).

[247]  Ex. 4, Orr Dep. 519:3–8, July 22, 2014.

[248]  Ex. 35, Moore Report 8.

**B.    The Proposed Plan Fails to Optimize Cost Savings and Revenue Increases and Fails to Explain the Intent and Effect of Reinvestment Initiatives.**

190.   The Debtor filed for chapter 9 in the face of declining revenues, substantial structural liabilities, and operational inefficiencies.   Reasonable creditors could expect the Debtor to deal with these obstacles in a comprehensive manner through the bankruptcy process.   However, the Debtor has wasted this opportunity.

191.   Incredibly, in formulating its proposed Plan, the Debtor did no work to assess its ability to generate additional revenue by increasing existing taxes or implementing new taxes.   The Debtor simply asserted that raising taxes would be "futile" with no evidentiary support for this assertion.[249]

192.   And in creating its restructuring and reinvestment initiatives, the Debtor did not consult those individuals with the best actual knowledge of the Debtor's operations.   The Debtor did not reduce the number of or restructure its collective bargaining agreements to allow for more flexible and efficient management, a major issue impeding the efficient operation of the Debtor.   By failing to capitalize on the opportunities bankruptcy provides to increase revenue and eliminate operational inefficiencies and bad past practices, the Debtor has deprived creditors of value they should be receiving in connection with this case.

---

[249]   Reply ¶ 132.

104

### 1. Creditors Could Reasonably Expect the Debtor to Take Further Concrete Steps to Increase Its Revenue.

193.   As discussed in Section III.B.3, the Debtor undertook absolutely no analysis to support its assertions that raising taxes to generate incremental revenue would be futile.[250]  The Debtor has provided no evidence that it changes to its tax policy would yield marginal revenue.  Notably, nothing in the feasibility expert's report undermines the Debtor's ability to generate revenue through changes to tax policy either.

194.   The Court's feasibility expert, Martha Kopacz, did not make any attempt to determine what additional revenue would be available to the Debtor.

> Q:    And you did not attempt to—to determine whether the—the City might do better than the—the forecasts such that there would be more to distribute to creditors, correct?
>
> A:    Yes.  And I—I think at some point in my report I said there are—there are things I didn't—that I very clearly didn't do and I didn't—I didn't look at best interest of creditors.  It was outside of my scope, and I didn't look to see if there was a way in which the City could generate more cash, and I didn't look at any of the alternative plans.[251]

Ms. Kopacz's opinion as to feasibility of the Plan does not address whether the forecast contained in the Plan represents the Debtor's upside.

---

[250]  *See* Reply  ¶ 132.

[251]  Kopacz Dep. 101:2–13, July 31, 2014, attached hereto as **Exhibit 36**.

## 2. The Proposed Reorganization and Reinvestment Initiatives Were Created in a Vacuum.

195. The Debtor's advisors have invented the Plan's proposed reorganization and reinvestment initiatives without any coordination with or diligence into the City itself. Debtor's counsel and advisors consistently failed to consult those employees with the best knowledge of the Debtor's operations when developing the Plan's restructuring and reinvestment initiatives. For instance, the Debtor failed to consult the Debtor's Senior City Planner—one of, if not the most, important drivers of City operations and planning—regarding how the Plan's proposed reinvestment initiatives will reconcile with the Debtor's key urban planning documents.

> Q: Has anyone ever specifically asked you about the relationship between the restructuring and reinvestment initiatives, blight spending, and the Master Plan?
>
> A: No. I have not been asked that question.
>
> Q: Have you been asked the same question with regard to the City's restructuring and reinvestment initiatives on blight and the Urban Renewal Plans?
>
> A: No, I have not.
>
> Q: Have you ever been asked that question with respect to the EDC and the restructuring and reinvestment initiatives?

A:    No.[252]

196.  Similarly, the Debtor failed to consult the Executive Director of the Retirement Systems—the individual with the most knowledge of the functioning of the Retirement Systems—regarding, among other things, development of the plan and its proposed changes to the Retirement Systems, including creation of an investment committee to oversee the Retirement Systems' boards of trustees.

