**Exhibit 4**

**Excerpts of July 22, 2014 K. Orr Deposition Transcript**

KEVYN ORR, VOLUME 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

In Re: ) Chapter 9

CITY of DETROIT, MICHIGAN, ) Case No. 13-53846

Debtor. ) Hon. Steven Rhodes

___________________________

VOLUME 2

The Videotaped Deposition of KEVYN ORR,
in his personal capacity and as Rule 30(b)(6) witness,
Taken at 2 Woodward Avenue,
Detroit, Michigan,
Commencing at 9:10 a.m.,
Tuesday, July 22, 2014,
Before Leisa M. Pastor, CSR-3500, RPR, CRR.

APPEARANCES:

GREGORY M. SHUMAKER, ESQ.,
DAN T. MOSS, ESQ.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Appearing on behalf of the Debtor.

ROBERT HERTZBERG, ESQ.
Pepper Hamilton, LLP
4000 Town Center, Suite 1800
Southfield, Michigan 48075
Appearing on behalf of Debtor.

STEPHEN C. HACKNEY, ESQ.
Kirkland & Ellis, LLP
300 North Lasalle Street
Chicago, Illinois 60654
Appearing on behalf of Syncora.

JEFFREY BEELAERT, ESQ.
Sidley Austin, LLP
1501 K Street, N.W.
Washington, D.C. 20005
Appearing on behalf of National Public Financing.

ERNEST J. ESSAD, JR., ESQ.
Williams, Williams, Rattner & Plunkett, P.C.
380 North Old Woodward Avenue, Suite 300
Birmingham, Michigan 48009
Appearing on behalf of Financial Guaranty Insurance Company.

ALFREDO R. PEREZ, ESQ.
Weil, Gotshal & Manges, LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Appearing on behalf of Financial Guaranty Insurance Company.

LISA SCHAPIRA, ESQ.
Chadbourne & Parke, LLP
30 Rockefeller Plaza
New York, New York 10112
Appearing on behalf of Assured Guaranty Municipal Corporation.

Page 182

KEVYN ORR, VOLUME 2

**it's fair to say that they built on a lot of the other work that had been done in the prior almost year and a half.**

Q. That may be true, but you agree that they had a huge amount of work to do in a short period of time.

MR. SHUMAKER: Object to form.

**A. Yeah, I think that he had -- you know, the adjectives can change. I think they had a significant amount of work to do, but I think they built on a lot of work that had already been done.**

BY MR. HACKNEY:

Q. And you agree they had a relatively short period of time to do it?

**A. Relative -- and this is why I'm trying to relay the time frame. If you go back to 2011 and this is all a continuum of time, then no, that's not accurate. If you talk about solely from the formal retention of Conway MacKenzie till June, depending upon the amount of work that they had to do, I want to be very careful not to follow your characterization because the reality may be some of the work that they did was an extrapolation of work that had already been done.**

Q. If Chuck Moore testified that Conway MacKenzie was drinking from a fire hose, would you have a basis to

Page 183

KEVYN ORR, VOLUME 2

disagree with that characterization?

**A. No.**

MR. SHUMAKER: Object to form.

**A. No, I think we all were.**

BY MR. HACKNEY:

Q. Okay, what -- isn't it true that you negotiated the first swaps agreement in a two-week period in early June of 2013?

**A. Yes, I think that's fair.**

Q. Okay. That was the one where you agreed to pay something in the neighborhood of $265 million, correct?

**A. Yeah, I -- I think that's about the right amount.**

Q. Mr. Orr, do you agree that the bankruptcy and your appointment as emergency manager represent an historic opportunity for the City to revitalize itself?

**A. Yeah, I think that's fair.**

Q. Now, when the City went into bankruptcy, it had 13 units in 47 total bargaining -- 13 unions and 47 total bargaining unions -- units; is that correct?

**A. Well, if you count the subunions and locals, it was significantly more than that, but that's -- that's approximately correct.**

Q. Okay, and that's how many it will have when it comes

Page 184

KEVYN ORR, VOLUME 2

out, correct?

**A. Roughly the same, yes.**

Q. You have not altered the City charter; isn't that correct?

**A. I cannot alter the City charter.**

Q. Okay, and the City does not have any specific proposed changes to the City charter that are to be implemented in the near term, correct?

**A. Well, two things. The charter reformed process is extensive and expensive, the charter was just reformed in 2012, so that's difficult. The statute does -- 436 does provide me with the opportunity to recommend either charter reforms or adoption of model charter provisions, which we may do.**

Q. Okay, you haven't as you sit here today, correct?

**A. I can't, I can't make any charter changes.**

Q. But you haven't made any proposed changes, correct?

MR. SHUMAKER: Object to the form.

BY MR. HACKNEY:

Q. You haven't proposed any changes?

**A. I haven't formally proposed any changes.**

Q. Okay, you haven't are disclosed to creditors your proposed changes?

**A. That is true, yes, mm-hmm.**

Page 185

**KEVYN ORR, VOLUME 2**

Q. Okay, and you're not aware of any other proposed changes to the City charter that have been made public to the creditors?

**A. Yes, I think that's true.**

Q. At the outset of the bankruptcy you believe that a regional water authority was in the best interests of the City and the DWSD's customers, correct?

**A. Yes.**

Q. As things stand today, you have not been able to achieve that goal; isn't that correct?

**A. As things stands today, yes, that's correct.**

Q. Okay. And you have not had sufficient time to reach agreement on a regional water authority; is that a fair statement?

**A. The -- I continue to believe that a regional water authority is in the best interests of the City and its customers, including the Counties. The issues regarding those negotiations are involved in mediation, so I want to be very careful --**

Q. Yeah.

**A. -- about where things -- but I think it is fair to say that as it stands here today we have not reached agreement on a regional water authority.**

Q. You don't have to tell me what the discussions are at

KEVYN ORR, VOLUME 2

urban planning process is currently in flux?

**A. I think that's fair.**

Q. And as we sit here today, isn't it true that the City has not yet arranged exit financing for itself; isn't that correct?

**A. That is correct.**

Q. It's in process but has not been completed?

**A. Yes.**

Q. Mr. Orr, do you recall that you filed your first plan of adjustment on February 21st, 2013?

**A. I believe that's -- yes, I believe that's right.**

Q. Okay. You believed at that time that that first plan presented a feasible way forward for the City, correct?

MR. SHUMAKER: I'm going to object just -- did you say 2013?

BY MR. HACKNEY:

Q. I did say 2013.

**A. Yeah. And I -- 2014.**

Q. Okay, let's --

**A. I got to watch you.**

Q. I know. I got all sorts of games I play.

MR. SHUMAKER: I got to be a little quicker, too.

KEVYN ORR, VOLUME 2

BY MR. HACKNEY:

Q. I'm going to impeach you then -- what are you doing --

**A. You didn't either.**

Q. That's what you'll come back with.

**A. Okay.**

Q. I'll be impeaching myself.

Do you recall that you filed your first plan of adjustment on February 21st, 2014?

**A. I think February 21st, 2014 is the correct date for both of us.**

Q. All right, we're both doing better.

**A. Right.**

Q. Okay. Now, you believed at that time that that plan presented a feasible way forward for the City; isn't that correct?

**A. I believe so.**

Q. And that plan proposed cuts of approximately 26 percent to the face amount of GRS pensions and 6 percent to the face amount of PFRS pensions if the Grand Bargain were approved, correct?

**A. Yes, I believe those were the numbers.**

Q. So I'm going to try and talk about the cut levels in a way that we can kind of relate to one another.

**A. Mm-hmm.**

**KEVYN ORR, VOLUME 2**

Q. They are reported in a lot of different ways because sometimes the COLAs is meshed in, and sometimes it isn't, and so what I -- I want to get general agreement on, I think we just did, is that -- is that the initial plan called for 26 percent cuts to GRS and elimination of COLA and 6 percent cut to PFRS and elimination to COLA; is that correct?

**A. I think that -- I'd have to go back and look to be sure, but I think both plans called for an elimination of COLA -- and let's do it this way. Generally when we're talking about plans we're talking about, one, cuts percentage wise to the pension payments, two, the COLA, cost of living adjustment, as it goes forward and with regard to GRS now, we talk about recoupment of alternative savings fund.**

**For PFRS, we generally just talk about percentage cuts to pension payments and, two, a reduction in COLA, but they don't have an alternative savings fund account so there will be no discussion of that component.**

Q. Fair enough. I'm going to refer to this concept of the 26 percent and the 6 percent cuts to GRS and PFRS, respectively, as a shorthand to describing the City's initial plan proposal --

KEVYN ORR, VOLUME 2

**A. Okay.**

Q. -- okay?

Now, you understand that the -- there's a disclosure statement that accompanied that first plan, correct?

**A. Yes.**

Q. And the City asserted in that disclosure statement that it believed that its first plan was feasible; isn't that correct?

**A. Yes.**

Q. And you authorized the filing of both that first plan and that first disclosure statement, correct?

**A. Yes.**

Q. And you believe that the City's statement that the first plan proposed was feasible was a true statement at the time that it was made; isn't that correct?

**A. Yes.**

Q. And you believe it's a true statement as you sit here today; isn't that correct?

**A. I believe that the first plan was feasible when it was filed? Yes.**

Q. Now, at the time that you proposed the first plan, the City did not have agreement with any of the associations or committees representing retirees;

KEVYN ORR, VOLUME 2

isn't that correct?
A. **I believe that's correct.**
Q. Now, you understand that one of the complexities of the case has been that the retirees are -- are kind of disbursed out there in the world, and as a practical matter you've typically been dealing either with retiree associations, retirement trusts, or the official committee of retirees when it came to negotiating plan treatment; is that a fair statement?
A. **Yes. I think it's a fair statement to say we tried to deal with representative organizations as opposed to individual retirees.**
Q. The general strategy was you deal with the representative organizations and if you can strike agreements with them, the hope is that they'll then recommend approval of the plan and the retirees will -- will vote consistently with that recommendation, correct?
A. **Yes, I think that's fair.**
Q. Now, as of February 21st, 2014, you had just over seven months left on your term; isn't that correct?
A. **Yes, I think that's fair.**
Q. Okay. And you said in the press at the time of the first plan that it was quote/unquote crucial that the

KEVYN ORR, VOLUME 2

City reach an agreement with its creditors, correct?
A. **Yes, I believe I said that.**
Q. And in particular, you were referring to the pensioners, correct?
A. **I was referring to everyone.**
Q. Okay. And you also said at that time: "We really do not have time for a lot of acrimony and litigation." Isn't that correct?
A. **Yes, I probably said that.**
Q. Okay. Now, you said that it was crucial that the City reach agreement with its creditors in part because time was short on your tenure as emergency manager, correct?
A. **I suppose you could say in part, but it was also that the City needed to get out of a space that it had been in effectively for almost two years, that we needed to get to revitalization, and I said a bunch of other things during that time about how important it was to get out of this space.**
Q. And wasn't it also crucial that the retirees agree to the first plan you proposed because you knew you couldn't cram them down at the proposed pension cut levels if they didn't agree?
A. **There were other reasons, not just the issue regarding**

**KEVYN ORR, VOLUME 2**

**cramdown. We certainly wanted people that were going to be impacted and severely affected by this process to have some level of buy-in for -- for the future of the City and for their interests, I don't want to give the impression that we were merely looking at it from a technical perspective, there is a human dimension here that we were very concerned about, too.**
Q. But as of the first plan the reason you were so focused and in terms of saying it was crucial to reach agreement, at least as we're talking about retirees, it was because you knew that you couldn't cram them down at the proposed plan levels, correct?
A. **I knew that we could not cram them down at proposed plan levels, but I think there are plenty of statements out there by me importuning the retirees to support the plan for a number of other reasons, as well.**
Q. And why couldn't -- why did you believe you couldn't cram them down at the proposed plan levels in the first plan?
A. **Well, I didn't know if we could get in consultant -- I won't into discussions we had with counsel, but we were concerned that we might not be able to meet some of the requirements in the code but also here again,**

**KEVYN ORR, VOLUME 2**

**wanted to be sure that we addressed the human dimension.**
Q. And you didn't have -- is it -- are you referring to the fact that as of the first plan, you didn't even have an impaired assenting class?
A. **I think it's fair to say that we did not have -- well, when was the date?**
Q. Feb 21, 2014.
A. **I don't know if that's true because I don't recall the dates that we may have reached agreements with the financial creditors.**
Q. And when you're talking about the human dimension, what are you talking about there?
A. **Very simply, and I think I've said this before, the -- the pensioners are people many of whom are in their sixties, seventies, and eighties and don't have an option. They have worked for the City, most of them have done nothing wrong. They are -- the covenant that the City had with its employees and retirees was that if they perform work for the City that upon their retirement they'd be taken care of for the rest of their natural life, that some of this came as quite a shock to them because they had planned their affairs accordingly. Many of them, like my own family members**

KEVYN ORR, VOLUME 2

pensioners at the proposed cut levels so much as you were trying to develop a fair proposal that addressed the human dimension of their situation?

A. **I think that's fair. I mean, in fact, I think -- you know, you focus a lot on statements that I made in public, I think there were statements made at that time that we don't want a cramdown with those classes, that we were trying to get consensual resolution and buy-in not just for the technical financial restructuring but so that the City is not bruised coming out of bankruptcy and that the parties have a level of buy-in to the process, so that's why I was saying before when you're focusing on a cramdown, I don't really recall that that was a lot of the discussion because we weren't focused so much on whether or not we could technically cram people down. I would say we were almost more focused on trying to get good faith agreements with classes that are either currently working for the City or had worked for the City.**

Q. Okay. So as of April 15, which is the date the first of your representative retiree agreements are announced, correct?

A. **If you say so, yeah.**

**KEVYN ORR, VOLUME 2**

Q. I believe that's when they started to hit the papers --

A. **Right.**

Q. -- but I only have access to the press so --

A. **And that's why I'm being very care -- there were times that agreements may have been reached that were not publicized. So I don't want to create a situation where someone comes in later and says well, wasn't it, in fact, March 25th? Whatever you're going on is available in the public domain, and I'll go with it, but I know there were times there were agreements that we reached that we didn't necessarily publicize them --**

Q. Yeah.

A. **-- I just don't have those times --**

Q. Is it your best recollection that you didn't have a publicly announced retiree representative agreement prior to April 15th?

A. **My best recollection is based upon the reports that you have so if that's what you -- if that's what you recall, then I have no reason to believe that's not true.**

Q. Let's see what I've got here. For example, here's one that I won't mark just for speed, but it's an article

KEVYN ORR, VOLUME 2

dated April 1, 2014, that's called Detroit's New Plan. And the article is headlined, "The City's art collection would be saved under the proposal but pensioners face benefit cuts of between 6 percent and 26 percent." If I showed you this article, would it lead you to conclude that that was the proposed cut levels as of April 1st?

