# Exhibit 7

# Excerpts of July 2, 2014 M. Hall Deposition Transcript

                    MICHAEL HALL
         IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE EASTERN DISTRICT OF MICHIGAN


    In re                ) Chapter 9
    CITY OF DETROIT, MICHIGAN,    ) Case No. 13-53846
             Debtor.  ) Hon. Steven W. Rhodes

    _____


         The Videotaped Deposition of MICHAEL HALL,
         Taken at 1114 Washington Boulevard,
         Detroit, Michigan,
         Commencing at 8:57 a.m.,
         Wednesday, July 2, 2014,
         Before Kathryn L. Janes, CSR-3442, RMR, RPR.

                    MICHAEL HALL
    APPEARANCES:

    DEBORAH KOVSKY-APAP, ESQ.,
    LESLEY S. WELWARTH, ESQ.
    Pepper Hamilton LLP
    4000 Town Center
    Suite 1800
    Southfield, Michigan 48075
         Appearing on behalf of the Debtor.





    DAN BARNOWSKI, ESQ.
    Dentons US LLP
    1301 K Street, NW
    Suite 600, East Tower
    Washington, DC 20005-3364
         Appearing on behalf of the Retiree Committee.

                    MICHAEL HALL
    MICHAEL J. PATTWELL, ESQ.
    Clark Hill, PLC
    212 East Grand River Avenue
    Lansing, Michigan 48906
         Appearing on behalf of the Retirement Systems
         for the City of Detroit.



    STEPHEN C. HACKNEY, ESQ.
    Kirkland & Ellis LLP
    300 North LaSalle
    Chicago, Illinois 60654
         Appearing on behalf of Syncora Guarantee Inc.
         and Syncora Capital Assurance Inc.

                    MICHAEL HALL
    VINCENT J. MARRIOTT, III, ESQ.
    Ballard Spahr LLP
    1735 Market Street
    51st Floor
    Philadelphia, Pennsylvania 19103
         Appearing on behalf of Hypothekenbank Frankfurt
         AG; Hypothekenbank Frankfurt International S.A.;
         and Erste Europaische Pfandbriefund
         Kommunalkreditbank Aktiengesellschaft in
         Luxemburg S.A.



    MARK R. JAMES, ESQ.
    Williams, Williams, Rattner & Plunkett, P.C.
    380 North Old Woodward Avenue
    Suite 300
    Birmingham, Michigan 48009
         Appearing on behalf of the Financial Guaranty
         Insurance Company.

Pages 1 to 4

Elisa Dreier Reporting Corp.  (212) 557-5558
         950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 7150-7  Filed 08/28/14  Entered 08/28/14 01:05:39  Page 2 of 12

Page 93

1   MICHAEL HALL
2   familiarizing yourself with the state of the
3   City's workforce, that you had a lot of concerned
4   employees; do you remember that?
5   A. Yes.
6   Q. What were the concerns that they were expressing
7      to you?
8   A. Oh, people had concerns regarding the bankruptcy
9      and, you know, what was going to be the outcome
10     and, you know, how much of their salary they could
11     lose, what would their health care look like, what
12     would the benefit packages look like, and, you
13     know, how much job security would they really have
14     that they thought they had prior to the
15     bankruptcy.
16  Q. Any other concerns that they raised or is that
17     representative of the principal concerns?
18  A. You know, those were key concerns that people had
19     because it was all about job security.
20  Q. Sure.
21  A. How do I provide for my family.
22  Q. Sure.
23  A. How do I plan for my future.
24  Q. So wages, health care benefits and is my job
25     going to be around?

Page 94

1   MICHAEL HALL
2   A. That's correct.
3   Q. Those were the three main concerns that were
4      expressed?
5   A. That's it.
6   Q. Now, one of the things that you also talked about
7      was -- I was asking you questions about whether
8      you found the City's workforce to be inefficient,
9      and I think you said words to the effect of,
10     well, you know, it's up to the department heads
11     to determine the efficiency of their departments;
12     do you remember that testimony?
13  A. Sort of.
14  Q. Yeah, well if I -- maybe I didn't say it right.
15     I think what I thought you said was I didn't
16     study efficiency per se other than maybe in my
17     own department, but it's up to the department
18     heads of the other departments to assess their
19     efficiency?
20  A. Correct.
21  Q. My question was: Did you have interaction with
22     these other department heads about what they were
23     finding with respect to the efficiency of their
24     department?
25  A. No.

