## Exhibit 9

**Excerpts of July 16, 2014 K. Buckfire Deposition Transcript**

1        KENNETH BUCKFIRE, VOLUME 2
2      IN THE UNITED STATES BANKRUPTCY COURT
3      FOR THE EASTERN DISTRICT OF MICHIGAN
4
5
6
7   In Re:       )   Chapter 9
8
9   CITY of DETROIT, MICHIGAN, )   Case No. 13-53846
10
11      Debtor.  )  Hon. Steven Rhodes
12   _____
13
14            VOLUME 2
15
16   The Videotaped Deposition of KENNETH BUCKFIRE,
17   a Rule 30(b)(6) witness,
18   Taken at 1114 Washington Boulevard,
19   Detroit, Michigan,
20   Commencing at 8:09 a.m.,
21   Wednesday, July 16, 2014,
22   Before Leisa M. Pastor, CSR-3500, RPR, CRR.
23
24
25

1        KENNETH BUCKFIRE, VOLUME 2
2   APPEARANCES:
3
4   THOMAS F. CULLEN, JR., ESQ.
5   Jones Day
6   51 Louisiana Avenue, N.W.
7   Washington, D.C. 20001
8      Appearing on behalf of the Debtor.
9
10
11
12   CORINNE BALL, ESQ.,
13   BENJAMIN ROSENBLUM, ESQ.
14   Jones Day
15   222 East 41st Street
16   New York, New York 10017
17      Appearing on behalf of the Debtor.
18
19
20
21
22
23
24
25

1        KENNETH BUCKFIRE, VOLUME 2
2
3
4   CLAUDE D. MONTGOMERY, ESQ.
5   Dentons US LLP
6   1221 Avenue of the Americas
7   New York, New York 10020
8      Appearing on behalf of the Retirement Committee.
9
10
11
12   JENNIFER K. GREEN, ESQ.
13   Clark Hill, PLC
14   500 Woodward Avenue, Suite 3500
15   Detroit, Michigan 48226
16      Appearing on behalf of the Retirement Systems for the
17   City of Detroit.
18
19
20
21
22
23
24
25

1        KENNETH BUCKFIRE, VOLUME 2
2   ROBIN D. BALL, ESQ.
3   Chadbourne & Parke, LLP
4   350 South Grand Avenue, 32nd Floor
5   Los Angeles, California 90071
6      Appearing on behalf of Assured Guaranty Municipal
7   Corporation.
8
9
10
11   GUY S. NEAL, ESQ.
12   Sidley Austin, LLP
13   1501 K Street, N.W.
14   Washington, D.C. 20005
15      Appearing on behalf of National Public Financing.
16
17
18
19
20
21
22
23
24
25

Pages 1 to 4

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-9   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 2 of 28

KENNETH BUCKFIRE, VOLUME 2

2  recovery is for the class 9 COPs claims?

3  **A. Zero to 10 percent.**

4  Q. Now you mentioned a little bit ago that the plan

5  contains various settlements in it, correct?

6  **A. Correct.**

7  Q. Okay. I'm not going to go into the substance of -- of

8  all of them, and some of them you can't testify about,

9  as you've said earlier, but let me ask did Miller

10  Buckfire have a role on behalf of the City in any of

11  those settlements?

12  **A. We had a role in all of the settlements?**

13  Q. In all of them?

14  **A. Yes.**

15  Q. Without going into the substance of it, what was

16  Miller Buckfire's role in connection with the

17  settlement process?

18      MR. CULLEN: You can describe what your

19  role was.

20      THE WITNESS: In general?

21      MR. CULLEN: In general.

22  **A. Okay, we provided advice to the emergency manager and**

23  **the City of Detroit on the relative value of each**

24  **claim that need to be settled, the manner in which the**

25  **negotiations should be handled, constructing the**

KENNETH BUCKFIRE, VOLUME 2

2  **various offers to those creditors for settlement**

3  **purposes, assisting the emergency manager in**

4  **negotiations with creditors to arrive at acceptable**

5  **transactions.**

6      **We did substantial analysis of all**

7  **proposals provided to us by the different**

8  **constituencies and insured along with other**

9  **consultants to the City that the settlements in**

10  **totality would allow the City to propose a feasible**

11  **plan.**

12  Q. Did Miller Buckfire have a role in developing the

13  proposed treatment of each of the classes of unsecured

14  claims that we just read about in the disclosure

15  statement?

16  **A. Yes.**

17  Q. And what was Miller Buckfire's role in that?

18  **A. It's what I just testified to.**

19  Q. The same?

20  **A. Yes.**

21  Q. Did you have a personal role in that?

22  **A. In several of the negotiations, yes.**

23  Q. And also in proposing the treatment of each of the

24  classes?

25  **A. Yes.**

KENNETH BUCKFIRE, VOLUME 2

2  Q. Was Miller Buckfire involved in the decision to

3  provide a greater percentage of recoveries to classes

4  10 and 11 as compared to class 9?

5      MR. CULLEN: Objection, foundation, you can

6  address that if it makes sense to you.

7  **A. I was -- and my firm was involved actively in all**

8  **analysis of all recoveries for all classes.**

9  BY MR. SOTO:

10  Q. That included that comparison of 10, 11, and 9?

11  **A. Correct.**

12  Q. Do you recall the basis of the decision for the

13  differentiation of those classes, 10, 11, and 9?

14      MR. CULLEN: I would caution the witness

15  not to talk about lawyer/client --

16      THE WITNESS: Right.

17      MR. CULLEN: -- issues or mediation issues

18  with respect to those.

19      MR. SOTO: And that can be a standing,

20  you've been directed as such.

21      MR. CULLEN: I understand.

22  **A. And I'm just thinking about how I can frame my answer**

23  **give me a minute.**

24  BY MR. SOTO:

25  Q. Please.

KENNETH BUCKFIRE, VOLUME 2

2  **A. All right, would you please repeat the question?**

3  Q. Sure, and maybe I can make it clearer. What I'm

4  trying to determine and see if you have facts on --

5  facts on is the process and the elements that went

6  into distinguishing classes 10 and 11 as compared to

7  class 9 and the recoveries that they were going to

8  get?

9  **A. I see. Well, as a purely financial or banking matter,**

10  **it was my judgment that the status of the class 9**

11  **claims and the pension and so-called OPEB claims was**

12  **basically the same, that is they were general**

13  **unsecured claims of the City of lesser priority than**

14  **the general obligation claims, certain other claims of**

15  **the City. And so that was the starting point of our**

16  **analysis and indeed was the basis for the City's**

17  **original proposal in June of '13 where all these**

18  **claims would be in the same pool and would share pro**

19  **rata.**

20      **It also became clear to us that as part of**

21  **our financial analysis that even though we believed**

22  **that the claims were general unsecured claims, the**

23  **fact that the COPs claims were indirect obligations of**

24  **the City and not direct obligations to the City had to**

25  **be given some consideration, and that is how we ended**

Elisa Dreier Reporting Corp.   (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-9   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 3 of 28

KENNETH BUCKFIRE, VOLUME 2

1  up recommending to the emergency manager that only 40
2  percent of the COPs claims be allowed because we were
3  uncertain about what their ultimate status would be
4  because again, I'm -- I'm making a legal conclusion,
5  but the claim of the COPs against the service
6  corporations would result in the service
7  corporation's claim being an asset of the COPs and
8  that was sufficiently in dispute as to a financial
9  matter as to what value would be, we felt 40 percent
10  was the appropriate allowed claim.
11         Then the distinction we had to draw with
12  the class 10 and 11 claims had to take into account
13  from a financial matter, the proposed treatment of
14  OPEB as a practical matter from the City's prospective
15  the financial obligations due to its retirees were
16  both pension and healthcare related and because we
17  were proposing to substantially impair or eliminate
18  our healthcare plans and in consideration for doing so
19  move our retirees to new insurance programs of much
20  lesser cost, that resulted in a very large claim, but
21  therefore, as a practical matter, rather than
22  throwing -- using the OPEB claim and the pension
23  claims to be pari passu with respect to recovery.
24  Part of the settlement discussion with the retiree --

KENNETH BUCKFIRE, VOLUME 2

1  I'm trying to be careful --
2      MR. CULLEN: Okay.
3  A. -- from a financial prospective, we viewed those
4  claims as being part of the same pool for purposes of
5  arranging an overall recovery and therefore how that
6  recovery would be applied would be up to the
7  beneficiaries which is now reflected in the plan of
8  adjustment.
9  BY MR. SOTO:
10  Q. Let me break that down. That was a --
11  A. Yeah.
12  Q. -- pretty cool answer so --
13  A. It's complicated.
14  Q. So taking -- taking the first thing that you
15  highlighted, you highlighted the distinction between
16  direct and indirect claims and the class 9 claims you
17  viewed as indirect and there were other direct claims.
18  You said that led to you -- and again, if I'm saying
19  something wrong, you correct me, you said that allowed
20  to allowing only 40 percent of that claim.
21         So can you explain to me what analysis you
22  did of what analysis you did of what those claimants
23  you mentioned that they had claim -- it would result
24  in claims against the surface corporations is I think

KENNETH BUCKFIRE, VOLUME 2

1  how you put it, how would the fact that those clients
2  have claims against the service corporations
3  differentiate in their mind?
4  A. Well, the City was not the direct obligor of the COPs
5  That was the whole point of the transactions, it was
6  an indirect obligor.
7  Q. So you were taking into account the fact that the
8  service corporations would still be there to be able
9  pay those obligations?
10  A. To the extent they had assets to do so, that's
11  correct.
12  Q. Okay. Did you take into account the fact that they
13  would only have assets, that the --
14      (Electronic telephone statement: Chris
15      Filburn, Paul Weiss, has left the conference.
16  A. I'm sorry, could you --
17      MR. CULLEN: He'll be missed.
18  BY MR. SOTO:
19  Q. Now I've lost it all, Chris. Let's start again.
20      Did you take into account the fact that the
21  sources of revenue for the service corporations to pay
22  the COPs holders was also going to be affected by the
23  plan?
24  A. Yes, I did.

KENNETH BUCKFIRE, VOLUME 2

1  Q. So recognizing that if the service corporations had no
2  money to pay the COPs holders, you still took that as
3  a distinction in allowing only 40 percent?
4  A. I did.
5  Q. And were there any other factors that I missed in that
6  exchange?
7  A. No.
8  Q. Then you went on to talk about the proposed treatment
9  of OPEB, and I just want to make sure it's clear for
10  the record or at least I understand it. So you took
11  into account the fact that here were another group of
12  unsecured creditors who were going to be impacted
13  because you were affecting their pensions and their
14  healthcare, correct?
15  A. Correct.
16  Q. Is there anything else you took into account?
17  A. I'm not sure how I can answer this question. Can I
18  just ask?
19  Q. Sure, please.
20      (Counsel confers with the witness.)
21      MR. HACKNEY: What was the last question?
22      MR. SOTO: Anything else he took into
23  account other than the fact that there's a pension and
24  healthcare?

Pages 97 to 100

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-9   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 4 of 28

KENNETH BUCKFIRE, VOLUME 2

In the context of -- of the plan of adjustment that is at issue in this matter now, I understand it's going to be amended or at least we've been told it is, but as it exists that you can testify about, were you involved in analyzing how that plan met the best interests tests from an investment banker's standpoint?

A. Yes.

Q. And the "you" I was referring to there was Miller Buckfire, but I'm going to ask you again, you personally and Miller Buckfire, both?

A. Yes.

Q. Okay. What was your personal participation in that analysis?

A. Well, I've reviewed proposed treatment of our creditors consistently since last June, I've been involved in discussions involving recommendations to the emergency manager for proposed settlements to make sure they were consistent with those provisions.

Q. Would you agree that a municipality in a chapter 9 in connection with the best interests test should make reasonable efforts to repay creditors?

A. Yes.

Q. And in -- and I understand that you're wearing two

KENNETH BUCKFIRE, VOLUME 2

hats here, and I'm going to ask you an opinion question because you're an expert or being proffered as an expert, as well. What constitutes a reasonable effort to repay creditors in your opinion?

A. In a municipal context?

Q. In the context of this municipal bankruptcy.

A. Okay.

Q. Which is unique as you testified --

A. Yes.

Q. -- at length yesterday.

A. Well, recognizing that it is a unique bankruptcy in many ways, we believe and advised the emergency manager and indeed the State of Michigan from the beginning of our engagement including, by the way, the mayor of the City of Detroit, I should have said that, too, that designing a plan that would take into account the City's best ability to repay its creditors had to start with the premise that the City was effectively service insolvent and that whatever was available to repay creditors from the cash flows of the City, that is, the revenues of the City, was really only available after taking into account the cost of the revitalization/rehabilitation of the City, itself, and that was the beginning point of our

KENNETH BUCKFIRE, VOLUME 2

analysis which began last January which we were intimately involved in along with Ernst & Young and Conway MacKenzie.

So that leads you to first determine well how much do you really have available once you take into account that set of requirements to eliminate service insolvency, that leaves you with a projected stream of cash flow which is available for in this context fixed and unfixed debt obligations and from that, we then calculate what's available to satisfy our creditors pursuant to the best interests test.

Q. And so you determined what services this is my understanding of what you just said and tell me if I'm wrong, you determine what services the City has to give, ought to be giving, or isn't giving that it should be giving, or is giving too many, you look at the services that the City as a City: you start with that?

A. Correct.

Q. And then once you determine, you know, what those are, along with all these people that you mentioned earlier, the mayor and everyone else, then you see, well, what are the revenues that the City has to address those?

