# Exhibit 22

**Expert Report of Victor Weiner Associates**

**VICTOR WIENER ASSOCIATES,** LLC.

FINE ART CONSULTANTS AND APPRAISERS

201 WEST 89TH STREET, 11 D
NEW YORK, NY 10024
TEL: 646-206-3992

*In re City of Detroit, Michigan*, Case No. 13-53846 (SWR)

**Expert Report**

**Prepared by Victor Wiener,**
**Director of Victor Wiener Associates, LLC**

**July 25, 2014**

## EXPERT WITNESS DISCLOSURE BY VICTOR WIENER, DIRECTOR OF VICTOR WIENER ASSOCIATES, LLC

The following expert report (**REPORT**) has been prepared by Victor Wiener of the firm Victor Wiener Associates, LLC (**VWA**) an art appraisal and consultancy firm located in New York City with associates and affiliates worldwide.

The Report contains:

- The issues to be addressed

- The opinions reached in addressing these issues

- The data which was relied upon in forming these opinions

- Certain attachments, which support the opinions stated in the body of the Report

- The qualifications of the expert witness

- A list of all publications authored by the witness during the previous 10 years as stipulated

- A list of all cases in which the witness has testified as a witness within and beyond the stipulated 4 years required in this disclosure

Compensation to the witness has been agreed at $300 per hour for the preparation of this and supplemental reports if necessary: $400 per hour for preparation for all testimony including depositions; $5,000 per day for deposition and court testimony; reimbursement for all out-of-pocket expenses, including travel, associated with the expert witness testimony.

## SUBJECT PROPERTY

The subject property to be appraised is over 60,000 works of art (**SUBJECT PROPERTY**) comprising the entire art collection of the Detroit Institute of Arts (**DIA**) located in Detroit, Michigan.

## VALUATION CONCLUSIONS

In fulfillment of the appraisal assignment VWA reached the following valuation conclusion:

That the total value of the collection is **8,552,395,675** and probably more than that.

The appraised total has been determined as of July 25th, 2014.

## METHODOLOGY DETERMINING VALUE CONCLUSIONS

**Methodology Step by Step Chart**

| Step 1 | Valuation of High-Value Works by VWA | | | |
|---|---|---|---|---|
| | # of Units | Low Value | High Value | Average Value |
| | 387 | 3,092,419,700 | 4,040,303,800 | 3,566,361,750 |

| Step 2 | Valuation of other High-Value Works performed by independent third parties (e.g., Christie's, Artvest, and Winston) | |
|---|---|---|
| | # of Units | Average Value |
| | 616 | 434,357,825 |

| Step 3 | Projected valuation of other works as measured by DIA's Insurance Value, and estimated for appreciation | | | |
|---|---|---|---|---|
| | # of Units | DIA Insurance Value | % Appreciation | Projected Value |
| | 16,378 | 631,949,458 | 64.6% | 1,040,125,005 |

| Step 4 | Pricing matrix of remaining works based on average Christie's and Sotheby's sales price by department for 2013 | |
|---|---|---|
| | # of Units | Average Value |
| | 42,844 | 3,511,551,095 |

| Step 5 | Combined value | |
|---|---|---|
| | **# of Units** | **Total Average Value** |
| | **60,225** | **8,552,395,675** |

## ASSIGNMENT

The following section discusses:

- The background of the assignment, in which specifics of the appraisal assignment are discussed

- The decision to accept the assignment

- The specific qualifications of VWA in fulfilling the assignment

- Time restrictions dictating the nature of the Appraisal Report

## Background of the assignment

In May 2014 Victor Wiener was contacted by Ian Peck of Art Capital Group (**ACG**), an art financing company to see if VWA would be interested in appraising the entire collection of the DIA constituting the Subject Property cited above with a view to producing an appraisal report which could be used in the process of generating a loan to the City of Detroit (**DETROIT**).

After considerable discussion, VWA committed to perform the appraisal report and ACG committed to retain the services of VWA.

At that point, AGC submitted a non-disclosure agreement in order to send Mr. Wiener confidential documents to review in order for Mr. Wiener to determine the scope of work required to fulfill the assignment.


## The decision to accept the assignment

Mr. Wiener had an initial hesitation in accepting the assignment; considerable attention within the media had been devoted to press stories of Detroit's bankruptcy and the possibility that the holdings of the DIA would be sold to cover Detroit's obligations.

As discussed in this report and disclosed in Mr. Wiener's CV (*see* Attachment A), Mr. Wiener has had extensive museum experience. As such, he felt that the DIA holdings should be maintained.

However, once Mr. Wiener had a chance to review the Catalogue of Information Concerning Artwork Housed at the Detroit Institute of Arts, prepared by Houlihan Lokey Capital, Inc. (**HOULIHAN CATALOGUE**), Mr. Wiener was convinced that a loan was a viable plan for the DIA collection, including the loan proposed by ACG.

In order for the loan to take place, a credible appraisal report of the DIA holdings was required.

Mr. Wiener had informed ACG that any report VWA would submit would be in conformity with the Uniform Standards of Professional Appraisal Practice (**USPAP**), the universally accepted appraisal standards within the United States and abroad for all classes of property which require appraisals.

The USPAP stresses that the USPAP have been written to contribute to "public trust" of the appraisal practice (*see e.g.* Attachment D: Select Slides from Uniform Standards of Professional Appraisal Standards course material written by the Appraisal Foundation [emphasis added by Appraisal Foundation]).

In keeping with this requirement appraisers are given the option of refusing an assignment (see EG USPAP U-8 Management).

Taking all the facts into consideration, Mr. Wiener concluded that the public trust would indeed be served if indeed VWA conducted the appraisal assignment.

Sometime after VWA had committed its services to ACG, Mr. Wiener was informed that, in keeping with confidentiality requirements and the fact that court testimony would be required, VWA would be retained by the law firm Weil, Gotshal & Manges, LLP (**WEIL**), working on behalf of Financial Guaranty Insurance Company (**CLIENT**). However, the assignment would also have the stipulation that ACG would be named as an intended user of the report and the appraisal report could also be used by any additional funders ACG may require to help in putting together the funding necessary to advance a loan to keep the DIA collection in place.


## Specific qualifications of VWA in fulfilling the assignment

In accepting the assignment, VWA felt extremely well qualified. Two of the principals in the appraisal process have extensive museum experience.

Victor Wiener received a certificate in Museum Training given jointly by the Institute of Fine Arts of New York University and the Metropolitan Museum of Art. In addition to having instructors from the Institute of Fine Arts and the Metropolitan Museum of Art, his instructors also included Pierre Verlet, head of the department of furniture at the Louvre, and Charles Sterling, curator emeritus of paintings at the Louvre. In addition, Mr. Wiener received a two-year fellowship from the Ford Foundation providing for internship at the Department of Prints, Drawings, and Photographs at the Metropolitan Museum of Art and the Victoria and Albert Museum in London under direct supervision of the Museum's director, Sir John Pope-Hennessy. Upon returning from London to New York, Mr. Wiener was awarded a Chester Dale Fellowship from the Metropolitan Museum of Art, providing for another year of work at the Department of Prints, Drawings, and Photographs where he curated an exhibition, "Eighteenth Century Italian Prints." In addition, prior to assuming the position of executive director of the Appraisers Association of America, Mr. Wiener worked directly for the Philadelphia Museum of Art on loan agreements and appraisals for loan exhibitions. He has also lectured on several occasions for the American Association of Museums. Further discussion of Mr. Wiener's credentials and his complete curriculum vitae are appended to this report. (*See* Attachment A.)

David Shapiro has also had direct relationships with museums in a variety of capacities. He has taught courses of art history at the Museum of Modern Art (MoMA), and he has worked as an in-gallery museum educator at MoMA PS1, the Dahesh Museum of Art, and the Bronx Museum of the Arts, interpreting collections and special exhibitions for diverse audiences, largely school groups. Mr. Shapiro's proposal to create the Rockaway Museum of Contemporary Art was featured in MoMA PS1's exhibition "EXPO 1" as a response to a Call for Proposals to revitalize the Rockaways after the damage of Superstorm Sandy. Shapiro's writing has also been published in a catalogue by MoMA

to accompany a major retrospective exhibition. Mr. Shapiro has also worked extensively with museums in external roles. At the Fashion Institute of Technology (FIT), he taught "Art in New York," an on-site course that takes place entirely in the city's museums and galleries. Presently, he works indirectly with museum collections as an editor of higher-education art history textbooks. Mr. Shapiro's academic and appraisal credentials are discussed in greater detail below.

## Time restrictions dictating the nature of the Appraisal Report

The retention agreement was not finalized and signed until July 11th, 2014; since all expert reports were required by the Court to be filed by July 25th, 2014, VWA had less than two weeks to finalize a report for more than 60,000 works of art.

Under these circumstances it was decided that a preliminary appraisal report would be written which would be of a summary nature; however the document to be filed would be in compliance with the USPAP in which all requirements for such a report would be fulfilled. Complete discussion of the format of the report is given below.

There were further complications impeding the timely production of the Report.

It is our understanding that the DIA was requested to produce in a timely fashion a searchable inventory of the museum collection.

Among the documents supplied to us was a 17,000-page image inventory with about 40% of the photographs of objects in the collection missing. (*See* Attachment E: DIA Inventory Page, Missing Photograph Example)

In addition, all inventory entries were in PDF format and not within a searchable or sortable format.

Furthermore, instead of giving the name of the artist or creator of specific objects all objects were named "Unknown, American." In other words, a painting by Italian Renaissance artist, Benozzo Gozzoli created ca. 1460 was labeled on the PDF, "Unknown, American," before America was discovered by Columbus; or the paintings by Van Gogh who never even visited America were called "Unknown, American." (*See* Attachment F: DIA Inventory Page, Mislabeled "Unknown, American" Examples.)

One presumes that the DIA has a searchable database since a partial database is available online on the DIA website. This database was useful for thumbnail photographs for a selection of the works, but VWA was unable to get an electronic count of how many objects were in each of the DIA's curatorial departments.

