# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re | : | Chapter 9 |
| | : | |
| CITY OF DETROIT, MICHIGAN, | : | Case No. 13-53846 |
| | : | |
| Debtor. | : | Hon. Steven W. Rhodes |
| | : | |

## OFFICIAL COMMITTEE OF RETIREES' PRETRIAL BRIEF IN SUPPORT OF CONFIRMATION OF SIXTH AMENDED PLAN FOR ADJUSTMENT OF DEBTS FILED BY THE CITY OF DETROIT, MICHIGAN

Claude D. Montgomery
Carole Neville
DENTONS US LLP
1221 Avenue of the Americas
New York New York 10020
Tel:  (212) 768-6700
Fax: (212)-768-6800
claude.montgomery@dentons.com
carole.neville@dentons.com

Sam J. Alberts
Daniel D. Barnowski
DENTONS US LLP
1301 K Street, NW, Suite 600 East Tower
Washington, DC 20005
Tel: (202) 408-6400
Fax: (202) 408-6399
sam.alberts@dentons.com
dan.barnowski@dentons.com

Matthew E. Wilkins
Paula A. Hall
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Tel: (248) 971-1800
Fax: (248) 971-1801
wilkins@bwst-law.com
hall@bwst-law.com

*Attorneys for the Official Committee of Retirees of the City of Detroit, Michigan*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

PRELIMINARY STATEMENT ........................................................................................... 1

I.    THE EVIDENCE AT THE HEARING WILL SHOW THAT THE PLAN'S TREATMENT OF PENSION CLAIMS IN CLASSES 10 (PFRS) AND 11 (GRS) REFLECTS A PACKAGE OF REASONABLE COMPROMISES THAT RESULTED IN SUBSTANTIAL CUTS TO FUTURE PENSION BENEFIT PAYMENTS ........................................................................................................ 7

    A.    The *Allowed* Pension Claims in Classes 10 and 11 are Compromise Figures Resulting from Settlement Negotiations, And Are In Amounts Significantly Less than the *Actual* Values of Pension Claims in Each Class ........................... 7

    B.    The Impact on Retirees From the Cuts to Pensions and COLA Benefits, Compounded for Certain Retirees by the ASF Recoupment Program, Is Substantial and Permanent ................................................................................ 11

        1.    Pension Cuts ............................................................................................. 12

        2.    ASF Recoupment Impacts Thousands of Class 11 Members, And in Many Instances to a Substantial Degree ...................................................... 15

II.    THE EVIDENCE AT THE HEARING WILL SHOW THAT THE PLAN'S TREATMENT OF RETIREE HEALTH CLAIMS IN CLASS 12 REFLECTS MULTIPLE REASONABLE COMPROMISES AND FURTHER REDUCES THE RETIREES' OVERALL RECOVERY ............................................................. 16

    A.    The Disclosure of ASF Recoupment was Adequate ......................................... 17

    B.    The Formula Results For Calculation of ASF Recoupment Were Generally Known .................................................................................................. 18

    C.    The Retiree Affected By ASF Recoupment Received Notice of The ASF Recoupment Calculation ................................................................................ 20

    D.    ASF Recoupment is Not a Recovery ................................................................ 22

    E.    The Vested OPEB Rights ................................................................................. 23

    F.    The Actual Value of the OPEB Claims is Approximately $5 Billion to $8 Billion ............................................................................................................ 25

    G.    The Plan Relieves the City of Responsibility for Post-Effective Date Retiree Healthcare Benefits and Should Be Approved ................................................... 27

ii

III. IN ADDITION TO THE DEVASTATING CUTS RETIREES FACE IN
PENSION AND OPEB BENEFITS UNDER THE PLAN, THERE IS LITTLE
DOUBT THAT ANY DEEPER CUTS WOULD RENDER THE PLAN NOT
FEASIBLE ............................................................................................................... 26

IV. THE OBJECTIONS OF THE DWSD PARTIES SHOULD BE OVERRULED ....... 29

V. THE COURT SHOULD APPROVE THE 6.75% RATE AS A CONSERVATIVE
ASSUMPTION FOR PENSION INVESTMENT RETURNS AND DISCOUNT
FOR FUTURE BENEFITS AND CONTRIBUTIONS ............................................. 31

CONCLUSION .......................................................................................................................... 33

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re A & C Props.*,
784 F.2d 1377 (9th Cir. 1986) ............................................................12

*In re Accredited Home Lender Holding Co.*,
441 B.R. 443 (Bankr. D. Del. 2011) ....................................................11

*In re Bard*,
49 Fed. Appx. 528 (6th Cir. 2002)........................................................12

*In re Bath Bridgewater South, LLC*,
2012 Bankr. LEXIS 4353. (Bankr. E.D. N.C. Sept. 20, 2012)................26

*Bender v. Newell Window Furnishings, Inc.*,
681 F.3d 253 (6th Cir. 2012) ...............................................................30

*Boyd v. Engman*,
404 B.R. 467 (W.D. Mich. 2009) .........................................................12

*Buchwald Capital Advisors, LLC v. Papas (In re Greektown Holdings, LLC)*,
475 B.R. 563 (E.D. Mich. 2012), *aff'd in part and vacated in part,* 728 F.3d
567 (6th Cir. 2013)................................................................................12

*Cole v. ArvinMeritor, Inc.*,
549 F.3d 1064 (6th Cir. 2008) ..............................................................30

*In re Commonwealth Group-Mocksville Partners, LP*,
2013 Bankr. LEXIS 1648 (Bankr. E.D.Tenn. April 22, 2013)................27

*In re Crosscreek Apartments, Ltd.*,
213 B.R. 521 (Bankr. E.D. Tenn. 1997) ...............................................34

*In re Dow Corning Corp.*,
255 B.R. 445 (E.D. Mich. 2000), *aff'd,* 280 F.3d 648 (6th Cir. 2002)....................34

*Hindelang v. Mid-State Aftermarket Body Parts, Inc. (In re MQVP, Inc.)*,
477 Fed. Appx. 310 (6th Cir. 2012).......................................................12

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Yard-
Man, Inc.*,
716 F.2d 1476 (6th Cir. 1983) ..............................................................30

*Jack Burton Management Co.*,
77 F. Supp. 2d 1106 (E.D. Mo. 1999); *aff'd,* 242 F.3d 375 (8th Cir. 2000) ............................11

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987)...........................................................................3, 15

*Lenders Prot. Group v. USA Commer. Mortg. Co. (In re USA Commer. Mortg. Co.)*,
    2007 WL 2571947, 2007 U.S. Dist. Lexis 65264*38 (D. Nev. August 29, 2007) ........................................................................................................................28

*In re Monnier Bros.*,
    755 F.2d 1336 (8th Cir 1985) .............................................................................26

*In re Quigley Co.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007) ................................................................16

*In re Snyders Drug Stores, Inc.*,
    307 B.R. 889 (Bankr. N.D. Ohio 2004) ..............................................................16

*Welch v. Brown*,
    935 F. Supp. 2d 875 (E.D. Mich. 2013), *aff'd,* 551 Fed. Appx. 804 (6th Cir. 2014) ....................................................................................................................30

**Rules & Statutes**

Fed. R. Bankr. P. 7001(7) ....................................................................19, 27, 29

Fed. R. Bankr. P. 9019 ...............................................................................19, 31

11 U.S.C. § 901 ...............................................................................................2, 5

11 U.S.C. § 943 ...................................................................................................5

11 U.S.C. § 943(b) ..............................................................................................2

11 U.S.C. § 1125 ...............................................................................................26

11 U.S.C. § 1126 ...............................................................................................29

11 U.S.C. § 1129 .................................................................................................5

11 U.S.C. § 1129(a) .............................................................................................2

11 U.S.C. § 1129(a)(3) .......................................................................................15

11 U.S.C. § 1129(b) .............................................................................................2

11 U.S.C. § 1129(b)(1) ........................................................................................8

11 U.S.C. § 9019 ...............................................................................................12

Detroit City Charter § 7-1203 ................................................................................................35, 36

Detroit Code §§ 13-8-1 to -3...........................................................................................................29

Detroit Code §.47-1-18 (2010) .......................................................................................................22

M.C.L. § 141.1558............................................................................................................................15

MCL 38.1133(6) ..............................................................................................................................20

Pursuant to the Eighth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment, signed August 13, 2014 [Dkt. No. 6699], the Official Committee of Retirees of the City of Detroit, Michigan (the "Committee") submits this pretrial brief outlining the testimony and other evidence the Committee anticipates offering at the hearing on confirmation with respect to the Sixth Amended Plan for Adjustment of Debts of the City of Detroit (the "Plan") [Dkt. No. 6908] filed on August 20, 2014, and specifically in response to the objections of the DWSD Parties and the COPs Parties, as defined below, relating to the treatment of retiree claims under the Plan. The Committee previously submitted the Official Committee of Retirees' Memorandum of Law in Support of Confirmation of Fifth Amended Plan for Adjustment of Debts Filed by the City of Detroit, Michigan, dated August 4, 2014 (the "Committee Legal Memorandum" or "Comm. Legal Mem.") [Dkt. No. 6508], which is incorporated herein by reference. As the Court knows, the Committee supports confirmation of the Plan, and respectfully states as follows:

## PRELIMINARY STATEMENT

As the Court is aware, the retirees have voted in favor of the Plan's treatment of Classes 10, 11 and 12. Thus, the Committee will seek to be heard only on a limited number of issues that will arise in the upcoming confirmation hearing. Instead, the Committee will stand on the arguments advanced in its Committee Legal Memorandum, as well as the evidence offered by the City in support of the treatment of Classes 10, 11 and 12, and itself, offer only evidence that demonstrates the treatment of Classes 10, 11 and 12 meets the confirmation requirements of Code section 1129(a) and (b), incorporated into chapter 9 by sections 901 and 943(b), or otherwise relates to issues relevant to the retirees' interests.

