**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

-------------------------------------------------------x
:
In re                        : Chapter 9
:
CITY OF DETROIT, MICHIGAN,    : Case No. 13-53846
:
            Debtor.      : Hon. Steven W. Rhodes
:
:
-------------------------------------------------------x

## NOTICE OF FILING OF EXIT FACILITY
## COMMITMENT LETTER AND RELATED TERM SHEET

### PLEASE TAKE NOTICE OF THE FOLLOWING:

1.      On August 20, 2014, the City of Detroit (the "City") filed its Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6908) (the "Plan"). The principal terms of the Exit Facility contemplated under the Plan were attached as Exhibit I.A.172 to the Plan.[1] On August 21, 2014, the City filed the City of Detroit's Errata Sheet with respect to Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6942).

2.      On August 27, 2014 the City executed a commitment letter ("Commitment Letter") with Barclays Capital Inc. ("Barclays"), which, among other items, includes a commitment from Barclays to provide up to $275 million in

---

[1]    Capitalized terms not otherwise defined herein have the meanings given to them in the Term Sheet.

CHI-1940697v1

exit financing.  A copy of the Commitment Letter and related term sheet is attached hereto as <u>Exhibit 1</u>.

[The remainder of this page is intentionally blank.]

CHI-1940697v1

Dated:  August 28, 2014

Respectfully submitted,

/s/  Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens
David A. Hall
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
bberens@jonesday.com
dahall@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
   STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

CHI-1940697v1

# **EXHIBIT 1**

CHI-1940697v1

# BARCLAYS CAPITAL INC.

**PERSONAL AND CONFIDENTIAL**

August 27, 2014

The City of Detroit, Michigan
c/o James Doak
Managing Director
Miller Buckfire & Co., LLC
601 Lexington Avenue, 22nd Floor
New York, New York 10022

Michigan Finance Authority
c/o Thomas Saxton
Richard H. Austin State Office Building
430 West Allegan Street
Lansing, Michigan 48922

## $275,000,000 Exit Financing—Commitment Letter

Dear Mr. Doak and Mr. Saxton:

Barclays Capital Inc. ("Barclays," or the "Purchaser") understands that the City of Detroit, Michigan (the "City") filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears case number 13-53846 (the "Bankruptcy Case") and has been assigned to the Honorable Steven W. Rhodes. On August 20, 2014, the City filed with the Bankruptcy Court its Sixth Amended Plan for the Adjustment of Debts of the City of Detroit Docket No. 6910 (as may be further amended from time to time, the "Plan"). The confirmation hearing to determine whether the Plan can be confirmed is currently scheduled to begin on September 2, 2014. The Plan contemplates, as part of its implementation, that the City will obtain exit financing through the issuance of financial recovery bonds (the "City Bonds") pursuant to Section 36a(7) of the Home Rule City Act upon its emergence from bankruptcy protection.

You have further advised Barclays that provisions of Section 36a(7) of the Home Rule City Act require that the City Bonds be sold to the Michigan Finance Authority ("MFA" and, together with the City, "you") and that the MFA will issue bonds (the "Bonds") secured by the City's bonds in order to implement the exit financing facility (the "Exit Facility").

Capitalized terms used but not defined herein are used with the meanings assigned to them in Exhibit A attached hereto (collectively with all exhibits attached thereto, the "Term Sheet" and, together with this letter, collectively, the "Commitment Letter"). As used herein, the term "Transactions" means, collectively, the entering into and funding of the Exit Facility, the consummation of certain other transactions contemplated by the Commitment Letter and all other related transactions, including the payment of fees and expenses in connection therewith.

The City has previously entered into an Engagement Letter, dated October 6, 2013, with Barclays (the "Engagement Letter") relating to the subject matter of the Exit Facility. The City acknowledges that the Engagement Letter remains in full force and effect.

## 1. Commitments, Titles and Roles

You hereby appoint Barclays, and Barclays hereby agrees to act, as exclusive underwriter and syndication agent (in such capacities, the "Underwriter") for the Exit Facility. You hereby appoint Barclays to act, and Barclays hereby agrees to act, as sole lead arranger and sole bookrunner (in such capacities, the "Arranger"), for the Exit Facility. Each of the Arranger and the Underwriter will have the rights and authority customarily given to financial institutions in such roles. In connection with the Transactions, the Purchaser is pleased to advise you of its commitment (the "Commitment") to provide an exit financing facility in the aggregate principal amount of up to $275,000,000 on the terms and subject to the conditions set forth in this Commitment Letter and the Term Sheet.

As consideration for the execution and delivery of this Commitment Letter by the Purchaser, the City agrees to pay or cause to be paid the fees and expenses set forth in this Commitment Letter and the Term Sheet as and when payable in accordance with the terms hereof.

No additional underwriters, agents, arrangers, bookrunners or lenders may be appointed or engaged with respect to the Exit Facility without our written consent and neither the City nor the MFA will directly or indirectly offer or sell any securities to, or otherwise contact, approach or negotiate with respect thereto with any third party with respect to the Exit Facility during the term of this engagement without the prior written consent of Barclays. Barclays's advertising name will appear at the bottom center of the front page of any offering or information memorandum related to the Exit Facility. Barclays, in consultation with the City and the MFA, shall have the sole responsibility to (i) establish the schedule for investor meetings, (ii) coordinate all pre-marketing activity, (iii) coordinate roadshow logistics, (iv) coordinate the final allocation of any commitments or notes issued in connection with the Exit Facility, (v) if applicable, act as billing and delivery agent, (vi) if applicable, act as stabilization agent, and (vii) determine, after consultation with the City and the MFA, whether and to what extent to exercise the Flex Provisions described in the Term Sheet in order to achieve a Successful Syndication on the terms set forth in the Term Sheet within 150 days after the Closing Date of the Bonds.

## 2. Conditions Precedent

The Purchaser's commitments and the Underwriter's agreements hereunder are subject to the conditions set forth in this Section 2 and in the Term Sheet under the heading "Conditions Precedent."

2

The Purchaser's commitments hereunder and the Purchaser and the Underwriter's agreements to perform the services described herein are further subject to the following conditions: (i) the Purchaser and the Underwriter shall not have become aware, after the date hereof, of any information or other matter regarding the City, which was not (x) previously disclosed to the Purchaser and the Underwriter by the City and (y) not otherwise publicly available to them, that either of them reasonably determines to be material and adverse relative to the information or other matters regarding the City disclosed to them by the City prior to the date hereof; (ii) the Purchaser's satisfaction that there is no competing offering, placement, arrangement or syndication of any debt securities or debt facilities by or on behalf of the City, other than debt securities or debt facilities contemplated in connection with the City's Plan (including the financing contemplated in the City's Motion to approve postpetition financing in connection with a tender of water and sewer bonds [Docket No. 6644] (the "Tender Financing")); (iii) the City's performance of (x) all of its obligations hereunder to provide information and other diligence materials to the Purchaser and otherwise assist in the efforts to underwrite and syndicate the Exit Facility, and (y) compliance with all of its obligations hereunder to pay fees and expenses; and (iv) the execution of a bond purchase agreement and other transaction documents containing such terms, covenants, conditions, representations, warranties and indemnities as set forth in the Term Sheet and providing for the delivery of legal opinions (consistent with the forms set forth in the Term Sheet).

All fees and expenses payable hereunder and under the Term Sheet will be payable in U.S. dollars in immediately available funds to Barclays for its own account, or as directed by it, free and clear of and without deduction for any and all present or future applicable taxes, levies, imposts, deductions, charges or withholdings and all liabilities with respect thereto (with appropriate gross-up for withholding taxes) and will not be subject to reduction by way of setoff or counterclaim. Once paid, no fee or expense will be refundable under any circumstances.

## 3.    Syndication; Underwriting

Within 150 days of the closing date of the Bonds (the "Closing Date"), the Underwriter will undertake a coordinated, one-day secondary market sale and syndication of the Bonds in a manner similar to a primary offering of bonds in the municipal bond market, with the purpose of establishing a fair market value for the Bonds and selling the Bonds at the price described in the Term Sheet. The Underwriter will lead the underwriting and syndication and exclusively manage all aspects of the underwriting and syndication, including determining the timing of all offers to prospective purchasers, the acceptance of commitments and the amounts offered. You hereby acknowledge and agree that the Underwriter will have no responsibility other than to arrange the underwriting and syndication as set forth herein and in no event shall the Underwriter or the Purchaser be subject to any fiduciary or other implied duties in connection with the transactions contemplated hereby.

The City agrees to actively assist the Underwriter in completing timely and orderly sales of the Bonds satisfactory to the Underwriter. Such assistance shall include (a) direct contact between the City, its agents, representatives and advisors, on the one hand, and the Underwriter and proposed purchasers, on the other hand, (b) the hosting, with the Underwriter, of one or more meetings of or telephone conference calls with prospective purchasers at times and locations to be mutually agreed upon, (c) seeking to procure credit ratings in respect of the Bonds from two

3

of Standard & Poor's Rating Services ("S&P"), Fitch Ratings Inc. ("Fitch") and Moody's Investors Service, Inc. ("Moody's"), (d) completing, prior to the settlement of the Bonds, a rating evaluation service or equivalent procedure with two of Moody's, S&P and/or Fitch, and (e) there being no competing issues, offerings, placements or arrangements of debt securities or commercial bank or other credit facilities of the City or the MFA being issued, offered, placed or arranged, other than debt securities or debt facilities contemplated in connection with the City's Plan, including the Tender Financing. The completion of any syndication of the Bonds shall not constitute a condition to the commitments hereunder or the purchase of the Bonds by the Purchaser on the Closing Date.

The City agrees that it will deliver such documents as shall be required for the Underwriter to comply with Rule 15c2-12, the MSRB rules and other applicable rules and regulations, including, without limitation, delivery of a Preliminary Official Statement, final Official Statement, Continuing Disclosure Agreement and such documents as Barclays may reasonably request to qualify the Bonds for offer and sale under the "Blue Sky" or other securities laws and regulations of such states and other jurisdictions of the United States of America as Barclays may (in its sole discretion) designate. The City shall provide such representations and certifications as deemed appropriate by Barclays for the purpose of compliance with Rule 10b-5 of the Securities Act.

4.    **Information**

To assist the Underwriter in its underwriting and syndication efforts, the City agrees to promptly prepare and provide to the Underwriter all information with respect to you and the Transactions in form and substance satisfactory to the Underwriter, including such financial information and projections as the Underwriter may reasonably request in connection with the structuring, arrangement, syndication and underwriting of the Exit Facility. The City represents, warrants and covenants that: (i) all information (other than the Projections (as defined below)) that has been or will be made available to the Underwriter, the purchasers or any of their respective affiliates directly or indirectly by or on behalf of the City or the MFA or their agents or representatives in connection with the Transactions is and will be, when taken as a whole, complete and correct in all material respects and does not and will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances under which such statements are made and (ii) the projections and other forward looking information (the "Projections") that have been or will be made available directly or indirectly to the Underwriter, the purchasers or any of their respective affiliates by or on behalf of the City or the MFA or their agents or representatives have been and will be prepared in good faith upon assumptions that are believed by the City to be reasonable when made and when made available to the Underwriter, the purchasers and their respective affiliates. The City agrees that if at any time prior to the Closing Date, during the underwriting period, and thereafter pursuant to any continuing disclosure requirements, any of the representations in the preceding sentence would be incorrect in any material respect if made at such time, then the City will promptly supplement, or cause to be supplemented, the information and Projections so that such representations will be correct in all material respects in light of the circumstances in which statements are made. The City understands that in providing services pursuant to this Commitment Letter, the Purchaser and the Underwriter may use and rely on the information and Projections without independent verification thereof.

