**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                                         Chapter 9
City of Detroit, Michigan,                                     Case No. 13-53846
        Debtor.                                   Hon. Steven W. Rhodes
_____/

**Order Granting in Part Motion to Strike**
**and**
**Order to Show Cause Why Sanctions Should Not Be Imposed**
**Under Bankruptcy Rule 9011 and 28 U.S.C. § 1927**

In the 13 months since this case was filed, the Court has observed that the attorneys for

the many parties have consistently and uniformly conducted themselves with the highest degree

of professionalism and civility.  That conduct has demonstrated that zealous advocacy does not

require any less than that even when the litigation is high-stakes, complex and, at times,

emotional.  It has brought honor to those attorneys, the bar and our legal process.

That record of achievement in this case came to an end, however, when Syncora[1] filed its

Second Supplemental Objection to the Debtor's Plan of Adjustment ("the Objection") on August

12, 2014.  (Dkt. #6651)  In support of Syncora's claim that the City did not propose its Plan of

Adjustment in good faith, the Objection asserted, without colorable basis, that two of the Court's

mediators in this case, Chief United States District Judge Gerald Rosen and attorney Eugene

Driker, are biased in favor of the creditors with pension claims and against the financial

creditors, and that as result of that bias, the "favored" creditors will be paid in full while the

_____

[1] "Syncora" refers to creditors Syncora Guarantee Inc. and Syncora Capital Assurance
Inc.

financial creditors will be paid almost nothing.  The Objection also falsely asserted that the mediators had failed to disclose that Mr. Driker's wife had been on the board of the Detroit Institute of Arts Corporation, which manages the Detroit Institute of Arts under contract with the City, and that this undisclosed conflict also defeats the City's good faith in proposing its plan.

On August 18, 2014, the City responded with a motion to strike the Objection in part ("Motion to Strike" or "Motion").  (Dkt. #6845)  On August 22, 2014, Syncora filed a response in opposition to the Motion ("Response").  (Dkt. #7007)  Several parties also filed statements regarding the City's Motion to Strike.[2]

On August 25, 2014, the Court held a hearing.  The motion is granted in part and denied in part.

## I. Syncora's Second Supplemental Objection

The focus of the City's Motion to Strike is upon Section I of the Objection.  Because the Motion challenges the allegations that the Objection makes against the mediators, the Court must quote them at some length rather than attempt to summarize them.

---

[2] Responses in support of the motion were filed by the Official Committee of Retirees (Dkt. #6897), the Retired Detroit Police & Fire Fighters Association, Donald Taylor, individually, and as President of the RDPFFA, and the Detroit Retired City Employees Association and Shirley V. Lightsey, individually, and as President of the DRCEA (Dkt. #6906), the Detroit Police Officers Association (Dkt. #6972), the State of Michigan (Dkt. #6980), and the Detroit Retirement Systems (Dkt. #7009).

Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City Of Detroit Retirees filed a statement in aid of the Court's consideration.  (Dkt. #6931)

Section I.A. of the Objection[3] argues that the Grand Bargain[4] is the product of improper mediation because "[t]he Grand Bargain was orchestrated to maximize recoveries for politically favored, insider creditors while protecting the Museum Assets from all other creditors and the City itself." Objection at 12. (Dkt. #6651)

The Objection contends that "the Plan fails the good-faith test because the DIA Settlement is . . . the product of agenda-driven, conflicted mediators who colluded with certain interested parties to benefit select favored creditors to the gross detriment of disfavored creditors and, remarkably, the City itself[.]" *Id*. at 11.

The Objection explicitly asserts that the City's plan is born of "collusion," which the Objection defines as "[a]n agreement between two or more persons to defraud a person of his

---

[3] The argument discussed in the text is in Section I.A. of the Objection. Section I.B. of the Objection also asserts that "[t]he Grand Bargain, if approved, amounts to a judicially sanctioned fraudulent transfer." The City seeks to strike this argument on the grounds that it is untimely because it violates the restriction in the order, then in effect, that limited supplemental objections to those which "result from discovery, the results of plan voting, or changes incorporated in the City's latest plan of adjustment." (Dkt. #6560) The City also argues that the fraudulent transfer claim lacks merit.

The Court concludes that Syncora's fraudulent transfer argument is based on evidence resulting from discovery and is therefore timely. The Court further concludes that whatever the ultimate merit of the argument, it is not scandalous or otherwise subject to striking under Rule 12(f) of the Federal Rules of Civil Procedure or Rule 9018 of the Federal Rules of Bankruptcy Procedure. Accordingly, the aspect of the motion that seeks to strike Section I.B. is denied.

