UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .          Docket No. 13-53846
          MICHIGAN,            .
                               .          Detroit, Michigan
                               .          August 25, 2014
                   Debtor.     .          9:00 a.m.
. . . . . . . . . . . . . . . .

        HEARING RE. (#6644) MOTION TO USE CASH COLLATERAL
    MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO (I)
   11 U.S.C., SECTION 105, 364(c), 364(d)(1), 364(e), 902,
        904, 921, 922 AND 928 (A) APPROVING POST-PETITION
      FINANCING AND (B) GRANTING LIENS AND (II) BANKRUPTCY
    RULE 9019 APPROVING SETTLEMENT OF CONFIRMATION OBJECTIONS
    FILED BY DEBTOR IN POSSESSION CITY OF DETROIT, MICHIGAN;
       (#6845) MOTION TO STRIKE DOCUMENT (RELATED DOCUMENTS
       6651 OBJECTION TO CHAPTER 9 PLAN) CITY OF DETROIT'S
        MOTION TO STRIKE IN PART SYNCORA GUARANTEE, INC., AND
    SYNCORA CAPITAL ASSURANCE, INC.'S, SECOND SUPPLEMENTAL
        OBJECTION TO THE DEBTOR'S PLAN OF ADJUSTMENT FILED
       BY DEBTOR IN POSSESSION CITY OF DETROIT, MICHIGAN
            BEFORE THE HONORABLE STEVEN W. RHODES
            UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                     By:  HEATHER LENNOX
                     222 East 41st Street
                     New York, NY  10017
                     (212) 326-3837

                     Jones Day
                     By:  ROBERT HAMILTON
                     325 John H. McConnell BLVD., Suite 600
                     Columbus, OH  43215
                     (614) 469-3939

                     Jones Day
                     By:  THOMAS CULLEN
                     51 Louisiana Avenue, N.W.
                     Washington, DC  20001
                     (202) 879-3939

                     Pepper Hamilton, LLP
                     By:  ROBERT S. HERTZBERG
                     4000 Town Center, Suite 1800
                     Southfield, MI  48075-1505
                     (248) 359-7333

APPEARANCES (continued):

| | |
|---|---|
| For Syncora Holdings, Ltd., Syncora Guarantee Inc., and Syncora Capital Assurance, Inc.: | Kirkland & Ellis, LLP<br>By:  STEPHEN C. HACKNEY<br>        RYAN BENNETT<br>300 North LaSalle<br>Chicago, IL  60654<br>(312) 862-2000 |
| For Financial Guaranty Insurance Company: | Weil, Gotshal & Manges, LLP<br>By:  ALFREDO PEREZ<br>700 Louisiana, Suite 1600<br>Houston, TX  77002<br>(713) 546-5040 |
| For National Public Finance Guarantee Corp.: | Sidley Austin, LLP<br>By:  JEFFREY BJORK<br>555 West Fifth Street, Suite 4000<br>Los Angeles, CA  90013<br>(213) 896-6037 |
| For Three Bond-Holders of DWSD Ad Hoc Water and Sewer Bondholder Committee: | Mintz, Levin, Cohn, Ferris, Glovsky and<br>  Popeo, PC<br>By:  WILLIAM KANNEL<br>One Financial Center<br>Boston, MA  02111<br>(617) 348-1665 |
| For County of Oakland, Michigan: | Young & Associates<br>By:  JAYE QUADROZZI<br>27725 Stansbury Blvd., Suite 125<br>Farmington Hills, MI  48334<br>(248) 353-8620 |
| For Assured Guaranty Municipal Corp.: | Chadbourne & Parke, LLP<br>By:  LAWRENCE LAROSE<br>        ROBERT SCHWINGER<br>30 Rockefeller Plaza<br>New York, NY  10112<br>(212) 408-5100 |
| For the State of Michigan: | Dickinson Wright<br>By:  STEVEN HOWELL<br>500 Woodward Avenue, Suite 4000<br>Detroit, MI  48226-3245<br>(313) 223-3033 |
| For the Official Committee of Retirees: | Dentons US, LLP<br>By:  CLAUDE D. MONTGOMERY<br>1221 Avenue of the Americas, 25th Floor<br>New York, NY  10020-1089<br>(212) 632-8390 |

APPEARANCES (continued):

| | |
|---|---|
| For the Detroit Retirement Systems: | Clark Hill, PLC<br>By: ROBERT D. GORDON<br>151 South Old Woodward Avenue, Suite 200<br>Birmingham, MI 48009<br>(248) 988-5882 |
| For the Detroit Fire Fighters Association and the Detroit Police Officers Association: | Erman, Teicher, Zucker & Freedman, P.C.<br>By: BARBARA A. PATEK<br>400 Galleria Officentre, Suite 444<br>Southfield, MI 48034<br>(248) 827-4100 |
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Lippitt O'Keefe, PLLC<br>By: RYAN C. PLECHA<br>370 East Maple Road, 3rd Floor<br>Birmingham, MI 48009<br>(248) 723-6263 |
| Court Recorder: | Kristel Trionfi<br>United States Bankruptcy Court<br>211 West Fort Street, 21st Floor<br>Detroit, MI 48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI 49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1    THE CLERK: All rise. Court is in session. Please

2  be seated. Calling Case Number 13-53846, City of Detroit,

3  Michigan.

4    MS. LENNOX: Good morning, your Honor. For the

5  record, Heather Lennox of Jones Day on behalf of the city.

6  We're here today, your Honor, on a motion to approve

7  financing and a settlement related to the DWSD secured debt.

8  What I'd like to do, with your Honor's permission, is to

9  explain sort of the -- at a very high level all of the moving

10 parts and pieces of the transaction and how they fit

11 together, including the settlement pieces, and I'd also like

12 to inform the Court as I go through that of some recent

13 positive developments that have occurred over the weekend

14 with respect to our ability to bring National Public Finance

15 Guarantee on as a settling party.

16    To start at the beginning, as your Honor is well

17 aware, our prior plans have contemplated the impairment of

18 certain of the CUSIPs, not all of them but certain of the

19 CUSIPs that comprise the DWSD bonds. The goal in doing that

20 has always been to achieve some debt relief savings for the

21 department going forward. As your Honor is also well-aware,

22 that has created a firestorm of objections from every secured

23 creditor and the trustee on the DWSD bondholders' side. As

24 that plan process was going on, the department continues to

25 operate, and the department is always in need of capital

funding.  It has started some very important projects related
to its sewer system, and those projects are ongoing.  In late
spring and early summer, however, the department decided that
it needed to borrow some money to be able to complete the
sewer capital projects, and at the time they were targeting
about $150 million net of fees and costs and OID.  So at that
time, they interviewed four investment banks that could help
them go to market to help raise that money, and as part of
that process they chose Citibank to help.  As that process
was going on and they were developing that request, as your
Honor knows, we moved into the summertime, and your Honor set
briefing on legal arguments, some of which were related to
the DWSD financial parties' objections to the plan.  We went
through that briefing, and we had legal argument, and as part
of that process, mediation efforts with respect to the DWSD
financial parties were reengaged.

        Out of that process, your Honor, came a potential
solution for a consensual transaction that our lenders and
the market could support and that would also provide, if
successful, significant debt service relief to DWSD.  We
shorthand this process by calling it the tender, but it has
many, many interrelated parts, and I'd like to just go
through that at a very high level.

        The first part of this process involved going to the
market and asking the bondholders to sell to the city their

1   current bonds that they hold or basically to tender the bonds

2   to us for our purchase.  We extended that invitation to all

3   DWSD bondholders, but we actually were targeting a group of

4   about 1.85 billion or so that, if tendered or if we call them

5   because some bonds that are currently callable, they would

6   provide the most savings to the department in terms of debt

7   service relief over the next 30 years.

8           The second part of this process involved calling, as

9   I mentioned, about $250 million of currently callable bonds

10  that also would provide savings to the department if we

11  redeemed them now and then replaced them with the new 2014

12  bonds that we asked to be approved in this motion.

13          The third part was including the need for the new

14  money that I just talked about for the sewer projects in this

15  larger financial transaction, so the 2014 bonds will also

16  provide the new money needed to complete the sewer capital

17  projects.

18          The fourth part -- and this is probably the most

19  intricate part -- dealt with negotiating with our bond

20  insurers and the trustee and the ad hoc committee to bring

21  about certain transactions that will help the tender process

22  and allow us to realize some additional savings for the

23  department, and it involves securing insurance for the new

24  2014 bonds to be issued, resolving the insurers' objections

25  to the plan, at least their DWSD objections to the plan --

1          THE COURT:  I have to interrupt you to ask you to

2     perhaps bring the mike closer to you.

3          MS. LENNOX:  Sure.

4          THE COURT:  Apparently some people are having a hard

5     time hearing you.

6          MS. LENNOX:  Is that better, your Honor?

7          THE COURT:  Yes.

8          MS. LENNOX:  Okay.  And we also resolved their

9     claims for fees against the department that they intended to

10    assert pursuant to various bond documents and ordinances, so

11    that's a lot in one little paragraph, so I'd like to break

12    this up and take this kind of one by one.

13          I'm pleased to report, your Honor, that all four

14    insurers are now settling parties as well as the ad hoc

15    committee and the trustee.  You may recall that at the time

16    the motion was filed, only three of the four insurers,

17    Assured, FGIC, and Berkshire Hathaway, were on board as was

18    the ad hoc committee and the trustee.  Over the weekend, I'm

19    pleased to report that National Public Finance Guarantee came

20    on board as a settling party and has offered to provide

21    insurance for some of the 2014 bonds as well, and it has also

22    settled its fee claim.

23          So individually what are these parties doing, and

24    what are they getting in return?  First, let's start with

25    Assured because Assured is a very important part of this

1   transaction.  Assured has agreed that it will insure the

2   senior lien 2014 bonds, including the new money bonds.  The

3   amount of the commitment is up to the amounts that Assured

4   has already insured for both senior and junior lien bonds, so

5   we have some new capacity to provide insurance on additional

6   senior lien bonds that may not have been insured in the past.

7   And that's important because insured bonds usually have a

8   lower cost of capital and a lower interest rate than

9   noninsured bonds.  The insurance premium, per the term sheet

10  that was attached to the motion, will be 1.2 percent for BBB-

11  rated bonds by S&P and 1.8 percent for BB rated bonds.

12  Assured will also provide to the department debt service

13  reserve fund surety policies up to $70 million, and what that

14  means, your Honor, is under the bond documents, DWSD is

15  required to keep in certain -- they call them reserve funds

16  cash that is basically -- serves as security for payment of

17  the bonds if the department doesn't make cash payments on the

18  bonds, so that's cash that's trapped, cash that can't be

19  used, cash that's just sitting there.  By providing the

20  surety policies, we will be able to release about -- we're

21  estimating about $50 million from those debt service

22  reserves, and then we will use that money to purchase some of

23  the new bonds, so that means we don't have to borrow another

24  $50 million to purchase bonds back.  The cost of that policy

25  is 15 percent of face.

1    FGIC and Berkshire are not insuring bonds because I

2    don't think they're in that business anymore, but they have

3    been cooperating with Assured behind the scenes with respect

4    to the bonds that they have insured to make sure that this

5    transaction works seamlessly and with the new Assured

6    insurance.

7    FGIC also has some consent rights to certain aspects

8    of this deal.  One of the policies it issued, I believe, back

9    in 2001 gave it consent rights for changes to the indenture

10   and to ordinances.  They have consented.  It's my

11   understanding they have consented to these transactions in

12   exchange for a $125,000 consent fee.  The trustee, similarly,

13   is participating in all aspects of the settlement to make

14   sure that it moves expeditiously and can be closed.

15   The ad hoc committee has been a very important group

16   in negotiating and developing this transaction.  The ad hoc

17   committee, your Honor may recall, consists of five of the

18   largest DWSD bondholders, Nuveen, BlackRock, Franklin,

19   Fidelity, and Eaton Vance.  As your Honor knows and has seen,

20   they have participated quite vigorously in this case to date.

21   Collectively, I believe that they hold in excess of a billion

22   three of the DWSD bonds.  As we were considering this

23   transaction and structuring the transaction, they provided

24   good feedback in terms of how we should structure the

25   transaction and approach the market with it to ensure its

1    success.  In addition, they promised to and did tender a

2    substantial portion of their impaired bonds, so they are an

3    important part of the success of what we have accomplished to

4    date.

5         National came fashionably late to the party, but we

6    are very glad that they have arrived.  They have agreed to

7    provide insurance under market terms and conditions.  Under

8    the term sheet that I believe we've provided to the Court

9    prior to this, they will insure debt service on a senior lien

10   basis at 1.2 percent of face and second lien junior debt

11   service at 1.4 percent of face.  Obviously they've got

12   market -- normal market conditions and everything for doing

13   that.

14        So that is the insurance and the financial part of

15   the transaction and the settlement.  As your Honor knows,

16   these creditors have objected to the debtor's view that all

17   of the DWSD allocated pension payments related to the now

18   frozen plan's UAAL had to be subordinated to all of DWSD's

19   bond payments.  The city, of course, disagreed.  We called it

20   all O&M, and we -- that issue has been briefed and has been

21   argued in front of your Honor.  That issue is resolved by the

22   settlement.  It is resolved by stating that for the nine

23   years of the pension payments called for in the plan, 24

24   million of the total that is due in each year will be

25   accounted for as operating and maintenance expenses, and the

1    remainder for the year will be accounted for in an account

2    that falls immediately below the debt service and debt

3    service reserve accounts and the DWSD payment waterfall, so

4    it's immediately below debt service and ahead of any other

5    payments that the department would be required to make.

6           This resolution is consistent with and it does not

7    disturb the global pension settlement.  What that settlement

8    required was that DWSD will make the payments called for in

9    the plan, and DWSD will do so regardless of how they are

10   accounted for.  In fact, working with the Retiree Committee,

11   the Retirement Systems, and the counsel for the two leading

12   retiree associations, we have worked out and we filed on

13   Friday clarifying and protective language in the revised form

14   of order.  It's paragraph 24 of the order.  That language

15   satisfies all parties that the settlement will work in

16   conformity with the bond indentures and the ordinances and

17   with the pension settlement that are set forth in the plan,

18   so because this accounting treatment does not disturb the

19   global pension settlement, the city firmly believes that it

20   would not require resolicitation of Classes 10 and 11.

21          Finally, we have also resolved all of the DWSD

22   credit parties' fee claims that they had intended to assert

23   against the department.  I will tell the Court that the total

24   amount of the claims were in excess of $30 million in the

25   aggregate that were intended to be lodged against the

1    department.  As part of the settlement, we will be paying

2    Assured $3 million, National $3 million, FGIC $550,000 in

3    addition to its consent fee, and the ad hoc committee $1.2

4    million.  That's a total of 7.75 or about 13 percent of the

5    totals that would have been asserted against the department.

6    There aren't any success fees being paid to any of the

7    financial advisors for any of these creditors.

8         In addition and finally, we have worked out a

9    process to determine the fee claims of the trustee.  Those

10   will be determined through an arbitration process.  That

11   process was set forth in the motion, but we have collared the

12   department's exposure on that claim, and that will be worked

13   out through arbitration within the parameters of $2.25

14   million on the low end and $5.75 million on the high end.

15        Now, if the Court approves the motion today, we will

16   plan to go out to the public markets to seek to sell the new

17   2014 bonds that will pay for the tendered and redeemed bonds

18   and the new capital improvements bonds.  We fully expect the

19   public process to be successful as there now appears to be a

20   very active market for DWSD debt, but if that process is not

21   successful and the city and DWSD determine that it's still in

22   their best interest to close these tender transactions, they

23   can because another part of this deal is that Citibank has

24   provided a backstop under which Citibank will loan the money

25   required to buy the bonds.  The terms of that are disclosed

1   in Exhibit 6 to the motion.  The interest rates are very

2   favorable for 12 months, so that would give the city a period

3   of time to try the market again after it settles down

4   after -- hopefully after the bankruptcy is over.  As I noted,

5   we do not expect to have to use it.

6          And then finally, your Honor, the last part of the

7   settlement, which is a very important part of the settlement,

8   which is the modification to the plan of adjustment, we were

9   required and did file an amended plan of adjustment last

10  Wednesday, and that reflects the possibility of this tender.

11  What the new plan says -- and we have committed not to change

12  it -- is that if this tender closes, all of the remaining

13  DWSD bonds will be unimpaired.  Their treatment under the

14  plan will be unimpaired.  If, however, the tender doesn't

15  close, then we resort to what the plan currently said, which

16  was some are impaired and some are not.  So what are the

17  results of the tender?  We have over $1.467 billion worth of

18  bonds tendered.  That represents 44 percent of the bonds that

19  were in the impaired classes under the plan.  I think it's

20  safe to say that the tender would not have been successful if

21  the threat of impairment hadn't been out there.  In addition,

22  these tendered bonds represent, when added to the $250

23  million of bonds that we will also redeem, 93 percent of the

24  bonds that we were targeting to provide the maximum savings

25  to the department in this process, so we would call this a

1    success.

2         We do have the required consents from all

3    governmental parties, including we have several sets of Board

4    of Water Commissioner resolutions.  We have several emergency

5    manager orders.  The City Council met on October 14th to

6    consider whether they should approve the issuing of the 2014

7    bonds.  They unanimously approved it, so we did not have to

8    go to the Emergency Loan Board.

9         THE COURT:  August 14th?

10        MS. LENNOX:  Oh, I'm sorry.  Yes.  Did I say

11   something different?  Yes, August 14th, your Honor.  And the

12   MFA and treasury have given their approval as well, so I

13   believe we have all required consents to move forward other

14   than your Honor's approval, which is why we're here today

15   because I think the market would like to know that the Court

16   has approved this transaction going forward.

17        We only have one objection to the motion.  It is

18   Syncora's.  Syncora is neither a bondholder nor is it an

19   insurer of DWSD bonds, and we believe, as we've set forth in

20   our reply that we filed on Friday, that they have absolutely

21   no conceivable interest in this transaction, and, again, we

22   believe they have no standing to assert the objection that we

23   have.  We can address that now, or we can address it in

24   argument.

25        So with that, your Honor, if your Honor has

1  questions, I'd be happy to answer them.  If not, we are

2  certainly prepared to put on our affirmative case.

3          THE COURT:  Thank you.  Would anyone like to be

4  heard regarding this matter?

5          MR. LAROSE:  Good morning, your Honor.  Lawrence

6  Larose from Chadbourne & Parke for Assured Guaranty.  Your

7  Honor, we agree with the structure that Ms. Lennox has laid

8  out for you.  This is a very complex and comprehensive

9  settlement that is the result of literally a year of intense

10 mediation among numerous parties to bring a resolution to you

11 which is almost unprecedented.  It literally gives the

12 parties -- all the parties benefits that they sought in the

13 case and literally hurts no one.

14         I do want, for the record, to thank the efforts of

15 Chief Judge Rosen, Judge Elizabeth Perris, and Professor Gina

16 Torielli, who worked tirelessly with all the parties in the

17 mediation to bring this settlement to you today, your Honor.

18 This is a consensual resolution to complex legal and business

19 issues that literally benefit all affected parties.  The DWSD

20 benefits, your Honor, by getting out from under the cloud of

21 this bankruptcy with access to the credit markets so it can

22 fund its capital and other needs.  Bondholders will benefit

23 by having a market-based choice to sell their bonds to the

24 city or to keep them without coercion or impairment.  My

25 client, your Honor, benefits not only by resolving these

1   complex objections that we've brought to you, but, your

2   Honor, by being able to be part of the solution to the city's

3   problems is a great benefit to Assured and to the other bond

4   insurers.  By providing their credit to the city for decades

5   to come, we become part of the solution to help turn around

6   the city and keep the DWSD moving forward.

7        Finally, your Honor, the city benefits greatly by

8   obviously resolving a major part of the objections to this

9   case and helping to move this case forward to confirmation.

10        Finally, we agree, your Honor, that no other

11   creditors are hurt with this settlement.  As we set forth in

12   the papers, the DWSD is a closed loop under Michigan law.

13   All the savings generated from this transaction remain in the

14   system.  The DWSD has consented to the level of savings.  The

15   city finds the level of savings sufficient to move forward,

16   and literally no other creditors have claims to those

17   savings.

18        So, finally, for these reasons, your Honor, we hope

19   that you'll approve the tender today.  Thank you.

20        MR. KANNEL:  Good morning, your Honor.  William

21   Kannel for the ad hoc group of DWSD bondholders.  I'm simply

22   going to endorse what Mr. Larose said.  We fully support the

23   settlement.  I also wanted to call out your attention to the

24   efforts of Ms. Lennox, Ms. Fillingham, Ms. Van Dusen, and the

25   amount of work that went into pulling this all together.

1  Thank you.

2      THE COURT:  Thank you, sir.

3      MR. PEREZ:  Good morning, your Honor.  Alfredo Perez

4  on behalf of FGIC.  Your Honor, we, too, support the

5  transaction.  There is one slight caveat.  We have not been

6  asked to consent to any amendment of the bond ordinance,

7  which we believe would be required if there was a private

8  placement.  The likelihood of that happening is remote based

9  on Ms. Lennox's representation, so it should be no issue, but

10  I just wanted to highlight that.

11      THE COURT:  Thank you, sir.

12      MR. BJORK:  Yes, your Honor.  Jeff Bjork on behalf

13  of National.  We support the transaction and endorse the

14  city's position with respect to the motion.  Thank you.

15      THE COURT:  Thank you.

16      MR. BENNETT:  Good morning, your Honor.  Ryan

17  Bennett on behalf of Syncora.  Your Honor, I can present our

18  objection now or wait until after the affirmative case put

19  forward by the city.  I wanted to just check with your Honor

20  before we proceed.

21      THE COURT:  Well, I really leave it to you.

22      MR. BENNETT:  If I could --

23      THE COURT:  It does strike me that there is value in

24  at least considering the standing argument before we jump in

25  with both feet to the evidentiary hearing.

1    MR. BENNETT:  Sure.  I thought so as well.  Thank
2  you, your Honor.  I'll do that.
3    THE COURT:  If we're going to -- if we're going to
4  do that, let me hear the city's argument on that point first,
5  and then I'll hear from you.
6    MR. BENNETT:  All right.  Sounds good.  Thank you,
7  sir.
8    MS. LENNOX:  Thank you, your Honor.  I think, as
9  you've heard, this transaction is a win-win for everybody
10  involved.  In fact, nobody that's conceivably affected by
11  this transaction is complaining about it.  Everyone has
12  embraced it as kind of an elegant market-based solution to
13  the parties' competing goals in this case, everyone, that is,
14  except the one party who isn't affected by it at all and,
15  therefore, we believe has no standing to object.  Syncora
16  does not own any DWSD bond.  It doesn't insure any DWSD bond.
17  This transaction does not affect the general fund or any of
18  its creditors at all in any way.  There is no injury at all
19  that Syncora can allege that provides standing to it, which
20  is the first principle of having standing.  You have to have
21  an injury.  I know your Honor has heard argument several
22  times over the last months about the standards for standing
23  in this case, constitutional, prudential, and otherwise, but
24  the first principle in all of the constitutional and
25  prudential standing cases, including Lujan and including In

1    re. Cannon and White versus JPMorgan, which are Sixth Circuit

2    cases, is you have to have an injury. One has not been

3    articulated. One does not exist. And without an injury at

4    all, I don't think you even need to move to the other

5    considerations of standing, so unless Syncora -- and as far

6    as I can tell in their briefs, they haven't articulated

7    one -- can articulate why they think it is affected by what

8    is purely an internal DWSD financing transaction, I don't

9    believe they have standing to be heard.

10           THE COURT: All right.

11           MR. BENNETT: Thank you, your Honor. Ryan Bennett

12    on behalf of Syncora again. On the standing point, so our

13    objection related to the general opacity of these various

14    transactions as well as the lack of disclosure associated

15    with the motion. Just for a transaction for $5.5 billion of

16    financing of this size, Syncora raised to the Court that the

17    debtor be held to its burden for purposes of disclosing

18    information and providing details into the transaction which

19    the debtor in many ways seeks a broad grant of authority to

20    proceed forward after it -- after this hearing.

