# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| In re | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

## SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC.'S AMENDED SECOND SUPPLEMENTAL OBJECTION TO THE DEBTOR'S PLAN OF ADJUSTMENT

KE 33201145

# TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ............................................................................2

**RELEVANT BACKGROUND** ..........................................................................5

    I.    Initial Plan Objection ............................................................5

    II.   Chronology of Material Events ............................................6

**ARGUMENT** ....................................................................................................11

    I.    The Grand Bargain Is A Fraudulent Transfer. . ...................12

    II.   The City Has Failed to Satisfy Due Process Requirements. ...............19

    III.  In Direct Contravention of Applicable Law, the City Seeks to Exculpate Certain Creditors Under the Plan. ......................................25

    IV.  The Fifth Amended Plan's Definition and Treatment of COP Claims Violates the Bankruptcy Code. .................................................29

    V.   Confirmation Must Be Denied Because Syncora's Pending Appeals Could Affect the Plan. ............................................................35

        A.    Prudence dictates that the Court should deny Plan confirmation. ..............................................................35

        B.    The Plan purports to distribute assets that are not property of the City. ................................................................37

        C.    The Plan fails to provide for distribution of other assets improperly divested by the City during the Chapter 9 Case. ......................................................................................39

**CONCLUSION** ................................................................................................40

KE 33201145

# TABLE OF AUTHORITIES

**Cases**

*Breon v. Coca-Cola Bottling Co. of New England*,
  232 F.R.D. 49 (D. Conn. 2005) ............................................................37

*Butner v. United States*,
  440 U.S. 48 (1979)................................................................................50

*Creative Data Forms, Inc. v.*
  *Pennsylvania Minority Bus. Dev. Auth.*,
  72 B.R. 619 (E.D. Pa. 1985),
  *aff'd*, 800 F.2d 1132 (3d Cir. 1986)....................................................51

*Dearborn St. Bldg. Associates LLC v. D & T Land Holdings, LLC*,
  No. 1:07-cv-1056, 2009 WL 3011245 (W.D. Mich. Sept. 16, 2009)...................28

*Herbert v. Lando*,
  441 U.S. 153 (1979)..............................................................................37

*In re Abrams*,
  305 B.R. 920 (Bankr. S.D. Ala. 2002)..................................................38

*In re AGSY, Inc.*,
  120 B.R. 313 (Bankr. S.D.N.Y. 1990)..................................................51

*In re Atlantic Gulf Communities Corp.*,
  369 B.R. 156 (Bankr. D. Del. 2007)......................................................51

*In re Cedar Rapids Meats, Inc.*,
  121 B.R. 562 (Bankr. N.D. Iowa 1990)................................................51

*In re Dolphin Titan Int'l, Inc.*,
  93 B.R. 508 (Bankr. S.D. Tex. 1988) ...................................................51

*In re Dow Corning Corp.*,
  255 B.R. 445 (E.D. Mich. 2000)
  *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002)........................ 32, 40

*In re Dow Corning Corp.,*
  287 B.R. 396 (E.D. Mich. 2002)...........................................................41

*In re Dynamic Brokers, Inc.*,
  293 B.R. 489 (B.A.P. 9th Cir. 2003) ............................................ 46, 47

*In re Expert South Tulsa, LLC*,
  456 B.R. 84 (Bankr. D. Kan. 2011) ......................................................51

KE 33201145

*In re Gregory Boat Co.*,
  144 B.R. 361 (Bankr. E.D. Mich. 1992)..............................................................12

*In re Kessler, Inc.*,
  142 B.R. 796 (W.D. Mich. 1992) ......................................................................47

*In re Menden*,
  No. 07-33707, 2011 WL 4433621 (Bankr. N.D. Ohio Sept. 21, 2011) ..............33

*In re Moritz Walk, LP*,
  No. 10-41069, 2011 WL 4372405 (Bankr. S.D. Tex. Sept. 19, 2011)................34

*In re Newstar Energy of Texas, LLC*,
  280 B.R. 623 (Bankr. W.D. Mich. 2002) ...........................................................33

*In re Oakland Care Ctr., Inc.*,
  142 B.R. 791 (E.D. Mich. 1992)........................................................................47

*In re Pac. Gas & Elec. Co.*,
  273 B.R. 795 (Bankr. N.D. Cal. 2002) ..............................................................33

*In re Palm Beach Heights Dev. & Sales Corp.*,
  52 B.R. 181 (Bankr. S.D. Fla. 1985) .................................................................51

*In re Rapp*,
  16 B.R. 575 (Bankr. S.D. Fla. 1981) .................................................................33

*In re Royal Bus. Sch.*,
  157 B.R. 932 (Bankr. E.D.N.Y. 1993) ...............................................................51

*In re Syncora Guarantee Inc.*,
  No. 14-1719, 2014 WL 2959242, (6th Cir. July 2, 2014) ................ 10, 48, 50, 53

*In re Walker*,
  165 B.R. 994 (E.D. Va. 1994) ...........................................................................34

*In re Wolf Creek Valley Metro. Dist. No. IV*,
  138 B.R. 610 (D. Colo. 1992)............................................................................33

*Miner v. Kendall*,
  No. 96-1126, 1997 WL 695587 (D. Kan. Sept. 17, 1997) ..................................37

*Moody v. Amoco Oil Co.*,
  734 F.2d 1200 (7th Cir. 1984) ..........................................................................50

*Mullane v. Cent. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950)..........................................................................................32

*Newcomb Carlson v. Farmers Home Admin.*,
  744 F.2d 621 (8th Cir. 1984) ............................................................................51

iii

*Official Unsecured Creditors Comm. of Long Dev., Inc. v. Oak Park Village Ltd.*
   *P'Ship* (*In re Long Dev., Inc.*),
   211 B.R. 874 (Bankr. W.D. Mich. 1995) ...........................................................29

*Sharp v. Dery*,
   253 B.R. 204 (E.D. Mich. 2000).................................................................. 50, 51

## Statutes

11 U.S.C. § 1123(a)(4)...........................................................................................45

11 U.S.C. § 1129(a)(1)...........................................................................................32

11 U.S.C. § 1129(a)(3).................................................................................... 11, 24

11 U.S.C. § 901 .....................................................................................................47

11 U.S.C. § 942 .....................................................................................................47

11 U.S.C. § 943(b)(4)............................................................................................24

Mich. Comp. Laws § 566.31.................................................................................29

Mich. Comp. Laws § 566.34(1)(a)........................................................................24

Mich. Comp. Laws § 566.34(2)(a)........................................................................27

Mich. Comp. Laws § 566.35(1).............................................................................28

## Other Authorities

Am. Arbitration Ass'n *et al.*,
   *Model Standards of Conduct for Mediators* (September 2005) .............. 14, 15, 17

C. Devitt, *Kellogg Foundation Pledges $40M to Detroit's Pensions*,
   Bond Buyer (Jan. 29, 2014 4:30 p.m. (ET)),
   http://www.bondbuyer.com/issues/123_19/kellogg-foundation-
   pledges-40m-to-detroits-pensions-1059364-1.html ............................................28

Detroit Bankruptcy & Beyond, *Remarks of Rip Rapson*,
   https://www.
   youtube.com/watch?v=z7nXphsL_QA (last visited Aug. 9, 2014) ....................22

Detroit Institute of Arts, *Media Room: Board of Directors*,
   www.dia.org/about/board-of-directors.aspx (last visited Aug. 9, 2014)..............16

E. Blair, *Foundations Keep Detroit Art Off the Auction Block*, NPR: All Things
   Considered
   (Jan. 13, 2014 4:00 p.m. (ET)),
   http://www.npr.org/2014/01/13/262185978/foundations
   -keep-detroit-art-off-the-auction-block................................................................28

GM News, *GM and GM Foundation Lead Auto Sector Support of 'Grand Bargain' to Help Secure DIA Future* (June 9, 2014), http://media.gm.com/media/us/en/gm/news. detail.html/content/Pages/news/us/en/2014/Jun/0609-dia.html .................... 21, 29

Knight Blog, *Proposed DIA Deal an Important Step for Detroit's Future* (Jan. 14, 2014, 9:48 a.m. (ET)) http://www.knightfoundation.org/blogs/knightblog/ 2014/1/14/deal-detroits-future/ ................................................................... 21, 27

Next Chapter Detroit, *Detroit's Chief Mediator: Judge Gerald Rosen Speaks About the Bankruptcy Process*, http://www.nextchapterdetroit.com/ detroits-chief-mediator-judge-gerald-rosen-speaks-about-the-bankruptcy-process (last visited Aug. 9, 2014)........................................................ 17, 19, 22, 23, 25

*Update 1-Philanthropists Pledge Over $330 mln to Help Detroit Art Museum*, Reuters (Jan. 13, 2014, 11:16 a.m. (ET)), http://www.reuters.com /article /2014/01/13/ usa-detroit-idUSL2N0KN14S20140113...................... 18, 27

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (together, "Syncora") [1] submit this amended second supplemental objection (this "Second Supplemental Objection") to the Debtor's Plan pursuant to the Court's August 28 Order [Docket No. 7180], which, among other things, granted in part the City's motion to strike [Docket No. 6845].

