# EXHIBIT 12

# VOLUNTARY LABOR ARBITRATION TRIBUNAL

*In the Matter of the*
*Arbitration Between:*

CITY OF DETROIT

-and-

MICHIGAN AFSCME COUNCIL 25
and its Locals 457, 273 and 1642

Case No. 12-007708-CL
Gr. No. 25-01-12
Log No. D26311-999-2012

## ARBITRATOR'S OPINION AND AWARD

APPEARANCES:

FOR DETROIT MEDICAL CENTER:

Andrew Jarvis, Assistant Corporation Counsel

FOR MICHIGAN AFSCME COUNCIL 25
and its Locals 457, 273 and 1642:

Richard Mack, Attorney

## Introduction

The City of Detroit and Michigan AFSCME Council 2 5 and its Affiliate Locals were parties to a Master Agreement, including Council 25's Locals 457, 273 and 1642, who represented employees in the City of Detroit Health and Wellness Promotion Department, the Human Services Department and the Detroit Workforce Development Department. The cover sheet of this Master Agreement contained the following dates – "July 1, 2008 - June 30, 2012."

Page 81 of the Master Agreement contained the following:

### 51. MODIFICATION AND TERMINATION

It is agreed between the parties that this Contract shall continue in full force and effect until 11:59 p.m., June 30, 2012. If either party desires to modify this Contract they shall give written notice during the month of February 2012. Negotiations for a new contract shall commence thirty (30) days after that date.

In the event that the City and the Union fail to arrive at an agreement on wages, fringe benefits other monetary matters, and non-economic items by June 30, 2012, the Agreement will remain in effect on a day to day basis. Either party may terminate the agreement by giving the other party a ten (10) day written notice on or after June 20, 2012.

The parties agree that this sole and complete Agreement is intended to cover all matters affecting wages, hours, and other terms and conditions of employment and that during the term of this Agreement, neither the City nor the Union will be required to negotiate on any further matters affecting these or any other subjects not specifically set forth in this Agreement, except by mutual agreement of the parties hereto.

On June 20, 2012, Lamont Satchel, Director of the City of Detroit Labor Relations Division, wrote Albert Garrett, President, Michigan Council 25, the following letter:

RE:    Termination of 2008-2012 Collective Bargaining Agreement(s)

Dear President Garrett:

This letter serves as notification that in accordance with our collective bargaining agreement, the City hereby provides ten (10) days written notice of its intent to terminate the master and supplemental bargaining agreements as of July 1, 2012.

Please be advised that the City will continue its practice, where required, of disciplining and discharging non-probationary unit employees under a just cause standard notwithstanding the contract termination. The City also agrees to maintain the grievance and arbitration procedures with regards to all discipline and discharge cases. With regard to non-discipline or discharge cases, the City's position, in accordance with Michigan law, is that the termination of the agreement ends the contractual arbitration procedures for any dispute based upon facts arising after the termination date of the agreement, or not involving rights accrued or vested under the agreement. Accordingly, the City will determine its arbitration obligations on a case-by-case basis, and will act in accordance with its rights and obligations under Michigan law. The City of Detroit reserves all rights pursuant to applicable legal authority.

Previously, on May 31, 2012, DeAngelo Malcolm, Council 25 Staff Representative, had filed the following grievance with the City:

STATEMENT OF FACTS: The Union protests the actions taken by the City of Detroit. The city has shutdown various Departments (The

2

Health Department, Human Services Department, The Detroit Workforce Development Department) and laid off members of this bargaining unit and replaced them with 3rd party entities.

VIOLATIONS: The actions taken by the employer clearly violates, Purpose and Intent, Article -1 Recognition, Article 2, Management Rights and Responsibilities, Article-16 Reductions In Force, Lay Off, Demotion and Recall, Article 19 Contractual Work, Article 21- Maintenance of Condition, Article 42 Successor, Article-47 Retirement, MOU-Labor Management Committees of the CBA., as well as Local and State Laws and any other applicable Articles or Laws.

DISPOSITION REQUESTED: We demand that the City immediately cease and desist violating the CBA, Local and State laws, require the successor entities to recognize the union, hire its members who currently work in the affected positions, adopt a bargaining agreement with the union for said employees, expeditiously return all laid off employees affected and make the Union whole in all areas.

*The Union reserves the right to modify this grievance.

On the same day, the grievance was appealed to arbitration.

### Procedural Background

The question concerning the arbitration of this matter ended up in litigation involving these parties in the Wayne County Circuit Court, namely, American Federation of State, County and Municipal Employees Council 25, and its affiliated Locals 457, 273 and 1642 v. City of Detroit, Loretta Davis and Pamela Moore in Case No. 12-007708-CL before the Honorable Wendy M. Baxter who on June 27, 2012 issued an Order granting partial relief in denying a request for preliminary injunction and writ of mandamus wherein Judge Baxter ordered "that the City of Detroit and AFSCME shall arbitrate in an expedited fashion to commence within 28 days after the date of this Order; and it is further ordered that the arbitrator shall render a decision immediately thereafter on the grievance and/or unfair labor charge;"

Arbitration hearings were held on July 26, August 3, 7, 9, 14, 16 and 20, 2012. Post-

3

hearing briefs were thereafter filed.

## The City of Detroit Health and Wellness Promotion Department

The City of Detroit Health and Wellness Promotion Department is a local health department as defined by the Michigan Public Health Code, MCLA §333.2422. The Michigan Public Health Code imposes certain requirements on the City as a local health department. MCL §333.2431 provides:

> Sec. 2431. (1) A local health department shall:
>
> (a) Have a plan of organization approved by the department.
>
> (b) Demonstrate ability to provide required services.
>
> (c) Demonstrate ability to defend and indemnify employees for civil liability sustained in the performance of official duties except for wanton and willful misconduct.
>
> (d) Meet the other requirements of this part.

MCL §333.2433(1) states that a "local health department shall continually and diligently endeavor to prevent disease, prolong life, and promote the public health through organized programs, including prevention and control of environmental health hazards; prevention and control of diseases; prevention and control of health problems of particularly vulnerable population groups; development of health care facilities and health services delivery systems; and regulation of health care facilities and health services delivery systems to the extent provided by law.

MCL §333.2433(2) states that a local health department shall:

> (a) Implement and enforce laws for which responsibility is vested in the local health department.
>
> (b) Utilize vital and health statistics and provide for epidemiological and other research studies for the purpose of protecting the public health.

