UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) ) | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) ) ) | Case No. 13-53846 |
|  | ) ) | Hon. Steven W. Rhodes |
| _____ | ) ) |  |

**CREDITOR COALITION OF DETROIT UNIONS
RESPONSE TO DEBTOR OBJECTION TO ITS PROOF OF CLAIM**

Now comes Coalition of Detroit Unions (Coalition or Claimant) in their response to the Objection of the City of Detroit (Docket No. 4874), filed pursuant to Sections 105 and 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), and the Federal Rules of Bankruptcy Procedure Local Rules of the Bankruptcy Court of the Eastern District of Michigan (the "Local Rules"), concerning proof of claim number 2958 ("Claim") filed by said Coalition, and states as follows:

**I. INTRODUCTION**

On February 21, 2014, Claimant, Coalition of Union, representing nearly thirty Detroit unions, filed Proof of Claim Number 2851.

Claim number 2851 alleges that Debtor City of Detroit bargained in bad faith by refusing to execute a union contract that had been tentatively agreed to

1

between the City and Union negotiators, and subsequently ratified by the Coalition unions. Not only did the City refuse to execute the ratified Coalition contract, but the City top officials who bargained the contract – the deputy mayor and chief operating officer – later encouraged the City Council not to ratify the Coalition contract, and even refused to present the contract to the City Council for them to ratify. Finally, the City executed a "consent agreement" with the state of Michigan which undermined and repudiated portions of the Coalition contract. The Coalition argues that the City's actions were in violation of the Public Employment Relations Act (PERA), MCL§§ 423.209, 423.210, & 423.215.

On May 15, 2014, Debtor filed objections to Claim Number 2851 arguing that the duty to bargain in good faith under PERA was suspended after the City entered into the consent agreement (aka the Financial Stability Agreement (FSA)). This argument is meritless because, as the City admits, the duty to bargain was not "suspended" until, at the earliest, one month after the consent agreement was executed. Thus, at the time the City bargained in bad faith and undermined the Coalition contract – March and April 2012 – the City unquestionably had a statutory duty to bargain with the Unions.

With its Objections, the City has provided notice of hearing for this matter (Docket No. 4874), and the hearing date was subsequently set for October 1, 2014. (Docket No. 5454). The City's Notice of Hearing designates the hearing as a "pre-

trial conference only" where "neither testimony nor other evidence will be received" and that "a pre-trial scheduling order may be issued as a result of the pre-trial conference." (Docket No. 4874) While the October 1st hearing will not be evidentiary, the Claimant outlines the legal and factual arguments which will be made at the subsequently-scheduled evidentiary hearing.

Even more, Claimant suggests that these matters be placed before a labor arbitrator for his/her assessment of the merit and value of the claims. Given that October 1st is currently designated as a hearing date for the plan confirmation trial, (Docket No. 6699), the hearing date for these objections will likely have to be adjourned. Thus, the parties should seek resolution of these matters while awaiting a rescheduled date.

## II. EVIDENCE TO BE PRESENTED REGARDING THE PROOFS OF CLAIM

In November 2011, the City of Detroit Mayor warned of a pending cash shortage the following year, and asked for help from the City's forty-seven (47) labor unions. Most of these unions were working under (concessionary) bargaining agreements at the time.[1] The Mayor requested the Unions to willingly "open up" their union contracts in order to bargain even further concessions, all

---

[1] The concessions were steep. They required, for instance, employees who made on average just over $30,000 per year to lose 10% of their pay by not working one out of every ten days (furlough day). The average unionized City worker makes just over $31,000 per year.

3

within a matter of a few months.

The unions responded in the affirmative. For the first time in the City's history, a coalition of approximately thirty (30) civilian (non-police or fire) unions formed, in order to permit the City to bargain these concessions all at once – instead of with each individual union, thereby saving the City many months in bargaining time. ("Coalition of Detroit Unions" or "Coalition").

The parties reached a tentative agreement (TA) on February 1, 2012. (City Objection, Docket No. 4874, Exhibit 3) The City encouraged the Coalition to ratify the TA (usually done with a vote of the membership). On February 2, 2012, the city published a press release, celebrating the Coalition TA. (*Exhibit 1*) The press statement mentioned that the Coalition members would "review and ratify" the TA prior to a final agreement being reached. (*Exhibit 1*) Thus, each of the unions in the Coalition conducted a ratification vote all in less than three weeks.

