**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

------------------------------------------------------x
                      :

In re                     :         Chapter 9
                      :

CITY OF DETROIT, MICHIGAN,    :         Case No. 13-53846
                      :

           Debtor.      :         Hon. Steven W. Rhodes
                      :
                      :

------------------------------------------------------x

**CONSOLIDATED RESPONSE TO CERTAIN *PRO SE* OBJECTIONS
TO CONFIRMATION OF THE SIXTH AMENDED PLAN
FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................1

ARGUMENT ....................................................................2

I.    ASF RECOUPMENT ..................................................2

    A.    Background Regarding the Annuity Savings Fund..........................2

    B.    Development of the ASF Recoupment Program...............................6

    C.    ASF Recoupment Does Not Violate Any Statute of Limitations (Issue 1(a)(i)) ................................................10

    D.    ASF Recoupment Does Not Violate Any Provision of the Detroit Municipal Code (Issue 1(a)(ii)) ...........................13

    E.    ASF Recoupment Is Constitutional (Issue 1(a)(iii)) .........................14

    F.    ASF Recoupment Is Not Effectuated Pursuant to Sections 547 or 548 of the Bankruptcy Code or Other Applicable Fraudulent Transfer Law (Issues 1(a)(iv), (v)) ......................................17

    G.    ASF Recoupment Does Not Implicate the Doctrine of *In Pari Delicto* (Issue 1(a)(vi)) .......................................18

    H.    The 6.75% Interest Rate Used in Annuitizing ASF Recoupment Payments for ASF Distribution Recipients Who Do Not Elect the Lump-Sum Payment Option Is Not Usurious (Issue 1(a)(vii)) ...........................................20

    I.    The City Did Not Conceal the Interest Rate Applicable to Annuitized ASF Recoupment Payments (Issue 1(a)(viii)) ................20

        1.    The 6.75% Interest Rate Does Not Cause Annuity Savings Fund Excess Amounts to Breach the ASF Caps ........24

II.    THE PLAN IS IN THE BEST INTERESTS OF CREDITORS .................25

    A.    The City Is Not Required to Liquidate Its Assets to Maximize Creditor Recoveries (Issue 2(a)) .......................................25

    B.    The Professional Fees Incurred By the City in Connection With Its Restructuring Are Necessary and Reasonable (Issue 2(b))..........26

III.    THE PLAN DOES NOT DISCRIMINATE UNFAIRLY ...........................28

    A.    Classes That Have Accepted the Plan May Not Argue that the Plan Discriminates Unfairly Against Them (Issues 3(a), 3(c-f)) .......28

B. The Plan Does Not Discriminate Unfairly Against Tort Claimants (Issue 3(d)) ..........................................................29

IV. THE PLAN PROVIDES SUBSTANTIALLY SIMILAR TREATMENT TO ALL CLASS 11 CLAIMS ...........................................31

A. The Plan Provides Substantially Similar Treatment to All Class 11 Claims (Issue 4)..............................................................31

V. THE PLAN IS FEASIBLE...........................................................34

A. Appropriate Controls Will Ensure the City's Compliance with the Plan, and Retirees Will Be Adequately Represented Post-Confirmation (Issue 5(a)).........................................34

1. The Plan is the Result of Extensive Negotiation with Retiree Representatives, and Retirees Will Have Substantial Representation with Respect to the Implementation of the Plan......................................38

B. The Reinvestment Initiatives Were Developed After Consideration of Numerous Factors and Contain Appropriate Mechanisms to Monitor the City's Performance (Issue 5(b)) ............40

C. Historic Property Tax Collection Issues Do Not Render the Plan Infeasible (Issue 5(c)).............................................42

VI. THE FUNDING CLAUSE...........................................................44

A. The Plan Does Not Violate the Funding Clause of the Michigan Constitution (Issue 6) ..........................................44

VII. NOTICE..................................................................................47

A. The City Has Provided Adequate Notice to All Known Parties in Interest Throughout the Plan Confirmation Process (Issue 7).......47

VIII. DUE PROCESS........................................................................53

A. Creditors' Due Process Rights Have Not Been Violated (Issue 8) .................................................................53

IX. THE IMPAIRMENT OF PENSION CLAIMS...........................................57

A. The Plan Does Not Improperly Impair the Claims of Individual Creditors Against Third Parties (Issue 9)...........................57

X.   GRS PENSION CLAIMS OF DWSD, LIBRARY AND
     GRANT-FUNDED EMPLOYEES ............................................................60

     A.   The GRS Pension Claims Held by Employees and Retirees of
          DWSD and the Detroit Public Library As Well As
          Grant-Funded Employees Are Similar in Legal Nature and
          Character to Other GRS Pension Claims and Are Properly
          Impaired Under the Plan (Issue 10) ....................................................60

XI.  SOLICITATION AND BALLOTING PROCEDURES.............................62

     A.   The Solicitation of Votes on the Plan, and the Balloting
          Process, Complied with the Bankruptcy Code (Issue 11).................62

XII. THE NON-CONSENSUAL RELEASE ......................................................63

     A.   The Plan's Non-Consensual Release Provisions Are Lawful and
          Appropriate (Issue 12)........................................................................63

XIII. THE CLASS 10 AND 11 VOTING INCENTIVE ......................................64

     A.   The Voting Incentive Provided Jointly to Classes 10 and 11
          Was Lawful and Appropriate (Issue 13) ............................................64

XIV. THE PLAN COMPLIES WITH APPLICABLE LAW ..............................67

     A.   The Treatment of Unlimited Tax General Obligation Bond
          Claims Does Not Violate Michigan Law (Issue 14(a)).....................67

     B.   The Plan Does Not Violate Michigan Public Act 344 of 1945
          (Issue 14(b)) .......................................................................................71

     C.   The Grand Bargain Does Not Constitute an Improper Use of
          Tobacco Settlement Funds (Issue 14(c))............................................72

     D.   The Plan Does Not Violate 49 U.S.C. § 5333(b)(2)(A)
          (Issue 14(d)) .......................................................................................73

XV.  PENSION FUNDING LEVELS .................................................................77

     A.   The Plan Does Not Overstate Pension Underfunding Levels
          (Issue 15) .............................................................................................77

XVI. ASSUMED INVESTMENT RATE OF RETURN FOR PENSIONS.........78

     A.   The Use of an Assumed Investment Rate of Return of 6.75% Is
          Appropriate (Issue 16).........................................................................78

CONCLUSION ...................................................................................................79

## <u>TABLE OF EXHIBITS</u>

Exhibit A:    Objection Response Summary

Exhibit B:    June 5, 2014 GRS Presentation

Exhibit C:    April 22, 2014 MERC Fact-Finder's Decision

Exhibit D:    E-mails Accepting April 22, 2014 MERC Fact-Finder's Decision

# TABLE OF AUTHORITIES

CASES

Amos v. PPG Indus., Inc., 699 F.3d 448 (6th Cir. 2012) ................................. 76-77

Bd. of Trs. v. City of Detroit, No. 259592, 2006 WL 2061403
    (Mich. Ct. App. July 25, 2006) ............................................................5

Bosiger v. US Airways, Inc., 510 F.3d 442 (4th Cir. 2007) ............................15, 54

Capital One Auto Fin. Inc. v. Bolden (In re Bolden), No. 12-14979,
    2013 WL 3897048 (E.D. Mich. July 29, 2013) ..................................... 14-15, 54

Carpenter v. Mumby, 273 N.W.2d 605 (Mich. Ct. App. 1978) .............................11

Claire-Ann Co. v. Christenson & Christenson, Inc., 566 N.W.2d 4
    (Mich. Ct. App. 1997) ..........................................................................69

Cleveland Elec. Illuminating Co. v. Util. Workers Union of Am.,
    440 F.3d 809 (6th Cir. 2006) ...............................................................76

GAC Enters., Inc. v. Medaglia (In re Medaglia), 52 F.3d 451
    (2d Cir. 1995) .................................................................................. 15-16

Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.,
    530 U.S. 238 (2000) .......................................................................... 5-6

Hashem v. Les Stanford Oldsmobile, Inc., 697 N.W.2d 558
    (Mich. Ct. App. 2005) ..........................................................................19

In re City of Detroit, 504 B.R. 97 (Bankr. E.D. Mich. 2013)..................... 54-55, 60

In re Drexel Burnham Lambert Grp., Inc., 138 B.R. 714
    (Bankr. S.D.N.Y. 1992) ..................................................................... 65-66

In re Gulf States Long Term Acute Care of Covington, LLC, 487 B.R. 713
    (Bankr. E.D. La. 2013) ........................................................................68

In re MCorp Fin., Inc., 137 B.R. 219 (Bankr. S.D. Tex. 1992)........................ 65-66

In re UNR Indus., Inc., 143 B.R. 506 (Bankr. N.D. Ill. 1992) ...............................32

In re Zenith Elecs. Corp., 241 B.R. 92 (Bankr. D. Del. 1999) ...............................65

13-53846-tjt   Doc 7303   Filed 09/05/14   Entered 09/05/14 17:55:19   Page 6 of 193

Jackson v. Estate of Green, 771 N.W.2d 675 (Mich. 2009) ....................................11

Kohut v. Metzler Locricchio Serra & Co. (In re MuniVest Servs., LLC),
    500 B.R. 487 (Bankr. E.D. Mich. 2013) .....................................................18

Lash v. City of Traverse City, 735 N.W.2d 628 (Mich. 2007) ...............................69

Local Div. 732, Amalgamated Transit Union v. Metro. Atlanta Rapid Transit
    Auth., 667 F.2d 1327 (11th Cir. 1982) ................................................76

Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306 (1950) .......... 14-15, 54

Musselman v. Governor, 533 N.W.2d 237 (Mich. 1995) ......................................44

Orzel ex rel. Orzel v. Scott Drug Co., 537 N.W.2d 208 (Mich. 1995).............. 18-19

Protective Comm. for Independent Stockholders of TMT Trailer
    Ferry, Inc. v. Anderson, 390 U.S. 414 (1968) ...................................12

Romeos v. Salvation Army, No. 312713, 2014 WL 265530
    (Mich. Ct. App. Jan. 23, 2014) ................................................... 18-19

Thickstun Bros. Equip. Co. v. Encompass Servs. Corp.
    (In re Thickstun Bros. Equip. Co.), 344 B.R. 515
    (B.A.P. 6th Cir. 2006) ......................................................................36

United Student Aid Funds, Inc. v. Espinoza, 559 U.S. 260 (2010) ........................14

Wayne Cnty. Emps. Ret. Sys. v. Wayne Cnty., 836 N.W.2d 279
    (Mich. Ct. App. 2013) ...........................................................................5

White v. JPMorgan Chase Bank, NA, 521 F. App'x 425 (6th Cir. 2013) ...............68

**FEDERAL STATUTES, REGULATIONS, RULES & LEGISLATIVE HISTORY**

11 U.S.C. § 547 ............................................................................ 17-18

11 U.S.C. § 923 ...............................................................................49

11 U.S.C. § 941 ...............................................................................50

11 U.S.C. § 942 ........................................................................... 50-51

11 U.S.C. § 943 ........................................................................... 27-28

11 U.S.C. § 945 ...................................................................... 36-37

11 U.S.C. § 1123 ..................................................................... 31-34

11 U.S.C. § 1127 ..................................................................... 50-51

11 U.S.C. § 1129 .........................................................................29

49 U.S.C. §§ 5301, <u>et</u> <u>seq.</u> ............................................... 73-77

49 U.S.C. § 5333 ..................................................................... 73-77

Fed. R. Bankr. P. 2002 ............................................................48, 52

Fed. R. Bankr. P. 3017 ........................................................... 47-49

Fed. R. Bankr. P. 3019 ........................................................... 50-51

H.R. Rep. No. 95-595 (1977), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963 ....................32

## STATE CONSTITUTION & STATUTES

Mich. Const. art. IX, § 24 ..................................................... 44-46, 58

Mich. Public Act 34 of 2001, M.C.L. §§ 141.2101, <u>et</u> <u>seq.</u> ............... 69-70

Mich. Public Act 181 of 2014, M.C.L. §§ 141.1631, <u>et</u> <u>seq.</u> ...................35

Mich. Public Act 182 of 2014, M.C.L. §§ 117.4s, <u>et</u> <u>seq.</u> .....................36

Mich. Public Act 189 of 1979, M.C.L. §§ 141.161, <u>et</u> <u>seq.</u> ............... 68-70

Mich. Public Act 314 of 1965, M.C.L. §§ 38.1132, <u>et</u> <u>seq.</u> ............. 4-5, 13

Mich. Public Act 344 of 1945, M.C.L. §§ 125.71, <u>et</u> <u>seq.</u> ............... 71-72

M.C.L. § 38.1133 .......................................................................5, 13

M.C.L. § 117.4 ..............................................................................36

M.C.L. § 141.1549 ........................................................................27

M.C.L. § 141.1636 ........................................................................35

M.C.L. § 141.1637 ........................................................................35

M.C.L. § 141.2201 ......................................................................69

M.C.L. § 600.5807 ......................................................................12

M.C.L. § 600.5827 ......................................................................11

LOCAL LAWS

Detroit Home Rule Charter § 11-101 ....................................................58

Detroit Home Rule Charter § 11-102 ....................................................59

Detroit Home Rule Charter § 11-103 ....................................................39

1964 Detroit City Code § 54-2-1 (Ord. No. 77-H) ....................................59

1964 Detroit City Code § 54-2-3 (Ord. No. 77-H) ....................................59

1964 Detroit City Code § 54-2-4 (Ord. No. 77-H) ....................................59

1964 Detroit City Code § 54-2-6 (Ord. No. 77-H) ....................................59

1964 Detroit City Code § 54-2-7 (Ord. No. 77-H) ....................................59

1964 Detroit City Code § 54-43-3 (Ord. No. 39-05) ..................................59

1964 Detroit City Code § 54-43-4 (Ord. No. 76-H) ..................................59

1964 Detroit City Code § 54-43-5 (Ord. No. 04-05) ..................................59

Detroit City Code § 47-1-2 .......................................................... 60-61

Detroit City Code § 47-1-18 ...................................................... 16-17, 19

Detroit City Code § 47-2-17 ........................................................ 13-14

Detroit City Code § 47-2-18 ........................................................ 13-14

OTHER AUTHORITIES

7 Collier on Bankruptcy ¶ 1123.01[4][b] (16th ed. rev. 2014)................................32

Ascher, Mark L. et al., Scott and Ascher on Trusts § 29.1.6 (5th ed. 2008) .............6

Bogert, George Gleason et al., The Law of Trusts and Trustees
§ 866 (2014)..........................................................................................6

Restatement (Third) of Restitution and Unjust Enrichment § 70 (2011) ...............11

Restatement (Third) of Trusts § 78(1) (2007) ..........................................................5

Restatement (Third) of Trusts § 104 (2012) .............................................................6

The Wall Street Journal, Market Data Center, Guaranteed Investment
Contracts as of Dec. 30, 2011,
http://online.wsj.com/mdc/public/page/2_3024-gic.html....................................4

## INTRODUCTION

The City of Detroit ("Detroit" or the "City") hereby submits this consolidated response (this "Response") to certain objections filed by creditors that are not represented by counsel (collectively, the "Objections") to confirmation of the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6908) (the "Sixth Amended Plan" or, as it may be further supplemented, modified or amended, the "Plan"), in accordance with the Order Requiring City to Respond to Certain *Pro Se* Objections to Confirmation (Docket No. 6640) (the "*Pro Se* Briefing Order").

In this Response, the City addresses each of the issues identified by the Court in the *Pro Se* Briefing Order in the order set forth therein.  The City incorporates by reference into this Response all previously filed briefs and other papers in support of confirmation of the Plan (the "Prior Briefing"), including, without limitation:  (i) the Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5034) (the "Consolidated Reply"); (ii) the Debtor's Supplemental Brief on Legal Issues Relating to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5707) (the "Legal Issues Brief"); (iii) the City's Supplemental Brief Regarding Standing of Syncora to Raise Certain Objections to Confirmation (Docket No. 6010)

(the "Standing Brief"); and (iv) the Consolidated (A) Pretrial Brief in Support of

Confirmation of Sixth Amended Plan for the Adjustment of Debts of the City of

Detroit and (B) Response to (I) Certain Objections Filed by Individual

Bondholders and Individual Retirees and (II) Supplemental Objections (Docket

No. 7143) (the "Pretrial Brief").[1]  In support of this Response, the City respectfully

represents as follows:

## ARGUMENT

I. **ASF RECOUPMENT**

    A.    **Background Regarding the Annuity Savings Fund**

        1.    The City previously described the operation of the Annuity

Savings Fund ("ASF") in the Prior Briefing and, in particular, the crediting to ASF

---

[1]    The City's responses to (a) the Objections addressed herein and (b) all other
timely *pro se* Objections that were filed on or after May 26, 2014 and that
otherwise were in compliance with the relevant requirements set forth in the
Court's scheduling orders are summarized in the table attached hereto as
Exhibit A.  The City's responses to all other timely and compliant objections
to confirmation of the Plan are summarized in the tables attached as
Exhibit A to the Consolidated Reply and Exhibit B to the Pretrial Brief, as
more fully described therein.

The City solicited acceptances of the Fourth Amended Plan for the
Adjustment of Debts of the City of Detroit (Docket No. 4392) (the "Fourth
Amended Plan").  On August 20, 2014, the City filed the Sixth Amended
Plan, which contained non-material or favorable modifications and
clarifications to the Fourth Amended Plan, as more fully described in the
Pretrial Brief.

Except as expressly provided herein, capitalized terms not otherwise defined
in this Response have the meanings given to them in the Plan or, if not
defined therein, in the Pretrial Brief.

accounts of interest payments far in excess of asset performance.

See Consolidated Reply, at § VII; Disclosure Statement, at § II.A.2. As discussed in the Consolidated Reply, this arrangement benefitted those City employees who could afford to maximize their participation in ASF at the expense of those whose circumstances required them to rely exclusively upon the GRS's traditional defined benefit pension plan (the "GRS Traditional Pension Plan") because the source of funds used to pay the excess interest to ASF participants was the diversion of assets of the GRS Traditional Pension Plan into select individuals' ASF accounts. See Consolidated Reply, at § VII.

2. At the Confirmation Hearing, Charles M. Moore, Senior Managing Director and Shareholder of Conway MacKenzie, Inc. ("CM"), will testify regarding the operation of ASF. The City expects Mr. Moore to testify that approximately $450 million in GRS Traditional Pension Plan funds were diverted to the private accounts of ASF participants during the ten-year period beginning with fiscal year 2004 (July 1, 2003 to June 30, 2004) and ending with fiscal year 2013 (July 1, 2012 to June 30, 2013), through the payment of returns in excess of actual asset performance. By way of an extreme example, the City expects that Mr. Moore will testify that, in fiscal year ending June 30, 2009, an amount equal to more than *one quarter of the total value of all ASF assets* was diverted from the GRS Traditional Pension Plan to subsidize artificial ASF returns

at a rate of 7.9% when the actual value of the assets in ASF accounts, in fact, *fell* by approximately 20%.  Indeed, the trustees of GRS (collectively, the "GRS Trustees"), who granted ASF participants with interest credits at 7.9% annually, regardless of the actual rates of return on invested GRS assets, essentially allowed the ASF program to function as a 7.9% guaranteed investment contract, and they did so during a period in which such contracts in the commercial insurance market offered dramatically less generous investment income.[2]  Many hundreds, if not thousands, of GRS employees, consequently built up individual ASF accounts in the hundreds of thousands of dollars.

      3.     The GRS Trustees, who possessed sole authority to allocate interest payments to ASF accounts, breached various fiduciary duties by diverting GRS Traditional Pension Plan assets to the private accounts of ASF participants to provide these excessive returns.  The GRS Trustees owe fiduciary duties to the GRS Traditional Pension Plan and its participants and beneficiaries under Michigan Public Act 314 of 1965, the Public Employee Retirement System Investment Act, M.C.L. §§ 38.1132, et seq. ("PERSIA"), as well as the common

---

[2]    According to The Wall Street Journal, as of December 31, 2011, the interest rates applicable to guaranteed investment contracts ranged from 0.40% to 2.60%.  See The Wall Street Journal, Market Data Center, Guaranteed Investment Contracts as of Dec. 30, 2011, http://online.wsj.com/mdc/public/page/2_3024-gic.html (last visited Sept. 5, 2014).

law of trusts.  See, e.g., Bd. of Trs. v. City of Detroit, No. 259592,

2006 WL 2061403, at *4 (Mich. Ct. App. July 25, 2006) ("Plaintiffs have

fiduciary obligations, specified by the common law and [PERSIA] ....").

Moreover, the GRS Trustees owe a duty of loyalty to all GRS Traditional Pension

Plan participants to "discharge [their] duties solely in the interest of the

participants and their beneficiaries" and use assets of the defined benefit GRS

Traditional Pension Plan for the "exclusive benefit of the participants and their

beneficiaries."  M.C.L. §§ 38.1133(3), (8); Restatement (Third) of Trusts § 78(1)

(2007).  The City believes that these duties were violated when the GRS Trustees

depleted the assets of the GRS Traditional Pension Plan for the purpose of

subsidizing inflated returns to the defined contribution accounts of the ASF

participants – a *subset* of the participants in the GRS Traditional Pension Plan.

See, e.g., Wayne Cnty. Emps. Ret. Sys. v. Wayne Cnty., 836 N.W.2d 279, 296

(Mich. Ct. App. 2013) (holding that a breach of the duty of loyalty occurred where

a county ordinance required the use of funds set aside for one pension benefit to

support another benefit), appeal granted, 843 N.W.2d 924 (Mich. 2014).

       4.     It is well settled that, when a trustee transfers trust property to

an individual not entitled to it (e.g., the transfer of GRS Traditional Pension Plan

assets to an ASF participant's defined contribution account), that individual takes

the property subject to the trust.  See, e.g., Harris Trust & Sav. Bank v. Salomon

Smith Barney Inc., 530 U.S. 238, 250 (2000) ("it has long been settled that when a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person, the third person takes the property subject to the trust"); Restatement (Third) of Trusts § 104 cmt. g(3) (2012) ("if a beneficiary receives trust property to which the beneficiary is not entitled (… ***without regard to whether the beneficiary knew the distribution was improper***), the beneficiary is liable to the trust for the improper distribution, except to the extent that a defense to restitution applies") (emphasis added); Mark L. Ascher et al., Scott and Ascher on Trusts § 29.1.6 (5th ed. 2008) ("Plainly an innocent donee takes subject to the trust, even without notice of the trust, because he or she would otherwise be unjustly enriched."); George Gleason Bogert et al., The Law of Trusts and Trustees § 866 (2014) ("That this remedy exists … whether the property or its product is in the trustee's hands or is held by a third person, is unquestioned."). Accordingly, ASF participants, as recipients of improperly diverted GRS Traditional Pension Plan funds, *hold those funds in trust* for the benefit of all GRS Traditional Pension Plan participants.

## B. Development of the ASF Recoupment Program

5. The City determined – and the Retiree Committee, the GRS, the largest City retiree organizations and the majority of the City's unions (collectively, the "Retiree Representatives") ultimately agreed – that it would be

inequitable to address the underfunding of the GRS, which underfunding was increased and exacerbated by the imprudent crediting of interest credits to ASF accounts, through greater across-the-board cuts in the accrued pensions of active and retired GRS participants beyond the 4.5% cut that the parties had settled upon. To do so would allow those ASF participants who benefitted from the ASF program to retain all the improvidently granted interest at the expense of all of the other participants in the GRS Traditional Pension Plan – many of whom did not participate in the ASF program, or could not afford to participate at the levels of those who were higher paid or understood the significance of the above-market benefits the ASF program offered.

6.      The City, therefore, developed (and, in consultation with the Retiree Representatives, refined) the ASF Recoupment program described in the Plan to recover as much of the improperly diverted GRS Traditional Pension Plan funds as possible while minimizing the hardship of recovery on the recipients of these funds. For example, rather than seek to recover *all* improperly diverted assets, the City and the Retiree Representatives negotiated that the City would seek to recover only a portion of those GRS Traditional Pension Plan assets that were improperly diverted to ASF, and only during a portion of the period during

which improvidently granted credits were made, beginning July 1, 2003 and ending on June 30, 2013. [3]

       7.     In addition, even though the recipients of improperly diverted GRS Traditional Pension Plan funds had no right to retain funds held in trust as a legal matter, the City was aware that, as a practical matter, it might impose an undue hardship on ASF Participants who had already taken a distribution of their ASF account balances (such as retirees receiving a GRS pension) if the City were to insist on immediate recovery of excess interest amounts in a lump sum. Accordingly, the City and the Retiree Representatives agreed that the City would seek to recover improperly diverted GRS Traditional Pension Plan funds in two ways: (a) for active City employees who continued to maintain ASF accounts, through reduction of their share of the compromised amount of the ASF excess, and (b) for those who already had received a full distribution of their ASF accounts, through reduction in the monthly GRS Traditional Pension Plan amount such persons receive, equal to their share of the compromised ASF excess. In the latter case, the recipient's share of the compromised ASF excess would be converted into an annuity amount over the applicable recipient's expected life at

---

[3]    Importantly, ASF Recoupment is designed solely to recover only a portion of the excessive credited interest; it *does not* apply to (a) contributions made by the ASF participants themselves or (b) interest earned thereon commensurate with market returns.

an interest rate of 6.75%, and such annuity amount would then be deducted from his or her pension checks (these persons are known as "ASF Distribution Recipients," in recognition that they already have received a distribution of their ASF accounts and would pay back their share of the compromised ASF excess from future pension checks).[4]

        8.     Finally, the City and the Retiree Representatives agreed that the amount to be recovered from each recipient of improperly diverted GRS Traditional Pension Plan funds will be subject to two independent caps (together, the "ASF Caps"). First, the total amount to be recovered will be capped at 20% of the highest value of the recipient's ASF account balance during the period beginning on July 1, 2003 and ending on June 30, 2013 (including any unpaid loans taken by the participant from his or her ASF account as of such date). Second, assuming the DIA Proceeds and the State Contribution (together, the "Outside Funding") are received, no pension benefits of a GRS retiree who was retired as of June 30, 2014 will be reduced by more than 20% of his or her annual pension benefit as of June 30, 2014, including both (a) the 4.5% reduction

---

[4]     Pursuant to the Plan, each ASF Distribution Recipient may *choose* to make a lump-sum ASF Recoupment Cash Payment in *lieu* of having their future pensions reduced by the annuity value. See Plan, at § II.B.3.r.ii.D.2.ii. Under the Plan, and in all events, the City will not recover interest on Annuity Savings Fund Excess Amounts for the period from the original improper transfer of the applicable funds through the Effective Date of the Plan.

in benefits arising from the impairment of GRS Pension Claims and (b) ASF Recoupment.  Such amount was calculated and disclosed to each affected retiree on his or her Ballot as though it were payable in a lump sum; if the retiree does not elect to pay in a lump sum, that amount will then be annuitized over time using the GRS 6.75% rate of return.  That monthly annuitized amount was also disclosed on the retiree's Ballot.  As a result of these measures, the City expects to recover approximately $190 million of the approximately $450 million in GRS Traditional Pension Plan funds improperly diverted during the period from fiscal year 2004 through fiscal year 2013.

### C. ASF Recoupment Does Not Violate Any Statute of Limitations (Issue 1(a)(i))

9. Certain objecting parties argue that ASF Recoupment violates various specified and unspecified statutes of limitations ranging from 90 days to six years by seeking to recover GRS Traditional Pension Plan funds that were diverted as far back as July 1, 2003.[5]

---

[5]  See, e.g., Docket Nos. 4578 (Objection of Jean Vortkamp) (arguing that the ASF Recoupment Period is "excessive"), 4579 (Objection of Mary Jo Vortkamp) (same), 5057 (Objection of Hassan Aleem, et al.) (arguing that a limitations period of two years applies), 5089 and 5923 (Objections of Michael J. Karwoski) (arguing that a limitations period of six years should apply), 5126 (Objection of George Cannon) (arguing that a limitations period of two years applies), 5795 (Objection of Demetria Wright) (arguing generally that ASF Recoupment violates an unspecified statute of limitations), 5887 (Objection of Mattie D. Prichett) (arguing that a two-year

10.   ASF Recoupment does not violate any such statute of limitations because the City's claims are only now accruing.  For the reasons stated above and in the Consolidated Reply, when the ASF participants received GRS Traditional Pension Plan assets in breach of trust, they took those assets as trustees for the GRS Traditional Pension Plan.  See Consolidated Reply, at 174-76.  Under Michigan law, with certain inapplicable exceptions, a "claim accrues at the time the wrong upon which the claim is based was done." M.C.L. § 600.5827; see also Jackson v. Estate of Green, 771 N.W.2d 675, 678 (Mich. 2009) (Young, J., concurring) ("a claim generally accrues when the wrong is done").  In the context of a trust, the wrong occurs when the trustee repudiates his obligations to the trust.  See Restatement (Third) of Restitution and Unjust Enrichment § 70, illustration 10 (2011); see also Carpenter v. Mumby, 273 N.W.2d 605, 611 (Mich. Ct. App. 1978) ("the period of limitations does not begin to run until the fiduciary relationship ends – that is, until all the fiduciary's duties have been discharged or repudiated").

---

limitations period should apply), 5971 (Objection of Dennis Taubitz) (arguing that either a 90 day or three year statute of limitations should apply).

Dennis Taubitz's argument that a 90-day statute of limitations should apply (presumably as the period applicable to the avoidance of non-insider preferences pursuant to section 547(b)(4) of the Bankruptcy Code) should be overruled because the City has never argued that ASF Recoupment constitutes an attempt to recover a preference, as set forth below in its response to Issue 1(a)(v).

11. Thus, the City's claims against the ASF participants will not accrue until the ASF participants repudiate their obligations to return the improperly diverted funds to the GRS Traditional Pension Plan – a "wrongful act" that may only be found to have occurred, if at all, since the filing of the City's original Plan on February 21, 2014 – when the first demand arguably was made for ASF participants to return improperly diverted assets held in trust. Accordingly, to the extent any statute of limitations applies to ASF Recoupment: (a) the statute is the six-year general provision provided under M.C.L. § 600.5807(8) (because no specific statute of limitations is provided for actions to recover improperly transferred assets held in trust); and (b) the statute has not yet run because the ASF participants have not, or have at most only recently, repudiated their obligations to return the improperly transferred assets.[6]

_____

[6]     As discussed above, the ASF Recoupment Period from July 1, 2003 through June 30, 2013 represents an agreed-upon recovery period settlement after extensive negotiations between the City and the Retiree Representatives. The entire structure of the ASF Recoupment mechanism, including the ASF Recoupment Period and the other limitations on ASF Recoupment described above, was negotiated by the City and the Retiree Representatives to equitably balance the City's interest in recovering the amounts improperly transferred to ASF accounts for the benefit of all GRS Traditional Pension Plan participants with the hardship that will be imposed on ASF participants by the ASF Recoupment process. It is well accepted that "[c]ompromises are 'a normal part of the process of reorganization.'" Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968). As a result of these compromises, the Plan does not seek to recover approximately $360 million in GRS Traditional Pension Plan funds improperly transferred during the applicable 10-year period to ASF accounts.

**D. ASF Recoupment Does Not Violate Any
Provision of the Detroit Municipal Code (Issue 1(a)(ii))**

12. One objecting party argues that ASF Recoupment is improper because the GRS Trustees were acting within their complete discretion under Sections 47-2-17 and 47-2-18 of the Detroit City Code by allocating excessive interest payments to ASF participants.[7] This Objection ignores the City's basis for recovering the improperly diverted GRS Traditional Pension Plan funds. The City agrees that the GRS Trustees possessed sole discretion under the Detroit City Code to allocate interest payments to ASF participants. But they had to exercise that discretion in a reasonable and prudent manner, consistent with the dictates of PERSIA and the common law of trusts. Granting ASF recipients interest credits that were not supported by the investment returns on the ASF funds hardly constituted "skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a similar capacity" would have applied. See M.C.L. § 38.1133(3)(a), (d). They clearly did not do so when they diverted funds from the GRS Traditional Pension Plan that benefitted all GRS participants

---

Moreover, in the absence of ASF Recoupment, the across-the-board reductions in GRS participants' pensions would need to be significantly greater – even if such participant *had never participated* in the ASF defined contribution program. See Disclosure Statement, at 23-25. ASF Recoupment, therefore, represents a reasonable compromise and does not violate any applicable statute of limitations.

[7] See Docket No. 5947 (Objection of Roger N. Cheek).

to enhance returns to a subset of the participants' defined-contribution ASF

accounts.  Whatever the extent of the GRS Trustees' discretion under

Sections 47-2-17 and 47-2-18 of the Detroit City Code with respect to ASF

accounts, such discretion does not license a breach of the GRS Trustees' fiduciary

duties to GRS Traditional Pension Plan participants.  Accordingly, this Objection

should be overruled.

E.    ASF Recoupment Is Constitutional (Issue 1(a)(iii))

13.    Another objecting party argues that ASF Recoupment proposes

a seizure of the assets of creditors holding Class 11 Claims without due process of

law because the City has not brought any action under bankruptcy or

non-bankruptcy law that would provide the legal basis for ASF Recoupment.[8]

This Objection should be overruled because ASF participants have received, and

continue to receive, due process with respect to ASF Recoupment.

14.    "Due process requires notice 'reasonably calculated, under all

circumstances, to apprise interested parties of the pendency of the action and

afford them an opportunity to present their objections.'"  Capital One Auto Fin.

Inc. v. Bolden (In re Bolden), No. 12-14979, 2013 WL 3897048, at *7

(E.D. Mich. July 29, 2013) (quoting United Student Aid Funds, Inc. v. Espinosa,

559 U.S. 260, 272 (2010) and Mullane v. Cent. Hanover Bank & Trust Co.,

---

[8]    See Docket No. 5887 (Objection of Mattie D. Prichett).

339 U.S. 306, 314 (1950)).  "Courts have interpreted the <u>Mullane</u> standard

flexibly in the bankruptcy context."  <u>Bosiger v. US Airways, Inc.</u>, 510 F.3d 442,

451 (4th Cir. 2007).  "To provide adequate notice and comply with due process, a

plan must (1) clearly and accurately characterize the creditor's claim and (2) give

the creditor an explanation of what the debtor proposes to do and the factual and

legal basis on which his proposal is based."  <u>Bolden</u>, 2013 WL 3897048, at *7

(citation and quotation marks omitted).

