UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,          .          Docket No. 13-53846
        MICHIGAN,                 .
                                  .          Detroit, Michigan
                                  .          September 2, 2014
                Debtor.           .          9:45 a.m.
. . . . . . . . . . . . . . . . .

HEARING RE. (#6699) FINAL PRETRIAL CONFERENCE (RE. EIGHTH
AMENDED ORDER ESTABLISHING PROCEDURES, DEADLINES AND
HEARING DATES RELATING TO THE DEBTOR'S PLAN OF ADJUSTMENT);
(#6787) MOTION TO EXCLUDE THE TESTIMONY OF KENNETH A.
BUCKFIRE REGARDING CREDITOR RECOVERIES UPON DISMISSAL
OF THE BANKRUPTCY CASE FILED BY INTERESTED PARTIES
SYNCORA CAPITAL ASSURANCE, INC., SYNCORA GUARANTEE,
INC.; (#6978) MOTION IN LIMINE TO PRECLUDE DEBTOR FROM
OFFERING EVIDENCE RELATING TO (A) THE RECOVERIES OF
CLASSES 10 AND 11 INDEPENDENT OF THE FUNDS FROM THE
DIA FUNDING PARTIES AND THE STATE AND (B) THE TOPICS
IDENTIFIED IN SYNCORA'S SUBPOENAS TO THE FOUNDATIONS
FILED BY INTERESTED PARTIES SYNCORA CAPITAL ASSURANCE,
INC., SYNCORA GUARANTEE, INC.; (#6979) MOTION IN
LIMINE BARRING THE CITY FROM INTRODUCING COMMUNICATIONS
PROTECTED BY THE COURT'S MEDIATION ORDER FILED BY
INTERESTED PARTIES SYNCORA CAPITAL ASSURANCE, INC.,
SYNCORA GUARANTEE, INC.; (#6982) MOTION IN LIMINE
BARRING THE CITY AND PLAN SUPPORTERS FROM INTRODUCING
EVIDENCE REGARDING THE POTENTIAL PERSONAL HARDSHIP OF
PENSIONERS FILED BY INTERESTED PARTIES SYNCORA
CAPITAL ASSURANCE, INC., SYNCORA GUARANTEE, INC.;
(#6985) MOTION/FINANCIAL GUARANTY INSURANCE COMPANY'S
MOTION IN LIMINE TO PRECLUDE THE INTRODUCTION OF EVIDENCE
OR TESTIMONY REGARDING MATTERS WITHHELD FROM DISCOVERY
ON THE BASIS OF THE MEDIATION ORDER FILED BY CREDITOR
FINANCIAL GUARANTY INSURANCE COMPANY; (#6990) MOTION/
FINANCIAL GUARANTY INSURANCE COMPANY'S MOTION IN LIMINE
TO PRECLUDE THE INTRODUCTION OF EVIDENCE OR TESTIMONY
REGARDING CERTAIN MATTERS PREVIOUSLY DEEMED IRRELEVANT
BY THE COURT OR THE CITY OF DETROIT FILED BY CREDITOR
FINANCIAL GUARANTY INSURANCE COMPANY; (#7001) MOTION IN
LIMINE TO PRECLUDE ITS COUNSEL, EVAN MILLER, FROM BEING
CALLED AS A TRIAL WITNESS FILED BY DEBTOR IN POSSESSION
CITY OF DETROIT, MICHIGAN; (#6699) PLAN CONFIRMATION
HEARING
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jones Day<br>By:  GEOFFREY S. IRWIN<br>        GREGORY M. SHUMAKER<br>        GEOFFREY S. STEWART<br>        THOMAS CULLEN, JR.<br>51 Louisiana Avenue, N.W.<br>Washington, DC  20001<br>(202) 879-3939 |
| | Jones Day<br>By:  BRUCE BENNETT<br>555 S. Flower Street, 50th Floor<br>Los Angeles, CA  90071<br>(202) 243-2382 |
| | Pepper Hamilton, LLP<br>By:  ROBERT S. HERTZBERG<br>4000 Town Center, Suite 1800<br>Southfield, MI  48075-1505<br>(248) 359-7333 |
| For Syncora<br>Holdings, Ltd.,<br>Syncora Guarantee<br>Inc., and Syncora<br>Capital Assurance,<br>Inc.: | Kirkland & Ellis, LLP<br>By:  STEPHEN C. HACKNEY<br>        MARC KIESELSTEIN<br>300 North LaSalle<br>Chicago, IL  60654<br>(312) 862-2000 |
| For the Detroit<br>Retirement<br>Systems: | Clark Hill, PLC<br>By:  ROBERT D. GORDON<br>151 South Old Woodward Avenue, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5882 |
| For the Detroit<br>Police Officers<br>Association: | Erman, Teicher, Zucker &<br>  Freedman, P.C.<br>By:  BARBARA A. PATEK<br>400 Galleria Officentre, Suite 444<br>Southfield, MI 48034<br>(248) 827-4100 |
| For County of<br>Macomb, Michigan: | Dechert, LLP<br>By:  ALLAN S. BRILLIANT<br>1095 Avenue of the Americas<br>New York, NY  10036<br>(212) 698-3600 |

APPEARANCES (continued):

```
For National          Sidley Austin, LLP
Public Finance        By:  GUY NEAL
Guarantee Corp.:      1501 K Street, N.W.
                      Washington, DC  20005
                      (202) 736-8041

For Financial         Weil, Gotshal & Manges, LLP
Guaranty Insurance    By:  EDWARD SOTO
Company:              1395 Bricknell Avenue, Suite 1200
                      Miami, FL  33131
                      (305) 577-3177

                      Weil, Gotshal & Manges, LLP
                      By:  ALFREDO PEREZ
                      700 Louisiana, Suite 1600
                      Houston, TX  77002
                      (713) 546-5040

For UAW:              Cohen, Weiss & Simon, LLP
                      By:  PETER DECHIARA
                      330 West 42nd Street
                      New York, NY  10036-6976
                      (212) 356-0216

For AFSCME:           Miller Cohen, PLC
                      By:  RICHARD MACK, JR.
                      6700 West Lafayette Blvd., 4th Floor
                      Detroit, MI  48226-3191
                      (313) 566-4787

For the State of      Dickinson Wright
Michigan:             By:  STEVEN G. HOWELL
                      500 Woodward Avenue, Suite 4000
                      Detroit, MI  48226-3245
                      (313) 223-3033

For County of         Young & Associates
Oakland, Michigan:    By:  JAYE QUADROZZI
                      27725 Stansbury Blvd., Suite 125
                      Farmington Hills, MI  48334
                      (248) 353-8620

For Ad Hoc Water      Kramer Levin Naftalis & Frankel, LLP
and Sewer             By:  JONATHAN M. WAGNER
Bondholders:          1177 Avenue of the Americas
                      New York, NY  10036
                      (212) 715-9393
```

APPEARANCES (continued):

```
For the Official      Dentons US, LLP
Committee of          By:  CLAUDE D. MONTGOMERY
Retirees:             1221 Avenue of the Americas, 25th Floor
                      New York, NY  10020-1089
                      (212) 632-8390

                      Dentons US, LLP
                      By:  SAM J. ALBERTS
                      1301 K Street, NW, Suite 600, East Tower
                      Washington, DC  20005
                      (202) 408-7004

For County of         Butzel Long, PC
Wayne, Michigan:      By:  MAX NEWMAN
                      Stoneridge West
                      41000 Woodward Avenue
                      Bloomfield Hills, MI  48304
                      (248) 258-2907

For Detroit Retired   Lippitt O'Keefe, PLLC
City Employees        By:  RYAN C. PLECHA
Association,          370 East Maple Road, 3rd Floor
Retired Detroit       Birmingham, MI  48009
Police and Fire       (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:

For Martha Kopacz:    Squire Patton Boggs, LLP
                      By:  SCOTT KANE
                           STEPHEN LERNER
                      4900 Key Tower
                      127 Public Square
                      Cleveland, OH  44114
                      (216) 479-8500

For Assured           Chadbourne & Parke, LLP
Guaranty Municipal    By:  LAWRENCE LAROSE
Corp.:                     ROBERT SCHWINGER
                      30 Rockefeller Plaza
                      New York, NY  10112
                      (212) 408-5100

For Deutsche          Katten Muchin Rosenman, LLP
Bank AG:              By:  JOHN RAMIREZ
                      575 Madison Avenue
                      New York, NY  10022
                      (212) 950-6435
```

APPEARANCES (continued):

For DIA:                Honigman, Miller, Schwartz & Cohn, LLP
                        By:  ARTHUR O'REILLY
                        2290 First National Building
                        Detroit, MI  48226
                        (313) 465-7628

For Wilmington          Drinker, Biddle & Reath, LLP
Trust:                  By:  KRISTIN GOING
                        1500 K Street, NW
                        Washington, DC  20005-1209
                        (202) 230-5177

Also Present:           JOHN QUINN
                        MICHAEL KARWOSKI




Court Recorder:         LaShonda Moss
                        United States Bankruptcy Court
                        211 West Fort Street, 21st Floor
                        Detroit, MI  48226-3211
                        (313) 234-0068

Transcribed By:         Lois Garrett
                        1290 West Barnes Road
                        Leslie, MI  49251
                        (517) 676-5092


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  13-53846, City of Detroit, Michigan.

2          THE COURT:  Appearances, please.

3          MR. SHUMAKER:  Good morning, your Honor.  Greg

4    Shumaker of Jones Day for the City of Detroit.  I'm with my

5    colleagues from Jones Day, Geoff Irwin, Bruce Bennett, Geoff

6    Stewart, and Tim Cullen and Mr. Hertzberg from Pepper

7    Hamilton.

8          MR. HACKNEY:  Your Honor, good morning.  Stephen

9    Hackney on behalf of Syncora along with Marc Kieselstein,

10   Doug Smith, Richard Howell, and Bill Arnault.

11         MR. BRILLIANT:  Good morning, your Honor.  Allan

12   Brilliant on behalf of Macomb County by and through its

13   public works administrator, Anthony Marrocco, and the Macomb

14   Interceptor Drain Drainage District.  I'm joined here by my

15   colleague, Debra O'Gorman.

16         THE COURT:  Thank you.

17         MR. DECHIARA:  Good morning, your Honor.  Peter

18   DeChiara from the law firm of Cohen, Weiss & Simon, LLP, for

19   the UAW International Union.

20         MS. QUADROZZI:  Good morning, your Honor.  Jaye

21   Quadrozzi, Young & Associates, on behalf of Oakland County

22   joined in the courtroom this morning by Joseph Fischer and

23   Robert Weisberg of Carson Fischer also on behalf of Oakland

24   County.

25         MR. SOTO:  Good morning, your Honor.  Ed Soto.  I'm

1  here with my colleague, Alfredo Perez, from the law firm of

2  Weil, Gotshal & Manges on behalf of FGIC.

3         MR. HOWELL:  Good morning, your Honor.  Steven

4  Howell, Dickinson Wright, special assistant attorney general,

5  representing the State of Michigan.  Along with me today --

6  with me today is Matthew Schneider, chief counsel in the

7  Attorney General's Office also representing the State of

8  Michigan.  Thank you.

9         MR. WAGNER:  Your Honor, Jonathan Wagner from Kramer

10  Levin representative the ad hoc COPs.  Also with me is Deb

11  Fish from Allard & Fish.

12         MR. NEWMAN:  Good morning, your Honor.  Max Newman

13  of Butzel Long on behalf of Wayne County.

14         MR. MONTGOMERY:  Good morning, your Honor.  Claude

15  Montgomery, Dentons US, for the Retiree Committee.  With me

16  today is Sam Alberts and Dan Barnowski, my partners.  Thank

17  you.

18         MS. PATEK:  Good morning, your Honor.  Barbara

19  Patek, Erman, Teicher, Zucker & Freedman, appearing this

20  morning on behalf of the Detroit Police Officers Association.

21         MR. GORDON:  Good morning, your Honor.  Robert

22  Gordon of Clark Hill on behalf of the Detroit Retirement

23  Systems.  With me today from Clark Hill are Ron King,

24  Jennifer Green, Sean Gallagher, and Shannon Deeby.  Thank

25  you.

 1          MR. O'REILLY:  Good morning, your Honor.  Arthur

 2    O'Reilly with Honigman Miller.  Also with me is Jason Abel

 3    also of Honigman Miller and Richard Levin of Cravath, Swaine

 4    & Moore.  We represent the DIA.

 5          MR. LAROSE:  Good morning, your Honor.  Lawrence

 6    Larose from Chadbourne & Parke for Assured Guaranty.  With me

 7    is my partner, Robert Schwinger.

 8          MR. NEAL:  Good morning, your Honor.  Guy Neal,

 9    Sidley Austin, for National Public Finance Guarantee Corp.

10          MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

11    from Lippitt O'Keefe Gornbein on behalf of the retiree

12    association parties.

13          MR. MACK:  Hi, your Honor.  Richard Mack with Miller

14    Cohen with AFSCME.

15          MR. QUINN:  Good morning, your Honor.  I'm John

16    Quinn representing myself, a member of Class 11, an objector.

17          MR. KARWOSKI:  Good morning, your Honor.  Michael

18    Karwoski, individual objector.

19          THE COURT:  Thank you.  Any other appearances for

20    the record?

21          MR. LERNER:  Your Honor, on the telephone Stephen

22    Lerner and Scott Kane of Squire Patton Boggs for your expert,

23    Ms. Kopacz.

24          MR. RAMIREZ:  Good morning, your Honor.  John

25    Ramirez, Katten Muchin Rosenman, LLP, on behalf of Deutsche

1  Bank AG London.

2       MS. GOING:  Good morning, your Honor.  Kristen

3  Going, Drinker, Biddle & Reath, on behalf of Wilmington Trust

4  as contract administrator.

5       THE COURT:  All right.  In my order of August 28th,

6  I had said that I wanted to do the final pretrial first and

7  then the motions in limine.  I do want to stick with that

8  order rather than do the motions in limine first, so let's

9  begin with the final pretrial conference.

10       First, I want to thank all of the attorneys for what

11  must have been a monumental effort in putting together the

12  corrected amended stipulation to entry of corrected amended

13  joint final pretrial order.  Thank you.  I am going to enter

14  an order I hope later today admitting into evidence those

15  exhibits as to which no objections were indicated in the

16  attachments to that document.  We are in the process of

17  making sure that our list of what those exhibits are is

18  accurate.

19       I do have a couple of points to raise regarding the

20  exhibits.  One second please.  First, Syncora proposes to

21  offer into evidence in Exhibits 4617 through 4647 various

22  statutes.  Mr. Hackney, normally we do not admit into

23  evidence statutes.  What's going on there?

24       MR. HACKNEY:  I agree with you.  The custom, I

25  think, your Honor, is for the Court to take judicial notice

1   of the law, and I don't have a problem with that.  I think

2   there are some circumstances where if the statute is a

3   historical statute there are times when it may actually come

4   into evidence as evidence of what the law was at a different

5   point in time, and I can't speak to all of the statutes on

6   the list, so to the extent they were --

7           THE COURT:  These are all current statutes.

8           MR. HACKNEY:  Then we would expect that they

9   would --

10          THE COURT:  And actually what we take judicial

11  notice of are facts, not law.  We find the law.

12          MR. HACKNEY:  Well, we won't seek to enter these

13  into evidence, your Honor, but we have marked them for

14  purposes of identification.

15          THE COURT:  All right.  If you want, you know, to

16  discuss with a witness some statute and use this marked

17  version of it for that purpose, that's fine, but I don't want

18  to admit it into evidence.

19          MR. HACKNEY:  Understood.

20          THE COURT:  All right.  So we will take that off of

21  the admitted list even though no one objected.

22          Secondly, I think it was FGIC -- yes -- FGIC

23  proposed to offer into evidence Exhibits 3578 through 3902.

24  These appear to be PDF's of various works of art at the DIA.

25  The city objected, I noted, on the grounds of hearsay, and so

1    I wondered if these works of art were really being offered to

2    prove the truth of anything they assert and, if not, why a

3    hearsay objection is a proper objection.

4              MR. IRWIN:  Your Honor, Geoff Irwin from Jones Day

5    for the record.  These may have been part of the number of

6    exhibits that came in late in the process that we had the --

7              THE COURT:  They're not.

8              MR. IRWIN:  Okay.  To the extent that the images are

9    simply being offered to show what is being displayed at the

10   Detroit Institute of Arts or what an expert considered in

11   connection with reaching his or her opinion on valuation, we

12   don't have an objection as to hearsay, so we withdraw that.

13             THE COURT:  All right.  Well, let's just clarify

14   that that's what FGIC's intention with this offer is.

15             MR. SOTO:  Yes, your Honor, it is.

16             THE COURT:  All right.  The Court will admit those

17   into evidence along with the others that there was no

18   objection to.

19        (FGIC Exhibits 3578-3902 received at 9:54 a.m.)

20             THE COURT:  One other thing, and perhaps, Mr. Irwin,

21   you're the right person to talk to about this.  When we were

22   in court the other day, we admitted into evidence documents

23   with exhibit numbers that had letters in them, and I expect

24   that the numbers have since been changed to eliminate the

25   numbers, and, if so, what are the new numbers for those

1    exhibits?  Can you help me with that?

2           MR. IRWIN:  Your Honor, we believe that we provided

3    a letter with the new numbers for those exhibits.  It's

4    something that we can certainly clarify and reprovide.

5           THE COURT:  You sent us a letter?

6           MR. IRWIN:  Correct.

7           THE COURT:  Okay.  Do we have that, Chris?  Okay.

8    All right.  We do have that.  My apologies to you.  All

9    right.  So we will get that corrected in our exhibit list.

10   I'm keeping an Excel spreadsheet in numerical order of

11   exhibits that have been offered and either admitted or denied

12   or stipulated to, and I want to keep that 100-percent

13   accurate, of course.  All right.  So that's all I had on my

14   agenda for the final pretrial conference.  Let me ask you,

15   the attorneys, if there are any issues you'd like to raise in

16   the context of the final pretrial conference, please.

17          MR. SHUMAKER:  Your Honor, again, for the record,

18   Greg Shumaker of Jones Day for the city.  I think both

19   Mr. Hackney and I at least have some issues we wanted to

20   raise with you, and the first is I wanted to share with your

21   Honor an agreement that the -- all the parties reached about

22   openings, which is a little -- always a little scary

23   proposition, agreeing to ground rules without including your

24   judge, so we kind of wanted to share this up front.  And if

25   you --

1          THE COURT:  Sure.  Go ahead.

2          MR. SHUMAKER:  If you think -- don't think this

3     works, obviously you wouldn't -- but this is what we did with

4     regard to demonstratives that the parties might be using in

5     their openings.  We sort of agreed on four rough categories

6     of demonstratives.  The first would be what we would consider

7     sort of your classic summary demonstrative that sort of

8     explains or reflects or summarizes other testimony or

9     evidence such as the ones that were used with Mr. Cline, and

10    so with regard to those -- that category, last night at about

11    five o'clock the parties exchanged what they would be using

12    so that we could see in advance and presumably raise issues

13    if we had them.  As I say that, I guess it would be hard to

14    undo that, so if you don't agree with that one, we would --

15          THE COURT:  Fine.

16          MR. SHUMAKER:  But hopefully that one is okay.

17          THE COURT:  Sure.

18          MR. SHUMAKER:  The second one is objectionable

19    evidence.  We went through sort of the fact that a lot of the

20    exhibit objections have not obviously been resolved.  The

21    Daubert motions still are outstanding, and, you know, the

22    deposition designations still need to be ruled upon, so what

23    we agreed to, with your Honor's permission, was that because

24    everyone wants the openings to go as seamlessly as they can,

25    we would agree that if a deposition excerpt was shown that

1   had been objected to, that was okay, and that the objecting

2   party would withhold the objection until later, and the party

3   using that kind of deposition excerpt would, of course, run

4   the risk that at the end of the closings if that testimony

5   did not -- was not permitted by your Honor, we, of course,

6   the objecting party, whoever that might be, would be able to

7   point that out and would also probably move to strike that as

8   well, but we wanted to move this along as much as we can.

9   So, for example, you know, if someone wants to talk about one

10  of the art experts, we didn't want to have to resolve the

11  <u>Daubert</u> motion because that's inconsistent with your Honor's

12  order, so that was the objectionable evidence category.

13  There was no exchange of exhibits last night in connection

14  with that.

15          The third category were video clips, and, as your

16  Honor knows, you already ruled upon Mr. Hackney's request to

17  allow video clips.  That then raises the issue of whose video

18  clips can you show.  There are both deposition video clips as

19  well as perhaps clips of certain people making statements in

20  public such as You Tube videos or things that are out there.

21  What we kind of worked out amongst ourselves was this, that

22  if you were going to show a clip for -- I don't believe the

23  city will be showing any clips, but if some of the objectors

24  show video clips of witnesses who could bind the city and

25  are, therefore, admissions either in deposition or in public,

1   that we would not be objecting to that, but if there's

2   videotape of witnesses who could not bind the city or who are

3   not with the city -- for example, Mr. Rapson of the Kresge

4   Foundation is mentioned in some of the motions in limine, and

5   there's a You Tube video of him -- if that were to come up,

6   the city would reserve the right to object because it is

7   classic hearsay.

8           THE COURT:  Well, of course, the purpose of opening

9   statements is to give the Court each party's perspective on

10  the evidence that they intend to prove in the hearing; right?

11  Can we all agree on that much?  In that connection, of

12  course, what an attorney presents to the Court has to be

13  grounded -- in an opening statement has to be grounded in a

14  good faith belief that the evidence discussed in the opening

15  statement is admissible evidence, will be offered, and that

16  any objections to it can arguably be overcome.  That's the

17  only standard I would apply here.

18          MR. SHUMAKER:  And that's -- in response to an

19  objection to such a video clip, that's what you --

20          THE COURT:  I mean it's not an objection to a

21  statement in opening statements that the discussed evidence

22  is not admissible.  That's not a proper ground to object

23  during opening statement.

24          MR. SHUMAKER:  One of the reasons --

25          THE COURT:  You don't waive any objections to the

1   admissibility of evidence by not objecting to its discussion

2   in the opening statement.

3           MR. SHUMAKER:  One of the -- one of the reasons this

4   came up, as you'll recall, your Honor, during eligibility,

5   how scrupulous you were about not hearing or seeing evidence

6   that wasn't in the record, and so we were trying to be

7   consistent with that approach.  So if you show the clip and

8   it's Mr. Rapson giving his statement --

9           THE COURT:  Well, if who's ever proffering that has

10  a good faith basis to believe that that clip is admissible in

11  evidence, I don't want to restrict opening statement.  If it

12  eventually doesn't come in, so be it, and it won't be

13  considered in the Court's deliberation on the issues.

14          MR. SHUMAKER:  And we would move to strike, correct,

15  your Honor.  So that was the video clip --

16          THE COURT:  Okay.

17          MR. SHUMAKER:  -- understanding.  And then the last

18  category were what I characterize as amplification

19  demonstratives.  Those would be, you know, a demonstrative

20  that would show the statute or would pull out deposition

21  testimony or exhibits, pull out certain parts of exhibits,

22  and the parties agreed that we would not exchange those, so

23  that was what we outlined.

24          THE COURT:  Okay.

25          MR. SHUMAKER:  And hopefully that's okay with your

1   Honor.

2           THE COURT:  Sure.

3           MR. SHUMAKER:  So that's what you'll expect in

4   today's openings.  The other issue that I wanted to raise was

5   on Thursday -- I think it's Thursday -- Thursday the city

6   provided to the objectors its witness -- trial witness order

7   list.  At the last status conference, I believe you --

8           THE COURT:  Um-hmm.

9           MR. SHUMAKER:  -- expected the objectors to, but no

10  date was set for that, so I wanted to raise that with your

11  Honor as to when you might think that would be appropriate to

12  require.

13          THE COURT:  What do you think?

14          MR. SHUMAKER:  Excuse me.

15          THE COURT:  What do you think?

16          MR. SHUMAKER:  I would say a week from today.

17          THE COURT:  Any objection to that?

18          MS. QUADROZZI:  Your Honor, Jaye Quadrozzi on behalf

19  of Oakland County.  I don't necessarily have an objection to

20  that, but as your Honor has heard from us a couple of times,

21  in light of the uncertainty of the presentation of DWSD-type

22  issues, I'm not sure -- if that's resolved a week from today,

23  then I think that we can live with that.  If some unclarity

24  still exists a week from today, that's going to make that

25  hard for us.

1    THE COURT:  Well, why don't you assume the status

2  quo and do the best you can by a week from today?  And if you

3  have to adjust it later, we'll deal.

4    MS. QUADROZZI:  Thank you, your Honor.

5    MR. SHUMAKER:  Thank you, your Honor.  And one

6  thing --

7    THE COURT:  And I wonder if I could have a copy of

8  that list -- that ordered list.

9    MR. SHUMAKER:  Absolutely, your Honor.  We'll get

10  that to you.

11    THE COURT:  Oh, Chris says we already have it.

12  Okay.  We're all set then.  Where is it?  Is it here?  Oh,

13  way over here.  Okay.  I do have it, so we're all set.  Thank

14  you.

15    MR. SHUMAKER:  Great.  And then another issue that I

16  wanted to raise with your Honor is the issue of a

17  sequestration order.  The city would like to invoke a

18  sequestration ruling but would also like to designate Kevyn

19  Orr as the party representative for the city.  Mr. Orr is

20  going to try to be here as much as he can consistent with

21  obviously other demands, but we'd like to do that, including

22  for opening this afternoon.  One issue would be coordination

23  with the U.S. Marshals because we had the issue of the

24  entrance and exit, so I don't mean to complicate things, but

25  perhaps I can just talk to the marshals about how to

1   accomplish that.

2           THE COURT:  Please.  Is there any objection to

3   sequestration and any objection to Mr. Orr being the city's

4   designate?

5           MR. PEREZ:  Your Honor, Alfredo Perez on behalf of

6   FGIC.  No objection to the sequestration or Mr. Orr being the

7   designee, but I do want to understand the contours of the

8   sequestration.  Generally, it doesn't apply to expert

9   witnesses.  I just wanted to make sure that that's the case.

10          THE COURT:  What's the city's position on that

11  question?

12          MR. SHUMAKER:  We agree with that, your Honor.

13          MR. PEREZ:  Thank you, your Honor.

14          THE COURT:  Okay.  In connection with sequestration,

15  I have to ask you all to supervise the sequestration because

16  I don't know by face who the witnesses are, and so you'll

17  have to watch for it and supervise this.

18          MR. SHUMAKER:  Then, your Honor, the final item on

19  my list was for the motions in limine argument.  I'm not sure

20  how your Honor will want to hear them, but there was a --

21  there was a good deal of overlap between Syncora and FGIC's

22  filings, and so if you use the FGIC motion in limine about

23  matters deemed irrelevant, that has sort of three basic

24  propositions.  One is about the validity of the COPs.  The

25  second is about the personal hardship for the pensioners, and

1    the third is about the terms and conditions of the settlement

2    discussions leading to the grand bargain.  And then Syncora

3    has sort of analogs to the latter two, the personal hardship

4    and then also the sort of grand bargain negotiations, so just

5    so your Honor -- how we pieced it up here, Mr. Stewart was

6    going to deal with the validity of the COPs aspect of the

7    FGIC motion.  Mr. Hertzberg is going to deal with the

8    personal hardship of the pensioners issue, and then I was

9    going to deal with the grand bargain settlement negotiations.

10   And so I just wanted to alert that to your Honor because if

11   that comes up first, then --

12          THE COURT:  I actually thought that 6982 and 6990,

13   which are the FGIC and Syncora motions you're talking about,

14   should be argued together.

15          MR. SHUMAKER:  Is that the one on mediation, your

16   Honor?

17          THE COURT:  No, no.  Those are the two motions

18   you're talking about, Syncora's motion in limine barring the

19   city and plan supporters from introducing evidence regarding

20   the potential personal hardship of pensioners -- that's

21   6982 -- and 6990, FGIC's motion in limine to preclude the

22   introduction of evidence or testimony regarding certain

23   matters previously deemed irrelevant.  Those are related and

24   I thought should be argued together.  And you can respond to

25   them however you see fit.

1          MR. SHUMAKER:  Okay.  Wonderful.

2          THE COURT:  Similarly, 6979, Syncora's motion, and

3     6985, FGIC's motion, both relating to the mediation order,

4     should be argued together and responded to together.

5          MR. SHUMAKER:  And the city responded with omnibus

6     responses --

7          THE COURT:  Right.

8          MR. SHUMAKER:  -- to a couple of those as well.

9          THE COURT:  Okay.

10         MR. SHUMAKER:  Thank you, your Honor.

11         MR. SOTO:  Your Honor -- related to that, your

12    Honor, so we've tried to coordinate so that we will not

13    duplicate, and on the first set, the one dealing -- the

14    motion in limine dealing with matters we believe were

15    previously deemed irrelevant, as well as on the mediation

16    one, I will take the lead on behalf of that, and Mr. Hackney

17    will follow.

18         THE COURT:  Okay.  Mr. Hackney and then you next,

19    sir.  Go ahead.

20         MR. HACKNEY:  Your Honor, good morning.  Stephen

21    Hackney.  Just a few nuts and bolts for you, your Honor.  One

22    was with respect to many of the exhibits we had on our list

23    that were newspaper articles, the city lodged a foundation

24    objection to them, and I asked Mr. Shumaker that to the

25    extent we're going to have a fight about the authenticity of

1    a newspaper article, I'd like to get it out of the way

2    because the prove-up of that is silly.  You know, it's I

3    downloaded it from the state's GTP site and so forth, and so

4    we hope to work that out, but we would like to kind of get

5    through that sooner rather than later so that we know that

6    there's not a problem as to the authenticity of the newspaper

7    articles.  I understand they'll reserve their other

8    objections as to how we intend to use them.  There is an

9    issue --

10          THE COURT:  Well, and let me just say, as I think

11   I've said before, I want to keep to an absolute minimum any

12   disputes regarding the authentication of any exhibits.

13          MR. HACKNEY:  Heard and understood.

14          THE COURT:  I've said before that true good faith

15   disputes regarding the authentication of documents are

16   extremely rare.

17          MR. HACKNEY:  Understood.  Your Honor, there's an

18   issue about deposition video testimony.  There are -- there

19   is a desire by us to have the videos themselves become part

20   of the record with the designated testimony.

21          THE COURT:  Um-hmm.

22          MR. HACKNEY:  It turns out that's not as simple as

23   you might expect, and I want to get instruction from you on

24   how you'd like this handled.  There are two ways to do it.

25   The first is that you can cut the testimony and do what's

1   called tuning it with all of the designated testimony and all

2   of the counterdesignated testimony, and we can give that to

3   you.  There is a second way to do it, though, which is to

4   wait for you to decide whether you sustained any objections

5   in the testimony and understand that first and then put

6   together final tuned videos based on your rulings.  The

7   reason it's important is the process of cutting and tuning a

8   video deposition is very time-consuming and expensive, so the

9   desire is to just do it once, and we wanted to know when you

10   wanted it done, before you've decided or after you've

11   decided.

12         THE COURT:  Is one or the other easier for you?

13         MR. HACKNEY:  It is easier to do it before because

14   we can start now and give it to you, and it will sort of, I

15   would say, be received into evidence with the understanding

16   that any objections that you sustain will be applicable to

17   that part of the video.

18         THE COURT:  Then that's fine with me.

19         MR. HACKNEY:  Okay.  And do you want the designated

20   and counterdesignated testimony all cut into one video, or do

21   you want them -- each party to do this separately?

22         THE COURT:  One video.

23         MR. HACKNEY:  Will do.  Your Honor, one of the

24   assignments that you've given yourself and fulfilled

25   throughout the case is the role of timekeeper, and I have to

1   ask you a favor, which is because the counties and others

2   have been working between ourselves to try and allocate time,

3   we actually need you to track time by COPs, counties, and

4   then UAW and DFFA, and that's because of the way we're trying

5   to work together to fit our cases in.

6           THE COURT:  Okay.  So are you going to disclose to

7   me how much time each of these parties have been allowed by

8   your agreements?

