```
 1                   UNITED STATES BANKRUPTCY COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3   IN THE MATTER OF,          Case No. 13-53846
                                Detroit, Michigan
 4   CITY OF DETROIT, MI        September 3, 2014
     _____/   8:30 a.m.
 5
                          IN RE:  TRIAL
 6             BEFORE THE HONORABLE STEVEN W. RHODES
                TRANSCRIPT ORDERED BY: ROBIN WYSOCKI
 7
     APPEARANCES:
 8
     For the City of Detroit, MI:  BRUCE BENNETT, ESQ.
 9                                 Jones, Day
                                   555 S. Flower Street
10                                 50th Floor
                                   Los Angeles, CA 90071
11                                 213-243-2382

12   For Detroit Institute of      ARTHUR O'REILLY, ESQ. (P70406)
     Arts Museum:                  Honigman, Miller, Schwartz &
13                                 Cohn
                                   2290 First National Building
14                                 660 Woodward Avenue
                                   Detroit, MI 48226
15                                 313-465-7628

16   For the Official Committee:   SAM ALBERTS, ESQ.
                                   Denton, U.S.
17                                 1301 K Street, N.W.
                                   Suite 600, East Tower
18                                 Washington, D.C. 20005-3364
                                   202-408-7004
19
     For Syncora Guarantee, Inc.:  MARC KIESELSTEIN, ESQ.
20                                 Kirkland & Ellis
                                   300 N. LaSalle
21                                 Chicago, IL 60654
                                   312-861-2000
22
     For Financial Guaranty        ALFREDO R. PEREZ, ESQ.
23   Insurance Company:            Weil, Gotshal & Manges
                                   711 Louisiana Street, 1600
24                                 Houston, TX 77002
                                   713-546-5000
25
```

```
 1   For COPS:                    JONATHAN WAGNER, ESQ.
                                  Kramer, Levin, Naftalis &
 2                                Frankel
                                  1177 Avenue of the Americas
 3                                New York, NY 10036
                                  212-715-9100
 4
                                  DEBORAH FISH, ESQ. (P36580)
 5                                Allard & Fish
                                  535 Griswold Street
 6                                Suite 2600
                                  Detroit, MI 48226
 7                                313-961-6141

 8   For Wilmington Trust Company: KRISTIN GOING, ESQ.
     (By Phone)                   Drinker, Biddle & Reath
 9                                1500 K Street, N.W.
                                  Suite 1100
10                                Washington, District of
                                  Columbia
11                                202-842-8800

12   For Oakland County:          JAYE QUADROZZI, ESQ. (P71646)
                                  Young & Associates
13                                27725 Stansbury Boulevard
                                  Suite 125
14                                Farmington Hills, MI 48334
                                  248-353-8620
15
     PRESENT:                     KEITH LERMINIAUX, ESQ.
16
     Court Recorder:              Kristel Trionfi
17                                LaShonda Moss

18   Transcriber:                 Deborah L. Kremlick

19

20   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
21

22

23

24

25
```

1      (Court in Session)

2          THE CLERK:  All rise.  Court is in session.  Please

3    be seated.  Calling case number 13-53846, City of Detroit,

4    Michigan.

5          THE COURT:  Good morning.  I think rather than take

6    the time to take appearances, we'll just assume everyone's

7    here.  Raise your hand if you're not here.  Mr. Bennett.

8          MR. BENNETT:  Thank you, Your Honor.  Bruce Bennett

9    of Jones, Day on behalf of the City of Detroit.

10      Where we left off yesterday we were discussing the best

11   interest test.  And in particular whether the city had any

12   ability to raise taxes and thereby generate more revenue as

13   opposed to harm itself by either continuing the downward

14   spiral that the city is already in, or making that situation

15   worse.

16      And then immediately when we left I was talking about the

17   fact that there's a competitive -- in addition to the cases

18   that talk about avoiding downward spirals, and I think

19   necessarily by the need to address downward spirals, there is

20   a competitive dimension that a municipality has to worry about

21   and that the Court has to worry about for a city that's in a

22   challenging position relative to its tax rates being charged

23   to residents and the services that are -- that it's providing.

24   That's just reality.

25      And as a result of these what I'll call facts on the

1  ground, or the here and now, as opposed to projections and

2  speculations and the so-called dismissal analysis.  The city's

3  debt can demonstrate, and I think will demonstrate quite

4  easily during the trial but it also, I'd point out, has

5  demonstrated as a result of the facts found at the eligibility

6  hearing a little bit more than a year ago, or excuse me, a

7  little less than a year ago, that the city -- that the city

8  does satisfy the best interest test even though it's not in a

9  position to raise taxes and doesn't pay taxes.

10  Now there's another dimension to the best interest test.

11  And it's the comparison to alternatives.  And the alternative

12  of course in a Chapter 9 case is dismissal.

13  And here again one of my themes is going to be we know an

14  awful lot about what a dismissal scenario is going to look

15  like for the city again, based on facts that have already been

16  found, or facts that we can find by looking around us.  And we

17  don't need to guess about the future and project about the

18  future, or gaze into crystal balls to the side that dismissal

19  is not a satisfactory alternative.

20  And again I want to remind the Court that the relevant

21  standard is not whether someone can conjure up -- some

22  creditor can conjure up a particularly rosy scenario for that

23  creditor as to how that creditor might navigate what I will

24  describe as a very disordered orderly process and somehow come

25  out the other end doing better than it would do under the plan

1 and doing better than everyone else. That's not the test in

2 Chapter 9. The test in Chapter 9 for best interest looks at

3 the creditor body as a whole.

4     So one of the things that we established earlier, I don't

5 think it's subject to dispute, is that the city can't raise

6 taxes itself. It's at the limits or very very close to the

7 limits of the taxes it is authorized to levy by the State of

8 Michigan.

9     Only Courts can raise taxes through the application of

10 the Judicature Act and it's only the property tax that can be

11 raised through -- by creditors through exercising that

12 creditor remedy with a Court order.

13     And if the city again, if we succeed in showing, if we

14 haven't shown -- if we -- as we have shown already, that the

15 city is in a downward spiral now. Dismissal followed by

16 increased taxes will only mean that the downward spiral will

17 continue or get worse.

18     And if that's the case, again as the cases demonstrate, I

19 don't think we need to -- to develop a forecast or speculate

20 about it. The city is going to be even less able to generate

21 revenue. It's going to -- it's going to lose more residents.

22 It's going to lose more businesses. It may well have more

23 delinquency problems. And that's going to make the entire

24 situation worse, not only for the residents that are still

25 here, it will make the situation worse for creditors as well.

1    And by the way, this is also a corollary of where the

2  city is today and its needs for a tremendous amount of

3  investment and more money to improve services.

4    Now the objectors say, one of their important prefatory

5  points is why a dismissal could actually work, is that the

6  recovery plan can still be implemented.  That the investments

7  can still occur and that the services can still be improved

8  using exactly the same amount of money as is contemplated

9  under the plan.

10    And -- and the reality is that that's not realistic at

11  all.  So again let's just focus on some things that we know.

12  We know that on dismissal the post-petition loan will default

13  and will become due and payable, payable at -- at using a big

14  chunk of city revenues.

15    We know that no exit financing will be available.  More

16  importantly I think the -- the argument that there will

17  somehow be an orderly process because of the way the

18  Judicature Act works, I think is wrong.

19    We actually decided that already, or Your Honor actually

20  decided that already when Your Honor found that the out of

21  Court negotiations in this case were impracticable.  Why did

22  you find that?

23    You took a look at the number of creditors, the multiple

24  kinds of creditors, the different kinds of liens, lien

25  substitutes, and priorities asserted by creditors, the

1  competition of different kinds of state law preferences.

2      We talked about at the eligibility hearing, and I'm sure

3  no one forgot, that there's a real problem under applicable

4  state law in the apples and oranges issue. For example, just

5  to take one apple and one orange.

6      You have in the LTGO context the "first budget item"

7  mandate. But you have a constitution that says, fully fund

8  pensions. To -- at least to me those seem a little bit

9  difficult to reconcile. I don't envy the Court that's going

10 to have to figure out which of those two come first. Or for

11 that matter, many many other different kinds of preferences

12 awarded to creditors in isolation by the legislature probably

13 without realizing, certainly without addressing the fact that

14 a different kind of preference, or privilege, or priority was

15 awarded to another creditor at a different time.

16     There is no ability to organize creditors, or at least a

17 greatly reduced ability to organize creditors outside of a

18 proceeding, or in a dismissal scenario. As -- as was noted

19 extensively at the eligibility hearing, many retiree groups

20 that -- that would -- that looking outside in one might expect

21 were capable of creating some form of organization, disclaimed

22 an ability to do so. And even those that said that they could

23 be representative, they were clear that they had no ability to

24 find the dissenters in any way.

25     Now when Your Honor decided that pre-petition

1 negotiations were impracticable, I don't think you decided

2 that the negotiations were impossible, but the situation would

3 nevertheless be adequately controlled by the State Courts.

4 But that's effectively what the objectors are arguing.

5     In their world everyone will get in line at the

6 courthouse very orderly in single file, obtain their judgment

7 liens, and be content to split pro rata anything that is

8 collected. Well, we know that's not going to happen. We've

9 proved that's not going to happen.

10     The first several months of this case I think are a good

11 living laboratory where the result that you would get

12 immediately following dismissal. And what am I referring to?

13     At the beginning of the case, and I've -- and I've had to

14 describe what was happening at the beginning of the case in --

15 in a number of different places. And I explain it this way.

16 That for several months you -- whenever I spoke to a creditor,

17 that creditor said, Detroit is in a very unfortunate and

18 difficult economic situation, but we should be paid 100 cents

19 and here are all the reasons why we should be paid 100 cents.

20     And Your Honor saw that play out in the courtroom. In

21 the beginning we dealt with eligibility objections by the

22 retirees asserting that well, Detroit may be in a difficult

23 situation, but the obligations to retirees could not be

24 impaired.

25     You then saw litigation by the UTGO holders that said

1  among other things, we have a lien on certain revenues

2  collected by the city and if you don't pay them to us, the

3  city has no right to collect those revenues and would have to

4  just not collect them from taxpayers.

5      You had the LTGO note holders.  We talked about them in

6  the different context of whether the settlement should be

7  approved.  But they came to Court and said they had a superior

8  position.

9      There is no reason why all of that wouldn't happen again.

10 There is every reason to expect that all of that would happen

11 again in the State Courts, but with a very important

12 difference.  State Court Judges would not have the supremacy

13 clause and the ordering principles that exist under the United

14 States Bankruptcy Code in Chapter 9 in particular to deal with

15 all of the conflicts and all of the priorities that are being

16 asserted.

17     Instead you would have State Courts having to -- to give

18 credit to all of the state laws there being no federal law

19 reason not to, and then have to reconcile all of them.

20     There is no evidence at all, there is no evidence that

21 one could possibly bring to the Court which would negate the

22 conclusion that arises from the -- the beginning of this case,

23 or the pre-filing history, or what happened in this case

24 itself to suggest that constituents that can point to any

25 particular provision that might possibly give them an edge

1  will not do so, will sit still and will be content to line up

2  just as the COPS holders would like them to, next to the COPS

3  and not in front or behind.

4       There is another part that I think is -- is -- is a

5  little hard to understand.  There is an assertion that the

6  Judicature Act liens are pari passu.  And frankly I think

7  that's right.  But that has bled into an additional assertion

8  that because the liens are pari passu, that all the money

9  collected would necessarily be distributed pari passu.

10      Well, the next point, the very next point I think that

11  the objectors make is, or -- or don't make, is that the

12  objectors are not even prepared to allege that enough will be

13  collected.  They don't assert that when these new bills go out

14  with all the different lines, and Your Honor has seen the

15  example of a bill during the LTGO and UTGO hearing where

16  there's a different line for each assessment.

17      No objector was prepared to say, I think FGIC spends the

18  most time on this, that in fact the bills will be completely

19  paid but there will be more money.  That's their assertion.

20      Well, it turns out that allocation is not a problem if a

21  taxpayer pays the entire bill, or if the taxpayer pays none of

22  the bill.  Those are both very easy cases.

23      But I don't think we'll be dealing with that case.  The

24  problem arises when a taxpayer pays part of a bill.  And the

25  taxpayer turns out can pay part of a bill, multiple different

1  ways.

2      Taxpayers actually can say, I am paying Assessment A,

3  Assessment B, and Assessment D, but not E, and not C, and none

4  of the rest of them.  They actually sometimes do it turns out.

5  How is that payment to be applied?

6      There turns out not to be an answer to that question.  It

7  might be coming to a State Court Judge near you if it turns

8  out that we have a dismissal in this case.  What if a taxpayer

9  doesn't say but sends a check in an amount that's the same as

10 one of the assessments.  Does it get attached to that

11 assessment, or do something different with it?  It turns out

12 that issue hasn't been decided either.

13     And finally, what if a taxpayer just pays a number that's

14 smaller than the total bill that doesn't match up to anything?

15 Is that necessarily pro rata?  And it turns out that actually

16 hasn't been litigated either.

17     So the reality is apart from the issue of creditors

18 asserting different priorities as a result of state law that

19 can't be reconciled as easily because you're not in a Chapter

20 -- Chapter 9 case, you also have the problem of yes, you may

21 have a whole bunch of pari passu liens and assessments that

22 appear on a bill, but unless they're paid in full, there is a

23 raft of allocation issues.

24     And I think Your Honor saw it actually in the LTGO/UTGO

25 case some indications of that because of course it never got

1  resolved because the case never got far enough.  But I think

2  Your Honor heard that there was a good deal of significant

3  issue concerning how -- how collections had been accounted for

4  and allocated to different assessments with respect to bills

5  that hadn't been completely paid.

6      And there is going to be, if that case didn't get

7  resolved, a -- a -- a -- one component of that larger dispute

8  was going to be figuring out exactly how much was collected on

9  account of different assessments and circumstances where bills

10 were partially paid.  A nightmare I am glad that we avoided

11 here, but would not be avoided in dismissal.

12     So our conclusion again from facts that we know, from

13 experience here, from things we know about this case and the

14 positions of creditors, not guesses about what they might be,

15 what we saw what they are, whether there is a race to a

16 courthouse or courthouses, or mob scenes at courthouses, there

17 is not going to be a single line where everybody agrees what

18 their rights are and settles for some form of treatment

19 arising out of a pro rata assessment as to which no one

20 expects it will be fully paid and where the allocation scheme

21 where partial payments occur, is not yet clear under the law.

22     That Your Honor, is a mess.  And it is a further

23 demonstration that the -- that a dismissal scenario is not

24 good for creditors generally.  I will go further to say I

25 don't think dismissal is good for any creditor.  But as I

1  indicated before, Chapter 9 very clearly states that the test

2  relates to creditors generally.

3      We will of course have more evidence on dismissal.  But

4  again I want to -- want to say that I think that in terms of

5  the record already established in this case, the -- we may

6  well, the city may well have already demonstrated and the

7  facts as they have developed in this case, may already have

8  demonstrated that dismissal is not a satisfactory alternative

9  for this debtor for which out of Court negotiations were

10  impossible or impracticable and as to which judicial machinery

11  that would apply wouldn't help make that more orderly very

12  much.

13      My last point with respect to this section is to return

14  to the FGIC argument that all this might be okay because by

15  creating liens pursuant to the Judicature Act on -- or not

16  liens, I'm sorry, assessments pursuant to the Judicature Act

17  and raising taxes would create such an uncomfortable situation

18  for the city that it would then change its mind and sell DIA

19  assets if it can to one of their preferred bidders as opposed

20  to pursuant to the grand bargain and the DIA settlement.

21      And -- and I would submit to the Court that that is a

22  completely inappropriate argument, it is an improper use of

23  the law, and an objective that this Court shouldn't tolerate

24  and would not change the outcome of the best interest test.

25      There's one more point in the best interest category that

1  I -- well, two more points.  They're -- I think they're

2  relatively small, but I should cover them.

3       First of all, there is an assertion that COPS, again it's

4  an assertion that's COPS specific and therefore in the city's

5  view not an appropriate consideration for application of the

6  best interest test, but we'll deal with it anyway.  The COPS

7  assertion is that the DWSD has an obligation to pay part of

8  the COPS arising from the fact that the DWSD has -- was

9  pre-petition charged by the general fund for a portion of the

10 COPS debt service.

11      Partly we think this issue should be disregarded

12 completely for the reason that what happened was that the DWSD

13 reimbursed the general fund.  The DWSD did not make any

14 payments directly to COPS creditors and it's not clear that

15 the DWSD would be obligated, in fact we don't think it would

16 be obligated to make payments directly to COPS creditors, it's

17 the city that's the obligor on the COPS, not the enterprise

18 fund called the DWSD.

19      The DWSD's obligation, if it has an obligation at all, is

20 to reimburse payments that the -- reimburse payments that the

21 general fund makes.  The -- the payments -- there will be some

22 payments in respect to the COPS, in respect to the B notes.

23 It's conceivable that there's a reimbursement obligation that

24 arises as a result of that.

25      But there isn't a reimbursement obligation that arises

1  with respect to -- to amounts that the general fund doesn't

2  pay.  And so it's -- it's hard to figure out a basis as to why

3  the -- the DWSD can be charged for a prior allocation in

4  amounts -- in respective amounts paid that will not be paid

5  any more.

6      That the general fund might be able to charge back

7  amounts it pays does not mean that the source of reimbursement

8  is liable to the city's creditor or that the city's creditor

9  has any interest in that -- in those funds.

10      Lastly, there is a series of complaints that we'll have

11 to deal with that not enough of a restructuring has been

12 achieved.  That the -- that there were ideas within city

13 departments that the emergency manager and his team didn't

14 consult adequately.  That although there is a plan to deal

15 with blight, there's no follow on land use planned for

16 blighted land.

17      That the -- the city did not adequately reform its labor

18 agreements, did not gain adequate ability -- adequate

19 flexibility under work rules, wasted an opportunity to reduce

20 the number of -- of labor groups it negotiates with,

21 bargaining units, or collective bargaining agreements.

22      And, Your Honor, the -- the evidence of the development

23 of the restructuring plan will demolish these assertions.  And

24 even Syncora admits in its papers that there have been changes

25 and there have been improvements.  Like everything else the --

1  the -- the structure of the labor relationships that the city

2  has is not necessarily ideal, but it's not the city's choice.

3      There are two sides to this equation.  And with respect

4  to agreements and work rules the city most certainly had a

5  negotiating position that included additional elements it

6  would have liked to have achieved but was not able to because

7  at the end of the day it wanted to reach compromises, it

8  wanted to reach agreements, and it did so.

9      The improvements that have been achieved are adequate.

10 It's not only the city and all of the people who worked on the

11 plan that will testify to that, Your Honor's expert witness on

12 feasibility will as well.  We don't think we will have any

13 evidentiary difficulty in demonstrating that the plan -- that

14 the -- that the restructuring part of the plan, the

15 rehabilitation part of the plan, was constructed exceptionally

16 carefully and that the results achieved are actually

17 impressive in light of the circumstances faced when the city

18 commenced its Chapter 9 case.

19     I'm now going to turn to discrimination which of course

20 is -- is -- is a topic that has been stressed quite a bit by

21 the objectors.  And the first part of the analysis is to

22 determine whether or not there is any discrimination in the

23 plan that can be fairly described as extreme.

24     And, Your Honor, it is the city's view that there is not

25 any extreme discrimination in the plan.  And I'm going to

1  spend a little bit of time discussing why.

2      First of all to begin with, we have to remember that the

3  plan treats the unfunded portion of pension claims.  And these

4  are classes 10 -- Class 10 for PFRS or the uniformed --

5  pension plan for uniformed employees.  And Class 11 which is

6  the pension plan for GRS employees.

7      And so in evaluating what the distribution really is on

8  account of a general unsecured claim, the first step is to

9  determine the allowable amount of pension claims as of the

10 petition date.  To calculate the unfunded portion as of the

11 petition date, we need to calculate the amount owed to

12 pensioners on that date and subtract the market value of the

13 assets held by the pension funds to pay those claims.

14     Not quite a situation where there's a secured claim and

15 an unsecured claim.  There's just another source in two

16 separate entities that will pay those amounts.

17     At this point I just want to digress to answer a question

18 you placed to Mr. Howell yesterday about who is liable.  The

19 city is -- the city and -- and I -- and I think the

20 representatives of the retiree committee mentioned this.  The

21 city granted pension rights, or contracted the pension rights

22 in agreements with employees.  They are city obligations.

23     The two retirement funds are separate legal entities that

24 are basically funding vehicles for the performance of that

25 city promise.  It's in all likelihood that an employee has a

1  right against the pension fund to the extent that the pension

2  fund doesn't use the pension fund resources to make payments

3  to the individual that were contracted by the city and were

4  supposed to be paid by the pension fund.  But the employee

5  nevertheless retains a right to get the city because this --

6  the employee's contract that has the pension rights in it is a

7  contract with the city.  So that's the way that works.

8     Okay.  So the assumption that is in the papers and that

9  Mr. Hackney articulated yesterday during the motions in limine

10  by the objectors, is that the agreement reached that has been

11  put in the plan that included a claim amount which by the way

12  was calculated as of not the petition date, but it was

13  calculated as of June 30th of this year, 2014, is determinative

14  with respect to the allowed amount of the claim on the

15  petition date.

16     For many reasons that is incorrect.  First of all, I

17  think we have to remember that what the disclosure statement

18  does is it's explaining to particular creditors what is

19  happening to their rights against the city.

20     And so with -- when dealing with bond holders it's

21  actually pretty easy because as we will see in a little bit

22  more detail in a minute, for Bankruptcy Code purposes, their

23  pre-petition claim is measured by their principal amount, all

24  post-petition interest being disregarded as unmatured

25  interest.  So it's really easy, that's the number everybody

1  focuses on.

2      With respect to pensions, as Your Honor learned when we

3  were trying to figure out how to make disclosure to creditors,

4  the situation is a lot different.  A pensioner isn't focused

5  on figuring out what that pensioner's claim is as of the date

6  of the filing of a petition versus the assets that are there.

7  A pension fund creditor wants to know, they got a check that

8  they're currently getting in a certain monthly amount.  As a

9  result of the restructuring what is that check going to look

10 like after the restructuring and how is it going to change.

11 And the lion's share of the negotiations and the lion's share

12 of the disclosure targets exactly that.

13     The other kind of arithmetic or math, arithmetic is

14 probably oversimplifying it, that was done in connection with

15 the disclosure statement, was to look at the one, rate of

16 return for -- that should be expected with respect to pension

17 amounts that's the 6.75, there are complaints about that too,

18 we'll come to it.

19     But also the stream of payments that were expected to be

20 paid to -- to pensioners both in the pre-petition environment,

21 but again as of June 30th, 2014, and the in post-petition

22 environment, were also discounted back again to June of '14,

23 using the same rate as investment return, the 6.75%.

24     That clearly reflects a convention that actuaries use and

25 that accountants use to determine whether a pension fund is

1  more or less in balance or fully funded.  Why do they use that

2  convention?

3      They use that convention because they're assuming, the

4  assumption is that the 6.75% return will be achieved.  And

5  mathematically the way to determine if an investment flow

6  generating a 6.75% of return is actually sufficient to pay

7  pension benefits, is to assume that those pension benefits are

8  moving at the same rate.  It's just a way to make sure the

9  numbers match up over time, subject to a little bit of flex

10 which isn't important for our purposes.

11     But let's talk a little bit about the 6.75% rate.  The

12 6.75% rate is a rate that includes an investment assumption.

13 It's about how money is going to grow going forward.  It isn't

14 a rate that one would necessarily use if one wanted to answer

15 the question what would be the pension holder's allowable

16 claim as of the date of the petition.

17     It's an irrelevant question under the agreement that was

18 reached between the retirees and the city concerning the

19 adjustment of their pensions.  It becomes a very relevant

20 question when we want to compare the return that is being

21 given to pension holders on account of what their pre-petition

22 claims would be to the return being given to COPS holders on

23 account of their claim.

24     I'm going to demonstrate this a couple of different ways.

25 First of all, we know that the pensioner -- that -- excuse me,

1  that the COPS holders believe that the recovery -- the B notes

2  with an interest rate of 5% really shouldn't be valued at par

3  because they think the relevant investment return rate that

4  should be applicable to the B notes is even higher.  Okay.

5      But the -- whatever investment return rate that is put

6  on, or whatever proffered discount rate is put on the B notes,

7  that is not a rate that changes the allowable amount of the --

8  of the claim that's asserted by the -- by the bond holders.

9  They are completely separate calculations.

10     And as -- and -- and as I said before in the case of the

11 bond world, the calculation is based upon the principal amount

12 without regard to interest.  So the investment return that is

13 going to apply to the distribution on account of the bond

14 claims has nothing to do with valuing or calculating the bond

15 claim as of the date of the petition.

16     Now, there's another exercise that I thought about which

17 could demonstrate to the Court that using a 6.75% rate for

18 discounting the obligations to the pension holders in an

19 effort to -- to find their pre-petition claim generates a

20 number that is not comparable for purposes of comparing the

21 distributions on bonds.

22     And what I did, and I think the first slide is the one

23 I'd like everyone to look at, it's exhibit number -- it has an

24 exhibit tag 614.  And I am really -- I wear glasses too, I

25 can't stand this chart how small the numbers are.  But it's

1  what it took to get them on one page.

2      What I did here, and this is just a mathematical exercise

3  but it does have a point.  As I said, let's take a look at

4  what would happen if we took all of the cash flows that the

5  COPS are entitled to under their instruments and discounted

6  them back at 6.75.

7      Again, clearly not the way we're supposed to value the

8  bond the -- the bond claim amount.  The bond claim amount is

9  just the principal amount without interest.  But if -- but if

10 6.75% is right for those guys, the retirees, why don't we see

11 what would happen to the COPS if we applied that rule to the

12 COPS.

13     So I have this chart and a couple of things by way of

14 background.  There is -- there is basically three different

15 sets of COPS.  The first block at the top not highlighted is

16 the fixed rate COPS.  They're not highlighted, not because

17 they're not important it's just because it's a little less

18 complicated to make the calculations.  So we know what the

19 principal is, we know what the interest is, and we calculate

20 that every single year for the entire maturity.  And then we

21 put the total payments in each year.  Kind of like what you

22 would do with retiree benefits.  You'd look at what they are

23 in each year going forward for out into the future as long as

24 you would expect to be paying them.

25     And there are two clumps of variable rate COPS.  They're

1  larger in the aggregate.  The first they differ in terms of

2  their libor spread.  They're both based upon three month

3  libor.

4      The first set on the chart is libor plus 30 basis points,

5  or libor plus .3.  And the second set on the chart is libor

6  with a spread of .34.  So it's a slightly more expensive set.

7  And I just highlighted the ones for 2014 to show that the --

8  the current interest rate on the COPS is pretty low.  Well

9  lower by the way, than the 6.75%.

10     All of the fixed rate COPS are also lower than 6.75%.

11 You can find the actual interest rates and the proposal for

12 creditors are on Page 118.  The -- about 640,000,000 of the

13 COPS are between 4 and 4.95% and around 150,000,000 of the

14 COPS are at -- are at 5.989%, so pretty close to 6.

15     So because the -- because the COPS are -- the two sets of

16 COPS on the bottom, the two ninety-nine and the -- and the

17 roughly five hundred, are floating rate.  We had -- and it's

18 very low now.  We had to find a forecast and we picked one

19 from Bloomberg because they had -- there is a forward market

20 for three month libor and we plotted that out all the way

21 across.

22     I'm not going to ask the -- to change the projection

23 because this is the part we need to see.  But it goes -- but

24 there's a projection, a three month libor, all the way through

25 to 2034.  That's actually only relevant to go out that far

1  with respect to the second group.  The first group matures in

2  2029.

3      And you can see, I found this interesting, that the swap

4  market is telling us that we will get back to something like a

5  normal interest rate environment in 2018 and 2019.  This is

6  clearly a projection.  There are other ways to do this.  They

7  won't vary the analysis very much.

8      The important point is, is that the -- that at least

9  based upon current expectations, the interest rates never get

10 above about 3 1/2%.

11     And then if you can move down on the page a little bit,

12 please.  You'll note that the original -- the principal

13 balance of the COPS in total is the $1,452,000,000 number that

14 has appeared in many of the presentations.

15     But if you discount all the cash flows at 6.75%, you get

16 $1,100,000,000 which is not the deviser that we used to

17 calculate the COPS distribution at all.  I am not suggesting

18 that this is the way we should determine the amount of the

19 bond claims.  We don't have a choice.  That's hard coded into

20 the Bankruptcy Code.

21     But what is not hard coded into the Bankruptcy Code is

22 the method for discounting pension claims.  On there the only

23 directive we have is to figure out the amount that they would

24 be, the allowed amount in U.S. dollars as of the petition

25 date.

1        So we have to decide how to do that in a way that's going

2    to generate comparable numbers.  I just realized I forgot

3    something.  Your Honor, will likely -- you can't forget that

4    there -- that the COPS holders argue that 6.75% is too low.

5    If it was higher, the one million one -- 1,110,000,000.3

6    number would be even smaller.  So it would create a further

7    discrepancy and methodology concerning discounting to push

8    6.75% higher.  I just want to make that point.

9        Okay.  There are three ways that we submit are a better

10   and more accurate way to look at pension claims in order to

11   determine their allowable amount as of the petition date so

12   that we can figure out as closely as possible on an apples to

13   apples basis what the distribution is on account of pension

14   claims in a way that it can be clearly and accurately compared

15   to COPS claims.

16       Number one, follow the U.S. Air decision.  It's in our

17   papers.  Your Honor may be familiar with it.  It was written

18   by Judge Mitchell.  If I had time, I would read the quote that

19   we included in our papers where Judge Mitchell says, the

20   reason you do not use some form of reasonable investor return

21   rate for purposes of discounting pension claims is not because

22   the PBGC specifies a rule.  That was PBGC's argument, which is

23   listen to me.

24       His reasoning was that has the effect of -- of putting

25   investment risk on to the pensioners.  But if there's one

1 thing that we know about the Detroit pension plans, both PFRS

2 and -- and GRS in their pre-petition incarnation is that the

3 retirees were insulated from and had no investment risk, 100%

4 of the investment risk was on the city.

5          THE COURT:  Would you adjust that microphone so it's

6 pointed right at you?

7          MR. BENNETT:  I'm sorry.

8          THE COURT:  Yes, thank you.

9          MR. BENNETT:  Is that better?

10          THE COURT:  Yes.

11          MR. BENNETT:  Okay.  As I said before, we wouldn't

12 borrow here the PBGC rate.  And wouldn't argue that we should

13 use the PBGC rate because the PBGC promulgates it.  Of course

14 the PBGC rules, regulations, and statute is inapplicable.

15     But what we do know from Judge Mitchell's opinion and

16 from the way the PBGC describes that it calculates the rates

17 that it uses, is that they have a fairly innovative and

18 interesting and accurate method of canvassing the market.

19 Accurate because it's blind.  No one knows who is asking the

20 questions.

21     And they basically solicit bids from other insurance

22 companies to write annuities and figure out the implicit

23 interest rates that insurance companies are using for issuing

24 annuities and they use that discount rate.  So -- so one of

25 the approaches is to follow the U.S. Air case, use its

1  methodology, borrow some work from the PBGC because they seem

2  to do a good job and have a methodology that other courts have

3  found to be sound, and use its rate.

4      Now one of the things we have to clearly talk about is

5  the CSC Industries case decided by the 6th Circuit where the

6  CSC Industries case had a Bankruptcy Court that used the --

7  the investment return type rate, or the investment return

8  loaded rate like the 6.75 instead of the PBGC rate and the CSC

9  Court said they weren't going to upset that.

10     And I think the important thing about the CSC, the 6th

11 Circuit decision in CSC is it's not trying to decide which is

12 right, it just said the Bankruptcy Court was free to decide

13 under the circumstances of that case that the reasonable

14 investor rate was the right rate to use.

15     By the way the CSC Industries Court found that because

16 they were concerned about doing an apples to apples comparison

17 within a class and that Court thought that for purposes that

18 aren't completely clear from the 6th Circuit opinion, that the

19 -- that the equivalent of the 6.75%, it was like 10, it was

20 higher, was the -- was the best way to achieve the

21 distributional equity within the class that the Court was

22 dealing with.  That that was a closer discount rate.

23     The exercise that I had on Chart 1 shows that 6.75 isn't

24 actually a good rate to create a comparable analysis with

25 respect to the COPS claims, you need a lower rate.

1    So in any event one alternative is to see -- is the -- is

2    to use the PBGC rate and I'd like to put Chart number 2 up.

3    No, that's not the one.  Number 616.  That one is for later.

4    Okay.  This is the effect of using the PBGC discount

5    rates on the PFRS and GRS anticipated claim numbers.  The

6    recovery for purposes of this exercise as you can see, and

7    we'll get this argument about what counts in the recovery and

8    what doesn't.

9    For purposes of preparing this chart we have done it the

10   city's way.  This chart can be prepared any other way, but for

11   purposes of just getting into the ballpark what you will see

12   is the recovery percentages if things are calculated in

13   accordance with the PBGC rates.  For PFRS it's around 8.6%,

14   for GRS it's around 21%, 20.7%.

15   The last comment I'm going to make with respect to the

16   use of the -- the CSC reasonable investor rate is that history

17   has not been kind to the Courts that have used those rates.

18   And we show in our papers that -- that there are lots of very

19   high rates that came out of these reasonable expectation

20   calculations, or these investor expectation calculations that

21   were never realized.

22   And I would submit that it's another suggestion that it's

23   hazardous to be discounting fully enforceable obligations to

24   retirees under applicable non-bankruptcy law with a rate that

25   includes investor expectations which by the way it looks like

1  historically have turned out to be too high.  That's not fair

2  to retirees.

3      Okay.  This isn't the only approach.  There's another

4  approach.  And the retirees actually believe that the second

5  one is -- is -- is more appropriate and that's to use a risk

6  free discount rate.

7      This turns out to generate very close results to the PBGC

8  type approach.  It's the same effective approach.  It uses a

9  different interest rate.  You would expect the risk free rates

10  to be slightly lower because the annuity pricing survey that

11  the PBGC does is a survey done of profit making companies.

12      So if we can now see the next chart, it's Exhibit 617.

13  Oh, the risk free rates also -- the risk free rates also the

14  -- the -- they don't -- they don't have a step in them that

15  the PBGC does.  So I guess they're -- they're a little bit

16  lower on the front end and a little bit higher on the back end

17  is what happens.

18      Here you see you wind up with essentially the same

19  numbers.  Recovery percentage of about 9.3% for PFRS, recovery

20  percentage of about 22 for GRS.

21      And then there's a third alternative which actually has

22  the charm it turns out of tracking the methodology prescribed

23  in the Bankruptcy Court for dealing with bonds most closely of

24  all.

25          THE COURT:  Can I interrupt you with a question?

1          MR. BENNETT:  Sure.

2          THE COURT:  On -- on both 616 and 617 you have your

3   recovery amounts there on the second line.

4          MR. BENNETT:  Uh-huh.

5          THE COURT:  Three sixty-one nine and seven

6   seventy-three eight.  You see those, right?

7          MR. BENNETT:  Yes.

8          THE COURT:  Where do those numbers come from?  What

9   are those numbers?

10          MR. BENNETT:  This is the -- okay.  The -- in three

11   sixty-one nine on the left, it's the only thing that is

12   included is the city general fund contribution to the -- to

13   the PFRS which kicks in beginning in year ten.

14       What is excluded is right below that.  We've included all

15   the data you would need to do it differently if you chose to.

16   The state -- the state contribution headed the PFRS is the

17   92.9.  The DAA is -- is 19.2, that's its fraction of the 100.

18   And the foundation is 134.3.

19       With respect to GRS, the seven seventy-three is a list of

20   a whole bunch of different things that are going in at the --

21   going into that including the DWSD contribution that we're

22   going to talk about.  The UTGO, the library reimbursement and

23   all those things together, the 403 and those three numbers add

24   up to the 773.8.

25          THE COURT:  Okay.  So the city general fund recovery

1  element, three sixty-one nine and four oh three five is

2  provided when?

3        MR. BENNETT:  That -- they -- they come in beginning

4  in -- beginning in year ten after the first nine years.

5     And as Your Honor may remember, the agreement is, is that

6  the funds are funded to -- out of other sources to a certain

7  point and then beginning in year ten, the -- the city picks up

8  the difference.

9        THE COURT:  And so this -- this chart doesn't

10 discount that for present value?

11        MR. BENNETT:  It does discount that to present value

12 using the 6.75%.

13        THE COURT:  Yes, okay.

14        MR. BENNETT:  The relevant -- the -- the -- the

15 investment return -- on the investment return side is

16 included.  That's why the (Inaudible) comes out at three

17 twenty-eight, not four twenty-eight for those reasons.

18     Okay.  The -- the last approach that I want to talk about

19 is in many ways becoming my favorite.  And -- and this is --

20 as you remember the approach that applies in the case of a

21 bond is you ignore interest, you take principal, you don't

22 discount principal.

23     Well, it turns out that the Detroit pension funds are

24 actually not structured too dissimilarly than that.  In the

25 colloquial language of this case we refer to the COLAs with

1  respect to the two pension funds.  COLA of course is cost of

2  living adjustment.

3      But what we don't often explain but it's true, is that in

4  the case of the two Detroit pension plans, the COLA is not an

5  adjustment based upon actual changes in the price level.  It

6  is a stipulated contractual rated increase that is applied

7  every single year.

