b. A mandamus and preliminary injunction be issued against Kaye Willmoth, Head Start Regional Program Manager and any other Head Start officials, mandating that a clause be included in the contract with the replacement grantee mandating that Plaintiff and her fellow APTE members be offered continued employment to administer the Head Start grant for the period of 7/1/2012 through 10/31/2012.

c. The preliminary injunction be converted into a permanent injunction.

Respectfully submitted,

JEROME D. GOLDBERG, PLLC

_____
Jerome D. Goldberg (P61678)
Attorney for Plaintiff
2920 East Jefferson, Suite 101
Detroit, MI 48207
Phone (313) 393-6001

DATED: June 12, 2012



CITY OF DETROIT
MAYOR'S OFFICE

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVE., SUITE 1126
DETROIT, MICHIGAN 48226
PHONE: 313•224•3400
FAX: 313•224•4128
WWW.DETROITMI.GOV

July 18, 2012

**To:**       All City Employees

**From:**   Jack Martin, Chief Financial Officer  *Jack Martin*

**Subject:**   Reduction In Force Activities

---

As a result of the 2012-2013 Fiscal Year Budget and the City's fiscal crisis, the Administration will begin reduction in workforce activities the week of **July 17, 2012**. The goal is to achieve the City's Adopted Headcount Budget of **10,437** employees (**6,575** General City Agencies and **3,862** Enterprise Agencies) for the fiscal year. This represents a headcount reduction of **2,227** position (**1,284** General City Agencies and **943** Enterprise Agencies) from the 2012 fiscal year budget. Layoffs, retirements, attrition and elimination of vacancies will all contribute to achieving the City's Adopted headcount budget.

In conjunction with the above workforce reduction, the City will be implementing a more stringent approval process across the City, for filling positions that are not 100% funded Enterprise Agencies. Only **Critical Positions** will be approved for recruiting and the process going forward is summarized as follow:

- Departments will be held accountable to achieve their Adopted Headcount Budget
- All open requisitions currently in Human Resources will be voided
- Current vacancies should be reviewed in the context of department's Adopted Budget and how critical the position is to providing essential service(s)
- Department Heads should submit new Critical Position requisitions to, and have a discussion with, their Group Executive to explain the critical nature of the position
- Group Executives will be responsible for discussing and obtaining approval, from the Chief Operating Officer where appropriate
- Chief Operating Officer will be responsible for obtaining approval from the Chief Financial Officer for **all** positions deemed critical
- Chief Financial Officer will forward approved requisitions to Budget for processing
- Budget will forward approved requisition to Human Resources

In order to comply with the November 4, 2011 court order, the hiring process will not apply to the Detroit Water and Sewerage Department.

Thank you in advance for your cooperation and understanding as we collectively work to ensure the City's financial sustainability.

Dave Bing, Mayor



RICK SNYDER
GOVERNOR

DEPARTMENT OF HUMAN SERVICES
LANSING

MAURA D. CORRIGAN
DIRECTOR

February 13, 2012

Mayor Dave Bing
Coleman A. Young Municipal Center
2 Woodward Ave. Ste. 1126
Detroit, Michigan 48226-3443

Re: Detroit Department of Human Services Community Action Agency Designation

Dear Mayor Bing:

   I am writing this letter on behalf of Maura Corrigan, Director of the Michigan Department of Human Services. Thank you for meeting with us on Friday, February 3, 2012. We believe it was a productive meeting.

   The purpose of this letter is to confirm, in writing, our understanding of your position regarding the transfer of the Community Action Agency ("CAA") designation from the Detroit Department of Human Services ("DDHS") to a new, non-profit CAA. At the February 3 meeting, in response to our inquiry, you indicated that you would cooperate with our intention to effect this transfer and you agreed that a new, non-profit entity should be selected to serve as the CAA. We appreciate your willingness to help take this constructive step toward ensuring that federal grant funds intended for Detroit residents are, in fact, received by Detroit residents.

   Our next step, with respect to this issue, will be to consult with City Council. Please let me know as soon as possible if—for any reason—this letter does not accurately state your position with respect to DDHS's administration of Community Service Block Grants.

Sincerely,

Paul C. Smith

Cc:  Charles Pugh, City Council President
     Kirk Lewis, Maura Corrigan, Harvey Hollins, Stephanie Comai



CITY OF DETROIT
HUMAN RESOURCES DEPARTMENT
LABOR RELATIONS DIVISION

COLEMAN A. YOUNG
MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 332
DETROIT, MICHIGAN 48226
PHONE 313•224•3860
FAX 313•224•0738
WWW.DETROITMI.GOV

June 12, 2012

*Sent via email & first class mail*

Michi Czerniak, Labor Mediator
Michigan Employment Relations Commission
3026 West Grand Ste. 2-750
P.O. Box 02988
Detroit, MI 48202-2988

Re:     City of Detroit and Association of Professional and Technical Employees

Dear Ms. Czerniak:

I am writing in response to your e-mail requesting the City of Detroit's position on the request of the Association of Professional and Technical Employees ("APTE") for mediation on a 2008-2011 collective bargaining agreement. This mediation request has apparently been made preliminary to a Petition for Fact-Finding which will be filed by the Union for the same period.

The City's position is that any request for mediation or fact-finding for a 2008-2011 period is improper, and untimely for several reasons. First, the request is, in essence, for retroactive negotiations and fact-finding. Act 54 prohibits public employers from granting retroactive wage or benefit increases during contract hiatus periods, and accordingly the City of Detroit could not lawfully grant increases for a 2008-2011 period even if a fact-finder ruled that such was warranted in the APTE unit.

Second, any request for mediation and fact-finding for a three year period that <u>ended</u> a year ago should be barred by equitable principles of waiver and estoppel. Several City unions completed mediation and fact-finding proceedings concerning this period, yet APTE offers no reasons or justification whatsoever for its inaction during the last four years.

Third, as you note in your e-mail, the City has filed a unit clarification petition seeking to split the current APTE unit into two units of DWSD employees and non-DWSD employees. The unit clarification petition was filed based upon Judge Cox's Order of separate collective bargaining agreements, as well as the fact that the DWSD (and not the City's Labor Relations Division) is now responsible for the negotiation and administration of any DWSD collective bargaining agreements, as well as the wages, hours and terms and conditions of employment of DWSD employees. It is pointless for the Commission to engage in mediation and fact-finding for a combined bargaining unit which, the City maintains, is no longer appropriate for purposes of collective bargaining under PERA.



The Commission should also reject any prospective request by APTE for mediation or fact-finding. Because the City has filed a unit clarification petition raising legitimate issues of the appropriateness of the current combined DWSD/non-DWSD unit, the petition must be ~~adjudicated by the Commission before any mediation or fact-finding will even be~~ contemplated; how can the parties bargain until the Commission decides what the appropriate unit for bargaining should be?

Finally, and more significantly, , the City's bargaining duty under PERA has been suspended by virtue of its entry into a consent agreement governed by Section 14a(10) of Public Act 4. Accordingly, the City does not have any current legal duty to engage in mediation or fact-finding proceedings with regard to an APTE unit, and respectfully declines to do so.

In sum, the City of Detroit maintains that APTE's requests for mediation and fact-finding are unjustified and should be rejected by the Commission. Please feel free to contact me should you have any questions.

Sincerely,

Lamont D. Satchel, Esq.
Labor Relations Director


cc:     Dempsey Addison, APTE President
        Kirk Lewis
        Chris Brown
        Patrick Aquart
        Jack Martin
        Craig Schwartz
        Reginald Jenkins
        Anita Berry

CITY OF DETROIT
HUMAN RESOURCES DEPARTMENT
LABOR RELATIONS DIVISION

COLEMAN A. YOUNG
MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 322
DETROIT, MICHIGAN 48226
PHONE 313•224•3860
FAX 313•224•0738
WWW.DETROITMI.GOV

January 25, 2013

Ms. Dempsey Addison, President
Association of Professional and Technical Employees
2727 Second Avenue – Ste 152
Detroit, MI 48202

Re: Budget Required Furloughs

Dear President Addison:

Please find below response to APTE's information request submitted on January 9, 2013. I would note, as I have expressed during negotiations, that most of the questions and information sought are irrelevant for purposes of our furlough negotiations. Nevertheless, the City has, where possible, provided responses and does not waive any objection it may have with respect to the appropriateness of your requests.

1. *What bargaining units have agreed to the BRF Proposal:* The City objects to this question as presumptively irrelevant and provides a response without waiving said objection. None

2. *Is AFSCME negotiating for the Coalition?* The City objects to this question as presumptively irrelevant and provides a response without waiving said objection. This matter has to be discussed with AFSCME.

3. *CET was repealed also with repeal of Public Act4? Note: Consent Agreement under Section 14A of Public Act 4 was repealed.* The City objects to this question as presumptively irrelevant and provides a response without waiving said objection. The City disagrees with the Associations position.

4. *APTE Employees currently under a 10% pay cut must be rescinded.* The City objects to this question as presumptively irrelevant and provides a response without waiving said objection. The City has no plans to rescind the 10% wage cut.

5. *Stop 10% cut currently imposes on APTE employees.* The City objects to this question as presumptively irrelevant and provides a response without waiving said objection. The City has no plans to rescind the 10% wage cut.

6. *Allow employees to buy up to three years for retirement.* The City objects to this question as presumptively irrelevant and provides a response without waiving said objection. The City has no current plans to offer an early [...]

7. *Why are employees still working at Department of Human Services.* The City objects to this question as presumptively irrelevant and provides a response without waiving said objection. The Detroit Department of Human Services is the temporarily designated CAA for the City of Detroit until a permanent replacement is chosen.

8. *What is the future of Planning and Development Department?* The City objects to this questions as presumptively irrelevant and provides a response without waiving said objection. The department continues to function as a City run agency.

9. *Increase in health care cost eliminate it.* The City objects to this question as presumptively irrelevant and vague.

Additionally, the City has revised it BRF proposal, attached, for the Association's review and consideration. I have scheduled Monday, January 28, 2013 @ 2:00 p.m. to continue BRF negotiations with you and your bargaining team. I again reemphasize the emergency nature of our negotiations and the necessity to reach agreement in short order. If there are any additional questions or concerns, please contact Labor Relations on 313-224-3860.

