```
 1              UNITED STATES BANKRUPTCY COURT
               EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3  IN THE MATTER OF,          Case No. 13-53846
                               Detroit, Michigan
 4  CITY OF DETROIT, MI        September 4, 2014
    _____/   8:31 a.m.
 5
          IN RE:  TRIAL RE: CONFIRMATION OF CHAPTER 9 PLAN
 6           BEFORE THE HONORABLE STEVEN W. RHODES
             TRANSCRIPT ORDERED BY: ROBIN WYSOCKI
 7
    APPEARANCES:
 8
    For the City of Detroit, MI:  GEOFFREY STEWART, ESQ.
 9                                 Jones, Day
                                   51 Louisiana Avenue, N.W.
10                                 Washington, D.C. 20001-2113
                                   202-879-3939
11
    For Oakland County:            JAYE QUADROZZI, ESQ. (P71646)
12                                 Young & Associates
                                   27725 Stansbury Boulevard
13                                 Suite 125
                                   Farmington Hills, MI 48334
14                                 248-353-8620

15  For County of Macomb,          ALLAN BRILLIANT, ESQ.
    Michigan and Macomb            Dechert, LLP
16  Interceptor Drain Drainage     The 1095 Avenue of the
    District:                      Americas
17                                 New York, NY 10036
                                   212-698-3500
18
    For Wayne County Corporation:  MAX NEWMAN, ESQ. (P51483)
19                                 Butzel, Long
                                   Stoneridge West
20                                 41000 Woodward Avenue
                                   Bloomfield Hills, MI 48304
21                                 248-258-1303

22  For International Union,       PETER DECHIARA, ESQ.
    United Automobile, Aerospace   Cohen, Weiss & Simon
23  and Agricultural Implement     330 West 42 Street
    Workers of America             25th Floor
24  International Union, UAW:       New York, NY 10036
                                   212-356-0208
25
```

```
 1                              RICHARD MACK, ESQ. (P58657)
                               Miller, Cohen
 2                              600 West Lafayette
                               4th Floor
 3                              Detroit, MI 48226
                               313-964-4454
 4
    For AFSCME Sub-Chapter      STEPHEN HACKNEY, ESQ.
 5  98, Cit of Detroit Retirees: DOUGLAS SMITH, ESQ.
                               Kirkland & Ellis
 6                              300 North LaSalle
                               Chicago, IL 60654
 7                              312-862-2000

 8  Court Recorder:            Kristel Trionfi
                               LaShonda Moss
 9
    Transcriber:               Deborah L. Kremlick
10

11
    Proceedings recorded by electronic sound recording, transcript
12  produced by transcription service.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| 1 | WITNESS FOR | | Direct | Cross |
|---|---|---|---|---|

**WITNESS FOR**          *Direct*     *Cross*
**FOR THE CITY:**

JOHN HILL             62        208

**EXHIBITS:**                                                    ID    ADM

| | | | ID | ADM |
|---|---|---|---|---|
| CX15 | CAFR | | 104 | 104 |
| CX24 | Major Taxes of the City | | 115 | 116 |
| CX30 | Summary of City's Revenue Consensus | | 262 | 263 |
| | Conference | | | |
| CX38 | Revenue Consensus Conference Report | | 107 | 107 |
| CX54 | Cost Saving Initiatives | | 153 | |
| CX55 | Revenue Initiatives | | 147 | 150 |
| CX58 | Equalized Value for Tax Rolls | | 204 | |
| CX59 | Dashboard | | 164 | 165 |
| CX577 | Cost of Restructuring Initiatives | | 160 | 163 |
| CX579 | Break out of Investments | | 144 | 147 |
| CX581 | Summary of Revenue Initiatives | | 145 | 147 |
| CX582 | Total Amount of Cost Saving | | 152 | 155 |
| CX584 | Demonstrative Exhibit | | 201 | 203 |
| CX593 | Ten Year Financial Projection | | 175 | 178 |
| CX595 | Forecast | | 182 | 183 |
| CX597 | Table – Blow Up | | 125 | 125 |
| CX598 | Demonstrative Exhibit | | 76 | 81 |
| CX599 | Memorandum | | 141 | 141 |
| CX620 | Summary of Reinvestment Initiative | | 156 | 158 |
| | | | | |
| SX4111 | Email Chain | | 257 | 261 |
| SX4127 | Judgments | | 241 | 242 |
| 4128 | | | | |

1      (Court in Session)

2          THE CLERK:  13-53846, City of Detroit, Michigan.

3          THE COURT:  It appears everyone is here.  Ms.

4   Quadrozzi, would you like to proceed?

5          MS. QUADROZZI:  Good morning.  Thank you, Your

6   Honor.

7      Before I get back to precisely where I was yesterday, I

8   want to provide a more complete answer to a question that Your

9   Honor asked me.  You asked me about the 6.75 rate and whether

10  or not we would adduce evidence that would show that that rate

11  -- that -- that other public pension funds had exceeded that

12  rate in the past.

13     And I answered yes.  And in fact that is true, that we

14  will adduce that evidence.  But I do want to point out that

15  there is a trial exhibit and that is trial Exhibit 1017, it

16  has not been objected to by anybody, that talks about the

17  historical interest rate of the GRS and the PRF -- PFRS.

18     And shows that over the past five years the PFRS averaged

19  greater than 9% and the GRS averaged greater than 10%.  In

20  addition, Your Honor, the NASRA study that both I and Mr.

21  Wagner talked about yesterday shows that the -- of those 126

22  plans in that survey, over the past five years they averaged

23  over 12 1/2%.  So I wanted -- you will hear additional

24  testimony, but I did want to answer that in a more fulsome

25  way.

1          THE COURT:  Thank you.

2          MS. QUADROZZI:  Now when we concluded yesterday --

3     actually, let me back up.  Because there is a slide that I --

4     that I skipped yesterday and I think that's -- I think that is

5     important.

6          And that's demonstrative number 5.  And the rate that we

7     talked about, that 6.75 that the city selected and we talked

8     about the fact that we believe that it is in fact much greater

9     than it should be -- much lower than it should be.

10          The result of that is because that investment return

11    assumption is set too low and there will be no contradicted

12    testimony on this.  That setting an interest rate assumption

13    too low increases the size of the projected liabilities.  And

14    the result of that is it increases the UAAL and therefore

15    increases the amount that DWSD is being asked to put in by way

16    of pension contributions.

17          And we will show that that exceeds the amount that's

18    necessary to fund the DWSD obligations.  And this is an

19    important point and I -- I neglected to mention it yesterday.

20          The plan does not contain any provisions for a refund of

21    any amounts in excess of the actual UAAL.  So and I've cited

22    to Mr. Moore's testimony and he will be here in -- in a day or

23    two and -- and we will ask him about this.

24          But because there is no provision the expert on the

25    city's side has testified that it is not the city's intention

1  for any monies to be paid back to the extent the monies paid

2  in exceed that 6.75 and therefore exceed DWSD's actual

3  contribution.  Therefore the result of that is that DWSD will

4  be paying pension costs for non-DWSD employees and we talked

5  about the fact that the law does not permit that.

6      So, Your Honor, where we left yesterday with that brief

7  aside was we had been talking about Mr. Orr's testimony in his

8  deposition that DWSD had capital needs that exceeded what he

9  called the steady state.  And then we showed the chart and

10  that was where I was when we left off.

11      And this chart which is demonstrative number 10.  And you

12  will remember when we talked yesterday, Your Honor, that the -

13  - this chart shows the blue line being DWSD's annual budget,

14  the red line being the 70% of what was spent.  And you asked

15  yesterday what accounted for the fact that the 70% was spent

16  as opposed to the actual amount.

17      And Your Honor, I apologize, I didn't get a chance to go

18  back and look at the transcript last night so I can't remember

19  if I answered -- if I gave you this answer.  But certainly

20  part of the reason that that money was not spent was something

21  that I had alluded to in the beginning of my opening statement

22  yesterday which was that over the past number of years, DWSD

23  has been consistently losing money.  I think I said over the

24  past seven years, $200,000,000 a year on average.

25      And so you will hear testimony, Your Honor, that one of

1  the ways that DWSD has responded to that incredible loss of

2  revenue is to do one of the few things that they can do which

3  is reduce expenses.  And so certainly the fact that the amount

4  of money spent is less than the amount of money they

5  projected, that is one large contributing factor.

6      Now what this chart does, Your Honor, is it then takes,

7  and this is the fiscal 2014, so present day.  It then takes it

8  and the blue line is actually the amount that the city's plan

9  projects and then the red line is 70% of that.

10      So what you'll see, Your Honor, is that the amount of

11  money DWSD has been spending over the last ten years has

12  declined consistently with obviously a couple of spikes.  And

13  that the levels that they are spending now, the steady state

14  that has resulted in the critical problems that Mr. Orr

15  mentioned in his deposition, is exactly what the city is

16  planning to continue to spend, the steady state.

17      And you will hear -- so two days ago, three days ago, I

18  want you to contrast this with a picture that Mr. Bennett

19  painted of all of the things that the city was going to do

20  with the money from among other places that they are seeking

21  to take from DWSD.

22      Because all of the good that the city plans to do, the

23  only way they can do that is to continue this decline with

24  this steady state.  And the city simply does not -- they just

25  don't address it.  They just ignore that fact that there is a

1  give and take.

2      Now, Your Honor, you're going to hear from Chris Andrews.

3  And he is an expert in the area of restructuring and he's a --

4  actually a former Chief Operating Officer for the City of

5  Detroit who analyzed a number of capital improvement plans and

6  spoke to a number of experts and looked at plans that

7  different consultants on behalf of DWSD had worked on over the

8  years.

9      And Mr. Andrews will testify that the city's projected

10  capital improvement plan does not meet the requirements of the

11  customers, doesn't adequately provide for the replacement of

12  aging assets, and is below its own objectives and below peer

13  cities.

14      And, Your Honor, the differences here are not minor.  I'm

15  not going to spend an inordinate amount of time on the detail

16  here, but just one example.  There are over 800 miles of large

17  diameter water pipes -- water mains in the DWSD system.

18      They have a useful life of between 50 and 100 years and

19  right now they are all at least 50 years old.  Under the

20  city's plan, they propose to replace these pipes at about a

21  mile and a half per year.

22      I think I demonstrated yesterday that math on my feet may

23  not be my strong point, but I did the math in advance.  And

24  what that means is that the pipes will be replaced in 561

25  years.  These are pipes that have a useful life of 50 to 100

1 years and they're already at least halfway into their useful

2 life.

3    So I was curious and I looked.  Five hundred and

4 sixty-one years.  For a little perspective, 561 years ago was

5 the fall of Constantinople.  The -- the -- the Turks invaded

6 the Ottoman empire.  It's the end of the middle ages.  That --

7 DWSD simply needs more, much more than that.

8    Now I want to spend a moment on some additional aspects

9 of the financial projections that the city makes that they are

10 basically --

11    THE COURT:  Well, how much would it cost to replace

12 these mains at a pace that -- that you or your client thinks

13 is more appropriate?

14    MS. QUADROZZI:  So the plan that my client projects

15 was that they be replaced at a rate of eight -- I'm going to

16 say eight and a half.  I might be off by -- by a -- a -- a

17 decimal, but about eight and a half miles per yet.

18    Now that would replace them in a hundred years.  I don't

19 have the -- the separated figure for that one replacement, but

20 I will tell you that the city's plan projects spending about

21 2.9 billion dollars on capital improvements over the next ten

22 years and you'll hear from Mr. Andrews that he projects that

23 the needs of the system at about four and a half billion

24 dollars over the next ten years.

25    THE COURT:  Okay.

1              MS. QUADROZZI:  So when we look at the financial

2    projections that the city makes, Mount Carbon is instructive.

3    Because we're talking about feasibility.  And Mount Carbon

4    tells us that in Chapter 9 a feasibility determination

5    requires a practical analysis of whether the debtor can

6    accomplish what the plan proposes and whether they can also

7    provide governmental services.

8         And it's important that it's not just governmental

9    services, but governmental services that are at the level

10   necessary to fund its viability as a municipality.

11        Now Mount Carbon also says that success -- it doesn't

12   have to be guaranteed.  It doesn't have to be certain.  But it

13   has to be more than just the hope that the plan can be

14   achieved.  And the problem is what you see from the city is

15   not analysis that demonstrates the ability to achieve its

16   plan, but just hope.

17        They don't offer any support for their projections.  And

18   -- and to be clear, Your Honor, these are not the city's

19   projections.  These are not -- excuse me, these are not DWSD's

20   projections.  These are the city's projections.

21        DWSD, not a single DWSD witness is going to testify that

22   they had significant input, that they were asked to provide

23   their views on the plan of adjustment.  The city simply took

24   factual documents and projected out.

25        And we saw this a little bit ago when we talked about the

1  water revenues, or we will see this, I apologize.  When we

2  talk about water revenues that the city projected and in fact

3  Ms. Sue McCormick, DWSD director at her deposition said we're

4  optimistic.

5      So they were created by the city's consultant to support

6  that four twenty-eight number.  They don't have any studies

7  that show that despite decades of problems that consultants,

8  committees that the Court set up and the Court proposed, they

9  can solve the problems.  They don't do anything to address the

10  detailed findings of Judge Cox.  And yet Mr. Orr himself

11  stated that the city needs to have more than the steady state.

12          THE COURT:  All right.  So let's pause there.  If --

13  if your witness is correct about the capital needs over the

14  next ten years, 4.3 did you say?

15          MS. QUADROZZI:  4.5 billion, I believe, Your Honor.

16          THE COURT:  4.5 billion, the difference between that

17  and what the city proposes 2. --

18          MS. QUADROZZI:  2.9.

19          THE COURT:  Nine billion, that difference which I

20  won't try to calculate in my head what it is, it's certainly

21  more than the 428,000,000 that the city proposes to take from

22  DWSD on account of the UAAL, right?

23          MS. QUADROZZI:  Correct.

24          THE COURT:  So the question remains where does DWSD

25  get the money to do the capital improvements that your witness

1  says are required over the next ten years?  Where is that

2  money going to come from unless it's from raising rates?

3              MS. QUADROZZI:  And, Your Honor, that's a very very

4  good question.  And what we can say is, that it can't -- it

5  can't be the case that the solution to the problem is to take

6  that $428,000,000 out.

7       And what we're here to talk about --

8              THE COURT:  Okay.  But I'm asking the next question.

9              MS. QUADROZZI:  And -- and I understand that, Your

10  Honor.  And I think that that's part of the reason that I

11  wanted to -- to begin yesterday with the statement that we

12  know this isn't a trial about DWSD or how to solve its

13  problems.

14       Because frankly those problems are very very complicated.

15  They're certainly not beyond the complicated nature of the

16  case.

17              THE COURT:  I wonder -- I wonder why you - why you

18  assert that this isn't the trial to solve DWSD's problems.

19  DWSD is a department of the city, the city is here.  Let's

20  solve problems, that's what we do.

21              MS. QUADROZZI:  Your Honor, I think that the

22  question that we were -- that we're faced with is, is the plan

23  that the city proposes right now one that can work, one that

24  you should confirm.

25       And I think that answer is no.  The second question of

1  how do we resolve DWSD.  I think that is a question for more

2  people than are probably sitting in this courtroom today,

3  although I think Your Honor has potentially suggested that

4  they're sitting in another courtroom.

5          THE COURT:  Well, but you're not -- you're not

6  telling me that your client Oakland County doesn't have an

7  answer to my question.  I mean you can't -- you can't come to

8  court and say the city needs to spend 4.5 billion dollars on

9  capital improvements without an answer to the question of

10  where that money is going to come from.

11          MS. QUADROZZI:  I believe, and I'm going to try to

12  tread carefully around Your Honor's mediation order.

13          THE COURT:  Okay.

14          MS. QUADROZZI:  I believe the answer to that

15  question lies in a number of legs of a DWSD table.  I think

16  one of those legs has got to be keeping DWSD's money inside

17  DWSD which is just what --

18          THE COURT:  Okay.

19          MS. QUADROZZI:  -- the law provides.

20          THE COURT:  I got -- I got that.

21          MS. QUADROZZI:  I think that the second plan is one

22  that the DWSD itself has been undergoing, albeit we would

23  suggest undergoing at a rate that's perhaps one slower than

24  Oakland County would want.

25          But two, frankly, I think slower than DWSD themselves

1 the director would want.  And that is a effort to optimize

2 within the organization.  And certainly there has been a lot

3 of publicly released documents, so this is not anything that

4 is protected that talk about the effort to reduce the head

5 counts and try to be a more lean, efficient operation.

6     I think the third leg is going to be something that has

7 to be addressed inside the city whether it's the -- I don't

8 remember -- I don't -- my terms aren't good.  I don't remember

9 if I'm in this -- this -- this -- the current Mayor or prior

10 Mayor, but right sizing was -- was one of the things that --

11 that has been talked about.

12     DWSD as I mentioned has a huge service area, 1,000 --

13 more than 1,000 square miles.  Obviously it was built for a

14 city that is not the size that this city is now.

15     And so one of the things, and the third thing, a third

16 leg that is happening within DWSD, is an -- an analysis to

17 determine what can be done to shrink the system providing the

18 essential services that needed -- need to be provided.

19     The problem is, Your Honor, that that takes time.  That

20 those efforts take -- take time and they take time within the

21 next nine years which is the nine years that the city proposes

22 to make it --

23          THE COURT:  Well, they take more than time.  They

24 take commitment.

25          MS. QUADROZZI:  Correct

1        THE COURT:  And resources.

2        MS. QUADROZZI:  Yes.  And I think that you will -- I

3  think that there has been recently a effort, and I believe

4  funded by the state to have a consultant go into DWSD.  I

5  think they started actually a little bit ago, over the next

6  two or three months to look at some of those very issues.

7        So I think that you do see that there are funding sources

8  that are outside the city.  I think the state has stepped

9  forward and -- and I know DWSD and the counties really

10  appreciate that.

11        And the third leg, and this is one that is difficult and

12  Your Honor has raised it before, is -- is raising rates.  And

13  I think that the system is -- is at risk of -- it sells its

14  services, that's all it has.  And to pay for those services

15  the city is going to have to be looking at raising rates.

16        THE COURT:  Well, I raise these questions not

17  because I have any preconceived notions about the answers.

18  But now is the time to solve these problems.  It's not enough

19  just to say we have problems.

20        MS. QUADROZZI:  And -- and, Your Honor, I appreciate

21  that and I'm glad you raised the questions.  Because I think

22  think is an issue that -- that needs -- I think it's an issue

23  that needs to be solved and we welcome the opportunity to

24  present experts that I think will be able to answer some -- in

25  some more detail than I may have been able to.

1        Now, one of those experts that you're going to hear from,

2   Your Honor, is an expert by the name -- oh, and I -- is an

3   expert by the name of Michael Nadol. And Mr. Nadol is an

4   expert in the area of municipal budgeting and importantly

5   previously served as the CFO for the Philadelphia Water

6   Department, one of the nation's largest.

7        Now Mr. Nadol will testify that with respect to the

8   projected fiscal position of DWSD, the city's plan

9   incorporates a series of broad assumptions, flaws and outdated

10  assumptions and just doesn't present a realistic picture.

11       So I want to look at just a few of the problems with the

12  city's projections. I won't go through all of them, but just

13  -- just a few, Your Honor.

14       So over the past 15 years the sewer and water volumes

15  have steadily declined. Yet the plan assumes significantly

16  increased billable water and sewer sales in 2014 and 2015.

17  Now I mentioned a moment ago that the DWSD director referred

18  to these forecasts as optimistic.

19       And again, and I mentioned this. This is a fundamental

20  point. Water and sewer services are what they sell. So the

21  city's use of an unrealistic revenue projection for the sale

22  of those products is a little like General Motors basing the

23  budget on the assumption that they're going to sell a

24  1,000,000 cars when their management and their experts tell

25  them absolutely you're not going to sell a 1,000,000 cars.

1 And the sale of cars has been declining.

2        THE COURT:  What -- what are the projected increases

3 that your chart here says are significant?

4        MS. QUADROZZI:  Let me take you to another chart

5 that has that -- that has that detail.

6        THE COURT:  Okay.

7        MS. QUADROZZI:  So what you're looking at here are

8 retail water volumes, the actual versus what the plan of

9 adjustment and the DWSD itself projected.  And it's early in

10 the morning and this is probably more detail than anybody

11 wanted, but what this shows you right here are the units.  And

12 water and sewer rates are measured in units of thousand cubic

13 feet, so MCF is -- is the abbreviation of usage.

14    So what you see here is 4.3 million thousand cubic feet,

15 just so we understand.  And then of course the time running

16 out.

17    And the lines that you see this -- this line here, the

18 black kind of dotted line, is the downward trend.  That is

19 what has been happening.  This chart shows over the past five

20 years but in fact it -- it goes back more than 15 years with a

21 declining use.

22    And that is, Your Honor, as a result of the declining

23 population, the loss of businesses, but it also is as a result

24 of some efficiencies that are just happening in our technology

25 and in our commerce where less water is being used.  So this

1 is a -- everyone acknowledges is trend.  This isn't -- this

2 isn't contested.

3      So the blue line is the actual.  This is what has

4 happened to the city's projections.  This is what -- this is

5 what the city has actually sold.

6      Now the green line, and that goes from 2014 forward.  You

7 will recall yesterday that I mentioned Bart Foster, a expert

8 that the city has -- DWSD has used for years, financial as

9 well as rate consultant.

10      And he -- this was his projection.  You'll see a document

11 in evidence that Mr. Foster projected going forward that's

12 what you should do.  This is what the city projected.  So they

13 took -- and this right here, this 3.6 that just popped up

14 here, 3.6 is the actual water sales for 2013.

15      So the city did their projection, did this red dotted

16 line going straight up with no relation to reality.  So if you

17 look down here, the amount that was billed in fiscal 2014 was

18 3.4 million cubic square feet.

19      Okay.  Well, we won't look at that.  Okay.  So -- so

20 you've got actual at 3.6.  Then next year actual at 3.4.  And

21 this is where the city projects it.  And that's at 4,000,000.

22      So what the city does is take this -- this that the

23 director says is optimistic, that the rate consultant didn't

24 recommend, and while yes, you will hear them say that they

25 followed the downward line, they first jumped it up an

1  unexplainable amount.

2      And what that does of course is that it compounds by

3  relying on the unrealistic assumptions, is that compounds

4  those unrealistic assumptions going forward.  Just a quick

5  example and I -- I won't go into detail on it, this is the --

6  the next slide is the sewer projections because we were

7  looking at water projections.

8      The sewer projections is exactly the same thing.  So

9  you'll see the downward trend, you'll see the actual.  This is

10  Mr. Bart Foster's recommendation, the guy who spent, you know,

11  the past 30 years analyzing things for DWSD.  And that's what

12  the city chooses to do.  So --

13          THE COURT:  And what's -- what's the dollar

14  difference that that translates into?

15          MS. QUADROZZI:  Your Honor, I apologize, I actually

16  don't have the answer to that question.  The expert will be

17  able to talk to you in detail about that.

18          THE COURT:  Okay.

19          MS. QUADROZZI:  So going back just for a moment to

20  demonstrative number 12.  So a second material flaw in the

21  city's plan can be found in the bad debt expense.  And as Your

22  Honor knows, bad debt expense and customer non-payment levels

23  are extraordinarily high.  We've seen that play out here.

24      They're increasing and in fact they are demonstratively

25  higher than the city's projections.  And yet the city projects

1  that bad debt expenses will somehow decline.  Without a plan,

2  without a study, they just project it.

3      And the third flaw that the city has in its projections

4  has to do with the City of Flint.  The City of Flint which is

5  one of the -- was one of Detroit Water and Sewer Department's

6  largest customers, exited DWSD in April of 2014.

7      Now ignoring this reality the city projects that Flint

8  revenues are going to continue to generate 8 1/2% of DWSD's

9  wholesale water receipts for another two years.  You're going

10 to hear, Your Honor, that Mr. Nadol will testify that the plan

11 of adjustment would drive DWSD towards untenable deficits and

12 cash shortfalls and that to remain solvent addressing the

13 shortfalls would require doing what has been done in the past

14 and put us at this critical juncture, that is cutting

15 maintenance and cutting renewal and replacement of critical

16 assets.

17     To quantify the impact of the city's overall ten year

18 projection on DWSD, Mr. Nadol prepared two models.  So in the

19 first model he just corrected the overt flaws, just the -- the

20 mistakes.  And using that model, he'll testify that the city's

21 plan is going to fall short by an estimated $789,000,000 over

22 the ten year period.

23     Beyond the outright flaws, the city's projection also

24 relied on a number of very very favorable assumptions such as

25 improving population, improving industry.  Using the second

1  model, what Mr. Nadol did based on his experience with the

2  Philadelphia Water Department, is he stress tested the city's

3  analysis using less favorable assumptions.

4      And under that second model, the city's plan would fall

5  short by an estimated two and a half billion over the ten year

6  period.  And the second scenario Mr. Nadol is going to tell

7  you is not -- it's not a worst case scenario, it's not a sky

8  is falling scenario.

9      It is a reasonable scenario that suggests occasionally

10 things don't go according to plan.  There are other very

11 adverse things that could happen from a severe infrastructure

12 failure to a -- a significant problem with regulatory

13 requirements that would further cause difficulty with respect

14 to the city's projections.

15     Now the city responds that even if its projections are

16 off, that what needs to be done is to increase rates.  Mr.

17 Bennett asked a question in the first day of his opening that

18 I actually haven't been able to get out of my head.

19     And he said that Detroit had the highest taxes in the

20 state and the worst level of service in the -- in the area.

21 And using an analogy of a department store, he asked, would

22 anyone consider raising prices at that store.  And his answer

23 was, of course not.

24     The analogy to DWSD is uncanny.  Because that's exactly

25 what the city's plan is going to force DWSD to do.

1    You're going to hear from Bill Stannard.  Mr. Stannard is

2  an expert in financial and utility rate making.  That the

3  amounts that rates can be increased is constrained by a

4  community's ability to pay.

5    Now Mr. Bennett again talked about this same concept.  He

6  talked about it to you in the concept of taxes.  But he was --

7  again the analogy is, is very -- is very close.  Because you

8  can't just increase rates and assume that that increase is

9  going to yield additional revenues.

10    Mr. Bennett called it the issue of tax saturation.  And

11 so I would say it's rate saturation.  The rates are already so

12 high that so many people can't afford to pay them, that you

13 see the problem that has been created with -- with the shut

14 offs over the course of the summer.

15    Secondly, raising rates is incompatible with the goal of

16 saving the city much as raising taxes as Mr. Bennett outlined

17 or proposed, is -- is incompatible with -- with saving the

18 city.  Rates are something that businesses and people look to,

19 are there affordable rates, is the service something that

20 could be provided.  Is it -- is it safe, is it secure, is it

21 reliable.

22    And people make decisions on that and the decisions that

23 people -- we need people to make as a city, is to make the

24 decision to come.  Raising rates has the opposite effect.

25    In -- in closing, Your Honor, the city bears the burden

1  here of -- of proving that the proposed plan is feasible and

2  that it's legal.  That is it complies with state and local

3  laws.

4       We would suggest that the plan, and we will adduce

5  evidence that the plan is neither feasible nor is it legal.

6  And we would ask that you not confirm the plan.  Thank you,

7  Your Honor.

8            THE COURT:  Thank you.

9            MR. BRILLIANT:  Good morning, Your Honor.  For the

10  record, Allan Brilliant on behalf of Macomb County by and

11  through its public works administrator Anthony Morroco and

12  also on behalf of Macomb Interceptor Drain Drainage District,

13  a Class 14 claimant.

14       For the record, Your Honor, I'm going to refer to Macomb

15  Interceptor Drain Drainage District as MIDD.  Your Honor, out

16  of -- you know, I kind of feel like I'm between -- between you

17  and the testimony and I'm sure everybody, you know, wants to

18  see the beast.  So I'm going to try to be as, you know, as

19  quick as possible and not to repeat the arguments -- or not

20  arguments, but you know, the -- the summary of the -- of the

21  evidence that's going to come in that's been discussed by --

22  by other counsel.  And -- and obviously, you know, like --

23  like other parties here, I'm not going to repeat what's --

24  what's in our objections and our -- our briefs.

25       There are a few items, however, Your Honor, that I do

1   want to put a finer point on and give Your Honor some sense as

2   to what the testimony is going to be over the next well, you

3   know, several weeks.

4        You know, the first Your Honor I'm going to talk a little

5   bit about DWSD.  I'm not going to repeat very much of what Ms.

6   Quadrozzi has said and then I'm going to turn a little bit and

7   talk about the -- the MIDD claim.  And I promise I'm going to

8   be as -- as brief as -- as I can since I know that we're all

9   on the clock.

10       Your Honor, the evidence will show that from the first

11  day on the job as emergency manager, Mr. Orr and his team were

12  focused -- focused on monetizing DWSD assets for the city's

13  general fund.

14       Now I use the term monetizing and you've heard it from

15  Ms. Quadrozzi and others today.  Now this isn't -- this isn't

16  my word, and it's not Ms. Quadrozzi's word.  This is a word

17  that you're going to hear as testimony, Your Honor, was -- was

18  a word that was regularly used, you know, by Mr. Orr's team.

19       And by this -- and you're going to hear testimony that

20  what they meant by this was trying to extract value from DWSD

21  for the benefit of the city and its non-DWSD creditors.  And

22  the evidence will show that they sought to monetize these

23  assets notwithstanding the fact that there were statutes which

24  prohibited the use of DWSD assets for other parties and for

25  other creditors of -- of the city because of the nature of the

1  fact that DWSD is an enterprise -- is a separate fund and the

2  state law prohibits its revenues and its assets from being

3  used for other, you know, other purposes.

4      And also that they sought to monetize these assets even

5  though the city had already pulled all of its investment out

6  of the -- the DWSD, you know -- you know, many years, you

7  know, earlier.

8      As Ms. Quadrozzi alluded there were negotiations that

9  occurred with -- with the counties and, you know, through that

10 ultimately the -- the -- the city, you know, settled on trying

11 to get a $47,000,000 a year annual lease permit, you know,

12 from -- from -- from the counties.  When the counties balked

13 at that, the city set out to get the $47,000,000 they needed

14 to fill their cash flows, you know, in other -- in other

15 areas.  And by forcing the DWSD, you know, to pay the money.

16     So Your Honor, and you know -- you know, the testimony of

17 Mr. Buckfire, you know, when asked the question, how did you

18 fill the hole for this $47,000,000 in required cash flow

19 that's referenced there.  And he -- and he answered, we

20 decided instead to have the department provide catch up

21 payments to recognize the fact that it had been under funding

22 its obligations under the plan for years.  So in fact instead

23 of having this as a lease payment, we characterized part of it

24 as just the catch up payments.

25     So, you know, Mr. Buckfire was very up front.  They had

1  -- they based their whole projection and their negotiations in

2  coming up with their plan and having $47,000,000 a year come

3  out of DWSD.  When they weren't able to do that through the

4  creation of a regional authority, they basically looked and

5  tried to figure out how can we get this $47,000,000 out of

6  DWSD.

7      And to fill the hole what they -- what they did was they,

8  you know, sought to require the $47,000,000 to come out

9  through extensible lease payments.  But even using the very

10 low interest discount rate of 6.75% which increased the

11 liability and even having the payments made only in a short

12 period of nine years, it still didn't get them to the

13 $47,000,000 per year they -- they needed.

14     So -- so when that wasn't enough they -- they took the --

15 they added 2.5 million dollars per year in administrative

16 expenses even though the convention that's used is that the

17 administrative expenses are included in the interest rate.

18 The interest rate is net of the expenses.  The -- the

19 projection is always ahead of the expenses.

20     And when you look at all the charts and you hear the

21 comparisons you're going to be hearing numbers that take into

22 account all of the -- all of the, you know, the expenses.  But

23 using the lowest possible rate they could you know, with --

24 with a straight face that they could use, the 6.75, they still

25 didn't get to $47,000,000 a year so they then added on the 2.5

1  million dollars which is really double counting of the

2  expenses since in -- in theory and you will hear this from the

3  testimony of Milliman when they ran all of their numbers

4  initially until -- until the end, they -- when they added in

5  the 2.5 million dollars at the direction of the -- of the

6  city, all of them were net of the expenses, but then they

7  added in.

8      And that still just got them to 45.4 million dollars, a

9  little bit short of the -- of the 47,000,000.  So then they

10  added in in year one, a $20,000,000 administrative expense and

11  you're going to hear testimony, you know, from Mr. Moore that

12  they did not go back and say how much of the legal fees, you

13  know, are attributable to the DWSD part of the bankruptcy.

14  Instead they just apportioned, you know, based upon, you know,

15  head count and various other factors, you know, a portion of

16  the projected $130,000,000 legal fees which got them to the

17  $20,000,000 which filled their $47,000,000 a year hole.

18      The evidence will be clear, Your Honor, that -- that the

19  city backed into what they perceived DWSD should have to pay

20  in order to fill the hole that they needed.  It was based on

21  what they needed in order to be able to finance their plan and

22  not based upon what DWSD is actually responsible for paying or

23  what -- what they're owed.

24      And, Your Honor, it's not a coincidence that the -- the

25  amount that they used to fill the hole, you know, gets them

1  basically to the $47,000,000.  It's not a coincidence at all.

2  And Mr. Buckfire was -- is very forthright about it.

3      It's what they needed, it's not necessarily -- he's not

4  going to say this, but it's not -- you know, Your Honor, I

5  think the testimony is going to be clear, it's necessarily

6  what DWSD actually, you know, owed.

7      Now, Your Honor, you've heard a lot about the 6.75%

8  interest rate and what an outlier isn't.  You know, here is

9  the, you know, the NASRA report that you know that, you know,

10  the parties have been talking about, you know, the last few

11  days.  And you can see of the numerous, you know, state funds

12  what the distribution is.

13      And the 6.75 is, you know, the lowest end of the -- of

14  the chart.  And in fact as I said earlier, given that all of

15  those assumptions include all the administrative expenses

16  which are then being taken out of DWSD separately, you know,

17  it's -- it's very marginal but effectively the rate that the

18  -- the city has -- has chosen here is, you know, the lowest

19  rate of the -- of everyone on this -- on this chart.

20      And you're going to hear testimony even from the pension

21  committee's expert, Ms. Nicholl that she's not aware -- only

22  aware of one other, you know, pension fund of this size that

23  had any -- you know, that is 6.75% or less that's not

24  included, you know, on -- on this chart.

25      And, Your Honor, as Ms. Quadrozzi just said what -- what

1  makes this, you know -- you know -- you know, even more

2  difficult that they picked the 6.75% and really reflects, you

3  know, the unfairness of it is -- is the fact that this is a

4  fixed amount.

5      All these numbers here that you see are not fixed amounts

6  and -- and the -- you know, they're all based and adjusted

7  over time.  As the, you know, over the 30 or 40 year -- year

8  period if the experience of the interest rate return is higher

9  or alternatively the pension obligations are lower, it's

10  adjusted over -- over time so the parties don't over pay.

11      Here instead with respect to DWSD, the payments are --

12  are fixed.  The payments amount for nine years.  If it turns

13  out that the pension obligations are higher or alternatively

14  the -- the experience on the interest rate is -- is lower,

15  DWSD has to pay more.  But if you on the other hand exceed

16  these numbers or the pension obligations turn out to be -- to

17  be less, DWSD doesn't get the money back.  Instead the money

18  goes into the pension restoration trust and is shared across

19  all of the pensioners, not just the ones in the GRS, but also

20  the -- you know, the uniformed employees and basically taking

21  the excess monies that DWSD is paying and paying the -- the

22  other pensioners.

23      And as, you know, from our briefs and our previous

24  arguments, Your Honor, you know, the -- you know, that

25  violates, you know -- you know, Michigan, you know, statutes.

1      And -- and, Your Honor, I'm just going to talk about it

2   very briefly just so it's, you know, mentioned on the record.

3   You know, if that wasn't bad enough in -- in terms of trying

4   to extract value in violation of -- of state law out of DWSD,

5   the plan also gives to the pension restoration trust and to

6   the -- the general fund a -- a CBR that would allow the

7   proceeds of any qualifying DWSD transaction, you know, to go

8   to -- to the restoration trust benefit of the pensioners and

9   -- and to the city which is also in -- in violation of state

10  law.

11     You heard in Mr. Bennett's opening well, that may not

12  happen.  But that's not the point.  It's in the plan.  The

13  plan if approved will have the force of law and it -- and it

14  provides for something, you know, that is clearly, you know,

15  unlawful under Michigan law and they could have put in the

16  plan that this will happen to the extent it's lawful under

17  Michigan law, but they -- they didn't put that in the plan.

18     It just provides in fact that that -- that will, you

19  know, be what happens.  And that is just something that just,

20  you know, clearly, you know, violates law.

21     I'm going to talk just briefly about the MIDD claim.

22  Your Honor, you know, for the 3018 hearing is a little bit

23  familiar with it.  MIDD is part of Class 14 which is other

24  general unsecured claims.  You know, that class rejected the

25  plan.

1    You know, notwithstanding the fact that we have the 3018

2   hearing which occurred, you know, as the voting was -- was

3   going on.  It didn't really matter, you know, whether for

4   purposes of voting we allowed it for $1.00, or we allowed it

5   for the 26,000,000.  You know, a lot -- the class rejected it

6   notwithstanding the fact that of MIDD's claim.  So it wasn't

7   MIDD, you know, itself who was objecting to this, it was the

8   general unsecured creditors generally, you know, who -- who

9   objected to -- you know, who opposed the plan based upon, you

10  know, the vote both in terms of numerosity and in terms of the

11  -- the out -- you know, the full amount of the claim.

12    Now Class 14, Your Honor, is made up of trade creditors,

13  you know, some -- some creditors with -- with contract claims.

14  You know, tort claimants.  You know MIDD is in there.  You

15  know, Syncora, and -- and some of the COPS.  You know -- you

16  know, purport to have, you know, claims in that -- in that

17  class, you know, as well.

18    Some of the creditors, you know, trade creditors

19  voluntarily, you know, extended credit to the city, others,

20  the tort claimants MIDD was a fraud claim arising from the

21  over charges related to the sink hole.  You know, were

22  involuntary, you know, creditors, you know, of the city.

23    You know, under the plan as Your Honor knows, Class 14

24  creditors receive a pro rata share of B notes, you know, that

25  will have a face value depending on the allowed amount of the

1  claims in the class between 10 and 13% of the face value of

2  the claims, you know, according to the projections, you know,

3  of the -- you know, of the city.

4      Now, you know, the B notes, they mature in 30 years.

5  They're interest only for the first ten years.  And the first

6  20 years they bear interest at 4% and then, you know,

7  thereafter they bear interest at -- at 6%.

8      You know, the interest rate on these notes, you know, is

9  akin to tax exempt interest rates 4 and 6%, but these are

10  unsecured notes, they're taxable, and they're -- they're 30

11  years.  So when Your Honor heard testimony about the DWSD

12  financing, you know, for instance that's occurring, you know,

13  in the 5 to 6% range we're talking about secured notes, it's

14  DWSD's credit as distinct from these notes which are general

15  city obligations unsecured credits.

16      Now Your Honor is going to hear testimony from Stephen

17  Spencer who is going to be put on by -- by FGIC, you know, who

18  is going to, you know, value the -- the -- the B notes.  And

19  he's going to, you know, tell Your Honor that among other

20  things in order to have these notes be worth the face -- the

21  face amount they would have to have, you know, a 9%, you know,

22  taxable, you know, interest rate.  And based upon that, that

23  effectively the notes are worth about 60% of what is the, you

24  know, the face amount of the notes.

25      So effectively, you know, Class 14 creditors are getting

1  something in the nature, you know, of 6 to 8%, you know, based

2  upon the -- the value of the -- of the notes they're going to

3  receive. You know, in contrast to what LTGO, you know, and

4  the pension claimants, you know, are getting.

