# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

In re:

CITY OF DETROIT, MICHIGAN,                    CASE NO.: 13-53846
                                              CHAPTER 9

        Debtor.

---

## APPELLANT CITY OF DETROIT, MICHIGAN'S DESIGNATION OF THE CONTENTS OF THE RECORD AND STATEMENT OF ISSUES ON APPEAL

Pursuant to Rule 8006 of the Federal Rules of Bankruptcy Procedure, appellant City of Detroit, Michigan (the "City") submits this designation of the contents of the record and statement of issues on appeal regarding the City's Notice of Appeal [Doc. No. 6691] filed on August 13, 2014, pursuant to 28 U.S.C. § 158(a)(1) and Rule 8001(a) of the Federal Rules of Bankruptcy Procedure from the Order Granting Allen Park Retirees Associations Motion for Clarification and Relief from the Court's Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non- Officer Employees, and (C) Agents and Representatives of the Debtor (Doc. No. 5455) [Doc. No. 6401] entered on July 30, 2014.

### Statement of Issues

1.      Whether the Bankruptcy Court erred in holding that the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay

22853522.2\022765-00202

13-53846-swr  Doc 7443-2  Filed 09/12/14  Entered 09/12/14 01:36:18  Page 1 of 145
13-53846-swr  Doc 7092  Filed 08/27/14  Entered 08/27/14 21:46:24  Page 1 of 145

to Certain (A) State Entities, (B) Non Officer Employees and (C) Agents and Representatives of the Debtor entered on July 25, 2013 [Doc. No. 166] does not apply to the Allen Park Retiree Case[1] where the Complaint contains allegations that that PA 436[2] is facially unconstitutional, and a holding in the Allen Park Retirees Case that PA 436 is unconstitutional could pose serious questions regarding the validity of actions taken by Detroit's Emergency Manager in the Bankruptcy Case.[3]

      2.      Whether the Bankruptcy Court erred in concluding that "a finding by another court that P.A. 436 is unconstitutional will not automatically result in the removal of Kevyn Orr. Further action would need to be taken, and any such further action is subject to the automatic stay" where a holding in the Allen Park Retirees Case that PA 436 is unconstitutional could render PA 436 void *ab initio*, and thus, could pose serious questions regarding the validity of actions taken by the City's Emergency Manager in the Bankruptcy Case.

---

[1] *Allen Park Retirees Association, et al. v. The State of Michigan*, Case No. 13-000164-MZ, State of Michigan Court of Claims.

[2] Public Act 436 of 2012 of the State of Michigan, also known as the Local Financial Stability And Choice Act, Mich. Comp. Laws §§ 141.1541-141.1575.

[3] *In re City of Detroit, Michigan*, United States Bankruptcy Court for the Eastern District of Michigan, Case No. 13-53846.

<div align="center">**Designation of Items**</div>

Appellant designates items from the Bankruptcy Court docket to be included in the record on this appeal to the United States District Court for the Eastern District of Michigan, as listed on the Appendix, attached hereto.

Dated: August 27, 2014        Respectfully submitted,

By: /s/Timothy A. Fusco
Jonathan S. Green (P33140)
Stephen S. LaPlante (P48063)
Timothy A. Fusco (P13768)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com
fusco@millercanfield.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

ATTORNEYS FOR THE CITY OF DETROIT

22853522.2\022765-00202

13-53846-swr Doc 7447-3 Filed 09/12/14 Entered 09/12/14 13:46:34 Page 4 of 145
13-53846-swr Doc 7092 Filed 09/12/14 Entered 09/12/14 10:36:18 Page 4 of 45

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

In re:

CITY OF DETROIT, MICHIGAN,                    CASE NO.: 13-53846
                                              CHAPTER 9

      Debtor.

_____

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned hereby certifies that on August 27, 2014, I electronically

filed Appellant City of Detroit, Michigan's Designation of the Contents of the

Record and Statement of Issues on Appeal with the Clerk of the Court for the

United States Bankruptcy Court, Eastern District of Michigan, Southern Division

using the ECF System, which will send notification of such filing to all attorneys

and parties of record registered electronically.

Dated: August 27, 2014

                                     By: /s/Timothy A. Fusco
                                     Timothy A. Fusco (P13768)
                                     150 West Jefferson, Suite 2500
                                     Detroit, Michigan 48226
                                     Telephone: (313) 963-6420
                                     Facsimile: (313) 496-7500
                                     fusco@millercanfield.com

**MEDIA, TranscriptREQ, NOCLOSE, DirApl, APPEAL**

## U.S. Bankruptcy Court
### Eastern District of Michigan (Detroit)
### Bankruptcy Petition #: 13−53846−swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

*Debtor In Possession*
**City of Detroit, Michigan**
2 Woodward Avenue
Suite 1126
Detroit, MI 48226
WAYNE−MI
Tax ID / EIN: 38−6004606

represented by **Bruce Bennett**
555 S. Flower Street
50th Floor
Los Angeles, CA 90071
(213) 489−3939
Email: bbennett@jonesday.com

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465−7344
Fax : (313) 465−7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313−496−7567
Email: carlson@millercanfield.com

**Tamar Dolcourt**
500 Woodward Ave.
Suite 2700
Detroit, MI 48226
313−234−7161
Email: tdolcourt@foley.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226−4415
(313) 496−8435
Email: fusco@millercanfield.com

**Eric B. Gaabo**
1650 Frist National Building
Detroit, MI 48226
(313) 237−3052
Email: gaabe@detroitmi.gov

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500

Detroit, MI 48226
(313) 963−6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586−7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800
Southfield, MI 48075−1505
248−359−7300
Fax : 248−359−7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky−Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359−7300
Fax : (248) 359−7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075−1505
(248) 359−7300
Fax : (248) 359−7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496−8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212−326−3939
Email: hlennox@jonesday.com

**John A. Simon**
500 Woodward Avenue
Suite 2700
Detroit, MI 48226
(313) 234−7100
Email: jsimon@foley.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496−7591
Email: swansonm@millercanfield.com

| *U.S. Trustee* | represented by | **Sean M. Cowley (UST)** |
| **Daniel M. McDermott** | | United States Trustee |
| | | 211 West Fort Street |
| | | Suite 700 |
| | | Detroit, MI 48226 |
| | | (313) 226−3432 |
| | | Email: Sean.cowley@usdoj.gov |

**Richard A. Roble (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226−6769
Email: Richard.A.Roble@usdoj.gov

| *Creditor Committee* | represented by | **Brett Howard Miller** |
| **Committee of Unsecured** | | 1290 Avenue of the Americas |
| **Creditors** | | 40th Floor |
| *TERMINATED: 03/03/2014* | | New York, NY 10104 |
| | | (212) 468−8051 |
| | | Email: bmiller@mofo.com,whildbold@mofo.com |
| | | *TERMINATED: 03/03/2014* |

**Geoffrey T. Pavlic**
25925 Telegraph Rd.
Suite 203
Southfield, MI 48033−2518
(248) 352−4700
Fax : (248) 352−4488
Email: pavlic@steinbergshapiro.com
*TERMINATED: 03/03/2014*

**Mark H. Shapiro**
25925 Telegraph Rd.
Suite 203
Southfield, MI 48033−2518
(248) 352−4700
Fax : (248) 352−4488
Email: shapiro@steinbergshapiro.com
*TERMINATED: 03/03/2014*

| *Creditor Committee* | |
| **Charlene Hearn** | |
| PO Box 6612 | |
| Detroit, MI 48206 | |

| *Retiree Committee* | represented by | **Sam J. Alberts** |
| **Official Committee of Retirees** | | 1301 K Street, NW |
| | | Suite 600, East Tower |
| | | Washington, DC 20005−3364 |
| | | (202) 408−7004 |
| | | Email: sam.alberts@dentons.com |

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: hall@bwst−law.com

**Claude D. Montgomery**

620 Fifth Avenue
New York, NY 10020
(212) 632−8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768−6889
Email: carole.neville@dentons.com,daniel.morris@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: wilkins@bwst−law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 07/25/2013 | | 166 | Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non Officer Employees and (C) Agents and Representatives of the Debtor (Related Doc # 56). (jjm) (Entered: 07/25/2013) |
| 11/06/2013 | | 1536 | Opinion and Order Denying NAACP's Motion for Relief from Stay (Dkt. #740) and Granting Phillips' Motion for Relief from Stay (Dkt. #1004) (RE: related document(s)740 Motion for Relief From Stay filed by Interested Party Detroit Branch NAACP, Interested Party Michigan State Conference NAACP, Interested Party Thomas Stallworth III, Interested Party Rashida Tlaib, Interested Party Maureen Taylor, Interested Party Donnell White, 1004 Motion for Relief from Stay and Waiving FRBP 4001 (a)(3) filed by Creditor Catherine W. Phillips). (ckata) (Entered: 11/06/2013) |
| 12/20/2013 | | 2256 | Order Denying Motion for Reconsideration (Dkt. #1745) (Related Doc # 1745). (jjm) (Entered: 12/20/2013) |
| 06/19/2014 | | 5455 | Motion for Relief from Stay Re: Relief From Stay *Non−Party to Proceedings*. Fee Amount $176, Filed by Other Professional Allen Park Retirees Assn (Porter, Mark) (Entered: 06/19/2014) |
| 07/09/2014 | | 5890 | Response to (related document(s): 5455 Motion for Relief from Stay Re: Relief From Stay *Non−Party to Proceedings*. Fee Amount $176,) Filed by Interested Party State of Michigan (Schneider, Matthew) (Entered: 07/09/2014) |
| 07/09/2014 | | 5894 | Objection to (related document(s): 5455 Motion for Relief from Stay Re: Relief From Stay *Non−Party to Proceedings*. Fee Amount $176,) Filed by Debtor In Possession City of Detroit, Michigan (Fusco, Timothy) (Entered: 07/09/2014) |
| 07/21/2014 | | 6153 | Brief *Reply to Dockets #5890 &#5894* Filed by Other Professional Allen Park Retirees Assn (RE: related document(s)5455 Motion for Relief from Stay Re: Relief From Stay *Non−Party to Proceedings*. Fee Amount $176,). (Porter, Mark) (Entered: 07/21/2014) |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-------------------------------------------------x
                                       :
In re                                  :          Chapter 9
                                       :
CITY OF DETROIT, MICHIGAN,             :          Case No. 13-53846
                                       :
                       Debtor.         :          Hon. Steven W. Rhodes
                                       :
                                       :
-------------------------------------------------x
```

## ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON OFFICER EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR

This matter coming before the Court on the Motion of Debtor,

Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order,

Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer

Employees and (C) Agents and Representatives of the Debtor (the "Motion"),[1]

filed by the City of Detroit, Michigan (the "City"); the Court having reviewed the

Motion and the Orr Declaration and having considered the statements of counsel

and the evidence adduced with respect to the Motion at a hearing before the Court

(the "Hearing"); and the Court finding that:  (a) the Court has jurisdiction over this

---

[1]   Capitalized terms not otherwise defined herein have the meanings given to
      them in the Motion.

matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (c) notice of the Motion and the Hearing was sufficient under the circumstances, (d) the unusual circumstances present in this chapter 9 case warrant extending the Chapter 9 Stay to the State Entities, the Non-Officer Employees and the City Agents and Representatives; and the Court having determined that the legal and factual bases set forth in the Motion and the Orr Declaration and at the Hearing establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.  The Motion is GRANTED.

2.  Pursuant to section 105(a) of the Bankruptcy Code, the Chapter 9 Stay hereby is extended to apply in all respects (to the extent not otherwise applicable) to the State Entities (defined as the Governor, the State Treasurer and the members of the Loan Board, collectively with the State Treasurer and the Governor, and together with each entity's staff, agents and representatives), the Non-Officer Employees and the City Agents and Representatives.

3.  For the avoidance of doubt, each of the Prepetition Lawsuits hereby is stayed, pursuant to section 105(a) of the Bankruptcy Code, pending further order of this Court.

4.    This order is entered without prejudice to the right of any creditor to file a motion for relief from the stay imposed by this order using the procedures of and under the standards of 11 U.S.C. § 362(d)-(g).

.

**Signed on July 25, 2013**

                        **_/s/ Steven Rhodes_**
                        **Steven Rhodes**
                        **United States Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                                  Chapter 9
                                                        Case No. 13-53846
City of Detroit, Michigan,                              Hon. Steven W. Rhodes

     Debtor.
_____/


**Opinion and Order**

**Denying NAACP's Motion for
Relief from Stay (Dkt. #740)**

**and**

**Granting Phillips' Motion for
Relief from Stay (Dkt. #1004)**


This opinion addresses two motions for relief from the stay. The first motion (Dkt. #740) relates to *Detroit Branch NAACP v. Snyder*, No. 13-12098 (E.D. Mich. filed May 13, 2013). The other motion (Dkt. #1004) relates to *Phillips v. Snyder*, No. 13-11370 (E.D. Mich. filed March 27, 2013). Both suits challenge the constitutionality of the Local Financial Stability and Choice Act, Michigan Public Act No. 436 (2012), MCL §§ 141.1541–141.1575 ("P.A. 436").

For the reasons stated in this opinion, the Court concludes that the motion for relief from the stay as to the *NAACP* suit should be denied while the motion for relief from the stay as to the *Phillips* suit should be granted.


## I. The Procedural History

On March 27, 2013, Catherine Phillips and several other plaintiffs filed a lawsuit in the United States District Court for the Eastern District of Michigan against Governor Richard Snyder and State Treasurer Andrew Dillon, asserting that P.A. 436 is unconstitutional and

seeking declaratory and injunctive relief.  Specifically, they assert that P.A. 436 violates their rights under the United States Constitution, art. IV, § 4; amend. I; amend. XIII; amend. XIV; and the Voting Rights Act of 1965, 42 U.S.C. §§ 1973–1973(q).  Most of the individual plaintiffs are residents or elected officials of several municipalities in which emergency managers have been appointed under P.A. 436 – the City of Detroit, the City of Flint, the City of Benton Harbor, and the City of Pontiac.  Three of the plaintiffs are also members of the Detroit Public Schools Board; an emergency manager has also been appointed for the Detroit Public Schools.  The suit seeks damages, declaratory relief, and injunctive relief, including relief "restraining the Defendants and any present and future EMs from implementing or exercising authority and powers purportedly conveyed by Public Act 436."  Complaint at 49–50, *Phillips*, No. 13-11370.

The second suit was filed on May 13, 2013, by the Detroit Branch NAACP, the Michigan State Conference NAACP, Donnell White, individually and on behalf of Detroit Branch NAACP and Michigan State Conference NAACP, Thomas Stallworth III, individually, Rashida Tlaib, individually, and Maureen Taylor, individually.  It was filed in the United States District Court for the Eastern District of Michigan against Governor Richard Snyder, State Treasurer Andrew Dillon, and Secretary of State Ruth Johnson, in their official capacities.  The suit alleges that P.A. 436 violates constitutional voting rights under the Equal Protection Clause and the Due Process Clause of the 14th Amendment.  In their first amended complaint, filed June 27, 2013, the plaintiffs sought: (1) to enjoin the defendants and others from implementing or enforcing P.A. 436; (2) an order prohibiting any emergency manager appointed under P.A. 436 from exercising any authority; (3) an order that actions exercised by any emergency manager are unenforceable; and (4) preclearance of the cities and school districts currently with emergency

managers under § 3(c) of the Voting Rights Act. Amended Complaint at ¶¶ 32–33, *Detroit Branch NAACP*, No. 13-12098.

On July 18, 2013, the City of Detroit filed this chapter 9 bankruptcy case.

On July 25, 2013, upon a motion filed by the City (Dkt. #56), the Court entered an order pursuant to 11 U.S.C. § 105(a) extending the stay to certain state entities, including the governor and the treasurer. (Dkt. #166)

On August 22, 2013, the district court entered separate orders staying and administratively closing both the *Phillips* case and the *NAACP* case due to the City's bankruptcy filing and this Court's July 25, 2013 order.

The plaintiffs in both of those lawsuits have filed separate motions for relief from the stay. Each group of plaintiffs contends that its lawsuit is not stayed by the Court's July 25, 2013 order because its suit was not included in the City's motion to extend the stay. In the alternative, each group seeks relief from the stay to permit it to continue its district court lawsuit.

The City and the State of Michigan filed objections to both motions.

The Court conducted a hearing on the NAACP motion October 2, 2013, and took the matter under advisement. The Court concluded that a hearing is not necessary on the Phillips motion.

## II. Whether the July 25, 2013 Order Applies to the Two Lawsuits

The July 25, 2013 order extending the automatic stay provides in part:

> 2) Pursuant to section 105(a) of the Bankruptcy Code, the Chapter 9 stay hereby is extended to apply in all respects (to the extent not otherwise applicable) to the State Entities (defined as the Governor, the State Treasurer and members of the Loan Board, collectively with the State Treasurer and the Governor, and together with each entity's staff, agents and representatives), the Non-Officer Employees and the City Agents and Representatives.

3

3) For the avoidance of doubt, each of the Prepetition Lawsuits hereby is stayed, pursuant to section 105(a) of the Bankruptcy Code, pending further order of this Court.

The plaintiffs in each suit argue that the order does not apply to their lawsuit because they are not creditors of the City and their lawsuit does not assert any claim against the City.

The City and the State of Michigan assert that the order does apply to the plaintiffs' lawsuits because the lawsuits will directly interfere with the City's chapter 9 case and may deny the City the protections of chapter 9.

The Court will first address the circumstances of the *NAACP* case and explain why the order does apply to that suit. The Court will then address why the July 25, 2013 order does not apply to the *Phillips* case.

## A. Whether the July 25, 2013 Order
## Applies to the *NAACP* Case

The Court concludes that this order does apply to the *NAACP* case. This suit explicitly seeks to remove all power and authority from the Detroit emergency manager. Also, if the plaintiffs had included the City as a defendant in the lawsuit, it would have been stayed as to the City under 11 U.S.C. § 362(a) because the lawsuit had the potential to directly impact the City's bankruptcy case. The July 25, 2013 order extended that stay to any suits against the governor and the treasurer that might have the same impact on the City's bankruptcy case.

The Court recognizes that the *NAACP* lawsuit purports to seek relief not only as to the emergency manager for the City of Detroit, but also as to the emergency managers in several other municipalities who are not before the Court – the City of Allen Park, the City of Benton Harbor, the Detroit Public School System, the City of Ecorse, the City of Flint, the Highland Park School System, the Muskegon Heights School System, and the City of Pontiac. Obviously,

4

whatever interests the plaintiffs in the *NAACP* case may have in vindicating their rights, if any, in those municipalities can only be addressed elsewhere.

Without addressing the substantive merits of the NAACP plaintiffs' claims in their suit, there is nonetheless one aspect of the suit that substantially undermines their interest in pursuing their claims as to these other municipalities. Although the suit purports to challenge all of the emergency manager appointments under P.A. 436, there is a serious question as to whether this suit is really about any emergency manager other than the Detroit emergency manager. This concern arises because it does not appear that any of the plaintiffs in the *NAACP* suit have standing to challenge any of the emergency manager appointments other than the Detroit emergency manager appointment. Accordingly, unlike the *Phillips* case, discussed below, the *NAACP* case appears to be directed much more to the Detroit emergency manager than any other emergency manager.

Before developing this point any further, however, the Court must pause to recognize that the precise issue of whether these plaintiffs have standing to pursue their claims in their district court lawsuit is not before this Court in this bankruptcy case and it would be inappropriate for this Court to address the standing issue directly.

The basis of this concern about the NAACP plaintiffs' standing lies in their first amended complaint. It alleges that each individual plaintiff is a resident and voter in the City of Detroit. First Amended Complaint at ¶¶ 24–27, *Detroit Branch NAACP*, No. 13-12098. Accordingly, their standing to challenge the emergency manager appointments in any other municipality would be highly suspect.

The Supreme Court has established this test to determine a plaintiff's standing:

> The Art. III judicial power exists only to redress or otherwise
> protect against injury to the complaining party, even though the

court's judgment may benefit other's collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action[.]"

*Warth v. Seldin*, 422 U.S. 490, 499, 95 S. Ct. 2197, 2205 (1975) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S. Ct. 1146, 1148 (1973)); s*ee also Hollingsworth v. Perry*, 133 S. Ct. 2652, 2663 (2013) ("It is, however, a 'fundamental restriction on our authority' that '[i]n the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.'") (quoting *Powers v. Ohio*, 499 U.S. 400, 410, 111 S. Ct. 1364, 1371 (1991)); *Kowalski v. Tesmer*, 543 U.S. 125, 125 S. Ct. 564 (2004); *Conn v. Gabbert*, 526 U.S. 286, 119 S. Ct. 1292 (1999).

In this suit, the two other plaintiffs are the Detroit Branch NAACP and the Michigan State Conference NAACP. Describing these organizations, the first amended complaint states:

> 22. Plaintiff Detroit Branch NAACP, chartered in 1912, is the NAACP's largest Branch in America. Plaintiff Detroit Branch NAACP has, throughout its 99 year history, fought, through the democratic process, for the cause of civil rights and equal treatment for all. Plaintiff Detroit Branch NAACP has fought in the courts to preserve and protect voting rights in the State of Michigan. . . .

> 23. Plaintiff Michigan State Conference NAACP is the umbrella organization for all NAACP units or branches within the State of Michigan. It is the central authority, responsible for coordinating all local NAACP branches around the State.

First Amended Complaint at ¶¶ 22–23, *Detroit Branch NAACP*, No. 13-12098.

The Sixth Circuit has addressed the standing of a membership organization like the Detroit Branch NAACP:

> A voluntary membership organization has standing to sue on behalf of its members "when (a) its members otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires participation of

6

individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm.*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)[.]

*Am. Civil Liberties Union of Ohio Found., Inc. v. Ashbrook*, 375 F.3d 484, 495–96 (6th Cir. 2004).

It does appear likely that under *Ashbrook*, the Detroit Branch NAACP has standing to challenge the Detroit emergency manager appointment. However, the first amended complaint alleges no facts that would establish its standing to challenge any of the other emergency manager appointments.

Similarly, the first amended complaint alleges no facts establishing that the Michigan State Conference NAACP would have any standing under *Ashbrook*. Indeed, as quoted above, paragraph 23 only states that it is an "umbrella organization" for the NAACP branches within Michigan, and that it is the "central authority, responsible for coordinating all local NAACP branches around the State."

These standing considerations strongly suggest that despite the much more broadly stated goals of the lawsuit, its primary, if not sole, objective is the removal of the Detroit emergency manager. In any event, it appears likely that this relief is the only relief that the plaintiffs could be granted, if any.

The impact in this bankruptcy case of the potential removal of the Detroit emergency manager by the plaintiffs' lawsuit cannot be overstated. Section 18(1) of P.A. 436 provides, "This section . . . empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9." M.C.L. § 141.1558(1). The NAACP plaintiffs' lawsuit seeks an order prohibiting any emergency manager appointed under P.A. 436 from exercising any authority under the act. This lawsuit, therefore, directly threatens the City's

7

ability to continue in this bankruptcy case. If P.A. 436 were found to be unconstitutional, as the plaintiffs' lawsuit claims, then the City's emergency manager would be removed from office. Under applicable state law, no one else would be authorized to prosecute this chapter 9 case on behalf of the City.

Accordingly, due to its potential impact on this bankruptcy case, the Court concludes that the July 25, 2013 order does apply to the *NAACP* case.

## B. Whether the July 25, 2013 Order
## Applies to the *Phillips* Case

In contrast to the *NAACP* case, the *Phillips* case includes residents and officials of not only the City of Detroit but also some of the other municipalities in which emergency managers have been appointed. Significantly, in the motion for relief from the stay that the plaintiffs in the *Phillips* case filed, they have attempted to overcome the concerns that compelled the conclusion that the *NAACP* case is subject to the July 25, 2013 order. The Phillips motion states:

> 15. Petitioners also seek to amend their Complaint, (Exh. 6.1, the *Phillips* case Dkt. #1), to withdraw the plaintiffs Phillips, Valenti and AFSCME Council 25 as plaintiffs from the underlying action and to voluntarily dismiss, without prejudice, Count I of the Complaint, which was asserted by the withdrawing plaintiffs.

(Dkt. #1004) Count I of the complaint, which the plaintiffs propose to withdraw, asserted the plaintiffs' claims in relation to the effect of P.A. 436 in Detroit.

Moreover, the conclusion of the motion reiterates that the plaintiffs intend to "amend their Complaint to provide for the voluntary withdrawal of individual plaintiffs Phillips, Valenti, and AFSCME Council 25 and the voluntary dismissal of Count I of their Complaint, without bearing on the Debtor's rights in this bankruptcy proceeding." (Dkt. #1004, at 15)

By these representations, which the Court accepts, it appears that the plaintiffs in the *Phillips* case intend to withdraw from their suit any request for relief as to the Detroit emergency

manager.  The Court concludes that this proposed amendment would eliminate the potential that the *Phillips* case might result in the removal of the Detroit emergency manager.  Therefore, the potential amendment also removes the *Phillips* case from the effect of the July 25, 2013 order.  Accordingly, subject to that condition, the Court concludes that the *Phillips* case is not subject to the July 25, 2103 order.

### III. Whether to Grant the NAACP Plaintiffs' Motion for Relief from the Stay for Cause

Because the July 25, 2013 order does stay the *NAACP* case, those plaintiffs seek relief from the extended stay in order to proceed with their lawsuit.

The July 25, 2013 order states, "This order is entered without prejudice to the right of any creditor to file a motion for relief from the stay imposed by this order using the procedures of and under the standards of 11 U.S.C. § 362(d)–(g)."

11 U.S.C. § 362(d)(1) states, "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay . . . for cause[.]"

Under 11 U.S.C. § 362(g), the debtor bears the burden of proving that there is not cause for relief from the stay.

"Cause" is not a defined term, "so courts must determine whether discretionary relief is appropriate on a case-by-case basis."  *Trident Assoc. Ltd. P'ship v. Metro. Life Ins. Co.* (*In re Trident Assoc. Ltd. P'ship*), 52 F.3d 127, 131 (6th Cir. 1995) (quotation marks omitted) (quoting *In re Laguna Assoc. Ltd. P'ship*, 30 F.3d 734, 737 (6th Cir. 1994)).  Whether to grant such relief "resides within the sound discretion of the bankruptcy court."  *Garzoni v. K-Mart Corp.* (*In re Garzoni*), 35 F. App'x 179, 181 (6th Cir. 2002).

"Determining cause is not a litmus test or a checklist of factors. It requires consideration of many factors and a balancing of competing interests." *Chrysler LLC v. Plastech Engineered Prods., Inc.* (*In re Plastech Engineered Prods., Inc.*), 382 B.R. 90, 109 (Bankr. E.D. Mich. 2008); *see also In re Cardinal Indus., Inc.*, 116 B.R. 964, 983 (Bankr. S.D. Ohio 1990) ("In determining whether or not cause exists, the bankruptcy court must balance the inherent hardships on all parties and base its decision on the degree of hardship and the overall goals of the Bankruptcy Code.").

Accordingly, in balancing the competing interests to determine whether there is cause for relief from the stay, the Court will consider both the harm to the City if the motion is granted and the harm to the NAACP plaintiffs if the motion is denied. In addition, the Court concludes that it is appropriate to consider the public interest in this context, just as it was appropriate to consider the public interest when determining whether to extend the stay when the City requested it. *See, e.g., In re Trans-Serv. Logistics, Inc.,* 304 B.R. 805, 807 (Bankr. S.D. Ohio 2004).

The NAACP plaintiffs contend that there is cause for relief from the stay due to the extraordinary importance of the voting rights that their lawsuit seeks to vindicate and because their lawsuit will have little or no impact on the City's bankruptcy, to which they do not object. At the hearing on this motion, the plaintiffs' counsel clarified that in their lawsuit, the plaintiffs seek only prospective relief and do not seek to invalidate any actions taken by the emergency manager in Detroit or in any other city. They do acknowledge, however, that success in their lawsuit may lead to the removal of the emergency manager in Detroit. They contend nevertheless that the mayor of Detroit can then decide whether to proceed in chapter 9. They assert that their lawsuit is not a collateral attack on this bankruptcy, but a much broader challenge to the emergency manager law.

The City and the State of Michigan contend that the plaintiffs have failed to demonstrate cause for relief from the stay. They argue that numerous parties in this case have challenged the constitutionality of P.A. 436 in the context of eligibility objections and that it does not promote judicial economy to have that issue litigated in other courts.

### A. The Harm to the City
### If Relief from the Stay Is Granted

The harm to the City that might result if relief from the stay is granted is largely the same harm that §§ 362(a) and 922(a)(1), as well as the Court's July 25, 2013 order, seek to prevent. Those bankruptcy code provisions and the Court's order are designed to consolidate into the bankruptcy case all proceedings that relate to and impact the case, so that the debtor, and, for that matter, all of the other parties, are not required to endure the expense and complexity of litigating multiple issues in multiple courts. Such duplicative litigation also creates the risk of inconsistent results.

If relief from the stay were granted, the City would be required to request leave from the district court to intervene in the plaintiffs' lawsuit in order to protect its interest in adjusting its debts through this bankruptcy. That would require the City to incur the expense of litigating the constitutionality of P.A. 436 in two courts. Indeed if other similar motions for relief from the stay are granted, the issue would then have to be litigated in that many more courts.

The plaintiffs have attempted to minimize the impact of their lawsuit on the City by arguing that if the mayor of Detroit so chooses, this bankruptcy case can continue even without an emergency manager. However, as developed above, that is not so. M.C.L. § 141.1558(1) states that only the emergency manager may represent the City in this chapter 9 case. There is no provision in law for the mayor or any other city official to act on the City's behalf in this case.

## B. The Harm to the NAACP Plaintiffs
## If Relief from the Stay Is Denied

The harm that results to the NAACP plaintiffs if relief from the stay is denied is substantial. They will be required to defer litigating the important voting rights claims in their lawsuit until this bankruptcy case is resolved. However, this harm is as much a consequence of their own choices as it is of either the bankruptcy stay or this Court's July 25, 2013 order. The plaintiffs had the same full opportunity to file a timely eligibility objection challenging P.A. 436 as every other creditor, voter and resident of the City of Detroit had.

On that point, it should be noted that the plaintiffs do not assert that they were not aware of the filing of this bankruptcy case by the City of Detroit in time to file a timely eligibility objection. Moreover, the plaintiffs have submitted no evidence that they were not aware of the Court's August 19, 2013 deadline to file eligibility objections. Moreover, at the hearing on this motion, the Court offered the plaintiffs an opportunity to file an objection to eligibility, but plaintiffs' attorney declined that opportunity.

The record reflects that the NAACP plaintiffs made the conscious choice not to file an objection to eligibility in this case and instead chose to take the risk that their lawsuit would be allowed to proceed despite this bankruptcy case. Indeed, the NAACP plaintiffs rather vehemently assert that they do not object to the City's eligibility to be in a chapter 9 bankruptcy case. But the terminating impact that the success of their lawsuit would have on this bankruptcy makes that assertion ring hollow. Much of their lawsuit is precisely an eligibility objection, simply not labeled and filed as such. Although they were certainly not required to file an eligibility objection, their choice has the legal consequence that their suit is stayed by this case.

## C. The Public Interest

Certainly, the public has a substantial interest in the speedy and efficient resolution of litigation like the *NAACP* suit that seeks to vindicate a right as central to our democracy as the right to vote.

At the same time, however, the public has a substantial interest in the speedy and efficient resolution of a municipal bankruptcy case that affects as many people and institutions, and as much of the local, regional and national economy, as this case does.

The public also has an interest in the opportunity that this bankruptcy case may provide for the City of Detroit not only to adjust its debt and to restore the basic services that its residents need for their health and safety but also to regenerate its economic livelihood.

The NAACP plaintiffs' motion for relief from the stay does not require this Court to choose which of these important interests should prevail. It only requires the Court to determine whether it is necessary and appropriate to continue to defer the resolution of the plaintiffs' lawsuit pending the outcome of this bankruptcy.

## D. Conclusion

In its discretion, the Court concludes that although the considerations on each side are substantial, on balance, the factors suggesting that the motion for relief from the stay should be denied outweigh the considerations suggesting otherwise. The NAACP plaintiffs' claims in their lawsuit are important claims. However, those claims primarily and directly challenge the appointment of the Detroit emergency manager and the claims could have been presented in this case in a timely eligibility objection.

The NAACP plaintiffs' decision to forego that opportunity creates the potential, if the motion is granted, for the City to incur unnecessary litigation expense and delay in this

proceeding.  It also creates the potential to prematurely terminate this bankruptcy case.  In these circumstances, the Court concludes that it is appropriate to require the plaintiffs to await resolution of their claims until this bankruptcy case is resolved.

Accordingly, the Court concludes that the City of Detroit and the State of Michigan have met their burden of establishing that there is not cause for relief from the stay.

## IV. Order

For these reasons, it is hereby ordered that it is not necessary for the Court to grant relief from the stay to allow the *Phillips* case to proceed because that case is not subject to the Court's July 25, 2013 order.  This order is conditioned on the Phillips plaintiffs' amendment of their complaint to eliminate their request for the removal of the Detroit emergency manager and for any other relief that diminishes the Detroit emergency manager's authority under P.A. 436.

It is further ordered that the *NAACP* case is subject to the Court's July 25, 2013 order and that the NAACP plaintiffs' motion for relief from the stay is denied.


For publication


Signed on November 06, 2013

<div style="text-align:right">

     /s/ Steven Rhodes
     Steven Rhodes
     United States Bankruptcy Judge

</div>

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                              Chapter 9
City of Detroit, Michigan,                          Case No. 13-53846
      Debtor.                                    Hon. Steven W. Rhodes
_____/

## <u>Order Denying Motion for Reconsideration (Dkt. #1745)</u>

Governor Rick Snyder and former Treasurer Andy Dillon filed a motion for reconsideration of this Court's Opinion and Order Denying NAACP's Motion for Relief from Stay (Dkt. #740) and Granting Phillips' Motion for Relief from Stay (Dkt. #1004). (Dkt. #1536) The City of Detroit filed a concurrence and joinder. (Dkt. #1777) The Court entered an order requiring the Phillips parties to file a response and setting the matter for hearing on December 16, 2013. Following the hearing, the Court took the matter under advisement.

This motion is to be decided pursuant to Local Bankruptcy Rule 9024-1(a)(3), which provides:

> Generally, and without restricting the discretion of the court, a motion for reconsideration that merely presents the same issues ruled upon by the court, either expressly or by reasonable implication, shall not be granted. The movant shall not only demonstrate a palpable defect by which the court and the parties have been misled but also show that a different disposition of the case must result from a correction thereof.

LBR 9024-1(a)(3).

The State essentially argues that even though the plaintiffs in this suit have removed any request for the removal of Kevyn Orr as Detroit's emergency manager, a successful challenge to P.A. 436 will inevitably lead to that result. However, the Court must conclude that such is not the case. A finding by another court that P.A. 436 is unconstitutional will not automatically

13-53846-tjt Doc 7445-1 Filed 09/12/14 Entered 09/12/14 01:26:34 Page 27 of
145
13-53846-swr Doc 7255-1 Filed 08/22/14 Entered 08/22/14 03:36:34 Page 27 of 22

result in the removal of Kevyn Orr.  Further action would need to be taken, and any such further

action is subject to the automatic stay.  Accordingly, the motion for reconsideration is denied.

It is so ordered.

.

**Signed on December 20, 2013**

