UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FILED (1)

2014 SEP 12 P 2:04

U.S. BANKRUPTCY COURT
E.D. MICHIGAN-DETROIT

In the matter of:

CITY OF DETROIT, MICHIGAN, Debtor /

No. 13-53846-swr
Chapter 9
Hon. Steven W. Rhodes

**DOCUMENTS FOR THE COURT TO CONSIDER PURSUENT TO DOCKET 6896 LINE ITEM 20**

Thomas Cattron hereby request the Court to consider the attached documents and to modify the Plan of Adjustments to be consistent with prevailing laws as indicated below.

1. I am interested in the Bankruptcy of the city of Detroit (City) because I retired from the city of Detroit Department of Transportation in 2012.

2. The subject matter of the attached documents are as follows:

    a. Document titled: *Transit Cooperative Research Program, Sponsored by the Federal Transit Administration, LEGAL RESEARCH DIGEST, June 1995--Number 4*; see Page 4(I)(B)(1)(¶4) *Legislative History of Section 13(c)* which states:

    > *The transit unions were concerned that private transit employees would consequently lose collective bargaining rights, the right to strike, and pension and retirement benefits, because state and local government employers were (and remain) expressly exempt from coverage under the National Labor Relations Act (NLRA).*[10]

    and, see Page 7(I)(D)(2) *Preservation of Rights, Privileges, and Benefits under Existing Collective Bargaining Agreements* which states:

    > *This is a statutory requirement under Section 13(c)(1). Existing rights and benefits obtained through the process of collective bargaining (including pension benefits) must be preserved and continued, but* ***may be modified (except for vested rights)*** *through the collective bargaining process to substitute other rights, privileges, and benefits.*[42]

    This document rebuts the assertions made in DOCKET 7303 Line Items 97 through 101.

    b. Detroit City Code, Sec. 47-3-8. *1998 Defined Contribution Plan; vesting.* Which indicates the employee and employer retirement contributions are vested rights. The document, when read in support of Document A (above), rebuts the assertion

made in DOCKET 7303 Line Item 97 that transit employee vested benefits can be negotiated.

c. Booklet titled: Questions and Answers on the General Retirement System 1973 Defined Benefit/Defined Contribution Plan {FTE 92151 – March 2002}, see Page15(14)(b) which states:

> *The Defined Contribution Plan is funded only by employee contributions and earnings from the assets of the System.*

The System means General Retirement System, as in the booklet title. This document rebuts the assertion that earnings of the Defined Contribution Plan were improperly distributed to employees, which is the basis indicated for the ASF recoupment.

d. Laws that limit "clawback" arrangements to an finance industry standard of two years and to executive officers (ASF recoupment) under the Dodd Frank Act, Section 210(s)(1) which states:

> *(s) RECOUPMENT OF COMPENSATION FROM SENIOR EXECUTIVES AND DIRECTORS.—*
>
> *(1) IN GENERAL.—The Corporation, as receiver of a covered financial company, may recover from any current or former senior executive or director substantially responsible for the failed condition of the covered financial company any compensation received during the 2-year period preceding the date on which the Corporation was appointed as the receiver of the covered financial company, except that, in the case of fraud, no time limit shall apply.*

and also under Sarbanes-Oxley Act of 2002, Section 306(a)(2)(A) and (B) which states:

> *(2) REMEDY.—*
> *(A) IN GENERAL.—Any profit realized by a director or executive officer referred to in paragraph (1) from any purchase, sale, or other acquisition or transfer in violation of this subsection shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such director or executive officer in entering into the transaction.*
> *(B) ACTIONS TO RECOVER PROFITS.—An action to recover profits in accordance with this subsection may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer fails or refuses to bring such action within 60 days after the date of request, or fails diligently to prosecute the action thereafter, except that no such suit shall be brought more than 2 years after the date on which such profit was realized.*

These documents rebuts the assertion that a ten (10) year period is proper for the ASF recoupment, and that the subjects for recoupment should be the employees rather than the senior executives or directors in charge of the Defined Contribution Plan. Also, in Section 304 (copy attached) affirm the responsible parties as CEO and CFO.

I hereby certify that the statements made herein are true and correct under penalty of perjury and contempt of Court under the laws of the United States of America.

Wherefore I request the Court deny the Debtor's proposed relief sought in said filing and modify the Plan of Adjustment to be consistent with the law.

Respectfully submitted,

Name: Thomas Cattron

Signature: [signature]

Address: 13330 Vassar Ave.
Detroit, MI 48235
Email: thoscat@yahoo.com

Dated: September 12, 2014

Transit Cooperative Research Program
Sponsored by the Federal Transit Administration

# LEGAL RESEARCH DIGEST

June 1995--Number 4

Subject Areas: IA Planning and Administration; IC Transportation Law; and VI Public Transit

## Transit Labor Protection--A Guide to Section 13(c) Federal Transit Act

*This report was prepared under TCRP Project J-5, "Legal Aspects of Transit and Intermodal Transportation Programs, "for which the Transportation Research Board is the agency coordinating the research. The report was prepared by G. Kent Woodman, Jane Sutter Starke, and Leslie D. Schwartz. James B. McDaniel, TRB Counsel for Legal Research, was the principal investigator and content editor.*

### THE PROBLEM AND ITS SOLUTION

In reauthorizing federal assistance for surface transportation programs through the 1990s, the Intermodal Surface Transportation Efficiency Act calls for the adaptation of new concepts and techniques in planning, funding, constructing, and operating these programs. These changes will affect the institutional framework--laws and administrative processes--as well as engineering and operational elements of these programs. The nation's transit agencies need to have access to a program that can provide authoritatively researched, specific, limitedscope studies of legal issues and problems having national significance and application to their businesses. The TCRP Project J-5 is designed to provide insight into the operating practices and legal elements of specific problems in transportation agencies.

The intermodal approach to surface transportation requires a partnership between transit and highways, and in some instances, waterways. To make the partnership work well, attorneys for each mode need to be familiar with the legal framework and processes of the other modes. Research studies in areas of common concern will be needed to determine what adaptations are necessary to carry on successful intermodal programs.

Transit attorneys have noted that they share common interests (and responsibilities) with highway and water transport agencies in several areas of transportation law, including

- Environmental standards and requirements;
- Construction and procurement contract procedures and administration;
- Civil rights and labor standards; and
- Tort liability, risk management, and system safety.

In other areas of the law, transit programs may involve legal problems and issues that are not shared with other modes; as, for example, compliance with transit-equipment and operations guidelines, FTA financing initiatives, private sector programs, and labor or environmental standards relating to transit operations. Emphasis would be on research of current importance and applicability to transit and intermodal operations and programs.

### APPLICATIONS

Section 13(c) of the Federal Transit Act is an especially complex Federal requirement. It has a unique history, which must be appreciated. It is administered by two Federal agencies, primarily the U.S. Department of Labor (DOL) and secondarily the U.S. Department of Transportation (DOT), which do not always share the same policies or interpretations. Decisions regarding Section 13(c) are not generally published.

This report provides descriptions of how the Section 13(c) certification process works. It should be a reference for attorneys, transit administrators, labor representatives, comptrollers, transit planning and grant officials, Metropolitan Planning Organizations, and local officials.

TRANSPORTATION RESEARCH BOARD
NATIONAL RESEARCH COUNCIL

CONTENTS

FOREWORD .......... 3

INTRODUCTION AND OVERVIEW .......... 3

I. BACKGROUND OF SECTION 13(C) LABOR PROTECTION .......... 4
- A. Statutory Requirements .......... 4
- B. Legislative History of Section 13(c) .......... 4
- C. Historical Perspective--Labor Protections in the Railroad Industry .......... 6
- D. Common Elements of Section 13(c) Agreements .......... 6
- E. Nature and Source of Section 13(c) Guidance .......... 8

II. THE SECTION 13(C) PROCESS AND PROCEDURAL ISSUES .......... 9
- A. The Section 13(c) Certification Process .......... 9
- B. Section 13(c) Process for "Standardized" Protections .......... 13
- C. The Section 13(c) Claims Process .......... 14

III. THE SUBSTANTIVE LAW OF SECTION 13(C)--MAJOR ISSUES AND DECISIONS .......... 15
- A. Scope of Protected Employees .......... 15
- B. Scope of Key Definitions .......... 16
- C. Relationship to State Law .......... 17
- D. Scope of DOL Authority .......... 17
- E. Conditional Certifications .......... 18
- F. Interest Dispute Resolution .......... 19
- G. Notice and Implementing Agreements .......... 20
- H. New Jobs Clause .......... 21
- I. Contracting Out--Sole Provider Clause .......... 21
- J. "Carryover" Rights and Change in Contractors .......... 22
- K. Successor Clauses .......... 24
- L. Worsening Benefits .......... 25

IV. CONCLUSION .......... 25

ENDNOTES .......... 26

## FOREWORD

As a precondition or prerequisite to a grant of federal assistance by the Federal Transit Administration (FTA), Section 13(c) of the Federal Transit Act requires that "fair and equitable" protective arrangements must be made by the grantee to protect employees affected by such assistance. Under the provisions of Section 13(c), the Secretary of Labor is given authority to determine what is fair and equitable, and certifies to the FTA that such protections are in place before grant funds are released. The process for obtaining such a certification, and the substantive requirements and interpretations of the law, are described in this report.

Historically, the origins of federal financial support of mass transit date back to the 1960s. Legislation was introduced in Congress in 1962 that would have supported urban rapid transit through capital grant assistance. This legislation did not achieve support from important groups, including the labor and automobile lobbies, and it was defeated. The labor groups were concerned about the possible loss of jobs and possible loss of rights that had been gained through collective bargaining, if private transit companies were taken over by municipalities and other public entities. Because several states prohibited collective bargaining by public employees, these concerns had a valid basis. In 1964, legislation was again introduced in Congress. This time, the support of labor was secured by inclusion of a clause that provided job protection for employees of private bus companies purchased by public agencies and provided for the right to collective bargaining. The support of organized labor was critical in securing federal funding, as described by George Smerk in *Urban Mass Transportation: A Dozen Years of Federal Policy* (1974) and Gordon Fielding in *Managing Public Transit Strategically* (1987). The provision that won the support of labor was Section 13(c), and the bill that passed in 1964 was the Urban Mass Transit Act, redesignated the Federal Transit Act in 1991. In this sense, the Federal Transit Act can be said to be both a transit funding and labor protection act.

This report, which is intended to serve as a research tool for transit managers and lawyers, provides a descriptive guide to and interpretation of the process for obtaining certification from the Department of Labor (DOL). Sources for guidance on DOL's interpretation of "fair and equitable" are set out, as well as judicial determinations as to how the Secretary may exercise his discretion in deciding what is fair and equitable. Of particular interest to less experienced transit managers and lawyers will be the process by which the certification is reached. DOL takes the position that agreements should be negotiated between parties, that is, the grantee and affected labor groups. Only when no agreement can be reached will DOL impose a protective arrangement.

The report should be of assistance to any pubic entity that is considering a first application for FTA financial assistance, and will also provide guidance to experienced transit managers and attorneys in understanding the certification process.

**James B. McDaniel**
**Counsel for Legal research**
**Transportation Research Board**
June 1995

## TRANSIT LABOR PROTECTION--A GUIDE TO SECTION 13(C) FEDERAL TRANSIT ACT

By G. Kent Woodman, Jane Sutter Starke, Leslie D. Schwartz

Attorneys at Law
Eckert Seamans Cherin & Mellott
Washington, D.C.

### INTRODUCTION AND OVERVIEW

Section 13(c) is quite well known in the transit industry as the labor protection provision of the Federal Transit Act. Despite the general awareness of Section 13(c) requirements, its interpretation and application have long been a source of uncertainty and even confusion among transit managers and lawyers. It is the goal of this paper to shed light on the procedural and substantive aspects of Section 13(c).

Section 13(c) generally requires, as a precondition to a grant of federal assistance by the Federal Transit Administration (FTA), that fair and equitable protective arrangements must be made by the grantee to protect employees affected by such assistance. The statute requires that provisions addressing five specific matters be included in such protective arrangements:

(1) The preservation of rights, privileges, and benefits under existing collective bargaining agreements;

(2) The continuation of collective bargaining rights;

(3) The protection of employees against a worsening of their positions with respect to their employment;

(4) Assurances of employment to employees of acquired mass transportation systems and priority of reemployment for employees terminated or laid off; and

(5) Paid training or retraining programs.

The U.S. Department of Labor (DOL) is charged with ensuring that Section 13(c) protective conditions comply with the statute's requirements. Typically, DOL carries out this responsibility by certifying to FTA that fair and equitable protective arrangements are in place in connection with a specific FTA project. This certification is the last step in a process under which a potential grantee and the union(s) that represent transit employees who may be affected by the federally funded project develop Section 13(c) protections. In many cases, the grantee and the union will agree to utilize Section 13(c) protections that have been negotiated and approved by DOL in connection with prior grants. In other situations, such as where a first-time grantee is involved or where modifications to existing Section 13(c) conditions are sought by the union or the grantee, negotiations between the grantee and the unions will be required to develop alternate protections, sometimes necessitating DOL's direct involvement.

This paper is intended to give the reader an overview of the procedural and substantive requirements of Section 13(c). Section I provides background information necessary to develop an understanding of the statutory provisions, including a discussion of the legislative history, an overview of typical Section 13(c) protective conditions, and an introduction to resources available to the attorney practicing in this area. Section II discusses the Section 13(c) negotiation and claims processes. Section II also identifies concerns related to the administration of DOL's Section 13(c) program, which grantee counsel should be prepared to encounter. Section III reviews the substantive requirements of Section 13(c),

addressing issues that frequently arise during the process and the applicable judicial and administrative precedents.

## I. BACKGROUND OF SECTION 13(C) LABOR PROTECTION

### A. Statutory Requirements

The statutory requirements of Section 13(c) of the Federal Transit Act, which are codified at 49 U.S.C. § 5333(b),[1] provide as follows:

> It shall be a condition of any assistance under section 3 of this Act that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of the Act of February 4, 1887 (24 Stat. 379), as amended. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements.[2]

### B. Legislative History of Section 13(c)

*1. Need for Legislation and Labor Protection*

The Urban Mass Transportation Act of 1964[3] represented a strong congressional response to the long neglected and deteriorating condition of urban mass transit systems in the United States.[4] Caught in a vicious cycle of rising costs and declining patronage, private transit systems at the time were being forced to increase fares, trim service, and defer maintenance. The result was a further loss in ridership, which only exacerbated the problem and imperiled the ability of urban mass transportation providers to offer adequate service. Users of mass transit services were increasingly faced with rising fares and inconvenience and were forced to rely instead on automobile travel, resulting in increased congestion on streets and highways. Between 1956 and 1960, revenue passengers carried by buses and streetcars declined by about 22 percent.[5] In the decade just prior to enactment of the Urban Mass Transportation Act, 243 transit companies were sold and 194 were abandoned. As a direct result, transit labor and services were significantly and adversely affected. Between 1945 and 1960, transit employment plummeted from 242,000 employees to 156,000 employees, with 35 percent of that loss occurring between 1950 and 1960.[6]

Congress viewed the state of mass transit as a national problem rather than simply a local problem, on the basis that operation and growth of the nation's urban centers were essential to the national welfare; bills to provide assistance to the fledgling mass transit industry were thus introduced in both houses of Congress as early as 1960.[7] It was not until 1964, however, that Congress took definitive action to implement a new program to assist the nation's urban mass transit systems. The mass transit program developed under the Urban Mass Transportation Act provided federal funding through grants and loans to finance

the capital facilities and equipment necessary to extend and improve urban mass transportation systems. The improvements helped maintain the continuing growth of commerce in the nation's urban centers, while reducing street and highway congestion.

Believing that federal assistance could adversely affect transit labor, the transit unions began in 1963 to voice concerns about the potential loss of transit employment that would accompany projects paid for or supported by federal funds. In testimony before both houses of Congress on the issue of protecting transit employees, the transit unions described two scenarios in which they envisioned the Urban Mass Transportation Act could adversely affect transit labor.[8] First, the unions were concerned that federal funding would promote technological advances or automation that would lessen the need for transit labor. For example, one transit union's testimony before Congress included descriptions of driverless, electrically powered, automated cars and buses then under development, which could potentially displace drivers and other transit workers.[9]

The unions' second concern focused on the potential impact of transferring transit operations from private ownership to ownership by state or local public bodies, using federal funding expressly provided to acquire financially troubled private transit systems. In such cases, it was foreseeable that private employees protected under federal labor law would in many instances become public employees. The transit unions were concerned that private transit employees would consequently lose collective bargaining rights, the right to strike, and pension and retirement benefits; because state and local government employers were (and remain) expressly exempt from coverage under the National Labor Relations Act (NLRA).[10] Moreover, in some states public employers were prohibited from bargaining collectively with their employees. The transit unions were particularly troubled about the experience of private transit workers in Dade County, Florida, who were told by the public authority, after it had acquired their employer, that as public employees their right to bargain collectively could not be exercised. After the acquisition, decisions regarding wages, hours, and working conditions were unilaterally made by the public authority in accordance with applicable Florida law, despite the fact that the employees had for many years been represented by a union and had engaged in collective bargaining. Similarly, a proposed takeover of the private transit system by the City of Portland, Oregon, which was ultimately defeated by voters, would reportedly have involved not only a loss of collective bargaining rights, but also the loss of seniority credits for purposes of calculating pension benefits. Based on these concerns, the transit unions and the Administration sought to protect the interests of transit employees who would be adversely affected by assistance provided under the Urban Mass Transportation Act.[11]

*2. Congressional Debate and the Meaning of Section 13(c)*

The legislative history of Section 13(c), particularly congressional debate on the provision, provides useful guidance as to the meaning and purpose of the five statutory elements enumerated in the Section.

*Paragraph 1. Preservation of Rights, Privileges and Benefits under Existing Collective Bargaining Agreements.--Section* 13(c)(1) requires the preservation of rights, privileges, and benefits under existing collective bargaining agreements. As described above, the legislative history indicates that transit labor unions and supporters of the labor protection provisions were particularly concerned that, in cases where a public entity acquired a private transit system with assistance

under the Urban Mass Transportation Act, rights acquired by workers through collective bargaining (such as wages, hours, working conditions, and benefits) would be lost through the unilateral action of the new public employer.[12] To address this concern, Section 13(c)(1) assures that if a state or local public body desires federal grant funds, it must agree that existing collective bargaining rights will be preserved and continued. Under this provision, rights achieved through bargaining cannot be taken away unilaterally; if they are to be changed, that change must occur through collective bargaining and agreement of the parties.

*Paragraph 2. Continuation of Collective Bargaining Rights.--Section* 13(c)(2) requires that collective bargaining rights be continued. The hearings and debate over Section 13(c)(2) focused on the acquisition of private transit companies by public entities that were prohibited under state law from bargaining collectively with employees. This is probably the most contested element of Section 13(c). Some members of Congress evidenced serious concern that this obligation would require states to do what was believed to be precluded by many state constitutions--that is, for public entities to bargain collectively with public employees. In fact, as originally drafted, Section 13(c)(2) would have required only the "encouragement" of the continuation of collective bargaining rights,[13] and as originally proposed by the Administration, the subsection would have required "the prevention of curtailment of collective bargaining rights."

Congressional debate over this issue of collective bargaining reflected two conflicting views. One view was that the right of public employees to engage in collective bargaining, precluded in many states, should not prevent a state from receiving federal assistance, and that in connection with an acquisition of an existing transit system, no absolute requirement to continue collective bargaining rights should be imposed. Consistent with this approach, members in both houses proposed that collective bargaining rights would be continued only to the extent not inconsistent with state law.[14] The other view, which as discussed below was ultimately adopted in Section 13(c), was that a state or local grantee must assure that collective bargaining rights will be continued in connection with the acquisition of an existing transit system. Under this view, the grantee would not qualify for federal assistance unless it could assure such continuation of collective bargaining rights. This did not mean that a state necessarily had to change its state law prohibiting collective bargaining with public employees, but it would have to find some other means for preserving existing bargaining rights if it wanted federal transit funds.

The version of Section 13(c)(2) finally adopted was sponsored by Senators Morse, McNamara, and Williams. Senator Morse, in support of his amendment, argued that the "encouragement" language originally introduced in the Senate was too vague a standard and afforded little if any protection to private unionized workers who, through public acquisition, would become public employees.[15] In arguing for adoption of his amendment, Senator Morse stated:

> The question of policy is this: Should the Federal Government make available to cities, States and local governmental units Federal money to be used to strengthen their mass transit system in those communities when the use of that money would result in lessening the collective bargaining rights of existing unions?
>
> ....
>
> ...[I]t is my underlying thesis as I press for the adoption of the amendment: That is, we ought to *maintain the status quo*.
>
> ....
>
> ...If you have collective bargaining now, I think the bill ought to be so drawn that you will be assured of a continuance of collective bargaining, so far as the Federal Government is concerned.[16]

According to the legislative history, in cases where no collective bargaining rights existed prior to the influx of federal funding, Section 13(c)(2) was not intended to require the imposition or creation of new collective bargaining requirements or obligations. Thus, as to systems started by public transit agencies, Section 13(c) was not intended to require that public employers *establish* a right to collectively bargain in connection with the receipt of federal assistance. However, where transit employees had the right to bargain, in either the public or private sector, Section 13(c) was intended to require that such right not be adversely affected by assistance under the Urban Mass Transportation Act.[17]

To assure the continuation of existing collective bargaining rights, Senator Morse indicated that under his amendment, federal money would be withheld from a public body seeking funding to acquire a private transit system if its state law precluded public-sector collective bargaining, unless an arrangement was made to assure that collective bargaining would be continued. Senator Morse then described a "Memphis formula" arrangement, a situation where a publicly owned transit system, legally prohibited from collective bargaining by state law, establishes a private managerial commission to operate the service. The private commission, under contract with the public entity, would employ the transit workers, handle labor relations, and be permitted to enter into collective bargaining agreements with the employees.[18] Although the Memphis plan concept received limited attention during congressional debate, it has recently become the center of considerable discussion in the Section 13(c) program, as discussed in more detail in Section III of this report.

Finally, Congress did not provide any express mechanism in Section 13(c) for resolving disputes concerning the making of collective bargaining agreements. During Senate debate, Senator Morse, in response to questions regarding the right to strike, clearly stated that Section 13(c) did not guarantee the right to strike "in violation of Federal or State law in any case where the Federal law has not supervened."[19] Although it is clear, therefore, that Congress did not intend to confer on public employees the right to strike where no such right exists, the issue of what alternative dispute mechanisms, if any, could be used to resolve collective bargaining disputes was not mandated by Congress.[20]

*Paragraph 3. Protection Against Adverse Effects.--In* reaction to labor's concern that technology and automation would be particularly harmful to transit employees, Section 13(c)(3) requires that an employee whose position is worsened as a result of federal assistance should receive benefits not "less than those established pursuant to section 5(2)(f) of the Interstate Commerce Act." This language, which was borrowed from railroad labor protections discussed later in this report, reflects the basic policy determination that employees should be compensated in the event of any "worsening" (i.e., economic harm, such as loss of a job or reduction in compensation) resulting from their employer's receipt of federal assistance. While the concept of worsening is clearly reflected in the statute, the scope of that protection (that is, what types of employee impacts are covered under a "worsening") remains a subject of debate.[21]

*Paragraph 4. Employment Assurances in Acquisitions and Priority of Reemployment.--As* originally proposed, Section 13(c)(4) only required "priority of employment or reemployment of employees terminated or laid off."[22] Expansion of Section 13(c)(4) to provide assurances of employment to employees of mass transportation

systems acquired with federal funds was introduced as part of the Morse-McNamara-Williams amendment.[23] Senator Morse remarked that the amendment would provide "for the continuation of employment of any employees of any mass transportation system which has been transferred in consequence of any project which has been assisted under the bill."[24] In further explanation of the provision, Senator Morse remarked, "It means the employees must be taken over with the plant; the position of the successor is no more or no less than his predecessor under this provision of the amendment."[25] The language of the first provision of Section 13(c)(4) as proposed in the Morse amendment was ultimately adopted despite concerns that the provision would perpetuate featherbedding in the transit industry by guaranteeing positions that are no longer necessary for operations.[26] The obligation to provide employment assurances was apparently based on Congress's desire to protect private transit employees of systems that were acquired with federal assistance, regardless of any economic inefficiencies that may have resulted from such requirements.[27]

Section 13(c)(4) also includes a second element, which provides employees terminated or laid off as a result of a federally assisted project with an opportunity to fill vacant positions on the transit system as they arise. This provision was the subject of little congressional debate.

