```
 1                UNITED STATES BANKRUPTCY COURT
                  EASTERN DISTRICT OF MICHIGAN
 2                     SOUTHERN DIVISION

 3  IN THE MATTER OF,          Case No. 13-53846
                               Detroit, Michigan
 4  CITY OF DETROIT, MI        September 8, 2014
    _____/  8:30 a.m.
 5
            IN RE:  TRIAL RE: CONFIRMATION OF CHAPTER 9 PLAN
 6            BEFORE THE HONORABLE STEVEN W. RHODES
              TRANSCRIPT ORDERED BY: ROBIN WYSOCKI
 7
    APPEARANCES:
 8
    For the City of Detroit, MI:   ROBERT W. HAMILTON, ESQ.
 9                                 Jones, Day
                                   325 John H. McConnell Boulevard
10                                 Suite 600
                                   Columbus, OH 43215
11                                 213-243-2382
                                   614-469-3939
12
                                   GREGORY, SHUMAKER, ESQ.
13                                 THOMAS CULLEN, ESQ.
                                   GEOFFREY STEWART, ESQ.
14                                 Jones, Day
                                   51 Louisiana Avenue, N.W.
15                                 Washington, D.C. 20001
                                   202-879-3939
16
                                   ROBERT HERTZBERG, ESQ. (P30261)
17                                 Pepper, Hamilton
                                   4000 Town Center
18                                 Suite 1800
                                   Southfield, MI 48075-1505
19                                 248-359-7300

20  For Syncora Guarantee, Inc.:  DOUGLAS SMITH, ESQ.
                                   STEPHEN HACKNEY, ESQ.
21                                 Kirkland & Ellis
                                   300 N. LaSalle
22                                 Chicago, IL 60654
                                   312-861-2000
23


24


25
```

```
 1  For Oakland County:          JAYE QUADROZZI, ESQ. (P71646)
                                 Young & Associates
 2                               27725 Stansbury Boulevard
                                 Suite 125
 3                               Farmington Hills, MI 48334
                                 248-353-8620
 4
     For Macomb County & MIDD:    DEBRA O'GORMAN, ESQ.
 5                               Dechert, LLP
                                 1095 Avenue of the Americas
 6                               New York, NY 10036
                                 212-698-3500
 7
     PRESENT:                     JAMIE FIELDS, ESQ. (P52808)
 8                               555 Brush #2409
                                 Detroit, MI 48226
 9                               313-570-3906

10                               JOHN QUINN

11  Court Recorder:             Kristel Trionfi

12  Transcriber:                Deborah L. Kremlick

13

14  Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
15

16

17

18

19

20

21

22

23

24

25
```

1

2                          INDEX

3  WITNESSES FOR        Direct     Cross    Redirect    Recross
   THE CITY:

4
   CHARLES MOORE                   8,17       40        54,55
5  BETH NIBLOCK          84        143
   CAROLINE SALLEE      164        258

6
   EXHIBITS:                                          ID    ADM

7
   CXM     Disclosure statement Conway's Projections    6      8
8  CX482   Chart                                        43     44
   CS560   Steps to Forecast General Operating Taxes   182    189
9  CX561   Taxable Value for City of Detroit           191    195
   CX562   Change in Taxable Value                     195    199
10 CX586   Property Taxes in Detroit                   180    182
   CX588   Restructuring and Reinvestment Analysis     232    233
11 CX589   Model                                       200
   CX590   Worksheet                                   242    244
12 CX593   Ten Year Financial Projections              225    227

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Court in Session)

2            THE CLERK:  All rise.  Court is in session.  Please

3    be seated.  Calling case number 13-53846, City of Detroit,

4    Michigan.

5            MR. HACKNEY:  Your Honor, good morning.  Stephen

6    Hackney of Syncora.  I'm sorry to interrupt the examination,

7    but I was wondering -- there's -- there's one issue that

8    pertains to the examination.  I also have a couple other nuts

9    and bolts that I can either wait on or raise now.

10           THE COURT:  Go ahead, sir.

11           MR. HACKNEY:  The issue that relates to the

12   examination is that on Friday when we were talking about City

13   exhibit number 3 which is the disclosure statement and how it

14   was in evidence, that caught me a little bit by surprise.

15       And so we went back over the weekend we found, I think,

16   an inadvertent error that was made when the city submitted the

17   list of exhibits to you showing exhibits.  And I've worked

18   through it with Mr. Shumaker and Ms. Hale for Jones, Day and

19   there is no allegation here that this was done on purpose.

20   Ms. Hale was synthesizing an enormous number of duplicated

21   lists and there was a lot going on.

22       It -- it is agreed though that our hearsay objection to

23   the disclosure statement was inadvertently left off.  And so

24   City Exhibit number 3 ought not to have come into evidence as

25   an unobjected to exhibit

1          THE COURT:  Okay.

2          MR. HACKNEY:  I wanted to raise that because it was

3   part of the Moore testimony.

4          THE COURT:  Uh-huh, okay.  The city agrees?

5          MR. SHUMAKER:  Good morning, Your Honor.  Greg

6   Shumaker, Jones, Day for the city.  We agree about the

7   inadvertent error and I know Your Honor likes to deal with the

8   hearsay objection in the context of the witness' testimony.

9      We really don't understand how there's not -- why this

10  would be hearsay and the disclosure statement itself.  But

11  nonetheless we agree that the -- the inadvertent error

12  occurred and so reinstatement of the -- of the objection would

13  seem appropriate.

14         THE COURT:  All right.  The Court will order that

15  without prejudice the disclosure statement is not admitted

16  into evidence until it's moved and admitted.

17         MR. HACKNEY:  Your Honor, I have other nuts and

18  bolts issues, but they don't have to be raised now, so I'm at

19  your pleasure in terms of how you'd like to handle them.

20         THE COURT:  Well, I -- I leave it to you, whatever

21  you want to do is fine with me.

22         MR. HACKNEY:  Perhaps I'll wait for Mr. Moore to

23  conclude if that's okay.

24         THE COURT:  Okay.

25         MR. HAMILTON:  Good morning, Your Honor.  Robert

1   Hamilton of Jones, Day on behalf of the city.  In connection

2   with the resolution of the disclosure statement.

3       With respect to Mr. Moore's testimony, the only impact I

4   think it has is with respect to Exhibit M to the disclosure

5   statement which -- which we discussed with Mr. Moore and which

6   he testified that he was the one, or Conway, MacKenzie was the

7   firm that prepared those objections and that they were the

8   projections of DWSD's revenues and expenses over the next ten

9   years.  And on that basis I would move Exhibit M to the

10  disclosure statement as Conway's projections into evidence

11  based on his testimony.

12      (City's Exhibit M was identified)

13          THE COURT:  And it's not a separately numbered

14  exhibit?

15          MR. SHUMAKER:  It is not.  It is just Exhibit M to

16  disclosure statement -- to the disclosure statement which is

17  Exhibit 3 to the -- the city's exhibits.

18          THE COURT:  Any objection to that?

19          MS. QUADROZZI:  Well, Your Honor. Jaye Quadrozzi on

20  behalf of Oakland County.

21          THE COURT:  Really you can just sit.  I don't want

22  you to strain your back ending over into a microphone.

23          MS. QUADROZZI:  The -- we don't have a foundational

24  objection that in fact there is testimony that Mr. Moore and

25  his firm Conway, MacKenzie was the first that actually created

1  Exhibit M.  But of course as we discussed and Your Honor

2  sustained the objection on Friday, we would certainly object

3  that the exhibit should not be allowed for the truth of the

4  projections because it was not something that as an expert Mr.

5  Moore or anyone at Conway, MacKenzie testified to or offered.

6          MR. HAMILTON:  Your Honor, I would make -- I would

7  have two responses.  One, I know Mr. Stewart was the one that

8  really wanted to do this, but I'm not sure how projections --

9  how you could view it as projections as the truth of a

10  projection.  They are the projections that were prepared by

11  Conway.

12     And second, the only objection that was made to the

13  disclosure statement and its exhibits was hearsay by Syncora.

14  Ms. Quadrozzi did not make an independent objection to the

15  exhibits to the disclosure statement.

16     We had provided the foundation for Exhibit M to resolve

17  the hearsay objection.  They are Conway, MacKenzie's

18  projections as Mr. Moore testified under oath.  That was the

19  only objection that was made to Exhibit  M and on that basis

20  we think the hearsay objection should be overruled.  And the

21  other objection is untimely and should be overruled by the

22  Court.

23          THE COURT:  Okay.  Do I have the exhibit up here, or

24  does someone have ready access to it?

25          MR. HAMILTON:  It should be Exhibit 3 in the binder,

1 | Your Honor.

2 | THE COURT:  Stand by, please. Anybody have any idea

3 | what page Exhibit M is?

4 | MR. HAMILTON:  I believe it's 796, is it -- did I

5 | get that right?  686, Your Honor, of the -- of the pdf.

6 | THE COURT:  Yeah.  All right.  The Court will

7 | overrule the objection and admit Exhibit M of Exhibit 3 into

8 | evidence.

9 | (City's Exhibit M was admitted)

10 | MR. HAMILTON:  Thank you, Your Honor.  Recall Mr.

11 | Moore to the stand.

12 | (WITNESS CHARLES MOORE WAS PREVIOUSLY SWORN)

13 | THE COURT:  Mr. Fields, you -- you have about 30

14 | more minutes.

15 | MR. FIELDS:  For the record, Your Honor, Jamie

16 | Fields.

17 | CROSS EXAMINATION

18 | BY MR. FIELDS:

19 | Q   Good morning, Mr. Moore.  In your Stockton -- in your

20 | expert report that you did for Stockton, you said that you

21 | discussed Stockton was subsidizing certain entertainment

22 | venues.  And you said that they are particularly difficult to

23 | justify given the city's financial condition.  Did you say

24 | that?

25 | A   I recall saying something along those lines, yes.

1  Q    Are you aware the City of Detroit in their current budget

2  provides a $533,000 subsidy for the Detroit Zoo?

3  A    I am not aware of that number, no.

4  Q    Are you aware that Detroit in its current budget provides

5  a $301,000 subsidy for the Detroit Historical Museum?

6  A    I am not aware of that number either.

7  Q    Are you aware that currently the City of Detroit provides

8  a $1,308,000 subsidy for the African American Museum?

9  A    I'm not aware of that number either.

10 Q    Are you aware currently that the City of Detroit provides

11 a $171,000 subsidy to Eastern Market?

12 A    No, I'm not.

13 Q    In your declaration you stated that you would examine

14 opportunities to sell what you termed excess assets, is that

15 correct?

16 A    Which declaration -- which declaration are you referring

17 to?

18 Q    This case in the City of Detroit case.

19 A    Could you tell me which date?

20 Q    The -- at the beginning of the case where you made a

21 declaration and you said that you would be looking at a

22 certain number of things including restructuring and including

23 selling excess assets.

24 A    If you're referring to my declaration from July 18th of

25 2013, I believe there is a paragraph in that that describes

1 | what the overall activities of Conway, MacKenzie would be in

2 | this assignment.

3 | Q    Okay.  And that's the one I'm referring to.  In your --

4 | in the city's disclosure statement, they listed that the

5 | Detroit -- they listed certain city assets they had.  And one

6 | of the assets was the Detroit -- or the Veterans Memorial

7 | Building.  At that time a sale was pending and there was no

8 | further information.  Has that sale been consummated?

9 | A    That's not an activity that Conway, MacKenzie is involved

10 | in.

11 | Q    The City of Detroit owns three golf courses including one

12 | in Huntington Woods.  Are they what you would consider excess

13 | assets?

14 | A    That also is not an activity that Conway, MacKenzie is

15 | involved in.  That's more of an investment banking activity.

16 | Q    Are you -- do you know if the media reports are true that

17 | the management company that operates the golf courses owes

18 | $478,000 in back water bills to the City of Detroit, is that

19 | true?

20 | A    I'm not sure which media reports you're referring to.

21 | Q    Okay.  I'll go on.  The city owns two media -- two

22 | marinas.  That wouldn't be part of your analysis either as far

23 | as assets?

24 | A    Those type of assets and the potential for those asset

25 | sales is not included within our scope

1  Q    Okay.  Did the -- you mentioned -- did you consider

2  selling any of the art, was that within your scope?

3  A    That is not included within our scope.

4  Q    You testified that the first set of RRI is in -- in 2013

5  would cost the city approximately 1.25 billion dollars.  And

6  now you're current RRI's would be approximately 1.7 million

7  dollars, is that correct?

8  A    No.  Actually just to bridge these two numbers together.

9  In June of 2013 there were approximately $950,000,000 in what

10 are referred to typically as capital expenditure type items.

11      And then there was another $300,000,000 in additional

12 operating expenses.  And that took that amount to

13 approximately 1.25 billion.  That number was net of cost

14 reductions.  When you also factor in the revenue initiatives

15 at that time which were about 250,000,000, it was about a

16 $1,000,000,000 even.

17      Now the reinvestment initiatives that are included in my

18 expert report and to which I testified on Friday that net

19 number after taking into account the cost reductions as well

20 as the revenue initiatives is now $877,000,000.  So it's a

21 reduction of approximately $123,000,000 from June of 2013.

22 Q    What would happen if the city is unable to raise the

23 revenues through the RRI's of this plan?

24 A    When you say raise the revenues through the RRI's could

25 you be more specific?

1  Q    Yes.  There is -- one of the reasons we got into this

2  situation we're in now with the bankruptcy is, unrealistic

3  assumptions made from previous administrations.  When you did

4  your long range projections you made certain assumptions.

5       For example you're assuming that for the -- for every

6  year that we're going to save the -- the city is going to save

7  $2,000,000 in lawsuit settlements, if something like that

8  doesn't come to fruition does that affect your overall

9  projection?

10 A    Well, it could.  I would say that $2,000,000 compared to

11 the $877,000,000 net is a fairly immaterial amount.  But all

12 of these items certainly are subject to some level of risk.

13 And there are also opportunities as well.  So it would go

14 either way.

15 Q    Well, there is a variety of assumptions.  I just put for

16 one example.  Another example would be that you predicted one

17 more -- $1,000,000 more per year in revenue from grants.  And

18 I don't know how you can -- is it possible to predict

19 increased revenues from grants in the future?

20 A    Well, there are certain grants that the city has received

21 in the past.  And we believe that there is a strong likelihood

22 that they'll receive in the future.

23       There are other grants that the city has not received

24 before that the city will going for and so those ones there

25 may be more risk as to whether the city would receive those.

1  Q    After your RRI's in 2013, Mayor Duggan was elected and he

2  asked you to open parks.  That was something that was

3  important to him, correct?

4  A    Yes.

5  Q    And you changed the RRI's to reflect that, correct?

6  A    Yes.

7  Q    Is there anything else that someone, a politician, or

8  otherwise has asked you to consider to change the RRI's?

9  A    Well, going back to when this process began in late

10 January of 2013, this has been a collaborative process with

11 the city's leadership throughout that entire time period.

12    And so when you refer to politicians, we are working with

13 the city leadership.  That includes the executive branch, the

14 Mayor's office, obviously the emergency manager's office, the

15 legislative branch, city council, as well as all the

16 department heads.

17    So it has been a collaborative process.  And a

18 collaborative process would also involve some recommendations

19 that would be made by Conway, MacKenzie.  That may or may not

20 be accepted by the city.

21    And other -- other items that the city may propose that

22 in the end were not decided upon to be included.  So it has

23 been an iterative collaborative process.

24 Q    Therefore in the future it's possible other politicians

25 or new people elected would have different ideas of what the

1 | money should be spent on, is that correct?

2 | A    I can't speculate on that.

3 | Q    Okay.  One final thing.  You talked about the cushion.

4 | The city has a 1% or approximately a $10,000,000 cushion for

5 | unforeseen circumstances, is that correct?

6 |           THE COURT:  You probably mean reserve?

7 |           MR. FIELDS:  A reserve, yes.

8 | A    There are two different items.  There is a minimum cash

9 | balance which it ranges from about 80,000,000 to $85,000,000

10 | per year and that represents about two months of employee

11 | related expenditures.

12 |      In addition to that there's also an annual contingency of

13 | about 1% of general fund revenues that's built into the

14 | forecast.

15 | Q    For example last winter was a extremely bad winter and

16 | salt was probably double.  It wouldn't take much of a incident

17 | to go through the 1%, would it?

18 | A    Could you be more specific on your question?

19 | Q    Yeah.  Let me rephrase that.  In the -- in the event that

20 | the 1% was depleted by some unforeseen contingency, is there

21 | anything in the plan -- how would the plan replenish that

22 | money?  Would it build it up, or just forget about it?

23 | A    The city contemplates always maintaining a minimum cash

24 | balance.  And as I mentioned that's 80,000,000 to $85,000,000

25 | throughout the ten year projection period.

1    So presumably the city is always going to be maintaining

2  that's what a cash balance -- if it goes below that, it would

3  replenish that cash balance.  In addition to that, there are

4  other -- there is the contingency and certainly there are

5  anticipated opportunities as well as risks in the projections.

6  Q    In -- in the past the city has taken money meant for

7  reinvestment initiatives and used it to backlog operational

8  expenses in -- in the case of unforeseen contingencies.  Is

9  that the type of replenishing you would be talking about?

10 A    I'm not sure what you're referring to.

11 Q    Taking money from the reinvestments to RRI's and using it

12 to replenish the -- the cushion or the reserve?

13 A    I'm not aware of that happening.

14 Q    Okay.  Are you aware of any people being hired in the

15 city to insure other than the elected officials to insure that

16 the benchmarks are met that the money is used in order to meet

17 the benchmarks?

18 A    Yes.  Actually this is a quite significant effort that's

19 underway right now.  As I indicated in my testimony on Friday,

20 the plan, the reinvestment initiatives include an additional

21 nine people in the finance area to track and monitor

22 reinvestment initiatives.

23    Another four people in the accounting area to improve the

24 reporting.  And then in addition to that I have had several

25 meetings over the last couple of months with both the

1  legislative policy division of the city council as well as the

2  auditor general where I focused specifically on how they will

3  be tracking items.  And that is on top of, or in addition to

4  the financial review commission which will obviously be

5  focused in on reinvestment initiatives.

6  Q    Now you're talking about financial tracking.  Is anybody

7  going to be doing any operational tracking?

8  A    Could you define what you mean by operational tracking?

9  Q    For example I realize the financial review commission

10  looks at city budgets.  But there is many times when things

11  happen and for example overtime.

12      Let's say the unforeseen event of the Detroit Lions

13  winning the Super Bowl and there's a celebration.  That would

14  be -- entail a lot of police overtime.  So instead of going

15  before somebody and requesting a budget amendment they just

16  blow through the budget, they just spend the money.

17      Is anybody there tracking to see that they actually limit

18  themselves to their overtime budget?  Based on the past

19  they've always run deficits and it comes out at the end of the

20  year.

21  A    So I would submit to you that everything you just

22  described has a financial impact and shows up in the

23  financials I think as your question was indicating, and so

24  that is specifically what's going to be tracked.

25      And those types of items budget amendments and insuring

 1 | that appropriations are made are exactly what types of things

 2 | have been discussed in my meetings with both city council,

 3 | legislative policy division, the auditor general, as well as

 4 | substantial meetings with the finance department on those

 5 | items.

 6 | Q    Have those people been hired yet?

 7 | A    Which people?

 8 | Q    The people you've mentioned in the finance, the extra

 9 | accounting people?

10 | A    The additional nine people have not been hired yet.

11 |           MR. FIELDS:  Okay.  No further questions, Your

12 | Honor.

13 |           THE COURT:  Thank you, sir.  Any further questions

14 | for the witness?

15 |                     CROSS EXAMINATION

16 | BY MR. QUINN:

17 | Q    Good morning, Mr. Moore.

18 | A    Good morning.

19 | Q    My name is John Quinn.  I'm just representing myself.

20 | First of all, I wanted to talk a little bit about Exhibit 583

21 | and one particular item on it.  That was the exhibit that

22 | showed the sources and uses of cash available for payments to

23 | unsecured claims -- on unsecured claims through 2023.

24 |      One of the lines on there show -- I believe you said it

25 | showed payments to retirees in the amount of $993,000,000, is

1  that correct?

2  A    If you could please put up that exhibit, I believe the

3  number was actually 999,000,000.

4  Q    Okay, I'm sorry.  It's up.  Retiree payments, 999.3

5  million.  And I just wanted to clarify that is not payments to

6  retirees, that's payments to others on -- for the benefit of

7  retirees, is that correct?

8  A    The payments specifically would involve contributions to

9  both the GRS and PFRS retirement systems as well as

10 contributions related to note B if you will.

11 Q    Which is for the VEBA?

12 A    That is correct.

13 Q    Let's move on to the annuity savings plan.  Now

14 participation in the annuity savings plan has been optional

15 since about 1982 or 1983, is that correct?

16 A    I'm not sure of which year it became optional.

17 Q    But it was sometime in the eighties, is that a fair

18 statement?  Is that -- do you know?

19 A    I don't know.

20 Q    You don't know, okay.  And the way it's funded is first

21 of all participating members make their contributions from

22 their after tax income?

23 A    For people that participate they have the option of

24 contributing 3, 5, or 7% of their after tax pay.

25 Q    And there's also the option of 3% up to the Social

1  Security wage base plus 5% of anything above that wage base,

2  correct?

3  A    I'm not familiar with the Social Security aspect.

4  Q    Okay.  And then member contributions are commingled with

5  city contributions and then they're invested along with the

6  city contributions in one big investment sum that GRS manages?

7  A    Yes.  The balances that are in individual annuity savings

8  fund accounts, that's both their contributions as well as the

9  interest that's been credited are commingled and co-invested

10  with the GRS pension assets.  And to be clear this is only

11  with the general retirement system, the GRS pension system.

12  Q    Right.  Okay.  And then the GRS you mentioned interest.

13  GRS trustees have had discretion to award interest, or in some

14  years not to award any interest on the ASF accounts of

15  individual members, correct?

16  A    Going back to 1973, I'm not aware of a year that interest

17  was not credited to the participants.

18  Q    What about 2013?

19  A    That is true.  In 2013 that -- there was no interest

20  credited.  That was after obviously everything that has

21  happened with the city.

22  Q    Right.  Now in 2013 though that GRS did have positive

23  returns on its investments, did it not?

24  A    That's my understanding, yes.

25  Q    And they were greater than 6.75%, correct?

1  A    Are you referring to calendar year 2013, or fiscal year

2  2013?

3  Q    Fiscal year.

4  A    Fiscal year 2013 they were greater than 6.75%, yes.

5  Q    Right.  And they awarded 0% to the GRS fund -- to the --

6  excuse me, to the ASF accounts, correct?

7  A    That's correct.

8  Q    Okay.  Now the city has always had the authority if it

9  chose to impose limits on the trustee's discretion to award

10  interest on funds, is that correct?

11  A    That's a legal question that I don't think I can respond

12  to.

13  Q    In any event until 2013 and still until 2011, the city

14  did not impose any limits, correct?

15  A    Again it's legal question.  I'm not aware of any changes

16  though.

17  Q    Prior to 2011?

18  A    Prior to 2011, yes.

19  Q    You are aware that in 2011 by ordinance the city imposed

20  limits saying that it could not be above the assumed rate of

21  return in any year regardless of whatever return GRS realized

22  on investments it could never award interest on the ASF

23  accounts greater than the assumed rate of return, is that

24  correct?

25  A    Correct.  And regardless of whatever the loss was the

1  accounts could never be subtracted from or have a return of

2  less than 0%.

3  Q    And then this interest of course is compounded.  The

4  interest that's awarded to the ASF funds is compounded?

5  A    Interest is credited to the annuity savings fund account

6  balance so yes, as interest is credited, future interest would

7  be credited on top of that.

8  Q    All right.  Now let's talk about how money gets out of

9  members' ASF funds.  First of all, a member -- until a member

10 has been working for the city for 25 years he or she cannot

11 withdraw funds from the ASF account, is that correct?

12 A    Members actually can take loans from their ASF accounts.

13 Q    There is a difference between a loan and a withdrawal

14 though, isn't there?

15 A    Well, I guess you could be more specific in how you use

16 the word withdraw.  I view any time funds come out of that

17 account, whether that's through a loan, or a permanent

18 withdrawal, as a withdrawal from the account.

19 Q    All right.  The -- a member with less than 25 years

20 seniority cannot take money from the ASF account without --

21 without any obligation ever to return it, again without 25

22 years seniority, correct?

23 A    That is my understanding is that it is at 25 years that

24 an individual would be able to withdraw amounts in their

25 annuity savings fund account.

1  Q    So that for example in 2013 an ASF participant who sees

2  that the -- I am only getting -- I'm getting 0% interest on my

3  account even though the markets are doing considerably better

4  than that, if he doesn't have 25 years seniority he cannot

5  simply withdraw his money and put it in another investment

6  vehicle, can he?

7  A    I believe that's the case.  Certainly members can halt

8  contributions at any time.

9  Q    All right.  They can halt contributions, it's what's

10 already there they can't touch until 25 years except for a

11 loan?

12 A    That's correct.

13 Q    And then at the time of retirement, a member can use all

14 or part of the money in the ASF account to buy an annuity from

15 GRS essentially, correct?

16 A    At retirement someone can either take a lump sum

17 withdrawal, or they can have their annuity savings fund

18 account annuitized and have that paid as a supplemental

19 portion of their monthly pension for the rest of their lives.

20 Q    Right.  So that's essentially buying an annuity from GRS?

21 A    I don't disagree with how you've characterized it.

22 Q    And when that happens then the -- that individual's ASF

23 account is closed and any money the member does not withdraw

24 stays with GRS to purchase this annuity?

25 A    Yes.

1  Q    All right.  And that decision to purchase an annuity from

2  GRS is irrevocable.  The annuitants cannot later on say, I

3  changed my mind, I want -- I want -- I want my money back?

4  A    I believe that's correct.

5  Q    Okay.  And then the terms of the annuity are, first it's

6  a -- it's a fixed rate annuity, is that correct?

7  A    That's my understanding.

8  Q    All right.  So that for example if at the time of an

9  individual retirement the annuity he gets from GRS is at a

10  7.9% rate.  The following year GRS earns 10% on its

11  investments, he's still just going to get 7.9%?

12  A    Yes.  And conversely if there's 0%, or a 20% loss, still

13  getting 7.9%.

14  Q    Which is -- that's the way fixed rate annuities work in

15  the insurance industry in general?

16  A    That's correct.

17  Q    Right.  And it's payable for the life of the annuity and

18  the designated beneficiary if there is a designated

19  beneficiary, correct -- it's annuitized, I'm sorry.

20  A    That's my understanding.

21  Q    All right.  Now upon the death of an annuitant or the

22  designated beneficiary, whichever happens later, there is no

23  distribution to the heirs of the -- the annuity funds, the

24  fund that the money that the annuitant used to buy the -- the

25  annuity from the GRS, correct?

1  A    As you had just indicated, that's typically how an

2  annuity would work, yes.

3  Q    That's how this one works in particular?

4  A    Yes.

5  Q    Now you say that's typical how an annuity would work.

6  There is actually in the open market there are a great variety

7  of annuities, are there not?  I mean they're not -- for

8  example they're not all fixed rate?

9  A    That's correct.  There are typically counter parties that

10  are willing to set up almost any arrangement that you'd like

11  to do.

12  Q    Right.  And it can -- you can have -- there are

13  arrangements  such that you can have for example an annuity

14  for life with the principal then going to your heirs?  That

15  does happen in -- in the market, does it not?

16  A    I'm aware of that, yes.  It's similar to how this works

17  with the GRS pension system right now for pension benefits.

18  Q    Just a minute.  With the pension benefits they go to --

19  they're for the life of the retiree or the life of his

20  designated beneficiary if any and then it stops.  Nothing goes

21  to heirs after that, isn't that correct?

22  A    I'm using that as an example where people have the option

23  of choosing a survivor spouse option if they desire.

24  Q    Okay.  So that for example let's say an ASF participant

25  has $200,000 in his account at the time he retires.  He uses

1  it all to buy an annuity at a fixed rate.  Let's say it's

2  7.9%.

3      Ten years later this annuitant dies leaving no designated

4  beneficiary.  So over the ten years at 7.9% on $200,000, would

5  -- would have received 15,800 per year approximately, is that

6  right?

7  A    Is that --

8  Q    It's kind of hard to ask you to do the math in your head.

9  A    Yeah.  I was going to say, I'm -- I have to rely on you

10  for those calculations.  I can't comment one way or another on

11  that.

12  Q    Okay.  But in any event the principal that was in the

13  annuity, the amount that was paid to buy the annuity is not --

14  does -- stays with GRS at that point upon the death, is that

15  correct?

16  A    I think the point that you're making is whether someone

17  dies earlier, or conversely, lives longer than expected.  They

18  could get less than what was in their annuity savings fund

19  account balance at the time that they retired.  Or they could

20  get potentially more then.

21  Q    No, frankly that's -- I'm not making a point.  I'm -- I'm

22  just asking questions.  It is a fact that while -- when the

23  annuitant leaves that money with GRS upon retirement, GRS

24  continues to invest it, is that correct?

25  A    Yes, to support the annuity.

1  Q    And invest it as it has in the past.  It's commingled

2  with all -- with the other GRS funds and invested, correct?

3  A    Yes.

4  Q    All right.  And GRS at least in the past has assumed --

5  had an -- an assumed rate of return.  And -- and it will in

6  the future it will just be -- under the plan at least, it

7  would be a lower rate of return, correct?

8  A    There have been many times in the past that the assumed

9  rate of return has been less than 6.75%.

10  Q    Right.

11  A    It is right now for GRS 7.9% and that will pay 6.75%

12  under the plan.

13  Q    Okay.  But in any event if the assumed rate of return is

14  in the long term correct, then the expectation is that GRS

15  will earn enough interest on the money that the annuitant

16  needs to buy to purchase the annuity to fund all of the

17  payments to the annuitant under the annuity, correct?

18  A    Could you put numbers against the hypothetical that you

19  were just indicating?

20  Q    Okay.  Let's take the -- my hypothetical is a $200,000 in

21  the account at the time of retirement and it's all used to

22  purchase an annuity, okay?

23  A    Okay.

24  Q    Then GRS pays out to the annuitant 7.95 of that 200,000

25  every year.  If he bought it at a fixed rate of 7.9%, correct?

1  A    They're not paying out 7.9%.  They're paying an annuity

2  which uses the 7.9% interest rate over the expected life of

3  that participant.

4  Q    So each year that annuitant would receive 7.9% of

5  $200,000?

6  A    No, sir.  7.9% is the interest rate that's used to

7  calculate the annuity payment.  The annuity payment, the

8  amount of the payment is based on what the anticipated life

9  expectancy of that individual is.

10    And so if you have no actuarial variances meaning that

11  the person lived exactly how long was anticipated, as well as

12  no investment return variances, then that person would be paid

13  exactly their -- the amount of their annuity savings fund

14  account.

15  Q    You're quite sure that's the way it actually works in

16  practice?  You've -- you've looked into this?

17  A    We're talking about a hypothetical situation and I'm

18  giving you a hypothetical response.

19  Q    But it is your understanding if -- let me make sure we're

20  clear on this, that the amount paid out on an annuity each

21  year is not the interest rate -- is not the rate that the

22  annuitant agreed to at the time, rather it is a rate that

23  takes into account life expectancy of the annuitant and his --

24  his or her beneficiary, is that correct?  Is that what you're

25  saying?

1  A    My understanding is that the -- in calculating the

2  annuity, that the assumed rate of return is taken into

3  account.  Right now that's 7.9%.

4  Q    Right.

5  A    In terms of what life expectancy is used, I don't have

6  specific visibility to that.  I don't know which mortality

7  tables may be used, but my understanding is that a life

8  expectancy aspect is taken into account.

9  Q    Okay.  That's your understanding.  Have you actually

10  researched that to make sure that's correct?

11  A    I've had numerous conversations with counsel as well as

12  individuals from the retirement system on these points.

13  Q    All right.  All right.  Now you -- you did testify about

14  the ways that were considered when you -- you and others were

15  attempting to decide what to do about recouping what you

16  believed were excess interest payments into annuity accounts

17  during certain years.  And -- and you listed several things

18  that were considered before you -- you hit on what you finally

19  incorporated into the plan, is that correct?

20  A    Yes.

21  Q    And I think one was you considered suing those who

22  benefitted from the alleged over payments, right?

23  A    I don't recall using those words exactly, suing them.

24  But bottom line, the primary considerations were with

25  recoupment the benefit reductions for all participants would

1  be less than if there was no recoupment.

2  Q    Okay.  So another -- another approach that was considered

3  but rejected would be an across board for all members of Class

4  11, an across board reduction sufficient so that that would

5  cover the amount of the alleged excessive interest, correct?

6  A    I just want to make sure that, you know, I go back to my

7  previous response.  Because I want to make sure I use more or

8  less in the right way.

9      To the extent that there is some level of recoupment,

10 then the across the board reduction would be less than if

11 there was no recoupment.  In which case to your follow up

12 question, the across the board reduction would be higher.

13 Q    Right.  And if there were no recoupment, what would the

14 across the board reduction be, did you calculate that?

15 A    Yes.  And the information is included in the disclosure

16 statement.

17 Q    And you don't recall what it is?

18 A    I believe that we indicated the impact from the asset

19 recoupment was approximately 8.8%.

20 Q    So that instead of it would -- to get what it would be

21 across the -- across the board, if we did it -- if you did not

22 use the recoupment to get back the allegedly excessive

23 interest, the overall for all members of Class 11, the pension

24 cut would be 8.8% plus 4.5%, correct?

25 A    Under scenario A or alternative A --

1   Q     Yes.

2   A     Compared to alternative A and alternative B, that were in

3   the plan and disclosure statement.

4   Q     And then of course you considered the plan that you

5   actually incorporated it into or -- or the approach to the

6   alleged over payments that you actually incorporated into the

7   plan, which is that it's taken -- that you do have recoupment

8   of some of the alleged over payment from certain ASF

9   participants and then but the majority of plan -- of members

10  of Class 11 just simply have the 4.5 reduction, is that

11  correct?

12  A     I don't recall the exact split of people that are in

13  Class 11 that have recoupment.

14  Q     You don't recall?

15  A     I don't recall the exact split, no.

16  Q     Do you know -- you are aware though that most -- more

17  than half of the members of Class 11 have no -- no charge for

18  recoupment?

19  A     That's the number that I can't recall.  And if I --

20  generally speaking I think, if I recall correctly, it's about

21  half and half.

22  Q     Right.

23  A     Maybe it's slightly more than half that don't have

24  recoupment, I can't recall the exact number.

25  Q     And then a good portion of those who do have recoupment

1  have recoupment of less than 5%, correct?

2  A    I would have to go through each individual's recoupment.

3  Q    All right.  Now did you also consider prosecuting a claim

4  against the trustees and their advisors who -- who according

5  to the city, violated their fiduciary duties by awarding the

6  allegedly excess interest?

7  A    Well, there are two things to that.  And first of all,

8  these are both legal items that I don't want to get too far

9  into this --

10  Q    I know.  I'm not asking you whether you would have such a

11  claim.  Was any consideration given to pursuing such -- such

12  claims?

13  A    My understanding is that there is -- there is not a

14  release granted in the plan.  And so if that is decided upon

15  that path, that that is still available.

16  Q    Available to whom?

17  A    That's a legal question that I shouldn't answer.

18  Q    Now let's get clear on the purpose of the ASF recoupment.

19  And is it to recoup for the city some of the $450,000,000 that

20  it had to pay GRS to make up for the alleged diversion of

21  pension funds to pay the excess interest?  Is that the

22  purpose?

23  A    To be clear, in my testimony on Friday, I indicated in

24  that ten year period, fiscal year '03 through fiscal year '12

25  which really extends to fiscal year '13 since there was no

1  interest in fiscal year '13, that there was excess interest,

2  not total interest credited, but excess interest credited of

3  $450,000,000.

4      The annuity savings fund recoupment as contemplated in

5  the plan, recoups 190,000,000 of that $450,000,000 of excess

6  interest.

7  Q   So it's recouping that for the city because the city had

8  -- had to pay that into the plan to make up for the -- the

9  money that went out -- went -- that went out of the plan to

10  the ASF participants, is --

11  A   No, sir.  That recoupment goes or comes into the pension

12  system and it stays in the pension system to be able to pay

13  out benefits.  That's the reason why there is a -- as I

14  indicated before, without ASF recoupment, that the across the

15  board cuts would be higher.

16  Q   So that would mean that the alternative that you did

17  suggest -- the approach that is taken in the plan, it does not

18  result in the city recovering anything from the persons whose

19  accounts had received the alleged excess interest, is that

20  correct?

21  A   Could you please restate that question?

22  Q   Okay.  Well, let me put it another way.  Is it fair to

23  say that the ASF recoupment in the plan is of no financial

24  benefit to the city itself?

25  A   I think that's generally fair to say.  And the reason why

1  is because the ASF recoupment comes into the GRS plan in a

2  sense.

3      Those GRS plan assets are used to pay beneficiary

4  payments.  And the city does not receive any portion of that

5  ASF recoupment.

6  Q    Right.  And so that mean -- that means it's also of

7  course not available for other creditors?  To make payments to

8  other creditors.  It -- it just stays within the plan, it

9  never becomes the city's money.

10 A    Correct.

11 Q    Okay.

12 A    Correct as to it stays within the plan.  In terms of

13 being available to other creditors, that again, that's a legal

14 question that I can't answer.

