```
                    UNITED STATES BANKRUPTCY COURT
                    EASTERN DISTRICT OF MICHIGAN
                          SOUTHERN DIVISION

IN RE:   CITY OF DETROIT,     .         Docket No. 13-53846
         MICHIGAN,            .
                             .         Detroit, Michigan
                             .         September 9, 2014
              Debtor.        .         8:38 a.m.
. . . . . . . . . . . . . . .

           TRIAL RE. CONFIRMATION OF CHAPTER 9 PLAN
            BEFORE THE HONORABLE STEVEN W. RHODES
             UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                     By:  GREGORY M. SHUMAKER
                          THOMAS CULLEN, JR.
                          GEOFFREY STEWART
                     51 Louisiana Avenue, N.W.
                     Washington, DC  20001
                     (202) 879-3939

                     Jones Day
                     By:  HEATHER LENNOX
                     222 East 41st Street
                     New York, NY  10017
                     (212) 326-3837

                     Pepper Hamilton, LLP
                     By:  ROBERT S. HERTZBERG
                     4000 Town Center, Suite 1800
                     Southfield, MI  48075-1505
                     (248) 359-7333

For Syncora          Kirkland & Ellis, LLP
Holdings, Ltd.,      By:  STEPHEN C. HACKNEY
Syncora Guarantee         DOUGLAS SMITH
Inc., and Syncora         WILLIAM ARNAULT
Capital Assurance,        RICHARD HOWELL
Inc.:                300 North LaSalle
                     Chicago, IL  60654
                     (312) 862-2000

For County of        Dechert, LLP
Macomb, Michigan:    By:  DEBRA O'GORMAN
                          ALLAN BRILLIANT
                     1095 Avenue of the Americas
                     New York, NY  10036
                     (212) 698-3600
```

APPEARANCES (continued):

| | |
|---|---|
| For Financial Guaranty Insurance Company: | Weil, Gotshal & Manges, LLP By: KELLY DIBLASI 767 Fifth Avenue New York, NY 10153 (212) 310-8032 |
| For County of Oakland, Michigan: | Young & Associates By: JAYE QUADROZZI 27725 Stansbury Blvd., Suite 125 Farmington Hills, MI 48334 (248) 353-8620 |
| For County of Wayne, Michigan: | Butzel Long, PC By: MAX NEWMAN Stoneridge West 41000 Woodward Avenue Bloomfield Hills, MI 48304 (248) 258-2907 |
| For Official Committee of Retirees: | Dentons, US, LLP By: CLAUDE D. MONTGOMERY 670 Fifth Avenue New York, NY 10020 (212) 632-8390 |
| | Dentons, US, LLP By: DAN BARNOWSKI 1301 K Street, NW Suite 600, East Tower Washington, DC 20005-3364 (202) 408-6417 |
| For the Detroit Retirement Systems: | Clark Hill, PLC By: ROBERT D. GORDON 151 South Old Woodward Avenue, Suite 200 Birmingham, MI 48009 (248) 988-5882 |
| For the Detroit Police Officers Association: | Erman, Teicher, Zucker & Freedman, P.C. By: BARBARA A. PATEK 400 Galleria Officentre, Suite 444 Southfield, MI 48034 (248) 827-4100 |

Court Recorder:      Kristel Trionfi
                       United States Bankruptcy Court
                       211 West Fort Street, 21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:      Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2   be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Good morning.

4          MR. HERTZBERG:  Good morning, your Honor.

5          MR. SHUMAKER:  Good morning, your Honor.

6          THE COURT:  Give me just one second here.  Okay.

7   You may proceed.

8          MR. SHUMAKER:  Good morning, your Honor.  Greg

9   Shumaker of Jones Day for the City of Detroit.  I was hoping

10  to just raise two very minor housekeeping matters with your

11  Honor before we get started today if that's okay.

12         THE COURT:  Sure.  Go ahead.

13         MR. SHUMAKER:  The first one, your Honor, is that if

14  you look at the order of witnesses that's on file, after Ms.

15  Sallee, Edsel Jenkins and Chief Craig are the next couple of

16  witnesses.  Ron Bloom is listed as being after those two, but

17  because of a conflict, we're going to drop him in the order

18  if that's okay, so he will slide back.  I believe he will be

19  behind Ms. Erickson, but I need to confirm that, so I just

20  wanted to let you know.  The city let the objectors know on

21  Sunday night, so --

22         THE COURT:  Okay.

23         MR. SHUMAKER:  -- they knew and you didn't.  I

24  wanted to make sure that that was not the case any longer.

25  And then the second quick matter was the second amended final

1   joint pretrial order that was filed last night, your Honor,

2   was simply a couple of minor things, the city's objections to

3   the FGIC documents, the 700 or so -- I'll call -- I don't

4   want to call them late, but, in any event, it has those

5   objections and a couple of additional exhibits.

6           But the last thing is I wanted to flag for your

7   Honor two exhibits that may have -- could require the Court's

8   attention.  One is Exhibit 476, which did not have any

9   objections listed to it, and it may just have been missed by

10  the Court in the admission of evidence early, so I wanted to

11  flag that.  And then the second one, because of --

12          THE COURT:  The Court will order the admission into

13  evidence of Exhibit 476.

14      (City Exhibit 476 received at 8:41 a.m.)

15          MR. SHUMAKER:  Thank you, your Honor.  And then

16  Exhibit 2 as well, there was a mixup.  This had to do with

17  the inadvertent mistranscription of Syncora's objection.  And

18  when you redo that, there are no longer any objections to

19  Exhibit 2 as well, so I wanted to flag that for your Honor

20  for admission.

21          THE COURT:  Okay.  Exhibit 2 is admitted.

22      (City Exhibit 2 received at 8:42 a.m.)

23          MR. SHUMAKER:  Thank you, your Honor.

24          MR. SMITH:  Good morning, your Honor.

25          THE COURT:  Good morning.

1          CAROLINE SALLEE, CITY'S WITNESS, PREVIOUSLY SWORN

2                        CROSS-EXAMINATION

3     BY MR. SMITH:

4     Q   Good morning, Ms. Sallee.  Good to see you.  Ms. Sallee,

5     you would agree that blight reduction could increase property

6     values; correct?

7     A   Yes.

8     Q   And but you haven't done any analysis that's tried to

9     determine how much blight removal will increase revenues to

10    the city in your analysis of property tax revenue; correct?

11    A   So blight removal is part of the restructuring

12    activities, and so we received information about planned

13    blight removal and took that into account when we were doing

14    the restructuring scenario.

15    Q   If you could turn to page 121 of your deposition, line 4

16    to 9.

17    A   I'm sorry.  What page?

18    Q   121, lines 4 to 9.  Did I ask --

19              MR. STEWART:  Your Honor, before we go, we have

20    counter-designated language on either side of this part of

21    the transcript, and, therefore, as a matter of completeness,

22    we would --

23              THE COURT:  I need you to get by the microphone, so

24    why don't you just go ahead --

25              MR. STEWART:  Sorry, your Honor.

1          THE COURT:  -- and be seated?

2          MR. STEWART:  I apologize.

3          THE COURT:  Go ahead and be seated, sir.

4          MR. STEWART:  Okay.  We have counter-designated

5    testimony on either side of this question and answer, and,

6    therefore, in the interest of completeness, we believe that

7    they, too, should be included in the questions and answers

8    that Mr. Smith would now ask of the witness.

9          MR. SMITH:  Well, I don't think that the other

10   matter has anything to do with my impeachment of the witness,

11   your Honor.  I mean the fact that they've designated other

12   testimony of her is not really relevant.  They haven't shown

13   how it ties up with the particular question that I'm asking.

14         MR. STEWART:  Well, then I would suggest we hand the

15   transcript to the Court for that purpose.  I can do so if

16   your Honor would like.

17         MR. HACKNEY:  Your Honor, we're just impeaching at

18   this point.  We're not in any --

19         THE COURT:  One lawyer --

20         MR. HACKNEY:  I'm sorry.

21         THE COURT:  -- please --

22         MR. HACKNEY:  I'm sorry.

23         THE COURT:  -- because if I don't enforce that rule,

24   I've got six Jones Day lawyers over here --

25         MR. HACKNEY:  Understood.

1          THE COURT:  -- who want to be heard.

2          MR. HACKNEY:  Understood.

3          THE COURT:  Okay.  So here's how we'll handle this.

4     I will let counsel proceed with his impeachment as he sees

5     fit, and I will let counsel for the city proceed with their

6     redirect as they see fit.

7          MR. STEWART:  Thank you.

8          MR. SMITH:  Thank you, your Honor.

9     BY MR. SMITH:

10    Q   Ms. Sallee, at page 121, lines 4 to 9, did I ask you the

11    following question, and did you give the following answer?

12              "Question:  And you've done no analysis that's

13              tried to determine how much the blight removal will

14              increase revenues to the city in your analysis;

15              correct?

16              Answer:  I have not, right, so in my analysis I

17              did not look at the direct relationship between

18              blight removal and property tax revenue."

19              And that was your testimony?

20    A   Yes, um-hmm.

21    Q   All right.  And at least at the time of your deposition,

22    you didn't know the amount the city was going to spend on

23    blight reduction; correct?

24    A   We received information that had updated several times

25    about planned blight expenditures, and so as I noted above

1  the portion that you read, there is no direct relationship

2  between expending on blight removal translates into a certain

3  dollar amount of property tax revenue, but it was part of the

4  restructuring activities that were looked at and that were

5  considered in doing the restructuring scenario.

6  Q    Okay.  And I know the city is going to spend some money

7  on blight reduction.  You're aware of that; right?

8  A    Um-hmm.

9  Q    But at the time of your deposition, you didn't know how

10  much money the city was going to spend on blight reduction;

11  correct?

12  A    It was known at the time of my deposition.  I couldn't

13  recall off the top of my head how much they had planned to

14  spend in a given year.  It's changed.

15  Q    And you didn't know if it was hundreds of millions of

16  dollars or not; correct?

17  A    I knew -- I did not know the exact amount.  That's

18  correct.

19  Q    And you didn't know any of the details of how the city

20  was going to spend the blight reduction money; correct?

21  A    I did not, unh-unh.

22  Q    And at least at the time of your deposition, you had not

23  reviewed Mr. Moore's expert report; correct?

24  A    That's correct.

25  Q    And, in fact, at the time of your deposition, you did not

1  know who Mr. Moore was; correct?

2  A    Correct.

3  Q    And you didn't know who Mr. Moore was even though you'd

4  been working on the Detroit matter for over a year; correct?

5  A    Um-hmm.

6          THE COURT:  Is your answer "yes"?

7          THE WITNESS:  Yes.

8  BY MR. SMITH:

9  Q    And you also -- you agree that it's also at least

10 theoretically possible that improving city services could

11 improve property tax revenues; correct?

12 A    That is possible.

13 Q    But you did no analysis to determine the effect of

14 improved services on property tax revenues; correct?

15 A    Improved services my understanding were part of the

16 restructuring plan, so, as I mentioned, as part of the

17 overall restructuring activities, that would improve the

18 economic conditions.  We took that into account when we did

19 our analysis.

20 Q    Okay.  If you could turn to page 191, line 25, to 192,

21 line 4.

22          MR. STEWART:  191 --

23          MR. SMITH:  191, line 25, to 192, line 4.

24          MR. STEWART:  Okay.  Your Honor, the same objection,

25 but I'll deal with it on redirect.

1          THE COURT:  That's fine, sir.

2    BY MR. SMITH:

3    Q   Did I ask you the following question, and did you give

4    the following answer?

5              "Question:  Okay.  So you did no analysis to

6              determine the effect on improved services on

7              property tax revenues; correct?

8              Answer:  Did not look at the relationship

9              between improved city services and property tax

10             revenue."

11             That was your testimony; correct?

12   A   Correct.

13         MR. SMITH:  All right.  Thank you.

14         THE COURT:  Is that it, sir?

15         MR. SMITH:  That's it, yes, your Honor.

16         THE COURT:  Any other examination of the witness

17   before we get back to redirect?  Okay.

18                    REDIRECT EXAMINATION

19   BY MR. STEWART:

20   Q   Let's start with the deposition segment we just had, and,

21   Ms. Sallee, let me just read another part of the deposition.

22   And my question, once I've done that, will be, "Was this your

23   testimony?"  And I'm not sure whether we do or don't have it

24   to put up on the screen.  Do you remember just moments ago

25   Mr. Smith directed your attention to your deposition

1   transcript, page 121, lines 4 to 9?  That had to do whether

2   you'd done any analysis to determine how much the blight

3   removal would increase revenues to the city.  Do you remember

4   being asked about that just a few minutes ago?

5   A    I do.

6   Q    Okay.  Here are the questions and answers that preceded

7   it, and they begin at page --

8            MR. SMITH:  Your Honor, I object to just reading the

9   deposition testimony in the record.  I don't think that's a

10  proper question.  I mean he can ask the witness if she

11  recalls saying something else or something like that, but

12  it's leading, and I don't believe it's proper.

13           THE COURT:  I'm going to permit it in light of the

14  impeachment.  Go ahead.

15           MR. STEWART:  Thank you.

16  BY MR. STEWART:

17  Q    And once again, page 120, line 5, all the way through,

18  then the question and answer Mr. Smith asked you.

19           "Question:  And you haven't done any analysis to

20           determine the effect of the city's blight reduction

21           efforts on housing prices; correct?

22           Answer:  We -- in our forecast and reinvestment

23           scenario, we take into account removal of blight

24           property as part of the economic -- general economic

25           improvement to the city, and so we -- in that

1    scenario, we factored in removal of blight as a

2    positive for our forecast.

3        Question:  Do you actually know whether the

4    forecasts that have been done for the city attach a

5    dollar value to blight removal in terms of improved

6    revenue for the city?

7        Answer:  What's the question?

8        Question:  Do you actually know whether the

9    forecasts that have been done attach a dollar amount

10    to blight removal?

11        Answer:  There's been money put in for each year

12    for blight removal in what I've seen.

13        Question:  But do you know in terms of increased

14    revenue?

15        Answer:  There has not been the sort of one

16    relationship done to say this much spending on

17    blight translates to X dollars of revenue."

18        And then we get to the question and answer asked of

19 you by Mr. Smith.  Was that your deposition testimony in its

20 entirety on that subject?

21 A    Yes.

22 Q    Okay.  Let me now ask about something else.  In Tab 6 of

23 the binder in front of you -- and let me grab my binder.

24        MR. STEWART:  And could we put up that exhibit?

25 That is Syncora Exhibit 4220.  Maybe I should ask the Syncora

1  person to put that up.

2  BY MR. STEWART:

3  Q    Do you remember being questioned yesterday afternoon by

4  Mr. Smith about this exhibit?

5  A    Yes.

6  Q    And, in particular, he asked you about the increase in

7  property prices for the City of Detroit for the comparison

8  year to date May 2014 to May 2013, and I believe the number

9  is 42.13 percent.

10        MR. STEWART:  If it could be -- if it could be

11 highlighted, if you take -- Steve, arrow down and to the

12 right, that's it.  And blow that up if you could.

13 BY MR. STEWART:

14 Q    Okay.  Do you see the 42.13 percent there?

15 A    Yes.

16 Q    Okay.  Does that represent, in fact, a return of housing

17 values in Detroit to what they had been years before?

18 A    No.

19 Q    Now, let's put up Exhibit 562 if we could.  Do you

20 recognize Exhibit 562?

21 A    Yes.

22 Q    Do you see where on that chart we have the uptick in

23 values of house sales in 2013 to 2014?

24 A    Yes.

25 Q    Now, is that a -- and I believe the previous exhibit

1  recited that that was a 43.18-percent increase.

2  A   Between the year to date, May 2013 and May 2014.

3  Q   And how could it be such a large increase when property

4  values are so low?

5  A   Because the prices had fallen to around 17,000 on average

6  for the sale price, so it's very easy to have a large

7  percentage on such a small base.

8  Q   Now, you had been asked by Mr. Smith, and he referred you

9  to your deposition transcript, whether you in your work had

10  forecast a continued increase in residential property values

11  in Detroit, and I believe you testified your chart showed

12  there was going to be an increase.  Is an increase of the

13  magnitude that was portrayed on that Detroit previous

14  exhibit, the Syncora 4220?

15  A   The data shows those increases.  The chart does, um-hmm.

16  Q   Okay.  Now, I believe -- 4748 -- excuse me one minute

17  while I go to this.  Let me now go to -- you were asked on

18  cross-examination, and then your deposition was shown to you,

19  about whether you knew the methodology the city uses for

20  assessing properties.

21  A   Yes.

22  Q   I believe you said you did know, and then your deposition

23  was shown to you.  Can you tell us how you know that?

24  A   I know it for two reasons.  One, I read the state Tax

25  Commission's assessing manual, so I --

1    Q    The manual?

2    A    The manual.

3    Q    Okay.

4    A    So in this case, there are approved methods for doing

5    assessments, and so I know what they were, what they are,

6    what they can use, how they work, so not since I know what

7    they are.  At any given point, what the assessor's office is

8    choosing to use, I don't know.

9    Q    Okay.

10   A    They should produce, you know -- in theory, they should

11   produce similar assessments, so that's the clarification.

12   Q    Okay.  You have it from having read the manual?

13   A    Yeah.

14   Q    Okay.  You were asked just moments ago about Charles

15   Moore --

16   A    Yes.

17   Q    -- and I think you testified you had not known who he

18   was.

19   A    Um-hmm.

20   Q    What do you know about Conway MacKenzie?

21   A    So Conway MacKenzie provided the restructuring

22   expenditures and plans that we were given to use in

23   developing our scenario.

24   Q    And did you rely on materials from Conway MacKenzie?

25   A    I did.

1  Q    Did you know anything about Mr. Moore's relationship to

2  Conway MacKenzie?

3  A    No.

4  Q    But you knew of Conway MacKenzie?

5  A    Yes.

6  Q    You were asked yesterday by Mr. Smith about state

7  equalized value --

8  A    Yes.

9  Q    -- and about Wayne County -- Wayne County's assignment of

10  an equalization value of one.

11  A    Yes.

12  Q    Okay.  That value is intended to represent what?

13  A    The value tells you whether or not property has been

14  assessed consistently throughout the county.

15  Q    And you had done work to look into -- and Wayne County

16  had in recent years determined what in terms of the state

17  equalization value?

18  A    So it had been given a factor of one in the past ten

19  years that I looked at, and I think going back, what I --

20  something I read going back 30 years.

21  Q    Was that equalization factor of one consistent with the

22  analysis you had done of the change of property values in

23  Detroit?

24  A    No.

25  Q    So what, if anything, did you do to look into Wayne

1  County's practice in assigning that equalization value?

2  A   So I went to the State Tax Commission site, and I found

3  the analysis for equalization valuation done by the county,

4  and so I pulled those most recent reports that were on that

5  site.

6  Q   What did they tell you?

7  A   What they showed me was that for each class of property,

8  there would be the assessments coming in, and then that ratio

9  is calculated.  And to get a factor of one, it has to be 50

10 percent -- the assessment has to be 50 percent of the market

11 value.  What I saw was those ratios were not 50 percent, but

12 then there's a line that has an adjustment, so there was

13 value taken off to pull it into line with that 50 percent,

14 and then the factor of one could be awarded.

15 Q   And who took those values off?

16 A   So this is from the Wayne County equalization document,

17 so I'm assuming the county did.

18 Q   Okay.  So to summarize that, they did assign an

19 equalization factor of one --

20 A   Yes.

21 Q   -- but only after first reassessing the property

22 downward.

23 A   Only after an adjustment that lowered the assessments.

24        MR. STEWART:  Thank you very much.  That's all I

25 have, your Honor.

1    THE COURT:  Any further examination of the witness?

2    MR. SMITH:  Yes, your Honor.

3    THE COURT:  Go ahead, sir.

4                    RECROSS-EXAMINATION

5    BY MR. SMITH:

6    Q   Ms. Sallee, isn't it true, as I think we discussed

7    yesterday, that when you submitted your expert report, you

8    used data for the Detroit housing prices through December

9    2013 only; correct?

10   A   Correct.

11   Q   And if we look at your expert report that's behind Tab 2,

12   this is Exhibit 467.  You actually attached to that report --

13   and this is at 467-30 -- a copy of that graph that we were

14   just looking at --

15   A   Um-hmm.

16   Q   -- correct?

17   A   Correct.

18        MR. SMITH:  If you could go there, Roman.

19        THE WITNESS:  Right.

20   BY MR. SMITH:

21   Q   And that's Exhibit 562 if we could have that; right?

22   A   Yes.

23   Q   And isn't it true -- it's true, isn't it, that the

24   housing price stated on her -- it only goes through December

25   2013; correct?

1   A    That's correct.

2   Q    You haven't analyzed in your chart this 40-percent

3   increase in housing prices that's occurred from January to

4   the present in Detroit; correct?

5   A    What you just said is not accurate because the 40 percent

6   is looking year to date, so it's May to May, so --

7   Q    Okay.

8   A    So when he asked me did I take into account increases, I

9   did because there's a -- and I think I mentioned this

10  yesterday.  In my recollection, there's around a 25- to 28-

11  percent increase during 2013, and so this graph captures

12  that.  You're right.  It continued to go up since December.

13  Q    And you haven't included in your graph the continuing

14  increase in housing prices that's occurred since December;

15  correct?

16  A    The five months are not shown in here; right.

17  Q    Okay.  And if we did do that, then housing -- the red

18  line would continue to go up; correct?

19  A    That's right.

20  Q    And the other thing about this graph is you're looking at

21  percentage changes here; right?

22  A    That's right, um-hmm.

23  Q    If we actually looked at the absolute values --

24  A    Um-hmm.

25  Q    -- the taxable value that's at the top there would

1   actually be below the state equalized value.  It has to be;

2   correct?

3   A    That's right.

4           MR. SMITH:  Okay.  Thank you.  No further questions.

5           THE COURT:  Anything further for the witness?

6           MR. STEWART:  Not from us, your Honor.  Thank you.

7           THE COURT:  All right.  Thank you very much for your

8   testimony.  You are excused.

9       (Witness excused at 9:00 a.m.)

10          MR. HACKNEY:  Your Honor, before the city calls Mr.

11  Jenkins -- Commissioner Jenkins to the stand, I was wondering

12  if I could be heard briefly.  For the record, Stephen Hackney

13  on behalf of Syncora.  I spoke with Mr. Hertzberg about this,

14  but I wanted to get your permission as well.  One of the

15  things that the fire department did was they retained an

16  independent fire expert to help develop a restructuring plan,

17  and that work is actually not final yet, but a much more

18  substantive draft of their report was just produced to us

19  yesterday.  That firm is called TriData.  And I've asked

20  Mr. Hertzberg if he would object to me asking you if we could

21  have an exception to the rule that a witness only testifies

22  once so that we can study the report that was just produced

23  yesterday to understand whether we might like to examine

24  Commissioner Jenkins adversely in our case in chief.  I don't

25  assign a high likelihood to it, but I'd like to reserve the

1  right to it just because this report is so substantive and

2  because we just got it yesterday.

3          MR. HERTZBERG:  Your Honor, Robert Hertzberg, Pepper

4  Hamilton, on behalf of the city.  We have no objection to

5  that.

6          THE COURT:  All right.  Thank you.  The Court will

7  permit that.

8          MR. HACKNEY:  Thank you.

9          MR. HERTZBERG:  Your Honor, the city now calls the

10  Fire Commissioner Jenkins to the stand.

11          THE COURT:  Step forward, please, sir.  Raise your

12  right hand.

13              EDSEL JENKINS, CITY'S WITNESS, SWORN

14          THE COURT:  Please sit down.

15                      DIRECT EXAMINATION

16  BY MR. HERTZBERG:

17  Q   Good morning, Commissioner.

18  A   Good morning, sir.

19  Q   Could you please state your full name for the record?

20  A   Edsel Jenkins.

21  Q   And where are you currently employed?

22  A   City of Detroit Fire Department.

23  Q   And what is your position with the City of Detroit Fire

24  Department?

25  A   Executive fire commissioner.

1  Q   And how long have you been the executive fire

2  commissioner?

3  A   Since April of this year.

4  Q   April of this year?

5  A   Yes.

6  Q   Where do you live?

7  A   City of Detroit, sir.

8  Q   And were you born in the City of Detroit?

9  A   Yes, sir.

10 Q   I'd like to spend a few minutes and talk about your

11 educational background and your work background, so let's

12 start first with where did you go to college?

13 A   I started off at Wayne County Community College where I

14 received an associates of arts degree when I was 19.  After

15 that I went to Wayne State University where I received a

16 bachelor of science in business administration with a major

17 in accounting.  And then some years later I went back to

18 college.  I went to Walsh College of Business and obtained a

19 master's of business -- MBA, master's in business

20 administration, with a specialization in finance.

21 Q   Did you receive any professional licenses or

22 certifications?

23 A   Yes.  In 1986 I received my CPA as a staff accountant

24 with then Coopers & Lybrand, now PricewaterhouseCoopers.

25 Q   And you worked during what period for Coopers & Lybrand?

1   A    That was from 1984 through 1986, sir.

2   Q    During that period of time, did you hold down a second

3   job?

4   A    Yes.  I also maintained my position in Detroit Fire

5   Department.

6   Q    So you were a CPA and a fireman during the same period of

7   time?

8   A    That's correct, sir.

9   Q    Okay.  Let's now spend some time and go through your

10  history at the fire department in Detroit.  When did you

11  first join the fire department?

12  A    August 8th, 1977.

13  Q    And what was your position?

14  A    I was a -- started off as a trial fire fighter.

15  Q    And did you receive any promotions ever?

16  A    Yes.  I passed my promotionary period, became a fire

17  fighter, moved to the rank of sergeant, and my last rank held

18  was lieutenant.

19  Q    Let's spend a minute and discuss when you were sergeant.

20  What were some of your job responsibilities when you were

21  sergeant of the fire department?

22  A    As a sergeant, it was my job to be in charge of a either

23  ladder truck or rescue squad depending upon where I was

24  assigned, various reports, records, weekly training of

25  personnel, fire suppression, assisting EMS, rescues.

1  Q   Were you involved in any grant writing?

2  A   Yes.  As a sergeant, I was recruited by then chief of the

3  department, Ronald Nawman (phonetic), to help procure grants

4  for the Detroit Fire Department.

5  Q   And then you became lieutenant of the fire department;

6  correct?

7  A   That's correct, sir.

8  Q   And when was that?

9  A   I believe that was in my 20 -- after 23-1/2 years.  I

10  believe that was in 2001 I was promoted to lieutenant.

11  Q   And as lieutenant, what were your job responsibilities?

12  A   As a lieutenant, I was responsible for a fire company.  I

13  had a regular work assignment, and my duties and

14  responsibilities mirrored that of a sergeant, but I had more

15  responsibility over a company versus being detailed as a

16  sergeant across the city.

17  Q   At some point, you decided to retire from the fire

18  department?

19  A   Yes.  That was in February of 2003 I retired and went

20  into private industry.

21  Q   What was your first job in private industry after you

22  retired?

23  A   First job in private industry was with Parsons

24  Consulting.  They are a subsidiary of Proudfoot Consulting, a

25  firm that's on the London Stock Exchange.  They're based out

1  of England.

2  Q   What were your job responsibilities at Parson Company?

3  A   I performed management consulting, Sarbanes-Oxley work,

4  internal audit work.

5  Q   And then you left Parsons & Company; correct?

6  A   That's correct.  I believe that was in June of 2005, and

7  I went to work for Accretive Solutions.

8  Q   And what is Accretive Solutions?

9  A   They're a professional national consulting firm,

10  management consulting firm.

11  Q   What did you do at Accretive Solutions?

12  A   There I did pretty much the same thing, management

13  consulting.  I've performed internal audit work, Sarbanes-

14  Oxley work, attesting to the internal controls of

15  organizations.

16  Q   Then you left Accretive Solutions?

17  A   Yes.  That was in February of 2006, and I was hired into

18  Delphi Corporation as part of their -- as a senior internal

19  auditor.

20  Q   What did you do at Delphi Corporation?

21  A   I performed internal audits of various components of the

22  organizations in the United States, Mexico.  From there I was

23  moved over to HR Finance working with the labor group of

24  Delphi.  I became the global labor cost analyst.  And from

25  that position I was moved over to the controller's staff.

1  Q    July of 2012 you joined the fire department again;
2  correct?
3  A    Yes.  I was recruited and asked to come back to work by
4  then executive fire commissioner Donald Austin.
5  Q    How did that come about?
6  A    My wife and I live here in Victoria Park, and it was a
7  community picnic day, I believe, in July.  And at that same
8  time, the BURN movie was coming out about the Detroit fire
9  fighters, so the producers were going around the city with
10  the executive fire commissioner looking at different parts of
11  the city.  And he happened to come down where the subdivision
12  I live in -- it's one of the last subdivisions that the
13  city -- that was built in the city, and he thought it was a
14  very nice community, and he wanted this picture of the City
15  of Detroit to be inside the BURN movie.  So he and the
16  producers that were inside the park, they came over to where
17  the picnic was.  And my wife, being who she is -- she's kind
18  of nosy.  She had to go over and inquire what was happening,
19  and she came across Don Austin.  And he introduced himself as
20  the fire commissioner, and she said, "Oh, my husband applied
21  for that job," and from that point on, they exchanged
22  numbers.  We've talked several times on the phone.  I got an
23  interview, and he asked me to be his deputy fire
24  commissioner.
25  Q    So you are where you are because of your wife today; is

1  that correct?

2  A   Yes.  Behind every good man there's a woman, and I have

3  one.

4  Q   Okay.  What made you decide to come out of retirement

5  from the fire department and rejoin the fire department?

6  A   Well, during my -- I was retired for about nine years

7  when I worked in the private sector, and I came across a

8  number of fire fighters periodically, and they always asked

9  me to come back because they thought I could make a

10  difference because when I joined in '77, we were experiencing

11  the same conditions that's going on now in terms of

12  equipment, facilities, morale, and I guess I left a good

13  impression with a number of people, and I was honored to come

14  back to try and assist.

15  Q   So you came back originally in 2012 as the deputy

16  commissioner?

17  A   That's correct.

18  Q   And what were your job responsibilities as deputy

19  commissioner?

20  A   Well, under Commissioner Austin, I worked as his chief

21  operating officer overseeing fire personnel, looking at the

22  budget, looking at equipment, facilities, and trying to

23  manage the fire department on a day-to-day basis for him.

24  Q   Do any grant writing to secure money for the fire

25  department?

1  A   Yes.  I worked with the grant writers that were assisting

2  us in putting together a couple of the grants we received,

3  one of the -- two of the SAFER grants, some AFT grants for

4  equipment for the arson squad.

5  Q   What are SAFER grants?

6  A   SAFER grants are grants that don't have a match.  They're

7  from FEMA, and what they do, they provide salaries and

8  benefits for fire fighters, to recruit new fire fighters or

9  to maintain fire fighters to prevent layoffs.

10 Q   How large is the SAFER grant that you get annually?

11 A   Oh, I believe the first one was approximately 20 million

12 before I came back.  After that, we procured one for 24

13 million, and I believe the last one was approximately $10

14 million.

15 Q   Okay.  What's HazMat?

16 A   Hazardous materials.  We have a hazardous materials team.

17 Q   And did you work with the HazMat team?

18 A   Yes.  When I came back to the fire department, the HazMat

19 team was off line, and I worked with the individuals on the

20 HazMat team, the chiefs -- chief of fire department to get

21 that unit up and running again.

22 Q   How long did you act as the deputy fire commissioner?

23 A   Approximately two and a half years.

24 Q   And then you became the actual executive commissioner of

25 the fire department; correct?

1    A    Yes, in April of this year.

2    Q    And how did that happen?

3    A    After the election, we had a new mayor, Mayor Mike

4    Duggan, and when he entered office, he appointed Jonathan

5    Jackson as interim fire commissioner.  Then about after three

6    months of being the interim commissioner, Commissioner

7    Jackson took ill and was unable to continue in that position,

8    so he retired.  And upon his retirement, Mayor Duggan

9    appointed me executive fire commissioner.

10   Q    Were you approved by the city council?

11   A    Yes, sir.

12   Q    What are your responsibilities as the executive fire

13   commissioner?

14   A    As the executive fire commissioner, my job is to oversee

15   the operations of the entire Detroit Fire Department, fire

16   fighting, EMS, repair and maintenance of facilities and

17   apparatus.

18   Q    Communications?

19   A    Yes, communications also.

20   Q    What about the fire marshal division?

21   A    Yes.  We have eight divisions in the fire department.  We

22   have fire fighting division, we have the EMS division,

23   communications, community relations.  We have budget

24   operations, and we have the fire marshal division.  And we

25   also have apparatus, which is now under the general services

1  division.

2  Q    When you talk about budgets, I assume you use your skills

3  as a certified public accountant in that aspect of the job?

4  A    Yes, sir.  They have come in handy.  When I first came on

5  the job and I was studying at Wayne State, a lot of the old

6  timers said, "Kid, that'll never help you on this job," but

7  I'm proving them wrong today.

8  Q    About how many employees does the fire department

9  currently have?

10  A    Approximately 1,150.

11  Q    I want to debunk an urban myth that's been going around

12  and was on the front page of the -- I believe the Detroit

13  News on Saturday about a can sitting on a fax machine and

14  that notifying a fire department of a potential fire.  Tell

15  me the story of the can on the fax machine.

16  A    Well, that goes back to the mid-1980s.  Before -- prior

17  to 1985, we had in the city what is known as the Gamewell

18  system.  It's a telegraph system that was in every fire

19  station across the city.  The central office was located on

20  Macomb Street in downtown Detroit.  And whenever there was a

21  box alarm, a large fire alarm in the City of Detroit, central

22  office would send out this telegraph, this ticker tape across

23  the whole city.  There were run boards in each fire station,

24  so depending upon the series of numbers where it might be

25  9376, you would count the digits, and you would go to that

1   tape.  And if that was your -- it came over three times, and

2   if that was in your district, you'd go to the run board.  You

3   saw the location.  It could be Gratiot-Mt. Elliott.  You

4   informed the officer, you pushed the alert, and everybody

5   went.  And central office also controlled the lights, and we

6   had -- and a bell, so if it was a box alarm, you got one long

7   ring, and the tape would go across.  If it was a still alarm,

8   meaning just for engine and truck, you got two rings.  Might

9   be a small rubbish fire.  If it was a special like a rescue,

10  you got three rings.  In 1984 that system was put out of

11  service because it was hard to obtain parts for it, and I

12  believe the only person that repaired it had either retired

13  or died, and at that point the city purchased its first CAD

14  system.  So there was supposed to be a citywide alert system

15  to be put in when that CAD system was purchased, but it was

16  never done.  We had this big long printer, and you had this

17  big long paper, you know, that you got your runs off of much

18  like the fax machines today.  So what we did back in the mid-

19  1980s, we hooked little buzzers or the guys put pipes or cans

20  to alert the person on watch, but that's a convenience for

21  the person on watch.  There's a person on watch 24 hours a

22  day in the firehouse.  We have four watches, morning,

23  afternoon, midnight, and jump watch, so someone is always on

24  either by the phone or has the radio.  That device that was

25  put on the printer is a convenience for the person on watch

1    in case they have to walk away from their station to use the

2    restroom or to get something out of the refrigerator, but a

3    person is on watch 24 hours a day.

