**EXHIBIT I.A.243**

FORM OF NEW C NOTES DOCUMENTS

ORDER NO. __

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $88,430,021 FINANCIAL RECOVERY BONDS IN ONE OR MORE SERIES FOR THE PURPOSE OF SATISFYING CERTAIN COP CLAIMS AS PROVIDED IN THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND AUTHORIZING THE EMERGENCY MANAGER TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE DELIVERY IN PARTIAL SATISFACTION THEREOF AND EXCHANGE OF SAID BONDS TO THE HOLDERS OF SAID CLAIMS.

# TABLE OF CONTENTS

**Page**

ARTICLE I         DEFINITIONS AND INTERPRETATION ............................................ 3
    Section 101. Definitions................................................................................... 3
    Section 102. Interpretation .............................................................................. 6

ARTICLE II DETERMINATIONS.................................................................................... 7
    Section 201. Finding, and Declaration of Need to Issue Bonds ...................... 7

ARTICLE III AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE
             BONDS ....................................................................................... 7
    Section 301. Authorization of Bonds to Satisfy the Claims and Pledge........... 7
    Section 302. Designations, Date, Interest, Maturity and Other Terms of the Bonds
             to Satisfy the Claims ................................................................... 7
    Section 303. Execution, Authentication and Delivery of Bonds ..................... 9
    Section 304. Authentication of the Bonds ....................................................... 9
    Section 305. Transfer of Registration and Exchanges on the Bonds............... 9
    Section 306. Regulations with Respect to Exchanges and Transfers .............. 9
    Section 307. Form of the Bonds ..................................................................... 10
    Section 308. Registration ............................................................................... 17
    Section 309. Mutilated, Destroyed, Stolen or Lost Bonds............................. 17
    Section 310. Book-Entry-Only System Permitted ......................................... 17

ARTICLE IV FUNDS AND ACCOUNTS.......................................................................... 18
    Section 401. Establishment of Accounts and Funds ...................................... 18
    Section 402. Debt Retirement Fund............................................................... 18
    Section 403. Investment of Monies in the Funds and Accounts.................... 19
    Section 404. Satisfaction of Claims ............................................................... 19

ARTICLE V THE PAYING AGENT ............................................................................... 20
    Section 501. Paying Agent ............................................................................. 20

ARTICLE VI SUPPLEMENTAL ORDERS AND RESOLUTIONS....................................... 21
    Section 601. Supplemental Orders and Resolutions Not Requiring Consent of
             Holders of the Bonds ................................................................. 21
    Section 602. Bond Counsel Opinion............................................................. 21

ARTICLE VII DEFEASANCE ........................................................................................ 21
    Section 701. Defeasance ................................................................................ 21

ARTICLE VIII        OTHER PROVISIONS OF GENERAL APPLICATION...................... 22
    Section 801. Account Control Agreement ...................................................... 22
    Section 802. Approval of Other Documents and Actions............................... 22
    Section 803. Delegation of City to, and Authorization of Actions of Authorized
             Officers ...................................................................................... 22
    Section 804. Approving Legal Opinions with Respect to the Bonds ............. 23
    Section 805. Appointment of Bond Counsel; Engagement of Other Parties.. 23
    Section 806. Preservation of Records ............................................................. 23
    Section 807. Parties in Interest........................................................................ 23

# TABLE OF CONTENTS
(continued)

**Page**

Section 808.  No Recourse Under Resolution ................................................................. 23
Section 809.  Severability ............................................................................................... 23
Section 810.  Cover Page, Table of Contents and Article and Section Headings............ 23
Section 811.  Conflict ..................................................................................................... 24
Section 812.  Governing Law and Jurisdiction............................................................... 24
Section 813.  Order and Supplemental Order are a Contract.......................................... 24
Section 814.  Effective Date ........................................................................................... 24
Section 815.  Notices ...................................................................................................... 24

ORDER NO. __

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $88,430,021 FINANCIAL RECOVERY BONDS IN ONE OR MORE SERIES FOR THE PURPOSE OF SATISFYING CERTAIN COP CLAIMS AS PROVIDED IN THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND AUTHORIZING THE EMERGENCY MANAGER TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE DELIVERY IN PARTIAL SATISFACTION THEREOF AND EXCHANGE OF SAID BONDS TO THE HOLDERS OF SAID CLAIMS.

WHEREAS, on March 1, 2013, the Governor (the "Governor") of the State of Michigan (the "State") determined that a financial emergency existed within the City of Detroit, County of Wayne, State of Michigan (the "City") pursuant to the Local Government Fiscal Responsibility Act, Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"); and

WHEREAS, on March 14, 2013, the Governor confirmed that a financial emergency existed within the City and, pursuant to Act 72, assigned to the Local Emergency Financial Assistance Loan Board established pursuant to the Emergency Municipal Loan Act, Act 243 Public Acts of Michigan, 1980, as amended (the "Board") the responsibility for managing the financial emergency; and

WHEREAS, on March 14, 2013, pursuant to Act 72, the Board appointed Kevyn D. Orr as Emergency Financial Manager for the City; And

WHEREAS, by operation of law the financial emergency continues to exist within the City pursuant to the Local Financial Stability and Choice Act, Act 436, Public Acts of Michigan, 2012 ("Act 436") and the Emergency Financial Manager continues in the capacity of the Emergency Manager for the City (the "Emergency Manager"); and

WHEREAS, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

WHEREAS, on August 20, 2014, the Emergency Manager filed on behalf of the City a Sixth Amended Plan of Adjustment of the Debts of the City of Detroit (now and as subsequently amended, the "Plan of Adjustment") in the Bankruptcy Court to provide for the adjustment of the debts of the City pursuant to and in accordance with Chapter 9 of the Bankruptcy Code; and

WHEREAS, the Plan of Adjustment provides, among other things, for the satisfaction of certain claims of unsecured creditors as set out in the Plan of Adjustment in exchange for the

1

receipt of unsecured pro rata shares ( each a "Pro Rata Share") of New C Notes (the "New C Notes"); and

WHEREAS, upon satisfaction of all of the terms and conditions required of the City related to the confirmation of the Plan of Adjustment, the City shall establish the Business Day upon which the Plan of Adjustment shall become effective (the "Effective Date"); and

WHEREAS, on or as reasonably practicable after the Effective Date, the City shall execute New C Notes Documents and issue New C Notes in the form of Financial Recovery Bonds authorized under Section 36a of the Home Rule City Act, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279") and this Order, and distribute the New C Notes, in the form of the Financial Recovery Bonds, through the Litigation Trust, as defined in the Plan of Adjustment, to Settling COP Claimants as provided in the Plan of Adjustment (the "Settling COP Claimants"); and

WHEREAS, the Emergency Manager of the City deems it necessary to authorize the issuance of Financial Recovery Bonds in one or more series (the "Bonds"), in the aggregate principal amount of not to exceed Eighty Eight Million Four Hundred Thirty Thousand Twenty One Dollars ($88,430,021) pursuant to Section 36a of Act 279; and

WHEREAS, the Bonds will be payable from City Parking Revenues or a portion thereof and secured by a pledge of the City's limited tax full faith and credit; and

WHEREAS, Section 36a of Act 279 authorizes a city, for which a financial emergency has been determined to exist, such as the City, to borrow money and issue Financial Recovery Bonds subject to the terms and conditions approved by the Board; and

WHEREAS, the City must receive prior approval of the terms and conditions for the issuance of the Bonds from the Board in accordance with Section 36a of Act 279; and

WHEREAS, the Emergency Manager desires to submit this Order to the Board proposing the issuance by the City of Financial Recovery Bonds, in one or more series, under Section 36a of Act 279, to provide for a portion of the financing of the City under the Plan of Adjustment, solely to satisfy the Settling COP Claimants' COP Claims; and

WHEREAS, prior to submission of this Order to the Board, pursuant to Sections 12(1)(u) and 19(i) of Act 436, the Emergency Manager must obtain approval of the issuance of the Bonds by the City Council of the City (the "City Council"), and if the City Council disapproves the issuance of the Bonds, the issuance of the Bonds must be approved by the Board.

NOW, THEREFORE, BE IT ORDERED AS FOLLOWS:

2

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 101. <u>Definitions</u>.    The words and terms defined in the preambles and recitals hereof and the following words and terms as used in this Order shall have the meanings ascribed therein, herein or in the Plan of Adjustment to them unless a different meaning clearly appears from the context:

"Account Control Agreement" means that certain Account Control Agreement by and among the City, the Paying Agent and the Depository Bank in favor of the Paying Agent with respect to the bank account that holds the City Parking Revenues.

"Act 243" means Act No. 243, Public Acts of Michigan, 1980, as amended.

"Act 279" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"Act 436" means Act No. 436, Public Acts of Michigan, 2012.

"Authorized Denominations" shall mean denominations of Bonds equal to multiples of $1.00.

"Authorized Officer" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the chief administrative officer of the City, the Finance Director or his or her designee, or (ii) any other person authorized by a Certificate of an Authorized Officer to act on behalf of or otherwise represent the City in any legal capacity, which such certificate shall be delivered, if at all, in the City's sole discretion.

"Bankruptcy Case" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"Bankruptcy Court" has the meaning set forth in the Plan of Adjustment.

"Board" has the meaning set forth in recitals hereto.

"Bond Counsel" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

"Bond" or "Bonds" means the Financial Recovery Bonds, Series 2014C of the City authorized to be issued by the Order in the aggregate principal amount not to exceed $88,430,021, in one or more series, and bearing such other designations as determined by the Authorized Officer in the Supplemental Order.

3

"Bond Registry" means the books for the registration of Bonds maintained by the Paying Agent.

"Bondowner", "Owner" or "Registered Owner" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry.

"Business Day" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Paying Agent or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"Certificate" means (i) a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to this Order.

"Charter" means the Charter of the City, as amended from time to time.

"City" means the City of Detroit, County of Wayne, State of Michigan.

["City Parking Facilities" means _____.]

"City Parking Revenues" means revenues collected by the City related to (i) tickets issued for parking violations, including, but not limited to, meter collections, towing, storage fees and booting fees, other than revenues that would otherwise be paid to the 36th District Court, and (ii) if the Bonds are issued in a principal amount greater than $21,271,804, garage operations at City Parking Facilities, other than the Grand Circus Park facility.

"Closing Date" means the Date of Original Issue.

"Code" means the Internal Revenue Code of 1986, as amended.

"Constitution" means the Constitution of the State of Michigan of 1963, as amended.

"Confirmation Order" has the meaning set forth in recitals hereto.

"COP Claims" has the meaning set forth in the Plan of Adjustment.

"Date of Original Issue" means the date upon which all conditions precedent set forth in the Bond Purchase Agreement to the transactions contemplated therein and herein have been satisfied and the Bonds have been issued to the Purchaser.

"Debt Retirement Fund" means the Debt Retirement Fund established under Section 501 hereof, and any subaccounts thereof established hereunder for the payment of principal of and premium and interest on the Bonds.

"Depository Bank" means a bank or banks or other financial institution which the Emergency Manager of the City designates as depository of the City.

"Emergency Manager" has the meaning set forth in the recitals hereto.

4

"Final Order" has the meaning set forth in the Plan of Adjustment.

"Fiscal Year" means the period from July 1 to and including June 30 of the immediately succeeding calendar year or such other fiscal year of the City as in effect from time to time.

"Interest Payment Date" means June 30 of each year commencing with the June 30 specified in the Supplemental Order.

"Interest Rate" means 5% per annum from the Date of Original Issue until the Maturity Date, or such other interest rates as confirmed in the Supplemental Order.

"Litigation Trust" has the meaning set forth in the Plan of Adjustment.

"Maturity Date" means June 30, 20__ or such other final date of maturity of each series of the Bonds as specified in the Supplemental Order.

"Maximum Aggregate Principal Amount" has the meaning given such term in Section 201.

"Order" means this Order of the Emergency Manager as supplemented by the Supplemental Order, and as amended from time to time pursuant to Article VII.

"Outstanding" when used with respect to:

(1) the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered under this Order, except:

 (A) Bonds theretofore canceled by the Paying Agent or delivered to such Paying Agent for cancellation;

 (B) Bonds for whose payment money in the necessary amount has been theretofore deposited with the Paying Agent in trust for the registered owners of such Bonds;

 (C) Bonds delivered to the Paying Agent for cancellation in connection with (x) the exchange of such Bonds for other Bonds or (y) the transfer of the registration of such Bonds;

 (D) Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to this Order or otherwise pursuant to law; and

 (E) Bonds deemed paid as provided in Section 701.

"Paying Agent" means the bond registrar, transfer agent and paying agent for the Bonds.

"Petition Date" has the meaning set forth in the recitals hereto.

"Plan of Adjustment" has the meaning set forth in the recitals hereto.

5

"Registered Owner" means the registered owner of a Bond as the registered owner's name appears on the Bond Registry under Section 305.

"Regular Record Date" has the meaning given such term in Section 302.

"Security Depository" has the meaning given such term in Section 310.

"Settling COP Claimant" has the meaning set forth in the Plan of Adjustment.

"State" has the meaning set forth in the recitals hereto.

"State Treasurer" means the Treasurer of the State of Michigan.

"Supplemental Order" means the order or orders of the Authorized Officer making certain determinations and confirming the final details on the Bonds upon issuance, in accordance with the parameters of this Order.

"Unsecured Pro Rata Share" has the meaning set forth in the Plan of Adjustment.

Section 102. Interpretation. (a) Words of the feminine or masculine genders include the correlative words of the other gender or the neuter gender.

(b) Unless the context shall otherwise indicate, words importing the singular include the plural and vice versa, and words importing persons include corporations, associations, partnerships (including limited partnerships), trusts, firms and other legal entities, including public bodies, as well as natural persons.

(c) Articles and Sections referred to by number mean the corresponding Articles and Sections of this Order.

(d) The terms "hereby, "hereof", "hereto", "herein", "hereunder" and any similar terms as used in this Order, refer to this Order as a whole unless otherwise expressly stated.

## ARTICLE II

## DETERMINATIONS

Section 201. Finding, and Declaration of Need to Issue Bonds. The Emergency Manager hereby finds and declares that it is necessary for the City to issue the Bonds hereunder in such sum as shall be determined and approved by the Emergency Manager, not in excess of $88,430,021 (the "Maximum Aggregate Principal Amount"), and to evidence such debt by the issuance of the Bonds in one or more series not in excess of the Maximum Aggregate Principal Amount, in Authorized Denominations, pursuant to and in accordance with the provisions of Section 36a of Act 279, for the purpose of satisfying the Claims.

6

# ARTICLE III

## AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE BONDS

Section 301. <u>Authorization of Bonds to Satisfy the Claims and Pledge</u>. The City hereby authorizes the issuance of the Bonds as hereinafter defined in such principal amount as shall be confirmed in the Supplemental Order to satisfy a portion of the COP Claims as determined by the Authorized Officer in the Supplemental Order or subsequently confirmed by the Authorized Officer to Bond Counsel. The principal of and interest on the Bonds shall hereby be payable from (i) the City Parking Revenues and (ii) secured by the limited tax full faith and credit pledge of the City.

In the event of insufficient City Parking Revenues, the City pledges to pay the principal of and interest on the Bonds as a first budget obligation from its general funds and in case of insufficiency thereof, from the proceeds of an annual levy of ad valorem taxes on all taxable property of the City, subject to applicable constitutional, statutory and charter tax rate limitations.

Section 302. <u>Designations, Date, Interest, Maturity and Other Terms of the Bonds to Satisfy the Claims</u>. (a) The Bonds shall be designated "FINANCIAL RECOVERY BONDS, SERIES 2014C" and may bear such later or earlier dates and additional or alternative designations, series or subseries as the Authorized Officer may determine in the Supplemental Order, shall be issued in fully registered form and shall be consecutively numbered from "R-1" upwards, unless otherwise provided by the Authorized Officer in the Supplemental Order. The Bonds shall be dated and issued in Authorized Denominations all as determined by the Authorized Officer and confirmed by the Authorized Officer in the Supplemental Order.

(b)     The Bonds of each series shall mature on the Maturity Date not more than 13 years from the Date of Original Issue and shall bear interest at the Interest Rate on a taxable basis, payable on the Interest Payment Dates, all as shall be determined and confirmed by the Authorized Officer in the Supplemental Order. Unless otherwise provided by the Authorized Officer in the Supplemental Order, interest on the Bonds shall be calculated on the basis of a 360-day year and twelve 30-day months. The Bonds shall be payable, as to principal and interest, in lawful money of the United States of America.

(c)     Except as may be otherwise determined by the Authorized Officer in the Supplemental Order, interest on the Bonds shall be payable to the Registered Owner as of the 15th day of the month, whether or not a Business Day (a "Regular Record Date"), prior to each Interest Payment Date. Interest on the Bonds shall be payable to such Registered Owners by check or draft drawn on the Paying Agent on each Interest Payment Date and mailed by first class mail or, upon the written request of the Owner of $1,000,000 or more in aggregate principal amount of Bonds (with complete wiring instructions no later than the Regular Record Date for such Interest Payment Date), by wire transfer by the Paying Agent to such Owner. Such a request may provide that it will remain in effect with respect to subsequent Interest Payment Dates unless and until changed or revoked at any time prior to a Regular Record Date by subsequent written notice to the Paying Agent.

7

(d)     Interest on Bonds not punctually paid or duly provided for on an Interest Payment Date shall forthwith cease to be payable to the Registered Owners on the Regular Record Date established for such Interest Payment Date, and may be paid to the Registered Owners as of the close of business on a date fixed by the Paying Agent (a "Special Record Date") with respect to the payment of such defaulted interest to be fixed by the Paying Agent, or may be paid at any time in any other lawful manner.  The Paying Agent shall give notice to the Registered Owners at least seven days before any such Special Record Date.

(e)     The principal of the Bonds shall be payable to the Registered Owners of the Bonds upon the presentation of the Bonds to the Paying Agent at the principal corporate trust office of the Paying Agent.

(f)     The Bonds shall be subject to optional, mandatory sinking fund and mandatory redemption prior to maturity or shall not be subject thereto, upon such terms and conditions as shall be determined by the Authorized Officer and confirmed in the Supplemental Order.

Unless waived by any registered owner of Bonds to be redeemed, official notice of redemption shall be given by the Paying Agent on behalf of the City.  Such notice shall be dated and shall contain at a minimum the following information:  original issue date; maturity dates; interest rates, CUSIP numbers, if any; certificate numbers, and in the case of partial redemption, the called amounts of each certificate; the redemption date; the redemption price or premium; the place where Bonds called for redemption are to be surrendered for payment; and that interest on Bonds or portions thereof called for redemption shall cease to accrue from and after the redemption date.

In addition, further notice shall be given by the Paying Agent in such manner as may be required or suggested by regulations or market practice at the applicable time, but no defect in such further notice nor any failure to give all or any portion of such further notice shall in any manner defeat the effectiveness of a call for redemption if notice thereof is given as prescribed herein.

Section 303.  <u>Execution, Authentication and Delivery of Bonds</u>.  The Bonds shall be executed in the name of the City by the manual or facsimile signatures of the Mayor and the Finance Director of the City and authenticated by the manual signature of the Finance Director or an authorized representative of the Paying Agent, as the case may be, and a facsimile of the seal of the City shall be imprinted on the Bonds.  The Bonds shall be delivered to the Litigation Trust for the Benefit of the Settling COP Claimants as described in the Plan of Adjustment.  Additional Bonds bearing the manual or facsimile signatures of the Mayor of the City and the Finance Director, and upon which the facsimile of the seal of the City is imprinted may be delivered to the Paying Agent for authentication and delivery in connection with the exchange or transfer of Bonds.  The Paying Agent shall indicate on each Bond the date of its authentication.

Section 304.  <u>Authentication of the Bonds</u>.  (a)   No Bond shall be entitled to any benefit under this Order or be valid or obligatory for any purpose unless there appears on such Bond a Certificate of Authentication substantially in the form provided for in Section 307 of this Order, executed by the manual or facsimile signature of the Finance Director or by an authorized signatory of the Paying Agent by manual signature, and such certificate upon any Bond shall be

conclusive evidence, and the only evidence, that such Bond has been duly authenticated and delivered hereunder.

(b) The Paying Agent shall manually execute the Certificate of Authentication on each Bond upon receipt of a written direction of the Authorized Officer of the City to authenticate such Bond.

Section 305. <u>Transfer of Registration and Exchanges on the Bonds</u>. (a) The registration of each Bond is transferable only upon the Bond Registry by the Registered Owner thereof, or by his attorney duly authorized in writing, upon the presentation and surrender thereof at the designated corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner thereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor.

(b) Each Bond may be exchanged for one or more Bonds in equal aggregate principal amount of like maturity and tenor in one or more authorized denominations, upon the presentation and surrender thereof at the principal corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner hereof or his attorney duly authorized in writing.

Section 306. <u>Regulations with Respect to Exchanges and Transfers</u>. (a) In all cases in which the privilege of exchanging Bonds or transferring the registration of Bonds is exercised, the City shall execute and the Paying Agent shall authenticate and deliver Bonds in accordance with the provisions of this Order. All Bonds surrendered in any such exchanges or transfers shall be forthwith canceled by the Paying Agent.

(b) For every exchange or transfer of Bonds, the City or the Paying Agent may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer and, except as otherwise provided in this Order, may charge a sum sufficient to pay the costs of preparing each new Bond issued upon such exchange or transfer, which shall be paid by the person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.

(c) The Paying Agent shall not be required (i) to issue, register the transfer of or exchange any Bond during a period beginning at the opening of business 15 days before the day of the giving of a notice of redemption of Bonds selected for redemption as described in the form of Bonds contained in Section 307 of this Order and ending at the close of business on the day of that giving of notice, or (ii) to register the transfer of or exchange any Bond so selected for redemption in whole or in part, except the unredeemed portion of Bonds being redeemed in part. The City shall give the Paying Agent notice of call for redemption at least 20 days prior to the date notice of redemption is to be given.

Section 307. <u>Form of the Bonds</u>. The Bonds shall be in substantially the following form with such insertions, omissions, substitutions and other variations as shall not be inconsistent with this Order or as approved by an Authorized Officer in the Supplemental Order:

[Form of Bonds]

[Unless this certificate is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC") to the City (as hereinafter defined), or its agent for registration of transfer, exchange, or payment and any certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein.]

UNITED STATES OF AMERICA
STATE OF MICHIGAN
COUNTY OF WAYNE

CITY OF DETROIT

FINANCIAL RECOVERY BOND, SERIES 2014C

| Interest Rate | Maturity Date | Date of Original Issue | CUSIP |
|---|---|---|---|
| | | _____, 2014 | |

Registered Owner:

Principal Amount: Dollars

      The City of Detroit, County of Wayne, State of Michigan (the "City"), acknowledges itself to owe and for value received hereby promises to pay to the Registered Owner specified above, or registered assigns, the Principal Amount specified above, in lawful money of the United States of America, on the Maturity Date specified above, unless prepaid prior thereto as hereinafter provided, with interest thereon at the Interest Rate specified above per annum from the Date of Original Issue specified above until the Maturity Date specified above or until the Principal Amount specified above is paid in full.  Interest is payable annually on June 30 in each year commencing on June 30, 20__ (each an "Interest Payment Date").  The interest so payable, and punctually paid or duly provided for, will be paid, as provided in the hereinafter defined Order, to the person in whose name this Bond is registered on the books maintained for such purpose by the hereinafter defined Paying Agent (the "Bond Registry"), on the close of business on the Regular Record Date for such interest payment, which shall be the fifteenth day (whether or not a Business Day) of the calendar month immediately preceding such Interest Payment Date.  Any such interest not so punctually paid or duly provided for shall herewith cease to be payable to the Registered Owner on such Regular Record Date, and may be paid to the person in whose name this Bond is registered at the close of business on a Special Record Date for the payment of such defaulted interest to be fixed by the Paying Agent, notice of which shall be given to Registered Owners at least seven days before such Special Record Date, or may be paid at any time in any other lawful manner.

10

Capitalized terms used herein but not defined herein, shall have the meanings ascribed to them in the Order.

The principal of this Bond is payable in lawful money of the United States of America upon presentation and surrender of this Bond at the designated corporate trust office of _____, _____, _____, as registrar, transfer agent and paying agent under the Order (such bank and any successor as paying agent, the "Paying Agent"). Interest on this Bond is payable in like money by check or draft drawn on the Paying Agent and mailed to the Registered Owner entitled thereto, as provided above, by first class mail or, upon the written request of a Registered Owner of at least $1,000,000 in aggregate principal amount of Bonds (with complete wiring instructions no later than the Regular Record Date for such Interest Payment Date), by wire transfer by the Paying Agent to such Registered Owner, and such request may provide that it will remain in effect with respect to subsequent Interest Payment Dates unless and until changed or revoked at any time prior to a Regular Record Date by subsequent written notice to the Paying Agent. Interest shall be computed on the basis of a 360-day year consisting of twelve 30 day months. For prompt payment of this Bond, both principal and interest, the full faith, credit and resources of the City are hereby irrevocably pledged.

In the event that the City fails to make a principal and interest payment when due (a "Payment Default"), the City shall have 30 days, following written notice of such default (the "Cure Period"), to cure such Payment Default. Failure to cure a Payment Default within the Cure Period will result in application of additional default rate interest at the rate of 2% per annum until such Payment Default is cured.

This bond is one of a series of bonds aggregating the principal sum of $_____, issued under and in full compliance with the Constitution and statutes of the State of Michigan, and particularly Section 36a of Act No. 279, Public Acts of Michigan, 1909, as amended ("Act 279"), for the purpose of satisfying certain Claims, as defined in the Order. The Bonds are limited tax general obligations of the City, and the City is obligated to levy annually ad valorem taxes on all taxable property in the Issuer, subject to applicable constitutional, statutory and charter tax rate limitations. Pursuant to the Authorizing Orders, the bonds of this series (the "Bonds") are payable in the first instance from the City Parking Revenues.

The "Order" is an Order of the Emergency Manager issued on _____, 2014, supplemented by a Supplemental Order of an Authorized Officer of the City issued on _____, 2014, authorizing the issuance of the Bonds.

The bonds of this series shall be subject to redemption prior to maturity as follows:

*(a) Optional Redemption.* Bonds or portions of bonds in Authorized Denominations of integral multiples of $1.00 are subject to redemption prior to maturity, at the option of the Issuer, in such order as the Issuer may determine, and by lot within a maturity on any date after the Date of Original Issue, at a redemption price of par plus accrued interest to the date fixed for redemption.

11

*(b) Mandatory Sinking Fund Redemption.* This bond is subject to mandatory sinking fund redemption in part prior to maturity, by lot in such manner as the Paying Agent may determine, at a redemption price of 100% of the principal amount thereof plus interest accrued to the date fixed for redemption, on the dates and in the principal amounts as follows:

| Date (June 30) | Principal Amount |
| --- | --- |
| 20__ | $ |
| 20__ | |
| 20__ | |
| 20__ | |
| 20__ | |
| 20__ | |
| 20__ | |
| 20__ | |
| 20__ | |
| 20__ | |
| 20__ | |
| 20__† | |

†Final Maturity

The amounts to be so redeemed may be reduced by the principal amounts of this bond theretofore redeemed (otherwise than through operation of the Mandatory Sinking Fund Redemption described above), or otherwise acquired and delivered to the Paying Agent, at least 45 days prior to the payment date for credit against the Mandatory Sinking Fund Redemption requirement described above and shall be applied in direct order of date of redemption.

*(c) Mandatory Redemption from Proceeds of Sale of City Parking Facilities.* In the event the City sells any City Parking Facilities, this bond is subject to redemption in part at a price equal to the principal amount to be redeemed plus accrued interest to the date fixed for redemption from the net proceeds of such disposition.

*General Redemption Provisions.* In case less than the full amount of an outstanding bond is called for redemption, the Paying Agent, upon presentation of the bond called for redemption, shall register, authenticate and deliver to the registered owner of record a new bond in the principal amount of the portion of the original bond not called for redemption.

Notice of redemption shall be given to the registered owners of Bonds or portions thereof called for redemption by mailing of such notice not less than thirty (30) days but not more than sixty (60) days prior to the date fixed for redemption to the registered address of the registered owner of record. Bonds or portions thereof so called for redemption shall not bear interest after the date fixed for redemption, whether presented for redemption or not, provided funds are on hand with the Paying Agent to redeem such Bonds.

*Event of Default Provisions.* The Bonds and the Bonds are subject to, Events of Default and acceleration in the manner, at the times and subject to the conditions specified in the Indenture and incorporated herein and made a part hereof by reference.

Reference is hereby made to the Order for the provisions with respect to the nature and extent of the security for the Bonds, the manner and enforcement of such security, the rights, duties and obligations of the City, and the rights of the Paying Agent and the Registered Owners

12

of the Bonds.  As therein provided, the Order may be amended in certain respects without the consent of the Registered Owners of the Bonds.  A copy of the Order is on file and available for inspection at the office of the Finance Director and at the principal corporate trust office of the Paying Agent.

The City and the Paying Agent may treat and consider the person in whose name this Bond is registered on the Bond Registry as the absolute owner hereof, whether this Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal hereof and interest hereon and for all other purposes whatsoever, and all such payments so made to such person or upon his order shall be valid and effectual to satisfy and discharge the liability hereon to the extent of the sum or sums so paid.

The registration of this Bond is transferable only upon the Bond Registry by the Registered Owner hereof or by his attorney duly authorized in writing upon the presentation and surrender hereof at the designated corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner hereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor as provided in the Resolution upon the payment of the charges, if any, therein prescribed.

It is hereby certified, recited and declared that all acts, conditions and things required by law to exist, happen and to be performed, precedent to and in the issuance of the Bonds do exist, have happened and have been performed in due time, form and manner as required by the Constitution and statutes of the State of Michigan, and that the total indebtedness of the City, including the Bonds does not exceed any constitutional, statutory or charter limitation.

This Bond is not valid or obligatory for any purpose until the Paying Agent's Certificate of Authentication on this Bond has been executed by the Paying Agent.

IN WITNESS WHEREOF, the City of Detroit, by its Mayor, has caused this bond to be signed in the name of the City by the facsimile signatures of its Mayor and Finance Director of the City, and a facsimile of its corporate seal to be printed hereon, all as of the Date of Original Issue.

CITY OF DETROIT

By: _____
      Mayor


By: _____
      Finance Director

(SEAL)

(Form of Paying Agent's Certificate of Authentication)

DATE OF AUTHENTICATION:

CERTIFICATE OF AUTHENTICATION

This bond is one of the bonds described in the within-mentioned Order.

_____
_____
_____, Michigan
Paying Agent

By: _____
    Authorized Signatory

## ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____
(Please print or typewrite name and address of transferee)


the within bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to transfer the within bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated:                                                  _____

_____          _____

Signature Guaranteed:                           NOTICE:  The signature(s) to this assignment must correspond with the name as it appears upon the face of the within bond in every particular, without alteration or enlargement or any change whatever.  When assignment is made by a guardian, trustee, executor or administrator, an officer of a corporation, or anyone in a representative capacity, proof of such person's authority to act must accompany the bond.


Signature(s) must be guaranteed by a commercial bank or trust company or by a brokerage firm having a membership in one of the major stock exchanges.  The transfer agent will not effect transfer of this bond unless the information concerning the transferee requested below is provided.

Name and Address: _____

PLEASE INSERT SOCIAL           _____
SECURITY NUMBER OR OTHER
IDENTIFYING NUMBER OF          _____
TRANSFEREE.                          (Include information for all joint owners
                                        if the bond is held by joint account.)

```
_____
|                                 |
|                                 |
|_____|
```
(Insert number for first named
transferee if held by joint account.)

16

Section 308. <u>Registration</u>. The City and the Paying Agent may treat and consider the Registered Owner of any Bond as the absolute owner of such Bond, whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal (and premium, if any) thereof and interest thereon and for all other purposes whatsoever, and all such payments so made to such Bondowner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid.

Section 309. <u>Mutilated, Destroyed, Stolen or Lost Bonds</u>. (a) Subject to the provisions of Act 354, Public Acts of Michigan, 1972, as amended and any other applicable law, if (i) any mutilated Bond is surrendered to the Paying Agent or the City and the Paying Agent and the City receive evidence to their satisfaction of the destruction, loss or theft of any Bond and (ii) there is delivered to the City and the Paying Agent such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the City or the Paying Agent that such Bond has been acquired by a bona fide purchaser, the City shall execute and the Paying Agent shall authenticate and deliver in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Bond, a new Bond of like tenor and principal amount, bearing a number not contemporaneously outstanding.

(b) If any such mutilated, destroyed, lost or stolen Bond has become or is about to become due and payable, the City in its discretion may, instead of issuing a new Bond, pay such Bond.

(c) Any new Bond issued pursuant to this Section in substitution for a Bond alleged to be mutilated, destroyed, stolen or lost shall constitute an original additional contractual obligation on the part of the City, and shall be equally secured by and entitled to equal proportionate benefits with all other Bonds issued under this Order.

Section 310. <u>Book-Entry-Only System Permitted</u>. (a) If determined by the Authorized Officer in the Supplemental Order, the Bonds or portions of the Bonds shall be issued to a securities depository selected by the Authorized Officer (the "Security Depository") to be held pursuant to the book-entry-only system maintained by the Security Depository and registered in the name of the Security Depository or its nominee. Ownership interests in Bonds held under such book-entry-only system shall be determined pursuant to the procedures of the Security Depository and Article 8 of the applicable Uniform Commercial Code (such persons having such interests, "Beneficial Owners").

(b) If (i) the City and the Paying Agent receive written notice from the Security Depository to the effect that the Security Depository is unable or unwilling to discharge its responsibilities with respect to the Bonds under the book-entry-only system maintained by it or (ii) the Authorized Officer determines that it is in the best interests of the Beneficial Owners that they be able to obtain Bonds in certificated form, then the City may so notify the Security Depository and the Paying Agent, and, in either event, the City and the Paying Agent shall take appropriate steps to provide the Beneficial Owners with Bonds in certificated form to evidence their respective ownership interests in the Bonds. Whenever the Security Depository requests the City and the Paying Agent to do so, the Authorized Officer on behalf of the City and the Paying Agent will cooperate with the Security Depository in taking appropriate action after

17

reasonable notice to make available Bonds registered in whatever name or names the Beneficial Owners transferring or exchanging Bonds shall designate.

(c)    Notwithstanding any other provision of the Order to the contrary, so long as the Bonds are held pursuant to the book-entry-only system maintained by the Security Depository:

(i)    all payments with respect to the principal and interest on such Bonds and all notices with respect to such Bonds shall be made and given, respectively, to the Security Depository as provided in the representation letter from the City and the Paying Agent to the Security Depository with respect to such Bonds; and

(ii)    all payments with respect to principal of the Bonds and interest on the Bonds shall be made in such manner as shall be prescribed by the Security Depository.

## ARTICLE IV

## FUNDS AND ACCOUNTS

Section 401.  <u>Establishment of Accounts and Funds</u>.  The City hereby establishes and creates the following special, separate and segregated accounts and funds:

(a)    City Parking Revenue Fund.  There is hereby established at the Depository Bank the City Parking Revenue Fund.  City Parking Revenues shall be directly remitted to and deposited by the Depository Bank into the City Parking Revenue Fund as provided in Section 801.

(b)    Debt Retirement Fund.  The City hereby establishes and creates the Debt Retirement Fund as a special, separate and segregated account and fund which shall be held for and on behalf of the City by the Paying Agent.

(c)    The Finance Director is hereby authorized to establish such additional accounts, subaccounts or funds as shall be required for the Bonds to accommodate the requirements of such series of Bonds.

Section 402.  <u>Debt Retirement Fund</u>.  General funds of the City, proceeds of all City Parking Revenues transferred by the Depository Bank pursuant to Section 801 and taxes levied pursuant to Section 301 hereof shall be used to pay the principal of and interest on the Bonds when due.  The foregoing amounts shall be placed in the Debt Retirement Fund and held in trust by the Paying Agent, and so long as the principal of or interest on the Bonds shall remain unpaid, no moneys shall be withdrawn from the Debt Retirement Fund except to pay such principal and interest.  Any amounts remaining in the Debt Retirement Fund after payment in full of the Bonds and the fees and expenses of the Paying Agent shall be retained by the City to be used for any lawful purpose.

Section 403.  <u>Investment of Monies in the Funds and Accounts</u>.  (a) The Finance Director shall direct the investment of monies on deposit in the Funds and Accounts established hereunder, and the Paying Agent, upon written direction or upon oral direction promptly

confirmed in writing by the Finance Director, shall use its best efforts to invest monies on deposit in the Funds and Accounts in accordance with such direction.

(b)    Monies on deposit in the Funds and Accounts may be invested in such investments and to the extent permitted by applicable law.

Section 404. <u>Satisfaction of COP Claims</u>.  On the Effective Date, the City shall issue the Bonds in an amount sufficient to satisfy the portion of the COP Claims to be satisfied thereby. An Authorized Officer shall arrange for delivery of the Bonds to the Litigation Trust to be distributed to satisfy the portion of the COP Claims on behalf of the Settling COP Claimants as provided in the Plan of Adjustment.  Upon delivery of the Bonds to the Litigation Trustee, an Authorized Officer shall take all necessary steps to extinguish any related existing debt, including the cancellation of any obligation of the City representing portions of the COP Claims settled thereby.

## ARTICLE V

## THE PAYING AGENT

Section 501.  <u>Paying Agent</u>.  The Paying Agent for the Bonds shall act as bond registrar, transfer agent and paying agent for the Bonds and shall be initially _____, or such other bank or trust company located in the State which is qualified to act in such capacity under the laws of the United States of America or the State.  The Paying Agent means and includes any company into which the Paying Agent may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Paying Agent may sell or transfer all or substantially all of its corporate trust business, provided, that such company shall be a trust company or bank which is qualified to be a successor to the Paying Agent as determined by an Authorized Officer, shall be authorized by law to perform all the duties imposed upon it by this Order, and shall be the successor to the Paying Agent without the execution or filing of any paper or the performance of any further act, anything herein to the contrary notwithstanding.  An Authorized Officer is authorized to enter into an agreement with such a bank or trust company, and from time to time as required, may designate a similarly qualified successor Paying Agent and enter into an agreement therewith for such services.

## ARTICLE VI

## SUPPLEMENTAL ORDERS AND RESOLUTIONS

Section 601.  <u>Supplemental Orders and Resolutions Not Requiring Consent of Holders of the Bonds</u>.  The City may without the consent of any Bondowner adopt orders or resolutions supplemental to this Order for any one or more of the following purposes:

(i)    to confirm or further assure the security hereof or to grant or pledge to the holders of the Bonds any additional security;

19

<blockquote>
(ii)    to add additional covenants and agreements of the City for the purposes of further securing the payment of the Bonds;

(iii)    to cure any ambiguity or formal defect or omission in this Order; and

(iv)    such other action not materially, adversely and directly affecting the security of the Bonds.
</blockquote>

provided that (A) no supplemental order or resolution amending or modifying the rights or obligations of the Paying Agent shall become effective without the consent of the Paying Agent and (B) the effectiveness of any supplemental resolution is subject to Section 702 to the extent applicable.

Section 602. <u>Bond Counsel Opinion</u>. Before any supplemental order or resolution under this Article shall become effective, a copy thereof shall be filed with the Paying Agent, together with an opinion of Bond Counsel that such supplemental order or resolution is authorized or permitted by this Article; provided that, Bond Counsel in rendering any such opinion shall be entitled to rely upon certificates of an Authorized Officer or other City official, and opinions or reports of consultants, experts and other professionals retained by the City to advise it, with respect to the presence or absence of facts relative to such opinion and the consequences of such facts.

<h3 style="text-align:center">ARTICLE VII</h3>

<h3 style="text-align:center">DEFEASANCE</h3>

Section 701. <u>Defeasance</u>. Bonds shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon, as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturity, irrevocable instructions to call such Bonds for redemption shall be given to the Paying Agent. Such cash and securities representing such obligations shall be deposited with a bank or trust company and held for the exclusive benefit of the Owners of such Bonds. After such deposit, such Bonds shall no longer be entitled to the benefits of this Order (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Order for the benefit of such Bonds shall be discharged.

# ARTICLE VIII

## OTHER PROVISIONS OF GENERAL APPLICATION

Section 801. <u>Account Control Agreement</u>. (a)      The City shall enter into the Account Control Agreement with the Depository Bank and the Paying Agent, pursuant to which the bank account described in Section 401(a) shall be established at the Depository Bank.   Daily, City Parking Revenues deposited in the City Parking Revenue Fund shall be remitted by the Depository Bank to the Debt Retirement Fund held by the Paying Agent until sufficient funds are on deposit therein to pay the principal and interest payable on the Bonds during that fiscal year (the "Annual Deposit Requirement").   Once the Annual Deposit Requirement is satisfied, any additional City Parking Revenues shall be remitted to the City for deposit into its general fund and used for any other purposes permitted by law.

(b)      In connection with the execution of any of the agreements authorized by this Section, an Authorized Officer is authorized to include therein such covenants as shall be appropriate.

Section 802.      <u>Agreements with Third Parties Related to Deposit of City Parking Revenues; Approval of Third Parties</u>.   The Emergency Manager  is hereby authorized and directed on behalf of the City to take any and all other actions and perform any and all acts that shall be required, necessary or desirable, including, but not limited to, negotiate the terms and enter into the Account Control Agreement in such form and with such terms as shall be subsequently approved by the Emergency Manager (such subsequent approval to be conclusively evidenced by his execution and delivery of the Account Control Agreement) as security for the Bonds.

Section 803.   <u>Approval of Other Documents and Actions</u>.   The Mayor, the Finance Director, the Treasurer, the City Clerk and any written designee of the Emergency Manager are each hereby authorized and directed on behalf of the City to take any and all other actions, perform any and all acts and execute any and all documents that shall be required, necessary or desirable to implement this Order.

Section 804.   <u>Delegation of City to, and Authorization of Actions of Authorized Officers</u>. (a)  Each Authorized Officer is hereby authorized and directed to do and perform any and all acts and things with respect to the Bonds which are necessary and appropriate to carry into effect, consistent with this Order, the authorizations therein and herein contained, including without limitation, the securing of ratings by bond rating agencies, if cost effective, the negotiation for and acquisition of bond insurance and/or other credit enhancement, if any, to further secure the Bonds or any portions thereof, the acquisition of an irrevocable surety bond to fulfill the City's obligation to fund any reserve account, the printing of the Bonds and the incurring and paying of reasonable fees, costs and expenses incidental to the foregoing and other costs of issuance of the Bonds including, but not limited to fees and expenses of bond counsel, financial advisors, accountants and others, from Bond proceeds or other available funds, for and on behalf of the City.

(b)     Except as otherwise provided herein, all determinations and decisions of the Authorized Officer with respect to the issuance and sale of the Bonds or the negotiation, execution or delivery of agreements as permitted or required by this Order shall be confirmed by this Authorized Officer in a Supplemental Order or Supplemental Orders, and such confirmations shall constitute determinations that any conditions precedent to such determinations and decisions of the Authorized Officer have been fulfilled.

Section 805.  Approving Legal Opinions with Respect to the Bonds.  Delivery of the Bonds shall be conditioned upon receiving, at the time of delivery of the Bonds; the approving opinion of Bond Counsel, approving legality of the Bonds.

Section 806.  Appointment of Bond Counsel; Engagement of Other Parties.  The appointment by the Emergency Manager of the law firm of Miller, Canfield, Paddock and Stone, P.L.C. of Detroit, Michigan, as Bond Counsel for the Bonds is hereby ratified and confirmed, notwithstanding the periodic representation by Miller, Canfield, Paddock and Stone, P.L.C., in unrelated matters of other parties and potential parties to the issuance of the Bonds.  The fees and expenses of Miller, Canfield, Paddock and Stone, P.L.C. as Bond Counsel and other accumulated bond related fees and expenses shall be payable from available funds in accordance with the agreement of such firm on file with the Finance Director.

Section 807.  Preservation of Records.  So long as any Bond remains Outstanding, all documents received by the Paying Agent under the provisions of this Order shall be retained in its possession and shall be subject at all reasonable times to the inspection of the City, and the Bondowners, and their agents and representatives, any of whom may make copies thereof.

Section 808.  Parties in Interest.  Nothing in this Order, expressed or implied, is intended or shall be construed to confer upon, or to give to, any person or entity, other than the City, the Paying Agent and the Owners of the Bonds, any right, remedy or claim under or by reason of this Order or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Order contained by and on behalf of the City or Paying Agent shall be for the sole and exclusive benefit of the City, the Paying Agent and the Bondowners.

Section 809.  No Recourse Under Resolution.  All covenants, agreements and obligations of the City contained in this Order shall be deemed to be the covenants, agreements and obligations of the City and not of any councilperson, member, officer or employee of the City in his or her individual capacity, and no recourse shall be had for the payment of the principal of or interest on the Bonds or for any claim based thereon or on this Order against any councilperson, member, officer or employee of the City or any person executing the Bonds in his or her official individual capacity.

Section 810.  Severability.  If any one or more sections, clauses or provisions of this Order shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions hereof.

Section 811  Cover Page, Table of Contents and Article and Section Headings.  The cover page, table of contents and Article and Section headings hereof are solely for convenience of

reference and do not constitute a part of this Order, and none of them shall affect its meaning, construction or effect.

Section 812 <u>Conflict</u>. All resolutions or parts of resolutions or other proceedings of the City in conflict herewith shall be and the same hereby are repealed insofar as such conflict exists.

Section 813 <u>Governing Law and Jurisdiction</u>. This Order shall be governed by and construed in accordance with the laws of the State.

Section 814 <u>Order and Supplemental Order are a Contract</u>. The provisions of this Order and the Supplemental Order shall constitute a contract between the City, the Paying Agent and the Bondowners.

Section 815 <u>Effective Date</u>. This Order shall take effect immediately upon its adoption by the Council.

Section 816 <u>Notices</u>. All notices and other communications hereunder shall be in writing and given by United States certified or registered mail, expedited courier overnight delivery service or by other means (including facsimile transmission) that provides a written record of such notice and its receipt. Notices hereunder shall be effective when received and shall be addressed to the address set forth below or to such other address as any of the below persons shall specify to the other persons:

If to the City, to:                          City of Detroit
                                             Finance Department
                                             1200 Coleman A. Young Municipal Center
                                             Detroit, Michigan 48226
                                             Attention: Finance Director


If to the Paying Agent, to:                  _____


                                             Attention:


SO ORDERED this ____ day of September, 2014.


                                             _____
                                             Kevyn D. Orr
                                             Emergency Manager
                                             City of Detroit, Michigan

23

A-1

**EXHIBIT I.A.244.a**

FORM OF NEW GRS ACTIVE PENSION PLAN

# COMBINED PLAN
# FOR THE
# GENERAL RETIREMENT SYSTEM
# OF THE
# CITY OF DETROIT, MICHIGAN

**Effective July 1, 2014**

# COMPONENT I

# TABLE OF CONTENTS

**Page**

ARTICLE 1 – GENERAL PROVISIONS ........................................................................1

Sec. 1.1. General Retirement System Established; Adoption of 2014 Combined Plan Document .......................................................................1

Sec. 1.2. Retirement System Intended to be Tax-Qualified ..............................1

Sec. 1.3. Board of Trustees .................................................................................1

Sec. 1.4. Board of Trustees – Membership; Appointment ................................1

Sec. 1.5. Board of Trustees; Retiree Member Election .....................................2

Sec. 1.6. Board of Trustees; Oath; Term; Vacancies .........................................2

Sec. 1.7. Board of Trustees; Officers and Employees .......................................3

Sec. 1.8. Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum ....3

Sec. 1.9. Board of Trustees; Compensation; Expenses ......................................3

Sec. 1.10. Rules for Administration of Funds ......................................................4

Sec. 1.11. Board of Trustees; Certain Data to be Kept ........................................4

Sec. 1.12. Board of Trustees; Annual Audit Report ............................................4

Sec. 1.13. Board of Trustees; Legal Advisors .....................................................4

Sec. 1.14. Designation of Actuary; Authority to Engage Additional Actuaries ...4

Sec. 1.15. Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System ...........................................................................5

Sec. 1.16. Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities ............5

Sec. 1.17. Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties ................................................................................5

Sec. 1.18. Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties ................................................................................6

Sec. 1.19. Investment Committee; Membership; Appointment ...........................6

Sec. 1.20. Investment Committee; Term; Resignation and Removal; Vacancies ...7

Sec. 1.21. Investment Committee; Operation; Meetings; Quorum; Voting .........8

Sec. 1.22. Investment Committee; Expenses .......................................................8

ARTICLE 2 – DEFINITIONS ....................................................................................10

Sec. 2.1. Definitions .........................................................................................10

ARTICLE 3 – MEMBERSHIP ...................................................................................16

Sec. 3.1. Eligible Employees ...........................................................................16

Sec. 3.2. Cessation of Membership; Re-Employment by the Employer ..........16

Sec. 3.3.    Report of the Employer ........................................................................... 17

ARTICLE 4    – SERVICE CREDIT ............................................................................ 18

Sec. 4.1.    Credited Service ...................................................................................... 18

Sec. 4.2.    Vesting Service ....................................................................................... 18

Sec. 4.3.    Service Credit; Military Service ............................................................. 18

Sec. 4.4.    Service Credit; Qualified Military Service ............................................ 19

ARTICLE 5    – ELIGIBILITY FOR RETIREMENT BENEFITS ............................... 20

Sec. 5.1.    Eligibility for Unreduced Normal Retirement Benefit ........................... 20

Sec. 5.2.    Eligibility for Reduced Early Retirement Benefit .................................. 20

Sec. 5.3.    Eligibility for Deferred Vested Retirement Benefit ................................ 20

Sec. 5.4.    Eligibility for Retirement Benefit – Disabled Members ......................... 20

Sec. 5.5.    Return of Accumulated Mandatory Contributions to Non-Vested
Member .................................................................................................... 20

ARTICLE 6    – RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT
FACTOR (ESCALATOR) ...................................................................... 21

Sec. 6.1.    Retirement Allowance ............................................................................. 21

Sec. 6.2.    Variable Pension Improvement Factor (Escalator) ................................. 21

ARTICLE 7    – DEATH BENEFITS ........................................................................... 22

Sec. 7.1.    Accidental Death Benefit; Performance of Duty .................................... 22

Sec. 7.2.    Death Benefits for Surviving Spouses Generally ................................... 22

Sec. 7.3.    Refund of Accumulated Mandatory Contributions Upon Death of
Member .................................................................................................... 22

Sec. 7.4.    Benefits Offset by Compensation Benefits; Subrogation ....................... 22

ARTICLE 8    – FORMS OF PAYMENT .................................................................... 24

Sec. 8.1.    Retirement Allowance Options ............................................................... 24

Sec. 8.2.    Disposition of Surplus Benefits upon Death of Retiree and Beneficiary ........... 25

ARTICLE 9    – FUNDING AND RESERVES ............................................................ 26

Sec. 9.1.    Funding Objective of the Retirement System ......................................... 26

Sec. 9.2.    Funds ....................................................................................................... 26

Sec. 9.3.    Method of Financing Retirement System Benefits ................................. 27

Sec. 9.4.    Member Contributions Picked-Up .......................................................... 27

Sec. 9.5.    Fiscal Responsibility: Increased Funding Obligations and Benefit
Reductions ............................................................................................... 28

ARTICLE 10    – VOLUNTARY EMPLOYEE CONTRIBUTIONS ............................ 30

Sec. 10.1.    Voluntary Employee Contributions; Amount; Vesting ......................................30

Sec. 10.2.    Changing an Election to Contribute........................................................30

Sec. 10.3.    Individual Member Accounting; Crediting of Earnings .................................30

Sec. 10.4.    Distribution of Accumulated Voluntary Employee Contributions ...................30

ARTICLE 11    – LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS............32

Sec. 11.1.    The Loan Program ........................................................................32

Sec. 11.2.    Eligibility for Loan ........................................................................32

Sec. 11.3.    Amount of Loan............................................................................32

Sec. 11.4.    Terms and Conditions ....................................................................32

Sec. 11.5.    Loan Balance ..............................................................................33

Sec. 11.6.    Default .....................................................................................33

Sec. 11.7.    Distribution ...............................................................................33

ARTICLE 12    - LIMITATION ON BENEFITS AND CONTRIBUTIONS ...........................34

Sec. 12.1.    Compliance With Code Section 415(b) And Regulations .................................34

Sec. 12.2.    Compliance with Code Section 415(c) and Regulations ...................................36

ARTICLE 13    - RETIREMENT SYSTEM ADMINISTRATION..........................................38

Sec. 13.1.    Board of Trustees as Retirement System Administrator.................................38

Sec. 13.2.    Powers and Duties of Board ............................................................38

Sec. 13.3.    Executive Director; Employees .........................................................40

Sec. 13.4.    Discretionary Authority .................................................................40

Sec. 13.5.    Administrator's Decision Binding ......................................................40

ARTICLE 14    – MANAGEMENT OF FUNDS ..........................................................41

Sec. 14.1.    Board as Trustee of Retirement System Assets .......................................41

Sec. 14.2.    Maintenance of Segregated Funds......................................................41

Sec. 14.3.    Custodian of Funds ......................................................................41

Sec. 14.4.    Exclusive Purpose........................................................................41

Sec. 14.5.    Prohibited Conduct ......................................................................41

ARTICLE 15    – INVESTMENT OF RETIREMENT SYSTEM ASSETS ...........................43

Sec. 15.1.    Investment Powers of the Board and the Investment Committee......................43

Sec. 15.2.    Investment Management ................................................................44

Sec. 15.3.    Best Practices.............................................................................45

Sec. 15.4.    Chief Investment Officer ...............................................................45

Sec. 15.5. Investment Consultants ...................................................................................46

ARTICLE 16 – MISCELLANEOUS ...........................................................................................48

Sec. 16.1. Nonduplication of Benefits ..............................................................................48

Sec. 16.2. Assignments Prohibited ...................................................................................48

Sec. 16.3. Protection Against Fraud .................................................................................48

Sec. 16.4. Amendment; Termination; Exclusive Benefit .................................................48

Sec. 16.5. Forfeitures Not to Increase Benefits ...............................................................49

Sec. 16.6. Required Distributions - Compliance with Code Section 401(a)(9) and Regulations .....................................................................................................49

Sec. 16.7. Direct Rollovers ...............................................................................................49

Sec. 16.8. Construction.....................................................................................................50

Sec. 16.9. Severability ......................................................................................................50

# ARTICLE 1 – GENERAL PROVISIONS

## Sec. 1.1.  General Retirement System Established; Adoption of 2014 Combined Plan Document

Effective July 1, 1938, a General Retirement System for the employees of the City of Detroit was established for the purpose of providing retirement and survivor benefits for eligible City employees and their beneficiaries.  The provisions of the Detroit General Retirement System, as in effect July 1, 2014, are set forth in this Combined Plan Document.  Component I of the Combined Plan Document applies to benefits accrued by Members on and after July 1, 2014 and to operation of the Detroit General Retirement System on and after July 1, 2014.  Component II of the Combined Plan Document applies to benefits accrued by Members prior to July 1, 2014.  Except as specifically provided in Component II, benefits provided under Component II of the Combined Plan Document are frozen effective June 30, 2014.

This Combined Plan Document shall replace in its entirety Chapter 47 of the Detroit City Code as in effect on June 30, 2014 and any conflicting provisions in any collective bargaining agreements covering Members (including, without limitation, the City Employment Terms that applied to Members effective July 18, 2012). All resolutions and policies of the Retirement Board previously adopted which are inconsistent with the provisions of this Combined Plan Document are also hereby also repealed to the extent of such inconsistency.

## Sec. 1.2.  Retirement System Intended to be Tax-Qualified

The Retirement System is a governmental plan under Section 414(d) of the Internal Revenue Code which is intended to be a qualified plan and trust pursuant to applicable provisions of the Internal Revenue Code.  The Board shall construe and administer the provisions of the Retirement System in a manner that gives effect to the tax-qualified status of the Retirement System.

## Sec. 1.3.  Board of Trustees

Effective July 1, 1938, a Board of Trustees of the Detroit General Retirement System was created. The Board is vested with responsibility for the general administration, management and operation of the Detroit General Retirement System and with the trust and investment powers conferred in this Combined Plan Document.

## Sec. 1.4.  Board of Trustees – Membership; Appointment

The Board of Trustees of the Detroit General Retirement System shall consist of ten Trustees, as follows:

(1)     The Mayor, *ex officio*, or the Mayor's designee;

(2)     One City Council Member, *ex officio*, who is selected by that body;

(3)     The City Treasurer, *ex officio*;

(4)     Five active employee members of the Retirement System to be elected by the Members in accordance with such rules and regulations as may be adopted by the Board. No more than one Trustee shall be elected from any one City Department;

(5)     One Detroit resident, appointed by the Mayor subject to the approval of the Board, who is neither an employee of the City nor is eligible to receive benefits under the Retirement System; and

(6) One retiree who is receiving benefits under the Retirement System and who is elected by Retirees in accordance with procedures described in Section 1.5.

## Sec. 1.5. Board of Trustees; Retiree Member Election

The procedures for the election of the Retiree member of the Board of Trustees shall be as follows:

(1) *Notice*. Notice of a primary election shall be sent to each Retiree by United States Mail.

(2) *Nominating petitions*. No candidate's name shall be placed on the primary election ballot unless a nominating petition containing the signatures of at least one hundred and twenty-five Retirees is filed with the secretary of the Board. The form of the nominating petition, the filing of the petition, and the procedure for verification of signatures shall be in accordance with rules and regulations adopted by the Board.

(3) *Ballot*. Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position held by the Retiree at the time of retirement and by the word "incumbent" if the candidate is a current trustee seeking re-election. No ballot shall contain any organizational or political designation or mark. Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4) *Voting*. Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(5) *Procedures*. Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(6) *Board Rules*. Any matters relative to the election of the Retiree member of the Board not covered by this Section 1.5 shall be handled in accordance with such rules and regulations as the Board may adopt.

## Sec. 1.6. Board of Trustees; Oath; Term; Vacancies

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the Detroit City Clerk.

The regular term of office for the elected Member Trustees and the appointed Detroit resident Trustee shall be for a period of six years, one such Trustee to be elected or appointed, as the case may be, each year. The term of office for the Retiree Trustee shall be two years.

If an active employee Trustee leaves the employ of the City, or if an elected or appointed Trustee fails to attend four consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board. By resolution, the Board shall declare the office vacated as of the date of adoption of such resolution. If a

vacancy occurs in the office of Trustee, the vacancy shall be filled at the next regular election held by the Board, or at any special election ordered by resolution adopted by the Board.

### Sec. 1.7.  Board of Trustees; Officers and Employees

The Board shall elect a chair and vice-chair from its members. The executive director of the Retirement System shall serve as secretary of the Board.  The Board may employ such actuarial, medical and other employees as shall be required, subject to the powers and authority reserved to the Investment Committee and subject to the *Public Employee Retirement System Investment Act*, as amended, MCL 38.1132 *et seq*.

### Sec. 1.8.  Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum

(1)     The Board shall hold regular weekly meetings, at least one in each month, and shall designate the time and place thereof in advance. The Board shall adopt its own rules of procedure, including provisions for special meetings and notice thereof, and shall keep a record of proceedings.  All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act,* MCL 15.261 *et seq.*

(2)     Each Trustee shall be entitled to one vote on each question before the Board.  A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(3)     Five Trustees shall constitute a quorum.

### Sec. 1.9.  Board of Trustees; Compensation; Expenses

Members of the Board of Trustees shall serve without additional compensation from the Employer, but they shall be compensated by the Retirement System as follows:

(1)     *Stipend*.  Trustees are eligible for a meeting stipend, provided the Trustee attends one or more regular or special Board meetings during a month. The stipend amount shall be a minimum of sixty-seven dollars ($67.00) per week multiplied by the Trustee's years of service.  Eligibility rules and the amount of the stipend shall be set by Board resolution. However, the amount of the weekly meeting stipend shall not exceed two hundred dollars ($200.00).

(2)     *Ex Officio Trustees*.  Ex Officio Trustees are not eligible for a stipend payment.

(3)     *Attendance*.  For purposes of this Section 1.9, attendance at a Board meeting shall include actual attendance at a meeting or being otherwise available to attend a Board meeting canceled for lack of a quorum.

Trustees shall be reimbursed from the Expense Fund for all actual, reasonable and necessary expenses incurred in the performance of their duties as Trustees.

### Sec. 1.10.  Rules for Administration of Funds.

Subject to the limitations contained in this Plan document, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this Plan document and for the transaction of its business.

### Sec. 1.11.  Board of Trustees; Certain Data to be Kept

The Board shall keep or cause to be kept, in convenient form, such data as shall be necessary for an actuarial valuation of the Retirement System and for checking and compiling the experience of the Retirement System. The ordinary actuarial, accounting and clerical services for the operation of the Retirement System shall be performed by the employees of the Retirement System.

### Sec. 1.12.  Board of Trustees;  Annual Audit Report

The Board shall render a report to the Mayor, the City Council and the Investment Committee on or before the fifteenth day of January, showing the fiscal transactions of the Retirement System for the year ending on the preceding thirtieth day of June, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the Retirement System by means of an actuarial valuation of the assets and liabilities of the Retirement System.

### Sec. 1.13.  Board of Trustees; Legal Advisors

(1)  The Board shall appoint legal advisors (including a general counsel) who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees.  Any legal advisor to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems.  The qualifications of legal counsel shall be approved by the Board of Trustees.

(2)  Legal advisors to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

(3)  Costs and expenses relative to the position of legal advisors to the Board shall be payable out of the assets of the Retirement System, subject to the provisions of the *Public Employee Retirement System Investment Act,* as amended, MCL 38.1132 *et seq.*

### Sec. 1.14.  Designation of Actuary; Authority to Engage Additional Actuaries

The Retirement System actuary as of July 1, 2014 shall continue to serve as such until resignation or removal by the Board.  In the event the Board desires to retain a new actuary, the Board and the Investment Committee shall collectively participate in the evaluation and selection of a qualified actuary. The Retirement System actuary shall be responsible for assisting the Board and the Investment Committee in performing its actuarial duties and shall comply with all requests for information or modeling requested by the Investment Committee, and shall attend meetings of the Board and Investment Committee as requested, so as to allow the Investment Committee to perform satisfactorily the rights and duties set forth In the Term Sheet and the Plan of Adjustment.  Furthermore, the Board shall not act on any recommendation made by the Retirement System's actuary based on any calculation, assumption or assessment rejected by the Investment Committee.

Nothing herein shall be interpreted as limiting the Investment Committee's authority to engage an actuarial consulting firm other than the Retirement System's actuary to perform actuarial services deemed necessary to fulfill its fiduciary and other duties to the Retirement System as set forth in the Term Sheet and the Plan of Adjustment.

**Sec. 1.15.  Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System**

(1)     Subject to Section 15.1, the Board shall adopt such mortality and other tables of experience, and a rate or rates of interest, as shall be necessary for the operation of the System on an actuarial basis, provided, that the authority granted by this section shall not permit or be used to provide for an interest rate which would violate the prohibitions of Subsection (2) or (3) of this section.

(2)     The Retirement System and the Trustees charged with management of the System shall not make any payment to active or retired Members other than payments that are required by the governing documents of the Retirement System. This prohibition applies to all payments that are not authorized by this Code, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(3)     Anything in this Combined Plan Document or any other document to the contrary notwithstanding, the annual actuarial interest rate assumption for the period commencing July 1, 2014 and ending June 30, 2023 shall be six and three-quarters percent (6.75%).

**Sec. 1.16.  Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities**

Subject to Section 15.1, each year, on the basis of such mortality and other tables of experience, and such rate or rates of regular interest as the Board shall adopt pursuant to Section 1.15, the Board shall cause to be made an actuarial valuation of the assets and liabilities of the Retirement System.

**Sec. 1.17.  Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties**

The Board of Trustees shall have such powers and duties as are necessary for the proper administration of the Retirement System and the custody and investment of Retirement System assets, other than those powers and duties reserved to the Investment Committee.  To the extent the Board exercises discretion with respect to investment of Retirement System assets, the Board shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act,* as amended, MCL 38.1132 *et seq.*, and shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act*, as amended, MCL 38.1132 *et seq.*  A member of the Board of Trustees shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Board members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflicts with the provisions set forth in this Combined Plan Document.

**Sec. 1.18.  Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties**

As of the effective date of the Plan of Adjustment, but subject to consummation of that certain Contribution Agreement by and between the Retirement System and the State of Michigan as provided in the Plan of Adjustment, an Investment Committee is hereby created for the purpose of making recommendations to the Board of Trustees with respect to certain investment management matters relating to the Retirement System.  The creation and operation of the Investment Committee is controlled by the term sheet regarding Investment Committee Governance for General Retirement System, as attached to the Plan of Adjustment ("Term Sheet").  The Investment Committee shall remain in effect for a period of not less than twenty years following the date of confirmation of the Plan of Adjustment.  The Investment Committee shall be an investment fiduciary as defined in the *Public Employee Retirement*

*System Investment Act*, as amended, MCL 38.1132 *et seq.* and shall have all powers granted fiduciaries under the first sentence of MCL 38.1133(5) and (6). The Investment Committee shall service in a fiduciary capacity with respect to the investment management of Retirement System assets, determination of the investment return assumptions, and Board compliance with provisions of the governing documents of the Retirement System. An Investment Committee member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act*, as amended, MCL 38.1132 *et seq.* An Investment Committee member shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Investment Committee members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflicts with the provisions set forth in the Term Sheet.

**Sec. 1.19.  Investment Committee; Membership; Appointment**

The Investment Committee shall consist of seven (7) members, determined as follows:

(1)     Five independent members, two of whom must be residents of the State of Michigan, and none of whom may be a party in interest with respect to the Retirement System, as defined in as defined in Section 38.1132d(4) of the *Public Employee Retirement System Investment Act,* as amended, MCL 38.1132 *et seq.* Each independent Investment Committee member shall have expert knowledge or extensive experience with respect to either (a) economics, finance, or institutional investments, or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one of the independent Investment Committee members shall satisfy the requirements of (a) above and at least one of the independent Investment Committee members shall satisfy the requirements of (b) above. The initial independent Investment Committee members shall be selected by mutual agreement of the appropriate representatives of the State of Michigan, the City and the Board, in consultation with the Foundation for Detroit's Future, and shall be named in the Plan of Adjustment. If one or more of the five initial independent Investment Committee members are not selected by mutual agreement prior to confirmation of the Plan of Adjustment, then the United States Bankruptcy Court, Eastern District of Michigan shall designate such number of independent Investment Committee members as necessary to bring the number of independent Investment Committee members to five (5);

(2)     One Retiree who is a Retiree member of the Board of Trustees who shall be appointed by the Board; and

(3)     One Employee Member who is an employee member of the Board of Trustees who shall be appointed by the Board.

**Sec. 1.20.  Investment Committee; Term; Resignation and Removal; Vacancies**

The term of office for the independent members of the Investment Committee shall be six years; provided, however, that the initial term for the independent Investment Committee members shall be determined as follows:

| Independent Member | Term of Office |
|:---:|:---:|
| (1) | 2 years |
| (2) | 3 years |

|     |         |
|-----|---------|
| (3) | 4 years |
| (4) | 5 years |
| (5) | 6 years |

The term of office for a Retiree or employee Investment Committee member shall be the number of years remaining on such individual's term of office as a member of the Board of Trustees. Each Investment Committee member shall serve until his or her successor is appointed at the expiration of his or her term of office, or until his or her death, incapacity, resignation or removal, if earlier. Notwithstanding any provision of this Combined Plan Document, an initial independent Investment Committee member shall not be prohibited from becoming a successor independent Investment Committee member after expiration of his or her initial term.

An Investment Committee member may resign at any time by giving ninety days' prior written notice to the Investment Committee, the City and the Board, which notice or time period may be waived by the Investment Committee. An Investment Committee member may be removed from office by majority vote of the other Investment Committee members for any of the following reasons: (a) the member is legally incapacitated from executing his or her duties as a member of the Investment Committee and neglects to perform those duties; (b) the member has committed a material breach of the provisions of the Retirement System or the policies or procedures of the Retirement System and the removal of the member is in the interests of the Retirement System or its Members and Beneficiaries; (c) the member is convicted of a violation of law and the removal is accomplished by a vote of the members of the Investment Committee in according with the voting procedure set forth in Section 1.21; or (d) if the member holds a license to practice and such license is revoked for misconduct by any State or federal government. A member who fails to attend four (4) consecutive scheduled meetings of the Investment Committee shall be deemed to have resigned, unless in each case his or her absence is excused for cause by the remaining Members attending such meetings. In the event of such removal or resignation, the Investment Committee shall by resolution declare the office of the member vacated as of the date such resolution is adopted.

An Investment Committee member Committee may have his or her voting privileges temporarily suspended by a 70% or higher vote of the other members if the member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the Investment Committee, or for other alleged financial crimes, including fraud.

Any vacancy occurring on the Investment Committee shall be filled within sixty (60) days following the date of the vacancy for the unexpired portion of the term, in the same manner in which the office was previously filled.

Successor independent Investment Committee members shall be recommended by a majority of the remaining independent Investment Committee members and shall be confirmed by the Board and the Treasurer of the State of Michigan, in consultation with the Foundation for Detroit's Future, pursuant to such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with the Term Sheet or the Plan of Adjustment). In the event the Board and the Treasurer of the State of Michigan cannot agree on the successor independent Investment Committee member within thirty (30) days of the receipt of the recommendation of the Investment Committee, the remaining independent Investment Committee members shall appoint the successor independent Investment Committee member.

In the event the United States Bankruptcy Court, Eastern District of Michigan appoints one or more independent Investment Committee members, successors to any such independent Investment Committee member shall be appointed in the same manner as provided in the preceding paragraph

following three (3) weeks' notice to the Board of the individuals appointed, in accordance with such rules and regulations as may be adopted by the Investment Committee, provided that such rules are not inconsistent with either the Term Sheet or the Plan of Adjustment.

Successor Investment Committee members shall have the powers and duties conferred on Investment Committee members herein.

**Sec. 1.21.  Investment Committee; Operation; Meetings; Quorum; Voting**

The Investment Committee members shall select from among the independent members a chair and a vice chair.  The Investment Committee members shall select from among themselves a secretary. The Investment Committee shall hold regular meetings, not less frequently than once every other month, and shall hold special meetings as necessary.  The Investment Committee shall designate the time and place thereof in advance. The secretary or his or her designee shall be responsible for providing meeting notices to the other Investment Committee members. The Investment Committee shall adopt its own rules of procedure and shall keep a record of its proceedings.  Notice and conduct of all Investment Committee meetings, both regular and special, shall be public and subject to the *Michigan Open Meetings Act,* MCL 15.261 *et seq.*  All Investment Committee meeting shall be held within the City of Detroit.

Five Investment Committee members shall constitute a quorum at any meeting, as long as at least three of the independent Investment Committee members are in attendance.  Each Investment Committee member shall be entitled to one vote on each question before the Committee.  Except as otherwise provided in the Term Sheet, at least four concurring votes shall be necessary for a decision by the Investment Committee.

**Sec. 1.22.  Investment Committee; Expenses**

Investment Committee members shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties.  All reasonable and proper expenses related to the administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System.  The Investment Committee may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the Investment Committee as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Retirement System.  Such engagements shall not be subject to approval of the Board.

Investment Committee members shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System.

# ARTICLE 2 – DEFINITIONS

## Sec. 2.1. Definitions

Unless a different meaning is plainly required by context, for purposes of Component I of this Combined Plan Document the following words and phrases have the meanings respectively ascribed to them by this section:

(1) *Accumulated Mandatory Employee Contributions* means the sum of all amounts deducted from the compensation of a Member and credited to the Accumulated Mandatory Employee Contribution Fund for periods on and after July 1, 2014.

(2) *Accumulated Voluntary Employee Contributions* means the total balance in a Member's individual account under Component I of the Retirement System.

(3) *Actuarial Equivalent or Actuarially Equivalent* means a Retirement Allowance or benefit amount having the same Actuarial Equivalent Value as another applicable benefit. The rates of interest adopted by the Board from time to time to determine Actuarial Equivalence shall not violate the terms of the Plan of Adjustment.

(4) *Actuarial Equivalent Value* means the value of an applicable Retirement Allowance or benefit amount, where values are calculated under generally accepted actuarial methods and using the applicable tables, interest rates and other factors established by the Board upon recommendation of the Investment Committee.

(5) *Administrative Rules and Regulations* means rules and regulations promulgated by the Board of Trustees for the administration of the Retirement System and for the transaction of its business.

(6) *Age, Attainment of* means the age an individual reaches on the day of his or her birthday.

(7) *Average Final Compensation* means the average Compensation received by a Member during the ten consecutive years of Credited Service which immediately precede the date of the Member's last termination of employment with the Employer. If a Member has less than ten years of Credited Service, the Member's Average Final Compensation shall be the average of the annual Compensation received by the Member during the Member's total years of Credited Service. If a Member is absent from service with the City for a period of not less than two months during his last two years of employment because of an unpaid leave under the Family and Medical Leave Act, such Member's Average Final Compensation will mean the average Compensation received by the Member during the ten consecutive year period out of the last twelve years of Credited Service which produces the highest average.

(8) *Beneficiary* means any person who is entitled to receive a Retirement Allowance or pension payable from funds of the Retirement System due to the participation of a Member.

(9) *Board of Trustees or Board or Retirement Board* means the Board of Trustees of the Detroit General Retirement System.

(10) *City* means the City of Detroit, Michigan, a municipal corporation.

(11) *City Council or Council* means the legislative body of the City.

9

(12)  *Compensation* means a Member's base salary or wages actually paid to the Member for personal services rendered to the Employer, excluding bonuses, overtime pay, payment of unused accrued sick leave, longevity pay, payment for unused accrued vacation, the cost or value of fringe benefits provided to the Member, termination or severance pay, reimbursement of expenses, or other extra payment of any kind.  Compensation will include any amount which is contributed by the City to a plan or program pursuant to a salary reduction agreement and which is not includable in the income of the Member under Sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code.

For periods of time prior to July 1, 2014, the City shall provide to the Retirement System actual base salary or wages paid to Members using the best and most reliable sources of information available to the City.  In the event the City is unable to provide actual base wages to the Retirement System, the City shall make reasonable estimates of each Member's base salary or wages for purposes of determining a Member's Compensation.

Notwithstanding the foregoing, for purposes of determining a Member's Voluntary Employee Contributions, Compensation shall mean the gross salary or wages paid to the Member for personal services rendered to the Employer.

The annual Compensation of each Member taken into account for the purposes of determining all benefits provided under the Retirement System for any determination period shall not exceed the limitation set forth in Code Section 401(a)(17) ($260,000 for the Plan Year commencing July 1, 2014).  Such limitation shall be adjusted for the cost-of-living in accordance with Section 401(a)(17)(B) of the Internal Revenue Code.  The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year.  If Compensation for any prior determination period is taken into account in determining a Member's benefits for the current determination period, the Compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that determination period.  If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the numerator of which is the number of months in the short determination period, and the denominator of which is 12.

(13)  *Credited Service* means service credited to a Member to the extent provided in Section 4 of Component I of this Combined Plan Document.

(14)  *Detroit General Retirement System or Retirement System* means the General Retirement System of the City of Detroit created and established by Title IX, Chapter VI, of the 1918 Detroit City Charter, as amended, continued in effect through the 1974, 1997 and 2012 Detroit City Charters, Article 47 of the Detroit City Code and this Combined Plan Document, as amended from time to time, which consists of:

(a)  The *2014 Defined Benefit Plan,* the terms of which are described in Component I hereof;

(b)  The *Defined Contribution Plan,* consisting of the Voluntary Employee Contribution Account, the terms of which are described in Component I hereof;

(c)  The *Frozen 1973 Defined Benefit Plan,* the terms of which are described in Component II hereof;

(d)     The *Frozen 1973 Defined Contribution Plan,* the terms of which are described in Component II hereof; and

(e)     The *Frozen 1998 Defined Contribution Plan*, the terms of which are described in Component II hereof, which was never implemented by the City.

References to the words *Retirement System* in Component I of the Combined Plan Document shall mean the provisions of the *Defined Benefit Plan and Defined Contribution Plan* described in Component I, unless a different meaning is plainly required by the context.

(15)    *Disability* means that a Member is mentally or physically totally incapacitated for the further performance of duty for the Employer and that such incapacity is likely to be permanent, provided that the Member shall be eligible to receive long term disability benefits under a policy or plan of insurance or self-insurance maintained by the Employer for the period of such incapacity.

(16)    *Employee* means any regular and/or permanent officer, agent, or person in the employ of the Employer, but does not include:

(a)     individuals whose services for the Employer are compensated on a contractual or fee basis;

(b)     persons who are employed in positions normally requiring less than six hundred hours of work per annum;  or

(c)     any person during any period when such person is classified by the Employer as a non-common-law employee or an independent contractor for federal income tax and withholding purposes whose compensation for services is reported on a form other than Form W-2 or any successor form for reporting wages paid to and taxes withheld from employees, even if a court or administrative agency determines that such person is a common-law employee of the Employer.

If a person described in (c) above is reclassified by the Employer as a common-law employee of the Employer and otherwise meets the definition of an Employee, the person will be eligible to participate in the Retirement System prospectively as of the actual date of such reclassification only (and only to the extent such individual otherwise qualifies as an Employee).

(17)    *Employer* means the City, or any board, commission, or court serving the City, to the extent that both the City, through the action of City Council, and the governing authority of such board, commission or court, shall mutually agree to include the employees of such board, commission, or court, as Employees under the provisions of this Retirement System at such time as they are eligible. To the extent that any employees of a board, commission, or court are considered Employees for this purpose, all employees of such board, commission, or court, shall be so included. However, only City board members and commissioners who are also Employees are eligible to participate in the Retirement System, unless otherwise specifically provided for in the Combined Plan Document. In all cases of doubt, the Board of Trustees shall decide who is an Employee.

(18)    *Family and Medical Leave Act* means the federal Family and Medical Leave Act of 1993, as amended, and regulations issued thereunder.

11

(19)     *Hour of Service* means (i) each hour for which a Member is paid or entitled to payment by the Employer for the performance of duties, and (ii) each hour for which a Member is directly paid or entitled to payment by the Employer for reasons other than the performance of duties (such as vacation, holiday, illness or approved leave of absence).

(20)     *Internal Revenue Code or Code* means the United States Internal Revenue Code of 1986, as amended.

(21)     *Investment Committee* means the committee established pursuant to Section 1.18 which shall have the powers and duties described herein.

(22)     *Mandatory Employee Contributions* mean the contributions made by a Member to the Retirement System pursuant to Section 9.3(3).

(23)     *Member* means any Employee who is included in the membership of the Retirement System and who has not retired or died.

(24)     *Normal Retirement Age* means age sixty-two (62).  Notwithstanding the foregoing, the Normal Retirement Age of a Member who is an active Employee as of June 30, 2014 and who has 10 or more years of Vesting Service as of such date shall be as follows:

| Age as of July 1, 2014 | Normal Retirement Agee |
|---|---|
| 61 years | 60 years and 0 months |
| 60 years | 60 years and 0 months |
| 59 years | 60 years and 3 months |
| 58 years | 60 years and 6 months |
| 57 years | 60 years and 9 months |
| 56 years | 61 years and 0 months |
| 55 years | 61 years and 3 months |
| 54 years | 61 years and 6 months |
| 53 years | 61 years and 9 months |

(25)     *Normal Retirement Date* means for any Member the later of the date (i) the Member attains 10 years of Vesting Service, or (ii) attains Normal Retirement Age.

Pursuant to Code Section 411(e), as in effect in 1974, a Member shall be 100% vested in his accrued benefit under the Retirement System upon attainment of his or her Normal Retirement Date while in Service.

(26)     *Notice to Members, Beneficiaries, and Retirees* means a mailing using First Class United States Mail to the Members, Beneficiaries, and Retirees at their last known addresses.

(27)     *Pension Reserve* means the present value of all payments to be made on account of any Retirement Allowance. Such Pension Reserve shall be computed upon the basis of such mortality and other tables of experience and interest, as provided herein until June 30, 2023 and, thereafter, as shall be adopted by the Board upon the recommendation of the Investment Committee.

(28)     *Plan Actuary or Actuary* means the enrolled actuary or actuarial firm appointed as provided in Section 1.14 to serve as technical advisor to the Investment Committee and the Board on matters

regarding the funding and operation of the Retirement System and to perform such other duties as the Board or the Investment Committee may direct.

(29)   *Plan Document or Combined Plan Document* means this instrument, effective as of July 1, 2014, with all amendments hereafter adopted.

(30)   *Plan of Adjustment* means the Plan for the Adjustment of Debts of the City of Detroit, which has been approved by the United States Bankruptcy Court in *In re City of Detroit*, Michigan, Case No. 13-53846.

(31)   *Plan Year* means the twelve month period commencing on July 1 and ending on June 30.

(32)   *Prior Service* means the service credit awarded to a Member before July 1, 2014 under the terms of Component II of the Retirement System as in effect on June 30, 2014, as certified by the Board of Trustees.

(33)   *Retiree* means a former Member who is receiving a Retirement Allowance from the Retirement System.

(34)   *Retirement* means a Member's withdrawal from the employ of the Employer with a Retirement Allowance paid by the Retirement System.

(35)   *Retirement Allowance* means an annual amount payable in monthly installments by the Retirement System, whether payable for a temporary period or throughout the future life of a Retiree or Beneficiary.

(36)   *Service* means personal services rendered to the Employer by a person as an Employee, provided such person is compensated by the Employer for such personal services.

(37)   *Spouse* means the person to whom a Member is legally married under applicable law at the time a determination is made.

(38)   *Straight Life Retirement Allowance* means payment of a Member's Retirement Allowance over the Member's lifetime.

(39)   *Vesting Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document.

(40)   *Voluntary Employee Contributions* mean the after-tax contributions made by a Member to the Retirement System pursuant to Section 10.1.

(41)   *Voluntary Employee Contributions Account* means the account established pursuant to Section 10.3 for a Member who elects to make Voluntary Employee Contributions.

## ARTICLE 3 – MEMBERSHIP

### Sec. 3.1.  Eligible Employees

The membership of the Retirement System shall consist of all persons who are full time Employees, except:

(a)      persons who are members of the Police and Fire Retirement System of the City of Detroit, established under Title IX, Chapter VII of the 1918 Detroit City Charter, continued in the 1974, 1997 and 2012 Detroit City Charters, and continued in the form of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan; and

(b)      Any person who is a member of any other public employee pension or retirement plan adopted by the State of Michigan, other than the Michigan National Guard, or by any other political subdivision of the State of Michigan.

### Sec. 3.2.  Cessation of Membership; Re-Employment by the Employer

(1)      The following provisions shall apply to a non-vested Member who terminates employment with the Employer and is re-employed:

(a)      Except as otherwise provided in this Article 3, if any non-vested Member leaves the employment of the Employer for any reason other than retirement or death, such person shall continue to be a Member until such time as the Member receives a total distribution of his Accumulated Mandatory Employee Contributions and Accumulated Voluntary Employee Contributions. Upon receipt of his Accumulated Mandatory Employee Contributions, the Member's Credited Service and Vesting Service at that time shall be forfeited.

(b)      If re-employment occurs within a period of six years from and after the date employment with the Employer last terminated, any forfeited Credited Service and Vesting Service rendered on and after July 1, 2014 shall be restored for purposes of determining the Member's Retirement Allowance after re-employment, provided that within the two year period beginning on the Member's re-employment date, the Member re-contributes to the Retirement System any Accumulated Mandatory Employee Contributions that were distributed to the Member pursuant to Section 5.5.

(c)      If re-employment of a non-vested Member does not occur within a period of six years from and after the date employment with the Employer last terminated, the Member shall not be permitted to re-contribute to the Retirement System any Accumulated Mandatory Employee Contributions that were distributed to the Member pursuant to Section 5.5 and any forfeited Credited Service and Vesting Service shall not be restored at the time of the Member's re-employment.

(2)      A former Employee who is vested but has not yet begun to receive a Retirement Allowance and who is rehired prior to being separated for six years shall have his benefit pertaining to his total Credited Service earned on and after July 1, 2014 calculated in accordance with the terms of Component I of the Retirement System in effect at the time of his last termination of employment.

14

(3)     A former Employee who is vested but has not begun to receive a Retirement Allowance and who is rehired after being separated for more than six years shall be entitled to two separate and distinct pensions under Component I, each to be calculated in accordance with the provisions of Component I of the Retirement System in effect at the time of each separation from service.

(4)     Retirement benefits for a Retiree who returns to active full time employment shall be subject to the following:

(a)     A Retiree who returns to work will have his Retirement Allowance suspended upon re-employment. The variable pension improvement factor (escalator) shall not be added to the amount of the original Retirement Allowance during the Retiree's re-employment period.

(b)     A Retiree who returns to work will be entitled to receive a second Retirement Allowance in accordance with the provisions of the Retirement System in effect during his re-employment period.

(c)     A Retiree's Average Final Compensation for purposes of determining the Retiree's second Retirement Allowance will be based upon the Compensation earned by the Retiree after he returns to work.

(d)     An individual who retires for a second time will not be allowed to change the payment option selected by the Member with respect to the original Retirement Allowance. However, the individual may select a separate payment option with respect to his second Retirement Allowance.

(e)     The Coordination of Benefits (Equaled Social Security) option will not be available with respect to payment of the second Retirement Allowance.

## Sec. 3.3.  Report of the Employer

It shall be the duty of the Employer to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, date of hire, and length of service of each Member, and such other information as the Board of Trustees may require or reasonably request for proper administration of the Retirement System.

15

# ARTICLE 4 – SERVICE CREDIT

### Sec. 4.1.  Credited Service

(1)     The Board shall keep an accurate record of each Employee's accumulated Service credit from the date of commencement of employment with the Employer to the date of termination of employment with the Employer.

(2)     A Member shall be credited with one month of Credited Service for each calendar month during which he performs one hundred forty (140) or more Hours of Service for the Employer as an Employee beginning on the later of July 1, 2014 or his date of hire with the Employer and ending on the date his employment with the Employer is terminated.  Service shall be credited in years and twelfths $(1/12^{th})$ of a year.  Not more than one-twelfth $(1/12^{th})$ of a year of Credited Service shall be credited to a Member on account of all Service rendered to the Employer in a calendar month.  Not more than one year of Credited Service shall be credited to a Member on account of all Service rendered to the Employer in any period of 12 consecutive months.

(3)     A Member who does not perform Service for the Employer by reason of a Disability which begins on or after July 1, 2014 shall be credited with Credited Service for the period of his Disability during which he is entitled to receive long-term disability benefits under the Employer's plan or policy.

(4)     Solely for purposes of determining eligibility for a retirement benefit under Section 5.2, a Member shall be credited with the sum of his Prior Service as determined by the Board and his Credited Service on and after July 1, 2014 determined under Section 4.1(2).

### Sec. 4.2.  Vesting Service

(1)     A Member shall be credited with a year of Vesting Service for each Plan Year commencing on or after July 1, 2014 during which the Member performs 1,000 or more Hours of Service for the Employer.

(2)     A Member's total Vesting Service shall be the sum of his Prior Service and his Service determined under Section 4.2(1).

### Sec. 4.3.  Service Credit; Military Service

An Employee who enters the military service of the United States while employed by an Employer shall have the period of such military service credited as Service in the same manner as if the Employee had served the Employer without interruption, provided that (1) the Employee's entry into such military service and re-employment thereafter shall be in accordance with applicable laws, ordinances, and regulations of the State of Michigan and the Employer, (2) he or she is re-employed by the Employer upon completion of such military service; and (3) the Member contributes to the Retirement System the Mandatory Employee Contributions that would have been made by the Member but for the Member's military service.. During the period of military service and until return to employment with the Employer, the Employee's Mandatory Employee Contributions to the Retirement System shall be suspended.

### Sec. 4.4.  Service Credit; Qualified Military Service

Notwithstanding any provision of this Combined Plan Document to the contrary, contributions, benefits, and service credit with respect to qualified military service under Component I, shall be

16

provided in accordance with Code Section 414(u). Notwithstanding anything to the contrary herein, if a Member dies while performing qualified military service (as defined in Code Section 414(u)), to the extent required by Code Section 401(a)(37), the survivors of the Member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the Member had resumed and then terminated employment on account of death.

## ARTICLE 5 – ELIGIBILITY FOR RETIREMENT BENEFITS

**Sec. 5.1. Eligibility for Unreduced Normal Retirement Benefit**

Any Member who attains his Normal Retirement Date may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired. The date of retirement shall be effective as of the first day following the later of (i) the Member's last day on the City payroll, or (ii) the date the Member executes and files an application for retirement, notwithstanding that the Member may have separated from Service during the notification period. Such a Member shall be entitled to receive an unreduced Retirement Allowance calculated as provided in Section 6.1 and payable in a form of payment selected by the Member pursuant to Section 8.1.

**Sec. 5.2. Eligibility for Reduced Early Retirement Benefit**

Any Member who has attained Age fifty-five, who is credited with thirty or more years of Credited Service, and who has not attained his Normal Retirement Date, shall have the option of retiring upon written application filed with the Board setting forth the date on which the Member desires to be retired. The Retirement Allowance payable to a Member who retires early shall be the Actuarial Equivalent of the Retirement Allowance that would be payable to the Member at his Normal Retirement Date pursuant to Section 6.1, as determined by the Plan Actuary. A Member's early retirement benefit shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

**Sec. 5.3. Eligibility for Deferred Vested Retirement Benefit**

Any Member who ceases to be an employee before satisfying the requirements for receipt of a retirement benefit under Section 5.1 or Section 5.2 and who is credited with ten or more years of Vesting Service (regardless of age), shall be entitled to receive an unreduced Retirement Allowance commencing at any time following his attainment of Age sixty-two. Deferred vested retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

**Sec. 5.4. Eligibility for Retirement Benefit – Disabled Members**

Any Member who becomes Disabled prior to his Normal Retirement Date shall be entitled to receive an unreduced Retirement Allowance commencing at any time following the Member's attainment of Age sixty-two. Disability retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

**Sec. 5.5. Return of Accumulated Mandatory Contributions to Non-Vested Member**

If a Member ceases to be an Employee before becoming eligible for a deferred vested Retirement Allowance under Section 5.3 or a disability Retirement Allowance under Section 5.4, the Member may elect to receive distribution of the Accumulated Mandatory Employee Contributions made to the Retirement System by such Member. If a Member elects to receive his Accumulated Mandatory Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

## ARTICLE 6 – RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR)

### Sec. 6.1.  Retirement Allowance

The Retirement Allowance payable to a Member commencing at the later of his Normal Retirement Date or his actual retirement from employment with the Employer in the form of a Straight Life Retirement Allowance shall be equal to one and one-half percent (1.5%) of the Member's Average Final Compensation multiplied by the Member's years (computed to the nearest one-twelfth (1/12th) year) of Credited Service earned on and after July 1, 2014.

### Sec. 6.2.  Variable Pension Improvement Factor (Escalator)

Except as provided in Section 9.5, beginning July 1, 2018 and effective the first day of each Plan Year thereafter, the Trustee may determine that a Retiree's annual Retirement Allowance shall be increased by a factor of two percent (2.0%), computed each year on the basis of the amount of the original Retirement Allowance received at the time of Retirement; provided, that the recipient of said Retirement Allowance shall have attained Age sixty-two and shall have been receiving a Retirement Allowance for a period of not less than twelve months prior to the first day of such Plan Year.

19

# ARTICLE 7 – DEATH BENEFITS

## Sec. 7.1.  Accidental Death Benefit; Performance of Duty

(1)     If a Member is killed in the performance of duty in the service of the Employer, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the Employer, and such death, illness, or injuries resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the Employer, the Member's surviving Spouse shall be entitled to a monthly annuity benefit equal to the Member's Retirement Allowance at the time of his death, unreduced for early payment. Such benefit shall be payable until the earlier of the surviving Spouse's death.

(2)     The minimum annual Retirement Allowance payable to a surviving Spouse under this Section 7.1 shall be equal to ten percent (10%) of the Member's Average Final Compensation determined as of his date of death.

## Sec. 7.2.  Death Benefits for Surviving Spouses Generally

If any Member dies while in the employ of the Employer (other than in the performance of duty) after the date such Member has earned ten or more years of Credited Service, the Member's surviving Spouse shall receive a Retirement Allowance. The Retirement Allowance payable to the Spouse shall be computed in the same manner in all respects as if said Member had (i) retired effective the day preceding the Member's death, notwithstanding that the Member had not attained Normal Retirement Date, (ii) elected a Joint and One Hundred Percent Survivor Allowance as described in Section 8.1, and (iii) nominated the surviving Spouse as Beneficiary.

## Sec. 7.3.  Refund of Accumulated Mandatory Contributions Upon Death of Member

If a Member dies while employed by the City or following termination of employment but prior to commencement of a Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions to the Retirement System at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated Beneficiary surviving, the Member's Accumulated Mandatory Employee Contributions shall be paid to the Member's estate.  If a Member  who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Mandatory Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

## Sec. 7.4.  Benefits Offset by Compensation Benefits; Subrogation

(1)     Any amounts which may be paid or payable to a Beneficiary on account of a Member's death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' benefits, shall be an offset against any amounts payable from funds of the Retirement System on account of the Member's death. If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the Pension Reserve for the Retirement Allowance payable by the Retirement System, the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the amounts payable by the Retirement System, and such amounts as may be provided by the Retirement System, so reduced, shall be payable as provided in this Combined Plan Document.

20

(2)     In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the Retirement System shall be subrogated to the rights of said person against such third party to the extent of the benefit which the Retirement System pays or becomes liable to pay.

# ARTICLE 8 – FORMS OF PAYMENT

## Sec. 8.1.  Retirement Allowance Options

(1)     Until the date the first Retirement Allowance payment check is issued, any Member may elect to receive a *Straight Life Retirement Allowance* payable throughout life, or the Member may elect to receive the Actuarial Equivalent of the *Straight Life Retirement Allowance* computed as of the effective date of retirement, in a reduced Retirement Allowance payable throughout life, and nominate a Beneficiary, in accordance with the options set forth below:

(a)     *Option One. Cash Refund Annuity.* If a Retiree who elected a Cash Refund Annuity dies before payment of the Accumulated Contributions made to the Retirement System on and after July 1, 2014 has been received in an aggregate amount equal to, but not exceeding the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between said Accumulated Mandatory Employee Contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to a Beneficiary nominated by written designation duly executed by the Member and filed with the Board. If there are no such designated Beneficiaries surviving said Retiree, any such difference shall be paid to the Retiree's estate.

(b)     *Option Two. Joint and One Hundred Percent Survivor Allowance.* Upon the death of a Retiree who elected a *Joint and One Hundred Percent Survivor Allowance,* one hundred percent of the reduced Retirement Allowance shall be paid to and continued throughout the life of the Beneficiary nominated by written designation duly executed and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(c)     *Option "A". Joint and Seventy-Five Percent Survivor Allowance.* Upon the death of a Retiree who elected a *Joint and Seventy-Five Percent Survivor Allowance,* seventy-five percent of the reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(d)     *Option Three. Joint and Fifty Percent Survivor Allowance.* Upon the death of a Retiree who elected a *Joint and Fifty Percent Survivor Allowance,* fifty percent of the reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(e)     *Option "B". Joint and Twenty-Five Percent Survivor Allowance.* Upon the death of a Retiree who elected a *Joint and Twenty-Five Percent Survivor Allowance,* twenty-five percent of the reduced Retirement Allowance shall be paid throughout the life of the Beneficiary nominated by written designation duly executed and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(2)     *Joint and Survivor Optional Forms of Payment.* The *Joint and Survivor Optional Forms of Payment* provided under the Retirement System shall be made available in either the standard form or the pop-up form, as follows:

22

(a) *Standard Form.* Under the *Standard Form,* the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree.

(b) *Pop-up Form.* Under the *Pop-up Form,* the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree and the designated Beneficiary. In the event of the death of the designated Beneficiary during the lifetime of the Retiree, the amount of the Retirement Allowance shall be changed to the amount that would have been payable had the Retiree elected the *Straight Life Retirement Allowance Form of Payment.*

(3) *Coordination of Benefits.* According to such rules and regulations as the Board shall adopt, until the first payment of a Retirement Allowance becomes due, but not thereafter, a Member under Age sixty-five may elect to have the Member's *Straight Life Retirement Allowance* provided for in this Retirement System equated on an Actuarial Equivalent basis to provide an increased Retirement Allowance payable to Age sixty-two or Age sixty-five, and to provide a decreased Retirement Allowance thereafter. The increased Retirement Allowance payable to such Age shall approximate the total of the decreased Retirement Allowance payable thereafter and the estimated social security benefit. If a Member elects to receive increased and then decreased Retirement Allowance payments provided for in this paragraph, he or she may also elect to have such payments reduced by electing one of the optional forms of payment provided for in paragraph (1) of this Section 8.1. This coordination of benefits option shall not create any additional actuarial costs.

### Sec. 8.2. Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, a Joint and Fifty Percent Survivor allowance, or a Joint and Twenty-Five Percent Survivor allowance as provided for under Section 8.1(1), both a Retiree and his Beneficiary die before they have received in Retirement Allowance payments an aggregate amount equal to the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between the said Accumulated Mandatory Employee Contributions and the aggregate amount of Retirement Allowances paid to the Retiree and Beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the Retiree duly executed and filed with the Board. If there are no such person or persons surviving the Retiree and the Beneficiary, any such difference shall be paid to the estate of the second to die of the Retiree or Beneficiary.

# ARTICLE 9 – FUNDING AND RESERVES

## Sec. 9.1.  Funding Objective of the Retirement System

The funding objective of Component I of the Retirement System is to establish and receive Employer and Member contributions during each Plan Year that are sufficient to fully cover the actuarial cost of benefits anticipated to be paid on account of Credited Service rendered by Members during the Plan Year (the normal cost requirements of the Retirement System), and amortize the unfunded actuarial costs of benefits likely to be paid on account of Credited Service rendered on or after July 1, 2014 and before the first day of the Plan Year (the unfunded actuarial accrued liability of Component I of the Retirement System).

## Sec. 9.2.  Funds

Component I of the Retirement System shall consist of the Accumulated Mandatory Employee Contribution Fund, the Accumulated Voluntary Employee Contribution Fund, the Pension Accumulation Fund, the Rate Stabilization Fund, the Expense Fund, and the Income Fund, as follows:

(1)     The Accumulated Mandatory Employee Contribution Fund shall be the Fund in which shall be accumulated the contributions of Members to provide their Retirement Allowances.  Upon the Retirement, termination, or death of a Member with a vested Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions shall be deemed to be part of the Pension Reserve which shall be used to pay the Member's Retirement Allowance.

(2)     The Accumulated Voluntary Employee Contribution Fund shall be the Fund in which shall be accumulated the voluntary after-tax contributions of Members together with earnings thereon.

(3)     The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the Retirement Allowances and other benefits payable from that portion of the Employer's annual contribution that is not credited to the Rate Stabilization Fund, and from which shall be paid Retirement Allowances and other benefits on account of Members.

(4)     The Rate Stabilization Fund shall be the Fund to which shall be credited Employer contributions in excess of the amount of the Employer's contribution which is credited to the Pension Accumulation Fund.

(5)     The Expense Fund shall be the fund to which shall be credited any money provided by the Employer to pay the administrative expenses of the Retirement System, and from which shall be paid certain expenses incurred in connection with the administration and operation of the Retirement System.

(6)     The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of Component I of the Retirement System and any earnings thereon, all gifts and bequests received by Component I of the Retirement System, and all other moneys credited to Component I of the Retirement System, the disposition of which is not specifically provided for in this Article 9. There shall be paid or transferred from the Income Fund, all amounts required to credit earnings and losses to the various Funds of the Retirement System in accordance with the provisions of Component I of this Combined Plan Document.

24

## Sec. 9.3.  Method of Financing Retirement System Benefits

(1)     The pension liabilities for Members shall be determined by the Plan's Actuary using the entry-age normal cost method of actuarial valuation.

(2)     The Employer's annual contribution to finance the prospective pension liabilities for the nine Plan Year period commencing July 1, 2014 and ending June 30, 2023 shall be five percent of the Compensation of active Members for the applicable Plan Year.  A portion of the Employer's annual contribution for each Plan Year shall be credited to the Rate Stabilization Fund.  The remainder of the City's annual contribution shall be shall be allocated to the Pension Accumulation Fund.

(3)     Except as provided in Section 9.5, for each Plan Year, a Member shall contribute to the Retirement System an amount equal to four percent of his or her Compensation for such Plan Year. A Member's Mandatory Employee Contributions for the Plan Year beginning July 1, 2014 and ending June 30, 2015 shall commence as of July 14, 2014.  The officer or officers responsible for processing the payroll shall cause a Member's Mandatory Employee Contributions to be deducted from the Member's Compensation on each and every payroll, for each and every payroll period, from the date of his participation in the Retirement System to the date he ceases to be a Member.  The contribution shall be deducted from the Members' Compensation, notwithstanding that the minimum compensation provided by law for any Member shall be reduced thereby. Payment of compensation, less said Mandatory Employee Contributions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment.  Member Mandatory Employee Contributions will be used for the purpose of funding the normal cost of the Retirement System.

## Sec. 9.4.  Member Contributions Picked-Up

(1)     The Employer shall pick up Member Mandatory Employee Contributions required pursuant to Sections 9.3(3) and 9.5 in accordance with Code Section 414(h).

(2)     The picked-up contributions, although designated as employee contributions shall be treated as City contributions for the purpose of determining a Member's tax treatment under the Internal Revenue Code.  The City shall pay the contributions picked-up on behalf of a Member from the same source of funds that are used for paying compensation to the Member.

(3)     The Employer shall pick up Member Mandatory Employee Contributions by a reduction in the Member's cash salary or an offset against a future salary increase, or both.  The Employer shall designate Mandatory Employee Contributions that are picked-up and paid to the Retirement System as employer contributions and not as employee contributions. No Member who participates in the Retirement System shall have the option of choosing to receive the contributed amounts directly instead of having those amounts paid by the City to the Retirement System.

## Sec. 9.5.  Fiscal Responsibility: Increased Funding Obligations and Benefit Reductions

(1)     To safeguard the long-term actuarial and financial integrity of the Retirement System, in the event the funding level of Component I of the Retirement System projected over a five year period falls below one hundred percent (100%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than one hundred percent (100%):

(a)      the Trustee may not award the variable pension improvement factor (escalator) described in Section 6.2 to any Retiree;

(b)      all amounts credited to the Rate Stabilization Fund shall be transferred to the Pension Accumulation Fund for the purposes of funding benefits payable under Component I of the Retirement System; and

(c)      Member Mandatory Contributions shall be increased from four percent (4%) of Compensation to five percent (5%) of Compensation for the next following five Plan Years.

(2)      In the event the funding level of the Retirement System determined as provided in Section 9.5(1) is projected to fall below eighty percent (80%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than eighty percent (80%):

(a)      the remedial action required in Section 9.5(1) shall be implemented or continued;

(b)      the Retirement Allowance payable to a Retiree shall not include the variable pension improvement factor (escalator) that was most recently added to the Retiree's Retirement Allowance for a Plan Year;

(c)      Member Mandatory Employee Contributions shall be increased from five percent (5%) of Compensation to six percent (6%) of Compensation for the next following five Plan Years;

(d)      the Retirement Allowance payable to a Retiree shall not include the variable pension improvement factor (escalator) that was most recently added to the Retiree's Retirement Allowance for the Plan Year preceding the Plan Year referenced in paragraph (b) above; and

(e)      the Retirement Allowance accrued by Members for up to a five Plan-Year-period shall be determined as provided in Section 6.1, except that one percent (1%) shall be substituted for one and one-half percent (1.5%) wherever it appears in said Section 6.1.

In determining whether the eighty percent (80%) funding level under this Section 9.5(2) has been achieved, the Plan's Actuary shall calculate the funding percentage of the Retirement System after taking into account the elimination of the variable pension improvement factor (escalator) pursuant to Section 9.5(1)(a) but prior to taking into account the remedial steps provided in Sections 9.5(1)(b) and (c).

(3)      For purposes of this Section 9.5, the "funding level" shall mean the ratio of the market value of the assets of Component I of the Retirement System to the actuarial accrued liability of Component I of the Retirement System.  The actuarial accrued liability shall be calculated by the Plan's Actuary utilizing an interest rate assumption of six and three-quarters percent (6.75%) and other reasonable assumptions as directed by the Board upon the recommendation of the Investment Committee.  The market value of assets shall be determined on the basis of a three-year look back period of smoothed investment returns.

26

# ARTICLE 10 – VOLUNTARY EMPLOYEE CONTRIBUTIONS

## Sec. 10.1.  Voluntary Employee Contributions; Amount; Vesting

Subject to procedures established by the Board, a Member may elect to reduce his Compensation for any Plan Year by a whole percentage equal to three percent (3%), five percent (5%) or seven percent (7%) and have such amount contributed by the Employer to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System.  Voluntary Employee Contributions shall be made to the Retirement System on an after-tax basis.  Amounts credited to a Member's Voluntary Employee Contribution Account shall be one hundred percent (100%) vested at all times.

## Sec. 10.2.  Changing an Election to Contribute

A Member may change or revoke an election to make Voluntary Employee Contributions to the Retirement System pursuant to this Article 10 in such manner and with such advance notice as the Board shall determine.  Notwithstanding the foregoing, a Member shall be permitted to change such election not less frequently than annually.

## Sec. 10.3.  Individual Member Accounting; Crediting of Earnings

The Board shall maintain a Voluntary Employee Contribution Account on behalf of each Member who elects to make Voluntary Employee Contributions to the Retirement System.  Each Plan Year, a Member's Voluntary Employee Contribution Account shall be credited with earnings at a rate equal to the actual net investment rate of return on the assets of the Retirement System for the second fiscal year immediately preceding the fiscal year in which the earnings are credited; in no event, however, shall the earnings rate credited to a Member's Voluntary Employee Contribution Account for any Plan Year be less than zero percent (0%) nor greater than five and one-quarter percent (5.25%).

## Sec. 10.4.  Distribution of Accumulated Voluntary Employee Contributions

(1)  If a Member ceases to be an Employee other than by reason of death, the Member may elect to receive distribution of the Accumulated Voluntary Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Voluntary Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

(2)  In lieu of receiving distribution of his Accumulated Voluntary Employee Contributions as provided in Section 10.4(1), a Member may elect to have the actuarial equivalent value of his Accumulated Voluntary Employee Contributions added to his Retirement Allowance and paid in the form of an annuity described in Section 8.1.

(3)  If a Member dies while employed by the Employer or following termination of employment but prior to receiving distribution of the Member's Accumulated Voluntary Employee Contributions, the amounts credited to the Member's Accumulated Voluntary Employee Contribution Account at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated Beneficiary surviving, the Member's Accumulated Voluntary Employee Contributions shall be paid to the Member's estate.  If a Member who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Voluntary Employee Contributions at the time of death

may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

## ARTICLE 11 – LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS

### Sec. 11.1. The Loan Program

A loan program shall be available to Members who have amounts credited to a Voluntary Employee Contributions Account. The Board is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of the loan program. Copies of the rules shall be made available to eligible Members in the offices of the Retirement System. Any loans granted or renewed under the Retirement System shall be made and administered pursuant to and in compliance with Section 72(p) of the Internal Revenue Code and regulations thereunder.

### Sec. 11.2. Eligibility for Loan

Subject to the rules and procedures established by the Board, loans may be made to eligible Members from such Member's Voluntary Employee Contribution Account. An eligible Member is any Member who has participated in the Retirement System for twelve (12) months or more. Former Members, Spouses and Beneficiaries are not eligible to receive any loans from the Retirement System. No Member shall have more than two (2) outstanding loans from the Retirement System (Component I and/or Component II) at any time. A Member who has previously defaulted on a loan shall not be eligible for a loan from the Retirement System.

### Sec. 11.3. Amount of Loan

An eligible Member who has satisfied applicable rules and procedures established by the Board may borrow from his Voluntary Employee Contribution Account an amount, which does not exceed the lesser of (i) fifty percent (50%) of the Member's Voluntary Employee Contribution Account balance, and (ii) Ten Thousand Dollars ($10,000.00), in each case reduced by the excess, if any, of: (1) the Member's highest outstanding loan balance under the Retirement System during the one (1) year period ending on the day before the date on which the loan is made, or (2) the outstanding loan balance under the Retirement System on the date on which the loan is made, whichever is less. The minimum loan amount shall be One Thousand Dollars ($1,000.00).

### Sec. 11.4. Terms and Conditions

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(a) Each loan application shall be made in writing.

(b) All loans shall be memorialized by a collateral promissory note for the amount of the loan, including interest, payable to the order of the Retirement System and properly executed by the Member.

(c) Each loan shall be repaid by substantially equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years. In no case shall the amount of the payroll deduction be less than Twenty Dollars ($20.00) for any two-week pay period. A Member receiving a loan will be required to authorize payroll deductions from his compensation in an amount sufficient to repay the loan over its term.

(d)        An amount equal to the principal amount of the loan to a Member (but not more than one half of the Member's vested interest in the Retirement System) will be designated as collateral for guaranteeing the loan.

(e)        Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among Members in its determination of interest rates on loans. However, loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the loan. The loan interest rate shall be calculated in a manner that will not negatively affect either the Employer's costs with respect to the Retirement System or the investment return allocated to Members.

(f)        Loan repayments shall be suspended during a period of military service, as permitted by Section 414(u)(4) of the Internal Revenue Code. A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

### Sec. 11.5. Loan Balance

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's Voluntary Employee Contribution Account (provided that the interest credited to the Member's Voluntary Employee Contribution Account shall be reduced appropriately to cover the administrative costs of the loan program and avoid negatively affecting the Employer's costs or the Retirement System's investment returns), and shall not be part of the Retirement System's net investment income or part of the Member's Voluntary Employee Contribution Account balance for the purpose of allocation of net investment income under the Retirement System.

### Sec. 11.6. Default

In the event a Member defaults on a loan before the loan is repaid in full, the unpaid balance thereof will become due and payable and, to the extent that the outstanding amount is not repaid by the end of the calendar quarter which follows the calendar quarter in which the last payment was received, such amount shall be deemed to have been distributed to the Member for tax purposes, consistent with Section 72(p) of the Internal Revenue Code.

### Sec. 11.7. Distribution

No distribution shall be made to a Member, former Member, Spouse or Beneficiary from the Retirement System until all outstanding loan balances and applicable accrued interest have been repaid or offset against amounts distributable to the Member from the Retirement System.

# ARTICLE 12 - LIMITATION ON BENEFITS AND CONTRIBUTIONS

## Sec. 12.1. Compliance With Code Section 415(b) And Regulations

(1)     Notwithstanding any other provision of this Combined Plan Document, the defined benefit component of the Retirement System shall be administered in compliance with the provisions of Code Section 415(b) and regulations thereunder that are applicable to governmental plans.

(2)     The maximum annual benefit accrued by a Member during a limitation year (which shall be the Plan Year) and the maximum annual benefit payable under the Retirement System to a Member at any time within a Plan Year, when expressed as an annual benefit in the form of a straight life annuity (with no ancillary benefits), shall be equal to $160,000 (as such amount is adjusted pursuant to Code Section 415(d) for such Plan Year).

(3)     Notwithstanding the foregoing:

(a)     if the benefit under the Retirement System is payable in any form other than a straight life annuity, the determination as to whether the limitation described in Section 12.1(2) has been satisfied shall be made, in accordance with the regulations prescribed by the Secretary of the Treasury, by adjusting such benefit to the Actuarially Equivalent straight life annuity beginning at the same time, in accordance with Section 12.1(8) or (9);

(b)     if the benefit under the Retirement System commences before Age sixty-two, the determination of whether the limitation set forth in Section 12.1(2) (the "Dollar Limit") has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by reducing the Dollar Limit so that the Dollar Limit (as so reduced) is equal to an annual benefit payable in the form of a straight life annuity, commencing when such benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-two; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-two and the age of benefit commencement, then the Dollar Limit (as so reduced) shall equal the lesser of (i) the amount determined under this Section 12.1(3)(b) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the straight life annuity under the Retirement System, commencing at Age sixty-two; and

(c)     if the benefit under the Retirement System commences after Age sixty-five, the determination of whether the Dollar Limit has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by increasing the Dollar Limit so that the Dollar Limit (as so increased) is equal to an annual benefit payable in the form of a straight life annuity, commencing when the benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age 65; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-five and the Age of benefit commencement, the Dollar Limit (as so increased) shall equal the lesser of (i) the amount determined under this Section 12.1(3)(c) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the immediately

commencing straight life annuity under the Retirement System, commencing at Age sixty-five.

(4)   Notwithstanding the foregoing provisions of this Section 12.1, except as provided in Section 12.1(5), the maximum annual benefit specified in Section 12.1(2) above shall not apply to a particular Retirement System benefit if (a) the annual amount of such Retirement System benefit, together with the aggregate annual amount of any other pensions payable with respect to such Member under all other defined benefit plans maintained by the Employer, does not exceed $10,000 for the Plan Year or any prior Plan Year and (b) the Member was not at any time a participant in a defined contribution plan maintained by the Employer.

(5)   In the case of a Member who has less than ten years of participation in the Retirement System, the limitation set forth in Section 12.1(2) shall be such limitation (without regard to this Section 12.1(5)), multiplied by a fraction, the numerator of which is the number of years of participation in the Retirement System (or parts thereof) credited to the Member and the denominator of which is ten.  In the case of a Member who has less than ten years of Vesting Service, the limitations set forth in Paragraph (b) of Section 12.1(2) and in Section 12.1(4) shall be such limitations (determined without regard to this Section 12.1(5)) multiplied by a fraction, the numerator of which is the number of years of Vesting Service, or parts thereof, credited to the Member and the denominator of which is ten.

(6)   Notwithstanding anything in this Section 12.1 to the contrary, if the annual benefit of a Member who has terminated employment with the Employer is limited pursuant to the limitations set forth in Section 12.1(2), such annual benefit shall be increased in accordance with the cost-of-living adjustments of Code Section 415(d).

(7)   For purposes of determining actuarial equivalence under Paragraph (b) or (c) of Section 12.1(3), the interest rate assumption shall be five percent (5%) and the mortality table used shall be the applicable mortality table specified by the Board.

(8)   The actuarially equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) does not apply, as required by Paragraph (a) of Section 12.1(3), is equal to the greater of (a) the annual amount of the straight life annuity payable under the Retirement System commencing at the same annuity starting date as the form of benefit payable to the Member, or (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the interest rate and mortality assumptions set forth in Section 12.1(7).

(9)   The actuarially equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) applies, as required by Paragraph (a) of Section 12.1(3), is equal to the greatest of (a) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same Actuarial Equivalent present value as the form of benefit payable to the Member, (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using a five and one-half percent (5.5%) interest rate assumption and the applicable mortality table specified by the Board, or (c) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the applicable interest rate and the applicable mortality table, both as specified by the Board, divided by 1.05.

32

(10)    For purposes of applying the limitations set forth in this Section 12.1, all qualified defined benefit plans (whether or not terminated) ever maintained by the Employer shall be treated as one defined benefit plan.

(11)    For purposes of this Section 12.1, the term "compensation" shall include those items of remuneration specified in Treasury Regulation § 1.415(c)-2(b) and shall exclude those items of remuneration specified in Treasury Regulation § 1.415(c)-2(c), taking into account the timing rules specified in Treasury Regulation § 1.415(c)-2(e), but shall not include any amount in excess of the limitation under Code Section 401(a)(17) in effect for the year. The term "compensation" as defined in the preceding sentence shall include any payments made to a Member by the later of (a) two and one-half months after the date of the Member's severance from employment with the Employer or (b) the end of the limitation year that includes the date of the Member's severance from employment with the Employer, provided that, absent a severance from employment, such payments would have been paid to the Member while the Member continued in employment with the Employer and are regular compensation for services performed during the Member's regular working hours, compensation for services outside the Member's regular working hours (such as overtime or shift differential pay), commissions, bonuses or other similar compensation.

(12)    This Section 12.1 shall be administered in conformity with the regulations issued by the Secretary of the Treasury interpreting Code Section 415 including, but not limited to, any regulation providing for the "grandfathering" of any benefit accrued prior to the effective date of such regulations or statutory provision.

## Sec. 12.2. Compliance with Code Section 415(c) and Regulations

(1)    The "annual addition" with respect to a Member for a limitation year shall in no event exceed the lesser of:

    (a)    $40,000 (adjusted as provided in Code Section 415(d)); or

    (b)    One hundred percent (100%) of the Member's compensation, as defined in Code Section 415(c)(3) and regulations issued thereunder, for the limitation year.

(2)    The "annual addition" with respect to a Member for a limitation year means the sum of his Voluntary Employee Contributions

(3)    to the Retirement System, and the employer contributions, employee contributions and forfeitures allocated to his accounts under any other qualified defined contribution plan (whether or not terminated) maintained by the Employer, and the amounts described in Code Sections 415(l)(2) and 419A(d)(2) allocated to his account.

(4)    In the event the "annual addition" to the Retirement System on behalf of a Member would otherwise exceed the amount that may be applied for his benefit under the limitation contained in this Section 12.2, the limitation shall be satisfied by reducing the Member's Voluntary Employee Contributions to the extent necessary and distributing such amounts to the Member.

## ARTICLE 13 - RETIREMENT SYSTEM ADMINISTRATION

### Sec. 13.1. Board of Trustees as Retirement System Administrator

(1)    The Retirement Board shall have the power and authority to manage and administer the Retirement System in accordance with the provisions of the Combined Plan Document.

(2)    The Retirement Board shall provide procedures for the processing and review of benefit claims, corrections of errors, and similar matters, as further described in Section 13.2.

(3)    The Retirement Board and the Retirement System shall not make any payment to active or retired Members or Beneficiaries other than payments that are required by the Retirement System as established by this Combined Plan Document. This prohibition applies to all payments that are not authorized by this Combined Plan Document, whether such payments are those commonly referred to as a "thirteenth check" or payments by any other name.

### Sec. 13.2. Powers and Duties of Board

(1)    The Board shall have the following powers and duties:

(a)    exclusive authority regarding the administration, management and operation of the Retirement System, including, but not limited to, the right to contract for office space, computer hardware and software, and human resource services (any or all of which may be obtained from the City), and to make rules and regulations with respect to the operation of the Retirement System not inconsistent with the terms of the Combined Plan Document and applicable law, and to amend or rescind such rules and regulations;

(b)    to determine questions of law or fact that may arise as to the rights of any person claiming rights under the Retirement System;

(c)    to determine the contributions to the Retirement System required of the Employer and Members pursuant to the documents governing operation of the Retirement System, including the Plan of Adjustment;

(d)    to construe and interpret the provisions of the Retirement System and to reconcile any inconsistencies;

(e)    to perform ministerial functions, whether or not expressly authorized, which the Board may deem necessary or desirable in carrying out its duties under the Retirement System;

(f)    except to the extent authority is vested in the Investment Committee, authority to employ, contract and pay for professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation of the Retirement System;

(g)    except to the extent authority or responsibility is vested in the Investment Committee, to arrange for annual audits of the records and accounts of the Retirement System by a certified public accountant or by a firm of certified public accountants pursuant to generally accepted auditing standards;

34

(h)      to prepare an annual report for the Retirement System for each fiscal year in compliance with generally accepted accounting principles. The report shall contain information regarding the financial, actuarial, and other activities of the Retirement System during the fiscal year. The Board shall furnish a copy of the annual report to the Mayor and finance director of the City, to the chair of the City Council and to the Investment Committee. The report shall also contain a review of the latest actuarial valuation of the Retirement System;

(i)      to maintain or cause to be maintained such separate funds and accounts as are required to be maintained under the provisions of Components I and II of the Combined Plan Document and such additional accounts as the Board deems necessary or expedient for the proper administration of the Retirement System and the administration and investment of the assets of the Retirement System. The Board shall maintain suitable records, data and information in connection with the performance of its functions, including, but not limited to, accurate and detailed accounts of all investments, receipts, disbursements, and other actions, including the proportionate interest therein and accumulated contributions of each Member who has made contributions to the Retirement System;

(j)      to correct any error in the records of the Retirement System that results in overpayment or underpayment of contributions to the Retirement System by the Employer or a Member, or overpayment or underpayment of benefits to a Member, former Member, or Beneficiary by the Retirement System. In the event of overpayment to a Member, former Member or Beneficiary, the Board may, as far as practicable, adjust future payments to such individual, in such a manner that the Actuarial Equivalent of the benefit to which such individual was entitled shall be paid;

(k)      to the extent permissible under Michigan law (and consistent with the Retirement System's favorable tax qualified status under Code Section 401(a)), purchase one or more insurance policies to indemnify any person and such person's heirs and legal representatives who is made a party to (or threatened to be made a party to) any action, suit or proceeding whether brought by or in the right of the Board, the Investment Committee or the Retirement System or otherwise, by reason of the fact that such person is or was a Board member, Investment Committee member, director, officer, employee or agent of the Board (or an advisory body or committee of the Board) or the Retirement System. The insurance policies purchased by the Board shall not indemnify any person who is judicially determined to have incurred liability due to fraud, gross negligence or malfeasance in the performance of his duties; and

(l)      except to the extent authority or responsibility is vested in the Investment Committee, to perform any other function that is required for the proper administration of the Retirement System.

## Sec. 13.3. Executive Director; Employees

The Board shall employ on behalf of the Retirement System an executive director and any other employees for which the Board establishes positions. The executive director shall do all of the following:

(a)      manage and administer the Retirement System under the supervision and direction of the Board;

(b)      annually prepare and submit to the Board for review, amendment, and adoption an itemized budget projecting the amount required to pay the Retirement System's expenses for the following fiscal year; and

(c)      perform such other duties as the Board shall delegate to the executive director.

The executive director, unless such power is retained by the Board, shall determine the compensation of all employees of the Retirement System (except the executive director, whose compensation shall be determined by the Board; and the chief investment officer, whose compensation shall be determined by the Investment Committee) and such compensation shall be payable from the Retirement System. Any person employed by the Retirement System may, but need not, be an employee of the City.

## Sec. 13.4.  Discretionary Authority

The Board shall have discretion to:

(a)      interpret the provisions of the Retirement System;

(b)      make factual findings with respect to any and all issues arising under the Retirement System;

(c)      determine the rights and status of Members, Retirees, Beneficiaries and other persons under the Retirement System;

(d)      decide benefit disputes arising under the Retirement System; and

(e)      make determinations and findings (including factual findings) with respect to the benefits payable hereunder and the persons entitled thereto as may be required for the purposes of the Retirement System.

## Sec. 13.5.  Administrator's Decision Binding

The Board's decision on any matter arising in connection with administration and interpretation of the Retirement System shall be final and binding on Members, Retirees and Beneficiaries.

36

# ARTICLE 14 – MANAGEMENT OF FUNDS

## Sec. 14.1.  Board as Trustee of Retirement System Assets

The Board of Trustees shall be the trustee of the funds held under the Retirement System, shall receive and accept all sums of money and other property paid or transferred to it by or at the direction of the City and, subject to the terms of Article 15, shall have the power to hold, invest, reinvest, manage, administer and distribute such money and other property subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws*, as amended.

## Sec. 14.2.  Maintenance of Segregated Funds

The Board of Trustees shall maintain separate funds as required for the proper administration of the Retirement System and shall not commingle the assets held under the Retirement System for the purpose of funding benefits accrued by Members prior to July 1, 2014, together with earnings and losses on such assets (or replacement assets), as more fully described in Component II of this Combined Plan Document, with the assets of the Retirement System held for the purpose of paying benefits accrued by Members on and after July 1, 2014 as described in this Component I of the Combined Plan Document. Notwithstanding the foregoing, the assets held under Components I and II of this Combined Plan Document may be commingled for investment purposes.

## Sec. 14.3.  Custodian of Funds

The Board of Trustees shall appoint or employ custodians of the assets of the Retirement System. The custodians shall perform all duties necessary and incidental to the custodial responsibility and shall make disbursements as authorized by the Board.

## Sec. 14.4.  Exclusive Purpose

All money and other assets of the Retirement System shall be held by the Trustees and invested for the sole purpose of paying benefits to Members and Beneficiaries and shall be used for no other purpose.  In exercising its discretionary authority with respect to the management of the money and other assets of the Retirement System, the Trustees shall exercise the care, skill, prudence and diligence under the circumstances then prevailing, that a person acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of like character with like aims.

## Sec. 14.5.  Prohibited Conduct

Members of the Board and employees of the Retirement System are prohibited from:

(1)     Having any beneficial interest, direct or indirect, in any investment of the Retirement System;

(2)     Being an obligor or providing surety for any money loaned to or borrowed from the Retirement System;

(3)     Except as provided in Article 10, borrowing any money or other assets of the Retirement System; and

37

(4)      Receiving any pay or other compensation from any person, other than compensation paid by the Retirement System, with respect to investments of the Retirement System.

## ARTICLE 15 – INVESTMENT OF RETIREMENT SYSTEM ASSETS

### Sec. 15.1.  Investment Powers of the Board and the Investment Committee

Subject to the requirements set forth in this Article 15, the Board shall have the power and authority to manage, control, invest and reinvest money and other assets of the Retirement System subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314 of the Public Acts of 1965*, being sections 38.1132 *et seq. of the Michigan Compiled Laws*, as amended. Notwithstanding anything in this Combined Plan Document to the contrary, for the twenty year period following the effective date of the Plan of Adjustment, the Investment Committee shall make recommendations to the Board with respect to investment management matters as provided in this Article 15.

All investment management decisions made by the Board, as more fully described in Section 15.2, shall require a recommendation by an affirmative vote of the Investment Committee as provided in this Combined Plan Document.  The Board shall take no action with respect to any matter for which the Investment Committee has advisory responsibility and authority, unless and until such action has been approved by affirmative vote of the Investment Committee. All actions and recommendations of the Investment Committee shall be forwarded to the Board for consideration and are subject to Board approval.  If the Board (a) fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the Investment Committee, and such failure continues for forty-five days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such forty-five day period but fails to provide to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee  and the Chief Investment Officer are authorized to implement the decision.

If the Board disapproves an Investment Committee recommendation within such forty-five day period and provides to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee shall have forty-five days after the receipt of the Board response to either (a) withdraw the recommended Investment Management decision, or (b) request, in writing, a conference with the Board to be held within ten days, but not sooner than five business days, of the request to discuss the alternative proposal from the Board, unless a later date is agreed to in writing by the Board and the Investment Committee to discuss the disapproval as set forth in the Board's written response.  Any such conference shall be conducted with at least three independent Investment Committee members present in person or by phone.  Within ten days of the commencement of the conference or twenty days following the Investment Committee's request for a conference if no conference is held, the Investment Committee shall either withdraw the recommended Investment Management decision or provide the Board with a written explanation of the Investment Committee's decision to proceed with the recommended Investment Management decision.  After delivery of such written explanation by the Investment Committee, the Investment Committee and the chief investment officer are authorized to implement the decision.  Any action taken by the Board or the Investment Committee in violation of the terms of this Article 15 shall constitute an ultra vires act and the Investment Committee or the Board is granted the express right to seek to preliminarily enjoin such violation without the need to show irreparable harm.

### Sec. 15.2.  Investment Management

(1)      For purposes of this Combined Plan, investment management decisions shall include:

(a)     development of an investment policy statement with sound and consistent investment goals, objectives, asset allocation and rebalancing guidelines, performance benchmarks for strategic asset allocation and such other aspects of investment policy as are consistent with the needs of the Retirement System;

(b)     within 120 days after the effective date of the Plan of Adjustment, placement of all of the assets of the Retirement System not already under qualified management with qualified investment managers selected by the Investment Committee;

(c)     evaluation, retention, termination and selection of qualified managers to invest and manage the Retirement System's assets;

(d)     review and affirmation or rejection of the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Retirement System actuary including, but not limited to (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the pension restoration program attached to the Plan of Adjustment (as more fully described in Component II of this Combined Plan Document), (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after fiscal year 2024, the recommended annual contributions to the Retirement System in accordance with applicable law;

(e)     in accordance with approved actuarial work as provided in paragraph (d) above and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Retirement System's actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of a portion of the reduction in base monthly pension amounts and the payment of lost COLA payments, all in conformance with the pension restoration program attached to the Plan of Adjustment;

(f)     communication of the Retirement System's investment goals, objectives, and standards to the investment managers, including any material changes that may subsequently occur;

(g)     determination and approval of the Retirement System's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Retirement System;

(h)     periodic review and evaluation of the performance of the investment managers in context with established standards of performance, including restoration of benefits pursuant to Component II of the Retirement System;

(i)     the taking of corrective action deemed prudent and appropriate when an investment manager fails to perform as expected;

(j)     interpretation of Retirement System governing documents, existing law, the Plan of Adjustment and other financial information that could affect funding or benefit levels;

(k)     review and approval, prior to final issuance, of the annual audit and all financial reports prepared on behalf of the Retirement System and meet and confer with the Retirement System's auditor or other professional advisors as necessary prior to approval of the annual audit or other financial reports;

(l)        determination of the funding status of the Retirement System and any remedial action to be taken pursuant to Section 9.5; and

(m)       causing an asset/liability valuation study to be performed for the Retirement System every three years or, more often, as deemed necessary or prudent by the Investment Committee or as requested by the Board.

All actions of the Investment Committee shall comply with the provisions of pertinent federal, state, and local laws and regulations, specifically *Public Act 314* and *Plan Investment Guidelines*.

## Sec. 15.3.  Best Practices

Prior to adopting an investment policy and asset allocation policy, selecting investment managers or adopting investment return assumptions, the Investment Committee shall give appropriate consideration to the following:

(a)        the fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets;

(b)        the objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the Plan of Adjustment, to the extent that it is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Retirement System; and

(c)        the liquidity needs of the Retirement System.

## Sec. 15.4.  Chief Investment Officer

The Investment Committee shall have the exclusive power to select, retain and terminate the services of a chief investment officer for the Retirement System.  The Investment Committee shall determine any and all compensation and other terms of employment of any chief investment officer hired by it.  The chief investment officer shall report directly to the Investment Committee and the Executive Director of the Board.  The chief investment officer shall be responsible for assisting the Investment Committee and the Board with respect to oversight of the Retirement System's investment portfolio.  The chief investment officer shall provide such periodic reports relating to the Retirement System's assets to the Investment Committee and the Board as it or they shall request.

## Sec. 15.5.  Investment Consultants

The Board and/or Investment Committee may retain the services of one or more investment consultants who shall be responsible for assisting the Investment Committee and the Board with oversight of the Retirement System's investment portfolio.  Any such investment consultant shall be a registered advisor with the United States Securities and Exchange Commission and shall be a nationally recognized institutional investment consultant with expertise in the investment of public pension plan assets.  Any such investment consultant shall acknowledge in writing its role as investment fiduciary with respect to the Retirement System as defined in the *Public Employee Retirement System Investment Act,* as amended, MCL 38.1132 *et seq.*  The Board or the Investment Committee, as appropriate, shall determine the compensation and other terms of employment of any investment consultant hired by it.  The duties of an investment consultant may include, but shall not be limited to:

(a)        providing an asset/liability valuation study for the Retirement System;

(b)     reviewing the Retirement System's asset allocation based on current market assumptions;

(c)     identifying and recommending to the Investment Committee and the Board appropriate investment strategies based on the financial condition of the Retirement System;

(d)     implementing the approved investment strategies, such as recommending to the Investment Committee, for Board approval, an asset allocation strategy, building an investment structure for the Retirement System, and identifying qualified investment managers (through an organized search process) to execute and implement investment strategies;

(e)     monitoring and evaluating the ongoing progress of the investment managers toward stated investment goals and objectives;

(f)     recommending to the Investment Committee and the Board any necessary corrective actions, including adjustments to the investment structure or investment management organizations in the event of a deviation from expectations;

(g)     communicating the investment policies of the Retirement System to the investment managers;

(h)     reviewing the investment policies with the appropriate employees of the Retirement System;

(i)     aiding the Investment Committee in providing recommendations on issues relating to rebalancing and cash flow management, securities lending, transition management, cash equalization and other investment related topics;

(j)     attending Investment Committee and Board meetings in person, or telephonically, as needed or as requested;

(k)     meeting with the Investment Committee to provide detailed quarterly performance reports and executive summaries of performance;

(l)     meeting with the Investment Committee and the Board to review capital markets and inform the Board and Retirement System employees on the current investment environment; and

(m)     meeting with the Investment Committee and the Board to provide recommendations on asset allocation, investment structure, and manger selections.

## ARTICLE 16 – MISCELLANEOUS

### Sec. 16.1.  Nonduplication of Benefits

If any Member is a participant in another defined benefit pension plan, retirement system or annuity plan sponsored by the City (including Component II of this Retirement System) and the Member is or becomes entitled to accrue pension benefits under such plan or retirement system (including Component II of this Retirement System) with respect to any period of service for which he is entitled to accrue a benefit under Component I of this Retirement System, such Member shall not be eligible to accrue or receive payment of a benefit under Component I with respect to such period of service.

### Sec. 16.2.  Assignments Prohibited

The right of a person to a pension, annuity, the return of Accumulated Voluntary Employee Contributions and/or the return of Accumulated Mandatory Employee Contributions, the Retirement Allowance itself, to any optional form of payment, to any other right accrued or accruing to any person under the provisions of this Retirement System, and the monies in the various funds of the Retirement System shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever, except as specifically provided in this Combined Plan Document or by an eligible domestic relations order of a lawful court.

### Sec. 16.3.  Protection Against Fraud

A person who, with intent to deceive, makes any statements or reports required under this Retirement System that are untrue, or who falsifies or permits to be falsified any record or records of this Retirement System, or who otherwise violates, with intent to deceive, any terms or provisions of the Retirement System, shall be subject to prosecution under applicable law.

### Sec. 16.4.  Amendment; Termination; Exclusive Benefit

The City reserves the right to amend the Combined Plan Document created hereunder at any time; such amendments may include termination of the Retirement System; provided, however, that following the effective date of the Plan of Adjustment, no amendment other than amendments required to comply with applicable federal law or the Plan of Adjustment may be made effective prior to July 1, 2023, nor may any amendment or termination deprive any Member, former Member or Beneficiary of any then vested benefit under the Retirement System, except as provided in a Plan of Adjustment. Notwithstanding the foregoing, the City and the Board have the authority to amend the Combined Plan Document as necessary to retain the tax qualified status of the Retirement System under the Internal Revenue Code.  The City shall make no amendment or amendments to the Retirement System which causes any part of the assets of the Retirement System to be used for, or diverted to, any purpose other than the exclusive benefit of Members, former Members or their Beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law. Any amendment of the Retirement System by the City must be approved by the Council or person standing in the stead of the Council.

Upon termination of the Retirement System or upon complete discontinuance of contributions to the Retirement System, the rights of all Members to benefits accrued to the date of such termination or discontinuance, to the extent then funded, shall be nonforfeitable.

### Sec. 16.5.  Forfeitures Not to Increase Benefits

Any forfeitures arising under the Retirement System due to a Member's termination of employment or death, or for any other reason, shall be used to pay expenses of the Retirement System and shall not be applied to increase the benefits any Member would otherwise receive under the Retirement System at any time prior to termination of the Retirement System.

### Sec. 16.6.  Required Distributions - Compliance with Code Section 401(a)(9) and Regulations

The Retirement System will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the final regulations issued thereunder, notwithstanding any provision in the Combined Plan Document to the contrary.  Pursuant to Code Section 401(a)(9)(A)(ii), a Member's interest must begin to be distributed by the later of (i) the April 1 of the calendar year following the calendar year that he attains the Age of seventy and one-half (70-1/2), or (ii) April 1 of the calendar year following the year in which he retires.  Distributions will be made in accordance with Regulations Sections 1.401(a)(9)-2 through 1.401(a)(9)-9.  The provisions of this Section 16.6 and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options.

### Sec. 16.7.  Direct Rollovers

(1)     For purposes of compliance with Code Section 401(a)(31), a distributee may elect, at the time and in the manner prescribed by the board, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(2)     For purposes of this Section 16.7, the following terms shall have the following meanings:

        (a)     "Direct rollover" means a payment by the retirement system to an eligible retirement plan specified by a distributee.

        (b)     "Distributee" means a Member or former Member.  It also includes the Member's or former Member's surviving spouse, a spouse or former spouse who is the alternate payee under an eligible domestic relations order, or a nonspouse beneficiary who is a designated beneficiary as defined by Code Section 401(a)(9)(E).  However, a nonspouse beneficiary may only make a direct rollover to an individual retirement account or individual retirement annuity established for the purpose of receiving the distribution, and the account or annuity will be treated as an "inherited" individual retirement account or annuity.

        (c)     "Eligible retirement plan" means any of the following that accepts a distributee's eligible rollover distribution:

                (i)     a qualified trust described in Code Section 401(a);

                (ii)    an annuity plan described in Code Section 403(a);

                (iii)   an annuity contract described in Code Section 403(b);

                (iv)    an individual retirement account described in Code Section 408(a);

                (v)     an individual retirement annuity described in Code Section 408(b);

44

<blockquote>
<blockquote>

(vi)    a Roth IRA described in Code Section 408A; or

(vii)    a plan eligible under Code Section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or a political subdivision of a state that agrees to separately account for amounts transferred into that plan from the retirement system.

</blockquote>

(d)    "Eligible rollover distribution" means any distribution of all or any portion of the balance to the credit of a distribute under the retirement system, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or the life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any distribution that is not includible in gross income; and any other distribution which the Internal Revenue Service does not consider eligible for rollover treatment, such as any distribution that is reasonably expected to total less than $200 during the year.  Notwithstanding the foregoing, a portion of a distribution will not fail to be an "eligible rollover distribution" merely because the portion consists of after-tax contributions that are not includible in Member's gross income upon distribution from the retirement system. However, such portion may be transferred only (i) to an individual retirement account or annuity described in Code Section 408(a) or (b) or to a qualified defined contribution plan described in Code Section 401(a) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; (ii) to a qualified defined benefit plan described in Code Section 401(a) or to an annuity contract described in Code Section 403(b) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; or (iii) to a Roth IRA described in Code Section 408A.

</blockquote>

## Sec. 16.8.  Construction

Words in the singular should be read and construed as though used in the plural, and words in the plural should be read and construed as though used in the singular, where appropriate. The words "hereof", "herein", and "hereunder" and other similar compounds of the word "here", shall mean and refer to Component I of this Combined Plan Document and not to any particular provision or section thereof. The table of contents, article and section headings are included for convenience of reference, and are not intended to add to, or subtract from, the terms of the Combined Plan Document or the Retirement System created hereunder.

## Sec. 16.9.  Severability

If any section or part of a section of this Combined Plan Document or provision relating to the Retirement System is for any reason held to be invalid or unconstitutional, such holding shall not be construed as affecting the validity of the remaining sections of the Combined Plan Document or Retirement System or of the Combined Plan Document or Retirement System in its entirety.

CLI-2207829v7

**EXHIBIT I.A.244.b**

PRINCIPAL TERMS OF NEW GRS ACTIVE PENSION PLAN

## NEW GRS ACTIVE PENSION PLAN -- MATERIAL TERMS

1.      Benefit Formula:  FAC (average base compensation over last 10 consecutive years of employment)  x Years of Service  x 1.5%.  If an employee had leave of not less than 2 months without pay under the Family and Medical Leave Act in the last 2 years of employment, such employee's FAC will be determined using the highest 10 consecutive years of base compensation over the last 12 consecutive years of employment.  Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus.

2.      Actual time for accrual is actual time served.  For vesting and eligibility, 1,000 hours for a year of service.

3.      Normal Retirement Age – age 62 with a transition period for active employees as of June 30, 2014 as follows:

| Age as of July 1, 2014 | Normal Retirement Age |
|---|---|
| 61years | 60 years |
| 60 years | 60 years |
| 59 years | 60.3 years |
| 58 years | 60.6 years |
| 57 years | 60.9 years |
| 56 years | 61.0 years |
| 55 years | 61.3 years |
| 54 years | 61.6 years |
| 53 years | 61.9 years |
| 52 years | 62 years |

4.      10 Years of Service for vesting.

5.      Early retirement  -- Eligible at 55 & 30 years of service, with true actuarial reduction.  No pension payments allowed below age 55; terminated employees must wait until 62.

6.      Deferred Vested  -- 10 Years payable at  62.

7.      Disability  -- to be provided by commercial insurance until normal retirement age.  In applying the formula for an age 62 pension, a disabled employee will be credited with service for the period of long-term disability leave.

8.      Annuity Savings Fund - voluntary Annuity Savings Fund contributions equal to 3%, 5% or 7% of after-tax pay.  Interest will be credited at the actual net investment rate of return for GRS, but will in no event be lower than 0% or higher than 5.25%.  No in-service withdrawals permitted.

9.     Investment Return/Discount Rate – 6.75%

10.    COLA - Variable COLA benefit payable after the hybrid plan has been in effect for 4 full plan years, provided that the funding level is above 100%. A simple 2% COLA on hybrid benefit. Retirees become eligible for a COLA only for plan years after the retiree reaches age 62 and has been retired for a minimum of 12 months.

11.    Contributions - Employer contribution of 5% of the base compensation of eligible employees. A portion of such contribution is used to fund normal cost and a portion is credited to a rate stabilization fund. Employees contribute 4% of base compensation toward normal cost.

12.    If the funding level is below 100% (based on 3 year look back of smoothed returns), the plan's risk-shifting levers listed below will be applied in the listed order, until the actuary can state that by virtue of the use of levers, and a 6.75% discount rate and return assumption, the funding level is projected to be 100% on a market value basis within the next 5 years.

       (a)    No COLAs will be paid;
       (b)    Amounts credited to the rate stabilization fund will be used to fund accrued benefits; and
       (c)    Employee contributions to the hybrid will increase by 1% to 5% of base compensation for up to a 5 year period.

       If the funding level is below 80% (without taking into account the use of rate stabilization funds and the 1% increase in employee contributions):

       (d)    The steps taken in (a), (b) and (c) above will be continued;
       (e)    The most recently awarded COLA is rescinded (i.e., Members' future benefit payments will be not include that COLA);
       (f)    Employee contributions to the hybrid will increase to 6% of base compensation for up to a 5 year period;
       (g)    The second most recently awarded COLA is rescinded; and
       (h)    The benefit accrual rate is decreased from 1.5% to 1% for up to 5 years.

-2-

**EXHIBIT I.A.248.a**

FORM OF NEW PFRS ACTIVE PENSION PLAN

# COMBINED PLAN
# FOR THE
# POLICE AND FIRE
# RETIREMENT SYSTEM OF
# THE CITY OF DETROIT, MICHIGAN

**Effective July 1, 2014**

# COMPONENT I

# TABLE OF CONTENTS

ARTICLE 1  – GENERAL PROVISIONS ........................................................................1

Sec. 1.1.    Police and Fire Retirement System Established; Adoption of 2014 Plan Document...........................................................................................1

Sec. 1.2.    Retirement System Intended to be Tax-Qualified; Governmental Plan...............1

Sec. 1.3.    Board of Trustees..........................................................................................1

Sec. 1.4.    Board of Trustees – Membership; Appointment ...............................................1

Sec. 1.5.    Board of Trustees; Scheduling of Elections for Active and Retiree Trustees.....................................................................................................2

Sec. 1.6.    Procedures for election of Retiree Trustees ....................................................3

Sec. 1.7.    Board of Trustees; Oath; Term; Vacancies......................................................3

Sec. 1.8.    Board of Trustees; Officers and Employees .....................................................4

Sec. 1.9.    Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum ....................4

Sec. 1.10.   Board of Trustees; Compensation; Expenses ...................................................4

Sec. 1.11.   Rules for Administration of Funds ..................................................................4

Sec. 1.12.   Board of Trustees; Certain Data to be Kept.....................................................4

Sec. 1.13.   Board of Trustees; Annual Audit Report .........................................................5

Sec. 1.14.   Board of Trustees; Legal Advisors ..................................................................5

Sec. 1.15.   Designation of Actuary; Authority to Engage Additional Actuaries....................5

Sec. 1.16.   Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System...........................................................................................5

Sec. 1.17.   Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities...........6

Sec. 1.18.   Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties.........................................................................................................6

Sec. 1.19.   Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties............................................................................................6

Sec. 1.20.   Investment Committee; Membership; Appointment............................................7

Sec. 1.21.   Investment Committee; Term; Resignation and Removal; Vacancies ................7

Sec. 1.22.   Investment Committee; Operation; Meetings; Quorum; Voting .........................9

Sec. 1.23.   Investment Committee; Expenses....................................................................9

ARTICLE 2  – DEFINITIONS....................................................................................10

Sec. 2.1.    Definitions ...................................................................................................10

ARTICLE 3  – MEMBERSHIP ....................................................................................16

Sec. 3.1.    Eligible Employees .......................................................................................16

-i-

Sec. 3.2.    Cessation of Membership; Re-Employment ...................................................... 16

Sec. 3.3.    Report From City .................................................................................................. 17

ARTICLE 4    – SERVICE CREDIT ............................................................................................ 18

Sec. 4.1.    Credited Service .................................................................................................. 18

Sec. 4.2.    Vesting Service .................................................................................................... 18

Sec. 4.3.    Service Credit; Military Service .......................................................................... 18

Sec. 4.4.    Service Credit; Qualified Military Service .......................................................... 19

ARTICLE 5    – ELIGIBILITY FOR RETIREMENT .................................................................... 20

Sec. 5.1.    Eligibility for Unreduced Normal Retirement Benefit ...................................... 20

Sec. 5.2.    Eligibility for Deferred Vested Retirement Benefit ........................................... 20

Sec. 5.3.    Eligibility for Disability Retirement Benefit – Duty Disability ........................... 20

Sec. 5.4.    Eligibility for Disability Retirement Benefit – Non-Duty Disability ................... 22

Sec. 5.5.    Disability Retirees; Reexamination ..................................................................... 22

Sec. 5.6.    Return of Accumulated Mandatory Contributions to Non-Vested
Member ............................................................................................................... 23

Sec. 5.7.    Benefits Offset by Compensation Benefits; Subrogation .................................. 23

ARTICLE 6    – RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT
FACTOR (ESCALATOR) ............................................................................................ 24

Sec. 6.1.    Retirement Allowance ........................................................................................ 24

Sec. 6.2.    Variable Pension Improvement Factor (Escalator) ............................................ 24

ARTICLE 7    – DEATH BENEFITS .......................................................................................... 25

Sec. 7.1.    Accidental Death Benefit; Performance of Duty ............................................... 25

Sec. 7.2.    Non-Duty Death Benefits ................................................................................... 26

Sec. 7.3.    Refund of Accumulated Mandatory Contributions Upon Death of
Member ............................................................................................................... 26

ARTICLE 8    – FORMS OF PAYMENT ................................................................................... 27

Sec. 8.1.    Retirement Allowance Options ........................................................................... 27

Sec. 8.2.    Disposition of Surplus Benefits upon Death of Retiree and Beneficiary .......... 28

ARTICLE 9    – FUNDING AND RESERVES ............................................................................ 29

Sec. 9.1.    Funding Objective of the Retirement System .................................................... 29

Sec. 9.2.    Funds .................................................................................................................. 29

Sec. 9.3.    Method of Financing Retirement System Benefits ............................................ 30

Sec. 9.4.    Member Contributions Picked-Up ...................................................................... 30

Sec. 9.5.     Fiscal Responsibility: Benefit Reductions and Increased Funding Obligations ..................................................................................31

ARTICLE 10   – VOLUNTARY EMPLOYEE CONTRIBUTIONS ......................................33

Sec. 10.1.    Voluntary Employee Contributions; Amount; Vesting .....................33

Sec. 10.2.    Changing an Election to Contribute...............................................33

Sec. 10.3.    Individual Member Accounting; Crediting of Earnings ....................33

Sec. 10.4.    Distribution of Accumulated Voluntary Employee Contributions ....................33

ARTICLE 11   – LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS............35

Sec. 11.1.    The Loan Program .......................................................................35

Sec. 11.2.    Eligibility for Loan .......................................................................35

Sec. 11.3.    Amount of Loan...........................................................................35

Sec. 11.4.    Terms and Conditions..................................................................35

Sec. 11.5.    Loan Balance .............................................................................36

Sec. 11.6.    Default .......................................................................................36

Sec. 11.7.    Distribution ................................................................................36

ARTICLE 12   DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM ........................37

Sec. 12.1.    General Provisions ......................................................................37

Sec. 12.2.    Conversion to Retirement Allowance.............................................37

Sec. 12.3.    Death of Member While Participating in the DROP Program...........................38

Sec. 12.4.    Disability of Member While Participating in the DROP Program ....................38

Sec. 12.5.    Cost Neutrality............................................................................38

ARTICLE 13   – LIMITATION ON BENEFITS AND CONTRIBUTIONS...........................40

Sec. 13.1.    Compliance With Code Section 415(b) And Regulations .................40

Sec. 13.2.    Compliance with Code Section 415(c) and Regulations .................42

ARTICLE 14   – RETIREMENT SYSTEM ADMINISTRATION.......................................44

Sec. 14.1.    Board of Trustees as Retirement System Administrator....................44

Sec. 14.2.    Powers and Duties of Board .........................................................44

Sec. 14.3.    Executive Director; Employees .....................................................45

Sec. 14.4.    Discretionary Authority ................................................................46

Sec. 14.5.    Administrator's Decision Binding ..................................................46

ARTICLE 15   – MANAGEMENT OF FUNDS ............................................................47

Sec. 15.1.    Board as Trustee of Retirement System Assets ..............................47

Sec. 15.2.    Maintenance of Segregated Funds ................................................47

Sec. 15.3.     Custodian of Funds ................................................................................47

Sec. 15.4.     Exclusive Purpose ................................................................................47

Sec. 15.5.     Prohibited Conduct ..............................................................................47

ARTICLE 16   - INVESTMENT OF RETIREMENT SYSTEM ASSETS ...........................49

Sec. 16.1.     Investment Powers of the Board and the Investment Committee ...............49

Sec. 16.2.     Investment Management ........................................................................50

Sec. 16.3.     Best Practices .......................................................................................51

Sec. 16.4.     Chief Investment Officer .......................................................................51

Sec. 16.5.     Investment Consultants ..........................................................................51

Sec. 16.6.     Consistency With Plan of Adjustment ....................................................53

ARTICLE 17   MISCELLANEOUS ....................................................................................54

Sec. 17.1.     Nonduplication of Benefits ...................................................................54

Sec. 17.2.     Assignments Prohibited ........................................................................54

Sec. 17.3.     Protection Against Fraud ......................................................................54

Sec. 17.4.     Conviction of Felony; Forfeiture of Rights ............................................54

Sec. 17.5.     Amendment; Termination; Exclusive Benefit ..........................................54

Sec. 17.6.     Forfeitures Not to Increase Benefits ......................................................55

Sec. 17.7.     Required Distributions - Compliance with Code Section 401(a)(9) and
               Regulations .........................................................................................55

Sec. 17.8.     Direct Rollovers ...................................................................................55

Sec. 17.9.     Construction ........................................................................................56

Sec. 17.10.    Severability .........................................................................................57

# ARTICLE 1 – GENERAL PROVISIONS

## Sec. 1.1.  Police and Fire Retirement System Established; Adoption of 2014 Plan Document

Effective July 1, 1941, a Pension System for Policemen and Firemen of the City of Detroit was established for the purpose of providing retirement allowances and death benefits for Policemen and Firemen and their beneficiaries by amendment to the Charter of the City of Detroit.  That Pension System was amended on numerous occasions after July 1, 1941, including an amendment renaming the Retirement System as the "Police and Fire Retirement System of the City of Detroit." The provisions of the Police and Fire Retirement System of the City of Detroit, as in effect July 1, 2014, are set forth in this Plan Document.  Component I of the Plan Document applies to benefits accrued by Members on and after July 1, 2014 and to operation of the Police and Fire Retirement System of the City of Detroit on and after July 1, 2014.  Component II of the Plan Document generally applies to benefits accrued by Members prior to July 1, 2014.  Except as specifically provided in Component II, benefits provided under Component II of the Plan Document are frozen effective June 30, 2014.

This Combined Plan Document shall replace the provisions of the Police and Fire Retirement System of the City of Detroit as set forth in the City of Detroit Charter, the Detroit City Code and any conflicting provisions in any collective bargaining agreements, rulings or opinions covering Members (including, without limitation, City Employment Terms). All resolutions and policies of the Retirement Board previously enacted which are inconsistent with the provisions of this Plan Document are also hereby repealed to the extent of such inconsistency.

## Sec. 1.2.  Retirement System Intended to be Tax-Qualified; Governmental Plan

The Retirement System is a governmental plan under Section 414(d) of the Internal Revenue Code which is intended to be a qualified plan and trust pursuant to applicable provisions of the Internal Revenue Code.  The Board shall construe and administer the provisions of the Retirement System in a manner that gives effect to the tax-qualified status of the Retirement System.

## Sec. 1.3.  Board of Trustees

Effective July 1, 1941, a Board of Trustees of the Police and Fire Retirement System of the City of Detroit was created. The Board is vested with responsibility for the general administration, management and operation of the Police and Fire Retirement System of the City of Detroit and with the trust and investment powers conferred in this Combined Plan Document.

## Sec. 1.4.  Board of Trustees – Membership; Appointment

The Board of Trustees of the Police and Fire Retirement System of the City of Detroit shall consist of seventeen Trustees, as follows:

(1)    The Mayor, *ex-officio*, or the Mayor's designee;

(2)    The President of City Council or a member thereof elected by Council, *ex-officio*;

(3)    The City Treasurer or Deputy City Treasurer, *ex-officio*;

(4)    The City Finance Director, or a designated representative, *ex-officio*;

(5)    The City Budget Director, or a designated representative, *ex-officio*;

(6)  The Corporation Counsel of the City, or a designated representative, *ex-officio*;

(7)  Three Fire Members of the Retirement System to be elected by the Fire Members under such rules and regulations as may be established by the Board of Fire Commissioners to govern such elections, as follows:

    (a)  Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks; and

    (b)  One to be elected by and from Members holding ranks above the rank of lieutenant (or its equivalent);

(8)  Three Police Members of the Retirement System to be elected by the Police Members under the rules and regulations as may be established by the Commissioner of Police to govern such elections, as follows:

    (a)  Two to be elected by and from Members holding the rank of lieutenant (or its equivalent) and lower ranks; and

    (b)  One to be elected by and from Members holding a rank above lieutenant (or its equivalent); and

(9)  One individual who neither is a Member of the Retirement System nor an employee of the City in any capacity to be selected by the Board;

(10)  Two retirees receiving benefits under the Retirement System, one of whom shall be elected by Retired Police Members and one of whom will be elected by Retired Fire Members pursuant to Section 1.5 below;

(11)  One Trustee appointed by the Mayor upon election of a Retiree Police Trustee; and

(12)  One Trustee appointed by the Mayor upon election of a Retiree Fire Trustee.

**Sec. 1.5.  Board of Trustees; Scheduling of Elections for Active and Retiree Trustees**

(1)  Annual elections for active Police Officers and Firefighters shall be held in the Police and Fire Departments during the month of May to elect a trustee to fill the vacancy created by the expiration of a term.

(2)  Elections to fill vacancies created by the expiration of a term for a Retiree Trustee shall be held every three years during the month of May.

(3)  A special election for Retiree Trustees shall be held as soon as practicable after the Plan of Adjustment is confirmed.  Unless a Retiree Trustee elected by reason of this special election resigns or is removed from the position of Trustee in accordance with the terms of the Combined Plan Document, a Retiree elected to the office of Trustee in the special election shall be eligible to serve a full term of three (3) years from the date of the special election, plus such period of time until the last day of June that follows the third anniversary of the special election, at which time an election for Retiree Trustees shall be held in accordance with Section 1.6.

2

### Sec. 1.6.  Procedures for election of Retiree Trustees

The procedures for the election of the Retiree Trustees shall be as follows:

(1)    *Notice*.  Notice of a primary election shall be sent to each Retiree by United States Mail.

(2)    *Notice of Candidacy*.  A proposed candidate shall submit a notarized letter to the executive director notifying the Retirement System of his or her candidacy.

(3)    *Ballot*.  Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position the Retiree held at the time of retirement and by the word "incumbent" if the candidate is a current trustee seeking re-election. No ballot shall contain any organizational or political designation or mark.  Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4)    *Voting*.  Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(5)    *Procedures*.  Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(6)    *Board Rules*.  Any matters relative to the election of the Retiree member of the Board not covered by this Section 1.6 shall be handled in accordance with such rules and regulations as the Board may adopt.

### Sec. 1.7.  Board of Trustees; Oath; Term; Vacancies

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the City Clerk.

The term of office for each elected Trustee under Sections 1.4(7), (8) and (10) shall be three years.  The term of office for the Trustee who is selected by the Board under Section 1.4(9) shall be two years.  The term of office for the Trustees appointed by the Mayor under Sections 1.4(11) and (12) shall be three years.  Except as provided in Section 1.5(3), elected Trustees holding office on June 30, 2014 shall serve the remainder of their terms.

If a Trustee resigns or is removed by the other Trustees for cause, or if an elected or appointed Trustee fails to attend three consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board. If a vacancy occurs in the office of Trustee from any cause other than expiration of a term, the vacancy for the unexpired term shall be filled within sixty days of the date of said vacancy in the same manner as the office was previously filled.  No vacancy shall result by reason of a change in the rank or grade of a Trustee during the term of office.

3

### Sec. 1.8.  Board of Trustees; Officers and Employees

The Board of Trustees shall elect from its membership a chairman and a vice chairman.  The executive director of the Retirement System shall serve as Secretary of the Board of Trustees.  The Board may employ such special actuarial, medical and other employees as shall be required, subject to the powers and authority reserved to the Investment Committee and subject to the *Public Employee Retirement System Investment Act*, as amended, MCL 38.1132 *et seq*.

### Sec. 1.9.  Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum

(1)     The Board shall hold regular meetings, at least one in each month, and shall designate the time and place thereof in advance. The Board shall adopt its own rules of procedure, including provisions for special meetings and notice thereof, and shall keep a record of proceedings. All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act,* MCL 15.261 *et seq.*

(2)     Each Trustee shall be entitled to one vote on each question before the Board. A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(3)     Eight members of the Board, four of whom must be elected members, shall constitute a quorum.

### Sec. 1.10.  Board of Trustees; Compensation; Expenses

All members of the Board of Trustees shall serve without additional compensation from the City or the Retirement System; however Retiree Trustees shall receive a hourly stipend from the Retirement System equal to the lowest rate of pay received by an active employee Trustee for attending Board meetings, educational time and travel out of the City on official business of the Retirement System.  All Trustees shall be reimbursed from the Expense Fund for all actual, reasonable and necessary expenses incurred in the performance of their duties as Trustees.

### Sec. 1.11.  Rules for Administration of Funds.

Subject to the limitations contained in this Combined Plan document, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this Combined Plan document and for the transaction of its business.

### Sec. 1.12.   Board of Trustees; Certain Data to be Kept

The Board of Trustees shall keep, or cause to be kept, in convenient form, such data as shall be necessary for the actuarial valuation of the various funds of the Retirement System and for checking and compiling the experience of the Retirement System.  The ordinary actuarial, accounting and clerical services for the operation of the Retirement System shall be performed by the employees of the Retirement System.

### Sec. 1.13.  Board of Trustees; Annual Audit Report

The Board shall render a report to the Mayor, the City Council and the Investment Committee on or before the fifteenth day of January, showing the fiscal transactions of the Retirement System for the year ending on the preceding thirtieth day of June, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the Retirement System by means of an actuarial valuation of the assets and liabilities of the Retirement System.

4

### Sec. 1.14.  Board of Trustees; Legal Advisors

(1)  The Board shall appoint legal advisors (including a general counsel) who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees.  Any legal advisor to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems.  The qualifications of legal counsel shall be approved by the Board of Trustees.

(2)  Legal advisors to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

(3)  Costs and expenses relative to the position of legal advisors to the Board shall be payable out of the assets of the Retirement System, subject to the provisions of the *Public Employee Retirement System Investment Act,* as amended, MCL 38.1132 *et seq.*

### Sec. 1.15.  Designation of Actuary; Authority to Engage Additional Actuaries

The Retirement System actuary as of July 1, 2014 shall continue to serve as such until resignation or removal by the Board.  In the event the Board desires to retain a new actuary, the Board and the Investment Committee shall collectively participate in the evaluation and selection of a qualified actuary.  The Retirement System actuary shall be responsible for assisting the Board and the Investment Committee in performing its actuarial duties and shall comply with all requests for information or modeling requested by the Investment Committee, and shall attend meetings of the Board and Investment Committee as requested, so as to allow the Investment Committee to perform satisfactorily the rights and duties set forth in the Term Sheet and the Plan of Adjustment.  Furthermore, the Board shall not act on any recommendation made by the Retirement System's actuary based on any calculation, assumption or assessment rejected by the Investment Committee.

Nothing herein shall be interpreted as limiting the Investment Committee's authority to engage an actuarial consulting firm other than the Retirement System's actuary to perform actuarial services deemed necessary to fulfill its fiduciary and other duties to the Retirement System as set forth in the Term Sheet and the Plan of Adjustment.

### Sec. 1.16.  Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System

(1)  Subject to Section 15.1, the Board shall adopt such mortality and other tables of experience, and a rate or rates of interest, as shall be necessary for the operation of the System on an actuarial basis, provided, that the authority granted by this section shall not permit or be used to provide for an interest rate which would violate the prohibitions of Subsection (2) or (3) of this section.

(2)  The Retirement System and the Trustees charged with management of the System shall not make any payment to active or retired Members other than payments that are required by the governing documents of the Retirement System. This prohibition applies to all payments that are not authorized by this Code, whether such payments are those commonly referred to as a "thirteenth check" or by any other name.

(3)  Anything in this Combined Plan Document or any other document to the contrary notwithstanding, the annual actuarial interest rate assumption for the period commencing July 1, 2014 and ending June 30, 2023 shall be six and three-quarters percent (6.75%).

5

### Sec. 1.17. Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities

Subject to Section 15.1, each year, on the basis of such mortality and other tables of experience, and such rate or rates of regular interest as the Board shall adopt pursuant to Section 1.16, the Board shall cause to be made an actuarial valuation of the assets and liabilities of the Retirement System.

### Sec. 1.18. Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties

The Board of Trustees shall have such powers and duties as are necessary for the proper administration of the Retirement System and the custody and investment of Retirement System assets, other than those powers and duties reserved to the Investment Committee. To the extent the Board exercises discretion with respect to investment of Retirement System assets, the Board shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act,* as amended, MCL 38.1132 *et seq., and a* Board member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act,* as amended, MCL 38.1132 *et seq.* A member of the Board of Trustees shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Board members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflicts with the provisions set forth in this Combined Plan Document.

### Sec. 1.19. Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties

As of the effective date the Plan of Adjustment, but subject to consummation of that certain Contribution Agreement by and between the Retirement System and the State of Michigan as provided in the Plan of Adjustment, an Investment Committee is hereby created for the purpose of making recommendations to the Board of Trustees with respect to certain investment management matters relating to the Retirement System. The creation and operation of the Investment Committee is controlled by the term sheet regarding Investment Committee Governance for General Retirement System, as attached to the Plan of Adjustment ("Term Sheet"). The Investment Committee shall remain in effect for a period of not less than twenty years following the date of confirmation of the Plan of Adjustment. The Investment Committee shall be an investment fiduciary as defined in the *Public Employee Retirement System Investment Act,* as amended, MCL 38.1132 *et seq.* and shall have all powers granted fiduciaries under the first sentence of MCL 38.1133(5) and (6). The Investment Committee shall service in a fiduciary capacity with respect to the investment management of Retirement System assets, determination of the investment return assumptions, and Board compliance with provisions of the governing documents of the Retirement System. An Investment Committee member shall discharge his or her duties with respect to the Retirement System in compliance with the provisions of the *Public Employee Retirement System Investment Act,* as amended, MCL 38.1132 *et seq.* An Investment Committee member shall discharge his or her duties with the care, skill and caution under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters, would use in the conduct of an activity of like character and purpose. Investment Committee members shall comply with all Board governance policies and procedures, including the Ethics and Code of Conduct Policies, unless such compliance would violate the member's fiduciary duties or conflicts with the provisions set forth in Term Sheet.

### Sec. 1.20. Investment Committee; Membership; Appointment

The Investment Committee shall consist of nine (9) members, determined as follows:

6

(1)    Five independent members, two of whom must be residents of the State of Michigan, and none of whom may be a party in interest with respect to the Retirement System, as defined in as defined in Section 38.1132d(4) of the *Public Employee Retirement System Investment Act,* as amended, MCL 38.1132 *et seq.* Each independent Investment Committee member shall have expert knowledge or extensive experience with respect to either (a) economics, finance, or institutional investments, or (b) administration of public or private retirement plans, executive management, benefits administration or actuarial science. At least one of the independent Investment Committee members shall satisfy the requirements of (a) above and at least one of the independent Investment Committee members shall satisfy the requirements of (b) above. The initial independent Investment Committee members shall be selected by mutual agreement of the appropriate representatives of the State of Michigan, the City and the Board, in consultation with the Foundation for Detroit's Future, and shall be named in the Plan of Adjustment. If one or more of the five initial independent Investment Committee members are not selected by mutual agreement prior to confirmation of the Plan of Adjustment, then the United States Bankruptcy Court, Eastern District of Michigan shall designate such number of independent Investment Committee members as necessary to bring the number of independent Investment Committee members to five (5);

(2)    Two Retirees who shall be appointed by the Board consisting of one retired Police Member and one retired Fire Member who are serving on the Board and who are receiving benefits under the Retirement System; and

(3)    Two Employee Members who shall be appointed by the Board consisting of one elected Fire Department employee and one elected Police Department employee who are active members of the Board.

**Sec. 1.21. Investment Committee; Term; Resignation and Removal; Vacancies**

The term of office for the independent members of the Investment Committee shall be six years; provided, however, that the first term for the independent Investment Committee members shall be determined as follows:

| Independent Member | Term of Office |
|:---:|:---:|
| (1) | 2 years |
| (2) | 3 years |
| (3) | 4 years |
| (4) | 5 years |
| (5) | 6 years |

The term of office for a Retiree or employee Investment Committee member shall be the number of years remaining on such individual's term of office as a member of the Board of Trustees. Each Investment Committee member shall serve until his or her successor is appointed at the expiration of his or her term of office, or until his or her death, incapacity, resignation or removal, if earlier. Notwithstanding any provision of this Combined Plan document, an initial independent Investment Committee member shall not be prohibited from becoming a successor independent Investment Committee member after expiration of his or her initial term.

An Investment Committee member may resign at any time by giving ninety days' prior written notice to the Investment Committee, the City and the Board, which notice or time period may be waived by the Investment Committee. An Investment Committee member may be removed from office by

7

majority vote of the other Investment Committee members for any of the following reasons: (a) the member is legally incapacitated from executing his or her duties as a member of the Investment Committee and neglects to perform those duties; (b) the member has committed a material breach of the provisions of the Retirement System or the policies or procedures of the Retirement System and the removal of the member is in the interests of the Retirement System or its Members and Beneficiaries; (c) the member is convicted of a violation of law and the removal is accomplished by a vote of the members of the Investment Committee in according with the voting procedure set forth in Section 1.22; or (d) if the member holds a license to practice and such license is revoked for misconduct by any State or federal government. A member who fails to attend four (4) consecutive scheduled meetings of the Investment Committee shall be deemed to have resigned, unless in each case his or her absence is excused for cause by the remaining Members attending such meetings. In the event of such removal or resignation, the Investment Committee shall by resolution declare the office of the member vacated as of the date such resolution is adopted.

An Investment Committee member may have his or her voting privileges temporarily suspended by a 70% or higher vote of the other members if the member is indicted or sued by a State or federal government for an alleged violation of the law that relates to his or her service on the Investment Committee, or for other alleged financial crimes, including fraud. Any vacancy occurring on the Investment Committee shall be filled within sixty (60) days following the date of the vacancy for the unexpired portion of the term, in the same manner in which the office was previously filled.

Successor independent Investment Committee members shall be recommended by a majority of the remaining independent Investment Committee members and shall be confirmed by the Board and the Treasurer of the State of Michigan, in consultation with the Foundation for Detroit's Future, in accordance with such rules and regulations as may be adopted by the Investment Committee (provided that such rules are not inconsistent with the Term Sheet or the Plan of Adjustment). In the event the Board and the Treasurer of the State of Michigan cannot agree on the successor independent Investment Committee member within thirty (30) days of the receipt of the recommendation of the Investment Committee, the remaining independent Investment Committee members shall appoint the successor independent Investment Committee member.

In the event the United States Bankruptcy Court, Eastern District of Michigan appoints one or more independent Investment Committee members, successors to any such independent Investment Committee member shall be appointed in the same manner as provided in the preceding paragraph following three (3) weeks' notice to the Board of the individuals appointed, in accordance with such rules and regulations as may be adopted by the Investment Committee provided that such rules are not inconsistent with either the Term Sheet or the Plan of Adjustment.

Successor Investment Committee members shall have the powers and duties conferred on Investment Committee members herein.

**Sec. 1.22. Investment Committee; Operation; Meetings; Quorum; Voting**

The Investment Committee members shall select from among the independent members a chair and a vice chair. The Investment Committee members shall select from among themselves a secretary. The Investment Committee shall hold regular meetings, not less frequently than once every other month, and shall hold special meetings as necessary. The Investment Committee shall designate the time and place thereof in advance. The secretary or his or her designee shall be responsible for providing meeting notices to the other Investment Committee members. The Investment Committee shall adopt its own rules of procedure and shall keep a record of proceedings. Notice and conduct of all Investment Committee meetings, both regular and special, shall be public and subject to the *Michigan Open Meetings Act,* MCL

8

15.261 *et seq.* All Investment Committee meeting shall be held within the City of Detroit.

Five Investment Committee members shall constitute a quorum at any meeting, as long as at least three of the independent Investment Committee members are in attendance. Each independent Investment Committee member shall be entitled to one vote on each question before the Investment Committee. Each Retiree and Employee member shall be entitled to one-half vote on each question before the Investment Committee. Except as otherwise provided in the Term Sheet, at least four concurring votes shall be necessary for a decision by the Investment Committee.

### Sec. 1.23. Investment Committee; Expenses

Investment Committee members shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to the administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System. The Investment Committee may retain actuarial, legal counsel, audit or other professional or support personnel to provide advice to the Investment Committee as it deems reasonably necessary to perform its functions and such parties or persons may be reasonably compensated from the assets of the Retirement System. Such engagements shall not be subject to approval of the Board.

Investment Committee members shall be reimbursed for the reasonable, actual and necessary expenses incurred in the performance of their duties. All reasonable and proper expenses related to administration of the Investment Committee, including but not limited to the purchase of insurance, shall be payable out of the assets of the Retirement System.

9

# ARTICLE 2 – DEFINITIONS

## Sec. 2.1. Definitions

Unless a different definition is contained within this Combined Plan Document, or a different meaning is plainly required by context, for purposes of this Combined Plan Document the following words and phrases have the meanings respectively ascribed to them by this section:

(1)     *Accumulated Mandatory Employee Contributions* means the sum of all amounts deducted from the compensation of a Member and credited to the Accumulated Mandatory Employee Contribution Fund for periods on and after July 1, 2014.

(2)     *Accumulated Voluntary Employee Contributions* means the total balance in a Member's individual account under Component I of the Retirement System.

(3)     *Actuarial Equivalent or Actuarially Equivalent* means a Retirement Allowance or benefit amount having the same Actuarial Equivalent Value as another applicable benefit.  The rates of interest adopted by the Board from time to time shall not violate the terms of the Plan of Adjustment.

(4)     *Actuarial Equivalent Value* means the value of an applicable Retirement Allowance or benefit amount, where values are calculated under generally accepted actuarial methods and using the applicable tables, interest rates and other factors established by the Board upon recommendation of the Investment Committee.

(5)     *Administrative Rules and Regulations* means rules and regulations promulgated by the Board of Trustees for the administration of the Retirement System and for the transaction of its business.

(6)     *Age, Attainment of* means the age an individual reaches on the day of his or her birthday.

(7)     *Average Final Compensation* means the average Compensation received by a Member during the ten consecutive years of Credited Service (five consecutive years of Credited Service for members of the Detroit Police Command Officers Association and the Detroit Police Lieutenants and Sergeants Association) which immediately precede the date of the Member's last termination of City employment as an employee of the Police Department or the Fire Department. If a Member has less than ten years (or five years) of Credited Service, the Average Final Compensation shall be the average of the annual Compensation received by the Member during the Member's total years of Credited Service.

(8)     *Beneficiary* means any person who is entitled to receive a Retirement Allowance or pension payable from funds of the Retirement System due to the participation of a Member.

(9)     *Board of Trustees or Board or Retirement Board* means the Board of Trustees of the Police and Fire Retirement System of the City of Detroit.

(10)    *City* means the City of Detroit, Michigan, a municipal corporation.

(11)    *City Council or Council* means the legislative body of the City.

(12)    *Compensation* means a Member's base salary or wages actually paid to the Member for personal services rendered to the Employer, excluding bonuses, overtime pay, payment of unused accrued sick leave, longevity pay, payment for unused accrued vacation, the cost or value of fringe

benefits provided to the Member, termination or severance pay, reimbursement of expenses, or other extra payment of any kind. Compensation will include any amount which is contributed by the City to a plan or program pursuant to a salary reduction agreement and which is not includable in the income of the Member under Sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code.

For periods of time prior to July 1, 2014, the City shall provide to the Retirement System actual base salary or wages paid to Members using the best and most reliable sources of information available to the City. In the event the City is unable to provide actual base wages to the Retirement System, the City shall make reasonable estimates of each Member's base salary or wages for purposes of determining a Member's Compensation.

Notwithstanding the foregoing, for purposes of determining a Member's Voluntary Employee Contributions, Compensation shall mean the gross salary or wages paid to the Member for personal services rendered to the Employer.

The annual Compensation of each Member taken into account for the purposes of determining all benefits provided under the Retirement System for any determination period shall not exceed the limitation set forth in Code Section 401(a)(17) ($260,000 for the Plan Year commencing July 1, 2014). Such limitation shall be adjusted for the cost-of-living in accordance with Section 401(a)(17)(B) of the Internal Revenue Code. The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year. If Compensation for any prior determination period is taken into account in determining a Member's benefits for the current determination period, the Compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that determination period. If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the numerator of which is the number of months in the short determination period, and the denominator of which is 12.

(13)   *Credited Service* means service credited to a Member to the extent provided in Article 4 of Component I of this Combined Plan Document.

(14)   *Disability or Disabled:* see T*otal Disability or Totally Disabled.*

(15)   *DROP Account* means the account established by the Board for a Member who is eligible for and who elects to participate in the DROP Program.

(16)   *DROP Program* means a program established for eligible Members pursuant to Article 12.

(17)   *Employee* means an employee of the City's Police Department who has taken an oath of office or a Firefighter providing services to the City, but does not include:

(a)     individuals whose City services are compensated on a contractual or fee basis; or

(b)     any person during any period when such person is classified by the City as a non common-law employee or an independent contractor for federal income tax and withholding purposes whose compensation for services is reported on a form other than Form W-2 or any successor form for reporting wages paid to and taxes withheld from employees, even if a court or administrative agency determines that such person is a common-law employee of the City.

11

If a person described in (b) above is reclassified by the City as a common-law employee of the City and otherwise meets the definition of an Employee, the person will be eligible to participate in the Retirement System prospectively as of the actual date of such reclassification only (and only to the extent such individual otherwise qualifies as an Employee).

(18)  *Employer* means the City.

(19)  *Final Compensation* means the annual Compensation of a Member at the time of his or her termination of employment.

(20)  *Firefighter* means the rank in the Fire Department classified by the civil service commission as firefighter.

(21)  *Fire Member* means a sworn employee of the Fire Department of the City of Detroit who is a participant in the Retirement System.

(22)  *Hour of Service* means (i) each hour for which a Member is paid or entitled to payment by the City for the performance of duties, and (ii) each hour for which a Member is directly paid or entitled to payment by the City for reasons other than the performance of duties (such as vacation, holiday, illness or approved leave of absence).

(23)  *Internal Revenue Code or Code* means the United States Internal Revenue Code of 1986, as amended.

(24)  *Investment Committee* means the committee established pursuant to Section 1.19 which shall have the powers and duties described herein.

(25)  *Mandatory Employee Contributions* mean the contributions made by a Member to the Retirement System pursuant to Section 9.3(3).

(26)  *Member* means any Police Member or Fire Member who has not retired or died.

(27)  *Normal Retirement Age* means for any member of the Detroit Fire Fighters Association and the Detroit Police Officers Association, age fifty-two with twenty-five years of Credited Service.  For any member of the Detroit Police Command Officers Association or the Detroit Police Lieutenants and Sergeants Association, Normal Retirement Age is age fifty with twenty-five years of Credited Service, with the following transition period:

| Fiscal Year | Age and Service |
| --- | --- |
| 2015 | Age 43 and 20 years |
| 2016 | Age 43 and 20 years |
| 2017 | Age 44 and 21 years |
| 2018 | Age 45 and 22 years |
| 2019 | Age 46 and 23 years |
| 2020 | Age 47 and 24 years |

12

|                    |                     |
|--------------------|---------------------|
| 2021 and thereafter | Age 50 and 25 years |

Pursuant to Code Section 411(e), as in effect in 1974, a Member shall be 100% vested in his accrued benefit under the Retirement System upon attainment of Normal Retirement Age while in Service.

(28)   *Notice to Members, Beneficiaries, and Retirees* means a mailing using First Class United States Mail to the Members, Beneficiaries, and Retirees at their last known addresses.

(29)   *Patrolman* means the rank in the Police Department currently or formerly known as patrolman.

(30)   *Pension Reserve* means the present value of all payments to be made on account of any Retirement Allowance. Such Pension Reserve shall be computed upon the basis of such mortality and other tables of experience, and interest, as provided herein until June 30, 2023 and, thereafter, as shall be adopted by the Board upon the recommendation of the Investment Committee.

(31)   *Plan Actuary or Actuary* means the enrolled actuary or actuarial firm appointed prior to provided in Section 1.15 to serve as technical advisor to the Investment Committee and the Board on matters regarding the funding and operation of the Retirement System and to perform such other duties as the Investment Committee or the Board may direct.

(32)   *Plan Document or Combined Plan Document* means this instrument, effective as of July 1, 2014, with all amendments hereafter adopted.

(33)   *Plan of Adjustment* means the Plan for the Adjustment of Debts of the City of Detroit, which has been approved by the United States Bankruptcy Court in *In re City of Detroit, Michigan*, Case No. 13-53846.

(34)   *Plan Year* means the twelve month period commencing on July 1 and ending on June 30.

(35)   *Police and Fire Retirement System of the City of Detroit or Retirement System* means the Police and Fire Retirement System of the City of Detroit created and, prior to July 1, 2014, memorialized in Title IX, Chapter VI, of the 1918 Detroit City Charter, as amended, continued in effect through the 1974, 1997 and 2012 Detroit City Charters, Article 47 of the Detroit City Code, Article 54 of the Detroit City Code of 1964, and collective bargaining agreements and, on and after July 1, 2014, memorialized in this Combined Plan Document, as amended from time to time.

The Retirement System consists of:

(a)   The *2014 Defined Benefit Plan,* which is described in Component I hereof;

(b)   The *Defined Contribution Plan,* consisting of the Voluntary Employee Contribution Account and the DROP Account, which are described in Component I hereof;

(c)   The *Frozen Defined Benefit Plan,* which is described in Component II hereof; and

(d)   The *Frozen Defined Contribution Plan,* which is described in Component II hereof.

13

References to the words *Retirement System* in Component I of the Plan Document shall mean the provisions of the *Defined Benefit Plan and Defined Contribution Plan* described in Component I, unless a different meaning is plainly required by context.

(36) *Police Member* means a Police Officer who has taken the oath of office as prescribed in the Detroit City Charter, excluding patrolmen of other City departments, privately employed patrolmen and special patrolmen, who is a participant in the Retirement System.

(37) *Police Officer* means the rank in the Police Department known as Police Officer.

(38) *Prior Service* means the service credit awarded to a Member before July 1, 2014 under the terms of the Retirement System as in effect on June 30, 2014, as certified by the Board of Trustees.

(39) *Retiree* means a former Member who is receiving a Retirement Allowance from the Retirement System.

(40) *Retirement* means a Member's withdrawal from the employ of the City with a Retirement Allowance paid by the Retirement System.

(41) *Retirement Allowance* means an annual amount payable in monthly installments by the Retirement System, whether payable for a temporary period or throughout the future life of a Retiree or Beneficiary.

(42) *Service* means personal services rendered to the City by an employee of the Police Department or Fire Department, provided such person is compensated by the City for such personal services.

(43) *Spouse* means the person to whom a Member is legally married under applicable law at the time a determination is made.

(44) *Straight Life Retirement Allowance* means payment of a Member's Retirement Allowance over the Member's lifetime.

(45) *Total Disability or Totally Disabled* means:

    (a) during the first twenty-four (24) months that a Member receives benefits from the Retirement System due to injury, illness or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of the Member's occupation; and

    (b) during all subsequent months that a Member receives benefits from the Retirement System due to illness, injury or disease, that the Member is unable to perform, for wage or profit, the material and substantial duties of any occupation for which the Member is suited, based on education, training and experience

(46) *Vesting Service* means service credited to a Member to the extent provided in Section 4 of Component I of this Combined Plan Document.

(47) *Voluntary Employee Contributions* mean the after-tax contributions made by an eligible Member to the Retirement System pursuant to Section 10.1.

(48) *Voluntary Employee Contributions Account* means the account established pursuant to Section 10.3 for an eligible Member who elects to make Voluntary Employee Contributions.

14

## ARTICLE 3 – MEMBERSHIP

### Sec. 3.1.  Eligible Employees

(1)    The membership of the Retirement System shall consist of all persons who are employed with the Police and Fire Departments of the City and who are confirmed as Police Officers or Firefighters according to the rules and regulations of the respective Departments.  An eligible Employee's membership in the Retirement System shall be automatic; no eligible Employee shall have the option to elect to become a Member of the Retirement System.

(2)    Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a Member, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(3)    Any Police Officer or Firefighter who, prior to being confirmed, shall be killed or totally incapacitated as the result of the performance of active duty, shall be deemed to have been a Member.

(4)    Any Member who shall be transferred to a civilian position in his department shall continue as a Member, subject to all the obligations of a Member.

### Sec. 3.2.  Cessation of Membership; Re-Employment

(1)    If a Member dies, or is separated from service with the City by resignation, dismissal, retirement or disability, he shall cease to be a Member.

(2)    If a Member ceases to be a Member under paragraph (1) and later becomes a Police Officer or Firefighter, he shall again become a Member, subject to the obligations of a Member.

(3)    Retirement benefits for a Retiree who returns to active full time employment shall be subject to the following:

    (a)    A Retiree who returns to work will have his Retirement Allowance suspended upon re-employment. The variable pension improvement factor (escalator) shall not be added to the amount of the original Retirement Allowance during the Retiree's re-employment period.

    (b)    A Retiree who returns to work will be entitled to receive a second Retirement Allowance in accordance with the provisions of the Retirement System in effect during his re-employment period.

    (c)    A Retiree's Average Final Compensation for purposes of determining the Retiree's second Retirement Allowance will be based upon the Compensation earned by the Retiree after he returns to work.

    (d)    An individual who retires for a second time will not be allowed to change the payment option selected by the Member with respect to the original Retirement Allowance. However, the individual may select a separate payment option with respect to his second Retirement Allowance.

**Sec. 3.3.  Report From City**

It shall be the duty of the City to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, date of hire, and length of service of each Member, and such other information as the Board of Trustees may require or reasonably request for proper administration of the Retirement System.

# ARTICLE 4 – SERVICE CREDIT

## Sec. 4.1.  Credited Service

(1)    The Board shall keep an accurate record of each Member's accumulated Service credit from the date of commencement of employment with the City to the date of termination of employment with the City.

(2)    A Member shall be credited with one month of Credited Service for each calendar month during which he performs one hundred forty (140) or more Hours of Service for the City as a Police Officer or Firefighter beginning on the later of July 1, 2014 or his date of hire with the City as a Police Officer or Firefighter and ending on the date his employment with the City as a Police Officer or Firefighter is terminated.  Service shall be credited in years and twelfths $(1/12^{th})$ of a year.  Not more than one-twelfth $(1/12^{th})$ of a year of Credited Service shall be credited to a Member on account of all Service rendered to the City in a calendar month.  Not more than one year of Credited Service shall be credited a Member on account of all Service rendered to the City in any period of 12 consecutive months.

(3)    Not more than one month of Credited Service shall be granted for any period of more than one month during which the Member is absent without pay; notwithstanding the foregoing, any Member who shall  be suspended from duty and subsequently reinstated to duty without further disciplinary action shall receive credit for the time of such period of suspension.

(4)    Solely for purposes of determining eligibility for a retirement benefit under Sections 5.1 and 5.4, a Member shall be credited with the sum of his Prior Service as determined by the Board and his Credited Service on and after July 1, 2014 determined under Section 4.1(2).  The period of time during which a Member is on layoff from the service of the City shall be included in the Member's Credited Service solely for the purposes of determining whether the Member has attained twenty-five years of Credited Service for purposes of Section 5.1.

## Sec. 4.2.  Vesting Service

(1)    A Member shall be credited with a year of Vesting Service for each Plan Year commencing on or after July 1, 2014 during which the Member performs 1,000 or more Hours of Service for the City.

(2)    A Member's total Vesting Service shall be the sum of his Prior Service and his Service determined under Section 4.2(1).

## Sec. 4.3.  Service Credit; Military Service

A Member who enters the military service of the United States while employed with the City shall have the period of such military service credited as City Service in the same manner as if the Member had served the City without interruption, provided that (1) the Member's entry into such military service and re-employment thereafter shall be in accordance with applicable laws, ordinances, and regulations of the State of Michigan and the City, (2) he or she is re-employed by the City as a Police Officer or Firefighter upon completion of such military service, and (3) the Member contributes to the Retirement System the Mandatory Employee Contributions that would have been made by the Member but for the Member's military service.  During the period of military service and until return to City employment, the Member's Mandatory Employee Contributions to the Retirement System shall be suspended.

17

**Sec. 4.4.  Service Credit; Qualified Military Service**

Notwithstanding any provision of this Combined Plan Document to the contrary, contributions, benefits, and service credit with respect to qualified military service under Component I, shall be provided in accordance with Code Section 414(u).  Notwithstanding anything to the contrary herein, if a Member dies while performing qualified military service (as defined in Code Section 414(u)), to the extent required by Code Section 401(a)(37), the survivors of the Member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the Member had resumed and then terminated employment on account of death.

Notwithstanding anything to the contrary herein, if the City decides to provide Differential Wage Payments to individuals who are performing service in the uniformed services (as defined in Chapter 43 of Title 238, United States Code) while on active duty for a period of more than thirty (30) days, such Differential Wage Payment will be treated as compensation under the Code Section 415(c)(3) limits, but not for purposes of benefit accruals under the Retirement System.   For these purposes the term "Differential Wage Payment" means a payment defined in Code Section 3401(h)(2) that is made by the City to an individual who is performing service in the uniformed services while on active duty for a period of more than thirty (30) days.

# ARTICLE 5 – ELIGIBILITY FOR RETIREMENT

### Sec. 5.1.  Eligibility for Unreduced Normal Retirement Benefit

Any Member who attains his Normal Retirement Age may retire upon written application filed with the Board setting forth the date on which the Member desires to be retired. The date of retirement shall be effective as of the first day following the later of (i) the Member's last day on the City payroll, or (ii) the date the Member executes and files an application for retirement, notwithstanding that the Member may have separated from Service during the notification period.  Such a Member shall be entitled to receive an unreduced Retirement Allowance calculated as provided in Section 6.1 and payable in a form of payment selected by the Member pursuant to Section 8.1.

### Sec. 5.2.  Eligibility for Deferred Vested Retirement Benefit

Any Member who terminates employment with the City prior to satisfying the requirements for receipt of a retirement benefit under Section 5.1 and who is credited with ten (10) or more years of Vesting Service (regardless of age) shall be entitled to receive an unreduced Retirement Allowance commencing at any time following his attainment of Age sixty-two.  At a Member's election, the Member may begin receiving an immediate Retirement Allowance following his attainment of Age fifty-five, actuarially reduced for early commencement, in lieu of an unreduced Retirement Allowance beginning at age sixty-two.  Deferred vested retirement benefits shall be payable in accordance with a form of payment selected by the Member pursuant to Section 8.1.

### Sec. 5.3.  Eligibility for Disability Retirement Benefit – Duty Disability

(1)     If the Board shall find that a Member has become Totally Disabled resulting from performance of duty, upon written application to the Board by or on behalf of such Member or by the head of his department, such Member shall be retired, notwithstanding that during such period of notification he may have separated from Service with the City.  In making such determination, the Board may require that such Member undergo a medical examination to be made by a qualified physician or surgeon in the appropriate specialty at Detroit Receiving Hospital or other medical facility as may be selected by the Board.  A Member who retires as a result of duty disability shall receive for a period of twenty-four months the sum of:

(a)     a basic benefit equal to fifty percent (50%) of his Final Compensation at the time his duty disability retirement begins, and

(b)     a supplemental benefit equal to sixteen and two-thirds percent (16-2/3%) of his Final Compensation at the time his duty disability retirement begins.

Subject to Section 9.5, on the first day of each Plan Year, a Member's duty disability benefit will be increased as provided in Section 6.2.

(2)     After a Member receives benefits hereunder for a period of twenty-four months, the Board will determine whether the Member is disabled from any occupation.  If the Member is disabled from any occupation, the Member shall continue to receive the benefit provided in paragraphs (1)(a) and (1)(b) until such time as the Member would have attained twenty-five years of Credited Service had he continued in active Service with the City.  At that time, the Member shall continue to receive the benefit described in paragraph 1(a) above; however, benefits described in paragraph (1)(b) above will cease.  If the Member is not disabled from any occupation, he shall continue to

19

receive the benefit described in paragraph (1)(a) above; benefits described in paragraph 1(b) will cease.

(3)     In the event a Member receiving duty disability benefits has attained twenty-five years of Credited Service, duty disability benefits shall continue to be paid to the Member until the earlier of (i) the Member's attainment of age sixty-five, or (ii) the date the Member ceases to be Totally Disabled as determined by the Board.  Upon termination of disability or attainment of age sixty-five, a member with twenty-five years of Credited Service shall be eligible to receive a Retirement Allowance as provided in Section 6.1.  The amount of such Retirement Allowance shall be equal to the amount which would have been payable to the Member if the Member's conversion from duty disability retirement to a Retirement Allowance had occurred on the date the Member attained twenty-five years of Service Credit.

(4)     If a Member on duty disability retirement returns to active Service with the City and shall re-qualify for duty disability retirement for the same or related reasons within twenty-four  months of his return to active Service, then the disability shall be deemed a continuation of the prior Total Disability and the period of the Member's active Service following the return to work will not qualify the Member to be entitled to a new initial determination of disability for purposes of determining the benefit payable to the Member.  Instead, such Member will return to duty disability retirement benefits based on the number of months of disability with which the Member was credited at the time of his return to active Service, as if there had not been a break in his period of duty disability retirement.

(5)     During the period a Member is eligible to receive duty disability benefits under this Section 5.3, the Member shall continue to be credited with Credited Service until the Member accrues twenty-five years of Credited Service, at which time accrual of Credited Service shall cease.

(6)     In the event that a recipient of a duty disability retirement benefit receives earned income from gainful employment during a calendar year, the amount of the Member's disability benefit payable during the next subsequent Plan Year will be adjusted so it does not exceed the difference between (i) the Member's base salary at the date of duty disability, increased by the variable pension improvement factor (escalator) (if any) applicable to such benefit pursuant to Section 6.2 times the number of full Plan Years from the date of the Member's duty disability to the year in which the earnings offset is applied, and (ii) the amount of the Member's remuneration from gainful employment during the prior calendar year.  The amount of income received by a Member shall be determined by the Board based upon information received from the Member or based upon information secured from other reliable sources.  Furnishing such information to the Board shall be a condition for the Member's continued eligibility for duty disability benefits.

(7)     The Board shall not act upon or grant the application for duty disability benefits filed by a Member who, although not capable of performing the full duties of his prior position, has not suffered any diminishment of his base wages or benefits because he is either (i) regularly assigned to a position, the full duties of which he is capable of performing; or (ii) assigned to a restricted duty position, unless the Member's Department advises the Board that it intends to seek a duty disability retirement for the Member in the foreseeable future.  The provisions of this paragraph shall not affect a Member's right to seek a duty disability retirement benefit when no restricted duty position is available or restrict the authority of the Police Department of Fire Department (as applicable) to apply for a duty disability retirement benefit for such Member.

**Sec. 5.4.  Eligibility for Disability Retirement Benefit – Non-Duty Disability**

(1)     Upon the application of a Member or the Member's department head, a Member who becomes totally and permanently disabled in the employ of the City not resulting from the performance of duty shall be retired by the Board; provided that a qualified physician or surgeon in the appropriate specialty at Detroit Receiving Hospital or other medical facility as may be selected by the Board, shall certify to the Board after a medical examination, that such Member is mentally or physically totally and permanently disabled for the further performance of duty to the City.  Such a Member shall receive the following applicable benefits:

(a)     If such Member has less than five years of Credited Service at the time of his disability retirement, his Accumulated Mandatory Employee Contributions standing to his credit in the Accumulated Mandatory Employee Contributions Fund shall be returned to him, or at his option he shall receive a cash refund annuity which shall be the actuarial equivalent of his Accumulated Mandatory Employee Contributions.

(b)     If such Member has five or more years of Credited Service at the time of his disability retirement, he shall receive a disability Retirement Allowance computed in accordance with the provisions of Section 6.1 payable in any of the optional forms provided in Section 8.1 hereof. His annual straight life retirement allowance shall not be less than twenty per cent (20%) of his Average Final Compensation.

(2)     The Board shall not act upon or grant the application for non-duty disability benefits filed by a Member who, although not capable of performing his full duties, has not suffered any diminishment of his base wages or benefits because he is either (i) regularly assigned to a position, the full duties of which he is capable of performing; or (ii) assigned to a restricted duty position, unless the Member's employer advises the Board that it intends to seek a non-duty disability retirement for the Member in the foreseeable future.  The provisions of this paragraph shall not affect a Member's right to seek a non-duty disability retirement benefit when no restricted duty position is available or restrict the authority of the Police Department or Fire Department (as applicable) to apply for a non-duty disability retirement benefit for such Member.

(3)     If a Retiree receiving non-duty disability retirement benefits is or becomes engaged in a gainful occupation, business, or employment paying more than the difference between the disabled Retiree's Retirement Allowance and Average Final Compensation, the Retiree's Retirement Allowance shall be reduced by the amount of such difference. If the amount of the Retiree's earnings changes, the Retirement Allowance may be adjusted accordingly.

**Sec. 5.5.  Disability Retirees; Reexamination**

(1)     At least once each year during the first five years following the retirement of a Member under Section 5.3 or Section 5.4, and at least once in every three year period thereafter, the Board may require that such disability Retiree who has not attained his Normal Retirement Age undergo a medical examination, to be made by, or under the direction of, a qualified physician or surgeon in the appropriate specialty at Detroit Receiving Hospital or other medical facility as may be selected by the Board. Should any such Retiree who has not attained Normal Retirement Age fail to submit to at least one such medical examination in any such period, the Retiree's Retirement Allowance may be suspended by the Board until the examination is completed.  Should such failure continue for one year, all of the Retiree's rights in and to the Retirement Allowance may be revoked by the Board. If upon such examination of a Retiree, the examiner reports that the Retiree is no longer Totally Disabled, and such report is concurred in by the Board, the Retiree

21

shall be restored to active service with the City and the Retirement Allowance paid pursuant to Section 5.3 or Section 5.4 shall be suspended until the Retiree terminates active service with the City.

(2)    A disabled Retiree who has been, or shall be, reinstated to active service in the employ of the City shall again become a Member. All Credited Service at the time of the disability retirement shall be restored to the Member.

### Sec. 5.6. Return of Accumulated Mandatory Contributions to Non-Vested Member

If a Member ceases to be an Employee before becoming eligible for a deferred vested Retirement Allowance under Section 5.2 or a disability Retirement Allowance pursuant to Section 5.4 or 5.5, the Member may elect to receive distribution of the Accumulated Mandatory Employee Contributions made to the Retirement System by such Member. If a Member elects to receive his Accumulated Mandatory Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

### Sec. 5.7. Benefits Offset by Compensation Benefits; Subrogation

(1)    Any amounts which may be paid or payable to a Member, Retiree, or Beneficiary on account of disability or death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' and disability insurance benefits, shall be an offset against any amounts payable from funds of the Retirement System on account of the same disability or death. If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the Pension Reserve for the Retirement Allowance payable by the Retirement System, the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the amounts payable by the Retirement System, and such amounts as may be provided by the Retirement System, so reduced, shall be payable as provided in this Combined Plan Document.

(2)    In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the Retirement System shall be subrogated to the rights of said person against such third party to the extent of the benefit which the Retirement System pays or becomes liable to pay.

## ARTICLE 6 – RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT FACTOR (ESCALATOR)

### Sec. 6.1.  Retirement Allowance

The Retirement Allowance payable to a Member commencing at the later of his Normal Retirement Age or his actual retirement from employment with the City in the form of a Straight Life Retirement Allowance shall be equal to two percent (2%) of the Member's Average Final Compensation multiplied by the Member's years (computed to the nearest one-twelfth ($1/12^{th}$) year) of Credited Service earned on and after July 1, 2014.

### Sec. 6.2.  Variable Pension Improvement Factor (Escalator)

Except as provided in Section 9.5, beginning July 1, 2015 and effective the first day of each Plan Year thereafter, the Board may determine that the annual Retirement Allowance of a member of the Detroit Police Command Officers Association or the Detroit Police Lieutenants and Sergeants Association shall be increased by a factor of one percent (1.0%), computed each year on the basis of the amount of the original Retirement Allowance received at the time of Retirement; provided, that the recipient of said Retirement Allowance shall have been receiving a Retirement Allowance for a period of not less than twelve months prior to the first day of such Plan Year.

# ARTICLE 7 – DEATH BENEFITS

## Sec. 7.1.  Accidental Death Benefit; Performance of Duty

(1)    If a Member is killed in the performance of duty in the service of the City, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the City, and such death, illness, or injury resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the City, the following benefits shall be paid:

    (a)    His Accumulated Mandatory Employee Contributions standing to his credit in the Accumulated Mandatory Employee Contributions Fund at the time of his death shall be paid to such person or persons as he shall have nominated by written designation duly executed and filed with the Board.  If no such designated person survives the Member, his said Accumulated Mandatory Employee Contributions shall be paid to his legal representative, subject to paragraph (e) of this Section 7.1(1).

    (b)    His surviving Spouse shall receive a pension of five-elevenths of the Member's Final Compensation payable for the Spouse's lifetime.  If the Member's child or children under age eighteen years also survive the deceased Member, each such child shall receive a pension of one-tenth of such Final Compensation; provided, that if there are more than two such surviving children under age eighteen years, each such child's pension shall be an equal share of seven thirty-thirds of such Final Compensation.  Upon the death, marriage, adoption, or attainment of age eighteen years of any such child, his pension shall terminate and there shall be a redistribution of the benefit by the Board to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-tenth of the Member's Final Compensation.  In no case shall the total of the pensions provided for in this paragraph (b), payable on account of the death of a Member exceed two-thirds of the Member's Final Compensation.

    (c)    If no surviving Spouse survives the deceased Member or if the Member's surviving Spouse dies before his youngest unmarried surviving child attains age eighteen years, his unmarried child or children under age eighteen years shall each receive a pension of one-fourth of the Member's Final Compensation; provided that if there are more than two such surviving children under age eighteen years, each such child's pension shall be an equal share of one-half of such Final Compensation.  Upon the death, marriage, adoption, or attainment of age eighteen years of any such child, his pension shall terminate and there shall be a redistribution by the Board to the deceased Member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-fourth of the Member's Final Compensation.

    (d)    If the Member has no surviving Spouse or surviving children under age eighteen years and if the Member leaves surviving him either or both a father and mother, whom the Board shall find to be actually dependent upon such Member for financial support, such dependent father and mother shall each receive a pension of one-sixth of the Member's Final Compensation.

    (e)    If a Member dies intestate, without having designated a person or persons, as provided in paragraph (a) of this Section 7.1(1), and without heirs, the amount of his Accumulated Mandatory Employee Contributions in the Accumulated Mandatory Employee Contribution Fund, not to exceed a reasonable sum, to be determined by the Board, shall be used to pay his burial expenses, provided he leaves no other estate sufficient for such

purpose. Any balance credited to such Member in the Accumulated Mandatory Employee Contribution Fund, and not used for burial expenses shall remain a part of the funds of the Retirement System and shall be transferred to the Pension Accumulation Fund.

### Sec. 7.2.  Non-Duty Death Benefits

The surviving Spouse of any Member who dies while in the employ of the City (other than in the performance of duty) after the date such Member has earned ten or more years of Credited Service, shall receive a Retirement Allowance computed in the same manner in all respects as if said Member had (i) retired effective the day preceding the Member's death, notwithstanding that the Member had not attained Normal Retirement Age, (ii) elected a Joint and One Hundred Percent Survivor Allowance as described in Section 8.1, and (iii) nominated the surviving Spouse as Beneficiary.

### Sec. 7.3.  Refund of Accumulated Mandatory Contributions Upon Death of Member

If a Member dies while employed by the City or following termination of employment but prior to commencement of a Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions to the Retirement System at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated Beneficiary surviving, the Member's Accumulated Mandatory Employee Contributions shall be paid to the Member's estate.  If a Member  who dies without a legal will has not nominated a Beneficiary, the Member's Accumulated Mandatory Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

25

# ARTICLE 8 – FORMS OF PAYMENT

### Sec. 8.1.  Retirement Allowance Options

(1)     Until the date the first Retirement Allowance payment check is issued, any Member may elect to receive a *Straight Life Retirement Allowance* payable throughout life, or the Member may elect to receive the Actuarial Equivalent of the *Straight Life Retirement Allowance* computed as of the effective date of retirement, in a reduced Retirement Allowance payable throughout life, and nominate a Beneficiary, in accordance with the options set forth below:

(a)     *Option One. Cash Refund Annuity.*   A Retiree will receive a reduced Retirement Allowance for as long as he lives, provided that if he dies before payment of the Accumulated Mandatory Employee Contributions made to the Retirement System on and after July 1, 2014 has been received in an aggregate amount equal to, but not exceeding the Retiree's Accumulated Mandatory Employee Contributions at the time of retirement, the difference between said Accumulated Mandatory Employee Contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to a Beneficiary nominated by written designation duly executed by the Member and filed with the Board. If there are no such designated Beneficiaries surviving said Retiree, any such difference shall be paid to the Retiree's estate.

(b)     *Option Two. Joint and One Hundred Percent Survivor Allowance.* Upon the death of a Retiree  who elected a *Joint and One Hundred Percent Survivor Allowance*, one hundred percent of the Member's reduced Retirement Allowance shall be paid to and continued throughout the life of the Beneficiary nominated by written designation duly executed and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(c)     *Option "A". Joint and Seventy-Five Percent Survivor Allowance.* Upon the death of a Retiree who elected a *Joint and Seventy-Five Percent Survivor Allowance*, seventy-five percent of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(d)     *Option Three. Joint and Fifty Percent Survivor Allowance.* Upon the death of a Retiree who elected a *Joint and Fifty Percent Survivor Allowance*, fifty percent of the Member's reduced Retirement Allowance shall be continued throughout the life of and paid to the Beneficiary nominated by written designation duly executed by the Member and filed with the Board prior to the date the first payment of the Retirement Allowance becomes due.

(2)     *Joint and Survivor Optional Forms of Payment.* The *Joint and Survivor Optional Forms of Payment* provided under the Retirement System shall be made available in either the standard form or the pop-up form, as follows:

(a)     *Standard Form.* Under the *Standard Form,* the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree.

(b)     *Pop-up Form.* Under the *Pop-up Form,* the reduced Retirement Allowance shall be paid throughout the lifetime of the Retiree and the designated Beneficiary. In the event of the

26

death of the designated Beneficiary during the lifetime of the Retiree, the amount of the Retirement Allowance payable to the Retiree shall be changed to the amount that would have been payable had the Retiree elected the *Straight Life Retirement Allowance Form of Payment.*

### Sec. 8.2. Disposition of Surplus Benefits upon Death of Retiree and Beneficiary

If under a Joint and One Hundred Percent Survivor allowance, a Joint and Seventy-Five Percent Survivor allowance, or a Joint and Fifty Percent Survivor allowance as provided for under Section 8.1, both a Retiree and Beneficiary die before they have received in Retirement Allowance payments an aggregate amount equal to the Retiree's Accumulated Mandatory Employee Contributions (and if the Retiree makes an election pursuant to Section 10.4(2), his Accumulated Voluntary Employee Contributions) at the time of retirement, the difference between the said Accumulated Mandatory Employee Contributions (and Accumulated Voluntary Employee Contributions, if applicable) and the aggregate amount of Retirement Allowances paid to the Retiree and Beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the Retiree duly executed and filed with the Board. If there are no such person or persons surviving the Retiree and the Beneficiary, any such difference shall be paid to the estate of the last survivor of the Retiree or the Beneficiary.

# ARTICLE 9 – FUNDING AND RESERVES

## Sec. 9.1.  Funding Objective of the Retirement System

The funding objective of Component I of the Retirement System is to establish and receive City and Member contributions during each Plan Year that are sufficient to fully cover the actuarial cost of benefits anticipated to be paid on account of Credited Service rendered by Members during the Plan Year (the normal cost requirements of the Retirement System), and amortize the unfunded actuarial costs of benefits likely to be paid on account of Credited Service rendered on or after July 1, 2014 and before the first day of the Plan Year (the unfunded actuarial accrued liability of the Retirement System).

## Sec. 9.2.  Funds

Component I of the Retirement System shall consist of the Accumulated Mandatory Employee Contribution Fund, the Accumulated Voluntary Contribution Fund, the Deferred Retirement Option Program Fund, the Pension Accumulation Fund, the Rate Stabilization Fund, the Expense Fund and the Income Fund, as follows:

(1)     The Accumulated Mandatory Employee Contribution Fund shall be the Fund in which shall be accumulated the contributions of Members to provide their Retirement Allowances.  Upon the Retirement, termination, disability or death of a Member with a Retirement Allowance, the Member's Accumulated Mandatory Employee Contributions shall be deemed to be part of the Pension Reserve which shall be used to pay the Member's Retirement Allowance.

(2)     The Accumulated Voluntary Employee Contribution Fund shall be the Fund in which shall be accumulated the voluntary after-tax contributions of Members, together with earnings thereon.

(3)     The Deferred Retirement Option Plan Fund shall be the fund in which shall be accumulated the amounts credited to the DROP Accounts of Members who have elected to participate in the DROP Program pursuant to Article 11, together with earnings thereon.

(4)     The Pension Accumulation Fund shall be the fund in which shall be accumulated reserves for the Retirement Allowances and other benefits payable from that portion of the City's annual contribution that is not credited to the Rate Stabilization Fund and from which shall be paid Retirement Allowances and other benefits on account of Members.

(5)     The Rate Stabilization Fund shall be the Fund to which shall be credited City contributions in excess of the amount of the City's contribution which is credited to the Pension Accumulation Fund.

(6)     The Expense Fund shall be the fund to which shall be credited any money provided by the City to pay the administrative expenses of the Retirement System, and from which shall be paid certain expenses incurred in connection with the administration and operation of the Retirement System.

(7)     The Income Fund shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of the assets of Component I of the Retirement System, all gifts and bequests received by Component I of the Retirement System, and all other moneys credited to Component I of the Retirement System, the disposition of which is not specifically provided for in this Article 9. There shall be paid or transferred from the Income Fund, all amounts required to credit earnings and losses to the various Funds of the Retirement System in accordance with the provisions of Component I of this Combined Plan Document.

**Sec. 9.3.  Method of Financing Retirement System Benefits**

(1)      The pension liabilities for Members shall be determined by the Plan's Actuary using the entry-age normal cost method of actuarial valuation.

(2)      The City's annual contribution to finance the prospective pension liabilities for the nine Plan Year period commencing July 1, 2014 and ending June 30, 2023 shall be (a) eleven and two-tenths percent (11.2%) of the payroll of active employees who are members of the Detroit Fire Fighters Association and the Detroit Police Officers Association, and (b) twelve and one-quarter percent (12.25%) of the payroll of active employees who are members of the Detroit Police Command Officers Association and the Detroit Police Lieutenants and Sergeants Association, for the applicable Plan Year. A portion of the City's annual contribution for each Plan Year shall be credited to the Rate Stabilization Fund.  The remainder of the City's annual contribution shall be shall be allocated to the Pension Accumulation Fund.

(3)      Except as provided in Section 9.5, for each Plan Year, a Member who was an active employee as of June 30, 2014 ("current active") shall contribute to the Retirement System an amount equal to six percent (6%) of his or her Compensation for such Plan Year and a Member who is hired or rehired by the City on or after July 1, 2014 ("new employee") shall contribute to the Retirement System an amount equal to eight percent (8%) of his or her Compensation for such Plan Year. A Member's Mandatory Employee Contributions for the Plan Year beginning July 1, 2014 and ending June 30, 2015 shall commence as of July 14, 2014.  The officer or officers responsible for processing the payroll shall cause a Member's Mandatory Employee Contributions to be deducted from the Member's Compensation on each and every payroll, for each and every payroll period, from the date of his participation in the Retirement System to the date he ceases to be a Member. The contribution shall be deducted from the Members' Compensation, notwithstanding that the minimum compensation provided by law for any Member shall be reduced thereby. Payment of compensation, less said Mandatory Employee Contributions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment.  Member Mandatory Employee Contributions will be used for the purpose of funding the normal cost of the Retirement System.

**Sec. 9.4.  Member Contributions Picked-Up**

(1)      The City shall pick up Member Mandatory Employee Contributions required pursuant to Sections 9.3(3) and 9.5 in accordance with Code Section 414(h).

(2)      The picked-up contributions, although designated as employee contributions shall be treated as City contributions for the purpose of determining a Member's tax treatment under the Internal Revenue Code.   The City shall pay the  contributions picked-up on behalf of a Member from the same source of funds that are used for paying compensation to the Member.

(3)      The City shall pick up Member Mandatory Employee Contributions by a reduction in the Member's cash salary or an offset against a future salary increase, or both.  The City shall designate the Mandatory Employee Contributions that are picked-up and paid to the Retirement System as employer contributions and not as employee contributions. No Member who participates in the Retirement System shall have the option of choosing to receive the contributed amounts directly instead of having those amounts paid by the City to the Retirement System.

**Sec. 9.5.  Fiscal Responsibility: Benefit Reductions and Increased Funding Obligations**

(1)     To safeguard the long-term actuarial and financial integrity of the Retirement System, in the event the funding level of Component I of the Retirement System projected over a five year period falls below one hundred percent (100%), the Trustee may not award the variable pension improvement factor (escalator) described in Section 6.2 to any individual beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than one hundred percent (100%).

(2)     In the event the funding level of the Retirement System projected over a five year period falls below ninety percent (90%), the following remedial action shall be required in the order set forth below, beginning with the Plan Year following the Plan Year in which such determination is made and continuing until the funding level is restored to not less than ninety percent (90%):

(a)     the remedial action required in Section 9.5(1) shall be implemented or continued;

(b)     all amounts credited to the Rate Stabilization Fund shall be transferred to the Pension Accumulation Fund for the purposes of funding benefits payable under the Retirement System;

(c)     Mandatory Employee Contributions for active and new employees shall be increased by one percent (1%) for up to the next following five Plan Years;

(d)     Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year;

(e)     Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year;

(f)     the Retirement Allowance payable to a Retiree shall not include the variable pension improvement factor (escalator) that was most recently paid to the Retiree on the date the funding level is projected to fall below ninety percent (90%);

(g)     the Retirement Allowance payable to a Retiree shall not include the variable pension improvement factor (escalator) that was most recently added to the Member's Retirement Allowance for the Plan Year preceding the Plan Year referenced in paragraph (f) above;

(h)     Mandatory Employee Contributions for active and new employees shall be increased by an additional one percent (1%) per year; and

(i)     contributions made to the Retirement System by the City shall be increased, consistent with applicable actuarial principles and the *Public Employee Retirement System Investment Act,* as amended, MCL 38.1132 *et seq.*

(3)     For purposes of this Section 9.5, the "funding level" shall mean the ratio of the market value of the assets of Component I of the Retirement System to the actuarial accrued liability of Component I of the Retirement System.  The actuarial accrued liability shall be calculated by the Plan's Actuary utilizing an interest rate assumption of six and three-quarters percent (6.75%) and other reasonable assumptions as directed by the Board upon the recommendation of the Investment Committee.  The market value of assets shall be determined on the basis of a three-year look back period of smoothed investment returns.

# ARTICLE 10 – VOLUNTARY EMPLOYEE CONTRIBUTIONS

## Sec. 10.1.  Voluntary Employee Contributions; Amount; Vesting

Subject to procedures established by the Board, a Member who is covered by a collective bargaining agreement with the City that permits the Member to make voluntary employee contributions to Component I of the Retirement System may elect to reduce his Compensation for any Plan Year by a whole percentage not less than one percent (1%) nor more than ten percent (10%) and have such amount contributed by the City to a Voluntary Employee Contribution Account maintained on his behalf under Component I of the Retirement System.  Voluntary Employee Contributions shall be made to the Retirement System on an after-tax basis.  Amounts credited to a Member's Voluntary Employee Contribution Account shall be one hundred percent (100%) vested at all times.

## Sec. 10.2.  Changing an Election to Contribute

A Member may change or revoke an election to make Voluntary Employee Contributions to the Retirement System pursuant to this Article 10 in such manner and with such advance notice as the Board shall determine.  Notwithstanding the foregoing, a Member shall be permitted to change such election not less frequently than annually.

## Sec. 10.3.  Individual Member Accounting; Crediting of Earnings

The Board shall maintain a Voluntary Employee Contribution Account on behalf of each Member who elects to make Voluntary Employee Contributions to the Retirement System.  Each Plan Year, a Member's Voluntary Employee Contribution Account shall be credited with earnings at a rate equal to the actual net investment rate of return on the assets of the Retirement System for the second fiscal year immediately preceding the fiscal year in which the earnings are credited; in no event, however, shall the earnings rate credited to a Member's Voluntary Employee Contribution Account for any Plan Year be less than zero percent (0%) nor greater than five and one-quarter percent (5.25%).

## Sec. 10.4.  Distribution of Accumulated Voluntary Employee Contributions

(1)     If a Member ceases to be an Employee other than by reason of death, the Member may elect to receive distribution of the Accumulated Voluntary Employee Contributions made to the Retirement System by such Member.  If a Member elects to receive his Accumulated Voluntary Employee Contributions, such amounts shall be paid to the Member in a lump sum payment or in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time.

(2)     In lieu of receiving distribution of his Accumulated Voluntary Employee Contributions as provided in Section 10.4(1), a Member may elect to have the actuarial equivalent value of his Accumulated Voluntary Employee Contributions added to his Retirement Allowance and paid in the form of an annuity described in Section 8.1.

(3)     If a Member dies while employed by the City or following termination of employment but prior to receiving distribution of the Member's Accumulated Voluntary Employee Contributions, the amounts credited to the Member's Accumulated Voluntary Employee Contribution Account at the time of death shall be paid to the Beneficiary nominated in a written designation duly executed by the Member and filed with the Board. In the event there is no such designated Beneficiary surviving, the Member's Accumulated Voluntary Employee Contributions shall be paid to the Member's estate.  If a Member who dies without a legal will has not nominated a

Beneficiary, the Member's Accumulated Voluntary Employee Contributions at the time of death may be used to pay burial expenses if the Member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

# ARTICLE 11 – LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS

## Sec. 11.1. The Loan Program

A loan program shall be available to members of the Detroit Police Lieutenants and Sergeants Association and the Detroit Police Command Officers Association who have amounts credited to a Voluntary Employee Contributions Account. The Board is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of the loan program. Copies of the rules shall be made available to eligible Members in the offices of the Retirement System. Any loans granted or renewed under the Retirement System shall be made and administered pursuant to and in compliance with Section 72(p) of the Internal Revenue Code and regulations thereunder.

## Sec. 11.2. Eligibility for Loan

Subject to the rules and procedures established by the Board, loans may be made to eligible Members from such Member's Voluntary Employee Contribution Account. An eligible Member is any Member who has participated in the Retirement System for twelve (12) months or more. Former Members, Spouses and Beneficiaries are not eligible to receive any loans from the Retirement System. No Member shall have more than two (2) outstanding loans from the Retirement System (Component I and/or Component II) at any time. A Member who has previously defaulted on a loan shall not be eligible for a loan from the Retirement System.

## Sec. 11.3. Amount of Loan

An eligible Member who has satisfied applicable rules and procedures established by the Board may borrow from his Voluntary Employee Contribution Account an amount, which does not exceed the lesser of (i) fifty percent (50%) of the Member's Voluntary Employee Contribution Account balance, and (ii) Fifteen Thousand Dollars ($15,000.00), in each case reduced by the excess, if any, of: (1) the Member's highest outstanding loan balance under the Retirement System during the one (1) year period ending on the day before the date on which the loan is made, or (2) the outstanding loan balance under the Retirement System on the date on which the loan is made, whichever is less. The minimum loan amount shall be One Thousand Dollars ($1,000.00).

## Sec. 11.4. Terms and Conditions

In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

(a)    Each loan application shall be made in writing.

(b)    All loans shall be memorialized by a collateral promissory note for the amount of the loan, including interest, payable to the order of the Retirement System and properly executed by the Member.

(c)    Each loan shall be repaid by substantially equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years. In no case shall the amount of the payroll deduction be less than Twenty Dollars ($20.00) for any two-week pay period. A Member receiving a loan will be required to authorize payroll deductions from his compensation in an amount sufficient to repay the loan over its term.

33

(d)     An amount equal to the principal amount of the loan to a Member (but not more than one half of the Member's vested interest in the Retirement System) will be designated as collateral for guaranteeing the loan.

(e)     Each loan shall bear interest at a rate determined by the Board.  The Board shall not discriminate among Members in its determination of interest rates on loans.  However, loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the Retirement System's current assumed rate of return.  The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the Retirement System of administering the loan.  The loan interest rate shall be calculated in a manner that will not negatively affect either the City's costs with respect to the Retirement System or the investment return allocated to Members.

(f)     Loan repayments shall be suspended during a period of military service, as permitted by Section 414(u)(4) of the Internal Revenue Code.  A Member who has an outstanding loan balance from the Retirement System who is absent from employment with the City, and who has satisfied the requirements of Section 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the Retirement System during said periods of absence.

### Sec. 11.5.  Loan Balance

A Member's outstanding loan balance shall be considered a directed investment by the Member and interest payments shall be credited to the Member's Voluntary Employee Contribution Account (provided that the interest credited to the Member's Voluntary Employee Contribution Account shall be reduced appropriately to cover the administrative costs of the loan program and avoid negatively affecting the City's costs or the Retirement System's investment returns), and shall not be part of the Retirement System's net investment income or part of the Member's Voluntary Employee Contribution Account balance for the purpose of allocation of net investment income under the Retirement System.

### Sec. 11.6.  Default

In the event a Member defaults on a loan before the loan is repaid in full, the unpaid balance thereof will become due and payable and, to the extent that the outstanding amount is not repaid by the end of the calendar quarter which follows the calendar quarter in which the last payment was received, such amount shall be deemed to have been distributed to the Member for tax purposes, consistent with Section 72(p) of the Internal Revenue Code.

### Sec. 11.7.  Distribution

No distribution shall be made to a Member, former Member, Spouse or Beneficiary from the Retirement System until all outstanding loan balances and applicable accrued interest have been repaid or offset against amounts distributable to the Member from the Retirement System.

# ARTICLE 12 DEFERRED RETIREMENT OPTION PLAN ("DROP") PROGRAM

## Sec. 12.1.  General Provisions

The following provisions are hereby established as the Deferred Retirement Option Plan ("DROP") Program, which shall be available to members of the Detroit Police Lieutenants and Sergeants Association and the Detroit Police Command Officers Association.

(1)     In lieu of terminating employment and accepting a Retirement Allowance under the Retirement System, any Member of the Retirement System who is eligible for the DROP Program and who is eligible to immediately retire and receive an unreduced Retirement Allowance under Section 5.1 may elect to participate in the DROP Program and defer the receipt of his Retirement Allowance in accordance with the provisions of this Article 12.  Any such election shall be irrevocable.

(2)     Upon the effective date of a Member's participation in the DROP Program, the Member shall cease to accrue a Retirement Allowance pursuant to Section 6.1 and shall elect a form of payment for his Retirement Allowance pursuant to Section 8.1.  Seventy-five percent (75%) of the monthly Retirement Allowance (including applicable variable pension improvement factor (escalator) increases) that would have been payable, had a Member elected to terminate employment with the City on the effective date of his or her DROP election and receive an immediate Retirement Allowance, shall be paid into a DROP Account established on behalf of the Member under the Retirement System or in an entity selected by the City.

(3)     If amounts credited to a DROP Account are invested under the Retirement System, such amounts shall be comingled with the assets of the Retirement System for investment purposes and shall be invested by the Trustees.  The Member's DROP Account shall be credited with annual earnings at a rate equal to seventy-five percent (75%) of the actual net earnings rate of the assets of the Retirement System; however, in no event shall the earnings rate applied to a Member's DROP Account for any Plan Year be less than zero percent (0%) nor greater than seven and three-quarters percent (7.75%).

(4)     If amounts credited to a DROP Account are paid into an entity managed outside of the Retirement System, amounts credited to a Member's DROP Account shall be invested as directed by the Member within the investment choices provided by such entity.

(5)     Any fees associated with the maintenance of DROP Accounts outside of the Retirement System shall be paid by the Members by means of deduction from the DROP Account.

## Sec. 12.2.  Conversion to Retirement Allowance

(1)     A Member shall be entitled to participate in the DROP Program for a maximum of five years.  At the end of such five year period of participation in the DROP Program, the Member shall be retired from employment with the City.

(2)     A Member shall not receive a distribution of amounts credited to his DROP Account prior to his termination of employment with the City. Upon termination of employment, Member who is a participant in the DROP Program shall receive, at his option either a lump sum payment from the DROP Account equal to the amount credited to the DROP Account or an annuity based upon the amount credited to his DROP Account. In addition, the Member's full monthly Retirement Allowance that otherwise would have been paid upon the Member's retirement had he or she not elected to participate in the DROP Program shall commence to the Member in accordance with

35

the form of payment selected by the Member at the commencement of his or her participation in the DROP Program. Termination of employment includes termination of any kind, such as, resignation, retirement, discharge or disability.

### Sec. 12.3. Death of Member While Participating in the DROP Program

(1)    If a Member dies while participating in the DROP Program, a lump sum payment equal to the Member's DROP Account balance shall be paid to the Beneficiary named by the Member, or if no Beneficiary has been designated, to the Member's estate. In addition, the Member's Retirement Allowance, together with any applicable variable pension improvement factor (escalator) increases, will be restored to one hundred percent (100%) of the amount that would have been paid to the Member but for the Member's decision to participate in the DROP Program. Survivor benefits, if any, shall be paid in accordance with the payment Option elected by the deceased Member.

### Sec. 12.4. Disability of Member While Participating in the DROP Program

(1)    If a Member becomes Totally Disabled due to a duty disability while participating in the DROP Program and while still an Employee and his employment with the City is terminated because he is Totally Disabled, he shall be immediately retired with one hundred percent (100%) of his Retirement Allowance payable in the form of payment selected by the Member at the commencement of the DROP Program, plus any applicable variable pension improvement factor (escalator) increases.

(2)    If a Member becomes Totally Disabled due to a non-duty disability while participating in the DROP Program and while still an Employee of the City and his employment with the City is terminated because he is Totally Disabled, the Member (a) shall be immediately retired and his full Retirement Allowance, together with any applicable variable pension improvement factor (escalator) increases, will commence in accordance with the form of payment selected by the Member at the commencement of the Member's participation in the DROP Program, and (b) shall be entitled to receive payment of the funds in his DROP Account (as a lump sum or other form of payment described in Section 8.1). Such Member shall not be entitled to disability retirement benefits under Section 5.3 or Section 5.4 hereof.

### Sec. 12.5. Cost Neutrality

(1)    The DROP Program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP Program shall continue during the pendency of proceedings, described in paragraph (2) below, designed to restore the Retirement System to cost neutrality.

(2)    If the City contends that the DROP Program is costing it money, including, but not limited to, making the City's annual contribution to the Retirement System higher than it would be if the DROP Program was not in effect, the Retirement System's actuary as well as an actuary appointed by the City, shall meet and confer in good faith regarding the cost. If the actuaries are unable to reach an agreement as to cost, the matter shall be submitted to a third, independent, actuary, chosen or agreed upon by the Retirement System's actuary and the City's actuary who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries. This actuary, when rendering a decision, will be limited to ordering implementation of changes necessary to make the DROP Program cost neutral. Upon the implementation of changes necessary to make the DROP Program cost neutral, Members shall have thirty days to elect to either (a) retire from active employment with the City or (b) withdraw

36

from the DROP Program and resume active participation in the Retirement System. The Board shall notify the Member of these changes prior to implementation. Those Members resuming participation in the Retirement System shall not accumulate Credited Service for any time that they were participating in the DROP Program. Those not making either election shall resume active participation in the Retirement System.

# ARTICLE 13 – LIMITATION ON BENEFITS AND CONTRIBUTIONS

## Sec. 13.1.  Compliance With Code Section 415(b) And Regulations

(1)     Notwithstanding any other provision of this Combined Plan Document, the defined benefit component of the Retirement System shall be administered in compliance with the provisions of Code Section 415(b) and regulations thereunder that are applicable to governmental plans.

(2)     The maximum annual benefit accrued by a Member during a limitation year (which shall be the Plan Year) and the maximum annual benefit payable under the Retirement System to a Member at any time within a Plan Year, when expressed as an annual benefit in the form of a straight life annuity (with no ancillary benefits), shall be equal to $160,000 (as such amount is adjusted pursuant to Code Section 415(d) for such Plan Year).

(3)     Notwithstanding the foregoing:

   (a)     if the benefit under the Retirement System is payable in any form other than a straight life annuity, the determination as to whether the limitation described in Section 13.1(2) has been satisfied shall be made, in accordance with the regulations prescribed by the Secretary of the Treasury, by adjusting such benefit to the Actuarially Equivalent straight life annuity beginning at the same time, in accordance with Section 13.1(8) or (9);

   (b)     if the benefit under the Retirement System commences before Age sixty-two, the determination of whether the limitation set forth in Section 13.1(2) (the "Dollar Limit") has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by reducing the Dollar Limit so that the Dollar Limit (as so reduced) is equal to an annual benefit payable in the form of a straight life annuity, commencing when such benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-two; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-two and the age of benefit commencement, then the Dollar Limit (as so reduced) shall equal the lesser of (i) the amount determined under this Section 13.1(3)(b) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the straight life annuity under the Retirement System, commencing at Age sixty-two; and

   (c)     if the benefit under the Retirement System commences after Age sixty-five, the determination of whether the Dollar Limit has been satisfied shall be made, in accordance with regulations prescribed by the Secretary of the Treasury, by increasing the Dollar Limit so that the Dollar Limit (as so increased) is equal to an annual benefit payable in the form of a straight life annuity, commencing when the benefit under the Retirement System commences, which is Actuarially Equivalent to a benefit in the amount of the Dollar Limit commencing at Age sixty-five; provided, however, if the Retirement System has an immediately commencing straight life annuity commencing both at Age sixty-five and the Age of benefit commencement, the Dollar Limit (as so increased) shall equal the lesser of (i) the amount determined under this Section 13.1(3)(c) without regard to this proviso, or (ii) the Dollar Limit multiplied by a fraction the numerator of which is the annual amount of the immediately commencing straight life annuity under the Retirement System and the denominator of which is the annual amount of the immediately

38

commencing straight life annuity under the Retirement System, commencing at Age sixty-five.

(4)    Notwithstanding the foregoing provisions of this Section 13.1, except as provided in Section 13.1(5), the maximum annual benefit specified in Section 13.1(2) above shall not apply to a particular Retirement System benefit if (a) the annual amount of such Retirement System benefit, together with the aggregate annual amount of any other pensions payable with respect to such Member under all other defined benefit plans maintained by the City, does not exceed $10,000 for the Plan Year or any prior Plan Year, and (b) the Member was not at any time a participant in a defined contribution plan maintained by the City.

(5)    In the case of a Member who has less than ten years of participation in the Retirement System, the limitation set forth in Section 13.1(2) shall be such limitation (without regard to this Section 13.1(5)), multiplied by a fraction, the numerator of which is the number of years of participation in the Retirement System (or parts thereof) credited to the Member and the denominator of which is ten. In the case of a Member who has less than ten years of Vesting Service, the limitations set forth in Paragraph (b) of Section 13.1(2) and in Section 13.1(4) shall be such limitations (determined without regard to this Section 13.1(5)) multiplied by a fraction, the numerator of which is the number of years of Vesting Service, or parts thereof, credited to the Member and the denominator of which is ten.

(6)    Notwithstanding anything in this Section 13.1 to the contrary, if the annual benefit of a Member who has terminated employment with the City is limited pursuant to the limitations set forth in Section 13.1(2), such annual benefit shall be increased in accordance with the cost-of-living adjustments of Code Section 415(d).

(7)    For purposes of determining actuarial equivalence under Paragraph (b) or (c) of Section 13.1(3), the interest rate assumption shall be five percent (5%) and the mortality table used shall be the applicable mortality table specified by the Board.

(8)    The actuarially equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) does not apply, as required by Paragraph (a) of Section 13.1(3), is equal to the greater of (a) the annual amount of the straight life annuity payable under the Retirement System commencing at the same annuity starting date as the form of benefit payable to the Member, or (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the interest rate and mortality assumptions set forth in Section 13.1(7).

(9)    The actuarially equivalent straight life annuity for purposes of adjusting any benefit payable in a form to which Code Section 417(e)(3) applies, as required by Paragraph (a) of Section 13.1(3), is equal to the greatest of (a) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same Actuarial Equivalent present value as the form of benefit payable to the Member, (b) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using a five and one-half percent (5.5%) interest rate assumption and the applicable mortality table specified by the Board, or (c) the annual amount of the straight life annuity commencing at the same annuity starting date that has the same actuarial present value as the form of benefit payable to the Member, computed using the applicable interest rate and the applicable mortality table, both as specified by the Board, divided by 1.05.

(10)     For purposes of applying the limitations set forth in this Section 13.1, all qualified defined benefit plans (whether or not terminated) ever maintained by the City shall be treated as one defined benefit plan.

(11)     For purposes of this Section 13.1, the term "compensation" shall include those items of remuneration specified in Treasury Regulation § 1.415(c)-2(b) and shall exclude those items of remuneration specified in Treasury Regulation § 1.415(c)-2(c), taking into account the timing rules specified in Treasury Regulation § 1.415(c)-2(e), but shall not include any amount in excess of the limitation under Code Section 401(a)(17) in effect for the year.  The term "compensation" as defined in the preceding sentence shall include any payments made to a Member by the later of (a) two and one-half months after the date of the Member's severance from employment with the City or (b) the end of the limitation year that includes the date of the Member's severance from employment with the City, provided that, absent a severance from employment, such payments would have been paid to the Member while the Member continued in employment with the City and are regular compensation for services performed during the Member's regular working hours, compensation for services outside the Member's regular working hours (such as overtime or shift differential pay), commissions, bonuses or other similar compensation.

(12)     This Section 13.1 shall be administered in conformity with the regulations issued by the Secretary of the Treasury interpreting Code Section 415 including, but not limited to, any regulation providing for the "grandfathering" of any benefit accrued prior to the effective date of such regulations or statutory provision.

### Sec. 13.2.  Compliance with Code Section 415(c) and Regulations

(1)     The "annual addition" with respect to a Member for a limitation year shall in no event exceed the lesser of:

    (a)     $40,000 (adjusted as provided in Code Section 415(d)); or

    (b)     One hundred percent (100%) of the Member's compensation, as defined in Code Section 415(c)(3) and regulations issued thereunder, for the limitation year.

(2)     The "annual addition" with respect to a Member for a limitation year means the sum of his Voluntary Employee Contributions made to the Retirement System, and the employer contributions, employee contributions and forfeitures allocated to his accounts under any other qualified defined contribution plan (whether or not terminated) maintained by the City, and the amounts described in Code Sections 415(l)(2) and 419A(d)(2) allocated to his account.

(3)     In the event the "annual addition" to the Retirement System on behalf of a Member would otherwise exceed the amount that may be applied for his benefit under the limitation contained in this Section 13.2, the limitation shall be satisfied by reducing the Member's Voluntary Employee Contributions to the extent necessary and distributing such amounts to the Member.

## ARTICLE 14 – RETIREMENT SYSTEM ADMINISTRATION

### Sec. 14.1.  Board of Trustees as Retirement System Administrator

(1)     The Retirement Board  shall have the power and authority to manage and administer  the Retirement System in accordance with the provisions of this Combined Plan Document.

(2)     The Retirement Board shall provide procedures for the processing and review of benefit claims, corrections of errors, and similar matters, as further described in Section 14.2.

(3)     The Retirement Board and the Retirement System shall not make any payment to active or retired Members or Beneficiaries other than payments that are required by the Retirement System as established by this Combined Plan Document.  This prohibition applies to all payments that are not authorized by this Combined Plan Document, whether such payments are those commonly referred to as a "thirteenth check" or payments by any other name.

### Sec. 14.2.  Powers and Duties of Board

(1)     The Board shall have the following powers and duties:

   (a)     exclusive authority regarding the  administration, management and operation of the Retirement System, including, but not limited to, the right to contract for office space, computer hardware and software, and human resource services (any or all of which may be obtained from the City), and to make rules and regulations with respect to the operation of the Retirement System not inconsistent with the terms of the Combined Plan Document and applicable law, and to amend or rescind such rules and regulations;

   (b)     to determine questions of law or fact that may arise as to the rights of any person claiming rights under the Retirement System;

   (c)     to determine the contributions to the Retirement System required of the City and Members pursuant to the documents governing operation of the Retirement System, including the Plan of Adjustment;

   (d)     to construe and interpret the provisions of the Retirement System and to reconcile any inconsistencies;

   (e)     to perform ministerial functions, whether or not expressly authorized, which the Board may deem necessary or desirable in carrying out its duties under the Retirement System;

   (f)     except to the extent authority is vested in the Investment Committee, authority to employ, contract and pay for professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation of the Retirement System;

   (g)     except to the extent authority or responsibility is vested in the Investment Committee, to arrange for annual audits of the records and accounts of the Retirement System by a certified public accountant or by a firm of certified public accountants pursuant to generally accepted auditing standards;

41

(h)    to prepare an annual report for the Retirement System for each fiscal year in compliance with generally accepted accounting principles.  The report shall contain information regarding the financial, actuarial, and other activities of the Retirement System during the fiscal year.  The Board shall furnish a copy of the annual report to the mayor and finance director of the City, to the chair of the City Council and the Investment Committee. The report shall also contain a review of the latest actuarial valuation of the Retirement System;

(i)    to maintain or cause to be maintained such separate funds and accounts as are required to be maintained under the provisions of Components I and II of the Combined Plan Document and such additional accounts as the Board deems necessary or expedient for the proper administration of the Retirement System and the administration and investment of the assets of the Retirement System.  The Board shall maintain suitable records, data and information in connection with the performance of its functions, including, but not limited to, accurate and detailed accounts of all investments, receipts, disbursements, and other actions, including the proportionate interest therein and accumulated contributions of each Member who has made contributions to the Retirement System;

(j)    to correct any error in the records of the Retirement System that results in overpayment or underpayment of contributions to the Retirement System by the City or a Member, or overpayment or underpayment of benefits to a Member, former Member, or Beneficiary by the Retirement System.  In the event of overpayment to a Member, former Member or Beneficiary, the Board may, as far as practicable, adjust future payments to such individual in such a manner that the Actuarial Equivalent of the benefit to which such individual was entitled shall be paid;

(k)    to the extent permissible under Michigan law (and consistent with the Retirement System's favorable tax qualified status under Code Section 401(a)), purchase one or more insurance policies to indemnify any person and such person's heirs and legal representatives who is made a party to (or threatened to be made a party to) any action, suit or proceeding whether brought by or in the right of the Board, the Investment Committee or the Retirement System or otherwise, by reason of the fact that such person is or was a Board member, Investment Committee member, director, officer, employee or agent of the Board (or an advisory body or committee of the Board) or the Retirement System.  The insurance policies purchased by the Board shall not indemnify any person who is judicially determined to have incurred liability due to fraud, gross negligence or malfeasance in the performance of his duties; and

(l)    except to the extent authority or responsibility is vested in the Investment Committee, to perform any other function that is required for the proper administration of the Retirement System.

## Sec. 14.3.  Executive Director; Employees

The Board shall employ on behalf of the Retirement System an executive director and any other employees for which the Board establishes positions.  The executive director shall do all of the following:

(a)    manage and administer the Retirement System under the supervision and direction of the Board;

(b)     annually prepare and submit to the Board for review, amendment, and adoption an itemized budget projecting the amount required to pay the Retirement System's expenses for the following fiscal year; and

(c)     perform such other duties as the Board shall delegate to the executive director.

The executive director, unless such power is retained by the Board, shall determine the compensation of all employees of the Retirement System (except the executive director, whose compensation shall be determined by the Board and the chief investment officer, whose compensation shall be determined by the Investment Committee) and such compensation shall be payable from the Retirement System.  Any person employed by the Retirement System may but need not be an employee of the City.

## Sec. 14.4.  Discretionary Authority

The Board shall have sole and absolute discretion to:

(a)     interpret the provisions of the Retirement System;

(b)     make factual findings with respect to any and all issues arising under the Retirement System;

(c)     determine the rights and status of Members, Retirees, Beneficiaries and other persons under the Retirement System;

(d)     decide benefit disputes arising under the Retirement System; and

(e)     make determinations and findings (including factual findings) with respect to the benefits payable hereunder and the persons entitled thereto as may be required for the purposes of the Retirement System.

## Sec. 14.5.  Administrator's Decision Binding

The Board's decision on any matter arising in connection with administration and interpretation of the Retirement System shall be final and binding on Members, Retirees and Beneficiaries.

## ARTICLE 15 – MANAGEMENT OF FUNDS

### Sec. 15.1.  Board as Trustee of Retirement System Assets

The Board of Trustees shall be the trustee of the funds held under the Retirement System, shall receive and accept all sums of money and other property paid or transferred to it by or at the direction of the City, and subject to the terms of Article 16, shall have the power to hold, invest, reinvest, manage, administer and distribute such money and other property subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq.* of the Michigan Compiled Laws, as amended.

### Sec. 15.2.  Maintenance of Segregated Funds

The Board of Trustees shall maintain separate funds as required for the proper administration of the Retirement System and shall not commingle the assets held under the Retirement System for the purpose of funding benefits accrued by Members prior to July 1, 2014, together with earnings and losses on such assets (or replacement assets), as more fully described in Component II of this Combined Plan Document, with the assets of the Retirement System held for the purpose of paying benefits accrued by Members on and after July 1, 2014 as described in this Component I of the Combined Plan Document. Notwithstanding the foregoing, the assets held under Components I and II of this Combined Plan Document may be commingled for investment purposes.

### Sec. 15.3.  Custodian of Funds

The Board of Trustees shall appoint or employ custodians of the assets of the Retirement System. The custodians shall perform all duties necessary and incidental to the custodial responsibility and shall make disbursements as authorized by the Board.

### Sec. 15.4.  Exclusive Purpose

All money and other assets of the Retirement System shall be held by the Trustees and invested for the sole purpose of paying benefits to Members and Beneficiaries and shall be used for no other purpose.  In exercising its discretionary authority with respect to the management of the money and other assets of the Retirement System, the Trustees shall exercise the care, skill, prudence and diligence under the circumstances then prevailing, that a person acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of like character with like aims.

### Sec. 15.5.  Prohibited Conduct

Members of the Board and employees of the Retirement System are prohibited from:

(1)     Having any beneficial interest, direct or indirect, in any investment of the Retirement System;

(2)     Being an obligor or providing surety for any money loaned to or borrowed from the Retirement System;

(3)     Except as provided in Article 11, borrowing any money or other assets of the Retirement System; and

44

(4)      Receiving any pay or other compensation from any person, other than compensation paid by the Retirement System, with respect to investments of the Retirement System.

45

## ARTICLE 16 - INVESTMENT OF RETIREMENT SYSTEM ASSETS

### Sec. 16.1.  Investment Powers of the Board and the Investment Committee

Subject to the requirements set forth in this Article 16, the Board shall have the power and authority to manage, control, invest and reinvest money and other assets of the Retirement System subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by *Act No. 314 of the Public Acts of 1965*, being sections 38.1132 *et seq. of the Michigan Compiled Laws*, as amended. Notwithstanding anything in this Combined Plan Document to the contrary, for the twenty year period following the effective date of the Plan of Adjustment, the Investment Committee shall make recommendations to the Board with respect to investment management matters as provided in this Article 16.

All investment management decisions made by the Board, as more fully described in Section 16.2, shall require a recommendation by an affirmative vote of the Investment Committee as provided in this Combined Plan Document.  The Board shall take no action with respect to any matter for which the Investment Committee has advisory responsibility and authority, unless and until such action has been approved by affirmative vote of the Investment Committee. All actions and recommendations of the Investment Committee shall be forwarded to the Board for consideration and are subject to Board approval.  If the Board (a) fails to approve or disapprove an Investment Management decision that has been recommended by an affirmative vote of the Investment Committee, and such failure continues for forty-five days after the date that the recommendation was made to the Board, or (b) the Board disapproves an Investment Management decision within such forty-five day period but fails to provide to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee  and the Chief Investment Officer are authorized to implement the decision.

If the Board disapproves an Investment Committee recommendation within such forty-five day period and provides to the Investment Committee within such forty-five day period a detailed written response outlining the reasons for such disapproval, then the Investment Committee shall have forty-five days after the receipt of the Board response to either (a) withdraw the recommended Investment Management decision, or (b) request, in writing, a conference with the Board to be held within ten days, but not sooner than five business days, of the request to discuss the alternative proposal from the Board, unless a later date is agreed to in writing by the Board and the Investment Committee to discuss the disapproval as set forth in the Board's written response.  Any such conference shall be conducted with at least three independent Investment Committee members present in person or by phone.  Within ten days of the commencement of the conference or twenty days following the Investment Committee's request for a conference if no conference is held, the Investment Committee shall either withdraw the recommended Investment Management decision or provide the Board with a written explanation of the Investment Committee's decision to proceed with the recommended Investment Management decision.   After delivery of such written explanation by the Investment Committee, the Investment Committee and the chief investment officer are authorized to implement the decision.  Any action taken by the Board or the Investment Committee in violation of the terms of this Article 16 shall constitute an ultra vires act and the Investment Committee or the Board is granted the express right to seek to preliminarily enjoin such violation without the need to show irreparable harm.

### Sec. 16.2.  Investment Management

(1)      For purposes of this Combined Plan, investment management decisions shall include:

(a)    development of an investment policy statement with sound and consistent investment goals, objectives, asset allocation and rebalancing guidelines, performance benchmarks for strategic asset allocation and such other aspects of investment policy as are consistent with the needs of the Retirement System;

(b)    within 120 days after the effective date of the Plan of Adjustment, placement of all of the assets of the Retirement System not already under qualified management with qualified investment managers selected by the Investment Committee;

(c)    evaluation, retention, termination and selection of qualified managers to invest and manage the Retirement System's assets;

(d)    review and affirmation or rejection of the correctness of any and all calculations, actuarial assumptions and/or assessments used by the Retirement System actuary including, but not limited to (i) those underlying the restoration of pension benefits, funding levels and amortization thereof, all in accordance with the pension restoration program attached to the Plan of Adjustment (as more fully described in Component II of this Combined Plan Document), (ii) those underlying the determination of annual funding levels and amortization thereof, and (iii) on or after fiscal year 2024, the recommended annual contributions to the Retirement System in accordance with applicable law;

(e)    in accordance with approved actuarial work as provided in paragraph (d) above and based on the annual actuarial valuation reports and any other projections or reports as applicable from the Retirement System's actuary or other professional advisors, the determination of the extent of restoration of pension benefits, including but not limited to the payment of lost COLA payments, all in conformance with the pension restoration program attached to the Plan of Adjustment;

(f)    communication of the Retirement System's investment goals, objectives, and standards to the investment managers, including any material changes that may subsequently occur;

(g)    determination and approval of the Retirement System's investment and asset allocation guidelines, taking into account the appropriate liquidity needs of the Retirement System;

(h)    periodic review and evaluation of the performance of the investment managers in context with established standards of performance, including restoration of benefits pursuant to Component II of the Retirement System;

(i)    the taking of corrective action deemed prudent and appropriate when an investment manager fails to perform as expected;

(j)    interpretation of Retirement System governing documents, existing law, the Plan of Adjustment and other financial information that could affect funding or benefit levels;

(k)    review and approval, prior to final issuance, the annual audit and all financial reports prepared on behalf of the Retirement System and meet and confer with the Retirement System's auditor or other professional advisors as necessary prior to approval of the annual audit or other financial reports;

(l)    determination of the funding status of the Retirement System and any remedial action to be taken pursuant to Section 9.5; and

47

(m)     causing an asset/liability valuation study to be performed for the Retirement System every three years or, more often, as deemed necessary or prudent by the Investment Committee or as requested by the Board.

All actions of the Investment Committee shall comply with the provisions of pertinent federal, state, and local laws and regulations, specifically *Public Act 314 and Plan Investment Guidelines*.

## Sec. 16.3.  Best Practices

Prior to adopting an investment policy and asset allocation policy, selecting investment managers or adopting investment return assumptions, the Investment Committee shall give appropriate consideration to the following:

(a)     the fiduciary best practices and institutional standards for the investment of public employee retirement system plan assets;

(b)     the objective to obtain investment returns above the established actuarial investment return assumption to support the restoration of benefits under the Plan of Adjustment, to the extent that it is prudent and consistent with the overall funding, liquidity needs and actuarial assumptions governing the Retirement System; and

(c)     the liquidity needs of the Retirement System.

## Sec. 16.4.  Chief Investment Officer

The Investment Committee shall have the exclusive power to select, retain and terminate the services of a chief investment officer for the Retirement System.  The Investment Committee shall determine any and all compensation and other terms of employment of any chief investment officer hired by it.  The chief investment officer shall report directly to the Investment Committee and the Executive Director of the Board.  The chief investment officer shall be responsible for assisting the Investment Committee and the Board with respect to oversight of the Retirement System's investment portfolio.  The chief investment officer shall provide such periodic reports relating to the Retirement System's assets to the Investment Committee and the Board as it or they shall request.

## Sec. 16.5.  Investment Consultants

The Board and/or Investment Committee may retain the services of one or more investment consultants who shall be responsible for assisting the Investment Committee and the Board with oversight of the Retirement System's investment portfolio.  Any such investment consultant shall be a registered advisor with the United States Securities and Exchange Commission and shall be a nationally recognized institutional investment consultant with expertise in the investment of public pension plan assets.  Any such investment consultant shall acknowledge in writing its role as investment fiduciary with respect to the Retirement System as defined in the *Public Employee Retirement System Investment Act,* as amended, MCL 38.1132 *et seq*.  The Board or the Investment Committee, as appropriate, shall determine the compensation and other terms of employment of any investment consultant hired by it.  The duties of an investment consultant may include, but shall not be limited to:

(a)     providing an asset/liability valuation study for the Retirement System;

(b)     reviewing the Retirement System's asset allocation based on current market assumptions;

(c)    identifying and recommending to the Investment Committee and the Board appropriate investment strategies based on the financial condition of the Retirement System;

(d)    implementing the approved investment strategies, such as recommending to the Investment Committee, for Board approval, an asset allocation strategy, building an investment structure for the Retirement System, and identifying qualified investment managers (through an organized search process) to execute and implement investment strategies;

(e)    monitoring and evaluating the ongoing progress of the investment managers toward stated investment goals and objectives;

(f)    recommending to the Investment Committee and the Board any necessary corrective actions, including adjustments to the investment structure or investment management organizations in the event of a deviation from expectations;

(g)    communicating the investment policies of the Retirement System to the investment managers;

(h)    reviewing the investment policies with the appropriate employees of the Retirement System;

(i)    aiding the Investment Committee in providing recommendations on issues relating to rebalancing and cash flow management, securities lending, transition management, cash equalization and other investment related topics;

(j)    attending Investment Committee and Board meetings in person, or telephonically, as needed or as requested;

(k)    meeting with the Investment Committee to provide  detailed quarterly performance reports and executive summaries of performance;

(l)    meeting with the Investment Committee and the Board to review capital markets and inform the Board and Retirement System employees on the current investment environment; and

(m)    meeting with the Investment Committee and the Board to provide recommendations on asset allocation, investment structure, and manger selections.

## Sec. 16.6. Consistency With Plan of Adjustment

Nothing herein shall be interpreted as permitting the Investment Committee or the Board to alter or depart from the requirements set forth in the Plan of Adjustment.

# ARTICLE 17 MISCELLANEOUS

## Sec. 17.1. Nonduplication of Benefits

If any Member is a participant in another defined benefit pension plan, retirement system or annuity plan sponsored by the City (including Component II of this Retirement System) and the Member is or becomes entitled to accrue pension benefits under such plan or retirement system (including Component II of this Retirement System) with respect to any period of service for which he is entitled to accrue a benefit under Component I of this Retirement System, such Member shall not be eligible to accrue or receive payment of a benefit under Component I with respect to such period of service.

## Sec. 17.2. Assignments Prohibited

The right of a person to a pension, annuity, the return of Accumulated Voluntary Employee Contributions and/or the return of Accumulated Mandatory Employee Contributions, the Retirement Allowance itself, to any optional form of benefit, to any other right accrued or accruing to any person under the provisions of this Retirement System, and the monies in the various funds of the Retirement System shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever, except as specifically provided in this Combined Plan Document or by an eligible domestic relations order of a lawful court.

## Sec. 17.3. Protection Against Fraud

A person who, with intent to deceive, makes any statements or reports required under this Retirement System that are untrue, or who falsifies or permits to be falsified any record or records of this Retirement System, or who otherwise violates, with intent to deceive, any terms or provisions of the Retirement System, shall be subject to prosecution under applicable law.

## Sec. 17.4. Conviction of Felony; Forfeiture of Rights

If a Member or Beneficiary shall be convicted by a court of competent jurisdiction of a felony or high misdemeanor involving moral turpitude committed during active Service, the Board shall have the power to order the forfeiture of all rights of the Member or Beneficiary to benefits hereunder, except the return of the Member's Accumulated Mandatory Employee Contributions and Accumulated Voluntary Employee Contributions.

## Sec. 17.5. Amendment; Termination; Exclusive Benefit

The City reserves the right to amend the Combined Plan Document created hereunder at any time; such amendments may include termination of the Retirement System; provided, however, that following the effective date of the Plan of Adjustment, no amendment other than amendments required to comply with applicable federal law or the Plan of Adjustment may be made effective prior to July 1, 2023, nor may any amendment or termination deprive any Member, former Member or Beneficiary of any then vested benefit under the Retirement System, except as provided in a Plan of Adjustment. Notwithstanding the foregoing, the City and the Board have the authority to amend the Combined Plan Document as necessary to retain the tax qualified status of the Retirement System under the Internal Revenue Code. The City shall make no amendment or amendments to the Retirement System which causes any part of the assets of the Retirement System to be used for, or diverted to, any purpose other than the exclusive benefit of Members, former Members or their Beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law. Any amendment of the Retirement System by the City must be approved by the Council or a person

standing in the stead of the Council.

Upon termination of the Retirement System or upon complete discontinuance of contributions to the Retirement System, the rights of all Members to benefits accrued to the date of such termination or discontinuance, to the extent then funded, shall be nonforfeitable.

### Sec. 17.6.  Forfeitures Not to Increase Benefits

Any forfeitures arising under the Retirement System due to a Member's termination of employment or death, or for any other reason, shall be used to pay expenses of the Retirement System and shall not be applied to increase the benefits any Member would otherwise receive under the Retirement System at any time prior to termination of the Retirement System.

### Sec. 17.7.  Required Distributions - Compliance with Code Section 401(a)(9) and Regulations

The Retirement System will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the final regulations issued thereunder, notwithstanding any provision in the Combined Plan Document to the contrary.  Pursuant to Code Section 401(a)(9)(A)(ii), a Member's interest must begin to be distributed by the later of (i) the April 1 of the calendar year following the calendar year that he attains the Age of seventy and one-half (70-1/2), or (ii) April 1 of the calendar year following the year in which he retires.  Distributions will be made in accordance with Regulations Sections 1.401(a)(9)-2 through 1.401(a)(9)-9.  The provisions of this Section 17.7 and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options.

### Sec. 17.8.  Direct Rollovers

(1)     For purposes of compliance with Code Section 401(a)(31), a distributee may elect, at the time and in the manner prescribed by the board, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(2)     For purposes of this Section 17.8, the following terms shall have the following meanings:

(a)     "Direct rollover" means a payment by the retirement system to an eligible retirement plan specified by a distributee.

(b)     "Distributee" means a Member or former Member. It also includes the Member's or former Member's surviving spouse, a spouse or former spouse who is the alternate payee under an eligible domestic relations order, or a nonspouse beneficiary who is a designated beneficiary as defined by Code Section 401(a)(9)(E).  However, a nonspouse beneficiary may only make a direct rollover to an individual retirement account or individual retirement annuity established for the purpose of receiving the distribution, and the account or annuity will be treated as an "inherited" individual retirement account or annuity.

(c)     "Eligible retirement plan" means any of the following that accepts a distributee's eligible rollover distribution:

(i)      a qualified trust described in Code Section 401(a);

(ii)     an annuity plan described in Code Section 403(a);

(iii) an annuity contract described in Code Section 403(b);

(iv) an individual retirement account described in Code Section 408(a);

(v) an individual retirement annuity described in Code Section 408(b);

(vi) a Roth IRA described in Code Section 408A; or

(vii) a plan eligible under Code Section 457(b) that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or a political subdivision of a state that agrees to separately account for amounts transferred into that plan from the retirement system.

(d) "Eligible rollover distribution" means any distribution of all or any portion of the balance to the credit of a distribute under the retirement system, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or the life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any distribution that is not includible in gross income; and any other distribution which the Internal Revenue Service does not consider eligible for rollover treatment, such as any distribution that is reasonably expected to total less than $200 during the year. Notwithstanding the foregoing, a portion of a distribution will not fail to be an "eligible rollover distribution" merely because the portion consists of after-tax contributions that are not includible in Member's gross income upon distribution from the retirement system. However, such portion may be transferred only (i) to an individual retirement account or annuity described in Code Section 408(a) or (b) or to a qualified defined contribution plan described in Code Section 401(a) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; (ii) to a qualified defined benefit plan described in Code Section 401(a) or to an annuity contract described in Code Section 403(b) that agrees to separately account for amounts so transferred (and earnings thereon), including separately accounting for the portion of the distribution that is includible in gross income and the portion of the distribution that is not so includible; or (iii) to a Roth IRA described in Code Section 408A.

## Sec. 17.9. Construction

Words in the singular should be read and construed as though used in the plural, and words in the plural should be read and construed as though used in the singular, where appropriate. The words "hereof", "herein", and "hereunder" and other similar compounds of the word "here", shall mean and refer to Component I of this Combined Plan Document and not to any particular provision or section thereof. The table of contents, article and section headings are included for convenience of reference, and are not intended to add to, or subtract from, the terms of the Combined Plan Document or the Retirement System created hereunder.

## Sec. 17.10. Severability

If any section or part of a section of this Combined Plan Document or provision relating to the

Retirement System is for any reason held to be invalid or unconstitutional, such holding shall not be construed as affecting the validity of the remaining sections of the Combined Plan Document or Retirement System or of the Combined Plan Document or Retirement System in its entirety.

CLI-2205395v6

## EXHIBIT I.A.248.b

PRINCIPAL TERMS OF NEW PFRS ACTIVE PENSION PLAN

## NEW PFRS ACTIVE PENSION PLAN -- MATERIAL TERMS

1.    Benefit Formula:

    a.  Detroit Fire Fighters Association Employees
        i.  FAC (average base compensation over last 10 consecutive years of employment) x Years of Service earned after June 30, 2014  x 2.0%. Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus – just employee's base salary.

    b.  Detroit Police Command Officers Association Employees
        i.  FAC (average base compensation over last 5 consecutive years of employment) x Years of Service earned after June 30, 2014  x 2.0%. Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus – just employee's base salary.

    c.  Detroit Police Officers Association Employees
        i.  FAC (average base compensation over last 5 consecutive years of employment) x Years of Service earned after June 30, 2014  x 2.0%. Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus – just employee's base salary.

    d.  Detroit Police Lieutenants and Sergeants Association Employees
        i.  FAC (average base compensation over last 5 consecutive years of employment) x Years of Service earned after June 30, 2014  x 2.0%. Average base compensation means no overtime, no unused sick leave, no longevity or any other form of bonus – just employee's base salary.

2.    Actual time for benefit accrual is actual time served.  For vesting service,  1,000 hours in a 12 month period to earn a  year of service.

3.    Normal Retirement Age

    a.  Detroit Fire Fighters Association Employees
        i.   age 52 with 25 years of service

    b.  Detroit Police Command Officers Association Employees
        i.   age 50 with 25 years of service, with the following 7 year transition period:

| Fiscal Year | Age and Service |
|---|---|
| 2015 | Age 43 and 20 years |
| 2016 | Age 43 and 20 years |
| 2017 | Age 44 and 21 years |
| 2018 | Age 45 and 22 years |
| 2019 | Age 46 and 23 years |
| 2020 | Age 47 and 24 years |
| 2021 and thereafter | Age 50 and 25 years |

    c.  Detroit Police Officers Association Employees
        i.  age 50 with 25 years of service with the 7 year transition period described in paragraph 3b

    d.  Detroit Police Lieutenants and Sergeants Association Employees
age 50 with 25 years of service, with the 7 year transition period described in paragraph 3b

4.        10 Years of Service for vesting.

5.        Deferred vested  pension -- 10 years of service and age 55.

6.        Duty Disability  - consistent with current PFRS

7.        Non-Duty Disability – consistent with current PFRS

8.        Non-Duty Death Benefit for Surviving Spouse – consistent with current PFRS

9.        Duty Death Benefit for Surviving Spouse – consistent with current PFRS

10.      COLA

    a.  Detroit Fire Fighters Association Employees
        i.  no COLA

    b.  Detroit Police Command Officers Association Employees
        i.  1% compounded, variable

    c.  Detroit Police Officers Association Employees
        i.  1% compounded, variable

    d.  Detroit Police Lieutenants and Sergeants Association Employees
        i.  1% compounded, variable

11.      DROP Accounts

    a.  Detroit Fire Fighters Association Employees
        i.   no future payments into DROP.

    b.  Detroit Police Command Officers Association Employees
        i.  available for existing and future accrued benefits for employees who are eligible to retire under concurrent eligibility requirements.  No more than 5 years of DROP participation for employees not already in DROP. DROP accounts will be managed by the PFRS instead of ING, if administratively and legally feasible.  If managed by PFRS, interest will be credited to DROP accounts at a rate equal to 75% of the actual net investment return of PFRS, but in no event lower than 0% or higher than 7.75%.

c. Detroit Police Officers Association Employees
    i. available for existing and future accrued benefits for employees who are eligible to retire under concurrent eligibility requirements. No more than 5 years of DROP participation for employees not already in DROP. DROP accounts will be managed by the PFRS instead of ING, if administratively and legally feasible. If managed by PFRS, interest will be credited to DROP accounts at a rate equal to 75% of the actual net investment return of PFRS, but in no event lower than 0% or higher than 7.75%.

d. Detroit Police Lieutenants and Sergeants Association Employees
    i. available for existing and future accrued benefits for employees who are eligible to retire under concurrent eligibility requirements. No more than 5 years of DROP participation for employees not already in DROP. DROP accounts will be managed by the PFRS instead of ING, if administratively and legally feasible. If managed by PFRS, interest will be credited to DROP accounts at a rate equal to 75% of the actual net investment return of PFRS, but in no event lower than 0% or higher than 7.75%.

12. Annuity Savings Fund

a. Detroit Fire Fighters Association Employees
    i. no future Annuity Savings Fund contributions.

b. Detroit Police Command Officers Association Employees
    i. voluntary Annuity Savings Fund contributions up to 10% of after-tax pay. Interest will be credited at the actual net investment rate of return for PFRS, but will in no event be lower than 0% or higher than 5.25%. No in-service withdrawals permitted.

c. Detroit Police Officers Association Employees
    i. voluntary Annuity Savings Fund contributions up to 10% of after-tax pay. Interest will be credited at the actual net investment rate of return for PFRS, but will in no event be lower than 0% or higher than 5.25%. No in-service withdrawals permitted.

d. Detroit Police Lieutenants and Sergeants Association Employees
    i. voluntary Annuity Savings Fund contributions up to 10% of after-tax pay. Interest will be credited at the actual net investment rate of return for PFRS, but will in no event be lower than 0% or higher than 5.25%. No in-service withdrawals permitted.

13. Investment Return/Discount rate – 6.75%

14. City Contributions

a. Detroit Fire Fighters Association Employees

     i.  11.2% of the base compensation of eligible employees. A portion of such contribution (not less than 1% of base compensation) will be credited to a rate stabilization fund.

  b.  Detroit Police Command Officers Association Employees
     i.  12.25% of the base compensation of eligible employees. A portion of such contribution will be credited to a rate stabilization fund.

  c.  Detroit Police Officers Association Employees
     i.  11.2% of the base compensation of eligible employees for payroll periods beginning prior to the effective date of the collective bargaining agreement. 12.25% of the base compensation of eligible employees for payroll periods beginning after the effective date of the collective bargaining agreement. A portion of such contribution will be credited to a rate stabilization fund.

  d.  Detroit Police Lieutenants and Sergeants Association Employees
     i.  12.25% of the base compensation of eligible employees. A portion of such contribution  will be credited to a rate stabilization fund.

15.    Employee Contributions – Employees hired before July 1, 2014 (current actives) will contribute 6% of base compensation (pre-risk shifting); employees hired on or after July 1, 2014 (new employees) will contribute 8% of base compensation (pre-risk shifting). Maximum employee contributions of 10% (current actives) and 12% (new employees).

16.    Risk Shifting:

  a.  If the funding level is less than 90% (using the fair market value of assets), COLAs will be eliminated (to the extent applicable).

  b.  If the funding level is 90% or lower (using the fair market value of assets and a 3-year look back period), the following corrective actions will be taken in the order listed below, until the actuary can state that by virtue of the use of corrective action, and a 6.75% discount rate and return assumption, the funding level is projected to be 100% on a market value basis within the next 5 years:

      i.  eliminate COLAs (if applicable);
     ii.  use amounts credited to the rate stabilization fund to fund accrued benefits;
    iii.  increase employee contributions by 1% per year (6% to 7% for current actives and 8% to 9% for new employees) for up to 5 years;
    iv.  increase employee contributions (active and new employees) by an additional 1% per year;
     v.  increase employee contributions (active and new employees) by an additional 1% per year;
    vi.  implement a 1 year COLA fallback;
    vii.  implement a second 1 year COLA fallback;
   viii.  increase employee contributions by an additional 1% per year; and

ix.  increase City contributions consistent with applicable actuarial principles and PERSIA.

**EXHIBIT I.A.252**

NOTICE OF COP SETTLEMENT ACCEPTANCE

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

```
-----------------------------------------------------x
                                                     :
In re                                                :         Chapter 9
                                                     :
CITY OF DETROIT, MICHIGAN,                            :         Case No. 13-53846
                                                     :
                              Debtor.                 :         Hon. Steven W. Rhodes
                                                     :
                                                     :
-----------------------------------------------------x
```

## NOTICE OF COP SETTLEMENT ACCEPTANCE

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On September 15, 2014, the City of Detroit (the "City"), filed
the Seventh Amended Plan for the Adjustment of Debts of the City of Detroit
(Docket No. ____) (the "Seventh Amended Plan").[1]

2.      Section II.B.3.p.iii.A of the Seventh Amended Plan provides as
follows:  "Each holder of a COP Claim may settle issues related to the allowance
and treatment thereof and become a Settling COP Claimant as to all of the COP
Claims held by such holder and its Affiliates by submitting to the City a Notice of
COP Settlement Acceptance prior to the Effective Date."  Seventh Amended Plan,
at § II.B.3.p.iii.A (the "Plan COP Settlement").

---

[1]      Capitalized terms not otherwise defined herein have the meanings given to
them in the Seventh Amended Plan.

3. The undersigned Holder of the COP Claim(s) identified below hereby accepts the terms of the Plan COP Settlement as set forth in the Seventh Amended Plan and elects, by this notice, to become a Settling COP Claimant. This notice shall constitute a Notice of COP Settlement Acceptance as such term is defined in the Seventh Amended Plan.

4. To submit this notice to the City, you must deliver it by overnight delivery service, facsimile transmission, courier service or messenger to:

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

Date: _____ Signature: _____

Claim Number(s) of COP Claim(s): _____

Become a Settling COP Claimant with respect to $_____ in principal amount of COPs.

-2-

**EXHIBIT I.A.275**

PRIOR GRS PENSION PLAN

# COMBINED PLAN
# FOR THE
# GENERAL RETIREMENT SYSTEM
# OF THE
# CITY OF DETROIT, MICHIGAN

**Effective July 1, 2014**

# COMPONENT II

**This Component II of the Combined Plan For the General Retirement System of the City of Detroit, Michigan is intended to memorialize the documentation for the General Retirement System of the City of Detroit as it existed on June 30, 2014.**

# TABLE OF CONTENTS

Page

**ARTICLE A.** **[Formerly ARTICLE I. COMMON PROVISIONS OF THE GENERAL RETIREMENT SYSTEM. [*]]** .................................................. 1

Sec. A-1.   [Formerly Sec. 47-1-1. Certain ordinances and Charter provisions saved from repeal.] .................................................................................. 1

Sec. A-2.   [Formerly Sec. 47-1-2. General Retirement System Established.3] ......................... 1

Sec. A-3.   [Formerly Sec. 47-1-3. Board of trustees; created.4] ................................................ 1

Sec. A-4.   [Formerly Sec. 47-1-4. Board of Trustees; Membership; Appointment; Election.5] .................................................................................................................. 1

Sec. A-5.   [Formerly Sec. 47-1-5. Board of Trustees; Retiree Member Election.7] .................... 2

Sec. A-6.   [Formerly Sec. 47-1-6. Board of Trustees; term.8] ................................................... 3

Sec. A-7.   [Formerly Sec. 47-1-7. Board of Trustees; vacancies.9] ........................................... 3

Sec. A-8.   [Formerly Sec. 47-1-8. Board of Trustees; meeting attendance; compensation.10] ...................................................................................................... 3

Sec. A-9.   [Formerly Sec. 47-1-9. Board of Trustees; Oath of Office.11] ................................. 4

Sec. A-10.  [Formerly Sec. 47-1-10. Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum.12] ...................................................................................... 4

Sec. A-11.  [Formerly Sec. 47-1-11. Board of Trustees; Rules for Administration of the Pension System.13] .............................................................................................. 4

Sec. A-12.  [Formerly Sec. 47-1-12. Board of Trustees; Officers and Employees.14] ................ 4

Sec. A-13.  [Formerly Sec. 47-1-13. Board of Trustees; certain data to be kept.15] ................... 5

Sec. A-14.  [Formerly Sec. 47-1-14. Board of Trustees; Record of Proceedings; Annual Report.16] ................................................................................................... 5

Sec. A-15.  [Formerly Sec. 47-1-15. Board of Trustees; Legal Counsel.17] ............................... 5

Sec. A-16.  [Formerly Sec. 47-1-16. Board of Trustees; Medical Director.18] ........................... 5

Sec. A-17.  [Formerly Sec. 47-1-17. Board of Trustees; Designation of Actuary.19] ................. 5

Sec. A-18.  [Formerly Sec. 47-1-18. Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments By Retirement System.20] ............................................................................. 6

Sec. A-19.  [Formerly Sec. 47-1-19. Board of Trustees; Periodic Actuarial Experience Study.21] ................................................................................................ 6

Sec. A-20.  [Formerly Sec. 47-1-20. Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities.22] ...................................................................................... 6

Sec. A-21.  [Formerly Sec. 47-1-21. Definitions.23] ................................................................... 7

Sec. A-22.  [Formerly Sec. 47-1-22. Service Credit.60] ........................................................... 10

Sec. A-23.  [Formerly Sec. 47-1-23. Service Credit; Former Employees of the Founder's Society—Detroit Institute of Arts.62] .................................................. 10

| | | |
|---|---|---|
| Sec. A-24. | [Formerly Sec. 47-1-24. Service Credit; Transfer to Other Governmental Service.64] | 10 |
| Sec. A-25. | [Formerly Sec. 47-1-25. Service Credit; Military Service.65] | 11 |
| Sec. A-26. | [Formerly Sec. 47-1-26. Service Credit; Qualified Military Service (Pre-Employment Service).66] | 11 |
| Sec. A-27. | [Formerly Sec. 47-1-27. Freeze of General Retirement System as of June 30, 2014.] | 11 |

**ARTICLE B.**    **[FORMERLY ARTICLE II. DEFINED BENEFIT/DEFINED CONTRIBUTION (ANNUITY) PLAN OF THE GENERAL RETIREMENT SYSTEM.]** .......... **14**

| | | |
|---|---|---|
| Sec. B-1. | [Formerly Sec. 47-2-1. Membership.70] | 14 |
| Sec. B-2. | [Formerly Sec. 47-2-2. Cessation of Membership; Re-Employment by the Employer.71] | 14 |
| Sec. B-3. | [Formerly Sec. 47-2-3. Election to Transfer to 1998 Defined Contribution Plan.79] | 16 |
| Sec. B-4. | [Formerly Sec. 47-2-4. Service Retirement.80] | 16 |
| Sec. B-5. | [Formerly Sec. 47-2-5. Service Retirement Allowance.91] | 19 |
| Sec. B-6. | [Formerly Sec. 47-2-6. Disability Retirement.95] | 21 |
| Sec. B-7. | [Formerly Sec. 47-2-7. Accidental Death Benefit; Performance of Duty.107] | 23 |
| Sec. B-8. | [Formerly Sec. 47-2-8. Accumulated Contributions; Return of 1973 Defined Contribution Plan Amount.114] | 24 |
| Sec. B-9. | [Formerly Sec. 47-2-9. Retirement Allowance Options.115] | 25 |
| Sec. B-10. | [Formerly Sec. 47-2-10. Benefits for Surviving Spouses; Generally.118] | 26 |
| Sec. B-11. | [Formerly Sec. 47-2-11. Benefits for Surviving Spouses; Disability Retirees.120] | 27 |
| Sec. B-12. | [Formerly Sec. 47-2-12. Disposition of Surplus Benefits upon Death of Retiree and Beneficiary.121] | 27 |
| Sec. B-13. | [Formerly Sec. 47-2-13. Pensions Offset by Compensation Benefits; Subrogation.122] | 28 |
| Sec. B-14. | [Formerly Sec. 47-2-14. Disability Retirees; Reexamination; Authority of the Board.124] | 28 |
| Sec. B-15. | [Formerly Sec. 47-2-15. Transfer of department or department functions; Generally.125] | 28 |
| Sec. B-16. | [Formerly Sec. 47-2-16. Pension improvement  factor.126] | 29 |
| Sec. B-17. | [Formerly Sec. 47-2-17. Funds.] | 30 |
| Sec. B-18. | [Formerly Sec. 47-2-18. Method of financing.129] | 30 |
| Sec. B-19. | [Formerly Sec. 47-2-19. Determination of City's annual contribution.137] | 36 |
| Sec. B-20. | [Formerly Sec. 47-2-20. Management of Funds.140] | 37 |

Sec. B-21.  [Formerly Sec. 47-2-21. Detroit Housing Commission Employees; Transfer of Pension Accumulation Funds to the Municipal Employees Retirement System.] .................................................................................37

Sec. B-22.  [Formerly Sec. 47-2-22. Participant loan program.] ................................................38

**ARTICLE C.  [Formerly ARTICLE III. 1998 DEFINED CONTRIBUTION PLAN OF THE GENERAL RETIREMENT SYSTEM.] [**] ............... 41**

Sec. C-1.  [Formerly Sec. 47-3-1. Funds.]...............................................................41

Sec. C-2.  [Formerly Sec. 47-3-2. Definitions.].........................................................41

Sec. C-3.  [Formerly Sec. 47-3-3. Participation.] .......................................................42

Sec. C-4.  [Formerly Sec. 47-3-4. Employer Contribution Account.] .....................................46

Sec. C-5.  [Formerly Sec. 47-3-5. Employee Contribution Account.]......................................46

Sec. C-6.  [Formerly Sec. 47-3-6. Maximum additions.] ..................................................48

Sec. C-7.  [Formerly Sec. 47-3-7. 1998 Defined Contribution Plan; Employee Rollover Account.]..............................................................................48

Sec. C-8.  [Formerly Sec. 47-3-8. 1998 Defined Contribution Plan; vesting.]........................48

Sec. C-9.  [Formerly Sec. 47-3-9. Participant-directed Investments.]....................................49

Sec. C-10.  [Formerly Sec. 47-3-10. Benefits.] ...........................................................50

Sec. C-11.  [Formerly Sec. 47-3-11. Plan Administration.] ...............................................53

Sec. C-12.  [Formerly Sec. 47-3-12. Participant Loan Program.] ..........................................54

Sec. C-13.  [Formerly Sec. 47-3-13. Trust Fund.].........................................................55

Sec. C-14.  [Formerly Sec. 47-3-14. Miscellaneous.].....................................................56

**ARTICLE D.  [Formerly ARTICLE IV. MISCELLANEOUS PROVISIONS OF THE GENERAL RETIREMENT SYSTEM] ........................................... 58**

Sec. D-1.  [Formerly Sec. 47-4-1. Assignments prohibited.]..............................................58

Sec. D-2.  [Formerly Sec. 47-4-2. Protection against fraud.].............................................58

Sec. D-3.  [Formerly Sec. 47-4-3. Enforcement; civil action.]............................................58

Sec. D-4.  [Formerly Sec. 47-4-4. Amendments; termination.]............................................58

Sec. D-5.  [Formerly Sec. 47-4-5. Errors.]................................................................59

Sec. D-6.  [Formerly Sec. 47-4-6. Limitation of other statutes.] .........................................59

Sec. D-7.  [Formerly Sec. 47-4-7. Construction.]........................................................59

**ENDNOTES TO ARTICLES A, B, C, AND D [Formerly NOTES TO CHAPTER 47] ........................................................................................ 60**

**LEGEND TO FOOTNOTES TO ARTICLES A, B, C, AND D........................................... 67**

## ARTICLE A. [FORMERLY ARTICLE I. COMMON PROVISIONS OF THE GENERAL RETIREMENT SYSTEM. [*]]

### Sec. A-1. [Formerly Sec. 47-1-1. Certain ordinances and Charter provisions saved from repeal.]

Nothing in this Code or in Ordinance No. 593-H[1] shall be deemed to repeal the General Retirement System of the City of Detroit as provided by ordinance or Charter, or to contradict the provisions of Article IX, Section 24 of the 1963 Michigan Constitution.[2] All existing sections of the 1918, 1974 and 1997 Detroit City Charters and the 1964 Detroit City Code, as amended, relating to the General Retirement System shall remain in full force and effect, until specifically amended or repealed by ordinance.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. A-2. [Formerly Sec. 47-1-2. General Retirement System Established.[3]]

A General Retirement System for the employees of the City of Detroit is hereby established for the purpose of providing retirement and survivor benefits for eligible City employees and their beneficiaries. The effective date of this system is July 1, 1938.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. A-3. [Formerly Sec. 47-1-3. Board of trustees; created.[4]]

A Board of Trustees of the General Retirement System is hereby created. The Board is vested with the general administration, management and responsibility for the proper operation of the System, and for making effective the provisions of chapter.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. A-4. [Formerly Sec. 47-1-4. Board of Trustees; Membership; Appointment; Election.[5]]

The Board of the General Retirement System shall consist of ten Trustees, as follows:

(1)   The Mayor, ex officio, or the Mayor's alternate;

(2)   One City Council Member, *ex officio,* who is selected by that body[6;]

(3)   The City Treasurer, *ex officio;*

(4)   Five members of the Retirement System to be elected by the members of the Retirement System in accordance with such rules and regulations as may be adopted by the Board. No more than one Trustee shall be elected from any one City Department;

(5)   One Detroit resident, appointed by the Mayor subject to the approval of the Board, who is neither an employee of the City nor is eligible to receive benefits under the Retirement System; and

(6)   One retiree who is receiving benefits under the Retirement System and who is elected by retired City employees in accordance with procedures established by Section 47-1-5

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 28-06, § 1, 9-13-06)

1

The membership of the Board of Trustees of the General Retirement System (GRS) shall be changed to consist of 11 trustees as follows:

(1)   The Mayor, ex-officio or designee.

(2)   The President of the City Council, ex-officio.

(3)   The City Treasurer, ex-officio.

(4)   The Budget Director, ex-officio.

(5)   The Finance Director, ex-officio.

(6)   The Human Resources Director, ex-officio.

(7)   Three members of the retirement system to be elected by the members of the retirement system, under such rules and regulations as may be from time to time adopted by City Council; except that no more than one trustee shall be from any one department.

(8)   The Mayor shall appoint, subject to the approval of City Council, as a trustee, an individual with a background in investment and/or municipal finance.

(9)   The Mayor shall appoint, subject to the approval of City Council, a retiree who is receiving benefits under the retirement system.

The City reserves the right to change the composition, structure and decision making procedures of the Board.[a]

Effective August 1, 1999, or the earliest date thereafter when all required agreements are reached between the City and other parties **[or Effective July 1, 2003[b]]**, the membership of the General Retirement System, Board of Trustees (Article II, Section 2, Subjection (1)) shall be modified to provide that one of the trustees is: "The Mayor of the City or his/her designated representative, ex-officio.  Such designated person shall be a full time appointive or classified City employee."[c] **[or "The Mayor of the City or his/her designated representative, ex-officio."[d]]**

DWSD and the Union acknowledge that they do not control the Retirement Board composition.[e]

## Sec. A-5.  [Formerly Sec. 47-1-5. Board of Trustees; Retiree Member Election.[7]]

The procedures for the election of the Retiree Member of the Board of Trustees shall be as follows:

---

[a]     CBA-1 (§ 43.Q.), CBA-2 (§ 35.S.), CET-1 (§ 49), CET-2 (§ 47.Q.), CET-3 (§40).

[b]     CBA-11 (§ 39.S.).

[c]     CBA-3 (§ 46.P.), CBA-4 (§ 15.Q.), CBA-5 (§ 20.R.), CBA-6 (§ 26.R.), CBA-7 (§ 26.Q.), CBA-8 (§ 25.P.), CBA-10 (§ 33.Q.), CBA-11 (§ 39.S.), Reopener-2 (§ 25.P.), Reopener-3 (§ 39.R.), Reopener-4 (§ 20.R.).

[d]     CBA-9 (§ 31.S.), Reopener-1 (§ 31.S.).

[e]     CBA-10 (§ 33.V.).

(1) *Notice.* Notice of a primary election shall be sent to each retiree of the System by United States Mail.

(2) *Nominating petitions.* No candidate's name shall be placed on the primary election ballot unless a nominating petition containing the signatures of at least one hundred and twenty-five retirees of the Retirement System is filed with the Secretary of the Board. The form of the nominating petition, the filing of the petition, and the procedure for verification of signatures shall be in accordance with rules and regulations adopted by the Board.

(3) *Ballot.* Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position held at the time of retirement and the word "incumbent" if the candidate is a current trustee seeking re-election. No ballot shall contain any organizational or political designation or mark. Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4) *Voting.* Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same procedures as adopted and followed by the Board in the immediately preceding election of an Active Employee Trustee.

(5) *Procedures.* Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same procedures as adopted and followed by the Board in the immediately preceding election of an Active Employee Trustee.

(6) Any matters relative to the election of the Retiree Member of the Board not covered by this Section shall be according to such rules and regulations as the Board may adopt.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. A-6. [Formerly Sec. 47-1-6. Board of Trustees; term.[8]]

The regular term of office for the Elected Member Trustees and the Appointed Detroit Resident Trustee shall be for a period of six years, one such Trustee to be elected or appointed, as the case may be, each year. The term of office for the Retiree Trustee shall be two years.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. A-7. [Formerly Sec. 47-1-7. Board of Trustees; vacancies.[9]]

If a Trustee leaves the employ of the City, or if an elected or appointed Trustee fails to attend four consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board. By resolution, the Board shall declare the office vacated as of the date of adoption of such resolution. If a vacancy occurs in the office of Trustee, the vacancy shall be filled at the next regular election held by the Board, or at any special election ordered by resolution adopted by the Board.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. A-8. [Formerly Sec. 47-1-8. Board of Trustees; meeting attendance; compensation.[10]]

(a) *Attendance at a Board meeting* shall include conducting Board business on a meeting date or being otherwise available to attend a Board meeting canceled for lack of a quorum.

(b) *Elected and Appointed Citizen Trustees.* Effective July 1, 2000, elected and Appointed Citizen Trustees are eligible for a weekly meeting stipend, provided the Trustee attends one or more regular or special Board meetings during a week. The stipend amount shall be a minimum of sixty-seven dollars ($67.00) per week

3

multiplied by the Trustee's years of service. Eligibility rules and the amount of the stipend shall be set by Board resolution. However, the amount of the weekly meeting stipend shall not exceed two hundred dollars ($200.00).

(c) *Elected Active Employee Trustees.* Effective July 1, 2000, elected active employee Trustees are eligible for a quarterly service stipend if such Trustee attends a minimum of nine meetings in a quarter. The stipend amount shall be a minimum of eight hundred and thirty-three dollars ($833.00) per quarter multiplied by the Trustee's years of service. Eligibility rules and the amount of the stipend shall be set by Board resolution. However, the amount of the quarterly service stipend shall not exceed twenty-five hundred dollars ($2,500.00) per quarter.

(d) Stipends paid under this Section 47-1-8 of this Code shall be considered as ordinary income for tax and pension purposes.

(e) *Ex Officio Trustees* are not eligible for a stipend payment.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. A-9. [Formerly Sec. 47-1-9. Board of Trustees; Oath of Office.[11]]

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the Detroit City Clerk.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. A-10. [Formerly Sec. 47-1-10. Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum.[12]]

(a) The Board shall hold regular weekly meetings, and shall designate the time and place thereof in advance. The Board shall adopt its own rules of procedure and shall keep a record of proceedings. All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act,* MCL 15.261 *et seq.*

(b) Each Trustee shall be entitled to one vote on each question before the Board. Five Trustees shall constitute a quorum. A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. A-11. [Formerly Sec. 47-1-11. Board of Trustees; Rules for Administration of the Pension System.[13]]

In accordance with the provisions of this Article, the Board shall establish rules and regulations for the administration of the system and for the transaction of its business.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. A-12. [Formerly Sec. 47-1-12. Board of Trustees; Officers and Employees.[14]]

The Board shall elect a chair and vice-chair from its members. The finance director or the director's designee shall be the *ex officio* secretary of the Board. The Board may employ such special actuarial, medical and other employees as shall be required, subject to the *Public Employee Retirement System Investment Act,* as amended, being MCL 38.1132 *et seq.*

(Ord. No. 29-01, § 1, 11-30-01)

4

### Sec. A-13. [Formerly Sec. 47-1-13. Board of Trustees; certain data to be kept.[15]]

The Board shall keep or cause to be kept such data as is necessary for an actuarial valuation of the System and for checking and compiling the experience of the System.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. A-14. [Formerly Sec. 47-1-14. Board of Trustees; Record of Proceedings; Annual Report.[16]]

The Board shall keep a record of its proceedings which shall be open to public inspection. On or before January fifteenth of each year, the Board shall send a report to the mayor and to the council showing the system's fiscal transactions for the year ending the preceding June thirtieth, and the balances in the various funds of the System. The Board shall produce or cause to be produced an annual actuarial valuation of the System's assets and liabilities.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. A-15. [Formerly Sec. 47-1-15. Board of Trustees; Legal Counsel.[17]]

(a) The Board shall appoint a Legal Counsel who shall be directly responsible to and hold office at the pleasure of the Board. The Legal Counsel to the Board shall be an attorney licensed to practice in Michigan who is experienced in matters relating to pension systems.

(b) The Legal Counsel to the Board shall have such duties relative to pension matters as are assigned by the Board.

(c) Costs and expenses relative to the position of Legal Counsel to the Board shall be payable out of the earnings of the system, subject to the provisions of the *Public Employee Retirement System Investment Act,* as amended, being MCL 38.1132 *et seq.*

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. A-16. [Formerly Sec. 47-1-16. Board of Trustees; Medical Director.[18]]

(a) The Board shall appoint a Medical Director who is directly responsible to and shall hold office at the pleasure of the Board. The Medical Director shall be a physician who has not at any time been regularly or permanently employed by any department, board, or commission of the City, county, or state, has not held an elective, appointive, or salaried office in any city, county, or state government at any time, and is not eligible to participate in the City Pension System. However, service as an intern in any city, county, or state hospital or sanitarium and service in any state military body shall not disqualify a physician for appointment as Medical Director.

(b) The Medical Director shall arrange for and pass upon all medical examinations required under the provisions of this article, and shall report in writing to the Board of Trustees his or her conclusions and recommendations on medical matters referred.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. A-17. [Formerly Sec. 47-1-17. Board of Trustees; Designation of Actuary.[19]]

The Board shall designate an actuary who shall be the technical advisor to the Board on matters regarding the operation of the system, and who shall perform such other duties as are required.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. A-18. [Formerly Sec. 47-1-18. Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments By Retirement System.[20]]

(a)    The Board shall adopt such mortality and other tables of experience, and a rate or rates of regular interest, as shall be necessary for the operation of the System on an actuarial basis, provided that the authority granted by this section shall not permit or be used to provide for an interest rate which would violate the prohibitions of Subsections (b) and (c) of this section or the plan for the adjustment of debts of the City of Detroit, as confirmed by an order of the United States Bankruptcy Court for the Eastern District of Michigan in the City's chapter 9 bankruptcy case (*In re City of Detroit, Michigan*, Case No. 13-53846).

(b)    The Retirement System and the trustees charged with management of the System shall not make any payment to active or retired participants other than payments that are required by the Retirement System plan as established by this Code to govern the System or the plan for the adjustment of debts of the City of Detroit, as confirmed by an order of the United States Bankruptcy Court for the Eastern District of Michigan in the City's chapter 9 bankruptcy case (*In re City of Detroit, Michigan*, Case No. 13-53846).  This prohibition applies to all payments that are not authorized by this Code, whether such payments be those commonly referred to as a "thirteenth check" or by any other name.

(c)    The Retirement System and the trustees charged with management of the System shall not provide any savings plan, annuity plan, or other participant investment or savings vehicle that provides an annual return to investing participants which in any year is greater than the actual investment return net of expenses of the Retirement System invested reserves for the year in which the return is earned and accrued, *provided that* such return shall neither be greater than the assumed annual return as expressed in the Retirement System's valuation for that year nor less than zero.  This prohibition shall apply to all returns credited to accounts of investing members in the Annuity Savings Fund of the Defined Contribution Plan of 1973 from the effective date of Ordinance 37-11 to June 30, 2014.  Notwithstanding anything in this section to the contrary, effective for plan years beginning on and after July 1, 2014, the annual rate of return credited to a member's account in the Annuity Savings Fund of the 1973 Defined Contribution Plan shall be no less than zero and no greater than the lesser of (i) 5.25% or (ii) the actual investment return net of expenses of the Retirement System's invested reserves for the second fiscal year immediately preceding the fiscal year in which the annual return is credited.

(Ord. No. 18-14, Sec. 47-1-18; Ord. No. 29-01, § 1, 11-30-01; Ord. No. 37-11, § 1, 11-29-11)

### Sec. A-19. [Formerly Sec. 47-1-19. Board of Trustees; Periodic Actuarial Experience Study.[21]]

At least once every five years, the Board shall cause an actuarial experience study to be made of the mortality, service, and compensation experience of the System's members, retirees and beneficiaries.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. A-20. [Formerly Sec. 47-1-20. Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities.[22]]

Each year, on the basis of such mortality and other tables of experience, and such rate or rates of regular interest as the Board shall adopt, the Board shall cause to be made an actuarial valuation of the assets and liabilities of the System.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. A-21. [Formerly Sec. 47-1-21. Definitions.[23]]**

Unless a different definition is contained within Section 47-3-2 of this Code, or a different meaning is plainly required by context, for purposes of this Chapter the following words and phrases have the meanings respectively ascribed to them by this section:

*Accrued Service*[24] means a member's credited service for employment rendered before the date of an actuarial valuation of the Retirement System.

*Accumulated Contributions*[25] means the sum of all amounts deducted from the compensation of a member and credited to the member's individual account in the Annuity's Savings Fund, together with regular interest thereon.

*Administrative Board of Trustees*[26] means the Board of Trustees of the General Retirement System.

*Administrative Rules and Regulations*[27] means rules and regulations promulgated by the Administrative Board of Trustees pursuant to Section 47-1-11 [28] of this Code for the administration of the System and for the transaction of its business.

*Age, Attainment of*[29] means the age an individual reaches on the day of his or her birthday.

*Annuity*[30] means the portion of the retirement allowance which is paid for by a member's accumulated contributions.

*Annuity Reserve*[31] means the present value of all payments to be made on account of any annuity or benefit in lieu of any annuity. Such annuity reserve shall be computed upon the basis of such mortality table and regular interest as shall be adopted by the Board.

*Average Final Compensation*[32] means:

(1)  *On or before June 30, 1992.* For those members who retired or separated from active service with vested pension rights on or before June 30, 1992, the highest average compensation received by a member during any period of five consecutive years of credited service selected by the member from the ten years of credited service which immediately precede the date of the member's last termination of City employment. If a member has less than five years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the members total years of credited service.

(2)  *On or after July 1, 1992 but before July 1, 1998.* For those members who retired or separated from active service with vested pension rights on or after July 1, 1992 but before July 1, 1998, the highest average compensation received by a member during any period of four consecutive years of credited service selected by the member from the ten years of credited service which immediately precede the date of the member's last termination of City employment. If a member has less than four years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the member's total years of credited service.

(3)  *On or after July 1, 1998.* For those members who retire or separate from active service with vested pension rights on or after July 1, 1998, the highest average compensation received by a member during any period of three consecutive years of credited service selected by the member from the ten years of credited service which immediately precede the date of the member's last termination of City employment. If a member has less than three years of credited service, the Average Final Compensation shall be the average of the annual compensation received during the member's total years of credited service.

(4)  *On or after July 1, 1999.* For those members with a regular or early service retirement who retire on or after July 1, 1999, in computing the highest average compensation received by a member, the member shall have the option of adding the value of twenty-five percent (25%) of the member's unused accrued sick leave at the time of retirement to the earnings used in computing the Average Final Compensation. Any member choosing to exercise this option shall be entitled to receive a lump sum payment of the value of twenty-five percent (25%) of the member's unused accrued sick leave at the time of retirement.

Effective for bargaining unit members who retire on or after July 1, 1999, they shall have the option to (1) select the Unused Sick Leave On Retirement payment benefit provided for in the bargaining agreement, or (2) choose to receive payment of one-quarter (1/4) of their unused sick time and have that sum included in the average final compensation calculation used to compute the membership service pension portion of their retirement allowance.[f] **[For any member choosing to exercise this option the lump sum payment the member will receive will be the remaining value of the unused accrued sick leave bank as provided in the bargaining agreement.[g]]**

Effective for bargaining unit members who retire on or after July 1, 2012 **[or July 1, 1999[h]]**, they shall have the Unused Sick Leave On Retirement payment benefit provided for in the bargaining agreement.[i]

*Beneficiary[33]* means any person who is entitled to receive a retirement allowance or pension payable from funds of the General Retirement System.[34]

*Board of Trustees or Board[35]* means the Board of Trustees of the General Retirement System as provided in Section 47-1-4 [36] of this Code.

*City[37]* means the City of Detroit, Michigan, a municipal corporation.

*City Council or Council[38]* means the legislative body of the City.

*Compensation[39]* means:

(1) *On or before June 30, 1992.* For those members retired or separated from active service with vested pension rights, on or before June 30, 1992, all remuneration, *excluding* longevity payments, paid to a member because of personal services rendered by the member to the employer. Compensation in excess of the limitations set forth in Section 401(a)(17)[40] of the Internal Revenue Code shall be disregarded.

(2) *On or after July 1, 1992.* For those members who retire on or after July 1, 1992, all remuneration, *including* longevity payments, paid to a member because of personal services rendered by the member to the employer. Compensation in excess of the limitations set forth in Section 401(a)(17)[41] of the Internal Revenue Code shall be disregarded.

*Conversion* means that date on which a member's benefits change from disability retirement benefits to normal retirement benefits.

*Credited Service[42]* means membership service credited to a member to the extent provided in this Article.

*1998 Defined Contribution Plan Implementation Date[43]* means that date after the Plan is established on which it is open for participation by eligible members.

*Detroit General Retirement System or DGRS[44]* means the General Retirement System of the City of Detroit established under Section 47-1-2 of this Code which consists of:

(1) The *Defined Benefit Plan,* which plan is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code;

---

[f]    CBA-3 (§ 46.G.), CBA-4 (§ 15.I.), CBA-5 (§ 20.I.), CBA-6 (§ 26.I.), CBA-7 (§ 26.H.), CBA-8 (§ 25.G.), CBA-9 (§ 31.I.), CBA-10 (§ 33.I.), CBA-11 (§ 39.I.), Reopener-1 (§ 31.I.), Reopener-2 (§ 25.G.), Reopener-3 (§ 39.I.), Reopener-4 (§ 20.I.).

[g]    CBA-4 (§ 15.I.), CBA-5 (§ 20.I.), CBA-6 (§ 26.I.), CBA-7 (§ 26.H.), CBA-9 (§ 31.I.), CBA-10 (§ 33.I.), Reopener-1 (§ 31.I.), Reopener-3 (§ 39.I.), Reopener-4 (§ 20.I.).

[h]    CET-1 (§ 48.I.).

[i]    CBA-1 (§ 43.H.), CBA-2 (§ 35.J.), CET-1 (§ 48.I.), CET-2 (§ 47.H.).

(2) The *1973 Defined Contribution Plan,* which Plan is a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code; and

(3) The 1998 Defined Contribution Plan. A Defined Contribution Plan, which is hereby designated the 1998 Defined Contribution Plan, the components of which are the

    a.   Employee Contribution Account,

    b.   The Employee Rollover Account,

    c.   The Employer Contribution Account, and

    d.   The Annuity Savings Account,

all of which constitute the 1998 Defined Contribution Plan Retirement Trust, which Plan is intended to be a qualified plan and trust pursuant to applicable sections of the Internal Revenue Code.

*Employee*[45] means any regular and/or permanent officer, agent, or person in the employ of the employer, as defined in this section, but does not include:

(1) Individuals whose City services are compensated on a contractual or fee basis;

(2) Persons who are employed in positions normally requiring less than six hundred hours of work per annum; or

(3) The medical director of the pension system.

*Employer*[46] means the City, or any board, commission, or court serving the City, to the extent that both the City, through the action of City Council, and the governing authority of such board, commission or court, shall mutually agree to include the employees of such board, commission, or court, as City employees under the provisions of this Chapter at such time as they are eligible. To the extent that any employees of a board, commission, or court are considered City employees for this purpose, all employees of such board, commission, or court, shall be so included. However, only City board members and commissioners who are also employees of the City are eligible to be included, unless otherwise specifically provided for by an ordinance passed or a resolution adopted by the Council. In all cases of doubt, the Board of Trustees shall decide who is an employee within the meaning of the provisions of this Article.

*Final Compensation*[47] means a member's annual rate of compensation at the time City employment is last terminated.

*Member*[48] means any employee who has not retired.

*Notice to Members, Beneficiaries, and Retirees*[49] means a mailing using First Class United States Mail to the members, beneficiaries, and retirees at their last known address.

*Pension*[50] means the portion of a retirement allowance which is paid for by appropriations made by the City into the appropriate funds.

*Pension Reserve*[51] means the present value of all payments to be made on account of any pension, or benefit in lieu of any pension. Such pension reserve shall be computed upon the basis of such mortality and other tables of experience, and regular interest, as shall be adopted by the Board.

*Regular Interest*[52] means such rate or rates per annum, compounded annually, as the Board of Trustees shall determine in accordance with the limitations contained in Section 47-1-18 of this Code.

*Retiree*[53] means a former member who is receiving a retirement allowance from the *DGRS Article II* plan or is eligible to receive fringe benefits from the *DGRS Article III* Plan.

*Retirement*[54] means a member's withdrawal from the employ of the City with a retirement allowance or pension paid by the system.

*Retirement Allowance*[55] means the sum of the annuity and the pension.

*Retirement System or System*[56] means the general employees retirement system of the City created and established by Title IX, Chapter VI, of the 1918 Detroit City Charter, as amended,[57] continued in effect through the 1974 and 1997 Detroit City Charters and codified in this Article. *See DGRS.*

*Service*[58] means personal services rendered to the City by a person as an employee of the City as defined in Section 47-1-21 of this Code, who is compensated by the City.

*Service credit for purposes of the 1973 Defined Benefit/Defined Contribution (Annuity) Plan*[59] means that in accordance with such rules and regulations as the Board shall adopt, each member shall be credited with service as follows: (1) One month of service credit is earned when the member is paid for eighty hours of work during the month; (2) A full year of credit is earned for nine months of credit in any calendar year, except the member's last year of work. Less than nine months of service rendered in a calendar year shall neither be credited as a full year of service, nor shall more than one year of service be credited to any member for service rendered in any one calendar year. Service credit is used to determine eligibility for service retirement, vesting, non-duty disability and survivor benefits. Service credit is also earned by a member retired on a duty disability or while receiving Workers' Compensation benefits.

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 37-11, § 1, 11-29-11)

## Sec. A-22. [Formerly Sec. 47-1-22. Service Credit.[60]]

The Board shall keep an accurate record of each employee's Accumulated Service credit[61] from the date of commencement of employment with the employer.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. A-23. [Formerly Sec. 47-1-23. Service Credit; Former Employees of the Founder's Society— Detroit Institute of Arts.[62]]

Pursuant to Section 6-519[63] of the 1974 Detroit City Charter, and for the sole purpose of computing service credit to determine eligibility for a retirement allowance from the General Retirement System, a person who was inducted into the classified service of the City of Detroit during the calendar year 1984 as a result of the transfer of certain functions at the Detroit Institute of Arts from *The Founder's Society/Detroit Institute of Arts* to the City of Detroit, shall be credited with service credit equivalent to continuous time worked as a full time employee of the *Founder's Society/Detroit Institute of Arts* retroactive to January 1, 1984. Such *Founder's Society/Detroit Institute of Arts* service credit shall have no effect upon the amount of retirement benefits paid by the General Retirement System. Such *Founder's Society/Detroit Institute of Arts* service credit shall be added to the service credit earned as a City of Detroit employee only for purposes of meeting service credit eligibility requirements under the General Retirement System. The Board of Trustees of the General Retirement System shall make all determinations of crediting of such *Founder's Society/Detroit Institute of Arts* service credit in accordance with the pension plan provisions.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. A-24. [Formerly Sec. 47-1-24. Service Credit; Transfer to Other Governmental Service.[64]]

A member transferred from the City payroll by his or her department head to the payroll of any City, county, state, or federal government to serve the Interests of the City during peace time shall continue to be a member of the retirement system for purposes of service credit in accordance with the ordinance or resolution passed to implement such transfer.

(Ord. No. 29-01, § 1, 11-30-01)

10

**Sec. A-25.  [Formerly Sec. 47-1-25. Service Credit; Military Service.[65]]**

An employee of the employer who enters the military service of the United States while so employed shall have such service credited as City service in the same manner as if the employee had served the employer without interruption, provided that 1) the employee's entry into such service and re-employment thereafter shall be in accordance with applicable laws, ordinances, and regulations of the State of Michigan and the City, and 2) he or she is re-employed by the employer upon completion of such service. During the period of service and until return to City employment, his or her contributions to the fund shall be suspended and the fund balance shall be accumulated at regular interest.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. A-26.  [Formerly Sec. 47-1-26. Service Credit; Qualified Military Service (Pre-Employment Service).[66]]**

(a)     Notwithstanding any provision of this Chapter to the contrary, contributions, benefits, and service credit with respect to qualified military service, shall be provided in accordance with Section 414(u)[67] of the Internal Revenue Code. Up to three years of pre-employment service credit may be purchased for the following periods: service for a period of not less than ninety days between (1) the date of declaration of war by Congress and the recognized date of cessation of military hostilities; (2) the onset of World War II on December 8, 1941 to its conclusion on July 1, 1946; (3) the onset of the Korean Conflict on June 27, 1950 to its conclusion on December 31, 1953; (4) the onset of the Vietnam Conflict on February 28, 1961 to its conclusion on May 7, 1975, or (5) beginning on the date of the recognition of an emergency condition by the issuance of a presidential proclamation or a presidential executive order, during which emergency condition the member received the Armed Forces Expeditionary or other Campaign Service Medal authorized by the Federal Government for the Expedition or Campaign.[68]

(b)     This time may be applied toward a member's credited service and may be used in meeting the minimum time needed for an automatic Option Two or automatic Option Three pension.[69]

(c)     This time shall not apply toward meeting the minimum service and age requirements for vesting, for a non-duty disability pension, or for a service pension.

(Ord. No. 29-01, 11-30-01)

**Sec. A-27.  [Formerly Sec. 47-1-27. Freeze of General Retirement System as of June 30, 2014.]**

Notwithstanding anything in Articles I, II, III, or IV of Chapter 47 of the 1984 Detroit City Code to the contrary, effective as of June 30, 2014 (the "Freeze Date") –

(a)     No new employee hired by an Employer on or after July 1, 2014 shall become a member who is eligible to accrue a benefit under the terms of the General Retirement System in effect as of the Freeze Date;

(b)     No employee who is rehired by an Employer on or after July 1, 2014 shall become a member who is eligible to accrue either a benefit or service credit for any purpose under the terms of the General Retirement System in effect as of the Freeze Date; *provided, however,* that a member who is entitled to a Frozen Accrued Benefit as defined in subsection (c) of this Section 47-1-27 and who is rehired by an Employer on or after July 1, 2014 but prior to the date the member incurs a six-year break in service shall be eligible to accrue service credit following rehire solely for the purpose of determining the member's eligibility for payment of his Frozen Accrued Benefit;

11

(c)   Benefit accruals for members with respect to service rendered prior to July 1, 2014 will be frozen based on a member's years of service, Average Final Compensation, and the pension multiplier formulae as of such Freeze Date ("Frozen Accrued Benefit");

(d)   Except as otherwise provided in subsection (e) of this Section 47-1-27, compensation of a member shall be frozen effective as of the Freeze Date for purposes of determining the member's Frozen Accrued Benefit.  No compensation of any type earned by a member after the Freeze Date shall be taken into consideration for purposes of determining the member's Frozen Accrued Benefit under the General Retirement System;

(e)   Any member who, as of June 30, 2014, would have been eligible to elect to use a portion of his unused accrued sick leave to increase his Average Final Compensation ("Sick Leave Rollover") if the member had been eligible to retire and had elected to retire as of June 30, 2014, shall have a one-time election as of June 30, 2014 ("Special Election") to add the value of twenty-five percent (25%) of the member's unused sick leave accrued for purposes of the Sick Leave Rollover in accordance with the terms of the applicable collective bargaining agreement, City Employment Terms or Detroit Code of Ordinance to the earnings used in computing Average Final Compensation for purposes of determining the member's Frozen Accrued Benefit; *provided, however,* that at least twenty-five percent (25%) of the member's sick leave accrued for purposes of the Sick Leave Rollover in accordance with the terms of the applicable collective bargaining agreement, City Employment Terms or Detroit Code of Ordinance remains in the member's sick leave bank at the time the completed Special Election form is received by the Retirement System and, *provided further* that the completed Special Election form is received by the Retirement System no later than August 15, 2014. A member's Special Election shall be made in the manner set forth by the Board of Trustees and the Retirement System.  Notwithstanding anything in this subsection (e) to the contrary, a member's Special Election will be void and the determination of the member's Average Final Compensation for purposes of calculating the member's Frozen Accrued Benefit will not take into account any of the member's unused sick leave, if (i) the electing member would not have been eligible to receive an immediate service retirement if he retired as of June 30, 2014, and (ii) the electing member's employment with an Employer is terminated before the electing member becomes eligible for an immediate service retirement under the Retirement System;

(f)   Service earned after the Freeze Date shall be credited to a member solely for purposes of determining the member's vesting in and eligibility for payment of his or her Frozen Accrued Benefits.  Service credit for all members for benefit accrual purposes under the terms of the General Retirement System in effect as of the Freeze Date shall be frozen effective as of the Freeze Date and no member shall earn service credit with respect to benefits payable under the terms of the General Retirement System in effect as of the Freeze Date (except for vesting and benefit payment eligibility purposes) after the Freeze Date;

(g)   No member shall make contributions to the Annuity Savings Fund under the General Retirement System in effect as of June 30, 2014 with respect to wages earned on or after July 14, 2014, and all Annuity Savings Fund contributions made on or after July 14, 2014 shall be made to and in accordance with the terms of the Combined Plan for the General Retirement System of the City of Detroit, Michigan; and

(h)   The 1998 Defined Contribution Plan will be closed to all employees hired or rehired by an Employer on or after July 1, 2014.  On or after July 1, 2014, no person may make an election to participate in the 1998 Defined Contribution Plan, and no future contributions will be made to or accepted by the 1998 Defined Contribution Plan with respect to wages earned on or after July 1, 2014.

The foregoing terms of Section 47-1-27 shall be referred to as the "Freeze" of the provisions of the General Retirement System as in effect on the Freeze Date and the provisions of Articles I, II, III, or IV of Chapter 47 of the 1984 Detroit City Code shall be interpreted and construed by the Board of Trustees and the Retirement System to give full effect to the Freeze.  To the extent that a conflict arises between this Section 47-1-27 and other provisions in Chapter 47, or any collective bargaining agreement or other document governing the terms of employment of any employee, the Board of Trustees and the Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Freeze.

(Ord. No. 17-14, Sec. 47-1-27.)

---

**By Agreement**

---

    Effective July 1, 1995, all members of the bargaining unit have the option of purchasing pre-employment military time for pension purposes in accordance with the 1995-1998 arbitration award.[j]

---

[**Secs. 47-1-28—47-1-30. Reserved**.]

---

[j]    CBA-1 (§ 43.P.), CBA-2 (§ 35.R.), CET-2 (§ 47.O.).

13

## ARTICLE B. [FORMERLY ARTICLE II. DEFINED BENEFIT/DEFINED CONTRIBUTION (ANNUITY) PLAN OF THE GENERAL RETIREMENT SYSTEM.]

### Sec. B-1. [Formerly Sec. 47-2-1. Membership.[70]]

The membership of the General Retirement System *1973 Defined Benefit/Defined Contribution (Annuity) Plan* shall consist of all persons who are full time employees of the employer as defined in Section 47-1-21 of this Code, except:

(a)    persons who are members of the *Policemen and Firemen Retirement System,* established under Title IX, Chapter VII of the 1918 Detroit City Charter and continued in the 1974 and 1997 Detroit City Charters;

(b)    persons who make an election to become a participant in the Retirement System *1998 Defined Contribution Plan* pursuant to Section 47-3-3 of this Code; and

(c)    Any person who is a member of any other public employee pension or retirement plan adopted by the State of Michigan, other than the Michigan National Guard, or by any other political subdivision of this state.

---

### By Agreement

---

Special Service employees who work more than fourteen hundred forty (1440) hours per fiscal year will be eligible for Pension Plan (General Retirement System).[k]

---

### Sec. B-2. [Formerly Sec. 47-2-2. Cessation of Membership; Re-Employment by the Employer.[71]]

(a)    Any member who retires under Section 47-2-4(a), (b), or (c),[72] or dies, shall have a non-forfeitable right to a benefit.

(b)    With respect to persons not on the active payroll prior to October 1, 2005, the following provisions of this subsection shall apply:

(1)    Except as otherwise provided for in this Article II, if any non-vested member leaves City employment for any reason other than retirement or death, such person shall thereupon cease to be a member and his or her credited service at that time shall be forfeited. In the event of re-employment by the City, such person shall again become a member of the Retirement System. If re-employment occurs within a period of six (6) years[73] from and after the date City employment last terminated, credited service last forfeited shall be restored to his or her credit for purposes of accruing a benefit after re-employment.

(2)    With respect to persons on the active payroll on or after October 1, 2005, re-employment shall restore any previously forfeited service credit notwithstanding the time of re-employment.

(c)    Vested former employees rehired prior to receiving pension benefits.[74]

(1)    Former employees who are vested but have not yet begun to receive pension benefits who are rehired prior to being separated for six (6) years shall have their pension calculated in accordance with the rules in effect at the time of their last termination of active service or retirement.

(2)    Former employees who are vested but have not begun to receive pension benefits and are rehired after July 1, 1992 after being separated for more than six (6) years who accumulate enough service credit to be

---

[k]    CET-3 (§ 39.C.).

14

eligible for a second pension shall be entitled to two (2) separate and distinct pensions, each to be calculated in accordance with the rules in effect at the time of each separation from service.

(3) An employee who becomes eligible to collect his or her previously vested pension while still working, shall not be eligible to receive his or her vested pension but will be entitled to have the pension improvement factor added to the vested amount of the original pension for payment when the employee eventually retires. The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will only be included on the employee's original pension.

(4) Members who have separated from city service with vested rights under Article II and return to work after a separation of more than six (6) years, prior to the receipt of a vested pension benefit, may elect to be a member of either the Article II or Article III Fund during their new period of service. Such election must be made within ninety (90) days of re-employment with the city. If the member elects the Article III Fund for the new period of service and becomes eligible to collect their previously vested pension while still working, they may begin to collect their vested pension on their eligibility date.

(d)    Retirement benefits for retirees who return to active full time employment.[75]

(1) Retirees who return to work will have their Defined Benefit Plan pension benefit amount suspended upon re-employment. However, retirees who have not withdrawn their defined contribution amounts shall be entitled to continue to receive the monthly annuity from the 1973 Defined Contribution Plan. The pension improvement factor shall continue to be added to the vested amount of the original pension but not be paid on the defined benefit amount until the employee again separates from service.

(2) Retirees who return to work will be entitled to receive a second pension benefit in accordance with the rules in effect at the time of their final separation with respect to service credit earned after the retiree returns to active employment. Previous service credit will be used to determine what retirement factors will be credited to service time earned after return to active employment and used to calculate the new pension amount.[76]

(3) Average final compensation will be based upon the amounts earned after the retiree returns to work.[77]

(4) Employees who retire under this Section 47-2-2(d) for a second time will not be allowed to change the original option selection with respect to the original pension benefit. However, employees may make a separate option selection on their second pension benefit amount.

(5) The basic pension amount of twelve dollars ($12.00) per year for up to ten (10) years will be included only on the employee's original pension.

(6) The coordination of benefits (equated Social Security) option will not be available on a second pension amount.

(7) If a retiree who returns to work and dies while working, had an accumulated combined total service time of at least twenty years, the employee's spouse will be eligible for automatic *Option Two* benefits,[78] Notwithstanding the option form of retirement originally elected.

(8) If a retiree who returns to work and dies while working had an accumulated combined total service time of at least fifteen years but less than twenty years, the employee's spouse will be eligible for automatic *Option Three* benefits, notwithstanding the option form of retirement originally elected.

(9) If the employee returns to work and dies prior to accumulating a combined total of fifteen years of service credit, the original pension and benefit option chosen shall resume unless the employee had chosen the Straight Life Option which would result in no survivor pension benefits.

(10) The Board of Trustees will determine all entitlements for re-employed individuals on a case by case basis consistent with this section and will resolve all issues based upon special circumstances or unique situations.]

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 08-03, § 1, 4-9-03; Ord. No. 29-01, § 1, 11-30-01; Ord. No. 38-05, § 1, 12-14-05)

### Sec. B-3.  [Formerly Sec. 47-2-3. Election to Transfer to 1998 Defined Contribution Plan.[79]]

Any employee member who is also a member of the Coverage Group as defined in Section 47-3-2 of this Code who makes an election to transfer to the *1998 Defined Contribution Plan* pursuant to Section 47-3-3 of this Code, shall transfer to the Trust of that Plan both the *1973 Defined Contribution Plan* (Annuity Savings Fund) balance and the actuarial present value of the *1973 Defined Benefit Plan* credited benefits of such individual under the *DGRS* in accordance with Section 47-3-3 of this Code and the rules and procedures established by the Board.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. B-4.  [Formerly Sec. 47-2-4. Service Retirement.[80]]

(a)    *Retirement after thirty years service.[81]* Any member who has accumulated at least thirty or more years of credited service regardless of age, or, for any members hired under a collective bargaining agreement, any member who was hired on or after the date specified in the applicable collective bargaining agreement who has accumulated at least thirty or more years of credited service and has attained age fifty-five, may retire upon written application filed with the Board setting forth the date on which the member desires to be retired. The date of retirement shall be effective not less than thirty, nor more than ninety, days subsequent to the execution and filing of the application for retirement. On the specified date, the member shall be retired notwithstanding age or the fact that during such period of notification the member may have separated from City service. Upon retirement, the member shall receive a retirement allowance as provided in Section 47-2-5 of this Code.

---

**By Agreement**

---

Any Employee who is covered by the provisions of this Agreement and who is a member of the General Retirement System of the City of Detroit who on July 1, 1995, or later has twenty-five (25) or more years of credited service may retire upon his/her written application filed with the Board of Trustees setting forth the date, which shall not be less than thirty (30) nor more than ninety (90) days, subsequent to the execution and filing of said written application, he/she desires to be retired.  On the date so specified for his/her retirement he/she shall be retired notwithstanding that pending such period of notification he/she may have separated from City service.  Upon his/her retirement he/she shall receive a Retirement Allowance as provided by the City Charter and Municipal Code.[l]

**[Retirees who began receiving a Duty Disability Pension after July 1, 1995 may choose to convert to a service retirement at the time they would have had twenty five (25) years with the City.[m]]**

---

(b)    Retirement at age sixty-five with eight years of service; at age sixty with ten years of service.

(1)    *Sixty-five and eight.* Any member who has attained sixty-five years of age and has at least eight years of credited service may retire upon written application filed with the Board setting forth an anticipated retirement date.

---

l          CBA-1 (§ 43.A.), CBA-2 (§ 35.A.), CET-2 (§ 47.A.).

m          CBA-2 (§ 35.A.), CET-2 (§ 47.A.).

16

(2) *Sixty and ten.* Any member who has attained sixty years of age and has at least ten years of credited service may retire upon written application filed with the Board setting forth an anticipated retirement date.

(3) Any such anticipated retirement date shall not be less than thirty nor more than ninety days subsequent to the filing of the application. On the specified date, the member shall be retired, notwithstanding that during such period of notification he or she may have separated from City service. Upon retirement, the former member shall receive the retirement allowance provided for in Section 47-2-5 [82] of this Code.

(c) Retirement after twenty-five years of service without attaining age sixty years; reduced pension.

(1) *Early retirement.* Any member of the Retirement System who is on the payroll on or after July 1, 1992, and who has twenty-five years of credited service and has not attained sixty years of age[n], shall have the option of early retirement by accepting an actuarially reduced retirement allowance as determined by the Board of Trustees after consultation with the Board's Actuary, notwithstanding the age of the member who elects early retirement. Said election shall be made within ninety days of separation from City service. Actuarial tables provided by the Board's Actuary shall always provide this actuarially reduced retirement allowance at no cost to the employee.

---

## By Agreement

Employees who have resigned with 25 or more years of service since July 1, 1992, shall have ninety (90) days to submit an application for this option from the date they are officially notified by the Pension Bureau that said application can be processed.

After the initial enrollment of applicants by the Pension Bureau, employees who subsequently leave City employment shall have ninety (90) days from their last paid date on the City payroll to select this option.

Retirees who began receiving a Duty or Non-Duty Disability Pension after July 1, 1992, may convert to this option no later than (90) days after they would have had twenty-five (25) years with the City and have been notified by the Pension Bureau of the availability of this option.

Employees who began receiving Income Protection Benefits after July 1, 1992 may convert to this option anytime after they have had twenty-five (25) years of service with the City.

The above paragraphs notwithstanding, employees hired after January 1, 1996, shall not be eligible for a Service Retirement until they shall have attained fifty-five (55) years of age. This requirement shall apply to both the regular service retirement with thirty (30) years of service and for pension calculation purposes to the early service retirement (actuarially reduced) with twenty-five (25) or more years of service.[o]

---

(2) Employees utilizing the early retirement provision in this Section 47-2-4(c)(1) will not be entitled to the fringe benefits, if any, accruing to employees who qualify for a normal service retirement until such time as they would have qualified for a normal service retirement under 47-2-4(a) or (b) of this Code. However, employees may maintain health care benefits, if any, through the City's *COBRA* program, or its equivalent, until that time.

(d) Retirement allowance; age forty and eight years of service; ten years of service regardless of age.[83]

(1) Eligibility.

---

[n]  Not limited to those under sixty in the following agreements: CBA-3 (§ 46.A.), CBA-4 (§ 15.A.), CBA-5 (§ 20.A.), CBA-6 (§ 26.A.), CBA-7 (§ 26.A.), CBA-8 (§ 25.A.), CBA-9 (§ 31.A.), CBA-10 (§ 33.A.), CBA-11 (§ 39.A.), CET-1 (§ 48.A.), Reopener-1 (§ 31.A.), Reopener-2 (§ 25.A.), Reopener-3 (§ 39.A.), Reopener-4 (§ 20.A.).

[o]  CBA-3 (§ 46.A.), CBA-4 (§ 15.A.), CBA-5 (§ 20.A.), CBA-6 (§ 26.A.), CBA-7 (§ 26.A.), CBA-8 (§ 25.A.), CBA-9 (§ 31.A.), CBA-10 (§ 33.A.), CBA-11 (§ 39.A.), CET-1 (§ 48.A.), Reopener-1 (§ 31.A.), Reopener-2 (§ 25.A.), Reopener-3 (§ 39.A.), Reopener-4 (§ 20.A.).

    a.    *Any member hired before July 1, 1980* who has reached forty years of age and has acquired eight or more years of credited service shall be eligible to receive benefits provided by Section 47-2-4(d)(2) of this Code.

    b.    *Any member hired on or after July 1, 1980* who has acquired ten years of credited service shall be eligible to receive the benefits provided by Section 47-2-4(d)(2) of this Code regardless of age.

    c.    *Any non-union member hired on or after July 1, 1980 but before March 31, 1992* who has acquired ten years of credited service regardless of age or has reached age forty with eight or more years of credited service, whichever is earlier, shall be eligible to receive benefits provided by Section 47-2-4(d)(2) of this Code.

(2)    Benefits.

    a.    *Any member described in Section 47-2-4(d)(1)*[84] *of this Code who leaves City employment on or before June 30, 1992* but prior to the date the member would have first become eligible to retire as provided in Section 47-2-4(a),[85] (b)[86] or (c)[87] of this Code, for any reason except discharge for reasons covered by the State Forfeiture Law,[88] retirement or death, shall be entitled to a retirement allowance based upon one point five percent (1.5%) of average final compensation for the first ten years of service and one point six three percent (1.63%) for service in excess of ten years. There shall be no change to the base pension upon which future increases are based.

    b.    *Any member described in Section 47-2-4(d)(1)* of this Code *who leaves City employment on or after July 1, 1992,* but prior to the date the member would have first become eligible to retire as provided in Section 47-2-4(a), (b) or (c) of this Code, for any reason except discharge for reasons covered by the State Forfeiture Law,[89] retirement or death, shall be entitled to a retirement allowance computed according to Section 47-2-5 [90] of this Code.

    c.    The retirement allowance shall begin on the first day of the calendar month following the month in which the retirement application is filed with the Board, on or after that date on which the member would have been eligible to retire with an unreduced service retirement under Section 47-2-4(a) or (b) of this Code, had City employment continued or on the date when age sixty is reached, whichever is earlier. Unless otherwise provided in this Article, no service credit shall be earned for the period of absence from City employment and such person's beneficiary shall not be entitled to any other benefit afforded in this Article except those benefits afforded either in Section 47-2-4 or in Section 47-2-5 of this Code notwithstanding termination of membership.

(3)    *Withdrawal of accumulated contributions.* Upon separation from City employment, members who qualify for benefits pursuant to Section 47-2-4(d)(1) of this Code may withdraw their *1973 Defined Contribution Plan* accumulated contributions and all other funds standing to their credit in the Annuity Savings Fund at that time without affecting their benefits under Section 47-2-4(d)(2) or 47-2-5 of this Code.

(Ord. No. 29-01, § 1, 11-30-01)

18

For employees hired on or after July 1, 1980, the vesting provisions of the City Retirement Plan shall require ten (10) years of service regardless of age in lieu of the "40 and 8" age and service requirements.[p]

In the event that any law, State or Federal, is passed during the term of the collective bargaining agreement or City Employment Terms agreement which permits Employees to vest their pension prior to meeting the vesting requirements set forth in this contract, any Employee who vests his/her pension in such a manner shall not be eligible for any pension benefits until his/her sixty-second (62nd) birthday. This provision will not affect the current practice governing disabled Employees.[q]

### Sec. B-5. [Formerly Sec. 47-2-5. Service Retirement Allowance.[91]]

Upon retirement, a member who meets the qualifications set forth in section 47-2-4(a), (b) or (c) of this Code, shall receive a *Straight Life Retirement Allowance,* and shall have the right to elect to receive in lieu of the *Straight Life Retirement Allowance,* a reduced retirement allowance under an option provided for in Section 47-2-9 [92] of this Code.

The *Straight Life Retirement Allowance* shall consist of:

(a) An Annuity which shall be the actuarial equivalent of the members accumulated contributions in the 1973 *Defined Contribution Annuity Savings Fund* at the time of retirement; and

(b) (A *Basic Pension* of twelve dollars ($12.00) per annum multiplied by the number of years, and fractions of years of credited service, not to exceed ten (10) years; and

(c) A Membership Service Pension.

(1) *For members who retire on or before June 30, 1992,* a membership service pension of one point five percent (1.5%) of Average Final Compensation for the first ten (10) years of service and one point six three percent (1.63%) for service in excess of ten (10) years.

(2) *For members who retire on or after July 1, 1992 but prior to July 1, 1998,* a membership service pension of one point five percent (1.5%) of Average Final Compensation for each year of service for the first ten (10) years plus one point seven percent (1.7%) of Average Final Compensation for each year of service in excess of ten (10) years up to twenty (20) years of service, plus one point nine percent (1.9%) of Average Final Compensation for each year of service in excess of twenty years. In no event shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation.

(3) For members who retire on or after July 1, 1998 **[or July 1, 1992[r]], [using the highest paid 36 consecutive months out of the last 120 including longevity payments [received prior to July 1, 2012[s]] as Average Final Compensation[t]]** a membership service pension of one point six percent (1.6%)

---

p   CBA-1 (§ 43.D.), CBA-2 (§ 35.D.), CBA-3 (§ 46.C.), CBA-4 (§ 15.C.), CBA-5 (§ 20.C.), CBA-6 (§ 26.C.), CBA-7 (§ 26.C.), CBA-8 (§ 25.C.), CBA-9 (§ 31.C.), CBA-10 (§ 33.C.), CBA-11 (§ 39.C.), CET-1 (§ 48.C.), CET-2 (§ 47.D.), Reopener-1 (§ 31.C.), Reopener-2 (§ 25.C.), Reopener-3 (§ 39.C.), Reopener-4 (§ 20.C.).

q   CBA-1 (§ 43.D.), CBA-2 (§ 35.D.), CBA-3 (§ 46.D.), CBA-4 (§ 15.D.), CBA-5 (§ 20.D.), CBA-6 (§26.D.), CBA-7 (§ 26.D.), CBA-8 (§ 25.D.), CBA-9 (§ 31.D.), CBA-10 (§ 33.D.), CBA-11 (§ 39.D.), CET-1 (§ 48.D.), CET-2 (§ 47.D.), Reopener-1 (§31.D.), Reopener-2 (§25.D.), Reopener-3 (§ 39.D.), Reopener-4 (§ 20.D.).

r   CBA-9(§ 31.H.), Reopener-1 (§ 31.H.).

s   CBA-3 (§ 46.F.), CBA-8 (§ 25.F.), Reopener-2 (§ 25.F.).

of Average Final Compensation for each year of service for the first ten (10) years plus one point eight percent (1.8%) of Average Final Compensation for each year of service in excess of ten (10) years up to twenty (20) years of service, and plus two percent (2%) of Average Final Compensation for each year of service in excess of twenty (20) years up to twenty-five (25) years, plus two point two percent (2.2%) of Average Final Compensation for each year of service in excess of twenty-five (25) years. In no case shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation **[except in the case where a higher pension amount has been earned in accordance with the provisions in effect prior to July 1, 1992[u]]**.

---

## By Agreement

---

Employees who retire on or after July 1, 2012 **[or after July 1, 1998 but before July 1, 2012[v]]**, shall have their pensions computed according to the following formula. Using the highest paid thirty-six (36) consecutive months out of the last one hundred twenty (120), including longevity payments, as Average Final Compensation; two percent (2%) **[or one and one-half percent (1.5%)[w]]** of Average Final Compensation for each year of service; plus twelve dollars ($12) for each year of City service not to exceed one hundred twenty dollars ($120). In no case shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation except in the case where a higher pension amount has been earned in accordance with the provisions in effect prior to July 1, 1992.[x]

---

For all years of credited service accrued by bargaining unit members after July 1, 2012, the multiplier as set forth previously in this section shall be reduced to one and one-half percent (1.5%) of Average Final Compensation per year.[y]

---

Effective April 1, 2013 **[or Effective on the first month after ratification[z]]**, the pension multiplier shall be 1.5% for all years of service after that date.[aa]

---

(d)  With respect to regular service retirees under Section 47-2-4(a) and (b) [93] of this Code only and excluding persons who receive vested benefits under Section 47-2-4(c) and (d) of this Code, in no case shall the total of the annual Straight Life Pension be less than three hundred sixty dollars ($360.00) times each of the first ten (10) years of service at retirement plus one hundred twenty dollars ($120.00) for each year of service in excess of ten (10) years. Effective July 1, 2007, each year of service in excess of ten (10) shall be calculated using two hundred twenty-five dollars ($225.00).

(e)  The recalculation of the pension benefit shall include previous pension improvement factors but shall not include special increases granted by prior separate ordinances.[94]

---

[t]  CBA-3 (§ 46.F.), CBA-4 (§ 15.H.), CBA-5 (§ 20.H.), CBA-6 (§ 26.H.), CBA-7 (§ 26.G.), CBA-8 (§ 25.F.), CBA-9 (§ 31.H.), CBA-10 (§ 33.H.), CBA-11 (§ 39.H.), CET-1 (§ 43.H.), Reopener-1 (§ 31.H.), Reopener-2 (§ 25.F.), Reopener-3 (§ 39.H.), Reopener-4 (§ 20.H.).

[u]  CBA-3 (§ 46.F.), CBA-4 (§ 15.H.), CBA-5 (§ 20.H.), CBA-6 (§ 26.H.), CBA-7 (§ 26.G.), CBA-8 (§ 25.F.), CBA-9 (§ 31.H.), CBA-10 (§ 33.H.), CBA-11 (§ 39.H.), CET-1 (§ 43.H.), Reopener-1 (§ 31.H.), Reopener-2 (§ 25.F.), Reopener-3 (§ 39.H.), Reopener-4 (§ 20.H.).

[v]  CBA-2 (§ 35.G.).

[w]  CET-2 (§47.G.).

[x]  CBA-1 (§ 43.G.), CBA-2 (§ 35.G.), CET-2 (§ 47.G.).

[y]  CBA-1 (§ 43.G.), CBA-2 (§ 35.H.), CET-1 (§ 48.H.), CET-2 (§ 47.G.).

[z]  CBA-10 (§ 33.U.).

[aa]  CBA-3 (§ 46.V.), CBA-10 (§ 33.U.).

20

(f)     If a retiree dies before receipt of *Straight Life Retirement* allowance payments in an aggregate amount equal to, but not exceeding, the retirees accumulated contributions in the *Annuity Savings Fund* at the time of retirement, the difference between these accumulated contributions and the aggregate amount of *Straight Life Retirement* allowance payments received, shall be paid to such person or persons nominated by written designation duly executed by the retiree and filed with the Board. If there is no such designated person or persons surviving the retiree, such difference shall be paid to his or her estate. In no case shall any benefits be paid under this section because of the death of a retiree if the retiree had elected any of the Options provided for in Section 47-2-9 of this Code.

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 02-08, § 1, 1-23-08)

## Sec. B-6.  [Formerly Sec. 47-2-6. Disability Retirement.[95]]

(a)     *Duty Disability; Eligibility.* Upon the application of a member or the member's department head, a member who becomes totally and permanently incapacitated for duty in the employ of the employer shall be retired by the Board; provided, such incapacity is found by the Board to be the natural and proximate result of the actual performance of duty, without willful negligence on the part of the member; provided further, that the Retirement System Medical Director shall certify to the Board after a medical examination, that such member is mentally or physically totally and permanently incapacitated for the further performance of duty to the employer, and that such member should be retired from City service.

---
**By Agreement**
---

Effective September 28, 2010 **[or Effective February 11, 2010[bb] or upon approval of Board of Water Commissioners[cc] or Effective February 16, 2020 (Local 531) and effective March 9, 2010 (Local 488)[dd] or Effective March 30, 2010[ee]]**, any employee **[or any employee covered by this agreement[ff]]** who is seeking a duty disability retirement, shall have an examination conducted by an independent medical examiner (IME).  If the IME concludes that the employee's physical or medical condition does not relate to his/her employment with the City of Detroit, the employee shall not be eligible for the duty disability retirement.[gg]

---

(b)     *Duty disability; Benefits.* [96] Upon retirement for disability as provided in Section 47-2-6(a) of this Code, a retiree shall receive the following benefits:

(1)     Any member who is eligible for a *Service Retirement* under Section 47-2-4(a) or (b) of this Code shall receive a *Service Retirement Allowance* as provided in Section 47-2-5 [97] of this Code and shall have the right to elect an option provided for in Section 47-2-9 [98] of this Code.

(2)     Any member prior to eligibility for a *Service Retirement* under Section 47-2-4(a) or (b) of this Code shall receive a *Disability Retirement Allowance* to begin as of the date of disability. In no case shall the *Disability Retirement Allowance* be retroactive to more than six months before the date the application for Disability Retirement is filed with the Board, or prior to the date the member's name last appeared on a City payroll with pay, whichever is later. The *Disability Retirement Allowance* shall continue until the

bb         CBA-3 (§ 46.K.), CBA-8 (§ 25.K.), CBA-9 (§ 31.K.), Reopener-1 (§ 31.K.), Reopener-2 (§ 25.K.), Reopener-3 (§ 39.K.).

cc         CBA-5 (§ 20.K.), Reopener-4 (§ 20.K.).

dd         CBA-6 (§ 26.K.).

ee         CBA-7 (§ 26.K.).

ff         CBA-3 (§ 46.K.), CBA-5 (§ 20.K.), CBA-6 (§ 26.K.), CBA-7 (§ 26.K.), CBA-9 (§ 31.K.), CBA-11 (§ 39.K.), CET-1 (§ 48.K.), Reopener-1 (§ 31.K.), Reopener-2 (§ 25.K.), Reopener-3 (§ 39.K.), Reopener-4 (§ 20.K.).

gg         CBA-3 (§ 46.K.), CBA-5 (§ 20.K.), CBA-6 (§ 26.K.), CBA-7 (§ 26.K.), CBA-9 (§ 31.K.), CBA-11 (§ 39.K.), CET-1 (§ 48.K.), Reopener-1 (§ 31.K.), Reopener-2 (§ 25.K.), Reopener-3 (§ 39.K.), Reopener-4 (§ 20.K.).

member reaches eligibility for *Service Retirement* or recovers prior to that event. Upon reaching eligibility for *Service Retirement,* he or she shall receive a pension as provided in Sections 47-2-5(b)—(e) of this Code, together with an annuity which shall be the equivalent of the annuity which would have been received had contributions to the *Annuity Savings Fund* continued. Said contributions are to be based on the final compensation at the date of disability and the annuity percentage in effect for the employee on the July first prior to the effective date the employee is added to the disability retirement payroll, provided said July first is at least six months prior to the effective date that the employee is added to the regular retirement payroll. In computing the pension, membership service credit shall be given for the period a *Duty Disability Retirement Allowance* is received. The *Disability Retirement Allowance* shall consist of:

aa.  *Cash Refund Annuity*[99] which shall be the actuarial equivalent of the member's accumulated contributions in the *Annuity Savings Fund* at the time of retirement. If a retiree dies before receipt of annuity payments in an aggregate amount equal to, but not exceeding, the retiree's accumulated contributions, the difference between the accumulated contributions and the aggregate amount of annuity payments received shall be paid in a single lump sum to such person or persons nominated by written designation duly executed and filed with the Board. If there is no such designated person surviving the retiree, such difference shall be paid to the retiree's estate.

bb.  In addition to the *Annuity,* a *Pension*[100] of sixty-six and two-thirds of the member's Average Final Compensation at the time of disability, subject to the provisions of Sections 47-2-13 and 47-2-14 of this Code. This *Pension* shall in no event exceed fifty-seven hundred dollars ($5,700.00) per annum.

cc.  *For members who retired on disability on or after January 1, 1999, a pension,* in addition to the *Annuity,* of sixty-six and two-thirds of the member's average compensation at the time of disability subject to the provisions of Sections 47-2-13 and 47-2-14 of this Code. This *Pension* shall in no event exceed nine thousand dollars ($9000.00) per annum.

---

## By Agreement

Effective January 1, 1999 **[or July 1, 2012[hh]]**, the maximum annual amount payable to an individual on a Duty Disability pension shall be increased to $9,000 and for Non-Duty Disability pension to $6,000.[ii]

---

(c)  *Non-Duty Disability; Eligibility.*[101] Upon the application of a member or the member's department head, a member who has at least ten years of credited service who becomes totally and permanently incapacitated for duty as a result of causes which do not occur in the actual performance of duty to the employer, may be retired by the Board if the Medical Director certifies to the Board after examination that such member is mentally or physically totally incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that such member should be retired.

(d)  *Non-Duty Disability; Benefits.*[102] Upon retirement for disability as provided in Section 47-2-6(c) of this Code, a member shall receive the following benefits:

(1)  After attaining sixty years of age, a member shall receive a *Service Retirement Allowance* as provided in Section 47-2-5 of this Code and shall have the right to elect an Option as provided in Section 47-2-9[103] of this Code.

(2)  Prior to age sixty, a member shall receive benefits as provided in Section 47-2-6(d)(2)aa—dd[104] of this Code:

---

[hh]  CET-2 (§ 47.I.)

[ii]  CBA-1 (§ 43.I.), CBA-2 (§ 35.K.), CBA-3 (§ 26.H.), CBA-4 (§ 15.J.), CBA-5 (§ 20.J.), CBA-6 (§ 26.J.), CBA-7 (§ 26.I.), CBA-8 (§ 25.H.), CBA-9 (§ 31.J.), CBA-10 (§ 33.J.), CBA-11 (§ 39.J.), CET-2 (§ 47.I.), Reopener-1 (§ 31.J.), Reopener-2 (§ 25.H.), Reopener-3 (§ 39.J.), Reopener-4 (§ 20.J.).

aa. A *Cash Refund Annuity* [105] which shall be the actuarial equivalent of the member's accumulated contributions in the *Annuity Savings Fund* at the time of retirement. In the event a retiree dies before the total of the *Cash Refund Annuity* payments received equals or exceeds the amount of his or her accumulated contributions at the time of retirement, the remainder shall be paid in a single lump sum to such person or persons nominated by written designation duly executed by the member and filed with the Board. If there is no such designated person or persons surviving, any such remainder shall be paid to the retiree's estate.

bb. In addition to the *Annuity, a Disability Pension* [106] which shall be based on the *Service Retirement* factors in effect on the effective date of disability. The service retirement factors shall be multiplied by the *Average Final Annual Compensation* multiplied by the number of years and fractions of years of service credited to the retiree. In addition, a basic pension of twelve dollars ($12.00) per annum for a maximum of ten years of credited service shall be added for a total not to exceed one hundred twenty dollars ($120.00) and adjustments thereto, as calculated pursuant to applicable provisions of the Detroit City Charter, as amended, and the Detroit City Code, as amended. Said *Disability Pension* shall begin as of the date of the disability. However, in no case shall the pension begin more than six months before the date the application for disability retirement was filed with the Board, or prior to the date his or her name last appeared on a City payroll with pay, whichever is later. Payment of the *Disability Pension* shall continue to age sixty. Said *Disability Pension* shall not exceed thirty-nine hundred dollars ($3900.00) per annum, and shall be subject to the provisions of Sections 47-2-13 and 47-2-14 of this Code.

cc. A member who retired on disability on or after January 1, 1999 shall receive a *Disability pension* as provided for in Section 47-2-6(d)(2)bb of this Code. Said *Disability Pension* shall not exceed six thousand dollars ($6,000.00) per annum, and shall be subject to the provisions of Sections 47-2-13 and 47-2-14 of this Code.

dd. Effective July 1, 1967, notwithstanding the limitations contained in Section 47-2-6(d)(2)bb of this Code, disability retirees under Section 47-2-6(c) of this Code, who retired (1) prior to August 13, 1953, shall receive a supplementary *Pension* of forty dollars ($40.00) per month; or (2) after August 13, 1956 and prior to July 1, 1966, shall receive a supplementary pension of twenty dollars ($20.00) per month.

ee. *Upon Attaining Age Sixty,* the retiree shall receive a *Pension* computed according to the provisions of Section 47-2-5(b)-(e) of this Code; provided, that no service credit shall be given for the time a *Disability Pension* provided for in Section 47-2-6(d)(2)b of this Code was received. Upon attaining age sixty, the retiree shall have the right to make an election under Section 47-2-9 of this Code.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. B-7.  [Formerly Sec. 47-2-7. Accidental Death Benefit; Performance of Duty.[107]]

If a member is killed in the performance of duty in the service of the employer, or dies as the result of illness contracted or injuries received while in the performance of duty in the service of the employer, and such death, illness, or injuries resulting in death, is found by the Board to have resulted from the actual performance of duty in the service of the employer, the following benefits shall be paid, subject to Section 47-2-13 of this Code:

(a) *Annuity Savings Fund.*[108] accumulated savings in the members *Annuity Savings Fund* at the time of death shall be paid in a single lump sum to such person or persons as the member nominated in a writing duly executed and filed with the Board. In the event there is no designated person or persons surviving the member, the accumulated contributions shall be paid to the member's estate.

(b) A *Pension* [109] of one-third of the final compensation of said member shall be paid to the surviving spouse to continue until remarriage. If an unmarried child, or children under age eighteen also survive the deceased member, each surviving child shall receive a pension of one-fourth of said final compensation, to be divided equally. Upon any such child's adoption, marriage, attainment of age eighteen, or death, whichever occurs first, such child's pension shall terminate and there shall be a redistribution by the Board to the surviving

eligible children under age eighteen. In no event shall any child receive a pension of more than one-fourth of said final compensation.

(c)  *No Surviving Spouse; Children.* [110] If there is no surviving spouse, or if such surviving spouse dies or remarries before the youngest surviving child of a deceased member shall have attained the age of eighteen, any unmarried child or children under age eighteen, if any, shall receive a *Pension* equal to one-fourth of the deceased member's final compensation; provided, that if there are more than two such surviving children, each shall receive a pension of an equal share of one-half of said final compensation. Upon any such child's adoption, marriage, attainment of age eighteen, or death, whichever occurs first, the child's *Pension* shall terminate and there shall be a redistribution by the Board to the surviving eligible children under age eighteen. In no case shall any such child's *Pension* be more than one-fourth of the deceased member's final compensation.

(d)  *Annual Limit.* [111] The total amount payable under Section 47-2-7(b) and (c) of this Code on account of the death of a member, shall not exceed nine thousand dollars ($9,000.00) per annum.

---

## By Agreement

The maximum amount of the Accidental Death Benefit as found in Chapter VI, Article VI, Part C, Section 1, Paragraphs B and C of the City Charter shall be increased from $2,400 to $5,700 **[or $9,000**[jj]**]** per annum.[kk]

---

(e)  *Dependent Father and/or Mother.* [112] If the deceased member has no surviving spouse or children eligible for pensions under this section, a *Pension* equal to one-sixth of the deceased member's final compensation shall be paid to the member's surviving dependent father and/or mother; provided that in no case shall either parent's *Pension* exceed fifty dollars ($50.00) per month. Payment to a dependent parent or parents shall be contingent upon a finding by the Board of Trustees after investigation that such parent or parents were actually dependent upon said deceased member through a lack of earning power resulting from physical or mental disability.

(f)  *Section 47-2-13 of this Code Applicable.* [113] The benefits provided in Section 47-2-7 of this Code shall be subject to Section 47-2-13 of this Code.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. B-8.  [Formerly Sec. 47-2-8. Accumulated Contributions; Return of 1973 Defined Contribution Plan Amount.[114]]

(a)  Cessation of Employment.

(1)  If a member ceases to be an employee of the employer before becoming eligible for a *Pension* paid out of City contributions to the Retirement System, such member shall be paid all or part of the member's *Annuity Savings Fund, being the 1973 Defined Contribution Plan* amount, as the member shall demand by written application filed with the Board.

(2)  Except as otherwise provided in this Article, upon death a member's *Annuity Savings Fund* shall be paid to such person or persons nominated in a written designation duly executed by the member and filed with

---

[jj]  CBA-2 (§ 35.L.), CBA-3 (§ 46.H.), CBA-6 (§ 26.J.), CBA-8 (§ 25.H.), CBA-9 (§ 31.L.), CBA-10 (§ 33.J.), CBA-11 (§ 39.J.), CET-2 (§ 47.J.), Reopener-1 (§ 31.L.), Reopener-2 (§ 25.H.).

[kk]  CBA-2 (§ 35.L.), CBA-3 (§ 46.H.), CBA-4 (§ 15.J.), CBA-5 (§ 20.J.), CBA-6 (§ 26.J.), CBA-7 (§ 26.I.), CBA-8 (§ 25.H.), CBA-9 (§ 31.L.), CBA-10 (§ 33.J.), CBA-11 (§ 39.J.), CET-1 (§ 48.J.), CET-2 (§ 47.J.), Reopener-1 (§ 31.L.), Reopener-2 (§ 25.H.), Reopener-3 (§ 39.J.), Reopener-4 (§ 20.J.).

24

the Board. In the event there is no such designated person or persons surviving, the member's said accumulated contributions shall be paid to the member's estate.

(3) If a member who dies without a legal will has not nominated a beneficiary as provided in Section 47-2-8(a)(2) of this Code, the member's accumulated Annuity Savings Fund contributions at the time of death may be used to pay burial expenses if the member leaves no other estate sufficient for such purpose. Such expenses shall not exceed a reasonable amount as determined by the Board.

(4) Accumulated contributions to be returned as provided in this section may be paid in equal monthly installments for a period not to exceed three years, according to such rules and regulations as the Board may adopt from time to time. After a member ceases to be a member, any balance in the *Annuity Savings fund* which is unclaimed by the said member or the member's heirs, shall remain a part of the funds of the Retirement System and shall be transferred to the *Pension Accumulation Fund.*

(b) *One Time Withdrawal; Twenty-Five Years.* Prior to the receipt of the first retirement benefit check, employees with twenty-five or more years of service shall be allowed to withdraw either a partial or full amount of their accumulated contributions, one time only.

(c) *One Time Withdrawal; Duty and Non-Duty Disability Retirees.* Duty and non-duty disability retirees shall be allowed to withdraw either a partial or full amount of their accumulated contributions one time only.

(d) *One Time Withdrawal.* Withdrawal by a member under either (b) or (c) of this Section 47-2-8 constitutes the one time withdrawal allowed.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. B-9.  [Formerly Sec. 47-2-9. Retirement Allowance Options.[115]]

(a) *Election by Member.* Until the first retirement allowance payment check is cashed, or six months after the first payment check is issued but not thereafter, any member may elect to receive a straight life retirement allowance payable throughout life, or the member may elect to receive the actuarial equivalent of the *Straight Life Retirement Allowance* computed as of the effective date of retirement, in a reduced retirement allowance payable throughout life, with the exception that there will be no reduction in the benefits received pursuant to Section 47-2-5(e) of this Code; and nominate a beneficiary, in accordance with the options set forth below:

*Option One. Cash Refund Annuity.[116]* If a retiree who elected a Cash Refund Annuity dies before payment of the annuity portion of the reduced retirement allowance has been received in an aggregate amount equal to, but not exceeds the retiree's accumulated contributions in the *Annuity Savings Fund* at the time of retirement, the difference between said accumulated contributions and the aggregate amount of annuity payments already received, shall be paid in a single lump sum to such person or person nominated by written designation duly executed by the member and filed with the Board. If there are no such designated person or persons surviving said retiree, any such difference shall be paid to the retiree's estate.

*Option Two.* Joint and One Hundred Percent Survivor Allowance.[117] Upon the death of a retiree who elected a *Joint and One Hundred Percent Survivor Allowance,* one hundred percent of the reduced retirement allowance shall be paid to and continued throughout the life of the person nominated by written designation duly executed and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

*Option "A". Joint and Seventy-Five Percent Survivor Allowance.* Upon the death of a retiree who elected a *Joint and Seventy-Five Percent Survivor Allowance,* seventy-five percent of the reduced retirement allowance shall be continued throughout the life of and paid to the person nominated by written designation duly executed by the member and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

25

*Option Three. Joint and Fifty Percent Survivor Allowance.* Upon the death of a retiree who elected a *Joint and Fifty Percent Survivor Allowance,* fifty percent of the reduced retirement allowance shall be continued throughout the life of and paid to the person nominated by written designation duly executed by the member and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

*Option "B". Joint and Twenty-Five Percent Survivor Allowance.* Upon the death of a retiree who elected a *Joint and Twenty-Five Percent Survivor Allowance,* twenty-five percent of the reduced retirement allowance shall be paid throughout the life of the person nominated by written designation duly executed and filed with the Board prior to the date the first payment of the retirement allowance becomes due.

(b)  *Joint and Survivor Optional Forms of Payment.* The *Joint and Survivor Optional Forms of Payment* provided under Section 47-2-9(a) of this Code shall be made available in either the standard form or the pop-up form, as follows:

  (1)  *Standard Form.* Under the *Standard Form,* the reduced retirement allowance shall be paid throughout the lifetime of the retiree.

  (2)  *Pop-up Form.* Under the *Pop-up Form,* the reduced allowance shall be paid throughout the lifetime of the retiree and the designated beneficiary. In the event of the death of the designated beneficiary during the lifetime of the retiree, the amount of the allowance shall be changed to the amount that would have been payable had the retiree elected the *Straight Life Form of Payment.*

(c)  *Coordination of Benefits.* According to such rules and regulations as the Board shall adopt, until the first payment of a retirement allowance becomes due, but not thereafter, a member under age sixty-five may elect to have the member's *Straight Life Retirement Allowance* provided for in Section 47-2-5 of this Code equated on an actuarial equivalent basis to provide an increased retirement allowance payable to age sixty-two or age sixty-five, and to provide a decreased retirement allowance thereafter. The increased retirement allowance payable to such age shall approximate the total of the decreased retirement allowance payable thereafter and the estimated social security benefit. If a member elects to receive increased and then decreased retirement allowance payments provided for in this paragraph, he or she may also elect to have such payments reduced by electing one of the optional forms of payment provided for in paragraph (a) of this section. This coordination of benefits option shall not create any additional actuarial costs. **[This provision shall include all Employees who retire on or after July 1, 1974, and shall be retroactive to that date.[II]]**

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. B-10.  [Formerly Sec. 47-2-10. Benefits for Surviving Spouses; Generally.[118]]

(a)  The surviving spouse of any member who dies while in the employ of the City or in the employ of a second governmental unit as provided in Section 47-2-15 of this Code after the date such member either (1) has earned twenty years of credited service regardless of age, or (2) has earned eight years of credited service and has attained age sixty-five, or (3) has earned ten or more years of credited service and has attained age sixty, shall receive a retirement allowance. The spouse's retirement allowance shall be computed according to Section 47-2-5 of this Code in the same manner in all respects as if the said member had retired effective the day preceding the member's death, notwithstanding that the member had not attained age sixty, elected a *Joint and One Hundred Percent Survivor Allowance* as provided for in Section 47-2-9 of this Code, and nominated the surviving spouse as beneficiary. Prior to the date the first payment of the retirement allowance provided hereunder becomes due, the said beneficiary may elect to receive the deceased member's accumulated contributions in the Annuity Savings Fund. No payments shall be made under this section on account of the death of a member if any benefits are paid under Section 47-2-7 [119] of this Code. If there is no eligible surviving spouse, dependent children shall be paid a total of nine thousand dollars ($9,000.00) which shall be divided equally among all eligible dependents until the youngest child reaches age nineteen, or for life, if a child is permanently physically or mentally impaired.

II          CBA-1 (§ 43.B.), CBA-2 (§ 35.B.), CET-2 (§ 47.B.).

Effective January 1, 1999, minor dependents under age nineteen (19) or permanently mentally or physically impaired dependent children who become impaired prior to age nineteen (19) of Employees who die with twenty (20) years of service without a surviving spouse shall receive a payment of nine thousand dollars ($9,000) per year which shall be divided equally amongst all eligible dependents. The payment will cease when the last minor attains age nineteen (19) or for mentally or physically impaired children at death. There shall be no retirement escalator for this payment.[mm]

(b)     In addition to in-service death benefits which existed prior to July 1, 1998 for members with twenty or more years of service, if a member dies on or after July 1, 1998 **[or January 1, 1999[nn] or July 1, 1999[oo]]**, after having attained fifteen or more but less than twenty years of creditable service at any age below sixty, the surviving spouse will be paid a *Fifty Percent Joint and Survivor* election. If there is no eligible surviving spouse, dependent children shall be paid a total of six thousand dollars ($6,000.00) which shall be divided equally among all eligible dependents until the youngest child reaches age nineteen, or for life if a child is permanently physically or mentally impaired.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. B-11. [Formerly Sec. 47-2-11. Benefits for Surviving Spouses; Disability Retirees.[120]]

The surviving spouse of a disability retiree who retired under the provisions of Section 47-2-6 of this Code and who died before the age of sixty shall receive a retirement allowance computed in the same manner as if the disability retiree had been a member who became eligible for benefits under Section 47-2-10 of this Code, provided the disability retiree had earned fifteen or more years of credited service. In the case of a non-duty disability retiree, credited service shall be determined on the effective date of the non-duty disability retirement. In the case of a duty disability retiree, credited service shall be determined on the date of death of the disability retiree assuming City employment had continued until the date of death.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. B-12. [Formerly Sec. 47-2-12. Disposition of Surplus Benefits upon Death of Retiree and Beneficiary.[121]]

If under a *Joint and One Hundred Percent Survivor allowance*, a *Joint and Seventy-Five Percent Survivor allowance*, a *Joint and Fifty Percent Survivor allowance*, or a *Joint Twenty-Five Percent Survivor allowance* as provided for under Section 47-2-9 of this Code, both a retiree and beneficiary die before they have received in retirement allowance payments, an aggregate amount equal to the retiree's accumulated contributions in the annuity savings fund at the time of retirement, the difference between the said accumulated contributions and the said aggregate amount of retirement allowances paid the retiree and beneficiary, shall be paid in a single lump sum to such person or persons nominated by written designation of the retiree duly executed and filed with the Board. If there are no person or persons surviving retiree and beneficiary, any such difference shall be paid to the retiree's estate.

(Ord. No. 29-01, § 1, 11-30-01)

---

[mm]      CBA-1 (§ 43.K.), CBA-2 (§ 35.M.), CBA-3 (§ 46.I.), CBA-4 (§ 15.K.), CBA-5 (§ 20.L.), CBA-6 (§ 26.L.), CBA-7 (§ 26.J.), CBA-8 (§ 25.I.), CBA-9 (§ 31.L.), CBA-10 (§ 33.K.), CBA-11 (§ 39.L.), CET-1 (§ 48.L.), CET-2 (§ 47.K.), Reopener-1 (§ 31.L.), Reopener-2 (§ 25.I.), Reopener-3 (§ 39.L.), Reopener-4 (§ 20.L.).

[nn]      CBA-1 (§ 43.L.), CBA-2 (§ 35.N.), CBA-3 (§ 46.J.), CBA-8 (§ 25.J.), CET-2 (§ 47.L.), Reopener-2 (§ 25.J.).

[oo]      CBA-6 (§ 26.M.).

**Sec. B-13.  [Formerly Sec. 47-2-13. Pensions Offset by Compensation Benefits; Subrogation.[122]]**

(a)  *Generally.* Any amounts which may be paid or payable to a member, retiree, or to the dependents of a member or retiree on account of any disability or death under the provisions of any Workers' Compensation, pension, or similar law, except federal Social Security old-age and survivors' and disability insurance benefits, shall be offset against any pensions payable from funds of the Retirement System on account of the same disability or death. If the present value of the benefits payable under said Workers' Compensation, pension, or similar law, is less than the pension reserve for said pension payable by the Retirement System, the present value of the said Workers' Compensation, pension, or similar legal benefit shall be deducted from the Pension Reserve, and such pensions as may be provided by the Pension Reserve so reduced shall be payable as provided in this Article.

(b)  *The City's right of subrogation.* [123] In the event a person becomes entitled to a pension payable by the Retirement System because of an accident or injury caused by the act of a third party, the City shall be subrogated to the rights of said person against such third party to the extent of the benefit which the City pays or becomes liable to pay.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. B-14.  [Formerly Sec. 47-2-14. Disability Retirees; Reexamination; Authority of the Board.[124]]**

(a)  *Medical examination.* At least once each year during the first five years following the retirement of a member with a Disability Retirement Allowance or Disability Pension, and at least once in every three year period thereafter, the Board may, and upon the retiree's application shall require that any disability retiree who has not attained age sixty undergo a medical examination, to be made by, or under the direction of, the Medical Director. Should any such disability retiree who has not attained age sixty refuse to submit to at least one such medical examination in any such period, the retiree's retirement allowance or pension may be discontinued by the Board until withdrawal of such refusal. Should such refusal continue for one year, all of the disability retiree's rights in and to the Pension portion of the Retirement Allowance may be revoked by the Board. If upon such examination of a disability retiree, the Medical Director reports that the retiree is physically able and capable of resuming employment, and such report is concurred in by the Board, the retiree shall be restored to active service with the City and the Disability Retirement Allowance shall terminate.

(b)  *Other employment.* If such disability retiree is or becomes engaged in a gainful occupation, business, or employment paying more than the difference between the retiree's Disability Retirement Allowance and final compensation, the Pension portion of the Disability Retirement Allowance shall be reduced by the amount of such difference. If the amount of the earnings changes, the Pension may be adjusted accordingly.

(c)  *Reinstatement to active service.* A disability retiree who has been, or shall be, reinstated to active service in the employ of the City as provided in this Section, shall again become a member of the Retirement System. All credited service at the time of the retirement shall be restored to full force and effect and a duty disability retiree shall be given membership service credit for the period said retiree was out of service due to such duty disability.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. B-15.  [Formerly Sec. 47-2-15. Transfer of department or department functions; Generally.[125]]**

In the event a function or functions of a City Department or the Department itself is transferred to the federal or state government, or to a political subdivision of the state (second governmental unit), a member of the Retirement System whose employment is transferred from the City to the second governmental unit shall be entitled to a retirement allowance payable by the Retirement System subject to the following conditions:

28

(a) *Employment within sixty days of transfer.* The employee enters the employment of the second governmental unit within sixty days from and after the effective date of the transfer of the function or functions of a City Department or the Department itself to the second governmental unit.

(b) *Credited service combined; ten year minimum.* The employee's credit service as a member of the Retirement System plus any credited service acquired in the employ of the second governmental unit totals at least ten years;

(c) *Retirement; second governmental unit.* If the employee retires from the employment in the second governmental unit on account of age and service, the employee's Retirement Allowance shall be computed in accordance with Section 47-2-4(b) or Section 47-2-5 of this Code, whichever is applicable. If the employee retires from employment in the second governmental unit because of total and permanent disability arising from non-service connected causes, the Retirement Allowance shall be computed in accordance with Section 47-2-6(d) of this Code. In computing the Retirement Allowance, the basic pension shall not exceed twelve dollars ($12.00) per year for a maximum of ten years for a total amount to not exceed one hundred twenty dollars ($120.00), and the membership service pension shall be based only upon City-credited service existing at the time of transfer. In determining the Average Final Compensation defined in Section 47-1-21 of this Code, the compensation received as an employee of the second governmental unit shall be regarded as compensation paid by the City. If the employee leaves the employ of the second governmental unit with a deferred retirement allowance, no City retirement allowance shall be paid unless the employee has met the requirements of Section 47-2-4(d)(1) of this Code.

(d) *Allowance starting date.* The retirement allowance shall begin upon retirement from the employment of the second governmental unit, but in no event prior to the date the employee would have become eligible for retirement had the employee continued in City employment. If retirement is because of total and permanent disability arising from non-service-connected causes, the retirement allowance shall begin upon the approval of retirement by the Board.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. B-16. [Formerly Sec. 47-2-16. Pension improvement factor.[126]]

(a) *Increase of pension.* [127] On or after July 1, 1992, and the first day of July of each year thereafter, the pension portion of any Retirement Allowance or Accidental Death Benefit which is paid or payable under this Article shall be increased by a factor of two point twenty-five percent (2.25%), computed on the basis of the amount of the original pension received at the time of retirement, including, if applicable, any supplemental pensions provided under this Article; provided, that the recipient of said pension shall have been on the retirement rolls at least one year prior to said July first date. If the recipient has been on the retirement payroll less than one year prior to said July first date, the amount of the increase shall be prorated accordingly.

(b) *Payment.* [128] the pension improvement factor of two point twenty-five percent (2.25%) provided for in Section 47-2-16(a) of this Code, shall be payable notwithstanding any Retirement Allowance or pension amount limitation provisions in this Article to the contrary.

(Ord. No. 29-01, § 1, 11-30-01)

After the effective date of the City Employment Terms between the City of Detroit and Police Officers Association of Michigan presented to the Union on July 18, 2012, employees will no longer receive the two and one-quarter percent (2.25%) per annum escalation.[pp]

Effective April 1, 2013, the post-retirement escalator factor for all service after that date shall be eliminated.[qq]

Effective on the first month after ratification, the cost of living allowance for all service after that date shall be eliminated.[rr]

## Sec. B-17.  [Formerly Sec. 47-2-17. Funds.]

The *1973 Defined Benefit/Defined Contribution (Annuity) Plan* shall consist of the *Annuity Savings Fund,* the *Annuity Reserve Fund,* the *Pension Accumulation Fund,* the *Pension Reserve Fund,* and the *Income Fund.*

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. B-18.  [Formerly Sec. 47-2-18. Method of financing.[129]]

(a)    Annuity Savings Fund of the 1973 Defined Contribution Plan. [130]

(1)    The *Annuity Savings Fund* of the *1973 Defined Contribution Plan* shall be the fund in which shall be accumulated at regular interest, in accordance with the limitations that are contained in Section 47-1-18 of this Code, the contributions of Members to provide their annuities. At the election of the Member, the amount of the basic contribution of a Member to the Retirement System may be zero percent (0%), three percent (3%), five percent (5%), or seven percent (7%) of annual compensation. If a Member elects three percent (3%), his or her contribution shall be that amount which is subject to taxation under the provisions of the *Federal Insurance Contribution Act,* 26 USC 3101 et seq. (Act), plus five percent (5%) of the portion of annual compensation, if any, which exceeds the amount subject to taxation under that Act.

(2)    The contribution rate elected by the Member under Section 47-2-18(a)(1) of this Code shall be deducted from the Members' compensation notwithstanding that the minimum compensation provided by law for any Member shall be reduced thereby. Payment of compensation, less said deductions, shall be a complete discharge of all claims and demands whatsoever for the services rendered by the said Member during the period covered by such payment, except as to benefits provided under this Article.

(3)    Upon retirement of a Member with a *Retirement Allowance,* the Member's accumulated contributions shall be transferred from the *Annuity Savings Fund* to the *Annuity Reserve Fund,* refunded to the Member, or a combination thereof.

---

[pp]      CBA-1 (§ 43.M.), CBA-2 (§ 35.O.), CET-1 (§ 48.N.)(referencing the effective date of their own CET), CET-2 (§ 47.P(1)( referencing the effective date of their own CET).

[qq]      CBA-3 (§ 46.V.).

[rr]      CBA-10 (§ 33.U.).

## Pension – Employer Contribution (414h Plan):

Upon notification by the Union to the City of its desire to activate a 414(h) Plan, the City will take steps to implement the provisions contained in the following paragraphs. The Union initated the discussions and proposed the provisions contained in the paragraphs and the parties recognize and agree that it will take some time before this program can become operational due to the necessity of making changes in the City's computerized payroll system.

It is hereby agreed that every member of this bargaining unit shall be required to make contributions in the amount of 5% of their annual compensation to the Annuity Savings Fund of the General Retirement System. The said 5% employee contribution to the Retirement system Annuity Fund, although designated as employee contributions, shall be paid by the City of Detroit in lieu of contributions by the employee. The employee shall not have the option of choosing to receive the contributed amount directly instead of having them paid by the employer to the annuity fund. There shall be no additional contribution expense to the City of Detroit, and the amounts so contributed by the employer on behalf of the employee shall be treated, for tax purposes, as employer contributions and thus shall not be taxable to the employee until these amounts are distributed or made available to the employee.

These provisions shall not affect the amount or benefits level of the retirement allowance, or the City of Detroit's obligation thereto.[88]

---

(b)   *Annuity Reserve Fund.* [131] The *Annuity Reserve Fund* shall be the fund, from which all annuities and benefits in lieu of annuities payable as provided in this Article, shall be paid. If a disability retiree is reinstated to active City service, the retiree's Annuity Reserve at that time shall be transferred from the *Annuity Reserve Fund* to the *Annuity Savings Fund* and credited to his or her individual account therein.

(c)   *Pension Accumulation Fund.* [132] The *Pension Accumulation Fund* shall be the fund in which shall be accumulated reserves for the pensions and other benefits payable from the contributions made by the City, and from which shall be paid pensions and other benefits on account of Members with prior service credit, and transfers as provided in this Section, Contributions to and payments from the *Pension Accumulation Fund* shall be made as follows:

(1)   Upon the basis of such mortality and other tables of experience and Regular Interest, as the Board shall adopt from time to time, the Actuary shall annually compute the amount of contributions, which, when made annually by the City during the entire prospective City service of Members without prior service credit, will be sufficient to provide the pension reserves required at the time the Members leave City employment, to cover the pensions to which they might be entitled or which might be payable because of their City employment. Upon the retirement of a Member without prior service credit, or upon a Member's death in the performance of duty, the *Pension Reserve Fund* for the pension or pensions to be paid on the Member's account shall be transferred from the *Pension Accumulation Fund* to the *Pension Reserve Fund.*

(2)   Upon the basis of such mortality and other tables of experience and regular interest as the Board shall adopt from time to time, the Actuary shall compute annually the pension reserve liabilities for pensions being paid to Retirees and Beneficiaries.

(3)   On an annual basis, the Board shall ascertain and report to the Mayor and the Council the amount of City contributions due to the System. The Council shall appropriate and the City shall pay such contributions during the ensuing Fiscal year. When paid, such contributions shall be credited to the *Pension Accumulation Fund.*

---

[88]   CET-1 (§ 48.O.), CBA-11 (§ 39.S.).

31

(4) If the amount appropriated by the City and paid to the System for any Fiscal year is insufficient to make the transfers and pay the pensions from the *Pension Accumulation Fund* as provided in this Section, the amount of such insufficiency shall be provided by the appropriating authorities of the City.

(d) *Accrued Liability Fund.* Pursuant to Ordinance No. 5-05, which authorizes the creation of the *Detroit General Retirement Service Corporation,* the City has entered into a transaction (the "Pension Funding Transaction") to obtain funds as an alternative to those available through the traditional funding mechanism described above in Subsection (c). The proceeds generated by the Pension Funding Transaction (or any Additional Pension Funding Transactions, as described below) that will be deposited into the System will be termed the "Funding Proceeds." The Funding Proceeds will be deposited into a new fund in the System to be called the *Accrued Liability Fund.* The purpose of the Funding Proceeds will be to fund all or part of the heretofore unfunded actuarial accrued liability ("UAAL") of the System, as determined as of a date certain, that is, the "Determination Date," pursuant to the System's actuarial valuation as of that date. The Funding Proceeds will be assets of the System and will be applied, together with all other assets of the System, to fund the System's obligation to pay accrued benefits.

This *Accrued Liability Fund* shall contain only the Funding Proceeds of this Pension Funding Transaction, and any earnings thereon. Should the City, by future ordinance, choose to raise additional moneys by additional pension funding transactions ("Additional Pension Funding Transactions") in order to fund the then existing UAAL of the System as of a future date certain, a new and separate *Accrued Liability Fund* shall be created within the System to contain the proceeds, and any earnings thereon, of any Additional Pension Funding Transactions, and a new *Accrued Liability Fund* will be created for each successive Additional Pension Funding Transaction undertaken by the City, if any. The treatment of any Additional *Accrued Liability Fund* shall be the same as described below:

(1) The Funding Proceeds deposited in the *Accrued Liability Fund* will be subject to the oversight and investment direction of the Board of Trustees of the General Retirement System, consistent with the Board's obligations under Section 47-2-20 (Management of Funds). The Board will invest the Funding Proceeds as part of the System's overall assets, and will not differentiate the Funding Proceeds from other System assets for investment purposes.

(2) All interest, dividends and other income derived from the investment of the Funding Proceeds shall be credited annually to the applicable *Accrued Liability Fund* on a total System rate of return basis determined by crediting the applicable *Accrued Liability Fund* with the investment return experienced by the System in total for all of its investments for the year. This shall be done by first determining the rate of return for the total assets in the System for the fiscal year, and then crediting back to each *Accrued Liability Fund* an amount that is determined by multiplying that rate of return times the balance in the *Accrued Liability Fund* as of the beginning of the fiscal year, less an amount obtained by multiplying one-half of the System's rate of return times the amount transferred to the *Pension Accumulation Fund* for that year. As provided in Section 47-2-18(g)of this Code, the interest, dividends and other income derived from the investment of the Funding Proceeds deposited in any *Accrued Liability Fund* are "other moneys" the disposition of which is specifically provided for in this Article, and these moneys will not be credited to the *Income Fund.* The interest, dividends and other income derived from the investment of the Funding Proceeds deposited in any *Accrued Liability Fund* will not be credited to any Funds other than the *Pension Accumulation Fund.*

(3) Upon the creation of the *Accrued Liability Fund* and the deposit of the Funding Proceeds into the applicable *Accrued Liability Fund,* there shall be established a schedule for transferring assets of the *Accrued Liability Fund* by crediting them to the *Pension Accumulation Fund* on a regular basis over the period required to fully amortize that portion of the System's UAAL determined as of the applicable Determination Date.

The System's UAAL determined as of the applicable Determination Date shall be the "Determined Accrued Liability." The period over which the Determined Accrued Liability is to be fully amortized, as specified in the System's actuarial valuation as of the applicable Determination Date, is the "Amortizing

Period." The amount to be transferred each fiscal year (or monthly portion thereof) to the *Pension Accumulation Fund* from the *Accrued Liability Fund* is the "Scheduled Amortizing Amount."

With respect to the Pension Funding Transaction and any Additional Pension Funding Transactions, the Scheduled Amortizing Amount will equal a level percentage of the City's monthly payroll during the fiscal year, as determined by the City's weekly payroll reports made available to the Board. The level percentage of the City's monthly payroll that will be used to determine the Scheduled Amortizing Amount will be a level percentage that is equal to the level percentage that is specified in the actuarial valuation as of the applicable Determination Date as being the percentage of the City's monthly payroll required to amortize the Determined Accrued Liability over the Amortizing Period multiplied by a fraction. The numerator of the fraction shall be the amount of the applicable Funding Proceeds up to the full amount of the Determined Accrued Liability as of the Determination Date. The denominator of the fraction shall be the System's Determined Accrued Liability on that date.

**Commentary:** By way of example only, the Scheduled Amortizing Amount would be determined as follows: (1) the Determination Date is June 30, 2004, (2) the Funding Proceeds are deposited into the System during the 2004-2005 Fiscal Year, (3) the June 30, 2004 actuarial valuation produced a UAAL of $800 million, (4) the City's contribution required to amortize that UAAL is 16% of the City's payroll, and (5) the Funding Proceeds are $600 million, then the Scheduled Amortizing Amount for Fiscal Year 2005-06 would be 16% times ($600 million/$800 million) times the City's payroll for 2005-2006. This would be 12% times the City's payroll for that fiscal year.

With respect to the Pension Funding Transaction, or any Additional Pension Funding Transactions, where the applicable Determination Date occurs after the date of the actuarial valuation that determines the City's contribution for the fiscal year during which the applicable Funding Proceeds are deposited into the System, for such fiscal year, there will be transferred from the applicable *Accrued Liability Fund* to the *Pension Accumulation Fund* an amount that is specified in such actuarial valuation as being the City's required contribution needed to amortize the System's UAAL as of the date of such actuarial valuation, multiplied by a fraction. The numerator of the fraction shall be the amount of the applicable Funding Proceeds up to the full amount of the UAAL specified in such actuarial valuation, and the denominator of the fraction shall be the System's total UAAL as set forth in that same actuarial valuation.

**Commentary:** By way of example only, the Scheduled Amortizing Amount in this case would be determined as follows: (1) the Determination Date is June 30, 2004, (2) the Funding Proceeds had been deposited into the System during the 2004-2005 Fiscal Year, (3) the June 30, 2003 actuarial valuation produced a UAAL of $733 million, (4) the City's contribution required to amortize that UAAL is 13.9% of the City's payroll, and (5) the Funding Proceeds are $600 million, then the Scheduled Amortizing Amount for Fiscal Year 2004-05 would be 13.9% times ($600 million/$733 million) times the City's payroll for 2004-2005. This would be 11.4% times the City's payroll for that fiscal year.

Should the Board at some future time adopt a different period for amortizing the System's UAAL (a "Revised Amortizing Period"), the Scheduled Amortizing Amount for ensuring years may change. If the Revised Amortizing Period provides for a longer period during which to amortize the System's UAAL (that is, an "Extended Amortizing Period"), then the Amortizing Period initially used to amortize the applicable Determined Accrued Liability will also be revised. There will then be established a new schedule for amortizing the Determined Accrued Liability, and the Scheduled Amortizing Amount will be based on the level percentage of the City's monthly payroll being equal to what it would be if the then unamortized balance of the Determined Accrued Liability were re-amortized over the Extended Amortizing Period. If the Revised Amortizing Period is changed so that the System's UAAL is to be amortized over a shorter period than the one initially used to amortize the applicable Determined Accrued Liability, then that Scheduled Amortizing Amount will not be changed.

(4)     Each year (or monthly portion thereof), when the City is required to make its regular contribution to the System — the amount of which is to be determined pursuant to Subsection (c) and the timing of which is set forth in Section 47-2-19(b) — the Board will transfer the Scheduled Amortizing Amount from the

*Accrued Liability Fund* and credit it to the *Pension Accumulation Fund;* provided, however, that this transfer cannot occur unless and the until the Board has been notified pursuant to the Pension Funding Transaction, or any Additional Pension Funding Transaction, if applicable, that the City is current on the service payments required under the applicable Pension Funding Transaction.

(5)  Should the Scheduled Amortizing Amount not be available for transfer because of the City's failure to make a timely service payment pursuant to the applicable Pension Funding Transaction, the Board will take any permitted action, including the filing of a civil action against the City, as contemplated in Section 47-4-3(3), to effectuate the transfer of the Scheduled Amortizing Amount.

Should the City's Finance Director certify to the Board by a duly attested notice that the City has no available funds to make the service payments required by the applicable Pension Funding Transaction, in that specific circumstance, the Board shall be authorized to transfer the Scheduled Amortizing Amount for that fiscal year (or monthly portion thereof) to the *Pension Accumulation Fund,* absent the notice requirement set forth in Section 47-2-18(d)(4).

(6)  Since the Funding Proceeds are to be considered assets of the System and are intended to fund the applicable Determined Accrued Liability, the City shall be required to make only a proportional contribution for any fiscal year (or monthly portion thereof) ending after the date the Funding Proceeds are deposited into the applicable Accrued Liability Fund, but prior to a fiscal year whose corresponding actuarial valuation includes the Funding Proceeds in the System's total assets. The proportional contribution to fund the System's then existing UAAL, if any, shall be the level percentage of the City's payroll specified in the actuarial valuation for the applicable fiscal year as the City's required contribution needed to amortize the System's then existing UAAL, multiplied by a fraction. The numerator of the fraction shall be the amount of the System's total UAAL as determined in such actuarial valuation minus the amount of the applicable Funding Proceeds, but not less than zero. The denominator of the fraction shall be the amount of the System's total UAAL in such valuation. Actuarial valuations following the deposit of the applicable Funding Proceeds into the System shall include the Funding Proceeds in the total assets of the System to determine any ensuing UAAL of the System, and the Funding Proceeds shall offset any such actuarial liability accordingly.

**Commentary:** By way of example only, the following indicates how the procedure described above would operate. Assume the following facts — (1) the Determination Date is June 30, 2004; (2) the June 30, 2004 actuarial valuation produced a UAAL of $800 million and a contribution toward the UAAL of 16% of the City's payroll; (3) the Funding Proceeds were $600 million and were deposited in the System during the 2004-2005 Fiscal Year; (4) the first actuarial valuation which included the Funding Proceeds in the System's assets was as of June 30, 2005 and (5) the June 30, 2003 valuation which determines the City's required contribution for fiscal 2004-05 produced a total UAAL of $733 million and a contribution toward that UAAL of 13.9% of the City's payroll. Then:

•    The fiscal year ending after the date of deposit would be the year ending June 30, 2005, or the 2004-2005 Fiscal Year.

•    The first fiscal year whose corresponding valuation reflected the Funding Proceeds in its assets would be the 2006-2007 year.

•    Thus, the City's required UAAL contribution for fiscal 2004-2005 would be 13.9% of the City's payroll times ($733 million — $600 million) divided by $733 million, or 2.5% of payroll. The City's required UAAL contribution for fiscal 2005-06 would be 16% of the City's payroll times ($800 million — $600 million) divided by $800 million, or 4% of the City's payroll.

•    Beginning with the Fiscal Year 2006-2007, whose contribution is determined by the June 30, 2005 actuarial valuation, the City's required UAAL contribution would be the percentage of its payroll developed in the corresponding actuarial valuation that included the Funding Proceeds as being part of the System's assets.

(7)  Any contribution the City has made to the System for any fiscal year during which the Funding Proceeds from any applicable Pension Funding Transaction have become assets of the System. Where the amount

of the contribution is equal to or less than the normal cost of that fiscal year, the City's contribution shall be deemed to have been made in satisfaction of its obligation to contribute an amount equal to the System's normal cost for that fiscal year, and not as payment towards any portion of its obligation to pay an amortized portion of the System's UAAL due in that fiscal year. The term "normal cost" as used in this Section 47-2-18(d)(6), shall be given its generally accepted actuarial meaning.

To the extent the City's contribution for that fiscal year exceeds its required contribution for normal cost owed in that fiscal year, its excess contributions shall be deemed as having been made for the immediately following fiscal year, and shall offset the City's normal cost contribution obligation for the immediately following fiscal year.

**Commentary:** By way of example only, the following indicates how the procedure described in the preceding paragraphs would operate. Assuming the same facts as in the prior *Commentary,* and the City contributed $40 million for the 2004-2005 Fiscal Year and the total normal cost for that year was $40 million:

- The entire $40 million would be deemed as payment of the required normal cost for 2004-2005, and

- No part of the $40 million contribution would be deemed payment toward UAAL.

Now assume that the facts remain the same, but that the City had contributed a total of $45 million for 2004-2005:
- The City's total required contribution for 2004-2005 would be deemed paid in full, and

- $5 million, that is, $45 million minus $40 million, would be deemed prepayment of the City's required normal cost for 2005-2006 and its required normal cost contribution for 2005-2006 would be reduced accordingly.

(8) The System's auditor shall verify (a) the assets credited to the *Pension Accumulation Fund* and any *Accrued Liability Fund* at the beginning and end of each fiscal year, (b) that each Fund had been properly credited, and (c) that transfers from the *Accrued Liability Fund(s)* to the *Pension Accumulation Fund* had occurred as intended under this Section 47-2-18(d) of this Code.

(9) Should the System's auditor certify that the total assets then existing in the System, not including the assets in any *Accrued Liability Fund,* together are insufficient to pay the benefits then due under the System, the System's auditor will then determine and certify the minimum amount needed to fund the benefits then due and owing (the "Minimum Necessary Amount"). In this limited circumstance, the Board is authorized to transfer the Minimum Necessary Amount from the *Accrued Liability Fund* to the *Pension Accumulation Fund* absent the notification required pursuant to Section 47-2-18(d)(4) of this Code.

(10) At the end of the Amortizing Period, or the end of the Extended Amortizing Period, if applicable, should there be any moneys that remain credited to the *Accrued Liability Fund,* the Board may transfer, at its discretion, any such remaining moneys, in whole or in part, by crediting them to the *Pension Accumulation Fund.* The *Pension Accumulation Fund* is the only Fund into which the remaining moneys credited to any *Accrued Liability Fund* may be transferred.

(e) *Pension Reserve Fund.*[133] The *Pension Reserve Fund* shall be the fund from which pensions shall be paid to beneficiaries. Should a Disability Retiree be reinstated to active service, the Retiree's pension reserve at that time, shall be transferred from the *Pension Reserve Fund* to the *Pension Accumulation Fund.*

(f) *Expense Fund.*[134] The *Expense Fund* shall be the fund to which shall be credited all money provided by the City to pay the administrative expenses of the Retirement System, and from which shall be paid all the expenses necessary in connection with the administration and operation of the System.

(g) *Income Fund.*[135] The *Income Fund* shall be the Fund to which shall be credited all interest, dividends, and other income derived from the investments of the System (other than those derived from the investments

35

credited to any *Accrued Liability Fund*), all gifts and bequests received by the System, and all other moneys the disposition of which is not specifically provided for in this Article. There shall be paid or transferred from the *Income Fund,* all amounts required to credit Regular Interest to the various Funds of the Retirement System, except for the *Accrued Liability Fund* which is to be credited with interest, dividends and other earnings pursuant to Section 47-2-18(d)(2) of this Code in accordance with the limitations that are contained in Section 47-1-18 of this Code.

(h)     Maintenance of Reserves.[136]

   (1)   The maintenance of proper reserves in the various Charter-based funds of the Retirement System within this *Article II* except the *Expense Fund* are hereby made obligations of the *Pension Accumulation Fund.*

   (2)   City contributions to the Retirement System to the extent necessary to provide pensions on account of members who are employees of a revenue-supported division of the City shall be made from the revenues of the said division. Any City contribution to the Retirement System from any Fund by law with a certain and definite purpose shall at the direction of the Finance Director, be accounted for separately.

   (Ord. No. 29-01, § 1, 11-30-01; Ord. No. 03-05, § 1, 2-4-05; Ord. No. 37-11, § 1, 11-29-11)

## Sec. B-19.   [Formerly Sec. 47-2-19. Determination of City's annual contribution.[137]]

   The annuity and pension reserve liabilities for members, retirees, and beneficiaries, shall be actuarially evaluated as set forth in this Article for each division as is accounted for separately pursuant to Section 47-2-18(g)(2) of this Code.

(a)     Pension Liabilities.[138]

   (1)   The pension liabilities for members shall be determined using the entry age-normal cost method of actuarial valuation.

   (2)   The City's annual contribution, expressed as a percentage of active member compensation, to finance the prospective pension liabilities shall be determined by dividing the total cost of the individual annual normal costs of the active members by the active members' annual compensation used in the valuation.

   (3)   The City's annual contribution to finance any unfunded accrued pension liabilities, expressed as a percentage of active member compensation, shall be determined by amortizing such unfunded accrued pension liabilities as a level percentage of covered payroll over a period or periods of future years as established by the Board.

(b)     *Pension Accumulation Fund.[139]* Based upon the provisions of this Article including any amendments, the Board of Trustees shall compute the City's annual contributions to the Retirement System, expressed as a percentage of active member compensation each fiscal year, using actuarial valuation data as of the June thirtieth date which date is a year and a day before the first day of such fiscal year. The Board shall report to the Mayor and Council the contribution percentages so computed. Such contribution percentages shall be used in determining the contribution dollars to be appropriated by Council and paid to the Retirement System. Such contribution dollars shall be determined by multiplying the applicable contribution percentage for such fiscal year by the member compensation paid for such fiscal year. Such contribution dollars for each fiscal year shall be paid to the Retirement System in such fiscal year in a manner to be agreed upon from time to time by the Board and the City, provided, for any fiscal year for which the agreement has not been reached before the first day of such fiscal year, such contribution dollars shall be paid in equal monthly installments at the end of each calendar month in such fiscal year.

   (Ord. No. 29-01, § 1, 11-30-01; Ord. No. 37-11, § 1, 11-29-11)

36

### Sec. B-20. [Formerly Sec. 47-2-20. Management of Funds.[140]]

(a) *Board Named Trustee for Various Funds.*[141] The Board shall be the Trustee of the funds of the *1973 Defined Benefit/Defined Contribution (Annuity) Plan* of the Retirement System, the Board shall have the full power to invest and reinvest such funds subject to all terms, conditions, limitations, fiduciary duties, and restrictions imposed by *The Public Employee Retirement System Investment Act,* as amended[142], provided, that notes, bonds, or obligations of the City shall not be subject to said restrictions or limitations. The Board shall have the power to purchase notes, bonds, or obligations of the City before or after the same are offered to the public and with or without advertising for bids.

(b) *Purchase, sale, etc., of securities and investments.*[143] The Board shall have full power to hold, purchase, sell, assign, transfer, and dispose of any of the securities and investments of the Retirement System, as well as the proceeds of said investments and any moneys belonging to the System.

(c) *Annual interest.*[144] The Board annually shall allow Regular Interest on the mean balance in each of the Funds of the Retirement System, except the *Income Fund* and the *Expense Fund.* The amounts so allowed shall be due and payable to said Funds, and shall be annually credited thereto from interest and other earnings on the moneys and investments of the System; provided, however, that moneys, including all investment earnings, credited to any *Accrued Liability Fund* shall not be credited to other Funds in the System, unless and until such moneys have been transferred from the applicable *Accrued Liability Fund* to the *Pension Accumulation Fund.*

(d) *Custodian of Funds.*[145] The City Treasurer or other person or entity designated by the Board of Trustees of the General Retirement System shall be the custodian of the Funds of the Retirement System. All payments from such Funds shall be made by the Treasurer or other designated custodian. Payments made by the *General Retirement System* shall be based upon vouchers signed by two persons designated by the Board. A duly attested copy of a resolution of the Board designating such persons and bearing upon its face specimen signatures of such persons, shall be filed with the Finance Director and the custodian of the Funds as their authority for making payments upon such vouchers. No voucher shall be drawn unless it shall have been previously authorized by a specific or continuing resolution adopted by the Board.

(e) *Available Funds shall be kept upon deposit.*[146] Available funds shall be kept on deposit for the purpose of meeting disbursements for pensions, annuities, and other payments.

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 03-05, § 1, 2-4-05)

### Sec. B-21. [Formerly Sec. 47-2-21. Detroit Housing Commission Employees; Transfer of Pension Accumulation Funds to the Municipal Employees Retirement System.]

(a) Pursuant to MCL 125.651, and action by the City of Detroit as interpreted by the Michigan Courts,[162] the "City of Detroit Housing Commission" has been reconstituted as a separate and distinct legal entity, the "Detroit Housing Commission" ("new entity");

(b) City employees previously assigned to the "City of Detroit Housing Commission" ("old entity") had a right to make an election whether to remain as a City of Detroit employee or leave City employment for employment with the separate and distinct legal entity "Detroit Housing Commission" ("new entity");

(c) Former City employees previously assigned to the "City of Detroit Housing Commission" ("old entity") who have made an election to remain with the new entity "Detroit Housing Commission" terminated their employment with the City of Detroit upon becoming an employee of the new independent entity "Detroit Housing Commission;"

37

(d) Those former City of Detroit Housing Commission employees were participants in the City of Detroit *1973 Defined Benefit Plan* and were eligible to participate in the *Defined Contribution (Annuity) Plan* of the *General Retirement System* (DGRS);

(e) Each former City of Detroit Housing Commission employee as a participant in the City of Detroit *1973 Defined Benefit Plan* accrued certain potential rights to *Defined Benefit Plan* benefits;

(f) The "Detroit Housing Commission" ("new entity") has arranged for the Municipal Employees Retirement System ("MERS") to be the provider of a pension system for its employees;

(g) The current Detroit Housing Commission ("new entity") employees, including former City employees, are now participants in the Municipal Employees Retirement System ("MERS");

(h) The City of Detroit, subject to certain conditions, has agreed to the transfer of the actuarial value of the accrued *Defined Benefit* of each such former City employee who elected to become an employee of the new independent "Detroit Housing Commission" to the Municipal Employees Retirement System.

(i) The conditions of such transfer of funds contemplated in paragraph (h) above are:

   (1) The benefits for such employees have been 100% funded in the *1973 Defined Benefit Plan* of the General Retirement System of the City of Detroit.

   (2) Upon the transfer of said funds to the MERS from the *1973 Defined Benefit Plan* of the City of Detroit, such former City employees will have no claims whatsoever to pension benefits from the General Retirement System of the City of Detroit or the City of Detroit.

   (3) Each such former employee must sign a Waiver and Acknowledgment (the content of which is subject to approval of the Board of Trustees of the General Retirement System of the City of Detroit) consistent with the terms of this ordinance.

   (4) Present value calculations and methodology shall be approved by the Board of Trustees of the General Retirement System after consultation with its actuary.

   (5) All questions/issues related to the implementation of this ordinance shall be determined by the Board of Trustees of the General Retirement System of the City of Detroit consistent with the terms of this ordinance.

(Ord. No. 06-06, § 1, 2-17-06)

## Sec. B-22. [Formerly Sec. 47-2-22. Participant loan program.]

(a) *Established.* Any loans granted or renewed shall be made pursuant to a Participant Loan Program which shall conform with the requirements of Section 72(p) of the Internal Revenue Code, 26 U.S.C. 1 et seq. Such loan program shall be established in writing by the Board of Trustees, and must include, but need not be limited to the following:

   (1) The identity of the administrator of the Participant Loan Program;

   (2) A procedure to apply for loans, the amount of loan that will be approved or denied, and limitations, if any, on the types and amount of loans offered;

   (3) The procedures under the program for determining a reasonable rate of interest; and

   (4) The events constituting default and the steps that will be taken to preserve plan assets.

38

(b)    The Loan Program.

    (1)    This Loan Program shall be contained in a separate written document copies of which shall be made available in the offices of the City of Detroit General Retirement System for prospective participants in the program. The Board of Trustees is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of this program. Copies of the rules shall also be made available to prospective participating members of the system in the offices of the General Retirement System; and

    (2)    All collective bargaining agreements which accept the terms of this section are specifically agreeing to be subject to the Boards authority to modify or amend the Participant Loan Program from time to time, including during the effective terms of the applicable labor agreement and no such modification or amendment shall be deemed a violation of said labor agreement and no grievance or other form of action shall be effective to overturn or alter the Boards decision.

(c)    *Eligibility.* Subject to rules and procedures established by the Board, loans will initially be made only to non-union participants of the General Retirement System. Union employees will be eligible when their respective bargaining unit has accepted the program.[tt] Former participants, spouses of participants, and beneficiaries are not eligible to receive any loans from the Plan. Subject to rules and procedures established by the Board, a participant who has been in the plan for twelve (12) months or more is eligible to apply for a loan from this plan.

(d)    *Amount of Loan.* A participant who has satisfied applicable rules and procedures may borrow from his or her account an amount, which does not exceed fifty percent (50%) of the participants vested accumulated balance, or ten thousand dollars ($10,000.00) reduced by the excess, if any, of: 1) the highest outstanding balance of loans from the trust during the one (1) year period ending on the day before the date on which the loan is made, or 2) the outstanding balance of loans from the trust on the date on which the loan is made, whichever is less. The minimum loan amount shall be one thousand dollars ($1,000.00).

(e)    *Terms and Conditions.* In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

    (1)    Loan applications shall be in writing;

    (2)    Loans shall be repaid by equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years. In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two-week period;

    (3)    Each loan shall be made against the assignment of the participants entire right, title, and interest in and to the trust, supported by the participants collateral promissory note for the amount of the loan, including interest payable to the order of the trustee;

    (4)    Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among participants in its determination of interest rates on loans. Loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the pension systems current assumed rate of return. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the pension trust of administering the trust. The loan interest rate shall be calculated in a manner that will not negatively affect the City's costs to the trust or the return to trust members;

---

[tt] The following bargaining units have accepted the annuity loan program: CBA-3 (§ 53.), CBA-6 (§ 44.), CBA-7 (§ 44.), CBA-8 (§ 40.), CBA-9 (§ 43.), CBA-10 (§ 48.).

(5) Loan repayments shall be suspended under this plan as permitted by Section 414(u)(4) of the Internal Revenue Code, 26 U.S.C. 414(u)(4). A participant who has an outstanding loan balance from the plan who is absent from employment with the employer, and who has satisfied the requirements of 26 USC 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the fund during said periods of absence.

(f) *Renewal of Loan.* Any loans granted or renewed shall be made pursuant to the participant loan program and Section 72(p) of the Internal Revenue Code, 26 U.S.C. 72(p) and the regulations thereunder.

(g) *Loan Balance.* A participants outstanding loan balance shall be considered a directed investment by the participant and interest payments, shall be credited to the participants account balance, and shall not be part of net investment income or part of the participants account balance for the purpose of allocation of net investment income under Section 47-2-18 of this Code.

(h) *Distributions.* No distributions shall be made to a participant, former participant, or beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been liquidated.

(i) *Annual Report.* The General Retirement System shall include, in their annual report to all members, an accounting of the loan program established by this section, which contains the number and amount of loans made, the costs of administering the program, the amount of payments made including interest received by the trust, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in that fiscal year covered the costs of administering the program.

(Ord. No. 17-08, § 1, 7-29-08)

**[Formerly Secs. 47-2-23—47-2-30. Reserved.]**

**ARTICLE C. [FORMERLY ARTICLE III. 1998 DEFINED CONTRIBUTION PLAN OF THE GENERAL RETIREMENT SYSTEM.] [**]**

*** Note: The 1998 Defined Contribution Plan of the General Retirement System was never implemented by the City of Detroit.*

### Sec. C-1.[Formerly Sec. 47-3-1. Funds.]

The Funds of the Retirement System *1998 Defined Contribution Plan* shall be the *Employee Contribution Account,* the *Employee Rollover Account,* the *Employer Contribution Account,* the *Annuity Savings Account,* and such other accounts as may become necessary from time to time.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. C-2. [Formerly Sec. 47-3-2. Definitions.]

Definitions contained in this Article shall not be construed as amending or repealing existing definitions contained in Section 47-1-21 of this Code unless specified herein. For purposes of this *Article III* only, the following words and phrases shall have the meanings respectively ascribed to them by this Section 47-3-2 of this Code.

*Accumulated balance* means the total of all accounts maintained on behalf of a participant, former participant, or beneficiary.

*Actuarial present value of credited benefits* means the present value of pension benefits determined as if the member had terminated *DGRS* membership on the measurement date. The calculation of the actuarial present value of benefits shall be based solely on interest and mortality assumptions approved by the Board after consideration of the advice of the System's Actuary.

*Administrative Rules of the plan* means the rules and regulations established and adopted from time to time by the Board of Trustees to govern the administration and the operation of this plan and the trust.

*Annual additions* means for each limitation year, which is the calendar year, all employer or employee contributions to the plan (including after-tax employee contributions but excluding rollover contributions), forfeitures, contributions, allocated to an individual medical account described in Section 415(l)(2)[147] of the Internal Revenue Code and amounts described in Section 419A(d)(2)[148] of the Internal Revenue Code.

*Annuity Savings Account* means the account established for a participant with respect to such participant's interest, in the plan as a result of the participant's election to transfer his annuity savings fund balance from the *1973 Defined Benefit/Defined Contribution Plan* to this plan pursuant to Section 47-3-3 of this Code.

*Beneficiary* means a person or persons designated by a participant or former participant in a writing filled with the Board to receive distribution of the accumulated balance in the event of the death of the participant or former participant, subject to the terms and conditions of Section 47-3-9(b) of this Code.

*Coverage group* means all elected and appointed officials of the employer as defined in Section 47-3-21 of this Code, all non-union employees as defined in Section 47-1-21 of this Code, as well as any other employees who are members of a bargaining unit represented by a union or association if such union or association has agreed to offer its members the option of belonging to the current *Article II* Plan or the *1998 Defined Contribution Plan* established under this Article III.

*Defined Contribution Plan Implementation Date* means that date after the *1998 Defined Contribution Plan* is established on which the Plan is open for participation by eligible members.

*Designated Component Funds* means asset allocation funds set up by the trustee which invests participant funds, until the participant elects specific investment funds.

*Effective Date of the 1998 Defined Contribution Plan means July 1, 1998, See, Defined Contribution Plan Implementation Date.*

41

*Employee Contribution Account* means the account established for a participant with respect to such participant's interest in the Plan resulting from the participant's contributions made pursuant to Section 47-3-5 of this Code.

*Employee Contributions—"Picked Up" by the Employer.* Employee contributions are "picked up" by the employer if: (1) the employer specifies that the contributions, although designated as employee contributions, are being paid by the employer in lieu of contributions by the employee, and (2) the employee cannot be given the option of choosing to receive the contributed amounts directly instead of having them paid by the employer to the plan.

*Employee Rollover Account* means the account established for a participant with respect to such participant's interest in the Plan resulting from transfers from other qualified plans pursuant to Section 47-3-7 of this Code.

*Employer,* for the purposes of the provisions of this *Article III* Plan, means the City, or any board, commission, or court serving the City, to the extent that the City through action of its council and the governing authority of such Board, commission, or court, shall mutually agree to include the employees of such Board, commission, or court, in the Coverage Group for this plan. To the extent that any employees of a Board, commission, or court, are included as members of the Coverage Group for this Plan, all employees of such board, commission, or court, shall be so included. However, only City board members and commissioners who are also employees of the City are eligible to be included in the coverage group of this plan, unless otherwise specifically provided for by ordinance or resolution adopted by the Council.

*Employer Contribution Account* means the account established for a participant with respect to such participant's interest in the Plan resulting from employer contributions made pursuant to Section 47-3-4 of this Code and from the participant's election to transfer the actuarial present value of credited benefits of such individual from the *1973 Defined Benefit/Defined Contribution Plan* to this Plan pursuant to Section 47-3-3 of this Code.

*Fiduciary* means the Board of Trustees or the Fund Financial Investment Trustee.

*Financial Investment Trustee* means the Trustee approved by the Board of Trustees, or such successor Trustee as selected by that Board, which shall be responsible for the investment, management and control of the assets of the trust.

*Former Participant* means an individual who is no longer eligible to be a participant.

*Measurement date* means the date of the member's termination or transfer from the *1973 Defined Benefit Plan* to the *1998 Defined Contribution Plan.*

*Participant* means an employee who is a member of the coverage group and who has satisfied the requirements of Section 47-3-3 of this Code.

*Plan* means the *1998 Defined Contribution Plan* of the City of Detroit General Retirement System.

*Plan Year* means the City's fiscal year.

*Resignation* means, for all purposes in this *Article III,* in the case of an elected or appointed official, resignation from office, or the expiration of the term of office or of the appointment.

*Termination of employment* means, for all purposes in this *Article III,* in the case of an elected or appointed official, any circumstance which results in separation of the official from the elected or appointed office, whether voluntary or involuntary, including voluntary resignation, expiration of the term of office or of the appointment, involuntary termination of employment or office or forfeiture of office.

*Trust* means the City *Defined Contribution Retirement Trust* maintained in accordance with the terms of the Trust Agreement, as amended, which constitutes part of this plan.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. C-3.  [Formerly Sec. 47-3-3. Participation.]

(a)    Election of the Plan. Current DGRS members.

42

(1)     Any member of the *DGRS* who is also a member of the Coverage Group and who continues to be a member of the Coverage Group may become a participant in the *1998 Defined Contribution Plan* if such individual elects to transfer to the Trust of the Plan, both the *Annuity Savings Fund* balance and the actuarial present value of credited benefits of such individual under the *1973 Defined Benefit/Defined Contribution (Annuity)* Plan. Such irrevocable election must be made within twenty-four months of the implementation date of the *1998 Defined Contribution Plan.* The Annuity Savings Fund balance and the actuarial present value of credited benefits of an individual under the 1973 Defined Benefit/Defined Contribution Plan who elects to make a transfer to this Plan shall be transferred to this Plan on a date which shall in no event be later than one hundred and twenty days after receipt of the individual's written election by the Board; provided, however, that such individual shall become a participant in this Plan as soon as administratively feasible following receipt of the Individual's written election by the Board.

(2)     The actuarial present value of credited benefits shall be calculated based upon the interest and mortality assumptions utilized at the date of such transfer upon the advice of the System's Actuary for purposes of determining the employer's annual contribution to the *1973 Defined Benefit/Defined Contribution Plan.* The actuarial present value of the participant's credited benefits under the *1973 Defined Benefit/Defined Contribution Plan* shall be transferred to the participant's Employer Contribution Account under this Plan and the participant's *Annuity Savings Fund* balance under the *1973 Defined Benefit/Defined Contribution Plan* shall be transferred to the participant's *Annuity Savings Account* under this Plan. After any such transfer to this Plan, the participant's account balances shall be subject to the vesting schedules set forth in Section 47-3-8

(b)     *Current DGRS Members; Annual election period.* Each calendar year following the implementation date of the *1998 Defined Contribution Plan,* the Board of Trustees shall establish at least one election period for that year during which any member of the *DGRS* who is also a member of the Coverage Group may elect to become a participant in the *1998 Defined Contribution Plan;* such election must be made within twenty-four (24) months of the implementation date.

(c)     Election of the Plan. Members who separated from City service on or after July 1, 1998 with vested Article II pension rights. Any person who separated from City service with vested Article II pension rights on or after July 1, 1998, but prior to the implementation of the Plan, may become a participant in this Plan if such individual elects to transfer to the Trust of this Plan, both the Annuity Savings Fund Balance on the date of transfer, and the actuarial present value of the 1973 Defined Benefit Plan credited benefits as of the date of the member's transfer to this Plan, as if such individual were a member of the Coverage Group under (a) above. The Pension Board shall notify each former member of his or her eligibility for the Plan by certified mail. A former member's election to become a participant in the Plan must be made within six months after verification of the receipt of notice by the former member. Such election shall be irrevocable.

(d)     Election of the Plan. Members who separated from City service on or after July 1, 1998, but prior to the implementation of the Plan, without vested pension rights under Article II. Any person who separated from City service on or after July 1, 1998, but prior to the implementation of the Plan, without vested pension rights under Article II, may become a participant in this plan if such individual elects to transfer to the trust of this Plan, both the Annuity Savings Fund balance on the date of transfer and the actuarial present value of the 1973 Defined Benefit Plan credited benefits, as of the date of the member's transfer to this Plan as if such individual were a member of the Coverage Group under (a) above. The Pension Board shall notify each former member of his or her eligibility for the Plan by certified mail. A former member's election to become a participant in the Plan must be made within six months after verification of the receipt of notice by the former member. Such election shall be irrevocable.

(e)     Employees hired on or after the date of implementation of the Plan.

        *"Election period."* A person who becomes or again becomes a member of the Coverage Group on or after the date of the implementation of the *1998 Defined Contribution Plan* may elect to participate in the *1973 Defined Benefit/Defined Contribution (Annuity) Plan* or the *1998 Defined Contribution Plan.* Such election to participate in the 1998 Defined Contribution Plan may be made at date of hire or during enrollment periods held during the participant's first two years of employment with the City ("Election Period"). Such election shall be irrevocable.

43

Participant shall be a member of the 1973 Defined Benefit/Defined Contribution (Annuity) Plan until or unless an election is made to participate in the 1998 Defined Contribution Plan during the enrollment period.

*Employer* and employee contributions made on the participant's behalf to the *1998 Defined Contribution Plan* shall be invested in the designated component fund(s) until such participant has chosen the investment vehicles in which his or her contributions will be invested. If no such choice is made within six months after the effective date of the participant's participation in the *1998 Defined Contribution Plan,* such contributions shall remain invested in the designated component fund(s) until an appropriate change is processed by the member.

(f)    *Non-eligibility for participation in the Plan.* The following individuals shall not be eligible for participation in the Plan:

(1)    *Contractual services.* Individuals whose services are compensated pursuant to a personal services contract or on another contractual or fee basis, and who are not members of the Classified Service[149] or elected or appointed to City positions as provided for in the 1997 Detroit City Charter.

(2)    *Insufficient annual hours worked.* Individuals who are employed in positions normally requiring less than six hundred (600) hours of work per annum[150] or any other minimum hour requirement provided by collective bargaining agreements, as appropriate.

(3)    *Retirees.* Individuals who are retirees of the City of Detroit General Retirement *Article II* Pension Plan who return to employment with the City after a break in service of less than six years. However, vested *Article II* retirees returning to work after a break of more than six years of service, may enroll in this *Article III* Pension Plan with no loss of *Article II* Pension Plan benefits.

(4)    *Members of other public employee plans.* Individuals who are members of any other public employee pension or retirement plan adopted by the State of Michigan, other than the Michigan National Guard, or any of its political sub-divisions, unless there is a reciprocity agreement between the city and such entities.

(g)    *Simultaneous participation in other plans prohibited.* On or after the date of implementation of the *1998 Defined Contribution Plan,* a participant shall not take part in any other retirement plan for simultaneous service rendered to the employer unless otherwise provided for in an applicable collective bargaining agreement. This prohibition does not apply to deferred compensation plans established pursuant to Section 457 of the Internal Revenue Code.

(h)    Termination of participation in Plan.

(1)    *Retirement, death, or termination of employment.* A participant who retires from active service, is terminated from city employment, dies, or becomes ineligible to participate, shall become a former participant beginning on the day immediately following the event that caused the ineligibility.

(2)    *Termination for reasons other than duty disability; Re-employment.* Subject to the provisions hereinafter stated in this subpart, if an employee terminates employment and ceases to be a participant for any reason other than duty disability, any service previously credited to the employee for purposes of vesting shall be disregarded. In the event of re-employment by the City as a member of the coverage group, such person shall again become a participant. If such re-employment occurs within a period of six years from and after the date city employment was terminated, prior service shall be restored for vesting purposes during the period of such re-employment. However, such vesting service shall only apply to employer contributions made on behalf of such employee subsequent to the date of re-employment. Vesting service credited after the employee's re-employment shall not be applied to increase his or her vested percentage in his or her pre-break *Employer Contribution Account.*

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 37-03, § 1, 11-7-03)

44

Members of the bargaining unit shall have the option of belonging to the City's current defined benefit/defined contribution retirement plan or a new defined contribution retirement plan in accordance with the rules the City will issue for a defined contribution plan. **[All employees hired on or after February 16, 2010 (Local 531) and March 9, 2010 (Local 488) shall be enrolled in the General City Retirement System Defined Contribution Plan (DCP).[uu]]** The parties agree that the defined contribution plan the Executive Branch will propose for acceptance by the City Council, although not specifically detailed at this time, is intended to be primarily in accordance with the provisions which were last advocated by the Executive Branch in November-December, 1997.[vv]

---

To the extent that employees in the bargaining unit participate in any supplemental retirement plans other than the General City Retirement System, the City reserves the right to withdraw from such supplemental plans at any time and in accordance with applicable law.[ww]

---

Members of the bargaining unit shall have the option of belonging to the City's 1998 defined contribution retirement plan until such time as the City discontinues that option or establishes a replacement defined contribution plan in accordance with the rules of the City.[xx]

---

Employees hired prior to July 1, 2012 may remain in the City's defined benefit program as described in the bargaining agreement. Effective July 1, 2012 **[or Effective the first payroll after ratification of this agreement[yy]]**, the employee, if he/she elects to remain in the defined benefit program shall make a pre-tax contribution of five percent (5%) to the defined benefit plan.

The employee may elect a voluntary, irrevocable conversion to the defined contribution plan described in the collective bargaining agreement. Existing vested employer and employee contributions shall be converted to the employee's account in the defined contribution plan. The conversion shall be calculated based upon the actuarial standard described in the 1998 Ordinance.

DWSD's contribution shall be six percent (6%) of the employee's base salary. The employee's contribution shall be voluntary. If the employee elects to make a contribution, it shall be matched by DWSD dollar for dollar up to a maximum of three percent (3%) of the employee's base salary. This matching contribution by DWSD shall be in addition to its contribution of six percent (6%).[zz]

---

Employees hired on or after July 1, 2012 shall not be enrolled in the City's defined benefit plan, but shall be enrolled in a defined contribution plan **[established by the 1998 ordinance[aaa]]**.[bbb] **[DWSD's contribution and the employee's contribution shall each be five percent (5%) of the employee's base salary.[ccc]]**

---

[uu]     CBA-6 (§ 26.Q.).

[vv]     CBA-3 (§ 26.O.), CBA-4 (§ 15.P.), CBA-5 (§ 20.Q.), CBA-6 (§ 26.Q.), CBA-7 (§ 26.P.), CBA-8 (§ 25.O.), CBA-9 (§ 31.Q.), CBA-10 (§ 33. P.), CBA-11 (§ 39.Q.), CET-1 (§ 48.R.), Reopener-1 (§ 31.Q.), Reopener-2 (§ 25.O.), Reopener-4 (§ 20.Q.).

[ww]    CET-1 (§ 48.T.).

[xx]    CBA-1 (§ 43.O.), CBA-2 (§ 35.O.), CET-2 (§ 47.N.).

[yy]    CBA-10 (§ 33.U.), Reopener-3 (§ 39.T.).

[zz]    CBA-3 (§ 46.T.), CBA-4 (§ 15.S.), CBA-5 (§ 20.V.), CBA-6 (§ 26.U.), CBA-7 (§ 26.T.), CBA-8 (§ 25.T.), CBA-9 (§§ 31.W., 31.X., & 31.Y.), CBA-10 (§ 33.U.), Reopener-2 (§ 25.T.), Reopener-3 (§§ 39.T. & 39.Q.), Reopener-4 (§ 20.V.).

[aaa]     CBA-4 (§ 15.T.), CBA-5 (§ 20.U.), CBA-6 (§ 26.T.), CBA-7 (§ 26.S.), CBA-8 (§ 25.S.), CBA-9 (§ 31.U) Reopener-2 (§ 25.S.), Reopener-3 (§ 39.X.), Reopener-4 (§ 20.U.).

**[DWSD's contribution shall be six percent (6%) of the employee's base salary. The employee's contribution shall be voluntary. If the employee elects to make a contribution, it shall be matched by DWSD dollar for dollar up to a maximum of three percent (3%) of the employee's base salary. This matching contribution by DWSD shall be in addition to its contribution of six percent (6%).<sup>ddd</sup>]**

---

### Sec. C-4.  [Formerly Sec. 47-3-4. Employer Contribution Account.]

(a)　*Basic Employer Contributions.* The employer shall contribute an amount equal to six percent (6%) of the participant's compensation to each participant's *Employer Contribution Account* each pay period. For members on duty disability, the amount contributed shall be equal to six percent (6%) of the participant's final compensation on the date of disability. For members receiving Workers' Compensation who are not on an approved disability retirement, the amount contributed shall be equal to six percent (6%) of the participant's base pay. Such contributions shallcontinue until the participant would have been eligible to convert to normal retirement benefits under Section 47-2-4 of this Code. City contributions to participants who are employees of a revenue-supported division of the City shall be made from the revenues of such division.

(b)　*Matching contributions.* On behalf of each participant who makes a basic employee contribution as described in Section 47-3-5(a) of this Code, the employer shall make a matching contribution of one hundred percent of such participant's basic employee contribution to a maximum of three percent (3%) of compensation contributed to the plan by the participant. The matching contribution shall be made in accordance with the rules and procedures established by the Board.

(c)　*Periods of absence due to non-duty disability.* The employer shall not make any basic employee contributions for persons on non-duty disability.

(d)　*Forfeiture.* Except in the event of retirement under Section 47-3-10(A)(1) of this Code, duty disability or death, to the extent a participant, former participant or beneficiary is not vested in any part of his or her *Employer Contribution Account* under Section 47-3-8 of this Code, the right of a participant, former participant, or beneficiary to a distribution of some or all of the *Employer Contribution Account* balance is subject to forfeiture pursuant to the *Public Employee Retirement Benefits Forfeiture Act,* as amended, MCL 38.2701 *et seq.* In the event that any account balances are forfeited, the amounts so forfeited shall be used to offset past or future expenses of the Plan. To the extent that forfeitures exceed the expenses to be settled for a given Plan Year, such excess forfeitures shall be used to offset the City's contribution to the Plan for the Plan Year. To the extent excess forfeitures are available after offsetting the City's contribution for the Plan Year, the Board shall allocate such excess to the participant accounts in proportion to the compensation of each participant for that Plan Year.

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 37-03, § 1, 11-7-03)

### Sec. C-5.  [Formerly Sec. 47-3-5. Employee Contribution Account.]

(a)　*Basic employee contributions which are matched by the employer.* At the time the Participant elects to participate in the 1998 Defined Contribution Plan pursuant to Section 47-3-3(a) or (d), a participant may elect to make a basic pre-tax contribution of zero, one, two or three percent (0%, 1%, 2%, 3%) of compensation. Such election shall be irrevocable and the basic employee contribution shall be made each year to such

---

<sup>bbb</sup>　　CBA-4 (§ 15.T.), CBA-5 (§ 20.U.), CBA-6 (§ 26.T.), CBA-7 (§ 26.S.), CBA-8 (§ 25.S.), CBA-9 (§ 31.U) CBA-10 (§ 33.T.), Reopener-2 (§ 25.S.), Reopener-3 (§ 39.X.), Reopener-4 (§ 20.U.).

<sup>ccc</sup>　　CBA-10 (§ 33.T.).

<sup>ddd</sup>　　CBA-4 (§ 15.T.), CBA-5 (§ 20.U.), CBA-6 (§ 26.T.), CBA-7 (§ 26.S.), CBA-8 (§ 25.S.), CBA-9 (§ 31.V.), Reopener-2 (§ 25.S.), Reopener-3 (§ 39.X.), Reopener-4 (§ 20.U.).

participant's *Employee Contribution Account* under the *1998 Defined Contribution Plan*. Subject to the approval of the Internal Revenue Service, basic employee contributions will be made on a pre-tax basis.

(b)    *Additional voluntary employee contributions which are not matched by the employer*. To the extent permitted by the Internal Revenue Service, the Plan will accept additional pre-tax voluntary contributions from the participants as follows: at the time the Participant elects to participate in the 1998 Defined Contribution Plan pursuant to Section 47-3-3(a) or (d), a participant may elect to make an additional voluntary employee contribution of zero, one, two or three percent (0%, 1%, 2%, 3%) of such participant's compensation. Such election shall be irrevocable and the additional voluntary employee contribution shall be made each year to such participant's *Employee Contribution Account* under the *1998 Defined Contribution Plan*. Such additional voluntary contributions shall not be matched by the employer, and are in addition to the basic employee contributions described in Section 47-3-5(a) of this Code.

(c)    Contributions "picked up" by the employer.

(1)    Effective as of the adoption and approval of the *1998 Defined Contribution Plan* by City Council or the implementation date, if later, no participant may elect to receive such participant's basic employee contributions or additional voluntary employee contributions that have been "picked up" by the employer directly instead of having them paid by the employer to the participant's *Employee Contribution Account* under the *1998 Defined Contribution Plan*. If a participant irrevocably elects to have such participant's basic employee contributions and additional voluntary employee contributions "picked up" by the employer, such employee contributions shall be paid by the employer to the *1998 Defined Contribution Plan* and not paid to the participant.

(2)    *Election to Make After-Tax Contributions*. A participant who does not utilize the maximum participant's contributions, as detailed in Section 47-3-5(a) and (b), "picked up" by the employer, may elect to make employee contributions on an after-tax basis and change his or her contribution percentage in accordance with procedures established by the Board, provided utilizing Sections 47-3-5(a), 47-3-5(b), and 47-3-5(c)(2) does not exceed the three percent (3%) maximums of Sections 47-3-5(a) and 47-3-5(b).

(d)    Conversion of unused leave; Post-tax basis.

(1)    *Vacation time*. In accordance with the rules and procedures established by the Board, a participant who at the end of a Plan Year has accrued, but not used, an amount of vacation time, may make an irrevocable election to convert the value of some or all of such vacation time, in an amount not to exceed fifteen vacation days, as an additional contribution to such participant's *Annuity Savings Account* on an after-tax basis. The value of such additional contribution shall be one-half of the number of vacation hours converted multiplied by the hourly rate of pay applicable on each September thirtieth or such other date as approved by the Board.

(2)    *Sick time*. In accordance with rules and procedures established by the Board, a participant who is one hundred percent (100%) vested in the *Employer Contribution Account* pursuant to Section 47-3-8(b) of this Code, who has accrued but not used an amount of sick time, and who ceases to be a participant on or after the effective date of the Plan due to retirement or resignation, may make an irrevocable election to convert the value of some or all of such employee's unused accrued sick time as an additional contribution to such participant's *Annuity Savings Account* on an after-tax basis. The value of such additional contribution shall be the value of one half the number of sick time hours converted, using both current and reserve banks, by the hourly rate of pay applicable on the effective date of retirement or resignation.

(Ord. No. 29-01, § 1, 11-30-01; Ord. No. 37-03, § 1, 11-7-03)

**Sec. C-6.  [Formerly Sec. 47-3-6. Maximum additions.]**

(a)  Notwithstanding anything contained herein to the contrary, total annual additions for a participant in any calendar year, shall not exceed the limits set forth in Section 415 of the Internal Revenue Code and regulations thereunder, the terms of which are specifically incorporated herein by reference. For the purpose of complying with Section 415 of the Internal Revenue Code, compensation shall have the same meaning as set forth in Section 415(c)(3)[151] of that Code.

(b)  Notwithstanding the foregoing, otherwise permissible annual additions under this Plan may be reduced to the extent necessary as permitted by United States Department of Treasury Regulations, to prevent disqualification of the Plan under Section 415 of the Internal Revenue Code.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. C-7.  [Formerly Sec. 47-3-7. 1998 Defined Contribution Plan; Employee Rollover Account.]**

A participant may transfer to his or her *Employee Rollover Account,* an "eligible rollover distribution," as defined in Section 402(c)(4)[152] of the Internal Revenue Code, provided the transfer is made in accordance with Section 402(c)(5)(c)[153] of the Internal Revenue Code and applicable regulation. *Employee Rollover Accounts* are not considered "annual additions" within the meaning of Section 47-3-2(3) of this Code.

(Ord. No. 29-01, § 1, 11-30-01)

**Sec. C-8.  [Formerly Sec. 47-3-8. 1998 Defined Contribution Plan; vesting.]**

All account balances are subject to the following vesting schedules:

(a)  *Employee Contribution Account.* A participant shall always be one hundred percent (100% vested in such participant's *Employee Contribution Account.*

(b)  *Employer Contribution Account.* A participant shall be vested in the balance of such participant's *Employer Contribution Account* as follows:

| Years of Service | Percentage vested |
|---|---|
| Less than two | 0% |
| At least two, but less than four | 50% |
| Four or more | 100% |

Service for vesting purposes shall include prior service under the 1973 Defined Benefit/Defined Contribution (Annuity) Plan of the DGRS.

(c)  *Employee Rollover Account.* A participant shall always be one hundred percent vested in the balance of such participant's *Employee Rollover Account.*

(d)  *Annuity Savings Account.* A participant shall always be one hundred percent (100%) vested in the balance of such participant's *Annuity Savings Account.*

(Ord. No. 29-01, § 1, 11-30-01)

48

For employees who separate from City service with a vested pension prior to reaching eligibility for a regular service retirement, time earned after July 1, 1986 **[or July 1, 1988[eee]]**, shall not be factored into the formula for determining their pension benefit until they shall have attained age 62. This provision will not affect the current practice governing disabled employees.[fff]

## Sec. C-9. [Formerly Sec. 47-3-9. Participant-directed Investments.]

(a)  *Participant-directed Investments; Type.* Each participant and former participant may direct the investment of such participant's or former participant's account balances in specific types of investments made available by the Board. Such investments shall include:

Short term securities, fixed income securities, equity securities, and any other investment category the Board considers appropriate.

(b)  *Participant-directed Investments; Annual Review.* Each participant, former participant, and, following the death of a participant or former participant, the beneficiary of such participant or former participant, to the extent allowed by law, shall be given the opportunity, at least annually, to:

(1)  Elect to direct the investment of such participants, former participant's, or beneficiary's account balances;

(2)  Change the investment allocation; or

(3)  Cease to direct the investments.

All such elections shall be in accordance with procedures promulgated by the Board. The account balances of any participant, former participant, or beneficiary who elects not to direct the investment of such account balances, shall be invested in the designated component fund(s). If the law does not allow a beneficiary, following the death of a participant or former participant, to direct the participant's or former participant's account balances, then the account balances shall be liquidated and paid to the beneficiary.

(c)  *Participant-directed investments; income.* The income earned on each participant's investments shall be credited directly to such participant's account or accounts, except as provided in Section 47-3-12(g) of this Code.

(d)  *Expenses; Forfeitures.* In the event that any account balances are forfeited under Section 47-3-4(d) of this Code, the amounts so forfeited shall be used to offset past or future expenses of the Plan incurred during that Plan Year Such expenses shall be settled in the following order: administrative, investment, legal, accounting, actuarial, and then all others as determined by the Board. To the extent that forfeitures exceed the expenses to be settled for a given Plan Year, such excess forfeitures shall be used to offset the City's contribution to the Plan for that Plan Year. To the extent excess forfeitures are available after offsetting the City's contribution for that Plan Year, the Board shall allocate such excess to the participant accounts in proportion to the compensation of each participant for the Plan Year. The employer shall cover the cost of all expenditures which exceed forfeitures.

(Ord. No. 29-01, § 1, 11-30-01)

---

eee        CBA-4 (§ 15.D.), CBA-5 (§ 20.D.), CBA-6 (§ 26.D.), CBA-7 (§ 26.D.), Reopener-4 (§ 20.D.).

fff        CBA-3 (§ 46.D.), CBA-4 (§ 15.D.), CBA-5 (§ 20.D.), CBA-6 (§ 26.D.), CBA-7 (§ 26.D.), CBA-8 (§ 25.D.), CBA-9 (§ 31.D.), CBA-10 (§33.D.), CBA-11 (§ 39.D.), CET-1 (§ 48.D.), Reopener-1 (§ 31.D.), Reopener-2 (§ 25.D.), Reopener-3 (§ 39.D.), Reopener-4 (§ 20.D.).

**Sec. C-10.  [Formerly Sec. 47-3-10. Benefits.]**

(a)    Eligibility for Benefits.

    (1)    *Retirement.* In the event of the participant's retirement under Section 47-2-4(a), (b), or (c) of this Code, the eligible former participant shall be paid the total balance of the participant's accounts in accordance with Section 47-3-10(c) of this Code.

    (2)    *Death.* In the event of a participant's death, the beneficiary of the participant shall be paid the total balance of each of the participant's accounts in accordance with Section 47-3-10(c) of this Code. Designation of a participant's or former participant's beneficiary shall be made in accordance with Section 47-3-10(b) of this Code. Upon death, the deceased former participant shall be one hundred percent (100%) vested in the balance of all of his or her accounts.

    (3)    *Duty disability; eligibility.* Upon the written application of a participant or of the participant's department head, a participant who becomes totally incapacited for duty in the employe of the City, shall be retired by the Board; provided that such incapacity is found by the Board to be the natural and approximate result of the actual performance of duty, without willful negligence on the participant's part; and provided further, that the Board Medical Director, after a medical examination of such participant, certifies in writing to the Board that such participant is mentally or physically totally incapacitated from further performance of duty to the City, and that such participant should be retired. Upon such duty disability retirement, such former participant shall be one hundred percent (100%) vested in the balance of all of the former participant's accounts.

    (4)    *Duty Disability; Benefits.* In the event of the duty disability of a participant, the eligible former participant shall be paid the total balance of each of his or her accounts in accordance with Section 47-3-10(c) of this Code.

    (5)    *Non-duty Disability; Eligibility.* Upon the written application of a participant or of the participant's department head, a participant who becomes totally and permanently incapacitated, as the result of causes not occurring in the actual performance of duty to the City, may be retired by the Board, provided that the Medical Director, after a medical examination of such participant, certifies in writing that such participant is mentally or physically incapacitated for further performance of duty to the City, and such incapacity is likely to be permanent and that such participant should be retired.

    (6)    *Non-duty Disability; Benefits.* In the event of the non-duty disability of a participant, the eligible former participant shall be paid the vested portion of each of his or her accounts in accordance with Section 47-3-10(c) of this Code.

    (7)    *Other termination.* If a participant's employment is terminated for any reason other than the participant's retirement under Section 47-3-10(a)(1) of this Code, duty disability, or death, the participant shall immediately become a former participant and shall be entitled to receive the vested portion of each of such participant's accounts. A participant's vested portion of such participant's accounts shall be determined in accordance with the provisions of Section 47-3-8 of this Code. Payments under this Section shall be made in accordance with Section 47-3-10(c) of this code.

    (8)    *Forfeiture.* Any participant who terminates employment for reasons other than retirement under Section 47-3-10(a)(1) of this Code, duty disability or death, shall forfeit the non-vested portion of such participant's *Employer contribution Account,* if any. Such forfeiture shall become effective upon the participant's termination of employment with the employer, other than by retirement, duty disability, or death.

(b)    Designation of Beneficiary.

(1) *Participant's spouse, if any.* For the purpose of receiving survivor benefits under this Plan, the beneficiary of a participant or former participant shall be the participant's or former participant's spouse, subject to Section 47-3-10(b)(2) of this Code.

(2) *Non-spousal Beneficiary; Designation.* A participant or former participant may designate a non-spousal beneficiary on a form satisfactory to the Board.

(3) *Revocation of Designation.* A participant may revoke a previous designation of beneficiary or change the designation of a beneficiary at any time, by filing written change of beneficiary on a form satisfactory to the Board.

(4) *Absence of Valid Designation of Beneficiary.* If a valid designation of beneficiary pursuant to Section 47-3-10(b) of this Code is not on file, the Board shall direct the Trustee to distribute the vested portion of the accumulated balance in a lump sum to the surviving spouse of the deceased participant or former participant, if any, or, if none survives the participant, to the estate of the deceased participant or former participant.

(c) Payment of benefits.

(1) *Method of Distribution.* A former participant or beneficiary may elect one or a combination of several of the following methods of distribution of the vested portion of such participant's accumulated balance:

a. A lump sum distribution to the recipient; or

b. A lump sum direct rollover to another qualified pension Plan, or to an Individual Retirement Account or Annuity (IRA); or

c. The purchase of an annuity from the Investment Trustee or another qualified annuity provider, the form of which shall be selected by the former participant or beneficiary, or required under the terms of an order issued pursuant to *The Eligible Domestic Relations Order Act,* MCL 38.1701 *et seq.*

d. Regular installments over a period certain.

e. No distribution, in which case the accumulated balance shall remain in the Plan until distributed at the election of the participant pursuant to Section 47-3-10(c)(2) below to the extent allowed by Federal Law.[154]

(2) *Commencement of Payment of Benefits.* [155] All benefit payments under the Plan shall be made, or shall commence to be made, as soon as is practicable after written election by the participant designating the time and method of distribution following entitlement thereto.

(3) *Required Distribution.* Lifetime of the participant or beneficiary. In accordance with Section 401(a)(9)[156] of the Internal Revenue Code the entire interest of each participant shall be distributed to such participant over the lifetime of the participant or beneficiary, beginning no later than the later of the April first of the calendar year following (1) the calendar year in which the employee attains age seventy and one-half or (2) the calendar year in which the employee retires.[157]

(4) *Upon the Death of the Participant.* Upon the death of the participant, the following restrictions shall apply to the distribution of the participant's interest under the Plan:

a. If the participant dies after starting to receive benefits but before the participant's entire interest under the Plan has been distributed, the remaining portion of such interest must be distributed at least as rapidly as under the method of distribution selected by the participant in effect at the date of the participant's death.

51

b. If the participant dies before receiving any of his or her interest under the Plan, the entire interest shall be distributed to the participant's beneficiary by December thirty-first of the calendar year in which the fifth anniversary of the participant's death falls, with the following exceptions:

   1. If any portion of such interest is payable to or for the benefit of a designated beneficiary, such portion shall be distributed in accordance with applicable treasury regulations over a period not extending beyond the life expectancy of such beneficiary. The payments to such beneficiary shall begin not later than December thirty-first of the calendar year after the calendar year of such participant's death.

   2. If the participant's surviving spouse is the designated beneficiary, payments to such spouse shall begin not later than December Thirty-first of the calendar year in which the participant would have attained age seventy and one-half or by the date specified in 1. above, whichever is later. If such surviving spouse dies before payments have begun to be made to such spouse, then payments to the person or persons entitled to the same shall be subject to the distribution restrictions under this subparagraph b. which would have applied had the spouse been an unmarried participant.

   3. The amount required to be distributed under 1. and 2. above for each calendar year beginning with the distribution for the first calendar year for which a minimum distribution is required must be at least equal to the quotient obtained by dividing the participant's interest in the Plan by the life expectancy of the beneficiary. The participant's interest in the Plan for purposes of this paragraph 3. shall be the participant's account balance as of the last valuation date in the calendar year immediately preceding the first calendar year for which the distribution is required, adjusted as provided in treasury regulations for allocations of contributions, forfeitures and distributions, if any, after such valuation date.

   4. For purposes of subparagraphs 1. and 3. above, life expectancy shall be computed by use of the return multiples included in Tables V and VI of Section 1.72-9 of the Federal Income Tax Regulations. For purposes of subparagraphs 1. and 3. above, the life expectancy of the participant's spouse may be recalculated annually. The life expectancy of a beneficiary other than the participant's spouse may not be recalculated.

c. Subject to applicable regulations, for purposes of a. and b. above, any amount paid to a child of the participant shall be treated as if it had been paid to the surviving spouse of the participant if such amount will become payable to the surviving spouse upon such child reaching the age of majority or other designated event permitted under applicable treasury regulations.

d. If, prior to January 1, 1984, such participant had made a valid, unrevoked, written designation pursuant to Section 242(b) of the *Tax Equity and Fiscal Responsibility Act of 1982* as in effect prior to amendments made by the *Tax Reform Act of 1984,* then distributions to such participant and his or her beneficiary shall be made according to such designation.

e. Subject to subparagraph d. above, all distributions under the Plan shall be made in accordance with Section 401(a)(9)[158] of the Internal Revenue Code and the regulations thereunder, including but not limited to regulations Section 1.401(a)(9)-2.[159]

f. With respect to distributions under Plan made for calendar years beginning on or after January 1, 2001, the Plan will apply the minimum distribution requirement of Section 401(a)(9) of the Internal Revenue Code in accordance with the Regulations under Section 401(a)(9) that were proposed on January 17, 2001, notwithstanding any provision of the Plan to the contrary. This Section f. shall continue in effect until the end of the last calendar year beginning before the effective date of final regulations under Section 401(a)(9) or such other date as may be specified in guidance published by the Internal Revenue Service.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. C-11.  [Formerly Sec. 47-3-11. Plan Administration.]

(a)   *Powers and Duties.* The Board shall administer the Plan and shall have such powers and duties as may be necessary to discharge the responsibilities of the Board, including, but not limited to, the following:

    (1)   To construe and interpret the Plan, decide all questions of eligibility and determine the amount, manner, and time of payments of any benefits hereunder;

    (2)   To prescribe procedures to be followed by participants, former participants, and beneficiaries filing, applications for benefits;

    (3)   To distribute information explaining the Plan, in such manner as it deems appropriate;

    (4)   To receive from the employer and participants, such information as shall be necessary for the proper administration of the Plan;

    (5)   To prepare a written annual report with respect to the administration of the Plan;

    (6)   To appoint or employ individuals to assist in the administration of the Plan and any other agents the Board deems advisable.

(b)   *Limitation on Powers.* The Board shall have no power to add to, subtract from, or modify, any of the terms of the Plan, or to change or add to any benefits provided by the Plan, or to waive, or fail to apply any requirements of eligibility for a benefit under the Plan. This Section 47-3-11(b) does not apply to the Administrative Board of Trustee's Administrative Rules and Regulations promulgated pursuant to Section 47-1-11 of this code.

(c)   Denial of claims; hearing by Board; written decision.

    (1)   Any participant, former participant, or beneficiary who has been denied a benefit by a decision of the Board shall be entitled to request that the Board give further consideration to his or her claim, by filing a written request with the Board within sixty days after notice of denial by the Board, together with a written statement of the reasons why the claimant believes such claim should be allowed.

    (2)   The Board shall then conduct a hearing at which the claimant may be represented by an attorney or any other representative of the claimant's choosing, and at which the claimant shall have an opportunity to submit written and oral evidence and arguments in support of the claimant's claim. At the hearing, or prior thereto upon five business days written notice to the Board, the claimant or other claimant's representative shall have an opportunity to review all documents in the possession of the Board which are pertinent to the claim at issue and its disallowance.

    (3)   A final decision as to the allowance of the claim shall be made by the Board within sixty days of the close of the hearing, unless there has been an extension due to special circumstances, provided that the delay and the special circumstances causing it, are explained to the claimant. The Board's decision shall include specific reasons for the decision and specific references to the pertinent Plan provisions on which the decision is based.

    (4)   By resolution, the Board may designate a person or persons to serve as a hearing officer for the hearing of claims filed under Section 47-3-10(a)(3) of this Code. The Hearing Officer shall make written findings and a recommended disposition of such claims to the Board.

(d)   *Public Meeting.* The Board shall conduct a public meeting of participants, beneficiaries, and former participants, at least once each Plan Year and shall meet at such additional time as it deems necessary.

## Sec. C-12. [Formerly Sec. 47-3-12. Participant Loan Program.]

(a) *Participant Loan Program established.* Any loans granted or renewed shall be made pursuant to a Participant Loan Program which shall conform with the requirements of Section 72(p) of the Internal Revenue Code. Such loan program shall be established in writing by the Board of Trustees, and must include, but need not be limited to, the following:

   (1) The identity of the administrator of the Participant Loan Program;

   (2) A procedure for applying for loans; the amount of loan that will be approved or denied, limitations, if any, on the types and amounts of loans offered;

   (3) The procedures under the Program for determining a reasonable rate of interest; and

   (4) The events constituting default and the steps that will be taken to preserve Plan assets.

(b) Amendment of Loan Program.

   (1) This Loan Program shall be contained in a separate written document which, when properly executed, shall be incorporated by reference and made a part of the Plan. Such Participant Loan Program may be modified or amended by action of the Board, in willing, without the necessity of amending the Plan or this ordinance. The Board shall communicate any such modification or amendments, in writing, to all participants.

   (2) All collective bargaining agreements which accept the terms of this ordinance are specifically agreeing to be subject to the Board's power to modify or amend the Participant Loan Program from time to time, including during the effective term of the applicable labor agreement, and no such modification or amendment shall be deemed a violation of said labor agreement and no grievance or other form of action shall be effective to overturn or alter the Board's decision.

(c) *Eligibility.* Loans shall be made only to participants, former participants, spouses of participants, and beneficiaries are not eligible to receive any loans from the Plan. Subject to rules and procedures established by the Board, a participant who has been in the Plan for twelve months or more is eligible to apply for a loan from this Plan.

(d) *Amount of Loan.* A participant who has satisfied applicable rules and procedures may borrow from the participant's accounts an amount which does not exceed fifty percent (50%) of the participant's vested accumulated balance, or fifty thousand dollars ($50,000.00) reduced by the excess; if any, of (1) the highest outstanding balance of loans from the Trust during the one-year period ending on the day before the date on which the loan is made, or (2) the outstanding balance of loans from the Trust on the date on which the loan is made, whichever is less. The minimum loan amount shall be one thousand dollars ($1,000.00).

(e) *Terms and Conditions.* In addition to such rules and procedures as established by the Board, all loans shall comply with the following terms and conditions:

   (1) Loan applications shall be in writing.

   (2) Loans shall be repaid by equal payroll deductions over a period not to exceed five years, or if the loan is for the purpose of buying a principal residence, a period not to exceed ten years. In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two week period;

(3) Each loan shall be made against the assignment of the participant's entire right, title and interest in and to the Trust, supported by the participant's collateral promissory note for the amount of the loan, including interest, payable to the order of the Trustee;

(4) Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among participants in its determination of interest rates on loans. Loans initiated at different times may bear different interest rates if, in the opinion of the Board, the difference in rates is supported by a change in market interest rates. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration.

(5) Loan repayments shall be suspended under this Plan as permitted by Section 414(u)(4) of the Internal Revenue Code. A participant who has an outstanding loan balance from the Plan who is absent from employment with the employer, and who has satisfied the requirements of 26 USC 414(a),[160] of the Internal Revenue Code shall not be required to make loan repayments to the fund during said periods of absence.

(f) *Renewal of Loan.* Any loans granted or renewed shall be made pursuant to the participant loan program and Section 72(p) of the Internal Revenue Code and the regulations thereunder.

(g) *Loan Balance.* A participant's outstanding loan balance shall be considered a directed investment by the participant and interest payments shall be credited to the participant's account balance and shall not be part of net investment income nor part of the participant's account balance for the purpose of allocation of net investment income under Section 47-3-9(c) of this Code.

(h) *Distributions.* No distribution shall be made to a participant, former participant, or beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been liquidated.

## Sec. C-13.  [Formerly Sec. 47-3-13. Trust Fund.]

(a) *Establishment of Trust fund; selection of financial investment Trustee.* The Board shall establish a Trust fund by a Trust agreement with a financial investment Trustee to carry out the purposes of the Plan.

(b) *Financial Investment Trustee.* The Financial Investment Trustee shall be the Trustee selected by the Administrative Board of Trustees, or such successor Financial Investment Trustee as selected by the Administrative Board of Trustees.

(1) *Employer and participant contributions to the Financial Investment Trustee.* All contributions by the employer, and any contributions by participants, shall be paid to the Financial Investment Trustee of the fund.

(2) *Financial Investment Trustee; Investment of funds.* The fund(s) shall be invested in such investments as are permissible under state law for governmental Plans, made available by the Administrative Board of Trustees, and as specified by the participant, former participant or beneficiary.

(3) *Duties of the Financial Investment Trustee.* The Trustee shall have the powers, rights and duties as specified in the Trust agreement with the Board, in addition to those specified elsewhere in the Plan or prescribed by law. The Trustee shall receive the contributions to the fund and, subject to the directed investments of participants, shall hold, invest and reinvest fund assets, and shall distribute fund assets plus any earnings thereon, pursuant to the provisions of the Plan and of the Trust agreement with the Administrative Board of Trustees. The Financial Investment Trustee shall determine all questions relating to accounting and to the financial position of the fund and the shares and interest of the participants in accordance with information supplied by the employer and the Board, and, in general, shall discharge all of the duties and functions imposed by the terms of the Plan, either expressly or by implication.

(4) *Financial Investment Trustee expenses.* The reasonable expenses of the Financial Investment Trustee relating to the fund, including such compensation for the Financial Investment Trustee as may be agreed to in writing by the Board and the Financial Investment Trustee, shall be paid to the Financial Investment Trustee and shall be deducted from the fund. Such expenses shall include training of prospective Plan participants, whether conducted by the Financial Investment Trustee or a third party on its behalf.

(5) *Accounting.* At the request of the employer or the Administrative Board of Trustees, the Financial Investment Trustee shall prepare and submit an accounting of the fund as of any date specified, but the Financial Investment Trustee shall not be required to render accounting more frequently than monthly during any Plan Year. The Financial Investment Trustee shall prepare and render to the employer, the Administrative Board of Trustees, and Council an accounting of the total fund as of the last day of each Plan Year. The Financial Investment Trustee shall not be required to render an accounting of the total fund to individual participants but only to the employer and Board, which may submit reports of the fund to the participants from time to time, provided, however, that the Financial Investment Trustee shall render periodic reports to each participant on all of his or her individual accounts and shall provide copies of such reports to the Board.

(c) *Taxes.* After reasonable notice to the Board, any taxes assessed against the fund or any of its assets, including income, property, transfer, and other taxes, shall be paid by the Financial Investment Trustee and deducted from the fund. Whenever possible, these amounts shall be paid from forfeiture funds.

(d) *Limitation of liability to assets of fund.* Except as required under applicable law, the benefits of the Plan shall be only such as can be provided by the assets of the fund, and there shall be no further liability or obligation on the part of the Board or the employer after its mandated contributions have been once paid to make any contributions or payments to establish or maintain the Plan, whether in the event of termination of the Plan or otherwise. No liability for the payment of benefits under the Plan shall be imposed on the Board or the employer.

(Ord. No. 29-01, § 1, 11-30-01)

## Sec. C-14. [Formerly Sec. 47-3-14. Miscellaneous.]

(a) *Amendments; Termination. Subject to the Terms of the Collective Bargaining Agreements,* the City reserves the right to amend this *Article III* and this Plan at any time. Such amendments may include termination of the Plan; provided, however, that no such amendment or termination shall deprive any participant, former participant or beneficiary of any then vested benefit under the Plan. The City shall make no amendment or amendments to the Plan and this ordinance which causes any part of the Trust fund to be used for, or diverted to, any purpose other than the exclusive benefit of participants, former participants or their beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law. Any amendment of the Plan which alters any terms of this *Article III* requires an amendment of this ordinance approved by the Council.

(b) *Non-guarantee of employment.* Nothing contained in the Plan or this ordinance shall be construed as a contract of employment between the employer and any employee, or as a right of any employee to be continued in the employment of the employer, or as a limitation of the right of the employer to discharge any of its employees, with or without cause.

(c) *No right to trust assets.* No participant, former participant or beneficiary shall have any right to, or interest in, any assets of the Trust Fund upon termination of employment or otherwise, except as provided under this Plan, as amended, and then only to the extent of the benefits payable under the Plan to such participant, former participant, or beneficiary out of, the assets of the Trust Fund. All payments of benefits as provided for in this Plan shall be made solely out of the assets of the Trust Fund and the fiduciary shall not be liable therefore in any manner.

56

(d)   *Non-forfeitability of benefits.* Subject only to the specific provisions of this ordinance, nothing shall be deemed to divest a participant, former participant, or beneficiary, of the right to the non-forfeitable benefit which such participant, former participant, or beneficiary, becomes entitled to in accordance with the provisions of this ordinance.

(e)   *Non-alienation of benefits.* Except as otherwise provided in this subsection, the right of a person to an accumulated balance or any other benefit from the Plan is unassignable and is not subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or other process of law. The right of a person to an accumulated balance or any other benefit from the Plan is subject to award by a court pursuant to MCL 552.18,[161] and to any other order of a court pertaining to alimony or child support. The right of a person to an accumulated balance or other benefit from the Plan is subject to an order issued pursuant to the *Eligible Domestic Relations Order Act,* MCL 38.1701 *et seq.*

(f)   *Right of set-off.* The Plan has the right of set-off to recover any overpayment made by the Plan and to satisfy any claim arising from embezzlement or fraud committed in their capaCity as an employee of the employer by a participant, former participant, beneficiary, or other person who has a claim to an accumulated balance or any other benefit under this Plan.

(g)   *Collective bargaining agreements; conflict.* This ordinance shall not modify any provision of a collective bargaining agreement. In the event of a conflict between this ordinance and a collective bargaining agreement, the agreement shall control.

(h)   *Collective bargaining agreements; acceptance of ordinance terms.* All collective bargaining agreements which accept the terms of this ordinance are specifically agreeing to be subject to the Board's power to modify or amend the administrative rules and procedures governing this *Article III* Plan from time to time, including during the effective term of the applicable labor agreement, and no such modification or amendment shall be deemed a violation of said labor agreement and to grievance or other form of action shall be effective to overturn or alter the Board's decision.

(i)   Enforcement against any act or practice which violates state law, the 1997 Detroit City Charter, the 1984 Detroit City Code or the terms of this Plan. A civil action may be brought by:

   (1)   A Plan participant who is or may become eligible to receive a benefit;

   (2)   A beneficiary, who is or may become eligible to receive a benefit;

   (3)   A Plan fiduciary, including a Trustee;

   (4)   The Finance Director, on behalf of the City as Plan sponsor.

   (Ord. No. 29-01, § 1, 11-30-01)

**[Formerly Secs. 47-3-15—47-3-20. Reserved.]**

## ARTICLE D.  [FORMERLY ARTICLE IV. MISCELLANEOUS PROVISIONS OF THE GENERAL RETIREMENT SYSTEM]

### Sec. D-1.  [Formerly Sec. 47-4-1. Assignments prohibited.]

The right of a person to a pension, annuity, or retirement allowance, the return of accumulated contributions, the pension, annuity, or retirement allowance itself, to any optional benefit, to any other right accrued or accruing to any person under the provisions of this Code, and to the monies in the various funds of the Retirement System shall not be assignable and shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever, except as specifically provided in this chapter of the Code or by an Eligible Domestic Relations Order of a lawful court.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. D-2.  [Formerly Sec. 47-4-2. Protection against fraud.]

A person who, with intent to deceive, makes any statements or reports required under this chapter of the Code that are untrue, or who falsifies or permits to be falsified any record or records of this Retirement System, or who otherwise violates, with intent to deceive, any terms or provisions of this chapter of the code, shall be subject to prosecution under applicable law.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. D-3.  [Formerly Sec. 47-4-3. Enforcement; civil action.]

A civil action for relief against any act or practice which violates the state law, the 1997 Detroit City Charter, 1984 Detroit City Code or the terms of this Plan, may be brought by:

(1)  A Plan participant who is or may become eligible to receive benefit;

(2)  A beneficiary who is or may become eligible to receive a benefit;

(3)  A Plan fiduciary, including a Trustee;

(4)  The Finance Director, on behalf of the City as Plan sponsor.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. D-4.  [Formerly Sec. 47-4-4. Amendments; termination.]

*The* City reserves the right to amend this Chapter 47 and the Plans created hereunder at any time; such amendments may include termination of the Plan; provided, however, that no such amendment or termination shall deprive any participant, former participant or beneficiary of any then vested benefit under the Plan. The City shall make no amendment or amendments to the Plan and this ordinance which causes any part of the Trust fund to be used for, or diverted to, any purpose other than the exclusive benefit of participants, former participants or their beneficiaries; provided, that the City may make any amendment necessary, with or without retroactive effect, to comply with applicable federal law. Any amendment of the Plan which alters any term in this Chapter 47, requires an amendment of this ordinance approved by the Council.

(Ord. No. 29-01, § 1, 11-30-01)

58

### Sec. D-5.  [Formerly Sec. 47-4-5. Errors.]

If any change or error in the records results in any person receiving from the Retirement System more or less than the person would have been entitled to receive from the system had the records been correct, the Board shall correct such error, and as far as practicable, shall adjust the payment in such a manner that the actuarial equivalent of the benefit to which such person was correctly entitled shall be paid.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. D-6.  [Formerly Sec. 47-4-6. Limitation of other statutes.]

No other provision of law, charter, or ordinance, which provides pensions or retirement benefits wholly or partly at the City expense, exclusive of federal Social Security old-age and survivors' insurance benefits for City employees, their surviving spouses and other dependents, shall apply to members, retirees or beneficiaries of the Retirement System, their surviving spouses or other dependents.

(Ord. No. 29-01, § 1, 11-30-01)

### Sec. D-7.  [Formerly Sec. 47-4-7. Construction.]

Words in the singular should be read and construed as though used in the plural, and words in the plural should be read and construed as though used in the singular, where appropriate. The words "hereof", "herein", and "hereunder" and other similar compounds of the word "here", shall mean and refer to the entire ordinance and not to any particular provision or section thereof. Article and section headings are included for convenience of reference, and are not intended to add to, or subtract from, the terms of the Plans created hereunder.

**[Formerly Secs. 47-4-8—47-4-10. Reserved. ]**

**\* Editor's note—** Ord. No. 29-01, § 1, adopted Nov. 30, 2001, amended the general retirement system of the city and enacted a new Ch. 47 to this Code as herein set out. Previously provisions relating to the retirement systems of the system had been incorporated by reference.Ord. No. 1-02, adopted Jan. 9, 2002, repealed certain previously uncodified provisions relating to city retirement systems. Ord. No. 1-02 provides, in part, as follows:    IT IS HEREBY ORDAINED BY THE PEOPLE OF THE CITY OF DETROIT THAT:    Section 1. Chapter 47 of the 1984 Detroit City Code, Code, titled 'Retirement Systems,' be amended by repealing uncodified Sections 47-2-1 (Ordinance No. 15-87), 47-2-2 (Ordinance No. 5-92), 47-2-3 (Ordinance No. 5-92), 47-10-2 (Ordinance No. 10-86), 47-10-5 (Ordinance No. 3-87), 47-10-6.1 (Ordinance No. 2-93), 47-10-7 (Ordinance No. 6-91), 47-10-8, 47-10-9, 47-10-10, 47-10-11, 47-10-12, 47-10-13, 47-10-14, 47-10-15, 47-10-16 (Ordinance No. 2-93), all of which have now been codified in Sections 47-1-1 through 47-2-20, as follows: (Back)

| | |
|---|---|
| **Sec. 47-2-1** Repealed. | **Sec. 47-10-7.** Repealed. |
| **Sec. 47-2-2** Repealed. | **Sec. 47-10-8.** Repealed. |
| (2) After attaining age forty with eight or more years | **Sec. 47-I0-9.** Repealed. |
| of credited service, whichever is earlier. | **Sec. 47-10-10.** Repealed. |
| **Sec. 47-2-3** Repealed. | **Sec. 47-10-11.** Repealed. |
| **Section 47-3-1 through 47-3-11** Repealed. | **Sec. 47-10-12.** Repealed. |
| **Sec. 47-10-2.** Repealed. | **Sec. 47-10-13.** Repealed. |
| **Sec. 47-10-5.** Repealed. | **Sec. 47-10-14.** Repealed. |
| **Sec. 47-10-6(1),(2).** Repealed. | **Sec. 47-10-15.** Repealed. |
| **Sec. 47-10-6.1.** Repealed. | **Sec. 47-10-16.** Repealed. |

[1]Ordinance No. 593-H is the re-codification ordinance, 1984 JCC pp 1292-93.

[2]"The accrued financial benefits of each pension Plan and Retirement System of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby. Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities."

[3]1918 Detroit City Charter, T.9, C. VI, A. 1, as amended effective September 15, 1964.

[4]1918 Detroit City Charter, T.9, C. VI, A. 2, §1, as amended effective September 15, 1964.

[5]1918 Detroit City Charter, T.9, C. VI, A. 2, §2, as amended effective September 15, 1964; current language is contained in the 1997 Detroit City Charter Section 11-103.

[6]Originally the Council Trustee was the Council President; as amended by Ordinance 173-H, effective December 22, 1976; amended by Ordinance 338-H, effective September 5, 1979. [Ord. Nos. 173-H and 338-H were repealed by Ord. Nos. 24-01.]

[7]1964 Detroit City Code Section 54-3-1, as amended by Ordinance 56-H, effective August 8, 1975. [Ord. No. 56-H was repealed by Ord. No. 24-01]

[8]1918 Detroit City Charter, T.9, C. VI, A. 2, §2.1, as amended effective September 15, 1964.

[9]1918 Detroit City Charter, T.9, C. VI, A. 2, §3, as amended effective September 15, 1964.

[10]1918 Detroit City Charter, T.9, C. VI, A. 2, §4 "shall be fixed by ordinance," as amended effective September 15, 1964. *See,* Ordinance 297-G, §1; Ordinance 715-G, §1, and Ordinance 494-H, effective April 22,

1982. This section is a revision of Ordinance 494-H, which has been in place for over twenty years. [Ord. No. 494-H was repealed by Ord. No. 24-01.]

[11] 1918 Detroit City Charter, T.9, C. VI, A. 2, §5, as amended effective September 15, 1964.

[12] 1918 Detroit City Charter, T.9, C. VI, A. 2, §6, as amended effective September 15, 1964; new language added to reflect changes in the law.

[13] 1918 Detroit City Charter, T.9, C. VI, A. 2, §7, as amended effective September 15, 1964.

[14] 1918 Detroit City Charter, T.9, C. VI, A. 2, §8, as amended effective September 15, 1964. Before the passage of the *Public Employee Retirement System Investment Act,* MCL 38.1132 *et seq.,* the selection of Board employees was subject to City Council approval.

[15] 1918 Detroit City Charter, T.9, C. VI, A. 2, §9, as amended effective September 15, 1964.

[16] 1918 Detroit City Charter, T.9, C. VI, A. 2, §10, as amended effective September 15, 1964.

[17] 1918 Detroit City Charter, T.9, C. VI, A. 2, §11, as amended effective September 15, 1964. Before the Board established the right to its own counsel, it was represented by the Corporation Counsel. *See,* 1964 Detroit City Code Section 54-2-10, as amended by Ordinance 65-H, effective October 17, 1975.

[18] 1918 Detroit City Charter, T.9, C. VI, A. 2, §12, as amended effective September 15, 1964.

[19] 1918 Detroit City Charter, T.9, C. VI, A. 2, §13, as amended effective September 15, 1964.

[20] 1918 Detroit City Charter, T.9, C. VI, A. 2, §14, as amended effective September 15, 1964.

[21] 1918 Detroit City Charter, T.9, C. VI, A. 2, §15, as amended effective September 15, 1964.

[22] 1918 Detroit City Charter, T.9, C. VI, A. 2, §16, as amended effective September 15, 1964.

[23] 1918 Detroit City Charter, T.9, C. VI, A. 3. §1, 1.1-1.23, as amended effective September 15, 1964, as amended effective July 1, 1973.

[24] 1964 Detroit City Code, Section 54-1-1, as amended by Ordinance 83-H, effective February 10, 1976, retroactive to July 1, 1975. [Ord. No. 83-H was repealed by Ord. No. 24-01.]

[25] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.2.

[26] This is a new definition.

[27] This is a new definition.

[28] Section 47-1-11 gives the Board of Trustees the authority to establish rules and regulations for the administration of the pension system.

[29] This is a new definition.

[30] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.15, as amended by 1964 Detroit City Code Section 54-1-1, as amended by Ordinance 83-H, effective February 26, 1976, retroactive to July 1, 1975. [Ord. No. 83-H was repealed by Ord. No. 24-01.]

[31] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.19.

[32] 1918 Detroit City Charter T.9, C. VI, A. 3, §1, 1.13, as amended.

[33] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.10, as amended by 1964 Detroit City Code Section 54-1-1, as amended by Ordinance 83-H, effective February 26, 1976, retroactive to July 1, 1975. [Ord. No. 83-H was repealed by Ord. No. 24-01.]

[34] A retiree is also a "beneficiary."

[35] 1918 Detroit City Charter, T.9, C. VI, A. 2, §1, as amended by 1964 Detroit City Code Section 54-1-1, as amended by Ordinance 83-H, effective February 26, 1976, retroactive to July 1, 1975. [Ord. No. 83-H was repealed by Ord. No. 24-01.]

[36] Section 47-1-4 lists membership of the Board.

[37] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.4.

[38] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.5.

[39] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.6.

[40] 26 USC 401(a)(17). The current maximum compensation is $200,000.00, Pub. L. 99-514, Title XI, §1106(d)(1), (i)(5), October 22, 1986, 100 Stat 2423, 2425, applicable to years beginning after December 31, 1988 (as adjusted for inflation).

[41] *Ibid.*

[42] This is a new definition.

[43] This is a new definition.

[44] 1918 Detroit City Charter, T.9, C. VI, A. 1, as amended by 1964 Detroit City Code Section 54-1-1.

[45] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.2.

[46] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.2(d)(e).

[47] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.14.

[48] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.3, as amended by 1964 Detroit City Code Section 54-1-1.

[49] This is a new definition.

[50] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.16, as amended by 1964 Detroit City Code Section 54-1-1, as amended by Ordinance 83-H, effective February 26, 1976, retroactive to July 1, 1975. [Ord. No. 83-H was repealed by Ord. No. 24-01.]

[51] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.20.

[52] This is a new definition.

[53] Formerly referred to as "retirant," 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.23, as amended by 1964 Detroit City Code Section 54-1-1, as amended by Ordinance 83-H, effective February 26, 1976, retroactive to July 1, 1975. A "retiree" is also a beneficiary. [Ord. No. 83-H was repealed by Ord. No. 24-01.]

[54] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.18.

[55] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.17.

[56] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.1, as amended by 1964 Detroit City Code Section 54-1-1, amended by Ordinance 83-H, effective February 26, 1976, retroactive to July 1, 1975. [Ord. No. 83-H was repealed by Ord. No. 24-01.]

[57] 1918 Detroit City Charter, T.9, C. VI, A. 1, as amended by 1964 Detroit City Code Section 54-1-1.

[58] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.7.

[59] 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.22.

[60] *See,* 1918 Detroit City Charter, T.9, C. VI, A. 3, §1, 1.22.

[61] *"Service credit"* is defined in Section 47-1-21.

[62] Ordinance No. 15-87, effective 5/22/87; retroactive to January 1, 1984; uncodified Section 47-2-1.

[63] *Consolidation of entities.*

[64] 1918 Detroit City Charter, T.9, C. VI, A. 5, §2, as amended effective September 15, 1964.

[65] 1918 Detroit City Charter, T.9, C. VI, A. 5, §3, as amended effective September 15, 1964, as amended by Ordinance 357-H, effective December 30, 1979, retroactive to January 1, 1979. [Ord. No. 357-H was repealed by Ord. No. 24-01.]

[66] 1918 Detroit City Charter, T.9, C. VI, A. 5, §3, as amended effective September 15, 1964.

62

[67] *See,* 26 USC 414(u) "Special Rules Relating to Veterans' Re-employment Rights Under USERRA," P.L. 104-183, 110 Stat 1883 (104th Congress, 2d Session 1996) (2 U.S. Code Congressional and Administrative News, p. 1883).

[68] This is consistent with Chapter 18, Article VI, of the 1984 Detroit City Code; as amended.

[69] *See,* Section 47-2-5, this ordinance.

[70] 1918 Detroit City Charter, T.9, C. VI, A. 2, §1, as amended effective September 15, 1964.

[71] 1918 Detroit City Charter, T.9, C. VI, A. 2, §2, as amended effective September 15, 1964.

[72] Those provisions outline the age and service requirements for normal service retirement, this is, after thirty years, at sixty-five with eight years, at sixty with ten years or twenty-five years of service.

[73] The "six-year rule" was upheld in *Weeks* v *Board of Trustees,* 160 Mich App 81; 408 NW2d 109 (1987).

[74] Policy Resolution of the Board of Trustees, Meeting No. 2952, October 6, 1993.

[75] *Ibid.*

[76] *Ibid.* For example, if the retired employee had more than twenty-five years of service for his/her initial retirement, his/her factor for all new service would be two point two percent (2.2%).

[77] *Ibid.* For example, if the retiree works three years, the divisor would be three, with the highest three consecutive years out of the last ten years used whenever possible.

[78] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.E., §1(a), as amended by the 1964 Detroit City Code Section 54-11-1(1) as amended by Ordinance 50-H, effective June 25, 1975, retroactive to July 1, 1974. [Ord. No. 50-H was repealed by Ord. No. 24-01.]

[79] This section is new.

[80] 1918 Detroit City Charter, T.9, C. VI, A. 6, §1.1, as amended effective September 15, 1964, as amended effective August 16, 1966. In summary, a member may retire (a) with thirty years of credited service; (b) if hired after January 1, 1996, with thirty years of credited service and age fifty-five; (c) if sixty or older with ten years of credited service; or, (d) if sixty-five or older with eights years of credit service. A member may elect an actuarially reduced service retirement at any age with twenty-five or more years of service.

[81] 1964 Detroit City Code Section 54-7-1.1, as amended effective September 15, 1964, as amended effective August 16, 1966.

[82] Service retirement allowance.

[83] 1984 Detroit City Code Section 47-2-2 and 47-2-3 (uncodified), effective March 30, 1992, retroactive to July 1, 1980. In summary, an employee is vested if; (a) hired before July 1, 1980 with eight years of service and are at least forty years of age; (b) hired before July 1, 1980 or after, after ten years of service regardless of age. Non-union employees hired between July 1, 1980 and March 20, 1992; vest under either the "forty and eight" or the "ten year" rule.

[84] Vested pension — Forty years of age with eight years of service or ten years of service.

[85] Thirty years of service.

[86] Sixty-five years of age with eight years of service, sixty years of age with ten years of service.

[87] Under sixty years of age with twenty-five years of service.

[88] *The Public Employee Retirement Benefits Forfeiture Act,* MCL 38.2701 *et seq.*

[89] *Public Employee Retirement Benefits Forfeiture Act,* MCL 38.2701 *et seq.*

[90] *Service retirement allowance.*

[91] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.A., §2, as amended effective September 15, 1964, as amended effective August 16, 1966, as amended effective July 1, 1969, as amended effective July 1, 1973, as amended

effective July 1, 1996 (Ordinance 2-97), as amended effective July 1, 1992 (Ordinance 1-98), as amended effective July 1, 1992 (Ordinance 3-98), as amended effective July 1, 1992 (Ordinance 9-99).

[92] Retirement allowance options.

[93] Service retirement Plan.

[94] For example, but not limited to, Ordinance No. 85-H, effective February 19, 1976, retroactive to July 1, 1975; Ordinance No. 165-H, effective December 3, 1976, retroactive to July 1, 1976. [Ord. Nos. 85-H and 165-H were repealed by Ord. No. 24-01.]

[95] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §1, as amended effective September 15, 1964.

[96] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §2, as amended effective September 15, 1964.

[97] Service retirement benefits.

[98] Retirement allowance options.

[99] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §2(b)(1), as amended effective September 15, 1964, as amended effective August 15, 1966, as amended effective July 1, 1973.

[100] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §2(b)(2), as amended effective September 15, 1964, as amended effective August 16, 1966, as amended effective July 1, 1973.

[101] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B. §3, as amended effective September 15, 1964. A member must have at least ten years of credited service to be eligible for a non-duty related disability benefit.

[102] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §4, as amended effective September 15, 1964, as amended effective August 16, 1966.

[103] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §4(a), as amended effective September 15, 1964, as amended effective August 16, 1966.

[104] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B. §4(b), as amended effective September 15, 1964, as amended effective August 16, 1966.

[105] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §4(b)(1), as amended effective September 15, 1964, as amended effective August 16, 1966.

[106] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §4(b)(2), as amended effective September 15, 1964, as amended effective August 16, 1966, as amended effective July 1, 1973.

[107] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.C, §1, as amended effective September 15, 1964, as amended effective August 16, 1966.

[108] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.B, §1(a), as amended effective September 15, 1964, as amended effective August 16, 1966.

[109] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.C, §1(b), as amended effective September 15, 1964, as amended effective August 16, 1966.

[110] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.C, §1(c), as amended effective September 15, 1964, as amended effective August 16, 1966.

[111] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.C, §1(e), as amended effective September 15, 1964, as amended effective August 16, 1966, as amended effective July 1, 1996 (Ordinance 29-96).

[112] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.C, §1(d), as amended effective September 15, 1964, as amended effective August 16, 1966, as amended effective July 1, 1996 (Ordinance 29-96).

[113] *Pensions offset by compensation benefits; subrogation.*

[114] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.D, §1, as amended effective September 15, 1964, as amended effective July 1, 1973.

64

[115] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.E, §1(a), as amended by 1964 Detroit City Code Section 54-11-1; as amended by Ordinance 50-H, effective June 25, 1975, retroactive to July 1, 1974, as amended by Ordinance 6-91, effective April 5, 1991, extends pop-up option to employees who retired before the option was available. [Ord. No. 50-H was repealed by Ord. No. 24-01.]

[116] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.E, §1(a), as amended by 1964 Detroit City Code Section 54-11-1; as amended by Ordinance 50-H, effective May 25, 1975, retroactive to July 1, 1974, (Option 1). [Ord. No. 50-H was repealed by Ord. No. 24-01.]

[117] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.E, §1(a), as amended by 1964 Detroit City Code Section 54-11-1(2); as amended by Ordinance 50-H, effective June 25, 1975, retroactive to July 1, 1974, (Option 2). [Ord. No. 50-H was repealed by Ord. No. 24-01.]

[118] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.E, §2.

[119] Accidental death benefit.

[120] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.E, §2.1, as amended.

[121] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.E, §3, as amended.

[122] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.F, §1.

[123] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.F. §2.

[124] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.G, §1.

[125] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.H, §1.

[126] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.H, as amended by Ordinance 2-93, effective February 8, 1993, retroactive to July 1, 1992

[127] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.H, §1.

[128] 1918 Detroit City Charter, T.9, C. VI, A. 6, P.H, §2.

[129] 1918 Detroit City Charter, T.9, C. VI, A. 7.

[130] 1918 Detroit City Charter, T.9, C. VI, A. 7, §1.

[131] 1918 Detroit City Charter, T.9, C. VI, A. 7, §2.

[132] 1918 Detroit City Charter, T.9, C. VI, A. 7, §3, as amended by Ordinance 84-7, effective February 10, 1976, retroactive to July 1, 1975.

[133] 1918 Detroit City Charter, T.9, C. VI, A. 7, §4.

[134] 1918 Detroit City Charter, T.9, C. VI, A. 7, §5.

[135] 1918 Detroit City Charter, T.9, C. VI, A. 7, §6.

[136] 1918 Detroit City Charter, T.9, C. VI, A. 7, §7.

[137] 1964 Detroit City Code Sections 54-1-7 to 54-1-9.

[138] 1964 Detroit City Code Section 54-1-8.

[139] 1964 Detroit City Code Section 54-1-9.

[140] 1918 Detroit City Charter, T.9, C. VI, A. 8.

[141] 1918 Detroit City Charter, T.9, C. VI, A. 8, §1.

[142] MCL 38.1132 *et seq.*

[143] 1918 Detroit City Charter, T.9, C. VI, A. 8., §2.

[144] 1918 Detroit City Charter, T.9, C. VI, A. 8., §3.

[145] 1918 Detroit City Charter, T.9, C. VI, A. 8., §4.

[146]1918 Detroit City Charter, T.9, C. VI, A. 8., §5.

[147]26 USC 415(l)(2).

[148]26 USC 419A(d)(2).

[149]The classified service of the City consists of all employment in the City service except: (1) elected officers; (2) persons holding appointments under the Charter; (3) persons employed to make or conduct a temporary or special inquiry, investigation, or examination on behalf of the City, and (4) others exempted by the Charter, 1997 Detroit City Charter, Section 6-517.

[150]Six hundred (600) hours is the minimum. *See,* definition of *"employee"* found in Section 47-1-21.

[151]The term "participant's compensation" means the compensation of the participant from the employer for the year, 26 USC 415(c)(3)(A).

[152]The term "eligible rollover distribution" means any portion of which may be excluded from gross income under subsection (a)(5) of this section [rollover amounts — beneficiaries of an exempt employees' Trust] or subsection (a)(4) of section 403 [rollover amounts — beneficiaries of a qualified annuity Plan] if transferred to an eligible retirement Plan in accordance with the requirements of such subsection. 26 USC 402(c)(4).

[153]26 USC 402(c)(5)(C).

[154] *See,* 26 USC 401(a)(9).

[155]Source: 26 USC 401(a)(9)(C)(i)(ii).

[156]Correct citation is Section 401(a)(9).

[157]Title 26, Section 401(a)(9)(C) defines the "required beginning date" for purposes of distributions as the later of (1) the calendar year in which the employee attains age 70-½, or the (2) calendar year in which the employee retires.

[158]26 USC 401(a)(9).

[159]Correct citation is Section 1.401(a)(9)-2. Capitalization in text is for printing purposes only.

[160]Special rules relating to veterans' preemployment rights under USERRA.

[161]MCL 552.18(2) provides that unvested retirement benefits may be considered as part of the marital estate.

[162] *American Federation of State, County and Municipal Emloyees* vs. *City of Detroit,* 252 Mich App 293; 652 NW2d 240 (2002); *aff'd* 468 Mich 388; 662 NW2d 695 (2003.)

66

# LEGEND TO FOOTNOTES TO ARTICLES A, B, C, AND D

The retirement plan provisions of a number of bargaining agreements contain identical language. The agreements that share the same provisions are consolidated into the following groups and designated with random numbers to distinguish each group from the others. Following the group name is a list of all collective bargaining agreements or city employment term agreements that contain identical language, and that apply the changes for the group as annotated in the plan document above. Unless otherwise indicated, the effective dates apply uniformly to all agreements within a group.

**CBA-1:**

- Master Agreement Between the City of Detroit and the International Union of Operating Engineers IUOE Local 324 (Principal Clerks) 2013-2018 (effective December 18, 2013 through December 31, 2018)

- Master Agreement Between the City of Detroit and the International Brotherhood of Teamsters Teamster Local 214 2013-2018 (effective December, 2013 through December 31, 2018)

**CBA-2** (effective November 12, 2014 through December 31, 2018)**:**

- Master Agreement Between the City of Detroit and the Police Officers Association of Michigan POAM 2013-2018

**CBA-3** (effective 2013 through June 30, 2018)**:**

- Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL-CIO Local 2920 (2013 – 2018 Collective Bargaining Agreement)

**CBA-4** (effective 2013 through June 30, 2016)**:**

- Building Trades Foremen Unit of Michigan Building and Construction Trades Council, AFL-CIO (2013 – 2016 Collective Bargaining Agreement) *(Please Note: The retirement provisions in this agreement apply only to those employees covered under this agreement, and hired prior to July 1, 2012.)*

**CBA-5** (effective 2013 through June 30, 2016)**:**

- Michigan Building and Construction Trades Council, AFL-CIO (2013 – 2016 Collective Bargaining Agreement)

**CBA-6** (effective March 26, 2013 through June 30, 2016)**:**

- Utility Workers Union of America Local 488 and Local 531 (2012 – 2016 Collective Bargaining Agreement Extension)

**CBA-7** (effective 2013 through June 30, 2016)**:**

- Utility Workers Union of America Local 504 (2013 – 2016 Collective Bargaining Agreement)

**CBA-8** (effective March 26, 2013 through June 30, 2020)**:**

- Association of Professional Construction Inspectors (2012 – 2020 Collective Bargaining Agreement Extension)

**CBA-9** (effective March 25, 2013 through June 30, 2022)**:**

- I.U.O.E. Local 324 – Operating Engineers, Detroit Principal Clerks & Park Management Units (2012 – 2022 Collective Bargaining Agreement Extension) *(Please Note: The retirement provisions in this agreement apply only to those employees hired prior to July 1, 2012.)*

**CBA-10** (effective 2014 through June 30, 2016)**:**

- Detroit Senior Water Systems Chemists Association (2014 – 2016 Collective Bargaining Agreement)

**CBA-11:**

- Master Agreement Between the City of Detroit and Michigan Council 25 Local 1023 of the American Federation of State, County and Municipal Employees, AFL-CIO Emergency Services Operators Chapter (2009 – 2013). This agreement expired by its terms on June 30, 2013. A letter from the Labor Relations Director dated August 23, 2013 ("Re: Terms and Condition of Employment") implemented certain changes to the employment terms (none affecting the retirement provisions), and kept all other terms the same as in this agreement.

**CET-1** (effective July 18, 2012 until modified by a collective bargaining agreement)**:**

- City Employment Terms Between the City of Detroit and Association of Professional Construction Inspectors

- City Employment Terms Between the City of Detroit and Assistant Supervisors of Street Maintenance & Construction

- City Employment Terms Between the City of Detroit and Building & Safety Inspectors – Tripartite

- City Employment Terms Between the City of Detroit and Building & Construction Trades – Foreman

- City Employment Terms Between the City of Detroit and Building & Construction Trades - Non Supervisory

- City Employment Terms Between the City of Detroit and Detroit Income Tax Investigators Association

- City Employment Terms Between the City of Detroit and International Union of Operating Engineers Local 324

- City Employment Terms Between the City of Detroit and Association of City of Detroit Supervisors

- City Employment Terms Between the City of Detroit and Association of Detroit Engineers

- City Employment Terms Between the City of Detroit and AFSCME, Local 2394 Michigan Council 25 Supervisory Unit

- City Employment Terms Between the City of Detroit and AFSCME Forestry and Landscape Foreman

- City Employment Terms Between the City of Detroit and AFSCME Non Supervisory

- City Employment Terms Between the City of Detroit and AFSCME, Paving Foreperson's

- City Employment Terms Between the City of Detroit and Association of Municipal Engineers

- City Employment Terms Between the City of Detroit and Association of Municipal Inspectors

- City Employment Terms Between the City of Detroit and Association of Professional & Technical Employees

- City Employment Terms Between the City of Detroit and International Union of Operating Engineers Local 324 - Principal Clerks Unit

- City Employment Terms Between the City of Detroit and International Union of Operating Engineers Local 324 - Park Management Association

- City Employment Terms Between the City of Detroit and Police Officers Labor Council Detention Facility Officers

- City Employment Terms Between the City of Detroit and Police Officers Labor Council - Health Department

- City Employment Terms Between the City of Detroit and Senior Accountants, Analysts, & Appraisers Association

- City Employment Terms Between the City of Detroit and Service Employees International Union Local 517M Non Supervisory Unit

- City Employment Terms Between the City of Detroit and Service Employees International Union Local 517M Professional & Technical Unit

- City Employment Terms Between the City of Detroit and Service Employees International Union Local 517M Supervisory Unit

- City Employment Terms Between the City of Detroit and Teamsters Local 214

- City Employment Terms Between the City of Detroit and United Auto Workers Local 212 - Civilian Police Investigators

- City Employment Terms Between the City of Detroit and United Auto Workers Local 412 – Paralegals

- City Employment Terms Between the City of Detroit and United Auto Workers Local 2211 - Public Attorney's Association

**CET-2** (effective July 18, 2012 until modified by a collective bargaining agreement)**:**

- City Employment Terms Between the City of Detroit and Emergency Medical Service Officers Association

- City Employment Terms Between the City of Detroit and Police Officers Association of Michigan

**CET-3** (effective July 18, 2012 until modified by a collective bargaining agreement)**:**

- City Employment Terms Between the City of Detroit and AFSCME Motor City Seasonals

**Reopener-1** (executed March 12, 2014)**:**

- International Union of Operating Engineers *(Please note: §§ 39.A. through 39.S. apply to employees hired prior to July 1, 2012.)*

**Reopener-2** (executed March 21, 2014)**:**

- Association of Professional Construction Inspectors *(Please note: §§ 25.A. through 25.Q. only apply to employees hired prior to July 1, 2012.)*

**Reopener-3** (executed March 25, 2014 and effective until June 30, 2019)**:**

- Teamsters

**Reopener-4** (executed March 26, 2014)**:**

- Building & Construction Trades Council / Building Trades Council ("BTC") *(Please note: §§ 20.A. through 20.S. apply to employees hired prior to July 1, 2012 unless modified by any plan of adjustment approved by the United States Bankruptcy Court.)*

LAI-3210845v9