**<u>EXHIBIT I.A.276</u>**

PRIOR PFRS PENSION PLAN

# COMBINED PLAN
# FOR THE
# POLICE AND FIRE
# RETIREMENT SYSTEM OF
# THE CITY OF DETROIT, MICHIGAN

**Effective July 1, 2014**

# COMPONENT II

**This Component II of the Combined Plan For the Police and Fire Retirement System of the City of Detroit, Michigan is intended to memorialize the documentation for the Police and Fire Retirement System of the City of Detroit as it existed on June 30, 2014.**

COMPILATION
OF
PLAN PROVISIONS
OF THE
POLICE AND FIRE RETIREMENT SYSTEM
OF THE CITY OF DETROIT


JULY 1, 2014


Including


Article IX, Section 24
of the
1963 State of Michigan Constitution


Article 11
of the
2012 Home Rule Charter
of the
City of Detroit
effective January 1, 2012


Chapter VII of Title IX
of the
1918 City of Detroit Charter
as amended and supplemented from time to time
by amendments to the Charter, City Ordinance and by Agreement


Chapter 54, Article II
of the
1964 Detroit City Code
as amended and supplemented from time to time
by City Ordinance
which was saved from repeal by
Section 11-102 of the 1974, 1997, and 2012 Detroit City Charters
and incorporated by reference into, but not codified in,
Chapter 47 of the 1984 Detroit City Code


Collective Bargaining Agreements

# TABLE OF CONTENTS

Page

Article IX, Section 24 of 1963 State of Michigan Constitution ................................................... ix

Article 11 of January 1, 2012 City of Detroit Charter ................................................... x

Chapter VII of Title IX of the 1918 City of Detroit Charter, as amended and supplemented from time to time by amendments to the Charter, City Ordinance and by Agreement (Retirement System of the Policemen and Firemen Retirement System of the City of Detroit)............................................................................................................... 1

Special Provisions ................................................................................................................ 2

| | | |
|---|---|---|
| Sec. 1. | Freeze of Police and Fire Retirement System as of June 30, 2014 | 2 |
| Sec. 2. | Limitation on Interest Crediting Rate for Police and Fire Retirement System Annuity Savings Fund; Rates of Regular Interest Adopted by Board for Actuarial Purposes | 4 |

ARTICLE I.      Name and Date of Establishment ................................................... 5

ARTICLE II.      Definitions ................................................... 6

| | | |
|---|---|---|
| Sec. 1. | 'System' | 6 |
| Sec. 2. | 'Policemen' | 6 |
| Sec. 3. | 'Firemen' | 6 |
| Sec. 4. | 'Member' | 6 |
| Sec. 5. | 'City' | 6 |
| Sec. 6. | 'The Council' | 6 |
| Sec. 7. | 'The Medical Director' | 6 |
| Sec. 8. | 'Service' | 6 |
| Sec. 9. | 'Prior service' | 6 |
| Sec. 10. | 'Membership service' | 7 |
| Sec. 11. | 'Beneficiary' | 7 |
| Sec. 12. | 'Regular Interest' | 7 |
| Sec. 13. | 'Accumulated contributions' | 7 |
| Sec. 14. | 'Average Final Compensation' | 7 |
| Sec. 15. | 'Final compensation' | 9 |
| Sec. 16. | 'Annuity' | 10 |
| Sec. 17. | 'Accrued Service' | 10 |
| Sec. 18. | 'Pension' | 10 |
| Sec. 19. | 'Retirement allowance' | 10 |
| Sec. 20. | 'Retirement' | 10 |
| Sec. 21. | 'Annuity reserve' | 10 |
| Sec. 22. | 'Pension Reserve' | 10 |
| Sec. 23. | 'Merit Board' | 10 |
| Sec. 24. | 'Patrolman' | 10 |
| Sec. 25. | 'Fire-fighter' | 10 |
| Sec. 26. | 'Board of trustees or board' | 10 |
| Sec. 27. | 'Decrement probabilities' | 10 |

# TABLE OF CONTENTS
### (continued)

Page

Sec. 28.      'Salary factors' ...................................................................................................10

ARTICLE III.      Administration; Board of Trustees................................................................ 12

Sec. 1.      Board created ...................................................................................................12
Sec. 2.      Membership of Board ......................................................................................12
Sec. 3.      Terms of Active Trustees, Trustee Selected by Board, Retirant
Trustees, and Trustees Designated by Mayor ................................................15
Sec. 4.      Scheduling of Elections for Active and Retirant Trustees................................15
Sec. 5.      Procedures for Election of Retiree Trustees ....................................................16
Sec. 6.      Vacancies .......................................................................................................16
Sec. 7.      Compensation ..................................................................................................17
Sec. 8.      Oath.................................................................................................................17
Sec. 9.      Meetings..........................................................................................................17
Sec. 10.     Rules for administration of funds ....................................................................17
Sec. 11.     Officers............................................................................................................17
Sec. 12.     Data for actuarial valuation of funds ...............................................................18
Sec. 13.     Record of proceedings; annual report .............................................................18
Sec. 14.     Legal advisor....................................................................................................18
Sec. 15.     Medical Director ..............................................................................................18
Sec. 16.     Actuary of Retirement System technical advisor to Board............................19
Sec. 17.     Investigation of mortality, service and compensation experience of
members...........................................................................................................19
Sec. 18.     Regular actuarial investigations .......................................................................20
Sec. 19.     Actuarial valuations of assets and liabilities....................................................20

ARTICLE IV.      Membership ................................................................................................ 22

Sec. 1.      Generally..........................................................................................................22
Sec. 2.      Membership election option ............................................................................24
Sec. 3.      Cessation of membership.................................................................................24
Sec. 4.      Report on employees........................................................................................24

ARTICLE V.      Service Creditable ........................................................................................ 26

Sec. 1.      Members to file statement of service, etc .........................................................26
Sec. 2.      Credit for service.............................................................................................26
Sec. 3.      Employees in military service...........................................................................26
Sec. 4.      Verification of service claimed.........................................................................29
Sec. 5.      Prior service certificates...................................................................................30
Sec. 6.      Creditable service at retirement .......................................................................30

ARTICLE VI.      31

Part A —      Service Retirement Allowance .................................................................... 31

Sec. 1.      Petition for retirement, mandatory age .............................................................31
Sec. 2.      Amount of allowance – Old Plan Members......................................................34

# TABLE OF CONTENTS
## (continued)

Page

Sec. 2.1.    Amount of allowance – New Plan Members ................................................... 35

Sec. 2.2.    Pension Multiplier............................................................................................ 35

Sec. 3.      Disposition of surplus benefits upon death of beneficiary.............................36

Sec. 4.      Retirement allowance for certain persons leaving city employment
             after eight years service.................................................................................37

Part B —     Total Disability Pension and Retirement Allowances ................................... 39

Sec. 1.      Duty disability.................................................................................................39

Sec. 2.      Duty disability benefits; members in service on or after July 1, 1941
             but prior to January 1, 1969...........................................................................40

Sec. 2.1.    Duty disability benefits; members beginning service on or after January 1,
             1969................................................................................................................ 41

Sec. 3.      Non-duty disability ........................................................................................50

Sec. 4.      Benefits ...........................................................................................................50

Part C —     Application, Escalation and Change in Compensation, Rank ....................... 51

Sec. 1.      Generally.........................................................................................................51

Sec. 2.      Increase of Benefits........................................................................................52

Sec. 3.      Payment...........................................................................................................54

Part D —     Death Benefits................................................................................................ 54

Sec. 1.      Generally.........................................................................................................54

Part E —     Nonduty Death ............................................................................................... 56

Sec. 1.      Payment of accumulated contributions...........................................................56

Sec. 2.      Allowances to widows, etc .............................................................................57

Part F —     Termination of Membership Otherwise than by Retirement, Death or
             Becoming a Beneficiary.................................................................................. 59

Sec. 1.      Payment of benefits.........................................................................................59

Sec. 2.      Payment of benefits.........................................................................................60

Sec. 3.      Deferred vested benefits .................................................................................60

Part G —     Conviction of Felony ..................................................................................... 60

Sec. 1.      Forfeiture of rights ..........................................................................................60

Part H —     Option Elections............................................................................................. 60

Sec. 1.      Generally.........................................................................................................60

Sec. 2.      Disposition of surplus benefits upon death of member and beneficiary..........63

Part I —     Pension Offset by Compensation Benefits .................................................... 63

Sec. 1.      Generally.........................................................................................................63

# TABLE OF CONTENTS
## (continued)

Page

Part J — Monthly Payments ........................................................................ 63

Part K — Re-Examination of Beneficiaries ............................................... 63

  Sec. 1. Authority of Board ........................................................................ 63

Part L — Medical Board of Review ........................................................... 65

Part M — Benefit Limitations ..................................................................... 65

Part N — Withdrawal of Accumulated Contributions ............................... 65

  Sec. 1. Member With Twenty or Twenty-Five Years of Service .............. 65
  Sec. 2. Disabled Member .......................................................................... 65

ARTICLE VII. Method of Financing ......................................................... 69

  Sec. 1. Annuity Savings Fund ................................................................... 69
  Sec. 2. Annuity Reserve Fund ................................................................... 70
  Sec. 3. Alternative Financing Method ....................................................... 70
  Sec. 4. Contributions to and payments from pension accumulation fund .................. 76
  Sec. 5. Retiree payments from Pension Reserve Fund; reinstatement of
        disability retirees to active service ............................................... 77
  Sec. 6. Expense Fund ................................................................................. 77
  Sec. 7. Appropriations ............................................................................... 77
  Sec. 8. Maintenance of reserves ............................................................... 77
  Sec. 9. Survivors Benefit Fund .................................................................. 78
  Sec. 10. Computation of annuity and pension reserve liabilities for members,
        retirants and beneficiaries ............................................................ 79
  Sec. 11. Determination of city's annual contribution — Disability pension
        liabilities ....................................................................................... 82
  Sec. 12. Determination of city's annual contribution — Death pension
        liabilities ....................................................................................... 82
  Sec. 13. Determination of city's annual contribution — Actuarial evaluation of
        annuity and pension reserve liabilities ........................................ 82
  Sec. 14. Determination of city's annual contribution — Service pension
        liabilities ....................................................................................... 82
  Sec. 15. Board of trustees to compute city's annual contribution ............. 83
  Sec. 16. Repealed ...................................................................................... 83
  Sec. 17. Refunds for certain members ...................................................... 83

ARTICLE VIII. Management of Funds ...................................................... 85

  Sec. 1. Board named Trustees for various funds ...................................... 85
  Sec. 2. Purchase, sale, etc., of securities and investments ....................... 85
  Sec. 3. Annual interest .............................................................................. 85
  Sec. 4. Custodian of funds ......................................................................... 85
  Sec. 5. Available funds shall be kept upon deposit ................................... 86
  Sec. 6. Prohibition against reversion of funds to the City ........................ 86
  Sec. 7. Enforcement; Civil Action ............................................................ 86

13-53846-tjt   Doc 7502-3   Filed 09/16/14   Entered 09/16/14 01:20:42   Page 8 of 201

ARTICLE IX.     Miscellaneous ............................................................. 87

    Sec. 1.     Assignments prohibited ............................................87
    Sec. 2.     Protection against fraud ............................................87
    Sec. 3.     Errors...........................................................................87
    Sec. 4.     Recall of beneficiaries during emergencies .................87
    Sec. 5.     Limitation of other statutes .......................................88
    Sec. 6.     Tax Qualified Plan ....................................................89
    Sec. 7.     Definition of Compensation.......................................89
    Sec. 8.     Limitation of Compensation ......................................90
    Sec. 9.     Limitation of Benefits ...............................................91
    Sec. 10.    Direct Rollovers ........................................................92

ARTICLE X.      Collective Bargaining Agreements ............................... 94

ARTICLE XI.     Compliance With USERRA ......................................... 95

ARTICLE XII.    Deferred Retirement Option Plan ................................ 96

ARTICLE XIII.   Participant Annuity Savings Fund Loan Program ....................................... 101

## § 24.   Public pension plans and retirement systems, obligation.

Sec. 24.  The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

## ARTICLE 11.
## RETIREMENT PLANS

### Sec. 11-101.  City's Duties.

1.      The city shall provide, by ordinance for the establishment and maintenance of retirement plan coverage for city employees.

2.      Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and that funding shall not be used for financing unfunded accrued liabilities.

3.      The accrued financial benefits of active and retired city employees, being contractual obligations of the city, shall in no event be diminished or impaired.

### Sec. 11-102.  Continuation of Existing Plans.

The retirement plans of the city existing when this Charter takes effect, including the existing governing bodies for administering those plans, the benefit schedules for those plans and the terms for accruing rights to and receiving benefits under those plans shall, in all respects, continue in existence exactly as before unless changed by this Charter or an ordinance adopted in accordance with this article.

### Sec. 11-103.  Principles Applicable In Administering Plans.

Not more than two (2) governing bodies for administering the city's retirement plans may be established.

1.      The board of trustees of the general retirement system shall consist of:

   A.      The mayor;

   B.      A city council member selected by that body;

   C.      The city treasurer;

   D.      Five (5) members of the retirement system, to be elected by the members of the retirement system under rules and regulations as may be adopted by the board;  except that not more than one (1) trustee shall be elected from any department;

   E.      A citizen of the city who is neither an employee of the city nor eligible to receive benefits under the retirement system, appointed by the mayor, subject to approval of the Board; and

F. One (1) retirant, receiving benefits under the retirement system and elected by retired city employees under procedures established by ordinance.

2. The board of trustees of the police and fire retirement system shall consist of:

A. The mayor or in the absence of the mayor, a designee;

B. A city council member selected by that body;

C. The city treasurer;

D. The chief of police;

E. The fire commissioner;

F. Three (3) firefighters who are members of the retirement system elected by the firefighter members under the rules and regulations as may be adopted by the board. Trustees shall be:

1. Two (2) to be elected by and from members holding the rank of lieutenant (or equivalent) and lower ranks;

2. One (1) to be elected by and from members holding a rank above lieutenant (or equivalent);

G. Three (3) police officers who are members of the retirement system elected by police officer members under the rules and regulations as may be adopted by the board. Trustees shall be:

1. Two (2) to be elected by and from members holding the rank of lieutenant (or equivalent) and lower ranks;

2. One (1) to be elected by and from members holding a rank above lieutenant (or equivalent); and

H. Two retirants, receiving benefits under the retirement system, who shall be residents of the city, one elected by retired firefighters and one elected by retired police officers under procedures established by ordinance.

Staff services required by a governing body shall be provided as determined by the finance director.

### Sec. 11-104. Information Required Before Benefit Increase.

Before final action on any proposed change in future retirement benefits is taken, the city council shall obtain a report as to the immediate and long-term costs of the change from an independent actuary of its choosing and may not take final action until at least three (3) months after the report of the actuary is made public at a meeting of the city council.

**Sec. 11-105.   Audits.**

The board of trustees for the city retirement plans shall contract for annual independent audits.

**CHAPTER VII OF TITLE IX**
**OF THE**
**1918 CITY OF DETROIT CHARTER**
**as amended and supplemented from time to time**
**by amendments to the Charter, City Ordinance and by Agreement**


Including


**CHAPTER 54, ARTICLE II**
**OF THE**
**1964 DETROIT CITY CODE**
**as amended and supplemented from time to time**
**by City Ordinance**
**which was saved from repeal by**
**Section 11-102 of the 1974, 1997, and 2012 Detroit City Charters**
**and incorporated by reference into, but not codified in,**
**Chapter 47 of the 1984 Detroit City Code**

1

**Special Provisions**

**Sec. 1.  Freeze of Police and Fire Retirement System as of June 30, 2014.**

Notwithstanding anything in Chapter 47 of the 1984 Detroit City Code, or in Chapter 54, Article II of the 1964 Detroit City Code, or any ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other documents governing terms of employment to the contrary, effective as of June 30, 2014 (the "Freeze Date") –

(a)  No new employee hired by the City on or after July 1, 2014 shall become a member who is eligible to accrue a benefit under the terms of the Police and Fire Retirement System in effect as of the Freeze Date;

(b)  No employee who is rehired by the City on or after July 1, 2014 and who received a distribution of his accumulated employee contributions prior to July 1, 2014, shall become a member who is eligible to accrue a benefit under the terms of the Police and Fire Retirement System in effect as of the Freeze Date; *provided, however*, that if a member who is entitled to a Frozen Accrued Benefit as defined in subsection (d) of this Section 54-2-15 and who is rehired by the City on or after July 1, 2014 repays to the Police and Fire Retirement System in accordance with a payment schedule approved by the Board of Trustees the amount of accumulated employee contributions that he withdrew then such member shall be eligible to accrue service credit following rehire solely for the purpose of determining the member's eligibility for payment of his Frozen Accrued Benefit;

(c)  No member shall make contributions to the Annuity Savings Fund under the Police and Fire Retirement System in effect as of June 30, 2014 with respect to wages earned on or after July 14, 2014 and all member contributions made on or after July 14, 2014 shall be made to and in accordance with the terms of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan;

(d)  Benefit accruals for members with respect to service rendered prior to July 1, 2014 will be frozen based on a member's years of service and Average Final Compensation and the pension multiplier formulae as of such Freeze Date ("Frozen Accrued Benefit");

(e)  Except as otherwise provided in this Section 54-2-15, compensation of a member shall be frozen effective as of the Freeze Date for purposes of determining the member's Frozen Accrued Benefit.  No compensation of any type earned by a member after the Freeze Date shall be taken into consideration for purposes of determining the member's Frozen Accrued Benefit under the Police and Fire Retirement System;

(f)     Any member who, as of June 30, 2014, would have been eligible to elect to use a portion of the unused accrued sick leave that he could have received in cash upon retirement ("Cashable Sick Leave") to increase his Average Final Compensation if the member had been eligible to retire and had elected to retire as of June 30, 2014, shall have a one-time election to have the value of twenty-five percent (25%) of the member's Cashable Sick Leave as of June 30, 2014 included in the computation of the member's Average Final Compensation for purposes of determining the member's Frozen Accrued Benefit ("Sick Leave Election"); provided, however, that the amount of the member's Cashable Sick Leave at the time the completed election form is received by the Retirement System is at least equal to the value of twenty-five percent (25%) of the member's Cashable Sick Leave as of June 30, 2014 and, provided further that the completed election form is received by the Retirement System no later than August 15, 2014. A member's Sick Leave Election shall be made in the manner set forth by the Board of Trustees and the Police and Fire Retirement System. Notwithstanding anything in this subsection (f) to the contrary, a member's Sick Leave Election will be void and the determination of the member's Average Final Compensation for purposes of calculating the member's Frozen Accrued Benefit will not take into account any of the member's Cashable Sick Leave, if (i) the electing member would not have been eligible to receive an immediate service retirement benefit if he retired as of June 30, 2014, and (ii) the electing member's employment with the City is terminated before the electing member becomes eligible for an immediate service retirement benefit under the Police and Fire Retirement System;

(g)     Service earned after the Freeze Date shall be credited to a member solely for purposes of determining a member's vesting in and eligibility for payment of his or her Frozen Accrued Benefit and to a rehired member solely for purposes of determining the member's eligibility for payment of his or her Frozen Accrued Benefit. Service credit for all members for benefit accrual purposes under the terms of the Police and Fire Retirement System in effect as of the Freeze Date shall be frozen effective as of the Freeze Date and no member shall earn service credit with respect to benefits payable under the terms of the Police and Fire Retirement System in effect as of the Freeze Date (except for vesting and benefit payment eligibility purposes) after the Freeze Date; and

(h)     Effective as of July 1, 2014, the Deferred Retirement Option Plan ("DROP") shall be closed to, and no longer a distribution option with respect the Frozen Accrued Benefit of, members who are represented by the Detroit Fire Fighters Association or the Detroit Police Officers Association and who, as of June 30, 2014, have not elected to participate in the DROP. The DROP shall remain in effect for all members who either have enrolled in or elected to participate in the DROP as of June 30, 2014. Further, for members who are represented by the Detroit Police

3

Command Officers Association and the Detroit Police Lieutenants and Sergeants Association who elect to participate in DROP after June 30, 2014, participation in DROP with respect to their Frozen Accrued Benefit shall be limited to five years.

The foregoing terms of Section 54-2-15 shall be referred to as the "Freeze" of the provisions of the Police and Fire Retirement System as in effect on the Freeze Date and the provisions of the Police and Fire Retirement System shall be interpreted and construed by the Board of Trustees and the Police and Fire Retirement System to give full effect to the Freeze. To the extent that a conflict arises between this Section 54-2-15 and other provisions in Chapter 54 of the 1964 Detroit City Code, or any Charter, ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other document governing terms of employment of an employee, the Board of Trustees and the Police and Fire Retirement System are directed to interpret any inconsistency or ambiguity to give full effect to the Freeze.

(Ord. No. 12-14, Sec. 54-2-15.)

**Sec. 2.    Limitation on Interest Crediting Rate for Police and Fire Retirement System Annuity Savings Fund; Rates of Regular Interest Adopted by Board for Actuarial Purposes.**

Notwithstanding anything in Chapter 47 of the 1984 Detroit City Code or in Chapter 54, Article II of the 1964 Detroit City Code, or any City Charter provision, ordinances, resolutions, or orders, or parts thereof, whether codified or not codified, or any collective bargaining agreement or other documents governing terms of employment to the contrary, effective as of June 30, 2014 for plan years beginning on and after July 1, 2014;

(a)    the annual rate of return credited to a member's account in the Annuity Savings Fund of the Police and Fire Retirement System of the City of Detroit shall be no less than zero and no greater than the lesser of (i) 5.25% or (ii) the actual investment return net of expenses of the System's invested reserves for the second fiscal year immediately preceding the fiscal year in which the annual return is credited; and

(b)    the rate(s) of regular interest adopted by the Board from time to time as necessary for the operation of the system on an actuarial basis shall not violate the plan for the adjustment of debts of the City of Detroit, as confirmed by an order of the United States Bankruptcy Court for the Eastern District of Michigan in the City's chapter 9 bankruptcy case (*In re City of Detroit, Michigan*, Case No. 13-53846).

(Ord. No. 13-14, Sec. 54-2-16.)

4

## ARTICLE I.

### Name and Date of Establishment.

A Pension System for Policemen and Firemen of the City of Detroit Police and Fire Departments is hereby established for the purpose of providing retirement allowances, death and survivor benefits for eligible police and fire employees and their beneficiaries. The effective date of this System is July 1, 1941. Upon the effective date of this Ordinance, the former *Policemen and Firemen Retirement System* shall be called the *Police and Fire Retirement System*. (Ord. No. 04-05, Sec. 54-43-1.)

---

### By Agreement

Defined Contribution Plan for Current and New Hires – The City reserves the right to design, establish, manage, amend, and implement a Defined Contribution Plan and related duty disability retirement provisions for current employees and new hires, which may include a Defined Contribution Retirement health care plan.

The City reserves the right to modify, amend, and/or eliminate any and all aspects of its pension/retirement plan(s), unless prohibited by law.[1]

---

---

[1] DPCOA (§ 41.O-R.).

# ARTICLE II.

## Definitions.

The following words and phrases as used in this amendment, unless a different meaning is plainly required by the context, shall have the following meanings:

Sec. 1. "System" shall mean the Police and Fire Retirement System of the City of Detroit created and established by Title IX, Chapter VII of the 1918 charter of the city as amended through June 30, 1974 and continued in effect by the provisions of the July 1, 1974 city charter. (Ord. No. 77-H, Sec. 54-2-1.)

The system consists of a defined benefit plan (having a pension accumulation fund and pension reserve fund) and a defined contribution plan (having an annuity savings fund and annuity reserve fund) and income and expense funds applicable to each of the plans.

Sec. 2. "Policemen" shall mean all employees of the Police Department who have taken the oath of office as prescribed in Section 12 of Chapter XXI of Title IV of the 1918 Detroit City Charter, and who shall be in the employ of the Police Department of the City of Detroit on the effective date of this amendment and all persons who shall take the said oath of office and become members of the Police Force thereafter, excluding Patrolmen of either departments, privately employed patrolmen and special patrolmen.

Sec. 3. "Firemen" shall mean all employees of the Fire Department employed therein prior to November 10, 1937, and all future employees whom the Board of Trustees shall designate as Firemen; provided, however, that employees inducted subsequent to November 10, 1937, and excluded from the provisions hereof by reason of their classification as civilian employees, shall become eligible for membership in the Retirement System for employees of the City of Detroit under Title IX, Chapter VI of the 1918 Detroit City Charter, and their inclusion under such System shall not affect the rights of any other member of the Fire Department.

Sec. 4. "Member" shall mean any member of the retirement system who has not retired. (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 5. "City" shall mean the City of Detroit, State of Michigan.

Sec. 6. "The Council" shall mean the City Council of the City of Detroit.

(Per July 1, 1974 Charter, "The Council" means City Council of the City of Detroit.)

Sec. 7. "The Medical Director" shall mean the physician provided for in Article III, Section 12 (a) of this amendment.

Sec. 8. "Service" shall mean service as a Policeman or Fireman.

Sec. 9. "Prior service" shall mean service as an employee of the Police Department or Fire Department prior to the effective date of this amendment.

6

Sec. 10. "Membership service" shall mean the total service rendered as a Policeman or Fireman after the effective date of this amendment.

Sec. 11. "Beneficiary" shall mean any person, except a retirant, who is in receipt of a retirement allowance or pension payable from funds of the system. (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 12. "Regular Interest" shall mean, for a period of five years from the effective date of the system interest at four per centum per annum, compounded annually. For the subsequent five year period, and each five year period thereafter "regular interest" shall be such rate of interest as the Board of Trustees, in its discretion, may determine and adopt.

Sec. 13. "Accumulated contributions" shall mean the sum of all amounts deducted from the compensation of a member and credited to his individual account in the Annuity Savings Fund, together with regular interest, as provided in Article VII and VIII of this amendment.

Sec. 14. "Average Final Compensation" shall mean:

(a)     With respect to an "old plan member" the current maximum salary for the rank(s), grade(s) or position(s) held by the member over the sixty (60) months immediately preceding the date his employment with the city last terminated. The salary shall be obtained from the official compensation schedule for the fiscal year of the member's elective date of retirement **[and an average is determined[2]]**. A member who retires on or after July 1, 1998 shall have the member's most recent full longevity payment included in his average final compensation.

(b)     With respect to a "new plan member" **[retiring on or after July 1, 1992[3]]** the current maximum salary for the rank(s), grade(s) or position(s) held by the member over the sixty (60) months immediately preceding the date his employment with the City last terminated. The salary shall be obtained from the official compensation schedule for the fiscal year of the member's elective date of retirement **[and an average is determined[4]]**. If more than one (1) rank, grade or position has been held over the sixty (60) month period, a weighted average is determined based on time spent in each rank, grade or position during this sixty (60) months period. (Ord. No. 18-93, Sec. 47-12.2-14(C).) A member who retires on or after July 1, 1998 shall have the member's most recent full longevity payment included in his average final compensation. Effective July 1, 2000, the average final compensation shall be calculated for members of the DPCOA, Executive members and their fire equivalents by using the current maximum salary for the rank(s), grade(s) or position(s) held by the member over the thirty-six (36) months immediately preceding the date his employment with the City last terminated.

---

[2]     DPCOA (§ 41.D.1.); DPLSA (§ 51.D.1.).

[3]     DPLSA (§ 51.D.2.).

[4]     DPCOA (§ 41.D.2.); DPLSA (§ 51.D.2.).

Effective July 1, 1992, with respect to reduced duty disability retirements, on or after July 1, 1992, notwithstanding the provisions of Article VI, Part B, Section 2.1, for those members who receive benefits under Article VI, Part B, Section 2.1(a), the average final compensation used in the computation of the reduced duty disability allowance shall mean the maximum salary at the date of conversion to reduced duty disability retirement for the rank(s), grade(s), or positions(s) which were held by the member over the sixty (60) months prior to his or her duty disability retirement. (Ord. No. 18-93, Sec. 47-12.2-14(E).)

For purposes of computing the average final compensation received by a member who retires on or after July 1, 2008, the member shall have the option of adding the value of the three year average of twenty-five percent (25%) of the member's unused accrued sick leave at the time of retirement to the earnings used in computing the Average Final Compensation.

---

**By Agreement**

---

**Definition of Average Final Compensation**

The average final compensation for "old plan" and "new plan" members **[or for "old plan" members and for "new plan" members retiring on or after [July 1, 1992[5] or July 1, 2000[6]]** is calculated by using the current maximum salary for the rank(s), grade(s) or position(s) held by the member over the sixty (60) months just prior to the member's elective date of retirement **[plus the amount of their most recent full longevity payment. The salary is obtained from the Official Compensation Schedule for the fiscal year prior to the member's elective date of retirement and an average is determined[7]]**.[8]

---

**DFFA**

---

Effective July 1, 2000, for members with a parity relationship with the DPCOA Inspector, the average final compensation shall be calculated by using the current maximum salary for the ranks(s), grade(s), or position(s) held by the member over the thirty-six (36) months just prior to the member's elective date of retirement. The salary is obtained from the Official Compensation Schedule for the fiscal year prior to the member's elective date of retirement and an average is determined.

For members having a parity relationship with the DPLSA and the DPCOA Inspector, who retire on or after July 1, 1998 and for those having a parity relationship with the DPOA who retire on or after July 1, 2000, the amount of the member's most recent full longevity payment shall be included in the definition of average final compensation.

---

[5] DPOA (§ 33.J.)(does not include longevity pay for these members).

[6] DPOA (§ 33.J.)(does include longevity pay for these members).

[7] DPOA (§ 33.J.)(The longevity pay is included only for those members retiring on or after July 1, 2000.).

[8] DFFA (§ 22.A.14.k.); DPOA (§ 33.J.).

All members who retire on or after July 1, 2008, may choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank and have that sum included in the average compensation used to compute the members' service pension of their retirement allowance.[9]

---

**DPCOA**

---

Retirement and Death Sick Leave Payment

(1) Effective January 15, 2010, non-union uniformed Police and Fire executives shall receive full pay for one hundred percent (100%) of the unused accumulated sick bank amounts, or

(2) choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank as provided in (1) above, and have that sum included in the average final compensation used to compute the member's service pension of their retirement allowance. For any member choosing to exercise this option, the lump sum payment the member will receive will be the remaining value of the unused accrued sick leave bank as provided in (1) above.[10]

---

**DPLSA**

---

(1) Effective July 1, 2008, a member shall receive full pay for eighty-five percent (85%) of the unused accumulated sick bank amounts, or

(2) choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank as provided in 1) above, and have that sum included in the average final compensation used to compute the member's service pension of their retirement allowance. For any member choosing to exercise this option, the lump sum payment the member will receive will be the remaining value of the unused accrued sick leave bank as provided in 1) above.

---

Sec. 15. "Final compensation" shall mean the annual rate of earnable compensation of a member at the time of termination of employment. Effective July 1, 1992, compensation shall also include the value of the percentage reduction in compensation for non-union employees, pursuant to ordinance, resolution or executive order. In cases of any doubt regarding these values, the decisions of the Board of Trustees of the Policemen and Firemen Retirement System of the City of Detroit shall be controlling to implement the intention that no non-union employee will suffer a diminution of pension benefits computation due to reduction in compensation because of fiscal emergency and that pension benefits with respect to fiscal years beginning July 1, 1992 and thereafter should always be computed as if no reduction in compensation occurred

---

[9]   DFFA (§ 22.A.14.k.).

[10]   312 Award # 2, Union Issue No.5-Sick Bank Payout, pg. 20 (as articulated in a memorandum from Joseph P. Martinico, Labor Relations Director to the Detroit City Council, dated March 22, 2010 titled "Re: Implementation of Wage Increases and Fringe Benefit Changes for Non-Union Uniformed Police and Fire Executives").

due to ordinance, resolution or executive order or directive. (Ord. No. 18-93, Sec. 47-12.2-14(D).)

Sec. 16. "Annuity" shall mean payments derived from the accumulated contributions of a member. (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 17. "Accrued Service" shall mean a member's credited service for employment rendered before the date of an actuarial valuation of the retirement system. (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 18. "Pension" shall mean the portion of a retirement allowance which is paid for by appropriations made by the City. (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 19. "Retirement allowance" shall mean the sum of the annuity and the pension.

Sec. 20. "Retirement" shall mean for any member that such member has retired, with a pension payable from the funds of the retirement system.

Sec. 21. "Annuity reserve" shall mean the present value of all payments to be made on account of any annuity, or benefits in lieu of any annuity, computed on the basis of such mortality tables and regular interest as shall be adopted by the Board of Trustees.

See. 22. "Pension Reserve" shall mean the present value of all payments to be made on account of any pension, or benefit in lieu of any pension, computed upon the basis of such mortality tables and regular interest as shall be adopted by the Board of Trustees.

Sec. 23. "Merit Board" shall mean the Police Merit Board established by section 14, of Chapter XXI, of Title IV, of the 1918 Detroit City Charter, as amended.

Sec. 24. "Patrolman" shall mean the rank in the Police Department currently known as patrolman. (As amended November 5, 1968. In effect January 1, 1969.)

Sec. 25. "Fire-fighter" shall mean the rank in the Fire Department currently classified by the civil service commission as fire-fighter. (As amended November 5, 1968. In effect January 1, 1969.)

Sec. 26. "Board of trustees" or "board" shall mean the board of trustees of the City of Detroit police and fire retirement system. (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 27. "Decrement probabilities" shall mean the probabilities of a member's withdrawal from City employment, death while in the employ of the City, retirement from City employment with a pension payable from funds of the retirement system, and death after retirement. (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 28. "Salary factors" shall mean the ratio between a member's rate of compensation as of the date of an actuarial valuation of the retirement system and his rate of compensation as of the date of his retirement. (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 29.  "Retirant" shall mean any member who has retired with a pension payable from funds of the retirement system.  (Ord. No. 77-H, Sec. 54-2-1.)

Sec. 30.  "Old plan" shall mean the plan originally created by Title IX, Chapter VII, Article IV, Section 1(A) and (B) of the 1918 City of Detroit Charter as amended through June 30, 1974 and continued in effect by Article 11, Section 102 of the July 1, 1974 City of Detroit Charter.  (Ord. No. 18-93, Sec. 47-12.6A-2.3.)

Sec. 31.  "New plan" shall mean the plan originally created by Title IX, Chapter VII, Article IV, Section 1(D) of the 1918 City of Detroit Charter as amended through June 30, 1974 and continued in effect by Article 11, Section 102 of the July 1, 1974 City of Detroit Charter. (Ord. No. 18-93, Sec. 47-12.6A-2.3.)

Sec. 32.  The masculine pronoun shall include the feminine pronoun.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. II.)

# ARTICLE III.

## Administration; Board of Trustees.

### Sec. 1.    Board created.

There is hereby created a Board of Trustees of the System, in which is vested the general administration, management and responsibility for the proper operation of the System and for making effective the provisions of this amendment.  The Board of Trustees shall be organized immediately after five of the Trustees, provided for in this article, shall have qualified and taken the oath of office. (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 1.)

### Sec. 2.    Membership of Board.

The Board of Trustees shall consist of seventeen (17) Trustees as follows:

(1)    The Mayor of the City or his delegate, or his or her designated representative, ex-officio;

(2)    The President of the City Council or another member of the Body elected by the City Council, ex-officio;

(3)    The City Treasurer, or Deputy City Treasurer, ex-officio;

(4)    The Finance  Director, or a designated representative, ex-officio;

(5)    The Budget Director, or a designated representative, ex-officio;

(6)    The Corporation Counsel, or a designated representative, ex-officio;

(7)    Three (3) firefighters who are members of the System to be elected by the Firemen members as follows:

    (a)    Two (2) to be elected by and from the members holding the rank of lieutenant, or its equivalent, and lower ranks; and

    (b)    One (1) to be elected by and from the members holding ranks above the rank of lieutenant, or its equivalent;

(8)    Three (3) police officers who are members of the System to be elected by the Policemen members, as follows:

    (a)    Two (2) to be elected by and from the members holding the rank of lieutenant, or its equivalent, and lower ranks; and

    (b)    One (1) to be elected by and from the members holding a rank above the rank of lieutenant, or its equivalent;

(9)     One (1) trustee who neither is a participant in the plan nor employed by the City in any capacity and is selected by the Board;

(10)    Two (2) retirees who are receiving benefits under the System, are residents of the City of Detroit, and are elected in accordance with Section 5 of this Article, as follows:

    (a)     One (1) to be elected by retiree police officers; and

    (b)     One (1) to be elected by retiree firefighters;

(11)    Upon election of a retiree police officer trustee, the Mayor shall designate one (1) non-participating trustee; and

(12)    Upon election of a retiree firefighter trustee, the Mayor shall designate one (1) non-participating trustee.

(Ord. No. 07-12, Sec. 54-2-8.1; Ord. No. 19-93, Sec. 47-9-1; Ord. No. 339-H, Sec. 54-2-9.)

---

## By Agreement

(a)     The Board of Trustees shall consist of twelve (12) trustees, as follows:

(1)     The Mayor of the City or his/her designated representative, ex-officio.

(2)     The President of the City Council, or another member thereof elected by the City Council, ex-officio.

(3)     The City Treasurer or Deputy City Treasurer, ex-officio.

(4)     The Finance Director or designated representative, ex-officio.

(5)     The Budget Director or designated representative, ex-officio.

(6)     The Corporation Counsel or designated representative, ex-officio.

(7)     Three (3) Firefighters who are members of the system to be elected by the Firefighter members under such rules and regulations as may be established by the Fire Commissioner to govern such elections. Such trustees shall consist of:

    a.     Two (2) to be elected by and from members holding the rank of Lieutenant (or its equivalent) and lower ranks.

    b.     One (1) to be elected by and from the members holding rank above the rank of Lieutenant (or its equivalent).

(8)     Three (3) Police Officers who are members of the system to be elected by the Police Officer members under such rules and regulations as may be established by the Police Chief to govern such elections. Such trustees shall consist of:

      a.     Two (2) to be elected by and from the members holding the rank of Lieutenant (or its equivalent) and lower ranks.

      b.     One (1) to be elected by and from the members holding ranks above the rank of Lieutenant (or its equivalent).

(b)     Annual elections shall be held in the Police and Fire Departments during the month of May to elect a trustee to fill the vacancy created by the expiration of a term.

    In each such election the members entitled to vote shall be those of classes provided above, the term of whose representative is about to expire. The terms of office for all elected trustees shall be three (3) years. Elected trustees holding office on the effective date of this provision shall serve the remainder of their term.

(c)     Deadlock and thirteenth trustee: **[Effective September 1, 2011,[11]]** an additional thirteenth trustee, who may not be a participant in the plan or employed by the City in any capacity, shall be selected by the Board of Trustees. Such trustee shall serve as a full member of the Board of Trustees and vote on any and all matters considered by the Board. This thirteenth member of the Board of Trustees, and successors, shall serve as a member for two (2) years from the date of selection.

(d)     Equal number of participant trustees and non-participant trustees: **[Effective September 1, 2011,[12]]** under no circumstances shall the number of trustees on the Board of Trustees who are participants in the plan exceed the number of non-participant trustees named in paragraphs A.1 through A.6 herein. The Mayor of the City shall designate an additional trustee or trustees pursuant to subparagraph A.1 as necessary to maintain compliance with these provisions.[13]

---

**DPCOA**

The City reserves the right to change the composition, structure and decision making procedures of the Pension Board.[14]

---

[11]     DPOA (§ 46.J.).

[12]     DPOA (§ 46.K.).

[13]     DFFA (§ 21.); DPCOA (§ 42.); DPLSA (§ 56.); DPOA (§ 46.).

[14]     DPCOA (§ 42.E.).

**Sec. 3.** **Terms of Active Trustees, Trustee Selected by Board, Retirant Trustees, and Trustees Designated by Mayor.**

(a)     The term of office for elected active trustees under Sections 2(7) and (8) of this Article shall be three (3) years. Elected trustees holding office on the effective date of this section shall serve the remainder of their term.

(b)     The term of office for the trustee who is selected by the Board under Section 2(9) of this Code shall be two (2) years from the date of selection.

(c)     Except as otherwise provided in Section 4(c), the term of office for elected retirant trustees under Section 2(10) of this Article shall be three (3) years.

(d)     The term of office for trustees who are designated by the Mayor under Sections 2(11) and 2(12) of this Article shall be three (3) years.

(Ord. No. 14-14, Sec. 54-2-8.2; Ord. No. 07-12, Sec. 54-2-8.2)

**Sec. 4.** **Scheduling of Elections for Active and Retirant Trustees.**

(a)     For active police and firefighters, annual elections shall be held in the Police and Fire Departments during the month of May to elect a trustee to fill the vacancy created by the expiration of a term.

(b)     For retirants;

(1)     The first election to elect the two (2) retirant trustees shall be held sixty (60) days after the effective date of this section; and

(2)     After the first election, an election shall be conducted every three (3) years during the Month of May to fill vacancies created by the expiration of a term.

(c)     A special election for retirant trustees shall be held as soon as practicable after the plan for the adjustment of debts of the City of Detroit is confirmed by an order of the United States Bankruptcy Court for the Eastern District of Michigan in the City's chapter 9 bankruptcy case (*In re City of Detroit, Michigan*, Case No. 13-53846). Notwithstanding anything in Section 3(c) to the contrary, unless a retirant trustee elected by reason of this special election resigns or is removed from the position of trustee in accordance with the terms of the governing documents for the retirement system, a retirant elected to the office of trustee in the special election shall be eligible to serve a full term of three (3) years from the date of the special election, plus such period of time until the first month of May that follows the third anniversary of the special election, at which time an election for retirant trustees shall be held in accordance with Section 5.

(Ord. No. 14-14, Sec. 54-2-8.3; Ord. No. 07-12, Sec. 54-2-8.3)

15

**Sec. 5.      Procedures for Election of Retiree Trustees.**

The procedures for the election of the retiree trustees shall be as follows:

(a)      *Notice*.  A notice of a primary election shall be sent to each retiree of the System by Unites States mail;

(b)      *Nominating petitions*.  No candidate's name shall be placed on the primary election ballot, unless a nominating petition containing the signatures of at least one hundred and twenty-five (125) retirees of the System is filed with the Secretary of the Board.  The form of the nominating petition, the filing of the petition, and the procedure for verification of signatures shall be in accordance with rules and regulations adopted by the Board;

(c)      *Ballot*.  Each candidate whose name appears on the ballot at any election held for the Office of Retiree Trustee shall be identified by the title of the position held at the time of retirement and the word "incumbent" where the candidate is a current trustee seeking re-election.  No ballot shall contain any organizational or political designation or mark.  Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board;

(d)      *Voting*.  Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same procedures as adopted and followed by the Board in the immediately preceding election of an active employee trustee;

(e)      *Procedures*.  Procedures regarding the selection and certification of successful candidates for nomination, the selection of trustees from nominees, the votes, and the destruction of ballots shall be the same procedures as adopted and followed by the Board in the immediately preceding election of an active employee trustee; and

(f)      Any matters relative to election of the retiree members of the Board not covered by this section shall be according to such rules and regulations as the Board may adopt.

(Ord. No. 07-12, Sec. 54-2-8.4; Ord. 56-H, Sec. 54-3-3.1.)

**Sec. 6.      Vacancies.**

If a vacancy occurs in the office of Trustee from any cause other than expiration of a term, the vacancy for the unexpired term shall be filled within sixty days of the date of said vacancy in the same manner as the office was previously filled.  No vacancy shall result by reason of change in rank or grade of a Trustee during his term of office. (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 3.)

### Sec. 7.   Compensation.

All members of the Board of Trustees shall serve without additional compensation from the City, but they shall be reimbursed from the Expense Fund for all necessary expenses incurred through service on the Board of Trustees.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 4.)

### Sec. 8.   Oath.

Each Trustee shall, within ten days after his appointment or election, take an oath of office to be administered by the City Clerk.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 5.)

### Sec. 9.   Meetings.

(a)   The Board of Trustees shall hold meetings regularly, at least one in each month, and shall designate the time and place thereof.  It shall adopt its own rules of procedure, including provisions for special meetings and notice thereof and shall keep a record of its proceedings.  All meetings of the Board of Trustees shall be public.

(b)   Each Trustee shall be entitled to one vote in the meetings of the Board of Trustees.  Five members of the Board of Trustees, three of whom must be elected members, shall constitute a quorum and a majority of concurring votes shall be necessary for a decision by the Trustees at any meeting of the Board of Trustees.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 6.)

### Sec. 10.   Rules for administration of funds.

Subject to the limitations contained in this amendment, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this amendment and for the transaction of its business.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 7.)

### Sec. 11.   Officers.

The Board of Trustees shall elect from its membership a Chairman and a Vice Chairman. The City Controller or his representative, shall be ex-officio Secretary of the Board of Trustees. The Board of Trustees may employ, and fix the compensation of such special actuarial, medical and other employees as shall be required.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 8.) (Historical Reference:  the words "and subject to the approval of the Common Council" after the word "employ" in the last sentence were deleted pursuant to Public Act 55 of 1982 effective April 6, 1982.)

### Sec. 12.   Data for actuarial valuation of funds.

The Board of Trustees shall keep, or cause to be kept, in convenient form, such data as shall be necessary for the actuarial valuation of the various funds of the System and for checking and compiling the experience of the System.   The ordinary actuarial, accounting and clerical services for the operation of the System shall be performed by the employees of the Retirement System provided for by Chapter VI of Title IX of the 1918 Detroit City Charter.   (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 9.)

### Sec. 13.   Record of proceedings; annual report.

The Board of Trustees shall keep a record of all its proceedings, which shall be open to public inspection.   It shall render a report to the Mayor and the City Council on or before the fifteenth day of July, showing the fiscal transactions of the System for the year ending on the preceding thirty-first day of December, the amounts of accumulated cash and securities in the various funds of the System, and the last balance sheet showing the financial condition of the System by means of an actuarial valuation of the assets and liabilities of the System.   (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 10.)

### Sec. 14.   Legal advisor.

(a)   The Board of Trustees shall appoint a legal counsel who shall be directly responsible to and shall hold office at the pleasure of the Board of Trustees. The appointment shall be made jointly with the Board of Trustees of the General City Retirement System.

(b)   The legal counsel to the Board of Trustees shall be an attorney licensed to practice law in the State of Michigan and shall be experienced in matters relating to pension systems.   The qualifications of candidates for the position shall be examined by the Board of Trustees.

(c)   The legal counsel to the Board of Trustees shall have such duties relative to pension matters as shall be assigned by the Board of Trustees.

(d)   Costs and expenses relative to the position of legal counsel to the Board of Trustees shall be payable out of the earnings of the system, subject to approval of the City Council.

(Ord. No. 65-H, Sec. 54-2-10.)

### Sec. 15.   Medical Director.

(a)   The Board of Trustees shall appoint as Medical Director the Medical Director of the Retirement System provided for by Chapter VI of Title IX of the 1918 Detroit City Charter.

(b)   The Medical Director shall arrange for and pass upon all medical examinations required under the provisions of this amendment; shall

investigate all essential statements and certificates by or on behalf of a member in connection with application for disability retirement and in connection with all applications for death benefits, and shall report in writing to the Board of Trustees his conclusions and recommendations on matters referred to him.

(c)     If the Board of Trustees, any member, any beneficiary or any other person claiming, benefits hereunder, shall disagree with any medical finding of the Medical Director, the Board of Trustees on its own motion may or on petition of any such member, beneficiary or person claiming benefits hereunder, shall refer the matter in dispute to a Medical Board of Review consisting of three physicians or surgeons, of whom one shall be named by the Board of Trustees, one by the affected member, beneficiary, or other person claiming benefits, and the third by the two so named. The Medical Director shall in no case be a member of the Board of Review. Such Board of Review shall be named within ten days after the filing of such petition. The Board of Review shall promptly examine the medical findings in dispute and shall within sixty days from its appointment file with the Board of Trustees a written report of its findings, which shall be final and binding as to the medical findings. The reasonable expenses of such Board of Review shall be paid from the Expense Fund.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 12.)

## Sec. 16.    Actuary of Retirement System technical advisor to Board.

The actuary of the Retirement System shall be selected by the Board of Trustees and, shall be the technical advisor to the Board of Trustees on matters regarding the operation of the funds created by the provisions of this amendment and shall perform such other duties as are required in connection therewith. (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 13.)

## Sec. 17.    Investigation of mortality, service and compensation experience of members.

Immediately after the establishment of the System, the Board of Trustees shall authorize such investigation of the mortality, service and compensation experience of the members as the actuary shall recommend and, on the basis of such investigation, the actuary shall recommend for adoption by, the Board of Trustees such tables and such rates as are required in Section 18, Paragraphs (a) and (b) of this Article. The Board of Trustees shall adopt tables and certify rates, and, as soon as practicable thereafter, the actuary shall make a valuation, based on such tables and rates, of the assets and liabilities of the various funds of the Retirement System created by this Charter amendment. (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 14.)

Effective as of July 1, 1984, for purposes of determining a benefit which is actuarially equivalent to any other benefit, the actuarial reserve required to provide the benefit must be equal to the actuarial reserve required to provide such other benefit computed on the basis of the actuarial rates, tables and procedures outlined below:

13-53846-tjt    Doc 7502-3    Filed 09/16/14    Entered 09/16/14 01:20:42    Page 32 of 201

| interest rate: | 6 ½% for joint and survivor benefits, and 5% for all other benefits |
| --- | --- |
| mortality table: | 1971 group annuity mortality table assuming a 90% male and 10% female mix |

No adjustment in a determination of an actuarially equivalent value or amount shall be made if such tables, rates and procedures are changed subsequent to such determination. (Historical reference: de facto operation July 1, 1984. See also: June 26, 1986 Board resolution.)

## Sec. 18.   Regular actuarial investigations.

At least once in each five year period, the Board of Trustees shall cause an actuarial investigation to be made into the mortality, service, and compensation experience of the members and beneficiaries of the Retirement System, and shall make a valuation of the assets and liabilities of the funds of the Retirement System, and on the basis of such investigation and valuation, the Board of Trustees shall:

(a)     Certify the rates of contributions payable by the members under the provisions of this Charter amendment;

(b)     Certify the rates of contribution payable by the City on account of new entrants into the retirement system at various ages;

(c)     Adopt for the Retirement System a regular rate of interest as defined in Article II, Section 12 of this Charter amendment.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 15.)

## Sec. 19.   Actuarial valuations of assets and liabilities.

On the basis of such tables, adopted by the Board of Trustees under the provisions of Section 18 of this Article, the Board of Trustees shall cause to be made an actuarial valuation of the assets and liabilities of the funds of the System created by this amendment. (1918 Detroit City Charter, Title IX, Ch. VII, Art. III, § 16.)

───────────────── **By Agreement** ─────────────────

Within fifteen (15) days of the effective date of this CET, the Pension Board shall provide to the Mayor and City Council all pension plan documents, including but not limited to: Plan Documents, Plan Amendments, Favorable Determination Letters (Pension Only), Summary Plan Descriptions, All Summaries of Material Modifications, Model Enrollment Forms, Insurance Contracts, All Funding/Actuarial Reports, All Explanations provided to Participants/Employees such as "Benefits at a Glance" and/or other summaries. The Pension Board shall provide to the Mayor and City Council all future amendments to any such documents within five (5) days of the

amendment.[15]

---

15          DPCOA (§ 42.E.); DPOA (as modified by 312 Award # 1, Issue # 96, pg. 59).

21

13-53846-tjt    Doc 7502-3    Filed 09/16/14    Entered 09/16/14 01:20:42    Page 34 of
201

# ARTICLE IV.

## Membership.

**Sec. 1.    Generally.**

The membership of the System shall consist of the following:

(a)    All Policemen and Firemen, as defined in sections 2 and 3 of Article II, who are in service on or after July 1, 1941, but prior to January 1, 1969; provided, however, that any Policeman or Fireman who, on or before July 1, 1941, shall have been in the employ of the Police or Fire Department for a period of twenty years, or who shall have a total of twenty years of creditable service, shall be excluded from the provisions hereof and shall retain for himself, wife, children, dependent mother and dependent sister all rights and privileges provided by Chapters XV and XXI of title IV of the 1918 Detroit City Charter, unless such Policemen or Firemen, on or before June 1, 1941, shall file with the City Controller his written election to become a member of the System, in which event he shall be a member; such excluded Policeman not electing to become members, from and after July 1, 1941, while they remain active members of the Police Department, shall pay five per cent of each salary payment into the fund for retired Policemen, and such excluded Firemen not electing to become members, from and after July 1, 1941, while they remain active members of the Fire Department, shall pay five per cent of each salary payment into the Fire Department Pension and Retirement Fund, and such salary contributions shall hereafter be used toward the payments of retirement allowances provided for under Chapter XV. section 14, subsections (1), (2), and (3) thereof.  On retirement, the contributions of such excluded members shall cease.

(b)    All persons who become Policemen or Firemen on or after July 1, 1941, but prior to January 1, 1969, and who are confirmed as Policemen or Firemen according to the rules and regulations of the respective Departments shall thereupon become members of the System; subject, however, to the following provisions:

(1)    Any person who shall become a Policeman or Fireman at an attained age of thirty-one years or more may become a member of the System only by vote of the Board of Trustees who shall fix the rate of contribution of such member on a basis recommended by the Actuary for the attained age of such member.

(2)    Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a member of the System, paying contributions and entitled to

benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(3)    Any Policeman or Fireman who, prior to being confirmed, shall be killed or totally incapacitated as the result of the performance of active duty, shall he deemed to have been a member of the System.

(c)    Any member as defined in paragraph (a) or (b) of this section who shall be transferred to a civilian position in his department shall continue as a member, subject to all the obligations of a member.

(d)    All persons who become Policemen or Firemen on, or after January 1, 1969, and who are not individuals re-employed with the police and fire departments on or after January 1, 1969, and who are confirmed as policemen or firemen according to the rules and regulations of the respective departments shall thereupon become members of the system subject, however, to the following provisions:

(1)    Any person who shall become a Policeman or Fireman at an attained age of thirty-one years or more may become a member of the system only by vote of the Board of Trustees who shall fix the rate of contribution of such member on a basis recommended by the actuary for the attained age of such member.

(2)    Any appointive official of the Police Department or Fire Department appointed from the membership thereof shall be permitted to remain a member of the system, paying contributions and entitled to benefits as though he had remained in the rank, grade or position held at the date of his appointment.

(3)    Any Policeman or Fireman who, prior to being confirmed, shall be killed or totally incapacitated as the result of the performance of active duty, shall be deemed to have been a member of the system.

(4)    Any member as defined in section 1 (a), (b), or (c) of this article who was separated from service by resignation or dismissal or discharge who subsequently again becomes a member shall be considered a member for all purposes under this chapter under section 1 (a), (b), or (c) of this article and shall not be considered a member under section 1 (d) of this article.

(5)    Any member as defined in section 1 (d) of this article who shall be transferred to a civilian position in his department shall continue as a member, subject to all the obligations of a member. (As amended November 5, 1968. In effect January 1, 1969.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. IV, § 1.)

## Sec. 2.   Membership election option.

Any person who is a member as defined in section 1 (a), (b), or (c) of this article who is in active service on January 1, 1969, shall have the option to elect to become a member of the system as defined in section 1 (d) of this article by filing his written election with the board of trustees on or before January 31, 1969, or any retirant retired on or before December 31, 1968, under the provisions of article VI, part B, section 2, who later returns to active service shall have the option to elect to become a member of this system as defined in section 1 (d) of this article; by filing his written election with the board of trustees on or before thirty days after his return to active service.  The election shall be effective on the date that it is filed with the Board of Trustees.  (As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. IV, § 2.)

## Sec. 3.   Cessation of membership.

(a)   Should a member die or become a beneficiary or be separated from service by resignation, dismissal, or disability, he shall thereupon cease to be a member.

(b)   Any person who became a member under section 1 (a), (b), or (c) of this article and ceases to be a member, as provided in section 3(a) of this article, and who later becomes a policeman or fireman, shall again become a member of the system, under section 1 (a), (b), or (c) of this article subject to the provisions of article VII, section 1 (d).

(c)   Any person who became a member under section 1 (d) of this article and ceases to be a member, as provided in section 3(a) of this article, and who later becomes a policeman or fireman, shall again become a member of the system under section 1(d) of this article, subject to the provisions of article VII, section 1(d).  (As amended November 5, 1968.  In effect January 1, 1969.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. IV, § 3.)

---

**By Agreement**

---

Any member of the Policemen and Firemen Retirement System from the Fire Department who retires as a member of that System and who later is rehired as a civilian member of the Fire Department may elect to again become a member of the System.[16]

---

## Sec. 4.   Report on employees.

It shall be the duty of the City Controller to submit to the Board of Trustees a statement showing the name, title, compensation, duties, date of birth, and length of service of each

---

[16]   DFFA (§ 22.A.14.o.).

member, and such other information as the board of trustees may require. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. IV, § 4.)

## ARTICLE V.

## Service Creditable.

**Sec. 1.    Members to file statement of service, etc.**

Under such rules and regulations as the Board of Trustees shall adopt, each Policeman and Fireman who shall become a member on the effective date of this amendment shall file a detailed statement of all prior service rendered by him as an employee of the Police Department or Fire Department, for which he claims credit, and of such other facts as the Board of Trustees may require, for the proper operation of the System.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. V, § 1.)

**Sec. 2.    Credit for service.**

The Board of Trustees shall fix and determine by appropriate rules and regulations how much service in any year is equivalent to a year of service, but in no case shall less than six months' service constitute one year, nor shall more than one year of service be creditable for all service in one calendar year.  The Board of Trustees shall not allow credit as service for any period of more than one month during which the member was or shall be absent without pay provided that if a member shall be transferred from his Department payroll to the payroll of any City, County or State government or the Federal Government, by his Department Head, during peace times, then such member shall continue to be a member of the System and shall he required to make regular contributions into the Annuity Savings Fund; and provided further, that if a member, so transferred, shall fail to make such contributions for three consecutive months, he shall cease to be a member of the System four months (of 31 days each) after the due date of his first defaulted annuity contribution; and provided further, that any member who was or shall be suspended from duty and subsequently reinstated to duty without further disciplinary action, shall receive total credit for the time of such period or periods of suspension.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. V, § 2.)

**Sec. 3.    Employees in military service.**

(a)    If a member of the System was or shall be drafted, or enlisted or shall enlist into military, naval, marine, or other service of the United States Government during time of war, or if a member shall be drafted into such service during time of peace, and within ninety days from the date of his separation from such government service or from the date peace was or shall be established by treaty, whichever date was or shall be earlier, resumed or shall resume employment as a Policeman or Fireman, then such government service shall be credited to him as a member of the System.  During the period of such government service of a member, his contributions to the Annuity Savings Fund shall be suspended and the balance in the Annuity Savings Fund, standing to his credit as of the last payroll date preceding his leave of absence from the service of his Department shall be accumulated at regular interest.  Even though the applicant may be unable to satisfy all the foregoing requirements, the

13-53846-tjt    Doc 7502-3    Filed 09/16/14    Entered 09/16/14 01:20:42    Page 39 of 201

Board of Trustees shall have the power to grant the privileges provided for by this section in exceptional or extraordinary cases.

(b)     A member on the City payroll on or after January 1, 1979 who, prior to employment in the city service, was called to or entered or is called to or enters any full time military service of the United States during time of war, period of compulsory military service, or period of unusual emergency as defined in this ordinance, shall have the required period of active duty credited him as membership service, subject to the following conditions and limitations:

(1)     The member files a written election with the Board of Trustees, within 180 days following the effective date of this ordinance or 180 days from the date of his first employment in the city service, whichever is most recent, to claim military service credit under the provisions of this section.  A member who is included in a collective bargaining unit shall file a written election to claim military service credit with the Board of Trustees within 180 days following the date of a negotiated approval and acceptance of this section by his duly authorized bargaining agent as transmitted to the Board of Trustees by the Labor Relations Director or, in the case of members hired subsequent to the transmittal of approval and acceptance by his duly authorized bargaining agent, within 180 days from the date of his first employment in the city service.

(2)     The member furnishes the Board of Trustees such information as the Board of Trustees determines necessary to verify the amount of military service claimed.

(3)     The member pays to the Pension Accumulation Fund of the Retirement System an amount of five (5) percent of the member's annual rate of compensation at the time of payment multiplied by the years or parts of years of military service claimed.

(4)     The required payment shall be made under one of the following options:

a.      Payment in full within 30 days of the election to claim military service.

b.      Payment in equal bi-weekly installments by payroll deduction over a 36 month period starting 30 days following the election to claim military service.   Interest shall accrue during the period of installment payments at the compound rate of 5 percent per annum. Payments must be completed prior to application for retirement.

c.      If a member has sufficient funds in the principal portion of his annuity, he may authorize the Pension Bureau to transfer such

funds to the Pension Accumulation Fund to meet the required payment.

(5)     In the event a member, who has filed the required election of this benefit, and who would be eligible for a pension in all respects except for paying the full amount, dies prior to completion of the payment required in Item (4) preceding, the person otherwise entitled to a retirement allowance may pay the full amount due within 30 days of the member's death to become eligible for on additional pension credit under this section.

(6)     Military service credited under the provisions of 54-30-3(c) shall not be claimed or credited under the provisions of this section.

(7)     Military service which is or will be the basis of service credit under any other public employee retirement program shall not be claimed or credited under the provisions of this section.

(8)     In no case shall more than 3 years of pre-employment military service be credited a member on account of military service. For the purpose of this limitation, military service credited pursuant to Section 54-30-3(a) shall be combined with military service created pursuant to this section.

(9)     The required payments made to the Pension Accumulation Fund for military service credit pursuant to this section shall, upon application by the member or his estate, be returned without interest to any member who dies or leaves City employment prior to being eligible for a pension.

(10)    Only honorable military service during the following periods:

World War II — December 8, 1941 to July 1, 1946.

Korean Conflict — June 27, 1950 to December 31, 1953.

Vietnam Conflict — August 5, 1964 to May 7, 1975, are applicable to this section.

(11)    The military service credit pursuant to this section shall not apply toward meeting the minimum service and age requirements for vesting, for a non-duty disability pension or for a service pension. Such service credit may be used in meeting the minimum time needed for an automatic Option Two Pension in case of death of a member.

(12)    In no case shall benefits be based on the military service credit provided by this section unless the member shall have been credited a minimum of eight years of service credit not including military service credit.

(13)    Special service, contractual, part time, seasonal and summer camp employees are not eligible for the military service credit.

(14)    In cases of doubt, the Board of Trustees will determine whether a member is entitled to the benefits of this section consistent with the requirements and limitations herein.

(Ord. No. 356-H, Sec. 54-30-3(b).)

---

## By Agreement

**Military Service Credit**

Any member of the bargaining unit who performed military service prior to employment by the City of Detroit and inclusion in the pension systems may claim service credit as a member of the retirement systems for time spent in the military service in accordance with Ordinances 356-H and 357-H of the Ordinances of the City of Detroit.

**[This provision will be retroactive to July 1, 1983.[17]]**

Effective December 15, 2008, any member who has performed any honorable military service may claim up to thirty-six (36) months service in the pension for time spent in the military. However, those provisions in Ordinance 356-H of the Ordinance of the City of Detroit that required the member to purchase this military service credit are not modified by this change.[18]

---

## DPOA

Effective March 8, 2007, all bargaining unit members who have served in the military may purchase a maximum of three (3) years pension time.[19]

---

**Sec. 4.    Verification of service claimed.**

Subject to the above restrictions and to such other rules and regulations as the Board of Trustees may adopt, the Board of Trustees shall verify, as soon as practicable after the filing of such statements of service, the service therein claimed.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. V, § 4.)

---

[17]    DPCOA (§ 40.B.); DPLSA (§ 49.B.).

[18]    DFFA (§ 22.A.14.n.); DPCOA (§ 40.); DPLSA (§ 49.).

[19]    DPOA (§ 33.T.).

**Sec. 5.     Prior service certificates.**

Upon verification of the statements of service, the Board of Trustees shall issue prior service certificates, certifying to each member the length of prior service rendered, with which he is credited.  A prior service certificate shall be final and conclusive for retirement purposes as to such service; provided, however, that within one year from the date of issuance or modification of such certificate the Board of Trustees on its own motion or on the request of a member may modify or correct his prior service certificate.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. V, § 5.)

**Sec. 6.     Creditable service at retirement.**

Creditable service at retirement, on which the retirement allowance of a member shall be based, shall consist of the membership service rendered by him and if he has a prior service certificate, in full force and effect, the amount of service certified thereon.  (As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. V, § 6.)

# ARTICLE VI.

## Part A — Service Retirement Allowance

**Sec. 1.    Petition for retirement, mandatory age.**

(a)     Any member as defined in article IV, section 1 (a), (b), or (c) in service may file with the Board of Trustees his written application for retirement setting forth on what date not less than fifteen days nor more than ninety days subsequent to the filing thereof, he desires to be retired; and provided the Board of Trustees shall determine that the member, at the date so specified or his retirement will have a total of twenty-five years or more of creditable service he shall on the date specified be retired, notwithstanding that during such period of notification he may have separated from service.

Provided, further, that in the case of any fireman as defined in article IV, section 1 (a), (b) or (c) having served twenty-five years or more of creditable service, upon recommendation of the Board of Fire Commissioners, the fireman shall be retired forthwith, by the Board of Trustees.

(b)     Any members as defined in article IV, section 1 (d) in service may file with the Board of Trustees his written application for retirement setting forth on what date not less than fifteen days nor more than ninety days subsequent to the filing thereof, he desires to be retired; and provided the Board of Trustees shall determine that the member, at the date so specified for his retirement, will have a total of twenty-five years (effective as of March 8, 2007, twenty years for members of DPOA and their fire equivalents) or more of creditable service and has attained age fifty-five, he shall on the date specified be retired, notwithstanding that during such period of notification he may have separated from service.

Provided, further, that, effective July 1, 1983 for DPOA and Fire equivalents and July 1, 1986 for LSA and equivalents and new members, a member described in article IV, section 1(d) shall be eligible to retire upon attainment of twenty-five years (effective as of March 8, 2007, twenty years for members of DPOA and their fire equivalents) or more of creditable service, regardless of age.  Effective July 1, 1998 (June 30, 2001 for DPOA members and their fire equivalents), the time a member is on layoff from service of the City shall be included in actual service rendered to the City for purposes of determining whether a member has twenty-five years or twenty years of creditable service.  The pension benefit to which such member is entitled shall be based on his actual years of creditable service.

Pursuant to IRC 411(e), as in effect in 1974, an employee shall be 100 percent vested in their System accrued benefit upon attaining normal retirement hereunder while in service.

---

## By Agreement

**[Effective June 30, 1986,[20] or July 1, 1983,[21]]** the requirement that a member as defined in Article IV, Section 1(d) of the Policemen and Firemen Retirement System shall attain age 55 to be eligible for retirement shall be eliminated. **[Effective March 8, 2007,[22]]** such members will be eligible to retire after 25 **[or twenty (20)[23]]** years of service regardless of age.[24]

**[Effective June 30, 2001, any member who has been laid off shall be eligible to retire at what would have been the member's 25th anniversary. To determine eligibility for retirement, the member's actual service time and time on lay off shall be combined.[25]] [To calculate the member's retirement allowance, however, only actual service time shall be used. For members having a parity relationship with the DPLSA and the DPCOA Inspector, only lay off time which occurred between July 1, 1973 and July 1, 1998 will be credited.[26]]**

---

## DFFA

**Service Retirement**

1. For employees in ranks or classifications with a parity relationship to employees represented by the Detroit Police Lieutenants and Sergeants Association and employees in higher ranks or classification, the requirement that a member as defined in Article IV, Section 1(d) of the Policemen and Firemen Retirement System shall attain age 55 to be eligible for retirement shall be eliminated. Such members will be eligible to retire after 25 years of service regardless of age.

2. For employees in ranks or classifications with a parity relationship to the employees represented by the Detroit Police Officers Association, the requirement that a member as defined in Article IV, Section 1(d) of the Policemen and Firemen Retirement System shall attain age 55 to be eligible for retirement shall be eliminated. Effective March 8, 2007, such members will be eligible to retire after twenty (20) years of service regardless of age.

---

[20]     DPLSA (§ 51.E.).

[21]     DPOA (§ 33.H.).

[22]     DPOA (§ 33.H.).

[23]     DPOA (§ 33.H.).

[24]     DPCOA (§ 41.E.); DPLSA (§ 51.E.); DPOA (§ 33.H.).

[25]     DFFA (§ 22.A.14.d.); DPOA (§ 33.H.).

[26]     DFFA (§ 22.A.14.d.).

Effective July 1, 1989, the minimum age 55 requirement for deferred pensions payable for post 1969 members hired before June 30, 1985, shall be eliminated.[27]

---

### DPCOA

Reduction in Force Time: Effective in accordance with the specific date and terms of the Detroit Police Lieutenants and Sergeants Association (DPLSA) award in Act 312 No. D98 F-0944, the membership of this bargaining unit shall have the right to retire on their 25th Anniversary Date, notwithstanding any service time they may have lost due to any layoffs, as provided therein.[28]

---

### DPOA

Effective July 1, 1989, the minimum age 55 requirement for deferred pensions payable for post 1969 members hired before June 30, 1985 shall be eliminated.

Employees hired on or after July 1, 1985 who leave City employment after being vested shall not be eligible for pension benefits until said individual reaches his or her sixty-second birthday.[29]

---

(c)     Any member of the system as defined in article IV, section 1 (a), (b), (c), and (d) who shall reach the age of sixty years shall be retired forthwith, or on the first day of the calendar month next succeeding that in which the member shall have reached sixty. On the written request of the member and of the Commissioner of Police or the Board of Fire Commissioners, as the case may be, the Board of Trustees may continue such member in active service for a period of two years beyond his sixtieth birthday, and on the expiration of such period, on like request, may continue such member for a further period of two years. (As amended November 5, 1963. In effect January 1, 1969.)

(d)     Any member of the system who satisfies the requirements for a pension as defined in article VI, section 4 shall be eligible upon ninety days notice to make an irrevocable election to receive an immediate retirement allowance, actuarially reduced for early commencement, in lieu of a deferred retirement allowance.

(e)     Any member of the retirement system who was in the service of the City on or after July 1, 1941 but prior to January 1, 1969 and who was still an active member on July 1, 1983 for LSA and equivalents and July 1, 1986

---

[27]     DFFA (§ 22.A.14.d.).

[28]     DPCOA (§ 41. F.).

[29]     DPOA (§ 33.H.).

for DPOA members and fire equivalents shall have the option of retiring under the old plan or the new plan.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part A, § 1.)

---

**By Agreement**

---

**Old Plan/New Plan**

Members of the Policemen and Firemen Retirement System as defined in the previous charter of the City of Detroit – Chapter VII of Title IX, Section 2 of Article II as adopted by Article 11, Section 11-102 of the present charter of the City of Detroit as previously amended to July 1, 1977, who were in the service on or after July 1, 1941 but prior to January 1, 1969, and are still active members shall have the option of retiring under any existing plan of the pension system (i.e., amendment of November 5, 1969, or previous plan) commonly known as new plan and old plan.[30]

**[This provision shall be effective July 1, 1986.[31]]**

---

### Sec. 2. Amount of allowance – Old Plan Members.

Upon his retirement from service, a member as defined in article IV, section 1 (a), (b), or (c) ("old plan member") shall receive a straight life retirement allowance which shall consist of the benefits provided in paragraphs (a) and (b) below; and he shall have the right to elect an option provided for in part H of this article:

(a)     An annuity which shall be the actuarial equivalent of his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his retirement; and

(b)     A pension, which when added to his annuity, will provide a straight life retirement allowance equal to two percent (2.0%) of his average final compensation, multiplied by the number of years, and fraction of a year, of his creditable service, not to exceed twenty-five years; provided, that the pension of a policeman shall in no case exceed fifteen twenty-seconds of the maximum earnable compensation of a patrolman and the pension of a fireman shall not exceed fifteen twenty-seconds of the maximum earnable compensation of a fire fighter (and if either or both of the said ranks shall be hereafter abolished, the equivalent thereof).  The foregoing pension limitation shall not apply to any policeman or fireman who on July 1, 1941, shall be entitled to a certificate for twenty years or more of prior service and who remains under the provisions of chapter XV or chapter XXI of

---

[30]     DFFA (§ 22.A.14.m.); DPCOA (§ 41.H.); DPLSA (§ 51.G.); DPOA (§ 33.N.).

[31]     DPOA (§ 33.N.).

Title IV of the 1918 Detroit City Charter. (As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part A, § 2.)

### Sec. 2.1.    Amount of allowance – New Plan Members.

Upon his retirement from service, a member as defined in article IV, section 1(d) ("new plan member") shall receive a straight life retirement allowance which shall consist of the benefits provided in paragraphs (a) and (b) below; and he shall have the right to elect an option provided for in part H of this article:

    (a)    An annuity which shall be the actuarial equivalent of his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his retirement; and

    (b)    A pension which when added to his annuity, will provide a straight life retirement allowance equal to:

        (i)    two and one-half percent (2.5%) of his average final compensation multiplied by the number of years and fraction of a year of his creditable service, for the first twenty-five (25) years of such service; and

        (ii)    two and one-tenths percent (2.1%) of his average final compensation multiplied by the number of years and fraction of a year of his creditable service in excess of twenty-five (25) years subject to a maximum of thirty-five (35) years.

### Sec. 2.2.    Pension Multiplier

Effective July 1, 1992 each member who retires on or after said date shall be entitled to a pension which, when added to the annuity, will provide a straight life retirement allowance equal to 2.1% of his/her average final compensation, multiplied by the number of years and fraction of a year, of his/her creditable service, not to exceed thirty-five (35) years service for new plan members and twenty-five (25) years service for old plan members. (Ord. No. 18-93, Sec. 47-12.6A-2.3.)

---

**By Agreement**

---

**[Effective September 1, 2012, each member who retires shall only be entitled to a pension which, when added to the annuity, will provide a straight life retirement allowance equal to 2.1% of his/her average final compensation multiplied by the number of years and fraction of a year of his/her creditable service earned or accrued on or after September 1, 2011. Hence, for the first twenty-five (25) years of service accrued on or after September 1, 2011, the multiplier shall no longer be 2.5%; rather, 2.1%. Maximum years of service for**

**pension credit shall be thirty-five (35) years for new plan members and twenty-five (25) years for old plan members. Service credit accrued prior to September 1, 2011 will be unaffected by this modification.[32]**

Effective July 1, 1997 **[or following the effective date of the CET-DPCOA[33]]**, each member who retires shall be entitled to a pension which when added to the annuity will provide a straight life retirement allowance equal to 2.5% **[or 2.1%[34]]** of his average final compensation multiplied by the number of years and fraction of year of his creditable service for the first twenty-five (25) years **[or of his creditable service earned or accrued on or after the effective date of the CET-DPCOA[35]]**.

For years of service over twenty-five (25) years the multiplier shall be 2.1%. Maximum years of service for pension credit shall be thirty-five (35) years for new plan members and twenty-five (25) years for old plan members.[36]

**[Each member who retires shall only be entitled to a pension which, when added to the annuity, will provide a straight life retirement allowance equal to 2.1% of his her average final compensation multiplied by the number of years and fraction of a year of his/her creditable service earned or accrued following the date of the Act 312 Award in D09 G-0786. Hence, for the first twenty-five (25) years of service accrued after the date of the Act 312 Award, the multiplier shall no longer be 2.5% as stated in the paragraph above; rather, as stated in this paragraph, 2.1%. Maximum years of service for pension credit shall be thirty-five (35) years for new plan members and twenty-five (25) years for old plan members.[37]]**

---

**Sec. 3.      Disposition of surplus benefits upon death of beneficiary.**

In the event a beneficiary, who was a member, dies before he has received in straight life retirement allowance payments an aggregate amount equal to his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his retirement, the difference between his said accumulated contributions and the said aggregate amount of straight life retirement allowance payments received by him shall be paid to such person or persons as he shall have nominated by written designation duly executed and filed with the board of trustees. If there be no such designated person or persons surviving the said deceased beneficiary (who was a member) such difference, if any, shall be paid to his legal representative. No benefits shall be paid under this section on account of the death of such a beneficiary if he had elected Option

---

[32]      DPOA (§ 33.B.).

[33]      DPCOA (§ 41.L.).

[34]      DPCOA (§ 41.L.).

[35]      DPCOA (§ 41.L.).

[36]      DFFA (§ 22.A.14.j.); DPCOA (§ 41.L.); DPLSA (§ 51.K.2.).

[37]      DPLSA (§ 51.K.3.).

1, 2 or 3 provided for in part H of this article. (As amended September 1, 1964. In effect September 15, 1964.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part A, § 3.)

### Sec. 4.    Retirement allowance for certain persons leaving city employment after eight years service.

Should any LSA member or any fire equivalent who (1) has attained age forty years of age, and (2) has acquired eight or more years of credited service, or any member who terminates employment with the City on or after August 29, 2003 with ten or more years of credited service leave the employ of the police department or fire department of the City of Detroit prior to the date he would have first become eligible to retire as provided in this part A, for any reason except his retirement or death, he shall be entitled to a retirement allowance computed according to section 2 or 2.1 of this article, whichever is applicable, as said section was in force as of the date of his employment with the city last terminated; provided, that he does not withdraw his accumulated contributions from the Annuity Savings Fund. His retirement allowance shall begin the first day of the calendar month next following the month in which his application for same is filed with the Board of Trustees, on or after the date he would have been eligible to retire had he continued in city employment. Notwithstanding the foregoing, prior to March 3, 2008 the retirement allowance of a DPOA member or a fire equivalent hired on or after July 1, 1985 shall not begin prior to the date on which the member reaches his sixty-second birthday. Unless otherwise provided in this chapter such person shall not receive service credit for the period of his absence from the City Police Department and/or Fire Department employ, nor shall he or his beneficiary be entitled to any other benefit afforded in this chapter except the benefits provided in part A, section 2 or 2.1 or part F of this article VI, whichever is applicable, subject to the above provisions, notwithstanding, his membership has terminated. (As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part A, § 4.)

---

### By Agreement

**Reduced Early Pension Benefits (40 & 8 Vesting Retirees)**

1.  Members who terminate employment who are eligible for a pension pursuant to Article VI, Part A, Sec. 4 of the Policemen and Firemen Retirement System (40 & 8) provision shall have the option of receiving an immediate, but reduced early pension benefit in lieu of a deferred pension.

2.  This reduced early pension benefit shall not result in an increase in employer contribution rates therefore, the value of the Reduced Early Pension Benefit shall be the actuarial equivalent of the 40 & 8 pension.

3.  No other benefits or amounts payable pursuant to the Policemen and Firemen Retirement System including benefits available to persons who retire under Article VI, Sec. 4 shall be affected by this contractual provision. Health insurance benefits payable under this provision will commence when the member would have been eligible to retire with a

service retirement under Article 22 B 14 (d) of the collective bargaining agreement **[or Article VI of the Pension Plan[38]]**.

4. **[For employees in ranks or classifications with a parity relationship to employees represented by the Detroit Police Lieutenants and Sergeants Association and employees in higher ranks or classifications,[39]]** upon termination, an employee vesting his pension must within 90 calendar days make an irrevocable election as to whether or not to take this option.

5. **[Individuals, who terminated prior to July 1, 1986, are not eligible for this [new[40]] option.[41]]**

6. An employee who receives a lump sum payment for accumulated time upon termination is not allowed to have that time count towards his retirement service.

7. Since members **[or all DFFA members, except those members in ranks or classifications with a parity relationship to employees represented by the Detroit Police Officers Association,[42]]** are eligible to begin collecting their vested pension as soon as they would have been eligible to retire had they continued their City employment, minimum retirement age (i.e. age 55) shall not be a factor in computing the actuarially reduced pension benefit.[43]

---

### DFFA

All members, except those members in ranks or classifications with a parity relationship to employees represented by the Detroit Police Officers Association, electing to receive the Reduced Early Pension Benefits shall receive upon separation full pay for fifty (50) percent of the unused sick bank amounts. This provision shall have no effect on a member electing to receive the deferred 40 & 8 vested pension who shall continue to be reimbursed for unused sick time in accordance with the formula in Article 22.B.9(e).

Employees hired on or after July 1, 1985, with a parity relationship to employees represented by the DPOA, who leave City employment after being vested shall not be eligible for pension benefits until said individual reaches his or her sixty-second birthday.

---

[38]     DPCOA (§ 41.G.3.); DPLSA (§ 51.F.3.).

[39]     DFFA (§ 22.A.14.f.4.).

[40]     DFFA (§ 22.A.14.f.5.).

[41]     DFFA (§ 22.A.14.f.5.); DPLSA (§ 51.F.5.).

[42]     DFFA (§ 22.A.14.f.).

[43]     DFFA (§ 22.A.14.f.); DPCOA (§ 41.G.); DPLSA (§ 51.F.).

Effective August 28, 2003, DPOA allied members who terminate employment after ten (10) years of service shall be vested and shall have all options afforded to current 40 & 8 retirees.[44]

---

**DPOA**

---

**Reduced Early Pension Benefits**.  Members who terminate employment who are eligible for a pension pursuant to Article VI, Part A, Section 4 of the Policemen and Firemen Retirement System (40 & 8) provision shall have the option of receiving an immediate, but reduced early pension benefit in lieu of a deferred pension.

This reduced early pension benefit shall not result in an increase in Employer contribution rates, therefore, the value of the Reduced Early Pension Benefit shall be the actuarial equivalent of the 40 & 8 pension.

Effective August 28, 2003, members who terminate employment after ten (10) years of service shall be vested and shall have all options afforded to current 40 & 8 retirees.

No other benefits or amounts payable pursuant to the Policemen and Firemen Retirement System, including benefits available to persons who retire under Article VI, Section 4, shall be affected by this contractual provision.  Health insurance benefits payable under this provision will commence when the member would have been eligible to receive a regular service retirement under Article 33.F. of the collective bargaining agreement.

This provision shall be retroactive to July 1, 1986.[45]

---

**Part B — Total Disability Pension and Retirement Allowances.**

**Sec. 1.    Duty disability.**

If a member shall become totally incapacitated for duty by reason of injury, illness or disease resulting from performance of duty and if the Board of Trustees shall find such injury, illness or disease to have resulted from the performance of duty, on written application to the Board of Trustees by or on behalf of such member or by the head of his Department such member shall be retired; notwithstanding that during such period of notification he may have separated from service; provided, the Medical Director, after examination of such member shall certify to the Board of Trustees his total incapacity.  If said member was separated from service after filing of the written application, and he had attained twenty-five (25) years or more of service prior to the date of separation, the Board of Trustees, shall retire said member, under this part B.  (Ord. No. 5-00, Sec. 54-2-11; Ord. No. 4-00, Sec. 54-2-11.)

---

[44]      DFFA (§ 22.A.14.f.).

[45]      DPOA (§ 33.I.).

**Sec. 2.    Duty disability benefits; members in service on or after July 1, 1941 but prior to January 1, 1969.**

(a)    A member, as defined under Article IV, Section 1(a), (b), or (c), shall receive the following benefits:

(1)    Each such member shall receive a disability pension of fifty percent (50%), or such other higher percentage that is in effect and applies to such member, of the member's average final compensation at the time of disability retirement. On the date that a member, who retired under Section 1 of this Part and who receives benefits under this Section, would have accrued twenty-five (25) years of creditable service had the member continued in active service, or on the date that the member reaches age sixty (60), whichever comes first, the member shall be eligible for optional benefits as provided Part H of this Article.

(2)    In addition to the disability pension provided for in Section 2(a)(1), any member who receives a disability pension pursuant to Section 2(a)(1) and has not accrued a total of twenty-five (25) years of creditable service, as of the date of the member's disability retirement shall receive a supplemental disability payment in the amount of sixteen and two-thirds percent (16-2/3%) of the member's average final compensation at the time of disability retirement. This supplemental payment shall terminate upon the expiration of the period when a member who retired under Section 1 of this Part and who receives benefits under Section 2(a)(1) would have accrued twenty-five (25) years of creditable service and the member continued in active service, or on the date that the member reaches age (60), whichever comes first.

(3)    In the case of a member retired under Section 1 of this Part who receives benefits under 2(a)(1) and 2(a)(2), the accumulated contributions standing to the member's credit at the date of retirement shall continue to be held in the defined contribution plan and regular interest shall be credited thereto. If such member dies before the date upon which the member would have achieved a total of twenty-five (25) years of creditable service had the member continued in active service and before such member reaches age sixty (60), the balance of the member's defined contribution plan including interest thereon shall be paid as provided in Part D and Part E of this Article.

(b)    This Section shall be applicable to those members receiving benefits on the date of adoption of this Section who are not covered by the arbitration decision regarding the Detroit Police Officers Association which became effective July 1, 1995, or the arbitration decision regarding the Detroit Police Lieutenant's and Sergeant's Association which became effective June 30, 1998.

(c)     This Section does not rescind any substantive rights of disability retirees from the Policemen and Firemen Retirement System who retired prior to the July 1,1995 arbitration award, or the substantive rights of disability retirees from the Detroit Police Lieutenant's and Sergeant's Association who retired prior to the June 30, 1998 arbitration award.

(d)     This Section does not amend any computations used to determine disability benefits payable under this Section 2, or result in an increase or decrease in such disability benefits.

(e)     Existing 1099R reporting procedures shall continue as currently in effect. A change in said procedures shall only occur as the result of an Internal Revenue Service ruling letter in favor of such change.

(Ord. No. 05-00, Sec. 54-2-12; Ord. No. 04-00, Sec. 54-2-12.)

**Sec. 2.1.     Duty disability benefits; members beginning service on or after January 1, 1969.**

(a)     A member, as defined under Article IV, Section 1(d), who retired under Section 1 of this Part, shall receive the following benefits:

(1)     Each such member shall receive a disability pension of fifty percent (50%), or such other higher percentage that is in effect and applies to such member, of the member's average final compensation at the time of disability retirement, On the date that a member who retired under Section 1 of this Part and who receives benefits under this Section would have accrued twenty-five (25) years of creditable service had the member continued in active service, or on the date that the member reaches age sixty (60), whichever comes first, the member shall be eligible for optional benefits as provided Part H of this Article.

(2)     In addition to the disability pension provided for in Section 2.1(a)(1) of this Part, any member who receives a disability pension pursuant to Section 2.1(a)(1) of this Part and who has not accrued a total of twenty-five (25) years or more of creditable service as of the date of the member's disability retirement shall receive a supplemental disability payment in the amount of sixteen and two-thirds percent (16-2/3%) of the member's average final compensation at the time of the member's disability retirement. This supplemental payment shall terminate when a member who retires under Section 1 of this Part and who receives benefits under Section 2.1(a)(1) of this Part would have accrued twenty-five (25) years of creditable service had he or she continued in active service or on the date that the member reaches age sixty (60), whichever comes first.

---

**By Agreement**

---

**Disability Conversion**

**[Effective July 1, 1992,[46]]** add to the Policemen and Firemen Retirement System, Article VI, Part B, [Section 2.1(a)(2)] the following:

". . . with the specific exception that for those members who receive benefits under [Section 2.1(a)(1)], above, the 'average final compensation' used in this computation shall mean the current maximum salary for the rank(s), grade(s) or position(s) which would have been held by the member over the sixty (60) months prior to retirement (reduced disability/service retirement when the member would have attained a total of twenty-five (25) years of credited service) had he/she continued working in that classification which he/she held at the time of his/her disability.**["[47]]** For members who begin receiving such benefits on or after July 1, 1998, the amount of the member's most recent full longevity payment shall be included in the definition of average final compensation.[48]

---

### DFFA / DPOA

---

Add to the Policemen and Firemen Retirement System, Article VI, Part B, [Section 2.1(a)(2)] the following:

". . . with the specific exception that for those members who receive benefits under [Section 2.1(a)(1)], above, the 'average final compensation' used in this computation shall be the highest average annual compensation that would have been received by such a member had he/she continued working in the classification he/she held at the time of his disability, during any period of five consecutive years, selected by the member, contained within the last ten years immediately preceding the expiration of the period when the member would have attained a total twenty-five years of creditable service."[49]

---

### DPCOA

---

Effective July 1, 2000, the "average final compensation" used in this computation shall mean the current maximum salary for the rank(s), grade(s) or position(s) which would have been held by the member over the thirty-six (36) months prior to retirement, including the annual longevity payment provided above.[50]

---

(3)     In addition to the disability pension provided for in Section 2.1(a)(1) of this Part, any member who receives a disability pension pursuant to Section 2.1(a)(1) of this Part and who has accrued more than

---

[46]     DPLSA (§ 51.C.).

[47]     DPCOA (§ 41.C.); DPLSA does not have a closing quotation mark within this paragraph.

[48]     DPCOA (§41.C.); DPLSA (§ 51.C.).

[49]     DFFA (§ 22.A.14.e.); DPOA (§ 33.E.).

[50]     DPCOA (§41.C.).

twenty-five (25) years ("additional years") of creditable service as of the date of the member's disability retirement shall receive another supplemental disability payment equal to two percent (2%), or such other higher percentage that is in effect and applies to such member, of the member's average final compensation, multiplied by the number of additional years of creditable service the member has accrued; provided, however, that such supplemental disability payment shall not exceed twenty percent (20%), or such other higher percentage that is in effect and applies to such member, of the member's average final compensation.

(4)     In the case of a member who retired under Section 1 of this Part and who receives benefits described under Section 2.1(a)(1) through (3) of this Part, the accumulated contributions standing to the member's credit at the date of disability retirement shall continue to be held in a separate fund in the annuity savings fund and regular interest shall be credited thereto. If such member dies prior to the time when the member would have achieved a total of twenty-five (25) years of creditable service had the member continued in active service and before such member reaches age sixty (60), the amount of the member's accumulated contributions so set aside and interest thereon shall be paid as provided in Part D and Part E, of this Article.

(5)     The amendment of Section 2.1(a)(1) of this Part shall not result in an increase or decrease in the amount of disability benefits payable to members.

(b)     This Section shall be applicable to those members receiving benefits on the effective date of this Section who are not covered by the arbitration decision regarding the Detroit Police Officers Association which became effective July 1, 1995, or the arbitration decision regarding the Detroit Police Lieutenant's and Sergeant's Association arbitration decision which became effective June 30, 1998.

(c)     This Section does not rescind any substantive rights of disability retirees from the Policemen and Firemen Retirement System who retired prior to the July 1, 1995 arbitration award, or the substantive rights of disability retirees from the Detroit Police Lieutenant's and Sergeant's Association who retired prior to the June 30, 1998 arbitration award.

(d)     This Section does not amend any computations used to determine benefits under Section 2.1 of this Part, or result in an increase or decrease In such benefits.

(e)     Existing 1099R reporting procedures shall continue as currently in effect. A change in said procedures shall only occur as the result of an Internal Revenue Service ruling letter in favor of such change.

(Ord. No. 5-00, Sec. 54-2-13; Ord. No. 4-00; Sec. 54-2-13.)

---

**By Agreement**

---

**Duty Disability Retirement Provisions**

1.  **[As applicable to all current employees who file applications for disability retirement on or after July 1, 1995,[51] [for employees with a parity relationship with the DPOA, and on or after June 30, 1998, for employees with a parity relationship with the DPLSA and the DPCOA Inspector, and to all future employees[52] [As applicable to all current employees who file applications for disability retirement on or after June 30, 1998, and to all future employees,[53] [and to all future employees,[54]** the definition of "total disability" and "total incapacity" in the Policemen and Firemen Retirement System pension plan will be changed to read as follows:

    Own Occupation: During the first 24 months of benefits, total disability exists when, due to injury, illness or disease, an employee is unable to perform, for wage or profit, the material and substantial duties of the employee's occupation.

    Any Occupation: After the first 24 months of benefits, total disability exists when, due to illness, injury or disease, an employee is unable to perform, for wage or profit, the material and substantial duties of any occupation for which the employee is suited, based on education, training and experience.

2.  a.   The duty disability retirement benefits payable to an eligible member shall consist of the amount derived from the sum of the applicable following factors and annual escalators in accordance with the definitions of "own occupation" and "any occupation" as set forth in paragraph 1 above.

    (1)   Part A.   A basic duty disability benefit amount which is 50% of the member's final compensation at the time his duty disability retirement began.

    (2)   Part B.   A supplemental duty disability benefit which is 16 2/3% of the member's final compensation at the time his duty disability retirement began.

    (3)   **[Escalators.   On July 1st of each year, the amounts of Parts A and B then payable will each be increased by adding to said amounts the product of 2.25% times the initial amount of said Part A and B benefit**

---

51      DFFA (§ 22.A.14.q.); DPOA (§ 33.Q.1.).

52      DFFA (§ 22.A.14.q.).

53      DPLSA (§ 51.N.1.).

54      DPOA (§ 33.Q.1.).

3
3

333333333

**which was computed at the time the duty disability retirement began.[55]**

b.    For the first 24 months that a member is on duty disability retirement his benefit shall be the sum of Parts A and B plus applicable escalators.

c.    After 24 months, a member who is disabled from any occupation shall continue to receive a duty disability retirement benefit which is the sum of Parts A and B plus applicable escalators.  After the expiration of the period when the member would have attained 25 years of creditable service had he/she continued in active service, payment of Part B will cease.

d.    After 24 months, a member who is not disabled from any occupation shall only receive Part A plus applicable escalators as his duty disability retirement benefit.

e.    Conversion.  Duty disability retirement benefits shall continue to be paid to a member on duty disability retirement after the member has attained 25 years of credited service, to the earlier of (i) the member's attainment of age 65, or (ii) termination of disability as determined by the third party administrator (TPA).  Upon termination of disability or attainment of age 65, a member with 25 years of credited service shall be eligible to receive a service retirement benefit.  The amount of such service retirement benefit shall be the same amount which would have been payable if the conversion from duty disability retirement to service retirement had occurred at the date of attaining 25 years of service credit. **[In the event that the examinations and/or investigations conducted by the Police Department result in a determination that the member is not qualified for reappointment as a police officer, for medical reasons, disability benefits will be continued.[56]]**

f.    If a member on duty disability retirement returns to active service and within a 24 month period re-qualifies for duty disability retirement for the same or related reasons he/she had been retired, then the disability shall be deemed a continuation of the prior disabling condition and the period of the return to work will not have caused the employee to be entitled to a new initial determination of Part A and B benefit amounts as set forth in sub-paragraphs 2.a.(1) and 2.a.(2) above.  Instead, such employee will return to retirement at the point he/she had reached in sub-paragraphs 2.b., 2.c. or 2.d. above as if there had not been a break in his period of placement on duty disability retirement.

g.    Non-duty disability benefits will continue to be calculated as provided by the City Charter.

---

[55]    DFFA (§ 22.A.14.q.); DPLSA (§ 51.N.2a.3.); DPOA (§ 33.Q.2.a.3.).

[56]    DPOA (§ 33.Q.2.e.).

h.  **[As in the past,[57]]** disability retirement benefits shall continue to be considered Charter benefits which are paid instead of and not in addition to any benefits under the State Workers' Disability Compensation Act.

i.  Survivor Benefits. Survivor benefit coverage applicable to active members shall be continued during the period a member is eligible for a duty disability benefit. Upon conversion to a service retirement benefit as provided in 2.e., automatic survivor benefit coverage shall terminate. At that time, the member shall have the right to elect an optional form of payment in the same manner as if he/she had retired from active membership on the conversion date.

3.  Pension Credit While on Duty Disability Status.

a.  While eligible to receive duty disability benefits, regular defined pension service credit shall continue to accrue.

b.  The accrual of regular defined benefit pension service credit will cease when the member has 25 years of credited service.

4.  Earnings Offset.

a.  In the event that a recipient of a duty disability retirement benefit receives earned income from gainful employment during a calendar year, the amount of the member's disability benefit payable during the next subsequent fiscal year will be adjusted so it does not exceed the difference between (i) the member's base salary at the date of disability, increased by 2.25% times the number of full years from the date of disability to the year in which the earnings offset is applied, and (ii) the amount of remuneration from gainful employment during the prior calendar year.

b.  The earnings test shall be based on information the TPA may periodically require from a duty disability benefit recipient or have secured from other reliable sources. Furnishing such information shall be a condition for continued eligibility for a duty disability benefit.

5.  Annuity Withdrawal. The current withdrawal provision of the retirement system will continue. If a duty disability recipient elects annuity withdrawal after attaining 25 years of credited service, the applicable benefit reduction will offset the duty disability benefit until the conversion date, after which it will offset the converted service retirement benefit.

6.  The disability retirement procedure will be revised as follows:

a.  **[Medical Boards of Review will no longer be used.[58]]** The function now performed by Medical Boards of Review with respect to the determination of

---

[57]  DPOA (§ 33.Q.2.h.).

[58]  DPOA (§ 33.Q.6.a.).

whether an applicant is disabled will be performed by a qualified physician or surgeon in the appropriate specialty at Detroit Receiving Hospital or such other medical facility as may subsequently be mutually determined by the Union and the City. If either the Union or the City desires to terminate the services of the medical facility, it shall give notice in writing to that effect to the other party, specifying the date of termination. The parties shall then send a joint written notice to the medical facility of its termination. Neither party may terminate the services of a medical facility unless it has heard at least one case. Once the medical facility has received written notice that its services are terminated, it shall hear no further cases. However, the medical facility shall render decisions on all cases where the applicant has been examined and evaluated prior to receiving such notice. The medical facility will select the doctor who will perform the examination and evaluation. The medical finding of this physician or surgeon as to whether the applicant in disabled shall be final and binding on all interested parties.

b.    If the applicant is determined to be disabled, the Board of Trustees or its designee will examine the pension file, including the submissions of the applicant and the Police or Fire Department, to determine if there is any dispute as to whether the disability "resulted from the performance of duty" within the meaning of the pension plan. If it is undisputed that the disability did result from the performance of duty, the Board of Trustees will grant duty disability retirement benefits. If it is undisputed that the disability did not result from the performance of duty, the Board of Trustees will grant non-duty disability retirement benefits, provided the applicant meets the other conditions of eligibility, e.g., five years of creditable service. If the performance of duty issue is in dispute, the Board of Trustees will refer the matter to arbitration by a member of the Disability Retirement Review Board (DRRB). The decision of the DRRB member as to whether the disability resulted from the performance of duty shall be final and binding upon all interested parties. The DRRB shall consist of 3 qualified arbitrators who will be individually assigned in rotating order to decide the matters referred to arbitration by the Board of Trustees. **[[By March 1, 1998,[59] or within thirty (30) days after the issuance of the Act 312 Award (Case No. D92 C-554),[60]] the Union and the City shall convene and select 3 disinterested persons qualified as labor arbitrators to serve as members of the DRRB.[61]]** The procedure for the termination of umpires and the selection of new umpires **[currently in use by the Union and the Police or Fire Department[62] or found**

---

[59]     DPLSA (§ 51.N.6.b.).

[60]     DPOA (§ 33.Q.6.b.).

[61]     DPCOA (§ 41.N.6.b.); DPLSA (§ 51.N.6.b.).

[62]     DFFA (§ 22.A.14.q.6.b.)(referring to "the DFFA and the Department"); DPCOA (§ 41.N.6.b.)(referring to "the DPOA [sic] and the Department"); DPLSA (§ 51.N.)(referring to "the DPOA [sic] and the Department").

**in Article 8[63]**] shall apply to the termination and the selection of new DRRB arbitrators.

c.       The hearing before a member of the DRRB will be conducted in accordance with the following procedures:

1.       The applicant and the City will have the right to appear in person or otherwise, may be represented by counsel if they wish and will be afforded an equal opportunity to present evidence relevant to the issues;

2.       A court reporter will be present and make a stenographic record of the proceedings;

3.       The hearing will be closed to the public, except that the applicant may select one person to be with him in the hearing room; provided, however, that person may not testify;

4.       The witnesses will be sequestered;

5.       The witnesses will be sworn by the court reporter and testify under oath;

6.       The applicant may not be called by the City as an adverse witness;

7.       The DRRB member will apply the rules of evidence and follow the procedures which are customarily applied and followed in labor arbitration cases;

8.       If the applicant wishes to have an employee of the City released from duty to appear as a witness on his behalf, the applicant may so inform the Board of Trustees in writing which, in turn, will submit a written request to the appropriate Department executive for the release of the employee for the purpose of so testifying;

9.       The DRRB member will afford the parties an opportunity for the presentation of oral argument and/or the submission of briefs;

10.      The DRRB member will issue a written decision containing credibility resolutions as necessary, findings of fact and conclusions with respect to all relevant issues in dispute.  The decision of the DRRB member shall be final and binding on all interested parties;

11.      The authority of the DRRB member is limited to deciding whether or not the applicant's disability "resulted from the performance of duty" within the meaning of the Pension Plan.  The DRRB member shall have no authority to add to, subtract from, modify or disregard the terms of the Pension Plan; and

---

[63]       DPOA (§ 33.Q.6.b.).

12.    The costs associated with the hearing, including the arbitrator's fees and expenses, and the court reporter's fees and expenses, shall be paid by the Board of Trustees.

d.    A Third Party Administrator (TPA) mutually selected by the Union and the City shall provide all ongoing duties of administering the disability benefits after initial eligibility has been determined. These duties shall include:

1.    Monthly payment of benefits;

2.    The former duties of the Medical Director for conducting investigations to assure continuing eligibility for disability retirement benefits, including the annual re-examination of disability beneficiaries;

3.    Conducting investigations to determine any earnings the disability beneficiary may have for offset to system benefits; and

4.    The TPA shall have reasonable powers to insure compliance with re-examination and proof of earnings requirements including the withholding of monthly payments until compliance is achieved.

e.    If a disability beneficiary is determined by the TPA to no longer be disabled, he/she may appeal that determination within seven (7) days thereof by filing a written request with the TPA for a re-examination by a qualified physician or surgeon at and selected by the medical facility identified in paragraph 6.a. above whose medical finding will be final and binding. The TPA shall promptly arrange for such re-examination. The applicant's disability benefits will be continued pending that final and binding medical finding, and if the finding is that the applicant is no longer disabled, his disability benefits will be further continued while the Police or Fire Department is conducting such examinations and/or investigations as necessary to determine whether the applicant is qualified for reappointment to active duty. **[In the event that the examinations and/or investigations conducted by the Police Department result in a determination that the member is not qualified, for medical reasons, for reappointment to active duty, disability benefits will be continued.[64]]**

f.    In the event that the Union and the City are unable to reach agreement upon the medical facility to perform the functions described in paragraph 6.a. or the TPA to perform the functions described in paragraph 6.d. of this section, within thirty (30) days after a vacancy occurs, each shall nominate one choice as its selection and after reviewing any materials submitted and considering any arguments advanced by the parties in support of their respective nominations, a member of the DRRB

---

[64]    DPLSA (§ 51.N.6.e.).

shall decide which of the two nominees shall serve as the medical facility or the TPA.[65]

7. **[The Board of Trustees shall not act upon or grant the application filed by an officer who, although he/she is not capable of performing the full duties of a police officer, has not suffered any diminishment of his/her base wages or benefits because he/she is either:**

    a.     **regularly assigned to a position, the full duties of which he/she is capable of performing; or**

    b.     **assigned to a restricted duty position, unless the Police Department advises that it intends to seek a disability retirement for the officer in the foreseeable future.**

8. **The provisions in paragraph 7 above are not intended to and will not:**

    a.     **affect the officer's right to seek a disability retirement when no restricted duty position is available; or**

    b.     **restrict in any way the existing authority of the Chief of Police to seek a duty or non-duty disability retirement for an officer or for that officer at that time to request a duty or non-duty disability retirement.[66]]**

---

## Sec. 3.     Non-duty disability.

On written application to the Board of Trustees by or on behalf of a member or by the Head of his Department, a member, who becomes totally incapacitated for duty by reason of injury, illness or disease not resulting from the performance of duty, shall be retired by the Board of Trustees; provided, the Medical Director, after an examination of such member, shall certify to the Board of Trustees his total incapacity. If said member was separated from service after the filing of the written application and had attained 25 years or more of service prior to the date of separation, the Board of Trustees shall retire said member, under this Part B. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part B, § 3.)

## Sec. 4.     Benefits.

A member retired under section 3 above shall receive the following applicable benefits:

---

[65]     DFFA (§ 22.A.14.q.); DPCOA (§ 41.N.); DPLSA (§ 51.N.); DPOA (§ 33.Q.). All references to "Police or Fire Department" mean either the Police Department or the Fire Department, whichever is applicable to the respective Union.

[66]     DPCOA (§ 41.N.7-8.); DPLSA (§ 51.N.7-8.); DPOA (§ 33.Q.7-8.).

(a)    If such member has less than five years of creditable service at the time of his retirement, his accumulated contributions standing to his credit in the Annuity Savings Fund shall be returned to him, or at his option he shall receive a cash refund annuity which shall be the actuarial equivalent of his accumulated contributions. (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part B, § 4(a).)

(b)    If such member has five or more years of creditable service at the time of his retirement, he shall receive a disability retirement allowance computed in accordance with the provisions of this article, part A, section 2 or 2.1, whichever is applicable, and he shall have the right to elect an option provided for in Part H of this Article. His straight life retirement allowance shall not be less than twenty per cent of his average final compensation. Such retirement allowance shall be subject to Parts I and K of this Article. (As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part B, § 4(b).)

(c)    If a member receiving non-duty disability benefits has any accumulated contributions standing to his credit in the Annuity Savings Fund upon attainment of twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) of creditable service, such member may withdraw the balance of such contributions at that time.

---

**By Agreement**

---

Persons who are retired on disability pensions pursuant to Article VI, B of the Policemen and Firemen Retirement System shall be entitled to lump sum payments of all accumulated time from the date that the Board of Trustees determines that they are entitled to such a pension. Members shall not be required to utilize such time delaying their retirement date.[67]

---

### Part C — Application, Escalation and Change in Compensation, Rank

All applications for retirement shall be subject to the provisions of section 14, as amended, of Chapter XXI, Title IV of the 1918 Detroit City Charter, insofar as the same are applicable. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part C.)

### Sec. 1.    Generally.

If hereafter the rate of compensation of the rank, grade or position on which the service retirement allowance, disability pension or disability retirement allowance of a beneficiary who was a member or is a beneficiary of member as defined in article IV, section 1 (a), (b), or (c) is

---

[67]    DPCOA (§41.J.); DPLSA (§ 51.I.).

based shall be changed, his service retirement allowance, disability pension, or disability retirement allowance shall be changed proportionately, and if such rank, grade, or position shall have been abolished, his service retirement allowance, disability pension, or disability retirement allowance shall be changed in proportion to the change made in the compensation of the existing rank, grade, or position most nearly approximating the rank, grade, or position so abolished. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part C, § 1.)

### Sec. 2.    Increase of Benefits.

The retirement allowance or death benefit of a member who was hired prior to July 1, 1969 shall be increased proportionally with the increases in the pay of active employees of the rank on which the retirement allowance was computed.

On and after July 1, 1969, and the first of July of each year thereafter until July 1, 1992, the pension portion of any retirement allowance or death benefit of a member or beneficiary of a member as defined in article IV, section 1(d), which is paid or payable under this chapter shall be increased at the rate of two per cent (2.0%) per annum computed on the basis of the amount of the pension received at the time of retirement. (As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part C, § 2.)

On or after July 1, 1992 and the first of July each year thereafter, the pension portion of any retirement allowance or death benefit of a member or beneficiary of a member as defined in article IV, section 1(d), shall be increased at the rate of two and twenty-five one-hundredths per cent (2.25%) per annum computed on the basis of the amount of the pension received at the time of retirement. (Ord. No. 18-93, Sec. 47-12.6C-2.1.)

Effective for members who retire on or after July 1, 1997 (July 1, 1998 for DPOA members and their fire equivalents), the pension escalator described in this section shall be compounded annually.

---

### By Agreement

**Post Retirement Escalator**

For persons **[or members with a parity relationship with the DPLSA and the DPCOA Inspector[68]]**, retiring on or after July 1, 1998 **[or July 1, 2001[69]]**, under the new plan provisions, the 2.25% per annum escalation amount shall be re-computed each fiscal year on the basis of the amount of pension received in the previous fiscal year (i.e., the 2.25% per annum escalation amount shall be compounded).[70]



### DFFA

---

[68]    DFFA (§ 22.A.14.a.).

[69]    DPOA (§ 33.K.).

[70]    DFFA (§ 22.A.14.a.); DPLSA (§ 51.L.); DPOA (§ 33.K.). As of the effective date of the 312 Award # 1, this provision has been deleted from DPOA. 312 Award # 1, Issue # 61, pgs. 121–24.

For members with a parity relationship with the DPOA, retiring on or after July 1, 2001, under the new plan provisions, the 2.25% per annum escalation amount shall be re-computed each fiscal year on the basis of the amount of pension received in the previous year.[71]



**DPCOA**

Pension benefits based on service rendered after the effective date of this CET-DPCOA shall not be subject to any escalation amounts.[72]

**DPLSA / DPOA**

On or after July 1, 1992, and the first of July each year thereafter, the pension portion of any retirement allowance or death benefit of a member or beneficiary of a member as defined in Article VI, Section 1(d) of the plan provisions, and **[Article 51.G. of the DPLSA CBA or Article 33.K. of the CPOA CBA]** (to include those members who opt to retire under the new plan provisions) shall be increased at the rate of 2.25% per annum computed on the basis of the amount of the pension received at the time of retirement by all new plan members who are currently retired or who retire on or after July 1, 1992.

The pension portion of any retirement allowance or death benefit of a member, or beneficiary of a member as defined in Article IV, Section 1(d) of the plan provisions, and **[Article 51.G. of the DPLSA CBA or Article 3.K. of the DPOA CBA]** (to include those members who opt out to retire under the new plan provisions) earned after **[the date of the Act 312 Award in D09 G-0786 or September 1, 2011]**, shall not be increased whatsoever, per annum or otherwise. The pension portion of any retirement allowance or death benefit of a member, or beneficiary of a member as defined herein, accrued prior to **[the date of the Act 312 Award in D09 G-0786 or September 1, 2011]**, shall still be increased as provided herein. Hence, pension benefits earned based on service rendered after **[the date of this Award or September 1, 2011]** is issued will no longer receive the 2.25% per annum escalation amount. The 2.25% per annum escalation amount shall continue to apply to pension benefits earned based on service rendered before **[the date this Award was issued or September 1, 2011]**.[73]

**[Pension benefits based on service rendered after the effective date of this Agreement shall continue to not be subject to any escalation amounts.[74]]**

---

[71]       DFFA (§ 22.A.14.a.).

[72]       DPCOA (§ 41.M.).

[73]       DPLSA (§ 51.L.) (all references to the DPLSA CBA, or "the date of the Act 312 Award in D09 G-0786," or "the date of this Award," or "the date this Award was issued" apply to this DPLSA CBA); DPOA (§ 33.K.)(all references to the CPOA CBA or the date of September 1, 2011 apply to this DPOA CBA).

[74]       DPOA (as modified by 312 Award # 1, Issue # 61, pgs. 121–24).

## Sec. 3.    Payment.

The escalation factor contained in section 2 above shall be payable to the member or beneficiary of a member as defined in article IV, section 1 (d), notwithstanding any retirement allowance or pension amount limitation provisions in this chapter to the contrary.  (As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part C, § 3.)

### Part D — Death Benefits.

## Sec. 1.    Generally.

If a member, or a beneficiary who was a member, is killed in the performance of his duty or dies as the result of illness contracted or injuries received while in the performance of his duty and such death, illness or injuries resulting in death, be found by the board of trustees to have resulted from the performance of his duty, the following applicable benefits shall be paid, subject to part I, section 1, of this article.

(a)    His accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his death shall be paid to such person or persons as he shall have nominated by written designation duly executed and filed with the board of trustees.  If there be no such designated person surviving, his said accumulated contributions shall be paid to his legal representative, subject to subsection (e) of this section.

(b)    His widow shall receive a pension of five-elevenths of the maximum earnable compensation for the rank of patrolman or fire fighter as the case may be, to continue during her widowhood.  If his child or children under age eighteen years also survive the deceased member each such child shall receive a pension of one-tenth of such maximum earnable compensation; provided, that if there be more than two such surviving children under age eighteen years each such child's pension shall be an equal share of seven thirty-thirds of such maximum earnable compensation.  Upon the death, marriage, adoption, or attainment of age eighteen years of any such child his pension shall terminate and there shall be a redistribution by the board of trustees to the deceased member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-tenth of such maximum earnable compensation.  In no case shall the total of the pensions, provided for in this sub-section, payable on account of the death of a member exceed two-thirds of the maximum earnable compensation for the rank of patrolman or fire fighter, as the case may be.

Effective July 1, 1986, widows of Fire Department employees who have been receiving a flat monthly benefit of $300.00 pursuant to the authority of Title IV, Chapter 15, Section 16 of the 1918 City of Detroit Charter, and Section 13-107 of the July 1, 1974 Charter should receive an increase

of $500.00 per month thereby making the flat monthly benefit $800.00. (Ord. No. 11-86, Sec. 47-10-3; Ord. No. 348-H, Sec. 54-100-3.)

Effective July 1,1986, widows of Police Department employees who have been receiving a flat monthly benefit of $300.00 pursuant to the authority of Title IV, Chapter 21, Section 19 of the 1918 City of Detroit Charter, and Section 13-107 of the July 1, 1974 Charter, should receive an Increase of $500.00 per month thereby making the flat monthly benefit $800.00. (Ord. No. 11-86, Sec. 47-10-4; Ord. No. 349-H, Sec. 54-100-4.)

(c)     If no widow survives the deceased member or if his widow dies or remarries before his youngest unmarried surviving child attains age eighteen years, his unmarried child or children under age eighteen years shall each receive a pension of one-fourth of the maximum earnable compensation for the rank of patrolman or fire fighter, as the case may be; provided that if there be more than two such surviving children under age 18 years, each such child's pension shall be an equal share of one-half of such maximum earnable compensation.   Upon the death, marriage, adoption, or attainment of age eighteen years of any such child his pension shall terminate and there shall be a redistribution by the board of trustees to the deceased member's remaining eligible children, if any; provided, that in no case shall any such child's pension exceed one-fourth of the maximum earnable compensation for the rank of patrolman or fire fighter, as the case may be.

(d)     If there be no widow and if there be no children under age eighteen years surviving such deceased member and if he leaves surviving him either or both a father and mother, whom the board of trustees shall find to be actually dependent upon such member for financial support, such dependent father and mother shall each receive a pension of one-sixth of the maximum earnable compensation for the rank of patrolman or fire fighter, as the case may be.

(e)     If a member dies intestate, without having designated a person or persons, as provided in sub-section (a) of this section, and without heirs, the amount of his accumulated contributions in the Annuity Savings Fund, not to exceed a reasonable sum, to be determined by the board of trustees, shall be used to pay his burial expenses, provided he leave no other estate sufficient for such purpose; any balance credited to such member in the Annuity Savings Fund, and not used for burial expenses shall remain a part of the funds of the retirement system and shall be credited to the Pension Accumulation Fund.

(f)     If the maximum earnable compensation for the rank of patrolman or fire fighter, as the case may be, is subsequently changed, the pensions provided in this section for beneficiaries of members as defined in article IV, section 1 (a), (b), or (c) shall be proportionately changed.

(g)     The maximum earnable compensation for the rank of patrolman or fire-fighter, as the case may be, to be used in computing the pensions provided in this section for beneficiaries of members as defined in article IV, section 1 (d) shall be the maximum earnable compensation of the rank of patrolman or fire-fighter as established by the city's budget for the fiscal year of the member's death. (As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part D.)

---

## By Agreement

The City agrees that in the Policemen and Firemen Retirement System Article VI, D and Article VI, E, all references to "widow" shall include "widower" and in Article VI, E, Section 2(a), the disability and dependency restrictions on widowers shall be removed.[75]

---

## DPOA

Duty and non-duty death benefits under the City of Detroit Policemen and Firemen Retirement System shall be payable to widowers in the same manner as they are now payable to widows. Widowers seeking non-duty death benefits under the system shall not be required to demonstrate any degree of dependency on their wives.[76]

---

## DFFA / DPOA

Effective July 1, 2001, **[for DPOA allied members,[77]]** the re-marriage penalty on any pension shall be removed.[78]

---

## Part E — Nonduty Death.

### Sec. 1.    Payment of accumulated contributions.

If a member, or a member who retires after June 30, 1965, under part B, section 1 of this article, dies and no pension or pensions become payable under this chapter on account of his death, his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his death shall be paid to such person or persons as he shall have nominated by written designation duly executed and filed with the board of trustees. If there be no such designated person or persons surviving the said member, his said accumulated contributions shall be paid to his legal representative. If such member dies intestate, without having designated a person as

---

[75]     DFFA (§ 22.A.14.a.); DPCOA (§ 41.A.); DPLSA (§ 51.A.).

[76]     DPOA (§ 33.C.).

[77]     DFFA (§ 42.A.14.j.).

[78]     DFFA (§ 42.A.14.i.); DPOA (§ 33.P.).

above provided, and without heirs, his said accumulated contributions not to exceed a reasonable sum to be determined by the board of trustees, shall be used to pay his burial expenses, provided he leaves no other estate sufficient for such purpose; and any balance credited to such member in the Annuity Savings Fund not so used for burial expenses shall be transferred to the Survivors Benefit Fund. (As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part E, § 1.)

### Sec. 2.    Allowances to widows, etc.

Upon the death of a member, or a member who retires after June 30, 1965, under part B, section 1 of this article, and such death was found by the board of trustees not to have resulted from the performance of his duty, the applicable retirement allowances provided in paragraphs (a), (b), (c) and (d) of this section shall be paid from the Survivors Benefit Fund and shall be subject to paragraphs (e), (f) and (g) of this section.

(a)    His widow, or in the case of a female member, her widower, whom the board of trustees finds to be totally and permanently disabled and to have been dependent upon the said female member for at least fifty per cent of his financial support, shall receive a retirement allowance computed in the same manner in all respects as if the said member had (1) regularly retired the day preceding the date of his death, notwithstanding that he might not have acquired twenty-five years of creditable service, in the case of a member as defined in article IV, section 1 (a), (b), or (c), or notwithstanding that he might not have acquired twenty-five years of service or more and had not attained age fifty-five, in the case of a member as defined in article IV, section 1 (d), (2) elected option 2 provided for in part H of this article, and (3) nominated his said widow or widower as joint beneficiary; provided, that in no case shall the retirement allowance payable to such joint beneficiary be less than twenty per cent of said member's average final compensation. If a member who had less than twenty-five years of creditable service dies prior to July 1, 2001, the retirement allowance payable to the widow/widower shall be terminated in the event the widow/widower remarries.

(b)    His unmarried child or children under age eighteen years shall each receive a retirement allowance of one-seventh of the annual maximum earnable compensation of the rank of a patrolman or a fire fighter, as the case may be; provided, that if there be more than two such children, each child shall receive a retirement allowance of an equal share of two-sevenths of said annual maximum earnable compensation of a patrolman or a fire fighter. Upon any such child's adoption, marriage, death or attainment of age eighteen years, whichever occurs first, his retirement allowance shall terminate, and there shall be a redistribution by the board of trustees to the deceased member's remaining eligible children under age eighteen years; provided, that in no case shall the retirement allowance

13-53846-tjt    Doc 7502-3    Filed 09/16/14    Entered 09/16/14 01:20:42    Page 70 of 201

payable to any such child exceed one-seventh of the said annual maximum earnable compensation of a patrolman or a fire fighter.

(c)    If, at the time of the said member's death, there shall be neither a widow nor children eligible for a retirement allowance provided for in this section, each of his parents shall receive a retirement allowance of one-seventh of the annual maximum earnable compensation of a patrolman, or a fire fighter, as the case may be; provided, that the board of trustees finds that such parent was dependent upon the said member for at least fifty per cent of his financial support.  Upon the remarriage of any such parent, his retirement allowance shall thereupon terminate.

(d)    In the event all the retirement allowances, provided for in this section, payable on account of the death of a member, terminate before there has been paid an aggregate amount equal to the said member's accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his death, the difference between his said accumulated contributions and the said aggregate amount of retirement allowances shall be paid to such person or persons as the said member shall have nominated by written designation duly executed and filed with the board of trustees.  If there be no such designated person or persons surviving the said member such difference, if any, shall be paid to his legal representative.

(e)    In no case shall any retirement allowance be paid under this section on account of the death of a member if any benefits are paid under part D of this article on account of his death.  The retirement allowance provided for in this section shall be subject to part I of this article.

(f)    All benefits provided in this part E for beneficiaries of members as defined in article IV, section 1 (a), (b), or (c) shall be based on the maximum earnable compensation of the rank of patrolman or fire fighter, as the case may be.  If hereafter the compensation of such rank shall be changed, the benefits provided shall be changed proportionately.  All benefits provided in this part E for beneficiaries of members as defined in article VI, section 1 (d) shall be based on the maximum earnable compensation of the rank of patrolman or fire-fighter as established in the city's budget for the fiscal year of the member's death.

(g)    In the event a member has withdrawn his accumulated contributions from the Annuity Savings Fund and has not returned in full all amounts due the fund by him, the survivors benefits provided in paragraphs (a), (b), (c) and (d) of this section shall be reduced to the proportion that the member's accumulated contributions standing to his credit in the Annuity Savings Fund, at the time of his death bears to the amount his accumulated contributions would have been had he not made a withdrawal from the Annuity Savings Fund.  (As amended September 1, 1964.  In effect

September 15, 1964.  As amended November 5, 1968.  In effect January 1, 1969.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part E, § 2.)

---

### By Agreement

The City agrees that in the Policemen and Firemen Retirement System Article VI, D and Article VI, E, all references to "widow" shall include "widower" and in Article VI, E, Section 2(a), the disability and dependency restrictions on widowers shall be removed.[79]

---

### DPOA

Duty and non-duty death benefits under the City of Detroit Policemen and Firemen Retirement System shall be payable to widowers in the same manner as they are now payable to widows. Widowers seeking non-duty death benefits under the system shall not be required to demonstrate any degree of dependency on their wives.[80]

---

### DFFA / DPOA

Effective July 1, 2001, [for DPOA allied members,[81]] the re-marriage penalty on any pension shall be removed.[82]

---

### Part F — Termination of Membership Otherwise than by Retirement, Death or Becoming a Beneficiary.

**Sec. 1.    Payment of benefits.**

If the membership of a member as defined in article IV, section 1 (a), (b), or (c) shall terminate for any reason other than his retirement, his becoming a beneficiary, or his death, he shall be paid the accumulated contributions standing to the credit of his individual account in the Annuity Savings Fund, such payment to be made within ninety days after such termination of membership; provided, however, that if a member eligible for retirement shall resign or be dismissed from the service, the Board of Trustees, on the written petition of such member filed within one year from his separation from service and prior to the withdrawal of his accumulated contributions in the Annuity Savings Fund, shall grant such member service retirement benefits computed in accordance with article VI, part A, section 2, subject to the provisions of part G of this article.  (As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part F, § 1.)

---

[79]    DFFA (§ 22.A.14.a.); DPCOA (§ 41.A.); DPLSA (§ 51.A.).

[80]    DPOA (§ 33.C.).

[81]    DFFA (§ 42.A.14.j.).

[82]    DFFA (§ 42.A.14.i.); DPOA (§ 33.P.).

- 59 -

## Sec. 2.    Payment of benefits.

If the membership of a member as defined in article IV, section 1(d) shall terminate for any reason other than his retirement, his becoming a beneficiary or his death, he shall be paid the accumulated contributions standing to the credit of his individual account in the Annuity Savings Fund, such payment to be made within ninety days after such termination of membership; provided, however, that if a member having twenty-five or more years of service and having attained age fifty-five shall resign or be dismissed from the service, the Board of Trustees, on the written petition of such member filed within one year from his separation from service and prior to the withdrawal of his accumulated contributions in the Annuity Savings Fund, shall grant such members service retirement benefits computed in accordance with article VI, part A, section 2.1, subject to the provisions of part G of this article.  (As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part F, § 2.)

## Sec. 3.    Deferred vested benefits.

A member (i) whose employment is terminated before August 28, 2003 and who is credited with eight or more years of creditable service  and has attained age forty, or (ii) whose employment is terminated after August 27, 2008 and who is credited with ten or more years of creditable service, but in each case less than twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) of creditable service shall be eligible to receive a full retirement allowance beginning on the date upon which the member would have been eligible to commence a full retirement allowance had he continued in the service of the City until such date.  Alternatively, such member may elect to receive an actuarially reduced early retirement allowance at any time following his termination of employment with the City.

## Part G — Conviction of Felony.

## Sec. 1.    Forfeiture of rights.

If a member or beneficiary as defined in Article IV, section 1 (a), (b), (c) or (d) shall be convicted by a court of competent jurisdiction of a felony or high misdemeanor involving moral turpitude committed during active service, the Board of Trustees shall have the power to order the forfeiture of all rights of the member or beneficiary to benefits hereunder, except the return of his accumulated contributions.  (As amended November 5, 1968.  In effect January 1, 1969.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part G, § 1.)

## Part H — Option Elections.

## Sec. 1.    Generally.

(a)    Prior to the first payment of any retirement allowance normally due, except a disability pension payable under Part B, Sections 2 and 2.1 of this article, a member may elect to receive his or her retirement allowance as a straight life retirement allowance payable throughout the member's life; or the member may elect to receive the actuarial equivalent, as of the date of the member's retirement, of his or her straight life retirement allowance in a reduced retirement allowance payable throughout the member's life and

13-53846-tjt    Doc 7502-3    Filed 09/16/14    Entered 09/16/14 01:20:42    Page 73 of 201

nominate a joint beneficiary, in accordance with the provisions of Options 1, 2 or 3 as follows:

(1)     OPTION 1.  *Cash Refund Annuity*.  Under Option 1, a member will receive a reduced retirement allowance.  If a member who selected Option 1 dies before full payment of the annuity has been received, the person or persons nominated by that member's written designation duly executed by the member and filed with the Board of Trustees shall receive in a single payment the difference between the present value of the member's annuity on the date the member retired, minus the amount of annuity payments already paid to the member.  If there is no such designated person(s) surviving the retired deceased member, such difference, if any, shall be paid to the member's legal representative; or

(2)     OPTION 2.  *Joint and Last Survivorship Retirement Allowance*. Under Option 2, upon a member's death, payment of a reduced retirement allowance shall be continued through the life of and paid the person having an insurable interest in the member's life and nominated by written designation duly executed by the member and filed with the Board of Trustees prior to the first payment of the member's retirement allowance is due; or

(3)     OPTION 3.  *Modified Joint and Last Survivorship Allowance*. Under Option 3, upon a member's death, payment of one-half of the member's reduced retirement allowance shall be continued throughout the life of and paid to the person having an insurable interest in the member's life and nominated by that member's written designation duly executed by the member and filed with the Board of Trustees prior to the date the first payment of the retirement allowance is due.

(b)     This Section shall be applicable to those members receiving benefits on the effective date of this Section who are not covered by the arbitration decision regarding the Detroit Police Officers Association which became effective July 1, 1995, or the arbitration decision regarding the Detroit Police Lieutenant's and Sergeant's Association arbitration decision which became effective June 30, 1998.

(c)     This Section does not rescind any substantive rights of disability retirees from the Policemen and Firemen Retirement System who retired prior to the July 1,1995 arbitration award, or the substantive rights of disability retirees from the Detroit Police Lieutenant's and Sergeant's Association who retired prior to the June 30,1998 arbitration award.

(d)     This Section does not amend any computations used to determine benefits under Part B, Sections 2 and 2.1 of this Code, or result in an increase or decrease in such benefits.

    (e)    Existing 1099R reporting procedures shall continue as currently in effect. A change in said procedures shall only occur as the result of an Internal Revenue Service ruling letter in favor of such change.

(Ord. 5-00, Sec. 54-2-14; Ord. 4-00, Sec. 54-2-14.)

*Joint and Survivor Optional Forms of Payment.* The Joint and Survivor Optional Forms of Payment provided under the retirement system shall be made available in either the standard form or the pop-up form, as follows:

    (1)    *Standard Form.* Under the *Standard Form,* the reduced retirement allowance shall be paid throughout the lifetime of the retiree.

    (2)    *Pop-up Form.* Under the *Pop-up Form,* the reduced allowance shall be paid throughout the lifetime of the retiree and the designated beneficiary. In the event of the death of the designated beneficiary during the lifetime of the retiree, the amount of the allowance shall be changed to the amount that would have been payable had the retiree elected the Straight Life Form of Payment.

    In addition, a member may elect to have all or part of his accumulated contributions paid to the member in a single sum or used to purchase an annuity contract from an insurance company of his choice in which case, any annuity payments attributable to such amount under the retirement system shall not be payable from the annuity reserve fund but shall be the responsibility of the insurance company. A member' s retirement allowance shall be reduced by the actuarial equivalent of the amount so paid or used.

    Effective July 1, 1992, retirees of the Policemen and Firemen Retirement System shall be entitled to change their pension option from either Option 2 or Option 3 **[or effective July 1, 2000, Option A[83]]** to a straight life pension after they have commenced collection of the pension if the member's beneficiary predeceases the member. The actuarial cost of the change in benefit shall be borne by the member who seeks change in his option election. The pop-up option shall be based upon the investment return assumption as recommended by the Board's actuary and adopted by the Board of Trustees. **[This provision shall be effective July 1, 1986.[84]]** (Ord. No. 18-93, Sec. 47-12.6H-1(A).)

---

**By Agreement**

---

Effective July 1, 2000, members shall have the option of selecting a 75% surviving beneficiary option.[85]

---

    [83]    DFFA (§ 22.A.14.l.).

    [84]    DPOA (§ 33.M.).

    [85]    DPLSA (§ 51.M.).

**Sec. 2.  Disposition of surplus benefits upon death of member and beneficiary.**

In the event a member elected Option 2 or 3 provided for in section 1 of this part H and his designated joint beneficiary die before there has been paid in retirement allowances an aggregate amount equal to his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his retirement, the difference between his said accumulated contributions and the said aggregate amount of retirement allowances paid shall be paid to the said retired member's legal representative.  (As amended September 1, 1964.  In effect September 15, 1964.)  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part H, § 2.)

## Part I — Pension Offset by Compensation Benefits.

**Sec. 1.  Generally.**

Any amounts which may be paid under the provisions of any workmen's compensation, or pension, or similar law to a member, or to the dependents of a member on account of any disability or death, shall be offset against and payable out of funds provided by the City under the provisions of the system on account of the same disability or death.  In case the present value of the total commuted benefits under said workmen's compensation, pension, or similar law, is less than the pension reserve on benefits otherwise payable from the funds provided by the City under this System, then the present value of the commuted payments shall be deducted from the pension reserve, and such benefits as may be provided by the pension reserve, so reduced, shall be payable under the provisions of the System.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part I, § 1.)

## Part J — Monthly Payments.

Unless otherwise herein provided, all benefits payable under this system shall be paid in equal monthly installments.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part J.)

## Part K — Re-Examination of Beneficiaries.

**Sec. 1.  Authority of Board.**

(a)  Once each year during the first five years following retirement of a member on a disability pension or a disability retirement allowance and at least once in every three year period thereafter the Board of Trustees may, and upon his application, shall require any disability beneficiary, if he would not then be eligible for a service retirement allowance had he remained in active service; to undergo a medical examination:  such examination shall be made by, or under the direction of the Medical Director at a place to be fixed by the Board of Trustees.  Except when the examination is on the application of the beneficiary, if the beneficiary shall be required to travel more than twenty miles to reach such place, the Board of Trustees shall pay his reasonable traveling expenses.  Should such disability beneficiary refuse to submit to such examination his disability pension or disability retirement allowance may be discontinued until he shall submit to such examination and should such refusal continue

for one year, all his rights in and to a pension may be revoked by the Board of Trustees. If on medical examination of a beneficiary, the Medical Director reports, and the report is concurred in by the Board of Trustees, that the beneficiary is physically able and capable of resuming active duty as a Policeman or Fireman, he shall be restored to such duty and his disability pension or disability retirement allowance shall cease. Such member so restored to active duty shall be returned to duty in a rank or grade equivalent to or higher than the rank or grade in which he was serving at the time of his last retirement and his compensation shall be that provided for the rank or grade in which he is restored to service. It shall be the duty of the Commissioner of Police or the Board of Fire Commissioners to restore such member to duty forthwith.

(b)     If the Medical Director reports and certifies to the Board of Trustees that a disabled old plan member is engaged in a gainful occupation, paying more than the difference between his final compensation and his disability pension, or disability retirement allowance, and if the Board of Trustees concurs, the amount of his pension shall be reduced to an amount, which together with the amount earned by him, shall equal the amount of his final compensation. If the Medical Director reports and certifies to the Board of Trustees that a disabled new plan member is engaged in a gainful occupation, paying more than the difference between his base salary at the time of disability increased by two and twenty-five one hundredths percent (2.25%) for each full year from the date of disability and his disability pension, or disability retirement allowance, and if the Board of Trustees concurs, the amount of his pension shall be reduced to an amount, which together with the amount earned by him, shall equal the amount of his final compensation. Should his earnings be later changed, the amount of his pension may be further modified in like manner.

(c)     A disability beneficiary, who shall be reinstated to active service, as provided in this section, shall from the date of such restoration again become a member of the System; and he shall contribute to the System thereafter in the same manner and at the same rate as he paid prior to his disability retirement. Any prior service and membership service on the basis of which his services were computed at the time of his retirement shall be restored to full force and effect, and he shall be given service credit for the period of time he was in retirement due to such disability, except in the case of nonservice connected disability.

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part K, § 1.)

## Part L — Medical Board of Review

As to all applications under this Article, the medical findings of the Medical Board of Review shall be binding on the Board of Trustees. (1918 Detroit City Charter, Title IX, Ch. VII, Art. VI, Part L.)

## Part M — Benefit Limitations

The Defined Benefit Plan of the Retirement System is subject to Section 415 of the Internal Revenue Code. The Retirement System shall be administered, operated and limited consistent with all applicable Sections of the Internal Revenue Code (IRC) including Section 415, as described in Article IX, Section 8.

## Part N — Withdrawal of Accumulated Contributions

### Sec. 1.    Member With Twenty or Twenty-Five Years of Service.

Effective July 1, 1982, a member with twenty-five years or more of creditable service (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) shall be allowed to withdraw either a partial or the full amount of his accumulated contributions, one time only, whether or not the member retires. A member shall make such election prior to the receipt of his first retirement benefit check.

### Sec. 2.    Disabled Member

A member who is receiving disability benefits (duty or non-duty) from the System and who has twenty-five years (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) or more of creditable service shall have the right to withdraw the full amount of his accumulated contributions. If such member withdraws his accumulated contributions, his retirement benefit shall be actuarially reduced to reflect such withdrawal.

---

**By Agreement**

---

(a)    Optional Annuity Withdrawal

    1.    **[Effective for those retiring on or after July 1, 1974;[86]]** a member shall have the right to elect to receive on the effective date of his service retirement a partial or total refund of his accumulated contributions. If a member makes such an election, an annuity payable under any retirement allowance or reduced retirement allowance shall be reduced proportionally. If the total accumulated contributions are withdrawn, no annuity shall be payable.

    The limitation of fifteen twenty-seconds of the maximum earnable compensation of a patrolman and fireman continues in effect. For purposes of determining the fifteen twenty-seconds limitation, a computation based on the annuity which is an actuarial equivalent of the accumulated contributions standing to a member's credit in the Annuity Savings Fund prior to any partial or total refund will be used.

    This provision affords the members of this collective bargaining unit a similar option available to members of the General Retirement System pursuant to 1973 Amendment K. The parties agree that no other benefits or amounts payable

---

[86]    DPOA (§ 33.D.).

pursuant to the Policemen and Firemen Retirement System are affected by this contractual provision.[87]

**[On or after July 1, 1974, members or former members who are entitled to begin to receive the "40 & 8" benefit will be entitled to the annuity refund withdrawal option.**

**On or after July 1, 1974, non-duty disability retirants who retired pursuant to Title IX, Chapter VII, Article IV, Section 1, a, b or c prior to having twenty-five years of service credit, shall be entitled to the annuity refund withdrawal option on the date he/she would have had twenty-five years of service credit had he/she continued as an active member. Said option shall only apply to the balance of accumulated contributions, if any, remaining in such retirant's credit in accordance with the existing annuity refund provisions.**

**Survivor benefit beneficiaries as defined in Title IX, Chapter VII, Article VI, Part E, Section 2, parts (a), (b) and (c) of the 1918 City Charter in effect as of June 30, 1974, and continued in effect by Section 11-102 of the July 1, 1974, City Charter shall be entitled to the annuity withdrawal refund option subject to the same rules that would have been applicable to the deceased member or members had he/she not died. Said option shall only apply to the balance of accumulated contributions, if any, remaining in applicable former member's credit.**

**In any case of doubt, the Board of Trustees shall decide whether a member or beneficiary is entitled to an annuity refund withdrawal option.[88]]**

2.  In addition to the provisions of the current CET or collective bargaining agreement, pension charter and ordinance provisions and all other pension rights of members, a member shall have the right on or after the effective date of his becoming eligible for a full service retirement allowance (members who have twenty-five (25) years of creditable service) to elect to receive a partial or total refund of his accumulated contributions to the Annuity Savings Fund. If a member makes such an election, an annuity payable under any retirement allowance or reduced retirement allowance shall be reduced proportionally. If the total accumulated contributions are withdrawn, no annuity shall be payable.

    If a member makes such an election, the retirement allowance shall be reduced to reflect the value of the annuity withdrawn. The amount of the annuity at the time of such election shall be the amount used at the time of retirement for purposes of computing the retirement allowance.

---

[87]    DFFA (§ 22.A.14.b.); DPCOA (§ 39.A.); DPLSA (§ 48.H.); DPOA (§ 33.D.).

[88]    DFFA (§ 22.A.14.b.); DPCOA (§ 39.B-E.); DPLSA (§ 48.H.).

**[Beginning July 1, 1982, and thereafter,[89]]** all members who complete their required years of service, shall have the right to withdraw all or part of their accumulated contributions whether they choose to retire or not. [90]

**[For members having a parity relationship with the DPOA and the DPCOA Inspector beginning July 21, 2000,[91]] [Effective July 1, 2003,[92]] [Beginning July 21, 2000,[93]] [a member who has elected to retire and elected to withdraw his/her annuity for the purposes of calculating his/her retirement allowance (thereby lowering the retirement allowance), may nevertheless choose to leave the annuity in the Retirement System collecting regular annuity interest with the option of a one-time withdrawal of the annuity funds at a later date.[94]]**

**[For members [or employees with a parity relationship with the DPLSA and the DPCOA Inspector[95]] who retire on or after July 1, 1990, and who have made or make an election to receive a total or partial refund of his/her accumulated contribution to the Defined Contribution Plan, there shall be no reduction of retirement allowances due to the portion of withdrawal representing interest credits.[96]] [This subsection shall be controlled by the requirements of the Act 312 arbitration award issued June 25, 1990 (MERC Case No. B89 C-0622, page numbers 22 and 23.[97]]**

**[Effective January 15, 2010[98] or December 15, 2008[99] or March 8, 2007,[100]]** a member **[or a DPOA, DPLSA, or DPCOA allied member of DFFA[101]]** who retires and elects to leave a balance in the Defined Contribution Plan (Annuity Savings Fund) would have the option of receiving a quarterly payment of interest earnings only or to allow periodic withdraws of principal, in addition to a one time complete withdrawal.[102] **[Members must make their selection a minimum**

---

[89]     DPOA (§ 33.F.).

[90]     DFFA (§ 22.A.14.b.); DPCOA (§ 39.F.); DPLSA (§ 48.H.); DPOA (§ 33.F.).

[91]     DFFA (§ 22.A.14.b.).

[92]     DPLSA (§ 48.I.).

[93]     DPOA (§ 33.F.).

[94]     DFFA (§ 22.A.14.b.); DPLSA (§ 48.I.); DPOA (§ 33.F.).

[95]     DFFA (§ 22.A.14.b.2.).

[96]     DFFA (§ 22.A.14.b.2.); DPCOA (§ 39.H.); DPLSA (§ 48.H.).

[97]     DFFA (§ 22.A.14.b.2.); DPLSA (§ 48.H.).

[98]     DFFA (§ 22.A.14.b.)(effective date for DPCOA allied members); DPCOA (§ 39.J.)("Effective with the Act 312 Award in MERC Case No. D07 K-1456, dated January 15, 2010…")

[99]     DFFA (§ 22.A.14.b.3.)(effective date for DPLSA allied members ); DPLSA (§ 48.J.).

[100]    DFFA (§ 22.A.14.b.)(effective date for DPOA allied members); DPOA (§ 33.S.).

[101]    DFFA (§ 22A.14.b.3.)

[102]    DFFA (§ 22.A.14.b.); DPCOA (§ 39.A-H, J.); DPLSA (§ 48.A-H, J.); DPOA (§ 33.S.).

- 67 -

**of thirty (30) days before the beginning of a quarter; quarter defined as beginning March 1, June 1, September 1, and December 1.[103]]**

**[An employee who is entitled to a retirement allowance under Article VI, Part A, Section 4 of the Policemen and Firemen Retirement System and who leaves the employ of the Police or Fire Department of the City of Detroit on or after July 1, 1982 shall have the right to elect to receive on the effective date of termination a partial or total refund of his accumulated contributions. The pension portion of his retirement allowance shall be computed as if the member had not withdrawn his/her accumulated contributions from the Annuity Savings Fund until the date he/she was eligible to retire had he/she continued in City employment.[104]]**

---

### DPCOA

Effective in accordance with the specific date and terms of the Detroit Police Officers Association (DPOA) award in Act 312 No. D98 E-0840 (Chairman Donald F. Sugerman, dated July 21, 2000) the membership of this bargaining unit shall have the right to leave his/her withdrawn annuity in the pension system and accumulating interest, as provided therein.[105]

---

[103]    DFFA (§ 22.A.14.b.)(applicable to DPLSA and DPCOA allied members); DPCOA (§ 39.A-H, J.); DPLSA (§ 48.A-H, J.).

[104]    DFFA (§ 22.A.14.b.); DPCOA (§ 39.G.); DPLSA (§ 48.H.).

[105]    DPCOA (§§ 39.I.).

## ARTICLE VII.

### Method of Financing.

The funds of the retirement system shall be the Annuity Savings Fund, Annuity Reserve Fund, Pension Accumulation Fund, Pension Reserve Fund and the Survivors Benefit Fund. (As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VII.)

**Sec. 1.    Annuity Savings Fund.**

(a)    The Annuity Savings Fund shall be the fund in which shall be accumulated at regular interest, the contributions deducted from compensation of members to provide for their annuities. The contributions of a member as defined in article IV, section 1 (a), (b) or (c) shall be five percent of a member's compensation until the member has acquired twenty-five years of creditable service. The contribution of a member as defined in article IV, section 1(d) shall be five per cent of his compensation until he has acquired at least twenty-five years of creditable service (effective as of March 8, 2007, twenty years for DPOA members and fire equivalents) and attained age fifty-five. No member shall have the option of choosing to receive the compensation required to be contributed hereunder directly instead of having such amounts paid by the City to the Annuity Savings Fund.

(b)    The officer or officers responsible for making up the payroll shall cause the contributions provided for in paragraph (a) above to be deducted from the compensation of each member on each and every payroll, for each and every payroll period, from the date of his entrance in the system to the date he ceases to be a member.

(c)    The deductions provided for herein shall be made notwithstanding that the minimum compensation provided by law for any member shall be reduced thereby. Every member shall be deemed to consent and agree to the deductions made and provided for herein, and payment of his salary or compensation, less said deduction, shall be a full and complete discharge and acquittance of all claims and demands whatsoever for the services rendered by such person during the period covered by such payments, except as to the benefits provided under this chapter. The amounts to be deducted shall be deducted by the city treasurer and when deducted shall be paid into the Annuity Savings Fund and shall be credited to the individual account of the member from whose compensation said deduction was made.

(d)    If, under the provisions of this chapter, any person shall withdraw or be paid any part or all of his accumulated contributions and shall thereafter again become a member, he shall, in addition to the contributions provided

for in paragraph (a) above, redeposit in the Annuity Savings Fund, by an increased rate of contribution to be determined by the board of trustees, or by a single payment, such amount that his accumulated contributions at the date of his eligibility for retirement will be the same amount it would have been had no withdrawal or payment been made therefrom.

(e)    Except as is otherwise provided in this chapter, upon the death or retirement of a member, his accumulated contributions shall be transferred from the Annuity Savings Fund to the Annuity Reserve Fund. (As amended September 1, 1964. In effect September 15, 1964. As amended November 5, 1968. In effect January 1, 1969.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 1.)

## Sec. 2.    Annuity Reserve Fund.

The Annuity Reserve Fund shall be the fund from which shall be paid all annuities payable as provided in this chapter, except annuities which are payable from the Survivors Benefit Fund. Should a disability beneficiary be restored to active service, his annuity reserve at the time shall be transferred from the Annuity Reserve Fund to the Annuity Savings Fund and credited to his individual account therein. (As amended September 1, 1964. In effect September 15, 1964.) (1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 2.)

## Sec. 3.    Alternative Financing Method.

Except as provided regarding the survivors benefit fund, the pension accumulation fund shall be the fund in which shall be accumulated reserves for the pensions and other benefits payable from contributions made by the city, and from which transfers shall be made as provided in this section.

(a)    Accrued Liability Fund. Pursuant to Ordinance No. 05-05, which authorizes the creation of the Detroit Police and Fire Retirement System Service Corporation, the City has entered into a transaction ("the Pension Funding Transaction") to obtain funds as an alternative to those available through the traditional funding mechanism described in Section 4. The proceeds generated by the Pension Funding Transaction (or any Additional Pension Funding Transaction, as described below) that will be deposited into the System will be termed the "Funding Proceeds." The Funding Proceeds will be deposited into a new Fund in the System to be called the Accrued Liability Fund. The purpose of the Funding Proceeds will be to fund all or part of the heretofore unfunded accrued liabilities ("UAAL") of the System, as determined as of a date certain, i.e., the "Determination Date," pursuant to the System's actuarial valuation as of that date. The Funding Proceeds will be assets of the System and will be applied, together with all other assets of the System, to fund the System's obligation to pay accrued benefits.

This Accrued Liability Fund shall contain only the Funding Proceeds of the Pension Funding Transaction, and any earnings thereon. Should the City, by future ordinance, choose to raise additional monies by additional pension funding transactions ("Additional Pension Funding Transactions") in order to fund the then existing UAAL of the System as of a future date certain, a new and separate Accrued Liability Fund shall be created within the System to contain the proceeds, and any earnings thereon, of any Additional Pension Funding Transactions, and a new Accrued Liability Fund will be created for each successive Additional Pension Funding Transaction entered into by the City, if any. The treatment of any Additional Accrued Liability Funds shall be the same as described below.

(b)    The Funding Proceeds deposited in the applicable Accrued Liability Fund will be subject to the oversight and investment direction of the Board of Trustees of the Police and Fire Retirement System, consistent with the Board's obligations under Article VIII (Management of Funds), The Board will invest the Funding Proceeds as part of the System's overall assets, and will not differentiate the Funding Proceeds from other System assets for investment purposes.

(c)    All Interest, dividends and other income derived from the investment of the Funding Proceeds shall be credited annually to the Accrued Liability Fund on a total System rate of return basis, determined by crediting the applicable Accrued Liability Fund with the investment return experienced by the System in total for all of its investments for the year. This shall be done by first determining the rate of return for the total assets of the System for the fiscal year, and then crediting back to each Accrued Liability Fund an amount that is determined by multiplying that rate of return times the balance in the Accrued Liability Fund as of the beginning of the fiscal year.

The interest, dividends and other income derived from the investment of the Funding Proceeds deposited in any Accrued Liability Fund will not be credited to any Funds other than the Pension Accumulation Fund. Morever, because the Accrued Liability Fund has been impressed with a certain and definite purpose, it shall be accounted for separately as provided for in Section 8, Maintenance of Reserves.

(d)    Upon the creation of an Accrued Liability Fund and the deposit of the Funding Proceeds into the applicable Accrued Liability Fund, there shall be established a schedule for transferring assets of the applicable Accrued Liability Fund by crediting them to the Pension Accumulation Fund on an annual basis over the period required to fully amortize the System's UAAL determined as of the applicable Determination Date.

The System's UAAL determined as of the Determination Date shall be the "Determined Accrued Liability." The period over which the Determined

Accrued Liability is to be fully amortized, as specified in the System's actuarial valuation as of the applicable Determination Date, is the "Amortizing Period." The amount to be transferred each fiscal year to the Pension Accumulation Fund from the Accrued Liability Fund is the "Scheduled Amortizing Amount."

With respect to the Pension Funding Transaction and any Additional Pension Funding Transactions, the Scheduled Amortizing Amount will equal a level percentage of the City's payroll for each fiscal year. The level percentage of the City payroll that will be used to determine the Scheduled Amortizing Amount shall be a level percentage that is equal to the percentage that is specified in the actuarial valuation as of the applicable Determination Date as being the percentage of City's annual payroll required to amortize the Determined Accrued Liability over the Amortizing Period, multiplied by a fraction. The numerator of the fraction shall be the amount of the applicable Funding Proceeds up to the full amount of the Determined Accrued Liability as of the Determination Date. The denominator of the fraction shall be the System's Determined Accrued Liability on that date.

**Commentary**: By way of example only, the Scheduled Amortizing Amount would be determined as follows: (1) the Determination Date is June 30, 2004, (2) the Funding Proceeds are deposited into the System during the 2004-2005 Fiscal Year, (3) the June 30, 2004 actuarial valuation produced a UAAL of $600 million, (4) the City's contribution required to amortize that UAAL is 21% of the City's payroll, and (5) the Funding Proceeds are $400 million, then the Scheduled Amortizing Amount for Fiscal Year 2005-06 would be 21% times ($400 million/$600 million) times the City's payroll for 2005-2006.This would be 14% times the City's payroll for that fiscal year.

With respect to the Pension Funding Transaction or any Additional Pension Funding Transactions, where the applicable Determination Date occurs after the date of the actuarial valuation that determines the City's contribution for the fiscal year during which the applicable Funding Proceeds are deposited into the System, for each fiscal year, there will be transferred from the applicable Accrued Liability Fund to the Pension Accumulation Fund, an amount that is specified in such actuarial valuation as being the City's required contribution needed to amortize the System's UAAL as of the date of such actuarial valuation, multiplied by a fraction. The numerator of the fraction shall be the amount of the applicable Funding Proceeds up to the full amount of the UAAL specified in such actuarial valuation, and the denominator of the fraction shall be the System's total UAAL as set forth in that same actuarial valuation.

**Commentary**: By way of example only, the Scheduled Amortizing Amount in this case would be determined as follows: (1) the

Determination Date is June 30, 2004, (2) the Funding Proceeds had been deposited into the System during the 2004-2005 Fiscal Year, (3) the June 30, 2003 actuarial valuation produced a UAAL of $516 million, (4) the City's contribution required to amortize that UAAL is 19.07% of the City's payroll and (5) the Funding Proceeds are $400 million, then the Scheduled Amortizing Amount for Fiscal Year 2004-2005 would be 19.07% times ($400 million/$516 million) times the City's payroll for 2004-2005. This would be 14.77% times the City's payroll for that fiscal year.

Should the Board at some future time adopt a different period for amortizing the System's UAAL (a "Revised Amortizing Period"), the Scheduled Amortizing Amount for ensuing years may change. If the Revised Amortizing Period provides for a longer period during which to amortize the System's UAAL (i.e., an "Extended Amortizing Period"), then the Amortizing Period initially used to amortize the applicable Determined Accrued Liability will also be revised. There will then be established a new schedule for amortizing the Determined Accrued Liability and the Scheduled Amortizing Amount will be based on the level percentage of the City's payroll being equal to what it would be if the then unamortized balance of the Determined Accrued Liability were re-amortized over the Extended Amortizing Period. If the Revised Amortizing Period is changed so that the System's UAAL is to be amortized over a shorter period than the one initially used to amortize the applicable Determined Accrued Liability, then that Scheduled Amortizing Amount will not be changed.

(e)     Each year, when the City is required to make its annual contribution to the System — the amount of which is to be determined pursuant to Section 4 and the timing of which is set forth in Section 4(b) — the Board will transfer the Scheduled Amortizing Amount from the Accrued Liability Fund and credit it to the Pension Accumulation Fund; provided, however, that this transfer cannot occur unless and until the Board has been notified pursuant to the Pension Funding Transaction, or any Additional Pension Funding Transaction, that the City is current on the service payments required under the applicable Pension Funding Transaction.

(f)     Should the Scheduled Amortizing Amount not be available for transfer because of the City's failure to make a timely service payment as required by the applicable Pension Funding Transaction, the Board will take any permitted action, including the filing of a civil action against the City, as contemplated in Article VIII, Section 7, to effectuate the transfer of the Scheduled Amortizing Amount.

Should the City's Finance Director certify to the Board by a duly attested notice that the City has no available funds to make the service payments required by the applicable Pension Funding Transaction, in that specific circumstance, the Board shall be authorized to transfer the Scheduled

Amortizing Amount for that fiscal year to the Pension Accumulation Fund, absent the notice requirement set forth in Section 3(e).

(g)    Since the Funding Proceeds are to be considered assets of the System and are intended to fund the applicable Determined Accrued Liability, the City shall be required to make only a proportional contribution for any fiscal year ending after the date the Funding Proceeds are deposited into the applicable Accrued Liability Fund, but prior to a fiscal year whose corresponding actuarial valuation includes the Funding Proceeds in the System's total assets. The proportional contribution to fund the System's then existing UAAL, if any, shall be the level percentage of the City's payroll specified in the actuarial valuation for the applicable fiscal year as the City's required contribution needed to amortize the System's then existing UAAL, multiplied by a fraction. The numerator of the fraction shall be the amount of the System's total UAAL as determined in such actuarial valuation minus the amount of the applicable Funding Proceeds, but not less than zero. The denominator of the fraction shall be the amount of the System's total UAAL in such valuation. Actuarial valuations following the deposit of the applicable Funding Proceeds into the System shall Include the Funding Proceeds in the total assets of the System to determine any ensuing UAAL of the System, and the Funding Proceeds shall offset any such actuarial liability accordingly.

**Commentary**: By way of example, the following indicates how the procedure describe above would operate. Assume the following facts — (1) the Determination Date was June 30, 2004, (2) the June 30, 2004 actuarial valuation produced a UAAL of $600 million and a contribution toward the UAAL of 21% of the City's payroll, (3) the Funding Proceeds were $400 million and were deposited in the System during the 2004-2005 Fiscal Year, (4) the first actuarial valuation which included the Funding Proceeds in the System's assets was as of June 30, 2005 and (5) the June 30, 2003 valuation which determines the City's required contribution for fiscal 2004- 05 produced a total UAAL of $516 million and a contribution toward that UAAL of 19.07% of the City's payroll. Then:

•    The fiscal year ending after the date of deposit would be the year ending June 30, 2005, or the 2004-2005 Fiscal Year

•    The first fiscal year whose corresponding valuation reflected the Funding Proceeds in its assets would be the 2006- 2007 year.

•    Thus, the City's required UAAL. contribution for fiscal 2004-2005 would be 19.07% of the payroll times ($516 million — $400 million) divided by $516 million, or 4.3% of payroll. The City's required UAAL contribution for fiscal 2005-06 would be 21% of payroll times ($800 million — $400 million) divided by $600 million, or 7% of the City's payroll.

• Beginning with the Fiscal Year 2006- 2007, whose contribution is determined by the June 30, 2005 actuarial valuation, the City's required UAAL contribution would be the percentage of payroll developed in the corresponding actuarial valuation that included the Funding Proceeds as being part of the System's assets.

Any contribution the City has made to the System for any fiscal year prior to the date the Funding Proceeds from any applicable Pension Funding Transaction have become assets of the System. Where the amount of the contribution is equal to or less than the normal cost of that fiscal year it shall be deemed to have been made in satisfaction of the City's obligation to contribute an amount equal to the System's normal cost for that fiscal year, and not as payment towards any portion of its obligation to pay an amortized portion of the System's UAAL due in that fiscal year. The term "normal cost" as used in this Section 3(g), shall be given its generally accepted actuarial meaning.

To the extent the City's contribution for that fiscal year exceeds its required contribution for the normal cost owed in that fiscal year, its excess contributions shall be deemed as having been made for that immediately following fiscal year, and shall offset the City's normal cost contribution obligation for that immediately following fiscal year.

**Commentary**: By way of example, the following indicates how the procedure described in the preceding paragraphs would operate. Assuming the same facts as in the prior Commentary, and the City contributed $40 million for the 2004-2005 Fiscal Year and the total normal cost for that year was $40 million:

• The entire $40 million would be deemed as payment of the required normal cost for 2004-2005, and

• No part of the $40 million contribution would be deemed payment toward UAAL, as no UAAL contribution is required for that year.

Now assume that the facts remain the same, but that the City had contributed a total of $45 million for 2004-2005:

• The City's total required contribution for 2004-2005 would be deemed paid in full, and

• $5 million, i.e., $45 million minus $40 million, would be deemed prepayment of the City's required normal cost for 2005-2006 and its required normal cost contribution for 2005-2006 would be reduced accordingly.

(h)     The System's auditor shall verify (1) the assets credited to the Pension Accumulation Fund and any Accrued Liability Fund at the beginning and

end of each fiscal year, (2) that each Fund had been properly credited, and (3) that transfers from the Accrued Liability Fund(s) to the Pension Accumulation Fund had occurred as intended, under this Section 3.

(i)     Should the System's auditor certify that the total assets then remaining in the System, not including the assets of any Accrued Liability Fund, together are insufficient to pay the benefits then currently due under the System, the System's auditor will then determine and certify the minimum amount needed to fund the benefits then due and owing (the "Minimum Necessary Amount"). In this limited circumstance, the Board is authorized to transfer the Minimum Necessary Amount from the Accrued Liability Fund to the Pension Accumulation Fund absent the notification required pursuant to Section 3(e).

At the end of the Amortizing Period, or the end of the Extended Amortizing Period, if applicable, should there be any moneys that remain credited to the Accrued Liability Fund, the Board may transfer, at its discretion, any such remaining funds, in whole or in part, by crediting them to the Pension Accumulation Fund. The Pension Accumulation Fund is the only Fund into which the remaining moneys credited to the Accrued Liability Fund may be transferred.

(Ord. No. 04-05, Sec. 54-43-4.)

**Sec. 4.     Contributions to and payments from pension accumulation fund.**

Contributions to and payments from the pension accumulation fund shall be made as follows:

(a)     Upon the basis of such assumptions as to future financial experiences as the board of trustees shall from time to time adopt, the actuary shall annually compute the city's contribution, expressed as a percent of active member contributions, to provide the pension reserves covering the pensions or other city-financed benefits to which members might be entitled or which might be payable at the time of their discontinuances of city employment; provided, such contribution percents shall not be less than amounts which, expressed as percents of active member compensations, will remain level from generation to generation of Detroit citizens.  Upon the retirement or death of a member, the pension reserve for any benefits payable on his behalf shall be transferred from the pension accumulation fund to the pension reserve fund, to the extent of there being assets in the pension accumulation fund.

(b)     The board of trustees shall annually ascertain and report to the mayor and the council the amount of contributions due the retirement system by the city, and the council shall appropriate and the city shall pay such contributions to the retirement system during the ensuing fiscal year.

When paid, such contributions shall be credited to the pension accumulation fund.

(Ord. No. 04-05, Sec. 54-43-5; Ord. No. 76-H, Sec. 54-43-4.)

### Sec. 5. Retiree payments from Pension Reserve Fund; reinstatement of disability retirees to active service.

Except as to the survivor's benefit fund, the pension reserve fund shall be the fund from which shall be paid pensions on account of members. Should a disability retirant be reinstated to active service, the member's pension reserve, at that time, shall be transferred from the pension reserve fund to the pension accumulation fund. (Ord. No. 04-05, Sec. 54-43-6; Ord. No. 76-H, Sec. 54-43-5.)

### Sec. 6. Expense Fund.

The Expense Fund shall be the fund to which shall be credited all money provided by the City to pay the administration expenses of the system, and from which shall be paid all the expenses necessary in connection with the administration and operation of the System. (1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 5.)

### Sec. 7. Appropriations.

(a)     The Board of Trustees shall certify the amount of the appropriation necessary to pay to the various funds of the System the amounts payable by the City as enumerated in this amendment, according to legal budget procedure.

(b)     To cover the requirements of the System temporarily, such amounts as shall be necessary to cover the needs of the System shall be paid into the Pension Accumulation Fund and the Expense Fund by special appropriations or transfers to the System; provided, however that no transfers can be made from the accrued liability fund other than the annual transfer of the scheduled amortizing amount, or transfers under special circumstances pursuant to Sections 3(f) and 3(I).

(Ord. No. 04-05, Sec. 54-43-7; 1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 6.)

### Sec. 8. Maintenance of reserves.

The maintenance of the annuity reserves in the Annuity Reserve Fund and the pension reserves in the Pension Reserve Fund are hereby made obligations of the Pension Accumulation Fund. All income, interest, and dividends derived from deposits and investments authorized by this ordinance, excluding any amounts credited to the Accrued Liability Fund, which are not required for the allowance of interest to the funds of the System as provided herein, shall be credited to the Pension Accumulation Fund. The moneys credited to the Accrued Liability Fund shall be credited to the Pension Accumulation Fund only to the extent of the annual transfer of the Scheduled Amortizing Amount or the special circumstance transfers authorized pursuant to

Sections 3(f) and 3(i). Any contributions by the City to the System from any Fund impressed by law with a certain and definite purpose shall be accounted for separately. (Ord. No. 04-05, Sec. 54-43-8; 1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 7.)

**Sec. 9.    Survivors Benefit Fund.**

(a)    The Survivors Benefit Fund shall be the fund in which shall be accumulated, at regular interest, the reserves for survivors benefits provided for in article VI, part E, section 2, hereof, and from which such benefits shall be paid.

(b)    After June 30, 1965 and prior to July 1, 1986, each member shall contribute to the Survivors Benefit Fund one per cent of his compensation paid by the city until he has acquired twenty-five years of creditable service. The officer or officers responsible for making up the payroll shall cause the said contributions to be deducted from the member's compensation, on each and every payroll, for each and every payroll period so long as he remains a member and has not acquired twenty-five years of creditable service. Each and every member shall be deemed to consent and agree to the said deductions. Said contributions, when deducted, shall be credited to the Survivors Benefit Fund and shall in no case become a part of the said member's accumulated contributions, nor be subject to refund.

(c)    Each member who retires after June 30, 1965, under part B, section 1 of article VI shall, prior to July 1, 1986, contribute to the Survivors Benefit Fund one per cent of his final compensation as defined until he would have had a total of twenty-five years of creditable service had he continued in active service. The officer or officers responsible for making up the retirement roll shall cause the said contribution to be deducted from the pension of each such retired member on each and every retirement roll, for each and every retirement roll period, so long as he is receiving a pension under part B, section 2(a) of article VI. Each and every such retired member who is receiving a pension under part B, section 2(a) of article VI shall be deemed to consent and agree to said deductions. Said contributions, when deducted, shall be credited to the Survivors Benefit Fund and shall in no case become a part of said member's accumulated contributions, nor be subject to refund.

───────────── **By Agreement** ─────────────

**Survivor's Benefit Fund**

The contributions, required by Article VII, Section 8(b) and 8(c) of the Policemen and Firemen Retirement System, to the Survivor's Benefit Fund shall be eliminated for Union members.[106]
**[The City shall make the contributions necessary to maintain the benefit level by**

---

[106]    DFFA (§ 22.A.14.g.); DPCOA (§ 41.B.); DPLSA (§ 51.B.); DPOA (§ 33.L.).

contributing that amount necessary to replace the members' contributions to the Survivor's Benefit Fund.[107]]

[This provision shall be effective July 1, 1986.[108]]

---

(d) Upon the basis of such mortality and other tables of experience, and regular interest, as the board of trustees shall from time to time adopt, the actuary shall annually compute the liabilities for benefits being paid from the Survivors Benefit Fund. The board of trustees shall report to the mayor and the common council the amount of contributions to be made by the city to the Survivors Benefit Fund, and the council shall appropriate and the city shall pay such amount to the retirement system during the ensuing fiscal year. When paid, such appropriations shall be credited to the Survivors Benefit Fund. If the balance in the fund is not sufficient to fully cover the liabilities so computed, the city shall appropriate and pay, in the ensuing fiscal year, the amount of such insufficiency.

(e) Upon the death of a member, on whose account survivors benefits become payable as provided in article VI, part B, section 2, hereof, his accumulated contributions standing to his credit in the Annuity Savings Fund at the time of his death shall be transferred from the Annuity Savings Fund to, and shall become a part of, the Survivors Benefit Fund, notwithstanding any provisions in this chapter to the contrary. (As amended September 1, 1964. In effect September 15, 1964.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. VII, § 8.)

**Sec. 10. Computation of annuity and pension reserve liabilities for members, retirants and beneficiaries.**

In computing the annuity and pension reserve liabilities for members, retirants and beneficiaries, the board of trustees shall cause the following annual decrement probabilities, salary factors and interest assumption to be used.

(a) The annual decrement probabilities and salary factors to be used in evaluating the annuity and pension liabilities for members shall be as shown in Tables 1 and 2 hereinafter set forth.

(b) The total of active member annual compensations shall be assumed to increase three percent per annum, compounded annually.

---

[107] DFFA (§ 22.A.14.g.); DPOA (§ 33.L.).

[108] DPOA (§ 33.L.).

(c)     The mortality assumption for retirants and beneficiaries shall be the mortality rates contained in the 1971 group annuity male mortality table, without setback for men and set back five years for women.

(d)     The investment return assumption shall be five percent per annum, compounded annually.

## TABLE 1.

### City of Detroit Policemen and Firemen
### Retirement System
### Active Member Annual Decrement Probabilities
### and Salary Factors

| Age | Withdrawal from Service | Death in Service | Salary Factors |
|---|---|---|---|
| 18 | .04120 | .00098 | .10561 |
| 19 | .04090 | .04099 | .11327 |
| 20 | .04030 | .00100 | .12126 |
| 21 | .04000 | .00101 | .12988 |
| 22 | .03960 | .00102 | .13913 |
| 23 | .03910 | .00103 | .14913 |
| 24 | .03890 | .00104 | .15971 |
| 25 | .03840 | .00105 | .17068 |
| 26 | .03800 | .00107 | .18204 |
| 27 | .03700 | .00108 | .19347 |
| 28 | .03600 | .00111 | .20527 |
| 29 | .03480 | .00113 | .21712 |
| 30 | .03340 | .00117 | .22916 |
| 31 | .03200 | .00121 | .24124 |
| 32 | .03000 | .00126 | .25321 |
| 33 | .02730 | .00133 | .26522 |
| 34 | .02370 | .00143 | .27753 |
| 35 | .01990 | .00154 | .29015 |
| 36 | .01500 | .00168 | .30306 |
| 37 | .01160 | .00184 | .31637 |
| 38 | .00850 | .00204 | .32995 |
| 39 | .00600 | .00227 | .34405 |
| 40 | .00390 | .00252 | .35851 |
| 41 | .00210 | .00281 | .37333 |
| 42 | .00090 | .00313 | .38861 |
| 43 | .00000 | .00348 | .40435 |
| 44 | .00000 | .00387 | .42051 |
| 45 | .00000 | .00429 | .43709 |
| 46 | .00000 | .00475 | .45395 |
| 47 | .00000 | .00526 | .47144 |

| Age | Withdrawal from Service | Death in Service | Salary Factors |
|---|---|---|---|
| 48 | .00000 | .00582 | .48929 |
| 49 | .00000 | .00643 | .50750 |
| 50 | .00000 | .00710 | .52639 |
| 51 | .00000 | .00783 | .54560 |
| .52 | .00000 | .00864 | .56535 |
| 53 | .00000 | .00953 | .58548 |
| 54 | .00000 | .01051 | .60612 |
| 55 | .00000 | .01157 | .62711 |
| 56 | .00000 | .01270 | .64867 |
| 57 | .00000 | .01392 | .67066 |
| 58 | .00000 | .01520 | .69319 |
| 59 | .00000 | .01656 | .71610 |
| 60 | .00000 | .01802 | .73939 |
| 61. | .00000 | .01959 | .76316 |
| 62 | .00000 | .02133 | .78747 |
| 63 | .00000 | .02322 | .81211 |
| 64 | .00000 | .02526 | .83715 |
| 65 | .00000 | .02750 | .86258 |
| 66 | .00000 | .03000 | .88848 |
| 67 | .00000 | .03277 | .91514 |
| 68 | .00000 | .03584 | .94264 |
| 69 | .00000 | .03919 | .97094 |
| 70 | .00000 | .04278 | 1.00000 |

**TABLE 2.**

**City of Detroit Policemen and Firemen
Retirement System
Annual Probabilities of Age and Service
Retirement Applicable to Members
Who Are Eligible to Retire**

| Age | Probabilities of Retirement |
|---|---|
| 45 | 25% |
| 46 | 25 |
| 47 | 25 |
| 48 | 25 |
| 49 | 25 |
| 50 | 25 |
| 51 | 25 |
| 52 | 25 |
| 53 | 25 |
| 54 | 20 |

| | |
|---|---|
| 55 | 20 |
| 56 | 15 |
| 57 | 10 |
| 58 | 15 |
| 59 | 30 |
| 60 | 100 |

(Ord. No. 77-H, Sec. 54-2-2; Ord. No. 462-f, Sec. 2.)

## Sec. 11. Determination of city's annual contribution — Disability pension liabilities.

The city's annual contribution, expressed as a percent of active member compensations, to finance disability pensions shall be determined by dividing the average of the pension reserve liabilities for disability retirements incurred, during the three fiscal years ending with the date of the valuation by one percent of the active members' annual compensation used in the valuation. (Ord. No. 77-H, Sec. 54-2-3; Ord. No. 462-F, Sec. 3.)

## Sec. 12. Determination of city's annual contribution — Death pension liabilities.

The city's annual contribution, expressed as a percent of active member compensations, to finance death-in-service pensions shall be determined by dividing the average of the pension, reserve liabilities for death-in-service claims incurred during the three fiscal years ending with the date of the valuation by one percent of the active member's annual compensations used in the valuation. (Ord. No. 77-H, Sec. 54-2-4; Ord. No. 462-F, Sec. 4.)

## Sec. 13. Determination of city's annual contribution — Actuarial evaluation of annuity and pension reserve liabilities.

The annuity and pension reserve liabilities for members, retirants and beneficiaries shall be actuarially evaluated as set forth in this article. (Ord. No. 77-H, Sec. 54-2-5.)

## Sec. 14. Determination of city's annual contribution — Service pension liabilities.

(a) The service pension liabilities for members shall be determined using the entry age-normal cost method of actuarial valuation.

(b) The city's annual contribution, expressed as a percent of active member compensations, to finance the prospective service pension liabilities shall be determined by dividing the total of the individual annual normal costs of the active members by one percent (1%) of the active members' annual compensations used in the valuation.

(c) The city's annual contribution, expressed as a percent of active member compensations, to finance any unfunded accrued service pension liabilities, including instances in which assets exceed liabilities, shall be determined by dividing such unfunded accrued service pension liabilities by one percent (1%) of the present value of future compensations payable during a period of future years. Such period of future years shall be thirty

(30) years for the actuarial valuation as of June 30, 1974, decreasing one (1) year at each subsequent June 30th until a twenty (20) year period is reached, which twenty (20) year period shall be used in each subsequent actuarial valuation until June 30th, 2004 when the period shall again be thirty (30) years.

(Ord. No. 39-05, Sec. 54-43-3; Ord. No. 77-H, Sec. 54-2-6; Ord. No. 462-F, Secs. 5, 6.)

**Sec. 15.   Board of trustees to compute city's annual contribution.**

Based upon the provisions of this article, including any amendments, the board of trustees shall compute the city's annual contributions, expressed as a percent of active member compensations, to the retirement system for the fiscal year beginning July 1, 1975, using actuarial valuation data as June 30, 1974, and for each subsequent fiscal year using actuarial valuation data as of the June 30th date which date is a year and a day before the first day of such fiscal year.  The board shall report to the mayor and to the city council the contribution percents so computed, and such contribution percents shall be used in determining the contribution dollars to be appropriated by the city council and paid to the retirement system.  For each fiscal year beginning July 1, 1975 and each fiscal year thereafter, such contribution dollars shall be determined by multiplying the applicable contribution percent for such fiscal year by the member compensations paid for such fiscal year; provided for the one fiscal year beginning July 1, 1975 and ending June 30, 1976 such member compensations so used shall not exceed 106.09 percent of the active members' annual compensations used in the actuarial valuation determining such contribution percent.  (Ord. No. 77-H, Sec. 54-2-7; Ord. No. 462-F, Sec. 8.)

**Sec. 16.   Repealed.**  (Ordinance No. 77-H, Sec. 54-2-8).

**Sec. 17.   Refunds for certain members.**

Effective July 1, 1974, a member of the policemen and firemen retirement system who holds the rank of police inspector and above and who is not covered by a collective bargaining agreement shall, notwithstanding any other pension provisions to the contrary, have the right to elect to receive on the effective date of his service retirement a partial or total refund of his accumulated contributions. Effective as of March 8, 2007, a DPOA and fire equivalent retiree who elects not to withdraw his accumulated contributions as of the effective date of his service retirement shall have the option of receiving a quarterly payment of interest credited to his accumulated contributions or to receive periodic withdrawals of the contributions such retiree made to the plan.  If a member makes such an election, an annuity payable under any retirement allowance or reduced retirement allowance shall be reduced proportionately.   If the total accumulated contributions are withdrawn no annuity shall be payable.  The limitations of fifteen twenty-seconds of the maximum earnable compensation of a patrolman and fireman continues in effect.  For purposes of determining the fifteen twenty-seconds limitation, a computation based on the annuity which is an actuarial equivalent of the accumulated contributions standing to an above-defined member's credit in the annuity savings fund prior to any partial or total refund will be used.  This provision affords the members as defined above a similar option available to members of the general retirement system pursuant to 1973 Charter Amendment K.  No other benefits or amounts payable pursuant to other provisions of the policemen and firemen

retirement system are increased by this section.  The mechanical steps involved in computing the service retirement allowance of a member as defined above shall be determined by the board of trustees of the policemen and firemen retirement system subject to approval of the law department.  (Ord. No. 29-H, § 1; Sec. 54-2-9.)

---

**By Agreement**

---

**Employer Contribution**

**[Effective January 1, 1987[109] or upon issuance of the 1986-89 Act 312 Award[110]]** the employee contributions to the Policemen and Firemen Retirement System Annuity Fund, although designated as employee contributions, shall be paid by the City of Detroit in lieu of contributions by the employee.  The employee shall not have the option of choosing to receive the contributed amount directly instead of having them paid by the employer to the annuity fund. There shall be no additional contribution expense to the City of Detroit, and the amounts so contributed by the employer on behalf of the employee shall be treated, for tax purposes, as employer contributions and thus shall not be taxable to the employee until these amounts are distributed or made available to the employee.

This provision shall not affect the amount or benefit level of the retirement allowance, or the City of Detroit's obligation thereto.[111]

---

[109]    DFFA (§ 22.A.14.h.); DPLSA (§ 51.J.).

[110]    DPOA (§ 33.O.).

[111]    DFFA (§ 22.A.14.h.); DPCOA (§ 41.K.); DPLSA (§ 51.J.); DPOA (§ 33.O.).

# ARTICLE VIII.

## Management of Funds.

**Sec. 1.   Board named Trustees for various funds.**

The Board shall be the Trustee of the several funds provided for in this Article, and shall have full power to invest and reinvest such funds subject to all terms, conditions, limitations, fiduciary duties, and restrictions imposed by The Public Employee Retirement System Investment Act, as amended, provided, that notes, bonds, or obligations of the City shall not be subject to said restrictions or limitations. The Board shall have the power to purchase notes, bonds, or obligations of the City before or after the same are offered to the public and with or without advertising for bids.  (Ord. No. 04-05, Sec. 54-43-9(a); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 1.)

**Sec. 2.   Purchase, sale, etc., of securities and investments.**

The Board shall have full power to hold, purchase, sell, assign, transfer, and dispose of any of the securities and investments of the Retirement System, as well as the proceeds of said investments and any moneys belonging to the System.  (Ord. No. 04-05, Sec. 54-43-9(b); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 2.)

**Sec. 3.   Annual interest.**

The Board annually shall allow Regular Interest on the mean amount of assets in each of the Funds for the preceding year. The amounts so allowed shall be due and payable to said Funds, and shall be annually credited thereto by the Board from interest and other earnings on the moneys of the System; provided, however, that the balance in any Accrued Liability Fund shall not be included in determining the mean amount of assets of the System when the Board makes this determination, and no Regular Interest on the mean amount of assets in the Accrued Liability Fund shall be credited to other Funds in the System until transferred to the Pension Accumulation Fund pursuant to Article VII, Section 3(e) or under special circumstances pursuant to Article VII, Sections 3(f) and 3(i). Any additional amount, required to meet the Regular Interest on the Funds of the System, shall be paid by the City and any excess of earnings, over such amount required, shall be a portion of the amounts to be contributed by the City.  (Ord. No. 04-05, Sec. 54-43-9(c); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 3.)

**Sec. 4.   Custodian of funds.**

The City Treasurer or other person or entity designated by the Board shall be the custodian of the Funds of the Police and Fire Retirement System. All payments from such Funds shall be made by the Treasurer or other designated custodian. Payments made by the System shall be based upon vouchers signed by two persons designated by the Board. A duly attested copy of a resolution of the Board designating such persons and bearing upon its face specimen signatures of such persons, shall be filed with the Finance Director and the custodian of the Funds as their authority for making payments upon such vouchers. No voucher shall be drawn unless it shall have been previously authorized by a specific or continuing resolution adopted by

the Board. (Ord. No. 04-05, Sec. 54-43-9(d); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 4.)

**Sec. 5.      Available funds shall be kept upon deposit.**

Available funds shall be kept on deposit for the purpose of meeting disbursements for pensions, annuities, and other payments. (Ord. No. 04-05, Sec. 54-43-9(e); 1918 Detroit City Charter, Title IX, Ch. VII, Art. VIII, § 5.)

**Sec. 6.      Prohibition against reversion of funds to the City.**

This pension plan and trust has been created for the exclusive benefit of the members and beneficiaries as set forth herein. The funds thereof have been established for the benefit of the members and for the operation of the pension system. No part of the principal and income of any of the funds of this plan and trust shall revert to or be returned to the city prior to the satisfaction of all liabilities, hereunder to all members, beneficiaries and anyone claiming by or through them. (Ord. No. 153-H, Sec. 54-45-6.)

**Sec. 7.      Enforcement; Civil Action.**

A civil action for relief against any act or practice which violates the state law, the 1997 Detroit City Charter, the 1984 Detroit City Code or the terms of the System, may be brought by:

> (a)      A member or retiree who is or may become eligible to receive a benefit under the System;
>
> (b)      A beneficiary who is or may become eligible to receive a benefit under the System;
>
> (c)      A Plan fiduciary, including a Trustee; or
>
> (d)      The Finance Director, on behalf of the City as sponsor of the System.

(Ord. No. 04-05, Sec. 54-43-10.)

# ARTICLE IX.

## Miscellaneous.

### Sec. 1.    Assignments prohibited.

The right of a person to a pension, an annuity, or a retirement allowance, to return of contributions, the pension, annuity, or retirement allowance itself, an optional benefit, any other right accrued or accruing to any person under the provisions of this amendment and the moneys in the various funds created by this amendment shall not be subject to execution, garnishment, attachment, the operation of bankruptcy or insolvency law, or any other process of law whatsoever and shall be unassignable except as in this amendment specifically provided.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 1.)

### Sec. 2.    Protection against fraud.

Whoever with intent to deceive, shall make any statement or report required under this amendment which is untrue, or shall falsify or permit to be falsified any record or records of this System, or who shall otherwise violate with intent to deceive, any of the terms or provisions of this amendment, upon conviction thereof, shall be fined not to exceed five hundred dollars or imprisoned in the Detroit House of Correction for a period not to exceed ninety days, or both. (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 2.)

### Sec. 3.    Errors.

Should any change or error in the records result in any member or beneficiary receiving from the System, more or less than he would have been entitled to receive had the records been correct, the Board of Trustees shall correct such error, and as far as practicable, shall adjust the payment in such a manner that the actuarial equivalent of the benefit to which such member or beneficiary was correctly entitled shall be paid.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 3.)

### Sec. 4.    Recall of beneficiaries during emergencies.

During an emergency declared by the Commissioner of Police or the Board of Fire Commissioners, the Commissioner or the Board, as the case may be, shall have power, with the consent of a beneficiary, to recall to active duty a beneficiary for such period of service as the commissioner or the Board shall deem advisable; provided, however, that the foregoing power shall not apply in the case of a beneficiary who has reached the age of sixty-four years, and provided further, that any beneficiary so recalled may, at any time, separate from active duty on his own application or by order of the Commissioner or the Board.  A beneficiary so recalled shall serve in the rank at which he retired, or a higher rank, and shall receive the pay of such rank without deduction.  On subsequent separation from active duty, such beneficiary shall resume the beneficiary status held by him prior to such recall.  (1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 4.)

**Sec. 5.    Limitation of other statutes.**

No other provision of law, Charter or Ordinance, which provides wholly or partly at the expense of the City for pensions or retirement benefits for Policemen or Firemen, their widows, or other dependents, shall apply to members or beneficiaries of the System established by this amendment, their widows, or other dependents.

(a)    All provisions of laws, inconsistent with the provisions of this amendment, are hereby repealed to the extent of such inconsistency.

(b)    This amendment shall not apply to any person who, at the effective date of this amendment shall be receiving a pension or other benefit from the City under the provisions of Chapter XV or XXI of Title IV of the 1918 Detroit City Charter, or who is excluded from membership in this System as provided by article IV, section 1 (a) of this amendment.

(c)    Savings clause.  If any part, article, chapter, section, subsection, sentence, clause or phrase of this amendment is for any reason held to be unconstitutional, such decision shall not affect the validity of the remaining parts, articles, chapters, sections, subsections, sentences, clauses and phrases of this amendment or the amendment as an entirety.

(d)    Effective date.  The 1940 amendments of this chapter are effective July 1, 1941.

The 1951 amendments to this chapter are effective November 15, 1951.
The 1953 amendments to this chapter are effective November 13, 1953.
The 1964 amendments to this chapter are effective July 1, 1965.
The 1968 amendments to this chapter are effective January 1, 1969.

(e)    (Adopted November 5, 1940.  In effect November 15, 1940.  As amended November 5, 1968.  In effect January 1, 1969)  (Historical Reference: Certain amendments and benefits became effective per defacto operation due to historical administration and collective bargaining agreements. Public Employment Relations Act became effective in 1965.  Supreme Court ruling that pensions are a mandatory subject of bargaining was issued on February 1, 1974.)

(1918 Detroit City Charter, Title IX, Ch. VII, Art. IX, § 5.)

(f)    System provisions are subject to Public Act 314 of 1965 as amended and applicable case law.

(g)    Distributions.    The System will apply the minimum distribution requirements of IRC 401(a)(9) in accordance with the final regulations under IRC 401(a)(9), notwithstanding any provision in the System to the contrary. Pursuant to IRC 401(a)(9), a member's interest must begin to be distributed by the later of (i) April 1 of the calendar year following the

calendar year that he attains the age of 70-1/2, or (ii) April 1 of the calendar year he retires. Distributions will be made in accordance with this Section and Regulations 1.401(a)(9)-2 through 1.401(a)(9)-9. The provisions of this Section and the regulations cited herein and incorporated by reference override any inconsistent plan distribution options. Pursuant to Code Section 401(a)(9)(H), Annuity Savings Fund minimum required contributions otherwise required for 2009 ("2009 RMDs") will not be distributed for 2009 unless the member so chooses to receive them and 2009 RMDs will be treated as eligible rollover distributions.

(h)    Termination. Upon System termination or upon complete discontinuance of contributions under the System, the rights of all employees to benefits accrued to the date of such termination or discontinuance to the extent then funded, or the amounts credited to the employees' accounts are nonforfeitable.

## Sec. 6.    Tax Qualified Plan.

The Retirement System is intended and has been administered to be a qualified pension plan under § 401 of the Internal Revenue Code, as amended ("IRC" or "Code"), or successor provisions of law, including the Tax Reform Act of 1986 (TRA '86); the Technical and Miscellaneous Revenue Act of 1988 (TAMRA); the Unemployment Compensation Amendments of 1992 (UCA); the Omnibus Budget Reconciliation Acts (OBRA); the Uniformed Service Employment and Reemployment Rights Act of 1994 (USERRA); the Uruguay Round Agreements Act of 1994 (GATT); the Small Business Job Protection Act of 1996 (SBJPA '96); the Taxpayer Relief Act of 1997 (TRA '97); the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA '98); the Economic Growth and Tax Relief Reconciliation Act of 2001 (EGTRRA), and other applicable laws, regulations and administrative authority. The Retirement System is a governmental plan under IRC § 414(d) and is administered for the exclusive benefit of the plan's participants and their beneficiaries. The Retirement System trust is an exempt organization under IRC §501. All applicable provisions of the Internal Revenue Code are incorporated by herein by reference and such IRC provisions supercede any contrary provisions of the Retirement System.

## Sec. 7.    Definition of Compensation

Compensation will mean compensation as that term is defined in Article II, Sections 14 and 15 of the Plan. For any self-employed individual covered under the Plan, compensation will mean earned income. Compensation shall include only the compensation which is actually paid to the participant during the determination period. The determination period shall be the plan year.

Notwithstanding the above, compensation shall not include any amount which is contributed by the employer pursuant to a salary reduction agreement and which is not includible in the gross income of the employee under sections 125, 402(e)(3), 402(h) or 403(b) of the Internal Revenue Code.

The term compensation means the compensation of the member (participant) from the employer for the year consistent with Article II, Sections 14 and 15. The term "compensation" shall include any elective deferral (as defined in IRC Section 402(g)(3)) and any amount which is contributed or deferred by the employer at the election of the employee and which is not includible in the gross income of the employee by reason of IRC Sections 125, 132(f)(4), or 457.

For purposes of the Internal Revenue Code Section 415 limits, Compensation is defined pursuant to IRC Section 415(c)(3), by incorporating by reference the definition of Compensation pursuant to Treas. Reg. 1.415(c)-2. (Note: Notwithstanding that IRC 415(c)(3) applies only to defined contribution plans, this language is added to the defined benefit plan to satisfy the requirements of the Internal Revenue Service.)

## Sec. 8.    Limitation of Compensation

The Plan is subject to IRC 401(a)(17) and applicable regulations, as amended which currently provide:

Compensation shall not include any amount which is contributed by the employer pursuant to a salary reduction agreement and which is not includible in the gross income of the employee under sections 125, 402(e)(3), 402(h) or 403(b) or other applicable sections of the Internal Revenue Code.

For years beginning on or after January 1, 1989, and before January 1, 1994, the annual compensation of each participant taken into account for determining all benefits provided under the plan for any plan year shall not exceed $200,000. This limitation shall be adjusted by the Secretary at the same time and in the same manner as under section 415(d) of the Internal Revenue Code, except that the dollar increase in effect on January 1 of any calendar year is effective for plan years beginning in such calendar year and the first adjustment to the $200,000 limitation is effective on January 1, 1990.

For years beginning on or after January 1, 1994, the annual compensation limit of each participant taken into account for determining all benefits provided under the plan for any determination period shall not exceed $150,000, as adjusted for the cost-of-living in accordance with section 401(a)(17)(B) of the Internal Revenue Code. The cost-of-living adjustment in effect for a calendar year applies to any determination period beginning in such calendar year.

If a determination period consists of fewer than 12 months, the annual compensation limit is an amount equal to the otherwise applicable annual compensation limit multiplied by a fraction, the numerator of which is the number of months in the short determination period, and the denominator of which is 12.

If compensation for any prior determination period is taken into account in determining a participant's benefits for the current plan year, the compensation for such prior determination period is subject to the applicable annual compensation limit in effect for that prior period. For this purpose, in determining benefits in plan years beginning on or after January 1, 1989, the annual compensation limit in effect for determination periods beginning before that date is $200,000. In addition, in determining benefits in plan years beginning on or after January 1,

1994, the annual compensation limit in effect for determination periods beginning before that date is $150,000.

For year beginning on and after July 1, 2001, the annual compensation of a member taken into account for determining benefits for any plan year shall not exceed $200,000.00.

### Sec. 9. Limitation of Benefits.

The amount of annual benefits and contributions that is credited a member in any given year shall be subject to the following limitations:

(a) **Defined Benefit Plans.** The maximum permissible Annual Pension Benefit with respect to any member shall be in accordance with IRC §415(b) which provides that such Annual Pension Benefit shall not exceed $90,000, as adjusted for inflation, which for 2002 is $160,000 (the "Dollar Limit").

(1) Special Dollar Limitations. If the benefit is payable prior to age 62, the dollar limitation shall be reduced to the actuarial equivalent of a benefit commencing at age 62. In the case of any full-time police or fire employee who is a Qualified Participant as defined in IRC §415(b)(2)(G), there is no reduction in the dollar limitation. If the benefit is not payable until after age 65, the dollar limitation shall be increased to the actuarial equivalent of a benefit commencing at age 65.

(2) In the case of an employee who has less than ten (10) years of participation in the Plan, the Dollar Limitation shall be reduced 1/10 for each year of participation in accordance with IRC §415(b)(5).

(b) **Defined Contribution Plans.**

(1) For limitation years beginning after December 31, 1986 the term "annual addition" means, for purposes of this section the sum, credited to a participant's account for any limitation year, of:

a. Employer contributions;

b. Employee contributions; and

c. Forfeitures.

(2) Annual additions that may be contributed or allocated to a participant's account for a limitation year will not exceed the lesser of:

a. 100% percent of participant's compensation, within the meaning of IRC §415(c)(3), or

        b.       $40,000, as adjusted for increases in the cost of living pursuant to IRC §415(d).

## Sec. 10.   Direct Rollovers.

The defined benefit plan does not currently provide for lump sum payments. However, to the extent lump sum payments are allowed, the plan will meet the following requirements regarding IRC 401(a)(31).

(a)    **Direct Rollovers.** This section applies to distributions made on or after January 1, 1993. Notwithstanding any provision of the plan to the contrary that would otherwise limit a distributee's election under this part, a distributee may elect, at the time and in the manner prescribed by the plan administrator, to have any portion of an eligible rollover distribution that is equal to at least $500 paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(b)    **Eligible rollover distribution**: An eligible rollover distribution is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently that annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under section 401(a)(9) of the Internal Revenue Code; any hardship distribution described in section 401(k)(2)(B)(i)(iv) received after 12-31-98; the portion of any other distribution(s) that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities); and any other distribution(s) that is reasonably expected to total less than $200 during a year.

(c)    **Eligible retirement plan**: An eligible retirement plan is an individual retirement account described in section 408(a) of the Code, an individual retirement annuity described in section 408(b) of the Code, an annuity plan described in section 403(a) of the Code, or a qualified plan described in section 401(a) of the Code, that accepts the distributee's eligible rollover distribution. However, in the case of an eligible rollover distribution to the surviving spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity. On and after January 1, 2008, an eligible retirement plan, for purposes of accepting a rollover, shall include a Roth IRA to the extent permitted by Code Section 408A, and the regulations promulgated thereunder.

(d)    **Distributee**: A distributee includes an employee or former employee. In addition, the employee's or former employee's surviving spouse and the

employee's or former employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in section 414(p) of the Code, are distributees with regard to the interest of the spouse or former spouse. On and after January 1, 2008, the retirement system shall allow nonspousal beneficiary transfers to an individual retirement plan in accordance with and subject to Internal Revenue Code Section 402(c)(11).

(e)     **Direct rollover**:  A direct rollover is a payment by the plan to the eligible retirement plan specified by the distributee.

# ARTICLE X.

## Collective Bargaining Agreements.

Collective Bargaining Agreement Provisions. Under Michigan Law if there is any conflict between the Retirement System provisions and collective bargaining agreement provisions, the terms of the collective bargaining agreement control.

(a)    The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 1998-2001 collective bargaining agreement between the City of Detroit and the Detroit Police Officers Association with respect to police officers covered by said collective bargaining agreement. Said provisions are attached as Exhibit A.

(b)    The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the 1998-2001 collective bargaining agreement between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association. Said provisions are attached as Exhibit B.

(c)    The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the July 1, 1996 - June 30, 2004 collective bargaining agreement between the City of Detroit and the Detroit Police Command Officers Association. Said provisions are attached as Exhibit C.

(d)    The Board of Trustees shall administer the Retirement System consistent with the pension provisions of the July 1, 1998 - June 30, 2001 collective bargaining agreement between the City of Detroit and the Detroit Fire Fighters Association. Said provisions are attached as Exhibit D.

# ARTICLE XI.

## Compliance With USERRA.

USERRA.  The Retirement System shall comply with applicable, required provisions of Internal Revenue Code Section 414(u).  On and after January 1, 2007, notwithstanding anything to the contrary herein, if a member dies while performing qualified military service (as defined in Internal Revenue Code Section 414(u)), to the extent required by Internal Revenue Code Section 401(a)(37) the survivors of the member are entitled to any additional benefits (if any, and other than benefit accruals relating to the period of qualified military service) provided under the Retirement System as if the member had resumed and then terminated employment on account of death.

Notwithstanding anything to the contrary herein, on and after January 1, 2009, if the City decides to provide Differential Wage Payments to individuals who are performing service in the uniformed services (as defined in Chapter 43 of Title 238, United States Code) while on active duty for a period of more than 30 days, such Differential Wage Payment will be treated as compensation under Code Section 415(c)(3) limits, but not for purposes of Plan benefit accruals. For these purposes the term "Differential Wage Payment" means a payment defined in Code Section 3401(h)(2) that is made by the Retirement System to an individual who is performing service in the uniformed services while on active duty for a period of more than 30 days.

# ARTICLE XII.

## Deferred Retirement Option Plan.

The following provisions are hereby established as the Deferred Retirement Option Plan ("Drop") Program with respect to those members of the Retirement System who are covered by a collective bargaining agreement with a DROP Program (currently DPOA, DPCOA and DFFA and non-union executives of the Police Department and Fire Department).

(a)     In lieu of terminating employment and accepting a service retirement allowance under the plan provisions, any applicable member of this system who is eligible for the DROP Program and who is eligible to immediately receive a 25 year service retirement allowance may elect to participate in the Deferred Retirement Option Plan (DROP) and defer the receipt of retirement benefits in accordance with the provisions of this resolution.  This DROP feature is effective for DROP eligible members retiring on or after March 1, 2002 or after IRS approval of the DROP provisions, whichever is later.

(b)     No additional service credit shall be earned by a participant in the DROP program.

(c)     There is no limit to the duration of participation in the DROP program.

(d)     Participation in the DROP program shall be consistent with applicable collective bargaining agreements.  For DPOA members, Section 33N of the 1998-2001 collective bargaining agreement between the DPOA and the City of Detroit shall be controlling unless modified by future collective bargaining agreement.

(e)     Upon the effective date of the commencement of participation in the plan, active membership in the Retirement System shall terminate.  However employer contributions shall continue to be paid into the Retirement System for the DROP participant as if the DROP participant was not a DROP participant.   For purposes of this section, compensation and credit service shall remain as they existed on the effective date of commencement of participation in the DROP program.  Seventy-five (75%) percent of the monthly retirement benefits (including applicable escalator increases) that would have been payable, had a member elected to cease employment and receive a service retirement allowance, shall be paid into the deferred retirement option plan (DROP) account.  Upon termination of employment, deferred benefits (i.e. the DROP account balance) shall be paid as provided by this resolution.

(f)     The ICMA Retirement Trust has been selected as the initial DROP depository entity.

(g)     The Deferred Retirement Option Plan applicable amounts shall be invested as directed by the member within the investment choices as provided by the ICMA Retirement Trust (or substitute entity).

(h)     The fees for the DROP account shall be determined by the ICMA Retirement Trust (or substitute entity), which fees shall be paid by the DROP participant per deduction from the DROP account.

(i)     Upon termination of employment, a participant in the DROP program shall receive, at his or her option either a lump sum payment from the DROP account equal to the payments to the account plus earnings adjusted for any losses or a true annuity based upon his or her adjusted account, or he or she may elect any other method of payment allowed by the ICMA Retirement Trust (or substitute entity); provided, notwithstanding anything to the contrary herein, the Participant's adjusted DROP account balance at termination of employment shall not be less than total system DROP payments into his or her account (not including earnings and losses).  The participant's monthly benefits that would have otherwise been paid at retirement prior to participation in the DROP program (i.e. 100%) shall begin to be paid to the retiree.  Termination of employment includes termination of any kind, such as, resignation, discharge or disability.

(j)     If a participant dies during the period of participation in the DROP program a lump sum payment equal to his or her account balance shall be paid to his or her named beneficiary, or if none, to his or her estate; provided, notwithstanding anything to the contrary herein, the Participant's adjusted DROP account balance at death during the period of participation shall not be less than total system DROP payments into his or her account (not including earnings and losses).

(k)     In the event that a member dies prior to termination of employment while participating in the DROP, the member's designated beneficiary(ies) shall be entitled to the funds in the DROP account.  In addition, the member's retirement allowance, with escalators, will be restored to one hundred percent (100%) of the amount that would have been paid, but for the member's decision to participate in the DROP program shall be paid in accordance with the deceased member's election option; provided, notwithstanding anything to the contrary herein, the Participant's adjusted DROP account balance at death shall not be less than total system DROP payments into his or her account (not including earnings and losses)..

(l)     If an employee becomes disabled after the period of participation in the DROP program but while still an employee and his employment is terminated because he is disabled, he or she (A) shall be immediately retired with the form of retirement selected by the employee at the commencement of the DROP program plus any applicable pension improvement increases, and (B) shall be entitled to the funds in the DROP account (as a lump sum or other allowed method).  Such employee shall not be entitled to disability retirement benefits.

(m)     The ICMA Retirement Trust (or substitute entity), consisting of five (5) pages which are attached hereto, will receive the DROP funds and the funds of each participant shall be invested as directed by the member within the investment choices provided by the ICMA Retirement Trust (or substitute entity).

(n)     The Board of Trustees of the Policemen and Firemen Retirement System will enter into an Administrative Services Agreement with the International City Management Association Retirement Corporation "RC" (or substitute entity) which will serve as Investment Advisor to the ICMA Retirement Trust (or substitute entity).

(o)     The ICMA Retirement Trust (or substitute entity) will offer a series of separate funds for the investment of DROP account assets as referenced in the ICMA Retirement Trust's (or substitute entity) disclosure documents.

(p)     Any matters relating to the DROP program not covered by the July 21, 2000 DPOA Act 312 Act Award, collective bargaining provisions, the ICMA Retirement Trust (or substitute entity) or any applicable law or authority shall be resolved by decision of the Board of Trustees of the Policemen and Firemen Retirement System.

(q)     The Board of Trustees may replace the ICMA Retirement Trust with an equivalent trust type vehicle subject to approval of the applicable collective bargaining associations.

(r)     The effective date of the foregoing DROP Program provisions are subject to confirmation from the Internal Revenue Service that the DROP Program does not adversely affect the qualified status of the Defined Benefit Plan of the Policemen and Firemen Retirement System.  The appropriate forms applying for a qualified plan determination letter with the DROP provisions shall be filed by the Retirement System and any other applicable party.

The DROP program is subject to all applicable Internal Revenue Service rules, regulations, authority and applicable provisions of the Internal Revenue Code.

---

## By Agreement

---

**Deferred Retirement Option Program (DROP)**

**[The Deferred Retirement Option Program (DROP) plan option shall be discontinued and no longer available to members not currently enrolled in the plan.  The plan shall remain in effect for all members currently enrolled.[112]]**

**[Effective July 1, 2003[113] or July 21, 2000[114]]** a Deferred Retirement Option Program (DROP) plan option shall be made available as a retirement option with the following features:

(a)     **[To participate in the program a member must have at least twenty-five (25) [or twenty (20)[115]] years of [active[116]] service with the City as a member of the Policemen and Firemen Retirement System.[117]] [Members entering the DROP Plan after the date of the Award must remain in a full-duty status for the duration of their participation in the DROP Plan.  If a member is not able to return to full-duty**

---

[112]     DPCOA (§ 43.A.).

[113]     DPLSA (§ 51.O.).

[114]     DPOA (§ 33.R.).

[115]     DPOA (§ 33.R.1.).

[116]     DPOA (§ 33.R.1.).

[117]     DFFA (§ 22.A.14.r.); DPLSA (§ 51.O.1.).

**status within six months, their participation in the DROP Plan shall terminate and he/she shall revert to a regular pension.[118]**

(b)     There will be no limit on the number of years a member may participate in the program. **[For members of the bargaining unit entering into the DROP Plan after the date of this Award, participation in the DROP Plan shall be limited to ten (10) years.[119]]**

(c)     If a member is injured to the point that the member is disabled and placed off on a duty disability per the Retirement System, the member will revert to his regular pension.

(d)     A DROP accumulation account will be established with an outside investment company chosen by the Union.

(e)     The amount paid into the DROP accumulation account shall be 75% of the member's regular retirement allowance plus the applicable annual escalator **[of 2.25% times that portion of any retirement allowance earned prior to the date of the Award.[120]] [applicable to the credited service years.[121]] [(applicable escalator x the full regular retirement allowance x 75%)[122]] [or (2.25% x the full regular retirement x 75%).[123]]**

(f)     Once a member has chosen to place his DROP proceeds into the DROP accumulation account, the member shall not be allowed to remove those funds until the member permanently retires.

(g)     Upon permanent retirement, the member shall be given the right to remove funds from the DROP accumulation account.

(h)     When the member permanently retires, the member will receive a regular retirement allowance calculated as if the member retired on the day the DROP account started. The member's retirement allowance shall include all annual escalator amounts **[(2.25%)[124] or subject to Article 31(K)[125]]** that would have been added while the member was participating in the DROP plan. [126]

---

[118]     DPLSA (§ 51.O.1.)(All references to "the Award" in this section mean the Act 312 Award in MERC Case No. D09 G-0786, as cited in the CBA.)

[119]     DPLSA (§ 51.O.2.).

[120]     DPLSA (§ 51.O.5.).

[121]     DPOA (312 Award # 1, Issue # 62, pgs. 120–21 deleted the reference to 2.25%; Issue # 64, pgs. 121–24 modified the language to the current version.).

[122]     DPCOA (§ 43.A.4.).

[123]     DFFA (§ 22.A.14.r.).

[124]     DFFA (§ 22.A.14.r.); DPLSA (§ 51.O.8.). Although referenced by DPOA (§ 33.R.8.), 312 Award # 1, Issue # 62, pgs. 120–21 deleted the reference to 2.25%.

[125]     DPOA (as modified by 312 Award # 1, Issue # 65, pgs. 121–24. It is unclear whether this intends to reference Section 33.K. of the DPOA CBA.).

[126]     DFFA (§ 22.A.14.r.); DPCOA (§ 43.); DPLSA (§ 51.O.); DPOA (§ 33.R.).

(i)     [This program will not be put into effect unless it is certified by the IRS that it will not affect the tax exempt status of the Retirement System under the Internal Revenue Code.

(j)     This program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP Plan shall continue during the pendency of proceedings, described below, designed to restore the Plan to cost neutrality.

(k)     If the City contends that the program is costing it money, including, but not limited to, making the City's annual contribution to the P&F Pension System higher than it would be if the DROP Plan was not in effect, the parties, along with the Plan's actuary as well as an actuary appointed by the City, shall meet and confer in good faith regarding the cost.  If the parties are unable to reach an understanding, the matter shall be submitted to a third, independent, actuary, chosen or agreed upon by the Plan's actuary and the City's actuary who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries.  This actuary, when rendering a decision, will be limited to ordering implementation of changes necessary to make the program cost neutral.  Upon the implementation of changes necessary to make the program cost neutral, participants shall have thirty days to elect (a) retiring from active employment or (b) withdraw from the DROP Plan, continuing active employment and resuming participation in the regular retirement plan. The Board shall notify the participant of these changes prior to implementation. Those resuming participation in the regular retirement plan shall not accumulate service credit for any time that they were participating in the DROP Plan.  Those not making either election shall remain participants in the DROP Plan.

(l)     In the event the DROP Plan cannot be changed to restore cost neutrality, it shall be discontinued and participants shall have the option of either (a) retiring, or (b) continuing active employment and resuming participation in the regular retirement plan.[127]]

---

[127]     DFFA (§ 22.A.14.r.9-12.); DPLSA (§ 51.O.9-12.); DPOA (§ 33.R.9-12.).

# ARTICLE XIII.

## Participant Annuity Savings Fund Loan Program

**By Agreement**

**Participant Annuity Savings Fund Loan Program**

The undersigned parties have agreed that a Participant Annuity Savings Fund Loan Program (Participant Loan Program) will be established and available to bargaining unit members. Its terms will be as follows:

(a) **Established:** Any loans granted or renewed shall conform to the requirements of Section 72(p) of the Internal Revenue Code, 26 U.S.C.1 et seq. Such loan program shall be established in writing by the Board of Trustees of the Police and Fire Retirement System, in conformity with the terms of this Memorandum of Agreement, and must include, but need not be limited to the following:

  1. The identity of the administrator of the Participant Loan Program;

  2. A procedure to apply for loans, the amount of loan that will be approved or denied, and limitations, if any, on the types and amount of loans offered;

  3. The procedure under the program for determining a reasonable rate of interest;

  4. The events constituting default and the steps that will be taken to preserve plan assets.

(b) **The Loan Program:** The Participant Loan Program shall be contained in a separate written document copies of which shall be made available in the offices of the City of Detroit Police and Fire Retirement System for prospective participants in the program. The Board of Trustees is authorized to adopt rules and regulations, from time to time, to govern the administration and the operation of this program. Copies of the rules shall also be made available to prospective participating members of the system in the offices of the Police and Fire Retirement System.

(c) **Eligibility:** Subject to the rules and procedures established by the Police and Fire Retirement System Board, loans may be made to bargaining unit members from such member's contributions to the Annuity Savings Fund. Former participants, spouses of participants, and beneficiaries are not eligible to receive any loans from the Plan. Subject to rules and procedures established by the Board, a participant who has been in the plan for twelve (12) months or more is eligible to apply for a loan from this plan.

(d) **Amount of Loan:** A participant who has satisfied applicable rules and procedures may borrow from his or her annuity savings fund account an amount, which does not exceed fifty percent (50%) of the participant's vested accumulated balance, up to fifteen thousand dollars ($15,000.00) reduced by the excess, if any, of: (1) the highest

outstanding balance of loans from the trust during the one (1) year period ending on the day before the date on which the loan is made, or (2) the outstanding balance of loans from the trust on the date on which the loan is made, whichever is less. The minimum loan amount shall be one thousand dollars ($1,000.00).

(e) **Terms and Conditions:** In addition to such rules and procedures that are established by the Board, all loans shall comply with the following terms and conditions:

    1.    Loan applications shall be in writing.

    2.    All loans shall be memorialized by a promissory note made to the Police and Fire Retirement System and properly executed by the participant.

    3.    Loan shall be repaid by equal payroll deductions over a period not to exceed five (5) years, or, where the loan is for the purpose of buying a principal residence, a period not to exceed fifteen (15) years. In no case shall the amount of the payroll deduction be less than twenty dollars ($20.00) for any two-week period.

    4.    Each loan shall be made against the assignment of the participant's entire right, title, and interest in and to the trust supported by the participant's collateral promissory note for the amount of the loan, including interest payable to the order of the trustee.

    5.    Each loan shall bear interest at a rate determined by the Board. The Board shall not discriminate among participants in its determination of interest rates on loans. Loans initiated at different times may bear different interest rates, where, in the opinion of the Board, the difference in rates is supported by a change in market interest rates or a change in the pension system's current assumed rate of return. The loan interest rate shall bear a reasonable relationship to market rates for secured loans of a similar duration and shall bear a reasonable relationship to the costs to the pension trust of administering the trust. The loan interest rate shall be calculated in a manner that will not negatively affect the City's costs to the trust or the return to trust members.

    6.    Loan repayments shall be suspended under this plan as permitted by Section 414(u)(4) of the Internal Revenue Code, 26 U.S.C. 414(u)(4). A participant who has an outstanding loan balance from the plan who is absent from employment with the employer, and who has satisfied the requirements of 26 USC 414(u) of the Internal Revenue Code shall not be required to make loan repayments to the fund during said periods of absence.

(f) **Renewal of Loan:** Any loans granted or renewed shall be made and administered pursuant to the participant loan program and Section 72(p) of the Internal Revenue Code, 26 U.S.C.72(p) and the regulations thereunder.

(g) **Loan Balance:** A participant's outstanding loan balance shall be considered a directed investment by the participant and interest payments shall be credited to the participant's account balance (provided that the interest credited shall be reduced appropriately to

cover the administrative cost of the loan program and avoid negatively affecting the City's costs or the trust's investment returns), and shall not be part of net investment income or part of the participant's account balance for the purpose of allocation of net investment income under [Article VII].

(h)    **Distribution:**  No distributions shall be made to a participant, former participant, or beneficiary until all loan balances drawn on the applicable vested accumulated balance and applicable accrued interest have been liquidated.

(i)    **Annual Report:**  The Police and Fire Retirement System shall include, in their annual report to all members, an accounting of the loan program established by this section, which contains *the* number and amount of loans made, the costs of administering the program, the amount of payments made including interest received by the trust, the amount of loans outstanding, including any defaults or delinquencies, and an evaluation as to whether the interest charged in the fiscal year covered the costs of administering the program.

The parties agree that eligibility for participation in said loan program will be in accordance with the provisions contained herein, and shall be effective immediately upon the signing of this Memorandum of Understanding.   All necessary steps shall be taken to ensure that the implementation date of the Employee Loan Program for members of this bargaining unit shall occur as soon as administratively possible so that it coincides with the initial implementation date established by the Police and Fire Retirement System.

The parties agree that this Memorandum of Understanding represents the sole and complete agreement regarding the Participant Loan Program for members of this bargaining unit, that this Agreement shall be incorporated in the Labor Agreement and shall remain in full force for the duration of said agreement, and that no modifications can be made unless collectively bargained and mutually agreed between the parties hereto.[128]

---

[128]        DPLSA (MOU, pg. 87.); DPOA (MOU, pg. 108.).

# LEGEND TO FOOTNOTES

As used in the footnotes to this compilation, the acronyms below refer to the following documents:

- **DFFA** means the Master Agreement between the City of Detroit and the Detroit Fire Fighters Association (2009–2013). Although the CBA is expired, the Director of Labor Relations kept the current terms in place until a subsequent agreement is negotiated in a letter dated June 28, 2013, "Re: Terms and Conditions of employment following the expiration of the 09-13 Collective Bargaining Agreement (CBA)."

- **DPCOA** means the City Employment Terms Between the City of Detroit and Detroit Police Command Officers Association, executed on July 18, 2012.

- **DPLSA** means the Master Agreement Between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association (2009–2013), as modified by the Act 312 Award executed March-April, 2011 in the matter of CITY OF DETROIT and DETROIT POLICE LIEUTENANTS AND SERGEANTS ASSOCIATION, MERC Case No. D09 G-0786 before Chairman Thomas W. Brookover.

- **DPOA** means the Master Agreement Between the City of Detroit and the Detroit Police Officers Association (2009–2012).

- **312 Award # 1** means the Act 312 Award effective March 25, 2013 in the Matter of CITY OF DETROIT and DETROIT POLICE OFFICERS ASSOCIATION, MERC Case No. D12 D-0354 before Chairman George T. Roumell, Jr. This Award invalidated the City Employment Terms between the City of Detroit and Detroit Police Officers Associated, executed on July 18, 2012, and reinstated the Master Agreement Between the City of Detroit and the Detroit Police Officers Association (2009–2012), subject to the modifications made by the Award. See pg. 6 of 312 Award # 1.

- **312 Award # 2** means the Act 312 Award effective January 15, 2010 in the Matter of CITY OF DETROIT and DETROIT COMMAND OFFICERS ASSOCIATION, MERC Case No. D07 K-1456 before Chairman Mark J. Glazer.

- **DPLSA MOU** means the Memorandum of Understanding Between the City of Detroit and Detroit Police Lieutenants and Sergeants Association regarding Adding Unused Sick Leave to Average Final Compensation, dated May 13, 2008.

LAI-3214123v5

**EXHIBIT I.A.287**

RESTORATION TRUST AGREEMENT

## CITY OF DETROIT PENSION RESTORATION TRUST

THIS TRUST AGREEMENT, entered into effective _____, 2014, by and among, the City of Detroit ("Detroit" or the "City") acting by and through **[Kevyn Orr acting as the appointed Emergency Manager pursuant to PA 436, M.C.L. §141.1541 et seq./Mayor Michael E. Duggan]** and each member of the Board of Trustees named herein.

### W I T N E S S E T H:

WHEREAS, Detroit filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 in the United States Bankruptcy Court for the United States Bankruptcy Court Eastern District of Michigan, Case No. 13-53846 (the "Court");

WHEREAS, pursuant to the Plan for the Adjustment of Debts of the City of Detroit (as confirmed by the Court, the "Plan of Adjustment"), the City agreed to establish a trust upon the Effective Date of the Plan of Adjustment (i) to hold the DWSD CVR (as defined in the Plan of Adjustment) and enforce rights related to its terms, and to consult with the trustees and investment committee of the Police and Fire Retirement System for the City of Detroit ("PFRS") and the General Retirement System for the City of Detroit ("GRS"), respectively in connection with General Restoration and Special Restoration relating to the DWSD CVR, each as defined below;

WHEREAS, Detroit hereby establishes this City of Detroit Pension Restoration Trust (the "Trust");

WHEREAS, the Board of Trustees shall be responsible for maintaining and administering this Trust and managing the property held by this Trust;

WHEREAS, the members of the Board of Trustees are willing to exercise the authority and rights of consultation granted to it herein with regard to the Trust; and

NOW THEREFORE, in consideration of the premises and the covenants contained herein, Detroit and the members of the Board of Trustees agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1    Board of Trustees or Board.  The Board of Trustees is the body described in Article VII to which Detroit has delegated responsibility for:  (i) maintaining and administering this Trust and managing the property held by this Trust; and (ii) exercising the duties and responsibilities of the Board of Trustees set forth in this Trust Agreement.  The Board of Trustees shall be constituted in accordance with Article VII and shall have the duties and authorities described in Article V.

Section 1.2    Code.  Means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

Section 1.3     <u>Beneficiaries</u>.  Means the beneficiaries of this Trust, which beneficiaries shall be the GRS, the PFRS and the participants in GRS and PFRS entitled to the benefits of the Restoration Plan.

Section 1.4     <u>DWSD CVR</u>.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.5     <u>General Restoration</u>.  Means the potential restoration or replacement of benefit reductions imposed by the Plan of Adjustment pursuant to the terms of the Restoration Plan.

Section 1.6     <u>GRS</u>.  Means the General Retirement System for the City of Detroit.

Section 1.7     <u>Holder of Pension Claims</u>.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.8     <u>Plan of Adjustment</u>.  Means the Plan for the Adjustment of Debts of the City of Detroit, as confirmed by order of the Court dated [---], a copy of which is attached hereto as Exhibit A.

Section 1.9     <u>PFRS</u>.  Means the Police and Fire Retirement System for the City of Detroit.

Section 1.10     <u>Qualifying DWSD Transaction</u>.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.11     <u>Restoration Plan</u>.  Means the general rules governing pension benefit restoration to the PFRS and the GRS as set forth in Exhibit II.B.3.q.ii.C and Exhibit II.B.3.r.ii.C of the Plan of Adjustment.  A copy of the Restoration Plan is attached hereto as Exhibit B.

Section 1.12     <u>Retiree Committee</u>.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.13     <u>Special Restoration</u>.  Means the potential restoration or replacement of benefit reductions imposed by the Plan of Adjustment in connection with a Qualifying DWSD Transaction, as described in Section IV.F of the Plan of Adjustment.

Section 1.14     <u>Trust Agreement</u>.  This agreement as it may be amended hereafter from time to time by the parties hereto.

Section 1.15     <u>Trust or Trust Fund</u>.  The City of Detroit Pension Restoration Trust established by this Trust Agreement, comprising all property or interests in property held by, or under the custody and control of, the Board from time to time under this Trust Agreement.

## ARTICLE II
## ESTABLISHMENT OF TRUST

Section 2.1    Purpose.  The Trust is established to receive and hold the DWSD CVR and enforce rights related to its terms, and to consult with the trustees and investment committee of the PFRS and the GRS, respectively in connection with General Restoration and Special Restoration relating to the DWSD CVR.

Section 2.2    Receipt of Funds.  The Board shall accept all sums of money and other property contributed to the Trust by Detroit pursuant to Article III.  The Board shall hold, manage and administer the Trust Fund without distinction between principal and income.

Section 2.3    Inurement and Reversion Prohibited.  At no time shall any part of the principal or income of the Trust Fund be used for, or diverted to, any purpose other than distributing proceeds from the DWSD CVR in the manner described by Section IV.F of the Plan of Adjustment.  Nothing in this Trust Agreement shall be construed in such a way as to prohibit the Board from using the assets of the Trust Fund to pay reasonable fees and other expenses and obligations incurred in maintaining and administering the Trust or to maintain a reserve of funds needed to pay reasonable fees and expenses expected to be incurred in the future.

Section 2.4    No Residual Interest.  Detroit shall not have any legal or equitable interest in the assets of the Trust Fund at any time, including following the termination of the Trust.

## ARTICLE III
## CONTRIBUTIONS TO THE TRUST FUND

Section 3.1    Detroit Contributions.  The Board will accept the City's contribution of the DWSD CVR to the Trust Fund pursuant to the Plan of Adjustment.  Apart from the contribution of the DWSD CVR (and any amounts payable to the Trust Fund pursuant to the terms of the DWSD CVR), Detroit shall have no further obligation to contribute to the Trust.

## ARTICLE IV
## PAYMENTS FROM THE TRUST FUND

Section 4.1    Payments from the Trust Fund.

(a)    Subject to paragraph (b) below, the Board shall within a reasonable time after receiving proceeds from the DWSD CVR distribute such proceeds (less the amount retained by the Trust Fund in the sole discretion of the Board to pay reasonable fees and expenses previously incurred or expected to be incurred to maintain and administer the Trust) directly to the GRS and PFRS in the manner described in Section IV.F of the Plan of Adjustment.

(b)    The Board may retain or withhold all or any part of any payment as the Board in the exercise of its reasonable discretion may deem proper, to protect the Board and the Trust against any liability or claim on account of any income or other tax whatsoever; and with all or any part of any such payment so retained or withheld, may discharge any such liability. Any part of any such payment so retained or withheld by the Board that may be determined by

82645430\V-2

3

CLI-2245193v3

the Board to be in excess of any such liability will upon such determination by the Board be paid to the GRS and PFRS in the manner described in Section IV.F of the Plan of Adjustment.

Section 4.2    Excessive Payments.  If the payment of any distributions under the Trust is determined to have been excessive or improper, and the recipient thereof fails to make repayment to the Board or Board's agent of such excessive or improper payment upon the Board's request, the Board shall deduct the amount of such excessive or improper payment from any other benefits thereafter payable to such person.  Until repaid to the Board or Board's agent, the amount of said excessive or improper payment shall not be included in the Trust Fund.

## ARTICLE V
## BOARD POWERS AND DUTIES

Section 5.1    Powers of the Board Generally.  The Board has whatever lawful powers are required to discharge its obligations and to accomplish any of the purposes of this Trust Agreement, including (but not limited to) the powers specified in the following Sections of this Article, and the powers and authority granted to the Board under other provisions of this Trust Agreement.  The enumeration of any power herein shall not be by way of limitation, but shall be cumulative and construed as full and complete power in favor of the Board.

Section 5.2    Powers Exercisable by the Board.  The Board is authorized and empowered to exercise the following powers at its discretion in satisfaction of the duties imposed on it under this Trust Agreement:

(a)    To place securities orders, settle securities trades, hold securities in custody, deposit securities with custodians or securities clearing corporations or depositories or similar organizations, and other related activities as shall be necessary and appropriate in performing its duties under this Trust Agreement.  Trades and related activities conducted through a broker shall be subject to reasonable fees and commissions established by the broker, which may be paid from the Trust Fund or netted from the proceeds of trades.

(b)    To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

(c)    To cause any investment in the Trust Fund to be registered in, or transferred into, the name of any institutional custodian appointed by the Board, or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Board shall at all times show that all such investments are part of the Trust Fund, and the Board shall be fully responsible for any misappropriation in respect of any investment held by its nominee or held in unregistered form; and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States;

(d)    To receive, hold, invest and reinvest Trust Fund assets and income under provisions of law from time to time existing and in accordance with Article V;

(e)     To exercise or abstain from exercising any option, privilege or right attaching to any Trust Fund assets;

(f)     To make payments from the Trust Fund in accordance with Article IV and for the payment of expenses as provided in Section 5.5;

(g)     To employ suitable agents and depositaries (domestic or foreign), public accountants, brokers, custodians, ancillary trustees, appraisers, legal counsel and other expert advisors as shall be necessary and appropriate, and to pay their reasonable expenses and compensation;

(h)     To pay any income or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on income of the Trust, if any, out of the Trust Fund;

(i)     To file all reports and returns that are required to be made with respect to the Trust:

(j)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund; and

(k)     To accept, compromise or otherwise settle any obligations or liability due to or from the Trust as the Board hereunder, including any claim that may be asserted for taxes, assessments or penalties under present or future laws, or to enforce or contest the same by appropriate legal proceedings.

Notwithstanding the foregoing, the Board shall not (i) assign, transfer, convey or sell its interest in the DWSD CVR except for an assignment due to the appointment of successors to members of the Board in accordance with Section 7.2; and (ii) invest any assets in real estate or real estate securities

Section 5.3     Title to Trust Fund.  All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Board.

Section 5.4     General Duties and Obligations of Board.

(a)     In accordance with Article II but subject to Section 4.1, the Board shall hold all property received by it and any income and gains thereupon.  In accordance with this Article, the Board shall manage, invest and reinvest the Trust Fund, shall collect the income therefrom, and shall make payments or disbursements in accordance with Section 4.1.

(b)     The Board shall confer with the trustees and investment committee of the GRS and PFRS, respectively, with respect to the Special Restoration and General Restoration; provided, however, that the Board shall not have any right to initiate any enforcement

proceedings against the trustees or investment committee of either GRS or PFRS with respect to Special Restoration or General Restoration.

    (c) The Board shall discharge its duties in the interests of the Beneficiaries and for the exclusive purpose of making distributions to the GRS and PFRS as provided in Section 4.1 and defraying reasonable expenses of administering the Trust and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims.

   Section 5.5 <u>Payment of Expenses</u>. The Board shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses) reasonably incurred by the Board in connection with maintaining and administering the Trust, including attendance at meetings related thereto. The expenses of the Board shall constitute a lien on the Trust Fund.

   Section 5.6 <u>No Board Compensation</u>. Except as provided in Section 5.5, the members of the Board shall serve without compensation.

**ARTICLE VI**
**BOARD ACCOUNTS**

   Section 6.1 <u>Records</u>. The Board shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to the Trust, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by interested persons at the principal office of the Trust.

   Section 6.2 <u>Annual Audit</u>. The Trust Fund shall be audited annually by an independent firm of certified public accountants, and a statement of the results of such audit shall be provided to the Board and also made available for inspection by interested persons at the principal office of the Trust.

   Section 6.3 <u>No Interest by Beneficiaries</u>. In no event shall any Beneficiary have any interest in any specific asset of the Trust Fund. At no time shall any account or separate fund be considered a savings account or investment or asset of any particular Beneficiary, or class of Beneficiaries, and no Beneficiary shall have any right to any particular asset which the Board may have allocated to any account or separate fund for accounting purposes.

   Section 6.4 <u>Accounting Year, Cash Basis</u>. The accounting year of the Trust shall be the calendar year. All accounts of the Board shall be kept on a cash basis.

## ARTICLE VII
## COMPOSITION OF AND PROCEDURES FOR THE BOARD OF TRUSTEES

Section 7.1    Number and Appointment of Members.  The Board of Trustees shall consist of five (5) voting members.  The Retiree Committee has selected the following initial members of the Board of Trustees:[_____, _____, _____, _____, and _____.]

By execution of this Trust Agreement each Board member hereby acknowledges his or her appointment and acceptance of the duties and responsibilities set forth in this Trust Agreement.

Section 7.2    Term of Office.  Each member of the Board shall serve a period of four years until the termination of the Trust, or if earlier, until his or her death, incapacity to serve hereunder, or resignation.  In the event of a vacancy, the replacement Board member shall be appointed pursuant to procedures established by the Board.

Section 7.3    Resignation.  A Board member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least ninety (90) days' advance written notice to the remaining Board Members stating a date when such resignation shall take effect, which notice or time period may be waived by the Board.

Section 7.4    Operation of the Board; Quorum.  The Board shall select from among its members a chair and a vice chair.  The Board shall hold regular meetings, and shall designate the time and place thereof in advance.  The Board shall adopt its own rules of procedure and shall keep a record of proceedings.  Each Board Member shall be entitled to one vote on each question before the Board.  Three (3) members shall constitute a quorum at any meeting.  A majority vote of the members present at a meeting of the Board at which a quorum exists shall be necessary for a decision by the Board.

Section 7.5    Reliance on Written Instruments.  Each member of the Board shall be fully protected in acting upon any instrument, certificate or paper believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 7.6    No Individual Liability on Contracts.  The members of the Board shall not be liable personally for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts.  Such claims and obligations shall be paid out of the Trust; provided, however, that the Board shall not be exempt from personal liability for willful misconduct, intentional wrongdoing, breach of applicable fiduciary duty, negligence or fraud, and the Trust shall not indemnify the Board for such liabilities, or to the extent that application of this sentence would violate any law.

Section 7.7    <u>City Not Liable for Conduct of Board</u>.  The Board is not, in its capacity as the Board of Trustees, an officer, agent, employee, or representative of Detroit.  In its capacity as the Board of Trustees, the Board is a principal acting independently of the City, which shall not be liable for any act, omission, contract, obligation, or undertaking of the Trust, the Board or its officers, agents, or representatives.

Section 7.8    <u>Liability Insurance</u>.  The Board may obtain and keep current a policy or policies of insurance, insuring the members of the Board from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act, or omission to act, in connection with the performance of their duties, responsibilities and obligations under this Trust Agreement or the Plan.  To the extent permitted by applicable law, the premiums on such policies may be paid from the Trust Fund.

Section 7.9    <u>Reimbursement for Defense of Claims</u>.  To the extent permitted by applicable law and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Board, employees of the Board and persons acting on the Board's behalf pursuant to an express written delegation (each separately, the "Indemnified Party") shall be reimbursed by the Trust Fund for reasonable expenses, including without limitation attorneys fees, incurred in defense of any claim that seeks a recovery of any loss to the Plan or Trust Fund or for any damages suffered by any party to, or beneficiary of this Trust Agreement (a) for which the Indemnified Party is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Board or, where required by applicable law, an independent fiduciary determines that the settling Indemnified Party was not primarily responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Board or an independent fiduciary), provided that, the Board shall have the right to approve of the retention of any counsel whose fees would be reimbursed by the Trust Fund, but such approval shall not be withheld unreasonably.

### ARTICLE VIII
### AMENDMENT, TERMINATION AND MERGER

Section 8.1    <u>Duration of the Trust</u>.  Unless terminated earlier pursuant to Section 8.3, this Trust Agreement shall terminate automatically on the earlier of:  (a) the eighth anniversary of the Effective Date of the Plan of Adjustment if the City and the Board shall have agreed in writing that no Qualifying DWSD Transaction has occurred; or (b) the later of (i) written notice from GRS and PFRS of the death of the last individual who was a participant in such pension plans on the Effective Date of the Plan of Adjustment or (ii) the 90th anniversary of the effective date of this Trust Agreement.

Section 8.2    <u>Amendment</u>.  The Trust Agreement may be amended at any time in writing by the Board or by Court order upon proper motion by the Board or the City, provided, however, that no amendment may impose a contribution obligation on the City beyond that specified in Section 3.1.  No amendment to the Trust Agreement shall modify the responsibilities of the Board hereunder unless the Board has first consented to such amendment.

Section 8.3    Termination.

(a)    Notwithstanding Section 8.1, the Trust and this Trust Agreement may be terminated at any time in writing by the Board with a copy of such written instrument to be provided to the City, or by Court order upon proper motion.  Upon termination of this Trust Agreement, the assets of the Trust Fund, if any, shall be paid out at the direction of the Board to the GRS and PFRS as provided in Section IV.F of the Plan of Adjustment.  Neither Detroit nor the Board shall have any beneficial interest in the Trust Fund.  If the Trust Fund has assets at the time of its termination, it shall remain in existence only until all such assets have been distributed.

(b)    Upon termination of the Trust pursuant to Section 8.1 or 8.3, the Board shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1    Rights in Trust Fund.  No Beneficiary or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right against the Board, the Board, or Detroit, except as may be otherwise expressly provided in this Trust Agreement.

Section 9.2    Non-Alienation.  Except to the extent required by applicable law, the rights or interest of any Beneficiary to any future distributions under the provisions of the GRS or PFRS shall not be subject to attachment or garnishment or other legal process by any creditor of any such Beneficiary, nor shall any such Beneficiary have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingent or otherwise, under GRS or PFRS.

Section 9.3    Controlling Laws.  The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

Section 9.4    Counterparts.  This Trust Agreement may be executed in any number of counterparts, each of which shall be considered as an original.

Section 9.5    Headings.  The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

Section 9.6    Notices.  All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of receipt if served personally or by confirmed facsimile or other similar confirmed electronic communication; (b) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (c) on the fourth business

day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

<u>If to the City:</u>

**[insert name and address]**

<u>If to the Board:</u>

**[insert name and address]**

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

**CITY OF DETROIT**

By: _____
Print Name: _____
Title: _____
Date: _____


**MEMBERS OF THE BOARD OF TRUSTEES**

By: _____
Print Name: _____

    Acknowledged by me on the _____ day of _____,
    Signature_____
    Printed name_____

    Notary public, State of Michigan, County of
    My commission expires_____


By: _____
Print Name: _____

    Acknowledged by me on the _____ day of _____,
    Signature_____
    Printed name_____

    Notary public, State of Michigan, County of
    My commission expires_____


By: _____
Print Name: _____

    Acknowledged by me on the _____ day of _____,
    Signature_____
    Printed name_____

    Notary public, State of Michigan, County of
    My commission expires_____

By: _____
Print Name: _____

    Acknowledged by me on the _____ day of _____,
    Signature_____
    Printed name_____

    Notary public, State of Michigan, County of
    My commission expires_____


By: _____
Print Name: _____

    Acknowledged by me on the _____ day of _____,
    Signature_____
    Printed name_____

    Notary public, State of Michigan, County of
    My commission expires_____

**EXHIBIT A**

**PLAN OF ADJUSTMENT**

**EXHIBIT B**

**RESTORATION PLAN**

**EXHIBIT C**

**CONFIRMATION ORDER**

**EXHIBIT I.A.293**

RETIREE HEALTH CARE SETTLEMENT AGREEMENT

# SETTLEMENT AGREEMENT

**Plaintiffs, the Official Committee of Retirees of the City of Detroit, Michigan (the "Committee"), Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, and AFSCME Sub-Chapter 98, City of Detroit Retirees (collectively with the Committee, the "Plaintiffs") and Defendants, the City of Detroit, Michigan (the "City") and Kevyn Orr, individually and in his official capacity as Emergency Manager of the City of Detroit, Michigan (collectively with the City, the "Defendants"), hereby enter into this Settlement Agreement as of the 14th day of February, 2014 (the "Agreement"), which contains the following terms:**

## I. GENERAL PROVISIONS

**1.    Agreement Modifies March 1, 2014 Plan**.  The City agrees to make the changes listed in Part II herein to the City of Detroit Retiree Health Care Plan for the period March 1, 2014 through December 31, 2014.  The changes enumerated in Part II are modifications to the City of Detroit Retiree Health Care Plan described in the 2014 Health Care Plan Options Booklet ("Booklet") distributed approximately January 2, 2014.  These modifications are premised on the terms summarized in the Booklet going into effect on March 1, 2014, subject only to the modifications set forth in this Agreement, which resolves the Plaintiffs' claims in Adversary Proceeding No. 14-04015 (the "Adversary Proceeding").

**2.    Modifications Will Not Decrease Benefits Offered in March 1, 2014 Plan**. None of the modifications in Part II reduces or eliminates any of the benefits in the City of Detroit Retiree Health Care Plan for the period March 1, 2014 through December 31, 2014 as described in the Booklet, except as specified in Part II(4)(a) and (b) below.

**3.    Effective Date of Plan Modifications**.  The modifications listed in Part II of this Agreement shall be effective with the beginning of the plan on March 1, 2014 unless otherwise noted in the Agreement.

**4.    Aggregate Caps**.  Unless specifically noted below, there is no cap on the amount that the City will spend to fulfill the modifications listed in Part II.  For the two modifications listed in Part II(3)(a)/(b) and (d)/(e) that expressly include capped funds of $2,500,000 and $3,000,000, respectively, the City shall aggregate those caps to a total of $5,500,000 such that if one capped fund is exhausted the City must draw from the other capped fund to the extent that the other capped fund has not been exhausted.

**5.    Conditions on Agreement**.  This Agreement, and the additional benefits set forth herein, are conditioned upon the City receiving debtor in possession financing that can be used for quality of life purposes on or before May 1, 2014 (the "DIP").  In the event the DIP is not in effect on or before May 1, 2014 and the City is unable to otherwise perform under this

Agreement, this Agreement shall be null and void and the parties shall be returned to their respective positions.

## II.  MODIFICATIONS TO THE CITY'S RETIREE HEALTH CARE PLAN FOR THE PERIOD MARCH 1, 2014 THROUGH DECEMBER 31, 2014

1.      <u>Modification of Dental and Vision Coverage</u>.

(a)      <u>Dental Coverage</u>.  The City will make available an additional dental benefits option in addition to the dental benefits coverage option described in the Booklet.  The additional option will be offered by Golden Dental Inc. ("Golden").  The premium charged for this group coverage option will be no greater than $23.73 per month for single coverage, $38.83 per month for two-person coverage, and $57.17 per month for family coverage, and the benefits will be as described in Exhibit 1 hereto; provided, however, that the amount charged to the retiree shall be increased to include an additional administrative charge, which administrative charge shall not exceed 20% of the applicable premium.  The enrolling retiree will be fully responsible to pay the premium associated with this dental option, including the additional administrative charge, and the City shall allow the retirees to utilize the pension reduction feature for payment of the monthly premium.  The City will use Reasonable Efforts to have such coverage effective June 1, 2014, including taking Reasonable Efforts to notify retirees by mail of this option as soon as practicable, and taking Reasonable Efforts to minimize the administrative charge.  Reasonable Efforts, as used in this Agreement, requires the City to use good faith and reasonable diligence in light of its capabilities.

(b)      <u>Vision Coverage</u>.  The City will make available an additional vision benefits option in addition to the vision benefits coverage option described in the Booklet.  The additional option will be offered by Heritage Vision Plans, Inc. ("Heritage").  The premium for this group coverage option will be no greater than $6.95 per month for single coverage and $13.75 per month for 2 or more person coverage; provided, however, that the amount charged to the retiree shall be increased to include an additional administrative charge, which administrative charge shall not exceed 20% of the applicable premium.  The option shall be a national network vision option similar to the option that the City provides to active employees.  The enrolling retiree will be fully responsible to pay the premium associated with this vision option, including the additional administrative charge, and the City shall allow the retirees to utilize the pension reduction feature for payment of the monthly premium.  The City will use Reasonable Efforts to have such coverage effective June 1, 2014, including taking Reasonable Efforts to notify retirees by mail of this option as soon as practicable, and taking Reasonable Efforts to minimize the administrative charge.

2.      <u>Modifications for Retirees Eligible for Medicare</u>.

(a)      <u>Extension of Enrollment Deadline to Opt Out of Medicare Advantage Plan Coverage</u>.  For retirees of the City who are enrolled in Medicare and receive

coverage under a City-sponsored Medicare Advantage Plan through February 28, 2014, the date to opt out of such coverage was extended to February 7, 2014. Such retirees may opt out by hand delivery (no later than close of business February 7) or first-class mail delivery (post-marked on or before February 7) of the designated opt out form to the City Benefits Administration Office at Suite 1026, 2 Woodward Avenue, Detroit MI 48226. Retirees were permitted to request the designated opt out form by calling the City's Benefit Administration Customer Service Line or contacting the City Benefits Administration Office at the address above. The City will use Reasonable Efforts to process any such opt outs for which it receives timely notice in a manner so as to eliminate such Medicare Advantage Plan coverage effective March 1, 2014. To the extent the City is not able to process the timely sent opt out notices in a manner so as to eliminate such coverage effective March 1, 2014, such coverage shall be eliminated effective April 1, 2014. Retirees who did not opt out by February 7, 2014 will be enrolled in a City-sponsored Medicare Advantage Plan as described in the Booklet.

(b) **HRA Contribution for Medicare-Eligible Retirees Who Opt Out**. For each Medicare-eligible retiree who opted out of coverage under the City-sponsored Medicare Advantage Plans on or prior to February 7, 2014, the City shall automatically enroll such retiree in a City-sponsored Health Reimbursement Arrangement ("HRA"). The HRA shall be administered by Flex Plan, Inc. The City will provide each electing enrollee with a vested $115 monthly contribution credit to his or her HRA during the remainder of 2014, which will carry forward until used by the retiree or otherwise forfeited under terms to be negotiated by the parties hereto. The City will make all Reasonable Efforts to implement the HRA credits effective May 1, 2014, retroactive to March 1, 2014. The initial monthly credit for May 2014 shall be in an amount equal to the total of $115 multiplied by the number of months starting March 2014 for which the enrolled retiree did not have Medicare Advantage Plan coverage (e.g., if John Smith had City-sponsored Medicare Advantage Plan coverage until February 28, 2014, the initial monthly credit for May 2014 will be $345, covering March, April, and May; thereafter, the payments shall be $115 per month for each month in 2014).

(c) **Medicare Advantage Plan Catastrophic Drug Expenses**. Each of the Medicare Advantage Plans sponsored by the City for the period March 1, 2014 through December 31, 2014 include Medicare Part D prescription drug coverage, under which, once the $4,550 out-of-pocket threshold is met, the participant's cost sharing obligation is limited to the greater of 5% of the cost of the prescription, or $2.55 per prescription for generic and preferred multi-source drugs or $6.35 per prescription for all other prescription drugs; provided, that the participant's cost sharing obligation shall never be greater than the cost sharing that applied prior to the participant meeting such threshold. For each participant who meets the $4,550 out-of-pocket threshold while enrolled in one of the City's Medicare Advantage Plans during the period March 1, 2014 through December 31, 2014, the City will reimburse the amount of this cost sharing obligation to the related

retiree.  For the avoidance of doubt, participant means both retiree and any retiree's spouse who is covered by the City's Medicare Advantage Plans.

**3.**      <u>Modifications for Retirees Not Eligible for Medicare</u>.

**(a)**      <u>Additional Stipend to Retirees With $75,000 or Lower Household Income Who Acquire  Health Care Coverage  on an Exchange</u>.  The City will provide non-duty disabled retirees who are not eligible for Medicare a $125 stipend that they may use to purchase health care coverage.  The City will increase this stipend by $50 for any non-Medicare eligible retiree who either (i) was enrolled in the City's retiree health program on December 31, 2013 or (ii) transitioned from active City benefits to retiree City benefits on or after November 1, 2013; but only to the extent such retiree described in (i) or (ii) above meets the following requirements:

i)      Not eligible for Medicare or Medicaid;

ii)      Not eligible for a benefit under Part II(4);

iii)      Not a duty-disabled retiree (duty-disabled retirees are eligible for higher stipends as provided for in the Booklet);

iv)      Under 65 years old (non-Medicare eligible retirees age 65 and older may receive an increased stipend under Part II(3)(c) below);

v)      Household income is $75,000 or less, as demonstrated by satisfaction of the process set forth in Part II(3)(b);

vi)      Does not acquire a City-offered group health plan as set forth in Part II(3)(f); and

vii)      Purchases or is covered by a health insurance policy acquired through a health insurance exchange ("Exchange") established pursuant to the Patient Protection and Affordable Care Act.

**(b)**      <u>Process to Obtain Additional $50 Monthly Stipend.</u>

i)      The City will retain Aon Hewitt to administer the eligibility process for the additional $50 monthly stipend set forth above in Part II(3)(a).  Retirees will be given a 30-day notice period, to expire no later than April 30, 2014, during which they shall provide to Aon Hewitt the following:

(1)      Submission of having purchased an insurance policy through an Exchange that covers such retiree.  Such submission shall include information necessary to validate the retiree's eligibility, including the name of the insurer, monthly premium amount, and the amount of federal

subsidy, if any, that the retiree is to receive in connection with such Exchange-acquired coverage; and

(2)     If the proof of Exchange-acquired coverage shows that the retiree's premium does not also include a federal subsidy amount, such retiree shall also submit a copy of his or her most recently filed federal income tax return with proof of filing, but in no event a return prior to the 2011 tax year. If such federal income tax return shows household income in excess of $75,000 and the retiree believes that household income in 2013 was below $75,000, the retiree shall also submit – along with a copy of the most recently filed federal income tax return – proof sufficient for Aon Hewitt to conclude that his or her household income in 2013 was less than $75,000.

ii)     Aon Hewitt shall submit to the City its list of retirees eligible for the additional $50 monthly stipend and the monthly stipends shall be paid to the approved eligible retirees beginning in the month of June 2014 or as soon thereafter as administratively practical, with payments retroactive to March 1, 2014. For example, if the first payment is made in June 2014, it will be in the amount of $200 for the months of March, April, May, and June; thereafter, the payments shall be $50 per month for each succeeding month in 2014. The list provided by Aon Hewitt shall be final and no changes shall be made to such list for the remainder of 2014.

*The City shall cap the amount that it pays for this additional $50 stipend during the period from March through December 2014 at $3,000,000.* In the event that there are more retirees meeting the requirements in Part II(3)(a) and (b) (*i.e.*, retirees listed on the final list) than can be paid in full for $3,000,000, each retiree will have his or her stipend amount reduced pro rata, unless there are additional funds that can be used as detailed in Part I(4).

(c)     **Additional Payment to Non-Medicare Eligible Retirees Age 65 and Older**.
The City will increase the stipend that it gives non-Medicare eligible retirees who are 65-years-old and older to $300/month. For such purposes, a non-Medicare eligible retiree is any retiree age 65 or older who is not – directly or through his or her spouse – eligible to automatically enroll in and obtain premium-free coverage under Part A of Medicare as evidenced by a denial letter from the Centers for Medicare and Medicaid Services ("CMS"). Retirees who have previously submitted such a letter to the City will not be required to resubmit it. Non-Medicare eligible retirees who are duty-disabled will not be eligible for this increase because their stipend is already $300 or more. The City will coordinate with Blue Cross Blue Shield of Michigan to determine the number of non-Medicare eligible retirees who are eligible for this $300 stipend. The increased stipend will apply for each month from March 2014 through December 2014. The City will make all Reasonable Efforts to implement the $300 increased

monthly stipend beginning April 1, 2014, with payment of the increased amount over the stipend otherwise paid for prior months being retroactive to March 1, 2014; thereafter, the stipend shall be $300 per month for each succeeding month in 2014. Such eligible retirees will not receive any other stipend amounts from the City that are described in the Booklet or this Agreement.

(d)    **$125 Monthly Stipend For City Retirees' Spouses Who are Under Age 65, With $75,000 or Lower Household Income, and Are Enrolled in Health Care Coverage on an Exchange**. The City will provide a $125 stipend to certain married retirees whose spouses either (i) were enrolled in the City's retiree health program on December 31, 2013 or (ii) transitioned from active City benefits to retiree City benefits on or after November 1, 2013; but only to the extent such spouse described in (i) or (ii) above meets the following requirements:

    i)    Not eligible to enroll in one of the City's Medicare Advantage Plans;

    ii)   Not eligible for Medicaid;

    iii)  Not eligible for a benefit under Part II(4);

    iv)   Under 65 years old;

    v)    Household income is $75,000 or less, as demonstrated by satisfaction of the process set forth in Part II(3)(e);

    vi)   Does not acquire a City-offered group health plan as set forth in Part II(3)(f); and

    vii)  Purchases or is covered by a health insurance policy acquired through an Exchange.

(e)    **Process to Obtain $125 Monthly Spouse Stipend.**

    i)    The City will retain Aon Hewitt to administer the eligibility process for the $125 monthly spouse stipend. Retirees will be given a 30-day notice period, to expire no later than April 30, 2014, during which they shall provide to Aon Hewitt the following proof:

         (1)    Submission of proof that their spouse is covered under an insurance policy purchased through an Exchange, including information necessary to validate the retirees' eligibility, including the name of the insurer, monthly premium amount, and the amount of federal subsidy, if any, that the spouse is to receive in connection with such Exchange-acquired coverage; and

         (2)    If the proof of Exchange-acquired coverage shows that the spouse's premium does not also include a federal subsidy

amount, such retiree shall also submit a copy of his or her most recently filed federal income tax return with proof of filing, but in no event a return prior to the 2011 tax year. If such federal income tax return shows household income in excess of $75,000 and the retiree believes that household income in 2013 was below $75,000, the retiree shall also submit – along with a copy of the most recently filed federal income tax return – proof sufficient for Aon Hewitt to conclude that his or her household income in 2013 was less than $75,000.

ii)     Aon Hewitt shall submit to the City its list of retirees who are eligible for this $125 monthly stipend and the monthly stipends shall be paid to the approved married retirees beginning in the month of June 2014 or as soon thereafter as administratively practical, with payments retroactive to March 1, 2014.  For example, if the first payment is made in June 2014, it will be in the amount of $500 for the months of March, April, May, and June; thereafter, the payments shall be $125 per month for each succeeding month in 2014.  The list provided by Aon Hewitt shall be final and no changes shall be made to such list for the remainder of 2014, except as follows:

(1)     if an eligible retiree ceases to be married (whether by death or divorce), the retiree's spouse will cease to be eligible for this stipend and the retiree shall be removed from the list effective as of the month immediately following such event; and

(2)     if a retiree's spouse transitions from active City benefits to retiree City benefits during 2014 and meets the eligibility provisions described in Part II(3)(d) and is approved as eligible pursuant to the process described in Part II(3)(e), the related retiree shall be added to the list effective as of the month in which the transition to retiree City benefits occurs, provided there is sufficient availability under the Aggregate Caps as described below.

*The City will cap the amount that it pays for spousal stipends at $2,500,000.* In the event that there are more retirees initially satisfying the requirements in Part II(3)(e) (*i.e.*, retirees listed on the first list submitted by Aon Hewitt to the City) than can be paid in full for $2,500,000, each such retiree will have his or her stipend amount reduced pro rata, provided that if there are additional funds that can be used as detailed in Part I(4), each such retiree will only have his or her stipend amount reduced pro rata to the extent the aggregate amount is not sufficient to satisfy the full amount of such stipends. Retirees who become eligible for this spousal stipend during the year, as described above, shall only be eligible for a stipend to the extent there is sufficient availability under the

Aggregate Caps detailed in Part I(4).  The addition or removal of retirees from the list shall not impact the amount of the stipend being paid to other eligible retirees.

**(f)**     **City Group Plan**.  In 2014, the City agrees to contract with Blue Cross Blue Shield of Michigan to offer a fully-insured group health plan option to retirees who are not eligible for Medicare.  Such plan option shall be reasonably equivalent to the coverage offered by the City to active employees in 2014.  The enrolling retiree will be fully responsible to pay the monthly premium associated with this option.  The premium cost to retirees of such policy will include the cost to the City of enrollment and administration related to this policy option, so that the City will not incur any additional expense in offering this policy.  The parties will use Reasonable Efforts to have such coverage effective May 1, 2014.  The City shall provide a monthly stipend of $100 to each retiree who enrolls in the City group plan, beginning with the May 1, 2014 payment.  No other stipend amounts from the City that are described in the Booklet or this Agreement shall be available to retirees enrolling in this group option, unless either (i) the retiree is duty-disabled, in which case, he or she will instead receive the stipend available to duty-disabled retirees described in the Booklet, or (ii) the retiree is eligible for the stipend described in Part II(3)I, in which case, he or she will instead receive such stipend.

**4.**     **Modifications for Retirees Below the Federal Poverty Level**.

**(a)**     **Coverage for Michigan Resident Retirees Eligible For Medicaid Coverage On or After April 1, 2014**.  The parties recognize that CMS has approved the State of Michigan's request to operate the "Healthy Michigan" program for adults who will become eligible for Medicaid under Section 1902(a)(10)(A)(i)(VIII) of the Social Security Act, and that on April 1, 2014 Michigan will provide Medicaid coverage to all adults residing in the State with income up to and including 133% of the Federal Poverty Level.  "Federal Poverty Level" means the applicable poverty guideline based on state of residence and household size issued annually by the U.S. Department of Health and Human Services.  For those retirees who are eligible for Medicaid under the scheduled April 1, 2014 expansion, the City will facilitate their  transition in the following manner: Within 10 days of the effective date of this Agreement, the City shall contact by letter those non-Medicare eligible retirees, who, according to the Retirement Systems' records, reside in Michigan and whose annual pension income is in an amount less than 100% of the Federal Poverty Level.  Such retirees will be given a 30 day opportunity to submit to Aon Hewitt proof that their income falls below the Federal Poverty Level.  Upon receipt by Aon Hewitt of a list of such retirees falling below the Federal Poverty Level, the City shall provide payment to such retirees of the amount equal to the value of the federal subsidy for the month of March that they would have received in connection with the second lowest cost Exchange-purchased silver plan, had such retiree, and to the extent the retiree is married, such retiree's spouse, been eligible for such subsidy for the month of March 2014 for such plan based on a determination of household income at 100% of the Federal Poverty Level.  A similar payment will be made by the City in

connection with insurance coverage for April 2014 if such retiree and spouse are not covered by Medicaid. To the extent that the Medicaid expansion rules in Michigan have not provided such retirees the opportunity to migrate into the Michigan Medicaid program by May 1, 2014, the City shall cease its continued payment but the parties agree to negotiate in good faith an additional reasonable accommodation to such retirees that balances the City's and such retirees' interests. *Retirees eligible for payments under this subsection are not eligible for any other payment offered by the City as set forth in the Booklet or as set forth in this Agreement.*

(b)     **Coverage for Non-Medicare Eligible Retirees in States that Have Not Expanded Medicaid**. The City recognizes that not all States have chosen to expand Medicaid coverage in accordance with Title II of the Patient Protection and Affordable Care Act, and certain non-Medicare eligible retirees residing outside the State of Michigan whose incomes fall below 133% of the Federal Poverty Level will not be eligible for Medicaid coverage. Accordingly, in connection with such retirees, the City will pay a monthly amount equal to the lesser of: (1) the second lowest cost monthly premium for a silver plan for such retiree and spouse purchased through an Exchange in their place of residence; or (2) the ratable monthly amount necessary to increase the retiree's annual household income to 100% of the Federal Poverty Level. Within 10 days of the effective date of this Agreement, the City shall contact by letter those retirees, who, according to the Retirement Systems' records, reside in states that do not provide Medicaid coverage to adults up to the Federal Poverty Level, and whose annual pension income is in an amount less than 100% of the Federal Poverty Level. Such retirees will be given a 30 day opportunity to submit to Aon Hewitt proof that their income falls below the Federal Poverty Level. The City shall commence such payments as soon as reasonably practicable after receiving a list of such retirees from Aon Hewitt. *Retirees eligible for payments under this subsection are not eligible for any other payment offered by the City as set forth in the Booklet or as set forth in this Agreement.*

### III.  RELEASES, FUTURE LEGAL PROCEEDINGS, AND MISCELLANEOUS

1.     **Future Claims in City Plan Confirmation Proceedings**. This Agreement is entered into without prejudice to any party to this litigation with respect to any issue involving the rights, claims, obligations, and payments of health care and other post-employment benefits ("OPEB"); provided that the City will not seek to recover directly from the retirees any postpetition OPEB payments made to or on behalf of retirees. Each party expressly reserves its rights on OPEB issues in connection with negotiations of a plan of adjustment, and the Plaintiffs are free to pursue, and the City to oppose, their position that the postpetition OPEB payments the City made to or on behalf of retirees were a business necessity.

2.     **Release**. Following the execution of this Agreement, the Plaintiffs will promptly dismiss the lawsuit – which solely addresses 2014 retiree health care benefits – with prejudice; provided, however, that any party to the lawsuit may bring an action in the Bankruptcy Court to enforce the terms of this Agreement resolving the lawsuit (an "Enforcement Action") and if the

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

3. **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

4. **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

5. **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants


_____
Sam J. Alberts, attorney for the Committee


_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association


_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees


Acknowledged:


_____
Judge Wiley Daniel, Mediator

ATI-2594662v5

-10-

13-53846-tjt    Doc 7502-3    Filed 09/16/14    Entered 09/16/14 01:20:42    Page 144 of 201

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

      **3.**    <u>**Counterparts.**</u>  This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

      **4.**    <u>**Good Faith.**</u>  As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

      **5.**    <u>**Plan of Adjustment.**</u>  The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants

_____
Sam J. Alberts, attorney for the Committee

_____
Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____
Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____
Judge Wiley Daniel, Mediator

ATI-2594662v5

-10-

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

      3.     **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

      4.     **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

      5.     **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____

Evan Miller, attorney for Defendants

_____

Sam J. Alberts, attorney for the Committee

_____

Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____

Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____

Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

      **3.**    <u>**Counterparts.**</u> This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

      **4.**    <u>**Good Faith.**</u> As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

      **5.**    <u>**Plan of Adjustment.**</u> The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____

Evan Miller, attorney for Defendants

_____

Sam J. Alberts, attorney for the Committee

_____

Brian O'Keefe, attorney for Detroit Retired City Employees Association and Retiree Police and Fire Fighters Association

_____

Richard Mack, attorney for AFSCME Sub-Chapter 98, City of Detroit Retirees

Acknowledged:

_____

Judge Wiley Daniel, Mediator

conditions contained in the last sentence of Part I(5) occur, then Plaintiffs are free to reinstate the Adversary Proceeding. Solely for purposes of an Enforcement Action, the City consents, pursuant to 11 U.S.C. § 904, to the Bankruptcy Court's hearing and deciding such Enforcement Action.

     3.    **Counterparts.** This Agreement may be signed in counterparts, and each counterpart shall be treated as an original.

     4.    **Good Faith.** As evidenced by the undersigned acknowledgment of Judge Wiley Daniel, Mediator, this Agreement was negotiated and entered into by all parties in good faith.

     5.    **Plan of Adjustment.** The terms of this Agreement, including Part III(4), shall be incorporated into any plan of adjustment filed by the City and confirmed by the Bankruptcy Court in 2014 in this bankruptcy case.

Agreed,

_____
Evan Miller, attorney for Defendants


_____
Sam J. Alberts, attorney for the Committee


_____
Brian O'Keefe, attorney for Detroit Retired City
Employees Association and Retiree Police and
Fire Fighters Association


_____
Richard Mack, attorney for AFSCME Sub-
Chapter 98, City of Detroit Retirees


Acknowledged:

_____
Judge Wiley Daniel, Mediator

**EXHIBIT 1**

(See next page)



January 2014

# Certificate of Coverage
# City of Detroit Retirees

## CLASS I
**Diagnostic and Preventive:**

Exams, X-Rays, Prophylaxis, Fluoride -up to age 19        **100%**

## CLASS II
**Restorative:**

Fillings, Root Canals, Routine Extractions        **100%**

## CLASS III
**Prosthetics:**

Crowns, Bridges, Partials, Dentures, Space Maintainers        **80%**

## CLASS IV
**Specialty Care:**

Periodontics
Endodontics
Oral Surgery        **70%**

**ORTHODONTICS** (Interceptive excluded)

Lifetime Benefit Maximum: Dependents up to age 19        **$3,000**
Lifetime Benefit Maximum: Subscriber and Spouse        **$3,000**

**Out-Of-Area Emergency Coverage $100 reimbursement**

**Annual Maximum:**     $1,600.00
**Annual Renewal:**     **07/01**
**Membership Card Reads:**   Detroit Retirees

| Rate Type | Current Rates |
|---|---|
| Single Person | $23.73 |
| Family of two | $38.83 |
| Family | $57.17 |

## EXHIBIT I.A.300

SCHEDULE OF SECURED GO BOND DOCUMENTS

## SCHEDULE OF SECURED GO BOND DOCUMENTS

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted February 23, 2010<br><br>Finance Director's Order dated March 11, 2010<br><br>Master Debt Retirement Trust Indenture dated as of March 1, 2010, as supplemented and amended (the "<u>Master Indenture</u>"), between the City of Detroit and U.S. Bank National Association, as trustee | Distributable State Aid General Obligation Limited Tax Bonds, Series 2010 | $252,475,366 |
| Resolution of the City Council adopted July 20, 2010<br><br>Finance Director's Order dated December 9, 2010<br><br>Master Indenture | Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment) | $101,707,848 |
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and Series 2012(B2))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A2) | $39,254,171 |
| Resolution of the City adopted March 27, 2012<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B) | $31,037,724 |

| Secured GO Bond Documents | Series of Secured GO Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(B))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012(B))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(B))<br><br>Master Indenture | General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B) | $6,469,135 |
| Resolution of the City Council adopted March 27, 2012<br><br>Finance Director's Order dated March 28, 2012 (Series 2012(A2) and Series 2012(B2))<br><br>Finance Director's Order dated July 3, 2012 (Series 2012 (A2) and  Series 2012(B2))<br><br>Finance Director's Order dated August 16, 2012 (Series 2012(A2-B), Series 2012 (A2) and Series 2012(B2))<br><br>Master Indenture | Self Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2) | $54,055,927 |

## EXHIBIT I.A.327

STATE CONTRIBUTION AGREEMENT

## CONTRIBUTION AGREEMENT

This Contribution Agreement ("Agreement"), dated as of _____, 2014, is made by and among the Michigan Settlement Administration Authority, a Michigan body public corporate (the "Authority"), the General Retirement System of the City of Detroit, the Police and Fire Retirement System of the City of Detroit and the City of Detroit (the "City").

## RECITALS

A.    The City filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 (the "Chapter 9 Case") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court").

B.    During the course of the Chapter 9 Case, the City has asserted that the City's Police and Fire Retirement System (the "PFRS" or a "System") and the General Retirement System (the "GRS" or a "System" and collectively with the PFRS, the "Systems") are underfunded.

C.    During the course of the Chapter 9 Case, there have been suggestions that the State of Michigan (the "State") may be obligated to pay all or a portion of the underfunding of pension benefits payable to retirees, a suggestion the State vigorously disputes.

D.    As part of the mediation process in the Chapter 9 Case, the mediators asked the State and other parties to assist in reducing the amount of underfunding in the PFRS and GRS pension funds by providing settlement funds for the benefit of pensioners that would not be otherwise available.

E.    As part of its determination that the City was eligible to file the Chapter 9 Case, the Court determined that pension obligations of the City can be impaired or diminished in the Chapter 9 Case and are not protected from such impairment or diminution by the State Constitution.

F.    In support of confirmation of the City's Fourth Amended Plan of Adjustment dated May 5, 2014 (as may be further amended from time to time, the "Plan"), the State has agreed, subject to satisfaction of the terms and conditions set forth herein and in the Plan, to make a contribution to the GRS and PFRS in return for releases from, among others, the GRS and PFRS as set forth in the Support and Release Agreement entered into by the State and each of the Systems in connection with this matter.

G.    On June 20, 2014, the Authority was established as the disbursement agent for the State with respect to the State Contribution (as defined below).

H.    Capitalized terms used in this Agreement but not defined have the same meanings as set forth in the Plan.

1

NOW THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

1. <u>State Contribution</u>. On the later of (a) the date on which the Conditions Precedent have been satisfied, and (b) 60 days after the Effective Date of the Plan, the Authority shall disburse $98,800,000 to GRS and $96,000,000 to PFRS (collectively, the "<u>State Contribution</u>") for the purpose of increasing the assets of the PFRS and GRS. The total aggregate State Contribution is equal to the net present value of $350,000,000 payable over 20 years determined using a discount rate of 6.75%, which results in a total contribution by the State of $194,800,000. The State Contribution shall only be used to fund payments to holders of GRS Pension Claims and PFRS Pension Claims, each as defined in the Plan.

2. <u>Governance Requirements of the GRS and PFRS</u>. At all times during the 20 year period following the disbursement of the State Contribution to the GRS and PFRS, the GRS and PFRS each must establish an investment committee (the "<u>Investment Committee</u>") for the purpose of making recommendations to, and approving certain actions by, the respective System's board of trustees and/or making determinations and taking action under and with respect to Investment Management, as set forth in the terms and conditions enumerated on **Exhibit A** and **Exhibit B**, respectively, each attached to and incorporated by reference into this Agreement. Further, the Emergency Manager for the City and any subsequently appointed emergency manager for the City, appointed under PA 436 or under any successor or replacement statutes to PA 436, shall not seek to exercise any powers granted under section 12(1)(m) of PA 436 (or equivalent provision under any successor or replacement statute) against the Board of GRS or the Board of PFRS until the earlier of (a) one year following entry of an order confirming the Plan, and (b) December 31, 2015.

3. <u>Income Stabilization Funds and Income Stabilization Payments</u>. The City, GRS and PFRS shall establish an income stabilization program and amend the governing documents for GRS and the governing documents for PFRS to include the following:

   a. A supplemental pension income stabilization payment (the "<u>Income Stabilization Payments</u>") payable on an annual basis beginning not later than 120 days after the Effective Date, to each Eligible Pensioner equal to the lesser of (a) the amount needed to restore the Eligible Pensioner's reduced pension benefit to the amount of the pension benefit that the Eligible Pensioner received from GRS or PFRS in 2013, or (b) the amount needed to bring the total annual household income of the Eligible Pensioner up to 130% of the Federal Poverty Level in 2013.

   b. In addition, to the extent an Eligible Pension's Estimated Adjusted Annual Household Income in any calendar year is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional benefit ("<u>Income Stabilization Benefit Plus</u>"). The Income Stabilization Benefit Plus shall be equal to the lesser of either (a) 100% restoration of pension benefits, including escalators and cost of living adjustments; or (b) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

2

c.  An Eligible Pensioner's "Estimated Adjusted Annual Household Income" shall be calculated as follows: (i) the annual pension benefit amount paid in 2013 shall be subtracted from the Eligible Pensioner's 2013 total household income (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation) as adjusted for inflation or Social Security COLA increases to create a base additional income amount, plus (ii) the following three items as applicable, (x) the reduced pension benefit that GRS will pay the Eligible Pensioner for that year, (y) any GRS pension restoration due to an improved GRS funding level, and (z) the Eligible Pensioner's Income Stabilization Benefit. Notwithstanding the foregoing, Income Stabilization Payments, including the Income Stabilization Benefit Plus, under both GRS and PFRS shall not exceed $20 million in aggregate.

d.  A separate recordkeeping sub-account called the "Income Stabilization Fund" will be set up under each of GRS and PFRS for the sole purpose of paying the Income Stabilization Payments to Eligible Pensioners. The assets credited to the sub-accounts will be invested on a commingled basis with the applicable System's assets and will be credited with a pro-rata portion of the System's earnings and losses.

e.  Amounts credited to the Income Stabilization Fund, including the Assigned UTGO Bond Tax Proceeds, may not be used for any purpose other than the payment of Income Stabilization Payments to Eligible Pensioners, except as expressly provided in subparagraph (f) below.

f.  In 2022, provided that the State has not issued a certificate of default with respect to a System at any time prior to 2022, the Investment Committee for that System shall conduct a valuation to determine the Income Stabilization Payments anticipated to be made from the System in the future, in order for the System to fulfill the obligation to make Income Stabilization Payments (the "Estimated Future Liability"). In the event that 75% of the independent members of the Investment Committee determine that the GRS or PFRS Income Stabilization Fund is credited with assets in excess of its Estimated Future Liability (the "Excess Assets"), the Investment Committee may, in its sole discretion, recommend to the Board of Trustees that the Excess Assets, but not more than $35 million, be used to fund each System's payment of Adjusted Pension Amounts. The Investment Committee shall have the right to engage professionals to assist in this task as necessary, and such expenses shall be paid by the Systems. If any funds remain in the GRS or PFRS Income Stabilization Fund on the date upon which no Eligible Pensioners under their respective System are living, the remainder of each System's Income Stabilization Fund shall be used to fund each System's payment of Adjusted Pension Amounts.

3

g. "Eligible Pensioners" are those retirees or surviving spouses who are at least 60 years of age or those minor children receiving survivor benefits from GRS or PFRS, each as of the Effective Date, whose pension benefit from GRS or PFRS will be reduced by the confirmed Plan, and who have a total household income equal to or less than 140% of the Federal Poverty Line in 2013 (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation). No new persons will be eligible to receive an Income Stabilization Payment at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

h. The initial determination of Eligible Pensioners, and the amounts of Income Stabilization Payments payable to Eligible Pensioners shall be made by the State in its sole discretion. The State shall transmit the list of Eligible Pensioners to the Investment Committee and the Board of Trustees of GRS and PFRS, as applicable. The Board of Trustees, with the assistance of the Investment Committee of GRS and PFRS, shall be responsible for properly administering the respective Income Stabilization Fund and annually certifying to the Treasurer that it has properly administered the requirements for eligibility and payment of benefits with respect to Eligible Pensioners.

4. Conditions Precedent. The Authority's obligations under this Agreement are not effective or enforceable until each of the following conditions (the "Conditions Precedent") have been met to the satisfaction of the Authority and the Treasurer, unless any one or more of such conditions are waived in a writing executed by the Authority and the Treasurer:

a. The Authority receives the State Contribution from the State.

b. An endorsement of the Plan by the Official Retiree Committee which will include a letter from the Official Retiree Committee as part of the Plan solicitation package recommending to Classes 10 and 11 a vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in the respective classes.

c. Cessation of all litigation, including the cessation of funding of any litigation initiated by any other party, as it relates to the City (a) challenging PA 436 or any actions taken pursuant to PA 436, including but not limited to, a dismissal with prejudice of the cases set forth on **Exhibit D**, or (b) seeking to enforce Article IX, Section 24 of the Michigan Constitution; provided, however, (i) until the State Contribution is received by the Systems, the Systems agree to stay any pending litigation described in this subparagraph, and (ii) that as a condition precedent to the GRS and the PFRS dismissing any pending litigation described in this subparagraph that they are prosecuting, the GRS and the PFRS have the right to receive written confirmation from the Authority

4

that the Authority is prepared and authorized to disburse the State Contribution in accordance with this Agreement and the Plan, subject only to the dismissal by the GRS and PFRS of any pending litigation described in this subparagraph that they are prosecuting.

d.  Active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way (including funding) the litigation described in subparagraph 4(c) by the parties listed on **Exhibit C**, or equivalent assurance of litigation finality (which, as to the Systems, shall be deemed satisfied by the execution of the Support and Release Agreement to be entered into by the State and each of the Systems in connection with this matter).

e.  Classes 10 and 11 accept the Plan.

f.  By December 31, 2014, the Court enters a final, non-appealable order confirming the Plan that includes, at a minimum, the following:

   i.  A release of the State and State Related Entities by each holder of a Pension Claim of all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities.

   ii.  A requirement that the governing documents of GRS and the governing documents of PFRS be amended to include:

   a)  the governance terms and conditions set forth in Paragraph 2, Exhibit A and Exhibit B of this Agreement; and

   b)  the Income Stabilization Payments and Income Stabilization Fund described in Paragraph 3 of this Agreement.

   iii.  Approval of, and authority for the City to enter into, the UTGO Settlement.

   iv.  A requirement that the City irrevocably assigns the right to receive not less than an aggregate amount of $20,000,000 of the payments on the Reinstated Stub UTGO Bonds to the Income Stabilization Funds of the GRS and PFRS. Such payments will be made to the Income Stabilization Funds in the form of annual installment payments over a 14 year period, pursuant to a payment schedule approved by the State.

5

> > v. Approval of, and authority for the City to enter into, the DIA Settlement.
>
> > vi. Agreement to and compliance with MCL 141.1561 and cooperation with the transition advisory board appointed pursuant to MCL 141.1563, or compliance with any new legislation that is enacted regarding post-bankruptcy governance.
>
> g. Evidence satisfactory to the State of an irrevocable commitment by:
>
> > i. The Foundations to fund $366,000,000 (or the net present value thereof) as part of the DIA Settlement; and
>
> > ii. The DIA Corp. to fund $100,000,000 (or the net present value thereof) as part of the DIA Settlement.
>
> h. The Plan Effective Date occurs on or before April 1, 2015.

5. <u>Non-occurrence of Conditions Precedent</u>. If the Conditions Precedent are not met to the satisfaction of the Authority and the Treasurer on or before April 1, 2015, upon written request of the Treasurer, the Authority shall remit the State Contribution to the Department and shall have no further obligations under this Agreement.

6. <u>Default by GRS and PFRS; Cure Period; Remedies</u>.

> a. A System will be in default if the System has not materially complied with any of the terms and conditions set forth in (i) the Plan, (ii) the Governing Documents, or (iii) this Agreement, including, but not limited to, failing to make the required Income Stabilization Payments or using funds in the Income Stabilization Fund for unauthorized purposes. For the purposes of this Agreement, "<u>Governing Documents</u>" shall mean, (x) for the GRS, the Combined Plan for the General Retirement System of the City of Detroit, Michigan, and (y) for the PFRS, the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan. Notwithstanding subparagraph 'e' below, there shall not be an event of default for purposes of this paragraph 6 unless and until the Treasurer delivers to the alleged defaulting System a written notice declaring and specifically identifying the facts of an alleged default (the "<u>Default Notice</u>"). Nothing herein shall prohibit the subject System from contesting the alleged default; provided, however, until the contest over the alleged default is resolved, the subject System may not include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.
>
> b. In the event of a default by a System, the System shall have 100 days after receiving the Default Notice in accordance with subparagraph 'a' above (the "<u>Cure Period</u>") to cure such default by remedying the damages sustained as a result of the default, as well as making any delinquent

6

Income Stabilization Payments, and restoring any funds improperly removed from any other fund maintained by the System, including the Income Stabilization Fund, as applicable. Prior to the expiration of the Cure Period, at least six of the seven total aggregate votes of the Investment Committee for the defaulting System must certify to the Treasurer that (i) the default has been cured, and (ii) that no material damages have been caused by the default that have not otherwise been remedied (the "Cure Certification"). During the Cure Period, the defaulting System may not include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

c.    If the Investment Committee for the defaulting System provides the Cure Certification to the Treasurer in accordance with subparagraph 'b' above, then the default will be deemed cured and the defaulting System may once again include its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored.

d.    If the Investment Committee for the defaulting System fails to provide the Cure Certification to the Treasurer in accordance with subparagraph 'b' above, then no portion of the total State Contribution to the defaulting system, as adjusted for earnings and losses, may be taken into consideration by the System during the remainder of the 20 year period following the date of such default for purposes of determining whether benefits reduced by the Plan may be restored. Notwithstanding the foregoing, if at any time during or after the Cure Period the Investment Committee certifies by a simple majority vote, that (i) the default has been cured; and (ii) that no material damages have been caused by the default that have not otherwise been remedied, then the Treasurer may consent to the defaulting System once again including its State Contribution, as adjusted for earnings and losses, for purposes of determining whether benefits reduced by the Plan may be restored, which consent shall not be unreasonably withheld.

e.    Each Investment Committee shall provide compliance reports to the Treasurer on a semi-annual basis and at such other times as the Treasurer reasonably may request (each, a "Compliance Report") that certifies that the Investment Committee is not aware of any defaults, or, if the Investment Committee is aware of a default, specifically identifying the facts of such default. After review of a Compliance Report, the Treasurer shall provide to the System either a certificate of compliance or a Default Notice.

f.    Notwithstanding the foregoing, in the event of a default, the Treasurer and the Authority shall have the right to pursue all available legal and

equitable remedies against the Board of Trustees for the defaulting System, the Investment Committee, or any other person.

7.    Execution in Counterparts.  This Agreement may be executed in counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

8.    Governing Law/Jurisdiction.  This Agreement shall be construed in accordance with the laws of the State of Michigan, without reference to its conflict of law provisions, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.  The Bankruptcy Court of the Eastern District of Michigan shall have exclusive jurisdiction over any action or proceeding solely with respect to this Agreement, and each party, to the extent permitted by law, agrees to submit to such jurisdiction and to waive any defense based on venue or jurisdiction of such court.

9.    Amendment.  This Agreement may be amended, modified, superseded or canceled, and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the Parties.

10.   Limitation of Liability.  The obligation to make the State Contribution is not a general obligation or indebtedness of the State or the Authority and is subject to satisfaction of the conditions described herein.  Furthermore, neither the State nor the Authority has any liability or obligation arising from or related to the contributions and funding of the Income Stabilization Fund of each System.   Notwithstanding anything contained herein to the contrary, no State Related Entity or board member of the Authority shall have any liability for the representations, warranties, covenants, agreements or other obligations of the State or the Authority hereunder or in any of the certificates, notices or agreements delivered pursuant hereto.

11.   Severability.  If any one or more of the covenants, agreements or provisions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, the invalidity of any such covenants, agreements and provisions shall in no way affect the validity or effectiveness of the remainder of this Agreement, and it shall continue in force to the fullest extent permitted by law.

12.   Headings.  Any headings preceding the text of the several articles and sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience or reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

[Remainder of Page Intentionally Left Blank – Signatures on Following Page]

8

**MICHIGAN SETTLEMENT ADMINISTRATION AUTHORITY**


By: _____
Title: Authorized Officer


**GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT**


By: _____
Title: Authorized Officer


By: _____
Title: Authorized Officer


**POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT**


By: _____
Title: Authorized Officer


By: _____
Title: Authorized Officer


**CITY OF DETROIT**


By: _____
Title: Emergency Manager

9

**EXHIBIT A – GRS Governance Terms**

**EXHIBIT B – PFRS Governance Terms**

**EXHIBIT C**

1. General Retirement System

2. Police and Fire Retirement System

3. AFSCME

4. UAW

5. Detroit Police Officers Association

6. Detroit Police Command Officers Association

7. Detroit Police Lieutenants and Sergeants Association

8. Detroit Fire Fighters Association

9. Retired Detroit Police and Fire Fighters Association

10. Retired Detroit Police Members Association

11. Detroit Retired City Employees Association

12. Official Retirees Committee

13. City of Detroit

**EXHIBIT D**

Cases to be dismissed:

1.    GRS et al. v. Emergency Manager of Detroit (Ingham County Circuit Court)
2.    Webster et al. v. State of Michigan, Governor, and State Treasurer (Ingham County Circuit Court)
3.    Detroit Library Commission v. Governor, State Treasurer, and Detroit Public Schools Emergency Manager (Ingham County)
4.    Flowers et al. v. Governor, State Treasurer, and State of Michigan (Ingham County Circuit Court)
5.    DPOA v. City of Detroit (Michigan Court of Appeals)

The settling parties will not attempt to amend to include the City of Detroit or its Emergency Manager as a defendant, or collaterally or retroactively attack the Detroit bankruptcy or actions of Detroit or its EM, or otherwise participate, support, fund or appeal in the following cases:

1.    Phillips et al v. Governor and State Treasurer (E.D. Mich.)
2.    Michigan AFSCME Council 25 v. Governor, State Treasurer, et al. (E.D. Mich.)
3.    NAACP v. Governor, State Treasurer, and Secretary of State (E.D. Mich.)
4.    Robert Davis/Citizens United Against Corrupt Government v. Governor, State of Michigan, Dept. of Treasury, Dept. of State Police, et al. (Ingham County Circuit Court)
5.    Robert Davis/Citizens United Against Corrupt Government v. Michigan Department of Treasury and Carla Robert (Wayne County Circuit Court)
6.    Robert Davis v. Local Emergency Financial Assistance Loan Board (Ingham Court)
7.    Robert Davis v. Weatherspoon, Governor, Attorney General, and State Treasurer (E.D. Mich.)
8.    Allen Park Retirees v. EM Parker, City of Allen Park (Wayne Circuit)
9.    Allen Park Retirees v. State (Court of Claims)
10.   Deborah Moore-El v. Snyder (E.D. Mich.)
11.   Faith, et al. v. Snyder (E.D. Mich.)
12.   Sarella Johnson, et al. v. Snyder (E.D. Mich.)
13.   United Retired Government Employees (URGE) et al. v. Governor, et al. (E.D. Mich.)

DETROIT 56620-1 1314985v13

**<u>EXHIBIT I.A.338</u>**

FORM OF SYNCORA SETTLEMENT DOCUMENTS

# SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (this "Agreement") is entered into as of September __, 2014, among the City of Detroit, Michigan (the "City"), Syncora Guarantee, Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora"). The City and Syncora are referred to herein each individually as a "Party" and collectively as the "Parties".

**WHEREAS**, the Detroit General Retirement System Service Corporation, a Michigan nonprofit corporation ("DGRS"), and the Detroit Police and Fire Retirement System Service Corporation, a Michigan nonprofit corporation ("PFRS" and, together with DGRS, each a "Service Corporation" and collectively the "Service Corporations") created each of (i) the Detroit Retirement Systems Funding Trust 2005 (the "2005 Pension Funding Trust") pursuant to the Trust Agreement, dated June 2, 2005, among the Service Corporations and U.S. Bank National Association as trustee and (ii) the Detroit Retirement Systems Funding Trust 2006 (the "2006 Pension Funding Trust") pursuant to the Trust Agreement, dated June 12, 2006, among the Service Corporations and U.S. Bank National Association as trustee;

**WHEREAS**, the 2005 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2005 (the "2005 Pension Funding Securities") and the 2006 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2006 (the "2006 Pension Funding Securities" and collectively with the 2005 Pension Funding Securities, the "Certificates of Participation");

**WHEREAS**, the Service Corporations are parties to swap transactions under certain ISDA Master Agreements referred to as the COP Swap Agreements;

**WHEREAS**, the City issued $44,020,000 in General Obligation Bonds (Unlimited Tax), Series 2003-A;

**WHEREAS**, Syncora has issued insurance policies in respect of certain of the Certificates of Participation;

**WHEREAS**, Syncora has issued insurance policies in respect of certain of the Swap Agreements;

**WHEREAS**, Syncora has issued insurance policies in respect of certain of the General Obligation Bonds (Unlimited Tax), Series 2003-A;

**WHEREAS**, Syncora beneficially owns or insures Certificates of Participation in the amounts set forth herein;

**WHEREAS**, the Parties and their representatives have engaged in good faith, arm's length settlement discussions regarding a consensual resolution of their disputes under or in respect of the Certificates of Participation and the COP Swap Agreements;

1

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**Section 1          Definitions and Interpretations.**

 **1.1     Plan Definitions.**  Capitalized terms used herein, but not otherwise defined, shall have the meaning ascribed to such terms in the POA.

 **1.2     Additional Definitions.**  The following terms have the respective meanings set forth below for all purposes of this Agreement.

 "Class 9" means that class of claims associated with COPs as set forth in the Sixth Amended POA.

 "POA" means that certain Plan for the Adjustment of Debts of the City of Detroit, as amended in accordance herewith.

 "Sixth Amended POA" shall mean that certain Sixth Amended Plan for the Adjustment of Debts of the City of Detroit, as filed with the Bankruptcy Court.

 **1.3     Other Definitional and Interpretive Provisions.**  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to Sections and Schedules are to Sections and Schedules of this Agreement unless otherwise specified.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.  References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all applicable law.

**Section 2          Plan.**

 **2.1     Proofs of Claim.**  The Parties agree Section 2, Section 4 and Section 5 hereof fully resolve, address, satisfy and discharge Proofs of Claim # 1352 and 1354; provided that, except as expressly provided to the contrary herein, this Agreement shall have no effect regarding any UTGO Claims asserted in such Proofs of Claim or otherwise held or insured by Syncora, and any such UTGO Claims shall receive the treatment provided for all UTGO Claims by the POA and the UTGO Settlement Agreement.  The City shall not file or otherwise assert any objection to such Proofs of Claim.

 **2.2     Voting.**  All votes cast by Syncora to accept or reject the Sixth Amended POA shall be deemed to have been cast as accepting the POA.

**2.3    Approval.**   The City shall (i) use its best efforts to seek approval of this Agreement in connection with confirmation of the POA, and (ii) seek a Confirmation Order, which Confirmation Order shall be in form and substance reasonably acceptable to Syncora (solely with respect to any terms thereof that affect the rights of Syncora or any Related Entity with respect to Syncora), that approves (A) this Agreement and all transactions contemplated hereby, (B) the Development Agreement and all transactions contemplated thereby, and (C) the assumption of the Tunnel Lease, as amended pursuant to the First Amendment to Lease dated as of ___, 2014 between the City of Detroit and the Detroit Windsor Tunnel LLC.

**2.4    Plan Support.**

(a)    Syncora shall (i) use commercially reasonable efforts to support the City's efforts to seek approval of this Agreement in connection with confirmation of the proposed POA, (ii) support confirmation of the POA, and (iii) not object to confirmation of the POA and withdraw all objections, oppositions and reservations of rights to confirmation of the POA (collectively, the "<u>Syncora Plan Objections</u>"), including those objections filed with the Bankruptcy Court at ECF #'s 4679, 5706, 6009, 6651, 7041, 7150 and its participation in 7103 (A) without prejudice (and subject to Syncora's retaining the right to assert such objections in the event this Agreement is terminated) as soon as reasonably practicable after execution of this Agreement and (B) with prejudice as soon as reasonably practicable after Bankruptcy Court approval of this Agreement and confirmation of the POA.

(b)    Without limiting the foregoing, Syncora shall withdraw all objections to the UTGO Settlement Agreement (including those contained in Syncora's objections to the Plan) (i) without prejudice (and subject to Syncora's retaining the right to assert such objections in the event this Agreement is terminated) as soon as reasonably practicable after execution of this Agreement and (ii) with prejudice as soon as reasonably practicable after Bankruptcy Court approval of this Agreement and confirmation of the POA. The City shall not alter or amend the treatment provided to holders of Allowed Class 8 Claims in the Plan.

(c)    Without limiting the foregoing, Syncora shall not object to inclusion of the COP Swap Counterparties in the definition of "Exculpated Parties" under the POA.

**2.5    Plan Amendment.**   The City shall not, without Syncora's prior written consent, amend the POA in a manner that (a) would have a materially adverse effect on Class 9 or (b) adversely affect Syncora.

**Section 3          <u>Global Resolution; Litigation Support; Etc.</u>**

**3.1    Global Resolution.**   The Parties agree that this Agreement shall constitute a global resolution of all matters among the Parties as and to the extent set forth herein, and all litigation (including appeals) outstanding between the City and Syncora arising out of or related to the City's Chapter 9 Case shall be dismissed as and to the extent set forth herein.

**3.2    Withdrawal of Syncora Plan Objections.**   Syncora shall withdraw the Syncora Plan Objections as set forth in Section 2.4 hereof.

3

**3.3    Stay and Withdrawal or Dismissal of Appeals.**    As soon as reasonably practicable after execution of this Agreement, Syncora and the City shall file joint motions with the applicable courts requesting stays of those certain appeals styled: 2:14-cv-10501-BAF-PJK (PLA appeal); 2:14-cv-11995-BAF-PJK (PPF appeal); 2:14-cv-12062-BAF-PJK (COP Swap Settlement appeal); 2:13-cv-14305-BAF-PJK (property of the debtor appeal); and 2:14-cv-13044-BAF-PJK (Mediation Order Appeal) (collectively, the "Syncora Appeals").  As soon as reasonably practicable after Bankruptcy Court approval of this Agreement and the occurrence of the Effective Date with respect to the POA, Syncora will voluntarily dismiss with prejudice the Syncora Appeals.

**3.4    Litigation Support.**    Syncora shall provide such reasonable, active support as may be reasonably requested by the City, the Litigation Trust or any successor plaintiffs in the COP Litigation.

**3.5    Retention of Counsel.**    Syncora shall continue to retain Kirkland & Ellis LLP in connection with satisfying the support obligations set forth in Sections 2.4(a) and 3.2 hereof.

**Section 4        Class 9 Treatment.**

**4.1    Amendment to Sixth Amended POA.**    The City shall amend the Sixth Amended POA as set forth on Schedule 1.

**Section 5        Swap Related Claims; Etc.**

**5.1    Swap Related Claims.**    On the Effective Date or as soon thereafter as practical, the City shall pay the sum of $5 million in full satisfaction of all of Claims filed or asserted against the City by Syncora relating to the COP Swap Agreements and any agreements related thereto, including the COP Swap Insurance Policies and the COP Swap Collateral Agreement.

**Section 6        Representations and Warranties.**

**6.1    Representations and Warranties of the City.**    The City represents to Syncora that:

(a)    It is a municipal corporation of the State of Michigan.

(b)    It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken all necessary action to authorize such execution, delivery and performance.

(c)    Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets.

(d)    Other than (i) approvals by the City Council, the Emergency Loan Board, the State Treasurer, the execution of the  Emergency Manager Order, and the approvals required by Section 19 of Act 436, and (ii) the approval of the Bankruptcy Court, all governmental and Emergency Manager consents and approvals that are required to have been obtained by it as of

4

the date of execution of this Agreement with respect to the execution, delivery and performance of this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

       **6.2**      **Representations and Warranties of Syncora.**  Syncora represents to the City that:

       (a)     It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and in good standing.

       (b)     It has the power to execute this Agreement, to deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary action to authorize such execution, delivery and performance.

       (c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets.

       (d)     All governmental consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with.

       (e)     Syncora owns or insures COPs in the principal amount of $299,155,000.00; Syncora paid insured principal claims in an amount not less than $52,750,000.00; and, as of the Petition Date, Syncora paid insured interest claims in an amount not less than $1,649,692.00.

       (f)     The *Stipulation by and Between the City of Detroit, Michigan and the COPs Creditors Regarding Certain Facts and the Admission of Certain Exhibits for the Confirmation Trial* remains in effect.

**Section 7**       **No Admission.**

       This Agreement is a proposed settlement of claims and disputes among the Parties and is the product of good faith, arm's length negotiations among the Parties hereto. If this Agreement is terminated, this Agreement will not be an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating hereto will not be admissible into evidence in any proceeding. However, this Agreement will be admissible into evidence in any proceeding to obtain court approval of this Agreement or to enforce or interpret the terms of this Agreement, and, subject to any otherwise applicable rules in the Federal Rules of Evidence (other than Federal Rule of Evidence 408), this Agreement may be admitted into evidence in any proceeding arising as a result of or in connection with a Party's breach of this Agreement or in which breach of this Agreement is alleged as a relevant fact. The admissibility of all negotiations related to this Agreement shall be governed by the *Mediation Order* [Docket No. 322] entered by the Bankruptcy Court, as the same has been amended and supplemented. Notwithstanding the foregoing, nothing herein shall limit the scope or effect of the Mediation Order.

**Section 8**          __Termination.__

        Any Party may terminate this Agreement upon one Business Day's prior written notice to the other Party if: (a) the Bankruptcy Court denies approval of this Agreement or the transactions contemplated hereby, the Development Agreement or the transactions contemplated thereby, or the assumption of the Tunnel Lease, as amended pursuant to the First Amendment to Lease dated as of ___, 2014 between the City of Detroit and the Detroit Windsor Tunnel LLC, or confirmation of the POA; (b) if the Confirmation Order is not in form and substance reasonably acceptable to Syncora (solely with respect to any terms thereof that affect the rights of Syncora or any Related Entity with respect to Syncora) or is vacated or reversed on appeal or, after entry, is modified without the terminating Party's consent, in any matter considered by the terminating Party to be adverse to the terminating Party; or (c) the other Party is in material breach of any provision of this Agreement, and such breach is continuing and has not been cured within 5 Business Days.

        In the event that this Agreement is terminated as set forth herein, then neither this Agreement, nor any document filed with the Bankruptcy Court with respect to the approval of this Agreement, will have any res judicata or collateral estoppel effect or be of any force or effect, and each of the Parties' respective interests, rights, remedies and defenses will be restored without prejudice as if this Agreement had never been executed and the Parties will be automatically relieved of any further obligations under this Agreement. For the avoidance of doubt, in the event this Agreement is terminated, Syncora shall retain the right to make any arguments, objections, or other assertions (other than res judicata or collateral estoppel as set forth in the preceding sentence), pursue any litigation, appeals, or other disputes related to confirmation of the POA (or any other plan) or any other matter otherwise resolved by this Agreement.

**Section 9**          __Miscellaneous.__

      **9.1**      **Execution of this Agreement**. This Agreement may be executed and delivered (by facsimile, PDF, or otherwise) in any number of counterparts, each of which, when executed and delivered, will be deemed an original, and all of which together will constitute the same agreement. Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

      **9.2**      **Binding Obligation; Successors and Assigns**. This Agreement is a legally valid and binding obligation of the Parties, enforceable in accordance with its terms, and will inure to the benefit of the Parties and their respective successors, assigns and transferees. This Agreement grants no rights to any third party.

      **9.3**      **Complete Agreement; Interpretation**. This Agreement and the POA constitute the complete agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto. This Agreement is the product of negotiation by and among the Parties. Any Party enforcing or interpreting this Agreement will interpret it in a neutral manner. There will be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party

6

having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

      **9.4**    **Costs**.  Each Party will bear its own costs and expenses (including legal and other professional fees and expenses) incurred in connection with all matters set forth herein, including in connection with Sections 2 and 3 of this Agreement.  Syncora agrees to pay any Allowed Claim for COP Agent Fees held by the COP Agent in accordance with and as set forth in the POA.

      **9.5**    **Amendment, Modification and Waiver**.  This Agreement may be modified, altered, amended, or supplemented only by an agreement in writing signed by each Party.  No waiver of any provision of this Agreement will be effective unless made in a writing signed by the Party making the waiver, nor will the waiver be extend to any other right, claim or remedy.

      **9.6**    **Notices**.  All notices and other communications required under this Agreement will be given in writing and delivered, if sent by telecopy, electronic mail, courier, or by registered or certified mail (return receipt requested) to the following addresses and telecopier numbers (or at such other addresses or telecopier numbers as will be specified by like notice):

      If to the City:

      City of Detroit, Michigan
      1200 Coleman A. Young Municipal Center
      2 Woodward Avenue
      Detroit, Michigan 48226
      Attention: CFO

      with copies (which shall not constitute notice) to:

      City of Detroit Law Department
      First National Building, Suite 1650
      660 Woodward Avenue
      Detroit, Michigan 48226
      Attention: Corporation Counsel

      and

      Jones Day
      222 East 41st Street
      New York, NY 10017-6702
      Attn: Corinne Ball (cball@JonesDay.com)

      If to Syncora:

      Syncora Guarantee, Inc.
      Syncora Capital Assurance Inc.
      Attn: Claude LeBlanc
      135 West 50th Street, 20th Floor

7

New York, NY 10020
claude.leblanc@scafg.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
Attn: Ryan B. Bennett
300 N. LaSalle
Chicago, IL 60654
rbennett@kirkland.com

Any notice given by delivery, mail, or courier will be effective when received. Any notice given by telecopier will be effective upon oral or machine confirmation of transmission. Any notice given by electronic mail will be effective upon oral or machine confirmation of receipt.

       **9.7**    **Headings**. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

       **9.8**    **Governing Law and Jurisdiction**. THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN, WITHOUT REGARD TO ANY PRINCIPLES OF CONFLICTS OF LAW THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees that any dispute with respect to this Agreement will be resolved by the Bankruptcy Court to the extent that the Bankruptcy Court then has jurisdiction and power to enforce the terms of this Agreement. Each of the Parties irrevocably consents to service of process by mail at the addresses listed for such Party in Section 9.6 hereof. Each of the Parties agrees that its submission to jurisdiction and consent to service of process by mail is made for the sole and express benefit of each of the other Parties to this Agreement.

       **9.9**    **Waiver of Jury Trial**. TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

[Signature Pages Follow]

8

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

THE CITY OF DETROIT

By:_____

    Name:

    Title:

SYNCORA GUARANTEE, INC.


By:_____
    Name:
    Title:

SYNCORA CAPITAL ASSURANCE INC.

By:_____
    Name:
    Title:

TUNNEL LEASE AMENDMENT

# FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "**Amendment**") is made and entered into as of the ___ day of _____, 2014 (the "**Date Hereof**"), by and between the City of Detroit, a Michigan municipal corporation (the "**City**"), and Detroit Windsor Tunnel LLC, a Michigan limited liability company ("**Tenant**").

## R E C I T A L S

A.      The City, as landlord, and Tenant, as successor-in-interest to Detroit & Canada Tunnel Corporation ("**DCTC**"), as tenant, are parties to the Tube Lease, dated March 20, 1978 (the "**Tube Lease**"), whereby the City leases to Tenant the portion of the Detroit Windsor Tunnel (the entire such tunnel, the "**Tunnel**") located in Detroit, which portion is more particularly defined in the Tube Lease and referenced herein as the "**Tube**."

B.      The City, as landlord, as successor-in-interest to Ford Motor Properties, Inc. as sublandlord, and Tenant, as tenant, as successor-in-interest to DCTC as subtenant, are parties to the Sublease, dated March 20, 1978 (the "**Plaza Lease**"; together with the Tube Lease, the "**Lease**"), whereby the City leases to Tenant certain property defined in the Plaza Lease as the "New Tunnel Plaza" (such premises, the "**Plaza Premises**"; together with the Tube, the "**Property**").

C.      The term of the Lease (the "**Term**") expires on November 3, 2020, and the period commencing on the Effective Date through and including November 3, 2020 shall be referenced herein as the "**Existing Remainder Term**".

D.      The City desires to enter into a long-term agreement regarding the operation of the Property to assure that (i) the Tunnel will continue to provide to residents of Detroit and to other Tunnel passengers a safe and efficient route between Detroit and Windsor; (ii) the Property will be maintained and enhanced; and (iii), to promote such goals, there is transparency to the City regarding the operation of the Property.

E.      In furtherance of the goals of the City, the Tenant desires to enter into a long-term agreement with the City regarding the leasing and operation of the Property.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      <u>Capitalized Terms; Effective Date</u>.  Any capitalized term used herein and not otherwise defined shall have the meaning ascribed to such term in the Plaza Lease.  "**Effective Date**" means the first day of the month next succeeding the month in which occurs the Date Hereof.

2.      <u>Extension of Term</u>.  The term of the Tube Lease is extended for the period beginning November 4, 2020 and ending on December 31, 2040 (such period, the "**Extension Term**"), upon all the terms and conditions as contained in the Tube Lease and applicable during the Third Renewal Option (as defined in the Plaza Lease), except as amended hereby.  The term

of the Plaza Lease is extended for the Extension Term, upon all the terms and conditions as contained in the Plaza Lease and applicable during the Third Renewal Option (as defined in the Plaza Lease), except as amended hereby.

3.    <u>Existing Term CapEx Credit; CapEx Schedule</u>.

(a)    For any Capital Expenditures (as defined below) paid by Tenant during the Existing Remainder Term (the "**Existing Remainder Term Capital Expenditures**"), Tenant shall receive a credit equal to the amount of such Existing Remainder Term Capital Expenditures (a "**CapEx Credit**") against the aggregate rentals payable by Tenant pursuant to Article IV of the Plaza Lease (such amounts, the "**Rent**") during the Existing Remainder Term; *provided, however*, that the aggregate CapEx Credit to which Tenant is entitled pursuant to this Paragraph 3 shall not exceed the aggregate Rent payable by Tenant during the Existing Remainder Term. Tenant shall not claim a CapEx Credit for any Capital Expenditures paid in advance of the performance of the related work, other than for progress payments customary in the industry (or payments required due to emergency) without the City's prior written approval, which shall not be unreasonably withheld, delayed or conditioned. Subject to Paragraph 5, Tenant may not take a CapEx Credit during the Extension Term for an Existing Remainder Term Capital Expenditure.

(b)    "**Capital Expenditures**" means (i) capital expenditures, as determined by generally accepted accounting principles consistently applied in the United States ("**GAAP**"), paid for work to or at the Plaza Premises and (ii) (x) while the Existing JOA (as defined herein) or any successor agreement between Tenant (or its affiliate) and the City of Windsor (or its instrumentality) (any such agreement, a "**D/W Agreement**") is in effect, 50% of the total capital expenditures, determined in accordance with GAAP, paid by Tenant (or its affiliate) and the City of Windsor (or its instrumentality) pursuant to a D/W Agreement for work to or at all or any portion of the underground tube of the Tunnel (i.e., the tube from and including the Detroit portal to and including the Windsor portal; such tube, the "**Underground Portion**"); provided, however, that Capital Expenditures made to the Underground Portion while a D/W Agreement is in effect shall be made such that the Detroit side of the Underground Portion is in a condition commensurate with the condition of the Windsor side of the Underground Portion; or (y) if no D/W Agreement is in effect, 100% of the capital expenditures, determined in accordance with GAAP, paid by Tenant for work to or at all or any portion for the Tube.

(c)    Within ninety (90) days after the Effective Date, Tenant shall provide the City a detailed plan and schedule for the capital improvements planned to be made to the Tunnel during the year in which the Effective Date occurs and the approximately five (5) years following the Effective Date. On or before each January 31st during the Term, Tenant shall deliver to the City an annual update of such plan together with a plan for the succeeding five (5) years.

4.      Extension Term CapEx Credit.

(a)     For any Capital Expenditures paid by Tenant during the Extension Term (the "**Extension Term Capital Expenditures**"), Tenant shall receive a CapEx Credit against the Rent payable by Tenant during the Extension Term equal to the amount of such Extension Term Capital Expenditures; *provided, however*, the aggregate CapEx Credit to which Tenant is entitled during the Extension Term pursuant to this Paragraph 4 shall not exceed $8,000,000; and *provided, further,* that the annual CapEx Credit claimed by Tenant under this Paragraph 4 in any given calendar year of the Extension Term shall not exceed 75% of the Rent payable for such calendar year (but such annual limitation shall not in any way reduce the aggregate CapEx Credit to which Tenant is entitled under this Paragraph 4). If the Lease (as amended from time to time) terminates prior to December 31, 2040, other than due to a default by Tenant, then the City shall pay to Tenant, on thirty (30) days' written notice from Tenant, the amount of CapEx Credits that have accrued to Tenant but have not been applied against the Rent.

(b)     No more than sixty (60) days prior to November 4, 2020, Tenant shall provide the City a high-level, strategic plan for the capital improvements that may be made to the Tunnel during the Extension Term to the extent such plan is known or is customary in the tunnel operations field.

5.      CapEx Credit Documentation.

(a)     Tenant may offset the amount of any accrued but uncredited CapEx Credits against any monthly payments of Rent, subject to the limitations in Paragraphs 3 and 4. On or prior to the date of claiming any CapEx Credit (i.e., on or before the date of payment of any monthly installment of Rent, or if none is payable, on or before the date such monthly installment of Rent would otherwise have been payable) or requesting payment pursuant to the last sentence of Paragraph 4(a), Tenant shall submit to the City a notice setting forth the amount of the claimed CapEx Credit, together with reasonably detailed written documentation of the Capital Expenditures (and the work associated therewith) for which Tenant is entitled to a CapEx Credit (such notice, a "**CapEx Notice**"). Within five (5) days after receipt of any CapEx Notice, the City shall have the right to ask for reasonable additional information to verify such Capital Expenditures were paid and to determine the nature of work associated with such Capital Expenditure. If the City in good faith believes that a CapEx Credit was claimed for an expenditure that does not fall within the definition of "Capital Expenditure," as such term is defined in Paragraph 3(b) above, then the City shall give Tenant notice thereof (a "**Dispute Notice**") within fifteen (15) days after receipt of the applicable CapEx Notice, and the date on which Rent is due shall be extended by fifteen (15) days. If the City timely delivers a Dispute Notice, Tenant shall receive the portion of the CapEx Credit that is undisputed, if any, and shall pay the amount of disputed Rent, subject to the provisions of Article XVIII(2) of the Plaza Lease regarding disputed payments.

(b)    Notwithstanding anything to the contrary in the Lease, as amended hereby, if the City timely provides a Dispute Notice in connection with a CapEx Credit claimed for Existing Remainder Term Capital Expenditures, and if and to the extent such dispute is resolved in Tenant's favor, then the City shall promptly pay an amount equal to the formerly disputed CapEx Credit to Tenant, or at Tenant's option, Tenant may credit such formerly disputed CapEx Credit against the Rent next coming due; provided, however, if (i) the aggregate accrued but unapplied CapEx Credit to which Tenant is entitled under Paragraph 3, plus the formerly disputed CapEx Credit, exceed the aggregate Rent payable during the portion of the Existing Remainder Term commencing at the time the dispute is resolved; or (ii) at the time the dispute is resolved, the Existing Remainder Term has ended; then in addition to, and without in any way reducing, the CapEx Credits to which Tenant is entitled under Paragraph 4, Tenant may take such formerly disputed CapEx Credit as a credit against the Rents payable during the Extension Term. Notwithstanding the foregoing, in no event shall Tenant be entitled to aggregate CapEx Credits for the Existing Remainder Term Capital Expenditures in excess of the aggregate Rent payable during the Existing Remainder Term.

(c)    Notwithstanding anything to the contrary in the Lease, as amended hereby, if the City timely delivers a Dispute Notice in connection with a CapEx Credit claimed for Extension Term Capital Expenditures, and if and to the extent such dispute is resolved in Tenant's favor, then the City shall promptly pay an amount equal to the formerly disputed CapEx Credit to Tenant, or at Tenant's option, Tenant may credit such formerly disputed CapEx Credit against the Rent next coming due (in addition to, and not in limitation of, any CapEx Credit due under Paragraph 4). Notwithstanding the foregoing, in no event shall Tenant be entitled to aggregate CapEx Credits for Extension Term Capital Expenditures in excess of $8,000,000.

(d)    The provisions of this Paragraph 5 shall survive the expiration or sooner termination of the Lease, as amended hereby.

6.    <u>Repair and Maintenance Standards</u>.  Notwithstanding anything to the contrary in the Lease, but subject to the casualty and condemnation provisions therein, Tenant shall maintain the Property in a good and safe condition and repair, in compliance with all applicable laws, and in accordance with the following sections of the Existing JOA (as defined below): Sections 8.1(d), (e) and (f), and the first grammatical paragraph of Section 8.1; Sections 8.3(a), (b) and (c); Section 8.4; Section 8.6;  Section 9; Exhibit 8.1 and Sections 1, 2 and the first paragraph of Section 3 of Exhibit  9.1, provided that the second sentence of that first paragraph of Section 3 of Exhibit 9.1 shall be replaced with "The program shall include regular and customary cleaning and grounds maintenance."    In the event that the Existing JOA is terminated or amended, these standards shall continue to apply (to the extent applicable).

7.    <u>Reporting</u>.  In addition to its reporting obligations under the Lease, but subject to Paragraph 10 hereof, Tenant shall deliver, at its sole cost and expense, the following reports and information to the City:

(a)     Within one hundred eighty (180) days following the end of each calendar year ending during the term of the Lease: (i) a copy of the audited balance sheets of Tenant at the end of each such calendar year and the related audited statements of income, calculation of annual rental, changes in equity and cash flows for such year, including, in each case, the notes thereto, together with the report thereon of the independent certified public accountants of Tenant, in each case in a manner and containing information consistent with Tenant's current practices and certified by Tenant's chief financial officer that such financial statements fairly present the financial condition and the results of operations, changes in equity and cash flows of Tenant as at the respective dates of and for the periods referred to in such financial statements, all in accordance with generally accepted accounting principles in the United States consistently applied; (ii) a report, in a format reasonably acceptable to the City, certified by the Tenant's chief financial officer, providing reasonably detailed information regarding any work associated with Capital Expenditures undertaken by the Tenant with respect to the Property, including such information as may be reasonably requested by the City, which shall include the type of work associated with such Capital Expenditures, the expected cost therefor, the expected completion date, the contractor engaged to perform such work associated with such Capital Expenditures, and any expected disruption of traffic in the Property as a result of the work associated with such Capital Expenditures; and (iii) a report, in a format reasonably acceptable to the City, detailing the amount of traffic through the Property on a weekly, monthly and quarterly basis, the make-up of that traffic and the Tenant's projections for the traffic in the upcoming calendar year and the Tenant's basis therefor;

(b)     Within thirty (30) days after the end of each six-month period, commencing with the six-month period ending June 30, 2015, a report, in a format reasonably acceptable to the City, detailing all material incidents that occurred in the Tunnel, including, but not limited to, vehicular accidents and hazardous material releases, but in each case only if such incidents materially impeded the normal operations of the Tunnel;

(c)     promptly after the occurrence thereof, an email report on any incident occurring in the Tunnel and causing material damage to property or injury to persons, if such incident results in the closure of any portion of the Tunnel for at least an hour;

(d)     within thirty (30) days after receipt by Tenant, a copy of (i) the engineering reports required by Sections 8.7 and 8.8 of the Joint Operating Agreement by and among the Corporation of the City of Windsor, the Windsor Tunnel Commission and Tenant (as successor-in-interest to DCTC and The Detroit and Windsor Subway Company, Ltd.) dated November 1, 1997 (the "**Existing JOA**"); or (ii) if the Existing JOA is amended or modified to change the requirements for those reports, (x) every year, an engineering report based on visual inspection of the Tunnel made by an independent, licensed engineer reasonably acceptable to Tenant and (y) every five (5) years a comprehensive engineering report on the Tunnel prepared by an independent, licensed engineer reasonably acceptable to

the City, which report shall include, but not be limited to, an analysis of the structural integrity of the Tunnel, a description of the current state of the Tunnel, including its fixtures and mechanical systems, recommended capital expenditures for the Tunnel and such other information as the City may reasonably request; and

(e)     Within thirty (30) days after such request, any information regarding the Property reasonably requested by the City, provided that such information is in the possession or control of Tenant.

8.     <u>Right to Inspect</u>.  The City shall have the right, upon at least three (3) business days' written notice to Tenant, at reasonable times, provided that such inspection does not unreasonably interfere with the normal operation of the Property (and as to any portion of the Property subleased as of the date hereof or subsequently subleased to a governmental authority, does not violate the applicable sublease) and at the City's sole cost and expense, to have the Property inspected by an engineer, who is (i) either employed directly by the City or with whom the City has contracted; and (ii) licensed and has at least ten (10) years' experience in engineering matters related to construction, maintenance and repair of infrastructure projects or tunnels.  Inspections made pursuant to this Paragraph 8 may only be performed once in each calendar year, except such limitation shall not apply when Tenant is in default of its obligations under Paragraph 6 of this Amendment or any other of its obligations regarding the repair, maintenance and operation of the Tunnel.  Tenant shall make the Property and a senior officer who is responsible for maintenance and/or operations of the Property reasonably available to such engineer for the purposes of such inspection and shall provide such engineer any documentation in Tenant's possession or control, reasonably requested by such engineer, subject to Paragraph 10.  Without limiting any provision hereof, any such engineering inspections conducted by or on behalf of the City shall be performed in accordance with all applicable laws and with all reasonable operating rules and regulations applicable to the Property.  The City shall cause any individual or firm performing an inspection pursuant to this Paragraph 8 to be bound by the confidentiality obligations of the City pursuant to the provisions of Paragraph 10 hereof.

9.     <u>Calculation of Net Operating Income</u>.  For the avoidance of doubt, in calculating "net operating income" as defined in Section IV(2)(b) of the Plaza Lease, Tenant shall not include any expenses that are not attributable to the operation, maintenance and repair of the Property or to Tenant's obligations under the Lease; and, to the extent Tenant or Tenant's affiliates incur costs that are only partially attributable to the Property, Tenant shall not include as an expense for Section IV(2)(b) of the Plaza Lease the portion of those costs that are not attributable to the Property.  Allocations will be prepared consistent with GAAP and the specific methodology and allocation shall be reflected and set forth in the companies' audited financial statements.

10.     <u>Confidentiality</u>.

(a)     Notwithstanding anything to the contrary in the Lease, no information or document provided by Tenant to the City pursuant to or in connection with the Lease, as amended hereby, shall be subject to any confidentiality restrictions, and the City may publicly disclose such information or disclose such information to

third parties as it deems appropriate in its sole discretion; *provided, however*, that Tenant shall have no obligation to deliver to the City (and Tenant may redact from information it delivers to the City) any Confidential Information (as defined below); and *provided, further*, that if Tenant delivers to the City any Confidential Information (and labels it as such), then the City shall not disclose such information to third parties (other than to its professional advisors, employees, third-party report providers, affiliates, officers, members, underwriters, agents, consultants, lenders, investors and legal counsel and as to those, only on a need-to-know basis, as reasonably determined by the City, provided such parties are bound by the confidentiality obligations of the City set forth in this Paragraph 10).

(b) "**Confidential Information**" means information that (i) relates to maintaining national security and/or to maintaining security at the Tunnel; (ii) is required to be kept confidential by applicable law, regulation or order; or (iii) is a trade secret or is other information that is proprietary to Tenant (including, without limitation, information regarding Tenant's proprietary toll and revenue collecting and accounting system and Tenant's mobile app for express payments, and other technical and business information relating to Tenant's proprietary ideas, patentable ideas, copyrights, and other proprietary systems and software).

(c) If Tenant chooses to withhold Confidential Information from the City, Tenant shall promptly provide written notice that it has done so. The City, through its authorized representative, shall have the right, upon reasonable advance written notice to Tenant, to inspect any Confidential Information, which shall not be redacted, at the offices of Tenant within the City to verify during customary business hours that such information is Confidential Information and to review such Confidential Information, provided that the City may not make a copy of such Confidential Information.

(d) Notwithstanding anything to the contrary in Lease (as amended hereby), in an effort to ensure that the City, Tenant and the City of Windsor can effectively and efficiently operate the Tunnel in an integrated and seamless manner, the City shall have the right to share with Windsor all information regarding the Tunnel it receives, and Tenant shall cause it and its affiliates to not restrict the City of Windsor, or its affiliates, from providing the City any information related to the Tunnel.

(e) Nothing contained in this Lease (as amended hereby) shall be construed to limit or reduce the rights and powers of the State of Michigan or the United States of America.

11. <u>Ineligible Parties</u>. It shall be a default under the Lease, as amended hereby, if any Ineligible Party (as defined below) shall be involved in the operation, financing, construction or management of the Property or the improvements thereon, or if such Ineligible Party has a direct or indirect beneficial interest in Tenant. "**Ineligible Party**" means any individual or entity, or any entity controlled by, controlling or under common control with any individual or entity, maintaining a controlling interest in any crossing of the border between the State of Michigan

and Canada, such as any tunnel, bridge or other similar infrastructure; *provided, however* that the term "Ineligible Party" shall not include Pike Pointe Holdings, LLC; any entity controlled, controlling or under common control with Pike Pointe Holdings LLC; or Windsor.

12.    <u>Operation of an Integrated Tunnel</u>.  The parties acknowledge that it is in their respective and joint interests to cause the entire Tunnel to be operated in a harmonious and integrated manner.   The City understands that to effect such operation, Tenant intends to negotiate a new or amended operating agreement with the City of Windsor (or an agency or instrumentality thereof), and that Tenant will negotiate such agreement in good faith (but that Tenant shall have no obligation to enter into such an agreement).  The City also understands that achieving such purpose may require amendments to the Lease  (as amended hereby) and agrees to be reasonable, and to act in good faith, in discussing and considering any such amendments. For avoidance of doubt, (i) Tenant will not have any obligation to enter into any such amendment that would (x) adversely affect (other than in a de minimis manner) its rights under the Lease, as amended hereby, (y) increase (other than in a de minimis manner) its obligations under the Lease, as amended from time to time or (z) decrease (other than in a de minimis manner) the City's obligations under the Lease, as amended from time to time; and (ii) the City will not have any obligation to enter into any such amendment that would (x) adversely affect (other than in a de minimis manner) its rights under the Lease, as amended hereby, (y) increase (other than in a de minimis manner) its obligations under the Lease, as amended from time to time or (z) decrease (other than in a de minimis manner) Tenant's obligations under the Lease, as amended from time to time.

13.    <u>Notices</u>.   Article XVIII(3) of the Plaza Lease and Article XV(3) of the Tube Lease are each amended and restated as follows:

3. All notices and other communications authorized or required hereunder, to be given to the City or the Tenant, shall be in writing and shall be given by hand delivery or by nationally recognized overnight courier to the following addresses:

If to the City, to

**The City of Detroit**
Office of the Mayor
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 1126
Detroit, MI 48226
Attn: Mayor

with a copy to (which will not constitute notice):

**The City of Detroit**
Law Department
Coleman A. Young Municipal Center
2 Woodward Avenue, 5th Floor
Detroit, MI 48226
Attention: Corporation Counsel

If to Tenant, to

> Detroit Windsor Tunnel LLC
> 100 East Jefferson Avenue
> Detroit, MI 48226
> Attn: Neal Belitsky

with a copy to

> Dykema Law Firm
> 400 Renaissance Center
> Detroit, MI 48243
> Sherrie L Farrell, Esq.

Notices shall be effective if given by a party's attorneys. Any party may change its address for notices by a notice given in accordance with this section. Notices shall be deemed given and received on the date received, as evidenced by receipt.

14. <u>Counterparts</u>. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

15. <u>Conflict</u>. In the event the terms of the Lease conflict with the terms of this Amendment, the terms of this Amendment shall control and govern in all instances.

16. <u>Full Force and Effect</u>. The Lease, as modified hereby, remains in full force and effect.

17. <u>Severability</u>. If any provision of this Amendment or the application thereof to any person or circumstances shall, to any extent, be declared invalid, illegal or unenforceable by a court of competence jurisdiction, all other provisions and applications hereof shall remain in full force and effect.

18. <u>Inter-Governmental Authority</u>. Expressly subject and subordinate to the terms of the Lease (as amended hereby and as amended from time to time), the City may enter into an agreement with Windsor to establish an intergovernmental authority concerning the Tunnel. For avoidance of doubt, no such agreement shall adversely affect (other than in a de minimis manner) Tenant's rights nor increase (other than in a de minimis manner) its obligations under the Lease, as amended from time to time.

19. <u>Memorandum of Lease</u>. This Amendment shall not be recorded; *provided, however,* that upon the request of either party, the other party shall join in the execution of a memorandum or short form of the Lease, as amended hereby, which shall describe the parties, the Demised Premises, the term of the Lease, and special provisions and shall incorporate the Lease, as amended hereby, only by reference.

*[**Signature page follows**]*

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

**CITY:**

CITY OF DETROIT

By: _____

    Name:

    Title:


**TENANT:**

DETROIT WINDSOR TUNNEL LLC

By: _____

    Name:

    Title:

OPTION AGREEMENT

# OPTION AGREEMENT

THIS OPTION AGREEMENT (this "**Agreement**") is made and entered into as of the ___ day of _____, 2014, by and between Pike Pointe Holdings, LLC ("**Pike Pointe**") and the City of Detroit, a Michigan municipal corporation (the "**City**").

## R E C I T A L S

A.     The City owns that certain parking garage, commonly known as the Grand Circus Parking Garage, located at 1600-01 Woodward Avenue, Detroit, Michigan, as more particularly described in Exhibit 1 (the "**Circus Garage**").

B.     The Detroit Building Authority (the "**DBA**") had previously owned the Circus Garage and had leased it to the City pursuant to the Contract of Lease No. 2 by and between the City and the DBA, dated October 1985, (as amended, the "**DBA Lease**").

C.     The DBA Lease has previously terminated pursuant to its terms, and pursuant to the terms of the DBA Lease, title to the property leased thereunder, including the Circus Garage, reverted back to the City.

D.     Syncora Capital Assurance Inc. and Syncora Guarantee Inc. (collectively, "**Syncora**") own the entire beneficial interest in Pike Pointe.

E.     Syncora, through one or more of its affiliates, including Pike Pointe, owns and operates certain public infrastructure projects.

F.     In connection with the continued improvement of the City, the City desires to grant an option to Pike Pointe with respect to the possibility of negotiating and entering into a mutually agreeable concession agreement for the operation and maintenance of the Circus Garage pursuant to the terms of this Agreement, and Pike Pointe desires to accept such option.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Option.  Pike Pointe shall have the option, in its sole discretion, to enter into a concession for the Circus Garage (the "**Option**") on the terms set forth herein.  In order to exercise the Option, Pike Pointe must deliver written notice to the City notifying the City that Pike Pointe has exercised the Option (the "**Exercise Notice**"), which Exercise Notice must be delivered within one (1) year from the effective date of the Seventh Amended Plan for the Adjustment of Debts of the City of Detroit, as it may be further amended and as modified (the "**Plan of Adjustment**").  After delivery of the Exercise Notice, the City and Pike Pointe shall promptly and in good faith, negotiate a concession agreement in accordance with the terms set forth in Exhibit 2; provided, however, that neither party shall be obligated to execute a concession agreement.  If, within ninety (90) days following the delivery of the Exercise Notice, an agreement has not been reached between the City and Pike Pointe regarding the Circus Garage, either party may, by delivery of notice to the other party, terminate this Option, and thereafter Pike Pointe shall have no right with respect to the Circus Garage.

2.  <u>Failure to Exercise</u>.  If Pike Pointe fails to send the Exercise Notice within one (1) year after the effective date of the Plan of Adjustment, Pike Pointe will be deemed to have not exercised the Option and will have no further right to do so nor shall it have any interest in the Circus Garage.  At such time, this Agreement and the Option will have no further force or effect.

3.  <u>Anti-Assignment</u>.  Pike Pointe may not assign to any third party (other than a wholly owned subsidiary or other affiliate of Syncora in which Syncora is the direct or indirect beneficial owner (a "**Pike Pointe Affiliate**"), any interest in this Agreement or the Option without the City's prior written consent, which consent may be withheld in the City's sole discretion.  Any attempted assignment without the City's consent shall be void ab initio and of no force and effect, and such purported transferee shall have no right to exercise the Option nor shall it have any interest in the Circus Garage.  Notwithstanding anything to the contrary in this Agreement, Pike Pointe shall have no right to exercise the Option if, at the time of such exercise and the execution of the Concession Agreement, Syncora is not a direct or indirect beneficial owner of Pike Pointe.

4.  <u>Title to Circus Garage</u>.   The City shall cause the DBA to execute such documentation as is necessary to confirm the transfer of ownership of the Circus Garage to the City promptly after execution of this Agreement.   The City shall retain title to the Circus Garage during such time as Pike Pointe has the right to exercise the Option and shall maintain the Circus Garage in at least the same condition and repair as of the date hereof.

5.  <u>Development Agreements</u>.  Pike Pointe hereby acknowledges that the City has entered into certain development agreements with third party developers, which agreements contemplate that those developers will have the right to use parking spots within the Circus Garage at fair market rates (as determined by Pike Pointe from time to time and consistent with the rates provided to other patrons of the Circus Garage), and Pike Pointe agrees that it shall execute leases, licenses or other usage agreements with such developers on those terms.  The City will provide the material terms and conditions of those development agreements with respect to developers' use of Circus Garage as soon as is reasonably practicable following execution of this Agreement.

6.  <u>Due Diligence Activities</u>.

(a)  Prior to delivery of the Exercise Notice, Pike Pointe shall have a period commencing on the date hereof and continuing through and including the date of the delivery of the Exercise Notice or the expiration or termination of this Option, whichever is sooner, (the "<u>Due Diligence Period</u>") to conduct its due diligence activities on the Circus Garage, which shall not unreasonably interfere with the use and operation of the Circus Garage.   For purposes of this Agreement, "<u>Due Diligence Activities</u>" include but are not limited to the following:

(A)  such physical inspections, soil borings and bearing tests, surveys, and possible relocation of utilities on or for the Circus Garage as Pike Pointe deems appropriate, all of which shall be completed at Pike Pointe's expense;

(B)     investigations, environmental site assessments, including Phase I and Phase II site assessments, sampling and testing of soil, groundwater, surface water, soil vapors, indoor air, and building materials (such as Asbestos and lead-based paint), and/or a Baseline Environmental Assessment, ("**BEA**"), as defined in Part 201 of the Natural Resources and Environmental Protection Act ("**NREPA**"), being MCL 324.20101 et seq., and such other investigations and assessments as Pike Pointe may deem needed in its sole discretion to determine the condition of the Circus Garage and the Circus Garage's compliance with applicable law, all of which shall be completed at Pike Pointe's expense; and

(C)     a review of the title evidence, survey, entitlements, and payment of taxes and assessments, all of which shall be completed at Pike Pointe's expense;

(D)     a review of financing sources related to Pike Pointe's proposed use of the Circus Garage, or any other matter that in Pike Pointe's sole discretion is relevant to Pike Pointe's use of the Circus Garage;

(E)     a review of all City Information and all publicly-available information with respect to the Circus Garage;

(F)     a review of available public and private utilities and public accesses necessary for the proposed use of the Circus Garage; and

(G)     application and procurement of any zoning, site plan, elevation, special land use, environmental, conditional use or other municipal approvals or permits, or variances therefrom, required or appropriate for the proposed use of the Circus Garage.  The City hereby authorizes Pike Pointe to submit and apply for all such approvals, permits, and variances upon the commencement of the Due Diligence Period.

(b)     <u>Restoration of City Property</u>.  Promptly following completion of a Due Diligence Activity, Pike Pointe shall restore the Circus Garage and all property therein to the state in which it existed prior to the commencement of the Due Diligence Activity.

(c)     <u>City Information</u>.  The City shall use reasonable efforts to make available to Pike Pointe all information in the City's (or the City's agencies' or departments') possession or control related to the Circus Garage within thirty (30) days following the effective date of the Plan of Adjustment, including but not limited to existing leases, licenses, permits, approvals, contracts, warranties, title searches and policies, surveys, appraisals, environmental audits, Phase I environmental site assessments, Phase II reports or other testing or sampling data, asbestos surveys, reports, specifications, from the Planning, Building, Assessing, Environmental

Affairs and Fire Departments, notices of violations of applicable laws, regulations and ordinances or other documents in the City's possession or control related to the Circus Garage, to the extent the City is not required by law or applicable agreement to keep such information confidential (collectively, the "**City Information**").  The City shall cooperate with Pike Pointe and use reasonable efforts to facilitate Pike Pointe's Due Diligence Activities, all at no material incremental cost to the City, including providing information, coordinating with third party users of the Circus Garage as applicable, and executing such documentation as may be reasonable and necessary for Pike Pointe's access to the site and  completion of the Due Diligence Activities including the preparation of a BEA.

(d)     <u>Insurance</u>.  Prior to entering onto the Circus Garage for any Due Diligence Activities, Pike Pointe or its contractors shall enter into a right-of-entry agreement regarding the entry into the Circus Garage to be reasonably agreed to by the City and Pike Pointe.

(e)     <u>Indemnity</u>.  Pike Pointe shall defend, indemnify and hold harmless the City from and against any loss, liability, cost or expense incurred by the City to the extent resulting from Pike Pointe's (including its duly authorized employees, agents, engineers or other representatives) negligence or willful acts occurring in connection with the Due Diligence Activities; provided, however, that Pike Pointe shall in no circumstance have any obligation or liability with respect to any conditions pre-existing at the Circus Garage including without limitation any environmental condition, soil or groundwater contamination or other environmental conditions that may be discovered in the course of the Pike Pointe's Due Diligence Activities and thereafter disclosed to the City, except to the extent such conditions are materially exacerbated due to the negligence or willful acts of Pike Pointe or any of its duly authorized employees, agents, engineers or other representatives, and (ii) Pike Pointe shall not be responsible for any loss, liability, cost, or expense resulting from the discovery of any adverse information or condition regarding the Circus Garage or from the City's (or the City's agencies' or departments') negligence or misconduct.

7.     <u>Notices</u>.  All notices, demands and other communications given or delivered under this Agreement shall be given in writing to the address indicated below (or such other address as the recipient specifies in writing) and will be deemed to have been given when delivered personally, three (3) business days after mailed by certified or registered mail, return receipt requested and postage prepaid, or when delivery is guaranteed if sent via a nationally recognized overnight carrier, or when receipt is confirmed if sent via facsimile or other electronic transmission to the recipient with telephonic confirmation by the sending party.

**[The City of Detroit**
Office of the Mayor
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 1126
Detroit, Michigan 48226

Facsimile: (313)224-4128
Attention: Mayor ]


with a copy to (which will not constitute notice):

        The City of Detroit
        Law Department
        Coleman A. Young Municipal Center
        2 Woodward Avenue, 5th Floor
        Detroit, Michigan 48226
        Telephone: (313)224-1352
        Facsimile: (313)224-5505
        Attention: Corporation Counsel


with a copy to (which will not constitute notice):

        The City of Detroit
        Municipal Parking Department
        1600 W. Lafayette
        Detroit, Michigan 48216
        Telephone: (313)221-2500
        Facsimile: (313)221-2501
        Attention: Director of Municipal Parking

        **[Pike Pointe]**

        _____
        _____
        _____
        _____

       8.     <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

       9.     <u>Time of Essence</u>.  Time is of the essence of this Agreement.

       10.     <u>Severability</u>.  If any provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be declared invalid, illegal or unenforceable by a court of competence jurisdiction, all other provisions and applications hereof shall remain in full force and effect.

       11.     <u>Merger of Prior Agreements</u>.  This Agreement supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof.

       12.     <u>Governing Law; Venue</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan.  By its execution and delivery of this

Agreement, each of the City and Pike Pointe irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement, or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding shall be brought in the Bankruptcy Court for so long as it has jurisdiction, and thereafter in the United States District Court for the Eastern District of Michigan; provided that if the United States District Court for the Eastern District of Michigan does not have jurisdiction, then such legal action, suit or proceeding shall be brought in such other court of competent jurisdiction located in Wayne County, Michigan. By execution and delivery of this Agreement, each of the City and Pike Pointe irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding and specifically consents to the jurisdiction and authority of the Bankruptcy Court to hear and determine all such actions, suits, and proceedings under 28 U.S.C. §157(b) or (c), whichever applies.

13.    _Amendments_.  Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by the parties hereto.

14.    _Captions_.  The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and will not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement will be enforced and construed as if no caption had been used in this Agreement.

15.    _Successors and Assigns_.  This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their permitted respective successors, heirs, administrators and assigns.

16.    _No Strict Construction_.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent.  In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

[*Signature page follows*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**CITY:**

CITY OF DETROIT

_____

By:
Its:


**TENANT:**

[PIKE POINTE]

_____

By_____
Its _____

## EXHIBIT 1

## DESCRIPTION OF GRAND CIRCUS PARKING GARAGE

Grand Circus is a three level underground parking structure, situated below the two parcels described below.  Grand Circus includes all ramps, walkways, stairwells and other ingress and egress points to the parking structure existing as of the date hereof.

**Parcel 02001886: 1883 Woodward Ave**
Legal Description: W WOODWARD ALL THAT PT OF GOVERNOR AND JUDGES PLAN BOUNDED BY WOODWARD AVE, E ADAMS ST & PARK AVE A K A WLY PT OF GRAND CIRCUS PARK2/--- 357 IRREG
**Parcel 01004139: 1600 Woodward Ave**
Legal Description: E WOODWARD ALL THAT PT OF GOVERNOR & JUDGES PLAN BOUNDED BY WOODWARD AVE, E ADAMS AND WITHERELL STS A K A ELY PT OF GRAND CIRCUS PARK1/--- 357 IRREG

## EXHIBIT 2

## CONCESSION AGREEMENT TERMS

- 30 year term, structured as a concession agreement
- Pike Pointe (or a Pike Pointe Affiliate) is obligated to operate and maintain the Circus Garage during the term at its sole cost and expense and has the right to collect all parking revenue derived from the Circus Garage
- Pike Pointe (or a Pike Pointe Affiliate) shall be responsible, at its sole cost and expense, for all necessary capital expenditures to the Circus Garage, including, without limitation, $13.5 million in capital expenditures during the first 5 years of the term.
- Rent to the City will be calculated as 25% of Free Cash Flow. Free Cash Flow is defined as revenue collected from the Circus garage minus operating expenses minus capital expenditures, which shall not include the $13.5 million in initial capital expenditures made by Pike Pointe.
- No Rent shall be due to the City until Pike Pointe has received a return of 140% on its initial capital expenditures of $13.5 million.
- Pike Pointe (or a Pike Pointe Affiliate) will enter into market-rate long term leases, licenses or usage agreements with the developers of properties adjacent to the Circus Garage pursuant to existing development agreements between the City and such developers.