Jamie S. Fields (P-52808)\
Attorney-at-Law
555 Brush #2409
Detroit, Michigan 48226
313-570-3906
jeansartre@msn.com

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re | Chapter 9 |
| City of Detroit, | Case No. 13-5384 |
| Debtor | Hon. Stephen W. Rhodes |

**OBJECTIONS IN OPPOSITION TO THE SEVENTH AMENDED PLAN FOR**
**THE ADJUSTMENTS OF DEBTS OF THE CITY OF DETROIT OF CREDITORS**

WILLIAM OCHADLEUS, SHELTON HAYES, SHIRLEY BERGER, JOHN CLARK, FREDERICK T. McCLURE JR., JIM BENCI, JANICE BUTLER, MORRIS WELLS, DEBORAH WARD, MELVIN F. WILLIAMS SR., SARAH GIDDENS, KIMBERLY ANN SANDERS, JACKIE FULBRIGHT, ED GAINES, CATHERINE TUTTLE, RITA SERRA, MARTIN TREADWELL, JOHN J. O'NEILL, BARBARA TRIPLETT-DECREASE, ROY MCCALISTER, POLLY MCCALISTER, JESSIE BANKS, HENRY ELLIS, GAIL WILSON TURNER, LOLETHA PORTER COLEMAN, AFFORD COLEMAN, LESTER COLEMAN, DEBORAH LARK, MOSES LARK, SHARON COWLING, MICHAEL COWLING, ROBERT JACKSON, RASHELLE PETTWAY, MICHAEL A. ADAMS, JOHN HAWKINS, LAURA ISOM, DUANE MCKISSIC, HERBERT MORELAND, CYNTHIAN DIANE MORELAND, KEITH JACKSON SR., DEBORAH ROBINSON, JAMES ALEXANDER JR., BRENDA GOSS ANDREWS, LAWRENCE PORTER, JAMIE FIELDS, RICARDO C. JENKINS, JACQUELINE JACKSON, TOMMIE CARODINE, DEBRA J. FAIR, ROBBIN RIVERS, JAMES R. YOUNGER, JOE SMITH, ROSCOE MAYFIELD, CHARLES BARBIERI, JAMES JONES, CRAIG SCHWARTZ, REGGIE BARNES, GLENDA COLE-DIXON, WALTER LONG JR., GEORGE GRAVES, CALVIN ADKINS, JACK ALIOTTA, TERRANCE ANDERSON, DAVID ANDERSON, NANCY YOUNG FOWLER, GEORGE CHESTER, ANTHONY KLUKOWSKI JR, TODD KLUKOWSKI, ROGER KLUKOWSKI, MIKE FOLEY, LOIS KLUKOWSKI-HOGEN, ANDY SMITH, PATRICIA E. MCCABE, PATTI GRAVES, JEANNETTA WASHINGTON, GREG JONES, PAULA DAY, DEBORAH MCCREARY, GREG JONES, ANDREW WHITE, CHRISTINE MARIE JEPSEN, JOHN JEPSEN, ALICIA TERRY, JOYCE DANIEL, BRYAN GLOVER, TOBI ASCIONE YOUNG, GREG HUIZAR, LORI GALLMAN, BEVERLY HOFFMAN-NICHOLS, BARABARA STAFFORD, MICELLE PIERSON, SHELLEY I. FOY, PARRIE LEE HIGHGATE, RENEE ELLIS-SUMPTER, DAVID POMEROY, JIM LEMAUX SHELLEY HOLDERBAUM, KEITH OLENIACZ, EDGARDO APONTE, JON GARDNER, JUDITH NORWOOD, KENNETH EMERSON, PATRICIA LOFTON DANIEL P. ROOT, KAREN LESKIE, ROOSEVELT LAWRENCE JR., SONJA HOLLIS, DEREK HICKS, MARSHA THOMPSON-KIDD, WILLIAM ANDERSON, YVONNE WILLIAMS JONES, LULA MILLENDER, WILLIAM DAVIS, EVELYN OWEN SMITH, CECILY MCCLELLAN, PAULETTE BROWN, JESSE J. FLORENCE SR., BELINDA A. MYERS-FLORENCE, LINDA WHITE, STEVE LEGGATT