> Q:    And you can be as modest or not modest as you would like but is there anyone who has more knowledge than you about the retirement—about the two retirement systems?
>
> . . .
>
> A:    Of the funds?
>
> Q:    Yes.
>
> A:    No.
>
> Q:    Okay.  And have you had any input into the development of the plan of adjustment of the City?
>
> A:    No.
>
> Q:    Has the City asked for your advice or input?
>
> . . .
>
> A:    No.
>
> . . .

---

[252] Todd Dep. 128:21–129:8; 138:8–18, July 9, 2014, attached hereto as **Exhibit 37**.

Q:    And it would have been prudent of the City to speak to the executive director of both retirement systems with respect to this process, correct?

A:    In my opinion, yes.[253]

197.    With respect to cuts to pension benefits, neither the Debtor nor its advisors even consulted the Debtor's Labor Director regarding the possible impact such cuts would have on its workforce—including on employee morale, with which the Debtor purports to be so concerned.

Q:    Were you consulted about the level of cuts that were going to be proposed in this plan?

A:    No.

Q:    Okay. So at the time this plan was proposed, you were involved in negotiations with the labor unions, correct?

A:    Correct.

. . .

Q:    But no one from the City came to you to get your sense of what the appropriate levels of cuts the pensions could be; isn't that correct?

A:    That's correct.[254]

198.    The Debtor's consistent failure to consult with those individuals with the most knowledge of the Debtor's operations calls into question the

---

[253]  Ex. 8, Thomas Dep. 134:24–135:15; 137:18–24, July 9, 2014.

[254]  Ex. 7, Hall Dep. 148:14–149:2, July 2, 2014.

reasonableness and accuracy of the Plan and is inconsistent with creditors'
reasonable expectations.

### 3. The Debtor Does Not Propose Any Comprehensive Reinvestment Initiative.

199. Notwithstanding its creation of a $1.7 billion fund for revitalization
efforts, the Plan does not contain a comprehensive reinvestment strategy.

> Q: So would you agree that it wouldn't make sense to make a decision regarding blight remediation only and not make a corresponding decision regarding land use moving into the future as part of an urban plan?
>
> A: It would be ideal to be able to accomplish both. When the blight remediation, if you will, is paramount and of great concern in terms of its resultant impact on a city, it may be warranted to make a blight remediation decision without having a full vision or understanding as to what will come behind that area, but certainly, again, in terms of varying degrees of complexity, one should know, generally speaking, what will follow. Should have a vision in terms of what will follow.[255]

200. Additionally, the Debtor's purported bankruptcy blight remediation
plan bears no relation to the Debtor's preexisting Master Plan of Policies regarding
land use or Urban Renewal Plans.

> Q: Do you know how the City's plan to spend approximately $440.3 million on blight remediation through its restructuring and reinvestment initiatives integrates with the City's

---

[255] Ex. 37, Todd Dep. 35:1–13, July 9, 2014.

> Master Plan of Policies or the Urban Renewal
> Plans that we were just discussing?
>
> A:     I am not aware of any specific document or
>        dialogue wherein those documents and that
>        initiative have been reconciled.[256]

### 4.     The Debtor Did Not Reform Labor Agreements.

201.    The Debtor admits that "significant labor cost reductions may be possible by restructuring jobs and streamlining work rules for both represented and unrepresented workers."[257] But, the Debtor wasted its opportunity to (a) reduce the number of collective bargaining agreements and (b) reform the work rules in its newly negotiated collective bargaining agreements.

202.    Dave Bing, former mayor of Detroit, testified that the high numbers of bargaining units and collective bargaining agreements inhibit the Debtor's ability to operate efficiently.

> Q:     I take it, you would agree that the number of
>        unions and bargaining units caused problems for
>        the city?
>
> A:     Yes.
>
> Q:     And besides—
>
> A:     That's from an efficiency standpoint.  I mean, you
>        just mentioned that the labor relations department,
>        which was huge, you know, if we—if we had done
>        things a different way, a more efficient way, that's

---

[256] Ex. 37, Todd Dep. 128:6–13, July 9, 2014.

[257] Disclosure Statement 166.

a department that probably didn't need nearly as many people.

Q:    Okay.  So the fact that there were more than 50 bargaining units just led to inefficiencies—

A:    Yeah.[258]

203.    The Debtor has not, through this bankruptcy process, reduced the number of bargaining units.

Q:    Now, when the City went into bankruptcy, it had 13 units in 47 total bargaining—13 unions and 47 total bargaining unions—units; is that correct?