A. **It would refresh my recollection that at that time that was the reported levels. I have not sat down and gone back and prepared a calendar of each agreement and the date it was entered into and the date it was announced, but I have no reason to dispute you. The only reason I'm trying to say is the actual dates may be different but generally based upon what was publicly announced, I think that's accurate.**

Q. Okay. Okay, so I'm trying to figure out how to do this. Let's try and -- my best information is that your first publicly announced deal on the pension cuts came in the mid-April time frame on or about April 15th, 2014. As you sit here today, do you have a basis to disagree with that?

A. **No.**

Q. Okay. Now, do you understand that the pension cuts that you ultimately struck and that are in the current

KEVYN ORR, VOLUME 2

plan are different from the pension cuts we've been discussing up until this point?

A. **Yes.**

Q. The pension cuts are reduced to 4-1/2 percent for GRS, with the elimination of COLA, and 0 percent for PFRS with the elimination of approximately 45 percent of the COLA, correct?

A. **I think that's accurate.**

Q. There are also additional nuances with respect to the possibility for restoration and ASF recoupment that were parts of both of those deals, correct?

A. **ASF is part of GRS but restoration is part of GRS and PFRS.**

Q. Okay, but I just want to basically get on the same page with you that the deals that you ultimately got the retiree representative groups to buy into were at the 4-1/2 percent cut level on the GRS pension and the 0 percent cut level on the PFRS pension, correct?

A. **Yes.**

Q. And that represented a substantial improvement in the deal from the prior proposed cuts of 26 percent and 6 percent, correct?

A. **I think that's fair.**

Q. And you understand that at the current proposed rates

KEVYN ORR, VOLUME 2

of recovery in the plan that is currently on file, classes 10 and 11 are being paid more than the COP holders; isn't that correct?

A. **Yeah, are being paid more than as proposed to the COP holders, yes.**

Q. Okay. And they're being paid substantially more, correct?

A. **I think it's a significant difference.**

Q. Okay. Now, in fact, under the current plan, according to the disclosure statement the GRS and PFRS classes recover approximately 59 cents on the dollar, correct?

A. **Yeah, I think in the plan, obviously, there's a schedule that shows percentage, but if that's the schedule, yes.**

Q. I think it's actually technically 60 cents for GRS and 59 cents for PFRS?

A. **Yeah, that's --**

Q. That's about correct, right?

A. **That's about correct, maybe a little bit lower on the PFR -- but that's about correct.**

Q. Okay, and the COPs recover at most 10 cents on the dollar, correct?

A. **Yeah, there's a range of potential recovery for the certificates of participation but it's stated at 10**

KEVYN ORR, VOLUME 2

**percent.**

Q. That's based, in part, on the fact that there is an invalidity lawsuit against the certificates and the potential to settle that as part of the plan, correct?

A. **Yes, I think that's fair.**

Q. The 10 cents that's in the disclosure statement represents the best the COPs can do if they are vindicated in the invalidity lawsuit, meaning that the certificates are found to be valid?

A. **Well, no, that's why I said I think there's a range. The --**

Q. I mean the 10 cents is the best they can do?

A. **Yeah, I -- okay, 10 cent -- the 10 cents is our estimate of the best they could do.**

Q. Okay, so with respect to the plan that is on file, and that you're seeking to confirm, with respect to classes 10 and 11 on the one hand and the COPs holder class on the other hand, why did you decide to discriminate in favor of classes 10 and 11 as compared to the COPs holders? And by discriminate, I mean pay them more recovery than you've paid to the COPs holder class?

A. **Right. As we said earlier this morning, in addition to, you know, the assets that the retirement funds had**

KEVYN ORR, VOLUME 2

**in them, which would mean we'd have less ground to make up as opposed to the liability of the certificates which is a -- an ongoing liability, as between the concerns that the obligations, the human dimension, the responsibility the City had to try to keep its covenant with its employees and retirees as opposed to legal arguments that have been made in the papers regarding the COPs that we believe they are void ab initio and that we have no obligation and probably a number of other factors that I'm just not recalling as I sit here today, that resulted in us proposing in the plan that the GRS and PFRS beneficiaries receive a higher recovery than the COPs.**

Q. Okay. So my question is trying to drive on the factors that you considered in exercising your judgment to discriminate between these two classes.

A. **Right.**

Q. Do you understand that?

A. **Yes.**

Q. And you identified four, the existence of assets held in the trusts --

A. **Mm-hmm.**

Q. -- the human dimension that we've discussed earlier, the City's covenant to pay retirees their pensions --

KEVYN ORR, VOLUME 2

A. **Mm-hmm.**

Q. -- and the invalidity of the COPs?

A. **Yeah, the legal position of the COPs, but there may be -- there may be other factors that go into that analysis. I'm just trying to give you off the top of my head sitting here today some of the factors that we considered in terms of proposing the plan.**

Q. Well --

A. **There may be --**

Q. Oh, sorry.

A. **There may be factors having to do with negotiated positions, with a number of other issues, so I don't want to give you the impression that the only thing are the factors you're writing down, there may be other considerations we took into account.**

Q. Well, I guess I'll say understood, but you are the decider, right?

A. **Yes, I am.**

Q. Okay, and so --

A. **I am the -- the decider has a different connotation to it, so I'm the emergency manager.**

Q. You're talking what, the "W" connotation?

A. **Yeah.**

Q. Oh, okay.

KEVYN ORR, VOLUME 2

**A. I don't want to --**

Q. How easy (ph.) do you think I'm going to get on cross?

**A. Yeah, yeah, I don't want to read in the paper Kevyn Orr --**

Q. Okay.

**A. -- thinks he's the decider.**

Q. Kevyn Orr --

**A. I'm the emergency manager who's charged under 436 with discharging certain obligations in a sole discretion including making decisions regarding proposals to classes of creditors.**

Q. You are the man. No. Okay. They were ready to hang up.

(Whereupon conference phone makes noise.)

BY MR. HACKNEY:

Q. I'm out of here, they said, okay, this deposition is off the rails. Hang up and...

MR. ALBERTS: Should we go off the record for a minute?

BY MR. HACKNEY:

Q. Hold on, let me just finish this. It's just a couple more questions, then perhaps we can take a break. Then we can reconnect our friends on the phone and...

Okay, so you are the emergency manager that

KEVYN ORR, VOLUME 2

had to make the decision as to what level of discrimination was appropriate; don't you agree with that?

**A. Yes.**

Q. And I'm trying to understand what went into your decision on that front, and I just want to make sure that I've collected the -- all of the bases that went into the decision that you can recall as you sit here today?

**A. Yes, and I'm trying to give them to you.**

Q. Okay, I understand that, and I just want to make sure that as -- as you're sitting here today, I've exhausted what you're able to recall.

**A. That's fair.**

Q. And these are the four that you're able to recall as you sit here today?

**A. As I said, there are probably many other factors that go into the decision, the potential for the City to be able to pay it going out, a number of other factors that I sat down and had various discussions with my consultants on, but sitting here today, those are the ones that come to me off the top of my head.**

Q. Okay, like there are probably many other factors that you considered but you can't remember them today,

KEVYN ORR, VOLUME 2

correct?

**A. Yeah, I don't want to give you the impression that, you know, I say something, and next thing I know, there's a discovery request well, prove that you considered this or any -- there are many other factors that went into the decision; those are the ones I can remember sitting here today.**

Q. Okay. But is it fair to say that you can remember all of the important factors?

**A. Those are the ones that I can remember today, there may be other ones that are important that I'm just simply not remembering.**

Q. So there may be important factors that went into your decision that you can't recall as you sit here today?

**A. As I sit here today.**

Q. Okay. This is a good time to take a break, so especially with this phone thing.

**A. I'm -- do you want to take? I'm good to go.**

Q. No, I know you are, but I got to --

**A. Okay, you want to take a break, okay.**

MR. SHUMAKER: Let's take a break.

VIDEO TECHNICIAN: The time is 10:16 a.m., we are now off the record.

(Recess taken at 10:16 a.m.)

KEVYN ORR, VOLUME 2

(Back on the record at 10:35 a.m.)

VIDEO TECHNICIAN: The time is now 10:35 a.m., we are back on record.

BY MR. HACKNEY:

Q. Mr. Orr, did you discuss your testimony with your counsel at the break?

**A. No.**

Q. Okay, I want to talk about with respect to the four grounds that you can recall, the information that you relied upon with respect to each.

**A. Mm-hmm, yes.**

Q. And I wanted to start with the assets held in the trusts.

**A. Mm-hmm.**

Q. That was the first ground you mentioned. For that, I take it you relied upon data from the retirement trust regarding the various levels of their assets?

**A. We relied on data from the retirement trust including reports by Gabriel Roeder, their actuary, as well as their own documents but we also relied upon data from Milliman, which was the actuary hired by the City, and analyses prepared by E & Y, Miller Buckfire, and Conway MacKenzie, as well.**

Q. Is it fair to say that to describe the body of

KEVYN ORR, VOLUME 2

respect to their mean pensions.

A. **No, it was also with probable -- it wasn't just pensions, it also -- there was aggregate data regarding healthcare, there's aggregate data regarding an alternative savings fund recoupment. So I know you're focusing principally on pensions, but I looked at a number of data as a composite of what the impact would be to these pensioners from a human dimension.**

Q. Okay, and evaluating the personal hardship they would suffer?

A. **Correct.**

Q. Okay. And that was -- was that one of the most important things that drove you in connection with this decision? It seems like it's moved you.

A. **Well, I don't know if it's one of the most important, but it -- all of them are important, the amount of money, the Grand Bargain, the -- the grantors have given us $866 million we didn't have seven months ago, so that's pretty important.**

**The human dimension certainly is something that you have to take into account. These are real people with real consequences. So all of it's fairly important to me.**

Q. Okay. Now, you -- the third thing you talked about

KEVYN ORR, VOLUME 2

was the City's covenant, which I understood you to mean the City's promise that it would pay these people their pensions?

A. **Yes.**

Q. And I take it from that the information you would have relied upon was just the contract saying that folks were entitled to these pensions?

A. **No, you know, we -- I also had access -- you know, I talked with some City employees, for instance, who currently work for the City, Gary Brown, who is a retired Detroit police officer but is on a personal service contract here in the City now, PSC, and I talked to him about the historical commitments that the City has made, he's a lifetime resident, been here a long time. Chief Craig, who was born here, for instance, and his parents have been in the City, I talked to him. I talked to individuals.**

**So it's not just an analysis of, say, raw data. I mean, I have communications with people on staff here in the City who will ask me if they can come in and talk to me, and I'll listen to them.**

Q. I guess what I meant here is one of the factors you identified as -- as informing your judgment with respect to what to pay classes 10 and 11 versus COPs

KEVYN ORR, VOLUME 2

holders, you identified was the City's covenant.

A. **Yes.**

Q. And I took that to mean the fact that the City had a contractual obligation to pay these people?

A. **Right, and what I'm trying to relay to you is it's not just a fact that the City had a contractual obligation; it is the commitment and reliance on that commitment behind that contractual obligation that various City employees and retirees will come and express to me in very real terms what this means to them.**

Q. I see.

A. **And so the covenant is not just a technical document, it is also an expectation, a reliance, a commitment the City has made, and employees and retirees express it to me in very -- sometimes very candid terms.**

Q. I see. What you're saying is you relied not only the existence of the legal obligation to pay but also testimonies you got from people that they had relied on that?

A. **Yes.**

Q. And isn't it fair to say that this is another element of the human dimension, which is the unfairness of cutting the pensions of people who relied on the

KEVYN ORR, VOLUME 2

City's covenant in making decisions about how to allocate their work time?

A. **You could say that.**

Q. And then the last issue that you identified was the invalidity of the COPs; do you remember that?

A. **Yes.**

Q. And that was something that you factored into your decision in terms of paying the COPs less than classes 10 and 11, correct?

A. **Yes.**

Q. And I take it you relied upon legal analysis from your counsel about the potential invalidity of the COPs, correct?

A. **Yes.**

Q. And I know that there had been a lawsuit filed prior to the time of the current plan being filed, but I assume that if I asked you questions about what your attorneys had advised you with respect to the invalidity of the COPs you'll invoke the attorney-client privilege and decline to answer?

A. **Yes.**

Q. Okay, so I hope we can stipulate that if I ask a bunch of questions about how the COPs analysis factored into the decision that the attorney-client privilege will

KEVYN ORR, VOLUME 2

be invoked?

MR. SHUMAKER: Assuming your question gets to communications between counsel and Mr. Orr, yes.

BY MR. HACKNEY:

Q. Well, I mean, did you -- did you -- in assessing the invalidity of the COPs as a factor justifying the level of discrimination, did you consider anything other than legal advice around the invalidity of the COPs? It seems like a legal question.

**A. It's a legal question, but in an effort to be forthcoming and fair to you, I'd have to say yes, and I'll try to tell you, for instance, without discussing the -- and going afield of many discussions, legal opinions, analyses, meetings, written opinions, that I received from counsel.**

**So for instance, in looking at the COPs, in addition to those things, you know, I examined news reports about that transaction, I think I've even examined those -- some of those before I got here. Reports, for instance, by the auditor general that it questioned the propriety and validity of the COPs reports at that time when -- I think it was Auditor General Hart (ph.) back in 2005, City Council statements that were made. Statements made by the**

**KEVYN ORR, VOLUME 2**

**City treasurer back then that it was invalid and inappropriate to enter into the COPs and that it would make the City bankrupt and that the City should have declared bankruptcy in 2005.**

**So there's other data that I looked at to inform myself, just not the legal analyses about position of the COPs, and some of that data was contemporaneous with when they were initially entered into and some of that was subsequent to that.**

Q. And you identified a number of individuals or reports that you had read; I didn't hear any lawyers in any of those things. Were there?

**A. None of my lawyers were in those things, so there was -- there's, you know, document -- documentary evidence that is short of the legal opinions I got from my counsel.**

Q. Okay, so but to tie it up, was the principal information that you relied upon legal advice conveyed to you by your lawyers about the invalidity of the COPs?

**A. Yes.**

Q. And I -- just so I understand the way the judge -- the factor plays through your judgment, you looked at the potential invalidity of the COPs and viewed that as

KEVYN ORR, VOLUME 2

one reason to pay the COPs on their best day 10 cents?

**A. Yeah, I don't know -- I don't want to give the impression that it was that binary, you know, a number of issues, as I said before, went into what we could afford to pay --**

Q. Yes.

**A. -- the validity of the claim, which is pretty typical in bankruptcies, all that stuff, but I think that's a fair statement.**

Q. Okay, I'm talking when you were deciding how to divide the pie, the COPs best day recovery was impacted by this factor of the potential invalidity of the COPs?

**A. Yes.**

Q. Now, with respect to the information in these four areas that we've just talked about, the information that relates to each of the four factors you identified --

**A. Mm-hmm.**

Q. -- was there a material change in this body of information between April 1 and April 15 of 2014?

**A. I don't know, you say material change, what are you -- what do you mean?**

Q. Is there anything that sticks out to you with respect to any of your four factors and the information

KEVYN ORR, VOLUME 2

associated with each that changed materially between April 1 and April 15?