Page 95

1   MICHAEL HALL
2   Q. Okay. I take it that, is it fair to say that you
3      didn't have a bunch of department heads coming to
4      you and saying my department is completely
5      inefficient like what can you do to help us?
6   A. No, I haven't had that. You know, we looked at
7      collective bargaining agreements and what was --
8      you know, that data had been collected prior to my
9      arrival saying, you know, what's needed out of the
10     collective bargaining agreements to make them more
11     efficient, but you know, all these departments
12     weren't tied to collective bargaining agreements.
13  Q. I want to go back to that subject of work rules
14     that we talked about in the context of collective
15     bargaining agreements, is it true that -- I'm
16     going to give you a list of things that I think
17     the City has identified as being examples of work
18     rules. I took this list out of the disclosure
19     statement that I had to read, but that's just so
20     you know where it's coming from, but I want to
21     ask you whether you agree these are examples of
22     work rules that are in the City's -- that were in
23     the City's collective bargaining agreements.
24        Seniority is an example of a -- a work
25     rule that affects the City's ability to manage

Page 96

1   MICHAEL HALL
2   its union workforce, correct?
3   A. Yes.
4   Q. Bumping rights are also an example of a work
5      rule, right?
6   A. Correct.
7   Q. The collective bargaining agreements also limit
8      the ability of management to make changes to the
9      work environment; isn't that correct?
10  A. Yes.
11  Q. The union employees also have arbitration rights
12     with respect to grievances; isn't that correct?
13  A. Correct.
14  Q. And isn't it true that the collective bargaining
15     agreements also require the City to collect union
16     dues for the unions and deduct them from the
17     employee's paychecks?
18  A. Correct.
19  Q. Are there any other work rules of which you were
20     aware that stick out in your mind of ones that
21     the collective bargaining agreements impose on
22     the City in terms of limiting how the City can
23     operate?
24        MS. KOVSKY-APAP: Objection. Are you
25     talking about the ones that are currently under --

Pages 93 to 96

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-7   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 3 of 12

1  MICHAEL HALL
2  MR. HACKNEY: That's a good --
3  MS. KOVSKY-APAP: -- discussion or the
4  ones that have already been made public or the
5  ones that existed way back prior to their
6  expiration?
7  MR. HACKNEY: That's a good
8  clarification.
9  BY MR. HACKNEY:
10 Q. So I'm talking about when you came to the job and
11    you -- I know the collective bargaining
12    agreements have all expired, okay, but I'm trying
13    to understand what were the types of work rules
14    that were in those expired collective bargaining
15    agreements that were, you know, ones that stick
16    out in your mind or as ones that were limiting
17    the City's ability to operate?
18 A. **I think those are the key ones that you mentioned.**
19 Q. Okay. Now, in fourth quarter of 2013, there were
20    approximately ten collective bargaining
21    agreements or memoranda of understanding that
22    were struck; is that correct?
23    MS. KOVSKY-APAP: Again, I'll caution
24    the witness not to answer to the extent that any
25    of these have not yet been made public.

Page 98

1  MICHAEL HALL
2  A. **I can't --**
3  BY MR. HACKNEY:
4  Q. Need to see them?
5  A. **Yeah.**
6  Q. I have them, they're in that box over there and
7     I'll show them to you later. We can talk about
8     them later, but I got them from the data room.
9  A. **Okay.**
10 Q. You do agree that at least some of the unions
11    have signed new agreements that were signed in
12    the fourth quarter of 2013, correct?
13 A. **That's correct.**
14 Q. You signed some of those, correct?
15 A. **Correct.**
16 Q. What's the difference between a memorandum of
17    understanding and a new collective bargaining
18    agreement?
19 A. **The memorandums of understanding that we signed**
20    **were not complete bargaining -- bargaining CBAs,**
21    **there were certain initiatives we wanted to get in**
22    **place to make us more efficient.**
23 Q. I see. So it's like it affects like a little
24    piece --
25 A. **That's correct.**

Page 99

1  MICHAEL HALL
2  Q. -- of the relationship, but then you'll negotiate
3     the full CBA later?
4  A. **That's correct.**
5  Q. But did you sign some CBAs in the fourth quarter
6     of 2013?
7  A. **Yes.**
8  Q. Yeah, I thought so. There are some really thick
9     ones that look like a CBA and then there's some
10    little thin ones that are the memorandum of
11    understandings?
12 A. **Correct.**
13 Q. With respect to the CBAs that you have signed,
14    the ones that were -- I'm not talking about the
15    ones that are in process, I'm talking about the
16    ones that were already signed back in that fourth
17    quarter time period, do you generally know what
18    I'm referring to?
19 A. **Yes.**
20 Q. Those maintained seniority as an aspect of a work
21    rule, correct?
22 A. **Correct.**
23 Q. And they maintained bumping rights, correct?
24 A. **Some bumping rights, but maybe not to the extent**
25    **that they were before.**