KENNETH BUCKFIRE, VOLUME 2

A. Well, the revenue analysis on which our financial conclusions are based is obviously very critical to feasibility of the plan, itself. Once you understand how confident you can be in the revenues of the City on a projected very long basis then you have to apply those revenues necessary costs to providing essential services to the citizens of Detroit, and of course a central element of the plan was effectively a new program of the reinvestment to take into account the severe underinvestment by the City in those services for decades which had been a major factor, itself, in the decline of the City by encouraging businesses and citizens to leave.

So by reestablishing adequate services to address the service insolvency issue, that had a certain cost associated with it.

A. Once that cost is taken into account, then you have whatever you have left over from revenues and that is therefore available to satisfy our obligations to our creditors.

Q. And I think you said it in a way that I understood, so you start by figuring out what the basic services should be in a plan that you think is going to work that's going to be meeting the tests we talked about,

KENNETH BUCKFIRE, VOLUME 2

1 and after you determine the cost of that, and you
2 think the real revenues are, then you can decide well,
3 what's left over for the creditors?
4 **A. Correct. And of course, we also look at whether there**
5 **are other sources of repayment. Certain noncore**
6 **assets that might be monetizable, might not, all**
7 **disclosed in our original June 2013 report.**
8 MR. CULLEN: 2014.
9 THE WITNESS: No, June of '13.
10 MR. CULLEN: I'm sorry.
11 BY MR. SOTO:
12 Q. You mentioned the June 2013 report, and I have only
13 one question left that wasn't asked yesterday in some
14 way, and that is have you done an analysis of that
15 report since then to update it?
16 **A. Well, everything we've been doing has been based on**
17 **the conclusions we laid out in that report in June of**
18 **2013. So it's been the roadmap and effectively the**
19 **strategy for the rehabilitation of the City since it**
20 **was first made public last year. We haven't done a**
21 **further analysis because it has been superseded by the**
22 **analysis provided in the plan of adjustment and the**
23 **disclosure statement.**
24 Q. So the plan of adjustment disclosure statement is a

KENNETH BUCKFIRE, VOLUME 2

1 progeny of the June 13th plan?
2 **A. That's right.**
3 Q. Is there anything that you now look back on in seeing
4 that June '13 -- June 2013 plan that you think we were
5 wrong?
6 **A. The City was wrong?**
7 Q. Well, you as an investment banker, I don't attribute
8 all of that to the City.
9 **A. I thought we would have more cooperation from the**
10 **Counties in creating the authority than we did.**
11 Q. All right, let's -- anything else?
12 **A. No.**
13 Q. Let's go on to the next one. So one of the other COPs
14 holders' objections is that the plan is not fair and
15 equitable and you -- you gave and you gave me your
16 understanding of what you understood that to mean.
17 Q. Would you agree that the COPs holders' claims, the
18 class 9 creditors, are considered an impaired class?
19 **A. From a financial perspective, I would deem them**
20 **impaired.**
21 Q. Other than what you've testified about today and
22 yesterday, did you undertake an analysis to ensure
23 that the fair and equitable standard was -- was being
24 satisfied with respect to the treatment of the class 9

KENNETH BUCKFIRE, VOLUME 2

1 creditors?
2 **A. Not independent of what's been disclosed in the**
3 **disclosure statement and plan.**
4 Q. So in specifics, what do you believe was done to
5 ensure that the treatment of the class 9 creditors
6 was -- was fair and equitable?
7 **A. Well, leaving aside the legal issues, which I'm not**
8 **competent to speak to, the allowed claim of 40 percent**
9 **as being allowed to participate pro rata with all**
10 **other similarly situated claims with respect to B note**
11 **recovery, so I believe that satisfies the test.**
12 Q. And anything else other than that?
13 **A. No.**
14 Q. Moving on to the objection regarding good faith and
15 your understanding of it, let me hand you an exhibit.
16 We'll put this in context.
17 MARKED FOR IDENTIFICATION:
18 DEPOSITION EXHIBIT 29
19 10:27 a.m.
20 BY MR. SOTO:
21 Q. Okay, Mr. Buckfire, you've been handed what has been
22 marked as Exhibit 29, and it is an e-mail from you,
23 Kenneth Buckfire, dated Tuesday, July 30th, 2013, to
24 Bennett Bruce -- or I guess that's Bruce Bennett and

KENNETH BUCKFIRE, VOLUME 2

1 David Heiman (ph.)?
2 **A. That's right.**
3 Q. And the subject is Christie's and the DIA. Could you
4 take a few moments to take a look at that to refresh
5 your recollection of that if you need to?
6 **A. My recollection is refreshed.**
7 Q. Okay. So I'm going to ask you some specific questions
8 but in general. Do you remember this process?
9 **A. Yes.**
10 Q. What was this e-mail part of?
11 **A. Can I ask a question to my counsel for a second?**
12 Q. Sure, please.
13 (Counsel confers with witness .)
14 **A. Just wanted to make sure. Well, very early on in our**
15 **engagement with the City, I was made aware of the fact**
16 **that the Detroit Institute of Arts was effectively not**
17 **a separate institution but, in fact, was owned by the**
18 **City, although, it was operated by the DIA Trustee**
19 **Corporation, the building and collection was**
20 **technically owned by the City of Detroit. We**
21 **recognized early on that that would require it under**
22 **certain scenarios to be valued as a potential noncore**
23 **asset and dealt with appropriately if it was**
24 **determined that the City would have to seek protection**

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022

13-53846-tjt   Doc 7150-9   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 6 of 28

KENNETH BUCKFIRE, VOLUME 2

2  cooperation of the operators and the trustees than
3  over their objections because they made it very clear
4  to us that they would fight us to the ends of the
5  earth if we touched the collection even though it
6  belonged to the City.
7  Q.  Let me -- let me give you an again this is related to
8     the DIA there's all going to be under that subheading.
9     This is an e-mail --
10          MARKED FOR IDENTIFICATION:
11          DEPOSITION EXHIBIT 31
12          11:14 a.m.
13  A.  This is a vacation.  I don't have to talk about DWSD
14     for a while.  This is great.
15  BY MR. SOTO:
16  Q.  Exhibit 31, and I will tell you the Bates number, it
17     is POA 00041062.  And it is an e-mail from -- from
18     Kenneth Buckfire to Gene Gargaro, dated Monday, April
19     29, 2013, subject, DIA visit.  Simple statement in it
20     and very consistent with your personality here in this
21     deposition, you say the DIA is an important cultural
22     asset and the board should be proposing something
23     dramatic, not just about refurbishing the parking
24     garage.  What did you mean by that?
25  A.  That's the first time I've laughed in two days.

KENNETH BUCKFIRE, VOLUME 2

2          MR. HACKNEY:  I was going to say we were
3     aligned with you on that one, Mr. Buckfire.
4  A.  I had a meeting with them, and they said well, what do
5     you think we should do?  I said well, you notice that
6     the parking garage is dilapidated and condemned
7     because nobody spent any money on it.  Why don't you
8     offer it as part of your proposal to spend the money
9     to renovate it so people will come visit your museum,
10     and they said oh, what a great idea, and I said no,
11     but you got to do more than that.
12  Q.  Okay.  So this was your meeting with Mr. Gargaro where
13     you were again discussing some alternatives with
14     respect to the maximization of that asset?
15  A.  Yeah, this was after our first meeting, actually, we
16     had a first discussion of the issues, and I had
17     urged them to think about doing something that would
18     justify conveying the collection into an authority.
19  Q.  At this point, you didn't have -- you still or --
20     you know what, let me ask you the question instead of
21     answering it.
22          Did you have any idea in your head at this
23     point around April 2013, April 29, 2013, of, you know,
24     gee, what would be the right value that the City would
25     need to get in order to be able to convey that asset?

KENNETH BUCKFIRE, VOLUME 2

1  A.  No, we had no idea, just it would have to be a big
2     number.
3  Q.  When did the -- I know I have this somewhere in my
4     papers, but do you have in your head when Christie's
5     actually came out with its assessment?
6  A.  I think it was right -- right around the -- well, I
7     first learned of their range before it was published,
8     sometime in November, and then the published report, I
9     believe came out end of November, early December.
10  Q.  Of 2013?
11  A.  Yes.
12  Q.  Okay.  So -- and I think you might have already
13     answered this, did you have anything in particular in
14     mind when you used the word dramatic?
15  A.  A big number.
16  Q.  Okay.  This is -- these have become sort of favorite
17     phrases, I've been to just a few hearings on this
18     matter, but I've heard these questions asked, so I'm
19     going to ask you since I've heard other people ask
20     them.  Do you know if Miller Buckfire and you did
21     anything to find out what the 100 most valuable pieces
22     of art were in the DIA?
23  A.  Me personally?
24  Q.  Well, not just you personally, but you and/or Miller

KENNETH BUCKFIRE, VOLUME 2

1  Buckfire, did you guys undertake any other steps other
2     than undertaking Christie's?
3  A.  No, we're not experts in this field, we have no basis
4     upon which to make that judgement.
5  Q.  And I assume that the answer is still the same, but
6     I'll ask again.  Do you know if you or Miller Buckfire
7     took any steps to try to figure out which of the
8     pieces of art were valued at more than a million
9     dollars, you know, which -- or which were
10     considered -- let me strike that and start again.
11          Let's start it this way:  Do you know if
12     you or Miller Buckfire took any steps to find out what
13     the 100 most valuable pieces of art were within the
14     DIA collection?
15  A.  No, aside from retaining Christie's.
16  Q.  Do you know if you or anyone at Miller Buckfire took
17     any steps to determine which of the pieces of art
18     within the DIA had some restrictions on alienation or
19     use or transfer?
20  A.  No.
21  Q.  And again, you would have been relying on Christie's
22     for some of those things?
23  A.  Correct.
24  Q.  So as you sit here today, do you know if Christie's

KENNETH BUCKFIRE, VOLUME 2

2    did anything like that?

3    A. Well, we had directed them, this had been publicly

4    disclosed, to review the portion of the collection

5    paid for by Detroit City Tax revenues. That was the

6    initial mandate they had, that required them to

7    appraise, I think, several thousand individual

8    objects, and we decided to defer review of the gifted

9    items to a later stage if we ever got to that point.

10   Q. That's the distinction I've heard of where review the

11   ones that are owned by the City, you can get the

12   others later?

13   A. Paid for by the City.

14   Q. Paid for by the City?

15   A. Correct.

16   Q. Do you know if in the process of doing that that they

17   even of that group, did they -- did they pick, you

18   know, the 100 most valuable of that group, do you

19   know?

20   A. Well, they appraised several thousand objects. I

21   think if you go to their property, which is publicly

22   available, they do put out an appraisal by object, so

23   you can look at that and figure out that subset.

24   Q. I see.

25   A. You can figure out which of the hundred are most

KENNETH BUCKFIRE, VOLUME 2

2    valuable.

3    Q. If they have a value, you can figure that out?

4    A. Yeah, that's right.

5    Q. And so -- this is to make sure we get something in the

6    record that we're going to be using in another

7    deposition, and we won't be here long, but let me mark

8    as the next exhibit -- and it's, by the way P-- I'm

9    sure it's probably an exhibit here, it's POA 0000252.

10        MR. CULLEN: Oh, that one.

11        MR. SOTO: Got a good one.

12   BY MR. SOTO:

13   Q. It's entitled Christie's Appraisals, Inc. We'll mark

14   it as the next exhibit.

15        MARKED FOR IDENTIFICATION:

16        DEPOSITION EXHIBIT 32

17        11:21 a.m.

18   BY MR. SOTO:

19   Q. Another way of putting it was oh, that's my favorite.

20   A. You guys are guys are sick.

21   Q. You do this enough, you would be too.

22        COURT REPORTER: 32.

23

24

25

KENNETH BUCKFIRE, VOLUME 2

2    BY MR. SOTO:

3    Q. So Mr. Buckfire, I've handed you Exhibit 32, which has

4    on the top of it Christie's, there's a link, and it

5    has a date of 02 August 2013. Do you ever recall

6    seeing a document like this before in connection with

7    your retention of Christie's?

8    A. Yes.

9    Q. Is this the time of agreement that was ultimately

10   executed to retain Christie's by the City?

11   A. The City -- well, this is not signed. The one that we

12   signed with them, I believe, was an actual letter,

13   which was much more specific as to the scope of

14   services delivery of reports and the like. I believe

15   this was originally an exhibit to that letter, and it

16   may be superseded by it, but we never signed this.

17   Q. Let me hand you what will be our next exhibit, 33, and

18   it is Bates No. POA00000249.

19        MARKED FOR IDENTIFICATION:

20        DEPOSITION EXHIBIT 33

21        11:23 a.m.

22   BY MR. SOTO:

23   Q. And it's a letter dated -- take a moment to read it.

24   It's a letter dated August 4th, 2013, to Kenneth A.

25   Buckfire from Douglas M., as in Michael, Woodham?

KENNETH BUCKFIRE, VOLUME 2

1    A. Yes.

2    Q. Is this the letter you were just referring to?

3    A. I believe so.

4    Q. Okay, and so Exhibit 32 would have been attached as a

5    part of an Exhibit 33?

6    A. That's my recollection. This is their standard

7    identification and release agreement, but it's part of

8    the actual letter, itself.

9    Q. And to get it in the record, this Exhibit 33 was the

10   actual formal retention letter of Christie's on behalf

11   of the City?

12   A. Well, you don't have the signed contract. I know we

13   produced it, but I've seen this before. I'm not sure

14   which -- what exactly it ended up that the emergency

15   manager's office executed, but this is familiar to me.