VWA made numerous requests before our official retention to be supplied with digital data that we could use, but we were not provided with the information.

It was only on July 18th, 2014, just about one week before the report was due, that we received some of the electronic data we had requested, but it was still incomplete, which presented substantial challenges.

For these reasons the current report is labeled "preliminary."


## QUALIFICATIONS OF APPRAISERS

The above valuation was formulated by VWA.

VWA has brought together a select team of the most qualified expert appraisers and consultants offering its clients specialized services and highly personalized attention coupled with utmost confidentiality.

This team has been assembled by Victor Wiener, who for over twenty years served as Executive Director of the Appraisers Association of America. During his tenure and afterwards, Mr. Wiener identified and worked with those experts now employed by VWA.

Those appraisers who worked on this Report are:

### Victor Wiener:  Principal author and signatory

Currently an appraiser in private practice, Victor Wiener served as executive director of the Appraisers Association of America for 21 years. Prior to that he worked for several auction houses in Rome, London, and New York, including Sotheby's and Christie's, where he was Director of the fine arts department in Rome. A trained art historian, Mr. Wiener has worked at several museums including the Metropolitan Museum of Art in New York and the Victoria and Albert Museum in London. He has published extensively, and is co-editor and a principal contributor to *All About Appraising: The Definitive Appraisal Handbook* (2003)*,* and a co-author of *An Underwriter's Guide to the Valuation of Art, Antiques & Collectibles* published by the Inland Marine Underwriters Association, 2001. He has also taught the appraisal of fine and decorative arts at The New School, Baruch College, and New York University (NYU), where, for over twenty years, he has been an adjunct assistant professor on the faculty of the Appraisal Studies Program. At NYU, he teaches courses on the Legal and Ethical Responsibilities for Appraisers and on the USPAP; he previously taught IRS Rules and Regulations. Mr. Wiener is one of the few instructors of the USPAP with a specialty in personal property to be certified by the Appraisal Standards Board of the Appraisal Foundation, the organization "authorized by Congress as the source of appraisal standards and appraiser qualifications" (*cf.* text on Appraisal Foundation's logo).

Mr. Wiener has served as an expert witness in several high-profile art cases including matters concerning the estates of Andy Warhol and Louise Nevelson, and litigation concerning two of the most important works by Damien Hirst. He has been employed by

several agencies of the Canadian government; by the Department of Justice as an expert witness in the litigation, *Charles Malette v. H.M. the Queen*; by the Canadian Cultural Property Export Review Board (CCPERB) in the determination of value of property seeking certification as culturally relevant to Canada; and by the Canadian Revenue Agency (CRA) in the review of donated items to Canadian cultural institutions. Mr. Wiener has written extensively on the application of blockage discount and other tax-related matters.

His work in valuing highly valuable property is extensive. He has served as an expert witness in *Stephen and Elaine Wynn v. Those Certain Underwriters at Lloyds, London et al.*, in which the value of the damaged painting *Le Rêve* by Picasso was the matter at issue; at the time *Le Rêve* the most expensive painting ever to have been sold ($139 million). Subsequent to the settlement of the Wynn case, he published an extensive article on the determination of loss in value for highly valuable works of art. This article is cited in Mr. Wiener's CV, which has been appended to this document. (*See* Attachment A.)


## David Shapiro: Valuation and report preparation

David Shapiro brings to his appraisals a significant background as an art historian with specific expertise in contemporary art. The founding editor of the online contemporary art publication *Museo* and founding owner of Museo Publications, a business providing expert editorial solutions for art historical publications, Mr. Shapiro has played critical editorial roles in recent editions of a number of industry-leading higher education art history titles including Janson's *History of Art* and Marilyn Stokstad and Michael Cothren's *Art History*. His interview with Jeff Wall was published in the Museum of Modern Art's book *Jeff Wall: Selected Essays and Interviews* (MoMA).

An Associate Member of the Appraisers Association of America, Mr. Shapiro's appraisals are compliant with the USPAP. He holds a BA in Art History from Columbia University and a certificate in Appraisal Studies in Fine and Decorative Arts from New York University. He studied Modern Art in the PhD program in Art History at the Graduate Center of the City University of New York and has taught courses of Art History at the Fashion Institute of Technology, Pratt Institute, Parsons The New School for Design, and The Museum of Modern Art.

Mr. Shapiro has worked with VWA on several significant donation, damage and loss, and collateral loan appraisals.


## Shaun Cooper: Appraisal coordination and financial review

Shortly after receiving his Master of Arts degree from L'Université Libre de Bruxelles in 1993, Shaun Cooper began working for a private Manhattan art dealer before opening a gallery specializing in twentieth-century decorative arts. As a dealer, Mr. Cooper has

participated in international art fairs, bought and sold works privately and at public auction, and has developed a deep understanding of the market. His studies include a Bachelor of Arts degree from McGill University in Montreal, a certificate in French Language and Civilization from L'Université de Paris IV, and a certificate in Appraisal Studies in Fine and Decorative Arts from New York University. He is certified in the USPAP and is an Associate Member of the Appraisers Association of America.


### Charles Wong, LL.M.: Review and compliance

Charles Wong, LL.M. provided technical and administrative review and assistance for the methodology used in this report. He has had over 20 years' commercial legal experience working as in-house counsel for listed corporations both in Australia and in the United Kingdom. He has co-authored, with Victor Wiener, an article on "The Role of Appraisers in the Process of Authentication and in Other Related Valuation Issues" and another article that has been published on the Chubb Collectors website concerning "Why Auction Estimates are not Appraised Values." Mr. Wong is certified in the USPAP.


### Robert Leeds: CEO Silar Advisors, LP.: Technical, statistical, and financial analysis

Robert Leeds has over 25 years of investment experience largely focused on all aspects of large pools of underlying assets. His responsibilities included capital commitments, asset valuations, asset pricing, and advising clients on multi-billion dollar asset transactions. Prior to forming Silar Advisors in 2006, he spent 13 years at Goldman Sachs & Co in institutional sales and mortgage trading, 3 years at Nomura Securities responsible for the firm's residential whole loan trading platform, where he built a profitable conduit that acquired and securitized over $20 billion in loans, and approximately 2 years at Fortress Investment Group as a Managing Director and partner in the Drawbridge Special Opportunities Fund, LP. Mr. Leeds is a 1985 graduate from Hamilton College.


### Zhang Yi: Art market analysis

Zhang Yi began his career in the financial industry from 2006 to 2014 in HSBC and Goldman Sachs. Meanwhile, he headed the Research Department of HIHEY.COM, an e-commerce company specializing in art from 2011 to 2014. From 2012 to 2014, he was also the head of the Art & Finance Department in the China Art Market Research Center, where he was in charge of art economic research, art and finance research, and art wealth management.

Zhang Yi was a visiting lecturer at the Central Academy of Fine Arts in 2013 for "Art and Finance." He co-authored "China Art Market Research Report" and "China Art Market Annual Report" from 2011 to 2013. Since 2013, he has been a consultant on the Chinese art market for the annual "TEFAF Art Market Report." His writings and

interviews on contemporary art and economics have appeared in *China Culture Daily, Bazaar Art, China Auction,* and *Bloomberg Weekly*.

Zhang Yi received an MA from the Art Administration Department of the Central Academy of Fine Arts in 2013 and BAs in Finance from Wuhan University and International Economics and Trade from Huazhong Agriculture University.

**Jannette Barth, Ph.D.: Discount analysis**

Jannette Barth, Ph.D. is the principal of J.M. Barth & Associates, Inc. Holding degrees from The Johns Hopkins University and the University of Maryland, Inc., Dr. Barth has worked in the field of economic research, demand analysis, and econometrics for over 30 years. She has held positions as Chief Economist, New York Metropolitan Transportation Authority, and as Consultant and Account Manager, Chase Econometrics/Interactive Data Corporation.

Dr. Barth has extensive experience in the economic analysis of the art market. As a practicing economist with a Certificate in Appraisal Studies in Fine and Decorative Art from New York University and a Certificate in American Art from Sotheby's Institute of Art, Dr. Barth's work in the art market ranges from the analysis of particular segments of the art market for litigation support to the analysis and calculation of blockage discount for galleries and artists' estates.

Dr. Barth has taught economics courses at both the graduate and undergraduate levels and was a Senior Lecturer in the MA in Art Business program at Sotheby's Institute of Art. She regularly lectures on art as investment and blockage discount, including seminars at appraisal conferences and for staff of Internal Revenue Service Art Appraisal Services.

**James Callahan: Valuation, Asian art**

James Callahan is Director of Asian Art for the auction house James D. Julia, Inc. He has expertise on wide-ranging aspects of Asian art, including Chinese, Japanese, Korean, Vietnamese, Khmer, Thai, Burmese, Ottoman Turkish, Armenian, Arabic, Persian, and Indian objects. He is also an appraiser of arms and armor, nineteenth-century European and American furniture and decorative arts, and eighteenth- to twentieth-century fine silver. A frequent lecturer and consultant to museums, historical societies, and independent art groups nationwide, Mr. Callahan has worked with the Brooklyn Museum to bring to auction over 200 important pieces of Southeast Asian art from the collection of Samuel Eilenberg.

**Jason Christian: Valuation, photography**

Jason Christian is a photography specialist and founding principal of the appraisal firm

Christian | Reilly. Since 2004, he has appraised photographs for insurance, donation, and estate purposes for clients including the estates of Ansel Adams, Brett Weston, Cole Weston, Ernst Haas, and Yousuf Karsh and institutions including the San Francisco Museum of Modern Art; the Museum of Fine Arts, Boston; and the Los Angeles County Museum of Art. Mr. Christian holds an M.A. from Dartmouth College and a B.A. from the University of California, Santa Cruz. He maintains a current USPAP certification.

## Sarah Cox: Valuation, ancient art

Sarah Cox has worked as a researcher of ancient art at the New York gallery Fortuna Fine Arts, Ltd. since 1999. A Romanist with specialist expertise in numismatics and mosaics, she has published and lectured extensively on a range of subjects in these areas. Dr. Cox holds a Ph.D. in Classical Studies from Columbia University and a certificate in Appraisal Studies from New York University. Her professional affiliations include membership in the Appraisers Association of America, the Archaeological Institute of America, the Society for Classical Studies, L'Association Internationale pour l'Etude de la Mosaïque Antique, and the Society of Architectural Historians.