These confirmation objections in large part arise from the Class 9 holders of certificates of participation: the Detroit Retirement Systems Funding Trust 2005 Certificates of Participation Series 2005-A; the Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A; the Detroit Retirement Systems Funding Trust Series 2006-B; ("COPs") and their insurers (together, the "COPs Parties"), the DWSD bondholders, their insurers and three counties (Macomb, Oakland and Wayne, (the "Counties")) whose commercial and individual residents are indirect retail customers of DWSD (together with the DWSD bondholders, the "DWSD Parties"). There is an additional question related to the appropriate assumed rate of investment return and present value discount for benefits and contributions raised by the Court's feasibility expert, Martha E.M. Kopacz, which warrants further discussion.

The majority of objections of the COPs Parties and others are addressed in the Committee Legal Memorandum (pp. 3 - 5, 28, 35, 39, 42 - 48) and need not be detailed here. Among their most strenuous complaints, however, is the COPs Parties' objection that the Plan discriminates unfairly against them, primarily through a purportedly greater and less-risky recovery for the pension claims in Classes 10 and 11,[2] which those parties complain is compounded by an overstatement of the value of those pension claims.[3] As detailed below and as will be shown from the evidence at the hearing, the COPs Parties' arguments as to alleged unfair discrimination are based on either factual errors or distortions.

In this regard, the Committee submits the evidence at the hearing will show: (1) the disparity between Plan distributions on COPs Parties claims and retirees' pension claims is not

---

[2]    As the Court is aware, the Plan's reductions in pension benefits include across the board cuts to Class 10 and 11 pension benefits in the form of reduced or eliminated annual escalators ("COLA"). For Class 11 GRS retirees, the Plan provides an additional 4.5% across the board pension cut.

[3]    *See* COP Holders' Objection to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit. [Dkt. No. 4653] pp. 6-13. *See also* Syncora Capital Assurance Inc. and Syncora Guarantee Inc.'s Objection to the Debtor's Plan of Adjustment, [Dkt. No. 4679] pp. 30-31.

significant, particularly when the retirees' actual pension-claim values, pension trust assets,[4] the non-City contributions[5] and the lost OPEB (other post-employment benefits) are accounted for;[6] (2) in the interest of reaching a consensual Plan for the benefit of all the City's constituencies, if this Plan is confirmed the retirees agreed to withdraw their appeal of the Court's eligibility ruling, specifically addressing the Michigan Constitution's Pension Clause, a reversal of which could have increased retirees' pension distributions but doomed any consensus-based City restructuring and revitalization; and (3) without the Plan's minimal level of pension payments allowing tens of thousands of retirees and their dependents to survive, the active employees and other communities within the City would likely also lose faith and the incentives to work together rebuilding the City, eliminating the feasibility of any such plan.  In sum, disparate treatment of the retirees is not "unfair" discrimination.  The Plan's treatment is made possible by existing plan assets held by the Retirement Systems and additional consideration in the form of supplemental contributions from the City and third parties. The retirees are paying a dear price for the Plan's treatment of their claims and the consideration received from third parties, but no plan or revitalization of the City would be feasible without protecting the retirees.

One key aspect of  understanding the extent of the retirees' aggregate claims and refuting the unfair-discrimination argument is the retirees' loss of OPEB benefits. On this point, the City

---

[4]    It is not unfair discrimination to give the retirees benefits paid with the assets of the pension trusts. Kevyn Orr testified that one of the factors that determined the retiree benefits was the fact that pension plans had assets to pay those benefits. See Orr Dep. at 206:3-16 (July 22, 2014): Q. So the existence of assets in the retirement systems was something that you considered in your discrimination analysis, in your decision to propose a plan that discriminates. A. In my decision to propose a plan that provided different payout levels for creditors, yes.

[5]    As shown below, an objection based on an unfair discrimination claim is limited to the distribution of assets of the debtor, and should not consider any distributions from non-debtor third parties.  *See In re Jersey City Med. Ctr.,* 817 F.2d 1055 (3d Cir. 1987).

[6]    As detailed below, the testimony of  Kim Nicholl from the Segal Company, with over 30 years of experience as an actuary in public sector pension plan financing, will clarify the facts surrounding the actual value and treatment of the pension claims generally and will address the above pension issues, demonstrating no unfair discrimination results from the Plan.

will present the expert testimony of Suzanne Taranto of Milliman, who will testify as to the City's and Committee's differing views as to the actual value of the OPEB claims in Class 12, as well as the reasonableness of both of their positions, to demonstrate the reasonableness of the settled claim amount and to assist the Court's understanding of the negotiated compromise underlying the allowed claim for that class.

A separate set of objections comes from the DWSD Parties[7] who argue, without support from the express language of the provisions of the bond documents or historical practice, that the post-Effective-Date DWSD contributions to the GRS pension plan violate the provisions in the indentures of the water and sewer bonds, governing ordinances, and Sixth Circuit law. They contend that the DWSD contributions strip liens and impair the ability of the DWSD to make the payments on the bonds or provide services at the going rates. These arguments not only misread the operative documents, but also ignore crucial realities that (a) the contributions to the GRS pension plan make up for the historical underfunding from DWSD for its own retirees, and (b) DWSD operations and finances are significantly improved under the Plan. Despite DWSD's and the rate payers obligation to pay for 100% of the costs and expenses of its workforce. The Counties speculate, without any evidentiary support, that catch-up payments to the General Retirement System from DWSD will divert funds from improvements to the system (in violation of Michigan law and the operative documents) and result in higher rates for the actual ratepayers.

While the COPs Parties and the DWSD Parties argue that the retirees are being treated too well, hundreds of retirees have attacked the Plan based on the severity of the cuts to their

---

[7]     A recent proposed settlement reached by the City, the Committee and various other DWSD Parties may moot a significant number of the DWSD objections. As detailed in the City's Proposed Financing and Settlement Motion, [Dkt. No. 6644] ¶ 24, in essence and to the extent relevant to the Committee, under this proposed settlement the DWSD promise to fund 100% of its required UAAL contribution to GRS remains in tact. It will pay the GRS up to $24 million annually (plus the DWSD's share of defined contributions for DWSD employees) from the Operations and Maintenance Fund (which maintains priority over certain DWSD bond obligations), with the remaining annual GRS contributions ($24 million) being made from a fund that is subordinate to certain bond obligations.

pension and health care benefits.  As the Court reported, there have been approximately 600 individual objections that report the personal hardships faced by retirees as a result of the cuts.[8] The Court devoted an entire day to testimony of these individual objectors. Their proffered testimony on the limited impact of restoration on benefits never paid contradicts the COPs Parties' wildly inaccurate contention that the retirees are receiving 100 percent or more of their promised benefits.