4

The City will advise Barclays immediately of the occurrence of any event or any other change known to it that results in any offering circular, private placement memorandum, prospectus or other similar disclosure document relating to the Bonds containing an untrue statement of a material fact or omitting to state any material fact required to be stated therein or necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading and will promptly supplement, or cause to be supplemented, such offering circular, private placement memorandum, prospectus or other similar disclosure document so that such offering circular, private placement memorandum, prospectus or other similar disclosure document will be correct in all material respects under those circumstances.

## 5.    **Indemnification and Expenses**

To induce the Purchaser and the Underwriter to enter into this Commitment Letter and to proceed with the documentation of the Exit Facility, the City hereby agrees, to the extent permitted by law, to indemnify upon demand and hold harmless the Underwriter, the Arranger, the Purchaser and their respective affiliates and each partner, trustee, shareholder, director, officer, employee, advisor, representative, agent, attorney and controlling person thereof (each of the above, an "Indemnified Person") from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities, costs or expenses (including fees, disbursements, settlement costs and other charges of counsel), joint or several, of any kind or nature whatsoever that may be brought or threatened by the City, any of its agents, representatives, employees, creditors or any other person or entity (whether or not the City is a party to such action, suit proceeding or claim and regardless of whether such claim is brought by or on behalf of the City) which may be incurred by or asserted against or involve any Indemnified Person (whether or not any Indemnified Person is a party to such action, suit, proceeding or claim) as a result of or arising out of or in any way related to or resulting from this Commitment Letter, the Exit Facility, the Bankruptcy Case (to the extent related to the Transactions) or the Transactions, and, to the extent permitted by law, to reimburse each Indemnified Person upon demand for any documented and reasonable legal or other out-of-pocket costs and expenses incurred in connection with investigating or defending any of the foregoing (whether or not we or any other Indemnified Person is a party to any action, suit, proceeding or claim out of which any such expenses arise); provided that the City will not have to indemnify an Indemnified Person against any action, suit, proceeding (including any investigation or inquiry), claim, loss, damage, liability, cost or expense (a) to the extent that the same resulted from the gross negligence or willful misconduct of such Indemnified Person (to the extent determined by a court of competent jurisdiction in a final and non-appealable judgment) or (b) to the extent that the same arose in connection with the syndication, underwriting or other public distribution of the Bonds by the Purchaser or Underwriter after the Closing Date.   Regardless of whether the Closing Date occurs or any Bond Documents (as defined in the Term Sheet) are executed and delivered or any bonds are purchased or extensions of credit are made under the Exit Facility, the City agrees, to the extent permitted by law, to reimburse promptly upon written demand the Purchaser and its affiliates for all documented and reasonable costs and expenses incurred in connection with the enforcement of any rights and remedies hereunder or the administration, amendment, modification or waiver of any of the Commitment Letter, the Bond Documents or the definitive documentation in respect of the Exit Facility. It is further agreed that the Purchaser, the Underwriter and the Arranger shall only have liability to you with respect to the Exit Facility and this Commitment Letter and not to any other

person. No Indemnified Person will have any liability (whether in contract, tort or otherwise) to the City as a result of or arising out of or in any way related to or resulting from this Commitment Letter, the Exit Facility, the Bankruptcy Case (to the extent related to the Transactions) or the Transactions or any use or intended use of the proceeds of the Exit Facility, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct. Notwithstanding any other provision of this Commitment Letter, no Indemnified Person will have any responsibility or liability (whether in contract, tort or otherwise) to you or any other person or entity for damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence or willful misconduct.

The City's indemnity and reimbursement obligations under this Section 5 will be in addition to any liability that the City may otherwise have and will be binding upon and inure to the benefit of the successors, assigns, heirs and personal representatives of the City and the Indemnified Persons.

The City further agrees that it will, to the extent permitted by law, indemnify the MFA and its board members, staff, officers, employees, advisors, attorneys and agents to the same extent it is indemnifying the Underwriter, Purchaser and Arranger as set forth in this Section 5.

Neither the Purchaser, the Underwriter, the Arranger nor any other Indemnified Person will be responsible or liable on any theory of liability to you or any other person or entity for any indirect, special, punitive or consequential damages (collectively "Consequential Damages") which may be alleged or otherwise claimed as a result of or in connection with this Commitment Letter, the Exit Facility, the Bankruptcy Case (to the extent related to the Transactions) or the Transactions or any use or intended use of the proceeds of the Exit Facility. The City will not be responsible or liable on any theory of liability to any Indemnified Party or any other person or entity for any Consequential Damages which may be alleged or otherwise claimed as a result of or in connection with this Commitment Letter, the Exit Facility, the Bankruptcy Case (to the extent related to the Transactions) or the Transactions or any use or intended use of the proceeds of the Exit Facility; provided that nothing contained in this sentence shall otherwise limit the City's indemnity obligations to the extent set forth in this Section 5, including any Consequential Damages.

## 6.   **Assignments**

This Commitment Letter may not be assigned by you without the prior written consent of the Purchaser (and any purported assignment without such consent will be null and void), is intended to be solely for the benefit of the parties hereto and the Indemnified Persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person (including your employees or creditors) other than the parties hereto (and any Indemnified Person). The Purchaser may assign its commitments and agreements hereunder, in whole or in part, to any of its affiliates; however the Purchaser shall not be released from the portion of its commitment hereunder so assigned until after the Closing Date unless you and the Purchaser agree in writing.

The Purchaser and the Underwriter reserve the right to employ the services of their respective affiliates in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates certain fees payable to the Purchaser in such manner as they and their respective affiliates may agree in their sole discretion. This Commitment Letter may not be amended or any term or provision hereof waived or modified except by an instrument in writing signed by each of the parties hereto.

## 7.    USA PATRIOT Act Notification

The Purchaser and the Underwriter notify you and your agents and representatives that, pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (as amended, supplemented or modified from time to time, the "Patriot Act") they may be required to obtain, verify and record information that identifies you and your agents and representatives, including the name, address and tax identification number of each such person and other information that will allow the Purchaser and the Underwriter to identify each such person in accordance with the Patriot Act and other applicable "know your customer" and anti-money laundering rules and regulations. This notice is given in accordance with the requirements of the Patriot Act and is effective for the Underwriter and the Purchaser.

## 8.    Affiliate Activities; Absence of Fiduciary Relationship

You acknowledge that Barclays and its affiliates are full service securities firms and as such may from time to time effect transactions, for their own account or the account of customers, and may at any time purchase, sell, hold or vote long or short positions and investments in securities, loans, commodities, currencies, derivative transactions (including total return swaps and credit default swaps), indebtedness, or options thereon, of you. With respect to any securities and/or financial instruments so held by Barclays, any of its affiliates or any of their respective customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights in its sole discretion. Barclays and its affiliates will have economic and other interests that are different from or conflict with those of the City regarding the transactions contemplated hereby, and you acknowledge and agree that Barclays has no obligation to disclose such interests to you. You further acknowledge and agree that nothing in this Commitment Letter or the nature of services provided hereunder or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between Barclays, on the one hand, and you, your agents or your representatives, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against Barclays for breach of fiduciary duty or alleged breach of fiduciary duty and agree that Barclays will have no liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your agents, representatives, employees or creditors. You acknowledge and agree that the Transactions (including the exercise of rights and remedies hereunder) are arms' length commercial transactions and that Barclays is acting solely as principal and in its own best interests. You acknowledge and agree that you have consulted and are relying on your own legal, accounting, regulatory and tax advisors and other experts and advisors to the extent you have deemed appropriate to determine whether the Transactions are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby and are responsible for making your own independent investigation and

7

appraisal of the Transactions (including, without limitation, with respect to any consents needed in connection with the transactions contemplated hereby). Any review by Barclays or its representatives of you, the Transactions, the other transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of Barclays and shall not be on behalf of you or any of your agents, representatives or creditors. In addition, you acknowledge that Barclays may employ the services of its affiliates in providing certain services hereunder and may exchange with such affiliates information concerning you and companies that may be the subject of the Transactions and Barclays's affiliates will be entitled to the benefits afforded to Barclays hereunder, provided that any such communication shall be subject to the Confidentiality Agreement dated September 3, 2013 between Barclays Capital Inc. and the City (the "Confidentiality Agreement"). You acknowledge and agree that Barclays does not have any obligation or liability to you or your agents or representatives with respect to the transactions contemplated hereby except those obligations or liabilities expressly set forth herein or in any other express writing executed and delivered by Barclays and you or any such agent or representative.

Consistent with Barclays's policies to hold in confidence the affairs of its customers, it will not use or disclose confidential information obtained from you by virtue of the Transactions in connection with Barclays's performance of services for any of its other customers (other than as permitted to be disclosed under this Section 8) and any such information shall remain at all times subject to the terms of the Confidentiality Agreement. Furthermore, you acknowledge that neither Barclays nor any of its affiliates have an obligation to use in connection with the Transactions, or to furnish to you, confidential information obtained or that may be obtained by Barclays from any other person.

Please note that Barclays and its affiliates do not provide tax, accounting or legal advice.

9.      **Waiver of Jury Trial; Governing Law; Submission to Jurisdiction; Surviving Provisions; Miscellaneous**

**ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION, SUIT, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY HERETO ARISING IN CONNECTION WITH OR AS A RESULT OF ANY MATTER REFERRED TO IN THIS COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER IS HEREBY IRREVOCABLY WAIVED BY THE PARTIES HERETO. THIS COMMITMENT LETTER AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS COMMITMENT LETTER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) WILL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN.**

Each of the City, the Underwriter and the Purchaser hereby irrevocably and unconditionally (i) submits, for itself and its property, (a) prior to the consummation of the Exit Facility, to the exclusive jurisdiction of the Bankruptcy Court and (b) after the consummation of the Exit Facility, to the non-exclusive jurisdiction of the courts of the State of Michigan and the United

States District Court for the Eastern District of Michigan and, in each case of the foregoing, any appellate court from any such court, in any action, suit, proceeding or claim arising out of or relating to this Commitment Letter, the Transactions or the other transactions contemplated hereby or thereby, the performance of services contemplated hereunder, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action, suit, proceeding or claim may be heard and determined in such court; provided that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction located in Michigan, (ii) waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any action, suit, proceeding or claim arising out of or relating to this Commitment Letter, the Transactions or the other transactions contemplated hereby or thereby or the performance of services contemplated hereunder in any such court in Michigan, (iii) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of any such action, suit, proceeding or claim in any such court and (iv) agrees to commence any such action, suit, proceeding or claim in such courts, as applicable. The City agrees, on behalf of itself and its agents and representatives, that the foregoing provisions of this paragraph shall also apply to its agents and representatives to the same extent as to the City, and the Purchaser's obligations hereunder are being made in reliance on the foregoing. Each of the City, the Underwriter and the Purchaser hereby agrees that service of any process, summons, notice or document by registered mail addressed to the City, the Underwriter or the Purchaser, as applicable, shall be effective service of process for any such action, suit, proceeding or claim brought in any such court.

This Commitment Letter is issued for your benefit only and no other person or entity (other than the Indemnified Persons) may rely hereon. This Commitment Letter and the Engagement Letter are the only agreements that have been entered into among you, the Underwriter and the Purchaser with respect to the Exit Facility and set forth the entire understanding of the parties with respect thereto.