[4] Some of the parties use the phrase "Grand Bargain" to refer to a complex settlement, incorporated into the City's plan of adjustment but not yet approved by Court, under which several parties - charitable foundations, the Detroit Institute of Arts, and the State of Michigan - will contribute $816 million to the City's pension funds to enhance the recoveries of pension claimants and the City will transfer the art collection at the DIA into a charitable trust. Among the parties to the Grand Bargain are the City, the State of Michigan, the City's two pension plans, the Official Committee of Retirees, and several charitable foundations. The settlement is also sometimes called the "DIA settlement."

Syncora objects to the Grand Bargain, asserting that it unfairly discriminates against it, is not fair and equitable, is illegal, and is not proposed in good faith.

rights by the forms of law, or to obtain an object forbidden by law . . . . A secret combination, conspiracy or concert of action between two or more persons for fraudulent or deceitful purpose." *Id.* at 11.

In the Objection, the core of this contention appears in this allegation:

> Neither Judge Rosen nor Mr. Driker ever disclosed any biases or conflicts of interest that might affect their ability to serve as impartial mediators in this case, but, while Syncora takes no pleasure in saying it, both were biased and conflicted from the beginning. Mr. Driker is conflicted and certainly, at a minimum, would appear to be so to an objective observer—**his wife is a longtime member (now emeritus) of the Board of Directors of the Detroit Institute of Arts,** an active party in this case that asserts an implied charitable trust over the City's most valuable assets and one of the parties to the DIA Settlement that is the linchpin of the Grand Bargain.

Objection at 15. (Dkt. #6651)

The Objection also asserts, "Regrettably, but truly, it could not be clearer that the mediators—rather than mediating discrete disputes—designed and later executed a transaction in furtherance of their own personal vision of what was important to protect and for whom." *Id.* at 18. It argues:

> What brought the strange bedfellows of the Grand Bargain together was not an unbiased attempt to resolve genuine disputes among the parties; it was a quasi-political maneuver by Judge Rosen and Mr. Driker to pick winners and losers in the bankruptcy (pensioners and mostly suburban patrons of the art versus other creditors) while simultaneously transferring the Museum Assets beyond the reach of all present and future creditors other than the chosen winners. Worse still, Judge Rosen and Mr. Driker will have caused the City—with its acquiescence—to alienate billions of dollars of assets forever.

*Id.* at 18-19.

The Objection also cites and quotes several public statements by Chief Judge Rosen concerning the Grand Bargain, which, Syncora argues, "discarded any pretense of impartiality among the creditors[.]" *Id.* at 20.

The Objection concludes:

> The Grand Bargain at the heart of the Plan was not proposed in good faith to settle a dispute—as discussed, there was no actual ownership dispute between the City, on the one hand, and the foundations and State, on the other—but rather was engineered by two mediators who colluded with a select group of interested, insider parties to accomplish their discriminatory agenda in violation of basic standards of conduct for mediators.
>
> * * *
>
> It would be an affront to the notion of good faith for this Court to place its imprimatur on a Plan conceived by biased mediators and that exhibits such naked favoritism to favored, insider creditors. Federal bankruptcy law—indeed, the rule of law—is meant to insulate the judicial process from political considerations, and it is meant to protect the unpopular and those without political influence. The Court must reject the Plan to preserve the integrity of judicial and mediation processes.

Objection at 22-23. (Dkt. #6651)

## II. The City's Motion to Strike

The City responded to the Objection with its Motion to Strike Section I of the Objection on two grounds. The City seeks to strike Section I of the Objection on the grounds that the factual claims in it are manifestly improper and false, including Syncora's attack on the mediators and the mediation.

The Motion establishes that the mediators did timely disclose Mrs. Driker's connection to the DIA. Motion to Strike at 1. (Dkt. #6845) That connection, along with the fact that Mr. and Mrs. Driker have made contributions to the DIA, was disclosed shortly after the mediators were appointed. On September 9, 2013, Chief Judge Rosen sent a letter to all parties disclosing Mr.

5

Driker's many connections with the City of Detroit. Disclosure Letter at 5-7, *in* Motion to Strike, Ex. 6-C. (Dkt. #6845) Specifically, Chief Judge Rosen's letter disclosed:

> Mr. Driker's wife, Elaine, served for a number of years as a member of the Board of Directors of the Detroit Institute of Arts. Her term ended in 2011, but she was elected a Director Emerita in 2012, entitling her to attend Board meetings, without a vote. Both Mr. and Mrs. Driker have been contributors to the DIA for many years.