21           With respect to standing, you know, the question

22    keeps being raised as to whether Syncora has some kind of

23    pecuniary interest here or injury, which includes an actual

24    or a threatened injury, to give it standing. Syncora is a

25    COPs holder and insurer, and under the plan, to the extent

 1   it's consummated, the currency that Syncora will be provided

 2   are Series B new notes.  Those new notes are serviced in part

 3   through DWSD, and DWSD has a service obligation to pay the

 4   principal and interest on those notes.  And it's indicated in

 5   Exhibit 8 and I believe 9 of the debtor's motion, which is

 6   the invitation to the tender, where it's detailed that part

 7   of the responsibilities of the DWSD will be to honor -- will

 8   be to fund its allocation of the Series B notes, so we have

 9   an interest in -- as a COPs holder, as someone who may be

10   required to receive these Series B notes, we have an interest

11   in seeing that the debtor, the city, is able to service them

12   going forward, that DWSD, through this transaction that the

13   debtor is seeking to have approved, will be able to honor

14   those obligations and make good on the service for those

15   notes, so that's a primary issue.

16        The second one, Judge, is our issue with respect to

17   confirmation.  You know, the transaction and the settlement

18   are being for whatever reason accelerated ahead of

19   confirmation.  You know, they -- you know, it's -- the

20   transaction has a number of components in it that are very

21   much plan like.  They involve the treatment of claims for the

22   DWSD claimholders.  Not surprisingly or coincidentally, the

23   result of the transaction is a number of plan objections are

24   settling and falling away.  One of our concerns as a creditor

25   and objector to the plan is that to the extent the city seeks

1  to use this transaction or this accelerated approval of the

2  transaction to front-run any of its confirmation requirements

3  or its burden with respect to confirmation, so we wanted to

4  make sure when we filed our objection and we came before you

5  today to have preserved on that front the fact that nothing

6  in this approval of this transaction will impair our

7  objections later on down the road or shorten or shortcut the

8  city's burden with respect to confirmation.  That's it, your

9  Honor.  Thank you.

10       THE COURT:  Thank you.  Any response to Syncora on

11  the standing issue?

12       MS. LENNOX:  Just briefly, your Honor.  Syncora

13  doesn't allege that this transaction hinders DWSD's ability

14  to service its share of the B notes should the plan be

15  confirmed.  In fact, it doesn't allege this at all.  In fact,

16  if this transaction goes forward, it would aid in the

17  department's ability to service those notes because it

18  provides debt service relief and cash flow and increases cash

19  flow.  So I think that concern is, first, not stated

20  articulately in the papers at all, and, secondly, even if it

21  were, it's overblown, so it doesn't provide injury.

22       And then finally I just want to confirm we're not

23  purporting to end-run our obligations to prove up our

24  confirmation case, so it should not be a concern.

25       THE COURT:  All right.  I want to take the matter of

1  standing under advisement for a few minutes and then give you

2  a decision, so we will take a recess now and reconvene at

3  9:40, please.

4          THE CLERK:  All rise.  Court is in recess.

5      (Recess at 9:28 a.m., until 9:45 a.m.)

6          THE CLERK:  All rise.  Court is in session.  Please

7  be seated.

8          THE COURT:  The Court concludes that Syncora does

9  not have standing to object to this motion, and, accordingly,

10 its objections are overruled on that ground.  The record

11 firmly establishes that there are no circumstances related to

12 this transaction one way or the other under which Syncora

13 would be harmed, prejudiced, or injured nor has it actually

14 alleged any such injury.  What it has identified in terms of

15 the funding of the B notes under the plan is, in the Court's

16 view, too attenuated to give it standing to object to this

17 transaction.  On the other hand, the Court does agree, as

18 does the city, that nothing in the Court's overruling of

19 Syncora's objection to this motion prejudices its right to

20 object to the plan in any way.  You may proceed.

21         MS. LENNOX:  Thank you, your Honor.  My colleague,

22 Bob Hamilton, will handle the presentation of our affirmative

23 case.

24         THE COURT:  Okay.  Sir.

25         MR. HAMILTON:  Good morning, your Honor.  Robert

1   Hamilton of Jones Day on behalf of the City of Detroit and

2   the Detroit Department of Water and Sewerage.  We didn't want

3   to be presumptuous on assuming how the Court would rule on

4   the standing issue.  We did prepare exhibit binders.  While I

5   could pare them a little bit, I'd just rather just give the

6   Court the binders and ask the witnesses and use them in --

7           THE COURT:  Sure.

8           MR. HAMILTON:  -- anticipation of the full hearing.

9   When we put them together, we had it in one binder.  It's

10  pretty thick because it's a lot of bond documents because

11  that's what bond lawyers do.  For your Honor and for the

12  witness, we've divided --

13          THE COURT:  Does that include the magnifying glass

14  you need to actually read them?

15          MR. HAMILTON:  Wait till you see the ordinance.  But

16  for the witness set and for your Honor, we divided it into

17  two smaller binders so it's easier to flip.  May I approach

18  with your set, your Honor?

19          THE COURT:  Sure.

20          MR. HAMILTON:  I also have a set for your clerk,

21  your Honor.

22          THE COURT:  I'm sorry?

23          MR. HAMILTON:  I also have a set for your clerk.

24          THE COURT:  Okay.  Okay.  Mr. Hamilton --

25          MR. HAMILTON:  Yes, sir.

1          THE COURT:  -- like Ms. Lennox, I have to ask you to

2    be very careful to speak right into the microphone so

3    everyone can hear you.

4          MR. HAMILTON:  I will do so, sir.

5          THE COURT:  Yeah, yeah.  Bend it up so it's pointed

6    right at you.

7          MR. HAMILTON:  Is that better?

8          THE COURT:  A little.

9          MR. HAMILTON:  I'll talk louder.  Our first witness,

10   your Honor, is Nicolette Bateson.  I call Nicolette Bateson

11   to the stand.

12         THE COURT:  Step forward, please, and raise your

13   right hand.

14          NICOLETTE BATESON, DEBTOR'S WITNESS, SWORN

15         THE COURT:  All right.  Please sit down over there.

16                     DIRECT EXAMINATION

17   BY MR. HAMILTON:

18   Q   Good morning, Ms. Bateson.

19   A   Good morning.

20   Q   And what is your job?

21   A   I am the chief financial officer for the City of Detroit

22   Water and Sewer Department.

23         THE COURT:  Help.

24         MR. HAMILTON:  Have you fixed it?

25         THE COURT:  No.  I was hoping an IT person would

1  burst through the door.  He's running.  Okay.  Let's wait a

2  second until we get this feedback under control.  Help.  Let

3  me ask you to stand right over there just for a few minutes

4  to be sure everything is under control.  Okay.  Let's try it

5  out.

6          MR. HAMILTON:  Sure.

7  BY MR. HAMILTON:

8  Q    Ms. Bateson, when did you start as the CFO for DWSD?

9  A    February 2013.

10 Q    And what was your job before you joined DWSD?

11 A    Prior to DWSD, I was with the Michigan State University

12 local extension program.

13 Q    If I could ask you to open up the little -- the smaller

14 binder and go to Tab 2, do you recognize this document,

15 Ms. Bateson?

16 A    Yes, I do.

17 Q    What is it?

18 A    It is a declaration of myself in support of the motion.

19 Q    Did you review this document before it was filed with the

20 Court?

21 A    Yes, I did.

22 Q    Does this document accurately and truthfully state your

23 testimony with respect to these matters?

24 A    Yes, it does.

25 Q    Okay.  Are you familiar with the bonds that have been

1    issued by the DWSD over the past several years?

2    A    Yes, I am.

3    Q    If I could ask you to open up the large binder to Tab 44,

4    which is at the very back, second to last exhibit -- all

5    right.  Are you there?

6    A    Yes, I am.

7    Q    All right.  Do you recognize what this document is?

8    A    Yes.  This is the fourth amended disclosure statement

9    related to the plan of adjustment for the City of Detroit.

10   Q    All right.  If you could look to the last two pages of

11   that exhibit, it has down at the bottom pages 99 and 100 of

12   the disclosure statement.  Are you there?

13   A    Yes, I am.

14   Q    And do you see that Roman -- or the letter B, little 1,

15   little A, a description of bonds issued by the DWSD?

16   A    Yes, I do.

17   Q    Did you review -- have you reviewed that description in

18   the disclosure statement?

19   A    Yes, I have.

20   Q    Does that description truthfully and accurately

21   characterize the existing bond structure of DWSD at the time

22   of the petition date?

23   A    Yes, it does.

24   Q    Okay.  Are the bonds issued by the DWSD currently, are

25   they secured?

1    A    Yes.

2    Q    What are they secured by?

3    A    They are secured by the net revenues of the water and

4    sewer systems.

5    Q    And what are net revenues?

6    A    Net revenues are operating revenues for water and sewer

7    services less operations and maintenance expense.

8    Q    Okay.  And what governs how the DS -- the Department of

9    Water and Sewer, how it must apply or use its net revenues?

10            THE COURT:  Excuse me one second.  I have to ask you

11   to speak directly into --

12            THE WITNESS:  Okay.

13            THE COURT:  -- the microphone also.

14            THE WITNESS:  Thank you.

15            THE COURT:  Can you repeat your question?

16            MR. HAMILTON:  Yes, sure.

17   BY MR. HAMILTON:

18   Q    What law or what document governs how the department must

19   use its net revenues?

20   A    The key document is the bond ordinance --

21   Q    Okay.

22   A    -- of the City of Detroit.

23   Q    I'd like you to turn back to the little binder and go to

24   Exhibit 10 and Exhibit 11.  Start with Exhibit 10.  Are you

25   there?

1  A   Yes, I am.

2  Q   What is this?

3  A   This is the ordinance -- the bond ordinance for the
4  sewage system.

5  Q   All right.  And what is Exhibit 11?

6  A   And Exhibit 11 is a companion ordinance for the water
7  system.

8  Q   Okay.  And recognizing that you don't have the magnifying
9  glass that the Court referenced earlier, could I ask you to
10  turn to Section 12 of the sewer ordinance, which is Exhibit
11  10, if you can find it?  Stay in Exhibit 10 and get to
12  Section 12, which is the page that has page 83 of 98 in the
13  bottom right-hand corner.

14  A   I am there.

15  Q   Okay.  Are you familiar with the Section 12 of this
16  ordinance?

17  A   Yes.

18  Q   Okay.  What is Section 12?

19  A   Section 12 is the flow of funds that designates the
20  priority for the security pledged by the -- for the bonds.

21  Q   All right.  Are you familiar with the term "waterfall" as
22  it's used in connection with net revenues for the DWSD?

23  A   Yes.

24  Q   Does this Section 12 relate to that concept?

25  A   This defines that concept.

1    Q    Okay.  And if you were to -- what is at the very bottom

2    of the waterfall?

3    A    The very bottom of the waterfall is the improvement and

4    extension fund.

5    Q    Okay.  And then if you go to Section 13 of this

6    ordinance, what does that provide?

7    A    Section 13 talks about the receiving fund in which the

8    funds are recorded when they're first received and collected.

9    Q    And if you look at 13A little B --

10   A    13A little B defines that at the end of the fiscal year

11   funds remaining in the receiving fund shall be placed into

12   the surplus fund.

13   Q    All right.  So if there's any money left at the end of

14   the year after all the other funds in the waterfall, the

15   ordinance directs that any remaining money goes in the

16   surplus fund; is that right?

17   A    That is correct.

18   Q    And then if you look at 13F, which is on the next page,

19   what does that provide?

20   A    13F defines how funds remaining in the surplus fund may

21   be used.

22   Q    All right.  And what does it require the funds to be --

23   how does it say the funds can be used?

24   A    Under the oversight and governance of the commissioners,

25   it may be used to cover any deficit in the O&M fund or in the

1    interest and redemption fund.

2    Q    All right.  And then if there's any money left, does it

3    say that it has to be used for purposes of the -- for

4    purposes related to the system?

5    A    Yes.  It may be used for purposes related to the system.

6    Q    All right.  Are you familiar with the phrase "closed

7    system" for the Department of Water and Sewer?

8    A    Yes.

9    Q    Is this related to the phrase "closed system"?

10   A    Yes.

11   Q    Okay.  How?

12   A    The funds raised for -- through revenues for the purpose

13   of the system stay within the system.

14   Q    All right.  Is there also a trust indenture document that

15   also corresponds to this waterfall set forth in the

16   ordinance?

17   A    Yes, there is.

18   Q    Could I ask you in that same binder to look at Exhibits

19   18 and 19?  What is Exhibit 18?

20   A    Exhibit 18 is the trust indenture agreement for the City

21   of Detroit water and sewer fund.  It's an agreement between

22   the department and U.S. Bank as trustee, who executes the

23   trust indenture agreement.  Tab 18 is the agreement for the

24   sewage disposal system.  Tab 19 is a companion document

25   designated for the water supply system.

1   Q   And do these indentures also restrict the department as

2   to how it can use the net revenues that it receives?

3   A   Yes.

4   Q   Now, the existing bonds, there's -- how many different

5   series of sewer bonds were out there at the time of the -- at

6   the time the City of Detroit filed its petition?

7   A   I can't recall the exact number offhand.  I would say

8   there's at least 20 or 25.

9   Q   All right.  And the issuing dates range from --

10  A   They go back as -- if I may answer in terms of the water

11  and sewer system as a whole, they go back as early as 1993

12  and mature going into the future up to 2041.

13  Q   All right.  And each of the series have different

14  interest rates and call protection provisions?

15  A   That is correct.

16  Q   Okay.  Why is it that some of the more recently issued

17  senior lien bonds have liens that are equal in priority to

18  bonds that were issued ten years earlier?  What provisions of

19  the ordinance enables the department to do that?  Are you

20  familiar with the additional bonds test?

21  A   Yes.  The additional bonds test is -- really underpins

22  the whole process of the bond issuance process.  The

23  additional bonds test is what determines whether the

24  department has capacity to take on additional bonds.  It's

25  essentially a debt service coverage test.  It may be applied

1   on a forecast basis or on a historical basis.

2   Q   All right.  So is the department allowed to issue new

3   bonds with equal seniority status on the security to bonds

4   that were previously issued under the terms of the ordinance?

5   A   Yes.

6   Q   All right.  And has it done so in the past?

7   A   Yes.

8   Q   All right.  If you look at Exhibit 10, which is the bond

9   ordinance for the sewer -- for the sewer, and if you look at

10  Section 21C, is that where the additional bonds test is set

11  forth in the ordinance?

12  A   Yes.

13  Q   Okay.  And that's for the sewer department.  Is there a

14  comparable provision in the ordinance for the water

15  department?

16  A   Yes, there is.

17  Q   Okay.

18  A   I should state that it's also stated as the projected net

19  revenues test in the ordinance.

20  Q   Okay.  You're familiar with the department's need for

21  $150 million of new bond proceeds to fund capital

22  improvements; is that correct?

23  A   Yes.

24  Q   All right.  Can you explain to the Court where --

25  A   Um-hmm.

1    Q    -- why you need this money?

2    A    Um-hmm.  There's two drivers of the need for the new

3    money issuance.  DWSD has a history of compliance issues that

4    were overseen by -- which caused the department to be

5    overseen by the federal court since 1977.

6    Q    And you need to try and speak into the microphone when

7    you do that just so people that are listening --

8    A    Yes.

9    Q    -- remotely can hear.

10   A    Thank you.  And the department emerged from federal court

11   oversight in March 2013.  Despite exiting oversight, the

12   department still has an administrative court order and

13   compliance with the National Pollutant Discharge Emission

14   Systems requirements called the NPDES permit that allows the

15   department to operate.  The department funds its capital on a

16   program basis rather than a specific project basis, and the

17   existing capital improvement program has two key projects to

18   maintain compliance with the federal and state guidelines.

19   There's two key projects, each a little bit different.  The

20   first project is to deal with the department's handling of

21   biosolids, and in March 2012 a symposium was held of key

22   stakeholders, academics and others on how to determine how

23   best to handle biosolids for DWSD in the future, and it was

24   determined that constructing a biosolids dryer was the best

25   option as it provided for reuse of the byproducts whether as

1  a fertilizer or as an energy fuel source.  That contract and

2  construction project began in 2013, and it is currently

3  underway.  It is also about six months ahead of schedule.

4  Because we fund based on a program, it had been anticipated

5  all along that we would be issuing bonds in the spring of

6  2014 to continue this project and process.

7          The other project and process is related to

8  incineration to reduce emissions.  The DWSD wastewater

9  treatment plant has two incinerators.  Incinerator one is 60

10  to 70 years old and failing.  The goal is to bring that off

11  line and to do improvements to incinerator complex two.  Both

12  of these projects are required to be on line and operating by

13  March 2016 to --

14  Q   Required by what?

15  A   Oh, I'm sorry.  Required under the administrative court

16  order as well as the NP -- for our NPDES permit.

17  Q   And can I ask you to look at in the small binder Exhibit

18  8?  Is that the administrative consent order that you're

19  referring to?

20  A   Yes, it is.

21  Q   Okay.  And then if I could ask you to look at the next

22  exhibit, Exhibit 9, what is that document?

23  A   This is the department's capital improvement program.  We

24  adopt a five-year program that is updated on an annual basis,

25  and this is the capital improvement program for the sewer

1  program that encompasses the two projects that I just

2  described and was last updated by the board on July 9th,

3  2014, to update current projections because the project is

4  ahead of schedule.

5  Q   And those two projects that you identified, do they

6  have -- are there contracts that the department has already

7  entered into with respect to those projects that have

8  milestones coming up?

9  A   Yes.  The projects are under construction.  As I stated

10 earlier, they're six months ahead of schedule.  Because we

11 anticipated on closing in the April, May, June time frame for

12 cash flow purposes, we're now getting concerned about cash

13 flow because the project is ahead of schedule.

14 Q   All right.  So put yourself back in the February, March

15 time period of this year.  What did you do to start the

16 process of preparing to get the money you needed from new

17 financing to pay for these projects?

18 A   The department began the process as it normally would to

19 pursue a public offering for issuance of a net $150 million

20 worth of bonds to fund these projects.

21 Q   Did you send out an RFP?

22 A   The department worked in conjunction with the Michigan

23 Department of Treasury because working with the emergency

24 manager it was determined the best course was to work with

25 Department of Treasury through the Michigan Municipal Finance

1   Authority, and --

2   Q    By that --

3   A    Um-hmm.

4   Q    -- who was going to issue the bonds to the public?

5   A    The Michigan Municipal Finance Authority.

6   Q    So the DWSD would issue a bond to the MFA, and the MFA

7   would then turn around and issue a bond to the public; is

8   that right?

9   A    That is correct.

10  Q    All right.  So did you, in conjunction with the MFA, send

11  out an RFP to potential managing agents for this issuance?

12  A    Yes.  A request for proposal was sent soliciting -- was

13  issued soliciting proposals for underwriters.

14  Q    Could I ask you to turn to Tab 22 in the bigger notebook?

15  Is this the RFP that was sent out by the MFA and the

16  department?

17  A    Yes, it is.

18  Q    Who did you send the RFP to?

19  A    The RFP was distributed by the Department of Treasury.

20  It was publicly posted on their website and distributed

21  through their normal vehicles.

22  Q    Who did you receive responses from?

23  A    There were responses received from five firms indicating

24  an interest to serve as senior managers.

25  Q    I'd ask you to take a look at Tab -- Exhibit 23, the next

1  one.

2  A    Um-hmm.

3  Q    What is that?

4  A    This is one of the five firms that responded to the RFP,

5  Siebert, Brandford & Shank.

6  Q    What is Exhibit 24?

7  A    Exhibit 24 is the response to the proposal by JPMorgan.

8  Q    What is Exhibit 25?

9  A    Exhibit 25 is the response provided by Goldman Sachs.

10  Q    What is Exhibit 26?

11  A    Exhibit 26 is the response by Citigroup.

12  Q    And what is Exhibit 27?

13  A    27 is the response to the proposal from Barclays.

14  Q    Which of these beauty contestants did the MFA and the

15  department select?

16  A    Citigroup.

17  Q    Okay.  Why?

18  A    Citigroup brought a very deep bench of municipal utility

19  experience as well as experience in addressing Chapter 9-

20  related matters.

21  Q    Do you know who Lee Donner is?

22  A    Yes, I do.

23  Q    Who's Lee Donner?

24  A    Lee Donner is the financial advisor from the firm of

25  First Southwest that has served as the lead financial advisor

1  for the transaction that began with the new money transaction

2  when we started back in the spring and continuing forward.

3  Q   How did First Southwest get selected as the advisor?

4  A   First Southwest is the advisor of record, it's my

5  understanding, for the Department of Treasury.  Because this

6  was a mutual undertaking financing with the City of Detroit

7  and the Municipal Financial Authority, based on their

8  experience, it made sense that they would be -- that First

9  Southwest would be the financial advisor for the transaction

10  overall.

11  Q   And is First Southwest the advisor to both the MFA and

12  the department?

13  A   Yes, they are.

14  Q   Okay.  Who's Bart Foster?

15  A   Bart Foster is the president of Foster Group, LLC, who

16  serves as the city's -- as DWSD's feasibility consultant as

17  it relates to bond issuances and is the one who attests to

18  being able to meet the additional bonds test that we

19  discussed earlier.

20  Q   Okay.  Did you become familiar with the treatment of the

21  department's existing bonds in the fourth amended plan of

22  adjustment that was filed with the Court in early May of this

23  year?

24  A   Yes, I did.

25  Q   Can you give just a very brief general description of how

1   those bonds were treated in that plan?

2   A    In that plan, certain classes of special revenue bonds

3   were designated as impaired or nonimpaired by CUSIP, and the

4   plan contemplated a potential interest rate reset and perhaps

5   a change to the call terms.

6   Q    All right.  And is that treatment that you just generally

7   described more fully detailed in the excerpts from the

8   disclosure statement that we provided in Exhibit 44 of your

9   big notebook?

10  A    Yes, it is.

11  Q    Okay.  And is the description in the disclosure statement

12  an accurate depiction of how those bonds were treated in the

13  fourth amended plan?

14  A    Yes, it is.

15  Q    Okay.  How did the fourth amended plan deal with the

16  department's obligation to make payments to the General

17  Retirement System for the DWSD's share of the UAAL

18  liability --

19  A    Um-hmm.

20  Q    -- for the frozen part of the pension obligation of DWSD?

21  A    The plan calls for an annual payment of $45 million for

22  nine years beginning in fiscal year 2015 with any tail end

23  liability to be settled in the tenth year based on actuarial

24  analysis and rate of returns.

25  Q    All right.  If you take a look at Exhibit 20 in your --

1   in the big binder, what is this document?

2   A   This is the preliminary official statement for the sewage

3   disposal system published in conjunction with the Michigan

4   Finance Authority local government loan program.

5   Q   Is this the offering statement for the new refunding

6   bonds for the sewer -- sewer refunding bonds?

7   A   Yes, it is.

8   Q   All right.  Would you take a look at page 17 of the

9   offering statement?  I'm sorry.  Wrong page.  Page 98 down at

10  the bottom of the page, does that paragraph that starts down

11  at the bottom of the page and continue onto the next page,

12  does that accurately describe how the proposed plan of

13  adjustment proposes to require the department to make its

14  payments for the UAAL going forward over the next nine years?

15  A   Yes, it does.

16  Q   Okay.  And is the -- what is Exhibit 21?

17  A   Exhibit 21 is the similar document except for the water

18  system.

19  Q   Okay.  Did the DWSD bondholders and the companies that

20  had insured those bonds object to the proposed treatment of

21  the bonds in the plan of adjustment proposed by the city?

22  A   Yes, they did.

23  Q   What were the nature of their objections generally?

24  A   The general nature of the objections would be the

25  legality of the proposed treatment as well as the terms of

1    the interest rate reset.

2    Q    Whether or not the interest rate reset chart was really

3    consistent with the current market rates?

4    A    Correct.

5    Q    Was there any challenge to the legality of requiring the

6    department to pay off its UAAL over nine years?

7    A    Yes.

8    Q    Historically, when the department made its payments to

9    the pension system in part to pay off its -- that year's

10   share of the UAAL, how was that accounted for in the

11   waterfall for the department?

12   A    It was in the operations and maintenance expense

13   category.

14   Q    Okay.  And what was the -- right before the petition was

15   filed, what was the amortization period for paying off the

16   UAAL on an annual basis?

17   A    Thirty years.

18   Q    And how did the plan of adjustment adjust that

19   amortization period?

20   A    The payment is over 30 years.

21   Q    But for the department, what is --

22   A    I must say I'm a little confused by the question on the

23   amortization because the plan's amortization may still be

24   under the General Retirement System.

25   Q    How long does the department have to pay off its UAAL

1    under the plan of adjustment?