Syncora and its counsel, Kirkland & Ellis LLP, also want to use this opportunity to acknowledge explicitly that the original Second Supplemental Objection should not have said or implied that Mediator Gene Driker had at any time failed to disclose his wife's position with the Detroit Institute of Arts. This was a mistake: Judge Rosen circulated information last September disclosing Mrs. Driker's association with the Detroit Institute of Arts. We were wrong. While we have already privately conveyed our apologies to the Drikers, the public nature of the mistaken claim demands both a public withdrawal of that claim and, just as importantly, a public apology. We are deeply sorry for the mistake we made and for any unfounded aspersions it may have cast on the Drikers.

* * *

---

[1] Capitalized terms used but not otherwise defined herein have the meanings given to them in the *Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 6379] (including all exhibits and attachments thereto, and as may be further amended or modified, the "Plan") or *Syncora Capital Assurance Inc. and Syncora Guarantee Inc.'s Objection to the Debtor's Plan of Adjustment* [Docket No. 4679] (the "Initial Plan Objection"), as applicable.

1

This amended Second Supplemental Objection raises objections that were unripe, unknown, or unknowable when Syncora filed its Initial Plan Objection.[2] In further support of its Objections, Syncora respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Despite the passage of time, and despite the City's opportunity to remedy key defects, the Plan has no chance of surviving the adversarial process—it is unconfirmable under settled bankruptcy principles.  Indeed, in light of the shortcomings discussed below and those raised in Syncora's other Objections, the Court should deny confirmation *summarily* and send the City back to the drawing board.  If the Court declines and proceeds to trial, the parties—*including the City*—will waste significant sums litigating a plan that is, at best, a model for transgressing virtually every cardinal principle of federal bankruptcy law.  And, if the Court confirms *this* Plan, it will permit the City to squander a once-in-a-lifetime opportunity to revitalize one of America's most treasured cities.

2.      Specifically, the cornerstone of the Plan is the DIA Settlement—part of the so-called "Grand Bargain" and it unfairly alienates the City's most valuable

---

[2]   In response to the Court's *Order Identifying Legal Issues, Establishing Supplemental Briefing Schedule and Setting Hearing Dates and Procedures* [Docket No. 5235] (the "Legal Issues Order"), Syncora filed *Syncora's First Supplemental Objection Regarding Certain Legal Issues Relating to Confirmation* [Docket No. 5706] (the "First Supplemental Objection," together with the Initial Plan Objection and this Second Supplemental Objection, collectively, the "Objections").

2

KE 33201145

assets for the sole benefit of one creditor group. Because the DIA settlement, if approved, would constitute a judicially sanctioned fraudulent transfer, the Plan, as proposed by the City, does not meet the "good faith" requirement of 11 U.S.C. § 1129(a)(3).

3. The Plan also cannot be confirmed for the independent reason that the City has violated creditors' fundamental due process rights. With the Court's assistance, the City has pursued confirmation at a break-neck pace. Yet the City has had more than sufficient time, had it chosen to do so, to satisfy its obligation to fully disclose key agreements that underpin the Plan. Instead, the City has refused to provide timely and full documentation regarding settlements imbedded in the Plan. It has, thus, failed to provide affected creditors with adequate notice and deprived creditors of their opportunity to present their case at trial. Moreover, the City employed an amorphous mediation privilege that lead-lined the mediation itself and deprived creditors of information necessary to evaluate whether their property interests are affected by the Plan.

4. The Plan also purports to exculpate certain creditors in contravention of controlling law. At a minimum, the Court must require the City to meet its burden of proving that the Plan's exculpation provisions satisfy the standard for non-consensual, third-party releases in the Sixth Circuit. Of course, because the

KE 33201145

City cannot satisfy this burden as to the Exculpated Parties, especially the COP Swap Counterparties, the Plan independently cannot be confirmed for this reason.

5.     The Plan's amended definition of "COP Claims" amounts to an improper objection to Syncora's Other Unsecured Claims by lumping Syncora's Class 14 Claims into Class 9 but not providing a corresponding treatment for Syncora's Class 14 Claims. Additionally, the Plan's confluence of Syncora's Class 9 and Class 14 Claims—without providing a mechanism for treating the latter— runs afoul of Bankruptcy Code section 1123. As a result, for these independent reasons, the Plan does not comply with the Bankruptcy Code and cannot be confirmed.

6.     Last, the Court should deny confirmation for the independent reason that the outcomes of Syncora's appeals could materially alter the assets available for distribution under the City's Plan. If, for example, Syncora prevails in its appeal regarding the casino revenue, the City will be forced to re-write its Plan so as not to rely on that revenue source. Indeed, Syncora has four well-founded appeals pending, any one of which may tear the fabric of the Plan at its seams. Prudence, therefore, counsels that the Court deny Plan confirmation.

4

KE 33201145

13-53846-tjt    Doc 7213    Filed 09/01/14    Entered 09/01/14 23:30:22    Page 10 of 48

# RELEVANT BACKGROUND

7.  To frame this amended Second Supplemental Objection, Syncora provides a brief summary of its Initial Plan Objection as well as a chronology of the material events in the Chapter 9 Case relevant to Syncora's Objections.

## I.  Initial Plan Objection

8.  As set forth more fully in its Initial Plan Objection, Syncora asserts multiple fundamental objections to the Plan, most of which independently require denial of confirmation. Discovery has confirmed that those objections remain valid, despite the City's attempts to amend the Plan. Specifically, Syncora objects to the Plan on the following bases, among others:

- *Best Interests*. The Plan fails the best interests test because holders of COP Claims and Other Unsecured Claims would receive a greater recovery if the Chapter 9 Case was dismissed.[3]

- *Unfair Discrimination*. The Plan fails the unfair discrimination test because holders of COP Claims and Other Unsecured Claims are treated far worse than Pension Claim holders, notwithstanding that holders of such claims sit *pari passu* with respect to the City.[4]

---

[3] *See* Initial Plan Objection ¶¶ 14–27.

[4] *See id.* ¶¶ 28–60. Since Syncora's Initial Plan Objection, the City and certain counterparties entered into the LTGO Settlement. Based on the treatment afforded to LTGO Claim holders, the Plan unfairly discriminates between holders of such claims and holders of COP Claims. Accordingly, Syncora objects to the LTGO Settlement.

5

- ***Fairness and Equity***.  The Plan fails under Bankruptcy Code section 1129(b) because creditors can reasonably expect to be paid more if the Plan was structured differently.[5]

- ***Compliance with State Law***.  The Plan fails under Bankruptcy Code section 943(b)(4) because the UTGO Settlement violates applicable state law.[6]

- ***Good Faith***.  The Plan fails because the City has not proposed it in good faith.  Specifically, the Plan is inconsistent with the principles underlying chapter 9 of the Bankruptcy Code and does not treat creditors with fundamental fairness.[7]

## II.    Chronology of Material Events

9.    Although the Court is well-aware of the history of the Chapter 9 Case, Syncora here presents a succinct chronology of events germane to the arguments below:

- ***Automatic Stay Order***.  On August 28, 2013, the Court entered an order holding that certain casino revenues were property of the Debtor and subject to the automatic stay under Bankruptcy Code section 362.[8]  Syncora timely appealed the Automatic Stay Order.[9]

- ***PLA Transaction***.  On December 6, 2013, the Court entered an order permitting the City to consummate a transaction with the Public Lighting Authority (the "PLA"), under which transaction

---

[5]    *See id.* ¶¶ 61–72.

[6]    *See id.* ¶¶ 73–75; *see generally* First Supplemental Objection.

[7]    *See* Initial Plan Objection ¶¶ 76–27.

[8]    *Order Regarding Casino Revenues and Automatic Stay* [Docket No. 670] (the "Automatic Stay Order").