4

(c) Make investigations and inquiries as to:

    (i) The causes of disease and especially of epidemics.

    (ii) The causes of morbidity and mortality.

    (iii) The causes, prevention, and control of environmental health hazards, nuisances, and sources of illness.

(d) Plan, implement, and evaluate health education through the provision of expert technical assistance, or financial support, or both.

( e) Provide or demonstrate the provision of required services as set forth in section 2473(2).

(f) Have powers necessary or appropriate to perform the duties and exercise the powers given by law to the local health officer and which are not otherwise prohibited by law.

(g) Plan, implement, and evaluate nutrition services by provision of expert technical assistance or financial support, or both.

If there is an imminent danger to the health or lives of individuals, then the Health Department shall perform certain actions and issue orders incorporating findings concerning the imminent danger and demand certain immediate action. *See* MCL §333.2451. And when there is an epidemic present, there are certain responsibilities placed upon the health department. MCL §333.2453.

    Similarly, the health department has responsibilities in monitoring restaurants and evaluating conditions of buildings and approving cemeteries. *See* MCL §333.2455, 333.2458, MCL §333.245.

    There is no dispute that prior to July 1, 2012 the Department of Health and Wellness Promotion, consistent with the above State statute, provided services such as immunizations, family planning and TB control programs, pediatric dental, vision and hearing screening, home visits by public nurses, inspection of food service establishments and epidemiology among other

various health programs. (Tr. 603-605).

Prior to July 1, 2012 and subsequent to July 1, 2012 Loretta Davis was and continues as the City's Chief Health Officer and Director of the City of Detroit Health and Wellness Promotion Department. (Tr. 607). As such, she is an appointee of the Mayor of Detroit. As such, she is responsible for enforcement of the health ordinances of the City. (Tr. 605-608). Betsy Pash, both before and after July 1, 2012, was and continues as Deputy Director of the Health and Wellness Promotion Department for the City of Detroit. (Tr. 116).

Ms. Pash acknowledged that in late February 2012 City officials decided the City of Detroit Health and Wellness Promotion Department would no longer provide statutory mandated health services to the citizens of Detroit. These services that had been performed by the City of Detroit Health and Wellness Promotion Department were to be performed by an outside entity.

By April 2012, a new corporation separate from the City of Detroit was incorporated, known as the Institute of Population Health (IPH). The incorporators were Loretta Davis and Betsy Pash. Loretta Davis became President and CEO and Betsy Pash became Chief Operating Officer of IPH. (Tr. 151, 604). The IPH was incorporated for the purposes of transferring the Health Department functions to the IPH. According to Ms. Pash, the Mayor no longer wanted the City to directly provide public health services. (Tr. 119).

On July 1, 2012, virtually all previous services that had been provided by the Department of Health and Wellness Promotion were transferred to the IPH.

According to Ms. Pash and confirmed by Ms. Davis, Ms. Pash acknowledged that "a lot of the money" funding the health department comes from State and Federal grants; that the grant money was either shifted or intended to be shifted over to the IPH. (Tr. 119-121, 602). Ms.

6

Davis testified that the Health and Wellness Promotion Department had been funded "around 95%" from State and Federal grants received by the City. (Tr. 602).

There was a discussion concerning four grants that go directly to the City that would be under the plan funneled through the City "through work done by the IPH, and by the SEMHA contractors". (Tr. 169). There was testimony that where the Health Department oversees in the past animal control that since there was no grant funding for animal control, this function would now be transferred to the Police Department. In the past, vital statistics was a source of revenue. Initially, this source of revenue was planned to be funneled to IPH. It was decided that the City would not transfer this function. (Tr. 363-364).

As noted, Ms. Davis is the President and CEO of IPH. Ms. Pash is Chief Operating Officer of IPH. (Tr. 134-135). Ms. Pash identified her and Ms. Davis' relationship as being on loan from the City to IPH as follows:

> The City will continue to pay us. We will continue to be City
> employees. We will be able to enforce laws and ordinances in our
> public health capacity, but we will also be overseeing the operations at
> the IPH.
> (Tr. 134).

The City would pay both Ms. Pash's and Ms. Davis' salary and IPH would reimburse the City. (Tr. 134). When Ms. Davis later testified, she contradicted Ms. Pash's testimony on this point and seemed to be confused about how her salary would be paid. Ms. Davis testified: "I would also be on loan to the IPH for about a year, to help stand that up as their president and CEO. In those two roles, I will have exactly the same responsibilities that I was deemed qualified to do now." (Tr. 606).

The record further reveals that IPH, at least in the near future, would continue to use City

7

facilities to perform the functions that were previously performed by the City Health Department.

IPH is not paying rent for the use of facilities.

Prior to any layoffs, there were 167 City employees in the Health Department, though there were 267 budgeted positions. (Tr. 127). It was unclear, however, whether all of these employees were represented by AFSCME. As early as May 4, 2012, the City began notifying AFSCME representatives of layoffs in the Health Department. In regard to the notices of layoffs and the intention of the Health Department concerning layoffs, Ms. Pash testified:

> Q    (By Mr. Mack)  I'm looking at Exhibit 11, page 5. It indicates that their initial layoff notifications to the unions took place on May 4th.  does that sound right?
>
> A    Correct.
>
> Q    And then the layoff notices to the employees took place on June 8th?
>
> A    That sounds right.
> (Tr. 358).

In regard to what actually occurred, Ms. Pash testified:

> ARBITRATOR ROUMELL:  And did I understand you to say that you have continued the City employees until September 20th?
>
> THE WITNESS: 28th, yes.
>
> ARBITRATOR ROUMELL: Have you laid off any people?
>
> THE WITNESS:  We laid off some people because of budget cuts that happened on July 1st.
>
> ARBITRATOR ROUMELL  All right. How many people do you still have employed, approximately?
>
> THE WITNESS:  110.
>
> ARBITRATOR ROUMELL:  How many did you lay off?
>
> THE WITNESS:  We laid off – we eliminated 15 positions. It

8

ended up being about nine people.

    REPORTER: 15?

    THE WITNESS: 15.

    ARBITRATOR ROUMELL: All right. so basically, the Health Department is intact. Am I correct?

    THE WITNESS: Yes.

    ARBITRATOR ROUMELL: But you plan to lay off everyone by September 28th?