The Coalition indeed announced that the TA had been ratified, at a press conference on March 23, 2012. This ratification press conference was attended by the Deputy Mayor and Chief Operating Officer, the top City officials who had negotiated the Coalition TA. The City also published its own press release, on March 23, 2012, celebrating the Coalition contract and referring to it as "historic". (*Exhibit 2*) The press release referred to the Coalition contract as "ratified agreements," (*Exhibit 2*) suggesting each union in the Coalition no longer had

4

"tentative" agreements after ratification. Detroit's City Council also votes to ratify union contracts, which had yet to be done. Typically, however, City council ratification is a pro forma exercise following union ratification.

The TA was estimated to generate nearly $100 million in annual concessions for the City. The concessions agreed to by the employees included significant increases in health care costs, sizeable reductions in pension benefits, and benefit reductions. Unfortunately, some state officials were unhappy with certain aspects of the Coalition contract. While pleased with the financial concessions, the Unions understand state officials wanted to see certain operational changes which had little, if any, financial consequence for the City. As one example, the state officials opposed a laid off employee's contractual right to remove (or "bump") another employee, of the same job classification but lower seniority, in a different department (referred to as "city-wide bumping").

Opposition of state officials caused the City leadership to reverse course. Thus, the same high-level city officials who negotiated the Coalition contract and attended the press conference celebrating ratification, began telling City Council not to ratify the deal. The City officials even refused to submit the Coalition contract to the City Council, for its vote of ratification. Indeed, when members of the City Council sought to act on the TA, the Mayor discouraged it.

Instead, on April 10, 2012, the City entered into a "Consent Agreement"

with the state of Michigan, under the emergency manager law. (City Objection, Exhibit 4)  Importantly, at the time the City executed the Consent Agreement with the State, it was under obligation within state law, PERA, to collectively bargain with its unions.  The City asserts that its duty to bargain with the City unions, due to the emergency manager law (Public Act 4) terminated at the earliest on May 10, 2014. (City Objection, ¶ 9).  Thus, as of April 10, 2012, it was subject to PERA as it executed the consent agreement.

Despite its obligation to bargain, the City negotiated a consent agreement which expressly repudiated a number of provisions in the Coalition contract.  For instance, page 32 of the Consent Agreement – referred to as the Financial Stability Agreement – prohibited the City from entering into any union contract unless it "satisfies the requirements of Annex D as determined by the Financial Advisory Board".[2]  One requirement of "Annex D" is that the City would not agree to any "snap-back" provisions during or at the end of the Coalition contract. (City Objection, Exhibit 4, pg 32-33) The Coalition contract contained such a "snap back" provision, which required that non-Coalition employees be subject to the same concessions as being faced by the Coalition.  If they were not, the Coalition unions' economic package would "snap back" to pre-concession levels.  This gave the Coalition assurance that its member-unions were not alone in facing

---

[2] The Financial Advisory Board is an entity appointed by the Governor to oversee the City's finances in mid-2012.

6

concessions, and helped draw other unions into the Coalition to avoid worse treatment.

Importantly, in the Consent Agreement, Annex D also stated that:

On or before July 16, 2012, the City shall have either negotiated or imposed new labor agreements with those Unions whose contracts have expired or will expire on or about June 30, 2012.

Thus, the City could choose to bargain with its unions, or unilateral imposition of contract terms as of July 16, 2012. This removed any incentive to bargain.

Indeed, on June 21, 2012, the City warned its unions that it had no intention of bargaining a new union contract. (*Exhibit 3*) Later, on July 18, 2012, the City imposed unilateral employment terms on Coalition unions, without negotiation. These were referred to as City Employment Terms (CET). (City Objection, Exhibit 5) The CET consisted of steep concessions in wages, healthcare, retirement and other benefits. While City Council rejected imposition of the CET, the City imposed regardless. (*Exhibit 4*)

The Coalition of Detroit Unions filed "unfair labor practice charges" against the City of Detroit for bad faith bargaining, before the Michigan Employment Relations Commission, on April 3rd and July 2, 2012. (*Exhibit 5*) As described below, under state labor laws, an employer which negotiates a tentative agreement is obligated to support the tentative agreement before the legislative body which votes on its ratification. Here, before the May 10, 2012 "suspension" of the City's

duty to bargain under PERA, the City violated labor law by refusing to permit ratification of the Coalition contract, discouraging such before the City Council, and even undermining the contract that it had just negotiated.

Had the Coalition contract been executed, then the City would have been unable to impose the CET terms on the Coalition unions' membership. So the City refusal to implement the Coalition contract, so that the CET terms could be imposed, violated State labor law.

The Coalition has estimated the value of the changes brought about by the City's refusal to execute the Coalition contract and, implementation of the Consent Agreement.

### III.  ARGUMENT

A.  **Legal Standards for Objections**

The Bankruptcy Code broadly defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). Claims also include "a cause of action or right to payment that has not yet accrued or become cognizable." 2 COLLIER ON BANKRUPTCY ¶ 101.05 at 101-38 (2011).