      15.    Although actual notice is not always necessary, it is sufficient

to satisfy the requirements of due process.  <u>Espinosa</u>, 559 U.S. at 272 (creditor's

due process rights were satisfied where it had "actual notice" of the bankruptcy

proceeding); <u>see</u> <u>also</u> <u>Bosiger</u>, 510 F.3d at 451-52 (pension holder who was

mailed notice of bankruptcy proceeding to discharge his pension received due

process); <u>GAC Enters., Inc. v. Medaglia (In re Medaglia)</u>, 52 F.3d 451, 455

(2d Cir. 1995) ("due process is not offended by requiring a person with actual,

timely knowledge of an event that may affect a right to exercise due diligence and

take necessary steps to preserve that right").

      16.    Here, the objecting party received Class 11 and Class 12

solicitation packages, which packages included, among other things, a supplement

for employees and retirees (the "<u>Plain Language Insert</u>") describing in detail the

effect of ASF Recoupment.  The objecting party, therefore, received actual notice

of the Plan and of the ASF Recoupment program.  Indeed, the simple fact that the

objecting party filed a timely Objection to confirmation of the Plan precludes any

argument that the objecting party has not received notice and an opportunity to be

heard.  See Medaglia, 52 F.3d at 455 (fact that creditors' counsel submitted a letter

"precludes any … suggestion" that the creditors did not receive notice or any

opportunity to be heard).  The City, therefore, has satisfied the requirements of

due process with respect to ASF Recoupment, and the relevant Objection should

be overruled.

        17.     Several Objections argue that ASF Recoupment is an

unconstitutional *ex post facto* application of Section 47-1-18(c) of the Detroit City

Code.[9]  This City Code section, which was passed by the City in 2011 in an effort

to restrict the discretion of the GRS Trustees to award unwarranted returns to ASF

participants at the expense of the GRS Traditional Pension Plan, provides as

follows:

> The Retirement System and the trustees charged with
> management of the System shall not provide any savings
> plan, annuity plan, or other participant investment or
> savings vehicle that provides an annual return to
> investing participants which in any year is greater than
> the actual investment return net of expenses of the
> Retirement System invested reserves for the year in
> which the return is earned and accrued, provided, that

---

[9]     See Docket Nos. 4296 (Objection of Thomas Cattron), 4297 (Objection of
        Denise Cattron), 5923 (Objection of Michael J. Karwoski).

such return shall neither be greater than the assumed annual return as expressed in the plan's valuation for that year nor less than zero. This prohibition shall apply to all payments made to participants in the Defined Contribution Plan of 1973 from the effective date of this amendment.

Detroit City Code, § 47-1-18(c).

18.     There is no basis for the objectors' argument. As discussed at length above and in the Consolidated Reply, although ASF Recoupment was developed with reference to the limitations on the crediting of interest set forth in section 47-1-18(c) of the Detroit City Code, the City possesses an independent basis for recovering the GRS Traditional Pension Plan funds improperly diverted to ASF participants and, therefore, does not need to – and is not attempting to – enforce the provisions of Section 47-1-18(c) of the Detroit City Code in an *ex post facto* manner. Accordingly, these Objections should be overruled.

### F.     ASF Recoupment Is Not Effectuated Pursuant to Sections 547 or 548 of the Bankruptcy Code or Other Applicable Fraudulent Transfer Law (Issues 1(a)(iv), (v))

19.     A number of Objections raise the argument that ASF Recoupment constitutes an improperly asserted preference or fraudulent transfer action that exceeds the applicable statute of limitations for such actions.[10]

---

[10]     See, e.g., Docket Nos. 4789 and 5971 (Objection of Dennis Taubitz) (arguing that ASF Recoupment is an improperly asserted preference action); 5887 (Objection of Mattie D. Prichett) (arguing that ASF Recoupment is improperly asserted as a preference or fraudulent transfer action).

Because the City has not asserted in the Plan or elsewhere that ASF Recoupment is premised upon a preference or fraudulent transfer theory of liability, and because, as discussed above, ASF Recoupment is not so premised, these Objections should be overruled.

### G. ASF Recoupment Does Not Implicate the Doctrine of *In Pari Delicto* (Issue 1(a)(vi))

20. Certain objecting parties argue that the City should be precluded from recouping the Annuity Savings Fund Excess Amounts because the City had knowledge of, or somehow participated in, the allocation of such amounts to the ASF participants.[11] For the following reasons, these Objections, sounding in the doctrine of *in pari delicto*, must be overruled.

21. Michigan law recognizes the "wrongful conduct" rule, which incorporates the doctrine of *in pari delicto*. Kohut v. Metzler Locricchio Serra & Co. (In re MuniVest Servs., LLC), 500 B.R. 487, 494-95 (Bankr. E.D. Mich. 2013). "Michigan has long recognized the wrongful-conduct rule, a common law doctrine that precludes a plaintiff from recovering when his claim is based in whole, or in part, on the plaintiff's wrongful conduct." Romeos v. Salvation Army, No. 312713, 2014 WL 265530, at *2 (Mich. Ct. App. Jan. 23, 2014) (citing Orzel ex rel. Orzel v. Scott Drug Co., 537 N.W.2d 208,

---

[11] See, e.g., Docket Nos. 4578 (Objection of Jean Vortkamp), 4579 (Objection of Mary Jo Vortkamp), 5887 (Objection of Mattie D. Prichett).

212-13 (Mich. 1995); <u>Hashem v. Les Stanford Oldsmobile, Inc</u>, 697 N.W.2d 558
(Mich. Ct. App. 2005)).

22.     "To implicate the wrongful-conduct rule," however, "the
plaintiff's conduct must be prohibited or almost entirely prohibited under a penal
or criminal statute and the wrongful conduct must be serious in nature." <u>Romeos</u>,
2104 WL 265530, at *2 (quoting <u>Hashem</u>, 697 N.W.2d at 561) (quotation marks
omitted); <u>see</u> <u>also</u> <u>Orzel</u>, 537 N.W.2d at 214.

23.     The objectors point to no conduct *of the City* that would meet
the foregoing standard.  As set forth above, the allocation of Annuity Savings
Fund Excess Amounts to ASF Participants was made at the sole discretion *of the
GRS Trustees*.  As such, the City did not participate in the diversion of assets from
the GRS Traditional Pension Plan to the ASF Accounts.  The bare allegation that
the City, along with all other parties, was aware of the amounts credited does not
amount to the violation of any criminal or penal statute, and the objectors offer no
evidence of any such violation.  Indeed, to the contrary, as discussed above, in
2011, the City eventually took action to *end* the practice through the passage of
Section 47-1-18(c) of the Detroit City Code, which restricts the discretion of the
GRS Trustees to credit excess amounts to ASF accounts.  Accordingly, the
doctrine of *in pari delicto* or wrongful conduct is inapplicable to ASF
Recoupment, and the relevant Objections should be overruled.

**H.  The 6.75% Interest Rate Used in
        Annuitizing ASF Recoupment Payments
        for ASF Distribution Recipients Who Do Not Elect the
        Lump-Sum Payment Option Is Not Usurious (Issue 1(a)(vii))**

24.     Several objecting parties argue that the interest rate of 6.75%

used to annuitize ASF Recoupment payments is usurious.[12]  The objecting parties

cite no provision of Michigan law, however, that is violated by this interest rate.

Moreover, the City is not aware of any limitation on interest rates under Michigan

law that would (a) apply to the ASF Recoupment program or (b) prohibit an

interest rate as low as 6.75% on the annuitization of ASF Recoupment amounts.

The proposed interest rate is reasonable and mirrors the assumed investment rate

of return on GRS and PFRS assets employed throughout the Plan.  Because

wholly unsupported allegations of usury are insufficient to defeat confirmation,

the relevant Objections should be overruled.

**I.  The City Did Not Conceal the Interest Rate Applicable to
        Annuitized ASF Recoupment Payments (Issue 1(a)(viii))**

25.     At least one Objection claims that the City unfairly and

fraudulently failed to disclose on Class 10 and Class 11 Ballots the annuitization

of ASF Recoupment at an interest rate of 6.75%.[13]  There was no such subterfuge.

---

[12]     See Docket Nos. 5211 (Objection of Fiorenzo Fabris), 5887 (Objection of
         Mattie D. Prichett).

[13]     See Docket No. 5791 (Objection of Dennis Taubitz).

26.     The City provided sufficient disclosure of the interest rate used to annuitize ASF Recoupment.  Every Ballot delivered to holders of GRS Pension Claims that are ASF Distribution Recipients, for example, disclosed *a precise dollar amount* for the aggregate reduction in monthly benefits that would result from ASF Recoupment, which aggregate amount was calculated by reference to the 6.75% interest rate.  Accordingly, all ASF Distribution Recipients were provided notice of the economic impact the 6.75% interest rate would have upon their monthly checks.

27.     Moreover, in connection with the City's distribution of replacement Ballots to certain Class 11 claimants, the amount of the interest rate was *specifically* disclosed in documents provided to many retirees – and publicly filed in the Chapter 9 Case – more than one month before the Voting Deadline.[14]

> If you are a current retiree, the estimated Annuity Savings Fund Monthly Recoupment Amount on your ballot was calculated using actuarial assumptions, including, but not only, life expectancy and an interest component calculated at 6.75%, which is the rate used in the Plan for the valuation of pension assets and the targeted rate of return.

Stipulation Regarding Certain Class 11 and Class 10 Ballots (Docket No. 5206), at Annex A, filed on June 4, 2014.  Notice of the precise amount of the applicable interest rate was further disseminated among Class 11 claimants on June 5, 2014,

---

[14]     See Stipulation Regarding Certain Class 11 and Class 10 Ballots (Docket No. 5206).

when the GRS made a presentation to participants – which presentation was immediately posted to the GRS website – that specifically disclosed the use of the 6.75% interest rate to calculate annuitized Annuity Savings Fund Excess Amounts. A copy of this presentation is attached hereto as Exhibit B.

  28. Notably, ASF Distribution Recipients are particularly familiar with the fact that annuitization commonly involves the incurrence of interest at the same rate as the assumed rate of return on GRS assets. As the City expects Mr. Moore to testify, upon becoming eligible to take distributions from their respective ASF accounts, every ASF Distribution Recipient is offered the option of taking their ASF distribution in the form of either (a) a lump sum or (b) an annuity. If they choose to receive a distribution of their ASF account in the form of an annuity (which annuity is added to their GRS Traditional Pension Plan amount), GRS takes the lump sum amount and converts it into a monthly annuity amount based upon the recipient's life expectancy and using *the assumed rate of return of the GRS assets*. Consequently, all ASF Distribution Recipients should be familiar with the fact that annuitized ASF distributions implicate the application of an interest rate tied to GRS' assumed rates of return. Thus, when the City disclosed in the Plan, the Disclosure Statement and the Plain Language Insert that Annuity Savings Fund Excess Amounts would be "converted into monthly annuity amounts based on [each ASF Distribution Recipient's] life

expectancy and other factors," ASF Distribution Recipients should not have been left in doubt as to either (a) the imposition of interest through the annuitization process or (b) the fact that the rate of such interest would mirror the assumed rate of return on GRS assets.  Fourth Am. Plan, at 34; Disclosure Statement, at 25; Plain Language Insert, at 18-19.  Moreover, because historically the rate of annuitization of ASF distributions has been based upon the assumed GRS investment rate of return of 7.9%, the rate used to annuitize Annuity Savings Fund Excess Amounts under the Plan is significantly *lower* than the rate with which the ASF Distribution Recipients are familiar, thereby lowering the amount withheld from their benefit checks.

29.     Accordingly, because (a) the total amount to be deducted from the benefit checks of ASF Distribution Recipients was disclosed from the outset, (b) the specific interest rate to be used was disclosed to many ASF Distribution Recipients by various means and (c) ASF Distribution Recipients are familiar with the annuitization of benefits using the GRS's assumed investment rate of return, there was no fraudulent concealment of the interest rate applicable to annuitization of Annuity Savings Fund Excess Amounts, and the relevant Objection should be overruled.

###### 1. *The 6.75% Interest Rate Does Not Cause Annuity Savings Fund Excess Amounts to Breach the ASF Caps*

30.     In a letter filed with the Court,[15] one DWSD retiree states that, as a result of the imposition of the 6.75% interest rate to annuitize the Annuity Savings Fund Excess Amounts, amounts recovered from ASF Distribution Recipients will "greatly exceed[ ]" the ASF Recoupment Cap, which is 20% of the highest value of the applicable ASF Distribution Recipient's Annuity Savings Fund account during the ASF Recoupment Period.  See Plan, at § I.A.32.

31.     This statement is incorrect.  The Plan expressly provides that "in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension checks exceed the ASF Recoupment Cap or, if applicable, the Current GRS Retiree Adjustment Cap."[16]  This provision means what it says.

---

[15]     Docket No. 6870 (letter filed by Steven Wojtowicz) (the "ASF Cap Letter").

[16]     The Plan defines the ASF Recoupment Cap, for both ASF Current Participants and ASF Distribution Recipients, as follows:

> 20% of the highest value of such participant's Annuity Savings Fund account during the ASF Recoupment Period.  For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from such participant's Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

Plan, at § I.A.32.

The Plan defines the Current GRS Retiree Adjustment Cap as follows:

To the extent that the total amount by which an ASF Distribution Recipient's

monthly pension check would be reduced exceeds 20% (accounting for both the

impairment of the ASF Distribution Recipient's GRS Pension Claim and

ASF Recoupment), the total amount deducted from the ASF Distribution

Recipient's monthly pension check will be capped at 20%.  Moreover, once

Annuity Savings Fund Excess Amounts – as annuitized using the 6.75% interest

rate (as previously disclosed on Class 11 Ballots) – equaling an ASF Distribution

Recipient's particular ASF Recovery Cap have been recovered from the

ASF Distribution Recipient, no further ASF Recoupment will be required from

that specific ASF Distribution Recipient.  Accordingly, to the extent the ASF Cap

Letter may be interpreted as an Objection to confirmation of the Plan, this

Objection should be overruled.

## II.    THE PLAN IS IN THE BEST INTERESTS OF CREDITORS

### A.    The City Is Not Required to Liquidate Its Assets to Maximize Creditor Recoveries (Issue 2(a))

32.    Several objecting parties argue that the City must sell all of its

assets to satisfy Pension Claims or is otherwise not realizing sufficient value from

---

if the funding from the State Contribution Agreement and
the DIA Settlement is received, an ASF/GRS Reduction
in an amount not to exceed 20% of the Current Accrued
Annual Pension of a person who was a current retiree as
of June 30, 2014

Plan, at § I.A.97.

them.[17]  For all of the reasons set forth in the Prior Briefing, the City is not

required to liquidate the DIA Collection or any of its other assets to satisfy the

Claims of creditors, cannot increase tax revenues and has made reasonable efforts

to increase other revenues.  See Consolidated Reply, at § III; Pretrial Brief,

at §§ II, III.  Accordingly, the relevant Objections should be overruled.

### B. The Professional Fees Incurred By the City in Connection With Its Restructuring Are Necessary and Reasonable (Issue 2(b))

33.     One objecting party argues that the City's hiring of consultants,

the Emergency Manager and his team and the State's alleged withholding of

revenue sharing indicate that there are adequate funds at the City's disposal to

reimburse employees forced to take a 20% cut in pay (presumably as a result of

the City Employment Terms), improve City services and pay off all of the City's

creditors.[18]

34.     The Objection confuses in part City funds with State funds.

The compensation of the Emergency Manager is paid by the State.  See M.C.L.

---

[17]      See, e.g., Docket Nos. 2900 (Objection of Cecily McClellan), 3557 and 3557 (Objections of Kenneth Anthony Joyce), 3692 (Objection of Sylvester Davis), 3741 (Objection of Bonnie D. Armstrong), 3747 (Objection of Fredia M. Butler), 3748 (Objection of Mary Jackson), 3752 (Objection of Bettina Moore), 3845 and 4789 (Objections of Dennis Taubitz), 4364 (Objection of Angela M. Carter), 4404 (Objection of Jamie S. Fields), 4632 (Objection of Dawn M. DeRose), 4895 (Objection of Irma Industrious), 5279 (Objection of Diane L. Urbanik), 6019 (Objection of Dorothy M. W. Baker).

[18]      See Docket No. 3254 (Objection of Lashae Currie).

§ 141.1549(3)(e) ("The emergency manager's compensation shall be paid by this state and shall be set forth in a contract approved by the state treasurer."). In addition, the State controls the constitutional and statutory sharing of sales tax revenue and economic vitality incentive payments (as more fully described in the Disclosure Statement). <u>See</u> Disclosure Statement, at § VII.A.4.e. Accordingly, these funds are not available to the City to increase the salaries of its employees or satisfy the Claims of creditors.

35. As for the financial, legal and other advisors retained by the City, their assistance within their specialized fields of expertise is necessary to guide the City through its restructuring and the largest chapter 9 case in history. Although, in the abstract, the compensation paid to the City's advisors is not insubstantial, these amounts are reasonable in comparison to benefits that the City will receive upon confirmation of the Plan as a result of, among other things: (a) the impairment of the City's unsustainable unsecured debt burden; and (b) the implementation of Reinvestment Initiatives, including their related cost savings and revenue generating initiatives.

36. Moreover, as more fully described in The City of Detroit's Brief Regarding the Court's Authority to Determine the Reasonableness of Fees Under 11 U.S.C. § 943(b)(3) (Docket No. 6842): (a) all fees of the City's Fee Review Professionals to date in the Chapter 9 Case have been found to be fully

disclosed and reasonable pursuant to section 943(b)(3) of the Bankruptcy Code;

and (b) the Plan expressly provides that fees and expenses of the Fee Review

Professionals will continue to be reviewed under the terms of the Fee Review

Order for the period through the Effective Date. See Plan, at § IV.M.2.

Accordingly, the fees paid and to be paid by the City to its advisors during the

course of the Chapter 9 Case support confirmation of the Plan and, in particular, a

determination that it is in the best interests of creditors, and the relevant

Objections should be overruled.

## III.    THE PLAN DOES NOT DISCRIMINATE UNFAIRLY

### A.    Classes That Have Accepted the Plan May Not Argue that the Plan Discriminates Unfairly Against Them (Issues 3(a), 3(c-f))

37.    Holders of Pension Claims and OPEB Claims have no basis to

argue that the Plan discriminates unfairly against them.  In the Prior Briefing, the

City addressed, at length, arguments that the Plan discriminates unfairly by

providing materially better treatment to retirees than to other unsecured creditors.

See Consolidated Reply, at §§ II.A-D; Pretrial Brief, at §§ I.A-B.  Several *pro se*

parties, however, raise the reverse objection – i.e., that the Plan discriminates

unfairly against Classes 10, 11 and 12.[19]  These Objections must be denied

because Classes 10, 11 and 12 each voted to accept the Plan, and the unfair

---

[19]    See Docket Nos. 2898, 2970, 2979, 3205, 3214, 3217, 3218, 3219, 3374, 3787, 3794, 3830, 3845, 4258, 4404, 4579, 5887, 5923, 5947, 5971, 5722, 5909.

discrimination inquiry is relevant only with respect to classes that did not accept

the Plan.  See Paque Declaration (Docket No. 6179), at ¶¶ 32-38 (stating that

Classes 10, 11 and 12 voted to accept the Plan); 11 U.S.C. § 1129(b)(1) (unfair

discrimination test applies only "with respect to each class of claims or interests

that is impaired under, and has not accepted, the plan") (emphasis added).

38.     Similarly, one *pro se* objector asserts that the Plan

discriminates unfairly against Class 7 Limited Tax General Obligation Bond

Claims because it provides holders of such claims with only one eighth the

amount that will be paid to "local creditors."[20]  Because Class 7 also has accepted

the Plan, this Objection also must be denied.  See Supplemental Paque Declaration

(Docket No. 6665), at ¶¶ 7-11 (stating that Class 7 voted to accept the Plan);

11 U.S.C. § 1129(b)(1).

## B.     The Plan Does Not Discriminate Unfairly Against Tort Claimants (Issue 3(d))

39.     The Plan does not discriminate unfairly against tort claimants,

as alleged by one objecting party.[21]  Tort claims are classified under the Plan

either as Other Unsecured Claims in Class 14 or else as Convenience Claims in

---

[20]     See Docket No. 5828 (filed by Laurance J. Aurbach); see also Docket No. 3735 (Objection also filed by Mr. Aurbach stating that the Plan "is weighted to political interests in Detroit, rather than the interests of bondholders from elsewhere").

[21]     See Docket No. 4306 (Objection of Janice M. Guy-Simmons).

13-53846-tjt    Doc 7303    Filed 09/05/14    Entered 09/05/14 17:55:19    Page 39 of 193

Class 15 (any such Claim, a "Tort Claim").  For all of the reasons set forth in the

Prior Briefing, the Plan does not discriminate unfairly against Other Unsecured

Claims.  See Consolidated Reply, at §§ II.A-D; Pretrial Brief, at §§ I.A-B.

40.    As the City explained at length in the Pretrial Brief, critical

business considerations demonstrate that the differential treatment of Pension

Claims, Unlimited Tax General Obligation Bond Claims and Limited Tax General

Obligation Bond Claims is fair under the unique circumstances of the City's

Chapter 9 Case.  Pretrial Brief, at § I.B.  Accordingly, such differential treatment

does not constitute unfair discrimination against Other Unsecured Claims

(including Tort Claims).  Specifically, the differential treatment of Pension Claims

is justified because the City will be unable to remedy its service delivery

insolvency and provide adequate services to Detroit residents going forward

without the goodwill, cooperation and motivation of the City's existing workforce

and the ability to attract qualified employees in the future.  Id. at § I.B.1.  Because

current employees are motivated not only by current compensation but also by the

expectation of future benefits, the Plan must provide reasonable recoveries to

holders of Pension Claims to preserve the goodwill of the City's workforce and

enable the City, prospectively, to hire and retain competent and motivated

employees, such as police officers and fire fighters.  Id.  In addition, the

differential treatment of Pension Claims, Unlimited Tax General Obligation Bond

Claims and Limited Tax General Obligation Bond Claims is fair – and does not constitute unfair discrimination – because the treatment of such Claims is the result of arm's length, intensely negotiated settlements between the City and certain key creditor constituencies based on the relative strengths of the legal arguments presented by each Class of these settling creditors.  Id. at § I.B.2. Moreover, the differential treatment of Pension Claims, Unlimited Tax General Obligation Bond Claims and Limited Tax General Obligation Bond Claims under the Plan is proposed in good faith.  Id. at § I.B.4.  Because there is no unfair discrimination with respect to Other Unsecured Claims (or Convenience Claims) under the Plan, and thus no unfair discrimination against Tort Claims, the relevant Objection should be overruled.

## IV.    THE PLAN PROVIDES SUBSTANTIALLY SIMILAR TREATMENT TO ALL CLASS 11 CLAIMS

### A.    The Plan Provides Substantially Similar Treatment to All Class 11 Claims (Issue 4)

41.    Some objecting parties argue that the treatment of Claims in Class 11 under the Plan violates section 1123(a)(4) of the Bankruptcy Code because the holders of certain GRS Pension Claims are subject to ASF Recoupment whereas certain other holders of GRS Pension Claims are not subject

to ASF Recoupment.[22]  These Objections conflate the treatment of Claims and claimants and should be overruled.

42.    Section 1123(a)(4) of the Bankruptcy Code "applies to claims, not creditors."  H.R. Rep. No. 95-595, at 407 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6363; see also In re UNR Indus., Inc., 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992) (noting that the debtor had confused "equal treatment of *claims* with equal treatment of *claimants*") (emphasis in original), rev'd on other grounds sub nom. UNR-Rohn, Inc. v. Bloomington Factory Workers (In re UNR Indus., Inc.), 173 B.R. 149 (N.D.  Ill. 1994).[23]

43.    Section II.B.3.r of the Plan, which sets forth the proposed treatment of Class 11 Claims, provides that each and every holder of a Class 11 Claim will receive precisely the same *pro rata* treatment with respect to such Claims.  See Plan, at § II.B.3.r.  Section 1123(a)(4) of the Bankruptcy Code demands nothing more.  The Plan's treatment of Class 11 Claims thus easily satisfies the "same treatment" standard of section 1123(a)(4) of the Bankruptcy Code.

---

[22]    See Docket Nos. 3352 (Objection of Gerald G. Thompson), 4404 (Objection of Jamie S. Fields), 5723 (Objection of John P. Quinn), 5923 (Objection of Michael J. Karwoski), 5971 (Objection of Dennis Taubitz).

[23]    See also 7 Collier on Bankruptcy ¶ 1123.01[4][b] (explaining that section 1123(a)(4)'s requirement that the plan provide the "same treatment for each claim … of a particular class" does not apply "to the plan's overall treatment of the creditors holding such claims").

44.    The application of ASF Recoupment to certain holders of GRS

Pension Claims does not violate section 1123(a)(4) of the Bankruptcy Code

because ASF Recoupment is not a component of *the treatment of GRS Pension

Claims*.  ASF Recoupment does not relate directly to the City's liability to its

pensioners on account of GRS pension underfunding – i.e., the liability that gives

rise to GRS Pension Claims.  Instead, ASF Recoupment seeks to recover a portion

of the amounts improperly paid over from the GRS Traditional Pension Plan fund

to the individual ASF accounts of certain GRS participants.  See supra, § I;

see also Consolidated Reply, at § VII; Disclosure Statement, at § II.A.2.[24]

The purpose of ASF Recoupment – to restore the assets of the GRS Traditional

Pension Plan – is thus separate and distinct from the calculation of recoveries

provided the holders of GRS Pension Claims on account of their Claims.

45.    Of course, any City employee or retiree that is subject to ASF

Recoupment must also be a GRS participant because ASF was offered only to

GRS participants.  Thus, by definition, those creditors subject to ASF Recoupment

must be a subset of the holders of GRS Pension Claims.  For the convenience of

ASF participants, therefore – and in the interests of providing the fullest possible

disclosure to all GRS participants regarding their ongoing pension benefits – ASF

---

[24]    As set forth above, the City anticipates that Charles Moore will testify at the
Confirmation Hearing as to the purposes and expected impact of
ASF Recoupment.

Recoupment is addressed in the same section of the Plan that provides for the treatment of Class 11 Claims.  See Plan, at § II.B.3.r.  The Plan's organizational structure, however, does not dictate the nature or interpretation of any particular Plan provision.  See Plan, at § I.B.1.g ("captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan").

46.     The calculation of recoveries provided holders of GRS Pension Claims is uniform across all Class 11 Claims.  Thus, regardless of where provisions regarding ASF Recoupment appear in the Plan, such provisions constitute no part of the *pro rata* treatment of Class 11 Claims under the Plan.  Accordingly, because there is no disparate treatment of *Claims* in Class 11 under the Plan, section 1123(a)(4) of the Bankruptcy Code is satisfied, and the applicable Objections should be overruled.

## V.     THE PLAN IS FEASIBLE

### A.     Appropriate Controls Will Ensure the City's Compliance with the Plan, and Retirees Will Be Adequately Represented Post-Confirmation (Issue 5(a))

47.     Several objecting parties assert there will be insufficient oversight with respect to the Plan's post-confirmation implementation.[25]  As set

---

[25]     See, e.g., Docket No. 3205 (Objection of Gerald Galazka), at 2 (asserting the Plan lacks provisions to "audit and regulate the finances and investments" of the City); Docket No. 4404 (Objection of Jamie S. Fields), at 13-15

forth in the Prior Briefing and below, there are numerous safeguards in place to ensure the City is able to implement and fulfill its obligations under the Plan. See Consolidated Reply, at § IV.A.5; Pretrial Brief, at § IV.E.

48.     Recent State legislation provides oversight over the Plan's implementation.[26] Michigan Public Act 181 of 2014, M.C.L. §§ 141.1631, et seq., in particular, created the Michigan Financial Review Commission (the "Commission").  The Commission's primary focus is to ensure that the City complies with the terms of the Plan and responsibly manages its financial obligations.  M.C.L. § 141.1636.  To fulfill these purposes, the Commission possesses broad authority, including the ability to (a) approve the City's budget, (b) approve any debt issuance by the City and (c) establish other requirements for the City's financial performance and management.  M.C.L. § 141.1637. The Commission also possesses the authority to audit and inspect the City's financial statements, actuarial reports, revenue statements and other financial documents.  The Commission also may require the City to provide periodic financial reports, certified as to their accuracy by the City's Chief Financial Officer.  M.C.L. § 141.1636.

---

(asserting lack of adequate performance benchmarks); Docket No. 4837 (Objection of Vera C. Magee) (objecting to the committee governance for the Police and Fire Retirement System).

[26]     The Prior Briefing contains a more detailed discussion of this legislation. See Consolidated Reply, at § IV.A.5; Pretrial Brief, at § IV.E.

49.     In addition, Michigan Public Act 182 of 2014, M.C.L.
§§ 117.4s, et seq. ("PA 182"), requires the City to adopt a sound, multi-year
financial plan that, among other requirements, (a) is based upon reasonable
forecasts, (b) results in a balanced budget and (c) maintains adequate reserves.
M.C.L. § 117.4t.  PA 182 also increases fiscal transparency by requiring the City
to post its financial forecasts and contracts to the City website.  Id.  PA 182 further
requires the City to appoint a Chief Financial Officer with extensive municipal
finance, labor relations and pension-related experience to supervise the City's
finances and ensure its compliance with these measures.  M.C.L. § 117.4s.  Recent
State legislation, therefore, provides significant controls that will ensure the City's
compliance with the Plan.

50.     In addition to the requirements of State law, just as in other
bankruptcy cases, the Court will oversee implementation of the Plan.
Section 945(a) of the Bankruptcy Code provides that the Court "may retain
jurisdiction over the case for such period of time as is necessary for the successful
implementation of the plan."  11 U.S.C. § 945(a).  "Indeed, even the most
restrictive views of post-confirmation jurisdiction acknowledge that the
bankruptcy courts retain jurisdiction to interpret and enforce confirmed
[bankruptcy plans]."  Thickstun Bros. Equip. Co. v. Encompass Servs. Corp.
(In re Thickstun Bros. Equip. Co.), 344 B.R. 515, 522 (B.A.P. 6th Cir. 2006).

51.     Consistent with section 945 of the Bankruptcy Code, the Plan provides that, upon confirmation, the Court will retain "exclusive jurisdiction over all matters arising out of" the Chapter 9 Case and specifies that the Court retains jurisdiction to, among other actions, "[e]nter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan [and] [a]djudicate, decide or resolve any matters relating to the City's compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code."  Plan, at Article VII.  To the extent, therefore, that a creditor or other party in interest in the Chapter 9 Case believes that the City is not carrying out the terms of the confirmed Plan, such party potentially may seek injunctive or other relief from the Court.  Together, the Court's continuing jurisdiction and the recent State legislation provide comprehensive oversight of the City's ongoing compliance with the terms of the Plan.  Because there will be appropriate controls of the City's compliance with the terms of the Plan, the relevant Objections should be overruled.

1. ***The Plan is the Result of Extensive
   Negotiation with Retiree Representatives,
   and Retirees Will Have Substantial Representation
   with Respect to the Implementation of the Plan***

52. Certain objecting parties argue that the post-Effective Date governance of the City under the Plan lacks sufficient retiree representation.[27] Such Objections do not implicate any applicable confirmation standards as a threshold matter, as no provision of the Bankruptcy Code requires such retiree representation, and the relevant Objections should be denied on this basis alone.

53. In any event, the objectors are mistaken. The Plan is supported by, among other constituencies, (a) the Retiree Committee, (b) the Retirement Systems, (c) the City's primary retiree organizations and (d) the majority of the City's unions (including, most notably, AFSCME and the City's largest public safety union, the Detroit Police Officers' Association). Retiree representation via these parties has been substantial throughout the Court-ordered mediation process and the formulation of the Plan. This representation will continue following confirmation.

54. Retiree representatives comprise, for example, a significant portion of the governing bodies that are charged with administering (a) the City's retirement systems, (b) the Detroit General VEBA and (c) the Detroit Police and

---

27    See, e.g., Docket No. 4578 (Objection of Jean Vortkamp), 4579 (Objection of Mary Jo Vortkamp).

Fire VEBA.  The Plan and the Detroit Home Rule Charter specify that members

of the General Retirement System or retired city employees must elect six of the

ten members of the General Retirement System Board of Trustees.  Plan,

at Exhibit I.A.238a; Detroit Home Rule Charter § 11-103.  In addition, pursuant to

the State Contribution Agreement, one such retiree-elected member shall serve on

the Investment Committee of the GRS.  <u>See</u> Plan, at Exhibit I.A.318.  The Plan

also mandates that PFRS participants or retired City employees choose eight of

the seventeen members of the Board of Trustees for PFRS.  Plan,

at Exhibit I.A.242a, p.1.  Of these retiree representative members, two shall serve

on the Investment Committee of the PFRS pursuant to the State Contribution

Agreement.  <u>See</u> Plan, at Exhibit I.A.318.

      55.    Retirees likewise will have predominant representation with

respect to their retiree medical benefits.  Under the Plan, the Retiree Committee

and Detroit Retired City Employees Association will together appoint six of the

seven initial trustees of the Detroit General VEBA.  Plan § II.B.3.s.ii.A.[28]

Similarly, the Retiree Committee and the Retired Detroit Police and Fire Fighters

Association will together appoint six of the seven initial voting trustees of the

---

[28]    The City of Detroit's Errata Sheet with Respect to Sixth Amended Plan for
the Adjustment of Debts of the City of Detroit (Docket No. 6942)
(the "<u>Errata Sheet</u>") updates the Plan with the current terms of the Detroit
General VEBA Trust Agreement.

Detroit Police and Fire VEBA.  Plan, at § II.B.3.s.ii.B.[29]  Collectively, these

appointments give pension and OPEB claimants ample representation with respect

to those portions of the Plan that most directly impact their interests, and the

relevant Objections should, therefore, be overruled.