9           MR. HACKNEY:  Ms. Quadrozzi and I discussed this,

10  your Honor.  I knew that you would ask.  It's a fair

11  question.  Ms. Quadrozzi, I think, has expressed the view

12  that it may tend to reveal some element of strategy if we

13  talk about how much time has been allocated, and I've also --

14          THE COURT:  So you just want me to keep track of how

15  much time is used, and then you'll know --

16          MR. HACKNEY:  Yeah.

17          THE COURT:  -- how close you are running to your --

18          MR. HACKNEY:  Yes, sir.

19          THE COURT:  -- privately agreed upon amount.

20          MR. HACKNEY:  That's right.  And in --

21          THE COURT:  Okay.  That's fine with me.

22          MR. HACKNEY:  I appreciate it, your Honor.  In

23  truth --

24          THE COURT:  I have a -- I'm running an Excel

25  spreadsheet where I just enter the time you start and the

1  time you stop, and it automatically keeps track of how much
2  time you have used, so I'll just add categories for each of
3  your different parties.
4        MR. HACKNEY:  Yeah.  I'm sorry to burden you with
5  that.
6        THE COURT:  And I can -- we ought to try to figure
7  out a way where I can get you that information on a periodic
8  basis, daily or something like that.  I can just give you
9  that Excel spreadsheet.
10       MR. HACKNEY:  We'll also try to track it and
11 hopefully can compare.  We've also structured this in the
12 spirit of good faith with the notion that if someone's case
13 is running in more trimly than the other, they may be able to
14 help someone who's not, so --
15       THE COURT:  Okay.
16       MR. HACKNEY:  -- we'll work through it, your Honor.
17       THE COURT:  So the parties whose categories you want
18 me to keep track of are?
19       MR. HACKNEY:  COPs, counties --
20       MS. QUADROZZI:  As a group.
21       MR. HACKNEY:  -- as a group, and then I put the UAW
22 and DFFA together consistent with our prior conversation that
23 they would -- there would be a day that was devoted to them,
24 and I think that's likely to play out in a way that works
25 okay.

1      THE COURT:  Okay.

2      MR. HACKNEY:  Your Honor, I wanted to note that

3  you'll recall that the Court permitted a supplemental expert

4  opinion from Ms. Sallee but gave us the right to take her

5  deposition.  We haven't been able to do that yet in part

6  because Mr. Smith, who is on point with her, has some of the

7  earliest witnesses in the city's case, including Ms. Sallee.

8  It's our intention to allow him to get through his cross-

9  examinations of her and then pivot to the question of trying

10  to depose her on her supplemental report.  That's just in the

11  way of an update.

12      THE COURT:  Okay.

13      MR. HACKNEY:  Your Honor, we filed a motion in

14  limine with respect to what we call the OPEB combination

15  issue, and we were able to reach a stipulation with the city

16  that you entered.  Now, when we brought the motion, we were

17  focused on the proponent of the plan, which is to say the

18  city, and so the motion said that the city ought not to be

19  able to introduce this, but now there have been objections

20  that were filed by the retiree parties and the Retiree

21  Committee saying, well, that's well and good.  Maybe the city

22  can't, but we can.  And I think this kind of brings this

23  question that you and I talked about once before, which is is

24  it just one case in chief that's coming from the city and,

25  yes, they may call witnesses from a retiree committee, they

1   may call witnesses from the retiree association, but the city

2   is the proponent of the evidence, and, if so, the stipulation

3   binds the city, and we don't need to discuss it.  If we're

4   going to allow the idea that there are supporters of the plan

5   that have their own sort of case in chief where they put in

6   evidence, then I note it because I think that we then have to

7   argue the OPEB combination point today as a live controversy

8   notwithstanding the stipulation.

9           THE COURT:  Well, it is the Court's intention to

10  allow plan supporters to submit evidence but within the time

11  limit that the Court gave the city.  If you think that as a

12  result of that this issue needs to be -- I don't want to say

13  reopened, but argued as between you and some -- one or more

14  of those plan supporters, that's fine.  I'm not sure we need

15  to do that today, however.

16          MR. HACKNEY:  Fair point.

17          THE COURT:  I had sort of taken it off of my mental

18  list for today, so perhaps we can find another time to carve

19  out to argue that before it becomes an issue.  Is that okay?

20          MR. HACKNEY:  Certainly.  I think we can try to get

21  a sense of the plan supporters' witnesses of when it might

22  become relevant.  I know you were hoping that we wouldn't

23  have to at least argue the stipulations, but I think we may

24  have to.  It is novel to me.

25          THE COURT:  No.  If we have to, we have to.  That's

 1   all.

 2        MR. HACKNEY:  Yeah.  Where the proponent is saying

 3   that they will stipulate that it's not to be considered, I

 4   think it's a little -- gets a little philosophical, but I

 5   understand, and we'll look at that and try to understand when

 6   it will --

 7        THE COURT:  Well, I think that's a point that should

 8   be raised in connection with the motion -- the argument in

 9   the motion in limine.

10        MR. HACKNEY:  Yeah.

11        THE COURT:  You know, we'll see what interest these

12   people have in arguing this if the city is willing to

13   stipulate.

14        MR. HACKNEY:  Understood.  Your Honor, you'll

15   remember that at a prior hearing we discussed this idea that

16   because the UAW and the DFFA have discrete issues that we

17   might try to find a day for them later on.  I'm not sure that

18   we have to do that today, but to the extent you wanted to, I

19   wanted to remind you of that concept, that there would be a

20   specific day in the schedule.  It may not be the right day

21   today to pick it, but I wanted to raise it as a final

22   pretrial matter.

23        THE COURT:  It struck me that that should happen

24   after the city rests.  Does that make sense?  And we won't

25   know for quite some time when that might be.

1          MR. DECHIARA:  Your Honor --

2          THE COURT:  But I do want to do that for you.

3          MR. DECHIARA:  Your Honor, Peter DeChiara for the

4     UAW.  Yes, indeed, the UAW would request a date certain.  We

5     would prefer to know the date sooner rather than later,

6     preferably today, just so we could plan and also the adverse

7     witnesses we're calling, including the --

8          THE COURT:  Right.

9          MR. DECHIARA:  -- executive director of the Detroit

10    Public Library, could plan.

11         THE COURT:  Right.

12         MR. DECHIARA:  But if the Court doesn't believe it's

13    feasible to do that today, we'd like -- you know, we could do

14    that at the end of the city's case, but we'd prefer to have

15    it done today just for planning purposes.  And I do have

16    dates I know now that are not good for the UAW, which I could

17    share with the Court.

18         THE COURT:  Okay.  Go ahead.

19         MR. DECHIARA:  The dates that are not good for the

20    UAW are September 17th, September 24th through 26th,

21    September 29th, and October 3rd.

22         THE COURT:  Ms. Patek.

23         MR. DECHIARA:  And I did have one other item I'd

24    like to discuss, your Honor.

25         MS. PATEK:  Your Honor, I'm not here today on behalf

1   of the DFFA, but my latest understanding is that the DFFA

2   intends to rely on their legal objections and as of last

3   report did not intend to participate in the trial.  I will

4   confirm that with Mr. Legghio and let Mr. DeChiara and

5   Mr. Hackney know.

6           THE COURT:  Okay.  Let us know, too.  Sir.

7           MR. MACK:  Yes.  Richard Mack again with AFSCME.  On

8   that library issue, Judge, we would just request whatever

9   date ends up being selected, the later, the better given the

10  specifics of what's taken place in the discussions to try to

11  resolve the issue outright, so --

12          THE COURT:  Okay.

13          MR. MACK:  Thank you.

14          THE COURT:  What's the city's position on how to

15  schedule this?  Do you have a position?  Does it matter to

16  you that it's after the conclusion of your case, or do you

17  mind taking a break if the date we choose happens to fall

18  before you're quite done?

19          MR. SHUMAKER:  I mean I think we'd prefer at the

20  conclusion of the case, not to break our, you know,

21  presentation up.  I don't know if you set it at a time when

22  the objectors would definitely be on if that would -- if that

23  would work.

24          THE COURT:  Well, can you give us an estimate of

25  when you think it's reasonable to expect your case to be

1  done?

2          MR. SHUMAKER:  Well, I think we have 79-1/4 hours

3  right now.  How much of that is going to be taken up on

4  direct it's very tough to say, but I think that's about two

5  full weeks of time.  You know, I would imagine that the city

6  is going to be done -- now you're going to hold me to this,

7  but --

8          THE COURT:  No, no, no, no.

9          MR. SHUMAKER:  -- the fourth week -- the last week

10  of September.

11          THE COURT:  The only thing I'm holding you to is the

12  number of hours.

13          MR. SHUMAKER:  The last week of September or the

14  first week of October would be a guess --

15          THE COURT:  All right.

16          MR. SHUMAKER:  -- as I stand here.

17          THE COURT:  All right.  Thank you.

18          MR. DECHIARA:  Your Honor, the UAW has no problem

19  waiting until after the city has completed its case, so if

20  the Court chose to, for example, choose a day after the last

21  week of September, excluding the dates that I mentioned,

22  that's fine with the UAW.

23          THE COURT:  All right.  Let's see if we can just do

24  that right now, sir.  Stand by.  Can we shoot for Monday, the

25  22nd?

1           MR. DECHIARA:  Of September?

2           THE COURT:  Yes.

3           MR. DECHIARA:  Yes.  That should be fine.

4           THE COURT:  Is that okay?

5           MR. SHUMAKER:  Your Honor, I believe we'll be done

6    by then.  I can't promise it.  Perhaps a week out if it looks

7    like we're not close enough, perhaps we could alert you to

8    that fact and perhaps revisit whether that's a good day.

9           THE COURT:  You know, I'd rather give them a more

10   certain date now.  A week later is the 29th, but that's not

11   an available date, so how about September 30th?

12          MR. SHUMAKER:  That would be good, your Honor.

13          MR. DECHIARA:  That's fine.

14          THE COURT:  All right.  Chris, let's somehow make a

15   note of that on our calendar as well.

16          MR. DECHIARA:  Your Honor, just on a different

17   housekeeping matter, this concerns the city's motion in

18   limine to preclude the testimony of Evan Miller, who is a

19   Jones Day attorney that the UAW may call as part of its case,

20   although it may not.  We would propose to the Court that

21   rather than hearing argument and having a resolution of that

22   motion now that the Court put that off until after the city's

23   case since by then, "A," the UAW may have settled and be out

24   of the case or, "B," the UAW may have -- even if it hasn't

25   settled, may have decided not to call Mr. Miller, so by the

1   time the city's case is done, that motion may be moot, so we
2   believe it would be more efficient to put off the resolution
3   and argument of that motion.
4            THE COURT:  Mr. Hertzberg.
5            MR. HERTZBERG:  Yes, your Honor.  Robert Hertzberg,
6   Pepper Hamilton.  A little surprised that we're arguing this.
7   We had a discussion, myself and counsel, that he would argue
8   it during the hearing on the motion in limine, but he brought
9   it up anyways, but to address it, Mr. Miller is a critical
10  part of the team.  He's dealing with --
11           THE COURT:  We're not arguing the motion now.  The
12  question is whether to argue it in a little while or later
13  after the UAW determines that they actually want to call the
14  guy.
15           MR. HERTZBERG:  Okay.  Let me start again.  Mr.
16  Miller is a critical part of the team.  He would be subject
17  to sequestration as a witness, so we need to decide it today.
18  We don't believe there's a basis to call Mr. Miller, but he's
19  part of the pension and OPEB part of the case.  He's a
20  critical part of the case.
21           THE COURT:  So you oppose putting it off?
22           MR. HERTZBERG:  Absolutely, your Honor.
23           THE COURT:  Okay.
24           MR. DECHIARA:  Your Honor, we would waive
25  sequestration of Mr. Miller.

1          THE COURT:  Does that solve your problem?

2          MR. HERTZBERG:  No.  We still want to deal with it

3    today, your Honor.

4          THE COURT:  Why?

5          MR. HERTZBERG:  Because it's important to know

6    whether Mr. Miller is going to be called as a witness before

7    the Court.  As I indicated to the Court, he's a critical part

8    of the case.  There is absolutely no basis to have him called

9    as --

10         THE COURT:  Now you're arguing the merits.

11         MR. HERTZBERG:  I want the opportunity to argue the

12   merits because there's no basis, and I'd like the Court to

13   decide.

14         THE COURT:  You'll get an opportunity to argue the

15   merits when I say so, Mr. Hertzberg.

16         MR. HERTZBERG:  I understand, but you asked me

17   whether I would agree to an adjournment.

18         THE COURT:  And I'm asking you why not.

19         MR. HERTZBERG:  Because I think it's critical that

20   it be decided.

21         THE COURT:  How would an uncertainty regarding

22   whether he'll be a witness impact his participation in the

23   city's presentation of its case?

24         MR. HERTZBERG:  The uncertainty is that if there's

25   no basis for the motion, it should be dealt with on the front

1  end of the case.  I don't know why we can't deal with it.  I

2  know the Court was prepared to deal with it today because the

3  Court put it on its schedule.  There's no basis to push it

4  off.  There's no basis for it going --

5       THE COURT:  The argued basis is that it's premature

6  until the decision is made that he will be a witness.

7       MR. HERTZBERG:  Well, they've already decided to

8  list him as a will call witness.  We filed a motion in

9  limine --

10       THE COURT:  Oh, I thought it was may call.

11       MR. HERTZBERG:  May call.  And we decided to file a

12  motion in limine.  The Court felt it was correct to have a

13  hearing on the motion in limine.  The Court set it for

14  hearing today, and we think it's appropriate that the Court

15  hear it today.  There's no reason Mr. Miller should be left

16  under the cloud of whether he's going to be a witness -- an

17  attorney and a witness or just an attorney for the city.

18       THE COURT:  And why is that a cloud?

19       MR. HERTZBERG:  I mean, your Honor, if he's got to

20  be a witness, we've got to then prepare as if he's going to

21  be a witness and get him prepared to be put on the stand.

22  That's got to take place while he's preparing his case

23  dealing with the pensioners, dealing with the OPEB issues,

24  and then also preparing to be on the stand.  It's not fair.

25       THE COURT:  Give me one second, please.

1          MR. HERTZBERG:  Sure.

2          THE COURT:  All right.  Counsel, please approach the

3    lectern again.  I'm looking at the response to the motion in

4    limine.  It says, "UAW will be unable to make a more definite

5    determination as to whether to call Mr. Miller, however,

6    until after it reviews the city's response to the UAW's

7    supplemental objection to confirmation of its plan of

8    adjustment.  It's due on August 27th."  Did you get that

9    response, and why -- if so, why can't you make this

10   determination now?

11         MR. DECHIARA:  Yes, your Honor, we did get the

12   response.  The city's position in that brief was very

13   minimal.  There was really no factual assertions.  It was

14   really legal argument.  The reason we'd like to wait to see

15   what comes in on the city's case is to see whether any of the

16   city's witnesses either on direct or cross testify in a way

17   that may make it unnecessary for us to call Mr. Miller, so

18   it's true we did when we wrote that --

19         THE COURT:  That's not what your response says here.

20         MR. DECHIARA:  That's true, your Honor, and we did

21   hope when we wrote that to be able to make that determination

22   after seeing the city's pretrial brief, but having seen it,

23   that did not resolve for us our decision about whether to

24   call Mr. Miller.

25         THE COURT:  On balance, I think it is appropriate to

1  hear and attempt to resolve the motion today even though

2  there is some uncertainty about whether he will actually be

3  called, so we'll keep it on the list for today.  Anything

4  else in the context of our final pretrial conference?  Yes,

5  sir.

6          MR. HACKNEY:  Yes.  Just one final issue, your

7  Honor, and that is we'd like to raise an issue that came up

8  with respect to Mr. Cline's testimony that the Court already

9  took, and what you'll remember is that when he was testifying

10 about Exhibits 546 and 547, he was talking about the idea

11 that he had used seasonally adjusted employment data, and he

12 was relatively adamant about it.  And, in fact, when Mr.

13 Smith attempted to cross-examine him with charts that showed

14 that if you put in the most recent data, the gap between the

15 city and the state is narrowing, Mr. Cline said that's not an

16 apples to apples comparison because I used seasonally

17 adjusted data, and that's from the BLS website, and that is

18 not seasonably adjusted data.  But after the hearing, Mr.

19 Smith went to work to try to piece this together and

20 determined that Mr. Cline was mistaken, that this was apples

21 to apples comparisons.  The data from the BLS website that

22 both of the exhibits were based on is not seasonally

23 adjusted.  And so we reached out to the city and clarified

24 this all out, and obviously there's some chagrin on our part

25 because we'd have liked to have cross-examined him at the

1  time about this, but at a bare minimum we've said to the city

2  we would like these two exhibits entered into evidence, and

3  they have agreed, and so I would like to ask the Court to

4  admit Exhibits 4543, Syncora Exhibit 4543 and 4651, and I

5  have copies to the extent they're needed.

6         MR. STEWART:  No objection, your Honor.

7         THE COURT:  All right.  They are admitted.

8     (Syncora Exhibits 4543 and 4651 received at 10:34 a.m.)

9         MR. HACKNEY:  Thank you very much, your Honor.

10        MR. HOWELL:  Thank you, your Honor.  Again, Steven

11  G. Howell on behalf of the state.  Your Honor, I just want to

12  advise the Court that the state will be waiving opening but

13  will be making closing arguments, and we've made arrangements

14  with the city to do so.  So that the Court is alerted to

15  that, that's what we intend to do.

16        THE COURT:  All right.  Thank you.

17        MR. HOWELL:  Thank you.

18        MS. PATEK:  Your Honor, again, Barbara Patek for the

19  DPOA.  One very minor point with respect to, as the Court is

20  aware, the DPOA came late to the supporters' side of the

21  table.  The city, through the corrected amended final

22  pretrial order, did get all of our information in.  We have a

23  single may call witness who is not on the order of witness

24  since he's not in the order of witness.  It's not critical,

25  but we've spoken with the city about it, and  Mark Diaz,

1    who's the president of the DPOA, is our single witness.

2              THE COURT:  Okay.

3              MR. QUINN:  John Quinn, your Honor.  A couple of

4    questions.  The requirement for objectors to file the order

5    in which they intend to call witnesses, will that apply to in

6    pro per objectors?

7              THE COURT:  Will that apply what, sir?

8              MR. QUINN:  To in pro per objectors.

9              THE COURT:  No.

10             MR. QUINN:  Okay.  And, secondly, the Court has

11   previously indicated that it does not want post-trial briefs,

12   but it wants everyone to present their positions post-trial

13   by means of oral argument.  Will you want that from the in

14   pro per objectors if we choose to do it?

15             THE COURT:  If you request it, we can make an

16   accommodation for that.

17             MR. QUINN:  All right.  And at what point would you

18   like the request?

19             THE COURT:  Whenever it's convenient for you.

20             MR. QUINN:  Thank you, your Honor.

21             THE COURT:  Anyone else have anything to raise?  Mr.

22   Gordon.

23             MR. GORDON:  Thank you, your Honor.  I was going to

24   wait till later, but I think I'll follow suit with Mr. Howell

25   and just inform the Court that as to when you get to the

1  point of hopefully today opening statements, the Detroit

2  Retirement Systems expect that the evidence that they may put

3  in is still yet to be determined how we will coordinate with

4  the city.  We are playing a supporting role.  We expect that

5  our evidence would be subsumed within and consistent with

6  what the city plans to put in as its case in chief, so at

7  this point in time we do not plan to make an opening

8  statement and reserve our comments for closing argument.

9            THE COURT:  Thank you, sir.

10           MR. GORDON:  Thank you.

11           THE COURT:  All right.  Can we turn our attention

12  then to the motions in limine?  All right.  We'll begin with

13  6978.

14           MR. SOTO:  Good morning, your Honor.  Ed Soto again,

15  Weil, Gotshal & Manges, on behalf of FGIC.  I'll address

16  FGIC's motion in limine to exclude evidence on certain issues

17  that have previously been deemed irrelevant either by this

18  Court or by the city.

19           THE COURT:  That's actually not the motion that's

20  first on the list, so can I ask you to hold on that one for

21  me?

22           MR. SOTO:  Is it the mediation one?

23           THE COURT:  No.  It's not even that one.  It's

24  Syncora's motion in limine to preclude debtor from offering

25  evidence relating to, "A," recoveries of Classes 10 and 11

 1    independent of the funds from DIA funding parties and the

 2    state and, "B," topics identified in Syncora's subpoenas to

 3    the foundations.

 4            MR. HACKNEY:  Yeah.  This is the one, I think,

 5    motion in limine that does not have the level of overlap with

 6    what I --

 7            THE COURT:  Right.

 8            MR. HACKNEY:  -- call FGIC's three-headed monster,

 9    so --

10            THE COURT:  Okay.

11            MR. HACKNEY:  So, your Honor, as a procedural

12    matter, let me tell you that I think that this motion is

13    well-suited to a motion in limine, and I think it's a good

14    idea to resolve it now because it's going to have a

15    streamlining effect on the expert testimony that you will see

16    over the coming weeks.  And the issue here is when you're

17    doing an unfair discrimination analysis, what it is you count

18    when you're conducting that analysis.  And I don't believe

19    that, as the city suggested in its motion, that this is sort

20    of a summary judgment motion in disguise or an attempt like

21    under Lujan, the Sixth Circuit case, to sort of have what is

22    tantamount to a summary judgment-type argument decided in

23    limine.  This is actually an attempt to look at the legal

24    standard of relevance and then apply it to a body of evidence

25    that people are proposing to proffer and that we ought to

1  know now if they should not do that because the evidence is

2  irrelevant, so I think there's a real practical value to

3  resolving the issue now, and I'd like to explain the

4  practical value.

5          THE COURT:  We actually began this conversation the

6  other day.

7          MR. HACKNEY:  Which day was that?

8          THE COURT:   We began the discussion of isn't it

9  important to allow the parties to create their factual

10  records at this level because a court down the line may

11  decide it's relevant to the legal standard it wants or it

12  determines should be applied even if that's different from

13  the standard I think should be applied.

14          MR. HACKNEY:  Well, that is a -- I agree that that's

15  generally a valid concern.  Taken to its extreme, you know,

16  it would say that we're going to take 401 out of the case

17  because even if the evidence is not relevant, this party says

18  it is, so we best make as full a record as we can, and that

19  will be considered later.  And I think there is some

20  responsibility for the Court, even though it is a bench trial

21  and even though you are someone who is trusted to sift

22  evidence that's relevant and not relevant, so you have, I

23  think, more leeway than you might have in a jury trial.

24  There is still a practical value, I think, especially here

25  where I'm going to -- I'm going to point to things that the

1   city has done that I think are fairly dispositive on this

2   point, and maybe I can get -- I mean and it will be for you

3   to decide whether, you know, that is sufficiently dispositive

4   on this issue.  I do think that this will have the

5   streamlining effect.  I don't think I'm going to let the

6   city --

7          THE COURT:  None of us wants a remand because there

8   was insufficient factual development on whatever the standard

9   is that the Court of Appeals or whoever decide should be

10  applied.

11         MR. HACKNEY:  Well, that's fair, but none of us also

12  want a remand because the city is able to, for example, pour

13  in evidence with -- you know, relating to the idea that the

14  unfair discrimination was not as unfair as it appeared only

15  to later learn that it was erroneous to allow them to

16  exclude --

17         THE COURT:  All I can tell you is I hope that that's

18  a straight reversal and not a remand.

19         MR. HACKNEY:  Fair point.  Well, let me tell you why

20  I think it's clear enough now that there's value to

21  lancing --

22         THE COURT:  Okay.

23         MR. HACKNEY:  -- this boil, and the first thing,

24  your Honor, is that the disclosure statement itself describes

25  two people that you will be getting 59 cents or 60 cents if

1    you are in Classes 10 and 11 and that those numbers you can

2    only achieve by reference to the funds that are flowing in as

3    part of the grand bargain, so you already have an action

4    taken by the city as it's going around to describe recoveries

5    to people in connection with soliciting their votes saying

6    this will be your recovery if you approve the plan, and it

7    includes these amounts.  That's point one.

8         Point two is that there is no realistic dispute that

9    the amounts that are coming in via the grand bargain are

10   coming in connection with a plan of adjustment.  Even the

11   city does not dispute that.  And our view of the law is that

12   that is the relevant consideration that it is -- if it is in

13   connection with a plan, then that is fairly described as a

14   recovery to a party that should be considered.  And we have

15   some cases we've cited to you on this notion of gifting and

16   whether they can argue by analogy from gifting in the

17   absolute priority context, and we get into the questions

18   around gifting and whether it's applicable to this situation

19   and whether the doctrine itself is viable.  And I think you

20   know the case law on that better than I do, but what I'd like

21   to -- what I'd like to focus on actually is statements that

22   the city has made in its pretrial brief on this subject, so

23   let me read some of these statements to you.  In a dismissal

24   scenario, the city obviously would lose access to the $816

25   million in funds it is due to receive in connection with the

1  grand bargain.  That's from page 81 or paragraph 81.  As set

2  forth in the consolidated reply, the city will receive funds

3  with a nominal value of approximately 816 million over the

4  course of the 20-year period following the effective date.

5  That's from paragraph 165.  The city is receiving these funds

6  despite the significant dispute discussed in Section 2(c)(1)

7  supra as to whether the city even possesses an interest in

8  the DIA assets that are capable of monetization, thus, as the

9  testimony of the city's witnesses will establish at the

10  confirmation hearing, the consideration the city will receive

11  under the DIA settlement.  The statements are replete here,

12  and you can kind of see what happened when you read -- when

13  you read their pretrial brief, which is someone wrote the

14  unfair discrimination section, and they wrote down and said

15  these aren't city funds.  They don't count.  And then someone

16  wrote the fraudulent transfer section and said look at all

17  the money the city is getting.  What they didn't do is put

18  the two things together and say we're not arguing in the

19  alternative here.  We're actually taking positions, and we've

20  managed to take positions that are diametrically opposite to

21  one another.

22      Remember, too, how this dovetails with discovery

23  rulings that you made quashing our subpoenas to the

24  foundations because remember that what we're trying to elicit

25  from the foundations is the idea of who decided on this

1 structure, who was it that directed the funds to the
2 retirees. Did the city do that? Was that a condition that
3 you all imposed on the city? How did it come about? We
4 weren't allowed to explore that evidence, and so I think when
5 you combine all of these things and think of the way
6 discovery was handled, when you think of the positions the
7 city itself has taken in its disclosure statement, in its
8 plan, in its pretrial brief, that these are monies that the
9 city is receiving in connection with the alienation of its
10 asset -- largest asset and where there isn't a dispute that
11 the alienation of that asset is a condition of receiving all
12 of these monies, whoever gets them, I think it will
13 streamline this trial to say these funds are definitely part
14 of your recovery, Classes 10 and 11, and all of these experts
15 who are going to testify, they ought to take that into
16 consideration as they are preparing their direct examination.
17 If they don't, you get all of these, well, if you count this,
18 it's X, but if you don't count this, it's Y. I think that we
19 should lance this boil and decide today that these are
20 recoveries under the plan just like the city said in its plan
21 and in its disclosure statement, and they count. That's my
22 argument, your Honor.
23          THE COURT:  Thank you.
24          MR. SHUMAKER:  Your Honor, I don't know about you,
25 but that sounds like a legal argument to me.  It's on a

1    substantive legal point, and as we point out in our response

2    to their motion, that really what Syncora is trying to do is

3    eliminate a question of law from the case that's going to be

4    argued off of the facts that are presented.  He can point to

5    what he believes are inconsistencies in the city's pretrial

6    brief, but that is argument.  That's not precluding some

7    amorphously defined set of documents or some witness

8    testimony.  That really is something that you should be

9    doing, I would submit, as the witnesses are being questioned,

10   you know.  This is -- you know, this is an argument for

11   later.  I mean this is an argument when they can say it

12   was -- there was not sufficient evidence to establish the

13   point.  And, you know, we set forth in our papers, you know,

14   we think it's very clear that the monies coming from the

15   foundations and the DIA and the money coming from the state

16   are really not city funds.  They just simply are not.  If you

17   look at them, you know, as we point out, the facts are simply

18   wrong.  The facts are just -- the facts are laid out in part

19   in the documents that are attached to the plan of adjustment,

20   the sixth amended plan of adjustment.  You know, with regard

21   to the state funds, which are -- how they are directed is set

22   forth in the state contribution agreement, which is Exhibit

23   I.A.318 of the sixth amended plan.  It sets forth what the

24   state is providing money for.  It says that the

25   justifications in the House bill are also a matter of record.

1  The state contribution agreement indicates that the money
2  that the state is going to donate, which is 98,800,000 to GRS
3  and $96 million to PFRS, it states that the state
4  contribution -- Steve, if you could go to page 2 up at the
5  top up there, that first paragraph, you see the first
6  paragraph, your Honor, the last sentence, "State contribution
7  shall only be used to fund payments to holders of GRS pension
8  claims and PFRS pension claims."  The House Bill 5575, which
9  is the legislation that the state passed, indicates that
10  there are basically three, you know, important public
11  purposes for the state making the contribution.  One, it will
12  improve household income of pensioners, many of whom may
13  reside in other parts of the state, and reduce the likelihood
14  of their seeking public assistance; two, it will facilitate
15  prompt resolution of the City of Detroit's bankruptcy case
16  and save state taxpayers --
17          THE COURT:  I have to ask you to pause for a
18  second --
19          MR. SHUMAKER:  Sure.
20          THE COURT:  -- because it sounds to me like what you
21  are arguing now is that not only should Syncora's motion --
22  in limine motion be denied but that the Court should find in
23  your favor on the point that the motion raises.
24          MR. SHUMAKER:  If you're accusing me, your Honor, of
25  arguing the merits, that's probably fair.  I do --

1    THE COURT:  Yes.  I am making that accusation.

2    MR. SHUMAKER:  Yes.  I don't mean --

3    THE COURT:  I wouldn't have used the word

4    "accusation," but if you want to accept it, fine.

5    MR. SHUMAKER:  No.  But my point, your Honor, is

6    simple, that this is a legal argument that should be made at

7    closing after your Honor hears the evidence that -- from the

8    witnesses and these exhibits are in evidence, so I won't

9    belabor the point and go through it, but as we spell out in

10   the response, it's very clear to us that Syncora has its

11   facts wrong.  Now, they'll point to the inconsistencies, but,

12   in fact, we think that it's very clear once you go through

13   that state contribution agreement and the omnibus transaction

14   agreement, which dictates how funds from the DIA and from the

15   foundations flow.  So there's that.

16   And then, again, simply from an evidentiary

17   standpoint, it's really tough to tell what Syncora wants to

18   forbid the city from putting on.  Again, I think it's very

19   amorphously defined.  It has to do with the combination of

20   recoveries.  The reason it's tough to articulate is because

21   it's a legal issue, but, in fact, you know, there's no doubt

22   that there's a lot of evidence that's going to be put on

23   relating to the grand bargain, but -- and there's no doubt

24   that the mediation order will impact what can be presented to

25   your Honor, but at the end of the day, it's very clear that

1 the result of that mediation is something that the city's

2 witnesses, Mr. Orr and others, are going to need to testify

3 about. And we would submit that that is -- that issues such

4 as, you know, where you divide the line and assertions of the

5 mediation order, that that is something to be done when the

6 witness is on the stand or when we argue whether the exhibit

7 should be put into evidence, and I would submit to your Honor

8 that the Sixth Circuit has been very clear, as it has been in

9 the Sperberg case which we cite in our brief, that, and I

10 quote, "orders in limine which exclude broad categories of

11 evidence should rarely be employed," and we would submit,

12 your Honor, that this is not one of those rare instances.

13             THE COURT:  All right.  Any brief rebuttal?

14             MR. HOWELL:  Your Honor, may I?  Good morning your

15 Honor.  Again, briefly, Steven G. Howell on behalf of the

16 State of Michigan.  Just a couple points I'd like to make.

17 We concur with the city, but, in addition, your Honor,

18 there's a couple of factual statements they make in here that

19 they rely on for their motion.  One is that the state

20 contribution is in return for the DIA assets.  It's

21 consideration for the DIA assets.  And that statement is

22 incorrect.  State contribution relates to releases from

23 pensioners, from their supporting organizations, and

24 addresses certain litigation that will be disposed of, so

25 that statement is not correct.  The second statement -- and

1    the city has pointed out part of that.  That comes up in the

2    plan in Article III.D.7 and Article IV.D.3 and 4.  It's in

3    the state contribution agreement in the conditions at

4    paragraph 4, and it's in PA 187, which is the authorizing

5    legislation.

6         In addition, your Honor, Syncora asserts that the

7    city will receive the state contribution.  That statement is

8    also incorrect.  The city will not receive state

9    contribution.  As was briefly shown up there above the

10   highlighted section is the state contribution is being paid

11   directly to GRS and PFRS in stipulated amounts and is not

12   going to the city, doesn't pass to the city, goes right to

13   the funds, and that also is set forth in the state

14   contribution agreement at paragraph 1, the plan at Article

15   IV.D, and PA 187 at Section 8, subpart 2.  So, your Honor,

16   again, not arguing the facts -- I mean the legal argument on

17   the underlying issue but just pointing out that they rely on

18   two statements of fact that are incorrect as it relates to

19   the state, and they lump the state in with a whole lot of

20   their argument about the DIA.  And so on that basis, your

21   Honor, we think the Court should --

22        THE COURT:  Well, but your argument raises an

23   extremely complex question about whether the plans are

24   separate entities; right?