8      So it's kind of like an interest rate.  It's actually

9  extremely analogous to an interest rate.  So it occurred to me

10  why don't we apply the same rule.  Strip out all the interest,

11  all the COLAs from the pension -- from the pension plans and

12  just look at the payments to employees as principal amount.

13  And don't discount them.

14      THE COURT:  Okay.  But before we cause widespread

15  panic here, you're not talking about eliminating those COLAs

16  in your plan.

17      MR. BENNETT:  No.  This is -- this is just a

18  mathematical calculation.  The -- the -- the -- just to be

19  clear, the part of the -- the place we are on the map is we're

20  trying to figure out what is the best way to calculate the

21  theoretical, all this is theoretical.  We -- a deal has been

22  cut with all the retirees.

23      We are calculating the theoretical allowable amount of

24  the pension claim as of the petition date, calculated in the

25  way that is consistent as possible with the statutory mandate

1  as to how to calculate bond claims as of a petition date where

2  we have no specific statutory mandate for how to calculate the

3  pension claims. That's up to Judges.

4      So what we did is we stripped out the COLA for purposes

5  of the calculation, not -- we did not say we're terminating

6  the COLA. We -- we stipped it out of both PFRS and GRS and

7  then calculated the numbers again. And that's chart number 4

8  -- or excuse me, number 5 -- no, 4, I'm sorry. Four, Chart 4

9  we're up to. And that's this one.

10      THE COURT: 618.

11      MR. BENNETT: Exhibit 618. And again same

12  convention with respect to what's included in the distribution

13  or not included in the distribution. We're going to get

14  there, I'll cover that issue.

15      But if you do the numbers the city's way we now have

16  distribution amounts of 7% with respect to PFRS and 15.1% with

17  respect to GRS.

18      I think these speak for themselves. These are not --

19  these are -- there is -- whichever method that you choose to

20  more closely and more accurately figure out what pension

21  claims would be, what the unsecured amount of pension claims

22  would be at the petition date, you wind up with numbers that

23  don't discriminate or discriminate extremely slightly.

24      Before I move on to the issue of what assets count and

25  what assets don't count in the calculation, there's one more

1  issue we have to deal with and that's the issue of vested and

2  non-vested benefits.  And I'm afraid here there's been a lot

3  of confusion about what vesting means.

4      We use accrued benefits.  And we admit that accrued

5  benefits is the right measure.  We are accused of conceding

6  that the right amount is accrued invested benefits.  We have

7  never said that.

8      Vested benefits are of course lower than accrued

9  benefits.  But what does vested benefit mean?  The vested

10  benefit is the benefit that's protected if the employee

11  leaves.  If the employer breaches and, for example, to figure

12  out where it would show up in the cases, where -- where there

13  is an inappropriate termination of an employee by an employer,

14  the damage claim isn't the vested benefit, the damage claim is

15  the accrued benefit with by the way all of the seniority

16  improvements and enhances that the employee would have

17  achieved had he was not been fired.

18      When the debtor is in bankruptcy and is not performing

19  its obligations that is much more analogous to the

20  circumstance where the employer is the breaching party, not

21  where the employee is leaving.  So from our perspective, the

22  proper measure of damages is based upon accrued benefits, not

23  vested benefits.  All of these numbers have been accrued

24  benefits.

25      I won't spend the time here.  If this is still a dispute

1  at closing, I will bring the cases and there are many that

2  describe the remedy against an employer where it's an employer

3  breach and where the demonstration is that it's not the vested

4  amount, but it is the accrued amount in the Court's view that

5  -- that would be payable and is therefore the appropriate

6  measure of the claim.

7       Okay.  In terms of assets that should be included and not

8  included -- not included.  Number one, there was a assertion

9  that we were excluding UTGO settlement proceeds in the

10  calculations.  As you've seen here, we've actually included

11  them.

12      I'm not sure they should be.  By the way there's argument

13  they shouldn't.  The -- the part of the UTGO settlement

14  proceeds that's -- that is -- that -- that is being made

15  available under the plan for hardship cases in the pension

16  universe isn't actually being distributed evenly.  It's

17  frankly a appropriate policy response by a city to alleviate

18  distressed condition of a certain, you know, segment of its

19  population.

20      I would argue that's just a legitimate and reasonable use

21  of property.  But it's not a big number.  We included it so we

22  wouldn't have a fight over that.

23      The next assertion is that at the petition date when

24  calculating the claim we shouldn't simply subtract the market

25  value of the assets against the claim however it's calculated,

1  we should make some adjustment for the expected return on

2  assets.

3       This is of course silly when you have a stock or a bond

4  and it's got a price in the market today.  That price reflects

5  the expected future return on that asset.  It would be quite

6  absurd to say oh, let's go look in the paper, here's the price

7  of GM stock today and then say oh, I think that's going to

8  have a higher rate of return so I'm going to put it in at a

9  higher value.

10      That -- that is exactly the kind of accounting that we're

11  in the business I think of discouraging as opposed to

12  encouraging.  The only defensible measure of the amount of

13  value that is available for pensioners that does reduce the

14  amount of their unsecured claim is the amount of the market

15  value of the assets.

16      Cash at face amount, bonds at trading prices, stocks at

17  trading prices, and more exotic assets that are difficult to

18  value at fair market value.  That's the way to do it.

19      By the way that is the way we determined allowed secured

20  claims as well.  And for purposes of distribution, you have to

21  up take that number to the confirmation date of course because

22  the collateral increased in value and if the pension fund

23  increased in value, we've got to capture that too.

24      Then we are told that because in calculating the value of

25  the contributions from the state and the DIA and the

1  foundations, that the discount rate shouldn't be 6.75% because

2  those contributions are more certain.  But frankly that's not

3  the reason why they're discounted at 6.75%.  They're

4  discounted at 6.75% because it's an opportunity by people who

5  have made those commitments to get an early payment discount

6  at 6.75%.

7      So it would be wrong to -- to kind of adopt a -- a lower

8  discount rate when the person -- the payor can capture a 6.75%

9  discount rate.

10     And lastly, before I get to the ones where there's the

11 huge controversy.  There is the DWSD recovery which is --

12 which is a certain qualifying transactions generating very

13 specific kind of proceeds trigger an additional distribution

14 to pension claim holders, but that could very easily be zero.

15 And for right now we've included it as zero.  And of course if

16 you read the papers that were filed by the counties, their

17 view is it will forever be zero.

18     Okay.  Then there are several categories of payments that

19 are -- that are, you know, kind of -- have attracted a lot of

20 attention.

21     The first is ASF recoupment.  And here I think there's a

22 lot of confusion about what's going on in the ASF -- ASF

23 recoupment.  Our view of ASF recoupment is that it isn't

24 actually a part of a return on the city side at all.

25     The ASF recoupment is basically recovering money that had

1  been either lost or converted at some point in time like

2  collateral that had been lost or converted and then the

3  collateral was coming back.  So to the extent that the

4  opposition says, you shouldn't include the ASF claim in your

5  calculations of the amount owed, the answer is, to the extent

6  that the -- the ASF -- the ASF claim should not be included

7  except to the extent that there's any claim left over against

8  the pension funds and I think there isn't, but by the same

9  token the ASF value recovered should not be considered part of

10 the distribution, it is considered an offset to the amount of

11 the unsecured claim because basically collateral or value that

12 should have been available has been recaptured.

13     Now why is that significant?  The opponents use the --

14 you know, the big 50%, 60% numbers that are in the disclosure

15 statement.  Those numbers do include the ASF recoupment as a

16 part of the distribution because from the paycheck perspective

17 of a -- of an employee, the ASF numbers are coming out of the

18 ASF type program and going into the pension program.

19     But for purposes of determining whether there's been

20 unfair discrimination, the -- the "recovery of collateral" is

21 what I'm going to call it, is not part of the equation, it's

22 just not part of the unsecured claim at all.

23     So to the extent that they're saying the ASF claim

24 doesn't belong in the numbers, it doesn't.  But the ASF

25 property doesn't belong in the numbers either.  That's point

1    one.

2        Point two, exclusion of grand bargain payments.  Two

3    categories.  The -- the amount that came by reason of the DIA

4    transaction and the amount that -- that came from the

5    government or will come from the government as a result -- the

6    state government as a result of the state settlement.

7        The most important case in this area is <u>Bryson</u>

8    <u>Properties</u>.  That's a District Court case from the Middle

9    District of North Carolina.  I cite to it and say it's

10    important because of the quality of its reasoning.

11        And the situation there was that there were differences

12    in -- in payments between two classes.  It turned out that one

13    class had a guarantee from the -- the guarantee or liability

14    of the general partner.  I'm actually not remembering which

15    right now.

16        But it had a claim against someone other than the debtor

17    and the different class didn't have that right.  And the

18    assertion using essentially the same words that have been used

19    by the objectors, there was a provision in the plan for

20    satisfaction of the guaranteed or general partner liability

21    claims at a higher rate funded by the general partners.

22        And the objectors said, wait a second.  That's unfair

23    discrimination.  Both those payments are coming under the

24    plan.

25        And the <u>Bryson Properties</u> Court disposes of that

1  contention with I think perfect language.  I quote, "the third

2  plan ..." -- they were better than us, they got it done in

3  three.  We're on number six.  "The third plan does therefore

4  make some distinction in its treatment of the unsecured

5  creditors.  But the plan is not the source of Travelers', who

6  is the complaining creditor, disadvantage.  The distinction

7  made by the third plan is simply not one prohibited by the

8  Code".

9      So what's the test?  The test is why was there a

10  difference.  And if there was a reason for -- for a difference

11  that was just inherent in the claim of the creditor or

12  something else, then it's something that it's excluded.

13      So we have two different kinds of payments coming out of

14  the grand bargain.  I think the state payments are the

15  easiest.  They are exactly comparable to what was going on in

16  Bryson Properties.

17      The retiree committee vociferously has asserted that one

18  of the benefits going to retirees from the constitution and

19  the state's subsequent authorization of a Chapter 9

20  proceeding, is that the retirees have been damaged and that

21  the state is responsible for the difference.

22      The state has never admitted that.  The state in fact has

23  -- has -- has in all instances denied it and pointed out

24  reasons for the -- the basis of their position.  But they see

25  the virtue of a settlement of the claims against them as well.

1  And they are making available money that is certainly being

2  distributed pursuant to the plan but is nevertheless not the

3  source of the COPS disadvantage.  The COPS disadvantage is

4  they don't have a claim against the state.  In the

5  circumstances we think that none of the state contribution

6  counts.

7      We also think that the DIA and the foundation's

8  contribution shouldn't count either.  And here is still

9  another ripple of the very first topic of discussion that we

10 had yesterday which is do the COPS have any claims whatsoever

11 in respect of assets of the city.

12     I'm not going to repeat the argument here.  The basic

13 elements are take a look at applicable non-bankruptcy law,

14 can't find it there, take a look at Chapter 9, no change.  In

15 fact Chapter 9 doesn't enhance unsecured creditor remedies in

16 any respect, it cuts back on them.

17     There is no basis under applicable law to assert -- for

18 the COPS to assert or for anyone who is a normal unsecured

19 creditor to assert they have a right to any of this value.

20 It's another disadvantage that is not in the plan, it has

21 another source.

22     The retirees by the way, and we'll get to this in another

23 prong of the discrimination test, may be different.  Because

24 the retirees once again have a constitutional provision

25 outside of bankruptcy and I'm not referring to the non-

1  impairment position.  I'm referring to the full funding

2  position.

3      So we think that the way we treated the different

4  contributions on the chart is accurate and that the two just

5  described don't count as part of a distribution by the debtor

6  that is tested in the unfair discrimination universe.

7      Now we come to the point -- well, there is some

8  discrimination and if the numbers are used a little bit

9  differently than we do, or adjusted one way or another for one

10 thing, there might be a little bit more or a little bit less.

11 Is that justification -- is that discrimination justified?

12 And the answer is yes.

13     We assert several reasons for that justification and in

14 no particular order.  The first is the basic what Your Honor

15 talked about business justification, business reasons.

16 Whether that's the right term or not, I'm going to use that

17 term.  It is the term that the cases use.

18     And as I think we all know more than anything the city is

19 in a service business.  It needs a motivated and stable work

20 force and it is the city's assertion and the city's witnesses

21 will testify that actives are motivated, probably what's

22 happening to their own pensions and a lot of actives have

23 pensions, but they look to their left and look to their right

24 and -- and -- and think about what their employer will do in

25 the future by reason of how their employer treats others.

1    So in our view to an active, the treatment of a retired

2  person matters.  Maybe not as much as it matters what's

3  happening to the active himself, but it's part of this

4  equation.

5    The _Aztec_ case itself, _Aztec_ of course is being appealed

6  to because it has one of the statements of the way in which

7  the issues of discrimination might be managed by a Court.

8  It's discussing the Chapter 13 provision which is worded the

9  same way.

10    It sets out a -- guidelines and analysis that should be

11  useful for 1129(b)(1) purposes.  That's the -- that's where

12  the unfair discrimination provision is.  And it's -- and one

13  of them is, for example, does the proposed discrimination

14  protect a relationship with specific creditors that the debtor

15  needs to reorganize successfully.

16    And _Aztec_ collects about ten cases that support that

17  proposition.  One of them that seemed interesting is _In Re:_

18  _Hill_ which talks about making higher payments to health care

19  workers so that they'll continue to provide treatment.

20    And then another one that I thought was -- was

21  interesting, was _In Re: Perskin_ which was preferred treatment

22  of credit card bills for traveling salesmen.  There is eight

23  or so more, but those were a couple that I thought were

24  particularly interesting.

25    Now Aztec rejected the plan there because the Court

1  didn't find the exsitence of a relationship that needed to be

2  protected.  The beneficiary of the discrimination was one of

3  the principals.  But that certainly isn't what's going on

4  here.

5      And by the way, the -- the <u>Chateauguay</u> case and there are

6  of course many Chateaugay cases, but the one I'm referring to

7  is 89 F 2d 942.  There the -- and it's not really a

8  discrimination case because -- because a -- one claim was

9  given priority and made a post-petition administrative expense

10  and another claim wasn't.

11      So -- so in a technical level it isn't exactly in the

12  same place as we are but its reasoning is very interesting.

13  And there you had insurance companies that were on the hook

14  for certain health claims of employees because they had posted

15  bonds in certain states.  And you had employees in other

16  states that weren't the beneficiaries of bonds.

17      The debtor elevated and made post-petition claims, the

18  claims of employees that weren't the beneficiaries of bonds.

19  They did not elevate the reimbursement claims of the insurance

20  companies who had paid claims of employees in states where

21  there were bonds.

22      And the insurance company said, that's not fair.

23  Discrepancy, 100% payment for the employees whose claims were

24  elevated to administrative status, 37 to 44% for the insurance

25  companies that had reimbursement claims for having paid

1  exactly the same thing.

2      Answer, you can't run a business without employees.

3  discrimination was upheld.  Again, not really discrimination,

4  but the one getting priority and the other not getting

5  priority essentially the same concept.

6      The expert report that was -- was filed by the --

7  Murphy's expert report.  I don't remember whether Syncora or

8  FGIC.  If I read it correctly, and we're certainly going to

9  hear from him here, he doesn't because he can't argue from the

10  proposition that employees look to their left and look to

11  their right and figure out what their employees are doing for

12  others.

13      He's got a long sentence where at the end of the day he

14  seems to concede that that might actually happen.  I think

15  common sense says that it does.  If -- if -- if a partner,

16  quite likely at Jones, Day is treated badly, I'll notice and

17  do something about it.  That's natural.

18      But then interestingly Mr. Murphy goes on and spends a

19  longer part of his report saying the real problem is that by

20  giving improved pension treatment is an inefficient way of

21  achieving the objective of keeping your employees happy.  I

22  don't know whether that's true or not true.  I just don't find

23  that qualification in Aztec, or in LTV, or in cases like them.

24      Where that not only do you have to have a business

25  purpose for -- to justify discrimination, but you need a

1  business purpose and -- that is efficiently expressed by

2  discrimination, or efficiently implemented by discrimination.

3  That just doesn't seem to be in the law.

4       And so I find a lot of the evidence that the -- that the

5  opponents are going to appeal to as a basis for negating the

6  idea that there's reasonable business justification is just

7  not evidence that's relevant under the cases.  That's not the

8  only reason for the distinction.

9       There's also a settlement with retirees as Your Honor

10  knows.  Now the first attack on this theory or basis for

11  discrimination, is Syncora's assertion that the pensioners

12  really didn't give up anything.

13       As a factual matter, the cost of living adjustments which

14  we've just learned aren't actually cost of living adjustments

15  at all, they're stipulated, you know, rates of return.  If my

16  memory serves me correctly, and I wasn't able to verify this

17  figure, but I think it's right.  Between 14 and 16% of the --

18  of the calculation of total benefits is actually attributable

19  to those interest factors or COLA.  So it's not rounding

20  error.

21       And I think from the perspective of most employees 100

22  cents on the dollar or 95.5 cents on the dollar are not the

23  same.  In fact the Syncora assertions seem like statements

24  that one can only make when discussing someone else's

25  compensation.

1    I think the retirees will have more to say about the

2  consequences of their settlement on some of the people they

3  represent.

4    But in any event, one of the important points made by the

5  cases whether it's the <u>Markell</u> test or the <u>Aztec</u> test or -- or

6  even if there are lots of cases of course that don't endorse a

7  test and just talk about these factors.

8    Is that whether the COPS claims and the pension claims

9  are necessarily "enforceable" in the same manner outside of

10  Chapter 9.  And the answer is, outside of Chapter 9, the

11  pensions and the COPS are not necessarily enforceable in the

12  same manner.

13    Again to repeat something I've said before, there is the

14  diminished and impaired part which we assert, the city asserts

15  and Your Honor found but the 6th Circuit or the Supreme Court

16  hasn't had a crack at this yet, that the impairment provision

17  of the pensioner's clause is exactly the same as the

18  impairment provision under the contracts clause.

19    But there is that other part of the pensioner's

20  protection under the Michigan contribution -- constitution

21  relating to contributions and funding which wasn't implicated

22  in eligibility, but may well be worthy of thinking about in

23  this context.

24    There are no cases that explain to us, and I guess this

25  is a point that's also relevant to best interest.  There are

1  no cases that explain to us how a collision between kind of

2  all the other different preference provisions and the -- and

3  the full funding part of the constitution would be resolved

4  outside of Chapter 9.

5      But it's not irrational to conclude that some kind of

6  priority or some kind disparate treatment would result versus

7  COPS claims in a variety of circumstances.  And again the

8  argument by the objectors are since the same remedies are

9  available to retirees and Syncora well, yes, one of the

10  remedies is the Judicature Act but there may be a

11  constitutional remedy.

12      We already discussed the fact that exactly whether

13  outside of bankruptcy in a non-Chapter 9 scenario if there are

14  preferences, priorities, or other kinds of state differences,

15  a Court's going to have to figure out what they mean and it's

16  more likely than not they're going to mean something.

17      But more importantly than both of those is the ability of

18  the city to impair pension claims to begin with.  Your Honor

19  has most certainly ruled, we agree, I agree with Your Honor's

20  decision that there is no more protection in the pension's

21  clause than contracts have in the contracts clause.  It sounds

22  like that Mr. Hackney, Mr. Kieselstein, and Mr. Perez agree.

23      The only problem is none of us have made it to the 6th

24  Circuit or the Supreme Court.  And we don't have the last word

25  on this question.

1    And if there isn't a settlement with the pensioner's as

2  we know, the 6th Circuit is going to check in on that issue and

3  there is most assuredly some risk that the 6th Circuit Judges

4  will not see it the same way as we do and that would create

5  enormous problems for the city's restructuring.

6    For this reason there was a settlement.  And the

7  settlement has some bearing on whether the discrimination that

8  resulted is rational.

9    Lastly, in the issue of reasons for distinctions or

10  expectations.  It is asserted by Syncora that we ought to be

11  looking at the -- at the sophisticated pension funds as the

12  people ultimately protecting pensioners, not pensioners

13  themselves.

14    But even Syncora admits that the pensioners vote for the

15  boards and ultimately it's the pensioners who are responsible

16  for how the funds are managed and -- and I guess ultimately

17  how the funds deal with the city.  I think it is clear that

18  the pensioners are not nearly as sophisticated as Syncora

19  holds itself out to be.

20    Imagine the advertisement, Syncora: as sophisticated as

21  an average Detroit pensioner.  I don't think that's how they

22  would be selling themselves.  Syncora and FGIC on the other

23  hand hold themselves out as among the most sophisticated

24  entities to evaluate municipal debt.

25    And by the way they don't even lend money.  They don't

1  provide services that actually, you know, are delivered to

2  residents.  They evaluate credits and based upon their ability

3  to evaluate credits they sell insurance.  The only thing they

4  sell is sophistication and they charge a lot for it.

5      Whether they accurately understood Detroit's situation

6  when they insured the COPS, it wasn't that long ago by the

7  way, isn't fully known.  But it's much more reasonable to

8  expect that they should have understood it better than

9  Detroit's pensioners.

10      We cite cases in our papers for the -- for the opposition

11  that differences in expectations, reasonable differences in

12  expectations can affect the discrimination calculation.  There

13  is a couple of other standards that are applicable in the

14  discrimination context.  They shouldn't delay us for very

15  long.

16      One is was the distinction necessary to achieve

17  confirmation.  We submit that it is.  That the -- that the

18  deal with pensioners made possible the affirmative votes in

19  support for the plan for two of the largest creditors.  It

20  facilitates an early exit of -- from the -- from the

21  proceeding which is of course definitely in the interest of

22  the city.

23      It likely facilitated the ability to get a deal done at

24  OPEB at the extreme levels.  That that had to be done.  And

25  most importantly we have put behind us forever the litigation

1    over the -- over eligibility which as I mentioned could easily

2    have come back.

3         The next issue is whether or not the distribution to the

4    COPS is meaningful.  I don't know what to say other than

5    $140,000,000 in B notes is a meaningful amount of money.  It

6    may be smaller than the COPS holders want.  It's the same

7    distribution that was approved by OPEBs and that was in

8    respect of claims for medical benefits.  That the recovery is

9    small or smaller than the COPS holders would like does not

10   mean it isn't meaningful.

11        And finally the -- the discrimination that as we've seen

12   is quite modest, was proposed in good faith.  We all know it

13   was not -- it has not been finally determined that the pension

14   claims can be impaired in a bankruptcy case.  There is

15   enormous efforts to avoid finding out the answer to that

16   question at the 6th Circuit by all sides.

17        The -- there are -- there are potentially assertions that

18   -- that if the -- if the retirees are successful in convincing

19   the Court that the protection under the pensioner's clause is

20   greater than the protection under the contracts clause.  That

21   they are not pari passu with general unsecured claims.  That

22   there is some different status that they have.

23        COPS claims though are at best general unsecured claims.

24   They may not even be that.  And in light of those differences

25   of the asserted position making the deals that were made was

1  definitely in good faith.

2      The assertion is also made that there is discrimination

3  versus the LTGO claims.  I'm not going to add anything to what

4  I said about the reasonableness of that settlement yesterday.

5  I think that covers the basis for discrimination with the LTGO

6  claims which in terms of amount was, you know, roughly, you

7  know, the 10% recovery for the COPS versus roughly 30%.

8      As Your Honor may remember, among the claims that the

9  LTGOs made was a secure status claim, a lien substitute type

10 claim, a first budget item type claim.  Your Honor witnessed

11 that litigation and most of the positions that would be

12 asserted by the parties in the context of a motion to dismiss.

13 And I don't -- I think that's ample basis for the distinction

14 is that settlement.

15     I'm not going to go into the separate application of the

16 Markell test.  I think I've been tracking the consensus of the

17 cases and the summary of the cases that's in the Aztec case.

18 I will say that the Markell test is triggered by the existence

19 of two classes with the same priority.

20     And I said from the outset that that is one of the issues

21 that is settled as a result of this discrimination.  And we

22 don't start with the proposition that the -- that the pension

23 classes and the COPS classes are necessarily the same in all

24 respects particularly outside of applicable bankruptcy law.

25 That's one of the issues that was settled.

1    But I will also point out that the rebuttal factors in

2  _Markell_ also include a reference to the outside of bankruptcy

3  treatment because one of the potential rebuttal factors is

4  that outside of bankruptcy the dissenting class would receive

5  similarly less than the class of the "same priority".

6  Remember that's a little bit up in the air.  That is being

7  favored under the plan of adjustment.

8    Again I don't think that -- that the COPS can show that

9  outside of bankruptcy.  We can show that outside of bankruptcy

10  that the pensioners would do better.  I don't think the COPS

11  can show that they would not.

12    I'm running a little over estimate.  I'll skip some

13  things.  Let me talk about plan proposed in good faith.

14    In a lot of ways based upon our -- our arguments about

15  the reasonableness of settlements, satisfaction of the best

16  interest test, the fact that the plan's discrimination is not

17  unfair.  All of which is to a degree influenced by the rights

18  that unsecured creditors start out with in -- in a Michigan --

19  in a case of a Michigan municipality.

20    There isn't much left to talk about in terms of good

21  faith.  The city did what it was supposed to do.  It proposed

22  reasonable settlements, they'll have to be approved.  It

23  proposed a plan that meets the best interest test.

24    It didn't propose unfair discrimination.  That is the

25  most important indication of good faith.  The city did all of

1  this with the proper purpose of restructuring its financial

2  affairs and emerging from bankruptcy as a viable city.

3      What Your Honor recognized in the motion to strike --

4  your opinion on the motion to strike the Syncora pleading, was

5  that whether the plan was proposed in good faith is not

6  dependent upon what mediators said or did.  It is not also

7  dependent upon what steps everybody made between the filing of

8  the petition date to reach the agreements that were reached.

9      What is required is that the city in making the proposal,

10  complied with the applicable requirements of the Code,

11  proposed a plan that is overall fair and we've done that.  And

12  that was most of the point of the -- of all of the discussion

13  that we've had to this point.

14      I'm not going to spend any time dealing with the

15  assertions that the requirement to file a plan in good faith

16  includes a kind of parody objective with making sufficient

17  investment and expenditures for the city to survive and the

18  parody objective being pay creditors as much as you possibly

19  can.  It's first things first.

20      If the city doesn't reverse its -- its current condition

21  that is declining it's not going to be in a position to make

22  any recoveries for anyone.  First things first, is resolving

23  the city's current condition.

24      All of the money that's needed to do that has to come

25  first.  And as I indicated at the very beginning when I

1  started, while we think that the monies that have been

2  allocated for investment and expenditures towards services are

3  adequate, we are absolutely aware that there are no shortage

4  of other candidates for necessary expenditures that could well

5  have been included to make it even better.

6      So if anything the amounts are kind of on the lower end

7  of reasonable as opposed to the higher end of reasonable.  And

8  we couldn't do any better for the creditors.  The numbers show

9  that, the testimony of the -- of the Court's witness shows

10  that.

11      Okay.  Finally, a few words on feasibility.  Feasibility

12  of course is an intensely and unavoidably factual

13  determination.  There is not much law that is going to frame

14  that discussion other than the standard which is that -- that

15  the -- there has to be pursuant to the plan a more likely than

16  not result that the city recovers and is able to meet all of

17  its payment obligations and more importantly, provide adequate

18  services to its residents.

19      By the way, I think the last part has got to be obvious

20  from the very beginning because as I've asserted earlier, the

21  city is in a competitive condition as Mayor Duggan has said

22  and I'm sure he'll say here for the recovery to complete, the

23  population has to start increasing.  Can't be decreasing any

24  more.

25      And to get into a condition where that very important

1  result can be achieved, services have to be better.  The

2  investments have to be made.

3      Points that our witnesses will make.  Number one, the

4  projections are sound.  Yes, they were prepared by a team.

5  Can I have the last slide, please, number five.

6      This was too big a job for one person.  And the job had

7  to be split up among many different people having different

8  disciplines and also there's a little bit about how much time

9  in the day.

10          THE COURT:  For the record 615 is on the screen.

11          MR. BENNETT:  And what 615 shows is, where the

12  inputs came from.  That it came from lots of different people

13  and kind of generally what different kinds of -- of work was

14  done in -- by each individual and more correctly, individual

15  and people that were working for them.

16      The names on the charts are the witnesses that are going

17  to cover the different areas.  But the -- but this -- and I

18  would hope that the Court would use this as a useful guide as

19  to how the pieces will fit together.

20      It was -- the testimony will show, it was an enormous

21  job.  I don't think that it will surprise anyone.  The

22  different work flows were integrated and coordinated and

23  people talked to each other and they tried to do things as

24  consistently as possible in order to work toward one result

25  that everybody knew that we were pointing to which was

initially ten year projections and then the additional 30 year

extension.

You will hear testimony about how the work was split up.

That the entire process was well planned.  That the

integration into plan projections was performed correctly.

There's of course a reality that notwithstanding

everything that people have done up until this point, not all

of the work that needs to be done to repair the city is

completed.  And the work going forward needs to be done well,

it needs to be done within certain basic financial parameters

set out in the plan, but there's also the reality that in the

future things will happen that we haven't planned for.

Unexpected things will almost certainly happen.

And other people, not the emergency manager, and not

necessarily the team that put all this together, is going to

have to adjust to the future over time.  We expect those

adjustments.  We expect those changes.  They are impossible to

predict and nail down.

But by the way that is true of almost every Chapter 11

plan of reorganization which is not accompanied by 40 year

projections but is usually accompanied by three to five year

projections.  And even within that time frame there's a

recognition that it isn't going to happen that way, that this

is just the best guess as to how it's going to happen.

It is therefore important to remember throughout hearing

1  the testimony that the focus is whether it's more likely than

2  not, whether there is a reasonable -- more than a reasonable,

3  but a probable chance that everything that's been put in place

4  under the plan will in fact achieve its intended result.

5      We will show this through -- through many witnesses and

6  they're going to tell you that and more.  They're going to

7  tell you that yes, we believe that it's probable and more

8  likely than not, but they're also going to say, we think this

9  is the city's last best chance and that it's going to work.

10     We will cover this in several different ways.  We

11 obviously have to have testimony as to the projections, that

12 the projections are reasonable and why.  That they're based on

13 reasonable assumptions.  The calculations were performed

14 correctly.

15     The persons that are responsible for making sure that the

16 plan works going forward, are going to talk about the fact

17 that they've reviewed the plan and are committed to it.  That

18 they understand what it provides for.  What has to be done by

19 the Mayor's office and the city council going forward.

20     To be sure as has been pointed out by objectors, many

21 will say that there are adjustments that should be made in

22 some parts and that they wish some things had come out a

23 little differently.  As I've said before, there is sufficient

24 flexibility built into the plan so that people charged with

25 implementing it based on circumstances they see can make

1  appropriate reductions and it -- adjustments and it should

2  still work.  That's the way it's been designed.

3      There will be testimony that there is room for that.

4  There is testimony that everybody understands that there is a

5  blueprint.  There are some lines that are hard and can't be

6  erased.  There are some lines that are in pencil and can move

7  a little bit.  But the overall plan has to be adhered to.

8  Again, feasibility the test is whether it's more likely or not

9  that the plan will be successful.

10      I think I'm going to leave feasibility with that.  I'm

11 sure that I'll have more to say about it at the closing.  For

12 now I want to say, the evidence will show that all the city's

13 known financial problems are addressed and resolved in the

14 plan.

15      That the evidence will show that the resources available

16 to the city to provide services and to make investments for

17 the benefit of its residents is adequate.  The evidence will

18 show that Detroit has a better future after Chapter 9.  And

19 history will show that Governor Snyder was right when he said

20 that when this case was commenced, the Chapter 9 case will not

21 be viewed as the lowest point in the city's history, but at

22 the beginning of its recovery.

23      For these reasons and others in our papers, the facts

24 will show that Detroit has earned this Court's help in

25 escaping from its current distressed state through

1  confirmation of the sixth amended plan of adjustment.

2      And I said before, as we will show, the plan will

3  succeed.  Do you have any questions?  I'd be happy to answer

4  them.

5          THE COURT:  No.  Thank you.  One moment, please.

6  All right.  Let's take our morning recess now and reconvene at

7  10:20, please.

8          THE CLERK:  All rise.  Court is in recess.

9      (Court in Recess at 10:06 a.m.; Resume at 10:20 a.m.)

10          THE CLERK:  All rise.  Court is in session.  You may

11  be seated.

12          MR. O'REILLY:  Good morning, Your Honor.  Arthur

13  O'Reilly for the DIA Corp.

14      I'm here to talk about of course the DIA settlement.  And

15  I want to do something a little bit different I think.  And we

16  spent a lot of time talking about numbers and standards and I

17  want to switch gears just a little bit.

18      Josephine Ford was a very famous and very much beloved

19  benefactor of the museum.  She had a painting, quite an

20  amazing painting by Vincent Van Gogh called Portrait of a

21  Postman Roulin.

22      On April 2nd, 1992, she gave her interest in that painting

23  to the DIA Corp.  And she did it because her mother had wanted

24  it to be part of the DIA and at the museum for all to see.

25  And she also did it because she wanted it to serve almost as a

1  lead gift, something to inspire additional giving so that our

2  museum would be here for our children and our children's

3  children.

4      Edward Rothman owned several paintings and sculptures

5  including works by Degas, and Monet, and Pissarro, and Boudin.

6  He also had daughters.

7      Rather than give them to his daughters however, he made a

8  bequest and he made the bequest to the DIA Corp.  And he did

9  that so that those works would become part of the permanent

10  collection of the museum.

11      Robert Hudson Tannahill, he was one of the -- the lions

12  in terms of the support that he's given to the museum over the

13  years.  He spent his life collecting works, including works by

14  Van Gogh, and Picasso, and Monet, MO Digliani, and Seurat, and

15  Cezanne.

16      In his Will he gave a bequest in which he gave it all to

17  the DIA Corp. for the benefit of the museum.  One of the works

18  that he gave was The Diggers.

19      Edsel Ford another great supporter of the museum.  He was

20  also an arts commissioner at one point in time.

21          THE COURT:  I want to interrupt you.

22          MR. O'REILLY:  Yes.

23          THE COURT:  With this question.  This is important

24  history and I don't mean to discourage you from telling me

25  about it in your opening statement, but I want to be sure that

1  this is based on evidence that will be admitted here in the

2  trial.

3           MR. O'REILLY:  It is, Your Honor.

4           THE COURT:  Okay.

5           MR. O'REILLY:  It's based upon documents that have

6  been admitted and I don't believe that there's been an

7  objection.

8           THE COURT:  Okay.  Then you may proceed.

9           MR. O'REILLY:  Lizzie Merrill Palmer.  I don't know

10 a lot about Lizzie Merrill Palmer, but her documents are that

11 he gave -- she gave an endowment.  And the endowment was for

12 $10,000 for the purchase of paintings by American artists.

13 That fund still exists today.  A hundred years later it is

14 being used to purchase paintings.

15     Now the Court saw several of these objects when it did

16 its bus tour.  And when Your Honor reviews that video once

17 again you might recall some of them.  The Diggers is on the

18 right there.  The Postman is of course at the bottom.  And on

19 the left, upper left of course is the Detroit industry murals

20 that Edsel Ford had to help fund and Diego Rivera actually

21 painted at the museum.

22     You also might recall when you did your walk through the

23 museum you saw cards next to the various paintings and

24 objects.  Those cards include credit lines.  And if you looked

25 at those, and I don't know if you did, Your Honor, but they --

1 they tell you how the work got into the collection.

2      And you'll have noticed that many of them were actually

3 donated in some fashion to the museum.  In fact of the 60,000

4 approximate works in the collection, about 57,000 of them were

5 either donated or acquired with donated funds.  And each of

6 them have sort of a similar story about how they got into the

7 collection.

8      When you watch that video again at the end of the proofs,

9 you might recall you walked in the back of the museum.  Your

10 bus pulled up to the back.  You walked into a little atrium

11 and on your right was a restaurant or a cafeteria.

12      And on your left, and I don't know if you looked to your

13 left, but there was a donor board.  And that donor board was a

14 gold board covered with lots of names.  And it was done to

15 recognize all the gifts including monetary gifts by

16 individuals, and foundations, and corporations, and the city

17 itself in fact was listed there.  And that's the donor board

18 that's in that court -- that atrium that you walked into.

19      You'll also recall seeing volunteers throughout the

20 museum giving of their time.  And you saw of course people in

21 the galleries enjoying the museum.

22      So why did I start with these images and these stories?

23 Because this part of the case, this part of the DIA settlement

24 is about two things.  It's about respecting charitable

25 donations, and it's also about respecting the people's right

1  to art and culture.

2      At the close of the proofs and after you've heard all the

3  evidence, we'll ask Your Honor to consider two overarching

4  questions.  The first is, why did those people that I've

5  mentioned including Mrs. Ford, and Edsel Ford, and Mr.

6  Tannahill, and Mr. Rothman, and the thousands of others that

7  have given their time, their money, their family treasures to

8  the museum, why did they do that?  We're also going to ask you

9  a second question, is what is the importance of the museum to

10  this community today.

11      To address the first question, we have to start at the

12  beginning and I don't want to get outside of the proofs

13  really, but I can tell you that in 1883, sort of an

14  interesting time for this city.  The city was emerging as a --

15  as an industrial city.

16      Historically Belle Isle, I believe, had just opened.  I

17  think ground was about to break on Detroit's first skyscraper

18  in the Campus Marsh's area.

19      But it was also the time that the idea of a public art

20  institute in Detroit first took hold.  And it began with a

21  simple letter.  There's a Senator named Senator Palmer, a U.S.