Sincerely,

LaVerne Bronner-Wilson
Labor Relations Specialist

cc:    Lamont D. Satchel
       Anita Berry

Attachment

CITY BRF PROPOSAL
APTE
January 23, 2013

City Initials: _____
Union Initials: _____
Date TA'D: _____

# BUDGET REQUIRED FURLOUGH

Members of this bargaining unit will be required to take ~~up to one (1)~~ twenty-six (26) ~~mandatory budget required furlough days for a twelve month period each week. The furlough period will end December 31, 2013.~~ The City has the right to determine the date that the BRF period will commence.

If for any reason an employee is required to work on any mandatory budget furlough day, a substitute furlough day without pay must be scheduled by the Department and taken by the employee to ensure that the required mandatory budget furlough days without pay requirement will be met during this period.

The mandatory budget furlough days will impact the following economic provisions as specified below:

## OVERTIME
If an employee is scheduled to work less than 40 hours in a work week due to mandatory budget furlough time off, overtime for that work week shall not be payable until the employee works 40 hours in that work week.

## RETIREMENT
The period of reduced regular wages due to mandatory budget furlough time off shall not be recognized for pension computation purposes and appropriate calculations will be made to have any pension benefits equal the same amount the member would have earned had his or her regular pay not been reduced.

~~Employees who retire during this period shall continue to have their vacation, compensatory time bank and swing holiday, where applicable, run out in forty (40) hour per week increments.~~

## VACATIONS
Qualifications for earning time are proportionally reduced, and other appropriate modifications are agreed to as necessary to comport with the mandatory budget furlough hours reduction. *reduced To what?*

## SICK LEAVE
Qualifications for earning time are proportionally reduced, and other appropriate modifications are agreed to as necessary to comport with the mandatory budget furlough hours reduction. *Reduced To what?*



CITY OF DETROIT
HUMAN RESOURCES DEPARTMENT
LABOR RELATIONS DIVISION

COLEMAN A. YOUNG
MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 332
DETROIT, MICHIGAN 48226
PHONE 313•224•3860
FAX 313•224•0738
WWW.DETROITMI.GOV

**Sent via Email and First Class Mail**

February 06, 2013

Dempsey Addison, President
Association of Professional & Technical Employees
2727 Second Ave., Ste. 152
Detroit, MI 48202

RE:     Imposition of Budget Required Furlough (BRF) Days

Dear President Addison:

As you know, the City is in a severe fiscal emergency and faces an impending inability to meet payroll and operational costs if labor costs are not reduced immediately. Our negotiations on this issue with City unions have not uncovered any acceptable alternative to the City's proposed implementation of Budget Required (BRF) days, and therefore the City is compelled to implement BRF days for its workforce at this time to meet immediate cost containment needs. BRF days have already been approved by City Council for non-union Executive and Legislative Branch employees. Accordingly, employees will serve one BRF day on a bi-weekly basis for a one year period, with the specific schedule to be determined by the City. The furloughs will begin for union-represented employees Monday, February 25, 2013.

This is an emergency measure to address an immediate economic crisis, which will not foreclose future negotiations for a new collective bargaining agreement.

Please contact the Labor Relations Division at 224-3860 should you have any questions.

Sincerely,

Lamont D. Satchel, Esq.
Director, Labor Relations

LDS/ab

cc:     Honorable Dave Bing, Mayor
        Kirk Lewis, Deputy Mayor
        Jack Martin, Chief Financial Officer
        Kriss Andrews, Program Management Director
        Patrick Aquart, Human Resources Director
        Labor Relations Staff



CITY OF DETROIT
HUMAN RESOURCES DEPARTMENT
ADMINISTRATION

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 316
DETROIT, MICHIGAN 48226
PHONE: 313•224•3700 TTY:311
FAX: 313•224•1750
WWW.DETROITMI.GOV

## REVISED

Ms. Dempsey Addison
APTE
2727 Second Ave Suite #152
Detroit, MI 48202

Dear Ms. Addison:

In compliance with required notification and in an effort to keep you apprised of reductions to your labor union, please see the attached list of position reductions. As a result of these reductions, layoffs are anticipated. We anticipate that the last day of work will be no later than **February 24, 2012**. Layoffs notices shall be issued in accordance with your Collective Bargaining Agreement.

The list of titles and numbers is not intended to be exhaustive, as additional titles and/or numbers contained in your bargaining unit may be affected based on reduction in force rules and on-going budget adjustments.

The city reserves the right to modify this list as necessary to effectuate the citywide reduction in force.

If you have any questions please contact HR Manager – Bridget Lamar, or HR Analyst – Tamara Tarrance.

Sincerely,

Patrick A. Aguart
Human Resources Director

Attachment

cc:   Kirk Lewis, Chief of Staff ~ Mayor's Office
      Chris Brown, Chief Operating Officer ~ Mayor's Office
      Joseph Martinico, Labor Relations Director
      Loretta Davis, Department of Health & Wellness Promotion Director
      HR Manager/Lead HR Analyst

ATTACHMENT

- Supervising Public Health Nurse (1)

- Principal Medical Technologist (1)



CITY OF DETROIT
HUMAN RESOURCES DEPARTMENT
ADMINISTRATION

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 316
DETROIT, MICHIGAN 48226
PHONE: 313•224•3700 TTY:311
FAX: 313•224•1750
WWW.DETROITMI.GOV

**REVISED**

December 13, 2011

Ms. Dempsey Addison
APTE
2727 Second Ave. Suite152
Detroit, MI 48202

Dear Ms. Addison:

In compliance with required notification and in an effort to keep you apprised of reductions to your labor union, please see the attached list of position reductions. As a result of these reductions, layoffs are anticipated. We anticipate that the last day of work will be no later than **February 24, 2012.** Layoffs notices shall be issued in accordance with your Collective Bargaining Agreement.

The list of titles and numbers is not intended to be exhaustive, as additional titles and/or numbers contained in your bargaining unit may be affected based on reduction in force rules and on-going budget adjustments.

The city reserves the right to modify this list as necessary to effectuate the citywide reduction in force.

If you have any questions please contact HR Manager – Bridget Lamar, or HR Analyst – Tamara Tarrance.

Sincerely,

Patrick A. Aquart
Human Resources Director

Attachment

cc:   Kirk Lewis, Chief of Staff ~ Mayor's Office
      Cheryl Johnson, Finance Director
      Joseph Martinico, Labor Relations Director
      Charles Dodd, ITS Department, Deputy Director
      HR Manager/Lead HR Analyst

ATTACHMENT

Information Technology Services Department

- Database Administrator (1)

- System Program Coordinator (1)



COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 316
DETROIT, MICHIGAN 48226
PHONE: 313•224•3700 TTY:311
FAX: 313•224•1750
WWW.DETROITMI.GOV

CITY OF DETROIT
HUMAN RESOURCES DEPARTMENT
ADMINISTRATION

December 8, 2011

Ms. Dempsey Addison
APTE
2727 Second Ave. Suite152
Detroit, MI 48202

Dear Ms. Addison:

In compliance with required notification and in an effort to keep you apprised of reductions to your labor union, please see the attached list of position reductions. As a result of these reductions, layoffs are anticipated. We anticipate that the last day of work will be no later than **February 24, 2012**. Layoffs notices shall be issued in accordance with your Collective Bargaining Agreement.

The list of titles and numbers is not intended to be exhaustive, as additional titles and/or numbers contained in your bargaining unit may be affected based on reduction in force rules and on-going budget adjustments.

The city reserves the right to modify this list as necessary to effectuate the citywide reduction in force.

If you have any questions please contact HR Manager – Bridget Lamar, or HR Analyst – Raquiba Dismuke.

Sincerely,

Patrick A. Aquart
Human Resources Director

Attachment

cc:     Kirk Lewis, Chief of Staff ~ Mayor's Office
        Joseph Martinico, Labor Relations Director
        Pamela Moore, DWDD Department ~ Director
        HR Manager/Lead HR Analyst

ATTACHMENT

| Detroit Workforce Development Department |
|---|
| • Principal Accountant (1) |
| • Principal Government Analyst (1) |
| • Principal Social Planning Development Specialist  (2) |



CITY OF DETROIT
HUMAN RESOURCES DEPARTMENT
ADMINISTRATION

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 316
DETROIT, MICHIGAN 48226
PHONE: 313•224•3700 TTY:311
FAX: 313•224•1750
WWW.DETROITMI.GOV

December 8, 2011

Ms. Dempsey Addison

2727 Second Ave. Suite152
Detroit, MI 48202

Dear Ms. Addison:

In compliance with required notification and in an effort to keep you apprised of reductions to your labor union, please see the attached list of position reductions. As a result of these reductions, layoffs are anticipated. We anticipate that the last day of work will be no later than **February 24, 2012**. Layoffs notices shall be issued in accordance with your Collective Bargaining Agreement.

The list of titles and numbers is not intended to be exhaustive, as additional titles and/or numbers contained in your bargaining unit may be affected based on reduction in force rules and on-going budget adjustments.

The city reserves the right to modify this list as necessary to effectuate the citywide reduction in force.

If you have any questions please contact HR Manager – Bridget Lamar, or HR Analyst – Raquiba Dismuke.

Sincerely,

Patrick A. Aquart
Human Resources Director

Attachment

cc:     Kirk Lewis, Chief of Staff ~ Mayor's Office
        Cheryl Johnson, Director, Finance Department
        Joseph Martinico, Labor Relations Director
        HR Manager/Lead HR Analyst

ATTACHMENT

| Finance Department |
| --- |
| Principal Purchases Agent (2) |



December 8, 2011

Ms. Dempsey Addison
APTE
2727 Second Ave Suite #152
Detroit, MI 48202

Dear Ms. Addison:

In compliance with required notification and in an effort to keep you apprised of reductions to your labor union, please see the attached list of position reductions. As a result of these reductions, layoffs are anticipated. We anticipate that the last day of work will be no later than **February 24, 2012**. Layoffs notices shall be issued in accordance with your Collective Bargaining Agreement.