5      Now, Your Honor, we heard a lot in the opening from Mr.

6  Bennett and then again from the pension committee's counsel,

7  you know, with respect to what is the amount, you know, of the

8  claim that pensioners have. And that somehow with respect to

9  unfair discrimination that that's relevant.

10     Now, Your Honor, there's a -- there's a difference here

11 between what Class 14 creditors and what the COPS creditors

12 are getting and what the pensioners are getting. Using

13 bankruptcy parlance, what Class 14 gets is we have a pot plan.

14 You throw a certain amount of B notes in -- into the class,

15 everybody gets a pro rata share of those notes based upon the

16 claims.

17     The pension claims are completely different. They get a

18 percentage of -- of -- of the actual pensions that they're

19 entitled to. The city is obligated to make payments over

20 time, not during the -- you know, the first ten years, but

21 after that they're obligated to make payments over time to

22 make sure that the pensioners get in the case of GRS as Your

23 Honor remembers, you know, their full pension less 4.5, then

24 there's a certain reduction, you know, in the COLA. And with

25 the PFRS no rejection in -- no reduction in the pension but

1  then a -- a reduction, you know, in connection with -- with

2  the COLA.

3      So they don't have a -- a pot plan.  You know, they just

4  have a -- a fixed amount.  So now the -- the issue as to what

5  their claim is is relevant as it relates to DWSD and what

6  DWSD's here allocable share is.

7      But with respect to unfair discrimination what -- what

8  their claim is, isn't relevant.  Your Honor asked the right

9  question when Mr. Bennett showed you the chart and asked well

10  what's the city's contribution.

11      There is no fixed contribution for the city.  If they

12  would say that the city was going to give them X dollars, and

13  this is all you get and that -- and you have to get your

14  pension out of that, than what their claim would be would be

15  relevant for figuring out what they're owed.

16      But here they don't have a fixed, you know -- you know a

17  fixed pot to look at.  They get a percentage of what they're

18  getting.  So the way to calculate and to compare for unfair

19  discrimination Class 14 claims versus the pension claims, is

20  to figure out as to what are they giving up.

21      And you saw from in the retiree committee's you know,

22  analysis and you're going to hear, you know -- you know, Ms.

23  Nicholls, you know testify about this, about what they're

24  giving up and as Your Honor heard, you know, under their

25  calculations which we have some problems with and we think

1 they're, you know, too favorable for the pensions, and they

2 also don't take into account any upside for pension

3 restoration, you know, based upon earnings over 6.75%.

4     But basically what she's going to testify is that with

5 respect to GRS it's about 20% reduction.  But they're getting

6 about 80 cents on the dollar.

7     Now undoubtedly some portion of that is on account of the

8 secured claim, and some portion is on account of the unsecured

9 claim.  But it's if you do very simple math, and this -- and

10 the numbers are a little bit more favorable, you know, to --

11 to our side than to theirs.

12     But just to do simple math, if you assume 50% funding in

13 GRS which is pretty close, if you assume 50% funding in GRS

14 and they are having a 20% reduction in GRS, so 50% gets paid

15 100 cents on the dollar, you know, the value of their

16 collateral, and 50% gets paid 60 cents on the dollar and that

17 gets you a blended, you know, rate of 80%.  And that's what

18 the disclosure statement says their distribution is.  And

19 again that has assumptions of -- with respect to, you know,

20 the ASF and a very low discount rate, you know, a T bill

21 strip, you know, with respect to, you know -- you know

22 numbers.

23     But that number, Your Honor, is the minimum of what

24 they're getting.  And that's the number that should be

25 compared.  And the rest of these issues about what's the

1 claim, it doesn't matter for these purposes, Your Honor,

2 whether they're owed $1,000,000,000, or they're owed

3 $3,000,000,000, you're getting 60 cents more than, no less

4 than 60 cents on the dollar.

5      Now there is an issue about the state contribution and

6 the found -- and -- and -- and the monies coming in from the

7 grand bargain.  And that's a separate issue.

8      But in terms of this -- this argument about what the

9 claim is and they're getting 9.3%, Your Honor saw, you know,

10 the chart that Mr. Bennett put up, it's laughable.  I mean

11 talk about, you know, voodoo math.  That -- that the PFRS who

12 is getting a zero percent reduction in their pension and

13 getting a COLA reduction and Mr. Bennett's chart says they're

14 getting a 9.3% return, absurd.

15      Yeah, they're getting a 9.3% return if you assume that

16 the city only pays $381,000,000 for this huge, you know -- you

17 know -- you know pension obligation.  And really saying, Your

18 Honor, just to show how absurd, you know, their -- their

19 argument, you know is on it.  As the interest rate -- as the

20 claim amount goes up, the percentage that's secured goes down.

21      You know, using the 6.75, it's roughly 50 cents.  So you

22 would say that it's 50% gets paid in full, 50%, you know, gets

23 -- again talking about, you know -- you know, GRS.  You know,

24 50% pays.  Sixty percent you get to a cumulative amount of 80.

25      If you make the claim huge so that the unsecured portion

1  of it gets bigger, then the percentage has to be higher in

2  order to still get you to the blended 80%.

3     So having a bigger claim doesn't -- doesn't change

4  anything -- it doesn't make it that they're getting less, it

5  makes that they're getting more on account of the -- of the

6  unsecured -- unsecured debt.

7     Your Honor should just ignore all of that as it relates

8  to unfair discrimination because it really is completely

9  irrelevant and really just goes to show how little the, you

10 know, confidence that the -- that the city, you know, has in

11 its arguments here on -- on why this discrimination is fair.

12 That they have to now try to convince yourself by -- convince

13 Your Honor that, you know, through obfuscation that -- that

14 there really isn't the unfair discrimination or the -- the

15 amount of discrimination you know, that really exists under

16 the plan.

17    Your Honor, I'm not going to -- going to belabor this

18 anymore.  I think you've heard most of the issues.  In order

19 to confirm a plan and for the city to get a discharge, you

20 know, it has to meet the requirements of Chapter 9.  This plan

21 doesn't do that.

22    The plan unfairly discriminates.  It's not fair and

23 equitable.  It's not in the best interest of creditors.  It

24 violates state law.  It's not feasible as it relates to DWSD,

25 therefore, Your Honor, confirmation of the plan must be

1  denied.

2          THE COURT:  Thank you, sir.

3          MR. NEWMAN:  Thank you, Your Honor.  Max Newman on

4  behalf of Wayne County.  And I have the luxury of being brief

5  because I stand upon the shoulders of those who have gone

6  before me.  So I will try not to reiterate a lot of the things

7  that have been said to the Court before.  But I do think that

8  we bring a unique and important perspective to the case.

9          The City of Detroit is about 20% of the physical area of

10  Wayne County and 40% of the population of the county.  The

11  government of Wayne County and of the city interact in

12  numerous ways.  The restructuring of Detroit's finances could

13  not be more critical to the future of Wayne County.

14          If the effort fails a significant burden will be placed

15  on Wayne's already difficult financial situation.  Without a

16  doubt we would not only like, but we need for Detroit's

17  reorganization effort to succeed.

18          But what does it mean for Detroit's reorganization effort

19  to succeed?  Throughout this case the Court has talked about

20  no more bad deals for the City of Detroit.  And I would define

21  a bad deal as a deal that jeopardizes services to the

22  residents of Detroit and in this case related to the DWSD to

23  the residents of southeastern Michigan.

24          A bad deal is one that jeopardizes services and puts them

25  at risk.  What I would say is the Court was looking for a term

1  the other day to replace the business judgment rule in a

2  municipal bankruptcy case.

3      And I would use the term civic judgment because in

4  looking at it you look at more than just the dollars and

5  cents, but also the quality of life and the services.  If the

6  city is to succeed, it's got to provide a better level of

7  service to its residents, it's got to do so at an affordable

8  basis.  It's got to get people moving back both to the city

9  and to southeastern Michigan.

10      And if you look at it from a reasonable civic judgment

11  perspective from the DWSD, would it agree to a plan where in

12  the first nine years $428,000,000 flows out of the system.

13  And I think that the testimony will show that that is not in

14  the reasonable civic judgment of the DWSD and in fact

15  jeopardizes the services such that I -- I know that the Court

16  heard Ms. Jennings talk about the impact of loss of water and

17  sewage services to individuals who are having their services

18  cut off.

19      Services can be cut off both for financial reasons

20  because you didn't pay the bill, or because the system is not

21  functioning properly.  And the -- the hardships that she

22  discussed could be even more widespread than -- than they

23  already are.

24      As I mentioned we are concerned about the DWSD's future

25  budget and capital improvements.  The Court raised the point

1  yesterday that with respect to the pension plans which is the

2  -- the root of the money that is coming from the DWSD and

3  therefore the -- the root of our concerns.  Why should the

4  Court look at what the actuaries are going to -- to tell it

5  because, you know, we followed actuarial practice up till now

6  and it's left us with a -- a very significant under funded

7  liability.

8      And I think that the answer to that is twofold.  First of

9  all, actuarial science works in -- in the very long term.  We

10 have right now a snapshot of -- of the situation, I guess

11 we're now five years, six years after the great recession and

12 the market collapse that sucked so much value out of the

13 system.

14     And -- and of course at that point we are at an absolute

15 low point in what -- you know, in long term return on -- on --

16 on what investments would be and what assumptions we should

17 make.  Over the long term the actuarial science will show that

18 there are years where a better return on the investments will

19 justify a higher interest rate and will help destroy what the

20 recession has created which is some of the under funding.

21     What -- what I will say is, that in order for this to

22 work though, the money has to -- in a good year has to stay in

23 the retirement system as well as money getting sucked out of

24 it in a bad year.  And I think the Court is already familiar

25 and has heard about some of the practices of the past that

1   have prevented that from happening.

2       Obviously if you skew the results in the good years

3   downward by paying out -- by paying out excess benefits,

4   you're not going to get the benefit of them when -- when the

5   bad years come.  And -- and most assuredly, although hopefully

6   not as drastic as 2008 and 2009, but most assuredly bad years

7   will come again.

8       This is true also of the DWSD.  If we take money out of

9   the system at this point, we are going to render it

10  increasingly vulnerable to capital -- capital breakdown both

11  the routine breakdowns that lead to nearly 20% of the water

12  volume being unbilled to catastrophic breakdowns that could

13  interrupt services and disrupt life for everybody around the

14  Metro area.

15      Nobody is going to tell you that they have an absolute

16  solution that's going to prevent a water main break.  But the

17  current plan not only indicates, and you'll hear the testimony

18  from the DWSD representatives as well as from the experts,

19  that affordability constrained their analysis.

20      Well, and -- and the Court may look at me and say, of

21  course affordability constrains every analysis of every

22  budget.  But while affordability is constraining the capital

23  improvement budget, there is also a plan that is calling for

24  payment of the under funded pension liability in an unusually

25  short term with an unusually low discount rate which

1  completely compounds the problem.

2      If affordability is already a problem and a constraint on

3  the capital improvements that you are going to make, then you

4  cannot pull funds out of the system at the earliest possible

5  date.  You need to maintain as much as possible in the -- in

6  the system.

7      The Court also asked well, you know, there is going to be

8  testimony from Mr. Andrews as -- as Ms. Quadrozzi mentioned

9  that there may be needed up to 450,000,000,000 in -- excuse

10  me, 4.5 billion, I'm getting my numbers confused this morning,

11  I apologize.

12      4.5 billion in capital improvements over the next period.

13  And the Court said well, how is that going to be paid for.

14  And the answer -- and I agree with Ms. Quadrozzi that the

15  answer certainly is not in pulling money out of the system.  I

16  would suggest that an additional part of the answer has

17  occurred today where the -- the bond holders' settlement, my

18  understanding is that it closed this morning which will lead

19  to a significant interest rate savings for the DWSD.

20      Again, when we're all talking about budgets we are to

21  some extent shooting at moving targets.  Both the water rate

22  usage, the sewage rate usage, all change.

23      And here a -- a significant input change because

24  fortunately and change for the better because the interest

25  rate is going down.  That can help.

1       Other things that can help are -- are exploring the rates

2   as Ms. Quadrozzi said.  And a contribution from savings and

3   efficiencies to the system.

4       But the fact of the matter is that the money needs to be

5   spent.  And even if we cannot have an ideal capital

6   improvement plan, the one thing we can't have is a grossly

7   inadequate capital improvement plan.

8       So if -- if Mr. Andrews says that the system needs 4.5

9   billion dollars in capital improvements, at least we need to

10  get close to that target.  At least we need to approach it to

11  avoid both routine and catastrophic issues to the system.

12      I'm trying to edit my opening as -- as we go here because

13  there were more things said this morning that I -- that I do

14  not wish to -- to repeat.  As mentioned by others, we do

15  believe that the 6.75 rate is actuarially unsound.  That it is

16  too low and that it will shift costs to the DWSD.

17      And again it's important to -- to -- to bring this

18  together.  That the actuarial rate used will actually increase

19  the amount of the under funding if it is too low.  And it will

20  cause more money to be funded from the -- from the DWSD to the

21  general retirement system which effectively for the first nine

22  years of the plan is the only source of funds to the

23  retirement system and will go to the benefit of all retirees.

24      This both shifts the risk of the plan's success on to the

25  DWSD and violates the law about the DWSD remaining a closed

1  system.  And again I would add that it would also violate the

2  civic judgment rule.

3      From the DWSD's perspective, if you have a choice -- if

4  -- if you have a capital improvement starved system, and as I

5  think the unanimous testimony will show, and if you have a

6  choice between amortizing your under funded liability over

7  nine years or over 30 years, any reasonable civil judgment

8  from the perspective of the DWSD would say that you would not

9  take that option, that you would fund the liability over the

10 longest period possible.  And that has the added benefit of

11 making sure that you are only funding your own liability

12 because the other departments of the city will be forced to

13 fund their own.

14     Your Honor, I would -- on a final note I would -- I would

15 just add that it cannot be the answer that we simply raise

16 rates on the system.  There are already individuals and

17 communities that cannot afford the rates that exist based on

18 the -- the federal standards of what percentage of income a --

19 a water bill should be.

20     Specifically in Wayne County as mentioned in the briefs,

21 Hamtramck, River Rouge, and Inkster, all communities in my

22 county, with 55,000 total residents between them, already

23 can't afford the existing rates.

24     As the rates go up if the rates are forced to go up at a

25 -- a significant rate above inflation, that will only extend

1  not only to more residents of the city, but more communities

2  throughout Wayne County.

3      Again, services will be -- the quality of the services to

4  the residents of Detroit and the surrounding area will be the

5  marker for how this plan and how this restructuring effort is

6  judged historically.  And it is absolutely critical that the

7  quality of services improve the -- or the plan will fail.  And

8  the communities surrounding Detroit will suffer as well as it.

9  Thank you, Your Honor.

10         THE COURT:  Thank you, sir.

11         MR. DECHIARA:  Good morning, Your Honor.  Peter

12  Dechiara from the law firm of Cohen, Weiss, and Simon, LLP for

13  the UAW International Union.

14      Your Honor, before I launch into my remarks, I would just

15  like to inform the Court that the UAW is and continues to work

16  in earnest on reaching settlement of its issues and we hope to

17  reach a settlement prior to the September 30th day for when we

18  will put on our case.

19      Let me begin --

20         THE COURT:  Good idea.

21         MR. DECHIARA:  Let me begin by referring to a

22  colloquy Your Honor had yesterday with one of the counsel for

23  the financial creditors concerning whether or not, and this --

24  this arose in a discussion concerning the DIA.  Whether or not

25  the city could or should sell a library.

1       And I thought that was a good segue to my comments today

2  because putting aside whether or not as a philosophical matter

3  the city should sell a cultural asset like a library, the fact

4  of the matter is the city in this instance cannot sell the

5  library because the library does not belong to the city.  The

6  library is a distinct and separate municipal corporation.

7       The UAW objects to the city's plan of adjustment because

8  the plan by its terms would cut the pensions and OPEB of

9  employees and retirees of the Detroit Library Commission.  The

10 UAW is the collective bargaining representative not just of

11 certain units of city employees, but also three units of

12 library employees.

13      The UAW will present evidence that the library is a

14 municipal corporation separate from the city that has its own

15 source of revenue that hires and fires its own employees, and

16 that engages independent of the city in collective bargaining

17 with unions that represent its employees, including with the

18 UAW.

19      The library's employees and retirees are participants in

20 the same general retirement system pension plan as the

21 employees and retirees of the city.  But it is the library,

22 not the city, that pays out of its own funds the pension

23 contributions for the library employees and retirees.

24      The library has been making these contributions as far as

25 we know since 1938 when the library joined the GRS and it

1    continues to make those contributions today even after the

2    filing of the city's Chapter 9 bankruptcy.

3        The evidence will show that the GRS accounts separately

4    for contributions made by the library for the library GRS

5    participants and the GRS accounts separately for the pension

6    liabilities for the library participants.

7        The library also pays for the OPEB for the library's

8    retirees even though that OPEB -- even though those OPEB

9    benefits happen to be administered by the city.

10        The UAW has collective bargaining agreements with the

11    library that -- that remain in full force and effect and that

12    mandate the provision of these pension and OPEB benefits.

13    Despite all of this, the city's plan of adjustment defines

14    Class 11 to include any GRS participant.  And the city has

15    made clear to the UAW that this includes library participants.

16        In other words the plan would cut the pension benefits of

17    library employees and retirees just as it would cut the

18    benefits of city employees and retirees.  And not only would

19    the plan cut their defined benefit pensions, but it would also

20    subject the library GRS participants to recoupment from their

21    annuity saving fund accounts.  And we'll have testimony from

22    one of the librarians who will testify that she faces over

23    $100,000 in ASF recoupment.

24        The plan would reduce the library's contributions to the

25    GRS despite the fact that the city's own disclosure statement

1    says the plan would not affect the library's obligations and

2    despite the fact that the library is continuing to make

3    contributions to the GRS.

4        The plan also provides no exclusion from Class 12 for

5    retirees of the library who are now receiving OPEB benefits.

6    Worse still, while the plan would eliminate OPEB benefits for

7    library retirees, it excludes them from the VEBA that is to be

8    established to provide OPEB for city retirees, leaving the

9    library retirees who lose their OPEB with no recovery at all

10   and no alternative source of benefits.

11       It is the UAW's position in this trial that the city's

12   plan cannot be confirmed so long as it cuts pension benefits

13   of library GRS participants, subjects them to ASF recoupment,

14   and terminates their OPEB benefits.

15       Chapter 9 says that a debtor, "shall file a plan of

16   adjustment of the debtor's debts".  That's 11 USC Section 941.

17   But the library is not a debtor in this case.  And the

18   library's obligations are not debts of the debtor that are

19   subject to adjustment by this Court.

20       To the extent the plan affects the pensions and OPEB of

21   library employees and retirees, the plan violates Section

22   1129(a)(3) which requires that the plan be proposed in good

23   faith and not by any means forbidden by law.

24       First, cutting pension benefits of library participants

25   in the GRS would contravene the pension clause of the Michigan

1  constitution which as Your Honor well knows provides that

2  accrued pension benefits shall not be diminished nor impaired.

3      While this Court has held that Article 9, Section 24 of

4  the Michigan constitution does not preclude cutting pension

5  benefits of city employees, that ruling does not and cannot

6  extend to pension obligations of a municipal corporation that

7  is not a debtor in this case.  And this includes amounts in

8  the annuity savings fund accounts of the library employees and

9  retirees.

10     The State of Michigan has never consented to a Chapter 9

11  filing by the library authorizing this Court to adjust the

12  pensions of the library retirees and employees.

13     Moreover, at least as to those library employees and

14  retirees from UAW represented bargaining units, the library

15  has an ongoing contractual obligation to furnish pension and

16  OPEB under its collective bargaining -- excuse me, collective

17  bargaining agreements with the UAW which remain in effect.

18     This Court has no authority to alter those contractual

19  obligations.  For all of these reasons, the plan should not be

20  confirmed unless it is modified to make clear that it has no

21  impact on pension benefits and OPEB of library employees and

22  retirees.

23     Your Honor, there are some additional legal arguments we

24  make in our pre-trial brief.  For the sake of brevity, I will

25  not go over those now.

1           THE COURT:  Okay.  Thank you.

2           MR. MACK:  Good morning, Your Honor.  Richard Mack

3    on behalf of AFSCME.

4           I think I have the distinct honor of being last.  I don't

5    know whether that brings you pleasure or pain.  But I promise

6    you I'll be very brief because the issues that AFSCME has

7    concerning the library are identical to what you just heard

8    with the UAW.

9           There is one supplementation that we would add.  There

10   are six employees who are represented by AFSCME that are

11   employed by the Detroit Regional Convention Facility

12   Authority, Cobo Hall as commonly known.

13          And similarly with the library, there is a state statute

14   which requires that the contributions are made by the employer

15   into GRS fully funded.  So in other words the library as well

16   as the Cobo Hall authority has -- is required by state statute

17   to pay for the pension benefits of its employees.

18          The library and the authority are required by state

19   statute to pay for the OPEB benefits for its employees.

20   There's no dispute that these employees of these two entities

21   participate in the City of Detroit's OPEB programs and in GRS,

22   but they're paid for by state statute.

23          So in requesting -- in the city requesting Your Honor to

24   affirm a plan which requires impairment of those individuals,

25   even though their benefits have already been paid for, it's

1   asking Your Honor to violate a state law, in fact two state

2   statutes.

3       Very briefly I'll just quote from one of the state

4   statutes concerning the authority.  And it states that the

5   authority must, "contribute an amount determined by the local

6   government system actuary to be sufficient to fund the

7   liability for all of that employee's retirement and other

8   post-employment benefits under the system on a current basis".

9       Now AFSCME has not submitted any witnesses in this

10  matter, Your Honor, because we think frankly that the issues

11  are not really in dispute.  In looking at the city's fourth

12  amended disclosure statement and even its pre-trial brief

13  which was filed on August 27th, there's really no dispute over

14  the fact that the library is a separate entity, the city

15  acknowledges that.

16      There's no dispute over the fact that the library and the

17  authority maintain -- have benefits maintained by the GRS and

18  OPEB programs of the city.  There's no dispute about the

19  contractual relationship between the library and the authority

20  and its employees.  The city acknowledges that.

21      As a matter of fact the city indicates in its pre-trial

22  brief on Page 120, "the city has no contractual obligations

23  whatsoever to provide retiree welfare benefits and to the

24  library or DRCFA, the authority's retirees".

25      So there's an acknowledgment by the city that it is not a

1 part of that contractual relationship between the library, the

2 authority, and its union members.  And then there's no dispute

3 that the library and the authority pays for those benefits as

4 indicated again in Page 147 of the disclosure statement by the

5 city.  They indicate that the library pays an ad valorem tax

6 and is -- contributes on an actuarilly determined weight into

7 the GRS.

8     So and of course there's no dispute that the city -- I'm

9 sorry, the city acknowledges that the -- the library in fact

10 reimburses for those benefits.  We're on Page 120 of the

11 pre-trial brief, the city states, "the city is entitled to be

12 reimbursed by the library and the DRCFA for the cost of

13 providing retiree health and welfare benefits for their

14 respective retirees".

15     So essentially Your Honor, what you have is the city

16 impairing benefits that have already been paid for.  And I

17 think that's an important point.

18     With respect to cutting benefits of city retirees, it's a

19 different issue, that's an asset of the city, that's property

20 of the city.  But these benefits have been paid for by the

21 library.  And if there's any under funding concerning that

22 issue, that's for the library and the authority to deal with

23 separately.

24     And not only are there state statutes concerning these

25 issues, but there's also regarding contributions made into the

1   GRS and the OPEB program specifically, but there's also state

2   labor law.  There are legal obligations that the library and

3   the authority have to maintain its current benefits for those

4   employees and contractual obligations for those retirees kind

5   of brought out of the Public Employment Relations Act.

6       So for the city to ask Your Honor to impair those

7   benefits and to bring about a change in those benefits for the

8   active employees of the library and authority as well as for

9   their retirees, it would asking Your Honor to violate PERA and

10  state contractual law.

11      So for those reasons, Your Honor, we would simply ask

12  that the plan not be confirmed unless those provisions are

13  removed.  And I will state again, AFSCME is absolutely in

14  earnest seeking resolution of this matter as -- as I indicated

15  when we were scheduling the September 30th date.  I

16  specifically asked to have a date as far out as possible in

17  order to give us enough time to do that.  So we hope that this

18  matter will be resolved.  Thank you, Judge.

19          THE COURT:  And thank you.  Any other opening

20  statements?  All right.  Let's take our 15 minute recess now

21  and then we'll begin with the evidence and we will reconvene

22  please at 10:00.

23          THE CLERK:  All rise.  Court is adjourned.

24      (Court in Recess at 9:44 a.m.; Resume at 10:00 a.m.)

25          THE CLERK:  All rise.  Court is back in session.

1  You may be seated.

2       MR. SMITH:  Good morning, Your Honor.  You had

3  scheduled an argument on the Hill Daubert motion before Mr.

4  Hill testified.

5       THE COURT:  Oh, yes.  Okay.  You may proceed.

6       MR. SMITH:  And -- and I'll be brief.  As the city

7  acknowledged -- the city had mentioned, our motion is a narrow

8  one.

9       Mr. Hill has been designated as a fact and expert witness

10  and submitted a short expert report.  In his expert report he

11  wants to talk about how the consensus, the city's consensus

12  revenue conference, the results they obtained were consistent

13  with the Ernst & Young objections and the Conway, MacKenzie

14  reinvestment initiatives were reasonable.

15      And we don't have a problem with him talking about the

16  consensus conference that he participated in as a fact

17  witness.  But we do object to him vouch -- essentially

18  vouching for expert opinions by the city's experts which we

19  think is problematic for a few reasons.

20      First, Mr. Hill testified in his deposition that he -- he

21  doesn't know what the details or methodology of the Ernst &

22  Young forecasts were and he couldn't explain the calculations

23  that Conway, MacKenzie did.

24      So he may have some qualifications and we dispute some of

25  -- we don't think he has -- he's qualified to testify about

1  all aspects, but he -- he just hasn't done the leg work to be

2  able to talk about the Ernst & Young and Conway, MacKenzie

3  materials.

4      Second, even if he had done the work under Rule 702 it's

5  improper to have one expert come in and vouch for the opinions

6  of another.  And the city really doesn't dispute that point of

7  law.  Instead they suggest well, he's really not vouching for

8  their opinions.

9      But if you look at their response brief, you know, they

10  say on Page 10 that since Mr. Hill also knows the

11  methodologies used by EY which again said he didn't, he is in

12  a position to testify that the results reached by the two

13  approaches are properly compared and since E & Y and the RCCR

14  reached almost the same conclusions, this corroborates the

15  reliability of each approach.

16      While determinations of liability are before the Court,

17  Your Honor, it's not going to help to have one expert come in

18  and say oh, I looked at this and this is reliable.  And it's

19  particularly true here because as we know from the city's

20  internal correspondence, Ernst & Young was actually in the

21  room at the consensus conference and was preventing them from

22  taking a totally different view of revenues in the plan.

23      And Roman, if we could have Exhibit 4126.  And I -- I can

24  just read this while it's coming up on the screen.  This is

25  some internal email correspondence between Mr. Hill and his

1  colleagues and Mr. Hill's deputy Mr. Naglick noted EY Shavi

2  takes part to keep the group on track with comparisons to plan

3  of adjustment.

4      They try to mainly listen to the point of view of the

5  participants but then keep them from taking a totally

6  different view from revenues in the plan.  Don't know when the

7  plan is to share this with the FAB.

8      So it's not surprising that there is some consistency

9  between the consensus revenue report and the Ernst & Young

10 forecast because they had people from Ernst & Young and

11 Conway, MacKenzie sitting there.

12     So having a witness come in and tell you that is not

13 really going to be helpful to the Court.  And it's further not

14 going to be helpful to the Court because really there is a gap

15 between Mr. Hill's opinions and what the issues are in this

16 case.

17     Because the consensus revenue forecast had a very narrow

18 scope.  It didn't include revenues from the revenue

19 initiatives, it didn't include things like increased tax

20 collections the city was projecting.  Didn't include things

21 like accounts receivable rather Mr. Hill's only saying that

22 it's consistent with the baseline scenario that Ernst & Young

23 has.  It doesn't include all -- all the revenues that they're

24 projecting in the future from the revenue initiatives and

25 things like that.

1       So it's really not going to be very helpful to the Court

2   to say oh, it's consistent with their baseline scenario.  What

3   the Court is going to be looking at is how much revenue in

4   total is the city going to have which includes the revenue

5   initiatives, increased tax collections, things like that.

6       And obviously the revenue conference only looked at three

7   years.  It only looked at revenues, not expenses.  It didn't

8   go out to ten, or, you know, four year -- this four year

9   simulation that the city is sponsoring.

10      Stepping back for a minute, the Court might ask why does

11  the city think it's necessary to even have Mr. Hill come in

12  and try to vouch for the Ernst & Young forecast.  And we think

13  that it's clear from the record that's in the Daubert brief on

14  the forecast that many of the assumptions in the Ernst & Young

15  forecast are based on no date or they're based on -- or

16  they're actually inconsistent with the existing data.

17      And even when the Ernst & Young experts did look at data

18  as we saw with Mr. Cline, what they did was number one, bias

19  to lower the revenues.  For example Mr. Cline came in here and

20  he only looked at employment up till 2012, ignoring 2013 and

21  2014 when employment was increasing.  And then he didn't even

22  know what his employment numbers were based on.

23      He -- he came in here and said how wrong it would be to

24  use the unadjusted data and then low and behold I turns out

25  that's exactly what was in there.  So I think it's obvious why

1  they want Mr. Hill to come in here and try to vouch for the

2  testimony of these other experts, but it's inappropriate under

3  Rule 702.

4      And again we have no problem with him testifying as a

5  fact witness about consensus conference.  And the Court --

6          THE COURT:  Why does what Mr. Hill propose to

7  testify about constitute vouching?

8          MR. SMITH:  Because he's saying number one, that

9  Ernst & Young's calculations are consistent with the

10 calculations of the consensus conference which the city has

11 said in its response, it's going to use to demonstrate the

12 reliability of the Ernst & Young forecast and he's also going

13 to come in and say, I've looked at Conway, MacKenzie numbers

14 on the reinvestment initiatives and they're reasonable.

15     So he's bolstering what they did.  He's saying it's

16 reasonable and it's reliable.  And that's why it's vouching,

17 Your Honor.  Thank you.

18         MR. STEWART:  Your Honor, Geoffrey Stewart of Jones,

19 Day for the city.

20     Let me deal with one issue on this very quickly.  The

21 relevance of the baseline forecast as Your Honor would

22 remember from Mr. Cline's testimony, is that is the baseline

23 from which everything else is constructed.  So it becomes --

24 it's relevant per say for that reason.

25         But this isn't vouching and here's why it's not vouching.

1  Mr. Hill is the CFO of the city and it's going to fall on his

2  shoulders in the coming years if this plan is confirmed to

3  actually do the work to make the plan happen.

4      And I can't emphasize that enough.  This is the man whose

5  job it is going to be to deliver on those numbers.  And the

6  projections he dealt with from EY and Conway are the -- the

7  projections in the plan.

8      That is a given to him.  And so when he looks at them in

9  terms of his knowledge, experience, and the obligation he's

10  now going to be shouldering, it's highly relevant whether he

11  believes them to be reasonable or not regardless of who came

12  up with them or where they came from because these will be the

13  plans that he must execute upon.

14      The revenue consensus conference as we'll hear in a

15  moment, is a method the state and city have used for years to

16  figure out that hardest of budgetary propositions, namely

17  predicting revenue.  Expenses is a different story, but

18  revenue is hard.

19      The state and the city for some long period of time have

20  done this by pulling in people from different parts of the

21  government asking each to give an estimate, and then having

22  them sit down in a room and working out a consensus.  That was

23  done here.

24      It is important because to the extent that process has

25  yielded forecasts that are consistent with the plan, it helps

1  support the view whether the plan can be -- can be delivered

2  upon by Mr. Hill and whether the plan in his view is

3  reasonable.

4      I'd reflect on one thing about this motion.  I think it

5  is not so much a motion in most parts whether Mr. Hill should

6  be giving expert testimony.  I think it is more the question

7  is this expert testimony at all.

8      And if it is, I think we're covered.  If it is not, this

9  is moot.  One reason we designated him was to avoid some of

10 the issues we ran into in eligibility since he is so highly

11 knowledgeable, I did not want to be cabined in in examining

12 him by artificial distinctions of when he'd be wearing his hat

13 as a fact witness and when he might be stating things that

14 come from his expertise.  So that is why he's designated.

15     But in any event, I don't think there's any vouching

16 going on here.  He is dealing with the hand he was dealt and

17 he's opining on that hand.  The hand was dealt by E & Y and

18 dealt by Conway.  But that -- he is not going into their

19 methods or how they got there, this is what if Your Honor

20 approves the plan, what Mr. Hill will be living with.  Thank

21 you.

22         THE COURT:  Anything further, sir?

23         MR. SMITH:  The only thing I'd -- Your Honor, I'd

24 just remind you, is what they said in their response brief.

25 They say since Mr. Hill also knows the methodologies used by

1  EY, he is in a position to testify that the results reached by

2  the two approaches are properly compared and since E & Y and

3  the RCCR reached almost the same conclusions, this

4  corroborates the reliability of each approach.  That is

5  vouching, Your Honor.

6        THE COURT:  I have a sense that what this -- what

7  Syncora asserts is vouching by Mr. Hill is really more

8  argument by the city and its lawyers regarding the consistency

9  of its witness' testimony.

10     We can argue or dispute later whether that kind of

11  argument is appropriate or not.  But I don't see any violation

12  of Rule 701 or 702 here.  Accordingly, the motion is denied.

13        MR. STEWART:  Your Honor, the -- the city would call

14  John Hill to the witness stand.

15        THE COURT:  Mr. Hill, before you sit down, would you

16  please raise your right hand?

17     (WITNESS JOHN HILL WAS SWORN)

18        THE COURT:  All right.  Please sit down.

19        MR. STEWART:  Your Honor, I believe the Court has

20  asked that we provide the Court with five sets of the exhibits

21  we intend to use and I'm holding them.  May I approach and

22  hand them --

23        THE COURT:  Okay.

24        MR. STEWART:  Who -- who wants a set?  A set of these

25  also has been put on the witness stand and given to Mr. Smith.

1   May I proceed, Your Honor?

2           THE COURT:  Yes.

3           MR. STEWART:  Okay.

4                       DIRECT EXAMINATION

5   BY MR. STEWART:

6   Q    Mr. Hill, can you please give us your full name?

7   A    My name is John Wesley Hill, Jr.

8   Q    And where do you live?

9   A    I live at 1515 O Street, North West, Washington, D.C.

10  While in Detroit I live at 527 West Lafayette Avenue.

11  Q    Are you -- are you employed?

12  A    Yes, I am.

13  Q    What is your job?

14  A    I'm employed as the CFO of -- of Detroit.

15  Q    And how long have you been Detroit's Chief Financial

16  Officer?

17  A    Since the end of November.

18  Q    Of?

19  A    Of last year.

20  Q    Tell us in a nutshell, and I'm going to come back to

21  this, in a nutshell what are your responsibilities as the CFO

22  of the city?

23  A    As -- as the CFO I'm responsible for the budgeting.  Also

24  responsible for financial reporting.  And I'm responsible for

25  tax collections.  And also I'm responsible for managing and

1  paying debts and cash management.

2  Q    Let me ask a --

3  A    And a couple of other items as well.  I'm also

4  responsible for procurement for the city.

5  Q    Tell us if you could about your education.

6  A    Yes.  I have a B.S. Degree from the University of

7  Maryland which I received in 1976.

8  Q    In what field was your degree awarded?

9  A    It was in accounting.

10 Q    After college -- well, let me ask this.  Do you have any

11 professional or have you had any professional certifications?

12 A    Yes.  I passed the CPA exam in 1977.

13 Q    Are you active as a -- as a CPA?

14 A    I do not have a license right now.

15 Q    Is there something called a certified government

16 financial manager?

17 A    Yes.  I became a certified government financial manager

18 when I was at the general accounting office.

19 Q    And tell us first of all who awards that certification?

20 A    It's a separate certifying body.

21 Q    Okay.  And what is it a certification of?

22 A    It looks at a number of different areas but principally

23 the government financial management, government budgeting,

24 internal controls, auditing, those are the various categories.

25 Q    Okay.  Now after college you went to work in public

1  accounting for a few years, did you not?

2  A    Yes, I did.

3  Q    And you were at various times at Coopers and Lybrand and

4  also at PriceWaterhouse?

5  A    Yes, I was.

6         THE COURT:  Excuse me one -- one second.  I'm going

7  to step down from the bench and adjust that monitor so I can

8  see the witness better.

9         MR. STEWART:  Oh, okay.  Oh, of course.

10        THE COURT:  Much better.  Thank you.

11 Q    Did there come a time when you went to work for Marriott

12 Corporation?

13 A    Yes, I did.

14 Q    What year was that?

15 A    That was in -- oh, let's see, 1980 -- it was around 1980,

16 around that time.

17 Q    And what was your position at Marriott?

18 A    I was director of audits for the hotel division of

19 Marriott Worldwide.

20 Q    Did there come a time when you went to work for the

21 general accounting office?

22 A    Yes.

23 Q    For the record what is the general accounting office?

24 A    At that time it was called the general accounting office.

25 It's now the government accountability office so that we were

1   able to keep the same initials.  But that was in -- that was

2   in 1985.

3   Q    Okay.  And how long were you at the GAO?

4   A    For ten years.

5   Q    So I'm going to go through the jobs that you held there.

6   What was the first position that you had?

7   A    The first position that I had, I was a group director in

8   the accounting and financial management division.  And in that

9   position I actually came to GAO with two other managers of CPA

10  firms to do the first audits of government agencies.  So I did

11  a lot of the General Services Administration, the Veterans

12  Administration, and the Department of Agriculture were the

13  three that we did.

14  Q    Did there come a time when your title changed?

15  A    Yes.  I actually became a director after becoming a -- a

16  senior executive service member.

17  Q    Just for the record, what does senior executive service

18  mean when one works for the Federal Government?

19  A    It is -- it is the -- one of the highest career levels

20  within the government.  And GAO only has two positions that

21  will be above the senior executive service level.

22  Q    Did there come a time when your work at GAO caused you to

23  focus upon the fiscal posture of the City of Washington, D.C.?

24  A    Yes, there was.

25  Q    When was that?

1  A    That was about three or four years before the actual

2  creation of the control board.  So that was around 1990, '91

3  period.

4  Q    What were you asked to do at GAO with respect to the

5  District of Columbia?

6  A    Well, I was -- I was actually in charge of the

7  implementation of the Chief Financial Officer's Act when I

8  returned to their accounting and financial management

9  division.  And they asked me to lead the group that would

10  review the financial crisis that was beginning to loom over

11  the district's budget.

12  Q    Before we go there, I should have asked you, you've

13  talked about being one of the people implementing the CFO Act.

14  Just for the record what is the CFO Act?

15  A    The -- Congress passed legislation that required every

16  government agency to have and designate a CFO.  And also --

17  and as part of that act they also required that there be

18  financial audits of each government agency.

19      And I was the person who was tasked with helping the

20  CFO's of government agencies actually implement that

21  legislation.

22  Q    So I had interrupted.  You were telling us about your

23  work involving the District of Columbia.

24  A    Yes.  I was asked to lead a group to review the financial

25  crisis over the District of Columbia and testify before

1  Congress several times on -- on what was causing the issues

2  that the district was facing and also what some of the

3  potential solutions might be.

4  Q    Did there come a time when you left the GAO and took a

5  position with something called the D.C. Control Board?

6  A    Yes.

7  Q    Before we go further, I'd like you tell us what exactly

8  is or was the D.C. Control Board.