```
            /s/ Steven Rhodes
       Steven Rhodes
       United States Bankruptcy Judge
```

13-53846-tjt   Doc 7445-1   Filed 09/12/14   Entered 09/12/14 01:26:13   Page 28 of
13-53846-swr   Doc 2253-1   Filed 12/23/13   Entered 12/23/13 09:18:33   Page 23 of
145                                                                                            23

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re,                                          Chapter 9

CITY OF DETROIT, MICHIGAN,                      Case No. 13-53846

    Debtor.                 Hon. Steven W. Rhodes

---

**ALLEN PARK RETIREES ASSOCIATION, et al.'s MOTION FOR CLARIFICATION AND RELIEF FROM THE COURT'S ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE, EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON OFFICER EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR**

NOW COME Petitioners, the Allen Park Retirees Association, Inc., and lead Plaintiff Russell Pillar (herein "**the Petitioners**") to request that this Court clarify and modify as required its *Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non Officer Employees and (C) Agents and Representatives of the Debtor* (**Dkt. 166**), herein after cited as "**the Extended Stay Order**" as issued on July 25, 2013. Petitioners state as follows:

    1.    This motion is filed pursuant to LBR 9014-1 requesting relief from this Court as it applies to all matters in the Michigan State Courts cited as *Allen Park Retirees Association, Inc., and Russell Pillar v. The State of Michigan and State Department of the Treasury,* docket number 13-164-MZ in the Michigan Court of Claims. The Order for Administrative Closing from the Court of Claims is Attachment 6(A) to this motion.

    2.    Concurrence was denied by the State through its Brief in Reply to the Michigan Court of Claims on April 14, 2014 (included on this motion at Attachment 6(C), and at the hearing at that Court on April 18, 2014.

<center>1</center>

3.     This Court has jurisdiction to hear this motion pursuant to 28 USC 157(b)(1), (2)(G).   The Court has the power in equity to issue an injunction pursuant to 11 USC 105(a) against the non-debtors if the injunction contributes to the debtor's reorganization (the City of Detroit).  *Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993).

4.     As detailed in this motion, at no time has the City of Detroit, as the Debtor in this case, motioned the Court pursuant to 11 USC 105(a) to enjoin all actions against the State of Michigan's officers and State departments across the entire state.  Nor has it claimed that the Allen Park case in the Court of Claims "may" be related to the City of Detroit's current bankruptcy proceeding.

5.     The State, however, is now attempting to bootstrap the Court's Extended Stay Order (**Dkt. #166**) into a complete and statewide grant of safe harbor for the State of Michigan. It is now claiming that this Court's original injunctive Order protects it against all Plaintiffs who challenge the State's various versions of the emergency financial manager statutes across all communities statewide.  None of those various communities – including, in this motion, the City of Allen Park – have any legal or practical ties to the Debtor, the City of Detroit.

6.     On <u>October 07, 2013</u>, Petitioners filed a Verified Complaint in the Michigan 30th Circuit Court for the County of Ingham against the State of Michigan; the State Department of the Treasury; the State of Michigan's Emergency Manager for the City of Allen Park (Joyce A. Parker) in her official capacity, and the City of Allen Park, Michigan.  The Complaint is <u>Attachment 6(B)</u> to this Motion.

7.     The Petitioners' Complaint alleged violations of the State's emergency financial statutes at **1990 PA 72** and **2012 PA 436**.  Public Act 72 became the "interregnum" statute between the suspension and eventual repeal of Michigan **2011 PA 4** and the effective date of

2

**2012 PA 436**.  The complete 1990 PA 72 statute is <u>Attachment #5</u> of Petitioner's Verified Complaint and Pleadings, and is at <u>Attachment 6(B)</u> of this Motion.

8.      Joyce A. Parker was appointed by Michigan Governor Richard D. Snyder as the State's Emergency Manager for the City of Allen Park in October, 2012, pursuant to 1990 PA 72.  At no time has the State's Emergency Manager for the City of Detroit, Kevyn Orr, held that State-appointed position in the City of Allen Park.

9.      In part, the Petitioners' Complaint at the Ingham Circuit Court alleged at <u>Paragraphs 19-21</u> that the State's Emergency Manager had violated 1990 PA 72 by terminating the then-existing contracts for retiree health insurance, at MCL 141.1221(q).

10.      On <u>November 13, 2013</u>, Michigan's **2013 Public Act 164** became effective with immediate effect.  PA 164 radically altered the subject matter jurisdiction of the Michigan Court of Appeals, and required the State to transfer all Complaints against State officers and departments to the Court of Claims – whose judges are also elected judges to the Michigan Court of Appeals.

11.      On <u>December 06, 2013</u>, the State's attorney general transferred Defendants State of Michigan and Department of the Treasury to the reorganized Court of Claims – but intentionally left the State's Emergency Manager in the Michigan Circuit Courts.  The case was later transferred to the Michigan 3rd Judicial Circuit of Wayne County, in Detroit, along with Defendant City of Allen Park.

12.      On <u>April 14, 2014</u>, the State filed a brief [not a motion] at the Court of Claims asserting that Petitioners' case must be administratively closed because of the docket at this Court. (<u>Attachment 6(C)</u>).

13. At the time of the April 14, 2014 filing of its brief at the Court of Claims, the State was fully aware of this Court's Order lifting the stay on *Phillips et. al v. Richard A. Snyder and Andrew Dillon*, Case No. 13-CV-11370, currently pending before the Honorable George Caram Steeh (**Dkt. #1536** in this Court). The State filed for reconsideration after this Court lifted the stay, and this Court then stated in pertinent part:

> The State essentially argues that even though the plaintiffs in this suit have removed any request for the removal of Kevyn Orr as Detroit's emergency manager, a successful challenge to P.A. 436 will inevitably lead to that result. However, the Court must conclude that such is not the case. A finding by another court that P.A. 436 is unconstitutional will not automatically result in the removal of Kevyn Orr. Further action would need to be taken, and any such further action is subject to the automatic stay. Accordingly, the motion for reconsideration is denied. (**Dkt. #2256**, at pages 1-2)

14. Plaintiffs Russell Pillar and the Allen Park Retirees Association, Inc., (Petitioners before this Court) do not allege in their Complaint that the State's Emergency Manager for the City of Allen Park – nor any of the State's Emergency Managers in the various cities, townships, and school districts – must be removed by Court Order.

15. The gravamen of the Petitioners' Complaint is that the State has no privity in the contracts ratified by the City of Allen Park and its employees-retirees; nor does the State have the Constitutional power to terminate those existing contracts, based solely upon Michigan law as is existed under 1990 PA 72 or currently under 2012 PA 436.

16. In the bankruptcy case now before this Court, only the City of Detroit – and not the State of Michigan – is the designated Debtor with any entitlement to protection. There are no legal, factual, or practical ties between the Allen Park retirees' pending litigation against the State and the City of Detroit case now pending at this Court.

17. When the State filed its request for stay at the Michigan Court of Claims on April 14, 2014, it was with the full knowledge and certainty that the original motion for the extended

stay, filed at this Court on <u>July 19, 2013</u>, specifically and explicitly applied only to the City of Detroit, as the Debtor – and not to any other Michigan local governmental unit. (**Dkt. 56** at this Court).

18.    No other community under the control of a State Emergency Manager is cited by name or by indirect reference in the City/Debtor's motion to this Court, filed on <u>July 19, 2013</u> (**Dkt. 56**).  The language of that prior motion, regarding the limits of the stay, included the following narrow requests:

> 20.   The City requests that the Court exercise its equitable power under section 105(a) of the Bankruptcy Code to extend the Chapter 9 Stay to actions or proceedings against the Governor, the State Treasurer and the members of the Loan Board (collectively with the State Treasurer and the Governor, and together with each entity's staff, agents and representatives, the "State Entities") that, directly or indirectly, seek to enforce claims *against the City*, interfere with *the City's activities* in this chapter 9 case or otherwise deny the City the protections of the Chapter 9 Stay.  (Emphasis added)
>
> 21.   The State Entities are closely connected to the City and the Emergency Manager. As previously stated, the Emergency Manager originally was an appointee of the Loan Board and serves at the pleasure of the Governor. Moreover, the Governor, the State Treasurer and the Loan Board all have ongoing roles with respect to the Emergency Manager's *management of the City* under PA 436. See, e.g., PA 436 at § 19(2) (granting the Loan Board authority to review certain proposed actions of the Emergency Manager in certain circumstances); § 12(1)(x) (providing for State Treasurer approval of certain restructuring agreements); § 12(1)(r) (providing the Governor with the power to authorize certain actions of the Emergency Manager).   (Emphasis added)
>
> 22.   Given the City's dire financial condition, the magnitude of this chapter 9 case and the important interests at stake, the City has been – and continues to be – concerned that parties in interest may attempt to influence or exercise control over the City through indirect means (where direct action might otherwise be prohibited by the Chapter 9 Stay). Indeed, the City has already experienced such attempts through the Prepetition Lawsuits and the respective plaintiffs' pursuit of the Injunction Orders, which constituted attempts to (a) frustrate the City's access to bankruptcy court through the prosecution of claims against the State Entities and (b) interfere with the City's restructuring and the activities of the Emergency Manager both outside of and within chapter 9.
>
> 23.   Accordingly, the City has no reason to doubt that — absent this

Court's intervention — parties in interest will continue attempting to exert direct or indirect pressure on the City by commencing or continuing actions or proceedings against one or more State Entities in forums other than bankruptcy court for the sole and inappropriate purpose of attempting to improve their bargaining positions with respect to their claims and otherwise denying the City the protections of the Chapter 9 Stay. The City, therefore, requests that the Court enter an order (a) extending the Chapter 9 Stay to the State Entities and (b) providing expressly, for the avoidance of doubt, that each of the Prepetition Lawsuits is stayed pending further order of the Court. In effect, the City asks that the Court extend the Chapter 9 Stay to actions or proceedings against any employee of the City that seek to enforce claims _against the City_. (Emphasis added – footnote omitted)

24.    Consistent with the policies underlying section 922(a)(1) of the Bankruptcy Code, the City further requests that the Court exercise its equitable power under section 105(a) of the Bankruptcy Code to extend the Chapter 9 Stay to actions or proceedings against employees of the City that are neither City Officers nor inhabitants of the City (collectively, the "Non-Officer Employees") that seek to enforce claims against the City.

19.    The Allen Park retirees' cause of action against the State is not a core proceeding in the case at bar, in that the Allen Park proceeding in the Michigan Court of Claims does not invoke a substantive right created by federal bankruptcy law. In addition, the Allen Park retirees' cause exists outside, separate and apart from bankruptcy. _Wolverine Radio Company v. Michigan Employment Security Commission_, 930 F.2d 1132, 1144 (6th Cir. 1991).  Petitioners, the Allen Park retirees as non-debtors have no interest, nor proposed claim to any of the proceedings of the Debtor, City of Detroit. _In re Nat. Century Financial Enterprises, Inc_. 423 F3d 567, 578 (6th Cir. 2005).

20.    Petitioners submit to this Court that the State's actions in obtaining a stay of proceedings in the State Court of Claims were deliberately intended to delay as long as possible the Petitioners' rights to discovery and prosecution of the Petitioners' Complaint in the State Court.

6

13-53846-swr   Doc 7443-1   Filed 09/12/14   Entered 09/12/14 15:36:04   Page 34 of 145
13-53846-swr   Doc 7493-1   Filed 09/12/14   Entered 09/12/14 15:36:04   Page 4 of 29

a.      The State has moved to create procedural slowdowns, contrary to this Court's good faith attempts to expedite the docket for the City of Detroit's case.  In direct opposition to that goal, the State's priority is to use this Court's docket to create long delays by collateral tactics against the Allen Park retirees.

b.      The Petitioners' State Court of Claims action involves the health care benefits for the City of Allen Park's aging retirees, such as lead Plaintiff Russell Pillar – a retired police lieutenant who  is no 74-years old.  The more delays the State imposes, the more members of the Allen Park Retirees Association will die off, thereby weakening the roster and the ability of the retirees to lawfully prosecute their claims.

WHEREFORE, Plaintiffs-Petitioners respectfully that the Court:

1.      Clarify its Order of Extended Stay, dated July 25, 2013, or in the alternative lift the Order regarding the named Defendants in the case of *Allen Park Retirees Association, Inc. and lead Plaintiff Russell Pillar v. State of Michigan and the State of Michigan Department of Treasury*, currently docket number 13-164-MZ in the Michigan Court of Claims; and,

2.      Take such actions at law and by the rules of procedure that the Court deems appropriate.


Respectfully submitted by electronic filing:


<div style="display:flex; justify-content:space-between;">

_____June 19, 2014_____

By:      _____/s/ **Mark A. Porter**_____
Mark A. Porter (P-42280)
Attorney for the Petitioners APRA & Russell Pillar
Mark A. Porter & Associates PLLC
551 East 11-Mile Road – Suite 3-D
P. O. Box 71527
Madison Heights, Michigan 48071-0527
(248) 547 – 1911
(248) 547 – 1917 FAX
mporter@map-law.com
</div>

7

# Exhibit #1 – Form of Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                                    Chapter 9

CITY OF DETROIT, MICHIGAN,                Case No. 13-53846

      Debtor.                                      Hon. Steven W. Rhodes

_____/

**ORDER GRANTING**
**ALLEN PARK RETIREES ASSOCIATION, et al.'s MOTION FOR CLARIFICATION**
**AND RELIEF FROM THE COURT'S ORDER PURSUANT TO SECTION**
**105(a) OF THE BANKRUPTCY CODE, EXTENDING THE CHAPTER 9**
**STAY TO CERTAIN (A) STATE ENTITIES, (B) NON OFFICER EMPLOYEES**
**AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR**

     This matter coming before the Court on the Petitioners *Allen Park Retirees Association,*

*Inc., and Plaintiff Russell Pillar's Motion For Relief From Order Pursuant To Section 105(A) Of*

*The Bankruptcy Code Extending The Chapter 9 Stay To Certain (A) State Entities, (B) Non*

*Officer Employees And (C) Agents And Representatives Of The Debtor* and the Court having

determined that the legal and factual bases set forth in the motion establish just cause for the relief

granted herein;

1.     The Petitioners' motion is GRANTED; and,

2.     The Automatic Stay of 11 USC § 362 and the Order Pursuant To Section 105(A) Of The

Bankruptcy Code Extending The Chapter 9 Stay To Certain (A) State Entities, (B) Non Officer

Employees And (C) Agents And Representatives Of The Debtor (Dkt. 166) entered by this Court on

July 25, 2013 are found, in their entirety, not to apply to the case of *Allen Park Retirees*

*Association, Inc. and lead Plaintiff Russell Pillar v. State of Michigan and the State of Michigan*

*Department of Treasury*, currently docket number 13-164-MZ in the Michigan Court of Claims, and

all stays are otherwise lifted to permit that case to fully proceed without impediment before the

State of Michigan Courts to an adjudication on the merits and to permit the parties to proceed with

any concomitant appeals.


Dated: _____          Signed: _____

13-53846-tjt   Doc 7441-3   Filed 09/12/14   Entered 09/12/14 19:36:18   Page 38 of
13-53846-swr   Doc 7451   Filed 09/12/14   Entered 09/12/14 19:15:01   Page 38 of
145

33

# Exhibit #2 – Notice of Motion and Opportunity to Object

**UNITED STATES BANKRUPTCY**
**COURT EASTERN DISTRICT OF**
**MICHIGAN SOUTHERN DIVISION**

In re:                                                 Chapter 9

CITY OF DETROIT, MICHIGAN,                    Case No. 13-53846

      Debtor.                                       Hon. Steven W. Rhodes

_____/

### NOTICE UNDER LBR 9014-1 OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY & OPPORTUNITY TO OBJECT

    Petitioners **The Allen Park Retirees Association** *et al.* have filed papers with the court to clarify order and/or lift stay relating to the case of *Allen Park Retirees Association and Plaintiff Russell Pillar v. State of Michigan and State of Department of Treasury*, now pending at the Michigan Court of Claims with docket number 13-164-MZ.

    **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.)**

    If you do not want the court to clarify order and/or lift stay relating to the case of *Allen Park Retirees Association and Plaintiff Russell Pillar v. State of Michigan and State of Department of Treasury*, now pending at the Michigan Court of Claims with docket number 13-164-MZ, or if you want the court to consider your views on the Motion, within <u>fourteen (14)</u> days, you or your attorney must:

    1.    File with the court a written response or an answer, explaining your position at:[1]

            United States
            Bankruptcy Court
            211 West Fort Street
            Detroit, MI 48226

    If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above. All attorneys are required to file pleadings electronically.

---

[1] Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e)

You must also mail a copy to:

> Mark A. Porter
> Mark A. Porter & Associates PLLC
> P. O. Box 71527
> Madison Heights, Michigan 48071-0527

2. If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

| June 19, 2014 | By:   /s/ **Mark A. Porter** |
|---|---|

Mark A. Porter (P-42280)
Attorney for the Petitioners APRA & Russell Pillar
Mark A. Porter & Associates PLLC
551 East 11-Mile Road – Suite 3-D
P. O. Box 71527
Madison Heights, Michigan 48071-0527
(248) 547 – 1911
(248) 547 – 1917 FAX
mporter@map-law.com

# Exhibit #3 – Petitioners'
# Brief in Support of the Motion

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re, | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

---

**BRIEF IN SUPPORT:**
**ALLEN PARK RETIREES ASSOCIATION, et al.'s MOTION FOR CLARIFICATION**
**AND RELIEF FROM THE COURT'S ORDER PURSUANT TO SECTION**
**105(a) OF THE BANKRUPTCY CODE, EXTENDING THE CHAPTER 9**
**STAY TO CERTAIN (A) STATE ENTITIES, (B) NON OFFICER EMPLOYEES**
**AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR**

## I.     Introduction

On <u>December 12, 2013</u>, at docket number **1536**, the Court issued its "Opinion and Order

Denying NAACP's Motion for Relief from Stay (**Dkt**. #**740**) and Granting Phillips' Motion for

Relief from Stay" (**Dkt**. #**1004**).  On pages 4-5 of that opinion, the court noted that the NAACP

cause of action listed:

> … the emergency managers in several other municipalities who are not before the Court
> – the City of Allen Park, the City of Benton Harbor, the Detroit Public School System,
> the City of Ecorse, the City of Flint, the Highland Park School System, the Muskegon
> Heights School System, and the City of Pontiac. Obviously, whatever interests the
> plaintiffs in the NAACP case may have in vindicating their rights, if any, in those
> municipalities can only be addressed elsewhere.

The Court lifted the stay on behalf of the Phillips motion, and the State then filed a

motion for reconsideration.  To remove any further doubt this Court then clarified:

> The State essentially argues that even though the plaintiffs in this suit have removed any
> request for the removal of Kevyn Orr as Detroit's emergency manager, a successful
> challenge to P.A. 436 will inevitably lead to that result.  However, the Court must
> conclude that such is not the case.  A finding by another court that P.A. 436 is
> unconstitutional will not automatically result in the removal of Kevyn Orr.  Further

1

action would need to be taken, and any such further action is subject to the automatic stay. Accordingly, the motion for reconsideration is denied. (**Dkt. #2256**, at <u>pages 1-2</u>)

The petitioners in this motion, the Allen Park Retirees Association and Plaintiff Russell Pillar have included their Verified Complaint – originally filed at the Ingham County Circuit Court – at <u>Attachment 6 (B)</u>. Detroit's emergency manager has never been involved in the State's actions in the City of Allen Park – nor has the State's emergency manager in Allen Park had any connection with the Detroit emergency manager.

The Allen Park retirees' Complaint does not seek to remove the State's Emergency Manager for that City – nor does it seek to remove any State emergency manager in any of the current seventeen local governmental units currently under State financial control.

The Allen Park retirees seek to stop the State's emergency manager in Allen Park from violating the very statute that created that position – as well as alleging fact-based, "as applied" violations of the Michigan Constitution.

In addition, the current State emergency manager act contains the standard severability clause, protecting the State's authority to place financial managers in various local governments:

> If any portion of this act or the application of this act to any person or circumstances is found to be invalid by a court, the invalidity shall not affect the remaining portions or applications of this act which can be given effect without the invalid portion or application. The provisions of this act are severable. **MCL 141.1573**.

All of this was known to the Executive Branch of the State when it claimed at the Michigan Court of Claims that this Court's Order and Stay in equity pursuant to 11 USC §105(a) required that Court to administratively close the Allen Park retiree's case.

As detailed in this motion, subsequent to the passage of Michigan 2013 PA 164, the State attorney general transferred the State and State Department of Treasury to the Court of Claims/Appeals. It intentionally left the State's Emergency Manager for Allen Park, however, in

the circuit court system. The Michigan Court of Claims – *sua sponte* – then issued its own stay of proceedings on February 20, 2014, stating that the circuit court case should be resolved first.

The State moved to lift that stay. But when Plaintiffs' partial concurrence raised several issues of law for the Court of Claims to consider once the stay was lifted, the State then abruptly filed a reply brief, claiming that this Court's stay had to again close the Court of Claim's case. Attachment 6(C). At a hearing on April 18, 2014, in Lansing, the *sua sponte* stay was lifted, and then the case was immediately re-closed on the "bankruptcy" stay.

This Court's Order, issued on July 25, 2013, at docket #**166**, was clear and concise. It responded to a motion for equity pursuant to 11 USC §1105(a) that was brought by the City as the Debtor. It was explicitly aimed at pre-petition lawsuits and actions that had been filed against the City of Detroit – not other local governmental units statewide.

Nowhere did the Order state or imply that this Court was granting safe harbor to the Executive Branch of Michigan while it rummaged among the various communities that it declared to be in financial distress.

The State's actions regarding the Allen Park retirees were clearly designed to accomplish two goals: *first*, to delay as long as possible the Plaintiffs' right to discovery; and *second*, to clog this Court's docket with extraneous matters, in order to collaterally disrupt the Allen Park retirees' cause of action.

The Petitioners respectfully request that this Court consider these inappropriate actions of the State, when considering this motion and remedy.

## II.     **Standard of Review**

The Sixth Circuit Court of Appeals has clarified that one of the reasons that a stay issued pursuant to 11 USC §105(a) is appropriate is "when the debtor and the non-bankrupt party are

closely related or the stay contributes to the debtor's reorganization." *Patton v. Bearden*, 8 F3d

343, 349 (6th Cir. 1993). The Court then stated:

> It should be noted that such extensions, although referred to as extensions of the
> automatic stay, were in fact injunctions issued by the bankruptcy court after hearing
> and the establishment of unusual need to take this action to protect the administration of
> the bankruptcy estate. *Id.*

Such was the case, as this Court explained, when it declined to lift the stay on the case of

*Detroit Branch NAACP v. Snyder*, No. 13-12098 (E.D. Mich. filed May 13, 2013). The Court's

concern was that "the *NAACP* case appears to be directed much more to the Detroit emergency

manager than any other emergency manager." (**Dkt. 1536** at page-5).

This Court also pointed out in the same Opinion that the Debtor – the City of Detroit –

bears the burden of proving that there is not cause to grant the relief requested by the City of

Allen Park retirees. *Id*, at Page-9.

The Sixth Circuit Court of Appeals applies the same standard for "cause" in both

petitions to dismiss and for lifting a stay. *In re Laguna Associates Ltd. Partnership*, 30 F.3d 734,

737-738 (6th Cir. 1994).

Such determinations usually examine whether the debtor filed the petition in good faith;

and whether the debtor truly seeks reorganization under the code. *Id.* Such is not the case here,

in that the State – as the third party beneficiary of the Court's injunctive relief under §105(a) – is

now claiming absolute protections from all Plaintiffs, in all Courts, and for all reasons,

Statewide. The analysis and decision upon the merits of the State's tactics are left "simply to the

bankruptcy court's common sense and judgment." *In re Okoreeh-Baah,* 836 F.2d 1030, 1037

(6th Cir. 1988).

First, however, the Debtor must show that the Allen Park Retirees Association and lead

Plaintiff Russell Pillar are part of the core proceedings that give this Court jurisdiction pursuant

to 28 USC §157(b)(1). "A core proceeding either invokes a substantive right created by federal bankruptcy law or one which could not exist outside of the bankruptcy." *In re G.A.D Inc*., 340 F.3d 331, 336 (6th Cir. 2003), citing *In re Wolverine Radio Co*., 930 F.2d 1132, 1144 (6th Cir.1991).

Only if the Court has jurisdiction over the City of Allen Park; its retirees; and the Allen Park Retirees Association, is it necessary to proceed to the analysis for cause.

## III.  Argument

The State's claim is that – given this Court's Order pursuant to §105(a)**,** it can not only block current litigants across the State from due process in all Courts – it can also block all future litigants in the communities that will be pushed into financial emergency status by the State. [1]

As cited by this Court, "In determining whether or not cause exists, the bankruptcy court must balance the inherent hardships on all parties and base its decision on the degree of hardship and the overall goals of the Bankruptcy Code." *In re Cardinal Industries, Inc.,* 116 B.R. 964, 983 (Bankr. S.D. Ohio 1990).

Your Petitioners submit that the question may be succinctly stated:

> Do the overall goals Bankruptcy Code at 28 USC §157(b) include
> tasking this Court to determine all claims made against the State regarding
> its various financial emergency actions, in all communities under its control,
> and in all courts across the State, as a core proceeding within the Court's
> jurisdiction?

The State's Executive Branch has argued to the Michigan Court of Claims that, as a

---

[1] The State has declared a financial emergency in the City of Lincoln Park, as of April 22, 2014.

matter of law, this Court has encased the due process rights of all other Michigan communities in a block of ice, while permitting the State to continue perform any acts it desires against the citizens, employees, and retirees or those same local governments through its Emergency Managers. The State's reply brief making that argument is at Attachment 6(C). [2]

As cited in the opening paragraphs of this Brief in Support, this Court carefully delineated its boundaries in its Opinion and Order lifting the stay in *Phillips v Snyder*, No. 13-11370 (E.D. Mich. filed March 27, 2013). The Opinion and Order is docket #**1536**.

The State again tried to sway the Court's judgment in its Motion for Reconsideration; and again this Court clarified its reasoning:

> The State essentially argues that even though the plaintiffs in this suit have removed any request for the removal of Kevyn Orr as Detroit's emergency manager, a successful challenge to P.A. 436 will inevitably lead to that result. However, the Court must conclude that such is not the case. A finding by another court that P.A. 436 is unconstitutional will not automatically result in the removal of Kevyn Orr. Further action would need to be taken, and any such further action is subject to the automatic stay. Accordingly, the motion for reconsideration is denied. (**Dkt**. #**2256**, at pages 1-2)

The State's Executive Branch has now ignored both of the Court's Opinions, and argued a completely groundless assertion to its own Court of Claims, regarding this Court's Order of July 25, 2013, at docket #**166**.