*Paragraph 5, Paid Training or Retraining Programs.--Section* 13(c)(5) is largely self-explanatory. The legislative history clarifies that the grant recipient is to be financially responsible for employee training, when required. Secretary Wirtz, in describing the provision, stated as follows:

> It is m the contemplation of that phrase that it is a private provision for training and retraining, consistent with the pattern of present training programs which represent one of the major developments in the last year or two m labor relations. And this proposal does not contemplate the expenditure of federal funds except as prescribed programs might be applicable.[28]

## C. Historical Perspective--Labor Protections in the Railroad Industry

In considering and enacting Section 13(c), Congress relied on labor protections developed in the railroad industry, which were designed to protect employees in rail mergers, consolidations, abandonments, and purchase and lease transactions. Protections applicable to rail industry workers were formally developed as early as 1936, when a majority of the railroads operating in the United States and most of the railroad labor organizations negotiated the Washington Job Protection Agreement (WJPA) to protect employees adversely affected by rail coordinations.[29] WJPA gave management the authority to make workforce changes through coordination, but protected employees deprived of employment as a result of a coordination by providing an allowance based upon an employee's earnings. Under WJPA, a coordination allowance equal to 60 percent of an employee's wage level was payable for a period beginning with the date of the adverse impact and lasting for up to 5 years, depending upon the employee's length of service. An employee was able to elect a lump sum benefit payment, in lieu of the coordination allowance, to compensate for a dismissal. Displaced employees--those employees who retained employment but earned less compensation--were also entitled to an allowance, based upon the difference between their earnings before and after being adversely affected; this allowance was also payable for up to a 5-year period after the coordination. Certain expenses, such as transportation, moving, and losses incurred in connection with the sale of a home stemming from work location reassignments resulting from the transaction, were also to be borne by the railroad

Following the development of WJPA, Congress enacted the Transportation Act of 1940.[30] In that legislation, Congress required the Interstate Commerce Commission (ICC) to provide "fair and equitable" protection to railroad employees in connection with the ICC's review and approval of certain railroad transactions. Section 5(2)(f) of the Interstate Commerce Act provided, in relevant part, as follows:

> As a condition of its approval, under this paragraph....of any transaction involving a carrier or carriers by railroad subject to the provisions of this part, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result m employees of the carrier or carriers by railroad affected by such order being m a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was m the employ of such carrier or carriers prior to the effective date of such order.[31]

Over the years, in cases involving two or more railroads in merger, purchase, and lease transactions, ICC has refined and revised what it considers to be a "fair and equitable arrangement," in each case building upon the protections provided in WJPA.[32]

In enacting Section 13(c), Congress clearly relied upon the protections provided by Section 5(2)(f) of the Interstate Commerce Act. Section 13(c) explicitly refers to the protections provided to railroad employees under Section 5(2)(f) as the benchmark against which Section 13(c) protective arrangements are to be evaluated. The legislative history of Section 13(c) refers to Section 5(2)(f) as a model, including Secretary of Labor Wirtz's reference to Section 5(2)(f) during his testimony proposing the adoption of labor protection arrangements,[33] and comments by Mr. Cushman, general counsel of the Amalgamated Transit Union (ATU).[34] The Senate committee report also compares Section 13(c) to other arrangements in the transportation industry.[35]

Although Congress may have modeled Section 13(c) on protections developed in the railroad industry, rail labor protection imposed by ICC has a significant procedural difference from 13(c) protection. ICC has established standard terms and conditions for particular transactions,[36] while under Section 13(c) (as discussed below) DOL has taken the position that protective terms and conditions should be the product of individual negotiations.[37] Despite this procedural difference, in considering whether a Section 13(c) agreement provides fair and equitable protection for transit workers, DOL will at times look to the protections imposed by ICC in railroad transactions, most of which in one way or another can be traced to the provisions of WJPA.[38]

## D. Common Elements of Section 13(c) Agreements

Given the statutory requirements of Section 13(c), the following discussion will introduce the common provisions found in most Section 13(c) agreements. Some of these provisions are legally necessary and track the statutory language of Section 13(c); others have been adopted as part of standard Section 13(c) "custom and usage" and are found in similar form in the Model (national) Section 13(c) Agreement.[39]

Moreover, since Section 13(c) agreements are the product of individual negotiations, terms do vary from one agreement to another. Nonetheless, the following sets forth the common elements found in most contemporary Section 13(c) protections. For a more in-depth discussion of the requirements described, consult Section III of this report, which addresses substantive issues that frequently arise during the Section 13(c) process.

*1. Definitions*

The definition of "project" normally used in Section 13(c) arrangements is not limited to the particular activity being funded, but includes any change, whether organizational, operational, or otherwise, that occurs as a result of the federal assistance provided.[40] The standard definition of "as a result of the Project" is also broad, and includes events occurring "in anticipation of, during and subsequent to the Project and any program of efficiencies or economies related thereto."[41] Current issues related to the definitions of "project" and "as a result of the project" are addressed in Section III of this report.

*2. Preservation of Rights, Privileges, and Benefits under Existing Collective Bargaining Agreements*

This is a statutory requirement under Section 13(c)(1). Existing rights and benefits obtained through the process of collective bargaining (including pension benefits) must be preserved and continued, but may be modified (except for vested rights) through the collective bargaining process to substitute other rights, privileges, and benefits.[42]

*3. Continuation of Collective Bargaining Rights*

This is a statutory requirement under Section 13(c)(2). This provision requires a continuation of the process of bargaining collectively; it guarantees that employees will continue to have the right to bargain with their employer regarding terms and conditions of their employment.[43]

*4. Notice of Proposed Changes; Negotiation of Implementing Agreements*

This provision requires that the grantee or other responsible party give the union advance notice (usually 60 days) of any contemplated change or action as a result of a federal project that may adversely affect employees, such as changes in organization or operations of the transit system. After notice is given, the parties must meet to negotiate an "implementing agreement," which is designed to apply the Section 13(c) protections to the proposed change. (Implementing agreements are often used in railroad transactions, but much less frequently in the transit industry.) Current problems related to Section 13(c) implementing agreement provisions are discussed in Section III.[44]

*5. Section 13(c) Benefits*

Section 13(c)(3) requires that employees be protected against a "worsening" of their positions that occurs as a result of a federal project. This protection includes the following standard benefits:

· *Displacement Allowance--An* employee who is placed in a lower paying position or otherwise suffers a loss of compensation as a result of a federal project can be eligible for a monthly displacement allowance. This provides an allowance in an amount basically equal to the difference between the employee's prior compensation (measured over the 12-month period prior to the harm) and his or her new compensation. This allowance is payable for the employee's "protective period," which is 6 years for an employee who has been employed for at least 6 years and generally the length of service for an employee employed for less than 6 years.[45]

· *Dismissal Allowance--An* employee who is laid off as a result of a federal project can be eligible for a monthly dismissal allowance (basically equal to the employee's average monthly compensation during the 12-month period prior to the dismissal). The dismissal allowance is payable for the employee's protective period as described above.[46]

· *Lump Sum Separation Allowance--A* dismissed employee may elect a lump sum separation allowance, the amount of which is based on length of service, in lieu of all other Section 13(c) benefits.[47]

· *Moving Expenses--An* employee who is required as a result of a federal project to change the point of the employee's employment and move his or her residence in order to retain or secure a job with the grantee is eligible to be compensated for moving expenses, which include certain expenses of moving a household, some traveling expenses, and specified wage losses incurred during the move.[48]

· *Home Sale--An* employee who loses money as a result of having to sell his or her home because of a change in residence as a result of a federal project is entitled to compensation for that loss and related costs.[49]

· *General "Worsening" Protection--Under* some current Section 13(c) agreements, an employee whose rights, privileges, or benefits are adversely affected as a result of a federal project is entitled to have those benefits restored or to receive "offsetting" or compensatory benefits.[50] Those benefits are further discussed in Section III.

*6. Resolution of Section 13(c) Disputes*

Section 13(c) agreements typically include a process for the resolution of disputes and claims arising under the agreement. The normal process used is binding arbitration. (Note that this is Section 13[c] arbitration, which is different from binding *interest* arbitration discussed in Section III of this report.) Many such agreements provide for a three member arbitration panel, with one member selected by each party and one neutral member, generally selected from a list provided by the American Arbitration Association. Some agreements provide for dispute resolution by a single arbitrator or by the Secretary of Labor. The standard burden of proof, on its face, favors the employee, in that the employee prevails if the federal project had an effect on the employee, even if other factors also contributed to the harm.[51] The employee does have an initial burden, however, to identify the project and specify the pertinent facts of the project relied upon. In arbitration decisions, DOL has ruled that this means the employee must establish a causal link between the harm alleged and a federal project.[52]

*7. Claims Procedure*

Section 13(c) agreements normally contain a provision establishing a time period for the filing of claims. They also usually set forth a process under which the affected employee presents his or her claim to the grantee and the parties

attempt to resolve the issues by way of informal settlement. If the issues are not resolved, the matter is submitted to binding arbitration, as discussed above.[53]

*8. Resolution of Interest Disputes*

Section 13(c)(2) requires that the parties have some means for resolving "interest" disputes, which are disputes over the making or maintaining of a collective bargaining agreement or the terms to be included in that agreement. There are alternative ways of satisfying this requirement (which are further discussed in Section III):

- The right to strike (normally extended to private-sector employees pursuant to NLRA),
- Binding interest arbitration, or
- Fact-finding.

*9. Priority of Reemployment; Retraining*

This is a statutory requirement under Section 13(c)(4). Generally, a dismissed employee is entitled to priority of reemployment to fill any vacant position within the jurisdiction and control of the grantee that is reasonably comparable to the employee's previous job. He or she must be qualified or able to become qualified through retraining (with any retraining to be provided at the expense of the grantee).[54]

*10. New Jobs Clause*

Some Section 13(c) agreements contain a provision giving protected employees the first opportunity for any new jobs created as a result of the project. These provisions have been used in certain cases to provide job rights to existing bus employees in connection with the start-up of new rail projects. DOL has ruled that such a provision is not, however, required by Section 13(c), as discussed in Section III

*11. Duplication of Benefits*

Most Section 13(c) agreements contain a provision prohibiting the duplication or pyramiding of employee protection benefits (that is, receiving Section 13[c] benefits for a particular harm while also receiving protective benefits under another agreement for the same harm).[55]

*12. Successor Clause*

Most Section 13(c) agreements require that the successors or assigns of the parties be bound to honor all the terms and conditions. In recent years, DOL has attempted to extend this "successor" obligation to any entity operating services for the grantee under contract.[56]

**E. Nature and Source of Section 13(c) Guidance**

DOL has taken the position that Section 13(c) agreements should be the product of negotiations between the parties and therefore has not prescribed, for general application, the requisite elements of a Section 13(c) agreement. Thus, there is no single regulation, policy statement, or other guidance that summarizes what

Section 13(c) requires. As a result, in order to fully understand the requirements of Section 13(c) and the elements of a Section 13(c) agreement, it is necessary to consult several different sources.

*1. Formal Department Guidance*

The DOL's Section 13(c) Guidelines, found at 29 C.F.R. § 215, provide some description of the certification process. However, the Guidelines serve primarily as a general description of the process rather than providing guidance regarding the substantive requirements of Section 13(c). For example, the Guidelines do not describe or list what protective conditions are required for it to certify to FTA that "fair and equitable" arrangements have been developed in connection with any particular grant.

Nonetheless, some guidance regarding the legally required elements of Section 13(c) can be found in what DOL itself prescribes when protective arrangements are imposed by the Department rather than being the product of negotiation between the parties. One important example of DOL-imposed terms is the special 13(c) warranty, which is used for FTA grantees in nonurbanized areas funded under Section 18 of the Federal Transit Act. In connection with grants made under FTA's Small Urban and Rural Program, Section 13(c) requirements are imposed by the Secretary of Labor under the Section 18 warranty, which is then incorporated into the terms of the applicable grant agreement. The warranty, which incorporates by reference several provisions from the Model Section 13(c) Agreement, is further described in DOL's *Rural Transportation Employee Protection Guidebook* (1979). Certain provisions of the warranty are frequently incorporated into negotiated Section 13(c) agreements, because DOL has determined that such provisions meet the "fair and equitable" standard. Therefore, the guidance provided in the Section 18 Guidebook is a good starting point to understanding the substance of many provisions in a typical Section 13(c) agreement.

Another Section 13(c) document relied upon by DOL is the Nonunion Certification, which is used to establish Section 13(c) terms and conditions for public bodies with a nonunionized workforce. The Nonunion Certification, a two-page document that references the more detailed rail labor provisions of Appendix C1,[57] provides an additional source of guidance as to appropriate Section 13(c) labor protection provisions.

*2. Model Agreement*

Although these DOL-imposed protections provide useful guidance, probably the primary source of representative protections is the Model (national) Section 13(c) Agreement entered into on July 23, 1975, by representatives of the American Public Transit Association (APTA), ATU, and the Transport Workers Union of America, AFL-CIO, and (on July 31, 1975) by representatives of the Railway Labor Executives' Association, Brotherhood of Locomotive Engineers, Brotherhood of Railway and Airline Clerks, and International Association of Machinists and Aerospace Workers. The Model Agreement often serves as a ready-made basis for Section 13(c) certification of operating assistance projects.[58] DOL has specifically determined that the Model Agreement "provides fair and equitable arrangements to protect the interests of employees in general purpose operating assistance project situations and meets the requirements of Section 13(c)."[59] Because the Model Agreement's provisions have been repeatedly certified by DOL as "fair and equitable," the Model Agreement serves as the most frequently used

source document for standard terms and conditions incorporated into negotiated Section 13(c) agreements. As discussed below, however, some contemporary agreements and certifications appear to have expanded Section 13(c) protective language far beyond that found in the Model Agreement.

*3. Section 13(c) Certifications*

Another resource that can be used to interpret the requirements of Section 13(c) is the certification letters issued by DOL in connection with particular federal grants. In addition to setting forth the specific protective arrangements to be applied, certification letters sometime explain the Department's general policies and practices or address specific Section 13(c) issues, particularly when there has been an impasse in negotiations between the parties.[60] One problem for Section 13(c) counsel, however, is gaining access to DOL's certification letters. There is no index or general reference source, although the Department will normally provide relevant letters in response to requests that specifically identify the subject area of interest.

In situations in which DOL is involved as a mediator to assist in the Section 13(c) negotiation process, both management and labor often rely on prior Department certifications to advocate their respective positions.[61] However, certification letters are not drafted like legal opinions, and in many instances the rationale for applying certain protective conditions to a particular factual situation will not be set forth in any great detail. As a result, the guidance provided by certification letters can be of limited value.

*4. Judicial and Administrative Review*

Because DOL's certification decisions under Section 13(c) are subject to judicial review,[62] a handful of cases have been initiated in federal court seeking review of arrangements pursuant to which the Department has certified a pending grant. These cases, while limited in number, are clearly a valuable source of the legal requirements of Section 13(c).[63] Many of these cases are discussed in Section III of this report.

In addition, judicial and administrative decisions addressing the requirements of Section 5(2)(f) of the Interstate Commerce Act,[64] after which Section 13(c) was modeled, may also shed light on what arrangements DOL may impose to satisfy the "fair and equitable" requirement. DOL occasionally relies upon precedent under Section 5(2)(f) when making certification decisions.[65]

*5. Section 13(c) Arbitrations*

Another important resource for construing Section 13(c) terms and conditions is arbitration decisions. There are two basic sources for Section 13(c) arbitration decisions: DOL decisions and private arbitration decisions (decisions by an American Arbitration Association or Federal Mediation and Conciliation Service arbitrator). Arbitration decisions in which DOL acts as arbitrator are published in *Digest of Employee Protections* (1993). There are also several private arbitration decisions interpreting and applying Section 13(c) arrangements, but unfortunately there is no compilation of these decisions.[66] DOL, FTA, and organizations such as APTA could be consulted for Section 13(c) arbitration decisions on particular issues.[67]

*6. National Labor Relations Act*

In cases involving a private employer (such as a private contractor), the requirements of NLRA, as interpreted by judicial precedent and the National Labor Relations Board (NLRB), may be relevant in the Section 13(c) context. For example, provisions in a Section 13(c) agreement addressing interest disputes typically recognize the bilateral right of employees and management to use economic measures consistent with NLRA.

## II. THE SECTION 13(C) PROCESS AND PROCEDURAL ISSUES

In some respects, the procedural aspects of Section 13(c) can be more significant--and have a greater impact on a transit agency's project development and operations--than the substantive requirements of Section 13(c). The purpose of the following discussion is to focus on the two basic procedural aspects of Section 13(c): the certification process, and the 13(c) claims process. The certification process is often a time-consuming procedure known to most grantees; the claims process comes into play less frequently, but nonetheless is a part of the Section 13(c) picture that should be understood.

### A. The Section 13(c) Certification Process

The Section 13(c) certification process could be described as the procedure by which a grantee obtains a certification from the Secretary of Labor, as a statutory precondition to grant award, stating that "fair and equitable" arrangements have been made for the protection of affected employees. One of the most critical characteristics of the Section 13(c) program is that satisfactory protections must be in place and certified by the Secretary of Labor *before* FTA can release grant funds. As a practical matter, this means that the Section 13(c) negotiation and certification process can delay the receipt of funds, and that the equality of bargaining position may be affected as the transit agency becomes increasingly in need of grant funds.

As a starting point, there is very little statutory or administrative guidance as to the required process to develop Section 13(c) protections. As described above, the statutory language of Section 13(c) describes the basic substantive requirements of labor protections, but provides no process-related rules other than that the grant contract "shall specify the terms and conditions of the protective arrangements." The Section 13(c) Guidelines provide some overall procedural framework, but are rather general and not particularly illuminating as to the specifics of the parties' responsibilities or DOL's role.[68] Although Congress expressly articulated several issues that must be addressed in Section 13(c) protective arrangements, Congress did not believe that it was appropriate to expressly detail the specific provisions necessary to protect transit employees in each and every circumstance. The relevant Senate Report states the following:

> The Committee does not believe that it is feasible to enumerate or set forth in great detail the provisions that may be necessary to assure the fair and equitable treatment of employees in each case. In this respect, it is expected that specific conditions normally will be the product of local bargaining and negotiation, subject to the basic standard of fair and equitable treatment.[69]

As discussed in more detail below, this preference for local negotiation has been a critical factor in shaping the evolution and operation of the Section 13(c) program.

The Section 13(c) certification process will vary depending on several factors, the most basic of which is whether the employees being protected are represented by a labor organization. The following will focus primarily on the Section 13(c) process as it relates to protection of union-represented employees of urbanized systems receiving Section 3 or Section 9 funds from FTA.[70] Most of this discussion is based on actual experience and reflects, as a practical matter, how the process seems to be carried out in many cases.

*1. Section 13(c) Referral Process*

The initial stage of the Section 13(c) process begins with the transmittal of a Section 3 or Section 9 grant application from FTA to DOL. After reviewing the application, DOL's first action is to refer the grant application to the unions representing employees who may be affected by the assistance. The grantee itself will also receive a copy of the referral. In making its referral, DOL relies upon the information provided by the grantee in its grant application, which calls for an identification or listing of the labor organizations representing employees of urban mass transit carriers in the area of the proposed project.[71] In the grant application, the grantee is also directed to estimate the effects of the project on mass transit employees and to describe any steps that have been taken to develop Section 13(c) protections.[72] However, in practice, DOL will refer the project to unions in addition to those listed if it determines that those unions represent employees of mass transportation providers in the service area of the project. DOL may make such a determination on its own initiative, but it may also be based upon a particular union's request to be covered by Section 13(c) protections for a pending project.

The referral is obviously a critical aspect of the process, because it identifies the specific unions that DOL determines are entitled to Section 13(c) protection, and thus defines the scope of protections the grantee is required to provide. Contrary to what could be argued to be the intent of the statute, DOL does not require that there be any showing of potential impact or effect upon employees in order for those employees to be protected by Section 13(c) and to be the beneficiaries of a Section 13(c) referral. It appears that DOL basically relies upon a two-part test: (1) employees must be in the "service area" of the proposed project, and (2) the employees must be employed by a mass transportation provider.

There are two basic types of Section 13(c) referrals utilized by DOL, *recurring* referrals and *open* referrals.

*a. Recurring Referral.--In* a recurring referral, DOL cites in the referral documents the existing Section 13(c) protections that will, absent objection of the parties, be made applicable by DOL to the project.[73] For most existing FTA grantees, Section 13(c) referrals are made on the basis of a recurring referral. Under a recurring referral, any party to the Section 13(c) protections (the grantee or the affected unions) is given a specific time period, normally 30 days (or 14 days for general-purpose operating assistance grant applications where the parties have previously endorsed the Model Agreement),[74] in which to notify DOL whether it objects to the application of the existing protections to the pending grant. If no objection is received, or if DOL receives an affirmative statement from the parties that they agree to apply the existing protections, then those existing protections are simply applied and DOL will issue its Section 13(c) certification for the grant subject to the existing protections.[75] This process is referred to as piggybacking and is used in practice for the majority of Section 13(c) certifications. In fact, in the absence of the widespread use of piggybacking, the Section 13(c) process would be extremely difficult to administer, given the average time necessary to complete the actual negotiation of an agreement (as discussed below).

If either the grantee transit agency or the union objects during the referral period to the application of the existing protections, the institution of negotiations for new Section 13(c) protections is triggered. In stating its objection, a party only has to notify DOL that it does not wish to apply the existing protections to the pending grant. In practice, there is no requirement that the party identify any inadequacies in those existing protections, describe any particular impact of the pending grant, or provide any specific reasons for the desire to negotiate a new agreement. If an objection is made in a timely fashion by either party, the parties will be obligated to commence good faith negotiations over new or amended Section 13(c) terms and conditions.

In practice, the party most frequently objecting to the application of existing protections is the union, often with the goal of updating the terms and conditions to reflect contemporary Section 13(c) language, addressing some pending Section 13(c) issue or dispute with the grantee, or seeking resolution or leverage relating to some unrelated issue (such as collective bargaining terms and conditions) between the union and the grantee. On some occasions, however, the grantee may be the party objecting to the continued application of the existing Section 13(c) protections. Grantee transit agencies have, for example, instituted the negotiation of new Section 13(c) protections with the objective of removing binding interest arbitration provisions or revising Section 13(c) terms that are viewed as restricting operations or providing overly broad union or employee rights.