15 Q    Okay.  And so between these two alternatives, spreading

16 the -- the amount of money lost through allegedly excess

17 interest payments over all members of Class 11 and limiting it

18 to certain members of Class 11 who allegedly benefitted from

19 -- from the excess interest, between those two alternatives,

20 in terms of the city's financial position, they are equal.

21 They make no difference, do they?

22 A    I think that's fair to say.

23 Q    All right.  So would I be correct in understanding that

24 the -- the benefit to the city, if there is any benefit to the

25 city at all of the ASF recoupment, is that it allows many

1   members of the -- when we compare it to the alternative of

2   spreading it over everybody, is that it allows many members of

3   Class 11 to take -- in addition to the loss of COLA, only a

4   4.5% reduction in their pensions rather than 4.5% plus 8.

5   whatever it was, is that correct?

6   A    I think that's fair to say.  I -- I would also put a

7   caveat on my previous answer which is while there may not be a

8   direct benefit to the city, or a difference I should say,

9   between those two alternatives, it is unclear to me whether we

10  would have reached negotiated settlements with parties that

11  were involved with the pensions like the city did.  And so

12  that could have had an impact on the city without negotiated

13  settlements.

14  Q    All right.  But once the -- once it's settled and

15  incorporated in the -- in the plan, then it makes no

16  difference -- the city would get the same thing if it had

17  settled on spreading the alleged loss from excessive interest

18  payments over all of Class 11 or having only a sub part of the

19  people in Class 11 bear the cost of that.  As far as the

20  city's finances are -- are concerned, it makes no difference?

21  A    Correct.

22  Q    Okay.  And so -- but -- but of course the problem is, if

23  you ask the -- the -- the members of Class 11 to take a -- a

24  cut in their pensions of not 4.5%, but of something over 12%

25  or maybe 13%, that seriously reduces the chance that the

1  members of Class 11 would vote in favor of the plan, correct?

2  A    That would be speculating.

3  Q    That -- and that thought did not enter anyone's mind when

4  you were making the decision whether to -- whether to go this

5  way?  Whether -- whether to use ASF recoupment rather than

6  spreading the costs over all members of the plan?

7  A    Well, sir, as I indicated, these were options that were

8  considered by the city.  You see where we came out with our

9  settlements.  So that's what the end result was.

10  Q    I guess what I'm asking is, to get from those options to

11  decide on the one -- on the one you chose, was any

12  consideration given to the effect it might have -- that the --

13  the various options might have on the vote in Class 11?

14  A    Well, sir, certainly it would seem to me you're more

15  likely to get a vote in support of a plan if you have a

16  settlement than if you do not.  And we reached a settlement

17  which involves ASF recoupment.

18  Q    I want to briefly discuss an example you cited on Friday.

19  I think you -- you mentioned there was one ASF participant who

20  over the course of a 30 to 40 year career put 100,000 -- about

21  $100,000 into his or her ASF account and at the time of

22  retirement had 1.4 million in the account, is that correct?

23  Did I get your -- your numbers right?

24  A    Yes.  Generally speaking the numbers are correct.  And

25  Your Honor asked me to do just a little bit of follow up.  I

1 | can provide that information at this point, or I can wait.

2 |     What I do want to point out in the question that you

3 | asked it made it sound like there was only one person with

4 | these types of numbers and that is not the case.  I used that

5 | as an example.

6 |     There are many people that received an ASF withdraw or a

7 | lump sum payment that was north of a hundred --

8 | Q    Right.

9 | A    -- or north of $1,000,000.

10 | Q    Right.  And -- and of course they had all made

11 | contributions to -- to earn that.

12 | A    Presumably.

13 | Q    Now you mentioned there were many people.  And so I take

14 | it you selected a sample of ASF recipients and you found these

15 | people you're referring to, is that correct?

16 | A    As I indicated on Friday, we worked closely with the

17 | auditor general's office during its investigation that kicked

18 | off in June of 2013.  And that period focused -- or that

19 | investigation focused on a period from July 1st of 2011 through

20 | March 31st of 2013.

21 |     And there were certain transactions that occurred during

22 | that time that were selected as part of a sample and detailed

23 | reviews occurred as part of that.  This individual and their

24 | lump sum payment occurred during that time period and I did

25 | review the detailed ledger for that individual.

1  Q    And this selection you referred to to get a sample, was

2  that done by a statistician?

3  A    This is a sample that was selected by the auditor

4  general's office.

5  Q    Was it done by a statistician?

6  A    I don't know what the qualifications or the background of

7  the auditor general's office is.

8  Q    Okay.  In your considering -- in your study of this

9  sample, were you at all concerned about whether it was a

10  random or representative sample?

11  A    I am a CPA by background.  And so certainly I understand

12  samples and being able to make -- or reach various conclusions

13  based on samples.  And that was not what the auditor general's

14  office was doing.

15      The auditor general's office did not take a sample to

16  then extrapolate results and say this is the amount of the

17  excess interest.  This was a sample to look at specific

18  records to understand whether there were certain events that

19  had transpired.  And this is all contained within the auditor

20  general's initial 60 day report.

21  Q    And so there was no concern about whether the sample was

22  representative or random.  That -- that wasn't the point of

23  what you were trying to do, correct?

24  A    That's correct.  It was not to take the results of that

25  sample and extrapolate them to anything else.  As it relates

1  to the detailed ASF recoupment, that was done at a 100% level.

2  Q    Right.

3  A    Meaning that there were 100% of ASF participants from

4  fiscal year 2003 through 2013 that were looked at and it was

5  on an individual by individual basis that the $450,000,000

6  excess interest was calculated.

7  Q    So that actually the purpose of your use of the -- of

8  that sample, you were looking for an example -- for an example

9  with some shock value that could be used to make a rhetorical

10 point, correct?

11 A    No, sir.

12 Q    You, I'm sure, working in finance you've heard of the

13 miracle of compound interest?

14 A    I'm not familiar with that term.

15 Q    That's a term that financial planners use.  It's the idea

16 that if you start investing early, do it in a disciplined

17 manner because your returns compound year after year after

18 year with relatively small investments you can build up a very

19 comfortable nest egg.  I'm sure you've -- you're familiar with

20 that concept.

21 A    Well, I'm not familiar with the term miracle of

22 compounded interest.  It is a relatively straightforward

23 concept.  That's the whole purpose for saving.

24 Q    Right, okay.  And so -- and that's essentially what

25 people who invested in ASF were doing.  They were making --

1  taking advantage of the effect of compound interest to

2  increase their savings?

3  A    Well, let's talk about the individual that I mentioned on

4  Friday in terms of the specifics --

5  Q    No, I'm not asking you about that individual.  I'm asking

6  you about the 100% sample you referred to.  Those people, most

7  of whom didn't have anywhere near $1,000,000 in the ASF

8  accounts when they retired, fair enough?

9  A    What -- first of all, when you say most of whom --

10 Q    I mean a majority.

11 A    Of what?

12 Q    Of all of the people who have participated in ASF during

13 the ten year period that you have referred to.

14 A    Sir, there are a substantial number of people that had

15 north of $1,000,000 balance.

16 Q    I didn't ask you whether there are a substantial number,

17 I asked you whether it is true that most of the participants

18 had less than 100,000 -- less than $1,000,000.

19 A    How do you define most?

20 Q    More than 50%.

21 A    That's true.  That more than 50% -- or I should say 50%

22 of people did not have north of the $1,000,000 balances.

23 Q    In fact a more typical balance would be in the

24 neighborhood of low hundred thousands, correct?  Perhaps even

25 less.

1  A    What do you define as typical?

2  Q    All right.  Let's say we were doing a -- I'm looking for

3  a normal distribution with a -- with a bell curve.  What would

4  be number at the top of the bell curve for the balance in the

5  account?  Do you know?

6  A    Well, sir, you have to understand that some people

7  participated in the ASF program for three years, some

8  people --

9         THE COURT:  I'm going to bring a halt to this and

10  ask you to move on.

11        MR QUINN:  Thank you, Your Honor.  In that case, I

12  have no further questions, Your Honor.

13        MR. HAMILTON:  Redirect, Your Honor.  Robert

14  Hamilton, Jones, Day on behalf of the City of Detroit.

15                    REDIRECT EXAMINATION

16  BY MR. HAMILTON:

17  Q    Good morning, Mr. Moore.

18  A    Good morning.

19  Q    On Friday the Court asked you a question regarding how

20  the recoupment worked for the ASF recoupment for individuals

21  that selected the option of having the recoupment --

22  recoupment annuitized and having deductions taken from their

23  monthly pension checks going forward.  Do you recall your

24  interchange with the Court on that?

25  A    Yes, I do.

1  Q    Okay.  Did you have any -- did you do any subsequent

2  investigation with respect to the Court's question over the

3  weekend on that to confirm whether or not that in fact was the

4  terms of the settlement that the city agreed -- reached with

5  the retirees on the other side of that settlement?

6  A    Yes, I did.  Over the weekend I confirmed that as part of

7  the settlement to the extent that an individual's annuity

8  savings fund account balance -- or I'm sorry, the recoupment

9  amount is reached, that the recoupment payments end at that

10 point.

11      Just to put hypothetical numbers against that.  If the

12 annuity savings fund recoupment is $20,000, and that is

13 annuitized using the 6.75% rate, when that $20,000 plus the

14 interest is recouped, the recoupment ends.

15      The other element though does still hold which is if an

16 individual becomes deceased prior to that $20,000 being

17 recovered, there is no further recoupment.  So the recoupment

18 ends short of that $20,000.

19          THE COURT:  Do you have any estimation on what the

20 cost of that limitation is?

21 A    I specifically looked into that and that's impossible to

22 determine at this point because we would have to be

23 speculating on who would die early.

24 Q    Also during your testimony on Friday, the Court asked you

25 to over the weekend calculate the effective rate of return for

1   the illustrative example of the person we talked about who had

2   invested $100,000 of after tax wages in their ASF account and

3   then took a withdrawal of 1.4 million.  Did you do that over

4   the weekend?

5   A    Yes, I did.

6   Q    Could you describe for the Court what you came up with?

7   A    Yes.  The individual participated for a total of 42

8   years.  They began participating in 1970 under a predecessor

9   to the 1973 plan to which I referred.

10       And over the course of 42 years until 2012 the person had

11  contributed just over $100,000 in contributions.  The pay out

12  that occurred in October of 2012 was $1,360,000.

13       The effective rate of interest during that time was

14  approximately 13.6% earned over a 42 year period.  The ASF

15  recoupment for that individual under alternative A is

16  $120,000.  And so if we consider the $120,000 coming out of

17  that withdrawal even though that person has had access to the

18  funds for the last two years, that would lower the effective

19  rate of interest from 13.6% to 13.2%.

20  Q    All right.  Yesterday we looked at exhibit -- City

21  Exhibit 60, Page 8 and gave us a comparison of the actual GS

22  -- GRS rates of return.  And this was on Friday not yesterday,

23  excuse me.

24       A comparison of the actual GRS rate of return with the

25  amount credited to ASF.  And you testified as to those

1 | numbers.  Do you recall that?

2 | A    Yes, I do.

3 | Q    Did Conway, MacKenzie prepare a more -- or a -- a

4 | detailed chart that provided a longer period of time to

5 | compare the actual GRS rates of returns?

6 | A    Yes.  This -- this chart here specifically gets into ASF

7 | interest crediting.  Another analysis that we did was to

8 | calculate and compare the actual rates of return for both the

9 | GRS pension system and the PFRS system over the previous 15

10 | calendar years.

11 | Q    Can we bring up City Exhibit 482?  Could you blow up the

12 | numbers just the best you can there?  Thank you.

13 |      All right.  Is this the -- the -- the information that

14 | you just testified to that Conway, MacKenzie prepared?

15 | A    Yes, sir.

16 |      (City Exhibit 482 was identified)

17 | Q    And this -- this is the 15 year period?

18 | A    Yes.

19 |      MR. HAMILTON:  All right.  Your Honor, the city

20 | would move City Exhibit 482 into evidence.

21 |      THE COURT:  Any objections?

22 |      MR. HACKNEY:  I have an Your Honor.  I'm not sure I

23 | have enough foundation.  I can't see the document precisely so

24 | I'm not sure I understand exactly what it is yet.  I'm getting

25 | old.

 1          THE COURT:  Perhaps it would be good if your tech

 2  person could blow up half of it so that the individual lines

 3  are bigger.  And then we can look at the other half if

 4  necessary.  Ah, much better.  Thank you.

 5          MR. HACKNEY:  Yeah.  I think we maintain our

 6  objection to this document, Your Honor.  We lodged a hearsay

 7  objection and I think that this is being offered for the truth

 8  and it's improper.

 9          MR. HAMILTON:  It's being offered for the truth,

10  Your Honor.  Conway, MacKenzie prepared this data based on

11  their review of -- of the documents.  And this is his

12  testimony.

13          MR. HACKNEY:  But --

14          THE COURT:  All right.  The objection is overruled

15  and the exhibit is admitted.

16      (City's Exhibit 482 was admitted)

17  Q    And then finally, Mr. Moore, on -- on Friday you were

18  asked a series of questions by Ms. O'Gorman on behalf of the

19  counties with respect to DWSD.  And in particular --

20          THE COURT:  Hold on one second.

21          MR. HAMILTON:  Sure.

22          THE COURT:  Are you still asking questions about

23  this document?

24          MR. HAMILTON:  No, I'm not, Your Honor.

25          THE COURT:  All right.  Can we put it back up?

1          MR. HAMILTON:  Yes.

2          THE COURT:  All right.  Can you explain to us what

3  this exhibit demonstrates?

4  A    Yes, Your Honor.  I received directly from both the GRS

5  pension system and the PFRS system the actual rates of return

6  on a calendar year basis going back to 1999.

7          And so what this schedule shows is when you take into

8  account, or when you lay out the actual rates of return, if

9  you can scroll to the far right the average annual rate of

10  return for PFRS was 5.61% over that entire time period.  And

11  for the GRS pension system it was 5.19.

12          Now it's important to note that you can't just take the

13  rates of return every year, add them up and divide by 15.

14  This is based on compounding which is how asset returns work.

15  So this is an important element when we look at over a fairly

16  lengthy time period what the rates of return actually were.

17          Down below we have it on a fiscal year basis,

18  unfortunately that is only for the GRS pension system.  We

19  were not able to receive the same information for the PFRS

20  pension system.

21          THE COURT:  Thank you.

22  Q    All right.  Mr. Moore, on Friday, Ms. O'Gorman on behalf

23  of the counties asked you some questions about the DWSD

24  decision to retire its unfunded liability over a nine year

25  period.

1        And in particular Ms. O'Gorman asked you whether it's

2   true that the nine year period was selected because the city

3   needed those funds in that time period in order to fund its

4   reinvestment initiatives.  Do you recall that question, sir?

5   A    I do.

6   Q    And do you recall generally what your answer was?

7   A    Yes.  I indicated that there were two primary reasons for

8   the nine year pay off of the unfunded amount.  One was the

9   cost of capital item, and then the other one was as part of

10  and to facilitate the settlements that had been reached.

11  Q    Okay.  And the settlement that was reached that you're

12  referring to, could you describe just generally what that is?

13  A    Yes.  The plan of adjustment contains our settlement or

14  settlements and there are a number of items that impact DWSD

15  that were reached as a part of the settlement.

16       Not only do we have the reductions in the GRS pension

17  system, but also the treatment of the OPEB claims as -- as

18  well as the swaps and then the proposed treatment for the COPS

19  in the plan.

20  Q    Okay.  So what impact did reaching the settlements with

21  respect to pension and OPEB and the swaps have -- have for the

22  -- for the city in connection with the legacy liabilities of

23  DWSD?

24  A    The way that those liabilities were handled by DWSD is

25  that they would reimburse the city for those -- for amounts

1  related to those items.  By reaching those settlements, the

2  amount that DWSD would have to reimburse the general fund was

3  reduced significantly.

4  Q    So did you consider in -- in deciding whether or not the

5  city should -- or that DWSD should retire its unfunded

6  liability over a nine year period, what the overall impact of

7  all those settlements was on DWSD's overall legacy

8  liabilities?

9  A    Yes, sir.

10 Q    All right.  Can we bring up City Exhibit 201, please?

11 And can we blow up just the chart without the footnotes.

12      Mr. Moore, is this a document that you used in connection

13 with the city's consideration of retiring DWSD's unfunded

14 pension liability over a nine year period?

15 A    Yes.

16 Q    Can you describe for the Court what this document shows?

17 A    At the very top it contains the proposed payments on the

18 various items based on what is included in the plan of

19 adjustment.  And you see here that we have under POA, pension

20 payments.  These are payments on the frozen accrued benefits.

21      Then there are professional fees that were allocated to

22 DWSD.  Pension administrative costs.  OPEB --

23 Q    Let me interrupt you, sir.  On -- on those three if we go

24 over to the far right under two fifteen to two twenty-three,

25 if you total up those three, what number do you get?

1  A    That's the 428.5 million dollars.

2  Q    Okay.  Go ahead.

3  A    And the next line OPEB current retirees.  Those are the

4  proposed payments by DWSD pursuant to the treatment of OPEB

5  claims.  And then the final two are the proposed treatment

6  pursuant to pension obligation certificates and then the

7  swaps.  These are the amounts that DWSD would pay related to

8  the proposed treatment of these different claims.

9  Q    All right.  And then what's the next line under the sub

10 total for legacy payments?

11 A    Below that then there are additional contemplated costs

12 going forward.  So pension active employees represents

13 payments for prospectively earned pension benefits for DWSD.

14      And then OPEB future retirees represents amounts that

15 would be paid relative to new benefits that would be accrued

16 for retiree health care.

17 Q    All right.  And so then you have a total of DWSD legacy

18 payments under the plan, is that right?

19 A    That's right.

20 Q    What is that total for the nine year period?

21 A    Over the nine year period from 20 -- fiscal year 2015

22 through fiscal year '23, that's 502.6 million dollars.

23 Q    All right.  And then what's the next group of -- of rows

24 that's titled no restructuring.  What does that refer to?

25 A    The next group of rows get into what the potential

1  payments would be without restructuring.  Meaning based on how

2  these costs are right now and what DWSD is paying, what DWSD

3  would be paying during that same time period without the

4  provisions of the plan of adjustment.

5  Q    All right.  So the first line is pension payments.  And

6  it has 31.3 going across.  Can you describe for the Court what

7  that refers to?

8  A    Yes.  What this does and this -- this is a very

9  conservative technique that's been used here.  31.3 million

10  dollars represents what DWSD would be contributing to the GRS

11  pension system without any changes right now.  That is based

12  on the GRS actuarial valuation report.

13      So this is what GR -- or what DWSD would be contributing

14  in fiscal year 15.  To be very conservative that amount was

15  then extended all the way out.

16  Q    Now if -- and if -- if the total for the nine year period

17  for that line is -- is 281.7.  Do you see that, sir?

18  A    Yes, sir.

19  Q    An actually if you look there's total then for the

20  following all the way through 2043.  There's three totals, two

21  eighty-one, three thirteen, and three thirteen, is that right?

22  A    Yes, sir.

23  Q    If DWSD made those payments over the next, is that 30

24  years?

25  A    Approximately 30 years, 29 years.

1  Q    All right.  Would DWSD have retired its unfunded

2  liability for the pension -- for its pension obligations?

3  A    The liability if it was frozen at June 30th of 2014, but

4  there was no reduction to that liability, it would not be

5  repaid during that time period assuming no actuarial or

6  investment variances.

7  Q    So what would the number have to be each year if DWSD

8  wanted to completely retire its unfunded liability over the --

9  over the next 30 years?

10  A    To take the frozen accrued benefit balance as of June

11  30th, 2014, and to pay that out over 40 years at a 6.75%

12  interest -- I'm sorry, 7.9% interest rate, that would be

13  $40,000,000 per year.  And so that would be instead of 31.3

14  million dollars, $40,000,000 per year and that would go out

15  for 30 years.

16  Q    All right.  So those total come close to about -- on this

17  current chart, total about $900,000,000 for the 30 year

18  period, is that right?

19  A    That's right.

20  Q    If it was $40,000,000 a year what would the total be?

21  A    The $40,000,000 per year would be closer to 1.2 billion

22  dollars.

23  Q    All right.  So now let's go with the other lines here.

24  Under the -- under no --

25            THE COURT:  Excuse me.  Excuse me, sir.

1           MR. HAMILTON:  Yes.

2           THE COURT:  Before we jump ahead here, what's the

3  basis or the assumption, whatever it is, that goes into the

4  indication here of 31.3 million dollars per year every year?

5  A    It is a simplistic assumption, Your Honor.  And so it is

6  taking what the amount is today and assuming it's not going to

7  grow at all.  Because benefits are not -- no new benefits are

8  being accrued under this old system.

9           THE COURT:  Well, what -- what might the risks --

10  what are the risks or the variables that might actually impact

11  the yearly amount?

12  A    Sure.  Within the GRS pension system there are various

13  elements that come into play with future contributions.  One

14  of those is that the GRS pension system uses an asset

15  smoothing process which takes gains and losses and smooths

16  them out over a year -- over a certain period of years, seven

17  years.

18      Right now there are still unrecognized losses so the

19  actuarial value of the assets is higher than the market value

20  of the assets.  The 31.3 million dollars is based on an

21  actuarial value of the assets.

22      As those losses are bled in, the amount will go higher.

23  And previous projections that the pension system has done have

24  projected contributions growing over the next several years

25  because of that reason specifically.

 1      Now conversely, if there were significantly higher than

 2   anticipated returns, that could bring the required payments

 3   down.  Also if there were actuarial variances.  People lived a

 4   lot -- I'm sorry, passed away sooner, those types of things

 5   could bring that -- or offset that forecasted increase.

 6          THE COURT:  Do you have an opinion on whether the

 7   31.3 million dollar straight line amount you have here is more

 8   likely too high, or more likely is -- the actual contribution

 9   required is more likely to be higher than that, or more likely

10   to be lower than that?

11   A    I do, Your Honor.  And my opinion is that it's more

12   likely to be higher than 31.3 million dollars.

13   Q    Let's go down to the OPEB line under no restructuring.

14   Can you describe what that is?

15   A    Yes.  This is the anticipated amount that would have to

16   be paid by DWSD for OPEB costs assuming no restructuring.  So

17   no treatment of te claim consistent with what's in the plan of

18   adjustment.

19   Q    And what's the total for the nine year period?

20   A    263.7 million dollars.

21   Q    And then can you describe what the PSE and swaps lines

22   are?

23   A    Yes.  These are again amounts that DWSD would have to pay

24   relative to these liabilities assuming no restructuring -- no

25   restructuring or treatment of those claims as we have in the

1  plan of adjustment.

2  Q    And so what is the total DWSD legacy payments for the

3  nine year period if there is -- if the plan of adjustment and

4  its savings are not approved by the Court?

5  A    675.3 million dollars.

6  Q    All right.  So if we look at the very bottom line of the

7  last chart it says total savings/additional cost.  On the nine

8  year period you have a 172.8 circled.  Do you see that?

9  A    Yes, I do.

10  Q    Can you tell the Court what that represents?

11  A    This is the savings in the nine year period for DWSD as a

12  result of the restructuring.  So paying the pension -- paying

13  off the unfunded amount for the pension along with the

14  professional fee allocation and the administrative costs, plus

15  the treatment of the OPEB certificates of participation and

16  swap claims, will generate pursuant to the plan of adjustment,

17  would save DWSD approximately $173,000,000 over the nine year

18  period versus what DWSD would be paying for those same

19  obligations in the absence of a restructuring.

20  Q    Now Ms. O'Gorman asked you in considering whether or not

21  the four twenty-eight should be paid over nine years, whether

22  you considered the impact of that decision on rate payers that

23  would have to pay rates to pay that off over nine years.  Do

24  you recall that question?

25  A    Yes.

1  Q    Did you consider the overall savings that are achieved

2  for DWSD over the nine year period by retiring its unfunded

3  liability over nine years.  Did you consider the overall

4  savings impact on rate payers in making that decision?

5  A    Yes.  This analysis would indicate that with a nine year

6  amortization DWSD would be paying less than it otherwise

7  would.

8  Q    And what impact would that have on the rate payers over

9  the nine year period?

10  A    It may or may not have an impact on rates themselves, but

11  the cost structure obviously would be less which generally

12  speaking, all else being equal would result in lower rates

13  than if the costs were not restructured.

14          MR. HAMILTON:  I have no further questions, Your

15  Honor.

16          MR. HACKNEY:  Your Honor, just a short redirect if I

17  may.

18                   RECROSS EXAMINATION

19  BY MR. HACKNEY:

20  Q    Mr. Moore, good morning.  Stephen Hackney on behalf of

21  Syncora.  I was wondering if I could keep that up, I'm sorry.

22  Nice to see you again.

23  A    Good to see you.

24  Q    I think we sat together last December.

25  A    Yes.

1  Q    I just had a couple short questions about what you were

2  just talking about with Mr. Hamilton.  Do you see under the no

3  restructuring where it talks about the pension obligation

4  certificates, the POC and the swaps underneath that?

5  A    I do, yes.

6  Q    Am I correct that the source of the information that

7  informed that projection were the financial statements of the

8  DWSD in terms of the allocated portion of those two

9  liabilities to the DWSD?

10 A    Yes, sir.

11 Q    And the footnote indicates that it is an 18.5%

12 allocation, is that correct?

13 A    That's probably right.  I -- we'd have to just look at

14 the footnotes below.

15 Q    You should feel free to.  I just read it.  But feel free

16 to look at Footnote 10 if -- if you want to confirm.

17 A    Yes, that's correct.

18 Q    And that's -- that's consistent with the historical

19 allocation to DWSD, correct?

20 A    Yes, that's my understanding.

21         MR. HACKNEY:  No further questions.

22         THE COURT:  Any other questions for the witness?

23 Yes, Ma'am.

24         MS. O'GORMAN:  I just have one follow up question.

25                    RECROSS EXAMINATION

1  BY MS. O'GORMAN:

2  Q    You talked about some settlements that --

3            THE COURT:  Just so the record is clear, would you

4  identify yourself, please?

5            MS. O'GORMAN:  Yes, sorry.  Debra O'Gorman for

6  Macomb through its public works commissioner.

7  Q    Now the settlements that you talked about benefit all of

8  the city departments, not just the DWSD, correct?

9  A    Yes.  The settlements relate to the comprehensive plan of

10 adjustment.

11 Q    But only the DWSD is being asked to fully fund its

12 alleged share of the UAAL over a nine year period, correct?

13 A    Yes.

14           MS. O'GORMAN:  Thank you.

15           THE COURT:  Any other questions for the witness?

16 All right.  Stand by one moment, please.

17      I'd like to focus for a moment on the contract between

18 Conway and the city, please.

19 A    Yes, sir.

20           THE COURT:  How would you generally describe the

21 scope of that contract in terms of the work that Conway

22 obligated itself to -- to do for the city?

23 A    Yes, sir.  Our role specifically was to serve as the

24 operational restructuring advisor.  And so that involved

25 specifically looked at what are the options or the -- the

1  actions for the short term and long term that the city should

2  undertake relative to its operations to improve and provide

3  adequate services.

4          THE COURT: What does the contract foresee would

5  constitute the termination or end of your obligations under

6  the contract?

7  A   Yes, sir. Right now our contract goes through September

8  30th of 2014. That contract has an ability for the city to

9  cancel it, I think, at any time or maybe with 30 days notice.

10         We are in discussions right now with the city relative to

11  an extension to that contract. And we're discussing

12  specifically what those activities may be and what the scope

13  in terms of our -- how significant the involvement would be.

14         THE COURT: Do you have an opinion on whether the

15  city's present resources are adequate to permit it to execute

16  the restructuring and revitalization initiatives that your

17  report recommends?

18  A   The resources are not sufficient. There is a substantial

19  increase in head count that's going to be required. And while

20  there are certain --

21         THE COURT: I may have misstated my question or you

22  misunderstand it. My question is whether the city's resources

23  not to execute the plan, but to monitor the execution of the

24  plan, are adequate.

25  A   I believe that they are actually. I think there's going

1 to be a lot of manual effort involved in the beginning,

2 especially because of the deficiency from a system standpoint.

3     I've been very encouraged over the last couple of months

4 with the amount of focus both within the finance area, the

5 Mayor's area, city council, as well as the auditor general's

6 area on how are we going to specifically monitor and track all

7 of these items.

8     So from that standpoint there are a lot of resources that

9 I think are actually very good that are going to be able to do

10 it.

11     THE COURT:  Okay.  If you can answer this question

12 without breaching some confidentiality requirement.  What are

13 the discussions regarding Conway, MacKenzie's continued

14 providing of services to the city?

15 A    I think I can answer that.  Our goal from the beginning

16 and especially right now, is to have it set up so that the

17 city can operate without our involvement.

18     It's very clear and I certainly -- I don't like to speak

19 on behalf of others, but I think Mr. Hill has indicated that

20 point -- we have not gotten to that point yet.  So what we're

21 specifically talking about is when is that point and how do we

22 get to that point.  I think at that point -- or based on that,

23 that's where I should probably halt my description of where

24 the conversations stand.

25     THE COURT:  Okay.  Turning on to a -- to a different

1  subject.  You used the phrase cultural deficiencies.

2  A    Yes.

3           THE COURT:  In your direct examination.

4  A    Yes.

5           THE COURT:  What do you mean by that phrase?

6  A    This is something that actually the Court's expert

7  touched on and I agree with.  There are pockets, way too many

8  pockets within the city that don't necessarily feel that it is

9  their responsibility to provide a certain level of service

10  that it kind of goes the other way around.

11      People are there to be served.  And from that standpoint

12  it is -- it's ingrained in the culture of many areas within

13  the city within certain departments that people don't have to

14  perform to a certain level.

15      The lack of resources to track and monitor how

16  individuals as well as departments are performing has

17  contributed to that and there's no question that all of the

18  budget cuts that have been realized have also left people

19  somewhat helpless.

20      That specifically is what I was referring to in terms of

21  the cultural deficiency.  People not understanding or perhaps

22  not feeling that they have to perform to a certain level and

23  not having the management or leadership that actually holds

24  people in areas accountable.

25           THE COURT:  So you're talking strictly is it fair to

1  say, about an aspect of the culture of the municipal

2  government?

3  A    Yes.

4       THE COURT:  Not any wider sense of culture?

5  A    No.  And I would even characterize it as a management

6  deficiency.  Because I believe that whether you're talking

7  about management as a department head or two levels below the

8  department head, or all the way to the top.  Those are the

9  individuals that have to drive performance.  That have to

10 insure accountability.

11      THE COURT:  Is it fair to say that you are familiar

12 with the concepts of fraud, waste, and abuse in the government

13 context?

14 A    Yes.

15      THE COURT:  Have you done any investigation of what

16 efforts the city intends to make post-confirmation if the plan

17 is confirmed to minimize or eliminate fraud, waste, and abuse?

18 A    Yes.  A very important element that I touched on Friday

19 relates to Workers' Compensation.  That is an area where there

20 is documented evidence of substantial amounts of fraud, abuse,

21 and waste that has occurred.  That is --

22      THE COURT:  Let's pause there because you did give

23 us a number, right?

24 A    Yes, I did.

25      THE COURT:  What was that number?

1  A    Actually I touched on two different areas.  Generally

2  speaking there was an $18,000,000 number but under the

3  Department of Transportation, I also referenced a $14,000,000.

4  So those two together are $32,000,000.

5       There is a few other pockets that come into play, call it

6  $35,000,000 in anticipated savings by dealing with Workers'

7  Comp, fraudulent Workers' Comp claims.

8            THE COURT:  And what percentage of the budget is

9  that $32,000,000?

10 A    Across the Department of Transportation as an example,

11 I'd have to go back and calculate what that is.  But it's --

12 it's certainly a single digit percentage.

13           THE COURT:  Okay.  So please, go ahead with your

14 answer regarding your opinion of the city's efforts to

15 eliminate fraud, waste, and abuse post-confirmation.

16 A    Sure.  Workers' Compensation is certainly an area.

17 Another area relates to the law department and how the law

18 department has functioned in the past which is essentially to

19 settle everything and the approach being taken to fight or

20 combat especially claims that are without merit is an

21 important element in boosting the staff within the city's own

22 law department is going to be a very important piece of doing

23 that.

24      Those are the two primary areas where one could make a

25 strong argument that relate to fraud.  Now separate from that,

1  the abuse really gets into more of what I was referring to

2  before which is in ways the management aspect having the right

3  information to be able to track how things are getting done.

4      But also and most importantly, the ability to -- for

5  managers to take action.  Within all of the -- I shouldn't say

6  all of the collective bargaining agreements, but at least

7  within many of the collective bargaining agreements, new

8  agreements that have been struck, there are significantly more

9  management rights that have been built in.  And that will be

10  an important element along with having the right qualified

11  people in the management roles to carry out that part.

12          THE COURT:  Can you give me one example within this

13  collective bargaining context that -- that -- that you think

14  demonstrates this issue or this concern?

15  A    Yes, I will.  One that is near and dear to everyone's

16  heart is the police department.  And what has happened in the

17  past, certainly what was evident to us is that the department

18  had become incredibly top heavy.

19      And so the chief, Chief Craig now has the ability,

20  especially at the higher level, the command officer to really

21  restructure how he is going to set up his senior leadership.

22  And we worked incredibly closely with the chief in 2013

23  basically to promote a number of people, as well as to demote

24  individuals.

25          And what was unique about the promotions is that several

1  people leap frogged a number of levels.  It was a matter of

2  finding the right talent and putting them in the right

3  position.  So his leadership structure really changed around

4  quite a bit.

5        THE COURT:  And is it your opinion that that

6  expansion of Chief Craig's authority under the collective

7  bargaining agreement had the impact of saving money for the

8  city?

9  A    Yes.

10       THE COURT:  Have you -- or do you have any opinion

11  as to the dollar amount of that?

12  A    This is going back a little bit, but I -- I believe that

13  at the time it was about a $1,000,000 year in savings.

14       THE COURT:  And I assume there are other examples

15  within the collective bargaining agreement that you could

16  give?

17  A    Yes, yes.

18       THE COURT:  Okay.  Are there ways which in your

19  opinion the city could further combat fraud, waste, and abuse

20  but which the city's plans going forward do not accept?

21  A    I would characterize that as what we are trying to get

22  the city to do is adequate.  We are not through the

23  reinvestment initiatives, we're not getting the city to world

24  class.

25       So the difference between adequate and world class will

1  allow for, I think, much further improvement in that regard.

2  So I can't say that there would be a specific area where it's

3  been off the table, but it's just the level that we're

4  targeting versus like I say, world -- world class.

5         THE COURT:  Well, let me ask you to just give me one

6  example if you can of a change you might recommend to the city

7  to take it to that next level.

8  A    There are numerous examples that impact a lot of

9  departments related to maintenance.  The city has far more

10  vehicles than it needs because so many are inoperable.

11     In addition to that the maintenance operations have had

12  numerous issues in terms of job performance.  I'm not

13  convinced that the city should be in the maintenance business.

14     And that is an area that certainly there are parameters

15  that the city has to work with as it relates to potential

16  outsourcing or alternative ways of providing services.

17         THE COURT:  When you say parameters, do you mean

18  obstacles?

19  A    Yes.  And maintenance is one of those areas that I think

20  would -- could potentially have significant added benefits to

21  the city if maintenance was handled both within the general

22  services division which handles most non-transportation as

23  well as even the Department of Transportation.

24         THE COURT:  What obstacles?

25  A    There are both actual elements of the city charter and

1  whether that's -- whether those were ordinances or -- or

2  separate as part of the city charter, that provide certain

3  steps that have to be followed prior to any sort of

4  outsourcing.  And then there are certainly the political

5  considerations as well.

6          THE COURT:  Can -- can you define in a -- in a

7  summary fashion the -- the specific measures that the city

8  will take to the extent you know to assure the Court, the

9  creditors, and the residents of the city that the over

10 $1,000,000,000 that the city proposes to spend on these

11 initiatives will be spent in the most effective and efficient

12 way possible without any fraud, waste, or abuse.

13 A    Yeah.  I will give you a very specific example as to how

14 it's working right now.

15     As you're aware, Your Honor, the city obtained this

16 quality of life financing previously which this Court

17 approved.  And right now in order for any of those funds to be

18 used business cases have to be submitted.

19     And what's really important is these are not business

20 cases that are being developed solely by Conway, MacKenzie.

21 Certainly we are having -- or providing assistance, but these

22 are coming from departments and they are laying out why they

23 should be able to pursue a particular initiative and what the

24 amount is.

25     Many of those are rejected.  Some have to be reworked and

1  then they come up again.  But the finance area and

2  specifically under Mr. Hill's leadership, also driven by the

3  Mayor.  I believe it was the Mayor actually that came up with

4  this concept initially that individuals would have to submit

5  business cases is a great example of making sure that money is

6  not just spent.

7       For that money to be appropriated, and this is something

8  specifically that gets back to conversations that I've had

9  with finance, city council, as well as the auditor general's

10  office.  In order to take that step of appropriating funds for

11  an initiative, what is the amount of basis or justification

12  that will have to occur for that.

13       And the nice thing is, is this has been going on at least

14  four months now with the business case submission.  And it has

15  worked very well.  I think in some ways some people are

16  disappointed that perhaps they're not able to spend the money

17  quicker, but they're now starting to see that just because the

18  money exists doesn't mean that it can get spent, it has to be

19  justified.