4    Q   So that's just a convenience if someone walks away for

5    two minutes from the machine?

6    A   Right.

7    Q   Okay.  I'd like to spend some time and talk about some of

8    the challenges facing the fire department.  Can you tell me

9    about the vehicles and apparatus and the condition they're in

10   in the fire department?

11   A   Well, the apparatus that we have right now, the -- I'll

12   say the youngest part of the fleet is about ten years old,

13   seven to ten years old, and we have a large run volume in the

14   City of Detroit.  And some of the older vehicles, they go

15   back to 2002, 2003.  We've put extremely a lot of miles, and

16   these streets -- we drive those vehicles real hard trying to

17   get to all these different places in the city.  When I

18   started in 1977, we had about 82 companies covering the whole

19   city.  Now we have approximately 43 companies, so we still

20   have 139 square miles but half the companies.  So now we

21   drive much farther distances, and by it taking us longer to

22   get there in terms of distance, the fire grows more.  So

23   these rigs are really are stressed out when it comes to

24   mileage and when it comes to hours on the pumps.  So with the

25   abuse that we give these rigs, they're worn out in a matter

1    of three or four years, but we tend to hold onto them until
2    they die, maybe ten or fifteen years.
3    Q    Are they safe?
4    A    I would say that our repair shop does a very good job in
5    terms of keeping these rigs safe for our fire fighters, but
6    they are -- they break down on a regular basis.
7    Q    Do you think you have enough vehicles and equipment?
8    A    Presently, no.  We have -- we staff 43 vehicles right
9    now.  We have 25 to 28 engines, anywhere from 9 to 14 ladder
10   trucks running daily and 6 rescue squads, but those vehicles
11   are front-line vehicles, and we don't have a reserve fleet.
12   So when one of them breaks down, we tend to have to brown out
13   a company or put a company out of service.
14   Q    Have you recently had any rigs donated to you?
15   A    Yes.  Last year the -- through the Penske Group we had 23
16   ambulances donated to the city.  Then Commissioner Austin,
17   when he met with this group along with then Chief Logan and
18   the Mayor Dave Bing, Commissioner Austin was asked what's the
19   most critical need in the city, and at that point it was
20   ambulances because our ambulances were breaking down daily.
21   We were down to the point where we only had four ambulances
22   running in the city.
23   Q    Let's talk about the breathing apparatus.  What condition
24   is that in?  And explain what breathing apparatus is to the
25   Court, please.

1   A    You're talking about a SCBA or a self-contained breathing

2   apparatus.  It's the air pack that a fire fighter wears on

3   his or her back with a face piece, and these breathing

4   apparatus that they wear now, before I retired -- I think it

5   was the year 2002 -- myself and Fire Fighter Puckett wrote

6   the grant to get the monies from the federal government to

7   buy those breathing apparatus, and they're outdated.  They're

8   not -- they don't meet current NFPA standards.

9   Q    So the fire fighters are operating with equipment --

10  breathing equipment that's not within the dated time?

11  A    That's correct.  They need to be replaced.

12  Q    Let's turn to the fire stations for a couple minutes.

13  What's the average age of the fire stations in the City of

14  Detroit?

15  A    I would say about 90 to 100 years old.  They were old

16  when I started in '77, and they're -- they pretty much look

17  the same with just a little more wear and tear on them.

18  Q    You've got modern vehicles that you use, modern rigs to

19  put out fires.  How do those work within the existing fire

20  stations that were built 90 years ago when they were using

21  horse and carriage?

22  A    Yes.  The station -- most of the stations that we have

23  now were built for steamer and horse.  They weren't made to

24  handle these behemoths that we drive now.  There's a number

25  of fire stations across the city where we had to make an

1  investment in terms of shoring up the basement because the

2  rig was -- some of these apparatus were about to fall through

3  the floor.  Big cracks were appearing, so girders had to be

4  placed in the basement to shore up the floors to support the

5  apparatus.  And then, too, the doors aren't wide enough.

6  Some of these fire stations that we use today, there's only

7  minimum clearance on each side of the apparatus, so I must

8  commend our drivers because to pull out swiftly and to back

9  in and not really have that many accidents is outstanding.

10 Q   Let's spend a few minutes and talk about the workload.

11 On average, how many runs does the fire department do each

12 year?

13 A   On the fire side, about 30,000 runs.  On the EMS --

14 Q   Let's talk about -- we'll go over EMS in a minute.  Let's

15 talk about the types of fires they're making runs on.  Are

16 there a lot of runs to abandoned structures such as homes and

17 commercial buildings?

18 A   Yes.  A majority of our runs right now are to vacant

19 structures.  There's approximately anywhere from 40 to 50,000

20 dangerous structures in the city vacant.

21 Q   And what percentage of the runs go to these type of

22 facilities?

23 A   I would say at least 70 percent.

24 Q   What impact does it have on the fire department?

25 A   It has a big impact because we have a number of fire

1  fighters who are injured on a daily basis responding to these

2  vacant dwellings because these vacant dwellings are in

3  neighborhoods where people are living, so if that vacant

4  dwelling catches on fire and it's not contained within a

5  reasonable amount of time, then the people next door are

6  going to suffer damage and loss to their home.

7  Q   Why do these vacant structures end up catching fire so

8  often?

9  A   That's a good question.  I know pigeons don't smoke, so

10  I'm of the mind that, you know, there are some unscrupulous

11  individuals that set -- purposely set fires to these

12  buildings.

13  Q   There's a lot of arson?

14  A   Yes.

15  Q   Squatters, too?

16  A   Yes.  Our arson squad or fire investigators, as they like

17  to be called, are very -- kept very busy.

18  Q   Was there a significant fire on Garland Street recently?

19  A   Yes.  That was a few months back.  There were a number of

20  vacant houses on that street along with a lot of high brush,

21  trees, shrubbery, and one structure started, and it's just

22  moved from one to the other.

23  Q   Bringing up Garland Street because it has meaning to you,

24  doesn't it?

25  A   Yes.  I was raised on Garland Street in the City of

1   Detroit.

2   Q   What was it like when you were raised there and when?

3   A   That was the early '60s.  I mean the streets were

4   manicured, the homes, the lawns, and I can remember that the

5   alleys were maintained, the lights.  The alleys were so clean

6   that my mother and I -- I was about -- it was 1962, '63.  We

7   would actually walk to the corner market through the alley.

8   I mean we played baseball in the alley.  That's how clean the

9   streets were.  That's how nice the streets were, the homes.

10  Q   What's it like now?

11  A   It looks like a war zone over in Afghanistan, like a

12  couple of bombs have been hit in a few areas.

13  Q   Let's turn to EMS now.  What does EMS stand for?

14  A   Emergency medical services.

15  Q   On average, how many runs does EMS handle a year?

16  A   Anywhere from 100 to 110,000.

17  Q   How many ambulances does EMS have?

18  A   Now we're running approximately 20 ambulances a day.

19  Q   And how many do you actually own?

20  A   We had 23 donated.  We kept four of the older Fords that

21  we had, so that was about 27 or 5 -- 28, and we just

22  purchased another 15.

23  Q   Are they fully utilized, the vehicles, on a daily basis?

24  A   Yes.  And we also experience a number of breakdowns and,

25  you know, in this city some accidents, too, so they're

1    utilized.

2    Q    When you talk about the donated vehicles, you're talking

3    about the ones that came from Penske Corp.?

4    A    That's correct.

5    Q    Let's talk about staffing now for a minute.  In your

6    view, is the fire department properly staffed where you'd

7    like to see it?

8    A    No.  Right now we have approximately 770 fire fighters.

9    We need to be around 1,000, 1,020, 1,019.

10   Q    What about EMT's?

11   A    EMT's, we're understaffed.  I believe we're somewhere

12   around 220, and we need to have about 260.

13   Q    And about how many administrative staff do you have?

14   A    I'm looking at -- I'd say about 140.  You could look at

15   the divisions.  Communications, fire marshal divisions, and

16   other support staff.

17   Q    You have a fire academy?

18   A    Yes, sir.

19   Q    And that's used to train fire personnel?

20   A    Yes.  We have fire personnel and also EMS personnel.

21   They use the same facility.

22   Q    Do you currently have a class of fire fighters in the

23   academy?

24   A    Yes.  We have a class that's due to graduate on September

25   26th.  We started off with 80 candidates, and now we're down

1    to 61.

2    Q    And how many do you think of those will actually

3    graduate?

4    A    Per the chief, we might -- hopefully -- I'm hoping it's

5    61, but it might be 60.

6    Q    Okay.  Information technology.

7    A    Yes.

8    Q    What's the status of the IT systems in the fire

9    department?

10   A    Currently our IT system is somewhat antiquated.  A lot of

11   the -- well, all the towers in the fire stations and most of

12   them in headquarters are over five years old.  They're slow.

13   We're not running Windows 7, and we experience a lot of I

14   would say breakdowns.  And in terms of extracting

15   information, it's very slow.  The systems are very slow.

16   Q    What is a CAD system?

17   A    Computerized automated dispatch system.

18   Q    And do you have one?

19   A    Yes.  We have a Tiburon system.

20   Q    Is that in decent shape?

21   A    We're about eight or nine versions behind.  It's

22   antiquated, and it's not fast enough to handle the updated

23   software that we need to help us to be more efficient.

24   Q    If you need to dispatch EMS, tell me about the system you

25   have for dispatching EMS on an emergency medical run.

1    A    Well, currently right now the call comes into the

2    emergency service operator, the call-takers.  They take that

3    call.  If it's police or fire, they ship it over to the

4    respective department.  If it comes over to fire, it goes to

5    our dispatch.  Now, an EMS run will go to our EMS

6    dispatchers, and we -- because the Tiburon system is so old,

7    we cannot implement medical priority dispatching.  That's an

8    automated system that would go through and assess the

9    symptoms that the caller is telling the dispatcher, and that

10   would dictate to the dispatcher what type of unit to send,

11   paramedic or a regular EMT, or how to rate it, either a Code

12   10 priority, Code 20, or Code 30.  Right now since we don't

13   have an updated CAD system, our dispatchers have to go

14   through an antiquated manual card system and flip back and

15   forth to identify, you know, the proper response for that

16   call, so it does slow us down a little bit.

17   Q    Does that put any risk on people calling for medical

18   attention?

19   A    Yes, because if someone is having a heart attack, tissue

20   death occurs within four minutes, so it's very critical that

21   we get there as soon as possible.

22   Q    Let's turn for a minute and talk about response times by

23   the fire department.  What are the current response times for

24   the fire department related to fire fighting?

25   A    Fire fighting, we tend to get there anywhere from --

1  depending upon the locale, from seven to eight minutes.

2  Q    What's the national average?

3  A    National average is somewhere around seven minutes, six

4  to seven minutes.

5  Q    So you're pretty close to the national average?

6  A    That's correct.

7  Q    What's the current response time for EMS?

8  A    EMS now varies anywhere from 12 to 14 minutes, sir.

9  Q    Was it a little higher before?

10  A    Yes, it was higher, around 14 to 18 minutes, but within

11  the last three month -- two months we've implemented Romeo

12  units, and these Romeo units are not ambulances that

13  transport.  They're vehicles such as Crown Vics that are

14  staffed with a paramedic or EMT, and their primary

15  responsibility is to respond to Code 10's, get to that scene

16  as fast as possible and effect CPR, first-aid for that

17  individual.  But if they arrive on scene and see that it's

18  not a Code 10 or a priority run, they can call dispatch and

19  have a lower-grade unit dispatched or not make that a high

20  priority.

21  Q    What's the national average on response time on EMS?

22  A    EMS, I believe, is six minutes.

23  Q    Having this response time that's close to double the

24  national average --

25  A    Yes.

1  Q    -- does that put lives at risk?

2  A    Extremely, extremely.

3  Q    Let's spend a few minutes now and discuss the challenges

4  facing the fire department.  While you were deputy fire

5  commissioner, did -- let me first ask you do you know who

6  Conway MacKenzie is?

7  A    Yes, sir.

8  Q    And who are they?

9  A    They're management consultants.  They're a restructuring

10 firm specifically.

11 Q    And while you were deputy fire commissioner, did you work

12 with Conway MacKenzie at all?

13 A    Yes, sir.

14 Q    And when did that start?

15 A    I believe that was in the spring, May, June of 2013.

16 Q    Do you have an understanding of why Conway MacKenzie was

17 brought into the fire department?

18 A    Yes, to come in and help us assess our current situation

19 and assist us with our restructuring plan.

20 Q    Were they looking at operations costs and things of that

21 nature?

22 A    Yes.

23 Q    Are they experts, as far as you know, in the analysis of

24 fire departments?

25 A    No, sir.

1   Q    What's their expertise, as you understand it?

2   A    Restructuring, going into organizations, making an

3   assessment, and making recommendations from a business

4   perspective.

5   Q    Were you one of the point persons interfacing with Conway

6   MacKenzie when they were in there?

7   A    Yes.

8   Q    And who was your main contacts at Conway MacKenzie?

9   A    My main contacts was Kevin Hand and Emily Petrovski.

10  Q    What was your understanding of what the role and

11  responsibilities were of Conway MacKenzie?

12  A    To come in and gather -- first thing, gather data,

13  statistics, staffing, looking at our past budgets, response

14  time, and coming up with a picture in terms of where we were.

15  Q    Was it their responsibility to come up with a

16  comprehensive restructuring plan for the fire department?

17  A    No.  That was the responsibility of the administration of

18  the Detroit Fire Department.

19  Q    And you, as deputy commissioner and now as the executive

20  commissioner, is that your responsibility?

21  A    That's correct.

22  Q    And their role was what?  To assist?

23  A    To assist me, yes.

24  Q    Did you share information with Conway MacKenzie to assist

25  them in preparation of their information?

```
 1  A   Yes.  I instructed the staff to be very helpful with them
 2  and supply them with all the information that they need to do
 3  their analyses.
 4  Q   Did you make people available in your staff to interact
 5  with Conway MacKenzie in the assistance on preparing the
 6  restructuring initiatives?
 7  A   Yes, sir.
 8  Q   Do you think they had a sufficient understanding of the
 9  fire department?
10          MR. HACKNEY:  Objection.  Foundation.
11          THE WITNESS:  After about --
12          MR. HERTZBERG:  Hold on.
13          THE COURT:  Wait, sir.  I have to resolve the
14  objection.
15          THE WITNESS:  I'm sorry, sir.
16          THE COURT:  Mr. Hertzberg.
17          MR. HERTZBERG:  Let me lay a more in-depth
18  foundation.
19          THE COURT:  Okay.
20  BY MR. HERTZBERG:
21  Q   How long was Conway MacKenzie in the fire department
22  doing an analysis?
23  A   They started in the spring of 2013, and they still
24  provide assistance to me now, so they're still, you know --
25  Q   How often are they at the fire department assisting on
```

1  financial information?

2  A    In the first part -- in the first year they were there,

3  they were there on a regular basis coming over to assist, and

4  now I schedule meetings with them periodically to help review

5  my business cases.

6  Q    What type of information do you share with Conway

7  MacKenzie?

8  A    Pretty much everything.  I let them know about our

9  budgets, what we're spending, staffing, even labor issues.

10 Q    Have they reviewed all the financial information or

11 current financial information of the fire department?

12 A    Yes.  They stay up to date.

13 Q    Do you think they understand the challenges facing the

14 fire department?

15        MR. HACKNEY:  Same objection, your Honor.

16        THE COURT:  Overruled.  Go ahead, sir.

17        THE WITNESS:  Yes.  They not only worked with me

18 administratively, but they also took tours of the fire

19 stations and looked at various aspects of the city to

20 understand what fire and EMS faced on a daily basis.

21 BY MR. HERTZBERG:

22 Q    Did the fire department hire another consulting company?

23 A    Yes.  In the fall of 2013, we engaged TriData

24 Corporation.

25 Q    And who is TriData Corporation?

1  A   They're an organization that performs independent reviews

2  of fire and EMS services.

3  Q   Why did you need TriData when you already had Conway

4  MacKenzie assisting you?

5  A   Well, TriData is an independent source, and they're

6  experts in the fire service in terms of efficiency, in terms

7  of staffing, organization, and with the restructuring of the

8  fire department, then Commissioner Austin and myself felt

9  that we needed to have an independent source come in to lend

10  credibility to what we were doing.

11  Q   Did they prepare a report, TriData, for you?

12  A   Yes.  At this point, we have a draft report.

13  Q   Have you had an opportunity to review the draft report?

14  A   Yes, sir.

15  Q   You've put together restructuring initiatives with Conway

16  MacKenzie; correct?

17  A   With their assistance, yes.

18  Q   Does the TriData report confirm those findings?

19  A   Yes.  The TriData report actually lends credibility to

20  what we're doing.  It's a third -- I'm a CPA by trade, and

21  any time you went -- an investor or creditor, they want to

22  look at audited financial statements before they make an

23  investment, and to lend credibility to what we were doing, I

24  believe that TriData does that.

25  Q   You're familiar with the restructuring initiatives for

1    the fire department in the plan of adjustment?

2    A    That's correct, sir.

3    Q    Are you familiar with the proposed specific investments

4    in the fire department?

5    A    In terms of facilities, equipment, staffing, IT, yes,

6    sir.

7    Q    Did you have input in these restructuring initiatives?

8    A    Yes.

9    Q    Let's spend a minute and walk through some of the

10   specific initiatives.  What are you going to replace

11   vehiclewise under the initiatives as you understand it?

12   A    Our goal is to replace everything in terms of apparatus

13   in our fleet to have -- initially we're going to replace ten

14   engines, six rescue squads, fifteen ambulances, chief and EMS

15   response vehicles as well as vehicles for the fire marshal

16   division, and the goal is on a regular basis to have an

17   apparatus replacement rotation program and to maintain a

18   freshness in our fleet at any given point in time because in

19   the past we had a habit of using our vehicles until they

20   expired and having a tremendous cash outlay to purchase a

21   number of vehicles at one time, and the problem with that is

22   that they all go bad at the same time.  This is the condition

23   that we find ourself in right now.

24   Q    Is there going to be any capital expenditures on

25   facilities for the fire department?

A    Yes.  The goal is over the next ten years to build at

least seven to eight new stations, super stations, and

shutter and close down some of the older ones that we have.

Some of the older stations that we have are located within

neighborhoods.  Our goal is to locate these -- combine a lot

of these stations and put them on major thoroughfares whereby

the fire fighters would be in a more modern environment and

still be able to maintain their response times in their

districts.

Q    What are you going to do with facilities that need

maintenance?  Is that part of the restructuring initiatives

as you understand it?

A    Yes.  There are some stations that are going to be

maintained just based upon where they're located

geographically, and the goal is to have those stations

refitted and remodeled.

Q    Are you going to have any input or flexibility into how

those funds are allocated between existing facilities that

need maintenance and the construction of new facilities?

A    That's correct.

Q    What is fleet equipment?

A    Fleet equipment?  You're referring to the -- when we say

"fleet," we mean an apparatus.  We mean our engines, our

pumpers, our trucks, ladder trucks, our EMS vehicles, our

SUVs, our cars.

1    Q    And that's what you talked about previously on replacing

2    on an ongoing basis?

3    A    That's correct.

4    Q    Let's turn to labor and training.  What does the

5    initiatives provide for on labor and training, as you

6    understand, for fire personnel?

7    A    Labor and training, we want to cross-train our personnel.

8    Currently, our fire fighters are single function.  They just

9    perform fire suppression.  And as I mentioned earlier, we

10   only have 20 ambulances responding across this whole city to

11   medical emergencies, which makes our response times very slow

12   and well below the national average.  Our goal is to cross-

13   train these fire fighters first as medical responders, then

14   as EMTs and some as paramedics to go from having only 20

15   ambulances in the city that can respond to medical

16   emergencies to having over 80 units that can respond anywhere

17   in the city to a medical emergency in less than six minutes.

18   Q    Is this something being done in other cities throughout

19   the United States?

20   A    It has been done.  I believe Detroit is one, if not the

21   last major city that has not gone over to having fire

22   fighters cross-trained as EMTs and EMTs cross-trained as fire

23   fighters.

24   Q    Do you believe that the plan, as proposed, appropriately

25   targets what the fire department needs?

1    A    It targets it, yes, puts us in the right direction.

2            MR. HERTZBERG:  Could you pull up Exhibit, Steve,

3    626, page 2, please?  Could you blow up the section with the

4    fire department?

5    BY MR. HERTZBERG:

6    Q    Have you seen this before?

7    A    Yes.  Yes, sir.

8    Q    Okay.  What's your understanding of what this is?

9    A    It's the ten-year plan in terms of how we're going to be

10   spending our money to restructure the fire department.

11           MR. HERTZBERG:  Your Honor, just for your

12   information, it's been previously admitted into evidence.

13           THE COURT:  Thank you.

14   BY MR. HERTZBERG:

15   Q    What is the total being spent on the fire department

16   restructuring initiatives?

17   A    It's a little blurred here, but from what I recall, it's

18   about 158 million.

19   Q    Do you know where those figures came from?

20   A    Those figures came from working collaboratively with E&Y

21   and Conway MacKenzie in terms of our plan to restructure and

22   rebuild the fire department.

23   Q    When you say E&Y, do you mean Ernst & Young?

24   A    That's correct, sir.

25   Q    What input did you have into these numbers?

1  A   In terms of providing them information, explaining to

2  them our run rates, explaining our staffing levels, equipment

3  needs, repair and maintenance, supplies, and facility needs.

4  Q   Have you reviewed any of the supporting information and

5  data that back up this proposed $158 million spend by the

6  fire department?

7  A   Yes.  All the spreadsheets that were used to compile

8  these numbers were made available to me.

9  Q   Did you actually review those spreadsheets?

10  A   Yes, I did, sir.

11  Q   That's where you used your CPA skills?

12  A   Yes, sir.

13  Q   Okay.  What is NFPA?

14  A   National Fire Protection Association.

15  Q   Do they have professional standards for fire departments?

16  A   Yes.  Yes, sir.

17  Q   And what are -- just give me a few examples of what their

18  standards are.

19  A   They establish standards of response times in terms of

20  what the national average should be and what the average fire

21  fighter -- fire department or EMS service should be running

22  at at any given time.  I mean in terms of response time, what

23  the minimum response time should be.  They also establish

24  standards for training for fire apparatus, for the fire

25  marshal divisions in terms of building construction and fire

1  ordinances.

2  Q   Looking at the expenditures, 158 million proposed

3  expenditures over the next ten years, will this bring you up

4  to the NFPA standards?

5  A   I won't say it will -- I will not say it will bring us up

6  to those standards, but it'll help us get real close.

7  Q   Are there any other intangible benefits of the

8  restructuring investment such as safety, et cetera?

9  A   Yes.  Safety, as you mentioned, morale, and quality of

10  service to the people of the City of Detroit.

11  Q   Are you aware that the proposed plan of adjustment has an

12  impact on the fire personnel's pensions?

13  A   Yes, sir.

14  Q   And what is your understanding of the impact?

15  A   Well, going forward, the retirees will be responsible for

16  their own healthcare, so that's a negative effect that that's

17  having on a lot of fire fighters.  They look down the road in

18  terms of when they retire they'll have less disposable income

19  because a portion of it they will have to spend for their own

20  healthcare.

21  Q   What about COLA?

22  A   COLA has been reduced.  In the past, it was two percent

23  per year raise that was given or cost of living increase to

24  retirees.  That's been reduced down to one percent.

25  Q   Has this had -- these reductions had any impact on the

1    morale of your employees?

2    A    Yes.   There's been several that I know of recently that

3    have resigned from the fire department and sought employment

4    elsewhere.

5    Q    And why is that?

6    A    They're younger.   They're in their 30s, and they're

7    moving to departments where there's still a defined benefit

8    plan versus a contribution plan.

9    Q    So you think the impact of the pension reductions and the

10   healthcare have impacted your ability to retain fire

11   fighters?

12   A    Yes.   People look twice, you know.   We still have people

13   that are applying, but I think some people look elsewhere

14   because they're looking for more benefits.

15            MR. HERTZBERG:   I have no further questions.

16            MR. HACKNEY:   Your Honor, if I can approach.

17            THE COURT:   Yes, sir.

18            MR. HACKNEY:   If I can approach the witness, your

19   Honor.

20            THE COURT:   Yes, sir.

21            MR. HACKNEY:   May I proceed, your Honor?

22            THE COURT:   Yes.

23                          CROSS-EXAMINATION

24   BY MR. HACKNEY:

25   Q    Commissioner Jenkins, good morning.   It's nice to meet

1    you.  My name is Steve Hackney.  I represent Syncora in these

2    cases.

3    A    Good morning, sir.

4    Q    We didn't have a chance to meet.  My associate, Mr.

5    Arnault, took your deposition, so it's nice to meet you.

6    A    Yes, sir.

7    Q    And I think it's something everyone appreciates, all the

8    work that you do as a fire fighter, so I think I'd like to

9    note that for the record, although I think that when you say

10   that your wife is nosy on the record, we may have to send one

11   of those emergency teams home with you tonight after court,

12   so --

13   A    That's quite possible.

14   Q    But I'm going to leave you two to deal with that.

15   A    Okay.

16   Q    I want to talk about something that you just touched on

17   at the end there, which is the connection between morale and

18   the way benefits work in the fire department.  I want to ask

19   you a series of questions on that subject, sir, and some of

20   them will sound familiar because I think you may have

21   discussed them previously with Mr. Arnault, but I have to ask

22   them for the record here.  You understood back in October of

23   2013 that the city was going to be making changes to both

24   active and retiree healthcare.  Do you remember that?

25   A    In 2013?

1    Q    Yes.

2    A    Vaguely, yes, yes.

3    Q    Okay.  And, for example, you're aware that in October

4    2013, the city announced that it would be making those

5    changes; isn't that correct?

6    A    Yes.

7    Q    Now, I want to split up the changes, and we're going to

8    talk about them separately.  We're going to start by talking

9    about the changes to active employee healthcare.  Okay?  The

10   proposed changes to active employee healthcare obviously had

11   an impact on active employees; isn't that correct?

12   A    Yes.

13   Q    But as far as you could tell, the announcement of the

14   changes to active employee healthcare did not impact employee

15   productivity; isn't that correct?

16   A    Not for fire fighters.  We always do our job, yes, sir.

17   Q    And the announcement regarding the changes in active

18   healthcare did not have a negative impact on the fire

19   department's ability to attract new employees; isn't that

20   correct?

21   A    Yes.  We still attract people.

22   Q    And this is important.  You were not consulted about the

23   changes to the healthcare of active employees before they

24   were announced; isn't that correct?

25   A    Yes, sir.

1  Q   I'm sorry.

2  A   Yes, yes.

3  Q   Thank you, sir.  Now, I want to talk about the retiree

4  healthcare changes, which we separated out.  Okay.  And the

5  first point here is just like with respect to the changes to

6  active employees, you also were not consulted with respect to

7  the changes to retiree healthcare before they were announced

8  in October; isn't that correct?

9  A   Yes.

10  Q   And when it comes to healthcare, you've talked to a few

11  actives about the changes to retiree healthcare; correct?

12  A   Talked to quite a number of people, yeah.

13  Q   Okay.  Let me direct your attention -- if you could get

14  that -- there is a deposition transcript that's in the front

15  of your binder there, sir --

16  A   Okay.

17  Q   -- and get it and take it out to page 224 for me.  Let me

18  know when you've got there.

19  A   All right.

20  Q   And then if you have it, sir, at 224, take a look at line

21  20.  Do you have that there?

22  A   Yeah, line 20.  Yes, I do.

23  Q   Now I'm going to ask you, sir, you remember giving your

24  deposition with Mr. Arnault; isn't that correct?

25  A   Yes.

1  Q   And you remember you were under oath at that deposition;

2  right?

3  A   Yes.

4  Q   And were you asked the following question?  Did you give

5  the following answer?

6          "Question:  And did you talk to any actives

7          about the changes to the retiree healthcare?"

8  A   Yes.

9  Q          "Answer:  in passing, yes.  It's been a few, not

10     everybody, but a few people."

11         MR. HERTZBERG:  Your Honor, I'm going to object to

12  the use of the deposition.  It's not inconsistent with his

13  prior testimony.

14         THE COURT:  The objection is overruled.  You may

15  proceed.

16  BY MR. HACKNEY:

17  Q   Simple question.  Were you asked that question?  Did you

18  give that answer, Commissioner?

19  A   Yes.

20  Q   Okay.  And you did not notice any change in employee

21  productivity after the October announcement regarding the

22  changes to retiree healthcare; isn't that correct?

23  A   That's correct.

24  Q   Now, let's move ahead to November of 2013.  That's the

25  next month in the calendar.  In that month, the city

1  announced that it was going to delay the changes to retiree
2  healthcare.  Do you recall that?
3  A   Yes, I do.
4  Q   Okay.  And, again, you were not consulted in connection
5  with the decision to delay the changes to retiree healthcare;
6  isn't that correct?
7  A   That's correct.
8  Q   In fact, you were not even aware that those changes were
9  going to occur till you read about them in the newspaper;
10  isn't that right?
11  A   Yes.
12  Q   Now, obviously the decision to delay the changes to
13  retiree healthcare only directly impacted the retirees;
14  right?
15  A   Yes.
16  Q   And that announcement to delay the retiree healthcare
17  changes did not impact employee morale of actives, as far as
18  you could tell; isn't that correct?
19  A   I won't say it affected morale.  It didn't affect their
20  productivity in terms of their response.
21  Q   It didn't affect their productivity, but also you could
22  discern no impact on their morale; isn't that correct?  And
23  I'm talking about the decision to delay changes to retiree
24  healthcare.  That didn't impact active morale; correct?
25  A   Well, I can't read all their minds, but not that I could

1  determine, no.

2  Q   Okay.  That's fine.  I'm just talking about from your

3  perspective as the --

4  A   Yes.

5  Q   -- executive commissioner.  And as you've said just

6  moments ago, that November announcement to delay the changes

7  also did not impact employee productivity, as far as you

8  could tell; correct?

9  A   That's correct.

10  Q   And that November announcement did not have any impact,

11  as far as you could tell, on attracting new employees; isn't

12  that correct?

13  A   That's correct.

14  Q   Now, let's -- we've been talking about healthcare.  You

15  know it also is called OPEB.  You ever heard that?

16  A   Yes.  Other post-employment benefits.

17  Q   That's right.  As a CPA and someone who's dealt with

18  this, I'm sure that's a familiar acronym.  Let's move from

19  talking about OPEB to talking about pension cuts.  Okay.  And

20  let's start by talking about what the proposed cuts to the

21  PFRS pensions were.  Okay.  By the way, I should note for the

22  record you're actually on the board of trustees of the PFRS;

23  isn't that correct?

24  A   That's correct, sir.

25  Q   Okay.  Now, you're aware that in February of this year --

1    so I want to take you back to February of this 2014 year,

2    which is when the city filed its first proposed plan.  Okay.

3    And just so you know, it's obviously changed since that time.

4    We're going to talk about those changes.  Okay.

5    A    Okay.

6    Q    But you were aware in February of this year that the city

7    proposed to cut PFRS pensions in that first plan by ten

8    percent; isn't that correct?

9    A    Yes, sir.

10   Q    And, again, just as with active healthcare and just as

11   with retiree healthcare, you were not actually consulted in

12   advance of the decision to propose a ten-percent cut to PFRS

13   pensions; isn't that correct?

14   A    Yes, sir.

15   Q    And, in fact, you didn't have any involvement in

16   determining the appropriate size of the pension cuts; isn't

17   that correct?

18   A    Yes.

19   Q    Now, you testified a bit about the impact of pension

20   cuts, but the fact of the matter is that the announcement of

21   the ten-percent cuts back in February of 2014 did not

22   negatively impact employee productivity, as far as you could

23   tell; isn't that correct?

24   A    That's correct.

25   Q    And the announcement regarding the ten-percent cut to PFR

1   pension -- PFRS pensions back in February of 2014 did not

2   have any impact on attracting new employees, as far as you

3   could tell; isn't that correct?

4   A    That's correct.

5   Q    Now, you're aware that after February, so coming closer

6   to where we are today, after February of 2014, there was a

7   decision made to reduce the cuts to the PFRS pensions.  Are

8   you aware of that?

9   A    Yes.

10  Q    And, in fact, as things stand today, the pension cut was

11  actually reduced from ten percent so that there is now a

12  zero-percent cut to the face amount of the pension; isn't

13  that correct?

14  A    That's correct.

15  Q    And the folks in the PFRS saw their COLA go down by about

16  45 percent; correct?

17  A    That's correct.

18  Q    So on a go-forward basis, they will still have a COLA

19  that escalates their pension.  It just won't be as large as

20  it once was; isn't that correct?

21  A    That's correct.

22  Q    Now, again, just as with the active and retiree

23  healthcare, just as with the prior pension cuts, when it came

24  to determine the zero-percent cut, you weren't consulted;

25  correct?

1   A    That's correct.

2   Q    And as far as you could tell, the agreement to reduce the

3   cuts to the PFRS pensions did not impact the morale of the

4   active employees personally; isn't that correct?

5   A    In terms of their work productivity, there was no

6   decrease.

7   Q    Work productivity, morale, both of those things; isn't

8   that correct?

9   A    I'm not in every fire station.  I can talk to the --

10  Q    Understood.  Not trying to make you into every fireman in

11  the city, but we are talking about things that you perceived.

12  A    Okay.

13  Q    I'm saying you couldn't perceive an affect; correct?

14  A    Correct.

15  Q    Now, one of the things that you would agree are drivers

16  of employee morale are dilapidated equipment and antiquated

17  buildings of the sort that you talked about earlier; right?

18  A    Yes.

19  Q    That's because, you know, it's not nice to work in them,

20  and it's unsafe; right?

21  A    That's correct.

22  Q    And those are two things that are real drivers of

23  employee morale; correct?

24  A    Yes.

25  Q    And you intend to address those issues by way of the

1    restructuring and reinvestment initiatives; isn't that

2    correct?

3    A    Yes.

4    Q    And by the way, isn't it also true that the fire fighters

5    are getting a ten-percent raise as part of the new collective

6    bargaining agreement?

7    A    Over -- that hasn't been settled yet.

8    Q    That hasn't been decided yet.  Okay.  Do you know that

9    all of the -- I think all of the other union contracts have

10   effectively agreed that they'll restore pay to what it was

11   before you went to the city employment terms?

12           MR. HERTZBERG:  Objection.  Foundation, your Honor.

13           THE COURT:  Do you know the answer to that question?

14           THE WITNESS:  I know what I read in the paper.

15           THE COURT:  The objection is sustained.

16           MR. HACKNEY:  Okay.

17   BY MR. HACKNEY:

18   Q    But for all this talk about employee morale, one thing I

19   want to get clear on, Commissioner Jenkins, which is you

20   would agree with me that employee morale is not a critical

21   problem for the fire department; isn't that correct?

22   A    I can't agree to that.

23   Q    Let me direct your attention to that deposition again, if

24   you would.  Look at page 177 this time.  Let me know when you

25   have that, sir.  Take your time.