The forgoing City retirees, employees and beneficiaries submit this objection to the City's *Seventh Amended Plan* (the "Plan") (Doc.7502) that were unripe, unknown or unknowable when the objectors filed their objections to the City's *Sixth Amended Plan* with this Court. Since the City submitted *Seventh Amended Plan* in the middle of the confirmation trial this objection necessarily includes discussion of certain evidence presented that conflicts with the City's Plan.

## I. PRELIMINARY STATEMENT

Despite the City's ample opportunities to remedy key defects, the Plan is unconfirmable under settled bankruptcy principles. Indeed, in light of its shortcomings, the Court should deny confirmation summarily and send the City back to the drawing board. The City's failure to show a nexus between its financial projections and improved services cannot be cured. Bankruptcy has provided a unique opportunity to revitalize a great City that must not be squandered.

The City fails to address – much less resolve – a fatal defect. Why should the City be trusted now when it trumpets the baleful consequences of unfunded liabilities but it is loath to address how underfunding impacts on its costs and its ability to meet future pension obligations Pension shortfalls are largely attributable to the 2008-09 financial crisis which Ben Bernanke, the former head of the Federal Reserve, said "was the worst in global history, surpassing even the Great Depression" (CNN Money, 2013). Therefore, any "unfunded" liability may very well disappear well before much of it needs to be paid out because of improved market conditions.

The City has also taken steps to substantially reduce future liabilities (e.g., altering the pension formula, requiring employees to contribute to their pensions, freezing pension benefits for current employees, switching to a new "hybrid" pension plan, etc.). But, the City refuses to say how much this lopped off its future pension liabilities. And despite its protestations of poverty the City has ignored many of the pension reforms implemented by other municipalities.

Why should the City be trusted when its First *Amended Plan* proposed terminating its Deferred Retirement Option Plan (DROP) and their expert Charles Moore testified that they do not know if the DROP is "cost neutral?" Why should the City be able to use its alleged actuarial acumen as a sword to slash retiree pensions and then use the City's alleged lack of actuarial acumen as shield to keep the DROP? This Court should not give its imprimatur to the City's lack of diligence and its desire to sidestep inconvenient facts and have its Plan confirmed by affirmation.

Why should the City be trusted that their speculative revenue assumptions and efficiency savings are feasible yet complain that the prior administration's assumptions were unrealistic and speculative? Why should the City be trusted when the Court's expert believes that the Plan is barely feasible because of her confidence in Mayor Duggan's leadership but states the City's workforce is "unskilled" and its expert testified the workforce is "culturally deficient?"

The City's logic is reminiscent of a local car dealership commercial that heralded "we sell each car at a loss and make it up on volume." The City's Alice in Wonderland math is akin to computing the square root of a negative number - it is irrational (e.g., hire more "unskilled" employees than needed to make up for the lack of skilled employees). The ITS Director, Beth Niblock, testified that her previous employer had approximately the same number of residents but operated with 6,000 employees compared to the City's 9,000 employees. If the City had 1,500 fewer employees it would add more than 100 million dollars yearly to the City's budget.

The City is trying to put lipstick on a pig but it's still an unconfirmable pig. The time has come for the City to abandon its foolish game, end its crusade, acknowledge its obligations under the Code and propose a feasible and confirmable plan of adjustment. The Objectors ask the Court to deny confirmation and set the City on an appropriate path toward the exit in this case.