A:    Well, if you count the subunions and locals, it was significantly more than that, but that's—that's approximately correct.

Q:    Okay, and that's how many it will have when it comes out, correct?

A:    Roughly the same, yes.[259]

204.    Additionally, the Debtor failed to negotiate substantially reformed work rules, including bumping rights, limits on management changes to the work environment, grievance procedures, and collection of dues.[260]  The Debtor did not reform or eliminate these work rules during its recent labor negotiations.

---

[258]  Bing Dep. 55:13–56:2, July 21, 2014, attached hereto as **Exhibit 38**.

[259]  Ex. 4, Orr Dep. 183:19–184:3, July 22, 2013.

[260]  Ex. 7, Hall Dep. 96:4–18, July 2, 2014.

111

Q:    With respect to the CBAs that you have signed . . . . Those maintained seniority as an aspect of a work rule, correct?

A:    Correct.

Q:    And they maintained bumping rights, correct?

A:    Some bumping rights, but maybe not to the extent that they were before.

. . .

Q:    Okay. They also have limitations on the City's ability to, you know, change the workplace, correct?

A:    Against, they may be some restrictions, but they may not be as restricted as they were—as they were before.

Q:    Okay. They also maintain arbitration rights, correct?

A:    Correct.

Q:    And they also continue to require the City to collect union dues, correct?

A:    Correct.[261]

205.  Given the Debtor's admitted substantial operational benefit, it would be reasonable to expect the Debtor to try to capitalize on this opportunity to have labor play a meaningful role in the "shared sacrifice" Mr. Orr spoke of early on by implementing value-generating labor reforms.  But the Plan does not.

---

[261]  Ex. 7, Hall Dep. 99:13–100:16, July 2, 2014.

## V.     The Plan Is Not Proposed in Good Faith.

206.    The Plan has not been proposed in good faith and violates Michigan law, and so cannot satisfy section 1129(a)(3) of the Bankruptcy Code.[262]  The Plan fails on this front for the following reasons, as described in detail in Syncora's Objections.

- The Plan from its inception was focused on generating the best return possible for Pension Claims at the expense of all other unsecured creditors.

- The Debtor's failure to meaningfully assess its ability to generate value for COP Claims and Other Unsecured Claims further highlighted the biased nature of the negotiation process.

207.    It is a "general rule that a Chapter 9 plan proposed in good faith must treat all interested parties fairly and that the efforts used to confirm the plan must comport with due process."[263]

208.    This Court, and other courts in the Sixth Circuit, have acknowledged three interpretations of the "good faith" standard for purposes of confirming a plan of adjustment (a) "if the plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code;" (b) if the plan is "proposed with honesty and good intentions, and with a basis for expecting that a reorganization can be effected;" and (c) "fundamental fairness in dealing with one's creditors."[264]

---

[262]  *See* 11 U.S.C. § 1123(a)(3) (requiring plan be "proposed in good faith").

[263]  *In re Mount Carbon Metro. Dist.*, 242 B.R. at 39.

[264]  *See In re Gregory Boat Co.*, 144 B.R. 361, 366 (Bankr. E.D. Mich. 1992).

Additionally, as the bankruptcy courts in this jurisdiction have noted, with respect to analyzing whether a plan has been filed in good faith, "[a] bankruptcy judge is more than a pair of ears to hear the argument and a pair of eyes to read the law. . . Sometimes a bankruptcy judge's nose tells him/her that something doesn't smell right and further inquiry is warranted."[265]

### A. The Plan Is Not Proposed in Good Faith Because It Is Inconsistent with the Principles Underlying the Bankruptcy Code.

209. A debtor may not file chapter 9 to "evade creditors" by not paying its debts.[266] Congress articulated that "the primary purpose of Chapter 9 is to allow a city to continue operating while it adjusts or refinances creditor claims **with minimum (and in many cases, no) loss to creditors**."[267]  The Plan fails this dual purpose, which requires that a chapter 9 plan minimize creditor losses.[268]

210. The Plan is premised on reducing disfavored creditors' recoveries to minimum levels to fund the Debtor's reinvestment plan slush fund.

---

[265] *In re Dow Corning Corp.*, 244 B.R. 673, 676 (Bankr. E.D. Mich. 1999) quoting *In re John P. Timko et al.*, No. 87-09318 (unpublished) (Bankr. E.D. Mich. July 22, 1988).