**A. To be frank with you, I can't -- I can't recall if there was, but I don't -- nothing jumps out at me.**

Q. Okay. Now, in structuring the plan, did you take advice from Miller Buckfire?

**A. Yes.**

Q. And in deciding what levels of discrimination between creditors was appropriate, did you also take advice from Miller Buckfire?

**A. Yes.**

Q. And did you specifically take advice from Ken Buckfire?

**A. I -- I would have regular restructions (sic) with Ken and other members of his team, so I think it's fair to say yes.**

Q. Did Mr. Buckfire recommend to you that when it came to evaluating the recovery of the retirees that the City should consider the pension recoveries in combination with the OPEB recoveries in making a determination as to what the level of discrimination was?

MR. SHUMAKER: Object to the form.

BY MR. HACKNEY:

Q. Do you understand my question?

KEVYN ORR, VOLUME 2

**range.**

Q. And what's your estimation and what's the City's estimation of the anticipated cost of litigating the COPs invalidity lawsuit?

**A. The cost, here again, is a range from a continued rate of, perhaps, several -- low end of several million dollars a year to mid or high end of up to 5 to $10 million a year depending upon the fervor of the litigation.**

Q. Now, Mr. Orr, do you agree that the labor unions have been fierce advocates for active employees in the City of Detroit?

**A. Yeah, I'm -- you know, I don't know if they've been fierce advocates. They have certainly been supportive of the agreements that we reached and have encouraged their membership to vote yes and support the plan.**

Q. But they have been fierce adversaries when it came to negotiating the collective bargaining agreements, correct?

**A. Yeah, I will agree with that.**

Q. They -- they work hard to protect the interests of active employees, correct?

**A. Yes.**

Q. And the labor unions are also politically active in

KEVYN ORR, VOLUME 2

the City of Detroit; isn't that a fair statement?

**A. I think that's a fair statement.**

Q. And they're also politically powerful in the City of Detroit; wouldn't you agree?

**A. I mean, various people could handicap whether or not they're powerful. I know they are politically active and have been for sometime.**

Q. Well, do you -- I mean, come on, you've lived in this city, the bluest of the -- of some of the cities in Detroit (sic), and you must have a sense now that the labor unions are politically powerful entities in the City of Detroit?

**A. Well, no. Last year some of the unions were backing a different candidate than the candidate that won the mayoral race, so that would not necessarily be a testament to their power.**

Q. So you don't agree with the idea that the unions are politically powerful in Detroit?

**A. I don't necessarily disagree that they're powerful, I'm just saying that I don't want to give the impression that there's a level of power that reaches omnipotence. I think the unions are active, which I will agree with, and I'll be careful about characterizing whether or not they're powerful because**

KEVYN ORR, VOLUME 2

**they've mounted a pretty -- some of them mounted a pretty serious opposition against Mayor Duggan's campaign, and he ultimately prevailed.**

Q. Now, you also understand that the retirement systems have boards of trustees that have fiduciary duties to the beneficiaries of the retirement trusts, correct?

**A. Yes.**

Q. And those individuals are charged with protecting the beneficiaries of the trust, correct?

**A. Yes.**

Q. And you also understand that the retirement systems publish an enormous amount of data regarding the allocation of their assets and the investment returns and the financial performance of the pension trusts?

**A. Yes, they in conjunction with their advisors.**

Q. Okay. Now, would you agree that the retiree associations that we talked about earlier have also been strong advocates for retirees in this case?

**A. Detroit Retired City Employees Association, Detroit Retired Police and Firefighters Association, the Retiree Committee principally?**

Q. Yeah.

**A. Yeah, I believe that's true.**

Q. There's like a million acronyms so I just --

KEVYN ORR, VOLUME 2

**A. There's UCR, DPR, FR --**

COURT REPORTER: Eh-eh-eh-eh-eh.

(Laughter.)

**A. Yeah, you've been here long enough, they roll off your tongue, but yes, those groups.**

BY MR. HACKNEY:

Q. Yeah, you probably actually know them all?

**A. I do.**

Q. I'm not going to ask you that.

**A. Okay.**

Q. Isn't it true that many of the retirees are current or -- sorry, many of the retirees are former union members?

**A. Yes.**

Q. Wouldn't you agree with me that the retirees with all of these different types of representation of their interests are by no means helpless?

MR. ALBERTS: Objection.

**A. Yeah, I -- I'd be careful about characterizations like that. I mean, for instance, one of the things we were concerned about with the retirees was that they have representation, and thus we asked for a retiree committee to be formed so there was someone we could negotiate with.**

KEVYN ORR, VOLUME 2

**There are some individual retirees that some people would characterize as helpless. Some are disabled, some are of modest means, some are quite confused by the situation. So I don't want to say that there are not individual retirees who anyone charitably would characterize as helpless, but there are organizations that are designed to represent their interests.**

BY MR. HACKNEY:

Q. I mean -- I guess what I mean is to say is you would not characterize the retirees as helpless?

**A. Here again, there are organizations designed to represent their interests, I am concerned about some individual retirees who would be characterized as helpless, yes.**

Q. So have you ever attempted to make a determination as to which percentage of the retiree class 10 and 11 are helpless retirees as opposed to not helpless?

**A. No, as I said, we tried to create a structure in place there is someone we could talk to through the retiree committee to make sure that retirees' interest was represented.**

Q. Do you agree that during the history of the City of Detroit, to the extent active employees were concerned

KEVYN ORR, VOLUME 2

about the direction of the City of Detroit, they could leave their job and seek employment elsewhere?

**A. Yeah, there was no involuntary servitude in the City of Detroit. People could -- people could resign.**

Q. And in fact, isn't it your testimony that certainly in the run-up to bankruptcy, you saw people leaving their jobs because of concern?

**A. Well, that goes to your prior question about attrition, but yes, we did.**

Q. Okay. Now, we talked a little bit about the expectations of retirees in connection with the -- some of the discussions we had about whether people had relied on the covenant that we talked about?

**A. Yes.**

Q. Do you remember that?

**A. Yes, I do.**

Q. Is it fair to say that your analysis of information relating to retiree expectations is based principally on the conversations that you had with people about their reliance on the City's promise?

MR. ALBERTS: Objection.

**A. I think it's fair to say that between conversations that I had, analysis, talking with their professionals and advocates on their behalf, listening -- as I said,**

KEVYN ORR, VOLUME 2

**listening to some of the statements that were made, looking at some of the representations that have been made by the City over the years, I think it's fair to say there is a number of different information that came in concerning the obligations to retirees.**

BY MR. HACKNEY:

Q. Now, did you -- did you attempt to determine what other creditors' expectations were vis-a-vis the City?

**A. Oh, I certainly heard from other creditors, expectations from rating agencies, from financial publications, from statements made in the press from them, as well, that their expectation was that they were going to be paid.**

Q. For example, did you talk to any of the -- of the COPs holders to determine what their expectations were about when they invested?

**A. I know I talked to some of their representatives. I don't know if I talked to any of the principals or any of the individual holders.**

Q. Okay. Fair to say that you haven't talked to any COPs holder who told you that they expected not to be repaid, correct?

**A. I think that's fair.**

Q. And you haven't talked to any other financial creditor

KEVYN ORR, VOLUME 2

who told you that their expectation was that they would not be repaid, correct?

**A. There was a conference in New York last fall where some creditors as identified who represented that they had interest in Detroit's debt said that they knew that the City probably would not be able to pay this debt but nonetheless they expected to be paid and they were going to punish the City. They came up to me at the conference with their finger in my face about that. But I can't -- I don't know -- I didn't take their card, I don't know their name, but generally speaking, I -- I was -- excluding conversations we've had in mediation discussions, which are protected by the order, I don't recall with specificity any particular creditor principal coming up to me and saying they did not expect to be paid.**

Q. I mean, let me try to tie it up this way. By the way, I can't believe that thing actually happened to you, only in New York.

**A. No, it's happened to me many times --**

Q. No offense to New Yorkers --

**A. Oh, it was ugly.**

Q. We don't do that in Chicago but...

MR. PEREZ: I thought you were a Michigan

Page 302

KEVYN ORR, VOLUME 2

**efforts of the fund to drive down, for instance, on the general side the level of investments in real estate to a more acceptable level, and there's been some success with that, so I'm just not sure if that's -- if that's accurate.**

Q. So let's go back to restoration, and let me ask you, have you conducted an analysis that looks at the likelihood that restoration will be achieved?

**A. One, I personally have not done it, okay, so don't --**

Q. I think we'll both express thanks for that.

**A. But -- yes. But I do believe some of my -- I do recall, and I don't know if it was Milliman or some of the other advisors, but there being some analysis of what would be necessary to achieve restoration over the period of nine years.**

Q. So you think there has been analysis that shows this is what's required to achieve restoration?

**A. Yeah, I think there was an analysis about expected rate of return over that period of time and how you could get to restoration with the funding levels.**

Q. So that would be like a sensitivity analysis that said at this level, people will get this; at this level they'll get this?

**A. No, more of a rate of return or a run rate on expected**

Page 303

KEVYN ORR, VOLUME 2

**rate of returns to get to the restoration qualifier, you have to get to a certain point to be qualified to pursue it and I think there was some analysis done in that regard.**

Q. What is your understanding of the likelihood that restoration will occur in whole or in part?

**A. I don't know if I have an understanding. I mean, I -- as part of -- I don't think these were discussions with my attorneys. As part of discussions with my advisors, in particular, because I believe the funds performed fairly well in excess of 13 percent this year. As part of the discussions with some of my advisors, there was a general feeling that if the funds continue with that level of -- of commitment and sort of orthodox in terms of investment, that there's a good chance they could achieve restoration.**

Q. Okay. Is that -- is that the extent of your present understanding on the likelihood of restoration?

**A. Yeah, that's all I recall, I don't recall an analysis that said at this investment rate this percentage probability occurs and -- I don't recall that.**

Q. Okay. And is it -- am I correct in saying that the only restoration the PFRS can get is of the COLA, because that's the only thing that's been cut, right?

Page 304

KEVYN ORR, VOLUME 2

**A. I think -- yeah, I think that's right.**

Q. On the GRS side you can definitely get restoration of the cut to your face pension amount, right; is that correct?

**A. Yeah, the 5.5, yes.**

Q. Or the 4.5?

**A. 4.5? 4.5, yeah.**

Q. You can get the full amount of that restored if all these eventualities we discussed come to fruition, correct?

**A. That is a possibility, yes.**

Q. Can you get the COLA back?

**A. I think that if there's excess, you might be able to, but I'd have to go back and look at the document.**

Q. Just out of curiosity, isn't it true that the cost of living adjustment that has been claimed by classes 10 and 11 as -- as entitlements that they have under their -- their -- their agreements and the ordinances setting their pension levels are not actually found anywhere in the historical collective bargaining agreements?

**A. I don't -- I don't know if that's true, I don't recall.**

Q. Okay. Isn't it -- I had heard that the cost of living

Page 305

KEVYN ORR, VOLUME 2

adjustment was a practice of the systems and not a negotiated term of the -- of any of the City's historical CBAs, and I was wondering if you knew whether that was true or not.

**A. I don't recall.**

Q. Is that something you studied?

**A. In the discussions, probably, I just don't recall.**

Q. Now, Mr. Nowling acts as your communications director; isn't that correct?

**A. Yes.**

Q. Okay, and it's fair to say that you have worked closely with Mr. Nowling since the time he was hired, correct?

**A. Yes.**

Q. And Mr. Nowling was also -- had a role in connection with Governor Snyder's campaign for governor; isn't that correct?

**A. I believe so.**

Q. And wasn't he communications director for Governor Snyder?

**A. I don't know his exact title, but I know he was involved in the campaign.**

Q. And was Mr. Nowling recommended to you by Governor Snyder?

Pages 302 to 305

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

KEVYN ORR, VOLUME 2

**A. Yes, I think in part there have been reports for some time over practices, in addition to analyses they've done in this effort that have disclosed some of the practices led to underfunding.**

BY MR. HACKNEY:

Q. And these are also disclosed in the plan -- or in the disclosure statement in the plan, I believe?

**A. Yes.**

Q. And it is a fact that the City believes that the so-called 13th check contributed to the underfunding of the retirement systems, correct?

**A. Yes, there have been stories written about it in the Free Press at length about the 13th check.**

Q. And it's a fact that the City believes that the annuity savings fund and how that was handled contributed to the level of underfunding of the retirement systems, correct?

**A. Yes.**

Q. And it's correct that the board of trustees self -- declarations of their rates of return at rates that were different from the actual rates of return contributed to the underfunding of the pension system, correct?

MS. GREEN: Objection.

KEVYN ORR, VOLUME 2

COURT REPORTER: I'm sorry, who's objecting?

MS. GREEN: Ms. Green for the retirement systems.

**A. Yes, I believe in particular related to the alternative savings fund.**

BY MR. HACKNEY:

Q. And it's also correct that the City has found that pension trustees engaged in imprudent expense practices; isn't that correct?

COURT REPORTER: I can't hear you.

MS. GREEN: Objection, form, foundation.

MR. KING: Objection, foundation.

MR. ALBERTS: They're the same person.

**A. Yes, I believe that's true.**

BY MR. HACKNEY:

Q. And it's also true that the retirement trusts have had members of either their administration or their board of trustees convicted of Federal bribery charges; isn't that correct?

**A. I don't recall the specific charge but there have been people sent to prison, yes.**

Q. And it was for conduct unbecoming in connection with their job duties with the retirement trust, correct?

KEVYN ORR, VOLUME 2

MS. GREEN: Object to form and foundation.

**A. Yes, I believe that's true.**

BY MR. HACKNEY:

Q. So -- and I just want to make clear that the City actually believes after it -- having investigated these problems that these problems actually contributed to the level of underfunding of the GRS system, correct?

MS. GREEN: Same objection.

**A. Yes.**

MR. HACKNEY: What's the objection?

MS. GREEN: Objecting to form.

MR. HACKNEY: Right, but what's the form objection?

MS. GREEN: It's --

MR. HACKNEY: It's just important questions being asked, I'm going to object?

MR. KING: Well, foundation objection, also.

MR. HACKNEY: Well, I asked them if they conducted an investigation so...

BY MR. HACKNEY:

Q. How did that factor into your calculus of what recoveries classes 10 and 11 should get versus COPs

KEVYN ORR, VOLUME 2

holders?