Page 100

1  MICHAEL HALL
2  Q. Okay. So the bumping rights may have been
3     changed?
4  A. **That's correct.**
5  Q. Okay. They also have limitations on the City's
6     ability to, you know, change the workplace,
7     correct?
8  A. **Again, they may be some restrictions, but they may**
9     **not be as restricted as they were -- as they were**
10    **before.**
11 Q. Okay. They also maintain arbitration rights,
12    correct?
13 A. **Correct.**
14 Q. And they also continue to require the City to
15    collect union dues, correct?
16 A. **Correct.**
17 Q. Have you ever seen an economic analysis of the
18    expired collective bargaining agreements that
19    attempts to place a value on different elements
20    of the collective bargaining agreement?
21 A. **Each -- each one of our bargaining agreements that**
22    **we did had to be costed, you know, we had to cost**
23    **factor there to see what it was going to cost us,**
24    **and if they fit into the budget that the City had**
25    **set forth, so before we reached those agreements,**

Pages 97 to 100

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 7150-7  Filed 08/28/14  Entered 08/28/14 01:05:39  Page 4 of 12

Page 109

1  MICHAEL HALL
2  Q. Significant changes to the work rules. What are
3     the main changes that you recall?
4  A. You have stronger management rights clauses which
5     gives management more authority in really running
6     the business.
7  Q. Running the city?
8  A. Running the city, yeah, excuse me.
9  Q. Old habits die hard.
10 A. Yeah.
11 Q. Stronger management rights, meaning what are
12    examples of that?
13 A. In how we administer overtime is one, the
14    allocation of vacations is another. I'm trying to
15    think, you know, bumping rights in times of
16    layoffs, you know, we've restricted those. Those
17    were significant.
18 Q. Do you know the -- remember when you were talking
19    about the costing work that was done that you
20    haven't seen, I know, but it was done by someone
21    else; do you remember that testimony?
22 A. Yes.
23 Q. Do you know if that had already been done by the
24    time that you got there in September?
25 A. Yes, yes.

Page 110

1  MICHAEL HALL
2  Q. So that was done much earlier in the year?
3  A. That's correct.
4          MR. HACKNEY: We would definitely
5     call for the production of that information, so
6     I'll make sure to put that in, but maybe
7     Mr. Marriott can help me remember some of these
8     things, but that's obviously something we want to
9     see. I don't know, it could have been produced,
10    but we haven't seen it.
11 BY MR. HACKNEY:
12 Q. When you were -- when you joined the City either
13    as a consultant back in September of 2013, do you
14    know what the attrition rate was at the City?
15 A. No.
16 Q. Since that time, have you determined what the
17    attrition rate is?
18 A. No.
19 Q. You have not?
20 A. No.
21 Q. You're smiling a little bit. Why not?
22 A. Why not?
23 Q. Yeah.
24 A. I'm smiling because I had asked for that
25    information prior to getting here and I hadn't

Page 111

1  MICHAEL HALL
2     gotten it yet, so.
3  Q. Okay. So you literally don't know?
4  A. That's what I'm telling you.
5  Q. That's good.
6  A. That's what I'm telling you.
7  Q. You can't do anything other than tell me what you
8     know.
9  A. Yeah.
10 Q. Let's put the attrition rate to one side. Has
11    attrition -- was attrition a problem when you
12    first joined and were familiarizing yourself, did
13    you reach the conclusion that attrition was a
14    problem, and then I'm going to ask you about kind
15    of going forward since that time has it remained
16    a problem. But the first question is, did you
17    find attrition was a problem?
18 A. I don't view attrition as being a major problem
19    right now, and I say that because of the state of
20    the economy here in Detroit.
21 Q. You anticipated my next question, but go ahead.
22 A. Because there are not a lot of options here in the
23    city.
24 Q. You have a high unemployment in the city of
25    Detroit?

Page 112

1  MICHAEL HALL
2  A. That's correct.
3  Q. And when you have high unemployment, you tend to
4     see people stay at their job?
5  A. Thank you.
6  Q. Correct?
7  A. That's it.
8  Q. Okay. That was my sense as well, but I wanted to
9     confirm, was that your sense when you started
10    with the City that attrition was not going to be
11    one of the main problems?
12 A. Yes.
13 Q. And have you confirmed that it is not one of the
14    main problems?
15 A. It's not...
16 Q. Or it's not a problem?
17 A. Attrition is always going to be an issue at some
18    of your positions that you have. Now, when I look
19    at my bus drivers, attrition is going to be an
20    issue because of the wages I pay them. The wages
21    are low there for bus drivers, you know, for what
22    they have to do.
23 Q. Understood. I'm trying to --
24 A. When I look at my EMTs, another one of my, you
25    know, I'm training the people and those who can go

Pages 109 to 112

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 7150-7  Filed 08/28/14  Entered 08/28/14 01:05:39  Page 5 of 12