16   Q. Well, that's helpful in its own right, so we should be

17   looking for one that's signed somewhere in the --

18   A. And we did sign one, because I remember seeing it.

19   Q. And we'll look for it, okay. Other than what is laid

20   out in that Exhibit 33 -- well, first of all, we're

21   not sure that Exhibit 33 is the signed one. Can you

22   tell me in your own terms first if you recall the

23   scope of Christie's engagement?

24   A. Well, I had negotiated the scope with them, so this is

KENNETH BUCKFIRE, VOLUME 2

Q. Okay. Was the governor -- in your conversations with
him, did you express to the governor your duty to try
to maximize the value of assets for the City in
connection with an adjustment plan under chapter 9?

A. I did.

Q. And so he understood that you were trying to seek to
maximize the value of this asset, too, the DIA asset,
correct?

A. Correct.

Q. Did -- and you met with him a number of times, and
that was, again, before the mediation.

A. That's right. I should note that the meeting -- I'm
laughing about this because Mr. Gargaro met with the
governor for the specific purpose of getting us to
back off and leave his museum alone, and I had warned
the governor in advance that would be his agenda.

Q. When you first addressed the issue of the potential
transfer of the art to the authority, authority using
your word, was there any conversation with the
governor then about the pensions or anything like
that?

A. Not in this context, no.

Q. Okay. So we've talked about the State contribution
agreement and part of the Grand Bargain, and you

KENNETH BUCKFIRE, VOLUME 2

testified at length about the -- I don't have it, I
just skipped over, like, five pages of questions, but
in general terms, what was your understanding of the
DIA settlement that was going to be a part of the
Grand Bargain? And I'm not asking you to disclose
attorney-client privilege or mediation stuff.

A. Well, from a financial perspective, it incorporated
the following elements, first, that the millage which
funds a large part of the operating expenses of the
DIA would be maintained by the three counties which
originally had passed the legislation to impose it.
That's, of course, of material benefit to the City,
because it means we don't have to come up with 20 or
$25 million a year to pay for operating expenses; that
would be maintained.

Second, that a -- a collection of local
foundations, the board of trustees, and the State
would contribute over time a very material amount of
capital to the plan, which would be consistent with
the valuation range of the Christie's report, which
from my perspective, was very important because until
we actually had an appraisal and we had facts on which
to assess any offer for the collection, we would not
know whether the offer was fair to the City, and

KENNETH BUCKFIRE, VOLUME 2

because the amount of money being offered was in the
high end of the range of their report, I was quite
comfortable, rather, that it was fair to the City.

The amounts of money being provided by the
State by foundations and trustees was around $800
million, clearly, because those amounts can be
regarded as gifts because we haven't sold the
collection, the structure of it from a financial
perspective was to provide those moneys to the pension
funds directly, and what the State required was that
those parties, namely, the pension funds and the
retirees, dropped and -- or not proceed with any
litigation against the State post emergence, which
they viewed, that is, the State as a very material
consideration in exchange for funding solving. Those
are the principal economic elements.

Q. Okay. In connection with -- I appreciate your
testimony now, and then some things have transpired
since then, and for example, now there are additional
analyses done by the City of the art at the DIA
including art if he is and I know you testified that
you have and read it do you know if anybody at Miller
Buckfire is doing an analysis is undertaking an
analysis of whether or not that new art that's

KENNETH BUCKFIRE, VOLUME 2

appraisal or analysis whatever it is should affect,
you know whether or not the value that's being or the
the value of the Grand Bargain is recognizing the true
value, maximizing the true value of the DIA and the
art, I don't even think we've received a copy of it so
the answer is no.

Q. Is that something you would want to do in connection
with your assistance of the City as the investment
banker in connection with all the work you've done to
make sure this plan is the way --

A. Yes, it's simply because we just haven't had the time
to get to it that we haven't reviewed it yet but we
haven't even received a copy so...

Q. If you've testified about this, tell me and for some
reason it's seemed similar in my head, but do you
recall alternative -- alternative transactions that
you evaluated and considered that were alternatives to
the DIA settlement?

MR. CULLEN: I believe he did testify to
some of those earlier.

BY MR. SOTO:

Q. That's what I'm wondering if he can --

A. Well, yes, we've reviewed with Christie's assistance
other alternatives that have been proposed by others

Pages 157 to 160

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-9   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 9 of 28

KENNETH BUCKFIRE, VOLUME 2

1  including touring fees, lease of the collection, art
2  loans, things of that sort, including outright sale
3  and we concluded that, you know, there was unlikely to
4  generate substantial value, art even in the case of an
5  outright sale, that was Christie's view which they've
6  publicly stated that it might take years to properly
7  monetize a collection because unlike the
8  corporate securities market where the or the municipal
9  securities impact relatively fewer buyers of art at
10  any given time and interest for fore to sell art and
11  achieve the proper value is not a simple process.  As
12  you sit here today, do you understand that various
13  creditors have objected that that the art is not held
14  in a charitable trust and therefore is transferable,
15  have you heard that.
16  A.  I know there have been numerous objections to the
17  so-called Grand Bargain, I'm not aware of every
18  specific ones.
19  Q.  What about that one, do you have a recollection of
20  that?
21  A.  Not specifically.
22  Q.  Did you undertake or -- and this time I'm truly
23  meaning you or anyone else at Miller Buckfire and I am
24  segregating away your lawyers and all the lawyers that

KENNETH BUCKFIRE, VOLUME 2

1  work with you, but Miller Buckfire and you, did you
2  guys undertake to determine, you know, the ownership
3  of the art at the DIA and whether it was held in a way
4  that it could be transferred or monetized?
5  A.  No we limited ourselves to the source of funding that
6  was used to acquire these objects whether it was a
7  gift or purchased by the City.
8  Q.  And that's not one of the factors you took into
9  account in determining well, gee, this is a fair
10  market?
11  A.  No.
12  Q.  So I think I gave you the disclosure statement
13  already.  Or you gave it?
14  A.  I have it.
15  Q.  And which one is that, Exhibit --
16  A.  Twenty-eight.
17  Q.  -- so in the disclosure statement if you'll turn to I
18  used 157, but it's also page 172 of 197 of the
19  exhibit?
20  A.  Yes, I see it.
21  Q.  This limited disclosure statement sort of the mid-page
22  it says on it, April 9, 2014, do you see that
23  paragraph?
24  A.  I do.

KENNETH BUCKFIRE, VOLUME 2

1  Q.  And I think you've answered this question before but
2  you are familiar with the disclosure statement,
3  correct?
4  A.  I am.
5  Q.  Could you take a moment or two just to review this
6  page with me and ask you to read it.
7  So looking at it, are you familiar with the
8  four indications of interest that are laid out there
9  on page 157 that start with this catalyst acquisitions
10  L.L.C. and the next one is art capital group L.L.C.,
11  the next one is Polly international auction company
12  limited and the next one is one management Hong Kong
13  limited?
14  A.  All household names.
15  Q.  I'm asking if you're familiar with those -- what was
16  presented by those entities?
17  A.  Well, I've never been given the statements of
18  interest, the nonbinding proposals so I'm only
19  familiar with what's been reported here in the TOA.
20  Q.  So it was closed in the disclosure statement simply to
21  let everybody know that it had happened?
22  A.  That's correct.
23  Q.  Did you follow up with any of these to determine
24  anything more about the work that they had done or

KENNETH BUCKFIRE, VOLUME 2

1  their level of interest?
2  A.  No, in order err Houlihan never contacted me or any of
3  our bankers to give us any of the specifics about any
4  of these proposals, to my knowledge.
5  Q.  Would you have been interested enter an alternate
6  proposals like the ones that are being laid out here?
7  A.  Well, normally I would, but you know when you look at
8  the way they were captioned as nonbinding indications
9  of interest, I wouldn't put much value on such a
10  proposal.  That would call into question their
11  ultimate willingness to close on a transaction and
12  indeed their interest in the first place.  And they
13  were never provided to me either, so that tells me
14  that there's something straining about this whole
15  process.
16  Q.  Did you reach out to Houlihan to say hey, guys, do you
17  have anything more than this?
18  A.  They've never contacted us.
19  Q.  I know I got that part of it, I was asking you if you
20  reached out to --
21  A.  No, I haven't called.
22  Q.  Did anyone else at Miller Buckfire call them to try to
23  find out anything about the deals?
24  A.  Not to my knowledge.  But they're not deals; they're

KENNETH BUCKFIRE, VOLUME 2

1  nonbinding indications of interest.
3  Q. Okay.
4  **A. That's a long way from being an offer.**
5  Q. These nonbinding indications of interest, let me
6     correct?
7  **A. Correct.**
8  Q. So no one at Miller Buckfire ever asked about them
9     either?
10 **A. They're nothing more than what they say they are which**
11 **is maybe we'll buy it maybe for this price.**
12 Q. But is it true for an investment banker that's trying
13    to maximize an asset to not even call to try to find
14    out, well, gee, what are you guys proposing? What is
15    this?
16 **A. Well, this is an effort undertaken by Houlihan Lokey**
17 **(ph.) which of course is a banker to certain creditors**
18 **of the City of Detroit. We had assisted the emergency**
19 **manager in negotiating the so-called Grand Bargain,**
20 **which will generate demonstrable and concrete value**
21 **for this collection which is a fact plan to take into**
22 **account. These are nothing more than nonbinding**
23 **indications of interest a long way from being a -- a**
24 **value that one could depend on for purposes as serious**
25 **as a plan of adjustment.**

KENNETH BUCKFIRE, VOLUME 2

2  Q. So then let me -- I understand that's your view.
3     Apart from these that are listed in this disclosure
4     statement, were there other entities, I mean did this
5     whet your appetite to think well, maybe there are
6     other entities who would really be interested in the
7     asset that we should contact to try to maximize the
8     value of it. Recognize we're talking about these, did
9     you try to contact anybody who might be involved in
10    the art monetization world to try to see well, what do
11    you guys think about the DIA art?
12        MR. CULLEN: Subsequent to the -- to
13    receiving or being made aware of these expressions of
14    interest.
15        MR. SOTO: Well, I actually was going to
16    try to do it chronologically, so I --
17        MR. CULLEN: Oh, okay.
18        MR. SOTO: I was going to say at all and
19    then the substance into it but first at all?
20 **A. No.**
21 Q. Yeah, I'm done with that although, I will be asking
22    some additional questions.
23        So under the plan of adjustment switching
24    gears now, the City is transferring the entire art
25    collection and the building in exchange for

KENNETH BUCKFIRE, VOLUME 2

2  contributions from a group of foundations in -- in the
3     DIA: is that correct?
4  **A. In exchange for fully committed financing those from**
5  **parties, that's correct.**
6  Q. Looking at the plan as I reviewed it, and I know
7     you're familiar with it more so than I am, the
8     foundations are contributing $366 million over a --
9     over a period of time, correct?
10 **A. Correct.**
11 Q. Do you recall the period of time?
12 **A. I'd have to go back and check it, I think it's a**
13 **ten-year period. I know we've produced the consulting**
14 **agreement.**
15 Q. I'll tell you -- it's on page 158 or page 173, 197 and
16    I handed them to you earlier.
17 **A. It's a --**
18 Q. Which page are you talking about.
19 Q. Page 158 the DIA settlement we looked at it very
20    quickly but it says in that first full paragraph last
21    sentence?
22 **A. I'm sorry, are you looking at the docket page or the**
23 **plan page?**
24 Q. Oh, I'm sorry the plan page?
25 **A. Ah.**

KENNETH BUCKFIRE, VOLUME 2

2  Q. The docket page is 197?
3        MR. CULLEN: 173 of 197.
4  BY MR. SOTO:
5  Q. Oh, I'm sorry, 173, so I think if we get to the page
6     to the paragraph that says DIA settlement?
7  **A. Yes.**
8  Q. And that last settlement sentence of that first
9     paragraph as of the date of filing of this disclosure
10    statement the foundations had tentatively agreed to
11    pledge at least 366 million in foundation funds
12    payable or over a period of 20 years?
13 **A. Right.**
14 Q. In support of this agreement?
15 **A. That's right.**
16 Q. Do you know if that's changed at all in connection
17    with the plan?
18 **A. Not to my knowledge.**
19 Q. So it's 360 million over 20 years?
20 **A. Correct.**
21 Q. And in addition to the foundations, the DIA Corp. is
22    also committed to giving a hundred million over 20
23    years, correct?
24 **A. Correct.**
25 Q. And in determining whether or not you had maximized or

Pages 165 to 168

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-9   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 11 of 28

KENNETH BUCKFIRE, VOLUME 2

you were maximizing the value of that asset in
connection with this exchange, did you do calculations
to determine well, gee, what is the value of somebody
giving you 366 million over 20 years and somebody else
giving you a hundred million over 20 years, what does
that come out to in present terms, did you do that
work?

A. No.

Q. Do you know if anybody at Miller Buckfire did?

A. No. Well, yes, I'm sorry, yes, no one has done the
work.

Q. Okay. And can you -- can you tell me why -- wouldn't
you want to know you're taking the art today, what are
they giving you today?

A. Mm-hmm.

Q. Would you want to know that?

A. In certain circumstances I would, but one of the
elements of the Christie's valuation which you haven't
asked me yet is over what period of time they would
anticipate monetizing the collection to realize those
values if indeed we had directed them to do so so even
though they gave us a valuation range which is in the
POA, I don't believe they stipulated in this analysis
or this report how long it would take and what they

KENNETH BUCKFIRE, VOLUME 2

did tell us which I believe is in their original
report, it would take several years to quote monetize
the value of the art that they reflected in their
range so the range in and of itself is not present
value adjusted and for that reason we did not feel
necessary to calculate the present value of the
payment stream relative to the value of the art
because the art rate, itself, was perhaps not done
according to Black Sholes (ph.). It's a number but
it's a number with a lot of judgement around when you
would realize that. That also was a function of the
wide nature of range gap. I mean it's a pretty wide
range.