## Louise Devenish: Valuation, furniture and decorative arts

Louise Devenish is an appraiser and dealer specializing in American and European decorative art from the sixteenth century to the present. She is a consulting appraiser for the online marketplace 1stdibs as well as the founding principal of the professional arts community Devenish Group LLC.

Ms. Devenish has taught for over twenty years at both New York University, in the Appraisal Studies program, and at Parsons The New School for Design. She lectures widely at museums and historical societies and has served as the keynote speaker at the International Antiques Fair in Chicago. As an antiques dealer, she has participated in the International Confederation of Dealers at the Metropolitan Museum of Art. Ms. Devenish is recognized by the Appraisers Association of America as a Certified Appraiser in American and European decorative art. Her appraisals are compliant with the USPAP. She is also a member of the LAPADA: The Association of Art & Antique Dealers.

## Marina Whitman: Valuation, Islamic art

Marina Whitman is an independent appraiser specializing in Islamic art. She has taught art history at Pennsylvania State University and John Carroll University and has curated for the Lowe Art Museum, University of Miami. She has published articles on Islamic ceramics. Dr. Whitman holds a Ph.D. from New York University's Institute of Fine Art with a certificate in Museum Studies. She is an Accredited Property Appraiser from the International Society of Appraisers.

## THIS REPORT

### Content of this report

In conjunction with the steps taken in fulfillment of the assignment as listed and discussed below, VWA determined and settled with the Client the appropriate type of appraisal report in keeping with the USPAP.

As part of this process and in fulfillment of this assignment VWA also determined:
- the type and definition of value to be used;
- the appropriate marketplace(s) in which this value should be determined; and
- the valuation approach most appropriate for this report.

These are discussed in this report.

In conformity with the USPAP as discussed below, this Report is subject to extraordinary assumptions, hypothetical conditions, and limiting conditions as set out below.


### USPAP conformity

As cited above, this Report has been prepared in accordance with the USPAP. USPAP comprises standards promulgated by the Appraisal Foundation in Washington, D.C. as the major codification of appraisal standards for all appraisal disciplines. USPAP is both recognized by Congress (as stated on the Appraisal Foundation logo) and generally accepted in the United States and abroad.

All significant information affecting the valuation conclusions has been disclosed within the body of the report. Other, secondary, information to which the report may refer is retained in a work file for reference purposes.

The methodology VWA has employed to support its valuation conclusions is in conformity with a USPAP Appraisal Report as discussed below.


## SCOPE OF WORK

### Inspection and research

*Inspection*

Normally one would hope to have a physical inspection of the Subject Property, although USPAP does not preclude production of an appraisal report without physical inspection. [NB the Internal Revenue Service frequently performs audits of appraisal reports without performing physical inspections].

Due to the time constraints for the production of this report, a formal inspection of the Subject Property was not possible.

However, in late April 2014, Mr. Wiener made a trip to Detroit especially to view the collection.

*Research*

In the process of preparing this report, VWA conducted extensive research:

- VWA reviewed numerous database records for auction sales.

- Within a short amount of time, VWA consulted numerous books concerning sections of the Subject Property. Due to the time restrictions of producing the Report, VWA is continuing to work on the bibliography and will continue to update the production of documents upon which VWA relied to form the opinions in this Report, as necessary.

- VWA consulted dealers of material similar to works of art contained in the Subject Property.

- Of significant importance, VWA reviewed reports submitted by others. These include:

  o Expert Report of Vanessa Fusco of Christie's Inc., dated July 8th, 2014 (**CHRISTIE'S REPORT**)

  o Expert Witness Report of Michael Plummer of Artvest Partners, dated July 8th, 2014 (**ARTVEST REPORT**)

  o Fair Market Value Appraisal written by the Winston Art Group, dated March 25th, 2014 (**WINSTON REPORT**)

- VWA also reviewed an undated listing of insurance values prepared by the Detroit Institute of Arts (**DIA INSURANCE LIST**) and the Houlihan Catalogue.

  These documents are discussed in detail below.

## EXTRAORDINARY ASSUMPTIONS, HYPOTHETICAL AND LIMITING CONDITIONS

Most appraisal assignments are subject to extraordinary assumptions, hypothetical conditions, and limiting conditions.

An extraordinary assumption is defined in USPAP, 2014-15 edition, substantively as an assumption which the appraiser has every reason to believe is true at the time the report is written, but if subsequently this is proven not to be the case, then the valuation conclusions reached by the appraiser should be reviewed and may be subject to change (see USPAP, 2014-15 edition definitions).

A hypothetical condition as defined in USPAP, 2014-15 edition, is:

> That which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

A limiting condition is a factor that defines and limits the type of work an appraiser is able to do within the agreed-upon appraisal assignment and scope of work deemed necessary for fulfillment of the assignment.

Extraordinary assumptions, hypothetical conditions, and limiting conditions are frequently interlinked.

The specific extraordinary assumptions, hypothetical conditions, and limiting conditions associated with this assignment are listed and discussed below.

### *Extraordinary assumptions*

The extraordinary assumptions that VWA has taken in fulfillment of this assignment are as follows:

1. That the Subject Property has been accurately described within the DIA catalogue and that it will be recognized as such within the marketplace determined to be most appropriate within the context of this report.

2. That the Subject Property is in relatively good condition unless otherwise noted by the DIA or by other reliable sources.

3. That the Diego Rivera mural, *Detroit Industry*, can be removed successfully and that if necessary it would be removed by highly trained technicians with specialization in the removal of wall paintings.

4. That the charts given in Exhibit E of the Artvest Report are accurate.

5. In addition, VWA was told to assume that the Subject Property was not the subject of any encumbrances.

*Hypothetical conditions*

There are no hypothetical conditions connected with this report.


*Limiting conditions*

There are numerous limiting conditions connected with the production of this report. Among the most important ones are:

1.  That VWA had less than two weeks to produce an appraisal report for over 60,000 works of art.

2. That VWA was provided unsearchable data by the DIA.  Instead of providing a searchable database, similar to the type to be found on the DIA website, we were provided with 17,000 pages of a partially catalogued inventory of images, which could not be sorted, and each file was labeled "Unknown, American" instead of the true author and origin of the work of art.

3. That no file entries in the records provided note whether a work of art is signed or not. This in turn compromises an independent determination, based on the records, of whether an attribution is tenable or not.  As such, VWA has taken an extraordinary assumption that the attributions in the files are indeed tenable since these attributions were made by the DIA's highly qualified curatorial staff.

4. In addition, the catalogue entries provided contain incomplete entries concerning dates or other inscriptions, significant publications and exhibitions, all of which can influence value.  Thus the lack of time to research these matters ourselves constitutes a limiting condition.


## VALUATION

## TYPE OF VALUE USED FOR THIS REPORT:  MARKETABLE CASH VALUE

The type of value deemed most appropriate for this report is Marketable Cash Value which is defined as:

> The value realized, <u>net of expenses</u>, by a willing seller disposing of property in a competitive and open market to a willing buyer, both reasonably knowledgeable of all relevant facts, and neither being under constraint to buy or sell." (*All About Appraising: The Definitive Appraisal Handbook* [Appraisal Institute of America and The Educational Foundation of the Appraisers Association of America, 2003], p. 219)

The reason for the selection of this value is that this Report was originally commissioned by ACG whose purpose was to have proper appraisal documentation to generate a loan for the DIA collection.

Under such circumstances a value which is net of transaction costs is appropriate since, if the borrower were to forfeit on loan payments, a lender would confiscate the collateral (art in this case) and sell part or all of the property used as collateral to satisfy the debt. Consequently an appropriate value is one which reflects how much the lender would actually receive net of commissions rather than how much the sales agent for the lender, such as an auction house, would receive inclusive of commissions.

It should be noted that other values are used in other reports.

The Winston Report states that they used "fair market value" (**FMV**) which is defined in the body of the report as:

> …the price that property would sell for on the open market between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts. Note that in this case fair market values are inclusive of buyer's premiums.  (Winston report p. 3)

Presumably within the Winston Report definition, commissions due to the sales agent such as the auction house are also included as is commonly the case in the definition of fair market value.

The Christie's Report states that they have used fair market value, but they do not provide a definition of this value. In addition, they do not consider any buyer's premium, which is an essential important part of fair market value. (Christie's Report, p. 6)

The Artvest Report does not define which value was used.

The DIA Insurance List does not state which value has been used. Presumably it used Retail Replacement Value (**RRV**), which is the most common value used when art is scheduled on an insurance policy.

Retail Replacement Value is generally defined as:

> "A property's highest value, usually for insurance purposes, that is defined as the highest amount in terms of U.S. dollars that would be required to replace the property with another of similar age, quality, origin, appearance, provenance, and condition within a reasonable length of time in an appropriate and relevant market. When applicable, sales and/or import tax, commissions, and or premiums are included in this amount." (*Appraising Art: The Definitive* Guide [New York: Appraisers Association of America, p. 438])

## APPROACH SELECTED FOR THIS REPORT: THE MARKET COMPARISON APPROACH

USPAP requires appraisers to determine which valuation approach is necessary:

The three standard approaches to valuation cited in USPAP are the Market Comparison Approach, the Cost Approach, and the Income Approach. (See USPAP 2014-15, Standards Rule 7-4)

VWA has selected, as the most appropriate approach for this type of valuation, the Market Comparison Approach (*MARKET COMPARISON APPROACH*), in which the Subject Property has been compared to other similar and like objects which have sold or have been offered for sale as closely as possible to the Effective Date of Valuation stated above, in the marketplace designated as most appropriate.


## THE OTHER APPROACHES CONSIDERED

VWA has also considered the other two traditional approaches to valuation, the Cost Approach (*COST APPROACH*) and the Income Approach (*INCOME APPROACH*).