Many of the objections filed by individuals analyze the Plan treatment of retirees in Class 11, particularly the deduction of the Annuity Savings Fund ("ASF") Recoupment Amount from their pensions, in light of the confirmation requirements of Code sections 901, 943 and 1129. They contend, among other things, that ASF Recoupment was not adequately disclosed, violates classification requirements of the Code, conflicts with Michigan law and violates their constitutional rights.  The provisions regarding ASF Recoupment are part of the overall compromise of GRS pension claims that, among other things, reduces the across the board pension cuts to all Class 11 members and settles the City's asserted claims to recover excess interest paid to retirees at a reduced amount.  As a result of negotiations, in lieu of litigation to recover excess interest, the City reduced the proposed recoupment period from 1999-2013 proposed in the first version of its plan to 2003-2013 in the current version.  In addition, the City limited the recovery to 20% of a retiree's largest annuity savings account balance during that period.  The Committee negotiated a second cap on the total deductions from any retiree's pension and a lump sum option for the repayment of the ASF Recoupment Amount to eliminate lifetime pension deductions.  The method of calculating ASF Recoupment was detailed in the Disclosure Statement, the special supplement sent to retirees and as reported to the Court, in

---

[8]    *See* Notice of Hearing To Individuals Who Filed Plan Objections [Dkt. No. 5264].

numerous communications sent to retirees. The Class 11 ballot set out the amount of the recoupment as a gross number and as annuitized overtime. With that information the members of Class 11 voted to accept the Plan settlements.

Additionally, despite the deferral contribution plan nature of the ASF Program, the COPS Parties also argue any portion of the ASF individual account balances in excess of the actual earnings for the relevant years (approximately $387 million) should reduce Class 11 members' defined benefit plan claims as a setoff.

Finally, in her Expert Report, dated July 18, 2014 (the "Kopacz Report"), Ms. Kopacz voices concerns over the 6.75% rate for both the assumed investment rate of return and the discount rate for future liabilities (Kopacz Report p. 145 - 147). Ms. Kopacz concedes the 6.75% rate for assumed investment returns is lower than most municipal plans and, as the rate to discount liabilities, it "appears to be conservative" (Report pp. 135, 146), but also offers arguments for a risk-free rate. Ms. Kopacz subsequently clarified at her deposition that she was not suggesting that a risk-free rate should in fact be used for plan funding purposes, but rather that the valuation resulting from use of a risk-free rate should be disclosed. The Committee submits that the testimony of Ms. Nicholl on this point should help resolve the concerns Ms. Kopacz has raised regarding the use of risk-free rates to determine claim values—i.e., a disclosure obligation versus the City's ability to meet its future pension funding obligations.

Based on the above, and on the authorities and arguments set forth in the Committee Legal Memorandum, the Committee respectfully requests that the Court overrule the objections to confirmation of the Plan.

I. **THE EVIDENCE AT THE HEARING WILL SHOW THAT THE PLAN'S TREATMENT OF PENSION CLAIMS IN CLASSES 10 (PFRS) AND 11 (GRS) REFLECTS A PACKAGE OF REASONABLE COMPROMISES THAT RESULTED IN SUBSTANTIAL CUTS TO FUTURE PENSION BENEFIT PAYMENTS**

As the Court is aware, the treatment of pension claims in Classes 10 (PFRS pension claims) and 11 (GRS pension claims) under the Plan is the product of a number of mediation sessions involving retiree representatives, the Emergency Manager, and State representatives. While the Objectors seek to minimize the impact of the cuts that resulted from these settlements, the agreed-to cuts are both drastic and painful.

    A. **The Allowed Pension Claims in Classes 10 and 11 are Compromise Figures Resulting from Settlement Negotiations, And Are In Amounts Significantly Less than the Actual Values of Pension Claims in Each Class**

The Plan allows the pension claims, calculated as of June 30, 2013, in the amounts of $1.250 billion and $1.879 billion for the Police and Fire Retirement System ("PFRS") and the General Retirement System ("GRS"), respectively. *See* Plan II.B.3.q.i. and II.B.3.r.i. As noted above, one of the objections of the COPs Parties is that these amounts overstate the claims in Class 10 and 11, such that the recovery on Class 10 and 11 claims constitutes unfair discrimination under 11 U.S.C. §1129(b)(1).[9] These objections confuse the calculation of pension liability for contribution purposes and calculation of pension liability for claim allowance and recovery purposes.

Evidence at trial will show that the above amounts for the allowed claims for contribution purposes were calculated by the City's actuary, Milliman, using the 6.75% interest rate and the Entry Age Normal ("EAN") cost method to arrive at the Plan's underfunding. Under the EAN

---

[9]    The Macomb Interceptor, which holds a disputed claim in Class 14 that has been allowed for voting purposes, has also challenged the treatment of retiree claims on unfair discrimination grounds.

method, the present value of benefits for active employees is based on their projected salary history as of their projected termination date, determined on an actuarial basis. For retirees, who make up the majority of classes 10 and 11, no projections are involved as their work and salary history are already known. In no case are any portions of the allowed claim amounts allocable to years of service that have not in fact been worked (*i.e.*, the allowed amounts do not cover any future years of service). The Retiree Committee's expert, Kim Nicholl from the Segal Company, will testify that the Milliman calculation of the claims using this EAN method is actuarially appropriate for valuing a pension plan's unfunded accrued actuarial liability ("UAAL") in order to determine the amount of underfunding that will have to be made up from sources other than the value of the assets, and, indeed, is **required** under the plan rules for both GRS and PFRS. (Expert Report of Kim Nicholl, dated July 22, 2014 ("Nicholl Report") ¶¶ 73, 90 - 93).[10] The City has described the settled-upon 6.75% rate as a conservative investment rate and:

> [A]s a measure to ensure that both GRS and PFRS utilize prudent and conservative investment policies going forward to protect the assets in both pension plans from unnecessary and imprudent risk of depletion to the detriment of the plan beneficiaries and also to insulate the City -- given its extremely limited cash reserves -- from unforeseen and unbudgeted increases in required future contributions to the pension plans that could cause the City to experience budget deficits in the future.

(Disclosure Statement [Dkt. No. 4391] at 28 of 197)[11]

Ms. Nicholl will further testify that Milliman's use of the 6.75% discount rate for these purposes is consistent with accepted actuarial principles, because it was prescribed by the City (and thus was a "prescribed assumption" within the meaning of the applicable Actuarial

---

[10]    The Nicholl Report was served on the City and the objectors on July 22, 2014, but not filed on the docket. Per the Court's instructions, it has not been filed with this brief as an exhibit.

[11]    As noted above, this 6.75% rate was the result of settlement. The City originally proposed even lower investment/discount rates of 6.5% for PFRS and 6.25% for GRS, which would have resulted in steeper pension cuts.

Standards of Practice which Milliman was not only permitted but required to use). The 6.75% rate, while at the low end of the range of rates being used for contribution funding by public pension plans in general, is far higher than the rate properly used to determine claim value.

At the same time, while using the 6.75% rate and EAN method is appropriate for calculating UAAL for Plan and future contribution purposes, the resulting settlement amounts for the allowed claims are lower than the *actual* value of such claims for members of Classes 10 and 11. As Ms. Nicholl stated in her July 22nd Report and will confirm in her testimony at the hearing, the *actual* values of the claims in Classes 10 and 11 are considerably higher than the *allowed* values calculated by Milliman at the 6.75% rate. As a result, the allowed amounts reflect a significant compromise of those classes' claims. Contrary to the contentions of the COPs Parties, the holders of the pension claims (i.e., for promised benefits) in Classes 10 and 11 are the individual retirees, not the Retirement Systems.

More specifically, Ms. Nicholl will make the following points in her hearing testimony, as she set out in her Report (pp. 29 - 34, ¶¶ 71 - 82):

- The difference in the calculated settlement amounts and the actual claim values is due primarily to the discount rates used. Under accepted Actuarial Standards of Practice, in selecting a discount rate, the actuary should consider the purpose for which the discount to present value is being made.[12]

- From the class 10 and 11 perspective, the retirees' claims for pension benefits were based on unconditional promises by the City to pay pension benefits, which were free from risk of non-payment. Therefore, the appropriate discount rate is not the Plan's expected or targeted investment rate of return as is used in calculating UAAL, but rather should be a risk-free rate or yield curve such as Treasury strips.[13]

---

[12]    Actuarial Standard of Practice Number 27 ("ASOP 27") recommends that the actuary consider the purpose of the measurement or valuation and the perspective of different parties as the factors in determining the appropriate discount rate. (Nicholl Report ¶¶75-76).

[13]    *See, e.g., Jack Burton Management Co.,* 77 F. Supp. 2d 1106, 1109 - 1110 (E.D. Mo. 1999), (risk-free discount rate should be used to value future contract payments) *aff'd,* 242 F.3d 375 (8th Cir. 2000); *In re Accredited Home*

- The "Treasury Strips" yield curve, as described by Ms. Nicholl, recently has ranged from 0.10% for one year to 3.29% for thirty-years..