The provisions of Sections 3, 5, 8 and this Section 9 of this Commitment Letter will survive any termination or completion of the arrangements contemplated by this Commitment Letter, including without limitation whether or not the Bond Documents are executed and delivered and whether or not the Exit Facility is made available or any of the Bonds under the Exit Facility are purchased.

## 10.    **Acceptance; Termination**

This Commitment Letter may be executed in any number of counterparts, each of which when executed will be an original and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or other electronic transmission (e.g., "pdf" or "tif") will be as effective as delivery of a manually executed counterpart hereof.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to Barclays the enclosed copy of this Commitment Letter on or before 5:00 p.m., New York City time, on August 29, 2014, whereupon this Commitment Letter will become a binding agreement among you, the Underwriter, and the Purchaser. If not signed and returned as described in the preceding sentence by such date, this offer will terminate on such date. In the

9

event the Closing Date has not occurred on or prior to November 26, 2014, the Commitment shall terminate on such date, unless the Commitment is extended as set forth in the Term Sheet. In the event of a material breach by you or a failure of a condition under this Commitment Letter, then this Commitment Letter and the commitments hereunder shall automatically terminate unless the Purchaser shall, in its sole discretion, agree to an extension or waiver, as applicable. The termination of this Commitment Letter shall not adversely affect or otherwise limit any rights that Barclays may have pursuant to any prior agreement or understanding between Barclays and the City including, without limiting the foregoing, the Engagement Letter.

Attached as Appendix A hereto is Barclays' disclosure pursuant to MSRB Rule G-17 and attached as Appendix B hereto is Barclays' disclosure regarding the SEC's Municipal Advisor rule.

*[The remainder of this page is intentionally left blank.]*

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

**BARCLAYS CAPITAL INC.**

By: _____
       Name:  John Gerbino
       Title:    Managing Director

Accepted and agreed to as of
the date first written above:

**THE CITY OF DETROIT, MICHIGAN**

By: _____
       Name:
       Title:

**MICHIGAN FINANCE AUTHORITY**

By: _____
       Name:
       Title:

[Signature Page to Commitment Letter]

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

**BARCLAYS CAPITAL INC.**

By:_____
       Name:  John Gerbino
       Title:   Managing Director

Accepted and agreed to as of
the date first written above:

**THE CITY OF DETROIT, MICHIGAN**

By:_____
    Name:  KEVIN D. ORR
    Title:  EMERGENCY MANAGER

**MICHIGAN FINANCE AUTHORITY**

By:_____
    Name:
    Title:

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

BARCLAYS CAPITAL INC.

By: _____
    Name:  John Gerbino
    Title:   Managing Director

Accepted and agreed to as of
the date first written above:

THE CITY OF DETROIT, MICHIGAN

By: _____
    Name:
    Title:

MICHIGAN FINANCE AUTHORITY

By: _____
    Name:
    Title:   **EXECUTIVE DIRECTOR**

[Signature Page to Commitment Letter]

**MSRB Rule G-17 Disclosure Letter**



August __, 2014

Joseph Fielek
Executive Director
Michigan Finance Authority
430 W. Allegan St.
Lansing, MI 48922

*Re: Disclosures by Barclays as Sole Underwriter Pursuant to MSRB Rule G-17 –$275,000,000[*] Michigan Finance Authority Financial Recovery Bonds, Series 2014 (Exit Financing Bond Facility) issued on behalf of the City of Detroit, Michigan*

Dear Mr. Fielek:

Barclays Capital Inc. ("Barclays") is writing to provide you, as Executive Director of the Michigan Finance Authority ("Issuer"), with certain disclosures relating to the captioned Exit Financing Bond Facility (the "Exit Financing") as required by the Municipal Securities Rulemaking Board ("MSRB") Rule G-17 as set forth in MSRB Notice 2012-25 (May 7, 2012)[1].

In the context of this engagement between Barclays and you, in any discussions, communications, conferences, negotiations and undertakings, Barclays: (a) will act as a principal and not in a fiduciary capacity; (b) has not assumed an advisory or fiduciary responsibility in favor of you or the City of Detroit ("Borrower"); and (c) is acting as underwriter and not as financial advisor. As such, (i) the primary role of Barclays as an underwriter is to purchase, or arrange for the placement of, securities; (ii) such purchase or placement will be effected in an arm's-length commercial transaction between you and Barclays; and (iii) Barclays has financial and other interests that may differ from yours and the Borrower's. Further, Barclays advises you and Borrower to consult your own legal, financial and other advisors to the extent you or the Borrower deem appropriate.

As part of our services as sole underwriter, Barclays may provide advice concerning the structure, timing, terms, and other similar matters concerning the issuance of the Exit Financing.

As the issuer of the Exit Financing, the Issuer will be a party to a Commitment Letter and Bond Purchase Agreement or similar agreement and certain other legal documents to be entered into in connection with the issuance of the Exit Financing. The material financial risks described in this letter will be borne by the Borrower, as set forth in those legal documents. A copy of this letter is also being sent to the Borrower. Proposed terms of the Exit Financing are set forth in more detail in the Commitment Letter dated August 27, 2014 from Barclays to the Borrower (the "Commitment Letter") and the Term Sheet attached thereto.

I. Disclosures Concerning Barclays' Role:

(i) MSRB Rule G-17 requires an underwriter to deal fairly at all times with both municipal issuers and investors.

(ii) The underwriters' primary role is to purchase the Exit Financing in an arm's-length commercial transaction with the Issuer with a view to distributing the Exit Financing to investors (which may include one or more affiliates of the underwriter) and/or syndicating all or a portion of the Exit Financing. Barclays has financial and other interests that differ from those of the Issuer and Borrower.

(iii) Unlike a municipal advisor, Barclays does not have a fiduciary duty to the Issuer or the Borrower under the federal securities laws and is, therefore, not required by federal law to act in the best interest of the Issuer or the Borrower without regard to its own financial or other interests.

---

[*] Preliminary, subject to change.

(iv) Barclays has a duty to purchase the Exit Financing from the Issuer at a fair and reasonable price, but must balance that duty with its duty to sell the Exit Financing to investors, including its affiliates, at prices that are fair and reasonable.

(v) Barclays will review the Bond Purchase Agreement and other legal documents for the Exit Financing in accordance with, and as part of, its respective responsibilities to investors under the federal securities laws, as applied to the facts and circumstances of this transaction[2].

II. Disclosures Concerning Barclays' Compensation:

Barclays has been or will be compensated by a fee with respect to the Exit Financing that will be set forth in the relevant Commitment Letter, Term Sheet and/or Bond Purchase Agreement to be negotiated and entered into in connection with the issuance of the Exit Financing. The amount of the commitment fee of the Exit Financing will be based on a percentage of the principal amount of the Exit Financing, as more fully described in the Term Sheet attached to the Commitment Letter. The commitment fee in respect of the Exit Financing will be fully earned by Barclays upon the Borrower's delivery of its signed signature page to the Commitment Letter to Barclays, regardless of whether the Exit Financing is ultimately issued. The amount of the underwriting fee of the Exit Financing will be based on a percentage of the principal amount of the Exit

Financing, as more fully described in the Term Sheet. While this form of compensation is customary in the Exit Financing market, it presents a conflict of interest since the underwriter may have an incentive to discuss with the Issuer or Borrower a transaction that is unnecessary or to propose that the size of the transaction be larger than is necessary.

III. Additional Conflicts Disclosures:

Barclays has identified the following additional potential or actual material conflicts:

- Conflicts of Interest: Ordinary Course of Business Relationships

  - Barclays has conducted a search of certain databases used to check for investment banking conflicts, and has not discovered any relationship which would create a conflict of interest or the appearance of a conflict of interest if the firm were to act as an Underwriter to the Issuer. With that said, in the ordinary course of its business, Barclays maintains relationships with financial advisory firms, investment banks, and law firms, some of which may have relationships with the Issuer or Borrower. We are a full service investment bank, dealing in products provided by certain firms, we may utilize the professional services of certain of these entities for our own purposes, and we may work in concert with them for, and on behalf of, our clients. Further, in the conduct of its varied and extensive business activities, Barclays enjoys professional relationships with many and varied clients and customers, some of whom may have some relationship to the Issuer or Borrower. Barclays does not keep databases of employees' family relationships.

  - Barclays and its affiliates may receive compensation from the Issuer or Borrower for other services provided, such as: providing a letter of credit or standby bond purchase agreement, or acting as trustee, serving as remarketing agent, swap counterparty, escrow bidding agent, or GIC bidding agent. Affiliates of Barclays may serve in separate capacities in connection with the issuance of the Exit Financing, including serving as liquidity provider. The affiliated entity will be separately compensated for serving in that capacity. Barclays expects to receive a payment, value, or credit from its affiliated swap dealer if the Issuer decides to enter into an interest rate swap on the Exit Financing.

  - Barclays and its respective affiliates also may communicate independent investment recommendations, market advice, or trading ideas and/or publish or express independent research views in respect of such assets, securities or other financial instruments and at any time may hold, or recommend to clients that they should acquire, long and/or short positions in such assets, securities and other financial instruments.

- Other Potential Conflicts of Interest Disclosure

  - A Barclays affiliate may receive swap termination payment, loan repayment, post-petition facility repayment or redemption of bank bonds
  - Barclays may represent multiple issuers/obligors on the same project
  - A Barclays affiliate is a reference bank for purposes of setting LIBOR

IV. Disclosures Concerning a Municipal Securities Financing

Since Barclays has discussed with the Issuer and Borrower a financing structure that may be a "complex municipal securities financing" for purposes of MSRB Rule G-17, attached is a description of the material financial characteristics of that financing structure as well as the material financial risks of the financing that are known to us and reasonably foreseeable at this time.

V. Conclusion and Acknowledgement

If you or any other Issuer officials have any questions or concerns about these disclosures, please make those questions or concerns known immediately to the undersigned. It is our understanding that you have been authorized to bind the Issuer by contract with us, and that you are not a party to any conflict of interest relating to the subject transaction. If our understanding is incorrect, please notify the undersigned immediately.

We are required to seek your acknowledgement that you have received this letter. Accordingly, please send me an email to that affect, or sign and return the enclosed copy of this letter to me at the address set forth above. If additional potential or actual material conflicts are identified, we may be required to send you additional disclosures. At that time, we also will seek your acknowledgement of receipt of any such additional disclosures.

We look forward to working with you and the Borrower in connection with the issuance of the Exit Financing. Thank you.

Sincerely,

John Gerbino
*Managing Director*

Acknowledged:

Michigan Finance Authority

Joseph Fielek, Executive Director

Date: 8/27/14

---

[1] Interpretive Notice Concerning the Application of MSRB Rule G-17 to Underwriters of Municipal Securities (effective August 2, 2012).

[2] Under federal securities law, an issuer of securities has the primary responsibility for disclosure to investors. The review of the official statement by the underwriters is solely for purposes of satisfying the underwriters' obligations under the federal securities laws and such review should not be construed by an issuer as a guarantee of the accuracy or completeness of the information in the official statement.