*Id*. at 7.

The Motion also establishes that among the attorneys to whom Chief Judge Rosen sent this letter were the attorneys who signed and filed the Objection.

The City's Motion argues, "The assertion thus shows abject disregard for the professional reputation of Mr. Driker and Chief Judge Rosen, and for the integrity of the bankruptcy proceedings." *Id.* at 6. Pointing to the immediate local and national news reporting of Syncora's accusation, the City questions whether that was Syncora's intent. *Id.*

The Motion also argues that nothing prohibits a mediator from proposing any settlement and that it is for the parties to determine whether and how to settle based on their own interests. Thus the City argues that the Grand Bargain is the result of arms-length negotiations, subject to approval by the Court in the plan confirmation process, and that the origin of the Grand Bargain is legally irrelevant.

Relying on Rule 12(f) of the Federal Rules of Civil Procedure, the City requests that the Court strike Section I of the Objection on the grounds that it is "scandalous." The City also asks the Court to consider ordering Syncora and its attorneys to issue a formal apology, and to

consider ordering Syncora and its attorneys to show cause why sanctions should not be imposed under Rule 11 or 28 U.S.C. § 1927.[5]

### III. Syncora's Response to the Motion to Strike

Syncora's Response to the Motion to Strike begins by repeating its argument that the plan was not filed in good faith:

> The regrettable manner in which the mediation process slipped the bounds of propriety and became a delivery vehicle for a biased and untenable Plan goes directly to the issue of good faith. Seen in the light of day, the tainted mediation process poses an existential threat to the Plan, itself already in intensive care.

Response at 3. (Dkt. #7007)

From there, however, Syncora's argument undergoes a significant change. It abandons its contention that the mediators did not disclose Mrs. Driker's position with the DIA and that Mr. Driker had a conflict of interest "from the beginning," as it argued in its Objection. *See* Objection at 15. (Dkt. #6651) The Response instead argues that the conflict arose with the failure to disclose Mr. Driker's later involvement in negotiating the issues relating to the DIA:

> [T]he fact that Mr. Driker's wife sits on the board of the DIA is not inherently a conflict, and Syncora has not asserted otherwise. But the fact that Mr. Driker subsequently moved front and center to conceiving, negotiating, and soliciting contributions from foundations for the Grand Bargain is both contrary to the limited and specific role assigned to Mr. Driker at the outset of the mediation process and absolutely disabling.
> * * *

---

[5] The City also requests that the Court strike Section I.A of the Objection on the grounds that it is untimely and that Syncora's concerns about the mediators should have been presented to the Court months ago. Syncora contends otherwise.

The Court concludes that the interests of justice would be better served by resolving the motion to strike on the substantive grounds that the motion asserts. Accordingly, the Court will not address the timeliness issue.

7

At some unknown point between September 17, 2013 and December 11, 2013, Mr. Driker apparently expanded his mediation responsibilities to include issues relating to the DIA. No new letter was issued by Mr. Driker or Judge Rosen disclosing the change in Mr. Driker's role. Thus, on information and belief, Mr. Driker never disclosed to Syncora or any other mediation party that he was personally involved in mediations involving the City, the State, the DIA, and the Foundations regarding the Museum Assets or the DIA Settlement *prior to or during any such mediation sessions*.

* * *

In this situation, though a conflict did not initially exist when Mr. Driker's role was limited to mediating disputes involving the City and its pension funds, a disclosable potential conflict arose when he became involved in the negotiation of the Grand Bargain—and it is only now clear that this potential conflict was or quickly became an actual, disabling conflict. Despite a duty to inform the Court and all mediation participants of the change in Mr. Driker's responsibilities, the mediators failed to do so. And it is that conflict—and the corresponding non-disclosure—that lies at the heart of the good-faith objection in Syncora's Second Supplemental Objection.

Response at 2, 9-10. (Dkt. #7007) Thus, the Response contends that Chief Judge Rosen's disclosure letter is "unremarkable and proves nothing." *Id.*

The Response also protests:

But Syncora has not leveled allegations that unnecessarily reflect on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court. Indeed, Syncora took great pains to say—and it repeats—that it does not question Judge Rosen's or Mr. Driker's sincerity or integrity[.]

*Id.* at 14 (footnote and internal quote marks omitted).