2    A    Nine years with any tail in the tenth year.

3    Q    All right.  What did the department do to try and resolve

4    the objections that the holders and the insurers of those

5    bonds made towards the plan of adjustment?

6    A    The department participated in mediation to work to

7    resolve the matter.

8    Q    What was the result of that mediation?

9    A    The result of that mediation is what we refer to as a

10   market-based alternative to the plan of adjustment, which

11   resulted in the offer to -- the request to tender DWSD's bond

12   portfolio.

13   Q    Okay.  Can I ask you to take a look at Tab 5 of your

14   smaller notebook?  Do you recognize that document?

15   A    Yes.

16   Q    What is that document?

17   A    This is the term sheet of settlement with Assured

18   insurance.

19   Q    All right.  And does this set forth the terms on which

20   Assured reached its settlement that was the product of the

21   mediation?

22   A    Yes.

23   Q    Okay.  And can you describe for the Court what are two

24   key components of the settlement that resulted from this

25   mediation?

1  A   The two key components are the tender and providing a

2  resolution to this matter in an expedient manner as it's

3  played out over the past year as well as the movement towards

4  closing September 4th to resolve the matter.

5  Q   And if the Bankruptcy Court approves this transaction and

6  it closes on September 4th, then what?

7  A   Then the impairment of the bonds will be dropped.

8  Q   Okay.  When did the department launch the tender --

9  invitation to tender to the existing bondholders?

10  A   Approximately --

11  Q   Tell you what.

12  A   Yes.

13  Q   Why don't you take a look at Exhibit 6?

14  A   Thank you.  The invitation to tender responses were due

15  by August 21st.  The date of the invitation to tender the

16  bonds was initiated August 7th.

17  Q   Okay.  What is the -- what is Exhibit 6?

18  A   Exhibit 6 is the invitation to tender document.

19  Q   For?

20  A   For the sewage disposal system.

21  Q   And what is Exhibit 7?

22  A   Exhibit 7 is a like document for the water supply system.

23  Q   And you said that -- when did the -- when did the period

24  for tendering the bonds close?

25  A   August 21st.

1   Q   Okay.  Can I ask you to now turn to the last exhibit in

2   the big binder, Exhibit 45?  What is this document?

3   A   This document is an overview of the transaction of the

4   results of the tender period that closed on August 21st.

5   Q   Was this document presented to the Board of Water

6   Commissioners at a meeting on Friday, August 22nd?

7   A   Yes, it was.

8   Q   Okay.  Does this document accurately reflect the results

9   of the tender?

10  A   Yes, it does.

11  Q   All right.  And you'll see on the tender summary

12  statistics, the first line is total bonds tendered.  Is that

13  how -- the par amount of the total bonds that were tendered

14  as a result of the offer?

15  A   Yes, it is.

16  Q   Okay.  And if you look at the first section under

17  estimated par amount of new bonds under the category of

18  refunding bonds --

19  A   Um-hmm.

20  Q   -- it says the aggregate par is approximately 1.6

21  billion; is that right?

22  A   That is correct.

23  Q   Why is the number 1.6 billion substantially higher than

24  the total amount of the bonds tendered?

25  A   The amount of the bonds tendered was 1.4 million.  In

1  addition to that, there were refunding bonds that make up the

2  difference of approximately 252 million.

3  Q   All right.  So the refunding bonds that -- the bonds that

4  are tendered are going to be purchased and then canceled by

5  the department; is that right?

6  A   That is correct.

7  Q   And then there are some other bonds that weren't tendered

8  that the department is going to redeem through funds from the

9  new bonds; is that correct?

10 A   That is correct.

11 Q   All right.  And the bonds that they're redeeming, those

12 are bonds that are currently callable; is that right?

13 A   That is correct.

14 Q   What was the amount of the bonds that are going to be

15 redeemed as opposed to the tendered bonds that are going to

16 be purchased and canceled?

17 A   That is the 252 million.

18 Q   Okay.  Did the Board of Water Commissioners approve the

19 acceptance of all the tendered bonds and the issuance of

20 refunding bonds to pay for them at its meeting?

21 A   Yes, they did.

22 Q   Can I ask you to take a look at Exhibit 38?  What is this

23 document?

24 A   This document is the certified resolution based on the

25 action of the Board of Water Commissioners, the resolution

1    that they adopted to accept the bonds offered for tender.

2    Q    And what is Exhibit 39?

3    A    39 -- I'm sorry.  Exhibit 38 was for the -- a resolution

4    for the water supply system.  Exhibit 39 is, again, a like

5    resolution that was approved by the board for the sewage

6    disposal system.

7    Q    All right.  Did the Department of Water and Sewer

8    recommend to the Board of Water Commissioners that it accept

9    the tendered bonds?

10   A    Yes.

11   Q    Why?

12   A    This was a clearly appropriate and positive resolution --

13   I think the term "win-win" was used earlier today -- to bring

14   to closure the treatment of the bonds under the plan of

15   adjustment as well as settlement with other parties who are

16   objectors to the bonds --

17   Q    All right.  And --

18   A    -- or to the impairment.

19   Q    -- do you recall -- well, let's take a look back at

20   Exhibit 45, the summary sheet, last exhibit.  Based on the

21   existing market rates as of the end of last week, what is the

22   anticipated gross cash flow savings from doing the refunding

23   of the tendered bonds and redeeming the noncallable bonds?

24   A    The gross cash flow savings is approximately $241

25   million.

1    Q    And how does that translate into annual cash flow savings

2    for the department?

3    A    For the first 19 years, it's approximately $11.4 million

4    and then tails off based on the maturity of the remaining

5    bonds.

6    Q    And so for the entire period, what's the average?

7    A    Oh, I'm sorry.  The average annual cash flow savings is

8    approximately $8.9 million.

9    Q    For the first 19 years, it's --

10   A    It's higher.

11   Q    -- all the way up to 11.4?

12   A    Right.

13   Q    Okay.  And so what is the present value of the total net

14   savings from doing this transaction?

15   A    Approximately $107 million.

16   Q    Will the department be able to -- the Department of Water

17   and Sewer be able to satisfy the additional bonds test and/or

18   the alternative test for refunding bonds that's established

19   by the ordinances?

20   A    Yes.

21   Q    All right.  Can I ask you to turn back to Exhibits 20 and

22   21?  Let's just do 20, which is the offering statement, I

23   believe, for the sewer bonds.  If I can ask you to turn

24   towards the end, the last page of the offering statement, I

25   believe, is page 120, and then --

1    THE COURT:  Don't forget the microphone.

2  BY MR. HAMILTON:

3  Q   -- and then after that is an exhibit, attachment 2A -- or

4  an appendix 2A.  Can you tell the Court what that appendix

5  is?

6  A   Appendix 2A is the feasibility report, the financial

7  feasibility report provided by the Foster Group that supports

8  the financial feasibility for the proposed transaction.

9  Q   And when you say "supports the financial feasibility,"

10  how does that relate to satisfying the ABT test or the

11  additional alternative test for refunding bonds?

12  A   It affirms that the proposed transaction would -- that

13  the proposed transaction is consistent with the additional

14  bonds test.

15  Q   If you look at page 25 of that feasibility report by the

16  Foster Group, does that set forth its findings?

17  A   Yes.

18  Q   And then based on this report, did the Department of

19  Water and Sewer conclude that it would be able to satisfy the

20  ABT test or the -- and/or the alternative test for refunding

21  bonds through this transaction?

22  A   Yes.

23  Q   If this Bankruptcy Court authorizes the department to go

24  forward with the new refunding bond, what's next?  What do

25  you do next?

1  A    Scheduled for tomorrow is -- with Citigroup and First

2  Southwest is the pricing of the new bonds.

3  Q    Okay.  What if the department is unable -- and the MFA

4  are unable to sell the new bonds successfully on the open

5  market this week?  What happens?

6  A    Citi has provided a term sheet that would allow the

7  department to still move forward.

8  Q    What is Exhibit 4 in your -- the fourth exhibit in your

9  small binder?

10  A    Exhibit 4 is the term sheet with -- that includes the

11  Michigan Finance Authority as well as DWSD to provide the

12  terms under which alternative financing would be available.

13  Q    So this sets forth the terms of the Citibank backstop; is

14  that correct?

15  A    Correct.

16  Q    All right.  And if you are -- if you and the MFA are

17  successful in selling the bonds to the public this week, when

18  is the transaction expected to close?

19  A    September 4th.

20  Q    All right.  If you're able to close on September 4th,

21  what are the details of your settlement with the bondholders

22  that will enable you to resolve their objections to the plan

23  of adjustment?

24  A    The settlement with the -- if this transaction is

25  successful, then the impairment as proposed in the plan of

1    adjustment would no longer be in the plan of adjustment.

2    Q    Okay.  And then what is the settlement with respect to

3    the issue about how much of the UAAL payment over the next

4    nine years is considered O&M or subordinate to the

5    bondholders' net revenue collateral?

6    A    That matter would be resolved as outlined in the

7    documents.

8    Q    All right.  If you take a look at the offering statement

9    for the sewerage department, which is Exhibit 20 in your big

10   binder --

11   A    I'm sorry.  Did you state a page number?

12   Q    Not yet.

13   A    Okay.

14   Q    Page 17.

15   A    Okay.  Thank you.

16   Q    Starts on page 16 and goes a couple pages.  What does

17   this detail?

18   A    This details the flow of funds or the waterfall that we

19   discussed earlier.  It does add in a new provision to address

20   a payment -- a portion of the GRS payment, the General

21   Retirement System payment.

22   Q    Okay.  What is the portion that goes into O&M under this

23   settlement?

24   A    The portion that goes into O&M is $24 million plus the

25   department's share of the new defined contribution plan going

1  forward.

2  Q   Okay.  And where does the remainder go that doesn't fit

3  within that 24 million?

4  A   The remainder is -- on page 18 is defined as being the

5  fifth step in the flow of funds to a newly created pension

6  liability payment fund.

7  Q   All right.  Does this description of the flow of funds in

8  the offering statement accurately reflect the major terms of

9  the settlement with the bondholders on this issue?

10  A   Yes, it does.

11  Q   All right.  Will the retirees be adversely affected in

12  any way by this treatment of the department's payment of its

13  UAAL over the next nine years?

14  A   No.

15  Q   Why not?

16  A   The payment has been contemplated in the feasibility

17  analysis presented by the Foster Group as well as supported

18  in the department's financial forecasts and projections.  The

19  outcome of the plan of adjustment adjusts the liability such

20  that the combined payment of approximately $45 million is

21  comparable to what has been in the budget for the PAYGO

22  amount for OPEB of 21 million and the annual pension

23  contribution dollar amount of 26 million, so historically

24  we're looking at paying $47 million per year.  That was

25  probably going to increase if there wasn't an adjustment

1  made, and so the 45 million fits in within the existing

2  budget framework for the department.

3  Q   All right.  Can I ask you to turn to page 96 of that

4  document, of the offering statement?  What is the chart

5  that's reflected here on page 96?

6  A   This is the summary of projected revenues and revenue

7  requirements for the system.

8  Q   Does this chart accurately reflect the department's

9  projections of its revenues and expenses over the next five

10 years?

11 A   Yes, it does.

12 Q   All right.  And if you look -- the first line below total

13 projected revenue is operation and maintenance expense.

14 A   Correct.

15 Q   And that's the fund that comes before you get to net

16 revenues under the bond ordinances; is that right?

17 A   That is correct.

18 Q   All right.  So the 24 million portion of the UAAL payment

19 that you make each year under the plan, that goes in this

20 line; is that right?

21 A   That is correct.

22 Q   And where does the remainder go?

23 A   The remainder is -- as you continue reading down this

24 table, it shows the priority of payment of, for example,

25 senior lien, second lien, then SRF debt service, and then it

1  shows the unrestricted balance for other purposes, which then

2  includes the payment for the nonoperating portion of the

3  pension reimbursement.

4  Q    Is that that fifth level new account that is being

5  created that we looked at earlier in the offering statement

6  right there?

7  A    Yes, it is.

8  Q    Okay.  And then what's below that?

9  A    And then below that is the -- for 2014, the label POC

10  relates to the pension obligation certificates.  Beginning

11  with fiscal year 2015, the label B note nonoperating payments

12  applies to the, for example, five million in 2015 going

13  forward.

14  Q    All right.  So what do these projections show the

15  department will have over the next five years after it makes

16  its O&M payments, after it makes its debt service payments

17  and debt service reserve funding obligations, and after it

18  makes its payments to the new pension fund and to the fund to

19  fund its payments on the B notes?  What's left?

20  A    The line is labeled "available for capital improvements,"

21  and that is, per se, the bottom line of the net impact of the

22  annual revenues less O&M and less debt payments.

23  Q    And that shows amounts left over for capital improvements

24  ranging from 25 million in 2015 to over 80 million in the

25  last year of the projection; is that right?

1    A    That is correct.

2    Q    So is there any reasonable possibility that the retirees

3    will be injured or affected in any way by the treatment of

4    the UAAL payments under the settlement?

5    A    No.

6    Q    Okay.  Does the settlement with the bondholders also

7    resolve the fee disputes between the companies that insured

8    the bonds and the trustee, on the one hand, and the

9    department, on the other?

10   A    Yes.

11   Q    Okay.  What is the payment that was agreed to with

12   respect to Assured for their professional fees and expenses?

13   A    Assured, the settlement was for $3 million.

14   Q    Do you remember approximately what they were claiming?

15   A    Nine million.

16   Q    What is the settlement for the ad hoc committee,

17   professional fees and expenses?

18   A    Is 1.2 million.

19   Q    And for FGIC, do you remember what that number was?

20   A    550,000.

21   Q    Do you know what FGIC was claiming?

22   A    1.1 million.

23   Q    And then the DWSD trustee, that has a range.  This is

24   going to be an arbitrator's -- arbitration is going to pick

25   where in the range.  Do you know what the range was that was

1    agreed to?

2    A    The range is 2.25 million to 5.75 million.

3    Q    Okay.  And then what was the amount that's been agreed

4    over this last weekend with National?

5    A    Three million.

6    Q    And do you have a recollection of what they were claiming

7    as their professional fees and expenses?

8    A    Between 13 and 14 million.

9    Q    Did the Department of Water and Sewer determine that this

10   settlement of the fee and expense claims that's reflected --

11   that you just described is a reasonable settlement?

12   A    Yes, it is.

13   Q    Why?

14   A    It's reasonable because it brings closure to this matter.

15   It eliminates risk with leaving such a matter unresolved, and

16   it allows the department and its interested parties to move

17   forward.

18   Q    All right.  Has Assured offered or committed to provide

19   insurance to the new refunding bonds that it had -- that

20   replaced the existing bonds that it had insured?

21   A    Yes.  I was remiss in not also noting their participation

22   in providing insurance for the new bonds.

23   Q    And did Assured also offer to provide a new surety

24   policy?

25   A    Yes.

1 Q   All right.  What will be the impact of providing these
2 new surety policies?
3 A   The new surety policies allows the department to manage
4 the reserve funds required under the bond documents in a more
5 efficient manner, which would free up approximately $50
6 million per year in reserve funds.  It could be --
7 Q   So what would be the effect of freeing up that $48
8 million or $50 million of cash?
9 A   Um-hmm.  Being able to invest it in a manner that brings
10 a greater return on funds and additional financial
11 flexibility for the department.
12          MR. HAMILTON:  All right.  I have no further
13 questions, your Honor.
14          THE COURT:  You may step down.
15          THE WITNESS:  Thank you.
16     (Witness excused at 10:38 a.m.)
17          MR. HAMILTON:  Your Honor, our next witness is Lee
18 Donner.
19          LEE DONNER, DEBTOR'S WITNESS, SWORN
20          THE COURT:  Please sit down.
21                     DIRECT EXAMINATION
22 BY MR. HAMILTON:
23 Q   Good morning, Mr. Donner.
24 A   Good morning.
25 Q   What's your job?

1    A    I'm an investment banker with First Southwest Company.

2    Q    All right.  What is First Southwest's role in this

3    transaction?

4    A    First Southwest Company is a financial advisor to both

5    DWSD and the Michigan Finance Authority.

6    Q    Can you describe -- can you describe for the Court what

7    First Southwest does generally?  What's their business?

8    A    Our financial advisory role originally had to do with

9    assisting DWSD in structuring the new money bond financing

10   for the purposes of continuing payments on ongoing capital

11   improvement projects.  That involves helping them develop a

12   RFP for underwriter, analyzing the market, assessing our

13   ability to access that market and at what interest rate,

14   structure the financing based on that information and get it

15   to the marketplace.

16   Q    Can you take a look at Exhibit 1, which is the very first

17   exhibit in the small binder over to your right?  What is this

18   document?

19   A    This is the declaration I gave in conjunction with the

20   motion before the Court.

21   Q    And do the statements in that declaration accurately and

22   truthfully represent your testimony in support of the motion?

23   A    They do.

24   Q    Okay.  Can you describe for the Court generally what your

25   qualifications are as an investment banker in the municipal

1    finance markets?

2    A    I've been involved in the municipal finance market as an

3    underwriter or financial advisor for approximately 31 years,

4    the last 19 years of which have been with First Southwest

5    Company.  Prior to that, I was executive director of an

6    organization that was an issuer of municipal tax exempt

7    securities.  I held that position for approximately five

8    years.

9    Q    Okay.

10          MR. HAMILTON:  Your Honor, I would proffer Mr.

11   Donner as an expert as an investment banker in the municipal

12   finance markets.

13          THE COURT:  You may proceed.

14          MR. HAMILTON:  Okay.

15   BY MR. HAMILTON:

16   Q    Could I ask you, sir, to turn to Exhibit 45, which is the

17   very last document in the big binder?

18   A    I'm there.

19   Q    Did you present this document to the Board of Water

20   Commissioners last Friday on August 22nd?

21   A    I did.

22   Q    Okay.  And it shows that the total impaired bonds that

23   were tendered was approximately $984 million, is that right,

24   on the tender summary statistics?

25   A    I'm sorry.

1  Q   The total impaired bonds that were tendered was

2  approximately how much?

3  A   983 million.

4  Q   And what percentage of the total impaired bonds that were

5  out there is that -- does that figure represent?

6  A   That's approximately 43.9 percent of the total impaired

7  universe.

8  Q   What did you tell the Board of Water Commissioners on

9  Friday as to what percentage of the bonds that you had

10 targeted for tender were obtained?

11 A   We informed the board that of the bonds we had targeted

12 with the tender, we had received tenders for approximately 92

13 to 93 percent of that.

14 Q   How did you determine which bonds to, quote, target for

15 the tender?

16 A   Part of it was the impairment.  Some of the bonds

17 proposed for impairment had high coupons and if tendered at

18 acceptable prices produced significant savings, but it went

19 beyond that.  A number of the targeted bonds were outside the

20 impaired universe but had long call dates where they would

21 not be callable for a significant period of time but if they

22 could be -- if they were tendered at the accepted -- or at

23 the offered prices would produce considerable savings.

24 Q   All right.  And what did you do to actually -- with

25 respect to the bonds that you identified as providing the

1  best opportunity for savings, what did you do to target them?

2  A   It was a factor in the pricing that we established for

3  the tender.

4  Q   So you would like increase the price for bonds that you

5  had targeted for tender to make it more likely they would be

6  tendered?

7  A   That's correct.

8  Q   Okay.  All right.  And then how did you -- how was the

9  gross cash flow savings that's reflected on this chart from

10  the transaction, how was that calculated?

11  A   We have the tenders.  That is now a fact.  We have --

12  there are still a couple variables involved in arriving at

13  that estimation.  We have yet to receive ratings from the

14  rating agencies for the bonds that would be issued to

15  effectuate this refunding and the new money.  We expect to

16  receive those ratings today, and the numbers here we operated

17  on assumption about what that rating might be.

18  Q   Were those -- well, and did you also make assumptions as

19  to what interest rates you would get as a result of those

20  ratings?

21  A   Exactly.  That would be the second variable still open is

22  estimated interest rates.

23  Q   And the assumptions that underlie this figure, the 241,

24  were those assumptions aggressive or conservative?

25  A   Very conservative.  First Southwest worked with Citibank

1   to develop those assumed interest rates and outcomes, and we

2   took a conservative approach based on current market

3   conditions.

4   Q   So if the ratings that you get and the ultimate interest

5   rates that you get on the public market for the new bonds are

6   better than you assumed, what impact will that have on the

7   actual savings for the department?

8   A   The result would be that the actual savings would exceed

9   the projections, the estimations that we provided to the

10  Board of Water Commissioners.

11  Q   Okay.  And then how did you calculate the -- how is the

12  present value of the gross -- of the annual cash savings, how

13  was the present value of the net savings calculated?

14  A   We used the assumed discount rate on -- we used the

15  discount rate of 4.119 percent, which would be the arbitrage

16  yield on the bonds at the interest rates we're assuming they

17  would be issued at, so we discounted the savings back to a

18  present value number using that rate.

19  Q   And then the last line on the tender summary stats is

20  total net present value savings percentage; is that right?

21  A   Correct.

22  Q   What does this reflect?

23  A   That is the savings -- the projected savings on a present

24  value basis over -- as the numerator over the bonds being

25  refunded.

1  Q   And is the -- the number 6.243 percent, does that have

2  any significance for you?

3  A   The standard in the municipal world is generally three to

4  five percent net present value savings.

5  Q   Could you explain to the Court what you mean by the

6  standard in the municipal world is three to five percent?

7  A   The Government Finance Officers Association, for example,

8  establish the recommended three- to five-percent range to

9  justify.  Some issuers --

10 Q   Justify what, sir?

11 A   To execute a refinancing, to justify the costs of

12 executing a refunding or refinancing.  Some issuers go below

13 that down as low as one and a half to two percent, but the

14 established range I think -- a well-accepted range within the

15 industry would be three to five.

16 Q   And this is -- this exceeds that range?

17 A   Yes, significantly.

18 Q   Okay.  And why wouldn't a municipality go ahead and do a

19 refinancing if -- even if they only get half a percent or one

20 percent?  It'd still, when you're talking about billions of

21 dollars, get you a lot of savings; right?  Why wouldn't you

22 do it?

23 A   In certain cases you wouldn't do it because you would be

24 giving up the opportunity to produce even better savings at a

25 later date.

1  Q    Why is that?

2  A    Well, for one thing, a lot of times refundings involve

3  advance refundings, and if you advance refund, you've given

4  up the ability to ever refund those bonds again under tax

5  law.

6  Q    Why is that?  Why is it you can only do it once?

7  A    Under tax law, that's correct.  You're limited to a one-

8  time shot at that.

9  Q    What happens if you do it a second time?

10  A    You couldn't do it tax exempt.

11  Q    You'd lose the tax exempt status?

12  A    That's correct.  And on a current -- on a current

13  refunding basis, the reason you might not do it is because

14  when you refund that bond, you're probably going to have to

15  sell the refunding bond with significant new call protection

16  and, therefore, have locked yourself out from a better market

17  environment to have executed that refunding in.

18  Q    All right.  Let me ask you about on this sheet the

19  category number two, estimated cost of borrowing.  It has

20  under there the all in TIC.  What does that refer to?

21  A    That's a term of art in the industry.  All in means

22  inclusive of all -- not only the interest rate or the coupons

23  and the premiums that the bonds were sold at or the discount

24  that the bonds were sold at but also the cost of the

25  transaction.

1  Q   What does TIC refer to?

2  A   True interest cost.

3  Q   Okay.  And so it includes all the fees for the

4  transaction as well as the interest rates?

5  A   That's correct.

6  Q   All right.  Why is the all in TIC higher for the new bond

7  issuance than it is for the refunding bonds as it's shown on

8  this chart?

9  A   That's a function of two things.  One is we expect -- and

10  we're still refining the amount of this, but we expect some

11  portion of the new money bonds to be what's referred to as

12  private activity bonds.  That is a feature of the tax law the

13  result of which is investors will demand a higher interest

14  rate for private activity bonds.  The other factor is that we

15  are structuring the new money bonds to essentially be put

16  behind all of the currently outstanding debt in terms of

17  maturity.  There is a --

18  Q   They're going to have a longer maturity?

19  A   They're a much longer maturity.

20  Q   What is the impact of having a longer maturity on the

21  interest rate you get?

22  A   The further out the -- the further out in maturity, the

23  higher the interest rate.

24  Q   Okay.  The estimated costs of the transaction that are

25  detailed in Section 3, in your judgment and opinion, are

1  those fees at or below what would reasonably be expected in a

2  fair market for this type of transaction?