[9]    *See Notice of Appeal from Order Regarding the Automatic Stay* [Docket No. 797] (the "Automatic Stay Appeal").

6

the City is authorized to transfer up to $12.5 million each calendar year on account of its obligations under the transaction.[10] Syncora timely appealed the PLA Order.[11]

- **First Plan and Disclosure Statement**. The City first filed its Plan and Disclosure Statement on February 21, 2014.[12]

- **Solicitation Procedures**. On March 11, 2014, the Court entered an order approving the solicitation procedures to be used in connection with Plan voting.[13]

- **Amended Plan and Disclosure Statement**. On March 31, 2014, the City filed an amended Plan and Disclosure Statement.[14]

- **DIP Financing**. On April 2, 2014, after a storied history, the Court entered an order permitting the City, among other things, to incur $120 million of senior secured debt through debtor-in-possession financing.[15] Syncora timely appealed the DIP Order.[16]

---

[10] *Order (I) Authorizing the Debtor to Enter Into and Perform Under Certain Transaction Documents with the Public Lighting Authority and (II) Granting Related Relief* [Docket No. 1955] (the "PLA Order").

[11] *See Notice of Appeal from Order Authorizing the Public Lighting Authority Transaction* [Docket No. 2273] (the "PLA Appeal").

[12] *See Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 2708]; *Disclosure Statement with Respect to Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 2709].

[13] *Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment and (II) Approving Notice Procedures Related to Confirmation of the Plan of Adjustment* [Docket No. 2984].

[14] *See Am. Plan for the Adjustment of Debts of the City of Detroit (Mar. 31, 2014)* [Docket No. 3380]; *Am. Disclosure Statement with Respect to Am. Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 3382].

[15] *Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing,*

- ***COP Swap Settlement***.  On April 15, 2014, the Court entered an order approving a settlement and plan support agreement among the COP Swap Counterparties and the City.[17]  Syncora timely appealed the Swap Settlement Order.[18]

- ***Second Amended Plan and Disclosure Statement***.  The City filed a second amended Plan and Disclosure Statement on April 16, 2014.[19]

- ***Third Amended Plan and Disclosure Statement***.  On April 25, 2014, the City filed a third amended Plan and Disclosure Statement.[20]

- ***Disclosure Statement Approved***.  On May 5, 2014, the Court entered an order approving the City's disclosure statement.[21]

---

*(II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* [Docket No. 3607] (the "DIP Order")

[16] *See Notice of Appeal From Order Granting the Motion of the Debtor for a Final Order Approving Postpetition Financing* [Docket No. 4101] (the "DIP Appeal").

[17] *Order (I) Approving Settlement and Plan Support Agreement with UBS AG and Merrill Lynch Capital Services, Inc. Pursuant to Bankruptcy Rule 9019 and (II) Granting Related Relief* [Docket No. 4094] (the "Swap Settlement Order").

[18] *See Notice of Appeal from Order Granting the Motion of the Debtor for an Order Approving a Settlement and Plan Support Agreement* [Docket No. 4028] (the "Swap Appeal").

[19] *See Second Am. Plan for the Adjustment of Debts of the City of Detroit (Apr. 16, 2014)* [Docket No. 4140]; *Second Am. Disclosure Statement with Respect to Second Am. Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 4141].

[20] *See Third Am. Plan for the Adjustment of Debts of the City of Detroit (Apr. 25, 2014)* [Docket No. 4271]; *Third Am. Disclosure Statement with Respect to Third Am. Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 4272].

KE 33201145

- ***Fourth Amended Plan and Disclosure Statement***.  On May 5, 2014, after the Court's order approving the Disclosure Statement, the City filed its fourth amended Plan and Disclosure Statement.[22] The City commenced solicitation on the Plan shortly thereafter.

- ***Scheduling Orders***.  Since February 24, 2014, the Court has entered eight scheduling orders in connection with Plan confirmation.  The operative order provides that the confirmation trial will commence on August 21, 2014.[23]

- ***Syncora's Opposition to the Confirmation Schedule***.  At various times since the City first proposed a plan of adjustment, Syncora has opposed the schedule sought by the City and ordered by the Court.  Most recently, on July 18, 2014, Syncora sought a 45-day continuance of the confirmation hearing.  Syncora's request was based largely on the facts that (a) the City had yet to file a complete plan of adjustment (including all associated documentation), and (b) the City blew past the court-ordered deadline of June 20, 2014, to complete document production.[24] After the City filed its fifth amended Plan, the Court adjourned the confirmation hearing for one week.[25]

---

[21] *Order Approving the Proposed Disclosure Statement* [Docket No. 4401].

[22] *See Fourth Am. Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* [Docket No. 4392] (the "Fourth Amended Plan"); *Fourth Am. Disclosure Statement with Respect to Fourth Am. Plan for the Adjustment of Debts of the City of Detroit* [Docket No. 4391].

[23] *See Seventh Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment* [Docket No. 6560] (the "Seventh Scheduling Order").

[24] *See generally Motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to (I) Continue Hearing to Consider Confirmation of Debtor's Plan of Adjustment and (II) Extend Related Deadlines* [Docket No. 6136].

[25] *See* Seventh Scheduling Order.

- ***Status of Appeals***.  As noted above, Syncora has sought appellate review in at least four instances in this case:[26] the Automatic Stay Appeal; the PLA Appeal; the DIP Appeal; and the Swap Appeal. On April 4, 2014, the District Court *sua sponte* entered an order staying each of these appeals pending the Sixth Circuit's review of the Court's eligibility determination.  On June 10, 2014, Syncora filed a petition for writ of mandamus regarding the Automatic Stay Appeal.  On July 2, 2014, the Sixth Circuit found that mandamus was justified and issued the writ, directing the District Court to adjudicate the Automatic Stay Appeal by July 14, 2014.[27]  On July 11, 2014, the District Court affirmed the Automatic Stay Order, and Syncora filed a notice of appeal to the Sixth Circuit on the same day.  The Sixth Circuit held oral argument on July 30, 2014; a decision has not yet been issued.  The PLA Appeal and the DIP Appeal are pending in the District Court, and, as to the Swap Appeal, the District Court granted Syncora's motion for a direct appeal to the Sixth Circuit.

- ***Fifth Amended Plan***.  On July 25, 2014, the City filed its fifth amended Plan.  On July 29, 2014, the City filed the "corrected" version of its fifth amended Plan.[28]

---

[26]  In addition to the appeals noted here, Syncora sought appellate review in connection with the Court's *Order Denying Mot. of Creditors to View Or, in the Alternative, Unseal Supplemental Order Regarding Mediation Confidentiality (#5358)* [Docket No. 5746] (the "<u>Motion to View Order</u>").  *See Notice of Appeal from Order Denying Motion of Creditors to View or, in the Alternative, Unseal Supplemental Order Regarding Mediation Confidentiality* [Docket No. 5759] (the "<u>Sealed Order Appeal</u>").

[27]  *See generally In re Syncora Guarantee Inc.*, No. 14-1719, 2014 WL 2959242, at *1 (6th Cir. July 2, 2014).

[28]  *See Corrected Fifth Am. Plan for the Adjustment of Debts of the City of Detroit (July 29, 2014)* [Docket No. 6379].

10

# ARGUMENT[29]

10.    The proposed Plan cannot be confirmed for the multiple and independent reasons set forth below and those presented in Syncora's other Objections. Through discovery, and in light of material events since its Initial Plan Objection, Syncora has identified additional reasons that require denial of Plan confirmation.

11.    *First*, the  Grand Bargain is a fraudulent transfer that, as proposed by the City, does not meet the Bankruptcy Code's requirement of good faith.  11 U.S.C. § 1129(a)(3) (court shall confirm a plan only if, among things,  the "plan has been proposed in good faith").   It benefits pensioners unfairly while transferring the City's art collection to the detriment of all other creditors and the City itself.  .  *Second*, in prosecuting Plan confirmation, the City trampled fundamental notions of due process.  *Third*, the Plan purports to exculpate certain creditors in contravention of controlling authority.  *Fourth*, the Plan's amended definition of "COP Claims" is a *de facto* claim objection in contravention of bankruptcy law and, separately, violates Bankruptcy Code section 1123.   And,

---

[29]  By amending the Second Supplemental Objection to comply with the August 28 Order, Syncora does not waive, and explicitly preserves, its objections to that Order.  For the reasons and grounds explained at the August 25, 2014, hearing, Syncora has fundamental concerns about the process that led to the "Grand Bargain," and its compliance with the Court's order is not intended to suggest otherwise.