    THE WITNESS: Everyone but four positions.
(Tr. 356).

    Ms. Pash testified that after the planned layoffs of the City employees, IPH intends to hire new employees to perform the previous functions of the Health Department and have employed an outside employment agency to assist in hiring the new employees.

    The plan to transfer the function of the Health Department to IPH was announced to the City Council on May 7, 2012. Mayor Bing, in a letter dated June 5, 2012, to Governor Snyder advised the Governor of the plan, announcing it was the City's intention "to partner with the Institute for Population Health (IPH)". (Exhibit 36). By letter dated June 27, 2012, Governor Snyder wrote Mayor Bing acknowledging the letter of June 5, 2012 approving the shifting of the grants from the City of Detroit to the IPH. As noted, the announcement to the City Council and the exchange of letters between the Mayor and the Governor all occurred before the Master Agreement expired.

    In addition, the grievance challenging the change as a successor was filed on May 31, 2012.

9

## Department of Workforce Development

Prior to July 1, 2012, the City of Detroit's Department of Workforce Development provided such services as providing job training and various services to needy families through grants from the State and Federal governments. The Department was governed by a 25 person Workforce Development Board appointed by the Mayor of the City. (Tr. 51-53). In the last fiscal year of the City, the Department received 99.9% of its funding from grants with the City only contributing $1,500 to the Department's operation out of the General Fund. (Tr. 64). Pamela Moore was the Department Director. Calvin Sharp was the Deputy Director of the Department.

The Department on February 10, 2012 had received a letter from Elliott Forsyth, the State Director of Workforce Development, outlining problems in the Department which needed improvement, but did not suggest any outsourcing to another entity. (Tr. 63, 68). The record does not reveal that the Department received any other letter from Mr. Forsyth. Nor is there any evidence that the Department lost any State or Federal funding as a result of performance issues. (Tr. 62).

As of late June 2012, the Department had 48 City employees represented by the Union. On June 28, 2012, the Workforce Development Board signed a governance agreement with the Detroit Employment Solutions Corporation. On June 29, 2012, the 48 employees of the Department of Workforce Development were given a layoff notice and because of the injunction were not laid off until July 13, 2012. (Tr. 74). Three days later on July 16, 2012, 18 of the individuals previously working for the Department were hired by the Detroit Employment Solutions Corporation (DES) and are currently working for DES. They did not keep their City titles. The testimony was that "we found appropriate non-profit titles" for these employees. (Tr.

10

74). The testimony from Pamela Moore who is now the President and Chief Executive Officer of DES is: "We continue to hire. We have not stopped hiring. But to date there are 18 who have been brought over". (Tr. 75).

Pamela Moore resigned on June 30th as Director of the Department of Workforce Development and became President and CEO of DES. Calvin Sharp, who had been Deputy Director of the Department of Workforce Development became Chairman of DES. Pamela Moore also testified that previous employees of the Department of Workforce Development could be candidates for future employment of DES along with other possible candidates from other Workforce areas. In terms of hiring additional staff, Pamela Moore testified: "We project that the organization they have around 40 employees when we're done hiring, 35, 40." (Tr. 77). When asked "What determined that?", Ms. Moore responded, "The need. I mean, we still have the same functions that we have to provide, just in terms of administering $48 million worth of grant. But we still have the same function, plus some additional functions that the City provided when we were part of the City that we now have to procure such as legal – you know, legal advice or ...". (Tr. 77).

In her testimony, Ms. Moore was asked about the governance agreement as follows:

Q    It says, 13.0:

"The City of Detroit is the grant recipient under the Act and will carry out the roles and responsibilities associated with this function for the local Workforce Development area."

Do you see that?

A    I do.

Q    And then it says, 3.2:

"The City of Detroit as the grant recipient is financially

11

responsible and accountable for the management of all
Workforce funds available to the board"?

A   That is correct.

Q   But all of the people who were performing the operations upon
receiving this grant are now gone from the City?

A   That is correct.

Q   So how then is the City still on the hook financially and made
accountable if it has no people to perform that service?

A   So the Workforce Investment Act legislation--

Q   Right.

A   States that the local Workforce area and the chief elected official
is the grant recipient of these dollars. So the City of Detroit
continues to be the grant recipient of these dollars.

The Mayor and the Workforce Development board chair have
the authority and responsibility to appoint a fiscal and
administrative agent who will oversee these programs and
services responsibly.

In the past that administrative and fiscal agent has been the
Department of Workforce Development.

There has been a change, based on problems that were outlined
by the State and the board's decision to recommend to the Mayor
that the fiscal and administrative agent be changed, because
those issues that were laid out in that February 10th letter where
Mr. Forsyth does refer to DWDD, if those issues had been able
to--

Q   Well, ma'am, you are going beyond my question.

MR. JARVIS: Well, she is giving you an answer.

MR. MACK: No.

Q   (By Mr. Mack) My question was, how is it that Detroit - the
City of Detroit--is financially responsible and accountable for
the management of our Workforce funds, but it has no people to
oversee those funds?

12

ARBITRATOR ROUMELL: And she is answering that.

MR. JARVIS: She is answering that.

MR. MACK: She--well--

ARBITRATOR ROUMELL: Let her answer.

THE WITNESS: So again, the City of Detroit remains the grant recipient, but the power that is given to the board chair through the Workforce Investment Act and the chief elected official gives them the authority and the responsibility to designate a fiscal and administrative agent that will oversee these funds responsible.

Again, based on the State's issues that were outlined in the letter, a decision was made by the board chair and the Mayor and approved by the State to change the administrative and fiscal agent to Detroit Employment Solutions Corp.

(Tr. 85-87).

The City is financially responsible for the management of the grant money that is administered by DES as it was with the Department of Workforce Development. DES is using the same building previously operated by the Department of Workforce Development without any compensation to the City and the tenant in the building is the City. (Tr. 106-107). DES is using the same equipment and computers that were used by the Department of Workforce Development which are still owned by the City. (Tr. 399). This equipment contains the City serial numbers marked upon said equipment. (Tr. 400). The website of the Michigan State Department of Licensing and Regulatory Affairs shows that the Detroit Employment Solutions Corporation has the same I.D. number as the Workforce Development Board. (Tr. 765-767).

The grant money that previously was used to fund the Department of Workforce Development has been or is intended to be shifted to the DES.