"Tort claims constitute claims, and thus are payable out of the estate...." Id. ¶ 101.05[6] at 101-49; *see also In re Edge*, 60 B.R. 690, 694 (Bankr. M.D. Tenn.

*1986)*. Claims also include adversarial administrative proceedings. *See e.g., In re Halo Wireless, Inc.*, Nos. 11–42464–btr–11, 3: 11–cv–0058–DCR, 3: 11–cv–0059–DCR; 2012 WL 1190722, at *2-3 (E.D. Kent. April 9, 2012) Courts give the term "claim" the "broadest possible definition. *In re Lipa*, 433 B.R. 668, 669 (Bankr. E.D. Mich. 2010).

A properly filed proof of claim is prima facie evidence of the validity and amount of the claim. Fed.R.Bankr.P. 3001(f). A claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). Chapter 9 bankruptcies follow § 502 of the bankruptcy code. Objections may be based upon one of the specific, statutory grounds:

> Except as provided in subsection (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that –
>
> (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;
> (2) such claim is for unmatured interest;
> (3) if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property;
> (4) if such claim is for service of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services;
> (5) such claim is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under section 523(a)(5) of this title;
> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property...;

9

(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract...;
(8) such claim results from a reduction, due to late payment, in the amount of an otherwise applicable credit available to the debtor in connection with an employment tax on wages, salaries, or commissions earned from the debtor; or
(9) proof of such claim is not timely filed....

11 U.S.C. § 502(b).

The party objecting to a proof of claim bears the burden of proof to overcome the prima facie validity of the claim. 4 COLLIER ON BANKRUPTCY ¶ 502.02[3][f] at 502-17. "To defeat the claim, the objector must come forward with sufficient evidence and 'show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves.'" *In re McLaughlin*, 320 B.R. 661, 665 (Bankr. N.D. Ohio 2005)(quoting *Wright v Holm (In re Holm),* 931 F.2d 620, 623 (9th Cir.1991)).

**B.     The Objection Should Be Rejected As Meritless**

Debtor argues that the Coalition has no right to payment and that its claim is unenforceable against the Debtor and property of the Debtor, under any agreement or applicable law. This is untrue. Under PERA, it is an unfair labor practice for the Employer to refuse to bargain collectively with a union. MCL § 423.210(1)(e). The duty to bargain is further described in MCL § 423.215(1). The parties are required to bargain in good faith.

In public employment, collective bargaining agreements will typically

require ratification by the legislative branch of the public employer. *City of Pontiac*, 19 MPER 51 (2006) One of the requirements of good-faith collective bargaining under the Act is the expeditious and decisive acceptance or rejection of a tentative agreement. *City of Pontiac*, supra. In *City of Portage*, 11 MPER ¶ 29034 (1998), the union was found to be in violation of good faith bargaining when it waited more than six weeks to schedule a ratification vote of a tentative agreement. Here, the City refused to schedule a ratification vote on the TA. Even though negotiators reach agreement at the bargaining table, the public body must have the opportunity to independently consider the tentative agreement. That opportunity was never provided to the City Council.

Additionally, a party to a tentative agreement cannot simply withdraw from the agreement. The NLRB has held that an employer's withdrawal of a proposal, which has been tentatively agreed upon during collective bargaining, without good cause, is evidence of a lack of good faith. *Driftwood Convalescent Hospital*, 312 NLRB 247, 252 (1993); *Arrow Smith & Door Co*, 281 NLRB 1108, fn 2 (1980). Here, the City did not communicate its rejection of the Coalition contract to the Unions, but to the City Council instead.

Furthermore, the duty to bargain in good faith actually imposes the further obligation to affirmatively support the tentative agreement. For example, in *Brighton Area Schools*, 22 MPER ¶ 88 (2009), an official for the employer

negotiated a tentative agreement. Later, that official made statements in the media suggesting the employer could not afford the agreement reached. The MERC considered whether such statements were a violation of the employer's duty to bargain. The Commission first acknowledged "[t]he bargaining obligation includes the duty to approach the entire process with "an open mind and a sincere desire to reach an agreement." It further noted that "the bargaining obligation includes a duty on the part of the negotiators for each party to affirmatively support a tentative agreement when it is brought for ratification and the failure to do so may, in and of itself, constitute an unfair labor practice." *Id*. In that case, the employer's negotiator never called upon the legislative body to reject the tentative agreement. Yet the MERC still found that the employer was violating its duty to bargain in good faith, due to these statements. *Id*.

Here, after negotiating the Coalition contract and putting out a press release heralding it, the City's appointees campaigned against Coalition contract to City Council. Consequently, the City committed an unfair labor practice entitling the Coalition to relief under PERA.