**B.**      **The Reinvestment Initiatives Were Developed After
          Consideration of Numerous Factors and Contain Appropriate
          Mechanisms to Monitor the City's Performance (Issue 5(b))**

56.      One objecting party argues that the City is not "serious about

improving services" because the Reinvestment Initiatives allegedly are not based

upon metrics and benchmarks specifically tied to police and fire services.[30]

This allegation is false.  The City expects that the testimony of Charles Moore at

the Confirmation Hearing will establish that various metrics and benchmarks were

among the myriad factors considered by the City in developing the Reinvestment

Initiatives.  With respect to police and fire services in particular, the City

considered, among other metrics, comparative data on the three most widely used

statistics to benchmark the effectiveness and performance of public safety

operations:  response time, crime rates and cases closed.  By applying these

---

[29]      The Errata Sheet updates the Plan with the current terms of the Detroit
          Police and Fire VEBA Trust Agreement.  As set forth therein, the Retired
          Detroit Police Members Association will also appoint an eighth board
          member.  This position is *ex officio*, non-voting and will expire on
          December 31, 2018.

[30]      See Docket No. 4404 (Objection of Jamie S. Fields), at 13-14 (objecting to
          lack of benchmarks).

standard benchmarks to the Detroit Police Department (the "DPD"), the City was able to determine that its crime rate is five times the national average, that the DPD has historically been unable to meet national average response times to "Priority One" calls and that the DPD's case closure rate has been extremely low in comparison to peer cities.  Similarly, the City was able to determine that the Detroit Fire Department (the "DFD") has historically been unable to meet National Fire Protection Association standards for response time for both its Fire Fighting Division and its Emergency Medical Service Division.

The Reinvestment Initiatives include necessary spending to address and resolve these specific issues, thus addressing specific, widely accepted benchmarks for police and fire performance.

57.    Yet the development of the Reinvestment Initiatives required far more than the consideration of metrics and benchmarks and thus far exceeded the narrow scope of the Fields Objection.  As addressed in the Prior Briefing, the City expects that Mr. Moore's testimony will provide further details on the extensive bottom-up process undertaken by CM, with the assistance of City departments and the City's other advisors, to identify specific areas of investment necessary for the provision of adequate municipal services.  See Pretrial Brief, at § IV.F.  With respect to the objecting party's concerns related to police and fire services in particular, the City expects that Detroit Police Chief James E. Craig

and Detroit Executive Fire Commissioner Edsel Jenkins will testify as to their respective urgent requirements for the provision of adequate municipal services. See id. at § IV.F.2.

58.     To the extent the objecting party argues that the Reinvestment Initiatives lack adequate mechanisms to monitor the service improvements that the City is expected to realize, this allegation is also incorrect.  As more fully set forth in the Prior Briefing, the City anticipates that Mr. Moore and John Hill, the City's Chief Financial Officer, will testify that the Reinvestment Initiatives provide for the hiring of additional employees whose responsibilities will include the monitoring of the City's spending with respect to the Reinvestment Initiatives and corresponding service level improvements.  See Pretrial Brief, at § IV.D.

## C.     Historic Property Tax Collection Issues Do Not Render the Plan Infeasible (Issue 5(c))

59.     One objecting party complains that provision is not made in the Plan to pursue property taxes not paid by banks and investment firms on account of properties that were foreclosed upon in the past.[31]  The City's historic problems with respect to the collection of property taxes do not threaten feasibility of the plan or present any legally cognizable objection thereto.  Nevertheless, the Reinvestment Initiatives provide investment to improve the City's property tax collections.

---

[31]     See Docket No. 4622 (Objection of Michael D. Shane).

60.     The City agrees that the collection of property taxes, among other taxes, whether from individuals or corporations, is an area where the City has historically underperformed, collecting only 53% of property taxes in fiscal year 2011, for example.  See Disclosure Statement, at § X.C.  For this reason, since prior to the Petition Date, the City has been exploring reforms and initiatives designed to increase property tax collections.  See id.  In addition, at the Confirmation Hearing, the City expects that Mr. Moore will testify that the Reinvestment Initiatives provide for $23.0 million in incremental investment in the City's Treasury Division primarily related to (a) wages and benefits payable to Treasury staff employees focused on collections and (b) employee training costs.  Moreover, the Reinvestment Initiatives anticipate the City receiving an additional $13.5 million in incremental revenue, primarily generated from increased property tax collections resulting from the Reinvestment Initiatives.

61.     As the City will establish during the Confirmation Hearing, the Plan revenue projections are reasonably prepared, and the rates of property tax collections do not threaten the Plan's feasibility.  Therefore, any Objections to the contrary should be overruled.

## VI.  THE FUNDING CLAUSE

### A.  The Plan Does Not Violate the Funding
#### Clause of the Michigan Constitution (Issue 6)

62.     Article IX, section 24 of the Michigan Constitution provides in part that "[f]inancial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities" (the "Funding Clause").  Mich. Const. art. IX, § 24.  "The purpose of the [Funding Clause] is … to check legislative bodies, requiring them to fund pension obligations annually, and thereby preventing back door spending."  Musselman v. Governor, 533 N.W.2d 237, 241 (Mich. 1995), overruled on other grounds by Studier v. Michigan Pub. Sch. Emps.' Ret. Bd., 698 N.W.2d 350 (Mich. 2005).  "Article 9, § 24 arose out of concern about legislative bodies failing to fund pension obligations at the time they were earned, so that the liabilities of several public pension funds greatly exceeded their assets."  Musselman, 533 N.W.2d at 241.

63.     A number of Objections argue that the Plan violates the Funding Clause because (a) the City will not make up missed pension payments in the event that the Outside Funding is not received or (b) the Plan allegedly provides the City with a 10-year holiday on making pension contributions.[32]

---

[32]     See Docket Nos. 2899 (Objection of William Curtis Walton), 3776 (Objection of Cheryl Rayford), 4082 (Objection of William

64.     The Plan will not violate the Funding Clause in the event that the Outside Funding is not received because the Plan expressly defines the City's prospective funding obligations under such circumstances.  In the event that the Outside Funding is not received, the Plan provides that the City has no obligation to provide substitute funding to PFRS and GRS.  See Plan, at §§ II.B.3.q.ii.A, II.B.3.r.ii.A.[33]  Because the City will have no obligation under the Funding Clause

---

Ochadleus), 4404 (Objection of Jamie S. Fields), 4520 (Objection of Dorothy M.W. Baker), 4578 (Objection of Jean Vortkamp), 4579 (Objection of Mary Jo Vortkamp), 5211 (Objection of Fiorenzo Fabris), 5795 (Objection of Demetria Wright), 5887 (Objection of Mattie D. Prichett).

[33]     With respect to PFRS funding, Section II.B.3.q.ii.A of the Plan provides that:

> During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior PFRS Pension Plan only in the amounts identified on Exhibit II.B.3.q.ii.A. The exclusive source for such contributions shall be certain DIA Proceeds and a portion of the State Contribution.

Plan, at § II.B.3.q.ii.A.  With respect to GRS funding, Section II.B.3.r.ii.A of the Plan provides that:

> During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan only in the amounts identified on Exhibit II.B.3.r.ii.A. The exclusive sources for such contributions shall be certain pension related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million, a portion of the State Contribution, certain DIA Proceeds, a portion of the Assigned UTGO Bond Tax Proceeds and certain

to provide funding that is not expressly contemplated by the Plan, the City will not be in violation of the Funding Clause in the event that the Outside Funding is not received.

65.    The objecting parties cite to no authority in support of the suggested argument that the City must provide additional pension funding even if the Outside Funding is received, and the City is aware of none.  To the contrary, the provision of pension funding through the DIA Proceeds and the State Contribution fulfills the letter and purpose of the Funding Clause by saving the City from potential pension funding shortfalls as a result of (a) competing demands from the City's other creditors or (b) the City's obligation to provide basic municipal services to its citizens.

66.    Whether or not the Outside Funding is received – and the City fully anticipates that it will be – the City will comply with the governing terms of the Plan regarding pension funding, and the Funding Clause thereby will be satisfied.  The applicable Objections should, therefore, be overruled.

---

revenues from City departments and the Detroit Public Library.

Plan, at § II.B.3.r.ii.A.

## VII. NOTICE

### A. The City Has Provided Adequate Notice to All Known Parties in Interest Throughout the Plan Confirmation Process (Issue 7)

67.     Various individual creditors have objected to the Plan on grounds related to inadequate notice of certain aspects of the Plan solicitation and confirmation process. Because the City has provided all parties entitled to vote on the Plan with at least as much notice as is required under the Bankruptcy Rules (and often more), these objections lack merit and must be overruled.

68.     Certain parties have objected that they did not receive copies of the Fourth Amended Plan or the Fourth Amended Disclosure Statement, thus presumably impairing their rights to participate in the Plan process.[34] These objections are ill-founded and should be overruled. Following the court's entry of the Disclosure Statement Order and consistent with Bankruptcy Rule 3017(d), the City, through its claims, balloting and noticing agent, Kurtzman Carson Consultants, LLC ("KCC"), mailed to all impaired creditors that either filed timely proofs of claim in the Chapter 9 Case or were identified on the City's list of claims,[35] copies of (a) the Fourth Amended Plan, (b) the Disclosure Statement,

---

[34]     See, e.g., Docket Nos. 4808 (Objection of Hassan Aleem, et al.) (the "Aleem Objection"), 4827 (Objection of Vera Magee) (the "Magee Objection"), 5126 (Objection of George Cannon) (the "Cannon Objection").

[35]     See Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059) (the "List of Claims"), filed by the City on September 30, 2014.

(c) notice of the time within which acceptances and rejections of the Plan were to have been submitted, (d) notice of (i) the time fixed for filing objections to the Plan and (ii) the Confirmation Hearing (consistent with Bankruptcy Rule 2002(b)), (e) an approved form of Ballot and (f) all other information required to be distributed to holders of Claims in voting Classes under the Plan pursuant to orders of the Court.[36]  See Certificates of Service (Docket Nos. 6174, 6177). The City further complied with Bankruptcy Rule 3017(d) by mailing to holders of Claims in non-voting Classes under the Plan "notice that the Class is designated in the plan as unimpaired and notice of the name and address of the person from whom the plan … and disclosure statement may be obtained upon request and at the plan proponent's expense … together with the notice of the time fixed for filing objections to and the hearing on confirmation."  See Certificate of Service (Docket No. 6174).[37]  Finally, consistent with Bankruptcy Rule 3017(e), the

---

[36]     These orders consist of:  (a) the Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment and (II) Approving Notice Procedures Related to Confirmation of the Plan of Adjustment (Docket No. 2984) (the "Solicitation Procedures Order") and (b) the Order Establishing Supplemental Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment with Respect to Pension and OPEB Claims (Docket No. 4400) (the "Supplemental Solicitation Procedures Order").

[37]     The City's compliance with Bankruptcy Rule 3017(d) and the Solicitation Procedures Order with respect to non-voting Classes demonstrates that the City has not "intentionally with malice … discriminat[ed] against Creditors who[ ] are not impaired by this plan by assuming or coercing them to vote

Solicitation Procedures Order approved certain procedures for transmitting the information and documents required by Bankruptcy Rule 3017(d) to beneficial holders of certain of the City's securities. <u>See</u> Certificate of Service (Docket No. 6174). Accordingly, the City provided all individual creditors with the notice required by the Bankruptcy Rules in connection with confirmation of the Plan, and the relevant objections should be overruled.[38]

---

yes" (<u>see</u>, <u>e.g.</u>, Cannon Objection, at ¶ 6; Aleem Objection, at ¶ 5), and all objections to this effect should be overruled.

[38] To the extent that certain objectors argue that they received inadequate notice of iterations of the Plan prior to the Fourth Amended Plan (<u>i.e.</u>, the solicitation version) (<u>see</u>, <u>e.g.</u>, Cannon Objection, at ¶ 2; Aleem Objection, at ¶ 1), such objections are inconsistent with the requirements of Bankruptcy Rule 3017(a), which provides that plans of adjustment filed prior to the approval of a disclosure statement "shall be mailed … *only* to the debtor, any trustee or committee appointed under the Code, the Securities and Exchange Commission, and any party in interest who requests in writing a copy of the … plan." Bankruptcy Rule 3017(a) (emphasis added). Because individual creditors were not entitled to receive notice of pre-solicitation iterations of the Plan, objections based on the lack of such notice must be overruled.

Moreover, multiple objectors argue that the Plan should not be confirmed because of the City's alleged failure to comply with the publication notice requirements of section 923 of the Bankruptcy Code. <u>E.g.</u>, Cannon Objection, at ¶ 2; Aleem Objection, at ¶ 1(a). Section 923 of the Bankruptcy Code, however, applies only to the "notice of the commencement of a case under this chapter, notice of an order for relief under this chapter, and notice of the dismissal of a case under this chapter." 11 U.S.C. § 923. Moreover, consistent with paragraph 18 of the Solicitation Procedures Order, the City did, in fact, provide publication notice of the deadline to object to the Fourth Amended Plan and the Confirmation Hearing. <u>See</u> Affidavits of Publication at Docket Nos. 6209, 6211 and 6253. Accordingly, such Objections must be overruled.

69.     Moreover, contrary to the assertions of certain objectors (see, e.g., Cannon Objection, at ¶ 4), the iterations of the Plan filed subsequent to the Fourth Amended Plan (and other modifications thereto) (a) have been filed consistent with the requirements of sections 942 and 1127(d) of the Bankruptcy Code and Bankruptcy Rule 3019 and (b) do not deprive any individual creditor of his or her right to due process.  As set forth at length in the Prior Briefing, because:  (a) all creditors in the Chapter 9 Case received notice of the Confirmation Hearing (and will have the opportunity to object to any proposed amendments and modifications to the Plan at that time); (b) contemporaneous with the filing of each iteration of the Plan subsequent to the Fourth Amended Plan, the City has filed notices of redlines showing all changes made to both (i) the previous iteration of the Plan and (ii) the Fourth Amended Plan;[39] (c) all

---

Finally, the Cannon Objection, at paragraph 3, alleges that "there is no 'prima facie evidence' … that the Bankruptcy Court has issued an order fixing a date to file a plan," and, thus, that the City has failed to comply with section 941 of the Bankruptcy Code.  In fact, consistent with section 941 of the Bankruptcy Code, (a) the First Order Establishing Dates and Deadlines (Docket No. 280) (the "Initial Scheduling Order") did establish a March 1, 2014 deadline for the filing of the City's plan of adjustment and (b) the City complied with that deadline by filing the initial iteration of the Plan with the Court on February 21, 2014 (Docket No. 2708).

[39]     See Notice of Filing of Redlined Version of Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6258); Notice of Filing of Redlined Version of Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6381); Notice of

creditors were provided the opportunity to file supplemental objections with the Court following the filing of each subsequent amended version of the Plan; and (d) none of the proposed modifications to the Plan adversely affect the treatment of any Claim in a material manner, the Plan (as modified and amended) complies with sections 942 and 1127(d) of the Bankruptcy Code and Bankruptcy Rule 3019 and no individual creditor is prejudiced thereby.  See Pretrial Brief, at § XII.

70.    Certain objectors argue that confirmation of the Plan should be denied because the deadline for individual creditors to object to the Plan was unreasonably short.[40]  These objections allege that a May 12, 2014 objection deadline (which would have been a matter of days after entry of the Disclosure Statement Order and prior to service of the solicitation packages) would have been "inadequate, irrational, and a[n] injustice to anybody that plan[ned] to respond to make a[n] inform[ed] decision."  Id.  These objections mistake the objection deadline applicable to entities represented by counsel (i.e., May 12, 2014) for the objection deadline applicable to individual creditors (i.e., July 11, 2014, or nearly two months after the commencement of the Plan solicitation period).  See Fourth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating

---

Filing of Redlined Version of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6910).

[40]    See, e.g., Docket No. 4695 (Objection of Katrina Henry) (the "Henry Objection"), at 2; Aleem Objection, at ¶ 2; Magee Objection, at 2.

to the Debtor's Plan of Adjustment, at ¶ 15(b).  Given the extended period granted

to individual creditors for the filing of objections to confirmation (i.e., a period

more than twice that of the 28 days required by Bankruptcy Rule 2002), no

individual creditor has been deprived of due process and these objections should

be overruled.[41]

71.     Finally, certain individual objectors have argued that, because

"[t]his whole procedure from the notices to [the] Plan[s] of Adjustment[ ] and

[the] Disclosure Statement[ ] are not discern[able] and are incomprehensible to

[the objector] and the public as a whole" (see, e.g., Aleem Objection, at ¶ 2;

Magee Objection, at ¶ 1), the Chapter 9 Case should be dismissed.  Again,

however, the City, at the Court's direction, has taken extraordinary steps to

safeguard the due process rights of individual creditors.  Specifically, the City

included the Plain Language Insert in both the Disclosure Statement and its

solicitation packages, thus (a) providing more easily comprehensible information

to holders of Pension Claims and OPEB Claims regarding the effect of the Plan on

their claims and (b) thereby addressing the special circumstances of these

---

[41]     Indeed, certain objectors proposed, based on their misunderstanding of the
applicable objection deadline, that the Court grant them an additional
20 days to file their respective objections to confirmation.  See, e.g., Aleem
Objection, at 10; Henry Objection, at ¶ 5; Magee Objection, at ¶ 6.
As demonstrated above, individual creditors were accorded this amount of
time and more.

individuals.  See Certificate of Service (Docket No. 6177).  Accordingly,

objections based on the alleged incomprehensibility of the Plan should be

overruled.

72.    For all of the foregoing reasons, (a) all individual creditors

have received proper and adequate notice of all aspects of the Plan confirmation

process, (b) all rights to due process have been consistently safeguarded by the

City and the Court and (c) the relevant objections should be overruled.

## VIII.  DUE PROCESS

### A.    Creditors' Due Process Rights Have Not Been Violated (Issue 8)

73.    One objecting party alleges, without elaboration or example,

that "[t]his Court's undue haste has result[ed] in trampling the due process rights

of creditors."[42]  Because the Court has been extraordinarily and assiduously

solicitous of the rights and opinions of individual creditors in connection with

solicitation of the Plan and the Plan confirmation process, the Due Process

Objection must be overruled.[43]

74.    As articulated above in response to Issue 1(a)(iii), "due process

requires notice 'reasonably calculated, under all circumstances, to apprise

---

[42]    Docket No. 5971 (Objection of Dennis Taubitz) (the "Due Process
        Objection").

[43]    Due process-related arguments raised by objectors represented by counsel
        have been addressed by the City in the Prior Briefing and are not further
        addressed by the City herein.  See Pretrial Brief, at § VII.A.

interested parties of the pendency of the action and afford them an opportunity to present their objections.'" Bolden, 2013 WL 3897048, at *7 (quoting Espinosa, 559 U.S. at 272, and Mullane, 339 U.S. at 314). In addition, "[c]ourts have interpreted the Mullane standard flexibly in the bankruptcy context." Bosiger, 510 F.3d at 451.

75.     The suggestion that the Court has acted with "undue haste" in connection with the Chapter 9 Case – and thereby infringed upon creditors' due process rights – cannot be reconciled with either (a) the urgent need to address the circumstances that prompted the filing of the City's chapter 9 petition as a threshold matter or (b) the Court's actual administration of the Chapter 9 Case. As is recounted in detail in:  (a) the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 11) (the "Orr Declaration"), filed on the Petition Date; and (b) the Opinion Regarding Eligibility (Docket No. 1945), entered on December 3, 2013, the filing of the Chapter 9 Case was prompted by, among other things, (a) a State-declared "financial emergency" existing within the City, (b) a crippling "service delivery insolvency" that had left the City unable to provide its nearly 700,000 residents with basic municipal services (including services related to public health, safety and welfare) and (c) spiraling financial insolvency. See Orr Declaration, at ¶¶ 31-44, 52-57, 76-78, 112; In re City of

Detroit, 504 B.R. 97, 169, 171, 179 (Bankr. E.D. Mich. 2013). The urgent need to address the City's dire financial and operational circumstances through this Chapter 9 Case (a) required the efficient and expeditious administration thereof and (b) is incompatible with the delay apparently urged by the Due Process Objection.

76.     Moreover, the allegation that the Chapter 9 Case is fairly characterized as having been conducted with "undue haste" is belied by the facts. Throughout the Chapter 9 Case (and particularly with respect to the Plan solicitation and confirmation process), the Court has taken numerous and, to the City's knowledge, unprecedented steps to (a) protect the interests of individual creditors, (b) promote individual creditors' ability to understand the impact the Chapter 9 Case might have upon their respective interests and (c) ensure that each such creditor had the opportunity to safeguard his or her respective rights and be heard by the Court. Among other examples, the Court has protected the rights of individual creditors by:

- appointing an official committee of retirees to ensure the adequate representation of the interests of retired holders of Pension Claims and OPEB Claims (see Order, Pursuant to Section 1102(a)(2) of the Bankruptcy Code, Directing the Appointment of a Committee of Retired Employees (Docket No. 279));

- ensuring that all individual creditors were provided with an adequate opportunity to object to the City's eligibility to be a chapter 9 debtor (see Initial Scheduling Order, at ¶ 1

(establishing an objection deadline (<u>i.e.</u>, August 19, 2013) for the filing of eligibility objections));

- inviting all individual creditors that filed objections contesting the City's eligibility to be a chapter 9 debtor to appear at a day-long hearing held on September 19, 2013 (at which hearing 45 such objectors appeared and presented argument to the Court) (<u>see</u> Order Regarding Eligibility Objections, Notices of Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b) (Docket No. 642), at § VIII; Transcript of Hearing, September 19, 2013, *passim*);

- informally directing the City to include the Plain Language Insert within the Disclosure Statement and related solicitation packages;

- ensuring that all individual creditors were provided with adequate opportunity to object to approval of the Disclosure Statement and confirmation of the Plan (<u>see</u> Section VII above);

- establishing a process whereby individual creditors were able to meet and confer with counsel to the City regarding objections contesting the adequacy of information included in, and the approval of, the Disclosure Statement, which meet and confer session was held on April 11, 2014 (<u>see</u> Third Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment (Docket No. 3632), at ¶ 5);

- establishing a deadline for objections to confirmation of the Plan for individual bondholders and individual retirees (<u>i.e.</u>, July 11, 2014) that was approximately two months from the date of commencement of the Plan solicitation process (<u>i.e.</u>, May 12, 2014, which was the deadline for confirmation objections for creditors represented by counsel) (<u>see</u> Fifth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment (Docket No. 6376), at ¶ 6(b));

- inviting 79 individuals that filed objections that were deemed representative of the approximately 600 objections to confirmation filed by *pro se* objectors to appear at a day-long

hearing on July 15, 2014 (at which hearing 46 such objectors appeared and presented argument to the Court) (see Notice of Hearing to Individuals Who Filed Plan Objections (Docket No. 5264), entered on June 10, 2014);

- specifically requiring the City to respond by this Response, to 16 discrete topics (and more than 20 sub-topics) raised in more than 70 *pro se* Objections (see *Pro Se* Briefing Order (Docket No. 6640)); and

- allowing individual creditors to participate in the Confirmation Hearing.  See Order Regarding Participation at the Confirmation Hearing by Creditors Who Filed Objections Without an Attorney (Docket No. 6584); Order Regarding Motions to Participate in the Confirmation Hearing (Docket No. 6896).

77.     In light of the foregoing, although the Court has administered the Chapter 9 Case in an expeditious manner befitting the City's current financial and operational emergency, it is manifest that the Court has consistently protected the rights of individual creditors in a manner far exceeding the requirements of due process.  Accordingly, the Due Process Objection must be overruled.

## IX.     THE IMPAIRMENT OF PENSION CLAIMS

### A.     The Plan Does Not Improperly Impair the Claims of Individual Creditors Against Third Parties (Issue 9)

78.     Several objecting parties argue that, by reducing pension benefits, the Plan seeks improperly to impair the claims that employees and

retirees hold against the Retirement Systems (as opposed to the City).[44]  Because

these Objections misunderstand the legal nature of the pension obligations owing

to employees and retirees, they must be overruled.

79.    The Pensions Clause expressly provides that "[t]he accrued

financial benefits of each pension plan and retirement system of the state and its

political subdivisions *shall be a contractual obligation thereof* which shall not be

diminished or impaired thereby."  Mich. Const. art. IX, § 24 (emphasis added).

Objecting party John P. Quinn's attempt to impose ambiguity with respect to the

antecedent of the language italicized above is grammatically unwarranted.[45]

Moreover, it is belied by the Detroit Home Rule Charter, which confirms that

"[t]he accrued financial benefits of active and retired city employees, *being*

*contractual obligations of the city*, shall in no event be diminished or impaired."

Detroit Home Rule Charter § 11-101(3) (emphasis added).  Mr. Quinn also

attempts to draw a distinction between:  (a) the City's obligation to fully fund

employees' accrued pension benefits each year, as well as to fund any amount of

underfunding; and (b) the mechanical distribution of pension benefits by the

---

[44]    See Docket Nos. 4296 (Objection of Thomas Cattron), 4297 (Objection of
Denise Cattron), 5330 (Objection of Sylvester Tobias), 5723 (Objection of
John P. Quinn).

[45]    See Docket No. 5723, at 11-14 (suggesting that, under the Pensions Clause,
"shall be a contractual obligation thereof" might apply additionally to "each
pension plan and retirement system").

GRS.[46]  This, however, is a misreading of applicable law that seeks to obscure the

fact that, as set forth above, the ultimate liability for pension obligations does not

lie with the GRS, it lies with the City.  As more fully discussed in the Prior

Briefing, the City is the sole sponsor of the GRS and PFRS,[47] which are the

conduits by which the City funds its pension obligations.  See Pretrial Brief,

at § V.C.  As such, there can be no dispute that *the City* is liable to GRS and PFRS

participants on account of their Pension Claims.  Pension Claims are not claims

against the Retirement Systems.  *Moreover, as more fully discussed in the Prior*

*Briefing, nothing in the Plan otherwise seeks to impair any collectively bargained*

*pension or OPEB rights that employees of the Detroit Public Library*

---

[46]     See id.

[47]     See Detroit City Code § 47-2-18(c) (providing that the Pension
Accumulation Fund of the GRS, from which pensions are paid, shall consist
of the "accumulated reserves for the pensions and other benefits payable
from the contributions *made by the City* ...") (emphasis added); Detroit City
Code § 47-2-19 (specifying how the City's annual contribution to GRS shall
be calculated and providing for no funding source other than the City);
1964 Detroit City Code § 54-2-1 (Ord. No. 77-H) ("'Pension' means the
portion of a retirement allowance which is paid for by appropriations made
by the city.") (Chapter 54 of the 1964 Detroit City Code (as amended and
supplemented from time to time by City Ordinance) was saved from repeal
by Section 11-102 of the 1974, 1997 and 2012 Detroit Home Rule Charters
and is incorporated by reference in Chapter 47 of the 1984 Detroit City
Code.); 1964 Detroit City Code §§ 54-43-4 (Ord. No. 76-H), 54-43-5
(Ord. No. 04-05) (providing that the City shall fund the Pension
Accumulation Fund of the PFRS), §§ 54-2-3 (Ord. No. 77-H), 54-2-4
(Ord. No. 77-H), 54-2-6 (Ord. No. 77-H), 54-2-7 (Ord. No. 77-H), 54-43-3
(Ord. No. 39-05) (specifying how the City's annual contribution to PFRS
shall be calculated and providing for no funding source other than the City).

*(the "Library") or the Detroit Regional Convention Facility Authority*

*(the "DRCFA") may have against the Library or DRCFA.*  See Pretrial Brief,

at §§ V.C., IX.E.  Accordingly, the Plan's impairment of Pension Claims does not

constitute the improper impairment of claims against third parties.  See City of

Detroit, 504 B.R. at 154 (holding that pension claims are subject to impairment in

the City's Chapter 9 Case).

X. **GRS PENSION CLAIMS OF DWSD,
LIBRARY AND GRANT-FUNDED EMPLOYEES**

A. **The GRS Pension Claims Held by Employees
and Retirees of DWSD and the Detroit Public Library
As Well As Grant-Funded Employees Are Similar
in Legal Nature and Character to Other GRS Pension
Claims and Are Properly Impaired Under the Plan (Issue 10)**

80.    Certain objecting parties argue that the Pension Claims of

DWSD, the Library and grant-funded employees may not be impaired because

these entities allegedly have fully funded their allocated portion of the City's

pension obligations.[48]  The Objections ignore the fact that, although these entities

may contribute their allocable share of pension funding to GRS on behalf of their

respective employees, GRS consists of a single pension fund with a single funding

level and with respect to which the City is the sole sponsor – i.e., the single source

of ultimate liability.  See Detroit City Code § 47-1-2, et seq. (providing for the

---

[48]    See Docket Nos. 3350 (Objection of Lenetta Walker), 3435 (Objection of
Shirley Walker), 4288 (Objection of Keith Davis), 4520 (Objection of
Dorothy M.W. Baker), 6019 (Objection of Dorothy M.W. Baker).

establishment of a single GRS).  As a result, the City's underfunding liability applies to all participants in GRS equally, whether or not such participants are employees of an entity that has made all requested pension funding payments. Indeed, DWSD employees and grant-funded employees are employees *of the City* and, thus, the attempt to differentiate the pension obligations allocated to DWSD from the City's other pension obligations is entirely unwarranted.

81.     Moreover, with respect to Library employees, as discussed at length in the Prior Briefing, the City seeks to impair only *its own* obligations to such employees, not those of any other party.  See Pretrial Brief, at § V.C.  To the extent that the Library itself has contractual obligations to its employees or retirees, the Plan does not purport to affect those obligations.  The Library and its unions are free to address, enforce, resolve or renegotiate any such contractual obligations.  Nevertheless, if the City itself also has an obligation (such as it does for pensions), then the City's obligation is properly compromised as part of this chapter 9 case.  Accordingly, the fact that these entities have continued to contribute their allocable share to the GRS is not legally relevant to the impairment of GRS Pensions Claims of affected employees and retirees since the underfunding claims are claims against *the City* as the sole sponsor of the GRS.[49]

---

[49]     One objecting party's argument that the Pension Claims and OPEB Claims of DWSD employees should not be impaired because the City potentially is not impairing DWSD Bond Claims is misplaced because, unlike the DWSD

## XI. SOLICITATION AND BALLOTING PROCEDURES

### A. The Solicitation of Votes on the Plan, and the Balloting Process, Complied with the Bankruptcy Code (Issue 11)

82.     Certain objecting parties argue that the process by which the City solicited votes on the Plan was illegal and unfair.[50]  These Objections must be rejected because the solicitation process was undertaken pursuant to the Court's detailed orders establishing balloting and solicitation procedures and approving the form and content of Ballots.  See Solicitation Procedures Order; Supplemental Solicitation Procedures Order.  The argument, raised by Paulette Brown and Mary Diane Bukowski,[51] that the voting process was biased because the solicitation packages sent to claimants contained no letters urging recipients to reject the Plan, also lacks merit.  Importantly, the Disclosure Statement that accompanied each Ballot contained Court-approved statements (including the Plain Language Insert developed in consultation with the Retiree Committee and many other retiree representatives and dedicated to the interests of retirees) regarding – among many other aspects of the Plan – the consequences of a "yes" or a "no" vote, and

---

Bond Claims, the City's pension and OPEB obligations are not claims that are secured by the net revenues of the sewer and water systems.  See Docket No. 4288 (Objection of Keith Davis).

[50]     See Docket Nos. 5369 (Objection of Hassan Aleem, et al.); 5956 (Objection of Paulette Brown); 5966 (Objection of Mary Diane Bukowski); 5971 (Objection of Dennis Taubitz).

[51]     See Docket Nos. 5956 and 5966, respectively.

numerous risk factors relating to confirmation of the Plan.  <u>See</u> Disclosure

Statement, at §§ I.A, I.D, II.A.2, VI; Order Approving the Proposed Disclosure

Statement (Docket No. 4401), at ¶ 3 (stating that the Disclosure Statement

contains "'adequate information' as defined by section 1125(a)(1) of [the

Bankruptcy Code]," <u>i.e.</u>, adequate information to enable a claimant to make an

informed decision regarding whether to accept or reject the Plan).

> 83.     Several objecting parties also argue that the solicitation and

balloting procedures violated federal and State election law.  As the Court has

already determined, however, voting on a plan of adjustment does not implicate,

and therefore is not subject to, such election laws.  <u>See</u> Order Regarding Motions

to Participate in the Confirmation Hearing (Docket No. 6896), at ¶ 32 (denying

motion of Paulette Brown to present evidence "that the balloting process was

improper and illegal;" stating that the Court approved the solicitation materials

and the balloting process "because balloting for a plan under the bankruptcy code

is governed by rules very different from the rules governing elections").

Accordingly, these Objections must be overruled.

## XII.   <u>THE NON-CONSENSUAL RELEASE</u>

### A.    **The Plan's Non-Consensual Release Provisions Are Lawful and Appropriate (Issue 12)**

> 84.     Several objecting parties argue that the Plan provisions

regarding the release of the State and the State Related Entities, among others, are

13-53846-tjt   Doc 7303   Filed 09/05/14   Entered 09/05/14 17:55:19   Page 73 of 193

improper.[52]  For all of the reasons set forth in the Prior Briefing, the Plan's

non-consensual release provisions are appropriate and permissible under

applicable law.  See Consolidated Reply, at § X; Pretrial Brief, at § VIII.

Accordingly, these Objections should be overruled.

## XIII.  THE CLASS 10 AND 11 VOTING INCENTIVE

### A.    The Voting Incentive Provided Jointly to Classes 10 and 11 Was Lawful and Appropriate (Issue 13)

85.    Class 10 and Class 11 receive higher pension benefits under

the Plan if (a) the Outside Funding is received and (b) Classes 10 and 11 vote to

accept the Plan; i.e., Class 10 and Class 11 would receive lower pension benefits

if either such Class voted to reject the Plan.  See Plan, at § II.B.3.q.ii.H.  Attorney

Jamie S. Fields and certain objecting parties he represents argue that these voting

incentives improperly link the voting rights of holders of Claims in Classes 10

and 11.[53]  Because the voting incentives provided under the Plan to holders of

Claims in Classes 10 and 11 are permissible, reasonable and appropriate under the

circumstances of this Chapter 9 Case – and because the incentives as structured

---

[52]    See Docket Nos. 3178 (Objection of Derek S. Hicks), 3352 (Objection of Gerald Thompson), 4082 (Objection of William Ochadleus), 4578 (Objection of Jean Vortkamp), 4579 (Objection of Mary Jo Vortkamp), 5094 (Objection of William Ochadleus), 5723 (Objection of John P. Quinn), 5836 (Objection of Krystal A. Crittendon), 5887 (Objection of Mattie D. Prichett).