25        MR. HOWELL:  Whether the plans --

1          THE COURT:  Are entities -- I'll phrase it more
2  specifically -- are entities separate from the city.
3          MR. HOWELL:  GRS and PFRS, yes.  I am making an
4  assumption that they are for this argument, your Honor.
5          THE COURT:  Well, if that's so, why are the retirees
6  creditors of this case at all?
7          MR. HOWELL:  The retirees are creditors of this
8  case.
9          THE COURT:  Why?
10          MR. HOWELL:  Because --
11          THE COURT:  Why do they have claims against the city
12  at all?
13          MR. HOWELL:  Because they have -- in fact, are due
14  sums of money from the city.
15          THE COURT:  By whom?
16          MR. HOWELL:  By the city.
17          THE COURT:  Or the plans.  I don't mean to resolve
18  this now or even argue it now, only to suggest to you that
19  this is a very complex question that has to be resolved in
20  the context of this case.
21          MR. HOWELL:  All right.  We will address that --
22          THE COURT:  All right.
23          MR. HOWELL:  -- but we believe that it is -- that
24  the distinction needs to be made for purposes of this motion
25  today, your Honor.

1       THE COURT:  I can see that I got some rise in Mr.
2   Bennett's blood pressure here.

3       MR. MONTGOMERY:  Your Honor, we filed an opposition
4   to Mr. Hackney's motion because it relates to evidence that
5   we would propound in this case, and so I just want to make
6   two very brief points.  One, on the question of relevance, I
7   think the proper question for the Court is whether or not it
8   addresses a theory of the case that has not been removed or
9   dismissed by your Honor.  I think clearly in this context the
10  question of whether or not the noncity funds are excludable
11  from unfair discrimination is a theory of the case which has
12  not been removed.  And as the Sperberg case suggests, this is
13  not the right time to remove it.

14      Second thing I wanted to address very simply is that
15  there was a part of the motion which I'm not sure the city
16  addressed, which was the exclusion of the 30(b)(6) topics
17  that had been propounded to the foundations, and I just
18  wanted to make the point that we, in our response, had
19  identified how Mr. Hackney's client was, in fact, able to
20  conduct discovery in this area and that it remains relevant.
21  Thank you.

22      Oh, and one last thing, your Honor, the retirees are
23  the ones who received the promise, and, therefore, that's why
24  they are creditors of the city.  Thank you.

25      MR. HACKNEY:  So very briefly, your Honor, it is

appropriate, I think, at this time to resolve it for two
reasons.  You didn't hear a dispute from the city that they
presented this as a recovery in the disclosure statement.
You didn't hear a dispute that this is money that people will
get in connection with a plan.  So I think there is a
sufficient ground for the Court to say legally, yes, this
counts.  This is in connection with a plan.  That's what the
law says.  But when Mr. Shumaker says, "Your Honor, we're
just going to have a trial on the merits.  Then we'll argue
it," and doesn't mention the fact that our subpoenas to the
foundations were quashed, so we weren't allowed to develop
the testimony that said, yeah, this is going from the Kresge
Foundation to some escrow controlled by the city for the
benefit of the retirees because Kevyn Orr told them he wanted
it that way and that in an alternative universe where he
hadn't done that, the money might have come into the city and
to be ratably distributed, I can't make that case at trial
because I wasn't given access to that discovery.  And so when
Mr. Shumaker says, well, let's just have a trial on the
merits, that's when I say this is how it dovetails with our
discovery rulings that have happened because I've got one arm
tied behind my back.  So that's why I think it's appropriate
in limine on the threshold of trial to look at the undisputed
legal facts, also look at the positions the city took on the
foundation charitable -- the charitable foundation subpoenas

 1   where it said we don't see how this is relevant to plan

 2   confirmation.  I think they have to own the decisions they've

 3   made to date, and it will have this beneficial impact on the

 4   trial, so I really think it's better resolved now, but that's

 5   our argument.

 6          THE COURT:  All right.  Thank you.  I'm going to

 7   take this and all of the motions in limine under advisement

 8   and give you a decision on all of them when we are finished

 9   arguing all of them.  So let's turn our attention now to the

10   next one, which is actually the pair of motions, 6979 and

11   6985, relating to discovery -- or evidence relating to

12   matters withheld on account of the Court's mediation order.

13          MR. SOTO:  Good morning, again, your Honor.  So now

14   I'll turn to FGIC's motion in limine to exclude evidence this

15   time relating to matters withheld on the basis of the

16   mediation order.

17          THE COURT:  Okay.

18          MR. SOTO:  As your Honor is, of course, well aware,

19   the mediation order provides that, just quoting it, "all

20   proceedings, discussions, negotiations, and writings incident

21   to mediation shall be privileged and confidential, and shall

22   not be disclosed," and that order was entered on August 13th

23   of 2013.  "Incident" is the key word here, your Honor,

24   because when you look up "incident," it means resulting from

25   or likely to happen because of, and so we at FGIC took that

to mean that the mediation order covered anything that
resulted from the mediation or was likely to happen because
of the mediation. And certainly the city interpreted that to
mean something just as broad and just as far-reaching.
Indeed, the city shielded a wide variety of information from
FGIC on the basis of the mediation order, and we're not
saying that the city did anything wrong by doing that. On
the contrary, the city was required to strictly comply with
the mediation order and all that it provided. The problem is
that the city applied a more selective interpretation of the
mediation order with respect to certain issues, and it now
appears that the city intends to introduce evidence that
relates to issues that we think are clearly covered by the
mediation order.

THE COURT: Okay. So let's pause there. I'm having
difficulty seeing how to deal with this motion on an in
limine basis as opposed to a question-by-question basis.

MR. SOTO: And I think as I go through my
presentation you'll see why an in limine basis is probably --
and, again, I'm not -- I think I'm not saying the exact same
thing that Mr. Hackney said, but there are some instances in
which the nature of what was done with respect to the
discovery leads to the inability to address certain issues on
a case-by-case, issue-by-issue basis, but makes it better to
say, okay, if that's what happened here, then maybe all

1   evidence on that issue ought to be withheld.  And that's the

2   nature of our argument, your Honor.

3           THE COURT:  All right.  Go for it.

4           MR. SOTO:  And that's despite the fact that the

5   city's application of that order in selective instances did

6   prevent full and complete discovery on several of the same

7   issues they now want to introduce, and so the city has

8   characterized this technique in its papers as walking what

9   they call an admittedly fine line with respect to the

10  mediation order.  This fine line we believe is utterly

11  undefined at this point and, in fact, is a moving target.

12  And the city cannot be allowed to use this Court's order as

13  both a sword and a shield, and this flies in the face of

14  well-settled Sixth Circuit law which we address in our briefs

15  and which I will address momentarily.  It also flies in the

16  face, we think, of the purpose of the mediation order itself.

17          Let me give you some concrete examples of the city's

18  broad interpretation and application of the mediation order

19  when it comes to withholding discovery from FGIC and other

20  plan objectors.  Discovery was denied based on the mediation

21  order on a host of different topics, including, among other

22  things -- and this is not an exhaustive list, your Honor --

23  any and all communications between the city and the

24  foundations regarding the grand bargain -- that was applied

25  to stop discovery on that -- how the parties learned of the

1    grand bargain; why the state contribution was being directed

2    to pensioners; why the foundation contributions were being

3    directed to pensioners; what, if any, claims of pensioners

4    are being resolved through the state's contribution

5    agreement; whether outside the funder -- whether outside

6    funders would have contributed funds absent the transfer of

7    the DIA into a public trust; and whether outside funders

8    would have contributed funds absent the funds being earmarked

9    for pensioners.

10         Now, your Honor, we're not saying that the city

11    should have violated your order -- I keep going back to that

12    because I understand it's an order -- or that the city's

13    invocation of your order during the depositions was in error.

14    We're not readdressing those issues. We're not, as the

15    Retiree Committee argued in its papers, objecting to the

16    application of the mediation order. In fact, throughout

17    discovery, FGIC cooperated with all parties to avoid

18    violating the protections of the order.

19         What we are saying, though, is that the city

20    construed and applied the mediation order broadly during

21    discovery, and it is and should be bound by that construction

22    during the confirmation hearing in all respects. In other

23    words, evidence related to any matters that we weren't

24    allowed to fully explore during discovery as a result of the

25    mediation order, including matters on which the city provided

1   selective but limited discovery, should be excluded in their

2   entirety at the confirmation hearing.  Otherwise, FGIC will

3   incur significantly and unfair prejudice.  Indeed, there's

4   simply no way for FGIC to adequately address or test

5   arguments whose factual underpinnings it was prevented from

6   learning about and exploring as a result of the mediation

7   order, which goes to my answer to your last question.

8          And this is not just an abstract concern, your

9   Honor.  In fact, based on recent events, there appears to be

10  a very real risk that the city is going to redraw the so-

11  called fine line in an attempt to introduce evidence on

12  issues from which relevant information and facts were

13  previously specifically withheld in discovery.  Just one

14  example, and this is something I touched on previously.  It's

15  certainly become clear that based on Mr. Orr's testimony and

16  the city's motion to strike Syncora's supplemental objection

17  that the city intends to rely on evidence regarding the

18  intentions, conditions, and reasons for the structure of the

19  grand bargain despite the fact that discovery on that very

20  issue was deemed irrelevant and despite the fact that the

21  city withheld discovery regarding that information, again

22  based on the mediation order.  Kevyn Orr, for example,

23  refused to answer questions about whether the foundations

24  ever offered to contribute money without insisting on a

25  transfer of the DIA assets.

1          THE COURT:  Why is that relevant?

2          MR. SOTO:  And I'll go to that issue -- well, let me

3    just address it right now.  Okay.  It's relevant, as is the

4    question of, well, would the foundations have contributed the

5    money with no strings attached, because as part of the

6    business justification that the city is proffering in its

7    pretrial briefs -- and it mentioned it no less than five

8    times in its motion with respect to Syncora -- they're taking

9    the position that we would not have gotten this money if we

10   didn't -- if it weren't being directed to the pensioners.

11   The foundations, foundations that in many instances have

12   never given to pensioners, would never have given this to the

13   city but for the fact that we gave it to the foundations,

14   foundations that always give money to art issues, but here

15   they would never have given it if the proceeds wouldn't have

16   gone to the foundation.  They're saying that's the business

17   justification for why they can discriminate as significantly

18   as they are against, you know, certain classes of creditors,

19   including FGIC, and they're making it a key issue of their

20   business justification argument now, but when we would have

21   asked those very same questions that I'm addressing,

22   particularly the one that, look, you know, would the

23   foundations have given it with no strings attached if they

24   would have known that the art would have been saved, that all

25   of the reinvestment initiatives would have gone forward if

1   the city in that sense would have gone forward, do they

2   really care about that?  Is that something that we could

3   test?  We couldn't even begin to test it, and now we're

4   facing arguments, indeed, significant arguments on that very

5   issue.  And they intend to put Mr. Orr on, I suspect, to say

6   that very thing, something we could not inquire.

7          THE COURT:  Well, in a bankruptcy case, how would a

8   mediation order ever get reconciled with the proponents'

9   obligation to establish the business justification for the

10   settlement that results from the mediation?  How would you

11   propose to do that?

12          MR. SOTO:  Well, your Honor, I actually think there

13   are ways that the mediation order -- I'm not even saying

14   looking back, but you could certainly look back and propose

15   an order that allowed people to inquire into certain areas

16   like the areas that everyone knew -- for example, if the city

17   understood that its business justification for discriminating

18   against our class of creditors was going to be that, well,

19   you know, we wouldn't have been able to get, you know, the

20   money for the grand bargain but for that, then it shouldn't

21   have -- it shouldn't have taken the positions --

22          THE COURT:  But that wasn't even a glimmer in

23   anyone's eye when we did the mediation order.

24          MR. SOTO:  Well, certainly the grand bargain -- the

25   grand bargain has been the issue of much of the questioning

1    that has been the subject of the mediation --

2              THE COURT:  Right, but we had a mediation order in

3    place at that time, which, by the way, no one ever asked to

4    be amended.

5              MR. SOTO:  Well, I --

6              THE COURT:  My question is a very broad question.

7    How do we reconcile a mediation order in a reorganization

8    case with the plan proponents' obligation to provide business

9    justification for whatever settlements come out of that

10   mediation?

11             MR. SOTO:  I think there are several ways to do it.

12   One would have been for the city, if it knew it was going to

13   take the positions it was going to take -- and it did for

14   some time now -- to be able to say, "You know what, your

15   Honor?  We're being asked questions about something we intend

16   to put into evidence.  We understand that the law of evidence

17   says if we take the position that it can't be discovered" --

18             THE COURT:  So you're saying the burden was on the

19   city to move to amend the mediation order?

20             MR. SOTO:  Yes.  If they understood that this was a

21   position that they were, indeed, not being able to give

22   discovery on something that we couldn't get discovery on but

23   wanted -- and, indeed, the record shows we did try to get

24   discovery on it -- and they intended to rely on it and enter

25   it into evidence, it certainly shouldn't be us who didn't get

1   the discovery who should pay the price for that burden.  And,

2   in fact, we're not even suggesting that -- all we're

3   suggesting is once the city understood what its position was

4   going to be with respect to discriminatory treatment, they

5   were in a better position to understand what their position

6   was than we were.

7           THE COURT:  Probably not any case law on this one

8   way or the other, is there?

9           MR. SOTO:  Right, and there isn't.

10          THE COURT:  Yeah.  Okay.

11          MR. SOTO:  So, your Honor, we give the example of

12  Kevyn Orr, which we've discussed.  Additionally, Dennis

13  Muchmore, who is the governor's chief of staff, also withheld

14  information on this topic.  Mr. Muchmore was instructed by

15  counsel not to answer questions on why the state's

16  contribution would be going to pensioners instead of

17  creditors.  The testimony of Rip Rapson, which you've heard a

18  little bit about this morning, who's from the Kresge

19  Foundation, he's the only foundation testimony that the city

20  cites on this topic -- on its opposition to this motion.

21  It's another example of the city using the mediation order,

22  again, as a sword and a shield.  Mr. Rapson made public

23  statements about the general bargain in an address at Wayne

24  State University, which was made publicly available to

25  everyone actually on You Tube.  He then made contradictory

1  statements at his deposition, statements which, if the city

2  was applying the mediation order evenhandedly, should clearly

3  have been withheld.  But when Mr. Rapson was probed further

4  about the topic, the city objected based on the mediation

5  order and blocked FGIC from obtaining any additional

6  information, information that would have helped shed light on

7  the nature of the differences in Mr. Rapson's statements.

8  And I think it's telling, your Honor, to see it in the

9  perspective that we saw it in, and I would like -- if you

10 have the time, to show you.  Here's what we saw when we went

11 on line, if you could play --

12        THE COURT:  Oh, I don't want to see that.

13        MR. SOTO:  You don't?

14        THE COURT:  No.

15        MR. SOTO:  Okay.  Then you don't have to, but what

16 you would see is someone extending -- going on and on about

17 things that were important to him and the city, recognizing

18 that Kresge is a wonderful foundation not just for this city

19 but for many cities that have been very important in trying

20 to get urban renewal and so many other issues, and he talks

21 about the ideas that were given to him about how that could

22 be accomplished.  Later in his deposition he talks about,

23 well, we tried to put together some ideas, so were they given

24 to him?  Were they his ideas?  Would he be willing to do it

25 in any other way?  As soon as he was asked if there was any

1  other way, "In your conversations, did you think that there
2  was another way you could have done this?" it was stopped,
3  and so our position in defending ourselves in connection with
4  the discriminatory treatment, the significant discriminatory
5  treatment, and the argument that, well, the business
6  justification is is there's no other way this would have
7  happened, our hands are tied, completely tied.  We simply
8  cannot inquire whether there was any other way it would have
9  happened.

10         Your Honor, the city, in its response to FGIC's
11  motion in limine, claims that the Rapson deposition is an
12  example of the city walking the fine line with respect to the
13  mediation order, but, your Honor, there simply was no
14  consistent fine line.  The testimony of Dan Gilbert was
15  similar.  That's the other example that's given by the
16  Retiree Committees.  He's one of the witnesses that both the
17  city and the Retiree Committee rely on on the opposition.
18  It's another example of the inconsistent application of the
19  mediation order.  He was allowed to answer selective
20  questions about how the grand bargain was presented to him,
21  on the one hand, in fact, in the one and only meeting he ever
22  had on the issue, but in that same deposition when we tried
23  to ask, well, what would you have done if it had been
24  presented a different way, would you have done the
25  situation -- would you -- you know, and would you have given

1  the money if you knew that you could revitalize the city and
2  save the art regardless of what happened to pensioners, would
3  you have -- these are things that go right to the heart of
4  the position that the city is now taking, that but for the
5  way it was structured and the money going to the pensioners,
6  they wouldn't have the grand bargain. And those are issues
7  that handicap us now.

8          THE COURT: Well, but your argument assumes that the
9  reasonableness of some other plan is before the Court. It's
10 not.

11         MR. SOTO: Right. Actually, it doesn't. My
12 argument goes to whether or not there is sufficient discovery
13 to allow evidence that but for this money going to the
14 pensioners, it wouldn't have happened.

15         THE COURT: All right.

16         MR. SOTO: And that is a critical argument because
17 the law of evidence, which motions in limine go to, Rule 402
18 and Rule 403, the argument is, well, if it's relevant, okay,
19 we get it, no 402. If it's irrelevant -- and we'll get to
20 that issue when we face the other motions in limine -- well,
21 then, you know, it shouldn't come in anyway. But if it's
22 relevant but highly prejudicial -- and that prejudice can
23 come in many different forms. Here it comes in the form of
24 the result of the city taking the positions that it took
25 during discovery recognizing that it was taking them

1   during -- as a result of an order.  It's not -- I'm not --

2   they're wonderful lawyers.  That's not the point.  The point

3   is that we were -- "we" being creditors in this instance,

4   FGIC, were in the least powerful position to change where we

5   are today and to address it.  Certainly FGIC will be

6   significantly and unfairly prejudiced if the mediation order

7   is not strictly enforced and the city is allowed to introduce

8   evidence on issues that it previously withheld from discovery

9   on the basis of that order.  Prejudice occurs where, like

10  here, a party blocks discovery into purportedly confidential

11  matters prior to the trial but then tries to use

12  information --

13          THE COURT:  I need you to clarify this argument.

14  You say there was nothing improper about any of the

15  assertions of confidentiality that the city made.  Is that

16  right?

17          MR. SOTO:  Yeah.  What I'm saying is --

18          THE COURT:  Is that right?

19          MR. SOTO:  It depends.  There are some.  There are

20  one or two where we think --

21          THE COURT:  All right.  Mostly.

22          MR. SHUMAKER:  There are one or two where we think

23  they disclosed stuff and we said, "How can you let them

24  disclose that, but then you shut them down?"  So I can't say

25  none of them, but -- so, for example, for Dan Gilbert, they

1   shouldn't have done it.

2           THE COURT:  But where there was a confidentiality

3   claim made --

4           MR. SOTO:  Yeah.

5           THE COURT:  -- there was nothing improper about

6   that.  There may have been some situations where they

7   disclosed some things they shouldn't have, but where they did

8   claim confidentiality, it was proper.

9           MR. SOTO:  Right.  Under -- they simply applied the

10  order, yes, and the order is the order.

11          THE COURT:  So it's not the city that's blocking

12  your access to that.  It's the Court.

13          MR. SOTO:  Right.  We're not -- and we're not

14  pointing at the city here.

15          THE COURT:  All right.

16          MR. SOTO:  We're simply saying that the result of

17  the mediation order -- no party should be able to benefit and

18  certainly no one group should be prejudiced by it.  It ought

19  to be applied consistently.  If we've all been here in these

20  proceedings applying the order and living with the order,

21  while we may have one or two examples where we wish it would

22  have been applied differently, it simply should continue to

23  be applied consistently in connection with the trial.  That's

24  our plea.

25          THE COURT:  Okay.  All right.  Let me ask you to

1  wrap up, please.

2        MR. SOTO:  Your Honor, we think the relief that FGIC

3  is seeking here, if granted, would result in a uniform and a

4  fair application of the mediation order at the trial, and

5  contrary to the city's assertions, it's not duplicative.

6  It's not unnecessary because those issues are critical to at

7  least one of our objections.  We think, contrary to the

8  Retiree Committee's assertions, FGIC does not intend through

9  its mediation -- through this motion to prohibit the

10  admission of what they generally describe as "any evidence,"

11  in quotes.  That's not what we're seeking.  In fact, the

12  evidence cited by the committee that is relevant to the grand

13  bargain, various iterations of the plan, the disclosure

14  statement, they wouldn't be affected by the consistent

15  application of the mediation order.  Rather, the relief

16  requested is directed solely at evidence that FGIC has been

17  unable to fully discover as a result of the order.  Thank

18  you, your Honor.

19        THE COURT:  Thank you.  Mr. Hackney, did you want to

20  supplement that?

21        MR. HACKNEY:  I want to be brief and hopefully not

22  repetitive.  Your Honor, the focus for me here is very much

23  the state of mind evidence that Mr. Soto was just talking

24  about.  Now, the city says in its brief, "To be crystal

25  clear, information that was previously withheld on the basis

1    of the mediation order will not be introduced at the

2    confirmation hearing."  That's from their response.

3           THE COURT:  Right.

4           MR. HACKNEY:  It is a fact that I asked Mr. Orr or

5    attempted to explore what his state of mind was based on the

6    communications that he had as part of the grand bargain.  To

7    confirm, he would not tell me that because asking him about

8    his state of mind would tend to reveal the underlying

9    communication.

10          THE COURT:  What was the state of mind question

11   specifically or approximately?

12          MR. HACKNEY:  About whether he believed the

13   foundations would contribute -- I don't have the text in

14   front --

15          THE COURT:  Yeah.

16          MR. HACKNEY:  -- of me, but the --

17          THE COURT:  Approximately.

18          MR. HACKNEY:  -- line of questioning would have gone

19   to was there another way to do this, right, because the

20   argument by the city is it was my state of mind.  My business

21   justification for the cornerstone of the plan is that there

22   was no other way to do this.  And so my questioning is if I

23   ask you questions, Mr. Orr, about whether it could have

24   done -- approach --

25          THE COURT:  I'm just a little confused about the

1  language state of mind because I don't equate state of mind

2  with business justification.  In fact, to me they are two

3  very different things.

4          MR. HACKNEY:  I think they are related concepts in

5  the sense that the business justification speaks both to a

6  subjective and objective concept.  It has to be subjective in

7  the sense that you must show that it actually was something

8  that you attempted to formulate and decide upon, and also it

9  must be objectively reasonable in that it must satisfy the

10  Court that your business justification --

11          THE COURT:  Well, but isn't the former established

12  in the agreement that the Court is asked to approve?

13          MR. HACKNEY:  No, no, because the question is going

14  to whether there were alternatives, whether there were --

15          THE COURT:  Why is that relevant?

16          MR. HACKNEY:  It's relevant to good faith.  It's

17  relevant to unfair discrimination.  It's relevant to the

18  entire -- it's relevant to fair and equitable.  There's

19  nothing it's not relevant to.  This is the cornerstone of the

20  plan.  They are going to come in here and say we believe

21  there was no other way to do this, and when there is a

22  collision course between the basis for your business

23  justification, the statements are all made within the secrecy

24  of the mediation and our ability to discover that, it's a

25  fundamental due process issue.  I don't think it's even just

1  prejudice.  This is an issue of due process.  And I don't

2  think the --

3        THE COURT:  How do you -- what's your answer to the

4  question Mr. Soto didn't answer?

5        MR. HACKNEY:  On 9019?

6        THE COURT:  No.  Well, 9019 --

7        MR. HACKNEY:  When you said how would anyone ever

8  prove it up?

9        THE COURT:  How do you reconcile the mediation order

10  confidentiality provision with every plan proponent or

11  settlement proponent's obligation to establish the

12  justification for it?

13        MR. HACKNEY:  Well, the first point I would say is

14  that you yourself have said in the context when I said to

15  you, "Wait.  We saw Kevyn Orr violate the mediation order,

16  and he did it under oath in front of all of us" -- he was

17  describing what was going on during the Christmas Eve

18  mediation.  Your response to me was, "I don't listen to any

19  of that.  When I'm evaluating a 9019 settlement, I look at

20  the underlying facts and the underlying law.  I don't need to

21  know what happened in the settlement negotiations."  So point

22  one is there's no problem under Rule 9019 evaluating whether

23  a settlement falls within the range of reasonableness based

24  on the underlying facts.  The problem is when they're trying

25  to walk from 9019 to justify, for example, unfair

1  discrimination on the basis of undisclosed business

2  justifications, then I'm with Mr. Soto. My answer is they

3  have the burden. If they want to attempt to confirm a plan

4  that is based on evidence that's not going to be disclosed to

5  everyone, they either need to find a way to eliminate that

6  prohibition or they need to base their business justification

7  on something that we can all see. But let me turn it around

8  on you, your Honor. It can't be the case that a plan can be

9  confirmed over my objection on the basis of secret evidence

10 I'm never given access to. That's not how we do it. So I

11 would say -- and by the way, there were --

12         THE COURT: If you don't get access to it, then

13 neither do I, and how can it be confirmed?

14         MR. HACKNEY: Well, I think that's a tautological

15 statement. That's correct. They are going to now give you

16 the evidence that we haven't been able to test because

17 they're going to say, "I'm not" -- "I've kept" -- "Syncora

18 and FGIC are like the little kid in the schoolyard that you

19 hold down while he's trying to jump up and get at you, and so

20 what I've done is I've held them at bay, and so now they

21 can't test the fact that actually all the foundations told me

22 that they were really just focused on the art. They just

23 wanted to preserve the art collection. I was the one that

24 told them that we wanted the money to go to the retirees.

25 FGIC and Syncora can't get those admissions, but then I'm

1    going to come in at trial and say, 'Your Honor, it's the case

2    that these foundations are the ones that required it.  It's

3    not my doing.  It's the foundations.'"  It goes to the heart

4    of the case, and so that's the basis for the concern.

5          THE COURT:  All right.  Thank you.  Let me hear from

6    the city.

7          MR. SHUMAKER:  Your Honor, I think you're hitting

8    the nail on the head as to how this process should work.  The

9    city is not looking to put in evidence of what happened in

10   the mediation.  Of course, it's not going to do that.  What

11   it is going to put into evidence is what came out of the

12   mediation process, and what Mr. --

13         THE COURT:  Well, let's just pause there and ask

14   this direct question which Mr. Soto and Mr. Hackney raise, is

15   Mr. Orr going to be asked to testify that part of his

16   business justification for agreeing to the grand bargain was

17   that the foundations wouldn't do it any other way?

18         MR. SHUMAKER:  Well, he -- there is evidence that

19   that is the case coming out of the process.  For example --

20         THE COURT:  I need an answer to my question.

21         MR. SHUMAKER:  Is he going to testify about what

22   the --

23         THE COURT:  Is he going to be asked to testify that

24   part of his justification for agreeing to the grand bargain

25   was that the foundations wouldn't do it any other way?  They

1   would only give money if it was going to the pensions.

2          MR. SHUMAKER:  No.  He's going to testify that what

3   came out of the mediation process was the grand bargain, and

4   the money that was coming from the state --

5          THE COURT:  So the answer to my question is, no,

6   he's not going to testify to that.

7          MR. SHUMAKER:  That's right.  That's right.  And

8   that's where a lot of the issues that Mr. Soto and

9   Mr. Hackney describe came up because if you look carefully at

10  the testimony in those depositions of Mr. Orr, they're not

11  focused on, okay, let's talk about the grand bargain as it

12  came out of the process.  Instead they repeatedly go in what

13  happened in those negotiations, what did you say to the

14  foundations.  If you look at Mr. Orr's deposition, pages 203

15  to 211, it talks about -- there's the complaint that Mr. Soto

16  raises, what about the foundations, what were your back and

17  forth, how am I going to test this process.  Mr. Orr also

18  testifies that every single communication, conversation he

19  had with the foundations except for a couple, "Hello there,

20  how are you?" conversations was in the context of the

21  mediation, and, therefore, that's why the objections were

22  asserted, and that's why there wasn't -- there isn't any

23  exploration of the back and forth.  The back and forth

24  doesn't matter.  The result matters.  The result matters,

25  that there is a mediation, that the parties were represented

1   by sophisticated counsel, that they were hard-fought, arm's

2   length negotiations.  That's what the city is going to rely

3   upon but not who proposed what and here's this

4   counterproposal.

5          And as for -- you know, I think Mr. Soto -- I

6   appreciate the compliment because it was not an easy thing to

7   do, but all of the counsel representing witnesses in the

8   depositions tried to toe the line.  We were very aware of

9   what the mediation order said and what your Honor's dictate

10  was.  In fact, the city had been sanctioned for inadvertently

11  producing documents covered by the mediation order, so were

12  we sensitive about it?  Sure.  Did it come up quite a bit?

13  Sure, because a lot of things got sent to mediation, COPs,

14  UTGOs, LTGOs, collective bargaining agreements, practically

15  everything in this case, so the notion that it got raised in

16  a lot of different contexts just reflects the fact that the

17  mediation order was in place, that parties were sent to it on

18  a lot of different issues, and it worked properly.  And so,

19  you know, what I think it's pretty clear here is that Syncora

20  and FGIC want to penalize the city for compliance.  This is

21  not sword and shield.  We're not selectively out there

22  asserting the privilege and then saying, "Oh, no, you

23  can't" -- this is not the Arista case that Syncora cites

24  where part of our case is going to be the advice of counsel,

25  but, no, you can't have the advice.  That's not this

situation at all.  And if your Honor goes and looks at those
depositions, looks at that testimony, you'll see the counsel
trying to be very, very clear with the questioner.  You can
ask questions about this area, about the conversations with
the foundations, but you can't get in the mediation door.
Who said what to whom doesn't matter.  And what they want to
do now is shut things off and say, "Oh, anything relating to
the mediation order, we're somehow prejudiced."  The case is
what the case is.  The result of that mediation is what is
going to be presented to the Court.  Mr. Orr and others will
testify about that.  So sort of the notion of state of mind
that Mr. Hackney is talking about, state of mind was in the
context of mediation.  That's what he's testified -- that's
what he's being asked to testify about.  Well, of course, his
state of mind in the -- during the mediation is going to
reflect what's going on in the mediation, so to us this is --
you see there was no shutting down of evidence.  If you look
carefully at that, I think you'll agree that this was very
carefully policed by counsel.  You know, for example, Mr.
Rapson -- you know, Mr. Soto makes a big deal of what he said
at Wayne State.  If you look at that deposition, your Honor,
I asserted the privilege, and what I said to Mr. McCarthy in
the deposition was, "Look, I understand that he made some
public statements.  If you want to ask him about those public
statements -- about the public statement, fine, but you

1   cannot ask him about the back and forth with Judge Rosen."

2   That is a clear violation of the mediation order, and we're

3   not going to go there.  So, again, this is something which we

4   think they were able to test around the contours of the

5   mediation order, and how you reconcile, you know, what -- you

6   know, the mediation order with the plan proponents' need to

7   deal with what came out I think is exactly what we're going

8   to do.  This is what the plan says.  This is what Mr. Orr

9   thinks about it.  This is what he weighed when it was

10   presented to him and it looked like all of the money was

11   going to the pensioners as part of the deal, and he'll

12   testify why he thought that was a good thing to enter into

13   that settlement.  We don't think a sweeping order is

14   appropriate, your Honor, and we would agree that this is best

15   done on a question-by-question basis to the extent it

16   concerns the Court.  Thank you, your Honor.

17         THE COURT:  All right.  Let's move on and talk about

18   motions at Docket Numbers 6982 and 6990 relating to hardship

19   and matters deemed irrelevant.

20         MR. SOTO:  I've only hit that thing three times,

21   Judge, now, and it's not even a half an inch.  Again, I'll

22   address FGIC's motion that you just announced, your Honor.

23   Specifically, it's FGIC's contention that the Court should

24   exclude evidence related to the validity or invalidity of the

25   COPs service contracts, evidence related to the alleged

hardships that pensioners may or may not face, and evidence
related to the intentions, conditions, or reasons for the
structure of the so-called grand bargain settlements. It'll
touch a little bit on what we've discussed, and I think I'll
be able to even address something that my colleague here
suggested as well, Mr. Shumaker. Thanks. I can barely
remember my own name now, your Honor.

Let me say at the outset that because these issues
were previously deemed irrelevant, FGIC has either been
denied discovery or under the agreement of the parties has
withdrawn discovery requests with respect to each of these,
and so the introduction of evidence on these issues at this
juncture we believe will significantly prejudice FGIC.