22  Senator who sent a letter to Mr. William H. Brierly and he

23  said it was time for this city to have access to art, it was

24  time for them to have an art gallery.

25      And he was going to do his part.  He was going to commit

1  $10,000 if you could raise 40,000 from other sources.  That

2  $40,000 was raised from 40 other individuals.  Those 40 other

3  individuals got together, they drafted legislation, had it

4  introduced, saw it passed.

5      That 1885 act provided that the corporation that they

6  sought to form had to faithfully use the objects that they

7  received for the benefit and purposes of which the corporation

8  was found.

9      The 1885 act also prohibited that corporation from

10 selling or encumbering its museum art collection and it

11 prohibited that corporation from changing its purposes without

12 legislative approval.

13     On March 25th, 1885, that museum was founded, the DMA as

14 it was called, the Detroit Museum of Art was founded.

15 Construction began on a building, the first museum building.

16 And that first museum building was actually located at

17 Jefferson and with I-375, I believe is today.

18     They started gathering works of art together modestly at

19 first.  And then construction finally finished on the building

20 and it was open to the public on September 1, 1888.

21     A practical problem arose thereafter.  The city which had

22 been providing funds and which I believe had some board seats

23 on the DMA, was prohibited by a Michigan Supreme Court

24 decision from actually continuing to provide funding.

25     So what did they do?  Well, they switched roles.  The

1  city and the DMA switched roles.  They -- the -- the city

2  amended its charter in 1918 to create for an art's commission

3  that provided for a promise of permanent care and maintenance

4  of the collection.

5      The DMA went out and secured an amendment to the

6  legislation by which it was created that would allow it to

7  transfer its collection to the city provided that the city

8  faithfully use it for the same purposes for which that

9  corporation had been founded.

10      And that on April 15, 1919, the legislator -- legislature

11  amended the act or approved the amendment of the act.  The DMA

12  then gave legal title over to the city but the beneficial

13  interest remained right where it was because that's the nature

14  of this.  It remained right where it was with the public.

15      Thereafter the city in what was then called the Founder's

16  Society by the way because they've changed their name.  They

17  worked together to start and build a building that would

18  inspire greater gifts.  And that's the building Your Honor

19  visited.  They started construction and then on October 7,

20  1927, that new museum building on Woodward -- Woodward Avenue

21  opened up.

22      Now over the course of time there was quite a

23  considerable period of time, the city actually did allocate

24  funds to purchase art work fairly robustly at first.  But it

25  started to dwindle until around 1950's is when really new

1  allocations or new -- new allocations for art work ceased all

2  together.

3      The operational support was uneven until it dwindled down

4  severely and the state actually stepped in.  And that was in

5  approximately in the late seventies and eighties.

6      In the early 1990's that state operational support

7  declined as well.  And ultimately in October 7, 2012, the

8  counties passed a millage which we have heard about quite a

9  bit today.

10      Throughout this entire period of time the public has

11  continued to give its time, money, objects, family treasures

12  to the museum.  Why has -- why have so many contributed so

13  much for so long to this museum?  Well, let me tell you why.

14      From 1885 until the present, the public has actually been

15  told that this your museum.  This museum collection is yours.

16  The statements are replete throughout the documents of this

17  concept that they are actually the owners.  And that the city,

18  and the arts commission, and the DIA Corp. from time to time

19  also acknowledges and said that this collection is actually

20  held in trust.

21      Now the creditors say that what I've just told you, the

22  history I've told you, the stories I've told you, is actually

23  fiction not fact.  What they say is that the evidence will

24  show that the city created the museum, "from scratch".  And

25  I'm pulling that from their joint brief at Page 91.

1      They use pretty vivid and pretty evocative language and

2   they say that "when the "arts commission" was appointed it

3   sprang into action and immediately began building a collection

4   for the city independent from the DMA or its collection.

5      They say that the transfer by the DIA Corp. in 1919 was

6   not a gift but a sale of assets to the city end quote.  Or I'm

7   sorry, that was not a quote, excuse me.

8      And then they say this chain of events cuts deeply

9   against the DIA Corp. and the Attorney General's description

10   of the arts commission and the DIA as a continuation of the

11   DMA and its alleged trust.

12      The evidence will show that this isn't correct.  The

13   evidence will show that no -- no new museum was created from

14   scratch but rather there was a change in responsibility for

15   the museum.

16      By way of example, Your Honor, Ralph Harmon Booth, he was

17   the President in January 1919 of the Founder's Society which

18   is again the DMA.  That same month in January 1919 the first

19   President of the arts commission was actually Ralph Harmon

20   Booth.

21      Clyde Burrows was the secretary of the Founder's Society

22   in January of 1919.  January 1919 the arts commission

23   secretary was Clyde Burrows.

24      In 1919 the museum building for the DMA, remember the

25   building that I said was on Jefferson, was actually, and this

1  is the language from a later version.  The museum building was

2  this one, that was the old DMA building.  This same building

3  was the museum that housed the collection that they say was

4  started from scratch by the arts commission.

5      The evidence will show in document after document that

6  the DIA was a continuation of the DMA and that the arts

7  commission merely accepted the duty of carrying on the

8  charitable purposes of the DMA for the benefit of the public.

9      The very first DIA bulletin was October 1919.  That

10 bulletin says right there, the bulletin of the Detroit

11 Institute of Arts of which is the first number takes the place

12 of the bulletin the Detroit Museum of Art.

13     The evidence will also show that the 1919 conveyance was

14 not an asset sale, but the museum art collection as the

15 creditors would say.  And in fact the -- the citations that

16 they refer to deal, I believe, with mortgages and with

17 payments of attorneys fees.

18     In fact when -- when Your Honor goes back and looks at

19 your video of your bus tour when you went to the museum,

20 you'll remember again coming through the back and there was a

21 dimly lit hallway that you went through.  On your left was a

22 brick courtyard where people ate and they had coffee and

23 stuff.

24     And you went up a set of stairs.  And as you went up the

25 set of stairs at the top in lettering was the following.  The

1  Detroit Institute of Arts was founded March 25, 1885 as the

2  Detroit Museum of Art.  These words cut deeply against the

3  creditors' position in this case that there was no

4  continuation and that there was no trust.

5      Now they've largely ignored by the way the distinction

6  between legal ownership and beneficial ownership.  And what

7  they've decided to focus on are restrictions.  They say that

8  the museum had a policy.  It had a policy against accepting

9  works of art with restrictions.

10     They say that -- and by the way I'm not sure that they

11  point to a single deed where there was a transfer by the DIA

12  Corp. to the city that eliminated the transfers.  But they say

13  that that act, the transferring from the DIA Corp. to the city

14  somehow washed away any restrictions that existed and that the

15  actual filing of this Chapter 9 washed away any restrictions

16  that might exist.  And they say that -- that enormous

17  wonderful gift by Robert Tannahill, one of the greatest gifts

18  the city has ever seen, those restrictions don't exist.

19     The evidence will show otherwise.  The evidence is going

20  to show that the great preponderance of the gifts, the objects

21  and the museum art collection, were given to the DIA Corp. and

22  not to the city.  There's no evidence that the DIA Corp.

23  intended to give the city every single right to liquidate this

24  collection whenever it wanted, however it wanted, for whatever

25  purpose it wanted.  In any event the DIA couldn't have done so

1  because it did not possess the beneficial ownership.

2       The evidence will also show that the term unrestricted or

3  restricted in museum parlance means something quite different.

4  Museums must be able to carefully and knowledgeably take care

5  of a museum art collection.  That's their duty, that's their

6  trust.

7       And it inhibits their ability to do so if they accept

8  works with restrictions that say, you need to put that work of

9  art on the front of the building forever.  Well, that's not a

10  responsible thing to do.  And that in museum parlance is what

11  the term restrictive refers to.

12       The evidence will show that the very act of a sessioning,

13  and a sessioning, Your Honor, is a formal process of taking an

14  object and making it part of a collection.  That very act is

15  an act of significance.

16       The evidence will show that donors didn't give works of

17  art to the city at all directly.  But even if the city gave it

18  they didn't give it to the city to place in a building

19  downtown, Coho Hall, at the Coleman Young building.

20       These donors gave it so that it would be sessioned into

21  the museum art collection of the DIA so that the public would

22  have the ability to access it.  That's an act of significance,

23  Your Honor.

24       The evidence will also show the infirmity in the

25  creditors' claim that restrictions on art work were somehow

1  washed away either by the transfer from the DIA Corp., to the

2  city, or by the Chapter 9 filing here.

3     What they essentially are saying is that all the various

4  gifts, whether the Josephine gift, or the Lizzie Palmer gift,

5  any of them, you might as well tear them all up because they

6  are of no meaning.  What they're trying to say is that you can

7  take a work such as the work by Edgar Degas and that's Dancers

8  in Repose.  Remember Edward Rothman gave that gift.  He's the

9  one with the daughters.  Rather than give it to his daughters,

10  he gave that to the museum.  Send that to Christie's, sell it

11  for the highest price.

12     The work on the left I didn't discuss earlier, but it's a

13  gift.  And it reflects a gift by the children of Allen E.

14  Schwartz and Marianne Schwartz to honor their parents.  They

15  might as well sell that one off as well to do much else to get

16  the highest price.  These things cut pretty deeply against the

17  creditors' position that there are no restrictions in this

18  case.

19     Now to address the second question, Your Honor, we need

20  to -- we'll present evidence of the benefits that the museum

21  provides and also what it would mean if the museum actually

22  closed.  Annmarie Erickson, she is the executive Vice

23  President of the DIA Corp., she'll testify that this museum is

24  crucial to Detroit.

25     It provides programming for senior citizens, for

1  students, for people of all ages.  Its innovative programming

2  actually makes it one of the most accessible museums I think

3  in the world in my view.

4      So the evidence that, and in a city that's declined in

5  population to below a 1,000,000, that the museum in recent

6  years has -- has attracted as many as 600,000 visitors.

7      You'll hear or take evidence that any sale of the museum

8  art collection would actually put the museum itself in

9  jeopardy.  In fact Syncora's own witness, Elizabeth Von

10  Habsburg testified that "art is a universal language".  It is,

11  "our culture".  And she can't imagine -- can't imagine her

12  city, New York, without fine art.  The evidence will show that

13  Detroit without this museum is equally unimaginable.

14      Your Honor, our time and our role in this proceeding is

15  limited.  We have appeared and we participated at really

16  substantial cost for a non-profit so that the parties here

17  would have a full and fair opportunity to understand the

18  issues, to present them to you because the issues are

19  important to this proceeding, they are important to the city.

20      Consistent with that limited role, and as I said in the

21  beginning we'd ask you to consider two overarching questions.

22  And at the end of the proofs, we'll suggest an answer to

23  those.  And I don't think they'll be a surprise to anybody.

24      We'll say that the city, and certainly the creditors

25  can't force a sale of museum art collection because it's held

1  in trust and the public is the beneficial owner, period.  That

2  there are no restrictions and that this museum belongs to stay

3  right where it is for all the reasons explained in our

4  pre-trial brief.

5      As to the second question we'll say that the museum isn't

6  the glittering link to the history or the old time of this

7  city as the creditors have said in the past.  But that it is

8  in fact key to our present and our future.

9      And I said that the Court would -- we would ask the Court

10  to consider those questions, but I didn't say you would

11  actually have to answer each of them.  And that's because as

12  Your Honor knows, that's not the issue.

13     The issue is whether the debtor city here has made the

14  adequate showing that this settlement is within the range of

15  reasonableness.  The evidence will show that it is.

16     Now Mr. Bennett yesterday said that he wouldn't opine on

17  the merits and I understand why he won't.  And that's fine, so

18  be it.  But I have 130 years of history, I've got Michigan

19  case law on my side, and I've got the Attorney General all

20  saying that this collection can't be used to satisfy creditor

21  debts and obligations.

22     I'll note that the evidence will show that if the

23  settlement is not approved, and if the museum art collection

24  is placed in jeopardy, the DIA Corp. will fight on an object

25  by object by basis if necessary.  And it has to do so because

1  this collection doesn't belong to anybody except the public.

2  It has to do so because if it doesn't and it allows the

3  proposition that's being presented to Your Honor to actually

4  take hold, that somehow charitable gifts to a municipality are

5  to be treated just as any other, to be liquidated and used,

6  will chill philanthropic giving for generations to come in a

7  city that needs that philanthropic giving more than ever.

8       In closing, it's important to emphasize again that this

9  case is about respecting charitable donations and respecting

10 the people's right to education and culture.  To that end I

11 would ask the Court to again at the close of the proofs and as

12 it hears the evidence in this case, remember back to your bus

13 tour.

14      You went through various parts of town, some were

15 blighted, some were in decay, some were showing signs of

16 rebirth.  And I'm not sure exactly which path you went because

17 I wasn't on the bus, but the video had you coming up Woodward

18 Avenue.  That was probably showing the first signs of

19 construction of the M-1 rail.  And as you went past the museum

20 building, I'm hoping Your Honor looked out the right hand

21 windows and saw what was written on the front of the building.

22 Dedicated by the people of Detroit to the knowledge and

23 enjoyment of art.

24      As you hear the testimony and consider the evidence, I'd

25 ask the Court to consider what do those pivotal words mean.

1 Not just as it pertains to this settlement, but as to the

2 entire case because they are many and varied and there are

3 many issues upon which you must reflect.

4     I would ask the Court to consider what would it mean if

5 that statement of promise and ambition and hope were rendered

6 a dead letter. We would ask the Court to consider what would

7 charity mean and what would culture mean if the creditors have

8 their way. Thank you.

9         THE COURT: Thank you, sir.

10         MR. ALBERTS: Good morning, Your Honor. Sam Alberts

11 from Dentons on behalf of the Official Committee of Retirees

12 and may it please the Court.

13     The committee rises in support of confirmation of the

14 city's sixth amended plan of adjustment. As the Court may

15 know, the committee represents more than 23,000 current

16 retirees who work to preserve, protect, and enhance the City

17 of Detroit.

18     These men and women uniformed and non-uniformed workers

19 sacrifice private sector wages and in certain cases, literally

20 life and limb in exchange for a fundamental promise that when

21 they retired they would receive a modest pension and health

22 care for themselves and their spouses for their lives.

23     That promise was clear and immutable. By voting in favor

24 of the plan under Classes 10, 11, and 12, retirees, however,

25 if the plan is confirmed, will have a direct and fundamental

1    change to those promises made by the city.

2        The effect for general services retirees or GRS service

3    retirees will be particularly significant.  These general

4    service retirees of whom more than 50% who voted on the plan

5    live in Detroit proper, receive an average of less than

6    $20,000 a year in annual pension benefits.

7        These people who I speak of worked as arborists, water

8    and sewer workers, garage mechanics, lawyers and government

9    staff workers among others.  Under the plan, and this is

10   without dispute, every GRS retiree will see an immediate 4.5%

11   reduction to their monthly pension benefits.

12       In addition these retirees will lose a 2.25% annual

13   escalator which as the city has explained, is designed to help

14   these pensions keep pace somewhat with inflation.  As the

15   evidence will further show, thousands of these general

16   services workers will have their pensions reduced further to

17   cover alleged interest overpayments with respect to their

18   individual defined contribution annuity saving account funds

19   or ASF funds.

20       I say alleged because as you will hear from several of

21   the individual retiree plan objectors, these payments were

22   determined without any of their input and were made according

23   to contract and city ordinance.

24       Let's talk about the effect of these.  And I'm not

25   talking about hardship, I'm just talking about the effect of

1  the cuts themselves.  If you could pull up slide 2.5.

2      As to the general service retirees, when you add the 4.5%

3  immediate reduction with the cost of living adjustment which

4  affects younger retirees because there is a effect over time

5  of what they're losing, and the ASF.  You see that from what

6  they are receiving or what they were receiving

7  pre-bankruptcy to what they are receiving under the plan, has

8  a serious cumulative effect.

9      If you just look at the middle bar, and those on the very

10  top line are the number of retirees.  And the bottom line

11  shows the percent of reduction in their benefits.  You see

12  that for that middle band of 3,155.  We're talking about a 15

13  to 20% reduction in their benefits.

14      And these are for people who on average have pensions of

15  $19,000 or less.  A few outliers have very large reductions,

16  and a few have zero reductions but they -- they are explained

17  and -- and the testimony will explain in more detail how these

18  numbers are created.

19      Now --

20          THE COURT:  Sir, can I ask you to again point that

21  microphone more -- more towards you as best you can?

22          MR. ALBERTS:  Yes.  Is this better, Your Honor?

23          THE COURT:  You just need to slide it this way a

24  little bit more based on where you --

25          MR. ALBERTS:  How about this?

1          THE COURT:  Okay.  But now just point it right at

2    you.  Good.

3          MR. ALBERTS:  All right.

4          THE COURT:  Yeah.

5          MR. ALBERTS:  Testing.  Now, as to the brave men and

6    women who put their lives on the line every day, Detroit's

7    retired police and firefighters, or the PFRS retirees, they

8    will see a 55% reduction in their annual escalators.

9          Now remember these are workers who on average receive

10   $30,000 a year in pension, who typically retire earlier due to

11   mandatory requirements and do not receive Social Security

12   benefits or Social Security increases.  So this is not an

13   insignificant sacrifice.

14         Let's take a look at how this affects the PFRS retirees.

15   Now we put two charts here, Your Honor, because some of the

16   police and fire retirees receive a compound COLA and some do

17   not.

18         The differences though show that the reductions to their

19   value, the pension value, is very significant particularly as

20   we're talking about retirees who are 70 years old or under.

21   And you can see there, the older you get the less value a COLA

22   is worth because presumably people who are older will not live

23   as many years.

24         All right.  The core changes alone are worth

25   approximately seventy -- seven hundred -- $700,000,000 under

1   the city's 6.75 proposed rate under the plan.  And more than

2   -- more than 1.2 billion dollars if one were to use a riskless

3   rate which we -- which the evidence will show that is one of

4   the viable options.

5       Yet reductions to pensions tell only part of the story of

6   the challenges and the reductions to the benefits of retirees.

7   Now the objectors keep referring to the pensioners.  Well,

8   these retirees are more than just pensioners.  They received

9   more than just a pension promise.

10      They received a promise for valuable health care benefits

11  going forward for not only themselves, but for their spouses.

12  And in fact, Your Honor, the evidence will show that the

13  reductions of these benefits are significance of the -- in

14  themselves, but the plan itself is eviscerated under the plan.

15  The plan health care.

16      The city in effect is getting out of supplying health

17  care benefits to retirees under this plan.  Instead what the

18  city is doing is putting money into two VEBA trusts.  One for

19  the benefit of police and fire, one for the benefit of the

20  general service retirees.  The total amount of that at present

21  is $450,000,000.  And the amounts to put into the VEBA are

22  split fairly equally, 51% for the police and fire, and 49% to

23  the general service retirees.

24      Now prior to bankruptcy, the city provided more than a

25  dozen options for retirees who were both Medicare eligible and

1 those who were not.  Now I want to pause here a second, Your

2 Honor, people who are not Medicare eligible are not only those

3 that are not -- are under the age of 65.  We're also talking

4 about the people who are over the age of 65, some police and

5 fire who are not eligible for Medicare.

6    Now the effect of this is pretty significant.  Because

7 once you hit the age of 65, it is very difficult, in fact it's

8 very difficult for anybody who is retired to get insurance.

9 They pay -- they typically pay much higher premiums.  But as

10 you get older, it is a much more difficult and challenging

11 request for them.

12    Now as I mentioned, under the plan the promise of

13 valuable city health care is no more.  And no more is the

14 city's requirement to administer those programs.  Rather as I

15 mentioned, the city will be putting forward the two VEBAs.

16    Now I'd like to show the difference, Your Honor, between

17 what retirees were projected to receive under the health care

18 structure that the city had in place through 2013 moving

19 forward versus what can be gained on the notes themselves.  If

20 we could put up that slide please.

21    All right, Your Honor.  In red are the OPEB expenditures

22 that were projected by the city for each year for just the

23 first ten years.  And as you will see, the amount starts at

24 approximately $173,000,000 a year and moves up to more than

25 $250,000,000 a year.

1      Under the plan the city is providing the notes as I

2  mentioned.  Those notes because they are interest only for the

3  first ten years, will yield $18,000,000.  That is the

4  difference in what retirees are going to get under the notes.

5      Now one of the things that the VEBA trusts are permitted

6  to do, is to monetize those notes in an effort to increase the

7  value that is received.  But, Your Honor, if one were just to

8  take the interest off of those notes --

9          A VOICE:  So we had --

10         MR. ALBERTS:  This is --

11         A VOICE:  And --

12         THE COURT:  Who is on the phone?

13         A VOICE:  And I listed the wrong address for them.

14         THE COURT:  Turn the volume way down.  Sorry for

15  that, sir, go ahead.

16         MR. ALBERTS:  Thank you.  That is what would be

17  yielded in the first ten years.  That is a significant change.

18  Some of the changes have occurred during this case as the

19  Court is aware.

20      But that does not mean that because what the Court --

21  what -- what the city did during the case would be what was

22  necessarily under the plan.  In fact, Your Honor, if the blue

23  bar were to stay the same, the benefits that would be

24  available or the money available to retirees would be

25  significantly less than even what is being -- what the city

1 has agreed to provide during the case by almost half.

2      Now, I want to address the assertions made by some of the

3 objecting parties that the reductions in benefits to retirees

4 are not significant.  I would submit, Your Honor, that the

5 benefit reductions to these retirees are by any measurement

6 life changing.

7      As noted all retirees will experience fundamental and

8 drastic reductions in city sponsored health care and will

9 experience pain caused by the fundamental breach to their

10 pension promise.  Notwithstanding a few objecting parties, not

11 with -- excuse me, Your Honor.

12      These objecting parties, somewhat remarkably, include the

13 counties of Wayne, Macomb, and Oakland where many of the

14 retirees now live and whose water and sewer rate payers will

15 benefit from the elimination of the DWSD OPEB costs from those

16 savings that I just pointed on.

17      I'd like to show a chart actually of where these retirees

18 live.  I mentioned earlier, Your Honor, that fifty -- more

19 than 50% of the retirees who voted for the plan, actually on

20 the plan, live in Detroit proper.  Those are the GRS

21 employees.

22      Here you will see, Your Honor, that a full 73 1/2% live

23 in Wayne, Macomb, and Oakland and retirees of Detroit are

24 within that group.  Just a moment, Your Honor.

25      Your Honor, I'd like to show where the funds are coming

1  for -- from with respect to the pension payments themselves.

2  If we could put slide 10 up.

3      Your Honor, the -- these -- the numbers for this will be

4  shown at trial.  But this will give you a sense of where the

5  money is coming from for the first ten years of the pension

6  contributions.

7      And as you can see, with respect -- we have two -- two

8  levels here.  The first level is for the general service

9  pension contributions.  And the second level is for the police

10 and fire contributions.

11     Starting with the general service contributions.  The

12 most sizeable portion, the $428,000,000 you see come from

13 DWSD.  Then, Your Honor, we have $98,000,000 from the state

14 through the settlement.  And 31,000,000 from the UTGOs,

15 45,000,000 from the DT -- the DIA, and the other is city

16 funds.  With respect to the PFRS, all of the monies come from

17 a non-city source they're either state or foundation money.

18     Okay.  I think Mr. Bennett did a very good and thorough

19 job of showing that if there is difference in treatment with

20 respect to the pensions and other unsecured claim holders, it

21 was not nearly in the range that those other claim holders

22 assert.  Nowhere near 50% or nearly anywhere near 50% or

23 greater of what is being recovered by the COPS holders.

24     Now, Your Honor, I would like to also weigh in on why the

25 treatment for retirees is different, at least -- and on the

1  elements.  And -- and -- and something that hasn't been

2  touched on as well with respect to what could be if we did not

3  reach this accommodation with the city.

4      First, in contrast to the claim of other creditors,

5  including the COPS and the counties, pension claims as the

6  city has stated, has a special benefit of the Michigan

7  constitution pension clause.

8      Now we are aware and we're mindful of the Court's

9  December 3rd ruling on that issue.  And we are also mindful

10  that certain people might not think that that -- that the

11  protections provided by the Michigan constitution and this

12  Court's ruling would be reversed.  But there is significant

13  litigation risk.

14      And one can see the fact of that significant litigation

15  risk by the fact that the state has agreed to contribute what

16  it did in exchange for releases from retirees from pursuing

17  the claims not only against the city, but against the state.

18      Second, Your Honor, the treatment of retirees cannot

19  merely be viewed through the prism of the treatment of the

20  pension claims.  Rather, one must consider the treatment of

21  other -- the other claim which is the OPEB claim.

22      In fact as the evidence will show retiree pensions and

23  even more so OPEB claims, dwarf all other unsecured claims in

24  this case.  If you could put up the slide.

25      This is one stack.  On the left hand side you will see

1   the claims and what we're doing here is we are taking the

2   numbers as provided in the disclosure statement and plan.  And

3   we have formulated the percentages.

4       And you will see that we have given the COPS holders the

5   full amount -- we've assumed the full amount of their claim as

6   allowed at 1.4 billion dollars.  We similarly give amounts for

7   the LTGOs, the UTGOs, and some other amounts.

8       What we also do is we provide what the pensions have been

9   agreed to under the plan.  For the PFRS it's 1.25 billion.

10  And for the DGRS or the GRS, 1.879 billion.

11      And then you can see below that an amount for the OPEB

12  claim.  And the OPEB claim by itself at the agreed amount with

13  the city at 4.3 billion dollars, is worth almost 45%.  The

14  pension and the OPEB combined are 78%.

15      Now these percentages increase, Your Honor, if the

16  committee's position on its claims were to prevail which

17  absent an agreement between the city and the committee, the

18  committee would have pursued vigorously.  We are prepared to

19  demonstrate that the amount of the claims actually for both

20  the PFRS and the TGRS could be significantly higher at 3.8

21  billion and 3.54 billion respectively.  And the OPEB claim

22  would be worth $8,000,000,000.

23      And so the amount, Your Honor, we believe that has been

24  settled, and that's effectively what we're talking about here

25  is a settlement between the committee and other retiree

1  interests and the city, has reduced the amount that the

2  committee believes would be -- would be the entitlement for

3  retirees.

4      And, Your Honor, particularly when we're talking about

5  the OPEB claim, the amount of that claim by shrinking it

6  almost in half provides real value to the COPS holders because

7  they are with the OPEB claim sharing pari passu in the

8  recoveries.

9      Now it should be noted, Your Honor, that the claim for

10 OPEB could be enhanced if the COPS holders claims are deemed

11 disallowed in whole or in part.  There is a provision for

12 that.

13     Now if we could just go to the OPEB settlement ranges.  I

14 just wanted to -- the next slide, please.  I just want to

15 touch on this for a moment.  Because there may be an assertion

16 made that the proof of claim that was filed by the committee

17 was for less than the settlement amount.  And if you look at

18 columns 2 and 3, Your Honor can see that number 2 is the proof

19 of claim amount that was filed.  And number 3 is what the plan

20 of adjustment provides for.

21     And it's without dispute that the plan of adjustment

22 agreed to amount is more.  But there are a few reasons for

23 that, Your Honor.  Number one, when the proof of claim was

24 filed the committee did not have information on what is known

25 by the city as the opt outs.  These are people who currently

1 were not receiving health care benefits from the city but had

2 a right to receive that.

3     And let's be clear about the rights.  Those rights for

4 retirees are embedded in collective bargaining agreements.

5 They're embedded in the city's municipal ordinance as well.

6 Those rights are vested.

7     That issue has never been challenged by the city.  In

8 fact as the Court will recall, when we brought the litigation

9 against the city twice, the city never challenged the vested

10 nature of the rights.  What they asserted was this Court

11 didn't have jurisdiction.  But that was never in dispute what

12 rights of the parties there were.

13     Your Honor, I want to go back to the slide for a second.

14 If you put those opt ins back in, the claim amount just by the

15 calculation itself, would have gone up to 4.5 billion dollars.

16 And as you will hear in testimony from the city's witness, Ms.

17 Taranto, that all of these ranges are within the range of

18 reasonable, all of these bars, including our $8,000,000,000

19 bar.

20     So that was a significant settlement.  It was a

21 significant settlement in two levels.  One, by reducing the

22 claim to 4.3 billion dollars and then accepting the treatment

23 under the claim.

24     And, Your Honor, a third rationale for the treatment of

25 the retirees with respect to the pension was stated by the

1 city as a fundamental business justification.  And as the

2 evidence will show, Your Honor, Detroit active employees

3 actually do care about how the city treats its retirees.

4     Moreover, Your Honor, more than 70% of retirees live in

5 the Detroit Metro area with more than 50% of the GRS retirees

6 who voted on the plan living in Detroit proper.  This fact is

7 important, Your Honor.  As these people and their personal

8 income have a direct impact on the local economy.

9     But the retirees, Your Honor, are not nearly economic

10 participants in the local community.  They are citizens here

11 and they are critical threads in the warp and wolf of Detroit.

12     Having had the honor of representing the committee, Your

13 Honor, my colleagues and I have come to meet and speak with

14 dozens of Detroit retirees if not hundreds.  As such we have

15 developed a profound respect for these persons and the

16 sacrifices that they have made for the city.

17     And I can say confidently, Your Honor, that no retiree is

18 happy about seeing their pensions cut and their health care

19 benefits slashed.  Some in fact find aspects of the plan

20 unlawful and improper.  However, it is hard to find one who

21 does not have a warmth for the city and a hope for its future.

22     At bottom retirees understand that they are being called

23 upon to sacrifice for the city that they served once more.

24 Some have done so willingly, some have done under a feeling of

25 compulsion that voting against the plan would have triggered

1  far worse of an alternative.  And others still not and will

2  not accept the plan's proposed treatment.

3       However, as classes retirees have voted both in requisite

4  number and amount in favor of the proposed treatment under the

5  plan.  The committee stands with these retirees and urges the

6  Court to approve confirmation of the plan and to overrule the

7  objections of the plan.  Thank you, Your Honor.

8            THE COURT:  Thank you, sir.

9            MR. KIESELSTEIN:  My turn, Judge.

10           THE COURT:  It looks like it.

11           MR. KIESELSTEIN:  Good morning, Your Honor.  Marc

12  Kieselstein, Kirkland and Ellis, LLP on behalf of Syncora.

13       Your Honor, the first thing I wanted to do was to thank

14  the Court and your staff.  I think that's probably the one

15  thing I'll say today that everyone in this room will hopefully

16  agree with.  We've noted the armies and brigades and

17  battalions of lawyers facing this way and we have you wildly

18  outnumbered.

19       We appreciate all the energy that the Court has brought

20  to this case.  I can only imagine the very long hours and the

21  pressures that have been on your -- on your staff.  And we

22  thought it was only right and proper to acknowledge that from

23  the get go.

24       Now, Your Honor, these are extremely important days.

25  They're important days for the City of Detroit, they're

1   important days in the history of the United States Bankruptcy

2   Code, but first and foremost, these are crucially important

3   days for the rule of law.

4        For -- for now the debtor and its plan of adjustment is

5   in the dock of justice.  And today is the day of reckoning for

6   our plan.  The evidence will show it's so flawed in its

7   structure, so dismissive of basic duties, and so lacking in

8   evidentiary support that it cannot be confirmed without doing

9   serious mayhem to the rule of law, popular demand

10  notwithstanding.

11       The evidence will also show that it didn't have to be

12  this way.  Instead there was and still is a win win plan for

13  all stakeholders that could be crafted and that would not pit

14  financial creditors against actives and retirees.

15       Now today I intend to lay out some, but by no means all

16  of the ways the evidence will demonstrate that this plan

17  unfairly discriminates, fails the best interest test, and is

18  not fair and equitable.  And I want to start at the beginning.

19       Now at the beginning the debtor said a lot of the right

20  things.  It spoke about shared sacrifice fairly apportioned.

21  The June 2013 proposal of the creditors said and I quote,

22  "shared sacrifice would be required from all stakeholders to

23  achieve the city's dual and complimentary goals of maximizing

24  returns for its stakeholder constituencies while

25  simultaneously establishing the framework for a healthy and

1 growing Detroit going forward".

2     Now it wasn't sequenced the way Mr. Bennett did in his

3 opening.  These would dual and complimentary goals.  And that

4 same proposal by the way, talked about pro rata distributions

5 to all unsecured creditors.

6     Page 109 of the proposal made clear that all unsecured

7 claims, gold bonds, COPS, pension claims, OPEB claims, and

8 other general unsecured claims would receive "a pro rata

9 relative to all unsecured claims principal amount of the

10 notes".

11     Now last year Mr. Orr also talked about all assets being

12 on the table.  He said and I quote, "I have a fiduciary

13 obligation to account for all assets of the City of Detroit.

14 The foremost among them might very well be the DIA".

15     And as recently as December of 2013, Mr. Orr acknowledged

16 that all unsecured creditors had the same rights to

17 distributions in bankruptcy, the human dimension

18 notwithstanding.  And we'll come back to the human dimension

19 in a few minutes.

20     Now that was then.  Now we have a plan that engages in

21 epic levels of discrimination between creditors of equal rank

22 and the art collection has been pulled off the table for what

23 the evidence will show is a relative song.  So what on earth

24 happened?

25     Well, for today I'm going to leave that question to the

1  historians because it doesn't matter if the plan was brought

2  into this world by a mediation process we take issue with, or

3  whether it was delivered by the stork.  Viewed strictly on its

4  own terms in light of all available evidence the plan can't be

5  confirmed.

6      And as I will discuss, not only has discovery revealed a

7  failure across the board, discovery has also revealed that the

8  debtor in many instances gave itself a hall pass from even

9  attempting to develop basic evidence.

10      Now first I will discuss the plan's unfair discrimination

11  against Classes 9 and 14 under both the Aztec test and the

12  Markell test.  Second, I will discuss the plan's failure to

13  satisfy the best interest of creditors test and the debtor's

14  abject failure to even bother trying.  And third and finally,

15  I will discuss the plan's failure to satisfy the fair and

16  equitable test.

17      Now, Your Honor, in the interest of time and as an act of

18  clemency for a captive audience, I won't touch on good faith,

19  feasibility, and our miscellaneous technical objections today.

20  There will be plenty of evidence during the trial on those

21  issues and we'll plan to discuss those at closing.

22      Your Honor, as we ponder the -- the debtor's evidentiary

23  void in so many areas, I was reminded of the theological

24  doctrine fide sola, by faith alone.  And I remembered a quote

25  from St. Thomas Aquinas.  He famously said, where faith

1 exists, no explanation is necessary.  And where faith is

2 absent, no explanation is possible.

3      But we are not in a house of worship or an ecclesiastical

4 Court, we are in an American Court of law.  There are no

5 verities, there are no truths we hold to be self evident,

6 there is no received wisdom, there is no gospel according to

7 Mr. Buckfire or Mr. Orr.  And nothing is true simply because

8 the debtor fervently desires that it be true.

9      Now the evidentiary record and its many wide open spaces

10 will make plain the impossible position the Court has been

11 placed in.  One where the Court is asked by faith alone to

12 find that the debtor has met its many burdens.

13      And I want to preview just some of those articles of

14 faith the debtor will ask this Court to blindly accept.

15 First, additional reductions in pension recoveries would

16 adversely impact the morale, performance, and retention rate

17 of active employees.  That article of faith goes to unfair

18 discrimination.

19      The city's pension obligations alone are so large they

20 would eradicate any meaningful recovery for creditors outside

21 of Chapter 9.  That article of faith goes to best interest.

22      The retirement systems will invest in assets more

23 conservatively after the debtor emerges from bankruptcy.  That

24 article of faith goes to unfair discrimination and fair and

25 equitable.

1      The RJA process would yield inferior recoveries for all

2  creditors.  That article of faith goes to best interest.

3      Taxes cannot be raised in Detroit without having a net

4  negative impact on revenues.  That article of faith goes to

5  best interest and fair and equitable.

6      Delinquency rates will become unmanageable and there will

7  be mass immigration if tax rates go up.  That article of faith

8  goes to best interest and fair and equitable.

9      All grand bargain proceeds had to be paid exclusively to

10  Classes 10 and 11 because the foundations and the state

11  insisted on it.  That article of faith goes to unfair

12  discrimination and fair and equitable.

13      The debtor has reasonably determined that there is a

14  credible argument that the art collection is subject to an

15  implied charitable trust.  That article of faith goes to fair

16  and equitable.

17      And finally the museum assets are subject to a great many

18  donor restrictions that would prevent a sale.  That article of

19  faith goes to fair and equitable.

20      Now these are make or break arguments and there are

21  others.  And the debtor asserts them based on its say so and

22  nothing more.  And I'll speak to those in greater detail as I

23  go through my presentation.

24      And, Your Honor, a couple of table setters that until

25  yesterday I didn't think were particularly controversial.

1    First, it's absolutely true that Section 904 of the Code

2    restricts a Court's ability to interfere with municipal

3    operations.

4        But the cases are also clear that a Chapter 9 debtor

5    consents to a Bankruptcy Court's jurisdiction to adjudicate

6    the confirmability of a plan of adjustment.  I thought I heard

7    Mr. Bennett try to flip that around to suggest that 904

8    somehow trumps the 1129 confirmation requirements.  It

9    doesn't.

10        The obligation not to discriminate, to satisfy best

11    interest, to treat creditors fairly and equitably, none of

12    those are blotted out by Section 904 of the Code, or by any

13    Michigan law limiting creditor recoveries.  When a Chapter 9

14    debtor or any debtor gets the benefits of bankruptcy, the

15    automatic stay, the breathing spell, the fresh start, it also

16    takes on the burdens.