The list of titles and numbers is not intended to be exhaustive, as additional titles and/or numbers contained in your bargaining unit may be affected based on reduction in force rules and on-going budget adjustments.

The city reserves the right to modify this list as necessary to effectuate the citywide reduction in force.

If you have any questions please contact HR Manager – Bridget Lamar, or HR Analyst – Tamara Tarrance.

Sincerely,

Patrick A. Aquart
Human Resources Director

Attachment

cc:   Kirk Lewis, Chief of Staff ~ Mayor's Office
      Chris Brown, Chief Operating Officer ~ Mayor's Office
      Joseph Martinico, Labor Relations Director
      Loretta Davis, Department of Health & Wellness Promotion Director
      HR Manager/Lead HR Analyst

ATTACHMENT

| Department of Health & Wellness Promotion |
| --- |
| • Supervising Public Health Nurse (1) |



CITY OF DETROIT
HUMAN RESOURCES DEPARTMENT
ADMINISTRATION

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 316
DETROIT, MICHIGAN 48226
PHONE: 313•224•3700 TTY:311
FAX: 313•224•1750
WWW.DETROITMI.GOV

December 8, 2011

Ms. Dempsey Addison
APTE
2727 Second Ave. Suite152
Detroit, MI 48202

Dear Ms. Addison:

In compliance with required notification and in an effort to keep you apprised of reductions to your labor union, please see the attached list of position reductions. As a result of these reductions, layoffs are anticipated. We anticipate that the last day of work will be no later than **February 24, 2012**. Layoffs notices shall be issued in accordance with your Collective Bargaining Agreement.

The list of titles and numbers is not intended to be exhaustive, as additional titles and/or numbers contained in your bargaining unit may be affected based on reduction in force rules and on-going budget adjustments.

The city reserves the right to modify this list as necessary to effectuate the citywide reduction in force.

If you have any questions please contact HR Manager – Bridget Lamar, or HR Analyst – Tamara Tarrance.

Sincerely,

Patrick A. Aquart
Human Resources Director

Attachment

cc:     Kirk Lewis, Chief of Staff ~ Mayor's Office
        Cheryl Johnson, Finance Director
        Joseph Martinico, Labor Relations Director
        Charles Dodd, ITS Department, Deputy Director
        HR Manager/Lead HR Analyst

ATTACHMENT

| Information Technology Services Department |
| --- |
| Database Administrator (1) |

## Association of Professional & Technical Employees
### 2727 Second Avenue Suite 152 - Detroit Michigan 48201

| Dempsey Addison | Cecily McClellan | Jed Roberson | Mahesh Patel | Yolanda Acosta |
|---|---|---|---|---|
| President | 1st Vice President | 2nd Vice President | Treasurer | Secretary |

October 18, 2012

Ursula Holland
Director
Human Services Department
Herman Kiefer Health Complex
1151 Taylor
Detroit, Michigan 48202

Dear Ms. Holland,

The Association of Professional and Technical Employees is requesting Special Conference to discuss the following concerns of APTE.

1. Status of Human Services Department

2. Names and titles of APTE members who are currently working and those who were laid off, demoted, terminated, and retired in 2012.

3. Titles classified under APTE contract that were eliminated in 2012.

4. Successor opportunities for APTE members if Human Services Department CAA is eliminated

Please schedule meeting immediately to address APTE's issues.

Thank you.

Sincerely,

Dempsey Addison
President of APTE
Theda3t@yahoo.com

Cc: Cecily McClellan
Chris Brown
Attorney

## Association of Professional & Technical Employees
### 2727 Second Avenue Suite 152 - Detroit Michigan 48201

| Dempsey Addison | Cecily McClellan | Jed Roberson | Mahesh Patel | Yolanda Acosta |
|:---:|:---:|:---:|:---:|:---:|
| President | 1st Vice President | 2nd Vice President | Treasurer | Secretary |

October 18, 2012

Robert Anderson
Director
Planning and Development Department
65 Cadillac Square  Suite 2300
Detroit, Michigan 48226

Dear Mr. Anderson,

The Association of Professional and Technical Employees is requesting Special Conference to discuss the following concerns of APTE.

1. Status of Planning and Development Department with the Detroit Economic Growth Development.

2. Names and titles of APTE members who are currently working and those who were laid off, Promoted, terminated, and retired in 2012.

3. Titles classified under APTE contract that were eliminated in 2012 or pending elimination in 2013.

4. Successor opportunities for APTE members if Planning and Development Department is eliminated.

Please schedule meeting immediately to address APTE's issues.

Thank you.

Sincerely,

Dempsey Addison
President of APTE
Theda3t@yahoo.com

Cc:  Cecily McClellan
      Chris Brown
      Attorney

# Association of Professional & Technical Employees
## 2727 Second Avenue Suite 152 - Detroit Michigan 48201

Dempsey Addison    Cecily McClellan    Jed Roberson    Mahesh Patel    Yolanda Acosta
President    1st Vice President    2nd Vice President    Treasurer    Secretary

October 18, 2012

Loretta Davis
Director
Department of Health and Wellness Promotion
Herman Kiefer Health Complex
1151 Taylor
Detroit, Michigan 48202

Dear Ms. Davis,

The Association of Professional and Technical Employees is requesting Special Conference to discuss the following concerns of APTE.

1. Status of Department of Health and Wellness Promotion and the Public Health institute

2. Names and titles of APTE members who are currently working and those who were laid off, demoted, terminated, and retired in 2012.

3. Titles classified under APTE contract that were eliminated in 2012.

4. Successor opportunities for APTE members if DHWP is eliminated

Please schedule meeting immediately to address APTE's issues.

Thank you.

Sincerely,

Dempsey Addison
President of APTE
Theda3t@yahoo.com

Cc: Cecily McClellan
     Chris Brown
     Attorney

information as long as there exists a reasonable probability that the information will be of use to the union in carrying out its statutory duty. (internal citations omitted)

In the present case, one of the union's requests was for a breakdown by Department and funding source for all APTE represented employees. CP1. CP 3. The City never provided that information. That information is relevant in allowing the union to evaluate the City's actual cost savings from its wage and health concession proposals. Because grant-funded and enterprise funded employees are not paid out of the city's general fund, even if these employees were to take concessions there would be no cost savings to the city.

In addition, testimony in this ULP hearing makes clear that certain grant-funded employees have not been required to take the DWOPS because imposing a wage cut on them could jeopardize the grant. For example, Theresa Miller testified that despite the fact that her union, AFSCME, has accepted the DWOPS, she and her fellow local members in the Department of Human Services have not had the 10% cut imposed on them because they are grant funded. Tr, 3/26/2008, pp 26, 30.

APTE has a right to disclosure of which of its members are grant-funded so it can properly evaluate the impact the 10% wage cut on its members, by at least being able to estimate which members will be impacted by the cut and which will not.

Because these requests concern the wages and hours of bargaining unit employees, this information is presumptively relevant and the City's failure to disclose this information is an Unfair Labor Practice. In addition, gathering this information is relatively simple as it only

costs.

8

In addition, in *National Labor Relations v Truitt Manufacturing Co*, 351 US 149; 76 S Ct 753; 100 L Ed 1027 (1956), the U.S. Supreme Court held:

> Good faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy. . . .We agree with the Board that a refusal to attempt to substantiate a claim of inability to pay increased wages may support a finding of a failure to bargain in good faith.

*Id.* at 152.

Federal precedent is given great weight in interpreting PERA, at least where PERA's language is identical to that of the NLRA. *City of Battle Creek*, 12 MPER P30, 008.

In the present case, while asking for health care concessions, the City refused to provide a specific dollar amount in terms of the cost-savings to the City from implementation of its health care proposals. While the City produced some general financial documents, they refused to produce the Comprehensive Annual Financial Report (CAFR). Again, these documents would not require a $6000 outlay and are items readily accessible to the City and relevant to the union in evaluating the City's request for severe concessions.

With regard to the information regarding contractual employees by department and the salaries paid to them, this information was relevant based on the testimony of Ms. Addison that the City was replacing civil service workers with contractual workers who were being paid more than twice as much as union members with the identical titles and jobs. Obtaining these records would help the union in framing demands against subcontracting, a still unresolved bargaining

contractors twice as much as union employees for the same jobs, this calls into question the economic basis for the City's concession demands.

CHARGE 5 –
THE CITY OF DETROIT COMMITTED AN UNFAIR LABOR PRACTICE BY
UNILATERALLY ELIMINATING THE BLUE CARE NETWORK (BCN) AND TOTAL
HEALTH CARE (THC) HMO PLANS AS OPTIONS FOR BARGAINING UNIT
EMPLOYEES EFFECTIVE JULY 1, 2007.

## FACTUAL BACKGROUND

The 2001 – 2005 master agreement between the City of Detroit and the Association of

Professional and Technical Employees (APTE) stated the following with regard to health care

plans available to APTE members under the contract:

> F. **Employees and retirees shall have the option of choosing alternative
> hospitalization medical coverage from any plan or program made available
> by the City.** The City's contribution to the alternative plans or programs shall be
> limited to the premium cost for the level of benefits provided in Paragraphs B and
> D, as applicable. If at the end of the fiscal year an alternative hospitalization plan
> or program has failed to enroll 50 employees City wide, the City shall have the
> option of removing that plan from the list of eligible plans or programs. Effective
> with 1987-88 fiscal year all alternate carriers must account for their program
> charges without distinguishing between active and retired employees using the
> following format: Single person – Two persons – Family. (emphasis added)

Exhibit 11, 2001-2005 Master Agreement, Article 29, Section F (page 31). Transcript,
3/28/2008, pp 109, 110.