9  A    The D.C. Control Board which is the short name for it, it

10 was the D.C. Financial Management and Fiscal Responseability

11 Authority.  So it had a much longer name.

12      But the D.C. Control Board was created by an economist of

13 the United States.  It was a group of five members who were

14 appointed by the President.  They were all volunteers.  And

15 they had the responsibility for overseeing the finances of the

16 district of initially.

17 Q`   And -- and first of all, how many years were you at the

18 D.C. Control Board?

19 A    I was there for four years.  The first four years of the

20 control board.

21 Q    Did its responsibilities change during those four years?

22 A    Yes, it did.  The Congress was -- obviously the -- the

23 district is a place where anything that happens gets touted in

24 the press.

25      And so at the time we were working with Marion Barry who

1 | had been re-elected as Mayor of the district. And on about

2 | every issue the Mayor was fighting the control board and it

3 | became very public.

4 | The Congress was very concerned that that was slowing the

5 | pace of change in the city. And so the Congress took the nine

6 | largest agencies of the District of Columbia and moved them

7 | under the control board. So we then ended up running the nine

8 | largest agencies.

9 | Q    And I had forgotten to ask you, what was your title at

10 | the control board?

11 | A    I was the executive director. I was the top staff of the

12 | control board.

13 | Q    How many staff people worked there?

14 | A    At its height it was approximately 35, so --

15 | Q    And so tell us if you could, what were your

16 | responsibilities on a day to day basis and perhaps a higher

17 | basis while you were executive director of the D.C. Control

18 | Board.

19 | A    Well, I certainly supported the control board members

20 | because they were part time. None of them have full time

21 | jobs. It was my responsibility to make sure that all of the

22 | issues that needed their attention, brought it up to them.

23 | I also worked directly with the department heads on -- on

24 | their projects some of which were projects to help improve the

25 | efficiency and effectiveness of government in those areas.

1  Q    What responsibilities did you have for matters involving

2  budgeting for the nine departments the control board was

3  responsible for supervising?

4  A    Well, initially the control board took the tact of

5  actually reviewing the budget of the city and trying to get

6  the Mayor and the council to make the necessary changes.  One

7  of the largest issues was around reductions in staff.

8      It was thought that the city had quite a few more staff

9  than they needed.  And once the city was not willing to make

10 those changes, I actually reconstructed the budgets of the

11 District of Columbia and we -- we stepped into the shoes of

12 Congress and sent them to the Congress for approval.

13 Q    Is it fair to say the budgeting process became a process

14 the control board was in charge of?

15 A    Absolutely.

16 Q    And within the control board who was it who was

17 responsible for that budgeting process?

18 A    I was.  I was principally -- I was the chief staff, I was

19 responsible.

20 Q    As part of the budgeting was there a requirement to

21 forecast revenues or expenses for the city's departments, or

22 the city or its departments?

23 A    Yes, there -- there was.

24 Q    And was the responsibility?

25 A    The responsibility was to forecast all the various types

1  of revenues because that would set the absolute maximum

2  spending that would be allowed under the budget.  So -- so

3  before you would even start to construct what the expenses

4  would be you'd have to know how much revenue you were dealing

5  with.

6  Q    Did there come a time when you left the control board?

7  A    Yes.

8  Q    Where did you go?

9  A    I went to Arthur Andersen who later changed their name to

10 Andersen at the time.

11 Q    Okay.  What was your position at Andersen?

12 A    I was the partner in charge of state and local government

13 consulting for North America.

14 Q    Now after Arthur Andersen, you worked for a time for a

15 group called the Federal City Council?

16 A    Yes.

17 Q    Could you tell the Court what is the Federal City -- and

18 that's in Washington, D.C.?

19 A    It is in Washington, D.C., yes.

20 Q    What is it?  What is the Federal City Council?

21 A    The Federal City Council is a group of CEO's of major

22 companies in Washington so it would be pretty much the largest

23 companies.  And Federal City Council does projects to help

24 improve the -- the operations and the economics of Washington,

25 D.C.

1  Q    And after that did you start your own company?

2  A    I did.

3  Q    And what's the name of your company?

4  A    J. Hill Group.

5  Q    I should have asked you, do you sit on the boards of

6  directors of any public corporations?

7  A    Yes.  I sit on the board of two public corporations.

8  Q    What -- what are the two?

9  A    One of them is called the Costar Group where I chair the

10  audit committee.  And the other is Chesapeake Lodging Trust

11  Corporation where I chair the compensation committee and am a

12  member of the audit committee.

13  Q    Okay.  Now there came a time when you were asked to

14  become the CFO of the City of Detroit?

15  A    Yes.  I remember it well.

16  Q    And in that position what responsibilities have you had

17  for budgeting and forecasting?

18  A    I've had the responsibility to manage the consensus

19  budget process and also to pull together the budget that was

20  submitted to the council for approval.

21  Q    And what responsibilities have you had for reorganizing

22  or restructuring the finance function of the city?

23  A    Well, one of the plan of adjustment items that we've

24  already begun implementing is the restructuring of the office

25  of the CFO.  There was not an office of the CFO in the charter

1  for the city.  And so I am responsible for that restructure

2  that we're putting in place.

3          MR. STEWART:  Your Honor, I would move to qualify

4  Mr. Hill as an expert witness on government financial

5  management and restructuring.

6          MR. SMITH:  No objection.  We'll reserve our issues

7  for cross examination, Your Honor.

8          THE COURT:  You may proceed.

9          MR. STEWART:  Thank you.

10 Q    So now let me ask you about your employment by the city.

11 You -- I think you said you started in November of 2013?

12 A    Yes.

13 Q    How did your hiring come about?

14 A    The -- the previous CFO had -- had left and I was asked

15 by the emergency manager if I would become a CFO.  I had been

16 working on a project as -- as a -- my -- my company.  And the

17 project was to improve grants management operation.

18      And they also knew my background.  And so I was asked by

19 the emergency manager if I would step in and -- and help and

20 be the CFO.

21 Q    So let me break that down.  The emergency manager of

22 course is Mr. Orr.

23 A    Yes.

24 Q    And you -- you have told us that you had been working on

25 a project for the city before you were approached about

1  becoming it's Chief Financial Officer?

2  A    Yes.

3  Q    What was the project again?

4  A    Well, one of the principal pain points of the city with

5  respect to making sure that it's able to keep and use all of

6  the resources that it has, was the grants management

7  operation.  And the emergency manager wanted us to take a look

8  at grants management, come up with a solution, and then help

9  to implement that solution.  And I was working on that

10 project.

11 Q    Okay.  Is your tenure as CFO linked to the tenure of the

12 emergency manager himself?

13 A    It -- it is.  I have a contract that goes through the end

14 of September.  And -- and that's currently in my contract.

15 Q    Okay.  And what happens to your position if -- when the

16 emergency manager leaves, or his term expires?

17 A    My expectation is that my contract will be extended.  And

18 there is a process for selecting a new CFO that's embedded in

19 state legislature.

20 Q    And let's take a minute to talk about the legislation.

21 First of all, what is the state legislation you're referring

22 to?

23 A    Well, there -- there are two pieces.  There's a piece of

24 legislation that creates an office of the CFO in the charter

25 of the city.  And then -- and it's actually for cities over

1  600,000.  So it doesn't specifically name Detroit.  But I

2  think Detroit is the only city in Michigan over 600,000.

3  Q    Okay.

4  A    And then there's also a -- a piece of legislation that

5  creates a financial review commission that is also part of the

6  selection process for the CFO.

7  Q    So tell me as it has now been set forth in this

8  legislation, what will the selection process be for the CFO?

9  A    The Mayor nominates a new CFO.  Once the city exits

10 bankruptcy the CFO has to be confirmed by the council and then

11 also has to be confirmed by the financial review commission.

12 Q    Now where does that process stand today as it comes to

13 you?  I mean have you spoken to the Mayor or -- or what --

14 where are we with this?

15 A    Well, the Mayor was a part of -- of my selection process

16 as CFO before the emergency manager appointed me.  The Mayor

17 elect was actually.

18      And so I met with the Mayor elect and with

19 representatives of the state at that time.  The Mayor elect

20 asked me at that time if I would commit to four years which

21 would have been the rest of his term and I -- I said I wasn't

22 able to do that at this point, but let's go forward with the

23 existing contract and then, you know, he will -- he will

24 decide ultimately.

25 Q    Okay.  So where does this stand today?

1  A    It -- it doesn't.  I mean the Mayor has -- has indicated

2  his intention to appoint me, but obviously there's no

3  authority under which to appoint me to a position that isn't

4  created yet.

5  Q    If appointed and confirmed, would you serve?

6  A    I -- I would, yes.

7  Q    For how long?

8  A    That's uncertain but there are a number of major projects

9  that I'm in -- in the middle of right now and I think it's

10  very important to -- to continue the work that -- that I've

11  started.

12  Q    Okay.  Let me now ask you about the office that you had.

13  First of all, there's something called the office of the Chief

14  Financial Officer?

15  A    Yes.  There -- there is.

16  Q    Okay.  And what is that?

17  A    The office of the Chief Financial Officer would be the

18  CFO and also would be the director of finance.  You mean in

19  the new structure or --

20  Q    No.  It's -- I gather -- well, in -- yes, the new

21  structure.

22  A    Yeah.

23  Q    In fact why don't we put up demonstrative exhibit --

24  sorry 598.  Mr. Hill, could you tell us what demonstrative

25  Exhibit 598 is?

1  A    This is the current draft of the -- the revised

2  organizational structure for the office of the CFO.

3       (City's Exhibit 598 was identified)

4  Q    Okay.  And who -- who's decided this is the structure the

5  office should have?

6  A    I have in consultation with the emergency manager and the

7  Mayor.

8  Q    Okay.  And -- and how many people all together work in

9  the units of government we see on our demonstrative exhibit?

10 A    Well, total there would probably be about 400 people

11 which would include the -- any function within the agencies

12 that has a financial responsibility.  So --

13 Q    Sorry.  Go ahead.  I'm sorry.  I didn't mean to cut you

14 off.  Have you finished your answer?

15 A    It's just that this -- this structure really consolidates

16 all of the financial functions in government under the office

17 of the CFO.

18 Q    Okay.  So on our chart here we have you at the top, or

19 the CFO at the top.  And then four offices right underneath

20 you.  Grants management, contracting, and so on.  Please let's

21 go through them one by one.  What does grants management do?

22 A    The grants management office would be responsible for the

23 administrative functions essentially with the grants, grant

24 compliance, and also supporting the audit of grant functions

25 as well as being responsible for the centralized documentation

1  of grants.

2  Q    And then there is the office of contracting and

3  procurement.  Is it fair to say it does what it sounds like,

4  it contracts and procures?

5  A    Yes.

6  Q    Then we have agency CFO's.  What is that a reference to?

7  A    That's a -- there are people who currently are in the

8  departments who are designated as the top financial person

9  within that department.  They are agency CFO's.  Under this

10 structure they would report directly to the -- the overall

11 city Chief Financial Officer.  Under the current structure

12 they report directly to the agencies with the dotted line to

13 the CFO.

14 Q    And then we have the office of the assessor.  What is the

15 assessor?

16 A    That's the office that actually assesses property and

17 comes up with the values that are used in the assessment

18 process.  It manages the assessment process.

19 Q    And who is the assessor today?

20 A    The assessor is Gary Evanko.

21 Q    And who is the number two in that office?

22 A    Alvin Horhn.

23 Q    And have you worked with both?

24 A    Yes, I have.

25 Q    Okay.  Now I'm going to go to the next level of

1  organization.  There are four more boxes.  There's the office

2  of budget, then of treasury, then comptroller, and then it

3  looks like financial planning and analysis.  Tell me just

4  first of all what is -- what are the responsibilities of the

5  office of budget?

6  A    It -- it -- I guess technically those are all on the same

7  level because they all report up.  I just couldn't get them

8  all in -- in that one line.

9       But the office of budget is responsible for both the

10  development of the budget as well as monitoring the execution

11  of the -- the -- the implementation of the budget parts of the

12  new financial management system which is a special area that

13  we wanted to call out.

14  Q    Okay.  And who is the head of that -- who is the head of

15  the budget office?

16  A    Well, the head of the budget office is a Pam Scales,

17  Pamela Scales.

18  Q    Then office of treasury, what does it do?

19  A    The office of treasury is the office that handles all of

20  the cash management functions.  And also is responsible for

21  the taxing revenue division.

22  Q    Okay.  And I'm sorry and that's headed by who?

23  A    It's actually headed by the person who is also the

24  director of finance who is John Naglick.  So he has a dual

25  title.

1  Q      And then we have office of the controller.

2  A      Right.

3  Q      What does -- what does the controller do?

4  A      The office of the controller would be the area where we

5  would have all of the books and records of the city would be

6  kept so they would do all of the accounting functions for the

7  city.  They would be responsible for risk management as well

8  as payroll processing.

9  Q    Is this a new office?

10  A    It -- it is -- it was always a part of the finance

11  director's office.  So it's not -- it's new in the way that

12  it's been set up here.  It was always a part of the finance

13  director's office.

14  Q    And then finally the last box I'm going to ask you about

15  is the office of financial planning and analysis.  What is

16  that?

17  A    The office of financial planning and analysis is a new

18  office.  This is the office that is expected to help the

19  directors and the Mayor really commit finance information to

20  programmatic information.  And so they would also have a major

21  role in monitoring the implementation of any of the projects

22  under the plan of adjustment, the restructuring projects.

23        And also they would have a role in making sure that the

24  data that's collected in the financial system would be able to

25  help the departments to do the kinds of analyses that they

1  would need to do going forward.

2  Q   Is that a new -- you said it's a new office.  Who -- who

3  heads it?

4  A    No one heads this office at this point.  It's -- it's

5  been created.

6  Q   Okay.  Since you've become the CFO, I'm going to ask you

7  a series of questions what you've done since becoming the CFO

8  to improve the operations.

9           THE COURT:  Excuse me.  Before you do that -- before

10  you do that, I need to take a pause here.  Who here is in

11  charge of this screen?  Nobody.

12           A VOICE:  Is there a problem with it because we

13  might be able to help.

14           THE COURT:  Oh, yes.  Okay.  Then I'll -- I'll

15  accept any volunteer help.  The -- the -- the screen has

16  shifted too far to the right and the right hand edge of the

17  image is cut off.  Is it that way on all the screens?

18           A VOICE:  Yes.

19           A VOICE:  Yes.

20           A VOICE:  Yes.

21           THE COURT:  Oh, all right.  Well then that's a lunch

22  time problem, let's proceed.

23           MR. STEWART:  Your Honor, I should -- excuse me.

24  I'm sorry.  We'd offer this simply as a demonstrative, but it

25  think it might be useful to have it in the record.

 1          THE COURT:  Oh.

 2          MR. STEWART:  I'd move the admission of 598.

 3          MR. SMITH:  No objection.

 4          THE COURT:  Well, all right.  Yeah.  The image now

 5  is cut off, but the one that was there a moment ago was

 6  actually fine.

 7          MR. STEWART:  There we go, that's -- that's fine for

 8  my purpose.  I'm --

 9          THE COURT:  All right.  Well, you'll see what you

10  can do over lunch but in the meantime, let's proceed.  There

11  was no objection to the admission of this?

12          MR. SMITH:  Yeah, no objection.

13          THE COURT:  All right. Exhibit 598 is admitted.

14      (City's Exhibit 598 was admitted)

15  Q    And Mr. Hill, I would like to now ask you about some of

16  the issues in the city's financial function and what -- what

17  you've done if anything about them.  And let me start by

18  asking you about financial controls.

19      And let's get a definition.  Is there a term used in

20  management called financial controls?

21  A    There is.  And it's also internal controls over financial

22  reporting is -- is how it's termed usually.

23  Q    And what are they for?  What do they do?

24  A    They are there to protect the assets of an organization.

25  Also to make sure that financial transactions are recorded as

1  they -- as they occur and to provide information.  They can be

2  relied upon for a management of an organization.

3  Q    What was the state of the city's financial controls when

4  you became the CFO?

5  A    It was very very poor.

6  Q    And what's the risk to the city from having poor

7  controls?

8  A    The biggest risk is actually not knowing whether all of

9  the transactions have been recorded in -- in the system.  And

10 then also not knowing on a fast pace whether revenues are

11 coming in as they were intended, or whether expenses were

12 going out.

13     And so it's cash management issues.  They're -- they're

14 issues of being able to manage the budget and being able to

15 control spending.

16 Q    What have you done to address this?

17 A    Well, one of the biggest ways that you can improve the

18 financial management environment within the city is to

19 actually improve the financial management system.  And the

20 system that's currently in the city was never fully

21 implemented, so there are modules and there are parts of it

22 that don't talk to other parts of it.

23 Q    You're referring to a computer system, I assume?

24 A    Yes

25 Q    What's -- what's the name of that system?

1  A    It's called dreams is the name of the system that was

2  done by Oracle.  Most people refer to it as nightmares.

3  Q    I was going to -- I was going to ask that question, but

4  you -- you took my line away from me, but that's okay.  So

5  you're saying there were shortcomings in the computer system?

6  A    Yes.

7  Q    Okay.  So what have you done?

8  A    We've actually done a fast track, a minimal fast track

9  process to acquire a new financial management system.

10 Initially we were working with the state around the MNSA

11 process.  And because we thought that that process would move

12 forward more quickly, it did not.

13 Q    That's a state system of some sort?

14 A    No, it's -- it's a consortium of -- of jurisdictions that

15 is supported by the state to create a financial management

16 system for as many cities as are in need of one to be able to

17 move to rapid deployment of a financial management system.

18 Q    But I gather you -- you didn't pursue that, you did

19 something else?

20 A    We initially pursued that because it looked like it was

21 moving forward at a faster pace.  But we decided that it would

22 be quicker for us to actually procure the system directly and

23 that's what we're doing now.

24 Q    What is the new system?

25 A    There -- there are two that we're looking at.  We're

1  looking at a cloud based Oracle system.  And we're also

2  looking at a cloud based system that is done by CGI.

3  Q    Where does that effort stand?

4  A    We are currently evaluating both systems with the help of

5  -- of a consultant and we believe that we'll have a selection

6  by the end of September.

7  Q    Let me ask this.  Is it the responsibility of the CFO's

8  organization to prepare periodic accounting statements?

9  A    Yes, it is.

10  Q    And that includes things like bank reconciliations?

11  A    The bank reconciliation was a -- yeah it's a -- it's a

12  process.

13  Q    Okay.  And a -- monthly accounting statements?

14  A    Yes.

15  Q    Okay.  How capable was the city when you arrived to

16  perform those accounting functions?

17  A    Well, because the city wasn't really closing its books on

18  a monthly basis, it was very very difficult to get a good

19  monthly financial statement.  And even the annual financial

20  statement took a very very long time for us to prepare and to

21  have audited.

22  Q    What did you do to address that?

23  A    We actually put a team in place to make sure that the

24  audit became a priority.  You know, the -- the emergency

25  manager and I wanted to make sure that we got the -- a 2014

1  audit done and it was.

2      And we also have a team now that's working on monthly

3  closes for our financial statements.  We've begun identifying

4  all of the issues associated with those monthly closings and

5  working through those now.

6  Q    When do you think the finance function will be in a

7  position to actually -- pardon me, have monthly closings for

8  the city?

9  A    I'd say by the end of September or beginning of October.

10  Q    Now you mentioned, I think, that the treasury, the office

11  of the treasury is responsible for taking care of the city's

12  cash?

13  A    Yes, cash management.

14  Q    When you came to the job what was the state of the city's

15  cash management function?

16  A    When I came to the job the cash -- a lot of the cash

17  management functions were actually done by consultants in

18  conjunction with city oversight.  But -- and that is -- that's

19  still the case for some of our cash management functions.

20  Q    Was EY the consultant?

21  A    Yes, EY was.

22  Q    What plans do you have if any to reduce reliance on the

23  consultants?

24  A    Well, with -- with the implementation of the new

25  financial management system, we are revising all of the

1  accounting processes to take advantage of the controls that

2  are embedded in the new system.

3      So there -- I believe that there will be a period of time

4  where we will be reliant upon the consultants to continue that

5  operation.  To -- the city currently has a very -- the city

6  has a level of data input at every level of a process that is

7  much more extensive than many other cities that use more

8  sophisticated financial management systems.

9      And so the people that are currently involved in that

10  process are generally lower level people who sit at a screen

11  and input data all day and close out feeder systems and then

12  input that data into another system all day.

13      The new systems that we're looking at are integrated.  So

14  you won't have a need for people who will be sitting at a

15  screen doing that.  So I could either hire people now and then

16  let them go when the systems come on line, or use consultants

17  until the system comes on line and then hire people to -- to

18  do the new functions.

19      My preference would be to use consultants until the

20  system comes on line as opposed to bringing people in only to

21  let them go in -- in several months.

22  Q    Okay.  You, I think, testified earlier that your first

23  association with the city recently anyway had to do with

24  grants management.

25  A    Yes.

1  Q    When you became involved with grants management -- well,

2  first of all, tell us what grants are we talking about in

3  grants management?

4  A    Grants management really covers all grants to the city.

5  It would be federal grants that may be received through the

6  state.  It would be other grants from various organizations

7  that want to provide funding to the city.  So it's -- it's a

8  whole range of -- of -- of funding.

9  Q    What was the state of grants management when you were

10  hired to look into it?

11  A    Well, as a result of the audits that had been done it was

12  -- it was abysmal in that there were funds that were not being

13  drawn down on by the city.  There were documentation issues

14  with respect to the grants and the items that were actually

15  purchased under the grants.

16       There was no central place where you could go to see all

17  of the grants that the city had.  It was very decentralized in

18  a number of different systems around the city.

19  Q    So what -- what if anything has been done to make that

20  better?

21  A    We have actually created a new grants management office

22  which will -- which will place the CFO.  That's -- that's a

23  new office on the chart.

24       We've also created an interim grants management system

25  that will -- and is now has collected and has deposited in it

1  all of the grants that are currently active in the city with

2  some additional backup for about one or two years of history

3  of grants.

4  Q    Is -- is this a new system?

5  A    Yes.  It's a -- it's a brand new system.

6  Q    What is the name of that system?

7  A    It's called Ecivis system.  It -- it is able to link up

8  to our current financial management system.  My expectation is

9  that as we look at a new financial management system that we

10  will use the grant module that's in the new financial

11  management system.  But this one provides a -- an immediate

12  solution to a very difficult problem.

13  Q    And it's spelled E-c-i-v-i-s?

14  A    I believe so.

15  Q    Okay.  What state was the assessor's office when you

16  became the CFO of the city?

17  A    Well, the assessor's office had -- had a -- a review by

18  the state tax commission and by the state that indicated that

19  there were almost -- that the records that actually supported

20  the assessments were not what they should have been.  There

21  had not been an overall assessment of property for a number of

22  years.

23      And so we're currently working on a -- a plan -- well,

24  we're actually implementing a plan that has already been

25  developed to improve our assessment capability.

1  Q    Are new systems -- systems being acquired for the

2  assessor's office?

3  A    Yes.  There's a -- there's a new system that will allow

4  us to actually take data related to the condition of

5  properties from fly overs that -- that have already been done

6  and it will attach that --

7  Q    Are these drones?

8  A    No.  I think these were actually helicopters that -- that

9  do fly overs with a camera on the bottom of the helicopter.

10 And -- and these are actually high definition images that can

11 be associated with individual parcels of land.

12       And so -- and it's from a number of different views of

13 the city.  There is a -- there is a fly over and then there's

14 also street level views as well.  And so we can bring all this

15 data together and we will have data verified for every piece

16 of property in the city.

17       And -- and if there are any questions about the -- the

18 pictures that -- that you see, then they actually send people

19 out to verify those questions.  So we're right now going

20 through the verification of that entire data base.

21 Q    And I realize this isn't your department, but when you

22 came to the city, what was the state of its -- its HR

23 department, its human resources function?

24 A    Well, it -- it -- it -- it was -- it's very -- it was

25 very bad.  It still has a lot of work to do.  And a lot of the

1   functions that I would have turned to an HR department to do

2   in creating my own organizational structure and -- and -- and

3   when we created the organization structure we actually took

4   all of the individual work processes that have to occur within

5   the office of the CFO, identified every single one of them,

6   identified all of the skills that would be needed to do those

7   individual work processes.

8       We took those skills and compared them to positions in

9   other cities and then also compared the salaries to the

10  competitive zone.  The higher level positions, the competitive

11  zone was -- was thought to be more national for the lower

12  level positions, the competitive zone was thought to be more

13  local.

14      And so what we've done is actually built an entire

15  organization that has individual work steams, skills and

16  competencies of each individual that would be in that

17  organization, job descriptions, the bands in terms of the

18  salaries that they would have to be paid.

19      And that's what we're -- we're rolling out.  We're not

20  just rolling out a Orr chart.  And all those functions I would

21  have turned to a functioning HR department to do for me.  But

22  I had to bring in my own consulting and some of the

23  consultants that were there in order to -- to do that

24  function.

25  Q    So it's something you've -- you've done and definitely

1   the finance area seems to have its own HR department.

2   A    In this instance in doing those functions absolutely.

3   Q    Okay.  What's the city going to do if you know to reform

4   its HR functioning?

5   A    Well, you know, one of the things that we made sure when

6   we looked at all of the issues that we were dealing with HR

7   and the CFO's office, we cataloged all those issues because if

8   there were issues for us they were issues for the rest of the

9   city.  And so we've had discussions with the Mayor about the

10  things that you need to change.

11      The Mayor is also going through a very detailed briefing

12  of what we plan to do in the office of the CFO, all the way

13  down to the individual job lines.  And -- and this Mayor has

14  an -- an absolute thirst for detail.  I'm talking those that

15  you've covered very deeply and -- and then he'll -- he'll let

16  you move forward.

17      But so we are taking the experience that we have gained

18  and trying to restructure our office in creating a model that

19  can be used to restructure other departments around the city

20  and also restructure HR at the same time.  So some of the same

21  consultants that I hired to do my HR work are also working on

22  the restructuring of the -- the HR department.

23  Q    Okay.  Let me ask more then about your relationship with

24  and work with the Mayor.  Now at the time you came aboard as

25  the CFO, I think the Mayor had what, just been elected?

1  A     The Mayor had just been elected, yes.

2  Q     And the city was already in Chapter 9, correct?

3  A     Yes.

4  Q     Okay.  And how has it worked to have a Mayor in place

5  while there's been -- in terms of your own position, what is

6  your reporting to the Mayor --

7  A     I have a --

8  Q     -- in terms of your reporting to Mr. Orr?

9  A     Well, I have a direct line to Mr. Orr and I have a dotted

10  line to the Mayor, but that's not really the way we've

11  operated.

12  Q     And I'm going to ask you to define for us what you mean

13  by dotted line.

14  A     A dotted line means that -- that the Mayor has an

15  interest in the work that I'm doing but is not able to direct

16  that work.  And --

17  Q     How close do you work with the Mayor to date?

18  A     Very closely.  I have I mean at least three meetings a

19  week with the Mayor.  I have a one on one meeting with the

20  Mayor.  All of the plans that I meant to implement, I have

21  detailed discussions with the Mayor on those plans.

22        The Mayor is a part of the review process for deciding

23  the quality of life projects that we forward and sort of

24  coordinate with the Mayor on that.  So it's -- it's a -- it's

25  -- it's pretty much the normal relationship that you would

1  expect with the executive in a city.

2  Q    How many times a week do you see or speak with the Mayor?

3  A    Oh, probably of the seven or eight in some way or form

4  either by telephone or by meeting or --

5  Q    So now let me ask you about your conversations with the

6  Mayor about your future as CFO.  Tell us if you could, and I

7  realize this is a broad question, what he has said to you and

8  what you have said to him about your remaining as the city's

9  CFO after Mr. Orr's term expires.

10 A    He -- he has -- the way he brings it up is he asks me if

11 I've bought a house yet.

12 Q    And what do you say to him?

13 A    I say I haven't bought a house and that I'm -- I'm

14 probably not a house person, I'm a -- a condo downtown person.

15 And so but -- and -- and I told the Mayor that -- that there

16 are a lot of projects that have started but I would feel very

17 upset about having to leave them and that I would really want

18 to stay and -- and see many of those projects through some of

19 which will take at least two years to complete.

20 Q    And what discussions have you had with the Mayor about

21 the independence you would have or not have if you became the

22 CFO reporting to him after confirmation of this bankruptcy

23 plan?

24 A    Well, you know, the CFO structure that I was used to in

25 the district had actually and still does, an independent CFO.

1  Q    Okay.  And what does independent CFO mean as you just

2  used it?

3  A    It means we supported -- the CFO would have the final

4  word on the revenues that the city could use, the CFO

5  certifies those revenues.  The CFO has the final word on

6  whether or not legislation that is passed by the council meets

7  the budget requirements.  And the CFO has the final word on

8  whether the project complies with the requirements of

9  legislation.

10  Q    How has that worked for the District of Columbia?

11  A    I think it's worked very well.  I mean we have a

12  $2,000,000,000 fund balance right now positive.

13  Q    What's their credit rating?

14  A    It's -- it's one of the highest credit ratings it's like

15  AAA.  It's -- it's pretty high.

16  Q    It's higher than the U.S. Federal Government, is it not?

17  A    It is.

18  Q    Okay.  What is the structure going to be though here in

19  Detroit?

20  A    The structure, it's not an independent CFO structure.

21  The CFO actually reports to the Mayor.  In the legislation it

22  says the CFO can express his opinion on -- his or her opinion

23  on the -- on legislation and its affect on the budget.

24      But the CFO does not have independently the authority to,

25  you know, reduce spending or other things that the CFO within

1  a -- a district does.  The other -- the other difference is

2  that, and one thing we're trying to mirror here is that the

3  CFO in the district has absolute authority over all of the

4  people who report to the CFO.  So it's -- it's the CFO's

5  appointment only.  That's not necessarily the case in the CFO

6  structure here.

7  Q    So what have you said to the Mayor and what has he said

8  to you about the independence the CFO would enjoy in his

9  administration?

10 A    Well, I have made -- I have made no secret about my

11 concerns over the -- the legislation that was passed.  And --

12 and -- and as to whether or not it would -- it would have the

13 amount of independence for the CFO.

14      There -- there are two ways to get independence.  It's

15 independence in fact and also independence by structure.  I

16 think a better way is by structure.  But the Mayor has said to

17 me that he will not interfere -- he said that our goals are

18 aligned which was to make sure that the city never has another

19 deficit and that he will allow me to hire all of my people

20 without his -- his approval.

21      He will allow me to set up the structures that I think I

22 need.  And so far he has done that.  This -- this structure is

23 -- is one that I feel comfortable with that the Mayor has

24 supported.  And that he will allow me to operate

25 independently.

1  Q    Now you understand of course the reason we're here is

2  because the Court is to adjudicate the city's plan of

3  adjustment in this bankruptcy proceeding?

4  A    Yes.

5  Q    How familiar are you with the plan of adjustment?

6  A    Somewhat familiar.  I'm not -- I've -- we -- we're using

7  -- we're already starting to implement many of the items

8  within the plan of adjustment.  So I've had to become very

9  familiar with those -- those items.

10      And then also the we've already gone through a budget

11  cycle that is covered under the plan.  So we had to make sure

12  that in that budget cycle we would agree with the revenues

13  that were projected in the plan in order for us to move

14  forward with that budget cycle.

15  Q    So if I understand you correctly, already the city's

16  budget reflects what the plan provided for this current year?

17  A    Yes.  To the extent that the resources are already known.

18  For instance there are some restructuring initiatives that

19  would be funded by the exit financing.

20      We have not budgeted for those because we don't have the

21  dollars in place.  We have the 120,000,000 from the quality of

22  life loan and I've taken the position that we will not spend

23  money before we have it.

24  Q    As the city's CFO, what can you tell us your policy is or

25  will be if the plan is confirmed in terms of the hearing to

1  the financial structure that's set forth in the plan?

2  A    You know, there -- there -- there are -- there are two

3  things that we are currently doing to adhere to the financial

4  structure.  We -- we certainly are taking seriously the items

5  that are in the plan for reinvestment.

6       However with -- with each one of those items before we

7  approve the allocation of funding to support them, we also

8  look at whether or not there are other ways to achieve the

9  same goals and objectives.  And that is all documented and --

10 before we approve the funding.

11      So we will continue to move forward with that process.

12 It becomes especially more difficult when you don't have

13 discreet pots of funding that are being used to support the

14 reinvestment.  So in the out years where reinvestment is

15 funded by surpluses that are generated as part of the major

16 operations, you really will have to pull those surpluses and

17 then allocate them back out for reinvestment initiatives.

18 Q    Understood.  But let me ask you this question.  What

19 assurance can you give us that if this plan is confirmed as

20 the Chief Financial Officer of the city you will adhere to the

21 budget set forth in the plan?

22 A    I -- I can give you assurance that we'll do everything we

23 can to adhere to that with -- with a couple of caveats.  If

24 the revenues don't come in as intended in the plan we'll have

25 to make adjustments.

1    And so those adjustments would be changes in the plan

2  that the process would have us actually going through the

3  financial review commission for any of those changes.  But

4  initially we -- we definitely believe that -- that -- that the

5  plan gives us a road map to how we should be operating.

6  Q    As the CFO of the city, how comfortable are you with the

7  projections of revenue and the items of expense that the plan

8  sets forth?

9  A    I am -- I am fairly comfortable with them.  Obviously no

10  one can tell the future.  And there are a number of factors

11  that -- that come into play.

12    For instance in implementing the -- the office of the CFO

13  structure, it appears that we may be able to do it for

14  slightly less than the resources that are allowed in the plan.

15  Because no one knows exactly what it's going to cost until

16  you've -- until you have costed out each of the individual

17  positions in -- in that structure.

18    So we expect that as we move forward, we will find, you

19  know, differences that -- that we'll have to adjust to.  But

20  we will definitely -- I -- I believe that it could be

21  implemented.

22  Q    Let me ask you something else.  Are you aware of recent

23  legislation that's been passed and I think the bill number is

24  something like 5566 and 5567?

25  A    Yes.

1  Q    What do those bills -- or what does that legislation

2  provide when it comes to implementation of this plan assuming

3  the plan is approved?

4  A    Well, there has to be approval for deviations from the

5  plan by the financial review commission.  There -- there --

6  there is a -- and so the plan really becomes a -- a road map

7  for how we would operate going forward.

8  Q    And what is the financial review commission?

9  A    The financial review commission is an oversight

10 commission that's set up on a staff of which reside within the

11 office of the treasurer but it includes a number of members

12 from the state or their designees, the Mayor, the council, and

13 -- and other people who have specific knowledge and skills.

14 Q    When you say office of the treasurer, do you mean the

15 treasurer of the city, or the treasurer of the state?

16 A    Treasurer of the state.

17 Q    And has that been established yet?

18 A    It has not.

19 Q    Okay.  And what is -- what -- why do we not have this

20 commission yet?

21 A    Because the -- the legislation doesn't become effective

22 until the -- we leave bankruptcy, we exit bankruptcy.

23 Q    Okay.  You have mentioned something -- I'm going to move

24 to a different area now.  You've mentioned something called a

25 budget cycle.

1  A    Yes.

2  Q    Okay.  I'm going to ask you about the budget process that

3  the city uses.  Is that something you're personally familiar

4  with?

5  A    Yes.

6  Q    And in fact something you're in charge of?

7  A    Yes.

8  Q    First of all, how important as a practical matter, what's

9  the importance of the budget?

10  A    Well, the -- the importance of a budget is that it -- it

11  identifies the expected resources that the city will have.

12  And it also provides authority to spend those resources in the

13  categories that are identified in the budget.  So it is -- it

14  is a document that -- that gives authority to spend resources.

15  Q    You used a phrase earlier budget cycle.

16  A    Yes.

17  Q    Can you tell us what is a budget cycle?

18  A    Well, a budget cycle is the -- the process of -- of

19  re-estimating your previous budget and previous revenues and

20  then estimating future revenues, forecasting your future

21  revenues and then also determining the expenditures that you

22  would expect to make in order to achieve certain objectives.

23  Q    How often does the city go through the budget cycle?

24  A    It's -- it's really constant in -- in -- in some ways.

25  In that there should be a constant review of where you are

1  with respect to the current year's budget.  And then so that

2  it -- it really should occur constantly.  But -- but it

3  actually occurs more sporadically the last process is more

4  sporadic.

5  Q    And how many years does the city budget for when it goes

6  through a budget cycle?

7  A    The city will -- we look at the year that it's in and

8  then to future years.  If there is a change in that

9  requirement in legislation that was passed by the state and --

10  and -- and state law would require it would be four years.

11  Q    When will that take -- when will that take effect?

12  A    It takes effect the first budget -- for the first fiscal

13  year after the city exits bankruptcy.

14  Q    And fiscal year runs July 1 to June 30th for the city?

15  A    Yes.

16  Q    Okay.  And we're in fiscal year 15 now, correct?

17  A    Yes.

18  Q    Who within the office of the CFO is responsible for

19  preparing the city's budgets?

20  A    It is the budget department within the office of the CFO.

21  Q    Is that Ms. -- Ms. Scales?

22  A    Yes.

23  Q    Okay.  And tell us how the process works.  I mean how --

24  who -- who starts writing up numbers?

25  A    Well, at first there's the estimation of revenues that's

1  done through a –– a revenue estimation conference.  And again

2  there's the look back and the look forward.

3      And then the budget is prepared starting in the

4  individual departments that actually load their budget request

5  into the budget system.  We're able to control certain

6  parameters such as the –– the FTE costs and things of that

7  nature.

8      So –– and then that is –– that's accumulated, reviewed

9  with each agency director, and then the final budget it's ––

10  is –– would be reviewed by the Mayor because it's the Mayor's

11  budget that gets moved forward.  This last year we did that.

12  Q    Who gives it to the Mayor?

13  A    The CFO.

14  Q    You?

15  A    Yes.

16  Q    Okay.  And what does the Mayor do with it after you give

17  it to him?

18  A    And –– and this would be the –– the future process.  The

19  Mayor was not –– the –– the Mayor did not present the budget

20  this last year because it was under the emergency manager.

21      But it would be presented to the council for approval.

22  The council would go through their legislative review of the

23  budget and also their hearings with each department head.

24  Q    Okay.  And then after that what –– what becomes of the

25  budget?

1  A    Then the council would actually vote on the budget,

2  create a budget act, vote on it.  Under the new legislation

3  the Mayor will have line item veto authority on -- on the --

4  the budget.  And under the new process the budget would also

5  have to go to the financial review commission for approval.

6  Q    Okay.  And then once it's approved, that's the budget?

7  A    That's -- that's the law.  Unless there -- if there are

8  changes in resources, you have to make adjustments in what you

9  would expect to spend.

10  Q    Okay.  And what -- what is it that prevents people from

11  -- the city from spending money it hasn't budgeted?

12  A    We do have a -- a process now by which we issue budget

13  strings.  And so the city cannot spend money and pay for

14  things unless they have a budget string.  There have been

15  issues in the past with, you know, contracts that -- that

16  people have started without approval and -- but -- but those

17  are -- are now being -- those -- those holes are being

18  plugged.

19  Q    Is this part of the review of financial controls you

20  testified to earlier today?

21  A    Yes.  Yes, it is.

22  Q    You -- and I'm going to move to a new area now.  But you

23  had mentioned something called the CAFR.

24  A    Yes.

25  Q    Would you put it up, please?  What's the exhibit on that?

1  And that stands for what, comprehensive annual financial

2  report?