The substantive rights asserted by the Allen Park retirees were not created by the Federal Bankruptcy Code; and they are rights that exist outside and apart from the City of Detroit bankruptcy proceeding. They are not, therefore, core proceedings upon which this Court should assert jurisdiction. *Wolverine Radio, supra*.

If, *arguendo*, the City of Allen Park; its employees; citizens; and retirees are part of a core proceeding in the City of Detroit docket, the second prong of the *Cardinal Industries*

---

[2] The Court should not be surprised if the State's reply claims that it has numerous communities now under its control that are sitting "in front of the trigger" for bankruptcy filings. If, *arguendo*, that were true, none of the other communities would be real persons of interest in the current case before this Court.

balancing test applies.

As detailed in the original retirees' complaint at <u>Attachment 6(B)</u>, nowhere does the complaint seek to remove the State's Emergency Manager in Allen Park; nor any other State Emergency Manager. Further, the current **2012 PA 436**, used by the State's Executive Branch, contains the standard severability clause at **MCL 141.1573**.

The degree of hardship upon the retirees of the City of Allen Park is profound. The State claims that they are blocked from pursuing their claims in any Court – while simultaneously, the State's Emergency Manager is free to continue cutting, gutting, and eviscerating their contractual benefits at will. By either side of the *Cardinal Industries* balancing test, the inequities are clear and extreme.

The Allen Park retirees request that this Court clearly and directly put an end to the State's tactics against its own citizens – while claiming to use this Court for cover.

Respectfully submitted by electronic filing:

June 19, 2014                    By: _____/s/ **Mark A. Porter**_____
                                 Mark A. Porter (P-42280)
                                 Attorney for the Petitioners APRA & Russell Pillar
                                 Mark A. Porter & Associates PLLC
                                 551 East 11-Mile Road – Suite 3-D
                                 P. O. Box 71527
                                 Madison Heights, Michigan 48071-0527
                                 (248) 547 – 1911
                                 (248) 547 – 1917 FAX
                                 mporter@map-law.com

7

# Exhibit #4 – Certificate of Service Through Electronic Filing

13-53846-swr   Doc 7441-3   Filed 09/11/14   Entered 09/11/14 19:36:12   Page 50 of 68
13-53846-swr   Doc 5455-1   Filed 06/27/14   Entered 06/27/14 19:01:02   Page 2 of 48   45
145

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re,                                                    Chapter 9

CITY OF DETROIT, MICHIGAN,                                Case No. 13-53846

    Debtor.                              Hon. Steven W. Rhodes

---

## CERTIFICATE OF ELECTRONIC
## FILING AND SERVICE

I, MARK A. PORTER, certify that on June 19, 2014, I electronically filed *Allen Park Retirees Association et. al. Motion For Relief From Order Pursuant To Section 105(A) Of The Bankruptcy Code Extending The Chapter 9 Stay To Certain (A) State Entities, (B) Non Officer Employees And (C) Agents And Representatives Of The Debtor*, along with a Summary of Attached Exhibits and Exhibits **A-C** (as listed on the Summary), with the Clerk of the Court using the ECF system which will send notification of such filing to ECF participants in this matter.

    June 19, 2014        By:       /s/ **Mark A. Porter**
                                  Mark A. Porter (P-42280)
                                  Attorney for the Petitioners APRA & Russell Pillar
                                  Mark A. Porter & Associates PLLC
                                  551 East 11-Mile Road – Suite 3-D
                                  P. O. Box 71527
                                  Madison Heights, Michigan 48071-0527
                                  (248) 547 – 1911
                                  (248) 547 – 1917 FAX
                                  mporter@map-law.com

# Exhibit #5 – Affidavits
# In Support
# [No Affidavits Filed Specific To This Motion]

13-53846-tjt   Doc 7441-3   Filed 09/12/14   Entered 09/12/14 19:36:12   Page 52 of 98
13-53846-swr   Doc 5455-1   Filed 06/20/14   Entered 06/20/14 15:11:01   Page 52 of 98
145                                                                                              47

# Exhibit #6 – Attachments

**A**       **Administrative Order of Closure from the Michigan Court of Appeals, April 22, 2014**

**B**       ***Allen Park Retirees Association & Lead Plaintiff Russell Pillar v. State of Michigan, Michigan Treasury Department, State Emergency Manager for the City of Allen Park & City of Allen Park*, filed October 07, 2013 at the Ingham Circuit Court**

**C**       **Brief from the Michigan Attorney General Filed at the Court of Claims on April 14, 2014**

13-58846-swr   Doc 744-3   Filed 09/12/14   Entered 09/12/14 19:06:12   Page 53 of 98      48
13-53846-swr   Doc 5435-1   Filed 06/27/14   Entered 06/27/14 11:01:02   Page 53 of 98
145

# Exhibit 6(A)

# Michigan Court of Claims
# Order of Administrative Closure
# April 18, 2014

13-53846-tjt   Doc 7441-3   Filed 09/12/14   Entered 09/12/14 19:36:18   Page 54 of 68   49
13-53846-swr   Doc 5451-1   Filed 06/20/14   Entered 06/20/14 11:51:00   Page 45 of 98
145

| STATE OF MICHIGAN COURT OF CLAIMS | ORDER FOR ADMINISTRATIVE CLOSING DUE TO BANKRUPTCY STAY | CASE NO. 13-164-MZ |
|---|---|---|

| Court address | Court telephone no. |
|---|---|
| 2nd Floor, Hall of Justice, 925 West Ottawa Street, Lansing, MI 48909-7522 | (517) 373-0807 |

**NOTE: Do not use this form in domestic relations cases.**

| Plaintiff name(s) and address(es) | | Defendant name(s) and address(es) |
|---|---|---|
| ALLEN PARK RETIREES ASSOCIATION, INC., et al. | v | THE STATE OF MICHIGAN, A BODY POLITIC, AND THE STATE OF MICHIGAN DEPARTMENT OF TREASURY |

| Plaintiff(s) attorney, bar no., address, and telephone no. | Defendant(s) attorney, bar no., address, and telephone no. |
|---|---|
| Mark A. Porter (P42280)<br>551 East 11 Mile Road, Suite 3-D<br>Madison Heights, MI 48071-0527<br>(248) 547-1911 | Erik Graney (P69942)<br>Department of Attorney General<br>P.O. Box 30754<br>Lansing, MI 48909 (517) 373-1162 |

This case has been stayed in bankruptcy.

| Bankruptcy petition no. | United States District Court |
|---|---|
| 13-53846 | U.S. Bankruptcy Court, Eastern District of Michigan |

**IT IS ORDERED:**

1. This case is closed for administrative purposes without prejudice.

2. This closing does not constitute a dismissal or a decision on the merits. *or a party obtains relief from the stay*

3. When the bankruptcy stay has been removed this case may be reopened on motion of any party.

4-22-14
Date

Judge                                    P41??
                                         Bar no.

# Exhibit 6(B)

***Allen Park Retirees Association &
Russell Pillar et. al v. State of
Michigan, Michigan Department
of Treasury, State Emergency
Manager for the City of Allen Park
and the City of Allen Park,***
**Filed October 07, 2013**

<div align="center">

**STATE OF MICHIGAN**
**IN THE 30TH JUDICIAL CIRCUIT OF INGHAM COUNTY**

</div>

Allen Park Retirees Association, Inc.,
A Non-Profit Corporation, and its
Representative Plaintiff Russell Pillar,
on Behalf of Himself and Others Similarly
Situated in the Association as a Class,

|  |  |  |
|---|---|---|
| Case No. | **13-1096** | CZ |
| Hon. | **Rosemarie E. Aquilina** | |

      Plaintiffs,

There is no other civil action between
these parties arising out of the
transactions or occurrences alleged in
this Complaint pending in this Court, nor
has any such action been previously filed
and dismissed or transferred after having
been assigned to a judge.

     – v –

**The City of Allen Park, the State
Michigan, a Body Politic, the
State of Michigan Department
of Treasury, Joyce A. Parker, Acting
In Her Official Capacity as a State
Officer and the Emergency Manager
for the City of Allen Park, Michigan,**

Joint and Several,

     Defendants.             /

**Mark A. Porter (P-42280)**
Attorney for Plaintiffs
Mark A. Porter & Associates PLLC
551 East 11-Mile Road – Suite 3-D
**P.O. Box 71527**
**Madison Heights, Michigan 48071-0527**
(248) 547 – 1911
(248) 547 – 1917 FAX
mporter@map-law.com        /

<div align="center">

**VERIFIED COMPLAINT FOR BREACH OF CONTRACT,**
**DECLARATORY JUDGMENT;**
**VIOLATION OF THE MICHIGAN CONSTITUTION;**
**AND PETITION FOR INJUNCTIVE RELIEF**

</div>

     NOW COME the Plaintiffs, the Allen Park Retirees Association, Inc., and individual

Plaintiff Russell Pillar, by and through their attorney of record, to state:

<div align="center">1</div>

## THE PARTIES, JURISDICTION & VENUE

1.     The Plaintiff, the Allen Park Retirees Association, Inc. ["**APRA**"] is a non-profit corporation registered in the State of Michigan, whose membership is exclusively comprised of the public employee pensioners, their beneficiary spouses, and qualified dependents.

     a.     All Plaintiffs have retired under defined benefit pensions following their employment at the City of Allen Park, Michigan.

     b.     The APRA's membership as of the date of this filing numbers over <u>150</u> voluntary, dues-paying retirees-members, across all City departments and job classifications.

     c.     The defining moment and reason for its formation, incorporation, and standing on behalf of its members was the unilateral change in health care benefits imposed by the State of Michigan through the City of Allen Park on July 01, 2013.


2.     Individual Plaintiff Russell Pillar is a retiree of the City of Allen Park, as well as a member, and President, of the Allen Park Retirees Association, Inc.

     a.     He retired with distinction as a command officer from the Allen Park Police Department in July of 1993; and has vested rights under the collective bargaining agreement ["**CBA**"] between the City of Allen Park and the Allen Park Lieutenants and Sergeants Association (1991-1994 agreement).  See **<u>Attachment #1</u>** for the relevant CBA language for retiree vested rights and health care from the 1991-1994 contract.

     b.     He is representative of the class of persons who comprise the APRA.

3. Defendant, the City of Allen Park, Michigan ["**the City**"], is a municipal corporation that exists within the boundaries of Wayne County, Michigan, with its City Hall located at 16850 Southfield Road, Allen Park, Michigan 48101-2557.

4. Defendants, the State of Michigan and its Department of Treasury are located in Lansing Michigan. The Department of Treasury is an Executive Branch, Principal Department of the State of Michigan, pursuant to **MCL 16.104** and **16.175** *et seq*. The head of the Department of Treasurer is the State Treasurer, **MCL 16.176**. Its principal place of business is located in Ingham County at 430 West Allegan Street Lansing, Michigan 48922-1592.

5. Defendant Joyce A. Parker, acting in her official capacity as the Emergency Manager for the City of Allen Park, is a State officer pursuant to "The Local Financial Stability And Choice Act" of 2012, **2012 PA 436**, at **MCL 141.1541** *et seq*, at **141.1549(9)**. The Emergency Manager for the City of Allen Park, on information and belief, currently reports to the State Treasurer, to whom the Michigan Governor has delegated some or all of the duties of the Act pursuant to **MCL 141.1549(8)**.

6. The Emergency Manager for the City of Allen Park, as of <u>March 28, 2013</u>, has been operating as a State Officer and under claims of authority to supplant, and remove all City of Allen Park elected and appointed officials; as well as suspend State laws related to local governmental rule and discretion. **MCL 141.1552(1)(dd)-(ee)**. Prior to that date, the Emergency Manager's authority and powers were defined by **1990 PA 72**.

7. During the times related to the allegations and purposes of this Complaint and Pleadings, the Emergency Manager, on behalf of the State of Michigan, has operated pursuant to

3

both the predecessor **1990 PA 72;** as well as the current Emergency Manager Act cited in

Paragraph-5 *supra*, which became effective on March 28, 2013.

     8.     This Court has personal jurisdiction pursuant to **MCL 600.151**; **600.531**; **600.601**;

**600.605**; **117.1**; and **600.711**.

     9.     This Court has subject matter jurisdiction pursuant to **MCL 600.605**, **600.8301**

(amount in controversy over $25,000.00 – payable by Defendant **City**); and **MCR 2.605.**

     10.     The proper venue for the action against the State and its officers is in the 30th

Circuit Court of Ingham County, pursuant to MCL 600.1615 and 600.1621.

     11.     The Plaintiffs constitute a class of similarly-situated retirees.   Pursuant to **MCR**

**3.501(B)**, Plaintiffs will file a motion with the Court to certify the class action within 91-days of

the filing of this Complaint, based upon the following facts:

     a.     The members of the APRA comprise a class so numerous that the

joinder of over 150 members as individual Plaintiffs is impracticable.

     b.     The subject matter of this Complaint contains questions of law and fact

that are common to all members of the Association as a class; and they predominate

over questions affecting only individual members;

     c.     The claims of the Plaintiffs and Defendant are typical of the claims and

defenses of the class;

     d.     The representatives of the class have incorporated into a single, non-profit

corporation in order to assert and protect the interests of the entire class.

     e.     The filing and maintenance of the action at law as a class action is far

superior to other available methods of adjudication and promote the convenient

<div align="center">4</div>

13-53846-swr   Doc 7441-31   Filed 09/21/14   Entered 09/21/14 19:19:36   Page 23 of 88
13-53846-swr   Doc 7441-31   Filed 09/21/14   Entered 09/21/14 19:19:36   Page 23 of 88   55
145

administration of justice.  **MCR 3.501(A)(1)**.

      f.      The costs of litigation are prohibitive to individual plaintiffs.  Their singular and futile attempts to protest the gravamen of this cause of action – while living on fixed incomes by way of their individual pensions –  has been intentionally used by Defendants to institute current – and future – arbitrary changes to vested health care benefits.

      g.      Plaintiffs' Association has the standing acknowledged and granted by our State Courts pursuant to *Michigan Association of Chiropractors v Blue Care Network of Michigan*, 300 Mich App 577, 590-591; 834 NW2d 138  (2013).

12.      The Court is advised of the following factors regarding the members of the class of Plaintiffs contained within the Allen Park Retirees Association, Inc.:

      a.      The action involves written and ratified collective bargaining agreements and/or Letters of Understanding declaring defined health care benefits for the retirees and dependents of the City of Allen Park, Michigan.  There will be no inconsistent adjudications involving individual members of the class.

      b.      The adjudications with respect to the individual Plaintiff of this action, who is a member of the incorporated class, will be dispositive as a practical matter to all members of the class.

      c.      The action will be manageable as a class action; and the final relief when granted will be appropriate to all members of the class.

d.      The requested financial relief in relation to the expense carried by the Association as lead Plaintiff justifies the administration of the class action.

e.      Members of the Association, as a class, have a significant interest in controlling the prosecution and resolution of the cause of action to justify class action.

f.      Retirees of the City of Allen Park who are not currently affiliated with the City of Allen Park, and who are non-members of the Association have been invited to join by their affirmation and payment of dues.  They have declined, and thereby exercised their rights to be excluded from the class now standing before the Court.  **MCR 3.501(A)**.

## **GENERAL ALLEGATIONS**

### **A.**      **Actions Taken Under the Prior Emergency Manager Statute**

13.      Plaintiffs reincorporate by reference Paragraphs 1-12 of this Complaint.

14.      On or about <u>March 27, 2013</u>, Governor Rick Snyder, State Treasurer Andy Dillon and Joyce A. Parker ratified a contract making her the Emergency Manager for the City of Allen Park pursuant to **2012 PA 436**, at **MCL 141.1541** *et seq*, which took effect on <u>March 28, 2013</u>. The contract is posted on the State Department of Treasury website at:

  **http://mi.gov/documents/treasury/Parker-AllenPark_Contract_404311_7.pdf**.

15.      Prior to March 28, 2013, the former "Local Government Fiscal Responsibility Act," **1990 PA 72** was in effect, at **MCL 141.1201** *et seq*.  That act also created the Governor-appointed position of "Emergency Financial Manager," ["**EFM**"] at **MCL 141.1211(b)**, **141.1218**.  That Act did not permit the appointed EFM to modify, alter, breach, or terminate contracts in effect at the time that the 1990 statute was in effect.  See **Attachment #5** for the Act.

6

16.     On March 08, 2013 – 19-days prior to the repeal of **1990 PA 72**, the Emergency

Financial Manager for Allen Park mailed a form letter to all Allen Park retirees.  **Attachment #2**.

        a.      The letter announced that the State, through the EFM, was terminating all

health insurance contracts for retirees, which had been bargained and ratified by the

various collective bargaining unions and representatives.

        b.      Personal employment contracts with the City that provided retiree health

insurance were also being terminated.

        c.      The State, through the Emergency Financial Manager, was going to

unilaterally impose different, higher cost health insurance for all retirees as of July 01,

2013, known as "Blue Cross-Blue Shield Community Blue" insurance.

        d.      Yearly deductibles and co-pays for all retirees would change from little or

no cost to $500.00-$1,000.00/year for each retiree and dependent under 65/years.  For

each retiree and dependent over 65/years, co-pays and deductibles would be $1,000.00.

The costs would double or triple if the retiree/dependent had to go out of network.

17.     The letter of March 08, 2013 also announced an "informational meeting" to be

held on March 18, 2013 to confirm and explain the unilateral changes in health insurance – ten

(10) days ahead of the effective date of the current Emergency Manager statute.

18.     On April 12, 2013, 15-days after **2012 PA 436** became effective, the State

through the Allen Park Emergency Manager's office issued a *fait accompli* entitled "**Order No.**

**2013-015** that "officially" ordered the implementation of termination of existing retiree health

care insurance and the institution of the Community Blue insurance programs. **Attachment #3**.

7

19.     On July 01, 2013, the retiree health insurance terminations and changes did, in fact, take effect under the orders of the State through the Emergency Manager's office.  They remain in effect through the date of the filing of this Complaint and Pleadings.

20.     The State's decisions to terminate all vested retiree health insurance plans; enter into contracts increasing retiree out-of-pocket costs and fees, and otherwise breach collective bargaining agreements and personal employment contracts with retiree benefits was in direct violation of **1990 PA 72**, which explicitly prohibited certain acts by an Emergency Financial Manager, including the following:

> This subdivision does **<u>not</u>** authorize an emergency financial manager to **<u>impair vested retirement benefits</u>**.  See **MCL 141.1221(1)(q)** (Emphasis added)

21.     On information and belief – and because all relevant documents, contracts, and communications are within the exclusive control of the Defendants – Plaintiffs allege that all actions taken regarding retiree health insurance were flatly illegal and cannot be severed, revived, or saved by the *fait accompli* executive order of April 12, 2013.

## B.     <u>Actions Taken Under the Current<br>Emergency Manager Statute</u>

22.     Plaintiffs re-incorporate by reference Paragraphs 1-21.

23.     As cited above, the unilateral change in all Allen Park retiree health insurance benefits took place on July 01, 2013.

24.     The State's claimed authority for the unilateral changes was grounded in the current Emergency Manager statute at **MCL 141.1552(1)(k) [**also known as **"§12(1)(k)"**]**,** purportedly giving the State's Emergency Manager for Allen Park the authority to implement the "modification or termination" of "an existing collective bargaining agreement."

8

a.      Section **12(1)(k)** required a perfunctory conference with "the appropriate

bargaining representative."  However, no "appropriate bargaining representative" exists

for retirees who have vested retirement rights. See <u>Paragraph-25</u>, below, for further

information on retirees' legal status, reference "bargaining."

b.      Section **12(1)(k)(iv)** required that – assuming *arguendo* that unilateral

breaches of retiree rights were legal – that the changes be "<u>temporary</u>."  The State's

**Order 2013-05**, issued on <u>April 12, 2013</u> however, specifically excluded any reference to

the health care insurance alterations as being "temporary."

c.      Section **12(1)** explicitly required the State's Emergency Manager, prior to

implementing and changes in collective bargaining issues, to submit the proposed plan to

the Allen Park City Council.  See **MCL 141.1559(1)**, known as **§19(1)** of the Act. On

information and belief, the City Council "sat like the house by the side of the road," and

did nothing to protest the State's actions against its own City retirees.

25.      <u>Active</u> public employees in Michigan's municipalities are covered by the Public

Employment Relations Act, **MCL 423.201** *et seq.*

a.      <u>Retirees</u>, however, are no longer dues-paying union members; and the

Michigan Employment Relations Commission (the "**MERC**") has ruled that they have no

collective bargaining rights.

b.      Nor can active public employee unions that once represented the retirees

contest the changes to health care insurance and prescriptions by way of petitions

alleging Unfair Labor Practices.  *St Clair Shores – and – St Clair Shores Fire Fighters*

*Local #1744*, 22 MPER ¶ 50 (2009) – **<u>Attachment 4.</u>**  Accord: *Butler v Wayne County*,

<div align="center">9</div>

289 Mich App 664, 672; 798 NW2d 37 (2010).

c.      The MERC *St Clair Shores* decision also held that "the remedy for an employer's unilateral modification of a permissive contract term lies in a suit for breach of contract, not in an unfair labor practice charge." *Id.*

26.     The implementation of **2012 PA 436** repealed **§21(1)(q)** of **1990 PA 72**, at **MCL 141.1221(1)(q)**, retroactively destroyed vested contract rights that had been previously relied upon by the Allen Park retirees for their well being and necessary health care services.

a.     **1990 PA 72** was as well acknowledged at law as a binding obligation by the Allen Park City Council and elected officials. **1990 PA 72** is <u>**Attachment #5**</u> to this Complaint and Pleadings.

b.     Assuming *arguendo*, that such a power to alter retiree health insurance benefits exists, the State Legislature and Executive Branch explicitly attempted to inflict retroactive damage upon a defined class of persons, rather than making the current Emergency Manager statute prospective only.

### <u>COUNT I – VIOLATION OF THE MICHIGAN CONSTITUTION 1963, ARTICLE 1, SECTION-10</u>

27.     Plaintiffs reincorporate by reference Paragraphs 1-26 of this Complaint.

28.     **Constitution 1963 Article 1 §10** re-states **Constitution 1908 Article II §9**:

> No bill of attainder, ex post facto law or law
> impairing the obligation of contract shall be enacted.

10

29.     An *ex post facto* statute retrospectively takes away or impairs vested rights acquired under existing laws, and attaches a new disability, in respect of transactions or considerations already past. *Barber v Barber*, 327 Mich 5, 11; 41 NW2d 463 (1950).

30.     In determining such intent, the courts have evolved a strict rule of construction against a retrospective operation, and indulge in the presumption that the legislature intended statutes, or amendments thereof, enacted by it to operate prospectively only, and not retroactively. *Id.*

    a.     For a statute to apply retroactively, it must not create new rights nor destroy, enlarge, or diminish existing rights. *Grogan v Manistique Papers, Inc,* 154 Mich App 454, 458; 397 NW2d 825 (1986).

    b.     If a new statute abolishes an existing cause of action, it cannot be applied retroactively, regardless of legislature's incorporation of the abolishment into the successor statute. "It is clear that once a cause of action accrues – i.e., all the facts become operative and are known – it becomes a 'vested right' ." *In re Certified Questions from US Court of Appeals for the Sixth Circuit*, 416 Mich 558, 573; 331 NW2d 456 (1982)

    c.     The repeal of a statute does not take away the plaintiffs' cause of action under it for damages for an injury to person or property.  *Id*, citing: *Minty v State*, 336 Mich 370, 390; 58 NW2d 106 (1953).

    d.     In the case at bar, Plaintiffs' cause of action occurred on or about <u>March 08, 2013</u>, when the State announced the unilateral actions that breached the vested

rights of the retirees, contrary to **1990 PA 72**, at **MCL 141.1221(1)(q)**, notwithstanding

the legislative attempts under **2012 PA 436** to declare them "legal" at **MCL 141.1551(5)**.


31.    The State's actions – illegal by statute pursuant to **1990 PA 72**, are also an

unconstitutional *ex post facto* law, contrary to **Constitution 1963 article 1 §10**.

32.    The unilateral and arbitrary diminishments of the Allen Park retirees' health

insurance policies and benefits, under both the previous and current Emergency Manager Acts,

also unconstitutionally impaired their rights of contract, contrary to **Constitution 1963 Article 1,**

**§10** .

<div align="center">

### COUNT II – 2012 PA 436 VIOLATES
### MICHIGAN CONSTITUTION 1963 ARTICLE 1, SECTION 17,
### AND IS UNCONSTITUTIONALLY VAGUE

**A.    Due Process Violations**

</div>

33.    Plaintiffs reincorporate by reference Paragraphs 1-32 of this Complaint.

34.    In relevant part, **Constitution 1963, article 1 §17** states:

No person shall be compelled in any criminal case to be a witness against
himself, nor be deprived of life, liberty or property, without due process of law.

35.    Causes of action that accrue before the statute's repeal are vested rights, and

remain alive, by both the common laws of contract and the State's Constitution. They accrue at

the moment the plaintiff could first commence a lawsuit upon it, and when all the elements of the

claim have occurred and can be alleged in a proper complaint. *Hurt v Michael's Food Center*,

249 Mich App 687, 692-693; 644 N.W.2d 387 (2002), citing quoting 2 Cooley's Constitutional

Limitations (8th ed.), page 745; *Lumley v Board of Regents for University of Michigan*, 215

Mich App 125, 130; 544 NW2d 692 (1996).

<div align="center">12</div>

13-53846-tjt   Doc 7441-31   Filed 09/02/14   Entered 09/02/14 19:36:12   Page 68 of 68
13-53846-swr   Doc 7443-1   Filed 09/02/14   Entered 09/02/14 19:51:00   Page 68 of 68
145     63

36.     The Legislature is charged with knowledge of existing laws and the vested rights

contained therein when it promulgates new laws on the same subject.  It is presumed to be aware

of the consequences of the use, or omission, of language when it enacts the laws that govern our

behavior.  *Joe Dwyer, Inc v Jaguar Cars, Inc*, 167 Mich App 672, 684; 423 N.W.2d 311 (1988);

*People v Ramsdell*, 230 Mich App 386, 392; 585 NW2d 1 (1998).

37.     Procedural due process serves as a limitation on government action and requires

government to institute safeguards in proceedings that affect those rights protected by due

process, including life, liberty, or property. *Thomas v Pogats*, 249 Mich App 718, 724; 644

NW2d 59 (2002).

       a.     The constitutional guarantee of due process, in its most fundamental sense

is a guarantee against arbitrary legislation, *Whitman v Lake Diane Corp*, 267 Mich App

176, 181; 704 NW2d 468 (2005).

       b.     Legislation that is unrestricted or uncertain in its application, or otherwise

fails to institute safeguards in proceedings that affect those rights protected by due

process, i.e., life, liberty, or property, is, therefore, invalid for failure to meet the

constitutionally mandated requirement of due process.  *Id.*

       c.     The intentional violation of **1990 PA 72**, by impairing the vested

retirement rights of the Allen Park retirees, violated the Due Process guaranteed by

the Michigan Constitution.

       d.     The attempts by the Legislature and Executive Branch to rehabilitate

illegal acts through **2012 PA 436** are still invalid and unconstitutional.

38.     Plaintiffs have liberty and property interests protected by the Michigan

Constitution based upon their contracts and retirement agreements that created a reasonable expectation of entitlement, derived from existing rules or understandings that stem from an independent sources.

39.    The State's actions, taken during the time period that the former emergency manager statute was in effect, clearly violated that statute at **MCL 141.1221(1)(q)**; were *ultra vires* acts beyond the limits of the statute and were void *ab initio*.

40.    The Michigan Legislature hurriedly enacted **2012 PA 436** after the voters affirmed the rejection of **2011 PA 4** at the ballot boxes in November, 2012. The same legislative body that had passed **2011 PA 4** then passed **Senate Bill 865**, now **MCL 141.1541** *et seq*, and enrolled on <u>December 13, 2012</u>. It was signed into law on <u>December 31, 2012</u>. The current Act was again written in an attempt to contravention of **Constitution 1963 Article 1 §10**:

    a.    It removed the language in the former emergency manager act a **MCL 141.1221(1)(q)** that explicitly protected vested retiree benefits;