*b. Open Referral.--The* other type of Section 13(c) referral used by DOL is an open referral. An open referral is used where there are no existing protections to apply to the particular grantee and the covered unions. The case in which this most frequently arises involves a first-time grantee, but it may also arise in the case of a successor public agency, or where a grantee is required to provide protections for a new union, such as a union representing service area employees or a union that has recently organized employees of the grantee or its contractor. In an open referral, there is no time period established for the parties' response or action, or for the negotiation process in general; rather, DOL simply notifies the parties that Section 13(c) protective arrangements need to be developed through the negotiation process. Upon receipt of an open referral, the parties are expected to begin negotiations in good faith.[76]

*2. Section 13(c) Negotiation Process*

Following the referral process described above, the Section 13(c) negotiation process normally commences with one party submitting a proposed draft of protections to the other. The other party would normally be expected to respond with a full counterproposal or a counterproposal on specific issues (except in cases where the initial offer would be accepted). In open referral cases, it is more likely that both parties will be developing "new" Section 13(c) proposals, although frequently those will be based upon existing protections in place in other cases or with which a party is otherwise familiar. While in some cases Section 13(c) negotiations are conducted at the local level, the more common practice is for the grantee or its representative to negotiate with the union's national representatives.[77] DOL will not normally be involved during this stage of the process; in fact, the Department will not intervene until after the parties have engaged in these negotiations in good faith

One factor that has affected the negotiation process in recent years, and on occasion has made that process more time-consuming, is that the unions have identified prenegotiation issues that must be resolved as a "threshold" matter before formal Section 13(c) negotiations may begin. These threshold issues may be concerns raised by a union regarding the nature and type of service to be provided under the pending grant, may relate to the legal status of the grantee or its ability to carry out certain aspects of Section 13(c) obligations (such as the ability to preserve and continue collective bargaining rights), or may involve union requests for documentation or background information from the grantee on specific issues. In any event, these prenegotiation discussions can be quite prolonged.

There is no fixed time period or number of negotiation sessions required by DOL, and thus there are no established time limitations or a guaranteed end to the negotiation process. As a general matter, the number of meetings and the duration of the process will obviously be directly affected by the number of issues in dispute, the complexity of the matters presented, and the willingness of the parties to compromise. Moreover, from the perspective of transit management, as negotiations progress, the unions may utilize the open-ended nature of Section 13(c) negotiations and the need for the release of grant funds to attempt to soften a grantee's position and obtain more favorable terms.

It is interesting to note that the Section 13(c) Guidelines as originally proposed did apparently contain provisions dealing with the setting of time limits on negotiations by the Secretary of Labor. In the preamble to the final Guidelines, DOL, after noting grantees' advocacy of time limits and the unions' opposition, stated

> [W]e are very fearful that a fixed time limit automatically applicable to every case would constrict negotiations and replace a procedure which emphasizes voluntary action by the parties with one dominated by government decision making. This becomes all the more troublesome with the realization that the establishment of fixed time limits would acquire the accompanying adoption of formal [Department] review standards....Upon review, and in the face of such concerns and all available evidence we have concluded that fixed time limits should not be adopted. The record of recent *case* handling does not support the need for a drastic change m current procedures.[78]

DOL's decision not to impose time limits on the negotiation process, made at that relatively early period in Section 13(c) history, could certainly be viewed as a critical factor in the evolution of Section 13(c) certification into the often lengthy process it has become today.

Even though DOL decided not to provide firm time limitations, it did set forth in its Section 13(c) Guidelines, apparently as a compromise position, a mechanism for establishing and carrying out a time schedule for the Section 13(c) process. Section 215.3(d) of the Guidelines states that "a time schedule for case processing will be established by the Department of Labor where appropriate." That section states that (1) such a schedule "will be established" in cases where funding approval is anticipated and will, to the extent possible, conform to FTA's schedule for funding; (2) the schedule, when used, will be set forth in the referral letter to put the parties on notice; and (3) the Secretary will monitor the negotiations and will take "alternative action" when negotiations break down. While this provision of the Guidelines appears to establish a workable mechanism for imposing some order and timeliness on the Section 13(c) process, in practice it has rarely been used.

Notwithstanding the lack of formal time frames, there *is* a basic obligation in the Section 13(c) negotiation process, consistent with traditional labor law principles under NLRA, to engage in good faith negotiations. The Section 13(c) Guidelines provide that, following referral, the "parties will be expected to engage in good faith efforts to reach mutually acceptable protective arrangements through negotiations."[79] As the good faith concept is normally construed under federal labor law, it imposes on the parties an obligation to confer at reasonable times and at regular intervals.[80] Again, while the Section 13(c) Guidelines establish a framework for ensuring that good faith negotiations are conducted, grantees may encounter difficulties in getting this obligation enforced.

Normally, after several negotiation sessions, the parties will either resolve the outstanding issues or will identify those matters in dispute that may require some type of third party assistance from DOL. If the parties agree that they have reached an impasse and are not able to achieve further resolution through the negotiation process, it is appropriate for one or more of the parties to request DOL's assistance, as described in more detail below. As is often the case in Section 13(c) negotiations, however, the question of whether the parties are in fact at an impasse may itself be a matter of dispute.[81] To invoke the intervention and assistance of DOL, the grantee would need to show that it has negotiated in good faith, has fully discussed the Section 13(c) issues presented, has considered the union's position and potential compromises, and still has been unable to reach final agreement.

*3. DOL Technical Assistance*

One type of DOL assistance that can be invoked by the parties, separate and apart from the mediation process discussed below, is technical assistance. Although technical assistance may often be provided at the end of the negotiation process, it is also possible for such assistance to be provided as an intermediate step during the course of negotiations, when the parties request DOL's assistance or advice on one or more particular issues. The need for technical assistance normally arises in cases where the parties are in dispute as to a particular Issue that is Impeding further progress in the negotiations, and one or both parties believe that guidance from DOL (in the form of informal opinions or recommendations for solutions) would allow the parties to resolve or address that particular issue and proceed with the negotiations. Examples of technical assistance subjects include whether certain provisions must be included in a Section 13(c) agreement, whether the grantee has provided adequate project information, whether the grantee can legally comply with certain Section 13(c) obligations, and whether certain employees are covered by the Section 13(c) protections.

If technical assistance is provided during negotiations, the parties would then ordinarily resume negotiations; if it is provided at the end of negotiations, the parties would normally then proceed to the next stage of the process (mediation or impasse resolution).

*4. DOL Mediation*

If the parties are unable to resolve their differences and reach agreement through good faith negotiations (including any technical assistance), the dispute may be taken to DOL for mediation. Although the Section 13(c) Guidelines do not mention mediation specifically, Section 215.3(f) does provide that if the parties are unable to reach agreement, the Secretary "will review the positions of the parties to determine appropriate action."

The process normally followed is for one or both of the parties to request mediation assistance and to identify for DOL the issues that the parties agree are in

dispute. Mediation sessions are then scheduled to be held at DOL's offices, with one or more staff persons serving as mediator. The mediator is normally one of the individuals with Section 13(c) case responsibility in the Office of Statutory Programs. Although there is no fixed time period, mediation sessions often last from 2 to 5 days, not necessarily running consecutively.

The mediation sessions roughly follow the general structure of traditional labor mediation, with the DOL mediator meeting with each party independently in an attempt to understand that party's position on the issues in dispute and the underlying reasons for that position. The parties will often spend the majority of their time with the DOL mediator and little time in face-to-face discussions with the other party. The mediator often attempts an interests-based mediation, with the objective of determining the respective interests of the parties and identifying where those interests may be shared or are at least similar. The obvious goal of the mediation is to seek a final settlement and agreement between the parties, and to that end, the parties will often exchange compromise proposals on the particular matters in dispute. Even in those cases where mediation does not result in total agreement between the parties, it will still often produce agreement on some issues and thus serve to narrow the issues that are at an impasse.

If the mediation process is not successful, the next stage is impasse resolution by DOL, as described below. However, even after one or more mediation sessions, the parties may not necessarily agree upon the point in time in which ultimate impasse is reached, and that subject in itself can be the matter of considerable debate. The decision of whether further mediation is necessary or appropriate rests with DOL. Given its preference for negotiated rather than imposed protections, DOL has shown an increasing tendency to require further mediation or negotiation even where the grantee declares that any such action will serve no further purpose.

*5. Impasse Resolution-Written Submissions*

At the conclusion of mediation, if the parties are still at an impasse and DOL concludes no further progress can be achieved, it will ordinarily establish a briefing schedule for the submission of written positions from the parties on the issues remaining in dispute. While there is no absolute rule, DOL will normally set a briefing schedule of 3 to 4 weeks for the submission of initial briefs and 1 to 2 weeks for the submission of reply briefs. In addition, DOL has in recent years followed the practice of setting page lengths for briefs and reply briefs, which vary depending on the number and complexity of the issues in dispute.

Briefs in a Section 13(c) dispute should ordinarily contain citations to relevant federal court cases, DOL decisions in Section 13(c) dispute resolution cases, and DOL Section 13(c) certifications.[82] Recently, DOL has placed greater emphasis on the parties providing citations to legal authority in support of the propositions being advanced.

*6. DOL Certification*

Following the submission of reply briefs, DOL will rule on the matters in dispute in the context of a Section 13(c) certification letter that imposes protections applicable to the pending project.[83] Since DOL-imposed Section 13(c) protections are not the product of the parties' agreement, the protections are called "13(c) arrangements" rather than a 13(c) agreement. In addressing the issues that have been in dispute, DOL will normally describe its decision in the certification letter and then set forth the actual language in an attached Section 13(c) arrangement. On disputed issues, DOL will generally adopt either the grantee or the union's M, proposed language, but it may in some instances craft language of its own, which it believes meets the requirements of the Federal Transit Act. In addition, DOL may also address certain issues in dispute by including language in the Section 13(c) "conditions" set forth in the certification letter.

The extent to which certification decisions provide a specified rationale seems to vary. Generally, certification letters differ from the format of judicial or administrative decisions that provide a factual and legal basis and include citations to relevant precedent in support of the conclusions reached. While some certification letters set forth a short explanation, other decisions provide little or no explanation.[84] The failure of DOL in many instances to articulate fully the reasons for its decision, or the relevant factors that led to a particular ruling, has become a significant problem for transit grantees (and in some cases for the unions). Obviously, it is difficult for the parties to assess the extent of Section 13(c) obligations, or to plan future actions, where the rationale for the decision is limited.[85]

Since the certification decision is also the document that clears the way for the release of federal grant funds, the grantee that finds elements of that decision to be objectionable is faced with a genuine dilemma. Since those Section 13(c) terms are incorporated into the contract of assistance between the grantee and FTA, a grantee that desires the release of its federal grant funds must accept those funds conditioned on agreeing to the objectionable terms and conditions. However, if the grantee elects to challenge DOL's decision, it would need to reject DOL's imposed terms and conditions, and by so doing, decline the grant funds. Realistically, grantees are generally not willing to forego capital and operating grant funds and challenge DOL's decision. The impact of this characteristic of the certification process is critical: it means that Section 13(c) certification decisions have, in the 30 years of the program, rarely, if ever, been subject to meaningful judicial review in litigation initiated by a grantee.

*7. Scope of Protected Employees-Service Area Employees*

One of the more significant procedural developments in recent years in the Section 13(c) program has been the proliferation of protective arrangements that must be negotiated by a FTA grantee. DOL's long-standing position, as reflected in its *Rural Transportation Employee Protection Guidebook* (1979) and in its Section 13(c) Guidelines, is that employees of urban mass transportation carriers in the transportation service area of the project are entitled to substantially the same level of protection as employees represented by the union signatory to the Section 13(c) agreement.[86] The *Guidebook* explains that the Section 18 warranty provides protection for employees of the recipient of federal assistance and for the employees of "any other surface public transportation provider" in the service area. It further states that protected employees are "employees involved in providing transportation and related services for any Recipients and any other surface public transportation providers in the transportation service area of the project."[87] This latter category specifically covers "service area" employees who are not employed on the grantee's transit system. This position has historically been implemented by language in DOL's standard Section 13(c) certification letter, normally set forth in paragrap 3.[88]

DOL has described "service area" as including "the geographic area over which the project is operated and the area whose population is served by the project, including adjacent areas affected by the project."[89] Thus, if the routes and services

of the grantee are operated in the same geographical area or region as the routes or services of another transportation provider, then the employees of that other provider may be entitled to Section 13(c) protections. It is also possible in some cases that DOL could treat adjacent routes or services as being in the same service area. This means that Section 13(c) protection could extend to all transit employees that operate in the same geographic area (for example, the Chicago urbanized area). It may also mean that employees in one area are protected by more than one set of Section 13(c) protections. Under a broader reading, if a project in one county draws passengers away from a system in an adjacent county, employees potentially affected because of a reduction in service levels would be eligible for protection by a grantee in the first county as service area employees. The same would be true for employees of a carrier that passes through the service area of a project and who may be affected by that project.[90a]

For example, in order to obtain Section 13(c) certification, Fairfax County, Virginia, (a Washington, D.C., suburban area) was required to negotiate Section 13(c) protections for service area employees of the Washington Metropolitan Area Transportation Authority. Similarly, the Foothill Transit Zone, a primarily suburban operator in eastern Los Angeles County, was required to negotiate Section 13(c) protections for five transit unions representing employees of the primary operator in the urbanized area, the Los Angeles County Metropolitan Transportation Authority.

There is, of course, a critical second component of Section 13(c) coverage: a service area employee (or any employee) must also be engaged in mass transit services to be entitled to protections. This issue is discussed in more detail in Section III of this report.

While the concept of service area employee protection is not new, the means required for providing that protection are. For most of the history of the Section 13(c) program, the inclusion of the Paragraph 3 language in certification letters (providing service area employees with "substantially" the same protections as are included in the local 13[c] agreement) was considered sufficient by DOL, and was apparently acceptable to the unions, without the negotiation of separate arrangements for each group of service area employees. It is now much more likely that DOL will require the negotiation of separate Section 13(c) protective agreements between transit authorities and unions representing service area employees. This requirement is, of course, separate and apart from the requirement to provide protections for the employees of the grantee or its contractors.

Generally speaking, the reasons for this proliferation are twofold: the increasing number of transit providers in the same geographic area, especially through the establishment of suburban transit agency operators in major metropolitan areas, and the increased insistence of service area unions upon having their "own" set of Section 13(c) protections.

Obviously, one of the difficulties for grantees presented by requiring the negotiation of service area protections is simply the time and effort involved in negotiating multiple agreements. When added to the potential for delay in receiving grant funds and the expansion of Section 13(c) obligations, the change in DOL's approach can have significant impact on grantees. A more significant and often unstated problem is that the service area unions may have no particular stake in the pending federal project or the grantee's activities in general, since there is no employment relationship, and thus ordinarily no connection or shared interest between the grantee and the service area employees or their union. In fact, the more likely circumstance is that the grantee and the service area union may have an inherently adversarial relationship, since the success or expansion of the grantee's transit program may be seen as a threat to the service area union and its employees. Thus, while there is always a degree of leverage on the side of the unions in the Section 13(c) process, that leverage is tempered when the union is dealing with its own employer and there is an existing relationship, and the accompanying shared interests and issues, between the parties. Where that relationship exists, the employees and their union will normally benefit from, and ultimately have an interest in, the release of grant funds. The dynamics may change dramatically in the case of service area unions and their employees, however, since in many cases they may see little benefit in the grantee's project and little interest in the federal funds being provided.

In addition, protections normally contained in a Section 13(c) agreement expressly applicable to the grantee's own employees may not be appropriate for application in a service area context. For example, a grantee may not have the legal capacity to agree to continue the collective bargaining rights of employees with whom it has no collective bargaining relationship. Therefore, to satisfy the requirements of Section 13(c)(2), alternative language prohibiting the grantee from "impairing or interfering" with the preservation and continuation of collective bargaining rights has been certified by DOL in such situations.[91] Other provisions that may require attention in cases where a Section 13(c) agreement is being adapted to service area employees include the priority of reemployment provisions, which typically refer to employment within the jurisdiction and control of the grantee. These reemployment rights, if extended without limitation to service area employees, could conflict with applicable collective bargaining rights of the grantee's own employees.[92]

### B. Section 13(c) Process for "Standardized" Protections

Although Section 13(c) protections must normally be the product of local negotiations, DOL has adopted standardized protections to be used in two situations: (1) Section 3 or Section 9 grants to grantees whose employees are not represented by a labor organization, and (2) Section 18 grants to grantees in nonurbanized areas. For these categories of federal projects, the Section 13(c) process is significantly simpler and more expeditious.

#### *1. Nonunion Employees*

Section 215.4 of DOL's Section 13(c) Guidelines provides that if there is no labor organization representing employees, the Secretary will set forth the protective terms and conditions in the certification letter. Since there is no organization representing employees, the grantee is not required to engage in any Section 13(c) negotiations. In these cases, the Secretary imposes the "nonunion warranty," which is a simple two-page document under which the public agency grantee agrees to provide specific labor protection for employees in the "mass transportation industry" in the service area of the project. Although this document is quite abbreviated, it incorporates the more detailed rights and benefits set forth in the Appendix C-1 or Amtrak protections.[93]

#### *2. Section 18 Warranty*

Grants for nonurbanized areas under Section 18 of the Federal Transit Act also utilize a process that follows a standard set of Section 13(c) protections and

does not require individual negotiations. The protections are included in the grant agreement between FTA and the grant recipient, which is ordinarily the state department of transportation (DOT). The warranty requires the state DOT to ensure that project recipients of Section 18 funds (normally local public bodies receiving funds as "subrecipients") agree to be bound by certain specific terms of the Model Agreement. As previously noted, DOL's *Guidebook*, which includes the Section 18 warranty, is a good source of information on Section 13(c) requirements.

## C. The Section 13(c) Claims Process

*1. The Section 13(c) Claims Procedure*

As set forth in most Section 13(c) agreements, the claims handling procedure requires that the recipient be "financially responsible" for the application of the protective conditions, which essentially means financially capable of paying claims.[94] Most agreements include a period of limitation for the filing of claims, which provides that an employee affected as a result of a project may file a claim within 60 days after the date he or she is terminated or laid off, or within 18 months after the date his or her employment position is otherwise worsened. Unless the claims are filed within these time limitations, the grantee is relieved of all liabilities and obligations relating to the claims.[95] Claims under the Section 13(c) agreement that are other than for a dismissal or a displacement (such as a claim for violation of collective bargaining rights or a claim for failure to give notice of proposed changes in service that trigger the implementing agreement obligation) do not have any specified period of limitations set forth in the agreement and thus may not be subject to any precise time restriction (other than applicable state statutes of limitations or general equitable concepts of laches).

Under most Section 13(c) agreements, after the receipt of a claim, the grantee has an obligation to either accept the claim or give notice to the claimant of the reasons for denying or rejecting the claim. Standard agreements do not establish a period for the grantee's response, although in some recent Section 13(c) negotiations the unions have been seeking such a time period. If the claim is denied, the union is provided the opportunity for a "joint investigation of the claim," which is an informal procedure designed to provide more detailed information on the facts surrounding the claim and to facilitate discussion and possible settlement between the parties. In the absence of an agreement, or resolution through this informal process, the claim may be taken to arbitration.

It should be noted that certain unions currently argue that the informal claims process need not be exhausted prior to invoking Section 13(c) arbitration, and they have actually proposed not including joint investigation or any other informal claims process in the Section 13(c) agreement. DOL has recently indicated that while it "strongly encourages parties to include a claims handling procedure to provide additional opportunities for the resolution" of disputes prior to arbitration, it will not require a claims handling or informal investigation procedure in the absence of the parties' agreement.[96]

*2. Private Arbitration*

Section 13(c) labor protection arrangements traditionally provide a claims process that includes a claims handling procedure and a binding arbitration process for the resolution of disputes. Provisions addressing these issues are a standard part of Section 13(c) labor protections.

Under most 13(c) agreements, any dispute between the parties regarding the interpretation or application of the agreement (including a 13[c] claim) that is not A resolved within 30 days after the dispute arises may be submitted to arbitration.
The arbitration of Section 13(c) claims is ordinarily before a three-member arbitration panel. One arbitrator is selected by each of the parties, and a neutral arbitrator is selected by those two or, failing agreement, selected from a list normally provided by the American Arbitration Association or in some cases by the Federal Mediation and Conciliation Service. Dispute resolution is sometimes conducted by a single neutral arbitrator. The neutral arbitrator (or panel) is normally given the authority to subpoena witnesses and to compel the production of documents and other information that is relevant to the disposition of the claim. The arbitration proceeding could thus involve the testimony of witnesses, the submission of evidence, and the submission of written arguments or briefs.

Many Section 13(c) agreements set forth specific time frames for the arbitration process, including a time period (often 45 days) within which the arbitration decision is to be rendered, which normally begins to run either on the date of the appointment of the neutral arbitrator or the date of the conclusion of the hearing on the matter in dispute.[97]

Under standard Section 13(c) protective language, the burden of proof in a claims proceeding is favorable to the employee-claimant. The burden of proof language normally provides that the initial obligation is on the claimant to identify the project and "specify the pertinent facts of the project relied upon." The burden then shifts to the grantee to prove that factors other than the project affected the employee. The claiming employee will prevail if it is established the project had "an effect" upon that employee, even if other factors may also have affected the employee.[98] Technically, this language suggests that in a case involving multiple causes of harm to an employee, the employee may prevail and be entitled to full Section 13(c) relief if the federal project were a single element of that cause. However, while this burden of proof clearly appears to give a significant advantage to the employee-claimant, many actual decisions in Section 13(c) cases require the employee to establish affirmatively a causal connection, or nexus, between the harm alleged and a federal project.[99]

*3. Section 13(c) Claims Resolution*

While the standard means for resolving Section 13(c) claims of the grantee's employees is private arbitration as described above, a different method is followed for service area employees who are not signatory to a Section 13(c) agreement and are covered by DOL's certification.[100] As a general rule, where service area employees are provided protection through language in the Section 13(c) certification letter granting those employees "substantially the same levels of protection," the service area employees may not utilize the arbitration procedure set forth in the applicable protections because they are not signatory to that agreement.[101] Those employees must seek relief through DOL proceedings. DOL has established an internal process for the consideration and adjudication of Section 13(c) claims pursuant to which a DOL representative or neutral designee will be responsible for administering the case. Unlike the process generally set forth in Section 13(c) agreements for handling claims, DOL's claims process has no specific time frames or established structure. DOL may, at its discretion, hold a hearing on the dispute or proceed on the basis of written submissions (the latter approach appearing to be the norm).

While it appears that the DOL process was utilized with more frequency in the earlier years of the Section 13(c) program, that adjudicatory process nonetheless remains available for protected employees that are not able to take advantage of a specific contractual arbitration process included in the text of an agreement.

## III. THE SUBSTANTIVE LAW OF SECTION 13(C)--MAJOR ISSUES AND DECISIONS

This section provides guidance regarding the substantive requirements of Section 13(c) and highlights the major issues that may arise in the context of a Section 13(c) negotiation or a claims proceeding. This discussion, of course, is not exhaustive, and grantee counsel should consult the resources identified in Section I if confronted with other issues.

### A. Scope of Protected Employees

One of the most fundamental threshold issues is whether an individual is entitled to Section 13(c) protection. This turns on two specific questions: (1) whether the employee is engaged in mass transportation services; and (2) whether the employee is the type of employee, within a mass transit organization, that is entitled to Section 13(c) protection.