20       THE COURT:  Do you have an opinion on whether the

21  expenditure of the reinvestment funds that are specific to the

22  fire department will allow the fire department to meet the

23  standards that I think you called the NFPA fire department

24  standards?

25  A    Yes, sir.  Yes, they do.  That is the -- it's not going

1  to happen immediately and it may take several years, but the

2  investments that are specifically within the fire department

3  will get the fire department to those levels.

4          THE COURT:  How many years?

5  A   Hard to say at this point.  I -- I think that ideally

6  within five years.

7          THE COURT:  By ideally, do you mean best case

8  scenario five years?

9  A   No, I think actually things could go even quicker than

10  that.  Part of -- part of getting to NFPA standards is

11  response time.  And that is making sure that companies are in

12  the right locations.  That will take some time because there

13  still has to be finalized exactly where the -- the companies

14  and the stations will be located.  But then you have the

15  actual expenditures in -- in some instances construction or --

16  or building out new facilities.

17          THE COURT:  Are you generally aware of what the new

18  governance structures are for GRS and PFRS?

19  A   Yes, generally.

20          THE COURT:  Do you have an opinion on whether those

21  new governance structures are adequate to eliminate the kinds

22  of governance issues that have led the city to where it is

23  today at least in part with its UAAL?

24  A   I think I have the answer to that in two parts.  First,

25  as it relates to -- because there have been alleged and

1 documented abuses both in terms of the granting of benefits as

2 well as investments.

3     As it relates to how investments are to be handled with

4 the investment committee, I'm satisfied with that.  I think

5 that that is going to be a very good approach.

6     As it relates to the management of the benefits, at least

7 for the previously accrued benefits, those are now frozen.

8 And so there won't be any sort of changes to those.  We have

9 to make sure that the system is set up well.

10     The -- the GRS system as an example right now is really

11 disconnected from the HR system.  And the number of duplicate

12 systems, the amount of manual entry that's required, that --

13 that just creates opportunities for unintentional and

14 intentional errors.  I think that still has to be addressed.

15     But as it relates to new benefits can't be provided

16 because those have been frozen.  Now going forward we have a

17 situation where benefits will be accrued under new hybrid

18 plans.

19     And there are a number of corrective actions that will

20 take place assuming that the funded position goes below 100%.

21 At least in the next five years or so, I'm very satisfied that

22 this will be controlled.

23     But because benefits are part of collective bargaining

24 agreements, that tends to be the contract that provides for

25 these benefits, there is always the question in the future as

1  to when negotiation occurs, will there be an understanding of

2  the cost of benefits that are being provided.  I think the

3  hybrid structure and the fact that specifically employees are

4  impacted right away to the extent that that funding position

5  goes below 100%, or shortly after it goes below 100%, will

6  hopefully provide additional visibility.

7      I think this experience has also allowed people to see

8  what can happen if they're not understanding how benefits --

9  what the cost of benefits are and how benefits are being

10  provided for.

11      THE COURT:  I sense a certain amount of disagreement

12  or maybe lack of understanding of what the significance of

13  UAAL is in terms of the help of a pension plan and in terms of

14  the impact of that long term on a city's fiscal soundness.  Do

15  you have an opinion on whether there is a specific percentage

16  level of UAAL that is -- I guess the word might be tolerable

17  or allowable that would -- that would still allow the plan to

18  maintain itself as fiscally sound and for the city to maintain

19  that its governance of the plan is sound?

20      MR. HACKNEY:  And, Your Honor, I'm sorry to object

21  to the Court's question.  That's certainly the last thing I

22  want to do.  I do apologize.  Mr. Moore is an important --

23      THE COURT:  No apology necessary.  I do occasionally

24  sustain objections to my own questions.

25      MR. HACKNEY:  Well, I wanted to give you some

1   context and perspective.  I think Mr. Moore is an impressive

2   man.  He's got a distinguished --

3           THE COURT:  What is your objection?

4           MR. HACKNEY:  My objection though is, and I think

5   Mr. Moore will agree, he is not an actuary.  He doesn't hold

6   himself out as an expert in actuarial science.

7           THE COURT:  Okay.

8           MR. HACKNEY:  And I think that is a difficult

9   opinion to give without being trained in those sciences.  So

10  that's the objection, Your Honor.  I -- it's also obviously --

11  I don't -- I don't believe it's disclosed in his report so

12  it's not a -- a lay opinion that you can give, so --

13          THE COURT:  Well, let me explore the foundation then

14  before I ask the question.  Do you believe that the question I

15  asked, assuming you understood it, was one you are capable of

16  providing an answer to?

17  A    I am, yes.

18          THE COURT:  Why do you believe that?  What about

19  your experience and training says to you that you can answer

20  my question?

21  A    I am a Certified Public Accountant.  The standards under

22  which pension systems report are promulgated by accounting

23  boards if you will, the GASB or the FASB governmental

24  accounting stands board, financial accounting standards board.

25          The contributions that are involved with defined benefit

1  pension plans are financial, or have financial aspects to them

2  that have to factor in with the city's overall budget.  I

3  certainly am very well versed in municipal budgets and

4  financial projections.  So that would be the basis.

5         THE COURT:  All right.  I am going to find that that

6  is adequate and overrule the objection.  Please answer the

7  question.

8  A    Your Honor, there are a lot of different characteristics

9  of plans that make it a little bit difficult to answer the

10  question directly, however, I think that there are some good

11  guide posts.

12       The first item is, making sure that the liability is

13  being reported in the right way.  Too often, especially in the

14  municipal sector, the -- there are a number of techniques that

15  are used that don't necessarily provide great visibility to

16  what the UAAL is.

17       There are new GASB standards that are going into effect

18  that are going to assist with that.  They're going into effect

19  right now actually.  Now those are not going to drive funding

20  levels.  So municipalities will be reporting more, but it's

21  not going to necessarily change their funding.

22         THE COURT:  So this is a -- a standard by which

23  municipalities will report what the UAAL is in a way that

24  makes it more uniform and therefore understandable and

25  therefore more visible to everyone?

1  A     Yes, sir.  So with that said, I think that that will

2  help.  Again that does not -- those new accounting standards

3  will not impact funding decisions.

4       The -- a municipality could be -- it could have a pension

5  system that's 80% funded and that could be very bad for them.

6  Because the amount that is necessary that they have to

7  contribute could be well outside what their budget will allow.

8       Conversely a -- a municipality could be 50% funded but is

9  growing tremendously, has a strong revenue base, and can make

10  that up.  What we've tried to do with Detroit and how we've

11  designed the hybrid system gives you some indication as to

12  what we think.

13       And we think it's important to always be within, I'll use

14  the term within spitting distance of 100% funded.  So when you

15  see the corrective actions that are scheduled to go into play

16  with the new hybrid plans, they are meant to recognize as

17  quickly as possible when funding goes below 100% as well as --

18  and -- and take those corrective actions, but also when

19  funding goes above 100% provide some governor before

20  substantial additional benefits may be provided.  So that is

21  how we have viewed the benefits that will be accrued going

22  forward and where we feel the city needs to be.

23            THE COURT:  Well, the answer -- the answer to this

24  question may be obvious, but let's get it on the record

25  anyway.  Why is it your opinion that the City of Detroit

1  pension plans need to be within spitting distance of 100%?

2  A    Cities operate in such a way that they tend not to have

3  -- build up substantial reserves, multi-year reserves.  Their

4  expenditures very often are equaling their revenues coming in.

5       When a city is hit with an unexpected amount that makes

6  it very difficult for the city to deal with.  And so the

7  more --

8            THE COURT:  Expected amount of what?

9  A    Unanticipated contributions as an example.  So if the

10 funding level goes below a certain point and all of a sudden

11 contributions have to be increased substantially, that can

12 really wreak havoc on a city's budget and those are some of

13 the times that municipalities will start to play tricks on how

14 they're reporting and what contributions they're making.

15      The more that we can stay close to 100% funded, the more

16 predictable the contributions the city will have to make.  And

17 that is key in all aspects of budgeting, especially for a

18 municipality.  Predictability and then follow through on

19 actually making contributions.

20           THE COURT:  Unexpected contribution levels in any

21 given year result from the investment variables that you

22 mentioned and the actuarial variables?

23 A    Yes, sir.  And one other element which is getting into

24 the actuarial aspect, but what has actually been earned, the

25 benefit that's been earned.

1      And the city through the new hybrid plans are just going

2   to a base compensation level.  There are no more adders if you

3   will, things that can take what you anticipate have been the

4   case of benefits being earned and increase those substantially

5   through overtime and other ancillary compensation.

6           THE COURT:  Do you know generally speaking what the

7   phrase 401(k) plan refers to?

8   A    Yes, Your Honor.

9           THE COURT:  There may be a slightly different phrase

10  in the context of government or a municipality?

11  A    Yes, sir.  Yes.  401(k) is for corporations.  Essentially

12  there are a variety of items with municipalities.  There could

13  be a 401(a) which is like what the city has as well.  And

14  there are other provisions.  But these are all defined

15  contribution pension plans.

16          THE COURT:  Okay.  Let me use the phrase, defined

17  contribution plan then.

18  A    Okay.

19          THE COURT:  Do you know whether in connection with

20  its plan and its financial restructuring, the city considered

21  going to a pure defined contribution -- contribution plan?

22  A    Yes, Your Honor, it did.

23          THE COURT:  Do you know why it decided not to do

24  that?

25          THE COURT:  You've got to speak right into the

1  microphone.

2      MR. CULLEN:  I don't think that Mr. Moore can talk

3  about that without getting into the mediation, Your Honor.

4      THE COURT:  Well, let's ask.  Can -- can you answer

5  that question without violating this Court's order prohibiting

6  testimony regarding mediation?

7  A   Mr. Cullen took the words right out of my mouth.  In the

8  June 2013 creditor proposal the city had indicated about

9  moving to a defined contribution plan.  That's why I was able

10 to answer that question.  Unfortunately I'm not able to answer

11 the follow up question.

12     THE COURT:  Okay.  Okay.  That's all I have.  Any

13 follow up questions to my questions or to any questions?

14     MR. HACKNEY:  No, Your Honor.

15     MR. HAMILTON:  No, Your Honor.

16     THE COURT:  All right, sir.  Thank you very much for

17 your testimony.  You may step down and you are excused.

18 A   Thank you.

19     (WITNESS CHARLES MOORE WAS EXCUSED AT 10:22 A.M.)

20     MR. HACKNEY:  Your Honor, would it be okay if I

21 raised some of the additional sort of pre-trial issues that I

22 had mentioned earlier this morning before Ms. Niblock

23 testifies?  I didn't want to interfere with --

24     THE COURT:  Yes.  Let's do that.  And then we'll

25 take our morning break before that testimony begins.

1          MR. HACKNEY:  Some of these are just very

2   mechanical, nuts and bolts, Your Honor.

3          THE COURT:  Go ahead, sir.

4          MR. HACKNEY:  The first one is our Daubert motion on

5   forecasting creates a little bit of a puzzle under the Court's

6   scheduling order because it actually spans across three

7   witnesses, Mr. Cline, Ms. Sallee, and Mr. Malhotra.

8       And the scheduling order says we'll address the Daubert

9   motion before a witness will testify, but given the unique

10  nature of this, I proposed to Mr. Stewart that since you've

11  already seen Mr. Cline testify, and given the latitude that

12  you have as to when you'll consider a Daubert motion, that it

13  might make more sense to allow Ms. Sallee to testify with us

14  reserving, and Mr. Malhotra to testify, and then you could

15  hear the argument on that after you've seen the testimony of

16  the three witnesses to allow for a more informed argument

17  before you.  And he's in agreement with that.  We just wanted

18  to propose it to you.

19         THE COURT:  That is fine with me.

20         MR. HACKNEY:  Your Honor, second, I wanted to give

21  you a head's up that this notion of the OPEB --

22         THE COURT:  Pause for a second.  I'm going to -- I'm

23  going to leave it again to you to tell me when it is time to

24  -- to make that argument, sir.

25         MR. HACKNEY:  And we will do that.  We will do that.

1          THE COURT:  You'll tell me.

2          MR. HACKNEY:  And by the way to that effect you'll

3    remember there was this motion in liming with respect to the

4    concept of combining the OPEB and pension recoveries.  And the

5    city and Syncora stipulated on this point, but certain other

6    parties wanted to be heard.

7          And we -- we said we would tell you when we thought the

8    appropriate time was coming.  Ms. Renshaw is a retiree

9    committee witness who I think is going to testify likely

10   tomorrow.  And we wanted to let you know that we think that we

11   ought to argue that in advance of her testimony.

12         The last point is -- is a brief one, Your Honor, but it's

13   something I've been reflecting on and if this is my fault, I

14   will certainly take responsibility for it.  It's -- it's

15   something I -- I didn't fully appreciate with respect to your

16   order admitting exhibits.

17         And that is that I had not fully appreciated the idea

18   that exhibits from the objectors' lists that were not objected

19   to by the city would all go into evidence whole scale during

20   the city's case in chief.  And I'm not here to say that that's

21   not what you said, or indicated, but you may recall, I think,

22   in the -- you can do it different ways.

23         I think you did it that way in eligibility, or at least

24   I'm told you did.  I think in the swaps trial what would

25   happen is, parties have actually sponsored their exhibits when

1 they were presenting their case and at that time the

2 unobjected to exhibits would all come in.

3      The only reason I wanted to raise it was that I was going

4 to see if I could get some latitude from you because there are

5 certain exhibits on our objector exhibit lists that we did not

6 intend to offer the entire exhibit for the truth of the

7 matter.

8      We intended to offer it as an admission on a limited

9 point.  And actually are of the view that much of the exhibit

10 is hearsay and if the city had put it on its list we would

11 have objected.

12      When all of this went, you know, in I think with respect

13 to the vast majority of exhibits is probably okay.  But the

14 ones that I -- I didn't fully think through enough were things

15 like the disclosure statement prior drafts.

16      We have very limited goals for those things but they're

17 actually multi hundred page documents that have all sorts of

18 stuff in them that are ostensibly --

19           THE COURT:  What's the relief you seek?

20           MR. HACKNEY:  The relief I seek was I was wondering

21 if the objectors could have a 72 hour period to come to you

22 and identify exhibits that were on their own lists but that

23 they had intended to offer for a more limited purpose in the

24 way of asking you to reconsider their admission at this time,

25 reserving for when the objector offers the exhibit so that you

1 can have a sense of what they are proposing to use it for.

2 And then any completeness concerns that the city would have.

3     That way we don't have to do wholesale violence and just

4 take them all out and wait.  But I thought we would put the

5 burden on the objectors to say okay, I'm going to go back

6 through all my exhibits that got exhibit -- that got admitted

7 and -- and let the Court know actually these five or these

8 seven were ones that we had more limited aims for.

9     THE COURT:  Does the city have any objection to

10 this?

11     MR. SHUMAKER:  Greg Shumaker, Jones, Day for the

12 city.  Yes, Your Honor, we do.  And -- and principally because

13 we've been over this, you know -- we've been over this and

14 we've been very clear what the process was going to be from

15 the beginning.

16     And I went back and I looked and at the status conference

17 on -- on August 6th, Your Honor, Mr. Hackney and I had the

18 following exchange which was and this is Mr. Hackney speaking.

19     And that one, referring to earlier talking about the

20 exhibit list.  Mr. Shumaker and I suggested to each other that

21 the parties would put into their exhibit lists objections with

22 respect to whether they had a problem with relevance, or

23 prejudice, or hearsay in advance.  And then for one of the

24 middle documents that you really just cannot see objecting to,

25 if there isn't any objection, they would all go into evidence

1  at the start of the trial.

2      It's my understanding, this is how you handled this in

3  connection with eligibility.  We just wanted to confirm it.

4  Mr. Shumaker can let you know if I didn't say that in the

5  right way.

6      Your Honor, sir.  That was to me.  And I said that's

7  correct, Your Honor, we were thinking that with regard to the

8  documents and the exhibits that how we approached them in

9  eligibility went well and we made that a part of the joint

10  pre-trial order.

11      You said, right.  And I went on.  We listed all the

12  exhibits, we listed the authentication objections, any of the

13  other -- other relevance whatnot, and then at the beginning of

14  trial Your Honor recalls you admitted anything that was not

15  objected to.  The Court, right.  And then we fought and then I

16  said -- and then we fought over the others as they came up.

17      Which is why in the joint pre-trial order which Your

18  Honor has -- has entered, it says at Paragraph 7(a)(3) under

19  exhibits, I quote, "the parties have exchanged draft exhibit

20  lists and objections and have worked together in an effort to

21  admit documents into the record as to which there is no

22  evidentiary dispute.  The parties understand and agree that

23  proposed exhibits as to which there are no objections

24  indicated in this order, shall be admitted into evidence for

25  all purposes and all parties".

1       It was very clear what the procedure was going to be.

2   And then to hear Syncora want to revisit this particularly

3   when one of their favorite lines is the gaping holes in

4   evidence of the city's case to me suggests that this is just a

5   motion for reconsideration.  We've done this and -- and we

6   should move forward.

7       MR. HACKNEY:  Can I respond briefly?  I don't

8   dispute what Mr. Shumaker said.  I would call the Court's

9   attention to even our colloquy when I -- I discussed the

10  notion of run of the mill documents being ones that are not

11  700 page disclosure statements that are intended to come in

12  for all purposes.

13      And I would say even with respect to the pre-trial order

14  it is not -- it's not precisely clear that -- that they will

15  all come in during the city's case, or that they'll come in

16  when a party proffers it.

17      But I'm really not here to say I was right and -- and now

18  I'm asking you to reconsider.  I'm really saying that this is

19  at a level of complexity that I just had not fully foreseen.

20  And I'm asking for relief with respect to just a limited

21  category of documents like the prior drafts of the disclosure

22  statement.

23      I know I haven't teed it up for you specifically now, but

24  I -- I guess we would like -- we'd like at least to be allowed

25  to -- to identify these to you and say look, this is -- there

1  are levels of complexity and things that happen in Court that

2  -- one when you look at it and say, okay, Syncora objected to

3  the city's disclosure statement when the city listed on its

4  exhibit list but when it listed three -- three other drafts of

5  it, that shows that Syncora meant for those drafts to come

6  into evidence even though there was substantial overlap with

7  the one it objected to.  It's just -- it's a level of

8  complexity I -- I did not anticipate, did not fully understand

9  at the time these orders were negotiated.

10  I don't think that it's inappropriate to say can we

11  identify the exhibits that we were not sponsoring into the

12  record for all matters contained therein.  And it is not

13  uncommon for exhibits not to come in until a party sponsors

14  their motion into evidence.

15  I acknowledge that the pre-trial order doesn't say that

16  that's what's going to happen, but I would just say it wasn't

17  entirely clear until I saw it all happen and thought about it.

18  THE COURT:  All right.  Thank you.  I'll take this

19  under advisement and we'll be in recess until 10:45, please,

20  and I'll give you my decision then.

21  MR. HACKNEY:  Thank you.

22  THE CLERK:  All rise.  Court is in recess.

23  (Court in Recess at 10:32 a.m.; Resume at 10:46 a.m.)

24  THE CLERK:  All rise.  Court is in session.  Please

25  be seated.

1             THE COURT:  The record -- the record would -- would

2    not support any finding that either its orders or the parties'

3    agreement lacked clarity regarding the fact that all documents

4    as to which there were no objections would be admitted into

5    trial at the final pre-trial conference.

6             Indeed, I don't understand Syncora to be arguing

7    otherwise.  Rather it appears that Syncora's counsel didn't

8    understand the full implications of that and how the case

9    would actually play out.

10            In deciding whether there is cause to grant the relief

11   that Syncora seeks here, however, the Court feels compelled to

12   consider not only circumstances that led to the mistake, but

13   the extent to which the relief requested would prejudice the

14   city here.  That's an issue that city's counsel did not really

15   address at all.

16            So in -- in the circumstances I think we have to address

17   Syncora's request on a -- or an exhibit by exhibit basis to

18   see the extent to which the modification that Syncora seeks in

19   terms of what should be admitted, may have prejudiced the city

20   in its preparation for its case.

21            So let's see, today is Monday.  By the close of business

22   on Wednesday, Mr. Hackney, please -- or this would really

23   apply to everyone, please provide to the city a list of the

24   exhibits as to which reconsideration is sought.

25            Please try to keep the list to an absolute minimum.  And

1  then we'll allow the city an opportunity to review its

2  position regarding those documents and then we'll discuss it

3  further.

4          MR. HACKNEY:  I appreciate it and we will do that.

5          THE COURT:  All right.

6          MR. HERTZBERG:  Your Honor, Robert Hertzberg,

7  Pepper, Hamilton.  The city calls Beth Niblock to the stand.

8          THE COURT:  All right.  Before you sit down, please

9  raise your right hand.

10          (WITNESS BETH NIBLOCK WAS SWORN)

11          THE COURT:  Please sit down.  Before -- before you

12  begin, let me advise you that I do need to take our lunch

13  break really right at noon because we have -- we have a

14  Judge's meeting today.

15          MR. HERTZBERG:  Okay.  What I'll try and do then,

16  Your Honor, is right around noon, I'll try and see if there's

17  a good break point and let the Court know.

18          THE COURT:  Thank you.

19                    DIRECT EXAMINATION

20  BY MR. HERTZBERG:

21  Q    Good morning.

22  A    Good morning.

23  Q    Could you please state your name?

24  A    Beth Niblock.

25  Q    And what city do you live in?

1   A      The City of Detroit.

2   Q      And where are you employed currently?

3   A      The City of Detroit.

4   Q      In what position?

5   A      The Chief Information Officer.

6   Q      And when did you start your employment with the City of

7   Detroit?

8   A      February of 2014.

9   Q      I want to spend a minute and go through your educational

10  background with you.  Where did you go to college?

11  A      Furman University.

12  Q      And when did you go to college?

13  A      1982.

14  Q      Did you receive a degree from Furman University?

15  A      I did.  I had got a Bachelor of Arts in political science

16  with supporting courses in economics and psychology.

17  Q      I want to spend some time and detail going through your

18  work experience.  So let's go all the way back to the point

19  where you graduated college.  What was your first job out of

20  college?

21  A      I was a social worker.

22  Q      And where did you work at?

23  A      YMCA Safe Place.

24  Q      And after that what was your next job?

25  A      My next job was -- I was the Director of All Saints

1  Episcopal Camping Conference Center.

2  Q    When was that?

3  A    1983.

4  Q    And what were your job responsibilities there?

5  A    I ran the camp and conference center.  It was a retreat

6  center for the diocese episcopal diocese of Kentucky.

7  Q    And what was your next job after that?

8  A    My next job after that I worked for the Louisville Area

9  Chamber of Commerce as a Program Assistant and then an

10 Assistant Manager.

11 Q    Was that from 1983 to 1987 approximately?

12 A    It was.

13 Q    And what were your job responsibilities there?

14 A    At the chamber we did economic development and

15 legislative research and government affairs.

16 Q    And where did you go after that?

17 A    I went to the University of Louisville Bureau of Economic

18 Research.

19 Q    And was that from approximately 1987 to 1991?

20 A    It was.

21 Q    And what were your -- what position did you hold there?

22 A    I was a Program Manager and then the Assistant Director.

23 Q    Did you in that position have the opportunity to use

24 information technology?

25 A    I did.  We did econometric modeling and forecasting.  We

1  did a lot of data analysis and visualization.

2  Q    When I say information technology, if I referred to it as

3  IT, do you understand what I'm saying?

4  A    I -- I will.

5  Q    Okay.  Can you give a little more detail of exactly what

6  you were doing at that job?

7  A    So the Bureau of Economic Research did economic modeling,

8  economic research, economic impact studies.

9  Q    What are some of the examples of how you used IT at that

10 job?

11 A    So we had -- we used it for data analysis.  We had local

12 area networks that we had set up which networked computers

13 together.  We used them in our every -- everyday work.

14 Q    And you were the Program Director there?

15 A    I was.

16 Q    Okay.  After the school business, where were you next

17 employed?

18 A    The Kentuckiana Education and Workforce Institute.

19 Q    And was that from approximately 1991 to 1995?

20 A    It is and was.

21 Q    And what is the Kentuckiana Education and Workforce

22 Institute?

23 A    Commonly known as KEWI.  It was the work force institute

24 that really tried to understand the needs of the up and coming

25 work force.

1     For example, we looked at how different -- we had a

2  industry advisory group that would talk about their leads in

3  the work force.  So for example in -- in the medical arena we

4  would have the industry advisory group saying we need nurses

5  or nursing assistants who are very savvy in technology because

6  technology is becoming a bigger part of health care.

7     We would then work with a consortium of educational

8  providers both in the high school and with the colleges to

9  help them understand the needs of industry to try to -- to

10  bridge that gap so that you are creating a work force that has

11  the skills that the businesses needed.

12  Q     And what position did you hold?

13  A     I was the Director of Information Technology Research and

14  Publications.

15  Q     What other responsibilities did you have as the IT

16  Director at the institute?

17  A     I set up their local area network, commonly referred to

18  as a LAN.  And put in their computer systems.  And --

19  Q     Did you evaluate their existing and potential new

20  technology?

21  A     So as -- as we did a lot of our research we looked at

22  different technology that was on the market and how it might

23  impact not only what we used within the work force institute,

24  but what would be taught in schools.

25  Q     You said that LAN stands for local area network.

1   A    Yes.

2   Q    Explain in more detail what a LAN system is.

3   A    A LAN is basically the communication that allows a group

4   of typically PC's but computers to talk to one another.

5   Q    Was part of your role in that -- in that job to analyze

6   the costs of IT systems?

7   A    Yes.  So like any business when we were looking to put in

8   our IT systems, part of that was how much would it cost.  What

9   do we need it to do.  How much would it cost.  And what was

10  really the total cost of ownership of the lifetime of the

11  system.

12  Q    After you left KEWI --

13  A    Yes.

14  Q    Where did you go next?

15  A    I went to Greater Louisville, Inc.

16  Q    And what is Greater Louisville, Inc.?

17  A    It's the re-branded Chamber of Commerce.

18  Q    So it's different -- it's not any different from where

19  you worked before when you said you worked at the Chamber of

20  Commerce?

21  A    It is not.

22  Q    Same place?

23  A    Right.

24  Q    And how long were you there this time?

25  A    Five years.

1  Q    Was that approximately 1995 to 2000?

2  A    Yes.

3  Q    And what was the position you held this time?

4  A    I was the Director of Technology and then I became the

5  Vice President of Finance and Administration.

6  Q    So you were blending your skills between IT and finance?

7  A    Correct.

8  Q    Okay.  What were your job responsibilities?

9  A    It was all things operational.  So HR -- IT, finance, HR,

10 operations, and research.

11 Q    When you say HR you mean human resources?

12 A    I do.

13 Q    Okay.  I assume you use a specific methodology or steps

14 that you followed to develop and implement the chamber's

15 technology vision?

16 A    Yes.

17 Q    Can you explain what you did?

18 A    Sure.  Typically what you would do is you would meet with

19 the business unit or you would assess the needs of the

20 business.  So what -- what is it that we need to do.

21      Then you would go through and see for example, did you

22 have any existing software or systems that you already have in

23 place.  If you do, are you just not using those systems so

24 that you could fill the gap with a current system, or do you

25 need to put a new system in because the current system that

1  you have simply can't do what you need it to do.

2      If it's the latter of the two where you need to put a new

3  system in place, then you would go -- you'd put together

4  what's called the use case requirements of all the -- the

5  things that the system needs to be able to do, then you

6  typically would put it out.

7      You would research best practices and you would put out a

8  request for proposal commonly known as an RFP to get people to

9  respond to the system that you're trying to put in.  You

10  evaluate the systems and some of the evaluation would be is --

11  is it real or is it what we call vapor wares where it doesn't

12  really work, but can you prove that it's going to do these

13  things that we set out in a proposal to do.

14      And then you would also look at the financial aspects of

15  the system.  So you -- you would typically divide your use

16  requirements into -- these are the things that it absolutely

17  has to be able to do.  And then there are things that it would

18  be great if it could do, but you have a finite amount of

19  money.

20      And so you would look at the system that you could put in

21  for the -- for the dollars that you have available.  And then

22  you have to look at what we call the total cost of ownership

23  of how much that system is going to cost over time.

24  Q    Would this require any negotiations with vendors?

25  A    Oh, absolutely.  So typically what would happen is you

1  would have two competing vendors and -- or you typically

2  narrow it down to two vendors and at that point in time you

3  would negotiation them -- with them for their best and final

4  offer of if they were of equal merit.

5  Q    Is this similar to any -- the process you would take when

6  you would implement any IT system?

7  A    It is.

8  Q    What was your next job after that?

9  A    I went from the Greater Louisville, Inc. to Direct Tech

10 Corporation.

11 Q    And was that from 2000 to 2002?

12 A    It was.

13 Q    And what is Direct Tech Corporation?

14 A    It was a small inked 500 fast entrepreneurial company in

15 Louisville that was technology related.

16 Q    And what was your position there?

17 A    I was the VP of Administration and then I became the

18 Chief Operating Officer.

19 Q    And what were your job responsibilities?

20 A    Pretty much IT, HR, finance, and the web and marketing.

21 Q    Can you give a couple of examples of projects you worked

22 on when you were at Direct Tech?

23 A    Sure.  So when I was there it was a -- it was a kind of a

24 entrepreneurial business that was growing pretty rapidly.  And

25 we had to put in new systems say new financial systems.  We

1  put in a new what's called customer relationship management

2  system, commonly known by the acronym of CRM.  And we put in a

3  new phone system.

4  Q    In approaching these projects did you use the same

5  methodology we just talked about at Greater Louisville, Inc.?

6  A    I did.

7  Q    Was another one of your responsibilities to align the

8  business and the IT strategies?

9  A    It -- it was.

10  Q    What does it mean to do that?

11  A    So when you're talking about aligning the business and

12  the IT strategy it's very important that the -- that you work

13  with the business to understand what it is that they're trying

14  to accomplish and then you put the IT systems in that supports

15  that.

16      So for example if you -- if the business wants to become

17  a very mobile business and they don't want to have work force

18  in an office, you have to make sure that the IT strategy that

19  you're implementing actually supports mobility and mobile

20  workers or else you're then out of alignment with what the

21  business is trying to accomplish.

22  Q    Were you responsible for assessing the costs of the IT

23  projects and implementing them?

24  A    Yes.

25  Q    What was the methodology you followed in assessing the

1 | cost of the IT project there at Direct Tech?

2 | A    So we -- because it was a product company, we were able

3 | to -- again you start with what is it that you're trying to --

4 | to do with the project.  You go out, then you meet with

5 | vendors, and you would try to negotiate the best and final

6 | offer for what you were trying to do.

7 |      Sometimes depending on the staff that you would have

8 | available you might negotiate for implementation services of

9 | the -- the product that you're trying to install.  You look at

10 | the total cost of ownership over the life of the system.  And

11 | basically how much you could put at that point in time, trying

12 | to look at how much the hardware and -- and the overall costs

13 | would -- would cost the company.

14 | Q    Tell me what you mean by implementation services.

15 | A    So in several of my positions you -- you don't have the

16 | staff who can implement the system, so you have to bring on

17 | profession -- other additional staff to help implement the

18 | system.  So you would bring in somebody who is say a

19 | specialist in a particular data base or a specialist in

20 | telephony or whatever it was that you need.  So you would

21 | purchase professional services like you would in any other

22 | field to help implement that.

23 | Q    You're going to have to help me.  What's telephony?

24 | A    It's the telephones and data.

25 | Q    Okay.  When you get to that, break it down for us for

1  those of us who are IT deficient on occasions.

2  A    Okay.

3  Q    Where did you go next after that?

4  A    After Direct Tech, I went to the Louisville Medical

5  Center Development Corporation.

6  Q    And was that from about 2002 through 2003?

7  A    It was.

8  Q    And what was your position there?

9  A    Project coordinator.

10 Q    And what were your job responsibilities?

11 A    So the Louisville Medical Center Development Corporation

12 was a corporation that was funded by the area hospitals and

13 the universities to do technology transfer.

14     So for example if a faculty member had some breakthrough

15 research and then they wanted to take that and spin it out as

16 a company, they could go to the medical center which we call

17 LMCDC and it had -- we built buildings.  We had three

18 buildings.

19     I came on to help build one of the buildings that had lab

20 space, computer space, a data center, and they could go there

21 to do whatever it was.  They recruited a lot of faculty to do

22 say, you know, sickle cell anemia research and things like

23 that.

24 Q    When you say you built a data center you were the project

25 consultant on it.  What areas of IT did you cover in that

1  project?

2  A     Really we covered the data center, data center

3  redundancy, connectivity.  So whether it was internet

4  connectivity or the phone systems that we put through there.

5  And also really the client server environment so that would be

6  the environment where you have servers in the data center that

7  they could -- and the researchers would have on their desk and

8  they could store their data on -- in the data center where it

9  was backed up and redundant.

10 Q     Without going into it in detail, did you follow the same

11 methodology we discussed at the prior two jobs that you were

12 at?

13 A     I did.

14 Q     And that's how you did your assessment of the needs and

15 the costs?

16 A     Correct.

17 Q     And were you required to oversee the budgets on this

18 project?

19 A     I was.

20 Q     Where did you go after that?

21 A     I went to the City of Louisville.

22 Q     And was that from approximately 2003 to 2014 before you

23 took the job with the City of Detroit?

24 A     It was.  I came to the City of Louisville as the -- the

25 city and the county merged.  And I came --

1  Q    When did they merge?

2  A    In two thousand -- well, the voters voted on it in 2002,

3  so I think the actual official kick off of the newly merged

4  entity was January 3rd of 2003.

5  Q    And that's just when you started there?

6  A    I started a little after that in February.

7  Q    And what was your position?

8  A    I was the Chief Information Officer.

9  Q    And what did your job entail?

10 A    My job entailed IT support for everything that the city

11 did except for the police department.

12 Q    And you say everything the city did.  Give me some

13 examples if you would, please.

14 A    Sure.  So we put in a new financial management system.

15 So you -- you were merger with the city and the county.  The

16 city had one set of systems, the county had a completely

17 different set of systems.

18      We had to go through and figure out how we were going to

19 -- I mean it's like any other merger, right?  You're going to

20 go through and you need something that's working at the same

21 time.

22      So we put in a new financial system.  We put in -- we

23 upgraded the human resources information system.  We put in

24 with the metropolitan sewer district a work order management

25 system.  And a, what's called a 311 system which is where

1  citizens can call the number 311 and it goes to a centralized

2  service area where they can talk about hey, there's a pothole

3  here, there's tall weeds and grass, or an abandoned vehicle.

4  Q    When you say that you merged the financial systems, give

5  me a little more detail on that if you would, please.

6  A    Sure.  So the --

7  Q    What it entails for example.

8  A    The City of Louisville was on one financial system, and

9  the county was on a different financial system.  And so what

10 we did was there -- there had been committees of IT people who

11 were in the business community who helped us go through

12 because that was their expertise.

13      So we had companies like Humana and Aegon and folks from

14 the corporate world who we had an IT steering committee and

15 what we were able to do is help decide on what key systems we

16 were going to put in.

17      So the city was on one financial system, the county was

18 on another financial system.  It was determined that neither

19 system could support the financial needs of the newly merged

20 government, so we implemented.  We went out to bid and they

21 chose Oracle financials and we implemented in between 18 and

22 24 months, the new financial management system for the newly

23 merged entity.

24 Q    What is people soft human resources?

25 A    So people soft is specific to a -- a software.  The human

1  resources infra system is basically the -- the HR systems that

2  you use.

3       So it does things like time and attendance, some of the

4  labor calculations for bargaining unit labor contracts.  It

5  does -- we have -- we had a module that was grievance and

6  discipline.  We had a module that did training so you could

7  keep track of training.

8       It was also the core master record for anybody who was

9  employed by at that time -- the Louisville Metro Government

10 which was the merged entity.

11 Q    Did you implement that system?

12 A    It was -- people soft was already being used by the city,

13 but when we brought -- we brought the county people on and

14 then we upgraded it either two or possibly three times while I

15 was there.

16 Q    What is Hanson Customer Service Management System?

17 A    So Hanson is really a -- it's a -- and it's a huge

18 system.  It has many components.  We used it in conjunction

19 with our sewer district.

20      It is a work order management system.  It also handled

21 our 311 customer call in center.  It also handled planning and

22 development review as well as the division that we called

23 inspections, permits, and licensing.  So it's the people who

24 go out and if you're putting in a new water heater or whatever

25 they -- you have to pull permit and you -- they go out and

1  inspect and all that's on line.

2  Q    And did you implement that system when you took on the

3  new responsibilities?

4  A    Along with the sewer district because we shared the

5  system.

6  Q    You -- you were talking about building permits on line

7  and sewer permits.

8  A    Uh-huh.

9  Q    Was this something new that was implemented?

10  A    So, yes.  We had the basic system and then when we

11  upgraded the system the goal was for people -- citizens or

12  businesses to do business with the government in whichever way

13  was more convenient for them.

14      So if you were somebody who wanted to come in and stand

15  in line and get your permit, you could come in and stand in

16  line and get your permit.  But if you were the person who

17  wanted to be able to pull your permit on line then you could

18  do that.

19  Q    Did you implement IT for the public works system?

20  A    Yes.  So public works was also a part of all that.  So

21  when -- so if a call came in, we could -- for a pothole or

22  whatever, it would be referred over to the public works

23  department to -- to fix.