1  A    I have it.

2  Q    Okay.  And then look at line 15, if you would.  Okay.  Do

3  you see that, sir?

4  A    Yes.

5  Q    So were you asked this question?  Did you give this

6  answer?  "Question:  So you would say that DFD has an

7  employee morale problem?"  And then there was an objection.

8  Then there was your answer, "I wouldn't say it's a critical

9  problem, but it's just people would like better working

10  environments and better tools to work with."  Were you asked

11  that --

12           MR. HERTZBERG:  Your Honor --

13  BY MR. HACKNEY:

14  Q    Were you asked that question?  Did you give that answer,

15  sir?

16           MR. HERTZBERG:  I'm going to object.  It's not

17  inconsistent with his prior testimony, and it's being used to

18  impeach the witness.

19           MR. HACKNEY:  My prior --

20           THE COURT:  The objection is overruled.  Please

21  answer the question.

22  BY MR. HACKNEY:

23  Q    Was that your testimony, sir?

24  A    Yes, sir.

25  Q    I'd like to talk about the CBAs, which is you're involved

1    in the negotiations regarding the new CBAs; isn't that
2    correct?
3    A    Yes.
4    Q    And the new CBAs cover active fire fighters; correct?
5    A    Yes.
6    Q    Obviously they don't cover retirees; correct?
7    A    That's correct.
8    Q    Okay.  And the retirees have not been involved in the
9    negotiations of the CBAs; correct?
10   A    That's correct.
11   Q    Now, I want to ask you a few questions about your
12   recruiting efforts, Commissioner.  In October of 2013, so
13   we're going back around -- I know I'm jumping around, so if I
14   give you a second to locate yourself, that's just to be fair,
15   but -- so throw your mind back to October of 2013.  At that
16   time, you began an effort to recruit an additional 90 fire
17   fighters; isn't that correct?
18   A    That's correct.
19   Q    Okay.  Now, that was before the grand bargain had been
20   announced.  You know what the grand bargain is; right?
21   A    Yes.
22   Q    That was back before that time.  Do you remember that?
23   A    Yes.
24   Q    And that was back at a time when employees thought that
25   pension cuts were even going to be steeper than they were in

1    the first plan; isn't that correct?

2    A    That's correct.

3    Q    But, nevertheless, the fire department received 4,500

4    applications for 90 open positions; isn't that correct?

5    A    Yes, but in the past we received in excess of 10,000

6    applications, sir.

7    Q    But it received thousands of applications for those jobs;

8    isn't that right?

9    A    Yes.

10   Q    And you would agree there was a lot of interest in

11   working for the fire department; correct?

12   A    Yes.

13   Q    And as far as you can tell, the bankruptcy filing has not

14   had any impact on the fire department's ability to hire new

15   employees; isn't that correct?

16   A    Yes.

17   Q    Now, you have spoken with some of the folks that have

18   applied for jobs with the fire department; isn't that

19   correct?

20   A    Yes, I have.

21   Q    They've told you they view it as a good job; isn't that

22   result -- isn't that right?

23   A    Yes.

24   Q    And as a result, in your view, any attrition the fire

25   department has been suffering has generally just been driven

1  by normal retirement of age-appropriate retirees; isn't that
2  correct?
3  A   The majority.
4  Q   And by the way, on direct you even mentioned that there
5  were a couple fire fighters that left.  Do you remember that
6  testimony?
7  A   Yes.
8  Q   And that was interesting because you said they were
9  younger fire fighters; right?
10 A   Well, in the fire department, guys now with 20 years are
11 considered young.
12 Q   Yeah.  But the ones you were referring to, I thought you
13 were talking about the fact that they didn't like the hybrid
14 pension plan going forward; right?
15 A   It was about the pension plans and in terms of being a
16 retiree having to pay for their own healthcare.
17 Q   And didn't you say that they left to go find another fire
18 department that has a defined benefit pension plan; right?
19 A   Yes.  Better benefits, yes.
20 Q   And what happened at the fire department here is you
21 replaced the active go-forward pension plan with a hybrid
22 pension plan; right?
23 A   Yes.
24 Q   Okay.  And that's what your testimony was relating to
25 there; correct?

1  A    Yes.

2  Q    Now, other than the retirement-driven attrition that we

3  just talked about, there are no other attrition problems that

4  the fire department has faced, in your view; isn't that

5  correct?

6  A    We're just starting to experience people leaving this

7  last year or this year, so in terms of magnitude, I think

8  it's too early for me to speak on that.

9  Q    All right.  Well, let me direct your attention back to

10  that deposition again, if I could, sir, and take a look at

11  page 176.

12  A    Okay.

13  Q    You have that, sir?

14  A    Yes, sir.

15  Q    And take a look at line 24.

16  A    Okay.

17  Q    I'm going to read you a sequence of questions and answers

18  and ask you if it's your testimony.

19             "Question:  Has attrition been a problem for

20         DFD?

21             Answer:  Now, yes, because a lot of the fire

22         fighters -- average age is 47, 48 years old, so we

23         have guys who are retiring.

24             Question:  So the attrition is driven by

25         retirement.  Would that be fair?

1            Answer:  Yes.

2            Question:  Are there any other attrition

3        problems that DFD has faced?

4            Answer:  No."

5        Were you asked that question?  Did you give that

6   testimony, sir?

7   A   Yes, sir.

8   Q   I'd like to talk about the fire department's efforts to

9   deliver fire services, Commissioner.

10  A   Yes.

11  Q   Before retiring in 2003, I think you testified that you

12  spent 25-1/2 years as a Detroit fire fighter; isn't that

13  correct?

14  A   That's correct.

15  Q   So you've actually lived the whole life of a fire fighter

16  all the way from coming in and being a probie and then going

17  all the way up to being the chief; isn't that right?

18  A   Yes.

19  Q   And, in fact, consistent with that, you rose up through

20  the ranks during your career, as you testified.  You were a

21  sergeant and a lieutenant over time; isn't that right?

22  A   Yes, sir.

23  Q   And you have an executive fire officer certificate from

24  the Eastern Michigan School of Fire Staff and Command; isn't

25  that right?

1   A    Yes, sir.

2   Q    So you've received extensive training; correct?

3   A    Yes, sir.

4   Q    Now, you've testified that as deputy fire commissioner,

5   your role was to act for the commissioner, something like a

6   chief operations officer; isn't that correct?

7   A    Yes, sir.

8   Q    Now, you talked a little bit about the average response

9   time being in the seven to eight minutes point; right?

10  A    Yes.

11  Q    And that is within the standards for the National Fire

12  Protection Association; isn't that correct?

13  A    Yes, sir.

14  Q    Okay.  Now, during the bankruptcy case, you have been

15  working hard, haven't you, to try to improve the operations

16  during the case; correct?

17  A    Yes.

18  Q    And you've actually already achieved a number of

19  improvements, isn't that correct, Commissioner?

20  A    Some improvement with EMS response time, yes.

21  Q    Let me ask you about some of them.  You can see if you

22  agree.  For example, you think that the fire department has

23  significantly improved its recordkeeping and data collection;

24  isn't that correct?

25  A    Yes, we have.

1  Q   And, for example, the fire department has doubled the
2  number of fire inspectors it has going from seven to now it
3  has fourteen; isn't that correct?
4  A   Yes.  We had those positions open.  They just weren't
5  filled, but now we've got staffing deficiencies in fire
6  fighting.  All those positions that go up into the fire
7  marshal division are pulled from fire fighting.
8  Q   Right.  So you're saying it's good on the fire inspector
9  front, but now I've got holes to fill on the fire fighter
10 front?
11 A   Went from one pocket to the other.
12 Q   That's right.  Okay.  We'll talk about that in a sec, but
13 you do have -- you have doubled the number of fire
14 inspectors; correct?
15 A   Yes.
16 Q   And you've also doubled the number of arson
17 investigators; isn't that correct?
18 A   Yeah.  They come from the same pool.
19 Q   Now, with respect to hiring going forward, the fire
20 department has received a $24 million SAFER grant that will
21 allow it to hire 200 additional fire fighters; isn't that
22 correct?
23 A   Yes, but that funding only lasts for two years.  After
24 two years we have to be able to pay those fire fighters out
25 of our budget.

1  Q   Sure, unless there's another grant in two years that pays

2  for it; correct?  Can't know the future; right?

3  A   The SAFER grant is used to prevent fire fighters from

4  being laid off or to hire new fire fighters.  It's not used

5  just to maintain a level of staffing for regular, you know --

6  Q   You said the first part was to prevent them from being

7  laid off; right?

8  A   Yes.  You can use a SAFER grant to prevent fire fighters

9  from being laid off or it could be used to hire new fire

10 fighters.

11 Q   And you said you were at about 770 fire fighters on

12 direct; right?

13 A   Yeah, approximately.

14 Q   And you want to be closer to a thousand; right?

15 A   Yes.

16 Q   And the SAFER grant provides for 200; correct?  Now,

17 based on your extensive experience as an individual who's

18 worked at all levels of the fire department, you believe that

19 the fire department is currently meeting the public safety

20 needs of its citizens; isn't that correct?

21 A   We have no -- yes, we always do.

22 Q   Let me ask you a little bit about what are called the

23 restructuring and reinvestment initiatives.  You testified, I

24 think, that you're familiar with those; correct?

25 A   Yes, sir.

1   Q   Now, you're aware that as part of the plan of adjustment

2   the city is going to spend in total across the whole city

3   $1.7 billion subject to certain cost savings it hopes to

4   achieve.  Are you aware of that?

5   A   Yes, sir.

6   Q   And with respect to the fire department, I think you

7   testified, and EMS that the number is about 155.7 million; is

8   that correct?

9   A   Yes.

10  Q   Now, as part of the fire department's restructuring, the

11  city retained an independent fire expert to conduct an

12  independent review of the fire department; correct?

13  A   Yes, sir.

14  Q   Okay.  And that's the TriData group that you talked about

15  earlier; correct?  And the reason you wanted to hire TriData

16  was because Conway MacKenzie did not have the necessary

17  expertise in fire department restructuring; correct?

18  A   Well, we had the expertise.  They had the skill set I

19  needed to assist in the restructuring.

20  Q   Okay.  But they didn't have the necessary expertise in

21  fire department restructuring.  That's why you hired one that

22  did; correct?

23  A   Yes, yes.

24  Q   Now, TriData's goal -- what they're out there doing right

25  now is to create a comprehensive restructuring plan along

1  with you for the fire department and the EMS; correct?

2  A    That's correct.

3  Q    And as we stand here today, that's not even done yet;

4  right?

5  A    What's not done yet?

6  Q    Their report.

7  A    We have a draft report.  They're waiting on me and my

8  staff to send our comments after reviewing their report to

9  correct any errors or deficiencies.

10  Q    Understood.  So there's still a step to that process

11  before it's finished; right?

12  A    Yes, but after my review of the report, the changes are

13  minimal.

14  Q    Okay.  Now, that $155.7 million that we were talking

15  about earlier under the plan -- you remember that?

16  A    Yes.

17  Q    That does not take into account the comprehensive

18  restructuring plan that's been developed by TriData; correct?

19  A    TriData reports just -- for me just lends credibility

20  toward the plans we have for the fire department

21  restructuring that we did initially.

22  Q    Understood.  Understood.  But the 155.7 million obviously

23  didn't take into account the TriData work, right, because it

24  hadn't been done?

25  A    Well, the TriData work just confirms what we came up

1   with.

2   Q   I just want to -- I just want to get an answer to my

3   question, sir.  I understand your answer, but the 155.7

4   million, at the time it was conceived, it did not take into

5   account the comprehensive restructuring plan developed by

6   TriData; correct?

7   A   I'm not sure what you mean by that, take into account.

8   Q   Let me direct you to page 206 of your deposition.

9   A   Okay.

10  Q   And take a look, if you would, at line 17, Commissioner.

11  A   Okay.

12  Q   Were you asked the following questions?  Did you give the

13  following answers?

14          "Question:  And on this page the -- this

15          document lays out that the city has proposed to

16          invest a total of 155.7 million in fire and EMS; is

17          that right?

18          Answer:  Yes, sir.

19          Question:  And do you know if that figure takes

20          into account the recommendations from TriData?

21          Answer:  No.  We didn't have it."

22          Were you asked those questions?  Did you give those

23  answers, sir?

24  A   In terms of their recommendations, no, I didn't have it,

25  no.  I agree with that.

1  Q   Now, the plan of adjustment sets out what has been

2  allocated to the specific investments that the city is going

3  to make in terms of fire and EMS; isn't that right?

4  A   Yes.

5  Q   But it's your understanding that the allocations that

6  have been made by the plan of adjustment, those are

7  proposals; right?  They're not required spending by you;

8  correct?

9  A   Right.  I have latitude to --

10 Q   To decide how --

11 A   Yeah.

12 Q   -- you ultimately spend it --

13 A   Yes.

14 Q   -- right?  Okay.  Now, let's go back and talk about when

15 you were working with Conway MacKenzie, they essentially came

16 to you and asked, "What do you need?"; right?

17 A   I believe I was the right person to ask that question

18 because initially when I came back I was doing my own

19 assessment in terms of what has to be done in the fire

20 department.  I didn't have the skill set to do a lot of the

21 analysis.

22 Q   No.  Understood.  And I think that if I wanted to know

23 what the fire department needed, I would ask you as well.

24 You seem like someone who knows a lot about it from your

25 career.  But I'm trying to say that when they came to you,

1  they were asking questions to the effect of what does the

2  fire department need; right?

3  A    Yeah.  Essentially, yes.

4  Q    And you told them what you thought the fire department

5  needed; isn't that right?

6  A    Yes.

7  Q    And at no point did Conway MacKenzie have a conversation

8  with you where they told you that what you were asking for

9  was too expensive; isn't that correct?

10  A    That's correct.

11  Q    And, in fact, in your conversations with Conway

12  MacKenzie, cost just didn't come into play; correct?

13  A    Cost?  I gave them estimates in terms of what things

14  would cost.

15  Q    You told them what things would cost, but the idea of

16  there being limitations on cost just didn't come into play;

17  correct?

18  A    Correct.  I was just looking at what it would take to

19  bring the fire department up to an acceptable level in terms

20  of service.

21  Q    Understood.  Now, I want to talk about blight, if we

22  could.  I was struck by your testimony that the fire

23  department does approximately 30,000 runs, isn't that

24  correct --

25  A    Yes.

1   Q    -- a year?

2   A    Yes.

3   Q    And you also estimate that about 70 percent of those runs

4   are to blighted or abandoned structures; isn't that correct?

5   A    30,000 runs.  10,000 runs would be false alarms.  Another

6   10,000 runs would be to vacant structures, and another 10,000

7   runs would be a combination of occupied structures, car

8   fires, and rescues, things of that nature.

9   Q    Okay.  So is it only 10,000 of the runs of the 30,000 go

10  to blighted structures, which is about a third?

11  A    About a third.

12  Q    Okay.  So whatever it is, it's a substantial percentage.

13  A    Yes, it is.

14  Q    Literally thousands and thousands and thousands of runs

15  every year by fire fighters to these structures that are

16  abandoned --

17  Q    Yes.

18  A    -- right?  Now, you'd agree with me that the amount of

19  blight in the city significantly impacts service and response

20  times for the fire department and, you know, puts more miles

21  on the vehicle and does things like that; correct?

22  A    Yes.

23  Q    And you also are aware that as part of the city's

24  restructuring, the city intends to remediate substantial

25  portions of this blight; isn't that correct?

1 A    That's correct.

2 Q    In fact, there have -- are you aware that there are

3 hundreds of millions of dollars that are anticipated to be

4 spent on this subject that we're talking about right now, on

5 remediating blight?

6 A    Yeah.  Right now we're -- I believe the mayor has his

7 crews tearing down anywhere from 240 to 280 structures a

8 week.

9 Q    Yes.  Remarkable pace that they're undertaking.

10 A    Yes.

11 Q    But what's important, I think, from -- for the purposes

12 of our conversation is that if you look into the future four

13 to five years down the road, there's going to be a time when

14 that portion of runs, that 10,000 runs a year, is going to be

15 substantially reduced because of the fact that that blight is

16 gone.

17 A    And we're looking forward to that because a majority of

18 our runs are EMS runs.  We have people right now that are

19 dying because they don't have enough responders out there.

20 That's where we want to push our fire department --

21 Q    You want to reallocate the firemen to do the EMS runs;

22 correct?

23 A    And fire prevention, yes.

24 Q    And the blight remediation is going to dramatically help

25 with that; right?

1    A    Yes, because a healthy city doesn't burn, and that's our

2    goal.

3    Q    Just a few questions that are in your role as a trustee

4    at the PFRS, and then I think I'll be done.

5    A    Yes, sir.

6    Q    So just a few more, sir.

7    A    Yes, sir.

8    Q    You've been on the PFRS board for almost two years; isn't

9    that right?

10   A    Yes, sir.

11   Q    And you understand that as a trustee, you have a

12   fiduciary duty to pick a realistic investment rate

13   assumption; isn't that correct?

14        MR. HERTZBERG:  Objection, your Honor.  I understand

15   that the Court had originally when this issue came up during

16   the pretrial indicated that they would grant wide latitude on

17   cross-examination of witnesses.  This is way beyond the

18   latitude I believe the Court set when it agreed to allow

19   latitude during the cross.  There has been nothing on direct

20   regarding his role in that position.  There's been no

21   foundation made as to his responsibility on the rate of

22   return, and it's well beyond his direct examination.  And I

23   think it's inappropriate cross.

24        THE COURT:  Well, the choice is to have Syncora call

25   him back as a witness in its direct case.  Is that what you

1   would prefer?

2           MR. HERTZBERG:  No, your Honor.

3           THE COURT:  You may proceed.

4   BY MR. HACKNEY:

5   Q   So let me ask that question again, sir.  As a trustee,

6   you understand that you have a fiduciary duty to pick a

7   realistic investment rate assumption; isn't that correct?

8   A   As a board, not as an individual.

9   Q   That's right.  The board does together; correct?  And you

10  understand that -- you understand that the investment rate

11  assumption that you pick has an impact on how large the UAAL

12  is of the pension system?

13  A   Yes.

14  Q   Now, I want to throw your mind back again to last year.

15  Go back to January of 2013.  Okay.  We're talking six months

16  before the bankruptcy.

17  A   Okay.

18  Q   Okay.  On January 17th, 2013, the PFRS board passed a

19  resolution setting an asset allocation policy target; isn't

20  that correct?

21  A   Yes.

22  Q   And you believe that this asset allocation was prudent,

23  and that's why you voted in favor of it; correct?

24  A   Yes.

25  Q   You understand that as a trustee you have a continuing

1    duty to evaluate and review and make appropriate adjustments

2    to the asset allocation that represents the way the PFRS

3    invests the money; correct?

4    A    As a board, yes.

5    Q    Now, in 2013, the actuarial assumed rate of return that

6    we were just talking about was set at eight percent; isn't

7    that correct?

8    A    Yes, sir.

9    Q    And you believed that an eight-percent actuarial assumed

10   rate of return for 2013 was realistic; isn't that correct?

11   A    Yeah.  I think the return was something like 17.5

12   percent.

13   Q    I think it was, too.  And I'm not here to -- I'm not here

14   to criticize you.  I think that you're right to say it was,

15   but I do want to confirm that you thought it was a realistic

16   rate of return; correct?

17   A    Yes.

18   Q    And, in fact, the PFRS had been using that same rate of

19   return for the prior two years; isn't that correct?

20   A    Yes.

21   Q    And as you noted, I think, in both 2012, 2013, I think it

22   far exceeded that rate of return; correct?

23   A    Yes.

24   Q    And this is important.  As far as you know, the PFRS

25   board has not made any changes to the asset allocation since

1   January 2013, isn't that correct, or, put another way, you're
2   not aware of any changes?
3   A    No.  I'm not aware of any changes.
4         MR. HACKNEY:  Commissioner, thanks very much for
5   your time.  I'll pass the witness, your Honor.
6         MS. O'GORMAN:  Good morning, your Honor.
7                      CROSS-EXAMINATION
8   BY MS. O'GORMAN:
9   Q    Commissioner, my name is Debra O'Gorman.  I represent
10  Macomb County through its public works commissioner, Anthony
11  Marrocco.  Sir, is it true that you have no special expertise
12  in the science of human behavior?
13  A    Could you repeat that, ma'am?
14  Q    Is it true that you have no special expertise in the
15  science of human behavior?
16  A    That's correct, ma'am.
17  Q    And you're testifying here today as a fact witness, not
18  an expert witness; correct?
19  A    Yes.
20  Q    And you have no expertise on the Detroit labor market as
21  a whole; is that correct?
22  A    That's correct.
23  Q    And you have no special expertise in labor economics;
24  correct?
25  A    Yes.

1  Q   And any testimony that you gave about the behavior of

2  Detroit Fire Department employees is not the result of any

3  systematic study or analysis that you've conducted; correct?

4  A   No.

5  Q   Just based on some anecdotal conversations with a few

6  people?

7  A   Yes.

8         MS. O'GORMAN:  Okay.  Thank you.

9         MR. HERTZBERG:  Short redirect, your Honor.

10                    REDIRECT EXAMINATION

11 BY MR. HERTZBERG:

12 Q   As a manager of the -- or commissioner of the fire

13 department, do you view that the lower cuts as to the pension

14 and healthcare benefits is a positive for employee relations?

15 A   Say that one more time, sir.

16 Q   As the commissioner of the fire department, do you

17 believe the lower cuts on pensions and healthcare is a

18 positive for the police -- or for the fire department?

19 A   No.

20 Q   Mr. Hackney asked you on cross-examination about

21 attrition, and you indicated, I believe, that you are now

22 starting to experience attrition.  When you said now, is that

23 currently since the deposition was taken?

24 A   That's within the last several months.

25 Q   And that was after your deposition was taken?

1  A   Yes, yes.

2  Q   Mr. Hackney asked you if you believed you were meeting

3  the needs of the citizens of the City of Detroit, and your

4  answer was yes; is that correct?

5  A   Yes.  The fire department always meets the needs

6  regardless of the situation or the resources.

7  Q   But do you believe the resources that the fire department

8  has is adequate to continue to meet the needs of the citizens

9  of Detroit?

10  A   No.  We're strained.

11  Q   And that's why you need to spend 158 million under the

12  reinvestment initiatives?

13  A   Yes.

14          MR. HERTZBERG:  I have nothing further, your Honor.

15          THE COURT:  Sir, in your direct examination by

16  Mr. Hertzberg, you gave us some numbers regarding the number

17  of fire fighters, for example, you think the city should have

18  and the number of EMT personnel you thought the city should

19  have.  You remember that?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  How did you decide those numbers?

22          THE WITNESS:  Well, with the fire fighters, it's

23  based upon the number of apparatus.  Right now we run on

24  average 43 apparatus, a combination of engines, pumpers,

25  ladder trucks, and rescue squads.  In order to keep our

1   response times at a minimum of seven minutes or less, I feel
2   we need to go up to at least 49 companies, and I get that
3   staffing level by doing a -- you might say a head count or
4   staffing -- using a staffing factor to determine the number
5   of fire fighters I need to adequately staff 49 fire fighting
6   companies.  And the same thing with the number of EMS units.
7   We currently have 20 EMS units running on average daily.  I
8   believe we need to get up to 25, and I used a staffing factor
9   to determine the number of people that we need.

10          THE COURT:  You were also asked whether the
11  investments that the city foresees for the fire department
12  will permit the department to meet the standards of the
13  National Fire Protection Association.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  And you said you thought it would come
16  close.

17          THE WITNESS:  Yes.

18          THE COURT:  In what respects will it not meet those
19  standards?

20          THE WITNESS:  Well, we can always use more money,
21  but in terms of those standards, 49 companies is great.  When
22  I came on, we had 82 companies, and we were able to respond
23  to multiple fires, I mean large-scale fires.  I remember a
24  year we had a fifth alarm fire going, a third alarm, a second
25  alarm, and we still had enough fire companies to provide

1   protection throughout this whole city.  Right now with 43

2   companies, if I had a fifth alarm, I think two-thirds of my

3   equipment would be at that one site, and that would leave

4   vast distances for my other fire companies to cover.  So I

5   think we'll be close in terms of providing adequate fire

6   service for our city, but in terms of large scales,

7   catastrophes that may happen, we'll have to rely on, I

8   believe, our neighboring communities to come in and assist

9   us.

10          THE COURT:  And is it your testimony that that

11  deficiency is an issue with the NFPA standards?

12          THE WITNESS:  In terms of responding to high-rise

13  fires, in terms of responding to multiple alarm fires, they

14  give a range or they give an estimation of the number of fire

15  fighters that should be on scene at any given point in time,

16  and also they establish the response times in terms of

17  responding to an EMS call or fire call.  So if we have all

18  our resources tied up at one or two fires, that's going to

19  leave us really hard-pressed to meet the response times for

20  EMS and fire for regular runs.

21          THE COURT:  And is it your testimony that even with

22  the investment that the city proposes here, this is still a

23  concern for you?

24          THE WITNESS:  Yes.  I believe the money -- the $157

25  million will do a great deal to help the fire department, but

1    we're about 40 years behind in terms of technology,

2    equipment, and training, and we're going to get there.  I

3    mean this is a great cash injection that the department

4    needs, and if we get this money, it's going to be spent

5    wisely.  I can't say we'll be perfect, but we'll be very

6    close.

7            THE COURT:  All right.  Any further questions for

8    the witness?

9            MR. HACKNEY:  No, sir.

10            MR. HERTZBERG:  Your Honor, I want to raise an issue

11    I addressed with the Court before.  We were handed a binder

12    again with six -- approximately six documents in it, none

13    which were used in the impeachment of the witness.  There was

14    a deposition included within it, but the documents

15    themselves -- with Ms. Niblock we were given a binder of

16    similar size with similar amounts of documents.  None of them

17    have been entered into evidence or moved into --

18            THE COURT:  What's the issue?

19            MR. HERTZBERG:  I'd like them taken back.  I don't

20    think the Court should have to review all the documents to

21    determine whether they were admitted and read the documents.

22    I just don't understand why we're submitting documents --

23            THE COURT:  Mr. Hertzberg, you're going to have to

24    accept my assurance that I won't look at documents that

25    aren't admitted into evidence and my further assurance that

1  I'm not going to spend a minute of my personal time deciding
2  which of the exhibits that you guys are showering me with
3  have been admitted.
4         MR. HERTZBERG:  Thank you.
5         THE COURT:  I will leave that to you and staff.
6         MR. HACKNEY:  And, your Honor, I don't mean to
7  impose a burden on you.  It is no problem for us to recollect
8  those.  We sometimes don't know how the direct --
9         THE COURT:  It's not a problem at all.  The process
10  we've been using is just fine.  We don't need to change it at
11  all.  And, sir, you are excused.
12        THE WITNESS:  Yes.
13        THE COURT:  Thank you for your testimony.
14    (Witness excused at 10:24 a.m.)
15        THE COURT:  Let's take our morning recess now, and
16  we will reconvene at 10:40, please.
17        THE CLERK:  All rise.  Court is in recess.
18    (Recess at 10:24 a.m., until 10:41 a.m.)
19        THE CLERK:  All rise.  Court is in session.  Please
20  be seated.
21        MR. HERTZBERG:  Your Honor, before we call the next
22  witness, Ms. Patek would like to address the Court.
23        MS. PATEK:  Good morning, your Honor.  Barbara
24  Patek, Erman, Teicher, Zucker & Freedman, on behalf of the
25  Detroit Police Officers Association.  Your Honor, we are

1  aware of the Court's sequestration order, and Mark Diaz, who

2  is the president of the DPOA, is our client representative.

3  He is not here at the moment, but he may be here from time to

4  time.  We will exclude him and designate somebody else, but I

5  sent an e-mail to the group early this morning.  I haven't

6  turned my phone back on, but as of the time I came to Court,

7  I didn't have any objections, and I just wanted to clear that

8  to see if anybody had any objection to him being here.

9          THE COURT:  Any objections?

10         MR. HACKNEY:  No, your Honor.

11         THE COURT:  All right.  You're all set.

12         MS. PATEK:  Thank you, your Honor.

13         MR. HERTZBERG:  Your Honor, the city will call

14  Police Chief Craig as its next witness.

15         THE COURT:  Okay.  Please raise your right hand,

16  sir.

17            JAMES CRAIG, CITY'S WITNESS, SWORN

18         THE COURT:  Please sit down.

19         MR. HERTZBERG:  May I approach the witness with

20  water, your Honor?

21         THE COURT:  Yes.

22                  DIRECT EXAMINATION

23  BY MR. HERTZBERG:

24  Q   Good morning, Chief.

25  A   Good morning.

1   Q   Please state your name for the record.

2   A   James Craig.

3   Q   And where are you presently employed?

4   A   City of Detroit Police Department.

5   Q   And what's your position?

6   A   Chief of police.

7   Q   And how long have you been chief of police?

8   A   Fourteen months.

9   Q   You had the opportunity to testify previously before this

10  Court?

11  A   I have.

12  Q   Okay.  What I'm going to do is we're going to go back

13  over and plow that field one more time and get all your

14  background into the record.  Where do you currently reside?

15  A   City of Detroit.

16  Q   Did you grow up here?

17  A   I did.

18  Q   Do you have family members that live in the City of

19  Detroit currently?

20  A   I do.

21  Q   And how many?

22  A   Mother, father, siblings, cousins, aunts, uncles.

23  Q   Where did you attend high school?

24  A   Cass Technical High.

25  Q   And when did you graduate?

1  A   1974.

2  Q   Did you attend college?

3  A   I did.

4  Q   And where did you attend college?

5  A   First University -- or Mercy College until I was laid off

6  as a police officer, and then I moved to Los Angeles where I

7  attended West Coast University, then later University of

8  Phoenix.

9  Q   Did you receive a degree from West Coast University?

10  A   I did.

11  Q   And what degree did you receive?

12  A   Undergraduate degree in business.

13  Q   Did you ever receive a master's degree?

14  A   I did.

15  Q   From where?

16  A   University of Phoenix.

17  Q   And when was that?

18  A   2010.  I believe that was the date.

19  Q   Did you receive any other education, further education?

20  A   I did.  Started into a doctorate program, went in

21  probably three years and then put it on hold when I got hired

22  as Detroit's police chief.

23  Q   Did you go to the FBI National Academy at Quantico?

24  A   I did.

25  Q   Did you graduate?

1    A    I did.

2    Q    And when was that?

3    A    I'm not certain on the exact date.  I think it was '97.

4    I'd have to refer to my --

5    Q    I want to spend some time and go through your employment

6    history if we could, please.  You were a Detroit police

7    officer many years ago?

8    A    Yes.

9    Q    How long ago?

10   A    Thirty-seven years ago.

11   Q    And what position were you in?

12   A    Police officer.

13   Q    And why did you leave the Detroit Police Department?

14   A    I was one of 1,500 police officers laid off.

15   Q    What did you do after you were laid off from the Detroit

16   Police Department?

17   A    I joined the Los Angeles Police Department.

18   Q    And when was that?

19   A    That was January 1981.

20   Q    And what did you come in as?  As a police officer?

21   A    As a police officer, yes.

22   Q    Did you rise up through the ranks?

23   A    I did.

24   Q    And explain to the Court briefly what positions you held

25   at the LAPD.

1   A    Upon being hired by the Los Angeles Police Department, I

2   was what's described as a police officer one -- that's a

3   probationary police officer -- and after 18 months

4   automatically moved up to the position of police officer two

5   and after that competed for and was selected as a field

6   training officer attaining the position of police officer

7   three.  And then after a year I rose up and attained the

8   position and rank of police officer three plus one, a senior

9   lead officer.  Following that, I was promoted to the rank of

10  sergeant.  I held that rank until upgraded to a sergeant two

11  and following that promotion was promoted to the rank of

12  lieutenant, lieutenant one, and then was promoted again to

13  the rank of lieutenant two.  And then following that rank, I

14  was promoted to the ranks of captain one, two, and three

15  where I ultimately retired as a captain three.

16  Q    What were your responsibilities as a captain with the LA

17  Police Department.

18  A    As a captain one, entry level captain position, I was a

19  commanding officer over a patrol division in South Los

20  Angeles.  And then after promoting to captain two, I was a

21  commanding officer over a specialized operational division,

22  juvenile division.  And then once obtaining the rank of

23  captain three, I was an area commanding officer where I

24  provided management oversight of an area which had several

25  commanding officers under my command.

1  Q   You left the LAPD in April of 2009?

2  A   I did.

3  Q   Where did you go after that?

4  A   I was appointed as police chief for the City of Portland

5  in the State of Maine.

6  Q   And what were your job responsibilities as police chief

7  in Portland, Maine?

8  A   Overall command of the Portland Police Department.

9  Q   Did you oversee the budget and the equipment needs in the

10 police division?

11 A   I did.

12 Q   And when did you leave Portland, Maine?

13 A   After two years when I was appointed as the police chief

14 for the City of Cincinnati, Ohio.

15 Q   And what were your general duties as police chief there?

16 A   Basically the same, overall management and oversight of

17 the Cincinnati Police Department.

18 Q   How big is the -- or how many -- what was the population

19 of Cincinnati at the time you were police chief?

20 A   Population of Cincinnati was 300,000, and -- but it had a

21 metropolitan statistical area of about 1.3 million, which

22 affected policing responsibilities in the City of Cincinnati.

23 Q   When did you leave the Cincinnati Police Department?

24 A   In 2013 of -- June, late June.

25 Q   And why did you leave?

1    A    I was selected and appointed as Detroit police chief.

2    Q    Once you joined the police department in Detroit as the

3    chief, did you take steps to familiarize yourself with the

4    police department?

5    A    I had, yes.

6    Q    And what steps did you take?

7    A    I had conversations with consultants that were already

8    working with the Detroit Police Department; also, in

9    preparing to compete for the position, read news articles,

10   tried to understand the different issues that the department

11   was dealing with.  Then after being appointed, in addition to

12   meeting with the emergency manager and other local officials,

13   I met with rank and file officers and also met with members

14   from the community, business, clergy, the like.

15   Q    Did you review any documents or statistics?

16   A    I did.

17   Q    What type of stuff did you review?

18   A    For example, crime statistics.  Certainly the consultants

19   that were already working in the police department prepared

20   briefing notes on the command executive team of the Detroit

21   Police Department, which I reviewed as well.

22   Q    Do you have a strong understanding of the challenges

23   facing the Detroit Police Department?

24   A    I did and do.

25   Q    Can you summarize what you found at the police department

1  when you arrived as chief?

2  A    Well, the first thing, it was very clear that the morale

3  was at the very bottom, rank and file officers.  It was also,

4  in my judgment, clearly that the department lacked leadership

5  and accountability.  And lastly, something that became

6  obvious was the fact that the department had no credibility

7  with the community it served, the local community and the

8  surrounding communities.

9  Q    Were officers deployed in an appropriate efficient

10  manner?

11  A    Based on my review, they were not.  There were some

12  challenges in terms of how they were staffed and deployed.