2

## II. ARGUMENT

### A. THE CITY'S PLAN IS NOT FEASIBLE

The City "hangs its feasibility hat" on the fact that retirees voted to support the Plan. Support that was achieved by an argument best characterized as "reductions may or may not be necessary but if you don't vote yes your treatment will be far worse." The Jones-Day's Newsletter (August, 2007) said "ultimately, the best defense against any feasibility challenge is broad creditor support of the plan. Wrong does not cease to be wrong because the majority share in it. Broad creditor support does not make the City's notional Plan feasible.

Just as speculative prospects of success cannot sustain feasibility, speculative prospects of post-emergence failure cannot defeat it, *In re U.S. Truck Co.*, 47 B.R. 932 (E.D. Mich. 1985). However, Chapter 9's are unique in that they affect many more persons than a corporation's employees, retirees and creditors and affects the heart and soul of a community. The Court should require that the City provide a much higher level of assurance of success than it would require in a Chapter 11 to satisfy the Code's feasibility requirement. .

1. <u>The Plan Does Not Contain Adequate Benchmarks</u>

The City's restructuring expert, Charles M. Moore, testified that he helped develop benchmarks (response time, reducing crime and closure rates) for the police department. On cross-examination he said he "talked" to the Manhattan Institute and the Bratton Group who had a $600,000 contract with the City. But, Mr. Moore inexplicably failed to consider information they provided or listed them among his report's 226 "Exhibits Considered" because he "did not rely on anything specific from (the consultants)."

3

If Mr. Moore had talked to George Kelling, who was a consultant for the DPD and a well-known principle in both the Manhattan Institute and the Bratton Group who was the architect of the "broken windows" theory of policing he would have realized the City's glaring lack of management acumen or the ability to recognize how to measure performance let alone manage change. Mr. Kelling has stated:[1]

> "(A) favorite set of police statistics, the number and speed of responses to emergency calls, are uninformative. The anticrime potential of 911 was once thought to be quite high. Research and experience, however, have suggested that though rapid responses to calls for service have very limited impact on crime, they consume enormous amounts of police time. This view is now widely shared by police and police scholars, although less so by city policymakers, and politicians, for whom 911 has become a symbol of being "tough on crime."

2. <u>The City's Poor Management Since its Petition Date Cannot be Overlooked</u>

One way to assess the reliability and soundness of a debtor's projections is to use the period of the case as a test-run, and to see if the debtor has, indeed, been able to meet its projections. A court should determine if the debtor is on the path to recovery by doing better during the case than they were prior to filing bankruptcy. *See In re Haukos Farms, Inc.*, 68 B.R. 428 (Minn. 1986). Courts should ascertain the "root cause" of the filing and determine (1) whether it was the debtor's fault, and (2) whether it is gone or likely to be gone soon. See *In re Am. Family Enters*. 256 B.R. 377 (D.N.J. 2000). If it was the debtor's fault, then this is understandably not a good sign.

---

[1] *Measuring what matters: A New Way of Thinking about Crime and Public Order*, George Kelling, City Journal, spring 1992. Mr. Kelling is a partner in the Manhattan Institute and Bratton Group, former Director Police Foundation and University of Wisconsin Criminal Justice Professor and co-author of "Broken Windows Theory of Policing."

4

The following, partial list, illustrates since its bankruptcy petition date of July 18, 2013, the City has proven it is not capable of providing a modicum of comfort that the Plan is feasible:

- Detroit Expected $55 Million in Property Tax Revenues; it brought in $6.7 Million (Detroit News, 8-27-14);
- Detroit Spends $8.7 Million to Flip 30 Homes that bring in $2 Million (Detroit News, 5-29-14);
- EM substantially increases City Council's budget despite their consultant Conway Mackenzie's recommendation to reduce City Council budgets by over 50%;
- Detroit Fire Department's "pop can" alarm system: Several tech companies have offered to put in a "real" system for free. One CEO quoted in the paper said it would cost $10,000 stating "This is not brain surgery, this is something that we can do very quickly and easily....." (Detroit News 9-11-14).