[266] *In re City of San Bernardino, Cal.*, 499 B.R. 766, 786 (Bankr. C.D. Cal. 2013) (quoting *Int'l Assn. of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 295 (9th Cir. BAP 2009)).

[267] H.R. Rep. No. 95-595, at 6221 (1977) (emphasis added).

[268] *See In re Mount Carbon Metr.o Dist.*, 242 B.R. at 32.

114

Well, recognizing that it is a unique bankruptcy in many ways, we believe and advised the emergency manager and indeed the State of Michigan from the beginning of our engagement including, by the way, the mayor of the City of Detroit, I should have said that, too, that designing a plan that would take into account the City's best ability to repay its creditors had to start with the premise that the City was effectively service insolvent and that whatever was available to repay creditors from the cash flows of the City, that is, the revenues of the City, was really only available after taking into account the cost of revitalization/rehabilitation of the City, itself, and that was the beginning point of our analysis.[269]

211. The Debtor disavowed its core obligation in chapter 9—to minimize creditor losses—from the beginning.

**B.** **The Plan Is Not Proposed in Good Faith Because It Does Not Treat Creditors in a Fundamentally Fair Manner.**

212. A plan of adjustment proposed "in a fundamentally fair manner" must "treat *all* parties fairly."[270] A plan that restricts creditor recovery for unpopular creditors, "does not exhibit sincerity or fairness in dealing with its unsecured creditors."[271]

---

[269] Ex. 9, Buckfire Dep. 106:12–107:2, July 16, 2014; *see also* Moore Dep. 85:1–11, Dec. 4, 2013, attached hereto as **Exhibit 39** (admitting that creditor recoveries were determined based on money left over after accounting for reinvestment spending).

[270] *In re W.R. Grace & Co.*, 475 B.R. 34, 89 (Bankr. D. Del. 2012) (emphasis added, citing *In re Mount Carbon Metro. Dist.*, 242 B.R. at 39)).

[271] *In re Pierce Cnty. Hous. Auth.*, 414 B.R. at 721.

213. *First*, the Plan funnels every available dollar, including new funding sources like the federal blight money, Grand Bargain proceeds, 50 percent of the upside of a DWSD transaction,[272] and illegally assigns certain tax revenue pursuant to the UTGO Settlement to Pension Claims.

> Q:     And it's fair to say that ***it was the City that wanted to see the 26 cents go to the retirement systems*** for the antipoverty fund—the income stabilization fund, correct?
>
> A:     Yes . . .[273]

214. COP Claims and Other Unsecured Claims, meanwhile, share only in revenue from the Debtor's General Fund.

215. *Second*, as discussed in detail in Section II.B.3 and the Rosen Report, the Plan overstates the size of Pension Claims and understates the size of their recoveries to funnel additional value to the Retirement Systems. By pledging nearly all available funds to Pension Claims, overstating the size of the Pension Claims, and employing below-market expected rates of return on assets, the Debtor is doing everything within its power to funnel value to pensioners. The Plan does not afford other creditors any similar benefit.

---

[272] Disclosure Statement 9.

[273] Ex. 4, Orr Dep. 368:17–21, July 22, 2014 (emphasis added).

## VI. The DIA Settlement Does Not Satisfy Rule 9019.

216. Approval under Rule 9019 requires a four-part inquiry into: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved and the expense, inconvenience, and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.[274]

217. As this Court has previously noted, the Court's ability to evaluate the fairness of a settlement under Rule 9019 requires evidence regarding the strengths and weaknesses of the claims and defenses being settled. In connection with the Swap Settlement trial, this Court noted that

> I think back to the hundreds or thousands of motions to settle that I have been called upon to determine in the last 28 1/2 years. And in virtually every one of those cases, everyone knew what the claims were, what the defenses were, what the factual—the alleged factual bases were for those claims, the alleged factual bases for the defenses, and where the strengths and weaknesses were on either side. I don't have that here . . . So I'm at a loss as to how to evaluate the fairness of the settlement without that data.[275]

---

[274] *In re Bard*, 49 Fed. App'x. 528, 530 (6th Cir. 2002); *see In re Dow Corning Corp.*, 192 B.R. at 421.

[275] Hr'g Tr. 107:14–24 Dec. 18, 2013.