**A. Well, I think as I said before, we've taken everything into consideration, but recognizing some of the behavior and difficulty, some of the leadership had to be balanced against some of the lack of culpability, if you will, for lack of a better word of the rank and file membership. So while we were certainly aware that people have been convicted, that some of the practices were ill-advised over a number of years, we also have to consider that for the average pensioner, they have no culpability in those practices.**

Q. Why do you say that?

**A. The average pensioner wasn't making decisions that required them to go to jail or, perhaps, wasn't as informed as some of the other conduct that was occurring.**

Q. But they weren't getting the 13th checks?

**A. Some were getting the 13th checks, but that was a practice that many of them that I've talked to didn't even recognize as inappropriate. They had been told over a number of years that that was similar to the private sector's Christmas bonus and, in fact, helped some of them pay their heating bills during the winter.**

KEVYN ORR, VOLUME 2

Q. And you understand that the trustees, I think, are in large part elected to the board, right?
A. **Yes.**
Q. And they're elected by their pensioners, right?
A. **Yes.**
Q. Okay. So some of the wrongdoing was by people that had been put in position by the pensioners, right?
MR. KING: Form and foundation.
A. **Sure, but, you know, by that logic, the entire United States was responsible for Richard Nixon's behavior.**
BY MR. HACKNEY:
Q. Except for the ones that voted against him?
A. **Maybe so.**
Q. Now, the -- fair summary, that you didn't -- I guess you didn't hold these facts against the retirees when it came to making your decision of what they should recovery?
A. **No.**
Q. I'm correct?
A. **You are correct.**
Q. Now, you're aware that recoveries of the classes 10 and 11 are in part funded by the payments by the foundations and by the DIA Corp., correct?
A. **Yes, I'm aware of that.**

KEVYN ORR, VOLUME 2

Q. I asked Mr. Buckfire questions on this subject, I'll ask you, as well, but do you agree that the -- the riskiness of those contributions being made, and I'm talking about the charitable foundations and the DIA Corp., the relative riskiness that those folks won't come through on what they've said they'll do is very low?
A. **Yes, I will agree with that.**
Q. Okay. And these are very solvent charitable foundations that are going to be good to their word, correct?
A. **Well, let me just answer this. There are three categories of contributors. There are the foundations which number over a dozen which have made a contribution of commitment of 366 million, and all of them are quite solvent, some of them are the largest charitable organizations in the world. There are a group of DIA benefactors affiliated with the founder's society which have made commitments of a hundred million dollars, and most of those a combination of institutions, foundations and individuals, at least to the best of my knowledge, appear to be good for it, and then there is the State settlement which has a total value of 350 million, and that amount of $194.8**

KEVYN ORR, VOLUME 2

**million is going to be funded in cash upon confirmation. So the risk that that total 350 value will not occur is almost nonexistent because that will be a cash contribution.**
Q. You're right, the State -- the risk of the State contribution not being made will be zero if the plan is confirmed.
A. **That is correct.**
Q. The risk with respect to the charitable foundations and the DIA Corp that they will not come through on their contributions is very low?
A. **That is correct.**
Q. And if you were applying a discount rate to the charitable foundations and the DIA Corp. that took into account the time value of money and the risk that the payment wouldn't come in, you would apply a very low discount rate?
A. **I don't know if you would apply a very low one, you would apply a reasonable discount rate so that you could account for the value of the money actually being there in the out-years, recognizing that given economic vagaries that in any seven- to ten-year span on average, markets go up and markets come down.**
Q. Right. Okay, but have you attempted to determine --

KEVYN ORR, VOLUME 2

do you have an expectation of what the City's credit rating will be upon emergence?
A. **I have a hope that the City's credit rating would be investment grade, but we won't know until we -- actually until we go to market.**
Q. Have you taken any advice on this subject from anyone as to what they believe it will be?
A. **Yes.**
Q. Who?
A. **Well, some of it from our financial advisors, and there are others that are -- some of it is caught up in the mediations.**
MR. SHUMAKER: Mediation.
A. **Yes.**
BY MR. HACKNEY:
Q. Did you take advice on this subject from Mr. Buckfire?
A. **Yes.**
Q. And what advice did he give you?
A. **Putting aside any discussions relating to the mediations, some of his advice is if we could drive the City's performance and ratios, you know, on debt to income, debt to service, other ratios, that there might be an opportunity for us to achieve certainly a higher credit rating on some issuances and some**

Page 346

KEVYN ORR, VOLUME 2

subject -- it was one of the drivers of our motion to continue, but in fairness like I really may need to come back and re-depose you on this when it's been public for at least some period of time because it was in flux.

**A. Let me say this, like I said, whatever's public I have no reason to believe whatever's been made public is inaccurate, but I do know that they're continuing discussions regarding details of the settlement, so I just want to be very careful.**

Q. And you're also -- fair to say you're unwilling to say that the 55 million I alluded to represents the full amount of what they're getting, correct?

**A. I have no reason to believe that's not -- there is anything in addition to what you may have heard economically.**

Q. Okay. But are they only getting 55 million or not?

**A. I have no reason to believe there's anything more than that.**

Q. Okay. Well --

**A. Based upon published reports.**

Q. What is the basis for paying the LTGO 34 cents and paying COPs holders 10 cents?

**A. Now, I do think we are getting into the mediation**

Page 347

**KEVYN ORR, VOLUME 2**

**order.**

Q. Okay, so you're -- you'll decline to answer questions about your basis for discriminating between those two classes?

**A. I think I have to.**

Q. Okay.

MR. SHUMAKER: Well, you don't have to -- you don't have to reveal the terms of the settlement.

THE WITNESS: Right.

MR. SHUMAKER: But I think you could talk in abstract, in the abstract about comparing the LTGO settlement with the COPs holders, which I think is what Mr. Hackney is getting at.

**A. Well, let's do this, see if I can talk about it generally and I'll try to just step it as we go through it to see. I mean, I think it's fair to say that that is a result of a negotiated solution in the mediation process. I think it's fair to say there was some give and take between the parties as to what potential claim was. I think it's been reported that there was an argument made that that particular class of creditors had a different status than just general unsecured, and that that status should have some level of recognition. I think that's about all I can say.**

Page 348

**KEVYN ORR, VOLUME 2**

BY MR. HACKNEY:

Q. Okay, you do agree that the City has classified the LTGO creditors as general unsecured?

**A. I believe that's our last classification, yes.**

Q. Okay, and that's the same classification as the COPs holders?

**A. Yes.**

Q. And you also agree that the LTGO bondholders are financial creditors like the COPs holders?

**A. Yes, I believe there's financial creditors as opposed to pensioners, for instance, yes.**

Q. Right, and in fact, many of them have monoline insurers standing behind the bond, correct?

**A. Yes.**

Q. So you would agree there are a lot of similarities between the COP holder and the LTGO correct?

**A. There are a lot of perhaps superficial similarities but I think the allegations that have been made against the COP holders in the litigation raise other dissimilarities between them.**

Q. And you're talking about the invalidity suit?

**A. Yes.**

Q. Okay, and you understand that the way the plan works is that the -- a reserve is set up for the COP holders

Page 349

KEVYN ORR, VOLUME 2

that represents what their total recovery could be?

**A. Yes.**

Q. And that's what their total recovery could be if they prevail in the invalidity suit, correct?

**A. Yes, a reserve over a period of time as opposed to a hundred-and-X-million dollars of cash, yes.**

Q. Yeah. Well, it's actually a bunch of B notes that go into the reserve.

**A. That's what I said time, time wise, yes.**

Q. Okay, yeah. Now, are you aware of any other basis to distinguish the LTGO from the COPs other than the potential invalidity of the COPs and this argument that the LTGO have made that they are not an unsecured creditor?

**A. Am I aware?**

Q. Yeah.

THE WITNESS: Am I aware?

BY MR. HACKNEY:

Q. Or do you have any other basis for discriminating other than those two things?

MR. SHUMAKER: I think you can answer that.

**A. Yes.**

BY MR. HACKNEY:

Q. What is it?

Pages 346 to 349

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

**KEVYN ORR, VOLUME 2**

Q. Okay.

**A. But with some assistance of other documents, I might.**

Q. Okay. Now, we are going to now talk about the UTGO settlement --

**A. Okay.**

Q. -- which you had referenced earlier.

**A. Okay.**

Q. Now, you're aware that the -- a majority of the UTGO bonds entered into a settlement agreement with the City, correct?

**A. Yes.**

Q. Now, the way that settlement works is that the UTGO holders get 74 cents on the dollar of their -- the face amount of their bonds and the remaining 26 cents is paid to the retirement systems, correct?

**A. I believe that's correct.**

Q. And that 26 cents -- and you could correct me if I'm wrong here, because I may be, but doesn't -- isn't that the amount that goes to the, like, the so-called poverty --

**A. Income --**

Q. -- income --

**A. -- income stabilization plan.**

Q. Yeah.

KEVYN ORR, VOLUME 2

**A. Yeah.**

Q. That's earmarked to go in there to help folks that fall below the poverty level to make sure that they don't?

**A. Yeah, I believe the poverty level is indexed at 130 percent of the Federal poverty level for the metropolitan area, and that fund is designed for the term of the contributions, I believe 20 years, to have sufficient money to make sure that no employee or retiree -- no retiree typically falls below the poverty level.**

Q. Okay, so if you're a retiree and the cut to your pension and your other circumstances, I guess, lead it to that where you're below the poverty level and you can show that, then the fund that we're discussing now kicks in and gives you money to get you back up to 130 percent of the Federal poverty level?

**A. Yeah, above 130 percent. Generally, there is a -- while this is still under design, the expectation is is that there will be an application process to verify that the employee or retiree has fallen before (sic) the level and then upon verification of qualification for that program that they will be -- their retirement payments will be supplemented.**

**KEVYN ORR, VOLUME 2**

Q. Were either the retirement systems or the official committee -- and I'm going to use the official committee as a shorthand for the official committee and the fact that these retiree associations had some representation on the official committee so I can --

**A. That's fair.**

Q. Were the -- were the retirement systems or the official committee part of the City's negotiation with the UTGO holders?

**A. I don't recall.**

Q. Okay. The UTGO settlement is not contingent upon the settlements related to pensions and OPEB, correct?

**A. I believe that's correct.**

Q. It's a freestanding settlement?

**A. I believe that's correct.**

Q. And it's fair to say that it was the City that wanted to see the 26 cents go to the retirement systems for the antipoverty fund -- the income stabilization fund, correct?

**A. Yes, the City was concerned that any cuts in pension or adjustments would not push anyone into poverty and, therefore, have to apply for Federal -- for assistance.**

Q. Okay, that was one of the City's goals?

KEVYN ORR, VOLUME 2

**A. Yes.**

Q. And I take it it wasn't the UTGO were volunteering to give away 26 cents to the retirement systems, correct?

**A. The negotiations were robust and hard fought and at arm's length.**

Q. And they weren't volunteering to do that?

**A. They were not volunteering to do that.**

Q. Now, Mr. Orr, I want to ask you some questions about DWSD because I know you didn't get asked enough questions about that yesterday and because it's so fascinating.

The -- you understand that in history, the DWSD has been operated as an enterprise fund in many respects separate from the City's general fund, correct?

**A. Yes.**

Q. And you also understand that when it came to the City's UAAL obligations to the pension trusts, that the City has historically allocated a share of that UAAL to the DWSD enterprise fund, correct?

**A. The City has allocated a share of that obligation as a result of the employees at DWSD who are in the GRS fund for that enterprise fund's share of their employees' obligations.**

Q. That's exactly right, so the way to say it is when the City is looking at its UAAL obligations to the GRS it says to itself, well, part of this UAAL is attributable to former or current DWSD workers, right?
**A. Yes.**
Q. And it figures out what that percentage is and then it charges that percentage against the DWSD enterprise fund, correct?
**A. Yes.**
Q. And it earmarks a request for money from the DWSD enterprise fund to pay that percentage, correct?
**A. Yes, I'm unsure if the direct mechanics of whether or not that money is paid directly to the GRS fund or if it comes into the City and goes to GRS as part of the City's overall contribution but there is a percentage relationship for DWSD's share of the GRS obligation.**
Q. And when the COPs came along and ostensibly at least, plugged the hole in the UAAL that existed back in the time, the similar -- the City similarly employed the same sharing mechanism with respect to interest and principal expense for the COPs, right?
**A. Was there an allocation of the COPs funding related to GRS/DWSD employees?**
Q. Right.

**A. Yes, I believe so.**
Q. In fact, you and I have looked at that before, I think, where we've seen one of those kind of complicated allocations you see because remember when you didn't pay the COPs in June --
**A. Right.**
Q. -- that had implications for, you know, your appropriations from the DWSD?
**A. Yeah, allocable -- allocable share --**
Q. That's right.
**A. -- allocable share, yes.**
Q. And is it correct that the allocable share of the DWSD, whether it's to UAAL or to COPs interest and principal service, is approximately 11 percent?
**A. I don't recall the exact percentage, but I think it's in that range.**
Q. Okay, I was wondering if you -- I tried to figure it out --
**A. Yeah.**
Q. -- by looking at it and I couldn't and I wondered if you knew?
**A. At one point I probably did, but I just don't recall right now.**
Q. Now, you talked a lot with Mr. Neal the other day

about this idea that the DWSD is supposed to be a closed system; do you remember that?
**A. Yes.**
Q. And you do understand that -- that one of the notions is that the reason the City believes it can charge the DWSD for its fair share of either UAAL or COPs principal and interest service is because those are fairly considered overhead expenses of the system, correct?
MR. SHUMAKER: Object to the form.
BY MR. HACKNEY:
Q. Because they relate to employees that worked for the system and are part of the true cost?
**A. Yeah, I think you could call it overhead, we -- you know, I've always looked at it as just the City has a whole number of employees, a certain number of them are employed at an enterprise fund and there needs to be a -- roughly equivalent payment relative to those employees at that function at that department.**
Q. But you also understand that the characterization of it actually matters under, like, the bond documents, right?
**A. Right.**
Q. Don't you?

**A. Yeah.**
Q. It has to be characterized, I think, as overhead expense in order to be fairly charged against the system?
**A. That's fair, if that's what you're getting at --**
Q. Yeah.
**A. -- as the nomenclature, yes.**
Q. Because you can't just say I'd like some money from the DWSD, right?
**A. There has to be a reason within the terms of the documents that would justify that allocation.**
Q. That's right, and the reason we've discussed is the fact that a certain percentage of the retirees are former DWSD employees, right?
**A. Yes.**
Q. Okay. Now, if you charge the DWSD for its contribution, isn't it fair to say that the City has to actually use the money in the way that it tells the DWSD it's going to use it?
**A. Generally speaking, yes.**
Q. I mean you can't, like, charge the DWSD for its percentage of the COPs principal and interest service and then take the money and go build a park with it?
**A. Generally speaking, I think that's true.**

**KEVYN ORR, VOLUME 2**

Q. Okay. Do you agree that if the petition -- the bankruptcy petition were dismissed, it's likely that at a minimum, the City could continue to get from the DWSD its share of the COPs principal and interest service?

**A. I have no reason to believe that is not true.**

Q. The DWSD is not insolvent; isn't that correct?

MR. SHUMAKER: Object to the form.

**A. Yeah, I -- I -- there -- there may be -- I don't know if they are or they aren't.**

BY MR. HACKNEY:

Q. In the -- in the postconfirmation time period, if the plan is confirmed, will the DWSD bear any of the interest expense associated with the B notes?