Page 113

MICHAEL HALL
1  MICHAEL HALL
2  other places, they may go.  You know, but, you
3  know, we have to really look at that when we're
4  hiring people, what percentage are we going to
5  retain, what percentage will be leaving.
6  Q.  Sure.  Let me see if I can sum it up this way and
7      see if you agree.  There are certainly isolated
8      instances where attrition is an issue for the
9      City, but in general, you have not found a
10     pervasive attrition problem principally because
11     of the economic conditions in the city of
12     Detroit; is that correct?
13 A.  And again, I'll -- I'll state that, you know, due
14     to the economic conditions of the city, you're not
15     going to have a lot of people leaving secure jobs
16     with benefits.
17 Q.  It makes sense to me, do you agree, though, that
18     attrition is not something you would describe as
19     a pervasive problem for the City?
20 A.  Attrition is an issue in some of the fields.
21 Q.  Okay.  But is it a pervasive problem for the
22     City?
23         MS. KOVSKY-APAP:  Objection, asked and
24     answered.
25 BY MR. HACKNEY:

Page 114

1  MICHAEL HALL
2  Q.  You can answer.
3  A.  Attrition going forward may be a bigger issue.
4  Q.  A bigger issue than it is today?
5  A.  That's correct.
6  Q.  But you would not characterize it -- would you
7      even characterize attrition as a problem for the
8      City today, it doesn't appear to be a problem
9      from the documents, but I want to get your
10     testimony?
11 A.  Again, I, during my tenure at the City, I have not
12     viewed it as being a significant problem.  And a
13     lot of that has to do with the unrest right now.
14     People need to understand, you know, what's going
15     to happen to me, you know, as we change benefit
16     packages and everything else, you know, people are
17     going to be looking at it differently.
18 Q.  And when you talk about benefits packages, you
19     mean health care, correct?
20 A.  Health care is a major issue.  You know, when
21     people -- at one time people were able to retire
22     early from the City and go someplace else and
23     start a different career because they had
24     guaranteed health care.  Now they retire early
25     from the City and leave, they're going to get a

Page 115

1  MICHAEL HALL
2  stipend as opposed to being covered.  That's a big
3  difference.
4  Q.  Okay.  And that makes them more likely to stay,
5      correct?  Correct?
6  A.  Unless there's a viable offer out there on the
7      table for them.
8  Q.  If you only have a stipend going forward, it
9      helps keep people employed at the City so that
10     they can keep their health care benefits?
11 A.  But the younger people may leave saying I won't
12     have the job security that I once had, so some
13     younger, more professional people may be leaving
14     to take better offers someplace else.
15 Q.  Have you ever heard -- would a 22 percent
16     attrition rate strike you as high?
17 A.  Yes.
18 Q.  It strikes me as high if we were losing
19     22 percent of our lawyers on an annual basis.
20 A.  Right.
21         MR. HACKNEY:  Let's mark this a
22     document as an exhibit.  I'll explain what it is.
23     Is that Number 1?
24         MARKED FOR IDENTIFICATION:
25         DEPOSITION EXHIBIT 1

Page 116

1  MICHAEL HALL
2  11:10 a.m.
3  BY MR. HACKNEY:
4  Q.  So Mr. Hall, let me explain to you what this is.
5      This is all of the headcount reports that I was
6      able to find in the production going back as far
7      as I could find them.  Excuse me.  The -- this
8      first page right here is not, so we created this.
9      This is just an index.
10 A.  Okay.
11 Q.  Okay, but if you go forward from that, what
12     you'll see is all of the headcount reports that I
13     could find and I will tell you that I couldn't
14     find one for February of 2014, I couldn't find
15     that one.  Oh, these labels are upside down.  So
16     that's one I just couldn't find -- no, wait a
17     second, I couldn't find one -- oh, I see now.
18     Yeah, there is a February, it just says
19     January 2014 -- no, the date is not the same
20     thing.  So the date on the document lags the
21     month that it's for, so I couldn't find February,
22     okay.  I take it, you have seen these headcount
23     reports before?
24 A.  I haven't.
25 Q.  You have not?

Pages 113 to 116

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-7   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 6 of 12

## Page 133

MICHAEL HALL

Q. Now, the -- the changes to retiree health care and the changes to active employee health care were different, correct?
A. Correct.
Q. The -- what were the differences in the health care benefits going forward as you understood them?
A. **Going forward, prior to 2014, the benefit packages were basically the same for retirees and active. In January 2014, the retirees were going to get a stipend as opposed to being covered which is a tremendous cost savings for the City.**
Q. And what were happening to actives?
A. **Actives would still maintain their health care coverage.**
Q. Did the cost of it change for actives?
A. **Yes.**
Q. Did it go up or down?
A. **It went up.**
Q. It went up, so the actives had to bear a larger portion of the cost?
A. **That's correct.**
Q. Did the benefits go up or down or were they the same?