Q. So it's your understanding, and I want to make sure
what you said when Christie's gave these values, they
weren't saying that's the value of that piece of art
if you want to buy it today?

A. That's correct, they're saying when we go and properly
find the art and find the right buyer there might be
one buyer in the world for every piece, we believe
this is the price we'll get for you.

Q. And do you know where in their report they -- they
indicate that?

A. I'd have to go back and reread it, they certainly told

KENNETH BUCKFIRE, VOLUME 2

me that.

Q. And who at Christie's were you talking about, the same
lady, Alison --

A. No, Doug Woodham.

Q. Doug Woodham?

A. Yeah.

Q. If you were sitting here -- well you are sitting here
today, since you are sitting here today and they're
proffering you as an expert as well as you're an
intelligent factual witness can I ask you what
discount rate would you use if you were sitting there
and someone well what do you think the present value
is of this 360 -- well let's just add it together
because it's round numbers 466 million over 20 years
what do you think the present value of this is what
discount rate would you use?

A. Well, when you look at the quality of the funding
parties, I think it would be appropriate for example
with the State of Michigan since they are a double A
rated credit to use a very low discount rate
equivalent to their credit rating, standing to come to
a present value of their contribution. Like wise, all
the foundations because they are large, and are well
funded and have no, as I understand it, external debt,

KENNETH BUCKFIRE, VOLUME 2

would also merit a very low discount rate to reflect
the present value of their future contributions. I
can't speak to the discount rate with respect to the
individual members of the DIA board of trustees, but
my understanding is they're all very wealthy local
business people and other professionals who probably
would merit an equally low discount rate on their
contributions, that would lead me to conclude without
saying I've done the work because I haven't except for
the last 30 seconds that the discount rate I would use
would be probably somewhere between 2 to 4 percent
And that would only reflect the fact that the
contributions were coming in over four -- 20 years.

Q. And by that last statement, just to help me understand
what you meant by that, if it was over a shorter
amount of time you would change the discount rate?

A. I'd have had a much lower discount rate.

Q. And if it's longer --

A. You'd have to use a higher one.

Q. Thank you.

A. You're welcome.

Q. I'm going to switch gears if this is a good time for
you to break, we can, switch gears to your expert
reported I'm going to try like the first part not ask

Pages 169 to 172

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-9   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 12 of 28

```
1              KENNETH BUCKFIRE, VOLUME 2
2     questions that you've already been asked and just try
3     to hone in on this.
4              MR. SOTO:  There's supposed to be lunch.
5     If lunch is served this would be a good time for a
6     break.  If not, we can go another half hour and begin
7     the process, and not just sit around waiting for food.
8     Okay, so this is the time to break, so let's...
9              VIDEO TECHNICIAN:  The time is 12:04 p.m.,
10    we are off the record.
11             (Recess taken at 12:04 p.m.)
12             (Back on the record at 1:04 p.m.)
13             VIDEO TECHNICIAN:  We are back on the
14    record.  The time is 1:04 p.m.
15    BY MR. SOTO:
16    Q.  Mr. Buckfire, I'm still Ed Soto, and you're still
17        under oath, and we will continue where we were before
18        going into your expert report and I have just been
19        informed that it is Exhibit No. 4, so it's probably in
20        front of you under that pile towards the bottom.  It
21        looks like this?
22    A.  I know.  I have it.
23    Q.  Okay.  Now we discussed in general terms the best
24        interest -- a little earlier and I want to circle back
25        for a second.  Parted of the test is determining
```

```
1              KENNETH BUCKFIRE, VOLUME 2
2     whether the proposed plan would be better alternative
3     for creditors, than what they would have if the plant
4     weren't -- weren't -- if the plan weren't passed.  So
5     part of that analysis that you have in your expert
6     report, of whether or not the creditors would be
7     better off that took into account some of the issues
8     you took into account in the best issues test,
9     correct?
10    A.  Correct.
11    Q.  So looking at your opinion which is opinion B, and
12        it's on page 2, and it says:  Plan treatment compared
13        to treatment upon dismissal, the City's creditors
14        would be treated better under the City's plan of
15        adjustment than if the bankruptcy were dismissed, do
16        you see that?
17    A.  I do.
18    Q.  And you addressed the basis of that further on in your
19        opinion on page 5, correct?
20    A.  Yes.
21    Q.  Okay.  So I'm going to be asking you questions that if
22        you want to take a moment to look at it or if you feel
23        you already have, we can go forward either way?
24    A.  Just go ahead.
25    Q.  So looking at page 5 where you are, what is the basis
```

```
1              KENNETH BUCKFIRE, VOLUME 2
2     then for your opinion that the City's creditors would
3     be treated better in the City's plan in the bankruptcy
4     case than if the bankruptcy case were dismissed?
5     A.  Well, the most important factor is my judgment that
6         the City on a delevered basis with the ability to make
7         multi-year investments in rehabilitation and
8         revitalization and improvements of the City's services
9         will be able to maintain if not improve projected tax
10        revenues as opposed to a situation in which it could
11        not do so.
12    Q.  So when you say as opposed to a situation where it
13        would not do so, what are you contemplating or what
14        are you thinking of?
15    A.  If the petition was dismissed and it was not able to
16        use tax revenues to make multi-year commitments to
17        reinvestment programs, its ability to retain or
18        attract new residents and retain or attract new
19        businesses would be called in question.
20    Q.  Okay.  From the City's standpoint I understand that.
21        Now I'm going to ask and maybe I misunderstood your
22        answer correct me if I don't think ton that so I'm
23        going to ask the question from the standpoint of the
24        creditors and since you know who I represent we
25        represent FGIC so that would be one of the class 9
```

```
1              KENNETH BUCKFIRE, VOLUME 2
2     creditors so you can even aim at that if you are
3     predisposed to or you can even ask it in general if
4     you want to and we can get to that later but what I'm
5     asking for is what analysis, what went into your
6     thinking in your opinion that the City's creditors
7     would in your view be better off particularly class 9
8     creditors if the plan of adjustment were approved as
9     opposed to if it were dismissed?
10    A.  Well, it's a complex question because you have to
11        consider the alternative, which is that the City
12        cannot undertake a rehabilitation program and maintain
13        or improve its tax revenues.  The alternative and
14        likely true that in fact the City will begin to
15        liquidate itself, by that I mean the residents and
16        businesses will leave the tax revenues will decline
17        but the expense of the stiff with cannot be made to
18        decline as quickly, particularly if the petition is
19        dismissed, there will be enormous return to try to
20        sees or otherwise prevent the City from spending its
21        money on anything other than creditor claims and
22        because in the case of your clients there are
23        substantial creditors who have perhaps a better claim
24        against City tax revenues in your client, the likely
25        recovery to your clients would likely be zero.
```

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-9   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 13 of 28

1　　　　KENNETH BUCKFIRE, VOLUME 2
2　able to compare apples-to-apples?
3　A.　Not directly, no.　But clearly the COPs holders have
4　　the benefit of your insurance so the bondholders
5　　themselves will do perhaps better than the City is
6　　proposing.
7　Q.　And those bond hold he recalls are the creditors,
8　　correct?
9　A.　They are.　Insured by your client.
10　Q.　Who is also a creditor at some to some extent,
11　　correct?
12　A.　Correct.
13　Q.　Did you take that into account in your opinion that
14　　they -- let's just take the bondholders that the
15　　bondholders would do better?
16　A.　I don't believe the bondholders will do
17　　better than this plan in any other scenario that we've
18　　presented.
19　Q.　Were there any alternative scenarios other than a
20　　dismissal of the plan, were there any sort of
21　　alternative plans that you might have taken into
22　　account in determining whether or not they'd do better
23　　under this plan as opposed to the dismissal of this
24　　plan?　In other words, to be clear on the question,
25　　you're proposing a scenario where you either have this

1　　　　KENNETH BUCKFIRE, VOLUME 2
2　plan or you have a race to the courthouse, correct?
3　A.　Correct.
4　Q.　Were there any alternatives other than a race to the
5　　courthouse like maybe this plan or an alternate plan
6　　that you might have considered, for example, your June
7　　13th plan?
8　A.　Well, we obviously proposed the June 13th the plan
9　　first but no creditors wanted to consider it so it
10　　wasn't feasible.
11　Q.　And -- other than that, anything else?　Any other
12　　plans that you might have considered?
13　A.　Well, we obviously had many discussions with all of
14　　our creditors including your clients and with your
15　　institution pursuant to mediation so I don't know what
16　　-- where the line would be on what we considered to
17　　pursue.
18　　　　MR. CULLEN:　Anything that was discussed
19　　outside of mediation, you can discuss.
20　A.　Oh.
21　　　　MR. CULLEN:　Anything that was generated
22　　outside of mediation or shared outside of mediation,
23　　you can discuss.
24　A.　Well, the only thing that comes to mind, and again,
25　　there was no support for it by any creditor was our

1　　　　KENNETH BUCKFIRE, VOLUME 2
2　original provision in the June 2013 presentation for
3　　some, quote, upside sharing that if the City did
4　　better than its projections, there might be additional
5　　value to our creditors that could be there for a
6　　higher recovery call it the equity of the City
7　　approach.　But as I said, no creditor supported our
8　　original proposal so we dropped the idea.
9　BY MR. SOTO:
10　Q.　Did the City support it?
11　A.　That's why we presented it, yes.
12　Q.　And the upside sharing, do you recall the specifics of
13　　how that would -- how that would work?
14　A.　Well, it was complicated because we wanted to make
15　　sure that it was properly calculated, we wanted to
16　　make sure it was just a one off, one-year improvement
17　　over the baseline, there's actually a full description
18　　of it in the June 2013 proposal.
19　Q.　Is that the one in the June 13 proposal that had a
20　　capped $2 billion note?
21　A.　I'd have to go back and check, with we had several
22　　different ways of doing it do you have a page
23　　reference.
24　Q.　No, I don't but...
25　　　　(Counsel confer.)

1　　　　KENNETH BUCKFIRE, VOLUME 2
2　A.　I don't have the full proposal in front of me.
3　BY MR. SOTO:
4　Q.　And you know what we ought to give you the full
5　　proposal and have it marked as an exhibit otherwise so
6　　why don't we mark this -- it was -- the summary was
7　　13, the full one will become 36.
8　　　　MARKED FOR IDENTIFICATION:
9　　　　DEPOSITION EXHIBIT 36
10　　　　1:32 p.m.
11　A.　Yes, this is what I was referring to, the terms of the
12　　note on page 107 of the June 2013 proposal.
13　BY MR. SOTO:
14　Q.　Which for those of you down there is Bates stamped No.
15　　POA 00110544.　Thank you very much.　In connection
16　　with any alternate plans did the City consider
17　　monetizing and selling any specific assets as an
18　　alternative to the current plan and a dismissal, any
19　　in between?
20　A.　Well we discussed this earlier every asset that the
21　　City had that it could conceivably monetize was
22　　disclosed in the June 2013 plan that we did embark on
23　　a the City's behave a process of whether there was
24　　indeed realizable value from each of the assets so
25　　identified and pursued that aggressively on behalf of

Pages 189 to 192

Elisa Dreier Reporting Corp.　(212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt　Doc 7150-9　Filed 08/28/14　Entered 08/28/14 01:05:39　Page 14 of 28

1  KENNETH BUCKFIRE, VOLUME 2
2  A. Yes.
3  BY MR. SOTO:
4  Q. The answer is yes?
5  A. Yes.
6  Q. And would you agree that that -- when you say yes you
7     mean it's reflected in the range that you put in your
8     opinion?
9  A. It reflected in the range provided in the plan of
10    adjustment as a potential recovery for class value.
11 Q. So from zero to 10 percent?
12 A. Correct I'm at 10 percent, somebody else might be at
13    zero.
14 Q. Okay. Did you do the same analysis for the holders of
15    pension claims what their ultimate litigation claims
16    might be, in coming to the range that you came to for
17    them?
18 A. Well, there's a general unsecured claim. My analysis
19    was almost driven by how that underfunding which
20    result in the claim was calculated, that's why I made
21    sure I understood a larger claim they had, not whether
22    the claim, it satisfy, could be presented and be
23    admitted as a perfected claim in the bankruptcy.
24 Q. So if I'm understanding what he says, look, I
25    understand they're an unsecured claim I looked at what

1  KENNETH BUCKFIRE, VOLUME 2
2     the larger claim might be because they're not getting
3     what they claimed they're owed so that gap, what
4     they're not getting that it would be a bigger amount
5     but what I'm asking is a little different. I'm asking
6     did you do any analysis of what their legal action
7     might be outside of as an unsecured creditor outside
8     of bankruptcy?
9  A. I did not, no.
10 Q. Do you know if anybody did?
11 A. Yes.
12 Q. Again, would it be Jones Day?
13 A. It was.
14 Q. Did you take Jones Day' analysis into account in the
15    range of recovery that you ultimately recommended in
16    the plan of adjustment with respect to the pensioners?
17    MR. CULLEN: I don't know the answer to
18    that one.
19 A. Okay. Yes. I did.
20 Q. Would you agree that outside of the Chapter 9 plan of
21    adjustment that the holders of pension claims would
22    have the same remedy as the holders of other unsecured
23    claims if they were coming to the City?
24 A. That would be my understanding as a financial matter
25    yes.