The Cost Approach obliges the appraiser to take into consideration the amount of money required to re-fabricate the Subject Property if the Subject Property is of a type that lends itself to re-fabrication. The Subject Property could not be re-fabricated if for no other reason than the fact that there are numerous artists, many of whom are no longer living.

The Income Approach for the valuation of the Subject Property has been rejected as inappropriate to this assignment because the Subject Property, to the best of our knowledge, has no history of having been used primarily to generate income.


## THE MOST APPROPRIATE MARKET FOR VALUATION

Works of art can be sold in a variety of marketplaces. The two most prominent marketplaces are the public auction marketplace and the private gallery marketplace. For the purposes of this appraisal, VWA believes the auction marketplace to be the primary venue for valuation purposes of the Subject Property.

With this in mind, VWA has examined both marketplaces extensively. However, it should be noted that dealer representations are often anecdotal and are frequently hard to verify since such sales are confidential, and even redacted versions of sales receipts are difficult to obtain unless by court order. In addition, private dealers in the United States feel confined by the confidentiality provisions of the Gramm-Leach-Bliley Act of 1999.

In addition, of primary consideration is the fact that in a loan situation, if the borrower such as the City were to default on loan payments, a lender would most likely want to sell

the collateral as quickly and efficiently as possible. While consignment to private dealers may be an option for some of the works constituting the public property, the vast majority of the works would most likely fetch higher prices at public auction in a prominent sale highlighting the curatorial excellence of the DIA collection. Consequently, the most appropriate marketplace, without doubt, would be a public auction where large market exposure and competitive bidding would take place.


## VALUATION METHODOLOGY

In this section the general methodology followed by VWA is set forth and observations are made by contrasting the valuation methodology perceived to have taken place in the other reports.

### General methodology followed by VWA in determining value as reflected in the Report

As previously stated, VWA is comprised of a number of specialists, each highly qualified in the sector of valuation to which they are assigned primary responsibility (see credentials of appraisers given above).

While each specialist performed initial valuations for specific sectors, these valuations were only a point of departure. After the valuations were submitted to VWA they were reviewed by the team; in some cases further research was performed after review. In brief, the methodology for determining value by VWA is organic taking into consideration points made by specialists and comments made by colleagues. Final valuation figures are arrived at after intense review.

By nature of the assignment, the VWA appraisal has set about to value the entire collection of the DIA operating under highly limiting conditions as stated above and specified further below.

As stated above, the VWA team did not have the opportunity to view the Subject Property physically although the DIA collection was viewed by Mr. Wiener in situ before he was offered the opportunity to appraise the collection.

As such the team had to work with whatever resources were available including:

- Compromised data submitted by the DIA as discussed above.

- For the most, part thumbnail photographs taken from the DIA website. Although some additional photographs were supplied electronically by the DIA, the order in which they were supplied was so chaotic as to make them virtually unusable. The quality of the images used was not uniformly high resolution.

- VWA did not have the opportunity to discuss the collection with curators.

- VWA was not given access to the DIA files. As a result, information about significant publications and exhibitions, both of which can influence value was not shared by the DIA.

As a result of these limitations our report is classified as "preliminary." However, VWA feels secure in setting forth the values in this report in keeping with the nature of a preliminary report and in keeping with the requirements of USPAP.

## General methodology followed by Christie's in determining value as reflected in the Christie's Report

As is common with Christie's, the Christie's Report was done by a team of appraisers, each member coordinated by Vanessa Fusco of the Appraisal Department.

As stated in the Christie's Report, team members visited Detroit on numerous occasions, reflected in a billing of $65,000 for expenses.

The appraisal, as stated in the Christie's Report, used fair market value, but since no commissions were included in the range of values ascribed, the ultimate values are more in keeping with marketable cash values – although no accommodation was made to the fact that a seller's commission would normally be due to the auction house, this latter point may be moot since auction houses frequently do not charge important consignors, such as the DIA, a seller's commission.

However, what should be noted is that while using a range in value, as is common in auction estimates, Christie's assigned an extremely wide range, often as wide as over 100% between the low and the high value. While this may be understandable for objects where a value may require substantive analysis and the appraiser is not willing or able to perform such a task, it is hardly the norm in appraisal reports. As such, this factor places the Christie's Report in a position in which its credibility is called into question.

At no point does Christie's state that the Christie's Report is compliant with USPAP. While USPAP does allow for a range in value, such a wide range is definitely outside the norm.

## General methodology followed by Michael Plummer of Artvest in determining value as reflected in the Artvest Report

The Artvest Report was written by Michael Plummer, who signed it.

Mr. Plummer is not an appraiser. The Artvest Report is labeled an "Expert Witness Report" but since he states values which he formulated for the major part of the report, this would qualify as an appraisal under USPAP (see USPAP definitions, 2014).

Although the Artvest Report relied upon the input of experts, some of whom are known to VWA to be of high quality, the nature of many of the DIA pieces required the benefit of consultation by a committee for quality control.

While Mr. Plummer uses appraisers as consultants, the use of the data they have supplied is entirely his. As such the Artvest Report lends itself to uncertainty as an appraisal report.

The Artvest Report is not compliant with USPAP, nor does it state that it is. Some of the consultants are USPAP certified but they only supplied undefined values for Mr. Plummer to use as he saw fit. Unlike VWA, the values stated in the Artvest Report are not the products of team consensus since each value carries the name of the consultant who supplied it. (See documents appended to the Artvest Report).

It is not the intention of this Report to serve as an "Appraisal Review" as defined in Standard 3 in USPAP; as such a full description of how the Artvest Report is not compliant with USPAP is not given here but can be supplied if requested by the court.

VWA has mentioned the methodology the Artvest Report used determining individual or unit values – i.e. using individual consultants to make those determinations on their own.

The major part of the Artvest Report discusses general valuation considerations Plummer feels one should take into consideration in determining the total value of the DIA collection. It is VWA's intention to address these considerations as they appear within the methodological framework VWA uses to make its own determination of the total value of the DIA collection.

It should be mentioned at this point that the only appraisal reports VWA has seen so far in which the total value of the DIA collection is discussed are this Report and the Artvest Report. The other reports reviewed just address individual objects in the DIA collection but not the whole collection.


## THE IMPORTANCE OF THE DIA COLLECTION

The DIA is one of the largest and most significant art museums in the country, comprised of approximately 60,000 works of art from a range of cultures throughout the globe. It is one of the country's few encyclopedic art museums, representing the art of most major cultures from early ancient history to the present. The collection includes works of ancient Greek, Roman, Mesopotamian, and Egyptian art, as well as Islamic, African, Chinese, and Oceanic art and major collections of American art, European art, Modern art, and decorative art. It contains masterpieces by such artists as Pieter Bruegel, Caravaggio, Pablo Picasso, Auguste Rodin, Mark Rothko, Jacob van Ruisdael, Vincent van Gogh, and Andy Warhol. DIA also houses the armor collection of newspaper baron William Randolph Hearst.

As noted, the scope and breadth of the collection is extraordinary. Although it may hold fewer objects than other museums, the refined curatorial selection is unparalleled for a museum of its size.

The collection was assembled at a time when Detroit had funds beyond what most museums had and was able to attract curators of worldwide renown. A review of the holdings invites comparison with the holdings of the best of other museums anywhere in the world. This is an overwhelming valuation factor which serves as the proper orientation for this appraisal report.

The museum was established in 1885 as a result of the initiatives of another newspaper magnate, James Scripps, and his manager William H. Brearly. Among the institution's numerous prominent donors have been many leaders of the automobile, including the Ford family, particularly Edsel Ford, the Dodges, and the Firestones. Other important donors include Governor and U.S. Senator Russell A. Alger, U.S. Senators James McMillan and Thomas W. Palmer, businessman Dexter Ferry, distiller Hiram Walker (Canadian Club Whiskey), industrialists Christian Buhl, Charles Lang Freer, and John Stoughton Newberry, and department store magnates C.R. Mabley, Cyerenius A. Newcomb, Sr., and Robert Hudson Tannahill of the Hudson's Department Store fortune, who, upon his death, bequeathed a particularly large and important collection of European art, including Modern masters Paul Cézanne, Edgar Degas, Paul Gauguin, Pablo Picasso, and Georges Seurat. A pioneer in collecting taste, DIA was the first public collection in the United States to include works by Van Gogh and Henri Matisse.

The DIA collection is housed in 658,000 square feet of gallery space in over 100 galleries in a 1927 Beaux-Arts building designed by Paul Philippe Cret, with a portion of the collection kept in storage. Among the most celebrated rooms in the building is the Rivera Court, which contains Mexican painter Diego Rivera's monumental frescoes *Detroit Industry*, a cycle that commemorates the work that fueled the ascendency of a great American city.

## THE EFFECTS OF SELLING MUSEUM AND CELEBRITY ART

### Museum provenance

It is apparent that works of fine and decorative art, and other collectibles from museums and other significant collections perform much better at auctions than similar objects lacking notable provenance. This tendency manifests itself in the sales of objects that differ greatly in kind and value, similarly in major auctions of international importance, and small regionally scaled auctions.

An indication of the substantial potential premium that would be given to the collection of the DIA collection, were it to be auctioned, can be found in the Cleveland Museum of Art's January 2011 sale of two dozen European old master paintings. In an article in that

city's paper, *The Plain Dealer*, Steven Litt wrote of this sale, the largest sell-off from its collection in more than a half-century (…):

> From a market perspective, **collectors love things with a museum provenance** and hopefully, [the sale] will do well for the museum," said Christopher Apostle, a Sotheby's senior vice president and director for old master paintings in New York. (Steven Litt, "Cleveland Museum of Art to auction 32 old master paintings at Sotheby's," *The Plain Dealer*)

In fact, the sale performed 45% better than expectations, earning $450,000 more than the high estimate. (Steven Litt, "Cleveland Museum of Art earns more than expected from Sotheby's sale of selected old master paintings," Feb. 1st, 2011). The very strong performance of the sales from the Cleveland Museum of Art, no less at a moment when the art market was still in recovery from the financial crash of 2008-09, attests to the premium that buyers are willing to pay for works from great collections such as major museums.