- Also, instead of the EAN method which can only be used with a single discount rate, the preferable method of determining the claim amount from the claimants' perspective is Present Value of Future Accrued Benefits ("PVFAB"), which discounts projected payments using spot rates which vary by year. As applied here, the PVFAB method (like the EAN method) calculates the present value of expected benefits for active employees at projected decrement dates (*e.g.*, retirement or death) and projected salary based on actuarial assumptions; without any projected changes for retirees because their benefits are known and fixed. Here too, with the PVFAB method, no benefits for future service are included.

- Using the PVFAB method and the yield curve for Treasury strips, the actual value of the claims of PFRS (Class 10) members is $3.871 billion ($6.906 billion present value of future accrued benefits, minus $3.035 billion in plan assets), which is **$2.621 billion more** than Class 10's allowed claim of $1.250 billion in the Plan.

- Using the same PVFAB method and yield curve for Treasury strips, the actual value for of the claims of GRS (Class 11) members is $3.541 billion ($5.138 billion present value of future accrued benefits, minus $1.597 billion in plan assets), which is **$1.662 billion more** than Class 11's allowed claim of $1.879 billion in the Plan.

Thus, the Allowed Claims of Classes 10 and 11 as defined in the Plan are over $4 billion less than the actual values of the total claims in those classes. As Ms. Nicholl will confirm at the hearing, by reference to the City's Disclosure Statement the allowed claim values and the discount rates upon which they were calculated, appear to be the result of extensive arms-length negotiations (*See* Nicholl Report ¶ 67). Mr. Ron Bloom and Ms. Terri Renshaw can be expected to provide similar testimony.

As such, the allowed claim values fall easily within the standards in this jurisdiction for approval of compromises under Bankruptcy Rule 9019. Settlements are favored over the expense and burden of litigation. *See Hindelang v. Mid-State Aftermarket Body Parts, Inc. (In re MQVP, Inc.),* 477 Fed. Appx. 310, 312 (6th Cir. 2012) ("The very purpose of such a compromise

*Lender Holding Co.,* 441 B.R. 443, 451 (Bankr. D. Del. 2011) (to calculate the present value of a claim based on a stream of future payments, the risk-free discount rate should be used).

agreement 'is to allow the trustee and the creditors to avoid the expenses and burdens associated

with litigating sharply contested and dubious claims.'" (citing *In re Bard*, 49 Fed. Appx. 528,

530 (6th Cir. 2002)) (quoting *In re A & C Props.*, 784 F.2d 1377, 1380-81 (9th Cir. 1986)).

Although the court must be apprised of the relevant facts and the law underlying the settlement,

it need not conduct a mini trial to determine whether the settlement is fair and reasonable.[14]  In

approving the settlement, the Court may also consider whether the settlement is the product of

arms' length negotiations.  *See Buchwald Capital Advisors, LLC v. Papas (In re Greektown*

*Holdings, LLC),* 475 B.R. 563, 584 (E.D. Mich. 2012), (testimony established that the settlement

was the product of arms' length negotiation), *aff'd in part and vacated in part,* 728 F.3d 567 (6th

Cir. 2013).  The court may also consider the benefit to the estate.  *Boyd v. Engman*, 404 B.R.

467, 479 (W.D. Mich. 2009).

Recognizing the above-detailed substantial compromises of the actual values of the Class

10 and 11 pension claims, the importance of the calculation to the package resolution of benefits

reduction, the avoided expenses and burden of litigation, the results being the products of arms-

length negotiations and the benefit to the City, the Court should approve the Class 10 and 11

claims in the agreed-upon amounts set forth in the Plan.

**B.     The Impact on Retirees From the Cuts to Pensions and COLA Benefits,**
**Compounded for Certain Retirees by the ASF Recoupment Program, Is**
**Substantial and Permanent**

The Objectors have argued that the pension settlements do not actually reduce the

retirees' pensions, but the evidence at the hearing will demonstrate the opposite.  Aside from the

---

[14]   In addition, in determining whether to approve a settlement where there is litigation or the likelihood of
litigation, the courts in this jurisdiction consider: (a) the probability of success in the litigation; (b) the difficulties, if
any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense,
inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference
to their reasonable views in the premises. *See Bard*, 49 Fed. Appx. at 530.

above-noted roughly $4 billion decrease in value of the retirees' pension claims to the allowed amounts, the retirees are facing meaningful cuts in current and future monthly pension benefits.

### 1. Pension Cuts

The evidence at the hearing will show that Class 11 GRS retirees and beneficiaries will experience under the Plan a 4.5% reduction in their pension payments, and the elimination of all the annual escalator ("COLA") benefits. All Class 10 PFRS retirees face a cap on their COLA benefits. While certain objectors complain that no COLA should be maintained at all, even in the reduced amount for certain PFRS retirees, the fact is that COLA benefits were promised in retirees' collective bargaining agreements ("CBAs"). The inescapable fact is the Plan's cuts to retiree pension benefits are substantial.

Ms. Nicholl will illustrate in her testimony the reduction and loss of COLA for PFRS and GRS claimants, respectively, and will confirm these changes are significant concessions on the part of the affected retirees and provide commensurate benefits for the City. Gaurav Mulhotra estimated the value of the freeze, elimination of COLA, the 4.5% cut and ASF Recoupment for GRS at "somewhere between …$900 million to a billion." (*See* Mulhotra Dep. at 186: 15-25 July 15, 2014). He estimated the value of the COLA reduction for PFRS at roughly $400 million and the freeze at $55 million. (*Id.* at 187: 2-7).

Specifically, as outlined in her Report (¶¶ 55 - 65), Ms. Nicholl will make the following points concerning the Plan's changes to COLA:

- Until now, retiree COLA rights have been guaranteed and determined by various formulas in their collective bargaining agreements.[15]

---

[15] Depending on the date of retirement and employee election, COLA for PFRS is based upon different formulas. For the most part, the COLA for PFRS retirees are compound, which means that COLA is based upon each year's prior benefit amount. (Nicholl Report ¶ 61). The COLA for GRS is simple so that the benefit increase each year as a result of COLA is the same.

- As an example of the losses retirees are facing, the average GRS retiree pension benefits average about $20,000 per year, which for a hypothetical recent retiree would reach $33,500 after thirty years with COLA; whereas under the Plan, without COLA, obviously that average pension stays at $20,000 after thirty years, which (in nominal dollars) equates to roughly a 40% loss of benefits in that 30th year assuming no partial restoration of COLA (Nicholl Report ¶ 55 and Chart 55).

- In present value terms, the total loss in pension benefits due to the COLA reductions for the GRS retirees is $616 million. (Nicholl Report ¶ 56). While the actual reduction in the present value of pension benefits for individuals due solely to loss of COLA varies by gender, current age and other factors, the average reduction in the present value of pensions for GRS retirees due solely to COLA is 16.2% of benefits, and in combination with the direct pension cuts, is 22.3% of benefits (Nicholl Report ¶¶ 57-58).

- The reduction of COLA for the police and firefighters, who are subject to comparatively young mandatory retirement ages and do not have the backstop of social security benefits with cost of living adjustment, is a substantial loss. Using a hypothetical recent police retiree with an average $30,000 in pension benefits as an illustration, her pension could be expected to increase to $58,482 in thirty years, but with only 45% of the original COLA that pension only reaches $40,586 (in nominal dollars, roughly two-thirds the 100% COLA amount) after the same period. (Nicholl Report at ¶¶ 64 - 65 and Chart 62A). The present value of the COLA reductions for PFRS retirees is $688 million.

- The average reduction for PFRS is 12.7% of benefits.

These facts make clear the loss or reductions of COLA are substantial and painful concessions by the claimants in Classes 10 and 11, which should be weighed in assessing those classes' recovery under the Plan.

The COPs Parties' accusations that the so-called "Grand Bargain" reflects the State's and others' favoritism in favor of retirees is also refuted by the facts and events recognized by this Court in the Opinion Regarding Eligibility, dated December 5, 2013 [Dkt. No. 1945] (the "Elig. Op."), proving the widespread adversity to the City's retirees' interests, including:

- under the recently passed Public Act 436 (M.C.L. § 141.1558), the City's pension obligations were no longer protected by the Pension Clause of the Michigan Constitution (Elig. Op. at 92 - 93);

- although the governor had the authority to include a contingency in his order that the City could proceed with chapter 9, he declined to include that protection (Elig. Op. at 94); and

- the original purpose of the filing was to reduce active and retiree retired accrued pension benefits (Elig. Op. at 112).

- the City did not negotiate in good faith prior to filing its Chapter 9 petition (Elig. Op. at 119).

The COPs Parties' "favoritism" argument should not be credited.