CC:     City of Detroit, Michigan
        Miller Buckfire & Co., LLC
        Jones Day

3

## Disclosure Regarding SEC Municipal Advisor Rule

IRMA EXEMPTION

On July 11, 2014, Miller Buckfire and Co., LLC ("Miller Buckfire") notified market participants that it was contractually engaged to serve the City of Detroit the ("City") as an independent registered municipal advisor ("IRMA") with respect to the issuance of municipal securities in connection with the City's proposed Exit Financing and or pursuant to the Plan of Adjustment. By obtaining such representation, neither BCI nor Barclays Bank PLC ("BBPLC" and together with BCI, "Barclays") is acting as municipal advisor to the City and neither BCI nor BBPLC is subject to the fiduciary duty set forth in section 15B(c)(1) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

In the context of a potential underwriting engagement between Barclays and you (including the MFA's proposed issuance on behalf of the City of Financial Recovery Bonds, Series 2014), in any discussions, communications, conferences, negotiations and undertakings, Barclays: (a) will act as a principal and not in a fiduciary capacity; (b) has not assumed an advisory or fiduciary responsibility in favor of you; and (c) is acting as underwriter and not as financial advisor. As such, (i) the primary role of BCI as an underwriter is to purchase, or arrange for the placement of, securities; (ii) any purchase or placement will be effected in an arm's-length commercial transaction between you and Barclays; and (iii) Barclays has financial and other interests that may differ from yours. Further, Barclays advises you to consult your own legal, financial and other advisors to the extent you deem appropriate.

Barclays is not aware of any current Barclays employee who in the past two years qualified as an "associated" (as defined in section 15B(e)(7) of the Exchange Act) person of your IRMA. Additionally, Barclays has no knowledge of any former Barclays employee currently qualifying as an "associated" person of your IRMA. Accordingly, Barclays is assuming, unless you inform us otherwise, your IRMA is independent from Barclays for purposes of relying on the IRMA exemption available under the Securities and Exchange Commission's final rule relating to the registration of municipal advisors.

If you would like your IRMA to be present for all planned communications with Barclays, please inform us as soon as possible. Absent such notification, Barclays' understanding is that you will separately seek, consider and rely on the advice, analysis and perspective of your IRMA to evaluate any advice provided by Barclays.

UNDERWRITER EXEMPTION

The City and the MFA are both aware of the "Municipal Advisor Rule" of the Securities and Exchange Commission (effective July 1, 2014) and the underwriter exclusion from the definition of "municipal advisor" for a firm serving as an underwriter for a particular issuance of municipal securities.

The MFA has, pursuant to the Commitment Letter dated August 26, 2014, designated Barclays Capital Inc. ("BCI") as sole underwriter for the Financial Recovery Bonds, Series 2014. The

MFA anticipates issuing the Bonds on behalf of the City and expects that BCI will provide advice on the structure, timing, terms, and other matters concerning the Bonds.

**<u>Exit Facility Term Sheet</u>**

**<u>See Attached</u>**

**City of Detroit**
$275,000,000 Exit Financing Bond Facility
Summary of Certain Key Terms and Conditions

*Set forth below is a summary of certain key terms for the Exit Facility (as defined below). This summary of indicative terms and conditions (this "Term Sheet") does not purport to summarize all terms of the Exit Facility and related documentation.*

## 1. PARTIES AND TRANSACTIONS

| | |
|---|---|
| Issuer: | The City of Detroit (the "City"), as conduit borrower Michigan Finance Authority (the "MFA"), as conduit issuer |
| | On July 18, 2013, the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears case number 13-53846 (the "Bankruptcy Case") and has been assigned to the Honorable Steven W. Rhodes. On August 20, 2014, the City filed with the Bankruptcy Court its Sixth Amended Plan for the Adjustment of Debts of the City of Detroit Docket No. 6910 (as may be further amended from time to time, the "Plan"). The confirmation hearing to determine whether the Plan can be confirmed is currently scheduled to begin on September 2, 2014. The Plan contemplates, as part of its implementation, that the City will obtain exit financing upon its emergence from bankruptcy protection. |
| Initial Bond Purchaser | Relevant provisions of Section 36a(7) of the Michigan Home Rule City Act require that the bonds be sold to the MFA and the MFA will issue bonds secured by the City's bonds. |
| Secondary Bond Purchaser: | Barclays Capital Inc. ("Barclays"). Barclays may transfer the Bonds to Barclays Bank PLC ("Barclays Bank") or another affiliate of Barclays or Barclays Bank which qualifies as a sophisticated investor prior to the syndication and public offering described herein. |
| | The Secondary Bond Purchaser and each transferee pursuant to the preceding paragraph shall provide a letter in form and substance satisfactory to the City and the MFA confirming that it is a sophisticated investor. |
| | Barclays shall purchase the Bonds from the MFA at a price equal to par. |
| Indenture Trustee: | UMB Bank, N.A. or such other bank as agreed upon by the |

parties.

## 2. TYPE AND AMOUNT OF FACILITY

Type and Amount:

Up to $275,000,000 exit financing bond facility (the "Exit Facility") consisting of bonds issued by the MFA (the "Bonds") secured by Financial Recovery Bonds issued by the City pursuant to section 36a(7) of the Michigan Home Rule City Act. The Bonds will be sold initially to the Secondary Bond Purchaser and distributed as a public primary offering, the proceeds of which will be used for such purposes as approved by the local emergency financial assistance loan board (the "ELB"), including funding (i) the retirement of the City's $120 million postpetition financing facility, (ii) certain of the City's reinvestment and revitalization initiatives, and (iii) the City's obligations with respect to certain classes of claims under the Plan.

Maturity; Amortization:

| Bonds | Amortization Commencement | Final Maturity |
|---|---|---|
| Tax-Exempt | 5th anniversary of Closing Date | 15th anniversary of Closing Date |
| Taxable | 5th anniversary of Closing Date | 8th anniversary of Closing Date |

Principal will be amortized during each applicable year in such amounts so as to produce in the aggregate a pattern of level or declining annual debt service, except during any interest-only period. Any interest-only period will not extend beyond the fifth anniversary of the Closing Date.

Closing Date:

The Closing Date shall be the first business day on which all conditions precedent to the issuance of the Bonds under the Bond Documents (hereinafter defined) are satisfied.

Tax Exemption:

Barclays is committed to accomplishing the Exit Facility in a manner which maximizes the tax-exempt portion to the extent that the City and its counsel will permit. The City has informed Barclays that the City intends that up to $200 million of the Exit Facility will be tax-exempt and that portions of the Exit Facility funding the retirement of the City's obligations with respect to holders of Class 5 Claims in an amount of approximately $45 million and, potentially, with respect to holders of Class 7 Claims in an amount of approximately $55 million, will be taxable.

## 3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Interest Rate Structure: | The Bond Documents will incorporate a multi-modal rate structure with current interest. |
| Initial Interest Rates: | On the Closing Date, the Bonds will be issued in a variable rate mode, bearing interest as follows: |

<u>Tax-Exempt Bonds</u>: SIFMA Municipal Swap Index + 4.25%
<u>Taxable Bonds</u>: 1-month USD-LIBOR + 4.75%

Prior to consummation of the Public Offering, current interest on the Bonds will be payable on a monthly basis on the first business day of each calendar month. The Tax-Exempt Bond rate will reset weekly and interest will be calculated monthly based on the weighted average of such weekly rates. The Taxable Bond rate will reset monthly on the first business day of each calendar month and interest will be calculated monthly on the basis of such rate.

**Interest Rates Upon Public Offering:** On the date of consummation of the Public Offering (as defined below), the Bonds will be remarketed as fixed rate bonds with fixed rates as follows (which fixed rates shall become effective on the remarketing date):

<u>Taxable Bonds</u>:

The sum of:

  (i)  the yield on 7-year[1] US Treasury Notes, *plus*
  (ii) the Base Spread (set forth in Appendix A), *plus*
  (iii) the applicable Market Flex (See "Flex Provisions" below)

<u>Tax-Exempt Bonds</u>:

The sum of:

  (i)  the yield on Thomson Reuters Municipal Market Data 15-year[2] AAA Index, *plus*
  (ii) the Base Spread (set forth in Appendix A), *plus*
  (iii) the applicable Market Flex (See "Flex Provisions" below)

Following consummation of the Public Offering, interest on the Bonds shall be payable semiannually.

**Default Rate:** The bond interest rate shall be subject to an increase of 2% per

---

[1] Benchmark maturity subject to adjustment based on final maturity of Taxable Bonds.
[2] Benchmark maturity subject to adjustment based on final maturity of Tax-Exempt Bonds.

annum upon the occurrence of an Event of Default, but only if either (i) such a provision is required by one or more Rating Agencies or (ii) the Underwriter otherwise determines, in its reasonable discretion and in consultation with the City, that a Successful Syndication on the terms set forth in this Term Sheet is unable to be achieved within 150 days after the Closing Date without such a provision.

In the event that the Closing Date has occurred and the Bond Documents have been executed and delivered prior to the consummation of the Public Offering of the Exit Facility, the City and MFA hereby agree, at the City's expense, to take all such action as may be reasonably required in order to effect any amendments to the Exit Facility or disclosure documents, or other changes, as may be necessary or reasonably requested by the Secondary Bond Purchaser to document any changes pursuant to this Section.

| | |
|---|---|
| Flex Provisions: | The City and the MFA will agree that the Underwriter may, after consultation with the City and the MFA, increase the fixed rates of the Bonds (expressed as a positive Market Flex) or decrease the fixed rates of the Bonds (expressed as a negative Market Flex) and make any or all of the changes to the Exit Facility necessary to implement the flex provisions, which will be approved by the Bankruptcy Court in the Confirmation Order and will require no additional authorizations or approvals, at any time, and from time to time (including after the Closing Date), if the Underwriter determines, in its reasonable discretion and in consultation with the City, that a Successful Syndication on the terms set forth in this Term Sheet is unable to be achieved within 150 days after the Closing Date without exercising such flex provisions. Any such adjustments to the fixed rates on the Bonds shall be subject to the maximum positive Market Flex ("Maximum Market Flex") and maximum negative Market Flex ("Maximum Negative Market Flex") set forth in Appendix B hereto. |
| Syndication: | Within 150 days of the Closing Date, Barclays will undertake a coordinated, one-day secondary market sale of the Bonds in a manner similar to a primary offering of bonds in the municipal bond market, all designed to establish a fair market value (the "Public Offering").

If at the time of the Public Offering, the Bonds carry at least one long-term public credit rating from either Moody's or S&P in the investment grade category, a "Successful Syndication" will be deemed to be one in which the Bonds are sold to the market at par plus accrued interest. If at the time of the Public Offering, the Bonds do not carry at least one long- |

term public credit rating from either Moody's or S&P in the investment grade category, a "Successful Syndication" will be deemed to be one in which the Bonds are sold to the market at a price equal to par plus an amount equal to $2.50 per $1,000 bonds and plus accrued interest. This amount of $2.50/$1,000 will be retained by Barclays. See also "Underwriting Discount", below.

In the event that the Closing Date has occurred and the Bond Documents have been executed and delivered prior to the consummation of the Public Offering of the Exit Facility, the City and MFA agree, at the City's expense, to take all such action as may be required in order to effect any amendments to the Exit Facility or disclosure documents, or other changes, as may be necessary or reasonably requested by the Secondary Bond Purchaser to document any changes pursuant to the Flex Provisions. The City further agrees to reasonably cooperate with the Secondary Bond Purchaser with regard to immaterial changes requested by potential participants or purchasers prior to the consummation of the Public Offering of the Exit Facility. The Secondary Bond Purchaser's commitment in the Commitment Letter is subject to the agreements set forth in this Section, and the provisions of this Section and the Flex Provisions will survive the closing of the Exit Facility and the execution and delivery of the Bond Documents.

| | |
|---|---|
| Mandatory Prepayments: | N/A |
| Optional Prepayments: | The Tax-Exempt Bonds may be called for redemption in whole or in part on any business day upon 30 days' prior written notice at any time on or after the tenth anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest. |

Prior to the consummation of the Public Offering, the Taxable Bonds may be called for redemption in whole or in part on any interest payment date upon 30 days' prior written notice, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest.