## IV. Rule 12(f) of the Federal Rules of Civil Procedure

As noted, the City relies on Rule 12(f) of the Federal Rules of Civil Procedure, which

states, "The court may strike from a pleading an insufficient defense or any redundant,

immaterial, impertinent, or scandalous matter." The City's reliance on this rule, however, is misplaced.

Rule 7012(b) makes Rule 12(f) only applicable in adversary proceedings in bankruptcy. *In re Chase*, No. 05-45706, 2008 WL 2945997, at *7 n.12 (Bankr. S.D.N.Y. July 25, 2008); *In re Kunkel*, No. 01-25282REF, 2008 WL 783379, at *1 (Bankr. E.D. Pa.) ("[N]othing incorporates Federal Rule 12(f) into contested bankruptcy matters."); *In re Overmyer*, 24 B.R. 437, 441 (Bankr. S.D.N.Y 1982). The Objection was not filed in an adversary proceeding. Accordingly, Rule 12(f) does not apply here.

There is a second reason that the City's reliance on Rule 12(f) is misplaced. The rule allows the court to strike matter from a "pleading." Pleadings are those papers identified in Rule 7(a), such as a complaint and an answer, and an objection to a plan is not among them. *United States v. Coney*, 689 F.3d 365, 379 n.5 (5th Cir. 2012); *Marquette Transp. Co. v. Trinity Marine Prods., Inc.*, Nos. 06-0826, 06-827, 06-1281, 06-1282, 2006 WL 2349461, at *1 n.1 (E.D. La. Aug. 11, 2006) ("Because Rule 12(f) contemplates only striking 'pleadings' as defined by the Federal Rules, see Rule 7(a), and because plaintiffs' statements are not pleadings, defendants' motions to strike are DENIED."); *In re Fugitt*, No. 13-03094-NPO, 2014 WL 3888281, at *15 (Bankr. S.D. Miss. Aug. 8, 2014); 5C Charles Alan Wright et al., Federal Practice & Procedure 1380 & n.8.5 (3d ed. 2012) ("Rule 12(f) motions only may be directed towards pleadings as defined by Rule 7(a); thus motions, affidavits, briefs, and other documents outside of the pleadings are not subject to Rule 12(f).").

## V. 11 U.S.C. § 107(b)(2) and Rule 9018 of the Federal Rules of Bankruptcy Procedure

The Court will nevertheless consider the substance of the City's motion, because there is ample support for the relief that it requests in two other sources - 11 U.S.C. § 107(b) and Rule

9018 of the Federal Rules of Bankruptcy Procedure, and the Court's consideration of the Motion to Strike on these grounds rather than Rule 12(f) does not prejudice Syncora. 11 U.S.C. § 107(b) states, "On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may - . . . (2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title." Rule 9018 similarly provides, "On motion or on its own initiative, with or without notice, the court may make any order which justice requires . . . (2) to protect any entity against scandalous or defamatory matter contained in any paper filed in a case under the Code[.]"

In defining what constitutes "scandalous" matter under § 107(b)(2) and Rule 9018, the cases adopt a variety of approaches. One group concludes that it is appropriate to apply the case law that interprets the term in Rule 12(f). *In re Gitto Global Corp.*, 422 F.3d 1, 12-14 (1st Cir. 2005); *see also In re Starbrite Props. Corp.*, No. 11-40758 CEC, 2012 WL 2050745, at *6–7 (Bankr. E.D.N.Y. June 5, 2012); *In re Food Mgmt. Grp., LLC*, 359 B.R. 543, 558–59 (Bankr. S.D.N.Y. 2007) ("In interpreting § 107(b)(2) courts have considered Fed.R.Civ.P. 12(f). . . ."); *See also In re Phar–Mor, Inc.*, 191 B.R. 675, 678-79 (Bankr. N.D. Ohio 1995); *Hope v. Pearson*, 38 B.R. 423, 424–25 (Bankr. M.D. Ga. 1984). This group then concludes that under Federal Rule 12(f), "scandalous" is defined as "any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." *In re Anthracite Capital, Inc.*, 492 B.R. 162, 175 (Bankr. S.D.N.Y. 2013); *In re Starbrite Props. Corp.*, 2012 WL 2050745, at *6; *In re Food Mgmt. Grp.*, 359 B.R. at 558 n.16. See also Wright & Miller, Federal Practice and Procedure, § 1382 ("'[S]candalous' matter is that which improperly casts a derogatory light on someone[.]")