3  A    Given the complexity of the transaction, including the

4  environment in which it is occurring, the amount of work that

5  has been put into it by the various parties, of which there

6  are many, I consider the fees to be well below what one would

7  normally expect.

8  Q    All right.  Mr. Donner, do you have an opinion -- with

9  respect to the refunding bonds that are going to be used to

10 pay for the tendered bonds and redeem the other callable

11 bonds, with respect to the refunding bonds, do you have an

12 opinion as to whether or not DWSD is able to obtain such

13 credit to refund the tendered and redeemed bonds on the same

14 terms without issuing new bonds at a senior level of

15 security?

16 A    I'm not sure.

17 Q    Let me start over.

18 A    Yeah.

19 Q    I'm asking if you have an opinion, yes or no, as to

20 whether or not the department could get the same credit terms

21 for refunding the bonds if it issued new bonds that were only

22 at a second lien level as opposed to a senior lien level?

23 A    I do.

24 Q    What is your opinion?

25 A    My opinion is they would not.

1   Q    Why not?

2   A    The second lien debt, by its very nature, has lower debt

3   service coverage.  It has a higher interest rate and,

4   therefore, lower debt service coverage.  The coverage

5   requirement under the documents for senior lien debt is 120

6   percent.  The second lien debt is only 110.  That's going to

7   result in a significant -- a higher interest rate and in some

8   environments a significantly higher interest rate for that

9   second lien debt.

10  Q    So if you were to replace the current existing senior

11  lien debt with new debt that has a second lien, what would be

12  the impact on the department's debt service going forward?

13  A    It would -- well, it would raise the specter that the

14  current revenues of the department would be insufficient to

15  provide the required coverage.

16  Q    And what impact would that have on the ability of the

17  department to issue the new bonds to replace the old bonds?

18  A    It would raise real issues with the insurers and the

19  investors about the debt.

20  Q    Why would the investors care?

21  A    Because they are looking to the revenues to provide the

22  coverage stipulated in the resolution -- in the bond

23  resolutions and in the indenture.

24          MR. HAMILTON:  I have no further questions for this

25  witness, your Honor.

1    THE COURT:  Thank you.  And, sir, you may step down.

2    (Witness excused at 10:54 a.m.)

3    MR. HAMILTON:  Your Honor, our next -- we have two

4  more witnesses.  The next witness is David Brownstein.

5    DAVID BROWNSTEIN, DEBTOR'S WITNESS, SWORN

6    THE COURT:  All right.  Please sit down.

7    DIRECT EXAMINATION

8  BY MR. HAMILTON:

9  Q    Good morning, Mr. Brownstein.

10  A    Good morning.

11  Q    Can you tell the Court who you are?

12  A    For the record, my name is David Brownstein.  I'm a

13  managing director at Citigroup in New York.

14  Q    All right.  And what is the name of the exact group that

15  you work for?

16  A    Within Citi?

17  Q    Yes.

18  A    I am head of the public finance department, which is part

19  of the municipal securities division.

20  Q    All right.  And is there a difference between Citigroup

21  Global Markets and Citibank, NA?

22  A    They're two separate companies.  I'm also a vice

23  president of Citibank.

24  Q    Okay.  And which company is the one that's providing the

25  backstop that Ms. Bateson described?

1    A    That's Citibank.

2    Q    Citibank, NA?

3    A    Yes.

4    Q    Okay.  And what is Citigroup Global Markets doing in

5    connection with this deal?

6    A    Citigroup is our dealer side of our company where we

7    underwrite municipal securities.

8    Q    All right.  Can I ask you, sir, to take a look at Tab 3

9    in the small binder on your right there?

10   A    Yes.

11   Q    What is this document?

12   A    It's a declaration that I prepared.

13   Q    Are the statements in this declaration -- do they

14   accurately and truthfully reflect your testimony in support

15   of this motion?

16   A    Sorry.  Yes.

17   Q    Okay.  And, in particular, could you briefly describe for

18   the Court your experience as reflected in paragraphs 2 and 3

19   of that declaration?

20   A    Sure.  I am -- as I said, I am head of public finance.  I

21   am a registered individual with five securities exams under

22   my belt and was the former head of the Securities Industry

23   Financial Markets Association's Municipal Division --

24   Q    All right.

25   A    -- as its chair.

1   Q   As its chair.  And then did you get an award in your

2   capacity in that role?

3   A   Yes, sir.

4   Q   What was that?

5   A   It was the 2012 Honor Roll Award.

6   Q   Okay.  Do you manage a staff of investment bankers in the

7   municipal markets?

8   A   Yes.  I manage a staff of 125 people.

9   Q   Can you give the Court just a general understanding of

10  approximately how many municipal -- how many companies are

11  there out there that you do what you do that's your size,

12  just approximately?

13  A   There are about seven dealers who are major competitors

14  of ours in this industry.

15  Q   All right.  And what is their relative size compared to

16  Citi?

17  A   Several of them are much larger than us, and we're

18  probably in the middle of the pack with 125 people.

19  Q   Of the top seven?

20  A   Yes.

21  Q   Okay.  And under your leadership, approximately how many

22  commitments the size of the total of all commitments in the

23  municipal markets have you been involved with?

24          THE COURT:  Excuse me.  Before you answer that, sir,

25  would you lean into the microphone or pull it closer?

1          THE WITNESS:  Yes, sir.  In total I've been involved

2     in hundreds of municipal financings with a total of probably

3     $50 billion in commitments over time.

4     BY MR. HAMILTON:

5     Q    All right.  And did you -- were you involved in

6     connection with financing with respect to Puerto Rico, for

7     instance?

8     A    My firm is one of the underwriters for the Commonwealth

9     of Puerto Rico; correct.

10    Q    Did you have involvement in connection with the sewer

11    system problems down in Jefferson County, Alabama?

12    A    Yes.  We underwrote the takeout financing out of

13    bankruptcy for the county.

14    Q    All right.  And were you involved in the City of

15    Detroit's recent foray into the municipal markets in

16    connection with its public lighting authority?

17    A    Yes.  We served as lender to the lighting authority and

18    ultimately underwrote securities to take out the loan to the

19    public market.

20          MR. HAMILTON:  Your Honor, I would proffer Mr.

21    Brownstein as an expert as an investment banker in the

22    municipal finance markets.

23          THE COURT:  You may proceed.

24          MR. HAMILTON:  Thank you.

25    BY MR. HAMILTON:

1  Q   Mr. Brownstein, could I ask you to turn to Exhibit 45,

2  which is the last exhibit in the big binder, the summary

3  sheet of the --

4  A   Yes.

5  Q   -- results of the tender?  And you'll see on Section 3 on

6  estimated cost of transactions there's a list of fees for the

7  transactions.  Do you see that?

8  A   Yes, I do.

9  Q   Where are Citigroup's fees reflected in this chart?

10  A   There are three sections -- or four sections, I should

11  say, of this that deal with fees to Citigroup.  There's the

12  dealer manager fee for the tender offer.  The tender

13  solicitation fee is payable to dealers who bring in bonds

14  from individual investors.  I don't believe we shared in any

15  of that fee, but I can't confirm that.  There's the

16  management fee that is payable for the structuring of the

17  bond financing, and then the last fee is the underwriters'

18  takedown, which is associated with the sale of refunding

19  bonds.

20  Q   Okay.  And are the Citi's fees that are included here,

21  are they at or below market for comparable transactions in

22  the municipal markets?

23  A   They are below the fees that we generally charge

24  municipal insurers.

25  Q   With respect to the tender summary statistics, there is a

1  line that says gross cash flow savings of 241 million.  Do

2  you see that?

3  A   Yes.

4  Q   How did you calculate that amount?  How did you determine

5  what the savings would be?

6  A   What we've done is taken the old debt that was tendered

7  as well as the current refundings and modeled them against

8  the refunding bonds.  Assuming tomorrow's sale is at the

9  rates we assume, the difference between the old debt service

10  taking into account the cash funded reserve funds and the new

11  debt service utilizing surety policies in lieu of cash funded

12  reserve funds, then the difference between those two cash

13  payments is the annual savings.

14  Q   All right.  So you know what the tender price is for the

15  tendered bonds because you set that in the invitation; is

16  that right?

17  A   Correct.

18  Q   So how did you determine what the price would be of the

19  new refunding bonds that you'd have to issue to take out the

20  old ones that you tendered for?

21  A   Well, we will know that for sure tomorrow.

22  Q   But how did you -- how did you -- how did you assume it

23  for this chart?

24  A   We are in the business of selling debt.  We look at every

25  day what the value of each bond is in the marketplace,

1  including where Detroit's bonds trade in the secondary

2  market, to determine what is the interest rate that investors

3  should be willing to purchase the new bonds at taking into

4  account the assumed ratings as well as insurance from both

5  Assured and National.

6  Q   What steps did you do to determine what the conservative

7  estimate would be for the price you would get starting

8  tomorrow hopefully?

9  A   We enter into a dialogue with investors.  We start a

10 process of reviewing credit with them.  We have, as I believe

11 you're aware, a road show here in Detroit last week with 20

12 of the top institutional investors in our market where we

13 reviewed the credit with DWSD's staff and took them to visit

14 a sewer plant.

15 Q   Okay.  If I could ask you to turn to the second page of

16 this chart on sources and uses, I'm going to ask you a few

17 questions about the sources.

18 A   Sure.

19 Q   The first line is the par amount for both the refunding

20 bonds and the new bonds; is that right?

21 A   Correct.

22 Q   Okay.  And so the goal was to get a net $150 million of

23 new money for the department to pay for those two sewerage

24 projects that Ms. Bateson testified; right?

25 A   Correct.

1  Q   So why do you have to issue par amount of new bonds of

2  161 million to net 150 million?

3  A   So there are a couple of components that are involved in

4  the process of pricing a municipal bond issue.  Certain bonds

5  are sold to the market at a premium over par.  In fact, the

6  refunding bonds on average are being sold at a premium to

7  par, so investors are getting a coupon that is higher than

8  market and paying the differential between the two to the

9  city up front.

10 Q   Is that the 135 million figure for the premium under the

11 refunding column?

12 A   Correct.

13 Q   And then what's the negative ten million under the new

14 money column?

15 A   So because the new money bonds are structured to be in

16 the back end of the total debt longer than the refunding

17 bonds, the investors are looking for what's called original

18 issue discount, so those bonds will have a coupon that is

19 below market, and the investors will, in fact, pay less than

20 par for them, which is why the par size is higher than the

21 proceeds needed to fund construction.

22 Q   And what's the -- the last line on sources, accrued

23 interest equity contribution for the refunding bonds, what's

24 that?

25 A   Well, the bonds are going to be closing September 4th,

1    and there will be interest due on the refunded debt to that

2    date.  And a portion of that is already on hand at DWSD, and

3    a portion of that will be funded, if you will.

4    Q    Okay.  And then right above that there's cash from prior

5    reserve fund of 48 million and change.  What's that?

6    A    That's the number that you discussed with Nicki earlier.

7    That's the cash that will be released from the old reserve

8    funds and with the refunding bond proceeds, and so that will

9    go to reduce the size of the refunding and will be replaced

10   for the new issue with the surety policy.

11   Q    Okay.  Could I ask, you, sir, to just tell us what is

12   Exhibits 12 and 13 in the small binder on your right?

13   A    Exhibit 12 is a draft bond purchase agreement between the

14   underwriting syndicate and the Michigan Finance Authority

15   with respect to the refunding bonds to be issued.

16   Q    And what is 13?

17   A    It's the same document but with respect -- one is with

18   respect to the sewage bonds, and one is with respect to the

19   water bonds.

20   Q    And then what's Exhibit 14?

21   A    It's a purchase contract between DWSD and the Michigan

22   Finance Authority effectively selling them the bonds that

23   will back the bonds to be sold by the city -- or by the MFA.

24   Q    And what's Exhibit 15?  Just dotting some I's and

25   crossing some T's, Mr. Brownstein.

1 A    Same contract but with respect to the sewer bonds.  The

2 first one was with respect to the water bonds.

3 Q    And then what's Exhibit 16?

4 A    This is a form of the bank loan document to be used in

5 the event that Citibank purchases the bonds on an interim

6 basis in lieu of a sale to the public market.

7 Q    And Exhibit 17?

8 A    Same document again with respect to sewer bonds versus

9 water bonds.

10 Q    Okay.

11 A    Okay.

12          MR. HAMILTON:  Thank you very much, Mr. Brownstein.

13          THE WITNESS:  Thank you.

14          MR. HAMILTON:  I have no further questions for this

15 witness.

16          THE COURT:  Thank you.  And, sir, you may step down.

17          THE WITNESS:  Thank you.

18      (Witness excused at 11:07 a.m.)

19          MR. HAMILTON:  Your Honor, our final witness is Mr.

20 Kevyn Orr, the emergency manager.

21          THE COURT:  Okay.

22            KEVYN ORR, DEBTOR'S WITNESS, SWORN

23          THE COURT:  Please sit down.

24          THE WITNESS:  Yes, your Honor.

25                        DIRECT EXAMINATION

1  BY MR. HAMILTON:

2  Q   Good morning, Mr. Orr.

3  A   Good morning.

4  Q   You're the emergency manager for the City of Detroit; is

5  that right?

6  A   Yes.

7  Q   I want to do basically two things with your examination

8  this morning.  The first, we're going to cover the necessary

9  government approvals that the city and the department have

10  received for this transaction, and then I want to ask you

11  about why you have entered the orders you have and given the

12  approvals you have for this transaction.  Okay?

13  A   Yes.

14  Q   In front of you are two binders, one on your right and

15  one on your left.  You are mostly going to be looking at the

16  big binder, and I'm going to take you through a number of the

17  documents that establish the government approvals that we

18  received.  I want to first ask you do you recall when was the

19  tender offer launched?  Do you recall?

20  A   Yes.  It was early August, I believe August 6th.

21  Q   Okay.  And if you could take a look at Exhibit 28 in the

22  binder and tell the Court what that is.

23  A   Your Honor, this is my exhibit number twenty --

24  Q   Not 29, 28.

25  A   28?

1  Q    28.  Can you take a look at the first page of the

2  exhibit?

3  A    Yes.  No.  This is the certification by the Board of

4  Water Commissioners.

5  Q    Right.  So this is the resolution that was passed by the

6  Board of Water Commissioners authorizing the commencement of

7  the tender on August 6th; is that right?

8  A    Yes.  I thought I was looking for my order, but this is

9  the board's.

10  Q    Well, that's the board's.

11  A    This is the board's, yes.

12  Q    And then did you ratify this and approve this --

13  A    Yes.

14  Q    -- resolution?

15  A    Yes, I did.

16  Q    Take a look at Exhibit 29.

17  A    Yes.  This is Order Number 3, the order by which I

18  ratified the Board of Water Commissioners' resolution.

19  Q    All right.  And were then the terms of the DWSD refunding

20  bonds authorized by you a few days later?

21  A    Yes.

22  Q    All right.  Take a look at Exhibit 30.

23  A    Yes.

24  Q    Is this an order where you authorized the water bonds --

25  the new refunding bonds for the water bonds?

1 A    Yes.  This is Order Number 8 by which I authorized the

2 refunding of the water supply system bonds, the water bonds.

3 Q    Take a look at Exhibit 31.  Is that the same order with

4 respect to the sewer bonds?

5 A    Yes, yes.  This is the order entered on August 11th by

6 which I authorized the sewerage bonds.

7 Q    All right.  And then, to your knowledge, did the Michigan

8 Finance Authority also authorize the terms of these refunding

9 bonds?

10 A    Yes.

11 Q    Take a look at Exhibit 42.  Is this the document where

12 the MFA approves the bonds' terms?

13 A    Yes.  This is the resolution of the Michigan Finance

14 Authority by which they approve the bonds.

15 Q    All right.  And then that was on August 12th; right?

16 A    Yes.

17 Q    All right.  And then did the Board of Water Commissioners

18 then authorize the terms of the new refunding bonds as well?

19 A    Yes.

20 Q    Take a look at Exhibits 32 and 33.  Can you tell us what

21 those are?

22 A    Yes.  I've looked at them.

23 Q    All right.  Are those the resolutions where the Board of

24 Water Commissioners authorizes the terms of the bonds?

25 A    Yes.  32 authorizes the water supply system bonds, and 33

1  authorizes the sewage disposal system bonds.

2  Q   All right.  And then that was on August 13th and signed

3  and dated the next day, August 14th; is that right?

4  A   Yes.  The meeting was held on the 13th, and they were

5  signed on the 14th.

6  Q   And then did you then enter orders that ratified those

7  two resolutions by the Board of Water Commissioners a few

8  days later?

9  A   Yes.

10 Q   Take a look at Exhibits 34 and 35.  Are those the orders

11 that you entered ratifying the Board of Water Commissioners'

12 resolutions that they approved on the 13th?

13 A   Yes, they are.

14 Q   Okay.  And then did the Department of -- did the Michigan

15 Department of Treasury also approve the issuance of these

16 bonds?

17 A   Yes.

18 Q   Take a look at Exhibit 43.  Is this the approval by the

19 Michigan Department of Treasury for the bonds?

20 A   Yes, on August 19.

21 Q   And then did the Detroit City Council approve the -- both

22 the refunding bonds and the new money bonds for the

23 Department of Water and Sewer?

24 A   Yes.

25 Q   All right.  Do you remember like -- was it like a couple

1   days -- like last week?

2   A   It was last week.  I believe it was around the 20, 21st.

3   Q   Okay.  Take a look at Exhibits 36 and 37.

4   A   Yes.

5   Q   Are these the -- do these document the City Council's

6   approval of the refunding and the new revenue bonds?

7   A   Yes.  They include my letter to the City Council and the

8   execution by president pro tem, yes.

9   Q   Okay.  And then -- this is Monday.  Last Friday did the

10  Board of Water Commissioners accept the bonds that had been

11  tendered by the bondholders --

12  A   Yes.

13  Q   -- pursuant to the tender offer?  And take a look at

14  Exhibits 38 and 39.  Are these the resolutions that were

15  adopted by the Board of Water Commissioners accepting the

16  tendered bonds?

17  A   Yes, they are.

18  Q   And then later that afternoon last Friday, did you

19  approve and ratify the resolutions that were issued by the

20  Board of Water Commissioners accepting the tender?

21  A   Yes.

22  Q   Take a look at Exhibits 40 and 41.  Are those your orders

23  accepting and ratifying the Board of Water Commissioners'

24  resolutions accepting the tender?

25  A   Yes.

1  Q    All right.  So you're done with the documents.

2  A    Yes, sir.

3  Q    Can you tell the Court is this a good deal for the city?

4  A    Yes, sir.

5  Q    Why?

6  A    Your Honor, I believe it's a good deal for the city for

7  several reasons.  First of all, it provides much needed cash

8  to the city.  A component of the transaction is to lower the

9  debt service of the city, which I suspect has been discussed

10 in the papers that have been filed as well, but an ancillary

11 component for the city is to also have a settlement with some

12 of our dissenting bondholders.  And finally, your Honor, for

13 the third reason that I would say is that we are saying to

14 the city, in addition to lowering our coupon rate on these

15 bonds for the ones that have been tendered -- and there's

16 about 93 percent of the targeted bonds we're after -- but

17 we're also saying to the ratings agencies that we're getting

18 our financial house in order with regard to this department,

19 which we hope will result in a better rating for the

20 department instead and also greater capacity for the

21 department going forward to deal with its debt on the balance

22 sheet.  So for all of those reasons, I believe it's a very

23 good deal for the city.

24 Q    And those reasons were the basis for your judgment to

25 approve and ratify the resolutions of the Board of Water

1    Commissioners and to have the city approve and enter into
2    these transactions?
3    A    Yes.
4         MR. HAMILTON:  I have no further questions, your
5    Honor.
6         THE COURT:  Thank you.  You may step down.
7         THE WITNESS:  Thank you, your Honor.
8    (Witness excused at 11:18 a.m.)
9         MR. HAMILTON:  Your Honor, I would move Exhibits 1
10   through 44 -- or 45 into evidence.
11        THE COURT:  That motion is granted.
12   (Debtor's Exhibits 1-45 received at 11:19 a.m.)
13        MR. HAMILTON:  That concludes the presentation of
14   our case, your Honor.
15        THE COURT:  All right.  Is there any closing or
16   final statement that you wish to make?
17        MR. HAMILTON:  I would defer to Ms. Lennox.
18        THE COURT:  Okay.
19        MS. LENNOX:  Thank you, your Honor.  I'll be very
20   brief.  I think we've used the phrase "win-win" before, and
21   it really is.  This transaction is a win-win for all
22   involved.  First, DWSD can achieve significant reductions in
23   its debt service obligations over time.  You've heard 11.4
24   million annually in cash savings over the next 19 years
25   estimated to be $242 million in gross savings in total.

1          Second, it can do this consensually in a way that
2     the market and its bondholders find favorable, so it helps
3     not only for the savings for this case and this set of
4     transactions but also with future costs of capital.

5          Third, the issues surrounding the DWSD pension
6     payments in the plan are resolved vis-a-vis the bondholders,
7     and they've been resolved in a way that everyone who has an
8     interest in that is satisfied with.

9          Finally, assuming transactions close -- and we
10    certainly have every expectation that they will -- all of the
11    financial creditors and -- all of the financial creditors'
12    objections to the plan vis-a-vis DWSD are resolved because
13    the plan will unimpair the debt.

14         DWSD, I think you've heard from the testimony today,
15    has clearly articulated good business reasons for seeking,
16    first of all, the new money that it seeks to complete the
17    capital improvements and to complete the tender transactions.
18    The new money provides needed money for CAPEX.  The tender
19    settlements provide significant savings.  They settle
20    contested litigation, and they also significantly reduce the
21    DWSD lender fee claims against the city.  We think the terms
22    of the settlement are reasonable, beneficial, fair, and in
23    the best interest of the city and its creditors.  I think
24    these -- it's fair to say these were negotiated vigorously
25    and at arm's length.  The financing itself fits clearly

within the state statutes.  The new money can be issued as a

senior level pursuant to the water and sewer ordinances.  The

tender bonds are going to be swapped out for 2014 bonds in

the same priorities, again, pursuant to the ordinance.  The

bonds will be protected for adequate protection purposes by

the additional bonds test or the alterative refunding debt

service saving test and the rate covenant going forward,

which is the covenant that the DWSD has to charge enough --

sufficient rates to cover all of its obligations.

We're going to go out to the public for the bond

purchases, so this is going to be a wide open and very public

process, and it will determine the best terms.  And if that

fails, we have a reasonably priced commitment in case we need

to close and we need to use a backup.

So under all these circumstances, we think it's

appropriate for your Honor to enter 365(e) and 921(e)

protections for the lenders and the credit enhancers here.

We also think, as you've heard from the testimony, that we

satisfy the four factors for approval of settlements under

bankruptcy Rule 9019 as articulated by the Sixth Circuit in

the Bard and Greektown Holdings cases.  So for all these

reasons, your Honor, we'd ask you to approve the motion.

THE COURT:  Thank you.  The Court does conclude that

the record more than adequately warrants granting the motion

both as to the financing aspect of it and as to the

1  settlement aspect of it.  You may submit your order through

2  our order router process.

3          MS. LENNOX:  Thank you, your Honor.  We'll do that.

4          THE COURT:  All right.  We'll be in recess here in a

5  moment.  Ms. Lennox, Mr. Bennett, I want to see you at the

6  side of the bench over here, and we'll be in recess.

7          THE CLERK:  All rise.  Court is in recess.

8      (Recess at 11:23 a.m., until 4:45 p.m.)

9          THE CLERK:  All rise.  Court is in session.  Please

10  be seated.  Calling Case Number 13-53846, City of Detroit,

11  Michigan.

12          THE COURT:  All right.  Let's proceed, please.

13          MR. CULLEN:  Do you want to take appearances, your

14  Honor or not?

15          THE COURT:  Oh, that's a good idea.  Appearances,

16  please.

17          MR. CULLEN:  Thomas Cullen of Jones Day representing

18  the city.

19          MR. HERTZBERG:  Robert Hertzberg, Pepper Hamilton,

20  on behalf of the city.

21          MR. MONTGOMERY:  Claude Montgomery for the Retiree

22  Committee.

23          THE COURT:  I'll have to ask you to put your

24  appearance on the record by a microphone so we are sure that

25  we record it.

1          MR. MONTGOMERY:  Yes, sir.  Claude Montgomery,

2    Dentons US, for the Retiree Committee, and I'm accompanied

3    today by my partner, Dan Barnowski.