KE 33201145

*fifth*, the outcome of Syncora's pending appeals could affect key assumptions that underpin the Plan.

12.    For these reasons, each of which independently precludes confirmation, the Court must deny the City's proposed Plan.

## I.    The Grand Bargain Is A Fraudulent Transfer. .

13.    This Court and others within this circuit have held that Bankruptcy Code section 1129(a)(3)—which requires a plan to be "proposed in good faith"[30]— permits confirmation only if a plan:  "will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code" and if the plan evidences the debtor's "fundamental fairness in dealing with [its] creditors."[31]  Here, the Plan fails the good-faith test because the DIA Settlement amounts to a fraudulent transfer of Museum Assets that benefits select favored creditors to the gross detriment of disfavored creditors

14.    The Plan's proposed transfer of Museum Assets beyond creditors' and the City's reach is tantamount to a fraudulent transfer prohibited by the Michigan Uniform Fraudulent Transfer Act (the "UFTA") and, as such, does not comport with the requirements of 11 U.S.C. § 1129(a)(3).

---

[30]   11 U.S.C. § 1129(a)(3).

[31]   *In re Gregory Boat Co.*, 144 B.R. 361, 366 (Bankr. E.D. Mich. 1992).

15. A plan cannot be confirmed if it employs "means forbidden by law,"[32] or if the debtor is "prohibited by law from taking any action necessary to carry out the plan."[33] The UFTA prohibits as fraudulent any "transfer made or obligation incurred by a debtor . . . if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor."[34] The Grand Bargain's transfer of the Museum Assets falls squarely within these prohibitions.

16. ***First***, the DIA Settlement Agreement explicitly states that the transfer is intended to render the Museum Assets "free and clear of all security interests, liens, encumbrances, claims and interests of the City and its creditors."[35] This is unacceptable in light of the rock-bottom price ascribed to the Museum Assets as well as the skewed use of the proceeds.

17. ***Second***, virtually everyone involved in the Grand Bargain has acknowledged openly that the purpose of the transfer is to hinder present and future creditors.

---

[32] 11 U.S.C. § 1129(a)(3).

[33] 11 U.S.C. § 943(b)(4).

[34] Mich. Comp. Laws § 566.34(1)(a).

[35] DIA Settlement Agreement § 2.1.

18.    A January 2014 press release confirmed that one of the Grand Bargain's "twin goals" is "preserving the DIA's art collection," a euphemism for placing the art beyond the reach of "outsider" creditors and, equally important, the City itself.[36]

19.    The John S. and James L. Knight Foundation, one of the largest contributors to the Grand Bargain, eschewed euphemism and conceded that the art would be transferred to "*prevent the museum's world-class collection from any potential sale to satisfy the city's creditors now or at any time in the future*."[37] The Knight Foundation's director, Alberto Ibarguen, likewise confirmed the fraudulent intent of the transfer:  "the suggestion was, well, what if we had an additional pool of money that could buy the art, put it in trust, so that it stays as a cultural asset of Detroit and the State of Michigan?"[38]

20.    The W.K. Kellogg Foundation acknowledged that it agreed to contribute money for the City's unfunded pension debt "*in order to safeguard the*

---

[36]  *Update 1-Philanthropists Pledge Over $330 mln to Help Detroit Art Museum*, Reuters (Jan. 13, 2014, 11:16 a.m. (ET)), http://www.reuters.com/article /2014/01/13/ usa-detroit-idUSL2N0KN14S20140113.

[37]  Knight Blog, *Proposed DIA Deal an Important Step for Detroit's Future* (Jan. 14, 2014, 9:48 a.m. (ET)) http://www.knightfoundation.org/blogs/knightblog/ 2014/1/14/deal-detroits-future/ (emphasis added).

[38]  E. Blair, *Foundations Keep Detroit Art Off the Auction Block*, NPR: All Things Considered (Jan. 13, 2014 4:00 p.m. (ET)), http://www.npr.org/2014/01/13/ 262185978/foundations-keep-detroit-art-off-the-auction-block.

14

*city-owned art collection at the Detroit Institute of Arts museum[]*"[39]—that is,

safeguarded from claims of the City's legitimate creditors and the City's present

and future use of those assets to satisfy claims.

21.    General Motors and the General Motors Foundation explained in a

press release that the Grand Bargain is an effort to "protect the museum's art

collection[.]"[40]

22.    And notably, the transfer is to a quasi-insider:  the Museum Assets

will be transferred to the DIA Corp. "to be held in perpetual charitable trust for the

benefit of the citizens of the City and the State of Michigan."[41]  The UFTA

provides that a transfer to an insider is evidence of intent to defraud creditors.[42]

23.    ***Third***, the City cannot expunge the taint of fraud simply because the

Plan calls for the meager proceeds of the transfer to flow to pensioners—proceeds

sufficient to ensure pensioners would be paid in full, yet leaving nothing for other

---

[39]  C. Devitt, *Kellogg Foundation Pledges $40M to Detroit's Pensions*, Bond
Buyer (Jan. 29, 2014 4:30 p.m. (ET)), http://www.bondbuyer.com/
issues/123_19/kellogg-foundation-pledges-40m-to-detroits-pensions-1059364-
1.html (emphasis added).

[40]  GM News, *GM and GM Foundation Lead Auto Sector Support of 'Grand
Bargain' to Help Secure DIA Future* (June 9, 2014), http://www.
http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/e
n/2014/Jun/0609-dia.html.

[41]  DIA Settlement Agreement, Annex C at 1.

[42]  Mich. Comp. Laws § 566.34(2)(a).

15

creditors. The transfer is still fraudulent as to the City's other creditors, including Syncora.[43]

24. ***Fourth***, as discussed more fully below in connection with the City's disregard for due process, the City's aggressive use of the mediation privilege to prevent discovery into the intent behind the Grand Bargain further buttresses the overwhelming direct evidence that the Grand Bargain's *raison d'etre* was to place the Museum Assets beyond the reach of the City's creditors. The City and the foundations asserted the mediation privilege broadly in a variety of contexts: to avoid answering interrogatories about monetization of the art; to quash subpoenas to the foundations seeking documents and testimony related to the Grand Bargain; and to avoid answering questions during depositions.[44] In similar circumstances, the Western District of Michigan Bankruptcy Court ruled that a party's effort to conceal the intent behind a transfer is ***itself*** evidence of fraudulent intent.[45]

---

[43] *See, e.g., Dearborn St. Bldg. Associates LLC v. D & T Land Holdings, LLC*, No. 1:07-cv-1056, 2009 WL 3011245, at *7, *9 (W.D. Mich. Sept. 16, 2009) (finding that debtor made transfer with actual intent to defraud creditors, despite the fact that debtor used a portion of the proceeds from transfer to pay off a different creditor).

[44] *See, e.g.*, *City of Detroit's Statement in Support of the Foundation's Joint Motion to Quash Syncora's Subpoenas Duces Tecum* [Docket No. 5300]; Erickson Dep. Tr. at 184, 11–25; 185, 1–3 (July 22, 2014).

[45] *See Official Unsecured Creditors Comm. of Long Dev., Inc. v. Oak Park Village Ltd. P'Ship* (*In re Long Dev., Inc.*), 211 B.R. 874, 888 (Bankr. W.D. Mich. 1995).

KE 33201145

25.    *Fifth*, even putting aside the question of actual intent to defraud, , the Grand Bargain  still is constructively fraudulent because the City will receive less than reasonably equivalent value for the art.  As discussed in Syncora's Initial Plan Objection, the DIA Settlement is prohibited under section 5 of the UFTA because: (a) creditors' claims predate the transfer; (b) the City will be insolvent at the time of the transfer; and (c) the City will receive less than reasonably equivalent value in exchange for the Museum Assets.[46]  Accordingly, the Grand Bargain displays the *prima facie* elements of a constructively fraudulent transfer, in addition to the clear record showing actual intent to defraud creditors.