By any conceivable definition, this record establishes that the DES is a successor in the

13

Department of Workforce Development. The same management at the time of the hearing; same employees; same funding source except for $1,500. The City of Detroit is responsible for the grants. The same space and City of Detroit equipment being used, governed by the Workforce Development Board.

## Department of Human Services

The Department of Human Services assists low income members of the community by providing them with basic human needs. (Tr 259). The Department is 100% grant funded. (Tr. 262). The Head Start Grant amounts to about $50 million that DHS received annually, most recently from November 1, 2011 through October 21, 2012. (Tr. 263-264). The Head Start Grant is a direct award from the Federal government to the City. (Tr. 263). Another significant grant that is awarded to the City is the Community Service Block Grant. The City received varying amounts for this grant, but received it annually, and most recently received $6.8 million for October 1, 2011 through September 30, 2012 (Tr. 265). Cecily McClellan, a former center operations manager within the Department of Human Services, testified that the State had been withholding CSBG money from the City. (Tr. 196-197).

There had been a request from the Director of the Michigan Department of Human Services, Maura Corrigan, to de-designate as a Community Action Agency and to stop receiving CSBG funds. Ms. Corrigan supported de-designation because of problems with DHS being in compliance (Tr. 230). She wanted a non-profit to become the recipient of the grant and perform the services and not the City of Detroit. Director Corrigan had threatened an adversarial de-designation hearing. The Mayor had favored a voluntary de-designation. (Tr. 198-200). The City Council initially refused on March 16th, but later in June acquiesced. (Tr. 202).

14

The whole issue of designation was against a background where the State had delayed payments to the City. The dispute regarding use of City workers had centered compliance issues. (Tr. 230). Specifically "disallowance[s]" regarding grant money expenditures. (Tr. 287). There was some testimony that the State would not release the funds so long as it was city employees working on the projects (Tr. 215). DHS Planning Manager Sheila Washington-Bond indicated that the State would not release the funds if it was City workers doing the work. (Tr. 215). And Usula Holland, the Current Director of the Department of Human Services, testified that the State was very clear they did not want the City of Detroit to provide direct program service delivery. (Tr. 285-286).

The situation was as such that the State had already begun the process of an adversarial de-designation of the City. (Tr. 286). It was as an alternative that the city council acquiesced and all DHS staff were laid off. (Tr. 202, 209). After the lay offs, the State released the CSBG funds that had been withheld. (Tr. 300).

The City submits a new plan to the State every year for CSBG funds. The plan for the 2011-2012 year as originally submitted was similar to the 2010-2011 year, and was rejected by the State. (Tr. 272-273). These grant dollars were only awarded upon the State's recent approval of the Community Action Agency's revised plan for the 2011-2012 year. (Tr. 272-273). A material difference in the plan, and primary contingency upon which the State would grant the CSBG funds, is that the City would commit to go out of the business. (Tr. 285-286). As a result the State finally accepted the proposal and released the funds to be deposited with the City. (Tr. 301).

The understanding between the State and the City that the City would get out of the

15

business is even acknowledged by the Union in its post hearing brief: "The reason the City laid off the workers is because it committed to doing so to the State." (UB 14).

The City is self de-designating as a Community Action Agency and acting as only a temporary agent to contract these limited services funded by the CSBG out to the Detroit Rescue Mission and Salvation Army in the interim while the State looks for a new agency. (Tr. 299-301). This is not a permanent arrangement, as the State only released the funds contingent upon the City agreeing to no longer perform the work in the future. Prior to the Salvation Army and Detroit Rescue Mission taking the work, very little CSBG work had been performed between October, 2011 and February, 2012. And the City had done no CSBG work between February and June 2012. (Tr. 268).

Regarding the Head Start grant, the city has clearly indicated through its actions that it no longer wishes to stay in the business of providing those services. Head Start funds come directly from the federal government. Head Start is being ended. (Tr. 317). The State cut funding that provided weatherization utility assistance. (Tr. 246).

Ursula Holland is Director of Human Services. She acknowledged that the Department had 15 AFSCME employees, but they have been laid off. As she explained, "Our role is strictly closeout and interim provider". (Tr. 693). Ms. Holland explained that the City no longer has the weatherization program; that the federal government has identified another provider for the Head Start program. As she explained, these programs have been ended and Detroit will not be awarded these programs in the future. (Tr. 694-695).

16

1.  **Contract**

In presenting its grievance, Council 25 and its affiliated Locals 457, 273 and 1642 rely on the following provisions of the Master Agreement between the Council and the City of Detroit for the period July 1, 2008 - June 30, 2012:

Article 1 - RECOGNITION OF UNION

A.  Pursuant to and in accordance with all applicable provisions of Act 336 of the Public Act of 1947, as amended, the Employer does hereby recognize the Union as the sole and exclusive representative for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment and other terms and conditions of employment for the term of this Agreement of all employees of the Employer included in the bargaining units described in Exhibit 1, attached.

* * *

E.  When an operational function remains unchanged, but changes location, representation rights shall not be affected.

F.  In all other changes of operational functions, the employee has the right to retain membership in the Union.

Article 2 - MANAGEMENT RIGHTS AND RESPONSIBILITIES

Consistent with the express terms of this Agreement:

A.  The Union recognizes the prerogatives of the City to operate and manage its affairs in all respects in accordance with its responsibilities and powers of authority as set forth in the Charter and the Home Rule Act.

Article 19 - CONTRACTUAL WORK

A.  The City is genuinely interested in maintaining maximum employment for all seniority employees covered by this Agreement, consistent with the needs of the City. Therefore, in making these determinations the City intends always to keep the interest of the City's employees in mind.

B.  The right of contracting or subcontracting is vested in the City. The right to contract or subcontract shall not be used for the

17

purpose or intention of undermining the Union nor to discriminate against any of its members nor shall any seniority employee be laid off or demoted or caused to suffer a reduction in overtime work as a direct and immediate result of work performed by an outside contractor.

C.  In cases of contracting or subcontracting, including renewal of contracts, affecting employees covered by this Agreement, the City will hold advance discussion with the Union prior to letting the contract. The Union representatives will be advised of the nature, scope and approximate days of work to be performed and the reasons (equipment, manpower, etc.) why the City is contemplating contracting out the work.

## Article 21 - MAINTENANCE OF CONDITIONS

Wages, hours, conditions of employment and current proper practices which are beneficial to the employees at the execution of this Agreement, shall, except as provided and improved herein, be maintained during the term of this Agreement. Changes must be mutually agreed upon by the City and the Union.