The City's actions also constituted "regressive bargaining", in that it withdrew the offer in bargaining that had been accepted by both parties. See *Waldron Area Schools*, 10 MPER ¶ 28037 (1997) (finding no "regressive bargaining" without evidence on the record to "demonstrate that … the parties had

tentatively agreed to anything …") In *City of Springfield*, 31 MPER 31002 (1999), the employer negotiated a tentative agreement, which was rejected by the city council. Later, the employer made a proposal which "virtually ignored" the bargaining that had taken place earlier. The Commission noted that while the negotiators need not be clothed with the full ability to execute a final agreement, the employer must "treat the negotiation sessions as something more than an exchange of ideas." (citation omitted) It further noted that:

> "An employer may not sit idly by while its representatives negotiate with the union for an extended period of time and then, under the guise of exercising a reserved right of approval, reject, in large part, the results of those negotiations."

*Id*.

The City of Detroit, here, regressively bargained by repudiating its tentative agreement. It then imposed new terms and conditions, with terms at odds with the previously-bargained Tentative Agreement. In doing so, the City acted in bad faith.

The Coalition is justified in asking for a financial remedy for the City's violation of its duty to bargain. If one party violates its duty to bargain and imposes a contract, that party should not reap the benefit from its illegal conduct. In *Royal Oak Township*, 14 MPER 32041(2001) MERC found that the township committed an unfair labor practice in unilaterally changing employees' hours of work, wages and benefits without bargaining. Under these circumstances, "an appropriate

13

13-53846-tjt    Doc 7240    Filed 09/03/14    Entered 09/03/14 10:37:21    Page 13 of 16

remedial order that would effectuate the purposes of PERA requires that [the township] cease changing employees' hours, pay, and benefits; restore the status quo ante; reimburse employees who suffered monetary losses because of [the township's] unilateral action; and post a notice." Accordingly, MERC ordered that that the township "restore to the fire fighters the terms and conditions of employment that were applicable prior to [the unilateral changes]" and "make the fire fighters whole for any losses they may have suffered because of the unlawful imposition of and changes in terms and conditions . . . including interest at the statutory rate."

Thus, the Coalition's financial claim in its proof of claim seeks restoring the status quo ante, prior to the City's imposition of the CET.

Debtor also argues that it was not subject to the duty to bargain in good faith at the time it made the decision to ignore the Coalition contract. This argument runs counter to the language in Public Act 4. Specifically, PA 4 only suspended the applicability of section 215(1) of PERA thirty days after the City entered into the consent agreement:

> (10) Unless the state treasurer determines otherwise, beginning 30 days **after the date a local government enters into a consent agreement under this act**, that local government **is not subject to** section 15(1) of 1947 PA 336, MCL 423.215, for the remaining term of the consent agreement.

MCL § 141.1514a(10) (emphasis added).

Yet, City acknowledges in paragraphs 6 and 8 of its Objections that the TA was entered into on February 1, 2012—over two months before the Debtor entered into the consent agreement.  The duty to bargain was not suspended until May 10, 2012 at the earliest. Therefore, the City's sole defense and rationale for objecting to the Coalition's Proof of Claim is without merit as the duty to bargain in good faith was unquestionably in effect at the time.

## CONCLUSION

WHEREFORE, the Coalition of Detroit Unions respectfully requests that this Honorable Court overrule the City of Detroit's Objections.

Dated: September 2, 2014     /s/ Richard G. Mack, Jr.
Richard G. Mack, Jr., Esq.
Jack W. Schulz, Esq.
MILLER COHEN PLC
600 West Lafayette Blvd., 4th Floor
Detroit, MI 48226-3191
Telephone: (313) 964-4454
Facsimile: (313) 964-4490
richardmack@millercohen.com
jschulz@millercohen.com

*Counsel to Coalition of Detroit Unions*

|   |   |   |
|---|---|---|
| In re | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
|  | ) | Hon. Steven W. Rhodes |
|  | ) |  |

## PROOF OF SERVICE

The undersigned certifies that on September 2, 2014, the *Creditor Coalition of Detroit Unions Response to Debtor Objection to its Proof of Claim* were electronically with the Clerk of the Court for the United States Bankruptcy Court, Eastern District of Michigan, Southern Division using the CM/ECF System, which will send notification of such filing to all attorneys and parties of record registered electronically.

/s/ Richard G. Mack, Jr.
Richard G. Mack, Jr., Esq.
MILLER COHEN PLC
600 West Lafayette Blvd., 4th Floor
Detroit, MI 48226-3191
Telephone: (313) 566-4787
Facsimile: (313) 964-4490
richardmack@millercohen.com