[53]    See Docket Nos. 3830 (Objection of Jamie S. Fields), 4404 (Objection of Jamie S. Fields), 5964 (Objection of William Ochadleus, et al.).

were a condition imposed by the parties providing the Outside Funding on its availability – these Objections are unavailing.

86.     The objecting parties argue broadly that the voting incentives are impermissible under In re MCorp Financial, Inc., 137 B.R. 219 (Bankr. S.D. Tex. 1992).  In MCorp, the debtor's proposed chapter 11 liquidation plan provided that three classes of equity would receive enhanced recoveries only if one specific class voted in favor of the plan.  See id. at 236.  The MCorp court ruled, without substantial analysis or discussion, that the voting incentives at issue violated "unfair discrimination" and "fair and equitable" requirements.  See id.

87.     Since MCorp was decided, it generally has been accepted that nothing in the Bankruptcy Code prohibits a plan from incentivizing plan acceptance by providing enhanced recoveries for certain classes that vote in favor of the plan.

> There is no prohibition in the Code against a Plan proponent offering different treatment to a class depending on whether it votes to accept or reject the Plan.  One justification for such disparate treatment is that, if the class accepts, the Plan proponent is saved the expense and uncertainty of a cramdown fight.  This is in keeping with the Bankruptcy Code's overall policy of fostering consensual plans of reorganization and does not violate the fair and equitable requirement of section 1129(b).

In re Zenith Elecs. Corp., 241 B.R. 92, 105 (Bankr. D. Del. 1999) (internal citation omitted); see also In re Drexel Burnham Lambert Grp., Inc., 138 B.R. 714, 717

(Bankr. S.D.N.Y. 1992) (finding that "no statutory provision … proscribes such discrimination.…  We do not view the carrot and the stick, factually presented in this case, as forbidden by the Code or any other law we know of."), aff'd sub nom. Lambert Brussels Assocs. Ltd. P'ship v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.), 140 B.R. 347 (S.D.N.Y. 1992). Accordingly, conditioning the receipt of the Outside Funding upon the acceptance of the Plan by Classes 10 and 11 – especially where this was a condition imposed on the City by the parties providing the Outside Funding – is consistent with applicable law and does not violate any confirmation standard.

88.     Indeed, from the perspective of an individual claimant in either Class, it made no difference that the voting incentives employed by the Plan span Classes 10 and 11.  Unlike in MCorp, both Classes were given the opportunity to accept or reject the Plan, including the voting incentives.  In addition, no individual creditor in either Class would otherwise have held a blocking position over creditors in both Classes enabling it to control the outcome of the vote.  Moreover, the Pension Claims in both Classes benefit from the DIA Settlement, the DIA Proceeds and the State Contribution.  Accordingly, the Plan

voting incentives with respect to Classes 10 and 11 are appropriate, and the

relevant Objections should be overruled.[54]

## XIV. THE PLAN COMPLIES WITH APPLICABLE LAW

### A. The Treatment of Unlimited Tax General Obligation Bond Claims Does Not Violate Michigan Law (Issue 14(a))

89.     In an objection filed before the UTGO Settlement existed, a

single objecting party suggests that the anticipated treatment of Unlimited Tax

General Obligation Bond Claims violates Michigan law.[55]  This Objection lacks

merit for a number of reasons.  First, the objecting party does not possess standing

to object to confirmation of the Plan.  Second, the Objection's concerns regarding

the potential treatment of Unlimited Tax General Obligation Bond Claims under

the Plan have been mooted by the passage of time.  Finally, even if the Objection

could be read as a general allegation that the UTGO Settlement violates Michigan

law, this also is incorrect.  Consequently, the Objection should be overruled.

---

[54]     Notably, all of these Objections were filed on or before the Voting Deadline of July 11, 2014.  See Docket Nos. 3830 (filed April 6, 2014), 4404 (filed May 5, 2014), 5964 (filed July 11, 2014).  Both Classes ultimately accepted the Plan.  See Paque Declaration (Docket No. 6179), at ¶¶ 32-38 (stating that Classes 10 and 11 voted to accept the Plan).  Accordingly, to the extent such objections express concern that, as a result of the joint incentive provided to holders of Claims in Classes 10 and 11, it is possible that one Class would be precluded from qualifying for the voting incentives solely as a result of rejection of the Plan by the other Class, this Objection has become moot by the passage of time.

[55]     See Docket No. 3693 (Objection of Stephen Willson).

90.    The objecting party lacks standing to object to confirmation of the Plan.  The applicable Objection consists of a letter with an Illinois address.  The City (a) did not identify the objecting party in the List of Claims and (b) believes that the objecting party did not file a proof of claim.  Moreover, the objecting party makes no allegation that he is a creditor or taxpayer of, or is otherwise in any way related to, the City.  Indeed, the objecting party's only apparent connection to the Chapter 9 Case is that he was once an employee of a creditor of Orange County, California, which municipality was represented in its chapter 9 case by certain of the City's counsel.  "Only a 'party in interest' has standing to object to confirmation of  plan.  Generally, noncreditor third parties lack standing to object to confirmation of a plan."  In re Gulf States Long Term Acute Care of Covington, LLC, 487 B.R. 713, 726 (Bankr. E.D. La. 2013) (footnotes omitted); see also Standing Brief, at 3-4 (explaining that, to possess standing, a party has the burden of demonstrating, among other things, injury in fact and that it is asserting its own rights and not the rights or interests of others) (citing White v. JPMorgan Chase Bank, NA, 521 F. App'x, 425, 428 (6th Cir. 2013)).  With no indication whatsoever that the Objection has been properly raised by a party with standing, it should be overruled.[56]

---

[56]    Even if the objecting party were a Detroit taxpayer, he would lack standing to object to the legality of the UTGO Settlement under applicable State law – specifically, Michigan Public Act 189 of 1979, the Unlimited Tax Election

91.     Even if the objecting party possesses standing to object to the

Plan, the Objection has become moot.  The Objection complains that Unlimited

Tax General Obligation Bond Claims are "lumped in" with Limited Tax General

Obligation Bond Claims under the Plan.  This is simply not true.  The Plan

classifies Unlimited Tax General Obligation Bond Claims and Limited Tax

General Obligation Bond Claims in different classes (Class 8 and Class 7,

respectively), and provides for a greater percentage recovery on Unlimited Tax

General Obligation Bond Claims than on Limited Tax General Obligation Bond

Claims.  Because the Objection is premised upon incorrect facts, it should be

overruled.

---

Act, M.C.L. §§ 141.161, et seq. (the "UTEA") and Michigan Public Act 34
of 2001, the Revised Municipal Finance Act, M.C.L. §§ 141.2101, et seq.
(the "RMFA") – because no private right of action exists under either statute
for a taxpayer to raise such an objection.  See Claire-Ann Co. v. Christenson
& Christenson, Inc., 566 N.W.2d 4, 6 (Mich. Ct. App. 1997) (where a statute
"creates a new right or imposes a new duty unknown to the common law and
provides a comprehensive administrative or other enforcement mechanism
or otherwise entrusts the responsibility for upholding the law to a public
officer, a private right of action will not be inferred."); M.C.L. § 141.2201
(establishing a comprehensive enforcement mechanism under the RMFA
and entrusting enforcement of relevant provisions thereof to the Michigan
Department of Treasury); Lash v. City of Traverse City, 735 N.W.2d 628,
636-37 (Mich. 2007) (where a statute does not contain a comprehensive
enforcement provision, courts may infer a private right of action only where
there is clear evidence of legislative intent to create such a right, such as an
express private right of action).  The UTEA contains no such express private
right of action and none can reasonably be inferred.  See Standing Brief,
at ¶ 6.

92.     Even if the Objection could be read as a prospective, general allegation that the implementation of the UTGO Settlement under the Plan violates Michigan law, it would still lack merit.  As described in the Plan, the Unlimited Tax General Obligation Bonds were legally issued (a) in accordance with the provisions of the RMFA and (b) pursuant to authorizing resolutions and orders of the City.  Certain of these Unlimited Tax General Obligation Bonds (called "Stub UTGO Bonds" in the Plan) will remain outstanding; the remaining Unlimited Tax General Obligation Bonds will be restructured (refinanced) and allocated among the holders of Allowed Claims for Unlimited Tax General Obligation Bonds.  Contrary to the objector's assertion, the separate, dedicated debt millage will continue to be levied as intended, pursuant to, and in accordance with, the RMFA, and nothing in the Plan alters the authority under which the Unlimited Tax General Obligation Bonds, including the Restructured UTGO Bonds, have been or are being issued (respectively).[57]  The implementation of the UTGO Settlement complies with Michigan law, and, therefore, the Objection should be overruled.

---

[57]     In the Prior Briefing, the City responded to specific arguments that the UTGO Settlement violates the UTEA and the RMFA.  See Consolidated Reply, at § V.E; Legal Issues Brief, at § VI.

### B. The Plan Does Not Violate Michigan Public Act 344 of 1945 (Issue 14(b))

93.     Two objecting parties[58] allege generally that the Plan violates Michigan Public Act 344 of 1945, the Blighted Area Rehabilitation Act, M.C.L. §§ 125.71, et seq. ("PA 344"), by not providing for the involvement of residents and interested parties in blight remediation and rehabilitation.[59]

94.     As set forth in the Pretrial Brief, as part of its restructuring, the City intends to spend $440.3 million in Reinvestment Initiative funds on blight remediation projects to stabilize and revitalize Detroit's neighborhoods.  Pretrial Brief, at § IV.F.1.  Nothing in the Plan, however, identifies with any specificity the particular blight remediation projects that the City intends to implement or the methods it plans to employ with respect to such projects – including the level of involvement in such projects by residents and interested parties the City intends to allow.  Accordingly, there is no current project to which the provisions of PA 344

---

[58]     See Docket Nos. 3249 (Objection of Marie L. Thornton), 3481 (Objection of Douglas Yee).

[59]     PA 344 was enacted to authorize Michigan municipalities to adopt plans for the prevention and rehabilitation of blighted areas and to acquire real property for the purpose of implementing the rehabilitation plans.  PA 344 authorizes the acquisition of land by various means to carry out this purpose, and also provides for the establishment of citizens' district councils by ordinance to consult with the local governing body regarding the rehabilitation plans.

might be applied (and the objectors point to none).[60]  Moreover, the objectors do

not identify any specific provision of PA 344 that the Plan might violate.

Accordingly, even if it were possible to assess the Plan's compliance with PA 344,

that issue is not ripe for adjudication, and the relevant Objections should be

overruled.[61]

## C.    The Grand Bargain Does Not Constitute an Improper Use of Tobacco Settlement Funds (Issue 14(c))

95.    Krystal A. Crittendon argues that the State Contribution

consists of funds derived from the settlement of a class action lawsuit between the

State and the tobacco industry, which funds the State "equitably and morally"

should have given to the City (and other cities around the State).[62]

96.    The State's source of funds for the State Contribution is

irrelevant to confirmation of the Plan.  Moreover, the City is not aware of any

limitation on the State's authority to distribute tobacco settlement money in its

discretion.  The City is further unaware of any legal basis for Ms. Crittendon's

---

[60]    The City nevertheless remains committed to receiving citizen input on blight remediation issues, among other things.  At the Confirmation Hearing, the City expects Mr. Moore to testify, for example, that a component of the next stage of Detroit's blight tracking and remediation effort will involve the introduction of a mobile application allowing citizens to report blight, which the City anticipates will greatly enhance its ability to track this issue.

[61]    To the extent that the objecting parties wish to evaluate the City's compliance with applicable law following confirmation of the Plan, they will have every opportunity to do so.

[62]    See Docket No. 5836 (Objection of Krystal A. Crittendon).

claim that the City has equitable or moral entitlement to this money, and her

Objection identifies none.  Moreover, this contribution actually does aid the City

by supporting the City's retirees.  This Objection, therefore, has no merit and

should be overruled.

### D. The Plan Does Not Violate 49 U.S.C. § 5333(b)(2)(A) (Issue 14(d))

97.    Certain DDOT retirees allege that the impairment of their

Pension Claims and OPEB Claims under the Plan would violate section 5333(b)

of the Federal Transit Act (formerly known as the "Urban Mass Transportation

Act"), 49 U.S.C. § 5301, et seq. ("Federal Transit Act").[63]  With respect to its

DDOT *active employees*, the City bargained and reached agreement with all

DDOT unions, thereby complying with the requirements of the Federal Transit

Act.  As such, the City may impair active employees' Pension and OPEB Claims

under the Plan.  The City may also impair the Pension and OPEB Claims of

DDOT *retirees* because:  (a) the Federal Transit Act does not preserve any

bargaining right with respect to retirees, (b) under Michigan law, the DDOT

unions are not permitted to represent retirees in any such bargaining and

(c) notwithstanding the foregoing restrictions, the City nevertheless negotiated,

and reached agreement on the terms of the Plan, with the Court-appointed

---

[63]    See, e.g., Docket Nos. 4296 (Objection of Thomas Cattron), 5329 (Objection
of Judy Flowers-Tisdale), 5330 (Objection of Sylvester Tobias),
5883 (Objection of Gail M. Wilson).

representative of all retirees, i.e., the Retiree Committee. Thus, the City has complied with all aspects of the Federal Transit Act, and the relevant Objections should be overruled. In fact, the City has gone to considerable lengths to be certain that the Plan complies with the Federal Transit Act.

98.     Section 5333(b) of the Federal Transit Act requires that employers receiving federal assistance thereunder, as a condition of such assistance, provide certain labor protections to their employees, including the preservation of rights under collective bargaining agreements and the continuation of collective bargaining rights. Specifically, Section 5333(b) provides that:

> (1) As a condition of financial assistance under … this title, the interests of employees affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable.…

> (2) Arrangements under this subsection shall include provisions that may be necessary for: (A) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; [and] (B) the continuation of collective bargaining rights.…

49 U.S.C. § 5333(b).

99.     Again, the City has complied with the requirements of the Federal Transit Act with respect to all active employees because, in accordance with Section 5333(b) of the Federal Transit Act, the City bargained with and

ultimately entered into agreements with each of the six unions representing DDOT employees.[64]

100. The City is not required to collectively bargain with *retirees* to satisfy the Federal Transit Act. By its express terms, Section 5333(b) of the Federal Transit Act applies only to employees and not retirees. See 49 U.S.C. § 5333(b)(1) ("As a condition of financial assistance under … this title, the interests of *employees* affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable.") (emphasis added). The Eleventh Circuit has confirmed that the purpose of the Federal Transit Act is to protect active employees:

---

[64] The City entered into memoranda of understanding with five of the six unions representing DDOT employees as a result of collective bargaining. The City and two AFSCME locals initially disagreed on the amount of benefit reductions, however, and the parties entered into a fact-finding proceeding administered by the Michigan Employee Relations Commission ("MERC"). On April 22, 2014, the MERC-appointed fact-finder (the "Fact Finder") entered his decision (the "Decision") recommending that the City's requested impairment of pension and OPEB benefits be implemented. A copy of the Decision is attached hereto as Exhibit C. On May 1, 2014, the City accepted the Fact Finder's decision in its entirety. On May 2, 2014, the two AFSCME locals accepted the Fact Finder's Decision with respect to the impairment of pension and OPEB benefits, among other things (although they rejected certain other aspects of the Decision). Copies of the e-mails accepting the Fact Finder's Decision with respect to pension and OPEB benefits are attached hereto as Exhibit D. As such, the City's proposed reductions in pension and OPEB benefits were accepted by and are binding upon all parties.

> Although it was not the intent of the [Federal Transit Act] to curtail collective bargaining rights, *Congress recognized that in some instances, transit employees might be adversely affected by the introduction of new equipment or the reorganization of existing transit operations promoted by the legislation.* In particular, since the Act was to authorize grants or loans of federal funds to state or local public authorities to enable them to acquire private transit companies, employees of those companies would foreseeably become employees of the public agencies. *When it passed the Act, Congress was concerned that such employees might lose collective bargaining rights, the right to strike, or pension and retirement benefits. Section 13(c) of the Act [(now 49 U.S.C. § 5333(b))] is designed to protect affected employees from such losses.*

Local Div. 732, Amalgamated Transit Union v. Metro. Atlanta Rapid Transit Auth., 667 F.2d 1327, 1335 (11th Cir. 1982) (emphasis added) (internal citation omitted). Both the plain language and the stated purpose of the Federal Transit Act, therefore, indicate that the purpose of Section 5333(b) is to preserve the collective bargaining rights of active employees, not retirees. Thus, the Federal Transit Act did not require the City to collectively bargain proposed pension and OPEB benefit reductions with its retirees.[65]

---

[65]    As a practical matter, it would not have been possible for the City to collectively bargain with retirees because, under applicable Michigan law, unions generally are prohibited from representing retirees absent their individual, express consent. See, e.g., Cleveland Elec. Illuminating Co. v. Util. Workers Union of Am., 440 F.3d 809, 817-18 (6th Cir. 2006) (requiring that union obtain the consent of retirees to be authorized to act on their behalf); see also Amos v. PPG Indus., Inc., 699 F.3d 448, 453 (6th Cir. 2012) (holding that federal action was not "brought by the unions

101.    Nevertheless, even though the City was under no obligation to collectively bargain with retirees, as set forth above, the City did, in fact, negotiate extensively with the Retiree Committee (together with the other Retiree Representatives) and obtained its agreement on the terms of the Plan, including the proposed reductions in pension and OPEB benefits.  Because the City is modifying its DDOT-related pension and OPEB obligations in a manner consistent with section 5333(b) of the Federal Transit Act, therefore, confirmation of the Plan will not violate the Federal Transit Act.

## XV.  PENSION FUNDING LEVELS

### A.    The Plan Does Not Overstate
###        Pension Underfunding Levels (Issue 15)

102.    Several Objections contend that the funding level of the City's pensions is understated by the City under the Plan and that, as a result, Pension Claims need not be impaired.[66]  Unfortunately, these assertions are inaccurate. For all of the reasons stated by the City in the Prior Briefing, the estimated aggregate allowed amount of Pension Claims under the Plan – which results from

---

'in a representative capacity' on behalf of the plaintiff retirees" for the purposes of nonparty preclusion because unions did not obtain the assent of the retirees), cert. denied, 133 S. Ct. 2008 (2013).

[66]    See, e.g., Docket Nos. 2873 (Objection of Yvonne Williams-Jones), 3217 (Objection of Stina M. Santiestevan), 3244 (Objection of Reginald D. Amos), 3510 (Objection of Hal D. Parish), 3707 (Objection of Mark L.Smith), 4997 (Objection of James Capizzo), 6019 (Objection of Dorothy M.W. Baker).

the use of a discount rate agreed upon with Retiree Representatives after extensive

negotiations – in fact likely *understates* the City's economically reasonable

underfunding liability with respect to its pension funds.  <u>See</u> Consolidated Reply,

at § II.B.3; Pretrial Brief, at § I.A.1.  Accordingly, these Objections should be

overruled.

## XVI.  <u>ASSUMED INVESTMENT RATE OF RETURN FOR PENSIONS</u>

### A.    The Use of an Assumed Investment Rate of Return of 6.75% Is Appropriate (Issue 16)

103.    Certain objecting parties argue that the Plan's assumed rate of

return on the City's pension assets is unjustified.[67]  As set forth in the Pretrial

Brief, the City will present the testimony of Alan Perry, a Principal and

Consulting Actuary at Milliman, Inc., to establish that the 6.75% assumed future

investment rate of return on assets of the Retirement Systems is reasonable.

<u>See</u> Pretrial Brief, at § I.A.1.

---

[67]    <u>See</u> Docket Nos. 4789 (Objection of Dennis Taubitz), 4895 (Objection of Irma Industrious).  In addition, one objecting party argues that it was improper for the City to describe the treatment of Pension Claims in terms of discount rates and present values in the Plan and Disclosure Statement without defining or explaining these concepts.  <u>See</u> Docket No. 4578 (Objection of Jean Vortkamp).  As set forth above in connection with the City's response to Issue 11, the information for retirees in the Solicitation Package was developed by the City in consultation with the Retiree Committee and other parties and was approved by the Court.  <u>See</u> <u>supra</u>, § XI.  Accordingly, the City believes that this concern does not provide any legally cognizable basis for objecting to confirmation of the Plan.

## **CONCLUSION**

104.   For the reasons set forth herein, the City requests that the Court overrule the Objections and confirm the Plan.

Dated:  September 5, 2014          Respectfully submitted,


 /s/  Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone:  (248) 359-7300
Facsimile:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY

# **EXHIBIT A**

**SUMMARY OF THE CITY'S RESPONSES TO (I) *PRO SE* OBJECTIONS SPECIFIED IN THE ORDER REQUIRING CITY TO RESPOND TO CERTAIN *PRO SE* OBJECTIONS TO CONFIRMATION [DOCKET NO. 6640] AND (II) *PRO SE* OBJECTIONS NOT ADDRESSED IN THE CONSOLIDATED REPLY TO CERTAIN OBJECTIONS TO CONFIRMATION OF FOURTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT [DOCKET NO. 5034]**

| OBJECTION | SUMMARY OF CITY'S RESPONSE<br>(INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **1.    Objections of Yvonne Williams-Jones (Docket Nos. 2872, 5909)** | |
| The objecting party argues that the Plan should not be confirmed because (a) the Plan overstates levels of pension underfunding; and (b) the Plan discriminates unfairly against Class 11 Claims and favors Class 10 Claims. | The Plan does not overstate pension underfunding levels.  See Response, at § XV.A; Pretrial Brief, at § I.A.1; Consolidated Reply, at § II.B.3.  No basis exists for the objecting party's argument that the Plan discriminates unfairly against Class 11 Claims, because Class 11 voted to accept the Plan.  See Response, at § III.A. |
| **2.    Objection of Randy Walker (Docket No. 2898)** | |
| The objecting party argues that the Plan should not be confirmed because it discriminates unfairly against Class 11 Claims and favors Class 10 Claims. | No basis exists for the objecting party's argument that the Plan discriminates unfairly against Class 11 Claims, because Class 11 voted to accept the Plan.  See Response, at § III.A. |
| **3.    Objection to Plan of Adjustment [filed by William Curtis Walton] (Docket No. 2899)** | |
| The objecting party argues that the Plan should not be confirmed because the Outside Funding is not guaranteed and nothing requires the City to "guarantee any shortfall." | The Plan properly defines the City's funding obligations with respect to the Retirement Systems in the scenarios where the Outside Funding is, and is not, received.  See Response, at § VI.A.  Accordingly, the Plan does not violate the Funding Clause of the Michigan Constitution.  See id. |
| **4.    Objection of Cecily McClellan (Docket No. 2900)** | |
| The objecting party argues that the Plan should not be confirmed because (a) the City is not maximizing revenues from City-owned property and (b) the amount the City is paying in professional fees shows that the City can afford to pay creditors more than what is proposed under the Plan. | The City is not required to liquidate the DIA Collection or any of its other assets to satisfy the Claims of creditors, cannot increase tax revenues and has made reasonable efforts to increase other revenues.  See Response, at § II.A; Pretrial Brief, at § II; Consolidated Reply, at § III.B.  The professional fees incurred by the City in connection with its restructuring are necessary and reasonable.  See Response, at § II.B; see also The City of Detroit's Brief Regarding the Court's Authority to Determine the Reasonableness of Fees Under 11 U.S.C. § 943(b)(3) (Docket No. 6842) (the "Professional Fee Brief"). |

Capitalized terms not defined herein have the meanings given to them in the accompanying Response.  This table identifies, and summarizes the City's response with respect to, all objections to confirmation of the Plan (a) not previously identified on the tables attached as Exhibit A to the Consolidated Reply and Exhibit B to the Pretrial Brief except that one asterisk [*] denotes an Objection that the City previously identified and to which the City responded to in the Consolidated Reply or the table attached as Exhibit A thereto.  With respect to each such Objection, the City's response herein is limited to the issue(s) raised by the Court in the *Pro Se* Briefing Order.