First, I'll address evidence relating to the
validity of the COPs contracts. As your Honor is aware, the
city has commenced an adversary proceeding alleging that
certain service contracts related to the certificates of
participation are invalid and unenforceable, and, as you
know, that adversary proceeding is separate from the plan
confirmation hearing we're here on today, and it's still in
its initial stages. And the city has readily acknowledged in
the past and, in fact, represented at the May 28th, 2014,
hearing that evidence regarding the validity or invalidity of
the COPs service contracts would not be introduced at the
confirmation hearing because, again, it's irrelevant as to

1   whether the plan should be confirmed.

2          Your Honor, you also made it clear to the parties at

3   that same hearing on May 28 that the only way evidence

4   relating to the validity of the COPs transactions might come

5   in the confirmation hearing is if the parties open the door

6   to it.  Based on the city's representations and your Honor's

7   instructions, FGIC, the city, Syncora, Deutsche Bank, Dexia,

8   and Wilmington Trust, as the contract administrator, all

9   agreed to a stipulation relating to evidence that related to

10  the COPs transactions, and pursuant to that stipulation, the

11  parties agreed not to call six witnesses at the confirmation

12  hearing who could testify to issues regarding the validity of

13  the COPs transactions.  They also agreed to withdraw related

14  subpoenas because the issues they addressed were reserved, we

15  thought, for the adversary proceeding.  But after the parties

16  negotiated and agreed on the stipulation and after the Court

17  approved it, again, Kevyn Orr, the city's emergency manager,

18  testified at his deposition on July 22nd of this year that

19  one of the reasons for the plan's discrimination against

20  Class 9 creditors -- and, again, FGIC is a member of that

21  class -- is, and I'm quoting here, "the legal arguments that

22  have been made in the papers regarding the COPs that we

23  believe they are void ab initio and that we have no

24  obligation," end quote.  That's from Mr. Orr's deposition,

25  page 23 and leading onto page 224 -- 223 to 224.  The

1    Retirement Systems made a similar argument in their brief in

2    support of the plan.  Despite Mr. Orr's testimony, the city,

3    nevertheless, asserts in its opposition to this motion that

4    it agrees that evidence as to the validity of the COPs

5    service contracts is irrelevant and that it does not intend

6    to introduce such evidence at the confirmation hearing, but

7    at the same time, the city argues that information related to

8    the validity of the COPs service contracts should be allowed

9    in the confirmation hearing for three reasons.  First, the

10    city argues that it wants to bring in evidence that it relied

11    on the purported invalidity of the COPs service contracts in

12    formulating the plan.  Second, the city argues that FGIC,

13    through one of its expert reports, has reopened -- has opened

14    the door to validity issues by including a potential

15    disgorgement claim against the Retirement Systems in its

16    feasibility analysis.  And, third, the city argues that FGIC

17    has opened the door to validity issues by challenging the

18    amounts of the disputed COP claim reserves, a reserve that is

19    premised on the allowance and validity of FGIC's claims.

20          As to the first argument, your Honor, the city's

21    position that it wants to introduce evidence that it relied

22    on the purported COPS invalidity in discriminating against

23    Class 9 is filled with contradiction, and let me not

24    characterize the city's argument.  Here is their position as

25    you read it.  One of the reasons that claims were given the

1    treatment they were given under the plan is, and I'm quoting,

2    quote, "necessarily the city's views of the strength of its

3    claims that the COPs transaction was illegal and, thus, that

4    the COPs have no right to make a claim at all," end quote.

5    But, in fact, that argument flies in the face of its own plan

6    of adjustment, which is predicated on the very assumption

7    that the COPs service contracts are valid and that the COPs

8    claims will be allowed in full.  Your Honor, the city

9    can't -- and I say this a little differently -- eat its cake

10   and have it, too.  They decided to submit a plan that assumes

11   the validity of the COPs claims.  Arguing in support of the

12   same plan that they have a right to discriminate against the

13   COPs holders because the assumed valid contracts are actually

14   invalid tries to get in the back door exactly what this Court

15   and the parties agreed wouldn't be part of this confirmation

16   hearing.  Contrary to what the city argues in its position,

17   both the city's waffling position and the Retiree Committee's

18   position make it clear that FGIC's motion on this issue is

19   necessary at this juncture.

20          The city and other plan supporters should not be

21   permitted to introduce evidence on this issue at the

22   confirmation hearing for at least two reasons, your Honor.

23   First, as I said earlier, the terms of the plan are neutral

24   on the validity of the COPs service contracts.  As the city

25   itself represented to this Court, the plan, quote, "assumes

1   that at the end of the day the COPs claims are allowed in

2   full."  For purposes of confirmation, the COPs are assumed to

3   be allowed -- to be an allowed claim.  That's at the May 28th

4   hearing at the transcript on page 231, your Honor.  It's

5   clear then that based on the city's own statements, evidence

6   relating to the alleged invalidity of the COPs claims has no

7   bearing on whether the plan should be confirmed.  That means

8   this evidence is irrelevant, and, therefore, it's

9   inadmissible under Rule 402, which provides that irrelevant

10  evidence is not admissible.

11          And just so I'm clear on this point, your Honor,

12  what we're facing is a party standing here saying the plan

13  assumes the validity of the contracts, and for purposes of

14  this trial, the COPs claims will be presumed to be allowed in

15  full while at the same time they're saying that the plan

16  fairly discriminates against us because the contracts are

17  invalid and we should have a right to say so.  And that's in

18  the face of prior representations that this very issue

19  wouldn't be brought up, which led us to forego discovery on

20  the issue, and that's the core of the problem that we're

21  facing with the city's position on this one, your Honor.

22          That leads to my second point, which is that FGIC

23  will be significantly prejudiced if the city is allowed to

24  introduce evidence at the confirmation hearing of this

25  nature.

1          MR. SHUMAKER:  Your Honor, I don't mean to

2    interrupt, but we had -- would you like to hear the response

3    to the COPs validity now or at the end?

4          THE COURT:  At the end.  Thank you.

5          MR. SHUMAKER:  Okay.  I'm sorry.  Either way.  I'm

6    sorry.

7          THE COURT:  Yeah.  Go ahead, sir.

8          MR. SOTO:  Okay.  Okay.  We think we'd be

9    significantly prejudiced.  FGIC previously agreed to withdraw

10   discovery and potential witnesses on this issue based on the

11   city's representations that the validity of the COPs service

12   contracts was irrelevant.  As a result of that process, which

13   was agreed to by the parties, FGIC is not and could not be

14   adequately prepared to present evidence and testimony

15   regarding the validity of those transactions in these

16   proceedings.  The case law which is stated in our briefs

17   makes it clear that where a party didn't have the opportunity

18   for discovery on a certain matter because discovery process

19   agreed to by the parties, then that matter should not be

20   introduced into evidence.  This reasoning is particularly

21   compelling here because the city actually affirmatively

22   stated on the record that it didn't plan to address those

23   issues.

24          I'd like to briefly address two additional

25   arguments, your Honor, that the city raises in connection

1  with this issue.  One is that they say FGIC placed the merits

2  of the COPs service contracts at issue in Mr. Stephen

3  Spencer's testimony or report where he raises -- on the issue

4  of feasibility, has the city considered the possibility of a

5  disgorgement.  We're not asking the Court to decide the issue

6  of validity during the confirmation hearing, and Stephen

7  Spencer's expert report simply includes an analysis of plan

8  feasibility in that scenario.  Mr. Spencer's opinion did not

9  take into account the merits of the adversary proceedings and

10  can be fully addressed without reaching the merits of the

11  proceedings.  The city has already had the opportunity to

12  depose Mr. Spencer and it'll have the opportunity to cross-

13  examine him at his trial, something that can't be said about

14  the witnesses that FGIC and Syncora did not have the

15  opportunity to take testimony from.  Mr. Spencer's report

16  simply acknowledges that this litigation exists and that if

17  it does, it may have some impact.  Nothing is new about that.

18  Everybody understood that that was a potential occurrence.

19  What is new is the city's contention that to respond to this

20  argument it needs to address the merits or, you know, the

21  validity or invalidity of those agreements.

22       Indeed, your Honor, Mr. Spencer's analysis doesn't

23  bear on the merits whatsoever, but beyond that, because the

24  city has just now raised it, your Honor, if this Court thinks

25  that somehow Mr. Spencer's addressing that issue in his

1    report opens the door, as you had suggested at the hearing,

2    then FGIC is absolutely -- has no desire to do that. We

3    don't want to open the door to that, and we would be

4    perfectly willing to withdraw that part of Mr. Spencer's

5    analysis to make it clear that we haven't done that. We

6    would much rather do that than face what we think would be

7    the extreme prejudice of letting this other information in.

8          Finally, nor has FGIC opened the door by raising the

9    fact that the COPs disputed claims reserve is not big enough.

10   As the city has acknowledged previously, the disputed claims

11   reserve is premised on the assumption that the COPs holders'

12   claims are allowed in full under the plan and are valid, and

13   all Mr. Spencer is saying there is, well, if the city is

14   assuming that FGIC's claim is allowed in full, then the city

15   didn't put enough money in there for us. That's it. That's

16   all that does. Again, that doesn't bear on the merits of

17   whether the COPs service contracts are valid or not. It only

18   goes to how the plan already treats those agreements.

19         And, your Honor, that's the end of that first one.

20   It's probably the right time for someone if they want to

21   address that one. We can go on to the hardship as well if

22   you want to.

23         THE COURT: I want to do that.

24        MR. SOTO: Okay. Turning to the issue then of the

25   alleged hardship of the pensioners, your Honor has indicated

on numerous occasions that the hardship of the creditors,
including the pensioners, is not a relevant factor in
determining whether the plan should be confirmed.  For
instance, at the June 26 hearing, you stated from the
transcript, "I'm going to say here as unequivocally as I can
that as a matter of law, creditors' needs is not an issue
when it comes to determining unfair discrimination."  That's
at the June 26th hearing, the transcript on page 104.  You
further specified at that hearing that, quote, "The retirees'
hardships is not at all relevant to the issue of unfair
discrimination or fair and equitable."  Again, that's at the
June 26 hearing but this time on page 128.  You also
reiterated the same point just recently at an August 6th
hearing.  Importantly, counsel for the city affirmatively
represented at the June 26th hearing that, quote, "he can
affirm that the city is not going to be standing on the
personal hardship argument."  That was at that same hearing
transcript page 104.  Accordingly, the plan objectors agreed
to withdraw discovery requests related to this issue, and
your Honor acknowledged that.  Despite the city's
representations and your Honor's unequivocal statements,
Mr. Orr, nevertheless, testified that the hardships of the
pensioners was one of the key reasons the city chose to
discriminate against creditors in Class 9 in favor of the
pensioners.  Listen to this.

```
 1    (Audio played at 11:47 a.m. as follows:)
 2         "MR. HACKNEY:  Isn't it true that in coming to
 3         your" --
 4         MR. SOTO:  This is Mr. Buckfire.
 5         "MR. HACKNEY:   -- opinion that creditors do
 6         better under" --
 7    (Audio concluded at 11:47 a.m.)
 8         MR. SOTO:  Mr. Orr.  Okay.  Let me read it then.
 9         "Question:  And what was" --
10         THE COURT:  Thank you.
11         MR. SOTO:  Yes.
12         "Question:  And what was your basis for the
13         level of discrimination you proposed at the February
14         21 plan?
15         Answer:"
16    I do it better than he does anyway, Judge.
17         "Answer:  We were looking, we had been
18         admonished I believe by the court on several
19         occasions to be compassionate in our treatment of
20         individuals and retirees.
21         Question:  I want to focus on the process of
22         deciding which creditors get which part of the pie,
23         and I want to understand what information you relied
24         upon in deciding to give pensioners a larger slice
25         of the pie than you gave financial creditors.
```

1          Answer:  In deciding what we could pay

2          pensioners, there were, I would say, several

3          different factors which really spurred that

4          decision.  One was the amount of funds that were in

5          the various pension funds.  Two was the obligation

6          to try to take into account the situation of these

7          pensioners."

8      That's at the Orr deposition taken on July 22nd on

9  page 203 to 204 and again on page 209 to 210.  Counsel for

10  the Retirement Systems also recently indicated at the August

11  6 hearing and in their brief in support of the plan that they

12  intend to rely on this hardship argument in seeking to

13  justify the plan's discrimination.  Despite Mr. Orr's

14  testimony, the city now seems to take the position that it

15  does not intend to introduce evidence of the hardship.

16  Rather, it intends only to introduce evidence that Mr. Orr

17  relied on the purported hardship of the retirees in deciding

18  to discriminate against COPs holders.

19      Your Honor, we would suggest that this is no

20  different from what I said moments ago.  Here, too, the city

21  wants to have its cake and eat it.  It says that hardship

22  won't come in, but at the same time it wants to be able to

23  say that it relied on hardship in justifying its

24  discrimination against COPs holders.  Well, if they're

25  allowed to do that, your Honor, then it's in.  Simply put,

1   the city can't say on the one hand that they're going to be

2   introducing evidence of hardship while on the other hand

3   Mr. Moore -- that they're not going to do it, and then on the

4   other hand Mr. Moore -- Mr. Orr says, "Well, we relied on

5   that evidence," evidence that they don't intend to introduce

6   on a point that they haven't established yet.  That's the

7   city talking out of both sides of its mouth.  And critically,

8   we haven't had an opportunity to take discovery on that issue

9   either, which bears directly on whether the city -- you know,

10   whether or not the city's reliance on that alleged hardship

11   makes any sense at all.  In any event, your Honor, it's clear

12   the other plan supporters also intend to introduce this

13   evidence, so our position here is not mooted.  Both the

14   Retirement Systems and the Retirement Committee have argued

15   in their oppositions to FGIC's motion that the evidence is

16   relevant on a macroscopic level and that aggregate hardship

17   of the retirees somehow could, and I quote from their papers,

18   "potentially derail the city's entire reorganization effort,"

19   end quote, and, therefore, the evidence bears on the business

20   needs of the city.  Your Honor, the city and other plan

21   supporters shouldn't be allowed to introduce any of this

22   hardship evidence at the confirmation hearing.  In fact, the

23   case law on this issue confirms your prior rulings that

24   evidence of creditors' needs is irrelevant for purposes of

25   determining whether the plan should be confirmed.  As the

1   Bankruptcy Court for the District of Columbia held in the In

2   re. ARN case, and I quote, "While the Debtors prefer to pay

3   local businesses in full at the expense of banks and other

4   lenders, this treatment is not sanctioned by the Bankruptcy

5   Code.  The focus on a particular claim should not be the

6   claimholder, but rather the legal nature of the claim.  An

7   unsecured claim is simply that, an unsecured claim."

8        Your Honor has also indicated in other cases that

9   antipathy toward a creditor, which, by the way, is no

10  different than sympathy for a creditor, is not proper basis

11  for discrimination, and that's in In re. Graphic.  There's no

12  reason why this case law isn't equally applicable here,

13  meaning that evidence of the pensioners' hardship is

14  irrelevant.  And if it's irrelevant, then, your Honor, it's

15  inadmissible under Rule 402.

16       Equally important is the fact that because discovery

17  requests related to the pensioners were withdrawn based on

18  the prior rulings of this Court and the city's

19  representations, FGIC and other plan objectors did not seek

20  discovery.  On this issue, I would also add that the argument

21  that this evidence somehow bears on the hardship of the city

22  as a whole is directly contradicted by Mr. Orr's testimony

23  regarding how the city gathered that.  Mr. Orr testified that

24  in determining that hardship, he considered, and I quote,

25  "individual meetings with individual employees and pensioners

1    who recount their stories in detail."  He went on to say that
2    he met, quote, "with people on the street as well as he heard
3    accounts in their reports."  That's an interesting
4    description of anecdotal statements, but it's not macroscopic
5    evidence of the nature that was discussed at the August 6th
6    hearing, your Honor.

7           Finally, your Honor, I'm done with that, and I'll go
8    on since you've asked me to.  On the issue of intentions,
9    conditions, and reasons for the structure of the grand
10   bargain settlements, this was very directly related to the
11   mediation, and I won't repeat what we said there, but I will
12   say that there is a particular problem with this evidence.
13   So, for example, we say that evidence regarding -- and you
14   asked Mr. Shumaker directly on this issue, "Well, you know,
15   would you have given the money but for that?" paraphrasing
16   your question to him, so they use Mr. Rip Rapson's testimony,
17   which, again, is all over the lot depending upon which one
18   you look at, to try to address that, but Mr. Rapson is the
19   only -- the one and only foundation witness that was deposed
20   by any of the objectors, and that's because all of the
21   subpoenas on all of the others were quashed.  Indeed, the
22   subpoena as to Kresge was quashed, but Mr. Rapson was listed
23   as an independent and separate witness.  And because he was
24   listed as a separate witness and, indeed, he was listed as a
25   witness not even on that issue, not about the grand

1  bargain -- he was listed as a witness on issues of post-
2  confirmation work within the city because Kresge Foundation
3  has done a number of different programs within the City of
4  Detroit and continues to give on a yearly basis millions of
5  dollars separate and apart from anything we're doing here.
6  So when we took his deposition, we got this one beginning but
7  then couldn't inquire any further.  You've heard that story
8  from the last motion that we did.  But here the problem is
9  that they take that one statement by Mr. Rapson, who
10  represents one out of fifteen potential foundations, and,
11  frankly, only 15 percent of the money given by the
12  foundations, and they say, well, that shows that none of the
13  foundations would have given to the grand bargain but for the
14  way it was structured, but for the fact that it was going to
15  the pensioners.  And, again, I'm not trying to be repetitive,
16  but that was problematic as to Kresge.  It's extremely
17  problematic as to the other -- is it 14 -- the other 12
18  because nobody ever got to ask them anything.  We have no
19  idea what their position is, and so our position here is,
20  your Honor, again, since the city has taken the position that
21  that issue is either covered by the mediation order or
22  irrelevant because it just goes to settlement, then it is
23  irrelevant, and then the issue of the fact that they wouldn't
24  have given but for the direction should be addressed in this
25  context as well.  Thank you, your Honor.

1       THE COURT:  Let's go back to the issue of retirees

2  before you sit down.  Is it FGIC's position here that many or

3  most retirees will not suffer hardship if this plan is not

4  confirmed?

5       MR. SOTO:  Frankly, it's our position that if you

6  look at empirical evidence that we couldn't get from

7  discovery but you can do some research determining what is

8  the structure of the group of retirees, who they are, where

9  they live, what they do, how they compare to other people

10  within Detroit, it's our position that, you know, there's

11  a -- it's all over the lot, so the answer isn't black and

12  white, and it isn't that many.  We don't know yet, and,

13  frankly, our point is that we weren't given the opportunity

14  to know either.  And so the answer to that is --

15       THE COURT:  So you challenge the city's assertion

16  that many or most retirees will suffer hardship if this plan

17  is not confirmed.

18       MR. SOTO:  Yeah.  We challenge --

19       THE COURT:  Is that right, sir?  Is that right, sir?

20       MR. SOTO:  We challenge it --

21       THE COURT:  Is that right, sir?

22       MR. SOTO:  Yes.  The answer is, yes, we challenge it

23  only on the basis of they have --

24       THE COURT:  All right.  I want to hear from

25  Mr. Hackney.

1          MR. HACKNEY:  Your Honor, I'll try and be brief

2     without being repetitive.  I just want to explain what's

3     really going on here and then try and identify common ground

4     that will, I hope, focus our debate.  What's really going on

5     here is that when we got the reply brief back in the day, it

6     said personal hardship qua personal hardship, not connected

7     to some macroeconomic concept relating to the business of the

8     city, was a basis for the discrimination not only justifying

9     it but also that it was, in fact, a motivating factor behind

10    the decision to discriminate.  And Mr. Orr confirmed that

11    testimony in my deposition with him.  He confirmed that two

12    of the four bases that he identified were fairly

13    characterized as his compassion for the retirees, for the

14    human dimension, and the city covenant that we had with them,

15    and you'll hear more about this later today.  The reason I'm

16    giving you this background is because his testimony was not

17    the sort of newfangled testimony that we're starting to hear

18    out of the retirees.  It was just, "I was instructed to be

19    compassionate by the Court.  I was admonished by the Court to

20    be compassionate.  I exercised my compassion, and that" --

21    I'm not making this up -- "that factored into my decision to

22    discriminate."  What happened, though, in the interim was

23    that the Court held correctly under the law that is not a

24    permissible basis to discriminate between creditors, and so

25    after Mr. Orr gave that testimony, you started getting a

1  bunch of "oh-oh" from the retiree parties, the Retiree

2  Committee, and the city as people started to figure out wait

3  a second, he just testified that a legally impermissible

4  basis infected his decision to discriminate.  Now we're

5  starting to see the change, and so now we're going to try and

6  dress the evidence up and say that's not really what he said.

7  By the way, he was the 30(b)(6) witness on this subject and

8  happens to be the guy who made the decision, so you'd think

9  he'd know.

10       Here's what I think there's common ground, and

11  here's where I think there's not common ground.  There is

12  common ground amongst all of us, I believe, that we will not

13  hear testimony from retirees about the impact of the cuts on

14  them or why it imposes a hardship on them or anecdotes

15  relayed on that subject.  I believe even the city concedes

16  that.  I also believe we're on common ground that if the city

17  wants --

18       THE COURT:  But pause there.  I already got a day of

19  that.  What do I do with that?  Ignore it?

20       MR. HACKNEY:  Well, I think we typically trust

21  judges in bench trials to be able to sift the relevant and

22  the irrelevant, but this is another scenario where if you are

23  going to hear this testimony, we want to have the ability to

24  cross-examine Mr. Orr on the underlying substance of it, and

25  that's how it links up to discovery.

1          The second point where there's common ground, your

2    Honor, is if the city wants to come in and say different

3    pension cuts would have had an impact on morale or

4    productivity in the business of the city, I do not believe

5    that that is covered by our personal hardship motion in

6    limine.  It has to make those arguments consistent with the

7    evidentiary record and what its 30(b)(6) witnesses say and

8    what its other witnesses say, and I'll leave that for the

9    trial, but I don't think that's covered by what my motion

10   sought to preclude.

11          It is the third area that is the most important.  It

12   is the idea that, oh, well, we're not saying it's personal

13   hardship qua personal hardship.  What we really meant was

14   it's personal hardship and its impact on the city either

15   economically or in the form of the city services that may be

16   provided to those of the people that are in need.  And you

17   see this in the city's brief where the city uses interesting

18   language.  It says the city reasonably could have concluded

19   that maintaining pension benefits was the preferable

20   financial and business alternative to reducing those benefits

21   and being forced to offset those reductions with greater

22   public expenditures on other services.  Now, there's a reason

23   that they used the word "could have concluded" because, of

24   course, they actually didn't, and Mr. Orr did not say that

25   this is what the basis for the discrimination was.

1    The Retirement Systems are also trying to move this

2   argument, so it's if the city is losing its workforce in this

3   manner and cannot provide effective services to residents and

4   businesses -- and listen to this.  This is evocative

5   testimony -- or evocative argument.  If the streets are lined

6   with impoverished retirees dependent upon public welfare and

7   unable to buy services and properly maintain residential

8   neighborhoods, then it will lose existing businesses and will

9   not be able to attract investment and new business.

10    Now, what I want to remind the Court of is when you

11   go back to that key engagement that we had where I was

12   seeking discovery under my 30(b)(6) topic, that generated a

13   tremendous hue and cry that Syncora was at the focal point of

14   from people that were outraged as to why we were seeking this

15   information.  What we made clear was we only want to know

16   what it is that the city knows on this subject as it is

17   making its decision.  If the city has analysis that shows 15

18   percent of people will be put below the poverty line, that

19   will increase the number of people that seek free water or

20   different types of services from the city.  Economic cost X

21   justifies treatment Y for the entire class.  You know, it's a

22   difficult argument to make, but we wanted to see if they were

23   going to try to make it.  What's the information that you had

24   that you relied upon?  That was the colloquy that led Mr.

25   Shumaker to stand up after they had said in their brief it's

1    entirely irrelevant, we cannot fathom a reason why you would

2    want this information, Syncora, you're a bad person, now they

3    come back in and go, oh, you know what, actually it's at the

4    center of my business justification for discriminating

5    because it turns out the personal hardship of the retirees

6    has an impact on the business of the city.  That has an

7    economic impact on me as the city, and that's the

8    justification.  I'll prove to you at trial that that's

9    entirely inconsistent with the record.  I'll leave that for

10   another day.  This argument today is that's not fair.  They

11   said personal hardship wasn't in the case.  They denied us

12   access to the information that they had on the subject of

13   personal hardship, and they cannot now be heard to say,

14   sorry, it's personal hardship in a different disguise.  That

15   is the argument, your Honor.

16        MR. HERTZBERG:  Your Honor, Robert Hertzberg on

17   behalf of the city.  I'm going to address the personal

18   hardship issue, and then I'll turn it over to Mr. Stewart,

19   who will address the COPs issue.  I think it's important that

20   the Court understand the context in which the personal

21   hardship issue came up.  It was pursuant to a 30(b)(6)

22   request issued by Syncora.  And what they were trying to get

23   was the individual income and current assets of individual

24   retirees, and that's the context it came up in.  And we moved

25   the Court and said that this is not relevant, and they should

1 not be able to seek this information from the individual

2 retirees.  In other words, they shouldn't be able to get what

3 assets do they own currently and, second of all, what their

4 income is and information of that type.  And that's how the

5 issue became engaged.  And we said to the Court -- and we

6 stand by it -- that we're not going to --

7    THE COURT:  Mr. Hackney says that what was requested

8 was that information only to the extent that the city had it.

9    MR. HERTZBERG:  That's correct, your Honor.  And we

10 indicated to the Court at that hearing that we would not

11 introduce -- and we will not introduce evidence of, quote,

12 "personal hardship of the individual retirees."  In other

13 words, we're not going to parade up retirees who are going to

14 sit here and testify to the Court of their personal

15 situation, their personal hardship.  And based upon that, we

16 indicated to the Court we will not introduce that in

17 evidence.

18    The Court made it clear, however, that the issue is

19 business justification for the treatment from the debtor's

20 perspective, so what happened is Syncora asked Mr. Orr at his

21 deposition why he did what he did, why did he decide to

22 discriminate in one way on behalf of one group against

23 another, and he said it was the human dimension.  Then they

24 asked a series of further questions, and now they're trying

25 to block what Mr. Orr's reasoning was.  Mr. Orr is not going

to testify as to what individual hardship the retirees have.
What he's going to testify as to is what his thought process
was when he came to making decisions on putting the plan
together, and one of the thought processes along with several
others was the human dimension. That's not what the Court --
or what we agreed with the Court that we would not bring
evidence forward on. We said we wouldn't bring evidence
forward on the individual retirees, and we're not going to,
your Honor.

He said he looked at raw data of pensioners, which
he was questioned on by Syncora at his deposition. He can
testify to the group of retirees as an aggregate and how it
impacted his thought process. He cannot testify that this
individual retiree would suffer this hardship. That he
cannot, and he will not testify to that.

One second, your Honor. If you look at the standard
of Federal Rule of Evidence 401, the standard on evidence is
relevancy, and the standard is pretty low. And I'd suggest
to the Court in this situation that what Mr. Orr was thinking
when he made his decisions is important for the Court to
hear. His business justification is important, and this is
just one of the things that went into his thought process,
the human dimension. There will also be -- as Mr. Hackney
indicated, there will be testimony on employee morale, and
what I think I understood Mr. Hackney to say is that we can

1  present testimony.  He's not trying to block that testimony

2  by his motion in limine, so I'm not going to address that

3  issue, your Honor, but I think it's clear that what the Court

4  indicated was is that there would be no indication of

5  personal hardship.  Mr. Orr is not going to testify as to

6  individuals' personal hardship, just what his thought process

7  was, your Honor.

8       MR. STEWART:  Your Honor, Geoffrey Stewart of Jones

9  Day to deal with that part of the motion in limine relating

10 to proofs about the validity of the COPs transaction.  The

11 reason I was gazing off into space is I was thinking of the

12 Greek myth about Hercules and one of his labors, which is

13 itself a wonderful metaphor for all of us.  Mr. Hackney

14 referred to the three-headed monster, that Hercules had a

15 monster.  Every time he cut its head off, he got two new

16 heads.  And I was thinking of that in connection with the

17 COPs argument because there are some new heads here.

18       What didn't come up in Mr. Soto's argument -- and

19 I'm just going to go right to this -- is that his papers say

20 they intend to educe exactly this testimony, namely that one

21 of the factors Mr. Orr took into account in deciding the

22 treatment of Class 9 was Mr. Orr's view that the COPs claims

23 were -- that the COPs transaction was illegal, and,

24 therefore, the COPs claims not being legal would be -- would

25 have to be dealt with in a certain way.  I mention it only

1   because I'm not so certain why we're arguing this at all in

2   view of the fact that Mr. Soto's brief at paragraph 34 says

3   he intends to offer this exact point.  We would offer it for

4   the proposition of explaining what Mr. Orr's reasons were for

5   the treatment of Class 9, and this would be one of many,

6   namely that I didn't think the COPs holders had a valid claim

7   because it's an illegal transaction.  That would be it, not

8   I'm going to give you an opinion on why I think it's illegal,

9   not here are the various arguments back and forth, just

10  simply that.

11          In view of the fact, however, that FGIC intends to

12  educe the exact same testimony, I'm not certain of the

13  purpose of the motion in limine unless it is to say you're

14  not allowed to educe it because we're going to pick it up on

15  cross-examination.  Anyhow, one thing that does bear emphasis

16  is we have never planned in this case to get into the merits

17  of that part of the COPs claim, and so that is the beginning,

18  middle, and end of that argument.  However, that is where

19  this does turn into the Herculean point I just mentioned.

20          THE COURT:  Well, but stop there.

21          MR. STEWART:  Yeah, um-hmm.

22          THE COURT:  If that was, in fact, one of Mr. Orr's

23  justifications that he concluded -- I'm going to phrase it

24  slightly differently to fit my language --

25          MR. STEWART:  Um-hmm.

1      THE COURT:  -- a substantial likelihood of success

2  on the merits of his assertion that the transaction is

3  illegal --

4      MR. STEWART:  He wasn't that extreme, your Honor,

5  but I understand your point.

6      THE COURT:  In order for that justification to have

7  credibility, wouldn't he have to explain to the Court what

8  his legal analysis or factual premise for that conclusion

9  was, and when he does that, doesn't that open that up in a

10 way that violates the previous agreement not to go there in

11 this hearing?

12     MR. STEWART:  If we ask it in that way, yes, but,

13 frankly, the only question we would ask is please list the

14 things you took into account.  His deposition testimony was

15 that he looked at the papers filed in the case, and that was

16 the basis of his opinion.  That all having been said, if and

17 when Mr. Soto or FGIC raises this on cross, on redirect I

18 guess I get to go into it because, as your Honor has ruled,

19 the door now has been opened.  This is a long way of saying

20 I --

21     THE COURT:  Well, but this motion tests whether he

22 gets to say that on direct in the first place.

23     MR. STEWART:  Correct.  It does, but their brief

24 could not be more clear that they intend to educe it on

25 cross.  They intend to open up this issue.  That is why I'm

1  puzzled, I think, because then it's just a question --

2          THE COURT:  Well, doesn't it suit your interests to

3  wait and see if that happens, and then if the door is opened,

4  the door is opened?

5          MR. STEWART:  Yeah.  If they -- I think we could

6  live with that.

7          THE COURT:  All right.  Thank you.

8          MR. STEWART:  The more significant one, though, is

9  one that deals with this expert, Mr. Spencer, and let me --

10  we have to, I think, walk through the steps of what his

11  opinion is.  His opinion goes to feasibility, and his opinion

12  is this plan would not be feasible because of the COPs case,

13  and here is his string of logic.  Point one, if the city

14  prevails in the COPs case -- in other words, if it is true

15  it's a meritorious claim -- then FGIC or others similarly

16  situated would be in a position to counterclaim against the

17  city, which they've already done, or to go against the

18  Retirement Systems demanding disgorgement from them of the

19  proceeds of the original COPs deal.  And if that happened,

20  the Retirement Systems would thereby be underfunded by just

21  that much money.  It would turn back to the city and say,

22  well, now you must pay us more because we're underfunded

23  because of this claim made against us by FGIC.