17        And those burdens include more than thumbing your nose at

18    your rejecting classes and saying that outside of bankruptcy

19    the creditors couldn't force this or that and can only get

20    zero.  We're not outside of bankruptcy, we're in bankruptcy.

21    The debtor can impair contracts and compromise claims but what

22    it can't do is inflict unnecessary and outside losses on

23    disfavored classes.

24        Second, although the plan consists of a number of

25    settlements, including of course the so-called grand bargain,

1  the law is also clear that the deferential 9019 standards in

2  no way lessen the debtor's burden of proof on each and every

3  confirmation element.  There are --

4          THE COURT:  I want to go back to your argument about

5  the role of 904.

6          MR. KIESELSTEIN:  Yes.

7          THE COURT:  In the confirmation process.

8          MR. KIESELSTEIN:  Uh-huh.

9          THE COURT:  What -- what is your position on whether

10  904 has any role to play in interpreting or applying the

11  confirmation standards --

12          MR. KIESELSTEIN:  Uh-huh.

13          THE COURT: -- in -- in a Chapter 9 case?

14          MR. KIESELSTEIN:  We don't think it has a role, Your

15  Honor.  We think --

16          THE COURT:  None.

17          MR. KIESELSTEIN:  No role, Your Honor.  I mean if --

18  if -- if there was a plan that said, and I don't know if it

19  was the debtor's own plan, I don't know why it would say it,

20  that we will be forced to sell things, or lien things up.  904

21  says a Court can't force a city to do that.

22      A plan can't force a city to do those things either but

23  that's a different question from whether it's fair and

24  equitable for a city to opt not to do certain things that it

25  could do.  It's the difference between whether 904 means a

1  debtor can't be dragged kicking and screaming to do something

2  as opposed to whether a debtor has a duty under the fair and

3  equitable standard to take certain measures to minimize

4  creditor losses.

5          THE COURT:  And you don't think that Section 904

6  requires the Court to employ a somewhat more differential

7  standard in for example, unfair discrimination, or fair and

8  equitable.

9          MR. KIESELSTEIN:  We certainly do not, Your Honor.

10 We think the objective Trier of Fact has to find that the

11 debtor has carried its burden by a preponderance of the

12 evidence.  That's why I'm -- I'm talking about 9019 enormous

13 business judgment deference does not translate over into the

14 1129 or 943 elements.  And we think the case law is clear on

15 that point.

16     So, Your Honor, with regard to 9019, there are no

17 business judgment presumptions in a contested confirmation

18 hearing.  And Rule 9019 is not a Trojan horse to slip past the

19 fortifications of Section 1129 and 943.

20     Mr. Bennett spent a great deal of time on the lowest

21 range of reasonableness and such.  Now that tells me the

22 debtor plans to do exactly what you cannot do, conflate the

23 subjective debtor friendly deferential 9019 standard with the

24 coldly objective non-deferential standards of 943 and 1129.

25         So, for example, with respect to the art, we believe the

1  evidence will show the debtor did so little to vouch safe the

2  implied trust argument, or the donor restriction issue and ran

3  so fast and so far from any alternative proposals with respect

4  to the art that it can't satisfy even the lenient 9019

5  standard.

6      But even if Your Honor felt differently, that has

7  absolutely nothing to do with the debtor's need to satisfy the

8  confirmation standards.  It reminds me of that old Hebrew

9  National ad campaign from 20 years ago.  It said, we're

10 Kosher.  We have to answer to an even higher authority.

11     And 9019 and 1129 are like that.  1129 is a higher

12 standard, it's a higher authority.  You can't get around it

13 with 9019.

14     So with that groundwork laid, Your Honor, let me turn to

15 the key confirmation elements.

16         THE COURT:  Well, how would you articulate what that

17 difference is that you assert?

18         MR. KIESELSTEIN:  Between 9019 and 1129?  9019 as I

19 understand it is basically the equivalent of business judgment

20 rule protection that a Delaware director would get for a

21 decision that they made, did they go through a reasonable

22 process, did they inform themselves, et cetera.  And if they

23 -- those process answers are yes, the debtor looked into it,

24 they poked around, they -- they, you know, they asked a few

25 questions, that okay the -- the Court does not second guess

1  the debtor's business judgment there.  That had --

2         THE COURT:  That doesn't feel like the standard that

3  I applied in reviewing the settlements in this case so far.

4         MR. KIESELSTEIN:  Oh, no, certainly not, Your Honor.

5  But that's still not the same as the 1129 standards.  The 9019

6  standard we don't contest this, has an element of deference in

7  it, no two ways about it.  That's -- that's how it works.

8      And I think even when Your Honor turned down the first or

9  second swap settlement, I can't remember now, it was because

10  Your Honor found that that low bar had not been satisfied, not

11  that viewed straight up objectively that the debtor was wrong,

12  but the debtor hadn't satisfied the lowest range of

13  reasonableness.  That's not the test here.  That's -- that's a

14  -- a trap for the unwary, Judge.  That's an end around.  And

15  we don't think it's appropriate.

16      So, Your Honor, if I may.  With that ground work laid,

17  let's turn to the question of unfair discrimination.  Now

18  discrimination is relevant of course because the debtor seeks

19  to cram down Classes 9 and 14 --

20         THE COURT:  We have to pause one more time.

21         MR. KIESELSTEIN:  Yes.

22         THE COURT:  I want to be sure I understand what

23  you're arguing here.

24         MR. KIESELSTEIN:  Sure.

25         THE COURT:  Under -- under what kinds of

1   circumstances --

2           MR. KIESELSTEIN:  Uh-huh.

3           THE COURT:  Either generally or specifically would a

4   Court in a Chapter 9 case hold that a settlement is fair and

5   reasonable under 9019 but that the consequences of that

6   settlement to other creditors are not fair and equitable or

7   result in unfair discrimination in the confirmation context?

8           MR. KIESELSTEIN:  Well, this goes --

9           THE COURT:  That's what I'm having a hard time

10  comprehending.

11          MR. KIESELSTEIN:  This goes to the whole question of

12  -- of a settlement being so broad and so inclusive or having

13  such ramifications that it in essence amounts to a sub rosa

14  plan.  And settlements can be a way to circumvent --

15          THE COURT:  Okay.  But that's not an answer to my

16  question.

17          MR. KIESELSTEIN:  I'm sorry, could you re-ask your

18  question?

19          THE COURT:  I'm looking for what would it be, what

20  -- what circumstance would there be about a settlement that

21  the Court finds is fair and reasonable in a 9019 context.

22          MR. KIESELSTEIN:  Sure.

23          THE COURT:  But that would result in unfairness

24  either in the context of fair and equitable or unfairness in

25  the context of unfair discrimination.

1          MR. KIESELSTEIN:  Very simple.

2          THE COURT:  Give me -- give me

3          MR. KIESELSTEIN:  The grand -- the grand bargain --

4          THE COURT:  One -- one thing to think about that

5   answers that question.

6          MR. KIESELSTEIN:  Your Honor, the grand bargain.

7   The grand bargain if it was a two party dispute between the

8   retirees and the city or three party, the DIA, if you were to

9   say they could settle this dispute and it's fine because it

10  doesn't adversely impact the rights of others, we would argue

11  that that grand bargain is devastating to our rights, both

12  because every single penny of proceeds goes only to Classes 10

13  and 11 and none goes to any other class, including the COPS

14  class.

15      And two, it takes the art off the table permanently

16  without us having had the opportunity to say, wait a minute,

17  that's not fair and equitable.

18         THE COURT:  So the answer -- so you're arguing the

19  answer to my question is, a settlement might be fair and

20  reasonable as among the parties to it.

21         MR. KIESELSTEIN:  Uh-huh.

22         THE COURT:  But result in a consequence to other

23  parties that is arguably unfair, or is unfair.

24         MR. KIESELSTEIN:  Precisely, Your Honor.  And in

25  fact it's a live example in this case because after the grand

1  bargain was cut, the city has kind of come to us --

2          THE COURT:  Well, but -- but answer this question

3  for me.

4          MR. KIESELSTEIN:  Sure.

5          THE COURT:  Isn't it the case --

6          MR. KIESELSTEIN:  Uh-huh.

7          THE COURT:  -- that every time, every single time

8  there is a settlement in a bankruptcy case --

9          MR. KIESELSTEIN:  Uh-huh.

10          THE COURT:  -- between a debtor and one creditor

11  which results in that creditor getting more or the debtor

12  getting less than it might otherwise, that potentially

13  adversely impacts all the other creditors in the case.  Isn't

14  that so?

15          MR. KIESELSTEIN:  It's all a matter of degree, Your

16  Honor.  Yes, does every settlement has some potential

17  tangential impact on -- on another creditor.

18          THE COURT:  Oh, not tangential, direct.

19          MR. KIESELSTEIN:  Well, I -- I -- I would have to

20  think what the example was to tell you if I thought it was on

21  one side of the line or another.  But if someone came in and

22  settled their claim for, you know, X dollars and not Y dollars

23  and by definition that means that there is a larger claim pool

24  and more dilution for everybody else, yes, you could suggest

25  that that -- that's impactful.  Everything is impactful in a

1   bankruptcy as we all know.

2           THE COURT:  I mean --

3           MR. KIESELSTEIN:  But some things are devastatingly

4   impactful and other things are marginally impactful.  And

5   that's why you have the notion of -- of sort of sub rosa

6   plans, wait a minute these --

7           THE COURT:  But if the settlement is reasonable

8   based on an objective evaluation of the strengths and

9   weaknesses of the claims, and defenses, and the complexity,

10  and the length, and --

11          MR. KIESELSTEIN:  Uh-huh.

12          THE COURT:  -- and the cost and all of that stuff we

13  consider under 9019 --

14          MR. KIESELSTEIN:  Right.

15          THE COURT:  Would a Court ever say no to that

16  settlement just because it's going to have a devastating

17  impact on the other creditors?

18          MR. KIESELSTEIN:  Absolutely, absolutely.

19          THE COURT:  I'm not familiar with that concept.

20          MR. KIESELSTEIN:  Well, you know, I think the facts

21  will show, I think they're -- and I said there's nothing

22  that's self evident, so here I go contradicting myself.  I

23  think it's self evident that the grand bargain obviously

24  favors one group of creditors as opposed to another.  We get

25  no proceeds.

1    The -- the pension claim holders get 100% of the

2   proceeds.  I don't think it's stretch to say that that's --

3   the evidence will show that that favors one group rather than

4   another.  So I mean in that -- in that circumstance, you know,

5   that is where the line is crossed in my view.

6          THE COURT:  Okay.

7          MR. KIESELSTEIN:  So, Your Honor, back to the

8   question of unfair discrimination.  Here again there's a cram

9   down of Classes 9 and 4.  Those creditors are receiving far

10  less than other unsecured creditors.  I'll get to the new math

11  post solicitation in a minute.

12     Now on its face the plan provides vastly disparate

13  treatment for creditors.  Fifty-nine and 60% for PFRS and GRS

14  pension claims, only 10 and 13 cents for COPS claims and

15  general unsecured claims, not our evidence.

16     That's clearly stated in the disclosure statement

17  notwithstanding the furious and troubling back pedaling we've

18  seen by the debtor both in its pre-trial brief and as a large

19  part of Mr. Bennett's opening.  And I'll touch on that in a

20  bit.

21     Now this Court noted in early August that the debtor's

22  plan engages in "very significant discrimination".  And that

23  the debtor was going to need to lay out a "business

24  justification" for that discrimination.

25     And Mr. Orr agreed, watch for yourself.

1        (Video Being at Played at 11:32 a.m.; Concluded at 11:32

2    a.m.)

3        Now Mr. Orr was the debtor's 30(b)(6) witness.  And that

4    30(b)(6) witness' testimony is absolutely considered a binding

5    admission.  That's how 30(b)(6) works.

6        Now Mr. Bennett cannot walk that back from the podium.

7    This means that there is no dispute between the parties that

8    significant discrimination exists.  The debtor is bound by Mr.

9    Orr's admission on this point.

10        But as the evidence will show, and Mr. Wagner will speak

11    to this, very significant discrimination is actually a model

12    of understatement.  The discrimination is far more pronounced

13    than the debtor lets on.

14        Now despite its previous admission on the subject though

15    in its pre-trial brief and as we heard yesterday and today,

16    the debtor now attempts to argue that the discrimination is

17    not significant and that its own Court sanctioned disclosure

18    statement substantially overstates pension claim recoveries in

19    Classes 10 and 11.

20        On Pages 27 through 30 of the debtor's pre-trial brief

21    the debtor argues that a more accurate calculation of the

22    pension claims would utilize a lower or risk free discount

23    rate.  And we heard a lot about that this morning.

24        So the result of that would be by dint of arithmetic to

25    substantially increase the size of the pension claims

1  resulting in significantly decreased recoveries.  Now as an

2  aside the evidence will show that municipal pension funds

3  simply don't calculate their liabilities using any of the kind

4  of rates that Mr. Bennett talked about.  I know the evidence

5  to that effect.

6      Calculating the pension claim using the debtor's new math

7  and excluding the grand bargain proceeds would result in 20%

8  recoveries for GRS and single digit recoveries for PFRS.

9  These are astonishing numbers.

10      But what is also astonishing is that the debtor never

11  once mentioned its secret view that a risk free rate or some

12  lower rate should be applied to pension claims in either the

13  big disclosure statement or in the plain English disclosure

14  statement which was created for the expressed purpose of

15  explaining to retirees precisely what they are getting.

16      The debtor disclosed 59 and 60% recoveries and made no

17  changes to those numbers before the voting deadline.  Now I

18  just heard Mr. Bennett say, I believe, that there are,

19  "clearer and more accurate" ways to quantify the claim and the

20  recoveries.

21      If so, why weren't they in the disclosure statement?  Now

22  it wasn't until after seeing objections, expert reports, and

23  other evidence that will make clear the plan is unconfirmable

24  on the basis of unfair discrimination.  Only then did the

25  debtor disclose its heart of heart's view on the actual

1  recovery for the retirees.

2      Now this is discrimination three card Monty, Your Honor.

3  Either this new argument is just a continued effort to escape

4  Mr. Orr's binding admission, or there were very significant

5  omissions to creditors in the disclosure statement.

6      Now having obtained this Court's blessing to a disclosure

7  statement that pension claimants were getting 59 and 60 cents

8  in Classes 10 and 11, the debtor must be judicially estopped

9  from changing its position now.  We'll take that up at the

10 appropriate time when the evidence comes in.

11     But let's look at the real facts on unfair

12 discrimination.  Now in the coming weeks the evidence will

13 show that despite an ever changing list of justification,

14 there is no business justification for any let alone the

15 massive discrimination in the plan.

16     Now as the Court is aware, there are two tests for

17 determining whether a plan discriminates unfairly, Aztec and

18 Markell, no question the law is a bit confused in this area.

19 But it makes no never mind.  Because the -- the plan fails

20 both discrimination tests with flying colors.

21     And let's talk Aztec first.  Now Aztec is a four part

22 test.  The debtor must carry its burden as to each part.  Now

23 we cover them all in our pre-trial brief, but I'm only going

24 to focus on the first two parts because they are show

25 stoppers.

1    By the way extreme is not the standard, although I think

2  Mr. Bennett just invented that this morning.  The

3  discrimination has to be supported by a reasonable basis as

4  independently and objectively determined by the Trier of Fact.

5    Put another way it doesn't matter that a debtor thinks or

6  believes in good faith that the discrimination is reasonable.

7  And the discrimination must be necessary to confirm the plan.

8    Now Your Honor has recognized the need for a reasonable

9  basis noting that, "in the case law I'm familiar with, where

10  the issue is the business justification for whatever

11  discrimination is in the plan, it is determined based on the

12  business needs of the debtor".  So not only must a debtor

13  offer a reasonable business justification -- justification for

14  discriminating, it must have actually relied on it.  You can't

15  discriminate first and ask questions or find answers later.

16  But put another way a debtor has to know the business

17  rationale for its discrimination in advance, not in arrears.

18    So what does has the debtor said about the reasonableness

19  of its basis for discriminating?  Well, it's probably easier

20  to ask what hasn't the debtor said.  Trying to focus on the

21  debtor's discrimination case is a bit like looking through a

22  kaleidoscope.  Every time you think you've got the picture,

23  the debtor turns the handle and the landscape changes

24  entirely.

25    Let's start with Mr. Orr.  What did Mr. Orr again as the

1  debtor's 30(b)(6) witness say under oath about the decision to

2  discriminate?  Well, he cited four reasons and only four

3  reasons to justify the discrimination.

4      Some we had never heard before.  And remember this is

5  July of this year.  Other rationales that the debtor had

6  previously raised went entirely unmentioned.

7      He said he considered the human dimension, the city's

8  covenant with retirees, the potential invalidity of the COPS,

9  and the assets currently in the retirement systems.  That's

10 it.

11     Now if you line that up with the debtor's recently filed

12 pre-trial brief, you will find very little overlap.  So we

13 remain confused as to what the debtor actually intends to try

14 to prove.  What the evidence will show is that to this day the

15 debtor is still groping in the dark for some post hoc

16 justification of its initial decision to discriminate.

17     Now Mr. Orr spent a great deal of time talking about the

18 human dimension as a justification for discrimination.  What

19 is the human dimension?  Listen for yourself.

20     (Video Being Played at 11:39 a.m.; Concluded at 11:39

21 a.m.)

22     Now all of us being human, we all appreciate the human

23 dimension, Your Honor.  But let's remember the rule of law.

24 What does this have to do with an objective business

25 justification for discrimination under the plan?

1    In fact as I noted at the outset, Mr. Orr himself

2  admitted that the human dimension is a legally impermissible

3  basis for discrimination.  Here is a clip.

4    (Video Being Played at 11:40 a.m.; Concluded at 11:41

5  a.m.)

6    So, Your Honor, in between December of 2013 at his

7  deposition the human dimension took on a whole new dimension.

8  Where once it was legally insufficient to justify

9  discrimination, now we have Mr. Orr as a 30(b)(6) witness

10  saying, it is the very basis for discrimination.

11    Now what Mr. Orr obviously meant by the human dimension

12  was the impact that less favorable plan treatment might have

13  on individual pension claimants as opposed to financial

14  creditors.  In other words personal hardship.

15    But it's almost as if Mr. Orr and those who prepared him

16  for his 30(b)(6) deposition, were oblivious or indifferent to

17  this Court's very clear ruling, since reiterated, that

18  individual hardship is simply not germane to the unfair

19  discrimination analysis.  Again, the rule of law.

20    Specifically on June 26th of this year Your Honor said,

21  "I'm going to say here as unequivocally as I can, that as a

22  matter of law a creditor's needs is not an issue when it comes

23  to determining unfair discrimination".

24    Again on August 6th, Your Honor noted that in your view

25  "neither fair and equitable, nor unfair discrimination has

1 ever in any bankruptcy case considered the impact of a plan on

2 a creditor.  That is to say the adverse impact of a plan on

3 the creditor".

4      Now honestly, Your Honor, you could stop the trial right

5 here.  The debtor's decision to rely on the human dimension a

6 legally impermissible basis for discriminating between

7 creditors to determine treatment under the plan, is a legal

8 nonstarter.  That consideration affects the entire unfair

9 discrimination analysis.  It's enough to sink this ship.  And

10 it doesn't matter what else the debtor says.

11      Now obviously, Your Honor, whether the claims of retirees

12 ought to as a policy matter be elevated above those of

13 financial creditors in a Chapter or a Chapter 11 is a fair

14 question.  And a lot of people in this room might say yes.

15 And in other jurisdictions, other foreign jurisdictions, that

16 is the case.

17      But that's a question for elected officials whose job it

18 is to consider public policy questions and to take legislative

19 action.  With greatest respect for this Court and every other

20 Court, it's not for the judicial branch to make those kinds of

21 policy choices.

22      Your Honor clearly recognized as much in your personal

23 hardship rulings.  And just that it's not the Court's

24 province, it's certainly not the province of the debtor.  So

25 the human dimension as a reasonable business justification for

1  the discrimination must fail.

2      Now in another sign the debtor can't keep its

3  discrimination story straight, the debtor did not include the

4  human dimension in its pre-trial brief, notwithstanding it was

5  number one on Mr. Orr's hit parade.

6      Instead though in that brief the debtor has suggested at

7  the -- on the eleventh hour that personal hardship can somehow

8  be relevant in the aggregate.  And when viewed in terms of

9  aggregate impact on the city.

10      Just two problems.  One, there's no evidence that Mr. Orr

11  actually considered personal hardship or the human dimension

12  from that macro perspective.  This isn't back to the future.

13      Mr. Orr is not Marty McFly.  We can't pile into the

14  Delorean, go back in time to before he decided to discriminate

15  and make this the rationale.  Neither the law nor the space

16  time continuum allow for that.

17      Now second, there is no credible evidence that the debtor

18  actually studied, analyzed, or quantified any alleged

19  aggregate impact on the city.  And this is the point.  Alibis

20  for discrimination are not evidence supporting discrimination.

21  Sola fide, on faith alone where faith exists, no explanation

22  is necessary.

23      Now next Mr. Orr cited a covenant with the retirees by

24  which he meant the promise of the city to properly fund its

25  pension systems to insure benefits would be paid.  That is Mr.

1  Orr admits the covenant argument is just another variation on

2  the personal hardship theme.  And here he is again.

3      (Video Being Played at 11:45 a.m.; Concluded at 11:46

4  a.m.)

5      Now, Your Honor, perhaps the word covenant was used to

6  lend a sacred or mystical air to this promise as opposed to

7  all others.  But as Mr. Orr, an experienced bankruptcy

8  practitioner knows full well, bankruptcy is sadly the land of

9  broken promises.  And there will be no credible evidence to

10  suggest that the promises that were made to financial

11  creditors stand on lower ground than those made to retirees.

12      That's the whole point of the cardinal principal of

13  rateable distribution for similarly situated creditors.  Other

14  than the breathing spell of the automatic stay and the fresh

15  start, it's hard to conceive of a more fundamental bankruptcy

16  imperative.

17      Now this is especially true that in light of the fact

18  that contract, covenant, or holy veil, all unsecured creditors

19  have the same expectation of repayment.  And Mr. Orr admits as

20  much in his deposition testimony.

21      (Video Being Played at 11:47 a.m.; Concluded at 11:48

22  a.m.)

23      So, Your Honor, the covenant argument as an objective

24  business justification for significant discrimination fails.

25  Now third, Mr. Orr asserted that the potential invalidity of

1  the COPS is a legitimate basis for discrimination.

2      With respect that makes no sense.  There is no law and

3  there will be no evidence to support the proposition that a

4  debtor can discriminate against a creditor based on its

5  subjective belief that the creditor's claim is bogus.  A

6  debtor can object to a claim and the debtor has here.

7      The invalidity litigation will go on for a long time and

8  absent a settlement a final and non-appealable order will

9  issue from some Court some day.  And we have a view of the

10  merits, but as we all talked about yesterday, the merits are

11  irrelevant for this.

12      The critical point is that if the COPS are invalidated,

13  there will be no Class 9 claim.  And by definition

14  discrimination won't be an issue.  If on the other hand Class

15  9 claims are upheld as valid, there will be an allowed claim.

16      And in that allowed claim scenario it cannot possibly be

17  justifiable to discriminate on the theory that back in the day

18  the debtor tried but failed to invalidate the claim.  There is

19  a legal term for that sort of logic, heads, I win, tails, you

20  lose.

21      So the notion that the debtor can discriminate because it

22  has a gleam in its eye is also undermined by the plan itself.

23  The plan provides for a B note reserve that would pay allowed

24  Class 9 and 10 -- allowed Class 9 claims 10 cents on the

25  dollar.

1    So the plan acknowledges as it must that invalidity might

2   fail, but purports to discriminate even if it does.  Not

3   shockingly no case cited by the debtor suggests that a

4   priority discrimination can be based on a debtor's

5   idiosyncratic view of future claim resolution.  And so the

6   invalidity argument as an objective business justification for

7   significant discrimination fails.

8    Now last Mr. Orr said discrimination is justified because

9   there are assets in the pension systems.  But what earthly

10   connection is there between the pension funds containing

11   assets, and the very significant discrimination in favor of

12   pension claims?  The evidence will demonstrate no connection.

13    The fact that the pension funds have more or less assets

14   merely delineates the size of the under funding claim, nothing

15   more, nothing less.  But it has nothing to do with

16   discrimination or an objective business justification for

17   discrimination.

18    So the evidence will show that all of Mr. Orr's bases,

19   given as a 30(b)(6) witness for the debtor's discrimination

20   are woefully insufficient.  The evidence will show that none

21   of these rationales singly or collectively resemble an

22   objective reasonable business justification for what Your

23   Honor said was very significant discrimination.

24    Now as Mr. Wagner will discuss a little later on, the

25   evidence will show that the discrimination in the plan was

1  severely understated. And that evidence will also go directly

2  to a lack of good faith.

3      But notwithstanding that, Mr. Orr's 30(b)(6) testimony is

4  supposed to provide the only pertinent rationales for

5  discrimination, otherwise why bother having 30(b)(6)

6  witnesses. I want to briefly touch on a few of the enumerable

7  other purported bases for discrimination that the debtor has

8  tried on for size from time to time.

9      Now the debtor's reply uses these, employee morale,

10 settlement of the eligibility litigation, pensions in that --

11 pensioners inadequate ability to protect themselves, the grand

12 bargain proceeds are outside the plan and shouldn't be

13 considered. And discrimination is minimal when OPEB and

14 pension claim recoveries are viewed in the aggregate.

15     Now only some of these survived to make it into the

16 debtor's pre-trial brief. But I'm taking the time to talk to

17 the Court about these because given Mr. Orr's 30(b)(6)

18 testimony, there is no doubt that debtors will decide it must

19 come up with something different and better to keep the plan

20 afloat.

21     And this re-invention campaign on discrimination is

22 already in full swing. Now first the debtor has asserted that

23 treating pension claims far better than financial creditors is

24 reasonable because doing so will enhance the morale,

25 performance, and retention rates of the active work force.

1        Two problems.  First you will hear testimony from Kevin

2   Murphy of Charles River Associates.  He's a respected labor

3   economist and he will testify that he could find no economic

4   or empirical basis to support the debtor's contention that

5   active worker morale, productivity, or retention would be

6   adversely affected based on the magnitude of proposed pension

7   cuts for -- or Class 10 and 11 recoveries.

8        We heard Mr. Bennett's critique of that.  The evidence

9   will stand or fall on its -- on its own weight.

10        Second, the debtor has no credible evidence or analysis.

11   This is just another article of faith.  Discovery has revealed

12   no correlation whatsoever between retiree recoveries and

13   active employee performance, morale, and retention.

14        Moreover, and this is a problem you will hear over and

15   over and over again.  The debtor made no meaningful attempt to

16   establish any correlation before Mr. Orr made the decision to

17   discriminate.  Now Mr. Orr himself acknowledged that the

18   principal driver for employee retention is an individual's go

19   forward wages and benefits, not how pension claims are

20   treated, no mention of those.

21        (Video Being Played at 11:53 a.m.; Concluded at 11:54

22   a.m.)

23        Now, Your Honor, if reductions to retiree benefits most

24   notably pensions, was a key factor with respect to active

25   employee morale and retention, one would reasonably have

1  expected the discovery and the evidence to show two things.

2  First, one would reasonably expect a noticeable and measurable

3  difference in active employee productivity, morale, and

4  retention between the filing of the debtor's first plan of

5  adjustment which proposed a 26% cut to GRS members and later

6  filed versions which proposed only a 4 1/2% cut.

7       Second, one would reasonably expect that Mr. Orr and his

8  team would have worked hand in hand with those people closest

9  to the debtor's active work force such as the labor director

10  and the police and fire chiefs to determine what level of

11  pension reductions would be possible without compromising

12  employee morale, productivity, and retention.

13       Additionally one would expect the debtor to engage in a

14  systematic study and analysis of these issues.  But the

15  evidence will show none of that happened.

16       Now Mr. Michael Hall, the debtor's labor director,

17  testified at his deposition that there was no perceptible

18  uptick in employee morale and retention when the debtor's

19  initial 26% cut was reduced to 4 1/2%.  And here is that state

20  deposition testimony.

21       (Video Being Played at 11:55 a.m.; Concluded at 11:56

22  a.m.)

23       Now Mr. Hall further testified that no one consulted him

24  at any time regarding those proposed cuts about the

25  appropriate level of pension cuts to avoid these terrible

1  morale, productivity, and retention issues.

2     (Video Being Played at 11:56 a.m.; Concluded at 11:57

3  a.m.)

4     Now that's odd.  The debtor says the pension cuts have to

5  be ever so carefully calibrated to avoid damaging the morale,

6  productivity, and retention of the active work force.  But no

7  one bothers to keep the labor director in the loop.

8     Now finally Mr. Hall said at his deposition, that

9  attrition of the active work is "not a major problem" because

10 "there are not a lot of options here in the city".  And here

11 he is again, Your Honor.

12    (Video Being Played at 11:57 a.m.; Concluded at 11:58

13 a.m.)

14    Now, Your Honor, that last statement is one very

15 unfortunately that no one in this room is likely to seriously

16 dispute.  Now the debtor knows that it has a problem on this

17 point.  It's going to put police Chief James Craig and fire

18 Chief Edsel Jenkins on the stand to testify to the necessity

19 of the discrimination and the potential negative impact of

20 additional pension cuts on the active work force.

21    But there is still a problem.  The police Chief and the

22 fire Chief have already testified that no one from the debtor

23 consulted them either.

24    (Video Being Played at 11:58 a.m.; Concluded 11:59 a.m.)

25    So, Your Honor, in sum the debtor will have no credible

1  evidence or analysis to -- in support of this alleged business

2  justification for its very significant discrimination which

3  again takes me back to sola fide, by faith alone, where faith

4  exists no explanation is necessary.

5      And let me briefly discuss a couple of additional

6  rationales the debtor has thrown at the wall in its briefing.

7  For instance the debtor says an objective business

8  justification for discrimination in favor of pension claims is

9  the fact that the retirement systems settled their eligibility

10  dispute.

11      When Mr. Orr acknowledged that preferential treatment of

12  the pension claims was neither designed to induce, nor a

13  requirement for settlement of the eligibility litigation.

14  Watch for yourself.

15      (Video Being Played at 12:00 p.m.; 12:00 p.m.)

16      Okay.  So again one thing had nothing to do with the

17  other.  Discrimination bait and switch.  This is not what Mr.

18  Orr thought about when he made the decision to discriminate.

19      But even if it did, the fact that a creditor graciously

20  agrees to massively preferential treatment to that of pari

21  passu creditors cannot itself be the business justification

22  for that favorable treatment.  Now what little case law there

23  is addressing this perfect circle of an argument says what you

24  would expect, it's no rationale at all.

25      Now additionally, Your Honor, those who fought

1    eligibility lost before Your Honor, not by a little.  Your

2    Honor could not have been clearer that pension claims could be

3    compromised in Chapter 9 the same as other contractual claims.

4         Settling that argument cannot be a springboard to

5    enormously preferential treatment.  So we can strike that

6    rationale off the list as well.

7         Now the debtor also argues that an objective business

8    justification for its very significant discrimination is that

9    the pensioners have no real opportunity to protect themselves

10   from mismanagement and investment of pension assets.  Now even

11   if that were true and the evidence will demonstrate it isn't,

12   how would that be an objective business justification.  How

13   would discriminating on that basis lead to some business or

14   economic benefit for the City of Detroit and its citizens post

15   emergence.

16        The answer of course is that it wouldn't.  One thing has

17   nothing to do with the other.  So this is just personal

18   hardship in sheep's clothing.

19        Now in the first place let's all be clear that the

20   retirement systems hold the pension claims in Classes 10 and

21   11.  Payments to individual pensioners are not really what

22   we're talking about here.  And that's already been addressed

23   in this case.

24        Early on Mr. Bennett was asked, who holds the pension

25   claims and he forthrightly said, it was the retirement

1 systems.  And he was correct about that.

2      But even if individual pensioners held the pension

3 claims, the evidence, including Mr. Orr's testimony will

4 demonstrate that the pensioners had plenty of protection.

5 Specifically active employees are represented by unions,

6 retirees are protected by retiree associations, and all

7 pensioners are protected by the boards of trustees of the

8 retirement systems.

9      And the evidence will show that the systems released

10 significant financial disclosures and reporting each year for

11 accountability sake.  The evidence will also show that the

12 retirees even have the ability to vote in some, but not all of

13 the trustees giving them an additional lever to protect

14 themselves.

15      And on top of it all, the evidence will show that the

16 retirement systems have actually performed pretty well in

17 terms of return on investments when compared to their peers in

18 the market.  So I have to confess this rationale for

19 discrimination I actually don't really understand.  But it

20 also falls away.  And to the extent this argument is remotely

21 relevant, and we don't think it is, it doesn't support the

22 very significant discrimination.

23      Now next the debtor argues that pension claim recoveries

24 are substantially lower when the grand bargain proceeds are

25 excluded from the calculation of their recoveries.  And at

1   first the debtor states that these proceeds should be excluded

2   because they are payments outside the plan.

3       Now the first problem with this argument is that the

4   concept of payments outside the plan is an artificial one.

5   Mr. Bennett thinks he has his case law, we have ours.  We'll

6   deal with that at closing.  But Courts have explained that

7   "since all payments must be made according to the terms of the

8   plan, there really is no such thing.  It's a fiction".

9       And such is the case here.  But moreover the grand

10  bargain proceeds are expressly factored into pension claim

11  recoveries throughout the plan and the disclosure statement.

12  And the evidence will be crystal clear that the grand bargain

13  proceeds are directly attributable to the transfer of the DIA

14  assets which are assets of the debtor.

15      The consideration for the transfer of the debtor's

16  property, the proceeds of course become property of the

17  debtor.  Same as any 363 sale in a Chapter 11 context.  Liens,

18  claims attach to the proceeds.

19      If the -- if the asset was part of the -- of the debtor's

20  estate, and I know we don't have the estate issue here, but

21  it's still the debtor's property.  The fruits of -- of those

22  assets are by definition the debtor's property as well.

23      And the debtor has made multiple statements in its

24  pre-trial brief confirming the obvious, that the grand bargain

25  proceeds are transferred to the city.  Specifically the debtor

1  noted, "in a dismissal scenario, the city obviously would lose

2  access to the $816,000,000 in funds it is due to receive in

3  connection with the grand bargain".  That's Paragraph 81.

4  `    "As set forth in the consolidated reply, the city will

5  receive funds with a nominal value of approximately

6  $816,000,000 over the course of the 20 year period following

7  the effective date".  Paragraph 165.

8      Same paragraph, "the city is receiving these funds

9  despite the significant dispute as to whether the city even

10  possesses an interest and with DIA assets that are capable of

11  monetization".

12      Now I don't think you heard anything from Mr. Bennett

13  that really contradicted that.  I didn't have a final

14  transcript of yesterday's hearing, but I thought I heard him

15  say the city "gets a sum of money from the foundations and the

16  DIA Corp.", or words to that effect.

17      And by the way if the city truly believes its argument

18  that the grand bargain proceeds were not coming to the city in

19  the first instance, it would then also have to acknowledge

20  that it would therefore be receiving zero dollars on account

21  of the DIA assets.  That of course would be fatal, unfair,

22  equitable, fraudulent transfer, and even 9019 grounds.  If you

23  get zero, I think you -- you haven't satisfied the lowest

24  range.

25      Indeed if this were just a transaction between a bunch of

1  non-debtor third parties as has now been portrayed, I'm not

2  even sure this Court would have subject matter jurisdiction

3  over a settlement.  If the state, and the pension, and the

4  retirees want to go off and a have deal, you give me

5  $200,000,000, I'll give you a release, what's that got to do

6  with the debtor?  What's that got to do with this Court?  But

7  I don't think they're really saying that.

8      Now let's talk a bit about gifting because that's another

9  argument that we hear the debtor make.  But these proceeds are

10 not a gift.  And they're not a gift outside the plan.  We all

11 know gifting occurs when senior secured creditors voluntarily

12 offer a portion of their recovered property under a plan to

13 junior stakeholders.

14     Now the evidence will make clear that the DIA funding

15 parties are not creditors in this case.  In fact none of the

16 grand bargain parties are receiving recoveries under the plan

17 and by definition none of the grand bargain parties have a

18 recovery they can transfer.

19     They can't come bearing gifts because they have no gifts

20 to bear.  Now the evidence will show that this excuse for

21 discrimination is nonsensical.

22     Finally last, and possibly least, I want to talk just for

23 a second about the averaging argument.  Now the averaging

24 argument is that one should not measure Classes 9 and 10

25 against -- 10 and 11 against 9 and 14, but again some

1 combination that includes the OPEB class recoveries.

2    Now that was the subject of a motion in limine as Your

3 Honor knows.  And not surprising the debtor agreed to not

4 pursue this argument.  The plan proponent has abandoned this

5 argument.

6    So we don't think it actually should consume any trial

7 time.  But if -- if Your Honor is inclined to hear it, we will

8 demonstrate one, there is no case support for any such

9 proposition of averaging, it's a made up theory.

10    Second, the plan expressly places the pension claims and

11 OPEB claims in different classes.  And remember, the pension

12 claims are really owned by the retirement systems as Mr.

13 Bennett conceded.  The OPEB claims are owned by the individual

14 retirees.