Ms Addison testified that she received a letter dated March 27, 2007, from Niles Sexton

of Labor Relations. The letter stated:

> Please note that since the Blue Care Network (BNC) and Total Health Care
> (THC) HMO plans have both failed to enroll 50 employees City-wide in the plan
> design applicable to your members, they will not be offered by the City after June
> 30, 2007. All bargaining unit members enrolled in those plans must select
> another health care plan during the upcoming spring open enrollment period for
> coverage effective July 1, 2007. All affected bargaining unit members will be
> notified of their coverage termination and of the requirement to enroll in another
> health care plan in writing. If the member fails to select another plan during the
> spring open enrollment that member will be enrolled in the base plan recognized
> by your labor agreement, BCBFM traditional, and will be subject to the benefits
> and features of that plan, including paying the applicable bi-weekly employee
> contribution for that plan.

CP 38. Transcript 3/26/2008, p 37.

10

Ms. Addison testified that after receiving this letter she spoke to Niles Sexton about the elimination of the two health care plans, and stated she knew there were more than 50 people City-wide that were enrolled in Total Health Care and Blue Care Network. Transcript 3/26/2008, p. 37. She testified that CP 39 is a list of union members who were enrolled in Blue Care Network and Total Health Care as of March 27, 2007. The list includes 10 members in Total Health Care and 21 members in Blue Care Network.

Ms. Addison testified that she had conversations with Niles Sexton, the City's Labor Relations representative, about members who had previously been in Total Health Care remaining in Total Health Care under the alternative plan. The City responded by saying that there had to be 50 people within her bargaining unit as opposed to City-wide in order to keep these health plans. Transcript 3/26/2008, pp. 41, 42. She specifically testified that she stated at the table to Niles Sexton that since you are going to drop these two plans, then our members have a right to enroll in any plan that was available, including the Alternative Health plan, and he stated No we could not do that. He stated the reason was that the union had not settled their contract, that therefore they could not switch plans. He further stated that the local had to have 50 people enrolled in the Blue Care Network and 50 people enrolled in Total Health Care in order for the union to continue with those plans. *Id.*, pp. 43, 44.

Barbara Wise-Johnson testified that at the time Total Health Care and Blue Care Network was being eliminated for APTE members, THC and BCN at the minimum were being offered to other city employees as part of the Alternative plan. Transcript, 3/28/08, p. 108. She acknowledged that because health care is a mandatory bargaining subject, the benefits in the old contract stay in effect while negotiations go on. She stated, "The benefits are, yes". *Id.*, p. 110. She was asked if based on the language in the 2001-2005 contract, employees should

11

have been able to avail themselves of any health plan made available by the City. She answered: "Provided the plan had fifty contracts on a City-wide basis." *Id.* p 110. Ms. Wise-Johnson testified that as of July 1, 2007, the Alternative health plan had 50 employees enrolled in Total Health Care. *Id.*, pp. 110, 111. She testified that the Alternative design plan had more than 50 enrolled in the Blue Care Network. *Id.*, p. 111.

Asked why APTE members who wanted to stay in Total Health Care or Blue Care Network could not get these in the Alternative plan, Ms. Wise Johnson stated, "The City had the option of deciding whether or not it wanted to go forth with any of the plans that had less than 50 people City-wide. The original plan for Blue Care Network and Total Health Care did not have that. We administratively decided that we had a variety of plans going on, enough is enough, and it was causing us administrative problems as you can see. . . . . We administratively could not handle all those plans and were trying to get -- we had the option of deciding whether or not to have it or not to have it and we decided not to have it." *Id.*, pp 111, 112.

Ms. Wise-Johnson testified that Ms. Addison wrote to the City asking the City to inform APTE members who have BCN or THC of the actual medical plans, including premiums and coverage based on existing plans under the Alternative plan or the plans covered under the APTE contract for 2001-2005. *Id.*, p. 115, 116. CP 45.

Gregory Murray, a steward in SAAA, Senior Accountants, Appraisers and Analysts, testified that he worked for the Department of Human Services, City of Detroit. Murray stated that the contract between SAAA and the City for 2005-2008 has not been finalized. Transcript 9.29.2008, pp. 12, 13. Mr. Murray testified that the medical plans in his medical plans in the City of Detroit has been Total Health Care since the beginning of his employment with the City in 2004. He said that SAAA has approximately 324 members. He testified that currently he still has THC

12

and it is the same THC health plan that he has had since 2004. He specifically testified that he is not in the Alternative Plan; rather, he is in the same plan that he was under in the previous contract. Tr., 3/26/2008, pp. 13, 14.

Mr. Murray testified that it was his understanding that his contract has not been TA'ed with the City of Detroit. A union meeting was held at which the information was presented to the members by the union and it was soundly rejected. This was approximately one year ago. *Id.*, p. 21.

Theresa Miller, a member of AFSCME Local 1642 and formerly the secretary-treasurer of the union, also testified. She testified that her local ratified the 2005-2008 contract with the City in 2006. Ms. Miller testified that the members of her local have a choice of HAP, Community Blue, Total Health, Blue Care Network and Blue Cross Blue Shield for health plans. *Id.*, p. 30.

David Sole, an analytical chemist for the City's Water Department and president of UAW Local 2334, who has been president of the local for 14 years. The local has 92 members and has never had more than 110 members in the years he has been president. Transcript, 3/26/08, pp. 69, 70. The local settled its contract for 2005-2008. Mr. Sole testified that he believes the health plan that was accepted is the Alternative plan and certainly not the Mercer Plan. *Id.*, p. 72. Under the current contract, there are five carriers that are available to the members, including Blue Cross Traditional, Blue Cross Community PPO, Blue Care Network, Health Alliance Plan and Total Health Care. Sole testified that he believed these were the same carriers available to the members in the previous contract, and that ...............

was required to have 50 members in each carrier for the carrier to be available to its members and that is not the language in the contract. *Id.*, p. 73.

13

<u>LAW AND ANALYSIS</u>

"Under the Public Employee Relations Act (PERA), health care benefits provided by employers are mandatory subjects of bargaining. *St. Clair Intermediate Sch. Dist. v MEA/MESSA*, 458 Mich, 540, 551 (1998); *Houghton Lake Ed. Ass'n v Houghton Lake Bd. of Ed.*, 109 Mich App, 1, 7 (1981). Once a subject has been classified as a mandatory subject of bargaining, the parties are required to bargain concerning the subject and neither party may take unilateral action on the subject absent an impasse in negotiations. *Central Michigan University Faculty Ass'n v Central Michigan Univ.* 404 Mich 268, 277 (1978)." *Detroit Transportation Corp v Teamsters Local 214*, 20 MPER 112 (2007). "An employer taking unilateral action on a 'mandatory subject' of bargaining prior to impasse in negotiations has committed an unfair labor practice. MCL 423.310(1)(e); MSA 17.4555(10(1)(e)." *Local 1467, International Association of Firefighters AFL-CIO v City of Portage,* 134 Mich App 466, 473 (1984).

In addition, "An employer who notifies the union of its decision (to make a change in a mandatory subject of bargaining) only after the decision becomes a fact accomplished (fait accompli) violates its obligation to bargain in good faith. *Detroit Transportation Corp v Teamsters Local 214*, 20 MPER 112 (2007).

In *Detroit Transportation Corp*, supra, as in the present case, the employer sent a letter announcing a change in a health benefits as an accomplished fact. MERC held the charging party had no obligation to make a demand to bargain because the letter indicated such a demand

discussions about the elimination of THC and BCN for her members, but was rebuked by labor relations on each occasion.

14

In *University of Michigan and Graduate Employees* Organization, 18 MPER 5; 2005MPER (LRP) LEXIS 4, (January 26, 2005), MERC adopted the decision of Administrative Law Judge David M. Peltz. In that case, Judge Peltz looked to the language of the contract to determine if increasing co-pays for prescription drugs and emergency room visits, without bargaining, was an Unfair Labor Practice. The relevant section of the contract stated: "During the term of this Agreement, and consistent with the terms of each program or plan, employees with a one-quarter or greater employment fraction in a term are eligible to participate in the University's Group Health Care programs and Group Dental Option 1 Plan and Basic Group Life plans. University contributions toward the Group Health and Group Dental premiums shall be in the same amount as that provided to the University instructional staff for the coverage selected."

The charging party argued that although the collective bargaining agreement does not specify the level of health care benefits available to union members, the contract's reference to the "University's Group Health Care programs" means those plans that existed at the time the contract was signed. Judge Peltz rejected that argument. He noted that the contract provision relative to health care benefits does not set forth any specific benefit levels, nor does it specifically identify the deductibles or co-pays required of GEO members. Since the union had the opportunity to bargain for more specific language but failed to do so, it was not a ULP for the employer to raise co-pays for prescription drugs and emergency room visits.

Similarly, in the present case, the 2001-2005 contract is silent on any plan design reflecting a particular set of deductibles and co-pays, but simply says:

> hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of the fiscal year an alternative hospitalization plan

15

or program has failed to enroll 50 employees City wide, the City shall have the option of removing that plan from the list of eligible plans or programs.

Exhibit 11, 2001-2005 Master Agreement, Article 29, Section F (page 31). Transcript, 3/28/2008, pp 109, 110. (Emphasis added.)

The language clearly and unambiguously states that employees have the option of choosing alternative medical and hospitalization coverage from any plan made available by the City. Significantly, the language of the agreement is silent as to any particular "plan design". The only limitation on the coverage provided is that the city may eliminate a plan or program that has failed to enroll 50 employees city-wide, as well as the limitations on the city's contribution to premium costs.

It is undisputed based on the testimony cited above that the City still offers Total Health Care and Blue Care Network to city employees at least under the Alternative Plan, and that there are more than 50 employees enrolled in THC and BCN. For the City to discontinue Total Health Care and Blue Care Network for APTE employees without impasse and without bargaining over this change, constitutes a unilateral change in a mandatory subject of bargaining and is an Unfair Labor Practice under the law.

The City's argument that it no longer has to offer Total Health Care and Blue Care Network to APTE employees because allegedly there are no longer 50 employees enrolled in THC and BCN under the plan designs that existed under the 2001-2005 contract does not pass muster. The 2001-2005 contract does not specify any particular plan designs, but rather clearly says APTE members have the option of choosing any medical plans or programs made available by the testimony of Greg Murray, Theresa Wilson and David Sole and as admitted by Barbara Wise-Johnson herself, the City's discontinuance of THC and BCN for APTE members is a

16

blatant violation of the law. Wise-Johnson's testimony that the City had the option to discontinue THC and BCN because they were "administrative problems" is no excuse for unilaterally changing this mandatory bargaining term.