3  A    Yes.

4  Q    And I think it's Exhibit 15.  And just tell us very

5  briefly what is the CAFR?

6      (City's Exhibit 15 was identified)

7  A    The CAFR is the financial statement for the city which

8  would include all of the funds including general fund.  It's

9  also has a management discussion analysis as well as detailed

10 supporting schedules in -- in the back.

11 Q    Okay.  And -- and the screen doesn't reveal this, but in

12 fact I can -- I'm holding it.  It's a thick complicated

13 document?

14 A    It's -- it's thick.

15         MR. STEWART:  Okay.  And there's been no objection.

16 I think to the admission of the CAFR.  I'd move its --

17         MR. SMITH:  I have no objection to it.

18         MR. STEWART:  I'd move the admission of Exhibit 15,

19 Your Honor.

20         THE COURT:  All right.  Exhibit 15 is admitted.

21      (City's Exhibit 15 was admitted)

22 Q    Now the -- I'm not going to go into all the details.  Let

23 me ask you just a couple of questions.  This says it's the

24 comprehensive annual financial report for the fiscal year

25 ended June 30th, 2013, correct?

1  A    Yes.

2  Q    So that's the -- not the most recent fiscal year, but the

3  fiscal year before the one we just wrapped up, correct?

4  A    Yes, it is.

5  Q    Okay.  How long has it taken the city traditionally to

6  get the CAFR published?

7  A    It -- it -- it takes a long time.  I -- I don't know the

8  exact amount of time, but it -- it is very difficult to get it

9  published.

10 Q    I think you testified earlier that one of the things you

11 were able to do since you became CFO is see to the completion

12 of this CAFR and get it out the door, correct?

13 A    Yeah.  There was -- there were periods of time when we

14 weren't really sure that we were going to get to a CAFR that

15 was completed with the -- an opinion from our auditor.

16 Q    That was my next question.  This is an audited financial

17 statement?

18 A    Yes, it is.

19 Q    And who audits it?

20 A    It is KP&G.

21 Q    Okay.  That's one of the big four firms?

22 A    Yes.  I -- the reason I'm hesitating, when I started

23 there were eight.  I haven't counted how many there are now.

24 Q    Soon there will be one.  And they -- they deliver and

25 they report upon the CAFR, KP&G?

1  A     Yes, they do.

2  Q     Did the city -- what kind of opinion did the city get

3  from KP&G on the 2013 CAFR?

4  A     It's really an unqualified opinion, but with a number of

5  matter of emphasis paragraphs.

6  Q     Okay.  Now what have you done to try to make sure that

7  future CAFRs will be issued on a more timely basis than the

8  one was have as Exhibit 15?

9  A     We've immediately started the process for the 2014 CAFR

10 by making sure that all of the adjustments that occurred as a

11 result of this CAFR are being posted.  That that was one of

12 the -- one of the issues.

13      And we've also started doing all of the reconciliations

14 from the year end.  So we have already a -- a CAFR team in

15 place that is working on making sure that we move forward

16 quickly on the CAFR.

17 Q     Okay.  We can take that down.  Let me now ask you, Mr.

18 Hill, about the part of budgeting.  You mentioned the revenue

19 consensus conference report.

20 A     Yes.

21 Q     And let's if we could put up -- just put on the screen

22 for identification Exhibit 38.  Can you tell us what is

23 Exhibit 38?

24 A     It is the revenue consensus conference report for March

25 2014.

1          (City's Exhibit 38 was identified)

2   Q    Is this a document that you've seen before?

3   A    Yes, it is.

4   Q    What was your role in preparation of this document?

5   A    I -- I supervised the people who prepared the document.

6   It's the budget office so they report to me.

7   Q    Did you review this before it became a final document?

8   A    Yes, I did, several times.

9   Q    And have you had occasion to work with it since it became

10  a final document?

11  A    Yes, I have.

12          MR. STEWART:  Okay.  Your Honor, I would move the

13  admission of Exhibit 38 before questioning the witness more

14  about it.

15          MR. SMITH:  No objection, Your Honor.

16          THE COURT:  Thank you.  Exhibit -- excuse me,

17  Exhibit 38 is admitted.

18          (City's Exhibit 38 was admitted)

19  Q    So Mr. Hill, briefly describe to us how this revenue

20  consensus conference works.

21  A    There -- there are several parts to it.  The first --

22  there are at least three to four different participants.  The

23  -- the budget team as well as the legislative group for the

24  council and also the office of the AG --

25  Q    And who is the AG?  Does AG stand for Attorney General?

1  A     No.  It stands for auditor general.

2  Q     Auditor general.

3  A     The auditor general.

4  Q     Okay.  I'm sorry to have interrupted you.

5  A     Now these -- these -- these three groups actually have

6  their -- their own method for estimating revenues.  And so

7  they get together and they meet with a professor, and it's

8  Professor Scorsone who actually talks about the economy in the

9  city, the economy in the state, and the economy nationally so

10 that they have a good base for things that might be happening

11 in the economy that might affect their estimation.

12       And then they individually will estimate the major

13 revenue items.  They'll come back together with their own

14 individual estimates and then will decide as a group what

15 their consensus revenue number will be.

16       And then that whole process gets reviewed by the finance

17 -- financial sub committee of the -- of -- of the oversight

18 board, the financial advisory board that we have now.  And

19 then they make recommendations and then it gets reviewed by

20 the financial oversight board, the entire board and it's

21 approved.  And then it goes to the council as the document

22 that -- that establishes the revenues that can be used in the

23 budget process.

24 Q     Okay.  And so this is the process by which the revenue --

25 the revenue line in the budget is determined?

1 A    Yes.  And -- and we could have -- we could have just --

2 in fact there was a debate about why go through this process.

3 And it was my decision to actually go through this process.

4     Because as a practical matter the emergency manager could

5 set the budget for the city, he has that authority.  And I --

6 I felt that it was important for those people who would have

7 to help to implement the budget to be a part of a process that

8 they understood so that they would understand what was -- what

9 was in the numbers.  And so it was my decision to continue

10 this process.

11 Q    Let's go if we could now to -- to the last page of our

12 exhibit.  And if we can blow it up a little.  This sets forth,

13 does it not, Mr. Hill, the participants in the conference?

14 A    Yes, it does.

15 Q    Okay.  And the first named is you, correct?

16 A    Yes.

17 Q    And then two down is Mark Lockridge the auditor general.

18 So tell us in the City of Detroit who is the auditor general?

19 A    The auditor general was responsible for doing reviews and

20 can be actually given audits or reviews by either the

21 legislative group or by the city, and non-legislative.

22 Q    Is that akin to an internal audit role of some sort?

23 A    It -- it is.  But an internal -- yes, it is.  And it is

24 akin to that.  But there's also another auditor in the city as

25 well.

1  Q    Okay.  Or was it more like what the GAO did when you were

2  with the GAO?

3  A    It is more like what the GAO would do, yes.

4  Q    Okay.  Further down there is Pamela Scales, budget

5  director.  And she was involved, correct?

6  A    Yes, she was.

7  Q    So these are two different functions of this -- two

8  different offices of the city, am I right?

9  A    Yes, they are.

10  Q    Ms. -- Ms. Scales doesn't report to Mr. -- to Mr.

11  Lockridge, nor does Mr. Lockridge report to Ms. Scales,

12  correct?

13  A    That's correct.

14  Q    Okay.  Further down there is a person Irvin Corley of the

15  city council legislative policy division.  And the screen just

16  -- who is Mr. Corley?

17  A    Mr. Corley works for the council and he's -- he's the

18  general contact with the council who gets the much deeply

19  involved in budgets and projection -- and projections around

20  the budget.

21  Q    And did he too have a voice in this process?

22  A    Yes.

23  Q    Okay.

24  A    He had a role.

25  Q    Down a few more is a man named Alvin Horhn?

1  A    Yes.

2  Q    And who is Mr. Horhn?

3  A    Alvin Horhn is the deputy within the office of the

4  assessors.

5  Q    And -- and why -- why was he involved in this process?

6  A    Because if anyone had any questions about assessments

7  which are -- which -- which is a part of the revenues

8  submission, he would be able to answer those.

9  Q    Okay.  Two, further down is Dr. Eric Scorsone from

10  Michigan State University.  I think you mentioned him.  What

11  was -- what was Mr. -- what was Dr. Scorsone's role in this

12  process?

13  A    He was the economist who provided information to the

14  group around what was happening in the economy in the city,

15  the state, and -- and the nation as a whole.

16  Q    Why was that relevant to the conference's work?

17  A    So that the work could reflect certain trends that might

18  be occurring.  For instance if -- if -- if he had said that

19  unemployment was increasing, then you might expect that you

20  would not take in as much in terms of income tax, that -- that

21  type of thing.

22  Q    Now at the bottom there -- or next there are two

23  representatives from Ernst & Young.  Shavi Sarna and Juan

24  Santambrogio.  Can you tell us why they were involved?

25  A    We had Ernst & Young involved because we're going to --

1  Q    Who invited them to attend?

2  A    Pam -- Pam Scales did and she asked me if it was okay and

3  I said yes.

4  Q    Okay.  And -- and why were they there?

5  A    Because they will be able to explain the plan adjustment

6  numbers to the -- to the group if there were questions about

7  that.

8  Q    Why were those relevant to this group?

9  A    Well, because what I wanted to make sure of was that the

10  charge that I gave to the group was that if there were issues

11  with the plan of adjustment I wanted to know what they were

12  because I -- I did not feel that we could budget against

13  numbers that -- that we were not able to support

14  independently.  And so they were there to help explain their

15  numbers.

16  Q    Okay.  And then we have a number of people from Conway,

17  MacKenzie.  And why were they there?

18  A    They were there in case there were any questions about

19  the restructuring initiatives.

20  Q    Okay.  Now if we could, let's go to -- gosh, I guess it's

21  the fourth page.  And well, it's the fourth page of the

22  document which is numbered 1 of 14.  Well, it looks like we

23  have to go back one.  No, one more.  That's it.  Let's blow up

24  the top paragraph if we could.

25       Just generally you see the -- the language we have

1  expanded upon on the screen.  Do you see that, Mr. Hill?

2  A    Yes, I do.

3  Q    Okay.  Does this describe who attended the conference and

4  when it met?

5  A    Yes, it does.

6  Q    Okay.  So it says it met in October 2013 and again in

7  January 2014, correct?

8  A    Yes.

9  Q    And the conference itself is on February 7, 2014?

10  A    Yes.

11  Q    And then it went to the financial -- financial advisory

12  board finance committee on February 27, correct?

13  A    Yes.

14  Q    And then it -- below that if we get one more paragraph it

15  says the conference began with the discussion of economic

16  conditions that the -- that impact the City of Detroit

17  presented by Dr. Scorsone, right?

18  A    Yes.

19  Q    Do you remember what Dr. Scorsone said to the conference?

20  A    I remember yeah, some of the things that -- that he said.

21  And he said that he felt that it would -- well, he said a

22  number of things.  One, that there were really no numbers that

23  were -- there were no numbers --

24            MR. SMITH:  Objection, Your Honor, I think this

25  calls for hearsay.  If we're getting into a conversation from

1  somebody at Michigan State, you know, what he told Mr. Hill.

2          MR. STEWART:  I'm offering it, Your Honor, not for

3  the truth of what he said, but instead for what he said and

4  their reliance upon it.  The fact of what he said.

5          THE COURT:  Did you and the conference subsequently

6  take into account and rely on what this man said?

7  A    Yes, we did.

8          THE COURT:  All right.  For that purpose the Court

9  will overrule the objection and allow the evidence.  You may

10 -- you may continue.

11 A    He -- he actually discussed the -- the economy for the

12 nation as a whole and what was happening in the economy with

13 general improvement.  He also said that the State of Michigan

14 was improving not at the same rate that the rest of the

15 Federal Government had been improving.

16     He said that the industry base in the State of Michigan

17 and -- and also in Detroit was starting to become diversified.

18 He also said that there was steady improvement in unemployment

19 from 2009, I believe was the -- the year that he had said

20 where unemployment was about 24, 25% and now was down to about

21 14.  So -- so he talked about some of the major factors that

22 would impact a revenue estimate.

23 Q    Okay.

24 A    But he did not -- he did not estimate what the revenue

25 should be.

1  Q     Now do I understand correctly that the conference went

2  through the various items of revenue one by one?

3  A     Yes, they did.

4  Q     Okay.  So I'm going to come back to this document.  But

5  I'm going to before that ask you about another document which

6  I need to -- need to find here.  Exhibit 24, please.

7  Twenty-four.

8         MR. STEWART:  Your Honor, 24 is a document that may

9  best be viewed in hard copy form.  Because like many of the

10 exhibits we will using it's from an Excel spreadsheet and even

11 when expanded on the screen can be hard to read.  It is in the

12 packet that you have.

13        THE COURT:  Okay.  Thank you.

14        MR. STEWART:  And we have extra copies also.

15 Q     What -- what I'd first like you to do, Mr. Hill, is tell

16 us what is Exhibit 24.

17 A     Exhibit 24 lays out the major tax -- the major taxes of

18 the city and the results of the individual participants --

19 participant groups on each one of those taxes and then

20 compares those to the numbers that were in the plan of

21 adjustment.

22    (City's Exhibit 24 was identified)

23 Q     Okay.  And have you seen this document before?

24 A     Yes, I have.

25 Q     Who prepared it?

 1  A    This was prepared by the budget office.

 2  Q    And did you review it at any point?

 3  A    Yes, I have.

 4  Q    When did you review it?

 5  A    A number of times.  First before we went into the meeting

 6  with the financial advisory board finance committee.  And then

 7  I've reviewed it several times since.

 8         MR. STEWART:  Okay.  Your Honor, I'd move the

 9  admission of Exhibit 24.

10         MR. SMITH:  No objection, Your Honor.

11         THE COURT:  Exhibit 24 is admitted.

12     (City's Exhibit 24 was admitted)

13  Q    So first what I'd like to do, Mr. Hill, is to ask you

14  about the items of revenue by class that we see in the various

15  columns.  Can you tell us what -- what's covered there?

16  A    It would be -- it was a lot easier when it was bigger.

17  It would be the income tax, the state revenue sharing,

18  wagering taxes, also be property taxes as well as user --

19  utility user's tax and then all other sources of revenue which

20  were principally made up of some of departmental revenues.

21  Q    Okay.

22         THE COURT:  Would you like a hard copy as well, sir?

23         MR. STEWART:  There's one in the pile, Your Honor.

24         THE COURT:  You want to -- you want to take a moment

25  and find it?  It's towards the back.

1  A    Thank you, Your Honor.

2  Q    Let's now look if we could at the -- at the columns, the

3  first column from the left side.  It speaks here of the

4  participants?

5  A    Yes, it does.

6  Q    Okay.  And that's the auditor general, the budget

7  department, and the city council legislative?

8  A    Yes.

9  Q    Are those the persons that we talked about a few minutes

10 ago?

11 A    Yes, they are.

12 Q    Mr. Lockridge, Ms. Scales, and Mr. Corley, I think was

13 the --

14 A    Yes.

15 Q    Okay.  And then this is broken out by 2014, 2015, and

16 2016, correct?

17 A    Yes.

18 Q    Okay.  And if you could let's just choose a value here.

19 Let's look at the -- the first cell under income tax for the

20 auditor general.  And these don't seem to be numbered or

21 lettered, but do you see the cell I'm referring to?

22 A    Yes, I do.

23 Q    Okay.  What is that?

24 A    That is the auditor general's estimate in millions of the

25 income tax for 2014.

1  Q    And then below that is another number, that's a little

2  lower.  What is that number?

3  A    That's the budget estimate, the budget group's estimate.

4  Q    And then below that is yet another number.  What is that?

5  A    That's the city council legislative group's estimate.

6  Q    Okay.  And why aren't these the same number?

7  A    Because they used different processes to come to what

8  their individual estimate was.

9  Q    Later in this exhibit if we looked, would there be an

10  explanation of those processes?

11  A    Yes, there is.

12  Q    And that we've just talked about, income tax for 2014?

13  A    Yes.

14  Q    Below that is 2015?

15  A    Yes.

16  Q    Okay.  And then further down is a 2016 number as well,

17  correct?

18  A    Yes.

19  Q    Okay.  And if we were to go over the next column over

20  we'd see the same for state revenue sharing?

21  A    Yes.

22  Q    And then if we went over we'd see the same for all of

23  these different -- all these different columns, correct?

24  A    Yes.

25  Q    Let's go if we could to Page 4 of the exhibit.  And

1  that's one that in the upper corner says auditor general?

2  A    Yes.

3  Q    And there is a column there that says methodology.  Do

4  you see the methodology part of our page?

5  A    Yes, I do.

6  Q    And -- and what is that about?

7  A    This is the methodology that the auditor general used in

8  coming up with their -- his estimate for each one of the types

9  of taxes.

10 Q    Okay.  And then if we go two pages further back to a

11 sheet back there in the upper right hand corner we see budget

12 department, correct?

13 A    Yes.

14 Q    And then if we go to the next sheet we see their

15 methodology?

16 A    Yes.

17 Q    Okay.  Why was it that you allowed these different people

18 to use different methodologies?

19 A    Well, they used different methodologies because I -- I

20 thought that -- I think that it's important to look at the

21 revenue from a lot of different perspectives.  And -- and it's

22 -- if they were all using the -- the exact same methodology I

23 think it would be more mechanical than have the discussion

24 around why one chose one methodology over another and -- and

25 what those differences were the result of.  So I think it

1  makes for a much more active process.

2  Q    Let's go back to the first page then.  Pardon me, of

3  Exhibit 24.  And let's just focus on income taxes because it

4  will be easier for us to -- to just see that.

5       If we look at the -- if we scroll down a little bit we

6  see that in the part that's shaded it looks green or blue on

7  mine.  We have consensus estimates.  Do you see those?

8  A    Yes.

9  Q    It's two fifty.

10  A    Yes.

11  Q    Two fifty-six three and two sixty-two one.  Do you see

12  those?

13  A    Yes, I do.

14  Q    Tell us if you could how this conference came up with

15  those numbers.

16  A    Well, they actually met as a group on each one of these

17  income tax -- each one of these tax items and -- and decided

18  on what these numbers were.  So as a -- as a result of

19  discussion.

20  Q    Was this simply an averaging of the different numbers?

21  A    No, it's not.

22  Q    Okay.  Now if we could let's go back.  And we're going to

23  go back and forth between these exhibits just a little bit.

24  Let's go back if we could to exhibit number 38 that was --

25  that was this document

1    And let's go if we could to Page 2, or maybe it's -- no,

2   it's Page 2 of 14, one more page.  There you go.  If we can

3   just blow up the top paragraph under conference results.

4    It says here the conference estimate for the general fund

5   revenues from ongoing sources for 2014 is 958.5 million an

6   $88,000,000 or 8.5 decrease from fiscal year 2013 collections.

7   Do you see that?

8   A    Yes.

9   Q    First of all, why are we talking only about the general

10   fund?

11   A    Because it's the -- it's basically the general fund that

12   revenues that are part of the project, it's the general fund

13   that -- that runs the budget.

14   Q    And second, since this was in February 2014, why were

15   they talking about the current fiscal year?

16   A    Because it was important to also build in any changes

17   that may have occurred with the current fiscal year.  If

18   revenues were lower than we had expected, then we would have

19   had to take action in the current fiscal year.

20   Q    Okay.  Now if we go a couple of pages further back, I

21   think it's two further back, there we go.  Is there -- and I'm

22   not going to go into it in any great -- is there first of all

23   a discussion of how the conference reached its result on

24   income tax?

25   A    Yes.

1  Q    And then on state revenue sharing?

2  A    Yes.

3  Q    And then I'm going to go another page.  On the next page

4  there is a discussion of how they reached the result on

5  wagering taxes, correct?

6  A    Yes.

7  Q    And then below that was one on current property taxes.

8  Do you see that?

9  A    Yes.

10 Q    And this summarizes the thought process -- thought

11 processes that the revenue conference -- consensus conference

12 participants went through to reach their results?

13 A    Yes, it does.

14 Q    Okay.  Did you have any criticisms by the way of the

15 thoroughness of the work of the participants?

16 A    No.  I have -- I have no criticism of the thoroughness.

17 Q    Keep going.  Okay.  Now I have blown up on the screen

18 something about current property taxes.  Do you see that?

19 A    Yes.

20 Q    And we have three bullet points here.  The first bullet

21 point says the FY 2014 estimate assumes a 17.5% decline in

22 collections compared to fiscal year 2013 results.  Current

23 collection activities estimated to decrease by 23.4 million

24 dollars compared to fiscal year 2013 collections.

25 Next, although fiscal year 2013 collections ended 10.4

1  million dollars higher than the consensus estimate, this still

2  represents a negative 9.6% year over year decline in property

3  tax collections.

4       And then finally it says, preliminary discussions on the

5  ad valorem valuations for fiscal year 2015 and 2016 indicate a

6  continuing decline in taxable values at the same rate

7  experienced in fiscal year 2013.  The estimated decrease in

8  property tax collection for fiscal year 2015 and fiscal year

9  2016 is negative 10%.

10      This chronic state of decline in assessed value is

11  expected to continue beyond 2016.  Was that the consensus of

12  those who participated in this process?

13  A    Yes, it was.

14  Q    Now you testified that one of the people in the process

15  was Mr. Alvin Horhn?

16  A    Yes.

17  Q    And Mr. Horhn was from the assessor's office?

18  A    Yes.

19  Q    And in this part of the discussion how key was Mr. Horhn?

20  A    He was very key to -- to let the group know what was

21  actually happening with respect to the changes in assessed

22  value.

23  Q    Did he object to any of the findings set forth in this

24  exhibit?

25           MR. SMITH:  Your Honor, I think that calls for

1  hearsay asking what Mr. Horhn was telling the group.  The city

2  can call Mr. Horhn if it wishes, but not have Mr. Hill testify

3  about what he told them.

4           MR. STEWART:  The fact of an objection is all I'm

5  asking for.  He would be in a position to know if someone

6  expressed an objection to him.

7           THE COURT:  What would be the significance of that?

8           MR. STEWART:  Because among the proofs that have

9  been offered, it is the allegation that by expert witnesses

10 Syncora has, that the properties in the city are actually

11 under assessed, not over assessed.

12     This process which brings together experts from all areas

13 including the assessor's office addresses that.  If it's the

14 case that it just was a runaway train ignoring the assessor's

15 office, I'd want to know.

16     If Mr. Horhn expressed no objection to it, that's

17 probative of the fact that he did not see this was a defective

18 process.  But I'm asking only if he objected, not what he

19 said.

20          THE COURT:  Oh, but it sounds like it's being

21 offered for the truth of it.  I'll -- I'll sustain the

22 objection.

23 Q   So if we could now, let's go to Page 3 of 14.  But you

24 have to go back.  It's actually called 3 of 14.  I think it's

25 really the fourth page in the exhibit.  Could -- do you see

1  the table at the top there?

2  A    Yes, I do.

3         MR. STEWART:  Okay.  Let's put up 597, please.  I'd

4  represent that 597 is nothing more than an extract of the

5  table we just saw, Your Honor.  It's to make it easier to see

6  than what we have in our report.

7         MR. SMITH:  No objection.

8         THE COURT:  You're offering it?

9         MR. STEWART:  And I'd -- I'd move its admission even

10  though it's being a blow up. I'm not sure --

11        THE COURT:  All right.  It is admitted.

12        (City's Exhibit 597 was admitted)

13  Q    Do you have Exhibit 597 before you, Mr. Hill?

14  A    Yes, I do.

15  Q    Okay.  And tell us what 597 shows?

16  A    597 is a summary of the -- the revenue estimation

17  conference result and a comparison of that to previous years

18  as well.  So it's all -- all years.

19  Q    Okay.  And so let's just look at income tax because it's

20  our first line.  The conference determined that for fiscal

21  year 2014 the budget had been how much?

22  A    For 2014 the budget had been 257.2 million.

23  Q    And what did the conference determine the revised

24  estimate should be?

25  A    Two hundred and fifty million.

1  Q     And then for 2015?

2  A     Two hundred and fifty-six million.

3  Q     And 2016?

4  A     262.1 million.

5  Q     So this -- this table, what does it -- what does it

6  summarize for us?

7  A     It summarizes an improving situation in the income tax

8  which among other factors was a result of the expected

9  improvement in unemployment in the city.

10  Q     And fair to say this summarizes the findings of the

11  revenue consensus conference when it came to their projections

12  of these categories of taxes for these years?

13  A     Yes.  It is -- it is a summary of the findings.

14  Q     Now if we could before we leave the area, let's go back

15  to Exhibit 24.  That's the -- the large one we had to pull out

16  separately.  And to the first page of it.

17       Towards the bottom of it highlighted in yellow are

18  numbers for the plan of adjustment.  Do you see those?

19  A     Yes, I do.

20  Q     And what -- where did the numbers for the plan of

21  adjustment come from?

22  A     They actually came from the plan of adjustment one of the

23  earlier plan of adjustment numbers.

24  Q     Okay.  And why are they on this sheet?

25  A     Because I -- I wanted to actually have them compare to

1   the consensus estimates to see if we had any major issues in

2   revenues.

3   Q    And what did you do to compare the results of the

4   consensus -- revenue consensus conference with the -- with the

5   numbers in the plan of adjustment?

6   A    We actually looked at -- at the percentage -- percentage

7   difference between the consensus and the plan of adjustment.

8   Q    Why did you do that?

9   A    Because if -- if -- if we were not fully close to those

10  numbers, then I would have wanted to know exactly why and

11  would have wanted to have an adjustment in the plan of

12  adjustment for those years because these are the numbers that

13  we're going to -- we're going to budget against.

14  Q    And by the way the plan of adjustment numbers came from

15  Ernst & Young's projections?

16  A    Yes.

17  Q    Okay.  And I should -- well, should have asked you.

18  You're aware that E & Y or EY has something called a baseline

19  forecast?

20  A    Yes.

21  Q    And another document called a forecast with

22  restructuring?

23  A    Yes.

24  Q    Which of these two was the revenue consensus conference

25  more -- more to?

1  A    The baseline.

2  Q    Why is that?

3  A    Well, because it's not expected that in the first few

4  years there would be major changes in revenue as a result of

5  some of the restructuring initiatives.  So that was -- it

6  would be more than likely to reflect a -- a -- a projection of

7  the years that we were dealing with.

8  Q    What account if any did the revenue consensus forecast to

9  take of the restructuring initiatives?

10 A    None.  I mean not -- not much.  With -- with the

11 exception of some of the departmental revenues, but not -- but

12 not with respective in these forecasts.

13 Q    Okay.  So -- so the -- I think I was asking you about

14 these two lines.  So you conducted a comparison?

15 A    Yes.

16 Q    And what did you find?

17 A    We found that generally it was within about 1% with some

18 variation on some items, but overall about 1%.

19 Q    Now how closely did the methods of the revenue consensus

20 conference resemble those that E & Y used in its forecast?

21 A    They were -- they were not the same.

22 Q    Do you even know what methods E & Y used?

23 A    Generally but not specifically.

24 Q    What effort did you make in this process to have the

25 numbers of the revenue consensus process come as close as

1 possible to EY's?

2 A    None.

3 Q    Why not?

4 A    Because I -- I really wanted -- I really wanted to know.

5 I mean we were -- it's -- it's one thing to put together a

6 plan, it's another thing to put together a budget.  And I

7 really wanted to know what the revenues were that we could

8 support from the standpoint of the processes that the city

9 would normally use.

10    And -- and even as we move forward in the future the

11 state legislation requires a revenue consensus conference

12 slightly different than the one that -- that we had, but that

13 would set the revenues for those -- for those years under

14 review without regard to what's in the plan.

15 Q    Let me now ask you about the restructuring and

16 reinvestment initiatives.  And this will require us to move

17 some exhibits around, but let me start by just asking -- you

18 can take that exhibit down.

19    You're aware of them.  What can you tell us about the

20 reinvestment and restructuring initiatives?

21 A    Well, they're really grouped into a number of different

22 categories but principally they are to help the city to

23 improve its revenue or help the city reduce cost and also help

24 the city to improve its delivery and service.

25 Q    Who came up with these?

1    A    They were actually done by Conway, MacKenzie in

2    consultation with department heads and -- and -- and people in

3    the city at that time.

4    Q    Were these done before, during, or after the time you

5    arrived at the city?

6    A    They were done before I arrived.  Some of them have

7    changed since I've arrived.

8    Q    Okay.  And how did you learn about the details of the

9    restructuring initiatives?

10   A    I had briefings with Conway, MacKenzie and with other

11   department staff and actually sat down and went through the

12   documents that they had prepared.

13   Q    What -- what areas of the city's operations are to be

14   affected by restructuring initiatives?

15   A    The restructuring initiative is in almost every part of

16   the city's operation.

17   Q    How well do you personally know the restructuring

18   initiatives that have been proposed?

19   A    I -- I know some more than others, but -- but yeah, I --

20   I know them.

21   Q    In your judgment how viable is the city going to be

22   without implementation of the restructuring initiatives?

23        MR. SMITH:  Your Honor, objection.  This is improper

24   lay opinion testimony.  It wasn't disclosed in his expert

25   report.

1      MR. STEWART:  I think the CFO can testify about what

2  the city is going to look like with projects --

3      THE COURT:  I'm going to -- I'm going to ask you be

4  a little more specific about what you mean by viable.

5      MR. STEWART:  Okay.

6  Q    Mr. Hill, you testified a minute ago that some of the

7  restructuring initiatives are designed to reduce costs?

8  A    Yes.

9  Q    And others are designed to increase revenue?

10 A    Yes.

11 Q    How important to the city are these cost reductions and

12 increases of revenue?

13 A    I -- I think they're very important.  What is also very

14 important is improvement in the financial management systems

15 which is one of the restructuring initiatives.  Without that

16 improvement I -- I -- I think it would be very -- very

17 difficult for the city to get the kind of information it needs

18 to continue to operate.

19 Q    And how important to the city are the cost savings and

20 revenue additions set forth in the restructuring initiatives?

21 A    I think -- I think they're very important to the city.

22 Q    And now for my question.  How successful would the city

23 be financially without -- without the economic benefits of

24 these cost reductions and revenue enhancements?

25     MR. SMITH:  Objection, Your Honor.  It calls for him

1 to like speculate about the future and offer an explanation.

2          THE COURT:  Overruled, go ahead, sir.

3 A    I think that -- that -- I -- I could not imagine some of

4 these revenue -- some of these initiatives not being done and

5 the city getting -- the city improving either its operations

6 or its access to information, or its ability to control its

7 resources.

8          And if there's one thing I know from the work that I -- I

9 did at the control board, is that the improvement in the

10 information systems was -- is absolutely key to the success

11 that the District of Columbia is experiencing now.  And I see

12 no reason why that would be different in Detroit.

13 Q    And as a member of the Mayor's administration and as an

14 appointee of Mr. Orr, how important is it that the city

15 improve the quality of its delivery of services?

16 A    I -- I believe that it's extremely important.  People --

17 this has been a city that has been losing population over the

18 years and -- and I certainly believe that a part of that

19 population loss is a result of the high cost of -- of staying

20 in the city and low quality of service delivery.

21          And already some of the investments that were made in

22 part from the plan of adjustment have resulted in improved

23 service delivery in a number of different areas.  Trash

24 collection is -- is clearly one of them.  The cleanliness of

25 the parks and -- and the reduction of blight

1  Q    Now you're aware of something called a quality of life

2  loan?

3  A    Yes.

4  Q    And what is the quality of life loan?

5  A    The -- the quality of life loan is a -- a borrowing that

6  allowed the city to move forward around a discreet list of

7  restructuring initiatives that were shown in the plan in 2014

8  and 2015.

9  Q    What role if any have you or has your office had in the

10  administration of the quality of life loan?

11  A    Well, we -- we actually -- or the -- the group that

12  reviews all of the applications for use of those -- those

13  funds and I sign off on them as well as the Mayor and a member

14  of the Mayor's team.

15  Q    Now if the plan is confirmed and the city proceeds with

16  its restructuring initiatives, what role will the Chief

17  Financial Officer have in administering the restructuring

18  initiatives?

19  A    Well, I believe that the Chief Financial Officer will

20  have the role of certainly making sure that all of the dollars

21  that are laid out in the plans are spent in accordance with

22  the plan.  And I think with the Mayor's office will have the

23  responsibility for reviewing the results of those

24  restructuring initiatives.

25  Q    Let me ask you a couple more questions before I get into

1  details.  Is there a master schedule anywhere for each of the

2  restructuring initiatives and when it is to be done?

3  A    There's a -- there's a master schedule for the -- well,

4  the -- the plan of adjustment lays out a schedule for the

5  beginning of each one of those restructuring initiatives.  But

6  we have a schedule that actually shows the restructuring

7  initiatives that -- that have been applied for -- that people

8  have applied for funding.

9  Q    Who keeps -- let me back up.  I guess I want to make sure

10  of the following.  Is -- is there somewhere I could look and

11  get a list of every restructuring initiative that's been

12  proposed?

13  A    It would be -- it would be two -- two places.  And when

14  you proposed you mean proposed by --

15  Q    In the plan?

16  A    In the plan, yes.

17  Q    Where -- where is -- what would I look at?

18  A    You'd look at the schedules that are toward the back of

19  the disclosure -- disclosure statement that would show all of

20  the individual plan of adjustment items by department.  And

21  there also other schedules that show the details of would have

22  been expected in terms of revenue and expenditures against

23  those funds.

24  Q    Whose job is it going to be in the city to keep track of

25  those restructuring initiatives so that we know which ones are

1  being done and which ones are not being done?

2  A    I -- I believe that the CFO would take -- I've taken

3  responsibility for that.  I believe ultimately it's a joint

4  responsibility between the CFO and the Mayor because these are

5  operational restructuring initiatives that need to have

6  operational oversight as well.  So it will be joint

7  responsibility.

8  Q    What system or systems do you intend to set up to

9  implement this?

10  A    Well, it's interesting that the -- the Ecivis system --

11  Q    I'm going to stop you right there.  Ecivis is something

12  we talked about earlier today and I had you spell it, correct?

13  A    Yes.

14  Q    But that's for grants management.

15  A    It is, but a number of these projects are like grants.

16  My personal view of the restructuring initiatives is that

17  these are funds that -- that but for the bankruptcy and but

18  for the fact that we wouldn't be paying these funds over to

19  creditors, that the city has a responsibility to track all of

20  these funds as if they were grants.

21      And so within the grant system you have all of the -- you

22  have the ability to use that system to track money and to also

23  track results of those funds.

24  Q    And so do I understand you correctly Mr. Hill, the Ecivis

25  system if I remember the name correctly, is the tool the CFO

1  is going to use to stay on top of the restructuring and

2  reinvestment initiatives?

3  A    Yes.  Until there are specific modules within a -- an

4  overall financial management system that we could use.

5  Q    So let me ask you this.  Is it fair to -- I'm going to

6  try to break down these restructuring initiatives into four

7  categories.  Fair to say there's some that increase revenues?

8  A    Yes.

9  Q    Some that cut costs?

10  A    Yes.

11  Q    Some that restore critical city services?

12  A    Yes.

13  Q    And some that just improve the quality of life?

14  A    There's an overlap between quality of life and improving

15  critical services.

16  Q    Okay.  Let -- let me ask you for examples of each.

17  What's an example of a restructuring initiative that improves

18  -- that improves revenue?

19  A    The efforts to improve our collection rates within the --

20  the CFO's office to get additional staff to be able to go

21  after revenues.  That's -- that's one area that -- that would

22  improve collections.

23      Also departmental revenues and, you know, certain

24  departments that actually generate and collect revenues.

25  There are collection procedures that can be improved there.

1  Q    What's an example of a restructuring initiative that

2  would reduce costs?

3  A    The -- actually the restructuring of the CFO's office

4  would ultimately reduce costs.

5  Q    Okay.

6  A    And is -- is -- is expected to.  Also the outsourcing of

7  certain services which has already occurred, has had an impact

8  of both reducing costs and increasing -- and increasing

9  service delivery and service collections -- I mean not

10 collections, but trash collection.

11 Q    And what would be an example of restructuring initiatives

12 that restored critical services or improved the quality of

13 life?

14 A    The -- the purchases of fire equipment which are

15 currently outdated.  And also the purchases of -- of police

16 vehicles, new police officers that would be able to be on the

17 street.  In the police department there is an initiative to

18 actually civilianize some of the jobs that are currently held

19 by police that will free police officers to be on the beat.

20 That's also an improvement in quality of life.

21 Q    How much money does the city intend to spend on

22 restructuring initiatives?

23 A    You mean over ten year period?

24 Q    Uh-huh, the ten year period.

25 A    It's about 1.7 billion total

1  Q     How much of that is going to be borrowed?

2  A     At most about 200,000,000.

3  Q     And so where is the rest of it going to come from?

4  A     The rest of it actually will come from surpluses that are

5  projected to be generated in the plan.  And also some of the

6  initiatives themselves, the ones that reduce expenditures and

7  increase revenues.  But the -- are needed in order to fund --

8  to continue to fund the restructuring initiatives.

9  Q     Fair to say that to some degree the restructuring

10  initiatives are intended to fund themselves?

11  A     To some degree but it's certainly not 100%.

12  Q     Let's put up if we could Exhibit 579.

13         THE COURT:  Actually before we jump into these

14  details, would this be a good time to stop for lunch, sir?

15         MR. STEWART:  Any time would -- would work equally

16  well, Your Honor.

17         THE COURT:  All right.  Everyone just stand by for

18  one second.  You said sir, at the beginning of your testimony

19  that you were somewhat familiar with the plan.

20  A     Yes.

21         THE COURT:  For this afternoon's questioning or the

22  questioning that will follow this questioning, I need you to

23  be as familiar with the plan as possible.  So you have a lunch

24  time assignment.

25  A     Yes, sir.

 1          THE COURT:  To become as -- as familiar as you can

 2   with the plan, whether that means reading it, or discussing it

 3   with Mr. Orr, or with the lawyers, however you want to do it

 4   is up to you.  But I need you to be as familiar as you can

 5   with the plan, okay?

 6   A    I'm fairly familiar, Your Honor.  And how long is lunch?

 7          THE COURT:  It's not enough to read the plan from

 8   start to finish.  I'm sure of that.  We'll reconvene at 1:30.

 9          MR. STEWART:  Thank you, Your Honor.

10          (WITNESS JOHN HILL WAS TEMPORARILY EXCUSED AT 12:02 P.M.)

11          THE CLERK:  All rise.  Court is in recess.

12          (Court in Recess at 12:02 p.m.; Resume at 1:30 p.m.)

13          THE CLERK:  All rise.  Court is in session.  Please

14   be seated.

15          THE COURT:  It seemed to me there was an unusually

16   long line in security.  Is there anyone who we should wait for

17   as a courtesy?

18          A VOICE:  I think we've got it sufficiently covered

19   for Mr. Soto that we'll be okay.  I hope I don't speak for

20   everybody, but nobody sits on the right.

21          THE COURT:  Okay.  And did we fix the screen issue?

22   Yes?  Excellent.  Thank you so much.  You may proceed, sir.

23          (WITNESS JOHN HILL RESUMED THE STAND AT 1:30 P.M.)

24   BY MR. STEWART:

25   Q    Good afternoon, Mr. Hill.

1  A    Good afternoon.

2  Q    During the lunch break did you comply with the Judge's

3  instruction and familiarize yourself with the plan of

4  adjustment?

5  A    Absolutely.

6  Q    Okay.  And I'll -- I'll ask you later about it.  But you

7  had -- did you however bring with you to the witness stand a

8  copy of that document?