    b.    It then attempted to create *ultra vires* powers for emergency managers under **2012 PA 436** by giving those emergency managers the unilateral power to "reject, modify, or terminate one or more conditions of an <u>*existing*</u> contract," as well as collective bargaining agreements. **MCL 141 1551(c); 141.1552(1)(j), (k).**

    c.    The Act created an impermissible excess of statutory authority and jurisdiction within the administrative agencies and officers in the Executive Branch, which resulted in material prejudice and arbitrary decisions against Plaintiffs that are not authorized by law. *Northwestern National Casualty Co v Insurance Commissioner*, 231 Mich App 483, 488; 586 NW2d 563 (1998).

d. The Legislature's *ultra vires* creation of an agency and State officer's power – in order to violate the State Constitution by making decisions that are adverse to the Plaintiffs – can never be justified by any standard of "objective correctness." *Id.*

## B. 2012 PA 436 is Unconstitutionally Vague

41. Plaintiffs reincorporate by reference Paragraphs 1-40 of this Complaint.

42. The Legislature cannot adopt a statutory standard which conflicts with a constitutional standard. *Anchor Bay Concerned Citizens v People ex rel Kelley*, 55 Mich App 428, 432; 223 NW2d 3 (1974).

43. **2012 PA 436** creates a "State Financial Authority" for cities that are placed under the act. That "authority," by the Statute's own definition, is one and the same in the person of the State Treasurer. **MCL 141.1552(u)(i).** It creates a Ferris-wheeled and tautological line of command and "review" between an appointed emergency manager and a single State officer by declaring that the entire "sovereign power" of the State is invested in two executive branch employees, **MCL 141.1442(k)**.

44. **2012 PA 436** declared the City's retirees to be an "interested party" with standing at **MCL 141.1552(i)**, but then excluded them by silence from the rest of the act.

45. **2012 PA 436** attempts to give the State Treasurer as "the State Financial Authority" and the emergency manager unstructured, unbridled, and unlimited discretion in determining when and how to override **Constitution 1963 Article 1 §10** by rejecting, modifying and terminating *existing* contracts, and collective bargaining agreements. *Proctor v White Lake Township Police Dept*, 248 Mich App 457, 467-468; 639 NW2d 332 (2001).

46. The current Act effectively silences any legal action by the local government in

15

13-53846-swr Doc 7441-1 Filed 09/12/14 Entered 09/12/14 19:36:12 Page 74 of 98
13-53846-swr Doc 7441-1 Filed 09/12/14 Entered 09/12/14 19:36:12 Page 74 of 98
145    66

support of Plaintiffs. It does so by requiring that the local government must pay the legal fees charged by the State Attorney General to defend the State Treasurer and emergency manager against any action brought by the local government. **MCL 141.1560(3)**.

## COUNT III – LEGISLATIVE VIOLATION OF
## THE SEPARATION OF POWERS

47.     Plaintiffs reincorporate by reference Paragraphs 1-46 of this Complaint.

48.     **2012 PA 436** includes the following language:

A cause of action against this state or any department, agency, or entity of this state, or any officer or employee of this state acting in his or her official capacity, or any membership of a receivership transition advisory board acting in his or her official capacity, may not be maintained for any activity authorized by this act, or for the act of a local government filing under chapter 9, including any proceeding following a local government's filing…. **MCL 141.1572**

49.     The Act clearly violates the separation of powers at **Constitution 1963 article 3 §2**, by attempting to bar any cause of action to protect Plaintiffs under the Michigan Constitution. *Schwartz v City of Flint*, 426 Mich 295, 311; 395 NW2d 678 (1986).

50.     The Legislature was on long-standing notice that it cannot hamper the constitutional authority of the Courts to resolve conflicts between private parties – or between Plaintiffs and the State. *Gray v Hakenjos*, 366 Mich 588, 595; 115 NW2d 411 (1962).

51.     As a matter of constitutional law, the State is barred from raising any defense or demurrer based upon **MCL 141.1572** in this cause of action.

## COUNT IV – EQUITABLE ESTOPPEL

52.     Plaintiffs reincorporate by reference Paragraphs 1-51 of this Complaint.

53.     The retirees' health insurance benefits were obtained through accord and

16

13-53846-swr   Doc 7441-3   Filed 09/12/14   Entered 09/12/14 01:36:12   Page 72 of 98
13-53846-swr   Doc 7451-1   Filed 09/12/14   Entered 09/12/14 11:21:00   Page 72 of 145
145
67

satisfaction, as well as through the City's affirmance to provide benefits in retirement:

(a)    The City by representation intentionally induced its employees at the various times to believe that the benefits would be provided; and

(b)    The then-employees, now the City's retirees, justifiably relied and acted on that belief inducement by working the required number of years of service and remaining in good standing with the City.

(c)    The retirees will be irreparably prejudiced and subjected to further economic injuries if the State, which has now superseded the City's authority, is permitted to deny the existence of the facts in the cause of action, and continue to act in direct contravention of its own statutes, the State Constitution, and the established laws of contract. *Hughes v Almena Twp*, 284 Mich App 50, 78; 771 NW2d 453 (2009).

## COUNT V – PROMISSORY ESTOPPEL

54.    Plaintiffs reincorporate by reference Paragraphs 1-53, of this Complaint.

55.    The retirees' health insurance benefits were obtained through accord and satisfaction, as well as through the City's affirmance to provide benefits in retirement:

(a)    The City's affirmance to provide specific, defined health insurance policies through subscriptions paid by the City was a direct promise to its then-employees.

(b)    The City was aware that its promise would induce substantial action on the part of its then-employees, by convincing them to dedicate years (decades) of service to the City.

(c)    The City's promises did, in fact produce the reliance on the part of

17

13-53846-tjt    Doc 7441    Filed 09/12/14    Entered 09/12/14 19:36:12    Page 73 of 98
13-53846-swr    Doc 7441    Filed 09/12/14    Entered 09/12/14 19:36:12    Page 73 of 98    68
145

its then-employees, who are now the affected retirees.

(d)     The City's written promises were done under circumstances such that the promise must be enforced to avoid injustice. *Schmidt v Bretzlaff*, 208 Mich App 376, 378-379; 528 NW2d 760 (1995).

## COUNT VI – BREACH OF CONTRACT

56.     Plaintiffs reincorporate by reference Paragraphs 1-55 of this Complaint.

57.     The Michigan Supreme Court has ruled that the foundational principle of our contract jurisprudence is that parties must be able to rely on their agreements. A party to the collective bargaining agreement has a right to rely on the agreement as the statement of its obligations on any topic 'covered by' the agreement. *Macomb County v AFSCME Council 25*, 494 Mich 65, 833 NW2d 225 (2013).

58.     When collective bargaining agreements grant healthcare benefits to the spouses of retired employees, the vested rights of the spouses as third party beneficiaries apply pursuant to **MCL 600.1405**.

59.     Michigan Courts use the collective bargaining and contract case law of the Federal Courts as guidance – but not precedent – for Michigan cases involving public employees. *Quinn v Police Officers Labor Council*, 456 Mich 478, 482 n. 1; 572 NW2d 641 (1998); citing: *Demings v City of Ecorse*, 423 Mich. 49, 56; 377 NW2d 275 (1985).

60.     Customary rules of contract interpretation are used to determine the vesting rights of retirees through collective bargaining agreements. *UAW v Yardman*, 716 F2d 1476-1479 (6th Circ 1983); *cert denied*, 465 US 1007 (1984).  In the case at bar, the mutually-ratified language

18

13-53846-tjt   Doc 7441-31   Filed 09/02/14   Entered 09/02/14 19:06:12   Page 74 of 98
13-53846-swr   Doc 5431-1   Filed 06/27/14   Entered 06/27/14 19:01:00   Page 73 of 98
145     69

of the collective bargaining agreements and letters of understanding explicitly created Plaintiffs' vested rights to those health insurance programs specified by each written agreement. *Id.*

61.     Plaintiffs' vested health insurance programs are specifically linked to the pension articles and clauses contained in their respective collective bargaining agreements and letters of understanding. They vest at the time of retirement, *Butler v Wayne County*, 289 Mich App 664, 676; 798 NW2d 37 (2010); accord: *Golden v Kelsey-Hayes*, 73 F3d 648, 656 (6th Circ 1997).

62.     In each case, Plaintiffs provided the accord and satisfaction for their vested health care insurance programs.  They completed the required years of good faith service; as well as age, to retire from the City of Allen Park. The City has the burden of proof to prove otherwise – as well as the burden proof for all pleadings in this Complaint.

63.     The continuation of Plaintiffs' health care benefits, without interruption, prior to July 01, 2013, demonstrates the City  agreement that its contractual obligations began at the retirement date of each Plaintiff; and continued through every successive year, regardless of language changes in subsequent collective bargaining agreements. *Cole v Arvin-Meritor* 515 F Supp 2d 791, 803 (ED Mich 2006).    The State has now unilaterally abrogated those obligations.

    a.     The retirement benefits' clauses were "general" duration clauses, tied to "the lifetimes" of the Plaintiffs, with no expiration date tied to any subsequent collective bargaining agreement. *Id*, at pg-802.

    b.     The general duration clauses for retiree health care benefits are opposite in language and cutoffs to the specific durations of health insurance programs for active and laid-off City employees through subsequent contracts. *Id*, at pg-803.

19

64. The State's unilateral imposition of the health plan changes on July 01, 2013, is not reasonable in light of changes in health care; nor are they reasonably commensurate for Plaintiffs, given the fixed incomes of retirees, dating back to the late 1970s and early 1980s:

    a. As of July 01, 2013, the out-of-pocket expenses of Plaintiffs have jumped to $500.00-$1,000.00/year for each retiree and dependent under 65/years. For each retiree and dependent over 65/years, co-pays and deductibles would be $1,000.00. The costs would double or triple if the retiree/dependent had to go out of network.

    b. The out-of-pocket expenses now include co-pays and deductibles that have never before been imposed on Plaintiffs' and their spouses.

    c. The State has clearly communicated to Plaintiffs that these changes can themselves be amended with higher costs imposed on the future – or, in the alternative, eliminated completely by the State's unilateral actions.

65. The State's unilateral actions are material breaches of the various collective bargaining agreements and letters of understanding, previously obtained by accord and satisfaction with the City of Allen Park.

66. Both the State and the City are barred from claiming "impossibility" for unforeseen circumstances, given the knowledge of the City when it entered into the Plaintiffs' respective collective bargaining agreements and letters of understanding. *Rogers Plaza, Inc v SS Kresge Co*, 32 Mich App 724, 743; 189 NW2d 346 (1971).

67. Contrary to the current Emergency Manager statute at **MCL 141.1552(k)(iv)**, the State has disavowed its own statutory requirement to make any changes to a collective bargaining agreement "temporary." Instead, the State intends to set a "new baseline" for future,

20

13-53846-tjt Doc 7441-31 Filed 09/12/14 Entered 09/12/14 19:36:12 Page 76 of 88
13-53846-swr Doc 745-1 Filed 09/27/14 Entered 09/27/14 19:19:04 Page 76 of 145

71

unilateral changes and/or elimination of benefits – regardless of any future change in economic conditions.

## COUNT VII – DECLARATORY JUDGMENT

68.     Plaintiffs reincorporate by reference Paragraphs 1-67 of this Complaint.

69.     Pursuant to **MCR 2.605**, Plaintiffs have the right to petition the Court to declare their rights as pleaded in this Complaint; and to the uninterrupted delivery of the health insurance policies contained within the retirement documents in effect on their respective dates of retirement from the City of Allen Park, Michigan.

70.     Pursuant to **MCR 2.605(D)**, the Plaintiffs respectfully request that the Court advance these matters on its calendar for a speedy hearing.

71.     Pursuant to **MCR 2.605(F)**, the petition for Declaratory Judgment does not waive any other remedies that the Court may deem proper and available by the allegations stated in this Complaint and Pleadings.

## COUNT VIII – PETITION FOR INJUNCTIVE RELIEF

72.     Plaintiffs reincorporate by reference Paragraphs 1-71 of this Complaint.

73.     Plaintiffs' prayer for permanent injunctive relief is made pursuant to **MCR 3.310** and *Michigan Coalition of State Employee Unions v Michigan Civil Service*, 465 Mich. 212, 220; 634 NW2d 692 (2001).

74.     The Plaintiffs' Complaint and Pleadings for declaratory judgment cannot, standing alone, prevent the Defendants from future attempts to unilaterally alter or extinguish health insurance benefits.

          a.      The need for health insurance coverage increases with the advancing

21

13-53846-tjt   Doc 7441   Filed 09/02/14   Entered 09/02/14 19:36:12   Page 77 of
13-53846-swr   Doc 7451   Filed 09/02/14   Entered 09/02/14 19:51:00   Page 77 of
145                                                                              72

ages of retirees and their spouses.

        b.      Demands from health care providers for payment are expedited and draconian for retirees on fixed incomes, who cannot afford the continued returns to the Court to enforce the Order of Declaratory Judgment – while simultaneously attempting to deal with the high probability of future, individual illness and mental diminishments.

        c.      As the number of City retirees, as a class, dwindles over the future years, the State and City gain an increased and severe economic advantage in violating the Court's Declaratory Judgment – contrasted to the retirees ability to return to Court to enforce their rights and avoid irreparable harm.

        d.      The Court is empowered to protect the retirees through its issuance of a permanent injunction, in the interests of justice and judicial economy, and prevent future irreparable harm to the Plaintiffs. *Haverbush v Powelson*, 217 Mich App 228, 237-238; 551 NW2d 206 (1996).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that the Court:

A.      Permanently enjoin the State of Michigan and the City of Allen Park from the retiree health insurance changes that were unilaterally imposed on July 01, 2013;

B.      Order a return to the *status quo ante* for retiree health care insurance, as it operated prior to July 01, 2013, for all City retirees and dependents who were retired as of that date.

C.      Order that all affected retirees and their spouses be Made Otherwise Whole for all

costs incurred by them after July 01, 2013;

D.   Enter Declaratory Judgment affirming the rights of the Plaintiffs to their continued

health insurance benefits at the levels and payments previous to July 01, 2013:

E.   Enter Declaratory Judgment that the legislative and executive authority purported to

empower the State's Emergency Managers to unilaterally alter retiree health insurance

pursuant to **2012 PA 436** is unconstitutional, null and void.

F.   Take such action as the Court deems necessary at law; equity and court rules to effect its

Orders.

Respectfully submitted this date:

_____October 04, 2013_____                    _____s/Mark A. Porter_____
Dated                                         Mark A. Porter (P-42280)
                                              Counsel for Plaintiffs
                                              Mark A. Porter & Associates
                                              551 East 11-Mile Road – Suite 3-D
                                              **P.O. Box 71527**
                                              **Madison Heights, Michigan 478071-0527**
                                              (248) 547 – 1911
                                              (248) 547 – 1917 FAX
                                              mporter@map-law.com

23

13-53846-swr   Doc 7082-1   Filed 08/27/14   Entered 08/27/14 15:59:46   Page 74 of 98
13-53846-tjt   Doc 7441-3   Filed 09/12/14   Entered 09/12/14 10:36:18   Page 79 of 140
145

## VERIFIED PLEADINGS

As President of the Allen Park Retirees Association; and as a retiree from the
City of Allen Park, Michigan, I can attest to having reviewed the factual allegations
of Complaint and Pleadings above, and find them accurate, based upon my personal
knowledge and my knowledge of the Association's members through my
office as President.   I defer the legal arguments contained in this Complaint to our
attorney of record.

10-2-2013
_____
Dated

_Russell Pillar_
_____
Russell Pillar – President
Allen Park Retirees Association, Inc.


Subscribed and sworn before me on:
10/2/2013
_____
_Anne Wisusik_

Notary Public, _Wayne_
County.   My commission expires on:

06/22/2016

> ANNE WISUSIK
> NOTARY PUBLIC - STATE OF MICHIGAN
> COUNTY OF WAYNE
> My Commission Expires June 22, 2016
> Acting in the County of _Wayne_

# Attachment #1

# Plaintiff Russell Pillar's

# Collective Bargaining Agreement, Retiree Health Insurance Policies

13-58846-tjt Doc 7441-3 Filed 09/27/14 Entered 09/27/14 19:36:12 Page 81 of 98
13-53846-swr Doc 7455 Filed 09/27/14 Entered 09/27/14 19:51:00 Page 3 of 98    76
145

# AGREEMENT

Between

## THE CITY OF ALLEN PARK

and

## ALLEN PARK POLICE LIEUTENANTS
## AND SERGEANTS ASSOCIATION

JULY 1, 1991 – JUNE 30, 1994

otherwise.  No employee shall suffer a reduction in such benefits as a consequence of the execution of this Agreement.

## ARTICLE VIII - ASSIGNMENTS

Section 1.  The following procedure will be used when assignments are made to the Detective Bureau, including the Youth Bureau, Special Details, or the Staff, for a period of one week or longer.

    A.  This procedure will apply only to those assignments not covered by Act 78.

    B.  Assignments will be based on seniority and ability.

        i.  Proposed assignments will be posted for seventy-two (72) hours on the bulletin board in the Squad Room.

        ii.  Employees will sign the sheet to indicate their willingness to accept the assignment.

        iii.  Interested employees must sign the list within the seventy-two (72) hours regardless of vacations, long weekends, sick leave, or any other reason.

        iv.  After seventy-two (72) hours, the Union will submit its candidate for the assignment to the Chief of Police who will determine his/her  acceptability.

        v.  If the Union's candidate is not accepted by the Chief of Police, the Union and the Chief will meet to resolve the question.

        vi.  If no agreement is reached between the Union and the Chief, the Union will meet with the Commission of Public Safety and the Commission will resolve the question.

        vii.  The Chief has the right to assign a man to a posted position during the seventy-two (72) hour period.

## ARTICLE IX - SAFETY CODE

Lieutenants and Sergeants assigned to road patrol platoons may be assigned to patrol alone at the discretion of the Officer in Charge.

## ARTICLE X - PENSION

Section 1.  Employees in the unit will be covered by the Allen Park Employees Retirement System regarding Police and Fire employees as amended from time to time and more specifically as follows:

Section 2. That on July 1, 1978, an individual employee's contribution to the Retirement System shall be increased to six (6%) percent on both wages subject to Social Security Taxes and above, so that both contribution factors shall be six (6%) percent.

Section 3. That on January 15, 1979, an eligible employee's straight life pension prior to age sixty-five (65) equals 2.5% of his/her final average compensation multiplied by the number of years credited service and fractions thereof to a maximum of seventy (70%) percent.

Section 4. That on January 15, 1979, an eligible employee's straight life pension after age sixty-five (65) equals 1.6875% of his/her final average compensation multiplied by the number of years credited service and fractions thereof.

Section 5. Effective for retirants after January 1, 1984, an eligible employee's straight life pension shall equal 2.5% of his/her final average compensation multiplied by the number of years credited service and fractions thereof to a maximum of seventy (70%) percent.

Section 6. That on January 15, 1979, the normal age of retirement shall be reduced to fifty-seven (57) years of age from age sixty (60).

Section 7. That on January 15, 1979, the voluntary age of retirement shall be reduced to age fifty-two (52) from age fifty-five (55).

Section 8. That all employees as of July 1, 1976, shall be covered by the above enumerated amendments.

Section 9. For any employee hired as a police officer after January 1, 1985, an eligible employee's straight life pension shall equal one (1%) percent for the first five years and two and one-half (2 1/2%) percent thereafter of his/her final average compensation multiplied by the number of years credited service to a maximum of seventy (70%) percent. Minimum age of retirement for new employees shall be 54.5 years of age. (Explanatory Note: There was no intent by the parties to change pension benefits for current employees.)

Section 10. Annuity Withdrawal. Up to three (3) employees in this unit per fiscal year may elect to draw up to fifty (50%) percent of his/her pension contribution upon retirement. Application for annuity withdrawal must be made at least ninety (90) days prior to employee's date of actual retirement and shall be paid to the employee no later than ninety (90) days after the employee's effective date of retirement. It is understood that the election of this option shall result in reduced monthly benefits as determined by the actuary to reflect the amount of the employee's withdrawal. It is not being the intent to increase the employee's total pension benefits.

Section 11. Vesting Rights. Effective January 1, 1986, it is understood that members of this unit will vest their pension rights when they have fifteen (15) years of membership in the Allen Park Retirement System regardless of age. When their rights are vested, they and their dependents shall be entitled to all benefits allowable any other employee who has vested rights. This section may change to comply with any adopted federal or state law concerning vesting rights.

Section 12. One-time Change in Payment Option (Pop-up). A retiree, who elects to receive a reduced retirement income based upon the joint and survivor method wherein the retiree's spouse shall be eligible to receive said reduced pension income for the remainder of his/her life should the beneficiary predecease said retiree, may, on a one-time basis, revert to 100% of the amount provided said retiree for a straight life pension should the designated beneficiary predecease the retiree. Any extra cost associated with a retiree's election of this "pop-up" provision, shall be paid by the employee/retiree who elects to use said provision.

Section 13. Employees who retire on or after July 1, 1993, will have their final average compensation computed on the average of the highest three (3) consecutive years of service out of the last ten (10) years.

## ARTICLE XI
## WAIVER & PARTIAL INVALIDITY DURING LIFE OF AGREEMENT

The City and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively on any subject or matter referred to or covered in this Agreement, or with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subjects or matters may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated this Agreement.

In the event any of the provisions of this Agreement shall be or become legally invalid or unenforceable, such invalidity or unenforceability shall not affect the remainder.

## ARTICLE XII - WORKING CONDITIONS

Section 1 - Shift Schedules and Starting Times. Shift schedules and starting times in effect July 1, 1985, will not be unilaterally altered by the City for the life of the Contract, except:

A. During MATF emergencies.

B. When crime conditions warrant deployment of a tactical shift. Positions on a tactical shift will be filled with volunteers. If there are insufficient volunteers, the remaining positions will be filled in order of lowest seniority.

C. Trading of assignments. Subject to departmental manpower requirements, employees shall be permitted by approval of their respective shift/bureau commanders, to voluntarily trade work shift or leave days on a day-for-day basis, rank-for-rank, excluding the probationary officers, or trading from shift/bureau to shift/bureau. Change between different ranks may be approved by the shift/bureau commanders.

## ARTICLE XIV - <u>INSURANCE</u>

**Section 1 - <u>Hospital Insurance</u>.** A fully paid Blue Cross/Blue Shield policy, M.V.F.2, with Master Medical mandatory second opinion and $1.00 Deductible Drug Rider and reciprocity rider for each employee and his/her eligible dependents shall be paid by the City. The City will provide the same Blue Cross/Blue Shield policy for retirees under the age of 65 as is provided for employees covered by this agreement. The City shall also provide for retirees after age 65, Blue Cross Group plan No. 5 and Blue Shield Group plan No. 2 which are groups under the Blue Cross/Blue Shield "65 plan". A fully paid Blue Cross/Blue Shield policy on each of the retirees' eligible dependents shall be paid for by the City. The plan shall continue to be covered provided said spouse of the deceased retiree remains unmarried. Retired employees who obtain employment from an employer who provides Hospital Insurance shall not be covered by the City's Hospital Insurance for the duration of such employment.

Employees hired after December 1, 1991

All employees and eligible members of employee's family hired after 12/1/91 will be covered by an HMO with the same coverage as the Blue Cross/Blue Shield, cost sustained by the City. The City may at its option offer one or more plans. Employees who were hired after 12/1/91 who wish to upgrade to the Blue Cross/Blue Shield Plan may do so during enrollment period with not less than a ninety (90) day written notice to payroll office at the employee's own expense for the differential in premium cost (if any) via payroll deduction or direct payment to the City.

Retired employees who were hired after 12/1/91 shall be covered by an HMO plan with the same coverage as the Blue Cross/Blue Shield plan, cost sustained bvy the City, until the retired employee reaches age 65 or is eligible for Medi-Care, when the City will supplement with a "65 Plan." Should an employee, either active or retired, become deceased, said employee's spouse and eligible dependents under the plan shall continue to be covered, provided said spouse remains unmarried. If said retired employee and/or spouse intends to move out of the area covered by the HMO, he/she must give the City a minimum of 90 days prior notice of the location he or she intends to move to, and the City shall arrange for coverage by another HMO or other plan covering that area which provides the same or better coverage. If no said HMO is available, then the retired employee and/or spouse will be covered by the above-referenced Blue Cross/Blue Shield plan for retirees.

**Section 2 - <u>Life Insurance</u>.** Each employee shall be covered by $30,000.00 term life insuranceto be provided by the City, with double indemnity being paid in case of accidental death, riot, or civil disorder. (Effective 3/17/93)

To be effective 3-17-93 after issuance of the award: For employees retiring on or after December 31, 1992, a life insurance policy in the amount of $10,000 shall be paid for by the City for each retiree.

**Section 3 - <u>Dental Insurance</u>.** The City shall provide for employees and eligible members of employee's family: Delta Dental Plan, Full Family Coverage, Class I & II, 70% - 30% Co-payments, with maximum benefit payable in any one contract year not to exceed $1,000.00 per person. ($1,000 cap effective 3/17/93)

Retired employees shall continue to be covered by this plan, cost sustained by the City, until the retired employee reaches age 65 or is eligible for Medi-Care. Should an employee, active or retired, become deceased, said employee's spouse and eligible dependents under the plan shall continue to be covered by said insurance, provided said spouse remains unmarried. Retired employees who obtain employment from an employer who provides dental insurance shall not be covered by the City's dental insurance for duration of such employment.

Effective July 1, 1985, the City shall provide for active employees and eligible members of employee's family (eligible dependents only to age 19) a new plan which will include orthodontic services at 50% co-pay with a maximum not to exceed one thousand ($1,000.00) dollars per person, lifetime maximum.

Should an active employee become deceased, said employee's spouse and eligible dependents under the plan shall continue to be covered by said insurance, provided the spouse remains unmarried.

Section 4 - Optical Insurance Benefit. The City shall provide for employees and eligible members of employee's family Optical Plan B (Effective 3/17/93) as provided by the Co-op Optical Service. Copies of the plan will be given to the Union.

The plan in general provides every employee, spouse and all dependent children under the age of nineteen (19) an optometric refraction and glasses, if needed, once every two (2) years. The plan details the type of frames and lenses available.

Retired employees shall continue to be covered by this plan, cost sustained by the City, until the retired employee reaches age 65 or is eligible for Medi-Care. Should an employee, active or retired, become deceased, said employee's spouse and eligible dependents under the plan shall continue to be covered by said insurance, provided said spouse remains unmarried. Retired employees who obtain employment from an employer who provides optical insurance shall not be covered by the City's optical insurance for duration of such employment.