As to the first question, a review of the legislative history of Section 13(c) provides helpful guidance as to the class of employees Congress was intending to protect. There is evidence in the legislative history that only employees engaged in transit operations should be entitled to Section 13(c) protections. For example, the House Report discusses congressional concern over the impact of the legislation on "the interests of those engaged in transit employment."[102] In explaining the protections to be afforded by Section 13(c), the committee specifically noted that Section 13(c) was designed to protect *transit* employees, stating:

> The bill, accordingly, contains a specific provision that in communities where projects are to be assisted under the bill, fair and equitable arrangements, as determined by the Administrator, must be made *to protect the interests of affected transit employees*. (emphasis added)[103]

Similar legislative intent can be found in the Senate debate, in which Senator Williams explained the legislation as follows:

> [I]n this sick industry, where...transit workers do not know from day to day what will happen to their jobs, they were fearful that this assurance [the collective bargaining right] was not guaranteed....Now we are here with a measure that certainly meets the objective of preserving the hard-earned rights and benefits *of working people in the transit industry*. (emphasis added)[104]

This congressional intent to protect the interests of transit employees is also reflected in the Section 13(c) Guidelines. Section 215.2 of the Guidelines provides that applications for federal assistance are to be reviewed by DOL and, to facilitate such review, the grant application should "estimate the effects *on mass transportation employees of urban mass transportation carriers*" and should identify the labor organization, if any, representing employees of urban mass transit carriers in the area of the project (emphasis added).[105] Likewise, the Model Agreement states that Section 13(c) requires that suitable fair and equitable arrangements be made *"to protect urban mass transportation industry employees"* affected by federal assistance (emphasis added).[106]

Having established that Section 13(c) protections are to be afforded to mass transportation employees, the key question becomes what is the meaning of "mass transportation." The first place to look is the statutory definitions in the Federal Transit Act. The Act defines mass transportation as "transportation by bus, or rail, or other conveyance, either publicly or privately owned, which provides to the public general or special service (but not including school buses or charter or sightseeing service) on a regular and continuing basis."[107] Using this definition, FTA has determined that certain characteristics must be present before services will be considered mass transportation: (1) the service must be open to access by and of benefit to the general public at large and be under the control of the provider;[108] (2) the service will typically interconnect with and have transfer points to other mass transportation services;[109] and (3) the service will operate on a regular schedule (as opposed to an irregular, as-needed basis), engage in advertising, and have a printed schedule of services available to the public.[110] DOL has also explained, based on this definition, that the term "public transportation" does not include the following: (1) exclusive ride taxi service; or (2) service to individuals or groups that excludes use by the general public.[111]

As noted above, the second issue is whether the employee is the type of employee within the mass transportation organization entitled to Section 13(c) coverage. The term "employee" is not specifically defined in Section 13(c) or elsewhere in the Federal Transit Act. The legislative history indicates that the omission of a definition was intentional and that the term "employee" was intended to be understood according to its meaning in other relevant laws.[112] As discussed above, the most relevant statutory precedent at the time Section 13(c) was enacted was Section 5(2)(f) of the Interstate Commerce Act (49 U.S.C. § 11347), which provides labor protection for rail employees. Within this framework, the general rule followed by DOL is that the term "employee" should be broadly construed to encompass all but top-level individuals in policy-making positions. The broad construction of the term "employee" is supported in cases involving protection of railroad employees, such as *Edwards v. Southern Railway Company*[113] and *McDow v. Louisiana Southern Railway Company*.[114] The court in *Edwards* found that a stockholder and chief engineer of a railroad was not an "employee" entitled to labor protection on the basis that the term "as used in the present context by Congress and the ICC surely does not include the principal managers of a railroad who ordinarily are in a position to protect themselves from the consequences of consolidation."[115] The district court in *McDow* found that the vice president and general manager of a railroad was not eligible for labor protection benefits as a protected "employee" on the basis that the everyday meaning of the word "employee" did not include a vice president and general manager, and that a review of the legislative history of Section 5(2)(f) clearly indicated that the term "employee" as used in that section was not designed to include individuals in those positions.[116] While the claimants did not prevail in these two cases, the general reading of the scope of Section 5(2)(f) protection was quite broad, appearing to exclude only certain management personnel.

In addition to these federal court cases, DOL has also relied upon the definition of the term "employee of a railroad in reorganization" set forth in the Regional Rail Reorganization Act of 1973. That definition provides:

> "[E]mployee of a railroad in reorganization" means a person who, on the effective date of a conveyance of rail properties of a railroad, has an employment relationship with either said railroad in reorganization or any carrier...except a president, vice president,

treasurer, secretary, comptroller, and any person who performs functions corresponding to those performed by the foregoing officers.

Relying on this definition for Section 13(c) purposes, DOL stated the following in *King v. Connecticut Transit Management, Inc.*:

> On the basis of our review, we conclude that the term "employee"...should be broadly construed and should be considered to encompass all but the top level management of a carrier. In the top level we would include individuals performing functions corresponding to those positions cited in the definition of "employee of a railroad in reorganization" in the Regional Rail Reorganization Act.[117]

The DOL's determination of whether an individual is a covered employee is made on a case-by-case basis, requiring an examination of the position, duties, and responsibilities of the claimant to determine his "relative position in the hierarchy of management."[118] DOL has indicated that the decision as to whether an individual is an employee must be based upon the actual functions the individual performs, and that an individual's job title is not determinative.[119] In its review, DOL has focused primarily on two issues: the extent to which the claimant affects management policy, and whether the claimant exercises independent judgment and discretion of the type generally associated with top-level management.

When read together, DOL precedent indicates that a Section 13(c)-protected "employee" extends to all but top management of an organization (those individuals actually making the basic policy decisions or at least having a significant influence on management policy).

**B. Scope of Key Definitions**

A fundamental issue is the scope or reach of Section 13(c) protections. Adverse effects to employees are compensable under the terms of Section 13(c) agreements only if the harm is caused by a federal project undertaken by a grant recipient. Protective conditions entered into under Section 13(c), as well as the Model Agreement and other standard protections, routinely contain definitions of two key terms: "project" and "as a result of the project." These terms are critical because they essentially delineate the scope or reach of Section 13(c) protections.

The term "project" is normally defined in Section 13(c) protections as not being limited to "the particular facility, service, or operation assisted by federal funds," but as including "any changes, whether organizational, operational, technological, or otherwise, which are a result of the assistance provided." The term is thus broader than the actual capital assets being acquired or the operation being assisted, and extends to changes resulting from the use of federal assistance.[120]

The term "as a result of the project" is used in Section 13(c) protections as the trigger to establish the nexus required between federal funding and a particular effect. The Model Agreement defines the phrase "as a result of the project" to include "events occurring in anticipation of, during, and subsequent to the project and any program of efficiencies or economies related thereto."[121] Thus, the term can include events that may precede or follow the actual project and can include an action that is an economic or efficiency measure undertaken by a grantee that is related to the project. The definition in the Model Agreement expressly carves out from the scope of the Section 13(c) protections any "volume rises and falls of business, or changes in volume and character of employment brought about by causes other than the project (including any economies or efficiencies unrelated to the project)."[122] Thus, a decline in transit operations caused by factors other than the project being undertaken, or efficiency measures that are taken to streamline transit operations unrelated to a specific federal project, would be excluded by the definition from the scope of Section 13(c) protections.

The term "as a result of the project" is very critical because it serves to define when an employee is to be considered "displaced" or "dismissed" and thus entitled to the benefits that accompany that legal status. An employee is considered displaced or dismissed and entitled to Section 13(c) protections (in the form of allowances, priority of reemployment, or other 13[c] benefits) only when the displacement or dismissal occurs "as a result of the project."[123] In addition, the obligation to notify the union of contemplated changes and to negotiate an "implementing agreement" is typically invoked under Section 13(c) agreements when the action or change being considered by the grantee may (or will) result in the displacement or dismissal of employees "as a result of the project."[124]

Even though the traditional definitions are fairly broad, the past few years have witnessed some expansion in the scope of these terms beyond the definitions contained in the Model Agreement. Specifically, DOL has in some certification actions included language providing that the Section 13(c) protections cover adverse effects occurring as a "direct or indirect" result of a project. For example, an April 1992 certification for the Suburban Mobility Authority for Regional Transportation (SMART) included in the definition of "as a result of the project" language that covers "any program of efficiencies or economies directly or indirectly related thereto." DOL described its certification as making "it clear that employees are protected from project impacts which result *Indirectly* from a federally funded project.[125] (While stating that such a result is "clear," the decisions do not provide any precise legal basis for the extension to indirect impacts.)

DOL has also imposed language that provides that the phrase "as a result of the project" also includes "events or actions which are a result of Federal assistance" (rather than simply a specific federal project), on the basis that such language tracks the statutory language of Section 13(c). In a November 1991 certification for the Los Angeles County Transportation Commission, DOL indicated that the "statute itself specifies that protections will apply as a 'condition of any assistance' under the Act," and stated that to ensure fair and equitable protections, the language referencing events and actions that result from federal assistance would be imposed in the Section 13(c) arrangement.[126] Some efforts to broaden the scope of Section 13(c) protection have, however, been rejected by DOL determination. For example, in the April 1992 DOL certification in the SMART matter discussed previously, DOL rejected union-proposed language that would have included events "traceable" to federal assistance as within the scope of the Section 13(c) protections.

Finally, a related issue is the determination of when a federal project ends and whether, after project termination, employees are entitled to the benefit of Section 13(c) protections. DOL has not published a definitive statement for determining when a project ends for Section 13(c) purposes. Unlike many contracts, Section 13(c) agreements typically do not contain a definite term. Arguably, the point at which the useful life of federally funded equipment expires would be a logical starting point for determining when Section 13(c) protections related to a specific project cease. The issue of when a project ends was raised in connection with a recent certification action in which DOL requested FTA to review proposed Section 13(c) arrangements that required, as a condition to selling system assets procured with federal assistance, that the grantee require the operator using those assets to accept the grantee's Section 13(c) obligations. FTA objected to the

proposed language, stating that because "responsibility under section 13(c) flows with the federal assistance provided," when federally funded assets are sold and the federal interest is extinguished, the federal assistance is terminated "along with any attendant requirements including section 13(c)."[127] FTA's determination would appear to be consistent with the Model Agreement, which expressly excludes from the scope of worsening benefits employees whose situations are worsened solely because of the total or partial termination of the Project, discontinuance of Project services or exhaustion of Project funding.[128]

**C. Relationship to State Law**

The proper jurisdiction to seek judicial relief for breach of applicable Section 13(c) protective conditions is state court. In *Jackson Transit Authority v. Local Div. 1285, Amalgamated Transit Union*,[129] the court overturned a decision of the Court of Appeals for the Sixth Circuit holding that Section 13(c) implicitly provides a private federal cause of action to enforce Section 13(c) agreements, deciding that federal district courts could not assert federal question jurisdiction under 28 U.S.C. § 1331 (1976) to decide what amounted to state law breach of contract actions."[130] In that case, ATU challenged as a violation of Section 13(c)(2) the determination of the Jackson Transit Authority that it was no longer bound by the provisions of a collective bargaining agreement not set to expire for another 2 years. At the time, four other U.S. circuit courts had also decided in favor of the creation of a federal private right of action,[131] in essence allowing transit employees asserting protection under applicable Section 13(c) agreements to choose between state and federal jurisdictions to pursue their litigation. These precedents not only encouraged forum shopping, but also substituted federal law (Section 13[c]) for state labor laws, which provided more limited rights to public employees. In addition, by elevating what was in essence a breach of contract action to a private action for violation of a federal statute, the courts may have been opening the door to actions under 42 U.S.C. § 1983 (1976)[132] and to claims for attorneys' fees under the Civil Rights Attorney's Fees Awards Act of 1976.[133]

Until the *Jackson Transit* decision, only the Court of Appeals for the 11th Circuit had decided that a violation of a Section 13(c) agreement could not form the basis for federal question jurisdiction. In a case involving the Metropolitan Atlanta Rapid Transit Authority (MARTA),[134] ATU, relying on a Section 13(c) agreement executed by MARTA in connection with an earlier federal grant, convinced a federal district court to enjoin MARTA from reducing employees' salaries until the completion of interest arbitration over the terms of an expired collective bargaining agreement. ATU had relied upon a provision in the Section 13(c) agreement, which required that all contract conditions remain undisturbed pending the outcome of interest arbitration. In denying that federal question jurisdiction existed under 28 U.S.C. § 1331 to enforce the provisions of a Section 13(c) agreement, the circuit court found that the union had alleged a common law breach of contract action rather than a statutory violation,[135] stating that "there is no reason to believe that State courts, in the performance of their traditional common law role, cannot decide these private breach of contract cases as suitably as can federal courts."[136]

In the *Jackson Transit* decision, the Supreme Court agreed with the 11th Circuit Court's decision in *ATU v. MARTA*. Noting that neither the statute nor the legislative history expressly addressed the means for enforcing a Section 13(c) agreement, the Court relied primarily on the strong preference voiced by the Congress in enacting Section 13(c) for leaving matters of public employment for determination under state law, as interpreted by state courts. As the opinion notes:

> Congress made it absolutely clear that it did not intend to create a body of federal law applicable to labor relations between local governmental entities and transit workers. Section 13(c) would not supersede state law, it would leave intact the exclusion of local government employers from the National Labor Relations Act, and state courts would retain jurisdiction to determine the application of state policy to local government transit labor relations.[137]

The Court also concluded that 42 U.S.C. § 1983 did not permit the union to bring suit, based on its determination that breach of a Section 13(c) agreement did not constitute a violation of a federal law or a deprivation of a federal right secured by Section 13(c).[138]

The *Jackson Transit* decision not only limits to state courts any action brought by a union claiming breach of a Section 13(c) agreement (absent some other independent basis for federal jurisdiction), but it also confirms that Section 13(c) does not provide a basis to allege the deprivation of a federally guaranteed right protected under 42 U.S.C. § 1983. Additionally, the decision confirms that where public employees are protected by a Section 13(c) agreement, state labor law--not federal labor law or policy--should be consulted in order to construe the provisions of the applicable Section 13(c) agreement.

Other federal courts have considered issues similar to those raised in *Jackson Transit*. In a decision involving a Massachusetts statute that conflicted with provisions of an existing Section 13(c) agreement, the Court of Appeals for the First Circuit held that the Massachusetts statute prevailed over the provisions of the Section 13(c) agreement, despite the fact that the state law was enacted after the agreement was executed.[139] The Massachusetts case, however, left open the question of what would result if the state law precluded the state or its agencies from complying with Section 13(c), which was essentially addressed in a subsequent decision involving an ATU challenge to a DOL certification. The D.C. Circuit Court, in *ATU v. Donovan*, invalidated the DOL certification after it determined that one of the five enumerated requirements of Section 13(c)--the continuation of collective bargaining--could not be satisfied under a Georgia law that restricted MARTA from bargaining over certain issues which the court determined were mandatory subjects of collective bargaining.[140] The standard against which the court measured the Georgia law to determine whether collective bargaining had been continued was whether the employer retained "the power to establish wages, hours and other conditions of employment without the consent of the union or without at least first bargaining in good faith to impasse over disputed mandatory subjects."[141] Rather than supersede the operation of state law and force federal labor policy on the state, the court stated, "Section 13(c) does not proscribe mandatory labor standards for the states but rather dictates the terms of federal mass transit assistance.[142] In other words, the state is free to establish applicable labor law, and Section 13(c) does not override that state authority. Nonetheless, if a state or its political subdivisions desire federal funds, the state must satisfy Section 13(c) requirements. As indicated by the court, a state is, however, free to prescribe whatever labor laws and policies it chooses and forego federal funds.

**D. Scope of DOL Authority**

In the administration of Section 13(c), the Secretary of Labor's actions are subject to and reviewable in accordance with the requirements of the Administrative

Procedure Act.[143] Under such standards, a reviewing court will generally defer to the Secretary's exercise of discretion in administering the statutory requirements. However, as noted by the D.C. Circuit Court of Appeals in *ATU v. Donovan*, Section 13(c) does not confer "limitless discretion" on the Secretary.[144]

The *Donovan* case stemmed from the Georgia legislature's enactment of Act 1506, which prohibited MARTA from bargaining collectively over certain employee rights, required the submission of disputes to a neutral fact finder before resolution through binding interest arbitration, and limited the submission of issues concerning wages to binding interest arbitration upon the consent of both the union and MARTA. Following passage of Act 1506, MARTA and ATU agreed to certification of a pending grant based upon the terms of a previous Section 13(c) agreement; however, recognizing that the agreement's interest arbitration provision conflicted with Act 1506, both MARTA and ATU reserved their right to contest the validity of the arbitration provision. On this basis, the Secretary granted Section 13(c) certification to MARTA in June 1982. Following the Supreme Court's *Jackson Transit* decision, holding that breaches of Section 13(c) agreements are governed by state law, ATU, believing that the interest arbitration provision contained in the MARTA Section 13(c) agreement would be invalid under state law, requested that DOL withdraw its certification on the grounds that it no longer guaranteed the continuation of MARTA workers' collective bargaining rights as required by Section 13(c). DOL refused ATU's request, determining that despite the state law restriction on interest arbitration, the protective arrangements taken as a whole satisfied Section 13(c)'s fair and equitable standard. The Secretary's determination was affirmed by the district court, which concluded that while certification decisions were reviewable, DOL is only required to review a Section 13(c) agreement as a whole to ensure that it is fair and reasonable, a standard that the MARTA certification satisfied.

Before the D.C. Circuit Court of Appeals, the Secretary of Labor unsuccessfully argued that certification decisions are committed to agency discretion and are shielded from judicial review under the Administrative Procedure Act. The appeals court found that the Secretary's argument was "premised on a flawed interpretation of section 13(c)" and was "inconsistent with settled principles of judicial review of administrative actions."[145] The court went on to state that "[a] certification decision under section 13(c) of the UMTA clearly falls within the large category of agency decisions that, under *Chaney* and *Overton Park*, remain subject to judicial review."[146] Having then embarked on a substantive review of the Secretary's decision not to withdraw the MARTA certification, the court concluded that contrary to the Secretary's assertions, the five enumerated paragraphs of Section 13(c) are not merely "statutory suggestions." Rather, the court concluded that Section 13(c) provides legal standards that must be fully satisfied before the Secretary can find an agreement "fair and equitable" and that form the basis for judicial review of the Secretary's determination. As the opinion states:

> The statute does not confer limitless discretion on the Secretary to divine what is fair and equitable m the abstract Rather it prescribes statutory minima that both circumscribe his discretion and dictate standards for determining the fairness and equity of particular labor protective arrangements.[147]

Finding that Act 1506 prevented MARTA from complying with Section 13(c)(2), the court concluded that the Secretary's MARTA certification was improper and that unless Act 1506 was modified, federal funding would not be available to MARTA.[148]

The *Donovan* decision and subsequent judicial decisions have clarified that although DOL does not have unfettered discretion to ignore Section 13(c)'s statutory requirements, the Secretary does have broad discretionary authority to decide among acceptable Section 13(c) protections. Applying this principle, the court in *Amalgamated Transit Union Int'l. v. Reich*[149] upheld a Jackson Transit Authority certification in which DOL modified the interest arbitration provision applicable to previous Jackson Transit grants by including a provision from the Model Agreement, which DOL concluded also satisfied the requirements of Section 13(c).

As a related matter, if DOL determines that Section 13(c) arrangements do not meet the "fair and equitable" standard, it is difficult for a grantee to use any judicial mechanism to force DOL's certification of a pending grant. An example of this is found in the case of *City of Macon v. Marshall*.[150] In *Marshall*, the City of Macon instituted transit operations following a private operator's termination of transit services for economic reasons. The City hired most of the private company's drivers and, relying upon state law prohibitions, refused to collectively bargain with the union representing the drivers. Because the City refused to either bargain collectively with its employees or arrange for the continuation of collective bargaining, DOL concluded that it could not certify the City's pending grant.

The City brought suit against DOL, claiming the refusal to certify constituted an abuse of discretion under the Administrative Procedure Act, and sought a writ of mandamus requiring the court to compel the Secretary to certify the City's compliance with Section 13(c). Noting that agency action can be compelled except to the extent that a statute precludes judicial review or agency action is committed to agency discretion by law, the court determined it could not compel the Secretary to issue a Section 13(c) certification. The court stated:

> Thus while this court has jurisdiction under 28 U.S.C. § 1331(a), plaintiff City of Macon's remedy m this court, *if there is a remedy*, is set forth m the Administrative Procedure Act, 5 U.S.C. §§ 701 through 706; and that remedy does not apply--is not available to the City of Macon m this court--if this lawsuit involves agency action...committed to agency discretion by law.[151]

The court concluded that since Congress charged the Secretary with the responsibility for determining what is "fair and equitable," the court would not direct the Secretary to accept the City's view of what is "fair and equitable."[152]

**E. Conditional Certifications**

A natural corollary to the conclusion reached in *Donovan*, namely, that DOL must find that each of the five enumerated sections of Section 13(c) are satisfied prior to Issuing a certification, is the prohibition on conditional certifications. The D.C. Circuit Court of Appeals in *Amalgamated Transit Union v. Brock*[153] concluded that DOL had exceeded its statutory authority by issuing a certification requiring that the transit agency and union agree on a dispute resolution mechanism at some future date or have such an arrangement imposed by DOL. The rule articulated is clear: DOL may issue a certification, and funds may be disbursed, only *after* fair and equitable arrangements have been negotiated and are included in a Section 13(c) agreement or arrangement. Any DOL action that leaves for future negotiation any issues that are fundamental to compliance with the statutory obligations of Section 13(c) would constitute an impermissible conditional certification.

## F. Interest Dispute Resolution

Section 13(c)(2) requires that the protections contain provisions to provide for the continuation of collective bargaining rights. As part of this requirement, Section 13(c) protections typically will include (or recognize) a means to resolve interest disputes.[154] Interest disputes arise when the parties are unable, through the collective bargaining process, to agree on the terms and conditions of employment to be included in their labor contract. The type of procedure or means to resolve interest disputes included or referenced in the Section 13(c) protections will depend in part on the availability of any state law procedures for the resolution of interest disputes (in circumstances involving public employees) and on the applicability of the National Labor Relations Act (in instances where transit workers are employed by a private contractor of the grantee).

The range of procedures that can be used to resolve interest disputes includes binding arbitration, fact-finding, state statutory dispute resolution procedures (which may include mediation, arbitration, or fact-finding, or elements of each), and the right to strike.

*Binding arbitration* involves the presentation of disputes over proposed terms and conditions of employment to a neutral arbitrator (or panel of arbitrators) for resolution. The award of the arbitrator (or the panel) is binding on the parties and effectively results in the imposition of collective bargaining terms and conditions. *Fact-finding* is a nonbinding procedure pursuant to which a neutral party is selected to hear a dispute and issue recommendations. The parties may choose to accept or reject the fact finder's recommendations to resolve the dispute. If the recommendations are not accepted, management may implement its proposal. In addition, certain *state statutes* provide interest dispute resolution procedures applicable to public employees, which may involve binding arbitration, fact-finding, mediation, or a combination of all three and which may be utilized to satisfy the requirements of Section 13(c). Finally, the *right to strike* (or the use of economic measures) under the National Labor Relations Act[155] is recognized by DOL as a legally satisfactory means for addressing interest disputes for purposes of Section 13(c)(2).