24      Also within the -- the -- some of the modules that we had

25  within that system, you could inventory -- it's interesting to

1  me, all the street signs and -- and stop lights because you

2  needed to know exactly where they were so that if somebody

3  called in and said hey, there is a street sign down you know

4  what it was and how it was there and where it was.

5      So they did all that.  We also had a -- when I -- when I

6  was in the process of leaving, they had a -- they were putting

7  in a really awesome module that basically takes road wear data

8  and it takes how the wear that's on the road so the condition

9  of the road and then it feeds it into a module that allows

10  them to then schedule paving in a way that made sense.

11 Q    You've said twice now they were putting it in.  You mean

12 -- but were you overseeing it as the Chief Information

13 Officer?

14 A    Yes.  And I refer to they because I think it never works

15 the -- the department that's going to be using the technology

16 has to -- they have to own that.  It can't be IT ramming

17 something down somebody throat, so it's very much when we

18 talked earlier about what's the methodology and I keep saying

19 we have to go and start with the -- the department and help

20 them understand what they're trying to accomplish.  It is in

21 partnership though.

22 Q    You said when you started the job as CIO of the merged

23 county and city.

24 A    Uh-huh.

25 Q    That you were overseeing as CIO all departments of the

1 merged entity except for police, is that correct?

2 A    That is correct.

3 Q    When you left in 2014 was police -- had police been added

4 in?

5 A    They had been.

6 Q    And did you oversee that?

7 A    I did.

8 Q    Are you familiar with something called information

9 technology infrastructure library?

10 A    I am.

11 Q    And what do you call that?

12 A    I call it ITIL or everybody calls it ITIL.

13 Q    Okay.  And what is ITIL?

14 A    ITIL is a great framework.  It's a global standard in

15 delivering information technology.  There is -- they're on

16 ITIL version V-3.  And it is -- basically sets up a framework

17 of how to do service delivery, financial management, change

18 management.

19     It's -- and it covers all ways that you deliver

20 information technology to your customers, whether they're

21 internal or external.  And it -- it is a global standard for

22 doing business.  And it -- it came out of the United Kingdom.

23 Q    Did you implement ITIL at the City of Louisville?

24 A    I did.

25 Q    What did you do in your position as CIO of Louisville to

1  work toward aligning IT in businesses?

2  A    So -- so there -- so really I -- I have two -- two ways

3  of thinking about.  There's basic fundamental infrastructure

4  that has to be there.  And that's not really something that

5  you do a lot of consultation with your -- your customers on.

6      But because that basic fundamental infrastructure has to

7  be there.  But when it comes to the departments and what the

8  departments are trying to achieve, you sit down and you talk

9  with them and you figure out what their strategic plan is,

10  where they hope to be with the services that they're

11  delivering in three to five years and then you work with them

12  to have the technology that enables them to do that.

13  Q    What type of departments are you referring to in

14  Louisville?

15  A    So we had departments from, you know, what I would call

16  the core back office departments.  Like finance, human

17  resources, and then you have forward facing departments and

18  that could be anything from the Department of Corrections, the

19  police department, the fire department, emergency medical

20  services.

21      You have the Health Department.  You have Department of

22  Public Works.  You have inspections, permits, and licensing.

23  You have planning and design, criminal justice commission, you

24  know, the women's rights commission, commission on the

25  elderly.  I think that kind of --

1  Q    What is your tax dollars at work?

2  A    Your tax dollars at work is basically a transparency

3  effort by the government to show citizens how we're spending

4  your money.

5  Q    Did you implement that in Louisville when you were CIO?

6  A    I did.

7  Q    What is open data?

8  A    Open data is all about transparency.  It's about putting

9  information that the government has into the public realm.  So

10  for example in Louisville we published everybody's salary who

11  worked for the government.

12       So not only did we publish what you were budgeted to

13  make, we published where you were year to date and we

14  published how much you had made in overtime and how much you

15  had made in any special pass throughs that they have, mostly

16  for public protection because they get training dollars and

17  such.

18  Q    You know what a Smart phone is?

19  A    I do, unfortunately.

20  Q    Okay.  When you were in -- as the CIO of Louisville, did

21  you develop any apps for Smart phones?

22  A    We did, indeed.  So we had two main apps that we

23  developed.  One was called Louisville mobile.  And it had a

24  lot of different functionality on it.  One was you could see

25  all the news events from the City of Louisville.  You could

1 see the calendar of upcoming events with the City of

2 Louisville.

3     We put our restaurant inspections data on line so if you

4 wanted to see restaurants around you, if you allowed the app

5 to have access to your location information, it would then

6 geospacially locate you and tell you the restaurants around

7 there and then you could pull up their last three inspections.

8     We also had a really cool park finder so that you could

9 say I want a park that had an archery range that's close to me

10 and it would come back and tell you what was available and

11 then you could hit get directions and you could either take

12 public transit or it would tell you how to either walk or

13 drive there.

14     And we also then had an -- as part of that app, a button

15 that you could watch what we called -- the TV station reported

16 to me in Louisville.  It was called Metro TV.  And you could

17 watch live press conferences on that app.

18     The second app that we developed was in conjunction with

19 that 311 concept which is the one call for citizens.  It was

20 an app where if you were walking or driving -- well, hopefully

21 not driving, but walking and you could take a picture of say a

22 downed stopped sign, or tall weeds and grass, or whatever the

23 issue was.  It would geo -- again if you allowed it location

24 access, it would geospacially locate it.  You could put that

25 through putting your concern into the system and if you gave

 1  your email address then it would email you back and let you

 2  know the status of what was going on with that issue.

 3  Q    Did you oversee the creation and the implementation of

 4  these apps as the Chief Information Officer?

 5  A    I did.

 6  Q    Let's talk about live streaming of the Mayor's news

 7  conferences.  Did you implement anything in that regard?

 8  A    Yes.  We weren't live streaming and we were -- we -- when

 9  I inherited the TV station -- I ended up having five

10  additional departments rolled into me over -- over time.

11       And so the TV station was the last one.  And we felt that

12  it was important to be able to live stream events and press

13  conferences, or along with the Mayor and the council.  And so

14  we implemented that.

15       So wherever we were we could live stream.  So for example

16  when we had terrible wind storms and a lot of power was

17  knocked out, we could actually broadcast from a specific

18  location and people could not only get it on the TV, but they

19  could get it -- if they didn't have it they could watch it on

20  our --

21  Q    When you say you had five departments rolled in.  Which

22  five departments were rolled in under your control?

23  A    So it was all of the departments but I got additional

24  responsibility.  The -- at first the phone system was within

25  facilities so they moved phones in there.

1      And then I got the -- the -- the archives department

2  which was fascinating because that's the -- all the historical

3  preservation.  So we had to do the records retention,

4  historical artifacts, permanent things that had to be held

5  permanently which in Kentucky was at least 75 years.  So we

6  had to -- we did that.

7      I got the TV station rolled into me.  The police IT

8  group.  And then we had a -- a what was called the sinking

9  fund which is basically tax collection.  And their IT, just

10  their IT portion I -- I got -- I managed those folks as well.

11  Q    Did you do anything when you were with the City of

12  Louisville in regard to a system for issuing of permits?

13  A    Yes.  So when we talked about the Hanson system in

14  general, that was how we actually issued permits.  So a

15  citizen could go on line and take out, or contractors mostly,

16  would go on line and take out permits for the work that they

17  needed to do.

18  Q    And what type of things would they need permits for?

19  A    Gosh, anything -- so anything electrical, plumbing,

20  heating, air conditioning, cooling, having a -- those -- those

21  types of things.

22  Q    Did your team have anything to do with enabling citizens

23  to access services on line?

24  A    Yes.  So the web site was an area that reported to me in

25  Louisville and we worked very hard on getting as much

1  information accessible to citizens on line.

2       So we did things like you could pay your parking ticket

3  on line.  You could pay your pet licensing on line.  You could

4  reserve special events permits on line.  All -- all those

5  kinds of things.

6  Q    Could you pay your taxes on line?

7  A    Yes, you -- you could pay your taxes on line.

8  Q    What about trash pick up, accident reports, stuff like

9  that?

10 A    Yes.  I mean there's -- there's so many of them.  Trash

11 -- trash -- missed trash.  To get reminders of -- trash was a

12 big deal.  You could get reminders of when you needed to set

13 your trash out so you could sign up for a service and it would

14 text you and say hey, junk pickup is next week, start setting

15 everything out Sunday.  So those kinds of things.

16 Q    When you talk -- when you've been talking about the City

17 of Louisville and all the things that you implemented as the

18 Chief Information Officer, did you follow the same methodology

19 that you described previously at your other three positions, I

20 believe?

21 A    Yes.

22 Q    Did you have any responsibility as CIO on budgets for

23 information technology?

24 A    Yes.

25 Q    And what was that responsibility?

1   A    Every year we developed the -- both the operating and the

2   capital budgets for technology.  We would work with

3   departments.  Again we were partnered with them to see if they

4   were going to need new systems and if they were we would help

5   them put together a budget for putting together capital

6   requests for the system.

7   Q    By the way what's the size population wise of the merged

8   city and county entity that you were the Chief Information

9   Officer of?

10  A    About --

11  Q    Approximately.

12  A    About 680,000.

13  Q    A little bit -- about the size of the City of Detroit?

14  A    I think it's a little bit smaller than the City of

15  Detroit.

16  Q    Okay.

17  A    But close.

18  Q    How many people worked for you in your department?

19  A    Seventy-five.

20  Q    You serviced the employees of the City of Louisville, the

21  ones that worked for the city?

22  A    Uh-huh.

23  Q    How many were there that you serviced with the IT

24  department?

25  A    Not counting seasonal folks about 5,500.

1  Q    What's Detroit tech team?

2  A    Detroit tech team was a team of municipal CIO's that were

3  asked by the White House, specifically the office of science,

4  technology, and policy to come to Detroit to look at the

5  technology systems that the City of Detroit had.

6  Q    And were you a member of that team?

7  A    I was.

8  Q    And when did you start work on that project?

9  A    I think we formulated the team, or folks got asked and

10  that was in the October time range.  I know that we came to

11  Detroit --

12  Q    October of 2013?

13  A    Sorry, 2013, yes.  We came to Detroit right after the

14  mayoral election.

15  Q    How did you become a member that team?

16  A    I was asked by Brian Thorpe -- Thorpe for the office of

17  science, technology, and policy to be a member of that team.

18  Q    And why were you asked if you know?

19  A    Because of my competence in municipal IT and merging the

20  city and the county together.

21  Q    Who else was on the Detroit tech team?

22  A    Gail Roper who is the CIO of Charlotte, Raleigh.  John --

23  Nigel Jacob from Boston.  Allen Square from New Orleans.  And

24  John Tolva who was the CIO for the City of Chicago.

25  Q    What did you do as part of the Detroit tech team?

1  Explain in detail what your function was and what you did.

2  A     So we spent two days in the City of Detroit.  We came in

3  and we met with the IT team in Detroit.  We met with different

4  departments of the City of Detroit.

5       We also met with foundations and we also met with what we

6  -- I would call civic entrepreneurs, civic tech people.  So

7  those were people who are in the Detroit community who do

8  technology who had an interest and had been helping the City

9  of Detroit with things like the Motor City mapping project and

10  things of that nature.

11  Q     Did you put together a series of recommendations?

12  A     We did.

13  Q     Were they formalized into a report?

14  A     They were.

15  Q     And did you author any of the sections of the report?

16  A     We teamed up and I co-authored two sections.

17  Q     Do you remember which sections you co-authored?

18  A     311 and IT infrastructure.

19  Q     When was the report finalized?

20  A     March or April of this year.

21  Q     2014?

22  A     2014.

23  Q     And what happened with the report?  Was it given to

24  anyone?

25  A     It was given to Mayor Duggan.

1  Q    What were some of the recommendations in the report that

2  was given to Mayor Duggan?

3  A    Hire a CIO, check.

4  Q    Did they accomplish it?

5  A    They did quite surprisingly.  Hire a CIO, do civic tech

6  through really a director of civic tech engagement.  Look and

7  assess the IT infrastructure and architecture.  Do 311.  On

8  line permitting.

9      And then we had to leverage the geographic information

10 systems which is mapping within the city because there's a lot

11 of that going on and also a lot of that going on in the

12 community, and then really doing on line permitting.

13 Q    So fast forward a couple months after that, or just

14 before -- while you were involved in that project.  How did

15 you -- when were you first contacted by the City of Detroit to

16 come in as Chief Information Officer?

17 A    In -- in January.

18 Q    Did you jump at that opportunity?

19 A    No.  I said no twice.

20 Q    So how did you end up here?  What happened?

21 A    Well, if you've ever met Mayor Duggan, he's quite the

22 little force of nature.  And he wouldn't take no for an

23 answer.  So we got on the phone and talked for a really long

24 time and he asked me what I loved about Louisville and what I

25 did in Louisville and why I -- I wouldn't come to the City of

1  Detroit.

2       And at one point he asked me -- well, he said, I've never

3  been to Louisville.  What restaurant would you recommend?  I

4  told him my favorite restaurant, and he said can you hold on

5  for a minute?  I'm so sorry to put you on hold and he came

6  back on the line and said, I have a dinner reservation there

7  Friday night at 7:00.  I hope you won't make me eat alone.

8  Q    So -- so you made him drive all the way from Detroit to

9  Louisville to meet with you.

10 A    I did.

11 Q    And what happened at that meeting?

12 A    So one of the things that I -- when I was part of the

13 Detroit tech team that came in, I was so impressed by

14 everybody's commitment to the city and to turning it around

15 and to --

16 Q    I'm going to interrupt you.  When you say everybody.

17 A    Oh, so the people that we met with during the -- the

18 trip.

19 Q    Okay.  And so that was really impressive.  The civic tech

20 community here is very impressive.  And so we -- my partner

21 and I sat with Mayor Duggan and talked to him about what are

22 you going to do about blight?  What do you -- what is your

23 expectation?  What kind of role do you expect technology to

24 play in that?

25       He talked about his experience of technology and

1  technology improvements at the Detroit Medical Center.  And

2  basically, you know, said my expectation is that all the

3  technology will work and it will enable our people to do their

4  jobs.

5  Q    It sounds like you were interviewing him and not him

6  interviewing you, is that fair?

7  A    It was a nice position to -- to be in because I had no

8  expectation of -- of coming to Detroit.

9  Q    So what convinced you finally to come?

10 A    He did.

11 Q    Okay.  And you -- you took the position I think you said

12 in February of 2014 as Chief Information Officer for the City

13 of Detroit?

14 A    I did.

15 Q    And what department do you oversee?

16 A    I oversee the information technology services department,

17 commonly referred to because we have to have acronyms, ITS.

18 Q    And what does ITS do exactly?

19 A    ITS supports all of the -- the technology for all of the

20 departments that report to Mayor Duggan.

21 Q    And what are your job responsibilities as the CIO of the

22 City of Detroit?

23 A    Really to -- to look at the technology, to understand

24 what our shortcomings are, to put together the budget, and to

25 oversee all the IT that's in the city except for police and

1 | that report to the emergency manager.

2 | Q    What are the steps you needed to take, or are taking to

3 | get the IT system to work in the city?

4 | A    Well, the biggest one is I use it.  So --

5 | Q    What is that?

6 | A    I use the actual systems that we're trying to use.

7 | Q    Okay.

8 | A    So I have a lot of personal experience of trying to

9 | actually use the system, so emails that don't get delivered,

10 | different systems that are -- we don't have standard versions

11 | of -- of Office or Word, so we can't open documents.  I can't

12 | connect to my network drive to save things on the network

13 | where we want everybody to save them because then they're

14 | backed up.

15 | So there's the personal thing.  There is the meeting with

16 | department heads to see how -- what their experience of ITS

17 | and the services that we deliver are and how it is either

18 | helping or hindering what they are trying to in their

19 | departments.

20 | I also met with every single -- individually with every

21 | single employee who worked for ITS to learn about what they're

22 | trying to do and the impediments that they -- they have in

23 | there.  I've also looked through the plan of adjustment and

24 | met with Conway, MacKenzie and looked at how they put the

25 | projects together and looked at just historical information

1   like where -- who are the vendors that we spend money with,

2   what are the contracts that the city holds.

3   Q    And did you study each of the departments that were

4   underneath ITS?

5   A    I'm -- I'm -- I have looked at them, or talked with their

6   department heads.

7   Q    Have you engaged any outside services to help you?

8   A    I have.

9   Q    And who is that?

10  A    Plante Moran.

11  Q    Were they there when you took the job, or did you -- did

12  they start after you took the job?

13  A    They were there at the city when I started.  They were

14  working with the tax assessor the -- the tax department and

15  the city assessor.  And they had done some work also in

16  finance.

17  Q    What is Plante Moran doing for you in the ITS department?

18  A    Plante Moran is really looking at three verticals for me.

19  Q    What do you mean by verticals?

20  A    Okay.

21  Q    Okay.

22  A    So three areas, three buckets.

23  Q    Okay.

24  A    So the first area is basically our IT infrastructure.

25  And they are doing some things that we don't have the ability

1  to do.  They're doing say network penetration, network speed

2  testing, very technical tests of the network because there is

3  an issue with the network.

4       They're also looking at a general area of governance, how

5  we do business.  One of the areas that came up as a real issue

6  when I was meeting with all my employees, is we do not do a

7  good job with change in release management.

8       So we'll make changes.  We won't talk to one another and

9  so we'll cause system issues.  There is that ITIL, the

10  information technology infrastructure library actually gives

11  you a standard process by which to do change and release

12  management.  So they're helping put that place.

13       We also need a governance structure.  So we have clearly

14  a lot of projects in the plan of adjustment.  And the

15  governance committee will be made up of John Hill, the CFO,

16  myself, and other members of the Mayor's executive cabinet.

17       And they're really going to be the group that looks at

18  what projects go when and the priority of them.  Because you

19  can't do all of them at one time.  And so we were going to

20  prioritize them.

21       And then the third area --

22  Q    Uh-huh.

23  A    That they're going to look at is really -- are the ITS

24  employees and their skills.

25  Q    Have they entered -- have they issued a report to you at

1 | this point?

2 | A    They have not.

3 | Q    Let's talk about John Hill for a second.  Do you interact

4 | with John Hill at all?

5 | A    I do.  John Hill and I are -- he -- he likes to use the

6 | -- the term joined at the hip.  But we spend a -- an awful lot

7 | of time together because we're so dependent on one another

8 | with the especially the new financial management and HRS, the

9 | human resources system that we're going to put in which is one

10 | of the first big projects that we're doing.  So we -- we work

11 | together.  I'm in his office an awful lot.

12 | Q    Have you looked at the city's business processes and how

13 | they're affected by IT?

14 | A    I have.  I have -- so when you're trying to understand

15 | what's going on you go and talk to the people who actually do

16 | the work.  And you say why are you doing it the way you're

17 | doing it.

18 |     An so you -- you look at the underlying business process.

19 | And the thing that John Hill and I are -- and a lot of us are

20 | very committed to, is that there's a lot of broken processes.

21 | And so putting in a new IT system doesn't -- if you don't

22 | change the underlying function process it doesn't make

23 | anything better.

24 |     I think Bill Gates gave the quote, "if you automate a bad

25 | process, you're just doing the wrong thing faster".  We don't

1  want to do that.  We want to change the underlying business

2  process to be the most efficient that we can.

3      And this isn't a one shot deal.  I mean if you look at

4  continuous process improvement and the things that are brought

5  up there it's that life cycle of -- of as they say, the Kizan

6  which is the tip -- was what you do when you look at something

7  continually.

8      You take something, you make it better and then you --

9  you look at it to see if it is better.  If you can make it

10  better again, you make it better again.  So it becomes this

11  iterative cycle where you're trying to get it to be the best

12  most efficient process you can be.

13  Q    Have you looked at what other cities are doing in

14  building their IT systems?

15  A    I have.

16  Q    How have you done that?

17  A    So there are not unlike any profession, associations.  So

18  there's a large city CIO group that meets.  There are several

19  conferences.  The center for digital government which is under

20  the banner of Erepublic has a lot of meeting that where we all

21  meet and talk.

22      There's a group called the Metropolitan Information

23  Exchange where we CIO -- large jurisdiction CIO's communicate

24  with one another.

25  Q    Can you briefly describe the cost analysis you've done as

1 part of your role as CIO of the City of Detroit, please?

2 A    Sure.  So probably my first week on the job, I sat down

3 with my team and Conway, MacKenzie to go through the projects

4 that were in the plan of adjustment -- the ITS plan of

5 adjustment.

6     I looked at the -- the numbers, I looked at how they

7 tried to -- how they arrived at the numbers that they got.  So

8 I looked at past vendor invoices.  I've looked at different

9 proposals from -- from vendors.  Because you can go out and

10 get a rough order of magnitude for proposals.

11          MR. HERTZBERG:  Your Honor, at this point I'd move

12 to qualify Beth Niblock as an expert in municipal information

13 technology systems.

14          MR. HACKNEY:  No objection.

15          MR. FIELDS:  No objection.

16          MR. HERTZBERG:  Thank you.

17          THE COURT:  All right.  You may proceed, sir.

18          MR. HERTZBERG:  Your Honor, at this point I'm going

19 to start to get into the opinions and that will be as we build

20 to the end of her testimony.  It could be a good break point.

21 If not, if you want me to move forward to 12:00, that's fine

22 too.  Whatever you -- you wish.

23          THE COURT:  Let's go ahead.

24          MR. HERTZBERG:  Okay.

25 Q    Is one of your opinions that the city information

1  technology is deficient?

2  A    Pardon me?

3  Q    Is one of your opinions that th city's information

4  technology is deficient?

5  A    Yes.  I thought you said sufficient and --

6  Q    No, deficient.

7  A    I almost fell out of the chair.

8  Q    Oh, I'll pronounce my words better for you.

9  A    Sure.

10  Q    Deficient.

11  A    Yes, it is deficient.

12  Q    As a result of your assessment and valuations that we've

13  talked about previously, did you form an opinion about the

14  state of the city's IT systems and infrastructure?

15  A    I did.  It is -- it is --

16  Q    What is your opinion?

17  A    It is fundamentally broken, or beyond fundamentally

18  broken.  In some cases fundamentally broken would be good.

19  Q    Is it an old antiquated system at all?

20  A    It is.  There are pockets of it say the -- the thing that

21  is -- gives me well, a lot gives me sleepless nights, but one

22  of the things that gives me sleepless nights is the PERIL

23  system which is referred to because we need acronyms.

24      PPS which is the payroll -- I don't even know what it

25  stands for.  Just know it by the PPS.  It's basically the

1  payroll system and it's running on a Unisys mainframe that is

2  at past end of life.  Unisys really won't support it anymore.

3      We've had to go out to a third party to get help with

4  that.  It is the -- it is -- that is the system that pays 90%

5  of the City of Detroit employees.

6  Q    How are the desktop systems at the city?

7  A    They're -- they're atrocious.  You know, depending on

8  what luck of the draw you have, your desktop can take almost

9  ten minutes to boot up.

10 Q    What would be a normal time?

11 A    Well, if you have solid state drives it could be nearly

12 instantaneous.  If you had just regular hard drives it would

13 take, you know, a minute or -- minute, minute 15.

14 Q    How is the email system at the city?

15 A    Atrocious.  It was -- so when I met with Mayor Duggan he

16 handed me his phone and said can you just make -- make it so

17 that I can open an attachment on here.

18      It is very unreliable.  It was very unreliable.  We just

19 operated it to -- we were two or three version.  We were in

20 group wise eight and we just upgraded to group wise 2014.

21 So --

22 Q    What are you talking about when you --

23 A    Well, I'm sorry, it's the -- I'm sorry.  I'm in such

24 heaven.  It's the -- it is the email system that we use.  It's

25 called revised.  Some people use Microsoft Exchange or

1  Outlook, so --

2  Q    What the software like in the city?

3  A    A lot of it is we are generations or revisions of

4  versions of software behind.  So we are at the point -- so let

5  me -- let me specifically speak to those lovely desktops.

6       We are -- majority of our PC's are on Windows XP or older

7  which I'm actually old enough to remember Windows 2000.  But

8  they're old.  And Microsoft de-supported them.  They came to

9  the end of life, so they're not actually issuing security

10  updates to any of that.

11  Q    So I assume you have some security breaches?

12  A    Yeah.  That was a joyous fourth day of my job.  I walked

13  in and told the Mayor that we had had a security breach that

14  involved current and former fire and EMS employees and highly

15  personal information.

16       So they had access to their name, and Social Security

17  numbers, and birth dates which is about the worst combination

18  that you could have.  And then --

19  Q    Have you had another security breach?

20  A    Yeah, actually we had an issue this week.  Oh, last week,

21  sorry.  And we had an issue where there was an attack on our

22  web site and they were able to exploit a vulnerability and

23  pull information back for a small number of people who had

24  registered for a pre-sale inspections with our building safety

25  engineering and environmental division known as BSEED.

1  Q    Do you have any ability to save documents on the network

2  drive?

3  A    Sporadically, not -- not -- not --

4  Q    Is that a problem for the city?

5  A    Yeah, it's a real problem because you -- you really don't

6  want people to save information to their local PC, they're

7  what we would call their C drive.  You really want it out on

8  the network so then the network is backed up.  And so if there

9  is an issue you can pull back the -- the document or whatever

10  it is they're working on.

11  Q    The city is on -- its payroll system sits on a mainframe?

12  A    It does.

13  Q    Is that normal nowadays?

14  A    Most people are not on a mainframe.  I mean if you're a

15  huge corporation you might be running on a mainframe, but most

16  people, no.

17  Q    How does the payroll system work in the City of Detroit?

18  Is it functioning adequately?

19  A    It's very difficult.  The -- it is coded in a language

20  that we are so far behind in that it is very difficult outside

21  of the two people on my staff to actually update the code.

22       And the code base has been -- excuse me, in place for 20,

23  25 years.  And so it's -- it's very difficult to -- to work

24  through.

25  Q    Are there any deficiencies in the network to cause it to

1  go down or any of those problems?

2  A    Yes.  And this -- this weekend was a nightmare.  We --

3  because of the power situation, we lost our data center

4  temporarily which took most of our major systems off line.  So

5  the network is not reliable on its own.  And then couple that

6  with the power it was -- it was a long weekend.

7  Q    Approximately how many times a week does the network go

8  down?

9  A    So when I first came to try to understand because the --

10  the -- the behavior of the network was very odd when I was

11  trying to save documents back and forth.  And so I said, how

12  do we know what the network is doing and we really didn't have

13  a way to monitor that.

14      So we'd put a particular tool, we happen to use this one

15  there's several on the market.  It's called Solar Winds.  And

16  it allows you say set up critical alerting so that when

17  certain systems or certain locations has an issue it emails

18  you or in some cases if your email server happens to be

19  getting knocked out, we have an external feed to be able to

20  text us to tell us that -- that there is an issue.  And I

21  probably, not last week, but I -- I typically get between 60

22  and 80 a week.  Last week was way way more.

23  Q    How often would you get them when you were the CIO of

24  Louisville?

25  A    Well, after we did the upgrades in the network it -- it

1  was fairly rare.  I did get a set when we had an underground

2  sub station explode and that set off a few alarms.

3  Q    But besides that did you -- were you getting 80 of them a

4  week?

5  A    Oh, no, no.  It was very rare.

6  Q    Are there any particular departments that you've seen

7  that are suffering failures?

8  A    Yes.  The Detroit Fire Department has -- we get a lot of

9  Solar Winds alerts about the Detroit Fire Department.  And

10  them -- what we -- flapping up and down.

11       So especially if it rains, rain not good because they've

12  got a lot of copper into the fire stations and it really

13  affects their stability.  And there's also a lot of power

14  issues as well.  So that's kind of the worst possible words --

15  world when you have power flicking on and off.

16       On Friday, the Coleman A. Young municipal center had a

17  brown out.  So everything did a hard shot and we're all trying

18  to -- I mean the lights, everything went out.  So it's really

19  hard on equipment when that happens.

20  Q    You said that the desktop systems that the employees use

21  are antiquated?

22  A    Yes.

23  Q    What is the normal life span that you would expect out of

24  a desktop system used by an employee?

25  A    So typically it's -- it's typically four -- four to five

1  years.  Laptops are a little shorter than that just because

2  typically they're mobile and people aren't careful.

3  Q    When you were the CIO of Louisville, did you have a

4  standard replacement cycle for computers?

5  A    We did.  We had a depreciation fund based on four year

6  replacement.

7  Q    And what is the average age of the desktops in the City

8  of Detroit approximately?

9  A    It's -- it's hard to tell, but the best that I can piece

10  together looking at invoices, it would -- a majority of it

11  would be five plus years.

12  Q    How does this deficient desktop technology and the other

13  technology affect city employees and their ability to do their

14  jobs?

15  A    It -- it impedes them greatly.  So one, you know, they

16  think they've done work and they've saved it out to the

17  network and then it hasn't really been saved to the network

18  and sometimes you can pull it back, sometimes you can't.

19       We're on multiple versions of our Office product suite.

20  And so I can be in the same department, I can be sitting next

21  to you and I could email you a spreadsheet or a Word document

22  and you can't open it because I have a newer version of the

23  product than you have.

24  Q    Can you sync calendars?

25  A    Calendars, so that was a function of Group Wise the whole

1   -- it does calendar and mail as well.  And it -- we had all

2   kinds of problems with Group Wise 8 because it was such an old

3   version of it that especially accessing it mobily was very

4   difficult.

5       And it was very hard for me to sit in meetings because

6   people would say, well, did you get that email?  Well, I sent

7   you that email.  Did you get that calendaring thing and nobody

8   was quite -- had confidence in that the information was going

9   to be there.

10  Q    In your opinion can the city adequately function with the

11  current state of its IT?

12  A    No, it cannot.

13          MR. HERTZBERG:  Your Honor, before I move on to

14  another opinion, we're about seven minutes to, it might be a

15  good break point.

16          THE COURT:  Sure.  We'll take a break now and we're

17  going to take a little longer lunch because of my meeting, so

18  we'll reconvene please at 1:45.

19          MR. HERTZBERG:  Thank you, Your Honor.

20      (WITNESS BETH NIBLOCK WAS TEMPORARILY EXCUSED AT 11:52

21  A.M.)

22          THE CLERK:  All rise.  Court is in recess.

23      (Court in Recess at 11:52 a.m.; Resume at 1:45 p.m.)

24          THE CLERK:  All rise.  Court is in session.  You may

25  be seated.

1        MR. HERTZBERG:  May I proceed, Your Honor?

2        THE COURT:  Yes.

3        (WITNESS BETH NIBLOCK RESUMED THE STAND AT 1:45 P.M.)

4   BY MR. HERTZBERG:

5   Q    Good afternoon.

6   A    Hi.

7   Q    Is it your opinion that the IT reinvestment initiatives

8   are reasonable and when implemented will address the city's

9   deficiencies in the IT area?

10  A    It is.

11  Q    Are you familiar with the IT reinvestment initiatives in

12  the city's plan of adjustment?

13  A    I am.

14       MR. HERTZBERG:  Steve, could you pull up Exhibit

15  552, Page 2?

16  Q    You can look at that or I've put a hard copy in front of

17  you.  If you'd turn to Page 2 of that it might be easier if

18  it's blown up.  And could you blow that up?  Thank you.

19       Are you familiar with this document?

20  A    I am.

21  Q    What is it?

22  A    It is the plan of adjustment for the IT projects,

23  summarized by departments.

24  Q    Are any of the initiatives that are listed there taking

25  place in other departments other than the ITS department?

1  A    Yes.  Two of them are.  The ERP system and the -- I'm

2  sorry, the security access.

3  Q    What is the ERP system?

4  A    That's the financial management human resources

5  information system.  It is really coming out of the office of

6  the CFO.

7  Q    Are you overseeing the implementation of that?

8  A    I am working with John Hill to do that, yes.

9  Q    Are there other initiatives that are taking place outside

10 of ITS?

11 A    There are.  There are about 75 other IT initiatives that

12 are taking place.  The bulk of them being within the police

13 department, the fire department, and human resources.

14 Q    Will you be assisting in those areas as they build up

15 their IT?

16 A    I will be.

17 Q    But are you only offering an opinion today in regard to

18 the ITS department?

19 A    I am.

20 Q    How was it determined what initiatives will be part of

21 the plan of -- of adjustment?

22 A    So Conway, MacKenzie and the ITS staff sat down and

23 drafted the plan.

24 Q    Were you employed by the City of Detroit at the time that

25 Conway, MacKenzie put together the plan?

1  A     I was not.

2  Q     So the list was already developed by the time you started

3  employment with the city, correct?

4  A     That is correct.

5  Q     Did you have an opportunity to review the plan and

6  discuss it with anyone from Conway, MacKenzie?

7  A     I did.  I sat down with the team from Conway, MacKenzie

8  as well as the ITS staff who worked with Conway to put the

9  plan together.

10 Q     Do you feel you had adequate time to review it with them?

11 A     I do.

12 Q     Is it your opinion that the initiatives on this list are

13 necessary for the city?

14 A     It is.

15 Q     Is it your opinion that implementing each of the

16 initiatives will help remedy the city's IT deficiencies?

17 A     Yes.

18 Q     What I'd like to do now is walk through each of the ITS

19 departments' reinvestment initiatives and have you explain

20 them.  The first one is the Microsoft application update.

21 What will this -- what is it and what will this accomplish?

22 A     So earlier when we talked about how the desktops were

23 incompatible.  There -- there are several things that this

24 will address.

25        This will address the incompatibility of us having

1  different versions of Microsoft Office on the computer.  So

2  this will get us on to a standard version of -- of Office

3  product.

4  Q    The next one is data center backup.  What is it and what

5  will that address?

6  A    So right now we really only have one primary data center

7  which is a single source of failure.  We need to have a -- a

8  supplemental backup center so that we can put servers and

9  equipment to have redundancy and resiliency in the network.

10 Q    The next one is the city hardware upgrade.  What will

11 that initiative accomplish?

12 A    So that hardware upgrade will accomplish several things.

13 One, it will bring us up to either modern desktops or laptops.

14 It will also address the network hardware.  So we have old

15 routers and switches on the network that need to be upgraded.

16 It will also address some server upgrades and it will address

17 some storage upgrades.

18 Q    Okay.  Next city wide imaging and document management.

19 What will that initiative address?

20 A    That initiative is a electronic document management

21 system.  Right now everything that we do is stored on paper

22 and it goes off site to our either iron mountain, or a

23 facility called Grandy which I'm not --

24 Q    Is that -- is that paper storage?

25 A    Paper storage.  And this will be -- allow us to store

1  things electronically and to be able to recall them.

2  Q    Work Brain upgrade.  First tell me what Work Brain is.

3  A    It's a particular piece of software and what it does is

4  it does time and attendance and it also does some rule

5  calculations based on collective bargaining unit agreement

6  calculations.

7  Q    And what will this initiative accomplish?

8  A    Right now we're either two or three versions behind.  And

9  part of what happens is when you get so far behind the

10  software manufacturers at some point stop supporting that

11  version of the software.

12      So we're not technically at end of life with this, but we

13  will be soon.  So we need to fix it because that's how we keep

14  time and attendance.

15  Q    Okay.  City wide network infrastructure.  What is that

16  and what will that initiative accomplish?

17  A    So we had spoken earlier about the lack of resilience and

18  lack of redundancy.  There is not business -- what we call

19  business continuity and disaster recovery within the network.

20  And so this will allow us to upgrade switches and build in

21  that kind of redundancy that we need because of the services

22  we deliver.

23  Q    Next is active directory service migration.  What is that

24  and what will that initiative accomplish?

25  A    So active directory is a way that you actually organize

1  people accounts.  It gives -- you can assign rights to those

2  accounts.  You can also group accounts by departments or by

3  function so if you have a team that's working on a particular

4  function, you can actually grant permissions to the things

5  they need to get to through active directory.

6  Q    And the ERP system we already discussed, correct?

7  A    Correct.

8  Q    Okay.  Next up is help -- help desk software.  What is it

9  and what will that initiative accomplish?

10 A    So right now we have a -- a help desk that people can

11 call to get help on their computer.  But we're really using a

12 freeware/shareware product to help us catalog the calls.

13      One of the reasons you really want to do that is if you

14 start -- you -- you should be able to pull metrics off of your

15 help desk software so you can see one, whether the -- whether

16 the -- we have an issue.

17      So if you start seeing for example in my last

18 jurisdiction, we were able to see that we had a particular

19 hard drive in the new -- in new computers that we had rolled

20 out and we were having an issue with it so we were able to

21 contact the manufacturer and say hey, we see that we're having

22 a particularly high failure rate and we were able to do that

23 because we had put it in our help desk software.

24 Q    Is that critical to the city?

25 A    It -- it -- we need to be able to do that and we need to

1  be able to see how we're performing as far as resolving issues

2  and figuring out where we need to do training on new products.

3  So if you get a lot of calls about a particular thing, it's

4  like well people aren't understanding how to use it.  We need

5  to get some training out there to help people use it better.

6  Q    Okay.  Next is operating system upgrade.  What is that

7  and what will that initiative accomplish?

8  A    So the operating system is actually the thing that makes

9  your computer operate.  And when we had spoken about --

10  earlier about the fact that we are -- a majority of our

11  systems are on Windows XP or older, that's the operating

12  system.

13       We need to get off of that because it's de-supported by

14  Microsoft and we can't secure it anymore.  So part of what

15  we're doing is upgrading the operating system to a current

16  supported version.