13  The department was top heavy.

14  Q    Did you promote and demote --

15  A    I did.

16  Q    -- people in the department at the senior --

17  A    I did.

18  Q    -- leadership level?

19  A    I did.

20  Q    What did you do exactly?

21  A    Well, for one -- for starters, the department, in my

22  view, was top heavy, in my view and as well as the review by

23  the consultant team, and so I went about --

24  Q    Let me stop you there if I could interrupt you.  Which

25  consultants were employed by the police department?

1  A   There were two consultant groups, Conway MacKenzie and
2  also the Bratton Group.
3  Q   And who is the Bratton Group?
4  A   Now Commissioner Bratton, who leads the New York Police
5  Department, prior to being appointed to that position had a
6  consultant firm and had been working in the City of Detroit
7  in providing a review of the Detroit Police Department.
8  Q   And were both Conway and the Bratton Group there when you
9  joined the police force?
10 A   They were.
11 Q   So I interrupted you when you were talking about demoting
12 some of the senior leadership and promoting others.  Can you
13 explain what you did and why you did it?
14 A   After a methodical review, again, having conversations
15 with the consultants, also my direct meetings with the staff,
16 it was clear, one, that the department was top heavy
17 resulting in eliminating 11 command and executive positions
18 and, in addition to that, deappointing some who I felt did
19 not provide the kind of leadership that was required to move
20 the Detroit Police Department forward.  Some elected through
21 the deappointment process to retire.
22 Q   What do you think about the status of the leadership now
23 at the Detroit Police Department?
24 A   Good leadership team.  I was -- I didn't bring a team of
25 command or executive level individuals with me, so I used

1    existing staff from inside the Detroit Police Department.

2    Some of those early appointments I got wrong based on my

3    review, and, again, I came into an organization where I

4    relied on consultants and my face-to-face meetings, but

5    certainly within months I was able to make other assessments,

6    and so other changes were necessary.

7    Q   I want to talk about the vehicles that the police

8    department has, police cars, squad cars, and talk about

9    technology.  When you arrived, what was the condition of the

10   police vehicles, the squad cars?

11   A   When I arrived, it was obvious to me that in comparison

12   to police departments I worked at, the fleet of the Detroit

13   Police Department was probably the worst I had ever seen of

14   any police department.  In fact, I took note prior to my

15   appointment date I remember vividly a police vehicle that was

16   parked on the street that I thought was a taxicab -- the

17   paint -- it was dilapidated -- and found out it was actually

18   a police vehicle that was in service.  Once I was appointed

19   and took a closer look, I realized that the department's

20   fleet was certainly in need of replacement.  Most departments

21   will cycle vehicles out after 100,000 miles, and there were

22   some that had well over that.

23          During my early tenure, as another vivid example,

24   was myself responding to a call for assistance on the east

25   side of Detroit chasing a suspect who was armed with a gun.

We arrived at that location, and once that call was
completed, one of the marked units would not start, so the
officer, without hesitation, jumped underneath the vehicle
and started it by hitting the contacts on the starter.  And
he said he's had to do that in the past, and that's the first
time I've seen a police officer have to basically jump start
a car in that fashion.

Q   And this was since you became the chief?

A   That's correct, probably within my first couple of
months.

Q   What else did you see in regard to the vehicles as a
whole?

A   Just dilapidated, paint peeling off of many of them.  If
my memory serves me correct, probably half of the marked
fleet was 2007 or older.  Significant body damage on some of
the vehicles that were still being deployed in the field, and
when I asked the question why we would deploy vehicles with
substantial body damage, and the response we just don't have
enough vehicles.  And then I also learned that some of the
vehicles that were in the shop for repair had set for months.
In fact, the count during my early tenure was somewhere like
200 vehicles that were in need of repair.

Q   Let's talk about the bulletproof vests.  When you joined
the force as the chief, what was the condition of the
bulletproof vests?

1    A    When I joined, I learned early on that there were 300-

2    plus vests that the officers were wearing that was expired,

3    and so we went very quickly, because that's a necessary piece

4    of equipment to get those vests replaced, which we ultimately

5    did.  It became a key priority early on in my tenure, and the

6    vests were subsequently replaced.

7    Q    Do you require that every police officer wear a police

8    vest on duty?

9    A    Yes.

10   Q    Let's talk about the status of the police facilities.

11   What condition are some of the precincts in?  How many

12   precincts are there first?

13   A    Twelve precincts.

14   Q    And what condition are they in as a whole?

15   A    Varies.  Some are in better conditions than others.

16   Certainly police headquarters or public safety headquarters

17   is the newest facility, and it's in state of the art, but

18   when you talk about the neighborhood police stations, the

19   precincts, many are in need of repair.  One that comes to

20   mind -- I've had an opportunity to visit all the precincts,

21   but one that comes to mind is the fifth and ninth precinct

22   that are housed in the same building.

23   Q    The one on Gratiot?

24   A    That's correct.  Certainly what jumped out for me was the

25   fact that it appeared as if in the detective section of the

1   building or where detectives once worked, it seemed that the

2   ceilings were being propped up by beams, so the stations were

3   in poor state.  Certainly the one thing that was also notable

4   is in terms of security, security was absent on the exterior

5   of the building unlike other police departments I have

6   worked.  The lot where the police vehicles and the privately

7   owned vehicles of the officers and the civilian staff was

8   open.  Anyone could go into that lot and have access to those

9   vehicles.

10  Q    Is that true at the fifth and ninth precinct?

11  A    That's correct.

12  Q    Let's spend a minute and talk about response times when

13  you first arrived and took over as chief of police.  What was

14  the average response time?

15  A    Reported around 59 minutes.

16  Q    And were all calls responded to?

17  A    They were not.

18  Q    What was going on?

19  A    In fact, what I've learned through actually a recent

20  audit, we started a campaign of stop the clock, you know, so

21  that we could bring the response time into what's more

22  reasonable.  So what was going on is that the Detroit Police

23  Department handles between 450 to 500,000 calls annually.

24  Over the last prior five years, I learned the department had

25  a practice called can 04.  Can 04 was where a number of calls

1  were placed in this category.  So, for example, calls that --
2  not necessarily priority type calls, but calls that had been
3  sitting in communications for an inordinate amount of time
4  would be placed in what was called the can.  Some calls would
5  not even be handled.  Some would be given out to the command
6  that had the responsibility for that area.  They would handle
7  maybe eight to ten hours later, and 04 was a designation
8  because this happened at 04 o'clock, or four o'clock a.m. in
9  the morning.  So when I met with community members early on,
10  they said, well, police officers don't necessarily respond to
11  911 calls.  It was clear to me in reviewing this can 04 I
12  could understand why, so in looking back over some of the
13  five prior years, some years as many as 75,000 calls were
14  placed in can 04, 71,000 in another year, and 64,000.  I can
15  say that as of my tenure there is no can 04's.  All calls are
16  handled.  We do have a prioritization matrix where priority
17  calls for service are certainly handled first, and that's how
18  we measure our response time.  And priority one calls for
19  service are those calls -- generally they're crimes in
20  progress, shootings in progress, home invasions in progress.
21  Crimes in progress are generally priority one calls for
22  service.
23  Q   When you started as police chief, did you believe that
24  the department needed a restructuring?
25  A   I did.

1  Q  You started to indicate that you had two consulting

2  groups helping you, Conway MacKenzie and the Bratton Group.

3  Can you explain to the Court what different functions the two

4  groups were doing?

5  A  Conway MacKenzie group looked more at the financials,

6  although one of the consultants kind of replicated some of

7  what the Bratton Group did in terms of staffing and

8  organizational entities.  The Bratton Group did more of a --

9  what I would describe as a deep tissue dive into the

10  operations.  The consultants in the Bratton Group, some of

11  which I had already been acquainted with, looked at best

12  policing practices, made recommendations.  Ultimately, in

13  both instances the recommendations were recommendations, and

14  it was up to myself as police chief and the executive team

15  and command staff to decide what would be the best course of

16  action.

17  Q  Okay.

18         MR. HERTZBERG:  Could you bring up Exhibit --

19  Proposed Exhibit 66, please?  Approach the witness, your

20  Honor?

21         THE COURT:  Yes, sir.

22  BY MR. HERTZBERG:

23  Q  Have you seen this document before?

24  A  I have.

25  Q  What is it?

1  A    Detroit Police Department plan of action dated January

2  9th, 2014.

3  Q    Were you chief at that time?

4  A    I was.

5  Q    Was it prepared under your supervision?

6  A    It was.

7  Q    Who drafted the plan of action?

8  A    Combination of my staff, Conway MacKenzie, and Bratton

9  Group, so I would say three entities went into preparing this

10 document.

11 Q    Did you have input into the report?

12 A    I did.

13 Q    Was it done under your supervision and direction?

14 A    It was.

15 Q    The individuals at the police department who assisted in

16 preparation of this report, what functions were they doing in

17 this -- in helping in preparation of the report?

18 A    Review, editing, certainly writing the document.  They

19 certainly engaged in the lion's share of creating the

20 document.  A lot of the factual data was data that was

21 provided by both Conway MacKenzie and the Bratton Group.

22 Q    Was the plan of action drafted as part of the regularly

23 conducted activity of the police department?

24 A    I can't testify to -- as to what occurred prior to my

25 appointment.  I'm not sure if the department -- they may have

1  had a plan of action.  I'm not certain.

2  Q   When you've taken over Princeton and Cincinnati, did you

3  put together a plan of action?

4  A   We did.

5  Q   So this is something you did on a regular basis when you

6  were chiefs at different locations?

7  A   That's correct.

8  Q   Has this been published anywhere?

9  A   Yes.

10  Q   Where has it been published?

11  A   I believe it's on our website.

12         MR. HERTZBERG:  Your Honor, I'd move admission of

13  Exhibit 66.

14         THE COURT:  Any objections?

15         MR. ARNAULT:  No objection, your Honor.

16         THE COURT:  It is admitted.

17     (City Exhibit 66 received at 11:05 a.m.)

18         MR. HERTZBERG:  Your Honor, I have a copy for you.

19         THE COURT:  Okay.

20         MR. HERTZBERG:  Can you bring up page 2, please?

21  Make that page 3, please.  Thank you.

22  BY MR. HERTZBERG:

23  Q   You see page 3 of the document, Chief?

24  A   I do.

25  Q   And what is that?

1  A    That describes the plan of action, what this plan

2  involves.

3  Q    Can you give the Court a brief description of what's

4  involved in the plan of action?

5  A    In reviewing the plan of action that I have before me, it

6  addresses different aspects of the Detroit Police Department,

7  which includes field operations and administrative

8  operations, and then lastly the issue of the federal consent

9  decree.

10         MR. HERTZBERG:  One second, your Honor, please.

11         THE COURT:  Okay.

12         MR. HERTZBERG:  Thank you.

13  BY MR. HERTZBERG:

14  Q    What is that that's on your screen before you?

15  A    A letter that I drafted to the citizens of Detroit in

16  response to the work that we were embarking on, the

17  restructuring and the calls for the plan of action.

18  Q    And was that included as part of the plan of action?

19  A    That's correct.

20  Q    You indicated in that letter that the ultimate goal of

21  making this a premiere law enforcement agency was that -- was

22  that the goal of the plan of action?  Was that the footprint

23  for that?

24  A    That's correct.

25  Q    You stated in the letter that -- on page 2 of that letter

1  that only thing missing was leadership, accountability.  When

2  you say that, you weren't addressing issues in regard to

3  equipment and fleet?

4  A    Not directly, although I believe that leadership and

5  accountability play a role in ensuring that officers have

6  proper equipment, properly attired like the issue of

7  protective body armor which you raised that was an oversight,

8  in my judgment, in part by absence of leadership.

9  Q    So when you say "leadership," you refer to everything,

10  including the equipment, the precincts, and everything

11  related to the police department?

12          MR. ARNAULT:  Objection.  Leading, your Honor.

13          THE COURT:  The objection is sustained.

14  BY MR. HERTZBERG:

15  Q    When you indicate leadership, what does leadership

16  encompass?

17  A    Leadership is the ability to make decisions, take

18  appropriate action in a timely way, holding staff

19  accountable, that the department is functioning in an

20  efficient and effective manner, addressing the mission, the

21  vision of the organization.

22  Q    What is the status of implementation of the plan of

23  action?

24  A    I would say roughly 65 percent complete.

25  Q    And we'll go over in a minute the detail on that.  How

1  does this interplay with the restructuring initiatives under

2  the plan of adjustment?

3  A    It directly connects with the plan of adjustment.

4  Q    Let's turn to page 10 of the report, please.  Are you

5  there?

6  A    Yes, I'm there.

7  Q    What is page 10?

8  A    It cites our 2014 department goals and benchmarks.

9  Q    I want to go through these benchmarks and see where we're

10  at right now.  First benchmark in the plan was the reduction

11  of overall crime by ten percent compared to 2013.  Where are

12  we at on that benchmark?

13  A    Right now we've exceeded that goal.  We're sitting at a

14  19-percent overall reduction year to date in overall crime.

15  Q    Second benchmark was -- or goal and benchmark was reduce

16  response time to five minutes for all priority one calls for

17  service.  You indicated, I believe, that it was 58 minutes

18  when you took over as chief.

19  A    That's correct.

20  Q    And where are we at right now?

21  A    Right now obviously that five-minute for priority one

22  calls is a stretch goal, but in terms of how -- we measure it

23  in two ways.  First, travel time.  We're sitting at a ten-

24  minute response time to --

25  Q    When you say "travel time," is that when the officer gets

1  the call in the vehicle?

2  A    When the officer gets and arrives to the doorstep, ten

3  minutes, but we also measure the time the call comes into the

4  911 center to the time the officer arrives at the doorstep.

5  We're right now sitting on about 21 minutes.  In comparing

6  our response time today even going back one, two, three, four

7  years with fewer sworn personnel, we are certainly much more

8  efficient than we were a year, two, and three and four years

9  ago.

10  Q    But you're still about 16 minutes off where you want to

11  be?

12  A    The five minutes was based on travel time.  We're five

13  minutes off of it.  We're just going to use that.  But

14  looking at our staff, stretch goal, and that's going to be a

15  big challenge to meet five minutes.

16  Q    Is 21 minutes adequate, in your mind, for a call received

17  through the system and the response at the door of the

18  person?

19  A    Not adequate but significantly better.

20  Q    Okay.  Next goal and benchmark, increase the clearance

21  rate for homicide to 70 percent.  When you joined as the

22  chief, what was the clearance on homicide?

23  A    Eleven percent to homicide.

24  Q    Where are we at right now?

25  A    Right now we're at a 67-percent clearance, and if you

1   include cases that are sitting for approval in the

2   prosecutor's office, which right now numbers ten, we would be

3   at a 72-percent clearance rate.

4   Q   Next one is achieve a hundred percent compliance with the

5   mandated Department of Justice consent judgment by the end of

6   the second quarter, 2014.  Explain to the Court what the

7   consent judgment is first.

8   A   Eleven years ago the department came under a consent

9   decree -- actually, two consent decree.  One was issues of

10  confinement, which was one judgment, and then the second one

11  had to do with use of force, arrest.  Both consent decrees

12  were -- I should say Department of Justice, the plaintiff in

13  the case, a federal monitor was imposed to guide and review

14  our compliance to the consent judgment, and as of today, we

15  have successfully completed the consent judgment on both the

16  issues of confinement and the use of force.

17  Q   So the --

18  A   So now we are moving into a transition phase, an 18 month

19  without a federal monitor, but that we report back to the

20  Department of Justice.

21  Q   Is this a big achievement, in your mind?

22  A   Big achievement.  After 11 years, probably one of the

23  longest running consent judgments next to Oakland,

24  California, it is a significant accomplishment.

25  Q   Let's go to the next one, hire 150 new police officers by

1   the end of the second quarter 2014.  Where are we at on that?

2   A    We've hired 133 officers.

3   Q    Have you had any attrition?

4   A    Yeah.  Our attrition rate varies.  At high points we're

5   sitting at 25 officers per month, ranging between 20 and 25.

6   Last month our attrition rate was at about 10, and so it's

7   slowed some, and so what we're doing is hiring officers to

8   fill the void of the officers that are being attritted out.

9   Q    So you're not making any net gain.  You're just filling

10  the attrition?

11  A    Yes.  Our classes are ranging between 30 to 40 student

12  police officers, and currently we have two classes in the

13  academy with a third class set to go on line in a couple of

14  weeks.  When I arrived 14 months ago, there had been no

15  recruitment, and there were no classes in the academy.

16  Q    How long does it take from start to finish for an

17  individual to become a police officer through the academy, et

18  cetera?

19  A    It's an 18-month process.  However, regimented academy

20  training is six months.  Upon graduation, they're assigned to

21  a field command and a field training officer where they

22  complete the rest of their regimented training in the field.

23  Q    Okay.  Let's look at the next one, deploy detectives in

24  each of the 12 precincts by the end of the first quarter of

25  2014.  First, tell me why you wanted to do that and, second,

1  where we're at on that.

2  A    As I pointed out earlier in my testimony, in terms of

3  credibility of the police department and how we deliver

4  services, there was no detective staff assigned to the

5  neighborhood police stations, clearly a service void, and so

6  part of my review and that of the consultants and having

7  worked in other police agencies, a best practice was to have

8  detectives assigned to the precinct level, which we have

9  done.  We are a hundred percent -- we have deployed

10 detectives back into all the 12 precincts.  We created a new

11 rank called the rank of detective.  Those individuals are

12 being assigned to the neighborhood precincts.  We just filled

13 20 positions with the rank of detective, and we're set to

14 fill an additional 25 positions, all slated to go to the

15 precincts.

16 Q    We'll go into more detail in a couple minutes about the

17 status of the equipment and what needs replacing and the

18 reinvestment initiatives, but let's go to the next goal and

19 benchmarks, ensure that members of the DPD receive adequate

20 training and equipment to perform at optimal levels and to

21 continue to focus on improving the working environment of our

22 officers.  Where are we at on that?

23 A    Right now we are compliant.  Our in service officers

24 receive 40-hour block training, which involves leadership,

25 tactical training, and clearly all premiere police

1   departments have a robust training effort, so risk management

2   strategy -- certainly when you look at the consent judgment

3   and becoming compliant, training is a necessity.  It's also a

4   necessity not just that police departments function in an

5   optimal way, but also keeping officers safe, and so we have

6   ongoing 40-hour block of in-service training, so we have in-

7   service training, and then we have recruit training for our

8   new officers.

9   Q    Did you have in-service training -- or was there in-

10  service training when you joined the police force as the

11  chief?

12  A    There was some, not to the degree in which it is now.

13  Q    Next goal is improve our relationship with our community

14  by engaging in sustained problem-oriented policing exercises

15  with an emphasis on reducing the fear and perception of crime

16  within the City of Detroit.  What is that, and where are you

17  at on that goal?

18  A    In my judgment, we have met and are continuing to sustain

19  that goal.  Part of an initiative that we rolled out now six,

20  maybe seven months ago was what I call a neighborhood police

21  officer initiative, and that's where we divided up each

22  precinct into sectors.  Some of the precincts were divided

23  three, some by four, with an assigned officer as a

24  neighborhood police officer.  The purpose of that was to

25  establish relationships back at the neighborhood level,

1  businesses, residents, clergy, any neighborhood stakeholder,

2  and keeping that line of communication open.  We have done

3  that.  Each of the precincts have neighborhood police

4  officers assigned, and the feedback that we have been

5  receiving since rolling out this initiative has been very

6  favorable.  From our responsiveness with the community, the

7  credibility appears to have increased substantially.  And

8  when you look at our clearance rate to homicides, it's no

9  secret that homicides are mostly closed because witnesses or

10 people in the community will have conversations, will talk to

11 the police about crimes.  That is occurring, and so I would

12 say that our relationships have improved dramatically.

13 Q   Your last goal on the plan of action is open stand-alone

14 precinct facilities for the fifth, seventh, and eighth

15 precincts by the end of 2014.  Where are you at on that goal?

16 A   That is work in progress as it relates to the fifth

17 precinct.  Fifth precinct is under construction, and it will

18 probably open the first quarter of 2015.  The seventh

19 precinct is a building that we've identified, and we're still

20 in the process of closing that deal.  And then the eighth

21 precinct, likewise, the most densely populated area of

22 Detroit, that precinct was closed, and we're working with

23 Meijer Corporation to open up a new eighth precinct.

24 Q   You indicated previously in your testimony that you

25 believe there is an attrition problem at the police

1  department.

2  A    I did.

3  Q    What are the major groups or categories you've seen with

4  attrition?

5  A    One category is certainly those who have met their

6  obligation who are able to retire.  The other category, which

7  is more concerning, is the officers who are not or have not

8  reached the time of retirement but have chose to leave

9  service to take on a position in another police agency.  I

10 would say, if I were to break it down in a percentage, maybe

11 30 percent, 30 to 35 percent have opted to seek employment

12 elsewhere, and the reasons is pay, benefits, stability,

13 working conditions.

14 Q    What are the benefits you're referring to?

15 A    Healthcare, pension, and they just felt that with

16 everything that the city has faced over recent years, they

17 were concerned about the future of staying with the Detroit

18 Police Department.

19 Q    And these are what -- how many years of service are these

20 officers that you're seeing this category on?

21 A    It's ranged sometime as low as five and averages up to

22 maybe fifteen years of service.

23 Q    Do you think the cuts on the pensions and healthcare for

24 the police pension fund has had any impact on attracting

25 qualified candidates to the police department?

1  A    I believe it's a factor.  Certainly when you look at the

2  pay of a Detroit police officer in comparison to neighboring

3  law enforcement agencies and not even leaving the State of

4  Michigan but just in comparison to smaller agencies, that's

5  been a factor.  It's been a factor based on the fact that

6  Detroit police officers probably are one of the more

7  underpaid police officers in comparison to the challenging

8  work environment.

9  Q    We talked about the -- a few minutes ago about adequate

10 training and equipment for police officers.  What is the type

11 of equipment that you would consider is necessary for a

12 police officer to function at a required level?

13 A    Well, certainly I'm a believer and a proponent that

14 police officers, you know, be equipped with tasers.  Tasers

15 certainly can reduce the risk of injury to both suspects and

16 police officers.  Detroit police officers is one of the few

17 agencies today that does not have tasers.  Certainly we

18 talked about protective vests.  When you look at a

19 constitutional police department like the Detroit Police

20 Department is now, certainly on-body cameras, which is a

21 technology that's certainly getting a lot of traction

22 currently.  Currently the Detroit Police Department has in-

23 car video cameras as part of the consent judgment, but most

24 of those cameras are dated, and the technology is in need of

25 being replaced, and there's a pretty significant cost to

1   that.  Not all of the fleet is equipped with these in-car

2   video cameras, just as an example of --

3   Q    Please.

4   A    -- the type of equipment that would be necessary.

5   Q    What about working radios?

6   A    Oh, absolutely.  What they call the prep or the portable

7   radio that all officers are assigned when they go out into

8   the field is also dated equipment, and there are reports of

9   sporadic outages or the inability to effectively communicate,

10  and certainly that's a core issue for officer safety.

11  Q    Does that put the officer at risk?

12  A    It does put them at risk.

13  Q    We talked about vehicles.  You said that a lot of them

14  were as old as 2007; is that correct?

15  A    That's correct.

16  Q    Are some of them older than that even?

17  A    That's correct.

18  Q    And did you receive a donation of police cars?

19  A    We did.

20  Q    From whom?

21  A    The Penske Group, a group of local businesses that

22  donated 100 police vehicles.

23  Q    Kresge and Gilbert were part of that?

24  A    Kresge, Gilbert, Shinola.

25  Q    Optimally, when do you think police cars should be

1  replaced?

2  A   In a perfect world, I think they should be replaced

3  certainly at the hundred thousand mile mark and probably

4  within every two to three years because the police vehicles

5  are driven 24 hours, seven days a week, so there's extreme

6  wear and tear, and the type of driving, so two- to three-year

7  replacement cycle is optimal.

8       MR. HERTZBERG:  Can you bring up proposed

9  demonstrative Exhibit 631?  Your Honor, I want to use this.

10 This is part of the disclosure statement.  I understand it's

11 not in evidence at this point in time.  I'd like to use this

12 page only as a demonstrative exhibit.

13       MR. ARNAULT:  Objection, your Honor.  This isn't

14 really demonstrative of anything.  It's a page from the

15 disclosure statement, so it doesn't really summarize any

16 evidence.

17       MR. HERTZBERG:  It summarizes what the witness is

18 going -- it's going to be used by the witness to summarize

19 his testimony on what the reinvestment initiatives are.  It's

20 not being --

21       THE COURT:  Well, I think you have to establish a

22 proper foundation.

23       MR. HERTZBERG:  Okay.

24 BY MR. HERTZBERG:

25 Q   Have you seen this document before?

1  A   I don't have that document in front of me.

2  Q   It's up on the screen.  Let me --

3          MR. HERTZBERG:  May I approach the witness, your

4  Honor?

5          THE COURT:  Yes.

6          THE WITNESS:  Oh, I do.  I see it.  Yes, I have.

7  BY MR. HERTZBERG:

8  Q   When have you seen it?

9  A   I've seen it several times in the past.  I've seen it in

10 meetings with you, during deposition.

11 Q   Did the objectors use it when they deposed you and asked

12 you questions about it?

13 A   I recall that they did use the document.

14 Q   Are you familiar with the information on it?

15 A   I am.

16         MR. HERTZBERG:  Your Honor, I'd like to use it as a

17 demonstrative.

18         THE COURT:  It's not a demonstrative exhibit by the

19 evidence before the Court.

20         MR. HERTZBERG:  Okay.  Set that aside, please, and

21 take that down from the screen.

22 BY MR. HERTZBERG:

23 Q   Did you work with Conway MacKenzie in putting together a

24 proposal for restructuring of the police department?

25 A   We have had a number of meetings, yes.

1  Q   And did Conway MacKenzie put together the -- what we'll

2  call the numbers or the financial information for the

3  restructuring initiatives for the police department?

4  A   They did.

5  Q   And you relied upon them for those numbers?

6  A   We did.

7  Q   And you didn't do any independent testing of those

8  numbers, did you?

9  A   I did not.

10 Q   The restructuring initiative proposes spending a hundred

11 million dollars on vehicle replacements.  Do you think that's

12 reasonable?

13 A   It appears to be reasonable, yes.

14 Q   You are looking to hire civilian personnel for the police

15 department; is that correct?

16 A   That's correct.

17 Q   And how many are you looking to hire?

18 A   I think the last time it was in excess of 200, maybe 234

19 if my memory serves me correctly.

20 Q   And why are you doing that?

21 A   So that we could optimize sworn police officers being

22 deployed into the field.  Upon my appointment, it was clear

23 to me that we had a number of police officers performing

24 tasks better suited for civilian staff.  For example, in the

25 Detroit Police Department historically dispatchers have been

1    sworn police officers, and in most departments today dispatch

2    functions are performed by civilian staff.  Vehicle

3    maintenance officer, which was another assignment common to

4    the Detroit Police Department, was nothing more than someone

5    performing vehicle maintenance, and so that's better

6    performed by that of a civilian employee.

7    Q    If you hire these civilian employees, what will it do

8    with the police officers that were performing these functions

9    previously?

10    A    They'll be deployed to the field.

11    Q    Is that a good thing for the police department and the

12    residents of the city?

13    A    That's correct.

14    Q    You indicated that you believe that you needed to replace

15    a lot of the equipment and buy new equipment for the police

16    department such as tasers.

17    A    Yes.  Tasers is one piece of equipment that I think has a

18    lot of advantages from risk management when you talk about

19    reduced injuries on both suspects and police officers.

20    Q    Tell me about the status of the information technology at

21    the police department.  Do you think it's adequate?

22    A    I think it's old technology, and it's certainly in need

23    of upgrade.  And while we've implemented since my appointment

24    the COMPSTAT model, which is used in most major city police

25    departments today, that's just one aspect of how technology

1    could be used to make a department more efficient.

2    Q    What is the COMPSTAT model?

3    A    COMPSTAT as the acronym for computer statistics, and it's

4    an accountability and crime management model that, again, we

5    use on a regular basis as part of our strategic approach to

6    fighting crime.

7    Q    And how does it help you fight crime?  What does it do

8    exactly?

9    A    Well, we look at -- well, the model allows us to identify

10   trends.  Certainly we monitor and respond to incidents of

11   crime, and if there are trends, we can address that in a more

12   efficient way.  But as and equally important is holding

13   managers responsible for crime reduction.

14   Q    Who is running this program currently for you?

15   A    Currently the executive team, combination of the

16   executive team.

17   Q    Were you being assisted by Wayne State on that at some

18   point?

19   A    We are.

20   Q    And how is Wayne State assisting you?

21   A    The mapping part, you know, being able to depict the maps

22   that show incidents of crime.

23   Q    And are you intending on trying to bring that in house to

24   the police department?

25   A    It's currently in house now.

1  Q    But they're helping on the mapping?

2  A    They are helping.

3  Q    Okay.

4  A    But it is in house.

5  Q    We've talked about a bunch of initiatives, buying of

6  equipment, replacing fleet, building precincts, updating

7  other precincts.  Do you think all the initiatives, as you

8  understand them, the restructuring initiatives, will make the

9  Detroit Police Department a premiere police department?

10  A    I do.

11        MR. HERTZBERG:  I have no further questions, your

12  Honor.

13        MR. ARNAULT:  May I approach, your Honor?  More

14  binders.

15        THE COURT:  Yes.  Oh --

16        MR. ARNAULT:  Sorry.

17        THE COURT:  Ms. Patek?

18        MS. PATEK:  Just as a point of order, I have a

19  handful of questions, and I don't know, since I'm on the

20  supporting side, whether I should go next.

21        THE COURT:  Then you should go first.

22                     CROSS-EXAMINATION

23  BY MS. PATEK:

24  Q    Good morning, Chief Craig.

25  A    Good morning.

1  Q   I have just a handful of questions for you.  I want to

2  talk about the leadership issues within the police

3  department.  And you talked about your executive staff.  When

4  you came in as police chief, Commander Steve Dolan was the

5  president of the Detroit Police Command Officers Union; is

6  that correct?

7  A   That's correct.

8  Q   And what is his role now?

9  A   He is currently an assistant chief of police.

10  Q   And what is his job or task as assistant chief of police?

11  A   He's over the operational side of the organization.

12  Q   And as a layperson, what does that mean?

13  A   Patrol, detectives, anything dealing with field

14  operations, which has probably 65 to 70 percent of the police

15  department.

16  Q   And in addition to your command staff and your executive

17  staff, when you came on, would you agree that the union

18  leadership was also important to being able to bring the

19  department back to where you wanted to go?

20          MR. ARNAULT:  Objection.  Leading.

21          THE COURT:  The objection is sustained.

22  BY MS. PATEK:

23  Q   When you took over as chief, can you tell the Court what

24  role, if any, the union leadership played in terms of your

25  efforts to restructure and establish relationships within the

1  department?

2  A    I met with the leadership of the unions on a regular

3  basis to determine what the issues were in moving forward.  I

4  knew that -- as I'd pointed out in earlier testimony, that

5  morale was a key factor.  Morale, as I have recognized in

6  other police agencies, has a direct effect on how you reduce

7  crime, how you bring about credibility of an organization

8  back to the community, and so because morale was key for me,

9  I knew the best place to start and build a relationship was

10  union leadership.

11  Q    And in that regard, I take it from time to time you and

12  union leadership perhaps didn't always see exactly eye to

13  eye?

14  A    In comparison to other places I've worked, we've done

15  fairly well, at least on the surface, but certainly we didn't

16  agree on everything, but there was always a willingness to

17  discuss the issues.

18  Q    And has that leadership played a constructive role, in

19  your opinion?

20  A    I believe it has.

21  Q    And in that regard, have you established relationships

22  that you believe will help the department's restructuring

23  efforts?

24  A    Yes.

25  Q    In terms of execution -- and I don't want to talk about

1   anything that happened in mediation because you and I have

2   been in mediation, but I'm -- we've had some conversations

3   outside of mediation; is that right?

4   A    Correct.

5   Q    And one of your important issues with this department was

6   execution, their ability to do what needed to be done in a

7   timely and efficient way; is that fair?

8   A    That's correct.

9   Q    There have been, for example, the 4th of July holiday.

10  Can you tell the Court in terms of in spite of the fact that

11  you're down in numbers how the department handled that?

12  A    The 4th of July holiday, the fireworks display, I am told

13  it was considered or viewed as the most efficient and

14  effective operation -- in view of one tenured supervisor, who

15  said he had worked 35 fireworks displays, was the best run

16  and executed operation that he's seen in his entire time on

17  the department.

18  Q    And as some of these issues that we've talked about, the

19  pay, getting more officers on the scene, given the

20  relationships that you've established, do you expect that to

21  continue to improve?

22  A    Yes, I do expect it to continue to improve, yes.

23          MS. PATEK:  That's all I have, your Honor.

24          MR. ARNAULT:  May I approach, your Honor?

25          THE COURT:  Yes.

1          MR. ARNAULT:  May I approach the witness, your

2    Honor?

3          THE COURT:  Yes, sir.

4          MR. ARNAULT:  For the record, Bill Arnault from

5    Kirkland & Ellis on behalf of Syncora.

6                        CROSS-EXAMINATION

7    BY MR. ARNAULT:

8    Q    Good morning, Chief Craig.

9    A    Good morning.

10   Q    I'd like to begin by discussing the state of the Detroit

11   Police Department when you joined, and if some of these

12   questions sound familiar from your deposition, I apologize

13   for that.  Now, you officially started as chief of police on

14   July 1st, 2013; is that right?

15   A    That's correct.

16   Q    And that was approximately two weeks after Mr. Orr set

17   out his proposal to creditors that outlined significant cuts

18   to pensioners; is that right?

19   A    I'm not sure on the timeline.

20   Q    And while you've been chief of police, morale has been

21   one of your top priorities; is that right?

22   A    That's correct.

23   Q    And when you began, morale amongst the officers at the

24   police department was very low; is that correct?

25   A    That's correct.

1    Q   And there were a number of different reasons that morale

2    was low, and I'd just like to walk through them with you

3    right now.  First of all, morale was low because the police

4    officers had been forced to take a pay cut; is that right?

5    A   One reason, yes.

6    Q   And a second reason for the low morale was the lack of

7    accountability and poor leadership by management at the

8    police department; correct?

9    A   That's correct.

10   Q   The third reason for the low morale was the unfair

11   working conditions, by which I mean the fact that unqualified

12   people were getting promotions; is that correct?

13   A   I would say a part of, not the total reason.

14   Q   A fourth reason for the low morale was poor working

15   conditions such as lack of equipment and investment; is that

16   correct?

17   A   That's correct.

18   Q   And a fifth reason for the low morale at the police

19   department was the nature of the work.  Would that be fair?

20   A   Possibly, part of it.

21   Q   And you would agree with me that the morale of your

22   employees is affected most by factors that are directly

23   impacting their day-to-day working conditions; correct?

24   A   I would agree.

25   Q   And you believe that morale at the police department has

1  improved since you've arrived; correct?

2  A    I do.

3  Q    Now I'd like to move on to the announcement in October

4  2013 that the city would be making changes to both active and

5  retiree healthcare.  Okay.  And I'm going to start first with

6  the active.  Now, you were aware that in October of 2013, the

7  city announced that there would be changes to healthcare;

8  correct?