If it is not "brain surgery" and can be quickly and easily remedied what greater priorities was the Emergency Manager concentrating on over the last 18 months if a crucial public safety upgrade costing $10,000 was ignored?

3. <u>The City's Projections Rely on Unrealistic and Speculative Assumptions</u>

The City has rigged the game through their long range financial projections – a forecast that it can revise whenever "inspiration strikes." Mr. Moore testified that the City modified its RRI's based on Mayor Duggan's decision to spend more monies on parks. On cross-examination when asked if a future politicians could change the existing RRI's stated that it was "speculative." Courts understandably should be wary of debtors manipulating their projections by presenting a "moving target," that is, adjusting their projections or morphing them in a way that suggests gamesmanship, *In re Nw. Timberline Enters. Inc.*, 348 B.R. 412 (N.D. Tex. 2006) (noting debtors' projections were amorphous and were difficult to tie to financial statements

5

In an attempt to show feasibility the City inflated revenue assumptions by projecting overly optimistic revenue growth. The parallel accounting trick the City used was to inflate savings projections. The City puts today's obligations off until tomorrow. The City claims new revenue and savings that may or may not materialize. No matter how enthusiastically the City tortures the numbers RRI's based on assumptions of savings and revenue that may not materialize or may be ephemeral, shows that the City has not learned from its past.

Fantasy revenue has always had strong pull for the City who want to duck the politically tough choices (e.g., Mayor Kilpatrick's proposed "fast food" tax). Counting on speculative revenue allows the City to pretend it does not need to cut personnel; there is no need for such actions if the City has money (at least on paper) to cover its costs. But that approach only guarantees that the City remains awash in red ink when those wished-for dollars fail to show up. The deficit then rolls over into the next fiscal year, creating an even larger shortfall and increases the chances that the City will again resort to budgetary gimmicks, thus repeating the pattern.

The objectors certainly want the City to be optimistic about its long-run prospects - just not when it comes to static budget projections that are heavily shaped by the underlying assumptions. The City's experience has shown that optimistic budget assumptions lead to bad policies that produce unsustainable spending and deficits, while harming future growth. Indeed, overly optimistic budget assumptions can be found at the heart of the majority of recent municipal bankruptcies. The City's use of overly optimistic assumptions is not only misleading - it could prove outright destructive. Once enacted, policies become engrained and a retroactive reflection of actual versus projected costs will be of little use.

### 4. The City's Plan Lacks Liquidity to Deal with Unforeseen Contingencies

The desire for a "reserve" is driven by the desire to protect retirees from agreeing to enter into a risky relationship with the City who is promising to do better a second time around. Mr. Moore conceded on cross-examination that that the Governmental Finance Officers Association (GFOA) recommends a city maintain a two month (16.7%) "Rainy day" fund for unforeseen contingencies. The Plan only contains a 1% contingency reserve. In subsequent testimony the City referenced a "labor reserve." A labor reserve is just a fancy name for the unfilled budgeted positions the City maintains that usually go unfilled. At the end of the fiscal years the "positions" are absorbed by the general fund to pay for other areas that went over budget.

The City's aspirational RRI's is just a fancy name for a plug number. It is not based in fact but represents a number the City appears to have "backed into" – arbitrarily deciding what they wanted to save on pensions and OPEB and putting "monies saved" from retiree benefits into its RRI's. Since the RRI's are apparently elastic and can be revised whenever "inspiration strikes" the City can always "reach" the funds to pay for unforeseen expenses (e.g., raises for Council).

### 5. The City's Failed to Disclose the Cost of the Deferred Retirement Option Plan (DROP)

The City's first Amended Plan (3-31-14) stated "*no future payments into DROP.*" The City subsequently, without know the costs of the program, inexplicably has allowed it to continue.Employees that DROP "retire" and then go back to work immediately. When they return to work, pension payments are held while they continue collecting a salary. While in the DROP they receive interest payments in addition to annual COLA. When they leave they collect that money in a lump-sum payment.