117

218. Once again, the Debtor has brought a forward a settlement for approval under Rule 9019 without performing the requisite diligence to determine the strengths and weakness of the claims and defenses at issue. The Debtor has provided no evidence to satisfy the Rule 9019 factors.

- *First*, the Debtor has provided no evidence that the DIA Assets may not be sold and available evidence suggests otherwise.[276] In fact, the Debtor has done no diligence on restrictions on alienability of the art. Thus, the Debtor's likelihood of success in litigation against any party asserting such a restriction on alienability is high.

- *Second*, to the extent the second element is applicable, the whereabouts of the DIA Assets are known and the DIA Assets are readily movable. As a result, the risk of collection is a non-issue.

- *Third*, the litigation likely would not generate significant additional expense for the Debtor as the discovery that would need to be completed to litigate the Debtor's ability to sell the DIA Assets is already underway in conjunction with the confirmation hearing. Additionally, the potential upside from successfully litigating the issue, up to $4.6 billion according to the Debtor's art expert, would far outweigh the incremental cost incurred.

- *Fourth*, the paramount interest of creditors is maximizing their recoveries and the Debtor could achieve greater value for creditors from a sale to third-parties or collateralization of the art collection than pursuant to the Grand Bargain.[277]

---

[276] *See* Section IV.A.2.

[277] The State would have identical liability with respect to the Pension Claims regardless of whether the DIA Settlement was implemented. As a result, the State's interest in making the State Contribution and receiving a release from Pension Claim holders should remain unchanged.

219.   The facts speak for themselves.  The Debtor is receiving $455 million on a present-value basis in consideration for the Grand Bargain.[278]  That value—attributable to the entire art collection and all non-art Museum Assets (as well as releases from pensioners)—barely clears the low end valuation for *5 percent of the art collection*.[279]  Artvest valued the entire collection between $2.8 billion and $4.6 billion.[280]  The DIA Settlement would transfer the entire collection, including all non-art related assets, for only 24 percent of the low end of the Artvest valuation.[281]

## VII.   Waiver of the 14-day Stay Is Not Justified.

### A.   The Requested Waiver of the 14-day Stay Is Unnecessary and No More than an Attempt to Equitably Moot Arguments on Appeal.

220.   The Debtor has not met the burden for waiver of the 14-day stay. Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."[282]  The goal of this rule is to provide sufficient time for a party to seek

---

[278]   Ex. 21, Spencer Report 57.

[279]   Ex. 12, Christie's Letter 1–2 (appraising this portion of the art collection at a minimum of $452 million).

[280]   Ex. 13, Plummer Report 19.

[281]   *Id.*

[282]   Fed. R. Bankr. P. 3020(e).

a stay pending appeal before the plan is consummated.[283]  The Debtor has provided insufficient evidence to justify a waiver of the stay.

221.   While a slightly delayed implementation of the Plan would have no practical or adverse effect on creditors or citizens, waiver of the 14-day stay could equitably moot issues on appeal, irreparably harming objectors.  Additionally, the public interest in allowing for meaningful review of the Plan in the largest municipal bankruptcy in history weighs in favor of granting the stay.  As a result, the waiver must be denied.

---

[283]  *See  In re Adelphia  Commc'ns  Corp.*, 368 B.R. 140, 282 (Bankr. S.D.N.Y. 2007) (explaining the purpose of Bankruptcy Rule 3020(e).

KE 32740828

Dated:  August 27, 2014                    Respectfully submitted,

                                           */s/ Ryan Blaine Bennett*
                                           James H.M. Sprayregen, P.C.
                                           Ryan Blaine Bennett
                                           Stephen C. Hackney
                                           KIRKLAND & ELLIS LLP
                                           300 North LaSalle
                                           Chicago, Illinois  60654
                                           Telephone:   (312) 862-2000
                                           Facsimile:    (312) 862-2200

                                                   - and -

                                           Stephen M. Gross
                                           David A. Agay
                                           Joshua Gadharf
                                           MCDONALD HOPKINS PLC
                                           39533 Woodward Avenue
                                           Bloomfield Hills, Michigan  48304
                                           Telephone:   (248) 646-5070
                                           Facsimile:    (248) 646-5075

                                           *Attorneys for Syncora Guarantee Inc. and
                                           Syncora Capital Assurance Inc.*