**A. There are currently a series of mediations ongoing surrounding DWSD and its obligations. I don't want to bump up against the confidentiality provisions that I've been admonished not to -- not to breach. That being said, I think I can answer your question. Can you repeat your question?**

Q. Let's try it this way, Mr. Orr.

**A. Yeah.**

Q. Let's try it this way.

**A. Yeah.**

**KEVYN ORR, VOLUME 2**

Q. There are forecasts that you've reviewed, right?

**A. Right.**

Q. And the forecasts include postconfirmation forecasts that assume the plan of confirmation, right?

**A. Right.**

Q. In those forecasts, does the City bear the entirety of the B note interest expense? That's a good way to back into it.

**A. Okay, or is there some expense allocated to an enterprise --**

Q. Exactly right.

**A. I think your question -- that way of doing it, I think your question is fair. It does not bear the entirety of it; there is an allocation.**

Q. Oh, there is an allocation?

**A. I think that --**

Q. Let's put it this way. The answer to that question should be found in the forecast? I literally don't know.

**A. No, but I --**

Q. I was literally asking you a discovery question.

**A. Well, I'm trying -- there is an allocation of 428 million at DWSD that is supposed to go to help finance the note. I think I can speak to that.**

**KEVYN ORR, VOLUME 2**

Q. Oh, I see.

**A. Yeah.**

Q. Because do the pensioners get -- I thought the pensioners don't get B notes, do they?

**A. No, but I'm trying to -- I'm trying to --**

Q. Because I thought that -- that was the nine-year payment that you matched up with the Grand Bargain, but that was cash money --

**A. Yeah, that was --**

Q. -- over the retirement --

**A. That payment is year over year for nine years that's indexed to the possibility of restoration, that's why it's nine years. I'm not sure that goes into what 388 million B note but -- I'm trying to make sure that I don't bump up against any discussions that are going in -- that are ongoing.**

Q. Okay. I mean, is it a fair summary to say you don't know whether the forecast allocated a percentage of the B note interest expense through the DWSD or not?

**A. Yeah, I'd say that.**

Q. Okay. Let's talk about the Grand Bargain some more if we could, Mr. Orr.

**A. Sure.**

Q. Do you know -- the Grand Bargain can also be -- is

KEVYN ORR, VOLUME 2

also known as the DIA settlement, correct?

**A. Yeah, people call it different things, but I think it's fair that people call it either one of those.**

Q. Okay, and so the way it works, we've talked about it, but the DIA settlement is the -- is the contributions of the charitable foundations and the DIA Corp. in connection with the art collection going into a public trust, correct?

**A. Yes.**

Q. And then the state contribution of its money has a number of bells and whistles to it but is, itself, conditioned on the DIA settlement?

**A. Well, yes, it's conditioned on a settlement of claims against the State relating to that provision of the constitution, article 9, section 24 regarding pension rights and also in part for the DIA settlement and the art to be put into the trust.**

Q. Yeah, and that's what I meant by the other bells and whistles. Like even if the retirees gave the State a waiver, that's actually not sufficient for the State contribution. You have to get the DIA settlement, as well?

**A. Yes.**

Q. When did you agree to the Grand Bargain? Let me put

KEVYN ORR, VOLUME 2

it to you this way. The first plan of February 21 contained within it statements to classes 10 and 11 that if you vote to approve and the moneys are received, you'll get X, and if you don't, you'll get Y?

A. **Yeah.**

Q. Do you remember that?

A. **Yeah, it had the little box.**

Q. Yeah. So can we start with that date? Had you agreed to the Grand Bargain as of Feb 21, 2014?

A. **The only reason I'm hesitating is I believe that the values had been discussed but there may have been some other issues still ongoing in the mediation, but I think it's fair to say that to the extent we reported it out in the version of the plan that I had agreed to accept the Grand Bargain.**

Q. Okay. You had made the decision to go with the Grand Bargain?

A. **Yes.**

Q. And you'd made that decision certainly by February 21st, when it's in the plan or at least the contours of it are?

A. **Yes.**

Q. But assuming that you didn't decide on, you know,

KEVYN ORR, VOLUME 2

midnight on February 20th, like when had you reached in your own mind the decision that you were going to go with the approach embodied in the Grand Bargain?

A. **I don't recall. It was sometime prior to the 21st. I'm just trying to make sure that I don't trip over any of the discussions in the mediation but I think it was prior to the 21st, I think that would be fair.**

Q. Are you able to dial it in with any more specificity than that, days or weeks or months?

A. **No, it was evolving for a period of time from late 2013 until early 2014 and I just don't remember a specific date when I said this is something we'll go with.**

Q. Now, the Christie's valuation was not given to you until on or about December 17th, 2013; is that right?

A. **Yes, I believe that's accurate.**

Q. Is it fair to say that you had not decided to go with -- that's -- I'm trying to use a euphemism for the Grand Bargain but --

A. **Right, no, I know what you mean.**

Q. You had not decided to go with the Grand Bargain prior to December 17th, 2013?

A. **When you say go with, that is, that I had not had the full number of the 800 -- what do you mean by go with?**

**KEVYN ORR, VOLUME 2**

Q. Yeah, I mean I guess what I will say is that I understand that the concept's out there and it's kind of building momentum and speed, but can we agree that as an earliest date, let's use the term agreed to.

A. **Right.**

Q. You had not agreed to the Grand Bargain on or about December 17th, 2013, which is the date that you got the Christie's valuation, you had not agreed to it?

A. **I don't recall when you can say I had agreed to it. There had been --**

Q. I'm trying to say a date that we know you hadn't?

A. **Yeah, I know, and I'm trying to -- I don't recall -- I don't recall if that's true or not, I don't recall.**

Q. Oh, so it's possible that you had agreed to the Grand Bargain prior to December 17, you just can't recall one way or the other?

A. **I can't recall one way or the other.**

Q. Okay, so whatever the time is that you agreed to the Grand Bargain, whatever that date is, that's how we're going to describe it since we don't have a date --

A. **Okay.**

Q. -- okay?

As of that time, had the City inventoried the artwork in the DIA collection?

KEVYN ORR, VOLUME 2

A. **In connection with this process or just as a general principal of running DIA?**

Q. Either.

A. **Okay. I believe that the DIA maintained an inventory of the objet d'art that are at the art institute on a regular basis. In fact, I believe that some of that inventory is available via the website, so I think the DIA maintained an ongoing inventory of objects of art at the museum.**

Q. Okay, let me separate for a moment the DIA from what I'll call the City.

A. **Okay.**

Q. Because the DIA is an entity that has an operating agreement with the City, correct?

A. **There is the DIA Corp., which has an operating agreement starting in 1984 and most recently dated 1997, and then there is the Detroit Institutes of Art which is an enterprise with art in it, meaning the real estate and the art that is owned generally by the City, although there's some dispute about that. Generally the DIA Corp. works as a contractor on behalf of the City, but the art and its inventory including any -- any listing of inventory belonged to the City.**

had the City conducted an audit to determine which pieces in the collection were subject to restrictions on alienation that were specific to that piece? And what I mean here, Mr. Orr, is I understand there are arguments made by the attorney general and the DIA that apply to the collection at large.

**A. Yes.**

Q. Okay, I understand that, the public trust argument, the -- and so forth. I am not asking about that because those arguments, at least in theory, apply to everything. I am asking about a specific limitation, for example, in a bequest where someone says, City of Detroit, you can have this beautiful painting but only if you promise that you will never sell it?

**A. Yes.**

Q. Okay, do you understand my question?

**A. Yes.**

Q. Had -- as of the time you entered into the Grand Bargain had the City conducted an audit to determine which pieces were subject to restrictions on alienation that were specific to that piece?

**A. I don't know if the City or its contractor conducted an audit, I know that I had not seen one.**

Q. Okay, you had not seen one?

**A. Right.**

Q. And between the time you entered into the Grand Bargain and the present, has the City conducted such an audit?

**A. Not that I know of.**

Q. And why didn't the City conduct that type of audit before agreeing to enter into the Grand Bargain?

**A. Generally speaking, it was our understanding that there was an understanding of which pieces at the museum could possibly be de-assessed without limitation. That number was relatively low, in the hundreds, I think as has been reported, and that others in one form or another whether pursuant to an actual bequest or will or an understanding with the donor and the heirs or agreements with the museum in some form had some limitation on their ability to be sold outright.**

Q. And that understanding that the City had was based on communications made to it by the DIA Corp.?

**A. Well, communications by the DIA Corp., certainly the attorney general's litigation -- excuse me, members of the DIA board, and the Founder's Society, as well.**

Q. Those were the sources for that information, correct?

**A. There may be others but those are the ones that I**

**recall sitting here today.**

Q. But the City didn't undertake an effort to independently assess whether what it was being told was correct?

**A. No, in fact, the City was told that any attempt to do so might create a lawsuit regarding its ability to not only assess but have the intent to try to de-assess or to otherwise sell the art.**

Q. A lawsuit by the DIA?

**A. By any number of people. There's 60,000 pieces of art. At one point, someone told me that heirs or donors for virtually almost every piece could rise up and file litigation against the City's ability to sell the art.**

Q. And would sue you even if you tried to just conduct an audit to determine what restrictions might exist with respect to pieces of art?

**A. Well, I don't know if we did or didn't conduct an audit, but any audit or attempt to try to determine what the rights were might well create litigation by others who would come in and would say let's determine my view is that my rights are to have an agreement not to have this art sold or de-assessed in any way and I want that determination.**

Q. But are you saying that the City's attempt even to study what the rights of these heirs and other people might be was something that the City couldn't undertake because it might engender litigation?

**A. I'm not saying the City couldn't undertake it. I am saying that under -- and I think it's been fairly widely reported in the press at the time -- that any attempt would have created the situation where -- where donors, heirs, and others, even donors, would have sought to enter litigation prohibiting the City from attempting to sell one piece of art.**

Q. Any attempt to sell the art?

**A. Any attempt to assess it with an idea towards selling it or otherwise de-assessing it, that was what we were told.**

Q. But such an assessment has subsequently been done, correct?

**A. Right, the assessment was done.**

Q. By Artvest?

**A. By Artvest.**

Q. Okay. Did you go get the consent of all of the heirs and the DIA board to do the Artvest report?

**A. No.**

Q. Okay. Did you get the consent of the DIA Corp. to do

it?

**A. I don't know.**

Q. As of the time that you entered into the Grand Bargain, had the City identified which pieces in the collection were worth more than $1 million?

**A. I don't know.**

Q. What documents from the DIA did the City review, and I'm distinguishing the DIA obviously from the City, and I'm talking about your team --

**A. Mm-hmm.**

Q. -- people that worked for the City, your consultants and advisors what documents did they review from the DIA?

**A. Are you including Christie's? Because they were hired by us.**

Q. No, not Christie's, so put Christie's to one side, think about them separately.

**A. Okay.**

Q. What did you and your team and the City look at or get from the DIA in the way of documents?

**A. I don't know.**

Q. Was it substantial?

**A. I don't know. I -- generally speaking, when we came into the City, as you may recall, there was an initial**

**effort, I believe, in the spring time frame, March or April, to retain Christie's.**

**There was an uproar. We spent some time talking to the members of the DIA board about what we had to do and encouraged them to find a solution for the art. That didn't appear towards the fall of 2013 to be coming so we brought Christie's back in and had them because they were the professionals in this world, they understood it, provide an assessment for the pieces which we felt were owned outright by the City. I don't know if any of my professionals looked at any other documents of DIA prior to that. I know there were several meetings with the DIA board and I believe it was over at DIA, but I don't know what they looked at.**

Q. So you don't know what documents were reviewed, you don't know whether copies were produced, you don't know whether they were kept by the City, you don't know anything with respect to review of DIA documents, correct?

**A. Sitting here today, prior to Christie's, I don't know.**

Q. And when you say prior to Christie's, you mean you know that Christie's did work, right?

**A. Correct.**

Q. Okay. You're not saying that your advisors or employees sprung into action and then reviewed documents and you know they reviewed them?

**A. No, we retained Christie's to do the actual assessment.**

Q. As of the date that you agreed to the Grand Bargain what art industry experts had you consulted with?

**A. I think I talked to Christie's prior to the Grand Bargain whenever that was, which I believe was sometime towards the end of 2013, perhaps the early part of 2014, and I know that I talked with Christie's representatives prior to that.**

Q. Anyone else?

**A. I talked to members of the board of DIA Corp.**

Q. I take it -- I was asking about art industry experts, but they may be one.

**A. Yeah, they may or may not be. I'm just telling you who I talked to, but anybody --**

Q. That's okay.

**A. I'm trying to think --**

Q. So let me -- I'm saying other than the DIA and Christie's, did you go engage with any other experts in the art industry to get their knowledge and feedback?

**A. No.**

Q. As of the time that you entered into the Grand Bargain, had the City conducted any analysis of the current market for art?

**A. Other than Christie's?**

Q. Christie's is a fair market valuation, it certainly implicates that, but I guess I meant more like in terms of trends or --

**A. No, someone had sent me a report from somewhere about what was going on in the art world regarding contemporary art versus masters versus Renaissance and that one of the members of one of the houses was going out and started their own business which was focused more on modern art at this time, but there was no formal analysis. People just had information from time to time.**

Q. Okay, so this is going to be the fun part of the deposition. Mr. Orr, do you know who painted Nocturne in Black and Gold, the Falling Rocket?

**A. No, I do not.**

Q. Never heard of that?

**A. I've heard of it, but I don't know who painted it.**

Q. You don't know who painted it?

**A. No.**

KEVYN ORR, VOLUME 2

A. **Yes, correct, like an auction with a reserve to try to get a real value of the market, yes.**

Q. And it has never conducted a sale process with respect to any portion of the art collection, correct?

A. **That is correct.**

Q. It never put any portion of the art collection up for competitive bidding in an auction setting, correct?

A. **That is correct.**

Q. Now, the City has received inquiries from parties interested in buying the art collection or a portion thereof; isn't that correct?

A. **I have seen reports that there were inquiries from parties to buy the art or a portion thereof, correct.**

Q. Okay, and what -- you have seen reports -- oh, are you talking about the Houlihan Lokey?

A. **Yes.**

Q. Okay. So we're going to get to the Houlihan Lokey efforts. I'm talking about inbound inquiries to you and your team where you -- where Mr. Shumaker or someone comes in and says I've got an inquiry about buying the art.