## Page 134

MICHAEL HALL

A. **Benefits basically stayed the same.**
Q. Okay.
A. **The coverage wise.**
Q. So active employees were bearing a larger portion of the cost of their own health care?
A. **Correct.**
Q. And so were retirees, correct?
A. **Retirees incur a much -- much larger share.**
Q. Yeah, so there was a disparity between the two, correct?
A. **That's correct.**
Q. And the retirees took the -- they had the harsher change?
A. **Correct.**
Q. Okay. And in your judgment, this had a significant negative impact on employees?
A. **Correct.**
Q. Because they were now concerned that they would not have health care when they became a retiree?
A. **That's correct.**
Q. So do you know if someone retires from the City in December of this year after the bankruptcy may have concluded, okay, do you know what will govern their health care benefits in retirement?

## Page 135

MICHAEL HALL

Will they be governed by what's happening to retirees under the plan or will they be governed by a different plan?
A. **If you retire during this calendar year, you're covered under the retiree health care plan that's in place now.**
Q. That retirees are getting under the plan?
A. **Under the plan.**
Q. Okay. What if you retire after this calendar year?
A. **That's not communicated yet.**
Q. Not known?
A. **Right.**
Q. Do you know if that will be a function of the plan in place at the time that that employee retires?
A. **Repeat the question.**
Q. Do you know if I retire next year, I'm talking about how it typically works, is it typically the plan that's in place at the time I retire is the plan that I get going forward in my retirement?
      MR. BARNOWSKI: Objection, calls for a legal conclusion.
      MS. KOVSKY-APAP: Objection,

## Page 136

MICHAEL HALL

foundation.
A. **The plans can change.**
BY MR. HACKNEY:
Q. And if the plans change, that changes the level of coverage that retirees get as well?
      MR. BARNOWSKI: Same objection.
A. **The plans can change.**
BY MR. HACKNEY:
Q. I take it, that there's just one set of plans that you're administering at any one time; is that correct?
A. **At this time, we have a retiree plan and we have an active plan.**
Q. Well, that was -- okay. So let's strike that.
      At this time, there are two different plans that you're administering, one that relates to retirees and one that relates to actives, correct?
A. **Correct.**
Q. Traditionally was it your understanding that there was just one plan that related to both actives and retirees?
A. **That's correct.**
Q. Okay. But now there are two, correct?

Pages 133 to 136

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-7   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 7 of 12

Page 137

MICHAEL HALL

A. Correct.
Q. And you're saying that you don't know how employees that will retire after this calendar year, you don't know whether -- which of the two plans they'll be -- they'll get health care benefits under?
A. That's still in mediation.
Q. Oh, okay. And was it this calendar year or was it June 30, 2014?
A. This calendar year, this calendar year.
Q. Now, with respect to retiree health care, has that had an impact when it's come to hiring new employees?
    MS. KOVSKY-APAP: Objection, foundation.
A. I have no way of knowing.
BY MR. HACKNEY:
Q. Okay, have you ever seen a situation where you've lost a new employee or were not able to attract a new employee because of --
A. It hasn't been brought to my attention.
Q. Okay. Do you know how the City's health care benefits for active employees compare to surrounding communities?

Page 138

MICHAEL HALL

A. No.
Q. Have you ever attempted to study the question of what surrounding communities are offering when it comes to their health care benefits?
A. No.
Q. Do you know if anyone else has studied that question?
    MS. KOVSKY-APAP: Objection, it's a little broad.
BY MR. HACKNEY:
Q. At the City or its consultants?
A. I don't know what benchmarking our consultants did.
Q. Okay. I take it, you've never seen a study that says here's what folks around us are doing when it comes to health care benefits?
A. No.
Q. Is that correct, you have not seen that, correct?
A. I have not seen it.
    MR. HACKNEY: Let's mark this as Number 3.
    MARKED FOR IDENTIFICATION:
    DEPOSITION EXHIBIT 3
    11:36 a.m.

Page 139

MICHAEL HALL

    MS. KOVSKY-APAP: There is usually a button you can push for print friendly copy.
    MR. HACKNEY: So I did, and it still printed it like that, at least on the old one. The problem with the print button on some of these things, for whatever reason it strips the date of the article on it, so I've been going with the screen print.
    MR. BARNOWSKI: These ads are focused on your browsing patterns.
    MR. HACKNEY: Yes, I know. So believe me, that occurred to me as we were getting ready for this, I had to make sure there weren't any of the other types of ads that you could see.
    MR. BARNOWSKI: Sorry.
    MR. HACKNEY: No, that's okay. I'm in the market for a trash compactor if anyone has a recommendation.
BY MR. HACKNEY:
Q. Okay. So do you have Hall Exhibit Number 3 in front of you?
A. Yes.
Q. This is another one of those articles which I'm using to try and help you remember when certain

Page 140

MICHAEL HALL

things happened. Do you recall, and whether the article says that or not, you know, your recollection is obviously independent, but do you recall that in November that the City announced that it was going to extend the changes to the retiree health care; do you recall that?
A. Yes.
Q. Did you have input into that decision to extend?
A. No.
Q. The basic gist of the extension was that retirees maintained their existing health care while the parties continued to negotiate, so it -- it delayed when the new retiree health care rules would go into effect; is that correct?
A. That's correct.
Q. The City did not change -- the City did not delay its -- its changes to active employee health care; isn't that correct?
A. No, it didn't.
Q. And when did the active employee changes go into effect?
A. January the 1st.
Q. And did those, in fact, go into effect on January 1st?