1  KENNETH BUCKFIRE, VOLUME 2
2  Q. But leaving aside the impact that would have on the
3     City's ability to operate because it's clearly the
4     pension rights are held by both active and -- active
5     employees and retirees so depending on how the City
6     had to manage its work force might have an impact on
7     how they decide to treat those claims even as a
8     factual matter they're the same they might have
9     treated because they've got to maintain the safety and
10    welfare of the City because there might be cooperation
11    of employees so there might be a different?
12 Q. So there might be a desire to treat, you know, people
13    who are continuing working differently?
14 A. Correct.
15 Q. All right. But from the standpoint of any other
16    aspect, for example, the contractual nature of the
17    claim or whatever claim they would have under their
18    agreements, they would all be unsecured creditors
19    approaching the City the same way?
20 A. That's how I would view it, yes.
21 Q. In coming to your -- and this may be a subset of what
22    I've already asked and if it is, just let me know. In
23    coming to your opinion on this item B, what resources
24    of the City did you assume would you have to be
25    monetized to satisfy creditor claims in the case of a

1  KENNETH BUCKFIRE, VOLUME 2
2     dismissal scenario?
3  A. It was the same list of assets we've already discussed
4     relative to the June 2013 proposal and the City's
5     ongoing efforts to monetize those assets.
6  Q. So that would include as we already discussed, Coleman
7     Young Airport, that would include the tunnel, it would
8     include Belle Isle, it would include the parking
9     garages, it would include the DIA and the art, and it
10    would include other real estate?
11 A. The land.
12 Q. The land?
13 A. Correct.
14 Q. Are there any other assets that you think that are
15    included at this point?
16 A. No.
17 Q. I believe yesterday you testified about some of the
18    experiences that Miller Buckfire has in representing
19    distressed municipalities and your own, as well. In
20    your prior experience either individually or as a --
21    as an officer of Miller Buckfire, are you aware of
22    other scenarios where the distressed municipalities
23    have sold off assets to satisfy the claims of
24    creditors?
25 A. I'm not.

KENNETH BUCKFIRE, VOLUME 2

2 claims against the City are pursuant to the service
3 contracts, correct?
4 **A. I am.**
5 Q. And do you understand that those are direct claims
6 against the City?
7 **A. I do.**
8 Q. Do you remember that there was conversation with
9 Mr. Soto about the fact that there is $162 million in
10 B notes, face value B notes going to the -- the class
11 9?
12 **A. I do.**
13 Q. Is that the total amount that's going into the reserve
14 established for class 9 or is that the present value
15 of the total face value? Because in my mind there is
16 -- something's not adding up there and so I want to
17 try and understand it.
18 **A. Well, when you say it's not adding up, what is it not**
19 **adding up to?**
20 Q. So I thought that the way it worked was that a reserve
21 was set up --
22 **A. Mm-hmm.**
23 Q. -- and that the reserve was on a nominal basis without
24 present valuing 15 percent of the total amount of COPs
25 in B notes, meaning approximately $210 million in B

KENNETH BUCKFIRE, VOLUME 2

2 notes -- and by the way, I could have this all wrong,
3 210 million in B notes go into the reserve in the
4 event the COPs all try to litigate their rights and
5 are all vindicated, they would actually get 15 cents
6 in nominal face value B notes, that the 40 percent
7 discounted face value is only applied to a settling
8 COP holder who decided not to take the risk of
9 litigation and said I would like what I can get today.
10 That's my understanding, whether it's right or not is
11 up to you to decide, but what I'm trying to understand
12 is what is that $162 million figure from your
13 attachment 1 or whatever that one is?
14 **A. That's our calculation of the share that the COPs**
15 **would have, the total amount of B notes the City is**
16 **going to issue pursuant to the plan, so again if you**
17 **look at attachment 1, and albeit this is a summary of**
18 **information contained in greater detail in the plan**
19 **itself, the City is going to be issuing approximately**
20 **$650 million of series B notes, present value.**
21 Q. 632 maybe?
22 **A. Well, you have -- yeah, because you have to deduct the**
23 **exit financing from the billion 249, you have to deduct**
24 **the UTGO bonds and the LTGO DSA series. That leaves**
25 **you with, you know, 632, 650.**

KENNETH BUCKFIRE, VOLUME 2

2 Q. So is it your understanding that the reserve -- the
3 total amount of reserve on a nominal basis is 162
4 million in B notes?
5 **A. I'd have to go back and check the math against that.**
6 **That's my general recollection. But I have to go back**
7 **and verify it.**
8 Q. Okay.
9 **A. I haven't looked at that in a while.**
10 Q. Let me turn it around on you a bit and say do you know
11 whether -- take a look there at the pro forma
12 obligation, are any of those other numbers standing
13 out to you as ones that are present valued or
14 represent nominal amounts? Like look at the OPEB
15 UAAL, is the 450 million -- do you remember, isn't
16 that 450 in face B notes?
17 **A. Yes.**
18 Q. Okay, does that lead you to believe that the other
19 numbers you've represented on the pro forma are face
20 value B notes?
21 **A. Hold on a second. I'm just -- you want to know**
22 **whether these are present value numbers or nominal**
23 **numbers --**
24 Q. Yeah.
25 **A. -- or par amount?**

KENNETH BUCKFIRE, VOLUME 2

2 Q. Yeah.
3 **A. Oh, okay. These are the par amounts of the notes**
4 **being issued, okay? There's no present value**
5 **calculation of these notes, we have not actually done**
6 **a valuation of the notes from a market point of view**
7 **yet.**
8 Q. Now, isn't it true that in coming to your opinion that
9 creditors do better under the plan than they would do
10 in a dismissal scenario you did not construct a
11 forecast of the City's revenues and costs in a
12 dismissal scenario, correct?
13 **A. Correct.**
14 Q. And no one else has either, correct?
15 **A. Correct.**
16 Q. Now, your opinion that creditors are doing better
17 under the plan than they would in a dismissal scenario
18 is based on in part on the assumption that the City
19 would be unable and it would be impractical for the
20 City to raise taxes without further eroding revenue;
21 is that correct?
22 **A. That's right.**
23 Q. I quoted that from your report. Sound familiar?
24 **A. It does.**
25 Q. Has a ring to it. So let me separate unable and

Pages 233 to 236

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-9   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 16 of 28

KENNETH BUCKFIRE, VOLUME 2

1 impractical, okay, Mr. Buckfire? What is the basis
2 for your assumption that the City would be unable to
3 raise taxes in a dismissal scenario?
4 A. Well, it's -- I'll take it as a fact because it was
5 reported in our June 2013 report that the City was
6 already at the state-allowed maximum property tax
7 millage rates, and therefore, has no further ability
8 to raise the rate for property tax point of view. I
9 believe the income tax rate, itself, is already quite
10 high relative to neighboring communities, so that gets
11 to the question of both impracticability and
12 inability.
13 Q. And I'm holding impracticability to one side, I'm
14 talking about inability now.
15 A. Yes. There's also the inability, and this is again a
16 fact, that prior to the bankruptcy -- and it's getting
17 better slowly, the City proved -- how should I say
18 this nicely, consistently unable to collect taxes due.
19 Which is a failure of the City administration in
20 executing its responsibilities to collect taxes that
21 have been assessed. So even if you wanted to raise
22 the rate, you can't make people pay you, and if they
23 aren't going to pay you and you make no effort to
24 collect it's sort of irrelevant what the rate is.

KENNETH BUCKFIRE, VOLUME 2

1 Q. Now, with respect to the caps that are imposed on the
2 City with respect to income taxes and property taxes,
3 did you evaluate whether or not those caps are
4 applicable to a party who gets a judgment against the
5 City?
6         MR. CULLEN: Do you have a -- is that a
7 legal question?
8         MR. BALL: It certainly is kind of a --
9 it's a mixed question of law and analysis that would
10 go -- we're already talking about legal matters when
11 we talk about caps, those are statutes, right, the
12 cap?
13         MR. CULLEN: Do you have an understanding?
14 BY MR. HACKNEY:
15 Q. Yeah.
16 A. I have a general understanding.
17 Q. What is your general understanding?
18 A. It's that it's under certain circumstances a creditor might
19 seek a judgment requiring the City to raise taxes.
20 Q. Okay.
21 A. But whenever we -- I don't recall discussing this
22 issue, I was quickly reminded that the City already
23 has the highest property tax rates in the State of
24 Michigan and that even if we wanted to raise taxes and

KENNETH BUCKFIRE, VOLUME 2

1 could raise taxes, it would simply drive people out of
2 the City more quickly, so you might end up in a
3 situation that the higher you raise your rates the
4 less revenue you collect.
5 Q. So if I understand your testimony, what you're saying
6 is if a creditor got a judgment against the City, it
7 might make it so that the City was able to impose
8 taxes above the statutory caps but the heightened tax
9 would not yield additional revenue because it is
10 impractical to raise taxes in any event --
11 A. Right.
12 Q. -- is that correct?
13 A. Correct, otherwise known a Pyrrhic victory.
14 Q. A Pyrrhic victory or you can't get blood --
15 A. Blood from a stone, another way of saying it.
16 Q. It's got to be turnip, I'm sure. No one would ever
17 think you could get blood out of a stone, I think it's
18 water out of a rock.
19         MR. CULLEN: Proverbs are various.
20 BY MR. HACKNEY:
21 Q. Well, we should definitely get them all I think
22 straight, but I take it you did not undertake an
23 analysis of the amount of tax increase that could be
24 imposed via a creditor judgment against the City to

KENNETH BUCKFIRE, VOLUME 2

1 determine whether it would yield additional revenue?
2 A. Not directly, but we did ask the tax experts at E&Y to
3 do an analysis of the City's revenues and take into
4 account the sensitivity of revenues to tax rates.
5 Q. So you asked Mr. Klein at E&Y?
6 A. I did.
7 Q. And you asked Mr. Klein to study the question of what
8 would additional taxes yield in the way of revenue?
9 A. Well, not that -- I asked him to identify what the
10 sensitivity of the City's revenues would be to changes
11 in tax rates because the change of tax rates relative
12 to surrounding communities will have an influence on
13 whether or not people want to live here or in
14 Southfield, Michigan or any neighboring suburb.
15 Q. So you asked him to study the impact a tax increase or
16 a tax decrease would have on the tax base, correct?
17 A. Correct, I did.
18 Q. And what did he tell you?
19 A. You know, I've reviewed his expert report and I've
20 talked to him over months about these issues. His
21 conclusion was that because the City already has very
22 high tax rates, any further increase in rates would
23 certainly lead to a decline of revenue but that a
24 maintenance of rates was probably sustainable from a

Pages 237 to 240

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt  Doc 7150-9  Filed 08/28/14  Entered 08/28/14 01:05:39  Page 17 of 28

KENNETH BUCKFIRE, VOLUME 2

2 revenue point of view, but that a decline of rates
3 would over time have the ability to improve overall
4 collections, but it would take a long time to
5 demonstrate that effect.
6 Q. And did you rely on Mr. Klein's opinion in reaching
7 your own opinion?
8 A. Yes, because his opinion underpins the revenue
9 projections and therefore the cash flow projections of
10 the City's plan.
11 Q. And did Mr. Klein also opine that increasing taxes
12 would not yield marginal revenue?
13 A. He certainly told me that, but again to be very
14 specific we're talking about property tax revenues.
15 Q. Yes.
16 A. Okay.
17 Q. Understood. And did you rely on that information from
18 Mr. Klein in reaching your conclusion about the fact
19 that City's not going to generate additional revenue
20 from raising taxes?
21 A. Yes.
22 Q. Did you take any steps to pressure test Mr. Klein's
23 advice to you that raising taxes would not yield
24 marginal revenue?
25 A. No, I haven't done mathematical economics in a really

KENNETH BUCKFIRE, VOLUME 2

2 long time and he is a very well-qualified
3 econometrician and so I relied on him.
4 Q. So with respect to your conclusion that it would be
5 impractical to raise taxes, have you told me
6 everything that you've done with respect to reaching
7 that conclusion?
8 A. Yes.
9 Q. Now, have you reviewed the testimony of Mr. Evanko,
10 the City's senior assessor?
11 A. No.
12 Q. Have you ever spoken to that man?
13 A. I have not.
14 Q. Did you speak to anyone in the treasury department
15 about your -- your findings with respect to the City's
16 -- the impracticality of the City's raising taxes to
17 generate marginal revenue?
18 A. Only in the context of could the state assist the City
19 in collecting income taxes. All right. I had several
20 conversations with former State Treasurer Dillon last
21 year, because it had been a proposal by the City for
22 many years to ask the state to do withholding of City
23 income tax on people who were working in the City but
24 not living in the City.
25 Q. Okay.

KENNETH BUCKFIRE, VOLUME 2

2 A. And I asked him specifically what the state could do
3 to assist the City in terms of collecting more
4 efficiently those kinds of income taxes.
5 Q. So other than the notion of collecting more
6 efficiently the taxes you're already assessing or
7 imposing, you did not discuss with the treasury
8 department whether increasing taxes would yield
9 marginal revenue, correct?
10 A. That's correct.
11 Q. Now -- and isn't it fair to say that you, yourself,
12 did not do any forecasting of future revenues in a
13 scenario where the petition was dismissed?
14 A. Correct, we relied on Ernst & Young.
15 Q. And I'll come back to that in just a second. Ernst &
16 Young, they did not do a forecast for the situation
17 where the petition is dismissed, correct?
18 A. That's correct.
19 Q. They did a forecast for the future ahead in the
20 absence of the restructuring, correct?
21 A. They did a forecast assuming the restructuring was
22 successful. Which forecast are you referring to?
23 Q. In the June 2000 --
24 A. Oh, I see.
25 Q. They did the so-called steady state forecast, right?