In a 2007 article "Christie's is Cagey about Maier Museum Provenance, Discloses the Rose," Lee Rosenbaum identifies the same tendency:

> **Auction houses always tout museum consignments** in their presale press releases, because of the **cachet and higher market value that distinguished provenance confers**. (Lee Rosenbaum, "Christie's is Cagey about Maier Museum Provenance, Discloses the Rose," *CultureGrrl*, November 1st, 2007)

In a report for Christie's Features, Joshua Glazer and Alexis Glashot discuss this tendency as well:

> Deaccessioning sales, which occur infrequently and tend to be part of a carefully tailored collection-management strategy, **provide private clients with a unique opportunity to acquire works with impeccable museum provenance and often a substantial history of research and publication**, from some of the most hallowed and prestigious collections in the world. (…) **Our June New York Sale saw the successful sale of 11 works from the Metropolitan Museum of Art**, sold to benefit the acquisitions fund of the European Paintings department. The group, which was 100% sold, was led by Hubert Robert's The Ruins and The Old Bridge, which realized $1,874,500 (£1,219,310). (Joshua Glazer and Alexis Glashot, *Market Barometer: Old Master Paintings*, spring 2012)

Jesse Hamlin identifies the same tendency in a discussion of a sale of works from the M.H. de Young Memorial Museum:

A couple of thousand objects were put up for auction after being culled from the collections at the M.H. de Young Memorial Museum in Golden Gate Park and the California Palace of the Legion of Honor. About 95 percent of them were snapped up at Butterfields in San Francisco and online yesterday and Monday in auctions that included objects from the Art Institute of Chicago and other institutions. Most sold for more than their estimated value.

"That's very good news," said museums Director Harry Parker. "**I think there was a premium paid for objects that have a museum provenance. That gives them a cachet.**" (Jesse Hamlin, "Museum pieces auctioned / De Young, Legion items get top dollar," San Francisco Chronicler, June 27th, 2011)

The premium paid for a museum provenance can also be seen in the sale of Rafino Tamayo's *Watermelon Slices*. In an article for *Blouin Art Info*, Judith H. Dobrzynski predicted the effect of the MoMA provenance, which proved true; the painting sold for $2,200,000, which was $200,000 above the high estimate. Dobrzynski wrote:

Give Sotheby's credit for salesmanship: today, announcing **the sale of a painting by Rufino Tamayo, which is being deaccessioned by the Museum of Modern Art**, the auction house called Watermelon Slices "a major work…depicting one of his signature themes."

Estimated at $1.5 million to $2 million, it will be in the Nov. 16 auction of Latin American Art. Carmen Melian, the Latin American expert at Sotheby's, said "This is one of the most important Tamayo watermelon paintings to appear on the market for several years. **Collectors are sure to gravitate towards a work of this iconic subject matter from an important period that also boasts such distinguished provenance**." (Judith H. Dobrzynski, "MoMA To Sell Tamayo, With Acquisition Policy Implications," *Blouin ArtInfo*, October 19th, 2011)

In a 2011 article for *The New York Times*, Carol Vogel notes the tendency of museum provenance to be used as a sales tool:

It is clear from the Impressionist and modern art catalogs that a number of museums, eager to clean house, are willing to take a gamble on the market, hoping some of today's new buyers — predominately from Asia, Russia and the Middle East — **will be impressed by a museum provenance**. **For auction house experts, that's a compelling sales tool**. (Carol Vogel, "A Bouquet of Offerings to Test Uncertain Waters," *The New York Times*, October 28th, 2011.)

Vogel made a similar point seven years earlier, addressing the impact of MoMA provenance:

The top seller was Pollock's "No. 12, 1949," one of his classic drip paintings. Five bidders fought over the oil on paper, which sold to a telephone bidder for $11.6 million, **well above its $7 million high estimate and a record for the artist**. Practically no drip paintings are available**; this one came with an exceptional provenance: the Museum of Modern Art had owned it for 52 years**. (Carol Vogel, "Contemporary-Art Bidding Tops $102 Million in Sales," *The New York Times*, May 12th, 2004)

Suzanne Muchnic noted the same tendency in an article the same year, identifying the capacity of museum provenance to have a significant effect.

"Ultimately a painting sells based on its merits -- the quality of the work, whether it stems from the artist's greatest period, the condition of the work, whether it has been on the market recently," Eykyn says. "**But clients like to feel vindication of their taste. To be able to say a work has been in the collection of the Museum of Modern Art the last 40 or 50 years achieves that**."

Amy Cappellazzo, Christie's chief of Post-War and Contemporary art, also has MoMA consignments -- a small drip painting by Jackson Pollock, valued at $5 million to $7 million, and a painting of a cow by Jean Dubuffet, expected to fetch $2.5 million to $3.5 million.

"**The MoMA provenance adds cachet for sure**," she says. **The relatively obscure Anderson Fine Arts Center in Anderson, Ind**. -- which hopes to reap $1.8 million to $2.5 million from the sale of Edward Ruscha's 1964 painting "Damage," donated to the center in 1972-- **doesn't have the same effect. But the Anderson name can't hurt**, even though some of the proceeds are likely to fund operations not condoned by the American Assn. of Museums' code of ethics. (Suzanne Muchnic, "Art; Banking on big names; More than $500 million worth of art is up for auction in New York. Quality is important, but illustrious ownership can add real value to the sale price," *Los Angeles Times*, May 2nd 2004)

The effect of museum provenance on the market is known to be so significant that some dealers take great measures to ensure that works that they market have it. Joy Lo Dico wrote of this phenomenon in a recent article for the *London Evening Standard*:

This February Olyvia Kwok was in the sales room at Sotheby's for its Contemporary Art Auction. Two other Basquiats had sold well above their estimates already but, when it came to the Water-Worshipper canvas, the bidding was pedestrian. The auctioneer's hammer was falling when Kwok, dubbed the Chinese It-girl of the art market, put in one last bid for £2.49 million. She got her Basquiat, and below the expected price. "I think it

was a bargain," she told a journalist as she left the salesroom, and reckoned it would double in value over the next 18 months (…)
As for the Basquiat and the Twombly, Kwok has a plan. "I got the Basquiat for $4 million. It is now insured for $12 million. **We are going to place the painting in a museum so it will have a better provenance, because everyone likes things with more academic value**. Once placed we will talk to Basquiat experts, find out some more information, someone will write about it, and **we will put it back on the market for different collectors**." (Joy Lo Dico, "I look at artists like a commodity balance sheet: art dealer Olyvia Kwok on picking paintings and being sued by Sotheby's," *London Evening Standard*, July 3rd, 2014)

The tendency for museum provenance to elevate value can be found in art of diverse type. A 2012 article for BBC News, "Vase used as doorstop raises $1.3m at auction," demonstrates the phenomenon to take place in the sale of Chinese art:

Dr. Tao Wang, who was recently appointed head of the Chinese Works of Art Department at Sotheby's New York, said he was "thrilled" with the result of the first auction he has attended there. "We saw exceptional demand across the sale which drove the total to such heights," said Wang. "**Collectors from around the world were drawn to high-quality pieces with distinguished provenance, particularly that of museums**." ("Vase used as doorstop raises $1.3m at auction," BBC News, September 14th, 2012)

In a *Washington Post* article "Museum Quality," Jane Friedman notes that the Baltimore Museum of Art provenance will benefit the sale of pre-Columbian works:

Museums, like homeowners, occasionally need to winnow their possessions. But **when a museum's goods are put back on the market, their value usually is increased**.

Weschler Auctioneers and Appraisers, the Washington-based auction house, this weekend will sell more than 130 lots of pre-Columbian as well as African and Native American objects, most of which were in the collections of the Baltimore Museum of Art.

"**These works have been authenticated, and what we call provenance always affects the value**," says Frederick Lamp, the museum's curator of the arts of Africa, Asia, the Americas and Oceania. (Jane Friedman, "Museum Quality," *The Washington Post*, October 1st, 1998)

The same effect can be seen in the sale of Western antiquities, as addressed in Elspeth Moncrieff's 2006 article "Antiquities Sold to Pay New Art Bonanza in *The Daily Telegraph*:

The ongoing high-profile trial in Rome of Marion True, former antiquities curator at the Getty, on suspicion of conspiring to buy illegally excavated works of art for the museum, has uncovered a labyrinth of dealers, curators and collectors allegedly involved in handling illicitly excavated antiquities.

The trial has put the wind up everybody, and curators can no longer turn a blind eye to provenance. **Buying publicly at a vetted auction in which each item has a published museum provenance gives the buyer complete security - so these works are particularly desirable**. (Elspeth Moncrieff, "Antiquities Sold to Pay New Art Bonanza," *The Daily Telegraph*, November, 28th, 2006)

The elevating effect of museum provenance is not even particular to high-value fine art. In an article for *Forbes*, Missy Sullivan addresses this point:

You don't have to be in the market for a Monet or a Manet to benefit. If you look closely, you'll find museum property sprinkled among sales of almost every category (…) Bonus: When you buy a museum piece at auction, it comes free of sales tax.

**A museum provenance can exercise a halo effect on mediocre work, giving it a higher hammer price**. You can safely assume a museum piece has been well cared for and researched. (Missy Sullivan, "Yard Sale of the Gods," *Forbes*, December 24th, 2001)

The tendency of museum provenance can be seen in the sale of historical memorabilia. Steve Campbell discusses the museum provenance effect in a sale of Robert E. Lee memorabilia:

In 1867, Lee donated the items to help out an orphanage in Baltimore, Quinn said. The items were eventually bought by Civil War collector William Beverly Bristor Jr. of Baltimore, who died in 1999. That year, his heirs loaned the items to the National Park Service's Arlington House, Lee's former family home that became the Arlington National Cemetery. But an illness in the owners' family owners forced them to put the items up for auction.