The COPs Parties' arguments alleging unfair discrimination are also misplaced in attacking the distributions to Classes 10 and 11 that originate with the State, the DIA and other third-party contributors under the Grand Bargain. An unfair discrimination analysis requires the Court to distinguish between assets that are property of the debtor and assets contributed by third parties. *See In re Jersey City Med. Ctr.,* 817 F.2d 1055 (3d Cir. 1987) (plan confirmed over Code section 1129(a)(3) objection when recovery for only certain classes was made available by third parties); *In re Quigley Co.,* 377 B.R. 110, 116-17 (Bankr. S.D.N.Y. 2007) (no unfair discrimination where the settlement funds are from a non-debtor and being paid outside the plan); *see also In re Snyders Drug Stores, Inc.,* 307 B.R. 889, 894 (Bankr. N.D. Ohio 2004) (a "preliminary question is whether the proposed distribution comes from property of the estate[ ]"). ***Excluding contributions from the State, the DIA and other third-party contributors, based on the actual value of the retiree claims from the retiree perspective (discussed above in section I.A.), and the present value of the City's contributions, the recovery rate for GRS retirees is 31.7% and for PFRS is 17.6%*** (*See* Nicholl Report ¶98). The percentage recovery for retirees under the Plan should also factor in their recovery on their OPEB claims (discussed below), which the evidence will show will significantly reduce the percentage recovery. Based

on the value of claims alone, the difference in recoveries under the Plan among the classes is not disproportionate; nor is it unreasonable in light of the issues and risks facing the City.[17]

It must also be noted that the primary source for payment of the benefits to retirees under the Plan are the assets of the pension plan. Multiple witnesses, including Greg Bowen and Ms. Nicholl will testify that, as of June 30, 2014, PFRS held approximately $3.035 billion and GRS held $2.597 billion in plan assets an a market value basis.

### 2. ASF Recoupment Impacts Thousands of Class 11 Members, And in Many Instances to a Substantial Degree

As noted in the Committee Legal Memorandum (pp. 10 - 12), in addition to the above pension cuts, the Plan continues to provide for ASF Recoupment with the goal of recovering approximately $231 million (present value) for distribution to GRS retirees who would otherwise face deeper pension cuts. The Committee supports the recoupment, on the negotiated limited terms set forth in the Plan, because the recoupment avoids deeper cuts for a broader segment of GRS retirees. The impact of ASF Recoupment has been analyzed by Ms. Nicholl and others at Segal, which impact was discussed in the Nicholl Report (¶¶ 45 - 54), and which the Committee expects will also be covered in Ms. Nicholl's hearing testimony.

---

[17]The Committee anticipates there will be evidence at the hearing that the Committee considered the impact of the reductions in benefits and the recoveries in all of Classes 10, 11 and 12 in reaching a global settlement. The evidence will further show that the Committee would not have settled but for the global settlement of all three classes; and that the global treatment was an integral part of the settlement.

The ASF Recoupment provided in Class II is an integral part of the Class settlement the Plan of Adjusters Rule § 9019 and 7001(7) permit such a settlement.[18] Such an approach is also appropriate under Michigan law. It is clear that under the exclusive-benefit rule embodied in MCL 38.1133(6) of the Public Employee Retirement System Investment Act (PERSA), accounts such as the ASF funds here may only be used for the exclusive benefit of the participants and their beneficiaries, *Wayne County Employees Retirement System v. Wayne County*, 301 Mich. App. 1, 836 N.W.2d 279 (Mich. Ct. App. 2013), *app. granted,* 495 Mich. 983, 843 N.W.2d 924 (2014) (county ordinance invalid to extent it sought to take a credit against retirement system assets). By effectuating a class settlement, which minimizes across the board cuts, settles costly litigation and limits the downside risk to each retiree, the essence of the exclusive benefit rule has been achieved.

II. **THE EVIDENCE AT THE HEARING WILL SHOW THAT THE PLAN'S TREATMENT OF RETIREE HEALTH CLAIMS IN CLASS 12 REFLECTS MULTIPLE REASONABLE COMPROMISES AND FURTHER REDUCES THE RETIREES' OVERALL RECOVERY**

The Plan's treatment of retiree OPEB (Other Post-Employment Benefits) claims is also the product of negotiation between the City, the Committee and other retiree representatives. As the history of the OPEB claims and related litigations in this Court were detailed in the Committee Legal Memorandum (pp. 15 - 28), that history will not be repeated here. Rather, the Committee here will provide an overview of the vested OPEB claims, the actual value of the OPEB claims, and how the retirees' health care will be addressed going forward.

A. **The Disclosure of ASF Recoupment was Adequate**

Pursuant to the City Ordinances, the GRS offered employees the option to contribute zero percent (0%), three percent (3%), five percent (5%), or seven percent (7%) of their annual

---

[18] See *In re Commerical Mortgage Corp.*, supra at 40.

compensation to an annuity savings fund, which amount was deducted from their compensation. On retirement, the accumulated contributions with interest were transferred from the Annuity Savings Fund to an Annuity Reserve Fund to be paid out to the plan participant, refunded to him or her, or distributed in some combination thereof. Prior to 2011 when the Ordinance was amended, the GRS Board had discretion to credit additional interest over and above the "regular interest" and to take the excess interest from the pension fund as follows:

> Whenever the balance of the Income Fund is more than sufficient to cover current charges to the fund, such excess amount may be used for contingency reserves or may be transferred to any of the other Charter-created funds of the Retirement System within this Article II except the Expense Fund, to cover special needs of the Funds as the Board shall determine; provided, however, that in determining whether the balance of the Income Fund is more than sufficient to cover current charges to the Fund, the balance credited to any Accrued Liability Fund shall not be taken into account. In the event the balance in the Income Fund is insufficient to cover the charges to the Fund, the amount of the insufficiency shall be transferred from the Pension Accumulation Fund." (emphasis added).

Detroit Code Sec.47-1-18 (2010)

ASF Recoupment is the remedy in the Plan for recovery of the excess interest taken from the defined benefit plan funds and paid over to the employees' annuity savings accounts. Several thousand retirees and vested active GRS employees will be subject to ASF Recoupment based on excess interest attributed to their accounts or withdrawn during the period from July 1, 2003 through June 30, 2013 in addition to the 4.5% across the board reduction and loss of COLA. Although these pension reductions under the Plan are harsh for the retirees, the more severe potential alternatives compelled the legal and economic compromises negotiated by the retiree representatives, the Committee's support of the Plan based on the compromises and settlements, and ultimately the acceptance of the Plan by retirees.

The ASF Recoupment component of the Class 11 treatment made it possible to keep the across the board cuts to the GRS pensions at 4.5%. Notwithstanding the facts that ASF Recoupment combined with the 4.5% reduction in most cases is less than the pension reductions would have been if the ASF Recoupment had been eliminated and the effect of ASF Recoupment has been mitigated by the overall cap on reductions from pension, and the lump sum option, certain individual objectors affected by ASF Recoupment object to this compromise in Class 11. Several object on the grounds that the calculation of the ASF Recoupment amount, including the a 6.75% interest rate charged on the annuitized amount, was not adequately disclosed. However, as shown below, the disclosure was extensive, continuing and customized for each individual class member. Under the circumstances, the disclosure in the solicitation process meets the requirements of section 1129(a)(2).

**B.  The Formula Results For Calculation of ASF Recoupment Were Generally Known**

The formula for calculating the ASF Recoupment Amount and the application of the formula to each retiree's pension was disclosed in the Disclosure Statement and the special supplement for Class 11 participants, both of which described how the ASF Recoupment Amount was calculated for active employees and for retirees and provided examples. Both the aggregate amount of the ASF Recoupment and the annuitized amount were disclosed on the retirees' ballots. *See* Notice Of Final Exhibits In Connection With Corrected Motion Of The City Of Detroit For Entry Of An Order Establishing Supplemental Procedures For Solicitation And Tabulation Of Votes To Accept Or Reject Plan Of Adjustment With Respect To Pension And OPEB Claims [Dkt.4378].[20]  Each ballot showed the deduction for the estimated monthly ASF

---

[20] These solicitation materials were approved by order dated May 5, 2014 See Order Establishing Supplemental Procedures For Solicitation And Tabulation Of Votes To Accept Or Reject Plan Of Adjustment With Respect To Pension And OPEB Claims [Dkt 4400].

Recoupment Amount as well as the 4.5% across the board reduction from the current monthly payment amount for each affected retiree and disclosed the estimated resulting monthly pension amount. *See* Dkt. 4378 at 126- 131.