Following the consummation of the Public Offering, the Taxable Bonds may be called for redemption in whole or in part on any business day upon 30 days' prior written notice at any time at the Make-Whole Redemption Price.

For purposes hereof, the "Make-Whole Redemption Price" is the greater of (i) 100% of the principal amount of the Bonds to be redeemed and (ii) the sum of the present value of the remaining scheduled payments of principal and interest to the maturity date of the Bonds to be redeemed, not including any

portion of those payments of interest accrued and unpaid as of the date on which the Bonds are to be redeemed, discounted to the date on which the Bonds are to be redeemed on a semi-annual basis, assuming a 360-day year consisting of twelve 30-day months, at the adjusted Treasury Rate (as defined below) plus 30 basis points, plus, in each case, accrued and unpaid interest on the Bonds to be redeemed on the redemption date.

The "Treasury Rate" will be the yield to maturity as of the redemption date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least five (5) business days prior to the redemption date (excluding inflation indexed securities) (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the redemption date to the maturity date of the Bonds to be redeemed; provided, however, that if the period from the redemption date to such maturity date is less than one (1) year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one (1) year will be used.

The Make-Whole Redemption Price of the Bonds to be redeemed pursuant to the optional redemption provision described above will be determined by an independent accounting firm, investment banking firm or financial advisor retained by the City at the City's expense to calculate such Make-Whole Redemption Price. The Indenture Trustee and the City may conclusively rely upon the determination of such Make-Whole Redemption Price by such independent accounting firm, investment banking firm or financial advisor and neither the Indenture Trustee nor the City will be liable for such reliance.

## 4. COLLATERAL AND PRIORITY

Collateral:

The obligations owing by the City with respect to the City's bonds will be secured by a lien on income tax revenues of the City (the "Pledged Income Tax Revenue") and, to the extent permitted by law, income tax receivables of the City (collectively with the Pledged Income Tax Revenue, the "Pledged Income Tax"). Pursuant to section 36a(7) of the Michigan Home Rule City Act, once Pledged Income Tax Revenue is received by the Indenture Trustee in the Indenture Trustee Account (as defined below), the obligations owing by the City with respect to the City's bonds shall be secured by a first priority statutory lien in the Pledged Income Tax Revenue. Notwithstanding anything to the contrary herein, Pledged Income Tax Revenue shall exclude that portion of

income tax revenues transferred into the budget of the City's police department at any time, to be used exclusively to retain and hire police officers, in an amount equal to the sum of 0.2% of the income tax rate levied on resident individuals and 0.1% of the income tax rate levied on non-resident individuals for so long as bonds, obligations or other evidences of indebtedness of the City's Public Lighting Authority are outstanding and payable from taxes levied by the City under the Utility Users Tax Act 100, Public Acts of Michigan, 1990, as amended, MCL 141.1151, et. seq.

The City shall maintain the deposit account at Comerica into which the City's income tax revenues are deposited, currently bearing account number XXXXXX6191 (the "Comerica Account") in its own name, subject to the control of the Indenture Trustee pursuant to the Deposit Account Control Agreement. A new deposit account in the name and under the exclusive control of the Indenture Trustee, on behalf of the holders of the Bonds, shall be established at Comerica Bank (the "Indenture Trustee Account") into which, on a daily basis, all Pledged Income Tax Revenues shall be directly remitted and deposited by Comerica Bank ("Daily Transfer Obligation") and, thereupon, shall be subject to the statutory lien in favor of the Indenture Trustee. The Indenture Trustee Account shall be maintained in the name of the Indenture Trustee, on behalf of the holders of the Bonds, for so long as the Bonds (or any portion thereof) remain outstanding. Pledged Income Tax Revenues remitted and deposited into the Indenture Trustee Account will be used only to (a) cure any deficiency in the Debt Service Fund and/or Debt Service Reserve Fund balances and (b) fund the City's obligations to make any Debt Service Fund Deposits.

Notwithstanding the Daily Transfer Obligation, at any time during which (a) there is no deficiency in the Debt Service Fund balance or the Debt Service Reserve Fund balance, in each case, as required under the Bond Documents and (b) the City's obligations under the Bond Documents to make any Debt Service Deposits have been fully funded, the City, in its discretion, may transfer from the Comerica Account any Pledged Income Tax Revenue to one or more deposit accounts in the name of the City to be used by the City in its sole discretion, and neither the City nor Comerica Bank shall have any Daily Transfer Obligation with respect to that portion of the Pledged Income Tax Revenue.

| | |
|---|---|
| Release of Lien: | Release not applicable. |
| Other Terms: | Definitive documentation in respect of the Bonds will contain representations, warranties, affirmative and negative covenants, and other terms and conditions to be specified by |

the parties.

## 5. MAJOR BOND COVENANTS

| | |
|---|---|
| Events of Default: | Events of Default shall be:<br><br>(i) the failure to make any payment when such payment is due under the Bond Documents;<br>(ii) the failure of the City to comply with the Debt Service Covenant (described below). |
| Debt Service Covenant: | The City will maintain income tax rates sufficient to generate on an annual basis deposits of Pledged Income Tax Revenues deposited to the Comerica Account which are no less than 2.0X the aggregate maximum annual debt service on the Bonds plus any parity indebtedness and the City shall increase income tax rates in accordance with applicable law to the extent necessary to satisfy such requirement; provided, however, that to the extent that income tax rates in the City are set at the maximum rate allowed by law, the City shall not be in default if annual deposits of Pledged Income Tax Revenues to the Comerica Account are less than 2.0X the aggregate maximum annual debt service on the Bonds plus any parity indebtedness.<br><br>At least 75% of all Pledged Income Tax Revenues net of refunds collected each month will be deposited to the Comerica Account. |
| Debt Service Reserve Fund: | The City will maintain with the Indenture Trustee a cash funded Debt Service Reserve Fund sized to the lesser of (i) maximum annual debt service on the Bonds, (ii) 10% of the par amount of the Bonds, or (iii) 125% of average annual debt service on the Bonds, based, in each of (i) and (iii), on debt service calculated upon an assumed fixed rate. |
| Debt Service Fund Deposits: | Following the consummation of the Public Offering, each month, on a first-dollar basis an amount equal to 1/6 of the next interest payment requirement and 1/12 of the next principal payment requirement will be transferred from the Comerica Account to the Indenture Trustee Account and then deposited by the Indenture Trustee into the Debt Service Fund or equivalent. In each case, the Debt Service Fund shall be fully funded one month in advance of any applicable debt service payment requirement. Documents will also reflect (i) a monthly, first dollar pledge of Pledged Income Tax Revenues for the purpose of curing any deficiencies in the Debt Service Fund balances and (ii) a pledge of Pledged Income Tax Revenues for the purpose of curing any deficiencies in the Debt Service Reserve Fund balances, payable monthly after the payment of the other amounts specified in this paragraph. |

| | Following the transfers set forth herein to the Indenture Trustee Account to fund the Debt Service Fund Deposits and to cure any deficiency in the Debt Service Fund and/or Debt Service Reserve Fund balance, all Pledged Income Tax Revenues deposited in the Comerica Account will be transferred from the Comerica Account to the City. |
|---|---|
| Additional Obligations: | The City will confirm that no existing obligations (other than the $120 million DIP which will be repaid in full on the date of issuance of the Bonds using a portion of the proceeds of the Bonds) are secured by the City's income tax revenues. |
| | As long as the Bonds are outstanding, the City will not create or permit the creation of or issue any additional indebtedness or interest rate exchange agreement which will be secured by a charge or lien on the Pledged Income Tax that has a lien or payment priority which is superior to the Bonds. |
| | Prior to the date of consummation of the Public Offering, the City will not create or permit the creation of or issue any additional indebtedness or interest rate exchange agreement which will be secured by a charge or lien on the Pledged Income Tax that has a lien or payment priority which is on parity with the Bonds. |
| | Following the date of consummation of the Public Offering, additional parity indebtedness will be permitted, subject to satisfaction of the "Debt Service Covenant" above assuming that such proposed parity indebtedness had been issued, and based upon historical Pledged Income Tax Revenues deposited to the Comerica Account. |

## 6. UNDERWRITING COMMITMENT

| Amount: | Not to exceed $275 million |
|---|---|
| Sale Type: | Private Placement to Barclays |

## 7. FEES AND EXPENSES

| Commitment Fee: | The City shall pay an amount equal to 0.15% of the aggregate principal amount of the Bonds for any settlement period (from the date on which the City and the MFA execute the Commitment Letter (the "Commitment Date") to the date of issuance of the Bonds) of up to three months (the "Commitment Period"). The City and Barclays may agree to extend the Commitment Period for up to three (3) additional 30-day periods (each, an "Extended Commitment Period"). Barclays may charge the City an additional 0.07% of the aggregate principal amount of the Bonds (the "Additional Commitment Fee") for each Extended Commitment Period. The Commitment Fee shall be payable by the City on the Commitment Date, and any Additional Commitment Fee shall |

be due on the first business day of the related Extended Commitment Period. The City shall request each Extended Commitment Period by providing such request in writing to Barclays not less than five (5) business days prior to the last day of the Commitment Period (or then-current Extended Commitment Period).

| | |
|---|---|
| Underwriting Discount: | Barclays shall receive an underwriting discount equal to $5.00 per $1,000 par amount of Bonds issued, to be deducted from the gross proceeds thereof. |

See "Syndication" above with respect to additional compensation payable to Barclays in connection with the Public Offering of the Bonds.

| | |
|---|---|
| Out-of-Pocket Costs: | In addition to the Underwriting Discount, whether or not an Exit Facility is completed or any financing is arranged, the City shall pay all reasonable out-of-pocket costs and expenses of Barclays in connection with the Exit Facility, including the reasonable fees, expenses and disbursements of legal counsel. All out-of-pocket costs and expenses payable by the City hereunder shall be capped at $750,000 and shall be limited to those costs and expenses incurred prior to the date of consummation of the Public Offering; provided, however, that the City will be responsible at all times to Barclays for any legal fees and expenses incurred by Barclays that arise and are incurred at any time as a result of (a) third-party discovery or litigation directed at Barclays, in its capacity as Secondary Bond Purchase or Underwriter (or any related capacity, including, without limitation, as syndication agent), in connection with the City's efforts to obtain approval of the Exit Facility or (b) any revisions to or re-drafting of the Bond Documents and related documentation which are not anticipated by the Commitment Letter and this Term Sheet and which arise as a result of litigation or other legal proceedings relating to the Bankruptcy Case, in each case without regard to the cap set forth in this sentence. |

## 8. TERMINATION

In the event the Closing Date has not occurred on or prior to November 26, 2014, the Commitment shall terminate on such date unless the parties agree to an Extended Commitment Period. The termination of the Commitment shall not adversely affect or otherwise limit any rights that Barclays may have pursuant to any prior agreement or understanding between Barclays and the City, including, without limiting the foregoing, the Engagement Letter.