In *In re Gitto Global Corp.*, 422 F.3d at 14, the First Circuit considered the relationship between the truth of the challenged matter and its relevance to the action. It concluded, "[M]aterial that would cause a reasonable person to alter his opinion of an interested party triggers the protections of § 107(b)(2) based on a showing that either (1) the material is untrue, or (2) the material is potentially untrue and irrelevant or included within a bankruptcy filing for an improper end." *See also In re Creighton*, 490 B.R. 240, 247 (Bankr. N.D. Ohio 2013).

In *In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 432 (9th Cir. 2011), the Ninth Circuit rejected the First Circuit's conclusion in *Gitto Global*, concluding, "Under ordinary usage, then, matter is 'scandalous' if it [is] disgraceful, offensive, shameful and the like. There is no requirement that the material be either 'untrue' or 'potentially untrue' or that it be irrelevant or included within a court filing for 'an improper end.'"

The Court concludes that the reasoning and conclusion of *Gitto Global* are the most persuasive and adopts them, for one simple reason. Under *Roman Catholic Archbishop of Portland in Oregon*, determining whether matter is scandalous does not involve examining its relevance. The difficulty with this view is that many papers and pleadings in bankruptcy allege conduct that is arguably disgraceful, offensive or shameful - fraud, bad faith, willful and malicious injury, to name only a few - but which courts would not consider striking because those allegations are relevant to the legal claims that must be resolved. As the First Circuit observed in *Gitto Global*, "Many, if not the vast majority, of these papers will include material that is likely to affect an individual's reputation in the community." 422 F.3d at 8-9.

Accordingly, applying *Gitto Global*, the Court will grant the City's motion if it finds that the challenged matter would cause a reasonable person to alter his opinion of Chief Judge Rosen

and Mr. Driker, and that either (1) the challenged matter is false or (2) the challenged matter is potentially false and irrelevant or included within a bankruptcy filing for an improper end.

Finally, the Court finds wisdom in this astute observation from *Gitto Global*:

> While some parties seeking protection under § 107(b)(2) may be able to demonstrate untruthfulness solely on the basis of the papers filed with the court, such situations will be rare. More often than not, statements in a court filing are disputed. It would be unrealistic to require the bankruptcy court to resolve these factual disputes at a preliminary stage of the proceedings. The untruthfulness requirement would add an enormous burden to the bankruptcy courts' already heavy docket by turning motions for protection under § 107(b)(2) on an occasion for mini-trials. We therefore emphasize that although a bankruptcy court *may* grant protection under § 107(b)(2) based on a showing of untruthfulness, protection on this basis is available only in the rare case where the untruthfulness is readily apparent. Bankruptcy courts are under no obligation to resolve questions of truthfulness presented by a § 107(b)(2) motion where doing so would require discovery or additional hearings, or would be otherwise burdensome.

*Id.* at 11.

## VI. Whether Syncora's Allegations Would Cause a Reasonable Person to Alter His Opinion of the Mediators

The first issue under *Gitto Global*, therefore, is whether the allegations in Section I.A. of the Objection would cause a reasonable person to alter his opinion of Chief Judge Rosen and Mr. Driker. These are the allegations:

(1) The mediators failed to disclose Mrs. Driker's position with the DIA.

(2) The mediators' participation in mediating the Grand Bargain establishes that they were biased against the financial creditors in general or Syncora in particular.

(3) The mediators "colluded" with the City to defraud the financial creditors in general or Syncora in particular.

(4) "The Grand Bargain was orchestrated to maximize recoveries for politically favored, insider creditors[.]"

(5) The mediators "designed and later executed a transaction in furtherance of their own personal vision of what was important to protect and for whom."

12

(6) The Grand Bargain "was a quasi-political maneuver by Judge Rosen and Mr. Driker to pick winners and losers in the bankruptcy (pensioners and mostly suburban patrons of the art versus other creditors)[.]"

(7) "Judge Rosen and Mr. Driker will have caused the City—with its acquiescence—to alienate billions of dollars of assets forever."

(8) The Grand Bargain "was engineered by two mediators who colluded with a select group of interested, insider parties to accomplish their discriminatory agenda in violation of basic standards of conduct for mediators."

*See* Objection at 12, 15, 16, 18, 22, 27.  (Dkt. #6651)

The Response denies that the Objection "leveled allegations that 'unnecessarily reflect on the moral character'" of the mediators, and it protests that "it does not question Judge Rosen's or Mr. Driker's sincerity or integrity."  Response at 14  (Dkt. #7007)

The Court must reject this denial.  Section I.A. of the Objection does impugn the mediators' moral character and question their integrity.  The assertions of conflict of interest, bias, collusion, and political favoritism by the mediators would cause a reasonable person to alter his or her opinions of them.