4          MR. HOWELL:  Good afternoon, your Honor.  Steven

5    Howell, Dickinson Wright, special assistant attorney general,

6    appearing on behalf of the State of Michigan.

7          MR. PLECHA:  Good afternoon, your Honor.  Ryan

8    Plecha, Lippett O'Keefe Gornbein, on behalf of the retiree

9    association parties.

10          MS. PATEK:  Good afternoon, your Honor.  Barbara

11    Patek for the Detroit Police Officers Association.

12          MR. GORDON:  Good afternoon, your Honor.  Robert

13    Gordon of Clark Hill on behalf of the Detroit Retirement

14    Systems.

15          MS. QUADROZZI:  Good afternoon, your Honor.  Jaye

16    Quadrozzi on behalf of Oakland County.

17          MR. HACKNEY:  Your Honor, good afternoon.  Stephen

18    Hackney, Mark Kieselstein, and Ryan Bennett on behalf of

19    Syncora.

20          THE COURT:  I'm glad you made it, sir.

21          MR. HACKNEY:  Thank you.

22          THE COURT:  All right.  Let's proceed.

23          MR. CULLEN:  Good afternoon, your Honor.  Thomas

24    Cullen of Jones Day representing the city.  I would note for

25    the Court that Mr. Hertzberg has a couple of procedural

1  matters.  Do you want to do those first or last?

2        THE COURT:  Yeah.  Let's take care of those first.

3        MR. CULLEN:  Okay.

4        THE COURT:  Excuse me one second.  Yes, sir.

5        MR. HERTZBERG:  Your Honor, a couple things related

6  to the pretrial order.  One, there was an offer made by

7  Mr. Hackney on the use of his young associates to assist on

8  the direct examination of the pro se witnesses.  City hadn't

9  thought about it, and we've had a chance to think about it

10  since he brought it up, and the city objects to that

11  procedure.  We think it's prejudicial to the city, and we

12  wanted to note that for the Court.

13        Second, your Honor, I've advised all the

14  objectors -- we let them know on Friday, and I told them

15  today when they came in -- we're looking for the Court's help

16  on an issue related to the pretrial order.  Everyone has been

17  working hard on it.  The exhibits are a massive amount of

18  exhibits, and there's a lot of duplications.  And just for

19  example -- and I'm not blaming anyone because it's just the

20  nature of what's been going on.

21        THE COURT:  Right.

22        MR. HERTZBERG:  We have, for example, 17 copies of

23  the disclosure statement that are in the list of exhibits.

24  Some parties have eight listed, listed eight times, others

25  two, others three.  And what I think has happened in the

listing of these exhibits is that when they were used -- for
example, those were used as part of the depositions -- they
were marked and put in in deposition transcripts, have been
listed on the exhibit list.  And I've asked the objectors and
I've talked to them all except for I didn't have a chance to
go into detail with Mr. Hackney, but I'm asking the Court to
try and get the process and help us make the objectors get
together, get rid of all the dups out of the list of exhibits
and then come to us.  And then if we have them on our list,
maybe they'd just use ours or at least get rid of some of the
duplications because, for example, if we end up coming into
court with 14 or 17 disclosure statements, just the binders
alone for that are going to be impossible to manage,
especially when the Court advises us we're going to be moving
courtrooms, so hopefully maybe the objectors can get together
as a group, find a way to get all the duplications of the
exhibits out, come to us and make the process more
streamlined.  And that was my hope today of trying to get
that done, and the Court's assistance --

        THE COURT:  Anyone want to speak to this?

        MR. PEREZ:  Your Honor, Alfredo Perez on behalf of
FGIC.  Your Honor, I think that's a great idea.  It's just an
issue of time of everybody coordinating.  I mean people are
still -- I mean we exchanged pretrial orders today again.  We
were looking over the weekend.  We exchanged exhibits again

1    today.  So it's not like -- it would be great if we had like
2    a week solid just to work on that, but we just don't.  So
3    we'll obviously endeavor to do that, but it's not something
4    that it can be done quickly without some problem.

5           MS. QUADROZZI:  And, your Honor, Jaye Quadrozzi.  I
6    would just second that.  I think that all of us would prefer
7    to not have 15 copies of a single exhibit, and we will do
8    what we can to get there in the time that we have allowed.  I
9    don't know that we need any more than just a we should try
10   and work that out.  I don't think we really need the Court to
11   issue an order on that issue.

12          MR. HERTZBERG:  Your Honor, I'm not asking for an
13   order.  If they'll work it out and work on it and then we can
14   work with them, that'll be sufficient.  If a problem arises,
15   I can always discuss it with them or come back to the Court,
16   but the only purpose was is kind of nudge them on to dealing
17   with the duplicate --

18          THE COURT:  All right.  So I strongly discourage
19   duplicate exhibits, and I won't prohibit it because, you
20   know, if a duplicate slips through, okay, but it does seem to
21   be in everybody's best interest not to have duplicates.

22          MR. HERTZBERG:  Okay.  Your Honor, one last thing
23   that arose today, and it deals with Assured and the DWSD.
24   They raised the issue today, and the issue is one we thought
25   they could have brought up a lot earlier than today.  I told

1    Mr. Schwinger that we would at least -- I don't know if he's

2    on the phone or he was going to try and dial into the call

3    because it involves them, but we've been working, as I

4    indicated, hard with the objectors on the exhibits trying to

5    get rid of duplications, deal with admission issues so that

6    when we get the pretrial order, we're able to streamline

7    stuff.  They told us today that they are sure -- they assured

8    that they're going to reserve on all the exhibits.  Well,

9    that's just not going to work.  We understand we've entered

10   a --

11            THE COURT:  I'm sorry.  You're going to what?

12            MR. HERTZBERG:  That they're going to reserve

13   objections.  They're going to reserve their right to object

14   to all the exhibits, which just is not going to work.  We

15   entered a stipulation with them to deal with their particular

16   issues in light of the tender that is pending before the

17   Court, but they're reserving on the exhibits.  It's just

18   unsatisfactory.  And the reason it is is because if we move

19   forward and they have reserved objections, we haven't laid

20   proper foundations for exhibits where maybe the other

21   objectors have no objections to, and it's just an impossible

22   situation.  And when we said that it wouldn't work, their

23   response back to us was, "Fine.  We're just going to object

24   to every exhibit under 801 hearsay and other objections,"

25   which is not acceptable either, so we're asking for the

1   Court -- for some help on this.  We've been working with the

2   objectors -- the other objectors very hard to try and clear

3   the brush on objections that are not necessary to exhibits,

4   and now this has been thrown up today at us, and it's -- the

5   suggestion I have is they just need to go through the

6   exhibits, tell us realistically what --

7           THE COURT:  How many exhibits do you have?

8           MR. HERTZBERG:  I think we have about 500 or 550,

9   and some of these are really easy to deal with.  I mean the

10  plan, for example, the reserve on those type of things and

11  other simple documents just makes no sense, and it just puts

12  a heavy burden --

13          THE COURT:  And you had this conversation with whom?

14          MR. HERTZBERG:  I did not have it directly.  Mr.

15  Irwin, who might be on the phone -- I'm not sure if he's

16  dialed in -- from Jones Day has been discussing it with Mr.

17  Schwinger and someone from his office also.

18          THE COURT:  Mr. Schwinger, are you on the phone?

19          MR. SCHWINGER:  Yes, your Honor.  I've just joined.

20          THE COURT:  Hold on.  We're going to see if we can

21  make you louder.  Okay.  Okay.  Can you speak again so we can

22  see if we have you loud enough?

23          MR. SCHWINGER:  Yes, your Honor.

24          THE COURT:  Okay.  We're good now, so go ahead.

25  Were you able to hear Mr. Hertzberg okay?

1    MR. SCHWINGER:  I caught the last few minutes, and
2  obviously I'm aware of the situation here.  And, your Honor,
3  I'm sorry that this seems to have turned into a tempest in a
4  teapot, and obviously given the situation --
5    THE COURT:  This is not a tempest in a teapot.  This
6  would cause a major extension of this trial should you insist
7  on objecting to every single one of the city's 500 documents.
8    MR. SCHWINGER:  Right, and that's exactly my point,
9  your Honor.  That was not the way we had attempted to
10 proceed.  We originally -- the DWSD parties originally
11 proposed that we proceed simply by having a footnote in the
12 exhibit list that said that to the extent that documents
13 containing hearsay are offered, you know, for the truth as
14 opposed to some other purpose -- and most of them we believe
15 are intended to be offered for other purposes -- that we
16 reserve the right to object to that.  We got a -- had a phone
17 call this morning with one of the members of the Jones Day
18 team who was extremely emphatic that that was not acceptable,
19 and we were told very specifically that if we had any problem
20 with any statement in any of the city's exhibits, that we
21 needed to put an objection on the chart.  So we raced like
22 crazy to put down objections to the documents that raised
23 these issues, and we did so, and then we got the response
24 back from the city, which I fully understand where they're
25 coming from, and it is not our intention here to disrupt

1    the -- to disrupt the confirmation hearing or to be the tail

2    that wags the dog, especially given the posture of the DWSD

3    parties.  What we had proposed just most recently -- and I

4    had spoke with Mr. Irwin myself -- was saying, look, rather

5    than saying that we interpose an objection, could we simply

6    note a reservation that to the extent that, if necessary, we

7    reserve the right to seek from the Court a limiting

8    instruction or something similar to the extent based on if a

9    document is used for the purpose for which it's offered or

10   used, and in this respect we're doing nothing more than

11   what's already set forth in evidence Rule 105, which says

12   that if the Court admits evidence that's admissible for some

13   purpose or against some party, that the Court on timely

14   request must restrict the evidence to its proper scope and

15   instruct the jury accordingly.  That's all we're trying to do

16   is to protect ourselves in the event that some document is --

17   there are documents here that are hundreds of pages long, and

18   if there's some piece of fifth-level hearsay buried on page

19   212 of a document that we don't want to be in a situation

20   where we agree that that sentence can be used for any purpose

21   whatsoever in the trial.  And we're simply trying to reserve

22   our right to, if necessary, at an appropriate juncture, stand

23   up and make that point to the Court and have the Court say,

24   you know, "I will -- you know, we will accept that limitation

25   on the evidence."  And that's all we're trying to do here.

1    Mechanically I don't really care the method by which we do

2    that, but that's the concern we simply were trying to

3    address.

4           MR. HERTZBERG:  Your Honor, the --

5           THE COURT:  I have to say that I find that approach

6    deeply troubling.  In the Court's view, without intending to

7    discourage good faith objections to exhibits, when a party

8    asserts an objection to an exhibit in the final pretrial

9    statement, it must have some good faith evidentiary basis for

10   asserting that it is not authentic or it is not a business

11   document or is not relevant.  I don't want objections just

12   because they're in the Federal Rules of Evidence.  There has

13   to be a basis for every objection.

14          MR. SCHWINGER:  Yes, your Honor, and I certainly --

15   the issues we're concerned with are not -- we're not really

16   focused on issues such as authenticity or whether something

17   is a business record.  Really what we're concerned with is

18   hearsay being offered for the truth.  If there's a

19   document --

20          THE COURT:  For example, give me an example.

21          MR. SCHWINGER:  Okay.  There are documents where

22   they are produced by financial parties who have been --

23   people are talking about the DWSD bonds, and they are making

24   assertions.  They are quoting other people who are making

25   assertions.  Now, if the city wants to offer this document to

1  show that it received it and this was the state of its

2  knowledge, et cetera, about what the market -- what people in

3  the market were thinking about the bonds, that's fine, but if

4  the city is going to offer that document to say that a

5  sentence which one person in the document is quoting someone

6  else in the document who's quoting a third person in the

7  document, that that sentence has to come in for the truth of

8  that assertion, that's where we have our good faith objection

9  to it.  And that's the only real basis here is hearsay in

10  those type of situations when we have documents that have

11  many, many things embedded in them.

12  THE COURT:  So are you talking about documents that

13  were prepared in contemplation of this litigation?

14  MR. SCHWINGER:  Not necessarily, no.  They were

15  prepared in relationship to the bankruptcy, not necessarily

16  in contemplation of the litigation.

17  THE COURT:  Well, that's what I mean, in connection

18  with the bankruptcy.

19  MR. SCHWINGER:  Yes.  There were documents, for

20  example, about, you know, the DWSD bonds and what could be

21  done with them, what new financing might be available, for

22  example.  And we don't want to be in a position where we have

23  to either allow every sentence that's referenced in that

24  document to be admitted for any purpose whatsoever during the

25  trial or, you know, have to object to it in its entirety, and

1   that's not the approach we wanted to take.  We just simply
2   want a common sense recognition of the fact that documents
3   often can be admissible for many purposes, but there are some
4   purposes that cross the line.  And, if necessary, we want the
5   ability to stand up at the trial and say, "Judge, if they're
6   using it for this purpose, they're crossing the line."
7       THE COURT:  Well, I think you should assume that
8   when the city offers a document, unless it's restricted
9   otherwise, it is being offered for all purposes, and the
10  burden is on you to identify in the joint final pretrial
11  statement the aspects of it that you don't think are
12  admissible into evidence on the grounds of hearsay or
13  whatever.
14      MR. SCHWINGER:  Well, that was our original
15  objection that we put in the pretrial order, which the city
16  had a problem with.
17      THE COURT:  No, but on a document-by-document basis,
18  not on a broad basis, and not just a document-by-document
19  basis but section or sentence of document by section or
20  sentence of document within the document.  That's what it
21  means to object to evidence.
22      MR. HERTZBERG:  Thank you, your Honor.
23      MR. SCHWINGER:  All right, your Honor.  Then we will
24  prepare to proceed, you know, accordingly.
25      THE COURT:  Thank you.  Can we begin with the motion

1  now?

2          MR. HERTZBERG:  Thank you.

3          THE COURT:  Okay.  Let's do that.  Actually, one

4  second.  I actually forgot something in chambers back here,

5  so give me 30 seconds, and I will be right back.

6          THE CLERK:  All rise.  Court is in recess.

7      (Recess at 5:01 p.m., until 5:02 p.m.)

8          THE CLERK:  All rise.  Court is in session.  Please

9  be seated.

10         MR. CULLEN:  May it please the Court, Thomas Cullen

11  of Jones Day representing the city.

12         THE COURT:  You may proceed, sir.

13         MR. CULLEN:  Because of the explosive nature of some

14  of these issues and because of the extent --

15         THE COURT:  I need you to speak much closer to the

16  microphone.

17         MR. CULLEN:  I'm sorry.  Okay.  Because of the

18  explosive nature of some of these issues and because of the

19  thoroughness of some of the briefing -- and I know the Court

20  has read it all -- what I will try to do here is to approach

21  these issues as concisely and as clinically as I can because

22  some of these issues lend themselves to rhetoric that may

23  obscure as opposed to enlighten.  I thought in order to do

24  that I would undertake one of the devices that Syncora has

25  used in their papers, which is a timeline laying out the

1  development of this issue and the development of various

2  public knowledge about this issue.  We think that this

3  timeline and the context, as supplemented by several of the

4  key documents in this case, shows that these allegations

5  are -- these objections are scandalous, are untimely, are

6  legally impertinent, and are in many cases simply untrue.  If

7  I could, I have a timeline here which I have in hard copy and

8  which I have cued up to show on the screens if I might.

9         THE COURT:  Yes, sir.

10        MR. CULLEN:  One of the things I thought we were

11 going to do with this just as a matter of presentation is to

12 highlight the dates that Syncora used as well as the ones

13 that we are using.  The Syncora dates are in blue.  The

14 verbiage, however, with respect to each date is ours, so we

15 include some of the Syncora dates, but our explanation is

16 somewhat different.  Let's begin with May 26th, 2013, even

17 before the filing.  And as you can see, it's going to be

18 small on the left, but each one as we go through it we will

19 try to build the timeline that way in a readable size.

20        So in this, at this date, before the proceeding,

21 before the -- even before the filing it is broadly known that

22 two issues are interlinked.  One is the fate of the art, and

23 the other is the fate of the pensions.  If you look at the

24 next slide, the actual headline here is "DIA Art Takes Center

25 Stage in High-Stakes Drama to Decide Detroit's Future."  And

1    in the article itself, city's investment advisor said that

2    the cultural value of the DIA's collection must be weighed

3    against -- I think that's against the cost of not meeting

4    those obligations and telling workers and retirees that

5    promises to them cannot be kept from the outset, a confluence

6    of those issues being considered together before the

7    mediation even started.

8            The next date that we'd like to look at I think

9    relevant to these issues is August 13th of 2003 where the

10   Court enters an order --

11           THE COURT:  2013.

12           MR. CULLEN:  -- 2013; sorry -- enters an order

13   establishing certain procedures to facilitate mediation and

14   appointing Gerald Rosen as the lead mediator.  If you could

15   pull up the mediation order itself, Steve.  This broad

16   delegation to Judge Rosen -- the delegation is in paragraph

17   Number 3 and is accompanied by a couple of provisions, which

18   are an attempt to facilitate and protect the mediation

19   process, clear from the outset.  Paragraph Number 4, which

20   relates to confidentiality broadly, paragraphs Number 8 and

21   9, which relate to the status of the mediators as either

22   judges in this case or quasi judicial officers under the

23   authority of the Court and, therefore, immune to suit.  This

24   establishment of this kind of protected mediation space is

25   common in court-ordered mediation.  It is common because this

1    kind of protected space is necessary to encourage the free

2    interplay which makes mediation possible, and that's what

3    those --

4         THE COURT:  I'm sorry to interrupt you sir, but,

5    again, I have been asked to ask you to move closer to the

6    microphone because the people listening outside can barely

7    hear you.

8         MR. CULLEN:  I'm sorry, your Honor.  I'll attempt to

9    project a little better.  In this August 13th order, it was

10   followed by other orders by this Court and by Judge Rosen

11   establishing various procedures for the mediation, and one of

12   the procedures established in this time was a procedure

13   that's at issue here.  It said if you have a problem with any

14   of the mediators or their disclosures, inform the mediator

15   and inform Judge Rosen.  That is a requirement of this

16   Court's mediation procedures underneath the -- under the

17   aegis of this Court and vital to keep that mediation going

18   forward and to not allow parties to lie in wait with

19   objections.

20        If you look at August 16th, this is the

21   comprehensive referral and delegation of all the parties

22   here, including Syncora, and August 20th, Rosen -- Judge

23   Rosen asks the parties -- orders the parties to appear for

24   the first mediation session, which is September -- scheduled

25   for September 17th.  On September the 9th, there is a

1    comprehensive disclosure letter served on all of the parties.

2    It is worth looking at that disclosure letter briefly.  Could

3    you pull it up, Steve?  As the Court can see, the letter goes

4    through all of the mediators, proposed mediators, including

5    Judge Rosen, and it has pages 5 to 7 devoted to Mr. Driker

6    and his long career before the Detroit Bar.  In the

7    penultimate paragraph of that disclosure, there is explicit

8    disclosure about Mr. Driker's wife, Elaine, who served for a

9    number of years as a member of the board of the DIA and was

10   elected a director emerita in 2012.  You'll note also that

11   there are various undertakings made by Mr. Driker in the

12   course of this disclosure.  He has, in the course of his

13   career, represented the city in various contexts.  He's on a

14   preferred provider list for city -- for various city organs,

15   and he made commitments not to represent those organs or

16   accept any new matters with respect to those previous clients

17   in connection with his agreement to serve as a mediator here.

18          This disclosure is interesting because of its stark

19   conflict with the statement in the supplemental objection --

20   second supplemental objection at paragraph 19, and if you

21   could throw page 15 and paragraph 19 up on the screen, Steve,

22   that would be nice.  This is the second supplemental

23   objection.  If you look at it as a whole, the bolded part, it

24   says first, "Neither Judge Rosen nor Mr. Driker ever

25   disclosed any biases," and then it says, "Mr. Driker is

1   conflicted and certainly, at a minimum, would appear to be so

2   to an objective observer," bolding the presence of his wife

3   as an emeritus member of that board.  And it -- interestingly

4   enough, for that disclosure it cites the Detroit Institute of

5   Arts media room.  Of course, by this time they have a court

6   filing with that disclosure in it, so this paragraph says

7   that that disclosure was not made when it was, and they imply

8   here that they had to winkle it out of the public records of

9   the Institute of Art itself, and they state clearly that as

10  of this time, Mr. Driker was conflicted and that they were

11  prejudiced from the beginning.  Those were their words in

12  this context.

13         Now, when they revisit that allegation in their

14  attempt to justify themselves in their objection to the

15  motion to strike in paragraph 30, page 22, paragraphs 30 and

16  31, they make what I think is a flat misrepresentation of

17  what the initial paper said.  They say Syncora did not

18  contend and does not now contend that Mrs. Driker's service

19  resulted in a conflict of interest.  Instead, the conflict

20  came about when he began mediating the DIA settlement just

21  like Pepper Hamilton's conflict, et cetera, in a case they

22  cite.  That I submit cannot be squared with the clear words

23  of their objection before, and there is nothing in the

24  objection itself that refers to this springing conflict

25  theory or offers any way to test it.  They had a clear view

1   at the outset.  This is a conflict.  It was undisclosed.

2   Therefore, the mediation is tainted.  Totally new theory in

3   the second piece of paper, but that theory as well is tainted

4   by stretches and mischaracterizations as we will see going

5   forward with the timeline.

6           Could I see the next date, please?  September 17th,

7   first mediation session, Judge Rosen identifies Eugene

8   Driker.  He says that Mr. Driker will mediate disputes

9   involving the city's pension funds.  Now, if you look again

10  at Syncora's paper responding to this, they make a great

11  deal --

12          THE COURT:  Excuse me.  Let me stop you there.  Can

13  you put that back on the screen, please?

14          MR. CULLEN:  Put that back on the screen, yes.

15  September 17th.

16          THE COURT:  Yes.  Can you advise me or remind me

17  where in the record of this case Judge Rosen's statement on

18  September 17th appears?

19          MR. CULLEN:  Only in Syncora's paper.

20          THE COURT:  In which paper?

21          MR. CULLEN:  I think the --

22          THE COURT:  The objection or the response?

23          MR. CULLEN:  The response, I believe.

24          THE COURT:  The response to the motion?

25          MR. CULLEN:  Yes.

1        THE COURT:  All right.  Thank you.

2        MR. CULLEN:  There's a footnote to it that says

3   because this was a public meeting and that the initial

4   meeting had public aspects, they felt not constrained by the

5   confidentiality in that setting with respect to that

6   statement, if I'm --

7        THE COURT:  Thank you.

8        MR. CULLEN:  I believe I state it fairly.  So then

9   32, this is another statement by Syncora that says no basis

10  to challenge.  This is in the response in the objection to

11  the motion to strike, page 23, paragraph 32.  "Judge Rosen

12  stated - and Syncora counsel believed -," no citation, "that

13  Mr. Driker would only mediate disputes involving the city's

14  pension funds."  Let's look at that for a second.  First, the

15  word "only" hovers coyly outside the quotation marks.  Judge

16  Rosen said he would mediate disputes relating to the pension

17  funds.  From the outset of this case, disputes involving the

18  sources of money for those funds, including the art, have

19  been part of this case.  As with every member of this

20  mediation, every creditor in this case, and inevitably so and

21  stands to reason they were looking at every piece of possible

22  value that they could get out of the city.  From the outset,

23  May 26th is an early citation, but we could probably find

24  earlier ones.  The link between being able to pay the

25  pensions and being able to retain the art was a critical

1   public issue throughout, so when Syncora says they had no

2   reason to believe that negotiation with respect to the

3   pension funds would have any impact on any settlement with

4   the DIA, it is very hard to square with one's experience of

5   life, with one's experience of this case, and with the public

6   treatment of these issues, which joined these issues from the

7   outset.  They apparently would have you believe that they

8   thought and relied upon the idea that Mr. Driker's mediation

9   with respect to the funds -- with respect to the pensions

10  would have no impact or no dealing with any sources of those

11  funds.  I submit to you that that defies reason and it defies

12  the public record outside of the -- outside of the mediation.

13          Let's go to November 2013.  "Consistent with the

14  widespread longstanding recognition that the treatment of

15  pension claims and the fate of the city's art might be

16  intertwined, details surrounding a potential grand bargain

17  become public," and this is a block quote from the Detroit

18  Free Press of that day.  The federal mediator is asking a

19  group to consider collectively contributing.  Now, first,

20  this is interesting for a couple of reasons.  One, it

21  publicly links the issues in November.  Number two, it

22  clearly indicates who's asking who.  The federal mediator is

23  going out and asking.  This is the public report.  So the

24  idea that people did not know either that the mediators were

25  taking an active role with respect to this or that there were

1   implications for the pension mediation is, again, simply

2   incredible.