26.    *Finally*, the City has asserted—and will likely continue to assert—that it cannot be compelled to monetize its assets.  But that argument fails in the face of two important facts:   (a) the City *chose* to monetize the Museum Assets; and (b) the entire DIA Settlement is predicated on the notion that unsecured creditors (the pensioners) have at least a colorable claim against those assets.  The City cannot assert that the Museum Assets are beyond any creditor's reach, while simultaneously invoking this Court's jurisdiction to bless the DIA Settlement.  Given the City's acknowledgment in the DIA Settlement that creditors *do* have potential claims against the Museum Assets, the UFTA prohibits the City from

---

[46]   Initial Plan Objection, ¶ 75 at n.59; *see also* Mich. Comp. Laws § 566.35(1).

transferring those assets for the purpose of hindering or defrauding the City's creditors.[47]

27.    The mediation process was cloaked in secrecy (pursuant to this Court's mediation order) and not subject to discovery.   Nevertheless, the public record demonstrates that the Grand Bargain is a fraudulent transfer of multi-billion dollar assets that ensures wildly favorable treatment of a politically popular creditor group.   The Grand Bargain is procedurally and substantively antithetical to the concept of good faith and, accordingly, the Court cannot confirm the Plan.

28.    After all, even a casual observer of Detroit history can see the Grand Bargain for what it truly is:  the further impoverishment of Detroit's rich history and treasures by residents of affluent suburban towns and cities.  As noted above, the transfer of the Museum Assets under the DIA Settlement is ***irrevocable***.  Thus, should the Plan fail to revitalize the City sufficiently—and it will fail as presently proposed—Detroit will have forever lost significant assets that could be used in the future to satisfy the City's obligations.  In sum, the Grand Bargain is not so grand and, if it is a bargain, it is not one for the City or its citizens—let alone its creditors.

---

[47]    *See* Mich. Comp. Laws §§ 566.31 (f), (i) (stating that "debtor" includes a "government or governmental subdivision or agency").

## II.     The City Has Failed to Satisfy Due Process Requirements.

29.     The proposed Plan independently cannot be confirmed because, in prosecuting the Plan and confirmation process, the City has not satisfied a fundamental tenet of federal adjudication—the requirement to provide due process. As the Supreme Court has observed, "[m]any controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case."[48]  The district court in this district, too, has held that "an elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and *afford them an opportunity to present their objections*."[49]  Of course, the notice provided must give interested parties enough information so that they can adequately defend their rights.[50]  Put another way, for a party to present its objections, the party must know—with specificity—all of the ways in which their rights will be affected by the proposed action.

---

[48]  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950).

[49]  *In re Dow Corning Corp.*, 255 B.R. 445, 473 (E.D. Mich. 2000) (quoting *Mullane*; emphasis added) *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002).

[50]  *See id.* (citing *Mullane*).

19

30.    In the context of plan confirmation, the Due Process Clause of the Fifth Amendment applies with equal force.[51]  After all, a court-adjudicated plan of adjustment by its very nature deprives creditors of their rights in property.[52]  The Fifth Amendment, moreover, is not the end of the analysis.  The Bankruptcy Code is laced with notice and process provisions regarding plan confirmation.

31.    Specifically, Bankruptcy Code section 1123(a)(5) protects creditors by requiring that a plan "tell creditors what they [are] going to get and how they [are] going to get it."[53]  This disclosure is a critical component of the bankruptcy process, and a court may not confirm a plan that does not comply with section 1123(a)(5).[54]  Indeed, courts recognize that plans that fail to include the disclosure required by section 1123(a)(5) also unfairly inhibit creditors from raising, and

---

[51]  *See, e.g.*, *In re Wolf Creek Valley Metro. Dist. No. IV*, 138 B.R. 610, 614 (D. Colo. 1992) (quoting *Mullane* in finding that modifying a chapter 9 plan must comply with due process); *In re Newstar Energy of Texas, LLC*, 280 B.R. 623, 627 (Bankr. W.D. Mich. 2002) ("If a creditor does not receive adequate notice, that creditor is not bound by the confirmation order."); *In re Menden*, No. 07-33707, 2011 WL 4433621, at *4 (Bankr. N.D. Ohio Sept. 21, 2011) ("It is clear that Debtors were required to provide National Auto adequate notice of their proposed Amended Plan in order to apprise it that its rights may be altered and to afford it the opportunity to present any objection to the treatment of its claim in the Amended Plan").

[52]  *See, e.g.*, *In re Rapp*, 16 B.R. 575, 579 (Bankr. S.D. Fla. 1981) ("There is a deprivation of property in any bankruptcy action whereby a creditor is not paid the entire amount of its claim.").

[53]  *In re Pac. Gas & Elec. Co.*, 273 B.R. 795, 808 (Bankr. N.D. Cal. 2002).

[54]  *See* 11 U.S.C. § 1129(a)(1).

courts from evaluating, objections to other Bankruptcy Code confirmation requirements.[55]

32.     Yet, in this case, creditors still do not have adequate information regarding material transactions contemplated by the Plan and the related Plan changes affecting creditors' property interests.  Specifically, creditors require more information regarding the following to adequately press their objections at the confirmation trial:

- **Terms and Documents Regarding New Labor Agreements**.  The City has announced new collective bargaining labor agreements (the "CBAs") with certain of its employees represented by labor unions.  Yet, the City has not provided all of the proposed new CBAs to Syncora or other creditors.  The CBAs that remain undisclosed include the City's agreements with significant labor unions.  This information is necessary for assessing whether the plan is feasible and it is relevant to the unfair discrimination analysis.

- **DWSD Issues**.  On August 6, 2014, the City announced in open court that it had reached a settlement with certain DWSD parties.  On August 11, 2014, less than ten days before the start of the trial, the City filed a motion for approval of certain postpetition

---

[55] *See, e.g.*, *In re Walker*, 165 B.R. 994, 1004 (E.D. Va. 1994) (stating that "speculative, indefinite plans will necessitate objections by the creditors who have no reasonable means by which to assess whether a plan can achieve the results contemplated by the Code, and because the courts will have no objective criteria by which to make confirmation judgments"); *see also In re Moritz Walk, LP*, No. 10-41069, 2011 WL 4372405 (Bankr. S.D. Tex. Sept. 19, 2011) ("In the instant case, the plan lacks adequate means for its implementation. First, Debtor's proposed post-confirmation capital structure is not clear . . . This vagueness undercuts the means for the plan's implementation, and also is not consistent with the interests of creditors.").

financing related to a DWSD tender offer.[56]   Syncora is evaluating all issues related to the DWSD deal, and it reserves its rights to present objections at trial based on its analysis.

- *Exit Financing*.  In her report regarding the Plan's feasibility, Ms. Kopacz stated that the success of the Plan depends on the City's ability to access sufficient exit financing.[57]  The City filed a one-page summary of the principal terms of its exit facility late on August 11, 2014.[58]  This filing is insufficient to give creditors adequate notice of the City's proposed financing.

33.    The City's abuse of the mediation privilege and court-imposed limitations on discovery further deprived creditors of information necessary to evaluate the extent to which their property interests are affected by the Plan.  For example, the City has claimed the mediation privilege in response to discovery requests, including:

- *Objection to Syncora's First Interrogatories.*  The City made a general objection to the extent any request seeks information subject to privileges, including the mediation privilege, noting that

---

[56] *See Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§ 105,364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections* [Docket No. 6644].

[57] *Expert Report of Martha E.M. Kopacz Regarding the Feasibility of the City of Detroit Plan of Adjustment* 195 ("In the event that this financing is unavailable to the City on reasonable terms, is significantly lower in terms of facility amount, or is otherwise different than the assumptions in the POA, it is unlikely the City will have sufficient liquidity to operate and satisfy its obligations.").

[58] *See Notice of Filing Plan Supplement:  Exhibit I.A.146 (Principal Terms of Exit Facility); Exhibit I.A.255 (Form of Restoration Trust Agreement); Exhibit II.D.5 (Schedule of Postpetition Collective Bargaining Agreements); Exhibit III.D.2 (Retained Causes of Action)* [Docket No. 6647].

22

> "[t]he City objects to each and every one of these Interrogatories, and the instructions and definitions therein, to the extent that they seek information subject to the attorney-client privilege, attorney work product doctrine, the settlement or mediation privilege."

- ***Discovery of the Foundations.*** Syncora served deposition and document subpoenas on the Foundation funders of the Grand Bargain. Both the City and the Foundations invoked the mediation privilege to support the Foundations' motion to quash.[59]

34. Further, the City has used the mediation privilege as a shield from deposition testimony as far back as December 2013, notwithstanding that the City itself has selectively ***revealed*** certain aspects surrounding the mediation to justify its business judgment. In connection with Plan confirmation itself, the City has invoked the mediation privilege in virtually every deposition by holders of COP Claims to date, including the depositions of Glenn Bowen, Michael Hall, Ken Buckfire, Gaurav Malhotra, John Hill, Kevyn Orr, James Craig, Charles Moore, and Sonya Mays.