## Article 42 - SUCCESSOR CLAUSE

This Agreement shall be binding upon the successors and assignees of the parties hereto, and no provisions, terms or obligations herein contained shall be affected, modified, altered, or changed to the detriment of the other party in any respect whatsoever by the consolidation, merger, sale, transfer, lease, or assignment of either party hereto, or affected, modified, altered, or changed in any respect whatsoever by a change of any kind of the ownership or management of either party hereto of any separable, independent segment of their party hereto.

By any definition, the Institute for Population Health is the alter ego of the City of Detroit Department of Health and Wellness Promotion. The City has transferred a majority of the functions of the Department of Health and Wellness Promotion to the IPH – services which by State statute the City is obligated to provide. In doing so, the City's Chief Health Officer, along with the Deputy Director of the Health Department were among the incorporators of the IPH and are the Chief Executive Officer and Chief Operating Officer, respectively, of IPH. Loretta Davis

18

and Betsy Pash presented conflicting testimony as to how their City salaries would be paid or reimbursed or whether their salaries would be paid by IPH. IPH would be funded by the State and Federal grants that had been received by the City.

The evidence was overwhelming that IPH was formed and steps were taken prior to June 30, 2012 to execute the plans to transfer the Health Department work. The incorporation took place in April 2012. The State's approval was obtained in June 2012. Plans to layoff were announced as early as May 2012. The layoff plans were delayed by the injunction which was issued prior to June 30, 2012. Yet, after the injunction expired, IPH still continued to employ 110 City employees to perform the former City work required by State statute. (Tr. 358).

Finally, if there is any doubt that IPH is not the alter ego of the City of Detroit Health Wellness Promotion Department, the intention is that IPH employees are going to perform the same duties and work performed as City of Detroit employees is the fact, as just noted, IPH has found itself unable to operate, at least temporarily, without using City of Detroit employees to perform duties that they were performing prior to June 30, 2012.

As to the Department of Workforce Development, the same analysis would apply. Before the contract expired, the City was planning to shift the functions of the Workforce Development Department to the Detroit Employment Solutions Corporation. By June 28, 2012, a governance agreement had been signed between the DES and the Workforce Policy Board (a Board that was appointed by the Mayor) providing for the transfer of the Department to DES. On June 30th, Pamela Moore, who had been Department Chair resigned and became President and CEO of DES. Calvin Sharp was Deputy Director of the Department of Workforce Development and became Chairman of the Board of DES. The 48 employees of the Department of Workforce

19

Development were given notice on June 29, 2012 that they would be laid off. Because of the injunction, they were not laid off until by July 13. Eighteen were rehired on July 16 by DES. DES continued use of City facilities and City equipment.

As already noted, 99.9% of DES funding came from grants of State and Federal sources usually passed through the City.

By any definition, DES is the alter ego for the City. The planning and the action to implement both IPH and DES before June 30, 2012 and even the use of City employees after June 30, 2012 even beyond the expiration of the injunction confirms the alter ego status.

This Arbitrator finds as a fact that the IPH and the DES in labor parlance were alter egos to the City as the alter ego doctrine has been developed both by the Courts, the NLRB and arbitrators, including that the successor employers are bound by collective bargaining obligations. *See, NLRB v. Allcoast Transfer Inc.*, 780 F.2d 576 (6th Cir. 1986). *Also see*, the comments of Arbitrator Wolff in *Clark Food Service, Inc.*, 115 LA 1734 (2001), where he analyzes the NLRB standard as well as the standard of the courts in applying the alter ego doctrine.

However, the circumstances here can also be analyzed from the aspect that the City violated Article 1.A, E and F and Article 19. As this Arbitrator has concluded, the IPH and DES are alter egos of the Departments of Health and Wellness Promotion and Workforce Development. For this reason, this Arbitrator also concludes within the meaning of Article 1.E that the operational function remained unchanged. Therefore, those representation rights shall not be affected. Thus, as Arbitrator Chymy in *County of Santa Clara*, 97 LA 635 (1991), in interpreting similar recognition clauses, found the transfer of bargaining unit work to non-

20

bargaining unit employees violated the recognition clause. Transferring of work formerly performed by AFSCME employees in the Department of Health and Wellness Promotion and Workforce Development to IPH and DES violated the recognition clause.

A third reason why the City violated the 2008-2012 contract is Article 19. As noted, Article 19. B does provide that: "The right to contract or subcontract shall not be used for the purpose or intention of undermining the Union nor to discriminate against any of its members nor shall any seniority employee be laid off ... as a direct and immediate result of work performed by an outside contractor."

This is the intended result of both IPH and DES. Ms. Pash acknowledged that the IPH had employed an employment agency to recruit employees. As of the date of the last arbitration hearing, DES had employed 18 City employees, but DES expected to hire other employees who may not necessarily be City employees which could result in a violation of Article 19. Not to hire laid off City employees from the two Departments – Health and Workforce – would seem to undermine both the employees and the Union when the corporations can be construed as contractors, successors and alter egos.

As already noted, this grievance was filed on May 31, 2012 before the expiration of the 2008-2012 Master Agreement expiring on June 30, 2012. As further noted, there were activities that took place by the City prior to June 30, 2012 in preparation for the transfer of the work of the Department of Public Health and Wellness Promotion and the Department of Workforce Development to IPH and DES.

A dispute "arises under the contract" when material facts and occurrences arose before the expiration of the Collective Bargaining Agreement, even though some facts occur after the

21

expiration. *See, South Central Power Co. v. International Brotherhood of Electrical Workers Local Union 2359*, 186 F3d 733 (6th Cir. 1999), where the court analyzes the Supreme Court's decision on this point in *Nolde Bros. Inc. v. Local No. 358 Bakery and Confectionary Workers Union*, 430 U.S. 243 (1977), and *Litton Financial Printing Division v. NLRB*, 501 U.S. 190 (1991).

The point is that under the expired contract which the Union sought to enforce prior to the expiration of the contract by filing this grievance, because the City had taken steps, in the view of the Union, and which the Arbitrator agrees at least as to two Departments, violates the Union and the employees it represented of accumulated vested rights. The Union had the vested right to represent the employees under Article 1 and Article 42. The employees and the Union had the right not to be undermined pursuant to Article 19.B and the employees had certain rights under Article 19.B. These rights survived the expiration of the contract.