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **5.**      **Objections of Carlottie Shaw (Docket Nos. 2970, 3374)** | |
| The objecting party argues that the Plan should not be confirmed because it discriminates unfairly against Pension Claims and favors "the Banks." | No basis exists for the objecting party's argument that the Plan discriminates unfairly against Pension Claims, because Classes 10 and 11 voted to accept the Plan. See Response, at § III.A. |
| **6.**      **Objection of Stephen L. Gold (Docket No. 2979)** | |
| The objecting party argues that the Plan should not be confirmed because it discriminates unfairly against Pension Claims and favors "the banks." | No basis exists for the objecting party's argument that the Plan discriminates unfairly against Pension Claims, because Classes 10 and 11 voted to accept the Plan. See Response, at § III.A. |
| **7.**      **Objection to the Proposed Plan of Adjustment [filed by Derek S. Hicks] (Docket No. 3178)** | |
| The objecting party objects generally to confirmation of the Plan and to the Plan's non-consensual release provision. | The Plan's non-consensual release provisions are appropriate and permissible under applicable law. See Response, at § XII.A; Consolidated Reply, at § X; Pretrial Brief, at § VIII. |
| **8.**      **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Gerald Galazka] (Docket No. 3205)\*** | |
| The objecting party argues that the Plan should not be confirmed because the Plan (a) discriminates unfairly against Class 11 Claims and favors Class 10 Claims; and (b) fails to provide for adequate post-confirmation oversight mechanisms. | No basis exists for the objecting party's argument that the Plan discriminates unfairly against Class 11 Claims, because Class 11 voted to accept the Plan. See Response, at § III.A. Appropriate controls will ensure the City's compliance with the Plan. See id. at § V.A; Consolidated Reply, at § IV.A.5; Pretrial Brief, at § IV.E. |
| **9.**      **Objection of Heidi Peterson (Docket No. 3214)** | |
| The objecting party argues that the Plan should not be confirmed because it discriminates unfairly against Class 11 Claims and favors Class 10 Claims. | No basis exists for the objecting party's argument that the Plan discriminates unfairly against Class 11 Claims, because Class 11 voted to accept the Plan. See Response, at § III.A. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **10.**    **Objection of Stina Marie Santiestevan (Docket No. 3217)** | |
| The objecting party argues that the Plan should not be confirmed because (a) the Plan discriminates unfairly against retiree Claims and favors the Claims of other unsecured creditors, particularly "financial institutions;" and (b) the Retirement Systems are not underfunded. | No basis exists for the objecting party's argument that the Plan discriminates unfairly against Pension Claims or OPEB Claims, because Classes 10, 11 and 12 voted to accept the Plan. See Response, at § III.A. The Plan does not overstate pension underfunding levels. See Response, at § XV.A; Pretrial Brief, at § I.A.1; Consolidated Reply, at § II.B.3. |
| **11.**    **Objection of Willie N. Ham (Docket No. 3218)** | |
| The objecting party argues that the Plan should not be confirmed because it discriminates unfairly against Class 11 Claims and favors Class 10 Claims. | No basis exists for the objecting party's argument that the Plan discriminates unfairly against Class 11 Claims, because Class 11 voted to accept the Plan. See Response, at § III.A. |
| **12.**    **Objection to the City of Detroit's Plan of Adjustment [Docket 2708] [filed by Andrea Hackett] (Docket No. 3219)** | |
| The objecting party argues that the Plan should not be confirmed because it discriminates unfairly against retiree Claims in favor of the Claims of "bond holders and Wall Street investors." | No basis exists for the objecting party's argument that the Plan discriminates unfairly against Pension Claims or OPEB Claims, because Classes 10, 11 and 12 voted to accept the Plan. See Response, at § III.A. |
| **13.**    **Objection to City of Detroit's Plan of Adjustment [filed by Marie L. Thornton] (Docket No. 3249)\*** | |
| The objecting party argues that the Plan should not be confirmed because it violates Michigan Public Act 344 of 1945. | The Plan does not violate Michigan Public Act 344 of 1945. See Response, at § XIV.B. |
| **14.**    **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Lashae Currie] (Docket No. 3254)** | |
| The objecting party argues the City's hiring of consultants, the Emergency Manager and his team and the State's alleged withholding of revenue sharing indicate that there are adequate funds at the City's disposal to reimburse employees forced to take a 20% cut in pay (presumably as a result of the City Employment Terms), improve City services and pay off all of the City's creditors. | The Objection confuses in part City funds with State funds. See Response, at § II.B. In addition, the assistance and expertise of the financial, legal and other advisors retained by the City is necessary to guide the City through its restructuring. See id. Moreover, the professional fees incurred by the City in connection with its restructuring are reasonable. See id.; Professional Fee Brief. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **15.**     **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Lenetta Walker] (Docket No. 3350)** | |
| The objecting party argues that the Plan should not be confirmed because the Pension Claims and OPEB Claims held by employees of the City who are employed in grant-funded positions cannot be impaired. | The GRS Pension Claims held by grant-funded employees are similar in legal nature and character to other GRS Pension Claims and are properly impaired under the Plan. See Response, at § X.A. |
| **16.**     **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Gerald Thompson] (Docket No. 3352)** | |
| The objecting party argues that the Plan should not be confirmed because (a) the Plan improperly classifies the Claims of individuals subject to ASF Recoupment together in Class 11 with Claims of individuals not subject to ASF Recoupment and (b) the Plan's non-consensual release provision is unfair. | The Plan provides substantially similar treatment to all Class 11 Claims. See Response, at § IV.A. The Objection conflates the treatment of Claims and claimants and should be overruled. See id. The Plan's non-consensual release provisions are appropriate and permissible under applicable law. See id. at § XII.A; Consolidated Reply, at § X; Pretrial Brief, at § VIII. |
| **17.**     **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Shirley Walker] (Docket No. 3435)** | |
| The objecting party argues that, because she is employed by the City in a position that is grant-funded, her benefit Claims may not be impaired. | The GRS Pension Claims held by grant-funded employees are similar in legal nature and character to other GRS Pension Claims and are properly impaired under the Plan. See Response, at § X.A. |
| **18.**     **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Douglas Yee] (Docket No. 3481)** | |
| The objecting party argues that the Plan violates Michigan Public Act 344 of 1945. | The Plan does not violate Michigan Public Act 344 of 1945. See Response, at § XIV.B. |
| **19.**     **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Hal G. Parish] (Docket No. 3510)** | |
| The objecting party argues that "the degree of underfunding of the pension fund has been grossly overestimated" by the City. | The Plan does not overstate pension underfunding levels. See Response, at § XV.A; Pretrial Brief, at § I.A.1; Consolidated Reply, at § II.B.3. |
| **20.**     **Objections of Kenneth Anthony Joyce (Docket Nos. 3551, 3557)\*** | |
| The objecting party argues that the City should be compelled to sell the DIA Collection to fund the recoveries on Pension Claims. | The City is not required to liquidate the DIA Collection or any of its other assets to satisfy the Claims of creditors. See Response, at § II.A; Pretrial Brief, at § II; Consolidated Reply, at § III.B. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **21.**     **Objection of Sylvester Davis (Docket No. 3692)** | |
| The objecting party argues that the City should sell the DIA Collection to increase creditor recoveries and asserts that the City has given "tax breaks to [those] who can afford to pay taxes" and sold City-owned land "for peanuts to those who can afford to pay full price." | The City is not required to liquidate the DIA Collection or any of its other assets to satisfy the Claims of creditors, cannot increase tax revenues and has made reasonable efforts to increase other revenues. See Response, at § II.A; Pretrial Brief, at § II; Consolidated Reply, at § III.B. |
| **22.**     **Objection of Stephen Willson (Docket No. 3693)** | |
| The objecting party asserts that the Plan improperly classifies Unlimited Tax General Obligation Bond Claims and Limited Tax General Obligation Bond Claims together in the same Class and subjects all such Claims to the same treatment. | The Objection should be overruled because: (a) the objecting party does not possess standing to object to confirmation of the Plan; (b) the Objection mischaracterizes the treatment of Unlimited Tax General Obligation Bonds under the Plan; and (c) even if the Objection could be read as a general allegation that the UTGO Settlement violates Michigan law, this also is incorrect. See Response, at § XIV.A; Consolidated Reply, at § V.E; Legal Issues Brief, at § VI. |
| **23.**     **Objection of Mark L. Smith (Docket No. 3707); Supplementary Objection of Mark L. Smith (Docket No. 6445); Supplemental Objection of Mark L. Smith (Docket No. 7095)** | |
| The objecting party argues that the Plan should not be confirmed because (a) "the so-called unfunded pension is mostly due to the national economic downturn from 2008 and continuing to date" and that "[m]any other pension funds (private and public) have experienced the same or worse inconsequence;" (b) the Pensions Clause prohibits the impairment of Pension Claims; (c) the Plan voting process was unfair because solicitation packages did not include materials urging recipients to reject the Plan; (d) the Plan improperly classifies the Claims of individuals subject to ASF Recoupment together in Class 11 with Claims of individuals not subject to ASF Recoupment; (e) ASF Recoupment is "illegal" and "immoral;" (f) the interest rate applicable to annuitized ASF Recoupment balances was "hidden;" and (g) the Plan's non-consensual release provision is inappropriate. | The Plan does not overstate pension underfunding levels. See Response, at § XV.A; Pretrial Brief, at § I.A.1; Consolidated Reply, at § II.B.3. The Pensions Clause does not prohibit the impairment of pensions in chapter 9. See City of Detroit, 504 B.R. at 150-54. The solicitation of votes on the Plan and the balloting process complied with the Bankruptcy Code and orders of the Bankruptcy Court. See Response, at § XI.A; Confirmation Standards Exhibit, at § V. The Plan provides substantially similar treatment to all Class 11 Claims. See Response, at § IV.A. ASF Recoupment has a reasonable legal basis and is appropriate under the circumstances. See id. at §§ I.A-B. The City did not conceal the interest rate applicable to annuitized ASF Recoupment payments. See id. at § I.I. The Plan's non-consensual release provisions are appropriate and permissible under applicable law. See Response, at § XII.A; Consolidated Reply, at § X; Pretrial Brief, at § VIII. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **24.**     **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Bonnie Armstrong] (Docket No. 3741)** ||
| The objecting party objects generally to confirmation of the Plan, citing "selling of [C]ity assets." | To the extent that the objecting party attempts to argue that the City is required to sell City-owned assets to maximize creditor recoveries, the Objection must be overruled. The City is not required to liquidate any of its assets to satisfy the Claims of creditors. See Response, at § II.A; Pretrial Brief, at § II; Consolidated Reply, at § III.B. |
| **25.**     **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Fredia M. Butler] (Docket No. 3747)** ||
| The objecting party objects generally to confirmation of the Plan, citing "selling of [C]ity assets." | To the extent that the objecting party attempts to argue that the City is required to sell City-owned assets to maximize creditor recoveries, the Objection must be overruled. The City is not required to liquidate any of its assets to satisfy the Claims of creditors. See Response, at § II.A; Pretrial Brief, at § II; Consolidated Reply, at § III.B. |
| **26.**     **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Mary Jackson] (Docket No. 3748)** ||
| The objecting party objects generally to confirmation of the Plan, citing a "lack of [C]ity services" and "selling of [C]ity assets." | To the extent that the objecting party attempts to argue that the City is required to sell City-owned assets to maximize creditor recoveries, the Objection must be overruled. The City is not required to liquidate any of its assets to satisfy the Claims of creditors. See Response, at § II.A; Pretrial Brief, at § II; Consolidated Reply, at § III.B. |
| **27.**     **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Bettina Moore] (Docket No. 3752)** ||
| The objecting party objects generally to confirmation of the Plan, citing "selling of [C]ity assets." | To the extent that the objecting party attempts to argue that the City is required to sell City-owned assets to maximize creditor recoveries, the Objection must be overruled. The City is not required to liquidate any of its assets to satisfy the Claims of creditors. See Response, at § II.A; Pretrial Brief, at § II; Consolidated Reply, at § III.B. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **28.** **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Cheryl R. Rayford] (Docket No. 3776)** | |
| The objecting party argues that the Plan should not be confirmed because, under the Plan, "[t]he City will pay zero into the pension fund for the next 10 years." | The Plan properly defines the City's funding obligations with respect to the Retirement Systems in the scenarios where the Outside Funding is, and is not, received. See Response, at § VI.A. Accordingly, the Plan does not violate the Funding Clause of the Michigan Constitution. See id. Moreover, the City is in fact making contributions to GRS over the next 10 years. See Plan, at § II.B.3.r.ii.A. |
| **29.** **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Carol A. Johnson] (Docket No. 3787)** | |
| The objecting party argues that the Plan should not be confirmed because it discriminates unfairly against Class 11 Claims and favors Class 10 Claims. | No basis exists for the objecting party's argument that the Plan discriminates unfairly against Class 11 Claims, because Class 11 voted to accept the Plan. See Response, at § III.A. |
| **30.** **Objection to Debtor's Plan of Adjustment [Filed by Linda Appling] (Docket No. 3794)** | |
| The objecting party argues that the City should "make the banks pay" rather that impairing the Claims of retirees. | To the extent that the objecting party attempts to argue that the Plan discriminates unfairly against Pension Claims and OPEB Claims, and favors certain other unsecured Claims, no basis exists for such argument, because Classes 10, 11 and 12 voted to accept the Plan. See Response, at § III.A. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **31.** | **Objection of Jamie S. Fields to the City of Detroit's Amended Plan of Adjustment Dated March 31, 2014 (Docket No. 3830\*); Objection of Jamie S. Fields to the City of Detroit's Fourth Amended Plan of Adjustment Dated May 5, 2014 (Docket No. 4404\*); Supplemental Objection of Creditor Jamie S. Fields to the Confirmation of the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit, Michigan (May 5, 2014) (Docket No. 5162)** |
| The objecting party argues that the Plan should not be confirmed because: (a) the Plan discriminates unfairly against PFRS Pension Claims and OPEB Claims as compared with the Claims of all other unsecured creditors; (b) the Plan improperly links together the voting rights of Classes 10 and 11; (c) the City has not maximized creditor recoveries through asset liquidation, improving tax collection rates and operational restructuring; (d) the Plan improperly classifies Claims held by individuals subject to ASF Recoupment together in Class 11 with Claims held by individuals not subject to ASF Recoupment; (e) the Plan is not feasible because it does not contain benchmarks to determine whether the Reinvestment Initiatives are successful; (f) the Plan violates the Funding Clause because it allows the City to "forbear[ ] on [its] required annual pension contributions until 2023" and "pay less than [its] constitutionally required contribution until 2033;" (g) the DIA Settlement constitutes an "illusory promise" that violates Michigan contract law and section 943(b) of the Bankruptcy Code; and (h) the Plan voting process lacked integrity. | No basis exists for the objecting party's argument that the Plan discriminates unfairly against Pension Claims or OPEB Claims, because Classes 10 and 12 voted to accept the Plan. See Response, at § III.A. The voting incentives provided under the Plan to holders of Claims in Classes 10 and 11 – which incentives were structured as a condition imposed by the parties providing the Outside Funding on its availability – are permissible, reasonable and appropriate under the circumstances of this Chapter 9 Case. See id. at § XIII.A. The City is not required to liquidate the DIA Collection or any of its other assets to satisfy the Claims of creditors, cannot increase tax revenues and has made reasonable efforts to increase other revenues. See id. at § II.A; Pretrial Brief, at § II; Consolidated Reply, at § III.B. The Plan provides substantially similar treatment to all Class 11 Claims. See Response, at § IV.A. With respect to the treatment of Class 11 Claims, the Objection conflates the treatment of Claims and claimants and should be overruled. See id. The objecting party's argument regarding the Plan's alleged lack of service-related benchmarks is both premature and unpersuasive because the City expects that the testimony of Charles Moore at the Confirmation Hearing will establish that (a) various metrics and benchmarks were among the myriad factors considered by the City in developing the Reinvestment Initiatives and, in any event, (b) the development of the Reinvestment Initiatives required far more than the consideration of metrics and benchmarks. See id. at § V.B; Pretrial Brief, at § IV. The Plan properly defines the City's funding obligations with respect to the Retirement Systems in the scenarios where the Outside Funding is, and is not, received. See Response, at § VI.A. Accordingly, the Plan does not violate the Funding Clause of the Michigan Constitution. See id. Moreover, the City will in fact make contributions to GRS over the next 10 years. See Plan, at § II.B.3.r.ii.A. The DIA Settlement is not an illusory contract. See Pretrial Brief, at § XI.D. The solicitation of votes on the Plan, and the balloting process, complied with the Bankruptcy Code and orders of the Bankruptcy Court. See Response, at § XI.A; Confirmation of the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit, Exhibit A to Pretrial Brief (the "Confirmation Standards Exhibit"), at § V. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **32.** | **Objections to Debtor's Amended Plan of Adjustment [filed by Dennis Taubitz] (Docket No. 3845*); Creditor Objection to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [filed by Dennis Taubitz] (Docket No. 4789*); Creditor First Supplemental Objections to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [filed by Dennis Taubitz] (Docket No. 5971)** |
| The objecting party argues that the Plan should not be confirmed because (a) the Plan unfairly discriminates between retiree Claims and other unsecured Claims, and treats GRS claims differently from PFRS claims; (b) the City failed to value and liquidate many of its assets, including the DIA Collection; (c) ASF Recoupment violates applicable statutes of limitations; (d) 6.75% is not an appropriate rate of assumed investment return with respect to the Retirement Systems; (e) the Plan improperly combines Claims of individuals subject to ASF Recoupment together with Claims of creditors not subject to ASF Recoupment, in Class 11; (f) the City has "fraudulently" failed to disclose an interest rate of 6.75% applicable to ASF Recoupment Excess Interest; (g) the City has failed to set forth a legal rationale for ASF Recoupment; (h) the impairment of Pension Claims contravenes the Pensions Clause; (i) the Court's "undue haste" has resulted in the "trampling [of] the due process rights of creditors;" and (j) the balloting process was "a naked attempt by the Debtor to secure a 'yes' vote." | No basis exists for the objecting party's argument that the Plan discriminates unfairly against Pension Claims or OPEB Claims, because Classes 10, 11 and 12 voted to accept the Plan. See Response, at § III.A. The City is not required to liquidate the DIA Collection or any of its other assets to satisfy the Claims of creditors. See id. at § II.A; Pretrial Brief, at § II; Consolidated Reply, at § III.B. ASF Recoupment does not violate any statute of limitations. See Response, at § I.C. The use of an assumed rate of return of 6.75% with respect to assets of the Retirement Systems is reasonable. See id. at § XVI.A; Pretrial Brief, at § I.A.1. The Plan provides substantially similar treatment to all Class 11 Claims. See Response, at § IV.A. With respect to the treatment of Class 11 Claims, the Objection conflates the treatment of Claims and claimants and should be overruled. See id. The City did not conceal the interest rate applicable to annuitized ASF Recoupment payments. See id. at § I.I. ASF Recoupment has a reasonable legal basis and is appropriate under the circumstances. See id. at §§ I.A-B. The Pensions Clause does not prohibit the impairment of pensions in chapter 9. See In re City of Detroit, 504 B.R. 97, 150-54 (Bankr. E.D. Mich. 2013). Creditors' due process rights have not been violated. See Response, at § VIII.A. The solicitation of votes on the Plan and the balloting process complied with the Bankruptcy Code and orders of the Bankruptcy Court. See id. at § XI.A; Confirmation Standards Exhibit, at § V. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **33.** **Objection to the Plan of Adjustment [filed by William Ochadleus] (Docket No. 4082\*); Objection of William Ochadleus (Docket No. 5094)** | |
| The objecting party argues that the Plan should not be confirmed because (a) under the Plan, the City will contribute "nothing" to the Retirement Systems during the ten year period following the Effective Date; (b) the Plan's non-consensual release provisions are inappropriate; (c) PA 436 violates the Michigan and United States constitutions and the federal Voting Rights Act; (d) retirees are not adequately represented by the Retiree Committee; (e) the City's modifications to OPEB benefits are unlawful and unfair; and (f) the Michigan Constitution prohibits the impairment of pensions. | The Plan properly defines the City's funding obligations with respect to the Retirement Systems in the scenarios where the Outside Funding is, and is not, received. See Response, at § VI.A. Accordingly, the Plan does not violate the Funding Clause of the Michigan Constitution. See id. Moreover, the City will in fact make contributions to GRS over the next 10 years. See Plan, at § II.B.3.r.ii.A. The Plan's non-consensual release provisions are appropriate and permissible under applicable law. See id. at § XII.A; Consolidated Reply, at § X; Pretrial Brief, at § VIII. The OPEB Settlement is fair and equitable and within the range of reasonableness. See Pretrial Brief, at § XIII.A.1.b; Consolidated Reply, at § I.C. The Pensions Clause does not prohibit the City from impairing its pension obligations in chapter 9. See In re City of Detroit, 504 B.R. 97, 150-54 (Bankr. E.D. Mich. 2013). The objecting party's remaining arguments – regarding the legality of PA 436 and retiree representation by the Retiree Committee – do not raise any legally cognizable objection to confirmation of the Plan. |
| **34.** **Objection of Joann Watson (Docket No. 4258)** | |
| The objecting party argues that, under the Plan, retiree Claims "are subject to disparate treatment" as compared to the treatment of Claims of "banks and financial firms related to the illegal swap deal of 2005." | No basis exists for the objecting party's argument that the Plan discriminates unfairly against Pension Claims and OPEB Claims, because Classes 10, 11 and 12 voted to accept the Plan. See Response, at § III.A. |
| **35.** **Objections of Keith Davis (Docket Nos. 4288, 5967)** | |
| The objecting party argues that the Plan should not be confirmed because (a) Pension Claims held by employees and retirees of the DWSD "should be excluded from these proceedings" because the benefits received by such employees and retirees "are paid for in full by the rate payer revenues" of the DWSD; and (b) the Plan voting process lacked integrity because votes were not tabulated locally and such process did not allow for challenges. | The GRS Pension Claims held by employees and retirees of the DWSD are similar in legal nature and character to other GRS Pension Claims and are properly impaired under the Plan. See Response, at § X.A. Moreover, the objecting party's argument that the Pension Claims and OPEB Claims of DWSD employees should not be impaired because the City potentially is not impairing DWSD Bond Claims is misplaced because the City's pension and OPEB obligations are not special revenue liabilities. See id. The solicitation of votes on the Plan and the balloting process complied with the Bankruptcy Code and orders of the Bankruptcy Court. See id. at § XI.A; Confirmation Standards Exhibit, at § V. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **36.**     **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Thomas Cattron] (Docket No. 4296)** | |
| The objecting party argues that the Plan should not be confirmed because (a) ASF Recoupment amounts to an unconstitutional *ex post facto* law; (b) the Plan improperly impairs the Claims of individual creditors against third parties because the Retirement Systems are separate legal entities from the City, meaning that Pension Claims cannot be impaired under the Plan; and (c) the Plan violates the Federal Transit Act. | No basis exists for the objecting party's argument that ASF Recoupment amounts to an unconstitutional *ex post facto* law.  See Response, at § I.E.  The Plan does not improperly impair the Claims of individual creditors against third parties.  See id. at § IX.A.  The Plan does not violate the Federal Transit Act.  See id. at § XIV.D. |
| **37.**     **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Denise Cattron] (Docket No. 4297)** | |
| The objecting party argues that the Plan should not be confirmed because (a) ASF Recoupment amounts to an unconstitutional *ex post facto* law; and (b) the Plan improperly impairs the Claims of individual creditors against third parties because the Retirement Systems are separate legal entities from the City, meaning that Pension Claims cannot be impaired under the Plan. | No basis exists for the objecting party's argument that ASF Recoupment amounts to an unconstitutional *ex post facto* law.  See Response, at § I.E.  The Plan does not improperly impair the Claims of individual creditors against third parties.  See id. at § IX.A. |
| **38.**     **Objection of Janice Guy-Simmons (Docket No. 4306)** | |
| The objecting party argues that the Plan should not be confirmed because it discriminates unfairly against Claims held by tort claimants and favors Pension Claims. | The Plan does not discriminate unfairly against the Claims of tort claimants.  See Response, at § III.B; Consolidated Reply, at §§ II.A-D; Pretrial Brief, at §§ I.A-B. |
| **39.**     **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by Angela M. Carter] (Docket No. 4364)** | |
| The objecting party objects generally to confirmation of the Plan, citing a "lack of [C]ity services" and "selling of [C]ity assets." | To the extent that the objecting party attempts to argue that the City is required to sell City-owned assets to maximize creditor recoveries, the Objection must be overruled.  The City is not required to liquidate any of its assets to satisfy the Claims of creditors.  See Response, at § II.A; Pretrial Brief, at § II; Consolidated Reply, at § III.B. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **40.** **Objection to Fourth Amended Chapter 9 Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014) Filed by Debtor in Possession City of Detroit, Michigan [filed by Jean Vortkamp] (Docket No. 4578)*** | |
| The objecting party argues that the Plan should not be confirmed because (a) ASF Recoupment is unfair; (b) the Plan's post-confirmation oversight provisions are inappropriate; (c) the Plan fails to provide for (i) adequate post-confirmation oversight of the Retirement Systems and (ii) sufficient retiree representation on the Retirement Systems' boards of trustees; (d) the Outside Funding is not guaranteed and the Plan does not require any party to make up for missed payments; (e) the Plan's non-consensual release provision is inappropriate; and (f) 6.75% is in appropriate rate for calculation of pension underfunding. | ASF Recoupment has a reasonable basis and is appropriate under the circumstances. See Response, at §§ I.A-B. Under the Plan, appropriate controls will ensure the City's compliance with the Plan, and retirees will be adequately represented. See id. at § V.A; Consolidated Reply, at § IV.A.5; Pretrial Brief, at § IV.E. The Plan and the Detroit Home Rule Charter specify that members of the General Retirement System or retired city employees must elect six of the ten members of the General Retirement System Board of Trustees. See Plan, at Exhibit I.A.238a; Detroit Home Rule Charter § 11-103. In addition, pursuant to the State Contribution Agreement, one such retiree elected member shall serve on the Investment Committee of the GRS. See Plan, at Exhibit I.A.318. The Plan also mandates that PFRS participants or retired City employees choose eight of the seventeen members of the Board of Trustees for PFRS. See id. at Exhibit I.A.242a. Of these retiree representative members, two shall serve on the Investment Committee of the PFRS pursuant to the State Contribution Agreement. See Plan, at Exhibit I.A.318. The Plan properly defines the City's funding obligations with respect to the Retirement Systems in the scenarios where the Outside Funding is, and is not, received. See Response, at § VI.A. Accordingly, the Plan does not violate the Funding Clause of the Michigan Constitution. See id. The Plan's non-consensual release provisions are appropriate and permissible under applicable law. See id. at § XII.A; Consolidated Reply, at § X; Pretrial Brief, at § VIII. The Plan does not overstate pension underfunding levels. See Response, at § XV.A; Pretrial Brief, at § I.A.1; Consolidated Reply, at § II.B.3. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **41.** **Objection to City of Detroit's Plan of Adjustment [Docket 4392] [filed by Mary Jo Vortkamp) (Docket No. 4579)*** | |
| The objecting party argues that the Plan should not be confirmed because (a) ASF Recoupment violates applicable statutes of limitations; (b) the Plan fails to provide for (i) adequate post-confirmation oversight of the Retirement Systems and (ii) sufficient retiree representation on the Retirement Systems' boards of trustees; (c) the Outside Funding is not guaranteed and the Plan does not require any party to make up for missed payments; and (d) the Plan's non-consensual release provision is inappropriate. | ASF Recoupment does not violate any statute of limitations. See Response, at § I.C. Under the Plan, appropriate controls will ensure the City's compliance with the Plan, and retirees will be adequately represented. See id. at § V.A; Consolidated Reply, at § IV.A.5; Pretrial Brief, at § IV.E. The Plan and the Detroit Home Rule Charter specify that members of the General Retirement System or retired city employees must elect six of the ten members of the General Retirement System Board of Trustees. See Plan, at Exhibit I.A.238a; Detroit Home Rule Charter § 11-103. In addition, pursuant to the State Contribution Agreement, one such retiree elected member shall serve on the Investment Committee of the GRS. See Plan, at Exhibit I.A.318. The Plan also mandates that PFRS participants or retired City employees choose eight of the seventeen members of the Board of Trustees for PFRS. See id. at Exhibit I.A.242a. Of these retiree representative members, two shall serve on the Investment Committee of the PFRS pursuant to the State Contribution Agreement. See Plan, at Exhibit I.A.318. The Plan properly defines the City's funding obligations with respect to the Retirement Systems in the scenarios where the Outside Funding is, and is not, received. See Response, at § VI.A. Accordingly, the Plan does not violate the Funding Clause of the Michigan Constitution. See id. The Plan's non-consensual release provisions are appropriate and permissible under applicable law. See id. at § XII.A; Consolidated Reply, at § X; Pretrial Brief, at § VIII. |
| **42.** **Objection to the City of Detroit's Plan of Adjustment [filed by Michael D. Shane] (Docket No. 4622)*** | |
| The objecting party argues that the Plan should not be confirmed because the Plan fails to (a) "account for the ongoing foreclosure crisis in Detroit" and, as a result, the Plan "probably underestimate[s] the property tax receipts over the next 20 years, casting doubt on the viability of the Plan of Adjustment;" (b) "bring the parties that profited immensely during the run-up to the housing crisis and onset of the Great Recession to the table to negotiate a general reduction in the principal owed on home mortgages in Detroit," which would stabilize property tax values; and (c) pursue unpaid property taxes of "banks and investment firms who owned properties that they had foreclosed upon." | The City's historic problems with respect to the collection of property taxes do not threaten feasibility of the plan or present any legally cognizable objection thereto. Nevertheless, the Reinvestment Initiatives provide investment to improve the City's property tax collections. See Response, at § V.C. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **43.** **Objection to City of Detroit's Plan of Adjustment [filed by Dawn DeRose] (Docket No. 4632)\*** | |
| The objecting party asserts that the City has failed to maximize revenues with respect to Joe Louis Arena, the development of the new Detroit Red Wings arena district and Belle Isle Park. | The City is not required to liquidate any of its assets to satisfy the Claims of creditors, cannot increase tax revenues and has made reasonable efforts to increase other revenues. See id. at § II.A; Pretrial Brief, at § II; Consolidated Reply, at § III.B. |
| **44.** **Objections of the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit Issued May 5, 2014 [filed by Katrina Henry] (Docket No. 4695)\*** | |
| The objecting party argues that (a) she was not provided with sufficient notice regarding, and time to respond to, certain (unspecified) filings related to the Plan; and (b) "[t]his whole procedure from the notices to Plan of Adjustments and Disclosure Statements are not discerning and are incomprehensible to me and the public as a whole." | The City has provided adequate notice to all known parties in interest throughout the Plan confirmation process. See Response, at § VII.A. Creditors' due process rights have not been violated. See id. at § VIII.A. |
| **45.** **Objections of the Notice of Filing of Redlined Versions of (A) Fourth Plan for the Adjustment Fourth Plan for the Adjustment of the City of Detroit [sic] and (B) Fourth Amended Plan for the Adjustment of Debts of the City of Detroit Issued May 5, 2014 [filed by Carl Williams and Hassan Aleem (Docket No. 4808); Vera C. Magee (Docket No. 4827)]\*** | |
| The objecting parties argue that (a) they were not provided with sufficient notice regarding, and time to respond to, certain (unspecified) filings related to the Plan; and (b) "[t]his whole procedure from the notices to Plan of Adjustments and Disclosure Statements are not discerning and are incomprehensible to me and the public as a whole." The objecting parties further argue that, under the Plan, the governance structure of the PFRS provides for inadequate employee and retiree representation. | The City has provided adequate notice to all known parties in interest throughout the Plan confirmation process. See Response, at § VII.A. Creditors' due process rights have not been violated. See id. at § VIII.A. Under the Plan, appropriate controls will ensure the City's compliance with the Plan, and retirees will be adequately represented. See id. at § V.A; Consolidated Reply, at § IV.A.5; Pretrial Brief, at § IV.E. The Plan mandates that PFRS participants or retired City employees choose eight of the seventeen members of the Board of Trustees for PFRS. See Plan, at Exhibit I.A.242a. |
| **46.** **Creditor Objection to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [filed by Irma Industrious] (Docket No. 4895)\*** | |
| The objecting party argues that the Plan should not be confirmed because (a) the City has failed to liquidate "many major assets," and the Plan contemplates disposing of the DIA Collection for "far less" than its value; and (b) the City's "claim of an investment return assumption of 6.75% is not justified." | The City is not required to liquidate the DIA Collection or any of its other assets to satisfy the Claims of creditors and has made reasonable efforts to increase other revenues. See id. at § II.A; Pretrial Brief, at § II; Consolidated Reply, at § III.B. The use of an assumed rate of return of 6.75% with respect to assets of the Retirement Systems is reasonable. See Response, at § XVI.A; Pretrial Brief, at § I.A.1. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **47.** Objection by Robert Cole to the Fourth Amended Plan for the Adjustment of Debts for the City of Detroit (Docket No. 4950) | |
| The objecting party argues that (a) claims against individual police officers of the City (presumably brought under 42 U.S.C. § 1983) for alleged Constitutional violations cannot be impaired in chapter 9; and (b) the Plan unfairly allocates proceeds of the DIA Settlement and State Contribution Agreement solely to pension creditors. | Claims arising under 42 U.S.C. § 1983 may be impaired under the Plan. See Pretrial Brief, at § XIV.B; Legal Issues Brief, at § II. The Plan does not discriminate unfairly against the Claims of tort claimants. See Response, at § III.B; Consolidated Reply, at §§ II.A-D; Pretrial Brief, at §§ I.A-B. |
| **48.** Objection to City of Detroit's Plan of Adjustment [filed by James F. Capizzo] (Docket No. 4997) | |
| The objecting party asserts that the City's calculation of pension underfunding is inflated. | The Plan does not overstate pension underfunding levels. See Response, at § XV.A; Pretrial Brief, at § I.A.1; Consolidated Reply, at § II.B.3. |
| **49.** Supplemental Objections of the Modification of the (A) Fourth Amended Plan for Adjustment Fourth [sic] of Debts of the City of Detroit and (B) Fourth Amended Disclosure Statement with Respect to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit Issued May 5, 2014 [filed by Carl Williams and Hassan Aleem (Docket No. 5057); Woodrow C. McCarty (Docket No. 5060); Mary Louise Williams (Docket No. 5096); Thelma Milledge (Docket No. 5097); Joyce A. Davis (Docket No. 5098); Jerome T. Wills (Docket No. 5099); Jean Duckett (Docket No. 5100); Katrina Henry (Docket No. 5101); Dorothea Harris (Docket No. 5102); Errol Griffin (Docket No. 5103); Wayne Bernard (Docket No. 5105); James Lovely (Docket Nos. 5106, 5298); Belinda A. Myers-Florence (Docket No. 5107); Gregory T. Waller (Docket No. 5108); James L. Hale (Docket No. 5110); Jay C. Harris, Jr. (Docket No. 5111); David D. Espie (Docket No. 5112); Denise Steele (Docket No. 5113); Sylvester Davis (Docket No. 5114); Belinda Farhat (Docket No. 5115); Vickie L. Shackelford (Docket No. 5123); Love V. Miller (Docket No. 5124); Paulette Brown (Docket No. 5125); George Cannon (Docket No. 5126); Alma Cozart (Docket No. 5127); Walter Blaney (Docket No. 5295); Shelle Cannon (Docket No. 5296); Ronald Gene Patterson (Docket No. 5297)] | |
| The objecting parties argue that (a) the Emergency Manager lacked authority to file the City's chapter 9 petition and the Court lacks jurisdiction to preside over the case; (b) ASF Recoupment violates applicable statutes of limitations; (c) insufficient notice was provided to pensioners regarding Plan voting; (d) the Plan is not feasible or in the best interests of creditors; and (e) the Plan violates the due process and equal protection clauses of the U.S. Constitution by not permitting unimpaired creditors to vote. | The Emergency Manager was authorized to commence the Chapter 9 Case, and the Court had jurisdiction to determine that the City was eligible to be a chapter 9 debtor. See City of Detroit, 504 B.R. at 110, 161-62. ASF Recoupment does not violate any statute of limitations. See Response, at § I.C. The City has provided adequate notice to all known parties in interest throughout the Plan confirmation process. See id. at § VII.A. Creditors' due process rights have not been violated. See id. at § VIII.A. The solicitation of votes on the Plan, and the balloting process, complied with the Bankruptcy Code and the orders of the Bankruptcy Court. See id. at § XI.A; Confirmation Standards Exhibit, at § V. The Plan is feasible. See Response, at § V; Pretrial Brief, at § IV; Consolidated Reply, at § IV. The Plan is in the best interests of creditors. See Response, at § II; Pretrial Brief, at § III; Consolidated Reply, at § III. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **50.**    **Objection of Michael K. Pelletier and Lou Ann Pelletier (Docket No. 5062)** | |
| The objecting parties argue that (a) the City has not identified a sufficient legal justification for ASF Recoupment; (b) City officials have used "coercion and intimidation" to "force" retirees to vote in favor of the Plan; and (c) City employees are not sufficiently represented by "the retiree union(s) and others responsible for representing the interest of the employees" in the chapter 9 case. | ASF Recoupment has a reasonable legal basis and is appropriate under the circumstances.  See Response, at §§ I.A-B.  The City disputes the factual allegations contained in the Objection.  The Plan was proposed in good faith, and the objecting parties' allegations of illegal and unethical conduct must be rejected. See Pretrial Brief, at § IX.A.  The solicitation of votes on the Plan and the balloting process complied with the Bankruptcy Code and the orders of the Bankruptcy Court.  See Response, at § XI.A; Confirmation Standards Exhibit, at § V. The objecting parties' argument regarding union representation of retirees does not implicate any legal standard relevant to confirmation of the Plan. |
| **51.**    **Objecting Creditor Michael J. Karwoski's Identification of Legal Issues Relating to Confirmation (Docket No. 5089); Objecting Creditor Michael J. Karwoski's Objections to Confirmation of the Fourth Amended Plan of Adjustment (Docket No. 5923)** | |
| The objecting party argues that the Plan should not be confirmed because (a) ASF Recoupment violates applicable statutes of limitations; (b) the City's failure to disclose the interest rate applied to Annuity Savings Fund Excess Amounts violates applicable law; (c) the Plan improperly classifies Claims held by individuals subject to ASF Recoupment together in Class 11 with Claims held by individuals not subject to ASF Recoupment; (d) the Plan violates section 1129(a)(3) of the Bankruptcy Code because ASF Recoupment was not proposed in good faith; (e) the definition of "Excess Interest" set forth in the Plan amounts to an impermissible *ex post facto* application of section 47-1-18(c) of the Detroit City Code; and (f) the City cannot seek ASF Recoupment because the City is *in pari delicto* with respect to the prior mismanagement of the GRS. | ASF Recoupment does not violate any statute of limitations.  See Response, at § I.C.  The City did not conceal the interest rate applicable to annuitized ASF Recoupment payments.  See id. at § I.I.  The Plan provides substantially similar treatment to all Class 11 Claims.  See id. at § IV.A.  With respect to the treatment of Class 11 Claims, the Objection conflates the treatment of Claims and claimants and should be overruled.  See id.  The Plan was proposed in good faith and not by any means forbidden by law.  See Pretrial Brief, at § IX; Consolidated Reply, at § VIII.  No basis exists for the objecting party's argument that ASF Recoupment amounts to an unconstitutional *ex post facto* law.  See Response, at § I.E.  ASF Recoupment does not implicate the doctrine of *in pari delicto*. See id. at § I.G. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **52.**   **Objection of Steven Wojtowicz (Docket No. 5163); Motion for Explanation of ASF Monthly Recoupment Cap [filed by Steven Wojtowicz] (Docket No. 6870)[1]** | |
| The objecting party argues that ASF Recoupment is unfair, and an option should be proposed for individuals subject to ASF Recoupment to pay the entire owed amount in one lump sum. The objecting party further alleges that, after amortization, ASF Recoupment will exceed the ASF Recoupment Cap and the Current GRS Retiree Adjustment Cap. | ASF Recoupment has a reasonable legal basis and is appropriate under the circumstances. See Response, at §§ I.A-B. The Sixth Amended Plan contains a lump-sum payment option for individuals subject to ASF Recoupment. See Pretrial Brief, at § XII; Exhibit B to Notice of Filing of Redlined Version of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6910), at § II.B.3.r.ii.D.2.ii. The objecting party's assertion regarding the ASF Caps is based on a misreading of the relevant Plan provisions. The Plan expressly provides that "in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension checks exceed the ASF Recoupment Cap or, if applicable, the Current GRS Retiree Adjustment Cap." See Plan, at § II.B.3.r.ii.D.2.i; Response, at § I.I. To the extent that the total amount by which an ASF Distribution Recipient's monthly pension check would be reduced exceeds 20% (accounting for both the impairment of the ASF Distribution Recipient's GRS Pension Claim and ASF Recoupment), the total amount deducted from the ASF Distribution Recipient's monthly pension check, utilizing the 6.75% monthly pension check, will be capped at 20%. See Response, at § I.I. Moreover, once Annuity Savings Fund Excess Amounts – as annuitized using the 6.75% interest rate – equaling an ASF Distribution Recipient's particular ASF Recovery Cap have been recovered from the ASF Distribution Recipient, no further ASF Recoupment will be required from that specific ASF Distribution Recipient. Exact amounts have been disclosed on the Class 11 Ballots. See id. |

---

[1]   Although this filing (i) is styled as a motion and (ii) arguably constitutes an untimely Objection to confirmation of the Plan, the City wishes to respond to the factual allegation contained therein.