24          Now, we have any number of defenses to this.  At the

25  highest level, it's peculiar that someone says I'm lucky I

participated in an illegal deal because if it had been legal,

I only would have gotten ten cents on the dollar, but because

I was so clever to do one that's illegal, I now get a hundred

cents. More fundamentally, it violates Michigan law that

there is no right of unjust enrichment, no claim for unjust

enrichment in the case of someone who loans money illegally

to a municipality. And I could go on, but I won't. What I'm

trying to point out is if Mr. Spencer does indeed make this

argument, he has opened up the can of worms because we would

then need to prove why it is not a valid argument, why it

would not be grounds to challenge feasibility, and we would

be going into this entire nest of issues on the merits of the

COPs litigation. This was nothing we raised. It's something

they raised. Now, fairly put, it is a rebuttal point. We

could hold off on this, and that is just fine by me, but the

motion in limine seeks to bar -- and the quote is "any

evidence related to the validity of the COPs claims." That's

actually what the papers say. They can't offer Mr. Spencer

with his expansive opinion that goes to feasibility and say,

"But by the way, city, we don't want you offering any

evidence relating to the validity of the COPs claims." They

can't -- and I know it's the cliche of the day, but that is

the sword and shield, your Honor.

Finally -- and then with that I'm done -- they have

in filings here challenged the adequacy of the COPs reserve

1   on the ground it has not taken into account their

2   counterclaims against the city arising from the COPs

3   transaction.  Those counterclaims have many theories.  One is

4   fraud.  The city defrauded them.  Others are unjust

5   enrichment and so on.  If they are, indeed, going to offer

6   proofs of that, they are, once again, at least opening the

7   door.  That doesn't mean when Mr. Orr is on the stand we

8   would necessarily go into it, but, once again, I don't think

9   this broad sweeping motion in limine is appropriate if that's

10  one of the arguments they intend to offer at our trial.

11  Thank you, your Honor.

12          MR. SHUMAKER:  Very quickly on the third head, your

13  Honor, and that is FGIC's request that all parties are

14  precluded from introducing evidence or testimony at the

15  confirmation hearing related to, "C," the terms and

16  conditions of the settlement negotiations leading to the

17  grand bargain to the extent such evidence is introduced for

18  the purpose of demonstrating that the plan meets the

19  requirements for confirmation under Section 1129.  I think

20  all the terms and conditions, the back and forth that took

21  place in terms of the settlement negotiations that culminated

22  in the grand bargain is covered by the mediation order, and,

23  of course, we're not going to be putting that in.  I don't

24  know what else they are after.  You know, Mr. Soto talked

25  about Mr. Rapson.  A lot of what I would suggest I've already

1   argued in connection with the other motion, but he suggested

2   that Mr. Rapson testified about why the Kresge Foundation

3   contributed what it did, and Mr. Rapson did that, but that's,

4   I think, not a terribly controversial point because there are

5   transactional documents that reflect exactly what the DIA and

6   the foundations did in connection with the money.  Again,

7   that is the result of the mediation process that is relevant,

8   what got spit out, if you will, from mediation.  And part of

9   that was transaction documents that indicate that the DIA and

10  the foundations' money should be directed to Classes 10 and

11  11.  It's explicit in the document, so I'm not sure exactly

12  what they're getting after, but I think that the -- what I

13  argued to you before about the mediation order covers the

14  vast majority of it.  Thank you, your Honor.

15          THE COURT:  All right.  Would anyone else like to be

16  heard on any of these issues in connection with either of

17  these motions in limine?

18          MR. GORDON:  Thank you, your Honor.  Again, for the

19  record, Robert Gordon on behalf of the Detroit Retirement

20  Systems.  I wanted to address, if I could, for a moment, the

21  hardship issue.  I heartily second Mr. Hertzberg's comments

22  and his efforts to put the Court's statements from the June

23  26th hearing in their proper context.  I think it was

24  being -- it was in the context of a motion to quash a

25  subpoena requesting granular information about individuals'

personal assets and income and things of that nature, and in
that context it was agreed that the hardship of individuals
was not going to be introduced, and, therefore, the
information was not needed. It became at least somewhat -- I
don't know I would say clear, but at least I became concerned
subsequently based upon Syncora and FGIC's questioning of
Mr. Orr in July, quite frankly, that they may be -- have been
interpreting what happened at the June 26 hearing differently
from what I had heard. Mr. Hackney says hardship qua
hardship. I think that the issue isn't hardship qua
hardship. It's the question of what was that hardship going
to be used for and what hardship data was going to be used.
And so at the August 6th hearing before the Court, that is
why I raised the question with the Court to make sure that
there wouldn't be confusion, and I'm guessing it's kind of
tacky to quote yourself, but don't worry, I'm going to quote
you, too, your Honor. I asked -- I said to the Court at that
time on the record, and I quote, "I just want to make sure
that it was clear or understood by all parties that if there
is information or an argument to be made as to the impact
more broadly on retirees, not just as creditors but more
specifically as a part of the entity that we are trying to
rehabilitate, that that is relevant and fair game in the
context of a Chapter 9," end quote. And your Honor said,
among other things, that the issue -- speaking about

1    hardship, "The issue always is the business justification for

2    the treatment from the debtor's perspective.  Now, to the

3    extent that issue encompasses consideration of a hardship, I

4    would leave it to the proponents of the plan to argue and

5    prove that," and I'll end the quote there.  I would submit,

6    your Honor, at that point with counsel in the room for

7    Syncora and I believe FGIC as well that it behooved them to

8    step forward if they thought that what was discussed with the

9    Court at that moment was not consistent with their

10   understanding of what evidence was going to be able to be

11   presented or not.  And it wasn't raised at that time, and

12   instead a strategic decision was made at that point to

13   instead pursue this motion in limine some three, four weeks

14   later.  So what might have been an honest misunderstanding

15   about what did transpire on the June 26th hearing date seems

16   to have turned into something more in the way of a strategy,

17   and I think it would be prejudicial to the city to not be

18   able to introduce this evidence.  I don't think there was any

19   intention to eliminate the ability of the city to address the

20   impact on the city, on its retirees, and on its active

21   workforce -- that is part of the city -- of the confirmation

22   or the inability to obtain confirmation of this plan.  Thank

23   you, your Honor.

24        THE COURT:  Thank you.  All right.  I'd like to --

25   oh, was --

1        MR. SOTO:  If I may for one second --

2        THE COURT:  Well, one second.  I think Ms. Patek

3    also wanted to speak in opposition to the motion, and then I

4    will hear you, sir.

5        MS. PATEK:  Your Honor, again, Barbara Patek for the

6    Detroit Police Officers Association.  I'll be very brief.

7    But we keep talking about the business judgment idea, and I

8    think we have to remember that we are in Chapter 9, and so

9    while we expect our municipalities to make businesslike and

10   fiscally responsible decisions, to suggest -- I think Mr.

11   Hertzberg hit it right on the mark -- that the human

12   dimension can't be considered I think is simply wrong because

13   at the end of the day, the city has to be able to govern, and

14   I'm speaking here -- I think Mr. Hackney acknowledged that

15   with respect to active employees, they are pensioners, too.

16   They are affected by these cuts, and there's going to be a

17   lot of evidence to deal with that problem, but I think even

18   more importantly this whole macroscopic idea of the city's

19   ability to govern as part of being able to have this plan

20   confirmed --

21       THE COURT:  Can you suggest a phrase better for us

22   to use here than "business justification"?

23       MS. PATEK:  I'll be happy to think about it.  I

24   can't come up with one off the top of my head.

25       THE COURT:  If you do, let me know.

1    MS. PATEK:  But I -- you know, it is a business

2  justification, but I think that's a broader concern because

3  if we can't pay the fees --

4         THE COURT:  I agree.  It's not a business case.

5  It's a municipal case, but I just can't think of a better

6  phrase.  Municipal judgment doesn't sound right either, so I

7  don't know.

8         MS. PATEK:  No, but we can't --

9         THE COURT:  We'll work on it.

10        MS. PATEK:  But the most important piece of it is at

11  the end of the day if we can't pay these people, we can't

12  just say, "Oh, well, let's just divide up the spoils among

13  the creditors and go home," and I guess that's the simplest

14  way I can put it.  I don't have a word or a catchphrase for

15  that.

16        THE COURT:  Mr. Soto.

17        MR. SOTO:  First, if I could take the clock back

18  just 15 minutes or so when you had addressed the question to

19  me, and you asked if we challenged whether or not these

20  retirees would suffer, and I think I like the way that -- I

21  think it was either Mr. Shumaker or somebody from this table

22  said, "We're not challenging the fact that individuals are

23  going to be affected."  That's -- we get that.  What we're

24  concerned about is, in fact, whether or not there's going to

25  be the kind of testimony that Mr. Gordon talked about at the

1    August 6th hearing and that the Court clarified at the August

2    6th hearing and that I stood up and asked the Court and the

3    Court clarified again; that is, macroscopic, macroeconomic

4    evidence of the type of hardship that would have been

5    discoverable also by the subpoenas that were quashed because

6    the subpoenas did several things.  They did ask for some

7    individual information that would have gone to whether or not

8    individuals were, indeed, doing bad, but they also asked for

9    general information, and I appreciate the way the Court put

10   it, if the city had the general information about, you know,

11   what the impact would be, and so I just wanted to clarify

12   that.

13         Secondly, on the issue of what it is that Mr.

14   Spencer's feasibility report does or doesn't do, I agree, Mr.

15   Stewart, that, you know, if on rebuttal we stood up and

16   brought the issue up, it would fly squarely in the face of

17   your May 28th admonition to everybody in this courtroom which

18   said if you open it up, then it's here.  It's in.  It's open.

19   What we're suggesting is that the first step for the Court to

20   do is to see if it's keeping it out altogether.  That would

21   keep it out for everyone, including us, and that's why we

22   took the position that if someone thought that the analysis

23   by Mr. Spencer regarding disgorgement -- the disgorgement

24   analysis did that, that we would withdraw it.  And I wanted

25   to reiterate that for the Court.

1         And then finally, with respect to the issue
2    regarding Mr. -- on the settlement issues, again, our
3    position is a little bit different on this one.  On the
4    settlement issue, our position is when you have 13 or 14
5    foundations that are addressed and that are dealing with it
6    and one person from one of those foundations makes an obtuse
7    statement that may or may not have been within the confines
8    of the mediation order, may or may not have should have been
9    withheld one way or another, that that shouldn't be used as
10   the example as the support for opening up this issue with
11   respect to all of those foundations when nobody on the COPs
12   side had an opportunity to take that discovery, and that's
13   all we're saying.  And I thank you for your patience.

14        THE COURT:  All right.  All right.  I'm going to
15   stretch this out here a little bit and ask to conclude our
16   arguments with the issue of Mr. Miller's testimony or being
17   called as a witness, and I'm going to allow each side five
18   minutes, please.

19        MR. HERTZBERG:  Your Honor, Robert Hertzberg on
20   behalf of the city.  If you look at our motion -- or if you
21   look at their response to our motion in limine and you look
22   at specifically paragraph 5 of the motion, they indicate that
23   they want to call Mr. Miller for, quote, "discussions with
24   DLC," Detroit Library Commission, "regarding the DLC's
25   pension and OPEB obligations."  There was a deposition taken

1 of a representative of the library, JoAnn Mondowney.  I hope

2 I'm pronouncing that right.  I'm not sure.  And the UAW

3 counsel asked her, if you look at page 77 -- she indicated

4 that they had one phone call on February 24th.  And it

5 continues on, and I don't want to burden the Court with

6 reading the deposition, but I think it's important the Court

7 get a sense of Mr. Miller's involvement in what they're

8 trying to elicit from Mr. Miller by bringing him in as a

9 witness.  If you look at page -- bottom of page 77, it says,

10        "The library's relationship to the city and the

11        fact that the UAW had approached the Jones Day

12        attorneys about the library relationship pension and

13        healthcare.

14        Question:  Okay.  Who said what about the

15        library relationship with the city in that phone

16        call?

17        Answer:  We said that the city served the

18        library's fiduciaries, that the city administered

19        our pensions, healthcare, and other post-employment

20        benefits.

21        Did you and/or Ms. Moore say anything else on

22        that topic?

23        No.

24        Do you recall whether Ms. Lennox or Mr. Miller

25        said anything about the topic of the library

1    relationship with the city?

2        No.

3        They didn't say anything?  Do you recall that

4    they did not say anything or you don't recall

5    whether they said anything?

6        Answer:  We explained the library's relationship

7    to the city.

8        Right.  And my question is did the two lawyers

9    from Jones Day say anything on the topic?

10        No.

11        Was there any discussion by anyone on that phone

12    call about what impact the city's bankruptcy might

13    have on the pension and OPEB library retirees and

14    employees?

15        Answer:  The discussion was basically around all

16    participants and the general retirement and

17    healthcare to the city being subject to

18    modification."

19    And finally two last questions.

20        "Was there any specific discussion on how the

21    retirees or employees of the library might be

22    impacted?

23        Other than as participants, no."

24    And when asked,

25        "On what occasion did you speak with them again?

1            Answer:  I have to recall because I can't

2            remember exactly when.  I never spoke again to Mr.

3            Miller, but I did speak to Ms. Lennox."

4        I think it's important that this whole request to

5 have Mr. Miller testify revolves around one phone

6 conversation that they had, which can be fully explained by

7 the witness who was called to the deposition, JoAnn

8 Mondowney.  UAW's response is that they -- or the UAW has

9 never responded to and has never shown a compelling need to

10 call Mr. Miller or extraordinary circumstances, which is

11 required when you have an attorney that you're seeking to

12 have testify as a witness.  UAW has never indicated why it is

13 relevant, Mr. Miller's testimony.  We have this witness who's

14 been deposed who can discuss the conversation, and as I've

15 indicated, I read to you the discussion she had with Mr.

16 Miller, or why they could not get the information from

17 another source; i.e., this witness.  The UAW appears to be

18 going to try and elicit testimony from Mr. Miller that it is

19 either subject to the attorney-client privilege or subject to

20 the mediation order.

21        Finally, there's a three-part test that they have to

22 meet in order to get Mr. Miller's testimony before this Court

23 that the testimony sought is neither privileged or

24 confidential.  They haven't addressed that, and you can't

25 tell from their response what they're trying to elicit from

1   Mr. Miller.  They have not indicated how the information is

2   relevant or vital to the case.  If you read their response,

3   they've never given any indication why it's relevant or why

4   it's vital.  And they cannot present the information -- and

5   why they can't present the information from another source.

6   As I suggested to the Court, the deposition shows the other

7   source.

8           Based upon that, I believe that Mr. Miller should

9   not be called as a witness; that they have adequate other

10  sources to gather the information from.  Thank you, your

11  Honor.

12          THE COURT:  Thank you, sir.

13          MR. DECHIARA:  Peter DeChiara for the UAW.  Your

14  Honor, the UAW has reason to believe that Mr. Miller is the

15  most knowledgeable person representing the city concerning

16  pension and OPEB benefits and is knowledgeable, uniquely

17  knowledgeable about how this Chapter 9 case may impact the

18  pensions and OPEB of the library.  So, for example, he would

19  be in a position to know whether, contrary to the city's

20  assertions in its papers, whether this -- the plan of

21  adjustment would reduce the library's contributions to the

22  GRS.  The city has asserted and insisted that this plan of

23  adjustment would not impact the library's obligations.

24          THE COURT:  But he has that knowledge only in his

25  capacity as a lawyer for the city.

1    MR. DECHIARA:  Well, he's a representative of the
2  city.  We do not at all seek any privileged information from
3  him.  For example, we don't seek any communications that he,
4  as a lawyer for the city, had with the city.
5    THE COURT:  All right.  What's the question you want
6  to ask him?
7    MR. DECHIARA:  We would want to ask him whether or
8  not the -- there are a couple, but one would be whether or
9  not the plan of adjustment would reduce the library's
10  obligations to pay into the GRS.  We would want to ask him --
11    THE COURT:  All right.  Stop there.  I take it by
12  your felt need to ask that question that it isn't clear in
13  the plan itself?
14    MR. DECHIARA:  It's not sufficiently clear.  There
15  are documents that suggest that that --
16    THE COURT:  If it's not clear, why isn't that just
17  an objection that has to be dealt with by the city, and why
18  is it necessary to call one of the city's lawyers to ask that
19  question?
20    MR. DECHIARA:  Well, as part of our -- of the
21  UAW's --
22    THE COURT:  There's lots about the plan that may not
23  be clear, but we don't call the city's lawyers as witnesses
24  to ask them what their view is of what the plan's answer to
25  that uncertain question is.

1      MR. DECHIARA:  Well, your Honor, we think it's

2   central and fundamental to the UAW's objection that this

3   plan --

4      THE COURT:  Fair enough, but why is the way to get

5   an answer to the question to call the city's lawyer as a

6   witness?

7      MR. DECHIARA:  Because we think he's the one who has

8   the answer, who is most -- who is best positioned to give the

9   answer to this Court, to make the record on that key point.

10  We don't believe the executive director of the library knows.

11  We don't believe the executive director of the GRS is --

12     THE COURT:  And that may be fair enough, but why is

13  the answer to call him as a witness as opposed to just insist

14  that they respond to the question in the context of

15  responding to your objections?

16     MR. DECHIARA:  Well, I'm not sure I understand, your

17  Honor.  We have taken written discovery of the city.  We have

18  the city's pretrial brief.  What we've gotten were a lot of

19  nonanswers or unclear answers, and we think, as is often the

20  case, to have a live witness who you can question and have a

21  back and forth to really flesh out the answer, and we don't

22  think it's been fleshed out to the extent that it needs to be

23  fleshed out, and that's part of why we're seeking to question

24  Mr. Miller.  It would not be an extensive --

25     THE COURT:  Well, that doesn't matter.  What's the

1 other thing you want to know?

2        MR. DECHIARA:  Another example would be why the city

3 needs to cut or why the city perceives it needs to cut --

4        THE COURT:  That's not a question for a lawyer.

5        MR. DECHIARA:  Your Honor, again --

6        THE COURT:  That's a question for the city.

7        MR. DECHIARA:  And, your Honor, Mr. Miller, in our

8 view -- and I don't think the city disputes this -- is the

9 person uniquely knowledgeable about these pension and OPEB

10 issues as relate to the plan and particularly as relate to

11 the library.  He's the one who could answer --

12        THE COURT:  But only in his capacity as a lawyer for

13 a client.  If the client can't answer that question, then the

14 plan isn't confirmed.

15        MR. DECHIARA:  Your Honor, I believe the way -- the

16 reality is that the city has various representatives.  Some

17 are elected officials, some are lawyers for the city, some

18 may be consultants.  There's a constant --

19        THE COURT:  Ah, but we in litigation mark the

20 distinction between lawyers and clients very carefully;

21 right?

22        MR. DECHIARA:  I'm sorry, your Honor.  Are you

23 asking me a question?

24        THE COURT:  Yeah.

25        MR. DECHIARA:  I'm sorry.

1    THE COURT:  We don't call lawyers to ask them

2  questions about, for example, their clients' claims.

3    MR. DECHIARA:  That's generally true, your Honor,

4  but here we have a situation where Mr. Miller, who is not

5  part of, as I understand it, the litigation team, per se --

6  he's not the one at this table --

7    THE COURT:  He's still the city's lawyer.

8    MR. DECHIARA:  Well, that may be true, but he's --

9    THE COURT:  It's not may be true.  It is true.

10    MR. DECHIARA:  No, no.  It's obviously true he's a

11  lawyer for Jones Day, which is counsel for the city.

12  Obviously that's true.  But functionally he is -- and in

13  reality he is the one who has the knowledge, who can answer

14  the questions that are key questions to the UAW's case.

15    THE COURT:  And I have to ask what I asked earlier,

16  which is why isn't it sufficient to deal with your concern

17  about that or your objection about that to simply say that if

18  the city itself can't answer that question, the plan won't be

19  confirmed?

20    MR. DECHIARA:  Well, we will argue that, but

21  we're --

22    THE COURT:  We're all set then.

23    MR. DECHIARA:  Well, your Honor, what we'd like to

24  do is make a record, make a factual predicate, so we'd like

25  to bolster whatever legal arguments we have based on written

1   responses we've gotten from the city with testimony.  We

2   don't think the city would be prejudiced by us --

3           THE COURT:  So by your theory Syncora would call Mr.

4   Bennett as a witness to testify why the city needs to

5   discriminate against his client.  I don't think so.

6           MR. DECHIARA:  No, and I wasn't --

7           THE COURT:  This trial is long enough as it is.

8   What's the distinction?  I can't see a distinction.

9           MR. DECHIARA:  Your Honor, I'm not familiar enough

10  with Mr. Bennett's role to speak to that, but I can speak to

11  Mr. Miller.  The UAW has been dealing with Mr. Miller, and he

12  is the one --

13          THE COURT:  Well, all right.  All right.  Let's

14  assume Mr. Hackney isn't satisfied with Mr. Bennett's

15  answers.  Then he calls Mr. Hertzberg, and then he calls Mr.

16  Shumaker.  I mean we don't do that.

17          MR. DECHIARA:  Yeah.  No.

18          THE COURT:  We just don't do that.  It's the city's

19  plan.  It's not the lawyer's plan.  It's not the lawyer's job

20  to testify in support of the plan.  It's the city's job.

21          MR. DECHIARA:  And, your Honor, I agree with you

22  entirely in general; however, in this case the individual who

23  represents the city who has the knowledge to answer the

24  questions that are relevant to the UAW's case happens to be

25  with Jones Day as opposed to in-house with the city or a

1    consultant to the city or what have you.

2         THE COURT:  If that's true, the city is in trouble.

3    Got it?  All right.  I'm going to take all of these under

4    advisement, and we will reconvene at ten after two.  I will

5    give you a decision on these then, and then we'll start with

6    the opening statements.

7         MR. STEWART:  Thank you, your Honor.

8         MR. DECHIARA:  Thank you, your Honor.

9         THE COURT:  Mr. Hackney has his finger up.

10        MR. HACKNEY:  Just the Buckfire <u>Daubert</u> motion is --

11        THE COURT:  Oh, I forgot that one.  Yeah.  We need

12   to argue it.  We'll come back at ten after two and argue that

13   one, too, yes.  Thank you.

14        THE CLERK:  All rise.  Court is in recess.

15        (Recess at 12:42 p.m., until 2:10 p.m.)

16        THE CLERK:  All rise.  Court is in session.  Please

17   be seated.  Recalling Case Number 13-53846, City of Detroit,

18   Michigan.

19        THE COURT:  It appears that all counsel are present.

20   Addressing first the motion at Docket 6978, Syncora's motion

21   in limine to preclude debtor from offering evidence relating

22   to, "A," the recoveries of Classes 10 and 11 independent of

23   the funds from the DIA funding parties and the state, and,

24   "B," the topics identified in Syncora's subpoenas to the

25   foundations.  The Court concludes that this motion should be

1    denied at this time.  It is denied, however, without

2    prejudice to Syncora's right to raise any evidentiary

3    objection it sees fit during the trial.  The Court agrees

4    with the city that as to Part A of the motion, the motion

5    really requests and would require the Court to resolve an

6    important legal issue in the case at this time, and the Court

7    is not prepared to do that and does not think it would be

8    appropriate to do so.  While it certainly would streamline

9    the trial, there's -- the Court concludes that the better

10   course is to allow each party to submit the evidence that is

11   arguably relevant to its view of the law applicable to the

12   case and then for the Court to determine that law and the

13   facts at the conclusion of the case.

14          As to Part B, which relates to the topics identified

15   in Syncora's subpoenas to the foundations, I can only say

16   that as a general proposition, relevance decisions that are

17   made during discovery apply at trial, but it's hard to grant

18   or even consider this motion in the absence of specific

19   questions to specific witnesses, so this motion will be

20   denied but, as I say, without prejudice to the right of

21   Syncora to object to specific questions on this ground.

22          The next motion is 6979, Syncora's motion in limine

23   barring the city from introducing communications protected by

24   the Court's mediation order.  This is related to 6985, FGIC's

25   motion in limine to preclude introduction of evidence or

1   testimony regarding matters withheld from discovery on the

2   basis of the mediation order.  Once again, the Court

3   concludes that both of these motions should be denied but

4   with this caveat.  The Court has enforced and will continue

5   to enforce strictly the confidentiality provision of its

6   mediation order, but, again, how that gets worked out in our

7   trial has to be determined on a question-by-question basis,

8   and to attempt to give any more guidance than that would not

9   be prudent at this time.

10          Addressing next 6982, Syncora's motion in limine

11  barring the city and plan supporters from introducing

12  evidence regarding the potential personal hardship of

13  pensioners, and 6990, FGIC's motion in limine to preclude the

14  introduction of evidence or testimony regarding certain

15  matters previously deemed irrelevant, the Court has ruled

16  before and maintains now that the impact of confirming the

17  plan on any particular creditor or group of creditors or

18  class of creditors is not relevant to whether the plan should

19  be confirmed, and the Court intends to enforce that ruling on

20  relevance throughout the trial.  Having said that, once

21  again, it is difficult in the absence of specific questions

22  to give advice on how that ruling may play out during the

23  trial, so that motion from Syncora and that part of FGIC's

24  motion are denied but, again, without prejudice to their

25  right to object to specific questions on the grounds of lack

1   of relevance.

2          FGIC's motion asked to preclude a couple of other

3   matters, one relating to the validity of the COPs claim.

4   Once again, the Court does not see and is willing to see the

5   relevance of the validity of the COPs claim to the issue of

6   whether the plan should be confirmed or not, especially in

7   light of the parties' apparent agreement -- I shouldn't say

8   apparent agreement -- I should just say agreement --

9   agreement not to permit discovery regarding the validity of

10  the COPs claim in connection with their preparation for this

11  hearing today, and the Court understands that the city does

12  not intend to present any such evidence in its case in chief.

13  In the circumstances, therefore, the Court will deny the

14  motion but, again, without prejudice.  To the extent that

15  FGIC seeks some kind of ruling or advice or guidance on how

16  this might affect its decision to question its expert

17  regarding this, the Court is unwilling to give that advice or

18  guidance at this time.  FGIC and its counsel should simply

19  decide on its trial strategy however it decides is in its

20  best interest and take into account what the consequences of

21  it might be and endure those consequences.

22          The final aspect of FGIC's motion 6990 asks the

23  Court to enforce its previous ruling that the negotiations

24  surrounding the grand bargain are irrelevant.  In great

25  measure, this is essentially the same motion as enforcing the

1  mediation order. Nevertheless, the Court has indicated that

2  who said what to whom in connection with the grand bargain or

3  any of the settlements, for that matter, in connection with

4  the plan that the city now seeks the Court to confirm is all

5  irrelevant, but having said that, once again, without having

6  the context of a specific question, it's hard to give a

7  specific ruling, so in the circumstances the Court will deny

8  the motion but, again, without prejudice.

9          And, finally, with regard to the city's motion in

10 limine to preclude its counsel, Evan Miller, from being

11 called as a trial witness, Docket 7001, the Court concludes

12 that this motion should be granted. The record fails to

13 establish adequate justification for the UAW to call the

14 city's counsel as a witness here, and, accordingly, the

15 motion is granted.

16         The Court will prepare orders on each of these.

17 Let's turn our attention now then to the two motions that

18 address the testimony of Mr. Buckfire. Those are 6787 and

19 6826, please.

20         MR. HACKNEY: Your Honor, before I begin my argument

21 on this Daubert motion, I do think after we're done and

22 before we start openings I would benefit from being able to

23 ask you one question about your ruling on the COPs invalidity

24 point and what constitutes opening the door on that. It will

25 actually affect our opening presentation, so I want to make

1  sure that I have --

2      THE COURT:  Well, why don't we just get it out of

3  the way now before I forget what the issue was?

4      MR. HACKNEY:  Okay.  So the -- I agree and accept

5  and embrace the idea that we're not going to litigate the

6  validity of the COPs in this case.  It is a fact, however,

7  that in his 30(b)(6) testimony explaining his discrimination

8  decision, Mr. Orr did say that the invalidity of the COPs was

9  something that factored into that.  Our view has been that

10 establishing that fact and then establishing that that's

11 actually inconsistent with the structure of the plan would

12 not be tantamount to opening the door to litigating the

13 underlying merits, but the colloquy that I heard you have

14 with both Soto and Mr. Stewart suggested that I may be wrong

15 in thinking that, and I -- since we don't intend to open the

16 door on this point, I wanted clarity on it before

17 Mr. Kieselstein does his opening and -- because what we do is

18 we lay out what he said and then articulate why we believe

19 the evidence will show that's not a valid basis for

20 discrimination, but we don't want to open the door --

21     THE COURT:  I have to think that if that is the

22 response you raise, that that's not a valid consideration,

23 that doesn't open any doors.  What would open a door is if

24 you were to argue, yes, our claim is valid or why did you

25 think it was invalid, all of that.

1    MR. HACKNEY:  Agree.  It is for the limited purpose
2    of establishing the inconsistency between taking it into
3    account and the way this plan is structured, not for the
4    purpose of debating the merits.
5         THE COURT:  Okay.  I think you're all set.
6         MR. HACKNEY:  That's very helpful.
7         THE COURT:  I think you're all set then.
8         MR. HACKNEY:  Your Honor, with respect to the
9    Buckfire Daubert motion that we filed, it's not my intention
10   to repeat the motion itself.  What I'd like to do is rise
11   above a bit and look at the clash you've seen now between the
12   city's brief and ours and give you thoughts on that in a
13   relatively rapid fashion so that we can get to openings.  The
14   first point, your Honor, is that I think the first sign of
15   trouble in many respects in the city's brief is that they are
16   asking you to weaken the standard of Rule 702 when they
17   articulate that the gatekeeping function of the Court is not
18   as important in a bench trial as it is in a jury trial, and
19   then they actually say that there is a liberal standard for
20   admission of expert testimony.  Now, that is inconsistent
21   with cases that are legion that say that it is actually a
22   requirement of Rule 702 in the Supreme Court's holding in
23   Daubert that trial courts, whether they're administering jury
24   trials or bench trials, rigorously apply Daubert's
25   requirements of a relevant and reliable methodology and good

1    grounds.  And while it is true that in a bench trial you have

2    the discretion to decide the timing of when you will make

3    that decision, it is not true to say that the standards

4    itself are weaker in a bench trial.  Rule 702 is Rule 702 in

5    a bench trial or in a jury trial.

6         The second important framing point I wanted to make,

7    your Honor, is that remember, too, that the burden is on the

8    city to establish the admissibility of its expert testimony.

9    They are the proponent, and so if you pick up the city's

10   brief on this point, you'll find an attack on FGIC and an

11   attack on the way we have articulated what we think

12   Mr. Buckfire should be doing.  You don't find an affirmative

13   statement of methodology by the city where the city says here

14   is the methodology.  This is why it's relevant.  This is why

15   it fits the legal determination.  And so I think it's

16   important to remind ourselves it's not the burden of us to

17   establish that it's inadmissible.  It is their burden to

18   establish that it is admissible.

19        Now consider after you have read our two briefs, set

20   them side by side, what are the things that are not disputed

21   between the two of them.  It is not disputed that

22   Mr. Buckfire did not conduct a dismissal analysis.  It is not

23   disputed that he did not prepare and has not seen a dismissal

24   forecast.  It is not disputed that he did not conduct any

25   analysis of increased taxes pursuant to an RJA judgment.  It

1   is not disputed that the person whom he purported to rely on,

2   not disclosed in his reliance materials, but it came up in

3   his deposition, Mr. Cline, also did not conduct any analysis

4   of an RJA judgment and what it would do to revenues.  He did

5   not analyze which claims have accelerated, which have not.

6   He did not analyze which agreements survive bankruptcy and

7   which do not.  He did not analyze potential asset sales if

8   the case were dismissed.  He did not analyze potential cost

9   rationalization if the case were dismissed.  In the face of

10   these admissions by the city, the city cannot establish a

11   relevant and reliable methodology.  We are talking about an

12   expert report, your Honor, that is three pages long.  There

13   are no work papers.  The reliance materials portray that he

14   spoke to no witnesses.  And remember the question of how

15   creditors would fare if the case were dismissed is a highly

16   complicated, highly disputed one because of the unique

17   attributes of this plan.  For example, under this plan, there

18   is significant discrimination between creditors whereas out

19   there in the dismissal world the city concedes recoveries

20   would be pari passu.  In a dismissal scenario, the city would

21   still have the DIA art collection and might do something

22   different from it than it is doing in this case, and it could

23   generate monies that were distributed to all creditors, not

24   just to the pensioners, so the question of what happens if we

25   dismiss this bankruptcy case to creditor recoveries is not at

all obvious, and yet Mr. Buckfire did not do the work that
would allow him to answer that question. Instead, his
opinion can be boiled down to there's a race to the
courthouse, and I believe it's obvious that that would be bad
for everyone. It is the classic type of ipse dixit opinion
that the courts consistently reject.