15    And there's not that much overlap between the classes.

16 The retirement systems again hold the pension claims and

17 according to the debtor's own figures, there are 11,000

18 pensioners who do not hold OPEB claims.  So if they were

19 averaging there would be 11,000 people that would be averaging

20 one number which is not how averaging works.  I was not very

21 good at math, but I don't think you're going to average one

22 number.

23    Finally, the OPEB claims are massively overstated as the

24 evidence will show and contrary to my esteemed colleague, Mr.

25 Alberts, we think the evidence will demonstrate that those

1 claims were quite overstated and that the recoveries for OPEB

2 are much higher in reality.

3      So each of what we call the never mind what Mr. Orr said

4 rationales, fails.  And it is telling that for all the

5 rationales that debtor tossed around to justify

6 discrimination, only a few made the final cut into the

7 debtor's pre-trial brief.

8      Specifically the debtor held on to the morale argument

9 we've talked about, the settlement of the eligibility

10 litigation we've talked about, the inadequate protection we've

11 talked about, and the outside the plan point.  The rest are in

12 the discard pile.

13      But not a single one of those arguments were cited by Mr.

14 Orr in his 30(b)(6) testimony.  And, Your Honor, this is not a

15 game we're all playing.  The debtor is not supposed to be on a

16 never ending scavenger hunt for a reason to discriminate or

17 tossing darts at a discrimination dart board.  It was

18 obligated to actually consider and rely on a business

19 justification before and not after the fact.

20      So in sum, Your Honor, the evidence will demonstrate that

21 the debtor cannot demonstrate an objective -- objectively

22 reasonable business justification for its very significant

23 discrimination and the plan therefore fails the Aztec test.

24 Now even if the plan were otherwise pristine, and it is not,

25 confirmation must be denied.

1    I'm not going to spend much time on the other _Aztec_

2   elements, they're covered in our pre-trial brief.  But I did

3   want to talk briefly about whether the discrimination is

4   necessary.

5    And you can answer that question by looking at the

6   current plan itself.  The current plan itself contemplates a

7   potential cram down of the pension claims with lower

8   recoveries of 39 and 48% to Classes 10 and 11 respectively.

9   Because if they rejected the plan, the grand bargain proceeds

10   would have been unavailable.

11    Presumably the debtor meant what it said in its pleading

12   that it would pursue cram down on Classes 10 and 11 at those

13   lower recoveries if they rejected the plan.  If that's true,

14   if you could do that, if you could still confirm your plan, by

15   definition this discrimination is not necessary as I

16   understand the term.

17    Additionally Mr. Orr admitted at his deposition that the

18   first plan filed on February 2014 which proposed much lower

19   recoveries for pension claims was feasible.

20    (Video Being Played at 12:11 p.m.; Concluded at 12:11

21   p.m.)

22    Now if Mr. Orr believed that the first plan which offered

23   pension claim recoveries of 29 and 33 cents on the dollar was

24   feasible, then ipso facto the discrimination in the current

25   plan is not necessary and that's another body blow.

1    Now, Your Honor, I'm going to briefly turn to the <u>Markell</u>

2  test.  Now like <u>Aztec</u>, <u>Markell</u> brooks no deference to what the

3  debtor thinks or believes but requires independent

4  determination by the Trier of Fact.  And under <u>Markell</u> there

5  is a presumption of unfair discrimination if all of the

6  following factors are present.

7    First a dissenting class check, Classes 9 and 14.

8  Second, another class of the same priority, check, Classes 10

9  and 11.  Third, a difference in the plan's treatment of the

10  two classes that results in either material -- materially

11  lower percentage recovery or allocation of materially greater

12  risk, check, check.

13    And again <u>Markell</u> says materially lower percentage

14  recovery.  It doesn't say anything about extreme which is the

15  Mr. Bennett standard.

16    And there is no question that the notional 10% going to

17  the COPS is materially lower than the notional 59% going to

18  GRS and the notional 60% going to PFRS.  I'm not going to

19  belabor what I said about the debtor's troubling and belated

20  about face on true recoveries as opposed to the higher

21  recoveries it soliciting on and that we used to induce yes

22  votes in Classes 10 and 11.

23    Judicial estoppel is called for, we'll raise that at the

24  appropriate time.  But more to the point this Court has noted

25  the discrimination and Mr. Orr has agreed.  And Your Honor was

1  being your usually measured self when you referred to it as

2  very significant discrimination.

3      Now according to my dog eared -- dog eared copy of

4  Roget's Thesaurus, material and significant are recognized

5  synonyms and it's hard to tell from the debtor's latest

6  briefing, but I don't really think there's a serious -- let me

7  put it another way.  I don't think there's a material or

8  significant dispute that there's material or significant

9  discrimination in this plan.

10      But if even if somehow the notional discrimination was

11  not sufficient to be viewed as material, the evidence that Mr.

12  Wagner will touch on will show much greater discrimination.

13      Now additionally, Your Honor, the evidence is going to

14  clearly show that the plan assigned significantly greater risk

15  of recovery to COPS claims, no doubt about it.  Remember all

16  they get is a 30 year payment stream from a municipality that

17  lamentably is rated below investment grade.

18      The pension claims will receive payments over 20 years

19  from very well healed foundations and investment -- and the

20  investment grade State of Michigan.  So if you look at the

21  LightSquared case and other cases it's obvious that there was

22  materially more risk being assigned to the COPS aside from a

23  much more notional recovery.

24      In sum the evidence will be as clear as it can be that

25  the relative recoveries and risk allocations of pension and

1    COPS claims creates record breaking bone crushing presumptions

2    of discrimination under _Markell_.

3         Now there are three ways the debtors could rebut the

4    presumption.  The debtor could show that the COPS claims and

5    other unsecured claims can receive similarly less outside of

6    bankruptcy than the pension claims on a percentage basis.  Or

7    the COPS claims assumed pre-petition a similarly greater risk

8    of recovery, or the pension claims holders have infused new

9    value, i.e. money into the reorganization that exceeds --

10   maybe that's overstating it.  That matches or exceeds the

11   value of its plan recovery.  None of that is present here.

12        Now first the evidence will not permit the debtor to

13   demonstrate that outside of bankruptcy the COPS claims would

14   receive similarly less than the pension claims.  Here we would

15   argue less than one-tenth the debtor's notional recovery

16   suggests one-sixth.  Either way it will prove an

17   insurmountable task.

18        Now the city has no credible evidence whatsoever that the

19   COPS would fare any less well than the pension claims outside

20   of bankruptcy, let alone suffer anything remotely to the type

21   of first world, third world disparity in recoveries set out in

22   the plan.

23        Now let's first look at the offering circulars for the

24   COPS.  Now you know -- I can represent to the Court they don't

25   identify invalidity as a risk factor at all by the way.  But

1 they explicitly state that the remedy available to service

2 corporations in the event of non-payment is "the same remedy

3 that the retirement systems would have against the city if it

4 failed to make its annual payment required from -- required

5 annual payment, sorry, to fund UAAL under the traditional

6 funding mechanism".

7     Of course failure to fully fund UAAL is the precise claim

8 contained in Classes 10 and 11.  There is no need to reason by

9 analogy here.  We're not just talking apples to apples, we're

10 talking Granny Smith to Granny Smith.  It's the same remedy.

11     And that remedy of course is the ability to obtain a

12 judgment under the LJA and to cause the city to levy taxes to

13 satisfy the judgment irrespective of statutory caps.  Same

14 remedy, same priority.  And we know the pension funds have

15 occasionally had to go and get an RJA judgment.

16     Now the debtor's reply admits as it must, that "tax bills

17 that would ensue under the RJA would be of equal priority".

18 Now finally, and I'll talk about this when we get to the best

19 interest test, the evidence will be uncontroverted that the

20 debtor did no analysis whatsoever of how creditors would fare

21 outside of bankruptcy in a dismissal scenario.

22     So how it plans to prove a similarly skewed outcome or

23 any outcome, retirement systems versus COPS outside of

24 bankruptcy is beyond my admittedly limited powers of

25 comprehension.  So much for the possibility that the COPS

1  would receive similarly less than the pension claims outside

2  of bankruptcy.

3      And again, fide sola, on faith alone, no explanation

4  necessary.  Now correlated to the first method to rebut unfair

5  discrimination under <u>Markell</u> is the second.  That the COPS

6  claims assume different risks pre-petition.

7      Now as I mentioned before, the COPS claims recover

8  nothing in the event they are invalid in which case

9  discrimination is off the table.  But when comparing

10  pre-petition risk of recovery to risk of recovery under the

11  plan, it's imperative that the Court do so under the

12  assumption that the COPS are valid.  That's how the plan is

13  structured.

14      Ten cents for allowed COPS claims.  And that's how the

15  plan must be judged.  And as a result it's no answer at all to

16  wave the flag of invalidity.  That would be asking the Court

17  to assume the conclusion, to pre-judge really litigation that

18  Your Honor has noted it is likely to turn on a number of hotly

19  contested facts and is not a suitable case for summary

20  disposition.

21      So if the debtor wins on invalidity, no discrimination.

22  If the COPS win, no basis for discrimination.  So we'll hear

23  no evidence, no credible evidence regarding a finding of

24  greater pre-petition risks.  So we can take that one off the

25  table as well.

1    Now finally the debtor can rebut the presumption of

2  unfair discrimination by demonstrating that the favored class

3  is contributing new value.  But the evidence will show that

4  there is no new value contribution by the retirement systems

5  or pensioners and it's no slight against the pensioners to say

6  so.

7    They are either retired and by definition not

8  contributing new value, or active employees who are continuing

9  to provide their labor but of course are being paid their

10  wages and benefits for doing so.  So simply put the evidence,

11  or the lack of evidence developed or attempted to be developed

12  by the debtor, will leave but one possible conclusion.  And

13  that just as it failed under <u>Aztec</u> the plan fails under

14  <u>Markell</u>.

15    Now in the final reckoning, whatever test one employs,

16  the record will demonstrate that the plan engages in historic

17  levels of discrimination and cannot be confirmed.

18    And I wanted to turn to the best interest of creditors

19  test.  Now, Your Honor, that test which --

20    THE COURT:  Before you do that, can I ask how long

21  you'll be?

22    MR. KIESELSTEIN:  I am about two-thirds through my

23  presentation, although I've lost track of how long I've gone

24  already.

25    THE COURT:  Well, you've gone 90 minutes.  So I'm

1  going to suggest that we break for lunch now and you come

2  back.

3          MR. KIESELSTEIN:  Sure.

4          THE COURT:  For that, is that okay with you?

5          MR. KIESELSTEIN:  That is more than okay with me,

6  Your Honor.

7          THE COURT:  Okay.  So let's reconvene at 1:50,

8  please.  One second.  And we'll be in recess.

9          THE CLERK:  All rise.  Court is in recess.

10         (Court in Recess at 12:20 p.m.; Resume at 1:50 p.m.)

11         THE CLERK:  All rise.  Court is in session.  You may

12  be seated.  Recalling case number 13-53846, City of Detroit,

13  Michigan.

14         THE COURT:  It appears everyone is here.

15         MR. BENNETT:  Your Honor, just a brief point.

16  During the presentation this morning on at least one occasion

17  answers were projected without questions.

18      In the break I have asked Mr. Kieselstein to agree that

19  that won't happen again as we think it's potentially

20  misleading.  It may have been in that instance, we'll deal

21  with it at closing.  Mr. Kieselstein has told me that they

22  don't have that problem going forward, but we would like it

23  not to be repeated.

24         THE COURT:  All right.  I think that sounded nice.

25  And before we continue, I need another minute.  Is Ms. Neville

1  here or anyone from the committee?  Would you step forward,

2  sir, and Ms. Lennox is probably not here either, huh?

3      All right.  I need someone to volunteer to stand in for

4  her.  It's not -- it's not a complex matter.

5          MR. ALBERTS:  I will endeavor to do that.

6          THE COURT:  I received this letter from a woman

7  named Rita Dickerson who was one of the people who spoke on

8  July 15th.  And she raises an issue that I need for the two of

9  you or at least Ms. Neville and Ms. Lennox to deal with.  So I

10 have a copy of this letter for each of you.  Please take care

11 of that for me.

12         MR. ALBERTS:  Thank you, Your Honor.

13         MR. KIESELSTEIN:  May I resume, Your Honor?

14         THE COURT:  Hold on one second.

15         THE CLERK:  No audio.

16         THE COURT:  No audio.  Can you hear me now?

17         THE CLERK:  They can't hear it in the media room or

18 the other rooms.  I can hear.

19         THE COURT:  Is someone coming to deal with the

20 problem?  So we should hold off until that happens?  Okay.

21      While we're waiting, is it -- is it okay for us to have a

22 copy of your PowerPoint presentation during this opening, or

23 that you're using during this opening?

24         MR. KIESELSTEIN:  Of course, Your Honor, absolutely.

25         THE COURT:  All right.  Is there any objection to

1  that?

2          MR. BENNETT:  No objection, Your Honor.

3          THE COURT:  All right.  Do you have an extra copy

4  for us?

5          MR. KIESELSTEIN:  Can I just make sure I have no

6  chicken scratch on this one?

7          THE COURT:  Yes, although --

8          MR. KIESELSTEIN:  Not that it's legible, but --

9          THE COURT:  Yeah, I was going to say although we are

10  capable of ignoring all of that.  Also while we're waiting,

11  can I suggest to you, Mr. Kieselstein that it would help me if

12  you would slow down your presentation by about 20%.

13          MR. KIESELSTEIN:  Sure.  I took some riddling during

14  the break, Your Honor.

15          THE COURT:  Well, I don't -- I don't mean, you know,

16  to do that, but it would help me if you would slow down a bit.

17          MR. KIESELSTEIN:  I will do so, Your Honor.

18          THE COURT:  If you need help on how to do that, Ms.

19  Green is in the courtroom.

20          MR. KIESELSTEIN:  Your Honor, Mr. Hackney has a

21  cattle prod, so I'll be fine.

22          THE COURT:  Oh, well, I won't compete with that.

23  You're all set?  All right.  Let's settle down and proceed.

24          MR. KIESELSTEIN:  Thank you, Your Honor.  Again Marc

25  Kieselstein, Kirkland and Ellis, LLP on behalf of Syncora.

1   Deep breath.  Okay, Your Honor.

2       When we left off I was about to start with the best

3   interest of creditors test.  And I want to turn to that now.

4   Now Your Honor, that test is found in Section 943(b)(7) of the

5   Bankruptcy Code and it's simple.  For each and every creditor

6   and we'll talk about that momentarily.

7       The debtor must prove by a preponderance of the evidence

8   that it is receiving as much or more under the plan as it

9   would receive if the case were dismissed.  Now we're all

10  familiar with that test from Chapter 11 and we all know the

11  test is normally satisfied by a liquidation analysis and a

12  disclosure statement which demonstrates creditors were fair in

13  a hypothetical Chapter 7.

14      And of course these is inevitably a degree of conjecture.

15  Will the trustee try to operate the business for a short time

16  or shut it down and put everything under the hammer.  A dozen

17  other assumptions.  And notwithstanding the need for educated

18  guesswork every Chapter 11 debtor of any size does the work

19  through an expert in almost every case because they know they

20  must to meet their burden at confirmation.

21      Now of course municipalities can't be liquidated.  So the

22  analysis substantively is different and yes, more challenging.

23  But Congress didn't say it's too hard, it's too complicated,

24  don't bother, Congress said Chapter 9 debtor you must also

25  satisfy this test, you must also bear this burden and that's

1  the way it's been in municipal bankruptcies for eons.

2    Now to our amazement the evidence will show that the

3  debtor for all the tens of millions of dollars it has paid its

4  experienced advisors, simply didn't bother.  The only thing

5  the record will reflect that the debtor has done is to draft a

6  few declarative sentences in their briefs and for their expert

7  reports.  I'm obviously not going to talk about Mr. Buckfire's

8  report.

9    Now as the evidence will show, the debtor shirked its

10  duty in a case where they are paying rejecting creditors a

11  mere 10 cents on the dollar and as Mrs. Spence's report will

12  show, substantially less than that.  So a dismissal scenario

13  could be pretty ugly for unsecured claims and still clear that

14  very low bar.

15    Now Mr. Bennett talked yesterday about the debtor's novel

16  idea that the best interest test under Section 943 of the

17  Bankruptcy Code is different from the familiar best interest

18  test in Chapter 11.  Wildly so according to his opening

19  argument.

20    But neither the law nor the facts line up with what --

21  with what Mr. Bennett argued yesterday and to some extent this

22  morning.  Now fortunately for us was a preeminent law firm

23  that's already very recently done a comprehensive survey of

24  this field and this question and laid out a great summary far

25  better than I could.

1       So here's a brief filed by Jones, Day in the <u>Stockton,</u>

2  <u>California</u> bankruptcy.  And I'm going to read a lengthy

3  excerpt lest anyone suggest that I'm taking it out of context.

4       The phrase best interest of creditors is a familiar one

5  to bankruptcy practitioners.  Broadly stated, it embodies the

6  core requirement that a proposed plan provide a recovery to

7  each dissenting creditor that is superior to that otherwise

8  available to the creditor.

9       The basic protections for dissenting creditors has been

10  part of statutory bankruptcy law for well over a century.  The

11  earliest bankruptcy law specifically required that both

12  corporate plans of reorganization and municipal plans of

13  adjustment, I'm going to skip over an internal cite or two,

14  Judge, be in the best interest of creditors.

15       Now in the 1978 overhaul of the Bankruptcy Act, Congress

16  added specificity to the best interest test applicable in

17  Chapter 11, requiring a dissenting creditor to receive or

18  retain property of a value as of the effective date of the

19  plan that is not less than the amount that such holder would

20  have so received or retained if the debtor were liquidated

21  under Chapter 7 of this title on such date.

22       The legislative history explained that this provision

23  incorporates the form of best interest of creditors test found

24  in Chapter 11 but spells out precisely what is intended.  At

25  the same time for municipal restriction under Chapter 9,

1  Congress maintained the historic best interest terminology in

2  Section 943(b)(7).  The legislative history notes that the

3  newly formulated Chapter 11 test "is phrased -- is phrased in

4  terms of liquidation of the debtor".

5      Because that is not possible in a municipal case, the

6  test here is raised in its more traditional form using the

7  words of art.  "Best interest of creditors".

8      The purpose of the best interest test, however, remained

9  unchanged.  Specifically in both Chapter 9 and Chapter 11, the

10  test operates as the key protection for individual dissenting

11  creditors in a reorganization case.

12      While the cram down protections of Section 1129(b) apply

13  in the event that a dissenting class rejects the proposed

14  plan, the predictions of the best interest test apply to all

15  individual dissenting creditors, even those who claim -- whose

16  claims are classified within a class that has accepted the

17  plan.  Again, I'm going to skip the internal case cites.

18      Thus, if even one dissenting member of an impaired class

19  would get less under the plan than in a hypothetical

20  liquidation, the fact that the class as a whole approved the

21  plan is immaterial.  Again, skipping cites.

22      Consequently the best interest test is one of the

23  strongest protections individual creditors have.  This Court

24  has described it as a cornerstone of the theoretical

25  underpinnings of Chapter 11.  It stands as an individual

1   guarantee to each creditor or interest holder that it will

2   receive at least as much in reorganization as it would in

3   liquidation.

4       Skipping slightly ahead.  As the legislative history

5   quoted above makes clear, the same holds true in Chapter 9.

6   Simply put, the best interest test is designed to protect

7   individual creditors even in the face of majority support for

8   a plan.  This has been true in municipal restructurings for as

9   long as Chapter 9 has existed.

10      As the Supreme Court held long ago, minorities under the

11  various reorganization sections of the Bankruptcy Act cannot

12  be deprived of the benefits of the statute by reason of a

13  waiver, acquiescence, or approval of the other members of the

14  class.  The applicability of that rule to proceedings under

15  Chapter 9 is plain.  The fact that the vast majority of

16  security holders may have approved the plan is not the test of

17  whether the plan satisfies the statutory standard.  The former

18  is not substitute for the latter, they are independent.

19      All right.  I'm going to skip some internal cites again,

20  but they're other Chapter 9 municipal -- pre-Chapter 9

21  municipal cases to the same effect.  That's all I'm going to

22  say there, Judge.  I think it speaks for itself.

23          THE COURT:  Okay.  And what case did you say this

24  was filed in?

25          MR. KIESELSTEIN:  This was in a Stockton, California

1  case.

2        THE COURT:  All right.

3        MR. KIESELSTEIN:  Filed I believe in 2014, or late

4  2013.  And again I could not have said it better myself.

5      Now we can look at the facts here too.  Here's what the

6  debtor's own disclosure statement says.  "At the confirmation

7  hearing, the Bankruptcy Court will confirm the plan only if

8  all of the requirements of Section 943(b) of the Bankruptcy

9  Code are met.

10     Among the requirements for confirmation are that the plan

11 is accepted by the requisite holders of impaired classes of

12 claims, or if not so accepted, is fair and equitable and does

13 not discriminate unfairly as to the non-accepting class.

14     Two, is in the best interest of each holder of a claim

15 and each impaired class under the plan.  Three is feasible,

16 and four, complies with the applicable provisions of the

17 Bankruptcy Code".  But you get the point.

18     So now again the debtor is changing its tune.  And it's

19 doing so because it's realizing that its evidence is so

20 lacking that it cannot argue the traditional test and has to

21 try to create a new more lenient test.  But the rule of law

22 precludes that.

23     So with that put to bed, let's look at the actual

24 evidence.  Now again we have a slew of articles of faith.

25 They don't have the ring of evidence because they're not, but

1    rather sound like pronouncements on high.

2        But again the debtor is presenting a plan that must be

3    supported by evidence, not preaching a sermon to the faithful.

4    And let's take a look a few of these best interest articles of

5    faith.

6        First, dismissal of the Chapter -- the city's Chapter 9

7    case would be detrimental to all creditors.  Well, that's sort

8    of just a statement of the test.

9        Next, the city's pension obligations alone are so large

10   they would eradicate any meaningful recoveries for other

11   creditors outside of Chapter 9.

12       Next, tax bills will skyrocket in amount and complexity.

13       Next, the delinquency rates will become unmanageable.

14       And finally, there will be a great exodus from Detroit if

15   tax rates are raised.

16       Now it would take someone with a booming baritone and not

17   my nasal twang to lend these bare assertions the gravity that

18   the -- that the debtor would like you to ascribe to them.  But

19   singly or collectively, they are not evidence and they are not

20   analysis.  And the record will show that's all the debtor has.

21       Now the evidence will demonstrate that a dismissal

22   analysis requires a determination of the amount of claims that

23   would exist if the cases were dismissed and an assessment of

24   the debtor's ability to satisfy those claims.

25       Now Mr. Orr, who knows his way around the Bankruptcy

1   Code, rightly recognized that the best interest test requires

2   such a comparison of creditor recoveries.  Understandably of

3   course he didn't conduct that analysis himself.

4       (Video Being Played at 2:11 p.m.; Concluded at 2:11 p.m.)

5       And that's understandable.  After all Mr. Orr is a

6   lawyer, not a financial professional.  He testified that he

7   relied on Mr. Buckfire to conduct that analysis.

8       (Video Being Played at 2:11 p.m.; Concluded at 2:12 p.m.)

9       And Mr. Orr stated that he personally reviewed Mr.

10  Buckfire's analysis.

11      (Video Being Played at 2:12 p.m.; Concluded at 2:12 p.m.)

12      He even remembered what the document looked like.

13      (Video Being Played at 2:12 p.m.; Concluded at 2:12 p.m.)

14      Now there is only one slight problem with Mr. Orr's

15  testimony with respect to Mr. Buckfire's impressive sounding

16  dismissal analysis.

17          THE COURT:  Pull the microphone over.

18          MR. KIESELSTEIN: Dismissal -- sounding dismissal

19  analysis.  Is that better, Your Honor?

20          THE COURT:  Yes.

21          MR. KIESELSTEIN:  Okay.  As we now know Mr. Buckfire

22  did no such analysis.

23      (Video Being Played at 2:13 p.m.; Concluded at 2:13 p.m.)

24      Now, Your Honor ruled yesterday that Mr. Buckfire's

25  expert opinion won't come into evidence.  But here he's just

1 testifying to the facts. What did the debtor and its advisors

2 do or not do? And the facts are that the debtor didn't even

3 try to carry its burden on best interest.

4 So not to put too fine a point on it, Mr. Orr did

5 nothing. He stated he relied on a report by Mr. Buckfire that

6 does not now nor did it ever actually exist.

7 Not only that Mr. Orr said he personally reviewed the

8 analysis. But back at the ranch Mr. Buckfire was adamant time

9 and time again he undertook no such analysis. Okay. Well,

10 maybe Mr. Malhotra can clear things up. After all he was the

11 debtor's 30(b)(6) witness on and I quote, "the ability of the

12 city to pay its unsecured and/or -- and/or outstanding

13 obligations in the ordinary course if the city's bankruptcy

14 case were dismissed".

15 (Video Being Played at 2:15 p.m.; Concluded at 2:15 p.m.)

16 Okay. So now we have the debtor's 30(b)(6) witness on

17 this key confirmation element, the individual with the most

18 knowledge speaking not only on his own behalf, but on behalf

19 of the debtor acknowledging that he and thus the debtor itself

20 knows nothing in terms of a best interest analysis. Another

21 binding and devastating 30(b)(6) admission.

22 And again, and this bears repeating, with respect to what

23 creditors would recover if the Chapter 9 case were dismissed,

24 Mr. Orr did nothing and relied on an analysis by Mr. Buckfire

25 but Mr. Buckfire did nothing. And the debtor's 30(b)(6)

1  witness on the subject, Mr. Malhotra also did nothing.

2      So I'm going to go out on a limb here and say the record

3  will demonstrate that the debtor cannot meet its burden of

4  proof on this issue.  And Mr. Bennett brilliant and able as he

5  is, cannot do a stand up dismissal analysis from the podium as

6  he tried to do this morning.  This is emblematic of the

7  problem with this plan.  Very little work, a lot of talk.

8      Now, I have to say that I also didn't realize that the

9  first day of the confirmation hearing was the eligibility

10  hearing.  We'll have something to say about that.  But I don't

11  believe you can salvage your lack of an expert done,

12  methodically sound best interest analysis by pointing to the

13  eligibility hearing.  Basically, Your Honor, the debtor has

14  dropped a big mess on your doorstep.

15      Now related to the dismissal scenario, the debtor asserts

16  that if the cases were dismissed, the debtor would be unable

17  to raise additional revenue to pay creditors through changes

18  to tax policy as such attempts would be futile.  Now

19  specifically the debtor has argued that taxes cannot be raised

20  without adversely impacting revenues, that delinquency rates

21  will become unmanageable, and there will be a biblical exodus

22  from the City of Detroit if tax rates go up.

23      Let's see what the evidence is to back all that up.  Now

24  in reaching this very important conclusion, Mr. Orr heavily

25  relied on Mr. Buckfire's analysis of the debtor's capacity to

1 raise incremental revenue through tax policy.

2     (Video Being Played at 2:17 p.m.; Concluded at 2:18 p.m.)

3     And indeed Mr. Buckfire was unequivocal and to the point

4 in his opinion that the city would be unable to generate

5 additional revenue by raising taxes.

6     (Video Being Played a 2:18 p.m.; Concluded at 2:19 p.m.)

7     Okay.  But hold the phone.  It turns out that Mr.

8 Buckfire didn't study the tax issue.

9     (Video Being Played at 2:19 p.m.; Concluded at 2:19 p.m.)

10     Okay.  So maybe there is no problem after all because Mr.

11 Buckfire says he relied, as experts can, on the careful

12 analysis of another expert, Dr. Cline at Ernst and Young that

13 showed increasing taxes would lead to a decline in revenue.

14     (Video Being Played at 2:20 p.m.; Concluded at 2:21 p.m.)

15     Okay.  That's pretty meaty, Your Honor.  But let me pick

16 out something Mr. Buckfire said because it's important.  An

17 increase in property taxes would and I quote, "certainly lead

18 to a decline of revenue".

19     Well, those are best interest fighting words.  And I

20 heard Mr. Bennett talking tax saturation issues earlier but

21 not by reference to any evidence, just to other cases.

22     Now I'm not sure that advances the evidentiary ball, but

23 if true that would be at least a meaningful data point in

24 starting to put together a coherent and persuasive best

25 interest analysis.  It might be a start anyway.

1        But the evidence will reveal one small problem with Mr.

2   Buckfire's detailed testimony in this regard.  And that is Dr.

3   Cline's testimony which goes as follows.

4        (Video Being Played at 2:22 p.m.; Concluded at 2:23 p.m.)

5        Now Dr. Cline confirmed in his live testimony just days

6   ago that neither he nor any of his colleagues performed any

7   such tax and revenue analysis.  When queried at trial whether

8   he was "asked to identify ways for example in which the city

9   could increase its revenues through taxes", Dr. Cline's

10  unequivocal answer was, "we were not asked to do that".

11       So let's recap.  When forming the opinion that raising

12  taxes would be futile, Mr. Orr did nothing and relied on the

13  analysis of Mr. Buckfire of the debtor's ability to generate

14  incremental revenue.  However, Mr. Buckfire did no such

15  analysis.

16       Instead Mr. Buckfire relied on Dr. Cline's tax

17  sensitivity analysis.  But when asked at his deposition and in

18  live testimony whether such an analysis existed, Dr. Cline was

19  categorical.  Neither he nor anyone else at E & Y was asked to

20  do, nor did he do any work whatsoever to consider the tax rate

21  sensitivities for purposes of calculating that revenue impact.

22       Your Honor, it has to be said, the record will

23  demonstrate that the best interest portion of the debtor's

24  case is a fiasco.  Now the debtor is realizing how bad things

25  are looking for their evidentiary case on this point so it's

1 grasping at straws.

2    In other words trying to bring in, and you heard Mr.

3 Bennett say this, lay percipient witnesses to shore up its

4 case. Entirely after the fact. But it's too late. The

5 debtor's 30(b)(6) witness on the city's tax policy, taxing

6 capabilities, tax revenue assumptions projections and any

7 studies regarding the foregoing and "on the ability of the

8 city to pay judgments ordained by its creditors pursuant to

9 the revised Judicature Act of 1961". That witness, Mr. John

10 Hill has already testified that none of the work to evaluate

11 creditor recoveries under the RJA was ever done.

12    Now I would hazard a guess to say that any debtor case

13 that Mr. Bennett or I have been involved in, or any of the

14 other restructuring types in this courtroom have been involved

15 in, with a case of any size had an expert authored dismissal

16 analysis, be it Chapter 11 or Chapter 9. From the most

17 obscure, and you would have thought to the City of Detroit,

18 but not so.

19    Now again, Mr. Hill -- I'm sorry, but listening to

20 yourself on Mr. Hill, sorry.

21    (Video Being Played at 2:25 p.m.; Concluded at 2:26 p.m.)

22    And Mr. Hill again as a 30(b)(6) witness also testified

23 that the city historically charged a higher income tax, a

24 higher income tax rate similar to higher property taxes that

25 could be imposed if there were an RJA judgment and levy and

1  that has historically led to higher city revenues.  Here he is

2  again.

3       (Video Being Played at 2:26 p.m.; Concluded at 2:27 p.m.)

4       Now, Your Honor, we have asked ourselves a thousand times

5  in recent weeks why the debtor left such a gaping hole in its

6  confirmation case.  But it doesn't really matter why.  It

7  doesn't matter whether they were afraid of the answer, thought

8  the answer was obvious, or just forgot.

9       What will become clear from the evidence is a mind set

10  bent on taking every shortcut to get to the quickest possible

11  confirmation hearing.  But sometimes shortcuts lead to dead

12  ends.  And in the case of best interest, this plan has flown

13  over the rim of the canyon.

14       Now what this all means is that the debtor must throw

15  itself on the mercy of the Court, must ask Your Honor to save

16  it from itself.  But to do that, you would have to take

17  completely on faith that the best interest test is satisfied,

18  even as to creditors receiving 10 cents on the dollar and as

19  the evidence will show, significantly less than that.

20       Now that's an impossible position to be put in.  This

21  Court is a Trier of Fact, not a supplier of fact.  Again, fide

22  sola, by faith alone where faith exists no explanation is

23  necessary.

24       Although it is beyond question that the objectors bear no

25  burden on this point and the evidence will show the debtor

1  cannot meet its burden. There will in fact be substantial

2  evidence to suggest that the COPS holders would do

3  substantially better in a dismissal scenario than they are

4  under the plan.

5      Now in the first instance, the debtor has historically

6  allocated a portion of the GRS under funding to the DWSD.

7      (Video Being Played at 2:28 p.m.; Concluded at 2:29 p.m.)

8      Now, Your Honor, the evidence will show that the COPS

9  proceeds were used to shore up the PFRS and GRS pension funds

10 one of the great ironies of this case. And that of course

11 benefitted the DWSD by reducing its pension contributions on

12 account of its employees.

13     Now the evidence will further show that the city quite

14 rightly and to its credit has historically allocated a portion

15 of the COPS debt service to the DWSD. So that DWSD could

16 share burdens as well as benefits.

17     And the debtor's disclosure statement makes clear that

18 the DWSD contribution based purely on the ratio of city

19 employees, the DWSD employees, and consistent with historical

20 practice, has been approximately $170,000,000, 11 or 12% of

21 the total. And Mr. Orr has confirmed this.

22     (Video Being Played at 2:30 p.m.; Concluded at 2:30 p.m.)

23     Now under the plan of course that all goes away because

24 the COPS are cancelled. Now if however the cases were

25 dismissed, the evidence will show that allocation practice

1   would continue.  It's to the city's financial benefit after

2   all because it would reduce on a dollar for dollar basis the

3   amount of any annual RJA judgments that could be assessed

4   against the city on account of COPS principal and interest.

5       Now notwithstanding Mr. Bennett's statements from the

6   podium about reimbursement and -- and this or that, you'll

7   hear no credible evidence, no economically rational reason why

8   this practice would not continue.  And again let's revisit how

9   much money we're talking about.

10      The exhibits to the disclosure statement show that the

11  DWSD again has carried almost $170,000,000 of COPS liability.

12  If that were to continue post dismissal, and again there is no

13  reason frankly we can think of other than spite why it

14  wouldn't, the allocable share would be approximately 11.9%

15  according to the debtor's own numbers.

16      So let's pause on that for a second.  The COPS would

17  already be receiving more than they are said to receive under

18  the plan.  Twelve cents from the DWSD, an indisputably solvent

19  entity versus a notional 10 cents from the debtor.  That the

20  evidence will show is worth materially less than face value.

21      I think that's game over, Your Honor.  But of course on

22  top of that there are many other sources of recovery from the

23  RJA process where the evidence will show OPEB and pension

24  claims would no longer be accelerated as they were by

25  automatic operation of the Bankruptcy Code.  But would they be

1 done on a pay as you go, or spread over 30 years the way

2 pension under funding is normally handled.

3    From that fact to the debtor's own forecast its surplus

4 cash flows which the evidence will show are substantial even

5 after full funding of the reinvestment and revitalization

6 initiatives.

7    And by the way the debtor has repeatedly stated that in a

8 dismissal scenario the R & R monies would not be spent.  In

9 its reply the debtor stated the demise of the city's plan

10 would deprive city residents of the benefit of the city

11 reinvestment initiatives for which funds are available only in

12 conjunction with the restructuring transactions and cash

13 infusions contemplated by the plan.

14    So more money would be available to pay the city's

15 outstanding obligations in a dismissal scenario.  Now is that

16 a good scenario for the City of Detroit?  No, it's not.  We

17 don't pretend that it is.

18    But the best interest of creditors test is focused on the

19 best interest of creditors and on whether they would fair

20 better in that dismissal scenario than they would under the

21 plan.  And we have a very low bar to clear in this case.

22    Now I heard Mr. Bennett talk about how much conjecture is

23 involved in that, how theoretical it is, how hypothetical.

24 Yes, a dismissal scenario is by definition hypothetical.  If

25 that were a defense to doing liquidation analyses in Chapter

1   11 or dismissal scenarios in Chapter 9, there wouldn't be any.

2   But of course that's not the rule that obviously proves way

3   too much.

4         So in sum, though it is manifestly not the objectors'

5   burden, the evidence will show that the COPS would actually

6   fare much better in a dismissal scenario than they would under

7   the plan.  And that is why Chapter 9 plans of adjustment

8   simply don't impose these kinds of Draconian haircuts on

9   creditors, but rather adjust debts to pay them out on a

10  manageable time frame.

11        That is something the evidence will show is imminently

12  doable here.  That COPS holders have repeatedly said they are

13  open to discussing.  And that could produce a win win for

14  everyone, actives and retirees included as opposed to this

15  zero sum plan.

16        Now by its own admission that it failed to do the work,

17  every debtor prominent or obscure must do, the evidence will

18  demonstrate that the debtor cannot satisfy the best interest

19  test and for that reason also the plan cannot be confirmed.

20        Finally, Your Honor, I want to touch on fair and

21  equitable.  No doubt to the great relief of all assembled, I

22  will try to limit myself on this.

23        Mr. Perez is going to speak to the grand bargain and the

24  art in general and how the debtor's approach to all that is

25  inappropriate.  So I'm not going to step on his tag lines.

1        But in the Chapter 9 context this test boils down to

2   whether the amount proposed to be paid under the plan was "all

3   that the creditors could reasonably expect under the

4   circumstances".

5        And I want to get one thing out of the way because Mr.

6   Bennett spent a great deal of time talking about rights of

7   creditors outside of bankruptcy.  In -- in -- under Michigan

8   law creditors cannot lien up municipal assets.  Under Michigan

9   law creditors cannot force the sale of municipal assets.