In addition, it must be noted that Murray's testimony, and the contradictions in the testimony of Barbara Wise-Johnson regarding the SCATA contract, at least raise a red flag as to whether the City is continuing to offer THC and BCN under the old plan design to SCATA members, and just cut off APTE for punitive reasons. This is especially suspect, since the City is refusing to offer THC and BCN to APTE members even under the Mercer plan in the new contract. Transcript October 23, 2007, p 164.

**AMENDED CHARGE –**
**THE CITY UNILATERALLY AND WITHOUT BARGAINING ELIMINATED FLEX TIME TO DETROIT WORKFORCE DEVELOPMENT EFFECTIVE NOVEMBER/DECEMBER, 2007**

## FACTUAL BACKGROUND

The 2001-2005 contract contains the following language with regard to Flex Time:

Employees shall generally be permitted to arrive at their assigned work stations at any time between one hour before and one hour after their currently scheduled starting time. Quitting time for these employees would be that time following completion of their currently assigned work hours for that day.
a. If an employee's (or employees') presence is required on a specific day at a specific time, the supervisor may deny said employee or employees the right to fully utilize the above described flex-time system on that day. . . .
Those departments which have expressed major problems with the current flex-time system will meet with the Association representative and the Director of Labor Relations and or his/her designated representative conference to resolve the problems. These meetings shall take place upon departmental request, and any resulting modifications and or elimination of the program will be effectuated within thirty (30) days thereafter.

Ms. Addison testified that her understanding of the flex time provision and how it has been enforced over the years is that members of the association are entitled to flex one hour before and one hour after their designated start time. Transcript, July 10, 2008, p. 89. The end

17

time is adjusted accordingly. If an employee begins one hour after their start time then they have to work one hour over their end time. *Id.*, p. 89. Addison testified that she does not dispute that the City has a right to designate a regular start time and that the flex time is determined by their regular start time. *Id.*, p. 89.

Ms. Addison testified that she filed a grievance that was presented to Sharon McPhail over intimidation and denial of flex time in the Detroit Workforce Development Department. Members of the bargaining unit in Workforce Development were calling her telling her that flex time was being suspended. One member stated that she was being forced to use C time to cover leaving 45 minutes earlier that day because she was denied the opportunity to use flex time. Had she been able to continue to exercise flex time she would not have had to use C time. Tr., 7/10/2008, pp. 90, 91.

Ms. Addison testified that Sharon McPhail never requested a special conference with herself and the director of Labor Relations to take up any problems with flex time. *Id.*, p. 92. In fact, Ms. Addison requested a conference to deal with these issues in October, 2007. She testified that she did meet with Sharon McPhail but no agreements were made to change the contractual flex time. *Id.*, p. 93. The meeting did take up an effort by the union to persuade Ms. McPhail to not take away flex time entirely and to see if they could come to some type of agreement on how flex time was to continue because the members had been told that flex time was to be suspended. While recommendations were made, there was no agreement. *Id.*, p. 94.

Ms. Addison testified that to this day there are a number of members who are being response to a meeting that took place four months earlier. The letter is CP 66. Tr., 7/10/2008, p. 115. McPhail's letter in CP 66 states employees are still allowed by seniority to apply to

18

supervision for flex time as needed. Addison testified that that is not how flex time operated in Detroit Workforce Development, that based on the contract language each individual employee could flex one hour before and one hour after their designated start time. *Id.*, p. 118.

Mr. Emmanuel Mubiru testified that he has worked for the City of Detroit and the Detroit Workforce Development Department for 13 years. Prior to November 2, 2007, he was allowed to begin work from 7:00 a.m. to 9:00 a.m. and his ending hours would be adjusted according to when he came in. Transcript, 3/28/2008, p. 10, 11.

He testified that as of November 2, 2007, the City assigned specific starting times and ending times to employees at the Workforce Development and eliminated the two-hour window for the starting time. That was still the case as of his testimony on March 28, 2008. *Id.*, pp. 12, 13. He testified that the director of the Workforce Development Department is Lucius Vassar and that Sharon McPhail oversaw the department. *Id.*, p. 13. He testified that as of the posting of specific work hours for employees at his department except for Deborah Atkins and Sharita Bell, the workers were required to come in at the hours noted on CP 59. You could no longer flex. If your set time to begin was 9:00 a.m., you had to come in at 9:00 a.m. The meeting where this was first discussed actually took place before November 2, 2008. Tr. 3/28/2008, p. 19. He testified that he was never accused of abusing flex time. *Id.*, p. 22.

While Sharon McPhail's testimony on this issue was somewhat confusing, the gist of her testimony seemed to be that there was an agreement that employees could either use flex time before or after their starting time, but not both. Tr. 3/28/2008, p 77. However, she acknowledged there was no ~~~~~~~~~ to ~~~~~~~~~ ~~~~ ~~~~~~~ ~~~ ~~~~~~~~~~ ~~~~~~~~~~ provides that an employee can flex either one hour before or one hour after their starting time. Ex. 11. She testified that under the contract if your start time is 9:00 a.m. and you come in

between 8:00 a.m. and 10:00 a.m. everyday, that's not her interpretation of what the contract means, again contradicting the plain language of the contract. *Id.*, p. 79.

Significantly, the only writing memorializing the discussion between the union and Ms. McPhail was the March 29, 2008 letter, wherein Ms. McPhail indicates that flex time was only available by seniority based on applying to the supervisor. CP 66. This addition by Ms. McPhail clearly contradicts the plain language of the contract.

## LAW AND ANALYSIS

The unilateral elimination and/or change in the terms of flex time by the City of Detroit, without convening a special conference between the union, management and labor relations as required under the contract is another example of the city notifying the union of its decision (to make a change in a mandatory subject of bargaining) only after the decision becomes a fact accomplished (fait accompli). This violates the City's obligation to bargain in good faith and is an unfair labor practice under the law. *Detroit Transportation Corp v Teamsters Local 214*, 20 MPER 112 (2007).

## CHARGES 2, 4, AND 6 –
## REFUSING TO BARGAIN IN GOOD FAITH, MAKING THREATS AT THE BARGAINING TABLE, AND ENGAGING IN REGRESSIVE BARGAINING

### FACTUAL BACKGROUND

Cecily McClellan, first vice president of APTE, testified with regard to a negotiating session that occurred on April 4, 2007. The City had recently eliminated Blue Care Network and Total Health Care plans for APTE employees. At the session, Niles Sexton stated, with regard to

was going to get worse and progressively worse if the union did not accept the City's two proposals and the City was going to use APTE as an example for the other bargaining units that

hadn't settled. Transcript, October 23, 2007, pp. 104-107. McClellan stated that Sexton specifically used the words "use as an example." See p. 106.

Ms. Addison testified that APTE represents City civil servants at the principal level which is the highest level that is represented by unions before management. It represents principal accountants, principal government analysts, principal social planning and development specialists, principal purchasing clerks, nutritionists, nurse administrators, medical technologists, education coordinators, health coordinators, social service coordinators, database administrators, principal program or analysts. She further testified that the bargaining unit is dispersed throughout every department in the City except perhaps the Law Department. Transcript, 10/23/07, pp. 120, 121.

Ms. Addison testified that a number of the employees represented in the unit are grant funded employees, which means that these employees' wages, salaries and fringe benefits are funded by either the state or federal government. They are not paid out of the City's general fund. She testified that the grant funded employees are concentrated primarily in the Department of Human Services, Department of Workforce Development, Department of Health, and the Planning and Development Department. Id., pp. 121, 122.

She also testified that some employees in her unit are enterprise funded. This means that they work in departments that generate their own revenue, such as the Water & Sewerage Department. These employees are not paid out of the general fund. Id., pp. 122, 123. Ms. Addison further testified that of the approximately 250 employees in her unit, there are 90 that

Ms. Addison testified that she works in the Department of Human Services and that in that department, there are 39 employees funded through Head Start, 10 of which are in her local.

21

The grant provides the funding level for wages and benefits. *Id.*, p. 125. She testified Head Start mandates an annual improvement raise which is supposed to be paid through a cost of living adjustment, and that is a statutory provision of the Head Start program. To her knowledge there are other grants that have similar provisions attached to them. The other grants provide for wage levels and/or a wage level and fringe benefits. *Id.*, pp. 126-127.

Ms. Addison testified that none of the employees in her unit of the Department of Human Services have been under the DOWOP. There are four other unions besides APTE in her department, including SAAA, the Principal Clerks Union under the IUOE and AFSCME. AFSCME and the Principal Clerks definitely had settled their contract by October 2007, and the City contended that SAAA had settled their contract as well. The members of these units which had settled their contracts were not subject to the DOWOP because the Department of Human Services is a 100 percent grant funded department. *Id.*, 127-128. Based on this experience, Ms. Addison believed that even if her unit would accept the DOWOP, she would be exempted personally from the DOWOP.

Ms. Addison testified that APTE first began bargaining on the contract for 2005-2008 on May 4, 2006. There had been an introductory meeting with the City in May 2005 where the City stated that its main goal or objective in the bargaining process would be health care concessions called the Mercer Plan, and attempts to set wage reductions called DOWOP   days off without pay. After that initial introductory meeting with the unions and the City, there was no bargaining with APTE until May 4, 2006. She believed the City was bargaining with the larger unions such as AFSCME.

Ms. Addison testified that on May 4, 2006, the City of Detroit provided the local with two proposed health plans, the Mercer Plan and the Alternative Health Plan. The local's

22

assessment was that the Mercer Plan was totally cost prohibitive and the Alternative Plan was not as bad. *Id.*, pp. 131, 132. She testified that during discussions she was told not to worry about the Mercer Plan and just concentrate on the Alternative Plan by Al Lewis, Niles Sexton's supervisor in Labor Relations; that the Alternative Plan was the plan that the City had proposed in place of the Mercer Plan because they felt it was more palatable to the unions. *Id.*, pp. 131, 132.