9  A    Yes I did.

10        MR. STEWART:  Your Honor, may I approach?  I thought

11  I'd show it to --

12        THE COURT:  Sure.

13        MR. STEWART:  Opposing counsel.

14  Q    I think before the luncheon break, Mr. Hill, we were

15  talking about the restructuring and reinvestment initiatives.

16  And let me jump ahead of myself on one point.

17     We're going to go into the details of them presently, but

18  I'm going to jump ahead on one point.  Let's put up Exhibit

19  599 -- 599.  Do you have Exhibit 599 before you, Mr. Hill?  It

20  may be on your monitor and perhaps it's easier for you to see

21  there.

22  A    Yes, I do.

23        MR. STEWART:  Your Honor, is Your Honor's monitor --

24        A VOICE:  Couldn't you get it to stand up

25  straighter?

1          A VOICE:  Your IT director thought that would be

2   better for you.

3          A VOICE:  Steve, do you know how to do it?

4          THE COURT:  Okay.  Thank you.

5          MR. STEWART:  Okay.

6   Q    Mr. Hill, do you have Exhibit 599 before you?

7   A    Yes, I do.

8   Q    Have you seen this document before?

9   A    I have.

10  Q    What is it?

11  A    This is a document that was requested by the Mayor --

12  Q    Let me just ask just -- just is it a memorandum from you

13  to the Mayor?

14  A    Yes, it is.

15       (City's Exhibit 599 was identified)

16  Q    Okay.  Who wrote it?

17  A    I did and my staff.

18          MR. STEWART:  Your Honor, before questioning the

19  witness about Exhibit 599, I would move its admission.

20          MR. SMITH:  No objection, Your Honor.

21          THE COURT:  It is admitted.

22       (City Exhibit 599 was admitted)

23  Q    Mr. Hill, can you please tell me why you wrote this

24  memorandum to the Mayor?

25  A    The Mayor in his process to get familiar with the plan of

1  adjustment asked each department head to provide a memo that

2  spoke to the plan of adjustment and its probability of

3  execution.

4  Q    Okay.  And your memorandum here on 599 has a series of

5  actions that your department is expected to execute?

6  A    Yes, it does.

7  Q    Could you tell us what they are?

8  A    They are the ten year basically the revenue and expense

9  projections.  The finance department initiatives as well.

10  Q    Okay.  And this was written in May of 2014?

11  A    Yes, it was.

12  Q    Do you know one way or the other whether the Mayor made

13  this request of departments besides your own?

14  A    Yes.  He made this request to all department heads.

15  Q    Without getting into what any of the department heads

16  said, did you see memoranda to the Mayor from them resembling

17  599?

18  A    I did.

19  Q    Okay.  Let's focus only on this one, however.  Do you

20  know why it was the Mayor asked you to send him this

21  memorandum?

22  A    Well, the Mayor found out that he would have to testify

23  on the viability of the plan of adjustment and wanted to have

24  a detailed review by all of the department heads of the plan

25  and the sections that -- that -- that refer to their

1  departments.  And then he would base his conclusions on -- on

2  that review.

3  Q    And now let's now focus on our exhibit.  What initiatives

4  were you asked to look at or did you look at in Exhibit 599?

5  And you can respond generally.  We don't need to go through

6  every line on this document.

7  A    Oh, we -- we generally looked at the revenue projections

8  that are in the baseline.  We also looked at the expenses that

9  were projected as well for the -- the ten year baseline.  And

10  then we looked at each one of the initiatives that the office

11  of the CFO would have responsibility for which were -- there's

12  several.

13  Q    And did you assign percentages or likelihoods to each of

14  these in terms of the probability to be able to execute them?

15  A    Yes, we did.

16  Q    And do we see those on our exhibits?

17  A    Yes.

18  Q    Show us where they are, please.

19  A    It's on the first page the probability of execution of

20  the baseline revenue expenditures overall probability was 85%.

21  For the finance department restructuring initiatives overall

22  it was 75%.  And then there -- each one of the initiatives

23  were broken out on the back with various percentages for

24  implementation of each one.  And then also any comments as

25  well.

1  Q    So how did you determine what the probability of

2  execution was for any particular item here?

3  A    It was based on our -- based on a number of factors.  One

4  would be how difficult we thought the item was to implement.

5  And also whether or not we had the resources available

6  currently to be able to implement those initiatives.

7  Q    And now if we could, let's move to where we were right

8  before the lunch break.  Could we please have demonstrative

9  Exhibit 579 displayed?  Mr. Hill, do you have Exhibit 579 on

10 the screen in front of you?

11 A    Yes, I do.

12 Q    Okay.  And this is a demonstrative exhibit.  Can you tell

13 us what this -- what this shows?

14 A    This shows the total and the break out of the investments

15 in restructuring and reinvestment of 1.7 -- about 1.7 billion

16 dollars.

17     (City's Exhibit 579 was identified)

18 Q    And it's broken down into what it will be spent on?

19 A    It's -- it's broken down into various categories of types

20 of expenditures.

21 Q    And do you know who it was who came up with the numbers

22 and percentages we see on this exhibit?

23 A    The numbers and percentages were actually developed by

24 Conway, I believe.

25 Q    Okay.  And are these consistent with your understanding

1  of what the plan provides when it comes to restructuring

2  initiatives?

3  A    It is -- it is consistent with that.  And -- and -- and

4  also there were -- there was involvement of the other city

5  officials as well on this.

6  Q    Okay.  Do you know who calculated the projected expense

7  that we see here?

8  A    Yeah, the projected expense is actually a function of

9  schedules that were put together by Conway.  But it was a --

10 in some cases it was a collaborative effort with the groups

11 that would have responsibility for implementing them.

12 Q    Okay.  Now you testified earlier that some of these

13 restructuring initiatives are intended to increase the city's

14 revenues, correct?

15 A    Yes.

16 Q    Okay.  Let's put up Exhibit 581.  Do you have exhibit --

17 do you have Exhibit 581 on the screen, Mr. Hill?

18 A    Yes, I do.

19 Q    And please tell the Court what that is.

20 A    It is a summary of the four hundred and eighty-two,

21 almost $483,000,000 on revenue initiatives.

22      (City's Exhibit 581 was identified)

23 Q    And what does it show -- first of all how much is the

24 total amount projected to be gained in revenue?

25 A    The total is 483,000,00.

1  Q    And that's the number at the top?

2  A    Uh-huh.

3  Q    And then what does -- what does this breakdown mean?

4  A    It -- it's really broken down into in some cases various

5  departments.  In other cases it would be types of

6  expenditures.

7  Q    Okay.  Now and you're familiar with the one that refers

8  to the finance department, I assume?

9  A    Yes.

10 Q    Tell me first of all are those numbers correct for the

11 finance department revenue initiatives?

12 A    Yes, they are.

13 Q    Okay.  And what is the finance department intending to do

14 to attain revenue -- additional revenue of 65.4 million

15 dollars?

16 A    A number of different activities, one of which is the

17 collection of -- better collections of -- of taxes and

18 receivables.  Another would be the result of new systems and

19 being able to track those receivables and taxes better.

20       MR. STEWART:  Your Honor, for the convenience of the

21 Court, unless there is an objection, I would move in Exhibits

22 579 and 581, although they are proffered only as

23 demonstrative.

24       MR. SMITH:  I guess there's no objection, Your

25 Honor.

1          THE COURT:  All right.  They are admitted.

2      (City's Exhibits 579 and 581 were admitted)

3          MR. STEWART:  Okay.

4  Q    Now Mr. Hill, 581 shows the gross amount of revenue that

5  would come from these initiatives, correct?

6  A    Yes, it does.

7  Q    But do I understand correctly the city would have to

8  spend money to implement the measures that lead to this

9  additional revenue?

10 A    Yes.

11 Q    Did you conduct any kind of analysis of what would need

12 to be spent to raise this revenue?

13 A    We -- we did on several -- several of these we did, yes.

14 Q    And let's put up Exhibit 55, please.

15          MR. STEWART:  And 55, Your Honor, is yet another one

16 of the oversized sheets that we'll do the best we can on the

17 screen, but it may well be better to follow it on -- o paper.

18 Q    Mr. Hill, do you have Exhibit 55 before you?

19 A    Yes, I do.

20 Q    Okay.  Let's wait a minute.  What is Exhibit 55?

21 A    Exhibit 55 shows the breakdown of the revenue initiatives

22 by fiscal year.  It's -- it's the amount that would be

23 received and it's also the cost associated with the

24 implementation of that revenue initiative.

25      (City's Exhibit 55 was identified)

1  Q    Who prepared Exhibit 55?

2  A    This would have been prepared by Conway and MacKenzie.

3  Q    And what have you done to look at Conway's work to

4  determine whether it reflects your own understanding?

5  A    Well, any of these revenue initiatives that are already

6  moving forward, we would have had the department staff

7  actually present an analysis of how they were going to achieve

8  the revenue.  And so we would have reviewed that and –– and ––

9  and reviewed the –– the schedule generally.

10 Q    Is there any –– any initiative on –– pardon me, that you

11 can see that relates to your department?

12 A    Yes.

13 Q    I think –– and let me direct your attention to the second

14 page.  And the top?

15 A    Yes.

16 Q    Do you see initiatives there that are associated with the

17 finance department?

18 A    Yes, I do.

19      MR. STEWART:  Your Honor, before questioning the

20 witness further, I would like to introduce just this portion

21 of the document because he knows of it but not the entire

22 document because it's from someone else.

23      MR. SMITH:  We object to that.  This was opinion

24 work product created by Conway, MacKenzie.  I don't think that

25 Mr. Hill can sponsor that and it's expert –– expert opinion

1  and inadmissible for that reason.

2        THE COURT:  Can you establish a little more of a

3  foundation regarding this witness' participation in the part

4  of the exhibit that you are offering?

5        MR. STEWART:  Yes, Your Honor.

6  Q    Mr. Hill, do you -- do you see the part of the exhibit

7  I'm referring you to, the top three entries on the second page

8  of our exhibit?

9  A    Yes, I do.

10 Q    Okay.  Now you've testified the exhibit was prepared by

11 Conway, MacKenzie, correct?

12 A    Yes.

13 Q    Okay.  Let me just ask you what if anything did you do to

14 look at this part of the exhibit to determine whether it fit

15 with your knowledge of what your department was intending to

16 do?

17 A    Well, I -- I actually reviewed the underlying revenue

18 initiatives that are here.  And also determined whether or not

19 we felt that the cost associated with them was adequate for us

20 to be able to move forward on implementation.

21 Q    And what did you determine?

22 A    We determined that -- that it is adequate for us to be

23 able to move forward.  There -- obviously as we get further

24 and further into the implementation of each one of these

25 initiatives, we would expect there to be changes as we move

1  forward.  But --

2          MR. STEWART:  So, Your Honor, I would -- I would --

3  I wish to question only about his part of it.  But I think I

4  should move its admission.

5          THE COURT:  Well, let me just clarify this with one

6  -- one question here.  Is it your testimony that the

7  information reflected here for these finance department

8  revenue initiatives is accurate?

9  A    Yes, it is.

10          THE COURT:  All right.  Any objection?

11          MR. SMITH:  Well, Your Honor, we still have an

12  objection.  Because he's just said that he would review it

13  after the fact and, you know, thinks it's correct.  But that

14  doesn't mean that he has foundation.  He wasn't -- he hasn't

15  testified he participated in creating it.

16          THE COURT:  All right.  The objection is overruled.

17  And the -- this part of Exhibit 55 is admitted.

18      (City's Exhibit 55 was admitted)

19  Q    So, Mr. Hill, let me ask you just to look at -- let's use

20  fiscal year '15 for the -- for these three initiatives.  And

21  the first initiative is revenue related to newly established

22  grant administration administrative program.  And then there's

23  a cost and then there's a -- there's a net number, correct?

24  A    Yes.

25  Q    Please just tell us what that is telling us.

1  A    It's basically telling that for fiscal year 2015 that it

2  would cost $3,000,000 in order to set up this grants

3  administration function.  And we referred to this before as

4  the grants management office.

5  Q    Okay.

6  A    But that there is no revenue that would be expected in

7  that year.

8  Q    Okay.  Do you know why this is treated then as a revenue

9  generating item?

10  A    Well, it's -- ultimately it's expected to generate

11  revenue over time but the -- certainly there -- there would

12  have to be the expense of setting up the office.  There is an

13  -- an investment in creating additional revenue.

14  Q    Okay.  Let's go to the second one.  This says finance

15  department revenue upside, incremental collections primarily

16  related to non-filer project and income tax force.  And

17  there's other language there as well.

18       First of all, tell us if you could what the revenue line

19  looks like for let's just once again focus on fiscal year

20  2015.

21  A    It is expecting 4.9 million additional revenue in fiscal

22  '15.

23  Q    And then the cost is?

24  A    The cost is 400,000.

25  Q    And we could do the same analysis I gather with the next

1 item as well?

2 A    Yes.

3 Q    Is it your understanding that this is the exercise Conway

4 MacKenzie did with respect to all of the restructuring

5 initiatives?

6 A    Yes.

7 Q    Let's if we could now put up Exhibit 582.  And what is

8 Exhibit 582?

9 A    Exhibit -- Exhibit 582 is the total amount of cost

10 savings that would be expected from the revenue initiatives

11 from the restructuring initiatives.

12      (City's Exhibit 582 was identified)

13 Q    Okay.  And this is 358.2 million dollars?

14 A    Yes, it is.

15 Q    Once again that's the gross number, is it not?

16 A    Yes, it is.

17 Q    It does not reflect what it will cost to implement

18 initiatives to -- to save costs?

19 A    No, it does not.

20 Q    Let me ask you about your department.  Is there an entry

21 here for things that the finance department would be doing?

22 A    Yes, there is.

23 Q    And that's what, the upper right hand corner?

24 A    Yes.

25 Q    Okay.  Now, let me ask that Exhibit 54 to be displayed.

1  Can you tell us what is Exhibit 54?

2  A    Let me find the larger page.  Thank you.  Exhibit 54 is

3  the cost saving initiatives and which would -- which would

4  show the money that would be expected to be saved as a result

5  of certain activities.

6       (City's Exhibit 54 was identified)

7  Q    Okay.  And once again I'm going to direct your attention

8  only to the finance portion of this document which I think is

9  before you on the screen.  Did you personally look at this

10 part of Exhibit 54 to check the numbers that Conway -- and by

11 the way, Conway, MacKenzie prepared this document?

12 A    Yes, in concert with other city officials.

13 Q    Okay.  Did you -- well, what did you do to look at the

14 portions of the document relating to the finance department?

15 A    Well, we looked at the activities that were called for

16 and whether or not we believed that the savings could be

17 achieved with those activities.

18 Q    And what did you determine?

19 A    We determined that for -- for these initiatives that we

20 would be able to achieve the cost savings with the investments

21 that were shown here.

22 Q    Now in the course of your work, what conversations have

23 you had with others at the city to determine whether or not

24 they had done the same analysis of the Conway work that you

25 did?

1  A    Well, I had discussions with the Mayor's staff as well as

2  the department -- and several of the department heads about

3  the same type of format.  In fact as a result of some of the

4  work that was done we've actually had some changes that were

5  made in the plan of adjustment.

6  Q    Okay.  As a result of your analysis did you reach an

7  opinion whether or not the cost savings initiatives that we've

8  seen on our exhibits are realizable, or are reasonable

9  projections of cost savings the city can expect from the

10  restructuring initiatives?

11       MR. SMITH:  Your Honor, I'd just renew our objection

12  in the motion in limine just to preserve the record on this.

13       THE COURT:  All right.  Excuse me, your objection is

14  preserved.

15  A    Yes, I felt that they were reasonable.

16  Q    And as part of your work as the CFO did you also look at

17  the projections of additional revenue from Conway, MacKenzie

18  to determine whether in your opinion it was -- they were

19  reasonable projections of additional revenues the city would

20  receive as a result of the restructuring program?

21       MR. SMITH:  Same preservation objection, Your Honor.

22       THE COURT:  Okay.  Go ahead, sir.

23  A    Yes.  Within that ten year period.

24       MR. STEWART:  And, Your Honor, I would move into

25  evidence the last -- demonstrative number 582.  That was not

1  this document.  If you could put it up again, please, that the

2  witness has testified --

3          THE COURT:  Any objection to 582?

4          MR. SMITH:  No objection to 582, Your Honor.

5          THE COURT:  It is admitted.

6      (City Exhibit 582 was admitted)

7          MR. HACKNEY:  Your Honor, can I just clarify

8  something for the rest of the trial which is are the -- the

9  demonstratives are just coming in to become part of the record

10  as opposed to coming into evidence, is that correct?

11          MR. STEWART:  That's fine by me.

12          MR. HACKNEY:  Okay.  That's the -- that's the

13  custom.

14          THE COURT:  That's what I assumed.

15          MR. STEWART:  Yeah.  And maybe I should do a better

16  job, Your Honor, when I speak of admitting them and maybe ask

17  if the Court would receive them if that would be a better way

18  to put it.

19          THE COURT:  Well, I think if you used the phrase

20  demonstrative evidence that -- that absolutely clarifies it.

21  Q    Let me put up Exhibit 620.

22          MR. STEWART:  Well, and for the record, and I spoke

23  with Mr. Hackney about this yesterday.  Exhibit 620 is a page,

24  it's Page 4 of 70 of a -- a long and cumbersome spreadsheet

25  that comes from E & Y.  And 620 is extracted from Exhibit 108.

1    And because of the -- the difficulty working with

2  oversized sheets of paper and so on, we have extracted certain

3  pages, given them separate exhibit numbers for ease of

4  reference.  I think we discussed this yesterday.

5  Q    Mr. Hill, do you have Exhibit 620 before you?

6  A    Yes, I do.

7  Q    And what is Exhibit 620?

8  A    It is a summary of the restructuring reinvestment

9  initiatives and -- and their impact and cost.

10    (City's Exhibit 620 was identified)

11  Q    And how is this summary organized?

12  A    First, it would have the revenue -- the effects of the

13  revenue initiatives on -- on the top.  And that's the total

14  for the ten year period of four hundred and eight-two, almost

15  eighty-three million.

16    And then it would have the expenditures by object class

17  and listed -- it would -- and those would be the operating

18  expenses.  And then also would show the reorganization

19  investments as well which are expenses.

20  Q    You just used the words object class.  What is -- what is

21  an object class?

22  A    An object class is a type of -- it -- it goes to the type

23  of expenditure whether it is a -- a salary expenditure, or

24  training, or utilities, or so it -- so it breaks expenditures

25  down into their -- their individual characteristics.

1 Q    And does the City of Detroit's budget have defined object

2 classes?

3 A    Yes, it does.

4 Q    Who prepared Exhibit 620?

5 A    This would have been prepared by Conway, MacKenzie is my

6 understanding.

7 Q    Okay.  And have you yourself worked with or looked at the

8 numbers contained on Exhibit 620?

9 A    Yes.  It's -- it's the same information that is contained

10 in other newer detailed spreadsheets that -- that show the

11 reinvestment initiatives.

12 Q    And is Exhibit 620 a projection or forecast of revenue

13 and expenses relating to restructuring initiatives for the

14 years 2014 through 2023?

15 A    Yes, it is.

16 Q    And what use have you made of the information on Exhibit

17 620?

18 A    In its -- in its detailed form have used their

19 information on 620 to really understand the types of

20 activities and the expected cost of those activities in order

21 to implement the restructuring initiatives over a ten year

22 period and also to look at the types of revenues that were

23 expected to be achieved over that period of time.

24        MR. STEWART:  Your Honor, I would move the admission

25 of Exhibit 620.

1          MR. SMITH:  Your Honor, we object to that again.

2  This was not created by Mr. Hill but by an expert in the

3  litigation and it's just expert opinion.

4          THE COURT:  The objection is overruled.  The

5  document is admitted.

6      (City's Exhibit 620 was admitted)

7          THE COURT:  I have to ask you at the table to

8  actually pull those microphones closer.  We're having a little

9  bit of trouble picking you up.

10          MR. SMITH:  Sorry.

11          THE COURT:  And speak directly into them when you --

12  when you do speak.  Have enough lead line there to do that?

13          MR. SMITH:  Yeah, I think, yes.  I think we're okay,

14  Your Honor.

15          THE COURT:  Okay.

16          MR. SMITH:  Is this better?

17  Q   Mr. Hill, let's look at Exhibit 620 now.  And they've

18  numbered the rows on 620, correct?  And I'm going to refer to

19  the numbers.  Row 7 is the total revenue that is to come from

20  the revenue initiatives?

21  A   Yes, it is.

22  Q   Okay.  And Row 22 is the total expenditures, correct?

23  A   Yes, it is.

24  Q   Okay.  And then where are the savings, cost savings

25  reflected on Exhibit 620?

1  A    The cost savings are actually you know, netted into these

2  -- these expenditure numbers.

3  Q    Okay.  Line 23 speaks of -- pardon me, a surplus or

4  deficit?

5  A    Yes.

6  Q    Is that simply the arithmetic of subtracting Line 22 from

7  Line 7?

8  A    Yes, it is.

9  Q    And what is the -- what is the number for the ten year

10 period for Line 23?

11 A    It's two hundred and -- for the -- it's $292,000,000.

12 Q    Negative?

13 A    Negative, yes.

14 Q    Okay.  And then below it we have several more lines.  And

15 what are those?

16 A    Those are the reorganization expenditures as well as

17 investments on those principally and infrastructure and also

18 on buildings and -- and other equipment.

19 Q    Once again a -- a negative number?

20 A    Yes, it is.

21 Q    So Line 29 gives us the total net cost of the

22 restructuring and reinvestment program?

23 A    Line 29 yes, it does.

24 Q    And what is it?

25 A    That's 876,700,000

1  Q    The final line speaks to the incremental head count.

2  A    Yes.  The cost that is being driven by the permanent

3  labor expenditures are a function of the head count above and

4  beyond the baseline numbers.

5  Q    Now let's put up if we could Exhibit 577.  Mr. Hill, can

6  you tell us what is Exhibit 577?

7  A    Yes.  Exhibit 577 shows the cost of restructuring

8  initiatives and the savings and also revenues that are

9  expected to occur during that -- that same period of time.

10      (City's Exhibit 577 was identified)

11  Q    Okay.  And it's organized such that below the line -- by

12  the way do you know who prepared Exhibit 577?

13  A    `I -- I know that the information that -- that comes from

14  this exhibit is -- would have been from Conway, MacKenzie.

15  Q    And is the information the same information we've been

16  looking at in -- pardon me, in our other exhibits?

17  A    Yes.  It's the same information.

18  Q    Below the line we have numbers that are negative and in

19  green and above the line positive and in other colors.  What

20  does that depict?

21  A    Well, the negative numbers actually depict the

22  departmental initiatives and the department cost savings.  So

23  it would be negative expenses as well as revenues.  And then

24  on the top line indicates expenses.

25  Q    And does this show that for some years the city will be

1  spending more than it's receiving as result of the

2  reinvestment initiatives?

3  A    Well, this shows that in every year the city will be

4  spending more than it's receiving in reinvestment initiatives.

5  Q    Let -- let me ask you this.  Is it -- you've described

6  some of these initiatives raise money, some cut cost.  Is it

7  possible that the city's financial condition will be such that

8  certain of these initiatives will have to be delayed or

9  deferred?

10 A    Yes, it is -- it is possible depending upon how revenues

11 come in based on as close to the projections as -- as

12 possible.  Because there's only about -- I shouldn't say only,

13 there's about 200,000,000 of available funds that -- that I'm

14 aware of at this point that can be used for restructuring.

15 The rest is generated as a function of the initiatives and

16 also surpluses.

17 Q    What analysis has gone into determining which initiatives

18 would be deferred in the event deferral were necessary?

19 A    Well, we've -- we've asked Conway, MacKenzie to identify

20 all of those initiatives that show that have revenue

21 implications either by reducing expenses or increasing

22 revenue.  And have made a -- a policy decision that we will --

23 we will execute those -- those plan of adjustment items first

24 and so not defer those if -- if a deferral is necessary.

25 Q    Let me ask you then your opinion.  Have you reached an

1  opinion whether the city is likely to implement the

2  restructuring and reinvestment initiatives on a schedule that

3  would result in the additional revenues and cost savings we've

4  spoken of being realized in the amounts that we've seen in our

5  exhibits?

6          MR. SMITH:  Your Honor, I'd just like to preserve

7  our objection to this opinion.

8          THE COURT:  All right.  You may answer, sir.

9  A    I -- I believe that we will, however, you know, this is

10  -- none of these are easy to do.  You know, I have to say you

11  know, we're dealing with systems that are antiquated, that

12  need to be improved.  We're dealing with issues related to HR

13  and their ability to hire people at the right times when

14  they're needed in the plan.

15      So none of this is going to be easy.  And -- and so

16  although I do have a fairly high degree of confidence that we

17  will be able to move out on these because we have the

18  resources to do so and have done ways to get the talent that

19  we need to move forward, it's -- it is going to be very

20  difficult.

21  Q    Let me ask.  Now you already are administering the monies

22  that came to the city as a result of the quality of life

23  loans?

24  A    Yes, I am.

25  Q    Okay.  And that's something your department is doing?

1  A    Yes.

2  Q    How do those monies fit in if at all into the budgeting

3  process the city has?

4  A    Well, once the loan was -- was taken out, that creates

5  the budget resources in order to apply to expenditures.  And

6  then we create a budget string for each approved quality of

7  life loan item which is the same as the restructuring

8  initiatives that -- that we approve.  So that -- so that no

9  one can expend any funding until those projects are -- are

10  approved even though the money is in house.

11          MR. STEWART:  Your Honor, I would move by the way,

12  demonstrative Exhibit 577 into evidence before we put up our

13  next exhibit.

14          THE COURT:  Any objection?

15          MR. SMITH:  No -- no objection for demonstrative

16  purposes.

17          THE COURT:  It is admitted.

18      (City's Exhibit 577 was admitted)

19  Q    Please put up Exhibit 59.

20          MR. STEWART:  Exhibit 59, Your Honor, is yet another

21  one of the oversized exhibits.

22  Q    Mr. Hill, do you have Exhibit 59 here?

23  A    Yes, I do.

24          MR. STEWART:  Your Honor, I can -- I can hand up

25  another copy of it if it's missing from your pile or -- or

1  lost in all of those papers.

2          THE COURT:  I don't see it.

3          MR. STEWART:  You do have it.  If I may approach.

4          THE COURT:  We're all set.  Thank you.

5  Q    Mr. Hill, who -- who prepared Exhibit 59?

6  A    My -- my staff prepared it.

7  Q    And what is Exhibit 59?

8  A    It is a dashboard that really tracks the review process

9  on the quality of life loan business cases which have to be

10 prepared before we will release funding.  And -- and what

11 happens is that we --

12         (City's Exhibit 59 was identified)

13 Q    Before you go further, I just want to lay a foundation --

14 A    I'm sorry.

15 Q    -- before I get into the substance of it.  And this in a

16 nutshell, what does Exhibit 59 purport to depict?

17 A    It -- it shows each one of the items that were on a list

18 of quality of life loan potential projects that were sent to

19 the Judge for approval of the loan.  And then also it shows

20 the current status of the review process for those items.

21 Q    And this is maintained as an Excel spreadsheet?

22 A    Yes, it is.

23 Q    And who decided what should be on the spreadsheet?

24 A    I -- I did in -- in conjunction with my staff.

25         MR. STEWART:  Your Honor, I'd move the admission of

1 | Exhibit 59.

2 |          MR. SMITH:  No objection, Your Honor.

3 |          THE COURT:  Fifty-nine is admitted.

4 |     (City's Exhibit 59 was admitted)

5 | Q    Mr. Hill, at the top it's called quality of life --

6 | pardon me, business case request.  Do you see that?

7 | A    Yes.

8 | Q    What is a -- what is a business case?

9 | A    Well, with every quality of life loan item which is also

10 | a restructuring item, the law required the department heads

11 | who are seeking approval for these funds to actually review

12 | the quality of life loan item or the restructuring initiative

13 | and answer a number of questions.

14 |     They have to let us know if there are other ways that

15 | they feel they can achieve the same objective for less

16 | funding.  They also have to show us the time line for the

17 | expenditure of the funds without -- without necessarily using

18 | the quality of life loan or restructuring initiative dollars

19 | that -- that are -- that are outlined in the plan.  So this is

20 | -- this is how was I going to implement this plan and what

21 | resources are needed to do it.

22 | Q    Now the previous documents we have seen having to do with

23 | the restructuring initiatives came to us from Conway,

24 | MacKenzie, correct?

25 | A    That's correct.

1  Q    But now this is a document from your department, correct?

2  A    Yes, it is.

3  Q    How has it come to pass that control over the process

4  came to your department as opposed to being from Conway,

5  MacKenzie?

6  A    Well, this is implementation.  And so we felt that it was

7  important for -- for us to track all of the dollars that were

8  being applied to these restructuring initiatives and how to

9  weight a report back specifically on the progress.

10 Q    So let's go through this if we could.  Let's just take

11 the first line.  Item number 1.

12 A    Uh-huh.

13 Q    The first column says status.  And it says rejected.

14 A    Right.

15 Q    Who rejected it?

16 A    I did.  The team did and I -- I sustained their

17 rejection.

18 Q    And it says agency.  And that's public lighting, correct?

19 A    Right.

20 Q    And then over it says description, correct?

21 A    Right.

22 Q    And then there is something called cure all list item

23 number.  And this has N/A on it.  What is the list item

24 number?  What does that mean?

25 A    The list item number are -- it's the list of items that

1  we submitted to the Judge.

2  Q    And by the way the Judge is this Judge?

3  A    Yes.  Sorry, Judge.  It's the list of items that we

4  submitted in -- in order to gain approval to borrow the

5  $120,000,000 in funding.  And so we needed to make sure that

6  we were only spending those funds on things that -- that were

7  on that list.

8  Q    Okay.  So we go over it next has whether it's capital or

9  operating.  And then the amount requested.  Do you see that?

10 And then it's broken down by requested periods of time.  And

11 tell me why it is done that way.

12 A    It's -- it's done that way for budgeting purposes.  And

13 also I wanted to know, since funding is very limited, I wanted

14 to know how much of the funding was going to be needed within

15 the fiscal year and how much of it could wait until other

16 fiscal years.

17 Q    Now let's go back to the far left column.  Blow that up

18 if you could.  Just the left column.  There we go.

19      Now there is quite a number of these that you have

20 rejected.

21 A    Yes.

22 Q    Why have you rejected these?

23 A    Most of them have been rejected because they were not

24 listed on the approved list of items that quality of life loan

25 funding could be used for.  There were -- some that were

1  rejected because they may not have had the appropriate level

2  of detailed implementation plans attached to the request.

3  Q    And if we go further back in the document, is there more

4  detail about the review process your department has engaged

5  in?

6  A    Yes.  Yes, there is.

7  Q    Okay.  Now this is the tool you have used to administer

8  and supervise the quality of life loan proceeds, correct?

9  A    Yes, it is.

10 Q    Now if the plan is confirmed, then we would also have the

11 restructuring and reinvestment initiatives, correct?

12 A    Yes.

13 Q    And I think you've told us the tool you would plan to use

14 there. It's called what, Ecivis?

15 A    Ecivis.

16 Q    Ecivis.  How does it compare to the -- what we see here

17 on Exhibit 59?

18 A    It would show a lot of the same information, but it would

19 also provide the ability for someone to go in and actually

20 review the documents.  And to track expenditures directly

21 against the budget line items.

22     A lot of this is -- is prepared manually.  That once

23 implemented or once it's in the system, we would be able to

24 control it in the same way that we would control any other

25 grant of funding.

1  Q    And I think you told me this before, and I had forgotten

2  it.  When will Ecivis be ready to use?

3  A    It's ready to use now.

4  Q    And who -- who is the person in your department who is

5  responsible for making sure these projects are properly

6  followed in Ecivis?

7  A    I would -- that's where the responsibilities I've taken

8  on myself.  But -- but also it's the grants management office

9  would actually help with the implementation of that.

10 Q    Okay.  I'm now going to move to two quick short areas.

11 In terms of restructuring, is one of the areas that is going

12 to benefit from restructuring reinvestments information

13 technology?

14 A    Yes.

15 Q    Okay.  And do you know how much the reinvestment

16 restructuring program will be in that area?

17 A    The -- the actual dollar amount?  There's a significant

18 amount.  I know the individual projects which I could talk

19 about.

20 Q    Okay.  I think you've told us about some of them in the

21 finance department, correct?

22 A    Right.

23 Q    And some elsewhere.  Let me ask this.  As part of the

24 city's efforts has someone been specially hired to take --

25 well, let me ask this.  Until you came, or when you came,

1  where was the city's IT department located?

2  A    The IT department was located in the office of the CFO.

3  Q    In other words you're part of city government?

4  A    Yes.

5  Q    Has that changed?

6  A    Yes, it has.

7  Q    How has it changed?

8  A    The -- the city has hired a chief information officer,

9  Beth Niblock who has taken over responsibility for IT.

10 Q    And does she report to you?

11 A    She does not.  She reports to the Mayor.

12 Q    Okay.  How closely do you work with Ms. Niblock?

13 A    Every -- every day.  We work very very closely together.

14 We -- we call it being joined at the hip.

15 Q    Okay.  And what is she expected to do as part of the

16 restructuring initiatives?

17 A    Well, she is expected to improve the overall

18 infrastructure of the city's IT area.  And there are a number

19 of antiquated systems.  There's also equipment issues that we

20 have.

21       One major issue that she recently was able to take care

22 of as a result of quality of life loan dollars is the -- the

23 fact that all of our computers were still operating on XP

24 which Microsoft indicate they were no longer going to be able

25 to support.  And so she has managed the movement from XP over

1  to a system that -- that Microsoft would support.

2  Q    Fair to say though that there are risks to the

3  restructuring plans that would arise if the IT projects were

4  delayed or ran over their cost?

5  A    Yeah.  We -- we've had a lot of discussion about the risk

6  of implementation of IT projects.  And -- and we have -- there

7  are substantial risks associated with that.

8       There's the risk that the projects could take longer than

9  intended.  The risk that the projects could cost more.  The

10  risk that pieces of the project are not implemented whereas

11  our pieces are.

12      The risk that there is fatigue in the implementation of

13  all of the systems that need to be implemented because this is

14  a -- it's not just the implementation of the system, but it's

15  also the change in all of the processes that would lead up to

16  that system.  So it's -- it's a lot of work.

17  Q    So what have you done to protect the city against those

18  risks?

19  A    Well, we've made a couple of major decisions up front.

20  And these were decisions that Beth and I made and the Mayor

21  has supported and the EM has supported as well.

22      But we decided that the implementation of the financial

23  management system would be a cloud implementation which would

24  mean that the city itself would not be supporting the

25  infrastructure for the financial management system.  It would

1  basically outsource that.  And if it's a cloud implementation

2  it would mean it would always have the latest version of

3  software running our system.  So that was a decision we made.

4      And I also decided that we would look at best practices

5  for the operations that lead up to these systems and change

6  now all of the processes that are not best practice to best

7  practice processes so that when the system is implemented

8  we'll be able to tie directly into the controls that are

9  resident within many of these systems.

10     For instance, with procurement -- our procurement process

11  right now is almost exclusively paper driven.  We have people

12  who walk documents around to get signatures of various people

13  to evidence their approval of those -- those documents.

14     In -- in modern day procurement systems all of that is

15  done within the system and it's tracked in terms of how long a

16  person is holding the document before they digitally sign off

17  and review it.  And -- and they also have therefore the latest

18  version of that contract always at -- at hand.

19     And so paper can get lost.  It's -- it's -- and there's

20  additional input that has to occur once that paper document is

21  approved.  That would be the entire process that would change

22  drastically with the new -- new purchasing model -- module as

23  part of the ERP solution.  And that's just one of -- of

24  hundreds of different ways that the systems would be improved.

25  Q   That's the way they'd be improved.  So my question to you

1  is, how can you be confident that they'll be done on time and

2  at cost?

3  A    What -- what you have to do is assess the risk of

4  implementation and try to mitigate those risks.  We mitigate

5  the risk by using the cloud implementation for one.

6      That means we don't have to have people in Detroit

7  understand how the system operates on the machine.  That's one

8  way to mitigate the risk.  We mitigate the risk by moving now

9  to best practices to the extent that we can so that we don't

10  allow the systems to be changed so that we can continue to do

11  the same processes that we've always done.

12      That was part of the problem in the implementation of

13  Detroit's previous financial management system.  Because it

14  was being housed in Detroit and it also happened with the

15  implementation -- attempted implementation of an HR system.

16  Because it was being housed in Detroit, you could actually

17  have the vendor make changes to the system so that you don't

18  need to change any of your existing processes.

19      And that completely defeats the purpose of moving to a

20  new information system.  We've already made the decision that

21  we are not going to do that.  And so you control those -- you

22  control those variables and therefore you have a better chance

23  of implementing the system on time and having to do what you

24  originally intended it to do.

25  Q    When you spoke a minute ago about an HR system, are you

1  referring to the matter with ADP?

2  A     Yes.

3  Q     Tell the Court please what that was.

4  A     Well, there was an attempt to basically automate the

5  existing processes within the human resources environment.  So

6  there was never a look at what a modern human resource

7  department does and how it functions.

8      What happened was they decided that they would leave the

9  processes that they were doing in place and just automate

10 around those processes.  So -- so you -- it occurred -- HR

11 systems allow you to do a lot of things on handhelds that you

12 would not have been able to do in that particular environment.

13     It also gives the employee the ability to make certain

14 changes in various data that that employee needs to change

15 such as if you want to change the number of exemptions that

16 you might have, or -- or if there are life events that affect

17 your payroll, or that might affect your health care benefits,

18 et cetera.  And none of that was being built into or

19 anticipated in what -- what the city was doing with ADP.

20 Q     What did you do?

21 A     Well, when -- actually the emergency manager Kevyn Orr

22 asked me to take a look at this and we had a review of the

23 system done and I made the decision that this system should

24 not go forward and it should be -- by contract should be

25 stopped and we stopped it.

1  Q    Let me move on now to the financial part of the plan.

2  And let me begin with Exhibit 593.  Do you have Exhibit 593

3  before you?

4  A    Yes, on the screen I do.

5            MR. STEWART:  Okay.  Once again this is an oversized

6  document and therefore maybe it would be best on paper.  And

7  just for the record, Exhibit 593 that is Page 6 out of 82 of

8  Exhibit 109.  Which is yet another document that we've

9  extracted the from the bulkiness and cumbersomeness of the

10 underlying document.

11 Q    Do you have this before you, Mr. Hill?

12 A    Yes, I do.

13 Q    Okay.  And I'm going to ask you some questions before I

14 get to the substance of the document.  Can you tell us what

15 Exhibit 593 is?

16 A    Exhibit 593 is the ten year financial projection of the

17 general fund.  It's a general fund view meaning it's combined

18 all of the departments of what the city's revenues and

19 expenditures would be if legacy expenditures were unchanged

20 and the city actually invested in the reinvestment activities.

21      (City's Exhibit 593 was identified)

22 Q    Okay.  And who prepared Exhibit 593?

23 A    The -- the -- the top part of it was prepared by E & Y, I

24 believe.  And the bottom part would have come from information

25 from Conway because it's the restructuring initiatives.

1  Q    Okay.  And the information here about expenditures, do

2  you know where that would come from?

3  A    Yeah.  The -- the expenditure information actually comes

4  from the salaries and expenses based on the number of FTE's

5  that are shown in the -- in the city in those years.