Section 5 - Other Plans. The City reserves the right to change any and/or all insurance company(ies) and/or plan(s), providing the replacement program is equal to or better than the program available from the present company, subject to the mutual agreement of the City and the Union.

# Attachment #2

# State's Letter of March 08, 2013 to Allen Park Retirees

13-53846-tjt   Doc 7441   Filed 09/12/14   Entered 09/12/14 19:36:12   Page 88 of 98
13-53846-swr   Doc 7455-1   Filed 09/12/14   Entered 09/12/14 19:11:00   Page 88 of 98
145                                                                           83



**City of Allen Park**
**State of Michigan**

Joyce A. Parker
**Emergency Financial Manager**

16850 Southfield. Rd.
Allen Park, MI 48101

March 8, 2013

Dear City of Allen Park Retiree:

As you may be aware, in the City of Allen Park, a "State of Financial Emergency" has been declared by Governor Snyder due to a culumative and structural deficit in the city's general operating fund. An Emergency Financial Manager has been appointed by the Governor to address these concerns. In order to address the city's financial crisis, there is a need to re-evaluate the ever escalating costs of retiree healthcare. We are proposing changes in our healthcare program in an effort to reduce our expense, while making every effort to minimize the impact on retirees. Without making necessary cost reforms, the city may be forced to consider more drastic alterations or bankruptcy, and that is not an option I care to entertain. We are requesting your support of the changes that are proposed and outlined in this letter.

Effective July 1, 2013, the health insurance for all retirees and dependents will be changing. The coverage you will be afforded as of our fiscal year is Blue Cross Blue Shield of Michigan (BCBSM) *Community Blue PPO Option 2*. Community Blue PPO features an extensive network of doctors, hospitals and other health care providers that agree to accept BCBSM's benefit and payment policies. The Blue Cross PPO operates nationwide and allows members to receive services from any health care provider that accepts the Community Blue PPO ID card. This plan does not require the selection of a primary care doctor or other health care provider. Your out-of-pocket expenses are less when health care services are rendered by PPO network providers.

Included with this letter is a "benefits-at-a-glance" of the Community Blue PPO option 2 coverage. Along with this change to your medical coverage, effective July 1, 2013, your prescription drug copay will be $10 Generic / $20 Preferred Brand / $30 Non Preferred Brand. This Rx copay change aligns with the current Rx copay being paid by active employees.

**Informational Meeting**
We invite you to attend an informational meeting at the City of Allen Park - City Hall Council Chambers at 16850 Southfield Road, Allen Park, MI 48101 at 2pm on March 18th, 2013. A BCBSM representative will describe how the new Community Blue PPO plan will work and answer any questions you may have. Please review the "benefits-at-a-glance" and bring it with you to the informational meeting should you decide to attend.



**PPO Provider Network**
Members can use any doctor, specialist or hospital that accepts Community Blue PPO. Please check with your provider to verify that they participate with BCBSM Community Blue PPO.

If you have questions about this plan implementation, you may contact the city's benefit agent, Veronica Poremba @ Daly Merritt, Inc. at 734-324-3251 or email Veronica Poremba at veronica.poremba@dalymerritt.com.

Thank you in advance for your consideration and support.

Sincerely,

Joyce A. Parker
Emergency Financial Manager
City of Allen Park
(313) 928-1469

# Attachment #3

# State
# Emergency Manager
# Order #2013-015,
# City of Allen Park,
# Retiree Health
# Insurance

**Order of the Emergency Manager of the City of Allen Park, County of Wayne, State of Michigan, Providing for Changes to Retiree Health Insurance Effective July 1, 2013.**


## Order No. 2013 – 015


By the EMERGENCY MANAGER of the City:


WHEREAS, under the Local Government Fiscal Responsibility Act, Act 72, Public Acts of Michigan, 1990, as superseded by the Local Financial Stability and Choice Act, Act 436, Public Acts of Michigan, 2012 ("Act 436") and a Contract (the "Contract") between the State of Michigan and Joyce A. Parker, Joyce A. Parker has been appointed as the Emergency Manager (the "EM") of the City of Allen Park, County of Wayne, Michigan (the "City") and charged with the power to take actions with respect to the City, including the power to exercise the authority and responsibilities of the Mayor, the City Manager, as the chief administrative officer, and of the City Council, as the governing body of the City, concerning the adoption, amendment and enforcement of ordinances or resolutions affecting the financial condition of the City as provided in the Home Rule City Act, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279");

WHEREAS, under Act 436 the EM is authorized and directed to issue to the appropriate officials and employees of the local government the orders the EM considers necessary to accomplish the purposes of Act 436 for the benefit of the City.


WHEREAS, the City of Allen Park has been declared in a "State of Financial Emergency" by Governor Snyder due to a cumulative and structural deficit in the city's general operating fund; and, in order to address the city's financial crisis there is a need to mitigate the escalating costs of retiree health care.


**NOW, THEREFORE, BE IT ORDERED that** The City of Allen Park (hereinafter "City") shall provide health care benefits to the following groups as set forth herein:


1. All **Medicare** Part A and B enrolled/eligible retirees and their Medicare enrolled/eligible spouses and dependents.


   **Section 1. Health Coverage**

   Effective July 1, 2013, the City will provide enrolled/eligible retirees and dependents the following health coverage plan:

   i.   Blue Cross Blue Shield of Michigan Medicare Plus Group PPO with a $100.00 annual deductible, $1,000.00 annual In-Network out-of pocket maximum, and with $10/20/30 copay prescription drug coverage.

   ii.  Plan coverage will be subject to the coverage terms and regulations of the carrier

2.   All **Non-Medicare** enrolled/eligible retirees and their enrolled/eligible spouses and dependents.

### Section 1.   Health Coverage

Effective July 1, 2013, the City will provide enrolled/eligible retirees and dependents the  following health coverage plan:

i.   Blue Cross Blue Shield of Michigan Community Blue PPO Option 2 with $100/$200 annual deductible, $500/$1,000 annual In-Network out-of-pocket maximum, and with $10/20/30 co-pay prescription drug coverage.

ii.   Plan coverage will be subject to the coverage terms and regulations of the carrier.

This Order may be amended, modified, repealed or terminated by any subsequent Order issued by the Emergency Manager.

So ORDERED this _12th_ day of April, 2013

Joyce A. Parker
Emergency  Manager
City of Allen Park

# Attachment #4

# Michigan Employment Relations Commission Decision and Order,

# *St. Clair Shores & IAFF*
# 22 MPER ¶ 50 (2009)

13-53846-tjt   Doc 7441-31   Filed 09/12/14   Entered 09/12/14 19:36:12   Page 94 of 98
13-53846-swr   Doc 7451   Filed 09/12/14   Entered 09/12/14 19:01:00   Page 95 of 98    89
145



Michigan Employment Relations Commission

CITY OF **ST**. **CLAIR SHORES**, Public Employer-Respondent, and **ST**. **CLAIR SHORES**
FIRE FIGHTERS UNION, LOCAL 1744, Labor Organization-Charging Party.

No. C08 L-243

May 29, 2009

**Related Index Numbers**

16.4 Other Employees
43.131 Compensation, Benefits, Health Insurance
72.651 Unilateral Change in Term or Condition of Employment, Changes During Term of Contract, Change Not Covered by Contract
72.652 Unilateral Change in Term or Condition of Employment, Changes During Term of Contract, Repudiation of Contract

**APPEARANCES:**

Roumell & Lange, P.L.C., by Elizabeth A. Young, Esq., for Respondent

Gregory, Moore, Jeakle, Heinen & Brooks, P.C., by Gordon Gregory, Esq., for Charging Party

**Judge / Administrative Officer**

DERDARIAN
GREEN
LUMBERG

**Ruling**

MERC adopted an ALJ's recommended dismissal of an unfair practice charge, where no exceptions were filed from that dismissal. The ALJ rejected an unfair practice charge alleging, in part, that the municipal employer violated the PERA by unilaterally implementing changes in retiree health insurance. The ALJ found the employer's actions didn't affect the future health benefits of any actively employed individual. The parties' inclusion of a CBA provision concerning the health care benefits of already-retired employees didn't convert the issue into a mandatory bargaining topic, the ALJ reasoned. Therefore, no PERA violation occurred.

Alteration of retirees' health benefits comports with PERA

**Meaning**

Individuals who have already retired from their public employment don't qualify as employees within the definition of PERA or members of the union's bargaining unit. An employer has no duty to bargain over the concerns of third parties unless these concerns vitally affect the terms and conditions of employment of bargaining unit members.

**Case Summary**

MERC adopted an ALJ's recommended dismissal of an unfair practice charge, where no exceptions were filed from that dismissal. The ALJ rejected an unfair practice charge alleging, in part, that the municipal employer violated the PERA by unilaterally implementing changes in retiree health insurance and repudiating a CBA provision. The ALJ found the employer's actions didn't affect the future health benefits of any actively employed individual. Therefore, no PERA violation occurred.

The parties' inclusion of a CBA provision concerning the health care benefits of already-retired employees didn't convert the issue into a mandatory bargaining topic, the ALJ reasoned. The ALJ concluded that the employer didn't violate the PERA by repudiating and/or modifying the pertinent CBA provision.

**Full Text**

**Decision and Order**

On March 31, 2009, Administrative Law Judge Julia C. Stern issued her Decision and Recommended Order in the above matter finding that Respondent has not engaged in and was not engaging in certain unfair labor practices, and recommending that the Commission dismiss the charges and complaint as being without merit.

The Decision and Recommended Order of the Administrative Law Judge was served on the interested parties in accord with Section 16 of the Act.

The parties have had an opportunity to review the Decision and Recommended Order for a period of at least 20 days from the date of service and no exceptions have been filed by any of the parties.

**Order**

Pursuant to Section 16 of the Act, the Commission adopts the recommended order of the Admin-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

istrative Law Judge as its final order.

## Decision and Recommended Order of Administrative Law Judge on Summary Disposition

On December 1, 2008, the **St**. **Clair Shores** Fire Fighters Union, Local 1744, filed an unfair labor practice charge with Michigan Employment Relations Commission against the City of **St**. **Clair Shores**. The charge alleged that Respondent violated Sections 10(1)(a), (b) and (e) of the Public Employment Relations Act (PERA), 1965 PA 379, as amended, MCL 423.210. Pursuant to Section 16 of PERA, the charge was assigned to Administrative Law Judge Julia C. Stern of the State Office of Administrative Hearings and Rules.

On December 9, 2008, pursuant to my authority under Rules 165(1), 2(d) and (3) of the Commission's General Rules. AACS 2002 423.165, I issued an order to the Charging Party to show cause why the charge should not be summarily dismissed because it failed to state a claim upon which relief could be granted under the Act. Charging Party filed a response to my order on January 20, 2009. Respondent was granted permission to file a reply to this order. The reply, which included an affidavit from Respondent's human resources director, was filed on February 24, 2009. Based on undisputed facts as set forth in the charge and pleadings, I make the following conclusions of law and recommend that the Commission issue the following order.

### The Unfair Labor Practice Charge

The charge alleges that Respondent violated PERA as follows:

1. By negotiating directly with Fire Department retirees regarding health insurance notwithstanding the fact that the Public Employer and the Charging Party have previously bargained and reached agreement on retiree health insurance.

2. By proposing unilaterally to implement changes in retiree health insurance notwithstanding the fact that such changes were previously agreed upon and there is no impasse in bargaining.

3. By threatening to repudiate the existing collective bargaining agreement provision regarding retiree health care.

4. By undermining the status of the Charging Party as the exclusive collective bargaining representative by negotiating directly with retirees represented traditionally and in the instant negotiations by the Charging Party.

5. By initiating, creating and contributing to the formation of a group to engage in bargaining regarding terms and conditions of employment.

### Facts

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

At the time the charge was filed, Respondent and Charging Party were currently engaged in negotiating a new collective bargaining agreement. Their existing contract remained in effect pending agreement on the new contract. Article XVI, Section 2 of this contract read as follows:

Effective with retirements July 1, 2005 and after, retirees and dependent(s) will have the same medical benefit options available to the bargaining unit (currently: Blue Cross/Blue Shield PPO or Community Blue or HAP HMO). The changes made to this article, effective with the retirements July 1, 2005 and after, shall have no impact on any individual retiring prior to that date. Where a retiree or spouse of a retiree is able to provide equal or greater medical-hospitalization coverage through an employer, then said retiree shall not be eligible for benefits under this provision. To be eligible for benefits under this provision, a retiree or spouse who is employed shall be required to submit by the April 30 preceding the fiscal year any and all W-2 forms from all sources of employment for his/her spouse. This will include all members of the department now retired. Spouses of the deceased retirees shall receive complete coverage under this section as long as they receive City Pension benefits under a plan of the Pension and Retirement Act. This coverage, which provides for a semi-private room, shall include for a period of two (2) months all seniority and probationary employees who have exhausted their vacation and sick days. [sic] Retirees and spouses are required under this section to apply for Medicare, if and when eligible, with the premiums being paid by the City from the Act 345 millage, and with the understanding that coverage provided is comparable or better to than the existing plan.

During the parties' negotiations for a successor contract, they reached a tentative agreement which included a provision dealing with health care benefits for already retired individuals. This tentative agreement was rejected by Charging Party's membership shortly before the charge was filed.

On or about November 24, 2008, Respondent held a meeting with a group of individuals who retired from Charging Party's bargaining unit before July 1, 2005. At this meeting Respondent announced changes it planned to make to their existing health care benefits. It is not clear from the pleadings whether Respondent modified its plan as a result of discussions with this group. After the charge was filed, Respondent implemented certain changes to the benefits received by these individuals effective January 1, 2009. Respondent did not alter the existing health care benefits of active employees, the health care benefits promised to those employees after retirement, or the existing health care benefits of any individual who retired after July 1, 2005.

**Discussion and Conclusions of Law**

 Individuals who have already retired from their public employment are not employees within the definition of PERA or members of the union's bargaining unit. West Ottawa Ed. Assoc. v. West Ottawa Pub. Schs., 126 Mich. 306, 329 (1983), *citing* Chemical and Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., Chemical Division, 404 U.S. 157, 172, 179-182 (1971). An employer has no duty to bargain over the concerns of third parties unless these concerns vitally affect the terms and conditions of employment of bargaining unit members. *West*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Ottawa,* at 330; Chemical Workers, at 179. In Chemical Workers, the Court held that the future retirement benefits of active workers are part of their overall compensation, and that both the level of future benefits and provisions to protect them against future contingencies were mandatory subjects of bargaining. It concluded, however, that the health insurance benefits paid to already retired individuals was not a mandatory subject because their effect on active employees' retirement plans was "too speculative a foundation on which to base an obligation to bargain." Chemical Workers, 180-182.

It is now well established that the National Labor Relations Act, 29 USC 150 et seq., (NLRA) does not restrict an employer from changing the health benefits of already retired employees, although it does prohibit an employer from unilaterally changing the retirement medical benefits of active employees who **retire** on or after the dates the changes are implemented. Midwest Power Systems, Inc., 323 NLRB 404, 406 (1997); *In re* Mississippi Power, 323 NLRB 530, 550 (2000). The changes made by the Respondent in this case in January 2009 did not affect the future health insurance benefits of any individual actively employed at that time. I find that Respondent did not unilaterally alter the terms and conditions of employment of employees within the meaning of the Act.

Charging Party asserts that even if retirees are not employees under PERA, Respondent should be held to have violated its duty to bargain by repudiating the parties' contract. It notes that parties in this case have an established practice of negotiating health care benefits for already retired individuals, as evidenced by Article XVI, Section 2 of their contract. Charging Party argues that if an employer is permitted to repudiate its contractual agreements regarding retiree health care benefits, all retiree health care contract provisions will-be rendered meaningless.

Charging Party's argument concerning the parties' past practice was addressed in Chemical Workers, at 197. The Court noted that parties do not make a permissive subject mandatory by bargaining and agreeing on that subject. *See also* Local 1277 AFSCME v. Centerline, 414 Mich. 642, 654 fn. 5 (1982). The fact that the parties in this case included provisions addressing the health benefits of already retired employees in their collective bargaining agreements did not convert this topic into a mandatory subject of bargaining.

The Court also held in Chemical Workers, at 185 and 187-188, that a mid-term modification of a term of a collective bargaining agreement violates Section 8(d) of the NLRA only when it involves a mandatory subject of bargaining because the modification or repudiation of an agreement concerning a permissive subject of bargaining does not constitute a change in terms and conditions of employment. The Court held that the remedy for an employer's unilateral modification of a permissive contract term lies in a suit for breach of contract, not in an unfair labor practice charge.

*Relying on Chemical Workers,* the National Labor Relations Board (NLRB) held in Supervalu, Inc., 351 NLRB No. 41 (2007), that an" employer did not violate the NLRA by refusing to comply with an "after-acquired stores" clause in its contract that required it to recognize the union at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

newly acquired stores upon conducting a card check to establish the union's majority. The NLRB found that the General Counsel had failed to establish that this clause "vitally affected" terms and conditions of employment and that the clause was not a mandatory subject of bargaining. It held that while the employer's action might be a breach of contract, it was not a violation of the employer's duty to bargain under the NLRA for it to refuse to comply with a contract provision that concerned a permissive subject of bargaining. *See also* Tampa Sheet Metal Co., 288 NLRB 322, 325-325 (1988) and Hope Electrical Corp., 333 NLRB 933 (2003), in which the NLRB held that because interest arbitration is not a mandatory subject of bargaining under the NLRA, the repudiation of a collective bargaining agreement imposed through interest arbitration is not an unfair labor practice.

PERA does not contain a provision parallel to Section 8(d), but the duty to bargain under Section 15 of PERA includes a prohibition against mid-term modifications of contract provisions addressing mandatory subjects of bargaining. St. Clair Intermediate School Dist. v. Intermediate Educ. Association/Michigan Educ. Ass'n, 458 Mich. 540, 563-569, (1998). As the Court noted in that case, the prohibition is founded on the well established principle that once the parties have reached agreement on a mandatory subject and incorporated it into their contract, they have satisfied their obligation to bargain over that subject for the term of the contract. The parties, of course, have no obligation to bargain or reach agreement on a permissive topic.

The Commission has also held that an employer's repudiation of a provision or provision of its collective bargaining agreement may be tantamount to a rejection of its obligation to bargain. *Jonesville Bd. of Ed.,* 1980 MERC Lab Op 891; *City of Detroit, (Dept. of Transportation),* 1984 MERC Lab Op 937, *aff'd,* 150 Mich. App. 605 (1985). The Commission has not explicitly addressed the issue of whether a party's repudiation of a contractual agreement on a permissive topic constitutes a violation of its duty to bargain in good faith. However, because Section 10(1)(e) of PERA is patterned on Section 8(a)(5) of the NLRA, Michigan Courts and the Commission have consistently looked to decisions interpreting the NLRA in defining the nature and extent of the obligation to bargain under PERA. Detroit Police Officers Ass'n v. Detroit, 391 Mich. 44, 53-64 (1974) ("we deem that the Legislature intended the courts to view the Federal labor case law as persuasive precedent); Local 1467, IAFF v. City of Portage, 134 Mich. App. 466, 470 fn. 3 (1984) ("precedent under the NLRA is persuasive in construing PERA's requirements because of the parallel language in the two statutes.) As noted above, the theory underlying a finding of unlawful repudiation is that a party's refusal to honor a contract provision constitutes a rejection of its obligation to bargain. However, a party has no statutory obligation to bargain over a permissive topic. Therefore, in my view, its refusal to comply with a contract provision on a permissive topic does not violate any statutory duty. I recommend that the Commission follow federal precedent and find that while a provision of a collective bargaining agreement dealing with a permissive topic of bargaining may be enforced by an action for breach of contract, a party does not violate its duty to bargain in good faith under PERA by repudiating and/or modifying that provision. Accordingly, I recommend that the Commission find that Respondent did not violate PERA by changing the health care benefits it paid to individuals who retired from employment before July 1, 2005.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Charging Party also alleges that Respondent undermined and bypassed the Charging Party on a subject of bargaining previously agreed to, i.e. health care benefits for retired individuals, by dealing directly with these retired individuals. It asserts that although the retiree group is not a "labor organization," Respondent's negotiation with this group violated Section 10(1)(b) because it interfered with Charging Party's administration.

 As discussed above, individuals who have already retired from their public employment are not employees under PERA and are no longer members of a bargaining unit. In allegations of direct dealing, the inquiry focuses on whether the employer's conduct is "likely to erode the union's position as exclusive representative." *City of Detroit (Housing Commission),* 2002 MERC Lab Op 368, 376 (no exceptions), *citing* Modern Merchandising, 284 NLRB 1377, 1379 (1987). Since Charging Party is not the exclusive representative for already retired individuals, and since Respondent has no duty under PERA to bargain with Charging Party over their benefits, I find that Respondent did not bypass Charging Party or engage in unlawful direct dealing by discussing the retirees' benefits with them. I also find that Charging Party has not alleged a violation of Section 10(1)(b) of PERA. That section protects the independence of labor organizations by prohibiting a public employer from dominating them or, to a lesser degree, interfering with their administration. There is no allegation here that Respondent engaged in any conduct that might constitute unlawful domination of or interference with Charging Party.

Based on the discussion and conclusions of law set forth above, I find that the there is no genuine issue of material fact in this case, that the charge does not state a claim upon which relief could be granted under PERA, and that summary dismissal of the charge is appropriate under Rules 165(1), 2(d), and 2(f) of the Commission's General Rules. I recommend, therefore, that the Commission issue the following order.

**Recommended Order**

The charge is dismissed in its entirety.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Attachment #5

# 1990 PA 72

# Complete Statute

# LOCAL GOVERNMENT FISCAL RESPONSIBILITY ACT
## Act 72 of 1990

AN ACT to provide for review, management, planning, and control of the financial operation of units of local government, including school districts; to provide criteria to be used in determining the financial condition of a local government; to permit a declaration of the existence of a local government financial emergency and to prescribe the powers and duties of the governor, other state boards, agencies, and officials, and officials and employees of units of local government; to provide for a review and appeal process; to provide for the appointment and to prescribe the powers and duties of an emergency financial manager; to require the development of financial plans to regulate expenditures and investments by a local government in a state of financial emergency; to set forth the conditions for termination of a local government financial emergency; and to repeal certain acts and parts of acts.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

*The People of the State of Michigan enact:*

## ARTICLE 1
## GENERAL PROVISIONS

### 141.1201 Short title.

Sec. 1. This act shall be known and may be cited as the "local government fiscal responsibility act".

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

### 141.1202 Legislative determinations.

Sec. 2. The legislature hereby determines that the public health and welfare of the citizens of this state would be adversely affected by the insolvency of units of local government, including certain school districts, and that the survival of units of local government is vitally necessary to the interests of the people of this state to provide necessary governmental services. The legislature further determines that it is vitally necessary to protect the credit of the state and its political subdivisions and that it is a valid public purpose for the state to take action and to assist a unit of local government in a fiscal emergency situation to remedy this emergency situation by requiring prudent fiscal management. The legislature, therefore, determines that the authority and powers conferred by this act constitute a necessary program and serve a valid public purpose.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

## ARTICLE 2
## GOVERNMENTAL PROVISIONS

### 141.1211 Definitions.

Sec. 11. As used in this article:

(a) "Chief administrative officer" means any of the following:

(*i*) The manager of a village or, if a village does not employ a manager, the president of the village.

(*ii*) The city manager of a city or, if a city does not employ a city manager, the mayor of the city.

(*iii*) The manager of a township, the superintendent of a charter township, or if the township does not employ a manager or superintendent, the supervisor of the township.

(*iv*) The elected county executive or appointed county manager of a county; or if the county has not adopted the provisions of either Act No. 139 of the Public Acts of 1973, being sections 45.551 to 45.573 of the Michigan Compiled Laws, or Act No. 293 of the Public Acts of 1966, being sections 45.501 to 45.521 of the Michigan Compiled Laws, the chairperson of the county board of commissioners of the county.

(*v*) The chief operating officer of an authority or a public utility owned by a city, village, township, or county.

(b) "Emergency financial manager" means the emergency financial manager appointed under section 18.

(c) "Local government" means a city, a village, a township, a county, an authority established by law, or a public utility owned by a city, village, township, or county.

(d) "Review team" means the review team designated under section 13.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

### 141.1212 Preliminary review by state treasurer; conditions; notice; meeting with local government; informing governor of serious financial problem.

Sec. 12. (1) The state treasurer shall conduct a preliminary review to determine the existence of a local

13-53846-swr Doc 7449-1 Filed 09/12/14 Entered 09/12/14 09:36:02 Page 103 of 145

government financial problem if 1 or more of the following occur:

(a) The governing body or the chief administrative officer of a local government requests a preliminary review under this article. The request shall be in writing and shall identify the existing financial conditions that make the request necessary.