### *1. Interest Arbitration*

Binding interest arbitration is not a required element of Section 13(c) protection. Although DOL requires that there be some process to resolve interest disputes, arbitration is not mandated if not agreed to by both parties. As a practical matter, in most cases the objection will come from the grantee. The *Donovan* court, in examining the congressional intent of Section 13(c)(2), determined that interest arbitration was not required to be included in Section 13(c) protective conditions."[156] The court determined that Congress "neither protected the right to strike nor required interest arbitration as a condition of federal transit aid....[157] However, recognizing that Section 13(c)(2) requires the continuation of collective bargaining rights, the court held that "while section 13(c) does not entitle transit workers to any particular form of binding arbitration, it does require some process that avoids unilateral control by an employer over mandatory subjects of collective bargaining."[158] On this issue, it should also be noted that, during the consideration of Section 13(c), Congress considered and rejected an effort to include in the statutory requirements of Section 13(c) an enforceable right to arbitration."[159]

DOL certification decisions have followed and confirmed the *Donovan* case. As stated in an April 1988 Section 13(c) certification for the City of Boise, DOL does not require that Section 13(c) arrangements provide for interest arbitration, and in the absence of mutual agreement of the parties to utilize an interest arbitration procedure, an alternative fact-finding procedure can be fashioned by DOL (or agreed upon by the parties).[160] DOL has thus recognized that a recipient and a union can negotiate alternative procedures applicable to the resolution of interest disputes, and that the parties or DOL can change existing Section 13(c) protections that contain interest arbitration provisions to replace those provisions with a fact finding or other alternative process.[161] Of course, the parties remain free to adopt interest arbitration provisions, and if included in Section 13(c) agreements, such provisions are an acceptable means of satisfying Section 13(c)(2).

### *2. Fact-Finding*

The *Donovan* court rejected the notion that Section 13(c)(2) mandated a binding means to resolve disputes, explaining the Section 13(c)(2) obligation as follows:

> Section 13(c)'s requirement, therefore, that labor protective agreements provide for "the continuation of collective bargaining rights" means, at a minimum, that where employees enjoyed collective bargaining rights prior to public acquisition of the transit system, they are entitled to be represented in meaningful, "good faith" negotiations with their employer over wages, hours and other terms and conditions of employment. Collective bargaining does not exist if an employer retains the power to establish wages, hours and other conditions of employment without the consent of the union or without at least first bargaining in good faith to impasse over disputed mandatory subjects.[162]

Using this standard, the *Donovan* court set out a series of criteria to govern whether a fact-finding process meets the obligations of Section 13(c)(2). The criteria as follows:

(1) The requirement of good faith negotiations to the point of impasse;

(2) Mandatory fact-finding (at the request of either party) to resolve disputed interest terms;

(3) A fact-finding process that allows for the "full and fair airing" of bargaining disputes and equitable recommendations from a neutral fact finder;

(4) An obligation to seriously consider the recommendation issued by the fact finder in the "full eye of public scrutiny"; and

(5) An obligation to explain rejection of the fact finder's recommendations.[163]

Based on these standards, DOL has certified fact-finding procedures in Section 13(c) protections over the objection of transit unions.[164] In states in which a fact-finding process exists by statute and is applicable to the transit employees involved, DOL can (and will) utilize that established process. To the extent the existing state statutory procedures fail to fully comply with the *Donovan* standards, DOL will impose necessary supplementary provisions.[165]

For example, DOL has issued Section 13(c) certifications to SMART based on an interest dispute resolution process modeled on the Michigan State public employment statute,[166] under which the Michigan Employment Relations Commission (MERC) conducts mediation and fact-finding to resolve interest disputes. The process adopted by DOL supplements the Michigan statutory requirements by adding further procedural requirements to ensure that the issues in dispute are fully explored and that equitable recommendations for settlement will be issued. The specific supplementary provisions, designed to ensure compliance with *Donovan*, include a listing of factors to be considered by the fact finder to promote the full and fair airing of the dispute; a publication requirement to ensure that the process occurs "in the full eye of public scrutiny"; and a provision requiring that

conditions of employment remain effective until the earlier of an effective date of a new collective bargaining agreement or publication of the fact finder's recommendations (a "status quo" provision), which ensures the absence of unilateral control over conditions of employment. However, when a state interest dispute resolution process fully satisfies Section 13(c)(2), DOL will certify the arrangement as being 'fair and equitable," relying upon the state process without supplementation.

*3. Right to Strike*

In instances involving transit workers employed by a private entity (as in contracted operations), DOL recognizes that the right to strike that exists under NLRA is, in and of itself, sufficient to satisfy Section 13(c)(2) obligations. In such instances, the protective arrangements do not confer any right to strike, but simply ensure that the right as it exists is not infringed upon or affected by the Section 13(c) protective terms. As set forth in Paragraph 4 of the Model Agreement, the language typically used reads as follows:

> If, at any time, applicable laws or contracts permit or grant to employees covered by this agreement the right to utilize any economic measures, nothing in this agreement shall be deemed to foreclose the exercise of such right.[167]

Accordingly, where the right to strike exists, no process governing the resolution of interest disputes need be expressly included in Section 13(c) protections. It is probably appropriate to expressly recognize the preservation of this right, however, in order to ensure compliance with Section 13(c)(2).

**G. Notice and Implementing Agreements**

Section 13(c) protections typically contain a provision requiring the grant recipient to provide prior written notice to the union of a contemplated change in the organization or operation of the transit system that may result in the dismissal or displacement of employees or in the rearrangement of the working forces.[168] The notice obligation is usually 60 or 90 days prior to the anticipated change and is only triggered if the adverse effect to employees would occur as a result of a federally assisted project.

Once notice has been -provided, the grantee and the union are required to agree on implementing terms to apply the Section 13(c) agreement to the intended change. The implementing agreement has its origin in rail labor protection and is used in the rail industry to implement a rail transaction (such as a merger or consolidation) approved by ICC. In the rail context, an implementing agreement will often address the "dovetailing" of seniority rosters, the assignment of work to affected employees, the consolidation of work rules, and other transitional matters involving employees. Particularly in rail mergers, implementing agreements have a practical role in addressing labor issues that arise regarding the merged operations. Implementing agreements have rarely been used in the transit industry, however, since as a practical matter transactions requiring such an agreement are less likely to occur. However, the existence of this obligation in Section 13(c) protections could operate to impede or delay the implementation of desired changes to transit operations or services.

One current Section 13(c) issue relating to implementing provisions is whether the grantee may proceed with a proposed change at the end of the notice period, but before an implementing agreement is finalized. In earlier Section 13(c)

agreements, before any spotlight was focused on this issue, the notice and implementing agreement section was often silent on the issue of the ability to proceed. o (For example, the Model Agreement contains no language on this issue.) Moreover, the Appendix C-1 protections, incorporated in the nonunion warranty, grant a right to proceed in all cases at the end of the notice period. In recent years, however, transit unions have frequently sought strict prohibitions on the implementation of a proposed change until an implementing agreement is concluded, either through negotiation or, failing agreement, through binding arbitration. This is generally referred to as the "preconsummation" requirement. As a result, in some current Section 13(c) protections, there is an absolute ban on proceeding until the implementing agreement is in place. As a less restrictive alternative, some contemporary Section 13(c) agreements provide that whether a contemplated change may proceed at the end of the notice period will depend upon the particular type of transaction involved.

These rules on the ability to proceed have their roots in rail labor protection decisions of ICC, which base the determination as to whether a transaction may proceed on the degree or extent of employee impact. In railroad merger transactions, where significant adverse effects to employees can occur, there is a 90-day notice requirement and a prohibition on proceeding until an implementing agreement is concluded. These obligations are embodied in the *New York Dock* labor protections.[169] By contrast, in instances where the anticipated harm to employees is less, there is no impediment to proceeding with a proposed change at the end of the notice period, and the negotiation of an implementing agreement can occur after the effectuation of the change. For example, the Mendocino Coast protections, imposed by ICC in trackage rights and lease proceedings, provide for 20 days' advance notice of a proposed change, expressly allow for the change to occur prior to completion of an implementing agreement, and provide compensation to harmed employees from the time of adverse effect (if any harm occurs before agreement on implementing terms is reached).[170] As explained in the Mendocino Coast protections, in circumstances involving transactions that have lesser employee disruptive impacts, there is little justification to prohibit the transaction from going forward since the expeditious consummation of the transaction is in the public interest.[171]

In recent Section 13(c) certification decisions, DOL has recognized and adopted these ICC standards and incorporated them into the implementing agreement provisions of the Section 13(c) protections.[172] The language normally used gives the grantee the burden of proof to establish that a particular change is similar to a trackage rights or lease case, rather than a merger, sale, or coordination. While there is merit in relying on the ICC tests, reliance on the type of transaction rather than the degree of employee impact (which is the underlying principle in the ICC cases) may create unnecessary confusion in practice, since the rail transactions cited are rare in the transit industry.

If a dispute arises between the parties as to whether a proposed change fits within the merger category or the trackage rights category, recent Section 13(c) certifications have provided for the dispute to be decided under an expedited arbitration process. Under such a process, an arbitrator would determine whether the proposed change should be permitted to proceed under a fast-track arbitration schedule that Incorporates very short time periods for the various stages of the arbitration process.[173] The goal of the fast-track process is to provide a decision before the end of the notice period and avoid delayed implementation. If the

change is permitted to proceed, employees who are adversely affected must be kept financially "whole" from the time of the adverse effect.[174]

The implementing agreement obligation in Section 13(c) protections, while rarely evoked or utilized in the transit industry, can present impediments to a grantee's ability to put in place operational and service changes. The implementing agreement obligation requires not only that notice be given to the union on issues that management may view as being within its discretion, but also that an agreement with transit labor be reached on work assignments, seniority, and other employee issues, often as a precondition to effectuating service and other changes.

## H. New Jobs Clause

A Section 13(c) provision that has been somewhat controversial is the so-called new jobs clause, which gives union employees the first opportunity for employment in any new positions created as a result of a federal project. These provisions are most likely to be found in cases where the grantee is starting a new rail project. Although some Section 13(c) protective conditions contain new jobs clauses, DOL has determined that such clauses are not legally required by Section 13(c).

A March 1989 certification decision involving Utah Transit Authority addresses the new jobs clause.[175] The transit union involved in the proceeding proposed that existing workforce employees be provided with rights to new jobs created as a result of the federally assisted project. The transit authority refused to include such a right in its Section 13(c) proposal. The certification decision stated that this proposed right was "beyond the minimum requirements of Section 13(c)."[176] DOL also commented in the certification that the interests of any employees who are dismissed are protected by the priority of reemployment afforded under the Section 13(c) protections.[177]

The Utah certification decision does not provide a detailed explanation for declining to grant a Section 13(c) right to new jobs. It can be surmised, however, that the lack of a statutory requirement provided adequate rationale for DOL to decline to create an express right or entitlement to any new jobs created due to a federal project. Indeed, Section 13(c) was designed not to enhance rights or create new entitlements, but to preserve existing collective bargaining rights and the *opportunity* to achieve new rights through the collective bargaining process.[178] As is repeatedly mentioned throughout the legislative history, Section 13(c) obligations were fashioned to preserve the status quo and to ensure that federal assistance would not be used to diminish existing rights. The Utah certification decision acknowledges and is fully consistent with this express congressional purpose.

## I. Contracting Out-Sole Provider Clause

DOL has determined that Section 13(c) is not an impediment to the contracting out of transit services; neither does it dictate whether service can be contracted out. DOL's most recent pronouncement on this issue was in a certification letter involving a grant of operating assistance to South Bend Public Transportation Corporation. In that proceeding, the union had proposed language substantially similar to the "sole provider" clause discussed below, which attempted to limit the transit authority's ability to provide services by contract to instances (1) in which it had done so in the past and was doing so at the time the Section 13(c) agreement was signed, or (2) in which subcontracting was permitted by the applicable collective bargaining agreement. In rejecting the union's proposed language, DOL stated the following:

> Section 13(c) of the Act does not dictate whether or not service can be contracted out. Rather, it preserves existing collective bargaining rights during the term of a contract without precluding the parties from negotiating subsequent agreements. Therefore, the Department will not include the union's proposed language with respect to subcontracting.[179]

Terms included in Section 13(c) protections may nevertheless limit a transit authority's ability to contract out service, or diminish or negate the economic advantages to be gained by contracting out the service.[180] For example, some Section 13(c) agreements include language that may limit the ability to contract out service. The particular clause in question, found at Paragraph 23 of the Model Agreement, is commonly referred to as the "sole provider clause," providing in relevant part:

> The designated Recipient...shall be the sole provider of mass transportation services to the Project and such services shall be provided exclusively by employees of the Recipient covered by this agreement, in accordance with this agreement and any applicable collective bargaining agreement. The parties recognize, however, that certain of the recipients signatory hereto, providing mass transportation services, have heretofore provided such services through contracts by purchase, leasing or other arrangements and hereby agree that such practices may continue.

While DOL has stated that Section 13(c) does not require the inclusion of the sole provider clause in protective conditions,[181] no certification decisions have addressed the scope or meaning *of* the sole provider clause where it was included in a Section 13(c) arrangement by agreement of the parties. However, private arbitration decisions have addressed the issue. Based upon the interaction between the sole provider clause and the collective bargaining agreement, the majority view taken by arbitrators interpreting the sole provider clause is that where the collective bargaining agreement is silent on the issue of third-party contracting or expressly permits the practice, the arbitrator will defer to the parties' decision not to expressly limit subcontracting through the collective bargaining process, and the sole provider clause does not act to restrict or limit the subcontracting of service. For example, in an arbitration proceeding involving Transit Authority of River City (TARC), the union challenged the subcontracting of new service based upon the inclusion of the sole provider clause in the parties' Section 13(c) agreement.[182] The collective bargaining agreement between the union and TARC did not contain any specific prohibition against the hiring of contractors to perform bargaining unit work.[183] Determining that the sole provider clause would "supersede local labor contract provisions only where the Section 13(c) agreement was in conflict with the labor agreement,"[184] the arbitrator concluded that the Section 13(c) agreement did not specifically restrict subcontracting.[185]

A minority of arbitration decisions have held that the sole provider clause acts to prohibit the subcontracting of transit services other than service that has been previously contracted out.[186] An illustration of this view is an arbitration case involving a private contractor, Transportation Management of Tennessee, Inc. (TMT), which managed and operated fixed-route service in and around Nashville, Tennessee, on behalf of the Metropolitan Transit Authority (MTA). In the TMT case, the union representing TMT employees claimed that subcontracting new service peripheral to TMT's fixed-route service was prohibited by an applicable Section 13(c) agreement containing the sole provider clause.[187] The service in

13-53846-tjt Doc 7452 Filed 09/12/14 Entered 09/12/14 16:18:17 Page 24 of 43

question, the Downtown Circulator system, provided trolley service principally to persons traveling between downtown work locations and parking lots.[188]

The arbitrator ruled that MTA's operation of the Downtown Circulator system violated Paragraph 23 of the Model Agreement, stating that:

> The clear and unambiguous meaning of the quoted language is that the recipient of Federal operating assistance funds shall be the sole provider of mass transportation services to the project affected by those funds and that such services shall be provided by the recipient's employees exclusively except where such services have been provided through contracts.[189]

Contrary to the holding in the TARC decision, the arbitrator concluded that the phrase "in accordance with...any applicable bargaining agreement" in the sole provider clause did not act to limit the requirement that the recipient remain the sole provider of services, but rather merely operated to require that employees providing mass transportation services to the project have the benefit of any applicable collective bargaining agreement's terms and conditions. Furthermore, the arbitrator determined that the service did not represent the subcontracting of preexisting service. On the contrary, the arbitrator interpreted the sole provider clause exception for preexisting services narrowly to cover *only those specific services* previously subcontracted. In essence, the effect of the arbitrator's holding was that the mere existence of subcontracting practices would not serve to grandfather any and all subsequent contracting out activities.[190]

In light of the narrow and quite literal application given the sole provider clause in the TMT case, if a grantee is party to the Model Agreement and contemplates contracting out new or existing service, the grantee might consider withdrawing from the Model Agreement and negotiating individual Section 13(c) protective arrangements not containing such a provision for application to future operating assistance grants. As noted, DOL will not require inclusion of the sole provider clause over the objection of the grant recipient.

### J. "Carryover" Rights and Change in Contractors

Another provision that affects the contracting of transit services is commonly referred to as a "carryover" rights clause. Such clauses typically require that a contractor providing transit service hire the workforce of the preceding service provider and adopt the terms and conditions of the existing collective bargaining agreement. These provisions have on occasion been included, over the objection of the grantee, in Section 13(c) protective conditions certified by DOL. As discussed below, where DOL determines such obligations are required, the attendant liabilities, while not operating as a legal impediment to the subcontracting of service, may actually serve as a major financial disincentive to contracting. A required employee carryover could significantly affect the competitive procurement process, as well as the cost of contracting. In particular, the potential economic benefits of competitive contracting and any incentive to privatize transit services could be lost if labor costs are effectively locked in from one service provider to the next.

The scope and nature of Section 13(c) labor protection required in change in contractor cases has become a subject of significant recent debate. Specifically, until a recent certification decision involving the Regional Transportation Commission of Clark County, Nevada (discussed in more detail below), it appeared that DOL had become receptive to certain efforts by transit unions to include in

Section 13(c) protections a requirement that contractors providing transit services for a federal grantee hire the workforce of the preceding contractor and adopt the terms of existing collective bargaining agreements. The carryover provisions typically sought by transit unions essentially provided a guaranteed right of continued employment, a continuation of the then-effective collective bargaining agreement, and, if read literally, recognition of the existing union representative."[191]

An example of a carryover provision included at the suggestion of the union in a March 29, 1993, certification involving South Bend Public Transportation Corporation reads in relevant part as follows:

> In the event of a transition from public to private management and/or operation of the transit system or any part or portion thereof, or of a transfer of transit system operations to another public entity, employees represented by the Union shall be granted an *absolute* preference in hiring over all others to fill any and all positions with the new operator and/or manager reasonably comparable to the positions such employees held with the Recipient...subject to all the rights and benefits of this Arrangement....(emphasis added)
>
> ....
>
> As a precondition of such transactions, the Recipient shall require or otherwise arrange for its obligations with regard to wages, hours, working conditions, health and welfare, and pension or retirement provisions for employees to be assumed by any person, enterprise, body or agency, whether publicly or privately owned, required to continue the employment of the employees represented by the Union in accordance with this Paragraph (25).[192]

DOL's position regarding Section 13(c) obligations in changed contractor situations, first articulated in DOL's 1986 *Modesto* and 1987 *Snohomish* decisions, was that when a contract for a fixed length had been properly terminated in accordance with its terms, to the extent adverse effects that occur in a contractor transition were solely the result of the expiration of the contract, those effects would not to be considered "as a result of a federal grant or project, and therefore would not trigger benefits to affected employees.[193] DOL noted in those letters, however, that this rule would not apply to employees of a contractor under a Memphis plan or where the applicable Section 13(c) protections already in place provide for continued employment.[194] Given these exceptions, the analysis of what situations constitute a Memphis plan has become increasingly important.

As described by Senator Morse during the debate prior to enactment of the Federal Transit Act, a Memphis plan involves a situation in which a public entity acquires a failed (or failing) transit system with federal assistance, but state law precludes the public entity from engaging in collective bargaining."[195] In its May 1991 letter to the Urban Mass Transportation Administration, DOL, relying upon the remarks made by Senator Morse, described a Memphis plan as a situation in which a state law prohibits collective bargaining by public entities and a private entity employs the system's workforce in order to enable the public entity to comply with both its Section 13(c) obligations and state law.[196]

Following the *Modesto* and *Snohomish* decisions, the transit labor unions aggressively sought Section 13(c) provisions requiring a carryover of the workforce and collective bargaining agreements, both in the context of negotiations over the terms to be included in Section 13(c) agreements and in the form of claims filed under applicable Section 13(c) protections. (The claims filed have sought an express right to a carryover or, in the alternative, displacement or dismissal allowances.) In two March 1993 Section 13(c) certification decisions, DOL imposed provisions that required the inclusion of assurances of employment and the carryover of existing labor contracts.

13-53846-tjt Doc 7452 Filed 09/12/14 Entered 09/12/14 16:18:17 Page 25 of 43

The first decision involved South Bend Public Transportation Corporation. In connection with a 1992 operating assistance grant for South Bend, ATU requested the inclusion of an express provision requiring the carryover of South Bend employees upon "a transition from public to private management and/or operation of the transit system or any part or portion thereof, or of a transfer of transit system operations to any other public entity." DOL imposed the carryover provision, which had not been included in prior Section 13(c) certifications involving South Bend, explaining that because Section 13(c) clearly requires assurances of continued employment in the event of an acquisition of a transportation system with federal assistance (as, in DOL's view, had occurred in 1977), continuing employment guarantees for the previous private operator's employees in the event of a change in system operator are appropriate. DOL explained that assurances of continuing employment under Section 13(c)(4), and the other benefits of Section 13(c), continue in acquisition cases without "sunsetting," so that the passage of time in and of itself would not relieve South Bend of its obligations to such employees.[197] The letter further indicates that new service supported by federal funding may be contracted out without providing the carryover protection to employees providing the service.

The second certification decision requiring employee carryover involved New Jersey Transit Corporation (NJT). Since its 1977 inception, NJT had apparently subsidized the operation of certain local bus service provided by Monmouth County Bus Lines, Inc. (MBL), a private bus company, under a terminable at will contract. Pursuant to separate leases, MBL was also permitted to use NJT-owned, federally funded buses and other equipment. The final subsidy contract and equipment lease between MBL and NJT was terminated by NJT in July 1992 amid allegations of malfeasance by MBL. To maintain service in the affected area, NJT awarded a 6-month bridge contract and short-term lease of the buses previously leased to MBL, and thereafter, following a competitive bidding process, awarded a longer-term fixed-price contract pursuant to which a private operator was to provide service, including service along former MBL bus routes.[198] Apparently, less than 50 percent of MBL's employees were hired by the subsequent operator providing service along former MBL routes.

Following award of the competitively bid service contract, NJT applied to FTA for operating funds, and the grant was referred to DOL for Section 13(c) certification. The ATU local that organized the new contractor's workforce (which differed from the ATU local that organized MBL's employees) argued to DOL that the employees it represented were entitled to assurances of employment and the carryover of collective bargaining rights and benefits in the event of any subsequent change in system operator. DOL found that a right to "preferential hiring" existed, and indicated that it had assessed the situation "based on, but not limited to, such criteria as the history of the provision of service by NJT through non-competitively bid contracts, and the similarity to a Memphis situation." Thus, even though no acquisition occurred and no true Memphis plan situation existed (in that there was no legal impediment to collective bargaining), a preferential hiring provision was required to be included in the certified arrangement.