17  Q    Next is SQL server support.  What is that and what will

18  that accomplish?

19  A    SQL is structured queried language.  It is a data base

20  language that we happen to use.  We use Microsoft sequel

21  server.  We are not -- we are behind several versions and we

22  are not in compliance with what we should be legally licensed

23  for.

24  Q    And this will bring you into compliance?

25  A    It will.

1  Q    Next is group wise savings.  What does this refer to?

2  A    So that is our current email system.  Part of what we

3  want to do is put more and more things into the cloud.  We

4  expect our mail system to go into the cloud which would be

5  part of that Microsoft application update.

6       And so once we do that and we have paid off -- we -- we

7  should see savings from not paying maintenance to Group Wise

8  although there will be other costs associated with moving to

9  the cloud.

10 Q    Is it your opinion that these IT investment --

11 reinvestments initiatives will really address the issues with

12 the city's infrastructure?

13 A    Yes.

14 Q    Is it your opinion that the dollar amount and the time

15 frames contemplated for the IT reinvestment initiatives are

16 reasonable?

17 A    Yes.

18 Q    Let's look at that now.

19 A    Okay.

20       MR. HERTZBERG:  Could you Steve, spread it out, the

21 dollar amount?  If you take the whole frame in.  Yeah.  All

22 set?  Okay.

23 Q    The spreadsheet you have in front of you that you're

24 looking at on the monitor also?

25 A    Uh-huh.

1  Q    Has dollar amounts that the city plans to allocate to

2  each initiative.  Do you see that?

3  A    I do.

4  Q    Did you review these amounts?

5  A    I did.

6  Q    Did you review them with anyone else?

7  A    I reviewed them with Conway, MacKenzie and I also

8  reviewed it with my ITS team as well -- as well.

9  Q    Did you have the opportunity to ask questions of Conway,

10 MacKenzie in regard to these?

11 A    Yes, I did.  I asked a lot of questions about the -- the

12 time lines, the assumptions, how, you know, looking at other

13 system implementations knowing what we did in the City of

14 Louisville and looked at that and we had a conversation and

15 discussions about the amounts and time frame in there.

16 Q    When you look at the amounts, do you think that it's

17 adequate to do the reinvestment initiatives that we just

18 addressed?

19 A    I do.

20 Q    What is your opinion as to the time frame that's set

21 forth in there to do the initiatives, the ten years?

22 A    I think the time frame is one of my concerns.  It is -- I

23 think there are a lot of projects that are particularly front

24 loaded and I think we need to stage them and manage them very

25 tightly because while we need to do all of those things, we've

1  -- we've got to do one first and the second one second, and --

2  and do that in a very methodical way.

3  Q    We talked about and you testified previously that you had

4  experience in estimating costs and budgeting for IT projects,

5  is that correct?

6  A    That is correct.

7  Q    And based upon that experience, is it your opinion that

8  the amounts provided are reasonable for the city in trying to

9  do what you want to accomplish?

10 A    Yes.

11 Q    You started to talk about and I want to spend a minute at

12 least addressing the risk because there's got to be some risk

13 in the implementation, isn't there?

14 A    There is.

15 Q    Can you tell me what major -- give me the three major

16 risks you think are out there in the implementation and

17 explain each of them for me.

18 A    Okay.  I really think there are three -- three big risks.

19 I think the first one is what we call interfaces.  Is that's

20 when you have a system and it needs to talk to another system.

21      So how those systems connect and exchange information can

22 be very difficult and can be very complex.  One of the things

23 that makes it complex is that right now we don't know for

24 example with the financial management system we haven't picked

25 what that system is.

1    So understanding how it might need to talk to the tax

2    system, how it might talk to Work Brain because you'd be

3    getting time and attendance that has to then be accounted for

4    in the ledger.  That can become very complicated.  And there

5    is risk with that and as IT people because right now it's

6    unknown.  It's -- it's one of the things that we -- we

7    consider to be a risk.

8         The second thing --

9         THE COURT:  Well, but pause there.  You don't have

10   to reinvent wheels, right?  Lots of cities have -- have

11   investigated and experienced these issues.

12   A    You're -- yes, Your Honor.  But I think the -- the

13   specific combination since I don't know what financial

14   management system we're working with but we know that we have

15   Work Brain, whenever we pick that financial management system,

16   then it would be the time for me to reach out to my colleagues

17   and say, hey, is anybody working on this combination of

18   products.

19        Tell me how it was to make them talk.  How did the

20   interfaces go.  It's just something that we consider to be a

21   risk.

22        THE COURT:  Well, but wouldn't you choose systems

23   that are more compatible and take that into account?

24   A    Yes.

25   Q    You were going -- you were going to start the second risk

1 | factor.

2 | A    So –– so the second risk factor is people.  So being able

3 | to secure the appropriate resources to –– to do these

4 | implementations and then being able to really backfill when

5 | you take the subject matter experts who are the people who are

6 | doing a lot of the work in the departments out to do the

7 | implementation.  But somebody has to keep doing that work.  So

8 | that's a resource constrain that we have to really be careful

9 | of.

10 |     And then really the third risk that I mentioned already

11 | is the –– the stacking and the front loading of the projects.

12 | Q    How many people are you looking to hire in the ITS

13 | department?

14 | A    So in the plan of adjustment we have 14 new hires.

15 | Q    Do you –– do you think that will be adequate to carry out

16 | the reinvestment initiative?

17 | A    Well, one of the assumptions that we're making is that as

18 | we put the systems out for bid and we implement them, that we

19 | will get professional services.  I think we had talked about

20 | that earlier in with that.  And that –– that –– because that

21 | combination will allow us to move forward.

22 | Q    Okay.  And you have now walked me through or the Court

23 | through three risk factors.

24 | A    Uh-huh.

25 | Q    How are you going to manage or overcome those risks if

1  they come up?  Walk me through that process.

2  A    Sure.  So what we really need to do is do very strong

3  project management.  The project management institute has a

4  way of managing projects.

5      And one of the factors that you really look at is risk

6  and risk mitigation.  So understanding from the outset what --

7  what the risks are, managing against those risks and

8  minimizing those risks are very important.

9      The -- the second thing really is having a very strong

10 governing body.  IT projects can be somewhat -- what's the

11 word I'm looking for?  Not -- they can sometimes go out of

12 scope and get bigger than you really like oh, wow, we're doing

13 this, let's do that.

14     You really have to have that strong project management.

15 You've got to really have that strong governance committee

16 that's going to say no, we're not going to customize this.

17 No, we're going to hold the line at that.

18     And so having strong governance committee that will keep

19 that in check and on track and has the power to make decisions

20 of no, we're going to go or no, we're not going to go is very

21 important.

22     And then really the third thing which seems pretty

23 obvious, but is very important as we do these projects, is our

24 communication and our communication plan.  So not only

25 communicating with the members of the team and the departments

1 that we're working with about what the roles and

2 responsibilities and expectations are, the time lines, the

3 deadlines, the due dates, and roles and responsibility and

4 keeping folks accountable for that.

5     So the whole accountability of that.  And then the

6 communication to the end users who -- who will be using these

7 new systems as we bring them up.

8 Q    You talk about the importance of a governance committee.

9 A    Yes.

10 Q    Are you going to form one as part of your

11 responsibilities to oversee these?

12 A    There is an IT governance committee in place, but we are

13 going to change the members of it.

14 Q    Once the IT reinvestment initiatives are implemented,

15 will the city have a world class A+ information technology

16 system?

17 A    No.

18 Q    How would you describe the system that will be in place?

19 A    Depending on the grading scale it would be a B or a B-.

20 Q    And you feel that that will be adequate?

21 A    It will be huge.  It will be hugely better than where we

22 are now.

23         MR. HERTZBERG:  I have no further questions, Your

24 Honor.

25         THE COURT:  Any questions for the witness?

1          MR. HACKNEY:  Yes, Your Honor.  Your Honor, I have

2    some witness binders I was hoping to hand around.  I think you

3    all have -- may I approach?

4          THE COURT:  Yes.

5          MR. HACKNEY:  And I'm going to approach the witness

6    if that's okay.

7          THE COURT:  Yes, yes.

8          THE WITNESS:  Okay.  Thank you.

9                    CROSS EXAMINATION

10   BY MR. HACKNEY:

11   Q    Good afternoon, Ma'am.

12   A    Hi.

13   Q    My name is Steve Hackney, I'm one of the attorneys for

14   Syncora in these -- in these cases.  And I just want to say at

15   the start I think it's great that you accepted Mayor Duggan's

16   challenge and -- and came up here.  I'm sure that the

17   Louisville environment was perhaps a little more stable than

18   what you're doing here, but it seems like you can do a lot of

19   good here.

20       I wanted to ask you some questions about your report if I

21   could.

22   A    Certainly.

23   Q    I do want to clarify what you are and what you are not

24   opining about.  And we got some of that in your direct, but

25   you understand that the IT reinvestment initiatives as a whole

 1 | for the city across the city departments, they tally about

 2 | 151.7 million dollars, is that correct?

 3 | A    That's correct.

 4 | Q    But your opinions as to the reasonableness of the IT

 5 | initiatives are limited to the IT initiatives that are the

 6 | responsibility of your group which is ITS, correct?  The

 7 | amount of those IT initiatives comes to approximately 84.8

 8 | million dollars, is that right?

 9 | A    About, yes.

10 | Q    That was if we had tallied up those -- those ones that

11 | you identified that were on Exhibit 252, is that right?

12 | A    Yes.

13 | Q    Is that correct, Ma'am?

14 | A    It's correct.

15 | Q    Okay.  So you're not offering an opinion about the other

16 | 65 odd million dollars in IT reinitiatives, isn't that

17 | correct?

18 | A    That is correct.

19 | Q    And those include investments in the police department

20 | and the fire department, and -- and the other departments that

21 | are outside ITS, is that correct?

22 | A    That is correct.

23 | Q    I want to go back briefly Ma'am, to the concept of

24 | interfacing that you were talking about earlier with the

25 | Court.  An interface is something that allows two IT systems

1  to talk to one another, is that correct?

2  A    Correct.

3  Q    And a more precise way to say it is it's a shared

4  boundary across which two separate components of a computer

5  system exchange information, correct?

6  A    Correct.

7  Q    And I wanted you to know that I got that from Wikipedia,

8  lest you think that I actually know anything which I don't.

9  But to -- to put it in more colloquial terms for example, you

10 want to have -- to have an effective IT system you want your

11 payroll system to be able to talk with your financial

12 reporting system, correct?

13 A    Correct.

14 Q    And the way they talk to each other is the interface as

15 the name would suggest, right?

16 A    Correct.

17 Q    And you acknowledge that the full extent of the need for

18 interfaces even including which systems will require them, is

19 unknown at this time, is that correct?

20 A    Correct.

21 Q    And you agree that if any required interfaces are not

22 addressed and adequately funded, that this will affect the

23 city's ability to implement the IT reinvestment initiatives,

24 isn't that correct?

25 A    Can you say that again?

1  Q    Yeah, sure.  If any required interfaces are not addressed

2  and adequately funded, that this will affect the city's

3  ability to implement the IT reinvestment initiatives?

4  A    It will impact it, yes.

5  Q    And that would in turn impact your opinion that the

6  dollar amounts and the time frames are -- that are

7  contemplated are reasonable, correct?

8  A    It could, yes.

9  Q    Now interfaces can take a wide variety of formats, isn't

10 that right?

11 A    Yes, they can.

12 Q    They can sometimes require the IT owner to write

13 customized software that allows its systems to talk to one

14 another, correct?

15 A    Correct.

16 Q    Other times you can buy it off -- buy the interface off

17 the shelf, is that right?

18 A    You can.

19 Q    And then is it more common that it's some of both which

20 is that you acquire something off the shelf but then there is

21 required customization that the city imposes on the -- on the

22 product?

23 A    Yes.

24 Q    And as things stand today though, can you -- can you tell

25 the Court how many interfaces are we talking about here?  Even

1  if it's not, you know, 52, but can you give us an order of

2  magnitude about how many interfaces?

3  A    I'd hate to just guess.  I -- I didn't -- I have a count,

4  but I don't know it right off the top of my head.

5  Q    Because I -- the reason I ask is because I -- I think of

6  some of these different systems as being kind of like nodes

7  that you can put on a map and I think sometimes perhaps one

8  system may talk to more than just one other system, is that a

9  correct assumption on my part?

10  A    It can, yes.

11  Q    Okay.  So you kind of have to have all the nodes known

12  and then a more precise sense of how many multiple connections

13  there will be between each node, is that correct?

14  A    Yes.

15  Q    And is it -- let me make sure I'm not misunderstanding

16  you.  Is it fair to say that at this point in time you just

17  don't know what the total number of interfaces will be?

18  A    For the systems that we outlined here, yes.

19  Q    Okay.  And can you give us a sense of the anticipated

20  cost of -- just take a garden variety interface.  About how

21  much does it cost to purchase and customize, or draft from

22  scratch, or you know, impose your own parameter on it, but

23  give the Court a sense of what we're talking about.

24  A    Well, I can -- I can tell you from some experience in my

25  last jurisdiction.  There can be interfaces that can be

1   depending on what they are, can be as low as $2,000.  Then

2   they can be as much as, especially in the public protection

3   realm which I am not testifying to, but my interface question,

4   can be in the 25,000, 30,000, $50,000 range.

5   Q    Okay.  So we have to have some sense of the cost and some

6   sense of the total number in order to gauge the total impact

7   that this will have on the city's budget, is that a fair

8   statement?

9   A    I think it is an unknown, yes.

10  Q    And when will it -- when will it be far less of an

11  unknown than it is today?  I know that it's never fully known

12  because your IT environment continues to evolve, but when

13  could you tell the Court we'll really have a better grasp of

14  this issue by time X?

15  A    So on the -- on the projects, I mean if you look at the

16  projects that I'm talking about, those -- there are not a lot

17  of interfaces requirement.  The interfaces that are required

18  really are when it comes to the enterprise resource planning

19  system, the financial management, and HRS, and the Work Brain

20  are the two big ones.

21       So I think once we pick the financial management system,

22  that will make it very clear and to the Judge's point,

23  obviously minimizing the interfaces is something that's in our

24  best interest.

25  Q    That will inform your decision with respect to what you

1  select, is that what you're saying?

2  A    Certainly.

3  Q    As we stand here today though, there are no dollars

4  allocated in the budget to the cost of buying or developing

5  interfaces for the city's IT, is that correct?

6  A    There is some allotment within the budget that we have

7  for interfaces.

8  Q    Okay.  I guess is it another way to put it that there is

9  some money and as to whether it's adequate you can't say until

10  you know what the interfaces are and how much they'll cost?

11  A    That's correct.

12  Q    Now another assumption that you -- and by the way I was

13  asking about an assumption that you were making.  And the

14  assumption you were making is that the interfaces will be

15  adequately funded, right?  That was in Section 17(b) of your

16  report, I think.

17  A    Correct.

18  Q    Another assumption that you make is that the city will be

19  able to employ and retain individuals, or hire contractors

20  with the necessary technical knowledge to implement the IT

21  reinvestment initiatives across the city, is that correct?

22  A    That's correct.

23  Q    Now there is an implicit factual assertion in that

24  assumption, right?  Which is that the city does not presently

25  have the individuals with the necessary technical knowledge to

1  implement the IT reinvestment initiatives. Is that a fair

2  statement?

3  A    No.

4  Q    You wouldn't have to assume that it will hire them in the

5  future if you already had them today, isn't that a fair

6  statement?

7  A    No.

8  Q    That's not a fair statement?  Okay.  The -- and -- and by

9  the way, how many people do you believe the city needs to hire

10  in order to implement all of the IT initiatives city wide?

11  A    I don't know city wide.

12  Q    Okay.  What types of employees are we talking about

13  specifically here?

14  A    For which?

15  Q    For -- I'm talking about the folks that you're assuming

16  the city will be able to hire in order to implement the IT

17  reinvestment initiatives.

18  A    So it -- it depends on what we're talking about.  So it

19  could be that we have folks that we need to hire depending on

20  what the financial management system is, you would need people

21  who have that skill set.

22      For example, we are an Oracle financial management shop,

23  so we clearly have a lot of people who are -- use Oracle and

24  understand Oracle where currently a Work Brain time and labor

25  shop, we have people who do that.  Depending again on what we

1  end up doing, those resources we will either need to bring in

2  new -- we will bring in staff augmentation to help us get that

3  up while we are retraining our current work force if we can to

4  take over and run the new systems.

5  Q    Is it fair to say that this issue is a little bit similar

6  to the interface issue which is you need to know more about

7  some of the future decisions on the IT front before you'll

8  have a better sense of how many and who of the types of

9  employees that the city will need to hire?

10  A    Yes.

11  Q    Now in Louisville I think I heard you say that you had

12  about 75 people reporting to you, is that right?

13  A    That's correct.

14  Q    And is it -- that was obviously -- or I got the sense

15  from your examination that that is perhaps a more stable and

16  well functioning IT environment than here in the City of

17  Detroit, is that correct?

18  A    Correct.

19  Q    Yeah.  But here you have 36 people presently, is that

20  correct?

21  A    That is correct.

22  Q    Okay.

23  A    But I -- also --

24  Q    Oh, yeah.

25  A    -- have 30 of staff augmentation.

1  Q     What does that mean, staff augmentation means?

2  A     Basically contract employees.

3  Q     Oh, you have people that are on contract currently that

4  are working alongside your staff?

5  A     Correct.

6  Q     Understood, okay.

7  A     So that total comes up to 66 then, 65.

8  Q     Okay.  Now obviously though just from an outsider's

9  perspective like mine, certainly a different project that

10 you're on the front of as opposed to in Louisville where you

11 are I'm sure always improving the system, but you're otherwise

12 maintaining a well functioning environment.  Here you're

13 actually trying to bring one about, is that correct?

14 A     Correct.

15 Q     Now you have expressed concerns about the ability of your

16 group to both implement the ITS restructuring -- restructuring

17 initiatives and also to support the IT roll outs in other

18 departments in the city, isn't that correct?

19 A     That is correct.

20 Q     And in fact you told the Mayor that the problem is that

21 all of the city's IT projects will be relying on the same

22 constrained resources, isn't that right?

23 A     That's correct.

24 Q     And the constrained resources that you were referring to

25 were the personnel and the ITS group, right?

1  A    Correct.

2  Q    And to put it in common parlance what you're saying is,

3  there is going to be a lot to do and -- and a relatively small

4  number of people to do it?

5  A    Correct.

6  Q    Now at one point in time there was an inconsistency

7  between the two ten year forecasts that you had noted when it

8  comes to the question of how many people your group will hire

9  going forward.  Do you remember this?

10 A    I do.

11 Q    And at one point you noted that under the ten year

12 financial projections it showed your department being slated

13 to hire only three additional people starting in 2016, is that

14 correct?

15 A    Correct.

16 Q    But under the ten year plan of restructuring and

17 reinvestment initiatives, those have you hiring an additional

18 15 people with 11 of them being hired by this December,

19 correct?

20 A    Correct.

21 Q    Did they ever fix that glitch?

22 A    Here -- here is why that happened.  At one point in time

23 ITS was part of finance.  And so there are things in one plan

24 that were rolled up under the office of the CFO or the finance

25 department.  And then in another plan we were split out.  And

1  so we had to go through the reconciliation process.

2  Q    So how did it end up in terms of are you getting the

3  three people starting in 2016, or are you getting the 15

4  people --

5  A    Fifteen.

6  Q    Eleven of whom will start in December?

7  A    The 15.

8  Q    The latter.

9  A    Fourteen because they hired me.

10 Q    Oh, I see.  So you're the -- you're number one.  Okay,

11 good.  Okay.  But December is less than three months away from

12 us as we stand here today, is that correct?

13 A    That is correct.

14 Q    And so getting these folks hired is particularly

15 important because the city has also substantially front loaded

16 the IT restructuring initiatives, isn't that correct?

17 A    That is correct.

18 Q    What front loading means here is that there are a lot of

19 big projects that are going to be starting relatively soon,

20 right?

21 A    Correct.

22 Q    And again you have assumed that the city can achieve the

23 front loaded technology roll out, isn't that right?

24 A    I would assume that we will be able to hire contract

25 people when we -- when we select the system.  So part of that

1  is you bid out implementation as well.

2  Q    But one thing that's also true is that you think it's

3  going to be a challenge to attract and maintain highly skilled

4  technical resources, isn't that correct?

5  A    I think that's a challenge for any IT department.

6  Q    Okay.  But it will certainly be a challenge for Detroit,

7  right?

8  A    It will be a challenge.

9  Q    And in fact the reason that you'd expressed concern about

10 this to the Mayor was because you were worried about whether

11 the -- the budget amounts for salaries were going to be

12 sufficient to attract the talent to the Detroit area, isn't

13 that correct?

14 A    That is correct.

15 Q    And one of the things that you asked the Mayor to do, or

16 you urged him to do was to conduct an analysis of the current

17 compensation standards for IT professionals in the Detroit

18 area, is that right?  That was part of the memorandum that you

19 wrote in -- in -- in May.

20 A    I don't believe I -- I don't believe I remember saying to

21 him we need to do a comp and classification salary.  Can you

22 point me to the tab?  Is that Tab 2?

23 Q    So see if this refreshes your recollection.  Look at Tab

24 2.

25 A    Uh-huh.

1  Q    And look at the second page of your memo.

2  A    I do.

3  Q    And look at the last sentence in the second to last

4  paragraph.

5  A    I'm sorry, one more time.

6  Q    You bet.  So the second to the last paragraph.

7  A    Uh-huh.

8  Q    Look at the last sentence.

9  A    Yes.

10 Q    And then the question really is, it actually does it

11 refresh your recollection about what you said?

12 A    Quite clearly.

13 Q    And did you say that?

14 A    I did.

15 Q    Yes.  Do you know if anyone's done that?

16 A    Not -- no.

17 Q    Okay.  So fair to say -- obviously there's lots of

18 uncertainties in the future and -- and I don't think you're

19 required to have certainty, but is it fair to say that as you

20 sit here right now you just don't know whether or not the city

21 will be able to attract the -- the highly skilled technical

22 resources necessary to -- to implement these restructuring

23 initiatives?

24 A    I know that we can hire them through staff augmentation,

25 yes.

1  Q    And I take it those amounts are in the budget?

2  A    Yeah.  They're in the project.

3  Q    Okay.  They're in the project itself?

4  A    Right.

5  Q    Now right now you would agree that city employees cannot

6  do their jobs at a very basic level because of -- of deficient

7  IT.  That's the core of your opinion, isn't that correct?

8  A    That is one of them, yes.

9  Q    And you agree for example that the city's current IT is

10 creating problems for the city's finance department, isn't

11 that correct?

12 A    That is correct.

13 Q    And you talked about the fact that you and Mr. Hill are

14 -- are stapled together at the hip?  Or joined -- I'm sorry,

15 joined together at the hip.  And while you do want to see

16 business processes also improved alongside the IT you agree

17 that deficient IT negatively impacts the finance department's

18 ability to do a job for the city, isn't that correct?

19 A    That's correct.

20 Q    And you know the finance department does things like

21 collect taxes, correct?

22 A    Correct.

23 Q    And in fact your view is that the city's current state of

24 IT contributes to the -- or contributes to the rate of tax

25 delinquencies in the City of Detroit, isn't that correct?

1  A    I don't believe -- I don't -- where did I say that?

2  Q    Well, I guess we'll start with just isn't that true that

3  it contributes to the -- the tax delinquency right in the City

4  of Detroit?

5  A    I can't -- I can't give you that opinion of why the

6  city's tax rate is not -- tax collection rate is not good.  I

7  can tell you that IT does not help any of the departments

8  because the -- the systems are not adequate.

9  Q    And the hope is that improving the IT will improve the

10 tax collection efforts, correct?

11 A    I think the hope is improving the IT systems will improve

12 everybody's ability to do their job.

13 Q    Now I want to understand the order of events here a bit

14 if I could.  Most of the -- and I'm going to call these the

15 ITS restructuring initiatives to separate them from the IT

16 restructuring initiatives.  Do you know what I mean when I say

17 that?

18 A    Yes.

19 Q    The vast majority of the ITS restructuring initiatives

20 were included in the original plan that was filed in February

21 of 2014, is that correct?

22 A    Correct.

23 Q    Sorry?

24 A    Correct.

25 Q    Yes.  And I think you testified that they were developed

1  before you started but your understanding is that they were

2  developed by Conway, MacKenzie, is that right?

3  A     That's correct, with ITS.

4  Q     With involvement from ITS.

5  A     Right.

6  Q     Absolutely, sure.  Now do you know whether Conway,

7  MacKenzie has the expertise necessary to develop a

8  comprehensive IT strategy for a city?

9  A     I don't.

10  Q     Now in March of 2014 after you joined the city and after

11  these reinvestment initiatives on the IT fund had already been

12  proposed, the city solicited an RFP from Plante Moran, isn't

13  that correct?

14  A     That is correct.

15  Q     And one of the things that the city indicated in the RFP

16  was that the city was interested in hiring a consultant to

17  conduct an IT assessment and develop a strategic technology

18  plan, isn't that correct?

19  A     Correct.

20  Q     And Plante Moran does have the necessary expertise to do

21  that type of work, isn't that correct?

22  A     Correct.

23  Q     And the city has in fact entered into a contract with

24  Plante Moran, is that correct?

25  A     Correct

1  Q    Now as of your deposition which was back on July 31,

2  2014, Plante Moran had not finished its work, is that correct?

3  A    That is correct.

4  Q    And in fact I think I heard you testify that they -- they

5  still haven't, is that right?

6  A    That is correct.

7  Q    Now do you remember with Mr. Hertzberg when you were

8  talking about the methodology that you employ when you're

9  assessing an IT environment.  Do you remember that testimony,

10  Ma'am?

11  A    I do.

12  Q    What -- what I heard you say and -- and listen to see if

13  I get it right, but you said words to the effect of that the

14  first step of an IT assessment is to assess the needs of the

15  business or the city department that you're studying, correct?

16  A    Correct.

17  Q    Now what Plante Moran is doing is to be more specific,

18  they are going into departments like BSEED which stands for

19  building, safety, engineering and environmental department,

20  correct?

21  A    Correct.

22  Q    They are going into departments like BSEED and asking

23  them questions like, you run these four or five applications.

24  How are they operating?  Are they working?  Are they up?  Are

25  they able when you need them?  That's the type of thing that

1  Plante Moran is doing, correct?

2  A    Correct.

3  Q    And Plante Moran is doing that work even as you and I are

4  standing here talking today, is that right?

5  A    Correct.

6  Q    And they're doing that in all of the city departments

7  that require IT, is that correct?

8  A    That is not correct.

9  Q    Okay.  I want to close, Ma'am, with some questions about

10 Group Wise if I could.  Do you remember that testimony where

11 you talked about Group Wise which is the -- the email program?

12 A    Yeah, I do.

13 Q    Now you understand that one of the things that Conway,

14 MacKenzie did when it was putting some of these documents

15 together, is it not only would show a cost of something, but

16 it would also show the anticipated savings associated with a

17 particular project, is that correct?

18 A    That is correct.

19 Q    And is it correct that the city's forecasts project that

20 in 2015, '16, '17, and '18, meaning the next four years, four

21 calendar years, that the city will save approximately 1.4

22 million dollars in connection with moving its email system

23 called Group Wise into the cloud, is that correct?

24 A    I'm looking at the line on the bottom of the page and it

25 looks like if you add it -- yes.

1  Q    Now in fact that is actually something that you don't

2  believe will happen, correct?

3  A    Not in that time frame.

4  Q    That's right because you're actually not going to move

5  the system to the cloud until 2019, correct?

6  A    That is correct.

7  Q    So the million four that is forecasted to be -- to be

8  saved in the next four calendar years in your professional

9  opinion will actually not be saved until sometime thereafter,

10  correct?

11  A    That's correct.

12  Q    And that's actually an opinion that you expressed nearly

13  three months ago in May, isn't that right?

14  A    Yes.

15  Q    But to your knowledge the forecast has never been updated

16  to reflect that view?

17  A    Correct.

18        MR. HACKNEY:  Ma'am, thank you for your time.  Best

19  of luck to you.

20  A    Thank you.

21        THE COURT:  Anyone else to examine the witness?  Any

22  redirect?

23        MR. HERTZBERG:  One second, Your Honor.  Nothing,

24  Your Honor.

25        THE COURT:  Thank you for coming today, you are

1  excused.

2  A    Thank you.

3       (WITNESS BETH NIBLOCK WAS EXCUSED AT 2:27 P.M.)

4       MR. HERTZBERG:  Your Honor, what do you do with the

5  witness binders when none of the exhibits in the binders are

6  in evidence?

7       THE COURT:  You mean the ones that the witness had?

8       MR. HERTZBERG:  For example, Mr. Hackney gave this

9  one and I don't believe any of these exhibits are in evidence.

10      MR. HACKNEY:  I guess we can throw them away or I

11  can take them back or whatever is convenient for you.

12      THE COURT:  Normally, Mr. Hertzberg, normally what I

13  do is at the end of the trial we will sort out to be sure that

14  the exhibits I take into my possession are only those which

15  were admitted into evidence.

16      MR. HERTZBERG:  Okay.  Thank you, Your Honor.

17      MR. STEWART:  Your Honor, the city's next witness

18  will be Caroline Sallee.

19      THE COURT:  Please raise your right hand.

20      (WITNESS CAROLINE SALLEE WAS SWORN)

21      THE COURT:  All right.  Please sit down.

22      MR. STEWART:  Your Honor, may I approach?  I have

23  the five sets of the exhibits I'll be using that I would hand

24  out.

25      THE COURT:  Okay.

1        MR. STEWART:  But also I have one for the -- for the

2   witness.

3        THE COURT:  Okay.  And you proceed when you're

4   ready.

5        MR. STEWART:  Thank you, Your Honor.

6                      DIRECT EXAMINATION

7   BY MR. STEWART:

8   Q    Good afternoon, Ms. Sallee.  Could you please give the

9   Court your full name and your address?

10  A    Caroline Sallee, 1834 North Larrabee Street in Chicago,

11  Illinois.

12  Q    Are you employed?

13  A    Yes.

14  Q    Where are you employed?

15  A    I am employed by Ernst & Young.

16  Q    Okay.  And what is your title at -- at Ernst & Young?

17  A    I am a Manager.

18  Q    In what part of Ernst & Young do you work?

19  A    I work in the quantitative economic and statistics

20  practice.

21  Q    Sometimes that's called QUEST?

22  A    That's right.

23  Q    Do you know Dr. Robert Cline?

24  A    I do.

25  Q    And how closely had you worked with Dr. Cline before his

1 | retirement?

2 | A    I worked very closely with Dr. Cline on tax projects.

3 | Q    Okay.  You understand that EY has been engaged to work

4 | for the City of Detroit in its Chapter 9 proceeding?

5 | A    Yes.

6 | Q    And you're involved in that as well?

7 | A    Yes.

8 | Q    When did you become -- become involved?

9 | A    I started working on this project in May of 2013.

10 | Q    Okay.  And by this project are you -- tell us what your

11 | part of the project was.

12 | A    We were asked to forecast certain revenues for the city.

13 | Q    Okay.

14 | A    So a set of tax revenues and state revenue sharing

15 | payments.

16 | Q    Okay.  And you said property revenues?

17 | A    That's right.

18 | Q    Okay.  Before we go further, let me ask you more about

19 | your background.  Where did you go to college?

20 | A    I went to Augustana College.

21 | Q    And where is that?

22 | A    It's in Rock Island, Illinois.

23 | Q    What year did you graduate?

24 | A    2002.

25 | Q    Did you graduate with any academic distinctions or

1   recognition?

2   A     I did.

3   Q     And what were those?

4   A     I graduated summa cum laude and phi beta cappa.

5   Q     And after college did you go to graduate school?

6   A     I did.

7   Q     Where did you go to graduate school?

8   A     I went to the University of Michigan.

9   Q     What did you study there?

10  A     I received a Master's in public policy.

11  Q     In what year did you get your Master's Degree?

12  A     In 2005.

13  Q     Okay.  And you say Master's of public policy.  What does

14  that embrace?

15  A     I primarily studied economics and quantitative methods

16  and public finance.

17  Q     Okay.  And after you got your Master's Degree, where did

18  you go to work?

19  A     I started working for a small consulting firm called

20  Anderson Economic Group.

21  Q     And where was Anderson?

22  A     It is located in East Lansing, Michigan.

23  Q     I assume it has no connection with Arthur Andersen or

24  Andersen Consulting, the big firm we know, correct?

25  A     No.  My boss was named Patrick Anderson, so he named the

1  company after himself.

2  Q    Oh, one of those, okay.

3  A    Yes.

4  Q    How long did you work -- how long did you work at

5  Anderson Economic Group?

6  A    I worked for Anderson Economic Group for seven years.

7  Q    Okay.  Describe for us if you could the kind of work that

8  you did at Anderson Economic Group.

9  A    I worked on public policy and economic projects.  So I

10  would spend about half of my time doing tax analysis, state

11  and local tax analysis mainly, primarily in Michigan.  And

12  then the other half of my time I would do cost benefit

13  analyses or economic impact studies.

14  Q    Okay.  So tell us when you just used this word tax

15  analysis.  What is tax analysis?

16  A    So as a tax analyst, I would study tax systems.  I would

17  look at their structure, their operations.  I would look at

18  both sort of what creates the tax system and then the tax

19  revenue that was coming from different systems.

20  Q    Okay.  And how much of your work when you were at

21  Anderson Economic Group, pardon me, involved state taxes or

22  local taxes?

23  A    So all of the tax policy work that I did involved state

24  and local and I spent probably either 50% or more of my time

25  on tax analysis.

1  Q    Okay.  And how much of the tax work involved Michigan

2  taxes?

3  A    I would say about 90% of it.  It was a Michigan based

4  company and so I primarily did Michigan work.

5  Q    Now there came a time when you went to EY?

6  A    Yes.

7  Q    What year was that?

8  A    I joined EY in August of 2012.

9  Q    And since joining EY, tell us if you could about some of

10  the projects that you've worked on.

11  A    So while at EY, I primarily work on economic and tax

12  projects.  So I do economic and tax revenue impact studies.

13  I've done a 50 state tax burden study for businesses.

14  Q    Okay.  And what is a 50 state tax burden study?

15  A    So this is something that EY publishes annually.

16  Q    Uh-huh.

17  A    And we look at the taxes that businesses pay in each

18  state.  So for example households pay taxes, businesses pay

19  taxes.  So we did an analysis to estimate the share tax

20  revenue in each state that comes from businesses.

21  Q    Okay.  Tell me about some of the clients you've worked

22  for at EY if -- to the extent you can disclose.

23  A    Uh-huh.  So public clients or trade associations we have

24  worked for the council on state taxation.

25  Q    Uh-huh.

1   A    We work for a lot of large companies, most of those

2   projects are private so I don't -- I can't disclose who we

3   work for.  But we have kind of a mix of public and private

4   clients.

5   Q    Do I understand correctly you did some work for the City

6   of Flint, Michigan?

7   A    I did.

8   Q    When was that?

9   A    I did that work in January and February of this year.

10  Q    And what was the assignment from Flint, Michigan?

11  A    I was asked to forecast property incomes, taxes, state

12  revenue sharing payments for a five year period for the City

13  of Flint.

14  Q    Okay.  And then has some of your work also -- at EY also

15  involved work on behalf of universities here in Michigan?

16  A    I did a lot of work for universities in Michigan, so

17  U of M, Wayne State, and Michigan State.

18  Q    Okay.

19  A    I did that work when I was with Anderson Economic Group.

20  Q    Okay.  That was before you went to --

21  A    That's right.

22  Q    And let me reach back to them if I could.  The work for

23  the universities, what sort of -- what -- what was that

24  assignment about?

25  A    So I would estimate the employment, the earnings, the

1  sort of sale of activity that the universities generated for

2  the State of Michigan.  And so there is an annual study that

3  came out so I was the primary author of that study when I was

4  at Anderson.

5  Q    Okay.  Now let's go back to this -- this assignment, the

6  one for the City of Detroit.  You've been asked to appear and

7  to give expert -- opinions as an expert witness, correct?

8  A    That's right.

9  Q    Have you ever been an expert witness before?

10  A    I have not.

11  Q    And when you started this work did anyone tell you you

12  were going to be asked to give an expert opinion?

13  A    No, they didn't.

14  Q    All right.  By the way, are you being compensated for

15  your work?

16  A    I am.

17  Q    Okay.  At what range are you compensated?

18  A    EY bills my rate -- bills my hours at $550.00 an hour.

19  Q    So let me ask you a little bit about your field of work.

20  You testified earlier that you work in the field of tax

21  analysis?

22  A    Uh-huh.

23  Q    And I think you said tax analysis is the study of tax

24  systems?

25  A    Correct

1   Q     What is a tax system?

2   A     At its most basic level a tax system is governed by tax

3   laws and so those tell us what is being taxed, how it's being

4   taxed, the rate it's being taxed.

5   Q     Okay.  And when you -- and what's the purpose of studying

6   tax systems?

7   A     So typically I'm studying a tax system because I want to

8   know the impact of changing some component of the tax system

9   and what's going to happen to tax revenue.

10   Q     Does this include tax forecasting?

11   A     It does, uh-huh.

12   Q     Okay.  Anything else?

13   A     I often will do, as I mentioned before, tax burden

14   studies.  So often if there is some sort of tax change, or

15   changing how you're taxing there might be an impact on who is

16   paying the tax.  So I would look at that as well.