9  A    Correct.

10  Q    And although there was some discussion about the changes

11  to active employee healthcare, you don't know to what degree

12  this change impacted your employees; correct?

13  A    Correct.

14  Q    And you don't know the degree to which the changes to

15  active healthcare impacted employee morale; correct?

16  A    Correct.

17  Q    And even though changes to healthcare have come up

18  amongst your employees, it hasn't been the dominant issue;

19  correct?

20  A    One issue but not dominant.

21  Q    Right.  Pay becomes the larger issue; right?

22  A    In my judgment, I believe pay would be a key factor.

23  Q    And as far as you saw, the announcement in October about

24  changes to active workers' healthcare benefits did not have

25  any effect on productivity; is that right?

1   A   I don't believe so.  Given the metrics that we discussed,

2   I don't believe so.

3   Q   You don't believe that had any impact on productivity; is

4   that right?

5   A   I don't believe so.

6   Q   So that's correct?

7   A   Yes.

8   Q   And when it comes to recruiting, you don't know what

9   impact, if any, the announcement about the changes to active

10  workers' healthcare had on the city's ability to attract new

11  police officers; is that right?

12  A   A factor but not a sole factor.

13  Q   Let me say that again.  You don't know what impact, if

14  any, the announcement about the change to active workers'

15  healthcare had on the city's ability to attract new police

16  officers --

17          MR. HERTZBERG:  Objection.

18  BY MR. ARNAULT:

19  Q   -- is that right?

20          MR. HERTZBERG:  Objection.  Asked and answered.

21          THE COURT:  Sustained.  He answered your question.

22          MR. ARNAULT:  Okay.

23  BY MR. HERTZBERG:

24  Q   You took a deposition in this case, correct, Chief Craig?

25  A   That's correct.

1  Q   Okay.  If you look at that binder, the first document

2  should be your deposition transcript.  If you turn to page

3  190 and look at lines 15 through 19.

4  A   190 in the --

5  Q   That's correct.

6          MR. HERTZBERG:  What lines?

7          MR. ARNAULT:  190, 15 through 19.

8          MR. HERTZBERG:  Okay.  Hold on one second.  Let me

9  get there.  Okay.

10  BY MR. ARNAULT:

11  Q   And actually we can start at line 10.  Are you there yet?

12  A   Yes.

13  Q   Okay.

14          "Question:  Do you know if this announcement

15          about the changes to active healthcare had any

16          impact -- any effect on the city's ability to

17          attract new employees?

18          Answer:  I wouldn't be able to answer -- answer

19          anything about other employees in the City of

20          Detroit.

21          Question:  Did it have a negative impact on the

22          city's ability to attract new police officers?

23          Answer:  We held a recruitment fair.  People are

24          interested.  They attended.  I can't tell you or

25          testify to what impact, if any, it had."

1    Were you asked those questions, and did you give

2  those answers?

3  A    I was asked, and I did give those answers.

4  Q    And, in fact, you were not consulted about the changes to

5  active healthcare; correct?

6  A    That's correct.

7  Q    Now I want to switch gears a little bit and talk about

8  the changes to retiree healthcare.  Now, the first point here

9  is just like with the active employees, you were not

10  consulted about the changes to retiree healthcare in October

11  2013; correct?

12  A    That's correct.

13  Q    In fact, when it comes to decisions that are made

14  regarding benefits and financials, you're not consulted;

15  correct?

16  A    I wouldn't say consulted.  Have I had a discussion, yes.

17  Q    If you could turn to page 191 of your deposition, please,

18  and take a look at page -- line 25.  Let me know when you're

19  there.

20  A    You said 191?

21  Q    191, line 25.

22  A    I'm there.

23  Q         "Question:  And I take it you weren't consulted

24            about the changes to retiree healthcare; is that

25            right?

1      Answer:  As I've testified to in terms of
2           decisions made regarding benefits and financials,
3           I'm not consulted.  I might be made aware.  That's
4           not what I was I brought here to do."
5      Were you asked that question?  Did you give those
6  answers?
7  A   I did.
8  Q   And if I was to ask you --
9           THE COURT:  Excuse me.  How is that impeaching?  It
10 sounds to me like the exact same answer.
11          MR. ARNAULT:  Oh, I thought I asked him when it
12 comes to decisions that are made regarding benefits and
13 financials, you're not consulted.
14          THE COURT:  He said he was not consulted, but he had
15 discussions.
16          MR. ARNAULT:  Okay.
17          THE COURT:  That was your answer a moment ago;
18 right?
19          THE WITNESS:  Your Honor, yes.  Correct.
20          MR. ARNAULT:  Okay.
21 BY MR. ARNAULT:
22 Q   And if I was to ask you about the effect of the announced
23 changes to retiree healthcare on the morale and productivity
24 of active employees, you wouldn't be able to answer that
25 question; correct?

1  A   Restate your question, please.

2  Q   Sure.  If I was to ask you about the effect of the

3  announced changes to retiree healthcare --

4          THE COURT:  Instead of saying, "If I was to ask

5  you," why don't you just ask the question?

6          MR. ARNAULT:  Okay.

7  BY MR. ARNAULT:

8  Q   You wouldn't be able to answer the -- you wouldn't be

9  able to tell me what the effect of the announced changes to

10 retiree healthcare had on the morale or productivity of your

11 active employees; correct?

12 A   Correct.

13 Q   And the reason you don't know the effect is because you

14 haven't had any specific conversations with active employees

15 about the changes to retiree healthcare; correct?

16 A   I don't recall having a conversation with active

17 employees about retiree healthcare.

18 Q   Okay.  You didn't go out and poll active employees and

19 ask whether they were concerned with the changes to retiree

20 healthcare; correct?

21 A   I did not.

22 Q   In fact, you never asked any of your active employees

23 what they thought about retiree benefits or changes; correct?

24 A   I don't recall ever having that conversation.

25 Q   And that's because you have not discussed police retirees

1    with your active police officers; correct?

2    A    I may have had some conversations.  It may have come up,

3    but I don't recall specific.  It wouldn't have been something

4    that I would have sought out to see what impact, if any.

5    Q    Okay.  Well, let's shift from OPEB now and talk about

6    what happened when the city proposed certain cuts to the

7    holders of pension claims and the impact that you saw, so

8    let's first talk about the proposed cuts to PFRS pensions.

9    So you're aware that the city proposed in February to cut

10   pensions by 26 percent for GRS and 10 percent for PFRS;

11   correct?

12   A    I recall.

13   Q    But you only know about these proposed cuts based on

14   what's been written or talked about in the news; correct?

15   A    Correct.

16   Q    And, again, just as with healthcare, the fact is you were

17   not consulted about the proposal to cut PFRS pensions by ten

18   percent; correct?

19   A    Correct.

20   Q    And you are not aware of any impact that the announced

21   cuts to pensions had on active employee morale; correct?

22   A    I mean I've had conversations, as I've testified before,

23   with individuals who have raised issues about pension and

24   that they were concerned, and I think I also testified, if my

25   memory serves me correct, that some opted to take on

1 positions with other police departments because of the

2 uncertainty of the future, which would include pension and

3 benefits.

4 Q   If you could turn to page 208 of your deposition, please,

5 and look at lines 6 through 10.

6 A   208?  What line?

7 Q   208, line 6.

8           "Question:  As far as you know, is the impact

9           about cutting pension benefits -- it did not -- it

10           didn't impact employee morale," then an objection.

11           "Answer:  I'm unaware of any impact that it

12           had."

13           Were you asked that question?  Did you give that

14 answer?

15 A   I did.

16 Q   You are also unaware of any impact that the announced

17 cuts to pensions had on employee productivity; correct?

18 A   That's correct.

19 Q   And you are not aware of any impact that the announced

20 cuts to pensions had on attracting new employees; right?

21 A   Not specifically.

22 Q   Okay.  So correct?  That's correct?  Now I'd like to talk

23 about the recoveries of the holders of pension claims under

24 the current plan.  So you're aware that the current plan

25 proposes reduced cuts to pensions; is that right?

1  A    Yes.

2  Q    To be clear, though, as of the date of your deposition,

3  you were not aware of the specific percentages of the cuts to

4  PFRS pensions; correct?

5  A    That's correct.

6  Q    And with respect to the agreement to reduce cuts to PFRS

7  pensions, you were not consulted; correct?

8  A    That's correct.

9  Q    And, again, you don't know what impact, if any, the

10  agreement to reduce cuts had on employee morale; correct?

11  A    Correct.

12  Q    And you don't know what type of impact, if any, the

13  reduced cuts had on employee productivity; correct?

14  A    Correct.

15  Q    And you haven't heard any specific conversations amongst

16  your active employees about any of the other creditors in the

17  bankruptcy; correct?

18  A    No, not aware.

19  Q    So that's correct?

20  A    Correct.

21  Q    Now I'd just like to talk a little bit about the

22  recruiting efforts.  The police department has been focused

23  on recruiting efforts since you joined; correct?

24  A    Yes; correct.

25  Q    And the police department actually held a job fair in

1   August of 2013; right?

2   A    That is correct.

3   Q    And approximately 400 to 600 applicants attended the

4   police department job fair; right?

5   A    That's correct.

6   Q    And you actually -- you talked to some of the applicants;

7   right?

8   A    I did.

9   Q    And the individuals that you talked to wanted to get jobs

10  with the police department; right?

11  A    That's correct.

12  Q    And the impression that you got from speaking with the

13  applicants was that they believe that a job with the police

14  department was a good job; right?

15  A    Yes.

16  Q    And you believe that a job with the police department is

17  a good job; correct?

18  A    That's correct.

19  Q    Now I'd like to talk about some of the changes that you

20  discussed on direct that you've been able to implement into

21  the police department.  So when you started, the police

22  department was not meeting the basic needs of its citizens

23  when it came to public safety; is that right?

24  A    That's correct.

25  Q    And since July 2013, you've been able to implement

1  sweeping changes within the police department; is that right?

2  A   That's correct.

3  Q   And you talked about a lot of those changes on direct

4  this morning; is that right?

5  A   Yes.

6  Q   Okay.  Well, I don't want to go through all those, but I

7  think there were a few that you didn't hit on.  For example,

8  in October you conducted the first merit-based process for

9  appointments of executive and command staff ranks in the

10  police department in a long time; right?

11  A   That's correct.

12  Q   And this has helped to instill leadership and

13  accountability within DPD; is that right?

14  A   That's correct.

15  Q   And as we've discussed, you've also been able to improve

16  morale amongst the police officers; right?

17  A   That's correct.

18  Q   And as you said on direct, improving morale helped to

19  improve their performance on the job; is that right?

20  A   That's correct.

21  Q   And you've also been able to start the process of

22  civilianization by which I mean replacing police officers who

23  are doing administrative tasks with civilians; right?

24  A   That's correct.

25  Q   And now with all the changes and success that you've had

1   over the past 14 months or so, you believe that the police
2   department is meeting the basic needs of its citizens when it
3   comes to public safety; correct?
4   A   That's correct.
5   Q   And to determine whether you're meeting the basic needs
6   of the citizens, you use what the people from the community
7   tell you as your gauge; is that right?
8   A   That's one factor, yes.
9   Q   And the people in the community have told you that the
10  police department is meeting their basic needs when it comes
11  to public safety; is that right?
12  A   Yes.
13  Q   In fact, the feedback that you get daily from people in
14  the community is that they had never seen this kind of
15  response to their needs from the police department; is that
16  right?
17  A   That's correct.
18  Q   Now, even though you believe that the police department
19  is currently meeting the safety needs of the citizens of
20  Detroit, your current goal is to turn the police department
21  into a premiere law enforcement agency; correct?
22  A   That's correct.
23  Q   In fact, you would like the police department to be one
24  of the best law enforcement agencies in the country; right?
25  A   That's correct.

1    Q    And one of the things that you've done that you discussed
2    on direct is create a strategic plan of action; right?
3    A    That's correct.
4    Q    And this plan of action is kind of the master document
5    that sets the way forward for the police department; right?
6    A    That's correct.
7    Q    And you believe that if you implement all the steps that
8    are laid out in the plan of action, that the police
9    department will become a premiere law enforcement agency;
10   correct?
11   A    That's correct.
12   Q    And while you were creating the plan of action, Conway
13   MacKenzie never came to you and said that the city did not
14   have the money to implement your plan of action; right?
15   A    I don't recall ever having that conversation.
16   Q    Okay.  And when you were developing the plan of action,
17   you weren't aware of any financial restrictions or
18   limitations that were imposed upon you; right?
19   A    Unaware.  That's correct.
20   Q    You're unaware; correct?  Okay.
21   A    Yeah.
22   Q    And as you went through this morning, the plan of action
23   contains a list of goals and benchmarks that you hope to
24   achieve for 2014; right?
25   A    That's correct.

1   Q   And one of the goals that you discussed was a ten-percent

2   reduction in overall crime; correct?

3   A   That's correct.

4   Q   And a ten-percent decrease would be a significant

5   decrease in overall crime; right?

6   A   That's correct.

7   Q   Another one of the goals that you discussed this morning

8   was increasing the clearance rate for homicides to 70

9   percent; correct?

10  A   That's correct.

11  Q   And according to the FBI, the average clearance rate for

12  homicides for cities with a population of 500,000 to 999,000

13  people is approximately 50 percent; correct?

14  A   I thought it was 60 percent.  I could be wrong.

15  Q   Okay.  And you mentioned on direct that currently the

16  clearance rate for homicides is around 72 percent; is that

17  right?

18  A   Yes.  If you include the warrants that are in the

19  prosecutor's office, that's correct.

20  Q   Okay.  And as of the date of your deposition, it was

21  around 66 percent.  Would that be fair?

22  A   That would be fair.

23  Q   And you think that Detroit's 66-percent clearance rate

24  for homicides is phenomenal; right?

25  A   That's correct.

1    Q   Now, you're aware that under the city's plan of

2    adjustment the city intends to make a number of investments

3    in the police department; is that right?

4    A   That's correct.

5    Q   In particular, the city intends to invest approximately

6    $274 million in the police department; right?

7    A   That's correct.

8    Q   And you believe that the $274 million is the amount of

9    money that it will take to achieve all of the goals and all

10   of the changes that are set forth in your plan of action;

11   correct?

12   A   I believe so.

13          MR. ARNAULT:  No further questions, your Honor.

14          THE COURT:  Thank you, sir.

15          MR. ARNAULT:  Thank you, sir.

16          THE WITNESS:  You're welcome.

17          MR. HERTZBERG:  Your Honor, I have one question.

18          MS. O'GORMAN:  I just have a few.  Sorry.

19          MR. HERTZBERG:  Oh, I'm sorry.

20          MS. O'GORMAN:  Good morning, your Honor.

21                          CROSS-EXAMINATION

22   BY MS. O'GORMAN:

23   Q   Chief Craig, my --

24   A   Good morning.

25   Q   -- name is Debra O'Gorman.  I represent Macomb County

1  through its public works commissioner and the entity known as

2  MIDDD.  You're here testifying as a fact witness; correct?

3  A   As a fact --

4  Q   As a fact witness.

5  A   Yes.

6  Q   You're not being offered as an expert witness; correct?

7  A   That's correct.

8  Q   And you have no special expertise in labor economics?

9  A   I do not.

10  Q   And you have no special expertise in the science of human

11  behavior; correct?

12  A   I do not.

13  Q   And you're not an expert on the Detroit labor market;

14  correct?

15  A   I am not.

16  Q   And you have not done any study or analysis of the impact

17  of the plan of adjustment on the behavior of prospective or

18  current police department employees; correct?

19  A   I have not.

20          MS. O'GORMAN:  Okay.  Thank you.

21                    REDIRECT EXAMINATION

22  BY MR. HERTZBERG:

23  Q   Counsel just indicated she was from -- representing

24  Macomb County.  Do you have any jurisdiction in Macomb

25  County?

1   A    I do not.

2   Q    Okay.  Mr. Arnault asked you or read to you the following

3   deposition transcript on page 208, "Question:  Are you

4   aware" -- let me read that correctly.  "As far as you know,

5   is the announcement about cutting pension benefits -- it

6   didn't impact employee morale?"  And your answer was, "I'm

7   unaware of any impact that it had."  Please turn to page 210

8   of your deposition, line Number 5, and could you read that to

9   the Court, please?

10  A    What line again, sir?

11  Q    Line 5 where you answer a question.

12  A    "I think there was still some skepticism about pensions

13  and going forward still remain with some to this day."

14          MR. HERTZBERG:  No further questions, your Honor.

15          THE COURT:  All right.  Anything further for the

16  chief?  Yes.

17          MR. ARNAULT:  No, your Honor.  Oh, sorry.

18                      RECROSS-EXAMINATION

19  BY MS. PATEK:

20  Q    Just one question, Chief Craig.  You were -- or actually

21  two.  You were deposed in July of 2014; is that right?

22  A    Yes.

23  Q    And since that time -- and I don't want the content

24  disclosed -- have you actively participated in negotiations

25  with the Detroit Police Officers Association regarding their

1  pay and benefit issues?

2  A    I have.

3  Q    And why did you do that?

4  A    Because I understood and recognized the importance of

5  pay, and the mayor is keenly aware of the importance of pay,

6  and so that was the objective, to try and focus in on getting

7  pay for the police officers.

8         MS. PATEK:  Thank you.

9         THE COURT:  Anything further for the chief?

10        MR. HERTZBERG:  Nothing, your Honor.

11        MR. ARNAULT:  No, your Honor.

12        THE COURT:  For the record, sir, can you just state

13  what the definition of "clearance" is when you talk about the

14  phrase "clearance rate"?  What does "clearance" mean?

15        THE WITNESS:  Clearance is homicide cases that are

16  cleared by arrests, could be cleared by other -- for example,

17  if through the investigation a determination was made that

18  the person responsible was in custody on another charge,

19  deceased, that would be -- that would count as a clearance.

20        THE COURT:  Okay.  Thank you, sir.

21        THE WITNESS:  You're welcome.

22        THE COURT:  You're excused as a witness.

23        THE WITNESS:  Thank you.

24     (Witness excused at 12:01 p.m.)

25        THE COURT:  All right.  In a moment we're going to

1  break for lunch.  I have a couple of meetings that I have to

2  attend to, so we're going to extend our lunch again here.

3  We'll reconvene at 1:45.  The record should reflect that

4  before court today Ms. Lennox and the attorneys for the

5  counties asked for some of my time over this lunch hour.

6  Ms. Lennox, do you still want that?

7          MS. LENNOX:  Yes, your Honor.  It shouldn't take

8  more than a few minutes.

9          THE COURT:  All right.  Let's do that promptly in

10  chambers back here then, and we'll be in recess, as I say,

11  until 1:45.

12          MR. HACKNEY:  Your Honor, if I could, just a brief

13  heads-up that I believe -- is Ms. Renshaw the next witness?

14  And that will be the time when we would propose to argue that

15  OPEB combination motion just as a warning.

16          THE COURT:  Oh, okay.

17          MR. HACKNEY:  Thank you.

18          THE COURT:  Good.  Thanks for reminding me.

19          THE CLERK:  All rise.  Court is in recess.

20      (Recess at 12:02 p.m., until 1:45 p.m.)

21          THE CLERK:  All rise.  Court is in session.  Please

22  be seated.

23          THE COURT:  One second, please.  You may proceed.

24          MS. LENNOX:  Good afternoon, your Honor.  For the

25  record, Heather Lennox of Jones Day on behalf of the City of

1  Detroit.  I'd like to interrupt these trial proceedings, if I
2  may, to bring the Court up to speed on some developments that
3  occurred this morning and I believe have already hit the
4  news.  We filed shortly before noon today a document that has
5  been executed and signed by the City of Detroit, the State of
6  Michigan, and the Counties of Wayne, Oakland, and Macomb.
7  That document is a memorandum of understanding regarding the
8  formation of a water and sewer authority.  This is a
9  framework for the creation of an authority which would
10  operate and control the water and sewer systems that are
11  presently being operated by DWSD.
12       While this is a huge step forward, I think all
13  parties would agree, in not only this case but in the
14  delivery of these services to the residents of southeast
15  Michigan, there is still a lot of work to be done, not the
16  least of which is the preparation and negotiation of
17  definitive documentation with respect to this.  Governmental
18  consents need to be obtained both on the city side and on the
19  county sides.  Permits need to transfer.  And our credit
20  enhancers and bondholders -- a majority of the bondholders of
21  the DWSD bonds would have to consent to this transaction, so,
22  again, while this is really a momentous step, there is still
23  quite a bit of work to be done.
24       I would like to point out, your Honor, one thing to
25  make it crystal clear by reading some verbiage from the

1 | memorandum of understanding, and it's as follows, "nothing in

2 | this MOU modifies, or purports to modify, the obligations of

3 | DWSD as set forth in the Plan of Adjustment, and the

4 | Authority," assuming one is created and approved, "shall

5 | assume and comply with such obligations." So with that I

6 | also believe this resolves some of the objections to our plan

7 | of adjustment, and I would defer to the counties' counsel to

8 | report on that.

9 | THE COURT: Thank you.

10 | MR. NEWMAN: Your Honor, Max Newman on behalf of

11 | Wayne County. We have either already filed or will shortly

12 | file a withdrawal of our objection to the plan based on the

13 | memorandum of understanding. I would also like to thank the

14 | Court for ordering this matter to mediation as I believe that

15 | that was extremely beneficial in bringing about this

16 | historical settlement and truly appreciate it. Thank you,

17 | your Honor.

18 | THE COURT: Well, and let me take this opportunity

19 | to thank you and especially your client for the hard work

20 | that went into reaching this settlement and for bringing the

21 | motion that led to the order for mediation.

22 | MR. NEWMAN: Thank you, your Honor.

23 | MS. QUADROZZI: Good afternoon, your Honor. Jaye

24 | Quadrozzi on behalf of Oakland County. Oakland County also

25 | will this afternoon be filing a notice of withdrawal of its

1    objections, and I echo Mr. Newman's comments thanking the

2    Court for its time and its efforts.  Frankly, you and your

3    staff has devoted an enormous amount of resources, and it

4    certainly has been impressive to watch how hard and how

5    diligent everyone in this courtroom has worked, and we

6    appreciate all of that work.

7             THE COURT:  And please extend my thanks and

8    appreciation to your client, and I also thank you and your

9    office and Mr. Fischer and his office for his contribution to

10   the settlement and your contribution to the settlement as

11   well.

12            MS. QUADROZZI:  Thank you, your Honor.

13            MR. BRILLIANT:  Your Honor, this is Allan Brilliant.

14            MS. O'GORMAN:  Your Honor, I believe Mr. Brilliant

15   is on the phone, and he would like to address this issue on

16   behalf of --

17            THE COURT:  Okay.  Mr. Brilliant, are you there?

18            MR. BRILLIANT:  I am, your Honor.  Can you hear me,

19   your Honor?

20            THE COURT:  Hold on.  We're going to increase your

21   volume and lower the mike down closer to the speaker.  Can

22   you speak now, Mr. Brilliant?

23            MR. BRILLIANT:  Yes.  Yes, your Honor.  Is this

24   better?

25            THE COURT:  Yes.

1    MR. BRILLIANT:  You know, for the record, Allan

2  Brilliant on behalf of Macomb County by and through its

3  public works commissioner, Anthony Marrocco, and the Macomb

4  Interceptor Drain Drainage District.  I apologize, your

5  Honor, for not being there in person, but I had no advance

6  notice of the fact that this MOU was going to be announced

7  today, and I didn't realize that my presence might be

8  necessary.

9    My client is not a signatory to the MOU, and at this

10  time we are not prepared to waive our objections to

11  confirmation of the plan.  We are having talks with the city,

12  which even included, you know, talks during the lunch break,

13  to try to resolve our remaining DWSD-related objections, and

14  we're hopeful that those will lead to a resolution of our

15  issues.  In the meantime, you know, we're evaluating, you

16  know, the MOU, which, as Ms. Lennox said, has a lot of

17  contingencies that need to, you know, be resolved before the

18  transaction that it contemplates can go into effect and

19  trying to determine what effect, if at all, you know, this

20  has on any of our objections.

21    THE COURT:  Well, Mr. Brilliant, I have to say to

22  you that I am not prepared to agree with your assertion that

23  your client is not a signatory to this memorandum of

24  understanding.  If it has been presented to me properly --

25  and I'm sure it has -- Macomb County is a signatory to this

1    memorandum of understanding, and as your papers state, Macomb

2    County is your client, so --

3              MR. BRILLIANT:  Well, your Honor, I have --

4              THE COURT:  -- I'm not sure, sir, that your client

5    is not a signatory to this, and I think we're going to have

6    to have further discussions among us to determine whether --

7    what the status of that issue is and whether your client has

8    any further standing to object in this matter.

9              MR. BRILLIANT:  Your Honor, I understand your

10   concerns.  It is signed by the -- you know, the county

11   executive, who's a separate elected official in Macomb

12   County, and we believe that it's Commissioner Marrocco as the

13   public -- as the Macomb County public works administrator

14   who's the agent of the county for purposes of these

15   proceedings.  And, in addition, as your Honor knows, we have

16   filed objections on behalf of Macomb Interceptor, you know,

17   Drain Drainage District, you know, which is a separate

18   entity.

19             THE COURT:  Well, and just so the record is clear --

20   and thank you for bringing that up, Mr. Brilliant -- I have

21   no concern whatsoever about the continued standing and

22   ability of that separate district to assert its objections

23   and its claim, so my concern only extends to that aspect of

24   the objection that is otherwise asserted.  I've looked

25   carefully at the objections that were filed, and as I read

1    them, they say they were filed on behalf of Macomb County.

2           MR. BRILLIANT:  Correct, your Honor, by -- Macomb

3    County by the public workers commissioner, your Honor.  We've

4    been very clear as to who our client is.

5           THE COURT:  Well, regardless, Macomb County has

6    signed this memorandum of understanding, and I can tell you

7    unequivocally that I am not going to mediate let alone

8    resolve any disagreements or turf battles between the county

9    executive and the public works commissioner.  I've got enough

10   to do in this case.

11          MR. BRILLIANT:  Yeah.  We understand, your Honor,

12   and we're not asking you to resolve that.  You know, clearly,

13   to the extent there's an issue as to, you know, our standing,

14   we would be prepared to, you know, respond to that at the

15   appropriate time.

16          THE COURT:  Well, I think the appropriate time is

17   like right away.  Ms. Lennox, may I ask a question of you?

18   And it's the procedural question.  How does the city intend

19   to proceed in this case having achieved this major

20   settlement?  Do you intend by some means to ask the Court for

21   its approval of this, or do you plan to incorporate it into

22   an amended plan that you are going to seek confirmation of,

23   or are you just going to keep this separate from the

24   bankruptcy process?

25          MS. LENNOX:  I think at this point, your Honor,

1    first of all, the plan, as filed, currently contemplates the

2    creation of an authority, so the plan, as filed, would permit

3    this sort of resolution to occur.  As I indicated, there's a

4    little bit of wood to chop before we would get to final

5    documentation.  I think we can make a call once we see that

6    final documentation at that time, but I would not envision

7    that this is going to be a major amendment to the plan or

8    would require major revisions to the plan.  Should there be

9    an authority created before confirmation of this plan, we may

10   reference an authority also being able to set water rates,

11   but really in a review of the plan, that's all that would be

12   required to change in the plan, so we believe that the plan,

13   as currently constituted, can go forward in this proceeding.

14   And whether or if any further approvals are needed we can

15   deal with at that time.

16          THE COURT:  All right.  I don't think there's

17   anything further we can do on the record at this time

18   regarding this.  Ms. Lennox and Ms. O'Gorman, I want to see

19   you at the side of the bench.  Unfortunately, we're not set

20   up over there for Mr. Brilliant to be involved, but you'll

21   just have to keep him apprised as the day proceeds.

22          MS. DIBLASI:  Your Honor, may I just make a quick

23   statement, please?

24          THE COURT:  Who are you?

25          MS. DIBLASI:  Kelly DiBlasi on behalf of FGIC.

1          THE COURT:  Sure, absolutely.

2          MS. DIBLASI:  Good afternoon, your Honor.  Kelly

3  DiBlasi from Weil, Gotshal & Manges on behalf of Financial

4  Guaranty Insurance Company.  I just wanted to state on the

5  record we obviously just received the filing and are still

6  reviewing it and analyzing how it impacts FGIC both in its

7  position as insurer of some of the DWSD bonds as well as

8  FGIC's position as an insurer of certain of the COPs.  And as

9  we're undertaking that analysis, we just wanted to note for

10  the record that we reserve all our rights.

11          THE COURT:  I'm not sure that was necessary, but

12  okay.

13          MS. DIBLASI:  Thank you, your Honor.

14          THE COURT:  All right.  Ms. O'Gorman, Ms. Lennox.

15     (Conference at bench at 1:57 p.m., until 1:58 p.m.)

16          THE COURT:  Okay.  I think we can get back to our

17  trial now.

18          MR. HACKNEY:  Your Honor, good --

19          THE COURT:  Let's get settled here.

20          MR. HACKNEY:  I'm sorry.

21          THE COURT:  Okay.

22          MR. HACKNEY:  Your Honor, good afternoon.  Stephen

23  Hackney on behalf of Syncora.  Ms. Renshaw is the next

24  witness.  She's a member of the Retiree Committee.  And I

25  think there's a sufficient probability that this issue of

1    combining OPEB and pension claims could come up during her

2    testimony that we decided now was the appropriate time to

3    argue this motion.  I was hoping to make a short argument to

4    you on -- and make some points, and I think Mr. Barnowski is

5    here for the committee.

6              As you'll recall, your Honor, you know, part of our

7    view is that the city is casting about with respect to

8    potential reasons for -- to justify the discrimination in the

9    case, but if there was one limited victory that I thought we

10   had obtained, it was that the city itself was not going to

11   pursue the argument that combined OPEB and pension recoveries

12   could be used to justify discrimination, which is to say that

13   you put Classes 10 and 11 and 12 together.  And so the city

14   actually stipulated to that point, and it was a good

15   stipulation, in my view, both on the law but also on the

16   facts because I deposed Mr. Orr, and Mr. Orr was actually not

17   able to say that that was one of the bases that he'd used to

18   discriminate.  But as you know, the retirees and the

19   Retirement Systems have both, nonetheless, filed objections

20   to our motion, and they're contending that they ought to be

21   able to put on this sort of evidence, and so I want to give

22   you a brief argument as to why we don't think it's correct in

23   addition to the fact that we have a stipulation from the

24   proponent of the plan that they are not going to try to do

25   this.  I think it's consistent with the law also in terms of

1  the way the statute talks about looking at whether

2  discrimination is fair as to each class, and we found no case

3  out there on either side of the issue, candidly, but no case

4  saying that you can do something like take two classes that

5  have some level of overlap and look at them together when

6  comparing it to a disfavored class. And I think that there

7  has been some agreement in this argument from the retiree

8  counsel themselves. This is what Mr. Montgomery said on

9  August 25th when you asked him a question about the VEBAs,

10  and he was talking about if you engage in the exercise as

11  some people are tempted, we think it's unwarranted, but if

12  you combine them, the total recovery on behalf of retirees

13  drops dramatically, and I -- at the time I understood him to

14  be talking about this very issue. I could have

15  misunderstood, but -- and it's also important to remember,

16  your Honor, that it was the retirees themselves who insisted

17  upon the separate classification because of the important

18  differences between the two types of claims, so I think that

19  that has at least some bearing on talking about the propriety

20  of then looking at them in combination.

21       Combine this with the fact that you have very

22  substantial underlap between Classes 12 on the one hand and

23  10 and 11 on the other so that I think even as a logical

24  exercise it becomes difficult to perform, which is how do you

25  say if you look at these two classes in the aggregate it is

1  not an unfair level of discrimination without addressing the

2  folks in the Venn diagram that don't fall into the combined

3  class, so I think, as a logical exercise, it doesn't make

4  sense.  It poses questions like how much overlap do you need

5  before you start doing this type of analysis, what do you do

6  with the facts where there isn't any overlap, and why didn't

7  you separately classify people in this way to sort of mirror

8  what you were saying about the nature of their claims with

9  respect to the plan at large.

10       Let me give you a practical point about this and

11  then sit down with the last question about relevance.

12  There's a practical side to all of this, not just a tactical

13  side.  What happens when you start getting into the idea of

14  combination, which is because the valuation of the OPEB claim

15  is so large -- it's been valued at $4.3 billion -- that

16  valuation was the product of a negotiation, and I've always

17  been a skeptic as to whether it even mattered because one of

18  the things that I asked Kevyn Orr was, "Did you negotiate the

19  VEBAs first and then the claim sides or did you do them both

20  together?"  And he said he couldn't remember, but it doesn't

21  have the feel of something where, you know, there's been a

22  big connection between the two.  But we don't have very good

23  visibility into how they struck this 4.3 billion number

24  because it's in the mediation, but because that number is so

25  important to the 11-cent number you get out for Class 12, if

1    we start to engage this idea that you can put the classes

2    together, we also have to start engaging the, okay, well how

3    did you value this OPEB claim, and you start stumbling into a

4    bunch of expert testimony about the size of that claim.  I

5    think if we take this -- if we lance this boil and take it

6    off the table as we think it's legally and factually

7    justified to do, there may be some pickup in terms of the

8    expert cross-examination, and there may be a diminishment in

9    the amount of wrangling about the size of the OPEB claim

10   because that's principally why people have been interested in

11   it.  If it doesn't otherwise matter either to the recovery of

12   Class 12 or to the unfair discrimination analysis, then they

13   can say the OPEB claim is eight billion or two billion or

14   whatever.

15           I think there's a last point that I wanted to raise

16   and then I'll sit down, which is I think, if I understand Ms.

17   Renshaw's testimony, she's going to be talking about kind of

18   how the Retiree Committee saw the issues and how they saw the

19   various settlements and what their goals were and what their

20   thoughts were, and I'll wait for the testimony obviously, but

21   to the extent that's the justification, I kind of question

22   the baseline relevance of that testimony.  Under rule 9019,

23   as we've discussed before, I think it's supposed to be more

24   of an objective analysis as to whether it's a reasonable

25   settlement, not a, "I thought I could get more out of them,

1   and then I decided that I couldn't, and here's kind of what

2   our strategy was," because you really can't discover the

3   information that relates to those types of state of mind

4   anyway because when you go to ask someone, "Well, ma'am, what

5   did you tell the city about this?" then they say, "Well,

6   there's the mediation privilege," so I -- lurking around all

7   of this argument, there's some question in my mind as to the

8   utility of the testimony that I understand her to offer, but

9   I also won't front-run Mr. Barnowski, who maybe can explain

10  it better than I.

11          THE COURT:  Thank you, sir.

12          MR. BARNOWSKI:  Good afternoon, your Honor.  Dan

13  Barnowski for the committee.  We just heard almost entirely

14  about undue discrimination.  The problem with that argument

15  is -- the problem with that argument is that there are two

16  other reasons why this testimony is highly relevant.  The

17  first is because we've got a settlement.  We've got one big

18  global settlement.  The testimony will be undisputed that

19  these claims, 10, 11, and 12, were part of a global

20  settlement.  They weren't two or three separate settlements.