7

The DROP is costly and creates the appearance that employees are "double-dipping," collecting both salaries and pensions. Police officers or firefighters who DROP earn on average 100k per year (salary and pension benefits); lieutenants 128k and; commanders 175k, while other employees and retirees suffer reductions of pensions and benefits.

When DROP plans first appeared, there was justifiable skepticism among many public managers. Advocates' claims of "Something for nothing" just didn't ring right. In most cases (including Detroit) unions - not management - pushed for DROPs. Sympathetic actuaries, often recommended by unions, declared that the costs of these arrangements would be actuarially neutral and not create yet another taxpayer-financed boondoggle. The actuarial report when Detroit instituted the DROP was prepared by PFRS actuary (Gabriel Roeder).

Gabriel Roeder in evaluating the DROP made certain assumptions (e.g., number of participants, length of program, etc.). Gabriel Roeder said the program was "cost neutral" to the City. It is interesting that Charles Moore and Millman – with the benefit of reviewing Gabriel Roeder's assumptions in hindsight – found it inconclusive if the DROP is "cost neutral."

One important assumption Gabriel Roeder made in deciding that the DROP was "cost neutral" was the assumption that approximately 300 employees would participate in the program. The actual number, thus far, of employees that "dropped" is much closer to 700.

In addition, Mr. Moore's report discussed "larger" than anticipated "payouts" by retiring employees contributing to the City's malaise. This was the result of over hundreds of employees receiving millions of dollars in payouts (e.g., sick time) that is paid when an employee retirees. But were paid to employees that entered the DROP but had continued working.

8

DROP plans have been proven to be nothing more than another way for unions to outwit politicians - and siphon money off the pension fund. As this reality sets in, concerned elected officials are slowly awakening. San Diego found their DROP too costly and discontinued the program. Milwaukee County officials uncovered a massive actuarial deficiency and sued the actuary for misrepresenting the actual costs of their DROP plan (they settled for 45 million).

The Philadelphia DROP, according to a study conducted by Boston College, cost the city $258 million in extra pension costs over the last decade. Boston College who was hired by Philadelphia provided an estimate because they had to make assumptions (e.g., interest rates, wage growth). Because of those variables, the annual cost of DROP ranges from $21 to $36 million. But they said there was "no plausible scenario" in which DROP reduced pension costs.

Not only does the City claim it does not know if its DROP is cost neutral to the pension fund itself, but whether it's cost neutral to the overall budget. The City's Alice in Wonderland "through the looking glass" math does not work and makes its Plan unconfirmable.

## B. THE CITY'S PLAN IS NOT IN THE BEST INTEREST OF RETIREES

1. <u>The City of Detroit Admission that Retirees Could Recover More Outside of Bankruptcy Requires the Court to Dismiss Proposed Reductions to Pension Benefits as a Matter of Law</u>

The City of Detroit in its opening statement, in an apparent attempt to show that there was no "unfair discrimination" stated that while the insurers could not force the sale of city assets outside of bankruptcy the "(retirees)could do better outside of bankruptcy." Normally, an attorney's statements are not evidence. See *Guerrero v Smith*, 280 Mich App at 658 (2008). But, the City shocking concession that retiree's would be entitled to more outside of bankruptcy fails to meet the required "best interest" test of retirees and precludes the reduction of pensions.

### III. CONCLUSION

For all of the foregoing reasons, the Objectors request that the Court deny confirmation of the Plan or grant such other and further relief that protects the Objector's substantive and procedural rights or that the Court deems appropriate under the circumstances.

                                          /s/ Jamie S. Fields
                                          Jamie S. Fields (P-52808)
                                          555 Brush #2409
                                          Detroit, Mich. 48226
                                          (313) 570-3906

Date: September 16, 2014

10