A. **No, I haven't received any.**

Q. Didn't it get inquiries from Russian oligarchs and Brazilian millionaires?

KEVYN ORR, VOLUME 2

A. **Those weren't -- those were statements that I made. Those were general statements that I had heard, but when you said inquiries, I thought you meant like a letter or an offer or an actual real statement, and we had just heard general chatter from time to time about people expressing interest but nothing formal.**

Q. The City had not actually received inquiries from Russian oligarchs or Brazilian millionaires, correct?

A. **No, I had heard from word of mouth that someone overseas was potentially interested in the art institute, but nothing firm.**

Q. Okay, who did you hear that from?

A. **That was at a -- one of these meetings that you go to and, you know, it was like the comments from the bondholders about how they're going to punish the City, that sort of thing, I don't even know their name.**

Q. Okay, and I take you it you never followed up with that, whoever that person making that inquiry was?

A. **No, that person was quite agitated, so I never followed up.**

Q. Oh, they were saying that they were upset by the fact that they were hearing this?

A. **Yes.**

**KEVYN ORR, VOLUME 2**

Q. Was it a DIA person?

A. **No.**

Q. Who was it that told you this?

A. **It was some -- some individual at a meeting that I was at, I think in New York.**

Q. But you can't remember who?

A. **No, as you might imagine, a number of people come up to me on any given day with a number of different axes to grind about something I'm doing, to tell me either what I'm doing wrong or how they support something I'm doing right, and that includes how I dare -- there have been many people who have come up to me in many different venues in airports, on vacation, walking into my apartment about how I dare not sell the art, there are some people who are going to come and denude the City of all its assets.**

Q. Okay, I take it that this person told you that they had heard that some foreign person was interested in the art?

A. **Yes.**

Q. The City, itself, never received such inquiries, though?

A. **Not to the best of my knowledge.**

Q. Okay. And you never engaged other museums to see what

KEVYN ORR, VOLUME 2

they might pay for the art collection, correct?

A. **Other museums I think actually engaged us and said that they wouldn't do business with us if we tried to sell any art.**

Q. My statement's, therefore, correct, right?

A. **Yes.**

Q. The City also has never attempted to borrow against the art collection as collateral, correct?

A. **That is correct.**

Q. Now, we alluded to this earlier, which is the Houlihan Lokey efforts, you were made aware of those, correct?

A. **Yes.**

Q. And you became aware that Houlihan Lokey had received a number of different indications of interest from certain parties with respect to the art, correct?

A. **I became aware that I believe there were four different parties or groups of parties that I -- that Houlihan Lokey had gone out and in some fashion either solicited or received expression of interest from.**

Q. And do you know the names of those four parties?

A. **No, it's in the Artvest report and several other reports. I know that two are related to -- one is related to the Chinese government, another is related to an entity, there are two others and their exact**

KEVYN ORR, VOLUME 2

**names escape me right now.**
Q. You did not contact any of those parties, correct?
**A. No.**
Q. And nor did anyone working on your behalf, right?
**A. Not to the best of my knowledge.**
Q. Okay, and do you remember that one of the offers was for something like a billion five just for the Chinese art?
MR. SHUMAKER: Object to the form.
**A. Yes, I believe there was an offer just for the Chinese art and I believe it was approximately that amount.**
BY MR. HACKNEY:
Q. That one didn't interest you enough to follow up on?
**A. No.**
Q. Why not?
**A. I think we discussed it with some of our advisors and questioned whether or not it was a sincere offer because it didn't appear they'd done any real analysis but decided that in order to address it that we needed to get an appraisal I believe of all the art.**
Q. Did the City attempt to monetize its art collection at any time prior to your arrival on the scene as emergency manager?
**A. Not that I know of.**

KEVYN ORR, VOLUME 2

Q. What steps have you taken to learn about prior monetization efforts?
**A. I met with the director of the -- of the art institute and some of his staff and gone over prior efforts by the City, read as I said, September 9th, 2013 report and some other documents, generally about the DIA.**
Q. Okay, and based on that review, your understanding is that there have been no prior monetization efforts?
**A. None that I was made aware of.**
MR. SHUMAKER: Steve, I don't mean to interrupt, but we've been going about an hour and a half.
MR. HACKNEY: We have been.
MR. SHUMAKER: When's a good time to --
MR. HACKNEY: Like I said -- like I never mean to drive you too long, so --
THE WITNESS: It's quite okay, we can keep going.
MR. SHUMAKER: Let's -- let's take a quick break.
VIDEO TECHNICIAN: We have to get connected on the Livenote feed. The time is 3:02 p.m., we are now off the record.
(Recess taken at 3:02 p.m.)

KEVYN ORR, VOLUME 2

MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBIT 23
3:12 p.m.
(Back on the record at 3:22 p.m.)
VIDEO TECHNICIAN: The time is 3:22 p.m., we are back on the record.
BY MR. HACKNEY:
Q. Mr. Orr, I've handed you a document marked as Exhibit 23. Is this an e-mail that you received from Mr. Nowling on Tuesday, May 28th of 2013?
**A. I'll just read it. Sounds like Bill.**
Q. Yeah, great e-mail.
MR. ALBERTS: Got an extra copy?
MR. HACKNEY: Yeah.
MR. ALBERTS: Thank you.
MR. HACKNEY: I've got a couple actually.
BY MR. HACKNEY:
Q. Have you had a chance to look at it?
**A. Okay. I don't specifically remember but I have read it and have no reason to believe I did not receive it.**
Q. Okay, so the first thing I want to say is that the subject line is thoughts on DIA; do you see that?
**A. Yes.**
Q. And then Mr. Nowling says, let me take the devil's

KEVYN ORR, VOLUME 2

position on this; do you see that?
**A. Yes.**
Q. And the sort of devil's position to me means like let me be the devil's advocate, you know, let me take the opposite position.
**A. Yes, I understand what you mean.**
Q. Okay, so do you know what he's talking about when he says let me take the devil's position?
**A. I don't remember.**
Q. Do you know what this -- what prompted this?
**A. I -- I don't remember.**
Q. Was it a meeting with the DIA?
**A. No, I never had a direct meeting with the DIA, and to the best of my knowledge, neither did Mr. Nowling.**
Q. Okay. But -- and a fairly like, you know, impassioned e-mail from him and I'm just wondering if you can remember, this is about two months after you'd been appointed.
**A. Let me tell you generally what I -- what I recall. I knew that under -- I believe the Bankruptcy Code, some of the early sections 903 or 904 that the City -- I as emergency manager -- and this was prior to the filing, but I think under 436, also, that any efforts to sell any City assets would have to go through a cumbersome**

KEVYN ORR, VOLUME 2

Q. Ah, okay. One of my few victories in the bankruptcy court, and by "few," I mean I think one, was that we were able to compel the production of those documents that showed a fairly extensive exchange of e-mails back and forth between the AG office and the counsel for the DIA dating back I think even until April of 2013?
**A. Mm-hmm.**
Q. I take it that you were wholly unaware that that was taking place?
**A. Yes.**
Q. Fair to say that you did not authorize the DIA to communicate with the AG on that subject?
**A. Yes, I think it's fair to say that.**
Q. Okay, you understand that the DIA operates pursuant to an operating agreement with the City, correct?
**A. Yes.**
Q. And have you conducted a review to determine whether the DIA is -- is in compliance with its obligations under that operating agreement?
**A. Yes. I don't know if I'd call it a review but I believe I was informed that there was perhaps some noncompliance with the agreement.**
Q. And what were you told on that subject?

KEVYN ORR, VOLUME 2

**A. I don't remember specifically, but I believe there were some executory provisions and perhaps -- I don't recall specifically. I know that starting in 1984, Mayor Coleman Young began to bring the department within the City, an agreement was entered into in '87 or '88, it was subsequently amended in '97, and they've been operating under it since that time frame and that I was told by some of my advisors they might be in breach of that agreement.**
Q. Did you ever try to run that to ground to reach a final conclusion as to whether they were or were not?
**A. I think I was told what the -- what the breaches were and whether they were or were not, I just don't recall them today.**
Q. Oh, you were told there are breaches, you just can't remember what the breaches were?
**A. Yes.**
Q. Ah, okay, and do you remember when you were told that?
**A. I had -- well, it was -- I don't recall when.**
Q. Have you studied the question of rejecting the contract of the DIA?
**A. I know that in bankruptcy you have rights to reject, and I think at some point -- I don't recall if we did a deep dive, but as part of pursuing contracts to**

KEVYN ORR, VOLUME 2

**reject or assume, I believe we examined the DIA contract.**
Q. And what was your conclusion about whether to reject or assume it?
**A. I think we planned to assume it.**
Q. Okay. Did you consider the impact that rejecting the DIA operating agreement would have on the DIA standing to sue the City for doing things with respect to the art?
**A. I don't recall.**
Q. Now, you understand that the attorney general has opined that the art cannot be sold or transferred for purposes of satisfying debts or obligations of the City unrelated to the collection or the museum; isn't that correct?
**A. Yes.**
Q. Does the City agree with the attorney general's opinion?
**A. I think the City and my office have always maintained that I believe the crux of the attorney general's opinions that is held in trust and I think we've always maintained that while we recognize it is a valuable asset for the benefit of the City, that the issue of whether or not we own title to some of the**

KEVYN ORR, VOLUME 2

**pieces of the art and, therefore, have the ability to sell or de-assess it is a position that we believe we do.**
Q. Okay. So the City's position is that it has the right to sell at least some of the art, correct?
**A. Yes.**
Q. And the art that it can sell is the 35,000 pieces we discussed earlier?
**A. Not necessarily. I think the pieces that we discussed or the pieces in the Christie's appraisal were the 2,700, or maybe 2,773 or something like that, that for which there is outright title, and I think of that number something like -- a certain number of pieces, below 400 or so, contain 75 percent of the value, so it's a very small segment that contains the majority of the value over at the institute.**
Q. So I want to make sure we're getting clear on terminology a little bit because I may be misstating what Christie's did, so tell me if I'm wrong. I thought that Christie's was asked to value the 35,000 City-owned artworks.
**A. Right.**
Q. Is that correct?
**A. I believe that's correct.**

KEVYN ORR, VOLUME 2

Q. Initially?
**A. Yes.**
Q. And then after they got under the hood, they made a determination that their services were best deployed doing a formal valuation of the approximately 2,700 that are actually identified in their report?
**A. I think that's fair.**
Q. Okay. With respect to your -- the City's view on what it has a right to sell, isn't it correct that its view that it has a right -- what it -- what it can sell maps onto the 35,000 that it asked Christie's to value even though Christie's didn't end up valuing all of that?
**A. Yeah, I think it was our view the 35,000 may be the universe that we had. I think it was Christie's view that you would be better served looking at the 2,700 because there may be a dispute on the balance of the roughly 32,000 left as opposed to the other 60, so they looked at the 2,773 or so I think in balance.**
Q. Do you think --
**A. It was unclear that title, undisputed title was in the entire 35,000 pieces that we had.**
Q. You thought that Christie's actually assessed the -- the title of the 35,000?

KEVYN ORR, VOLUME 2

**A. No, I think what Christie's did was say that this 2,773 is clear, these others may have some questions, we're not going to delve into whether or not those questions are resolved as part of this process, let's focus on the 2,700 that we think qualify under what you're trying to look at.**
Q. Now, the 31,000 -- so if you have 66,000 total and we --
**A. 60 -- 60,000.**
Q. Okay, let's just -- I thought it was 66. What did you say it was, 68?
**A. I think it was 60,500, or something like that, you know, we'll say 61,000.**
Q. Oh, okay.
**A. Yeah.**
Q. So let's say you have 61,000, let's put the 35,000 we've already discussed off to one side --
**A. Right.**
Q. -- okay?
The remainder, what sounds like 26,000, those are ones that -- what is the City's position as to whether it can sell those?
**A. It is unclear.**
Q. Okay.

KEVYN ORR, VOLUME 2

**A. Those are the ones in addition to perhaps not having a significant value, but those are the ones to which there may be claims of heirs, donors, or others that we do not have a right to sell.**
Q. Okay, and the concern there is that if something was donated and it contained within the donation a limitation on alienation, that limitation may bar the City from selling that piece?
**A. Yes.**
Q. Okay, and I take it with respect to this notional 26,000 we're talking about, you don't know how many of them have such a limitation, correct?
**A. How many of them have such a limitation, how that limitation be enforced, what litigation was being -- ensue if we try to sell it in DSS, what the heirs' position would be, we have been told by the benefactors at DIA Corp., however, that virtually any sale of any piece would result in a contest.**
Q. Okay. There has been no heir of which you're aware that has communicated to you directly that they would sue the City, correct?
**A. I don't know if that's true. I did have a conversation with Richard Manoogian and Gene Garago (ph.), and some others, I don't -- I think Richard**

KEVYN ORR, VOLUME 2

**Manoogian may qualify as an heir, I don't think it was as course as a threat to sue, I think -- but it was clearly expressed to me on no uncertain terms that they would view any attempt to try to sell the art as forcing them to take positions to make sure the corporation could retain it.**
Q. Well, outside of the DIA trustees or the DIA administration, you haven't received a direct threat from an heir --
**A. No.**
Q. -- to initiate litigation?
**A. No.**
Q. What steps has the City taken to verify the facts that are in the attorney general's opinion?
**A. I don't know if we have.**
Q. Isn't it true that the City has never registered the collection, the art collection, on the registry of charitable trusts maintained by the attorney general?
**A. I don't know.**
Q. And isn't it true that the City has never filed financial accountings with the charitable trust section of the attorney general's office within six months of the end of each fiscal year?
**A. I don't know.**

Q. And the City has never filed copies of the instruments providing the City with title to donations to the DIA with the charitable trust section, correct?

**A. I don't know.**

Q. Isn't it true that the Detroit Museum of Art sold its art collection building and land to the City in December 1919?

**A. The institute was found in 1885. I believe in 1915 it went over to the City, in 1919, I don't know if that was a sale, the exact nature of the transaction, I know it was transferred from the Detroit Museum of Art to the Detroit Institute of Art, which at that point was a department of the City.**

Q. I take it you haven't made any effort to investigate these historical facts?

**A. No, I've talked to the -- the curator of the museum and the director and some of their staff. I just don't know the consequences of what you characterize as a sale. I haven't seen a bill of sale, I haven't seen a transcript, all that sort of stuff.**

Q. Okay, so was the art conveyed by a bill of sale?

**A. I don't know.**

Q. And you do know that the building and the land were conveyed by a deed; isn't that correct?

**A. I believe the land was transferred to -- the land and the then building were transferred to the City.**

Q. And are you aware that the members of the Detroit Museum of Art attempted to put a limitation on the building and the land and the way that they could be used in connection with the deed but that they were rebuffed by the City Council?

**A. I recall that there was an attempt to put a restriction on. I don't recall from -- I believe it was not attached -- I don't recall the process by which it occurred at City Council.**

Q. And is the City aware of any evidence of a trust agreement that was created at the time of the conveyance of the collection in the -- this time period in the early part of the 20th century, 1915 to 1919?

**A. I don't know if there was a trust agreement created.**

Q. And are you aware of any evidence of a trust agreement?

**A. No.**

Q. After acquiring the collection, the City never entered into a written trust agreement with respect to any of the art in the art collection; isn't that correct?

**A. I'm trying to recall the period from 1919 through 1984**

**and I don't recall a trust agreement being in effect.**

Q. I'm not aware of one, either. I take it the City has never found any evidence since the conveyance to the City of an intention to create a trust between the DMA and the City of Detroit?

**A. The DMA and then subsequently the DIA and the City of Detroit, and I don't know of any.**

Q. Okay. You're not aware of any such evidence?

**A. Correct.**

Q. And the City, itself, has never entered into a written trust agreement relating to the art collection of which you're aware, correct?