Pages 137 to 140

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-7   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 8 of 12

MICHAEL HALL

Q. Anyone that you can remember?

A. I can tell you union leadership, workers in the police, fire, employees that work in City Hall, people, employees that work in DDOT.

Q. Is it the same group who expressed concerns about how pensions were going to be handled?

A. Just different people at different times, different subjects.

Q. Is the -- was the principal focus of these employee concerns, whether it was health care benefits or pension was what does this mean for me when I retire, is that the main thing that they were --

A. These are general conversations with people talking about, you know, how is this going to affect me long-term wise, short-term as well as long-term.

MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBIT 4
11:45 a.m.

MR. HACKNEY: What number is this?

COURT REPORTER: 4.

BY MR. HACKNEY:

Q. Okay. So do you have Exhibit Number 4 in front

MICHAEL HALL

of you, sir?

A. Yes.

Q. And take a -- you should feel to read these, if you'd like. They're mainly designed to help with dates different things happened. Do you recall that the City filed its initial Plan of Adjustment on or around February 21, 2014?

A. Okay.

Q. Do you recall that?

A. I recall a plan being filed.

Q. Yeah. What -- you probably don't the recall the specific date?

A. No.

Q. Do you recall that the initial plan that the City filed proposed cuts to earned pension benefits, is how I'm going to describe it, of differing amounts for police and fire and general retirees?

MS. KOVSKY-APAP: Objection, form and foundation.

BY MR. HACKNEY:

Q. Do you recall that the plan involved cuts to pensions?

A. Yes.

Q. And do you recall that the proposed cuts in this

MICHAEL HALL

initial plan were 4 percent for police and fire and 26 percent for general retirees? I know it says that here, I'm --

A. It says it here.

Q. -- wondering if you remember?

A. I don't recall at that time, but I see it here.

Q. Yeah, so what I'm trying to ask you, do you remember there was a time when the City was proposing steeper cuts to pensions than it's proposing in the plan that's currently on file?

A. Yes.

Q. Do you understand that?

A. Yes.

Q. So I want to go back to that, that time when they were proposing -- I know you may not recall what the specific levels of cuts were, but I'm talking about the steeper levels of cuts, okay? Do you recall that time?

A. Yes.

Q. Okay. So does -- does the plan's filing stand out for you in terms of having had a material impact on -- on the workforce of the City; do you remember that time as being one where there was a significant level of employee activity coming to

MICHAEL HALL

you and expressing concern?

A. Not coming to me to express concern.

Q. Okay. So that was not something that generated increased level of activity at your desk?

A. Not at my desk, no.

Q. What about in terms of people coming to you and reporting to you?

A. Because it affected those people, it was general conversation around the -- around the building.

Q. Were you consulted in advance of the decision to file this proposed plan?

A. No.

Q. Were you consulted about the level of cuts that were going to be proposed in this plan?

A. No.

Q. Okay. So at the time this plan was proposed, you were involved in negotiations with the labor unions, correct?

A. Correct.

Q. We're talking February 2014, correct?

A. Correct.

Q. But no one from the City came to you to get your sense of what the appropriate levels of cuts the pensions could be; isn't that correct?

Pages 145 to 148

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7150-7   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 9 of 12

1  MICHAEL HALL
2  A. That's correct.
3  Q. What impact, if any, did this proposal have on
4     the City's workforce as far as you could tell?
5  A. Concern.
6  Q. Okay. Same types of concerns that were expressed
7     to you that you've described previously?
8  A. That's correct.
9  Q. Who did you speak to that expressed concern on
10    this subject?
11 A. Again, it was general conversation throughout the
12    buildings.
13 Q. With the same types of groups you told me about
14    earlier?
15 A. Same types of groups because it affected everyone.
16 Q. Now, you understand that active employees have
17    some benefits that they've already earned that
18    are affected by the cuts to the -- the pension
19    trusts?
20 A. Repeat that.
21        MS. KOVSKY-APAP: Objection to form.
22 BY MR. HACKNEY:
23 Q. Yeah, do you understand that some active
24    employees have pension benefits that they've
25    already earned that are impacted by the proposed

1  MICHAEL HALL
2     cuts to pensions?
3  A. I guess you have to explain that to me.
4  Q. Okay, sure. So do you understand that there are
5     these pension trusts out there that have assets
6     in them from which employee -- from which retiree
7     pensions are paid?
8  A. Correct.
9  Q. And do you understand that active employees have
10    an interest in those pension trusts based on
11    amounts that they have earned to date --
12       MS. KOVSKY-APAP: Objection, calls for
13    a legal conclusion.
14 BY MR. HACKNEY:
15 Q. -- in their pensions?
16       MS. KOVSKY-APAP: Objection, calls for
17    a legal conclusion.
18 A. I'm really not following you.
19 BY MR. HACKNEY:
20 Q. That's okay. This stuff is -- maybe I'm getting
21    it wrong. I'm trying to say the way I understand
22    it. Let me ask it another way.
23       Do you know whether active employees
24    have -- are impacted at all by these proposed
25    pension cuts under the City's plan?