KENNETH BUCKFIRE, VOLUME 2

2 A. Yes, that was a just a roll forward of the City as
3 they see it at that point.
4 Q. As they found it?
5 A. Yeah.
6 Q. And you have never seen from them a forecast of what
7 would happen if the case were dismissed in the next
8 couple months, correct?
9 A. No.
10 Q. Am I correct?
11 A. That's right.
12 Q. Now, is forecasting future revenues of a municipality
13 something that falls within your area of expertise as
14 an expert?
15 A. No.
16 Q. It's not something that you could do if you wanted to?
17 A. I could probably do it, but I'm not an expert. That's
18 why we sought out Ernst & Young to provide that
19 service because Mr. Klein is uniquely qualified to do
20 it.
21 Q. Okay, and did you ever ask Mr. Klein to perform a
22 forecast of the City's performance if the petition
23 were dismissed?
24 A. No.
25 Q. Are you familiar with the Government Finance Officers

KENNETH BUCKFIRE, VOLUME 2

2  Association?

3  **A.  No.**

4  Q.  I take it it's fair to say that you did not consider

5  any of their forecasting techniques to consider City

6  revenues in the case the petition were dismissed?

7  **A.  No, once we brought on Ernst & Young to provide the**

8  **service we relied upon them.**

9  Q.  Okay, and you have not employed any econometric models

10  to determine the future revenues in the City in the

11  event different types of taxes were increased,

12  correct?

13  **A.  Correct.**

14  Q.  You did not conduct any time series analyses to

15  determine future revenues of taxes were increased,

16  correct?

17  **A.  Correct.**

18  Q.  You have not conducted linear multiple regression

19  analysis to evaluate future revenues if taxes were

20  increased, correct?

21  **A.  Correct.**

22  Q.  And nor has anyone else to the best of your knowledge,

23  correct?

24  **A.  That's correct.**

25  Q.  Now, you also say that material increases in taxes

---

KENNETH BUCKFIRE, VOLUME 2

2  will likely increase delinquency rates and cause

3  residents to leave the City: do you recall that

4  opinion from your report?

5  **A.  I do.**

6  Q.  What do you mean by a material tax increase?

7  **A.  Materiality is always subject to judgment, but it's**

8  **probably something greater than 10 percent.**

9  Q.  Okay.

10  **A.  That would be regarded as material particularly on the**

11  **property tax side.**

12  Q.  Okay.  Did you do any quantitative analysis to

13  determine the impact of a less than 10 percent tax

14  increase on City revenue?

15  **A.  No.**

16  Q.  Do you know what the City's current delinquency rates

17  are for property taxes?

18  **A.  I don't.**

19  Q.  Do you know what they are for income taxes?

20  **A.  No.**

21  Q.  Have you ever studied either of those questions?

22  **A.  I did last year at the time the June 2013 report was**

23  **being produced, but I haven't really looked at that**

24  **issue since then.**

25  Q.  And let me just tell you that I know that it is

---

KENNETH BUCKFIRE, VOLUME 2

2  described in the report but were you the one that

3  actually conducted the study to determine the answer

4  or did you just -- are you just saying that you saw it

5  in that report?

6  **A.  I say that in the report.  The work was done by Conway**

7  **MacKenzie and Ernst & Young.**

8  Q.  Okay, so you personally have not studied the question?

9  **A.  That's correct.**

10  Q.  And you have never done anything to pressure test

11  Conway MacKenzie's findings, correct?

12  **A.  Correct.**

13  Q.  Now, have you ever quantified how much delinquency

14  rates would increase in different scenarios where

15  taxes are increased?

16  **A.  You're asking me whether I pressure tested this a**

17  **different way.**

18  Q.  Well, the first -- when I was asking about that

19  pressure testing I was saying you never checked to see

20  what they found to be the delinquency rates, whether

21  that was correct?

22  **A.  That's correct.**

23  Q.  Okay, but this is a different question which is, did

24  you ever attempt to quantify how delinquency rates

25  would go up if taxes went up?

---

KENNETH BUCKFIRE, VOLUME 2

2  **A.  No.**

3  Q.  Are you aware of any data showing that increasing

4  taxes will increase delinquency rates in the City of

5  Detroit?

6  **A.  Only by inspection of the City's historical record as**

7  **tax rates went up, my understanding from City**

8  **officers, including Jack Martin with whom I discussed**

9  **this issue, was the delinquency rate went up, as well**

10  Q.  Ah, so you're -- you're under the impression that

11  there's historical evidence in the City of Detroit

12  that shows a connection between increasing tax rates

13  and increasing delinquency rates?

14  **A.  It was anecdotal at the time he told me that.**

15  Q.  So you were told that by Mr. Martin.  Did you ever

16  attempt to confirm that?

17  **A.  No.**

18  Q.  Do you know whether the incomes tax in the City has

19  gone up or down over the last 15 years?

20  **A.  Are you talking about the rate or the revenues**

21  **collected?**

22  Q.  The rate, sorry.

23  **A.  I don't.**

24  Q.  Do you know whether --

25  **A.  But I'm referring to property taxes.**

KENNETH BUCKFIRE, VOLUME 2

2  Q. So let's not miss each other, so separately you don't
3     know whether income taxes have gone down over the last
4     15 years, correct?
5  **A. I don't.**
6  Q. And you don't know whether there's a historical
7     connection in Detroit between the income tax rate and
8     the delinquency rate, correct?
9  **A. That's correct.**
10  Q. You've never studied that connection?
11  **A. No.**
12  Q. Now, you were saying that your conversation with
13     Mr. Martin was limited to the subject of property tax
14     rates, correct?
15  **A. Correct.**
16  Q. And that what he told you was that property tax rates
17     had increased, and as they had increased,
18     delinquencies had increased, correct?
19  **A. Correct, it was all part of the blight issue because**
20  **as they assess property taxes people would walk away**
21  **from their houses and that would become blighted and**
22  **that would be counted as a delinquent tax issue by the**
23  **City.**
24  Q. Have you attempted to the economic literature for
25     scholarly articles connecting tax rates and

KENNETH BUCKFIRE, VOLUME 2

2     delinquency rates?
3  **A. No.**
4  Q. Have you reviewed data from any other cities with
5     respect to their tax increases and their delinquency
6     rate increases for either income or property taxes?
7  **A. No.**
8  Q. Do you know whether the relationship between
9     increasing taxes of either property or income and the
10     delinquency rates associated with income or property
11     taxes is a linear relationship?
12  **A. I don't.**
13  Q. If property taxes are increased by 10 percent, which
14     is right at the threshold of materiality as you
15     identify it, what will the percentage increase in
16     delinquencies be?
17  **A. I don't know.**
18  Q. Do you believe that increasing the casino tax will
19     increase delinquencies in the City of Detroit?
20  **A. I don't see what the correlation would be.**
21  Q. I take it so that the answer is no?
22  **A. No.**
23  Q. And what about the utility users tax, if the utility
24     users tax goes up will delinquencies go up?
25  **A. I think it would have a minimal impact on that.**

KENNETH BUCKFIRE, VOLUME 2

2  Q. I take it you have not studied the issue of whether
3     increases in either the casino tax or the utility
4     users tax would generate marginal revenue, correct?
5  **A. That's correct.**
6  Q. You also say that one of your assumptions is that an
7     increase in taxes will cause people to leave; is that
8     correct?
9  **A. Yes.**
10  Q. Have you conducted any analysis to determine how many
11     people will leave under different scenarios where
12     taxes are increased?
13  **A. No.**
14  Q. Do you know what the historical relationship between
15     tax increases and population levels is in the City of
16     Detroit?
17  **A. Well, it's not a simple correlation, there are many**
18  **other factors that have led to population loss.**
19  **Certainly increasing tax rates has been a contributing**
20  **factor to the population leaving the City but not the**
21  **only factor.**
22  Q. And what's your basis for that opinion?
23  **A. Just my knowledge of the City and, you know, looking**
24  **at the City's revenues, adjusted for population,**
25  **knowledge of the City's local economy and conditions**

KENNETH BUCKFIRE, VOLUME 2

2     here.
3  Q. Anything else?
4  **A. No.**
5  Q. There's obviously been a number of other things going
6     on in this area in addition to whatever tax policy has
7     been, correct?
8  **A. Which is what I just testified to.**
9  Q. Yeah, and I wanted to clear, so you've had significant
10     deindustrialization, correct?
11  **A. That has been a major factor of the deadline in**
12  **population in the City.**
13  Q. You have not conducted, however, any quantitative
14     analysis assessing the relationship between tax rates
15     and population levels over historical time periods in
16     Detroit, correct?
17  **A. Correct.**
18  Q. Do you know if Detroit raised property taxes by 30
19     percent how many people would leave?
20  **A. No.**
21  Q. What is the City's current millage rate on residential
22     homes; do you know?
23  **A. Not off the top of my head.**
24  Q. Do you know it approximately?
25  **A. I'd just be guessing, I don't -- I don't recall.**

Pages 249 to 252

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-9   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 20 of 28

KENNETH BUCKFIRE, VOLUME 2

Q. Okay, what about nonresidential properties? What's the millage rate on them?

A. **I don't recall the rates.**

Q. Do you know how the City's property taxes compare with the surrounding municipalities' property taxes?

A. **It was all disclosed in the June 2013 report. We did do a selected summary of total taxes paid by community on that type, that was disclosed.**

Q. Is that the extent of your knowledge on the subject?

A. **Yes.**

Q. And you didn't perform that data collection, correct, you're just -- you just saw it, right?

A. **That's right.**

Q. So do you know whether it's accurate or not?

A. **I don't.**

Q. Okay. You have not undertaken a comprehensive study of what surrounding municipalities levy when it comes to property taxes, correct?

A. **Correct.**

Q. Are you currently of the view that there is no surrounding municipality that has higher property taxes than the City of Detroit?

A. **No.**

Q. You're not of that view?

KENNETH BUCKFIRE, VOLUME 2

A. **I don't know.**

Q. Oh, there may be, there may not be, you don't know?

A. **I don't know for a fact.**

Q. Do you know how many cities in the metropolitan -- what does MSA stand for?

A. **Metropolitan statistical area.**

Q. There you go. In the MSA -- showoff -- have a population of more than 50,000?

A. **Let's see, in this area, it would be Detroit, Southfield, probably Troy, probably Dearborn, those are the ones that I would assume would be in that category.**

Q. Do you agree that blight remediation will have a positive impact on property values in Detroit?

A. **Yes.**

Q. And are you aware that property -- that certain blight remediation will take place even if the petition is dismissed?

A. **Yes.**

Q. And have you evaluated the extent to which that blight remediation will have a positive impact on property values in the City of Detroit?

A. **No.**

Q. Now, are you aware that the City recently reduced its

KENNETH BUCKFIRE, VOLUME 2

taxable value on assessed -- on properties in its jurisdiction by approximately $1 billion?

A. **I am.**

Q. And what do you know about that, just that it happened?

A. **I know that it happened.**

Q. And have you evaluated the extent to which that decrease has an impact on property owners' ability to withstand an increase in the rate?

A. **Nope.**

Q. Do you know the difference between taxable value and state equalized value?

A. **No.**

Q. Do you agree that the City's property tax enforcement mechanism has been ineffective in recent years?

A. **Is that -- yes, I would agree with that statement.**

Q. And what I mean by the enforcement mechanism is I mean the folks at the City who are responsible either for defending assessed values or for collecting property taxes; is that what you understand --

A. **It has been very ineffective.**

Q. Okay, now, have you studied the question to see the extent to which it is the broken enforcement mechanism that is driving delinquencies as opposed to the tax

KENNETH BUCKFIRE, VOLUME 2

rates?

A. **I've already testified to this that certainly the City's inability to officially collect assessed taxes has been a problem in terms of overall revenues being generated by those taxes.**

Q. And so the corollary of that is if you fix the enforcement mechanism you'll see delinquencies go down, correct?

A. **Or you might see more foreclosures because people really refuse to pay the taxes and they walk away from their homes.**

Q. And so do you understand, however, that the better you are enforcing your mechanism the more of a signal you're sending to the body politic that it needs to pay its taxes?

A. **Yes.**

Q. And so better enforcement can lead to decreased delinquencies, right?

A. **I would hope so.**

Q. But you did not study the extent to which improved enforcement would reduce delinquency rates, correct?

A. **Correct.**

Q. Have you studied the impact -- and by the way, have you reviewed the Plante Moran report?

KENNETH BUCKFIRE, VOLUME 2

A. Over a long period of time, and assuming that other
conditions necessary for people to make the decision
to live here, yes.

Q. Do you feel you've conducted an academic and
sufficiently sound study of that question to give that
opinion, sir?

A. No.

Q. Okay.

A. You said Pareto optimal, not me.

Q. Well, that was because you knew what MSA meant. I
take it you don't know the extent to which the City
must decrease taxes to reach the point of the Laffer
Curve at which revenues will no longer increase by a
further decrease in the rate?

A. Correct.

Q. Now, are there any other cities of which you are aware
that are on the so-called wrong side of the Laffer
Curve?

A. No.

Q. You haven't studied that question, either, have you,
sir?

A. No.

Q. All right, do you know what the total tax burden of
Detroiters is today considering state, federal, and

KENNETH BUCKFIRE, VOLUME 2

local tax burdens?