When Kathy Huxhold of Muncie, Ind., first contacted Quinn about selling the items collected by her uncle, he told her they held enormous potential. "**It was Robert E. Lee and we had museum provenance – this had the power to create a perfect storm at auction**," Quinn said, noting that 1,500 bidders signed up for the bidding. "We had estimated it at about $20,000 but the bidding started at $25,000. When it ended at $55,000, it was a tear-jerking moment to do something for a client," he said. (Steve Campbell, "Prolific Fort Worth Civil War collector scoops up rare Robert E. Lee items," *The Star Telegram*, February 2nd, 2014)

**Celebrity sales**

The effect of museum provenance is not unlike that of celebrity provenance, which tends to augment value dramatically.

The Elizabeth Taylor sale at Christie's New York on December 3rd to 17th, 2011 made $156,756,576. Every item that was offered sold. The evening sale of Taylor's jewelry alone achieved $115,932,000, becoming the most valuable jewelry auction in history. Seven new world auction records were established during the sale including price per carat for a colorless diamond and for a ruby. These record prices owed in large part to the golden provenance of having been part of Taylor's collection.

This provenance contributed to unexpectedly high achieved prices for the fine art in Taylor's collection as well.

For example, Vincent van Gogh's landscape painting *Vue de l'Asile et de la Chapelle de Saint-Rémy* illustrates the celebrity effect. Relatively modest in scale, bland in color, and prosaic in composition, this painting was offered with an ambitious estimate of £5,000,000 - £7,000,000 ($7,885,000 - $11,039,000) at Christie's London in February 2012. It sold for £10,121,250 ($15,991,575), more than doubling the low estimate, despite its relative deficiencies; this high realized price was in large part determined by the provenance. The celebrity factor can be discerned when comparing this painting to other relatively minor van Gogh oil paintings of landscapes that sold in the same general time period. For example, the slightly inferior painting by van Gogh *Pont de Clichy* sold for vastly less money ($6,130,919) at Koller in Zurich in June 2013. And the superior painting by van Gogh *Parc de l'hôpital* sold for less ($13,302, 947) in June 2010.

The collection of Yves Saint Laurent and Pierre Berge was also incredibly successful, setting numerous records including the biggest auction ever held in Europe. The auction made 374.4 million euros ($477 million with fees), dramatically surpassing the estimate of 200 million euros to 300 million euros. Nearly 96% of the lots sold, an extremely high sale rate. That success of this auction, which was the largest-grossing auction of a private collection, particularly in relation to its estimates, attests to the premium that collectors are willing to pay for work that has impressive provenance.

The capacity for celebrity provenance to draw extremely high prices at auction is perhaps most evident in the auction of Jacqueline Kennedy's personal memorabilia, which fetched astronomical prices in the 1990s. Collectors paid $772,500 for her golf clubs, and $211,500 for her fake pearls, among numerous other such prices, all of which attest to the premiums that collectors will pay for provenance. (*See* James Barron, "Reporter's Notebook; Oohs, Aahs and Millions in Frenzy to Buy Camelot," April 26th, 1996)

Damien Hirst sold 100% of his lots on September 16th, 2008 at Sotheby's London, setting the record for a one-artist auction the day after Lehman Brothers collapsed. The sale, which made $200.7 million, soaring past the high estimate of $177.6 million is another

example of the power of celebrity status. (*See* "Maev Kennedy, £111 Damien Hirst Total Sets Record for One-Artist Auction," *The Guardian*, September 16th, 2008).

The Christie's Report is silent on the importance of the museum provenance which is related to the celebrity provenance factor discussed above.

## Sale of any century

As art appraiser Elizabeth Gaidos says:

> I was Assistant Curator of American Art at the DIA many years ago. The collection is a world treasure, not just the subject of a regional dispute. A museum collection of this stature is a compilation of the curatorial expertise and donor contributions of decades. It has a life and character developed over time and is not merely an assemblage of individual properties." (posted on Linkedin July 18th, 2014)

The sale of the entire contents of the DIA would be unprecedented in scope. Given the extremely high quality and curatorial consistency of the DIA collection, even an auction sale of selected masterpieces from the museum would perform better than any sale in history, including major sales centuries ago, such as the dispersal of royal treasures of the French Revolution or the Walpole sale to Catherine the Great in the eighteenth century.

In view of this extensive evidence, it is instructive to contrast the comments of Artvest Report on this issue. Not only does the Artvest Report appear not to take into consideration the exalted factor of provenance but it belittles it.

The Artvest Report says:

> General gifts and other museum acquisitions often involve property with little or no sales value and/or scholarly or historic value only. Also in many instances donors give entire collections, which include poor to mediocre property side-by-side with good property. (Artvest Report p. 19)

While this may or may not be the case, what the Artvest Report ignores is that when and if museums receive gifts of low value, they more frequently than not sell unwanted objects, soon after receiving them.

Such sales are condoned by the American Association of Museums provided the proceeds of such sales are given to an acquisitions fund and are not dispersed for other purposes.

This is a fact that the Artvest Report ignores when discussing the recent sale by the Delaware Museum of Art of a William Homan Hunt painting, illustrated in the Artvest Report. (See Artvest Report, pp. 32-34)

There is also a major valuation flaw in the analysis of works under $5,000 in both the Artvest Report and the Christie's Report.

The Artvest Report states:

> For property with a value below $5,000 I attributed an effective value of $0, as is my opinion that the cost of cataloguing, handling, administering and finding buyers for this property will be equal or greater than the cost of selling it. For that reason this is a price level of property that Sotheby's and Christie's, under normal circumstances try to avoid selling. (Artvest Report p. 19)

The Artvest Report accepts without question Christie's classification of these works. However, Christie's did not provide a list of the works under $5,000 with illustrations, and so, the user of their appraisal report has no way of verifying whether these works are indeed under $5,000. In light of the fact that Christie's has not valued these objects, the total number of objects valued in their report may be closer to 1,500 rather than approximately 2,700, which they say they have valued. Yet, the Artvest Report accepts these numbers without question and incorporates them, and in so doing, skews the results.

Not only is this point fallacious for its refusal to account for the major cumulative value of works under $5,000 in the DIA collection, but it is untrue in regard to the business practices of Sotheby's and Christie's, both of which sell works under $5,000. Many of these works, such as his Polaroid photographs offered in Christie's online "Eye Candy" sale have estimates as low as $1,000-$2,000.

Sotheby's is also working in the lower end of the art market, having recently announced a partnership with eBay for online sales. (op cit. Carol Vogel and Mike Isaac, "A Warhol with Your Moose Head? Sotheby's Team with EBay," *New York Times*)

The Artvest Report also implies that selling museum works which are not condoned by professional associations result in lower realized prices, as evidenced by the Delaware Museum sale which took place in London, referenced above, which most likely was due to an aggressive estimate by Christie's. (*See* Artvest Report, p. 33).

Ironically, on July 14th, 2014, a few weeks after the Delaware Museum sale, the *New York Times* published a story of how an Egyptian statue de-accessioned from the Northampton Museum in England made approximately $27 million in London above its estimate of $7-11 million, despite the fact that both the Egyptian government, local residents and British museum officials tried to block the sale on "moral grounds" (using the terminology of the *New York Times*).

One of the most egregious errors in the Artvest Report is the treatment of Diego Rivera's *Detroit Industry* frescoes. The Artvest Report says that the frescoes "cannot be removed with cutting them off the wall and inflicting serious damage, and incurring significant cost." [*sic* – he presumably means "without cutting them…"]. While of course there would be costs associated with moving the frescoes, it is certainly possible, and it is fully

in keeping with the regulations of National Park Service, which organization has named the murals a national hallmark and explicitly noted that this designation "does not shield the property from ownership changes or prevent an owner from making any other changes they wish"; a review process is in fact only needed if federal funding is to continue (See "Iconic Diego Rivera mural at DIA named National Historic Landmark," *Detroit Free Press*, Apr. 24th, 2014)

In fact, frescoes are commonly moved from their original sites to museums. There is currently an exhibition in Ravenna, Italy titled *L'incanto dell'affresco* ("The Charm of the Fresco: Detached Masterpieces from Pompeii to Giotto, from Correggio to Tiepolo"). The show is comprised of 110 detached frescoes from antiquity to the nineteenth century. (*See* Attachment G: Article on *L'incanto dell'affresco esco*)

It is common for museums to display detached frescoes in this country as well. One prominent example of this is Domenico Ghirlandaio's detached fresco *Saint Christopher and the Infant Christ* in the Metropolitan Museum of Art. At the same institution, one can see several entire rooms of detached frescoes from villas such as Boscoreale and Boscotrecase; these paintings, buried under the lava of Mount Vesuvius, suffered a fate far worse than surgical modern processes that necessarily attend the transport of major frescoes, and yet, they are in very good condition and set up in situations that approximate the original rooms. The removal of frescoes in a setting such as a major museum today would be performed with state-of-the-art technology that would leave the works in essentially perfect condition in a new location.



Domenico Ghirlandaio, *Saint Christopher and the Infant Christ*

The relocation of room-scaled works is not particular to frescoes. Entire rooms are regularly moved without damaging effect. Consider Whistler's Peacock Room, which

was moved from Freer's Detroit mansion to the Freer Gallery of Art in Washington, DC. Consider, similarly, Louis Comfort Tiffany's Tiffany Chapel at the Morse Museum in Winter Park, Florida, which was moved three or four times prior to its current installation. Museums sometimes move entire buildings to great distances; consider the Temple of Dendur, which was moved from Egypt to the Metropolitan Museum of Art. With such examples in mind, the reconstruction of Rivera's masterful frescoes in a comparable museum is entirely plausible.

Later in the Artvest Report, in the section for individual valuations, Betty Krulik says "the works would be destroyed if they were removed from the building, therefore the value is 0 OR the value of the real estate." As discussed above, there is no indication that the works would be destroyed or even damaged if they were to be moved, and therefore these works, major masterpieces by the most important Mexican artist in history, have a value far in excess of zero. And since, as discussed above, the Rivera murals are of a class of property that can be relocated with relative ease, their value is not the value of the real estate.


**STATE OF THE CURRENT ART MARKET**

The time constraints of producing this preliminary and summary report preclude a detailed analysis of the state of the art market at present. However, a few general comments are in order.