The calculation of ASF recoupment was fully disclosed in the Disclosure Statement and supplement. For an active or terminated employee, who currently maintains an ASF account in GRS, the City recalculated that employee's ASF account value by applying the "Actual Return." The "Actual Return" is defined in the Plan as the actual net return percentage received on invested GRS assets by GRS for each year from July 1, 2003 through June 30, 2013, (unless the return was greater than 7.9%, in which case 7.9% was used or less than 0%, in which case 0% was used). The difference between the value of the value of the ASF account using the Actual Return and the value of the ASF account as of June 30, 2013 with full amount of the interest allocated by GRS is the "Annuity Savings Fund Excess Amount." Dkt 4378 at 71-2. To be clear, the recoupment does not recover either the amounts the actually contributed into the Annuity Savings Fund by the employee or interest credited by the GRS trustees to the Annuity Savings Fund account for the plan years prior to June 30, 2003.

For each GRS participant who participated in the ASF at any time during the period from July 1, 2003 through June 30, 2013, but who has already received a total distribution from the ASF, the City re-calculated that participant's ASF account value by applying the "Actual Return." The "Annuity Savings Fund Excess Amount" is the difference between (i) the value of the ASF account as of the date of distribution from the Annuity Savings Fund, at any time between July 1, 2003 and June 30, 2013, and (ii) the value of the ASF account as of such date, using the Actual Return. The Annuity Savings Fund Excess Amount was capped at 20% of the highest ASF account balance during the period July 1, 2003 through June 30, 2013. In addition,

the recoupment amount was capped at 15.5% of the retiree's pension such that when added to the 4.5% reduction, the total deduction from the monthly pension check would not be more than 20%. *See* Dkt 4378 at72-3.

The supplemental disclosure sent to Class 11 members included an example of allocation of interest in excess of actual return on GRS assets during one year of the ASF Recoupment Period as follows:

> During the period from 2003 through 2013, the GRS trustees credited to employee ASF accounts annual interest of no less than 7.9%, and in some years more than 7.9%, based upon actuarial computations. The ASF accounts essentially were treated as a guaranteed investment program, where, each year, ASF account holders would receive a return of at least 7.9%, regardless of the actual market investment returns on the assets in GRS. For example, in fiscal year 2009, the value of the assets that supported the Annuity Savings Fund accounts actually lost 19.67% percent of their value, but the GRS trustees credited the ASF account with 7.9% in interest. So, even though an ASF account holder who might have had $10,000 in his or her ASF account in 2009 actually lost 19.67% in market value and should have had only a balance of $8,033 in his or her account, instead his or her account was credited as having $10,790.

Dkt. 4378

### C. The Retiree Affected By ASF Recoupment Received Notice of The ASF Recoupment Calculation

In addition to the Supplemental Disclosure sent to the Class 11 members, the retirees received a number of additional transmissions regarding their treatment under the Plan. The formal and informal transmissions and meetings were detailed at length in a report filed by the Committee. *See* Dkt 6146 Official Committee Of Retirees' Report On (A) Interest Component Of ASF Recoupment and (B) The Effect Of Federal Transit Act On Treatment Of DDOT Retirees. As set forth in the Report, the fact that ASF Recoupment includes a 6.75% interest component was first disclosed in filings with the Court through a Stipulation and a proposed letter attached to the Stipulation with the Retiree Committee on June 2, 2014, very soon after the

solicitation process began. Notice of the interest rate was disclosed to retirees in the letter sent to the retirees affected by a change in the ballot shortly after the Court's approval of the Stipulation. Moreover, retiree participants in the Committee's second two Town Hall meetings at Cobo Hall on May 23, 2014 received oral disclosure of the same information as did retiree participants in the General Retirement System's four informational meetings on June 5 and June 12, 2014. Everyone in Class 11 affected by ASF Recoupment had notice of the aggregate ASF Recoupment Amount and the monthly deduction from his or her pension.

The retirees may have wanted even more information on ASF Recoupment than what was provided initially in the Disclosure Statement and in the subsequent transmissions. However, disclosure need not be perfect to meet the Bankruptcy Code requirements, provided that it is reasonable under the circumstances. *See In re Bath Bridgewater South, LLC*, 2012 Bankr. LEXIS 4353. *9 (Bankr. E.D. N.C. Sept. 20, 2012). The primary purpose of the disclosure statement is to give creditors adequate information to make an informed decision about how to vote. *See* 11 U.S.C. §1125. According to the legislative history of the section, courts are meant to have the flexibility to take a practical approach to determine what is necessary disclosure under the circumstances of the case. See *In re Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir 1985). The court in that case relied on the legislative history to determine whether it was appropriate to consider information that differed from the disclosure statement and provided in testimony:

Precisely what constitutes adequate information in any particular instance will develop on a case by case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case, such as the costs of preparation of the statements, the need for relative speed in solicitation and confirmation, and, of course, the need for investor protection . .

. . In reorganization cases, there is frequently great uncertainty. Therefore the need for flexibility is greatest. *citing* H.R. Rep. No. 595, 95th Cong., 1st Sess. 409, reprinted in 1978 U.S. Code Cong. & Ad. News 5963, 6365

See also *In re Commonwealth Group-Mocksville Partners, LP*, 2013 Bankr. LEXIS 1648 (Bankr. E.D.Tenn. April 22, 2013) ("The determination of whether a disclosure statement provides creditors with adequate information is "'left essentially to the judicial discretion of the court' and . . . '[t]he information required will necessarily be governed by the circumstances of the case.'") citing *Mabey v. S.W. Elec. Power Co. (In re Cajun Elec. Power Co.)*, 150 F.3d 503, 518 (5th Cir. 1998).

In this case, the Court reviewed and approved the Disclosure Statement after a giving all objectors, including the Retiree Committee several opportunities to object, suggest alternatives to the City, and address the Court with unresolved objections. The supplemental procedures were separately reviewed and approved. Thereafter, the retirees were inundated with information about their treatment under the Plan. Insofar as ASF Recoupment is concerned. each retiree had both the aggregate amount and the monthly amount of the deduction, as well as a full explanation of the method of calculation. Under the circumstances, the solicitation of retiree votes in Class 11 meets the requirement of section 1129(a)(2).

### D. ASF Recoupment is Not a Recovery

FGIC asserts in its Pretrial brief that the value of the excess interest claim should be regarded as a Class 11 recovery under the Plan or a claim reduction. [See Dkt. No. 7102 at 50]. This assertion that the Class based consensual reduction in future defined benefit payments for certain retirees subject to ASF Recoupment should be regarded as a "recovery" from the City should be ignored and overruled. Similarly, amounts paid by the GRS to individual ASF defined

contribution accounts are simply not available to satisfy the City's defined benefit plan liabilities. However, under Bankruptcy Rule 7001(7),[21] a class may compromise as part of a plan equitable claims held by a debtor without resort to adversary proceedings. *Lenders Prot. Group v. USA Commer. Mortg. Co. (In re USA Commer. Mortg. Co.)*, 2007 WL 2571947, 2007 U.S. Dist. Lexis 65264*38 (D. Nev. August 29, 2007). The exercise of such a procedural power by class members, does not convert such an equitable remedy into a "recovery" by the affected class as a whole. Nor does it make assets available by way of setoff against Class 11 as a whole.[22] Indeed, a bankruptcy court's discretionary determination that setoff would not be appropriate in light of the consensual class recoupment would be affirmed, because it would create unfair treatment as between Direct Lenders with Diverted Principal Claims who had not received Prepaid Interest and those that had Diverted Principal claims and had received Prepaid Interest.

*Id.* at *40.

Similarly, where the debtor does not seek from its Retirees the repayment from personal assets of amounts previously distributed but attributed to the City's theory of "excess interest", but merely nets the asserted liability against future promises to be paid from assets held the General Retirement System, the amount of such unrecovered funds should not be regarded as a recovery by Class 11 either in general or as a recovery from City sources.[23] The "netting

---

[21] Rule 7001(7) is expressly applicable to Chapter 9 cases.

[22] The recoupment process under the City's Plan, like the recoupment remedy under the USA Capital Realty Advisors is an equitable remedy.

[23] Some retirees also assert that the compromise cannot be approved because it was not consensual. The ASF Recoupment was part of a series of negotiated settlements and compromises with a several retiree representatives. The retiree representative recommended approval of the Plan, but could not bind the individual Class members to the treatment under the Plan. However, it was the class vote to accept the Plan that binds the non consenting individuals to the class treatment. *USA Capital Realty Advisors* at *41.

procedure is a treatment of claims not a determination of the validity, *extent* or priority of those claims." *Id*. (Emphasis added.) The city is recouping what it claims are improperly made payments to the retirees from the retirees' post confirmation pension benefits.