## 9. CERTAIN OTHER PROVISIONS

| | |
|---|---|
| Authority to Borrow | Prior to the Closing Date, the City shall have received authorization from the ELB under Section 36a(7) of the Michigan Home Rule City Act, the City Council or the ELB under P.A. 436, and the Financial Review Commission, as applicable, and the MFA board shall have adopted a supplemental resolution authorizing the MFA Bonds. |
| Governing Law: | Michigan. |
| Assignment and Participation: | Prior to the date of the consummation of the public offering by the Underwriter, the Secondary Bond Purchaser may assign, sell or sell participations in the Bonds in consultation with and with the consent of the City and the MFA, such consent not to be unreasonably withheld, delayed or conditioned; provided that no consent shall be required with respect to any transfer or assignment by the Secondary Bond Purchaser pursuant to the terms of the section above entitled "Secondary Bond Purchaser". Following assignment, sale or sale of any participation in the Bonds which occurs prior to such public offering, the Secondary Bond Purchaser shall retain all rights and authority, and shall, as between the City and the Secondary Bond Purchaser, be solely responsible and authorized, with respect to exercising any and all rights and remedies or otherwise administering the Bonds and related transaction documents. The City shall not, prior to the consummation of the public offering, be required to take any direction from any transferee or participant in the Bonds, nor shall any transferee or participant in the Bonds have authority to exercise any rights or remedies with respect thereto. |
| | Following the consummation of the public offering of the Bonds, the Bonds may be transferred by the holders thereof without the consent of the City or the MFA, subject to standard market transfer provisions for unrestricted freely transferable municipal bonds, and the holders thereof shall have all rights and remedies typically available to holders of freely transferable municipal bonds, as set forth in the Bond Documents. |
| Documentation | Each of the following in form and substance satisfactory to the Secondary Bond Purchaser. |
| | • Bond Purchase Agreement, including standard market conditions and termination events. |
| | • DTC-eligible Bonds, issued in denominations of not less than $100,000 plus $5,000 increments. |
| | • Such documents as shall be required for the Secondary Bond Purchaser to comply with Rule 15c2-12, the MSRB |

rules and other applicable rules and regulations and then current market practice. The sale of the Bonds by the Secondary Bond Purchaser will constitute a primary public offering of the Bonds, which will require, among other items, delivery of a Preliminary Official Statement, final Official Statement and Continuing Disclosure Agreement.

- A State law approving opinion relating to the Bonds of the MFA in a form customarily rendered in connection with the MFA's LGLP Local Project Bond Program delivered by MFA's bond counsel.

- A State law approving opinion relating to the Bonds of the MFA and the bonds of the City in the form attached as Appendix C hereto, dated the Closing Date and addressed to the Indenture Trustee and the Secondary Bond Purchaser, delivered by the City's bond counsel, including state and federal tax treatment of the Bonds and the City's bonds.

- A State law supplemental opinion in respect of the Bond Documents in the form attached as Appendix D hereto, dated the Closing Date and addressed to the Indenture Trustee and the Secondary Bond Purchaser, delivered by the City's bond counsel, including, with respect to the City's opinion, the City's right, power and authority, execution and delivery, no further consents, no registration of the Bonds and the City's bonds under federal securities laws, that the Bond Documents are exempt from qualification under the Trust Indenture Act of 1939, as amended and no governmental immunity under State law with respect to actions to enforce the Bonds and the City's bonds.

- New or amended Deposit Account Control Agreement or similar account documentation with Comerica with respect to the Comerica Account.

- Documentation necessary to establish and fund the Indenture Trustee Account in the name of the Indenture Trustee, including the designation of the Pledged Income Tax Revenues being deposited to the Indenture Trustee Account for the purpose of paying principal of and interest on the Bonds.

- Ordinances and resolution of governing bodies and consent of State officers, including Emergency Manager, whose consent is required by applicable law for execution of the Bond Documents and all related documents and granting of pledges and security interests described

therein.

The foregoing documents are collectively referred to herein as the "Bond Documents".

The City and the MFA will furnish such information, will execute and deliver such instruments and documents and will take such other action in cooperation with the Secondary Bond Purchaser as the Secondary Bond Purchaser may reasonably request at no cost to the City or the MFA to: (i) qualify the Bonds for offer and sale under the "Blue Sky" or other securities laws and regulations of such states and other jurisdictions of the United States of America as the Secondary Bond Purchaser may (in its sole discretion) designate; (ii) determine the eligibility of the Bonds for investment under the laws of states and other jurisdictions as the Secondary Bond Purchaser may (in its discretion upon consultation with, and agreement of the City) designate, and to provide for the continuance of such qualifications or exemptions in effect for so long as required for distribution of Bonds; and (iii) allow the Secondary Bond Purchaser to sell the Bonds, each in accordance with market practice and securities and state law at such time.

The City and the MFA shall, to the extent required by law, properly and timely file, with the assistance of bond counsel, Form 8038-G with the Internal Revenue Service pursuant to Section 149(e) of the Internal Revenue Code.

The City and the MFA shall provide a non-arbitrage certificate or tax regulatory agreement prepared by bond counsel, which shall set forth the facts, estimates and circumstances sufficient to satisfy the criteria which are necessary under the Internal Revenue Code to support the opinion of bond counsel that the interest on the Tax-Exempt Bonds is excludable from gross income to the beneficial owners thereof under the Internal Revenue Code.

With respect to the Tax-Exempt Bonds, the City and the MFA shall make all customary covenants required by the Secondary Bond Purchaser with respect to the tax-exempt status of such Bonds, including, without limiting the foregoing, covenants to the effect that (i) the City and the MFA will not take, or omit to take, any action lawful and within its power to take, which action or omission would cause interest on any such Bonds to become subject to federal income taxes, (ii) the City and the MFA will not permit any of the proceeds of such Bonds to be used in any manner that would cause any such Bonds to constitute a "private activity bond" within the meaning of

Section 141 of the Internal Revenue Code, (iii) the City and the MFA will not permit any of the proceeds of such Bonds or other moneys to be invested in any manner that would cause any such Bond to constitute an "arbitrage bond" within the meaning of Section 148 of the Internal Revenue Code or a "hedge bond" within the meaning of Section 149(g) of the Internal Revenue Code and (iv) the City and the MFA will comply with the provisions of Section 148(f) of the Internal Revenue Code relating to the rebate of certain investment earnings at periodic intervals to the United States of America.

**Conditions Precedent:**

Usual for municipal financings, including, without limiting the foregoing, execution and delivery of the Bond Documents satisfactory in form and substance in the sole discretion of the Secondary Bond Purchaser, including in respect of the Pledged Income Tax Revenue; delivery of satisfactory legal opinions of the MFA and officers' and public officials' certifications of the City and the MFA; delivery of documentation and other information to the Secondary Bond Purchaser to the extent reasonably required by Barclays pursuant to any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; payment of fees and expenses; accuracy of representations and warranties in all material respects; and absence of defaults.

Additionally, (1) the Bankruptcy Court having entered an order in form and substance reasonably satisfactory to the Initial Bond Purchaser, the Secondary Bond Purchaser and the Indenture Trustee (the "Confirmation Order") confirming the Plan and containing the findings of fact and orders set forth in Appendix E hereto; (2) the Confirmation Order is in full force and effect and not subject to a stay and which has not been reversed, modified, or vacated; (3) delivery of a legal opinion confirming clause (2) above in the form attached hereto as Appendix F hereto; and (4) occurrence of the effective date of the Plan.

Prior to settlement of the Bonds, the City and the MFA will complete a rating evaluation service or equivalent procedure with two of Moody's, Standard & Poor's and/or Fitch. The City and the MFA will seek to obtain credit ratings on the Bonds from two of Moody's, Standard & Poor's and/or Fitch in advance of the Public Offering. The City shall pay all costs and expenses in connection with the rating evaluation service or equivalent procedure and in connection with obtaining such credit ratings.

**Absence of Fiduciary Relationship:**

The City and the MFA acknowledge that the transactions described in this document are arms'-length commercial transactions and that the Secondary Bond Purchaser is acting

as principal and in its best interests. The City and the MFA are relying on their own experts and advisors to determine whether the transactions described in this document are in their best interests. The City and the MFA agree that the Secondary Bond Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Secondary Bond Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Secondary Bond Purchaser, on the one hand, and the City or the MFA, on the other hand. In addition, the Secondary Bond Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City and the MFA that may be the subject of the transactions described in this term sheet.

Please note that the Secondary Bond Purchaser and its affiliates do not provide tax, accounting or legal advice.

| | |
|---|---|
| Secondary Purchaser Contacts: | John Gerbino, Managing Director<br>Barclays Capital Inc.<br>745 Seventh Avenue, 19th Floor<br>New York, NY 10019<br>212 526 3466<br>john.gerbino@barclays.com |
| Secondary Purchaser Counsel: | Richard Levin, Esq.<br>Cravath, Swaine & Moore LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019-7475<br>212 474 1000<br>F 212 474 3700<br>rlevin@cravath.com<br><br>Ann D. Fillingham, Esq.<br>James P. Kiefer, Esq.<br>Courtney F. Kissel, Esq.<br>Dykema Gossett PLLC<br>Capitol View<br>201 Townsend Street, Suite 900<br>Lansing, MI 48933<br>517 374 9100<br>F 517 374 9191<br>afillingham@dykema.com<br>jkiefer@dykema.com<br>ckissel@dykema.com<br><br>David L. Taub, Esq.<br>Douglas I. Youngman, Esq.<br>McDermott Will & Emery LLP |

340 Madison Avenue
New York, New York 10173
212 547 5400
F 212 547 5444
dtaub@mwe.com
dyoungman@mwe.com

16

### Base Spreads

**Taxable Bonds**:  With respect to the Taxable Bonds, the Base Spread will be the rate corresponding to the Ratings (as defined below) of the Bonds in the table set forth below.  In the event of a split Rating (i.e., one of the Rating Agencies' Ratings is at a different level from the Rating of the other Rating Agency or Rating Agencies), then the Base Spread will be the average of the Base Spreads shown in the table corresponding to the two Rating levels; provided, that if the Taxable Bonds are rated by three Rating Agencies, the Base Spread will be determined by averaging the Base Spreads shown in the table corresponding to the two highest Rating levels.  If the Bonds have been assigned a Rating by only one single Rating Agency, the Base Spread will be the rate corresponding to such Rating plus 0.50%.  If no Rating Agency has assigned a Rating to the Bonds within the 150-day syndication period, the Base Spread will be the Base Spread shown below for the "BB/Ba2 or Below" category plus 0.50%.

| Rating | Base Spread |
| --- | --- |
| A-/A3 or Above | 2.25% |
| BBB+/Baa1 | 2.50% |
| BBB/Baa2 | 2.75% |
| BBB-/Baa3 | 3.50% |
| BB+/Ba1 | 4.50% |
| BB/Ba2 or Below | 4.75% |

**Tax-Exempt Bonds**:  With respect to the Tax-Exempt Bonds, the Base Spread will be the rate corresponding to the Ratings (as defined below) of the Bonds in the table set forth below.  In the event of a split Rating (i.e., one of the Rating Agencies' Ratings is at a different level from the Rating of the other Rating Agency or Rating Agencies), then the Base Spread will be the average of the Base Spreads shown in the table corresponding to the two Rating levels; provided, that if the Tax-Exempt Bonds are rated by three Rating Agencies, the Base Spread will be determined by averaging the Base Spreads shown in the table corresponding to the two highest Rating levels.  If the Bonds have been assigned a Rating by only one single Rating Agency, the Base Spread will be the rate corresponding to such Rating plus 0.50%.  If no Rating Agency has assigned a Rating to the Bonds within the 150-day syndication period, the Base Spread will be the Base Spread shown below for the "BB/Ba2 or Below" category plus 0.50%.

| Rating | Base Spread |
| --- | --- |
| A-/A3 or Above | 2.00% |
| BBB+/Baa1 | 2.25% |
| BBB/Baa2 | 2.50% |
| BBB-/Baa3 | 3.25% |
| BB+/Ba1 | 4.25% |
| BB/Ba2 or Below | 4.50% |

The term "**Rating**" as used above shall mean a long term unenhanced debt rating assigned by S&P, Moody's and/or Fitch (each a "Rating Agency" and collectively, the "Rating Agencies") to the Bonds at the time of the consummation of the Public Offering and remarketing of the Bonds as described herein.