## VII. Whether Syncora's Allegations Concerning the Mediators Are False

The next issue in the *Gitto Global* analysis is whether Syncora's allegations against Chief Judge Rosen and Mr. Driker are false.  In evaluating this issue the Court is mindful of the caution in *Gitto Global* that "although a bankruptcy court may grant protection under § 107(b)(2) based on a showing of untruthfulness, protection on this basis is available only in the rare case where the untruthfulness is readily apparent."  422 F.3d at 11.

The Court finds that it is readily apparent that each of the eight assertions summarized in the previous section is false.

13

The first allegation - that the mediators failed to disclose Mrs. Driker's position with the

DIA - is completely rebutted by Chief Judge Rosen's letter of September 9, 2013, quoted above,

which makes this precise disclosure.

At the hearing on this motion, Syncora's attorney argued that the Objection did not

actually assert that the mediators failed to disclose Mrs. Driker's position with the DIA. But it

did. As quoted above from the Objection:

> Neither Judge Rosen nor Mr. Driker ever disclosed any biases or
> conflicts of interest that might affect their ability to serve as
> impartial mediators in this case, but, while Syncora takes no
> pleasure in saying it, both were biased and conflicted from the
> beginning. Mr. Driker is conflicted and certainly, at a minimum,
> would appear to be so to an objective observer—***his wife is a
> longtime member (now emeritus) of the Board of Directors of the
> Detroit Institute of Arts,*** an active party in this case that asserts an
> implied charitable trust over the City's most valuable assets and
> one of the parties to the DIA Settlement that is the linchpin of the
> Grand Bargain.

Objection at 15. (Dkt. #6651)

This statement clearly asserts that "Mr. Driker is conflicted" because "his wife is a

longtime member (now emeritus) of the Board of Directors of the Detroit Institute of Arts." *Id.*

The statement also asserts that neither mediator "ever disclosed any biases or conflicts of

interest." *Id.* This is plainly a claim that Mrs. Driker's position with the DIA was not disclosed.

Accordingly, the Court must reject the denial by Syncora's counsel on this point.

The remaining allegations in Section I.A. of the Objection challenge the mediators'

conduct and management of the mediation in this case. Those matters are not of record in this

case and are confidential under this Court's mediation order. (Dkt. #322) Nevertheless, the

Court concludes that it is "readily apparent" that these allegations are false, as *Gitto Global*

requires. *See* 422 F.3d at 11. The Court further concludes that neither discovery nor a

burdensome evidentiary hearing is necessary to conclude that these allegations are false.

14

The falsity of the allegations is readily apparent from the circumstances. In their roles as mediators, Chief Judge Rosen and Mr. Driker were simply in no position to do any of the acts or accomplish any of the goals that the Objection alleges. They were in no position to "collude" with anyone, to "orchestrate" or "engineer" anything, to "execute a transaction," or to "pick winners and losers." These allegations misunderstand the nature of mediation. Even assuming that the mediators are as powerful as Syncora argues that they are outside of this case, and even assuming that the mediators did suggest solutions and compromises during their mediation sessions, as their role requires, it is nevertheless the parties who decide whether and how to resolve their disputes. Moreover, the parties make those judgments based upon their own evaluations of their best interests.

On this point the Court observes that the parties to these mediations were not only themselves sophisticated in the art of negotiation, but also were represented by highly competent and zealous advocates, as is Syncora. As much respect and gratitude as the mediators deserve for their dedication and skill in their accomplishments in this case, they could not impose their will, their plans, their agenda or their bias upon the parties through the mediation process, assuming they had any of those.

Finally, the Court must address the allegation of bias, which is really at the core of Section I.A. of the Objection. The allegation is that the mediators are biased in favor of the pension claimants and against the financial creditors. Two facts, however, completely rebut this allegation and make its falsity "readily apparent." First, the mediators have now successfully negotiated settlements with almost all of the institutional financial creditors, including:

(1) UBS AG and Merrill Lynch Capital Services, Inc., which held swaps termination claims totaling $288 million;

(2) Ambac Assurance Corp., Assured Guaranty Municipal Corp., Assured Guaranty Corp., and National Public Finance Guarantee Corp., on Unlimited Tax General Obligation Bonds totaling $375 million;

(3) BlackRock Financial Management and Ambac Assurance Corporation, on Limited Tax General Obligation Bonds totaling $160,970,000; and

(4) U.S. Bank National Association as DWSD Bond Trustee, Berkshire Hathaway Assurance Corporation, Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, BlackRock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisers, Inc. and Nuveen Asset Management, on Water and Sewerage Department Bonds totaling $5.2 billion.