3         November 26th, in response to this news, which, of

4   course, was not lost on Syncora or other objectors to the

5   plan, Syncora and other creditors asked the Court to

6   establish a committee to value and sell the DIA collection,

7   so as of right now we have two potential paths being

8   presented by Syncora.  One is -- or in public, for all the

9   public knows, including Syncora, one is something like the

10   grand bargain, and the other is Syncora's idea to sell the

11   collection.  These two things were in competition clearly as

12   of November 26th of 2013.

13         The newfound theory that they had no reason to

14   connect Mr. Driker's work on the pensions to the DIA, again,

15   it's just not credible.  And when Syncora says that they

16   believe that the statement by Judge Rosen that Mr. Driker

17   would be restricted to the pensions was something they could,

18   should, did rely on, well, number one, it didn't say

19   restriction.  It didn't say only.  Number two, this wasn't an

20   outline, a limit of responsibilities.  There were no averrals

21   made that the mediation team would work in perfect silos.

22   There is no indication in this record that Syncora's

23   lawyers -- there's a statement in the brief, but as a factual

24   matter about actual notice or even constructive notice of

25   these issues, there is no statement or declaration by anyone

1  about what they believed at various times about restrictions

2  of these parties.

3         MR. HACKNEY:  Your Honor, if I could rise to address

4  exactly that point, if I might be heard on a brief objection.

5         THE COURT:  What is your objection?

6         MR. HACKNEY:  If you read the Brown & Williamson

7  case, one of the things that it makes clear about motions to

8  strike is that they are for things that have absolutely no

9  relation to the proceeding, and the Court -- the Sixth

10 Circuit goes on in that case to say that they are treated in

11 the way of a demurrer; that is, the facts in the pleading

12 that you seek to strike are taken as true, and so that's why

13 you don't have extensive --

14        THE COURT:  All right.  I'll let you --

15        MR. HACKNEY:  -- evidentiary hearings.

16        THE COURT:  I'll let you argue this in your

17 response.

18        MR. HACKNEY:  Very well.

19        MR. CULLEN:  So then we say on November 26th,

20 "Today's filing comes in the wake of a recent meeting between

21 U.S. District Judge Gerald Rosen and leaders of national and

22 local foundations."  Rosen asked the foundations.  Rosen

23 asked the foundations, link between the foundations and the

24 pensions.  It's in the papers, the newspapers.

25        THE COURT:  All right.  I have to ask you to pause

1   one more time while we address a technical issue here, sir,

2   and just stay right where you are.

3           MR. CULLEN:  Okay.

4           THE COURT:  Okay, sir.

5           MR. CULLEN:  All right.  December 13th on Syncora's

6   papers they say early December 2013 details of the grand

7   bargain continue to emerge clearly linking the funds used to

8   purchase the DIA collection with increased recovery for the

9   pension claimants.  It perhaps would have been fairer to

10  actually put forward for the Court the DIA press release,

11  which says exactly what was happening and exactly what

12  Syncora is complaining about now as of December 11th.  The

13  press had already said some of the most powerful leaders are

14  working furiously to fashion a grand bargain in which

15  nonprofit foundations would put up 500 million to spin off

16  the Detroit Institute of Arts from the city, and that money

17  would be used to reduce pension cuts and help rebuild city

18  services.

19          On December 7th, a proposal being tossed about would

20  spin the Detroit Institute into a nonprofit, et cetera, while

21  also helping pensioners.  And then on December 11th, the

22  outline is first officially reported by the DIA, and let's

23  look at that.  DIA leaders enter discussions with federal

24  mediators.  The leadership of the Detroit Institute of Arts,

25  DIA, today applauded federal mediators, Chief Judge Gerald

1   Rosen and Eugene Driker, for initiating a positive

2   conversation around the need to protect the museum

3   collection, et cetera.  Note the words here, Rosen and

4   Driker.  Note the verb, initiated.  This is all of the

5   evidentiary basis for their motion right here in their hands

6   as of December of 2013, nine months ago.

7          Now, what the new theory is, theory two, is that

8   sometime in the time between the establishment of the

9   mediation panel and December of 2013, Mr. Driker's role

10   impermissibly swelled or surged in some way and that,

11   therefore, that tainted all that work that went between, and

12   they had no reason to believe and no reason to object to any

13   of that activity.  And even though they knew that Mr. Driker

14   as of this time was deeply involved in the DIA settlement

15   discussions, the previous disclosure had no impact on that

16   whatsoever for them.

17          Now, let me say both procedurally and substantively

18   this just can't be true.  Let's start procedurally.  They

19   acknowledge that they were on notice as of this point.  They

20   were on constructive notice that, in their view, something

21   was very wrong with the mediation process.  Their answer to

22   that is there was something very wrong with the mediation

23   process, but we had no obligation to tell Mr. Driker that he

24   had failed at some point in the evolution of his role to

25   inform us.  We could keep that little tidbit for ourselves.

1   We could keep it and save it so that we could spring it at

2   some moment down the road, not inform the Court, not inform

3   the mediators, spring it.  Why is that wrong?  Well, number

4   one, it's inconsistent as of this point, and it will become

5   inconsistent with the seventh amended order, but it's

6   inconsistent with the mediation protocol, which says if you

7   have an objection, come to the chief mediator.

8          Now, they had an objection with the chief mediator

9   apparently as well as -- as well as Mr. Driker, but does that

10  mean that they had no obligation to the process or the Court?

11  It's not their obligation to Mr. Driker that's at issue here.

12  It's their obligation to this process, to this Court, to the

13  other parties engaged in this process, and, as we will see as

14  we move through this timeline, an obligation to the whole

15  State of Michigan.  They have apparently hid or hondled or

16  kept secret this dramatic revelation, this dramatic charge

17  until the last possible most potentially destructive moment,

18  and we'll see that when we get to the -- how they handled it

19  moving forward.

20         December 2013 to January 2014, consistent with the

21  DIA's press release, the media widely reports that Mr. Driker

22  is involved in meetings related to the grand bargain.  Their

23  response, I'm not Mr. Driker's keeper.  The obligation is to

24  this Court and to the process, and I would submit that the

25  failure, if they had a serious complaint or thought they had

1    a serious complaint about a tainted mediation process, a
2    process that had been established by this Court and overseen
3    by the chief judge of this district, if they thought that
4    there we genuinely a tainted mediation process, they had an
5    obligation to the Court, but by their own story, they sat on
6    it because they had no obligation to Mr. Driker.

7         December 11th, <u>Detroit Free Press</u>, a statement
8    issued today said -- DIA leaders said they had pledged at a
9    Tuesday meeting with mediators, including Rosen and Driker,
10   to help refine the proposal that Rosen has been pushing
11   behind closed doors since November, everything they need for
12   their supposed grievance.

13        Let's look -- January 11, 2014, underlines the point
14   as well.  And by the 13th of January, the mediators issue a
15   public statement about what is going on here.  Part of --
16   this is time to pause, I think, to emphasize the degree to
17   which this objection -- the supplemental objection
18   misunderstands, misapprehends the nature of a mediation
19   process and the role particularly in this Court.  This
20   mediation process, which goes forth under the aegis of the
21   Court, number one, does not provide a plan.  The good faith
22   of the mediators is not an issue.  Their issue is to try to
23   provide ideas, motivation, creativity in order to allow the
24   parties to come to agreements.  Then the city, the city and
25   their counterparties, either decide on their own basis to

1   accept or not to accept the plan independently.  The
2   mediators can't order them.  And then after that happens the
3   Court decides whether the plan embodying those agreements is
4   acceptable and meets the fairness, the feasibility, the
5   discrimination standards of the Court.  Let me emphasize here
6   that all of those issues on which the city maintains the
7   burden are in this case.  From beginning to end until the
8   last order or the last settlement, those issues are in this
9   case, and this motion to strike does not change our burden on
10  those issues or the fact that they are in the case.  What the
11  motion to strike does is get out impertinent and scandalous
12  matter on flawed legal theories untimely brought and takes
13  that work out from under the very substantial work we have
14  left to do about real issues.

15          Then when we get to February the city files its
16  first plan of adjustment and the corresponding disclosure
17  statement.  DIA settlement is incorporated in the first
18  version of that plan, so that's seven months ago.

19          Then on May 12th Syncora files its initial plan
20  objection.  Public knowledge by this point that Mr. Driker
21  was involved in the grand bargain discussions, no mention of
22  the supposed conflict, no mention of the systemic from the
23  outset, from the creation taint of the mediation process,
24  notwithstanding the fact that it does complain at great
25  length about the preference issues and about the treatment of

1    various of the city's assets.  And on the next page you'll

2    see in the initial objection how that brings up these issues

3    in line with what I said a few moments ago.

4         And in June 4th, deposition and document request to

5    the foundations requesting depositions and documents relating

6    to the negotiations surrounding the settlement, the terms,

7    and the foundation's reason for entering the DIA settlement.

8    There's a press conference on June 9th where Judge Rosen

9    talks about a chance meeting with Mariam Nowland.  I would

10   submit that where the idea came from is irrelevant, and to

11   suggest that it was driven by agenda-driven, conflicted,

12   fraudulent, concealing mediators is both impertinent and

13   scandalous.

14        I have to stop for a minute there.  Every time I say

15   impertinent, I think of someone being sassy to their elders

16   as opposed to the legal definition, but I think that this

17   probably subsumes both.

18        So then what happens after that?  June 12th this

19   Court enters another order on mediation confidentiality

20   reaffirming the need for all of that, all of that

21   confidentiality to make the mediation which had begun to have

22   successes both with financial parties as well as with

23   pensioners in order to move that forward and protect it.

24   Syncora claims that even at this point prior to the June 9th

25   public statement by Judge Rosen it did not have sufficient

1   information to raise a good faith objection to the process

2   surrounding the grand bargain.  That is totally inconsistent

3   with the public record, it's totally inconsistent with the

4   basis of their objection, and it is very difficult to credit,

5   I would submit.  Think back to the December 11th DIA press

6   release, Driker and Rosen initiated.  Think back to Judge

7   Driker's early disclosure of his wife's role on the board.

8   They have nothing more than that now.  This is the other

9   problem.  Besides not understanding the nature of mediation,

10  what they also don't understand, I submit, is the difference

11  between a valid effort to benefit the city and a politically

12  corrupt deal.  I submit that what happens next or some of the

13  other things we should look at, which bear both on the

14  timeline and on the -- and on the substance of these

15  complaints, relate to the enactment of the grand bargain

16  itself.

17         First, before we get to that, let's look at the

18  seventh amended order, paragraph 4, August 12, 2014, is the

19  deadline for any party that filed a timely objection to the

20  plan to file a supplemental objection but only to the extent

21  that additional or modified objections result from discovery,

22  the results of plan voting, or changes incorporated in the

23  city's latest plan of adjustment.  Submit that their

24  objection is a violation of that -- second supplemental

25  objection is a violation of that order for the reasons

1　already stated.

2　　　　　Now, why did they do it?  Well, I would submit to

3　this Court that there are certain creditors here who are

4　nostalgic for the days when one could put a gun to Detroit's

5　head and are trying to recreate that scenario by filing a

6　late and scandalous and unsupportable complaint.  We have

7　referred to in our documents the -- supporting that

8　motivation, if you will, the transcript of Mr. Sprayregen,

9　senior partner at Kirkland & Ellis, press blitz after the

10　filing of the first complaint.  Now, if they really believed

11　in the springing conflict theory, which is in the second

12　piece of paper, it might have been respectful of the Court

13　and the parties to outline that theory so it could be dealt

14　with on its own terms as opposed to coming out from the front

15　conflicted from the beginning, clear nondisclosure of the

16　wife's role, and, therefore, this is a conspiracy against

17　Wall Street.  And so when Mr. Sprayregen is on the Bloomberg

18　news, it's all about the -- it's all about the complaint and

19　the settlement, and he said -- so, according to Syncora, this

20　just -- isn't just an agreement -- put it up on the screen,

21　would you, Steve?  Do we have it?

22　　　　　UNIDENTIFIED SPEAKER:  Yes.

23　　　　　MR. CULLEN:  All right.  And this is what it says --

24　he's quoting the complaint -- "and agenda-driven conflicted

25　mediators who colluded with certain interested parties to

1  benefit select favored creditors to the gross detriment of

2  disfavored creditors and, remarkably, the City itself," end

3  quote.  That's the story that they wanted out in the press.

4  That story -- and one story about some kind of springing

5  conflict wouldn't serve the purpose, and what was the

6  purpose?  If you look at the end, we apparently have a

7  corrupt, secretive, agenda-driven asset grab, and Mr.

8  Sprayregen says at the second page -- or page 4 of this,

9  "Yes.  Although we remain open to -- wide open to a

10  consensual resolution and we think the plan doesn't need to

11  be changed that much to treat us and other financial

12  creditors fairly," so even if the cat were ever successfully

13  in the bag, it's out.  This is an attempt to hit this process

14  and the city and this Court with a blunt object in order to

15  get what they want.  And when they backed off in their reply

16  papers from the initial disclosure and conflicted from the

17  beginning allegations, there was no -- there was no, oh, Wall

18  Street Journal, oh Bloomberg, we're sorry.  We got this a

19  little bit wrong.  It's a little bit more nuanced than that.

20  No.  The blunt object was the key here.  Now --

21          THE COURT:  Where is this interview in our record?

22          MR. CULLEN:  It's attached to our piece of paper.

23          THE COURT:  Your motion?

24          MR. CULLEN:  Yes.  Now, let's start with -- let's

25  start with impertinent and the good faith issue.  All of this

1    is supposed to be related to good faith.  But as the Court is

2    well aware, 11 U.S. Code 1129, confirmation of plan, the plan

3    has been proposed in good faith and is not by any -- and not

4    by any means forbidden by law.  As I noted above, that's the

5    city's good faith in proposing the plan.  It is not the good

6    faith of the counterparties that we deal with.  It's not the

7    good faith of the -- even of the mediators.  It's the city's

8    good faith, and we bear that burden, and we'll bear it in the

9    confirmation hearing regardless of what happens here.

10         Now, with respect to the grand bargain itself and

11    the fraudulent transfer claim, let me try and piece that out

12    insofar as I can get it.  The claim is that this kind of deal

13    is forbidden by law under the Michigan fraudulent transfer

14    statute and that, therefore, the grand bargain, as it has

15    been so called, is illegal under that statute and can't be

16    confirmed.  Let me pick out from the number of assembled

17    reasons that that argument can't work beginning with the most

18    technical.  One is that the grand bargain --

19         THE COURT:  Let me stop you there and ask you this

20    question.  Even assuming just for purposes of our argument

21    here that you are correct on the merits that nothing in

22    Michigan law or the Bankruptcy Code would prohibit this

23    transaction --

24         MR. CULLEN:  Yes.

25         THE COURT:  -- why is -- why would that mean that

1    the objection to the grand bargain on this theory in the

2    second supplemental objection should be stricken because

3    that's by -- a fraudulent transfer allegation by itself

4    doesn't feel scandalous.

5          MR. CULLEN:  It is based upon the same set of facts.

6    It is based upon the same set of allegations.  It is the

7    fraudulent transfer is a fraudulent transfer because the

8    mediators have colluded with favored insiders to put assets

9    beyond the reach of the creditors.  That's number one.  It's

10   the same operative core of --

11         THE COURT:  Okay.  I thought the focus of the

12   fraudulent transfer argument in the second supplemental

13   objection was that regardless of that, the city is

14   transferring its assets -- the city is transferring its

15   assets to defraud its creditors or without any reasonably

16   equivalent value in return.

17         MR. CULLEN:  And the issue of the reasonably

18   equivalent value, as part of the reasonableness of the

19   settlement, will be litigated here.  Fraudulent transfer is a

20   tag line to get in the supposed collusion, and there's a

21   strict legal reason to deal with that, and that is the nature

22   of the grand bargain itself and its enactment into law.  If

23   you'll note -- and as the Court is aware, the grand bargain

24   has ten different laws in it.  All of them perform various

25   pieces.  Part of the core of it, I think we would all agree,

1  is Enrolled House Bill 5575, which establishes the

2  administrator for the settlement.

3          THE COURT:  Well, but, Mr. Cullen, I want to be

4  careful here not to discuss the merits of the argument --

5          MR. CULLEN:  Well, what I'm saying --

6          THE COURT:  -- because this is not the confirmation

7  hearing.

8          MR. CULLEN:  I understand that.  The merits -- this

9  is not the merits of the argument.  This is the fact that

10  this Michigan statute precludes finding the grand bargain a

11  fraudulent transfer.  It is the more specific treatment under

12  the premises --

13          THE COURT:  Well, but, again, that's a legal

14  argument in response to the fraudulent transfer claim.

15          MR. CULLEN:  Right, yes.  And I would argue, your

16  Honor, that it's --

17          THE COURT:  Does that mean that it should be

18  stricken?

19          MR. CULLEN:  It's a legal argument that makes the

20  claim itself frivolous and a vehicle for aspersions on the

21  character of the process, what they're trying to do here, and

22  it's late.  Under supplemental order Number 7, it is late, so

23  that's the simple view.

24          THE COURT:  All right.  Well, let's be real

25  lawyerlike here and divide the fraudulent transfer claim into

1  what is apparently its two or dual aspects.  There's actual

2  fraudulent transfer and constructive fraudulent transfer;

3  right?

4          MR. CULLEN:  Yeah.

5          THE COURT:  Constructive is simply a transfer by an

6  insolvent transferor without reasonably equivalent value.

7          MR. CULLEN:  Right.

8          THE COURT:  That kind of a claim casts no aspersions

9  on anyone; right?

10          MR. CULLEN:  Yes, your Honor.

11          THE COURT:  Would you seek to strike that to the

12  extent it's argued in the supplemental objection?

13          MR. CULLEN:  I think that claim, not under the

14  heading of fraudulent transfer, but that factual premise is

15  in the case already.

16          THE COURT:  Okay.  So you don't seek the striking of

17  that argument from Syncora's list of objections to the plan.

18          MR. CULLEN:  No, no, because I think that's --

19          THE COURT:  So it's on the other side of the ledger,

20  on the actual fraudulent transfer side --

21          MR. CULLEN:  Yes.

22          THE COURT:  -- where you seek to strike, but let's

23  dig into the weeds a little further even on that one.

24          MR. CULLEN:  All right.

25          THE COURT:  Apart from the issue of the statute,

1  which we can deal with at the hearing, why is it necessary to

2  strike that argument from this objection if all that's

3  necessary to sustain the objection is proof that the city had

4  the requisite intent to defraud and, as you point out, the

5  intent of any other party to the transfer, including the

6  transferee, is irrelevant?  Why isn't it sufficient just to

7  stick to that line and not strike the argument?

8          MR. CULLEN:  Because we will then end up litigating

9  the -- we can stick to that line, and I think that that

10 should be a winner, but I also don't want to needlessly spend

11 weeks of trial time devoted to litigating the badges of

12 fraudulent concealment.  Let me talk about two more things

13 that I think should be dispositive here.

14         THE COURT:  Okay.

15         MR. CULLEN:  Right.  One is that in terms of the way

16 this works, the transfer does not occur until the city is

17 solvent.

18         THE COURT:  Yeah, but, see, again, that goes to the

19 merits, and I don't want to talk about the merits today.

20 Your argument is that this argument is impertinent and

21 scandalous.

22         MR. CULLEN:  I just -- we have six weeks to get this

23 done, and I think it is impertinent and scandalous to say

24 that we're going to spend a part of that time because -- let

25 me play out these cards for the Court.

1      THE COURT:  Okay.

2      MR. CULLEN:  This will say that, all right,

3  fraudulent transfer is on the table.  Besides its manifest

4  legal difficulties, besides the fact that it is relying on a

5  set of scandalous, as they plead it, averrals about the

6  mediators, despite the fact that it is late under Order

7  Number 7, and despite the fact that all of this lateness is

8  part of a scheme that shows contempt not only for the

9  mediation process but scant respect for the processes of this

10  Court, and as a result of that, if it stays in the case under

11  that heading, we're going to see headlines every day.  We're

12  going to see people coming up to this.  We're going to see

13  multiplication of proceedings attacking a transaction that

14  where by its terms the things are fraudulently transferred to

15  the City of Detroit, to the people of the City of Detroit and

16  the people of the State of Michigan.  I would submit that

17  there is no legal basis for that kind of a fraudulent

18  transfer claim.  You can make the words hunt in rough order,

19  but it's --

20      THE COURT:  Okay.  But why is a motion to strike the

21  right context to come to that conclusion?

22      MR. CULLEN:  If the Court would like us to file a

23  motion to dismiss, we will, but I thought that it --

24      THE COURT:  The last thing we need now is more

25  motions.

1      MR. CULLEN:  I understand that, your Honor, and I'm

2  really trying to focus in on the things that are clearly

3  beyond the --

4      THE COURT:  This actually raises another procedural

5  difficulty with your motion.  Your motion is grounded in Rule

6  12(f) of the Federal Rules of Civil Procedure; right?

7      MR. CULLEN:  Yes.

8      THE COURT:  Well, there are a couple of problems

9  there that I need you to address if you can.  The first is

10  that the rule in the Federal Rules of Bankruptcy Procedure

11  that incorporates Rule 12(f), which is Bankruptcy Rule 7012,

12  only applies in adversary proceedings, which this is not.

13  Second -- let me just get these out --

14      MR. CULLEN:  Sure, sure.

15      THE COURT:  -- and then you can respond.  Second,

16  the rule, as drafted and interpreted, applies to allow the

17  Court to strike matter in pleadings, which the courts say is

18  a technical term that refers to the complaint, the answer,

19  the counterclaim, et cetera, et cetera, and the cases say

20  does not apply to motions, for example.

21      MR. CULLEN:  I would say that the -- two things,

22  your Honor.  One is, again, it's late under these rules.

23  Both of them are late, and so they could be stricken for that

24  reason, simple as pie.  Number two, inherent power.  Number

25  three, objections are pleadings in that sense.  They are

1  pleadings the same way an answer is because they set up and

2  outline additional issues for the parties to try in the

3  context of a contested proceeding.

4  THE COURT:  Well, I have to wonder why you didn't

5  bring the motion under the rule that explicitly applies in

6  these circumstances and allows the Court to strike scandalous

7  and defamatory matter, which is Bankruptcy Rule 9018, which I

8  can't help but notice is right next to Jones Day's favorite

9  rule, 9019, and also 11 U.S.C., Section 107, both of which

10  specifically authorize the Court to strike scandalous and

11  defamatory matter.  I wonder why you didn't rely on those.

12  MR. CULLEN:  Because in the context of these

13  pleadings, which set additional -- which set additional late

14  claims before the Court with additional -- with an

15  inflammatory matter, number one, thought that we had a basis

16  to strike the complaint as a whole based on lack of

17  timeliness, and there was originally --

18  THE COURT:  You mean the objection, yeah.

19  MR. CULLEN:  Yeah, the objection.  I'm sorry.  The

20  objection as a whole on the basis of timeliness, and we

21  thought it deserved to be stricken on that basis as well as

22  on the basis of the impertinent matter in it, and we think

23  that inherent power allows the Court to get to that final end

24  point because in the way this has been pulled together --

25  THE COURT:  Well, Syncora's response to your motion

1  points out that you don't use the word "impertinent" once in

2  your motion, do you?

3          MR. CULLEN:  If they say that and if the Court has

4  checked it, I'll say that that's so, but I think that they

5  didn't reply to the impertinent part of our motion.  I'm not

6  sure, your Honor.  I'm just not sure.  I don't know.

7          THE COURT:  Well, all right.  Go ahead.

8          MR. CULLEN:  Your Honor, part of the argument that I

9  was going to make was related to the idea that because the

10  more general -- the more specific governs the more general in

11  statutory pleadings that it's frivolous to say that because

12  this grand bargain is imbedded in legislation, that -- and I

13  could go through the argument of how it's imbedded -- that it

14  precludes application of the fraudulent conveyance statute to

15  this circumstance.

16          THE COURT:  You're talking about the Michigan

17  legislation that was enacted as part of the grand bargain

18  that you had on the screen a moment ago?