35. Despite this extensive limiting of discovery under the mediation privilege, the Court has refused creditors' requests for production of a privilege log.[60] As an initial matter, such a ruling flies in the face of the notion that "[p]reparation of a privilege log is a critical step in discharging one's burden of

---

[59] *Foundations' Joint Motion to Quash Subpoena Duces Tecum* [Docket No. 5300]; *City's Statement in Support of Motion to Quash* [Docket No. 5494].

[60] Hr'g Tr. 269, May 22, 2014 [Docket No. 5203]

establishing the existence of a privilege."[61]  It also flies in the face of well-settled Supreme Court jurisprudence that privileges are exceptions to the general principle that parties are entitled to relevant evidence, and that any party asserting a privilege must defend and justify it if challenged—that is, the existence of applicable privilege must be demonstrated if challenged and not presumed.[62]  This failure to produce a privilege log compounds the due process violations already plaguing confirmation of the Plan; here, creditors do not even know what it is that they do not know.

---

[61] *Breon v. Coca-Cola Bottling Co. of New England*, 232 F.R.D. 49, 55 (D. Conn. 2005); *see also Miner v. Kendall*, No. 96-1126, 1997 WL 695587 (D. Kan. Sept. 17, 1997) ("This court has set forth in detail what is required of a party making a claim of privilege.  This includes the preparation of a privilege log that provides the court with sufficient information to enable the court to determine that each element of the privilege is satisfied as to each document for which a privilege is claimed.  It is important for the privilege log to be complete; . . . the court will not do the work of the party claiming the privilege.")

[62] *See, e.g.*, *Herbert v. Lando*, 441 U.S. 153, 175 (1979) (stating that "[e]videntiary privileges in litigation are not favored . . . [and a]s we stated, in referring to existing limited privileges against disclosure, '[w]hatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.'" (citation omitted)).

KE 33201145

36.     Accordingly, creditors have not been given the necessary notice and opportunity to object to the Plan that due process requires.[63] Therefore, the Plan cannot be confirmed for this independent reason.

## III.     In Direct Contravention of Applicable Law, the City Seeks to Exculpate Certain Creditors Under the Plan.

37.     The Plan's exculpation provisions, taken together, violate applicable law. As noted in its Initial Plan Objection, Syncora objects to the breadth and scope of the parties exculpated under the Plan.[64]

38.     The Plan's definition of "Exculpated Parties" includes a laundry list of creditors. Specifically, the following are exculpated under the Plan:

> (a) the RDPFFA and its board of trustees/directors, attorneys, advisors and professionals, (b) the DRCEA and its board of trustees/directors, attorneys, advisors and professionals, (c) the postpetition officers of the Detroit Police Lieutenants and Sergeants Association, (d) the postpetition officers of the Detroit Police Command Officers Association, (e) GRS and its postpetition professional advisors, (f) PFRS and its postpetition professional advisors, (g) Gabriel, Roeder, Smith & Company, (h) the COP Swap Exculpated Parties, (i) the LTGO Exculpated Parties and (j) the UTGO Exculpated Parties.[65]

---

[63]  *See In re Abrams*, 305 B.R. 920, 924 (Bankr. S.D. Ala. 2002) (allowing reconsideration of confirmation order because creditor "had no way of knowing" that its rights were impaired under plan and had no opportunity to object to its treatment).

[64]  *See* Initial Plan Objection ¶ 70 n.56.

[65]  Plan Art. I.A.143.

25

39.    Most recently, by an order dated July 11, 2014, the Court approved a

stipulation among the City and the COP Swap Counterparties.[66]  That stipulation,

while nominally settling disputes among the parties, creates a bigger problem than

those it resolves.   Pursuant to the Swap Stipulation, the Plan now purports to

exculpate the COP Swap Counterparties from

> any liability to any person or Entity for any act or
> omission in connection with, relating to or arising out of
> the City's restructuring efforts and the Chapter 9 Case,
> including the authorization given to file the Chapter 9
> Case, the formulation, preparation, negotiation,
> dissemination, consummation, implementation,
> confirmation or approval (as applicable) of the Plan, the
> property to be distributed under the Plan, the settlements
> implemented under the Plan, the Exhibits, the Disclosure
> Statement, any contract, instrument, release or other
> agreement or document provided for or contemplated in
> connection with the consummation of the transactions set
> forth in the Plan or the management or operation of the
> City.[67]

40.    The import of the exculpation provisions is clear:  the impermissible,

nonconsensual release of claims held by creditors against certain other creditors,

including the COP Swap Counterparties.  Such a nonconsensual third-party release

---

[66] *Order Modifying the Order Identifying Legal Issues, Establishing Supplemental
Briefing Schedule and Setting Hearing Dates and Procedures [Docket No.
5235]* [Docket No. 5924]; *see generally Stipulation Regarding Proposed Order
Modifying the Order Identifying Legal Issues, Establishing Supplemental
Briefing Schedule and Setting Hearing Dates and Procedures [Docket No.
5235]* [Docket No. 5907] (the "Swap Stipulation").

[67] Plan Art. III.D.6.

may only be approved where "unusual circumstances"—not at all present here—exist.[68]

41. More specifically, under *Dow Corning*, "unusual circumstances" exist only if all of the following seven factors are present:

- an identity of interest between the debtor and the non-debtor exists such that a suit against the non-debtor is functionally a suit against the debtor that will deplete the estate of assets;

- the non-debtor contributed substantial assets to the estate;

- the injunction is essential to the reorganization;

- the impacted class has overwhelmingly voted in favor of the plan;

- the plan provides a mechanism to pay for all, or substantially all, of the classes affected by the injunction;

- the plan provides an opportunity for non-settling claimants to recover in full; and

- the bankruptcy court made specific factual findings to support its approval of the releases.[69]

42. Here, the City has not attempted to satisfy the standard with respect to the Exculpated Parties. And, as shown below, it cannot satisfy the standard with respect to the COP Swap Counterparties.

43. *First*, the City and COP Swap Counterparties do not share an identity of interest. That is, a suit against the COP Swap Counterparties on account of their

---

[68] *See Class Five Nevada Claimants, et al. v. Dow Corning Corp., et al.* (*In re Dow Corning Corp.*), 280 F.3d 648, 658 (6th Cir. 2002).

[69] *Id.*

acts and omissions in connection with the Chapter 9 Case does not give rise to any indemnity obligations on the part of the City. **Second**, the COP Swap Counterparties have not made a substantial contribution to the Plan—indeed, the opposite is true:  the City is paying the COP Swap Counterparties $85 million.[70] **Third**, the exculpation of the COP Swap Counterparties is not **essential** to the reorganization—in fact, under the plain terms of the Swap Settlement, the City could have excluded the COP Swap Counterparties from the Plan's exculpation provision if that provision did not include other creditors of the City. **Fourth**, holders of COP Claims and Other Unsecured Claims, which would be affected by the release of their claims against the Exculpated Parties, categorically rejected the Plan.[71] **Fifth**, holders of COP Claims and Other Unsecured Claims are not paid in full under the Plan.[72] **Sixth**, the Plan makes no provision regarding non-settling claimants, such as Syncora, to recover in full.  And, **seventh**, the City has not put forth any basis, legal or factual, upon which the Court can make the necessary

---

[70]  *See* Swap Settlement Order; *see also In re Dow Corning Corp.,* 287 B.R. 396, 405 (E.D. Mich. 2002) ("The Shareholders' contribution of over two billion dollars of their equity to pay contested claims under the Joint Plan without requiring proof of disease causation is a substantial contribution to the Debtor's reorganization.")

[71]  *See Declaration of Michael J. Paque Regarding the Solicitation and Tabulation of Votes on, and the Results of Voting with Respect to, Fourth Amended Plan for the Adjustment of Debtors of the City of Detroit* ¶¶ 26, 43 [Docket No. 6179].

[72]  *See* Plan Art. II.B.3.p.

KE 33201145

findings. There are no bases whatsoever for this Court to grant the COP Swap Counterparties—or any of the Exculpated Parties—a non-consensual third-party release.

44.     In response to this straightforward application of the Sixth Circuit's test, the City and COP Swap Counterparties will likely contend that Syncora is carved out of the exculpation provision.[73] But this contention is meritless. The Plan contains text limiting the COP Swap Counterparties' exculpation vis-à-vis Syncora. But that text is imprecise and narrow, relating only to the Swap Settlement.[74] To be sure, Syncora has claims against the COP Swap Counterparties arising in tort and contract that go beyond any general reference to the Swap Settlement.[75] Accordingly, the modified exculpation provision does not pass muster, and the Plan cannot be confirmed.