This point is emphasized by the Sixth Circuit as recently as this summer in *United Steel, Paper and Forestry vs. American Standard Corp.*, __ Fed Appx, 2012 WL 2354365, 193 LRRM 2816 (6th Cir. Ky., June 21, 2012), where the contract was terminated on July 1, 2008. The employer had refused to extend the contract beyond that date for a separation pay provision in the contract. The employer closed the plant but refused to pay any of the employees separation pay. The Union grieved. The Employer refused to arbitrate. The Union sought to compel arbitration to court. The Sixth Circuit held that the separation pay accrued and vested under the expired contract, holding that the grievance for lack of separation pay filed after termination of the contract was arbitral. As the Sixth Circuit noted, "We conclude that the separation pay right in the CBA, accrued under the CBA." This ruling came even though the grievance was filed after

22

the contract had expired.

In this case, the grievance was filed before the contract expired. And the City was taking steps to violate the Master Agreement prior to its expiration, even though some of the actions violating the Agreement did not occur until after the contract was expired. For example, some of the layoffs were prevented by virtue of Judge Baxter's injunction until after July 13, 2012. Some layoffs were delayed for practical reasons.

As to the Department of Human Services, nearly all of the grants going to the Department of Human Services that were funding programs as a Community Action Agency have expired or been cut. This started with the weatherization utility assistance program being cut. (Tr. 246) The City has continually indicated, by permitting these grants to expire or the funding to be cut, that it is no longer looking to provide these services. (Tr. 199). The City has proposed a plan to the State that is largely to reimburse already CSBG incurred costs. (Tr 268). The CSBG grant money that is in excess of this reimbursement is provided as a one time exception and only under the express understanding that the City is to self de-designate and no longer to provide these services. The State has simply found it expedient to use the City as an agent to temporarily pass through this last fund to the Salvation Army and Detroit Rescue Mission while the State selects a new grant recipient for the oncoming fiscal year. The City should not be forced to provide services for which is has continually indicated it is trying to get out of the business of providing. As long as this is the last year the city accepts CSBG funds, and the State eventually contracts directly with a new agent for the performance of these tasks there is no violation by the City with regard to scaling back activities of the Department of Human Services.

The point is that both the State of Michigan and the Federal government have selected or

23

are in the process of selecting agencies other than the City of Detroit to furnish the services that

were previously performed by Human Services.  Even Ms. Holland is being transferred to

another City Department because her job is being eliminated due to the actions that were initiated

primarily by the State.  It is a far different situation than the IPH or DES situation and for this

reason the Arbitrator finds no basis for a contract violation as to what occurred in Human

Services.

Having reached this point in the analysis, the Arbitrator turns to the brief filed by the

City's Attorney which this Arbitrator, because of his emphasis, has chosen to quote in its totality

as follows:

### EMPLOYER CITY OF DETROIT'S POST HEARING BRIEF

Now comes, the City of Detroit, by and through its attorney,
Andrew Jarvis, I support of its post hearing brief states the following:

### I.    INTRODUCTION

On March 16, 2011, Public Act 4 of 2011 was enacted by the
legislature.  Section 4a of PA 4 suspended Section 15(1) of PERA for
employers subject to a consent agreement.  On April 4, 2012, the City of
Detroit and the State of Michigan entered into a consent agreement
pursuant to PA 4.

On June 20, 2012, The City of Detroit sent a letter to all Union
President stating: "This letter serves as notification that in accordance
with our collective bargaining agreement, the City hereby provides ten
(10) days written notice of its intent to terminate the collective
bargaining agreement as of July 1, 2012."

On July 18, 2012 the City of Detroit sent a letter to all Union
Officials.  This letter included the City Employment Terms (CET).  The
letter indicated that the language was approved by the Financial
Advisory Board on June 28, 2012 and July 12, 2012, and submitted to
Council for approval.  City Council voted not to approve the CET.  On
July 17, 2012, pursuant to the FSA, the CET was implemented by order
of the Program Management Director effective July 18, 2012.[1]

It is with this background that Judge Baxter order expedited

24

Arbitration in this matter. The Union also filed a companion MERC Unfair Labor Practice Charge C 12 F-123, alleging as alleged in the Civil case which was the catalyst for the grievance that the City breached its duty to bargain in good faith. The Union also alleged that the Successor Language contained in the Master Agreement between the City and the Union somehow survives the execution of the Finical Stability Agreement between the City and the State of Michigan as proscribed under Public Act 4 which in turn eliminated of the Duty to Bargain under MCR 423.215. The Union attempts to advance the argument that MCL 423.211 and MCL 423.210 are in place despite P.A. 4 and the Finical Stability Agreement. This argument was soundly addressed in the *Decision and Recommended Order*[1] in the companion MERC case.

Under PA 4, there was a suspension of the duty to bargain under PERA. That suspension persisted until the board of canvassers certified the repeal provisions and placed the issue of PA 4 repeal on the ballot. The actions complained of in this matter, and the implementation of the CET, occurred at a time that there was no duty to bargain.

Under the Unions theory, anything previously done under P A 4 is void now that PA 4 is suspended. The Union has not presented any legal support for this claim. This Court already ruled in *Robert v. Detroit Board of Education,* Wayne County No. 12-010545 that actions taken while PA 4 was in effect survive and stand)[3]

Furthermore the relief sought by the Union in this matter is for the Arbitrator to Order the Chief Executive of the City of Detroit to take grant monies from the Federal and State government(s) and restart the operations of Departments that the City has decided not to provide. This goes far beyond the s four corners of the Collective Bargaining Agreement and the Arbitrator would become the *de facto* Chief Executive of the City of Detroit.

### CONCLUSION

It is an unfortunate economic fact of life that public employers in the State of Michigan have and will continue to have situations which cost cutting is necessary for continued financial solvency. Personnel costs in the form of wages and benefits are a large component of the overall cost of services including the elimination of services provided by the City of Detroit and its various Departments .

For all of the foregoing reasons, City of Detroit, respectfully requests that the Arbitrator deny the Unions Grievance in *toto*.

---

1 See Exhibit 1

25

[2] See Exhibit 2

[3] Exhibit 3, Transcript from *Robert v. Detroit Board of Education* pp. 39-40.