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **53.** **Objection of Fiorenzo Fabris (Docket No. 5211)** | |
| The objecting party argues that the Plan should not be confirmed because (a) the 6.75% interest rate used in annuitizing ASF Recoupment payments for ASF Distribution Recipients who do not elect the lump-sum payment option is usurious; (b) the Retiree Committee has not adequately represented City retirees or informed retirees regarding the status of negotiations; and (c) the Plan depends upon the receipt of outside funding, which is uncertain, and does not require the City to "make up any shortfalls." | The 6.75% interest rate used in annuitizing ASF Recoupment payments for ASF Distribution Recipients who do not elect the lump-sum payment option is not usurious. See Response, at § I.H. The Plan properly defines the City's funding obligations with respect to the Retirement Systems in the scenarios where the Outside Funding is, and is not, received. See id. at § VI.A. Accordingly, the Plan does not violate the Funding Clause of the Michigan Constitution. See id. The objecting party's argument regarding the Retiree Committee's representation of retirees does not implicate any legal standard relevant to confirmation of the Plan. |
| **54.** **Objection of Paula J. Lytle (Docket No. 5215)** | |
| The objecting party argues that the Plan should not be confirmed because ASF Recoupment is unfair. | ASF Recoupment has a reasonable legal basis and is appropriate under the circumstances. See Response, at §§ I.A-B. |
| **55.** **Objection of Diane L. Urbanik (Docket No. 5279)** | |
| The objecting party argues that the DIA Collection, or a portion thereof, should be sold to enhance creditor recoveries. | The City is not required to liquidate the DIA Collection or any of its other assets to satisfy the Claims of creditors. See Response, at § II.A; Pretrial Brief, at § II; Consolidated Reply, at § III.B. |
| **56.** **Objection to City of Detroit's Plan of Adjustment [filed by Judy Flowers-Tisdale (Docket No. 5329); Sylvester Tobias (Docket No. 5330)]** | |
| The objecting party argues that the Plan should not be confirmed because (a) ASF Recoupment amounts to an unconstitutional *ex post facto* law; (b) the Plan improperly impairs the Claims of individual creditors against third parties because the Retirement Systems are separate legal entities from the City, meaning that Pension Claims cannot be impaired under the Plan; (c) the Plan violates the Federal Transit Act; (d) the Plan violates the Pensions Clause; (e) PA 436 violates the Contracts Clause of the United States Constitution; and (f) the Plan fails to provide "guarantees and assurances" that pension rights will not be impaired in any future bankruptcy proceeding. | No basis exists for the objecting party's argument that ASF Recoupment amounts to an unconstitutional *ex post facto* law. See Response, at § I.E. The Plan does not improperly impair the Claims of individual creditors against third parties. See id. at § IX.A. The Plan does not violate the Federal Transit Act. See id. at § XIV.D. The Pensions Clause does not prohibit the impairment of pensions in chapter 9. See City of Detroit, 504 B.R. at 150-54. The objecting parties' arguments that PA 436 violates the United States Constitution and that the Plan fails to guarantee that pensions will not be impaired in any future proceeding, do not implicate any legal standards relevant to confirmation of the Plan. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **57.** **Supplemental Objections to the Voting Ballot and the Process [Filed by Carl Williams and Hassan Aleem (Docket No. 5369); Barbara Yee (Docket No. 5370); Katrina Henry (Docket No. 5371); Douglas Yee (Docket No. 5372); Calvin C. Turner (Docket Nos. 5373 and 5425); Larry Johnson (Docket No. 5374); Lula Millender (Docket No. 5375); Carolyn Thompson (Docket No. 5376); Denise Steele (Docket No. 5377); Vera C. Magee (Docket No. 5378); Benyne Goldston (Docket No. 5423); Evelyn Owens Smith (Docket No. 5424); Sylvester Davis (Docket No. 5426); Grover Kennedy (Docket No. 5430); Gloria Ann Surles (Docket No. 5431); William M. Davis (Docket No. 5432); Errol Griffin (Docket No. 5433); Lucinda J. Darrah (Docket No. 5819)]** | |
| The objecting parties argue that the Plan voting procedures violate article XII, section 16 of the Michigan Constitution and are improper because (a) Jones Day should not be involved in counting Ballots; and (b) pensioners who vote in favor of the Plan "give up" pension rights, which are constitutionally protected. The objecting parties further argue that the Plan is improper because (a) the State has improperly withheld revenue sharing funds; (b) the City's filing of its chapter 9 petition was illegal; (c) the Court lacks jurisdiction to preside over the City's chapter 9 case; and (d) the Plan and Plan voting procedures violate the Fifteenth Amendment to the United States Constitution. | The City disputes the factual allegations in the Objection. Article XII of the Michigan Constitution contains no Section 16. It appears that the objecting parties intended to refer to voting and balloting requirements contained in Section 16 of the portion of the Michigan Constitution titled "Schedule and Temporary Provisions." See Mich. Const. art. Sched. & Temp. Provisions, § 16. That section, by its plain language, applies solely to voting and balloting with respect to amendments to the Michigan Constitution. Id. Thus, the objecting parties' reliance thereupon is misplaced. The solicitation of votes on the Plan and the balloting process complied with applicable law (including the Bankruptcy Code and orders of the Bankruptcy Court). See Response, at § XI.A; Confirmation Standards Exhibit, at § V. Creditors' due process rights have not been violated. See id. at § VIII.A. The Pensions Clause does not prohibit the impairment of pensions in chapter 9. See City of Detroit, 504 B.R. at 150-54. The Emergency Manager was authorized to commence the Chapter 9 Case, and the Court had jurisdiction to determine that the City was eligible to be a chapter 9 debtor. See id. at 161-62. State revenue sharing funds not actually received are not available to the City to satisfy the Claims of creditors. See Response, at § II.B. |
| **58.** **Objection to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [filed by Jerry Franks] (Docket No. 5525)** | |
| The objecting party states that he was unable to make an informed decision as to whether to vote to accept the Plan because his Ballot contained insufficient information. | The solicitation of votes on the Plan and the balloting process complied with the Bankruptcy Code and orders of the Bankruptcy Court. See Response, at § XI.A; Confirmation Standards Exhibit, at § V. |
| **59.** **Objection to City of Detroit's Plan of Adjustment [Docket 2708] [filed by William M. Davis] (Docket No. 5659)** | |
| The objecting party argues that the Plan should not be confirmed because ASF Recoupment is unconstitutional because it seeks to "unlawfully divert[ ] GRS assets from a very large Black group to a mostly large white group." | ASF Recoupment has a reasonable legal basis and is appropriate under the circumstances. See Response, at §§ I.A-B. The objecting party cites no authority and does not explain the basis of his assertion that ASF Recoupment is unconstitutional. In any event, ASF Recoupment is constitutional. See id. at § I.E. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **60.**     **Objection to City of Detroit Plan of Adjustment [filed by Benyne Goldston] (Docket No. 5722)** | |
| The objecting party argues that the Plan should not be confirmed because it unfairly discriminates against Class 11 Claims and favors Class 10 Claims. | No basis exists for the objecting party's argument that the Plan discriminates unfairly against Class 11 Claims, because Class 11 voted to accept the Plan. See Response, at § III.A. |
| **61.**     **John P. Quinn's Objections to Fourth Amended Plan of Adjustment (Docket No. 5723)** | |
| The objecting party argues that the Plan should not be confirmed because (a) ASF Recoupment violates section 1123(a)(4) of the Bankruptcy Code with respect to Class 11; and (b) the Plan improperly impairs the Claims of individual creditors against third parties because the Retirement Systems are separate legal entities from the City, meaning that Pension Claims cannot be impaired under the Plan. | The Plan provides substantially similar treatment to all Class 11 Claims; section 1123(a)(4) of the Bankruptcy Code is satisfied with respect to Class 11 Claims. See Response, at § IV.A. The Plan does not improperly impair the Claims of individual creditors against third parties. See id. at § IX.A. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|

**62.** Objection of Diane Martin-Parker to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5776); Objections of Terrance James Sims to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5881); Objection of Mattie D. Pritchett to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5887) [substantially similar objections]

| | |
|---|---|
| The objecting parties argue that the Plan should not be confirmed because (a) the Plan's non-consensual release provisions violate applicable Sixth Circuit law; (b) ASF Recoupment (i) violates applicable statutes of limitations, (ii) violates the United States Constitution because the City did not institute a legal proceeding to effect such recoupment, (iii) is improper under section 547(c)(2) of the Bankruptcy Code and (iv) cannot be justified under applicable fraudulent conveyance law; (c) the Plan violates section 1123(a)(4) of the Bankruptcy Code because it classifies the Claims of individuals subject to ASF Recoupment together in Class 11 with the Claims of individuals not subject to ASF Recoupment; (d) the Plan "does not require the City … to make any payments to Class 11 until 2023, negatively affecting the health of the GRS pension fund;" (e) the Plan is not "fair and equitable" with respect to Class 11; (f) the Plan is not in the best interests of creditors; and (g) the Plan requires the City to take actions that violate Michigan law because it impairs pensions in contravention of the Pensions Clause. | The Plan's non-consensual release provisions are appropriate and permissible under applicable law. See Response, at § XII.A; Consolidated Reply, at § X; Pretrial Brief, at § VIII. ASF Recoupment does not violate any statute of limitations. See Response, at § I.C. ASF Recoupment has a reasonable legal basis and is appropriate under the circumstances. See id. at §§ I.A-B. ASF Recoupment is constitutional. See id. at § I.E. ASF Recoupment is not effectuated pursuant to any fraudulent transfer or preference law. See id. at § I.F. The Plan provides substantially similar treatment to all Class 11 Claims; section 1123(a)(4) of the Bankruptcy Code is satisfied with respect to Class 11 Claims. See id. at § IV.A. The Plan properly defines the City's funding obligations with respect to the Retirement Systems in the scenarios where the Outside Funding is, and is not, received. See id. at § VI.A. Accordingly, the Plan does not violate the Funding Clause of the Michigan Constitution. See id. Moreover, the City will in fact make contributions to GRS over the next 10 years. See Plan, at § II.B.3.r.ii.A. No basis exists for the objecting parties to argue that the Plan is not "fair and equitable" with respect to Class 11 because Class 11 voted to accept the Plan. See 11 U.S.C. § 1129(b)(1) ("fair and equitable" test applies only "with respect to each class of claims or interests that is impaired under, *and has not accepted*, the plan") (emphasis added). The Plan is in the best interests of creditors. See Response, at § II; Pretrial Brief, at § III; Consolidated Reply, at § III. The Pensions Clause does not prohibit the impairment of pensions in chapter 9. See City of Detroit, 504 B.R. at 150-54. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **63.** | **Objections and Brief in Support of Objections of Creditors William Ochadleus, [*et al.*] to the Confirmation of the Fourth Amended Plan for the Adjustment of Debts of City of Detroit, Michigan (May 5, 2014) (Docket No. 5788); Objections and Amended Brief in Support of Objections of Creditors William Ochadleus, [*et al.*] to the Confirmation of the Fourth Amended Plan for the Adjustment of Debts of City of Detroit, Michigan (May 5, 2014) (Docket No. 5964)** |
| The objecting parties argue that the Plan should not be confirmed because (a) the Plan is not in the best interests of creditors because (i) it fails to provide creditors with all they can reasonably expect under the circumstances, (ii) holders of claims in Classes 10 and 12 would recover more outside of bankruptcy and (iii) the City has failed to maximize revenues to fund creditor recoveries; (b) the Plan improperly gerrymanders Class 10 claims by placing together in Class 10 both impaired claims and "unimpaired" claims held by active employees who receive COLA benefits "based on active employee raises;" (c) the Plan's voting incentive for Classes 10 and 11 constitutes an improper "death trap" by proposing greater recoveries for Classes 10 and 11 if such classes vote to accept the Plan; (d) the OPEB Settlement violates the "spirit of" Bankruptcy Rule 9019; (e) the Plan violates section 943(b)(4) of the Bankruptcy Code because (i) it requires the City to violate the Pensions Clause and (ii) the "Grand Bargain" is an illusory promise; (f) the Plan is not feasible because the City is incapable of implementing the Plan; (g) the Court should have declined to rule on the question of whether pensions may be impaired in this chapter 9 case, pursuant to the doctrine of constitutional avoidance; and (h) the Court lacks jurisdiction to approve the Plan's non-consensual third party release provisions. | The Plan is in the best interests of creditors. See Response, at § II; Pretrial Brief, at § III; Consolidated Reply, at § III. The City is not required to liquidate any of its assets to satisfy the Claims of creditors, cannot increase tax revenues and has made reasonable efforts to increase other revenues. See Response, at § II.A; Pretrial Brief, at § II; Consolidated Reply, at § III.B. The Plan does not gerrymander affirmative votes. See Pretrial Brief, at § V.B. The voting incentives provided under the Plan to holders of Claims in Classes 10 and 11 – which incentives were structured as a condition imposed by the parties providing the Outside Funding on its availability – are permissible, reasonable and appropriate under the circumstances of this Chapter 9 Case. See Response, at § XIII.A. The OPEB Settlement is fair and equitable and within the range of reasonableness. See Pretrial Brief, at § XIII.A.1.b; Consolidated Reply, at § I.C. The Pensions Clause does not prohibit the impairment of pensions in chapter 9. See City of Detroit, 504 B.R. at 150-54. The "Grand Bargain" is not an illusory contract. See Pretrial Brief, at § XI.D. The Plan is feasible, and appropriate controls will ensure the City's compliance with the Plan. See Response, at § V.A; Pretrial Brief, at § IV; Consolidated Reply, at § IV. The objecting parties' remaining arguments do not implicate any legal standards relevant to confirmation of the Plan. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **64.** **Objections to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [filed by Demetria Wright (Docket No. 5795); Billy Sercey (Docket No. 5796); Calvin Turner (Docket No. 5797); Mark L. Smith (Docket No. 5798); Barbara A. Magee (Docket No. 5800); Vera C. Magee (Docket No. 5801); Douglas Yee (Docket No. 5802); Barbara Yee (Docket No. 5803); Patricia Mason (Docket No. 5804); Eugene Mason (Docket No. 5805); Gloria Jones (Docket No. 5806); Errol Griffin (Docket No. 5808); Wanda Jan Hill (Docket No. 5809); James Lovely (Docket No. 5810); Walter Blaney (Docket No. 5811); Vaughn S. Brown (Docket No. 5812); Theresa Penson (Docket No. 5813); Curtis Lee Brooks (Docket No. 5814); Dolores H. Williams (Docket No. 5815); Dorothy Roach (Docket No. 5817); Belinda Ann Myers-Florence (Docket No. 5818); Dequaye Williams (Docket No. 5820); Lula Millender (Docket No. 5821); Katrina Henry (Docket No. 5822); Keith Malcolm Hines (Docket No. 5823); William M. Davis (Docket No. 5824); Sheila Thompkins (Docket No. 5825)]** | |
| The objecting parties argue that the Plan should not be confirmed because (a) the interest rate used to calculate pension underfunding is inappropriately low and overstates pension underfunding; (b) ASF Recoupment violates an (unspecified) statute of limitations and is otherwise impermissible; (c) the State has improperly refused to pay the City certain state revenue sharing funds; (d) the Plan violates the Pensions Clause; (e) the Emergency Manager is "perpetrating a fraud by impersonating an elected official;" and (f) in the event that the outside funding pursuant to the DIA Settlement or State Contribution Agreement is not received, the Plan "does not require the [C]ity to make up for any missed payments." | The Plan does not overstate pension underfunding levels.  See Response, at § XV.A; Pretrial Brief, at § I.A.1; Consolidated Reply, at § II.B.3. ASF Recoupment has a reasonable legal basis and is appropriate under the circumstances.  See Response, at §§ I.A-B.  ASF Recoupment does not violate any statute of limitations.  See id. at § I.C.  State revenue sharing funds not actually received are not available to the City to satisfy the Claims of creditors.  See id. at § II.B.  The Pensions Clause does not prohibit the impairment of pensions in chapter 9.  See City of Detroit, 504 B.R. at 150-54.  The Plan properly defines the City's funding obligations with respect to the Retirement Systems in the scenarios where the Outside Funding is, and is not, received.  See Response, at § VI.A. Accordingly, the Plan does not violate the Funding Clause of the Michigan Constitution.  See id.  The objecting parties' argument that the Emergency Manager has fraudulently impersonated an elected official implicates no legal standard relevant to confirmation of the Plan, and is frivolous. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **65.** **Supplemental Objections to the Voting Ballot and the Process [filed by Carl Williams and Hassan Aleem, Curtis Brooks, Paulette Brown, William M. Davis, Errol Griffin, Wanda Jan Hill, James Lovely, Vera C. Magee, Cecily McClellan, Tijuana Morris, Sheila Thompkins] (Docket No. 5827)** | |
| The objecting parties argue that the Plan should not be confirmed because it violates article XII, section 16 of the Michigan Constitution. | Article XII of the Michigan Constitution contains no Section 16. It appears that the objecting parties intended to refer to voting and balloting requirements contained in Section 16 of the portion of the Michigan Constitution titled "Schedule and Temporary Provisions." See Mich. Const. art. Sched. & Temp. Provisions, § 16. That section, by its plain language, applies solely to voting and balloting with respect to amendments to the Michigan Constitution. Id. Thus, the objecting parties' reliance thereupon is misplaced. The solicitation of votes on the Plan and the balloting process otherwise complied with the Bankruptcy Code and orders of the Bankruptcy Court. See Response, at § XI.A; Confirmation Standards Exhibit, at § V. |
| **66.** **Objections of Laurence Aurbach (Docket Nos. 3735, 5828)** | |
| The objecting party, a holder of a Limited Tax General Obligation Bond Claim, argues that the Plan should not be confirmed because it unfairly discriminates against Class 7 and favors other unsecured creditors. | No basis exists for the objecting party's argument that the Plan discriminates unfairly against Class 7 Claims, because Class 7 voted to accept the Plan. See Response, at § III.A. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **67.** **Objection of Dorothy M. W. Baker (Docket No. 5829); Request for Retirees to Vote Again [filed by Dorothy M. W. Baker] (Docket No. 6019)** | |
| The objecting party argues that the Plan should not be confirmed because (a) ASF Recoupment is unfair; (b) the Pension Claims held by employees of the Detroit Public Library cannot be impaired under the Plan because the Detroit Library Commission is separate from the City; (c) the Plan contains insufficient assurances that pensions will not be further reduced post-confirmation; (d) the City should be compelled to sell City-owned assets to enhance creditor recoveries; and (e) the City's calculation of pension underfunding is unreliable. The objecting party further argues that retirees should be given the opportunity to re-vote on the Plan because the Plan and Disclosure Statement failed to provide retirees with accurate information regarding several aspects of the Plan. | ASF Recoupment has a reasonable legal basis and is appropriate under the circumstances. See Response, at §§ I.A-B. The GRS Pension Claims held by Library employees are similar in legal nature and character to other GRS Pension Claims and are properly impaired under the Plan. See id. at § X.A; Pretrial Brief, at § V.C. The City is not required to liquidate any of its assets to satisfy the Claims of creditors. See Response, at § II.A; Pretrial Brief, at § II; Consolidated Reply, at § III.B. The Plan does not overstate pension underfunding levels. See Response, at § XV.A; Pretrial Brief, at § I.A.1; Consolidated Reply, at § II.B.3. The City has provided adequate notice to all known parties in interest throughout the Plan confirmation process. See Response, at § VII.A. Creditors' due process rights have not been violated. See id. at § VIII.A. The solicitation of votes on the Plan and the balloting process complied with the Bankruptcy Code and orders of the Bankruptcy Court. See id. at § XI.A; Confirmation Standards Exhibit, at § V. The objecting party's remaining argument – regarding assurances that pensions will not be further reduced post-confirmation – implicates no legal requirement relevant to confirmation of the Plan. |
| **68.** **Objection to the Plan of Adjustment and Confirmation of the Plan of Adjustment Because of Jones Day Law Firm Conflict of Inter[est] [filed by Hassan Aleem, Curtis Brooks, Paulette Brown, William M. Davis, Errol Griffin, Wanda Jan Hill, James Lovely, Vera C. Magee, Cecily McClellan, Tijuana Morris, Sheila Thompkins, Carl Williams] (Docket Nos. 5833, 5837)** | |
| The objecting parties allege that Jones Day was responsible for counting votes cast with respect to Plan confirmation, arguing that such alleged vote-counting constituted a conflict of interest. | The City disputes the factual allegations in the Objection; in fact Kurtzman Carson Consultants, LLC ("KCC"), the court-appointed claims and noticing agent in the Chapter 9 Case tabulated the votes on the Plan. See Order Appointing Kurtman Carson Consultants, LLC as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c) and Bankruptcy Rule 2002 (Docket No. 297). The solicitation of votes on the Plan and the balloting process complied with the Bankruptcy Code and orders of the Bankruptcy Court. See Response, at § XI.A; Confirmation Standards Exhibit, at § V. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **69.** **Objecting Creditor Krystal A. Crittendon's Objections to Confirmation of the City's Fourth Amended Plan of Adjustment (Docket No. 5836)** | |
| The objecting party argues that the Plan should not be confirmed because (a) the Emergency Manager lacked authority to file the City's chapter 9 petition; (b) the City's calculations regarding pension underfunding are unreliable; (c) the Michigan Constitution prohibits the impairment of pensions; (d) nothing in the Plan prohibits the City from further reducing pensions in the future; (e) modifications to the pension benefits of active employees constitute a "taking" without due process of law; (f) it was improper for KCC to count Plan votes in California because Detroit residents were unable to observe the vote-counting process; (g) because of the voting incentive offered jointly to Classes 10 and 11, the Plan's treatment of Pension Claims amounts to an unenforceable adhesion contract; (h) the Plan's non-consensual release provision is inappropriate; and (i) the "Grand Bargain" is an improper use of tobacco settlement funds. | The Emergency Manager was authorized to commence the Chapter 9 Case. See City of Detroit, 504 B.R. at 161-62. The Plan does not overstate pension underfunding levels. See Response, at § XV.A; Pretrial Brief, at § I.A.1; Consolidated Reply, at § II.B.3. The Pensions Clause does not prohibit the impairment of pensions in chapter 9. See City of Detroit, 504 B.R. at 150-54. The Plan's treatment of Pension Claims does not constitute a "taking" without process of law. See Pretrial Brief, at § XI.E. The solicitation of votes on the Plan and the balloting process complied with the Bankruptcy Code and orders of the Bankruptcy Court. See Response, at § XI.A; Confirmation Standards Exhibit, at § V. Representatives of the Retiree Committee and the Retirement Systems visited KCC's site in California to observe and monitor the vote-counting process. The voting incentives provided under the Plan to holders of Claims in Classes 10 and 11 – which incentives were structured as a condition imposed by the parties providing the Outside Funding on its availability – are permissible, reasonable and appropriate under the circumstances of this Chapter 9 Case. See Response, at § XIII.A. The Plan's non-consensual release provisions are appropriate and permissible under applicable law. See id. at § XII.A; Consolidated Reply, at § X; Pretrial Brief, at § VIII. The "Grand Bargain" does not constitute an improper use of tobacco settlement funds. See Response, at § XIV.C. The objecting party's remaining argument – regarding assurances that pensions will not be further reduced post-confirmation – implicates no legal requirement relevant to confirmation of the Plan. |
| **70.** **Objecting Creditor Frederick M. Rottach's Identification of Legal Issues Relating to Confirmation and Objection to Confirmation of the Fourth Amended Plan of Adjustment (Docket No. 5838)** | |
| The objecting party argues that the Plan should not be confirmed because (a) the City has not articulated a sufficient legal justification for ASF Recoupment; (b) the Plan improperly fails to disclose interest rates applicable to individuals subject to ASF Recoupment; and (c) the Plan improperly classifies Claims held by individuals subject to ASF Recoupment together in Class 11 with Claims of individuals not subject to ASF Recoupment. | ASF Recoupment has a reasonable legal basis and is appropriate under the circumstances. See Response, at §§ I.A-B. The City did not conceal the interest rate applicable to annuitized ASF Recoupment payments. See id. at § I.I. The Plan provides substantially similar treatment to all Class 11 Claims. See id. at § IV.A. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **71.** **Objection to the Plan of Adjustment and Any Confirmation of That Plan Because the Pensioners Cannot Speak for or Represent the Creditors [filed by Hassan Aleem, Curtis Brooks, Paulette Brown, William M. Davis, Errol Griffin, Wanda Jan Hill, LaVern Holloway, James Lovely, Vera C. Magee, Cecily McClellan, Sheila Thompkins, Carl Williams] (Docket No. 5840)** | |
| The objecting parties argue that the Plan should not be confirmed because the voting process violates M.C.L. § 168.485 by "creat[ing] prejudice for a yes vote." | Section 168.485 of the Michigan Compiled Laws sets forth requirements solely regarding questions submitted to electors of the State and political subdivisions thereof.  That statute is thus inapplicable to the voting process undertaken with respect to the Plan.  Moreover, the solicitation of votes on the Plan and the balloting process complied with the Bankruptcy Code and orders of the Bankruptcy Court.  See Response, at § XI.A; Confirmation Standards Exhibit, at § V. |
| **72.** **Objection of Deborah J. McCreary (Docket No. 5841); Objection of Gail Wilson Turner (Docket No. 5914); Objection of Ricardo C. Jenkins (Docket No. 5931); Objection of Jeffrey S. Romeo (Docket No. 5932); Objection of Reginald F. Barnes (Docket No. 5936);  Objection of Shelly Iris Foy (Docket No. 5940); Objection of J. B. Lawson (Docket No. 5942); Objection of Herbert Moreland (Docket No. 5943); Cynthian D. Moreland (Docket No. 5944); Sarah Elinda Giddens (Docket No. 5950); Objection of Robbin C. Rivers (Docket No. 5968) [substantially similar objections]** | |
| The objecting parties argue that the Plan should not be confirmed because (a) the Plan provides inadequate assurances that holders of claims in Classes 10 and 12 will receive increase in benefits if the City's financial status improves and that pension benefits will not be subject to post-confirmation reductions; (b) the City improperly reduced retiree OPEB benefits without first obtaining Court approval; and (c) the Plan contains insufficient information regarding the Detroit Police and Fire VEBA. | The Objections implicate no legal requirement relevant to confirmation of the Plan. Specifically, the objecting parties cite no authority – and the City is aware of none – (a) requiring the Plan to guarantee that the benefits of active or retired employees will increase (or remain the same in perpetuity) post-confirmation; or (b) prohibiting the City from modifying its OPEB benefit plans.  The Disclosure Statement contained "adequate information" regarding the Plan generally, including with respect to the Detroit Police and Fire VEBA.  See Order Approving the Proposed Disclosure Statement (Docket No. 4401) (the "Disclosure Statement Order"), at ¶ 3; see also Plan, at Exhibit I.A.106 (Form of Detroit Police and Fire VEBA Trust Agreement). |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **73.** **Objection to the Plan of Adjustment and Any Confirmation of the Plan Because Judge Steven W[.] Rhodes Is Not an Article III Judge [filed by Hassan Aleem, Walter Blaney, Curtis Brooks, William M. Davis, Errol Griffin, LaVern Holloway, James Lovely, Vera C. Magee, Cecily McClellan, Lula Millender, Tijuana Morris, Sheila Thompkins, Carl Williams] (Docket No. 5843)** | |
| The objecting parties argue that the Plan should not be confirmed because, as a non-Article III court, the Court lacks jurisdiction to "enter[ ] final judgment on these [unspecified] claims." | This non-specific objection does not implicate any legal standard relevant to confirmation of the Plan.  The Court already has held that – notwithstanding the fact that bankruptcy courts are non-Article III courts – it had jurisdiction to determine that the City was eligible to be a chapter 9 debtor.  See City of Detroit, 504 B.R. at 110, 161-62.  The objecting parties provide no support for the assertion that the Court lacks jurisdiction to "enter[ ] final judgment" on matters relating to confirmation of the Plan. |
| **74.** **Objection to Magistrate Judge Steven W. Rhodes Hand-Picked Committe[e] Before the Relief Has Been Entered [filed by Hassan Aleem, Walter Blaney, William M. Davis, Errol Griffin, Wanda Jan Hill, LaVern Holloway, James Lovely, Barbara A. Magee, Vera C. Magee, Cecily McClellan, Tijuana Morris, Carl Williams] (Docket No. 5844)** | |
| The objecting parties argue that the Plan should not be confirmed because an unspecified "handpicked committee," (presumably, the Retiree Committee), was improperly formed prior to the entry of the order for relief. | This non-specific objection does not implicate any legal standard relevant to confirmation of the Plan. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **75.** **Objection to Magistrate Judge Steven W[.] Rhodes Kangaroo Judicial Orchestrated Show Trial [filed by Hassan Aleem, Walter Blaney, William M. Davis, Errol Griffin, LaVern Holloway, James Lovely, Vera C. Magee, Cecily McClellan, Tijuana Morris, Sheila Thompkins, Carl Williams (Docket No. 5846); Yvonne Jones, Hassan Aleem, Walter Blaney, Curtis Brooks, William M. Davis, Errol Griffin, Wanda Jan Hill, LaVern Holloway, James Lovely, Barbara A. Magee, Vera C. Magee, Cecily McClellan, Tijuana Morris, Sheila Thompkins, Carl Williams] (Docket No. 5848); Objection to Magistrate Judge Steven W[.] Rhodes Deception [filed by Walter Blaney, Sheila Thompkins, James Lovely, William M. Davis, Cecily McClellan, Wanda Jan Hill, Tijuana Morris, Errol Griffin, Curtis Brooks, Vera C. Magee, Hassan Aleem, Carl Williams] (Docket No. 5847); Objection to Magistrate Judge Steven W[.] Rhodes P[er]petration of Deception [filed by Cecily McClellan, James Lovely, Errol Griffin, Yvonne Jones, Sheila Thompkins, Barbara A. Magee, Vera C. Magee, William M. Davis, Larry Johnson, Hassan Aleem, Carl Williams] (Docket No. 5856)** | |
| The objecting parties argue that (a) the hearing on individual Plan objections was not a legitimate hearing, but rather was a "kangaroo judicial orchestrated show trial;" (b) the hearing regarding individual objections to eligibility also constituted a "judicial orchestrated meeting;" and (c) by holding "informal meeting[s]" rather than formal hearings, on individual Plan and eligibility objections, the Court violated the rights of creditors and objectors pursuant to the Fifth, Ninth and Fourteenth Amendments to the United States Constitution. | The objecting parties appear to misapprehend the nature and purpose of the hearing regarding individual objections to confirmation of the Plan, which was held on July 15, 2014. To the extent that the Objection can be interpreted as an objection to confirmation of the Plan, it fails to assert any legally cognizable argument. Moreover, the Court has been extraordinarily and assiduously solicitous of the rights and opinions of individual creditors in connection with solicitation of the Plan and the Plan confirmation process, and thus the due process rights of creditors have not been violated. See Response, at § VIII.A. |
| **76.** **Objection to the Plan of Adjustment and Any Confirmation of That Plan Because the Bankruptcy Was Not By Consent of the Creditors or the Debtors and Fraudulent Concealment [sic] [filed by Hassan Aleem, Curtis Brooks, William M. Davis, Errol Griffin, Yvonne Jones, James Lovely, Vera C. Magee, Cecily McClellan, Tijuana Morris, Sheila Thompkins, Carl Williams (Docket No. 5851); Hassan Aleem, Walter Blaney, Paulette Brown, William M. Davis, Errol Griffin, Wanda Jan Hill, LaVern Holloway, James Lovely, Vera C. Magee, Cecily McClellan, Lula Millender, Tijuana Morris, Sheila Thompkins, Carl Williams (Docket No. 5855)]** | |
| The objecting parties argue that the Plan should not be confirmed because (a) the Court lacks jurisdiction because the Emergency Manager lacked authority to file the City's chapter 9 petition; (b) the Emergency Manager engaged in fraudulent concealment, in violation of M.C.L. § 600.5855, by concealing his alleged lack of authority to file the City's chapter 9 petition; and (c) the Plan violates sections 903 and 904 of the Bankruptcy Code because "[t]he bankruptcy did not have consent of the creditors or the debtors." | The Emergency Manager was authorized to commence the Chapter 9 Case. See City of Detroit, 504 B.R. at 161-62. The City disputes the objecting parties' frivolous allegations regarding fraudulent concealment, which are unsupported by any credible evidence. See Pretrial Brief, at § IX.A. The objecting parties' remaining arguments are unsupported, difficult to comprehend and do not implicate any legal standard relevant to confirmation of the Plan. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE<br>(INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **77.**     **Objection to the Favoritism of Magistrate Judge Steven W. Rhodes Have [sic] Shown Toward Jones Day Law Firm [filed by William M. Davis, Cecily McClellan, Yvonne Jones, Tijuana Morris, Sheila Thompkins, James Lovely, LaVern Holloway, Vera C. Magee, Barbara A. Magee, Errol Griffin, Hassan Aleem, Carl Williams] (Docket No. 5852)** | |
| The objecting parties object to confirmation of the Plan on grounds that, because the Emergency Manager formerly was employed by Jones Day, the Court should have requested that Jones Day "withdraw from the case." | The Objection does not implicate any legal standard relevant to confirmation of the Plan. |
| **78.**     **Objection of Prejudice Magistrate Judge Steven W. Rhodes [sic] [filed by William M. Davis, Walter Blaney, Tijuana Morris, Cecily McClellan, Yvonne Jones, Sheila Thompkins, Errol Griffin, Vera C. Magee, James Lovely, Hassan Aleem, Carl Williams] (Docket No. 5854)** | |
| The objecting parties object to confirmation of the Plan on grounds that the Court should not have appointed the Retiree Committee, asserting that the Retiree Committee "was created by Judge Rhodes to make it appear that pensioners lost money in the stock market by their action when the 'prim[a] facie evidence' shows otherwise." | The City disputes the factual allegations in the Objection, which are unsupported by any credible evidence. Moreover, the Objection does not implicate any legal standard relevant to confirmation of the Plan. |
| **79.**     **Objection of Gloria C. Williams to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5882)** | |
| The objecting party argues that the Plan should not be confirmed because (a) the Plan's non-consensual release provisions violate applicable Sixth Circuit law; (b) ASF Recoupment constitutes an improper avoidance action; (c) the Plan improperly classifies Claims held by individuals subject to ASF Recoupment together in Class 11 with Claims of individuals not subject to ASF Recoupment; (d) the Plan is not "fair and equitable" with respect to Class 11; (e) the Plan is not in the best interests of creditors; (f) the Plan requires the City to take actions that violate state law because it impairs pensions in contravention of the Pensions Clause; and (g) the Plan voting process violated 42 U.S.C. § 1971. | The Plan's non-consensual release provisions are appropriate and permissible under applicable law. See Response, at § XII.A; Consolidated Reply, at § X; Pretrial Brief, at § VIII. ASF Recoupment is not effectuated pursuant to any fraudulent transfer or preference law. See Response, at § I.F. The Plan provides substantially similar treatment to all Class 11 Claims. See id. at § IV.A. No basis exists for the objecting parties to argue that the Plan is not "fair and equitable" with respect to Class 11 because Class 11 voted to accept the Plan. See 11 U.S.C. § 1129(b)(1) ("fair and equitable" test applies only "with respect to each class of claims or interests that is impaired under, *and has not accepted*, the plan") (emphasis added). The Plan is in the best interests of creditors. See Response, at § II; Pretrial Brief, at § III; Consolidated Reply, at § III. The Pensions Clause does not prohibit the impairment of pensions in chapter 9. See City of Detroit, 504 B.R. at 150-54. Voting on the Plan complied with the Bankruptcy Code and does not implicate federal election laws such as 42 U.S.C. § 1971. See Response, at § XI.A. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **80.** **Objection to Confirmation of City of Detroit's Fourth Amended Plan of Adjustment [filed by Gail M. Wilson] (Docket No. 5883)** | |
| The objecting party argues that the Plan should not be confirmed because (a) by impairing pension rights, the Plan fails to comply with section 13(c) of the Urban Mass Transportation Act of 1964, 49 U.S.C. § 1609(c); (b) actual amounts recouped pursuant to ASF Recoupment will breach the ASF Caps; (c) the Plan improperly links together the voting rights of Classes 10 and 11; and (d) the Plan's release provisions are unfair because individual creditors cannot opt out of such releases by abstaining from voting. | The Plan does not violate the Federal Transit Act (formerly known as the "Urban Mass Transportation Act." See Response, at § XIV.D. The objecting party's assertion regarding the ASF Caps is based on a misreading of the relevant Plan provisions. The Plan expressly provides that "in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension checks exceed the ASF Recoupment Cap or, if applicable, the Current GRS Retiree Adjustment Cap." See Plan, at § II.B.3.r.ii.D.2.i; Response, at § I.I. To the extent that the total amount by which an ASF Distribution Recipient's monthly pension check would be reduced exceeds 20% (accounting for both the impairment of the ASF Distribution Recipient's GRS Pension Claim and ASF Recoupment), the total amount deducted from the ASF Distribution Recipient's monthly pension check, utilizing the 6.75% interest rate - will be capped at 20%. See Response, at § I.I. Moreover, once Annuity Savings Fund Excess Amounts – as annuitized using the 6.75% interest rate (the precise amounts for which were disclosed on Class 11 Ballots) – equaling an ASF Distribution Recipient's particular ASF Recovery Cap have been recovered from the ASF Distribution Recipient, no further ASF Recoupment will be required from that specific ASF Distribution Recipient. Exact amounts have been disclosed on the Class 11 Ballots. See id. The voting incentives provided under the Plan to holders of Claims in Classes 10 and 11 – which incentives were structured as a condition imposed by the parties providing the Outside Funding on its availability – are permissible, reasonable and appropriate under the circumstances of this Chapter 9 Case. See id. at § XIII.A. The Plan's non-consensual release provisions are appropriate and permissible under applicable law. See id. at § XII.A; Consolidated Reply, at § X; Pretrial Brief, at § VIII. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **81.** Objecting Creditor Brenda Goss Andrews' Objections to Confirmation of the City of Detroit's Fourth Amended Plan of Adjustment (Docket No. 5888) | |
| The objecting party argues that the Plan should not be confirmed because (a) the Pensions Clause prohibits the impairment of pension benefits; (b) under the Plan, holders of claims in Classes 10 and 12 will not receive a sufficient increase in benefits if and when the City's financial status improves; (c) the Plan does not provide adequate assurance that pension benefits will not be further reduced post-confirmation; (d) the City improperly reduced OPEB benefits on March 1, 2014, without first obtaining Court approval; (e) the Plan contains insufficient information regarding the Detroit Police and Fire VEBA; (f) the Plan would have a negative effect upon the Detroit Police Department's ability to recruit and retain police officers; (g) the Plan voting process lacks integrity because votes were counted in California, "thousands of miles away from watchful eyes." | The Pensions Clause does not prohibit the impairment of pensions in chapter 9. See City of Detroit, 504 B.R. at 150-54. The objecting party cites no authority – and the City is aware of none – (a) requiring the Plan to guarantee that the benefits of active or retired employees will increase (or remain the same in perpetuity) post-confirmation; or (b) prohibiting the City from modifying its OPEB benefit plans. The Disclosure Statement contained "adequate information" regarding the Plan generally, including with respect to the Detroit Police and Fire VEBA. See Disclosure Statement Order, at ¶ 3. The Plan provides for fair and reasonable recoveries to holders of PFRS Pension Claims in part to maintain the goodwill of current City employees and enable the City to attract and retain qualified employees – including police officers – in the future. See Pretrial Brief, at § I.B.1. Moreover, the City expects that the Reinvestment Initiatives will vastly improve the performance and working conditions of the Detroit Police Department. See id. at § IV.F; Disclosure Statement, at § IX.B.2.a. The solicitation of votes on the Plan and the balloting process complied with the Bankruptcy Code and orders of the Bankruptcy Court. See Response, at § XI.A; Confirmation Standards Exhibit, at § V. Representatives of the Retiree Committee and the Retirement Systems visited KCC's site in California to observe and monitor the vote-counting process. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **82.**     **Objection of Estella L. Ball to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5889)** ||
| The objecting party argues that the Plan should not be confirmed because (a) the Plan's non-consensual release provisions violate applicable Sixth Circuit law; (b) ASF Recoupment constitutes an improper avoidance action; (c) the Plan improperly classifies Claims held by individuals subject to ASF Recoupment together in Class 11 with Claims of individuals not subject to ASF Recoupment; (d) the Plan is not "fair and equitable" with respect to Class 11; (e) the Plan is not in the best interests of creditors; (f) the Plan requires the City to take actions that violate state law because it impairs pensions in contravention of the Pensions Clause; (g) the Plan "requires the establishment of the City of Detroit Oversight committee … which effectively takes all decision making away from the elected officials of the City of Detroit," in violation of then United States Constitution, the Voting Rights Act and 42 U.S.C. § 1983; and (h) the Plan "requires negating the City Charter provision that the GRS Board currently makes all administrative, actuarial and investment related decisions for the GRS." | The Plan's non-consensual release provisions are appropriate and permissible under applicable law. See Response, at § XII.A; Consolidated Reply, at § X; Pretrial Brief, at § VIII. ASF Recoupment is not effectuated pursuant to any fraudulent transfer or preference law. See Response, at § I.F. The Plan provides substantially similar treatment to all Class 11 Claims. See id. at § IV.A. No basis exists for the objecting parties to argue that the Plan is not "fair and equitable" with respect to Class 11 because Class 11 voted to accept the Plan. See 11 U.S.C. § 1129(b)(1) ("fair and equitable" test applies only "with respect to each class of claims or interests that is impaired under, *and has not accepted*, the plan") (emphasis added). The Plan is in the best interests of creditors. See Response, at § II; Pretrial Brief, at § III; Consolidated Reply, at § III. The Pensions Clause does not prohibit the impairment of pensions in chapter 9. See City of Detroit, 504 B.R. at 150-54. The objecting party apparently misapprehends the nature of the Financial Review Commission, which is a creature of State law and is not created by the Plan. Any claim that the legislation providing for the creation of a Financial Review Commission violates applicable law thus cannot be construed as an Objection to confirmation of the Plan. The City disputes the factual assertion that the Plan "requires negating the City Charter provision that the GRS Board currently makes all administrative, actuarial and investment related decisions for the GRS," which allegation is unsubstantiated and unexplained in the Objection. |
| **83.**     **Objection to City of Detroit's Plan of Adjustment [filed by Roger N. Cheek] (Docket No. 5947)** ||
| The objecting party argues that the Plan should not be confirmed because (a) ASF Recoupment is inappropriate because the GRS Board of Trustees had authority under the Detroit City Code to use its discretion in setting the interest rates applies to ASF accounts; (b) the Plan discriminates unfairly against Class 11 Claims and favors Class 10 Claims; and (c) ASF Recoupment amounts to an *ex post facto* modification of applicable ordinances. | ASF Recoupment has a reasonable legal basis and is appropriate under the circumstances. See Response, at §§ I.A-B. The trustees of GRS, who possessed sole authority to allocate interest payments to ASF accounts, breached various fiduciary duties by diverting GRS Traditional Pension Plan assets to the private accounts of ASF participants to provide excessive returns. See id. at § I.A. ASF Recoupment does not violate any provision of the Detroit Municipal Code. See id. at § I.D. No basis exists for the objecting party's argument that the Plan discriminates unfairly against Class 11 Claims, because Class 11 voted to accept the Plan. See id. at § III.A. No basis exists for the objecting party's argument that ASF Recoupment amounts to an unconstitutional *ex post facto* law. See id. at § I.E. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **84.** **Objecting Creditor Thomas J. Cipollone's Identification of Legal Issues Relating to Confirmation (Docket No. 5949); Objecting Creditor, Thomas J. Cipollone's Supplemental Objections and Issues Relating to Confirmation (Docket No. 6855)** | |
| The objecting party argues that the Plan should not be confirmed because (a) ASF Recoupment constitutes an illegal confiscation of vested property rights; (b) ASF Recoupment is subject to applicable statutes of limitations; (c) the City has failed to disclose its alleged intention to apply a 6.75% interest rate to Excess Interest amounts; (d) the Plan improperly classifies Claims held by individuals subject to ASF Recoupment together in Class 11 with Claims of individuals not subject to ASF Recoupment; (e) the Plan places an unfair burden upon retirees subject to ASF Recoupment while failing to recover funds from recipients of "13th checks;" (f) the City is estopped from recouping Excess Interest because ASF funds are held in "an independent trust;" (g) the City has improperly "allow[ed]" certain employees, and not others, to use the time accumulated in their Sick Leave bank as part of their Average Final Compensation for pension purposes;" and (h) "creditors must be allowed to vote on each [post-solicitation] change or amendment to the Plan of Adjustment which affects them." | ASF Recoupment is constitutional. See Response, at § I.E. ASF Recoupment seeks to remedy the breach, by the trustees of GRS, of various fiduciary duties by diverting GRS Traditional Pension Plan assets to the private accounts of ASF participants to provide excessive returns to the latter. See id. at § I.A. ASF Recoupment does not interfere with the property rights of ASF Distribution Recipients because it is well settled that, when a trustee transfers trust property to an individual not entitled to it (e.g., the transfer of GRS Traditional Pension Plan assets to an ASF participant's defined contribution account), that individual takes the property subject to the trust. See id. Accordingly, ASF participants, as recipients of improperly diverted GRS Traditional Pension Plan funds, *hold those funds in trust* for the benefit of all GRS Traditional Pension Plan participants. See id. ASF Recoupment does not violate any statute of limitations. See id. at § I.C. The City did not conceal the interest rate applicable to annuitized ASF Recoupment payments. See id. at § I.I. The Plan provides the same treatment to all Class 11 Claims. See id. at § IV.A. ASF Recoupment has a reasonable legal basis and is appropriate under the circumstances. See id. at §§ I.A-B. No legal standard relevant to confirmation of the Plan requires the City to recoup finds from recipients of "13th checks." Improperly diverted GRS Traditional Pension Plan funds are held in trust by ASF participants, and not, as the objecting party asserts, in an "independent trust." See id. at § I.A. The post-solicitation modifications to the Plan comply with the Bankruptcy Code, and resolicitation of votes is not required. See Pretrial Brief, at § XII, Confirmation Standards Exhibit, at § XVIII. The objecting party's remaining argument – regarding the sick leave of current City employees – implicates no legal standard relevant to confirmation of the Plan. |
| **85.** **Objection to City of Detroit's Plan of Adjustment [filed by Paulette Brown] (Docket No. 5956)** | |
| The objecting party objects on grounds that the process for voting on the Plan was "unfairly rigged to sway pensioners to vote to approve the plan," because voting packets sent to pensioners included letters urging recipients to vote in favor of the Plan and did not include any letters urging rejection of the Plan. | The solicitation of votes on the Plan and the balloting process complied with the Bankruptcy Code and orders of the Bankruptcy Court. See Response, at § XI.A; Confirmation Standards Exhibit, at § V. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **86.** **Objection to City of Detroit's Plan of Adjustment [filed by Paulette Brown] (Docket No. 5957)** | |
| The objecting party argues that the Plan should not be confirmed because ASF Recoupment violates the Fifth and Fourteenth Amendments to the United States Constitution by unlawfully depriving affected individuals of their property rights without due process of law. | ASF Recoupment is constitutional. See Response, at § I.E. ASF Recoupment seeks to remedy the breach, by the trustees of GRS, of various fiduciary duties by diverting GRS Traditional Pension Plan assets to the private accounts of ASF participants to provide excessive returns. See id. at § I.A. ASF Recoupment does not interfere with the property rights of ASF Distribution Recipients because it is well settled that, when a trustee transfers trust property to an individual not entitled to it (e.g., the transfer of GRS Traditional Pension Plan assets to an ASF participant's defined contribution account), that individual takes the property subject to the trust. See id. Accordingly, ASF participants, as recipients of improperly diverted GRS Traditional Pension Plan funds, *hold those funds in trust* for the benefit of all GRS Traditional Pension Plan participants. See id. ASF Recoupment does not violate any statute of limitations. See id. at § I.C. |
| **87.** **Petitioner's Objection to Magistrate Judge Steven W. Rhodes and Kevyn Orr Chapter (9) [sic] Plan of Adjustment and P[r]oposed Fourth Amended Plan of Adjustment (the Plan) [with] Regard to the Beneficiaries of the Detroit General Retirement System As To Have Legal Standing As One of Petitioners, Holders, Creditors Retirees [sic] [filed by Cornell E. Squires] (Docket No. 5962)** | |
| The objecting party objects on grounds that he was improperly denied a ballot to vote on the Plan, in violation of his equal protection and due process rights under the Fifth Amendment to the United States Constitution. | The City mailed a Ballot to the objecting party at the address reflected in the City's books and records. See Certificate of Service (Docket No. 6177), at Exhibit C. Although captioned as an Objection to confirmation of the Plan, this pleading articulates no cognizable argument that confirmation should be denied. Moreover, the solicitation of votes on the Plan and the balloting process complied with the Bankruptcy Code and orders of the Bankruptcy Court. See Response, at § XI.A; Confirmation Standards Exhibit, at § V. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **88.** **Objections to the 4th Amended Plan of Adjustment [filed by Mary Diane Bukowski] (Docket No. 5966)** | |
| The objecting party argues that the Plan should not be confirmed because (a) PA 436 is invalid, and the Emergency Manager lacked authority to file the City's chapter 9 petition; (b) the vote tabulation process lacked integrity because (i) votes on the Plan were tabulated by KCC in California, without creditor oversight, and (ii) ballot packets sent to retirees contained letters supporting the Plan but did not contain any letters opposing confirmation of the Plan; (c) the Plan is not in the best interests of creditors; (d) the City may not be able to survive as an "independent municipality" if the Plan is confirmed; (e) confirmation of the Plan would cause water and sewer rates to increase; (f) the City impermissibly reduced OPEB retirement benefits without Court approval; and (g) the Plan is the product of a conspiracy among the Emergency Manager, the State of Michigan, advisors to the City and "various banks" to enrich themselves at the expense of the citizens of Detroit. | The Emergency Manager was authorized to commence the Chapter 9 Case. See City of Detroit, 504 B.R. at 161-62. The solicitation of votes on the Plan and the balloting process complied with the Bankruptcy Code and orders of the Bankruptcy Court. See Response, at § XI.A; Confirmation Standards Exhibit, at § V. The Plan is in the best interests of creditors. See id. at § II; Pretrial Brief, at § III; Consolidated Reply, at § III. The Plan is feasible, and the Reinvestment Initiatives are designed to enable the City to provide the levels of services residents of an "independent municipality" reasonably expect to receive. The Plan is feasible. See Response, at § V; Pretrial Brief, at § IV; Consolidated Reply, at § IV. The objecting party cites no authority – and the City is aware of none – prohibiting the City from modifying its OPEB benefit plans. The City disputes the objecting party's factual allegations regarding an alleged conspiracy, which are wholly unsupported and frivolous. See Pretrial Brief, at § IX.A. The remaining assertions contained in the Objection implicate no legal standards relevant to confirmation of the Plan. Representatives of the Retiree Committee and the Retirement Systems visited KCC's site in California to observe and monitor the vote-counting process. |
| **89.** **Objection to the City of Detroit's 4th Amended Plan of Adjustment [filed by Kirk W. Hunter] (Docket No. 5970)** | |
| The objecting party argues that the Plan should not be confirmed because the Comprehensive State Release is unlawful. | The Plan's non-consensual release provisions are appropriate and permissible under applicable law. See Response, at § XII.A; Consolidated Reply, at § X; Pretrial Brief, at § VIII. |
| **90.** **Objection to City of Detroit's Plan of Adjustment [filed by Richard Shovein] (Docket No. 5973)** | |
| The objecting party argues that the Plan should not be confirmed because (a) Claims of DWSD retirees cannot be impaired because the DWSD is a separate entity from the City; (b) no lawful basis exists for ASF Recoupment; and (c) the 6.75% interest rate used in annuitizing ASF Recoupment payments for ASF Distribution Recipients who do not elect the lump-sum payment option is usurious. | DWSD is a department of the City, and DWSD's employees are City employees. The GRS Pension Claims held by employees and retirees of the DWSD are similar in legal nature and character to other GRS Pension Claims and are properly impaired under the Plan. See Response, at § X.A. ASF Recoupment has a reasonable legal basis and is appropriate under the circumstances. See id. at §§ I.A-B. the 6.75% interest rate used in annuitizing ASF Recoupment payments for ASF Distribution Recipients who do not elect the lump-sum payment option is not usurious. See id. at § I.H. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **91.** **Objection to the Annuity Savings Fund Recoupment As Unlawful [filed by Dorothea Harris] (Docket No. 5974)** | |
| The objecting party argues that the Plan should not be confirmed because ASF Recoupment is unlawful. | ASF Recoupment has a reasonable legal basis and is appropriate under the circumstances. See id. at §§ I.A-B. |
| **92.** **Supplemental Objection of Linda M. Mulder (Docket No. 6183)** | |
| The objecting party argues that the Plan should not be confirmed because the Plan is the result of a "grand experiment in pension theft by legal means" planned by Jones Day. | The City disputes the factual allegations contained in the Objection. The Plan was proposed in good faith. See Pretrial Brief, at § IX; Consolidated Reply, at § VIII. |
| **93.** **Supplemental Objection of Ronald Danowski (Docket No. 6387)** | |
| The objecting party argues that the Plan should not be confirmed because the City's payment of professional fees shows that the City is capable of increasing the recoveries on OPEB Claims under the Plan. | The treatment of OPEB Claims under the Plan reflects the terms of the OPEB Settlement, which is fair and equitable and within the range of reasonableness. See Pretrial Brief, at § XIII.A.1.b; Consolidated Reply, at § I.C. The assistance and expertise of the financial, legal and other advisors retained by the City is necessary to guide the City through its restructuring. See Response, at § II.B. Moreover, the professional fees incurred by the City in connection with its restructuring are reasonable. See id.; Professional Fee Brief. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **94.** **Objections (a) raising non-specific concerns or objecting generally to the Plan; (b) generally requesting that the Court not allow any modifications to retirement benefits pursuant to the Plan; or (c) requesting other relief unrelated to the confirmability of the Plan** | |
| Calvin C. Turner (Docket No. 4956); Johnnie Taylor-Tawwab (Docket No. 5064); Monica Lewis-Patrick (Docket No. 5109); James M. Edwards (Docket No. 5210); David L. Malhalab (Docket No. 5214); Patrick J. Murray (Docket No. 5244); Louise E. Anderson (Docket No. 5553); David A. Cole (Docket No. 5554); William M. Davis (Docket Nos. 5660, 5661 and 5955); Frenchie Lovell Williamson (Docket No. 5761); Scott Odum (Docket No. 5763); Reginald Williams (Docket No. 5764); Dennis Fisher (Docket No. 5777); Jon C. Solomon (Docket No. 5778); Stanton E. Wells (Docket No. 5779); Jan Kruszewski (Docket No. 5826); Theresa Jones (Docket No. 5830); James F. Capizzo (Docket No. 5831); Derek S. Hicks (Docket Nos. 5832 and 5839); David J. Fedenis (Docket No. 5834); Rosalie Fedenis (Docket No. 5835); Bernard P. Storm, Jr. (Docket No. 5842); Hassan Aleem, Curtis Brooks, William M. Davis, Errol Griffin, Wanda Jan Hill, LaVern Holloway, Yvonne Jones, Vera C. Magee, Cecily McClellan, Lula Millender, Tijuana Morris, Sheila Thompkins, Carl Williams (Docket No. 5853); Marvin T. Parker (Docket No. 5878); Claude V. Evans (Docket No. 5879); M. Neal (Docket No. 5880); Steven Cooley (Docket No. 5884); William J. Keyes (Docket No. 5885); Byron L. Robinson (Docket No. 5886); Jeffrey Michael Gadde (Docket No. 5908); Lula Millender (Docket No. 5910); Randy King (Docket No. 5911); Jon Harvey (Docket No. 5912); Tracey Scott Allen (Docket No. 5913); Geraldine McIntosh (Docket No. 5915); Sheila Thompkins (Docket No. 5916); Elizabeth A. Benson (Docket No. 5917); Dave Benson III (Docket No. 5918); Sivad H. Johnson (Docket No. 5919); Roger S. Harper (Docket No. 5933); Robert Earl Martin, Jr. (Docket No. 5934); Octavius E. Sapp. (Docket No. 5938); Jesse J. Florence, Sr. (Docket No. 5945); Belinda A. Myers-Florence (Docket No. 5946); Cecily R. McClellan (Docket No. 5951); Harold W. Collins (Docket No. 5952); Allen D. Martin (Docket No. 5953); Reginald L. Whitaker (Docket No. 5954); George Lyons (Docket No. 5961); Evelyn Smith (Docket No. 5963); Major L. Russell (Docket No. 5969); Lucinda J. Darrah (Docket Nos. 5975, 5976 and 5977); Ida Byrd-Hill (Docket No. 5991); Erik J. Brown (Docket No. 5992); Richard Makulski (Docket No. 5993); Barbara-Patricia Holt and Rickie-Allen Holt (Docket No. 6020); Nadya Cherup (Docket No. 6021); Donald Richardson (Docket No. 6022); Calvin Carter (Docket No. 6088). | The Objections raise nonspecific concerns regarding the Plan, generally request that the Court not allow any modifications to retirement benefits pursuant to the Plan, object generally to the Plan or certain features of the Plan or request other relief unrelated to the confirmability of the Plan. In most cases, these Objections do not raise legally cognizable or discernible challenges to the Plan that merit a response. To the extent that any discernible issues have been raised, they are addressed in the Brief or the City's Prior Briefing. In addition, the Court previously has determined that retirement benefits may be modified in chapter 9. See City of Detroit, 504 B.R. at 150-54. Accordingly, the Objections should be overruled. |