Now, if you put the problem of methodology to one
side, there is a second problem, which is the assumptions
that Mr. Buckfire's opinion are based upon were not
adequately vetted by Mr. Buckfire. In the city's brief, you
see them tearing apart straw men. So they say, for example,
Mr. Buckfire assumed rates are at statutory maximums, and, in
fact, rates are at statutory maximums. Creditors cannot
compel sale of assets. The grand bargain does go away in a
dismissal scenario. Yes, those are all assumptions that
Mr. Buckfire made that are, in fact, correct. Those aren't
the assumptions that we're talking about. We are talking
about, number one, his assumption that increasing taxes will
erode revenue. He did nothing, and Mr. Cline, on whom he
relied, did nothing. And what you are seeing in their brief
is nothing short of remarkable on this point. They are now
saying, well, they concede that, but you know what? We will
introduce supplemental declarations from Mayor Duggan or
Kevyn Orr that in their opinion raising taxes would erode
revenue and have the four or five different impacts on the

1   city that they articulate in their brief.  Now, think about

2   that for a second.  Think about where the city has come to on

3   this point.  They have Mr. Buckfire, who's an expert.  They

4   have Mr. Cline, who's an expert.  Neither of them evaluate

5   this question, and the city, in order to support

6   Mr. Buckfire, purports to rely on lay opinion testimony under

7   Rule 701.  They have two fundamental problems with that, your

8   Honor.  Point one, Mr. Buckfire himself didn't rely on it.

9   If you look at his reliance materials, he doesn't say he's

10  relying on Mayor Duggan's opinion that raising taxes is a bad

11  idea.

12          Point number two is this is not something that's

13  capable of lay opinion testimony, and what's interesting

14  about this is that you actually had a significant engagement

15  on the very subject of lay opinion testimony in the

16  eligibility trial, and it is critical to understand that

17  hypothetical questions are the classic hallmark of expert

18  opinion testimony under Rule 702, not lay opinion testimony

19  under 701, because 701 is typically reserved for the personal

20  experience of a lay witness that does not require the

21  application of specialized knowledge.  Those are two of the

22  hallmarks, in fact, the literal test under 701.  The

23  hypothetical question of what would happen in a dismissal

24  scenario if taxes were increased pursuant to a judgment to

25  city revenues is the quintessential Rule 702 testimony.  You

1    cannot have a witness come in as a layperson and say this is

2    what I think about that both because it's opinion testimony

3    that's not appropriate and because that person does not have

4    the specialized training to say that, and this is entirely

5    consistent with JGR, which is the Sixth Circuit case that was

6    at the crux of your analysis in eligibility.  Think about

7    what happened in JGR.  You had an attempt to use a lay

8    witness who was an accountant and an attorney to testify on

9    the subject of lost profits and business interruption.  And

10   what the Court said was that person ought not to have been

11   allowed to testify both because they relied on hearsay -- and

12   you can see from the proffered grounds of why Mayor Duggan or

13   Mr. Orr or whomever these people with the supplemental

14   declarations would be, that they would be relying on things

15   that they were told by others and also that the information

16   is of the quintessential sort that's specialized in nature.

17   So this is a situation where we disagree that they can

18   attempt to prop Mr. Buckfire up with a lay witness testimony.

19           In addition, your Honor, there are additional

20   assumptions where Mr. Buckfire simply has not done the work

21   to support the assumption.  He testifies that the city is

22   service delivery insolvent but admitted that he hasn't really

23   evaluated the extent of the service delivery insolvency, and

24   that's a flawed methodology when there have been, by the

25   admission of the city's own witnesses, changes in the level

1    of city services as a result of the bankruptcy.

2         In addition, he assumed that the city would not be

3    able to implement the reinvestment initiatives in a dismissal

4    scenario and that that would lead to eroding revenues of the

5    city, and, again, he did not adequately perform a methodology

6    that would involve testing that assumption to determine

7    whether or not it's correct or not because, of course, he

8    doesn't have a dismissal forecast that would allow him to see

9    what funds above operating expenditures the city might have

10   to invest, so you don't only have the problem of no

11   discernible methodology in Mr. Buckfire's three -- I'm

12   sorry -- three-paragraph, two-page opinion.  You also have a

13   number of assumptions that are just offered in the same sort

14   of ipse dixit way where the expert has not taken the time to

15   assess the underlying assumption, test its reasonableness.

16   And that's the argument in sum and substance.

17        THE COURT:  Thank you.  Anyone else on this one?

18        MR. SOTO:  Ed Soto, your Honor, on behalf of FGIC.

19   Our brief tried to address more issues of methodology and not

20   simply repeat the same ones.  I don't think there is any

21   doubt Mr. Buckfire has proffered four short paragraphs in

22   support of his opinion on the city's creditor -- that the

23   city's creditors will fare better under the city's plan than

24   if the bankruptcy were dismissed, and his opinion fails, we

25   believe, every one of the three requirements of Daubert, and

those are the requirement of reliability, the requirement of

his qualifications, and the requirement that it ultimately

would be helpful to this Court.  And I'm going to try to

touch on some issues that address those three requirements.

I agree with Mr. Hackney that there is no doubt that

certainly a trier of fact when the trier of fact is the

Court, it certainly means that the Court might have more

leeway in the timing of when something should or shouldn't

come in, but Dauberts are different than motions in limine,

and the key difference is that the Supreme Court has said

that the Court has a gatekeeping function to assure that

expert testimony that's inadmissible is simply inadmissible,

and it shouldn't come in, and that's why the Dauberts are

treated a bit differently and the gatekeeping function is

highlighted a little more.  And, again, Daubert's general

principles apply to expert matters described in 702, and that

includes the kinds of expert opinions that Mr. Buckfire is

trying to give on best interest.

So turning now to the reliability prong of Daubert,

which, again, this Court is required to assess, the Sixth

Circuit has held that this prong requires District Courts to

determine whether the principles and methodologies underlying

the testimony itself are valid.  The Sixth Circuit has

explained that in order to meet this requirement, the

expert's opinion must rest on some form of reliable

foundation, and I'm quoting from <u>In re. Scrap Metal</u>, which
was an antitrust case here in the Sixth Circuit a couple
years ago, and it's in our briefs.  Otherwise the expert's
opinion will constitute nothing more than his or her own --
and, again, they use that word ipse dixit.  And I -- you
know, it's not just -- not a word that I was familiar with,
so, again, I looked it up.  And in this one, ipse dixit is
sort of like when someone looks at you and says it's so
because I say it's so.  And there are a number of different
examples that they give, but that's the general one.  The
requirement that an expert be doing something more than that
absolutely applies in the context of Mr. Buckfire's expert
testimony, and, again, there's a distinction between
Mr. Buckfire's factual testimony because he is proffered as
both a factual witness and an expert witness, and we're only
addressing the expert testimony as it goes to best interests.

So what it requires is a necessary -- Mr. Buckfire's
best interest opinion precisely addresses this issue of ipse
dixit.  As you're probably aware, to satisfy best interests,
the creditors in the context of this Chapter 9 case has to
show that the creditors would fare better under the plan than
if the case were dismissed, and, again, that requires a
comparison of the creditors' recoveries under the plan with,
you know, estimated creditor recoveries outside of the plan.
And that comparison by its very nature requires an expert to

1  actually have evaluated and estimated what creditor

2  recoveries would be outside of the plan possibly in a

3  dismissal scenario.  And the only way to do that is to

4  actually consider all of the various complex issues that

5  ultimately determine what creditor recoveries would be within

6  the plan and in a dismissal scenario.  Now, for instance, the

7  debtors, what are their forecasted revenues, the value of the

8  debtor's assets, the possible monetization of any assets,

9  remedies that might be available outside of the context.

10 There are any number of things that were very clearly obvious

11 to be considered in connection with this best interest

12 analysis, how the debtor would use revenues.  This is not

13 made up analysis as the city argued in their brief.  It

14 simply is the way that -- you know, to lead to a reliable

15 conclusion on best interest.  In fact, the Court in In re.

16 Barnwell considered these exact factors in evaluating the

17 best interest test under a 943 scenario, and that's cited in

18 our briefs as well, your Honor.  There the Court considered,

19 one, the debtor's revenues in the absence of the proposed

20 plan; two, the value of the debtor's assets in the absence of

21 the proposed plan; three, the likely distribution of assets

22 to creditors in the absence of the proposed plan.  These are

23 the exact same factors that if you look at our brief we're

24 saying Mr. Buckfire specifically didn't consider.  It's not

25 arbitrary that we come up with these factors or unsupported.

1   They come from the case law.  The fact that the <u>In re.</u>
2   <u>Barnwell County Hospital</u> case ultimately turned on different
3   facts has absolutely no bearing on the types of general
4   overarching factors that courts should consider when they're
5   assessing the best interest analysis.  But Mr. Buckfire
6   failed to appropriately consider any of these factors.  In
7   fact, he made no effort whatsoever to systematically estimate
8   creditor recoveries in a dismissal scenario whether through
9   an estimated dollar or percentage amount or any other
10  formula.  Here are the clips of Mr. Buckfire's deposition
11  that I think are most relevant for the Court to hear.  I'm
12  hoping it's Mr. Buckfire.
13      (Deposition clips played at 2:38 p.m. as follows:)
14          "Question:  Isn't it true that in coming to your
15          opinion that creditors do better under the plan than
16          they would do in a dismissal scenario, you did not
17          construct a forecast of the city's revenues and
18          costs in a dismissal scenario; correct?
19          Correct.
20          And I take it you've never sat down with a piece
21          of paper and tried to work this out, right, in terms
22          of what the total claim size would be; correct?
23          Correct.  We have not done a dismissal
24          analysis."
25      (Deposition clips concluded at 2:38 p.m.)

1          Mr. Buckfire also admitted that he didn't do any
2    analysis as to how the city would use any surplus revenue to
3    satisfy creditor claims, and he admitted that he didn't do
4    any analysis as to whether the city could or would monetize
5    its assets in a dismissal scenario, including the DIA assets,
6    and how the monetization would impact any creditor
7    recoveries.  That's a really important issue in this case,
8    your Honor.  These are only a few of the relevant factors
9    that Mr. Buckfire readily admitted he didn't analyze in
10   coming up with his opinion, and it's not just Mr. Buckfire
11   who failed to conduct this analysis.  None of the city's
12   witnesses or representatives have filed, produced, or
13   otherwise provided any systematic or thorough dismissal
14   analysis that evaluates these factors that Mr. Buckfire could
15   rely on, and without that kind of analysis, an expert simply
16   cannot reliably estimate creditor recoveries in a dismissal
17   scenario or opine how creditors' recoveries in a dismissal
18   compare with the creditors' recoveries under the plan.
19         Your Honor, it's instructive to consider how
20   Bankruptcy Courts have approached the best interest analysis
21   in the context of Chapter 11 cases, although we're not in
22   one, but, again, they also reviewed those same factors, and
23   this was known to everyone when Mr. Buckfire was selected as
24   an expert to address that issue.
25         In this regard, I would point your Honor to the

1  report of FGIC's expert, Steve Spencer, who we've discussed a

2  little bit this morning, which was attached to our <u>Daubert</u>

3  motion, and that report stands in stark contrast to

4  Mr. Buckfire's report.  Mr. Spencer --

5       THE COURT:  Okay.  But what he said or did isn't

6  relevant to whether Mr. Buckfire's testimony is admissible.

7       MR. SOTO:  Well, what it's relevant to is to

8  determine what would you look at if you were trying to do a

9  dismissal scenario.  That's all.  And if the Court is happy

10  with that issue, we'll move on.

11       THE COURT:  Well, but, again, what he did or didn't

12  do doesn't tell me anything about what the law requires.

13       MR. SOTO:  No.

14       THE COURT:  It only tells me what he did.

15       MR. SOTO:  No.  I was using it --

16       THE COURT:  All right.

17       MR. SOTO:  -- as an example of what the law was.  We

18  just went through what the law requires by going through

19  the --

20       THE COURT:  All right.  All right.  Let's just let

21  that rest there then.

22       MR. SOTO:  And, your Honor, we're not talking about

23  whether Mr. Buckfire's opinion -- this is the other thing

24  that came up in the briefs.  I'm trying to respond to the

25  arguments in the briefs.  One of them was that, well, Mr.

1    Soto, really all you're saying is his opinion is weak, so

2    show it.  Show it.  Put him on the stand and show it.  But

3    that's not what we're talking about here.  We're talking

4    about a witness who did not do any of the analysis that's

5    required in order to give his interest opinion -- his best

6    interest opinion in the first place.  That's a little

7    different than the motions in limine that we just argued.

8    This is that gatekeeping function.  Instead of using a

9    reliable methodology, Mr. Buckfire assumes that the

10   creditors' recoveries in a dismissal would be de minimis.

11   It's literally a three-page order, and I won't repeat what

12   Mr. Hackney said about that, but that's what he does.

13          One of the assumptions that Mr. Buckfire addressed

14   was, for example, whether or not a city like Detroit could

15   choose like any other municipality could choose to monetize

16   an asset, sell it if it wanted to to address issues, because

17   the critical assumption is that somehow creditors -- and, of

18   course, he's right -- creditors couldn't force the City of

19   Detroit to sell these assets.  That has nothing to do with

20   whether or not the city -- whether in analyzing best interest

21   the city might elect to do that and might elect to do it for

22   any number of reasons, including its desire to continue to do

23   business with third parties that are owed money or any other

24   reasons.  So beyond that, your Honor, and, again, to get

25   around the issues that Mr. Hackney has already addressed,

there are other assumptions that Mr. Buckfire makes that are

unsupported.  For instance, he makes the unsupported

assumption regarding, as you heard before, the race to the

courthouse.  Again, he assumes that creditors' recoveries in

a dismissal will be de minimis.  Mr. Buckfire engaged no

analysis whatsoever regarding the claims or sources of the

claims that would result in this so-called race to the

courthouse.  Here again, Mr. Buckfire's response as to why no

such analysis was performed was that, look, we thought it was

pretty obvious people would run to the courthouse.  His

assumptions regarding the courthouse are, therefore, again,

totally unmoored in any analysis, in any methodology, or in

any facts that anybody could address.  While the city's

opposition focuses on the fact that a race to the courthouse

would, in fact, occur, that argument misses the point that

the Daubert law makes.  The more salient point for purposes

of Daubert is that Mr. Buckfire simply assumed it.  He did

nothing to substantiate it.  That's the distinction here on

Daubert from the other arguments we were making this morning.

Mr. Buckfire also made unsupported assumptions regarding the

availability of benefits of the grand bargain funds.

According to Mr. Buckfire, creditors would have -- would not

have the benefit of hundreds of millions of dollars stemming

from the grand bargain in a dismissal scenario, but

Mr. Buckfire testified that he never evaluated whether the

1  city would be able to solicit funding from the grand bargain

2  participants in the dismissal scenario, again, another issue

3  that we only tangentially touched this morning.

4      What's more, Mr. Buckfire's best interest opinion

5  extends to all the city's creditors, yet, as Mr. Buckfire

6  acknowledged at his deposition, only the retirees benefit

7  from the proceeds of the grand bargain.  He understood that.

8  That means that even if the proceeds of the grand bargain

9  were unavailable in a dismissal scenario, that certainly

10  wouldn't change anything for the COPs claims recoveries, and

11  yet Mr. Buckfire made no attempt to address that issue or to

12  support those assumptions.

13      THE COURT:  Let me ask you to wrap up, please.

14      MR. SOTO:  I will.  So beyond the unreliability and

15  beyond the unsupported assumptions is the issue of would it

16  be helpful.  And, again, I think this Court is certainly able

17  to address the issues that Mr. Buckfire addressed without any

18  assumptions.  Your Honor, you don't need Mr. Buckfire to make

19  the same unsupported assumptions.  If you want to make them,

20  you could make them.  The difference is you're the Court, so

21  his testimony won't assist the trier of fact in any way, and

22  we think it should be excluded under Daubert.

23      MR. CULLEN:  May it please the Court, Thomas Cullen

24  of Jones Day representing the city and opposing the motion.

25  I think what --

1          THE COURT:  Well, here's my question for you.

2          MR. CULLEN:  Yes.

3          THE COURT:  Is there anything more to Mr. Buckfire's

4    opinion than this?  He assumes the city cannot be compelled

5    to sell assets.  He assumes that creditors cannot lien

6    assets.  He assumes the city cannot raise taxes, and he

7    assumes that none of the grand bargain benefits would flow to

8    creditors in the case of a dismissal and that as a result of

9    all of those assumptions, creditors would get little or

10   nothing in the event of dismissal.  Is there anything more to

11   what he says than all of that?

12         MR. CULLEN:  Yes, there is, your Honor.  First --

13         THE COURT:  Well, I want to hear what that is

14   because if that's all there is to it, then I have to agree

15   with Mr. Soto that that's not helpful.

16         MR. CULLEN:  First, your Honor, note the nature of

17   Mr. Buckfire's expertise and his role in this case.  He is

18   the one who constructed and went to the market with -- and

19   went to the creditors with all of the financial instruments

20   that are at issue in this case.  He had to construct those

21   financial instruments so that they would be saleable to the

22   creditors and saleable to the market.  He had to construct

23   them on a basis of the plan itself and take the money for

24   those instruments and the expectations embodied in those

25   instruments out of the plan.  Very early on, as he testified

1   on deposition, he did a priority analysis with respect to the

2   creditors in the absence of a bankruptcy proceeding, and he

3   testified on deposition that the COPs claims in that priority

4   analysis, for instance, are swamped because of the size of

5   the other claims and the nature of their priorities in any

6   waterfall setting.  His specific expertise, which is the

7   financial plumbing, if you will, of something like this, is

8   precisely saying what is and what is not a saleable credit.

9   In the context of the bankruptcy, he is saying on the basis

10   of all of this that Detroit is not a bankable credit without

11   this plan.  It cannot access markets.  That's one of the

12   punch lines.

13        THE COURT:  Okay.  But that conclusion isn't being

14   challenged here.

15        MR. CULLEN:  But that's part of the best interest

16   conclusion.  In this case, as your Honor knows better than I,

17   that so many of the standards overlap because the elements

18   overlap, and part of the issue is here that they are

19   criticizing Mr. Buckfire merely for using his judgment based

20   on all of these things that if he were advising a client this

21   is in your better interest, that's his judgment.  He is

22   qualified to make that judgment.

23        THE COURT:  Right, but how is that judgment helpful

24   to the Court?  It has to -- it has to be helpful.

25        MR. CULLEN:  Well, I believe it is --

1    THE COURT:  If all it is is if the case is

2  dismissed, the creditors can't access the markets, access

3  assets or access taxes, therefore, they're better off through

4  the plan than they would be in a dismissal scenario, how is

5  that helpful to me?

6    MR. CULLEN:  It is --

7    THE COURT:  That's like duh.

8    MR. CULLEN:  It's a judgment, your Honor, and it's a

9  judgment by a man qualified to make these judgments.  I can

10  make this argument based upon the papers.  I can make the --

11  I could make all of those arguments based upon the

12  eligibility record and the eligibility findings of the Court,

13  but in terms of making a judgment that this financial

14  structure is better than that financial structure for the

15  creditors and using the stand-alone projections, the

16  projections without the plan, Exhibit J to the plan, as a

17  proxy for the analysis, that's -- that is helpful to the

18  Court.  I would also submit that helpful to the Court is the

19  idea of why, if this other analysis from Mr. Spencer is to be

20  offered, other kinds of dismissal analyses are going to be

21  offered, that he can testify in his expert opinion that

22  that's the inappropriate analysis to do in this case as to

23  why he didn't do it, why he made the judgment that that was

24  an inappropriate analysis.  And it's not just assuming with

25  respect to these things.  It is based upon the record in this

1   case that these things are established and if they're

2   established, what consequences --

3           THE COURT:  What is it you assert that is

4   established that he relied on?

5           MR. CULLEN:  Well, that there's a reasonable basis

6   for the assumption that the city can't raise taxes.  There's

7   a reasonable basis for the assumption that the city cannot be

8   compelled to sell assets, things which Mr. Hackney says he

9   agrees on now, so what does that mean to -- what do all of

10  those things mean to a financial creditor in the absence of

11  the plan?  And he's a man who makes his living devising these

12  instruments and notes and advising financial creditors on

13  whether this is a good one or whether that's a bad one, and

14  that is to some degree cumulative evidence but evidence of

15  this.  Part of what is the premise -- the premise of the

16  argument here and the premise of the attack on Mr. Buckfire

17  is that on the one hand I agree with the Court, and I agree

18  with some of the cases that in this kind of a setting, the

19  feasibility -- the best interest test should not be one of

20  the hardest things in this case.  There are other tougher

21  issues than this because of these self-evident propositions

22  that underlie the analysis, but those self-evident

23  propositions, some of them self-evident, some of them

24  established in eligibility or elsewhere, some of them

25  established by the testimony of other witnesses, all of those

1  things have to be subjected to a level of judgment, and it

2  isn't ipse dixit to supply judgment to a set of facts.

3  Daubert doesn't say that.  No one says you have to have a

4  model or you have to have a qualitative answer in order to

5  submit an expert opinion.  And I think underlying here,

6  stepping back again, your Honor, on this is that -- and this

7  is to some degree, I think, responsive to your nomenclature

8  question of earlier.  I think what is absent from this

9  objection and from the scenarios they spin out for the city,

10  one, is any sense of reality.  Number two is any concept that

11  the city has a civic responsibility that it can have a

12  justification for its actions based in its civic

13  responsibility.  The dismissal scenario they want to play

14  out, the liquidation scenario, is specifically outside the

15  realm of -- outside the realm of Title 9, so what we're --

16          THE COURT:  Well, but, see, now you're arguing the

17  weight to be given to this witness' testimony compared to

18  others, not its admissibility.

19          MR. CULLEN:  Well, and that's what I was going to

20  start out with, your Honor, the two cases they cite.  Let's

21  look at those cases.  In one, the Dura case, where they cite

22  for the mouthpiece point, that was actually -- it's

23  interesting to look at the procedural posture.  What had

24  happened is that a hydrogeologist had testified on the basis

25  of a flow model about participation and pollution.  It turned

1  out he hadn't conducted that analysis or he hadn't even --

2  and that analysis hadn't been subject to discovery, so how it

3  came up was to fix that problem they put in two affidavits of

4  the people who had conducted the study and who were expert in

5  that kind of mathematical model.  The District Court said

6  these are expert reports, these declarations, and they are

7  late, and, therefore -- and, therefore, they're out, and

8  there is nothing in the record that can arguably support

9  this.  But if there is something, if there is something in

10 the record to arguably support an expert's opinion, if there

11 is some basis for the assumptions -- and here we have

12 assumptions that have a strong basis to which he applied

13 seasoned judgment -- then they're let in.  And that is the

14 Scrap Metal case, so if you look at the language there, the

15 Court is pretty strong where it says, "Even if I don't agree

16 with the assumptions, that's for the trial.  We can litigate

17 out these different assumptions."

18          THE COURT:  Let's pause there.

19          MR. CULLEN:  Okay.

20          THE COURT:  It seems to me the strongest argument

21 that the movants here make in challenging Mr. Buckfire's

22 several premises relates to the RJA tax.  Buckfire says that

23 won't result in any significant revenue for the creditors --

24          MR. CULLEN:  Yes, your Honor.

25          THE COURT:  -- right?

1          MR. CULLEN:  Yes.

2          THE COURT:  Where's his analysis on that?  Where

3    does that come from?  What's the basis for that?

4          MR. CULLEN:  Well, if I may, your Honor, that there

5    has been no political figure associated with the city from --

6    let's cast our minds back to the eligibility trial and the

7    Court's review of all of the public reviews of what the city

8    could and could not do there and the fact that the city was

9    in a desperate situation and could not, consistent with

10   maintaining its population and its economics, raise its

11   taxes.  That was the consistent message of every study the

12   Court looked at.

13         THE COURT:  But this is a different question.  This

14   is not the city voluntarily raising its taxes.  This is the

15   city being mandated by a court to raise its taxes to pay a

16   judgment.

17         MR. CULLEN:  With all due respect, your Honor, that

18   requires -- and we've submitted a supplemental report on

19   that -- the fact that the city's assets, as Mr. Buckfire had

20   analyzed them over the course of this case, including the

21   analysis he went through at the very first hearing on

22   eligibility where we went through, if the Court will recall,

23   in detail all of those assets and the availability of the tax

24   base of the city as a source of revenue, we have made the

25   judgment all along and the responsible parties have made that

1    judgment that this is disastrous for the city.  And based

2    upon the uniform course of disaster for the city and raise

3    taxes, that is a reasonable assumption for him to make.  It

4    is reasonable for him to say that there's not --

5         THE COURT:  Well, but pause there because unless I

6    am missing something, his testimony as to what the basis of

7    that assumption was wasn't any of that; right?  It was Mr.

8    Cline who he, I think, testified did an analysis that he

9    relied on, but Mr. Cline did no such analysis.

10        MR. CULLEN:  This gets back a little bit to the Dura

11   case; right?  Mr. Cline is in Ernst & -- is in a group within

12   Ernst & Young.  Working with Mr. Cline is a Ms. Sallee, who

13   analyzed the property tax rates and the property tax basis.

14   It was Mr. -- Ms. Sallee reported to Mr. Cline.  All of that

15   work was part of what was going on here at the same time, and

16   if Mr. Buckfire referred to Mr. Cline, I think he was

17   referring to Mr. Cline's operation, which includes Ms.

18   Sallee, who did do the analysis.  So in this connection, what

19   we're really saying -- what we're really hearing here is

20   Mr. Buckfire didn't assume things that he knew not to be true

21   or felt -- had concluded were not true.  He didn't do an

22   analysis that he thought was not useful in this connection,

23   and now they say that he should have -- he needed to -- in

24   addition to exercising his professional judgment, he needed

25   to have a piece of paper that had numbers on it, whether he

1    thought those numbers were speculative or not, and he needed

2    to assume things about the city that the grand bargain

3    survives, that there's money for reinvestment, that there's

4    money in this already over-taxed tax base.

5         THE COURT:  No.  The argument is not that he should

6    have assumed that.  The argument is that he should have

7    investigated that.

8         MR. CULLEN:  Well, I submit, your Honor, that some

9    of the things they asked him to investigate are -- they say

10   assume that pigs fly, and then they ask him to say, well, has

11   he studied the aerodynamic qualities of pigs.  He didn't do

12   it because he concluded in his expert judgment that some of

13   it was just dumb, and he'll testify to that.  And the reason

14   that the lay testimony is useful on this is that I don't

15   think that it is really possible for anybody acquainted with

16   this city to get up there and testify as a fact witness that

17   any of these things could possibly happen; that there's any

18   factual basis for the idea that, oh, the grand bargain gets

19   reconstituted, oh, we impose a confiscatory tax rate and

20   people flock to this overtaxed city.  Oh, we sell everything

21   in the place, and that's all better for creditors.  No one

22   has -- no real person thinks those are real ideas.  No real

23   person will testify to that.  You can get a lawyer, you can

24   get an economist, you can run a model, but no real person

25   believes any of that, and so Mr. Buckfire did not test those

1   assumptions.

2         THE COURT:  All right.  So that circles back to my

3   original question.  If all he's testifying to is in the case

4   of a dismissal, there's no money for creditors, therefore,

5   the plan is better for creditors, why do I need him?

6         MR. CULLEN:  It helps, with all due respect, your

7   Honor, that there is a record here about how this entity will

8   be viewed by financial markets and by investors and by

9   creditors inside and outside of bankruptcy.  We all have our

10  opinions on that, some at the top of our lungs.  Mr. Buckfire

11  has the opinion of someone that the objectors identify as an

12  expert in these instruments and in these markets, and he can

13  testify --

14        THE COURT:  Okay, but let's pause there.  Does he

15  link --

16        MR. CULLEN:  -- one is better than the other.

17        THE COURT:  Does he link the city's access to

18  capital markets, a judgment which is not contested here, to

19  his conclusion that the plan is in the better interest of the

20  creditors compared to dismissal?

21        MR. CULLEN:  Yes, your Honor.  I believe he did on

22  the depositions.

23        THE COURT:  What's the link?  That doesn't jump off

24  the page at me.  What's the link there?

25        MR. CULLEN:  Well, the creditors -- nearly all of

1  the creditors are going to get paid with city paper of some

2  sort.  If the city is giving them paper, which is paper like

3  any other in financial markets, the city's creditworthiness,

4  the fact that the city has a bankable credit, is linked to

5  that.  That's the currency we're paying.

6          THE COURT:  Right, but that's a different question.

7  The question -- the best interest question is if the case is

8  dismissed, how is the city's lack of access to the credit

9  markets going to impact creditor recoveries?

10         MR. CULLEN:  We have no -- we have no currency in

11  which to pay them.  The currency which is available in notes

12  against a solvent city that doesn't need new access to the

13  capital markets is not there, so we have no currency with

14  which to pay them.  The only currency, the only currency is a

15  confiscatory property tax rate.  So without any currency or

16  access to currency, it would have --

17         THE COURT:  So the judgment -- so the judgment,

18  just, you know --

19         MR. CULLEN:  Okay.

20         THE COURT:  -- in kindergarten terms, the judgment

21  is the city wouldn't be able to borrow money to pay its past

22  debts.

23         MR. CULLEN:  That's part of it, your Honor, yes,

24  sir.

25         THE COURT:  Been there, done that, don't want to do

1    it again anyway.

2            MR. CULLEN:  Precisely, your Honor, precisely.

3            THE COURT:  Well, again, why do I need him to tell

4    me that?

5            MR. CULLEN:  We thought it would aid the Court.

6            THE COURT:  You can call me as a witness.  I've

7    already said the city is done making bad deals.  Strike that.

8    I didn't mean that.  I didn't mean that.

9            MR. CULLEN:  We meant it to aid the Court and the

10   record --

11           THE COURT:  I can see the headlines now, Judge says

12   city should call him as a witness.

13           MR. CULLEN:  We did it to aid the Court in coming to

14   these conclusions with a person who has the credibility to

15   come to these conclusions based upon his career and based

16   upon his talents.  This record is going to travel outside of

17   this courtroom.  It will be in front of -- with all due

18   respect to the Sixth Circuit, it will be in front of judges

19   who haven't worked this case as hard as you.  It will be in

20   front of other people who'll want to find different ways into

21   this complex set of events and into the --

22           THE COURT:  Well, but Rule 702 doesn't allow me to

23   admit otherwise inadmissible expert testimony because the

24   Court of Appeals might need it.

25           MR. CULLEN:  No, your Honor, but we all have a

1   responsibility to the record, number one, and what is

2   required -- and I think a close reading of both Scrap Metal

3   and Dura says that what we need is an expert with

4   qualifications.  What we need is a reliable method, the

5   method he uses to value securities and to look at financial

6   markets, and then he can make a judgment.

7            THE COURT:  If it's helpful.

8            MR. CULLEN:  Pardon?

9            THE COURT:  If it's helpful.  The rule says helpful;

10  right?

11           MR. CULLEN:  I understand, your Honor, and our job

12  of work here is to try to be helpful to the Court and helpful

13  to the record.  That's all I have, your Honor.

14           THE COURT:  All right.  I'm going to take this under

15  advisement for a mere five minutes, and we'll reconvene at

16  three -- you want to say something?

17           MR. HACKNEY:  One brief point.

18           THE COURT:  One brief point.

19           MR. HACKNEY:  I'm sorry.  I know that --

20           THE COURT:  No.  Don't apologize.

21           MR. HACKNEY:  Okay.  There was a statement made that

22  Mr. Buckfire may have been confused when he referred to Mr.

23  Cline instead of Ms. Sallee.  That is not correct.  Ms.

24  Sallee also testified in her deposition that she had not done

25  any analysis either, so this is not a situation where someone

1    at Ernst & Young did the analysis; it was just Ms. Sallee,

2    not Mr. Cline.  No one had done the analysis.

3              MR. CULLEN:  If I -- if you took me to imply that

4    someone had done a dismissal analysis --

5              MR. HACKNEY:  No.

6              MR. CULLEN:  -- of the sort that you said, I didn't

7    mean to --

8              MR. HACKNEY:  No.

9              THE COURT:  No, no.

10             MR. HACKNEY:  A tax increase analysis.

11             THE COURT:  Yeah.  The question was --

12             MR. HACKNEY:  Increase analysis.

13             THE COURT:  Right.

14             MR. HACKNEY:  That was not done.

15             THE COURT:  What would happen to the city's economy

16   or finances in the event of a mandated tax increase?

17             MR. HACKNEY:  Ms. Sallee had never heard of the RJA,

18   had not evaluated increased taxes pursuant to an RJA judgment

19   at the time of her deposition.

20             THE COURT:  All right.  Thank you.  All right.

21   3:15, please.

22             THE CLERK:  All rise.  Court is in recess.

23         (Recess at 3:07 p.m., until 3:15 p.m.)