10       True and I would hazard to guess true in every city and

11  state of the union.  But you cannot conflate creditor rights

12  outside of bankruptcy with creditor expectations inside of

13  bankruptcy.  Otherwise it would be fair and equitable to pay

14  unsecured creditors in every Chapter 9 case a brass farthing

15  and say they're doing better than they would outside of Court,

16  that's not the test.

17       The test is what is the debtor doing to try to maximize

18  creditor recoveries and minimize creditor losses.  And Wilber

19  of course is consistent with the sentiments articulated by

20  Congress when it explained the policy underlying Chapter 9.

21       Congress stated that Chapter 9 was meant to "allow the

22  municipal unit to keep operating while it adjusts or

23  refinances creditor claims with minimum and in many cases no

24  loss to its creditors".  And this makes perfect sense because

25  cities unlike companies are not candidates for liquidation

1  they live on in perpetuity and even if a city can't pay its

2  debts on time, it can presumably pay most or all of them back

3  in the fullness of time after it has the opportunity to get

4  back on its feet.  That's what a plan of adjustment is all

5  about.

6      Indeed the Oxford English Dictionary defines an

7  adjustment as a small alteration or a movement designed to

8  achieve a desired fit, appearance, or result.  Again, that

9  makes sense too.

10     The question is not how much cash on the barrel head can

11 the City of Detroit pay on the effective date of its plan.

12 The question is, how much can it pay over the long haul while

13 still being able to provide the basic services required of a

14 viable American city.

15     Now the city says that all the COPS creditors can

16 reasonably expect is 10 cents on the dollar in 30 year notes.

17 But whether -- and we think it's worth more like 6.  And

18 whether it's 6 or 10, the evidence will also show that the

19 creditors in Class 9 and 14 could reasonably expect not only

20 greater recoveries, but much greater effort to procure those

21 recoveries by this debtor.

22     Again, it's no answer to say as Mr. Bennett did that

23 unsecured creditors have no right to lien up assets.  And he's

24 conflating rights with expectations under fair and equitable.

25 And Mr. Bennett didn't talk about fair and equitable and to be

1  fair there are elements I'm not talking about.  I'm sure he'll

2  talk about it at closing.  But again he did put a lot of

3  stress on 9019, a much different standard than the fair and

4  equitable standard.

5      And again, as with best interest, it's not so much that

6  we disagree with the debtor's analysis as to what it could pay

7  although of course we do, but the threshold issue is that once

8  again the evidence will show that the debtor made a conscious

9  choice not to do the work to determine what it could

10  reasonably pay.

11      What the evidence will show is that the debtor cut the

12  grand bargain, committed to fund the R & R initiatives, then

13  pivoted to Classes 9 and 14, turned its pockets inside out and

14  said sorry, we're tapped out.

15      Now the evidence will show that's not nearly good enough

16  for a party that bears a burden of proof.  So let's talk

17  briefly about what the debtor failed to do when it comes to

18  fair and equitable.

19      Now first we heard -- as we heard from Dr. Cline already

20  and I won't repeat it at length, the debtor did not explore

21  any potential benefits from tax policy.  And as I noted when

22  we talked about best interest, no one else from the city or

23  E & Y, or Miller, Buckfire, or Conway, MacKenzie or anybody

24  else as far as we can tell studied this either.

25      And that's inexplicable, Your Honor.  What is a number

1 one lever that a city has to raise revenue?  We all know the

2 answer, taxes and fees.

3      Now it's no excuse that the debtor says that Detroit is

4 statutorily restrained from raising certain types of taxes.

5 First, the evidence will show this is not true for all taxes

6 such as the wage earning tax.  And there are substantial

7 revenues that could be raised without having to march up to

8 Lansing.

9      What the evidence will also show that no one at the

10 debtor bothered to examine whether and to what extent tax

11 rates could be raised, either voluntarily, or legislatively

12 with the help of the state.

13      The evidence will show that no one at the debtor bothered

14 to see again, what could be done to help achieve a fully

15 consensual plan.  Might that have been a successful expedition

16 up to Lansing?  We'll never know because the debtor never

17 embarked on the effort.

18      Now nobody likes doing homework.  And nobody likes

19 raising taxes.  And especially no one likes doing homework

20 about raising taxes.  Well, we're not dealing with a moody

21 hormonal high schooler, we are dealing with a Chapter 9 debtor

22 charged with the fiduciary responsibility to maximize value

23 and minimize losses as Mr. Orr rightly acknowledged early on.

24      The evidence will show that the debtor failed to honor

25 this obligation.  Again, the evidence will show virtually no

1 work on the revenue side and just -- and just -- and so when

2 the plan was filed, the original plan, and the sixth plan, Mr.

3 Orr didn't know the answer in terms of what revenue options

4 were available and what could be raised.  And he doesn't know

5 the answer today.

6     Just as with the dismissal analysis, the evidence will

7 show that the debtor was unforgivably lethargic when it came

8 to the subject of taxes.  And lethargy and a duty to treat

9 creditors fairly and equitably are incompatible.

10     Now I do want to talk for just a minute about the art.

11 Again, I'm going to leave the bulk of that to Mr. Perez.  But

12 just a brief point or two.

13     First, and this is a le peace with the lack of any

14 dismissal analysis and the lack of any tax policy analysis.

15 The evidence will show that the debtor did nothing prior to

16 the striking of the grand bargain to explore monetization

17 options for the art.

18     And the evidence will show that subsequent to striking

19 the grand bargain, the debtor has remained consistent, doing

20 nothing to explore superior alternatives for monetization of

21 the art.  And here's what Mr. Orr had to say on that topic in

22 his deposition.

23     (Video Being Played at 2:41 p.m.; Concluded at 2:42 p.m.)

24     Now, Your Honor, in any deal I have ever done

25 representing a debtor we are able to strike a deal with a

1  particular stakeholder group.  The debtor retains what we all

2  refer to as a fiduciary out.  And sort of goes to the 9019

3  back and forth we had earlier.

4      And that is the ability of a debtor whether acting as a

5  formal fiduciary or statutorily charged with minimizing

6  creditor losses to terminate the deal if something better

7  comes along.  The debtor has to always keep an open mind

8  because its fiduciary obligations, or put another way, it's

9  duty to minimize creditor losses are continuous.

10     Now here the evidence will show that the debtor did not

11  reserve an out for itself in the definitive grand bargain

12  documents when they were finally filed, none that we can find.

13     Further the evidence will reveal the unseemly spectacle

14  of a debtor not only not seeking out a better deal, but

15  refusing even to entertain the possibility of a better deal.

16  In fact actively and repeatedly resisting when the possibility

17  of a better deal comes along.

18     And to be very very clear, I don't just mean a better

19  deal for Syncora or the COPS.  I mean as good or better deal

20  for the pension claims, the OPEB claims, for everyone.  We are

21  not making a misery loves company argument.  We are not trying

22  to drag people down to 10 cents.

23     We're saying that the art, as well as enlightened tax

24  policies, as well as a number of other creative options the

25  debtor consciously ignored could light the way to a win win

1  for all creditors.  But the evidence will show that the

2  debtor's approach to minimizing creditor losses was like the

3  proverbial three monkeys.  See no alternatives, hear no

4  alternatives, speak no alternatives.

5      Just the other day Mr. Orr's spokesman, Mr. Nowling in

6  response to yet another alternative that had the potential to

7  increase recoveries through the art said the following.  "I am

8  sure there are many suggestions on how the DIA collection can

9  be monetized, but outside of the grand bargain such

10  discussions are academic".  Academic?  That may be one of the

11  least creditor friendly statements I've ever heard.

12      Now I'm not going to get into the question of how much

13  additional value is realizable from the art.  Mr. Perez will

14  speak to that.

15      But I did want to touch for a minute on the alleged legal

16  impediments to realizing greater value.  First is the Attorney

17  General opinion that the art collection is held in an implied

18  charitable trust.

19      And as Your Honor noted, the Attorney General opinion is

20  entitled to no special weight.  It's just one man's opinion.

21  Now we believe the opinion is plain wrong as a matter of

22  Michigan trust law and as a matter of bankruptcy law.  And so

23  does Mr. Orr, by the way.

24      (Video Being Played at 2:45 p.m.; Concluded at 2:46 p.m.)

25      Now, Your Honor, the larger and one would have thought

1 obvious point is that there are billions of dollars of value

2 potentially riding on whether the Attorney General and the DIA

3 are right as they contend, or wrong as we and Mr. Orr believe.

4     The debtor says it would take a few million dollars and

5 perhaps years to litigate. But after $100,000,000 plus of

6 professional fees it's -- it's hard for us to understand this

7 is where the debtor chooses to economize, it's single largest

8 asset.

9     And the evidence will show that it economized by

10 essentially accepting the AG's position at face value and

11 taking what by all accounts is a deeply discounted price for

12 the art.

13     Now the emergency manager was appointed almost 18 months

14 ago. The evidence will show the importance of the museum

15 assets was not lost on Mr. Orr. Remember, he spoke to the art

16 collection almost as soon as he was appointed.

17     And just last week Mr. Cullen noted the art had been in

18 the case from the very start. So that multi-year litigation

19 the debtor says must assiduously be avoided, we could have

20 been over a year into that litigation by now had the debtor

21 demonstrated the least bit of initiative with respect to its

22 largest asset.

23     Now the evidence will show that if the implied trust

24 argument was challenged and defeated, the value of the art

25 collection would be by all accounts multiple billions of

1  dollars.  If one were to be conservative and just say an extra

2  billion dollars were at stake and one believed as we just

3  heard Mr. Orr does, that the debtor would have the better of

4  the legal argument then obviously it would be economically

5  rational to invest and invest heavily in that litigation.

6       Now do creditors getting a notional 10 cents on the

7  dollar have a reasonable expectation that Mr. Orr, who has

8  acknowledged it is in the debtor's duty to maximize value,

9  would try as hard as he could to unlock that value, or at

10  least try at all.  Of course they do.

11       But the evidence will show that Mr. Orr and the debtor

12  made a deliberate decision to do absolutely nothing to analyze

13  or challenge the AG's opinion.  Here again is Mr. Orr.

14       (Video Being Played at 2:48 p.m.; Concluded at 2:48 p.m.)

15       And the evidence will also be uncontroverted that the

16  debtor did virtually nothing to assist bona fide third parties

17  identified by FGIC and others who had a genuine interest in

18  the collection.  Now, Your Honor, you may recall several

19  months ago, I stood on this spot and predicted that some day

20  the debtor would say that the indications of interest that it

21  tenatiously and successfully blocked from going forward, would

22  never have amounted to anything anyway and thus should be

23  dismissed out of hand.  Cue Mr. Buckfire.

24       (Video Being Played at 2:49 p.m.; Concluded at 2:50 p.m.)

25       Your Honor, there is a bankruptcy term for such a

1 cavalier approach by a Chapter 9 debtor to minimizing creditor

2 losses.  The term is chutzpah.  Now the debtor says well, what

3 about all of these donor restrictions.  They prevent us from

4 selling the art to anyone not connected with the DIA.

5      To which we say yet again, where is the evidence.  And

6 the answer is, and you are no doubt sensing a trend here,

7 there won't be any credible evidence of widespread

8 restrictions.  And there is no evidence because once again the

9 debtor has chosen -- chosen not to do the work to determine

10 whether there are significant restrictions or not.

11      But we think what evidence there is, will strongly

12 suggest such restrictions are minimal.  The DIA's own policies

13 reenforce this conclusion.  The evidence will show that since

14 at least 1941 and earlier, continuing through the present day,

15 it has been the DIA's policy that all gifts and bequests be

16 without restriction.

17      Now you can see right here the DIA's current collection

18 management policy says and I quote, "the acceptance of all

19 gifts and bequests shall be without restriction.  While it is

20 the museum's intention to accession for long term use and

21 preservation, no guarantee shall be made that the gift or

22 bequests will be retained by the museum in perpetuity.  There

23 shall be no exceptions to this policy unless any such

24 restrictions or special provisions are recommended by the

25 collection committee and approved by the DIA Corp. board of

1  directors.

2      Again, the evidence will show this has been the DIA's

3  policy for generations.  If acknowledgments that we found

4  dating back to 1926 confirm the longstanding nature of this

5  policy.

6      For example, gifts shall be received in fee simple and

7  without restriction.  And they shall be used in such manner

8  and placed and such disposition of them shall be made as the

9  art commission may deemed advisable".

10     Now perhaps that is why the evidence will show that while

11 the debtor has conjured up this specter of widespread donor

12 restrictions at every opportunity, it has made a conscious

13 choice not to do the work to even try to get to the bottom of

14 it.

15     And the evidence will show what little information the

16 debtor has gotten on this topic has been fed to it by the DIA.

17 And to no one's surprise, the DIA says the collection is chock

18 full of restricted pieces.  And the DIA is not a fiduciary to

19 creditors, the debtor is.

20     Now I heard Mr. Bennett talk about expectations of

21 donors.  And I heard a little bit more of that this morning

22 from the DIA's counsel.  Obviously many long since departed

23 and the obvious implicit assumption there is that those

24 expectations take precedence over the expectation of creditors

25 under the fair and equitable test.

1   We don't believe that that's the law.  We don't believe

2  that in the rough and tumble of bankruptcy, that's the order

3  of priority of expectations.

4   Yet even the DIA in its pre-trial brief admits that it,

5  "has not engaged in meaningful discovery from the city or

6  others" regarding restrictions on the DIA assets.  And it

7  merely speculates that "discovery will further undercut any

8  claim the city has the right to sell or monetize the museum

9  art collection".

10   So again the DIA acknowledges that the debtor has done no

11  meaningful discovery on this issue, although we and FGIC did

12  and that evidence will demonstrate again that the donor

13  restriction issue is mostly urban legend.

14   And I'm not sure what it means when we are starting a

15  trial today when the DIA says discovery will undercut.  Where

16  is the evidence now?  The debtor bears the fair and equitable

17  burden now, not later.

18   So in sum the DIA has provided no credible evidence that

19  the debtor cannot sell the art, merely stating its belief that

20  discovery would uncover such evidence.  Again, the debtor has

21  not done the work and is relying on the DIA to support a

22  position when they should be natural adversaries candidly in a

23  bankruptcy situation, in a situation of scarce resources.

24   From an evidentiary and burden perspective that doesn't

25  cut it.  And I'll say for the last time, fide sola, on faith

1  alone.  Where faith exists no explanation is necessary.

2      So, Your Honor, when we look at fair and equitable, we

3  see failure on all fronts.  Failure to explore tax policy,

4  failure to look at the art implied trust argument, failure to

5  look at the donor issues.

6      What we see is ring fencing of the art and funneling of

7  all the proceeds to the pension claims.  There is nothing

8  remotely fair and equitable about that.

9      Just two more points.  First, we have often heard the

10  debtor can't be forced to sell the art.  And Mr. Bennett

11  trotted that red herring out again in his opening.  That's

12  absolutely true and we've never disputed it.

13      But the fair and equitable test has absolutely nothing to

14  do with what a debtor can be dragged to kicking and screaming.

15  It has everything to do with what a creditor can reasonably

16  expect a debtor to do on its own, proactively to minimize

17  creditor losses as Chapter 9 commands.

18      Second there is the question of why it's so important to

19  the debtor to avoid monetizing the art.  And instead to put it

20  irrevocably beyond the reach of future administrations.  Is it

21  about economics, or is it about something completely

22  different.  Call it civic pride which we don't minimize but

23  has to yield to other things in the context of a Chapter 9

24  bankruptcy.

25      And Mr. Bennett talked about the alleged value of keeping

1  the collection in Detroit.  And I'll note that nothing was

2  said about the value of the city of having to keep the

3  collection completely intact.  And what we heard from the DIA

4  was an all or nothing argument.  You're either closing the

5  museum, or you're leaving everything untouched in this new

6  trust as if there was no in between.  Again, a failure of

7  creativity, imagination, and energy by the debtor.

8      Now we asked Mr. Orr if there had been any studies

9  commissioned or any analyses done regarding the DIA that he

10  had relied on, i.e. its economic value to the city.  And he

11  said he reviewed an economic analysis of the DIA.

12      (Video Being Played at 2:56 p.m.; Concluded at 2:57 p.m.)

13      Now however after requesting a copy of the analysis to

14  which Mr. Orr alluded, debtor's counsel informed us that no

15  such analysis exists.  Mr. Shumaker from Jones, Day stated,

16  "we have checked into this with Kevyn as well.  He cannot

17  recall a specific document or study and believes he may have

18  been recalling a newspaper article he read".

19      A newspaper article.  Again, in our view that sums up

20  nicely what the evidence will show was the debtor's approach

21  to this plan and this case.

22      So to wind this up, the evidence will show an extreme

23  inattention to the obligation of minimizing creditor losses as

24  Chapter 9 requires, and a failure to meet reasonable even

25  minimal creditor expectations.  The result a plan that is

1   neither fair nor equitable.

2       Now, Your Honor, I invoked one theological doctrine at

3   the outset of my remarks, I'm going to close with another.

4   And that is predestination.

5       The idea that from the outset some are saved and some are

6   damned.  And who falls into which category is ordained by a

7   higher power.  But if you fall into the latter category your

8   fate is sealed and no human force can change that.  The die is

9   cast.

10      And you can probably guess what category we think we

11  landed in.  It's not the one with the pearly gates.  But

12  thankfully, Your Honor, we live in a country with the greatest

13  legal system the world has ever known.  And the rule of law

14  means nothing is preordained and nothing is predestined.

15  Everything rises and falls with the strength of the evidence.

16      And we are confident that when Your Honor hears all the

17  evidence you will agree with us that the debtor's plan of

18  adjustment cannot be confirmed.  Thank you for listening.

19          THE COURT:  I have a question for you, sir.

20          MR. KIESELSTEIN:  Yes.

21          THE COURT:  What is Syncora's position on the

22  percentage of its claim that the city's plan should offer to

23  it in order for the plan to be confirmable under Chapter 9?

24          MR. KIESELSTEIN:  Your Honor, with all due

25  respect --

1           THE COURT:  I need a percentage.

2           MR. KIESELSTEIN:  Well, something that's within

3   shouting distance of what the actives and retirees are

4   getting, Your Honor.

5           THE COURT:  What's the percentage?

6           MR. KIESELSTEIN:  I'd have to consult with my

7   client.  I'm not -- I don't have authority to answer that

8   question, Your Honor.  I'd be happy to come back and answer

9   it.

10          THE COURT:  I want a percentage and I want it now.

11  Because you've talked for two hours now about how insufficient

12  this plan is.

13          MR. KIESELSTEIN:  Uh-huh.

14          THE COURT:  And you've made some very powerful

15  arguments.  Surely in the course of your preparation for this

16  you must have thought about what's the percentage that will

17  meet the Bankruptcy Code.

18          MR. KIESELSTEIN:  Your Honor --

19          THE COURT:  What is it?

20          MR. KIESELSTEIN:  I'm going to be violating your

21  mediation order.  There are mediation --

22          THE COURT:  I don't want to violate the media order

23  -- mediation order.  I want you to just give me a number.

24          MR. KIESELSTEIN:  Seventy-five cents, Your Honor.

25          THE COURT:  All right.  Thank you.  Where would the

1  city get 75 cents on the dollar to pay your client?

2          MR. KIESELSTEIN:  Through a combination of all the

3  initiatives I talked about.  Back ended securities, its share

4  in the -- in the revitalization of the city, upside sharing.

5  It's very commonly employed in Chapter 9 plans.

6          THE COURT:  Uh-huh.

7          MR. KIESELSTEIN:  The debtor took it off the table

8  here.

9          THE COURT:  Okay.

10          MR. KIESELSTEIN:  We think that there are --

11          THE COURT:  I'm not asking you about mediation.  I'm

12  just asking you to list where the city would get 75 cents on

13  the dollar.

14          MR. KIESELSTEIN:  Okay.  So that could be one space.

15  And remember are you talking about the COPS, or are you

16  talking about Syncora.  I know Mr. Perez, you know, wouldn't

17  be interested in --

18          THE COURT:  You represent Syncora.

19          MR. KIESELSTEIN:  I represent Syncora.

20          THE COURT:  I'm asking you where you think the city

21  should get 75 cents to pay your client.

22          MR. KIESELSTEIN:  Your Honor, there is the art we

23  just talked about that at great length.

24          THE COURT:  Uh-huh.

25          MR. KIESELSTEIN:  And we think an exploration of the

1 | many alternatives that have been out there would -- you could

2 | sell one or two pieces.  You could finance a few pieces and

3 | you would get us to that number very easily.  There would

4 | still be 59,997 pieces.

5 | THE COURT:  Of course if you finance you've got to

6 | pay it back.  So --

7 | MR. KIESELSTEIN:  If you can't service the debt,

8 | that's right.

9 | THE COURT:  Well, by serving -- servicing the debt

10 | you got -- that means paying the debt back.

11 | MR. KIESELSTEIN:  Of course, yes.

12 | THE COURT:  So why sell art and why not just pay you

13 | that money that they would use to pay the debt back?

14 | MR. KIESELSTEIN:  Okay.  We'll take it either way,

15 | Judge.

16 | THE COURT:  So it's got to come from income either

17 | way, right?

18 | MR. KIESELSTEIN:  It has to be -- it has to come

19 | from --

20 | THE COURT:  From -- from revenues, right.

21 | MR. KIESELSTEIN:  From revenues.

22 | THE COURT:  Cities don't have income, they have

23 | revenue.

24 | MR. KIESELSTEIN:  From revenues or from asset sales.

25 | And again revenues can be in the long haul.  I feel like we're

1  having a negotiation, Judge, but -- but that's --

2         THE COURT:  But the only negotiation here is you are

3  resisting answering my questions and I'm trying to cajole you

4  into doing it.

5         MR. KIESELSTEIN:  Well, you know, as Your Honor know

6  there have been mediation orders.

7         THE COURT:  And I'm not asking you to violate any

8  mediation orders.

9         MR. KIESELSTEIN:  Okay.

10        THE COURT:  I just want an answer to my question.

11 Where is the city going to get the money to pay you 75 cents?

12        MR. KIESELSTEIN:  So we think there is --

13        THE COURT:  You've told me sale of art.

14        MR. KIESELSTEIN:  We think the R --

15        THE COURT:  You told me revenue.

16        MR. KIESELSTEIN:  We think the R & R initiatives.

17 And we think Mayor Duggan --

18        THE COURT:  Oh, and you told me the --

19        MR. KIESELSTEIN:  I'm sorry.

20        THE COURT:  What you call the back end.  What was

21 the phrase?

22        MR. KIESELSTEIN:  Excess sharing.  No, I'm sorry.

23        THE COURT:  Excess sharing, yes, okay.

24        MR. KIESELSTEIN:   Profit sharing. It's very easy to

25 stretch your securities that say if the City of Detroit has a

1  DSCR of not greater than X, then it will pay Y.

2            THE COURT:  A D what?

3            MR. KIESELSTEIN:  Debt service coverage ratio.

4            THE COURT:  All right.

5            MR. KIESELSTEIN:  As measured by impartial third

6  parties or rating agencies and such.  There are a million ways

7  to get from the number we're at to the number --

8            THE COURT:  Okay.  You've given me four out of a

9  million.

10            MR. KIESELSTEIN:  Well, I'm not -- I'm -- I could --

11  I could trot Mr. --

12            THE COURT:  And I don't mean to minimize them

13  because those are interesting things.  But it's not a million,

14  okay.

15            MR. KIESELSTEIN:  Well, Your Honor, I'll give you

16  another while we're here.  Our view on the true value of the

17  pension claims here and the true rate of return, I don't want

18  to step on Mr. Wagner's line, the debtor has put in a 6.75

19  discount rate and a target rate of return which is less than

20  how well they've done over the last 10 and 25 years by and

21  large.

22      We haven't seen any reallocation of the assets.  So in

23  other words they have a low forecast but they have the same

24  successful allocation.

25            THE COURT:  Uh-huh.

1          MR. KIESELSTEIN:  I don't know how that works.  But

2   in any event that's the case.  We think there's going to be

3   barring another market meltdown and we -- none of us know

4   whether that's going to happen.  But there is going to be lots

5   of money going into the pension funds and pouring out of the

6   pension funds into the segregated accounts that are set up for

7   restoration of the pension cuts.

8      Okay.  Ten years from now the debtor has committed to

9   paying hundreds of millions of dollars on account of the -- of

10  the restoration.  We think in any fair reading the restoration

11  will have occurred by then.  And we hope it does, okay.

12         And if that's so, then you're just sort of -- Class 10

13  and 11 they're cup will runneth over.  And so what you could

14  do is you could say if in fact restoration has occurred, in

15  2023 instead of pouring even more money into the pensions,

16  look around, see if there's anybody you haven't paid, right.

17  And see if -- if you can augment their recovery.

18          THE COURT:  By that you mean you?

19          MR. KIESELSTEIN:  Yes, absolutely.

20          THE COURT:  Your client, okay.

21          MR. KIESELSTEIN:  That would be -- that would be me,

22  yes, Your Honor, my client.  So Your Honor again, you know we

23  have a financial advisor.  He's ten times smarter than I am.

24          THE COURT:  All right.  You've answered my

25  questions.  Thank you.

1          MR. KIESELSTEIN:  Okay.  That's -- anything else,

2    Your Honor?

3          THE COURT:  All right.  Is it okay if we take a

4    recess before we jump into yours?  Okay.  It's -- it's 3:05

5    and we'll resume at 3:20, please.

6          THE CLERK:  All rise.  Court is in recess.

7       (Court in Recess at 3:04 p.m.; Resume at 3:20 p.m.)

8          THE CLERK:  All rise.  Court is back in session.

9    You may be seated.

10         MR. PEREZ:  Good afternoon, Your Honor.  Alfredo

11   Perez on behalf of FGIC.

12       Your Honor, as Mr. --

13         THE COURT:  Thank you for providing this PowerPoint

14   set for us.

15         MR. PEREZ:  Thank you, Your Honor.  And, Your Honor,

16   there are -- I have three slides toward the end where and some

17   of them I don't have the answer and the question, so I'm going

18   to skip over those slides in -- because of the agreement with

19   Mr. Bennett.

20         THE COURT:  Okay.

21         MR. PEREZ:  But I think most of them are actually

22   played already by Mr. Kieselstein.  And I anticipated that it

23   would be 20 to 25 minutes, but I think it's going to be a

24   little bit shorter just because he covered some of the things

25   that -- that I had anticipated covering.

1          THE COURT:  Okay.

2          MR. PEREZ:  But I'm going to talk about the 9019

3    status.  And while Mr. Kieselstein focused on what the city

4    didn't do, I'm going to focus on what they would have found

5    had they actually done the work to evaluate a settlement under

6    -- under Rule 9019.

7          Your Honor, as the Court is aware, the -- the DIA

8    settlement centers around the sale of the art into a perpetual

9    trust that the city will own forever.  And I think I have the

10   better slides, but -- so we've got the State of Michigan

11   contribution a hundred and ninety-five, the DIA contribution

12   100,000,000 over 20 years.  The foundations three sixty-six

13   over 20 years goes into the charitable trust and of course

14   everything goes out to the retirement system.

15         So the first thing, Your Honor, is what's the real value

16   of -- of this settlement.  And, Your Honor, I don't think it's

17   anywhere near the $816,000,000 highlight number that we have.

18         Our expert will show that if you use the same discount

19   rates, the same option that they have, that it's about

20   455,000,000.  In other words, $361,000,000 less than what's

21   advertising.  So they're getting four hundred and fifty-five.

22         That's if you assume that you include the state

23   contribution.  If you take out the state contribution they're

24   only getting 260,000,000 for the art.

25         Second, Your Honor, despite Mr. O'Reilly's protestations

1  notwithstanding, I think we're going to -- I think the

2  evidence is going to demonstrate that there are virtually no

3  merit to the potential litigation that has been threatened.  I

4  mean what there is, is a threat.  There really isn't any

5  evidence that there are any of these impediments that people

6  are talking about.

7      And finally, Your Honor, the only evidence that I have

8  seen as to what the value of keeping the art in the city is

9  the work that Mr. Spencer has done.  The city will provide no

10  evidence as to what the value is other than anecdotal evidence

11  which is no evidence at all in this case.

12      So first let me talk about the 9019 standards.

13  Obviously, Your Honor, you're well aware of the requirements

14  under the 6th Circuit.  You have to appraise yourself of the

15  underlying facts, the independent -- and make an independent

16  judgment as to the fairness and reasonableness of the

17  settlement.

18      The Bard test, the four factors under the Bard test.

19  What I'm going to do, Your Honor, I'm going to go through each

20  one of these factors and show what the evidence will show with

21  respect to each one of these factors.

22      So first is the probability of success of the litigation.

23  So the issues that the city purports to settle include the

24  arguments raised by the Attorney General, as well as the

25  arguments raised by the DIA Corp. in its various filings.

1       And they basically fall into two categories, Your Honor.

2   One, that the entire collection is -- is protected by some

3   trust.  Doctrine, either equitable trust, remaining trust,

4   whatever you want to call it.  And unfortunately, Your Honor,

5   we did have to burden you with a very lengthy brief to deal

6   with all of these things.  But I think we tried to deal with

7   each one of their arguments methodically based on their own

8   records which I think completely dispute -- dispute any of

9   this knowledge.

10      Or second, Your Honor, that there are individual pieces

11  that are subject to donor restrictions and as a result

12  preclude monetizations.  And as Mr. Kieselstein stated, the

13  city basically just accepted these allegations at face value.

14  They failed to independently investigate any of the legal

15  merits of these claims.  They failed to independently analyze

16  the factual issues.  They didn't look at the documents.  For

17  them it was like Indiana Jones.

18      And Mr. -- Mr. Bennett pretty much admitted that on his

19  opening statement.  But we went in and we did the work.  And

20  actually the work that they could have just piggybacked on

21  what we did, yet they didn't do it.

22      So let me step back.  What would they have found had they

23  actually done the work which we did.

24      First, Your Honor, they would have found that the DIA has

25  -- that -- that the city has title to the DIA collection.  And

1  let me just -- and -- and we highlighted all -- all will be

2  exhibits in evidence, mostly from their either depositions or

3  their documents.

4      Let me just highlight three of them.  One is the city

5  charter in 1918.  The powers and duties of the art commission

6  shall be as follows, acquire, collect, own and exhibit in the

7  name of the city works of art, books and other objects such as

8  are normally -- are usually incorporated in museums of art.

9      Let me also look at the operating agreement dated

10  December 12, 1997.  This -- and this is the operating

11  agreement signed by the DIA.  The city shall retain title to

12  and ownership of A, the city art collection, B, the DIA

13  properties, including the fixtures.

14      And more importantly this is the financial statement at

15  the bottom.  The DIA's financial statement.  And what does it

16  say?  The city continues to own the museum art permanent

17  collection including the works acquired prior to and

18  subsequent to the operating agreement as well as the museum --

19  as well as the museum building and grounds, title to the art

20  objects purchased or donated by the DIA are offered to the

21  city's art department.  Title is transferred when accession to

22  the permanent collection has been approved by the board and

23  the arts commission of the city.

24      This is powerful evidence.  They can't get around it.

25  This is their own document, Your Honor.

1         THE COURT:  And those EX numbers are your exhibit

2   numbers?

3         MR. PEREZ:  Exactly, Your Honor.  So had they

4   actually done the work that we did, they would have found that

5   the DIA was established -- excuse me.

6         THE COURT:  Yes.

7         MR. PEREZ:  I was trying to get as exeberant as Mr.

8   Kieselstein, it didn't work.  The -- they would have found

9   that the DIA was established in 1918 when the city established

10  the new arts commission which was tasked with creating a

11  museum and that in 1919 it purchased the DMA collection and we

12  don't have to take it on faith.

13     We've got those documents.  You can see those documents

14  exactly what happened.  How it was sold.

15     Second, they would have learned that at that time that

16  the -- that the Attorney General thinks there was a charitable

17  trust under Michigan law.  There weren't any such things as

18  charitable trust.

19     So once you get away from the whole idea that this -- the

20  whole collection is somehow in trust, they would have gone to

21  -- well, let's look at the individual items.  Are they in fact

22  burdened by -- by restrictions?

23     And again, Your Honor, they would have -- if they -- if

24  they had done the work, the city had done the work, they would

25  have easily found out that it was a policy of the -- of the

1 DIA and the city not to accept items that were burdened by any

2 -- any sort of restrictions.

3     So when you look at the -- when you look at the

4 collections management policy, it says, you know, all gifts

5 and bequests shall be without restriction. There is no

6 guarantee shall be made that the gift or request will be

7 retained by the museum in perpetuity. That's what they were

8 told.

9     The -- and -- and they actually did that. So -- so

10 throughout its life the arts commission has routinely rejected

11 gifts that had strings attached. There may be some that have

12 strings attached, but they routinely rejected them that have

13 strings attached.

14     So when you look at let's just take the last one. Mr.

15 Booth who was referred to before. At a meeting of the art --

16 in 1952, January 14, 1952, at a meeting of the arts -- of the

17 arts commission was held. The trustees decline the Booth

18 bequest because of the limitations contained in -- in the

19 bequest which would prevent the museum from ever taking clear

20 -- clear title to the gifts.

21     So on and on the arts commission which was the city

22 entity that actually approved accessioning works to the DIA,

23 to the museum, rejected gifts because it had strings attached.

24     And finally, Your Honor, and Mr. O'Reilly referred to it,

25 to the extent that the city did find some gifts that had

1 strings attached for the most part, in fact I think we only

2 found one that wasn't. But for the most part, and we found

3 very few by the way, they were all basically contractual

4 obligations that were either satisfied before they were

5 accessioned, or even if they continue, they can -- they can be

6 easily dealt with in a -- in a Chapter 7 -- in a Chapter 9

7 context.

8       So had they undertaken the work they would have found

9 that the evidence that was detailed in our DIA brief that

10 clearly shows that the city on the first prong has a very high

11 likelihood of success in any litigation over the art.

12       Second, Your Honor, the second factor -- oh, I forgot the

13 -- here is the deed of gift which Mr. Kieselstein also put up

14 which -- and this is the form that's been used forever. It

15 says we here assign all my right, title, and interest and the

16 acknowledgment, gifts that shall be received in fee simple

17 without any restrictions and shall be used in a matter in a

18 place and such disposition of them shall be made by the arts

19 commission -- commission as deemed advisable. Clearly people

20 are on notice. This is the acknowledgment of the gift.

21       So, Your Honor, let's go to the -- the second factor.

22 Your Honor, this factor involves any difficulties in

23 collecting the amounts owed after a successful litigation. We

24 simply don't think there -- that this factor is at all

25 relevant here.

1        The DIA Corp. argues that somehow the city will have

2   difficulty realizing value for the DIA collection because of

3   the so-called market constraints in Mr. Plummer's report.

4   Obviously we disagree with that.  We think the evidence will

5   show that those are not valid.  In addition they're subject to

6   a Daubert motion.

7        And furthermore, Your Honor, we demonstrated in this case

8   through one of the motions that we filed, that there is

9   significant interest in -- in -- in the art.  So I don't think

10  if it's applicable, I don't think it's relevant.  And again,

11  it weighs in our favor.

12       So then we go to the third topic.  And -- and this is the

13  topic that I think is -- is the biggest red herring, Your

14  Honor.  Simply because it's just not true.

15       And that is what is the complexity of the purported

16  litigation and what would be the expense, inconvenience, and

17  delay.  So the city didn't conduct any factual analysis so

18  they really can't tell you what it is.  But they nevertheless

19  even yesterday came up with a lot of very very colorful

20  adverbs for what -- for what they think it would take.

21       So I think this is probably from one of the -- one of the

22  hearings.  It's probably a waste of time and money to look at

23  all of this.  It turns out to be a nightmare.  It's kind of

24  like a file room at the end of one of the Indiana Jones

25  movies.

1      It's like there's pages and pages and pages, they're

2  terribly well organized.  And in their -- in their filing

3  there are fish in their -- in their filing.  They actually

4  went through and said, complicated, time consuming, expensive.

5      But, Your Honor, that's just simply not -- not the case.

6  And the Court can't merely accept the city's assumptions and

7  unsupported assertions and they certainly can't accept the

8  DIA's threats of litigation that were made this morning.

9      It must make an educated estimate of the complexity of

10  the litigation involved, the -- the expense, the inconvenience

11  and here's what the evidence will show.  The collections

12  management policy pursuant to which the DIA is governed,

13  requires that the DIA maintain accurate and up to date

14  records, requires that the collection be comprehensively

15  inventoried.

16      Your Honor, what we found was that the DIA was extremely

17  professional.  That there was a file on -- more than one file

18  on every -- on every piece of object of art in -- in there.

19  That these were extremely well maintained.

20      And so, Your Honor, you know, we sent three people to the

21  DIA for three days.  We looked at the documents, tagged the

22  documents, and were able to make these -- these sorts of

23  assumptions that probably would have taken the city less time

24  than -- than -- than all of the steps that we had to take in

25  order to do that.

1    And that's what they would have found.  So in a very

2    short time period and modest cost, we were able to analyze the

3    documents and just simply determine that -- that what

4    everybody says is the case, is just simply not the case.

5    So -- and in many cases, Your Honor, you don't even have

6    to get to the factual issues.  These things can be decided as

7    a matter of law based on the documents.  The documents are all

8    there.  Yes, some of them are old, but the documents are all

9    there.