As of May 15, 2006, the Mercer Plan was the plan that was on the table between the City and APTE. *Id.*, p. 133. Ms. Addison testified that there were approximately three meetings that the union had with the City in May 2006. *Id.*, p. 133. Ms. Addison further testified that she received a letter dated May 15, 2006, from Barbara Wise Johnson, interim Labor Relations director. The letter states that if the 10 percent reduction in work hours and City Alternative Health care proposals were not accepted by July 1, 2006, that the Mercer Plan would replace the Alternative Health Plan that was on the table. In addition, there may be further reductions in the work force. CP 18. Ms. Addison testified that she first received the City's wage proposal for the 10 percent wage cut on May 15, 2006. At that time there had been approximately two or three bargaining sessions. Transcript March 26, 2007, p. 143, 144.

Ms. Dempsey further testified that at the time she received this letter the union was discussing the status of the City's financial health. That they had asked for a list of contract employees because the City had a deficit in the millions and were laying her people off at the same time they were in fact displacing union workers with contractual workers and attempting to contract out more City employees — they specifically contracted out approximately nine people from her bargaining unit in the Information Technology Services Department, but was paying contract workers two and a half times the amount that her members were being paid for the same

23

title and the same work. Her members were even being asked to train their replacements. Tr, October 23, 2007, pp. 135, 136.

On May 26, 2006, Ms. Addison issued a reply to Barbara Wise Johnson's letter of May 15, 2006. The reply is embodied in CP 21. Ms. Addison testified that the threat to impose the Mercer Plan if there was no agreement by July 1, 2006, was unwarranted and premature given the fact that negotiations didn't even begin until May 4, 2006. She noted that the union was prepared to negotiate with the City to try to find a solution prior to July 1, 2006, and acknowledged there were rough financial times for the City as well as for her own members. She testified that she noted in this letter that in addition to the information concerning contractual workers for the City, she was requesting information regarding general fund civil service employees, state and federal granted civil service employees and civil service employees who work for the Detroit Water & Sewerage Department. She again repeated a request for the total number of grant funded employees whose wages and fringe benefits would be covered under the grant as well as the total number of employees in DWSD whose wages and fringe benefits would be covered by enterprise funds. *Id.,* pp. 135-137. CP 21.

Ms. Addison testified that these were the same things that the union had been requesting for the past year. Transcript 10/23/2007, p. 137. She testified that these issues were especially important because she represented both grant funded and non-grant funded employees. Given the fact that she was in a peculiar situation, and 99 percent sure that she herself would not be required to take a 10 percent grant cut, she could not give the appearance of coming to an agreement ... impact it would have on all the members. She kept emphasizing that she needed to know who would be exempt from the 10 percent cut and who would be included in a wage cut, but never

24

could get that information. Her concern was that a blanket wage cut could have a disparate impact among the membership. *Id.*, p. 148.

Ms. Addison further testified that she submitted a wage concession proposal and asked for the City to consider voluntary DOWOPs that could be extended for the life of the contract rather than one year, and could be implemented for a week to even a month based on the discretion and needs of the department. Her proposal is embodied in CP 27.

Ms. Addison testified that this proposal for voluntary DOWOPs had been raised even before it was officially submitted on June 20, 2006, and in fact was talked about almost immediately when the union received the wage concession proposal that was submitted by the City from across the table during negotiations in May and June 2006. Transcirpt 10/23/2007, p. 140. She testified that she knew there were employees who would be willing to take voluntary DOWOPs, who needed it for health reasons or wanted to take time off to receive a corporate certification in their field or college credits, or needed time off to do an internship, or just wanted time off in the summer to spend with their children. *Id.*, p. 145. The proposal was seen as a serious proposal from the bargaining unit and was adopted by the whole bargaining team. *Id.*, p. 146. She testified that the City did not entertain any discussion on this proposal and that their position was no, no, no. *Id.*, p. 146.

Ms. Addison stated that she always emphasized that because she was in a grant funded program and she audits other programs to make sure they are in compliance with federal guidelines, that if an individual in a grant program takes the 10 percent cut, they were actually

said their only proposal was an across the board 10 percent cut. She asked them who was

25

exempt, and she was told by Niles Sexton that no one was exempt from the 10 percent wage cut. *Id.*, p. 147.

Ms. Addison further testified that the May 15 City proposal on wage concessions not only impacted the reduction in wages but also impacted overtime, vacation time, sick time, longevity and wage as compensation. *Id.*, p. 148, CP 19.

She testified that in the June 14, 2006 City proposal to APTE with regard to wage concessions, the City itself noted that where it would not be possible to implement a 10 percent reduction without severely impacting services and jeopardizing the safety of the public, the City would make every effort to achieve similar savings in other areas of overall compensation. *Id.*, p. 150, CP 26. However, Ms. Addison testified that despite the problems that the across the board 10 percent DOWOP would create for her local, they refused to address alternatives to the 10 percent DOWOP, such as the voluntary DOWOP proposed by the union. *Id.*, pp. 149, 151.

Ms. Addison testified on June 1, 2006, the City placed a wage proposal on the table that is embodied in CP Exhibit 21. This proposal included a zero percent wage hike for July 2005 to 2006, a 10 percent wage reduction for July 2006 to July 2007, a zero percent increase again for July 2007 and then on June 30, 2008, a four percent wage increase that would not be retroactive. Transcript 10/23/2007, p. 151. Ms. Addison testified that APTE did present its own health care proposal to the City on June 26, 2008 that was encompassed in CP Exhibit 28. Transcript 10/23/2007, p. 152. The proposal by APTE included accepting concessions under the Alternative Plan when it came to co-pays and deductibles, but sharing the costs and premium savings. The City's response to this proposal

In fact, Ms. Addison testified that the City would not sign off on anything with regard to the new contract. Their position was that the union first had to accept their health care plan and

26

wage concessions before they would entertain any proposals or even sign off on proposals that they had advanced. They would not even sign off on uncontested issues. Again, their position was they were not going to TA off on any issues until they get the wage and health concessions. *Id.*, p. 155.

The union submitted more proposals on June 28 regarding laid off employees. The June 28, 2006 proposal also reiterated the voluntary DOWOP. The City's response was they would not entertain the proposals that were submitted by the union on June 28, 2006. *Id.*, p. 156.

On June 28, 2006, Ms. Addison testified that she received a letter from Niles Sexton, manager of Labor Relations Division who represented that division in bargaining with APTE. In that letter, Sexton stated that because no agreement had been reached on the health care proposals and wage concessions, the City was returning the Mercer Plan to the table and that the four percent wage incentive would also be withdrawn. CP 30. In fact, Ms. Addison testified that as of the hearing on October 23, 2007, the Mercer Plan was the only City health plan on the table and that the four percent wage incentive at the end of the contract also was no longer on the table. Mr. Sexton stated the City would consider impasse if there was no agreement by July 1, 2006. In fact there is no impasse and negotiations are continuing.

Ms. Addison testified that during the course of negotiations APTE did advance proposals of their own, for example on streamlining the grievance procedure. The City said no to all these proposals. However, in the interest of moving negotiations forward, the union essentially took any new proposals off the table. Transcript 10/23/2007, p. 163.

included the 10 percent reduction in work force but specifically omitted the four percent wage incentive at the end of the contract. See PR, p. 160, CP 30.

27

On July 3, 2006, Ms. Addison wrote Mr. Sexton in response to his threatening letter of June 28, 2006. In this letter she notes that while they had been a number of bargaining sessions since negotiations commenced on May 4, 2006, very little bargaining had actually taken place. APTE repeatedly requested information necessary to evaluate the City's concessionary bargaining proposals but received further little response. The letter stated: "The City's take it or leave it approach to bargaining has flavored all our negotiations. Not one of APTE's proposals has been given serious consideration nor were there any tentative agreements on proposals submitted by either side." In this letter Ms. Addison reiterated "Should the City wish to engage in real give and take bargaining we remain ready, willing and able to return to the bargaining table at any time." CP 32.

Ms. Addison testified that the City simply refused to consider any alternatives to the plans that it had placed on the table, the DOWOPS and health care concessions. Their position was either take the City's proposals or there is nothing else to talk about. Transcript 10/23/2007, p. 162. The City refused to sign off on any contractual items or agree to anything while Mr. Sexton was the negotiator. His statement was, "First we had to sign off on health care concessions and the 10 percent wage cut." *Id.*, p. 163.

On July 18, 2006, Mr. Sexton again wrote Ms. Addison indicating that the Mercer proposal was now the health care proposal on the table and the four percent wage incentive was off the table. In fact the Mercer plan that was on the table at the time was not even the same Mercer plan as previously offered, as it eliminated Blue Care Network and Total Health Care. *Id.*, p. 164.

Ms. Addison testified that between July 2006 and January 2007, despite the fact that the parties entered mediation, there were no new proposals made. However, on January 19, 2007,

28

the union put forth a new bloc of proposals to the City. The proposals are embodied in CP 36. Ms. Addison testified that one of the proposals, COLA for grant funded employees, was based on the fact that the City actually was mandated to pay cost of living under grants such as Head Start and has been disqualified from funds and penalized for refusing to do so. If the City took a 10 percent wage cut for grant funded employees for Head Start they would be in violation of federal law and would actually lose money allocated to provide services to the population. Transcript 10/23/2007, pp. 166, 167.

Ms. Addison testified, however, that the entire bloc of proposals submitted on January 19 was rejected by the City. One of the proposals was to introduce the privatization ordinance language into the contract. Another proposal was for the voluntary DOWOP where it could be extended beyond the 2006-2007 fiscal year based on mutual agreement between APTE and the City. *Id.*, p. 171. The only proposal that was adopted by the City at all was a proposal for a modification of reduction of force language that was actually a proposal that the City adopted for all the unions. *Id.*, p. 172.

Ms. Addison testified that the City's response to the APTE proposal submitted on January 19, 2007, was that the City rejected all of the union's proposals. The City's position was that they weren't going to entertain any of APTE's proposals until they signed off on the health care plan and the DOWOP. Transcript, March 26, 2008, p. 32.