6  Q    What use have you made of Exhibit 593?

7  A    I've -- I've looked at it -- you know, certainly we've

8  looked at it with respect to the -- the forecast that is shown

9  particularly the -- in the first few years here for revenues.

10 And the first few years of -- of our budget, 2014, '15, and

11 '16.

12      And then have also looked at it to really determine, you

13 know, what might happen if the bankruptcy was not approved

14 because the legacy cost would still be there.

15 Q    And where are the legacy costs shown in the exhibit?

16 A    They're shown under the net operating surplus.

17 Q    Okay.

18 A    Totaling over a ten year period 6.9 billion dollars.

19 Q    Okay.  And what reliance have you placed or what use have

20 you made of the projections?  And I'm speaking only of the

21 projections.

22 A    I -- well, we made use of the -- I -- I don't completely

23 understand the question.

24 Q    Okay.  And in the course of your own financial planning,

25 what role has Exhibit 593 played?

1  A    It's -- it's played a role in having a comparison to the

2  revenue conference numbers, certainly the -- the years that

3  are covered in the revenue conference.  And then also to be

4  able to see directionally where things were expected to go

5  over that ten year period.

6          MR. STEWART:  Your Honor, I would move into evidence

7  the projection part, but only the projection part of Exhibit

8  593.  And that would be I guess the year starting with, I

9  suppose, 2013.  But I would not move in the historical part of

10 the document.

11         MR. SMITH:  Your Honor, number one, we object to

12 this again.  This is just Mr. Malhotra's opinion.  It's fine

13 to ask him questions about it, but it shouldn't come into

14 evidence.

15     And then if you're going to do it, don't admit part of

16 the document, admit the historical evidence that shows

17 inconsistencies with what Mr. Malhotra did.  It's -- I -- this

18 is really getting, I think, out of control.  You know, picking

19 and choosing out of documents what they think helps them and

20 admitting part of it.  And it's done by another expert who is

21 going to testify in Court.

22         MR. STEWART:  Your Honor, the objection to this

23 document was hearsay and only hearsay.  And I would --

24         THE COURT:  And that would be an objection to the

25 admission of the whole document?

1          MR. STEWART:  Yes.

2          THE COURT:  You do?

3          MR. STEWART:  They're -- the only objection --

4          THE COURT:  I'm asking you.  Mr. Stewart, do you

5   have any objection to the admission of the whole document?

6          MR. STEWART:  No.  No, none whatsoever.

7          THE COURT:  The Court will admit the whole document

8   into evidence and overrule the objection.

9   (City's Exhibit 593 was admitted)

10          MR. STEWART:  Thank you.  Your Honor, I was looking

11  forward to an evidentiary discussion of whether a projection

12  can be hearsay.  Which I hope to do another time.

13          THE COURT:  You can have that with your colleagues

14  at Jones, Day.

15          MR. STEWART:  I'm sorry, Your Honor, this is going

16  to be the high point of my afternoon.  Okay.  We'll move on.

17          THE COURT:  Yeah, I'll -- I'll withhold the obvious

18  response on that.

19          MR. STEWART:  I'm sure it was not the high point of

20  your afternoon.

21  Q    Mr. Hill, let's look at Exhibit 593 then, okay?  We are

22  -- we are all there?  Okay.  In the categories we have we

23  start with on the left side we have revenues, and then

24  expenditures, and then net operating surplus, and then we have

25  other items going down the side.  Do you see that?

1  A    Yes.

2  Q    Okay.  We have then a line that says debt service.

3  A    Yes.

4  Q    Okay.  And then there is a number of items under that.

5  And tell -- tell us if you could, what are those items?  The

6  items that start with debt service, end up with a line that

7  says legacy expenditures.

8  A    Those are the items of -- of debt that the city currently

9  has going into bankruptcy.  And the projection of what those

10  expenditures would be in these years based on the current

11  agreements that were in place.

12  Q    And then there's something under that that says --

13  they're added up to a line that says total surplus or deficit.

14  Do you see that?

15  A    Yes.

16  Q    Okay.  And what does that represent?

17  A    That just represents the subtraction of the net operating

18  surplus from the legacy expenditures in the -- yeah, the

19  legacy expenditures.

20  Q    So the organization at the top we have the total

21  revenues, then we have the expenditures.  And do I understand

22  that's just the cost of running the city.  And then we have

23  the legacy cost, correct?

24  A    Yes.

25  Q    And that gets us to the deficit excluding financing

1  proceeds line, correct?

2  A    Yes.

3  Q    Okay.  What does that line tell us?

4  A    It -- it -- it basically says that over a ten year period

5  if the legacy expenditures continue as they exist today, that

6  we would have a deficit of about $4,000,000,000 after that ten

7  year period.  And also if the revenues come in as -- as

8  projected and expenditures come in as projected.

9  Q    And below that there is a section entitled reinvestment

10 in the city?

11 A    Yes.

12 Q    And what is that?

13 A    That's basically the -- the revenue initiatives, the net

14 impact of the cost savings initiatives that are part of the

15 reinvestment initiatives.  And it's the net cost of those

16 initiatives.

17 Q    Would the city be able to undertake those initiatives if

18 it had the deficits at the levels being shown on Exhibit 593?

19       MR. SMITH:  Objection, Your Honor.  I think this is

20 impermissible lay opinion -- lay witness opinion.

21       THE COURT:  Overruled.  Please answer, sir.

22 A    I don't -- I don't see how because these deficits also

23 would reflect cash shortages.  And so you wouldn't have -- we

24 wouldn't have the cash to make these investments.

25 Q    Could the state city raise revenues?

1        MR. SMITH:  Objection, Your Honor.  Again, the same

2   objection.  The other thing is it's not anywhere in his expert

3   report.  They submitted an expert report from Mr. Hill and

4   they didn't include any of this.

5        And also 30(b)(6).  You know these -- these topics were

6   addressed to Mr. Hill, he was a 30(b)(6) witness.  He said

7   there was no study on any of these issues and I think you saw

8   that in the opening.  That he testified quite clearly that

9   there was no study about whether revenues or taxes or anything

10  could be raised.  And they shouldn't be allowed to come in and

11  contradict that now.

12       MR. STEWART:  Well, Your Honor, it's a fairly simple

13  question that I would -- you would ask a witness who is --

14       THE COURT:  I'm not sure how simple the question is.

15       MR. STEWART:  Okay.  All right.  I'm going to come

16  back to that.  All right.  I'll -- I'll come back to the issue

17  in a minute, Your Honor.

18       THE COURT:  All right.

19  Q   All right.  So now let me ask -- one last thing.  This is

20  for the general fund, correct?

21  A   Yes.

22  Q   Is there something called fund accounting?

23  A   Yes.

24  Q   What is fund accounting?

25  A   It's -- it's grouping various accounts into categories

1  based on the types of expenditures so that generally the

2  general fund would -- would be related to the ongoing

3  operations of the city.

4      There would also be a set of funds that were expected to

5  be self generating and those would be enterprise type funds.

6  And those are in separate accounts.

7      To the extent that there is a -- a need to support some

8  of the enterprise accounts then you could have funds going

9  back and forth between a general fund and the enterprise

10 accounts.  And there could be -- there also are bond funds as

11 well and sets of funds.

12 Q   Let's go to Exhibit 595.  Mr. Hill, could can tell us

13 what Exhibit 595 is?

14 A   Exhibit 595 is the forecast of revenues and expenditures

15 for the -- this was principally for the general fund.

16     (City's Exhibit 595 was identified)

17         MR. STEWART:  And just for the record, 595 is an --

18 is an extract of Exhibit 111.  And it's extracted for the same

19 reasons as it is Page 7 of 9 of that exhibit.  That we've

20 extracted it because of the cumbersomeness of the larger

21 exhibit.

22 Q   And who prepared Exhibit 595?

23 A   This would have been prepared by E & Y but as a result of

24 information from both E & Y and Conway because it does have

25 restructuring initiatives here as well

1  Q    And what have you -- what work have you done that

2  involves this exhibit?

3  A    We've -- we've reviewed this information in order to --

4  in -- in order to get a sense for where the budget, at least

5  in the first three years of this exhibit would come out.

6           MR. STEWART:  Okay.  Your Honor, I'd move the

7  admission of Exhibit 595.

8           MR. SMITH:  Your Honor, we object again.  This is

9  just Mr. Malhotra's opinion and basically we've been going

10 through and having Mr. Hill give Mr. Malhotra's opinions.  I

11 wonder if he's going to actually come and testify in Court.

12 And they're also subject to a Daubert motion that hasn't been

13 ruled on yet, Your Honor.

14          THE COURT:  You say you have reviewed this and

15 relied upon it in your work?

16 A    Yes, I have.

17          THE COURT:  The Court will admit 595 subject to

18 reconsideration depending on the results of the Daubert

19 motion.

20      (City's Exhibit 595 was admitted)

21 Q    Mr. Hill, pardon me.  I think you've testified that

22 Exhibit 595 is the EY projection for the first ten years with

23 restructuring, correct?

24 A    Yes.

25 Q    Okay.  And let's if we -- and let me ask you this.  And

1 so am I correct in understanding that Exhibit 595 would

2 reflect the additional revenue and also the cost savings to be

3 expected from the restructuring initiatives?

4 A    Yes, it does.

5 Q    Are the cost savings set forth here separately?

6 A    They really would be net of the expenditures here.

7 Q    Because they're embedded in the expense numbers?

8 A    Yes.

9 Q    Are the additional revenues set forth separately?

10 A    Yes.  They would be shown in the departmental revenue

11 initiatives.

12 Q    Okay, highlight that.  That's --

13 A    Up in the revenue section.

14 Q    Okay.  Scroll down a little.  There is department render

15 restructuring.  We have department revenue initiatives.

16 A    Yes.

17 Q    Okay.  And that's the 482.9 that we saw on earlier

18 exhibits?

19 A    Yes, it is.

20 Q    And does Exhibit 595 take into account in their entirety

21 both the cost and the -- the financial cost and the financial

22 benefits of the restructuring and reinvestment program?

23         MR. SMITH:  Objection, Your Honor, foundation.

24         THE COURT:  I think you should establish a

25 foundation.

1        MR. STEWART:  Okay.

2   Q    Mr. Hill, looking at Exhibit 595 I believe you testified

3   that it's a document you've worked with?

4   A    Yes.

5   Q    What have you done to check the numbers that we see on

6   Exhibit 595?

7   A    I have actually added up the restructuring initiatives

8   and removed the quality of life loan exit, interest and other

9   things that aren't in the restructuring initiatives and

10  compared it to other schedules that show those separately.

11  Q    Would one of those schedules be Exhibit 620 which we

12  looked at earlier today?

13  A    Yes.

14  Q    So and as a result of this work that you did, were you

15  able to determine the effect of the restructuring reinvestment

16  initiatives upon the city's forecasted expense -- I'm sorry,

17  revenue and expense for this period of time?

18  A    I -- I was able to determine that all of the

19  restructuring revenue initiatives, the effect of those as well

20  as all of the restructuring costs and cost savings initiatives

21  were reflected on this document.

22  Q    And does it show at the bottom what the net effect would

23  be in terms of the city's financial position as -- in the

24  coming ten years if the revenues turned out to be what they're

25  projected to be and the restructuring reinvestment initiatives

1  delivered the benefits we've discussed?

2  A    Yes, it -- it does.

3  Q    And where do we see that?

4  A    It's the funds available for unsecured claims.

5  Q    Now at the bottom of this page there is a line that says

6  contingency.  Do you see the word contingency at the bottom,

7  Mr. Hill?

8  A    Yes, I do.

9  Q    What is that a reference to?

10 A    It's a reference to a reserve that's about 1% of

11 revenues.  That is to -- it's shown on here for every year to

12 guard against either revenues coming in for less than what was

13 intended or expenses being more than what was expected.

14 Q    And do you know why 1% of revenues was the number set as

15 the contingency number?

16 A    I -- I don't -- I don't know why that particular number

17 was set.  It's -- I -- I don't know specifically.

18 Q    Are there other contingency sums or cushions in the

19 city's budgets for the coming years?

20 A    In the -- in the budgets there -- there are amounts that

21 may or may not materialize and -- and could be shown as

22 contingencies.  But the main legislation on -- on -- in the

23 law requires that there be a 5% reserve fund established in

24 all budgets going forward after the review commission comes

25 into being.

1  Q    And I'm going to get to that in one minute.  Let me ask

2  you a couple more questions about the 1% that we have here.

3  Do you know how that 1% contingency is expected to operate?

4  A    I -- I know how I would use the 1% contingency.  Is that

5  there's a possibility that revenues may not come in as

6  expected.  And so it could be certainly a buffer for that.

7       Or if some of the expenditures in a particular year are

8  more than you would expect it could also buffer that.  But

9  it's to try to make sure that you have some room in the bottom

10 line.

11 Q    What happens if the contingency is not used in a

12 particular year?

13 A    It would drop to the surplus for the city.

14 Q    Do you know whether or not one way or the other whether

15 the contingency is expected to build up year on year?

16 A    Well --

17 Q    Not used?

18 A    Well, if not used here in this model that the contingency

19 would build up year after year.  You know, because you would

20 have basically revenues coming in as you intended them to come

21 in and expenditures coming in as you intended.  Then that

22 contingency number would be just something that mathematically

23 would drop to a bottom line.  And -- and every year it would

24 -- it would drop to the bottom line.

25 Q    Now you've mentioned a moment ago legislation that speaks

1 of a 5% contingency?

2 A    Yes.

3 Q    What legislation is that?

4 A    That's the legislation that created the financial review

5 commission.  And in that legislation the city would be

6 required to present a budget that shows a 5% reserve that has

7 a 5% reserve fund.

8     The question is how that reserve fund gets created.  It's

9 not specified in legislation and it could be the result of the

10 city always reserving 5% cash.  It could be the result of

11 budgeting 5% less revenues than -- and -- and so there's

12 various ways that you could create that, but that's not

13 specified.

14 Q    Okay.  And you say that that may well though be the

15 requirement on the city depending on how things eventuate in

16 terms of the resolution of this case?

17 A    That won't -- that is the requirement.  It's currently in

18 law once that law becomes effective.

19 Q    And how will that affect your budgeting?

20 A    If -- first of all, you have to establish that reserve.

21 And in reviewing that if the reserve is not established, you

22 would have to budget 5% less expenditures than revenues so

23 that you could create such a reserve that would -- that would

24 move forward.  And -- and -- and that's what happened in the

25 District of Columbia as well.

1  Q    What if -- and in the city budgets you're dealing with,

2  how much room is there for that extra 4%?  First of all, this

3  is 5% of expenses?

4  A    It's -- it's 5% of revenues.

5  Q    Okay.  How much room is in the budget to set aside the

6  additional 4%?

7  A    I -- I don't -- I don't see any.  I think you'd probably

8  have to defer -- you could potentially defer other

9  reinvestment initiatives so long as you didn't defer ones that

10  had an impact on your revenues or cost savings because that

11  kind of defeats the purpose.

12  Q    Where does that effort stand right now with -- with you

13  in terms of examining what should be done to provide for the

14  higher contingency number?

15  A    Well, we certainly identified all of the restructuring

16  initiatives that result in a -- either a revenue -- a revenue

17  generation or a reduction in expenditures.  And we'll

18  prioritize those moving forward.

19       And we've had these discussions with the Mayor and the

20  emergency manager as well.  And so as we move forward on the

21  implementation of the -- of -- of the plan and the budget,

22  then we would reduce the amount that would be available to

23  expend on restructuring.

24  Q    Let me ask you now about the settlements that have been

25  proposed with some of the -- with the retirement systems.  Are

1  you generally aware of what those settlements consist of?

2  A    Thoroughly, yes.

3  Q    Well, first of all, tell us if you could what a defined

4  benefit plan is?

5  A    A defined benefit plan is a plan that actually sets a

6  benefit for an employee in that plan and then all of the costs

7  to support that benefit have to be paid either by the -- the

8  retiree or the employee and the sponsor of the plan.  And in

9  this case the city.

10  Q    Now and do you have experience with defined benefit

11  plans?

12  A    Yes.

13  Q    In a defined benefit plan, when there is not enough money

14  in the plan to make the required payments, what happens?

15  A    There would -- there would be an actuarially determined

16  amount that would have to be in the plan in order to support

17  payments over time.  And depending upon the way the plan is

18  structured it can either be the employees or the plan sponsor

19  who pay into the plan.

20  Q    Have you heard before the connection with defined benefit

21  plans, the term investment return assumption?

22  A    Yes.

23  Q    And what is an investment return assumption?

24  A    Well, there is a -- there has to be an assumption on what

25  the funds that are in a plan are going to be able to earn over

1  time in order to set the amounts that might be due to shore up

2  that -- that plan amount.

3  Q    And how does the amount or the level of the investment

4  return assumption affect the liabilities a city has to a

5  defined benefit plan?

6         MR. SMITH:  Your Honor, I think we're getting into

7  again an impermissible area of lay opinion testimony.  And Mr.

8  Hill specifically testified in addition in his deposition that

9  he's not an expert on pensions.  So I don't think he has any

10 expertise to be talking about this.

11        MR. STEWART:  This was expressed as an expressed

12 area in his expert report, Your Honor.

13        MR. SMITH:  It's -- I asked him the following

14 question.  Are you --

15        MR. STEWART:  This is for cross or Daubert.  You did

16 not move on Daubert grounds on this either.

17        MR. SMITH:  Actually we did in a footnote in our

18 brief.  We had -- we made the point of duplicative --

19 duplicative -- that it was duplicative but when Mr. Hill was

20 qualified as an expert he was not qualified as an expert on

21 pensions and he doesn't have expertise on pensions.

22     And I asked him this question.  Are you holding yourself

23 out as an expert on pensions?  And the answer was no.  That

24 was at Page 19, Lines 12 to 14 of his deposition.  So this is

25 impermissible lay testimony and he does not have the

1  qualifications to talk about pensions.

2          MR. STEWART:  I think, Your Honor, a CFO of the city

3  is certainly in a position to testify about what the city's

4  exposure would be under a defined benefit plan that the city

5  is -- is party to.

6          THE COURT:  Well, let me ask you to establish that

7  foundation.

8  Q    Mr. Hill, let's -- let me ask you when in your career you

9  have had occasion to deal with defined benefit plans?

10 A    When I was the executive director of the control board

11 for Washington, D.C.

12 Q    What defined benefit plans did Washington, D.C. have?

13 A    They had a number of defined benefit plans in fire and

14 police.  Um, many of those plans when we came in were defined

15 benefit plans.

16 Q    And just as a matter of background, how did it come to

17 pass that the District of Columbia had defined benefit plans?

18 A    They were really plans that were driven -- the District

19 of Columbia was actually -- employees in the district we had

20 some of them at one point were federal employees and they had

21 moved over to the district system.  So many of their plans

22 were the result of plans that they had in the Federal

23 Government at that point.

24 Q    And when you were executive director of the control board

25 financially, what was the state of the defined benefit plans

1    the District of Columbia had?

2    A    There was a -- a huge looming unfunded liability that

3    those plans had because, you know, the District of Columbia

4    government came into existence in the early seventies.  And so

5    all of the plans that employees were in were transferred over

6    to the district.  But the Federal Government had not funded of

7    them.

8    Q    As a -- as a result of that what financial liabilities

9    did the District of Columbia government have towards the

10   defined benefit plans?

11   A    They had extensive financial liabilities and this, I

12   believe at times about 5.9 billion, I believe.  But there was

13   legislation that was passed by the Congress that had the

14   Congress take responsibility for the unfunded liability.  The

15   district then changed the plans and they moved forward with

16   the new plans.

17   Q    How involved were you with these matters involving --

18   that you just described to us, involving the District of

19   Columbia's defined benefit plans?

20   A    I was involved in the review prior to the Congress'

21   decision to create a control board because that was one of the

22   issues that was driving the fiscal stability of the District

23   of Columbia.  And I was involved afterward in -- in creating

24   the solution as part of the control board.

25   Q    And as part of the defined benefit plans did the District

1   of Columbia have obligations to contribute to them?

2   A     Yes.

3   Q     And how did --

4   A     Substantial.

5   Q     How did you learn about that?

6   A     It was by looking at the actuarial documents, by

7   reviewing the projections in the project for the cost of these

8   plans going forward.  That's -- that's how -- and also having

9   conversations with the actuaries.

10  Q     And based on that did you come to have an understanding

11  of the term used in defined benefit plans called an investment

12  return assumption?

13  A     Yes.

14  Q     And tell us what that is.

15  A     It's -- the investment return assumption is the return on

16  which you actually are able to project what the value of the

17  plan should be over time just as a result of the assets that

18  are in the plan and assets that are added to the plan minus

19  the cost associated with plan benefits.

20  Q     What is the relationship mathematically between the level

21  of the investment return assumption on one hand and the

22  exposure of the city to payments to the plans on the other?

23  A     Well, it -- it depends on the level of actual investment

24  return.  If you have an investment return that is greater than

25  an actual investment return it's greater than the investment

1  return that the plan is using, then the liability would be

2  lessened.

3      If the actual investment return drops below that, then

4  the liability would be greater because you'd make up -- you'd

5  have to make up for the difference.

6  Q   Is it fair to say the higher the investment return

7  assumption the greater the risk to the city?

8  A   Yes.

9  Q   And -- go ahead.

10 A   Yes.  Depending upon the actual investment rate that the

11 fund is earning.

12 Q   But if the investment returns in the future are not

13 known, what's riskier for a city, to agree to a high

14 investment return assumption, or a low investment return

15 assumption?

16 A   It's the high one.

17      MR. SMITH:  I'm not sure if we're talking about

18 Detroit or not, but so far a foundation has not been laid that

19 he knows anything about what the investment returns have been

20 for the pensions in Detroit, or any other facts about pensions

21 in Detroit, so we'd object.

22      THE COURT:  Well, that objection is overruled

23 because he's speaking more generally and I believe he has the

24 -- I believe the foundation has been established for that.

25 But let me ask you this question.  What did you mean when you

1  told those Syncora attorneys that you were not holding

2  yourself out as a pension expert?

3  A    I'm not an actuary.  And I am -- I -- I would not

4  consider -- I understand pensions and how they operate, but I

5  wouldn't consider myself an actuary where someone that's able

6  to -- to go in and make those -- those calculations.  And I

7  would consider that a pension expert.  We hire pension experts

8  to -- to calculate those numbers.

9         THE COURT:  The knowledge and experience you have

10  with pensions is that which you got in your work with the

11  District of Columbia and what you've gotten here in the

12  meantime with the City of Detroit?

13  A    Yes.

14         THE COURT:  Any others?

15  A    There was some work that was done in Flint, Michigan when

16  I was with Arthur Andersen.  They were one of my major clients

17  on a grant from one of the foundations.  And there the looming

18  pension costs were a major issue also.

19      And so I -- I did receive some experience there as well.

20  And many of the cities that we were dealing with from a

21  consulting standpoint with Andersen had pension issues that --

22  that -- that we had to understand and -- and try to work

23  through.

24         THE COURT:  Is it fair to say that it is part of

25  your job as the CFO of Detroit and for that matter is it part

1  of the job of the CFO of any major city, to be familiar with

2  how defined benefit pension plans work?

3  A    Yes.  And I think it's the part of any CFO's job to

4  understand the risk associated with execution of the budget

5  and how those plans work and costs that might be associated

6  with those plans is -- is a major risk of the city.

7        THE COURT:  All right.  Syncora's objections are

8  overruled.  You may proceed.

9  Q    I think my question, Mr. Hill, was this.  What's the

10 relationship between financial risk for the city and the level

11 of the investment return assumption?

12 A    Well, the higher the investment return assumption, the

13 larger the payment the city would have to make in order to

14 meet that investment return assumption.

15 Q    As a result of your work for the City of Detroit, have

16 you reached an opinion whether the city has the financial

17 resources or stability sufficient to justify taking risks with

18 respect to its future pension contributions?

19        MR. SMITH:  Your Honor, I'd just preserve our

20 objection on -- on this.  This was also part of the Daubert

21 motion.

22        THE COURT:  All right.  Subject to that, you my

23 answer the question.

24 A    Sure.  I don't -- I don't see how the city would be able

25 to take additional risk at all in the implementation of the

1  plan moving forward.  There -- there are already some new

2  variables associated with the plan and its implementation, the

3  revenues coming in when they need to come in and so forth.

4      And also the execution of a number of -- of initiatives

5  for which the plan is relying on to be able to continue and

6  which the city is relying on to be able to continue the

7  investment in these initiatives going forward.

8      So I -- I -- I don't -- I don't believe the city is in a

9  position to.

10 Q   Let me ask one last investment return assumption risk.

11 Did the District of Columbia, do you know what the investment

12 return assumptions were associated with the defined benefit

13 plans for the district when you worked at the control board?

14 A   Yeah, they were in the low to the mid 6%.

15 Q   Thank you.  A couple of things.  Let's go back if we

16 could to Exhibit 595.  This, I think you testified was the EY

17 restructuring scenario projection, correct?

18 A   Yes.

19 Q   And I've asked you already about the city's budgetary

20 process, correct?

21 A   Uh-huh.

22 Q   Have you heard of the term called harmonization?

23 A   Yes, I have.

24 Q   What is harmonization?

25 A   The way I understood the term used is that it's -- it's

1  trying to make sure that the budget of the city reflects the

2  plan moving forward.

3  Q     And so what's being harmonized with what?

4  A     Well, it's -- it's taking all of the activities that are

5  expected within the plan and the dollars associated with them

6  and showing in a budget document the authorization for those

7  expenditures to be expended.

8  Q     What have you done or people working for you done to

9  harmonize the EY projections with the city budget?

10 A     What we've actually looked at the -- the projections and

11 also the budget.  The biggest -- the biggest issue for us were

12 the items that were in the restructuring initiatives and part

13 of the reason that was an issue is because the funding for

14 those initiatives is not really coming from the revenues that

15 are approved in the budget.

16      So for instance if -- if -- if I were to put all of the

17 restructuring initiatives that are expected in 2015 in the

18 2015 budget, I don't have the resources to pay for all those

19 initiatives because some of the money to pay for those

20 initiatives is coming from debt that has not yet been taken

21 out by the city.

22      So we have to be very careful not to provide departments

23 authority to spend against money that we don't have yet.  And

24 so that's why there are these differences and why we've

25 treated the reinvestment initiatives separately.

1    But what we're doing is and -- and I think it was very

2  confusing to some of our department heads because they didn't

3  -- weren't able to see in a budget document where the

4  resources were for them to hire the additional staff that are

5  called for in the plan, where to actually buy the equipment

6  that might be called for in the plan.

7    And so we put together documents now that show all of the

8  resources including restructuring initiatives by department

9  and are -- are working through how we would budget for those

10  so department heads can see all of the resources they have

11  available to them.

12  Q    So how does one go about harmonizing, Exhibit 595 for

13  example, with the budget that your department is required to

14  prepare?

15  A    Well, first is that the budget level, if you look at some

16  of the restructuring initiatives that are here, these

17  restructuring initiatives could include additional people in

18  them.  And so you would take out of these restructuring

19  initiatives the people and put them up in salaries and

20  fringes.

21    You would actually take every one of the restructuring

22  issues which -- which has that abject class information.  It's

23  not terribly difficult to do.  Because they have the abject

24  class information on those restructuring initiatives and group

25  that in a way that the department heads can see all of the

1 | resources that they have at their disposal.

2 |     But again I don't want any of the department heads to

3 | have access to restructuring dollars until there's a plan in

4 | place on how they're going to spend and -- and that they've

5 | looked at potentially other ways of achieving the same

6 | objectives.

7 | Q    Where does the harmonization process stand today?

8 | A    It's actually -- it's done.  And we have -- we have the

9 | documents.  Now what we have to do is -- you know, because the

10 | plan has continued to change, we will have to make

11 | recommendations for -- for changes in the budget to the

12 | council and with authority of the EM to -- to make those

13 | budget documents have all the resources in them.

14 | Q    I just have a few more things.  Just put up Exhibit 584,

15 | please.  It's a demonstrative exhibit.  Mr. Hill, are you --

16 | do you have Exhibit 584 before you either in paper or on the

17 | screen?

18 | A    Yes, I do.

19 | Q    And as the city's CFO, how familiar are you with its tax

20 | structure?

21 | A    I -- I am familiar with it.

22 |     (City's Exhibit 584 was identified)

23 | Q    And is it fair to say the city's ability to impose taxes

24 | is dependent upon what Michigan law permits it to impose?

25 | A    Yes.  Michigan law actually sets statutory the ceilings

1 | for -- one, it sets the ability of a city to levy taxes and

2 | also sets statutory ceilings for those taxes.

3 | Q    How much -- how close is the city to its statutory

4 | maximums in terms of the taxes it can impose today?

5 | A    It's -- it's at the statutory maximums.

6 | Q    What would be required for the city to raise taxes?

7 | A    To raise the tax rates it would require a change in

8 | legislation.  But of course taxes can be raised by increases

9 | in the value of property and -- and numbers of people who

10 | would come into the city and so forth.

11 | Q    What latitude does the city have to raise fees?

12 | A    Well --

13 |         MR. SMITH:  Objection, Your Honor, foundation.  It's

14 | also -- I mean he hasn't laid the foundation.

15 |         MR. STEWART:  Sure.

16 | Q    Is the imposition of fees a source of revenue for the

17 | city?

18 | A    Yes, it is.  And it -- it's driven by some of the

19 | departmental revenues actually.

20 | Q    Okay.  And are you personally familiar with the fees that

21 | the city imposes?

22 | A    Generally, yes.

23 | Q    And what they're imposed for?

24 | A    Yes.

25 | Q    And the amount of them?

1  A    Generally, yes.

2  Q    Okay.  What ability does the city have to raise fees

3  further?

4  A    Well, you know, raising fees is generally subject to

5  review and as to whether or not those fees actually reflect

6  the cost associated with providing the particular service.

7  And so a fee can be challenged if it is greater than the

8  service that's actually provided.

9  Q    Has that happened since you've been CFO of the city?

10 A    There have been challenges to the fees, yes.

11 Q    And do you know what's happened in -- in those

12 challenges?

13 A    I -- I don't -- I don't remember specifically.

14         MR. STEWART:  Before we move on, Your Honor, I'd

15 move demonstrative 584 into evidence.

16         MR. SMITH:  No objection for demonstrative purposes,

17 Your Honor.

18         THE COURT:  It is admitted.

19     (City's Exhibit 584 was admitted)

20 Q    Mr. Hill, let me -- let's put up Exhibit 58.  Do you have

21 Exhibit 58 in front of you?

22 A    Yes.

23 Q    Or on the screen if you can make it out on the screen.

24 A    I -- I can.

25 Q    Okay.

1  A    Make it out on the screen.

2  Q    What is Exhibit 58?

3  A    Exhibit 58 is the 2014 equalized value for the tax rolls

4  for the City of Detroit for property taxes.

5       (City's Exhibit 58 was identified)

6  Q    Who prepared Exhibit 58?

7  A    This one is generally prepared by the -- it's prepared by

8  the department of assessments.

9  Q    And that's part of your organization?

10 A    Yes.

11 Q    And after preparation, where does it go?

12 A    After preparation and when it's finalized it -- it

13 actually goes to the state, I believe.

14 Q    What review if any do you personally give this submission

15 before it is sent to the state?

16 A    I -- I -- I look at it from the standpoint of what the

17 values are showing here and from the standpoint of the -- the

18 taxes that might be assessed.

19 Q    Is this a document that the city periodically submits to

20 the state?

21 A    Yes.

22       MR. STEWART:  I'd move the admission of Exhibit 58.

23       MR. SMITH:  Your Honor, we do object to this.  There

24 was no testimony that he prepared this document.  And also at

25 the bottom it says it's tentative.  It's a tentative draft

1  And this was way back -- this was back in May of -- 19th, I

2  assume.  There's probably some sort of final.

3          THE COURT:  Was this document, this version of this

4  document submitted to the state?

5  A    This would not have been the formal submission, but the

6  state would have seen this document.  There's a -- there's a

7  final that's done after the review period.

8          THE COURT:  Does this document accurately portray

9  the information that's in it?

10 A    Yes, it does.

11         THE COURT:  All right.  The objection is overruled.

12 Q    Mr. Hill, could you tell us what Exhibit 58 portrays?

13 A    It actually shows the value of property that -- that

14 could be assessed and -- thank you for making it larger.  And

15 it also shows what the tax rolls would be.  So it would set

16 basically the levels of -- that could be used in the

17 assessment process.

18 Q    What's the relationship between the values shown here and

19 the amount of property taxes the city can levy?

20 A    The city can only levy against this particular roll.  So

21 this would determine what the levies would be.

22 Q    Finally, let me ask you about the 36th District Court.

23 A    Yes.

24 Q    What is the 36th -- 36th District Court?

25 A    The 36th District Court is the Court that the city has

1  responsibility for funding its operations and it is the Court

2  that administers many of the laws of -- of the city.

3  Q    Are you aware of any arrangement the city has with the

4  36th District Court in connection with this bankruptcy

5  proceeding?

6  A    Yeah.  I mean we've -- we've worked very closely, and I

7  personally worked very closely with the Judge at the 36th

8  District Court who has created -- who -- who was instrumental

9  in doing a review of the operations of the 36th District Court.

10 It's Judge Talbot.

11     And following through on a number of the recommendations

12 in that -- that report.  And so we've had maybe about six

13 different discussions with Judge Talbot and his staff on -- on

14 how the Court can improve its operations, but also its

15 collection of -- of revenues.

16 Q    Are you aware the claims that have been made against the

17 36th District Court by -- by a class of claimants?

18 A    Yes, I am.

19 Q    What arrangement or agreement if any has the city reached

20 with the 36th -- 36th District Court about the treatment of

21 those claims in this bankruptcy?

22 A    Well, those claims would have been -- the payment of

23 those claims would be passed on to the city.  Because the city

24 pays for the operations of the Court.

25     It's -- it's very similar to the treatment of the Courts

1  in the District of Columbia prior to new legislation.  The

2  city had to actually pay for all of the Superior Court costs

3  in -- in the district.

4  Q    Fair to say that the city agrees that it's legally

5  obligated to pay the 36th District Court's legal obligation to

6  this class?

7  A    Yes.  It would be something we would have to budget for

8  and pay out of our resources.

9          MR. STEWART:  Okay.  Thank you.  That's all the

10  questions I have of the witness, Your Honor.

11          THE COURT:  All right.  Thank you.

12          MR. STEWART:  I'm sorry, I may have -- I move to --

13          THE COURT:  All right.  We'll take our afternoon

14  recess now and then resume with cross examination.  So let's

15  reconvene at 3:30, please.

16      (WITNESS JOHN HILL WAS TEMPORARILY EXCUSED AT 3:12 P.M.)

17          THE CLERK:  All rise.  Court is in recess.

18      (Court in Recess at 3:12 p.m.; Resume at 3:30 p.m.)

19          THE CLERK:  All rise.  Court is in session.  Please

20  be seated.

21          THE COURT:  I have been advised that you all will be

22  competing tomorrow morning to get into the building with 190

23  potential jurors.  So I strongly urge you to get here much

24  earlier than you might otherwise.  And you may proceed.

25          MR. SMITH:  Okay.  Thank you, Your Honor.

1    (WITNESS JOHN HILL RESUMED THE STAND AT 3:30 P.M.)

2                    CROSS EXAMINATION

3    BY MR. SMITH:

4    Q    Good to see you again, Mr. Hill.  Did you see the present

5    I left for you there?

6    A    Yes.

7    Q    The binder.  And I've got your deposition transcript in

8    there and some documents that I may refer to as we talk today.

9         And you might see that some of the questions I'm going to

10   ask you are familiar, that we've -- since we've discussed a

11   lot of these topics before.  Okay?

12   A    Sure.

13   Q    I just had a couple quick questions on pensions.  You

14   understand that the investment rate of return is tied to the

15   asset allocation of a pension, correct?

16   A    Uh-huh.

17   Q    And if you change the investment rate of return, pension

18   managers try to match the asset allocations so that they

19   target the investment rate of return, correct?

20   A    Uh-huh.  I know that they try to target the investment

21   rate of return, yes.

22   Q    Okay.  And do you know the asset allocation for any of

23   the pensions in Detroit?

24   A    I don't.

25   Q    Were you aware that the pensions in Detroit have been

1  receiving better than 9% return for the last five years?

2  A    I -- I know what the recorded rate of return has been,

3  yes.

4  Q    Is it in that range better than 9%?

5  A    I don't remember it being that high, but I know that it

6  was --

7  Q    All right.  What -- what do you think the rate of return

8  has been?

9  A    Again, I don't remember specifically, but -- but I know

10 that it was in a range above -- above the rate that -- that

11 it's paid to them.

12 Q    Okay.  So would it be greater than 7 or 8%?

13 A    Greater than 7, yes.

14 Q    Okay.  And you haven't taken the time to go back and look

15 in preparation for your testimony to the historical returns of

16 the pension funds?

17 A    No, I have not.

18 Q    And you haven't looked at their asset allocations

19 historically, correct?

20 A    I have not.

21 Q    And do you know whether the pension funds are going to

22 change their asset allocations going forward?

23 A    I -- I don't know that.

24 Q    Okay.  You mentioned the harmonization between the Ernst

25 & Young projections and the budget.  Do you recall that?

1   A    Yes.

2   Q    Who actually performed that?  Was that Ernst & Young, or

3   city staff?

4   A    It was a combination of Ernst & Young and city staff.

5   Q    Okay.  And when was that started?

6   A    It was started about -- about three weeks ago.  But it's

7   been done in various formats.  First the city actually did one

8   and then we had one done jointly with Ernst -- Ernst & Young.

9   Q    I see.  And was -- and -- and that was about three weeks

10  ago?

11  A    It was about three weeks ago when -- when that one was

12  started, yes.  But we had been working on the other one even

13  before then.

14  Q    And was that after Ms. Kopacz's report came out?

15  A    Yes.  Well, it wasn't after her report came out, but it

16  was after she raised some of the concerns in discussions with

17  us.

18  Q    Okay.  And Mr. Hill, you became CFO at the end of

19  November 2013 after the prior CFO resigned abruptly, correct?

20  A    Yes.

21  Q    And at least at the time of your deposition you had no

22  idea who the CFO would be after the bankruptcy, correct?

23  A    I -- I still don't know.

24  Q    You mentioned the process where you have to get approval

25  by the Mayor or the city council and the control board?

1  A    Yes.

2  Q    And you haven't received any of those approvals, correct?

3  A    Not officially, no.

4  Q    And no one knows what the outcome of that process will

5  be?

6  A    No one knows.

7  Q    And at the time of your deposition you had not

8  permanently moved to Detroit, correct?

9  A    That's correct.

10 Q    Washington, D.C. is your primary residence?

11 A    Yes, it is.

12 Q    And you've been commuting back home to Washington, D.C.

13 on the weekends?

14 A    Generally.  Although I have been here weekends.

15 Q    Okay.  And at least at the time of your deposition you

16 had no plans to permanently move to Detroit, correct?

17 A    My only plans would have to occur after having a

18 permanent appointment.

19 Q    Okay.  So right now you have no plans to permanently move

20 to Detroit, correct?

21 A    Not at this point.

22 Q    And you know there are cities where city workers are

23 required to actually live in the city, correct?

24 A    At certain levels, yes.

25 Q    And requiring city employees to reside in the city is a

1  way cities can increase revenues?

2  A    Yes, it is.

3  Q    And in Detroit requiring city employees to live in the

4  city would increase revenues because they'd be subject to a

5  higher income tax rate, correct?

6  A    It -- it -- yes.  It -- it depends.

7  Q    And they might also be subject to property tax if they

8  purchased property in the city?