(b) The state treasurer receives a written request from a creditor with an undisputed claim that remains unpaid 6 months after its due date against the local government that exceeds the greater of $10,000.00 or 1% of the annual general fund budget of the local government, provided that the creditor notifies the local government in writing at least 30 days before his or her request to the state treasurer of his or her intention to invoke this provision.

(c) The state treasurer receives a petition containing specific allegations of local government financial distress signed by a number of registered electors residing within the jurisdiction of the local government equal to not less than 10% of the total vote cast for all candidates for governor within the jurisdiction of the local government at the last preceding election at which a governor was elected. Petitions shall not be filed under this subdivision within 60 days before any election of the local government.

(d) The state treasurer receives written notification from the trustee, actuary, or at least 10% of the beneficiaries of a local government pension fund alleging that a local government has not timely deposited its minimum obligation payment to the local government pension fund as required by law.

(e) The state treasurer receives written notification that employees of the local government have not been paid and it has been at least 7 days after the scheduled date of payment.

(f) The state treasurer receives written notification from a trustee, paying agent, or bondholder of a default in a bond payment or a violation of 1 or more bond covenants.

(g) The state treasurer receives a resolution from either the senate or the house of representatives requesting a preliminary review under this section.

(h) The local government has violated the conditions of an order issued pursuant to, or of a requirement of, former 1943 PA 202, the revenue bond act of 1933, 1933 PA 94, MCL 141.101 to 141.140, the revised municipal finance act, 2001 PA 34, MCL 141.2101 to 141.2821, or any other law governing the issuance of bonds or notes.

(i) The local government has violated the conditions of an order issued in the effectuation of the purposes of the emergency municipal loan act, 1980 PA 243, MCL 141.931 to 141.942, by the local emergency financial assistance loan board created by the emergency municipal loan act, 1980 PA 243, MCL 141.931 to 141.942.

(j) The local government has violated the requirements of sections 17 to 20 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.437 to 141.440, and the state treasurer has forwarded a report of this violation to the attorney general.

(k) The local government has failed to comply with the requirements of section 21 of the Glenn Steil state revenue sharing act of 1971, 1971 PA 140, MCL 141.921, for filing or instituting a deficit recovery plan.

(l) The local government fails to provide an annual financial report or audit that conforms with the minimum procedures and standards of the state treasurer and is required under the uniform budgeting and accounting act, 1968 PA 2, MCL 141.421 to 141.440a, or 1919 PA 71, MCL 21.41 to 21.55.

(m) The local government is delinquent in the distribution of tax revenues, as required by law, that it has collected for another taxing jurisdiction, and that taxing jurisdiction requests a preliminary review.

(n) A court has ordered an additional tax levy without the prior approval of the governing body of the local government.

(2) In conducting a preliminary review under this section, the state treasurer shall give the local government specific written notification of the review, and the state treasurer shall meet with the local government. At this meeting, the state treasurer shall receive, discuss, and consider information provided by the local government concerning the existence of and seriousness of financial conditions within the local government.

(3) When the state treasurer conducts a preliminary review under this section, he or she shall inform the governor within 30 days after beginning the preliminary review whether or not his or her investigation has determined that a serious financial problem may exist because 1 or more conditions indicative of a serious financial problem exist within the local government.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990;—Am. 2002, Act 408, Imd. Eff. June 3, 2002.

## 141.1213 Review team; appointment; conditions to undertaking local financial management review; effect of former law.

Sec. 13. (1) The governor shall appoint a review team of the state treasurer, the auditor general, a nominee of the senate majority leader, a nominee of the speaker of the house of representatives, and other state

officials or other persons with relevant professional experience to serve as a review team to undertake a local financial management review if 1 or more of the following occur:

(a) The governing body of a local government, by resolution, requests assistance under this article in meeting the ordinary needs of government. The resolution shall identify the existing financial conditions that make the request for assistance necessary. The resolution under this subsection shall be subject to the legislative vote requirement and the executive approval requirement applicable to enactment of an ordinance by the local government.

(b) The governor has been informed by the state treasurer pursuant to section 12 that he or she has conducted a preliminary review of a local government financial situation and has determined that 1 or more conditions indicative of a serious financial problem may exist within the local government.

(2) A review team appointed under the local government fiscal responsibility act, former Act No. 101 of the Public Acts of 1988, and serving on the effective date of this act shall continue under this act to fulfill their powers and duties. All proceedings and actions taken by the governor, the state treasurer, or a review team under former Act No. 101 of the Public Acts of 1988 before the effective date of this act are ratified and are enforceable as if the proceedings and actions were taken under this act, and a consent agreement entered into under former Act No. 101 of the Public Acts of 1988 is ratified and is binding and enforceable under this act.

History: 1990, Act 72, Imd. Eff. May 15, 1990.

### 141.1214 Review team; functions; report to governor; contents; time; copies of report; conclusion.

Sec. 14. (1) The review team appointed by the governor shall have full power in its review to perform all of the following functions:

(a) Examine the books and records of the local government.

(b) Utilize the services of other state agencies and employees.

(c) Sign a consent agreement with the chief administrative officer of the local government. The agreement may provide for remedial measures considered necessary including a long-range financial recovery plan requiring specific local actions. The agreement may utilize state financial management and technical assistance as necessary in order to alleviate the local financial problem. The agreement may also provide for periodic fiscal status reports to the state treasurer. In order for the consent agreement to go into effect, it shall be approved, by resolution, by the governing body of the local government.

(2) In the report to the governor under subsection (3) on the financial conditions of the local government, the review team shall inform the governor if 1 or more of the following conditions indicative of a serious financial problem exist, or have occurred, or are likely to exist or occur, if remedial action is not taken:

(a) A default in the payment of principal or interest upon bonded obligations or notes for which no funds or insufficient funds are on hand and segregated in a special trust fund.

(b) Failure for a period of 30 days or more beyond the due date to transfer 1 or more of the following to the appropriate agency:

(*i*) Taxes withheld on the income of employees.

(*ii*) Taxes collected by the government as agent for another governmental unit, school district, or other entity or taxing authority.

(*iii*) Any contribution required by a pension, retirement, or benefit plan.

(c) Failure for a period of 30 days or more to pay wages and salaries or other compensation owed to employees or retirees.

(d) The total amount of accounts payable for the current fiscal year, as determined by the state treasurer's uniform chart of accounts, is in excess of 10% of the total expenditures of the local government in that fiscal year.

(e) Failure to eliminate an existing deficit in any fund of the local government within the 2-year period preceding the end of the local government's fiscal year during which the review team report is received.

(f) Projection of a deficit in the general fund of the local government for the current fiscal year in excess of 10% of the budgeted revenues for the general fund.

(3) The review team shall report its findings to the governor within 60 days after their appointment, or earlier if required by the governor. Upon request, the governor may grant 1 30-day extension of this time limit. A copy of the report to the governor shall be sent to the chief administrative officer and the governing body of the local government, the speaker of the house of representatives, and the senate majority leader. The review team shall include 1 of the following conclusions in its report:

(a) A serious financial problem does not exist in the local government.

(b) A serious financial problem exists in the local government, but a consent agreement containing a plan

to resolve the problem has been adopted pursuant to section 14(1)(c).

(c) A local government financial emergency exists because no satisfactory plan exists to resolve a serious financial problem.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

### 141.1215 Determination by governor; notice; findings of fact; statement; hearing; confirmation or revocation of determination; report.

Sec. 15. (1) Within 30 days after receipt of the report provided for in section 14, the governor shall make 1 of the following determinations:

(a) A serious financial problem does not exist in the local government.

(b) A serious financial problem exists in the local government, but a consent agreement containing a plan to resolve the problem has been adopted pursuant to section 14(1)(c).

(c) A local government financial emergency exists because no satisfactory plan to resolve a serious financial problem exists.

(2) If the governor determines pursuant to subsection (1) that a financial emergency exists, the governor shall provide the governing body and chief administrative officer of the local unit with a written notification of the determination, findings of fact utilized as the basis upon which this determination was made, a concise and explicit statement of the underlying facts supporting the factual findings, and notice that the chief administrative officer or the governing body of the local government has 10 days after the date of this notification to request a hearing conducted by the governor or the governor's designate. Following the hearing, or if no hearing is requested following the expiration of the deadline by which a hearing may be requested, the governor shall either confirm or revoke, in writing, the determination of the existence of a local financial emergency. If confirmed, the governor shall provide a written report of the findings of fact of the continuing or newly developed conditions or events providing a basis for the confirmation of a local financial emergency, and a concise and explicit statement of the underlying facts supporting these factual findings.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

### 141.1216 Failure to abide by provisions of consent agreement.

Sec. 16. If, at any time following determination by the governor that a serious financial problem exists under section 15(1)(b), the state treasurer or the review team informs the governor that the local government is not abiding by the provisions of a consent agreement, the governor shall determine that a financial emergency exists in the local government, and section 15(2) and section 18 shall then apply to that local government.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

### 141.1217 Appeal; setting aside determination.

Sec. 17. A local government for which a financial emergency determination pursuant to section 15 or 16 has been confirmed to exist by the governor may appeal this determination to the circuit court for the county in which the local government is located or to the circuit court for the county of Ingham. The court shall not set aside a determination of the governor unless it finds that the determination is either of the following:

(a) Not supported by competent, material, and substantial evidence on the whole record.

(b) Arbitrary, capricious, or clearly an abuse or unwarranted exercise of discretion.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

### 141.1218 Assigning responsibility for managing local government financial emergency; appointment, qualifications, and term of emergency financial manager; compensation and expenses; staff and professional assistance.

Sec. 18. (1) If the governor determines that a financial emergency exists under section 15, the governor shall assign the responsibility for managing the local government financial emergency to the local emergency financial assistance loan board created under the emergency municipal loan act, Act No. 243 of the Public Acts of 1980, being sections 141.931 to 141.942 of the Michigan Compiled Laws. The local emergency financial assistance loan board shall appoint an emergency financial manager. The emergency financial manager shall be chosen solely on the basis of his or her competence and shall not have been either an elected or appointed official or employee of the local government for which appointed for not less than 5 years before the appointment. The emergency financial manager need not be a resident of the local government for which he or she is appointed. The emergency financial manager shall serve at the pleasure of the local emergency financial assistance loan board. The emergency financial manager shall be entitled to compensation and reimbursement for actual and necessary expenses from the local government as approved by the local

13-53846-swr   Doc 7495-31   Filed 09/12/14   Entered 09/12/14 15:36:24   Page 106 of 145

emergency financial assistance loan board. In addition to staff otherwise authorized by law, with the approval of the local emergency financial assistance loan board, the emergency financial manager may appoint additional staff and secure professional assistance considered necessary to implement this article.

(2) An emergency financial manager appointed under the local government fiscal responsibility act, former Act No. 101 of the Public Acts of 1988, and serving on the effective date of this act, except as provided in subsection (1), shall continue under this act to fulfill his or her powers and duties.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

### 141.1219 Orders.

Sec. 19. The emergency financial manager shall issue to the appropriate officials or employees of the local government the orders the manager considers necessary to accomplish the purposes of this act, including, but not limited to, orders for the timely and satisfactory implementation of a financial plan developed pursuant to section 20. An order issued under this section is binding on the local officials or employees to whom it is issued.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

### 141.1220 Written financial plan.

Sec. 20. (1) In consultation with the local government, the emergency financial manager shall develop, and may from time to time amend, a written financial plan for the local government. The financial plan shall provide for both of the following:

(a) Conducting the operations of the local government within the resources available according to the emergency financial manager's revenue estimate.

(b) The payment in full of the scheduled debt service requirements on all bonds and notes of the local government and all other uncontested legal obligations.

(2) After the initial development of a financial plan, the plan shall be regularly reexamined by the emergency financial manager in consultation with the local government, and if the emergency financial manager reduces his or her revenue estimates, the emergency financial manager shall modify the financial plan to conform to revised revenue estimates.

(3) The financial plan shall be in a form and shall contain that information for each year during which year the financial plan is in effect that the local emergency financial manager specifies.

(4) The emergency financial manager shall make public the plan or modified plan. This subsection shall not be construed to mean that the emergency financial manager must receive public approval before he or she implements the financial plan or any modification of the plan.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

### 141.1221 Additional actions by emergency financial manager.

Sec. 21. (1) An emergency financial manager may take 1 or more of the following additional actions with respect to a unit of local government in which a financial emergency has been determined to exist:

(a) Analyze factors and circumstances contributing to the financial condition of the unit of local government and recommend steps to be taken to correct the condition.

(b) Amend, revise, approve, or disapprove the budget of the unit of local government, and limit the total amount appropriated or expended during the balance of the financial emergency.

(c) Require and approve or disapprove, or amend or revise a plan for paying all outstanding obligations of the unit of local government.

(d) Require and prescribe the form of special reports to be made by the finance officer of the unit of local government to its governing body, the creditors of the unit of local government, the emergency financial manager, or the public.

(e) Examine all records and books of account, and require under the procedures of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.421 to 141.440a, or 1919 PA 71, MCL 21.41 to 21.55, or both, the attendance of witnesses and the production of books, papers, contracts, and other documents relevant to an analysis of the financial condition of the unit of local government.

(f) Make, approve, or disapprove any appropriation, contract, expenditure, or loan, the creation of any new position, or the filling of any vacancy in a permanent position by any appointing authority.

(g) Review payrolls or other claims against the unit of local government before payment.

(h) Exercise all of the authority of the unit of local government to renegotiate existing labor contracts and act as an agent of the unit of local government in collective bargaining with employees or representatives and approve any contract or agreement.

(i) Notwithstanding the provisions of any charter to the contrary, consolidate departments of the unit of

local government or transfer functions from 1 department to another and to appoint, supervise, and, at his or her discretion, remove heads of departments other than elected officials, the clerk of the unit of local government, and any ombudsman position in the unit of local government.

(j) Employ or contract for, at the expense of the unit of local government and with the approval of the local emergency financial assistance loan board, auditors and other technical personnel considered necessary to implement this article.

(k) Require compliance with the orders of the emergency financial manager by court action if necessary.

(*l*) Except as restricted by charter or otherwise, sell or otherwise use the assets of the unit of local government to meet past or current obligations, provided the use of assets for this purpose does not endanger the public health, safety, or welfare of residents of the unit of local government.

(m) Apply for a loan from the state on behalf of the unit of local government, subject to the conditions of the emergency municipal loan act, 1980 PA 243, MCL 141.931 to 141.942, in a sufficient amount to pay the expenses of the emergency financial manager and for other lawful purposes.

(n) Approve or disapprove of the issuance of obligations of the unit of local government on behalf of the municipality, subject to the conditions of the revised municipal finance act, 2001 PA 34, MCL 141.2101 to 141.2821, and the revenue bond act of 1933, 1933 PA 94, MCL 141.101 to 141.140.

(o) Enter into agreements with other units of local government for the provision of services.

(p) Exercise the authority and responsibilities of the chief administrative officer and governing body concerning the adoption, amendment, and enforcement of ordinances or resolutions affecting the financial condition of the unit of local government as provided in the following acts:

(*i*) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38.

(*ii*) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20.

(*iii*) The charter township act, 1947 PA 359, MCL 42.1 to 42.34.

(*iv*) 1851 PA 156, MCL 46.1 to 46.32.

(*v*) 1966 PA 293, MCL 45.501 to 45.521.

(*vi*) The general law village act, 1895 PA 3, MCL 61.1 to 74.25.

(*vii*) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28.

(q) Reduce, suspend, or eliminate the salary, or other compensation of the chief administrative officer and members of the governing body of the unit of local government during the financial emergency. This subdivision does not authorize an emergency financial manager to impair vested retirement benefits. If an emergency financial manager has reduced, suspended, or eliminated the salary or other compensation of the chief administrative officer and members of the governing body of a unit of local government before the effective date of the amendatory act that added this subdivision, the reduction, suspension, or elimination is valid to the same extent had it occurred after the effective date of the amendatory act that added this subdivision.

(2) If a financial emergency exists under the local government fiscal responsibility act, 1990 PA 72, MCL 141.1201 to 141.1291, the emergency financial manager shall make a determination as to whether possible criminal conduct contributed to the financial emergency. If the manager determines that there is reason to believe that criminal conduct has occurred, the manager shall refer the matter to the attorney general and the local prosecuting attorney for investigation. The determination required under this subsection shall be made by 1 of the following dates, whichever is later:

(a) Within 90 days after the effective date of the amendatory act that added this subsection.

(b) Within 180 days after the date the emergency financial manager is appointed.

(3) Not later than 90 days after the completion of the emergency financial manager's term, the governing body of the unit of local government shall review any ordinance implemented by the emergency financial manager during his or her term, except any ordinance enacted to assure the payment of principal and interest on bonds.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990;—Am. 2002, Act 408, Imd. Eff. June 3, 2002;—Am. 2003, Act 282, Imd. Eff. Jan. 8, 2004.

### 141.1221a Report filed by emergency financial manager with governor, senate majority leader, speaker of house of representatives and posted on website of local unit of government.

Sec. 21a. (1) An emergency financial manager appointed under this article shall file with the governor, the senate majority leader, and the speaker of the house of representatives and post on the internet on the website of the local unit of government a report that contains all of the following:

(a) A description of each expenditure made, approved, or disapproved during the reporting period that has a cumulative value of $10,000.00 or more and the source of the funds.

(b) A list of each contract that the emergency financial manager awarded or approved with a cumulative value of $10,000.00 or more, the purpose of the contract, and the identity of the contractor.

(c) A description of each loan sought, approved, or disapproved during the reporting period that has a cumulative value of $10,000.00 or more and the proposed use of the funds.

(d) A description of any new position created or any vacancy in a permanent position filled by the appointing authority.

(e) A description of any position that has been eliminated or from which an employee has been laid off.

(2) The report required under this section shall be submitted every 6 months, beginning 6 months after the starting date of the emergency financial manager.

**History:** Add. 2009, Act 181, Imd. Eff. Dec. 15, 2009.

## 141.1222 Authorization to proceed under federal law; local government as debtor; notice.

Sec. 22. (1) After giving written notice to the local emergency financial assistance loan board, the emergency financial manager may authorize the local government to proceed under title 11 of the United States Code, 11 U.S.C. 101 to 1330, unless this authorization is disapproved by the local emergency financial assistance loan board within 60 days after the notice has been received by the board. This section empowers the local government for which an emergency financial manager has been appointed to become a debtor under title 11 of the United States Code as required by section 109 of title 11 of the United States Code, 11 U.S.C. 109.

(2) The notice to the local emergency financial assistance loan board under subsection (1) shall include a determination by the emergency financial manager that no feasible financial plan can be adopted that can satisfactorily resolve the financial emergency in a timely manner, or a determination by the emergency financial manager that an adopted financial plan, in effect for at least 180 days, cannot be implemented, as written or as it might be amended, in a manner that can satisfactorily resolve the financial emergency in a timely manner.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

## 141.1223 Liability.

Sec. 23. The state, the members of the local emergency financial assistance loan board, and the emergency financial manager are not liable for any obligation of or claim against a local government resulting from actions taken in accordance with the terms of this article.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

## 141.1224 Failure of elected officials to provide assistance and information as gross neglect of duty; report; review and hearing; removal from office; filling vacancy.

Sec. 24. Elected officials of a local government shall provide the assistance and information necessary and properly requested by a review team, the local emergency financial assistance loan board, or the emergency financial manager in the effectuation of their duties and powers and of the purposes of this article. Failure of an elected official of a local government to abide by this article shall be considered gross neglect of duty, which the emergency financial manager shall report to the local emergency financial assistance loan board. Following review and a hearing with the local government elected official, the local emergency financial assistance loan board may recommend to the governor that the governor remove the elected official from office. If the governor removes the elected official from office, the resulting vacancy in office shall be filled as prescribed by law.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

## 141.1225 Revoking declaration of financial emergency; recommendation.

Sec. 25. The governor may determine that the conditions for revoking the declaration of a financial emergency have been met after receiving a recommendation from the local emergency financial assistance loan board.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

## 141.1226 Power to impose taxes.

Sec. 26. This act shall not be construed to give the emergency financial manager or the local financial assistance loan board the power to impose taxes, over and above those already authorized, without the approval at an election of a majority of the qualified electors voting on the question.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

ARTICLE 3

13-53846-swr   Doc 7403-1   Filed 09/02/14   Entered 09/02/14 15:36:02   Page 109 of 104
145

SCHOOL DISTRICT PROVISIONS

**141.1231 Definitions.**

Sec. 31. As used in this article:

(a) "Emergency financial manager" means the emergency financial manager appointed under section 34.

(b) "Review team" means the review team designated under section 34.

(c) "School board" means the governing body of a school district.

(d) "School district" or "district" means a local school district established under part 2, 3, 4, 5, or 6 of the school code of 1976, being sections 380.71 to 380.485 of the Michigan Compiled Laws, or a local act school district as defined in section 5 of the school code of 1976, being section 380.5 of the Michigan Compiled Laws.

(e) "School fiscal year" means a fiscal year that commences July 1 and continues through June 30.

(f) "State board" means the state board of education.

(g) "The school code of 1976" means Act No. 451 of the Public Acts of 1976, being sections 380.1 to 380.1852 of the Michigan Compiled Laws.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

**141.1232 Responsibility for monitoring and reviewing financial condition of school districts.**

Sec. 32. The superintendent of public instruction is responsible for monitoring and periodically reviewing the financial condition of school districts to ensure their compliance with state laws regulating budgetary and accounting practices and their financial soundness.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

**141.1233 Determination of serious financial problem; conditions; notice.**

Sec. 33. (1) The superintendent of public instruction may determine that a school district has a serious financial problem if he or she finds that 1 or more of the following conditions exist:

(a) The school district ended the most recently completed school fiscal year with a deficit in 1 or more of its funds and the superintendent of public instruction has not approved a deficit elimination plan within 3 months after the district's deadline for submission of its annual financial statement.

(b) The school board of the school district adopts a resolution declaring that the school district is in a financial emergency.