A September 21, 1994, certification issued for the Regional Transportation Commission of Clark County, Nevada, (RTC) signals a change DOL's approach to the carryover issue."[199] In the RTC certification, DOL rejected the union's proposal that language be included in the Section 13(c) arrangement to guarantee continued employment for employees of RTC's contractor, ATC/Vancom, if RTC changed the operator of the service either by contracting with a different provider or by providing the service directly. DOL rejected the union's argument that Sections 13(c)(1) or (c)(2) independently provide a guarantee of employment in the event of a change in service provider by stating as follows:

> Section 13(c)(1) and (2)...are not, in and of themselves, sufficient to ensure a right to jobs. In other words, no exclusive job right or preference is derived solely from 13(c)(1) and (2) absent the protections afforded by Section 13(c)(4) under an acquisition.
>
> ....
>
> The RTC correctly captures this point when it states that neither Section 13(c)(1) nor (c) (2) provide guaranteed jobs, but rather ensure that rights achieved through collective bargaining with an employer are preserved and that the process for negotiating labor contracts is continued with the employing entity. These provisions standing alone do not operate to create new employment relationships with a third party, nor do they require the hiring of a predetermined workforce.[200]

The RTC certification also found that no acquisition occurred that would trigger a guaranteed right of employment under Section 13(c)(4), which specifically provides for "assurances of employment" in acquisition cases. The RTC certification continued by stating the following:

> Employees of the transit system would be entitled to assurances of employment if it were determined that Federal assistance was used to acquire the LVTS transit system. Section 13(c)(4) ensures such protections to affected employees in the context of an acquisition.[201]

Finally, DOL's RTC certification rejected the union's attempt to rely on a Memphis plan argument to support guaranteed job rights. As the RTC certification states:

> The application of a Memphis formula, as envisioned by the Congress, was specifically intended to address a public sector prohibition on collective bargaining in the context of an acquisition. Any broad reference to a Memphis "type" situation which focuses on the use of a contractor and omits the critical factor of an acquisition is not an accurate characterization of a Memphis formula.[202]

It is clear from reviewing DOL's decision in the RTC case that, absent a Section 13(c)(4) acquisition, carryover rights will not be imposed in the event of a change in system operator. The decision also raises questions as to the property of the New Jersey and South Bend decisions. The potential for carryover protections to be imposed still exists, however, and will continue to have a significant impact on transit systems that rely on private contracting for commuter rail, fixed-route bus services, or paratransit operations.

Finally, it is possible that at some future point, the operation of a Section 13(c) carryover clause will require that a court address the issue of whether Section 13(c) obligations conflict with private-sector employment rights under NLRA. A recent decision of the U.S. District Court for the District of Columbia, *Washington Service Contractors Coalition v. District of Columbia*,[203] involved a challenge to District of Columbia statute, the Displaced Workers Protection Act of 1994 (DWPA), which essentially required certain contractors to retain employees of the predecessor after taking over service contracts.[204] Specifically, the statute obligated a contractor to hire the workforce of the preceding contractor for a transitional period, after which the contractor could lay off only those individuals not needed to perform the work or with unsatisfactory performance evaluations.[205]

On a motion for summary judgment, the court held that DWPA was "invalid and unenforceable" on the basis that it was preempted by NLRA. The court noted a

that the D.C. statute represented an "unprecedented incursion into an area that was previously unregulated," and it "upset the delicate balance between labor and management that is governed by the NLRA."[206] In conducting its analysis, the court relied upon the series of Supreme Court decisions concerning successorship principles and reaffirmed that an employer has *no* obligation to hire any of its predecessor's employees and may operate its enterprise with its "own independent labor force."[207] The court found that the "unprecedented nature of [the statute's] intrusion on an employer's prerogative to select members of its workforce" raised NLRA preemption issues, but more significantly that the statute's impact on collective bargaining so considerably "alters the balance of power between labor and management" that it is preempted by NLRA.[208] The court found the statute operated to "impose upon employers a duty to bargain that would not necessarily arise in the free market," and thereby to "interfere significantly with the traditional collective bargaining positions of labor and management."[209] As explained by the court, the statute altered labor law obligations by requiring contractors "to retain workers whom they may not wish to hire and triggering a duty to bargain with the union that represents these workers."[210] The court reasoned that requiring contractors to recognize unions when they take over contracts from predecessors with unionized workforces, "puts employers in a worse position than they would be in the free market as envisioned by the NLRA."[211] As further stated by the court:

> It also serves to put unions in a better position by relieving them of the time and expense ordinarily related to seeking recognition and bargaining rights. Once a union gains a foothold in a particular site, the [statute] effectively serves to keep that site unionized, regardless of what company takes over the contract at that site. This is not consistent with the NLRA.[212]

As to the required hiring obligations, the court also stated:

> There are numerous legitimate and *nondiscriminatory* reasons why a *successor may* not want to hire its predecessors' employees. For example, an employer may choose not to hire a particular worker because of that individual's past attendance record, poor work quality, prior insubordination or for a myriad of other reasons. Since the quality of an employer's workers may affect the awarding of future contracts, the hiring decision is an important economic tool. The [statute] strips the plaintiffs of this legitimate and valuable economic tool while simultaneously adding to the plaintiffs' collective bargaining obligations by creating a system that will impose collective bargaining obligations where they would not normally exist. *This deprives employers of their rights and disrupts the collective bargaining process.*[213]

The court concluded its assessment of the statute by stating, "[T]he District of Columbia 'has put its thumb on the balance scale between management and labor in a private industry, which a local government may not do.'"[214]

The *Washington Service Contractors* case, and successorship principles under NLRA, raise the question of whether a carryover clause imposed by DOL could withstand judicial scrutiny.[215]

**K. Successor Clauses**

Another area in which the reach of Section 13(c) obligations has been expanded is that of successor clauses. Successor clauses, often found in commercial contracts, are typically utilized to ensure that the successor to either party to the contract will assume the obligations of its predecessor. Section 13(c) protective conditions often contain a clause stipulating that the agreement is binding on the successors and assigns of the parties and that the successors to the management or operation of the transit system agree to be bound by the terms of the Section 13(c) agreement and accept responsibility for full performance of its conditions.[216]

In recent years, transit labor has been able to obtain successor language that attempts to bind contractors of the grant recipient to the Section 13(c) agreement, regardless of whether the contractor is actually a true successor or assign or whether the grantee retains full responsibility for the protections.[217] The intent is to impose Section 13(c) obligations on multiple entities, which may have no direct employment or other contractual relationship with the union signatory to the Section 13(c) agreement. In effect, this expansion has attempted to convert the successor clause into a multiparty liability clause. The effort to bind entities not party to the underlying contract raises basic legal issues and draws into question the enforceability of such a clause.

DOL's consideration of this issue has led to a series of determinations, which are somewhat inconsistent in their reasoning and increasingly expansive in their result. In a March 1989 certification for Utah Transit Authority, DOL indicated that a new operator undertaking operation of the transit system should be bound by the obligations in the Section 13(c) agreement. DOL expressed concern that the requirements of Section 13(c) could be circumvented if federal assistance was passed along to an "alter ego" of the transit system, but the corresponding obligations of Section 13(c) were not. Although the language included in the certified arrangement differed only slightly from that contained in the Model Agreement, the explanation given by DOL appears to focus more on the transfer or use of grant funds rather than on the nature of the successor entity.

In considering this issue again, in a March 1990 certification for SMART,[218] DOL determined that subcontractors were agents of the transit system and must comply with the Section 13(c) obligations assumed by the transit system. Although the language imposed did not differ in any material way from that imposed in the 1989 Utah Transit Authority certification, discussed earlier, DOL used the agency theory as the basis for its determination. DOL did not explain its reasoning for finding an agency relationship, but simply indicated that the grant recipient assumes the "major role of ensuring that employee protections are provided," while subcontractors "also must comply" with the Section 13(c) obligations assumed.[219] As a factual and legal matter, however, contractors generally have the status of independent contractors, not agents of the public body. The SMART determination thus did not clarify the relative obligations of grant recipients and its contractors, nor did it provide a basis for the imposition of Section 13(c) responsibilities on entities that may have no contractual or other legal relationship with protected employees. DOL considered this issue yet again in a Section 13(c) determination involving Los Angeles County Transportation Commission, issued in November 1991. In that certification, DOL imposed a successor clause that obligates a grant recipient to ensure that project contractors and any entity that undertakes the provision or operation of project services (or any part or portion thereof) will agree to be bound by the terms of the Section 13(c) protections and accept responsibility for full performance of the protective conditions. This more elaborate successor clause was explained by DOL as requiring the grant recipient to ensure that contractors that benefit from the receipt of federal assistance also share Section 13(c) obligations. DOL indicated that the language it included more accurately sets forth the obligations of the parties and ensures compliance with Section 13(c).[220]

One of the troubling aspects of the DOL-imposed contemporary successor language is that it does not reflect the true relationship of a grantee to its contractor. Specifically, despite the Section 13(c) language, the contractor rarely if ever accepts full responsibility for Section 13(c) protections--the grantee is the entity that has financial and administrative responsibility and assumes the specific Section 13(c) obligations. Further, if the grantee has full legal responsibility, it is not clear what labor protection purpose would be served by imposing that responsibility on a third party. Moreover, as a business matter, if contractors actually had to assume contingent liability for Section 13(c) claims, they would probably have to reflect that cost in their price proposal (or, in the alternative, it would not be worth the economic risk to undertake the contracted work).

Despite these determinations issued by DOL, there still is no clear legal basis justifying the imposition (or enforceability) of Section 13(c) obligations on contractors not party to Section 13(c) protections, nor has any reasoning been provided for multiple party responsibility. The effect of the imposition of Section 13(c) obligations on contracting entities, in terms of the cost and the willingness to provide transit services under contract, has yet to be assessed.

**L. Worsening Benefits**

The transit unions have begun to propose a separate provision to be included in Section 13(c) protections addressing benefits for employee "worsenings," claiming that the standard dismissal and displacement allowances are inadequate to fully address the range of employee worsenings protected by Section 13(c). The provision sought creates a separate category of protected employee--the "worsened employee"--defined as any employee "placed in a worse position with respect to hours, working conditions, fringe benefits or rights and privileges pertaining thereto as a result of the project." The provision also provides for some form of "make-whole" benefit, including restoration of the exact benefit lost or harmed, offsetting benefits, or as appropriate, compensatory damages.

DOL has in certain determinations afforded worsening benefits protection premised upon Section 13(c)(3), which requires that employees be protected against a worsening in their employment. However, protections developed under Section 5(2)(f), on which Section 13(c) is based and which provide the threshold for establishing benefits, do not include a separate worsening concept. Both the *New York Dock* and *Mendocino Coast* protective conditions only expressly recognize that "displaced" and "dismissed" employees are entitled to protection. No distinct category of worsened employee is recognized by either set of rail protections. In fact, a recent ICC discussion of the "make-whole" concept reveals that the ICC views make-whole protections as the provision of allowances or protective benefits during the period of time extending from the date of an employee's adverse effect and to the effective date of an implementing agreement.[221]

Despite the absence of what the authors believe is a clear legal basis for inclusion of worsening protection in *Section* 13(c) *protective* conditions, DOL has established a separate category of worsening benefits in a series of certification actions,[222] the latest of which incorporates the concept of the worsened employee.[223]

It should be noted that, prior to the formal inclusion of this language in Section 13(c) protections, DOL arbitration awards had recognized remedies for worsening other than the standard dismissal or displacement allowance.[224] Thus, the legal effect of including express worsening language is yet to be seen. The range of Section 13(c) benefits afforded will depend in part upon how arbitrators interpret the worsened employee concept.

**IV. CONCLUSION**

Recipients of certain categories of FTA financial assistance are required by Section 13(c) of the Federal Transit Act to provide employee labor protection as a condition to receiving such assistance. Any public entity that is for the first time considering applying for FTA grant funds should become familiar with both the procedural and the substantive requirements of Section 13(c). Failure to do so may result in labor protections that reduce management's flexibility to utilize the very grant funds that required the negotiation of Section 13(c) labor protections or affect management's ability to conduct transit operations in the most efficient and economic manner. In addition, because DOL's application of Section 13(c) continues to evolve, existing grantees of FTA assistance that are confronted with obtaining certification of additional grant monies should also stay abreast of Section 13(c) determinations. Beyond the development of protective conditions, grantees are also increasingly being faced with claims seeking benefits filed by employees or unions under the terms of Section 13(c) agreements

While this paper is intended to provide a comprehensive overview of the procedural and substantive requirements of Section 13(c), grantees are encouraged to carefully review developments in the area when confronted with the negotiation of new or revised Section 13(c) protections or claims.

## ENDNOTES

[1]Originally, Section 13(c) was designated as Section 10(c) of the Urban Mass Transportation Act of 1964, Pub. L. No. 88-365, 78 Stat. 307 (July 9, 1964). Amendments to the Act in 1966 resulted in the section's redesignation, Pub. L. No. 89-562, § 2(b)(1), 80 Stat. 716 (Sept. 8, 1966). Throughout this article the statutory provision is referred to as Section 13(c).
[2]The requirements of Section 13(c) are applicable to assistance granted under Sections 3, 5, 9, 16(b)(1), 17, and 18 of the Act. The provisions of Section 13(c) are also applicable to Sections 103 and 142 of the Federal-Aid Highway Act of 1973, 23 U.S.C. §§ 103 and 142.
[3]Pub. L. No. 88-365, 78 Stat. 302 (July 9, 1964). The Urban Mass Transportation Act of 1964 was redesignated as the Federal Transit Act by. Pub. L. No. 102-240, 105 Stat. 1914 (Dec. 18, 1991).
[4]H.R. REP. No. 204, 88th Cong., 1st Sess. (1963), *reprinted in* 1964 U.S. CODE CONG. & ADMIN. NEWS, 2569, 2572.
[5]*Id.* at 2571.
[6]*Id.* at 2577.
[7]Congress provided in the Housing Act of 1961 (Pub. L. No. 87-70) temporary loan and demonstration grant authority to the Federal Housing Administration to aid mass transit, pending completion of the Kennedy Administration's study on the plight of mass transit in the United States and the development of a longer range and more comprehensive federally assisted urban transportation program. The Kennedy Administration's study on the problem was completed in December 1961, leading to the presentation to Congress in 1962 of the Administration's mass transit bills, introduced as S. 3615 and H.R. 11158. When no final action was taken on either bill, a Senate joint resolution (S.J. Res. 235; Pub. L. No. 87-809) was passed authorizing a 6-month continuation of the temporary program established by the Housing Act of 1961. Bills implementing the Administration's proposal, H.R. 3881 and S. 6, were again introduced during the first session of the 88th Congress.
[8]*See* Hearings before the Comm. on Banking and Currency, House of Representatives, 88th Cong., 1st Sess., on H.R. 3881 at 628 (Feb. 27-Mar. 8, 1963) (hereinafter "House Hearings") (testimony of Bernard Cushman, General Counsel, Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, AFL-CIO ["Cushman Testimony"]).
[9]Cushman Testimony at 628-629.
[10]29 U.S.C.A § 152(2) (West Supp. 1993), commonly referred to as the Taft-Hartley exemptions. During Senate debate on S. 6, in response to questioning by Senator Goldwater as to whether Section 13(c) would be inconsistent with the National Labor Relations Act, Senator Morse responded that the language of the bill "makes[s] it clear that the Taft-Hartley exemptions are not changed by the amendment." 109 CONG. REC. 5674 (Apr. 4, 1963).
[11]U.S. CODE CONG. & ADMIN. NEWS at 2583, 2584.
[12]*See* House Hearings at 487 (testimony of Andrew J. Biemiller, Director of Legislation, AFL-CIO ["Biemiller Testimony"]).
[13]1964 U.S. CODE CONG. & ADMIN. NEWS at 2589.
[14]*See* 109 CONG. REC. 5422, 5582, 5684 (1963); 110 CONG. REC. 14,979-80 (1964).
[15]109 CONG. REC. 5675 (1963).
[16]*Id.* at 5671-72 (emphasis added).
[17]Where the existing right under state law was the "lesser" right of public employers to meet and confer with their employees (such as is found in the State of Texas), Section 13(c) likewise requires that that right be preserved and continued.
[18]109 CONG. REC. 5684 (1963).
[19]109 CONG. REC. 5672 (1963).
[20]As discussed *infra* text in Section III, interest arbitration is not legally required by Section 13(c)(2), and DOL has articulated through administrative determinations what interest dispute resolution procedures will satisfy Section 13(c)(2).
[21]*See infra* text, Section III.
[22]109 CONG. REC. 5287 (1963).
[23]*Id.* at 5627.
[24]*Id.* at 5671.
[25]*Id.* at 5676, 5677.
[26]*See* remarks of Senator Tower, 109 CONG. REC. 5679 (1963).
[27]1964 U.S. CODE CONG. & ADMIN. NEWS at 2584.
[28]House Hearings at 475, 485 (testimony of Willard W. Wirtz, Secretary of Labor ("Wirtz Testimony").
[29]WJPA represented the reaction of the railroad industry to the Emergency Railroad Transportation Act of 1933 in which Congress mandated a "job freeze" approach to protect employees of railroads engaging in consolidations, thus guaranteeing continued employment for the entire labor force of the railroads involved. By contrast, WJPA left employers free to alter the size of their workforce, while providing bargaining and compensation protection to affected employees. *See* New York Dock Railway v. United States, 609 F.2d 83, 86 (2nd Cir. 1979). In advocating statutory labor protection, the transit unions urged that WJPA serve as a model for Section 13(c) agreements. "Basically, this is the kind of protection which we are urging be extended to all employees adversely affected by technology or by any grants or Federal assistance granted under this act." Cushman testimony at 570.
[30]Transportation Act of 1940, ch. 722, 54 Stat. 898 (Sept. 18, 1940).
[31]*Id.* § 7, 54 Stat. 906. Section 5(2)(f) was amended by Section 402(a) of the Railroad Revitalization and Regulatory Reform Act of 1976 (Pub. L. No. 94-210, Feb. 5, 1976, 90 Stat. 62) and recodified as 49 U.S.C. § 11347. The provision provides in relevant part:

> When a rail carrier involved in a transaction for which approval is sought...the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interests of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 405 of the Rail Passenger Service Act (45 U.S.C. 565)....The arrangement and the order approving the transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the effective date of the final action of the Commission (or if an employee was employed for a lesser period of time by the carrier before the action became effective, for that lesser period).

[32]Protective conditions imposed by ICC in connection with mergers, acquisitions and coordinations are commonly referred to as the New York Dock conditions, after New York Dock Railway--Control--Brooklyn Eastern District Terminal, 360 I.C.C. 60, aff'd *sub nom.* New York Dock Railway v United States, 609 F.2d 83 (2d Cir. 1979). In lease and trackage rights cases, the protections developed in Norfolk and Western Ry. Co.--Trackage Rights--Burlington Northern, Inc., 354 I.C.C. 605 (1978), *modified* Mendocino Coast Ry.--Lease and Operate--California Western Ry., 360 I.C.C. 653 (1980), *aff'd sub nom.* Railway Labor Execs. Ass'n v. United States, 675 F.2d 1248 (D.C. Cir. 1982) are normally applied. In abandonments, the protections developed in

Oregon Short Line Railroad--Abandonment--Goshen, 360 I.C.C. 91 (1979) are applied.

[33]Hearings before a Subcommittee of the Committee on Banking and Currency, U.S. Senate, 88th Cong., 1st Sess. at 310 (1963) (hereinafter "Senate Hearings") (testimony of Willard W. Wirtz, Secretary of Labor ["Wirtz Senate Testimony"]).

[34]Cushman Testimony at 566.

[35]S. REP. No. 82, 88th Cong., 1st Sess. at 12 (1963).

[36]The protections currently imposed by ICC are discussed *supra* note 32.

[37]The Section 13(c) *process* is further discussed *infra* text Section II.

[38]Section 405 of the Rail Passenger Service Act of 1970, Pub. L. No. 91518, Oct. 30, 1970, 84 Stat. 1337, established similar protections for employees adversely affected in connection with the establishment of a national rail passenger system under the control of Amtrak. The labor protective provisions, codified at 45 U.S.C. § 565, require the Secretary of Labor to certify that a railroad has provided fair and equitable protection to employees affected by the "discontinuance of intercity rail passenger service," as defined therein. The standard labor protection arrangement established by the Secretary under Section 405 is commonly referred to as the Appendix C-1 Conditions.

[39]The Model Agreement is discussed *infra* text Section I.E.

[40]*See* Paragraph 1 of the Model Agreement.

[41]*See* Paragraph 1 of the Model Agreement.

[42]*See* Paragraph 3 of the Model Agreement. Note that some early Section 13(c) agreements provided that collective bargaining items could be modified through bargaining to substitute rights, privileges, and benefits of "equal or greater economic value."

[43]*See* Paragraph 4 of the Model Agreement.

[44]*See* Paragraph 5 of the Model Agreement.

[45]*See* Paragraph 6 of the Model Agreement.

[46]*See* Paragraph 7 of the Model Agreement.

[47]*See* Paragraph 13 of the Model Agreement.

[48]*See* Paragraph 11 of the Model Agreement.

[49]*See* Paragraph 12 of the Model Agreement.

[50]No similar provision is found in the Model Agreement.

[51]This formulation of the burden of proof is based upon the Appendix C-1 Conditions, as explained in Secretary Hodgson's Affidavit in Congress of Railway Unions v. J.D. Hodgson, Secretary of Labor, Civil Action No. 82571 (¶ 9).

[52]Stephens v Monterey Salinas Transit, Dep. Case Nos. 82-13c-4 & 6 (Nov. 10, 1982); Beard v. Town of Huntington, Dep. Case No. 80-13c-3 (Feb. 10, 1980); Dalton v Dallas Transit System, Dep. Case No. 78-13c-56 (May 20, 1980); Local 1986, Amalgamated Transit Union v Port Auth. of Allegheny County, Dep. Case No. 79-13c12 (Mar. 7, 1980).

[53]*See* Paragraph 17 of the Model Agreement.

[54]*See* Paragraph 18 of the Model Agreement:

[55]*See* Paragraph 16 of the Model Agreement.

[56]*See* Paragraph 19 of the Model Agreement.

[57]*See* discussion of Appendix C-1 *supra* text Section I.C.

[58]The Model Agreement contains a provision whereby transit agencies can become party to the Agreement, and through that mechanism many transit agencies and local unions have adopted the Model Agreement for use in connection with operating assistance grants. Once party to the Model Agreement, it is difficult to modify the protective provisions applicable to subsequent operating assistance grants, due in large part to the unions' strong opposition to any changes and to DOL's reluctance to require any such revisions. However, under DOL's Section 13(c) Guidelines, if the Department determines that special circumstances are presented by a project that require changes in the Model Agreement or supplemental arrangements, the parties will be directed to negotiate new arrangements. See Section 215.6 of DOL's Section 13(c) Guidelines. In the absence of special circumstances, a transit agency objecting to provisions of the Model Agreement may be forced to withdraw from the Model and to seek a locally negotiated Section 13(c) agreement. See Paragraph 28 of the Model Agreement, which allows parties to "opt out."

[59]*See* Section 215.6(b) of the Section 13(c) Guidelines, 29 CFR § 215.6(b) (1993).

[60]For example, as discussed *infra* text Section III, DOL has repeatedly stated in certification letters addressing the issue that it will not require binding arbitration of interest disputes.

[61]*See* discussion *infra* text Section II regarding the Section 13(c) process

[62]See Amalgamated Transit Union v. Donovan, 767 F.2d 939, 945 (D.C. Cir. 1985), *cert. denied*, 106 S. Ct. 1262, 475 U.S. 1046 (1986).

[63]Section 13(c) judicial precedent is discussed in Section III *infra* text.

[64]49 U.S.C. § 11347

[65]An example would be the implementing agreement and preconsummation issues discussed *infra* text Section III. [66]In fact, one of the problems facing counsel in preparing and conducting Section 13(c) arbitration cases is the lack of published precedent. There is no official compilation of 13(c) arbitration decisions by private arbitrators. Opinions circulate among 13(c) practitioners, but it is an ad hoc process at best.