17   Q     Is tax analysis recognized as a distinct professional

18   field?

19   A     It is.

20   Q     Okay.  Are there organizations for tax analysts?

21   A     There are.

22   Q     Do you belong to any?

23   A     I do.

24   Q     What -- what do you belong to?

25   A     The National Tax Association

1  Q    Are there -- is there -- are there academic or journals,

2  similar journals published in the field of tax analysis?

3  A    Uh-huh.

4  Q    What are some of those?

5  A    I think the most -- one would be the National Tax

6  Journal.

7  Q    Okay.  Have you personally written any cases in the field

8  of tax analysis that have been published?

9  A    The only published work I have is through my employer.

10  Q    Okay.

11  A    So no peer reviewed journal articles.  But the tax burden

12  study that I do with EY is published through EY.

13  Q    Okay.  Now what training and skills are needed for a

14  person who is going to work in the field of tax analysis?

15  A    So I find that I have to be able to, you know, read and

16  understand tax laws.  I have an economics background which is

17  important in understanding the inputs, the behavior, thinking

18  about how people respond to a tax system.

19  Q    Uh-huh.

20  A    And then my educational background, I took many methods

21  courses, so I have a quantitative background being able to

22  understand statistics for example.

23  Q    Now in your work for Detroit tell us some of the

24  materials or sources of information that you relied upon.

25  A    I used a combination of state and federal sources and

1    city sources, I guess as well.  So the City of Detroit

2    provided their ad valorem tax data.  So I was able to receive

3    information on the tax base.

4    Q    And let me stop you there.  What does ad valorem mean and

5    why is that relevant to what we're doing today?

6    A    Right.  So property is taxed at value.  And so they were

7    providing the tax base that was used for the general operating

8    fund.

9    Q    Uh-huh.  Okay.  What else did you look at?

10   A    The city also provided some of their revenue forecasts.

11   From the state I obtained different state economic reports.  I

12   obtained data on state revenue sharing payments, the state tax

13   commission has a lot of reports and data that I relied upon

14   for my analysis, including tax data for -- specific to the

15   City of Detroit, but also more general reports for the entire

16   state.

17        I also pulled data from U.S. Federal cites.  So data from

18   the U.S. census for the region.  Information from Bureau of

19   Labor Statistics.  So those are a few federal sources.  Also

20   from the congressional budget office, some of their economic

21   forecasts.

22   Q    Have you heard of the group called SEMCOG?

23   A    Yes.

24   Q    And what is SEMCOG?

25   A    SEMCOG is the Southeast Michigan Council of Governments.

1  Q    Did you rely on any of information from SEMCOG?

2  A    I did.

3  Q    Okay.  What sort of information from them?

4  A    So they had done a 40 year forecast of population for the

5  entire southeast Michigan region including specific break outs

6  for municipalities.  So they did a forecast for the City of

7  Detroit population and I relied upon that.

8  Q    Okay.  Any information from Wayne County?

9  A    Yes.  So Wayne County provided information on there in

10  that revolving fund.

11  Q    Okay.  I think we'll come to that later.  Okay.  Are

12  these the types of information that tax analysts rely upon in

13  doing their work?

14  A    Yes.

15  Q    How reliable have -- have you found these sources of

16  information to be?

17  A    I think these sources are reliable.

18  Q    And you've worked with them in the past?

19  A    Yes.

20  Q    In the course of your work did you speak with people from

21  the city?

22  A    I did.

23  Q    Tell us who from the city you spoke with.

24  A    I primarily spoke with the city assessor.

25  Q    Okay.  And who is that?

1  A    So currently Gary Evanko.

2  Q    Uh-huh.

3  A    And in the past Linda Bade.

4  Q    Anyone else in that office?

5  A    Alvin Horhn.

6  Q    Okay.  Who else from the city?

7  A    I also had a conversation with Michael Jamison.

8  Q    And for the record who is Mr. Jamison?

9  A    He's in the finance department.

10 Q    Okay.  And who for the state if anybody did you speak

11 with?

12 A    So I had several conversations with Jay Wortley in

13 treasury.

14 Q    Uh-huh.

15 A    And then I also had a number of conversations with Jim

16 Stansell and house fiscal agency.

17 Q    Okay.  Now are there standard methods professionals in

18 your field use to forecast tax revenues?

19 A    Yes.

20 Q    And what are the sources of these standards?

21 A    So the U.S. federal agencies have a standard way that

22 they forecast revenue.  Some of it's laid out by law, some of

23 it is sort of accepted practice.  So the congressional budget

24 office for example regularly does a ten year economic forecast

25 under a certain set of conditions.

1    So I looked to see what their standards were.  Also in

2   Michigan the consensus revenue estimating conference, they

3   have a way that they do their revenue forecasts which are in

4   agreement with how the Federal Government does.

5    And so they published a number of years ago a paper

6   describing their method.  And so I also looked to see what

7   their methodology was and followed that.

8   Q    And this is the State of Michigan?

9   A    That's the State of Michigan, yes.

10  Q    Now you mentioned a minute ago something called

11  quantitative methods?

12  A    Yes.

13  Q    What are those?

14  A    So quantitative methods here means for the tax analysis

15  that I did and that I normally do, I have to build a model.

16  And in that model I have to think about the components of the

17  tax system so what is being taxed, how it's being taxed.

18   In this case, I developed a model using a spreadsheet,

19  but there are other methods that you can use, different

20  statistical models or sometimes regression analysis could be

21  used for example.

22  Q    Uh-huh.

23  A    Those are quantitative methods.

24  Q    Did you use a regression analysis here?

25  A    We did not.

1  Q    Why not?

2  A    We -- when we -- when I say we, I mean Dr. Cline and I,

3  when we first started looking at this project we looked at the

4  recent performance of Detroit's economy and how it compared to

5  the state.  We looked to see what data was available.

6       We also looked to -- looked at the regression results of

7  someone who was hired previously.  And we came to the

8  conclusion that regression analysis didn't make sense for this

9  project given sort of the unique situation that Detroit was

10 in.

11      Regression analysis is really useful if you have good

12 data and the past helps you really predict the future.  And in

13 this case given the uniqueness of the situation, we didn't

14 think that was applicable here.

15 Q    Are there some packages you can use that can be used for

16 economic forecasting?

17 A    Yes.

18 Q    Did you look at those in connection with your assignment?

19 A    We did.  So we purchased a REMI model for the City of

20 Detroit.  And we started to look at this model so REMI

21 provided --

22 Q    Well, you better tell us who or what is REMI?

23 A    Okay.  So REMI -- REMI is Regional Economic Modeling,

24 Inc.  That's REMI.

25 Q    Okay.

1  A    And they provide statistical software and data that

2  allows for tax analysis and typically tax forecasting.  And

3  they provide these customized models so we purchased one for

4  the City of Detroit.

5     However, when we started to look at the different

6  components of it, we realized that the data that they had put

7  in the model for Detroit wasn't matching the data that we

8  could observe and could look at.

9     So we didn't think the model was good and that we were

10  going to have to spend a lot of time adjusting it.  So we

11  didn't use it.

12  Q    So instead you developed your own model?

13  A    We built our own model, uh-huh.

14  Q    All right.  Now in building your model, had -- did you

15  use the methodology that you described here earlier from the

16  congressional budget office and to the Michigan State

17  government?

18  A    Yes.

19  Q    Did you apply to that model the information you received

20  that you described to me earlier?

21  A    Yes.

22        MR. STEWART:  Okay.  Your Honor, I would proffer Ms.

23  Sallee as an expert witness in the field of state and local

24  tax analysis.

25        MR. SMITH:  Your Honor, we'd just reserve our

1  objection, you know, based on our pending Daubert motion.

2          THE COURT:  All right.  Subject to that you may

3  proceed.

4          MR. STEWART:  Thank you, Your Honor.

5  Q   All right.  So Ms. Sallee, let's start talking about your

6  work.  I think you told us that this began earlier this year.

7  And you were asked to create projections of property tax

8  revenue and state revenue sharing revenue?

9  A   That's correct.

10 Q   Okay.  And for what forecast periods were you asked to --

11 to forecast?  How far out?

12 A   I was asked to look at a ten year period and then to

13 extrapolate another 30 years for a total of 40 years.

14 Q   Have you seen forecasts or projections done by others

15 before of this length of time?

16 A   Yes.

17 Q   And what are some examples?

18 A   So at the -- level the congressional budget office will

19 publish a ten year economic forecast.  They also will do

20 longer range forecasts for specific programs.

21     So they will -- they have a 100 year projection for

22 Social Security.  But they regularly will have longer 20, 30,

23 40 years if it's -- they're analyzing a specific government

24 program.

25 Q   What about Michigan?

1   A    In Michigan the state revenue estimating conference they

2   will do a three year forecast.  And but treasury and house

3   fiscal and Senate fiscal will regularly do longer forecasts

4   for specific laws or programs.

5   Q    How -- what's the length of the Michigan State forecast

6   for sales taxes?

7   A    So in the revenue estimating conference is three years.

8   However, we obtained a estimate of the sales tax revenue from

9   treasury that went out to 2025.

10  Q    Okay.  And does the congressional budget office have a --

11  have a housing price forecast that goes out some number of

12  decades?

13  A    The -- the -- the CBO's housing value that I looked at

14  went out ten years.

15  Q    Okay.  So let's start by -- let's start with property

16  taxes.  And let's put up if we could, demonstrative Exhibit

17  586.  And Ms. Sallee, do you have Exhibit 586 in the screen in

18  front of you?

19  A    I do.

20  Q    Who prepared this?

21  A    I did.

22  Q    Okay.  And what does it purport to tell us?

23  A    It shows the different types of property taxes in Detroit

24  and the tax based drivers for each type of property.

25       (City's Exhibit 586 was identified)

1  Q    Okay.  So let's start.  We have two different categories

2  of property taxes, real and personal.

3  A    Yes.

4  Q    And then four different types of taxpayers who pay those

5  taxes, correct?

6  A    Right.

7  Q    Okay.  And so the -- the four different types are

8  residential, industrial, commercial, and utility?

9  A    Correct.

10  Q    Okay.  I see though there are two gray squares on our

11  exhibit.  Can you tell me what that represents?

12  A    That means that residential, personal property is not

13  taxed.  And utility of real property is already included in

14  the industrial.

15  Q    Okay.

16  A    Real property.

17  Q    So when we're looking at property taxes, we're looking at

18  six different places where it's imposed.  For example --

19  A    That's right.

20  Q    Residential real property or commercial personal

21  property, correct?

22  A    That's right.

23  Q    Okay.  Let's look now at --

24         MR. STEWART:  Your Honor, these are demonstratives.

25  I'd move them in as we've agreed for their use as a

1  demonstrative.

2          THE COURT:  Any objections?

3          MR. SMITH:  No objection, Your Honor.

4          THE COURT:  586 -- I'm sorry?

5          MR. SMITH:  Just one, Your Honor.  I assume we're

6  just doing the first one.

7          THE COURT:  Right.  586 is admitted.

8      (City's Exhibit 586 was admitted)

9          MR. STEWART:  Thank you.

10  Q    And Exhibit 560, let's put that up next.  Okay.  Ms.

11  Sallee, Exhibit 560 has been placed on the screen in front of

12  you.  Could you tell us what is Exhibit 560?  Well, first of

13  all who prepared it?

14  A    I did.

15  Q    And what does it tell us?

16  A    It tells you the steps that I took to forecast the

17  general operating taxes for the City of Detroit.

18      (City's Exhibit 560 was identified)

19  Q    Okay.  And there are five steps?

20  A    Correct.

21  Q    Now before we go further, let me ask you a couple of

22  threshold questions.  At the top it says steps to forecast in

23  Detroit general operating property taxes, correct?

24  A    Uh-huh.

25  Q    What is a general operating property tax?

1  A    So these are the taxes that are going into the general

2  fund.

3  Q    Okay.  And as opposed to what?

4  A    As opposed to taxes, in other levels of government.  So

5  taxpayers pay debt millages or library millages.  Taxpayers

6  also have, you know, taxes for schools.  So this is telling

7  you that I only looked at the general fund.

8  Q    Okay.  Now step one is entitled forecast taxable value by

9  property class.  And so let's stop right there so I can ask

10  you, what is taxable value?

11  A    So taxable value is the tax base.

12  Q    Okay.  And a tax base meaning that's what your tax bill

13  is assessed of -- assessed upon?

14  A    That's right.

15  Q    So how do you figure out for any given piece of property

16  what it's taxable value is?

17  A    So taxable value is the lesser of two things.

18  Q    Okay.

19  A    So it's the lesser of your state equalized value.

20  Q    Uh-huh.

21  A    Which you can think of as your assessed value.

22  Q    Okay.

23  A    Or your capped value.

24  Q    Okay.  And I'm going to slow you down here because I at

25  least find this confusing.  Not anything you've said, but on

1  the chart it says tax -- state equalized value is 50% of

2  market value.

3  A    That's right.

4  Q    So what is market value?

5  A    So you can think of this as the -- it's close to the

6  price of your home.  So in a market it's, you know, between

7  two sort of informed sellers, the -- the price that you would

8  pay for that home.  That would be your market value in most

9  cases.

10 Q    Okay.  And so state equalized value is simply half of

11 that?

12 A    That's right.

13 Q    Okay.  And so that's one of the possibilities for taxable

14 value?

15 A    Right.

16 Q    What's the other?

17 A    So the other is capped value.  So in Michigan if your

18 home starts to appreciate each year and your assessed value

19 would also follow that, taxpayers passed a series of laws, or

20 set of laws, to limit how fast your tax base can grow each

21 year.

22 Q    Okay.

23 A    So this says that your -- the value of your home that can

24 be taxed can only grow at the rate of inflation or 5%,

25 whichever is less.

1  Q    Okay.  So when we're going to need a taxable value, it's

2  the lesser of state equalized value or capped value.  And

3  capped value itself is the lesser of value grown at the rate

4  of inflation or 5%?

5  A    Correct.

6  Q    All right.  And then step two is select a tax rate?

7  A    That's right.

8  Q    How hard is that to do in Michigan?

9  A    Not very hard.

10 Q    And why not?

11 A    So the general operating tax rate, there is a limit on

12 how high it can go.  And there is also certain requirements

13 that in this case legal requirements for Detroit's current tax

14 rate to be 19.952 mills.

15 Q    Okay.  So all of the property tax is going to be taxed at

16 this rate?

17 A    The general operating tax rate is that, yes.

18 Q    Okay.  Why is it not a -- why is it not a round number?

19 A    It's not a round number because -- so there is an upper

20 limit of 20 mills and --

21 Q    Tell us what's a mill?

22 A    A mill is one one thousandth.

23 Q    Okay.

24 A    So you're taxed a dollar on every -- a one mill tax would

25 be a dollar on every thousand dollars worth of property.

1  Q    Okay.

2  A    Okay.

3  Q    But I didn't -- I didn't mean to interrupt.  You said

4  there was a ceiling of 20 mills.

5  A    There is a ceiling of 20 mills.  But in Michigan there is

6  a requirement that if your tax base grows faster than the rate

7  of inflation, you have to reduce your tax rate.  So in 2007

8  the City of Detroit had to go down from that 20 mills legally

9  to this current tax rate.

10 Q    Okay.  Step three is calculate the tax levy and tell us

11 how you do that.

12 A    So the tax levy is the aggregate tax bill.  And it's

13 taking your tax base times your tax rate.

14 Q    Okay.  And then let's skip step four which we'll come

15 back to.  And we have step five is applying an effective

16 collections rate.  So tell us if you could what is an

17 effective collections rate.

18 A    So you now have your tax levies, your tax bill has been

19 out, and some taxpayers pay it, and some don't.  And so the

20 effective tax collection rate is the amount of money the city

21 is taking in in a given year from the property tax system

22 divided by the tax levy.

23 Q    Okay.  Now the box to the right of step five speaks about

24 non-delinquent rates, collection rates, I guess by type of

25 property.  And then there are various percentages in there.

1  Where did those come from?

2  A     The city.

3  Q     Okay.  And do those reflect at least for recent years

4  what the collection rate has been by the city for different

5  categories of taxes?

6  A     That's right.

7  Q     Okay.  And for residential real estate it's 50%?

8  A     Correct.

9  Q     And 100% on the other hand for utility?

10 A     That's right.

11 Q     Okay.  And why if you know, are there such variances in

12 the collection rates?

13 A     So different taxpayers have been paying on time or not.

14 So for residential property there is a number of reasons why

15 they're not collecting.

16      For example, tax bills have been sent to homes where no

17 one is living, so they're not collecting on that.  Some of it

18 has been people aren't paying.  They either can't afford it,

19 or they think their tax bill is too high so they're

20 protesting.  So there's a number of reasons.

21      What we've seen in the data is that the -- you know,

22 fewer residential payers are paying taxes but it's, you know,

23 much higher for commercial industrial.

24 Q     Okay.

25 A     And utilities pay

1  Q    Okay.  Below that it speaks of the Wayne County

2  delinquent tax revolving fund.  What is the Wayne County

3  delinquent tax revolving fund?

4  A    In Michigan the -- when someone does not pay their taxes,

5  some of those taxes for example if you don't pay on your real

6  property, that is turned over to the county.  This is done

7  statewide, so the county takes on the responsibility of

8  collecting that tax payment.  And they provide a payment to

9  the city.

10  Q    Okay.  Now what happens if the county does not succeed in

11  its efforts to collect that tax payment?

12  A    The city has to pay it back.

13  Q    So if I live in the city and I owe a tax bill and I don't

14  pay it --

15  A    Uh-huh.

16  Q    Say I owe $1,000.  What does Wayne County do?

17  A    They will pay the city that $1,000 and if they can't

18  collect, they will eventually take it back from the city.

19  Q    From the city.

20  A    That's right.

21  Q    Okay.  And is that sometimes known as a claw back?

22  A    Yes.

23  Q    In recent years, what's been the level of claw backs by

24  Wayne County against the city under this system you just

25  described to us?

1   A    The last two years the claw backs have been over

2   40,000,000 just related to the general fund.

3   Q    Okay.  And that -- how do you take that into account in

4   your calculation of an effective collection rate?

5   A    So the collection rate has two components.  One, you have

6   taxpayers who pay on time, and then you have these net

7   payments from Wayne County.

8        So that net payment is the money that the county is going

9   to provide for the delinquent taxes minus any claw backs.  So

10  those claw backs have been reducing the amount of revenue

11  coming from the county.

12  Q    And reducing the effect of collections rate?

13  A    That's right.

14  Q    Okay.  Let's put up Exhibit 545.

15       MR. STEWART:  And, Your Honor, did we move 560 into

16  evidence?  Because if not, I would like to move it in now as a

17  demonstrative.

18       MR. SMITH:  For demonstrative purposes, no

19  objection, Your Honor.

20       THE COURT:  Is that your offer, sir?

21       MR. STEWART:  Yes, it is.

22       THE COURT:  All right.  560 is admitted.

23       (City's Exhibit 560 was admitted)

24  Q    Okay.  Ms. Sallee, Exhibit 545 has been put up on the

25  screen.

1            MR. STEWART:  And, Your Honor, I think this already

2   was admitted in connection with the testimony of Dr. Cline.  Q

3        Ms. Sallee, can you tell us what Exhibit 545 is?

4   A    It shows population for Detroit under a couple scenarios.

5   Q    And who prepared this?

6   A    I did.

7   Q    Okay.  And tell us how you went about preparing this.

8   A    So you'll see that there are four lines.  Three of them

9   are forecasts done by SEMCOG which we discussed earlier.  And

10  the red line is the EY QUEST forecast.

11  Q    Okay.  And so of the three different SEMCOG lines, which

12  one did you rely upon in your work?

13  A    We relied upon the baseline forecast which is the yellow,

14  the SEMCOG 1.

15  Q    Okay.  What were the other two SEMCOG numbers?  Were

16  those also forecasts, or were they something different?

17  A    They were alterative scenarios that they developed.  So

18  one is -- so the higher line, the blue line is under a

19  scenario where Detroit grew at Pittsburgh type rates, their

20  economy rebounded like Pittsburgh.

21       The lower line is a forecast where the region suffered a

22  lot more auto job losses.  So the manufacturing industry took

23  a hit and that was the population forecast from that scenario.

24  Q    And you chose the middle one?

25  A    We followed SEMCOG and used their baseline, the one that

1  they said was reasonable.

2  Q    Now there is a line that departs from the yellow line

3  that says EY QUEST.  And I assume you are EY QUEST?

4  A    I am.

5  Q    Okay.  So why did you depart from the yellow line when --

6  as shown on this chart?

7  A    Sure.  So SEMCOG put together their population forecast

8  before the city filed for bankruptcy and before there was any

9  discussion about restructuring or reinvestment.  So we

10 followed SEMCOG up until 2032 and then SEMCOG had some modest

11 growth and we accelerated it slightly as a result of the

12 restructuring activities in the city.

13 Q    Okay.  Let's -- and so this is the chart showing your

14 projection with restructuring?

15 A    That's correct, the 40 years only with restructuring,

16 uh-huh.

17 Q    Okay.  Let's look -- let's put up now Exhibit 561.  Ms.

18 Sallee, do you see Exhibit 561?

19 A    I do.

20 Q    Who prepared Exhibit 561?

21 A    I did.

22 Q    And tell us what it -- what it shows us.

23 A    It shows the total taxable value for the City of Detroit

24 for the last four fiscal years.

25      (City's Exhibit 561 was identified)

1  Q    Okay.  And let's focus for now just on the left side of

2  the chart.  We have four blue columns.  What -- and each has a

3  red top.  What does that represent?

4  A    So the blue part of the bar is the tax base that's

5  subject to the general operating taxes.

6  Q    Uh-huh.

7  A    And the red part is the value of the property that's

8  exempt from general operating because they are in a

9  renaissance zone.

10  Q    Okay.  Now the blue part that's all the types of property

11  taxes we spoke about earlier, correct?

12  A    That's right.

13  Q    Not just residential real estate.  That's everything?

14  A    That's everything, yes.

15  Q    So what's this renaissance zone that you referred to a

16  moment ago?

17  A    So and originally renaissance zones were geographic

18  regions in the city and if a business located in it they were

19  exempt from certain taxes.  Now it's done kind of on a

20  personal by personal taxpayer by taxpayer basis.

21  Q    Uh-huh.

22  A    So for our purposes it's showing that this is the amount

23  of property value that's exempt from general operating taxes.

24  Q    Okay.  So if we look at the column on the far left, the

25  total amount of taxable value is 8.8 billion with a total

1  amount of that which can really be taxed -- or be -- or in the

2  tax base is 8.3 billion, correct?

3  A    That's right.

4  Q    So and by -- well, as we look at these columns they seem

5  to go down.  Can you tell us what that -- what that

6  represents?

7  A    So you can see the taxable value going from 8.3 billion

8  in 2012 that's subject to general operating taxes, down to 6.5

9  billion in the most recent fiscal year.

10 Q    Now we're in fiscal year 2015, correct?

11 A    That's right.

12 Q    And this bar we have is for 2015, correct?

13 A    That's right.

14 Q    When for fiscal year 2015 are those -- is that taxable

15 value determined?

16 A    It's determined in the spring of 2014.

17 Q    Okay.  So it's determined before fiscal 2015 begins?

18 A    That's right.

19 Q    Okay.

20 A    It's the basis of the bills that go out in July.

21 Q    So we're -- just to be clear, so we're looking at a value

22 for 2015, that's an historic value?

23 A    Yes.

24 Q    Not a projection?

25 A    The tax base for 2015 is historic.  We don't know what

1  the collections will be --

2  Q    Right.

3  A    For 2015.

4  Q    Okay.

5  A    Yeah.

6  Q    So on the right we have a pie chart.  What's the pie

7  chart tell us?

8  A    The pie chart shows the breakdown by property class of

9  the taxable value for non-renaissance zone property or those

10 that pay the general operating millages.

11 Q    Okay.  And what did you base this on?

12         THE COURT:  Counsel, excuse me one second.  I need

13 you to back away from the microphone just a bit.

14         MR. STEWART:  Okay, I will.  Yes, Your Honor.

15 Sorry.

16 Q    The pie chart, what does -- what does it show us?

17 A    So the pie chart shows the mix of property by class, the

18 taxable value of property for the most recent fiscal year.

19 Q    Okay.  And the lower right hand corner is partially

20 obscured by the exhibit sticker, but that's residential,

21 correct?

22 A    That's right.

23 Q    And so -- and that says what the percentage is and what

24 the absolute amount is?

25 A    That's right.

1  Q    And what does it tell us for residential for example?

2  A    So residential makes up almost half of the taxable value.

3  Q    And the next biggest slice is?

4  A    Commercial at a little over a quarter.

5  Q    Okay.

6  A    Twenty-seven percent.

7  Q    And those two combined are three-quarters of the tax

8  base?

9  A    That's right.

10 Q    Okay.  Let's now look --

11        MR. STEWART:  And, Your Honor, I'd move 561 into

12 evidence as a demonstrative exhibit.

13        MR. SMITH:  No objection, Your Honor.

14        THE COURT:  It is admitted.

15      (City's Exhibit 561 was admitted)

16 Q    Let's put up now 562.  Ms. Sallee, do you see Exhibit

17 562?

18 A    I do.

19 Q    And what is Exhibit 562?

20 A    So this shows the percentage change in three things since

21 2007.  So it shows the change in taxable value for residential

22 real property only.  The change in state equalized value, or

23 assessed value for residential property.  And the change in

24 average home prices in Detroit.

25      (City's Exhibit 562 was identified)

1  Q    Okay.  Let me start with the -- the average home price.

2  And this is indexed, correct, to 2007?

3  A    That's right.

4  Q    Okay.  So in 2007 it's indexed at 100.  And what happens

5  -- what has happened to average home prices in the City of

6  Detroit since then?

7  A    You see a steep decline in average home prices and you

8  start to see at the end of the period a modest recovery.

9  Q    Okay.  Since 2007, how far have the average home prices

10  in Detroit fallen?

11  A    So overall they've fallen 63%.

12  Q    Okay.  Now let's look at the other lines.  We have a

13  state equalized value line and a taxable value line, correct?

14  A    That's right.

15  Q    Why aren't they the same line?

16  A    They are representing slightly different concepts.

17  Q    Okay.  And tell -- tell me if you could, how these two

18  concepts are different.

19  A    So the assessed value should follow pretty closely with

20  what's happening in the market since it's representing 50% of

21  market value.

22  Q    And which one of these is the assessed value?

23  A    It's the blue line.

24  Q    Okay.

25  A    The middle line.  And as you would expect, there is

1  usually a lag in how assessments follow the market.  So you

2  can see the market dips, but the blue line is flat and then

3  starts to gradually decline.

4      And so you'd expect this because assessments are done on

5  a certain rotation or they happen when properties are sold.

6  So you would expect a little bit of a lag but you would expect

7  assessments to follow closely with what's happening in the

8  market.

9  Q    Is the expectation that sooner or later the blue line and

10  the red line should meet?

11  A    You wouldn't expect them to meet perfectly because of

12  what's -- what properties are included for assessments.  But

13  they should be pretty close.

14  Q    And what's the green line doing in this chart?

15  A    So the green line is showing you your taxable value.  And

16  that is the tax base so it's important because this is what's

17  used to calculate the tax levy.  And the green line has a

18  little different trend.  It -- it goes up at first and then it

19  starts to fall at a much more gradual rate.

20  Q    Should it too at some point cross the other lines?

21  A    It will cross perfectly.  And the taxable value here, the

22  situation is unique that state equalized value has fallen so

23  much you'd -- taxable value is falling because it has to be

24  that -- that lesser of state equalized value or a capped

25  value.  So you'd expect the taxable value to continue to fall.

1  Q    Okay.  Let me ask you two other questions.  One, is if I

2  bought my house say back in 2007 at the peak of the market and

3  still have it, what would it be assessed at today?

4  A    It would be assessed a lot lower.

5  Q    Okay.  All right.  And then another question.  If

6  property values started increasing rapidly, how quickly would

7  assessments increase?

8  A    So if you bought your house in 2007, are you saying when

9  you -- if you were to sell it today?

10  Q    Yes.

11  A    And the assessments were -- so if you bought your house

12  in 2007 it would be reassessed when you sold it.  So it would

13  -- it would still be lower.

14  Q    Okay.  Now if I bought it today, say I bought a house

15  today.

16  A    Oh, I'm sorry, uh-huh.

17  Q    And housing prices just --

18  A    I see.

19  Q    -- just explode in Detroit.

20  A    Uh-huh.

21  Q    They go up 10% a year.

22  A    Uh-huh.

23  Q    How fast will my assessment go up?

24  A    So your assessment would follow the market, but your

25  taxable value is -- it would be restrained.  So it's sort of

1  like your assessment you can kind of run up the hill quickly,

2  but the taxable value is like you're carrying a weight.  You

3  have to go up more slowly.

4  Q    That's because it's capped every year?

5  A    That's -- that's right.  So your assessments can increase

6  following the market and they can go up 5, 10% per year.  But

7  what you're actually taxed on can only grow at the rate of

8  inflation or 5%, whatever is less.

9  Q    That's what you showed us earlier when you spoke of

10  capped value?

11  A    That's right.

12        MR. STEWART:  Okay.  Your Honor, I'd move Exhibit

13  562 into evidence as a demonstrative exhibit.

14        MR. SMITH:  No objection for demonstrative purposes,

15  Your Honor.

16        THE COURT:  All right.  It is admitted.

17     (City's Exhibit 562 was admitted)

18  Q    And let's put up if we could Exhibit 589.  Now --

19        MR. STEWART:  And, Your Honor, this is one of those

20  oversized documents that we had to deal with that is hard to

21  see on the screen and hard to work with on paper, but we have

22  both.  And I'll do the best I can.

23  Q    Ms. Sallee, could you tell us first of all, who prepared

24  Exhibit 589?

25  A    I did.

1  Q    And what is Exhibit 589?

2  A    589 is my model.

3       (City's Exhibit 589 was identified)

4  Q    Okay.  And what is it a model of?

5  A    It's a model of property taxes subject to general

6  operating taxes under the baseline scenario.

7  Q    Okay.  And what is the model -- does this model forecast

8  something?

9  A    It forecasts the property taxes for the City of Detroit

10 for the general fund.

11 Q    For what period of time?

12 A    For a ten year period.

13 Q    Okay.  And up in the left hand corner it says baseline

14 scenario.  Do you see that?

15 A    Yes.

16 Q    What is baseline scenario a reference to?

17 A    So baseline in this case is assuming that the

18 restructuring activities that are included in the plan do not

19 occur.

20 Q    Okay.  And then underneath it it says draft February 12th,

21 2014.  Is that the date of this document?

22 A    So we did do an analysis in February and it was updated.

23 And the numbers here are the June updated numbers.

24 Q    Okay.

25 A    The date is not updated.

1 Q    Okay.  So let's start with Row 9 if we could.

2 A    Okay.

3 Q    And do you see Row 9?  It says general fund taxable value

4 excludes ren zone?  Is that comparable to what we saw a few

5 minutes ago on the demonstrative exhibit with -- that had the

6 bars with the red tops on them?

7 A    That's right.  It was the blue portion of that bar.

8 Q    Okay.  And let's look just at fiscal year 2012.  There's

9 a number there, 8,270,165,916.  What is that?

10 A    So that -- that's at 8.3 billion of taxable value subject

11 to taxes -- general operating taxes.

12 Q    Okay.  And let's just move from this same row over to the

13 year 2015.  And that's the 6504.  Do you see that?

14 A    That's right.

15 Q    Now is that an historic or an actual value?

16 A    It's an actual value.

17 Q    I should have said historical or projected value.

18 A    It is the same thing.

19 Q    Sorry about that.  Now, a few rows above, there is a row

20 that says real and a road that says personal.  Do you see

21 that?

22 A    Yes.

23 Q    What are those?

24 A    So those are summing the real property taxable value

25 category shown below.

1  Q    Okay.  So Row 9 is the sum of Row 5 and Row 6?

2  A    Sorry, you said Row 9 -- yes.

3  Q    Nine is the sum of --

4  A    Uh-huh.

5  Q    I'm sorry Row 6 and Row 7, I guess, right?  It's 5 and 6.

6  A    It's 5 and 6, yeah.

7  Q    Five and six, okay.  So those just add up to Row 9, is

8  that right?

9  A    That's right.

10  Q    Okay.  So let's go now further down the chart if we

11  could.  Oh, one more thing I need to ask is if we look at the

12  columns of the chart, so those are actual values or historic

13  values for rows -- sorry, Columns B, C, D, and E, and the

14  projections start on Column F?

15  A    That's correct.

16  Q    Okay.  So now if we scroll down the chart down to about

17  Row 43, we have a title there it says components of property

18  taxable value non -- non-RZ.  Okay.  What is this -- what is

19  this part of -- part of your worksheet about?

20  A    It is showing the different tax bases that are subject to

21  the general operating taxes.

22  Q    Okay.  So let's start on Row 45.  Is that residential

23  property?

24  A    Yes.

25  Q    Okay.  And so let's choose a baseline value and am I

1  correct that the latest actual value we have for residential

2  property would be 2015?

3  A    That's right.

4  Q    And that would be cell number E-45?

5  A    Correct.

6  Q    So let's highlight E.  Okay.  Now below E-45 is a

7  pecentage, a negative percentage.

8  A    That's right.

9  Q    What is that?

10 A    It is telling you that the residential property taxable

11 value fell 20% between 2014 and 2015.

12 Q    Okay.  And that's not a projection, by you, that's what

13 the city did, is that right?

14 A    That's an actual so the city did.

15 Q    Okay.  What happened the year before 2015?

16 A    There is a reduction of 7%.

17 Q    And the year before that?

18 A    Another reduction of 7%.

19 Q    Now let's go to the projection part of this exercise.  So

20 that would be 2016.  And have you forecast a change in the

21 taxable value of residential real property for the year 2016?

22 A    Yes.

23 Q    And how did you make that forecast?

24 A    So the forecast is taking the previous year's actual

25 value and then applying a growth rate to it.

1  Q     In this case it's a negative growth rate?

2  A     That's right.

3  Q     Now where on the worksheet do we see the factors in that

4  growth rate?

5  A     So Rows 48 to 51 shows the different components of the

6  residential property growth rate.

7  Q     Okay.  So let's start with the top one.  It says

8  uncapping of TV.  I assume that's taxable value?

9  A     Right.

10  Q     As property sells?

11  A     Uh-huh.

12  Q     What is -- what are you referring to there?

13  A     So uncapping here refers to the lowering of assessments.

14  In this case when the property is sold.

15  Q     So that's my example if I bought at the peak of the

16  market but I sold it today that there is an adjustment to my

17  assessment?

18  A     That's right.  So your taxable value in the first year

19  equals your assessed value.  So if your assessments have

20  fallen, which in most cases it has, your taxable value would

21  fall.

22  Q     Okay.  So how did you come up with a negative value for

23  this for 2016?

24  A     I built a model.

25  Q     Okay.  What was in your model?

1  A    So I built a model that looked at the taxable value for

2  homes purchased a number of years ago, what their taxable

3  value would be.  So this model took into account the number of

4  sales that were happening each year, the average home price of

5  those sales, how long ago those sales took place.

6        So I used that to forecast what their likely taxable

7  value would be today under sort of the capped value growth

8  rate.  And then compared that to the sort of new taxable value

9  with the lower home sale prices.

10 Q    What was the source of your information for those factors

11 you mentioned to me a minute -- a minute ago?

12 A    So I primarily relied upon City of Detroit sales data

13 from the Detroit Association of Realtors.

14 Q    Okay.  And did you have to make predictions about how

15 many homes in the inventory of existing homes would sell in

16 any given year?

17 A    So I had a number of sales from the -- the realtors, but

18 in terms of how long people had been in their homes, or when

19 they were likely to sell, I used the census of housing data.

20 Q    And what is the census of housing data?

21 A    So it's -- it's census data that looks at -- will ask

22 people a number of questions about their homes.  Everything

23 from how many rooms, when was your structure built, to when

24 did you purchase the house.  So I could get a sense for

25 Detroit, how long ago people purchased their homes.

1  Q    Okay.  And that model led to the negative 4% that we see

2  here, is that right?

3  A    That's right.

4  Q    Okay.  Below we have on Row 49 additions, new

5  construction, increases in tenants, et cetera.

6  A    Uh-huh.

7  Q    And is that a positive or a negative number?

8  A    It's a positive number.

9  Q    How did you come up with that number?

10  A    So additions to the tax base could be through new

11  construction, or through increases in tenants, or an addition

12  on to an existing structure.  So you build an addition to your

13  house.

14      To come up, you know, to model this, I looked at building

15  permit data for Wayne County from census.  And it's only

16  available at the county level.

17  Q    Uh-huh.

18  A    So then I had to -- oh, I'm sorry, and this data provides

19  the value of construction.

20  Q    Right.

21  A    And so I was able then to estimate what taxable value

22  would be and then apportion that to Wayne County based on

23  Wayne County's share of taxable value.

24  Q    So just to break that down, the data exists at the Wayne

25  County level?

1  A    That's right.

2  Q    And that would tell you the value of what people are

3  adding to their homes?

4  A    Uh-huh.

5  Q    Then you had to turn that into a Detroit number?

6  A    That's right.

7  Q    So how do you turn that Wayne County number into a

8  Detroit number?

9  A    So I took, you know, Detroit's taxable value divided by

10 all of the taxable value in Wayne County to get that

11 percentage.  And multiplied that by that new taxable value, I

12 calculated from the census data.