21  That will be the testimony on the city's side and on the

22  committee's side.  The testimony will also be that they would

23  never have settled the claim but for the settlement of all of

24  the -- I'm sorry.  They would never have agreed to the global

25  settlement --

1          THE COURT:  Right, but it's a big step from there to

2     mathematically combining them for analysis purposes.

3          MR. BARNOWSKI:  Well, your Honor, you will be asked

4     at the end of this case to assess the reasonableness of the

5     settlement under 9019, and I question how could you ever do

6     that if you are not allowed to hear from the two sides who

7     settled the claim as to why they thought it was appropriate

8     and reasonable to agree to this settlement.  Kevyn Orr

9     testified for the city that he couldn't remember if he

10    combined --

11         THE COURT:  Fair enough possibly, but it's still a

12    long way from that to evidence of what the mathematical

13    combination is.

14         MR. BARNOWSKI:  Well, your Honor, the testimony will

15    be both from Ms. Renshaw and Mr. Bloom that they considered

16    that mathematical combination in determining whether they

17    thought it was fair to impose this burden upon all the

18    retirees and agree to the settlement.

19         THE COURT:  And why do I care what they think?

20         MR. BARNOWSKI:  Because you have to assess the

21    objective reasonableness of the settlement.

22         THE COURT:  Precisely, so why do I care what they

23    think?

24         MR. BARNOWSKI:  Well, clearly one of the -- one of

25    the factors you have to consider in assessing the objective

1  reasonableness is what the parties thought going in as to why

2  they would settle it.  That has to color --

3          THE COURT:  That is absolutely not crystal clear.

4  In fact, I have rejected that view in connection with every

5  settlement the city has ever presented to me.

6          MR. BARNOWSKI:  Okay.  Well, your Honor, we think

7  that it would be --

8          THE COURT:  Here?

9          MR. BARNOWSKI:  Pardon me.

10         THE COURT:  He's not here.  If he were here, he

11  would tell you that every time he's presented a settlement to

12  me I have said on the record I don't care what he thinks.

13         MR. BARNOWSKI:  Okay.  Well --

14         THE COURT:  What I care about is what are the merits

15  of the claims and defenses, what are the considerations that

16  the Sixth Circuit says I should take into account.

17         MR. BARNOWSKI:  Your Honor, the evidence --

18         THE COURT:  I have to perform an independent

19  evaluation of what's reasonable.

20         MR. BARNOWSKI:  Sure, but the evidence will be, your

21  Honor, that the reason the settlement came into being, the

22  reason why the committee --

23         THE COURT:  Again, I don't care what the reason is

24  it came into being.  The question is the claims and defenses

25  were settled.  Here's what was settled.  Here are the claims

1  and defenses that were settled, here are the merits of them,

2  and --

3          MR. BARNOWSKI:  Your Honor --

4          THE COURT:  -- here's the complexity of them and the

5  length of time and all of that other stuff.

6          MR. BARNOWSKI:  I understand, your Honor, but one of

7  the bits of evidence that will come in is the reason why the

8  committee received 50 or 40 -- I know the evidence has been

9  all over the place -- on the settlement of Classes 10 and 11

10  was that they agreed to take ten cents on 12.  That's the

11  totality of the circumstances of the settlement.  And how

12  could you assess the objective reasonableness of making that

13  kind of agreement if you do what Syncora is asking you to do,

14  which is to say look only -- look only at the part of the

15  settlement that we think helps our arguments, and don't look

16  at the part of the settlement that doesn't?

17          THE COURT:  Saying at all.

18          MR. BARNOWSKI:  Your Honor, that's exactly what

19  they're saying.  They're saying to you that you should

20  compare Classes 10 and 11 as to their settlement but not 12.

21          THE COURT:  If that's what they're saying, I'm going

22  to reject that, too, because I have to look at the totality

23  of the settlement to determine its reasonableness, but that

24  doesn't mean you mathematically combine otherwise dissimilar

25  matters.

1          MR. BARNOWSKI:  Okay.  Your Honor, also --

2          THE COURT:  Let me just give you a very simplified

3    example.  Okay.  A trustee in a Chapter 7 case -- are you a

4    bankruptcy lawyer?

5          MR. BARNOWSKI:  I'm a litigator who dabbles.

6          THE COURT:  Oy, the worst kind.  I'm sorry, sir.

7          MR. BARNOWSKI:  No offense taken.

8          THE COURT:  All right.  Good.  It was offensive, but

9    I'm glad you took no offense.  A trustee gets a Chapter 7

10   case in which the debtor is involved in two automobile

11   accidents with the same defendant.  One is settled at ten;

12   the other one is settled at thirty.  Okay.  Under no

13   circumstances would anyone argue that those two settlements

14   are fair because the average is 20.  You'd look at each

15   settlement and determine the reasonableness of it based on

16   the merits and demerits of each settlement.

17         MR. BARNOWSKI:  Okay.  Just to clarify then, your

18   Honor, are we going to be allowed to put in evidence that the

19   reason we took --

20         THE COURT:  Questions --

21         MR. BARNOWSKI:  Well, I want to make sure I

22   understand before I respond.

23         THE COURT:  I don't generally answer questions

24   during argument.

25         MR. BARNOWSKI:  Okay.  Fair enough.  Our evidence

1    will be at least that the reason why the committee and the

2    city, I believe, agreed to 50 cents on the dollar, for

3    instance, for one claim is because there was 10 cents on the

4    dollar on the other claim.  Ms. Renshaw would testify that

5    that's how she analyzed it.  She's not going to testify that

6    mathematically speaking that works out to 21 cents.

7         THE COURT:  Well, we can argue about the

8    admissibility of that when and if it's proffered, and I think

9    that's partly what Mr. Hackney was referring to, but it's a

10   long way from there to mathematically combining them and say

11   here's the mathematical combination, isn't it?

12        MR. BARNOWSKI:  Well, your Honor, I don't think it

13   is because I think you are being asked also under the good

14   faith analysis to assess the totality of the global

15   settlement, whether it's fair not, and the fact is --

16        THE COURT:  Why do I need a mathematical combination

17   to do that?

18        MR. BARNOWSKI:  Because it colors whether the --

19   first of all, the totality of the circumstances involves the

20   totality of the settlement.  It doesn't involve only the part

21   of it that Syncora wants you to look at.  Secondly, it helps

22   explain why this was -- why we believe this is a fair and in

23   good faith offer and settlement because it's not 50 cents on

24   the dollar, as Syncora will argue repeatedly.  It's much,

25   much, much lower.  And when you look at it globally, the

1   totality of the settlements, it's much closer to 19 cents on

2   the dollar.

3           THE COURT:  Congratulations.

4           MR. HACKNEY:  Yeah.  So much for the motion in

5   limine.

6           THE COURT:  All right.  Anything further, sir?

7           MR. BARNOWSKI:  That's all, your Honor.

8           THE COURT:  Anyone else want to speak on this?

9           MR. GORDON:  Good afternoon, your Honor.  Robert

10  Gordon of Clark Hill on behalf of the Detroit Retirement

11  Systems.  Your Honor, I come at it a very different way.  As

12  an initial matter, I didn't view the proposition which showed

13  up for the first time, I think, in the city's consolidated

14  reply to plan objections as suggesting that somehow we should

15  view the claims in Classes 10 and 11 on the one hand and the

16  claims in Class 12 on the other hand as somehow being subject

17  to some kind of a substantive consolidation or a mathematical

18  combination in some substantive sense.  I viewed it as a sort

19  of a soft suggestion that in considering not under Rule 9019,

20  as counsel has just suggested that we should look at this,

21  but under 1129(b)(1) where the Court of its own volition must

22  determine what's fair or not fair, the Court could at least

23  consider the fact that roughly I would -- according to my

24  calculation, maybe ten or 12,000 retirees who also hold OPEB

25  claims are going to have an impact, an overall impact under

1    the plan that is I think at least something that the Court

2    can consider when another class -- a class is claiming that

3    they are being unfairly discriminated against.

4             THE COURT:  Well, so much of --

5             MR. GORDON:  And it's just a data point.

6             THE COURT:  So much of that is absolutely arguable.

7             MR. GORDON:  Yes.

8             THE COURT:  But it's a step and maybe a big step to

9    say we're going to try to mathematically quantify that

10   impact.

11            MR. GORDON:  It's not that hard to do for someone

12   who has a claim in both categories, and, again, it's a motion

13   in limine.  It's a question --

14            THE COURT:  The issue isn't how hard it is to do

15   mathematically, although --

16            MR. GORDON:  Yeah.

17            THE COURT:  -- I think Syncora has issues there,

18   too.  I'm talking about the legal relevance of doing it.

19            MR. GORDON:  Your Honor, again, I approached it from

20   1129(b), not from a 909 -- 9019 standpoint.

21            THE COURT:  What's the argument there?

22            MR. GORDON:  So there the Court has to determine

23   what's fair or unfair discrimination, and the Code doesn't

24   prescribe what the Court looks at nor does it proscribe what

25   the Court can look at.  So if the overall impact -- if a

1    class of dissenting creditors is claiming that the plan is

2    unfair as to them and they're pointing at retirees, I think

3    it's at least fair for the Court to consider what the actual

4    recovery overall to in excess of 10,000 of those retirees is

5    actually.  What weight you give that ultimately is something

6    we can argue about later, but at the motion in limine stage,

7    it seems to me it's at least a valid relevant data point.

8    One of the ironies of the situation is, your Honor, you'll

9    recall last week when we were arguing about evidence of

10   hardship, even the city was saying that evidence of hardship

11   on a macroscopic basis is something that's relevant, but the

12   upshot of this argument today is that you can't really

13   consider the overall hardship to a major population group

14   within the city because you can only look at Class 10 and 11

15   or you can only look at Class 12.  You can't look at the

16   overall.  To me the Court can look at the overall.

17            THE COURT:  You can or at least you arguably can,

18   but that's not the focus of Syncora's motion.  The focus of

19   Syncora's motion is that when you're doing that, Judge, you

20   shouldn't consider the mathematical combination of them.

21            MR. GORDON:  Well, I guess, again, I didn't view

22   that proposition as -- I'm not sure if I'm understanding the

23   way the Court is talking about it.  Now I'm getting -- I feel

24   like we're getting into a semantical discussion a little bit.

25   I didn't view it as suggesting that there should be some hard

1    and fast conclusion about that as a legal matter.  I think it

2    was more a matter of what's fair or not fair.  I think the

3    math is not hard to do.  I don't want to -- I don't think

4    anybody was suggesting that somehow you should --

5        THE COURT:  Well, how do you deal with Mr. Hackney's

6    argument that it opens up the door to what the denominator is

7    on the OPEB side?

8        MR. GORDON:  Well, I think that Mr. Hackney is going

9    to probably open that door anyway -- well, maybe not on that

10   side because he's not arguing about Class 12 as much.

11       THE COURT:  I'm assuming he wouldn't if I grant this

12   motion.

13       MR. GORDON:  Yeah, that's true, too.  Well, I

14   guess --

15       THE COURT:  And I'm really good at holding people to

16   their promises.

17       MR. GORDON:  Well, I don't have much to say about

18   that.  I mean the convenience of Mr. Hackney is certainly

19   something I wouldn't want to consider, but, on the other

20   hand, I would want to consider what really is anything that

21   is really relevant for the Court.  I just think at a motion

22   in limine stage it's important not to exclude anything, but

23   obviously it's -- the Court can defer --

24       THE COURT:  All right.  Let me ask Mr. Hackney about

25   that.

1    MR. GORDON:  Absolutely.

2    MR. BARNOWSKI:  Your Honor, while Mr. Hackney comes

3  up, I just wanted to clarify because I didn't understand your

4  comment.

5    THE COURT:  Let me ask you to go to the --

6    MR. BARNOWSKI:  Sure.

7    THE COURT:  -- podium to clarify whatever you're

8  going to clarify.

9    MR. BARNOWSKI:  I apologize, your Honor.  I didn't

10  understand your comment when you said congratulations.  The

11  numbers I threw out, I wasn't meaning to put evidence into

12  the record, and it was purely hypothetical.  I apologize,

13  though, if that was misconstrued.

14    THE COURT:  Okay.

15    MR. HACKNEY:  I don't think that I misconstrued it,

16  but I may have.  So Mr. Howell has been on point for me, and

17  you're about to see him this afternoon actually.  What we

18  would say about the evidence on OPEB valuation is that we've

19  been principally in a defensive posture, which is we have

20  been reacting to the retirees --

21    THE COURT:  Okay.  I get that, but my -- the

22  question that I want you to address is the same old in limine

23  question we seem to get to every time, which is --

24    MR. HACKNEY:  Yeah.

25    THE COURT:  -- you know, is now the time to decide

1   that it's so clear that this is irrelevant that I shouldn't

2   even allow its proponents to make a record?

3        MR. HACKNEY:  That's right.  And I mean it's

4   emphatically -- this is -- of the many things that are

5   committed to your discretion, this is emphatically one of the

6   most obvious, right, which is it's the cost benefit because

7   we don't have a jury here, so you're right.  We're not

8   talking about prejudice and inflaming juries and we can

9   already say 19 cents at the podium, and I can still have some

10  hope that -- you know, that you're not now tarnished forever,

11  but the -- I think a trial judge maybe looks at it from a

12  more practical standpoint and says that as the confidence

13  that the trial judge has goes up on what he or she thinks

14  about an issue, their desire to tolerate complicated evidence

15  relating to OPEB valuation and the like maybe goes down, and

16  I leave that to you to decide.  What I wanted to foreshadow

17  for you now was the way it works so that you can have some

18  sense of why it may be valuable.

19       THE COURT:  Well, I appreciate that, and as I think

20  I may have mentioned to you before, it's not just for my

21  benefit or consideration that these issues need to be

22  resolved in favor of getting the evidence into the record

23  because, like it or not, I'm likely not the last judge or

24  court that's going to look at this.

25       MR. HACKNEY:  Right.  No.  Understood.  Understood.

1    I think no matter what you'll probably have to make a call at
2    the end of the day on it.
3            THE COURT:  Absolutely.
4            MR. HACKNEY:  And so whether you made the call in
5    the legal opinion where you either confirmed or denied
6    confirmation on the basis of this issue or whether you made
7    the call at the in limine stage -- and I can see you saying,
8    "Well, I don't want to make the call today."  And if that's
9    the ruling, that's fine.  It puts a little bit more of a --
10           THE COURT:  Right.
11           MR. HACKNEY:  -- focus on our part to object.  I
12   guess the one thing I wanted to leave you with, if I could,
13   which is if we kind of delectrify it -- because I know
14   whenever the -- whenever you're talking about pensions and
15   OPEB, there's sort of an added juice to it, but if you
16   thought about like just a Chapter 11 where you had a big
17   stack of different types of bonds --
18           THE COURT:  Um-hmm.
19           MR. HACKNEY:  -- 12 classes of bonds, the most
20   boring bonds you ever heard of in your life, and people start
21   coming up and saying, "Well, no, no, no.  If you look at
22   Classes 4 and 5 together because those five guys have those
23   and you compare it to Classes 7 and 8, then it's actually
24   fair," and other people rang in and said, "No, no, no.  But I
25   have Classes 1 and 12, and then when you" -- it's a

1  kaleidoscope, and so that's partly why I feel that the

2  confidence on the legal front is high enough at this point --

3  on the unfair discrimination front that we're encouraging you

4  to call the ball today, but we leave it to you.

5        THE COURT:  Well, I will begin my determination of

6  this motion by expressing skepticism about the factual or --

7  and legal basis for the proffered evidence that Syncora

8  objects to by this motion.  I can't, however, conclude that

9  it is so irrelevant or so frivolous that I shouldn't exercise

10  my -- or I should exercise my discretion to prohibit them

11  from even making a record.

12        MR. HACKNEY:  Understood.

13        THE COURT:  So I'm going to deny the motion.

14        MR. HACKNEY:  Understood, your Honor.  Thank you.

15        MR. MONTGOMERY:  Your Honor, may we call Ms. Renshaw

16  into the courtroom?

17        THE COURT:  You may.  Please raise your right hand.

18            TERRI RENSHAW, CITY'S WITNESS, SWORN

19        THE COURT:  Please sit down over there.

20        MR. MONTGOMERY:  For the record, your Honor, Claude

21  Montgomery, Dentons US, for the Retiree Committee.

22        THE COURT:  You may proceed, sir.

23        MR. MONTGOMERY:  Thank you.

24                    DIRECT EXAMINATION

25  BY MR. MONTGOMERY:

1  Q    Ma'am, would you state your full name for the record,

2  please?

3  A    Terri Lynn Renshaw.

4  Q    And where do you reside, Ms. Renshaw?

5  A    In Onsted, Michigan.

6  Q    Is Onsted, Michigan, within the City of Detroit?

7  A    No.

8  Q    Okay.  What connection, if any, do you have to the City

9  of Detroit?

10 A    I was born in the City of Detroit.  I spent my first

11 eight years, started elementary school here in Detroit.  I

12 returned to the city in 1979 after my first year in law

13 school at Wayne State and lived continuously in the City of

14 Detroit until 1999, raised two daughters here, sent them to

15 public school here.  I've been -- consider myself a

16 Detroiter, a native born Detroiter.

17 Q    Okay.  Now, Ms. Renshaw, could --

18         THE COURT:  Ma'am, you have a very soft voice, so I

19 need you to, "A," project it, and, "B," get closer to the

20 microphone.

21         THE WITNESS:  Okay.  Thank you.

22         THE COURT:  If the mike moves, you can just pull it

23 closer to you.

24 BY MR. MONTGOMERY:

25 Q    As always, the judge is way ahead of all of us.  Ms.

1   Renshaw, were you ever employed within the City of Detroit?

2   A    Yes.  Within the City of Detroit and by the City of

3   Detroit.

4   Q    When were you employed -- or excuse me -- in what

5   capacity were you employed by the City of Detroit?

6   A    I started with the City of Detroit as an employee on

7   January 16th, 1984, with the title of assistant corporation

8   counsel in the law department.

9   Q    Okay.  And what is the --

10  A    I'm sorry.  Junior assistant corporation counsel with the

11  law department.

12  Q    And what is a junior assistant corporation counsel in the

13  law department?

14  A    It was the entry level staff attorney position in the

15  city's law department at that time.

16  Q    And did you hold any other jobs for the City of Detroit?

17  A    Yes.  I received several promotions over the next several

18  years rising up through the assistant corporation counsel

19  ranks.  I left the City of Detroit law department sometime in

20  1996 and took a position as the assistant -- administrative

21  assistant to the finance director where I worked for

22  approximately a year or so, returned back to the law

23  department, continued with my career there, ultimately

24  becoming supervisor, supervising assistant corporation

25  counsel of the labor and employment section, and then finally

 1  my last position was as deputy corporation counsel.

 2  Q   And is the deputy corporation counsel one of many such

 3  titles within the law department?

 4  A   At the time I worked there, there was only one deputy

 5  corporation counsel.

 6  Q   And was it an appointed position?

 7  A   Yes, it was.

 8  Q   And by whom were you appointed?

 9  A   Mayor Dennis W. Archer.

10  Q   Okay.  So how many years in total did you work for the

11  city's legal department?

12  A   Just a couple months shy of 15.

13  Q   Fifteen years.

14  A   An employee.

15  Q   As an employee.  Did you work for the city's law

16  department in a capacity other than as employee?

17  A   I did.

18  Q   And what was that?

19  A   After my first year in law school, I was retained on an

20  independent services contract as a law clerk, and I continued

21  in that capacity from September of '79 until May of '81 after

22  which I graduated from law school and then became a law

23  intern on an independent services contract and continued in

24  that capacity until February of 1982.

25  Q   Now, while working for the city as a member of its law

1   department, did you have a progression of responsibilities
2   that you could describe to the Court?
3   A   I did.  I was -- until my appointment as deputy, I was
4   continually assigned to the labor and employment section of
5   the department, so we were responsible -- the section was
6   responsible for all matters involving employees and labor
7   relations matters, so litigation involving discrimination,
8   wrongful termination, contract interpretation cases,
9   discipline cases under the contracts, civil service cases,
10  other administrative cases, so as you progressed through the
11  ranks within the assistant corporation counsel title group,
12  your caseload became greater and your cases became more
13  complex and more potentially expensive to the city.
14  Q   Did you manage or try any long-running cases for the City
15  of Detroit?
16  A   I did.  I was primarily responsible for a matter
17  involving the Police and Fire Retirement System, which was
18  known inside the law department as the Gentile Yank case.
19  That was a long-running case pending before Judge Robert
20  Colombo in Wayne County Circuit Court.  And after some time,
21  I was also primarily responsible for the Schaefer Tannian sex
22  discrimination lawsuit against the police department that was
23  pending for the most part before Judge Ralph Freeman here in
24  the Eastern District of Michigan.
25  Q   Am I right that those were both long-running cases?

1   A    The <u>Schaefer</u> <u>Tannian</u> case was resolved three days shy of

2   its 25th anniversary.  The <u>Gentile</u> <u>Yank</u> case started in 1977

3   and was resolved sometime in the late '80s or early '90s.

4   Q    In your capacity in the labor employment section of the

5   city, did you have occasion to work with issues relating to

6   the pension plans for the city?

7   A    I did.

8   Q    And what are those two pension plans?

9   A    The General Retirement System was the Retirement System

10  for nonuniform, nonsworn officers, nonfire fighters.  The

11  PFRS, which is used in this proceeding -- I always refer to

12  as the P&F system, the Police & Fire system -- was the

13  retirement system for sworn police officers and for fire

14  fighters.

15  Q    And as an employee, were you a member of one or the other

16  system?

17  A    I was a member of the General Retirement System.

18  Q    Okay.  Before we move off of your career, did there come

19  a time when you left the City of Detroit?

20  A    I did.

21  Q    Excuse me.  Left the employment of the City of Detroit.

22  A    Yes, both, I did.

23  Q    Okay.  And why did you leave the employ of the City of

24  Detroit?

25  A    I was at a point in my job as deputy corporation counsel

1   where I no longer had an active caseload, and at that point
2   in my legal career, I was not willing to give up the active
3   practice of litigation, so I looked for a position -- an in-
4   house position in southeastern Michigan that would allow me
5   to continue to handle -- be primarily responsible for
6   employment-related litigation, so I took a position with K
7   Mart corporation.
8   Q    And just for the record, are you employed today?
9   A    Not as a lawyer.
10  Q    Not as a lawyer.  Are you a retiree?
11  A    I am.
12  Q    Okay.  And when did you submit your application for
13  retirement?
14  A    In November of last year, actually during a break during
15  the eligibility proceedings.
16  Q    Okay.  We'll come back to that.  In connection with your
17  giving advice to the city, did you ever have occasion to
18  offer settlement advice with respect to labor and employment
19  issues?
20  A    Oh, absolutely.
21  Q    Was that a routine part of your career?
22  A    Yes.
23  Q    Okay.  What kinds of cases did you settle for the city?
24  A    Well, both the Gentile Yank case was settled ultimately
25  after almost two decades of litigation as was the Schaefer

1  Tannian lawsuit.  There would have been settlements not just

2  with litigation but administrative cases, civil rights cases

3  pending with the EEOC or the Michigan Civil Rights

4  Commission, with the various labor unions that might bring a

5  discipline case involving a terminated employee.  Those were

6  often settled.  There were individual plaintiffs that filed

7  lawsuits against the city for sexual harassment or various

8  civil rights violations, and then those cases, as most

9  litigation, is ultimately settled rather than tried.

10 Q   And did the question of what benefits an employee may or

11 may not have been entitled to ever play a role in those

12 settlements?

13 A   Absolutely.

14 Q   In what way?

15 A   Well, if an employee was terminated and at least the

16 former employee, the plaintiff, was arguing that the

17 termination was improper, they would make an argument that

18 had their employment continued, they would have qualified for

19 a retirement benefit that they could now not qualify for

20 because of the termination, so that would become an element

21 of damages that the plaintiff's counsel would often argue.

22 Q   Okay.  And did the city, in fact, on your advice actually

23 settle such cases?

24 A   Yes.

25 Q   Okay.  Now, let's scroll forward in time.  What

1   connection, if any, do you have to the current Chapter 9 case
2   for the City of Detroit?
3   A    I am a member and the chair of the Official Committee of
4   Retirees.
5   Q    And could you please describe to the Court how you came
6   to hold that position?
7   A    One of my former colleagues at the law department who I
8   have the utmost admiration and respect for invited me to
9   lunch last summer and asked me if I would put my name in for
10  consideration for the committee, and I told her I would do
11  that because she had asked me to, and I did.  I submitted via
12  e-mail pursuant to the procedures the U.S. Trustee had
13  established my resume and a -- I think there was a
14  questionnaire that they had us -- had each applicant fill
15  out.  I came down to the courthouse here for a public meeting
16  during which the trustee explained the procedure that was
17  going to be used to select the committee members.  That day
18  they interviewed individuals.  I was one of the individuals
19  they interviewed.  That was a Tuesday, as I recall, and
20  either Wednesday or Thursday of that week I received a call
21  from the assistant U.S. Trustee here in Detroit to ask me if
22  I would be willing to serve as a committee member.
23  Q    Okay.  And after you joined the committee, did -- was it
24  the U.S. Trustee who appointed you chair of the committee?
25  A    No.  Our first meeting was Friday, August 23rd, of last

1  year.  And I had held several management positions during my

2  career, not just with the city but with subsequent

3  employer -- and a subsequent employer.  There are some people

4  who'd tell you I like to be in control of situations.  And I

5  basically volunteered for the chairperson's position, and my

6  committee members agreed that I could serve as chair.

7  Q    Just so the Court understands, what management roles did

8  you have outside of your employment with the City of Detroit?

9  A    When I retired from Comerica Bank, I was senior vice

10  president and general counsel for litigation and corporate

11  operations and ran a section of the Comerica -- I almost said

12  the city's -- Comerica's legal department and supervised

13  several attorneys and nonattorney support staff there as a

14  member of the department's management team.

15  Q    So you're fundamentally a management side lawyer; is that

16  correct?

17  A    That is correct.

18  Q    Okay.  Now, when you joined the City of Detroit as an

19  employee, what benefits, if any, did they offer you?

20  A    At the time I joined the city, just for a little

21  background, I was working for a small firm in southeastern

22  Michigan here.  I had recently been married and wanted to

23  start a family.  The firm had not previously had a female

24  associate in the firm, and I continued to press the

25  management of the firm to see what they would offer as far as

maternity leave benefits.  They had, for whatever reason,

difficulty giving me a straight answer to those questions.  A

position in my old section, the labor and employment section,

at the city came open, and I applied for it and was

successful.  One of the reasons I moved back to the city is

because of my prior work there.  I was very aware of the

benefit packages that were offered to city employees, the

vacation leave, the sick leave, the health insurance

benefits, and then -- and the pension benefits further on

down the road.

Q   By your prior work, do you mean your work as a law clerk

for the city?

A   Yes.

Q   Okay.  And what specifically -- what programs or benefits

did they, in fact, offer you when you became an employee of

the city?

A   Well, as I said, there was vacation time, sick time.

There were longevity benefits if you stayed employed with the

city long enough.  There were healthcare, health insurance.

There was a death benefit program.  There was a pension

program.  They had a savings program, annuity savings program

that you could be part of.  There was a tuition reimbursement

program.  That's all I can think of right now.

Q   Okay.  So with respect to when you first became an

employee, what was the pension program as you understood it

1  then?

2  A    You were enrolled in the pension program upon employment.

3  As I understood it, the city contributed a percentage of the

4  payroll for your department to that system to support your

5  ultimate pension benefits and that pension benefits were

6  calculated based on a formula that included average final

7  compensation and a percentage created by your years of

8  service and a percentage multiplier.  In addition, if you

9  participated in the annuity savings fund and left your

10  annuity money in the fund, you could annuitize that savings

11  and have that supplement your pension benefit.

12  Q    Okay.  Focusing on the pension plan for a moment rather

13  than the savings program, I think you indicated that there

14  were three elements that were utilized to compute your

15  benefits.  Did I understand that correctly?

16  A    To establish the initial benefit, there were three

17  elements.

18  Q    Were there any other mathematical formulas or variables

19  that could affect your ultimate retirement benefits?

20  A    There were an opportunity to have your initial benefit

21  increased on an annual basis if there were --

22  Q    And what was that?

23  A    There would be -- some people refer to it as a cost of

24  living adjustment or an annual escalation, so every year on

25  July 1st, which is the beginning of the city's fiscal year,

1    whatever the multiplier was that applied to you when you

2    left, your pension benefit would be increased by that

3    percentage.

4    Q    Now, based on the work that you did for the city in the

5    labor employment -- labor and employment section, how did an

6    employee know what plan or multiplier would apply to them?

7    A    Ninety-some percentage of the city's employees were

8    covered by collective bargaining agreements.  The nonunion

9    employees were governed by the City Code.  So you either

10   looked to your collective bargaining agreement for your

11   benefits, wages, hours, and working conditions, or you looked

12   to the civil service or personnel provisions in the City Code

13   to determine what your benefits were.

14   Q    And did that basic structure change at all during the

15   time you worked for the city?

16   A    No.

17   Q    Since you have become chair of the Retiree Committee, has

18   your understanding of how that structure worked changed at

19   all?

20   A    No.

21   Q    When you left the employment of the city for the last

22   time, were you eligible to retire?

23   A    No.  I was not eligible to receive retirement benefits at

24   that time.

25   Q    And what is the distinction you're trying to make there?

1   A   I had achieved the necessary criteria to qualify for a

2   vested pension.  When I left the city, it was governed -- my

3   employment was governed by what was known as the 40 and 8

4   rule.

5   Q   40 and 8 rule?

6   A   40 and 8.  So if you were at least 40 years of age and

7   had worked 8 or more years for the city, then you were

8   entitled to a vested pension at some point in the future.

9   There was some litigation over what point in the future that

10   would be, but the rules when I left made me eligible to

11   receive benefits on the 30th anniversary of my hire, which

12   would have been January of this year, 30 years after I

13   started with the city in January of '84.

14   Q   And is that eligibility in any way connected to when you

15   actually applied for retirement?

16   A   That's why -- they ask you about 90 days before you're

17   eligible to receive benefits to go in and make your formal

18   application.

19   Q   And when you made your formal application, what did they

20   tell you about the benefits to which you were entitled as a

21   retiree?

22   A   They give you a worksheet that has some demographic

23   information, your date of birth, your date of hire, your

24   years of service, your final -- your average final

25   compensation, and then there's a couple of different

1  scenarios depending on whether you have a spouse or
2  significant other, whether you want to collect the same
3  benefit over your lifetime, whether you want an increased
4  benefit until age 62, so they lay out all these different
5  scenarios.  They discuss the pros and cons, I suppose, or
6  answer your questions with respect to each one, and then they
7  will also indicate in the worksheet whether or not you're
8  entitled to annuitize your annuity savings fund.  I withdrew
9  my money, so I did not receive any.  My piece of that
10 worksheet was zero.  And then they explained what medical
11 benefits that you would be eligible for as a retiree.
12 Q   Okay.  You just mentioned the savings program.  Could you
13 tell the Court what you understood the savings program to be
14 when you joined the city's employment?
15 A   As I mentioned earlier, it was a component of your total
16 retirement benefit.  There was the pension piece, the defined
17 benefit plan piece of the program, and then there was the
18 savings program that would look a little bit more like a
19 defined contribution plan, and so you -- when I came in, your
20 only option was to not participate or participate at a seven
21 percent of your salary level.  I chose -- I am a saver, so I
22 chose to participate at the seven-percent level, so my monies
23 were put aside in an account that I could watch grow over the
24 years.  It accumulated interest based on the city's
25 investment of those funds, which I could also see on an

1 annual basis as I got reports. And then at the end of your

2 employment, you had a couple of options. You could withdraw

3 some or all of the money or you could leave it in, as I

4 mentioned, and purchase an annuity, which would supplement

5 the defined benefit piece of your retirement benefit.

6 Q    And the choice that you made when you left the city's

7 employment was what, ma'am?

8 A    To withdraw the total sum of my savings fund.

9 Q    And how frequently did you get information about the

10 balances in your ASF account?

11 A    As I recall, it was once a year.

12 Q    Once a year. May I call the annuity savings program ASF?

13 A    We can have that understanding. yes.

14 Q    When you left -- strike that. What role, if any, did the

15 availability of healthcare benefits for you as a future

16 retiree have in your planning as an employee when you were

17 working for the city?

18 A    At the time I was working for the city and when I left

19 the city, I was married to a Detroit police officer, and we

20 felt very comfortable planning for our future retirement

21 because between the two of us we would have lifetime

22 healthcare benefits. My marriage did not last, so I had to

23 rely on my own retirement benefits for that. I also -- so it

24 was part of the planning process that you didn't have to have

25 a job until a certain age that gave you healthcare benefits

1  because we would have -- once we both were eligible for

2  retirement, we would have those healthcare benefits supplied

3  to us.

4  Q   Did you think that there was any -- strike that.  Just

5  one more background question.  I think you indicated that you

6  had worked with the police and fire retirement system.  Did

7  you have any collective bargaining responsibilities while

8  working for the city?

9  A   When I was a law clerk, I actively participated in the

10  main table discussions involving the city and the AFSCME

11  union, frankly, more for edification purposes than

12  substantive purposes because I was still a law student.

13  During the course of my career, I would testify periodically

14  before Act 312 panels, and Act 312 -- I don't know if that's

15  been brought up in these proceedings -- is the process by

16  which public safety unions can resolve their -- can settle

17  their collective bargaining agreement with a public employer

18  through an arbitration process known as interest arbitration,

19  so I would testify at those proceedings, frankly, on pension

20  issues and some of the pension litigation that I was involved

21  in because of the impact -- financial impact it could have on

22  the city.  As deputy corporation counsel, we had a bargaining

23  team that bargained with the unions representing City of

24  Detroit law department employees.  I was not at the table but

25  was part of the management team that would help formulate

1    strategy, if you will, for those negotiations.  And then once

2    the collective bargaining agreements were settled, I spent

3    most of my time enforcing the contracts or addressing through

4    arbitration disputes on other contracts.

5    Q    Always as a management side person?

6    A    Always on the management side.

7    Q    Now, in your capacity as an employee or as a management

8    side representative or as someone who was engaged in personal

9    planning, did you ever think there was any risk to your

10   pension benefits?

11   A    I did not.

12   Q    And why not?

13   A    With all due respect, Judge Rhodes, I felt that the

14   constitutional protection would see that those benefits would

15   be paid, frankly, even if the City of Detroit ceased to

16   exist.

17   Q    All right.  Could you turn your attention for a moment

18   back to the question of the annual escalator or COLA that you

19   testified about earlier?  Do you have a specific

20   understanding of how it worked on the PFRS side of the city?