**A. Not that I'm aware of.**

Q. Do you know whether charitable trusts were recognized in 1885?

**A. I do not know.**

Q. It's not a question that you've studied?

**A. No, no, it's not.**

Q. And I take it you don't know what the intent was of the Detroit Museum of Art in transferring the art collection to the City?

**A. I -- I've -- I was informed that the museum from time to time as has been reported in press reports had had financial instability issues, and that from its**

**founding as Detroit Museum of Arts in 1885, going through 1915 and with the advent of postwar recession in 1919, it had been in troubled condition financially and that it was an effort to stabilize the museum because its ability to operate from what was then I think the Detroit Institute of Arts' Founder's Society had been in trouble.**

Q. That was the motivation for transferring it to the City?

**A. Yes.**

Q. Okay. Other than that, I take it you're not aware of any testimonial or documentary evidence with respect to the intent of the DMA in transferring the art collection and the building and land?

**A. There may be, but I'm not aware of it.**

Q. And PA 436 grants you broad powers to sell assets in order to rectify a local financial emergency; isn't that correct?

**A. Yes, subject to the terms of the disposition of assets.**

Q. And those generally provide that you have to give the City Council an opportunity to better your deal and consider it and they both go up to the emergency loan board, correct?

KEVYN ORR, VOLUME 2

that were at least initially subject to the Christie's appraisal?

A. **Yes.**

Q. Those were the ones that we've talked previously about the City owning free and clear; do you remember that?

A. **Yes.**

Q. Who identified for Christie's which pieces were the City-owned pieces?

A. **I instructed my team to -- after meeting with Christie's representatives, I instructed my team to assist them in making that determination and that might well have been done over at DIA Corp.**

Q. And do you know whether they made an independent assessment of that or whether they relied on the DIA to tell them?

A. **I do not.**

Q. Okay. Do you think it's a good idea to rely on the DIA to tell the City what art the City owns?

A. **I have no reason to believe that the DIA would do anything but perform their duties in a professional and honorable way.**

Q. Including their vehement opposition to selling the art, that doesn't give you pause in terms of whether they're the best party to ask?

KEVYN ORR, VOLUME 2

A. **I don't believe that I would anticipate the DIA would act unethically.**

Q. Isn't that kind of like foxes guarding the henhouse a little bit, Mr. Orr?

A. **No.**

MR. SHUMAKER: Object to the form.

BY MR. HACKNEY:

Q. Would you ask me to tell you what the validity of the COPs were?

A. **You're my opposition. The DIA is our contractor.**

Q. Well, the DIA was threatening to sue --

A. **I think you're candid with your clients, aren't you?**

Q. What's that?

A. **You're candid with your clients, aren't you?**

Q. Well, when I'm threatening to sue them, I think I'm in a different position.

A. **But that's adversarial. They were a contractor of ours, and I have no reason to believe that they would engage in anything but ethical practices.**

Q. But they were threatening to sue you?

A. **The board was threatening to sue me. I have no reason to believe that our contractor would engage in unethical practices.**

Q. Mr. Orr, do you believe that the DIA's a necessary and

KEVYN ORR, VOLUME 2

essential part of the municipal services offered by the City of Detroit?

A. **Yes.**

Q. Do you know how many municipalities in this country do not have an art museum?

A. **I do not.**

Q. Have you ever undertaken a study of that question?

A. **No.**

Q. Have you ever studied objective data on the average value of municipal art collections?

A. **No.**

Q. Have you looked to see whether such data even exists?

A. **Yes.**

Q. And does it?

A. **I remember seeing some data about the top -- I don't know if this is -- somewhere in the neighborhood of the top 100 -- somewhere between the top 10 and 100 art institutes around the country focusing principally on the ones in the larger cities, metropolitan areas such as New York, Chicago, and Los Angeles.**

Q. Do you doubt that there are literally thousands of towns and villages and cities in the country that don't have an art museum?

A. **I do -- I do not doubt that there are literally**

**KEVYN ORR, VOLUME 2**

**towns -- thousands of towns, cities, municipalities don't have an art museum. Some of them don't have a dog catcher; I don't doubt they don't have a lot of things.**

Q. You wouldn't say that they're not a City just because they don't have an art museum, right?

A. **It depends upon the definition of what a City is, but I wouldn't say that they don't exist just because they don't have an art museum.**

Q. Did you ever evaluate the question of whether or not the City of Detroit could get by with an art collection that was only worth a billion dollars?

A. **Well, some people say our art collection is only worth a billion dollars.**

Q. Well, not your expert.

A. **Well, our expert has given us a range up to 4.6, but I think if you're talking about Artvest, that that range also supposes that if you would try to de-assess it, or actually sell it, that that number could be as low as 1.1 billion.**

Q. But my question is couldn't the City get by with just a billion-dollar art collection? Would that be sufficient?

A. **I don't know if it would be sufficient or not, I know**

KEVYN ORR, VOLUME 2

**that the current state of affairs is we have the Detroit Institutes of Art, which is a significant cultural asset in the City, and that as I understand it, under the Bankruptcy Code and the provision of our statute we cannot be compelled to sell it.**

Q. Have you conducted an economic analysis to determine the economic contribution of the DIA to the City?

**A. I don't know if I did, but I think I -- I saw an analysis of the value that the art institute either through philanthropy events and visitors bring to the City.**

Q. Who prepared that analysis?

**A. I don't recall.**

MR. HACKNEY: Okay, I'd definitely ask that that be produced because it may exist or it may not but I -- it doesn't ring a bell.

BY MR. HACKNEY:

Q. And what did that -- what did that report say?

**A. I don't recall the exact numbers but it -- it -- what I do recall is it tended to suggest that there was actually a positive value to having the art institute in the City.**

Q. Like how much?

**A. Monetary and nonmonetary, cultural, I don't remember,**



KEVYN ORR, VOLUME 2

**but it wasn't -- it wasn't their $10 of value generated to the City, it was significant in the hundreds of thousands if not millions of dollars; I don't recall.**

Q. Okay. So you have a general recollection that this report indicated that the City (sic) generates something on the order of in the hundreds of thousands or the millions of dollars for the City --

**A. Yeah, I think there was.**

Q. -- on an annual basis? Sorry.

**A. No problem.**

Q. I was trying to --

**A. Got it. You know, I want to be respectful.**

Q. She's like now you want to be respectful.

**A. I've been trying.**

Q. We're both bad at it.

**A. I don't recall if it was in the form of a formal report or analyses or focused principally on the financial aspects, I do recall reading or being informed about an analysis of the positive value that the art institute brings to the City.**

Q. But you don't recall if it was reduced to a written report or memorandum?

**A. Yes, I don't recall.**



KEVYN ORR, VOLUME 2

Q. It may have been like in a newspaper article?

**A. Yeah, it may have been or it may have been in an e-mail or memo to me, but I remember seeing something along those lines.**

Q. Do you remember who prepared it?

**A. I do not.**

Q. Okay, and you don't remember what the size of the contribution was?

**A. I do not.**

Q. And what is the nature of the contribution that it brings? Where does the economic contribution come from?

**A. I seem to recall that it was focused something on visitation and activities and opening up and some of it was nonfinancial such as the number of visitors come and have the experience, but I don't recall the specific load star.**

Q. I take it that separate and apart from this thing that you had, you haven't commissioned an independent analysis of what the economic contribution is?

**A. That is correct.**

Q. And I take it you don't know what the average dollar spent by each visitor to the DIA is in the City of Detroit?



KEVYN ORR, VOLUME 2

**A. I don't sitting here today.**

Q. What percentage of visitors to the DIA are under the age of 15?

**A. Actually, I think the DIA might have that information but I don't have it on the top of my head today.**

Q. Okay. Part of the reason I'm asking is I grew up in Michigan, and you used to have to go to the DIA --

**A. Mm-hmm, mm-hmm.**

Q. -- and I actually can't remember when you would do it, but it was either like the seventh grade or the sixth grade, and I think you would go maybe once or twice, but do you agree that when you go to the DIA, you see lots of kids there?

**A. I've been to the DIA once, and that was in connection with the event you discussed earlier today. I have not been to the DIA during normal business hours, so I would not know.**

Q. Oh, so you've never noticed -- you've never seen the school busses all lined up and all the little kids running around?

**A. I've seen the school busses lined up, but I've never been inside for fear that if I go there, somebody will say that I'm casing the joint, so I have not been.**

Q. Would you say that I'm maybe not crazy in suggesting

KEVYN ORR, VOLUME 2

**A. Yes.**

Q. In fact, when the City didn't have enough money to operate it, it closed it right?

**A. Yeah, I think there were some closures approximately three, maybe a few more, one during the construction phase, I think there was another one back in the late nineties, there was another one prior to the millage where it was closed for two days a week. But there have been closures.**

Q. And those closures didn't generate any litigation to the best of your knowledge, correct?

**A. Not that I know of today.**

Q. You haven't conducted any surveys to determine what percentage of people who visit the DIA are tourists to the City, isn't that correct?

**A. No, I haven't, but I know there are analyses of what percentage are local, what percentage from the try County I area which because of the millage are entitled to attend the museum free of charge and what percentage may be from out of town.**

Q. And have you reviewed those analyses?

**A. I saw some report on that some time ago, I don't remember the actual breakout.**

Q. Do you agree that remediating blight is a critical

KEVYN ORR, VOLUME 2

concern to the City?

**A. Yes.**

Q. And isn't it true that the Detroit blight task force has recently estimated it will cost 850 million to remedy all residential blight?

**A. Yes, I believe there was an estimate up to 850 million including residential and light commercial, I believe.**

Q. And the plan of adjustment, roughly speaking, I think has about 460 million that it hopes to generate either through exit financing or operations of the City to remediate blight; is that correct?

**A. Yes.**

Q. What's more important in your mind, having the DIA or being able to remediate all of the residential blight in the City?

MR. SHUMAKER: Object to the form.

**A. I don't think that's a binary either/or question. I think while at the same time the City certainly has a high need to remediate and an obvious need to remediate endemic blight around the city, which has been talked about for at least 60 years, I think likewise, looking to the future, the City needs to put its position -- self in a position just like New York had to do with the municipal assistance corporation**

**KEVYN ORR, VOLUME 2**

**that it did not have to sell Central Park or its museum of art or the nation's capital in Washington, D.C., did not have to de-assess itself of various monuments along the capital mall that looking to the future, the City needs to also preserve what is probably the single largest cultural asset in the City today.**

Q. Do you dispute the Detroit Land Band Authority's estimate of the total cost to remedy all residential and light commercial blight?

**A. No.**

Q. So is it your expectation that the plan of adjustment in its anticipated funding level which is below the 850 million will not achieve the remediation of all residential blight in the City in the next ten years?

**A. It is my anticipation that the plan of adjustments revenue dedication to blight will not achieve the elimination of all residential blight align within the next ten years.**

Q. And can't we agree that you have made it at least an implicit choice to deploy the value of the art institute to the Grand Bargain and to retiree recoveries as opposed to plugging this hole in the blight remediation effort?

KEVYN ORR, VOLUME 2

MR. SHUMAKER: Object to the form.

**A. No, I prefer to think of it as we're trying to balance a number of different interests and obligations on behalf of the City while at the same time trying to get to a lot of endemic historical blight that by any measure and by any discussion is unanimously agreed to be a problem in the City. And at the same time try to balance that with the need not to denude the City of its assets in the future so that it is left without any significant cultural assets as it hopefully and intends to revitalize.**

BY MR. HACKNEY:

Q. How many museums does the City have?

**A. The City has in excess of, I want to say, in excess of five, at least.**

Q. So if it didn't have the art institute, it would have at least four other museums, right?

**A. Of different character, different nature, and smaller, yes.**

Q. You have described yourself as a fiduciary in your role as emergency manager; isn't that correct?

**A. Yes.**

Q. You've also described yourself as a receiver; isn't that correct?

KEVYN ORR, VOLUME 2

A. **Yes.**
Q. Wouldn't you agree that one of your duties as a fiduciary is to look at all options with respect to all of the City's assets, correct?
A. **Yes.**
Q. And in fact, you have promised that the City would look at every transaction that makes sense that provides the City with greater net present value; isn't that correct?
A. **Yes, I believe I said that.**
Q. And it's a true statement, right?
A. **I believe so.**
Q. You said their raising parking rates was, quote, prudent municipal management based on objective studies and data, correct?
A. **I believe so.**
Q. And you said that and you believe it's a true statement, correct?
A. **Yes.**
Q. You believe that prudent municipal management requires the use of objective studies and data, correct?
A. **Yes.**
Q. And in fact, in the case of the parking, you relied upon a recent study obtained by the City indicating

KEVYN ORR, VOLUME 2

that its parking fines were at the low end among cities its size or even smaller, correct?
A. **I believe that's true.**
Q. And you raised the parking rates to a point that would put Detroit quote about the average of where we should be among cities of its size, correct?
A. **Is that my quote?**
Q. It is actually.
A. **Okay, yes, it's true. I would agree with it, anyway. I'm just wondering if that was mine.**
Q. It was a bad one to trick on it if it wasn't.
You were part of the Jones Day pitch team to the City of Detroit, correct?
A. **Yes.**
Q. There was a pitch book that was created in connection with that; do you remember that pitch book? You have a picture in it?
A. **I remember there was a pitch book, I remember my picture and C.V. was in it. I haven't looked at it since sometime in early, God, I think that was January or February, January.**
Q. That was a big thing in the eligibility trial; do you remember that?
A. **I do.**

**KEVYN ORR, VOLUME 2**

Q. I mean they were all -- no offense.
MR. ALBERTS: None taken.
BY MR. HACKNEY:
Q. But -- so do you remember the way that pitch book worked was, like, there was a slide that was from the deck that you presented to the City, and then for the inside guys at Jones Day, on the back of the slide there were the speaker notes about the voiceover?
A. **Yeah, sort of a teacher's copy?**
Q. Yeah.
A. **Yeah, I haven't looked at it since the eligibility trial but I remember that.**
Q. And my main point was that you were given the opportunity to review and comment on that pitch book before it went to the City, correct?
A. **Yes.**
Q. And I take it you would not have allowed it to go to the City if it contained any statements that you thought were inaccurate?
A. **None that I was aware of.**
Q. Okay. And do you agree that the City needs to establish a record that all avenues have been explored to minimize the concessions sought from stakeholders?
A. **I don't know about what it needs established as a**

**KEVYN ORR, VOLUME 2**

**record, I'll leave that to my counsel, but what I do know is that I have an obligation to try to discharge my duties in as fair and reasonable manner as I can with the advice of my advisors, consultants, City employees, and others.**
Q. Mr. Orr, the current plan in your judgment satisfies the best interests of creditors' tests; isn't that correct?
A. **I believe so.**
Q. And you made a determination that it did before you allowed it to be filed, correct?
A. **Yes.**
Q. Now, you understand that in chapter 9, the best interests of creditors test compares what creditors are receiving under the plan to what they would receive if the petition were dismissed?
A. **I believe that's the standard.**
Q. Now, I take it you have not independently assessed this question, correct?
A. **That is correct.**
Q. Okay, now are you aware that Mr. Buckfire has been identified as an expert by the City with respect to the subject of how creditors would fare if the petition were dismissed?