1  MICHAEL HALL
2  A. If active employees are affected by the pension
3     cuts now?
4  Q. Yeah.
5  A. Well, what's happening with the active employees
6     is a snapshot was taken on the 30th of June, which
7     gave them what they would have earned up until
8     that time frame, so that -- that's there. And the
9     new pension plan would go forward from that point
10    onward.
11 Q. Okay. So you said it exactly right, which is the
12    snapshot is taken of what pension they've already
13    earned as of --
14 A. June 30th.
15 Q. -- June 30th, right. And then going forward
16    their pensions are going to be covered by the
17    hybrid plan?
18 A. That's correct.
19 Q. Correct. Do you agree that if active employees
20    had concerns about the level of cuts to the
21    pensions that they had already earned, that the
22    City could have addressed those concerns by
23    increasing the terms of the hybrid pension plan
24    going forward?
25       MS. KOVSKY-APAP: Objection, calls for

1  MICHAEL HALL
2     speculation.
3  A. I don't know.
4  BY MR. HACKNEY:
5  Q. You don't know?
6  A. No.
7  Q. Okay. Isn't it just a matter of logic that if
8     I'm concerned that you're cutting this part of my
9     pension, that the City can address that concern
10    by improving this other part of my pension?
11 A. No.
12       MS. KOVSKY-APAP: Objection, calls for
13    speculation.
14 A. No. You have to look at funding going forward.
15    You know, there's a reason why you were changing
16    the plan.
17 BY MR. HACKNEY:
18 Q. Absolutely, you got to look at funding going
19    forward in terms of how much you can put into
20    that hybrid pension plan, correct?
21 A. Correct.
22 Q. And so the more money you have available, the
23    more that you could put into the hybrid pension
24    plan, correct?
25 A. Correct.

Pages 149 to 152

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-7   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 10 of 12

MICHAEL HALL

**A. No.**
Q. Sorry, so is it correct that you have never seen a study on the subject of comparable pension plans at other municipalities?
**A. That's correct.**
Q. Now, are you aware that the City's collective bargaining agreements had expired prior to your joining the City?
**A. Repeat the question.**
Q. I think we went over this. I was trying to set it up. Do you recall we talked about the fact that the collective bargaining agreements at the City had all expired?
**A. Yes.**
Q. Okay, when you joined the City?
**A. Yes.**
Q. And the City's employees were operating under what are call CETs, correct?
**A. Correct.**
Q. And what impact were the CETs having as far as you could tell on the City's workforce?
 MS. KOVSKY-APAP: Objection, form.
BY MR. HACKNEY:
Q. If any?

MICHAEL HALL

**A. I had no comparison.**
Q. Okay.
**A. Nothing to compare it to.**
Q. Now, do you understand that the current Plan of Adjustment proposes a zero percent cut to PFRS pensions, it reduces the cost of living adjustment, but it doesn't cut the pension itself and 4.5 percent cuts to the GRS pensions and elimination of the cost of living adjustment?
 MS. KOVSKY-APAP: Again, I have to say if you're going to be asking him specific questions about the terms of the thing, put it in front of him.
BY MR. HACKNEY:
Q. Do you understand my question?
 MR. BARNOWSKI: Objection to foundation.
**A. I understand the question, I need to look at it.**
BY MR. HACKNEY:
Q. So do you know the current levels of cuts that are being proposed under the pensions?
**A. No.**
Q. Okay. Why not?
**A. I can't get give -- give it to you right now.**

MICHAEL HALL

Q. No, that's okay, I'll just -- I take it, this is not something you have at your fingertips --
**A. Right.**
Q. -- correct?
**A. Right.**
Q. Knowing the precise level of pension cuts is not particularly relevant to what you're doing today, correct?
**A. It's relevant, but it's -- it's set. You know, those talks reference pensions are being conducted at a different level.**
Q. Now, do you know that the cuts that are being proposed today are different from the cuts that were being proposed in February?
**A. Correct.**
Q. And they're less -- less harsh cuts, correct?
**A. Correct.**
Q. And what impact have the current proposed cuts had on -- on the City's workforce as far as you can tell?
 MS. KOVSKY-APAP: Objection, form.
**A. I can't. I can't tell.**
BY MR. HACKNEY:
Q. You can't distinguish it --