A. It's approximately 600, $650 million.

Q. I was looking as percentage, sorry, I didn't ask
that -- let me ask that again. Do you know what the
total tax burden of Detroiters is today considering
their state, federal, and local taxes as a percentage
of their income?

A. Oh, I see. I don't.

Q. Okay. Do you know if it's over 50 percent?

A. No.

Q. Have you studied the revenue forecasting techniques of
the State of Michigan?

A. No.

Q. Now, one of your opinions is that there would be a
race to the courthouse by creditors upon a dismissal,
correct?

A. I think it will be a race everywhere.

Q. I want to focus on the race to the courthouse if we
could.

A. Okay.

Q. That is one of your opinions, right?

A. It is.

Q. Why would there be a race?

A. Every creditor would be as aggressive as possible in

KENNETH BUCKFIRE, VOLUME 2

trying to protect whatever rights or claims it thought
it had against the City and to force the City to take
action to deliver value to that particular creditor
pursuant to the rights abided in their contract.

Q. And do you know -- why do people typically race to the
courthouse, is that within your area of expertise?

A. Yes.

Q. And why do they?

A. They want to get there first.

Q. Why though?

A. Because they believe by being first in line they can
convince a judge to give them a claim or a right to an
asset or revenue stream before another creditor gets
there.

Q. That's exactly right, right, isn't it the theory that
they'll be able to take their judgment and be able to
get a lien on the judgment debtor's property before
other parties?

A. So I have been advised by counsel over the years.

Q. Okay, that's where the whole concept of the race comes
from, correct?

A. Correct.

Q. But another one of your opinions is that creditors
cannot get liens in City property, correct?

KENNETH BUCKFIRE, VOLUME 2

A. Correct.

Q. Okay, so the typical mechanism that leads to the race
doesn't apply in the case of a municipality, correct?

A. It would be a race to other jurisdictions for
satisfaction.

Q. Okay.

A. Including the courthouse.

Q. Now, one of the things you have to do is you have to
determine who the racers to the courthouse are,
correct?

A. Yes.

Q. Now, did you take steps to determine who would be
racing to the courthouse upon the dismissal of the
bankruptcy case?

A. Are you asking for a legal conclusion?

Q. Well, this is going to your opinion where you're
envisioning these creditors racing to the courthouse,
so I'm trying to get at who you're envisioning racing?

A. Well, I think the people who would be going to the
courthouse first would be the UT and LT bondholders.

Q. Okay.

A. They presumably would be looking to enforce their tax
liens and ask for court permission or rights to do
that, because they do have the tax pledge. That would

Pages 265 to 268

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-9   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 22 of 28

KENNETH BUCKFIRE, VOLUME 2

A. You're assuming we don't pay their interest when due or the contract revenues when due?

Q. You already have not done so, sir.

A. I know that.

Q. Yeah.

A. So upon dismissal you're assuming we would continue not paying those service contracts.

Q. I actually think it doesn't matter whether you do or not. I think the acceleration happened, but that's just my opinion.

A. I see. No, we never considered that.

Q. You have not considered that. And I take it you haven't considered whether the UTGO or LTGO are accelerated upon dismissal of the bankruptcy or have previously been accelerated?

A. No.

Q. As you sit here today, do you know what the amount of the pension trust claim against the City is? I mean in the dismissal scenario.

A. Well, if you terminate the plans, this is where I'm trying to -- there are two different scenarios on the pension side. One is which the plan continues but you don't fund it, in which case the unfunded benefit is, you know, a cost -- that is perhaps as little as 3

KENNETH BUCKFIRE, VOLUME 2

perhaps as much of $4 billion dollars of underfunding as opposed to a termination of the plan, which would actually have created larger underfunding, which is one of the reasons that the City has taken the position we don't terminate the plans we'd rather freeze them. So in the dismissal scenario, which is what you're referring to, and we assume that we're not terminating the plans, I assume we would continue to have the obligation to fund whenever we can afford to fund; otherwise, we would be in default under our payment obligations.

Q. Okay, and the amount of the claim that the pension system would have upon dismissal would be the amount of the outstanding annual amount for that year?

A. Which we haven't paid.

Q. Yes, which you have not paid, is that your --

A. That's my understanding.

Q. And similarly the OPEB claimants would have their right to receive payment for the healthcare that they were entitled to that year, correct?

A. Correct.

Q. Okay. What about with UTGO or LTGO, what would the size of their claim be against the City upon dismissal?

KENNETH BUCKFIRE, VOLUME 2

A. Well, they have, as I mentioned before, in theory the right to tax revenues because they have revenue pledges, correct? So they would have presumably the same status and they would move to enforce their rights to receive all those tax revenues and, I believe, ask for relief not to share those revenues with the City general fund.

Q. Did you evaluate whether the City is in breach of the CETs? Do you know what those are?

A. I do.

Q. The City Employment Terms?

A. Yes.

Q. Yeah, is the City in breach of the CETs?

A. I don't believe we are.

Q. And you know the City has struck a number of collective bargaining agreements recently?

A. Yes, which is why I don't believe we are in breach of the CETs because they have been replaced --

Q. Let's bring it up to the present. You're aware the City has struck collective bargaining agreements with all of its unions, correct?

A. Yes.

Q. Other than the one fire union?

A. Right, I am aware of that.

KENNETH BUCKFIRE, VOLUME 2

Q. To the best of your knowledge, is the City in compliance with all of these collective bargaining agreements that it just struck?

A. To my knowledge, yes.

Q. Okay, isn't it are your expectation that active employees would not be people that had claims against the City in the dismissal scenario?

A. So long as we honor the terms of their agreements.

Q. What conclusion did you reach regarding the total number of claims that would be asserted -- total dollar value of claims that would be asserted against the City in a dismissal scenario?

A. It would be the sum of all the funded debt obligations, which we've already discussed, which includes the COPs and the GO debt and the pension and OPEB claim holders, which presumably we could not satisfy on an ongoing basis.

Q. And I take it you've never sat down with a piece of paper and tried to work this out, right, in terms of what the total claim size would be, correct?

A. Correct, we've not done a dismissal analysis.

Q. Okay.

A. I testified to that previously.

Q. Yeah, and I -- fair enough. Is it your understanding

Pages 273 to 276

Elisa Dreier Reporting Corp. (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-9   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 23 of 28

KENNETH BUCKFIRE, VOLUME 2

2 that the City would not be able to undertake the
3 restructuring and reinvestment initiatives if the
4 petition were dismissed?
5 A. It could only do so if it suspended payments to as
6 many of its creditors as possible.
7 Q. And have you made an assumption about what the City
8 would or would not do in the event the petition were
9 dismissed?
10 A. Well, I've already testified that back in, this was
11 December or January when the court initially declined
12 to approve the postpetition financing, we gave
13 consideration to how we would operate the City in the
14 event that we lost access to our required cash. We
15 began to think about that problem at that point. I
16 asked Ernst & Young and Conway to start developing an
17 emergency plan in the case that we lost access to
18 that, which we ultimately never actually went ahead
19 and did because it turned out we did get access to
20 postpetition financing. It was only in that context
21 we ever examined a worst-case scenario in which the
22 City had to, you know, allocate its remaining capital
23 to essential projects.
24 Q. And so I take -- so you have never personally
25 evaluated the extent to which the City would undertake

KENNETH BUCKFIRE, VOLUME 2

2 the restructuring reinvestment initiatives in the
3 dismissal scenario, correct?
4 A. Correct.
5 Q. Now, I think that you testified about this with
6 respect to Mr. Soto, but I was catching up a little
7 bit. Is it your understanding that in the dismissal
8 scenario, creditor recoveries would be on a pari passu
9 basis?
10 A. Not all creditors.
11 Q. Okay, which ones would be and which ones would not as
12 -- in your assumption?
13 A. Well, the UT and LTGO bondholders would be, in my
14 judgment, at a higher priority than other creditors
15 because they have the benefit of a tax pledge. It's
16 my view that the other creditors to the City should be
17 thought of as general unsecured claim holders and
18 therefore treated roughly the same.
19 Q. Okay, so the general unsecured claim holders would be
20 recovering on a pari passu basis in the dismissal
21 scenario, correct?
22 A. That would be my assumption, which is consistent with
23 the June 2013 proposed treatment of those creditors.
24 Q. So your estimation of COPs holder recoveries in the
25 dismissal scenario is that they would receive zero; is

KENNETH BUCKFIRE, VOLUME 2

2 that correct?
3 A. I didn't say that.
4 Q. I thought -- so what is your -- let me ask this then.
5 What is your estimation of what COPs holders would
6 recover in the dismissal scenario?
7 A. I think they're likely to recover zero, not because of
8 their classification as a creditor, which is -- I want
9 to be very clear about that, but just because the City
10 will have little or no value to distribute because its
11 remaining cash flow, right, will not be sufficient
12 once you get through allocation to the GO bondholders
13 and provide for essential City services to provide any
14 discretionary cash flow available for future debt
15 service, which would include sharing that cash flow
16 with other general unsecured claim holders, because on
17 the map that we use -- and this goes back to the June
18 2013 report, the COPs claims are a billion four, at
19 the time we believed that we had perhaps as much as
20 $10 billion of other claims. So on a best-case basis
21 if the COPs share pro rata, they might get at best 15
22 cents of whatever we had available to the overall pool
23 of general unsecured claim holders, that's the best
24 they could do, but if we have nothing to give anybody,
25 that is, no security that would trade in the market at

KENNETH BUCKFIRE, VOLUME 2

2 anything close to a fair value, yeah, they could get
3 zero.
4 Q. But that analysis assumes that all the other general
5 unsecured claims have accelerated, correct?
6 A. Yes.
7 Q. Now --
8 A. Or have a claim on the cash flow of the City, which
9 further reduces the amount of value available to
10 accelerate the claims.
11 Q. Okay. But you haven't actually done the analysis,
12 though, to see who would get any surplus revenue that
13 exists above operating expenditures and secured debt,
14 correct?
15 A. You've already asked me this, we have not done a
16 dismissal analysis.
17 Q. I'm sorry, I don't mean to go over and over, I just --
18 make sure I haven't asked it in a different way.
19 A. Anxious to get the answer which I can't give you.
20 MR. CULLEN: Some kind of turnip or dead
21 horse or something.
22 A. Is there a metaphor we haven't turned up yet?
23 MR. CULLEN: It's blood out of a stone.
24 Yeah, because you can't get blood out of a stone.
25 MR. HACKNEY: I can't -- I'm not going to

KENNETH BUCKFIRE, VOLUME 2

1
2  use them again.  I shot the wad on all three of them,
3  although shot the wad is a good one.
4      MR. CULLEN:  Gray area.
5      MR. HACKNEY:  I'm sorry, I agree.  Let's
6  move on, I'm sorry.
7  BY MR. HACKNEY:
8  Q.  These ad valorem taxes for the UTGO, you're familiar
9      with what those are?
10 A.  In general, yes.
11 Q.  Have you -- have you determined the extent to which in
12     a dismissal scenario a UTGO holder would be paid in
13     full?
14 A.  No.
15 Q.  So you don't know the answer to that question?
16 A.  Only in the -- only with respect to the revenues that
17     the City has been collecting relative to the millages
18     that applied to these UTGOs which have been
19     insufficient to cover the debt.  You are aware that
20     for years the City was supposed to be collecting this
21     millage but did not do so, and therefore, the ultimate
22     resolution of the UTGO claim had to take recognition
23     of that fact, the revenues were not sufficient.
24 Q.  But you haven't studied the question of whether in a
25     dismissal scenario UTGO would get more than 74 cents

KENNETH BUCKFIRE, VOLUME 2

1
2  on the dollar, correct?
3  A.  That's right.
4  Q.  One of your assumptions is that in the race to the
5      courthouse scenario, creditors are unable to compel
6      the City to sell assets or to take a lien on public
7      property; is that correct?
8  A.  Yes.
9  Q.  And you say that you understand this to be true,
10     correct?
11 A.  I do.
12 Q.  Who told you that?
13 A.  Jones Day.
14 Q.  And did you do any analysis to test whether or not
15     that advice was correct?
16 A.  No.
17 Q.  Now, you're aware that PA 436 requires the emergency
18     manager to resolve the fiscal crisis facing the City
19     of Detroit, correct?
20 A.  Yes.
21 Q.  Have you evaluated the extent to which asset sales
22     might be required in a dismissal scenario by PA 436?
23 A.  No.
24 Q.  When you were talking about the flexibility of
25     spending associated with the restructuring and

KENNETH BUCKFIRE, VOLUME 2

1
2  reinvestment initiatives, you ended up answering the
3  question to Mr. Soto in the context of if there was a
4  recession that caused impact X, you could study the
5  restructuring and reinvestment initiatives and
6  determine which could not be deferred and which could;
7  do you remember that answer?
8  A.  I do.
9  Q.  Have you undertaken a study to determine which of the
10     restructuring and reinvestment initiatives are
11     flexible in that way?
12 A.  Not a study, but I have an opinion.
13 Q.  You have an opinion?
14 A.  Yes.
15 Q.  Is it an opinion based -- I mean, is it just a sense
16     or is it a formal opinion or --
17 A.  It's just my opinion.
18 Q.  Just your opinion.  What is your opinion?
19 A.  That in that scenario the first thing I would advise
20     whoever was responsible to defer blight spending but
21     to maintain investment programs related to public
22     safety at all costs.
23 Q.  Okay, so in your view when you look at the
24     restructuring or reinvestment initiatives you see
25     public safety initiatives as being the ones that are

KENNETH BUCKFIRE, VOLUME 2

1
2  least flexible in terms of deferral and blight as
3  being the most flexible?
4  A.  On a very short-term basis.
5  Q.  On a very short term --
6  A.  If you had to defer spending on blight removal for six
7      months and come back six months later, you can do
8      that, the houses aren't going anywhere.
9  Q.  Now, have you undertaken to determine the total amount
10     of grant moneys the City has been awarded since the
11     June creditor proposal of last year?
12 A.  Not specifically, no.
13 Q.  Are you aware that the City has been awarded hundreds
14     of millions of dollars in grants since that time?
15 A.  I am.
16 Q.  And have you analyzed the extent to which the City
17     could use those grant moneys to fund restructuring and
18     reinvestment initiatives?
19 A.  No.  It does accelerate the program, however.  Having
20     more money allows them to take out more blight --
21 Q.  And I'm saying in a dismissal scenario have you
22     studied the extent to which the City could use the
23     grant moneys to fund restructuring and reinvestment
24     initiatives?
25 A.  No.