At the moment, as in the past, the art market tends to be strong for works of art of significant quality. The curatorial care which the DIA has exhibited over during the last century in particular has produced an extraordinary collection of world renown as stated by Elizabeth Galdos above.

Among the masterpieces in the DIA collection are:



Pieter Bruegel, *The Wedding Dance*

This major painting by Bruegel depicts a wedding festivity from his typical bird's-eye vantage point with a characteristic plethora of detail. It is among the best surviving examples of later Northern Renaissance painting and among this master's most important paintings.



Vincent van Gogh, *Self-Portrait with Straw Hat*

This self-portrait typifies one of the most important genres for the legendary Post-Impressionist. The self-portrait has a three-quarters pose, psychologically expressive gaze, pungent saturated color, and long dappled bushstrokes, all of which are characteristic of the artist's self-portraits.



Rembrandt van Rijn, *The Visitation*

This is a major religious painting by Rembrandt van Rijn, the most important Dutch painter of the seventeenth century. The architecture is similar to that of Rembrandt's masterpiece, *The Nightwatch*, painted around the same time but cut and altered in the nineteenth century. *The Visitation* remains unaltered, a very important consideration in valuing.



Frederic Church, *Cotopaxi*

This painting exemplifies the representation of the sublime in nineteenth-century American landscape painting. It epitomizes the artist's signature panoramic vantage

point, and stands out even from comparably well-painted Church paintings in its brilliant color.



Caravaggio, *The Conversion of the Magdalen*

The painting was made for Caravaggio's first major patron, Cardinal del Monte. Its realistic portrayal of ordinary people as models, dramatic approach to storytelling and strong value contrasts embody what a collector would expect in Baroque painting. The brilliantly painted elliptical mirror and its reflection served as an important point of departure for Baroque still life painting, and the gestures influenced many Baroque artists such as Georges de La Tour.



Mark Rothko, *Orange Brown*

This work is a classic example of Mark Rothko's style, in which large minimally modulated rectangular shapes float in an abstract space. This style of painting, called color-field painting, is a sub-style of Abstract Expressionism, and Rothko was its most prominent practitioner.



Henri Matisse, *The Window*

This painting features a classic subject for Matisse, namely an interior with a window. Characteristic of his painting style, flat planes of color are emphasized. The DIA was the first public collection in the United States to include a Matisse.



Pablo Picasso, *Melancholy Woman*

This is a significant Blue-Period painting by Pablo Picasso. The works for this series, his first mature body of work, feature cool colors, melancholy subjects, and significant attention to linear elements, all of which are present in this painting. As such, this is one of the most important paintings of Picasso's Blue Period.



Snake-dragon, symbol of Marduk, patron God of Babylon panel from the Ishtar Gate

This extremely rare glazed-brick relief is from the Ishtar Gate, a major Neo-Babylonian structure built by King Nebuchadnezzar II in honor of the Babylonian gate Ishtar. This relief depicts the god Marduk in the guise of a chimerical mixed creature. Only two other museums in the world have dragons from the Ishtar Gate; this is the only dragon in the United States.



Andy Warhol, *Double Self Portrait*

This large-scale self-portrait treats central themes in Warhol's Pop art oeuvre, namely celebrity, repetition, and the visual language of popular culture. The two-part format and the heightened color palette are signature for the artist.



Edgar Degas, *Danseuses au foyer (Dancers in the Green Room)*

This painting features ballerinas, the most important subject for Impressionist painter Edgar Degas. The asymmetrical composition of this early painting reflects his newfound interest in Japanese prints. The subject is accessible to contemporary collectors.



Henry Fuseli, *The Nightmare*

This painting is, by far, Fuseli's most important work. It is a defining monument of Romanticism, embodying the concept of the irrational and its connection to imaginative forces. It is a precocious painting, looking forward to themes that would occupy many artists in the nineteenth and twentieth centuries. It anticipates Surrealism, an important painting style for contemporary collectors. It has a place in psychology textbooks and art history textbooks alike.



James Abbott McNeill Whistler, *Nocturne in Black and Gold – The Falling Rocket*

This painting is the most important of Whistler's Nocturnes, a series of muted landscapes painted with limited palettes. This work, which closely looks forward to modern abstraction more than any other work in the series, was the subject of a major controversy and libel suit involving a foremost critic of the day, John Ruskin, who accused Whistler of "flinging a pot of paint in the public's face."

With a collection of masterpieces such as the twelve examples cited above, it is clear that any DIA sale would excite world attention no matter what generalized statements one could make about market performance within any one particular sector. A sale of such extraordinary works of art would transcend any generalized comments one might make because in point of fact there will has never been a sale comparable to that of the Subject Property.

Notwithstanding this more obvious observation, the Christie's Report did not comment on the state of the art market.

The Artvest Report mentions the topic, but it does not discuss in depth the prominence of the DIA collection.

Instead, the first part of the Artvest Report details observation on the current art market; a major source cited in the Artvest Report is the TEFAF Art Market Report prepared by art economist Clare McAndrew. (**TEFAF REPORT**)

Chinese art economist, Zhang Yi also worked on the TEFAF Report and is credited with this in the report. Mr. Zhang who also works with VWA was asked to comment on the observations made in the Artvest Report regarding the TEFAF Report. The Review of Expert Witness Report of Michael Plummer, Artvest Partners, dated July 8th, 2014, Submitted to VWA on July 25th, 2014, Prepared by Zhang Yi (***ZHANG REPORT***) is appended to this report. (*See* Attachment B.)

The Zhang Report states that the Artvest Report misstates or obscures the points raised and conclusions of the TEFAF Report.

Generally speaking, the conclusions that the TEFAF Report makes are based on heterogeneous mixed consignor sales which in many cases suffered by a paucity of excellent objects; in other words, sales which have profiles significantly different than what would be the case if there were a sale of the excellent holdings of the DIA.

Consequently, while the general observations made in the Artvest Report may or may not apply to mixed consignor sales of objects of uneven quality, a DIA sale would not fit such a profile and, as such, it is inappropriate to compare such a sale with what has taken place during the past sale season.

## THE ISSUES OF SUPPLEMENTS AND DISCOUNTS WITHIN THE CONTEXT OF MASS APPRAISALS

In the event that a valuation is predicated on the premise that a large group of similar and like items were to valued at one time in a hypothetical sales construct, USPAP Standard 6, under Mass Appraisals, instructs the appraiser to consider whether the value of the whole mass may be different than the sum of its parts.

Taking into consideration this valuation instruction, one should determine whether a supplement or a discount to a normal value would be appropriate.

## SUPPLEMENTS

Based on our discussion above, one would be justified in determining that an increase in value would be appropriate due to the extraordinary quality of works of art in the DIA collection.

In point of fact, such a sale would be the sale of any century.

VWA has taken a conservative view and have added conservative supplements to various sector of the DIA collection, which are discussed below. VWA feels justified in doing this because the "sale of any century" would consist of consistently superior items which

are distinctly different from the items which would be found in a mixed-consigner sale such as the ones in the TEFAF report cited by the Artvest Report.

The reason VWA has not applied an across-the-board supplement is because such supplements are hard to quantify.

However, it should be mentioned that Mr. Wiener was required to quantify a glamor supplement in the DeBekessy case, cited in the attached CV, in which Christie's sold a distinguished collection of French eighteenth-century furniture and decorative arts without citing provenance, publication and exhibition history, resulting in lower prices realized for the consignor than if such important factors had been cited.

Neither the Christie's Report nor the Artvest Report address the possibility of including a valuation supplement due to the DIA provenance.


## DISCOUNTS

VWA has not applied a valuation discount factor to the DIA collection, which one would normally do when valuing such a large collection of similar and like items, albeit in many diverse collecting categories, to be sold at one time. Given the nature of the DIA collection, it is unlikely that the entire collection would be sold at one time. Instead, a more likely hypothetical sale scenario would be one that takes place over time.

Alternatively, under the loan scenario presented by ACG and discussed in the Houlihan Catalogue, the DIA collection would not be sold at all, providing, of course, that the debtor would be able to repay the loan. The only way any of the works of art would be removed or sold would be if there were to be a loan default. Consequently the collection would not be valued as an organic whole or "mass" to use the terminology in USPAP Standard 6.

The Christie's Report does not address the issue of the appraisal of a mass.

The Artvest Report addresses the issue of applying a blockage discount, although it would appear that the Artvest Report ultimately rejects this, presumably because it is a draconian solution (although this point, in our opinion, is not entirely clear in the Artvest Report narrative). (*See* Artvest Report, pp. 27 ff).

The Artvest Report offers a number of different scenarii for calculating discounts which could be applied to value all 60,000 plus art holdings of the City.

These scenarii are articulated in a variety of tables. (See Artvest Report Tables 4, 5, 6, 7 pp. 28 – 7)

Economist Jannette Barth, Ph.D was asked to opine on the Artvest Report's view of blockage discount as it applied to the DIA and the supporting data use for the conclusions in the tables set forth in the Artvest Report.

Dr. Barth's conclusions are stated below and elaborated upon in the attached The Review of Expert Witness Report of Michael Plummer, Artvest Partners, dated July 8th, 2014, Submitted to VWA on July 24, 2014, Prepared by Jannette M. Barth, Ph.D., Pepacton Institute LLC (**BARTH REPORT**) is appended to this report. (*See* Attachment C.).

In brief, Dr. Barth opines that most, if not all, the discounts applied by the Artvest Report are unsustainable because of reliance upon unsupported data. The Barth Report goes through each discount the Artvest Report applies and shows that the data is either lacking or inconsistent with the conclusions reached. As such, the Barth Report concludes that the Artvest Report is unreliable.

With this in mind, one can see that the Artvest Report puts forth its own discount calculations stated in the conclusion, resulting in a discount scenario where the DIA collection would fetch between $1.1 and $1.8 billion "in the highest value scenario." (See Artvest Report, p. 48).

The Artvest Report also dismisses all expressions of interest by three potential purchasers and one potential lender as reported by Houlihan (See Artvest Report pp. 39-40).