Many individual retirees also object to the ASF Recoupment in the Plan on a number of the same grounds as the Direct Lenders in the *USA Capital Realty Advisors*[24] case. In that case, the bankruptcy court confirmed a plan which included a "compromise" between the debtor, a commercial loan originator and servicer and group of individual lenders who had purchased fractional interests in the loans. The debtor made monthly interest payments to the lenders, whether or not the underlying borrow and paid the debtor. Under the plan compromise, the debtor would collect and retain the sums collected from borrowers until it recovered the amount equal to each individual lender prepaid interest. Like the individual retirees in this case, the lender group objected to confirmation of the plan and the compromise on the grounds that the debtor could not take the interest without an adversary proceeding or force a compromise on a non consenting creditor. The court addressed the objections by reference to Rule 7001(7) and the class vote that binds a non consenting creditor to claim treatment under section 1126 of the Code. *Id*. Both references dispose of the same objections asserted by the retirees.

### E.    The Vested OPEB Rights

Preliminarily, to the Committee's knowledge, the City has consistently acknowledged its responsibility for its retirees' OPEB benefits. The current record and the hearing evidence will establish that the retirees' OPEB rights are fully vested. That evidence will include: (a) the City Code of Ordinances,[25] committing the City to provide lifetime healthcare benefits to its retired

---

[24] Although the case was decided on equitable mootness grounds, the court analyzed the substantive arguments raised by the plan objectors.

[25]    *See* Detroit Code §§ 13-8-1 to -3.

employees and their spouses at no or very low cost; (b) numerous collective bargaining agreements, also promising such healthcare benefits, and (c) a class settlement for most retired firefighters and police (the "Weiler Class Settlement"). Examples of these agreements include, but are not limited to:

> Agreement with District Council 77 of AFSCME, by which the City agreed to pay the premium for retirees who retire on or after July 1, 1974, and one-half of the premium for spouses, for hospitalization and medical coverage;

> Master Agreement with Michigan Council 25 of AFSCME, AFL-CIO, for 1977-80, by which the City agreed to "pay the premium for regular retirees and their spouses" who retire on or after July 1, 1977; and

> Settlement Agreement with all police officers who retired before April 9, 2007, all police lieutenants/sergeants/investigators and command officers who retired before August 1, 2008, and all firefighters (and their spouses) who retired at commensurate ranks. The City agreed to pay all premiums for their lifetimes for certain of those retirees and their spouses and to cap the premium share at 20% of the total premium for all other retirees and spouses.

These agreements all provide that a retiree and her spouse will be entitled to receive OPEB benefits as long as she remains eligible for a pension -- a lifetime right. As noted in the Committee Legal Memorandum (p. 17), the terms of these agreements are virtually identical to those construed in *Welch v. Brown*, 935 F. Supp. 2d 875 (E.D. Mich. 2013), *aff'd*, 551 Fed. Appx. 804 (6th Cir. 2014), which held, over the objection of the City of Flint, that such collective bargaining agreements provided retirees a vested contract right. The district court held that those agreements provide retirees with vested rights to healthcare benefits unless "the language of a CBA indicates that certain rights are temporally limited." *Id.* at 885. The City's agreements are not temporally limited.[26]

---

[26] As noted in the Committee Legal Memorandum (p. 18, n. 15), collective bargaining agreements are contracts, to which the usual rules of contract construction apply. *See Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064, 1069 (6th Cir. 2008). Rights that continue beyond the expiration of a CBA, such as rights to health care benefits, vest in retirees if the parties so intended. *Id.* Retiree benefits carry an inference that the parties intended them to continue in the same form for as long as the beneficiary remains a retiree. *Id.* (citing *Int'l Union, United Auto., Aerospace & Agr.*

### F. The Actual Value of the OPEB Claims is Approximately $5 Billion to $8 Billion

As noted in the Committee Legal Memorandum (p. 21), by agreement between the City and the Committee, the allowed aggregate claim for OPEB as of the Petition Date is $4.303 billion (*see* Plan II.B.3.s.i.), which reflects a reduction for the cost of post-petition health care of $143 million.

At the hearing, the evidence will show that the Committee has taken the position that its retirees' OPEB claims were properly valued at either $5 billion or $8 billion, depending on the discount rate used. The City's witnesses will testify that the City was aware of these assertions, and the City's OPEB expert, Ms. Suzanne Taranto, will confirm the Committee's valuations are within the range of reasonable estimate.

In short, the testimony will provide the Court with ample proof the actual claim for OPEB in Class 12 should be valued at up to $8 billion, and the heavily-negotiated allowed claim of approximately $4.3 billion should be accepted as a reasonable compromise. The Committee maintains that it would be likely to prevail on establishing an OPEB claim well over the $4.3 billion settlement amount. The parties contemplate that the Confirmation Order will constitute an order approving such compromise pursuant to Bankruptcy Rule 9019.[28] The legal authorities supporting this compromise are set out in the Committee Legal Memorandum (pp. 21 - 28), and need not be repeated here.

---

*Implement Workers of Am. v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983)); *Bender v. Newell Window Furnishings, Inc.*, 681 F.3d 253, 261 (6th Cir. 2012).

[28] The Plan, in section IV, G provides: "The City and the Retiree Committee have reached a settlement related to the allowance and calculation of the OPEB Claims in Class 12 and the treatment of such Allowed OPEB Claims, the terms of which are reflected in the Plan. the Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019."

**G. The Plan Relieves the City of Responsibility for Post-Effective Date Retiree Healthcare Benefits and Should Be Approved**

As stated above the City's goal with respect to health care coverage for its retirees was to reduce or eliminate its financial and operational obligations. In addition to allowing the retiree OPEB claim in the amount of $4.303 billion, the Plan shifts the responsibility for the provision of health coverage for retirees to two voluntary employee benefit associations ("VEBAs"). The Plan makes it clear that the City has no further obligation to provide OPEB benefits: "From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits." *See* Plan, II.B.3.s.ii.C.

**III. IN ADDITION TO THE DEVASTATING CUTS RETIREES FACE IN PENSION AND OPEB BENEFITS UNDER THE PLAN, THERE IS LITTLE DOUBT THAT ANY DEEPER CUTS WOULD RENDER THE PLAN NOT FEASIBLE**

As noted above, excluding non-City contributions and accounting for the actual value of the retiree pension claims and the present value of the City's contributions, the projected recovery rate for GRS retirees on their pension Claims is 31.7% and for PFRS is 17.6% (*see* Section I.B.1., *supra*; Nicholl Report ¶98). These recoveries are not significantly above the ranges for other classes. Moreover, these recoveries drop even further when the $1-to-$4 billion loss in OPEB Claim value is factored in to the analysis o the Global Settlement (Section II., *supra*).

That said, whatever differences remain between the Class 10 and 11 treatment and recoveries and those of other unsecured classes are the result of arms-length bargaining that leaves no further latitude and is more than justified by the circumstances of this case.[29]

---

[29] But for the Global Settlement, the Retiree committee could not support the 33% recovery and ??? contingent clam treat of Class 7, LTGO Claims.

First, as part of the so-called Grand Bargain, in the interest of reaching a consensual Plan for the benefit of all the City's constituencies, the retirees agreed to halt their appeal of the Court's ruling on the Michigan Constitution's Pension Clause. This was a valuable right: an asset with financial stakes dwarfing the rights of any other creditor constituencies. Indeed, pursuit of the appeal might have resulted in a reversal which could have confirmed the retirees' rights to full payment of their pensions. Such a result, however, would have doomed any consensus-based City restructuring which of necessity must accommodate various active employee groups and a platform for non-City contributions in exchange for preserving the cultural assets at the Detroit Institute of Arts. Thus, recognizing the appeal had to be dropped to allow for a broad-based restructuring, the Committee agreed to drop its valuable appeal.

In addition, the Committee recognized that any agreement on pension and OPEB had to avoid further devastating the City finances (thus destroying service revitalization, if not overall feasibility) and at the same time avoid starving the retirees. The post-Effective-Date pension distributions and OPEB cuts were the product of hard-fought, arms-length negotiations, ending with the deepest benefits cuts the Committee could accept without putting larger segments of its retiree constituency into poverty. Keeping the retirees out of poverty has a direct impact on the City and its surrounding counties. Evidence at the hearing will show that approximately 8,500 City retirees live in the City or greater Wayne County, and over 13, 361 retirees (or 73.5% of all City retirees) reside in the Detroit metropolitan area. The evidence will further show that the average pension of the PFRS and GRS retirees are approximately $30,000 and $20,000, respectively. Cutting their pensions and recouping ASF benefits in the amounts contemplated in the Plan, while at the same time severely slashing their healthcare benefits, will already dramatically impact those retirees' standards of living. Any further deterioration of their

financial well-being would almost certainly impose a substantial burden on local assistance programs, further straining the City's social safety net, and hinder the City's ability to revitalize.