## Appendix B

### Maximum Market Flex and Maximum Negative Market Flex

With respect to the Bonds, the Maximum Market Flex and the Maximum Negative Market Flex will be the rates corresponding to the Ratings (as defined below) of the Bonds in the table set forth below. In the event of a split Rating (i.e., one of the Rating Agencies' Ratings is at a different level from the Rating of the other Rating Agency or Rating Agencies), then the Maximum Market Flex and the Maximum Negative Market Flex will each be the average of the Maximum Market Flex and the Maximum Negative Market Flex, respectively, shown in the table corresponding to the two Rating levels; provided, that if the Bonds are rated by three Rating Agencies, the Maximum Market Flex and the Maximum Negative Market Flex, respectively, will be determined by averaging the Maximum Market Flex and the Maximum Negative Market Flex, respectively, shown in the table corresponding to the two highest Rating levels. If the Bonds have been assigned a Rating by only one single Rating Agency, the Maximum Market Flex and the Maximum Negative Market Flex will be the rates corresponding to such Rating plus 0.50%. If no Rating Agency has assigned a Rating to the Bonds within the 150-day syndication period, the Maximum Market Flex and Maximum Negative Market Flex will be as shown below for the "BB/Ba2 or Below" category plus 0.50% and -0.50%, respectively.

| Rating | Maximum Market Flex | Maximum Negative Market Flex |
|---|---|---|
| A-/A3 or Above | 1.75% | -1.75% |
| BBB+/Baa1 | 2.00% | -2.00% |
| BBB/Baa2 | 2.25% | -2.25% |
| BBB-/Baa3 | 2.75% | -2.75% |
| BB+/Ba1 | 3.50% | -3.50% |
| BB/Ba2 or Below | 3.75% | -3.75% |

The term "**Rating**" as used above shall mean a long term unenhanced debt rating assigned by S&P, Moody's and/or Fitch (each a "Rating Agency" and collectively, the "Rating Agencies") to the Bonds at the time of the consummation of the Public Offering and remarketing of the Bonds as described herein.

**Form of Bond Counsel State Law Approving Opinion**


City of Detroit
County of Wayne
State of Michigan


      We have acted as bond counsel to the City of Detroit, County of Wayne, State of Michigan (the "City") in connection with the issuance by the City of bonds in the aggregate principal sum of $_____, designated Financial Recovery Tax Revenue and Refunding Bonds, Series 2014 (the "Bonds"), for the purposes described in the Bonds. In such capacity, we have examined such law and the transcript of proceedings relating to the issuance of the Bonds and such other proceedings, certifications and documents as we have deemed necessary to render this opinion.

      The Bonds are in fully-registered form in the denominations of $100,000 each or integral multiples of $5,000 in excess thereof, numbered in order of registration, bearing original issue date of _____, 2014, payable as to principal and interest as provided in the Bonds, subject to redemption prior to maturity in the manner, at the times and at the prices specified in the Bonds.

      As to questions of fact material to our opinion, we have relied on the certified proceedings and other certifications of public officials and others furnished to us.

      Based upon the foregoing, we are of the opinion that, under existing law:

      1.     The Bonds have been duly authorized and executed by the City, and, except as otherwise set forth in this opinion letter, are valid and binding obligations of the City, enforceable in accordance with their terms. The Bonds are issued pursuant to Section 36a of Act 279, Public Acts of Michigan, 1909, as amended ("Act 279"), orders of the Emergency Manager for the City, dated _____, 2014 and _____, 2014, authorizing the issuance of the Bonds (the "Authorizing Orders"), and a Financial Recovery Bond Trust Indenture (the "Trust Indenture"), dated _____, 2014 between the City and UMB Bank, N.A., as trustee (the "Trustee"). Capitalized terms used herein without definitions shall have the meanings ascribed to them in the Trust Indenture.

      2.     The Bonds are payable in the first instance from the proceeds of certain ad valorem taxes levied by the City on all taxable property in the City, subject to applicable constitutional, statutory and charter tax rate limitations. Pursuant to the Authorizing Orders and Act 279, at the times and to the extent provided in paragraph 3 of this opinion, the Bonds are secured by a first priority lien on the Pledged Income Tax Revenue (as defined in the Authorizing Orders and the Trust Indenture).

      3.     Section 36a(7) of Act 279 creates a lien on the City's interest in all of the Pledged Income Tax Revenue that the City has pledged in connection with the Bonds on the terms and subject to the conditions described in the statute. Pursuant to Act 279, the City has provided in the Authorizing Orders for the deposit of the Pledged Income Tax Revenue into a deposit account dedicated solely to the receipt of Pledged Income Tax Revenue (the "Income Tax Deposit Account") at Comerica Bank, as Income Tax Depository Bank (the "Depository Bank"), all pursuant to the terms and conditions of (a) the

Trust Indenture, and (b) a Deposit Account Control Agreement (as defined in the Authorizing Orders) by and among the City, the Trustee and the Depository Bank. The Income Tax Deposit Account will be owned by and in the name of the City and the City shall cause all Pledged Income Tax Revenues to be deposited directly by the applicable taxpayers, or by the City if remitted by the taxpayers to the City, into the Income Tax Deposit Account. Pursuant to the Deposit Account Control Agreement, the Depository Bank will be instructed to transfer on a daily basis the Pledged Income Tax Revenues into an escrow account designated the "Pledged Income Tax Subaccount" of the Debt Service Fund, which will be an account at the Depository Bank established in the name of the Trustee under the Trust Indenture and to be used for the sole purpose of paying the principal of and interest on the Bonds and related administrative costs. Once the Income Tax Set-Aside Requirements (as defined in the Trust Indenture) have been satisfied from time to time in the Pledged Income Tax Subaccount such that (a) there is no deficiency in the Debt Service Fund balance or the Debt Service Reserve Fund balance, in each case, as required under the Trust Indenture, and (b) the City's obligations to make any deposits to the Debt Service Fund as of such date have been fully funded in accordance with the Trust Indenture, the balance of the Pledged Income Tax Revenue or any portion thereof, in the discretion of the City, may be released from the Income Tax Deposit Account and transferred to one or more accounts in the name of the City or otherwise, at the direction of the City. By the terms of Act 279, a statutory lien and trust is created applicable to those Pledged Income Tax Revenues that are received by the Trustee from the Depository Bank once they are deposited into the Pledged Income Tax Subaccount of the Debt Service Fund. Act 279 provides that the Pledged Income Tax Revenue paid to the Trustee for the purpose of paying principal of and interest on the Bonds shall be subject to a lien and trust, which is a statutory lien and trust paramount and superior to all other liens and interests of any kind, for the sole purpose of paying the principal of and interest on the Bonds and any other bonds subsequently issued by the City sharing a parity or subordinate pledge of that Pledged Income Tax Revenue. Act 279 further provides that the Pledged Income Tax Revenue held by the Trustee shall be held in trust for the sole benefit of the holders of the Bonds and is exempt from being levied upon, taken, sequestered, or applied toward paying the debts or liabilities of the City other than for payment of debt service on the Bonds to which the lien applies.

4.      [For Tax Exempt Portion Only] The interest on the Bonds (a) is excludable from gross income for federal income tax purposes and (b) is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. It should be noted, however, that with respect to corporations (as defined for federal income tax purposes), the interest is taken into account in determining adjusted current earnings for the purpose of computing the alternative minimum tax imposed on such corporations. Further, the Bonds and the interest thereon are exempt from all taxation by the State of Michigan or by any taxing authority within the State of Michigan except inheritance and estate taxes and taxes on gains realized from the sale, payment or other disposition thereof. The opinions set forth in this paragraph are subject to the condition that the City comply with all requirements of the Internal Revenue Code of 1986, as amended, that must be satisfied subsequent to the issuance of the Bonds in order that interest thereon be (or continue to be) excludable from gross income for federal and Michigan income tax purposes. The City has covenanted to comply with all such requirements. Failure to comply with certain of such requirements could cause the interest on the Bonds to be included in gross income retroactively to the date of issuance of the Bonds.

Except as stated in paragraph 4 above, we express no opinion regarding other federal or state tax consequences arising with respect to the Bonds and the interest thereon.

We express no opinion under paragraphs 2 or 3 of this opinion, or otherwise, on (a) the effect of Act 279 on Pledged Income Tax Revenue prior to the actual deposit of Pledged Income Tax Revenue into the Pledged Income Tax Subaccount of the Debt Service Fund in the name of the Trustee pursuant to the Trust Indenture (that time, the "Actual Deposit"), (b) except to the extent expressly provided in paragraph 3 of this opinion concerning the lien that arises under Section 36a(7) of Act 279 at the time of Actual Deposit, the validity, enforceability, perfection or priority of any security interest or other lien on Pledged Income Tax Revenue or any other collateral security for the Bonds; or (c) the effect of title 11 of the United States Code on the validity, enforceability, perfection or priority of any pledge of or lien on Pledged Income Tax Revenue. The rights and remedies of the Trustee and bondholders may be affected by bankruptcy, insolvency, fraudulent conveyance or other laws affecting creditors' rights generally, now existing or hereafter enacted, and by the application of general principles of equity, including those relating to equitable subordination.

This opinion is given as of the date hereof, and we assume no obligation to revise or supplement this opinion to reflect any facts or circumstances that may hereafter come to our attention, or any changes in law that may hereafter occur.

Very truly yours,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

## Appendix D

## Form of Bond Counsel State Law Supplemental Opinion

City of Detroit
County of Wayne
State of Michigan

Barclays Capital Inc.
New York, New York

UMB Bank, N.A.
Kansas City, MO

This opinion is submitted pursuant to Section [_____] of the Bond Purchase Agreement (the "Bond Purchase Agreement"), dated as of _____, 2014, among the City of Detroit, County of Wayne, State of Michigan (the "City"), the Michigan Finance Authority (the"MFA") and Barclays Capital Inc. (the "Purchaser"), relative to the purchase and sale of the City's Financial Recovery Tax Revenue and Refunding Bonds, Series 2014 in the aggregate principal sum of $_____ (the "Bonds") and is supplementary to our approving opinion bearing even date herewith (the "Approving Opinion").

We have examined (in addition to the proceedings and documents specified in the Approving Opinion), executed counterparts of the Bond Purchase Agreement, the Trust Indenture and the Deposit Account Control Agreement, each as hereinafter defined, pertaining to the Bonds. On the basis of such examination and our review of such other information, records and documents and matters of law as in our judgment is necessary and advisable, we are of the opinions that:

1.      The City is a validly incorporated and properly constituted home rule municipal corporation under the laws of the State of Michigan and has full legal right, power and authority to (i) adopt Order[s] No. __ [and __ ] of the Emergency Manager of the City on _____, 2014[and _____, 2014] ([together, ]the "Authorizing Order") and a duly executed Sale Order dated _____, 2014 (together with the Authorizing Order, the "Order"), authorizing the issuance, execution and delivery of the Bonds; (ii) enter into the Bond Purchase Agreement, the Financial Recovery Bond Trust Indenture, dated as of _____, 2014 (the "Trust Indenture"), by and between the City and UMB Bank, N.A. (the "Trustee"), and the Deposit Account Control Agreement, dated as of _____, 2014 (the "Deposit Account Control Agreement"), among the City, Comerica Bank and the Trustee *[expand to include such other transaction documents to which the City is a party as may be agreed upon by the parties]*; (iii) sell, issue and deliver the Bonds to the MFA as provided in the Bond Purchase Agreement; and (iv) carry out and consummate the transactions contemplated by the Order, the Bond Purchase Agreement, the Deposit Account Control Agreement and the Trust Indenture*[expand to include such other transaction documents to which the City is a party as may be agreed upon by the parties]*.