None of these financial creditors joined in the Objection and none of them have otherwise made any claim or suggestion of bias or any other impropriety against the mediators.

Second, on January 17, 2014, this Court entered an order disapproving a settlement between the swaps counterparties and the City to terminate the swaps for a payment of $169.2 million. (Dkt. #2511) The Court did that after concluding that the settlement amount that the mediators had negotiated and recommended was too high in the circumstances. These circumstances establish anything but bias against the City's financial creditors on the part of the mediators.

That circumstance demonstrates a crucial point that Syncora's allegations of bias completely overlook - all of the settlements that the mediators negotiate among the parties in this case are subject to Court approval under the very carefully crafted and balanced standards for the approval of settlements and plan confirmation that are applicable in chapter 9 of the bankruptcy code. The willingness and ability of this Court and the appellate courts to apply those standards is the protection that the law affords to creditors in bankruptcy. That was the protection that the creditors received when this Court disapproved the City's settlement with the swaps counterparties. And that is the protection that Syncora will get at the confirmation hearing in this case, and thereafter on appeal if necessary.

16

The mediators' record of accomplishment in this case establishes but one plan, one agenda, one bias - to settle as much of the case as they can and to do so tirelessly and selflessly.

The mediators have not yet been successful in mediating a settlement between Syncora and the City, but that is not because the mediators are biased against Syncora. Nor is it from lack of effort. The docket reflects that Chief Judge Rosen has entered 11 orders requiring Syncora to appear for mediation.[6] This attempt began with an order entered on August 23, 2013, just one month after the case was filed. (Dkt. #593)

Accordingly, the Court concludes that it is readily apparent that Syncora's allegations of failure to disclose conflicts, collusion, favoritism and bias on the part of the mediators are false. Under *Gitto Global*, therefore, the City's motion to strike these allegations should be granted.

### VIII. In the Alternative, Whether Syncora's Allegations Are "Potentially False" and Irrelevant

The Court will now discuss the alternative grounds under *Gitto Global* for granting the motion to strike Section I.A. of the Objection. Under this alternative, the motion to strike can be granted if Syncora's allegations are "potentially false" and irrelevant. *See Gitto Global*, 422 F.3d at 14.

The Court pauses, however, to state that it pursues this alternative with no intent to suggest any possibility of truth in Syncora's allegations. The Court has no such view.

Syncora's allegations are certainly "potentially false," as that phrase is used in *Gitto Global. Id.* at 11. Therefore, the issue becomes whether Syncora's allegations are relevant. In this case, the issue is whether the assertions in Section I.A. of the Objection are zealous

---

[6] See Dkt. ##527, 593, 738, 1105, 1205, 1291, 2251, 2262, 2345, 5612, and 7072.

advocacy of facts relevant to Syncora's claim that the plan was not proposed in good faith, as Syncora asserts, or whether they are irrelevant to the good faith issue, as the City asserts.

Now is not the time to decide what it means for a municipality to propose a chapter 9 plan of adjustment in good faith under § 1129(a)(3) of the bankruptcy code, as incorporated into chapter 9 by § 901(a). It is, nevertheless, helpful to review the potential scope of the alternative meanings of good faith in this context to determine if the challenged statements here might be relevant.

In *In re Mount Carbon Metro. Dist.*, 242 B.R. 18 (Bankr. D. Colo. 1999), the court surveyed the case law and found several interpretations of what it means to propose a plan in good faith:

"[A] Chapter 9 plan proposed in good faith must treat all interested parties fairly and . . . the efforts used to confirm the plan must comport with due process." *Id.* at 39.

"[T]he good faith requirement of § 1129(a)(3) is met if the plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *Id.* at 40.

"[T]he good faith requirement is met if the plan was proposed with honesty and good intentions, and with a basis for expecting that a reorganization can be effected." *Id.*

"[G]ood faith requires fundamental fairness in dealing with one's creditors." *Id.*

"In finding a lack of good faith, courts have looked to whether the debtor intended to abuse the judicial process and the purposes of the reorganization provisions[.]" *Id.*

Ultimately, the *Mount Carbon* court concluded that in determining a good faith issue, the court should examine:

> (1) whether a plan comports with the provisions and purpose of the Code and the chapter under which it is proposed, (2) whether a plan is feasible, (3) whether a plan is proposed with honesty and

> sincerity, and (4) whether a plan's terms or the process used to
> seek its confirmation was fundamentally fair.