19          MR. CULLEN:  Yes, your Honor.

20          THE COURT:  Was that in your motion to strike?

21          MR. CULLEN:  No, your Honor.  We alluded to the fact

22  that it would be bizarre to have a state statute overridden

23  by another state statute, a more general application, because

24  we were alluding to the fact that their fraudulent --

25          THE COURT:  Well, possibly so, but understand my

1  hesitance in asking Syncora to respond to a motion that

2  they're just now getting notice of.

3          MR. CULLEN:  Well, your Honor, what we were trying

4  to help the Court with was the idea that this claim, which is

5  late, doesn't make any legal sense, and it does rely on

6  impertinent or scandalous matter.

7          THE COURT:  All right.

8          MR. CULLEN:  All right.  Thank you, your Honor.

9          THE COURT:  Let me ask first, Mr. Hackney, if

10  there's anyone else who'd like to speak in favor of the

11  motion, and then you can respond to all of it.

12          MR. HACKNEY:  Absolutely.

13          MR. MONTGOMERY:  Thank you, your Honor.  Claude

14  Montgomery for the Retiree Committee.  Your Honor, we filed a

15  brief concurrence to support the city's motion to strike.  We

16  found in Syncora's pleadings the suggestion that there was

17  undisclosed collusion between insiders that gave rise to a

18  tainted transaction on the part of the city was, in fact,

19  erroneous at its core, and as Mr. -- as counsel for the city

20  has --

21          THE COURT:  Mr. Cullen, yeah.

22          MR. MONTGOMERY:  -- Mr. Cullen has suggested, the

23  timeline supports a narrow determination by this Court that

24  the pages 11 to 23 of the Syncora motion, which reference

25  those allegedly improper activities by the mediators as

1    adversely affecting the city, can and should be stricken as

2    scandalous and put forward solely for the purpose of delay

3    and vexatious litigation.

4         We, on behalf of the retirees, note that the

5    strangest suggestion of all is that the retirees are insiders

6    who are being paid in full.  Now, if either of those two

7    statements could possibly be true, I think I might actually

8    be a very happy man on behalf of retirees, but it's not true.

9    Neither are true, your Honor.  And you don't need much more

10   than that to understand that the pleading itself is

11   fundamentally flawed and that your Honor should exercise your

12   discretion to strike that portion of it.  Thank you, your

13   Honor.

14        THE COURT:  Well, do you have an estimate for us --

15   and excuse me if I've overlooked it or forgotten it -- as to

16   approximately as a class what the recovery is in the plan

17   that will result from the two VEBAs as opposed to what the

18   employees and the retirees were otherwise entitled to?

19        MR. MONTGOMERY:  Yes.  We believe that the

20   recoveries for the VEBAs, in particular, are less than the

21   city's stated ten percent, and we will have expert testimony

22   which supports that proposition, your Honor.  And then if you

23   engage in the exercise, as some people are tempted -- we

24   think it's unwarranted, but if you combine them, the total

25   recovery on behalf of retirees drops dramatically.  Now, that

1  particular issue is going to be the subject of an in limine

2  fight, so I don't want to address it.

3          THE COURT:  Okay.

4          MR. MONTGOMERY:  All right.  Thank you, your Honor.

5          MS. PATEK:  Your Honor, I'll be very brief from the

6  DPOA perspective and with respect to this discrimination

7  argument.  As the Court is aware, I represent the active

8  members, the active public safety workers of the City of

9  Detroit, and part of the idea -- the city came in here with

10 two big problems.  It was service delivery insolvent.  It's

11 undisputed that the fire fighters and the police were

12 overworked, underpaid, and the city didn't have the money to

13 pay them.  And then you had the staggering legacy costs.  And

14 I think in some ways the city had to figure out a way to

15 accomplish what was accomplished by the grand bargain, and I

16 can assure the Court that there is nobody in the police or

17 fire department who's out there high-fiving or spiking the

18 football about, you know, the preservation of their accrued

19 pension benefits.

20          Second -- and this is a little personal, and this

21 goes to the 9018(2) part of it -- Judge Rosen obviously --

22 his reputation precedes him, and the fact that he's been

23 elected the chief judge by his peers, I think, speaks for

24 itself, but also the allegations against Mr. Driker, that

25 felt like a personal attack on sort of the Bar here because

1  he is, I think, the lawyer that we all aspire to be.  That's

2  all I want to say.

3          THE COURT:  Anyone else to speak in favor of the

4  motion or in support of the motion?  All right.  Mr. Hackney.

5  Actually, let's take a break.

6          MR. HACKNEY:  Absolutely.

7          THE COURT:  It's five after.  Let's reconvene at a

8  quarter after.

9          THE CLERK:  All rise.  Court is in recess.

10      (Recess at 6:03 p.m., until 6:15 p.m.)

11          THE CLERK:  All rise.  Court is in session.  Please

12  be seated.

13          THE COURT:  One second.  Mr. Cullen, I looked at the

14  motion to strike for that transcript of that Sprayregen

15  interview that you talked about.

16          MR. CULLEN:  Yes.

17          THE COURT:  It's not there.  It's not attached.

18  What is attached are three exhibits, two of which are the e-

19  mails relating to the disclosure from the mediator --

20  mediators --

21          MR. CULLEN:  Right.

22          THE COURT:  -- and the third is Judge Rosen's

23  letter, the eight- or nine-page letter, whatever it is.

24          MR. CULLEN:  I apologize, your Honor.  I

25  misremembered.

1        THE COURT:  So it's not in the record.  Okay.

2   Mr. Hackney.

3        MR. HACKNEY:  Your Honor, thank you.  I think this

4   is the first time that I've ever said good evening, your

5   Honor, and I wanted to at the outset both thank you and

6   apologize.  I wanted to thank you very much for moving this

7   hearing back in the day, and I wanted to apologize to you and

8   all of your court staff as well for the fact that I delayed

9   it even further with my schedule.  I'm very sorry about that,

10  and I know that all of you have been working hard.  I don't

11  mean to make you work yet another late night, and I'm chagrin

12  that I was the cause of that, but I do appreciate you giving

13  me the opportunity to come and argue, your Honor.

14        THE COURT:  Okay.

15        MR. HACKNEY:  Your Honor, I'd like to start by

16  talking about three important framing devices that I'd like

17  the Court to bear in mind as it addresses this motion, and

18  I'd like to then move on to the issues surrounding Mr. Driker

19  because I think that, to my eye, was the focus of the motion

20  to strike.  It was the focus of Mr. Cullen's presentation,

21  and I would like to focus myself on what exactly was going on

22  there.  I'd like to move then to the chronology of events

23  told from our perspective so that you can see when we learned

24  what and understand how our knowledge evolved and why we

25  believe we have proceeded appropriately.  And then I have

 1   some concluding thoughts, and obviously I'm here to answer

 2   any questions the Court has.

 3          The three framing devices I want to talk about, your

 4   Honor, the first one is that it is important for all of us to

 5   remember that we have arranged for ourselves here an

 6   adversarial system that doesn't just encourage people to

 7   fight zealously on behalf of their clients.  It requires you

 8   to.  As an advocate on behalf of Syncora, I am here to fight

 9   for their rights, and Mr. Kieselstein and Mr. Bennett and I,

10   we believe -- we genuinely believe that the plan that has

11   emerged out of the mediation process, the cornerstone of

12   which is the grand bargain, is a tainted plan.  We believe it

13   did slit the bonds of propriety.  We believed that when we

14   said it, and we believe we are in breach of our obligation to

15   zealously represent our clients when we fail to make that

16   argument.  And if you look at the preamble of the Rules of

17   Professional Conduct in this state, they not only note the

18   requirement to fight zealously for your client, but also that

19   it is often a lawyer's duty to challenge the rectitude of

20   certain public actions.  That is one of the hard things about

21   being a lawyer is you have to say things from time to time

22   that are unpopular, and I've said many of them in this case,

23   and I do them both because I believe them and also because

24   part of my job as a lawyer is to fight on behalf of my

25   client.  That's point one.  Point two, your Honor, is what --

1       THE COURT:  Well, but that's not an unlimited

2   obligation.

3       MR. HACKNEY:  It is not, and I'd like to talk to you

4   about what we did in connection with that.  I want to talk

5   about the second thing that you started to get into with Mr.

6   Cullen, and this is absolutely critical, and this is the

7   strong preference in our legal system for resolving disputes

8   on the merits.  And think about what the Sixth Circuit said

9   in Brown & Williamson.  It is well established that the

10  action of striking a pleading should be sparingly used by the

11  courts.  It is a drastic remedy to be resorted to only when

12  required for the purposes of justice.  The motion to strike

13  should be granted only when the pleading to be stricken has

14  no possible relation to the controversy.  Your Honor, that is

15  powerful language from the Sixth Circuit that is emphasizing

16  the desire to resolve this on the merits.  And I will offer a

17  brief aside, which is as important as this motion is and this

18  hearing is to me personally, I was stunned to see that Mr.

19  Cullen had prepared this lengthy PowerPoint that he brought

20  in today when we're a week away from trial, and what it tells

21  you is the city does not want this issue to be resolved on

22  the merits.  They want to cut it off before we have an

23  opportunity to prove this to you, appeal to you, persuade

24  you.

25       And the third thing I want to talk about that's

important as you consider this dispute before you is the
breadth of good faith under the Bankruptcy Code.  There are a
bunch of cases that make clear that good faith isn't a make
way.  It's not just the plan unfairly discriminates, and,
therefore, it is not in good faith.  It is actually something
independent from the other elements.  And here's a brief
snippet I wanted to read from the In re. Downing Corp. where
the court is talking about what is this amorphus concept of
good faith, what does it mean.  And he talks about the -- the
Court there went to talk on, "However, we also believe that a
court of equity must use all of its senses to determine
whether a proposed course is fair and equitable.  A
bankruptcy judge is more than a pair of ears to hear the
argument and a pair of eyes to read the law.  Furthermore,
the mind, which may tell us intellectually that there is
nothing technically 'illegal' in a particular course of
action, is not always the final arbiter.  Sometimes a
bankruptcy judge's nose tells him/her that something doesn't
smell right and further inquiry is warranted."  And so the
importance here, your Honor, is that what constitutes good
faith or the absence thereof is a very broad concept that
goes to the very types of instinctual common sense type
aspects of being a judge and that we are not only entitled to
but required to advance to you our perspective on why this
plan isn't in good faith.

1    I want to remind the Court as we think about the
2 scheduling orders how this all transpired because we told you
3 that we were concerned about the fact that we had to do our
4 objections before the discovery, and the Court said there
5 will be a time where you can supplement the objections after
6 the discovery, so I understand that you'll have the right to
7 supplement.  What's happening here is exactly the type of
8 thing that you are -- that you live in fear of and that leads
9 people to over-object when they have the first objection
10 deadline because they're now trying to come and say to you,
11 "Your Honor, there were things that were in the public press
12 back in the fourth quarter of 2013.  Charge them to Syncora's
13 knowledge even though they've been denied every effort to
14 actually obtain proof of those things in discovery, and let's
15 trap-door their objection on good faith because they should
16 have put that in their original pleading."  It is remarkable
17 because we have never gotten discovery with respect to many
18 of the facts that are core to our good faith argument.  We
19 have had to by necessity divine all of them from the public
20 record, and it is only because of the extensive comments in
21 the case by the mediation team that we have been able to
22 perceive something the vast majority of which happened after
23 the date for our original objection that we for the first
24 time raised in our second supplemental objection these
25 concerns.  And I will go for -- I will go forward from that

1   date and show you what's the new evidence, what's it based
2   upon.

3          Like I said, it's difficult to discern what exactly
4   the city was saying in its brief.  It was saying a lot of
5   things, but there was no attempt to take the Rule 12(f)
6   standard and actually kind of apply it systematically to the
7   elements of Syncora's second supplemental objection so that
8   you could see this is scandalous, that is impertinent, this
9   is immaterial.  You have to kind of put it together for
10  yourself, and that makes it difficult to respond to.

11         As I formed up this argument, I saw two focuses, and
12  the first one is on the allegations around Mr. Driker, who is
13  a well-respected attorney here in town, and the second were
14  what I viewed as somewhat of a legal attack on the
15  sufficiency of our fraudulent transfer allegations.  And I'll
16  get to the second one much more briefly and quickly because I
17  think it's easier, but let's start with the first argument
18  that the city makes, which is that they contend --

19         THE COURT:  Actually, you can skip it.

20         MR. HACKNEY:  Okay.  I wanted to add one thing,
21  which is we also reserved explicitly on the issue of
22  fraudulent transfer in our original objection.  I think that
23  should be made clear.

24         Let me focus on Mr. Driker because I think this is
25  the one that's the most sensitive for the folks here locally

1  because of his reputation.  It's the most sensitive, I think,

2  and the largest focus of the city's presentation.  I'd like

3  you to come into my shoes for a moment, and I'm going to take

4  you back through what our understanding of what was going on

5  here was.

6         Now, the first argument is that they are contending

7  that we said in our pleadings that Judge Driker failed to

8  disclose that Mrs. Driker --

9         THE COURT:  Mr. Driker.

10        MR. HACKNEY:  Mr. Driker.  I do that all the time.

11  I think he seems like a judge type of guy.  Mr. Driker.  They

12  allege that we say in our second supplemental objection --

13  that we say Mr. Driker failed to disclose that his wife,

14  Elaine, sat on the board of the DIA.  That is not correct.

15  We did not say that.  If you read our objection, what we say

16  is that Judge Driker never disclosed a conflict.  Mr. Driker.

17  I would promise that I'm not going to do it again, but I keep

18  writing it down so I can't.  I promise I'll do my best, but I

19  want to make clear that we have never said -- we have never

20  said that he failed to disclose that his wife was on the

21  board of the DIA.  What we have said is that he failed to

22  disclose a conflict of interest and that we are concerned by

23  that.

24        Now, there is no dispute that his wife is on the

25  board of the DIA.  We don't dispute that we got the letter

from Judge Rosen.  We don't dispute that you can find it on
the Internet.  The question -- the second question is the
more important part, and you got a key admission by the city
today on this point, which is absolutely central to the
response brief that we filed to the motion to strike.  The
more important question is what is the conflict -- what are
the conflicting things between, what were people told about
what Mr. Driker would be doing in the mediation, because if
you think about what a conflict is, a conflict is two
concepts at war with each other creating the conflict.  It is
the personal bias, on the one hand, but more importantly it
is the way in which it intersects with a specific matter for
an attorney or a mediator that gives rise to the conflict,
and this is actually why the law is replete with statements
to lawyers and to mediators that it isn't a static
determination that you make at the outset of the case.  It is
something that you must continually update and monitor.  And
so the key admission that you got today is that we were told
exactly what we said we were told about what Mr. Driker would
be doing.  There was a roll-out from Judge Rosen of the
mediation team, and the reason we cited this, your Honor, is
because the press was in attendance for this, and it was
reported in the press.  And what did Judge Rosen say?  He
said, "Here are the silos of the mediation."  That's my term.
Judge Perris, SWAP dispute.  Mr. Driker, disputes involving

1    the city's pension funds.  Judge Daniel, talks involving the

2    retirees.  Judge Roberts, unions.  Judge Coar, Detroit

3    Economic Growth Corp. and Downtown Development Authority.

4          Now, the key assertion that you got from the city

5    today that I believe is sufficient alone to deny the motion

6    to strike is they admit that that's what we were told.  And,

7    your Honor, I would like to all go back in time to September

8    17th, which is the date on which we were told that, where

9    Mr. Bennett and I are lining up the disclosures that we have

10   with what the people are going to be doing under the

11   mediation order, the mediation responsibilities that they've

12   just been given.  And imagine me running into you and saying,

13   "Your Honor, Mr. Driker can't mediate disputes relating to

14   the Retirement Systems.  His wife sits on the board of the

15   DIA."  You would have looked at me and said, as you have on

16   occasion looked at me, "What are you talking about?"

17          THE COURT:  No.  Actually, I would not have.

18          MR. HACKNEY:  That was my perception of the issue.

19   In fact, your Honor, my reading of the issue then is not

20   alone, and do you know why?

21          THE COURT:  What do you mean by "reading of the

22   issue"?

23          MR. HACKNEY:  My reading that when he was dealing

24   with issues relating to the Retirement Systems, that that

25   meant discount rate and claim valuations.

1          THE COURT:  Oh, okay.

2          MR. HACKNEY:  GRS --

3          THE COURT:  That I get, but your prediction of how I

4     would have reacted had you put that issue before me is not as

5     you would have -- not as you have characterized it.

6          MR. HACKNEY:  Well, I don't mean to -- I don't mean

7     to bind you to me in terms of how you would have approached

8     it.  What I mean to say is when I thought about it, I didn't

9     see a conflict between the fact that he was going to be

10    working on GRS malfeasance and discount rates.

11         THE COURT:  Well, Mr. Cullen argues that everyone in

12    the case, including --

13         MR. HACKNEY:  Yeah.

14         THE COURT:  -- surely Syncora, knew that every

15    creditor in the case wanted the art.

16         MR. HACKNEY:  Well, that's the beauty of what Mr.

17    Cullen said because I told you that there was one admission

18    in his presentation.  The admission is that we were told

19    this.  The assertion in his presentation is that everybody

20    always understood that the art might go with the pensions.

21         THE COURT:  No.  No, no, no.  No.  The art might go

22    to the creditors.

23         MR. HACKNEY:  Your Honor, what I think people

24    generally understood -- I will say this is what I understood.

25    You actually look at the way your mediation order reads.  It

1   refers to the claims.  That's Part A, the claims.

2            THE COURT:  Um-hmm, um-hmm.

3            MR. HACKNEY:  And then I think B were specific

4   issues relating to the collective bargaining agreement.  That

5   was the first referral that you ever made.  When you think

6   about the way bankruptcies typically go, it's you first try

7   to understand what the amount of the claims are that are

8   being asserted against the debtor.  The question of how those

9   claims are going to be -- what they're going to recover, in

10  my mind, is a distinct question.  I don't see a logical

11  connection between Judge Driker -- Mr. Driker saying as he's

12  going through the GRS malfeasance story, the appropriate

13  discount rate, starting to grab up and grab onto a specific

14  asset that is common to all creditors.  That doesn't make

15  sense to me.  And to the contrary, the way I read his

16  disclosure along with the statements that were made by Judge

17  Rosen was that, of course, he wouldn't do that.  He can't

18  move over and start working on those issues when his wife is

19  on the board of the DIA.  And if he's going to do that, he

20  needs to make a disclosure.  Now, let me note for the record,

21  your Honor --

22            THE COURT:  A disclosure of what?

23            MR. HACKNEY:  That his role has changed.  And let me

24  note, your Honor, that the way the argument is being played

25  out today, as far as I can see it, is this is the city's

argument here. No question there was a conflict of interest by Mr. Driker, but Syncora has known about it for a very long time, and that makes it okay. And I am saying I agree with them on the first part. There was undeniably a conflict of interest. I disagree with them on the second part, which is we did not know that Mr. Driker was going to move over. We did not draw a logical connection between the art and the pensions, and, by the way, neither did Mariam Nowland because what Judge Rosen says in the newspaper article that was just quoted in that presentation is that when he proposed to her that they put the art together with the pensions, she had to pick herself off the floor because she was surprised by the novelty of the idea. And the arguments are legion in the newspapers that this was a novel approach to the bankruptcy, and I don't think we dispute the novelty of it, but to say you have known this all along is not correct. And there was an additional assertion that was made, which was he said even though they knew that Judge Driker was deeply involved in the negotiations of the grand bargain -- that's another assertion Mr. Cullen just stood up here and made -- that is not correct. In fact, as I was preparing this motion, I was trying to reconstruct what went down in connection with this whole grand bargain because one of the things you'll remember was I was neck deep in the SWAPs trial throughout the middle part of December, and there are these isolated disclosures

that pop up that are very nondescriptive. On December 11th
there is a press release from the DIA that says Mr. Driker is
involved, doesn't say what he's doing. You don't know what
role he is playing, but there were definitely issues that
were suggesting Mr. Driker's involvement. But what there was
no disclosure of, your Honor, was that there was no
disclosure by Mr. Driker that he was not only playing a role
in these negotiations but that the idea was his and Judge
Rosen's, and that is undisputed that that did not come to us
until after the date for filing our original objection.

So I will say, you know, there is agreement on the
fact that there was a conflict -- that it was a conflict for
Mr. Driker to begin putting the pensions and the art
together. There is now a dispute between them and us about
the fact that we were supposed to run around the Internet and
figure it out and go off half-cocked and run into you and say
we don't know what Mr. Driker is doing, but we don't know how
he's become involved in the DIA. You should absolutely knock
him out of the case. We didn't know what was going on. It's
easy for them to say everybody knew what was going on. We're
the ones that are on the outside of all of this. And, your
Honor, when we went into discovery, we did the responsible
thing. We had concerns about the way the grand bargain had
arisen, of course, and we made the merits-based concerns in
our objection. We made the concerns known about unfair

1  discrimination.  We made the fair and equitable arguments.

2  We reserved on fraudulent transfer.  But we went into

3  discovery with a focus on finding out how did this

4  transaction come together such that only these people can get

5  the money.  Was that the community's idea?  Was it the city's

6  idea?  Was it the mediator's idea?  And by the way --

7        THE COURT:  And why is that relevant?

8        MR. HACKNEY:  It's relevant because the mediators

9  are supposed to be impartial, and what you can't do is bring

10  your own view of what matters, of what really matters to the

11  mediation.  You facilitate.

12        THE COURT:  Why is that relevant to any issue

13  relating to plan confirmation?

14        MR. HACKNEY:  Because it goes to good faith.  We

15  believe that this plan is a product of that.  Your Honor,

16  this goes to the breadth of good faith, which is if the

17  judge's smell test says this has the uncomfortable appearance

18  to it of a creative but very politically popular plan that

19  was put together here, the Court is entitled to consider

20  evidence relating to that as it decides whether the plan is

21  proposed in good faith.  Is this -- was it truly had to be

22  structured in the way that it was, or was it actually that

23  the city wanted to find a way --

24        THE COURT:  I wonder why you assert this -- that

25  this plan is politically popular.  I got 600 objections that

1  suggest otherwise.

2  MR. HACKNEY:  Well, not from the retirees.  You got

3  something like --

4  THE COURT:  Oh, yeah.  Oh, yeah.

5  MR. HACKNEY:  Out of 20,000 retirees, 20,000.  From

6  my standpoint, that's a small percentage.

7  THE COURT:  The vote on that was not unanimous.

8  MR. HACKNEY:  It was not, but there were -- 88

9  percent of the OPEB creditors voted in favor, substantial

10 percentages there, much more than in the COPs.  I mean -- and

11 it's been hailed as a politically popular, you know, humane

12 novel approach to this.  And one of the things --

13 THE COURT:  Perhaps the political popularity of it

14 is beyond our ability to determine.

15 MR. HACKNEY:  I think that where you have a

16 situation where the governor has put into place a person that

17 admits under oath he reports to the governor, and you see

18 that person and in conjunction with the mediation team come

19 up with a result where the people in the state that vote get

20 the proceeds of the art and people like Syncora that don't

21 vote don't, that is the type of thing that the judge can

22 apply its smell test to in the In re. Dow Corning case and

23 say, "You know what, this doesn't feel right.  This doesn't

24 feel like bankruptcy law."  Our point here, your Honor, is

25 that we are on the outside looking in, and remember that all

1  of our efforts to discover how this came together were

2  frustrated.  When we deposed -- when we sought to subpoena

3  the foundations, those were quashed.  When I tried to ask

4  Kevyn Orr about how was it this was structured, what did you

5  think based upon statements that were made --

6           THE COURT:  What do you mean, they were quashed?

7           MR. HACKNEY:  You quashed my subpoenas to the

8  foundations.  You said that they did not seek information

9  that was relevant or even arguably relevant.  When I tried to

10  ask Mr. Buckfire and Mr. Orr about how did this deal come

11  together, at every opportunity they stopped, and so I would

12  say that we have -- we didn't actually go out looking for

13  this, your Honor.  This is something that came to us.

14           THE COURT:  Why did they stop?

15           MR. HACKNEY:  Why did they stop?

16           THE COURT:  When you asked about what happened in

17  mediation.

18           MR. HACKNEY:  Because of the mediation order.

19           THE COURT:  They were following a court order.

20           MR. HACKNEY:  Yes.  They were saying, "I will not

21  tell you what was said to me in the mediation, and I also

22  will not tell you what I thought as a result of what was said

23  to me in whole or in part in the mediation."

24           THE COURT:  Yeah.  And just as an aside -- and I

25  don't want to quibble about words, but sometimes words have

1    meaning.