## IV. The Fifth Amended Plan's Definition and Treatment of COP Claims Violates the Bankruptcy Code.

45.     The City's fifth amended Plan contains a number of substantive changes. Among the most perplexing is the City's revised definition of "COP Claim":

---

[73] *See id.* Art. III.D.6.

[74] *Id.*

[75] *See* First Supplemental Objection ¶¶ 33–37.

COP Claim means a Claim under or evidenced by the COP Service Contracts. For the avoidance of doubt, except as provided in any Final Order of the Bankruptcy Court, the definition of COP Claim shall include any Claim (other than a COP Swap Claim) on account of any act, omission or representation (however described) based upon, arising out of or relating to: (a) the issuance, offering, underwriting, purchase, sale, ownership or trading of any COPs (to the extent any such Claim is not a Subordinated Claim); (b) the COP Service Corporations; (c) any COP Service Contracts; (d) the 2005 COPs Agreement; (e) the 2006 COPs Agreement; (f) the Detroit Retirement Systems Funding Trust 2005; (g) the Detroit Retirement Systems Funding Trust 2006; (h) the Contract Administration Agreement 2005; (i) the Contract Administration Agreement 2006; (j) any allegations that have been made or could have been made by or against the City or any other person in the COP Litigation; or (k) any policy of insurance relating to the COPs.[76]

46.     The new definition of COP Claims is far more expansive than the definition contained in the Fourth Amended Plan: "'COP Claim' means a Claim under or evidenced by the COP Service Contracts."[77]

47.     Based on a plain and fair reading of the new COP Claim definition versus the prior definition, it is clear the City is reclassifying creditors' claims— Syncora's Other Unsecured Class Claims as COP Claims—in an attempt to disallow those claims.   While the COP Claim definition is now sweepingly broad, the COP Claim treatment only accounts for COP *principal-based* claims.

---

[76]  Plan Art. I.A.67.

[77]  *See* Fourth Am. Plan I.A.57.

Accordingly, the new COP Claim definition, read in conjunction with COP Claim treatment, establishes that the Plan violates Bankruptcy Code section 1123(a)(4).

48.     Specifically, Syncora's claims against the City for (a) fraud and fraudulent inducement, (b) unjust enrichment and restitution, (c) abuse of process, and (d) fees and expenses were Other Unsecured Claims under the Fourth Amended Plan.    Because these claims did not fall within the definition of COP Claim under that plan (i.e., claims "under or evidenced by the COP Service Contracts") or any other defined claim class, these claims fell squarely within the Fourth Amended Plan's definition of Other Unsecured Claims (i.e., claims not otherwise included in an unsecured claim class).

49.     Syncora's fraud-related claims arise because of false or misleading statements and omissions in the COP offering materials.    These claims do not arise under, and are not evidenced by, the Service Contracts and thus were not COP Claims under the prior definition.   But the new definition includes the following text to capture these claims:   "For the avoidance of doubt, except as provided in any Final Order of the Bankruptcy Court, the definition of COP Claim shall include any Claim . . . on account of any act, omission or representation . . . relating to: (a) the issuance, offering, underwriting, purchase, sale, ownership or trading of any COPs . . . ."[78]

---

[78]   Plan Art. I.A.67.

50. Syncora's fees and expenses claims arise in Class 3 and, in the Fourth Amended Plan, in Class 14. Such claims in Class 14 arise under the Contract Administration Agreement—not the Service Contracts. Here again, the City has changed the COP Claims definition to cover Syncora's Class 14 claims: "For the avoidance of doubt, except as provided in any Final Order of the Bankruptcy Court, . . . the definition of COP Claim shall include any Claim . . . relating to . . . (h) the Contract Administration Agreement 2005; (i) the Contract Administration Agreement 2006 . . . ."[79]

51. Syncora's unjust enrichment and restitution claims also exist in the absence of the Service Contracts and could not be COP Claims under the prior definition. Syncora believes the new COP Claim definition does not cover these claims, but it is not clear. It is possible the City intended to cover such claims by including sweeping references to claims relating to the "the COP Service Corporations," the "Detroit Retirement Systems Funding Trust 2005," and the "Detroit Retirement Systems Funding Trust 2006," each of which may tangentially "relate" to an unjust enrichment or restitution claim.[80] And if that is the case, Syncora objects.

---

[79] *Id.*

[80] Syncora also believes that its abuse of process claim—which arises from the City's unjustified and improper use of the legal process in response to

52.     In substance, the City's reclassification of Syncora's Other Unsecured Claims is tantamount to a claims objection.  As addressed above, the new COP Claim definition covers a wide swath of claims other than COP principal claims. Yet, the COP Claim treatment under the Plan only accounts for COP principal:

> Each beneficial holder shall be deemed to receive such COP Claims or portions thereof in ***an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs*** . . . . On the Effective Date, the City shall establish the Disputed COP Claims Reserve. The Disputed COP Claims Reserve shall contain:  (a) an Unsecured Pro Rata Share of New B Notes calculated as if such Disputed COP Claims ***were Allowed in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs***.[81]

53.     Because treatment of COP Claims ***is not*** coterminous with the COP Claim definition, the Plan operates as an objection to all other COP-related claims, including accrued and unpaid interest as of the Petition Date and Syncora's Other Unsecured Claims.  The City cannot amend its Plan to object to a claim and then ask the Court to bless its actions through the plan confirmation process.  Doing so circumvents bankruptcy law.[82]  Moreover, to the extent the City assumes that

---

Syncora's assertion of its rights—is a Class 14 claim even under the new COP Claim definition.

[81]  Plan Art. II B.3.p.ii–iii.A (emphasis added).

[82]  *See, e.g.*, *In re Dynamic Brokers, Inc.*, 293 B.R. 489, 497 (B.A.P. 9th Cir. 2003) ("Moreover, utilizing a plan confirmation proceeding as a method of objecting to a claim presents troubling policy issues in the face of rules of procedure that

33

Syncora's claims will be disallowed, the Plan is based on flawed data, and the Court cannot confirm the Plan.[83]

54. Additionally, the COP Claim treatment violated section 1123(a)(4) of the Bankruptcy Code under the Fourth Amended Plan because it provided no recovery on account of Syncora's claims for past paid COP interest. By lumping Syncora's Other Unsecured Claims into the COP Claim definition—yet not providing any treatment for such claims—the Plan further violates Bankruptcy Code section 1123(a)(4) by treating Syncora's "new" Class 9 claims differently.[84] For these independent reasons alone, the Plan continues to fail section 1129(a)(1)'s

---

appear to require formal objections to claims . . . . Neither the statute nor the rules say, 'oh, by the way, we can also sandbag you by sneaking an objection into a reorganization plan and hoping you do not realize that we can use this device to circumvent the claim objection procedure mandated by the rules.' That is not the law, and if it were the law, it would be a material disservice to public confidence in the integrity of the bankruptcy system.").

[83] *See id.* at 499 ("Because the court erred in effectively disallowing Varela's 'deemed allowed' claim without the benefit of a claim objection, the court's consideration of the confirmation requirements, based at least in part on Varela's erroneously reduced claim, was fatally flawed. Therefore, we must reverse the confirmation order . . . .").

[84] *See* 11 U.S.C. § 1123(a)(4) ("[A] plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."); *In re Oakland Care Ctr., Inc.*, 142 B.R. 791, 794 (E.D. Mich. 1992) ("The fundamental policy that similarly situated creditors share pro rata is also reflected in section 1123(a)(4) of the Bankruptcy Code."); *In re Kessler, Inc.*, 142 B.R. 796, 800 (W.D. Mich. 1992) (citing section 1123(a)(4) and stating that a "fundamental policy found in the overall structure of the Bankruptcy Code is the equality of distribution to similarly situated creditors").

34

requirement that it comply with the provisions of the Bankruptcy Code.[85]  This

flaw is fatal, and for this independent reason, the Court cannot confirm the Plan.