Exhibit 2 attached to the brief was the decision of Michigan Employment Relations Commission Administrative Law Judge David M. Peltz in *City of Detroit -and- Coalition of the City of Detroit Unions and American Federation of State, County and Municipal Employees, Council 25*, Case No. C12 F-125, Docket No. 12-001181-MERC, dated August 20, 2012. In his opinion, ALJ Peltz found at page 8:

> So these other provisions all derive from, when they make reference to the duty to bargain, they derive from the obligations set forth in Section 15 (1) of the Act, they are 'not the source of that obligation. Based on the statutory language itself, I find that by enacting PA 4 and amending Section 15 of PERA, the Legislature intended to relieve public employers found to be in a state of financial stress or emergency and subject to a consent agreement from the obligation to collectively bargain.

ALJ Peltz recommended to the Michigan Employment Relations Commission that it may issue an order dismissing the unfair labor practice charge filed by the Coalition of Detroit Unions and AFSCME Council 25 against the City of Detroit, charging the City with a failure to bargain in good faith concerning the implementation by the City of new terms and conditions of employment unilaterally on or about July 1, 2012.

The case had been assigned to ALJ Peltz who explained the background of the case when he wrote:

> This case arises from an unfair-labor practice charge filed on July 2, 2012, by the Coalition of Detroit Unions, a group comprised of thirty-three labor organizations representing employees of the City of Detroit, and by the American Federation of State, County and Municipal Employees (AFSCME), Council 25. The charge alleges that the City violated PERA when, on or about July 1, 2012, it unilaterally implemented new terms and conditions of employment for City employees, and by refusing to provide information to the Unions concerning those changes. Respondent contends that its actions were

26

authorized by Section 14a(I0), MCL 141.1514a(I) of the Local
Government & School District Fiscal Accountability Act, Public Act 4
of 2011, and by a recent amendment to Section 15 of PERA.[1]

[1] This matter was previously consolidated with Case No. C12 D-065; Docket
No. 12-000577, in which the same Unions assert that the City violated its duty to
bargain in good faith under PERA by failing or refusing to submit tentative
agreements to Respondent's City Council for ratification. Additional
proceedings are still pending in that matter.

Judge Peltz went on to explain the circumstances upon which the parties asked him to

rule at page 2:

> On August 8, 2012, the State Board of Canvassers voted to
> certify a referendum for the November ballot which, if passed, would
> repeal PA 4. Pursuant to Const 1963, art 2, Section 9 and MCL
> 168.477(2), the Board's action had the effect of suspending PA 4
> pending the results of the upcoming election. As result of the
> suspension of PA 4, the City acknowledges that Section 15(1) of PERA
> once again applies and that Respondent has a duty to negotiate in good
> faith with the Unions over terms and conditions of employment for
> members of Charging Parties' bargaining units. Nevertheless, both
> parties indicated that they wished to proceed with oral argument in this
> matter in order to clarify whether the City acted lawfully in
> implementing new terms and conditions of employment in July of 2012
> while PA 4 was in effect.

Attached to the City's brief was Exhibit 3, the transcript of the Motion for Injunctive

Relief plus the Ruling thereof in Case No. 12-010545-AW, Wayne County Circuit Court, *Roy*

*Roberts v. Rev. David Murray, et al and Detroit Board of Education.* In that case, the Honorable

John A. Murray, Judge of the Circuit Court, issued injunctive relief in effect upholding the status

quo. In doing so, he in effect echoed the belief that actions taken by Roy Roberts pursuant to

Public Act 4 prior to certification of the ballot initiative as to Public Act 4 by the Board of

Canvassers remained valid for at pages 38-40, in ruling on the point, Judge Murphy stated:

> Plaintiff Roy Roberts asks that we enter a status quo order
> allowing him to exclusively run the Detroit Public Schools
> notwithstanding the upcoming referendum vote on Public Act No.4.

27

Defendants believe that as a result of the upcoming referendum vote on Public Act 4, plaintiff has no basis in the interim to exercise any authority over the Detroit Public Schools.

Further, Public Act 4 repealed Public Act 72 and plaintiff cannot exercise authority under this former law.

This court disagrees with defendant's position on this latter point and finds that the actions of the plaintiff up to August 8, 2012 shall have — I will restate that.

The actions up to August 8, 2012 shall be maintained as part of a status quo order.

Article 2 Section 9 of our Michigan Constitution provides no law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election.

August 8, 2012, I believe, is the date the State Board of Canvassers certified the referendum.

My interpretation of this constitutional provision is consistent with MCL 168.477(2). It reads in part:

" ... A law that is the subject of the referendum continues to be effective until the referendum is properly invoked which occurs when the Board of State Canvassers makes its official declaration of the sufficiency of the referendum petitions ... "

Any further action taken by the plaintiff under Public Act 4 after August 8, 2012 would not be effective. He is powerless to act except in those areas we will discuss next. But first let me clarify. The status quo going forward includes actions taken by the plaintiff up through the date the State Board of Canvassers certifies the referendum.

The Rulings by ALJ Peltz and Judge Murphy may represent the external law as it affects the duty to bargain during the time that PA 4 was in effect. However, the reference to the Peltz/Murphy rulings do not resolve the issue before this Arbitrator. It must be emphasized that this Arbitrator has found that the City, before the Master Agreement was terminated, namely, prior to June 30, 2012, and prior to the City's unilaterally imposed City Employment Terms, took

28

specific steps both as to the Departments of Health and Wellness Promotion and Workforce

Development, as explained in this Opinion, to violate provision of the Master Agreement in

effect prior to June 30, 2012 and in particular Articles 1, 19 and 42. And this Arbitrator has been

called upon to interpret the Master Agreement pursuant to Article 8.B.

## The Remedy

Essentially, as to both the Department of Health and Wellness Promotion and IPH and the

Department of Workforce Development and DES, this Arbitrator has found that in each case the

City has violated Article 1 as to representation rights, and Article 19, contracting and

subcontracting for the purposes of undermining the Union and the employees it represented,

resulting in the layoff of seniority employees. Furthermore, by any definition, both IPH and

DES, within the meaning of Article 42, are alter egos of the Health and Wellness Promotion

Department and Department of Workforce Development, respectively, and therefore, successor

employers. To repeat, how can anybody reach any other conclusion when the Chief Health

Officer of the City admits that she is acting in a dual capacity for both the City and the IPH,

along with her Deputy. In the case of DES, the Mayor appointed Workforce Development Board

controlled DES and the former Director of the Department of Workforce Development is now

the CEO, along with her former Deputy, who is Chairman of the Board, who perform the same

functions that they performed for the City.