# EXHIBIT B

# General Retirement System of the City of Detroit

## Informational Meeting

Presented By:
Michael VanOverbeke
GRS General Counsel

**June 2014**





- The Board of Trustees of the General Retirement System of the City of Detroit makes today's presentation for informational purposes only. Nothing stated orally or in writing in this presentation is intended to be legal advice to you.

- BEFORE CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN, YOU SHOULD REVIEW THE MATERIALS INCLUDED WITH YOUR BALLOT, AND YOU ARE URGED TO CONSULT WITH LEGAL COUNSEL OF YOUR OWN CHOOSING REGARDING HOW TO VOTE.

- If there are any inconsistencies between the information in this presentation and the Plan, the terms of the Plan shall control.



# The Team

PROVIDING LEGAL COUNSEL IN DETROIT SINCE 1890

# CLARK HILL PLC

Clark Hill PLC is an entrepreneurial, full service law firm that provides business legal services, government & public affairs, and personal legal services to our clients throughout the country. With offices in Arizona, Delaware, Illinois, Michigan, New Jersey, Pennsylvania, Washington, DC, and West Virginia, Clark Hill has more than 300 attorneys and professionals.



### Robert D. Gordon
Special Restructuring Counsel to the Retirement Systems of the City of Detroit. Bob has broad experience representing various parties in bankruptcy and other judicial proceedings.



### Ronald A. King
Ron has been Lead Special Litigation Counsel in various commercial litigation and other matters for the Retirement Systems of the City of Detroit since 2006.



clarkhill.com

ARIZONA | DELAWARE | ILLINOIS | MICHIGAN | NEW JERSEY | PENNSYLVANIA | WASHINGTON, DC | WEST VIRGINIA



### Introduction

# Greenhill: A Unique Investment Banking Firm

**Founded 1996**

## How We Are Different

**Advising Clients is Our Only Business**
- No Investing, Trading, Lending or Underwriting
- No Products to Sell / No Conflicts

**Advice on a Wide Range of Matters**
- M&A, Financing, Restructuring, Capital Raising
- All Major Industry Sectors

**Substantial Teams in All Major Markets**
- ~70 Managing Directors, averaging ~25 years experience

## Global Reach



IPO 2004 (NYSE: GHL)
13 Offices
~$1.5bn Market Cap

## Selected Recent Assignments

### Financing

 $1.2bn bond exchange offer in connection with sale of retail propane business

 Advised New Enterprise on the $175mm refinancing of its credit facilities

 Sale of 23% stake with $1.7bn R&D funding from Intel, Samsung and TSMC

 $817mm rights issue and debt refinancing

### Restructuring

 Advised the PBGC on the Chapter 11 filing of AMR Corporation

**City of Detroit** Advising the Retirement Systems of the City of Detroit in connection with Detroit's Chapter 9 proceedings

 Advised Bosque Power Company on its negotiations with lenders and restructuring

 Advised in connection with its pre-arranged Chapter 11 proceedings

### M&A

 $25.1bn acquisition of Forest Laboratories and $8.5bn acquisition of Warner Chilcott

 Board of Directors on Safeway's $9.4 billion acquisition by Albertson's

COVENTRY $7.3bn sale to Aetna

 $5.9bn acquisition of the private label credit card of Target

 $16bn joint acquisition with Equity Residential of Archstone Enterprises

 $2.1bn sale of assets to Prudential Financial and Massachusetts Mutual Life

### Other

 The U.S. Department of Energy in an independent review of a $35.9bn energy loan portfolio

 The US Department of the Treasury on the sale of its $51.6bn ownership stake in AIG through numerous Secondary Public Offerings

 $1.1bn sale of Australian broadcasting rights to Fox Sports and Nine Network

 Restructuring of SAS Group

 Greenhill


ARNOLD & PORTER LLP

## Arnold & Porter LLP

- **Arnold & Porter LLP** has 800 lawyers in 9 offices worldwide and is nationally recognized in numerous practice areas

- *Appellate and Supreme Court Practice*
  - **Lisa S. Blatt** has argued thirty-three cases before the Supreme Court, prevailing in thirty-two (including three bankruptcy cases)
  - The group has been recognized as a top appellate practice by Chambers USA, Legal 500, U.S. News & World Report, and National Law Journal's "Appellate Hot List"

- *Bankruptcy and Corporate Reorganization Practice*
  - **Lisa Hill Fenning** is a former US Bankruptcy Judge for the Central District of California and a current fellow of the American College of Bankruptcy
  - The group has been recognized as a top bankruptcy practice by Chambers USA, Legal 500, and U.S. News & World Report.



 Gabriel Roeder Smith & Company

- In business since 1938.
- Independent actuary for the GRS.
- Independent actuary for PFRS.
- Has served both systems for many years.
- Serves many other public plans in Michigan and across the country.





# Significant Dates and Events

**6/14/13**
- **Proposal for Creditors presented by the Emergency Manager**.

**7/18/13**
- **City files Chapter 9 bankruptcy.**

**8/13/13**
- **Mediation ordered.**

**12/5/13**
- **The Bankruptcy Court determines that the City is eligible to be in bankruptcy and that pensions can be impaired**.

**12/26/13**
- **The Detroit Retirement Systems appeal to the Sixth Circuit.**



# Significant Dates and Events

**2/21/14**
- **The Grand Bargain announced.**

**5/5/14**
- **Fourth Amended Plan for the Adjustment of Debts for the City of Detroit filed.**

**7/11/14**
- **Voting Deadline**
- **Individual Retirees' last day to file objections to the Plan.**

**7/24/14**
- **Confirmation Hearing begins.**



# The Ballot



**RSCD**
Retirement System *City of Detroit*

# The Ballot

**SOLICITATION PACKET (Mailed May 12th)**

*Packet includes:*

- Ballot and Return Envelope
- Plain Language Summary
- Confirmation Hearing Notice
- Rules on Tabulation of Votes
- CD-Rom – POA, Disclosure Statement and Exhibits
- Letters of Plan Support

YOU CANNOT AVOID A REDUCTION IN YOUR PENSION BENEFITS BY REFUSING TO VOTE.



# The Ballot

**PENSION and RETIREMENT RELATED CLASSES**

Class 10 – PFRS
Class 11 – GRS
Class 12 – OPEB

There are two sets of Ballots for Class 11 GRS Participants:

- Active and Former Employees as of March 1, 2014 (Yellow)
- Retirees receiving a retirement benefit as March 1, 2014 (Blue)

If you hold Claims in other classes, you may receive more than one(1) Ballot and Solicitation Packet.



# The Ballot

## REVISED BALLOTS

Class 11 – GRS Claims w/ ASF Recoupment

The ASF Recoupment calculations included the July 1, 2002 - June 30 2003 Fiscal Year.

There will be approx. 3200 new Ballots for Class 11 GRS Participants:

- Active and Former Employees as of March 1, 2014 (Green)
- Retirees receiving a retirement benefit as March 1, 2014 (Pink)

Balloting Agent **MUST RECEIVE** Ballot by 5:00pm Eastern on July 11, 2014



# The Ballot

## THE GRS "PENSION CLAIM"

The Pension Claim amount stated on your Ballot is an estimated amount based upon your pro-rata share of the unfunded accrued liability (UAAL) in the GRS Plan.

*For Retirees:* formula utilizes amount of pension benefit and actuarial assumptions.

*For Actives:* formula utilizes age, years of service and non-retiree UAAL.

Includes Pension and ASF if applicable.

**It is for Voting purposes only.**

*For Class approval*: need more than 50% of members VOTING in each Class and two-thirds of the dollar amount of claims VOTED.


**Outside Funding -**

          **aka "The Grand Bargain"**

- $816M over 20 years

- Three Sources: Foundations ($366M); DIA ($100M;) and, State of Michigan ($350M $\rightarrow$ $196M NPV)

- Each source of funding has conditions which may, or may not be satisfied before Plan Confirmation (e.g. Class 10 & 11 voting "Yes", releases of claims and litigation, Board Governance, Consummation of DIA Settlement, relevant legislation, etc.)

- If either one or both of Class 10 and 11 members vote to reject the Plan, the Outside Funding will not be available.



# The Ballot

## BASIC BENEFIT CUTS: Alternative A

> ➤ *If Class 10 and Class 11 vote in support of the Plan, the Outside Funding is made and the Plan is confirmed:*

➤ Loss of future COLA (Approx.14.5% reduction in liabilities to GRS)

➤ 4.5% Reduction in current pension benefit

➤ Annuity Savings Fund Recoupment (Approx. 8.8% reduction in liabilities to GRS)

- Recoupment Period: 7/1/03 – 6/30/2013
- Excess earnings during this period capped at 20%
- Additional Cap of 15.5% of total pension benefit applied to Retirees and Active Employees who have withdrawn their ASF Account.

➤ Restoration of Benefits Program

➤ New Investment Committee



# The Ballot

**BASIC BENEFIT CUTS: Alternative B**

*If Class 10 OR Class 11 reject the Plan; and/or the Outside Funding is not made; and the Plan is confirmed:*

✦ Loss of future COLA (Approx.14.5% reduction in liabilities to GRS)

✦ 27% Reduction in benefit

✦ Annuity Savings Fund Recoupment (Approx. 8.8% reduction in liabilities to GRS)

- Recoupment Period: 7/1/03 – 6/30/2013
- Excess earnings during this period capped at 20%
- Additional Cap of 15.5% of WILL NOT APPLY.

✦ No Restoration of Benefits

✦ Board Governance?



# Loss of COLA



Amount shown are illustrations only. The average annual benefit as of June 30, 2013 for all participants in pay status is approximately $20,000.
The impact of lost COLA to you personally depends on your actual pension and retirement date.



# ASF Recoupment

## THE ANNUITY SAVINGS FUND

- A voluntary, individual account pension program

- Contributions of 0%, 3%, 5%, or 7% of gross pay, post-tax

- Assets commingled with other GRS Assets

- GRS Board granted discretion to declare interest credits to the ASF Accounts

- After 25 years of service, active employees may elect to withdraw from their ASF Account

- Upon retirement, withdraw lump sum or annuitize



# ASF Recoupment

## INTEREST CREDITS to the ASF ACCOUNTS

- The GRS Board has historically credited ASF Accounts with the actuarially assumed rate of investment return irrespective of Plan performance.

- Since the late 70's additional interest credits were credited dependent, in part, on investment performance.

- In 2011, City Council adopted an Ordinance limiting ASF interest credits to the Plan's net investment return, with a cap of 7.9% and a floor of 0%.

- The POA's calculation of "excess interest" applies the interest formula in 2011 Ordinance to the July 1, 2003 – June 30, 2013 Recoupment Period with a 20% Cap on the highest balance in this period.



# ASF Interest Credits

| General Retirement System | | | | |
|---|---|---|---|---|
| Fiscal Year (ending) | ASF Interest Rate | ASF Interest Bonus[i] | Fiscal Year Market Rate of Return | POA Recoupment Interest Rate Used |
| 6/30/2004 | 7.90% | | 15.577% | 7.9% |
| 6/30/2005 | 7.90% | 1.340% | 9.171% | 7.9% |
| 6/30/2006 | 7.90% | 1.3474% | 11.558% | 7.9% |
| 6/30/2007 | 7.90% | 15.0857% | 18.938% | 7.9% |
| 6/30/2008 | 7.90% | | -4.327% | 0.0% |
| 6/30/2009 | 7.90% | | -19.670% | 0.0% |
| 6/30/2010 | 7.90% | | 4.540% | 4.54% |
| 6/30/2011 | 7.90% | | 20.218% | 7.9% |
| 6/30/2012 | 7.90% | | 0.529% | 0.529% |
| 6/30/2013 | 7.90% | | 12.233% | 7.9% |

[i] Interest Bonuses were paid on the following Fiscal Year beginning balance.



# ASF Recoupment

| Fiscal Year | July 1st Balance | Contributions | ASF Interest | Interest Bonus | June 30th Balance | POA Interest | Market Interest |
|---|---|---|---|---|---|---|---|
| 03/04 | $29,647 | $3,117 | $2,464 | | $35,228 | $2,464 | $4,861 |
| 04/05 | $35,228 | $3,140 | $2,910 | $553 | $41,831 | $2,910 | $3,595 |
| 05/06 | $41,831 | $3,337 | $3,500 | $6,557 | $55,225 | $3,500 | $8,717 |
| 06/07 | $55,225 | $2,929 | $4,474 | $9,448 | $72,076 | $4,474 | $10,961 |
| 07/08 | $72,076 | $3,201 | $5,814 | | $81,091 | $0 | -$3,047 |
| 08/09 | $81,091 | $3,343 | $6,532 | | $90,966 | $0 | -$14,188 |
| 09/10 | $90,966 | $3,291 | $7,313 | | $101,570 | $4,130 | $2,726 |
| 10/11 | $101,570 | $3,295 | $8,157 | | $113,022 | $8,157 | $13,602 |
| 11/12 | $113,022 | $3,129 | $9,223 | | $125,374 | $598 | $445 |
| 12/13 | $125,374 | $3,045 | $10,018 | | $138,437 | $10,018 | $10,719 |
| | | | | | | | |
| **Total 03 - 13** | **$29,647** | **$31,827** | **$60,405** | **$16,558** | **$138,437** | **$36,251** | **$38,391** |



# ASF Recoupment

## Calculation of Excess Interest
## for ASF Recoupment Purposes - ILLUSTRATION ONE

($60,405 + $16,558) - $36,251 = $40,712

(ASF Interest + Interest Bonus)  -  POA Interest = Excess Interest

Largest Balance:     $ 138,437

CAP @ 20%           $   27,687

Total Excess          $   40,712

Lower of CAP or Excess: $27,687

Excess NOT subject to Recoupment: $13,025



# ASF Recoupment





# ASF Recoupment

| Fiscal Year | July 1st Balance | Contributions | ASF Interest | Interest Bonus | June 30th Balance | POA Interest | Market Interest |
|---|---|---|---|---|---|---|---|
| 03/04 | $139,315 | $2,838 | $11,116 | | $153,269 | $11,116 | $21,922 |
| 04/05 | $153,269 | $3,068 | $12,230 | $2,259 | $170,826 | $12,230 | $15,188 |
| 05/06 | $170,826 | $3,169 | $13,880 | $25,314 | $213,189 | $13,880 | $21,257 |
| 06/07 | $213,189 | $3,385 | $16,975 | $35,232 | $268,781 | $16,975 | $39,476 |
| 07/08 | $268,781 | $4,473 | $21,374 | | $294,628 | $0 | -$10,671 |
| 08/09 | $294,628 | $4,890 | $23,471 | | $322,989 | $0 | -$48,362 |
| 09/10 | $322,989 | $5,257 | $25,691 | | $353,937 | $14,644 | $9,015 |
| 10/11 | $353,397 | $796 | $19,319 | | -$374,052 | $19,319 | $43,391 |
| 11/12 | $0 | $0 | $0 | | $0 | $0 | $0 |
| 12/13 | $0 | $0 | $0 | | $0 | $0 | $0 |
| | | | | | | | |
| Total 03 - 13 | $139,315 | $27,876 | $144,056 | $62,805 | $374,052 | $88,184 | $91,216 |



# ASF Recoupment

**Calculation of Excess Interest
for ASF Recoupment Purposes - ILLUSTRATION TWO**

($144,056 + $62,085) - $88,184 = $118,677

(ASF Interest + Interest Bonus) - POA Interest = Excess Interest

Largest Balance: $ 374,052

CAP @ 20% $ 74,810

Total Excess $ 118,677

Lower of CAP or Excess: $74,810

Excess NOT subject to Recoupment: $43,867



# ASF Recoupment





# ASF Recoupment

**Recoupment for Active or Terminated Employees with an ASF Account**

- The "Excess Interest" previously credited to your ASF Account during the Recoupment Period (subject to the 20% Cap) will be deducted from your ASF Account and credited to the GRS Pension Plan.