24             THE CLERK:  Court is in session.  Please be seated.

25   Recalling Case Number 13-53846, City of Detroit, Michigan.

1    MR. CULLEN:  Your Honor, I'd like to note, for the

2    record, if I might, the addition at our table of Mr. Orr.

3        THE COURT:  Welcome, sir.

4        MR. ORR:  Thank you, sir.

5        THE COURT:  The matter is before the Court on the

6    motions of Syncora and FGIC to exclude the testimony of

7    Mr. Buckfire regarding creditor recoveries upon dismissal of

8    the bankruptcy case.  The Court concludes that the motion

9    should be granted.  The motions spend a lot of time

10   challenging the lack of analysis by Mr. Buckfire relating to

11   his various assumptions that led him to conclude that the

12   plan is in the best interest of creditors because they would

13   receive either nothing or a de minimis recovery outside of

14   bankruptcy in the event of a dismissal.

15       On this point, with the exception of the assumption

16   relating to taxes, the Court agrees with the city that most

17   of those assumptions are relatively self-evident.  It is

18   true, on the other hand, as is argued here, that Mr. Buckfire

19   should have done an analysis on a more careful basis

20   regarding the consequences to the city and to the city's tax

21   collections of RJA proceedings, but the real basis for the

22   Court's granting this motion is that it must conclude that

23   Mr. Buckfire's judgment about best interest is not

24   particularly helpful to the Court.  Ultimately, his judgment

25   is that if the sort -- if the city has no assets available to

1    pay creditors outside of bankruptcy and no ability to collect

2    additional taxes to pay creditors outside of bankruptcy and

3    no other sources of income such as perhaps from the grand

4    bargain with which to pay creditors outside of bankruptcy,

5    then creditors will get nothing outside of bankruptcy.  The

6    trouble with that conclusion is that there's really no

7    judgment involved there.  It inevitably flows, and it's

8    not -- it's, therefore, not helpful to the Court, so on that

9    grounds, the motion is granted.

10          Let's begin our trial now with the opening

11   statements from the city, please.

12          MR. BENNETT:  Your Honor, I have one question before

13   we begin.  What is your plans for wrapping up tonight?

14          THE COURT:  Our schedule calls for us to run until

15   five, so if there is a natural break in your opening

16   statement that occurs a few minutes before or a few minutes

17   after that, please let me know.

18          MR. BENNETT:  Okay.  I will aim for one.  And also

19   so that we don't have to break up during the discussion,

20   there will be five handouts that I will get to at some point

21   during the discussion.  They've all been supplied to the

22   objectors.  I've made a whole bunch of sets of --

23          THE COURT:  Thank you.

24          MR. BENNETT:  -- each one of the set of five for you

25   and your staff, so may I approach?

1    THE COURT:  Yes.  You may hand them up, please.

2                    OPENING STATEMENT

3    MR. BENNETT:  Your Honor, I'm going to begin with

4    your eligibility opinion, and right at the front you wrote,

5    "The evidence before the Court establishes" -- I'm sorry.

6    Bruce Bennett of Jones Day for the city.  Forgot.

7    THE COURT:  I think we got that.

8    MR. BENNETT:  "The evidence before the Court

9    establishes that for decades, however, the City of Detroit

10   has experienced dwindling population, employment, and

11   revenues.  This has led to decaying infrastructure, excessive

12   borrowing, mounting crime rates, spreading blight, and a

13   deteriorating quality of life.  The city no longer has the

14   resources to provide its residents with the basic police,

15   fire, and emergency medical services that its residents need

16   for their basic health and safety.  Moreover, the city's

17   governmental operations are wasteful and inefficient.  Its

18   equipment, especially its streetlights and its technology and

19   much of its fire and police equipment, is obsolete.  To

20   reverse this decline in basic services, to attract new

21   residents and businesses, and to revitalize and reinvigorate

22   itself, the city needs help."

23       There is no doubt, your Honor, that during the past

24   roughly year progress has been made, but Detroit is still a

25   city in distress, and the four paragraphs of your eligibility

1    opinion that I read hold as true today as they did then.

2         We are here today finally to obtain that help, and

3    the purpose is no less than to save the City of Detroit.  The

4    city needs more net revenue than it has to provide adequate

5    services and service legacy debts.  It's operated in a

6    distressed condition for so long that expenditures needed

7    include vast amounts of investment.  Sometimes we call it

8    reinvestment.  It's the same thing.  Detroit won't recover or

9    survive if this isn't done.  Because the city can't raise any

10   more revenue -- and we're going to talk a lot about that --

11   it was obviously a subject covered a few minutes ago -- its

12   taxes are already at statutory limits, and its tax rates are

13   the highest charged by the cities in Michigan, Detroit's

14   debts must be adjusted and be adjusted significantly.  The

15   plan is the vehicle that frees up necessary funds so the city

16   can, once again, provide adequate services for its residents.

17   The plan is immensely detailed and somewhat complex, but I

18   think just for a second I want to go over a half dozen

19   highlights.

20        Debts are reduced by roughly $7 billion.  Other

21   post-employment benefits represent the largest component of

22   debts eliminated in the plan, so this is not by any means a

23   plan that is made possible on the backs of financial

24   creditors.  Principal payments on the vast majority of the

25   remaining debt is deferred until the tenth year following

1    confirmation and runs out thereafter, and these things make

2    room for a massive investment program targeting the problems

3    found to exist in your eligibility decision.  The gross

4    amount of those investments are a little more than 1.7

5    billion, but some of those investments generate revenue

6    themselves.  Others have the effect of reducing expenses, so

7    we calculate a net investment of roughly 877 million.

8        I will get to feasibility later and in more detail I

9    think probably tomorrow, but for now I will say that the city

10   believes that the investment will be sufficient to address

11   the city's most pressing needs.  And while there are

12   undoubtedly additional expenditures on the lists of many who

13   have evaluated the city's condition, the city believes that

14   the planned investments will be sufficient to rehabilitate

15   the city.  Thus, the plan serves the overriding goal of

16   Chapter 9.  It will rehabilitate a city in distress.

17       At the same time -- and we mean this just as

18   firmly -- the plan provides creditors with all the city can

19   provide them from sources of value creditors are entitled to

20   reach.  That will be our first topic for today.  This is

21   demonstrated by the analysis of the Court's own expert and

22   the forecasts and projections produced by the city that show

23   that all or substantially all of the revenue sources that

24   creditors may reach and are permitted to reach are exhausted.

25       In light of the objections that have been filed and

1    the time we have to spend on dealing with them today and

2    through the confirmation trial, it's really easy to lose

3    sight of how broadly consensual the plan really is.  The

4    largest classes in this case are the retiree classes, the GRS

5    pension class, the PFRS pension class, and OPEB, and the plan

6    has been accepted by all of them.  Those are the largest in

7    terms of number of members.  They're also the largest in

8    amount.  And the OPEB distribution or the distribution on

9    account of the OPEB claims is the same as the COPs

10   distribution.

11           Further demonstrating that the plan is not a product

12   of hostility to financial market creditors, we note the plan

13   has been approved by the UTGO bond classes or class --

14   sorry -- the LTG bondholder class, and, of course, there was

15   a settlement reached with the DWSD bond insurers that

16   resulted in a refinancing and significant savings, so the

17   remaining debt is unimpaired here.

18           It would have pleased us enormously to have brought

19   to the Court a fully consensual plan, but given the number of

20   affected creditor constituencies and all of the different

21   positions they took at the outset of the case, that might

22   have been much too much to hope for.

23           We could be here all day and all day tomorrow if I

24   used this opportunity to do what is sometimes done in Chapter

25   11 confirmation hearings and review all of the confirmation

standards one by one and demonstrate how they are met.  We
just don't have the time for it.  That has been done
comprehensively in our papers, in particular in a chart I
hope the Court found helpful attached to our pretrial brief.
I am going to confine myself, first of all, to issues that
have been actively controverted and even there at some of the
more central and more important issues that are before the
Court.  That I leave something out in the oral presentation
does not mean a relevance standard hasn't been met.  It means
we've covered it in our papers, and it didn't rise to the
level of something to reserve time for today.  If there is
anything that I miss, we'll get to it on closing, but I've
tried to focus on the most important points in the
controversy, and I'm also going to use an organization that's
a little different from the organization that we used in the
papers.  And really my purpose is this.  I'm going to explain
why we meet the confirmation requirements that are most
actively controverted and how it is that we will overcome the
objections both as a matter of law and as a matter of the
facts that we will show.  One of the reasons for organizing
it as I have is that one of my contentions throughout will be
that the Court is actually confronted with many fewer
material disputed issues of fact than some of the objectors
would have the Court believe.  I think that we will be able
to demonstrate -- and it is one of my points here -- that the

1  city is much further along in having already established many

2  of the needs -- many of the things it needs to establish to

3  earn confirmation of its plan than our opponents are willing

4  to concede.

5          So here's the proposed organization.  You can't help

6  but notice that running through arguments on best interest,

7  whether settlements are approved and discrimination a central

8  topic is whether or not assets of the city and, in

9  particular, what I will call the DIA assets can be reached by

10  creditors in order to satisfy claims.  We will confront that

11  issue first.  And the resolution of that issue is going to

12  contribute to the argument and to the resolution of

13  objections to the approval of settlements and, in particular,

14  the DIA settlement, objections that the plan doesn't meet the

15  best interest of creditors, and about whether or not the plan

16  has any unfair discrimination in it.  As I said before, it

17  turns out that the status of assets in a Michigan Chapter 9

18  case is going to be an important building block to resolve

19  all of those issues, and at that point we will be in a

20  position to very briefly demonstrate that the plan was filed

21  in good faith.  There are a handful of relatively smaller

22  issues that if we have time I will digress to cover, and then

23  last but certainly not least -- we know it's very high on the

24  Court's agenda -- we will address the issue of feasibility.

25          Okay.  First big question.  What are an unsecured

creditor's rights to recover from assets owned by a Michigan city, and what, therefore, are such creditor's reasonable expectation about any such recovery? Let's start outside of Chapter 9 because outside of Chapter 9 are where creditor rights are fundamentally established. I think there is no disagreement left, I think, that outside of Chapter 9 the answer is absolutely no access to assets and, therefore, no expectations about a recovery from them. You don't have to take my word for it. One place you can look for it is in FGIC's pretrial brief at page 92 where, as part of their discussion of best interest, they say, "Pursuant to the RJA, which is the Revised Judicature Act, unsecured creditors' and the Retirement Systems' only remedy against the city would be to get a court to order the city to levy taxes in an amount sufficient to pay the judgments." I want to make two short observations of that before moving on, and this is an aside we'll come back to later. Outside of bankruptcy they may not be right actually about the retirees because there are two provisions in the Michigan Constitution dealing with retirees, the nonimpairment clause and the funding clause, but we'll get to that later. And the second point I want to just remind us about -- we'll come back to it -- is that the sentence I read is kind of a launching point for discussion in the FGIC brief about the idea that it would be a good idea to subject the city to increases of taxes under the RJA. It

1    would find -- the city would find that enormously

2    distressing, and, therefore, it would be convinced to sell

3    the DIA assets after all.  That is the route to assets that

4    was proposed in the FGIC brief.  But we don't have to take

5    the FGIC brief as the only basis for this.  As we point out

6    in our papers -- and I'm not going to repeat all the argument

7    about this -- most centrally Michigan law prohibits

8    creditors -- unsecured creditors from levying or executing --

9    the statute I think uses the word "executing" -- on any asset

10   of a municipality.  That's MCL 600.6021(I).  It's cited at

11   page 68 of our pretrial brief.  So just again pausing in the

12   out-of-court environment, the fact that no city assets can be

13   levied on or sold outside of Chapter 9 and that the exclusive

14   remedy is an increase in property taxes under the Judicature

15   Act is or ought to be a powerful warning to every potential

16   lender and insurer not to lend any money to a municipality

17   based on an expectation that a creditor can compel the sale

18   of an asset, core or noncore, to borrow terms others have

19   used but the Bankruptcy Code does not, to pay a debt.

20          Now, I want to pause a second.  It is certainly true

21   that for many purposes we bring to this Court models and

22   ideas about Chapter 11 cases and start applying them in

23   Chapter 9, and here's one place where it would be a big

24   mistake.  In Chapter 11 when we have a corporation, a

25   corporation has creditors.  Creditors can levy on almost

everything. There are very few exceptions in an individual

debtor case. There are some exemptions, state-level

exemptions. In the case of the corporate world, the one

people find themselves confronting most often is a relatively

odd rule in Delaware prohibiting the ability to execute on

LLC interests, but in -- the general rule with respect to

creditors are -- unsecured creditors, if they're not paid,

they go to court. They get judgments. They sometimes can

get attachments. It depends on the state. If they get a

judgment, it's not paid, they can execute. They get help

from a sheriff.

As we've just seen, at least as to Michigan

municipalities, a similar concept doesn't apply. An

unsecured creditor doesn't have a general claim against a

general estate or against all property of a Michigan

municipality. In fact, to the contrary. The statement is

there is no claims against the assets of a municipality or of

a city. There is only the ability to go to court to raise

property taxes to get a levy for a creditor's benefit on the

tax roll.

I don't know if FGIC, Syncora, or the initial

purchasers or petition date holders of the COPs ever focused

on the existence of the DIA assets when they made their

loans, but I do know that if any of them are one-tenth as

sophisticated as they say they are, the DIA assets weren't in

1   their credit analysis at all for these reasons.

2          Okay.  The next question is if that's the reality --

3   and it is under Michigan law -- did the filing of the Chapter

4   9 case change anything?  What the creditors have done or the

5   objectors have done is cited basically five cases for the

6   proposition that something about the best interest test

7   requires the use of city-owned assets to provide recovery for

8   creditors.  We are going to spend some time -- well, we spent

9   time with one already.  I don't think we only have to spend

10  time on the other four, and it's actually three because two

11  of them are the same case, but we've just seen that there's

12  nothing in Michigan law that supports that conclusion or

13  supports that argument, so what is it about Chapter 9, if

14  anything, that expands the rights of an unsecured creditor in

15  bankruptcy from what that creditor's rights are under

16  applicable nonbankruptcy law?  The answer is nothing.  There

17  are, of course, provisions of Chapter 9 that reduce or limit

18  creditors' rights.  A few that come to mind in the Chapter 9

19  context, invalidation of rights to gross revenues as opposed

20  to net revenues with respect to special revenue debt.  It

21  turns out that liens of distress for rent are not allowed in

22  in Chapter 11, Chapter 7 cases.  They're also not allowed in

23  Chapter 9.  Claims for unmatured interest are disallowed.

24  There is the automatic stay.  I can go on and on and on.  All

25  these are limitations of existing rights that exist under

1    state law.  There is no provision of Chapter 9 that enhances

2    the rights of an unsecured creditor in Chapter 9 at all.

3            In fact, if we were looking around, if we thought

4    that we needed additional reasons to say the baseline

5    Michigan law moves into Chapter 9 uninterrupted -- well,

6    actually significantly interrupted but not augmented in any

7    way, there's actually ample suggestions that the drafters of

8    Chapter 9 may well have thought or understood that Michigan

9    law and other states' law is not unique in this realm, and

10   there are ample suggestions that Chapter 9 is not much

11   concerned with property owned by a municipality at all, so

12   the first place to start, of course, has to be 904, which

13   says no court jurisdiction over municipal property, and then

14   just so that we know they meant it, no court jurisdiction

15   over or ability to interfere with -- ability to interfere

16   with income-producing properties.  They kind of got it both

17   ways in the same statutory provision.  It's been noted

18   before, I think, in this Court that there's no property of

19   the estate concept anywhere in Chapter 9.  There's no

20   turnover provision in terms of recovery of property of the

21   estate anywhere in Chapter 9.  There are no controls on the

22   use of sale of assets not in the ordinary course of business,

23   which, if you were concerned about assets in any way you

24   might have put into Chapter 9.

25            And now I want to turn to the cases because,

frankly, the cases aren't to the contrary. Case number one,
Fano. I don't think we have to talk about Fano anymore, but
it's -- to remind before, it's an eligibility case. It
nowhere states -- it says, of course, that debtor was not
eligible for relief in light of the circumstances. Remember
the circumstances, which is day one, debtor borrows money.
After day one, debtors improve a whole bunch of facilities,
create them, it seems from the opinion, to be a little bit
better than they absolutely need it to be, and after that the
debtor finds not having enough money. Of course, it is not
the facts of this case. It's never been asserted to be the
facts of this case that the city borrowed money, bought art,
found it couldn't repay money. Not the facts of this case at
all. But in any event, Fano is an eligibility case and never
says that as a consequence of what happened, even in Fano,
facts that aren't close to the facts here, that the result is
creditors have a right to recover assets, to execute against
assets, to compel their sale, to share in their value.

Pierce, second case that's appealed to for this
purpose. Why is Pierce appealed to? Pierce is the case that
involved the housing project that had all kinds of problems.
I think it was mold. There was a potential claim against
attorneys. The estate -- the plan says you can't pursue that
claim unless a certain committee agrees that you can. Pierce
is a case under Washington law, and, frankly, the most

1  important fact of the _Pierce_ case -- it's right in the

2  opinion.  It says that the housing authority there involved

3  had no taxing authority.  Now, I don't know what Washington

4  law was in front of the _Pierce_ court, but I have a nagging

5  suspicion that if it had no taxing authority, Washington law

6  as to housing authorities did not preclude access of

7  creditors to other assets.  It didn't have taxing authority

8  to be a major source.

9      Next are two hospital cases, _Barnwell County_

10 _Hospital_ -- _Barnwell_ came up a little in the last argument --

11 and _Bamberg County Memorial Hospital_.  It turns out those

12 hospitals are located near each other.  They were in two

13 separate vehicles, it seems.  That's actually not entirely

14 clear.  But the plan was for all -- for these two hospital

15 entities and several others in the area to sell their assets.

16 The case starts with an asset sale agreement, or I think it

17 was called an asset purchase agreement, from the other guy's

18 perspective, and the plan was to sell the hospitals and

19 distribute the proceeds.  You'll find that the form of the

20 opinions in _Barnwell_ and _Bamberg_ are findings of fact and

21 conclusions of law, and they kind of read like they started

22 with a form that was provided by prevailing counsel because

23 of just the words that are used and the way that the words

24 are used that kind of shows.  And along the way there is a

25 boilerplate finding in both opinions in exactly the same

1   words saying that the price was fair under a plan that was to

2   sell assets.  This, your Honor, does not amount to a

3   statement that somehow Chapter 9 changes background law,

4   creates rights that creditors don't have under background

5   law, and gives them the ability to reach assets they can't

6   reach under background law, compel them to be sold and then

7   to take the proceeds.

8          The last case, frankly, is going to be the most

9   memorable, I hope, and it is Connector 2000 Association, Inc.

10  Remember the Inc.  It's going to turn out to be important.

11  In Connector 2000 all impaired classes accepted, no trace of

12  any objection to filing of a plan in good faith or objection

13  on best interest grounds.  In fact, if you read through,

14  again, boilerplate-type findings of fact, conclusions of law

15  with many provisions that debtor's counsel like to put in but

16  judges don't often put in by themselves, it seems very clear

17  very quickly that scope of releases was the only litigated

18  issue in the case, but the boilerplate plan or findings of

19  fact, conclusions of law I think in three places has the

20  quote that has been brought to you in the Syncora brief, I'm

21  certain, and I think also in the FGIC brief to the extent

22  that they've maximized assets.  Well, I said remember the

23  Inc. in the caption.  The reason is is that Connector 2000

24  Association, Inc. doesn't involve a political subdivision

25  like a Michigan political subdivision whose assets are

protected by law.  It's a nonprofit corporation that was only
a municipality because its board was controlled by a public
agency, so it was a corp.  And in nonprofit corps in most of
the land, they can do the same things with their assets that
corporations can do, and unsecured creditors have the same
kinds of rights to reach and attach anything that isn't
encumbered or if it's encumbered that has excess value, so
its assets were likely subject to creditor claims under
applicable nonbankruptcy law.

So what I think this all demonstrates -- and it's
a -- as I said before, a very important point that is going
to ripple through the rest -- three other major points of
controversy in this case.  Number one, there's no foundation
in Michigan law for any creditor belief or expectation or
right that the DIA assets or any assets of the city other
than property taxes along the lines specified in the
Judicature Act can be reached by creditors to pay claims.

Number two, there is nothing about Chapter 9 itself
that augments in any way unsecured creditor rights in Chapter
9.  By the way, I forgot to say there's actually one place
where secured claimants, if they're not special revenues,
their rights are augmented, and that's because 1111(b)
applies to nonspecial revenue secured creditors.  That's not
applicable here, so it's not as if they forgot.  They're in a
place where Congress decided to augment rights.  They figured

1　out how to do it.  They actually did it in Chapter 9.

2　　　　There's no basis for any such expectation in the

3　Bankruptcy Code, and, lastly, there is nothing about the

4　cases that have been cited to your Honor for an expansion of

5　the best interest test that would expand or create new rights

6　that aren't recognized in the statute.  And what does this

7　mean for the trial?  Well, if your Honor has read the

8　pretrial briefs -- and I wouldn't blame you if you haven't

9　read all of them yet -- the city is roundly criticized and I

10　expect will be through all forms of expert testimony that

11　they didn't do adequate work to value assets.  They didn't do

12　adequate work -- the city didn't do adequate work to market

13　assets.  The city didn't have an adequate due diligence

14　effort concerning their assets.  The city didn't divide them

15　into, again, my view, nonexistent core and noncore

16　categories, at least nonexistent as a matter of bankruptcy

17　law.  It is all claimed that these are factual issues that

18　are important, that are worthy of your attention and of our

19　time.  They are not.  Because there is no vehicle to get your

20　Honor to rule on this earlier as opposed to later, we're

21　going to put evidence on these things, too, because it turns

22　out in a lot of ways a lot of the things that they claim we

23　didn't do, the city, in fact, did, but it's not relevant

24　because very clearly as a matter of law the rights of an

25　unsecured creditor against a Michigan municipality and I

suspect many other states' municipality, but that's not our
problem here -- municipalities -- that's not our problem
here, is very limited and does not extend to assets.

I think the -- it's probably already obvious to your
Honor and many people in this room that this is going to have
very substantial implications for the best interest test and
how narrow or broad the inquiries will have to be, but it
also has significant implications on the evaluation of the
DIA settlement, and that is what we're going to turn to now.

Approval of settlements.  I came to settlements next
because reasonable settlements that the Court is willing to
approve set the parameters of what assets the city really has
and what liabilities the city has to address.  It was
suggested that the approval of settlements might be used as
an end-run around confirmation requirements.  They don't do
that at all.  A settlement is necessary with respect to an
asset where title isn't clear.  A settlement is sometimes
necessary where a particular creditor's rights aren't clear.
And I'm referring, in particular, in this instance to the
LTGO settlement, which has gotten its fair share of criticism
in the papers.

In a way, approval of settlements are inputs to the
confirmation analysis, and that's why they're next in the
outline.  The DIA settlement is part of the grand bargain, so
let me define what I mean by the DIA settlement and what the

1    city means by the DIA settlement, and then we'll talk about

2    the other parts of the grand bargain in a minute.  The DIA

3    settlement involves an agreement to transfer title of the DIA

4    assets, which is the collection or at least a part of the

5    collection owned in title by the city and the buildings and

6    other property that is related to its exhibition, to what I

7    call the DIA Corp. because the corporation that is currently

8    the contracting party with the city to operate the museum is

9    also called the Detroit Institute of Arts, so I call it DIA

10   Corp., in trust.  And in exchange for this transfer of title,

11   the city gets three things.  It gets a sum of money, 466

12   million over 20 years from foundations and the DIA Corp.  I

13   haven't mentioned the state consideration because the state

14   consideration we regard, albeit a condition of this deal, is

15   actually a separate deal.  It's part of a separate deal

16   relating to releases, but I'll get to that in a minute.

17   Importantly, for purposes of ultimately valuing the 466,

18   there are opportunities to get discounts for early payment.

19   That's where the 6.75-percent discount comes in.  And as

20   of -- as certainly known to the Court, there are restrictions

21   on how the money that is paid in respect to the DIA

22   settlement can be used.

23          I will say that without trampling into the issue of

24   what evidence can and can't be presented as a result of the

25   existence of the mediation order and the mediation privilege,

1  I will go so far as to say that there has been no alternative

2  that has surfaced that has given the city a comparable --

3  would give the city a comparable amount of money while the

4  collection stays where it is in the City of Detroit and the

5  DIA continues to operate it as it has operated.  We'll talk

6  about some of the other proposals a little bit later on.

7       The second element of value is that the attorney

8  general and the DIA Corp. drop their objections to any

9  disposition of the DIA assets.  Litigation has not been

10  commenced by either of them.  That part is true.  But it has

11  most certainly been threatened.  We put into evidence the --

12  or asked the Court to look at the attorney general's opinion

13  and the DIA Corp.'s memoranda on these subjects to show that

14  there are challengers primed, ready, willing, and able to

15  object to, create litigation relating to an otherwise fight

16  about dispositions of DIA assets that they don't approve of.

17       And lastly -- and this is the part that manages not

18  to be mentioned in the opposition briefs but is,

19  nevertheless, a significant source of value -- the city

20  receives a commitment that the DIA assets will not be moved

21  and will stay in Detroit.

22       As to this last item, Mr. Spencer purports to value

23  this, the idea of the assets staying there by employing a

24  methodology that he claims is emerging.  We didn't burden the

25  Court with a Daubert motion, but there are some issues with

the fact that it's emerging.  But then he decides not to

follow the methodology he describes as emerging because it's

too expensive or too difficult to collect the data that the

people who are working on this new methodology note is needed

to perform the emerging methodology, and so your Honor will

hear Mr. Spencer's testimony, and your Honor will hear about

some flaws in his effort to minimize the value to the city of

retaining the DIA assets here.

I think it is important to note that in addition to

the fact that the opponents don't ever want to talk about

this component of value, it is most assuredly the case that

none of the alternatives presented by FGIC's experts give the

city this element of value, and certainly the proposed sales

don't give the city that element of value, but the proposed

loan structure doesn't either.  The problem with the loan

structure is that it would have to be repaid, and the idea, I

think, is that the lenders would get a lien on the collection

to secure a large loan which it said could be as big as $4

billion, but there are lots of conditions, and there's

actually -- $4 billion hasn't actually been committed.

Actually, I'm not sure any amount has been committed.  And

then they say, well, there will be a lien on the art, and

everyone will know that if the debt isn't paid, the art will

wind up foreclosed upon or realized against -- in respect of

a transaction if they can get satisfactory legal authority to

1    take such a lien, which they don't currently have under

2    applicable Michigan law, and that that pressure will open the

3    spigots and create the ability for the DIA to raise more

4    funds.  I don't think that's the kind of finance we are

5    supposed to be encouraging, but I will also say that in light

6    of the projections by the city, the city would have no

7    ability to service the loan.  In light of the DIA's fund-

8    raising actual experience, they wouldn't either.  So while

9    the loan structure is advertising as a means of keeping the

10   art in the city, it will achieve that temporarily.  It will

11   most assuredly not do so permanently.

12          I mentioned before that the DIA settlement is

13   conditioned on the state settlement, but the state settlement

14   is a separate deal.  I don't know, frankly, that anyone has

15   actually objected to the terms and conditions of the state

16   settlement.  I do believe that we'll have to deal with the

17   evidentiary question, and I think the documents themselves

18   resolve this, that the DIA and foundation contributions are

19   exchanges for the art and that the agreement with the state

20   are exchanges for releases.

21          Now, what do we do with the settlement?  Well,

22   there's well-established law as to the standards that a

23   Bankruptcy Court has to apply to approve it.  Number one --

24   and it's kind of a preficatory condition has to be met that

25   the settlement has to have been negotiated arm's length

between parties who are not colluding, and sometimes it says they also have to be well-represented.  Then the law actually talks about three factors in some cases, but they ultimately collapse.  One -- not collapse as in disappear but collapse into one theme.  One is probability of success in litigation, second is difficulties of collection or realization, and the third is complexity of litigation, including expense, inconvenience and delay that might be involved in the litigation.  It is these three factors that are considered in constructing what the cases call a range of reasonableness, and that range of reasonableness is intended to encompass the possible outcomes if the controversies are actually litigated.  Settlements are approved, we are told, if they are above the lowest bound of the range of reasonableness. We should just note for a second -- I'll come back to it -- that while there's been a tremendous amount of attention to how much the art might be worth at the high end -- and we most certainly will have evidence showing that that number is not $8 billion, in our view -- we wish it was -- that the upper end of the range isn't that important for purposes of what we have to do here today.  And then finally we are supposed to consider the interests of creditors and a proper deference to their reasonable views, and, by the way, Syncora points out that the creditors you're supposed to focus on are creditors whose interests are being affected by the

1   settlement.  Remember -- I'll come back to it later -- that
2   we don't think any unsecured creditors' interests are
3   affected by the settlement because they have no rights to
4   these assets anyway.  So we'll fold that into the settlement
5   analysis in a second.

6           Dealing with the first part, which I know is going
7   to be or might well be an issue of some contentiousness, who
8   are the adversaries when dealing with the DIA settlement, and
9   were they at arm's length?  Well, there's no -- one of the
10  adversaries was the retirees, and I never heard any
11  allegation that the city and the retirees were not at arm's
12  length or were colluding for any purpose.  The retirees were
13  also quite well-represented.  Another group that's approved
14  the plan that includes the settlement are the UTGO creditors.
15  UTGO creditors were, no doubt, arm's length from the city,
16  not colluding with the city, and well-represented.  Another
17  group that's approved the plan that includes the settlement
18  are the LTGO holders, again, a group that has clearly been at
19  arm's length from the city, not colluding with the city and
20  well-represented.  They were the parties on the other side
21  that were asking for more and taking less, and perhaps they
22  regard one of the consequences of that was that the art
23  wasn't going to be there for them or, in the case of the
24  retirees, not the value of the art, the total value of the
25  art.  There is no allegation that the city was not at arm's

length from the foundations, who also were separately and
well-represented.  And then finally there was ample
evidence -- there is ample evidence that the city was at
arm's length from the DIA Corp., which, to begin, has a board
containing of prominent and accomplished individuals and also
is represented by Honigman Miller and Cravath, Swaine &
Moore, no doubt adequate.

Objectors' own papers report that the city's initial
position was appropriate.  In fact, their complaint isn't
anything about the way the city started the case with respect
to the DIA assets.  Their complaint is about the fact that
they ultimately made a deal, so let's review this for a
second.  In the June 14th, 2002, presentation for creditors,
the objectors approve of the city position taken, which
listed the DIA assets among assets that would be considered
and looked at if -- and used if appropriate in order to
develop value.  They also cite public statements that were
made at about the same time, mainly by Mr. Orr, some by his
spokesman, Mr. Nowling, concerning that the city regarded the
art as something that was on the table.

Finally, through discovery, it's become known that
there were meetings between Mr. Orr's representatives,
including yours truly, and the DIA Corp. early in the case,
at which the city explained that there were arguments that
the DIA assets were going to be part of a potential

1    bankruptcy case and the DIA Corp. would be well-advised to do

2    something about that. And it was not about preparing a

3    defense, but it was about raising money because a settlement

4    might be a good idea.

5         All of this seems inconsistent with the accusation

6    that the city did not do due diligence because the city's

7    initial position lined up exactly with where the objectors

8    would have wanted them to or say they wanted them to, and I

9    suppose that for the time being we're going to have to say

10   that the city and its representatives were either ignorant or

11   lucky or they did our jobs or we did our jobs, and we'll come

12   back to why it is that we can't really go deeper than that.

13        The next thing the city did was it did actually

14   conduct a valuation. It was never advertised as a valuation

15   of the entire collection but only of a meaningful part for a

16   number of reasons. They were city-purchased art so that at

17   least donor restrictions didn't have to -- wouldn't interfere

18   with the analysis. It was a high concentration of relatively

19   more valuable works, which the numbers put forth in the

20   opposition paper seems to agree with. Narrowing the universe

21   allowed for a real piece-by-piece appraisal, which is not

22   possible with 60,000 pieces. And, frankly, it was thought

23   that even though you were looking at a piece, it would

24   provide some information about what we were dealing with as a

25   whole.

1       As a result of all these things that happened early

2  on in the case, I will say for sure I didn't receive holiday

3  greetings from Alan Schwartz of Honigman -- of the Honigman

4  firm or from Rich Levin of the Cravath firm or from the DIA

5  at the end of 2013.  They weren't happy with the city or with

6  me, and I, frankly, wasn't happy with them.  But I will also

7  point out that at that point in the case there were no deals

8  with any other creditor groups either, and then the outline

9  of a deal emerged.  And I think in bankruptcy we all know

10  parties are not only allowed to make deals and compromise

11  principles, the cases also say that's exactly what the

12  parties are supposed to do.  And the evidence will show that

13  around that time parties started working on developing and

14  later documenting the deal that became the DIA settlement,

15  expanded to be the grand bargain when the state joined, and

16  what the city didn't do was to continue efforts to develop a

17  litigation position against the groups we were settling with.