10    So, Your Honor, again on the degree -- on the third

11    factor, the degree of complexity, the expense, the delay, you

12    know, it's nowhere near what the city says and this factor

13    again weighs heavily against -- against the city.

14    So get to the fourth factor.  Is the proposed settlement

15    in the paramount interest of creditors giving deference to the

16    reasonable views of those creditors that would be adversely

17    impacted with the settlement.

18    And there, Your Honor, Mr. Bennett I think re-wrote the

19    law, certainly re-wrote the law as I knew it.  And that's not

20    the only place he re-wrote the law, but that's one of the

21    places he re-wrote the law.

22    But I think while it's tempting to look at this factor as

23    a popularity contest and determine whether there's support for

24    the DIA settlement by counting heads, the Court must assess

25    this prong by considering whether the settlement is in the

1 | best interest of those creditors who are adversely impacted by

2 | the settlement here primarily the Class 9 creditors.

3 |     And all I have to do I think is read TMT -- <u>TMT Trailer</u>.

4 | I mean there it says, the argument that compromise is proposed

5 | with the plan of reorganization were properly approved because

6 | no creditor objected to them seems dubious ... because a plan

7 | of reorganization which is unfair to some persons may not be

8 | approved by the Court even though the vast majority of

9 | creditors approved it.

10 |     So I don't think you count heads.  You look at who is

11 | affected.  So if we put aside just who's getting the money

12 | because that's -- that's really unfair discrimination.  It's

13 | not -- it doesn't -- in my mind it doesn't go entirely to the

14 | 9019 standard.

15 |     Are the paramount interest of the creditors affected.

16 | And -- and I would say that we are the creditors.  So we've

17 | got a situation where you have the DIA assets, they're going

18 | for four fifty-five.  Maybe really two ten.  And then you've

19 | got valuations, at least from our expert who thinks it's worth

20 | $8,000,000,000.  So what happens?  Maybe nothing.

21 |     It just completely tips the scales.  And you don't even

22 | have to take that.  I mean --

23 |         THE COURT:  Okay.  So how do you deal with Mr.

24 | Bennett's argument that your client doesn't have any interest

25 | in the art?

1    MR. PEREZ:  I don't have to have an interest in the

2  art, Your Honor.  I have an interest in the debtor following

3  the dictates of 1129 and -- and -- and the best interest test.

4  And that requires that the debtors do the best they can.

5    So if they don't -- if -- if they decide they don't want

6  to sell the art, they -- they probably would have to find some

7  other way of doing it.  I don't have to have an interest in

8  the art in order to be able to make this objection.  That --

9  that is a requirement never seen before, never will be seen

10  again.

11    THE COURT:  Is there -- is there any case law that

12  says that a creditor has a reasonable expectation that a

13  debtor in Chapter 9 will monetize, whatever that means, an --

14  an asset which that creditor cannot seek the monetization of

15  outside of bankruptcy.

16    MR. PEREZ:  Well, Your Honor, it -- by definition,

17  if you're an unsecured creditor in any municipality you're in

18  the same position by definition.

19    THE COURT:  Well, I'm -- I'm looking for a case.

20  Have you got a case for me?

21    MR. PEREZ:  Okay.  Well, Your Honor, the only -- the

22  only case that I would cite you to is -- is Judge Cline's

23  ruling in Stockton.  And that probably comes the closest to

24  saying that, you know, basically, you know you can -- you

25  don't even have to get approval for your 9019 statement

1    I -- I don't have authority.  You have it here because

2    they've come to you.  I don't have authority.  But -- but he

3    basically says, when you come -- when you come in for plan

4    confirmation, that's the witching hour.

5    And if your 9019 didn't meet the requirements then

6    there's no plan.  So -- so to that extent --

7              THE COURT:  Well, is -- is that a case in which a

8    settlement or plan confirmation was denied on these grounds?

9              MR. PEREZ:  My understanding the status of that is

10   that in that case the debtor did not seek approval of the 9019

11   settlement.  The Court reluctantly said, I don't have

12   jurisdiction, but basically said, you know, if I find that

13   this was untoward for whatever reason, then I'm not granting.

14   And my understanding is, is that -- and Mr. Bennett would

15   know more because they're much more intimately involved than I

16   am.  We read his pleading today.

17   But I think that that case has been -- the confirmation

18   hearing in that case has been continued to October 3rd.  That's

19   what -- that's what I learned today.

20             THE COURT:  So that's the only case in response to

21   my question?

22             MR. PEREZ:  Well, Your Honor, it's the only case

23   that I -- that I found between -- that I found --

24             THE COURT:  Okay.

25             MR. PEREZ:  -- today.  But -- but -- but again I

1 don't -- I mean I've never heard and I think it was just like

2 made up yesterday that you have to have an interest in the

3 asset before you can say that -- that it's -- that there is

4 not an obligation.

5 I mean there's many cases which say you have to do as

6 much as you can. The Fano case says that. There is many

7 cases that talk. Most Chapter 9 cases involve the taxing

8 power because that's generally all they have.

9 There has been a couple -- there is the one case where

10 they -- they denied confirmation and -- and denied

11 eligibility. I forget if it was eligibility or confirmation

12 because basically they had the gold plated sewer system and

13 they weren't doing anything about that.

14 But most Chapter 9 cases do not have assets that would be

15 monetized. So I think it was made up yesterday so I don't

16 know that I have a case for it today. So --

17 THE COURT: So why should the Bankruptcy Code be

18 construed to give creditors more rights than they would have

19 outside of bankruptcy? Normally --

20 MR. PEREZ: But I --

21 THE COURT: Normally it's the other way around.

22 MR. PEREZ: I disagree with that. We would have --

23 we would have -- we would have more rights inside of --

24 outside of bankruptcy than we do here because we would have

25 access to the revised Judicature Act. We would have the

1  ability to --

2          THE COURT:  Okay.  But -- but separating that, I

3  thought I heard you agree that you don't have the right to --

4          MR. PEREZ:  To compel the sale.

5          THE COURT:  -- compel the sale, or even the

6  monetization of the art.  If you don't have that outside of

7  bankruptcy, why should the Bankruptcy Code be construed to

8  give you that right?

9          MR. PEREZ:  Because Your Honor --

10          THE COURT:  Because normally bankruptcy contracts.

11          MR. PEREZ:  Absolutely not, Your Honor.  They're

12  getting the -- they're getting the automatic stay.  They're

13  getting a discharge.  They're getting a -- you know, a

14  breathing spell.

15      In return for that, what the creditors get is the

16  obligation for the debtor to do the best that it can to

17  satisfy the claims.  That's what we're getting.  That's the

18  only thing we're getting.

19      And if you take assets off the table, what if it were,

20  you know, securities worth $8,000,000,000?  What if it were

21  cash worth $8,000,000,000?  Do we take those off the table too

22  because we couldn't compel it otherwise?

23      We couldn't compel.  If they had $8,000,000,000 sitting

24  in their bank account --

25          THE COURT:  Why is -- why is the automatic stay

1 worth $8,000,000,000?

2     MR. PEREZ: Well, I don't know if it is or not. I

3 mean they obviously -- it's worth something, okay. And -- and

4 the discharge is worth something, okay. It may not be worth

5 8,000,000,000.

6     And -- and let's -- let's -- let's be practical, Your

7 Honor. I mean I think what Mr. Kieselstein said, it's not an

8 all or nothing situation. And I'm going to get to what some

9 of the indications of interest are. But it's not an all or

10 nothing situation.

11     We're talking about marginal dollars here. Dollars at

12 the margin. I mean right now we stand to get $90,000,000,

13 both of us together forever under this plan. Ninety million

14 dollars.

15     There's $130,000,000 already been spent on -- on fees in

16 this case. Forty million dollars more. And we're getting

17 $90,000,000.

18     So, Your Honor, let me go on before I digress.

19     THE COURT: Let you go on before I ask you some more

20 questions?

21     MR. PEREZ: So, Your Honor, our expert, the Winston

22 Group 582 objects worth 1,700,000,000. And even the city's

23 own expert is going to say multiple -- multiples of the -- of

24 the four fifty-five or the two sixty-six depending on -- on

25 how you can do it.

1         And -- and the -- and the alleged restrictions just

2    simply do not in any way justify the steep discount.  And then

3    we've also heard a lot about you know, what's the intangible

4    value of keeping the art in the city.

5         And from what I've seen there's only been one analysis of

6    that.  That was done by Mr. Spencer.  No one else did any

7    analysis and that analysis showed that the value is very low.

8    Again, you'll -- you'll see that.

9         You know, someone coming in and saying --

10             THE COURT:  By value there you mean economic.

11             MR. PEREZ:  Economic value which is -- which that's

12   how you -- and -- and -- and we'll go through this in his --

13   in his direct exam.  When you -- when you value a cultural

14   asset you have to -- how do you -- value that cultural asset

15   in an economic context.  And there are -- because in many

16   other countries and in fact in some cities in the United

17   States there are public assets that are cultural assets.  And

18   there is -- you know, there are budget constraints as to how

19   you allocate money.

20        People have come up with ways of measuring what the value

21   is of keeping a cultural asset or a public asset.  And -- and

22   that's what he's going to testify about, Your Honor.  And

23   you're --

24             THE COURT:  And it's going to put a value on

25   educational and civic value of this museum?

1        MR. PEREZ:  Your Honor, I'll let the testimony speak

2    for itself.  But -- but what the --

3        THE COURT:  He's your witness.  I'm asking you, what

4    is he going to say?

5        MR. PEREZ:  He's going to say that based on the

6    tri-county millage, the value to the City of -- the value that

7    the -- that the citizens of the City of Detroit place in -- in

8    keeping the art in Detroit is very small, like $75,000,000.

9        That's what he's going to say.  Based on that -- on that

10   level of support.  And based -- based on the analysis that

11   were done and we'll, you know, we'll quibble with Mr. Bennett

12   about whether the methodology was correct or not.  We'll have

13   that discussion.  But based on the analysis that he did that's

14   in essence what -- what he's going to say.

15       And -- and, Your Honor --

16       THE COURT:  Why -- why isn't that an analysis that

17   the value of the museum itself is $75,000,000?

18       MR. PEREZ:  Because in somebody else's hands it

19   could be worth a lot more, okay.  Because -- because the City

20   of Detroit, that's what the City of Detroit values it.  That's

21   the value.

22       I mean and Your Honor, let's -- let's make sure we

23   understand what the facts are.  It's been closed from time to

24   time because of lack of funds.  At one time the purse of the

25   -- of the museum was part of the purse of the city, so money

1 came in.  When money came into the DIA it was used to fund

2 things.

3    I mean we've come to a -- kind of in a rarified form with

4 the DIA subject to the 1997 operating agreement.  But -- but

5 before it was just basically run as another department of the

6 city that, you know, money came into the coffers, didn't come

7 into the coffers.  And -- and -- and the city arts commission

8 which was founded in -- in 19 -- 1918 basically controlled it.

9 And then back in 1997 or actually a little bit before that,

10 they entered into -- into this agreement.

11    But to say that the value that -- that I place on

12 something is the intrinsic value in a -- in a -- in a market

13 transaction is just simply not the case.  And furthermore, we

14 have real life experience on that.

15    I mean Mr. Spencer went out and solicited with his --

16 both hands tied behind his back because we had no cooperation,

17 didn't get cooperation in the first motion, didn't get

18 cooperation in the second motion.

19    The first motion, I had everyone involved say okay, can

20 we just look at it?  No.  And -- and you've got -- you've got

21 a loan, I know people don't like loans, but loans are loans.

22 And then you've got, you know, what a hundred and --

23       THE COURT:  Right, right.  The trouble with loans is

24 they have to be paid back.

25       MR. PEREZ:  That -- that -- that's -- I once had a

1  client, Your Honor, a banker who said I don't -- I don't

2  collect loans, I just make them.  And -- and you know, but

3  yeah, you got to pay it back.  You got to pay it back.

4          THE COURT:  How long did he last in commercial

5  lending?

6          MR. PEREZ:  He was a -- I -- I loved the guy, he was

7  a great guy.

8          THE COURT:  Well, yeah.

9          MR. PEREZ:  He didn't last very long.

10         THE COURT:  He's adorable.

11         MR. PEREZ:  So, Your Honor, you got Juan, 116

12 pieces.  I mean they got -- I know you -- I forget how many

13 they actually showed.  They've got like 57,000 of these pieces

14 in hiding for between nine hundred and a billion five.  So

15 there is significant market value in them.

16     And then, and Your Honor, and to some extent I'm -- I'm

17 going to cut a little short because Mr. Kieselstein actually

18 put in some of the -- some of the slides that -- that I had.

19     But initially, Your Honor, all the art assets were on the

20 table.  And when you look at both Bill Nowling's email from

21 May of 2013, when he says all options are on the table.

22 Financial emergencies require extraordinary measures including

23 maybe selling art.  I wasn't hired to protect it and neither

24 were you.  We have a job to do.

25     And -- and in the proposal that was made in June of 2013,

1 basically all -- all of the assets were on the table.  And so

2 you -- we kind of fast forward and then all of a sudden

3 there's no assets on the table.  The grand -- the grand

4 bargain comes forward and -- and so in essence while the city

5 was -- was giving lip service to the fact that all assets were

6 on the table, in fact they weren't.

7      And -- and then there was -- as the clip showed, they

8 really didn't explore anything beyond -- beyond the grand

9 bargain.  There -- there wasn't any serious -- they -- nobody

10 bothered to call and figure out are these real deals or are

11 they -- are they fake deals.  And some of these people

12 contacted the debtor directly.  They didn't even come to us.

13          THE COURT:  Let me ask you this hypothetical

14 question.  If the city owned the schools that its children

15 were educated in, or if the city owned the libraries and the

16 books in the libraries in the city, would you want those sold

17 and monetized too?

18          MR. PEREZ:  No, Your Honor.  And under 436 I think

19 the city draws a distinction between the -- the -- the assets.

20 So -- so you've got state law as well.  So under 436 it talks

21 about the -- the -- the assets that you needed for the health,

22 welfare, and safety.

23      And -- and the schools I would say are -- are clearly

24 welfare.  Question and -- and the question is, is the art

25 welfare?  I think the answer in this case is no, it is --

1          THE COURT:  How about the libraries?  Where do you

2    -- where do we draw the line?

3          MR. PEREZ:  Well, but where do you draw the line on

4    the other side?

5          THE COURT:  No, I'm asking you.  Where do you draw

6    the line?

7          MR. PEREZ:  Well --

8          THE COURT:  What about the libraries?  Would you

9    sell them too?

10         MR. PEREZ:  I would not sell the libraries.  I

11   wouldn't sell the libraries because --

12         THE COURT:  No, but books are what, more important,

13   more significant, more valuable than art?

14         MR. PEREZ:  I -- I don't know what intrinsic value

15   the library has.  And let me -- let me step back, okay.  When

16   the city --

17         THE COURT:  Assume it had really valuable books in

18   it.

19         MR. PEREZ:  Well, then -- then -- then perhaps, then

20   perhaps.  Okay.  When the city --

21         THE COURT:  Well, the answer might be yes.

22         MR. PEREZ:  Yeah.  So when the city -- let me -- let

23   me -- let me make this point.  And the documents show this.

24         THE COURT:  School building happened to be sitting

25   on an oil well.  The answer might be yes.

1          MR. PEREZ:  Well, no.  I think if the school

2     building -- I think if -- if the school building --

3          THE COURT:  You wouldn't argue that we'll take the

4     children and we'll put them in this other school.

5          MR. PEREZ:  You'd have to argue that, right?  And

6     the city would probably have done that, Your Honor.  The city

7     probably would have done that.

8       But let me -- let me make a -- let me make a point

9     because I think this is critical.  When the city embarked on

10    this venture and decided to spend money to create the DIA, one

11    of the compelling arguments was that yeah, we're putting this

12    money in there.  But these assets are appreciating.  That's

13    what they said.  These assets are appreciating.

14      It -- it was looked at as an appreciating asset.  I don't

15    think you would ever look at a school except perhaps for --

16    for the real estate as an appreciating asset.  It's the nature

17    of the asset, Your Honor.

18          THE COURT:  Did you client look at the art as an

19    appreciating asset when it did this deal?

20          MR. PEREZ:  Your Honor, I don't -- I don't believe

21    my client looked at the art at all when it did this deal.  But

22    that's beside the point.

23          THE COURT:  What does that say about fair and

24    equitable?

25          MR. PEREZ:  It doesn't say a thing about fair and

1 equitable, Your Honor, it really doesn't. It's -- it -- fair

2 and equitable, we're talking about today. My -- my clients --

3 I mean we --

4        THE COURT: It doesn't -- it doesn't bear on

5 reasonable expectations at all?

6        MR. PEREZ: It bears on reasonable expectations now

7 that we filed for bankruptcy. Reasonable expectations at the

8 time were pursuant to -- to our official statement. And if

9 you look back at the official statement, there is nothing in

10 there that says that there was going to be an invalidity

11 challenge. So there's nothing in there that said anything

12 other than we would be treated exactly as the pension systems

13 which we funded.

14   I mean that's the irony of the whole thing. They've got

15 a billion five of our cash and -- and we're the bad guys. How

16 could that be? They got a billion five of our cash.

17        THE COURT: Right. But that's not an issue of what

18 your reasonable expectations might be in the event of a

19 default.

20        MR. PEREZ: The reasonable expectations in the event

21 of a default were clearly defined within the -- the official

22 statement which was we would be on the same footing as the

23 pensions, as the UAAL.

24        THE COURT: Which means RJA --

25        MR. PEREZ: Which means RJA --

1            THE COURT:  Estimates.

2            MR. PEREZ:  Which means -- exactly.  But -- but,

3  Your Honor --

4            THE COURT:  It doesn't mean art, does it?

5            MR. PEREZ:  Well, it doesn't mean art in the sense

6  that I don't have a lien on the art.  But it does mean that

7  the city has to act prudently.  The city has to act prudently.

8      We're going to show 10, 15 municipal monetizations

9  because cities needed money.  That's going to be part of our

10 evidence.

11     THE COURT:  Uh-huh.

12            MR. PEREZ:  Okay.  Cities do that.

13            THE COURT:  You mean things that other cities have

14 done in other situations of distress.

15            MR. PEREZ:  Exactly, exactly.

16            THE COURT:  Oh, okay.

17            MR. PEREZ:  Okay.  I mean cities do that.  Cities

18 sell art.  They could sell a hundred pieces and we would all

19 go home happy, except perhaps for Mr. O'Reilly and Mr. Levitt.

20     So -- so, Your Honor, I mean it was clear that --

21            THE COURT:  A hundred pieces will get you to the

22 75%, Mr. Kieselstein wants to get for his client?

23            MR. PEREZ:  Probably, probably.  Probably would.

24 And we might be even more reasonable than him.  So -- we're --

25 we're the -- we're the --

1          THE COURT:  I think you've been challenged, sir.

2          MR. PEREZ:  We're the more reasonable twin.  And,

3    Your Honor, look at the statement.  I mean this is -- this is

4    -- this is classic.  If they -- if we were in a commercial

5    case, this would be --

6          THE COURT:  Okay.  But we're not.

7          MR. PEREZ:  Okay.  Yes, now and forever.  That's the

8    whole goal of this, to take it away from the creditors yes,

9    now and forever.

10     If we were doing a fraudulent conveyance, that's all I

11   would have to show.  That would be all my evidence.  That --

12   that you're taking it away, you should have sold -- never sold

13   to satisfy claims yes, now and forever.

14     I would -- I would rest.  I would put this on and rest.

15   And I'd probably get a directed verdict.  So, Your Honor --

16          THE COURT:  In a commercial case.

17          MR. PEREZ:  In a commercial case.  And -- and I'm

18   not sure what's -- what's so -- what's so different here.  So

19   -- and Your Honor, so I think as it relates to the -- the

20   fourth prong which is are -- are our interests protected, I

21   think the answer is that is no and I think they fail.

22     So in closing, Your Honor, I think that the evidence that

23   will be presented will show that the DIA settlement just flat

24   doesn't meet the standards of 9019.  It can't be approved.  It

25   -- it's the cornerstone of the plan, they repeatedly say it's

1   the cornerstone of the plan.  The cornerstone fails, the plan

2   fails without even getting to Mr. Kieselstein.  So thank you,

3   Your Honor.

4          THE COURT:  Thank you, sir.

5          MR. WAGNER:  Your Honor, Jonathan Wagner from

6   Kramer, Levin along with Deb Fish of Allard and Fish.  We

7   represent holders of $1,000,000,000 of certificates of

8   participation or COPS.

9     I have a -- slides which I can hand up in hard copy if

10  you would like.  May I?

11         THE COURT:  Thank you.

12         MR. WAGNER:  Your Honor, the first thing you'll note

13  from my opening slide is I was very optimistic September 2nd.

14  But I -- I will -- I did not think I would be opening at 4:00

15  on the second day, but I will try to be brief.  I believe that

16  our -- our brief was actually the -- the shortest brief that

17  was submitted from the objectors.

18    We will be joining in FGIC's remarks and FGIC's

19  presentation.  Our -- our COPS are actually all wrapped by

20  FGIC.  And we join in Mr. Kieselstein's remarks.  And my role

21  at trial will be limited.  I will be focusing on treatment of

22  the COPS vis-a-vis the pension classes and really as Mr.

23  Kieselstein remarked, the size of the pension class -- the

24  size of the pension claims.

25    It's not accurate as Mr. Bennett claimed, that the level

1   of discrimination between the COPS and the pension classes is

2   "quite modest" or "extremely small".  In fact the level of

3   discrimination as Mr. Orr mentioned during his deposition and

4   as Your Honor has observed is very significant.  This plan

5   does not treat the COPS with even a modicum of fairness.

6        Now on the face of the plan the level of discrimination

7   is already grossly disparate.  The pension classes are getting

8   59 to 60% and the COPS are getting nominally 10, really less.

9        But what we will show and what the evidence will show is

10  that the level of discrimination is actually greater.  And we

11  will do that by showing that the size of the pension claims is

12  substantially overstated and therefore the recovery to the

13  pension classes is in turn understated and thus the level of

14  discrimination set out in the plan already 50% is understated.

15       But even if that's not what the evidence showed, even if

16  we couldn't show that the pension claims are overstated, the

17  level of discrimination here is already a grossly disparate

18  number.  And one can't contort the Bankruptcy Code to count as

19  a plan that provides for discrimination at this level.

20       Now it's hard for the Court -- it's hard to assess who is

21  right here just reading all the words in the briefs and

22  listening to the openings.  And that's why we have a trial

23  with witnesses.  And there have been lots of assertions that

24  have been made by the city in its opening.

25       But the question is what does the evidence show.  Now we

1  will present one witness during this trial.  Mr. William

2  Fornia who is an expert on -- on pension issues.

3      And he will describe how the pension claim is overstated.

4  But the proof will also come from the city's own witnesses

5  from Mr. Glenn Bowen of Milliman which has been hired as the

6  actuary for the city since the bankruptcy.  Mr. Alan Perry who

7  is the city's expert from Milliman on pension issues.  And Kim

8  Nicholl who is the retiree committee's expert on pension

9  issues.

10     Now, there are three main ways -- okay, my -- okay.

11  There are three main ways that the pension claim is inflated

12  and therefore the discrimination level in the -- actually

13  exceeds 50%.

14     The first is that the city performed the wrong actuarial

15  exercise in calculating the size of the pension claim.

16  According to the plan and disclosure statement at Page 13 and

17  as Mr. Bennett noted in his opening, the city determined the

18  size of the pension claims by calculating something called

19  UAAL, unfunded actuarial accrued liability.

20     And the amount that the city calculated, and this will be

21  in the documents authored by Milliman is 3.1 billion dollars.

22  Your Honor, the evidence will show that using UAAL was -- was

23  not the right methodology here.

24     Most notably UAAL ignores that these plans have been

25  frozen.  And the only benefits that are owed to retirees in

1  that scenario, the only benefits to which participants have

2  rights are those benefits that have accrued and vested.  And

3  for that under Michigan law, AFT Michigan against State which

4  we cited in our brief, 303 Mich App 651 at 665.

5      And I also note the Court's eligibility decision at Page

6  153 in which you noted that -- in which you noted that,

7  "accrued motion benefits" have the status of contractual

8  obligations.

9      So what the pension experts and witnesses will testify to

10  if they adhere to what they said at their depositions, and I

11  have every expectation they will, is that UAAL includes future

12  benefits that have not yet vested and have not accrued.

13      And just what UAAL does it is makes actuarial predictions

14  as to what might vest in the future.  So you may have an

15  employee who has worked for the city --

16          THE COURT:  Why is vesting significant?

17          MR. WAGNER:  Because that's the only thing that

18  retiree -- that participants are entitled to under the law.

19  That's what the cases say and I believe that's the implication

20  from Your Honor's decision on eligibility.

21      It's only vested benefits.  And in fact, and again this

22  will come out in the evidence, the city's own actuaries agree

23  that when a plan is frozen you don't take into account in

24  assessing the liability, benefits that have not vested and

25  have not accrued.  That's from their own mouths.

1          THE COURT:  Well, but you're not equating not

2   vesting and not accruing, are you?  Or are you?

3          MR. WAGNER:  I think that certainly benefits that

4   haven't vested haven't accrued.  I don't know the -- the

5   nomenclature may be exactly the same.  But the bottom line is

6   that there is pretty unanimity amongst the experts who will

7   testify in this place -- in this case that benefits that have

8   not vested, future salary increases that haven't occurred yet,

9   and future wage inflation should not be taken into account in

10  measuring what's owed to the pension classes.

11         So no matter what nomenclature you use, those three

12  categories should not be taken into account in determining the

13  size of the claim.  That I think is very clear.

14         Now, the second mistake that the city makes is including

15  excess ASF in the size of the claim.  And the city's own

16  actuary, Mr. Bowen and indeed Mr. Bennett during his opening

17  acknowledged that the claim includes the excess ASF which is

18  about $387,000,000.

19         The city also in effect acknowledges in their -- their

20  pension --

21         THE COURT:  I want to be sure I understand what

22  you're arguing here.  Is it -- it is your position that

23  whatever incremental impact on an employee's pension would

24  result from the wages that employee would earn next year,

25  whatever that might be, should not be accounted for in UAAL?

1          MR. WAGNER:  Yes.  I believe those would be

2  excluded.

3          THE COURT:  And your position is that everyone

4  agrees with that?

5          MR. WAGNER:  You will hear from the pension experts

6  who agree that future salary increases --

7          THE COURT:  I'm not talking about salary increases.

8          MR. WAGNER:  Okay.  Then -- then --

9          THE COURT:  I'm talking about what the employee

10  earns next year.

11          MR. WAGNER:  Okay.  Then -- then I misunderstood the

12  question.  Yes, that can be included.  But --

13          THE COURT:  Can be?

14          MR. WAGNER:  Yes, can be.

15          THE COURT:  Should be?

16          MR. WAGNER:  Yes, should be.  But future salary

17  increases and future wage inflation should not be included.

18          THE COURT:  And why is that?

19          MR. WAGNER:  Because in a frozen--

20          THE COURT:  Even if they are reasonably foreseeable?

21          MR. WAGNER:  It's not an issue of whether it's

22  reasonably foreseeable.  It's an issue of whether it's owed.

23  And those benefits are not owed because the plan is frozen.

24          Once a plan is frozen, you won't have any future wage

25  inflation.  And you won't have any future salary increases

1    And you won't have any future vesting.  And in fact it's not

2    -- I mean look --

3                THE COURT:  Well, I'm doubly confused now.

4                MR. WAGNER:  Okay.

5                THE COURT:  Let's assume that this employee is not

6    at all vested.  They're just not.

7                MR. WAGNER:  Okay.

8                THE COURT:  I don't know when vesting will occur,

9    but it won't occur now and it hasn't occurred by now, and it

10   won't occur within the next calendar year, talking about 2015,

11   okay.  Assume all of that.

12               MR. WAGNER:  So that --

13               THE COURT:  Does UAAL include the incremental

14   liability that results from next year's salary?

15               MR. WAGNER:  So what -- if the person passes the

16   vesting point?

17               THE COURT:  No, hasn't.

18               MR. WAGNER:  Then -- then no.  I'm sorry, yes it --

19   I'm sorry, it would include, yes.  And it also --

20               THE COURT:  And so why would it include -- why would

21   it include the incremental piece of that, or resulting from

22   that, but not the 2% wage increase this employee is going to

23   get next year?

24               MR. WAGNER:  Because the plan is frozen and under

25   actuarial principals as the experts will say, that's the way

1  you --

2        THE COURT:  You say frozen.  You mean there will be

3  no pension consequence from that 2% COLA this employee is

4  going to get next year?  Is that what you mean by frozen?

5        MR. WAGNER:  Yes.

6        THE COURT:  Okay.

7        MR. WAGNER:  I'm sorry to burden the Court with

8  pension issues so late in the day.  But we've been living --

9  we've been --

10        THE COURT:  I doubt it's the hour it's -- it's the

11  result of my block here.

12        MR. WAGNER:  And you'll -- you'll hear -- in any

13  case with respect to ASF the city agrees that ASF is not

14  provided for under the plan.  And Mr. Bowen again, this is

15  from Milliman, the actuary for the city, has agreed that

16  benefits that are not permitted under the plan should not be

17  included in the size of the claim.

18        The last way, Your Honor, in which the size of the claim

19  is inflated is that the plan uses a rate of return that is too

20  low, what we call unconventionally low.  And it wasn't -- I

21  think all parties agree about this, but it wasn't quite

22  explained this morning.

23        But the lower the rate of return, the larger the size of

24  the pension claim.  And the reason for that is as a -- as a

25  pension convention, the lower the -- the rate of return is

1  used as a discount rate as well.  So you apply the discount

2  rate to the liability.  So the smaller the discount rate, the

3  smaller the effect on the liability.

4       So the city used a rate of 6.75%.  That's below the rate

5  that Milliman actually set for this plan.  Milliman looked at

6  this plan, looked at the assets, and came up with a rate of

7  7.2%.

8       The 6.75 is predicated on a change in asset mix but that

9  asset distribution hasn't changed and there's really no proof

10 in the record that it will change.  The 6.75, Your Honor, is

11 also below the industry average for similar plans by 100 basis

12 points.  And you'll hear of a -- of a prominent survey of

13 public pension plans and out of the 120 odd pension plans --

14            THE COURT:  Uh-huh.

15 `    `    MR. WAGNER:  -- surveyed, I think we had mentioned

16 this in the brief, only --

17            THE COURT:  How many trillions of dollars are public

18 pension plans behind in UAAL?

19            MR. WAGNER:  I don't know the answer to that, but I

20 think with respect to these plans they're --

21            THE COURT:  Four?

22            MR. WAGNER:  They're -- Your Honor, these -- the

23 evidence will show these plans are no better or worse than

24 other plans.  And while we --

25            THE COURT:  What do you -- what do you mean?

1              MR. WAGNER:  In terms of their --

2              THE COURT:  You mean -- you mean our Detroit plans?

3              MR. WAGNER:  Yes, yes.  In terms -- comparison to --

4     to the UAAL of other public pension plans.

5              THE COURT:  Well, but what does that prove?  Does it

6     prove anything more than that they're all in trouble?

7              MR. WAGNER:  There are people -- there are observers

8     who say they're in great trouble.  There are observers who say

9     they're actually -- that there is no crisis.  And look the --

10    the issue here is --

11             THE COURT:  Have you got one of the latter?

12             MR. WAGNER:  I'm sorry?

13             THE COURT:  Have you got one of the latter?

14             MR. WAGNER:  Yes, we will present him at trial, yes,

15    Mr. Fornia.

16             THE COURT:  Okay.

17             MR. WAGNER:  And I believe the -- I believe you'll

18    hear from the city's experts that they themselves have set

19    rates far higher than the 6.75 for the public plans for which

20    they are actuaries.

21        And I don't think they are going to claim that those

22    plans are under funded.  Every public pension plan on that

23    survey that -- for which Milliman is the actuary, uses a rate

24    over 6.75%.

25        So I'm -- we -- yes, we will stand by those rates.  And

1  they've also testified that the 6.75 is an outlier.  And the

2  retiree committee in its brief has acknowledged that the 6.75

3  is not based on pension practice and not based on historical

4  returns.

5      And look, we're not picking a return rate in the

6  abstract.  This in effect comes at our expense in terms of the

7  unequal treatment.

8      Now there are also exclusions from the numerator that Mr.

9  Kieselstein referenced.  In -- money from the UTGO settlement,

10  there are restoration of benefits that may occur if the -- if

11  the rate of return is over 6.75%.  And we've compiled on one

12  chart an analysis.

13      If you look at the -- well, just look at the first

14  column.  This is DGRS.  Under the city's calculation the rate

15  of return is 60%.  If you exclude the non-vested benefits,

16  you're up to 66%.  If you take out ASF you're up to 85%.  And

17  if you exclude, if you use a more conventional rate, 7.2 which

18  is actually what Milliman calculated for this plan, you're up

19  to 96% which in effect means that the plan is -- is properly

20  funded.

21      Now hemmed in by the statements in the plan --

22          THE COURT:  I -- I need to understand what that 96%

23  represents.  What --

24          MR. WAGNER:  That represents the level of funding

25  for this plan.

1              THE COURT:  The level of funding.

2              MR. WAGNER:  Yes.  Once you -- once you back out the

3   non-vested benefits ASF and you use a more conventional rate.

4   Now --

5              THE COURT:  And that's without the grand bargain?

6              MR. WAGNER:  Yes.  So -- no, that's with the grand

7   bargain.

8              THE COURT:  Oh.

9              MR. WAGNER:  So we've also done the calculation

10  without the grand bargain, not because we agree with that, but

11  because that issue has been raised.  And if you just look one,

12  two, three -- at the fourth row, excluding non-vested

13  benefits, we did the -- we did the plan of adjustment without

14  the state contribution, you're at 78%.

15       And without any grand bargain at all you're at 69%.  And

16  then if you go across we have done with the -- with the

17  restoration and then with the return from UTGO.  And Mr.

18  Fornia will give more detail concerning this chart.

19             THE COURT:  Okay.

20             MR. WAGNER:  Now, what does the city say in

21  response?  The city and the retiree committee.  First they say

22  back out the DIA and state contributions.

23       And -- and you have the information up there.  But as Mr.

24  Kieselstein noted, those monies are part of the plan.  It's

25  not as if the legislature voted to give money directly to

1  retirees.  The money is being run through the plan and the

2  state is getting a release and the DIA is getting assets.  So

3  I don't think that can be backed out.

4      The second defense that's been raised is that the pension

5  and OPEB classes can somehow be combined.  Now the city seems

6  to have dropped that point based on the stipulation that was

7  entered into.  The retiree committee is adhering to that

8  position.  But there's no case support for that.

9      The last point that's been raised in defense is the use

10 of the so-called risk free rate or PBGC rate, what Mr. Bennett

11 referenced this morning.  That would lead to a -- a wildly

12 inflated pension claim.  It's not -- it's far more extreme

13 than what's in the plan and what it would in effect mean that

14 the statements in the plan as to what the retirees are getting

15 are false.  And it would also contradict statements that the

16 retiree committee made to retirees to persuade them to vote

17 for the plan.

18     Mr. Bennett put up charts saying that recovery for PFRS

19 is 9.3% and GRS is 21.9%.  And then using the PBGC discount

20 rates 8.6% and 20.7%.  Where is that in the plan?  Where was

21 that disclosed to people who were voting on this Classes 9 and

22 10 who are voting on this -- I'm sorry, 10 and 11 who are

23 voting on this plan?

24     It would also contradict statements that the retiree

25 committee made to retirees to -- to persuade them to vote for

1  the plan.  And this is Exhibit 1043, the letter from the

2  retiree committee to retirees.

3      It stated with respect to PFRS that retirees, "will

4  receive 100% of your current pension and 45% of your annual

5  escalators or COLAs.  Elimination of 55% of your annual

6  escalators or COLAs amounts to a 9.9 reduction in the value of

7  your pension".  Where is the statement that they're getting

8  9%?

9      Same thing with respect to GRS.  You -- or, I'm sorry,

10  20% with respect to PFRS.  GRS, you will receive 95.5% of your

11  current pension, but no escalators over your lifetime and you

12  may be subject to ASF recoupment that will be subject to a

13  cap.  And then it goes on to quantify the value of losing the

14  COLA 14.5%.

15      And in the -- Mr. Alberts whose presentation was, you

16  know, quite eloquent trying to quantify the value to retirees,

17  but in the footnotes he set out what in fact the retirees are

18  getting.  And in those footnotes, I don't know if Your Honor

19  still has his slides, for DTRS, I think it was 22%, and PFRS

20  it was 12.7%.

21      So where is all of this information now when the

22  communications were supposed to made to the retirees as to

23  what they were getting.  This is all newfound.

24      And by the way under this math you could have zero cuts.

25  You could have no cuts in pension and the city would still

1  show a claim due retirees.  That's just not -- that's just

2  nonsensical.

3       And the city has another problem with respect to this

4  issue akin to the one that Mr. Kieselstein described.  And

5  that is that the city's pension expert and also Mr. Bowen

6  disavowed use of the risk free rate.  They said it's not

7  appropriate.

8       And of course it's not appropriate.  Nobody uses it.

9  There's not a single pension fund, this evidence is very

10  clear, not a single pension fund, public pension fund in this

11  country uses the risk free rate to calculate funding

12  requirements.

13       Now they may have arguments why to value a claim it makes

14  some sense.  We'll come to those during trial.  So there's

15  only one pension expert who is going to give evidence on the

16  risk free rate for the city's side.  And that is Kim Nicholl.