Ms. Addison testified that at several points, she asked the City for a list of APTE members that would be exempted from the DOWOP. She testified that she had made that request on several occasions as early as November 27, 2007. She asked Labor Relations to put in writing which employees would be exempted from the DOWOP. She said the City never responds to the requests and the one time

they did respond was to say that no one was exempt. *Id.*, p. 35. This contradicts the fact that grant funded employees such as in her unit have clearly been exempted.

Ms. Addison testified that she received a letter dated April 3, 2007, from Niles Sexton, stating that effective 11:59 p.m., April 9, 2007, the union's contract would be terminated and it was in fact terminated at that point. *Id.*, pp. 46, 47. She testified that on April 25, 2007, the union received a comprehensive list of proposals from the City. However, the City did not sign off on any of them. Sexton stated that he would not sign off on anything until the union first came to an agreement on accepting the Mercer Plan and the DOWOP which was proposed by the City. *Id.*, p. 47.

Ms. Addison testified that the Alternative Health plan was pulled off the table effective July 1, 2006, and never restored to the table after that point. *Id.*, p. 47. In addition, the City was not going to offer the four percent wage increase effective at the end of the contract. *Id.*, p. 48. On May 7, 2007, the union received a letter notifying it that the union would stop deducting union membership dues or service fees and in fact the City stopped deducting these fees at that point. *Id.*, p. 49.

CP 34 is a letter dated May 29, 2007, from Ms. Addison to Christine Beatty, chief of staff of the Mayor's office. Ms. Addison testified that at the time she wrote the letter it had been quite a while since the City and the union had contract negotiations and she was wondering what had happened. She had just learned that Niles Sexton had retired several weeks before, and the union was surprised the City had not contacted them to inform them he had retired and a new person

the negotiations to help get the contract resolved. CP 44. Transcript 3/26/2008, pp. 50, 51.

30

Following that letter, the union was contacted by Barbara Wise Johnson, director of Labor Relations, and negotiations resumed. For the first time the City began to TA on articles that were non-contested. Ms. Addison testified that the union essentially dropped most of its proposals in order to get the contract resolved and get a settlement. Essentially the union dropped modifications in language from the previous contract other than wages and health benefits and subcontracting in order to move the contract forward. These included a proposal for a full time union president, parking downtown, changes in the grievance procedure, etc. *Id.*, pp. 52, 53. Despite dropping its proposed modifications to these items and accepting the City's proposals that essentially incorporated the language from the old contract, the City still refused to put the Alternative Plan back on the table. *Id.*, pp. 53, 54.

Ms. Addison testified that in an effort to resolve the health care issue, APTE proposed to the City that it would accept the Alternative Plan and recognizing that there were some revenues lost because the union had not accepted the plan on July 1, 2006, the union would make up the difference in lost revenues. The City said they would look into this proposal and get back with the union at the next meeting. The City came back and stated that they estimated that they lost $223,000 in revenues by APTE members refusing to accept the alternative plan as of July 1, 2006, and that based on that figure of $223,000, each APTE member would be assessed $1,233.41. CP 47.

The union responded by reminding the City that many of APTE members were grant funded or worked in enterprise funded departments which generate their own revenue, and that revenue lost by the City. Excluding the 90 APTE members who were grant funded and 28 members who were enterprise funded, the union estimated that the actual cost to the City

31

incurred by APTE not accepting the Alternative Plan on July 1, 2006, was $77,000 and that each APTE member would be assessed $343 to make up that loss. This was made as a proposal to the City on August 15, 2007. CP 48. It was a good-faith offer by the union to try to resolve the health care question. Ms. Johnson read the proposal and said that the Alternative Plan was off the table again and there were no more negotiations about this offer. Transcript 3/26/2008, pp. 56-58.

Barbara Wise-Johnson testified that the City's estimates on revenue lost due to APTE not accepting the Alternative Plan on July 1, 2006, embodied in Exhibit 60, did not account for grant funded and enterprise funded jobs, where the payments were not made out of the City's general fund. Transcript, March 28, 2008, pp 130, 132. She acknowledged that the whole basis for the City advocating the alternative plan was to achieve cost savings relative to the previous plan. *Id.*, p. 133. She stated in response to questioning on why the City did not accept APTE's proposal for its members to pay back the cost of the actual loss to the City by the union not accepting the Alternative Plan in 2006, that she was instructed by Christine Beatty to reject the proposal because "it was just not consistent with what we were trying to achieve and the way in which we were dealing with all our employees." *Id.* p 132.

Ms. Addison testified that the last bargaining session as of the date of the March 26, 2008 hearing, took place on November 29, 2007. At that point there were three issues still on the table that had not been agreed upon – wages which included the DOWOP, the hospitalization and health care plan, and subcontracting. All of rest of the proposals that were signed off on were

modifications to these areas that the union had previously raised. *Id.*, p. 59.

At the November 29, 2007 session, the union again offered to volunteer DOWOPs and the City was not amenable to that. Ms. Addison testified that at the November 29 bargaining session, the City made wage proposals of a 10 percent reduction without the four percent wage increase at the end of the contract. The Mercer Plan with only three hospital plans was still on the table, excluding Total Health Care and Blue Care Network. Labor Relations told the union that this is the way it is and this is a hard lesson for you to learn. Transcript, March 26, 2008, p. 61.

Ms. Addison testified that she took that statement to mean the same thing that Niles Sexton had stated earlier, that the City is going to make an example of APTE. *Id.*, p. 62. She testified that a clause prohibiting subcontracting of APTE members' work had been eliminated from the contract. The whole article on this from the previous contract in 2001 had been eliminated. *Id.*, p. 62. She testified that at the last meeting on November 29, 2007, the union asked the City for a list of APTE employees that would be exempted from the DOWOP. The City refused to produce that list to the union. She testified again that the union was just trying to get an idea of who would be exempt in her bargaining unit.

Ms. Addison testified that the union had tried to come up with ways to spread the pain and suffering among all the local members, when they agreed to assess each member the same amount of money for the health care plan, and the same with the voluntary DOWOP. But all these had met with resistance from the City. Transcript, pp. 64, 65.

Ms. Addison testified that the privatization language that is in the City Charter provides

unions impacted by those contracts. They have to state the reasons why they want a contract and in addition give the unions the opportunity to bid on those contracts. The effect of the unions

bidding on the contracts would be to save jobs. Addison testified that she wanted the privatization language put into the union contract because she wanted to make sure that her people were aware of what their rights were. In addition, she testified that the union is not generally contacted by the City Council and the Mayor before a contract is voted on with respect to the members. They were never contacted by the City about the letting of contracts, even though she knows that they subcontracted her members' work in ICF and the Detroit Workforce Development. So again, one of the reasons for putting the privatization ordinance language into the contract would be to give the union a little more control over the subcontracting process and to allow the union to file a grievance at special conference for those departments that are violating the subcontracting language in the City Charter. *Id.*, pp. 139-141.

Barbara Wise-Johnson, Director of Labor Relations, testified that how the DOWOPs were implemented was a management decision, it was left up to the directors of the departments. Transcript, March 28, 2008, p. 61. Whatever worked best in that department, was the plan they were to work with. She acknowledged that there were some people working in grant funded departments that might not have taken the DOWOP because this would jeopardize the grant funding. This was true for other departments as well. *Id.*, pp. 59, 60. She reiterated that the decision on which employees would be excluded from DWOP was a decision that the department director would make. *Id.* p 128.

Ms. Johnson acknowledged that as of May 29, 2007, when Ms. Addison wrote a letter to Beatty upon learning Niles Sexton had left the employ of the City, no agreements between the City and the union had been reached.

Ms. Johnson testified she had no first-hand knowledge that Niles Sexton did not make the remarks that they "would have a hard lesson to learn," and that he was going to "make an

34

example out of APTE." *Id.*, p. 134. She testified that she may have stated to APTE on November 27 that it was a hard lesson to learn. *Id.*, p. 135. With regard to the health care plan, she stated, "I can say this to you. We are not trying to punish anyone. We made a proposal to APTE. We asked them to accept the proposal by a certain date. If they could not accept it by that date – we asked all our unions. This is not just APTE but all our unions. We said we needed to have a health care plan in place by July of 2006, and if they did not agree to that, the proposal was off the table and we had another plan for them that we were proposing. That was the City's position. That is still the City's position. Some unions came into us and accepted that because that was our word that we gave to them. This was our deadline date that the alternative health care plan would be offered to you." Transcript 03/28/08, pp. 136, 137. In June (2006) the City took the position if you accept it this is the plan we are offering now. If you don't accept by that date, that proposal would not be on the table. *Id.*, p. 144. She testified that the only union that now has the Mercer Plan is the POLC Health Department with 20 members. *Id.*, pp. 146, 147.

## LAW AND ANALYSIS

In *City of Springfield and American Federation of State, County and Municipal Employees, Council 25, Local 331*, 13 MPER (LRP) P31,002; 1999 MPER (LRP) LEXIS 67 (October 27, 1999), the Michigan Employment Relations Commission discussed the standard applied in refusal to bargain cases. The Commission held:

> In refusal to bargain cases, the important issue is whether the employer approached the bargaining process with "an open mind and sincere desire to reach an agreement. ~~Borden Casting Co.~~ LRRM 2536, 2538 (1974). Such a claim must be considered in the context of the Employer's total conduct. E.g. *Alba Public Schools*, 1989 MERC Lab Op 823, 827; *Kalamazoo Public Schools*, 1977 MERC Lab Op 771, 766. See also *Virginia Elec & Power Co.*, 313 US 469; 9 LRRM 405 (1941). Even if specific actions, standing alone, might be insufficient to support a finding of a refusal to

35

bargain, a party's overall course of conduct in negotiations may justify a determination that a party engaged in bad faith-faith bargaining.

In numerous cases, the National Labor Relations Board, as well as appellate courts that have reviewed NLRB decisions up to the U.S. Supreme Court, have held that a "take it or leave it" bargaining position is a strong factor in determining that an employer or union has engaged in bad faith bargaining.