9  A    If they purchased property, yes.

10 Q    And but no -- Detroit has no such requirement right now,

11 correct?

12 A    Not to my knowledge.

13 Q    You mentioned that you're relying on your experience in

14 Washington, D.C., correct?

15 A    Yes, I am.

16 Q    And as -- as we -- I think you discussed earlier today

17 the District of Columbia was in financial crisis when you

18 worked at the control board there?

19 A    Yes.

20 Q    And among the reasons the District of Columbia was in

21 financial crisis was because of a population loss and high

22 incidents of crime?

23 A    Those were some of the factors.

24 Q    And let's discuss some of the other ones.  In both the

25 District of Columbia and Detroit there were high unfunded

1  pension obligations that were the cause of fiscal crisis?

2  A    Yes.

3  Q    And another cause of Detroit's and the District of

4  Columbia's fiscal crisis was a lack of financial controls in

5  the city government?

6  A    Yes.

7  Q    And do you agree that fiscal mismanagement can lead to

8  financial crisis, correct?

9  A    I believe that it can.

10 Q    And another factor contributing to financial crisis in

11 both the District of Columbia and Detroit was poor collection

12 of taxes?

13 A    Yes.

14 Q    And Washington, D.C. successfully implemented strategies

15 to address the -- the fiscal crisis, correct?

16 A    Yes.

17 Q    And as you discussed they now have a $2,000,000,000

18 surplus and AAA credit -- credit rating or something like

19 that, correct?

20 A    Yes.

21 Q    And one successful strategy the District of Columbia

22 employed to address fiscal crisis was to raise taxes, correct?

23 A    Not necessarily.  Initially the District of Columbia did

24 try to raise taxes and then they actually reduced taxes

25 further along.  So I think that -- that some of the increases

1  that are occurring now are a function of having reduced taxes

2  below the rate that they -- they were earlier.

3  Q    Yeah, okay.  So there have been tax -- tax increases and

4  tax decreases over the time period you worked in Washington,

5  D.C., correct?

6  A    Yes, there have.

7  Q    And the District of Columbia actually has fairly high

8  taxes, correct?

9  A    Well, it is a city state.  So it has both state, and

10  city, and county taxes.  So --

11  Q    Okay.  When you -- are you paying Michigan and Detroit

12  taxes now?

13  A    I would pay as a non-resident for Michigan.  I will

14  starting with this return.

15  Q    Is that going to be a tax cut for you?

16  A    No, because I'll still have to pay the district taxes.

17  Q    Oh, okay.  That doesn't sound too good for you.  I mean

18  the tax rate in the district.  And it's as high as almost 9%

19  for the income tax, isn't that correct?

20  A    Yes.  But it's the city and the state.

21  Q    And another successful strategy that was implemented in

22  the District of Columbia to improve its fiscal situation was

23  to improve enforcement and collection efforts by going after

24  high profile tax cheats, correct?

25  A    Yes.

1  Q    And you also plan to publicize enforcement efforts in

2  Detroit as a means to try to improve the collection of taxes,

3  correct?

4  A    Absolutely.

5  Q    And another strategy that the District of Columbia

6  successfully used to address fiscal crisis was to cut spending

7  and programs, correct?

8  A    Yes.

9  Q    And the district recognized the big savings from cost

10  cutting efforts, correct?

11  A    It did.

12  Q    And the District of Columbia also increased fees to

13  address its fiscal crisis?

14  A    There were some increases in fees.

15  Q    But one thing the District of Columbia didn't do was it

16  didn't propose a $1,000,000,000 in new spending when it was in

17  fiscal crisis, correct?

18  A    It's apples and oranges.

19  Q    It didn't propose $1,000,000,000 in new spending,

20  correct?

21  A    It wasn't $1,000,000,000 in new spending, but the

22  District of Columbia was not in as bad a shape as the City of

23  Detroit is.

24  Q    Okay.  And even though it was in better shape than

25  Detroit, the district did not propose to spend more than a

1  $1,000,000,000, correct?

2  A    It -- it did not propose to spend a billion.

3  Q    And in fact you don't know of any other city that is has

4  proposed $1,000,000,000 in new spending when it's in fiscal

5  crisis, correct?

6  A    No, I don't.  I know that there are significant spending

7  on new systems in the New York fiscal crisis, but --

8  Q    Nothing like what's being proposed here, right?

9  A    Well, that was also in the seventies.  So I haven't done

10  the math about --

11  Q    Fair enough.  And the District of Columbia didn't enter

12  Chapter 9 bankruptcy as a result of its fiscal crisis because

13  it couldn't, correct?

14  A    It -- it wasn't able to, but it was deemed as being

15  insolvent by GAO is the report that I did.

16  Q    And the District Court did not use its -- use the

17  bankruptcy process then to cut its legal obligation to

18  financial creditors so they received only ten cents on the

19  dollar, correct?  That wasn't available to them.

20  A    No, it wasn't.

21  Q    And the District of Columbia also didn't use the

22  bankruptcy process because it's not available to them to

23  discriminate against certain creditors, correct?

24  A    Can you define discriminate?

25  Q    Pay -- pay certain creditors much more than other

1  creditors.  The district couldn't use the bankruptcy process

2  to do that, correct?

3  A    The district didn't have access to the bankruptcy

4  process.

5  Q    Okay.  And the District Court resolved its financial

6  crisis without having access to the bankruptcy process,

7  correct?

8  A    It did.

9  Q    And Detroit's already begun efforts to remedy its fiscal

10 crisis, correct?

11 A    It -- it has, but, you know, some of the efforts that

12 Detroit has been doing are being funded as a result of the

13 plan of adjustment dollars, yes.

14 Q    Okay.  And you're aware though that even before Detroit

15 went into bankruptcy it had taken efforts to try to

16 restructure and improve operations, correct?

17 A    I'm aware that efforts did occur, but they weren't

18 successful.

19 Q    Okay.  While you agree that now the city has successfully

20 improved its operations under the emergency manager, correct?

21 A    I believe that things have gotten better.  I don't

22 believe they're -- I wouldn't say the operations are good

23 operations.  There's a lot more that needs to be done.

24 Q    Okay.  But things have already improved under the

25 emergency manager, correct?

1  A      True, yes.

2  Q      And Detroit has successfully improved its ability to

3  increase revenues under the emergency manager?

4  A      Yes.

5  Q      And there are activities that have occurred under the

6  emergency manager that will have an impact of further reducing

7  costs in the future, correct?

8  A      Yes.

9  Q      And these include outsourcing that's already occurred,

10  grants management work that you discussed, and the

11  implementation of a new financial management system you were

12  discussing?

13  A      All of which is a part of the plan.

14  Q      Okay.  And the city has also been successful in

15  attracting businesses to the city in recent years, correct?

16  A      There have been some new businesses that have come to the

17  city, yes.

18  Q      And one of the reasons for Detroit's fiscal crisis is the

19  economy overall, correct?

20  A      That is one of the reasons, one of several.

21  Q      Okay.  And you agree that employment conditions are

22  improving in the city already?

23  A      There -- there's indication that employment is -- is

24  improving.

25  Q      And employment figures in fact have improved in Detroit

1 over the last several years, correct?

2 A     Yes.

3 Q     And you agree that they're signs that the economy is

4 improving in the city?

5 A     Yes.

6 Q     And the city is in a recovery phase after the recession

7 that occurred, correct?

8 A     The city is -- is in a recovery phase, yes, at the

9 beginning of one.

10 Q     Okay.  And the city continues on an ongoing basis to make

11 efforts to attract businesses to the city and improve the

12 economy, correct?

13 A     Of course.

14 Q     And Detroit actively promotes itself to businesses to try

15 to attract new businesses to come to the city?

16 A     Yes.

17 Q     Among other things the city offers space for businesses

18 to operate, offers opportunities for people to either start a

19 business, or live in the city, offers tax incentives for

20 businesses, and there are a number of visits by the Mayor and

21 others to other cities to try to attract business, correct?

22 A     Yes.

23 Q     And there are also groups of business leaders involved in

24 helping to bring business to the city?

25 A     Yes, there are.

1  Q    And there are private and non-profit entities engaged in

2  significant efforts to bring new businesses and jobs to the

3  City of Detroit?

4  A    Yes, there are.

5  Q    Among the efforts are the efforts by Quicken Loans and

6  their incubation of private companies which is a major effort

7  to create business here and to improve the growth of those

8  businesses, correct?

9  A    Yes, it is.

10 Q    And there are a number of organizations that are

11 providing grants to businesses to come to this city?

12 A    Yes, there are grants.

13 Q    And the business community has already committed to give

14 Detroit free assistance in its efforts to improve its fiscal

15 situation and to assist with issues such as blight?

16 A    Free assistance?

17 Q    Free assistance.

18 A    There have been efforts that the city has not been

19 charged for, yes.

20 Q    Okay.  And a lot of the blight plan that has been put

21 together was funded by outside support, correct?

22 A    Yes.

23 Q    And you expect that blight reduction will increase

24 property values?

25 A    In the out years, yes.

1  Q    And private foundations are providing resources to be

2  able to work on business attraction as well?

3  A    Yes.

4  Q    And the Federal Government has also engaged in ongoing

5  efforts to bring new business and jobs to the city, correct?

6  A    The Federal Government is involved in a number of

7  activities, yes.

8  Q    Okay.  And these include work on giving out grants to the

9  city or other parties that could bring new jobs and revenue to

10  the city, correct?

11  A    Yes.  The Federal Government is involved, yes.

12  Q    And some of the grants that -- that would have an impact

13  of bringing new jobs to the city include grants around

14  transportation such as expanding buses and bus routes, grants

15  around the M-1 line which would bring people from outside of

16  the city into the city to work, correct?

17  A    Yes.

18  Q    And you viewed the M-1 rail line as a critical project in

19  terms of increasing economic development in the city?

20  A    And -- and mobility, yes.

21  Q    Okay.  And the Detroit Land Bank has also been active in

22  -- in trying to improve the economic situation in Detroit,

23  correct?

24  A    Yes.

25  Q    The land bank has been auctioning properties, correct?

1  A    Yes, in -- in consultation with the Mayor, yes.

2  Q    And the land bank's auctions allow the bank to engage in

3  other functions that help improve economic conditions within

4  the city, correct?

5  A    Yes.

6  Q    And there are grants that could result in improving

7  business and the economy in Detroit the private entities are

8  receiving, correct?

9  A    There are grants that one would hope will have that

10 effect.

11 Q    And you agree that grants that the Federal Government for

12 example gives to entities other than the city could have the

13 effect of increasing the city's revenues, correct?

14 A    Yes.

15 Q    And there are all kinds of activities that are going on

16 to attract new business to the city, correct?

17 A    There are activities, yes.

18 Q    And the state city has been successful in attracting

19 businesses to the city in recent years?

20 A    Yes, they have had some success.

21 Q    And businesses that have come into the city in the last

22 few years either as a result of the city's efforts or the

23 general economic climate, correct?

24 A    Yes.

25 Q    And the city has plans to increase the level of effort

1  and activity to try to attract new businesses to the city,

2  correct?

3  A    Yes.

4  Q    And the Mayor is targeting to achieve an increased

5  population in the city before his next election in 2017?

6  A    That's -- that's his target.

7  Q    Okay.  And one of the criteria for success of the reforms

8  the city is engaged in is whether population increases by that

9  target date?

10 A    Ultimately there's hope that there would be an increase

11 in population.

12 Q    And -- and if there's not an increase in population

13 within that five year period, that would be a failure for the

14 reforms, correct?

15 A    I -- I wouldn't say that, no.

16 Q    Would it be -- it would be a disappointment to the city?

17 A    I think it would be a disappointment to the Mayor.

18 Q    Yeah.  And Detroit is engaged in significant efforts to

19 try to increase its population in the next few years between

20 -- before this five year target, correct?

21 A    Yes.  Blight is one of those efforts.

22 Q    Okay.  And we saw in the CAFR, I don't know you even have

23 a copy of that.  That was Exhibit -- City Exhibit 15.  It was

24 I think largest document you had in your stack.

25          Okay.  And I -- I just wanted to ask you about page, I

1  guess it's I-4.  It has the section on the local economy.

2      And well, actually if you go to the next paragraph.  The

3  bottom it says although the city's current economic condition

4  is for the future outlet for recovery and improvement is

5  positive.  Businesses are transferring employees from suburban

6  cities to the City of Detroit and new residents are moving

7  into the city's midtown area.  Are -- are those accurate

8  statements?

9  A    Those are accurate statements.

10 Q    And then you go on to talk about some of the significant

11 projects that are going to contribute to economic development.

12 Do you see that?

13 A    Yes.

14 Q    And one is the new international trade crossing?

15 A    Yes.

16 Q    And -- and that's going to be a boost to economic

17 development.  That's the new bridge with Canada?

18 A    That's the hope.

19 Q    And also the M-1 rail project that's going to -- that we

20 talked about that's going to be a boost to economic

21 development?

22 A    Yes.

23 Q    And again that's another critical project, correct?

24 A    Yes.

25 Q    And that's getting $100,000,000 in local funding from

1  some of these private sources that we've been talking about,

2  correct?

3  A    Uh-huh.

4  Q    And Detroit future city, that's another important project

5  for the economic development of the city.  Should -- should

6  increase economic development in the coming years?

7  A    It's -- it's a plan, yes.

8  Q    Okay.  Now the city is also actively engaged, I think you

9  -- you talked about you oversee revenue collections, correct?

10 A    Yes.

11 Q    And the city is actively engaged in efforts to increase

12 collection of revenues also, correct?

13 A    Yes, it is.

14 Q    And the city has already taken action that will increase

15 collections of revenues in the future?

16 A    Yes, we have.

17 Q    And you agree that it's important to consider collection

18 rates in doing a projection of revenues, correct?

19 A    Yes.

20 Q    And it's important to consider collection rates because

21 collection rates can determine the amount of revenue that is

22 taken into cash in the city, correct?

23 A    Yes, it can.

24 Q    And you're aware that MacKenzie did an analysis that

25 indicated that the city could raise revenue, correct?

1  A    I -- I'm aware that MacKenzie did an analysis.  I am not

2  familiar with the specific analysis.

3  Q    Other than that study you're not aware of any study that

4  has been conducted on the various city taxes, correct?

5  A    I have not, no.

6  Q    And you're not offering the opinion that the city can

7  increase -- cannot increase tax revenues, correct?

8  A    I'm offering the opinion that the city statutorily the

9  rates are such that it would be -- we're at the maximum rates.

10 Q    Do you agree though that the city can certainly increase

11 tax revenues through increased collections?

12 A    Absolutely.

13 Q    There's a lot of room there, right?

14 A    Absolutely.

15 Q    And the city also could go to the legislature and have

16 the tax rates that you talked about changed, correct?  That's

17 something they could lobby them for?

18 A    Whether or not that would be successful, I don't -- I

19 don't know, but --

20 Q    Fair -- fair enough.  You haven't made -- you're not

21 aware the city even making that many efforts to lobby the

22 legislature to increase the tax rates that you discussed,

23 correct?

24 A    I'm not aware of any efforts.

25 Q    And you agree that efforts to improve tax collection are

1  important because they increase revenue for the city, correct?

2  A    Yes.  Within a -- within a range, yes.

3  Q    And in fact going forward into the future, one of your

4  highest priorities is to increase tax collections in the city,

5  correct?

6  A    That is one of the priorities, yes.

7  Q    And that's one of your highest priorities because that

8  could be a big benefit for the city, correct?

9  A    Well, the highest priority is to make sure that we can

10 implement the plan.  And the plan calls for the increase in

11 revenues over time.

12 Q    Okay.  And there are things that are not in the plan that

13 you hope to do to continue increasing tax collections,

14 correct?

15 A    Yes.  And there isn't a Mayor that I know of that doesn't

16 try to increase revenues.

17 Q    Obviously.  And in the City of Detroit one of the biggest

18 upside opportunities for the city is to increase tax

19 collections because there has been a lot of problems

20 historically with, you know, the city's functioning in

21 collecting the taxes, correct?

22 A    Yes.

23 Q    And -- and currently you agree that collection rates for

24 the income and property taxes are low?

25 A    Yes.

1  Q    And you -- have you seen the estimates?  I know you were

2  reading the disclosure statement over lunch.  Have you seen

3  the estimate in there about how half of the, you know, the tax

4  -- property tax on half the parcels in the city isn't

5  collected?

6  A    I did see that, yeah.

7  Q    Okay.

8  A    But -- but it wasn't the first time I've read the

9  disclosure statement.

10 Q    Oh, right.  I didn't mean to imply that.  You're --

11 you're familiar with the -- you're familiar with the city's

12 statistic that it doesn't collect half the property taxes that

13 are owed, correct?

14 A    Yes, yes.  And -- and collection -- collection of taxes

15 in an economy that we were dealing with obviously with -- with

16 Detroit is very difficult.

17 Q    And there are a lot -- but there are a lot of factors

18 that can result in somebody not paying their taxes, correct?

19 A    Absolutely.

20 Q    And some -- one of the factors is if your enforcement

21 efforts aren't very good people see that nobody is going to

22 enforce the taxes and they don't pay them, right?

23 A    Enforcement has an impact on tax collection.

24 Q    And that was a big issue in the district where you

25 worked, right?

1   A    Absolutely.

2   Q    And you know that in the City of Detroit there are

3   intense efforts to try to fix the City of Detroit's collection

4   mechanisms with respect to collecting taxes?

5   A    Yes.

6   Q    And on this property tax, have you seen the estimate that

7   there is approximately $130,000,000 a year that's not being

8   collected in tax -- property taxes?

9   A    I -- I know that there are large amounts that aren't

10  being collected in property taxes.

11  Q    Have you seen the estimate that -- you know about this

12  issue with the reverse commuters not filing income tax

13  returns, correct?

14  A    Yes.

15  Q    And have you seen the estimate that as much as

16  $140,000,000 a year is not being paid by reverse commuters in

17  the -- in a MacKenzie and company study?

18  A    No, I have not seen that estimate.  And that -- that

19  estimate seems really high.

20  Q    Okay.  Have you -- are you familiar with the CRC report

21  on revenue that -- that's been put out with respect to the

22  Detroit -- the City of Detroit?

23  A    No, I haven't seen that.

24  Q    Are you familiar with the Citizens Research Council?

25  A    Yes.

1  Q    And that's a respectable organization, correct?

2  A    As far as I know, yes.

3  Q    Okay.  Fair enough.  MacKenzie and company though, has

4  anybody at the city provided access to you -- to MacKenzie and

5  company's studies regarding uncollected income taxes or other

6  taxes in the city?

7  A    I have all their reports.

8  Q    Okay.  It would be fair to say, it's tens of millions of

9  dollars at least that are not being collected each year in

10  income taxes?

11  A    Yes.

12  Q    And -- and in the last few years, the collection rates

13  have been higher than they are currently for the income and

14  property taxes, correct?

15  A    Yes.  They're starting to creep up.

16  Q    And -- and because of the intense efforts that Detroit is

17  going to be engaged in in the next few years, you anticipate

18  that collection rates will keep going up, right?

19  A    Yes.  The plan also calls for that.

20  Q    Okay.  And Detroit is not yet back to historical rates

21  though, just catching up to where it was in terms of

22  collection of property and income tax, correct?

23  A    No, it's not.

24  Q    And the city is currently engaged in a variety of

25  measures to try to increase tax collections in the future,

1  right?

2  A    Yes, it is.

3  Q    And this includes using outside parties to help collect

4  taxes?

5  A    Yes.

6  Q    Efforts with the state to help collect taxes?

7  A    Yes.

8  Q    And also restructuring of the finance function should

9  help collect taxes -- more taxes, right?

10  A    Yes.

11  Q    And there are certain actions that the city can take

12  unilaterally without cooperating with the state to improve tax

13  collections?

14  A    It -- it depends.

15  Q    And why don't I give you an example.  You -- you already

16  replaced the current income tax system with something called

17  city tax, right?

18  A    Yes.  But that required the state to approve it, so --

19  Q    Okay.  So you were successful in cooperating with the

20  state.

21  A    Yes.

22  Q    On the city tax reform that should increase tax

23  collections, correct?

24  A    Yes.

25  Q    And -- and the -- and that will help the city have the

1  data to follow up on delinquent taxpayers and be able to

2  compare tax data to see if there are other ways to collect

3  taxes, right?

4  A    Yes.

5  Q    And the city is also engaged in an ongoing review of

6  hardship exemptions for property taxes, right?

7  A    Yes, we are.

8  Q    You're looking to determine whether there are people who

9  are getting hardship exemptions for taxes who don't deserve

10 them, correct?

11 A    Who don't qualify.

12 Q    Yeah.  And the city believes that there are in fact

13 people who are taking hardship exemptions that should not be,

14 right?

15 A    We believe there could be.

16 Q    And you've also heard that there are people who just

17 don't pay their property taxes, speculators and such and allow

18 the properties to go into foreclosure and then buy them back

19 without paying the property taxes, right?

20 A    I've heard that but I -- but I don't have evidence

21 specifically about it that -- that I've seen.

22 Q    Okay.  Were you aware that there were proposals to change

23 the regulations so that people couldn't bid on properties if

24 they weren't paying the taxes?

25 A    Yes, I'm aware of that.

1 Q    And -- and that's designed to prevent the situation where

2 somebody just allows the property to go into foreclosure, buys

3 it back, and doesn't pay the taxes, right?

4 A    Right.

5 Q    Do you know if the city's actually implemented that

6 change, that reform?

7 A    It is something that we're looking at, yes.

8 Q    And that's something that again should increase property

9 taxes, right?  Property tax collections, right?

10 A    Yes.  Again it depends on the value of the underlying

11 property.  It's -- if -- if -- in some of the cases the value

12 of the property is actually less than the taxes that are owed

13 on it.  And so -- so it's not necessary that -- that that in

14 and of itself will increase the -- the taxes.

15 Q    And sometimes though there are people who might be a

16 landlord that has a building and is renting it out but let it

17 go into -- take the rent checks from the tenants right?

18 They'll let it go into foreclosure, buy it back, not pay the

19 taxes, right?

20 A    I don't know specifically of an example of that.

21 Q    You -- you haven't done anything to investigate that?

22 A    I -- I don't know specifically that example.

23 Q    And there are also businesses the city believes, who are

24 not reporting properly, or who are not withholding all the

25 taxes they should be, correct?

1  A     Yes.

2  Q     And there is an effort in the city that -- that you've

3  initiated to try to correct that problem, correct?

4  A     Yes, there is.

5  Q     And that should be completed by the end of the year?

6  A     Yes, by the end of the year.

7  Q     And the city is also undertaking a review to determine

8  whether there are city employees who owe the city money

9  through not paying taxes or for other reasons, correct?

10  A     Yes, we're doing that review.

11  Q     Okay.  And as -- as far as you know, has the city ever

12  done anything like that before?

13  A     I know that there has been in the past some review of

14  whether or not employees actually owe the city money, but not

15  to the extent that we're doing it now.

16  Q     Okay.  And you expect that to be another revenue

17  generating initiative?

18  A     I expect that we'll be able to find people who owe the

19  city money and we would have a means to collect through the

20  amount of money that we --

21  Q     That -- that's something that's obvious --

22  A     Yes.

23  Q     That the city should do, right?

24  A     It's -- it's what a lot of cities do, yes.

25  Q     And the city as you mentioned is also cooperating with

1  the state on tax issues?

2  A    Yes, we are.

3  Q    And there is an agreement with the state to have the

4  state piggyback tax collections for the city on the state

5  return, correct?

6  A    There's a discussion with the state about that.  It has

7  not been -- it has not gotten to the point of an agreement,

8  but there is a discussion.

9  Q    Isn't there an agreement in concept that there will be

10  piggybacking of the taxes?

11  A    There's an agreement in concept, yes.  But it still has

12  to be worked out.

13  Q    Okay.  And the -- isn't it also true that there has been

14  back and forth drafting of forms that would be used to

15  piggyback the taxes?

16  A    Yes, there has been --

17  Q    Okay.

18  A    -- discussions.

19  Q    And piggybacking the tax collections means that any

20  separate form for the city income taxes would go away and

21  there would just be a schedule for computing the city taxes on

22  the state tax return, correct?

23  A    Yes.

24  Q    And people would pay their Detroit taxes when you pay

25  your state taxes?

1  A     Yes.

2  Q     And piggybacking the tax collection should increase

3  income tax revenues for the city?

4  A     That's our hope.

5  Q     And piggybacking could identify non-filers of tax returns

6  because anyone who has a Detroit address would also then be

7  expected to file -- fill out the schedule for the Detroit tax,

8  right?

9  A     Yes.  It could help with compliance.

10 Q     And in addition the state's collection efforts including

11 any withholding that occurs whether it's from the state or

12 from the city could be used to support the payment of the

13 city's taxes, correct?

14 A     Yes.

15 Q     And as part of the piggybacking initiative, because the

16 city will be part of the state's income tax filing, when the

17 state is doing compliance work it would also help with

18 compliance work with the city?

19 A     Yes, it would.

20 Q     And this issue of the -- you know, the reverse commuters

21 and the piggybacking, basically there is an unfairness here

22 where somebody could be paying their taxes every year and

23 supporting the City of Detroit, but their neighbor doesn't

24 even bother to file a tax return, right?

25 A     That's a possibility, yes.

1  Q    And that would be a significant unfairness that you're

2  trying to remedy, correct?

3  A    Yes, we are.

4  Q    And by taking advantage of state collection efforts,

5  piggybacking the taxes, the potential not only to increase

6  revenue, but decrease costs for the city?

7  A    Yes, there's a potential.

8  Q    And the -- and as we discussed, the city and state are

9  engaged in planning for implementation of piggybacking,

10 correct?

11 A    Yes.

12 Q    And weren't you planning piggybacking to start for around

13 the 2015 tax year?

14 A    Yes.  You know, well, actually the -- yes, the taxes that

15 would be potentially the earliest they would start would be in

16 2016 for the 2015 taxes.

17 Q    So it would be -- or April 2016 that would be just a

18 single form?

19 A    That would be the earliest.  It has to be phased in

20 because of the -- because of the withholdings.

21 Q    In your -- in your direct testimony as you mentioned you

22 had discussed income tax rates, right?

23 A    Yes.

24 Q    And you know that the -- over the last several years the

25 maximum income tax rate that can be charged has been reduced,

1  correct?

2  A    By requirement, yes.

3  Q    Okay.  And when income tax rates were higher in the city

4  the collection of income tax revenue was higher than it

5  currently is, correct?

6  A    There were also other things that were higher as well.

7  Q    Okay.  And you haven't done any study of looking at the

8  impact of increasing or reducing tax rates in the city,

9  correct?

10  A    I have not.

11  Q    And you're not aware of anybody doing that, correct?

12  A    I'm not.

13  Q    And the city hasn't conducted any study that's looked at

14  whether an increase in income taxes would increase or decrease

15  tax revenues?

16  A    No, because it's at the max rate.

17  Q    Okay.  And I think we mentioned already you don't know of

18  any discussions with the state about trying to increase the

19  tax rates, the maximum tax rates, correct?

20  A    I'm not aware of any.

21  Q    And you don't know of any discussions with the state

22  where the city is trying to increase -- add new taxes?

23  A    No, I -- I do not.  I'm not aware of any.

24  Q    Okay.  And you don't know whether the city has even

25  looked at or investigated increasing any of the tax rates in

1   the city?

2   A    No.  It's generally thought the tax rates were pretty

3   high.

4   Q    But the city hasn't bothered to do this -- they have all

5   these advisors, they're spending more than $100,000,000 on

6   them.  The city has not bothered to investigate that, correct?

7   To increase or changing tax rates?

8   A    Well, investigate changing tax rates when the taxes are

9   at the maximum level?

10  Q    That's correct.

11  A    No, I have not seen that.

12  Q    You haven't done any study to identify the largest

13  sources of untapped revenue for the city?

14  A    I'm not -- I'm not sure which sources you're talking

15  about.

16  Q    Any revenue sources.  You haven't done any study to

17  uncover the largest sources of untapped revenue.  Revenue

18  that's still there to be had by the city?

19  A    I have not done one.

20  Q    And you also haven't done any study to look -- in an

21  attempt to look for the biggest untapped cost savings for the

22  city, correct?

23  A    Other than what's in the plan?

24  Q    I'm talking about the untapped ones.

25  A    Oh.

1  Q    Additional cost savings.  You haven't done any study to

2  investigate that?

3  A    No.  As I said I think implementing the ones that are

4  there are going to be very difficult, but -- but no.

5  Q    Okay.  You -- you can't represent to the Court that

6  during the next ten years the tax rates in the city won't

7  change, correct?

8  A    No, I can't represent that.

9  Q    And in fact recently there was an increase in the

10  corporate tax rate, correct?

11  A    Yeah.

12  Q    That's correct?

13  A    Yeah.

14  Q    And when the corporate tax rate increased from 1 to 2%

15  revenues increased by more than 100%, isn't that true?

16  A    Revenues did increase.  I -- I don't know the exact

17  percentage.

18  Q    Okay.  Isn't the exact percentage in the Ernst & -- Ernst

19  & Young forecast?

20  A    It is.

21  Q    And you were designated as the 30 -- as the city's

22  30(b)(6) witness on the issue of tax policy, taxing

23  capabilities, tax revenue assumptions and projections and any

24  studies regarding the foregoing, correct?

25  A    Yes.

1  Q    You also know that the city can increase property taxes

2  to pay the rates to pay judgments against the city, correct?

3  A    I know that's happened in the past, yes.

4  Q    And -- and the state legislature does not need to approve

5  the tax increases under the Revised Judicature Act to pay

6  judgments, correct?

7  A    Yes, I know that.

8  Q    And you know that the city has increased property taxes

9  above statutory maximums in order to pay judgments against the

10  city?

11  A    Yes, that has happened.

12  Q    And there are instances where there have been judgments

13  in which the city has increased property taxes in order to pay

14  for them, correct?

15  A    Yes.

16  Q    And the city paid those judgments?

17  A    Yes.

18  Q    And if you could turn to Tab 9 and 10 that's in your

19  binder that I gave you.  Are those the judgments, some of the

20  judgments that you're referring to that the city had paid?

21  It's Syncora Exhibit 4127 and 4128.

22      (Syncora's Exhibits 4127 and 4128 were identified)

23  A    Yes, these are -- these are the ones.

24  Q    Okay.  And these are judgments that the city ended up

25  raising property tax to pay, correct?

1  A     That's my understanding, yes.

2  Q     And one was for 74,000,000 and the other one was for

3  $53,000,000?

4  A     Yes.

5          MR. SMITH:  And Your Honor, I'd like to move the

6  admission of Exhibits 4127 and 4128.

7          MR. STEWART:  No objection, Your Honor.

8          THE COURT:  They are admitted.

9  (Syncora's Exhibits 4127 and 4128 were admitted)

10  Q     And you were designated as the city's 30(b)(6) witness

11  regarding judgments under the RJR, correct?

12  A     Yes.

13  Q     Now you talked about the grants management process and

14  how you've already improved grants management in the city,

15  correct?

16  A     Yes.  How we are improving grants management, yes.

17  Q     Okay.  And the financial stability agreement that was

18  executed between the city and the state before the emergency

19  manager came in actually required an improvement in grants

20  managements, correct?

21  A     Yes, it did.

22  Q     And that financial stability agreement that was executed

23  before the emergency manager came also required an improvement

24  to the information systems that you were discussing?

25  A     Yes.

1  Q     And one problem with the city's grant management process

2  historically is they didn't realize all the grant revenue they

3  received and so they had to return some of it to the Federal

4  Government, correct?

5  A     That was a problem, yes.

6  Q     And the city over the last ten years had has to return

7  tens of millions of dollars in grant funds for a variety of

8  reasons, correct?

9  A     Yes.

10 Q     And the city failed to utilize grant funds in a timely

11 manner?

12 A     Yes.

13 Q     And that caused the city to suffer these losses of the

14 grant money, correct?

15 A     Yes, it did.

16 Q     And there were also issues with the city in applying for

17 grants?

18 A     Yes.

19 Q     The city as you discussed in your testimony is engaged in

20 an ongoing effort to improve its grant application process?

21 A     Yes, it is.

22 Q     And by improving the grant application process, the city

23 hopes to increase the level of funding for grants it receives?

24 A     Yes, it does.

25 Q     And there are a number of different discussions with

1  federal authorities to get new grants that are current

2  ongoing?

3  A    There are discussions with federal authorities, yes.

4  Q    And there are for example we discussed there are

5  discussions with the Federal Government -- government about

6  additional money to support purchases of buses?

7  A    Yes.

8  Q    Have you -- do you know what the dollar figure is?

9  A    Not offhand.  But it's -- it's --

10 Q    It's a significant amount of money?

11 A    Yeah, a significant amount of money.

12 Q    It's millions of dollars?

13 A    Yes.

14 Q    And there are discussions with the Federal Government

15 about additional money for blight remediation that are

16 underway?

17 A    Yes, part of the grant -- part of the blight remediation

18 strategy is funded by grants.

19 Q    Okay.  And but they're additional monies though.  So

20 they're discussions about additional monies for blight,

21 correct?

22 A    Yes.

23 Q    And do you have an idea about the dollar amount?

24 A    No, I don't.

25 Q    All right.  It would be a significant amount of money

1  though, correct?

2  A    I -- I don't -- I don't know that. I would assume. But

3  I don't want to assume.

4  Q    Okay. As the CFO you don't know the -- the amount of

5  this grant, but that's being discussed, correct?

6  A    Well, you would not record it until it is actually

7  received.

8  Q    Okay. Fair enough. It would be millions of dollars

9  though?

10 A    Right, yes.

11 Q    Okay. And there is -- and there has been a discussion

12 with the Federal Government about -- in the past about a grant

13 from the Federal Government for an additional $100,000,000,

14 correct?

15 A    Which grant is that?

16 Q    That was the one that was mentioned with the city from

17 that city council report. Does that ring a bell or not

18 really?

19 A    It -- it doesn't ring a bell but if you tell me

20 specifically which grant I would know.

21 Q    We'll skip it then. There is discussion about additional

22 grant money for the M-1 project, correct?

23 A    There has been discussions, yes.

24 Q    And there is -- in fact there's a long list of grants

25 under discussion that would result in the city having more

1  money than it otherwise would have, correct?

2  A    Yes.

3  Q    And some of the grants that you're -- well, let me ask

4  you this.  You're also discussing with the Federal Government

5  easing restrictions on federal grants such as extending the

6  dates for the grants, correct?

7  A    We've had some of those discussions, yes.

8  Q    And one reason the city is asking for those extensions on

9  the grants is because so far it hasn't been able to adequately

10 use the grant funds it already has within the expiration

11 period for the grant, correct?

12 A    Yes.

13 Q    And the city also gets grants -- grants from private

14 entities, correct?

15 A    Yes, it does.

16 Q    They're private organizations that are cooperating with

17 the city to try to help improve its fiscal situation through

18 grant donations, correct?

19 A    Yes.

20 Q    And that would include the Ford Foundation, Skillman

21 foundation, Kresge Foundation, and Community Foundation?

22 A    Yes.

23 Q    And there are also a long list of corporations that have

24 been cooperating with the city to improve its financial

25 situation, correct?

1  A    Yes, there are.

2  Q    And private funds supported the grants management

3  project, correct?

4  A    The initial -- the initial reports that were done in

5  grants management were funded by -- the initial report was

6  funded by Ford Foundation.  The follow on work that had been

7  funded by a consortium of foundations.

8  Q    And private entities provided funds to have IT directors

9  from around the country come and look at the IT infrastructure

10  issues in the city, correct?

11  A    Yes.

12  Q    And there are always discussions with the state regarding

13  additional funding?

14  A    Yes, there are -- are discussions.

15  Q    And you know that the city is currently in discussion

16  with the state around a number of different possible increases

17  in revenue, correct?

18  A    I -- I do know that discussions -- the specific -- the

19  specifics of the discussions I don't know.

20  Q    Okay.

21  A    I do know there are discussions that are going on.

22  Q    In fact there's no question that the Mayor will have

23  discussions with the state for additional revenue and that

24  other revenue sources may be identified as a result of that?

25  A    Every Mayor I've ever worked for has -- worked with has

1  tried to get additional funding from their state.

2  Q    That -- that can be expected, correct?

3  A    Yes.

4  Q    And another area you had discussed was collection of --

5  you discussed the 36th District Court, correct?

6  A    Yes.

7  Q    And there are hundreds of millions of dollars of

8  receivables that are on the books and are owed to the 36th

9  District Court, correct?

10  A    There are a number of receivables.

11  Q    And you and your staff are working with the Court to try

12  to collect the money that's outstanding?

13  A    Yes, we are.

14  Q    And the Court's hired a new CFO?

15  A    It has.

16  Q    And the Court's already improved its collection of

17  amounts that were already outstanding and on the books?

18  A    Yes.  The earlier returns are promising.

19  Q    And in the last few months it's collected more than it

20  has been in collecting in the last several years, correct?

21  A    Yes.  Still not at the levels that are called for in the

22  plan, but we think that they're moving to that level.

23  Q    But you anticipate that the Court will continue to

24  improve its collections of amounts that are owed to the Court,

25  correct?

1   A    Yes, I do.

2   Q    The -- and you agree that after the bankruptcy case is

3   over the City of Detroit will continue to actively look for

4   new ways to increase revenues and decrease costs?

5   A    Yes.

6   Q    And you agree that every city should do that,

7   continuously look for new ways to increase revenues and

8   decease costs?

9   A    Every city I've had -- had any connection with has tried

10  to do that, yes.

11  Q    Okay.  And in fact there are a number of people at the

12  city that are going to be actively involved in continuing to

13  look for new opportunities to increase revenues or decrease

14  costs after the bankruptcy case is over?

15  A    Yes, there will be.

16  Q    And in fact the legislation you mentioned with the review

17  commission, that directs the commission to implement programs

18  with the city to improve tax collection, correct?

19  A    Yes.

20  Q    And it also directs the commission to require programs to

21  further streamline city services, correct?

22  A    Yes, it does.

23  Q    And as the CFO you actively look for new ways to increase

24  revenues and decrease costs for the city, correct?

25  A    Yes, that's -- yes

1  Q    One of your responsibilities is to secure new funding?

2  A    Well, the major responsibility is to collect more revenue

3  than we've been collecting.  And so, yes.

4  Q    Okay.  And you've -- you've created an entire office that

5  you call the chief revenue officer for the city whose job is

6  to work with the department directors to secure new funding?

7  A    It's -- the title has actually changed, but that's part

8  of the office of grants management and it is a revenue office

9  within the office of grants management to help departments

10 secure additional funding, yes.

11 Q    And there were actions or initiatives to increase

12 revenues or decrease costs that the city has discussed but did

13 not make it into the plan of adjustment, correct?

14 A    There are items that yes, were discussed.  But the

15 probability of their completion was so low that -- that they

16 were not put in the plan.

17 Q    Well, one -- one project that's been discussed is

18 privatizing the parking, right?

19 A    Well, there have been -- yes, there have been discussions

20 about that.

21 Q    Okay.  And in fact you've already sent out the RFPs to

22 privatize the parking to get bids for people to privatize it,

23 right?

24 A    There have been RFPs that have gone out, yes.

25 Q    And so that's something that you're moving forward with,

1  right?

2  A    That's something that we're gathering information on,

3  yes.

4  Q    Okay.  As far as you're aware, there's not any money in

5  the Ernst & Young projections for that, correct?  That's not

6  something you can point to?