(c) The superintendent of public instruction receives a petition containing specific allegations of school district financial distress signed by a number of registered electors residing within the school district equal to not less than 10% of the total vote cast for all candidates for governor within the school district at the last preceding election at which a governor was elected. Petitions shall not be filed under this subdivision within 60 days before any election of the school district.

(d) The superintendent of public instruction receives a written request, from a creditor of the school district with an undisputed claim against the school district, to find the school district has a serious financial problem. The superintendent of public instruction may honor this request only if the claim remains unpaid 6 months after its due date, the claim exceeds the greater of $10,000.00 or 1% of the annual general fund budget of the school district, and the creditor notifies the school district in writing at least 30 days before he or she requests the superintendent of public instruction to find that the school district has a serious financial problem.

(e) The superintendent of public instruction receives written notification from a trustee, paying agent, note or bondholder, or the state treasurer of a violation of 1 or more of the school district's bond or note covenants.

(f) The superintendent of public instruction receives a resolution from either the senate or the house of representatives requesting a review under this section of the financial condition of the school district.

(g) The school district is in violation of the conditions of an order issued pursuant to, or as a requirement of, former 1943 PA 202, the revenue bond act of 1933, 1933 PA 94, MCL 141.101 to 141.140, the revised municipal finance act, 2001 PA 34, MCL 141.2101 to 141.2821, or any other law governing the issuance of bonds or notes.

(h) The school district is in violation of the requirements of sections 17 to 20 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.437 to 141.440.

(i) The school district fails to provide an annual financial report or audit that conforms with the minimum procedures and standards of the state board and is required under the revised school code, 1976 PA 451, MCL 380.1 to 380.1852, and the state school aid act of 1979, 1979 PA 94, MCL 388.1601 to 388.1772.

(j) A court has ordered an additional tax levy without the prior approval of the school board of the school district.

(2) Upon determining that a school district has a serious financial problem, the superintendent of public

instruction shall notify the governor and the state board of that determination and of the basis for and findings supporting the determination.

History: 1990, Act 72, Imd. Eff. May 15, 1990;—Am. 1992, Act 265, Eff. Jan. 1, 1993;—Am. 2002, Act 408, Imd. Eff. June 3, 2002.

### 141.1234 Review team; appointment; composition; purpose; conditions; functions; report of findings; time; copies of report; conclusion.

Sec. 34. (1) Within 30 days after an occurrence described in this subsection, the governor shall appoint a review team composed of the superintendent of public instruction, the state treasurer, the director of the department of management and budget, a nominee of the senate majority leader, and a nominee of the speaker of the house of representatives to review the financial condition of a school district if 1 or more of the following occur:

(a) The governor is informed by the superintendent of public instruction pursuant to section 33(2) that he or she has determined that the school district has a serious financial problem.

(b) The school district is in default in the payment of interest on or principal of any obligation of the school district.

(c) The school district fails to pay its employees within 5 days of any regularly scheduled payday.

(d) The school district fails to make any contribution required by a pension, retirement, or benefit plan in accordance with state law.

(e) The superintendent of public instruction determines that the school district has failed to comply substantially with the terms of an approved deficit elimination plan required under section 102 of the state school aid act of 1979, Act No. 94 of the Public Acts of 1979, being section 388.1702 of the Michigan Compiled Laws.

(f) The state treasurer notifies the governor that the appointment of a review team is necessary to protect the credit of the school district or the state, or both.

(2) The review team appointed by the governor pursuant to subsection (1) shall have full power in its review to perform all of the following functions:

(a) Examine the books and records of the school district.

(b) Utilize the services of other state agencies and employees and employ professionals necessary to assist in its duties.

(c) Sign a consent agreement with the superintendent of the school district. The agreement may provide for remedial measures considered necessary, including, but not limited to, a long-range financial recovery plan requiring specific actions. The agreement may utilize state financial management and technical assistance as necessary in order to alleviate the financial problem of the school district. The agreement may also provide for periodic fiscal status reports to the superintendent of public instruction. Before the consent agreement becomes effective, the school board of the school district, by a majority vote of the total number of members authorized by law to serve on the board, shall approve the agreement.

(3) The review team shall report its findings to the governor and the state board within 30 days after its appointment, or earlier if required by the governor. Upon request, the governor may grant 1 60-day extension of this time limit. The review team shall send a copy of its report to the superintendent of public instruction, the school board of the school district, the senate majority leader, and the speaker of the house of representatives. The review team shall include 1 of the following conclusions in its report:

(a) The school district does not have a serious financial problem.

(b) The school district does have a serious financial problem, but a consent agreement containing a plan to resolve the problem has been adopted pursuant to subsection (2)(c).

(c) The school district has a financial emergency because a consent agreement containing a plan to resolve a serious financial problem within the school district has not been adopted.

History: 1990, Act 72, Imd. Eff. May 15, 1990.

### 141.1235 Determination by superintendent of public instruction; notice; findings of fact; statement; hearing; confirmation or revocation of determination; report.

Sec. 35. (1) Within 30 days after the state board receives the review team's report required by section 34(3), the superintendent of public instruction shall make 1 of the following determinations:

(a) The school district does not have a serious financial problem.

(b) The school district does have a serious financial problem, but a consent agreement containing a plan to resolve the problem has been adopted pursuant to section 34(2)(c).

(c) The school district has a financial emergency because a consent agreement containing a plan to resolve a serious financial problem within the school district has not been adopted.

(2) If the superintendent of public instruction determines pursuant to subsection (1) that a financial

13-53846-swr Doc 7403-1 Filed 09/02/14 Entered 09/02/14 15:36:02 Page 111 of 145

emergency exists, the superintendent of public instruction shall provide the school board of the school district with written notification of the determination, findings of fact utilized as the basis upon which this determination was made, a concise and explicit statement of the underlying facts supporting the findings of fact, and notice that the school board of the school district has 10 days after the date of this notification to request a hearing conducted by the superintendent of public instruction or his or her designee to contest the superintendent's determination. After the hearing, or if no hearing is requested, after the expiration of the deadline by which a hearing may be requested, the superintendent of public instruction shall either confirm or revoke, in writing, the determination that the school district has a financial emergency. If the determination is confirmed, the superintendent of public instruction shall provide a written report to the school board of the school district of the findings of fact of the continuing or newly developed conditions or events that provide the basis for the confirmation of the determination, and a concise and explicit statement of the underlying facts supporting these findings of fact.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

## 141.1236 Failure to abide by consent agreement.

Sec. 36. If, at any time following a determination by the superintendent of public instruction under section 35(1)(b) that the school district has a financial emergency, the superintendent of public instruction informs the governor and the state board that the school district is not abiding by the consent agreement, section 35(2) and section 38 shall then apply to that school district.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

## 141.1237 Appeal; setting aside determination.

Sec. 37. The board of a school district that the superintendent of public instruction has determined has a financial emergency may appeal this determination to the circuit court for a county in which the school district is located. The court shall not set aside a determination of the superintendent of public instruction unless it finds that the determination is either 1 of the following:

(a) Not supported by competent, material, and substantial evidence on the whole record.

(b) Arbitrary, capricious, or clearly an abuse of unwarranted exercise of discretion.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

## 141.1238 Emergency financial manager; nominees; appointment, qualifications, and term; contract; compensation and expenses; staff and professional assistance.

Sec. 38. (1) If the superintendent of public instruction determines under section 35 or 36 that a school district has a financial emergency, the superintendent of public instruction, within 30 days after that determination, shall submit to the state board the names of nominees who shall be considered for appointment to serve as an emergency financial manager for the school district. From the list of nominees submitted to the state board, the state board shall submit to the governor the names of not more than 3 nominees who shall be considered for appointment to serve as an emergency financial manager for the school district. From the list of nominees submitted to the governor, the governor shall appoint, with the advice and consent of the senate, an emergency financial manager for the school district who shall hold office for a term fixed by the governor, but not to exceed 1 year. The appointment shall be by written contract and may be renewed on an annual basis for not more than 1 year.

(2) An emergency financial manager appointed under this article shall be chosen solely on the basis of his or her competence in fiscal matters and shall not have been either an elected or appointed official or employee of the school district for which he or she is appointed for not less than 5 years before the appointment. The emergency financial manager shall not be the superintendent of public instruction. The emergency financial manager need not be a resident of the school district for which he or she is appointed.

(3) Unless the legislature provides special funding, an emergency financial manager shall receive compensation and reimbursement for actual and necessary expenses from the school district as approved by the superintendent of public instruction. In addition to staff otherwise authorized by law, with the approval of the superintendent of public instruction, the emergency financial manager may appoint additional staff and secure professional assistance considered necessary to implement this article.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

## 141.1239 Orders.

Sec. 39. The emergency financial manager shall issue to the appropriate officials or employees of the school district the orders that he or she considers necessary to accomplish the purposes of this article, including, but not limited to, orders for the timely and satisfactory implementation of a financial plan

developed pursuant to section 40. An order issued under this section is binding on the school district officials or employees to whom it is issued.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

## 141.1240 Written financial plan.

Sec. 40. (1) In consultation with the school board, the emergency financial manager shall develop, and may from time to time amend, a written financial plan for the school district. The financial plan shall provide for both of the following:

(a) Conducting the operations of the school district within the resources available according to the emergency financial manager's revenue estimate.

(b) The payment in full of the scheduled debt service requirements on all bonds and notes of the school district and all other uncontested legal obligations.

(2) After the initial development of the financial plan required by subsection (1), the emergency financial manager in consultation with the school board shall regularly reexamine the plan, and if the emergency financial manager reduces his or her revenue estimates, he or she shall modify the financial plan to conform to revised revenue estimates.

(3) The financial plan shall be in a form, and shall contain that information for each year the plan is in effect, that the school district's emergency financial manager specifies.

(4) The emergency financial manager shall make public the plan or modified plan. This subsection shall not be construed to mean that the emergency financial manager must receive public approval before he or she implements the financial plan or any modification to the plan.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

## 141.1241 Control over fiscal matters; fiscal decisions; actions by emergency financial manager; authorization to proceed under federal law; school district as debtor.

Sec. 41. (1) Upon appointment under section 38, an emergency financial manager shall immediately assume control over all fiscal matters of, and make all fiscal decisions for, the school district for which he or she is appointed.

(2) In implementing this article and performing his or her functions under this article, an emergency financial manager may take 1 or more of the following actions:

(a) Examine the books and records of the school district.

(b) Review payrolls or other claims against the school district before payment.

(c) Negotiate, renegotiate, approve, and enter into contracts on behalf of the school district.

(d) Receive and disburse on behalf of the school district all federal, state, and local funds earmarked for the school district. These funds may include, but are not limited to, funds for specific programs and the retirement of debt.

(e) Adopt a final budget for the next school fiscal year and amend any adopted budget of the school district.

(f) Act as an agent of the school district in collective bargaining and, to the extent possible under state labor law, renegotiate existing and negotiate new labor agreements.

(g) Analyze factors contributing to the financial condition of the school district and recommend to the legislature steps that need to be taken to improve the district's financial condition.

(h) Require compliance with his or her orders, by court action if necessary.

(i) Require the attendance of witnesses and the production of books, papers, contracts, and other documents relevant to an analysis of the financial condition of the school district.

(j) Recommend to the governor, the legislature, and the state board that the school district be reorganized with 1 or more contiguous school districts.

(k) Consolidate divisions or transfer functions from 1 division to another division within the school district and appoint, supervise, and, at his or her discretion, remove, within legal limitations, heads of divisions of the school district.

(l) Create a new position or approve or disapprove the creation of any new position or the filling of a vacancy in a permanent position by an appointing authority.

(m) Seek approval from the state board for a reduced class schedule in accordance with administrative rules governing the distribution of state school aid.

(n) Employ or contract for, at the expense of the school district and with the approval of the superintendent of public instruction, auditors and other technical personnel considered necessary to implement this article.

(o) Reduce expenditures in the budget of the school district.

(p) Borrow money on behalf of the school district.

(q) Approve or disapprove of the issuance of obligations of the school district.

(r) Order, as necessary, 1 or more school millage elections for the school district consistent with the school code of 1976, the Michigan election law, Act No. 116 of the Public Acts of 1954, being sections 168.1 to 168.992 of the Michigan Compiled Laws, and sections 6 and 25 through 34 of article IX of the state constitution of 1963.

(s) Sell or otherwise use the assets of the school district to meet past or current obligations, provided the use of assets for this purpose does not impair the education of the pupils of the district.

(t) Exercise the authority and responsibilities affecting the financial condition of the school district that are prescribed by law to the school board and superintendent of the school district.

(3) After giving written notice to the superintendent of public instruction, the emergency financial manager may authorize the school district to proceed under chapter 9 of title 11 of the United States Code, 11 U.S.C. 901 to 904, 921 to 932, and 941 to 946. This section empowers the school district for which an emergency financial manager has been appointed to become a debtor under chapter 9 of title 11 of the United States Code.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

### 141.1241a Report filed by emergency financial manager with governor, senate majority leader, speaker of house of representatives and posted on website of school district.

Sec. 41a. (1) An emergency financial manager appointed under this article shall file with the governor, the senate majority leader, and the speaker of the house of representatives and post on the internet on the website of the school district a report that contains all of the following:

(a) A description of each expenditure made, approved, or disapproved during the reporting period that has a cumulative value of $10,000.00 or more and the source of the funds.

(b) A list of each contract that the emergency financial manager awarded or approved with a cumulative value of $10,000.00 or more, the purpose of the contract, and the identity of the contractor.

(c) A description of each loan sought, approved, or disapproved during the reporting period that has a cumulative value of $10,000.00 or more and the proposed use of the funds.

(d) A description of any new position created or any vacancy in a permanent position filled by the appointing authority.

(e) A description of any position that has been eliminated or from which an employee has been laid off.

(2) The report required under this section shall be submitted every 6 months, beginning 6 months after the starting date of the emergency financial manager.

**History:** Add. 2009, Act 181, Imd. Eff. Dec. 15, 2009.

### 141.1242 Revoking declaration of financial emergency; recommendation; resolution.

Sec. 42. The superintendent of public instruction may determine and certify that the conditions for revoking the declaration of a financial emergency have been met after receiving a recommendation from the emergency financial manager. The emergency financial manager may condition his or her recommendation to the superintendent of public instruction upon the school board's adoption of a resolution that will ensure the adoption of a balanced budget, elimination of any remaining accumulated deficit, and the prevention of additional negative fund balances.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

### 141.1243 Assistance and information; compliance.

Sec. 43. The superintendent of public instruction; the department of education; and the school board, administrators, and employees of a school district that has a financial emergency shall provide the assistance and information considered necessary and requested by the emergency financial manager in the effectuation of his or her powers and duties under this article. The school board shall comply with orders issued by the emergency financial manager and may take those actions necessary to comply with this article and as may be prescribed by the review team, the superintendent of public instruction, or the emergency financial manager in implementing this article.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

### 141.1244 Liability.

Sec. 44. The state, the superintendent of public instruction, and an emergency financial manager are not liable for any obligation of or claim against a school district resulting from actions taken in accordance with this article.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

# ARTICLE 6
## MISCELLANEOUS PROVISIONS

**141.1291 Repeal of MCL 141.1101 to 141.1118.**

Sec. 91. Act No. 101 of the Public Acts of 1988, being sections 141.1101 to 141.1118 of the Michigan Compiled Laws, is repealed.

**History:** 1990, Act 72, Imd. Eff. May 15, 1990.

13-53846-swr    Doc 7943-1   Filed 09/02/14   Entered 09/02/14 15:36:02   Page 115 of 110
145

# Exhibit 6(C)

# Brief Filed by Michigan Attorney General at the Michigan Court of Claims, April 14, 2014



P.O. BOX 30754
LANSING, MICHIGAN 48909

**BILL SCHUETTE**
ATTORNEY GENERAL

April 14, 2014

Court of Claims                          **Hand Delivered**
Clerk of the Court
2nd Floor, Hall of Justice
925 West Ottawa Street
Lansing, MI 48909-7522

     Re:   *Allen Park Retirees et al v State of Michigan*
            Court of Claims No. 13-000164-MZ

Dear Clerk:

     Enclosed for filing please find Defendant's Reply Brief with Proof of Service
on opposing counsel.

                        Sincerely,

                        Erik A. Graney
                        Assistant Attorney General
                        State Operations Division
                        Phone:     (517) 373-1162
                        Fax:        (517) 373-2060

EAG/dab
Enc.
c:    Mark A. Porter

2013-0057509-B

STATE OF MICHIGAN

IN THE COURT OF CLAIMS

ALLEN PARK RETIREES ASSOCIATION,
INC., A NON-PROFIT CORPORATION,
AND ITS REPRESENTATIVE
PLAINTIFF RUSSELL PILLAR,
ON BEHALF OF HIMSELF                    Case No. 13-000164-MZ
AND OTHERS SIMILARLY
SITUATED IN THE ASSOCIATION             Hon. Amy Ronayne Krause
AS A CLASS,

                    Plaintiffs,

v

THE STATE MICHIGAN, A BODY POLITIC,
and THE STATE OF MICHIGAN DEPARTMENT
OF TREASURY,

Joint and Several.

                    Defendants.

_____/

**PROOF OF SERVICE**

STATE OF MICHIGAN    )
                     ) ss.
COUNTY OF INGHAM     )

        The undersigned certifies that on April 14, 2014, she served a copy of
Defendant's Reply Brief by e-mail and First Class Mail upon:

Mark A. Porter
Mark A. Porter & Associates PLLC
551 East 11-Mile Road – Suite 3-D
P.O. Box 71527
Madison Heights, MI 48071-0527

                                    _Denise Beechler_
                                    Denise Beechler, Legal Secretary

2013-0057509-B

STATE OF MICHIGAN

IN THE COURT OF CLAIMS

ALLEN PARK RETIREES ASSOCIATION,
INC., A NON-PROFIT CORPORATION,
AND ITS REPRESENTATIVE
PLAINTIFF RUSSELL PILLAR,
ON BEHALF OF HIMSELF                            Case No. 13-000164-MZ
AND OTHERS SIMILARLY
SITUATED IN THE ASSOCIATION              Hon. Amy Ronayne Krause
AS A CLASS,

            Plaintiffs,

v

THE STATE MICHIGAN, A BODY POLITIC,
and THE STATE OF MICHIGAN DEPARTMENT
OF TREASURY,

Joint and Several.

            Defendants.
_____/

Mark A. Porter (P42280)                    Erik A. Graney (P69942)
Attorney for Plaintiffs                       Suzanne Hassan (P67620)
Mark A. Porter & Associates PLLC      James J. Kelly (P72111)
551 East 11-Mile Road – Suite 3-D      Attorneys for Defendants, State of
P.O. Box 71527                                Michigan, Department of Treasury,
Madison Heights, MI 48071-0527        and Joyce A. Parker
Phone: (248) 547-1911                      Department of Attorney General
Fax:    (248) 547-1917                       State Operations Division
                                                   P.O. Box 30754
                                                   Lansing, MI 48909
                                                   Phone: (517) 373-1162
_____/

## DEFENDANTS' REPLY BRIEF

Defendants file this reply to bring to the Court's attention relevant

developments in the Wayne County Circuit Court since the filing of their motion

and to notify the Court of the applicability of the automatic stay in effect pursuant to the Detroit bankruptcy case.

## Case Update

After Defendants filed their motion for relief from this Court's February 24, 2014 sua sponte order, the Wayne County Circuit Court dismissed Case No. 14-001274-CZ upon the stipulation of the parties. (**Ex A**- stipulated order of dismissal.) Meanwhile, the original case filed in Ingham County Circuit Court, but transferred to Wayne County Circuit Court, was assigned Case No. 14-003826-CZ. As of the date of this filing, Case No. 14-003826-CZ is the only related case currently pending in Wayne County.[1]

## Applicability of Bankruptcy Stay

Defendants must also notify the Court at this time that this case is subject to the automatic stay in effect due to the Detroit Bankruptcy case. Accordingly, Defendants must clarify the relief requested in their motion to set aside this Court's order. Specifically, Defendants request that this Court grant their motion and set aside its Order staying this case pending resolution of the Wayne County Circuit

---

[1] Case No. 14-001274-CZ was the only case referenced by this Court in its sua sponte Order holding its case in abeyance. Under a literal reading of that sua sponte Order, since Case No. 14-001274-CZ has now been dismissed, and Plaintiffs have provided this Court with notice of that fact, this case is no longer held in abeyance. But, for the reasons discussed in Defendants' motion, to the extent the Court made a clerical error in referring to Case No. 14-001274-CZ, instead of the case originating in Ingham County Circuit Court and transferred to Wayne County Circuit Court (Case No. 14-003826-CZ), relief from the sua sponte order is still warranted.

2

Court litigation and then order this case closed for administrative purposes until the bankruptcy stay is lifted.

The automatic stay under the bankruptcy code is broad in scope. 11 USC § 362. Specifically, 11 USC § 362(a)(1) operates to stay:

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title

11 USC § 362 is applicable to the Detroit bankruptcy under 11 USC §§ 901, 922. Further, bankruptcy courts have jurisdiction to extend the automatic stay to non-debtors. 11 USC § 105(a). The court presiding over the Detroit bankruptcy case extended the automatic stay to apply to actions against the Governor, the State Treasurer, and their respective staff, agents, and representatives, that directly or indirectly interfere with the City of Detroit's activities in the bankruptcy proceedings. (**Ex B**- July 25, 2013 order; **Ex C**- Debtor's motion to extend stay).[2]

The Department of Treasury is a Defendant in this case and thus falls under the order of extension. Also, Plaintiffs seek a declaratory ruling that PA 436 is unconstitutional. Since PA 436 is the Act that provided for the appointment of the Detroit Emergency Manager, as well as the Emergency Manager's authority to file the bankruptcy petition, a ruling from this Court that PA 436 is void could, at least

---

[2] The bankruptcy court's jurisdiction extends to any proceeding that "could conceivably have any effect on the estate being administered in bankruptcy." *8300 Newburgh Rd Partnership v Time Constr (In re Time Constr)*, 43 F3d 1041 1044-1045 (6th Cir 1995).

3

indirectly, interfere with the City of Detroit's activities in the bankruptcy proceedings. Therefore, the automatic stay of the bankruptcy court applies, and the case must be administratively closed.

But Plaintiffs may petition the bankruptcy court for relief from the automatic stay. 11 USC § 362(d)-(g). "The automatic stay is an injunction issuing from the authority of the bankruptcy court, and bankruptcy court orders are not subject to collateral attack in other courts." *Gruntz v County of Los Angeles (In re Gruntz)*, 202 F3d 1074, 1082 (9th Cir 2000); citing *Celotex Corp v Edwards*, 514 US 300, 313 (1995). "Any state court modification of the automatic stay would constitute an unauthorized infringement upon the bankruptcy court's jurisdiction to enforce the stay." *In re Gruntz*, 202 F3d, at 1082.

And if Plaintiffs are successful in that regard, or if the Detroit bankruptcy is concluded, this case can immediately proceed upon reopening and without delay if the February 24, 2014 sua sponte order is vacated now. As such, before this case is administratively closed, in order to properly posture the case to proceed upon the lifting of the automatic stay, the Court should vacate the sua sponte order holding this case in abeyance for the reasons set forth in Defendants' motion.

<u>Plaintiffs' Response to Defendants' Motion for Relief from this Court's Order</u>

The issues Plaintiffs raise in their response to the motion are both irrelevant and relate to matters outside of the scope of this Court's authority.[3]

---

[3] Furthermore, as set forth above, the proper action to be taken at this time is to administratively close this case.

4

# EXHIBIT B

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
-----------------------------------------------x
                                     :
In re                                :        Chapter 9
                                     :
CITY OF DETROIT, MICHIGAN,           :        Case No. 13-53846
                                     :
                    Debtor.          :        Hon. Steven W. Rhodes
                                     :
                                     :
-----------------------------------------------x
```

## ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON OFFICER EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR

This matter coming before the Court on the Motion of Debtor,

Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order,

Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer

Employees and (C) Agents and Representatives of the Debtor (the "Motion"),[1]

filed by the City of Detroit, Michigan (the "City"); the Court having reviewed the

Motion and the Orr Declaration and having considered the statements of counsel

and the evidence adduced with respect to the Motion at a hearing before the Court

(the "Hearing"); and the Court finding that: (a) the Court has jurisdiction over this

---

[1]    Capitalized terms not otherwise defined herein have the meanings given to
them in the Motion.



matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding

pursuant to 28 U.S.C. § 157(b), (c) notice of the Motion and the Hearing was

sufficient under the circumstances, (d) the unusual circumstances present in this

chapter 9 case warrant extending the Chapter 9 Stay to the State Entities, the

Non-Officer Employees and the City Agents and Representatives; and the Court

having determined that the legal and factual bases set forth in the Motion and the

Orr Declaration and at the Hearing establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.    The Motion is GRANTED.

2.    Pursuant to section 105(a) of the Bankruptcy Code, the

Chapter 9 Stay hereby is extended to apply in all respects (to the extent not

otherwise applicable) to the State Entities (defined as the Governor, the State

Treasurer and the members of the Loan Board, collectively with the State

Treasurer and the Governor, and together with each entity's staff, agents and

representatives), the Non-Officer Employees and the City Agents and

Representatives.

3.    For the avoidance of doubt, each of the Prepetition Lawsuits

hereby is stayed, pursuant to section 105(a) of the Bankruptcy Code, pending

further order of this Court.

4.     This order is entered without prejudice to the right of any

creditor to file a motion for relief from the stay imposed by this order using the

procedures of and under the standards of 11 U.S.C. § 362(d)-(g).

Signed on July 25, 2013

                                              _____/s/ Steven Rhodes_____
                                              Steven Rhodes
                                              United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re | No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | Chapter 9 |
| Debtor. | HON. STEVEN W. RHODES |

## STATE OF MICHIGAN'S RESPONSE TO ALLEN PARK RETIREES ASSOCIATION'S MOTION FOR CLARIFICATION AND RELIEF FROM THE COURT'S ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE, EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON OFFICER EMPLOYEES, AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR [DKT. #5455]

The State of Michigan, through its undersigned attorneys, requests that the Court (i) hold that its July 25, 2013 Stay Extension Order (Dkt. #166) applies to the *Allen Park Retirees* case, and (ii) deny the Allen Park Retirees' relief from the Stay Extension Order.

## INTRODUCTION

The *Allen Park* case makes facial challenges to the constitutionality of P.A. 436 brought under state law. Accordingly, the State Defendants notified the Court of Claims of the Chapter 9 stay and

this Court's July 25, 2013 Order extending that stay to certain State entities.

Even though the Complaint does not contain explicit references to the City of Detroit and EM Orr – a ruling in *Allen Park* that P.A. 436 is unconstitutional could potentially threaten the continuation of the City of Detroit's chapter 9 case because such a ruling could render that statute void *ab initio*, and at a minimum compromise the authority of all EMs appointed and acting pursuant thereto. This could call into question whether EM Orr has the authority to continue to prosecute this chapter 9 case.

Further, contrary to the *Allen Park* plaintiffs' assertions, the Court's reasoning relating to the *Phillips* case distinguishes it from the case at bar. The *Allen Park* plaintiffs' Complaint seeks declaratory relief restraining the State from authorizing *all* emergency managers, including EM Orr, to exercise authority granted under P.A. 436. *Complaint,* Dkt. #5455 at 51.

# ARGUMENT

## A.    The Stay Extension Order applies to the *Allen Park* case.

The Stay Extension Order (Dkt. #1536) granted the City of Detroit's motion in which it requested that the automatic stay be extended to cases "that have the direct or practical effect of denying the City the protections of the automatic stay imposed by sections 362 and 922 of the Bankruptcy Code." *Motion to Extend Stay*, Dkt. #56 at 15. By issuing the Stay Extension Order, the Court made clear that lawsuits challenging P.A. 436 must be stayed during the pendency of the City of Detroit's chapter 9 case to the extent they threaten to diminish the authority of EM Orr to proceed on behalf of the City. The *Allen Park* case has the "practical effect" of denying the City of Detroit the ability to continue its chapter 9 case and poses the very threat that sections 362 and 922 of the Bankruptcy Code and the Stay Extension Order seek to eliminate.

The *Allen Park* Complaint seeks a declaratory judgment holding that P.A. 436 is "unconstitutional, null and void." *Verified Complaint,* Dkt. #5455 at 51. If the *Allen Park* plaintiffs are granted the declaratory relief they seek, P.A. 436 could be rendered void *ab initio*.

See *Green v. Mansour*, 474 U.S. 64, 68 (1985) citing *Ex parte Young*, 209 U.S. 123 (1908). A statute that is void *ab initio* is void as of its enactment. *Norton v. Shelby County*, 118 U.S. 425, 442 (1886) ("An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed."); See also *Stanton v. Lloyd Hammond Produce Farms*, 400 Mich. 135, 144, 253; N.W.2d 114, 117 (1977).

The *Allen Park* plaintiffs contend that their Complaint "does not seek to remove any State emergency manager" (*Brief in Support*, Dkt. #5455 at 16) but rather, that they seek only to "stop the State's emergency manager in Allen Park from violating [P.A. 436] … as well as alleging fact-based 'as applied' violations of the Michigan Constitution." *Id.* at 16. The *Allen Park* plaintiffs further contend that their lawsuit does not affect the City of Detroit's chapter 9 case or EM Orr in any way because a further action would have to be instituted to remove EM Orr from his emergency manager position. *Id.* at 20

But, Sixth Circuit case law suggests that even without a separate lawsuit or claim for injunctive relief (i.e., the further action), "[a]n

unconstitutional application of a statute and passage of a statute that is unconstitutional in all its applications may each be equally void from the outset." *Village of Mainville, Oh. v. Hamilton Tp. Bd. of Trustees*, 726 F.3d 762, 766 (6th Cir. 2013); See also *Stanton,* 253 N.W.2d 114. Thus, even if EM Orr is not actually *removed* from his emergency manager position, if plaintiffs are successful, this case raises serious questions whether EM Orr may continue to exercise authority under P.A. 436 and adversely impacts the City of Detroit's chapter 9 case.

If the *Allen Park* case is allowed to continue, P.A. 436 – the statute under which EM Orr derives authority to act on behalf of the City of Detroit – could be held to be unconstitutional, and thus, may be rendered "inoperative" raising the question of whether EM Orr may continue to act on behalf of the City in this chapter 9 case.

### B.     The *Phillips* case is distinguishable from the *Allen Park* case.

The *Allen Park* plaintiffs urge the Court to hold that the Stay Extension Order is not applicable for the same reasons that it held that the Stay Extension Order did not apply to the *Phillips* case. *Opinion and Order*, Dkt. #1536. But, with regard to the *Phillips* case, the Court

5

13-53846-swr   Doc 7441   Filed 09/12/14   Entered 09/12/14 10:36:24   Page 131 of 126
13-53846-swr   Doc 7441   Filed 09/12/14   Entered 09/12/14 10:36:24   Page 131 of   126
145

was persuaded by the representations that the *Phillips* plaintiffs would "withdraw from their suit any request for relief as to the Detroit emergency manager." *Id.* at 8. The *Phillips* plaintiffs did, in fact, amend their complaint to delete references to EM Orr and the City of Detroit, and to eliminate their request for injunctive relief restraining the State from granting authority to emergency managers under P.A. 436. *Phillips, et al. v. Snyder, et al.*, E.D. Mich. No. 2:13-cv-11370, R. 1, Complaint, Pg ID #49 (see also, Dkt. #1888-7 at 43) compare to, *Phillips*, E.D. Mich. No. 13-cv-11370, R. 39, First Amended Complaint, Pg ID #551 (see also, Dkt. #1004-7 at 50).

This Court has held that the Stay Extension Order did not apply to the *Phillips* case because by amending their complaint, the *Phillips* plaintiffs no longer sought to restrain the State from granting authority to EM Orr. In contrast, the *Allen Park* plaintiffs seek declaratory relief restraining the State from granting authority under P.A. 436 to *any* emergency manager appointed in Michigan - which would include EM Orr. *Complaint*, Dkt. #5455 at 51. Thus, the *Allen Park* plaintiffs' assertion that "[t]here are no legal, factual, or practical ties between the Allen Park retirees' pending litigation against the State and the City of

6

145
13-53846-swr   Doc 7441-31   Filed 09/12/14   Entered 09/12/14 16:36:24   Page 132 of 127
13-53846-swr   Doc 7441-31   Filed 09/12/14   Entered 09/12/14 16:36:24   Page 132 of   127

Detroit [chapter 9 case]" (*Motion for Clarification*, Dkt. #5455 at 4) is incorrect.

> **C.** **The Court should reject the *Allen Park* plaintiffs' suggestion that the severability provision of P.A. 436 saves the *Allen Park* case from being subject to the Stay Extension Order.**

The *Allen Park* plaintiffs suggest that because P.A. 436 contains a severability provision, P.A. 436 could be declared invalid yet the declaration would have no effect on EM Orr or the City of Detroit. In support of this suggestion, the *Allen Park* plaintiffs quote section 33 of P.A. 436, which states:

> If any portion of this act or the application of this act to any person or circumstances is found to be invalid by a court, the invalidity shall not affect the remaining portions or applications of this act which can be given effect without the invalid portion or application. The provisions of this act are severable.

Mich. Comp. Laws § 141.1573.

The *Allen Park* plaintiffs suggest that P.A. 436 could be held unconstitutional as to the authority granted the Allen Park Emergency Manager, yet remain valid as to the authority granted to other emergency managers, including EM Orr. This suggestion implies that the *Allen Park* case presents only "as applied" constitutional challenges

and ignoring the fact that the Complaint actually presents facial constitutional challenges, seeking a declaratory judgment that the "legislative and executive authority" of the State to "empower the State's Emergency Managers" to take certain actions under P.A. 436 is "unconstitutional, null and void." *Complaint*, Dkt. #5455 at 51.  This request for declaratory relief is so broadly stated that if such relief was granted it could potentially apply to the authority granted to *all* emergency managers in Michigan, including EM Orr.  Thus, the severability provision of P.A. 436 does not save the *Allen Park* case from being subject to the Stay Extension Order.

## D. Notifying the State Court of Claims of the Stay was proper.

The *Allen Park* plaintiffs confuse the issue of application of the stay with the issue of relief from the stay.  They assert that, because this Court held the stay does not apply in *Phillips* (as amended), the State should know that the stay does not apply to the *Allen Park* case.

First, *Phillips* is a case with different facts and different legal claims.  Second, on its face, the Stay Extension Order extending the chapter 9 automatic stay to State entities, including the Governor and

the State Treasurer, and their staffs, agents, and representatives

applies. (Docket 166 at 2.)[1] The *Allen Park* plaintiffs essentially, and

incorrectly, assert that this Court's order in *Phillips* effectively modified

the scope and application of the July 25, 2013 Stay Extension Order for

all subsequent lawsuits. The Allen Park plaintiffs' further suggest it is

for the State to determine whether the extended stay applies in any

particular case. (Brief, Dkt # 5455 at 15-17) Such a result is improper

and contrary to well-established law. 11 U.S.C. § 362 (d)-(g); see also

*Gruntz v. County of Los Angeles* (*In re Gruntz*), 202 F.3d 1074, 1082 (9th

Cir. 2000); citing *Celotex Corp v. Edwards*, 514 U.S. 300, 313 (1995).

---

[1] The *Allen Park* plaintiffs argued in State Court that the stay does not
apply to their case, in part because of this Court's ruling in *Phillips*, and
in part because the case is not about P.A. 436. In fact, the plaintiffs
presented the *Phillips* ruling for consideration in determining whether
the stay should be recognized. The Court of Claims found that the stay
should be entered and it was for this Bankruptcy Court to decide
whether it should be lifted.

## CONCLUSION

The State entities, therefore, request the Court hold that the Stay Extension Order applies to the *Allen Park* case and deny the *Allen Park* plaintiffs' relief from the Stay Extension Order.

Respectfully submitted,


*/s/ Matthew Schneider*
Matthew Schneider
Chief Legal Counsel
P.O. Box 30754
Lansing, Michigan  48909
(517) 373-3203
SchneiderM7@michigan.gov
[P62190]

Steven G. Howell
Special Assistant Attorney General
Dickinson Wright PLLC
500 Woodward Avenue, Suite 4000
Detroit, Michigan  48226-3425

Attorneys for the State of Michigan

Dated:  July 9, 2014

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Bankruptcy Case Number 13-53846 |
| City of Detroit, Michigan, | : | Honorable Steven W. Rhodes |
| Debtor. | : | Chapter 9 |
| _____ | : | |

## CITY OF DETROIT'S OBJECTION TO ALLEN PARK RETIREES ASSOCIATION, et al.'s MOTION FOR CLARIFICATION AND RELIEF FROM THE COURT'S ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE, EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON OFFICER EMPLOYEES AND <u>(C) AGENTS AND REPRESENTATIVES OF THE DEBTOR</u>

The City of Detroit (the "<u>City</u>"), by its undersigned counsel, files this objection ("<u>Objection</u>") to the relief sought in *Allen Park Retirees Association, et al.'s Motion for Clarification and Relief from the Court's Order Pursuant to Section 105(A) of the Bankruptcy Code, Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non Officer Employees and (C) Agents and Representatives of the Debtor* ("<u>Motion</u>," Doc. No. 5455), respectfully stating as follows:

Although this matter bears similarities to the previous *Phillips* motion for relief from stay, it is distinguishable because the Allen Park Retirees, as opposed to the *Phillips*' plaintiffs, seek a declaratory judgment prohibiting all emergency managers from exercising authority granted to them pursuant to P.A. 436 M.C.L. § 141.1541 *et seq*. ("<u>PA 436</u>"). (Doc. Nos. 1004, 1536.) This Court premised its ruling in *Phillips* on the basis that the amended complaint would have no bearing

on the City's bankruptcy case. (Doc. No. 1536 at 8.) A similar conclusion cannot be reached here.

In addition to the request for a declaratory judgment, the Allen Park Retirees assert facial challenges to the constitutionality of PA 436. Notwithstanding this Court's decision upholding the constitutionality of PA 436, the City was and remains concerned that issues of issue or claim preclusion could arise, thus delaying or otherwise negatively affecting the City's bankruptcy case.

A law found to be unconstitutional is treated as unenforceable. *Coleman v. Ann Arbor Transp. Auth.*, 904 F. Supp. 2d 670, 682-83 (E.D. Mich. 2012). In Michigan, the default rule is to treat such statutes as void *ab initio*. *Stanton v. Lloyd Hammond Produce Farms*, 400 Mich. 135, 144-45 (1977). Thus, a finding that PA 436 is unconstitutional could cast doubt upon the City's bankruptcy case, and most importantly, the various agreements that have been reached between the City and objecting parties, and the confirmability of the City's plan of adjustment. It is unrealistic to think that parties such as Syncora would not endeavor to utilize such a ruling to further complicate, delay, or even defeat the confirmation of the plan.

Here, though much of the Complaint appears styled as an "as applied" challenge focused on Allen Park and not a direct attack on the statute itself, the relief sought is broader. *See*, *e.g.*, Prayer for Relief, ¶ D ("Enter Declaratory

Judgment that the legislative and executive authority purported to empower the State's Emergency Managers to unilaterally alter retiree health insurance pursuant to 2012 PA 436 is unconstitutional, null and void."). This broad relief, if granted, could adversely affect the plan confirmation process as discussed above.

## CONCLUSION

WHEREFORE, to the extent that the Motion seeks relief that could be construed as a facial challenge to PA 436 or otherwise affect the powers of the Detroit Emergency Manager, the City asks this Court to DENY the Motion.

July 9, 2014                    Respectfully submitted,

                               By: /s/Timothy A. Fusco
                                   Timothy A. Fusco (P13768)
                                   Jonathan S. Green (P33140)
                                   Stephen S. LaPlante (P48063)

                               MILLER, CANFIELD, PADDOCK AND
                               STONE, P.L.C.

                               150 West Jefferson, Suite 2500
                               Detroit, Michigan 48226
                               Telephone: (313) 963-6420
                               Facsimile: (313) 496-7500
                               green@millercanfield.com
                               laplante@millercanfield.com
                               fusco@millercanfield.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)

JONES DAY

North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)

JONES DAY

555 South Flower Street Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

ATTORNEYS FOR THE CITY OF DETROIT

In re,                                                          Chapter 9

CITY OF DETROIT, MICHIGAN,                          Case No. 13-53846

    Debtor.                                              Hon. Steven W. Rhodes

---

**REPLY BRIEF:**
**ALLEN PARK RETIREES ASSOCIATION, et al.'s MOTION FOR CLARIFICATION AND RELIEF FROM THE COURT'S ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE, EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON OFFICER EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR**

    NOW COME Petitioners, the Allen Park Retirees Association, Inc., and lead Plaintiff Russell Pillar (herein "**the Petitioners**") to reply to the Debtor and the State as Interested Party:

### 1990 P.A. 72 Is The Statute At The Center Of Petitioners' Complaint

    **Docket #5455** is the Petitioners' Motion; and their Verified Complaint is Attachment 6(B). Paragraphs 16-22 of the Complaint specifically allege that the unilateral breaches of their health care contracts occurred during the interregnum between the voters' repeal of **2011 P.A. 4** and the effective date of **2012 P.A. 436,** now before this Court. The State had declared that **1990 P.A. 72** was resurrected during the interregnum, and Petitioners have not challenged that assertion. Attachment #5 of the Complaint at Docket #**5455** contains the complete P.A. 72.

    In Act 72, MCL 141.1222 did not authorize any State Emergency Manager to take a City into Chapter 9 bankruptcy. Rather, the statute only gave the Emergency Manager the authority to "authorize" the local government unit to itself file for bankruptcy. The objections of the Debtor-City and the State as an "Interested Party" are irrelevant to the gravamen of the actual Complaint.

## <u>The Cases Cited In The Responses Have Been Clearly Misstated</u>

Both the Debtor-City and State claim that the entire Act 436 is in peril, Statewide, by the fact that about 150-retirees from the City of Allen Park have challenged their economic injuries. But all of the cases cited by the Debtor-City and State involve Constitutional challenges limited to a single sub-section of an Act or administrative rule – not an entire statute itself. [1] The black letter law in both Federal and State Courts severs impermissible statute sections, to save the remaining and permissible legislation. See <u>MCL 8.5</u> also:

> Statutes should be interpreted to sustain their constitutionality when it is possible to do so…[the Court] will uphold the parts which are separable from the repugnant provisions." *Pletz v. Secretary of State*, 125 Mich. App. 335, 375; 336 N.W.2d 789 (1983) (Internal citations omitted).

And in the Federal Courts:

> …when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force… Accordingly, the "normal rule" is that partial, rather than facial, invalidation is the required course, such that a "statute may ... be declared invalid to the extent that it reaches too far, but otherwise left intact." *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 328-329; 126 S. Ct. 961 (2006) (Internal citations omitted).

Beginning at <u>page-88</u> of this Court's Order of Eligibility, **Docket #1945**, this Court's inspection of **2012 P.A. 436** limited its analysis to **§18**, (<u>MCL 141.1558</u>) and the authority of the State's Emergency Manager to bring the City Detroit within the Court's jurisdiction.

As detailed above, however, the bankruptcy sections of P.A. 436 are irrelevant in the Petitioners' Complaint, in that the damage done to them occurred while **1990 P.A. 72** was in

---

[1] *Stanton v. Lloyd Hammond Produce Farms*, 400 Mich. 135; 253 N.W.2d 114 (1977) merely decided whether the previous case of *Gutierrez v. Glaser Crandall Company*, 388 Mich. 654; 202 N.W.2d. 786 (1972) applied retroactively. *Gutierrez* in turn had declared only subsection **MCL 418.155(d)** of the State's Worker Disability Act to be unconstitutional; not the entire Act. *Id*, at 668, 674-675. Likewise, *Village of Mainville, Oh. v. Hamilton Twp. Bd. of Trustees*, 726 F.3d 762 (6th Cir. 2013) examined Ohio Revised Code subsection 5301.252 (Affidavits). In *Coleman v. Ann Arbor Transp. Authority*, 904 F. Supp. 2d 670, 676, (E.D. Mich. 2012) Plaintiff cited a single administrative rule of the transit system.

effect.  That statute did not give a State Emergency Manager the authority to file for bankruptcy.

## The Jurisdiction of the Bankruptcy Court in Equity

The principles and rules of equity jurisprudence apply to bankruptcy courts. *Young v. U.S.*, 535 U.S. 43, 50; 122 S.Ct. 1036 (2002).  The traditional understanding is that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships. *U.S. v. Energy Resources, Inc.,* 495 U.S., 545, 549; 110 S.Ct. 1239 (1990). Even if consistent with the bankruptcy code, however, a bankruptcy court order can be inappropriate if it conflicts with another law that should have been taken into consideration in the exercise of the court's discretion. *Id*, at page-550.

The Petitioners are neither creditors nor the debtor in the case at bar; and the City of Allen Park is separate and apart from the City of Detroit.  It is undisputed in the pleadings of all parties now before this Court that the petition before it is a non-core issue, relative to the Debtor-City of Detroit.

The gravamen of the State's injury to Petitioners occurred under **1990 P.A. 72**, and was continued "as applied" when **2012 P.A. 436** became effective, involving _non_-bankruptcy related issues.

The State's only standing in this Court is as an "Interested Party."  Yet it now tries to manipulate the standing of the Debtor-City's Emergency Manager, in order to stretch the Court's equity like a thin rubber band around the entire State.  Its goal is to have this Court give cover and harbor for all unbridled powers claimed by the State's Legislative and Executive Branches via P.A. 436.

A state legislature, however, cannot pass a statute that expands the jurisdiction of a federal court. "Since federal equity jurisdiction depends on federal statutes, the [State] statutory

3

provision has little meaning as applied to such cases." *Buford v. Sun Oil Company*, 319 U.S. 315, 317; 63 S.Ct. 1098 (1943). Stated in straight-forward terms:

> …. the equitable powers conferred by the Judiciary Act of 1789 did not include the power to create remedies previously unknown to equity jurisprudence. Even when sitting as a court in equity, we have no authority to craft a "nuclear weapon" of the law …. *Grupo Mexicano de DeSarrollo v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 332; 119 S.Ct. 1961 (1999).

A bankruptcy court's authority to issue injunctive relief "related to" its jurisdiction cannot be limitless. *Celotex Corp. v. Edwards*, 514 U.S. 300, 308; 115 S.Ct 1493 (1995). The property rights claimed by Petitioners do not involve the estate of the Debtor-City. In addition, as third parties to this Court's docket, the cause action between the Petitioners and the State has no effect on the estate of the Debtor-City. Petitioners' cause of action is thereby beyond the Court's jurisdiction. *Id*, at Fn-6.

These limits run in parallel to the "case and controversy" requirements of U.S. Const. art. III, §2:

> Just as this restriction applies to federal district courts, the courts of appeals, and the U.S. Supreme Court, this restriction necessarily applies to federal bankruptcy courts. *Cassim v. Educational Credit Management Corp.*, 594 F. 3d. 432, 437 (6th Cir. 2010)

Given that the initial actions taken against Petitioners by the State's Emergency Manager were done in violation of the 1990 Emergency Manager Act – and that there is no credible claim of any effect on the estate of the Debtor-City/Detroit – the State's claim to the Michigan Court of Claims was clearly specious.

### The State Seeks To Deny All Recourse And Remedies

The State's bald assertions of injunctive relief seek to completely remove all due process rights from the Allen Park retirees who have been harmed by the Emergency Manager of the State. It thereby falls squarely on point with another bankruptcy case, *Boddie v. Connecticut*,

401 U.S. 371; 91 S.Ct. 780 (1971). In that case, bankruptcy law was claimed to present a complete bar to the State's citizens' access to the State Courts for divorce proceedings. The Court rejected that denial of rights, stating:

> Resort to the judicial process by these plaintiffs is no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court. For both groups this process is not only the paramount dispute-settlement technique, but, in fact, the only available one. *Id*, at pages 376-377.

The State would have the Petitioners wither and die off while blocking all access to all Courts. It also gives the State *carte blanche* encouragement to keep at least one local unit of government in bankruptcy into perpetuity – thereby blocking all recourse to the Courts forever.

If, *arguendo*, the State's claim of this Court's powers in equity are true, then there is only one true remedy in equity that protects Petitioners. Using as a guide the State's extremely expansive reading of the Court's Order at **Docket #166** the Court's injunctive relief must be expanded to freeze all actions by all of the State's Emergency Managers – aside from the Emergency Manager for the Debtor-City of Detroit – pending the final outcome of this docket.

All are thereby treated alike – the powerful in State government; and the retirees who are currently being treated as expensive and unwanted chattel.


Dated for entry and service by electronic filing:


<div>

_____July 18, 2014_____    By: _____/s/ **Mark A. Porter**_____
                                     Mark A. Porter (P-42280)
                                     Attorney for the Petitioners APRA & Russell Pillar
                                     Mark A. Porter & Associates PLLC
                                     551 East 11-Mile Road – Suite 3-D
                                     P. O. Box 71527
                                     Madison Heights, Michigan 48071-0527
                                     (248) 547 – 1911
                                     (248) 547 – 1917 FAX
                                     mporter@map-law.com

</div>

5