[67]Either private or Department arbitration decisions can be utilized as precedent when involved in proceedings before the DOL.

[68]The DOL's Section 13(c) Guidelines are codified at 29 C.F.R. § 215.

[69]S. REP at 28. *See also* 1964 U.S. CODE CONG. & ADMIN. NEWS at 25842585 ("[S]ubject to the basic standards set forth in the bill, specific conditions for worker protection will normally be the product of local bargaining and negotiation").

[70]As mentioned, there are two other fact situations that may be presented--Section 13(c) protection for employees not represented by a union, and Section 13(c) protection for employees covered by the Special 13(c) Warranty applicable to the Section 18 Program. The following discussion also covers these situations in more detail.

[71]*See* 29 C.F.R. § 215.2 (1993).

[72]*Id.*

[73]For example, the referral letter will cite "the 13(c) Agreement between the Regional Transit Agency and ATU Local 123, dated September 21, 1978." [74]Recurring referrals of general purpose operating assistance grant applications are addressed at Section 215.6 of DOL's Section 13(c) Guidelines.

[75]In cases where a certification letter is issued for Section 9 capital and operating grants, it will reference the local capital Section 13(c) agreement, and if the grantee and the union are party to the Model, the Model Agreement. This certification letter is sent to the appropriate FTA Regional Office, with copies to the unions and the grantee.

[76]*See* the Section 13(c) Guidelines, 29 CFR § 215.3(c)

[77]At the time of the promulgation of the Section 13(c) Guidelines, some commenters suggested that the 13(c)

referrals (and thus the negotiations) involve local transit unions, DOL disagreed, citing labor's practice of "centralized handling of employee protection arrangements at the international union level." *See* Preamble to the Section 13(c) Guidelines, 43 Fed. Reg. 13,558 (Mar 31, 1978)

[78] *Id.*

[79] *See* 29 C.F.R. § 215.3(c) (1993).

[80] *See* THE DEVELOPING LABOR LAW, vol. I, 632 (Patrick Hardin, et al. eds., BNA, 3d ed., 1992) In cases under the NLRA, delay in scheduling meetings, willful avoidance of meetings, or resorting to delaying or evasive tactics has been considered to be evidence of bad faith. *See, e.g.*, Rhodes St. Clair Buick, 242 N.L.R.B. 1320, 101 L.R.R.M. 1448 (1979); Storall Manufacturing Company, 275 N.L.R.B. 220 (1985).

[81] In some cases the parties will proceed to DOL for a "status" meeting designed to facilitate a determination by DOL as to whether an impasse exists.

[82] While DOL takes the position that Section 13(c) cases are very fact specific and that precedent does not necessarily dictate future Departmental decisions, it is still advisable to cite relevant Department precedents.

[83] The authority of the Secretary to impose terms and conditions is set forth in 29 C.F.R § 215.3(f), which states that the action of the Secretary "may include the Secretary's determination of the terms and conditions upon which he will base his certification." *See also* 29 C.F.R. § 215.3(e) (1993).

[84] See in particular, discussion of the change in contractor certifications *infra* text Section III, for examples of where DOL has failed to provide a well-reasoned or extensive rationale for a decision that seems a radical departure from prior Department precedent.

[85] Since the certification decision constitutes final agency action, the failure to articulate cogently the reasoning behind the agency decision would appear contrary to basic requirements of the Administrative Procedure Act, 5 U.S.C.A § 551 et seq. (West 1977). *See, e.g.*, Phelps Dodge Corp v. NLRB, 61 S.Ct. 845, 853, 313 US 177, 196 (1941); Moon v. United States Department of Labor, 727 F.2d 1315 (D.C. Cir. 1984). It is certainly well established under the Administrative Procedure Act that a federal agency must make its decisions on the basis of a consideration of relevant factors and must have, and articulate, a rationale basis for its conclusions. *See, e.g.*, Duke Power Company v. U.S. Nuclear Regulatory Commission, 770 F.2d 386 (4th Cir. 1985); Mobil Oil Corp. v. U.S. Department of Energy, 610 F.2d 796 (D.C. Cir. 1979), *cert. denied* 446 U.S. 937 (1980).

[86] The Section 13(c) Guidelines provide that in reviewing applications for FTA assistance, it will evaluate "the effects on mass transportation employees of urban mass transportation carriers" 29 C.F.R. § 215.2

[87] GUIDEBOOK at 4.

[88] An example of the Paragraph 3 language referred to, as set forth in the Sept. 28, 1989, City of Modesto DOL Section 13(c) certification letter, is as follows:

> Employees of urban mass transportation carriers in the service area of the projects, other than those represented by the local union that is signatory to the executed agreement, shall be afforded substantially the same levels of protection as are afforded to the employees represented by the signatory union under the July 11, 1989 agreement and this certification. Should a dispute arise, after exhausting any available remedies under the 13(c) agreement and absent mutual agreement by the parties to utilize any final and binding procedure for resolution of the dispute, the Secretary of Labor may designate a neutral third party or appoint a member of her staff to serve as arbitrator and render a final and binding determination.

[89] See GUIDEBOOK at 4.

[90] *Id.* It should be noted that these cases are very fact specific, and will normally be considered by DOL on a case-by-case approach, rather than by the application of any absolute "black letter" principles.

[91] See Fairfax County, Virginia, U.S. Dept. of Labor Section 13(c) certification letter (Dec. 3, 1990); Feb. 25, 1994, letter from Ann G. Comer, Industrial Relations Specialist, to James J. Kelley and Roxy Herbekian (noninterference, nonimpair-ment language has been certified "in service area situations where mass transit employees have no employment relationship to the grantee, but may be Impacted by actions taken under the grant").

[92] *See* Paragraph 18 of the Model Agreement.

[93] Appendix C-1 Protections are discussed *supra* note 38.

[94] See Paragraph 17 of the Model Agreement. There is a constitutional Issue in some states, which has never been fully explored, as to whether the contingent financial liability in a Section 13(c) agreement violates state constitutional restrictions against the obligation of public funds beyond the current fiscal year.

[95] *See* Paragraph 17 of the Model Agreement.

[96] *See* North San Diego County Transit District, U.S. Dept. of Labor Section 13(c) certification letter (Sept. 13, 1994), 10.

[97] *See* Paragraph 15(a) of the Model Agreement.

[98] See Hodgson's Affidavit in Civil Action No. 825, *reprinted in* DIGEST OF EMPLOYEE PROTECTIONS (1993) at D36; and Paragraph 15(d) of the Model Agreement.

[99] *See* Fuller v. Greenfield and Montague Transportation Area and Franklin Regional Transit Authority, Dep. Case No. 81-18-16 (Apr. 13, 1987) ("[A]dverse affect on an employee after an UMTA grant has been awarded does not establish that the adverse affect was caused by the grant. There must be a nexus between the project and the direct cause of termination of employment"); Smith v Mid Mon Valley Transit Auth., Dep. Case No. 91-13(c)-19 (Dec. 18, 1992) at 10 ("the burden of proof is upon the Claimant to identify federally funded projects which allegedly adversely affected the Claimant's employment....The Claimant must also show that there is a causal connection between the UMTA project and a worsening of his employment position").

[100] Some early Section 13(c) agreements provided for arbitration by the Secretary if the parties were unable to agree upon a procedure. This approach is infrequently used in current Section 13(c) protections.

[101] As noted previously, service area employees are increasingly demanding negotiation of Section 13(c) protections. Where this is the case, DOL is generally reluctant to insert itself as the decision maker in the event of a dispute, citing mainly to staffing shortages As an alternative, the parties can negotiate a Section 13(c) arbitration process to be utilized to resolve such claims.

[102] H.R. REP. No. 204, 88th Cong., 2d Sess., *reprinted in* 1964 U.S. CODE CONG & ADMIN. NEWS at 2569, 2583. [103] *Id.* at 2584

[104] 109 CONG. REC. 5678 (1963).

[105] 29 C.F.R. § 215.2.

[106] *See* Model 13(c) Agreement, second Whereas clause.

[107] 49 U.S.C. App. § 1608(c)(6).

[108] 52 Fed. Reg. 11,919-20 (Apr. 13, 1987).

[109] *See* Annett Bus Lines v. City of Tallahassee, Fla., No.

FL-TALTRAN/90-02-01 (FTA Apr. 28, 1992).

[110] *See* Blue Grass Tours & Charter v. Lexington Transit, KY-88/08-1 (letter from FTA to Lextrans, Dec. 28, 1988).

[111] GUIDEBOOK at 4. Although the characteristics of mass transportation were thought to be fairly well established, a decision rendered by DOL on Sept. 30, 1993, which required the Regional Transportation Commission of Clark County, Nevada, to negotiate Section 13(c) labor protections with the union representing service area employees of Gray Line Tours of Southern Nevada, Inc., a charter operator, raises other issues regarding the range of service area employees that must be protected under Section 13(c). Gray Line provides sightseeing, charter service, and airport shuttle service in and around Las Vegas. In response to a request from the RTC to review the scope of its Section 13(c) referral, DOL consulted FTA regarding the scope of mass transportation providers covered under the Act. In response, FTA advised the DOL's Office of the Solicitor that the airport shuttle service operated by Gray Line constitutes mass transportation, but noted that the Gray Line charter and sightseeing services are not mass transportation. While the referral extends Section 13(c) protections to "employees providing airport flyer service," since employees rotate among the various Gray Line services, the practical implications of requiring the RTC to protect employees of Gray Line is difficult to assess.

[112] *See* King v. Connecticut Transit Management, Inc., Dep. Case No. 7813c-1 (May 1, 1978).

[113] 76 F.2d 665 (4th Cir. 1967).

[114] 219 F.2d 650 (5th Cir. 1955).

[115] 376 F.2d at 668.

[116] 219 F.2d at 652, footnote 1.

[117] Dep. Case No. 78-13c-1 (May 1, 1978).

[118] *See* King v. Connecticut Transit Management, *supra*.

[119] Salaried Employees v. Nassau County, Dep. Case No. 75-13c-7, January 30, 1975; and Giampaoli v. San Mateo County Transit District, Dep. Case No. 77-13c-30, May 26, 1978.

[120] *See* Paragraph 1 of the Model Agreement.

[121] *Id.*

[122] *Id.*

[123] The term 'displaced employee" is usually defined as an employee who is "placed in a worse position with respect to compensation as a result of the Project." *See* Paragraph 6(a) of the Model Agreement. Similarly, a "dismissed employee" is often defined as an employee who is "laid off or otherwise deprived of employment as a result of the Project." *See* Paragraph 7(a) of the Model Agreement.

[124] *See* Paragraph 5 of the Model Agreement.

[125] Suburban Mobility Authority for Regional Transportation, DOL Section 13(c) certification letter (Apr. 2, 1992) (emphasis added).

[126] Los Angeles County Transportation Commission, DOL Section 13(c) certification letter (Nov. 27, 1991).

[127] Letter dated May 19, 1994, from Gregory B. McBride, Acting Chief Counsel, FTA, to Frederick Bowen, Esq., DOL.

[128] *See* Paragraph 24 of the Model Agreement.

[129] 457 U.S. 15, 102 S. Ct. 2202 (1982).

[130] Local Div. 1285, Amalgamated Transit Union v. Jackson Transit Auth., 650 F.2d 1379 (6th Cir. 1981). [131] *See* Division 587, Amalgamated Transit Union v. Municipality of Metro. Seattle, 663 F.2d 875 (9th Cir. 1981); Local Div. 714, Amalgamated Transit Union v. Greater Portland Transit Dist. of Portland, Me., 589 F.2d 1 (1st Cir. 1978); Local Div. 519 Amalgamated Transit Union v. Lacrosse Mun. Transit Util., 585 F.2d 1340 (7th Cir. 1978); and Division 1287, Amalgamated Transit Union v. Kansas City Area Transp. Auth., 582 F.2d 444 (8th Cir. 1978), *cert. denied*, 439 U.S. 1090 (1979).

[132] *See* Maine v Thiboutot, 448 U.S. 1 (1980).

[133] 42 U.S.C. § 1988 (1976).

[134] Local Div 732, Amalgamated Transit Union v Metropolitan Atlanta Rapid Transit Auth., 667 F.2d 1327 (11th Cir. 1982).

[135] *Id.* at 1340.

[136] *Id.* at 1338.

[137] 457 U.S. at 27; 102 S. Ct. at 2209.

[138] *Id.* at 29, n. 12.

[139] *See* Local Div. 589, Amalgamated Transit Union v. Commonwealth of Massachusetts, 666 F.2d 618 (1st Cir. 1981); *cert. denied*, 457 U.S. 1117 (1982).

[140] ATU v Donovan, 767 F.2d 939, discussed (*see*, note 62 and accompanying text).

[141] *Id.* at 951

[142] *Id.* at 947

[143] 5 U.S.C. § 551 et seq. (1988).

[144] 767 F.2d at 944.

[145] 767 F.2d at 944.

[146] *Id.* at 945. *See* Heckler v. Chaney, 470 U.S 821 (1985) (holding that exception to reviewability of agency action under 5 U.S.C. § 701(a)(2) for action "committed to agency discretion" is narrow); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) (holding that where there are statutory standards for a reviewing court to apply, the exemption for action "committed to agency discretion" is inapplicable).

[147] *Id.* at 944.

[148] The court determined that under Act 1506, MARTA was unable to ensure the "continuation of collective bargaining rights" required by Section 13(c)(2), which requires "at a minimum, that where employees enjoyed collective bargaining rights prior to public acquisition of the transit system, they are entitled to be represented in meaningful 'good faith' negotiations with their employer over terms and conditions of employment." *Id.* at 951. The standard against which the court measured Act 1506 to determine whether collective bargaining had been continued was whether the employer retained "the power to establish wages, hours, and other conditions of employment without the consent of the union or without at least first bargaining in good faith to impasse over disputed mandatory subjects." Applying this standard, the court concluded that because Act 1506 removed from the scope of bargaining issues that were mandatory subjects of collective bargaining, and arguably conferred upon MARTA unilateral control over wages, MARTA's Section 13(c) agreement was "inadequate when measured against the express requirements of Section 13(c)." *Id.* at 956.

[149] No. 82-2922, 1993 U.S. Dist. *available in* LEXIS 15395 (D.D.C. Apr. 13, 1993).

[150] 439 F. Supp. 1209 (M.D. GA 1977).

[151] *Id.* at 1219 (emphasis in original).

[152] *Id.* at 1223, 1224.

[153] 809 F.2d 909 (D.C. Cir. 1987).

[154] Interest disputes are distinguished from grievance disputes, which involve interpretation or application of an existing collective bargaining agreement, and from Section 13(c) disputes, which involve interpretation and application of a Section 13(c) agreement.

[155] See NLRA § 7, 29 U.S.C.A. § 157 (West. 1979, and 1994 Suppl.)

[156] In determining that binding interest arbitration is not required to satisfy the requirements of Section 13(c)(2), DOL was likely influenced by judicial authority holding that the application of binding interest arbitration to public-sector employees violates state constitutional provisions. *See, e.g.,* Salt Lake City v. International Association of Firefighters 563 P.2d 786

(Utah 1977); Dearborne Firefighters Union v. City of Dearborne, 231 N.W.2d 226 (Mich. 1975); Greeley Police Union v. City Council of Greeley, 553 P.2d 790 (Col 1976); Sioux Falls v. Sioux Falls Firefighters, 234 N.W.2d 55 (S.D. Iowa 1975); Town of Berlin v Santaguida, 98 L.R.R.M. (BNA) 3259 (Conn. Super. Ct. 1978); Maryland Classified Employees Association v. Anderson, 93 L.R.R.M. (BNA) 2997 (Md. Cir. Ct. 1976). Relying upon principles underlying a democratic and representative form of government, state courts that have prohibited the application of interest arbitration to public-sector employees have determined that a constitutional infirmity arises because an arbitrator without public accountability is improperly delegated what are essentially legislative decisions, i.e., the determination of public employment terms and conditions. As one commentator has noted, the problem associated with the use of interest arbitration to resolve collective bargaining issues involving public employees is that it is "inimical to a basic precept of political democracy, namely that authoritative political decisions should be reached by government officials who are accountable to the public. Arbitrators are not accountable to the public." Horton, *Arbitration, Arbitrators and the Public Interest*, 28 INDUS. & LAB. REL. REV. 497, 499 (No. 4, 1975). It should be noted, however, that interest arbitration has withstood challenge in circumstances where the legislature's delegation of authority to the arbitrator was determined to contain adequate safeguards (*see* City of Detroit v Detroit Police Officers Association, 294 N.W.2d 68 [Mich. 1980]; City of Spokane v. Spokane Police Guild, 553 P.2d 1316 [Wash. 1976]; Milwaukee County v. Milwaukee District Council 48, 325 N.W.2d 350 [Wisc 1982]), and in other cases where special factual circumstances existed (*see* City of Warwick v. Warwick Regular Fireman's Association, 256 A.2d 206 [R.I. 1969]; and Harney v. Russo, 255 A.2d 560 [Pa. 1969]).

[157]767 F.2d at 954.

[158]*Id.*

[159]Amalgamated Transit Union v Commonwealth of Massachusetts, 666 F.2d 618, 634, n. 44. *See also* enclosure to letter dated Mar. 8, 1963, from Andrew J. Biemiller to Senator John Sparkman, Chairman, Senate Banking and Currency Subcomm. on Housing, *reprinted in* House Hearings at 637, proposing language to amend the legislation with language that ensured the existence of authority to enter into enforceable arbitration agreements.

[160]*See also* SMART, DOL Section 13(c) certification letter (Mar. 20, 1990) and Utah Transit Auth., DOL Section 13(c) certification letter (Mar. 2, 1989).

[161]*See* Grand Rapids Area Transit Authority, DOL Section 13(c) certification letter (Sept. 23, 1993). DOL noted in the Grand Rapids certification that the question of the continued effectiveness of Section 13(c) protections containing interest arbitration provisions as applied to previous grants is a matter for determination by state courts or an arbitrator, citing Jackson Transit Authority. *See also* Central New York Regional Authority, DOL Section 13(c) certification letter (June 4, 1987); Chattanooga Area Regional Transportation Authority, DOL Section 13(c) certification letter (Feb. 27, 1987).

[162]767 F.2d at 951.

[163]*Id.* at 956.

[164]*See supra* Section 13(c) certification for Utah Transit Authority, and City of Boise, DOL Section 13(c) certification letter (May 9, 1988).

[165]*See supra* Section 13(c) certification for SMART.

[166]*See* MICH. STAT. ANN., § 423.201 et seq.

[167]Similar language is also included in Paragraph 15(e) of the Model Agreement; however, this language expressly recognizes that the right to use economic measures is a "two way street" provided to employers as well as to employees. It reads:

> Nothing in this agreement shall be construed to enlarge or limit the right of any party to utilize, upon the expiration of any collective bargaining agreement or otherwise, any economic measures which are not inconsistent or in conflict with applicable laws or this agreement.

[168]See Paragraph 5(a) of the Model Agreement. The scope of changes that are subject to the notice obligation may vary in different Section 13(c) protections and may in some cases include changes in equipment, facilities, and/or services.

[169]New York Dock Ry., *supra*, App. III at 5.

[170]*See* Paragraph 4 of Article I, Appendix, to Norfolk and Western Ry. Co.--Trackage Rights--*Burlington* Northern, Inc., 354 I.C.C. 6(5 (1978). *See also* Paragraph 4 of Appendix C-1.

[171]*See* Mendocino Coast *supra*.

[172]*See* Miami Valley Regional Transit Authority, DOL Section 13(c) certification letter (Sept. 2, 1993), which effectively requires a comparison between transactions that occur in the rail industry with a change in operations or services in the transit industry, which are often (if not always) dissimilar.

[173]The expedited arbitration process certified by DOL is not nearly as quick as that typically provided in arbitration proceedings under the Expedited Labor Arbitration Procedures used by the American Arbitration Association. *See* Labor Arbitration Rules of the American Arbitration Association, Sept. 1, 1993. DOL has also placed a heavy burden of proof on the grantee in demonstrating that a proposed change should be able to proceed.

[174]*See* Section 13(c) certification letter to Miami Valley at Appendix A, Paragraph 5(c).

[175]Utah Transit Authority, DOL Section 13(c) certification letter (Mar. 21, 1989).

[176]*Id.* at 3. It is worth noting that the previous UTA Section 13(c) agreement, as well as Utah State statutory law, provided a new jobs right for ATU employees.

[177]The priority of reemployment right is discussed in Section I, *supra*. There is a significant distraction between a right to new jobs and a right to priority in reemployment. The priority of reemployment right Is afforded by the statutory language of Section 13(c)(4) and applies to an employee who has been dismissed as a result of a project. The reemployment right usually extends to vacant positions that are "reasonably comparable" to that previously held by the employee and for which the employee is qualified or can become qualified through retraining. The new jobs clause, by contrast, creates a first opportunity for employment for a class of employees and grants that right without regard to whether any of the employees are dismissed or otherwise adversely affected.

[178]See 109 CONG. REC. 5672, 5674 (1963) (statements of Senators Morse and Clark).

[179]South Bend Public Transportation Corporation, DOL Section 13(c) certification letter (Mar. 29, 1993). *See also* May 29, 1991, letter to Steven A. Diaz from Kelley Andrews, wherein the Department stated "...Section 13(c) of the Act does not preclude applicants for UMTA grants from contracting with private operators to provide transit services to the public."

[180]The federal emphasis on subcontracting transit services may be decreasing in that FTA recently re-

scinded its private enterprise participation policy pursuant to which FTA had encouraged the participation of private enterprise in the provision of mass transportation services. *See* 59 Fed. Reg. 21,890 (Apr 26, 1994). As long as there are economic benefits to be gained through contracting out service, however, it is likely that the practice will continue, and that the attendant Section 13(c) issues will be presented.

[181]Because Section 13(c) does not require that the obligations of the sole provider clause be included in order to afford fair and equitable arrangements, DOL will not impose sole provider language over the objection of the grant recipient. *See* 1993 South Bend 13(c) certification letter.

[182]In the matter of Transit Authority of River City (TARC) and Amalgamated Transit Workers Union, Local 1447, June 16, 1987 (Render, Arb.).

[183]*Id.* at 17.

[184]*Id.* at 20

[185]*Id.* at 20. *See also* Amalgamated Transit Union, Local 639 and Transit Authority of Lexington-Fayette County, Dec. 14, 1987 (Volz, Arb.).

[186]*See* In the Matter of Arbitration Between Port Authority of Allegheny County and Local 85, Amalgamated Transit Union, Aug. 9, 1991 (Newman, Klos and Tipton, Arbs), which suggests that existing practices may not be limited by operation of the sole provider clause even where the initiation of subcontracting follows the initial influx of federal funding.

[187]In the matter of Transportation Management of Tennessee (TMT) and Amalgamated Transit Union, Local 1235, Dec. 31, 1987 (Clarke, Tayor, and Baker, Arbs.).

[188]*Id.* at 21.

[189]*Id.* at 39.

[190]*Id* at 41.

[191]In successorship cases involving private-sector employees subject to NLRA, the new or acquiring company is not required to assume the existing workforce or the existing collective bargaining agreement. If the new company decides to hire 50 percent or more of the previous workforce, then a duty to bargain collectively with the representative of those employees regarding terms and conditions of employment is triggered. *See* Fall River Dyeing & Finishing Corporation v. NLRB, 482 U.S. 27 (1987).