13 Q    Okay.  And the next line is losses, population declines,

14 abandonment, foreclosures, rental vacancies.  Do you see that

15 -- that cell which I guess is what, E-50?

16 A    Yes.

17 Q    Okay.  And that's a negative 2?

18 A    That's right.

19 Q    How did you come up with negative 2?

20 A    So losses here are driven primarily through population

21 declines.  So that SEMCOG chart we showed earlier.

22 Q    Uh-huh.

23 A    Showed forecast of population decline, so I relied upon

24 that.  We also -- we being our team, looked at the

25 foreclosures and abandonment, the number of homes and that

1  factored into the loss as well.

2  Q    Okay.  So those factors add together to the negative 5%

3  we see on Line 46, correct?

4  A    That's right.

5  Q    And so what do you do with the negative 5%?

6  A    So you take the 2015 taxable value, that 3.1 billion, and

7  you multiply it times 1 plus the negative rate.

8  Q    Uh-huh.

9  A    To get to your new taxable value for the current year,

10 2016 in this case.

11 Q    And that comes up with the 2. it looks like 961 billion

12 dollars in 2016?

13 A    Yes, 2.98.

14 Q    Is that -- sorry.

15 A    Yeah.

16 Q    My eyes aren't very good.  And was this a process you

17 repeated year after year until you had finished doing so for

18 the full period of your forecast?

19 A    That's right.

20 Q    Using the same method in every year?

21 A    Yes.

22 Q    Let me jump forward though to cell number J-6 -- and

23 J-51.

24 A    Uh-huh.

25 Q    Do you see J-51?  We have losses and clean up of rolls

1  results of special appraisal study.  It's a negative 15%?

2  A    That's right.

3  Q    Okay.  That's a negative 15% of what?

4  A    It's a 15% loss of the residential taxable value.

5  Q    And why do you have that and let me ask why do you have

6  it in 2020?

7  A    So the city is currently doing a reappraisal study that's

8  city wide.  And the -- the city has hired out a firm to do

9  this.  We were told it would take three to five years.

10     So the analysis has -- oh, and the other part of this is

11  you do the entire reappraisal before the results start to show

12  up in the tax roll.

13  Q    I see.

14  A    So in this case I had the study finishing in 2019, so it

15  was showing up in fiscal year 2020.

16  Q    And who told you it would finish in 2019?

17  A    I had conversations with the city.

18  Q    Okay.  Who from the city?

19  A    Alvin Horhn.

20  Q    Okay.  And he's in the assessor's office, I think you

21  said?

22  A    Yeah, yeah.

23  Q    And how did you determine that negative 15% was an

24  appropriate factor to take into account as -- relating to this

25  reassessment study?

1  A    So looking at where current assessments are in taxable

2  value, that relationship modeling through the processes I've

3  discussed earlier.  After taking that into account, reached

4  the conclusion that it would probably drop another 15% and be

5  about half of the taxable value where it was in 2012 which is

6  what the city also thought it would be.

7  Q    Okay.  Now there was a significant reduction of assessed

8  value earlier in 2014, correct?

9  A    That's right.

10  Q    And we see that on -- in cell E -- oh gosh, well we see

11  it in something like E-47 or something like that, the negative

12  20%.

13  A    Yeah.

14  Q    How can you be sure you weren't double counting?

15  A    So the city talked to us about their current lowering of

16  assessments for this fiscal year.  And in conversations with

17  the Mayor and with other people in the city assessor's office,

18  Gary Evanko in January, I was told that they were lowering

19  assessments for a number of neighborhoods but they weren't

20  going to be doing that systematic city wide reassessment.

21      So they removed property -- so they lowered assessments

22  but then they also removed some property off the rolls, about

23  300,000,000 worth of taxable value.

24  Q    And what led you to think there was still more to be

25  taken off the rolls or reduced?

1  A    So doing some of the exercises discussed previously of

2  modeling assessment changes, how much further assessments

3  would likely need to fall given where the market is, reached

4  the conclusion that taxable value would likely fall further.

5  Q    Okay.  Let's go if we could now to commercial property.

6  Is that down in Row 53?

7  A    Yes.

8  Q    And fair to say that in terms of --

9         THE COURT:  Excuse me.

10        MR. STEWART:  Yes.

11        THE COURT:  Let's pause now for our afternoon break

12  and reconvene with this and we'll reconvene at 3:45, please.

13        MR. STEWART:  Yes.

14     (WITNESS CAROLINE SALLEE WAS TEMPORARILY EXCUSED AT 3:27

15  P.M.)

16        THE CLERK:  All rise.  Court is in recess.

17     (Court in Recess at 3:27 p.m.; Resume at 3:45 p.m.)

18        THE CLERK:  All rise.  Court is in session.  Please

19  be seated.

20        THE COURT:  Before we proceed, I want to advise you

21  regarding a schedule change for Thursday, this Thursday.  We

22  will be concluding that day at 1:00, so you all have the

23  afternoon off.  And then we'll resume our regular schedule on

24  Friday.

25        MR. STEWART:  May I continue Your Honor?

1          THE COURT:  Yes.

2          MR. STEWART:  Yes.

3          (WITNESS CAROLINE SALLEE RESUMED THE STAND AT 3:45 P.M.)

4    BY MR. STEWART:

5    Q    And so Ms. Sallee, I think let's go down now a couple of

6    lines to commercial property.  And we see that on Row 53?

7    A    Yes.

8    Q    In terms of the approach, in other words choosing a

9    baseline and applying a growth rate year on year, was your

10   approach the same for commercial real property as it was for

11   residential real property?

12   A    It was.

13   Q    And indeed is it the same for every single type of

14   property here?

15   A    Yes, uh-huh.

16   Q    Okay.  So what's our baseline here for commercial real

17   property?

18   A    So the baseline is shown in cell E-56.

19   Q    Okay.

20   A    For 2015.

21   Q    And that number is what?

22   A    1.749 billion.

23   Q    Okay.  And now the growth rates for this past year was

24   negative 2.1, correct?

25   A    That's right.

1  Q    And the year before negative 5?

2  A    Yes.

3  Q    And the year before that negative 2.6?

4  A    That's right.

5  Q    Okay.  So tell us how did you project growth rates for

6  future years starting with this year?

7  A    So I looked at the drivers for the commercial --

8  commercial tax base.  So being an income generating property,

9  I looked at population projections, so back to that SEMCOG

10  graphic.

11  Q    Okay.

12  A    And looking at employment forecasts for the city.  So

13  there I relied upon Dr. Cline's report and analysis.

14         MR. STEWART:  Okay.  And let's put up really briefly

15  Exhibit 556 which I think is in evidence from Dr. -- Your

16  Honor, from Dr. Cline's.

17  Q    And in particular Row 129 which I think is on the third

18  page.  Is that Dr. Cline's analysis of employment growth or

19  lack of growth in Detroit in the coming years?

20  A    Yes.

21  Q    And what use did you make of this?

22  A    So I used the employment reductions and the population

23  declines to help think about what happens to the tax base

24  since those are the people working at business establishments

25  or being people that are frequenting stores, restaurants.  So

1 thinking about activity related to commercial establishments.

2 Q    Okay.  And I should have been clearer.  What kind of

3 property is commercial property?

4 A    So those are things like your retail stores for example.

5 Q    Restaurants?

6 A    Restaurants, uh-huh.

7 Q    Okay.  All right.  And so what growth rates did you

8 project starting in 2016 for commercial real property?

9 A    So I have a negative 2% growth rate in 2016.  And that

10 falls to negative 1% in 2017 before stabilizing and then

11 starting to grow in the later part.

12 Q    Okay.  And how is it you determined that it should be

13 negative for a couple of years and then become positive?

14 A    So it's following kind of a general approach and analysis

15 of where the city is at, it's keeping with population

16 forecasts which become less negative over time.  The

17 employment trends follow that as well.

18     And then the important thing here too is that the city is

19 doing their reappraisal study and so since that, in this

20 analysis, the results of that show up in fiscal year 2020.  We

21 kind of have things decline until 2020 and then starting to

22 pick up once everything has been reassessed properly.

23 Q    Okay.  Let's go down to industrial real property.  Now

24 that's Line 64, I believe.

25 A    That's -- yes.

1  Q    And so once again please direct us to your baseline

2  value.

3  A    So the baseline starting value is shown in E-64.

4  Q    Okay.  And that's 446,673,365?

5  A    That's right.

6  Q    And then we have a growth rate.  What was the growth rate

7  most recently for industrial property in Detroit?

8  A    Negative 4%.

9  Q    The year before that?

10  A    Where am I?  Sorry.  Negative 2 1/2%.

11  Q    And the year before that?

12  A    Negative 17%.

13  Q    How did you calculate growth rates for industrial or

14  non-growth rates as the case may be for industrial real

15  property?

16  A    So I looked at the same driver as commercial.  Still

17  looking at employment trends, population trends, thinking

18  about what -- what property would be subject to general

19  operating.  But also looking at historically what has happened

20  to industrial property in a rebound compared to commercial.

21       And sort of seeing a kind of slower recovery in some

22  cases.  And so for example if you look out industrial stays

23  negative slightly longer than commercial.

24  Q    And why is it a slower rebound for industrial as compared

25  to commercial?

1  A    So commercial, the types of establishments you can

2  usually start.  They're not as capital intensive so you can

3  start a store in a shorter time period than some of the

4  industrial facilities that require a lot more planning or time

5  to build.

6  Q    Okay.  And so projecting out the industrial real property

7  we have it negative and then finally becoming flat in later

8  years?

9  A    Yes.

10  Q    Okay.

11  A    Uh-huh.

12  Q    Let me ask you now let's talk about personal property.

13  A    Uh-huh.

14  Q    First of all, hasn't the personal property tax in

15  Michigan been repealed?

16  A    It has.

17  Q    So why are you projecting personal property taxes at all?

18  A    So when we started this exercise the law had been passed

19  and signed by the Governor in 2012 subject to voter approval

20  last month which they did pass.  And there is a -- initially a

21  funding mechanism that replaced most but not all of the

22  funding.

23       And so in order to think about what revenue they would

24  likely lose, I forecasted personal property taxes throughout

25  this period so I could then make an adjustment to say, here's

1    the revenue you would expect, and if we need to lower it, due

2    to the funding mechanism not making up all of it, I knew how

3    much to adjust it by.

4    Q    And how did you know how much to adjust it by?

5    A    So initially the -- in the analysis, I assigned a

6    probability that the law would pass and I used Senate fiscal

7    agency estimates of what the average revenue loss would be for

8    a municipality which was about 20% to come up with that loss

9    of revenue.

10        So a 50% probability that you lose 20%, I factored in a

11   10% decline in the analysis which is shown up at the top part

12   of the model.

13   Q    And that's in Row 15?

14   A    That's right.

15   Q    Okay.

16   A    Yes.

17   Q    And by the way this is a 10% reduction simply in personal

18   property tax receipts, not in the overall city revenue budget,

19   is that what --

20   A    That's right the overall reduction is only a little over

21   1%.  So 1 1/2%.

22   Q    Okay.

23   A    Reduction.

24   Q    Let's go back to the bottom.  And tell us your baseline

25   once again on commercial personal property.

1  A    Commercial personal property is the 2015 value.  So that

2  that's 524,000,000.

3  Q    Okay.  And historically in recent years that's been a

4  negative growth rate, correct?

5  A    That's right.

6  Q    And what did you project for the coming years?

7  A    The same negative growth rate having personal property

8  follow the same trend as real property.

9  Q    Okay.  So you used the same method for commercial --

10  personal as you did for commercial real?

11  A    That's right.

12  Q    Okay.  And as always the math is the growth rate times

13  the tax base is the next year's tax base?

14  A    That's right.  The current year is the previous year

15  times the growth rate.

16  Q    Okay.  Let's look at industrial personal property now.

17  A    Uh-huh.

18  Q    Tell me where do we begin with that?

19  A    So industrial personal property, the baseline starts in

20  E-66.

21  Q    Okay.

22  A    The 253,000,00.

23  Q    Okay.  Now in recent years how has the growth looked in

24  industrial personal property?

25  A    There has been some increases to it.

1  Q    Okay.  What is industrial personal property by the way?

2  A    So you can think about equipment in a factory.

3  Q    Like machine tools or --

4  A    Like a machine.

5  Q    -- or a punch press or something.

6  A    Yeah.

7  Q    So how did you forecast future growth or lack of growth

8  for industrial personal property?

9  A    So I looked at several things.  One looking to see kind

10 of as part of the exercise, looking at historical trends and

11 what has happened to industrial personal property which kind

12 of moves around some.

13     There has been some categorization into renaissance

14 zones, so I looked to see the movements there.  And then

15 looking also at the same trends -- same forces that are

16 driving industrial real which would be the employment and

17 population trends.

18 Q    Okay.  And do you have here any entry on your worksheet

19 for renaissance zone taxable value change?

20 A    It's not shown in -- specifically here.

21 Q    Okay.  Look at Line 22 if you could.

22 A    Uh-huh.

23 Q    Okay.  What is that?

24 A    So that is the renaissance zone taxable value.  So that's

25 that red bar that we were showing earlier.

1  Q     Okay.  And that's what you took into account as part of

2  looking at industrial personal property?

3  A     Yeah.  In the past there was a pretty large increase in

4  renaissance zone properties.  There's some property when I

5  talked to the city had re-categorized it as a renaissance

6  zone.

7  Q     I see.  All right.  So now we've covered everything

8  except utility personal property, correct?

9  A     That's right.

10  Q    And what is -- well, first of all, who pays the utility

11  personal property tax?

12  A    The utility.

13  Q    The utility.  And what is the personal property they're

14  paying taxes on?

15  A    So that should be any equipment they're using to say, you

16  know, go up a telephone pole or fix an electrical line.  So

17  any kind of forklift or you know, machinery of that nature.

18  Anything that's associated with a structure or land.

19  Q    Uh-huh.

20  A    Would show up in industrial real.

21  Q    Okay.  So tell us how you went about calculating your

22  forecast for utility personal property.

23  A    Sure.  So you can see that utility personal property has

24  bounced around a little bit in previous years.  Some years

25  have positive growth, some have negative.

1    And there are two factors that play that would affect the

2  taxable value here.  So since it's personal property, personal

3  property is calculated as the acquisition cost and then it's

4  lowered each subsequent year to account for depreciation.

5  It's not as valuable in years out.

6    So there would be a decline due to depreciation and then

7  any additions the utilities were making would be added and

8  would raise the taxable value.

9  Q    Okay.

10 A    So looking at those two forces, positive and negative,

11 the -- use that to model a flat growth rate for most of the

12 period.

13 Q    Okay.  And that's another way of saying that they'll be

14 replacing equipment about in line with its depreciation

15 schedule?

16 A    That's right, uh-huh.

17 Q    All right.  Now we've looked at all the categories of

18 these -- the tax base.  Where on your spreadsheet are they

19 collected?

20 A    So the tax bases -- I think you mean -- are you asking if

21 the tax bases, where are they summed?

22 Q    Yes, where are they summed.

23 A    Okay.  They're summed in Row 9.

24 Q    Row 9.  So let's look at Row 9.

25 A    Uh-huh.

1 Q    And that's general fund taxable value.  And so you have a

2 number for every year going all the way to 2023?

3 A    That's right.

4 Q    Okay.  Now I think when we were looking at the

5 methodology chart and let's once again put up Exhibit 560.

6 Okay.  So now we've done step one.  We know what step two is.

7 And step three is you calculate the tax levy –– levy?

8 A    That's right.

9 Q    Okay.  Where on your spreadsheet do you do that?

10 A    It's Row 14.

11 Q    Okay.  And that's just the process of multiplication?

12 A    That's right.

13 Q    And then the next thing we do would be to determine an

14 effective collection rate?

15 A    That's right.

16 Q    So tell us how you went about determining the effective

17 collection rate.

18 A    So there are two steps involved.  So what we talked about

19 earlier first.  You have to think about who is paying on time.

20 And then the second component is what are the payments that

21 the county is going to give you for those that haven't paid

22 their taxes.

23        So the effective collection rate is –– takes into account

24 that blended non-delinquent rate of 65%, plus those net

25 payments by the county which have been around 15% or so of the

1  tax levy to get to the 80%.

2      And then I also looked to see what the historical

3  effective collection rates have been for the city which are

4  reported in their CAFR in their financial statements.

5  Q    Let me stop you there.  What is -- when it comes to

6  collections, what's our most recent historic or actual year?

7  A    The most recent is that 78% shown in D-16.

8  Q    Okay.  So two years ago it was 89.6%.  Last year it was

9  85.6%.  In fiscal '14, it's 78%, correct?

10  A    That's right.

11  Q    Okay.  What have you projected in terms of changes in the

12  collection rate?

13  A    I have an 80% collection rate taking into account the two

14  factors I talk about and in line with the historical

15  performance of the city.  So I have 80% up until that

16  reappraisal study hits the books.

17           A VOICE:  Sorry, Your Honor.  We have a technical

18  malfunction here.

19  A    So I have the collection rate increasing in 2020.

20           THE COURT:  One second, please.

21  Q    All right.  Okay.  I think I was asking you about the

22  collection rate that you -- you calculated.

23  A    You know, interesting stuff, yeah.

24  Q    Yeah, sorry, sorry.

25  A    The -- the collection rate is at 80% until 2020 which is

1  when the -- when the reappraisal study is completed.  And

2  modeling that some of the delinquent taxpayers start to pay a

3  little bit on time due to lowered assessments.

4      So I modeled residential taxpayers going back to

5  pre-recession levels.  Nothing crazy like 70%, but increasing

6  that --

7  Q    Okay.

8  A    -- slightly.

9  Q    Okay.  Back they were before the financial crisis?

10  A    That's right.

11  Q    Okay.

12  A    Uh-huh.

13  Q    Now, you've done all these steps.  Is there a place where

14  we can see your forecast of property -- of all property tax

15  collections for the City of Detroit for the general fund?

16  A    Yes.

17  Q    Where is that?

18  A    It's in Row 18.

19  Q    Okay.  Let's highlight 18.  And so that we have actuals

20  once again to 2015 and thereafter those are your projections,

21  correct?

22  A    No.  Actuals only go to 2014.

23  Q    Oh, '14 and thereafter.

24  A    And the tax base for 2015, but they haven't collected

25  yet.

1  Q    Okay.  And as a result of all of this work, have you been

2  able to reach an opinion about the property tax collections

3  the City of Detroit should be expected to receive for the

4  fiscal year -- for the ten fiscal years that will end in

5  fiscal year 2023?

6  A    Yes, I have.

7  Q    Let's move if we could to City Exhibit 593.  And in

8  particular if we could blow up on the right -- upper right

9  hand corner.  Right hand corner -- left hand corner, I'm

10  sorry.  First of all, what is Exhibit 593?

11  A    It is showing the ten year financial projections under

12  the baseline scenario for the ten year period.

13      (City's Exhibit 593 was identified)

14  Q    Okay.  And do you see here a line for the property taxes

15  that you have forecast for the ten year period I'd asked you

16  about?

17  A    Yes.

18  Q    And where is that?

19  A    It's being highlighted right now.

20  Q    Okay.  And I know on screen we can't see it all, but are

21  you able to see all of the years for property taxes?

22  A    Yes, on the exhibit.

23  Q    And what opinion if any have you reached about property

24  tax collections for the City of Detroit in the ten years

25  beginning in fiscal '14 and ending in fiscal 2023?

1  A    So it is my opinion that the property tax forecasts shown

2  here that are being highlighted are reasonable forecasts of

3  what the city could expect to collect in property taxes.

4  Q    For that period of time?

5  A    For that period of time.

6  Q    Okay.  Now let's move on.  You've heard of something

7  called restructuring and reinvestment initiatives?

8  A    Yes.

9  Q    And tell us for the record what --

10         THE COURT:  Excuse me one second.

11         MR. STEWART:  Uh-huh.

12         THE COURT:  Is it your intention to offer Exhibit

13  589 into evidence?

14         MR. STEWART:  Your Honor, 589 -- yes, it is, Your

15  Honor.  And let me do that now before I move on.

16         THE COURT:  Is there any objection to 589?

17         MR. SMITH:  Not for demonstrative purposes, Your

18  Honor.

19         MR. STEWART:  And no, Your Honor, I'm not offering

20  it only for demonstrative.  This is her work 589.  I'm

21  offering it for the truth of her calculation and projections.

22         MR. SMITH:  Well, I mean those are just -- that's

23  her opinion and it's hearsay and it's not necessarily all

24  based on actual data, so we do object to the admission of it

25  other than for demonstrative purposes.

1          THE COURT:  The document is admitted for all

2   purposes.

3          (City's Exhibit 589 was admitted)

4          THE COURT:  Now I want to caution both sides here.

5   Generally speaking, it is improper to ask the witness about

6   the contents of the documents -- a document before it's

7   admitted into evidence.  Now there was no objection here, so I

8   allowed it to go on.  But if the objection had been sustained

9   and the document not admitted, a whole lot of evidence would

10  have been struck and we would have wasted a whole lot of time.

11         MR. STEWART:  We would have.  Your Honor, I

12  apologize for that.

13         THE COURT:  I want you to move the admission of

14  documents into evidence before you ask substantive questions

15  about it.

16         MR. STEWART:  I will, Your Honor.

17         THE COURT:  Now a caution on the other side.  If you

18  fail to object to questions about the contents of a document

19  before it's admitted into evidence, the Court could very well

20  hold that not only have you waived your objection to that, but

21  you've waived your objection to the admission of the document.

22  So I really want to stick to this rule on both sides, it's

23  important.

24         MR. STEWART:  I apologize for the oversight, Your

25  Honor.  It was in my outline, I just didn't pay any attention

1  to it.

2      And but while I'm at it, Your Honor, as to Exhibit 593,

3  let me ask some foundation questions and move it -- and move

4  for its admission.

5          MR. HACKNEY:  Your Honor, can I just interpose one

6  question?  One of the things that we're struggling with, and

7  I'm sorry to interrupt.  One of the things that we're

8  struggling with is that these documents are -- they're hybrid

9  documents in the sense that they both contain historical

10  information that is not the witness' opinion and they contain

11  future opinions that the witness may have in part, but that

12  other witnesses have for other parts.

13      So that was our understanding as to why it was being used

14  on a demonstrative basis to facilitate understanding what her

15  opinions were.  That's the basis for our objection as to why

16  it didn't come into evidence.  I'm just trying to explain our

17  behavior with respect to the -- the exhibit.

18      Does your rule apply equally to demonstrative exhibits

19  which is that you don't want the witness to explain the

20  demonstrative first before it is admitted as a demonstrative?

21  Because --

22          THE COURT:  There needs to be a foundation for it

23  established, but that can be done without the witness

24  testifying as to -- as to the details of what the

25  demonstrative or really any evidence shows.

1    And I would like that foundation established and then the

2  document moved into evidence and you can object on whatever

3  grounds you see fit, or not object and then we can proceed.

4         MR. HACKNEY:  To clarify though, is this entire

5  document coming into evidence even though her opinions only

6  relate to discreet portions of it?

7         THE COURT:  I'm not sure I agree with the even

8  though part.  But the answer to your question is yes.  This

9  document is in evidence for all purposes.

10 Q   And Ms. Sallee, we have before us exhibit five ninety --

11        THE COURT:  When we're talking about this document,

12 we're talking about five eighty --

13        MR. STEWART:  Five ninety-three.

14        THE COURT:  We're not -- we're not at 593 yet.

15        MR. STEWART:  Okay.  Sorry, Your Honor.

16        THE COURT:  Because you haven't moved that yet.

17        MR. STEWART:  Right.

18        THE COURT:  Mr. Hackney was asking me about 589.

19        MR. HACKNEY:  No.  I was talking about 593.

20        THE COURT:  Oh, all right.  I haven't ruled on 593

21 yet, it hasn't been offered yet.

22        MR. HACKNEY:  But I thought that's what was --

23        MR. STEWART:  I said I was about to do it.

24        MR. HACKNEY:  Oh, I'm sorry.

25        MR. STEWART:  Yeah.  But, Your Honor, I think what

 1 | I'm going to do is --

 2 |          THE COURT:  Establish a foundation for 593 and then

 3 | move it into evidence, is that right, sir?

 4 |          MR. STEWART:  That's what I was planning to do, Your

 5 | Honor.

 6 |          THE COURT:  Okay.

 7 | Q    And Ms. Sallee, you have Exhibit 593 before you?

 8 | A    Yes.

 9 | Q    And what is Exhibit 593?

10 | A    So 593 shows the ten year financial projections for

11 | revenues, expenditures, a number of things.

12 | Q    And who prepared Exhibit 593?

13 | A    So parts of this and the revenue, the property tax and

14 | the city revenue sharing, those are my work.

15 | Q    Okay.  And who -- as a general -- Ernst & Young

16 | prepared --

17 | A    Ernst and -- I'm sorry

18 | Q    Okay.  And is this --

19 | A    -- overall Ernst & Young prepared.

20 | Q    Is this a document you have worked with?

21 | A    Yes.

22 | Q    And what does the document contain?

23 | A    So the document contains historical information up until

24 | 2014 and then forecasts.

25 |          MR. STEWART:  Thank you.  Your Honor, I would move

1  into evidence Exhibit 593.

2         MR. SMITH:  Your Honor, we don't have an objection

3  asking her about the property tax and revenue sharing which is

4  two lines on this.  But the vast majority of these numbers she

5  wasn't involved with, you know, calculating.

6         THE COURT:  Is it fair to say, Ma'am, that you are

7  not in a position to testify as to the accuracy of any of the

8  information on this page other than what you've identified

9  revenues?

10 A    That's correct.

11        THE COURT:  All right.  I'll -- I'm not going to

12 admit 593 until the accuracy of the entire document is

13 established by whatever other witnesses you have for it.  I

14 will permit you to ask the witnesses about the lines that she

15 did prepare.

16        MR. STEWART:  Yes.

17        THE COURT:  Is not in evidence.

18        MR. STEWART:  And Your Honor, then I will move it as

19 a demonstrative for that purpose so that it's properly before

20 Your Honor to that extent.

21        THE COURT:  No, I'm not going to admit it for any

22 purpose.  I am going to ask -- I'm going to permit you to ask

23 questions about the lines that the witness prepared.

24        MR. STEWART:  Okay.

25 Q    All right.  Let's move on.  Ms. Sallee, let's ask --

1  let's got to 588 if we could.

2          THE COURT:  All right.  So we're not going to ask

3  questions about 593 at all?

4          MR. STEWART:  We -- Your Honor, I did.  I asked her

5  about the line that said property taxes and asked her opinion

6  with respect to property taxes.  I believe her testimony was

7  it was her opinion that the amount shown as the property taxes

8  on 593 are a -- and I don't recall her precise words, are a

9  reasonable forecast and the property tax collections the city

10  should expect to receive for that period of time.

11          THE COURT:  Are the numbers on the property tax line

12  on 593 taken directly from 589?

13  A    They are.

14          THE COURT:  All right.  You may move on then.

15          MR. STEWART:  Thank you.

16  Q    Let me ask you now about restructuring and reinvestment

17  initiatives.

18  A    Okay.

19  Q    And let's look at 588.  Do you have Exhibit 588 before

20  you?

21  A    I do.

22  Q    What is Exhibit 588?

23  A    It shows the same type of analysis under the

24  restructuring and reinvestment initiatives have taken place

25  and have resulted in some economic improvements to the city

1      (City's Exhibit 588 was identified)

2  Q    And who prepared Exhibit 588?

3  A    I did.

4  Q    And why did you prepare it?

5  A    I prepared it to forecast general fund property tax

6  revenues under the condition that restructuring and

7  reinvestment activities had taken place.

8          MR. STEWART:  Your Honor, I move the admission of

9  Exhibit 588.

10         MR. SMITH:  Objection, hearsay.  Expert opinion.

11         THE COURT:  The objections are overruled and 588 is

12  admitted into evidence.

13     (City's Exhibit 588 was admitted)

14  Q    If you could, Ms. Sallee, could you -- well, first of

15  all, is it fair to say that your approach for 588 is the --

16  the same as we saw before when you were projecting property

17  tax revenues without restructuring?

18  A    It is.

19  Q    And so how -- that there are differences too?

20  A    Yes.

21  Q    What are the differences?

22  A    There are -- there are several differences.  So here

23  assuming that the restructuring activities that are in the

24  plan occur.  There are differences in growth rates for the

25  different tax bases as a result of those activities.

1      There is a different effective collection rate shown on

2   Line 14.  There is a difference in timing so you'll see that

3   for some of the tax bases there's recovery that's faster

4   because of those initiatives.

5   Q    And why are there -- why are these -- why are -- why are

6   there these differences?

7   A    So this scenario is taking into account improvements in

8   the economy which would affect things like people's ability to

9   pay so the collection rate goes up.  It factors into things

10  like employment growth so the restructuring scenario has a

11  slight improvement in employment in later years.  And so

12  that's factored in here as one of the drivers of commercial

13  industrial property for example.

14  Q    Let's just choose one line or one example.  Let's look at

15  Row 44 which is residential real property.  And once again we

16  start with the growth rate of negative 20.5 for 2015.  But the

17  negative growth in the coming years is different, is it not,

18  than you had had for the non-restructuring scenario?

19  A    That's right, it's less negative.

20  Q    Okay.

21  A    Uh-huh.

22  Q    And tell us just with respect to this one category, why

23  you concluded it was appropriate to have a less negative

24  growth rate?

25  A    So with the economic improvements those being taken into

1  account so for example things like, you know, more sort of for

2  residential and more people having jobs, being able to

3  actually own a home, be a tenant, those kinds of things made

4  some of the categories or the drivers less negative for

5  example.

6  Q    Okay.  Is there a determination, is there a forecast on

7  Exhibit 588 that you have reached of property collections for

8  the general fund end with the restructuring scenario?

9  A    Yes.

10 Q    And where -- where do we see that?

11 A    So the forecast of property tax collections for the

12 general fund is shown in Line 16.

13 Q    Okay.  And for example that would forecast for the year

14 2018 collections of 102,552,481?

15 A    That's right.

16      THE COURT:  Excuse me one second.  Before we get too

17 far ahead of this, how did you decide --

18 A    Uh-huh.

19      THE COURT:  -- how much less negative the growth

20 rates would be --

21 A    Uh-huh.

22      THE COURT:  -- in this scenario?

23 A    That's a very good question.  So I looked at a couple

24 things.  One would be in the past and during an economic

25 recovery what happened to these tax bases.

1    So for example in the last two recessions how did the

2  property tax base grow in coming years on average in order to

3  come up with the right magnitude of growth rate.  So I did an

4  analysis of historical recoveries.  And then second, looking

5  at some of the forecasted economic drivers.

6    So for things like employment growth that's used in Dr.

7  Cline's work, having half a percent growth for example there,

8  looking at those and helping to determine what would be a

9  reasonable growth rate that was less negative and thinking

10  about timing too, how long does it take for different bases to

11  recover.  If that makes sense.

12  Q    Ms. Sallee, let's -- let me direct your attention if we

13  could to Exhibit 595.  And could you tell us what is Exhibit

14  595?

15  A    So I think, let me look.  So 595 is -- contains the

16  property tax forecasts under the restructuring scenario.

17  Q    Okay.  And -- and this -- this page of the exhibit is for

18  the first ten years, correct?

19  A    That's right.

20    MR. SMITH:  And, Your Honor, we have the same

21  objection that we had on 593 that, you know, there are a

22  number of other numbers on here other than property taxes and

23  revenue sharing that this witness was not involved in.  And I

24  don't think it's been admitted into evidence.

25    MR. STEWART:  Well, that was what I was about to

1  next do, Your Honor.  But I think given your ruling on 593, I

2  would ask this be received for the same purpose as that which

3  is for purposes of allowing Ms. Sallee to identify the line

4  with the understanding that someone else will come get the

5  document itself into evidence.

6          THE COURT:  Okay.  I'll -- I'll permit you to ask

7  about so much of this document as this witness can testify

8  about.  But I won't admit it into evidence.

9          MR. STEWART:  Thank you.

10 Q   Ms. Sallee, let me direct your attention to the line on

11 Exhibit 595 that refers to property taxes.

12 A   Yes.

13 Q   And does that set forth the forecast you reached for

14 property taxes for the City of Detroit under a restructuring

15 and reinvestment scenario for the fiscal years 2014 to 2023?

16 A   Yes.

17 Q   And have you reached an opinion about that forecast?

18 A   I have.

19 Q   Please tell us what is your opinion?

20 A   It is my opinion that the forecasts shown in the

21 highlighted row are reasonable forecasts of what the city

22 could expect to collect in property taxes under the

23 restructuring scenario.

24 Q   Okay.  Let's if we could now go to Exhibit 594.  594.

25 Now, Ms. Sallee, have you -- do you have Exhibit 594 before

1 | you?

2 | A    I do.

3 | Q    Okay.  And what is Exhibit 594?

4 | A    So Exhibit 594 shows the revenues and expenditures during

5 | the 40 year period that we were asked to project.

6 | Q    Okay.  And do you have a projection here for property

7 | taxes for that 40 year period?

8 | A    I do.

9 |          MR. SMITH:  And -- and, Your Honor, this is the same

10 | issue as 593 and 595.  It's got the other numbers here for,

11 | you know, things that she didn't calculate.

12 |          MR. STEWART:  And, Your Honor, as with those

13 | exhibits, I intend to ask only about those matters she has

14 | worked on and wait for admission to a witness who is competent

15 | to --

16 |          THE COURT:  All right.  Thank you.  I will permit

17 | that.  Go ahead.

18 | Q    And Ms. Sallee, tell us what the property tax line on

19 | Exhibit 594 shows.

20 | A    So the property taxes it shows for those four decades

21 | that I prepared a projection for.

22 | Q    Okay.  And we start with the decade you just talked

23 | about, 2014 to 2023.

24 | A    That's right.

25 | Q    And then what do you do to extrapolate from that for

1  future years?

2  A    So the extrapolation exercise starts within the first

3  part of that second decade following CBO projections of

4  housing appreciation.  So following national trends saying

5  Detroit is going to look like the nation in terms of –– of

6  growth in housing appreciation.

7      And so use that to forecast the first part of that second

8  ten year period.  And then having it phased down to that long

9  run growth rate that we used for the remaining part of the 40

10  year period.

11      So in this exercise looking at such a long time horizon,

12  there are going to be ups and downs.  Year to year you can't

13  predict that far out.  And so instead the approach you used

14  here with other taxes is to look at what has been the long run

15  growth rate in the tax base for Detroit looking at some

16  different periods because recent history has been unique.

17      So looking at that long run growth for Detroit, selected

18  the 1 1/2% increase in taxable value, used that to forecast

19  the growth ultimately in collections for this four year

20  period.

21  Q    Now you mentioned the CBO house price study of some sort?

22  A    So the CBO does their ten year economic forecast.  And

23  one of the things they look at is housing.  They've included a

24  housing price index.

25  Q    Okay.  And so you took that into account and then you

1  said you referred to a long term growth rate?

2  A    That's right.

3  Q    What long term growth rate did you refer to?

4  A    So looking at the taxable value growth in Detroit over

5  the last -- looking at between 2000 and 2008, before kind of

6  craziness and even a longer run, looking at those two growth

7  rates just to come up with -- through the analysis to come up

8  with that 1 1/2% growth.

9  Q    And so is it fair to say in looking at your -- the next

10  30 years that you're projecting, you're taking the baseline

11  and applying a -- a constant rate of growth over the coming 40

12  years?

13  A    So at that initial first decade where I told you there's

14  slightly better growth, having that phase down and then

15  hitting that long run growth rate for the last two decades.

16  So that's why you see the growth after fiscal year '23 for

17  property taxes.  On average it's between that 1 1/2% and 2.2%.

18  Q    Okay.

19  A    Taking into account good growth initially.

20  Q    So as a result of your work have you reached an opinion

21  about the projected long term growth rate of property taxes

22  for the City of Detroit for the 40 years, or I should say for

23  the 30 years beginning in fiscal 2024 and ending in fiscal

24  2053?

25  A    I have.

1  Q    And can you tell us what is your opinion?

2  A    So my -- it is my opinion that the forecasts shown in the

3  highlighted rows are reasonable forecasts of what the city can

4  expect from property tax revenues during that 40 year period.

5  Q    Okay.  Now let's move on to the last part which is state

6  revenue sharing.  And you can take that down if you'd like.

7      First of all, you were asked to produce forecasts of

8  state revenue sharing that the city receives, correct?

9  A    That's right.

10  Q    Tell us briefly what are the types of state revenue

11  sharing Detroit receives?

12  A    So there are two components to state revenue sharing.

13  There is a constitutional component, and a component that's

14  put forth in the boilerplate language of the appropriation, so

15  it's not constitutional and statutory.  And it is the economic

16  vitality incentive program.

17  Q    E-V-I-P?

18  A    EVIP, uh-huh.

19  Q    Okay.  All right.  Now is -- how is EVIP determined?

20  A    So EVIP is at the discretion of the legislature in

21  Lansing.

22  Q    Okay.  All right.  So let me -- let's put up Exhibit 590.

23  Is Exhibit 590 before you, Ms. Sallee?

24  A    Yes.

25  Q    What is Exhibit 590?

1  A    So this is a worksheet that I did on state revenue

2  sharing.