21   A    I do.

22   Q    And could you tell the Court how that worked?

23   A    There were basically two plans under the P&F system when

24   I was employed by the City of Detroit.  We call it the old

25   plan and the new plan.  And I think the cutoff date was

1  sometime in 1969, if I recall.  There was also an old, old
2  plan, but there probably aren't too many people, if any,
3  covered under the old, old plan.  But under the old plan, the
4  pre-1969 hires, their annual escalator was based on what the
5  active employees of the same rank would be able to achieve
6  through collective bargaining, so, for example, if you were a
7  police officer and the DPOA resolved their contract with the
8  city and obtained a five-percent raise for police officers,
9  your escalation for those years of the contract would be five
10  percent.  Under the new plan, which were the post-1969 hires,
11  the annual escalation factor was fixed, and it may have
12  changed through collective bargaining, but it was always a
13  fixed number.
14  Q   Okay.  Do you happen to recall what that number was for?
15  A   I think it started out at two or two and a half percent.
16  I don't know what it is today, frankly.
17  Q   Turning your attention back to the more modern later
18  years of your career, as someone with concerns for the City
19  of Detroit, can you tell the Court what your understanding of
20  the role of the committee was in this case?
21  A   As I understood the charge given to us by the U.S.
22  Trustee, it was to represent the interests of retirees in the
23  bankruptcy proceeding and to speak on their behalf.
24  Q   Did that responsibility involve negotiations with the
25  city in any way?

1  A    Yes.

2  Q    And what kinds of things did you negotiate with as to the

3  city?

4  A    I'm sorry.  Could you repeat --

5  Q    What kinds of topics or issues did you attempt to address

6  through negotiation with the city?

7  A    There were mainly two topics, that of pension benefits

8  and that of what we call OPEB benefits or other post-

9  employment benefits.

10 Q    And did the committee negotiate directly?

11 A    Through counsel --

12 Q    Okay.

13 A    -- with the city.

14 Q    For the record, what's your counsel for the committee?

15 A    We have Dentons, and then local counsel is Mr. Matt

16 Wilkins' firm.

17 Q    Okay.  And do you have any other advisors?

18 A    We do.

19 Q    And what are those?

20 A    The Lazard firm is our financial advisor, and the Segal

21 firm is our actuarial advisors.

22 Q    In your role as chair, were you able to direct their

23 participation in negotiations with the city?

24 A    Well, the committee would direct their participation with

25 respect to their interactions with the city.

1    Q    Were you at all -- was you or the committee at all

2    involved in negotiations relating to the plan of adjustment?

3    A    Yes.

4    Q    And how or in what context did that occur?  Don't tell me

5    what was said, just how or in what context.

6    A    We actually had to push rather hard to have an active

7    participation of committee members in the settlement

8    negotiations and the mediation process.  We felt it was

9    important for our understanding of the issues that were being

10   discussed and for our ability to explain to our constituents

11   what the progress was being made and what the ultimate

12   outcome was that we be present during the negotiation

13   sessions whether as mere observers or as active participants,

14   and we were able to actively participate in the process as it

15   went on.

16   Q    Did you ever instruct your counsel to engage in

17   litigation with the city?

18   A    We did.

19   Q    On what topics?

20   A    We instructed counsel to commence litigation on the

21   city's qualifications to be eligible for bankruptcy.  We

22   instructed counsel to file suit to attempt to enjoin the city

23   when it announced the changes to OPEB benefits that were at

24   that time to take place at the end of the calendar year of

25   2013.  Once Judge Rhodes issued his decision on eligibility

1  in December, we instructed counsel to appeal that decision,

2  and then the original OPEB benefit suit was resolved through

3  a settlement subject to being raised again if things did not

4  progress.  They did not progress to our liking, and so we

5  instructed counsel to commence that litigation again in the

6  spring of 2014.

7  Q   So would you in any way characterize the committee's

8  relationship with the city as adversarial?

9  A   Absolutely.

10  Q   Okay.  Would you consider it -- was it at any time

11  hostile?

12  A   I don't think that's too strong a word to use for --

13  certainly many of the committee members felt that way.

14  Q   Focusing on the results of the plan of adjustment, are

15  there any particular classes in that plan of adjustment that

16  were relevant to the committee?

17  A   There were three classes in the plan of adjustment that

18  were relevant to the committee.

19  Q   And what were those?

20  A   Those would be Classes 10, which were police and fire

21  retirees, not the actives but the retirees in Class 10.

22  Class 11 would have been the general city retirees, and then

23  Class 12 related to the OPEB benefits.

24  Q   Okay.  Are there any other classes that had any relevance

25  under the plan of adjustment to the committee?

1  A    No.  Well, not the specific relevance with respect to --

2  I mean the whole plan was of interest to the committee, but

3  no other classes that had any specific relevance to the

4  committee.

5  Q    We'll come back to this in a moment.  What role, if any,

6  did the committee play in the drafting of the disclosure

7  statement?

8  A    I don't know if this committee had any role in the

9  drafting of the disclosure statement.

10  Q    Is there -- let me ask you.  Is there a section of the

11  disclosure statement that is of particular interest to the

12  retirees?

13  A    Yes.

14  Q    Okay.  Did the committee have any role in the review and

15  drafting of that particular section, and what was that role?

16  A    That was the section involving the global settlement of

17  the issues pertaining to the committee.

18  Q    Okay.  And did you receive a copy of the disclosure

19  statement from the city with ballots in it?

20  A    I actually received a couple copies of the disclosure

21  statement from the city with my ballots.

22  Q    And what ballots did you receive from the city?

23  A    I actually received three.  I received a Class 12 ballot

24  ultimately -- that took a little while to get to me -- on the

25  OPEB benefits, but initially I got two ballots, one as a

1  retiree and one as a former employee with vested pension

2  benefits.  I think my being eligible for retirement in

3  January of 2014 had the systems a little confused as to which

4  bucket I belonged in, so I got the two different colored

5  ballots that address those issues.

6  Q   And were each of those ballots accompanied by a

7  disclosure statement?

8  A   A CD that had the disclosure statement on it, yes.

9  Q   And did you actually read the disclosure statement?

10 A   I have glanced through all of it.  I have read in detail

11 some parts of it.

12       MR. MONTGOMERY:  I'm going to ask my person to put

13 the first page of City Exhibit 3 on the screen, please.

14 BY MR. MONTGOMERY:

15 Q   And what is this document?

16 A   This is the fourth amended disclosure statement with

17 respect to fourth amended plan for the adjustment of debts of

18 the City of Detroit.

19 Q   Is this the document that contained the special

20 supplement that you described for the Court regarding

21 retirees?

22 A   Based on the date that it was entered, it appears to be

23 the one that would have been included with the ballots.

24 Q   And that's the document that contains language that the

25 committee was involved in drafting and reviewing?

1  A    Yes.

2  Q    All right.  And did you, in fact, rely on that document

3  in casting your ballots --

4  A    Yes.

5  Q    -- Ms. Renshaw?

6          MR. MONTGOMERY:  Your Honor, I'd like to offer at

7  this time the City's disclosure statement into evidence as a

8  document that a creditor of the City of Detroit reviewed,

9  participated in the drafting of, and actually relied upon in

10  casting her ballots.

11          MR. HOWELL:  We object, your Honor.  I think this is

12  classic hearsay.

13          THE COURT:  Just go ahead and stay seated.  Go

14  ahead, sir.

15          MR. HOWELL:  Yeah.  Our objection is based on

16  hearsay.  This is an out-of-court statement that is --

17          THE COURT:  Well, let me interrupt you there and ask

18  are you offering this to prove the truth of every assertion

19  in there or just to show what she relied on and helped to

20  draft and consider?

21          MR. MONTGOMERY:  The latter, your Honor, and you

22  will see that we will point to areas that describe the issues

23  that were of particular relevance to the retirees.

24          MR. HOWELL:  Your Honor, we also object on the basis

25  similar to the motion we were just talking about, that the

1    state of mind of the Retiree Committee, even the chair of the
2    Retiree Committee, is not relevant, and I don't believe
3    there's any necessity to go into what the state of mind of
4    the Retiree Committee or its chair was.
5              THE COURT:  Well, I have expressed my concern about
6    that, but for the limited purposes for which the exhibit is
7    offered, the Court will admit it into evidence.  That's
8    Number 3.
9         (City Exhibit 3 received at 2:57 p.m.)
10             MR. MONTGOMERY:  Thank you, your Honor.
11             THE COURT:  Actually, let's stop now and take our
12   afternoon break.  I have business that I need to attend to,
13   so I'm going to -- I'm going to suggest we reconvene at 3:30,
14   please.
15             THE CLERK:  All rise.  Court is in recess.
16        (Recess at 2:57 p.m., until 3:46 p.m.)
17             THE CLERK:  All rise.  Court is in session.  Please
18   be seated.
19             MR. MONTGOMERY:  May we resume, your Honor?
20             THE COURT:  It looks like everyone is here.  You may
21   proceed.
22             MR. MONTGOMERY:  Thank you.
23   BY MR. MONTGOMERY:
24   Q   Ms. Renshaw, just as a housekeeping matter, could I ask
25   you to speak up and into the microphone so that both the

1   audio system and the Court can hear you clearly?

2   A    I will do my best.

3   Q    Thank you very much.  Now, Ms. Renshaw, a couple of

4   housekeeping matters.  I believe you indicated in your

5   earlier testimony that Exhibit 3, the disclosure statement,

6   accurately reflects your understanding of the POA as of May

7   5, 2014.  Is that essentially correct?

8   A    Yes.

9   Q    Okay.  Now, did the committee have any information about

10  matters relating to retirees or their treatment under the

11  plan that's not in the disclosure statement?

12  A    As of May 5th --

13  Q    Yes.

14  A    -- 2014?  No.

15  Q    Okay.  Did it have any information with respect to the

16  claim computations that was not in the disclosure statement?

17  A    Not at that time.

18  Q    Okay.  Did there come a time when the committee filed

19  proofs of claim in the case?

20  A    Yes, we did.

21  Q    Okay.  Could I ask -- and do you happen to know who

22  signed those proofs of claim for the committee?

23  A    Yes, I do.

24  Q    Who was that?

25  A    It was me.

1    Q    Okay.

2          MR. MONTGOMERY:  I'd like the Court -- excuse me.

3    I'd like my assistant to turn to Exhibit 1074 -- 10074.

4    Didn't realize this is -- and if you could expand the top

5    part of that document, please.

6    BY MR. MONTGOMERY:

7    Q    What is Committee Exhibit 10074, ma'am?

8    A    It is a claim form -- proof of claim form that was filed

9    in this matter regarding pension benefits.

10         MR. MONTGOMERY:  If you'll highlight the third box

11   down --

12         THE WITNESS:  Police and fire, so it would be -- it

13   would be Class 10.

14         MR. MONTGOMERY:  Class 10.  If you would highlight

15   for the Court the third box.

16   BY MR. MONTGOMERY:

17   Q    Could you read the third box?

18   A    Name of creditor, police and fire fighters retirement

19   system retirees and their beneficiaries by the Official

20   Committee of Retirees.

21   Q    Okay.

22         MR. MONTGOMERY:  And could you scroll down to the

23   signature that appears on the first page, sir -- rather, the

24   second page of this document?  I'm talking to the -- could

25   you highlight that?

1   BY MR. MONTGOMERY:

2   Q   Is that your signature, ma'am?

3   A   Yes, it is.

4   Q   And did you sign that on that date?

5   A   Yes, I did.

6   Q   Okay.

7           MR. MONTGOMERY:  Could you go back to -- could the

8   technician go back to the first page?  Could you go to Box

9   Number -- I believe it is 3, the amount of claim, case filed?

10  Right.  If you'd highlight that, please.

11  BY MR. MONTGOMERY:

12  Q   And what was the claim that the committee filed in the

13  case on behalf of police and fire retirees?

14  A   $5,207,847,016.

15  Q   Now, you said that --

16  A   Estimated.

17  Q   Okay.  And that relates only to Class 10; is that

18  correct?

19  A   Only retirees of Class 10.

20  Q   So it doesn't include actives at all?

21  A   That is correct.

22  Q   Is that number the same, larger, or smaller than the

23  allowed claim that appears for Class 10 under the plan?

24          MR. HOWELL:  Object to foundation.

25          MR. MONTGOMERY:  Okay.  I'll rephrase the question.

BY MR. MONTGOMERY:

Q   Does the plan provide for the settlement of a claim on behalf of Class 10?

A   Yes, it does.

Q   Okay.  Is that settlement stated in the plan and disclosure statement?

A   Yes, it is.

MR. MONTGOMERY:  Could I ask the technician to go to Exhibit 3 and go to page 25 of Exhibit 3?  25, 25.  I'm sorry, Mr. McLeod.  Okay.  And could you then turn --

BY MR. MONTGOMERY:

Q   What is the section that begins at Roman II -- rather, Arabic 2 of that document?

A   Special information regarding pension and OPEB claims.

Q   Was that the information that you were describing earlier to the Court that was unique to retirees?

A   Yes.

Q   Okay.

MR. MONTGOMERY:  Could you turn, Mr. McLeod, to the -- I believe it's the next page?

MR. MCLEOD:  Yes.

BY MR. MONTGOMERY:

Q   And would you look at the second paragraph, and would you --

A   The one that begins "the plan" --

1    Q    Yes.

2    A    -- or the second full paragraph?  The one that begins

3    "based on reports"?

4    Q    Yes.  The plan provides that.

5    A    Okay.  Do you want me to read it?

6    Q    No, ma'am.  First I'd like Mr. McLeod to highlight it,

7    the entire paragraph.  Now, do you see in that paragraph any

8    promises relating to a continuation of the pension plans by

9    the city?

10   A    Yes.

11   Q    Okay.  And what are those promises?

12   A    That the city will assume the obligations relating to the

13   already accrued benefits as those benefits are modified by

14   the plan.

15   Q    Okay.  And is -- was that part of the global settlement

16   that you described to the Court earlier?

17   A    Yes.

18   Q    Okay.

19        MR. MONTGOMERY:  Now, I would like Mr. McLeod to

20   turn -- to scroll down pages.  I think you have to go several

21   more pages.  I'm looking for -- keep going.  All right.  This

22   is the page I'm looking for.

23   BY MR. MONTGOMERY:

24   Q    This is, unfortunately, not the page I'm looking for, so

25   I'm going to just rephrase this whole line of inquiry for

1   you.  Do you happen to know what the -- whether the proof of

2   claim that the committee filed was allowed under the plan?

3   A   The proof of claim was allowed under the plan?

4   Q   Yes.  Do you happen to know the answer to that question?

5   A   No, I do not.

6   Q   Okay.  Who provided you the arithmetic information that

7   you included in the proof of claim?

8   A   The committee's actuarial experts.

9   Q   And who was that?

10   A   That was the Segal company.

11   Q   Okay.  And during the course of your work as committee

12   chair, did the estimate of the allowed claim for -- excuse

13   me -- the estimate of the liability for retirees change in

14   any way?

15   A   Yes, it did.

16   Q   And how did it change?

17   A   The numbers fluctuated based on information that we

18   received throughout the course of our interactions with the

19   city.

20   Q   Okay.  And was that true for -- strike that.  Did you

21   file any other proofs of claim in the case?

22   A   We filed three altogether.

23   Q   And what were the other two?

24   A   On behalf of retirees in Class 11 and on behalf of Class

25   12, the OPEB.

1    MR. MONTGOMERY:  Could Mr. McLeod put up 107 --

2  10073?

3  BY MR. MONTGOMERY:

4  Q   And what is that?

5  A   It is the proof of claim that was filed in this matter on

6  the OPEB or other post-employment benefits for retirees and

7  their beneficiaries by the Official Committee of Retirees.

8    MR. MONTGOMERY:  And could you turn to the signature

9  block on the second page, Mr. McLeod?

10  BY MR. MONTGOMERY:

11  Q   And is that your signature?

12  A   Yes, it is.

13  Q   And did you, in fact, file that proof of claim?

14  A   I did not file it.  I signed it, yeah.  I assume it was

15  field by counsel.

16  Q   Okay.  Could you go back to the first page?  Does it

17  reflect the existence of a file stamp by the clerk?

18  A   Yes, it does.

19  Q   Okay.

20    MR. MONTGOMERY:  At this time, I would like to move

21  the admission of both Committee Exhibit 10073 and 10074, your

22  Honor.

23    THE COURT:  Any objections?

24    MR. HOWELL:  No objection, your Honor.

25    MR. MONTGOMERY:  Okay.

1    THE COURT:  All right.  They are admitted.

2    (Retiree Committee Exhibits 10073 and 10074 received at

3    3:55 p.m.)

4    MR. MONTGOMERY:  Thank you.  Could you turn to

5  Exhibit 10075, Mr. McLeod?  No.  That's not 100, but let's

6  try, Mr. McLeod, 10072.

7  BY MR. MONTGOMERY:

8  Q   And what is this claim?

9  A   This is --

10  Q   Excuse me.  Did you file a claim in connection with GRS

11  benefits for retirees?

12  A   Yes.

13  Q   Okay.  And what is Exhibit 10072?

14  A   It is the claim -- proof of claim filed on behalf of the

15  Official Committee of Retirees for General Retirement System

16  retirees and their beneficiaries.

17    MR. MONTGOMERY:  Mr. McLeod, could you turn to the

18  signature block on the second page?

19  BY MR. MONTGOMERY:

20  Q   Is that your signature, Ms. Renshaw?

21  A   Yes, it is.

22  Q   Okay.  And could we go back to the first page?  And did

23  you, in fact, file this proof of claim or have filed this

24  proof of claim?

25  A   Instructed -- the committee instructed the claim be

1    filed, yes.

2    Q    Okay.

3            MR. MONTGOMERY:  I would like to admit at this time,

4    your Honor, Exhibit -- Committee Exhibit 10072.

5            MR. HOWELL:  Your Honor, our only objection is

6    giving us this four-inch binder and making us start at the

7    back and have to flip all the way through, but otherwise no

8    objection.

9            THE COURT:  Yes.  I'm very tempted to sustain that

10   objection, but it's not in the federal rules, so the

11   objection is overruled, and the document is admitted.

12        (Retiree Committee Exhibit 10072 received at 3:57 p.m.)

13   BY MR. MONTGOMERY:

14   Q    Okay.  Now, at this point in time, I would like you to

15   look at Exhibit 3, and I would like to turn to page 164 of

16   Exhibit 3.  And I would like to highlight Number 3 in the

17   paragraph right -- there we go.  Okay.  Ms. Renshaw, did the

18   global settlement involve anything having to do with OPEB

19   benefits other than simple allowance or disallowance of a

20   claim?

21   A    Yes.

22   Q    Okay.  And could you tell the Court what that was?

23   A    The global settlement that was reached regarding the OPEB

24   benefits provided for the funding of those benefits through a

25   note that was to be issued by the city and also a couple

1    additional sources of funding -- potential additional sources

2    of funding perhaps from the COPs litigation, and then there

3    were some other organizations or associations or foundations

4    that were willing to donate money on behalf of the OPEB

5    benefits.  They were to be -- those monies were to be

6    submitted to a VEBA -- actually two VEBA trusts, one for P&F

7    and one for General Retirement, and then those trusts would

8    be run by a board of trustees that would invest them and

9    utilize the money to provide some sort of benefit -- OPEB

10   benefits to the retirees.

11   Q    Now, the city -- did the city -- I think -- strike that.

12   You testified earlier that you engaged in litigation with the

13   city over its unilateral modification of OPEB benefits.  Did

14   the Court understand that correctly?

15   A    I don't know if the Court understood it.

16   Q    Did I understand that correctly?

17   A    Yes.  That was my testimony.  I wouldn't suppose to

18   testify what the Court knew or didn't know.

19   Q    Okay.  And, ma'am, is there any guarantee that the

20   program that's part of the plan of adjustment will continue

21   those benefits as described on page 164 of the disclosure

22   statement?

23   A    No, there is no guarantee.

24   Q    Okay.  What were the committee's goals as it was trying

25   to negotiate the plan of adjustment?

1    MR. HOWELL:  Object on relevance grounds, your

2  Honor.

3    MR. MONTGOMERY:  Your Honor, as part of the 9019

4  settlement, in particular, whether or not the parties were

5  engaged in adversarial conflicted position taking and

6  litigation, we believe that's relevant both to the city's

7  good faith or lack thereof with respect to the settlement and

8  as to its reasonableness, and we offer it for that purpose.

9    THE COURT:  I think it is arguable.  I'll permit it.

10  Go ahead.

11    THE WITNESS:  The committee had two basic goals

12  going into its work.  The first was to preserve as is our

13  pension benefits, and the second was to preserve as much as

14  possible the post-employment benefits that retirees had

15  anticipated enjoying throughout their lifetime.

16  BY MR. MONTGOMERY:

17  Q   Okay.  And protecting pension benefits?  Is that what you

18  just indicated?  Protecting healthcare benefits?  Did I

19  understand that correctly?

20  A   Yes.

21  Q   Were there any other goals that the committee had as it

22  approached the plan of adjustment?

23  A   It was important and arguably even necessary for the City

24  of Detroit to continue on as a viable entity in order to --

25  for the committee to achieve its -- the goals of preserving

1  those pension benefits.

2          THE COURT:  All right.  Once again, ma'am, please

3  pull the microphone closer or project yourself like a really

4  good lawyer --

5          THE WITNESS:  Okay.

6          THE COURT:  -- or both, but we need to be able to

7  hear what you say.

8          THE WITNESS:  Okay.  I'm sorry.  I will try.

9  BY MR. MONTGOMERY:

10 Q   Do you have strong feelings about how the city has

11 handled its pension and OPEB obligations in the case?

12 A   I personally, yes, have very strong feelings about how

13 the city has handled pension benefits and OPEB benefits.

14 Q   Do the members of the committee have strong feelings?

15 A   Yes.

16 Q   Do you think the retiree community as a whole has strong

17 feelings?

18 A   Absolutely.

19 Q   Okay.  Now, you've indicated that protecting pension

20 benefits was an important goal of the committee.

21 A   Yes.

22 Q   You said protecting healthcare benefits was an important

23 goal of the city.

24 A   Yes, of the committee.

25 Q   How is the viability of the city at all relevant to

1  achieving either of those goals?

2  A   The city --

3          MR. HOWELL:  Object.  Foundation.

4          MR. MONTGOMERY:  I believe the witness has said that

5  it was a material aspect of her goal-making.

6          THE COURT:  The objection is overruled.  Go ahead,

7  please.

8          THE WITNESS:  The plan itself provides for the city

9  to be responsible for paying into the pension system in the

10 future, so if the city is not in existence or its financial

11 circumstance are poor to horrible, they would not be able to

12 arguably be able to put in sufficient funds for the pension

13 benefits even at the level provided by the plan to continue

14 into the future.

15 BY MR. MONTGOMERY:

16 Q   So in order to achieve your first goal regarding pension

17 benefits, you needed to achieve your third goal regarding

18 viability of the city?

19         MR. HOWELL:  Objection.  Leading.

20         THE WITNESS:  Yes.

21         THE COURT:  The objection is sustained.

22 BY MR. MONTGOMERY:

23 Q   Is there any connection, Ms. Renshaw, between achieving

24 your first goal and achieving the third goal regarding the

25 viability of the city?

1    A    I think they're inevitably tied up together.

2    Q    And please tell the Court why.

3    A    The city has to -- the city has to exist.  Frankly, if

4    the city improves its financial condition, if it becomes a

5    location that people want to move to, to work in, to raise

6    their children in, raise their families in, that will benefit

7    the retirees who live in this community, who live in this

8    area.  It will benefit, based on the provisions of the plan,

9    the ultimate restoration provisions in the plan to provide --

10   to perhaps allow some of the benefits that are being cut to

11   be restored in the future.  There's an ongoing tension

12   between our ultimate goal of preserving a hundred percent of

13   our pension benefits and ensuring that the city has the

14   financial wherewithal to continue as an entity, but it's to

15   the benefit of all the retirees and to the communities they

16   live in that the city be a viable entity so we can continue

17   to enjoy the benefits even at the lower level that we are

18   entitled to.

19   Q    Now, were you successful in preventing changes to pension

20   benefits?

21   A    We were not.

22   Q    All right.  Were you successful in preventing changes to

23   OPEB benefits?

24   A    We were not.

25   Q    Did you achieve all the committee's goals as part of this

1  plan of adjustment?

2  A    We did not.

3  Q    Did the committee recommend supporting the plan

4  notwithstanding that?

5  A    Yes, we did.

6  Q    Did the committee tell retirees to vote notwithstanding

7  that?

8  A    Yes, we did.

9  Q    Why does the committee support the plan if its two most

10  important goals weren't achieved?

11        MR. HOWELL:  Object.  Relevance grounds again, your

12  Honor.  I just don't think the state of mind of the Retiree

13  Committee is relevant for this matter.

14        THE COURT:  Well, I have to conclude it's arguable,

15  so I'll permit it.  What's your answer, please?

16        THE WITNESS:  As part of the global settlement and

17  in order to allow the city to move forward and not to be

18  subjected to -- as I mentioned earlier, I've been involved in

19  litigation that's gone on literally for decades.  It would

20  not be a stretch of the imagination for litigation in this

21  matter to go on for decades to not have this matter resolved,

22  to not have some finality to it, so in order to achieve some

23  certainty, we reached a global settlement with the city.

24  Part of that settlement resulted in a cut to pension benefits

25  for General Retirement System members and their

beneficiaries.  It also provided for several other aspects,

including reductions or eliminations of the annual escalator,

and the provisions for restoration that I mentioned earlier

were included.  There was an agreement if there were -- on

funding sources from the state and the foundations.  There

were agreements to release certain causes of action against

the State of Michigan.  So all of these taken together, the

committee felt it was better than the alternative of the plan

not being supported, not being confirmed, the cuts being

deeper, and the litigation going on with uncertain potential

results.  And, again, as a litigator of some 30 years, I know

there are no guarantees in litigation regardless of how

strong a party feels their legal claims are, so in order to

get finality and certainty, we reached the global settlement

and argued and supported the plan -- argued for and supported

the plan.

BY MR. MONTGOMERY:

Q   Okay.  Is it only the committee that talks about it as a

global settlement?

A   I don't know.  I am sure there's other parties that refer

to it as a global settlement.  I'd like to think the city

refers to it as a global settlement.

Q   Okay.  Could I --

        MR. MONTGOMERY:  Mr. McLeod, could you put up

Exhibit 3, page 167, subparagraph D?  167, page 167-D.

1  BY MR. MONTGOMERY:

2  Q   And could you look to the third paragraph?  Could you

3  read the first sentence, please?

4  A   "On or about April 25th, 2014, the City and the Retiree

5  Committee agreed to settle their differences on the OPEB

6  claim issues, paren, the OPEB settlement, close paren, and

7  all other issues affecting pensions in this chapter 9 case,

8  paren, collectively with the OPEB settlement, the quote,

9  Global Settlement, end quote, close paren."

10 Q   And did you understand this to be part of a global

11 settlement in -- on or about May 5, 2014?

12 A   Yes.

13 Q   Okay.  Could you read the second sentence, please?

14 A   "The OPEB settlement results in an allowed Class 12 claim

15 of $4.303 billion, which comprises the parties' respective

16 positions set forth above."

17 Q   Okay.  Now, if you turn -- is that the same number that

18 was in the proof of claim that the committee filed?

19 A   No.  It's approximately $300 million more.

20 Q   Can you explain how that could possibly be?

21 A   There was a time gap of a couple of months between the

22 filing of the claim and the settlement that was reached as

23 part of the global settlement.  The committee obtained

24 additional information through its discovery and the

25 litigation that it filed that resulted in the higher number

1   being part of the settlement.

2   Q   Okay.  And when I -- when you were referring to the proof

3   of claim, you were specifically referring to 1074 -- 10074?

4   A   The previous exhibit that we -- that I testified about,

5   yes.

6   Q   Thank you.  Could you turn to --

7           THE COURT:  Mr. McLeod, could you put up Exhibit 3,

8   page 169?

9   BY MR. MONTGOMERY:

10  Q   Could you read that, please?

11  A   "The plan incorporates the global settlement and

12  contemplates that confirmation of the plan will constitute

13  approval of the global settlement pursuant to Bankruptcy Rule

14  9019."

15  Q   Ms. Renshaw, again, is that consistent with your

16  understanding that the plan of adjustment reflected by the

17  disclosure statement, in fact, incorporates the global

18  settlement?

19  A   Yes.

20  Q   Okay.  Ms. Renshaw, I believe I may have misled you

21  through an over-quick reading of an exhibit number.

22          MR. MONTGOMERY:  Mr. McLeod, could you put up

23  Exhibit 10073, please?

24  BY MR. MONTGOMERY:

25  Q   Now, that's the OPEB proof of claim that the committee

1  filed, not 10074; is that correct?

2  A    That's correct.

3  Q    And I apologize for that, Ms. Renshaw.  Could you turn --

4          THE COURT:  Mr. McLeod, could you put up Exhibit 3,

5  page 53?  And could you go to the second column, and there's

6  an estimated aggregate allowed claim under Class 11.  Could

7  you highlight that on the left-hand column?

8  BY MR. MONTGOMERY:

9  Q    At the very bottom, could you read for the Court that

10 number?

11 A    $1,879,000,000.

12 Q    Now, is that the same amount that the committee filed for

13 its proof of claim for GRS?

14 A    No, it is not.

15 Q    It's substantially lower, isn't it?

16 A    It is much lower.

17         MR. MONTGOMERY:  Mr. McLeod, could you put up

18 Exhibit 3, page 51?  The second column -- first column on the

19 left-hand side, could you highlight the number?

20 BY MR. MONTGOMERY:

21 Q    Could you read for the Court the allowed claims under the

22 plan for PFRS?

23 A    $1,250,000,000.

24 Q    Is that the same, higher or lower than the proof of claim

25 number that the committee filed on behalf of police and fire

1  beneficiaries and retirees?

2  A   It's considerably less.

3  Q   Is there an opportunity for restoration under the plan of

4  adjustment?

5  A   Yes.

6       MR. MONTGOMERY:  Mr. McLeod, could you turn again to

7  page 168 of Exhibit 3?  And could you look at paragraph --

8  the -- one, two, three four -- fifth and sixth bullets down;

9  right?  Right.

10  BY MR. MONTGOMERY:

11  Q   Could you read the first highlighted bullet from page

12  168, please?

13  A   "The plan will establish the restoration trust to hold

14  the Class 10 and 11 interest in the contingent payment rights

15  and to take an assignment of the GRS and PFRS beneficiaries'

16  rights with respect to any GRS restoration payment or PFRS

17  restoration payment."

18  Q   Okay.  And was that consistent with the global settlement

19  as you understood it in May of 2014?

20  A   As I understand it, yes.

21  Q   Could you read the next bullet, please?

22  A   "The Retiree Committee will defer to the Retirement

23  Systems and the state with respect to negotiating the post-

24  effective date governance of the prior GRS pension plan and

25  the prior PFRS pension plan and reserves the right to review

1    the results of such negotiation."

2    Q    First, did the committee ever raise the issue of post-

3    effective date governance of the pension plans?

4    A    As part of our discussions?

5    Q    Yes.

6    A    Yes.

7    Q    Okay.  And did we, in fact, defer -- excuse me.  Did you,

8    in fact, defer to the Retirement Systems in that regard?

9    A    Yes.

10            MR. HOWELL:  Objection.  It seems to me like we may

11   be treading into areas that are within the mediation

12   privilege here, and I'm just -- want to make sure -- excuse

13   me -- the mediation order.  Thank you.

14   BY MR. MONTGOMERY:

15   Q    Ms. Renshaw, are you able to answer that question based

16   on internal discussions of the committee and not the

17   mediation process?

18   A    The document says we'll defer, so we'll defer.

19   Q    And so that's the result of the global settlement?

20   A    Yes.

21   Q    And did you -- did the committee, in fact, defer?

22   A    Yes.

23   Q    Okay.  Did the state have any role -- strike that.  Does

24   the plan of adjustment and the global settlement agreement

25   provide for the state to have a role in the treatment of the

1 retirees under the plan of adjustment?

2 A    They have a funding role.  They've pledged present value

3 of $200 million toward pension benefits to reduce the cuts

4 that were otherwise being contemplated.

5 Q    And as a result of the plan of adjustment, if it is

6 confirmed, do retirees have to give the state anything?

7 A    Yes.

8 Q    What is that?

9 A    We released any claims we would have against the state

10 relating to the constitutional protection of those benefits,

11 among other claims.

12 Q    From the committee's perspective, independent of anything

13 that may have been said in the mediation process, was that a

14 meaningful point for the committee?

15 A    Absolutely.

16 Q    Why is that?

17         MR. HOWELL:  Objection.  Once again, this is a

18 relevance objection.  This goes to the state of mind of the

19 committee.

20         MR. MONTGOMERY:  Your Honor, I believe I've made my

21 proffer before on this.

22         THE COURT:  I will permit it.  Go ahead.

23         THE WITNESS:  The Article -- when I speak of the

24 constitutional protection, I'm speaking specifically of

25 Article IX, Section 24, of the Michigan Constitution, and

1   there were very strong feelings that that provision, again,

2   with all due respect to Judge Rhodes' decision --

3           THE COURT:  Yeah, and we all know what that means.

4   BY MR. MONTGOMERY:

5   Q   I believe, Ms. Renshaw, it means exactly what you said.

6   A   Yes.  That it would protect the benefits that we

7   anticipated to enjoy throughout our lifetime, so, yes, there

8   were very strong feelings that we should push ahead, that we

9   should litigate that issue.  I had been told on several

10  occasions -- you know, "fight to the death" was a term that

11  was often used with respect to that issue, so, yes, it was a

12  very big deal to give up the rights to that claim.

13  Q   What, if any, promises did the city make as part of the

14  plan of adjustment with respect to maintaining or not

15  maintaining the pension plans?

16  A   As I understand and read the document, the city has an

17  obligation to fund the plans at an appropriate level after

18  the year 2023.

19  Q   And how long does that obligation continue?

20  A   Into the future during the lives of all the retirees and

21  their beneficiaries.

22  Q   Okay.  Under the plan of adjustment, what is the funding

23  vehicle for the VEBAs?

24  A   The funding vehicle -- there are three sources of funding

25  for the VEBAs, the proceeds of a note that the city will

1  issue, the potential -- another potential source is proceeds
2  from the COPs litigation, and then there are some foundations
3  and associations and I think some labor -- maybe some labor
4  organizations that have offered to fund.  There's also some
5  funding coming from the -- I forget the name of the fund --
6  Benefit Stabilization Fund that the General Retirement System
7  is offering in the way of what we're calling runway funding
8  to assist the trust in providing benefits while the notes
9  are, I guess, maturing is the best word I can come up with.
10  Q    In your answer, you mentioned the COPs litigation.
11  A    Um-hmm.
12  Q    Could you expand on that, please?
13  A    There's ongoing litigation involving the certificates of
14  participation and that, if successful, there would -- it
15  would create a potential another source of money for the
16  VEBAs.
17  Q    And that's described in the disclosure statement?
18  A    Yes.
19        MR. MONTGOMERY:  Mr. McLeod, could you put up
20  Exhibit 3 again?  Go to page 168 and the fourth bullet
21  please.
22  BY MR. MONTGOMERY:
23  Q    Could you read that for the Court, please?
24  A    "If it is not settled or otherwise resolved by a final
25  order prior to the Effective Date, the City will continue to

1  fund the COP Litigation after the Effective Date.  All costs,

2  fees and expenses related to the COP Litigation from and

3  after the Effective Date will be deducted from the

4  distributions from the Disputed COPs Claim Reserve set forth

5  in Section Roman Numeral II.B.3.p.ii.B.2 of the Plan that are

6  not made to Holders of Disputed COPs Claims.  Thereafter,

7  distributions from the Disputed COPs Claims Reserve set forth

8  in Section II.B.3.p.iii.B.2 of the Plan that are not made to

9  Holders of Disputed COP Claims shall be made to the following

10 Entities in the following percentages:  (A) 65 percent

11 collectively to the VEBAs established for Holders of Allowed

12 Class 12 claims, and (B) 35 percent to the City, paren, which

13 may, in turn, distribute its share of New B Notes to Holders

14 of the Allowed Claims in Classes 7, 13 or 14, close paren."