Page 486

KEVYN ORR, VOLUME 2

**A. If you tell me that's true, I have no reason not to believe it, but I have not been involved in the identification necessarily in detail of who's going to testify to what technically.**

Q. Okay. He -- I am representing -- I am representing that to you, that's part of his expert report.

**A. That's fine.**

Q. Is it fair to say that you are relying on whatever City expert was designated on this subject with respect to your conclusion that the plan satisfies the best interests of creditors' tests?

**A. Yeah, I prefer to think I'm relying on what every City expert has been designated but also on my other advisors and counsel.**

Q. Okay. If Mr. Buckfire is the expert as I've said he is, are you relying on his opinion in reaching your conclusion?

**A. Yes.**

Q. And with respect to evaluating what creditors would obtain in the dismissal scenario is it correct to say that that entails a dismissal analysis of what claims would be chasing what dollars in the dismissal scenario?

**A. I think that's fair.**

Page 487

KEVYN ORR, VOLUME 2

Q. And is it -- it's your understanding that Mr. Buckfire has conducted that analysis in connection with his opinion?

**A. Yes.**

Q. Okay, and -- are you relying on any one -- on any one else other than Mr. Buckfire in connection with the dismissal analysis I just described?

**A. As I said -- wrong meeting. As I said, in addition to Mr. Buckfire, I relied on advice of counsel in consultation with them, as well as my other advisors, but I certainly rely on Mr. Buckfire to the extent he's been designated as evidence.**

Q. What I'm trying to tease out here, if I ask you about your communications with advisors, I would anticipate that you would invoke the attorney-client privilege, correct?

**A. Yes.**

Q. So I'm trying to identify the nonprivilege sources of analysis on which you're relying, and I will tell you the only opinion of which I'm aware is Mr. Buckfire's.

**A. Okay, and I guess I certainly will be -- try to be responsive to any questions you have about that opinion but I would qualify my statements by the fact that I usually have discussions with my counsel, some**

Page 488

KEVYN ORR, VOLUME 2

**of whom are here today, some are not, on a regular basis about any of those issues regarding status of the plan. So I'll try to answer your questions as best I can.**

Q. Okay. But other than communications with your counsel, are you relying on any other experts with respect to your conclusion that the plan satisfies the best interests of creditors's tests other than Mr. Buckfire?

**A. Yes, as I said, all of my consultants in terms of analyzing, say, for instance, cash flow projections, what we could afford, analyzing actuarial rates which I do not do, analyzing rates of return, analyzing what claims may be given up, analyzing the value, for instance, of reaching an agreement with some of our object golf course to extinguish the appeal of eligibility, all of those issues are discussed with all of my consultants in one fashion or another.**

**I understand the expert report has been put out there. Mr. Buckfire's been put out there for purposes of this process I have no reason to disagree with it, but I'm just trying to relay to you that in terms of reaching my conclusions, I include all of my advisors.**

Page 489

KEVYN ORR, VOLUME 2

Q. That's okay, but I guess I'm trying to drive on the question of a dismissal analysis like a formal analysis of dismissal?

**A. Yes, like a liquidation analysis in a chapter 7?**

Q. It is, that's right, except that you don't have a liquidation, it's a redistribution, municipality?

**A. Right, so I understand, and like I said, I will try to answer your questions as best I can without delving into the privilege.**

Q. So putting aside Mr. Buckfire, who we've already discussed, are you aware of a dismissal analysis prepared by any other expert?

**A. No.**

Q. Okay. To your knowledge, the only dismissal analysis was the one Mr. Buckfire did?

**A. Yes.**

Q. Did you actually review his dismissal analysis?

**A. Yes, I believe I did with my counsel, yes.**

Q. I take it it was a piece of paper with a bunch of numbers on it that showed the dismissal scenario?

**A. Yeah, similar to that.**

Q. It was a forecast of the City in a dismissal context?

**A. Yeah, steady state, no plan, there were a number of iterations of it, and here again, you know, just to be**

Pages 486 to 489

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

KEVYN ORR, VOLUME 2

**clear, I understand Mr. Buckfire's been designated, but I believe our other professionals, including Ernst & Young's participated in apprenticeship preparation of any analysis.**

Q. Is it your recollection that Mr. Buckfire's dismissal analysis showed de minimis recoveries for all creditors?

**A. It certainly -- you know, secured and unsecured?**

Q. No, unsecured, sorry?

**A. Okay so we're just talking about unsecured?**

Q. Yeah, sorry?

**A. I think it showed relatively low levels of -- of recovery for all creditors. I think the pensions and I'm without seeing the document in front of me, I think the pensions may have still fared better because they had assets but it showed relatively low recoveries, I think the concerns -- and I don't know if this is in the analysis -- but the concerns were that as you spread that out over years the pensions ran out of money in ten to 13 years.**

Q. Okay.

**A. So certainly there was an issue with regard to funneling over a period of time.**

Q. Give me a sort of a picture of what the analysis that

KEVYN ORR, VOLUME 2

Mr. Buckfire conducted looked like. So I take it it was a spreadsheet?

**A. There was -- yeah, there were various you say dismissal analysis there were various spreadsheets that went through the City in a structuring scenario a non-restructuring scenario, which you might call it dismissal analysis.**

Q. Okay.

**A. Something like that.**

Q. Well, and I'm not talking about what I would call, I'm talking about the dismissal analysis you were referring to --

**A. Right.**

Q. -- with Mr. Buckfire.

**A. If you have it with you...**

Q. I apologize, I did not bring it, I just wanted to ask you a few questions about what you recall about it.

**A. Why don't you ask me the questions, I'll see if I can answer them.**

Q. Do you recall what it looked like? Was it a spreadsheet?

**A. That's why I said if you have it with you to make -- I don't want to give you an inaccurate statement.**

Q. Yeah.

KEVYN ORR, VOLUME 2

**A. If you have what we're talking about, there were analyses that were prepared on spreadsheets, but I also as you might imagine I also receive a lot of information in various forms from slide decks, spreadsheets, schedules, and drafts.**

Q. Okay.

**A. So --**

Q. Isn't it fair to say that you didn't try to independently verify Mr. Buckfire's dismissal analysis?

**A. No, I rely on my consultant when it comes to that yeah.**

Q. Now, you are aware that the City has taken the position that it is impractical to raise taxes without further eroding revenues?

**A. Yes.**

Q. Okay, and I'm going to ask you a number of questions about this but I will tell that you Mr. Buckfire has also issued this opinion in his report.

**A. Yes.**

Q. Are you aware of that?

**A. Yes.**

Q. Okay. Are you relying on Mr. Buckfire's opinion in reaching your conclusion that it is impractical for

KEVYN ORR, VOLUME 2

the City to raise taxes without eroding revenue?

**A. Yes, but I'm also relying on various statements I've had, I've received from City residents, from City employees, from people in the finance department, from various reports in the public press that Detroit is -- is highly taxed and that is a disincentive to bring people into the City from -- from offspring of various City department heads who have stated they will not move into the City because of the relatively high taxes in conjunction with insurance costs, and high taxes with regard to auto insurance, for instance, so I want to say that it's not just an analysis of the relatively high tax rates from a -- a statistical or mathematical standpoint, it is also based upon what people have actually told me they experienced.**

Q. Okay. So that's a fair statement. You have collected what I will term anecdotal information from people expressing the view that the tax rate in the City impacts their willingness to live in the City, correct?

**A. Yes.**

Q. But with respect to an effort to engage in an expert analysis of what a tax increase -- what impact a tax increase would have on the City, is it fair to say

Page 494

KEVYN ORR, VOLUME 2

that you're relying on Mr. Buckfire for that?

**A. I think I've said yes, that's fair in conjunction with my other professionals. Yes. I think that's fair to say.**

Q. Well, let me turn it around on you, are you aware of any other professional other than Mr. Buckfire who has analyzed this question and given you advice on it?

**A. No, but what I'm trying to relay to you, not to dance around and not to try to run away from Mr. Buckfire's analysis, which I would support, is that part of that analysis is not just done simply in a vacuum that it's based upon other information that includes information given from our other consultants and as is compiled into what I would believe to be Mr. Buckfire's report.**

Q. Okay. What is your understanding of what Mr. Buckfire did to assess the question of whether increasing taxes would erode revenue?

**A. Well, as I think has been fairly widely reported, Mr. Buckfire has been working with the City both officially and unofficially for some period of time, at least since 2012, that he has informed himself of the tax rates in the City, of the State tax limits, I think which we're bumping against, I think it's 20 or 19.95, of the burden that that tax has a relatively**

Page 495

KEVYN ORR, VOLUME 2

**high rate compared to property values, relative to -- I think it's the highest rate in the State, relatively high rate of income tax compared to and compared to moderate incomes within the City, that he also had in the course met with other officials such as the treasurer's office and the finance department, which they do, anyway, on a regular basis.**

**I don't know if it was done just specifically for the liquid -- for a dismissal analysis or if it was just done as a matter of course, but Mr. Buckfire, I believe, had developed a number of different sources of information and data to inform himself to render an opinion.**

Q. Is it your understanding that he undertook, you know, what you would expect someone to do which is economic -- econometric modeling under a number of different scenarios with different tax rates to determine their impact on City revenues?

**A. Yeah, I don't know if I know with specificity what he did day in and day out during his opinion. I have no reason to believe he did not do that.**

Q. What's your expectation about what he did?

**A. The expectation is what I just said, that he would inform himself upon different rates that he would do**

Page 496

KEVYN ORR, VOLUME 2

**modeling that Miller Buckfire has done from time to time that he would build any analysis based upon the data that they have proprietarily developed and otherwise over the past period of time and develop an opinion as to what that outcome might be.**

Q. Now you have not independently attempted to study the cause of tax delinquencies in the City; am I correct?

**A. No, I rely on my professional.**

Q. And is it also your expectation that that's one of the subjects that Mr. Buckfire would have studied in connection with assessing tax increases?

**A. I would assume, but I don't know sitting here today.**

Q. Okay. You would assume he did, but whether he did or not, you don't know?

**A. Correct.**

Q. Did you actually review any work product from Mr. Buckfire that showed the impact of differing tax rates on City revenues?

**A. I -- I believe I reviewed work product, I don't know if it was solely from Miller Buckfire, that's why I said I rely on -- on all our consultants.**

Q. Okay, so you think you've seen something but you're not sure if you have and you're not sure who it was done by?

Page 497

KEVYN ORR, VOLUME 2

**A. Correct.**

Q. Okay. When did you see it?

**A. I have seen different reports and analyses regarding the potential impact of any of the City's functions, taxes, collection rates, delinquencies in a number of different forms. There is a lot of information that comes over the transom, and so just sitting here today, I just don't recall.**

Q. But for example, you haven't seen, and I'll tell you I have haven't seen you've never seen an analysis of the causes of the City's tax delinquencies right you've seen data about what the tax delinquencies are?

**A. Yeah, I don't -- you know, for instance, when you say analysis of the causes, I've sat in meetings with the budget director and the treasurer's office talking about problems with collection and the ability to pay where we looked over data, so I don't want to misrepresent that we had that meeting specifically in connection with an expert opinion but I've seen information regarding the causes of delinquency, data, vacancies, abandonment, squatter -- a whole bunch of information that may inform people about the causes of delinquencies.**

Q. What are the causes of income tax delinquencies in the

Pages 494 to 497

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

KEVYN ORR, VOLUME 2

A. **No, there's a whole host of policies, but that's one of the factors to consider, I think, suffice it to say that tax burden is one of the things people consider in conjunction with a number of other things such as what are they getting for their taxes, are they getting adequate schools? Our schools aren't adequate, they're under emergency management.**

**Are they getting adequate public health and support? We are just now getting to a point of rolling out services. Are they getting adequate public works services? We're trying to get the acquisition in terms, but you've seen our streets, you've seen our curbs. We just moved garbage collection, there was so much garbage.**

**We're trying to get to all these issues to encourage, stem the flight. As you know, from 2000 to 2010, we lost an average of 25,000 people, 250,000 people in ten years. That is a city the size of Taylor, Wyandotte, or Highland Park every year that the city lost. We're trying to stem that population outflow, stem the tide and encourage population inflow, and tax policy, as well as special assessment districts are some of the things that you have to be very careful with so that you do not impair what we**

**KEVYN ORR, VOLUME 2**

**hope is going to be an economic recovery.**

Q. You understand that the restructuring or reinvestment initiatives are being funded in part with amounts of money that were formerly owed to the creditors, correct?

A. **I think that's fair. We don't have a pocket of money available.**

Q. The hope is that these initiatives will revitalize the City; isn't that correct?

A. **Yes.**

Q. Now, if the City does better than the forecasts that are included in the plan, why shouldn't creditors participate in that upside?

A. **Well, I think some creditors may be able to participate in terms of better performance of the city and bond ratings, but our estimates and our projections have sober, they're very careful, the question becomes if you were to try to find, evolve a way for some level to participate in quote/unquote the upside, you know, are you impairing your ability, for instance, to get better bond ratings to be able to meet your going forward debt obligations better, are you impairing your ability -- as you just noted in the deposition, the amount of money we have in the plan is**

**KEVYN ORR, VOLUME 2**

**inadequate to deal with residential lighting. Why would we agree to give upside when we know going in we don't have adequate money to address some of the most fundamental issues necessary in the City, and we may not have it for some period of time. In my opinion, in trying to strike a balance, we have to be very careful. Our police officers are paid at 35 percent lower than other agencies within the State of Michigan. We know that in one of the most dangerous cities in the United States of America, our officers are underpaid. Why would we impair our ability to try to bring them up not to the current agency rate within the state, just to adequate rate for people who put their life on the line?**

**So we have to balance all these things in going into it in trying to leave the City some opportunity, not only to revitalize but try to get the adequate services and try to provide the necessary equipment and recompense for people who are providing those services in the city.**

Q. You agree that you have creative lawyers that work for you, don't you?

A. **Yes.**

Q. And if the City wanted to, it could structure security

KEVYN ORR, VOLUME 2

around its forecast that shared some of the upside that may materialize with -- with the creditors that are funding in part this effort to revitalize the City?

A. **I suppose we could structure any type of instrument but as I said, the decision of whether or not that is a good thing to do is mine, and in my opinion, it is not.**

Q. Okay, so -- now the State government hasn't agreed to fund any of the restructuring and reinvestment initiatives, correct?

A. **Correct.**

Q. And neither has the Federal government, correct?

A. **Well -- not directly. The -- the State government through Michigan -- Michigan State Housing & Development Authority has certain grant funds available to it, and has tried from time to time to make those funds available to the City for blight, but their -- they don't have a huge sum of money, and the Federal government, through existing programs of Federal grants, whether it's community development, block grants, CDBG income, section 108 housing, vouchers, and homeless shelter grants and other programs, I think they released in 2012, last year, 34**