MICHAEL HALL

**A. No.**
Q. -- from the prior levels of cuts in your mind?
**A. No.**
Q. Okay. So it hasn't had some massive impact as far as you can tell on employee morale, correct?
**A. No.**
Q. Is that correct?
**A. That's correct.**
Q. It hasn't had some massive impact on employee productivity as far as you can tell, correct?
**A. I can't tell.**
Q. You haven't been able to determine a significant impact on employee attrition, correct?
**A. Can't tell.**
Q. And you haven't been able to discern an impact on hiring new employees, correct?
**A. Correct.**
Q. Do you know what the annuity savings fund is? I've had to learn more pension stuff than I ever wanted to in my life, but the punishment is that now I've got to ask you about that.
**A. I can't go into detail on annuity saving fund.**
Q. Have you heard of it?
**A. Yes.**

Pages 157 to 160

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 7150-7  Filed 08/28/14  Entered 08/28/14 01:05:39  Page 11 of 12

1  MICHAEL HALL
2  Q. Do you have a -- what is your understanding of
3     what it is?
4  A. It's a fund that the employees could contribute
5     to.
6  Q. Yeah, it was -- it was extra money they could
7     save on top of their pension, right?
8  A. Correct.
9  Q. Now, do you know that -- have you ever heard of
10    the concept of the ASF, which is short for
11    annuity savings fund, the ASF clawback, have you
12    heard about this?
13 A. I've heard of it.
14 Q. What's your understanding of what the ASF
15    clawback relates to?
16 A. There was some overpayments that are now being
17    recouped.
18 Q. And do you understand that the period of
19    recoupment I think runs from around 2003 to 2013?
20        MS. KOVSKY-APAP: Objection, form and
21    foundation.
22 BY MR. HACKNEY:
23 Q. Do you know what the period of recoupment is?
24 A. No.
25 Q. Do you know whether the ASF clawback or the ASF

1  MICHAEL HALL
2     recoupment, however you call it, has that had an
3     impact on -- on employees as far as you can tell?
4  A. Yes.
5  Q. What impact has that had?
6  A. Frustration.
7  Q. Because they're seeing some of their savings
8     clawed back, right?
9  A. That's correct.
10 Q. And do you know if -- do you know about what
11    percentage of active employees were participants
12    in the annuity savings fund?
13 A. No.
14 Q. Do you know -- do you know whether the ASF
15    clawback disproportionally impacts actives versus
16    retirees?
17 A. No.
18 Q. I take it, you have never studied that question?
19 A. By being disproportionate, no, I haven't.
20 Q. The relative percentage of the ASF held by
21    actives versus retirees?
22 A. No.
23 Q. But just so I have your testimony, you agree that
24    the -- the ASF recoupment has had a negative
25    impact on employees because they're frustrated

1  MICHAEL HALL
2     about losing --
3  A. It's money -- it's money they thought they had --
4  Q. Yeah.
5  A. -- that they're going to lose.
6  Q. So that's had a negative impact --
7  A. Correct.
8  Q. -- in terms of their City's workforce?
9  A. Correct.
10 Q. Have you been able to participate or communicate
11    with anyone with respect to what the amount of
12    the ASF recoupment should be?
13 A. Have I been able to communicate what I think it
14    should be?
15 Q. Yeah.
16 A. I can't -- I can't give advice on what it should
17    be.
18 Q. Okay. For example, you've never gone to anyone
19    and said there should be no ASF recoupment
20    because it's having a negative impact on City
21    employees, correct?
22 A. That's correct.
23        MR. HACKNEY: This might be a good time
24    to take a break for lunch.
25        MS. KOVSKY-APAP: I was hoping you

1  MICHAEL HALL
2     would say that.
3        MR. HACKNEY: You bet.
4        VIDEO TECHNICIAN: The time is 12:01
5     p.m., we are now off the record.
6        (Recess taken at 12:01 p.m.)
7        (Back on the record at 12:56 p.m.)
8        VIDEO TECHNICIAN: The time is 12:56
9     p.m., we are now on the record.
10 BY MR. HACKNEY:
11 Q. Mr. Hall, since you have joined the City, have
12    there been any positions that the City has not
13    been able to fill with qualified applicants?
14        MS. KOVSKY-APAP: Objection, form and
15    foundation.
16 A. Not that I can acknowledge.
17 BY MR. HACKNEY:
18 Q. In fact, you've attended job fairs in connection
19    with the City of Detroit's hiring, correct?
20 A. Correct.
21 Q. And those job fairs have generated a significant
22    level of interest; isn't that correct?
23 A. That's correct.
24 Q. In fact, I read about one in the newspaper, I
25    think, where you are quoted as saying the City

Pages 161 to 164

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 7150-7  Filed 08/28/14  Entered 08/28/14 01:05:39  Page 12 of 12