Pages 281 to 284

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-9   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 25 of 28

KENNETH BUCKFIRE, VOLUME 2

2  Q.  Is the City going to be service delivery solvent upon
3      emergence from bankruptcy under the plan?
4  A.  I would say they would approach that standard within
5      the first year of emergence.
6  Q.  So you believe within a year of emergence the City of
7      Detroit will be providing the appropriate level of
8      municipal services?
9  A.  No, I said they will approach that level.
10 Q.  Okay.
11 A.  Okay?  You have --
12 Q.  Now, I'm not sure who's the lawyer.
13 A.  Well, no, it's a very complicated question -- it's a
14     complicated question --
15 Q.  Okay.
16 A.  -- because there are so many categories of service
17     delivery the City has to fix.
18 Q.  All right, let's take a step back.
19 A.  All right.
20 Q.  Let's break it down.  One of your opinions is that the
21     City is service delivery insolvent, correct?
22 A.  It was service delivery insolvent upon the filing of
23     the bankruptcy.
24 Q.  Filing of the bankruptcy, okay.  One of your opinions
25     is that the City was service delivery insolvent at the

KENNETH BUCKFIRE, VOLUME 2

1      time it filed, correct?
3  A.  Correct.
4  Q.  Now let's ask about today, is the City service
5      delivery insolvent today?
6  A.  Yes.
7  Q.  Okay.  Do you believe the City will be service
8      delivery insolvent as of the anticipated plan
9      confirmation date of September 30?
10 A.  You know, it's a complicated question to answer and I
11     hesitate only because you have to look at it by
12     service delivery segment, safety services being the
13     most important, followed by public lighting, followed
14     by transportation services.  The City has made
15     dramatic strides in all those areas to improve service
16     delivery, I'd have to go back and check because I'm
17     not totally up to speed on where they stand on those
18     programs.  My understanding is that by the time the
19     City emerges they will have made very dramatic
20     improvements to public safety programs, so on those --
21     programs they may well be service solvent, I don't
22     have a similar opinion on DDOT, which is the
23     Department of Transportation, and I do know that the
24     program to relight the City is ongoing and is expected
25     to be completed next year, so on that element they're

KENNETH BUCKFIRE, VOLUME 2

1      probably insolvent but in terms of overall safety they
2      will probably be solvent by the time they emerge.
4  Q.  That's a fair caveat.  So what you're saying is there
5      has been enormous work -- there has been an enormous
6      amount of work done to date?
7  A.  Yes.
8  Q.  That work may have rendered certain areas of the City
9      service delivery solvent, correct?
10 A.  Correct.
11 Q.  Included in those areas would be an area like public
12     safety, correct?
13 A.  Yes.
14 Q.  Other areas may be on a path to service delivery
15     solvency that ranges in time?
16 A.  Correct, and you should -- you should probably ask
17     Mr. Moore where the City stands on all these
18     programs --
19 Q.  Sure.
20 A.  -- because Conway MacKenzie's been managing most of
21     them.
22 Q.  That's a good advice.  We'll take you up on that, but
23     with respect to you --
24 A.  You can thank him for me.
25 Q.  What's that?

KENNETH BUCKFIRE, VOLUME 2

1  A.  You can thank him for me.
3  Q.  I will.  I will.  He's always glad to see me.  So do
4      you have an opinion as you sit here today of what
5      areas where the City is service delivery insolvent or
6      close to it at least in your view?  I know we can ask
7      Mr. Moore but --
8  A.  I'm not really not current on that.
9  Q.  So you don't know?
10 A.  It's July, I haven't looked at this issue in a number
11     of months so I am not current.
12 Q.  So you haven't studied the question?
13 A.  That's correct.
14 Q.  Now, have you evaluated the likelihood that the City
15     might choose to sell its art collection in a dismissal
16     scenario?
17 A.  No.
18 Q.  And have you -- I take it then you haven't evaluated
19     the impact such a sale would have on creditor
20     recoveries, correct?
21 A.  We have not done a dismissal analysis.
22 Q.  Okay.  Have you considered the possibility that the
23     grand bargain might happen even if the petition were
24     dismissed?
25 A.  Well, my understanding is that one of the principal

KENNETH BUCKFIRE, VOLUME 2

1  crippling liabilities would view that its position as
2  a lender might be at some point under attack by other
3  creditors, that it might find itself in a subsequent
4  Chapter 9, have to protect its rights to get repaid
5  pursuant to its pledge, and therefore they would want
6  to be paid for that risk. They would also probably
7  require that the terms of the loan be very short.
8  Q.  The postpetition facility, however, was not one that
9     required plan confirmation, isn't that correct?
10 **A.  That's correct.**
11 Q.  And Barclays facility tolerates dismissal of the
12    petition, correct?
13 **A.  That's right.**
14 Q.  And you actually felt that that was a very favorable
15    rate, if I recall, correct?
16 **A.  That's true.**
17 Q.  Something on the order of 3-1/2 percent, correct?
18 **A.  It is 3-1/2 percent.**
19 Q.  But your testimony is that even though you were able
20    to secure that loan on a secured basis during the
21    midst of a at the time nonconsensual bankruptcy that
22    if the petition were dismissed that there would be a
23    material difference in the secured barring of the
24    City?

KENNETH BUCKFIRE, VOLUME 2

1  **A.  Well, there were very different facts and**
2  **circumstances surrounding that. I don't believe that**
3  **in any way helps understand what the City would have**
4  **to do to borrow money in a dismissal situation, which**
5  **is what you're positing now.**
6  Q.  Yeah, you're right. By the way, the exit financing
7     that you're currently working to line up, that's also
8     going to be on secured basis, correct?
9  **A.  We have suggested to lenders that security is**
10 **available but we've also encouraged them to propose**
11 **unsecured financing facilities.**
12 Q.  I think we've talked about this before, but when you
13    suggest things to the market they have a tendency to
14    not want less than that, right?
15 **A.  Depends on the demand for the financing.**
16 Q.  Do you think that the exit facility might be
17    unsecured?
18 **A.  Ask me in a week.**
19 Q.  Okay. I will. Have you assessed the abilities to
20    save money by --
21 **A.  I know you will.**
22 Q.  I'm going to call you and ask you.
23 **A.  You have to call Tim first.**
24 Q.  Yeah, I'll get permission. Have you assessed the

KENNETH BUCKFIRE, VOLUME 2

1  abilities of the City to save money by privatizing
2  DDOT?
3  **A.  That issue has been studied.**
4  Q.  Have you studied it?
5  **A.  No.**
6  Q.  Now, that's something that could be done in a
7     dismissal context as well, correct?
8  **A.  In theory, yes.**
9  Q.  Okay, and I take it you have not tried to factor in
10    the privatization of DDOT to what creditor recovery
11    should be in a dismissal scenario because you did not
12    do a dismissal analysis, correct?
13 **A.  Yes.**
14 Q.  And I take it you would give the same answer for any
15    other asset whether it was parking or Belle Isle or
16    the art collection, correct?
17 **A.  Correct.**
18 Q.  Now, isn't it true that the City's exploring whether
19    it can enter into a public-private partnership in
20    connection with DWSD?
21       MR. CULLEN:  To the extent that that's
22    public knowledge, it's the subject of mediation.
23       MR. HACKNEY:  I think the RFP was --
24    public. I mean, I read articles about the fact that

KENNETH BUCKFIRE, VOLUME 2

1  emergency manager was soliciting requests for
2  proposal.
3       MR. BALL:  The RFP has been produced, it's
4     produced in the case.
5       MR. CULLEN:  The RFP for which?
6       MR. BALL:  For the public-private
7     partnership.
8  **A.  Yes.**
9  BY MR. HACKNEY:
10 Q.  Are you involved in that?
11 **A.  Yes.**
12 Q.  Okay. What is your expect -- so what is your
13    expectation regarding the structure of a PPP? And
14    what I mean is you remember how you had a conversation
15    earlier about the fact that the regional authority
16    might entail a sale lease-back with a $47 million
17    annual revenue stream; do you remember that?
18 **A.  I do.**
19 Q.  Is there an analog in the PPP context where somehow
20    the City gets revenue out of the PPP agreement?
21       MR. CULLEN:  This was not in the RFP and
22    this is part of the ongoing negotiations in the
23    mediation.
24 BY MR. HACKNEY:

1       KENNETH BUCKFIRE, VOLUME 2

2   percent discount rate calculation; isn't that correct?

3 **A. For purposes of the plan?**

4 Q. Yes.

5 **A. Yes.**

6 Q. Well, let me put it this way. You took the numbers

7   from the plan and those numbers are based on the 6.75

8   percent discount rate, correct?

9      MR. BALL: I'm going to object, that

10   mischaracterizes the plan.

11      MR. CULLEN: I couldn't hear you.

12      MR. BALL: I'm going object, it

13   mischaracterizes the plan.

14 **A. There are two different rates -- we use different**

15 **rates for PFRS and GRS, so which rate are you talking**

16 **about?**

17 Q. Let's do it this way. Let me see if I can speed it

18   up. When you calculated the pension UAAL at 3.129

19   billion, for that you relied on the presentation in

20   the plan?

21 **A. Yes.**

22 Q. Similarly for OPEB UAAL you calculated that to be

23   4.303 billion and you similarly relied on its

24   presentation in the plan for that number, correct?

25 **A. Yes.**

1       **KENNETH BUCKFIRE, VOLUME 2**

2 Q. You haven't independently sought to assess the

3   accuracy of either of those two numbers, correct?

4 **A. Correct.**

5 Q. Did I hear you say that you have sent out the

6   solicitation letter for the exit financing?

7 **A. Yes, it went out on Friday.**

8 Q. It went out on Friday?

9 **A. Yes.**

10 Q. You were waiting on approval of the treasurer's office

11   before that went out?

12 **A. That was -- yes. First, we were waiting for the**

13 **legislation to pass in Lansing establishing an**

14 **oversight commission, and that was not done until June**

15 **20th I think it was, and then we wanted to make sure**

16 **that the state treasurer's office agreed with the**

17 **amount of borrowing the City was attempting to seek,**

18 **and of course the holiday intervened with that so it**

19 **didn't go out until last Friday.**

20 Q. Got it. Okay. And you are following a similar

21   process to the one you did on the postpetition

22   financing which is to say that you send out a

23   solicitation letter and then you get back first

24   nonbinding indications of interest from potential

25   lenders and you evaluate them and then go to the next

1       KENNETH BUCKFIRE, VOLUME 2

2   stage?

3 **A. Yes.**

4 Q. And the first round in response to the solicitation

5   letter is where people give you, the investment

6   banker, nonbinding indications of interest, correct?

7 **A. That's right.**

8 Q. And then it's your job to follow up on those and see

9   who you can hammer into a firm commitment?

10 **A. Correct.**

11 Q. And if I asked you questions about who you're

12   approaching --

13      MR. CULLEN: We've been through this.

14      MR. HACKNEY: Did you cover this yesterday?

15      MR. CULLEN: Yes.

16      MR. HACKNEY: So because the exit financing

17   is an ongoing process you're asserting effectively a

18   commercial sensitivity privilege to --

19      MR. CULLEN: Yes.

20      MR. HACKNEY: -- questions relating to his

21   efforts in connection with the exit financing?

22      MR. CULLEN: Yes.

23      MR. HACKNEY: So I'll note for the record,

24   Mr. Cullen, what I could see -- I certainly see the

25   logic of it because it's ongoing, on the other hand we

1       KENNETH BUCKFIRE, VOLUME 2

2   are talking about an expert who has based his opinions

3   on access in part on it, so we may have to have a

4   conversation later about whether we revisit it with

5   him once he's gotten it done so --

6      MR. CULLEN: Well, might make a lot of this

7   moot.

8      MR. HACKNEY: That's probably true, maybe

9   we'll stand in awe of it.

10      MR. CULLEN: The world will be different

11   once it's done.

12      THE WITNESS: As I mentioned --

13      MR. HACKNEY: I'm just going to reserve on

14   that so we can get past it.

15      MR. CULLEN: No, and -- and --

16      MR. BALL: As we have.

17      MR. CULLEN: And Robin didn't roll over and

18   beg either so --

19 BY MR. HACKNEY:

20 Q. I'm sorry.

21 **A. I mentioned in my testimony -- my testimony yesterday**

22 **I did indicate that we'd already sent it out to 15**

23 **parties --**

24 Q. Okay.

25 **A. -- which we've been talking with for months and that**

Elisa Dreier Reporting Corp.  (212) 557-5558
950 Third Avenue, New York, NY 10022
13-53846-tjt   Doc 7150-9   Filed 08/28/14   Entered 08/28/14 01:05:39   Page 28 of 28