While VWA did not have direct access to the three potential purchasers, according to Houlihan, Poly International Auction House, who expressed interest in purchasing all Chinese works for up to $1 billion, Yuan Capital, who expressed interest in purchasing 116 pieces for $895 million to $1.473 billion, and Catalyst Acquisitions/Bell Capital Partners, who expressed interest in purchasing the entire collection for $1.75 billion. VWA did have access to ACG, who offered to provide a $2 billion loan.

VWA asked Ian Peck of ACG to comment on the way the Artvest Report characterized his offer to which he replied:

> The Artvest Report, and more specifically the sections referencing ACG and its proposal to monetize the art collection of the DIA, is predictably skewed and misleading. Our proposal, which was submitted April 9, 2014, laid out interest rate ranges and loan proceed estimates in hopes of having collaborative discussions with the DIA and bankruptcy administrators. All relevant estimates were bracketed within the proposal to signify that we were open to discussion and analysis. ACG is confident that any loan against the collection for the purposes of enhanced relief to creditors will price at the lower end of the aforementioned interest rate range thereby rendering Mr. Plummer's cost estimates in Section 70 a. inaccurate. In section 70 e. Mr. Plummer again utilizes his inflated numbers to calculate debt service amounts. ACG is prepared to look at all options to provide non burdensome terms in the early years of the loan i.e. interest taken out of loan proceeds, PIK structures, etc. To be clear, ACG's proposal has no language

included that requires sales of any of the DIA collection. Further, the absence of any fees in the proposal that would reward ACG if any sales did occur should mitigate any offensive claims asserted by Mr. Plummer in section 70 g. The spirit of our proposal was and continues to be a willingness to work with all sides to find a mutually agreeable solution, thereby protecting a national treasure and allowing it to remain in Detroit whilst effecting enhanced recovery to creditors.

## VALUATION DETERMINATION:  METHODOLOGY

1. VWA valued 387 items with a low value of $3,092,419,700, high value of $4,040,303,800 and an average value of $3,566,361,750.

2. The Christie's Report, the Artvest Report, and the Winston Report valued 616 works that VWA did not value.

3. VWA believes the values of the 616 works valued by the third parties stated above are generally too low.

4. The total of the average values of the 616 works arrived at by the third parties above was $434,357,825.

5. Combined, VWA and other third parties valued 1,003 works for a total average value of $4,000,719,575 (*See* Attachment J:  Step 2 Attachment).

6. Of 17,381 DIA insurance values, 16,378 were not valued by any of the third parties.

7. Many of the DIA insurance values were arrived at during the last decade or prior (see table "Overview of Age of DIA Insurance Value For Those Works that Have DIA Insurance Value and No Third Party Values")

8. VWA determined that a market percentage appreciation is appropriate for 16,378 of the DIA insurance values because the average weighted age of the values is 11.4 years (see chart "Overview of Age of Insurance Value For Those Works That Have DIA Insurance Values and No Third Party Values").

9. In order to determine a market appreciation rate, VWA first cross-referenced DIA insurance values to works that VWA valued and compared results. There were 317 works that had insurance values that VWA had valued.

10. With respect to the 317 pieces that had both insurance values and VWA reviewed, VWA calculated the weighted average age of the DIA's insurance value to be 5.9 years and an initial DIA insurance value of $2,166,816,839. (*See* Attachment L:  Step 3 Attachment).

11.    VWA calculated the percentage change between the VWA values and the initial DIA insurance values and used that percentage as the market appreciation rate to be applied to the 16,378 works to arrive at current market value for the 16,378 works.

12.    The current market value for the 16,378 works is $1,040,125,005. (*See* Attachment L: Step 3 Attachment)

13.    For the remaining works, VWA developed a pricing matrix based on average sales price of artworks by Sotheby's and Christie's by sales department for 2013 by using the chart from Exhibit E in the Artvest Report, "Sotheby's and Christie's Unsold Rates by Sector – 2013."

14.    For reasons previously discussed in this report, particularly the unparalleled provenance of the DIA works, and the examples of recent celebrity sales, VWA believes that if the DIA collection ever were to be offered for sale at public auction, the buy-in rate for unsold lots in the categories would be essentially zero.

15.    A premium or discount was applied to most of the DIA categories.

16.    When appropriate, premiums were applied to categories within the pricing matrix to compensate for factors including the strength of many individual market sectors and the high collectability and rarity of the DIA works in those sectors.

17.    When appropriate, discounts were applied to categories in the pricing matrix to compensate for less collectible works of art.

18.    The values of the remaining 42,844 DIA works were calculated by taking the average sales price described above (see above) and also applying the premium or discount where applicable.

19.    The total value of the remaining 42,844 DIA works was determined to be $3,511,551,095.

20.    VWA has considered that an error rate in the DIA data would affect results. Until VWA can consult with the DIA on quality control issues, VWA is unable to adjust for such errors.

21.    The preliminary MCV grand total for the works in the DIA collection is $8,552,395,675 and was determined by adding (1) the total value of works in the DIA collection valued individually by VWA, (2) the total value of works in the DIA collection valued individually by independent third parties (not including VWA), (3) the projected value of works not covered by clauses 1 and 2 in this paragraph but have aged DIA insurance values which VWA

subsequently estimated for market appreciation, and (4) the total values of remaining works which were valued using the pricing matrix. (*See* Attachment H: Methodology Step by Step Chart)

22.    All values were reviewed and adjusted by internal committee.


## <u>CONCLUSION</u>

In arriving at a determination of the value by VWA of the entire holdings (over 60,000 works of art) of the DIA, the following points should be stressed:

1.    The above appraisal report is to be considered as a preliminary report of a summary nature. All notes included in the work file may or may not have been included in the report. Clearly only when they are of truly determinative importance have such notes been cited, in keeping with the report's definition as both preliminary and summary.

2.    There have been at least three other appraisal reports reviewed by VWA which have been produced in conjunction with the above cited litigation. Two of these reports, the Winston report and the Christie's report take into consideration only a small segment of the DIA collection. The Report and the Artvest Report are the only two reports that attempt to value the entire DIA collection.

3.    Of these two reports, the Report is the only report issued in compliance with the Uniform Standards of Professional Appraisal Practice.

4.    Of these two reports, this Report is the only report issued by qualified appraisers. While the Artvest Report may have used qualified appraisal consultants that report was issued by Michael Plummer who is not an appraiser.

5.    Furthermore, as evidenced by the CVs attached to the Artvest Report, neither Mr. Plummer nor his appraisal consultants show any significant museum training.

6.    At least two of the leading appraisers responsible for the Report have significant museum training – i.e. Victor Wiener who holds a Certificate in Museum Training issued jointly by the Metropolitan Museum of Art and the Institute of Fine Arts, NYU and David Shapiro, who has worked in and with museums in a variety of capacities.

7.    This Report is the only report that takes into consideration in a prominent way the great importance of the art holdings of the DIA. This is an important valuation factor, which has been almost totally ignored in the other appraisal

reports.  In fact Artvest appears to denigrate the DIA holdings by saying it contains many items of low value, which may have been dumped into the museum collection by donors.

8.      VWA has had only two weeks in which to issue the preliminary report.

9.      Because the data supplied was compromised we were obliged to engage Silar Advisors to attempt to sort the data and assist in calculations.  This is an on-going process but enough progress has been made at this point to render credible results.

10.     Because much of the analysis of the Artvest Report is dependent on work done by Clare McAndrew and her associates for the TEFAF Report, as well as economic projections.  VWA consulted with Zhang Yi, a co-author of the TEFAF Report; we also consulted with Janette Barth, a noted economist to comment on these sections.  The Zhang Report and the Barth Report are appended to the Report.  In sum, both these authorities take issue with statements made in the Artvest Report.

11.     While the Report does make a number of economic projections, the methodology employed and the limitations under the time constraints are disclosed fully within the body of this report.  Such full disclosure is not obvious to us within the text of the Artvest Report.

12.     Under the limitations cited above and within the Report and within the nature of the type of preliminary report delivered, with all its disclosures, it is VWA's opinion that the Report has arrived at credible results.  Such is the overriding principle of USPAP which stresses that appraisers must strive to maintain "public trust" and perform assignments with "objectivity, independence and without bias."  VWA strives to maintain those principles.

Executed this 25th day of July, 2014, in New York, New York.


Victor Wiener

## USPAP Appraisal Certification:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and are the impartial and unbiased professional analyses, opinions and conclusions of the appraiser.

- The appraiser has no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- The appraiser has no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- The appraiser's engagement in this assignment was not contingent upon developing or reporting predetermined results.

- The appraiser's compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- The appraiser's analyses, opinions, and conclusions were developed and this report has been prepared in conformity with the *Uniform Standards of Professional Appraisal Practice.*

- Any person who has provided significant personal property appraisal assistance to the person signing this certification is listed in the body of the report.

- The appraiser has the appropriate experience and level of competence to appraise the property which is the subject of this report and the qualifications of all who have worked on this report are stated both within the body of the report and in the *curriculum vitae* of the principal appraiser which is appended to the report.

- While the appraiser attests to the descriptions of property contained in this report, this appraisal report is not to be considered to be a statement of authenticity or a warranty of the subject property, and is limited by the extraordinary assumptions stated with inches. However, careful review of all scholarly and market sources have not revealed any doubt about the authenticity of the subject property as of the date of this report, unless specifically stated.

_____
Victor Wiener for
Victor Wiener Associates, LLC
July 25th, 2014

## <u>ATTACHMENTS</u>

A:  Curriculum Vitae of Victor Wiener

B:  Zhang Report

C:  Barth Report

D:  Select Slides from Uniform Standards of Professional Appraisal Standards course
material written by the Appraisal Foundation

E:  DIA Inventory Page, Missing Photograph Example

F:  DIA Inventory Page, Mislabeled "Unknown, American" Examples

G:  Article on *L'incanto dell'affresco*

H:  Methodology Step by Step Chart

I:  Step 1 Attachment

J:  Step 2 Attachment

K:  Step 2 Attachment Supplement

L:  Step 3 Attachment

M:  Step 4 Attachment