Apart from the financial consequences of a mass exodus to welfare roles, the City likely would not be able to summon the resources needed to revitalize its infrastructure and services without the faith and morale its residents and employees need to have in those efforts. Evidence at the trial will demonstrate that the City's workforce has been closely watching how the City treats its retired workers. Witnesses will testify in the past that the City has been able to attract workers because of its attractive benefits programs, and its current workforce is avidly focused on whether the City would walk away from its retired workers at a time when those retirees depend on the City and are unable to pursue other options to protect themselves. By investing in its retirees as well as active employees, the City is building the morale in its current workforce that will be necessary to revitalize the City.

In short, whatever discrimination exists, it is fair because it is not that much when the contributions of third parties are properly eliminated from the analysis. Moreover, the retirees are paying a dear price for it, and no plan would be feasible without the Plan's bare-minimum protections for the retirees. *See In re Dow Corning Corp.,* 255 B.R. 445, 537-38 (E.D. Mich. 2000)*,* (plan does not unfairly discriminate if there is "a rational or legitimate basis for discrimination and [if] the discrimination [is] … necessary for the reorganization," citing *In re Crosscreek Apartments, Ltd.,* 213 B.R. 521, 537 (Bankr. E.D. Tenn. 1997)) *aff'd,* 280 F.3d 648 (6th Cir. 2002).

## IV. THE OBJECTIONS OF THE DWSD PARTIES SHOULD BE OVERRULED

Notwithstanding the sacrifices that the retirees make under the Plan, the DWSD bondholders, who are being paid in full, their insurers, who are protected by the bondholder

recovery and the Counties (Macomb, Oakland and Wayne counties)[30] have objected to the treatment of pension claims in Classes 10 and 11. Their objections focus primarily on the DWSD "catch up" or accelerated UAAL amortization payment to the GRS pension plan and the potential for Special or Supplemental General Restoration in the event of a transaction involving DWSD which benefit the City's general fund.[31] These objections are fundamentally legal in nature, the defects in which having been detailed in the Committee Legal Memorandum (pp. 42 - 49) and need not be repeated here.

That being said, two realities ignored by the DWSD arguments bear brief clarification here.

First, the DWSD's payment of its allocable share of UAAL of the GRS (after pension reductions under the Plan) is only paying DWSD costs. It is DWSD "catching up" on its own previously unpaid liabilities (Nicholl Report ¶ 25(a)). Under the Plan, DWSD will pay its allocable share of the reduced UAAL of the GRS over an approximate nine year period ending June 30, 2023. These payments comply with section 7-1203 of the City Charter in that such payments are only on account of that portion of accrued pension liabilities that are directly attributable to services rendered by DWSD employees and retirees. Detroit City Charter § 7-1203. Similarly, the payments are consonant with Michigan common law in that they do not exceed the amounts necessary to fund the cost of such services rendered for the benefit of the DWSD systems.[32] The contributions to the GRS fund generally are consistent with the

---

[30] While Wayne and Oakland counties are parties in interest with standing to object to the Plan with respect to contract assumption purposes, their standing to object to the Plan should be limited to those objections which derive from their own legal issues.

[31] *See generally* the objections of Macomb County and Macomb Interceptor Drainage District, [Dkt. No. 4637]; Wayne County, [Dkt. No. 4663]; Oakland County, [Dkt. No. 4627]; the DWSD Bond Trustee, [Dkt. No. 4647]; Berkshire Hathaway, [Dkt. No. 4657]; National Public Finance Guarantee Corp. ), [Dkt. No. 4665]; Assured Guaranty Municipal Corp., [Dkt. No. 4674].

[32] The DWSD Parties do not complain about being excused from paying OPEB benefits to DWSD retirees.

historical practice of the DWSD in funding its actuarially determined allocable share of the UAAL as an operating expense, which is paid in advance of debt service. However, under the Plan, DWSD will not be excused from paying less than the UAAL attributable to the past services of its employees.

Second, rather than facing prejudice from the Plan, the DWSD actually benefits under the Plan. In addition to reinforcing the DWSD's water and sewer customer rate base through the Plan's reinvestment, DWSD and its rate payers are major beneficiaries of the Plan's elimination of OPEB benefits and pension benefit reductions. That significant reduction in liability and annual expense is only due to the global settlements embodied in the Plan. The Plan substantially decreases the DWSD's aggregate funding of pension costs, which, as stated above, should be paid ahead of debt service. The Plan reduces approximately 90% of the City's OPEB liabilities, asking only that DWSD cure its share a of the $450 million Note B obligation to Class 12. The Plan also eliminates 100% of DWSD's exposure to the COPs. (City of Detroit's Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts [Dkt No. 5034] ("City Reply") ¶ 178). In total, the City estimates at least $500 million in cost savings for DWSD under the Plan that is expected to ease upward pressure on DWSD rates and allow for increased capital improvements to DWSD systems (City Reply ¶ 178). Affordable rates and improved capital structure only serve to improve the stability of debt service payments to DWSD bondholders.

## V.    THE COURT SHOULD APPROVE THE 6.75% RATE AS A CONSERVATIVE ASSUMPTION FOR PENSION INVESTMENT RETURNS AND DISCOUNT FOR FUTURE BENEFITS AND CONTRIBUTIONS

As noted above, Ms. Kopacz expressed concern with the 6.75% rate assumption for the pensions' investment returns and for the discount to present value for future benefits for the next

10 years. Importantly, Ms. Kopacz clarified in her deposition that she is not suggesting that the City actually use a risk-free discount rate *for plan funding purposes*, but rather she would like the City to disclose what the Plan liabilities would be in present value terms if a risk-free discount rate were employed. (Kopacz deposition, Day 2, 446 - 47)  Nonetheless, because the Kopacz Report comments on the 6.75% discount rate used by the City in calculating the contribution amounts through 2023, the Committee will address this issue at the hearing and outline that proof here.

The Committee believes the 6.75% is a conservative assumption, and the testimony of Ms. Nicholl will assist the Court in reaching the same conclusion.  As a preliminary clarification, Ms. Nicholl will testify that it is standard practice in this country for the discount rate for future benefits to be the same as the assumed investment return on pension assets.  Indeed, Ms. Nicholl has never seen it done any other way (Nicholl Report ¶ 85)

Further, the 6.75% rate is, by any comparison with other public pension plans, a conservative assumption for funding purposes, but not for Claim allowance  purposes.  As Ms. Nicholl notes in her Report and will confirm in her testimony, according to the National Association of State Retirement Administrators' April 2014 Investment Returns Assumption Brief, of the 126 pension plans measured in its Public Fund Survey, the average return/discount rate was 7.72% with only 4 of the 126 at 6.75% or below (Nicholl Report ¶ 89).  In fact, Ms. Nicholl is only personally aware of a single other public pension plan that uses an investment rate of return/discount rate of 6.75% or lower, the Pennsylvania Municipal Retirement System (*Id.*)  Indeed. Ms. Kopacz concedes the 6.75% rate is conservative (Kopacz Report pp. 135, 146).

The 6.75% rate is not only conservative but also the product of the Court-ordered mediation. Since the 6.75% rate is at minimum reasonable as part of the settlement, there is no basis for the Court to reject it.

## CONCLUSION

For the reasons set forth herein, the Committee requests that the Court overrule all objections and confirm the Plan.

Dated: August 27, 2014                      Respectfully submitted,
     New York, New York

By: */s/ Claude D.Montgomery*
Claude Montgomery                        Sam Alberts
Carole Neville                           Dan Barnowski
DENTONS US LLP                    DENTONS US LLP
1221 Avenue of the Americas       1301 K Street, NW, Suite 600 East Tower
New York, New York 10020         Washington, DC 20005
Tel:    (212) 768-6700             Tel: (202) 408-6400
Fax:    (212) 768-6800            Fax: (202) 408-6399
claude.montgomery@dentons.com    sam.alberts@dentons.com
carole.neville@dentons.com        dan.barnowski@dentons.com

BROOKS WILKINS SHARKEY & TURCO
PLLC
Matthew E. Wilkins
Paula A. Hall
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Direct: (248) 971-1711
Cell: (248) 882-8496
Fax: (248) 971-1801
wilkins@bwst-law.com
hall@bwst-law.com

*Attorneys for the Official Committee of Retirees of the City of Detroit, Michigan*

## CERTIFICATE OF SERVICE

I, Claude D. Montgomery, hereby certify that the foregoing document was filed and served via the Court's electronic case filing and noticing system on August 27, 2014.

By: */s/  Claude D. Montgomery*
Claude D. Montgomery