2.      The Bond Purchase Agreement, the Order, the Deposit Account Control Agreement and the Trust Indenture *[expand to include such other transaction documents to which the City is a party as may be agreed upon by the parties]* have been duly authorized, executed and delivered by the City, and assuming due authorization, execution and delivery of the Bond Purchase Agreement and the Trust Indenture *[expand to include such other transaction documents to which the City is a party as may be agreed upon by the parties]* by the other parties thereto, as to which no opinion is expressed, constitute the legal, valid and binding agreements of the City, enforceable against the City in accordance with their respective terms. The City is subject to suit with respect to its obligations under the Bond Purchase Agreement, the Order, the Deposit Account Control Agreement and the Trust Indenture *[expand to include such other transaction documents to which the City is a party as may be agreed upon by the parties]* and has no right to immunity from suit or other legal process on the grounds of governmental immunity, except with respect to tort liability arising through the exercise or discharge of a governmental function under the Governmental Tort Liability Act, MCL 691.1401, *et seq.*

3.      The execution and delivery of the Bonds, the Bond Purchase Agreement, the Order, the Deposit Account Control Agreement and the Trust Indenture [*expand to include such other transaction documents to which the City is a party as may be agreed upon by the parties*] and compliance by the City with the provisions contained therein, will not conflict with or constitute a breach of or default under any constitutional provision, law, material administrative regulation, judgment decree, loan agreement, indenture, bond, note, ordinance, resolution, agreement or other instrument to which the City is a party or to which the City is otherwise subject.

4.      No approval or other action is required to be obtained by the City from any governmental authority or agency in connection with the issuance and sale of the Bonds, or the execution by the City of the Bond Purchase Agreement, the Order, the Deposit Account Control Agreement or the Trust Indenture [*expand to include such other transaction documents to which the City is a party as may be agreed upon by the parties*] that has not already been obtained or taken, except that the offer and sale of the Bonds in certain jurisdictions may be subject to compliance with the provisions of the securities or blue sky laws of such jurisdictions (as to which no opinion is expressed).

5.      The Bonds are exempt from the registration requirements of the Securities Act of 1933, as amended, and the Order and the Trust Indenture are exempt from qualification pursuant to the Trust Indenture Act of 1939, as amended.

The opinions rendered herein and enforceability of the rights and remedies set forth in the Bonds, the Order, the Trust Indenture, the Deposit Account Control Agreement and the Bond Purchase Agreement may be limited by bankruptcy, insolvency, fraudulent conveyance or other laws affecting creditors' rights generally now existing or hereafter enacted, and by the application of general principles of equity including those relating to equitable subordination.

This opinion is given as of the date hereof, and we assume no obligation to revise or supplement this opinion to reflect any facts or circumstances that may hereafter come to our attention, or any changes in law that may hereafter occur.  This opinion is limited in all respects to the laws of the State of Michigan and the Federal laws of the United States of America, other than the laws under title 11 of the United States Code, upon which we render no opinion.

The addressees of this opinion may rely on our Approving Opinion addressed to the City, bearing even date herewith, as if it was addressed to them.

Very truly yours,


MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

## Appendix E

## Exit Financing Excerpts from Confirmation Order

### Findings of Fact

The terms and conditions of the Exit Facility and the Bond Documents and the fees to be paid thereunder are fair and reasonable, reflect the City's exercise of prudent judgment, are supported by reasonably equivalent value and fair consideration, proposed in good faith, critical to the success and feasibility of the Plan and in the best interests of the Debtor. The Exit Facility and the fees to be paid thereunder are the result of a full and fair marketing process conducted by the City and its agents and advisors. The Exit Facility and the Bond Documents and the fees to be paid thereunder were negotiated in good faith, without fraud or collusion and at arms' length among the parties, without the intent to hinder, delay or defraud any creditor of the Debtor, and is supported by reasonably equivalent value and fair consideration. Credit extended under the Exit Facility and the Bond Documents is extended in good faith for purposes and uses that are permitted by law, and not in violation of the Bankruptcy Code or of applicable nonbankruptcy law, and the Exit Facility (including the transactions contemplated by the Bond Documents) is not prohibited by applicable bankruptcy or nonbankruptcy law. The Purchaser, the Indenture Trustee and the Bondholders therefore shall not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, of any order finding jurisdiction, of the order for relief or of any other order.

### Order

(a)  The terms and conditions of the Exit Facility are fair and reasonable, and the Exit Facility has been negotiated in good faith and at arm's length. The City is hereby authorized to enter into execute, deliver, file, record and issue and the Bond Documents and to incur the obligations under the Exit Facility, including the granting of liens thereunder, the payment of all fees, expenses, indemnities and other amounts provided for in each of the Exit Facility, together with the other instruments, agreements, guaranties and documents entered into in connection therewith, all of which is hereby approved, and is authorized and empowered to incur and to perform its obligations in accordance with, and subject to, the Bond Documents and to perform all acts, make, execute and deliver all instruments and documents which may be required for the performance by the City under the Bond Documents and the creation and perfection of the liens described in and provided for by the Bond Documents. Subject to the terms and conditions set forth in the Bond Documents and to the City's compliance with the procedures for authorizing the borrowing of money under Sections 12(1) and 19 of Act 436 and the Board's approval of the Financing under Section 36a of the Michigan Home Rule City Act, the City is hereby authorized to issue the Bonds for purchase by the Purchaser on the Closing Date and is hereby authorized to enter into and incur the Exit Financing.

(b)  The Bond Documents and the obligations of the Debtor thereunder, including all related pledges and security agreements, shall upon execution, constitute legal, valid, binding and authorized obligations of the Debtor, enforceable in accordance with their terms. The loans, advances and financial accommodations to be extended under the Exit Facility are being extended, and shall be deemed to have been extended, in good faith, for legitimate purposes, are reasonable, shall not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever, and

shall not constitute preferential transfers, fraudulent transfers or conveyances or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

**Appendix F**

**Form of Bankruptcy Opinion**

_____, 2014

To:

Barclays Capital, Inc.
745 Seventh Avenue, 19th Floor
New York, New York 10019

Re: <u>City of Detroit</u>

Ladies/Gentlemen:

We have acted as primary restructuring counsel for the City of Detroit, Michigan (the "<u>City</u>") in its bankruptcy case (the "<u>Case</u>") pending under chapter 9 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et al., in the United States Bankruptcy Court for the Eastern District of Michigan (the "<u>Bankruptcy Court</u>"). In that capacity, we have represented the City in connection with, among other things, the $[300,000,000] Exit Financing Bond Facility (the "<u>Exit Facility</u>") consisting of Financial Recovery Revenue and Refunding Bonds, Series 2014 (the "<u>Bonds</u>") issued pursuant to (i) that certain local purchase contract (the "<u>Local Purchase Contract</u>") by and among the City and the Michigan Finance Authority as Purchaser (the "<u>MFA</u>") dated as of [_____], 2014, (ii) that certain bond purchase agreement (the "<u>Purchase Agreement</u>") by and among the MFA as Issuer and Barclays Capital Inc. as Purchaser ("<u>Barclays</u>") dated as of [_____], 2014 and (iii) the Trust Indenture (the "<u>Indenture</u>") by and among the City, [the MFA] and UMB Bank, N.A. (the "<u>Trustee</u>") dated as of [_____], 2014. Capitalized terms used herein and not otherwise defined herein have the meanings assigned to such terms in the Local Purchase Contract, Purchase Agreement or the Indenture, as applicable. With your permission, all assumptions and statements of reliance herein have been made without any independent investigation or verification on our part except to the extent, if any, otherwise expressly stated, and we express no opinion with respect to the subject matter or accuracy of the assumptions or items upon which we have relied.

In connection with the opinion expressed herein, we have examined such documents, records and matters of law as we have deemed necessary for the purposes of such opinion, including the Order [Confirming Sixth Amended Plan for the Adjustment of Debts of the City of Detroit] [Docket No. __] (the "<u>Confirmation Order</u>").

Based upon the foregoing, and subject to the limitations, qualifications and assumptions set forth herein, we are of the opinion that:

The Confirmation Order was entered on the docket of the Bankruptcy Court (the "<u>Docket</u>") on [_____], 2014. We have reviewed the Docket as it existed on [_____], 2014 at 11:59 P.M. Based solely on our review of the Docket as of such date and time: (1) the Confirmation Order is in full force and effect in accordance with its terms, (2) no motion to amend, reargue, stay, vacate or rescind the Confirmation Order has been filed with the Bankruptcy Court and (3) no order amending, granting reargument, staying, vacating or rescinding the Confirmation Order has been entered by the Bankruptcy Court and the Confirmation Order is not subject to any pending appeal, except the notices of appeal filed by [_____].

The opinion set forth above is subject to the following qualifications and limitations:

(A)     The opinion set forth above is qualified to the extent that (i) with respect to the opinion in clause (2), any motion to amend, reargue, stay, vacate or rescind the Confirmation Order is filed with the Bankruptcy Court or (ii) an order is entered reversing, amending, granting reargument, staying, vacating or rescinding the Confirmation Order, in the case of either (i) or (ii), after [_____], 2014 at 11:59 P.M.

(B)     The opinion expressed in this letter is limited to the application of 11 U.S.C. §§101-1532.

(C)     Our opinion is limited to that expressly set forth herein, and we express no opinion by implication. This opinion letter speaks only as of the date hereof and we have no responsibility or obligation to update this opinion letter, to consider its applicability or correctness to any person or entity other than its addressee(s), or to take into account changes in law, facts or any other developments of which we may later become aware.

(D)     The opinion expressed herein is solely for the benefit of the addressees hereof and of any other person or entity becoming a bondholder under the Purchase Agreement or the Indenture, in each case, in connection with the transaction referred to herein and may not be relied on by such addressees or such other persons or entities for any other purpose or in any manner or for any purpose by any other person or entity. At your request, we hereby consent to reliance hereon by any future assignee of your interest in the Bonds under the Purchase Agreement or the Indenture pursuant to an assignment that is made and consented to in accordance with the express provisions of the Purchase Agreement or the Indenture, on the condition and understanding that (i) this opinion letter speaks only as of the date hereof, (ii) we have no responsibility or obligation to update this opinion letter, to consider its applicability or correctness to any person or entity other than its addressee(s), or to take into account changes in law, facts or any other developments of which we may later become aware and (iii) any such reliance by a future assignee must be actual and reasonable under the circumstances existing at the time of assignment, including any changes in law, facts or any other developments known to or reasonably knowable by the assignee at such time.

Very truly yours,

## CERTIFICATE OF SERVICE

I, Heather Lennox, certify that the foregoing Notice of Acceptance of Tender was filed and served via the Court's electronic case filing and noticing system on this 28th day of August, 2014.

/s/ Heather Lennox
Heather Lennox