*Id.* at 40-41; *see also In re Pierce Cnty. Housing Auth.*, 414 B.R. 702, 720 (Bankr. W.D. Wash. 2009).

The extent to which these several approaches are substantively different is debatable. What is not debatable, however, is that the sole focus of the good faith inquiry, whatever that inquiry may be, are the plan and the debtor. No case law supports extending the good faith inquiry to the conduct of third parties, let alone to the conduct of the mediators who may have facilitated the settlements reflected in the plan. In this case, therefore, the sole good faith issue is the City's good faith in proposing its plan.

Certainly, as *Mount Carbon* suggests, the cases are legion across the rehabilitative chapters of the bankruptcy code in stating that the bankruptcy court must examine the "totality of the circumstances." 242 B.R. at 40. But this mandate identifies only where to look to determine the debtor's good faith. It does not identify what to look for and it does not authorize a broad-based examination into the motives and intentions of everyone in the case. This mandate to consider the "totality of the circumstances," therefore, does not make Syncora's challenge to the mediation and the mediators relevant to its objection that the City did not propose its plan in good faith.

Importantly, targeting the good faith inquiry on the plan and the debtor is also consistent with, and even required by, the Court's mediation order. That order states, "All proceedings, discussions, negotiation, and writings incident to mediation shall be privileged and confidential, and shall not be disclosed, filed or placed in evidence." (Dkt. #322) This requirement of confidentiality is a matter of necessity in facilitating settlements and no party, including Syncora, has objected to this provision in the mediation order.

19

Accordingly, the Court concludes that the allegations against the mediators in Section I.A. of the Objection are not relevant to the issue of the City's good faith in proposing its plan. Therefore, on these alternative grounds under *Gitto Global*, the City's Motion to Strike should be granted.

## IX. Conclusion

The Court finds that the allegations concerning the mediators in Section I.A. of the Objection are scandalous and defamatory.

Syncora's highly personal attack on Chief Judge Rosen in the Objection was legally and factually unwarranted, unprofessional and unjust. Justice requires the Court to strike the attack from its record.

Accordingly, as to Section I.A. of the Objection, the City's Motion to Strike is granted. As to Section I.B. of the Objection, the City's Motion to Strike is denied.

To administer this order, the Court will strike the Objection in its entirety and suppress it. Syncora shall have until September 2, 2014, to file an amended second supplemental objection that deletes and omits Section I.A and the references to it in other parts of the Objection.

Striking Section I.A. of the Objection, as the City requests, will not prejudice Syncora in arguing any contention that is relevant to whether the City proposed its plan in good faith - that the plan does not treat all parties fairly, that the plan will not fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code, that the plan was not proposed with honesty and good intentions, that the plan was not proposed with a basis for expecting that a reorganization can be effected, that the City did not act with fundamental fairness in dealing with its creditors, that the City intended to abuse the judicial process and the purposes of chapter 9, or that the plan's terms or the process used to seek its confirmation was not fundamentally fair.

20

At the trial on the confirmation of the City's plan of adjustment, the Court fully expects, and indeed welcomes, zealous advocacy. It is the Court's hope and expectation, however, that counsel will immediately return to that high degree of professionalism and civility that marked the first 13 months of this case, even as they zealously advocate for their clients at the trial.

The City's Motion also requested that the Court consider ordering Syncora and its attorneys to publicly apologize to Chief Judge Rosen and to Mr. Driker. Upon due consideration, the Court declines to do so, although not because a public apology is not warranted here. It is, and to Mrs. Driker, too. Rather, the Court concludes that a coerced and therefore insincere apology is not a true apology at all; it is not an acknowledgment of a mistake or an expression of regret.

The City's Motion also requested that the Court consider imposing sanctions against Syncora and its attorneys *sua sponte* under Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927. The Court concludes that this is appropriate, but under Rule 9011 of the Federal Rules of Bankruptcy Procedure. Accordingly, Syncora and its attorneys are directed to show cause why the specific conduct on their part described in this order did not violate Bankruptcy Rule 9011(b) and why sanctions should not be imposed under Bankruptcy Rule 9011(c) and 28 U.S.C. § 1927. Syncora and its attorneys shall file a response to this order to show cause by September 12, 2014. Other interested parties may file papers relating to this matter by September 19, 2014. The Court will determine at that time whether and when to set the matter for hearing.

It is so ordered.

Signed on August 28, 2014

                              _____/s/ Steven Rhodes_____
                              Steven Rhodes
                              United States Bankruptcy Judge