2            MR. HACKNEY:  Yes.

3            THE COURT:  Often.  Your response to the motion to

4    strike speaks frequently about something called the mediation

5    privilege.

6            MR. HACKNEY:  Yes.

7            THE COURT:  What happened here was not the assertion

8    of a mediation privilege.  A privilege can be waived.  They

9    had no authority to answer questions that would violate the

10   Court's confidentiality order.

11           MR. HACKNEY:  Understood.

12           THE COURT:  All right.

13           MR. HACKNEY:  I agree with you.  I know we lapsed

14   into that, but we often lapsed into it because we are drawing

15   analogies to cases where --

16           THE COURT:  All right.

17           MR. HACKNEY:  -- people assert a refusal to answer.

18   So, your Honor, I -- where the city concedes that we were

19   told that Mr. Driker would be handling issues related to the

20   pension trusts, the pension funds, where I am representing to

21   you -- and we have a good faith basis to assert that that

22   didn't say to us that he was going to be working on the DIA,

23   which was never the subject of a referral to the mediators.

24   There was never a specific order referring matters associated

25   with the DIA to the mediators.  Where there is no dispute

1  that he did, in fact, have a conflict and where there's no

2  dispute that he did not disclose to us that his role had

3  changed, we have an arguable controversy here.  We do not

4  have something that bears no relation to plan confirmation.

5  You may decide at plan confirmation that you disagree with

6  me, and that's why you're the judge and you wear the robe,

7  but let's have that fight on the merits, not cutting us off

8  early and trap-dooring us because of isolated disclosures

9  indicating that Judge Driker had some involvement in the

10 grand bargain.

11        THE COURT:  Mr. Driker.

12        MR. HACKNEY:  Mr. Driker.  I wish I could tell you I

13 was going to get it right for sure, but I am not.  I'd like

14 to tell you a little bit about what we learned subsequent to

15 the filing of our original objection on May 12th because as

16 we were getting shut down in all of our efforts to learn how

17 this deal had come together, we began to receive information

18 from the mediation team about the transaction itself, so

19 though the mediators would never have been subject to a

20 deposition subpoena by me because they are quasi judicial

21 officers, they began to go on an extensive press tour.  And

22 what they revealed on that press tour and in the course of

23 their activities is troubling to us and is the basis for our

24 objection on good faith.  Most notable amongst them is what

25 Mr. Rapson said in his speech at Wayne State University, and

1    I'd like to point out that though this speech is from April,

2    it is our belief that the video was not posted to You Tube

3    until May 30th.  And by the way, no one at Kirkland had

4    knowledge of even that until August.  This is the type of

5    evidence that if the Court were to issue a rule to show cause

6    saying that we should be sanctioned for this, we would

7    introduce and put into the record evidence showing that we

8    were not aware of Mr. Rapson's video.  That video is so

9    interesting because it goes to this problem that I'm

10   identifying of why it's so important for the mediators to be

11   impartial and not to impose their views on what's important

12   onto the process because what Mr. --

13        THE COURT:  Well, pause there.  Mr. Cullen argues

14   that it's inconsistent with the concept of mediation that

15   mediators impose their view.  They make suggestions, and the

16   parties decide in their own independent judgment whether to

17   accept that suggestion or negotiate changes to it or

18   negotiate a completely different deal.

19        MR. HACKNEY:  I kind of agree with the statement

20   that it is not consistent with the role of a mediator to

21   impose their view, and, in fact, your order says that they're

22   supposed to be facilitative.  That's part of our concern

23   here, though, your Honor, which is we believe that the record

24   contains evidence that shows that the mediators did impose

25   their views and that that imposition affected the way the

1 charitable foundations structured their giving. That's what

2 Mr. Rapson says. He says Judge Rosen came to him at the

3 outset of the process and said, "Rip, there are going to be

4 two issues here that are going to go all the way up to the

5 Supreme Court." All the issues in the case, he said there

6 are two issues, the art and the pensions, and that if we

7 don't do something about that, this case is going to be tied

8 up in the Supreme Court forever. We want to assert that that

9 was not proper for Mr. Rosen to have done that.

10          THE COURT:  That would be Judge Rosen.

11          MR. HACKNEY:  Judge Rosen. Oh, Lord. It's been a

12 long day, and I do apologize. I wish they were both judges

13 or --

14          THE COURT:  That's okay.

15          MR. HACKNEY:  -- both Mr's, and I would get it

16 right.

17          THE COURT:  I'm sure they don't.

18          MR. HACKNEY:  Fair point. You have additional

19 bullet points, your Honor, here of conduct that we look at

20 and say --

21          THE COURT:  Well, but pause there.

22          MR. HACKNEY:  Sure.

23          THE COURT:  You have focused on this one specific --

24          MR. HACKNEY:  I have.

25          THE COURT:  -- example. This is an independent

1    entity.  It got a request.  It complied with the request.

2    Nothing in law or in fact compelled it to.

3            MR. HACKNEY:  And by that you mean the foundations?

4            THE COURT:  Yeah.

5            MR. HACKNEY:  You're saying --

6            THE COURT:  This fellow who --

7            MR. HACKNEY:  Mr. Rapson.

8            THE COURT:  -- that Judge Rosen approached.

9            MR. HACKNEY:  Yes.  You're saying Mr. Rapson.  He

10   received an outreach from Judge Rosen, and they responded how

11   they responded, and what's the problem with that?  And my

12   answer is --

13           THE COURT:  That's the question.

14           MR. HACKNEY:  Yes.  My answer to that question is

15   that does not feel like the role of a facilitative mediator

16   to me, and I am asserting, your Honor, that by front-

17   running -- instead of going to them and saying we need to

18   preserve the art so that we can do the best we can by our

19   creditors and going and saying to people the most important

20   issues are the art and the pensions, let's connect the art to

21   the pensions, the mediators had precisely the impact on the

22   formation of the grand bargain that we are now lamenting,

23   which is apparently, although we're not allowed to discover

24   this evidence, the foundations are all now saying, yes, you

25   know, we will only give the money if it is conditioned and

1    goes straight to the pensions despite the fact that if you

2    look back in the press again -- and it goes to our

3    fluctuating level of knowledge -- there were varying levels

4    of understanding about how exactly it was going to come in.

5    At first it was going to come in generally to help, and then

6    later on it evolved to a structure where it was being piped

7    directly to the pension systems, and that was a condition.

8    And remember, too, that there were other statements that were

9    made by the city attributed to the foundations; i.e., sorry,

10   the foundations are requiring, pension funds, that you have

11   better oversight.  And the pension -- the charitable

12   foundations themselves then sent a letter saying that's not

13   something that we said.  Don't let them lay that off on us.

14   That's not what we said.  So you are already seeing

15   situations where things that are being attributed to the

16   charitable foundations as requirements that they are imposing

17   in one instance already have been proven to be false.  I'm

18   not here to win plan confirmation today, your Honor.  I'm

19   here --

20            THE COURT:  How do you deal with Mr. Cullen's

21   argument that where as in the supplemental objection you

22   argue that there was a conflict of interest on Mr. Driker's

23   part from the beginning, in the response to the motion to

24   strike you argue that it only arose when he took on the task

25   of negotiating the pensions vis-a-vis the DIA?

1          MR. HACKNEY:  Yes.  And I focused on that because

2    the phrase there that you have to unpack is from the

3    beginning, and you have to understand -- remember I don't

4    have the exact chronology of events.  Okay.  But this is what

5    I've been able to piece together from the newspapers.  The

6    initial meeting with the foundations and Judge Rosen was on

7    November 5th of 2013.  Judge Rosen said that that meeting

8    followed his conversation with Mariam Nowland by

9    approximately three weeks.  His meeting with her in the deli,

10   therefore, occurred sometime in just before the mid-point of

11   October.  Our assertion that there was a conflict from the

12   beginning is based on the reasonable basis to believe, the

13   reasonable assertion, the good faith assertion that Judge

14   Rosen and Mr. Driker came up with the idea that they spun out

15   together at some point between September 17th and the second

16   week in October, which is from the beginning of the case.

17   That is what we meant by that, your Honor.

18          THE COURT:  Okay.

19          MR. HACKNEY:  Your Honor, I will skip over the

20   fraudulent transfer argument for the reasons discussed, but I

21   wanted to close with something, if you'll indulge me, that I

22   thought a lot about this weekend because one of the things I

23   was thinking about is I think in addition to wanting to see a

24   full and fair trial on the merits, which is what the federal

25   courts require, I think there's a problem with these motions,

1    which is they're always brought against hated Syncora, and I

2    think there's --

3              THE COURT:  When you say "these motions," what other

4    motions might you be referring to?

5              MR. HACKNEY:  Motions by --

6              THE COURT:  This is the first motion to strike, eh?

7              MR. HACKNEY:  That's correct.  Motions for a

8    protective order because we're invading the privacy of the --

9    of all of the retirees.  I'm talking motions of that sort,

10   motions that are aimed at Syncora and generate tremendous

11   outpouring of response.  And I think the problem is that

12   Syncora is one of those hated minorities that you take fliers

13   with.  You say everyone hates Syncora.  Let's try to file

14   this motion.  Let's see if we can get them sanctioned.  Let's

15   see if we can knock this out of the --

16             THE COURT:  All right.  Let me ask you to pause

17   there while you're focused on that and ask you this question.

18   You assert a conspiracy based on a bias in favor of the

19   pension creditors but against whom?

20             MR. HACKNEY:  Against parties like Syncora.

21             THE COURT:  The financial creditors in the case?

22             MR. HACKNEY:  Certainly Syncora itself and FGIC.  We

23   contend that they are not the winners of that particular

24   grouping.

25             THE COURT:  You're sensing why I'm asking this

1    question.

2         MR. HACKNEY:  I'm not actually smart enough to do

3    that.

4         THE COURT:  Well, you yourself mentioned the SWAPs

5    trial that you were deeply involved in --

6         MR. HACKNEY:  Yes.

7         THE COURT:  -- in December and then again in

8    January.  You recall the results of that?

9         MR. HACKNEY:  Yes.

10        THE COURT:  The result was my disapproval of not one

11   but two settlements that the mediators negotiated in favor of

12   SWAP -- in favor of financial creditors.  Now, explain to me

13   how that demonstrates a bias against financial creditors by

14   the mediators.

15        MR. HACKNEY:  Your Honor, I don't know what to say

16   other than the mediators weren't involved in the negotiation

17   of the original agreement.  It was struck before there were

18   mediators appointed.  They came in and assisted with the

19   second settlement that you then shot down, which I would

20   submit was heavily framed by the agreement that had already

21   been negotiated, and so I can't speak to that, your Honor.  I

22   don't know what they thought on that front other than to say

23   they weren't involved in the first deal.

24        THE COURT:  They've certainly been involved in

25   settling the UTGOs, the LTGOs, the water bonds.

1          MR. HACKNEY:  That's actually a good point, though,
2     your Honor.  I mean take a look --
3          THE COURT:  Bias there against them, too?
4          MR. HACKNEY:  Sure.  What happened in every single
5     one of those transactions?  What happened in UTGO?  They went
6     and cobbled together that transaction that you heard argument
7     from Mr. Bennett and Ms. Lennox on the other day, but where
8     did the 26 cents go?  It went to the retirees.  Where does
9     the $428 million of UAAL coming out of the DWSD go?  It goes
10    to the retirees.  Fifty percent of a qualifying DWSD
11    transaction, sixty-five percent of the --
12         THE COURT:  But those financial creditors agreed to
13    that.
14         MR. HACKNEY:  But that's what's so interesting about
15    it, your Honor, which is the UTGO and the city are in a
16    negotiation relating to the UTGO, and what pops out is 26
17    cents more for the retirement systems.  We don't have to
18    decide it today.  I am saying there is a fair question about
19    when you talk about that -- the judge's instinct and sense of
20    whether the plan is the product of good faith or whether it's
21    the product of an impermissible agenda, all I'm saying to you
22    today is I believe we have an argument and we'd like to make
23    it to you.  This isn't the proceeding for them to say cut
24    them off before they get to make the argument.  Maybe you'll
25    reject the argument.  Maybe you'll say, "I've rejected a lot

1  of Syncora's arguments, and I reject this one, too.  He's

2  wrong on this one."  That's why you're the judge.  But let's

3  do it on the merits.

4       What I was thinking about, your Honor, is the

5  problem when you are a hated minority is that there can be

6  bias that creeps into the system, and as I was preparing for

7  this argument, I was thinking about John Rawls and what he

8  said about the veil of ignorance and how you can use the veil

9  of ignorance to try and assist yourself as a policymaker to

10  make sure that you don't know who is who when you come to any

11  particular circumstance, and you make the decision about the

12  fairness or ripeness of something blind to who you are in the

13  scenario, and I was thinking how can I convey to Judge

14  Rhodes -- how can I put the veil of ignorance on him to

15  decide this motion as if it weren't, once again, hated

16  Syncora, the obstructionist.  Mr. Cullen says we have a gun

17  to the city's head.  How can I help him do that?  And so what

18  I would like to do -- and I will not take forever to do this,

19  but I would ask you to hear me briefly on this, which is

20  consider the following alternative universe, which is the

21  City of Detroit files for bankruptcy, and a mediation team is

22  appointed.  And while one of the members of the mediation

23  team, his wife does sit on the board of the DIA or did --

24  she's a director emerita -- the chief mediator tells everyone

25  that that individual will be mediating issues relating to the

1   invalidity of the COPs, and everyone goes on from there.

2   Now, Ms. Neville and Mr. Gordon, who are fierce advocates on

3   behalf of the retirees, who I have gotten to know through

4   this case and who have done a great job for their clients,

5   they are certainly concerned about what is going on in

6   connection with this, but they are, you know, representing

7   their own clients and trying to do the best that they can do

8   for them, so they move on.

9          What happens next, your Honor, is you begin to hear

10  some rumblings about the fact that there is some deal out

11  there involving the art that will ultimately bring money into

12  the city, and you aren't sure about what exactly -- how this

13  is coming about.  You aren't sure exactly what the structure

14  of it is, and you won't be for months and months and months,

15  but you hear people saying things like it's important for it

16  to protect the city's credit rating, which is the lifeblood

17  of the city.  And as matters proceed very quickly from

18  rumblings in mid-December to in mid-January an announcement

19  that there will be contributions by foundations that are

20  designed to protect the credit rating of the city, which is

21  the lifeblood of the city, and there is an announcement that

22  the monies will go solely to the city's bondholders.  They

23  will not go at all to the retirees, and there are statements

24  by people to the effect of the retirees, those legacy costs,

25  they were 80 percent of the problem that put this city into

1    bankruptcy.  They caused it.  The unions broke this city.  We

2    shouldn't punish the financial creditors for the fact that

3    they got caught up in a fight between Detroit and its own

4    unions.  It's not their fault.  We have to protect the credit

5    rating of the city.  We need to get money for this art.  This

6    is a great thing.

7         Now, the retirees' lawyers, who are fierce

8    advocates, are absolutely appalled by what they are seeing.

9    They're also confused.  They don't know how the transaction

10   came about.  They don't know who decided that the money would

11   all go to one particular creditor and not to another, and

12   they are very concerned.  And so what they want to do is they

13   want to set out and take discovery and find out what happened

14   on this, but there's a bigger problem, and the bigger problem

15   is that the city and the mediators, whoever it was that

16   decided to make that public announcement that the grand

17   bargain funds would come in and that they would all go solely

18   to the bondholders, they made the announcement before they

19   actually got the bondholders to say that that would be

20   sufficient.  No indenture trustee, no monoline insurer

21   actually came in and said, "Yeah.  If you give us everything

22   that relates to the art, yeah, we'll take that, and we'll be

23   done."  They never say that.  So what happens is as the

24   mediation team and the city front-run this by announcing

25   this, they hand the keys to the bankruptcy over to the

1  bondholders, and the bondholders now realize the city is on

2  record saying two things. I am absolutely essential to the

3  future of the city, and the charitable foundations are

4  insisting not only that I get all of the money but also that

5  I approve the plan.

6       What Ms. Neville and Mr. Gordon see before they're

7  able to take any discovery or figure out what is going on is

8  they see a sequence of events where not only do the

9  bondholders get all of the amount of the money from the grand

10 bargain, but when there's an additional $200 million

11 settlement at 74 cents on the dollar or what the approximate

12 amount of that was, the 26 cents that are left over go to the

13 bondholders. When the Obama administration makes a hundred

14 million dollars in blight fees available to the city, blight

15 amounts don't go up by a hundred million dollars. It's part

16 of an improved deal for the bondholders. When there's a DWSD

17 transaction and they agree that over the next nine years the

18 DWSD will make substantial payments to the bondholders, they

19 seek to invalidate the pensions under the theory that the

20 pensions were obtained by corrupt means because of the fact

21 that the unions had always controlled Detroit and there was

22 no good arm's length negotiation, and so they ought to

23 invalidate those things. And they tell the bondholders

24 you'll get 65 percent of the reserve that we've set up to

25 litigate that claim. And with all this in hand, now that

1 they do have profound recoveries in the case by any standard,

2 now the bondholders come in and approve the deal.

3    Now, Ms. Neville wants to pick up her pen and write

4 an objection, but she can't because she has an aneurysm and

5 is taken to the hospital because she is absolutely infuriated

6 about what has happened here, and so what she does -- she

7 doesn't know how this has come together.  She's seen it all

8 play out in front of her, and it doesn't feel right to her.

9 She begins to try and take discovery.  She is stopped at

10 every stage in the process.  She tries to find out what

11 happened on the charitable foundation side.  She can't.  She

12 tries to find out from Kevyn Orr what happened with what you

13 were thinking, and he very solemnly tells her even though

14 there have been many published statements in the press about

15 this particular deal, "Oh, I'm sorry that now I can't say

16 anything with respect to that."  Now, at the same time that

17 she's getting blocked at every turn trying to develop this

18 evidence, she is watching something else unfold in public,

19 which is the chief mediator is lobbying the legislature to

20 pass the needed legislation to get the deal.  He's holding

21 press conferences, and in the press conferences he is saying

22 things like we need to remember that this grand bargain is --

23 what it's really about, and what it's really about are

24 Detroit's financial creditors, the bondholders that have

25 built our hospitals and our sewer systems and kept this city

running for so long.  That's what this is really about.  And

he turns to a group of people at the DIA, and he says, "And

I'd like to recognize one of the heros of this bankruptcy.

That hero is Claude LeBlanc.  He's the chief restructuring

officer of Syncora, and I want us all to stand up and to

applaud Claude LeBlanc as one of the heros of the

bankruptcy."  And he also quotes FGIC's CEO, but I don't know

who that is, so I can't put it in.

Ms. Neville is also about to learn something else,

which is she's going to learn in a video from one of the

foundations that very early on the mediator, who all agree --

the chief mediator is described as a powerful man in the

city, and he is a powerful man in the city -- that this

powerful man came to him and said there are two issues that

are going to tie this bankruptcy up.  Number one is the art,

and number two is the city's credit rating.  This city can't

function without a credit rating.  If we try to invalidate

those COPs, if we try and say general obligation bonds aren't

secured, it's going to go all the way to the Supreme Court,

and so will the art.  And so we've got to take care of that,

and what I'd like you to do is can you put together some of

your friends and come in and make a contribution solely --

we'll make sure it goes solely to the bondholders.  We won't

let those retirees get any of this, absolutely not.  We know

they're part of the problem.  They were crazy to have allowed

themselves to continue to work for the city with deferred
compensation. They live here. They know the politicians.
Their unions are the ones that run things around here.
They're getting what they deserve, but you bondholders, we're
going to do it like <u>Central Falls</u>. We're not going to let
you caught in the middle of this. That's what Ms. Neville
says.

Now, I would like to ask you something, your Honor.
Take the veil of ignorance that John Rawls talked about off
for a moment and ask yourself in that parallel universe do
you seriously think that you are engaging a motion to strike
Ms. Neville's supplemental objection that she files where she
says that it ain't right and that it's not consistent with
good faith and that she didn't know what was going on and
that this is the best she's been able to piece together from
the outside? Let's have a trial on the merits of this case,
your Honor. Let's not be striking things off and cutting
them off before we have an opportunity to at least be heard.
That is all we are asking.

Your Honor, I do want to close by saying thank you
again. I'm very sorry that we are arguing this motion and
you're having to listen to me go on and on at seven o'clock
at night, and I just wanted to say again to all of you thank
you very much for indulging me. I will make sure that
doesn't happen again.

1          THE COURT:  Well, you're welcome.

2          MR. CULLEN:  Couple of points, your Honor.  With

3     respect to the transcript of the interview with Mr.

4     Sprayregen, I misremembered.  It was cited at Footnote 3 of

5     our piece of paper, but it was not attached.  Sorry about

6     that.

7          THE COURT:  Okay.

8          MR. CULLEN:  And with respect to the concept of

9     impertinence, that was dealt with in Syncora's papers, pages

10    13 and 14.

11         I'd like to go back to something basic here, which

12    was not addressed in Mr. Hackney's statement.  It is that

13    under the seventh amended scheduling order, these objections

14    are late, and they're not late for any reason allowable under

15    that order.  They admit that as of December 11th when the DIA

16    is saying that the mediators initiated and that the lead

17    mediators were Driker and Rosen, they had a basis for saying

18    it didn't smell right, and they had the option at that point,

19    as the Court pointed out earlier, to go to you, to go to you

20    about your process, but they didn't go to you about your

21    process.  They held it to themselves and didn't do what they

22    should have done under the mediation order, and they didn't

23    do what they should have done under the initial objection

24    date.  They held it until later.  And during that time

25    period, extended negotiation went on among all the parties on

the basis that the grand bargain would come through.
Legislation was introduced on the basis of the grand bargain
without objection -- without this objection by them, plenty
of objections about other things. This is I would submit not
only contrary to the explicit rulings of the Court, mediation
process, and time for objections, it is sandbagging of an
Olympic sort. It's not only sandbagging the Court and the
parties here. It's sandbagging the whole State of Michigan.
That I think is unacceptable and why it being late is a
substantial hook. It's the obligation to the Court. And
when they said, "Oh, your Honor, you wouldn't have -- you
wouldn't have listened to any objection that we had because
we're hated Syncora," I submit to the Court that that's
wrong. I don't think that that shows the proper respect for
this Court's process. I think it is, in effect,
disrespectful of this Court's process. In his counterfactual
and any counterfactual where someone thinks that the process
has turned out wrong, that process, that result is going to
be in front of this Court. It is in front of this Court, and
the city will retain in Ms. Neville's example and in real
life the burden of proving that this is fair and feasible and
does not unduly or unreasonably discriminate. Maybe in the
Neville example that city couldn't bear that burden. We
think in this example we can, but that's the issue. Can we
bear that burden? Can we bear it in the plan confirmation

1  hearing?

2         Now, what the counterfactual doesn't tell you is

3  that there are going to be people in a complicated bankruptcy

4  who feel that they have been put upon, who feel that they

5  have a different ideological look at the world than the

6  mediators or than the other parties.  This is part of the

7  mediation process.  Not everybody gets what they want, and

8  does that mean that if anybody is able to say I am the

9  victim, I have deduced from these results that I am the

10  victim, therefore, I rip apart the mediation process, that's

11  not the way it works.  They get to say I am the victim, and I

12  oppose the plan.  I oppose the results.  I oppose the city's

13  fairness in putting forward the plan.  Ripping apart the

14  mediation process anytime -- anytime a party has a -- at

15  least a nine-month-old beef with respect to that process is

16  absolutely antithetical to letting that process go forward.

17  It allows anybody -- anybody to lie in wait to be the last

18  one standing and to blow up the process by saying, you know,

19  I look at these results, and I deduce that I have been put

20  upon.  That's not mediation.  That's not the law here, and

21  that is precisely what's happening here by Syncora waiting

22  until after the date for these objections to file them and

23  try and blow the mediation process up.  That's all I have,

24  your Honor.

25         THE COURT:  All right.  Thank you.  The Court will

1  take this matter under advisement, and I hope to issue a

2  written opinion this week before our trial next week.  And

3  we'll be in recess.

4         THE CLERK:  All rise.  Court is adjourned.

5      (Proceedings concluded at 7:06 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Nicolette Bateson | 24 | | | |
| Lee Donner | 56 | | | |
| David Brownstein | 67 | | | |
| Kevyn Orr | 76 | | | |

| EXHIBITS: | Received |
|---|---|
| Debtor's Exhibits 1-45 | 83 |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett                    August 30, 2014
_____        _____
Lois Garrett