## V. Confirmation Must Be Denied Because Syncora's Pending Appeals Could Affect the Plan.

### A. Prudence dictates that the Court should deny Plan confirmation.

55.    Respect to the judicial process dictates that the Court should deny

Plan confirmation until Syncora's pending appeals have been resolved.  On this

point, the Sixth Circuit was clear:

> If the bankruptcy court confirms the city's plan of adjustment before Syncora obtains judicial review of the merits of its appeal, Syncora may be left with no option but to seek an emergency stay of that plan.  That is hardly the process envisioned by the Federal Rules of Bankruptcy Procedure, which seek to expedite bankruptcy appeals by requiring parties to file their appeals within fourteen days rather than the normal thirty days . . . Nor is it consistent with this court's recurrent efforts to facilitate orderly bankruptcy appeals by interpreting the final judgment rule . . . "'to avoid the waste of time and resources that might result from reviewing discrete portions of the action only after a plan of reorganization is approved.'" . . . Insofar as a debtor's plan of adjustment incorporates final decisions reached by the bankruptcy court, any appeals from those decisions should generally be reviewed **before** the bankruptcy court confirms that plan.[86]

---

[85]  11 U.S.C. § 1129(a)(1).

[86]  *In re Syncora Guarantee Inc.*, No. 14-1719, 2014 WL 2959242, at *1, *5 (6th Cir. July 2, 2014) (internal citations omitted) (emphasis in original).

35

56.   As noted above, Syncora is prosecuting four appeals that, if any one of which is resolved in its favor, would compel the City to amend the Plan dramatically.

57.   As to the Automatic Stay Appeal, on which the Sixth Circuit heard oral argument on July 30, 2014, if Syncora is successful, the City will lose access to the casino revenues that underpin, in part, distributions to creditors under the Plan.  No one can seriously dispute that such an outcome would lead to material modifications of the Plan, which would, in turn, likely necessitate the City's re-solicitation of votes to accept or reject the Plan.[87]

58.   The same goes for Syncora's other appeals—namely, the PLA Appeal, the Swap Appeal, and the DIP Appeal.  If Syncora is successful on any one of these appeals, the City will be forced back to the drawing board, the negotiating table, and the courtroom before it could reasonably propose another plan that would withstand adversarial scrutiny.  Put another way, the City must run the table on four separate appeals to secure the viability of its Plan; if Syncora prevails on just one of its appeals, the City will be forced to make material alterations to the Plan.

---

[87] *See* 11 U.S.C. § 942 ("The debtor may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of this chapter. After the debtor files a modification, the plan as modified becomes the plan."); *see also id.* § 901.

36

59.     Under these circumstances, prudence dictates that the Court deny Plan confirmation.  After all, "[w]ithout a final decision on [these] question[s], the city will not know what amount its coffers will contribute to the bankruptcy estate, the creditors cannot know the size of the pie they are being asked to share, and the bankruptcy court cannot be confident that it is considering a legally and financially viable plan."[88]

**B.     The Plan purports to distribute assets that are not property of the City.**

60.     As argued more fully in connection with Syncora's Automatic Stay Appeal, the casino revenue is not property of the City until it is released from the holdback account after certain conditions are met.  It is a basic tenet of federal bankruptcy law that courts must look to state law to determine the existence and scope of a debtor's property rights, measured as of the date of the bankruptcy filing.[89]  The filing of a bankruptcy petition, therefore, does not expand or otherwise modify a debtor's state-law property interests held as of the date of the filing.[90]  Moreover, a bankruptcy filing does not "convert a Debtor's contingent right into a non-contingent right."[91]

---

[88]  *Syncora*, 2014 WL 2959242, at *5.

[89]  *See, e.g.*, *Butner v. United States*, 440 U.S. 48, 55–56 (1979); *Sharp v. Dery*, 253 B.R. 204, 206–07 (E.D. Mich. 2000).

[90]  *See, e.g.*, *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) ("[W]hatever rights a debtor has in property at the commencement of the case

61. As of the Petition Date here, the conditions for release of the casino revenues from the custodial account remained unsatisfied. Accordingly, those funds did not become property of the City, free and clear of the prepetition conditions imposed under the Collateral Agreement. Nevertheless, based on the Automatic Stay Order, the City purports to distribute the casino revenue under the Plan.

62. But Syncora's Automatic Stay Appeal remains pending—indeed, the Sixth Circuit heard oral argument on July 30, 2014. A decision in Syncora's favor could (and likely would) have a material effect on the Plan. Conversely, if the Plan is confirmed before the Automatic Stay Appeal is resolved, Syncora could be deprived of its rights **without recourse**. In light of this substantial risk, the Court should deny Plan confirmation.

---

continue in bankruptcy—no more, no less."); *Sharp*, 253 B.R. at 209 (stating that a bonus payment not was property of estate because debtor had no legally enforceable pre-petition right to payment).

[91] *In re Dolphin Titan Int'l, Inc.*, 93 B.R. 508, 512 (Bankr. S.D. Tex. 1988); *see also Creative Data Forms, Inc. v. Pennsylvania Minority Bus. Dev. Auth.*, 72 B.R. 619, 623 (E.D. Pa. 1985), *aff'd*, 800 F.2d 1132 (3d Cir. 1986); *Newcomb Carlson v. Farmers Home Admin.*, 744 F.2d 621, at 627 (8th Cir. 1984); *In re Expert South Tulsa, LLC*, 456 B.R. 84, 87 (Bankr. D. Kan. 2011); *Atlantic Gulf*, 369 B.R. at 163; *Royal Bus. Sch.*, 157 B.R. at 942; *In re Cedar Rapids Meats, Inc.*, 121 B.R. 562, 567 (Bankr. N.D. Iowa 1990); *In re AGSY, Inc.*, 120 B.R. 313, 318-19 (Bankr. S.D.N.Y. 1990); *In re Palm Beach Heights Dev. & Sales Corp.*, 52 B.R. 181, 183 (Bankr. S.D. Fla. 1985).

**C.    The Plan fails to provide for distribution of other assets improperly divested by the City during the Chapter 9 Case.**

63.    In contrast to the Automatic Stay Appeal, Syncora's other appeals seek to increase the amount of assets available for distribution under the Plan. Specifically, by the PLA Appeal, Syncora seeks to preserve $12.5 million by seeking an order reversing the PLA Order.  Likewise, by the Swap Appeal and DIP Appeal, Syncora seeks to preserve an aggregate $205 million for distribution to creditors.

64.    With regard to the PLA Appeal, Syncora contends that this Court erred by entering the PLA Order because the City failed to satisfy its burden of proof—and the Court did not make specific, necessary findings—for the relief sought.  As such, there was no basis for this Court to enter the PLA Order.

65.    With regard to the Swap Appeal, Syncora contends that the Swap Settlement unlawfully impairs third-party rights and attempts to resolve breach-of-contract disputes among parties other than the COP Swap Counterparties and the City.   Additionally, Syncora asserts that the plan support aspect of the Swap Settlement is not fair and equitable, nor is it advantageous to the City. Accordingly, the Court erred when it approved the Swap Settlement.

66.    With regard to the DIP Appeal, Syncora contends that the City did not seek approval for its debtor-in-possession financing facility through a properly-noticed motion and a hearing, but instead relied solely on a notice of presentment.

39

For this and other reasons, this Court erred when it approved the City's entry into the DIP facility.

67.    Of course, the merits of Syncora's appeals will be decided by higher courts.  And, to be sure, Syncora is not now seeking to re-litigate those issues in connection with Plan confirmation.  Instead, Syncora implores the Court to heed the Sixth Circuit's message:  "Insofar as a debtor's plan of adjustment incorporates final decisions reached by the bankruptcy court, any appeals from those decisions should generally be reviewed ***before*** the bankruptcy court confirms that plan."[92] Such a course will allow a more orderly review in the appellate courts, and it will preserve judicial resources by preventing the substantial litigation of issues that may be mooted by subsequent events on appeal.

68.    Accordingly, the Court should deny Plan confirmation until higher courts have finally resolved Syncora's appeals.

## CONCLUSION

69.    In the final analysis, the City's Plan cannot be confirmed.  Like the process that led to it, its centerpiece—the Grand Bargain—unfairly favors politically popular, insider creditors, and shields valuable assets from outsider creditors.  Moreover, in prosecuting the Plan, the City has run roughshod over fundamental constitutional protections; the Plan impermissibly exculpates certain

---

[92]  *Syncora*, 2014 WL 2959242, at *5.

creditors; the Plan's definition and treatment of COP Claims violates applicable law; and the Plan's key assumptions are subject to ongoing dispute in Syncora's appeals. In sum, there are multiple adequate and independent flaws in the Plan that each preclude confirmation. The Plan requires a complete overhaul before this Court can entertain its confirmation. And that is precisely what this Court should require.

*[Remainder of Page Intentionally Left Blank]*

41

Dated: September 1, 2014       Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: _/s/ Ryan Blaine Bennett_
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*