In formulating a remedy in such situations, arbitrators when finding a violation of a

successor clause or elements of subcontracting have remanded the case back to the parties for a

hearing on damages. *See, e.g., Marley-Wylian Co.*, 88 LA 978 (Jacobowski, 1987); *Boatman*

*Co.*, 91 LA 489 (Har, 1988).

29

Another approach has been taken by arbitrators where the arbitrator has ordered the company to cease and desist from allowing non-bargaining unit personnel from performing work of bargaining unit employees. *See, e.g., Dayton Power and Light Co.*, 111 LA 954 (Modjeska, 1998).

Similar results can be found in the public sector. In *County of Santa Clara*, 97 LA 635 (1991), Arbitrator Chvany, finding that the County violated the recognition, classification and wage provisions of the applicable agreement, ordered the County to cease and desist from transferring work to non-bargaining unit employees.

In *Clark Food Service, Inc.*, 115 LA 1734 (2001), Arbitrator Wolff ordered the successor employer to be bound to follow the contract of the parent employer under the facts of that case.

This Arbitrator has emphasized repeatedly in this Opinion and in this Remedy section that in regard to the IPH and the DES that the relationship between the City and the Department of Health and Wellness Promotion and the Department of Workforce Development and the Board of Workforce Development was virtually indistinguishable, particularly at the leadership level; that in this case that the remedy should be of the type suggested by Arbitrator Wolff in *Clark Food Service, Inc.* because of the obvious violation of the successor clause as well as the Article 19.B contractual work clause and what turned out to be, when one listened to the testimony, a violation of Article 1, Recognition.

And, again, to continue to emphasize the point, this was all planned and began to be executed prior to the June 30, 2012 termination of the July 1, 2008 - June 30, 2012 Master Agreement.

However, for the reasons stated in this Opinion, there is no basis to grant relief as to

30

Human Services and, therefore, as to Human Services, the grievance will be denied.

## A W A R D

1.     The grievance as to the Department of Health and Wellness Promotion is granted

with the following relief:

        A.      The City shall direct that the Institute of Population Health and its

                    President and Chief Executive Officer and Chief Operating Officer, who

                    also serve as the City's Health Officer and Director of the City's

                    Department of Health and Wellness Promotion and Deputy Director of the

                    City's Department of Health and Wellness Promotion to recognize

                    AFSCME Council 25 and its applicable Locals as representative of all

                    employees in any positions of the type that were performed by AFSCME

                    represented employees under the 2008-2012 Master Agreement in the

                    Department of Health and Wellness Promotion that are now employed or

                    will be employed by IPH in the future.

        B.      If IPH has hired or hires any employee who is not a laid off City of Detroit

                    AFSCME represented employee in positions or their equivalent,

                    previously held by AFSCME represented employees under the 2008-2012

                    Master Agreement in the Department of Health and Wellness Promotion

                    to perform duties formerly performed in the Department of Health and

                    Wellness Promotion, then the former AFSCME represented employees

                    who held said positions either in the Department of Health and Wellness

31

Promotion or IPH and had been laid off shall be reinstated in said

positions and be paid back pay and benefits from the time they were laid

off, either by IPH or the City of Detroit's Department of Health and

Wellness Promotion.

C.  The City shall cease and desist transferring any work previously done or

performed by the City of Detroit's Health and Wellness Promotion

Department prior to June 30, 2012 to IPH unless IPH recognizes AFSCME

and its Local(s) and honors this Award in its totality.

D.  The City shall cease and desist from or assisting in the transferring of any

grants to IPH unless IPH honors this Award in its totality in recognition

that it is the alter ego of the City of Detroit and successor as discussed in

the Opinion.

E.  It is the intent of this Award, as permitted by law, that IPH be obligated to

bargain with AFSCME Council 25 as to wages, hours and other conditions

of employment for the employees referred to in Paragraph 1.A above in

recognition that it is the alter ego of the City of Detroit and successor as

discussed in the Opinion.

F.  As to the planned layoffs testified to by Ms. Pash to take effect on

September 28, 2012 (see Transcript 356), the City and IPH are bound to

comply with Paragraph 1.B of this Award and not hire replacements in

positions or their equivalent previously held by AFSCME members under

the 2008-2012 Master Agreement in the Department of Health and

Wellness Promotion to perform duties formerly performed in the Department of Health and Wellness Promotion while there are former AFSCME members who performed those duties under the 2008-2012 Master Agreement who are on layoff or will be laid off.

2.   The grievance as to the Workforce Development Department is hereby granted and the remedy shall be as follows:

A.   The City shall direct the Detroit Employment Solutions and Workforce Development Board to recognize AFSCME Council 25 and its applicable Locals as representative of all employees in any positions of the type that were performed by AFSCME represented employees under the 2008-2012 Master Agreement in the Department of Workforce Development that are now employed or will be employed by DES in the future.

B.   If DES has hired or hires any employee who is not a laid off City of Detroit AFSCME represented employee in positions or their equivalent, previously held by AFSCME represented employees under the 2008-2012 Master Agreement in the Department of Workforce Development to perform duties formerly performed in the Department of Workforce Development, then the former AFSCME represented employees who held said positions either in DES or the Department of Workforce Development and had been laid off shall be reinstated in said positions and be paid back pay from the time they were laid off, either by DES or the City of Detroit's Department of Workforce Development.

33

C.     The City shall cease and desist transferring any work previously done or performed by the City of Detroit Workforce Development Department prior to June 30, 2012 to DES unless DES recognizes AFSCME and its Locals and honors this Award in its totality.

D.     The City shall cease and desist from or assisting in the transferring of any grants to DES unless DES honors this Award in its totality in recognition that it is the alter ego of the City of Detroit and successor as discussed in the Opinion.

E.     It is the intent of this Award, as permitted by law, that DES be obligated to bargain with AFSCME Council 25 as to wages, hours and other conditions of employment for the employees referred to in Paragraph 2.A above in recognition that it is the alter ego of the City of Detroit and successor as discussed in the Opinion.

3.     The grievance as to Human Services is denied.

4.     The Arbitrator reserves jurisdiction, at the request of either party within six (6) months of this Award, to address disputes concerning the relief provided in this Award.

_____

GEORGE T. ROUMELL, JR.
Arbitrator

September 26, 2012

34