# ASF Recoupment

## Recoupment for Retirees and Active Employees or Vested Retirees who took an ASF Distribution

- The "Excess Interest" previously credited to your ASF Account during the Recoupment Period (subject to the 20% cap) is calculated.

- The "Excess Interest" amount is actuarially converted to a monthly lifetime annuity amount based upon your life expectancy, interest at the actuarially assumed rate (6.75%), and the type of benefit selected at the time of retirement.

- The monthly lifetime annuity amount will be deducted from your monthly pension.

- Under Alternative A, if you are a retiree in pay status as of June 30,2014 and the Outside Funding is received, the total combined reduction in your current pension will not exceed 20% (e.g., 4.5 + 15.5% maximum reduction).



# GRS Pension Restoration Program

- Program to allow for the potential restoration of accrued benefits, including COLA and ASF Recoupment, that were reduced as part of the POA.

- Driven by improvement in the GRS Funded Level (investment returns, actuarial experience, outside contributions).

- DWSD Contingent Value Rights -  50% of a DWSD transaction within 7 years; Waterfall between GRS and PFRS.

- Supervised and administered by the GRS Board and the new Investment Committee.

- Restoration flows through 3 Waterfall Classes of GRS participants.



# GRS Pension Restoration Program

## WATERFALL CLASSES

There are three Waterfall Classes:

- **Waterfall Class 1** – Retirees in retirement benefit pay status as of June 30, 2014, and their surviving spouses and beneficiaries.

- **Waterfall Class 2** – Retirees who entered into retirement benefit pay status after June 30, 2014, and their surviving spouses and beneficiaries, and who are in pay status as of the end of the GRS Fiscal Year prior to the year in which the restoration decision is made.

- **Waterfall Class 3** – All other GRS participants who are not in retirement benefit pay status.



# GRS Pension Restoration Program

## RESTORATION of BENEFITS

- If the projected funded Level is above the Restoration Target, Assets are transferred to a Restoration Reserve.

- If assets in the Reserve sufficient to fund a restoration increment for the actuarial life expectancy to a Waterfall Class, Restoration is provided:

  - 4.5% benefit cut is restored in .5% increments until full restoration of 4.5% to each Waterfall Class;

  - COLA restored in 10% increments to Waterfall Classes in accordance with schedule;

  - ASF may be recouped as well – first non-retirees to retiree level, then all other ASF



# GRS Pension Restoration Program

| Period | Funding Target | Restoration Target | Reserve Suspension | Restoration Reduction |
|---|---|---|---|---|
| Until 6/30/23 | 70% | 75% | Below 71% | Below 70% |
| 7/1/23 – 6/30/33 | Actual 2023 Funded Level | Funding Target +3%; Min. 73% | Below Funding Target + 1% | Below Funding Target |
| 7/1/33 – 6/30/43 | Actual 2023 Funded Level | Funding Target + 3%; Min 73% | Below Funding Target +1% | Below Funding Target |



# GRS Pension Restoration Program

## PERMANENT RESTORATION

- Generally, in the event the projected funded level falls below the applicable Funding Target, transfer of assets from the Restoration Reserve to the Pension Plan will occur and future restoration benefits may be suspended, diminished or terminated.

- In the event the GRS satisfies the Permanent Restoration Targets in 2028, 2033 and 2043, (additional 1% outperformance above Restoration Trigger); restoration benefits in effect at that time which are fully funded shall be permanently restored and not subject to suspension, diminishment or termination.



# Other Issues

- BOARD GOVERNANCE

- FUND FOR INCOME STABILIZATION

- DIA AND FOUNDATION FUNDING

- STATE FUNDING

- EFFECT OF VOTING ON RELEASES

- RECOVERY CONSIDERATIONS



## Fourth Amended Plan of Adjustment



**Numerous objections to the Plan have been filed by bondholders, bond insurers, and bond trustees - - primarily attacking the Grand Bargain and the treatment of pension claims as being too favorable and, therefore, unfair.**

(1) State settlement, Foundation and DIA proceeds included for recovery analysis purposes. Recovery would be 48% for GRS and 39% for PFRS if excluded. Based on 6.75% discount rate based accrued liability and market value of assets for claim size per Milliman
(2) Based on nominal claim size of $279mm per market value as of 2/28/2014 (excluding accrued interest). $85 million or 30% recovery. Settlement approved April 11, 2014
(3) Assumes adverse litigation and 100% of COPs as Allowed Claim for illustrative purposes



# The Vote



# The Vote – If You…

**VOTE YES** to accept the Plan; and a majority of other Class 10 & 11 Members vote **YES**; and the Initial Funding Conditions for Outside Funding **are** satisfied: Get Alternative A and give up right to sue other parties.

**VOTE YES** to accept the Plan; however a majority of other Class 10 & 11 Members vote **NO**; therefore the Initial Funding Conditions for Outside Funding **are NOT** satisfied: Get Alternative B, if Plan is confirmed.

**VOTE YES** to accept the Plan; a majority of other Class 10 & 11 Members vote **YES**; however Initial Funding Conditions for Outside Funding **are NOT** satisfied or waived: Your Vote is treated as a rejection. Plan confirmation will be challenged, however, you may get Alternative B, if Plan is confirmed.



# The Vote – If You…

**VOTE NO,** thereby rejecting the Plan, however, a majority of other Class 10 & 11 Members vote **YES**; if the Initial Funding Conditions for Outside Funding **are** satisfied or waived and the Plan is confirmed: You will get Alternative A, benefit from the Outside Funding and give up right to sue other parties.

**VOTE NO,** thereby rejecting the Plan; and a majority of other Class 10 & 11 Members vote **NO** rejecting the Plan as well; the Initial Funding Conditions for Outside Funding **are NOT** satisfied therefore no Outside Funding is available. If the Plan is confirmed by the Bankruptcy Judge through a cram down process, you will get Alternative B.

**VOTE NO,** thereby rejecting the Plan; and a majority of other Class 10 & 11 Members vote **NO** rejecting the Plan as well; the Initial Funding Conditions for Outside Funding **are NOT** satisfied therefore no Outside Funding is available. If the Plan is NOT confirmed, the parties will be back at the table without the benefit of the Outside Funding.



If you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, the Ballot or the procedures for voting on the Plan, please contact the Balloting Agent: (a) by telephone (i) for U.S. and Canadian callers toll-free at 877-298-6236 and (ii) for international callers at +1 310-751-2658; or (b) in writing at:

City of Detroit

c/o Kurtzman Carson Consultants LLC

2335 Alaska Avenue

El Segundo, California 90245



# **EXHIBIT C**

## STATE OF MICHIGAN
## MICHIGAN EMPLOYMENT RELATIONS COMMISSION

**AFSCME LOCALS 214 AND 312**
                Union,

and
                                                 Case No. D13 J-0890
                                                 Thomas W. Brookover,
                                                 Fact Finder

**CITY OF DETROIT,**
                         Employer
_____/

Appearances:
For the City:
      E. Michael Rossman, Esq.
      David S. Birnbaum, Esq.
      Benjamin Coleman, Esq.
For the Union:
      Richard G. Mack, Esq.
      Teri Dennings, Esq.
      George B. Washington, Esq.

## FACT FINDING REPORT AND RECOMMENDATIONS

### INTRODUCTION

An Emergency Manager was appointed for the City of Detroit in April, 2013. As a result, under PA 436 the City's duty to bargain with its employee unions was suspended and the City could implement changes in the terms and conditions.

There is an exception. The Detroit Department of Transportation, ("DDOT") receives federal funds under the Urban Mass Transit Act. One of the conditions of such receipt is that arrangements be made to protect the interests of employees . As a result, in 1990 the City and both AFSCME Local 214 and 312 entered into what are known as "Section 13(c) Agreements" which preserved the collective bargaining rights of employees. Those agreements are in the record as Exhibits 3 and 4. The 13(c) agreements provided that if the parties cannot reach

agreement, the dispute will be submitted to the Michigan Employment Relations Commission ("MERC") for fact finding.

Such disputes arose, and on November 21, 2013 MERC appointed me the fact finder for both Local 214 and Local 312. (The locals are negotiating together, and participated in the fact finding together, so I will refer to them as the Union or the Unions). I was also appointed fact finder for the Amalgamated Transit Union, Local 14, but it entered into a contact with the City before proceedings began.

Pre-hearing conferences were held on December 6 and 17, 2013, and by agreement of the parties hearings were scheduled for January 17 and 28, 2014. In the interim, I ordered the parties to mediate with one of MERC's mediators, and to participate in at least two face to face negotiating sessions.

The Union filed a Motion to Remand which I denied in an Opinion and Order re: Motion to Remand dated January 7, 2014.

A hearing was held on January 17, and just prior to January 28 the City said that their witness was not going to be available. I met with counsel on January 28 and the parties were unable to agree on future hearing dates. I therefore issued an Order Re: Scheduling dated January 29, 2014, stating that the last day for hearings would be Friday, February 14, hearings would be conducted on February 12, 13 and 14 and there would be no hearings after February 14.

We held hearings on those dates and the parties agreed on a briefing schedule, later amended. Briefs were submitted to me on March 21, 2014. A panel meeting was held on April 22.

The City identified four issues on which it wanted fact finding. It is seeking Memoranda of Understanding (MOU) on wages, healthcare, retirement benefits and longevity pay. The duration of the contract is also an issue.

The Union has objected to fact finding arguing that the parties have not truly negotiated, and there are numerous other provisions in the contracts which are at issue.

# TESTIMONY AND EXHIBITS

A total of 83 exhibits were introduced by both sides and in most part the testimony of the witnesses amplified and explained the exhibits, so I will not review them specifically.

## CITY WITNESSES
### Michael Hall

Michael Hall is the Director of Labor Relations and Director of Human Resources for the City of Detroit. He began with the City in September 2013, after the bankruptcy filing, after a career in human and labor relations, mainly with General Motors. He has a Bachelors in Business Administration and a Masters in Industrial Management and Human Resources, both from Central Michigan . He is responsible for forty- seven bargaining units in the City.

He testified that there are approximately 9,200 union and non-union employees in in the City and he is responsible for all except those in the Water and Sewerage Department.

There are two pension plans, one for police and fire, and the General Retirement System, or GRS, for all others.

He testified that there is a tremendous need for cost savings in the City and it needs to reduce operating expenses so it can continue to provide the services the City should be providing to its citizens. To that end the City has instituted wage reductions, a new healthcare plan, termination of longevity payments, and a pension proposal.

The healthcare plan proposed to these locals is the same plan provided to other unionized and non-unionized employees in the City. He testified that the City's objective is to get the best coverage available under the circumstances of bankruptcy and to decrease the number of plan options in order to minimize administrative complexity.

He testified that the major changes to the healthcare plan were to increase the deductible for individuals from $250 to $750, for family from $500 to $1,500, and out of pocket expenses for a family were increased from $3,000 to $4,500.

The 2013 healthcare plan is no longer in effect and is not being offered to any employees in 2014. The only healthcare plan in effect is the new one.

He said he could not think of a reason why Locals 214 and 312 should get a different healthcare plan than other City employees and that members of Locals 214 and 312 are currently enrolled in the new plan.

The City proposed a 10% wage reduction which he understands will save the City about $36 million annually. He has not accepted the Union's wage proposal because the City wants all employees to assist in emerging from bankruptcy and he wants to treat them all equitably.

He testified that the City is currently trying to hire 16 new mechanics in Local 312 and admits that he has heard that the wage reduction has made it more difficult to hire them.

The pension proposal was for a freeze of the GRS as of December 31, 2013 and adoption of a defined contribution plan to which the City would contribute 5% of an employee's base wage annually. The plan does not permit employee contributions.

He explained that the Emergency Manager agreed with the Bankruptcy Court not to freeze the plan while mediation is continuing under the auspices of the federal court. AFSCME is actively involved in the mediations.

The City proposal goes on to say that whatever comes out of the Bankruptcy Court will be implemented.

He testified that it also reserves to the Employer the right to amend, modify or terminate the 401(c) plan. He could not testify as to the amount of savings anticipated by the pension change.

### Charles Moore

Charles Moore is a senior managing director with Conway MacKenzie, which is a turnaround and restructuring firm. He is a CPA and has both a BA and

an MBA in Accounting from Michigan State. He has experience working with such governmental entities as Jefferson County, Alabama; Stockton, California; Puerto Rico; the Wayne County Circuit Court and the Detroit Public Schools. He has been involved in numerous projects restructuring compensation, both wages and benefits, for employees. Conway is currently the operational restructuring advisor to the City.

He testified that the City and its advisors concluded that it was unable to meet its debts as they became due and a comprehensive restructuring plan was needed. That Plan was prepared and publicized to employees and creditors.

The City's objectives as set forth in the plan were to:

- Provide incentives (and eliminate disincentives) for businesses and residents to locate and/or remain in the City.
- Maximize recoveries for creditors.
- Provide affordable pension and health insurance benefits, and restructure governance of pension arrangements.
- Reform the City government operations to improve efficiency and reduce costs
- Eliminate blight to assist in stabilizing and revitalizing neighborhoods and communities within the City.
- Maximize collection of taxes and fees that are levied or imposed.
- Generate value from City assets where it is appropriate to do so.

He testified that the City's population and property values had been declining for years and it was necessary to halt and hopefully reverse those trends. The City needs stability and predictability and needs to spend adequate money on the things that residents and businesses value, so they will be attracted to the City. The City also has to provide as much as it can to its creditors.

He testified how the City has looked at adjusting wages, healthcare costs, and the cost of pensions.

He testified that the offers the City made to the local unions are consistent with those offered City wide for participants in the GRS.

He testified that 41% of the gross revenue of the General Fund Revenue is for wages and benefits. He also testified that it is very common for cities to have a substantial amount of its revenues go to wages and benefits.

With respect to the GRS, he testified that the difference between the actuarial value of the plan at June 30, 2012, and the actual value of assets, was $650 million.

A 7.9% rate of return had been used for valuing the fund. Using the actuarial value of the fund it is 77% funded but using the actual value, as well as using a more realistic rate of return, it is only about 55% funded.

He testified that the practical problems this causes are that significantly higher contributions are needed to fund the plan, and there might not be enough money to make pension payments, as soon as ten years out.

The goals in restructuring retirement benefits are predictability, maintaining a reasonable amount of benefits for retirees, and reducing the risk for benefits earned in the future.

He testified that to meet these goals the city proposes to close the current defined benefit plan to new entrants and freeze it so current employees do not accrue any more benefits. Current employees would participate in a defined contribution plan with a 5% contribution of base wage. Employees would not contribute to that plan but could make contributions to a separate plan.

He testified that the freeze did not go into effect because those involved in the Federal Court mediation process asked that it not be implemented while the parties continue mediating. He testified that the City's position still involves freezing and implementing a defined contribution plan. He said that AFSCME is involved in the mediation.

The City's offer on pensions states that it will be modified as might be necessary to conform to the plan of adjustment approved by the Bankruptcy Court.

He testified that the wage proposal calls for a ten percent reduction and a termination of longevity pay. Over ten years the plan is to provide annual increases to account for inflation of about 2%.

He testified that it is "incredibly difficult when you start selecting or choosing individual groups on which to focus these types of concessions and accommodations."

He testified that City-wide the wage reduction would result in savings of about $14 million for non-uniformed employees and elimination of longevity pay results in annual savings of about $4 million.

He testified that reducing the number of health care options saves money in administrative costs, and to the extent you can pool employees into fewer categories you can get better pricing. The City's proposal is estimated to save $12 million per year.

He testified that the new healthcare plan went into effect on January 1, there is no old plan for employees to participate in, and that employees of Locals 214 and 312 are participating in the new plan.

DDOT does not make money for the City, and does not cover the costs of its operations from fare revenue or grants, but requires a subsidy from the City of $60 to $90 million per year, and the goal of the restructuring plan is to reduce that as much as possible.

He testified that he did not cost each of the changes for Locals 214 and 312 specifically, but instead they looked at the proposed health care, pension and wage changes on a city wide basis.


**UNION WITNESSES**
**D'Angelo Malcolm**

The Union called D'Angelo Malcolm, who is Staff Representative for Michigan AFSCME Council 25 and represents Locals 214 and 312. His primary role is to negotiate and enforce contracts. He was involved in meetings and negotiations on the contracts at issue here. He testified that it was always difficult to understand the City's positions. He said the City wanted them to agree to certain things they had offered other employees, who did not have bargaining rights like these two locals have. The City had imposed CET, City Employment Terms, on other employees.

Mr. Malcolm testified as to the difficulty he and the Unions had negotiating with the City, because it delayed in providing detailed information on its proposals. The Unions asked questions, which simply were not answered. He testified that instead of going through the negotiation process, the healthcare proposal from then City was that "the Union will receive the City's Healthcare Plan and be subject to the City's healthcare polices for active employees and future retirees, as developed and implemented by the Emergency Manager". He said he didn't know what that meant.

He testified that in a normal concessionary negotiation the City would explain that it was trying to save a certain amount of money, and then the Union and City would explore ways to reach that number. That did not happen here.

### Philip Douglas

Philip Douglas is President of AFSCME Local 312, which represents approximately 220 members who are general auto mechanics and auto body mechanics, service guards, storekeepers and repairers.

He testified that the proposal to reduce wages 10% has had affected the City's attempt to hire more mechanics. He said that if you are a certified mechanic out in the field you are not going to quit your job to come work for the City for $18 per hour. Mr. Douglas testified that staffing levels have decreased in the past few years while the workload increased. There used to be over 120 mechanics and now there are 85. There are 300 active buses out of 464 total. The difference is accounted for by 30 to 35 busses waiting to be sent out for engine work, busses hard hit in accidents that will never be repaired, fire jobs and some that are simply waiting to be retired.

He testified that there are 45-50 mechanics who can retire in the next year, and many might do so because they are unsure of the future.

Most of the members work at least 10 hours of overtime a week, and some work 20 hours a week.

**Armelia June Nickleberry**

Armelia June Nickleberry is the President of AFSCME Local 214 which has about 99 members. The largest group, 29, are senior transportation service inspectors, who monitor and supervise the bus service on the roads, assist in making sure service is operable, and get replacements if a bus breaks down on the road.

Ms. Nickleberry also testified that her unit is understaffed, with membership reduced from 141 five years ago to 99 now, with numerous vacancies in the department. She testified that the City is in the process of outsourcing money handlers. She testified that her members suffered hardships when their take-home pay was reduced through the furlough days. She has been with the City twenty-five years and her hourly wage is $17.78. She said the average person in her local works 12 to 16 hours of overtime a week.

**Althea Johnson**

Althea Johnson has worked with the City for sixteen years, was a member of Local 312 for ten years and for the last three years has been a member of Local 214. Her current hourly wage is $15.26, which is the maximum for her position of customer service agent.

She testified that she has two dependents, ages 13 and 3, and she is the sole wage earner for her family. Her family had to move in with her mother a year and a half ago because of the furloughs. She is enrolled in the new health care plan, which is more expensive for her. Her children have asthma, and doctor visit co-pays went up from $10 to $25, and co-pays for the medication went from $5 to $10 for the generic drugs. She has two prescriptions, her 13-year old has three and the three year old has two. One daughter recently broke her hand and rather than taking her to the Emergency room, where the cost went from $75 if you do not have an overnight stay to $100, she took her to Urgent Care because it only costs $25.

She did testify that her health care premium went down from $127 to $113 every two weeks.

**Jack Shultz**

Jack Schultz, who is a recently admitted attorney with the firm representing the Union, did research while a law clerk on different ways the City could save money or look for money.

He testified about the numerous programs under which properties in the City were granted tax abatements, including Detroit Renaissance Zones, personal property exemptions, obsolete property rehabilitation exemption, and the commercial rehabilitation exemption. He also testified to news reports that the City only fully collects taxes on 53% of taxable property in the City. He also introduced various reports about the City's failing to collect taxes and fees.

During his testimony the City stipulated that as of June 2014 there were historical non-filers with outstanding tax obligations of approximately $250 million and it is pursing collection of those taxes.

**Christopher Fox**

Christopher Fox has a BA from Moravian College in U.S. History and an MA from the New School for Social Research in gender studies and feminist theory with a concentration in American politics.

He has worked for AFSCME International since 2003 as a fiscal policy analyst and has reviewed city and state budgets, participated in bargaining and testified in between 12 and 20 arbitrations and fact findings on ability to pay and comparability issues. He testified as an expert in fiscal analysis. He testified as to comparisons he did between wages for members of these locals and comparable jobs in the area. He testified that with the current wages the City is at a huge disadvantage for recruitment and retention of most employee groups in these locals. His comparison did not, however, take into account retirement and health care benefits, although he admitted that a comparison using total compensation would be helpful for recruiting and retention analysis. He acknowledged that he only compared six of the 43 job classifications in the locals.

He testified that there are a number of changes that can be made to a

defined benefit pension plan to alter and reduce costs. These include how sick time and other leave time is used to compute final average salary, reducing the multiplier which is used, changing employee contributions to the plan, and changing post retirement COLA adjustments to pension payments.

## FINDINGS AND RECOMMENDATIONS

### STANDARDS OF REVIEW UNDER THE LAW

No statute specifically outlines the criteria fact finders are to use in making their recommendations, but they have historically relied on the factors set forth in PA 312. Act 312 was amended in 2011 to state, in part, that arbitrators should give ability to pay the most significance and to state the importance of "internal comparables", directing arbitrators to compare the employees in question with other employees of the same city.

Those are the criteria I find to be most important in this case.

### GOOD FAITH BARGAINING

The Union has stated that the City did not bargain in good faith before and during this proceeding, and has presented testimony to that effect.

However, that is not an issue that is within my jurisdiction as fact finder and I will not make a ruling on it.

### PARTIES' ARGUMENTS

The positions of the parties have been well set forth by their respective witnesses. The City emphasizes that it wants a uniform approach to all employees with respect to the four issues it has identified. It states the obvious: The City is in bankruptcy after a long period of financial problems and drastic measures are necessary to bring it back to stability.

The Union argues that the City has not identified the specific savings that can be attributed to these two locals. It also argues that there are lots of ways thr

City can generate more funds without placing the burden on the employees and points out the numerous places where the City might collect more taxes and fees owed it, and provide fewer tax exemptions.

## THE ISSUES IN DISPUTE

The union points out that while the City wants to address only four issues, there are numerous other provisions in the contract. The Union is, of course, correct and proposes they all remain unchanged. In its Post-Hearing Brief the City has agreed with this proposal. Therefore I recommend that other than the four issues addressed by the City, and insofar as they are not inconsistent with my recommendations, the other provisions of the contract remain unchanged.

## DISCUSSION

The City is bankrupt.

The City is insolvent.

The City is not paying its debts as they become due, and it <u>cannot</u> pay its debts as they become due.

There is no question that the City has to make significant changes in order to survive. It cannot continue with the pension burden it has now, and cannot continue on the course it has been on.

Although the Union presented evidence on the many ways the City can increase its revenue, those changes alone cannot solve the City's problems.

There is no question that City employees, unfortunately, have to contribute to the effort to save the City. The question is, how much?

The Detroit Department of Transportation, ("DDOT") runs the City's fleet of busses. At the present time there are 464 busses, with about 300 of them active. The DDOT locals are different than other locals because there are 13(c) agreements which require the City to bargain in spite of the receivership imposed on the City under PA 436. The City's position is that under the Emergency Manager Law it has no duty to bargain with the other locals.

The Unions have argued that prior to the fact finding the City did not participate in good faith bargaining, failed to provide necessary information, was unable to answer questions about its proposals, and asked the Unions to sign off on ambiguous contract language. They point out that in normal concessionary bargaining the employer will identify the cost savings it wants to achieve and then the parties work through alternatives to seek to reach that goal.

The fact is that this is not normal concessionary bargaining. The City is attempting to restructure itself completely to attempt to emerge from bankruptcy. The plans it proposes apply to all employees groups.

And the fact remains that it is unclear what is going to happen in Bankruptcy Court.

Last best offers were exchanged before the hearings but ultimately final offers were exchanged on the last day of hearings. Those were marked Exhibit 81 (the Union offer), Exhibit 82 (the City offer for Local 214) and Exhibit 83 (the City offer for Local 312). Those exhibits are attached.

I accept all the testimony, in the most part, as factual. The City is in dire straits. The pension plan cannot continue as it is. Wage reductions will be painful for the employees, who have made a number of concessions and sacrifices over the years. Health care changes will be more costly for some employees, although will result in reduced costs for others

I also find that the Emergency Manager and the Bankruptcy Court have a massive and very complex task to save one of America's great cities. They must balance the interests of almost ten thousand employees with the hundreds of thousands of City residents, numerous creditors, and the effect on the State and surrounding communities, which are inextricably connected to the City.

13

**RECOMMENDATION ON WAGES**

The Union's wage proposal is for an 8% wage reduction effective immediately, with 2% increases for the next two years. The City's wage proposal is a 10% wage reduction in lieu of wage reduction and furlough days.

Because they have kept the right to bargain, these two locals are unique in the City. All other employees had an eight or ten percent wage reduction imposed last year. These locals have not faced the wage reduction so they have benefitted from their unique status. The members of the ATU, the bus drivers, who have bargaining rights with a 13(c) agreement, entered into a agreement with the City in November, continuing an 8% reduction which began in 2012.

Currently no one in Local 312 or 214 is on furlough or is subject to the 10% wage reduction.

I recommend a 10% wage reduction effective immediately. If these employees got an 8% wage reduction, they would be treated differently from, and better than, most other employee groups in the City. It is important to note that these employees have received their full pay while all other employees have had wage reductions in effect for a number of months.

Clearly the ten percent reduction will be painful as reductions and furloughs have been in the past. But it has been applied city wide and other employees have had to endure it. I cannot find a compelling reason why the members of these groups should be exempt from the reduction.

**RECOMMENDATION ON LONGEVITY**

The City's proposal on longevity reads as follows:

"Longevity payments are hereby eliminated effective January 1st, 2014 for the 2104-2015 fiscal year. There will be no future longevity payments after December 31, 2013"

At the last hearing date, Mr. Malcolm said that the Union agrees with the City's longevity proposal.

It developed that there was a misunderstanding between as to what the longevity proposal meant. Counsel for the City interpreted it to mean that all

longevity payments were terminated. Mr. Malcolm interpreted it to mean that there would be no longevity payments in the future, but it did not rule out a longevity payment for 2013.

Reading the proposal fairly, it does, in fact, leave open the question of whether longevity would be paid for 2013.

Mr. Malcolm confirmed that Locals 214 and 312 did not receive longevity pay in either 2012 or 2013, although there were other unions in the City that did.

I recommend the longevity proposal, as interpreted by the Union, and I recommend one last longevity payment for 2013.

Initially there does not seem to be a reason to treat these groups differently from the other employees for whom longevity payments have been terminated. However these unions did have the right to go to fact finding, and it appears that not until the last day of the fact finding hearing did the City act to change the meaning of its proposal.


**RECOMMENDATION ON HEALTHCARE**

The 2013 healthcare plan was ended and the City offered a 2014 healthcare plan. Employee premiums either stayed the same or went down from 2013 to 2014, while deductibles, co-pays, and other costs went up. Depending on circumstances, for some employees their costs will go up. Many, if not most, employees of these locals are participating in the new healthcare plan. As with any change some will benefit from the new plan and some will have to pay more.

At the last hearing the Union revised its last best offer on Healthcare to accept the City's proposal and the 2014 Healthcare plan. See Exhibit 81. Therefore I recommend it.


**RECOMMENDATION ON DURATION**

The City has proposed that the Memoranda of Understandings that they propose and other terms of the contract between the parties expire June 30, 2014. The Union has proposed an expiration date of June 30, 2015.

Unspoken in all of the hearings is the issue of whether the City will try to outsource any of the work done by these locals. It is a legitimate concern. These employees are concerned whether they will have jobs in the future as the City emerges from bankruptcy, and a longer expiration date would give them a bit more job security. The only testimony on the issue was that the City is in the process of outsourcing money handlers.

The unknown in all of this is what will ultimately be approved by the Bankruptcy Court and how that will affect the operations of the DDOT and these locals.

We do not know whether a final plan of adjustment will be approved by June 30, but we will be closer to knowing. The City has indicated that it anticipates that other employees will get a 2% raise in July of this year.

I recommend that the City and these locals enter Memoranda of Understanding to expire June 30, 2014. After that time, with perhaps a better understanding of what will come out of the bankruptcy proceeding, the parties can consider a new and longer-term contract.

### RECOMMENDATION ON PENSION/RETIREMENT BENEFITS

As much as any other issue, it is difficult to make a recommendation on the retirement plans. There are discussions ongoing in the confidential Federal Mediation. Because of the mediation the Emergency Manager did not put the pension proposal into effect as planned and the current pension plan remains in effect. In these hearings the City has said that its position remains what it has been.

I will make a recommendation, but it is a contingent one. If mediation results in an agreement on pensions and retirement plans, then that should be adopted.

In his testimony Mr. Malcolm expanded slightly on the proposal set forth in Exhibit 81 by saying that whatever the parties agree to in mediation the unions are willing to accept, thus agreeing with my conditional recommendation.

Of course if the parties do not reach an agreement, the plan of adjustment from the Bankruptcy court will deal with retirement benefits and pensions. Both sides seem to agree, and I do too, that we don't know whether the City and Union will have any choice or just be bound by the bankruptcy court orders.

It is still the role of fact-finding to make a recommendation on pensions. If the parties reach an agreement, then my recommendation will not matter. Nor will it matter if the bankruptcy court issues an order which is binding on the parties.

If there is no agreement, then I recommend that the City proposal be adopted. Pension costs arising out of the defined benefit plans have bedeviled the City for years and have been a substantial reason it is in bankruptcy now. The plan simply cannot continue as it is. I have not been convinced that changes in computing final average compensation, a reduction of the multiplier, or other modifications will enable the City to go forward with its defined benefit plan.

Respectively submitted,

_____

Thomas W. Brookover, Fact Finder

Dated: April _22_ 2014

# EXHIBIT D



Subject:
Re: AFSCME Locals 214 and 312 - Notification of Acceptance/Rejection of Fact Finders Recommendations
From:
Teri Dennings
05/02/2014 05:26 PM
To:
thomas.brookover
Cc:
dbirnbaum, richardmack, dmalcolm
Hide Details
From: Teri Dennings <teridennings@gmail.com>
To: thomas.brookover@gmail.com,
Cc: dbirnbaum@jonesday.com, richardmack <richardmack@millercohen.com>,
dmalcolm@miafscme.org
History: This message has been forwarded.

This Notice amends the prior Notification of Acceptance/Rejection by Local 214.

Local 214 also accepts in part and rejects in part the fact finders recommendations, for the reasons identified by Local 312.

I apologize for any inconvenience.

Teri Dennings


On Fri, May 2, 2014 at 4:58 PM, Teri Dennings <teridennings@gmail.com> wrote:
Fact Finder Brookover:

Thank you for your work in this matter. Pursuant to the 13(c) agreement between, please accept the following as the notification of acceptance/rejection of Locals 214 and 312:

Local 214 accepts the fact finders recommendations in whole.

Local 312 accepts the fact finders recommendations in part, and rejects the recommendations in part.

Specifically, Local 312 accepts the fact finders recommendations on health care, pension, and longevity.

Local 312 rejects the fact finders recommendations on wages and duration. The recommendations on wages is rejected because Local 312 will be treated less favorably than other unions in DDOT, who, as of July 2014, will be subject to a 6% wage cut as a 10% wage cut is imposed on Local 312.

Local 312 further rejects the fact finders recommendations on duration. This recommendation is rejected because it neither provides nor encourages labor stability or job security for these members for any significant time period. The fact finders recommendation requires the parties to begin negotiating a new contract within a couple of months after the fact finders decision was issued, starting the negotiations process over from the beginning.

Thank you,

Teri Dennings

file:///C:/Users/jp006787/AppData/Local/Temp/1/notesCC1272/~web1695.htm                    9/5/2014

Fact Finder Brookover --

The City of Detroit has reviewed your April 22, 2014 Fact Finding Report and Recommendations. Pursuant to Section 18(e) of the applicable 13(c) Agreements, the City accepts the Fact Finder's recommendations, in whole.

Thank you for your efforts in connection with these matters.

Regards,

David

David S. Birnbaum (bio)
JONES DAY® - One Firm Worldwide℠
77 West Wacker
Suite 3500
Chicago, IL 60601-1692
Office +1.312.269.4005
Fax +312.782.8585

==========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
==========

# **CERTIFICATE OF SERVICE**

I, Heather Lennox, hereby certify that the foregoing Consolidated Response to Certain *Pro Se* Objections to Confirmation of the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit was filed and served via the Court's electronic case filing and noticing system on this 5th day of September, 2014.

/s/  Heather Lennox