18  And why would we?  Partly because this is because we had more

19  than enough litigation to worry about, some of which were

20  generated by some objectors, but it would have also been a

21  big waste of time and money.

22       At this point, I think we're done showing that a

23  settlement was reached at arm's length and not collusively,

24  and here -- and it was shown even earlier today -- is where

25  the objectors claim there were two additional inquiries that

1   need to be addressed.  We think not.  Number one, they say

2   prove all the steps in the negotiations.  We are entitled to

3   know how it is you got from a position we approve of to a

4   settlement that we disapprove of.  And then they say tell us

5   exactly how much legal research and analysis was done, and

6   they claim that the settlement must mean that we didn't do

7   enough.  Well, there is no trace of this requirement in any

8   of the cases.  And, once again, we come to a point where the

9   trial can be consumed and may well wind up consumed with

10   trying to elicit and taking a great deal of evidence that's

11   got nothing to do with the approval of the settlement.  If

12   you read through the cases, what they focus on is, number

13   one, were the parties the right parties to be negotiating, do

14   we believe that they were in the right position to negotiate

15   the deal, were they not colluding, and then we're done until

16   we get to the result.  We'll get to the result and the range

17   of reasonableness in a second.

18         Why is there that gap in the cases?  Well, it makes

19   a tremendous amount of sense because looking into those

20   matters would involve inquiries that always involves -- would

21   always invade settlement discussions that parties may want to

22   keep confidential or are otherwise protected by privileges

23   such as the one in evidence Rule 408.  Some are negotiated in

24   confidential and privileged mediations, and proof of what

25   legal research and analysis was done would undoubtedly

require a disclosure of privileged materials. And this is
why I said the Court is probably not going to get to decide
whether the city was ignorant and lucky or did its job when
it evaluated the situation with DIA assets and took an
opening position in the case. The initial position and the
results will have to speak for themselves.

So now we get to the really important part, is the
DIA settlement in the range of reasonableness, and here I
think there are three separate questions that need to be
answered in order to decide what the range of reasonableness
should be. Question number one, which is the question, by
the way, and the only question that's actually focused on in
the papers, can the city sell the DIA assets and give free
title -- free and clear title to somebody else? Lots and
lots and lots of ink has been spilled on that. There's a
supplemental brief that runs roughly 180 pages, and the vast
majority of it is devoted to that question. But I didn't
start with that question when I started our argument today.
I started with what I regard as the second question that also
informs the range of reasonableness for the DIA settlement.
Do unsecured creditors or even in this case secured creditors
with deficiencies -- they're unsecured creditors, too -- have
any right to compel the sale of DIA assets and recover
anything from them? We've already answered that question.
We're going to factor it in. But there's still a third

question that relates to the formation of the range of
reasonableness, and that is should the city be compelled to
sell the DIA assets even if they could and even if creditors
had rights to reach those assets.

Your Honor, I think that if the answer to any of the
three questions is no or close to no, then the lower bound of
the range of reasonableness in this case for the DIA asset
disposition that is part of the DIA settlement is zero or a
number close to zero because if the city can't sell the DIA
assets, a reasonable outcome -- a possible outcome is that
there will be nothing.  If creditors have no right to compel
the sale of DIA assets or share in them as a matter of rights
to distributions, then they are going to get zero from those
assets.  And if the city shouldn't because it's not a good
idea sell the DIA assets even if the city can sell them and
creditors have a right to sell them, then that's another
reason why the lower end of the range would be pretty close
to zero.

So, as I said before, we've already answered that
second question.  Just quick review.  Unsecured creditors of
Michigan municipalities have no remedies that reach city
assets, including the DIA assets, and nothing in Chapter 9
changes this.  From a creditor perspective, the DIA assets
yield zero.  Based upon the law that teaches us how to
construct ranges of reasonableness, the lower bound of

1    reasonableness just on this basis is zero.

2         Next, I'm going to go to the question, question

3    number three, should the city sell the DIA assets.  There

4    will be testimony from many witnesses concerning the

5    importance of the Detroit Institute of Arts to the city.

6    Some will come from DIA Corp. representatives, some from

7    prominent citizens, some from government.  The DIA, of

8    course, is one of the few relatively -- they're one of the

9    relatively few institutions that Detroit has that might draw

10   residents back as, if, and when there is a recovery, and

11   so -- oops -- get my pages in order -- it would be most

12   assuredly a reasonable decision for Detroit to make to keep

13   it in Detroit even if it did have the ability to sell it and

14   even if the creditors could access it.  And as noted before,

15   in Chapter 9 decisions like this are decisions that not only

16   are left to the reasonable business judgment of the City of

17   Detroit, they are left to the City of Detroit.  That's one of

18   the very, very clear lessons of Bankruptcy Code Section 904.

19   Since the city could, acting very reasonably, decide not to

20   change the status of the DIA in any way, the range of

21   reasonableness under this question, the question of what the

22   city should do with the DIA assets, includes zero or is very

23   close to it.

24        And now, finally, let's go to question number one,

25   can the city sell the DIA assets.  As I said before, this is

1    the only question that was really briefed in the papers by
2    the opposition and in the papers that were filed by the DIA
3    Corp, and I am one of the city attorneys but not the only one
4    that was principally responsible for evaluating the facts and
5    law surrounding the controversy.  I will tell you that the
6    objectors and the DIA Corp. papers more than adequately
7    canvassed the issues, which is the requirement of the record
8    that needed to be before the Court, not anyone else's private
9    views.  I have views on the strengths and weaknesses of the
10   arguments presented on both sides, but they're privileged,
11   and they've got nothing to do with the analysis.  I'm not
12   going to predict which side would win, but I will say this
13   much because I think this is not controversial, and I think
14   they're the two -- what I regard as the two critical
15   observations that lead again to a determination that the
16   reasonable range has to include zero.
17           First -- and this might keep me off the DIA Corp.
18   Christmas card list -- I agree that the issue would be a good
19   deal clearer if there was a formal agreement entitled, quote,
20   "Trust Agreement," close quote, that was executed back when
21   the museum was formed and amended over the years as the
22   museum evolved.  There's no question about that.  But I'm
23   also nearly certain that no one who donated art to the DIA
24   or, as it turns out in most instances, donated to the DIA
25   Corp., which was then afterwards donated by the DIA Corp. to

1    the DIA -- and by the way, whenever art was donated -- it

2    seems it's common ground -- it was donated to the DIA Corp.

3    or to the DIA.  It wasn't donated to the, quote, City of

4    Detroit, just a matter of formality that it was not written

5    that way.  I don't think any of the donors thought that the

6    art could or would be sold to fill potholes, pay for the

7    collection of garbage, pay for any other city services or pay

8    debt -- any debt incurred for that purpose directly or

9    indirectly.  That's not why people donate art to museums.

10   People donate art to museums so that other people will see

11   it, and they all want it to be there forever.

12          Since a reasonable outcome, your Honor, of even this

13   issue, can the city sell the art, is that the collection is

14   protected by sale -- from sale by applicable law, as well as,

15   don't forget, the law we started with, which is the law that

16   limits creditor remedies to property taxes, and the museum

17   may well be damaged if litigation is commenced and takes

18   years to resolve, the lower end of the range of

19   reasonableness on this view, the view that what matters is

20   whether the art can be sold, is also close to zero.

21          Let's turn to the upper end of the range.  When I

22   started this topic, I said I didn't think that the upper end

23   of the range figured that seriously in the analysis for this

24   case.  There sometimes is arguments that a settlement was so

25   great that it was stretching the upper end of the range.  But

1   to the extent that there's some general attitude about
2   proportionality that ought to be -- that ought to be reviewed
3   as well, we will prove that a reasonable valuation for the
4   DIA assets is not eight billion, that it's considerably less,
5   that there are considerable difficulties and problems in
6   conducting any liquidation at all, and that the top end is a
7   good deal lower than eight billion.  But here again, the
8   legal framework that specifies what the city has to show in
9   order to earn its confirmation order and this Court's help in
10  emerging from bankruptcy demonstrates that the focus really
11  is at the bottom end of the range, not at a upper end of the
12  range, and, again, to the extent that it turns out that
13  there's hours and hours and hours of testimony about how high
14  high is, that isn't really the best use of our time in the
15  next few weeks.
16          The last part of the inquiry with respect to the
17  settlement is the reasonable views of creditors, and, again,
18  even Syncora says that the inquiry focuses on creditors who
19  are adversely affected by the settlement.  And Syncora's
20  point, put as grossly as possible, is there's this really big
21  asset, and we didn't get anything from it.  There's a reason
22  why I started with the analysis of what unsecured creditors'
23  rights are of assets of the city because if I'm right about
24  that, and I think I am -- I think the city is -- then Syncora
25  is never going to be in a position to realize value from the

1  DIA assets.  It's just not one of the rights that they have

2  as an unsecured creditor of a city in the State of Michigan,

3  FGIC, too.  I didn't mean to single Syncora out.  So I'm not

4  sure that their views matter at all, but if creditor views

5  matter, unsecured creditor views matter, there's a bunch of

6  creditor views that have been expressed by votes to the plan,

7  and there's a lot more creditors and a lot larger an

8  aggregate amount of claims represented by those creditors who

9  have effectively approved the settlement, and this, too,

10  points in favor of approval.

11        Again, it's been a long part, but to summarize, the

12  DIA settlement was negotiated arm's length without collusion

13  by well-represented adversaries.  The settlement is well

14  above the lower bound of the range of reasonableness, and for

15  three separate reasons, three separate ways of looking at the

16  art problem, the lower bound of the range of reasonableness

17  includes a number near zero.

18        There is overwhelming creditor support, but we're

19  not sure it matters because, again, a fundamental point that

20  is going to be resolved by your Honor is the rights of

21  unsecured creditors in Michigan to assets of municipalities.

22  And as we have seen, they have no rights, so the DIA

23  settlement should be approved.

24        We are next told that the DIA settlement is a

25  fraudulent transfer, and because it is claimed to be a

1    fraudulent transfer, the Court should not allow it to go
2    forward and the plan should not be confirmed.  Well, there's
3    a little bit of circularity here.  Actually, there's more
4    than a little bit.  If your Honor approves the DIA
5    settlement, you will have decided that it is a fair
6    resolution of the issues involved from the perspective of the
7    city.  And if the Court approves the other parts of the grand
8    bargain and confirms the plan, the transactions that comprise
9    the DIA settlement will close.  But if the Court does not
10   determine that the DIA settlement is fair to the city or if
11   the Court decides not to approve some other aspect of the
12   plan or of the grand bargain, the DIA settlement will not be
13   consummated, so I think it's almost tautological.  No
14   fraudulent transfer is going to occur.  Either a fair
15   settlement is going to be implemented or a fair settlement
16   will not be implicated.  By the way, once again, the issue of
17   fraudulent transfer is about whether creditors are being
18   harmed by a transfer, and another reason why we began with a
19   discussion of what unsecured creditors' really -- creditors'
20   rights really are to city assets, including the DIA assets,
21   is because it helps inform whether there's anything to any
22   claim of a fraudulent transfer under any circumstances.
23        Moving to the state contribution agreement, I'm
24   going to skip over it mainly because I don't detect a lot of
25   controversy over whether the state contribution agreement

makes sense or whether it's a good idea or whether the

contribution by the state was adequate.  The parties that are

giving up rights under the state contribution agreement are

the parties in -- the PFRS pension class and the GRS pension

class.  They have voted to accept the plan.  I think the --

and so I don't think there's any issue with respect to

approval of the state contribution settlement except with the

possible exception of the scope of releases.  And I think as

to the scope of releases, I may get to it if I have extra

time at the end, which I don't think I will, but it is

covered in the papers, and if it turns out to be a big point

of controversy, we'll be back to it at closing.

The next settlement on the list is the LTGO

settlement, and, again, I think the same methodology is

appropriate, little bit different order.  Once again, the

city's initial position, very clear, made clear in the

presentation to creditors dated June 14th, 2013, and it's in

evidence.  I think it was on both the Syncora and the FGIC

list.  And the city proposed to treat the LTGOs as a general

unsecured claim pari passu with COP claims assuming, of

course, that the COP claims were allowed.  Of course, the

presentation to creditors noted that the COP claims might not

be.  But as your Honor I'm sure remembers, the LTGO

holders -- and there are some that are uninsured in this

particular tranche -- and the LTGO insurer, which is Ambac,

disagreed with that position, and Ambac sued the city.
Negotiations ensued after that lawsuit.  They stalled, and an
important hearing was held, and your Honor presided over it.
I will tell you that the hearing I remembered being pretty
lonely on my side of the room.  FGIC, who says they now feel
very strongly about this issue, wasn't there.  Syncora, which
has managed to stake a position in almost every other major
issue that were -- that was decided by the Court, chose not
to intervene there and wasn't there.  The other side of the
room was more crowded, and it had the -- Ambac, the insurer,
a bunch of -- I think two prominent financial institutions
who were holders of insured or uninsured pieces -- I don't
remember which -- and a assortment of amicus briefs were
filed with respect to that hearing.  All were very -- clearly
adversaries of the city.  All were very clearly well-
represented, and none were colluding with the city.  Your
Honor didn't rule from the bench.  Settlement negotiations
began again, and a deal that -- and a deal was reached.

        The arguments that were not resolved in court but as
to which risk undoubtedly existed were, number one, the UT --
excuse me -- the LTGO creditors asserted that those claims
were secured by a lien.  Number two, they proposed an
assortment -- and your Honor commented on how many -- of what
has -- what I think is sometimes called lien substitutes that
might have been applicable to those particular bonds, and

while in the litigation but not part of the actual motion to
dismiss, which was the -- motions to dismiss that was the
subject of the hearing before your Honor was the meaning of
the words "first budget item" which appears in the
resolutions that relate to the UGOs -- the LTGOs.  Once
again, procedurally the right people were on the right --
different sides of the case.  They were clearly not
colluding.  They were actually fighting about it before your
Honor.  Your Honor will know whether you thought that the
positions were adequately litigated.  It seemed to me that
they were.  What's the lower end of the range of
reasonableness?  Well, there is definitely the possibility
that the LTGOs were unsecured creditors.  No one contended
that they should be disallowed.  No one contended there was a
discrepancy as to the amount, and no one contended they
should be subordinated.  What is the upper end of the range
of reasonableness?  That they would be fully secured by a
lien, somehow protected by one of the -- I think there were
five lien substitutes that were proposed, or that they were
senior on some basis by reason of the, quote, first budget
item language.  Is the settlement in the range of
reasonableness?  Absolutely it is.  Views of creditors, no
creditors other than the COPs creditors have objected.  The
LTGO settlement should be approved.

          I think we have time for one more large topic, and

1   that's the best interest of creditors test.  There is

2   immediately a collision, I think, between what is the best

3   interest test in Chapter 9.  The city says that the best

4   interest test is a test that is applied to the creditor body

5   as a whole.  Do the creditors of the debtor overall do better

6   than they would do under the plan? Some of the objectors

7   contend that the best interest test is a test that is applied

8   over and over again class by class to every class.  Well, I

9   think the statute, once again, answers the question directly,

10   and it answers it in favor of the city's interpretation.  The

11   best interest test in Chapter 9 is codified in Bankruptcy

12   Code Section 943(b)(7).  It is not codified in 1129(a)(7).

13   1129(a)(7) doesn't apply.  If you read 943(b)(7), the

14   requirement reads -- two are clumped together -- "The plan is

15   in the best interest of creditors and is feasible."  Compare

16   that to 1129(a)(7).  I don't have it written in my notes, but

17   it talks about that as to each class -- excuse me -- each

18   creditor within a class that the best interest test has to be

19   satisfied.  The language is different, very different, not

20   even close.  In Chapter 9, it's focused on the entire plan

21   for all creditors in the same way that 943(b)(7) deals with

22   feasibility as the entire plan with respect to the entire

23   city.  There is no room in the structure of 943(b)(7),

24   particularly compared with the language of 1129(a)(7), for a

25   standard that is applied creditor by creditor or class by

1     class. It is a standard that applies to creditors overall.

2         Again, this has implications for the testimony that

3     you really need to hear as opposed to testimony that people

4     are going to offer because you are -- already have been

5     treated to in the pleadings and will be treated to, I think,

6     in evidence a whole bunch of hypothetical scenarios as to how

7     a particular creditor can navigate the out of bankruptcy

8     post-dismissal world in a way that is better for it than its

9     particular treatment under the Chapter 9 plan.

10         If I thought that motions in limine were substitutes

11     for motions of summary judgment, I would have made that

12     motion, but I don't think that they are, so I think we may

13     have to listen to that testimony but at the end understand

14     that the standard we are applying is 943(b)(7), not

15     1129(a)(7), and that we need to look at the creditor body as

16     a whole and how the creditor body is doing as a whole as

17     compared with the dismissal scenario. I'm going to talk

18     about dismissal quite a bit.

19         And by the way, everybody -- any one creditor can

20     dream up a scenario, and it's going to be all about guesses

21     about the future, but they can always speculate to a scenario

22     where their result is better outside of bankruptcy and in

23     bankruptcy, so there will be a lot of proposals made about

24     how the world might be better for any particular creditor.

25     Again, we don't think any are relevant.

1        So the next area I wanted to talk about in the best

2   interest world is about asset sales, and with respect to the

3   DIA assets, if the settlement is approved -- we believe it

4   should be -- then we know what the asset is, that you have an

5   acceptable settlement that resulted in some money that has a

6   restriction attached to it, and that's the end of it.  But

7   even if the settlement isn't approved, we come back to where

8   we started today, which is if the DIA settlement isn't

9   approved and we were in a case where we just had the DIA

10  assets, would the existence of the DIA assets have any

11  bearing on the best interest test, and our answer is no.

12  Number one, they are not available outside of Chapter 9

13  because Michigan law prohibits creditors from accessing them.

14  They can't get an execution.  They can't collect from them.

15  They have an exclusive remedy.  The exclusive remedy is the

16  Judicature Act.  In the FGIC brief they even concede that's

17  it.  So I see the best interest test as effectively having

18  two components.  One is has the debtor tried hard enough,

19  made reasonable efforts -- how can anyone disagree with that

20  as being a sensible requirement somewhere in the best

21  interest test -- the other part being compare it to the

22  dismissal alternative.  From either perspective, city assets

23  don't count.  DIA assets don't count.  Incorporate here

24  everything I said in the first big unit that we discussed

25  today.

1          Notice also that when we discussed the issue of

2     whether or not DIA assets are city assets, can be exposed to

3     creditor remedies, I was pretty careful also to talk about

4     what would be reasonable expectations in light of the law as

5     we find it.  The reasonable expectations in the law as we

6     find it for realization from assets, including DIA assets, is

7     nothing, again, not properly part of the best interest test.

8          Now, argument has been made that municipalities

9     sometimes decide to sell assets if and when they think it's

10    appropriate, but that doesn't create an expectation that the

11    assets are available to satisfy creditor claims when a

12    municipality is in significant distress and doesn't want to

13    sell assets.  And the asset sale list that FGIC compiled or

14    Mr. Spencer, their expert in all things, compiled, only one

15    was really a distressed example, at least as I recognized it.

16    I might not understand all the situations as well as I

17    should.  And that one was Harrisburg where the Chapter 9 case

18    was dismissed and the municipality did have a gun to its

19    head.  That Detroit or another Michigan municipality may

20    decide it's in its best interest to sell or privatize an

21    asset just doesn't create a reasonable expectation that the

22    assets are going to be sold to benefit a creditor when a

23    creditor needs them to be sold.

24         Okay.  What does this mean about our trial?  I think

25    I may have mentioned this earlier.  I'm sorry if I did and

repeat myself, but complaints that the city didn't adequately

investigate all of its assets in addition to the DIA assets,

DIA assets -- they say we stopped looking at real estate too

soon.  The city is also criticized for inadequately

understanding the tunnel, perhaps inadequately understanding

the airport and the other things that are listed.  The bottom

line is that for best interest purposes for a Michigan

municipality there is no obligation to do those things at

all.  They're just not part of the equation.  Nevertheless,

your Honor will hear evidence that the city did more than a

reasonable amount, particularly under the circumstances of

the background law, to fully understand what assets it had

potentially available, what assets it might decide were in

its own best interest to monetize and on what basis.

I have one more digression before getting to

property tax increases, and that's a complaint by the

objectors that the recovery notes are no longer part of the

plan.  Recovery notes, if your Honor will remember, are also

described in the presentation, the proposal for creditors,

dated June 14th.  They are notes that had a nominal principal

amount of $2 billion but no maturity.  As you may recall in

the eligibility hearing, the city was criticized a lot about

the recovery notes and their indefiniteness.  And they're no

longer in the plan.  And the truth is is they're not in the

plan because creditors didn't want upside notes on any terms

1   that the city was willing to provide.  What the city -- what

2   the city -- what the city did in response to that is create

3   something called B notes.  I was told over lunch to make

4   clear that we knew that the alphabet started with the letter

5   A, and there actually were things called A notes that

6   disappeared.  There was also something called C notes that

7   disappeared.  The B notes were the ones that were left

8   standing.  The B notes were regarded as better.  They got a

9   deal done.  Now, I don't know -- and it's probably a little

10  late -- if Syncora would rather have the recovery notes from

11  the June 14th presentation rather than B notes, and if that's

12  what the problem really is, we might well have had a

13  solution.  I don't think it is really the problem, and the --

14  our response is is that we looked at that really hard.  We

15  don't think that by eliminating recovery notes we took things

16  away that we could give creditors.  I suppose in isolation

17  that's true, but the plan also -- a lot of other things

18  changed, including the introduction of B notes, including the

19  bigger UTGO notes, including the bigger LTGO recoveries,

20  which all affected whether or not you could ever also issue

21  things like recovery notes.  We think not.

22          Property tax increases in the best interest context.

23  It is true that taxes assessed as a result of the application

24  of the Judicature Act are not subject to state debt limits,

25  but it is not true that tax increases always generate

additional revenue. And there are two reasons that this
could happen, and the cases recognize two reasons. One is
tax saturation, which is basically the time when by raising
taxes you also increase the delinquency rate and don't
generate as much net revenue as you wanted to and maybe even
less net revenue than you did before. In general terms, the
cases that discuss the tax saturation problem which
municipalities can run into -- and we cite them -- cite some
of them in the briefs. On the tax cases, let me pause here.
In our briefs, we've generally cited and focused on cases
from what I'll call the modern era, from the time when the
precursor to the current Chapter 9 made it into the Code. In
fact, tax increase cases -- the tax increase jurisprudence
goes way back to the depression, and there are a lot of older
cases. And it may well be that as part of closing we'll go
back to some of the history behind the tax saturation cases
and the cases that go by the unfortunate title, quote, "death
spiral." But in our briefs we basically confined ourselves
to the more modern cases, but there's a whole bunch of others
back -- going back through history. So, at any rate, the
first kind of taxation problem that you can run into is tax
saturation, but there's another kind that, frankly -- tax
saturation is clearly an issue with respect to Detroit, but I
think it's easier, more direct, and kind of the facts have
already been established that it's the second problem which

is the most significant problem for the City of Detroit, and
that is is that raising taxes now is not compatible with the
goal of saving the city. And the issue there is that the
relevant cases talk about that raising taxes could cause a
city to -- or any municipality to go into a state of decline
that it can't escape from. And the most interesting -- and,
again, it's not the only case on this point, but the most
interesting of the modern cases is Villages at Castle Rock,
and I want to read a quote from it, so if you'd give me a
second to find it -- and this also -- this is an eligibility
case, Villages at Castle Rock. There may have been a plan on
file as well, but the discussion is clearly in the
eligibility section. And we'll go into this in more detail
in a minute, but I think the analysis is relevant both to the
prong of the best interest test to look to whether the city
is doing enough but also the prong of the best interest test
that the opponents, the objectors say has to be settled by a
dismissal analysis or some kind of dismissal forecast, and
we're going to discuss whether that's really the case in a
minute. So here's what the -- here's the words out of
Villages at Castle Rock, and it's -- I think it's page 76 or
77 is the jump cite. "Given the evidence in that case, it is
highly doubtful that the taxes which would be required from
District 1 property owners could be collected." What they
mean there is the amount needed to pay the debts. "The

1  required level of taxation would certainly discourage new
2  home construction, thereby eliminating tap fee income and
3  preventing a broadening of the tax base.  Moreover, if unpaid
4  taxes are enforced through tap sales, purchasers will be
5  difficult to find since an excessive mill levy will make the
6  homes uneconomic.  Land is removed from the tax rolls if no
7  bid is received at a tax sale.  The mill levy on any property
8  remaining on the tax rolls then must be increased still
9  further in order to maintain the same theoretical of revenue.
10  Kemper's brief aptly describes this cycle as a, quote, 'death
11  spiral,'" close quote.  Kemper's brief used that term because
12  that's what -- the term that's used in the older cases.

13        As an aside, I don't like the term "death spiral."
14  It's susceptible to misinterpretation.  It's a label for a
15  condition, and I'm going to use "downward spiral" as a
16  synonym in our discussion today.

17        In addition to the concept which is real and has
18  been found by the courts on multiple occasions to be a
19  genuine limit on taxation and a reason why a municipality
20  will not be required to raise taxes to pay creditors in
21  circumstances where this could occur is that for the Court in
22  the Villages at Castle Rock -- and, frankly, if you go back
23  to the depression and post-depression era cases where this
24  doctrine was first formed, this was all about projecting
25  forward.  You have a tax rate now.  That's okay.  If you

1   raise taxes, all these problems might occur, and if we find
2   that those problems are going to occur don't raise taxes.
3   Please hold that thought for a couple of seconds while I
4   cover a few other things.

5           Number one, the two tests, the saturation and the
6   test relating to downward spiral, are not completely separate
7   tests.  They're not completely separate concepts.  They
8   obviously do merge to some extent, and some cases talk about
9   both of them.  And Ms. Sallee does provide useful information
10  concerning how to think about tax saturation and maybe even a
11  little bit with respect to downward -- with the downward
12  spiral situation in the work that she did, but as in the case
13  of many other things that we've discussed today, there are,
14  in fact, fewer issues in genuine dispute, in my view, over
15  whether creditors in this case can seek greater recoveries
16  from interests in property taxes.  And I ask the Court to
17  remember again its findings in the eligibility hearing, which
18  were based on large part on the backup materials contained in
19  the proposal for creditors book dated June 14th, 2013.
20  Again, it's in evidence.  You found that the population in
21  Detroit is now declining, and it is; that the business base
22  is declining.  The tax revenues have been declining.  In
23  fact, you found that Detroit is already in the place that the
24  Villages at Castle Rock court properly would not allow the
25  Villages at Castle Rock to reach.  It's sad, it's going to

1    change, but Detroit is in a downward spiral.  Detroit is a

2    downward spiral case not only because we might project that

3    an increase in taxes would have the <u>Villages at Castle Rock</u>

4    effect but because Detroit is already there as a matter of

5    the facts that percipient witnesses can see and measure.

6    Borrowing some words from the hearing that we just finished

7    before I started, we're not talking about a need to project,

8    to estimate, to speculate, or guess about a hypothetical.

9    Detroit has these problems in the here and now.  This isn't

10   the only way to look at this problem without sending a whole

11   bunch of experts off to go about to try to predict the future

12   and convince your Honor what prediction is better.  There are

13   other facts that were established in the eligibility hearing

14   and that are established in the proposal for creditors that

15   are in evidence here that also show that Detroit shouldn't be

16   raising taxes.  Detroit has the highest tax rates of all

17   cities in Michigan, and it has the worst level of services in

18   the immediate area.  Let's borrow an apt Chapter 11 analogy.

19   Consider several competing department stores, and the one

20   before your Honor in a Chapter 11 case has the highest prices

21   and the lowest quality goods and services, and it's losing

22   business to the relevant competitive set.  Would anyone

23   consider raising prices at that store?  Of course not.  The

24   reality, again, is that most people who look for a new home

25   in an area that has several towns and school districts look

1  at the differences in tax rates and what services are

2  available to residents.  It is certainly true that it is a

3  little harder for people to change their residence when

4  services decline than it is to change department store

5  preferences, but Detroit has already reached the place where

6  shoppers are finding alternatives and leaving, and not enough

7  people are coming to take their place.  A city in Detroit's

8  situation -- again, the situation here and now, not a

9  projection that's dealt with in the cases, can't raise taxes

10 without further jeopardizing its future, and if it further

11 jeopardizes its future, it pays creditors even less and

12 collects less taxes.

13       So recognizing that Detroit as a matter of reality

14 if it's going to succeed, if it's going to be rehabilitated,

15 has to compete with other areas for residents and that its

16 recovery will not succeed if it can't is still another reason

17 why taxes can't be raised.  Again, not hypothetical, here and

18 now.  Percipient witnesses can give you all the facts that

19 you need.

20       I have a section here that I was going to say

21 implications for the trial, but I think I've discussed about

22 the implications for the trial.  We should be focusing --

23 your Honor should be focusing on the facts in the proposal to

24 creditors to the modest extent that they have changed.

25 Conditions in the city today, what challenges does the city

1  have today.  Frankly, your bus tour is exceedingly relevant

2  on the question is where is Detroit today and whether we are

3  dealing with a situation, unfortunately, where Detroit for

4  all kinds of bad reasons -- and we can't recreate the past --

5  all kinds of reasons Detroit found itself in a place where

6  most Bankruptcy Courts don't allow Chapter 9 debtors to go if

7  they can help it.

8          This is actually a good place to stop, and I can

9  pick up here -- pick up with the --

10         THE COURT:  Okay.

11         MR. BENNETT:  -- dismissal analysis part tomorrow

12  morning.

13         THE COURT:  Some planning questions for each of you.

14  How much longer do you think you will be, sir?

15         MR. BENNETT:  It will be less -- I would say about

16  an hour.

17         THE COURT:  Okay.

18         MR. BENNETT:  About an hour.

19         THE COURT:  Will there be other parties giving

20  opening statements in support of the plan?

21         MR. O'REILLY:  Yes, your Honor.  We'll have about 30

22  minutes tomorrow for the Detroit Institute of Arts.

23         THE COURT:  All right.

24         MR. ALBERTS:  Your Honor, Sam Alberts on behalf of

25  the Official Committee of Retirees.  We think about a half an

1  hour as well.

2       THE COURT:  Okay.  And have you all worked out an

3  order for the opening statements for the objecting parties?

4  And what is that, please?

5       MR. KIESELSTEIN:  Good afternoon, your Honor.  Marc

6  Kieselstein, Kirkland & Ellis, LLP, on behalf of Syncora.

7  Your Honor, we have.  I'm going to kick it off.  And if my

8  run-throughs prove accurate -- and they may or may not --

9  I'll be around 90 minutes, your Honor, and then I think Mr.

10  Perez is directly after me.

11       MR. PEREZ:  Your Honor, my run-throughs have been

12  between 20 and 25 minutes, so let's 30.

13       THE COURT:  Okay.

14       MR. WAGNER:  Your Honor, Jonathan Wagner on behalf

15  of COPs.  We'll follow Mr. Perez and be about 20 minutes.

16       MR. DECHIARA:  Your Honor, Peter DeChiara for the

17  UAW.  We're happy to go last.  We have an opening that's

18  probably ten, fifteen minutes.

19       MR. MACK:  Your Honor, Richard Mack with AFSCME.

20  About ten minutes.

21       MS. QUADROZZI:  Your Honor, Jaye Quadrozzi on behalf

22  of Oakland County.  We had discussed with the COPs that

23  Oakland would follow them.  I should be about 40 minutes and

24  then Macomb followed by Wayne.

25       MR. BRILLIANT:  Your Honor, on behalf of Macomb, I

1  think I'll be about 20 minutes.

2        MR. NEWMAN:  Your Honor, on behalf of Wayne, about

3  15.

4        THE COURT:  Okay.  Anybody else?  Okay.  Would

5  anyone else like to bring up anything today before we

6  adjourn?  No.  All right.  We are in adjournment then.  8:30

7  tomorrow morning.

8        (Proceedings concluded at 4:52 p.m.)

INDEX

|  | Page |
|---|---|
| Opening Statement by Mr. Bennett | 162 |

| EXHIBITS: | Received |
|---|---|
| FGIC Exhibits 3578-3902 | 11 |
| Syncora Exhibits 4543-4651 | 38 |

        I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett                        September 7, 2014
_____        _____
Lois Garrett