17  All of the city's eggs on this issue are in the Kim Nicholl

18  basket.

19       Your Honor, that's a very leaky basket.  Because before

20  this case and before Siegel was paid two and a half million

21  dollars in fees in this matter, she was the leading hawk on

22  not using the risk free rate.

23       And I'd ask that we put up Exhibit 1043, Page 3.  If you

24  could highlight the top for discussions.  This is a letter she

25  wrote before this case began to Siegel's client.  She works

1  for Siegel and Company.

2       For discussions about the likely cost of a public sector

3  plan to a sponsoring employer, or the long term financial

4  health of the plan, NVL, that's risk free rates, estimates

5  will be inaccurate at best and misleading at worse, since

6  these measurements explicitly exclude information about

7  funding and costs.  She's the wrong person to be urging use of

8  the risk free rate, Your Honor.

9       Now just one more point before I close.  Mr. Bennett

10  cited the U.S. Air case as a justification for using the risk

11  free rate.  He left out something very important about that

12  case.  That was a case in which a pension plan was

13  terminating, 303 BR 784 at 786.

14       The claim arises from the termination of the defined

15  benefit pension plan for the pilots of U.S. Airways.  As a

16  result of the termination the liabilities of the plan have

17  been taken over by the PBGC.

18       Your Honor, a termination is not the same as a frozen

19  plan.  There will continue to be investments made by the

20  investment managers of these plans and there are additional

21  requirements that the city must fund in 2023.

22       The pension experts will say it far better than I can.

23  This is not a termination situation and the considerations are

24  completely different.

25       Your Honor, when all the dust settles here, the level of

1  discrimination overwhelms everything else.  And, you know,

2  you'd have to have a heart of stone not to sympathize with the

3  retirees.  But the COPS would like a fair shake too.

4      And what's in this plan vis-a-vis the COPS is not fair

5  and not appropriate and can't be squared with the standards in

6  the Code.  And maybe a bad plan is better than no plan, but in

7  a legal plan, a plan that violates the Code does nobody here

8  any good.

9      And because it would set a bad precedent, the plan is

10  also a disservice to any municipality who may in the future

11  face the unhappy prospect of Chapter 9.

12      Your Honor, I was asked to note that the last COPS

13  objector, Wilmington Trust is on the phone.  They represent

14  the contract -- the contract administrator and they'd like to

15  speak for a few minutes now if that's okay with Your Honor.

16          THE COURT:  Sure.

17          MS. GOING:  Good morning, Kristin Going for --

18          THE COURT:  And who is that on the line, please?

19          MS. GOING:  -- the contract administrator.

20          THE COURT:  Oh, yeah, we have the volume turned

21  down. Hold on for us, please.  Okay.  Who is on the line,

22  please?

23          MS. GOING:  Thank you, Your Honor.  Kristin Going,

24  Drinker, Biddle and Reath on behalf of Wilmington Trust as the

25  contract administrator.

1          THE COURT:  Go ahead.

2          MS. GOING:  Your Honor, we just have two points to

3   make.  Wilmington Trust is the contract administrator.  It is

4   tasked with filing proofs of claim under the contract

5   administration agreement.  And we did that.  We filed four

6   proofs of claim prior to the bar date.

7          The two points that I want to make in the opening and we

8   have in fact joined the briefs of both the ad hoc COPS holders

9   and FGIC are that first the disputed COPS claims with regard

10  to the extent that it even exists is insufficient and it's a

11  -- an attempt to adjudicate the COPS claims through this plan

12  confirmation process.

13         And my second point is that if you look at the actual

14  proposed implementation of the B notes which is set forth in

15  the emergency manager's order number 5, this serves to further

16  the discrimination between the classes and -- and specifically

17  Class 9, the COPS claims holders.

18         And I want to go through that with you just very briefly

19  because emergency manager order number 5 is really the -- the

20  substance of B note bonds.  And what it provides first is that

21  the -- the B note bond issuance cannot exceed $632,000,000.

22         Now of that $632,000,000 the administrative and other

23  costs relating to those B note bonds are going to be paid from

24  the bond proceeds.  So those will come off the top of that

25  $632,000,000.

1    I can't tell you right now exactly what that amount will

2 be.  But it will not be insignificant.  And I say that because

3 if you look at for example the DWSD bond transactions that is

4 closing imminently, the -- the administrative costs and the

5 cost of issuance for the 2014 B bonds for instance is nearly

6 $20,000,000.  So we're not talking about insignificant sums.

7    Furthermore, if you go through the -- the bond statute,

8 it provides that on the effective date, Class 12 will receive

9 $450,000,000 of B notes.  That's significant because as you

10 know multiple creditors in classes are going to be receiving

11 the B notes, however only Class 12 is going to get a set

12 amount of those B notes.

13    All other creditors who are entitled under the plan to

14 receive B notes will be sharing in a pro rata share of B notes

15 meaning that the actual amount of B notes that they receive

16 will be dependent on the total amount of allowed claims that

17 ultimately share in the B notes.  And as Mr. Malhotra's 40

18 year projections have stated in footnote A, the final allowed

19 claim amounts for creditors sharing in the B notes may be

20 materially different than the estimates that are set forth in

21 his projections.

22    Plus Class 12 has what -- what we would call dilution

23 protection where they are going to get $450,000,000 of B notes

24 no matter how many claims are allowed or disallowed that are

25 also receiving the B notes.

1    And I -- I wanted to point that out and -- and I think

2  you're going to hear more testimony on -- on these issues.

3  But it's -- it's not only the terms of the plan, but it's --

4  it's the extraneous documents that are implementing the terms

5  of the plan that further the discrimination against Class 9.

6  Thank you, Your Honor.

7          THE COURT:  Thank you.  Okay, who is next, please?

8          MS. QUADROZZI:  Good afternoon, Your Honor.  Jaye

9  Quadrozzi on behalf of Oakland County.

10    Your Honor, I would like to introduce -- I have in the

11  courtroom with me this afternoon on behalf of my client, Keith

12  Lerminiaux, the Oakland County corporation counsel.

13          THE COURT:  Welcome, sir.

14          MS. QUADROZZI:  Your Honor, I have a booklet with

15  some demonstratives for you if I may approach.

16          THE COURT:  Sure.  Thank you.

17          MS. QUADROZZI:  Your Honor, the city's plan of

18  adjustment features two key restructuring efforts.  What has

19  been referred to as the grand bargain and the DWSD pension

20  contribution.

21    You've heard a great deal over the past couple of days

22  about the grand bargain and you'll be pleased, I think, to

23  hear that I will have nothing to say about that.  I'm going to

24  focus on the DWSD pension contribution because the city's plan

25  proposes to take a similarly significant amount from DWSD over

1 | the next nine years.

2 |    And that's something that Mr. Bennett yesterday described

3 | as one of the highlights of the city's plan.  A highlight that

4 | allows the city to delay principal payments over the vast

5 | majority of the city's remaining debt until the tenth year

6 | following the plan confirmation.  And that makes way as Mr.

7 | Bennett described, for a massive investment program.  I want

8 | to discuss this afternoon that aspect of the city's plan.

9 |    Your Honor, DWSD is critical to the regional economy and

10 | the quality of life in this area.  It offers vital services to

11 | the City of Detroit and on a wholesale basis, most of

12 | southeast Michigan.  It's one of the largest municipal water

13 | and sewage departments in the nation.  Its service area covers

14 | 1,000 square miles, more than 1,000 square miles and it

15 | actually services 40% of the population of the entire State of

16 | Michigan.

17 |    If the DWSD infra structure were to fail, this could

18 | jeopardize essential services such as the safety of the

19 | region's drinking water, the availability of water supply and

20 | pressure for fire fighting and for commerce.  And the

21 | environmental health and safety of the region's waterways.

22 |    In addition the affordability of water and sewer rates

23 | directly impact both household and business budgets and the

24 | willingness of residents and of businesses to invest in the

25 | area.

1    So it's easy to see why Oakland County is concerned about

2  DWSD.  Oakland County is a party to contracts through which

3  DWSD provides water and sewer services that are relied on by

4  Oakland County's residents and businesses in 62 of the

5  county's townships and villages.

6    And I want to stop here a minute because to be clear we

7  understand this is not a trial about DWSD or about how to fix

8  DWSD.  But the city's plan imposes burdens that will have a

9  significant impact on DWSD.  And DWSD is already in trouble

10 and they have been for decades, Your Honor.

11    So to examine the effect that the city's plan has and

12 will have, it's important -- and to determine if that plan can

13 be confirmed.  It's important to look at the current state of

14 DWSD.

15    Now there's no dispute that DWSD has been in financial

16 distress for many years.  They've posted operating losses for

17 each of the last seven years averaging about $200,000,000 a

18 year.  That's why in part as a city department DWSD was under

19 the control of the Honorable Judge Cox and the Honorable Judge

20 Feikens before him for some 34 years.

21    Despite this, the city's plan proposes a ten year

22 financial projection for DWSD that can best be described as

23 wishful thinking.  As Oakland County will show during this

24 trial, the revenue, expense, funding, and capital improvement

25 assumptions that underlie the city's plan are severely flawed.

1     As a result the city will be unable to show that under

2 its plan the essential services that DWSD needs to provide and

3 does provide now, will continue.  Because adequate functioning

4 of DWSD is critical for the future success of the city and the

5 confirmation of the plan.  The inability to prove that DWSD

6 can provide those adequate services is fatal to confirmation

7 of the plan.

8     Now the city's flawed projections for DWSD are

9 exacerbated, Your Honor, by the plan's attempt to

10 impermissibly impose non-DWSD expenses on DWSD.  And this

11 aspect of the plan Oakland County suggests is a transparent

12 attempt by the city to foist on DWSD customers, particularly

13 those outside the city, including Oakland County, the

14 increased costs that would result from DWSD's increased

15 pension obligations.

16     In reality w will show that if the plan were to be

17 confirmed, it would force non-Detroit residents who purchase

18 water and sewer services from DWSD, to fund the city's

19 retirement obligations by way of water and sewer rate -- rates

20 and rate increases.

21     So I want to focus, Your Honor, today on those two

22 arguments.  One, is the plan that the city proposes regarding

23 DWSD legal.  And two, is it feasible.  That is, can DWSD

24 continue to provide the services.  And the answers to both of

25 those questions is no.

1        I want to start with the law first, Your Honor.  The

2   city's plan to take money out of DWSD to fund the general

3   retirement system violates both state and local law.  The

4   Detroit City charter provides that monies paid into the city

5   treasury from fees collected shall be used exclusively for the

6   payment of expenses incurred in the provision of those

7   services.

8        And Michigan Compiled Laws Section 123.1412 provides that

9   the price charged by a city that contracts to sell water

10  outside of its territorial limits shall be at a rate which is

11  based on the actual cost of service determined under the

12  utility basis of rate making.

13       So that means just what it says.  The city may not use

14  DWSD revenues for the purposes that don't directly benefit

15  DWSD.

16       Now yesterday Mr. Bennett said that he didn't think any

17  of the individuals who donated art thought that the art would

18  be sold to pay for, his suggestion was filling potholes, or

19  for any other city services.  And I would suggest to you that

20  the same thing can be said for the rate payers.

21       I don't think that someone paying their water bills in

22  Pontiac, or in Farmington Hills thought that money could or

23  would be used to pay potholes in the City of Detroit to -- to

24  -- excuse me, to fill potholes in the City of Detroit.  And in

25  fact that's why the law says it can't.

1    Now the city argues that all they're doing is having DWSD

2  pay amounts to the general retirement system that DWSD already

3  owes.  But the evidence that will be presented at trial, Your

4  Honor, from both fact witnesses, and expert witnesses, and

5  some of which Mr. Wagner presented and I'm not going to repeat

6  all that he said.

7    But the evidence that we'll overwhelmingly show that the

8  city's assertion that this is money that is already owed is

9  simply not correct.

10    Now you've heard a lot of testimony about the general

11  retirement system and that it's a pooled system.  I'm not

12  going to go into that.  But suffice it to say that like it's a

13  long term pension plan and like most pension plans it requires

14  that actuaries regularly adjust the amounts that are necessary

15  to be paid into the plan and that process requires the

16  computation as you've heard of the UAAL.

17    So I want to just look briefly at the details of the

18  city's plan just so we know the framework in which we're

19  operating.  In the city's plan they propose that DWSD will pay

20  $386,000,000 by way of a UAAL.  They include a two and a half

21  million dollar -- excuse me, a two and a half million dollar a

22  year administrative fee and a 20,000,000 one time

23  restructuring fee.

24    They contemplate that that will be paid out over a period

25  of nine years.  The first year the payment will be 65.4

1    million dollars, including that $20,000,000 fee, and in the

2    subsequent years it will be 45.4 million dollars.

3        During that period of time, Your Honor, no other GRS

4    participating city department will contribute to the GRS

5    through that 2023 time frame.  Assets contributed by DWSD

6    during that time frame will be used to satisfy obligations of

7    both DWSD and non-DWSD retirees.

8        Now the city proposes -- excuse me, the -- the proposed

9    -- the proposal that the city suggests should go out in the

10   years 2015 and 2016 through 2023, vastly exceed the amount

11   that the DWSD has paid in in recent years.  And you'll see in

12   the bottom there is simply taken from the city's disclosure

13   statement at 22.

14       In 2009 in combining water and sewer the DWSD UAAL was

15   11.5 million.  2010, it was 11.4.  2011, 19.7.  2012, 10.8.

16   And in 2013, 24.2.

17       So the question is how did the city come up with that

18   UAAL.  From day one we will see, Mr. Orr has testified that a

19   key feature of the city's debt restructuring strategy has been

20   to monetize DWSD, to attempt to extract money from DWSD for

21   use by the city in its restructuring plan.

22       In March of 2013, Mr. Orr will testify -- or has

23   testified that he directed his advisors to look at ways to

24   monetize that system.  And those early discussions centered on

25   negotiations with the counties about the creation of a

1  regional water authority.

2     Initially -- and these negotiations occurred from that

3  March period all the way through the end of 2013.  Initially

4  the city proposed a lease to DWSD -- of DWSD to the counties

5  for an astronomical amount.  When that was rejected,

6  negotiations continued and the city came back with a proposal

7  for about $47,000,000 a year.

8     Now at the same time those regional authority discussions

9  were going on.  The city was reaching settlement -- a

10 settlement with the retirees and with the unions.  And when

11 the regional authority talks fell through and those fell

12 through in the spring of 2014, the city had to find a

13 different way to fill that hole, to come up with the money

14 that it had agreed with the retirees and the unions that it

15 would need to fulfill the settlement.  And the DWSD pension

16 contribution, Your Honor, was the means by which the city

17 chose to fill that hole.

18    Now you've seen that the UAAL wasn't recommended by the

19 GRS actuary, Gabriel Roeder.  It wasn't recommended by the

20 city's actuary, Milliman.  Nor did DWSD have anything itself

21 to do with the plan to have the DWSD pay out $428,000,000.

22    And we know that because that's what the city's witnesses

23 have testified to.  Mr. Orr in his deposition when asked about

24 the means by which the 6.7 percentage rate was -- was arrived,

25 question, now you understand that under the plan though the

1  city and the retirement systems have settled on a 6.75

2  percentage interest rate, correct?  Answer, yes.

3      Question, and that's -- that number was negotiated

4  between the city and the retiree parties, correct?  Answer,

5  yes.

6      Similarly, Charles Moore, Conway, MacKenzie, the city's

7  expert when asked the 6.75% interest return that is used to

8  calculate the DWSD pension contribution, how was that

9  percentage selected?  Answer, that was the product of

10  negotiation.

11      Question, in essence a settlement between the city and

12  retirees?  Answer, yes.

13      And lastly in her expert report, Martha Kopacz, the

14  Court's expert, testified that the plan of adjustment assumed

15  investment rate of 6.75 was a heavily negotiated component of

16  the plan of adjustment amongst the city, its retirees, the

17  retirement system, the retirement committee, and the labor

18  unions.

19      Now the city responds again by saying so what, it doesn't

20  matter how we arrived at the number.  All the plan of

21  adjustment seeks from DWSD is the amount -- is that they pay

22  their allocable share and that that amount is due and owing

23  right now.

24      You'll hear expert testimony, Your Honor, that that

25  assertion is simply wrong.  That under fundamental actuarial

1    principals, a UAAL is neither due nor immediately payable.

2    The recognition of a UAAL under actuarial principles is just a

3    means of addressing the unavoidable deviations, both positive

4    and negative of actual experience from the actuarial's

5    assessments.  If a UAAL arises it no more warrants a full

6    immediate contribution than a surplus would warrant an

7    immediate refund.

8         As Gabriel Roeder noted, and this is trial Exhibit 10144,

9    in the general retirement system of Detroit's 75th annual

10   actuarial valuation dated June 30, 2013, and this is at Page

11   E-8.

12        "Unfunded actuarial accrued liabilities do not represent

13   a bill payable immediately.  But it's important that policy

14   makers prevent the amount from becoming unreasonably high and

15   it's vital that there's a sound method for making payments

16   toward them so that they are controlled".  So a UAAL is --

17             THE COURT:  Why are they not payable immediately?

18             MS. QUADROZZI:  They're not payable immediately

19   because under sound actuarial principals, the amount is just a

20   calculation going forward of the amount needed to fund.  It's

21   similar to a mortgage, Your Honor.

22        So a homeowner who has $100,000 mortgage owes $100,000.

23   He -- but he owes $100,000 over time.  He has -- he pays the

24   mortgager periodic amounts over the length of time.

25        Now --

1          THE COURT:  Which is what the city wants to do here.

2          MS. QUADROZZI:  The city wants to -- wants to change

3   what is consistent with history, actuarial practice, and

4   common sense, Your Honor.  Interestingly the city ordinances

5   relating to --

6          THE COURT:  You're talking about nine years instead

7   of 30 years.

8          MS. QUADROZZI:  Correct, Your Honor.  And I -- and

9   I'm also attempting to answer your question about immediately

10  payable.

11      Because the city ordinances, and this is the Detroit City

12  Code, Section 47-2-18.  And they -- that's -- those are the

13  ordinances that govern the GRS, specifically discuss funding

14  the UAAL and they discuss funding it over an amortization

15  period rather than requiring the payment of that recalculated

16  UAAL in full every year.

17      Now the city also sometimes has referred to the UAAL as a

18  catch up payment.  But again, Your Honor, that is simply

19  incorrect.  And you will hear expert testimony to that effect.

20      To call the UAAL catch up payments incorrectly implies

21  that they're overdue or that they should have been paid

22  earlier and that's not the case.  The fact is that the DWSD

23  has every year made its calculated UAAL on a 30 year

24  amortization schedule which is what Milliman -- or excuse me,

25  what Gabriel Roeder recommended.

1       THE COURT:  Okay.  Then how did it happen that the

2   DWSD portion of the UAAL got to be over $400,000,000 if it's

3   not because somebody miscalculated what the annual payments

4   should be?

5       MS. QUADROZZI:  Well, I think there are two

6   questions -- two answers to that question.  First of all, it's

7   not $428,000,000.  And I mean --

8       THE COURT:  Whatever it is.

9       MS. QUADROZZI:  There have got to be a UAAL and you

10  will hear testimony about this primarily because of the I'm

11  going to call it one time great recession.  Contrary to what

12  you will hear -- what you have heard from the city and read in

13  their pre-trial briefs, it is not the case that there was a

14  systematic purposeful or even negligent under funding.

15  Something that you could have had some blame for.

16      The fact is and many -- many many plans held this same

17  problem.  You had a great recession that resulted in an under

18  funding.  But to be clear, Your Honor, the amount is not four

19  hundred twenty-eight, it's not three hundred and eighty-six,

20  and in fact it is significantly less.

21      THE COURT:  Pause -- pause there.  We'll get to

22  that.  We'll get to that.

23      So the answer to the question of how did it happen that

24  the UAAL got to be whatever it is, is the recession?

25      MS. QUADROZZI:  Well, I think there are a variety of

1  answers and I think you'll hear them during the course.

2         THE COURT:  And what else?

3         MS. QUADROZZI:  You will hear the recession.  You

4  will hear allegations of mismanagement that include the 13th

5  check that I'm sure Your Honor has heard about.  You will

6  hear --

7         THE COURT:  Yes.

8         MS. QUADROZZI:  So -- so there -- there are a

9  variety of different reasons, but I think Oakland County's

10 position when you take a look at the evidence that -- that you

11 hear, the significant causal contribution was the fall in the

12 market that everyone, I don't know, I hated opening my mail, I

13 think everybody suffered from.  So something that is not going

14 to happen every other year, but a really bad amount.

15        THE COURT:  We hope.

16        MS. QUADROZZI:  We very much hope.  So, Your Honor,

17 we will adduce additional detail about the calculations.  But

18 to be clear the assumptions that the city used to generate

19 that number are -- are simply wrong.  And by the number of

20 course I'm talking about the UAAL.  And they result in the

21 fact that --

22        THE COURT:  All right.  Let's get back to -- to the

23 question that I wouldn't let you answer.

24        MS. QUADROZZI:  Okay.

25        THE COURT:  You were going to tell me what you think

1  the UAAL is.

2          MS. QUADROZZI:  It's a -- it's a complicated

3  question and I --

4          THE COURT:  It's a number.

5          MS. QUADROZZI:  You're going to say oh, my God, it's

6  a lawyer and she's hedging.

7          THE COURT:  It's a number.  What's the number?

8          MS. QUADROZZI:  It is a number but there are a lot

9  of factors.  I'm going to tell you this.  I --

10          THE COURT:  Let's start with the number and then

11  we'll talk about the factors.

12          MS. QUADROZZI:  I think that it is no greater than

13  188,000,000.

14          THE COURT:  Okay.

15          MS. QUADROZZI:  So there will be a lot of detail

16  about the factors that contribute to that.  I'm not going to

17  spend a lot of time going through all of them.  But I am going

18  to focus on two that I think are significant.

19      One that you've heard a little bit about already and

20  that's the 6.75.  And the second is the nine year amortization

21  period.

22      So first let's look at that 6.75.  And I thought when I

23  got Mr. Wagner's demonstratives that perhaps he and I were

24  working off the same script.  This is very similar to what he

25  presented, but let me go through it quickly.

1    We know that the 6.75 was not created by actuarial

2   science.  We know in fact that in essence the city reverse

3   engineered.  It had an amount and they backed into it.  It was

4   below the rate developed by Gabriel Roeder, Gabriel Roeder has

5   been the actuary for the plan for -- since inception.

6    It was below the rate developed by Milliman.  You heard

7   Mr. Wagner say that they had recommended just in the November

8   of 2013, 7.2.  It was -- it's lower than, and again you heard

9   this 122 of 126 of the public pension funds in the study.  And

10  it was below the average rate of return for both the two plans

11  over the last 25 years and below it by 75 basis points.

12    The discrepancy between the plan's 6.75 and the higher

13  rates, all of those both history and experts tell us is just

14  because it wasn't developed using any actuarial science.  It

15  was just plugged.

16    And the second assumption suffers from the same defects,

17  Your Honor.  The nine year amortization period wasn't based on

18  any accounting standard or any actuarial standard.  It wasn't

19  based on Milliman's recommendation.  It wasn't based on

20  Gabriel Roeder's recommendation.  And it was not based on

21  anything that had happened in the past.

22    The DWSD in the past had paid its amount of UAAL --

23    THE COURT:  Okay.  But here's -- here's my problem

24  which I hope you or someone in this trial will address about

25  all of this.

1      It appears that accepted actuarial science and practice,

2  if that's what Gabriel Roeder and the plans followed, created

3  a very large, somewhere between 1.5 and 3.5 billion dollar

4  UAAL.  Yes?

5          MS. QUADROZZI:  I believe so, although I will have

6  to tell you -- that Your Honor, for the math purposes I'm more

7  comfortable with just the DWSD's UAAL.

8          THE COURT:  Whatever the UAAL is, it -- it occurred

9  when this actuarial science that you are relying upon was

10  used.

11          MS. QUADROZZI:  That is -- that is correct.

12          THE COURT:  Well, I hate to invoke my mother, but

13  she used to say that just because everyone does it, doesn't

14  make it right.

15          MS. QUADROZZI:  And -- and -- and that's -- I'm all

16  for mothers.  However, the fact of the matter is, not that

17  there is a UAAL, but that the city is proposing a UAAL that is

18  overstated and nearly everyone that you will hear will testify

19  about that.  And --

20          THE COURT:  Using actuarial science, that got us

21  into the hole we're in now.

22          MS. QUADROZZI:  That's -- that's the key.  They're

23  not using actuarial science.  They just --

24          THE COURT:  They the -- you mean --

25          MS. QUADROZZI:  I mean the city.  The city --

1    THE COURT: Okay. But what I'm saying is that the

2  experts that you're relying on to say that this rate of

3  return, or this 6.75% is too low, are -- are actuaries science

4  got us into the hole we're in in the first place.

5    MS. QUADROZZI: And -- and I would agree with you.

6  But I do think that simply because a -- an event or a group of

7  events happened that caused the UAAL to exist does not mean

8  that you do not look to sound methods and practices to try and

9  get out of that difficulty. And the city did not do that,

10  Your Honor.

11    And I think that in large measure because they have

12  created a UAAL that is based on this -- the incorrect

13  assumption, they have put themselves in a system where they

14  are proposing a plan that purports to do something that is

15  prohibited under law. And for that reason Oakland County

16  objects to that portion of the city's plan.

17    THE COURT: I guess the -- the broader question I

18  have is, if you have an investment enterprise, whether it's a

19  pension plan or whatever it is that has fiduciary obligations

20  and is therefore obligated to invest as if a prudent person

21  would invest, right?

22    MS. QUADROZZI: Yes.

23    THE COURT: Would -- would that kind of an investor

24  on a long range basis which I guess is what we have to look

25  at, be able to -- reasonably expect to achieve 6.75% rate of

1  return?

2            MS. QUADROZZI:  Yes, and more than that.

3            THE COURT:  And your evidence will support it?

4            MS. QUADROZZI:  And our -- we will -- we will

5  present -- but we will present expert and fact witnesses that

6  will testify to just that, Your Honor.

7            THE COURT:  What's been the rate of return of that

8  kind of an entity for the last five years?

9            MS. QUADROZZI: The entity --

10            THE COURT:  That I described.  With fiduciary

11  obligations and investing according to the standards of a

12  reasonably prudent person.

13            MS. QUADROZZI:  I'm not sure that I have the answer

14  to that question as I'm standing up here, but I --

15            THE COURT:  I have a sense it's nowhere near 6.75%.

16            MS. QUADROZZI:  I don't think that it is under six

17  point -- I do not believe that it is under 6.75%, Your Honor.

18            THE COURT:  Okay.

19            MS. QUADROZZI:  So, Your Honor, I want to turn now

20  to the second of Oakland's objection.  And that is based on

21  feasibility.

22      The city's attempted use of the DWSD assets in this

23  pension obligations and to fill this hole that we've been

24  talking about, is illegal as I've mentioned.  But we believe

25  also indefensible in light of the dilapidated state of the

1   DWSD system.

2        The evidence that we will adduce at trial will show that

3   DWSD for years has been financially distressed and unable to

4   comply with its regulatory obligations.

5             THE COURT:  And so what would you propose the city

6   do about that?

7             MS. QUADROZZI:  I would propose that what the city

8   do is not rely on the unreasonable projections that it does in

9   the plan of adjustment because first, I think that is a effort

10  to hide the problem.  And I -- I think it's a really bad

11  effort to hide the problem because the --

12            THE COURT:  Okay.  So I need an answer to my

13  question.  But what would you -- what would Oakland County do

14  about that?

15            MS. QUADROZZI:  Oakland County would ask that the

16  $428,000,000 payment not be asked of DWSD and force upon it.

17  So reduce it down to what the actual UAAL is, as I say no more

18  than a hundred and eighty-eight, amortize it out over the

19  similar length of time that it's been amortized over before so

20  the 30 years and take whatever money is available in that

21  system and put it back into that system.  Because the

22  system --

23            THE COURT:  How much is that?

24            MS. QUADROZZI:  Off the top of my head, I don't have

25  a figure.  But let's take the city's figures.  Let's say you

1  take four hundred and twenty-eight and you take the

2  $45,000,000 a year they propose to do out, and let's just say

3  you even cut it in half.  That leaves an additional twenty,

4  $25,000,000 a year that can be put directly back into the

5  system.  And my math is -- I'm probably --

6          THE COURT:  It sounds backwards to me.

7          MS. QUADROZZI:  Well, no, it's not.  If the

8  amount --

9          THE COURT:  And if you're giving -- if you're giving

10  DWSD less income it has less resources to do the very kinds of

11  expenditures you're asking it to do.

12          MS. QUADROZZI:  Okay.  So I'm --

13          THE COURT:  What am I missing?

14          MS. QUADROZZI:  I'm not communicating with you

15  correctly then.

16          THE COURT:  Okay.

17          MS. QUADROZZI:  If DWSD were not asked to -- to give

18  $45,000,000 a year for a inappropriate, we posit, UAAL.

19          THE COURT:  Oh, to pay it to the city.

20          MS. QUADROZZI:  Correct.

21          THE COURT:  Okay, okay.

22          MS. QUADROZZI:  If that amount weren't being taken

23  away, that is a dollar amount, and I just, you know --

24          THE COURT:  That's available for --

25          MS. QUADROZZI:  That's available --

1        THE COURT:  -- for improvements, okay.

2        MS. QUADROZZI:  For improvements.

3        THE COURT:  Okay.

4        MS. QUADROZZI:  So in their pre-trial brief the city

5  cites at length the analysis of Martha Kopacz and the analysis

6  that she reached in terms of the feasibility point.

7        But -- and her -- and her look at the city plan.  But to

8  be clear, and I -- I want to talk this just so we know what

9  we're looking at, Ms. Kopacz did not analyze DWSD at all.  In

10  her deposition, and I think this is the second day, so it's

11  August 2nd on Page 521 she was asked, okay, but you made no

12  analysis as to whether or not DWSD after the confirmation will

13  be feasible or viable, isn't that right?  Answer, that's

14  correct.

15        So we don't have the benefit of any work that she did.

16  There has been, however, no shortage of -- of analysis over

17  the years of the difficulties at DWSD and the city has

18  admitted to many of those problems.

19        Okay.  Since we're having trouble with it, okay.  DWSD

20  the city admits in their pre-trial order has a long history of

21  failing to comply with EPA requirements under the Clean Water

22  Act.  That's from the pre-trial order, Paragraph 54.

23        The city likewise admits in their pleading, docket number

24  6644, that there is -- that an acute shortage of resources has

25  been a primary contributing factor to the DWSD difficulties.

1  Likewise the city admits that the failure to comply with the

2  requirement of its NPDES permit and the ACO which is the

3  administrative consent order entered in the underlying Clean

4  Water Act case, risk DWSD's ability to operate the sewage

5  system for the benefit of the city residents and the other

6  users of the system.

7      THE COURT:  Well, I don't know about two, but one

8  and three has since been resolved.  Yes?

9      MS. QUADROZZI:  One and -- one and three have not

10  been resolved, Your Honor.  And -- and --

11      THE COURT:  Have --

12      MS. QUADROZZI:  Have not been resolved.

13      THE COURT:  -- not.

14      MS. QUADROZZI:  And -- and let me talk about why

15  that is the case.

16      THE COURT:  I thought Judge Cox determined that

17  there was compliance and released the -- the department from

18  his oversight.

19      MS. QUADROZZI:  Judge Cox determined that there was

20  compliance.  He however, issued a -- a number of orders.  I'm

21  sure Your Honor is familiar with -- with some of them and

22  we've certainly -- we certainly --

23      THE COURT:  Don't assume that.

24      MS. QUADROZZI:  He issued a number of orders in the

25  context of that case in an effort to solve problems that

1  existed at DWSD and he retained jurisdiction to enforce those

2  orders.

3       And let me -- let me take a look at --

4            THE COURT:  Receivership itself was terminated.

5  Yes?

6            MS. QUADROZZI:  That is correct.

7            THE COURT:  Okay.

8            MS. QUADROZZI:  So let's -- let's take a look at

9  Judge Cox's opinion in September of 2011.  And this was an

10  opinion Your Honor, that was filed in, as I say September 2011

11  and the city came to the Judge and said, we are in compliance,

12  we would like you to dismiss that Clean Water Act case.  It

13  had been filed in 1977.

14       And the -- and the Judge back in September of '11 denied

15  their request and said this.  For the more than 34 years

16  during which this action has been pending, the city and the

17  DWSD have remained in a recurring cycle wherein the DWSD is

18  cited for serious violations of its NPDES permit, the city and

19  DWSD agree to follow a detailed remedial plan and a

20  compliance, but the DWSD is unable to follow through the plan

21  and is again cited for the same or similar violations.

22       Although this Court has taken various measures designed

23  to eliminate various impediments to compliance that have been

24  identified by experts and acknowledged by the city, those

25  measures have proven inadequate to achieve sustained

1  compliance.

2    Now Judge Cox in that order, and that order is 44 pages

3  long, did some very detailed findings that I think are very

4  instructive and -- and help focus some of the concerns that

5  Oakland County has.  In that order he held -- found, that DWSD

6  had human resources issues chronically and had been a problem

7  for 34 years and that included the lack of qualified

8  personnel.

9    He also found there were --

10    THE COURT:  I have to stop you and ask if you will

11  attempt to show the relevance of these three year old findings

12  here three years later.

13    MS. QUADROZZI:  Yes, I will, Your Honor.

14    THE COURT:  Okay.  Then go ahead.

15    MS. QUADROZZI:  He found that there were chronic and

16  serious problems in purchasing and procurement for 34 years.

17  Those included accepted delays, implementing repairs,

18  improvements.  And that that adversely impacted operations and

19  impeded preventative maintenance.

20    Judge Cox also found the failure to comply with

21  environmental obligations in that underlying case.  And he

22  found that a failure to replace aged and deteriorated

23  equipment and to maintain facilities was also a root cause of

24  the cycle of non-compliance.

25    Now, Your Honor, noted correctly that this was three

1 years ago.  However, we will show at trial and introduce

2 evidence that many of these problems still exist today.  In

3 fact the city admitted, and we looked at some of those, that

4 the city admitted DWSD still has significant problems and that

5 an acute shortage of resources is part of those problems.

6      So these facts aren't disputed.  In fact Kevyn Orr

7 acknowledged in his deposition that the DWSD's failures in

8 providing services to its citizens was one of the concerns

9 that led the city to file the bankruptcy case.

10      When asked at the same time -- at the time the city filed

11 for bankruptcy on July 18th, 2013, are you stating that the

12 DWSD was itself was service delivery insolvent?  Answer, no.

13 I think -- I think what I'm trying to relay to you, Mr. Neil,

14 is that overall one of the issues confronting the city was the

15 ability to deliver adequate services to its citizens.  And

16 DWSD's inability to perform at acceptable levels was included

17 in that concern.

18      So this is the DWSD that the city is proposing to take

19 $428,000,000 out of.  And Mr. Orr said at his deposition

20 something else that Judge Cox noted three years earlier was a

21 problem.  So it was a problem three years earlier, and Mr. Orr

22 says it's still a problem.

23      Question, and do you remember the document that shows

24 over a ten year period that DWSD is able to pay operations and

25 maintenance expenses, pay bond debt on impaired, and fund

capital improvements over a ten year period? Answer, yes, but I believe that was a discussion we were having about steady state and steady state is inadequate. We have capital needs and repair obligations that exceed the steady state. And that's why the city system continues to break down the way it is.

So here's the problem, Your Honor. When you look at the city's projections for the amount that they will spend on capital improvements over the course of the next ten years, you will see that all they're proposing is a continuation of the steady state.

So what Your Honor is looking at here is a chart that we've put together with the amount of money spent on capital improvements down the side and the years running out. You'll see the blue line -- whoops, the blue line is the amount that DWSD budgeted. And the first period I'll look at is just 2004 to 2014.

So from 2004 to 2014, blue line represents the amounts budgeted. The red line represents the amounts actually spent. And the reason I included that line, Your Honor, is because you will see testimony from Bart Foster, a DWSD expert, and consultant who's been working for the system for years that on -- typically speaking DWSD spends about 70% less than -- than what it budgets. So --

THE COURT: And why is that? Why is that?

1          MS. QUADROZZI:  There are a myriad of reasons.  I

2   believe some of them included in his testimony were changes to

3   work orders going forward based on the work that was done.

4      Some of it you will hear testimony from experts has to do

5   with constraints on budget.  And some of it just has to do

6   with projects changing, I think.  But what I --

7          THE COURT:  All right.  Let me ask you to pause for

8   a second.

9          MS. QUADROZZI:  Certainly.

10          THE COURT:  And estimate for me how much longer

11   you'll be because if it's more than five or ten minutes, I'm

12   going to ask that we pick this up again tomorrow morning.

13          MS. QUADROZZI:  I think that it is probably going to

14   be on the nature of 15 minutes.

15          THE COURT:  All right.  Let's -- let's pause now and

16   continue in the morning with the balance of this one.

17          MS. QUADROZZI:  Thank you, Your Honor.

18          THE COURT:  All right.  So we'll be in recess until

19   8:30 tomorrow morning.

20          THE CLERK:  All rise.  Court is adjourned.

21      (Court Adjourned at 5:05 p.m.)

22

23

24

25

1

2

3

4

5

6

7   We certify that the foregoing is a correct transcript from the

8   electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 9-8-14
    Kristel Trionfi
12  LaShonda Moss

13

14

15

16

17

18

19

20

21

22

23

24

25