For example, in *National Labor Relations Board v Insurance Agents' International Union, AFL-CIO*, 361 US 477, 484; 80 S Ct 419; 4 L Ed 2nd 454 (1960), the U.S. Supreme Court held:

> "Collective bargaining is something more than the mere meeting of an employer with the representatives of his employees; the essential thing in bargaining is something more than the mere meeting of an employer with the representatives of the employees; the essential thing is rather the serious intent to adjust differences and to reach an acceptable common ground . . . The Board has repeatedly asserted that good faith on the part of the employer is an essential ingredient of collective bargaining." This standard had early judicial approval, e.g. *Labor Board v Griswold Mfg Co.*, 106 F2d 713. Collective bargaining, then, is not simply an occasion for purely formal meetings between management and labor, while each maintains an attitude of "take it or leave it"; it presupposes a desire a desire to reach ultimate agreement, to enter into a collective bargaining contract.

In *American Meat Packing Corp. and Beef Boners and Sausage Makers Union, Local 100A*, 301 NLRB 835, 836; 137 LRRM 1012 (1991), the NLRB upheld a charge of refusing to bargain in good faith, when the company, arguing dire financial circumstances, refused to consider anything but its own proposals for cost reductions. The NLRB held:

> We are guided by certain principles stated by the Board in *General Electric Co..* 150 NLRB 192 (1964), enfd. 418 F2d 736 (2d Cir 1969), a case that is similar in important respects to this case. In *General Electric*, the Board emphasized the observing as follows: "An employer . . . violates Section 8(a)(5) where it enters into bargaining negotiations with a desire not to reach an agreement with the union, or has taken unilateral action with respect to a term or condition of employment. . . .But having refrained from any of the foregoing conduct, an employer may still have failed to discharge its statutory obligation to bargain in

36

good faith. As the Supreme Court has said: . . .the Board is authorized to order the cessation of behavior which is in effect a refusal to negotiate, or which directly obstructs or inhibits the actual process of discussion, or which reflects a cast of mind against reaching agreement. **Thus a party who enters into bargaining with a "take it or leave it" attitude violates its duty to bargain, although it goes through the forms of bargaining, does not insist on any illegal or nonmandatory bargaining proposals, and wants to sign an agreement. For good-faith bargaining means more than "going through the motions of negotiating." ". . . the essential thing is rather the serious intent to adjust differences and to reach an acceptable common ground.** (Emphasis added.)

In the present case, the testimony as outlined above, makes clear that the City of Detroit entered into negotiations with APTE with a take it or leave it position relative to the fundamental issues of wages and health care. While negotiations with the City only began on May 4, 2006, as early as May 15, 2006, the City's position was that the union must accept the 10 wage reduction in the form of DOWOPS, and the health cuts embodied in the Alternative Plan, by June 30, 2006. When APTE failed to do so, the City replaced the Alternative Plan with the Mercer Plan, a more regressive health plan, eliminated two carriers, Total Health Plan and Blue Care Network from its health care proposal, and eliminated the 4% end of the contract payment from its wage offer. In other words, when APTE did not immediately respond to the City's take it or leave it offer, the City put forth even more onerous proposals from which they have not been willing to deviate one iota.

In contrast, from the beginning APTE expressed a willingness to discuss cost-savings to the City, but tried to raise proposals that reflected the particular character of its membership. The union also bent quite far in trying to resolve the health care issue, but was stone-walled by the City.

For example, in 2007, APTE approached the City with a willingness to discuss its members making up the revenue lost to the City by the union not accepting the Alternative health

37

plan by July 1, 2006, if the City would agree to the Alternative Plan and not Mercer plan being restored to the table. On August 15, 2007, APTE proposed that each of its members would pay the City $343.74, based on the actual lost revenue to the city taking in account that 118 members were grant or enterprise funded, if the City would reinstate the Alternative Plan. Incredibly, the City rejected this generous offer by APTE out of hand, showing their intention on enforcing their take it or leave it approach to bargaining in violation of the law. In other words, because APTE did not accept the Alternative Plan by the deadline the City imposed, it was forever off the table.

With regard to the 10% wage reduction through DOWOPS, APTE was in an unusual situation. 90 of its approximately 250 members are grant-funded. The testimony of Dempsey Addison, Theresa Miller, Gregory Murray, and even Barbara Wise-Johnson established that at least a significant number of these grant-funded positions would be precluded from taking the 10% reduction under the terms of these grants. In fact, Ms. Addison herself was in a position that likely would be excluded from the wage cut. Thus if the union was to accept the 10% reduction, it would be accepting a wage cut for some of its members while others lose nothing, thus undermining the solidarity which is essential to any union.

It was in attempting to address this issue, that the union proposed as an alternative method of implementing cost savings, a voluntary DOWOP plan to be extended throughout the course of the entire contract. Ms. Addison testified that based on her discussions with her members, she felt this kind of plan could achieve the cost savings desired by the City. However, the City rejected this proposal out of hand.

APTE members would be excluded from the DOWPs based on their grant-funded status.

Barbara Wise-Johnson testified that how the DOWOPs were implemented was a management decision, left up to the director of each department.

In *Oakland Community College and Teamsters State, County and Municipal Workers Local 234*, 15 MPER (LRP) P33,006; 2001 MPER (LRP) LEXIS 69, (October 24, 2001), the Commission held that there was an unfair labor practice and surface bargaining where the employer proposals reflected an insistence on unilateral control over significant terms and conditions employment, stripping the union of an ability to effectively represent its members and denying the union any effective voice in representing employees.

Similarly, in *Public Service Co. and International Brotherhood of Electrical Workers, Local Union* 1002, 334 NLRB 487, (2001), the NLRB held it was bad faith bargaining where the company sought to eliminate the union's role as representative. In that case, the company's final proposal denied the union any role in establishing or maintaining employee benefit levels during the life of the contract, permitting the employer to change employee benefits based on "business reasons".

In the present case, the City's insistence on a DOWOP proposal which would have a disparate impact on APTE members based on whether they were grant-funded or not, where the City failed to disclose how various members would be affected during negotiations and instead insisted this was a management prerogative, had the effect of stripping the union of an effective voice in representing its employees on the key issue of wages. The City's failure to bargain on alternative ways to implement this proposal to achieve cost savings, or even to be up front with

example of the kind of take-it-or leave bargaining that has been held to be an unfair labor practice under the law.

In *Regency Service Carts, Inc. and Shopmen's Local Union No. 455*, 345 NLRB 671, 672 (2005), the NLRB held that in determining whether a party has violated its statutory to bargain in good faith, the Board examines the totality of the party's conduct. The NLRB enunciated several factors to evaluate a party's conduct for evidence of surface bargaining. These included: delaying tactics, the nature of the bargaining demands, unilateral changes in mandatory subjects of bargaining, efforts to bypass the union, failure to designate an agent with sufficient bargaining authority, withdrawal of already-agreed upon provisions, and arbitrary scheduling of meetings. The NLRB made clear that a party is not required to have engaged in all these activities to be guilty of an unfair labor practice.

In *Regency* at 672, the Board looked to comments of the employer's representative, such as "[y]ou don't get it. You go on as long as you want, impasse is not an issue. Sooner or later defecate or get off the pot," as implying that the employer manifested no real intent to adjust differences, but rather had adopted a take-it-or leave-it attitude. Similarly, in the present case, Neil Sexton's comments that it was going to get worse and progressively worse if the union did not accept the City's two proposals and the City was going to use APTE as an example for the other bargaining units that hadn't settled, goes to the employer's take it or leave it attitude.

In *Regency* at 672, the Board looked to the employer's drawing several "lines in the sand" concerning various provisions without which there would not be a contract as evidence of bad faith bargaining. Again, this is identical to the present case, where the City refused to entertain any modifications to its wage and health care proposals.

In *Regency* at 672, the Board

requests for relevant information was evidence of the employer's bad faith. Similarly, in the

present case, the City to this date has failed to respond to the union's relevant requests for information related to bargaining.

With regard to some of the other *Regency* factors, the City has unilaterally implemented changes in mandatory subjects of bargaining by its elimination of Total Health Care and Blue Care Network, as well as flex time in the Department of Workforce Development. Neil Sexton, the City's main bargainer with APTE, refused to TA on any items in the contract without APTE agreeing to the City's wage cut and health care proposals, apparently in counter-distinction to the City's own policy, thus calling in question his authority to make agreements. And as noted above, the City's DOWOP proposal, vesting in department directors (not even labor relations) authority to decide who gets the wage cut and who doesn't, and being unwilling to provide the union with a list of grant-funded employees whose grants prohibit the City from imposing the 10% wage cut on them, is effectively an attempt to bypass the union on the critical question of wages.

## CONCLUSION

With regard to Charge 1, declare the City of Detroit guilty of an Unfair Labor Practice order the City of Detroit to produce all documents requested in CP1 and CP3.

With regard to Charges 2, 4 and 6, order the City of Detroit to cease and desist from refusing to bargain collectively and in good faith concerning wages, hours and working condition with APTE and specifically to cease from its take it or leave it bargaining position relative to wages, hours and health benefits.

members who desire these plans, either under the 2001-2005 plan design if it is established that 50 employees were enrolled in those plans under that plan design on June 1, 2007, or in the

41

alternative under the Alternative Plan. Make APTE members whole for any losses incurred as a result of the illegal elimination of THC and BCN.

With regard to the Amended charge, restore Flex time to APTE members in Detroit Workforce Development, and make whole any losses incurred by employees as a result of the elimination of Flex time.

Post copies of any notices of Unfair Labor Practices in conspicuous places on Respondent's premises where APTE members are stationed, and keep the posting up for 30 consecutive days.

Respectfully submitted,

JEROME D. GOLDBERG, PLLC

Jerome D. Goldberg (P61678)
Attorneys for APTE
2920 East Jefferson, Suite 101
Detroit, MI 48207
(313) 393-6005

DATED: September 22, 2008

## PROOF OF SERVICE

The undersigned certifies that on September 22, 2008, a copy of the foregoing document was personally served upon the attorney for the City of Detroit at City of Detroit Law Department, 660 Woodward Avenue, Suite 1650, Detroit, MI 48226.

Kris Hamel

42