7  A    For the effect of privatizing parking?  No.

8  Q    And Ernst & Young and along with Miller, Buckfire has

9  been engaged with that activity with you trying to privatize

10  the parking, right?

11  A    Putting out the RFP and -- and getting information, yes.

12  Q    Okay.  And you were also a party to discussions about

13  privatizing or leasing the water and sewerage functions,

14  correct?

15  A    I was aware of those discussions.  I wasn't intimately

16  involved with those discussions.

17  Q    And Mr. Orr and Miller, Buckfire, and Ernst & Young were

18  involved with that effort?

19  A    Yes.

20  Q    And that has actually occurred, correct?  I mean there's

21  been some sort of deal with the DWSD or not?

22  A    Not that I'm aware of.

23  Q    Okay.  Have you seen the report that there is a figure of

24  potentially $50,000,000 of additional revenue to the city per

25  year that's been mentioned in the press from that?

1  A    I don't know of any completed deal.

2  Q    Okay.  You know of a potential deal though to receive

3  $50,000,000 additional revenue for -- for -- relating to the

4  water or sewage services?

5  A    Well -- well, I know that there are negotiations that are

6  currently going on.  But I -- I don't know the result of those

7  negotiations.

8  Q    Okay.  And have you read the press about that at all?

9  A    I -- I -- no, not that particular --

10        THE COURT:  Counselor, are you talking about the

11  savings to the DWSD because of the bond deal that was just

12  done, is that what you're referring to?

13        MR. SMITH:  Yeah.

14        THE COURT:  Are you aware of that situation?

15  A    Oh, yeah.  No, I thought you were talking about a

16  different amount.

17  Q    Okay.  I mean there have also been discussions in the

18  past about other things you could do like privatize it and you

19  know get like 47,000,000 or $50,000,000 a year from that,

20  right?

21  A    That's what I thought you were referring to, yeah.

22  Q    Okay.  I mean one thing that the city was contemplating

23  doing was privatizing the services so that it could reap an

24  additional 47,000,000 or $50,000,000 a year and that would go

25  into the general fund, correct?

1  A    There were discussions, yes.

2  Q    All right.  And -- and your goal is to complete other

3  efforts to increase revenue for the city in the future like

4  privatizing the parking, or working with the grants

5  improvement or increasing tax collection, right?

6  A    Yes.

7  Q    And you know there are a number of creative ways cities

8  have used to increase revenues and decrease costs based on

9  your experience?

10  A    Yes.

11  Q    You know some cities have a vacant -- a tax on vacant

12  property, correct?

13  A    Yes, I do know that.

14  Q    And in such situations there -- there is a higher

15  property tax on vacant property than non-vacant property?

16  A    Yes, to encourage development.

17  Q    Yeah.  And the District of Columbia where you worked had

18  a -- a tax on vacant property, correct?

19  A    Yes.

20  Q    And the vacant property tax also generated additional

21  revenue for the city, correct?

22  A    It did.

23  Q    And in fact the District of Columbia now has an even

24  higher tax on blighted property were you aware of that?

25  A    Yes.

1  Q    Okay.  And -- and they charge something like $10.00 per

2  $100.00 of value on blighted property, right?

3  A    Yes, collectability is greater there than here.

4  Q    And -- and they do that to discourage blight among other

5  reasons, right?

6  A    Yes.

7  Q    And as far you know Detroit doesn't have a vacant

8  property tax or a tax on blighted property, correct?

9  A    There are fines associated with blighted property for

10  nuisance monies, but -- but not a tax.

11  Q    But not a tax that's anywhere near what the district or

12  other cities have, right?

13  A    That's correct.

14  Q    And the -- and the City of Detroit, I mean there's no

15  restriction on increasing fines for blighted property or

16  vacant property, correct?

17  A    Not that I know of.  I think you'd have to look at

18  collectability.

19  Q    Okay.  And the city -- the District of Columbia also had

20  imposed special taxes or fees on for profit hospitals?

21  A    Yes.

22  Q    And --

23  A    Yes.

24  Q    And hospitals can fund that kind of thing because they

25  get money from the Federal Government, from Medicare, or

1  Medicaid, or private insurers from treating patients, correct?

2  A    Yes, for profit hospitals, yes.

3  Q    As far as you're aware does Detroit have a comparable

4  tax?

5  A    Not that I know of.

6  Q    And you know that there are many cities that are funding

7  their pensions at lower levels than the City of Detroit?

8  A    Yes.

9  Q    And Chicago is one such city, right?

10 A    Yes.  It's also thought to be in trouble as a result of

11 that.

12 Q    But Chicago is not in Chapter 9 bankruptcy, right?

13 A    It was the subject of -- it was -- it was the subject of

14 the conference that I was at that indicated that the funding

15 was causing major concerns.

16 Q    And the -- and the funding in Chicago is less than 40%

17 funded rate for some of the pensions there, right?

18 A    It is, but you know, but --

19 Q    Okay.

20 A    They see that as a major issue.

21 Q    And -- and in Detroit it's above 90%, right?

22 A    They see that as a major issue in Chicago.

23 Q    And the -- the pension funds though in places like

24 Chicago are still making timely payments to retirees, correct?

25 A    For now.

1  Q    And you're not aware of the Chicago or other similar

2  cities to have low funded pensions that were defaulting on

3  their obligations?  I mean you're not aware of Chicago ever

4  defaulting on its obligations?

5  A    I'm -- I'm not aware of a default.  There's -- there's

6  certainly some concern about a default.

7  Q    And in the past you're aware that the city is defered --

8  City of Detroit has deferred payments to the pension funds,

9  right?

10  A    Yes.

11  Q    And it still made payments to the funds, it just delayed

12  doing it, right?

13  A    Yes.

14  Q    And that was a way of saving money, correct?

15  A    It was a way of managing cash.

16  Q    Okay.  And currently the plan doesn't contemplate any

17  deferral of payments to the pensions, correct?

18  A    No, it does not.

19  Q    In addition to looking for new efforts or ways to

20  increase revenues, you're also going to continue looking at

21  new ways to cut costs after the bankruptcy is over, correct?

22  A    Yes.

23  Q    And you've discussed those efforts in some of your

24  internal correspondence, correct?

25  A    Yes.

1  Q    And if you turn to Tab 6 which is Syncora Exhibit 4111.

2  Is that an email chain that you wrote some part of it, part of

3  the email there?  And if -- and are you there on that tab?

4  A    Yes, I'm on the tab.  I'm looking at the email now.

5       (Syncora's Exhibit 4111 was identified)

6  Q    Okay.  And if you'd turn to -- turn to the second page as

7  -- that's an email that you wrote, correct?

8  A    Yes, it is.

9  Q    And -- and you wrote, I do think there is a discussion we

10  need to have among the members of your team and then have that

11  discussion with the Mayor.  It's what is it that this city

12  will no longer do.  I believe reducing what government does

13  will ultimately take pressure off the plan of adjustment.  Do

14  you see that?

15  A    Yes.

16  Q    And you -- you -- that's an accurate statement of your

17  beliefs that reducing what government does in Detroit can help

18  make the plan more feasible?

19  A    And -- and some of that is incorporated in the plan, yes.

20  Q    And some of it's not incorporated, correct?  And -- and

21  what you meant is that you're going to go through a process of

22  deciding what Detroit's government can do and what it cannot

23  do in the future that may result in cutting additional

24  programs or revising them so they're less costly, correct?

25  A    It -- it meant basically going through a structure of

1  looking at the operations of each one of the departments, you

2  know, with the goal of having those departments operate more

3  effectively and efficiently.

4  Q    Okay.

5  A    Somewhat similar to the process that I talked about that

6  we went through with the office of the CFO.

7  Q    And that's a future process that you're going to engage

8  in to reduce costs that's not incorporated into the plan,

9  correct?

10  A   To reduce costs or improve the operations, yes.

11  Q    And one example is that Detroit's responsible for the

12  transportation department whereas in other cities that's done

13  not by the city, but by a regional authority, correct?

14  A    That is the case in similar cities, yes.

15  Q    And because the transportation department is part of the

16  city in Detroit, the general fund has to pay a subsidy to the

17  Department of Transportation, correct?

18  A    There is a subsidy, yes.

19  Q    And the subsidy is projected to be more than $100,000,000

20  in the Ernst & Young projections, correct?

21  A    Yes.

22  Q    And in fact the amount of the subsidy is increased over

23  the iterations of the plan and the projections, correct?

24  A    And the decreases, yes.

25  Q    Okay.  And the subsidy was increased by $20,000,000 in

1  the last revision of the projections, correct?

2  A     Yes.

3  Q     And you agree that going through the services that

4  Detroit provides and seeing if there are services that it

5  could eliminate or cut back on, other than what's in the plan

6  of adjustment, is an ongoing process that will be part of what

7  any -- any city would do as it moves forward, correct?

8  A     Yes.  We should do that.

9  Q     And going back to your -- your email, you also said in

10  the -- you know, it's about the fourth to last sentence.  We

11  can't put everything in the plan now and have no room to make

12  future adjustments in response to negotiations, correct?  Do

13  you see that?

14  A     Yes.

15  Q     And that was an accurate statement?

16  A     It -- it was an accurate statement at the time.

17  Q     Okay.  And you agree that not all the measures that could

18  increase city revenues or decrease city costs are actually in

19  the plan of adjustment, correct?

20  A     I believe there are other measures that we looked at that

21  didn't have the high likelihood of success that aren't in

22  there, yes.

23  Q     Okay.  Well, privatizing the parking, you're -- right now

24  you're soliciting bids for it, right?  That's correct?

25  A     There are bids that are being solicited, yes.

1  Q    And -- and you thought that that was a good enough

2  project that you invested in an outside consultant to help you

3  with that, correct?

4  A    Yes.  But there's no -- there's -- there's no

5  determination of what that will give to the city yet.  One of

6  the issues that we have with our parking is -- is the lack of

7  investment in infrastructure.  So that anyone coming in will

8  certainly want to keep some of the resources in order to be

9  able to invest and improve the infrastructure.  So it's not

10  really known what impact that would have on the bottom line

11  yet.

12  Q    But there are projects that are in process right now at

13  some point in the planning stages that are not reflected in

14  the plan of adjustment or the projections that could increase

15  revenues or decrease costs?

16  A    That's one that I know of, yes.

17  Q    And you agree that the city can certainly impose fees

18  without permission of the state, correct?

19  A    Generally, yes.

20  Q    And the city can raise the level of fees without

21  permission from the state, correct?

22  A    Yes.  But you have to look at collectability if you can

23  and -- and -- and there are -- there are requirements though

24  that fees can be subject to review to determine whether or not

25  those fees are actually commensurate with the cost associated

1  with providing those particular services.

2  Q    And you mentioned that some fees have been challenged,

3  correct?

4  A    Yes.

5  Q    But some fee increases have not been challenged, correct?

6  A    That's true.

7  Q    In fact the vast majority of fee increases aren't

8  challenged, right?

9  A    Some have not been, yes.

10  Q    And you're not offering any opinion that the city

11  couldn't pay creditors such as Syncora more money than it's

12  planning to pay, correct?

13  A    I'm not offering an opinion on that at all.

14  Q    Okay.  And if we look -- it you could turn to Tab 12,

15  Exhibit 30.

16          MR. SMITH:  Before we got to Tab 12, Exhibit 30, I

17  did want to go back to Exhibit 4111 which I'd like to move the

18  admission of.  That was in tab -- Tab 6.

19          THE COURT:  Any objections?

20          MR. STEWART:  No objection.

21          THE COURT:  It is admitted.

22          (Syncora's Exhibit 4111 was admitted)

23  Q    Then I'd like to go over to Tab 12 which is City Exhibit

24  30.  Do you see that that's a summary from the city's revenue

25  consensus conference?

1  A    Yes, it is.

2       (City's Exhibit 30 was identified)

3  Q    And on the right hand side there is a -- a bar for the

4  revenue from other than the five major revenue sources.  Do

5  you see that?

6  A    Yes.

7  Q    And -- and that -- that -- that amount that's reflected

8  there from the consensus conference would include revenue from

9  a wide range of different fees the city charges?

10 A    Yes.

11 Q    Okay.  And those revenues are larger than state revenue

12 sharing, and the gaming tax, utility tax, and property taxes,

13 correct?

14 A    Yes, they are.

15 Q    Okay.  And was this something that was created in the

16 ordinary course of the city's business operations?  This --

17 this -- this document?

18 A    This document?  Yes, it -- yes, it is.

19      MR. SMITH:  Okay.  I'd like to move for the

20 admission of City Exhibit 30, Your Honor.

21      MR. STEWART:  No objection.

22      THE COURT:  It is admitted.

23      (City's Exhibit 30 was admitted)

24 Q    Now we talked about the city's efforts to increase

25 revenues after the bankruptcy.  The city's plans to increase

1  tax collections, improve the economy, and population, cut

2  costs after the bankruptcy.  Potential asset sales like the

3  parking.  And a variety of other proposals for incremental

4  revenue and incremental cost cutting that may occur after the

5  bankruptcy, correct?

6  A    Yes.  You -- you brought those up.

7  Q    And -- and if it turns out that there are revenues beyond

8  what are in the plan in the projections that you talked about,

9  under the terms of the plan the COPS holders and creditors

10  like Syncora don't get any of that additional revenue upside,

11  right?

12  A    It -- it depends on -- on what the plan says when it's

13  completed and when it's -- when it's -- it's either approved

14  or -- or not by the Judge.

15  Q    Do you think it would be a good idea to consider giving

16  Syncora potential upside if the city's revenues are actually

17  higher than the projected amounts?

18  A    I -- I don't have an opinion on that.  Our -- the revenue

19  targets that are in the plan are going to be very difficult to

20  -- to meet.  There has to be flexibility within the -- the

21  plan to have other revenue sources that could potentially

22  replace those that don't materialize as indicated in the plan.

23       But I have -- I have no opinion on -- I would -- I would

24  obviously prefer as the CFO to have those resources available

25  within the city, but it's -- it's not my decision.

1  Q     Okay.  Whose decision is it?

2  A     It's -- it would be the Court and -- and would be what --

3  what happens as a result of this process, I -- I assume.

4  Q     Okay.  But your understanding of the plan, do you

5  understand that right now the creditors are just going to get

6  what they get and they don't get any potential upside in the

7  future, correct?

8  A     I -- I understand that's the way the plan is constructed,

9  yes.

10 Q     And so if we have a situation like happened in the

11 District of Columbia where reforms were implemented, cost

12 cutting, you know, increase in fees things like that, city

13 runs a $2,000,000,000 surplus, if that -- something like that

14 happened in Detroit we wouldn't get a penny of it as the

15 creditors, correct?

16 A     You're -- you're asking me to speculate whether Detroit

17 is going to have a $2,000,000,000 surplus at some point?

18 Q     No.  I'm just saying if something happens like the model

19 of the District of Columbia where there's a successful reform

20 and there's a surplus, it may be less than $2,000,000,000, it

21 may be $100,000, it could be $2,000,000,000 like the district.

22 Isn't it true that under the plan as it's currently drafted,

23 we wouldn't get the creditor -- the COPS holders and creditors

24 like Syncora don't get any of that money?

25             THE COURT:  We need this witness to testify to that.

1          MR. SMITH:  Okay.  I suppose not, Your Honor.  I'll

2   withdraw the question.

3   Q    As far as you know the city has not done any contingency

4   planning in the event the bankruptcy petition is dismissed,

5   correct?

6   A    I know of no contingency planning.

7   Q    And the city hasn't attempted to forecast revenues or

8   expenses for the city in the event the Court dismisses the

9   bankruptcy petition, correct?

10  A    Well, there are schedules that are within the disclosure

11  statement that show the recurring -- the continuing debt that

12  the city would have to be able to fund.

13  Q    Mr. -- Mr. Hill, were you asked this question and did you

14  give this answer at page --

15          MR. STEWART:  Line and page, please.

16  Q    At Page 177, Lines 7 to 10 of your deposition which is --

17  A    Hold on a minute.  Let me get it first.

18  Q    Which -- which is in the front of your binder, Mr. Hill.

19  A    What lines again?

20  Q    Seven to 10.  Okay.  Were you asked this question and --

21          MR. STEWART:  Wait a minute, I object.  I don't know

22  what the purpose is.  I don't think it's impeachment because I

23  don't think it's an inconsistent answer, Your Honor.

24          MR. SMITH:  It is an inconsistent answer.

25  A    Let's read the question then.

1          THE COURT:  He's -- he's already given that precise

2   answer to that precise question.

3          MR. SMITH:  He said that there were -- he thought

4   there was some sort of dismissal analysis, Your Honor.  I

5   think -- I think.  I mean if that's his testimony, I -- then I

6   have no problem --

7          THE COURT:  Oh, you're telling me he just now

8   testified to that?

9          MR. SMITH:  Yeah.  He just now testified

10  inconsistency with that is what I'm -- that's what --

11         THE COURT:  Did you just say there is a plan in the

12  event of a dismissal?

13  A    No.  There's not a plan, there's a schedule that shows

14  the -- there's a schedule that actually shows the cost that

15  would continue if there were no dismissal.  But that's not a

16  plan.

17         THE COURT:  I -- I agree that's not inconsistent.

18  The objection is sustained.

19  Q    Okay.  Could you look at Exhibit 593, please?

20  A    I -- I can look at it on the screen.

21  Q    Okay.

22  A    It will take a while to --

23  Q    Before we get to that document, when you're referring to

24  spreadsheets, you're talking about the Ernst & Young forecast,

25  correct?

1  A    Yes.

2  Q    Were you aware that Mr. Malhotra from Ernst & Young

3  testified that --

4          MR. STEWART:  Objection.  Your Honor, unless -- he

5  cannot confront a witness with the testimony of another

6  witness unless there's a foundation for it and here before he

7  could do that he would have to establish he was doing it in

8  connection with some kind of an expert opinion rendered.

9  Confronting a witness that's saying someone else said

10  something else isn't proper even if he had a transcript which

11  he does not.

12          MR. SMITH:  I'm trying to ask the foundational

13  question of whether he's aware of the testimony.

14          THE COURT:  What's the purpose of asking that?

15          MR. SMITH:  Because Mr. Malhotra testified there was

16  no dismissal scenario.  I want to know if this witness was

17  aware of that.

18          THE COURT:  The objection is sustained.

19  Q    Let's look at Exhibit 593, Mr. Hill.

20  A    Yes.

21  Q    Let me ask you this first.  You -- you came in and

22  offered some opinions about the Ernst & Young and Conway,

23  MacKenzie materials, correct?

24  A    Yes.

25  Q    Did you look at Mr. Malhotra's expert report?

1    A    I did not.

2    Q    Did you look -- do you know who Mr. Cline is?

3    A    I -- I know who Mr. Cline is, but I did not look at his

4    report.

5    Q    Do you know who Ms. Sallee is?

6    A    I did not look at the report.

7    Q    Do you know who she is?  Do you know if she works at

8    Ernst & Young?

9    A    I -- I don't -- I don't know her by that, you know, by

10   that name.

11   Q    Do you know who Mr. Moore is?

12   A    Yes.

13   Q    Did you look at Mr. Moore's report?

14   A    I did have a chance to look at his report.

15   Q    Did you review any of those individuals' deposition

16   testimony before you came to Court?

17   A    No, I did not.

18   Q    Okay.  There are some numbers on the spreadsheet, Exhibit

19   593.  And there is some -- for example there is some forecasts

20   here of different revenues for the city.  Do you see that up

21   at the top?

22   A    Yes, I do.

23   Q    For example you've got revenue in 2016 from income tax of

24   252.1 million.  Do you see that?

25   A    Yes.

1  Q    And it's up to 253.8, correct?

2  A    Yes.

3  Q    And you don't know how any of the numbers were calculated

4  in the Ernst & Young spreadsheet, correct?

5  A    I -- I do not.  I don't know them, no I don't.

6  Q    And in general any of the numbers in these spreadsheets

7  from Ernst & Young or Conway, MacKenzie, you don't know how

8  those were calculated, correct?

9  A    That's not true.

10 Q    Okay.  Which ones do you know?

11 A    Well, the numbers related to the expenditures I know how

12 those numbers were calculated generally, especially the ones

13 related to the largest expenditures which were generally the

14 personnel expenditures.

15 Q    Okay.  But the revenue -- the revenue numbers in the

16 Ernst & Young forecast you don't know how those were

17 calculated?

18 A    In -- in general.  I know that -- I know that they used

19 them -- that they used a model to calculate these.

20 Q    But you -- but you can't explain exactly how Ernst &

21 Young got any of the numbers that it got, correct?

22 A    I can't explain how they got the numbers in the out

23 years.  I know that the numbers closer on were projections of

24 the -- the historical numbers, but no, I can't.

25 Q    And you don't know how Conway, MacKenzie got their

1  numbers, correct?  How they actually went about calculating?

2  A    I know how they assembled their numbers around the

3  revenues.  And that is the departmental revenues and how they

4  assembled the numbers around the expenses, but no, I haven't

5  recalculated those numbers.

6  Q    You couldn't explain to the Court how to calculate any of

7  the numbers in the Conway, MacKenzie reports or spreadsheets,

8  correct?

9  A    That -- that wasn't something I did, no.

10 Q    And so you didn't check the reliability or reasonableness

11 of any of the Conway, MacKenzie or Ernst & Young numbers by

12 actually going back and seeing how they were calculated to

13 determine if they were reliably calculated, correct?

14 A    I -- I looked at them for reasonableness, but I did not

15 look at -- I did not check the numbers, no.

16 Q    Okay.  And you -- for the numbers that are the bottom

17 line numbers that you were referring to regarding the levels

18 of debt going forward, you don't know how those were

19 calculated, do you?  I mean the actual calculation you can't

20 explain to the Court, correct?

21        MR. STEWART:  Objection.  I'm having trouble

22 understanding pf which bottom line numbers he's talking about.

23 Q    You had mentioned to the Court that there was some -- you

24 were -- you were talking about a calculation of deficit

25 numbers.  Do you recall that?

1  A    Yes, I recall that.

2  Q    Okay.  But the actual way that they were calculated you

3  couldn't explain to the Court, correct?

4  A    Well, I know -- I know mathematically on the schedule how

5  they were calculated and I know the numbers in many of these

6  categories that are being projected.  But -- but actually

7  having recalculated these myself, no, I have not.

8  Q    And -- and those kind of numbers that go out and project

9  the deficit, they're not incorporating things like increased

10  income tax collections, or potential increased grants, or all

11  these other things that you've been talking about, correct?

12  A    Beyond what's in the plan, the items that are in the plan

13  are incorporated in here, but beyond that, no.

14  Q    Well, you were talking about a quote -- something

15  relating to dismissal, right?

16  A    No.  All I said was that there are legacy costs that are

17  included in this schedule that indicate the cost that would

18  continue if -- if there was a dismissal.

19  Q    Okay.  And if there were a dismissal though, there would

20  continue to be efforts to increase revenues.  You would keep

21  doing that, right?

22  A    Yes.

23  Q    And if you -- there were a dismissal scenario you would

24  keep trying to decrease the costs, right?  If you could.

25  A    The size -- the size of these numbers that would be very

 1  difficult to do.

 2  Q    Okay.  Okay.  But you're not aware of anybody that's

 3  actually tried to calculate the -- you know, take the legacy

 4  costs and then add on the revenue in a dismissal situation, or

 5  do any kind of calculation like that, correct?

 6  A    I'm -- I'm not aware of a dismissal plan.  The only thing

 7  I am aware of is that these legacy costs here are -- are shown

 8  on the screen.

 9  Q    And so there's no dismissal plan where --

10        MR. STEWART:  Did the witness finish his answer?

11        THE COURT:  Go ahead, sir.

12  Q    There's no dismissal plan that actually calculates what

13  the revenues and costs would be in a dismissal situation,

14  correct?

15  A    I don't know of one.

16  Q    Thank you.  You've -- I would like to talk a little bit

17  about Ernst & Young and Conway, MacKenzie initiatives but I

18  wanted to talk about your background a little bit.  You have

19  submitted an expert report in the case, correct?

20  A    Yes.

21  Q    You agree you're not an expert on economics?

22  A    I agree I'm not an expert in economics.

23  Q    And you're not -- never done any economy forecasting?

24  A    I've never done economic forecasting.  I've done revenue

25  forecasting.

1  Q    Okay.  So you haven't forecasted -- ever forecasted

2  things like population levels or wage growth rates or things

3  like that?

4  A    No, I have not.

5  Q    And you're not holding yourself out as an expert on tax

6  policy?

7  A    I'm not an expert on tax policy.  I've dealt with tax

8  policy.

9  Q    And -- and you're not holding yourself out as an expert

10 on health benefits, or information technology, or state

11 revenue sharing, correct?

12 A    No, I'm not.

13 Q    And you've never been qualified by a Court as an expert

14 before, correct?

15 A    Not by a Court, no.

16 Q    And you talked about the consensus revenue forecast.

17 Your staff actually put those revenue forecasts together,

18 correct?

19 A    My staff and staffs of other entities as well put the --

20 Q    And the consensus revenue forecast is it as its name

21 might suggest, forecasts revenue only, correct?

22 A    Yes.

23 Q    And the consensus revenue forecast occurred before the

24 updated financial information was available in the CAFR that

25 you showed the Court, correct?

1  A    Yes, it did.

2  Q    And the consensus revenue estimate doesn't attempt to

3  forecast all the city's revenues, correct?

4  A    No, it does not.

5  Q    And the consensus forecast does not include non-general

6  fund grant revenues, correct?

7  A    That's correct.

8  Q    There are lots of grants that may go to other departments

9  that aren't counted in the general fund, correct?

10 A    Yes.

11 Q    We talked about some things today, correct?

12 A    Yes.

13 Q    And the consensus forecast does not include future bond

14 sales?

15 A    No, it -- it does not.

16 Q    And the consensus forecast, why don't we take a look at

17 it.  It's in Tab 1, Exhibit 38.  And the -- if you look at

18 Page 11 of that document.  The next to last full.  It says,

19 ongoing improvements and collection efforts in fiscal year

20 2013 should net additional income tax revenues not currently

21 reflected in the consensus estimates.  Do you see that?

22 A    Yes.

23 Q    And -- and the -- that -- the consensus conference didn't

24 include increase tax collection -- tax collections that would

25 occur as a result of some of the efforts you're -- you're

1  engaged in, correct?

2  A    Right.  It was, yeah, current state.

3  Q    And then over on Page 12, at the top under the heading it

4  says, for purposes of the revenue estimating conference, the

5  City of Detroit finance department treasury division has been

6  deemed -- has deemed it prudent not to provide an estimate on

7  the collection of delinquent accounts receivable due to the

8  following factors.  Do you see that?

9  A    Yes.

10  Q    And so the consensus number didn't include accounts --

11  the delinquent accounts receivable, correct?

12  A    That's correct.

13  Q    And the consensus conference also did not include

14  revenues derived as a result of proposed restructuring and

15  reinvestment initiatives?

16  A    It did not.

17  Q    And --

18  A    Because it covered a period that -- before some of those

19  revenues would actually kick in.

20  Q    Yeah, okay.  So the consensus conference the -- the

21  revenue estimates is a very early period of time that it

22  covers, right?

23  A    Yeah.  The purpose is to provide the revenues for the

24  budget and the budget is for the early period of time.

25  Q    And it only covers three years, correct?

1  A    Yes.

2  Q    Okay.  And when you say that -- you -- you mentioned that

3  the consensus number is consistent with the Ernst & Young

4  forecast.  You're only looking at the baseline, correct?

5  A    Yes.

6  Q    It doesn't attempt to forecast what the revenue

7  initiatives or other additional revenues might be for the city

8  going forward, correct?

9  A    No, it does not.

10 Q    Okay.  And there were several people from Conway,

11 MacKenzie I think as you had mentioned that participated in

12 the conference, correct?

13 A    Yes.

14 Q    And also Ernst & Young?

15 A    Yes.

16 Q    And you -- when it came to the consensus conference you

17 weren't willing to do that conference completely without

18 having Ernst & Young present, correct?

19 A    It could have been done that way, but we chose not to.

20 There was no -- yeah.  We chose not to.  We chose to have them

21 in the room to explain certain areas in comparison to the

22 plan.

23 Q    And that was at the same time Ernst & Young was working

24 on this bankruptcy proceeding and putting together its

25 materials for the Court?

1  A    Yes.

2  Q    And there was a point in time though when some people at

3  the city they wanted to stop.  Not have the revenue

4  conference, correct?

5  A    Yes.

6  Q    There were people who questioned whether it was a good

7  idea to have that conference, right?

8  A    Yes, there were.

9  Q    And if we turn to Tab 8, Syncora Exhibit 4126.  And if we

10  actually go down to the -- the bottom, the last sentence.

11  There is Stacy Fox, she's the deputy emergency manager for the

12  city, right?

13  A    Yes.

14  Q    And she has been -- she was talking about the consensus

15  conference and said this is the first I've heard of this but

16  recommend if you agree that we have Kevyn suspend the

17  conference.  Do you see that?

18  A    Yes.

19  Q    And that's Kevyn Orr she's talking about?

20  A    Yes, it is.

21  Q    And she -- she had recommended that you not have the

22  consensus conference, correct?

23  A    She had.

24  Q    And then you had responded, I believe, to that.  And

25  you wanted to have the conference, right?

1  A     Yes, I did.

2  Q     Okay.  And your email is the next one in that change --

3  A     Yes.

4  Q     -- chain.  And you mentioned that there were some good

5  reasons to keep the process.  It keeps everyone in sync with

6  what's in the plan of adjustment.  That's what you wrote,

7  correct?

8  A     Yes.

9  Q     And then Mr. Naglick followed up on your -- your email,

10 correct?

11 A     Uh-huh.

12 Q     And he sent an email elaborating further, correct?  And

13 he -- he wrote -- Mr. Naglick, is he your deputy?

14 A     Mr. Naglick is the director of finance and acting

15 treasurer.

16 Q     Okay.  And does -- does he work for you in that structure

17 that we saw or --

18 A     That's the new structure.  He would -- he would be my --

19 well, the position he's currently holding would -- would be

20 the number two.  But he holds the position of director of

21 finance and interim treasurer.

22 Q     Okay.  And he wrote EY Shavi takes part to keep the group

23 on track with comparisons to plan of adjustment.  They try to

24 mainly listen to the point of view of the participants, but

25 then keep them from taking a totally different view from

1  revenues in the plan.  Don't know when the plan is to share

2  this with the FAB.  Do you see that?

3  A    Yes, I do see that.

4  Q    And then that was Mr. Naglick's response following --

5  elaborating on what you were saying, correct?

6  A    No, that was Mr. -- Mr. Naglick's opinion.

7  Q    Okay.  And in -- and in fact you went ahead with the

8  consensus conference, right?

9  A    Yes, I did.

10  Q    And -- and you went ahead with having Ernst & Young

11  participated like -- participate like Mr. Naglick had

12  suggested, correct?

13  A    No, not like Mr. Naglick had suggested.  Participating to

14  explain what's in the plan of adjustment.  And I made it very

15  clear to Pam who thought -- Pam Scales that I wanted this

16  process to be driven in a way that actually looks critically

17  at all of the revenues.

18  Q    Okay.  But Ernst & Young was there at the conference to

19  give their input so that the -- and as a result there isn't a

20  deviation between consensus conference and --

21  A    That's not -- I don't believe that's a result of their

22  input.

23  Q    Okay.  They were there in the room?

24  A    They were there in the room, but everyone -- they weren't

25  in the room when these individual entities within the city

1  made their own revenue estimation.  They were there in the

2  room when the group came back together.  But even the

3  individual revenue estimates from each group don't vary really

4  materially from what's in the plan of adjustment.

5  Q    Yeah.  And I mean did you ever discipline Mr. Naglick or

6  say that that was inappropriate?

7  A    I -- I talked to Mr. Naglick and said that that's not the

8  purpose of having the revenue estimation.

9  Q    Okay.  And did -- did you recognize that there was at

10  least an appearance of a conflict of Ernst & Young or Conway

11  was there and that's why you tried to --

12  A    I don't see it as a conflict.

13  Q    Yeah.  Now you -- were you actually present at all at the

14  revenue conference meeting?

15  A    I was present at the revenue conference meeting.  I

16  wasn't present at every -- every time they met.

17  Q    So there are parts of the revenue conference proceedings

18  that you weren't present at, correct?

19  A    I was getting reports directly from Pam Scales of what

20  was going on in the conference.

21  Q    And were there times when you weren't present but Ernst &

22  Young or Conway, MacKenzie was?

23  A    Yes.

24  Q    Okay.  And you offered some opinions about the Ernst &

25  Young forecast.  Do you know what the wage growth rates were

1 | that they used?

2 | A    I -- I don't know offhand.  I know that they're in the

3 | forecast.  And I know that -- that they were using wage growth

4 | rates that they were looking at as a result of the work that

5 | Scorsone was doing.

6 | Q    Do you know if Mr. Malhotra and Mr. Cline used the same

7 | wage growth rates?

8 | A    I -- I don't know which wage growth rates they used.

9 | Q    And do you know whether they -- the wage growth rates or

10 | other economic inputs that Ernst & Young did were the same or

11 | different from Mr. Scorsone's inputs that he gave the revenue

12 | conference?

13 | A    I wasn't -- I wasn't a part of Ernst & Young's estimation

14 | process.

15 | Q    And so you haven't reviewed all the assumptions in the

16 | Ernst & Young forecast to try to confirm the reliability of

17 | those, correct?

18 | A    I haven't reviewed all the assumptions, no.

19 | Q    And you haven't reviewed all of the calculations in the

20 | Ernst & Young forecast to try to confirm the reliability of

21 | those, correct?

22 | A    I don't know that anyone could.

23 | Q    Okay.  And you never asked the revenue conference to look

24 | at the Ernst & Young estimates for the ten or 40 year period

25 | they covered so they could review them and assess the

1  reliability or reasonableness?

2  A    No, I -- I didn't ask them to do that.

3  Q    You would agree that over the next ten years anything

4  could happen with respect to the city's revenues and costs

5  because there is so many factors that influence them?

6  A    Yes.  There are a number of factors that would -- or

7  variables that would influence the city's revenues and the

8  costs.

9  Q    And there are a number of uncertainties with respect to

10 the forecast in the case, correct?

11 A    Absolutely.

12 Q    And new people could be elected Mayor or elected to the

13 city council in the next ten years?

14 A    Absolutely.

15 Q    And you would expect that over the next ten years there

16 could be changes in the initiatives taken by the city which

17 would impact revenues and costs, correct?

18 A    Yes.

19 Q    Now in your expert report and today in your testimony,

20 you discuss certain costs for reinvestment initiatives that

21 were calculated by Conway, MacKenzie?

22 A    Yes.

23 Q    And you agree that it's important that the financial

24 benefits to the city of all the initiatives in the

25 restructuring outweigh the costs, correct?

1  A    No.

2  Q    Do you agree that it's important that all of the

3  activities in the restructuring will improve the financial

4  situation with the city within the city?

5  A    I believe that all of the restructuring initiatives

6  either have to improve revenue, reduce costs, or improve

7  service delivery in some way.

8  Q    And is -- is it true that the city is planning to

9  continuously to re-evaluate the reinvestment initiatives after

10 the bankruptcy is over to insure that they have a good cost

11 benefit analysis and change them if necessary?

12 A    That process is occurring as we are allowing spending on

13 current plan of adjustment items.  So as part of the process

14 of deciding whether or not we will release funding we are

15 looking at -- at the plans and -- and deciding whether or not

16 the plans need to go forward as -- as they -- they were

17 written.

18 Q    And you're not saying that the city can't survive unless

19 all of the reinvestment initiatives are implemented, correct?

20 A    I -- I haven't said that, no.

21 Q    Some of the reinvestment initiatives are more critical in

22 your mind than others, correct?

23 A    I think there's some that would definitely take priority.

24 Q    Yeah.  And some of the reinvestment initiatives you get

25 more bang for your buck than others, right in terms of

1   generating revenue or decreasing cost for the city?

2   A    It -- it really depends on -- on what period of time

3   you're looking at and which initiative.  For instance the work

4   that's being done on blight, that's a significant item within

5   the reinvestment initiatives that is expected to have

6   certainly improvement over time.  But the other initiatives

7   it's -- it's really hard to quantify exactly what the -- the

8   ultimate benefit will be of that.

9   Q    But several of the initiatives on collecting taxes for

10  example don't cost that much.  Like agreeing with the state to

11  piggyback the taxes but yet they have the potential to deliver

12  tens of millions of dollars to the city each year, right?

13  A    And those are ones that we're prioritizing.

14  Q    That would be the highest priority project in the

15  reinvestment initiatives, right?

16  A    Well, it would a highest -- one of the highest priorities

17  in the office of finance in the ones that I have

18  responsibility for, but people would argue that being able to

19  reduce the time that it takes for the police department or the

20  fire department to respond to emergencies is an important

21  initiative as well.  So -- so yeah, I think -- I think each

22  one of them has a certain benefit.

23  Q    All right.  And you agree that in the -- in graphs you

24  showed the Court every year the reinvestment initiatives have

25  a negative cost benefit, correct?  They cost more than they

1  bring into the city, right?

2  A    They cost more from the standpoint of revenues that are

3  -- are produced from them, or costs that are saved, yes.

4  There's a net cost to the city there's no question.

5  Q    And the net cost was the 876,000,000 that you were

6  showing the Court, correct?

7  A    Yes.

8  Q    And there is also what's called the restructuring

9  initiatives.  I mean restructuring number that's in some of

10 the forecasts, correct?

11 A    Yes.

12 Q    And the restructuring adds on other restructuring costs

13 on to the reinvestment initiatives, correct?

14 A    Yes.

15 Q    And that would include things like the $130,000,000 in

16 professional fees, right?

17 A    You mean the -- the --

18 Q    The restructuring costs would --

19 A    Yes.

20 Q    -- add on things like the professional fees, right?

21 A    Yes.

22 Q    And that number is higher, it's 2.4 billion or

23 approximately, right?

24 A    If -- if I can look at the schedule I could tell you

25 exactly what it is.

1  Q    Do you know -- I mean do you know what in the ballpark

2  the restructuring cost is to the city?

3  A    The restructuring costs are significant, very

4  significant.

5  Q    Okay.

6           THE COURT:  All right.  We're going to stop here for

7  today.

8           MR. SMITH:  Okay.  That's fair.

9           THE COURT:  And reconvene at 8:30 tomorrow morning,

10  please.  One moment before we break.

11           MR. HACKNEY:  Your Honor, just a moment.  If we

12  could save Mr. Hill --

13           MR. SMITH:  Well, I don't know.  We should just keep

14  him and come back.  It's going to take a little -- don't you

15  think?

16           MR. HACKNEY:  I don't know if Mr. Stewart was

17  planning on redirect, but if we can save him a day in the

18  office it might be good.

19           MR. STEWART:  Well, I do have a few questions but

20  more -- more to the point I think the Court said it had

21  questions.

22           MR. HACKNEY:  Oh, okay.

23           THE COURT:  Yeah.  So we need to recess now and

24  we'll reconvene at 8:30 tomorrow morning.  And we're all set.

25           (WITNESS JOHN HILL WAS EXCUSED AT 5:02 P.M.)

1          THE CLERK:  All rise.  Court is adjourned.

2      (Court Adjourned at 5:02 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7   We certify that the foregoing is a correct transcript from the

8   electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 9-11-14
    Kristel Trionfi
12  LaShonda Moss

13

14

15

16

17

18

19

20

21

22

23

24

25