[192]South Bend Public Transportation Corp., DOL Section 13(c) certification letter.

[193]*See* May 29, 1991, letter from Kelley Andrews, Director, Office of Statutory Programs, DOL, to Steven Diaz, General Counsel, UMTA, describing DOL's 1988 certification of assistance to the City of Boise and the Department's position on change in contractor cases ("Andrews Letter").

[194]*See* letters dated May 1, 1987, concerning Snohomish- County and Feb. 23, 1990, concerning Modesto, California.

[195]Senator Morse described a Memphis plan as follows.

> The Memphis formula involves a situation in which a transit line is publicly owned, but in which there is a law which prohibits collective bargaining with the union. However, use has been made of the device of establishing a private managerial commission to operate the line and the private commission, under contract with the city, handles labor relations and can enter into collective bargaining with the employees.

[195]CONG. REC. 5684 (1963).

[196]In its certification decision for the Regional Transportation Commission of Clark County, Nevada, discussed *infra* note 199 and accompanying text, DOL emphasized that a federally funded acquisition is a "critical factor" for a Memphis plan arrangement to exist.

[197]This determination appears to conflict with the notion that Section 13(c) was intended by Congress to provide "transitional" protection in such acquisition situations.

[198]*See* Division 819, Amalgamated Transit Union v. New Jersey Transit Corporation, Case No. A-1604-92T2 (Superior Court of New Jersey, Appellate Division, Apr. 8, 1993).

[199]Regional Transportation Commission of Clark County, Nevada, DOL Section 13(c) certification letter (Sept. 21, 1994), affirmed after reconsideration (Nov. 7, 1994).

[200]*Id.*, at p.5.

[201]*Id.*

[202]*Id.*, at p. 6.

[203]Civil Action No. 94-1127, 1994 U.S. Dist. *available in* LEXIS 9519 (D.D.C. July 11, 1994), *appeal docketed*, Nos. 94-7143 and 7144 (D.C. Cir. July 29, 1994).

[204]This hiring obligation extended to employees with 8 or more months of service. *See* D.C. Code § 36-1502(b).

[205]*See* D.C. Code § 36-1502(b), (e) and (f).

[206]Opinion, at 1 and 23.

[207]*See Id.* at 15-17.

[208]*Id.* at 19.

[209]*Id.* at 19-20.

[210]*Id.* at 21.

[211]*Id.*

[212]*Id.*

[213]*Id.* at 22, fn. 21. (emphasis added; citations omitted).

[214]*Id.* at 22 (citations omitted).

[215]In federally funded acquisition cases where Section 13(c)(4) expressly requires a carryover of employees, the requirements of Section 13(c) and NLRA must be reconciled. However, where DOL has essentially "created" a carryover right by administrative action, that action would appear suspect when judged against the clear statutory mandates and principles of NLRA.

[216]*See* Paragraph 19 of the Model Agreement.

[217]*See* NLRB v. Burns International Security Services, Inc., 406 U.S. 272 (1972), for the factual analysis applicable to determining if a subsequent entity and its operations constitute a legal "successor."

[218]Suburban Mobility Authority for Regional Transportation, DOL Section 13(c) certification letter (Mar. 20, 1990).

[219]*Id.* at 5.

[220]*Id.* at 4-5.

[221]D&H Ry--Lease and Trackage Rights Exemption-Springfield Terminal, 1990 ICC *available in* LEXIS 312 at 26.

[222]*See* Section 13(c) certifications for Utah Transit Authority, *supra*, and SMART, *supra*

[223]Foothill Transit Zone, DOL Section 13(c) certification letter (Mar. 1, 1994).

[224]Employees v. Metropolitan Suburban Bus Authority, Dep. Case No. 7512c-1 (Mar. 11, 1975) P. A-30; Jeffrey Behunik v. Connecticut Transit Management Inc., Dep. Case No. 7713c-34 (Nov 14, 1980) P. A-155.

**ACKNOWLEDGMENTS**

This study was performed under the overall guidance of TCRP Project Committee J-5. The Committee is chaired by RICHARD J. BACIGALUPO, N.E. Illinois Regional Transit Authority. Members are ARTHUR P. BERG, Port Authority of New York and New Jersey; RICHARD W. BOWER, California Department of Transportation; SHELLY R. BROWN, Federal Transit Administration-Region 10; DORVAL RONALD CARTER, JR., Federal Transit Administration-Region 5; PAUL STEPHEN DEMPSEY, University of Denver; DENNIS C. GARDNER, Metropolitan Transit Authority of Harris County, Texas; EDWARD J. GILL, JR., American Public Transit Association; BRIGID HYNES-CHERIN, San Francisco County Transportation Authority; and CLARK JORDAN-HOLMES of Stewart, Joyner, Jordan-Holmes, Holmes, P.A. DAN DUFF provided liaison with the Federal Transit Administration during the preparation of this study, and GWEN CHISHOLM SMITH represents the TCRP staff.

**TRANSPORTATION RESEARCH BOARD**
National Research Council
2101 Constitution Avenue, N.W.
Washington, DC 20418



## Sec. 47-3-8. 1998 Defined Contribution Plan; vesting. 

All account balances are subject to the following vesting schedules:

(a)

*Employee Contribution Account.* A participant shall always be one hundred percent (100% vested in such participant's *Employee Contribution Account.*

(b)

*Employer Contribution Account.* A participant shall be vested in the balance of such participant's *Employer Contribution Account* as follows:

| Years of Service | Percentage vested |
|---|---|
| Less than two | 0% |
| At least two, but Less than four | 50% |
| Four or more | 100% |

Service for vesting purposes shall include prior service under the *1973 Defined Benefit/Defined Contribution (Annuity) Plan of the DGRS.*

(c)

*Employee Rollover Account.* A participant shall always be one hundred percent vested in the balance of such participant's *Employee Rollover Account.*

(d)

*Annuity Savings Account.* A participant shall always be one hundred percent (100%) vested in the balance of such participant's *Annuity Savings Account.*

*(Ord. No. 29-01, § 1, 11-30-01)*

**Should you die before you are eligible to begin drawing, or before making application for your Vested Retirement Allowance, your spouse is not eligible for any allowance.** They would, however, receive any balance in your Defined Contribution Plan (Annuity Savings Fund) plus interest earned in a lump sum upon request. If you do not meet the requirements for a Vested Retirement Allowance, you or your designated beneficiary will be paid your accumulated contributions, including interest earned until the June 30th following your separation, in a lump sum upon request.

Employees eligible for a Vested Retirement Allowance should notify the Retirement Systems whenever they change addresses so that notice of Retirement Eligibility is sent to the appropriate location and Retirement collection begins on a timely basis.

### *12. Will I get credit for military service?*

**Yes.** If you are granted a leave of absence to enter the military while you are employed by the City, you will be given service time credit as if your service was uninterrupted, provided you return to City service after completing military duty within the period of time prescribed by law. You will not make contributions while you are in military service, but interest will continue to be credited to your accumulated contributions.

A new employee may purchase pre-employment military service credit for up to three years of **Honorable** Military Service served during the periods December 8, 1941 to July 1, 1946, June 27, 1950 to December 31, 1953 or February 28, 1961 to May 7, 1975.

A new employee must apply within 180 days from the date of hire. The cost would be 5% of the employee's annual rate of pay for each full year of service credit or .4167% for each full month.

**Pre-Employment Military Service Credit cannot be used to qualify for retirement. It can only be used to increase the amount of pension benefit you will receive upon retirement.**

### *13. Is my retirement allowance safe?*

**Yes.** The Michigan State Constitution provides that each year of service must be funded and makes pensions and retirement allowances a contractual obligation of the City and will not allow the City to decrease benefits. In addition, the City Charter and a City Council Ordinance provide for proper funding.

... by the retirees, a citizen, and five members elected by City employees (no two from any one department) who represent you and protect your retirement benefits.

### *14. Who pays for Retirement System benefits?*

As a member of the 1973 Defined Benefit/Defined Contribution Plan, you are eligible to participate in two plans:

a. **1973 Defined Benefit Plan.** The Defined Benefit Plan is a plan funded by employer contributions and earnings from the assets of the System. The City contributes actuarially computed amounts required to maintain the System as mandated by the Constitution of the State of Michigan.

b. **Defined Contribution Plan.** This Plan is also referred to as the Annuity Savings Plan; it is a voluntary optional program which permits you to contribute toward an annuity, which can be used to enhance your retirement. You may elect to contribute nothing, 3%, 5% or 7% of your gross pay toward an annuity. If you elect to contribute 3%, then 5% must be contributed on amounts which exceed the FICA limit. The Defined Contribution Plan is funded **only** by employee contributions and earnings from the assets of the System.

### *15. How are Retirement System Funds invested?*

The Board of Trustees of the Retirement System is responsible for the proper operation of the Retirement System. Investment of all Retirement System assets (which consist of the assets of the 1973 Defined Benefit/Defined Contribution plans) are made by the Board of Trustees as authorized by State Law. It is Board policy to prudently invest pension funds so that the highest return is attained among the safest investments. To assist in carrying out these responsibilities, the Board utilizes the services of Investment Advisors who make recommendations to the Board of Trustees regarding investments in accordance with the authority and limitations provided by law.

### *16. Is provision made for increased living costs as a result of inflation after I am retired?*

**Yes.** Your pension portion **only** will be increased by **2.25%** of the **original pension amount at retirement** on each July 1st. For example, if your original pension amount at retirement was $1,000 per month, each July 1st the allowance would increase

methods). This pension is based on years of service and average final compensation computed at the time of resignation. Payment will begin upon attaining eligibility and making application. **Should you die before you are eligible to begin drawing, or before making application for your Vested Retirement Allowance, your spouse is not eligible for any allowance.** They would, however, receive any balance in your Defined Contribution Plan (Annuity Savings Fund) plus interest earned in a lump sum upon request. If you do not meet the requirements for a Vested Retirement Allowance, you or your designated beneficiary will be paid your accumulated contributions, including interest earned until the June 30th following your separation, in a lump sum upon request.

Employees eligible for a Vested Retirement Allowance should notify the Retirement Systems whenever they change addresses so that notice of Retirement Eligibility is sent to the appropriate location and Retirement collection begins on a timely basis.

### 12. *Will I get credit for military service?*

**Yes.** If you are granted a leave of absence to enter the military while you are employed by the City, you will be given service time credit as if your service was uninterrupted, provided you return to City service after completing military duty within the period of time prescribed by law. You will not make contributions while you are in military service, but interest will continue to be credited to your accumulated contributions.

A new employee may purchase pre-employment military service credit for up to three years of **Honorable** Military Service served during the periods December 8, 1941 to July 1, 1946, June 27, 1950 to December 31, 1953 or February 28, 1961 to May 7, 1975.

A new employee must apply within 180 days from the date of hire. The cost would be 5% of the employee's annual rate of pay for each full year of service credit or .4167% for each full month.

**Pre-Employment Military Service Credit cannot be used to qualify for retirement. It can only be used to increase the amount of pension benefit you will receive upon retirement.**

### 13. *Is my retirement allowance safe?*

**Yes.** The Michigan State Constitution provides that each year of service must be funded and makes pensions and retirement allowances a contractual obligation of the City and will not allow the City to decrease benefits. In addition, the City Char-

The Retirement System is administered by a Board of Trustees composed of the Mayor, a member of the City Council, the City Treasurer, a retiree elected by the retirees, a citizen, and five members elected by City employees (no two from any one department) who represent you and protect your retirement benefits.

### 14. *Who pays for Retirement System benefits?*

As a member of the 1973 Defined Benefit/Defined Contribution Plan, you are eligible to participate in two plans:

a. **1973 Defined Benefit Plan.** The Defined Benefit Plan is a plan funded by employer contributions and earnings from the assets of the System. The City contributes actuarially computed amounts required to maintain the System as mandated by the Constitution of the State of Michigan.

b. **Defined Contribution Plan.** This Plan is also referred to as the Annuity Savings Plan; it is a voluntary optional program which permits you to contribute toward an annuity, which can be used to enhance your retirement. You may elect to contribute nothing, 3%, 5% or 7% of your gross pay toward an annuity. If you elect to contribute 3%, then 5% must be contributed on amounts which exceed the FICA limit. The Defined Contribution Plan is funded **only** by employee contributions and earnings from the assets of the System.

### 15. *How are Retirement System Funds invested?*

The Board of Trustees of the Retirement System is responsible for the proper operation of the Retirement System. Investment of all Retirement System assets (which consist of the assets of the 1973 Defined Benefit/Defined Contribution plans) are made by the Board of Trustees as authorized by State Law. It is Board policy to prudently invest pension funds so that the highest return is attained among the safest investments. To assist in carrying out these responsibilities, the Board utilizes the services of Investment Advisors who make recommendations to the Board of Trustees regarding investments in accordance with the authority and limitations provided by law.

### 16. *Is provision made for increased living costs as a result of inflation after I am retired?*

**Yes.** Your pension portion **only** will be increased by **2.25%** of the **original pension amount at retirement** on each July 1st. For example, if your original pension amount at retirement was

CITY OF DETROIT

BOARD OF TRUSTEES
GENERAL RETIREMENT SYSTEM

EX-OFFICIO MEMBERS

**Kwame M. Kilpatrick,** *Mayor*
**Brenda M. Scott,** *Council Designate*
**Clarence Williams,** *Treasurer*
**Reverend Wendell Anthony,** *Citizen*

ELECTED MEMBERS

**David C. Clark,** *Buildings & Safety Engineering Department*
**Ronald Gracia,** *Water & Sewerage Department*
**John Kanters,** *Retiree*
**Thomas Kneeshaw,** *Planning & Development Department*
**Thomas Sheehan,** *Finance Department*
**Sandra Studzinski,** *Municipal Parking Department*

**Sean K. Werdlow,** *Finance Director*
**Nicholas Degel,** *Executive Secretary*
**Joseph Glanton,** *Assistant Executive Secretary*
**Ronald Zajac,** *Legal Advisor*
**Reginald E. O'Neal, D.O.,** *Medical Director*

RETIREMENT SYSTEM
908 COLEMAN A. YOUNG MUNICIPAL CENTER
DETROIT, MICHIGAN 48226

FTE 92151 — March, 2002

# QUESTIONS

*and*

# ANSWERS

*on the*

## General Retirement System 1973 Defined Benefit/Defined Contribution Plan

*of the*

## CITY OF DETROIT

the terms of a loan or other obligation to such an extent that the property securing the obligation is foreclosed upon.

(s) RECOUPMENT OF COMPENSATION FROM SENIOR EXECUTIVES AND DIRECTORS.—

(1) IN GENERAL.—The Corporation, as receiver of a covered financial company, may recover from any current or former senior executive or director substantially responsible for the failed condition of the covered financial company any compensation received during the 2-year period preceding the date on which the Corporation was appointed as the receiver of the covered financial company, except that, in the case of fraud, no time limit shall apply.

(2) COST CONSIDERATIONS.—In seeking to recover any such compensation, the Corporation shall weigh the financial and deterrent benefits of such recovery against the cost of executing the recovery.

(3) RULEMAKING.—The Corporation shall promulgate regulations to implement the requirements of this subsection, including defining the term "compensation" to mean any financial remuneration, including salary, bonuses, incentives, benefits, severance, deferred compensation, or golden parachute benefits, and any profits realized from the sale of the securities of the covered financial company.

**SEC. 211. MISCELLANEOUS PROVISIONS.**

(a) CLARIFICATION OF PROHIBITION REGARDING CONCEALMENT OF ASSETS FROM RECEIVER OR LIQUIDATING AGENT.—Section 1032(1) of title 18, United States Code, is amended by inserting "the Federal Deposit Insurance Corporation acting as receiver for a covered financial company, in accordance with title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act," before "or the National Credit".

(b) CONFORMING AMENDMENT.—Section 1032 of title 18, United States Code, is amended in the section heading, by striking "**of financial institution**".

(c) FEDERAL DEPOSIT INSURANCE CORPORATION IMPROVEMENT ACT OF 1991.—Section 403(a) of the Federal Deposit Insurance Corporation Improvement Act of 1991 (12 U.S.C. 4403(a)) is amended by inserting "section 210(c) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, section 1367 of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (12 U.S.C. 4617(d))," after "section 11(e) of the Federal Deposit Insurance Act,".

(d) FDIC INSPECTOR GENERAL REVIEWS.—

(1) SCOPE.—The Inspector General of the Corporation shall conduct, supervise, and coordinate audits and investigations of the liquidation of any covered financial company by the Corporation as receiver under this title, including collecting and summarizing—

(A) a description of actions taken by the Corporation as receiver;

(B) a description of any material sales, transfers, mergers, obligations, purchases, and other material transactions entered into by the Corporation;

(C) an evaluation of the adequacy of the policies and procedures of the Corporation under section 203(d) and orderly liquidation plan under section 210(n)(14);

(b) FOREIGN REINCORPORATIONS HAVE NO EFFECT.—Nothing in this section 302 shall be interpreted or applied in any way to allow any issuer to lessen the legal force of the statement required under this section 302, by an issuer having reincorporated or having engaged in any other transaction that resulted in the transfer of the corporate domicile or offices of the issuer from inside the United States to outside of the United States.

(c) DEADLINE.—The rules required by subsection (a) shall be effective not later than 30 days after the date of enactment of this Act.

15 USC 7242.

**SEC. 303. IMPROPER INFLUENCE ON CONDUCT OF AUDITS.**

(a) RULES TO PROHIBIT.—It shall be unlawful, in contravention of such rules or regulations as the Commission shall prescribe as necessary and appropriate in the public interest or for the protection of investors, for any officer or director of an issuer, or any other person acting under the direction thereof, to take any action to fraudulently influence, coerce, manipulate, or mislead any independent public or certified accountant engaged in the performance of an audit of the financial statements of that issuer for the purpose of rendering such financial statements materially misleading.

(b) ENFORCEMENT.—In any civil proceeding, the Commission shall have exclusive authority to enforce this section and any rule or regulation issued under this section.

(c) NO PREEMPTION OF OTHER LAW.—The provisions of subsection (a) shall be in addition to, and shall not supersede or preempt, any other provision of law or any rule or regulation issued thereunder.

(d) DEADLINE FOR RULEMAKING.—The Commission shall—

(1) propose the rules or regulations required by this section, not later than 90 days after the date of enactment of this Act; and

(2) issue final rules or regulations required by this section, not later than 270 days after that date of enactment.

15 USC 7243.

**SEC. 304. FORFEITURE OF CERTAIN BONUSES AND PROFITS.**

(a) ADDITIONAL COMPENSATION PRIOR TO NONCOMPLIANCE WITH COMMISSION FINANCIAL REPORTING REQUIREMENTS.—If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for—

(1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and

(2) any profits realized from the sale of securities of the issuer during that 12-month period.

(b) COMMISSION EXEMPTION AUTHORITY.—The Commission may exempt any person from the application of subsection (a), as it deems necessary and appropriate.

**SEC. 305. OFFICER AND DIRECTOR BARS AND PENALTIES.**

(a) UNFITNESS STANDARD.—

appropriate exceptions from the requirements of this subsection, including exceptions for purchases pursuant to an automatic dividend reinvestment program or purchases or sales made pursuant to an advance election.

(4) BLACKOUT PERIOD.—For purposes of this subsection, the term "blackout period", with respect to the equity securities of any issuer—

(A) means any period of more than 3 consecutive business days during which the ability of not fewer than 50 percent of the participants or beneficiaries under all individual account plans maintained by the issuer to purchase, sell, or otherwise acquire or transfer an interest in any equity of such issuer held in such an individual account plan is temporarily suspended by the issuer or by a fiduciary of the plan; and

(B) does not include, under regulations which shall be prescribed by the Commission—

(i) a regularly scheduled period in which the participants and beneficiaries may not purchase, sell, or otherwise acquire or transfer an interest in any equity of such issuer, if such period is—

(I) incorporated into the individual account plan; and

(II) timely disclosed to employees before becoming participants under the individual account plan or as a subsequent amendment to the plan; or

(ii) any suspension described in subparagraph (A) that is imposed solely in connection with persons becoming participants or beneficiaries, or ceasing to be participants or beneficiaries, in an individual account plan by reason of a corporate merger, acquisition, divestiture, or similar transaction involving the plan or plan sponsor.

(5) INDIVIDUAL ACCOUNT PLAN.—For purposes of this subsection, the term "individual account plan" has the meaning provided in section 3(34) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1002(34), except that such term shall not include a one-participant retirement plan (within the meaning of section 101(i)(8)(B) of such Act (29 U.S.C. 1021(i)(8)(B))).

(6) NOTICE TO DIRECTORS, EXECUTIVE OFFICERS, AND THE COMMISSION.—In any case in which a director or executive officer is subject to the requirements of this subsection in connection with a blackout period (as defined in paragraph (4)) with respect to any equity securities, the issuer of such equity securities shall timely notify such director or officer and the Securities and Exchange Commission of such blackout period.

(b) NOTICE REQUIREMENTS TO PARTICIPANTS AND BENEFICIARIES UNDER ERISA.—

(1) IN GENERAL.—Section 101 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1021) is amended by redesignating the second subsection (h) as subsection (j), and by inserting after the first subsection (h) the following new subsection:

(1) SECURITIES EXCHANGE ACT OF 1934.—Section 21(d)(2) of the Securities Exchange Act of 1934 (15 U.S.C. 78u(d)(2)) is amended by striking "substantial unfitness" and inserting "unfitness".

(2) SECURITIES ACT OF 1933.—Section 20(e) of the Securities Act of 1933 (15 U.S.C. 77t(e)) is amended by striking "substantial unfitness" and inserting "unfitness".

(b) EQUITABLE RELIEF.—Section 21(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78u(d)) is amended by adding at the end the following:

"(5) EQUITABLE RELIEF.—In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.".

**SEC. 306. INSIDER TRADES DURING PENSION FUND BLACKOUT PERIODS.**

15 USC 7244.

(a) PROHIBITION OF INSIDER TRADING DURING PENSION FUND BLACKOUT PERIODS.—

(1) IN GENERAL.—Except to the extent otherwise provided by rule of the Commission pursuant to paragraph (3), it shall be unlawful for any director or executive officer of an issuer of any equity security (other than an exempted security), directly or indirectly, to purchase, sell, or otherwise acquire or transfer any equity security of the issuer (other than an exempted security) during any blackout period with respect to such equity security if such director or officer acquires such equity security in connection with his or her service or employment as a director or executive officer.

(2) REMEDY.—

(A) IN GENERAL.—Any profit realized by a director or executive officer referred to in paragraph (1) from any purchase, sale, or other acquisition or transfer in violation of this subsection shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such director or executive officer in entering into the transaction.

(B) ACTIONS TO RECOVER PROFITS.—An action to recover profits in accordance with this subsection may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer fails or refuses to bring such action within 60 days after the date of request, or fails diligently to prosecute the action thereafter, except that no such suit shall be brought more than 2 years after the date on which such profit was realized.

(3) RULEMAKING AUTHORIZED.—The Commission shall, in consultation with the Secretary of Labor, issue rules to clarify the application of this subsection and to prevent evasion thereof. Such rules shall provide for the application of the requirements of paragraph (1) with respect to entities treated as a single employer with respect to an issuer under section 414(b), (c), (m), or (o) of the Internal Revenue Code of 1986 to the extent necessary to clarify the application of such requirements and to prevent evasion thereof. Such rules may also provide for