3       (City's Exhibit 590 was identified)

4  Q    Okay.  You prepared this personally?

5  A    Yes.

6  Q    And what was your purpose in preparing Exhibit 590?

7  A    To -- to forecast revenue sharing payments that the City

8  of Detroit would receive.

9  Q    And where did you get your information from?

10 A    So --

11      MR. STEWART:  Well, actually, Your Honor, let me

12 move the admission of 590.  That was intended to be a

13 foundational question, but I think it could have strayed into

14 substance.  So I'll move it at this point.

15      MR. SMITH:  Your Honor, I do object, hearsay and

16 expert opinion.  And I believe that part of the numbers in

17 here were actually calculated by somebody at the state and not

18 Ms. Sallee.

19      THE COURT:  Did you do all of the calculations that

20 -- that this sheet reflects?

21 A    Some of these numbers are coming from the state.  So if

22 -- if you see growth rates, I calculated it.  But for part of

23 this, this is coming from treasury, some of the baseline.

24      THE COURT:  Can you identify the lines for example

25 that you obtained from the State of Michigan?

1  A    Yes.

2           THE COURT:  Go ahead.

3  A    So Line 19 and 20, and 21 are from the state.

4           THE COURT:  I'm looking at the screen and it doesn't

5  -- my screen doesn't have the line numbers on it.  So -- so

6  tell me what the detail is.

7  A    Sure.  So state revenue sharing amounts, you can see

8  constitutional EVIP total starting in fiscal year 2012.  Okay.

9  Going up until fiscal year 2025, those are state projections.

10          THE COURT:  So what's highlighted here now are from

11  the state?

12  A    That's correct, uh-huh.  And the same with the Detroit

13  revenue sharing, those same categories constitutional EVIP

14  total.

15          THE COURT:  So those are from the state also?

16  A    That's right, uh-huh.

17          THE COURT:  Would you like to respond to the

18  objection?

19          MR. STEWART:  Yes, Your Honor.  Perhaps I can lay a

20  foundation with this witness that might make -- might clarify

21  things for us.

22          THE COURT:  Go ahead.

23  A    In the course of your work in reaching an opinion with

24  respect to state revenue sharing, Ms. Sallee, did you obtain

25  information from the State of Michigan?

1  A    Yes.

2  Q    What information did you obtain from the State of

3  Michigan?

4  A    The Michigan Treasury provided me with their forecasts of

5  state revenue sharing amounts.

6          THE COURT:  Just answer this in response to my

7  questions.

8          MR. STEWART:  Sorry, Your Honor.  Your Honor, then I

9  -- I believe it's answered.  I think as an expert witness

10 she's allowed to rely on materials of the sorts of information

11 that is given to experts.  And I think state data which she

12 testified earlier she relied upon is a proper source of data

13 for her to rely upon in her calculations.

14         THE COURT:  All right.  The Court will admit the

15 document with the understanding that the projections that she

16 says she obtained from the state are allowed only to show what

17 she relied on and not for the truth of them.

18     (City's Exhibit 590 was admitted)

19         MR. STEWART:  Yes.

20 Q    Okay.  All right.  So Ms. Sallee, let's start if we could

21 with the EVIP portion of your -- of your projection.  Where do

22 we see that on your spreadsheet?

23 A    Row 29.

24 Q    Okay.  And what is our first historical or actual number

25 on Row 29?

1   A    The -- the first historical is 121.4 million shown in

2   B-29.

3   Q    Okay.  I'm sorry.  It is for what year again?

4   A    So the first actual is fiscal year 2012.

5   Q    Okay.  And what cell is it?

6   A    B-29.

7   Q    Okay.  And so E-29 is a value of one thirty-six?

8   A    No.  So the first actual is 2012.  And then the last

9   actual is fiscal year -- shown on this worksheet is fiscal

10  year 2014 which is 136,000,000.

11  Q    And why was one thirty-six chosen as the value for --

12  pardon me, state revenue, EVIP revenue sharing for that year?

13  A    So that's an actual that we then carried through

14  following current law.

15  Q    Okay.  And so every value after that is also one

16  thirty-six?

17  A    That's right.

18  Q    Why is that?

19  A    Because in this worksheet the most recently appropriated

20  number was the 136,000,000 for Detroit and following standard

21  procedures for forecasting you include what has been put into

22  law.  In this case it's the 136,000,000 and treasury follows

23  the same procedure in the forecast.

24  Q    Since that time has a different EVIP -- EVIP amount been

25  appropriated by the Michigan legislature?

1  A    Yes.

2  Q    When did that happen?

3  A    That happened in June.

4  Q    And what was the new amount?

5  A    140.5 million.

6  Q    And so this chart does not reflect that, correct?

7  A    That's right.

8  Q    But if you were to follow your methodology, what should

9  the chart be modified to read?

10 A    All right.  So this is an older worksheet.  And the newer

11 worksheet would have one forty showing in fiscal year 2015 for

12 EVIP and then carrying that amount through the rest of the

13 forecast period.

14 Q    Without any change?

15 A    Without any change, uh-huh.

16 Q    Even if it's a 40 year forecast?

17 A    That's right.

18 Q    Why would you not change it for the rest of the forecast?

19 A    Because this is at the discretion of the legislature and

20 they can eliminate the program at any time.  They can increase

21 it, but they can also decrease it.  And you can see in the

22 past they have increased and decreased statutory revenue

23 sharing amounts.

24      And so following the standard forecasting procedure,

25 taking what current law is, you use the most recent current

1  law EVIP amount of 140.5 million for fiscal year 2015 carrying

2  it throughout.

3  Q    Okay.  Let's go down to constitutional revenue sharing.

4  What is the source of constitutional revenue sharing?

5  A    The sales tax for the state.

6  Q    Okay.  And how is the amount Detroit is to receive

7  calculated under the constitutional formula?

8  A    So part of the sales tax is dedicated to revenue sharing.

9  So that formula is 15% of the first 4% of the sales tax.  The

10  sales tax is 6%.  So about 10% of the sales tax is put into

11  revenue sharing amounts.

12       And then Detroit's share is based on it's share of

13  statewide population.  So you take revenue sharing amount

14  times, you know, Detroit's share of the population in the

15  state.

16  Q    And how often is Detroit's share of the state population

17  determined?

18  A    It's adjusted with every census, every -- with every

19  decennial census every ten years.

20  Q    So today we're relying on the numbers from 2010?

21  A    That's right.

22  Q    And in the future, the next census these will change

23  again?

24  A    That's right.

25  Q    Okay.

1   A      Uh-huh.

2   Q    Does your worksheet show the ratio here of what

3   percentage of the population of Michigan is Detroit's?

4   A     It does not show that percentage.

5   Q    Okay.

6   A     Huh-uh.

7   Q    How did --

8   A     Oh, I'm sorry, it does.  Sorry, Line 35 shows that it's

9   -- it's 7%.

10  Q    Okay.  And that's calculated from the census data that --

11  that you just referred to?

12  A     It's -- so that 7% is based on census numbers, yes.

13  Q    Okay.

14  A     Uh-huh.

15  Q    Now what if anything did you do to determine the rate of

16  growth or not growth of sales tax revenue for the State of

17  Michigan?

18  A     So following the forecasting done by Michigan treasury

19  there --

20  Q    Stop you right there.

21  A     Uh-huh.

22  Q    You're saying that you relied on someone else's forecast?

23  A     I relied upon work done by treasury.

24  Q    Okay.

25  A     Uh-huh.

1  Q    The State Treasury Department?

2  A    That's right.

3  Q    And what did they tell you?

4  A    So they have a forecast of sales tax revenue of 2.9% per

5  year on average.

6  Q    They -- I'm sorry, they're forecasting growth at that

7  rate per year?

8  A    They are forecasting growth at that rate.

9  Q    Now let me stop you there.  Have you relied before on

10 forecasts made by the Michigan state government?

11 A    Yes.

12 Q    Okay.  And are forecasts made by the Michigan state

13 government something that economists rely upon in analyzing

14 tax revenues?

15 A    Yes.

16 Q    How reliable have you found the state tax forecast to be?

17 A    They're pretty reliable.  I mean they -- they do a good

18 job of taking the most recent information and trying to come

19 up with the best forecast.  So in terms of state level data, I

20 think it's very good.

21 Q    So with the two numbers you told me about which is the

22 state treasury forecast of sales tax growth and then the

23 percentage of state population that is in Detroit, what did

24 you do to forecast state revenue sharing for the city in the

25 -- in the coming ten years?

1    A    So for the constitutional piece I have the sales tax

2    growth similar to what the state has forecasted.  And I have

3    Detroit's share of that constitutional revenue declining

4    because the statewide population stays about the same

5    throughout the period following projections by the state and

6    by SEMCOG.

7        And so when Detroit loses population it's losing a share.

8    And so ever -- after every census, there's an adjustment

9    downward for state -- for Detroit's constitutional piece.

10   Q    So let's focus on the -- the period up till 2020.

11   A    Okay.

12   Q    The period up till 2020 we're dealing with the census

13   information from 2010, correct?

14   A    That's right.

15   Q    And do I understand correctly then that that percentage

16   remains constant until we have a new census?

17   A    That's right.

18   Q    And in all of the years that are covered by the Michigan

19   treasury forecast you're using a growth rate of sales taxes of

20   2.9%?

21   A    You can see that the -- the growth for most years is 2.9%

22   shown on Row 24.

23   Q    Uh-huh.  Okay.  You have changed it for some years

24   though?

25   A    So going past the period that the state forecasted, so

1  post 2025, the assumption has changed slightly.  Here you only

2  see the --

3  Q    You say here, what cell are you pointing to?

4  A    Oh, I'm sorry.  You do not -- past 2025, there is no --

5  you can't see the assumption, it's not shown in this

6  worksheet.

7  Q    Let's -- let's focus only on the first ten years.

8  A    Okay.

9  Q    Okay.  So up till 2020 we have the percentage of

10  population that is Detroit's is 7%, is that correct?

11  A    That's right.

12  Q    That does not change due to the new census, correct?

13  A    Uh-huh.

14  Q    And I believe you told us you've been relying on the

15  growth rates that came to you from the Michigan Treasury

16  Department, correct?

17  A    That's right.

18  Q    So up through the year 2020, how have you calculated

19  projected state revenue, constitutional state revenue sharing

20  for the City of Detroit?

21  A    So in this case it's shown on Line 28.

22  Q    Okay.  And tell us how you got there.

23  A    And that is the growth in sales taxes times Detroit's

24  share of it.

25  Q    Okay.  And the baseline number from which you calculate

1  the growth is what cell?

2  A    So for these what you're looking looks highlighted.  So

3  these are numbers --

4  Q    Just -- just give us -- you're going to have to give us

5  the cell, the cell number.

6  A    Well, so the baseline starts on this in D-28.

7  Q    Twenty-eight.

8  A    Uh-huh.

9  Q    And then from there you apply the annual growth rate that

10  you told us about, correct?

11  A    Yes.

12  Q    Now there's a new census in 2020.  Then what happens to

13  your analysis?

14  A    In 2020 you can see constitutional drops because of a

15  loss of population.

16  Q    And what makes you conclude there will be a loss of

17  population in 2020?

18  A    Using the population forecasts we looked at earlier.

19  Q    The chart we saw?

20  A    That's right.

21  Q    Okay.  And then what do you -- how do you forecast what

22  is to be the state's population in 2020?

23  A    And so the state population is kept around 10,000,000.

24  Q    And -- and why?

25  A    Because both Michigan treasury and SEMCOG have population

1  staying about the same.

2  Q    Okay.  And so in 2020 just to recap, you have the

3  population forecast of the city we already saw on exhibit --

4  let's put up 545, please.  And then you have projections from

5  SEMCOG and the state about what the state's population will

6  be, correct?

7  A    That's right.

8  Q    And from that what do you -- what do you calculate?

9  A    Can you say the question again?

10 Q    Well, from that you calculate what the new percentage

11 will be.

12 A    That's right.  So once you have a census in 2020 you can

13 see what Detroit's -- and you can see in cell K-35.

14 Q    Uh-huh.

15 A    Detroit's share falls from 7.2% to 6.3%.

16 Q    Okay.

17 A    Yes.

18 Q    And did you do the same exercise for its 2030 census?

19 A    That's right.

20 Q    And the 2040 census?

21 A    That's right.

22 Q    Using what sources?

23 A    Using the EY QUEST -- using SEMCOG up until 2032 and then

24 EY QUEST post that.

25 Q    And what for the population in Michigan as a whole for

1  those censuses?

2  A    So keeping Michigan's population constant according to

3  SEMCOG.

4  Q    Okay.  Now so we've now worked out in our constitutional

5  formula the part about population.  What did you do to project

6  growth rates, or lack of growth, in state sales tax revenue

7  for the periods after 2025?  Did you not tell me the state

8  projected it up to 2025, correct?

9  A    Right, uh-huh.

10  Q    And after 2025 what did you do?

11  A    That's right.  So I kept the total growth rate of

12  Detroit's revenue sharing shown on Line 30.  I kept that at

13  the same rate except for years following a census.  And so the

14  sales tax growth is not shown here.

15  Q    And what growth rate did you apply?

16  A    Using usually between 2 and 3%.

17  Q    Okay.  And how did you choose the rate of between 2 and

18  3%?

19  A    Following what the state had forecasted in recent

20  experience.

21  Q    I'm sorry, I didn't hear you.

22  A    Following what the state had used as guidance.

23  Q    Okay.  And but the state only forecast went to 2025,

24  correct?

25  A    That's right.

1  Q    So what did you -- what was your source for extrapolating

2  it after 2025?

3  A    I used the same growth rate post as you can see up to

4  2025 going forward.  So keeping the growth rate overall about

5  1% following what the treasury had done.

6  Q    Okay.  Now so you can describe to us your methodology for

7  forecasting state revenue sharing?

8  A    That's right.

9  Q    Under both EVIP and constitutional?

10  A    That's right.

11  Q    Is there a place on Exhibit 590 you summed the two to get

12  -- you added them together?

13  A    They're shown on Line 30.

14  Q    Okay.  And now Line 30 doesn't reflect the increase in

15  EVIP payments that you told us about from one thirty-six to

16  one forty, is that correct?

17  A    That's correct.

18  Q    Okay.  Let me ask you is that a calculation though that

19  you have done?

20  A    Yes.

21  Q    Okay.  Let me ask you to look a Exhibit 595, please.  And

22  is there a line on 595 for state revenue sharing?

23  A    Yes.

24         MR. STEWART:  Okay.  And Your Honor, this is the

25  exhibit we spoke of before that's not in evidence and I was --

1  Q    Is -- does this line on state revenue sharing reflect the

2  analysis you did of state revenue sharing that you just

3  testified about?

4          MR. SMITH:  And, Your Honor, I don't know that I

5  need to object again, but this is -- we don't have an

6  objection to talking about the state revenue sharing, but it's

7  the -- it's one of these documents with all these numbers on.

8          THE COURT:  The Court will permit this.  Go ahead.

9  Q    Ms. Sallee, do you see the state revenue sharing line on

10 Exhibit 595?

11 A    I do.

12 Q    Now is Exhibit 595 a projection of among other things

13 state revenue sharing revenues for the period from fiscal 2014

14 to 2023?

15 A    Yes.

16 Q    Have you reached an opinion?

17 A    I have.

18 Q    About the forecast of those revenues for that period of

19 time?

20 A    Yes.

21 Q    What is your opinion?

22 A    My opinion is that the forecast shown for state revenue

23 sharing is a reasonable forecast of what the city might

24 receive from the state revenue sharing program.

25 Q    Okay.  And let's go finally to Exhibit 594.  Do you

1  see --

2          MR. STEWART:  And, Your Honor, once again 594 is yet

3  another one of the documents that I will ask her about but

4  it's not admitted into evidence.

5  Q    Do you see --

6          THE COURT:  I'll permit you to question her about so

7  much of it as she contributed.

8  Q    Do you see on Exhibit 594, Ms. Sallee, the line for state

9  revenue sharing?

10 A    Yes.

11 Q    And before going further, tell us what periods of time

12 are reflected in Exhibit 594.

13 A    It is the 40 year projections.

14 Q    All right.  Have you reached an opinion about the -- the

15 projections as they appear on Exhibit 594 for state revenue

16 sharing for the -- the four decennial periods running from

17 2014 to 2053?

18 A    Yes.

19 Q    What is your opinion?

20 A    My opinion is that the forecasts shown for state revenue

21 sharing are reasonable forecasts of what the city might

22 receive from the state revenue sharing program.

23         MR. STEWART:  Thank you.  Your Honor, I'm -- that's

24 all I have.

25         THE COURT:  All right.

1          MR. SMITH:  Your Honor, I have some binders that I

2    may use.  If I may approach.

3          THE COURT:  Yeah.

4          MR. SMITH:  Your Honor, if I may approach the

5    witness?

6          THE COURT:  Yes.

7          THE WITNESS:  Hi.  Thank you.

8                          CROSS EXAMINATION

9    BY MR. SMITH:

10   Q    Good afternoon, Ms. Sallee.  It's good to see you again.

11   I have some questions about the opinions you discussed today

12   from your original expert report in this matter.

13        And I know you've done a rebuttal report which I won't be

14   asking about.  We're going to have another deposition when

15   we'll see each other again.  And then maybe we'll have a

16   chance to talk about that later, all right?

17   A    Sounds good.

18   Q    And speaking of your deposition, I handed you a binder

19   and in there I have your deposition and a few documents that I

20   may refer to.  And your deposition is right up front in the

21   binder.

22        Now you acknowledge that you're not an expert on property

23   assessment, correct?

24   A    Property assessment, correct, uh-huh.

25   Q    And you're not an expert on real estate valuation

1  correct?

2  A    That's correct.

3  Q    And this is the first time you have forecasted a taxable

4  value for property in a city, correct?

5  A    Correct, uh-huh.

6  Q    And you're not holding yourself out as an expert in real

7  estate in general, correct?

8  A    That's correct.

9  Q    And you're not an expert on property tax collection,

10 correct?

11 A    Correct.

12 Q    And before the Detroit matter you had never forecasted

13 the amount of property tax revenue a city would receive in

14 total, correct?

15 A    In total?  Correct.

16 Q    And before the Detroit matter, you had never forecast

17 state revenue sharing payments either, correct?

18 A    Correct.

19 Q    And you're not an expert on financial analysis, correct?

20 A    Correct.

21 Q    You're not an expert on accounting?

22 A    Correct.

23 Q    And as you mentioned you haven't been qualified as an

24 expert by any Court, correct?

25 A    That's correct

1  Q    You're not able to explain the methodology used in

2  assessing property taxes in Detroit, correct?

3  A    I understand the methods that are used.

4  Q    The -- if you turn to Page 47 of your deposition, Line 25

5  to 48, Line 4.  Did I ask you the following --

6  A    I'm sorry, what page?

7  Q    Page 47, Line 25 to Page 48, Line 4.  And did I ask you

8  the following question and did you give the following answer?

9  I mean can you -- are you able to explain the mechanism or

10  methodology used in assessing property taxes?  Answer, I don't

11  know what the city's assessor office was doing to assess

12  property.  I don't know.  Was that your testimony?

13  A    Yes.

14  Q    And -- and you don't know what factors the city actually

15  takes into account in assessing property in the city, correct?

16  A    I know what methods they are legally able to use.

17  Q    But you don't know what factors the city actually uses in

18  assessing property, correct?

19  A    And given from year to year, day to day what they

20  actually choose to use, you're right, I don't know.

21  Q    Yeah.

22  A    Yeah.

23  Q    And you can't explain the methodology used by the city in

24  collecting property taxes, correct?

25  A    Correct.

1  Q    And when you developed your opinions, you did not know

2  whether the assessor's office had been the subject of any

3  reviews by outside consultants, correct?

4  A    Does outside consultants mean outside of government,

5  or --

6  Q    Meaning yeah, outside of the City of Detroit.

7  A    I knew that there was talk of a review.  I don't know if

8  it happened.

9  Q    Okay.  But before you developed your opinions in this

10  case you weren't provided any of the reviews of the assessor's

11  office in the City of Detroit, correct?

12  A    Oh, that's correct.

13  Q    And in particular you weren't provided the reviews of the

14  assessor's office conducted by Plante Moran, correct?

15  A    That's correct.

16  Q    So when you developed your opinions you weren't aware

17  that people from the appraiser's office weren't showing up for

18  hearings on property taxes that were owed, correct?

19  A    That came up at some point.  Yeah.  But it might have

20  probably come up in my deposition.

21  Q    Probably at your deposition, right?

22  A    Uh-huh.

23  Q    And when you developed your opinions in this matter and

24  submitted your expert report you weren't aware that people

25  from the appraiser's office weren't showing up at the

1  hearings, correct?

2  A    Correct.

3  Q    And you weren't aware that property tax bills were

4  frequently sent to the wrong address in Detroit before your

5  deposition, correct?

6  A    I don't know about that.  There -- there is a number of

7  press articles and so I monitored what was happening in

8  Detroit and there are articles about the sort of problems

9  associated with residential property taxes.  So I was aware

10 of --

11 Q    Okay.

12 A    -- general problems, yes.

13 Q    And if you go to Page 88 of your deposition, Lines 4 to

14 7.

15 A    Okay.

16 Q    Did I ask you the following question and did you give the

17 following answer?  Are you there?

18 A    Yes.

19 Q    Going back to the -- were you aware that property tax

20 bills were frequently sent to the wrong address in Detroit?

21 Answer, no, I wasn't aware.  That was your testimony, correct?

22 A    Yes.

23 Q    And you weren't aware that homeowner's exemptions in

24 Detroit have been granted to people without proof of

25 eligibility, correct?

1  A    Correct.

2  Q    And you didn't know whether it was important in valuing

3  real estate to base valuations on arm's length transactions,

4  correct?

5  A    Can you restate that?

6  Q    You -- when you developed your opinions in this matter --

7  A    Uh-huh.

8  Q    You didn't know whether it was important in valuing real

9  estate to base valuations on arm's length transactions,

10  correct?

11  A    So valuations are done using arm's length transactions

12  and my analysis put that taxable value.

13  Q    And if you turn to Page 79 of your deposition, Line 22 to

14  Page 80, Line 3.

15  A    Okay.

16  Q    Question, then if you turn over to Page 21 -- well, let

17  me ask you this first before we get to the document.  Do you

18  agree with me that in valuing real estate it's important to

19  base valuations on arm's length transactions?  Answer, I don't

20  know.  That was your testimony, correct?

21  A    Where are you looking?

22  Q    Page 79, Line 22 to Page 80, Line 3.

23          MR. STEWART:  Your Honor, I object.  I'm not sure

24  this is impeachment.  I'm not sure she gave an inconsistent

25  answer here.

 1          MR. SMITH:  She said she was aware of it when she

 2   developed her opinions.

 3          THE COURT:  I'll permit it.  Go ahead.  Was that --

 4   was that your testimony?

 5   A    Let me read this.  Oh, I see.  That was -- yes, I said I

 6   don't know.

 7   Q    And when you -- you were deposed you didn't know the

 8   percentage of transactions in the city that are arm's length

 9   transactions, correct?

10   A    I did not, huh-uh.

11   Q    And you did not assess the reliability of the real estate

12   valuations for property in Detroit that you were provided,

13   correct?

14   A    Correct.

15   Q    Now Wayne County looks to determine whether property is

16   properly assessed in the county which includes Detroit,

17   correct?

18   A    That's right.

19   Q    And is that something called an equalization factor?

20   A    That's right.

21   Q    And you know that an equalization factor of one means

22   that the county believes property is properly assessed,

23   correct?

24   A    That's correct.

25   Q    And you know that for the last ten years you examined the

1  county has always given Detroit an equalization factor of one,

2  correct?

3  A    After adjustments, yes.

4  Q    And you have concluded in your opinions the property in

5  the city is over assessed and the county has concluded that

6  it's not, correct?

7  A    The county after they make adjustments and they lowered

8  some of the assessments to get that equalization factor of one

9  says it's properly assessed.

10 Q    Okay.  And as you discussed in your testimony you're

11 predicting the taxable values for residential property will be

12 cut in half over that ten year period you forecasted, correct?

13 A    Yes.

14 Q    And the drop I think as you mentioned in taxable values

15 you predict is due in substantial part to a reappraisal study

16 that has not occurred yet, but will be conducted in the

17 future, correct?  And the city wide reappraisal study is

18 scheduled to take three to five years as you mentioned,

19 correct?

20 A    That's right.

21 Q    And you don't know -- do you know now who is going to be

22 conducting the planned reassessment?

23 A    No.

24 Q    You -- you don't know, or at least when you developed

25 your opinions you didn't know what reassessment methodology

1  the contractor who is going to do the reassessment will

2  employ, correct?

3  A    That's right.

4  Q    And you still don't know that?

5  A    That's right.

6  Q    And while you're predicting that the reappraisal process

7  will wipe out half the taxable value in the city for

8  residential property, you don't have the reappraisal process

9  resulting in a huge drop in commercial and industrial taxable

10  value, correct?

11  A    That's right.

12  Q    And now you agree that increasing the housing prices is

13  one factor in your model that could lead to overall increase

14  in tax revenue, correct?

15  A    Can you say that again?

16  Q    Housing prices are one factor in your model that could

17  lead to an increase in tax revenue?

18  A    So increases to taxable value will lead to more revenue

19  all things being equal.

20  Q    Yeah.  And in coming up with your opinions, you had

21  mentioned you looked at average house selling prices from the

22  Detroit Board of Realtors, correct?

23  A    I looked at average prices in doing my analysis.

24  Q    And when you submitted your report you used data through

25  December 2013, correct?

1  A    When I submitted my report, yes, uh-huh.

2  Q    And you know that the Detroit realtor information shows

3  that housing prices continue to increase from the point you

4  used December 2013 to the most recent date in 2014, correct?

5  A    That's right.

6  Q    And then the day that you looked at, there was a 281.03%

7  increase in the average price of existing home sales, correct?

8  A    Between what?

9  Q    In the data you looked at up till December 2013, there

10  was about a 28% increase in average home prices, correct?

11  A    Between what two years is the 28%?

12  Q    In the -- in the total -- all the data that you looked

13  at.  Or do you recall what the actual numbers were for

14  increases during the period that you looked at?

15  A    Well, the -- I looked at historical information which had

16  the home prices plummeting.  And then --

17  Q    Oh, fair enough.

18  A    So then going forward --

19  Q    And then they're coming back up, right?

20  A    So there has been some increases.  There's been, you

21  know, average home prices -- I'm going off of memory, have

22  gone from, you know, 17,000 up to I think it's most recently

23  around 26,000.  So --

24  Q    And -- and one reason there's such wide variety of

25  fluctuation in the -- in the numbers you used is because

1  you're looking at average home sales, correct?

2  A    I looked at average home sales.

3  Q    Okay.

4  A    Uh-huh.

5  Q    And -- and the -- and the Detroit Board of Realtors data

6  shows that there was a 42.13% increase in home prices in

7  Detroit from 2013 to the most recent data in 2014, correct?

8  A    I would have to look at the data, is that okay?

9  Q    Okay.  If you look at -- turn to Tab 6.  Syncora Exhibit

10 4220.  That, I believe, is the -- the data.

11 A    Okay.

12 Q    If you want to refresh your recollection and take a look

13 at that.

14        MR. STEWART:  And, Your Honor, should this then be

15 put into evidence or somehow the foundation laid?

16        MR. SMITH:  I'm just -- she's said she would have to

17 look at the data and I'm just refreshing her recollection.

18        THE COURT:  Well, let's -- let's ask.  Does this

19 document refresh your recollection in response to counsel's

20 question?

21 A    I see what he's referencing, yes.

22        THE COURT:  Okay.  But the question is not what the

23 document says.  The question is what do you remember after

24 having seen it.

25 A    I see.  I have looked at this before and I did not

1   remember that it was this large of an increase.  And so I'm

2   looking at it now and seeing that that's what that says.

3          THE COURT:  Okay.  But is that what you remember?

4   A   I guess I don't remember this large of an increase, but

5   -- but that's what this shows.  If that makes sense.

6          MR. STEWART:  I'm going to object --

7          MR. SMITH:  Maybe -- maybe I could just ask her the

8   question now, Your Honor.

9          MR. STEWART:  I'd move to strike her answer in that

10  case because it's not refreshed recollection, it is something

11  else.

12         THE COURT:  The motion is granted.

13  Q   Now you agree with me, Ms. Sallee, that the Detroit Board

14  of Realtors data shows that there was a 42.13% increase in

15  home prices in Detroit from 2013 to 2014, correct?

16  A   Yes.

17  Q   And in all the data that you looked at from 2001 forward,

18  there was never a period of time where home prices have

19  increased by as much as 40%, correct?

20  A   I don't understand your question.  What?

21  Q   And you looked at data going back to 2001 from this

22  Detroit Board of Realtors, correct?

23  A   Uh-huh, that's right.

24  Q   And in all that time period there was never a period of

25  time where home prices have increased by as much as 40%,

1  correct?

2  A    That's probably correct.

3  Q    Okay.

4  A    Uh-huh.

5  Q    And there's also another index of home prices that's

6  created by economists that you looked at, the case Shiller

7  index, correct?

8  A    Right.

9  Q    And the case Shiller home price index is a widely used

10 measure of housing prices, right?

11 A    Yes.

12 Q    Many people in government, business, and academia rely on

13 the case Shiller index for housing prices?

14 A    That's right.

15 Q    And it's viewed as a reputable source of trends in

16 housing prices, correct?

17 A    Uh-huh.

18 Q    And the creators of the case Shiller housing --

19         THE COURT:  Yes?

20 A    My answer is yes.  Thank you.

21 Q    And the creators of the case Shiller housing price index

22 received the Nobel prize, correct?

23 A    One of them, yes.

24 Q    Okay.  And they're widely respected economists, correct?

25 A    That is correct.

1  Q    And if you could turn to Syncora Exhibit 4207 which is

2  Tab 3 in your binder.  Is that the case Shiller Detroit home

3  price index there?

4  A    Yes, for the Detroit Metro area.

5  Q    Okay.  And -- and there's a graph that's now behind the

6  projection that shows the housing prices, right?  Under the

7  case Shiller index, correct?

8             THE COURT:  Is this in evidence?

9             MR. SMITH:  Good point, Your Honor.

10 Q    You're familiar with this document, it's the type of data

11 that you've looked at in preparing your opinions, correct?

12 A    That's correct.

13            MR. SMITH:  Okay.  And I'd like to move it into

14 evidence, Your Honor.

15            MR. STEWART:  Objection, Your Honor, I want to voir

16 dire the exhibit.

17            THE COURT:  I'm sorry, sir, I didn't hear you.

18            MR. STEWART:  I'd like to voir dire the exhibit for

19 reliability because I think it's inherently unreliable and I

20 don't think --

21            THE COURT:  I'll permit your voir dire.  Go ahead.

22            MR. STEWART:  Ms. Sallee, do you see --

23            THE COURT:  You need to get by a -- a microphone

24 though.

25            MR. SMITH:  Here you can come over here, Geoff.

1          THE COURT:  Will you yield the lectern for him,

2   please?

3          MR. STEWART:  Ms. Sallee, Exhibit 4207 has been put

4   on the screen.  Do you have it before you?

5   A    Yes.

6          MR. STEWART:  And you understand this is a depiction

7   of the case Shiller Detroit home price index?

8   A    Yes.

9          MR. STEWART:  Is this a -- an index of houses in

10  Detroit only?

11  A    No.

12         MR. STEWART:  What is it an index of?

13  A    The Metro area.

14         MR. STEWART:  How many counties are in this Metro

15  area?

16  A    There are seven counties, I believe.

17         MR. STEWART:  Do you -- would you happen to know

18  which counties those are that would include Wayne County?

19  A    Wayne County, Oakland, Macomb, I'm having to go off

20  memory, sorry.

21         MR. STEWART:  And that would be all the counties

22  surrounding Detroit?

23  A    Basically.

24         MR. STEWART:  In that metropolitan area do you know

25  either exactly or from your training and education, what

1  percent in terms of population Detroit is in the metropolitan

2  area?

3  A    I think Detroit's population is around 12%.

4            MR. STEWART:  Okay.  Okay.  And so is this -- this

5  index, is this a -- in -- in your experience, is this an index

6  of housing prices for the City of Detroit?

7  A    No, it's a index of the Metro area.

8            MR. STEWART:  Okay.  Thank you.  Your Honor, we

9  would object on the ground this is an inherently misleading

10  document.  It is not what it purports to be.

11            MR. SMITH:  Your Honor --

12            THE COURT:  One second.  Have -- have you seen this

13  before?

14  A    I have.

15            THE COURT:  When you were preparing your report and

16  your projections and your opinions --

17  A    Uh-huh.

18            THE COURT:  Did you rely on the information in here

19  or not?

20  A    I looked at it so if that's what you mean by rely, yes.

21            THE COURT:  You told me you saw it before?

22  A    I have seen it.

23            THE COURT:  My question is --

24  A    Uh-huh.

25            THE COURT:  Did you rely on it when you prepared

1  your opinions, or did you just reject it because it's not

2  Detroit, it's the metropolitan area, or for whatever reason.

3  A    That's right.  I reviewed it and I did not rely on it.

4          THE COURT:  All right.  Then the objection is

5  sustained.

6  BY MR. SMITH:

7  Q    Ms. Sallee, all the data that you've looked at whether

8  you're relying on it or not, shows that residential real

9  estate values are increasing in 2014, correct?

10 A    Yes.

11 Q    And you agree that home prices will continue to increase

12 over the next ten years in Detroit, correct?

13 A    I wouldn't -- I wouldn't agree with that.

14 Q    Well, aren't you forecasting home prices to increase over

15 the next ten years?

16         THE COURT:  She said yes.

17         MR. SMITH:  Oh -- oh, she did?

18         THE COURT:  Did you?  You said no?

19 A    I said no.

20         THE COURT:  Oh, let's -- let's clarify this.

21 A    Yeah.

22         THE COURT:  Did you say I would agree with that, or

23 I would not agree with that?

24 A    I would not agree with that.

25         THE COURT:  You would not agree with that.  Okay.

1  A    Yeah.  So I have forecasted taxable value which looks at

2  what is happening to assessments.  And I -- you can have home

3  prices going up, and I didn't -- through some of my -- to be

4  clear, through some of the exercises I did, I do think home

5  prices may continue to grow, but what I specifically looked at

6  was taxable value for residential property which I have

7  falling.

8  Q    Okay.  And my question is about home prices.  And isn't

9  it true that you're forecasting home prices to increase over

10 the next ten years, correct?

11 A    I haven't forecasted home prices.

12 Q    And could you turn to Page 141 of your deposition,

13 please?  Lines 13 to 18.  Were -- were you asked these

14 questions and did you give these answers?

15       Okay.  So you're forecasting home prices to increase over

16 the next ten years, correct?  I am.  And that would include in

17 Detroit?  That's just for Detroit, I didn't look at the entire

18 area.  That was your testimony?

19 A    So there is part of the --

20       THE COURT:  The question is, was that your

21 testimony?

22 A    Yes, that's my testimony, sorry.

23 Q    Okay.

24       THE COURT:  All right.  And when you're reading from

25 the transcript it would help me if you identified which is the

1  question and which is the answer.

2         MR. SMITH:  Okay.  Sorry, Your Honor.  I'll -- I'll

3  try to remember that in the future.

4  Q    I'd like to ask you a couple questions about Exhibit 562

5  which you showed the Court and there should be a copy of it in

6  Tab 2 in your binder if you want to refer to it.

7         Now Exhibit 562 only shows the percentage change in

8  average prices, taxable value, and state equalized value

9  compared to the base year of 2007, correct?

10 A    That's right.

11 Q    And as we discussed, you've looked at some data for

12 example for the Detroit home prices that went back to 2001,

13 correct?

14 A    Uh-huh.

15 Q    And data is available for the other items on there going

16 back to at least that far, correct?

17 A    That's right.

18 Q    And the -- we discussed about how the -- the price data

19 that you used is not based on home value, but it's based on

20 home sales, correct?

21 A    Home sales, uh-huh.

22 Q    As you might expect because it comes from realtors who

23 are selling the houses, correct?

24 A    That's right.

25 Q    And most of the housing stock is not being sold at any

1  given time, correct?

2  A    That's correct.

3  Q    And it also -- the sales include sales that aren't arm's

4  length transactions, correct?

5  A    They shouldn't.

6  Q    Okay.  Is it possible that they do include sales that are

7  not arm's length transactions because people are under for

8  example financial distress and have to sell their homes?

9  A    They're usually flagged and not included in the

10 reporting.

11 Q    Okay.  And did you undertake an inquiry to figure out

12 what percent of sales would be arm's length transactions in

13 the Detroit data you used?

14 A    I spoke to the Detroit realtors to try to have that

15 question answered.  Houses that are -- and so to answer your

16 question, I don't know exactly, but I know they're usually

17 excluded.

18 Q    Okay.  But you don't know what --

19 A    I don't know for sure.

20 Q    You don't know what the percent would be, correct?

21 A    Right.

22            THE COURT:  All right.  We're going to stop now and

23 reconvene at our usual 8:30 time tomorrow morning.  And we'll

24 be in recess.

25       (WITNESS CAROLINE SALLEE WAS EXCUSED AT 5:04 P.M.)

1          THE CLERK:  All rise.  Court is adjourned.

2      (Court Adjourned at 5:04 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7   We certify that the foregoing is a correct transcript from the

8   electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 9-13-14
    Kristel Trionfi

12

13

14

15

16

17

18

19

20

21

22

23

24

25