15 Q   Do you regard that 65-percent collectively to VEBAs

16 established for holders of allowed Class 12 claims to be a

17 material part of the settlement?

18 A   Yes.

19 Q   Okay.  Now, Ms. Renshaw, I believe in response to a

20 question before the break you said there were no other

21 classes or interests involved in the global settlement.  Do

22 you want to correct your testimony in that regard?

23 A   The classes enumerated in this provision are of interest

24 to us because if -- as it says here, the city may distribute

25 its share of the Note B to holders of those claims.

1  Q   Thank you.  Have you ever heard the term "Weiler

2  settlement"?

3  A   I have.

4  Q   And how have you come to know that term?

5  A   Mostly from Mr. Taylor, who's a member of the committee,

6  who seems to be extremely familiar with it.

7  Q   Okay.  And can you tell the Court what is the Weiler

8  settlement?

9  A   As I understand it, it was a class action lawsuit that

10  was filed on behalf of police and fire retirees that retired,

11  I believe, before 2007 regarding the promise of lifetime

12  healthcare benefits.

13  Q   And do you happen to know the resolution of that

14  litigation?

15  A   I understand it was resolved through a settlement, which

16  was reduced to a consent judgment.

17        MR. MONTGOMERY:  Mr. McLeod, could you put up

18  Committee Exhibit 10058?

19  BY MR. MONTGOMERY:

20  Q   And could you identify for the Court that document,

21  please?

22  A   It is the consent judgment and order of dismissal in the

23  case of Alan F. Weiler and others versus the City of Detroit

24  filed in the Wayne County Circuit Court entered on August 26,

25  2009, by the Honorable Isidore Torres.

1  Q   And does this document bear the bar code from the Circuit

2  Court's clerk's office?

3  A   Yes, it does.

4  Q   And does it have the stamp from the issuing Circuit Court

5  judge?

6  A   Yes, it does.

7            MR. MONTGOMERY:  Your Honor, we would -- the

8  committee would offer into evidence Exhibit 10058.

9            MR. HOWELL:  We object on the basis of hearsay.  We

10  also object to any further questions with this witness on

11  this document on the basis that it sounds like her entire

12  foundation for being able to speak to this document is based

13  on hearsay conversations with Mr. Taylor.

14            MR. MONTGOMERY:  Your Honor, this is a public record

15  under 803.  It is maintained by the Court.  It is publicly

16  available and can be relied upon by anybody for any purpose.

17            THE COURT:  You do not object on the grounds of

18  authenticity?

19            MR. HOWELL:  No, your Honor.

20            THE COURT:  All right.  The Court will overrule the

21  admission of the document into evidence, but having said

22  that, the objection to the witness' ability to testify about

23  this lawsuit is sustained.  It sounds like it's all based on

24  hearsay from Mr. Taylor.

25            (Retiree Committee Exhibit 10058 received at 4:23 p.m.)

1       MR. MONTGOMERY:  Your Honor, I'm actually going to

2    ask the witness to read portions of this document for the

3    Court.

4            THE COURT:  If that's it, that's fine.

5            MR. MONTGOMERY:  Thank you.

6            THE WITNESS:  Mr. Montgomery --

7    BY MR. MONTGOMERY:

8    Q    Yes, ma'am.

9    A    Can I ask you if there's a stamp on the document that

10   refers to it as a true copy?

11           MR. MONTGOMERY:  Mr. McLeod, could you go to page 2

12   of Exhibit 10058?

13           THE WITNESS:  Okay.  That tells me that the record

14   was signed by the judge and it was entered into the record.

15           MR. MONTGOMERY:  Thank you.  Now, Mr. McLeod, could

16   you turn to page 13 of this exhibit?  Yes.

17   BY MR. MONTGOMERY:

18   Q    Could you read that paragraph A, please?

19   A    "As modified by and subject to this agreement, the city

20   shall provide to class members the healthcare benefits and

21   coverage and plan options set forth in the city's 2007

22   options booklet, including but not limited to the medical,

23   prescription drugs, dental, and vision benefits and coverage

24   and plan options, paren, hereinafter collectively referred to

25   as, quote, healthcare coverage, end quote, close paren,

1  contained in the 2007 options booklet.  Except as discussed

2  below in paragraph C-3 and E of this section, the city shall

3  provide healthcare coverage pursuant to this agreement to

4  each class member for so long as the class member is

5  receiving a city pension."

6  Q   And based on your understanding of the PFRS pension plan,

7  when does somebody stop receiving a pension?

8  A   Upon their death.

9  Q   One moment.

10         MR. MONTGOMERY:  Mr. McLeod, could you turn to page

11  8 of the settlement agreement, which is that same page, and

12  could you go up to Roman II, and could you highlight

13  paragraphs A, B, and C?

14  BY MR. MONTGOMERY:

15  Q   And, Ms. Renshaw, could you tell the Court who is covered

16  by the Weiler settlement based on the Weiler judgment?

17  A   "Class members shall consist of retired city police

18  officers and their spouses and city fire fighters who retired

19  at a rank having parity with that of police officers and

20  their spouses who were receiving health benefits from the

21  city as a result of their status as retirees and spouses of

22  retirees as of April 9, 2007, retired city police

23  lieutenants, sergeants, and investigators and their spouses

24  and city fire fighters who retired at ranks having parity

25  with those of lieutenants, sergeants, and investigators and

1    their spouses who were receiving health benefits from the
2    city as a result of their status as retirees and spouses of
3    retirees as of August 1, 2008, and retired city police
4    command officers and their spouses and city fire fighters who
5    retired at ranks having parity with police command officers
6    and their spouses who were receiving health benefits from the
7    city as a result of their status as retirees and spouses of
8    retirees as of August 1, 2008."
9    Q   Now, Ms. Renshaw, were the members of that class covered
10   by the proof of claim filed by the committee, which was
11   Exhibit 10073?
12   A   Yes.
13   Q   And are the members of that class, to your understanding,
14   included in Class 12 of the plan of adjustment?
15   A   Yes.
16   Q   Now, Ms. Renshaw, I asked you earlier what the
17   committee's relationship with the city was at the beginning
18   of the case.  What's the relationship of the committee with
19   the city today?
20   A   It's better, which is a relative term.  It's still
21   adversarial, but I would describe it basically as a trust but
22   verify relationship.  So we listen to what they say
23   respectfully, and then we ask our experts and our counselors
24   to check it out and make sure it's true, and then we accept
25   that as fact.

1     MR. MONTGOMERY:  No further questions, your Honor.

2          THE COURT:  Any cross of the witness?

3          MR. HOWELL:  Yes, your Honor.  Your Honor, Rush

4  Howell from Kirkland & Ellis on behalf of Syncora.  May I

5  approach?

6          THE COURT:  Exhibits?

7          MR. HOWELL:  Only copies of the deposition

8  transcript.  May I approach the witness as well?

9          THE COURT:  Yes.

10         MR. HOWELL:  Mr. Hertzberg will be happy to know

11 that there are no exhibits (inaudible).

12         MR. HERTZBERG:  Thank you, so much.

13                    CROSS-EXAMINATION

14 BY MR. HOWELL:

15 Q   Good afternoon, Ms. Renshaw.  It's nice to see you again.

16 A   Good afternoon.

17 Q   You may recall my name is Rush Howell, and we met at your

18 deposition in Birmingham just a few weeks ago.  I've got a

19 couple of questions for you today as well that may go over a

20 few of the things that we covered at the deposition.  Okay?

21 A   Okay.

22 Q   I've provided you with that very small binder, and in

23 that binder is a copy of your deposition transcript just in

24 case we need to refer to it.  Okay?

25 A   Okay.

1  Q   Now, Ms. Renshaw, you were appointed to the Official

2  Committee of Retirees on August 22nd, 2013; correct?

3  A   Yes.

4  Q   You are the chair of the Official Committee of Retirees;

5  correct?

6  A   Yes.

7  Q   As head of that committee, you're responsible for holding

8  and running meetings; correct?

9  A   Yes.

10 Q   And although you are an attorney, you were not retained

11 as an attorney in this matter; correct?

12 A   That is correct.

13 Q   And you do not consider yourself a benefits attorney;

14 right?

15 A   I do not.

16 Q   Nor do you consider yourself an ERISA attorney; correct?

17 A   I do not.

18 Q   And you have not then provided any legal advice to the

19 Official Committee of Retirees in this case; correct?

20 A   That's correct.

21 Q   Ms. Renshaw, you don't have any training in actuarial

22 science; right?

23 A   I do not.

24 Q   And you're not an actuary; correct?

25 A   That is correct.

1  Q   Now, the Official Committee of Retirees did, I think, you

2  said on direct, hire an actuarial consulting firm to assist

3  as part of these proceedings; correct?

4  A   Yes.

5  Q   That firm was Segal Consulting; right?

6  A   Yes.

7  Q   And you didn't have a problem, as the chair of the

8  Official Committee of Retirees, with using an actuarial

9  consulting firm; right?

10 A   No.

11 Q   Now, your work in this matter is done, you said on

12 direct, on behalf of the Official Committee of Retirees;

13 right?

14 A   Yes.

15 Q   Your work in this matter is not, therefore, done on

16 behalf of the active employees of Detroit; correct?

17 A   Yes.

18 Q   And you haven't provided any recommendations to the

19 active members of Class 10 or 11; correct?

20 A   The committee has not.

21 Q   You have not undertaken any analysis yourself on the

22 impact of the plan of adjustment on the active members of the

23 GRS and PFRS; correct?

24 A   The committee has not.

25 Q   And you yourself haven't?

1  A    I myself have not.  That's correct.

2  Q    Nor are you aware of the committee doing any such

3  analysis; correct?

4  A    That's correct.

5  Q    Now, the Official Committee represents around 23,000

6  retirees; correct?

7  A    That's my understanding.

8  Q    And you don't know exactly how many of those 23,000

9  retirees live in Detroit; right?

10  A    Not exactly, no.

11  Q    But you do know that less than half of the 23,000

12  retirees that are represented by the Official Committee live

13  in Detroit; correct?

14  A    Yes.

15  Q    Ms. Renshaw, you understand that the Official Committee

16  of Retirees has submitted three expert reports in connection

17  with this case; correct?

18  A    Yes.

19  Q    And are you aware that those three expert reports were

20  submitted by Ms. Nichol, Mr. Atkinson, and Mr. Wohl?

21  A    Yes.

22  Q    But you've never reviewed the expert report of Ms.

23  Nichol; correct?

24  A    I have not.

25  Q    Nor have you reviewed the expert report of Mr. Atkinson;

1  right?

2  A   That's correct.

3  Q   And you also haven't reviewed the expert report of Mr.

4  Wohl; correct?

5  A   That's correct.

6  Q   So I take it that these expert reports submitted by the

7  Official Committee have no impact on your personal view that

8  the retirees should support the plan of adjustment; correct?

9  A   The reports were issued long after the vote closed, so it

10  did not have any impact on the committee's recommendation

11  that the plan be supported.

12  Q   And I take it that you have never discussed any of these

13  expert reports with any of the retirees that are represented

14  by the Official Committee; correct?

15  A   That's correct.

16  Q   And you were not aware until your deposition that Ms.

17  Nichol's opines in her report that the actual claim

18  recoveries for Classes 10 and 11 are lower than what's

19  included in the disclosure statement; correct?

20  A   I remember that discussion from the deposition, yes.

21  Q   And that was the first time you had heard that; correct?

22  A   I believe so.

23  Q   In your position as chair of the Official Committee of

24  Retirees, you attended a couple of town hall sessions the

25  committee held at Cobo Hall regarding the plan of adjustment;

1 correct?

2 A   Yes.

3 Q   Those town hall meetings were the only interaction you've

4 had personally with retirees in your official capacity as the

5 chair of the Retiree Committee; correct?

6 A   As it relates to myself, that is correct.

7 Q   I'd like to talk just a little bit about these town hall

8 meetings.  They were also called information sessions

9 sometimes; right?

10 A   I believe so.

11 Q   To the best of your recollection, the town hall sessions

12 took place in June or July of this year; is that right?

13 A   Yes, I believe so.

14        THE COURT:  Can you remind me of the relevance of

15 what happened at these town hall meetings?

16        MR. HOWELL:  Yes.  At the town hall meetings the

17 relevance is this is where the Official Committee presented

18 the ballots and provided their recommendation to the Class 10

19 and 11 and 12 retirees regarding the vote.  That's the

20 relevance of the town hall meetings.

21        THE COURT:  Okay.  But how is that or any of that

22 relevant to any of the confirmation standards in the

23 Bankruptcy Code or any of your objections?

24        MR. HOWELL:  Well, first of all, in general, I would

25 agree that the committee's position regarding why to accept

1  or not to accept the plan of recommendation is not a relevant

2  issue before the Court; however, because the door has been

3  opened and we've had to hear testimony as to why the Official

4  Committee recommended the vote that it did, I want to also be

5  able to explore what they said to their retirees and make

6  sure that it's consistent with the arguments they're putting

7  forward in this case.

8          THE COURT:  So you're going to ask the witness what

9  they said to retirees about why they were recommending votes

10 in favor of the plan?

11         MR. HOWELL:  Yes, your Honor.

12         THE COURT:  Okay.

13 BY MR. HOWELL:

14 Q   The general topic of the town hall sessions was to

15 discuss the plan of adjustment and the treatment of the

16 retirees under the plan; correct?

17 A   And the content of the ballots, yes.

18 Q   And the purpose of the town hall meetings was to give

19 retirees access to information that would hopefully help them

20 make their decision on the vote; correct?

21 A   Yes.

22 Q   And just to be clear, the Retiree Committee's position

23 was that the Retiree Committee wanted the retirees to vote in

24 favor of the plan; correct?

25 A   Yes.

1  Q  And that was, in fact, the Retiree Committee's

2  recommendation during the town hall meetings was that the

3  retirees vote for the plan; correct?

4  A  Yes.

5  Q  And there were two sessions per day over two days of

6  these town hall meetings?

7  A  Yes.  I only attended the first two sessions.

8  Q  So you personally attended just one day and both sessions

9  on that day?

10  A  That's correct.

11  Q  And at the town hall sessions you did attend, there were

12  several hundred individuals there; correct?

13  A  Based on my best guess, yes.

14  Q  And counsel to the Retiree Committee put together an

15  agenda for those town hall meetings?

16  A  Yes.

17      MR. MONTGOMERY:  Objection to the extent it calls

18  for privileged information, your Honor.

19      MR. HOWELL:  I'm not asking for the contents of the

20  agenda.  I'm asking whether or not counsel put together an

21  agenda that was presented to all of the retirees which

22  counsel does not represent.

23      MR. MONTGOMERY:  The question of who --

24      THE COURT:  The objection is sustained.  You can ask

25  whether an agenda was passed out to the retirees if you like.

BY MR. HOWELL:

Q   The bulk of each session that you attended was a
presentation to the retirees; correct?

A   Yes.

Q   And that presentation took up around an hour and a half
of the two hours; right?

A   Approximately.

Q   Then there was around 30 minutes or so left for Q&A at
the end; correct?

A   Yes.  And then the --

        MR. MONTGOMERY:  Your Honor, if I might at this
point, counsel for the objector indicated that the line of
inquiry was to elicit reasons why the committee was
supporting.  This has nothing to do with the reasons why, and
it is an irrelevant exploration.

        THE COURT:  Yeah.  The relevance here is very
marginal.  I assume he's just sort of setting the scene, so
I'll permit a bit of that.

BY MR. HOWELL:

Q   No one on the -- I'm sorry.  Strike that.  The
presentation that was given was given by the attorneys from
Dentons; correct?

A   I believe there may have been a representative of Segal
there also to provide some information, but for the most part
it was the Dentons attorneys who made the presentation.

1   Q   Nobody on the Retiree Committee itself actually gave a

2   presentation; correct?

3   A   That's correct.

4   Q   And there was a presentation, including slides, in the

5   nature of a PowerPoint being put on the screen; right?

6   A   Yes.

7   Q   But no copies of slides were handed to the retirees;

8   correct?

9   A   That's correct.

10   Q   But you believe that hard copies of the plan were

11   distributed during that meeting; correct?

12   A   I believe the plan and the disclosure statement were made

13   available to some of the attendees.  They ran out of copies,

14   as I recall.

15   Q   Okay.  Because there were hundreds of people there;

16   right?  And during that presentation, in addition to looking

17   at the disclosure statement and the plan of adjustment, the

18   Dentons attorneys also went over the ballots for Classes 10,

19   11, and 12; correct?

20   A   Yes.

21   Q   Now, on direct testimony you testified that you relied in

22   part on the disclosure statement in deciding to cast your

23   ballot in support of the plan; correct?

24   A   Yes.

25   Q   Okay.

1     MR. HOWELL:  And so I'd like to pull back up

2 Exhibit -- I believe it was 3, if you could, Roman, and if we

3 could turn to page 51 of Exhibit 3.

4 BY MR. HOWELL:

5 Q   Okay.  And I believe you testified on direct that you had

6 reviewed this page of this disclosure statement which relates

7 to the estimated aggregate allowed amount for the PFRS;

8 correct?

9 A   Yes.

10 Q   Now, can you recall whether you went over this section of

11 the disclosure statement during the town hall meetings?

12 A   No, I don't.

13     MR. HOWELL:  If you could flip to the next page,

14 Roman, page 52, and if you'll blow up the kind of bottom

15 there.  This is still in Class 10, PFRS.

16 BY MR. HOWELL:

17 Q   You'll see there's an estimated recovery percentage with

18 outside funding of 59 percent.  Do you see that --

19 A   Yes.

20 Q   -- Ms. Renshaw?  And do you recall whether that was

21 discussed during the town hall meetings that you attended?

22 A   I don't recall it was discussed.

23 Q   Now, was this one of the sections, Ms. Renshaw, of the

24 disclosure statement that you relied on when deciding to cast

25 your ballot in favor of the plan?

1    A    No.

2    Q    So you relied on several sections of the disclosure

3    statement, the ones you testified about at direct; is that

4    correct?

5         THE COURT:  I'm sorry.  What's the relevance of this

6    witness' personal decision-making process?

7         MR. HOWELL:  Well, your Honor, it's just -- I would

8    like to know whether she relied on the estimated recovery --

9         THE COURT:  What's the relevance of it?

10        MR. HOWELL:  The relevance is what factors impacted

11   both this witness and then the retirees at the discussion in

12   the town hall meetings as to --

13        THE COURT:  I'll permit you to elicit testimony from

14   the witness about what was said at this town hall meeting,

15   but what this witness personally took into account in

16   deciding how to cast her ballot is not relevant.

17        MR. HOWELL:  Fair enough, your Honor.

18   BY MR. HOWELL:

19   Q    So you can't recall this portion of the disclosure

20   statement being discussed at the town hall meeting; correct?

21   A    That's correct.

22        MR. HOWELL:  And then, Roman, if you could turn to

23   page 53, that has the GRS, and if you'll go then to page --

24   we already looked at page 53.  If you'll look at page 54,

25   there are claim recovery percentages at the bottom of page

1    54.

2    BY MR. HOWELL:

3    Q   And, Ms. Renshaw, were these claim recovery percentages

4    discussed, to your knowledge, during the town hall meeting?

5    A   Not that I can recall.

6    Q   And did you have any input as to what would be presented

7    at the town hall meeting?

8    A   Had some input, yes.

9    Q   And you didn't view the actual claim recovery percentages

10   as listed in the disclosure statement as information that

11   needed to be covered during the town hall meetings; correct?

12   A   Yes.

13           THE COURT:  Excuse me one second.  I have to clarify

14   some of your language.

15           THE WITNESS:  Yes, sir.

16           THE COURT:  When you say "not that I can recall," do

17   you mean you don't remember whether it was discussed or it

18   was not discussed?

19           THE WITNESS:  It means I do not remember whether it

20   was discussed.  If I don't know, I would say I don't know.

21   That's my difference between "I don't recall" and "I don't

22   know."

23           THE COURT:  Okay.  But that wasn't my question.

24           THE WITNESS:  Okay.  I'm sorry.

25           THE COURT:  You use the language "not that I can

1  recall."

2         THE WITNESS:  Recall, which means --

3         THE COURT:  That's confusing to me --

4         THE WITNESS:  Okay.

5         THE COURT:  -- because I don't know whether it means

6  I don't remember or it was not.

7         THE WITNESS:  I mean it to -- I mean I do not

8  remember.

9         THE COURT:  Okay.  It was important for me to make

10 that clarification because counsel interpreted what you say

11 to mean the other answer, that it didn't happen.

12        THE WITNESS:  Okay.  Thank you.

13 BY MR. HOWELL:

14 Q   And you don't remember, Ms. Renshaw, any statements at

15 the town hall meetings to the effect that the recovery

16 percentages in the disclosure statement are substantially

17 overstated; correct?

18 A   I don't recall that being -- I don't remember that being

19 discussed.

20 Q   And you don't remember any statements at the town hall

21 meetings to the effect that the claim amounts in the plan

22 were substantially understated for the PFRS or GRS; correct?

23 A   I do not remember that being discussed.

24 Q   And you can't recall whether percentage claim recoveries

25 were ever discussed at the town hall meetings; correct?

1  A   Other than those that were arguing that anything less

2  than a hundred percent recovery was unacceptable.

3  Q   Now, during the town hall meeting that you attended, you

4  wanted to give the most complete and accurate information

5  that you could at the time to retirees; correct?

6  A   Correct.

7  Q   And as part of that presentation, the attorneys made

8  clear that the Official Committee supported the plan of

9  adjustment; correct?

10 A   Yes.

11 Q   And as the chair of the Official Committee, your view was

12 that the retirees should vote for the plan; correct?

13 A   It was the committee's position that the retirees should

14 vote for the plan.

15 Q   And one of the reasons that you felt that the retirees

16 should vote for the plan was that it was better than the

17 alternative of not voting for the plan; correct?

18 A   Of voting down the plan, that's correct.

19 Q   And the other reason that you recommended voting for the

20 plan was that you felt that after lengthy negotiations you

21 had gotten as much as you could out of the city on behalf of

22 the retirees; correct?

23 A   Yes.

24 Q   And there are no other reasons that you can think of as

25 you sit here as to why you recommended voting for the plan;

1 correct?

2 A     That it would allow the city to continue to be a viable

3 entity going forward.

4 Q     Now, Ms. Renshaw, I don't know if you were in the

5 courtroom when one of your attorneys talked about --

6       MR. MONTGOMERY:  Your Honor, I believe the witness

7 was not here during any part of the arguments in front of the

8 Court and should not be asked any questions about what might

9 have transpired in front of your Honor.  That's an objection.

10      THE COURT:  What was the question you were going to

11 ask, sir?

12      MR. HOWELL:  Well, I just want to make sure that one

13 of the reasons that --

14      THE COURT:  What was the question you were going to

15 ask?

16      MR. HOWELL:  I was going to ask whether you were

17 present in the court when your attorney talked about -- when

18 one of your attorneys talked about that you would testify

19 that one reason to vote for the plan was that you were

20 getting 50 percent under Class 10 and 11 but only 10 percent

21 under Class 12.

22      MR. MONTGOMERY:  Again, your Honor --

23      THE COURT:  If she was here at that time, that would

24 violate the Court's sequestration order.

25      MR. HOWELL:  Yes, I suppose it would, your Honor.

1    THE COURT:  Did you violate the Court's

2  sequestration order and appear in court when that statement

3  was made?

4    THE WITNESS:  I did not.

5  BY MR. HOWELL:

6  Q   The fact that the PFRS and GRS were getting around 50 or

7  60 cents but that the OPEB claimants were only getting ten

8  percent and combining those two for recovery was not one of

9  your rationale for recommending voting for the plan; correct?

10    MR. MONTGOMERY:  Objection, your Honor.  The witness

11  has never testified as to those numbers, cannot be asked

12  questions as to whether or not that was her testimony.

13    MR. HOWELL:  I'm not asking whether it's her

14  testimony.

15    THE COURT:  It's not an inappropriate cross-

16  examination question.  I'll permit it.  Please answer.

17    THE WITNESS:  The committee has long felt that

18  pension benefits had a greater level of protection because of

19  the constitutional provision in Article IX, Section 24, and

20  that OPEB benefits did not enjoy that same protection, so the

21  fact that the pension benefits have a greater recovery than

22  OPEB benefits -- the rationale behind that is not lost on

23  anybody.

24  BY MR. HOWELL:

25  Q   My question is it did not -- it was not one of your

1 rationale for supporting the plan that you could combine the

2 recoveries going to Class 10 and Class -- the retirees in

3 Class 10 and Class 11 with the recoveries going to retirees

4 in Class 12; correct?

5 A    I think that's a correct statement, yes.

6 Q    Ms. Renshaw, as part of your direct exam, you discussed

7 the various reductions in benefits to pensioners a little

8 bit.  Do you recall that?

9 A    Yes.

10 Q    Part of those reductions involved a 55-percent reduction

11 in the COLA for the PFRS participants; correct?

12 A    Yes.

13 Q    Part of those reductions involved an elimination of the

14 COLA for the GRS participants; correct?

15 A    Yes.

16 Q    Now, under the plan of adjustment, it's possible that

17 restoration could occur to reduce or eliminate those cuts to

18 the PFRS COLA; correct?

19 A    Going forward, that's correct.

20 Q    And under the plan of adjustment going forward, it's

21 possible that restoration could occur to reduce or eliminate

22 those cuts to the GRS COLA; correct?

23 A    Yes.

24 Q    But you have not conducted any analysis into the

25 probability of restoration occurring going forward; correct?

1  A    I have not.

2  Q    And you are also not aware that the Official Committee of

3  Retirees has conducted any analysis regarding the likelihood

4  of restoration occurring going forward; correct?

5  A    Yes.

6  Q    And you can't recall any details from the presentation at

7  the town hall meetings regarding the possibility of

8  restoration; correct?

9  A    The fact that restoration was part of the plan was

10 mentioned.  The likelihood or guarantee or odds of there

11 being restoration, I don't remember that that was discussed.

12 Q    So you felt the retirees should support the plan

13 regardless of whether or not restoration would occur;

14 correct?

15 A    Yes.

16 Q    One of the ways that restoration could occur to the

17 eliminated or reduced COLAs for Class 11 and Class 10

18 respectively would be through investment returns above 6.75

19 percent investment return assumption in the plan of

20 adjustment; correct?

21 A    I believe that's correct.

22 Q    And in order for restoration to kind of kick in, the

23 plans will have to remain above certain target restoration

24 funding percentages; right?

25 A    I believe that's correct, yes.

1  Q   I'd like to talk for just a minute about Class 12.  Class

2  12 is the OPEB class; correct?

3  A   Yes.

4  Q   And, Ms. Renshaw, you yourself were eligible for post-

5  employment health benefits from the city; correct?

6  A   Yes.

7  Q   And you received I think you said on direct a Class 12

8  ballot; right?

9  A   I did.

10  Q   But, Ms. Renshaw, you personally have not utilized the

11  city's healthcare plan; correct?

12  A   Actually, since my deposition I have received the monthly

13  stipend and retroactive to January 1st I was entitled to.

14  Q   Okay.

15  A   On the date of my deposition, I had not received it yet.

16  Q   Fair enough.  So let's go back to under the old plan,

17  okay, before March of 2014.  At that time you were not

18  utilizing the city-provided healthcare yourself; correct?

19  A   I was never given an opportunity to utilize those

20  benefits.

21  Q   Instead, you had access to other coverage through another

22  employer, and you utilized that other coverage; correct?

23  A   Yes.

24  Q   And are you still utilizing that other coverage through

25  another employer?

1 A    Yes.

2 Q    And now you're also getting a stipend under the new

3 plan --

4          THE COURT:  Again, why do we care about this

5 witness' personal experience here --

6          MR. HOWELL:  Well, your Honor --

7          THE COURT:  -- with all due respect?

8          MR. HOWELL:  Again, your Honor, I don't disagree

9 that the relevance is debatable here, but there are two

10 reasons that I think the door has been opened.

11          THE COURT:  If it's debatable, I would give it to

12 you.  What's the relevance of it?

13          MR. HOWELL:  I think the relevance for my line of

14 questioning is, number one, to understand what other options

15 are available to participants in the plan to mitigate the

16 loss of benefits they would be receiving under the new plan

17 versus the old plan, and, number two, to understand, because

18 it's already been testified to, as to the impact -- the

19 specific impact of these benefit reductions on Ms. Renshaw.

20          THE COURT:  Okay.  I'll permit you to inquire about

21 that but not on a personal level for Ms. Renshaw.

22          MR. HOWELL:  Fair enough.  Thank you.

23 BY MR. HOWELL:

24 Q    So, Ms. Renshaw, not speaking about you personally, but

25 the -- a retiree could utilize healthcare benefits through

1    another employer if they had access to benefits through

2    another employer; correct?

3    A    Yes.

4    Q    And you have not done any analysis of how many retirees

5    have access to healthcare through other jobs; correct?

6    A    Yes.

7    Q    Nor has the Official Committee of Retirees done any

8    analysis of how many retirees have access to healthcare

9    through other jobs; correct?

10    A    Yes.

11    Q    You also haven't done any analysis as to how many

12    retirees have access to healthcare through their spouse;

13    correct?

14    A    That's correct.

15    Q    And you're not aware of any analysis that's been done by

16    the Official Committee as to how many retirees have access to

17    healthcare through their spouse; correct?

18    A    I'm hesitating because we know there are retirees who are

19    eligible for post-employment benefits who do not take

20    advantage of them.  Some of them are married.  You can make

21    an assumption that some of them are not participating in the

22    city's plan because they have access to healthcare coverage

23    through their spouse, so we have looked at those numbers,

24    but, again, that's based on assumptions.  We don't know that

25    they're accessing healthcare through a spouse's other

1  employment.

2  Q    So you're aware of certain examples, but you haven't done

3  any sort of analysis to determine the total number of

4  retirees that would have access to healthcare through their

5  spouse, correct, and neither you nor the committee has done

6  any analysis of how many retirees would have healthcare

7  through Medicaid; correct?

8  A    That's correct.

9  Q    I just want to focus on Medicare for just a second.  You

10 have not engaged in any analysis comparing the old Medicare

11 plans that existed prior to March 2014 with the three new

12 Medicare Advantage plans that exist now; correct?

13 A    I have not.

14 Q    Nor are you aware of whether the Retiree Committee has

15 done any of that analysis; right?

16 A    I don't know whether the Segal group has done any of that

17 analysis, but I don't recall it being discussed at any of our

18 committee meetings.

19 Q    And now turning to the non-Medicare retirees, you also

20 haven't engaged in any analysis comparing what was available

21 to non-Medicare retirees under the old healthcare plan that

22 existed prior to March 2014 versus what's available with the

23 stipend going forward for those non-Medicare retirees;

24 correct?

25           MR. MONTGOMERY:  Your Honor, I'd like to object to

1  this line of inquiry.  Neither the witness testified about

2  the existence or nonexistence of Medicare wraparound plans,

3  and there's nothing in the disclosure statement that has

4  anything to do with that, your Honor, so I don't see the

5  relevance of this line of inquiry.

6          THE COURT:  No.  I think the relevance is arguable

7  here.  I'll permit it.  Oh, yes.  I've been asked to remind

8  you, Mr. Montgomery, to speak your objections into the

9  microphone, and for that purpose you may stay seated.

10          THE WITNESS:  Sir, can I ask you to repeat your

11  question, please?

12  BY MR. HOWELL:

13  Q    Certainly.  You have not engaged -- and I was talking

14  about the non-Medicare retirees now.  You've not engaged in

15  any analysis comparing what was available to non-Medicare

16  retirees under the old healthcare plans that existed prior to

17  March 2014 versus what's available with the stipend going

18  forward for those non-Medicare retirees; correct?

19  A    I have not.

20  Q    And you're also not aware, again, whether the Retiree

21  Committee has done that analysis?

22  A    Well, certainly members of the committee are aware of

23  what was available.  Some of our committee members are very

24  astute with respect to what programs were available prior to

25  the change in plans, but the committee as a whole has not

1    undertaken -- and, again, Segal may have done that review,

2    but the committee as a whole has not done that review.

3    Q    Now, Ms. Renshaw, you were a litigator for many years;

4    correct?

5    A    Yes.

6    Q    And you believed in this case that you had excellent

7    arguments to support objecting to the plan; correct?

8    A    Yes.

9    Q    In particular, you thought the constitutional arguments

10   were strong arguments to support objecting to the plan;

11   right?

12   A    Yes.

13   Q    And as a seasoned litigator, you like a good fight;

14   right?

15   A    I do.

16   Q    But ultimately you recommended to give up the

17   constitutional arguments and support this plan; correct?

18   A    Yes.

19   Q    And you made that decision to recommend the plan in part

20   because you felt the Retiree Committee had gotten all it

21   could get from the city; right?

22   A    Yes.

23   Q    It was important to you that you knew that you had pushed

24   the city as far as you could push them; right?

25   A    Yes.

1  Q   And you felt that you had, indeed, pushed the city as far

2  as you could push them; right?

3  A   Yes.

4         MR. HOWELL:  I have no further questions.

5         THE COURT:  All right.  We will stop for the day now

6  and reconvene tomorrow morning at 8:30.  Will there be

7  further questions of this witness, anyone?

8         MR. MONTGOMERY:  Your Honor, I do not believe we

9  will have any redirect based on the cross that has occurred.

10        THE COURT:  All right.  Can we excuse the witness

11  then?  All right, ma'am.  You are excused.

12        THE WITNESS:  Thank you.

13        THE COURT:  Thank you for your testimony.

14     (Witness excused at 5:00 p.m.)

15        THE COURT:  And 8:30 tomorrow morning.

16        THE CLERK:  All rise.  Court is adjourned.

17     (Proceedings concluded at 5:00 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Caroline Sallee | | 6 | 11 | 19 |
| Edsel Jenkins | 22 | 54/84 | 85 | |
| James Craig | 91 | 125/129/145 | 146 | 147 |
| Terri Renshaw | 175 | 231 | | |

| EXHIBITS: | Received |
|---|---|
| City Exhibit 2 | 5 |
| City Exhibit 3 | 200 |
| City Exhibit 66 | 107 |
| City Exhibit 476 | 5 |
| Retiree Committee Exhibit 10058 | 227 |
| Retiree Committee Exhibit 10072 | 209 |
| Retiree Committee Exhibit 10073 | 208 |
| Retiree Committee Exhibit 10074 | 208 |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    September 14, 2014
_____         _____
Lois Garrett