# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Steven W. Rhodes |
| Debtor. | Chapter 9 |

## DEBTOR'S DETAILED OBJECTION AND AFFIRMATIVE DEFENSES TO MACOMB INTERCEPTOR DRAIN DRAINAGE DISTRICT'S PROOF OF CLAIM

NOW COMES the Debtor, The City of Detroit, Michigan ("City" or "Detroit"), through its attorneys Miller, Canfield, Paddock & Stone, P.L.C., and objects to the Proof of Claim of Macomb Interceptor Drain Drainage District ("MIDDD"). Detroit denies that MIDDD is entitled to "damages or other amounts due in the amount of not less than $26 million" (see page 4 of document 4954-2, MIDDD attachment to Proof of Claim) or any amount whatsoever.

MIDDD's claim, Claim No. 3683, is premised upon the allegations contained in the Complaint MIDDD filed against the City on June 25, 2013, in Macomb Circuit Court (Case No. 13-2589-CZ). Because the claim consists of a complaint, the Debtor City of Detroit, as its objection, will answer the Complaint as follows:

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

MACOMB INTERCEPTOR DRAIN
DRAINAGE DISTRICT,

                        Case No. 13-2589-CZ

     Plaintiff,

                        Hon. John C. Foster

v.

CITY OF DETROIT, a municipal
corporation,
and its Detroit Water and Sewerage
Department,

     Defendant.

_____ /

| | |
|---|---|
| KIRK, HUTH, LANGE & BADALAMENTI, PLC | MILLER, CANFIELD, PADDOCK & STONE, P.L.C. |
| Robert W. Kirk (P35627) | Stephen S. LaPlante (P48063) |
| Raechel M. Badalamenti (P64361) | Jerome R. Watson (P27082) |
| Attorneys for Plaintiff | Attorneys for Defendant |
| 19500 Hall Road, Ste. 100 | 150 West Jefferson, Suite 2500 |
| Clinton Township, MI 48038 | Detroit, Michigan 48226 |
| (586) 412-4900 | (313) 963-6420 |
| rkirk@khlblaw.com | watson@millercanfield.com |
| rbadalamenti@khlblaw.com | |
| | OREILLY RANCILIO, P.C. |
| William W. Misterovich (P32512) | Lawrence M. Scott (P30228) |
| Chief Deputy, Macomb County Public Works Commissioner's Office | Albert B. Addis (P31084) |
| | Co-Counsel for Plaintiff |
| 21777 Dunham Road | 12900 Hall Road, Ste. 350 |
| Clinton Township, MI 48036 | Sterling Heights, MI 48313 |
| (586) 307-8210 | (586) 997-6462 |
| william.misterovich@macombgov.org | lscott@orlaw.com |
| | aaddis@orlaw.com |

_____

## ANSWER TO COMPLAINT

## PARTIES

1.    In response to the allegations in paragraph 1, Detroit states that the allegations constitute a legal conclusion requiring no answer.

2.    In answer to the allegations in paragraph 2, Detroit admits that it is a municipal corporation located primarily in Wayne County, Michigan and that in the past it owned, operated, and exercised authority in Macomb County over the system now known as the Macomb County Interceptor System.  Not knowing what MIDDD means by "at the relevant time," Detroit neither admits nor denies this allegation but leaves MIDDD to its proofs.  In further answer, Detroit states that the September 2, 2010 Acquisition Agreement speaks for itself and that the language quoted in paragraph 2 is as set forth in the definition section of the Acquisition Agreement.

3.    In answer to paragraph 3, Detroit admits that it provides water and wastewater treatment services to residents of Wayne, Oakland and Macomb Counties.  Not knowing what Macomb includes under the phrase "among other things," Detroit neither admits nor denies that allegation.

4.    In response to the allegations in paragraph 4, Detroit admits that MIDDD seeks amounts well in excess of $25,000, but denies that MIDDD is entitled to any amount, whatsoever.

5.      Detroit neither admits nor denies the allegations in paragraph 5, stating that the allegations constitutes a legal conclusion requiring no answer.  In further answer, however, Detroit does not dispute that this Court has the authority to determine the value (or more appropriately lack of value) of MIDDD's claim.

GENERAL AND FACTUAL BACKGROUND

6.      Stating that what MIDDD considers to be the basis of its cause of action is a matter within MIDDD's own province and requires no answer from Detroit, Detroit neither admits nor denies this allegation but leaves MIDDD to its proofs.   In further answer, Detroit denies that it breached the Acquisition Agreement or is liable for fraudulent inducement relating to the sale of assets to MIDDD.

7.      In response to the allegations contained in paragraph 7, Detroit admits that the case entitled *United States v. City of Detroit, Detroit Water and Sewerage Department and State of Michigan,* E.D. Mich. Case No. 77-71100 was assigned to Judge Feikens until 2010 when it was reassigned to Judge Cox.  Not having brought the 1977 action and therefore not being certain of the reason the action was brought, Detroit neither admits nor denies the remaining allegations of paragraph 7.

8.      In response to the allegations in paragraph 8, Detroit admits that on or about December 3, 2001, Judge Feikens appointed former Mayor Kwame

Kilpatrick ("Kilpatrick") as the Court's Special Administrator of the Detroit Water and Sewerage Department ("DWSD"), effective as of January 1, 2002, via an "Order Continuing Special Administratorship for the City of Detroit Water and Sewerage Department." In further answer, however, Detroit states that Judge Feikens' order speaks for itself and MIDDD's summary of the Order is not entirely apparent from the Order's terms.

9. Stating that Judge Feikens' December 2, 2001 Order speaks for itself, Detroit neither admits nor denies the allegations in paragraph 9 but leaves MIDDD to its proofs. Detroit does admit, however, that the Order gave Kilpatrick broad authority over DWSD.

10. In response to the allegations of paragraph 10, Detroit admits that the quoted language is contained in the Order and that Kilpatrick had the authority to find and hire a Director of DWSD.

11. Detroit admits the allegations of paragraph 11.

12. In response to the allegations contained in paragraph 12, Detroit admits that Kilpatrick appointed its former Deputy Chief of Staff Derrick A. Miller ("Miller") to the position of Chief Administrative Officer. Not knowing what MIDDD means by "involved" and, overall, having insufficient information to answer, Detroit neither admits nor denies whether "Miller became involved in the bidding and awarding of DWSD contracts."

-4-

13.     In response to the allegations in paragraph 13, Detroit states that due to the fraudulent concealment effected by Kilpatrick, Ferguson, Miller, and Mercado, Detroit was not aware of the claimed alleged wrongdoing described in paragraph 13 until the December, 2010 indictment of Kilpatrick, Ferguson, Miller, and Mercado.  Further, when it investigated the indictment allegations, Detroit did not have the opportunity to speak with Kilpatrick, Ferguson, Miller, or Mercado, and thus Detroit neither admits nor denies the allegations in paragraph 13 but leaves MIDDD to its proofs.  In further answer, Detroit does admit that the paragraph 13 allegations constitute a portion of the December 2010 indictment and that following the indictment a trial of Miller, Mercado, Ferguson and Kilpatrick was scheduled and conducted, with Miller and Mercado pleading guilty to certain offenses and Kilpatrick and Ferguson being convicted of various criminal offenses. The guilty pleas and convictions speak for themselves and have the legal impact required or allowed under applicable law.

14.     Detroit admits that the Superseding Indictment did allege the allegations contained in paragraph 14 of the Complaint.  Since its investigation neither confirmed nor refuted these allegations, Detroit neither admits nor denies them, but leaves MIDDD to its proofs.

15. Detroit neither admits nor denies the allegations in paragraph 15 but leaves MIDDD to its proofs, stating that the 2002 and early 2003 CS-1368 subcontractor assignments were overseen by Inland and not DWSD.

16. In response to the allegations in paragraph 16, Detroit admits that DWSD and Inland agreed to set fixed unit prices for subcontractor work on certain portions of CS-1368. Not knowing the motivations of Kilpatrick, Mercado, and Inland, and having insufficient information to answer the remaining allegations in paragraph 16, Detroit neither admits nor denies them but leaves MIDDD to its proofs.

17. Only becoming apprised of the alleged CS-1368 wrongdoing through the December, 2010 indictment and not having the opportunity to interview Mercado, Miller, or Kilpatrick during its post-indictment investigation, Detroit neither admits nor denies the allegations in paragraph 17 but leaves MIDDD to its proofs.

18. Having insufficient information to answer the allegations of paragraph 18, Detroit neither admits nor denies whether Inland and Ferguson reached some type of an agreement regarding the share of work Ferguson would receive on the as-needed point repairs. Detroit denies the remaining allegations of paragraph 18, stating that to its knowledge CS-1361 was never officially awarded and Detroit is not aware that "Defendant representatives conspired to take the As Need Point

-6-

Repairs Contract (CS-1361) away from bidder Lake Shore, Inc. d/b/a Lakeshore Engineering Services, Inc.), to whom it had already been awarded and give it to Inland as an amendment to Inland's existing CS-1368 contract."

19. Detroit admits the allegations of paragraph 19.

20. Having insufficient information to answer the allegations of paragraph 20, Detroit neither admits nor denies them but leaves MIDDD to its proofs. Inland's proposal was eventually approved by City Council in February, 2005.

21. Detroit denies the allegations of paragraph 21 as untrue, stating that DWSD did not enter into the contract for an unlawful purpose. In further answer, Detroit states that it has not spoken with Kilpatrick, Ferguson, Miller or Mercado and cannot state what their purposes were. Detroit does note that the four of them either pled guilty or were convicted of certain criminal offenses, however.

22. In answer to paragraph 22, Detroit admits that Inland retained L. D'Agostini & Sons as its "primary subcontractor" – at least on certain amendments to CS-1368. Defendant denies the remaining allegations of paragraph 22 as untrue and/or misleading in that Inland retained D'Agostini as the primary subcontractor on Amendments 2 and 3 of CS-1368, and, thus, the percentages of D'Agostini's work attributed to the original CS-1368 were of no consequence.

23.     In response to the allegations of paragraph 23, Detroit admits that the allegations were alleged in the First Superseding Indictment.  Having insufficient information to answer, Detroit neither admits nor denies whether the allegations are true, but leaves MIDDD to its proofs.

24.     Detroit admits that the allegations of paragraph 24 were contained in the First Superseding Indictment, but states that it does not have first-hand knowledge of the truth or falsity of the allegations.

25.     Not knowing what knowledge the contractors and subcontractors (specifically Inland and D'Agostini) had, Detroit neither admits nor denies the allegations of paragraph 25 but leaves MIDDD to its proofs.

26.     Not knowing what Inland and D'Agostini knew and thus having insufficient information to answer, Detroit neither nor denies the allegations of paragraph 26 but leaves MIDDD to its proofs.

27.     In response to the allegations of paragraph 27, Detroit admits that it paid Inland's invoices, although some were reduced.  Detroit denies that it paid all of D'Agostini's invoices, stating that D'Agostini was a subcontractor which generally was paid by the prime contractor.

28.     Having insufficient information to answer the allegations of paragraph 28 from its own personal knowledge, Detroit neither admits nor denies those allegations but leaves MIDDD to its proofs.  In further answer, Detroit states

-8-

that the allegations are consistent with the indictment and that a trial of the indictment claims resulted in a number of guilty pleas and convictions.

29. Detroit admits the allegations of paragraph 29.

30. Detroit admits that the allegations of paragraph 30 are substantially accurate. Detroit does note, however, that the stabilization and repair of the project were not totally separate occurrences.

31. In response to the allegations of paragraph 31, Detroit admits that around September 28, 2004, DWSD issued Special Administrative Order No. 2004-5 authorizing emergency amendment to CS-1368 that increased the total contract to $95 million, that this portion of the contract is commonly referred to as CS-1368-2, and that a copy was attached as Exhibit B. Detroit denies as untrue the implication that there was no need for an "emergency" amendment or that the stabilization of the Interceptor was complete.

32. Having insufficient information to answer the allegations of paragraph 32, Detroit neither admits nor denies them but leaves MIDDD to its proofs. Detroit did not have the opportunity to interview Miller, Mercado and/or Kilpatrick and cannot attest to their actions or intent.

33. To the extent the allegations of paragraph 33 are meant to indicate that contracts were routinely amended to benefit various contractors and subcontractors, Detroit denies the allegations as untrue. To the extent MIDDD is

alleging that Inland and D'Agostini benefitted from the amendment of CS-1368 without scrutiny, oversight, or competitive bidding, Detroit denies those allegations as untrue. In response to the remaining allegations of paragraph 33, having insufficient information to answer, Detroit neither admits nor denies them but leaves MIDDD to its proofs. Detroit does not know what "unlawful payments" or "unlawful gratuities" vendors paid to Kilpatrick, Ferguson, and/or Miller.

34.     Having insufficient information to answer, Detroit neither admits nor denies the allegations of paragraph 34 but leaves MIDDD to its proofs. Detroit cannot attest to the motivations of Inland in subcontracting work to Ferguson or others.

35.     Detroit denies as untrue the allegations of paragraph 35, stating that while Detroit believes there were overcharges on the project, the amount did not approach the difference (over $20 million) alleged by MIDDD.

36.     Detroit admits the allegations of paragraph 36.

37.     Detroit admits the allegations of paragraph 37.

38.     In response to the allegations of paragraph 38, Detroit admits that on or about July 2005, a fourth amendment in the amount of $12 million was proposed to CS-1368 to continue the work contemplated by the original CS-1368. Having insufficient information to answer the remaining allegations of paragraph 38, Detroit neither admits nor denies them but leaves MIDDD to its

-10-

proofs.  Detroit does acknowledge, however, that these allegations are contained in the First Superseding Indictment.

39.    In response to the allegations contained in paragraph 39, Detroit admits that on or about June 28, 2006, Amendment 5 was authorized and provided an additional $8 million to the contract, thereby increasing the total amount of CS-1368 to $138 million.  Detroit denies as untrue the allegations that the terms of Amendment 5 were identical to those of the original contract.

40.    Detroit denies as untrue the allegations of paragraph 40, stating that the purchase price of the Macomb Interceptor system was the result of extensive arms-length negotiation among Detroit, Macomb County and MIDDD, and the Project total was not grossly inflated.

41.    Detroit denies as untrue the allegations of paragraph 41, stating that it only became aware of the indictment allegations in December, 2010, well after the Acquisition Agreement was executed and that, to the extent Miller, Mercado and Kilpatrick participated in an illegal scheme, they were not agents of Detroit and not acting on Detroit's behalf.

42.    In response to the allegations of paragraph 42, Detroit admits that the Acquisition Agreement was executed on or about September 2, 2010 and that such a potential agreement was referenced in the May, 2009 Global Settlement Agreement.

-11-

43.    In response to the allegations contained in paragraph 43, Detroit admits that the quoted language is contained in the Bill of Sale and the Acquisition Agreement.  Detroit denies that all the terms are "relevant" in that in the prior proceeding (United States Eastern District Court Case 2-11:CV-13101, Macomb Interceptor Drain Drainage District v. Kilpatrick *et al.*) Judge Cleland ruled on the legal impact of various Bill of Sale and Acquisition Agreement terms.  Further, Detroit states that the Acquisition Agreement and Bill of Sale speak for themselves and must be considered in total, without cherry-picking certain portions to lead to a desired (and legally refuted) result.

44.    In response to the allegations of paragraph 44, Detroit states that the Bill of Sale speaks for itself, that MIDDD has recited only a portion of the Bill of Sale terms, and that Judge Cleland has already ruled that the Bill of Sale is subordinate to the Acquisition Agreement, thus refuting the claim MIDDD attempts to make.  In further answer, Detroit admits that the recited language is contained in the Bill of Sale.

45.    Detroit denies as untrue the allegations of paragraph 45, stating that the overall purchase price of $89,996,704.00 is substantially accurate but that the entire Project total was not included.  In further answer, Detroit states that the purchase price was a matter of lengthy negotiation and the parties could have used whatever method they wished to arrive at the purchase price.

-12-

46. In response to the allegations of paragraph 46, Detroit admits that the quoted language is contained in the Bill of Sale, but states that the Bill of Sale speaks for itself and the quoted language is immediately followed and limited by the phrase "and as contemplated by the Acquisition Agreement."

47. Detroit neither admits nor denies the allegations of paragraph 47, but leaves MIDDD to its proofs because paragraph 47 fails to apprise Detroit of the identity of the person that apprised MIDDD that the transfer included the tangible assets and intangible rights associated with the Macomb Interceptor.

48. Detroit denies as untrue the allegations of paragraph 48 because the parties never discussed or even contemplated who would own any tort claims resulting from events occurring before the Acquisition Agreement.

49. Detroit neither admits nor denies the allegations of paragraph 49 but leaves MIDDD to its proofs, stating that the allegations constitute a legal conclusion, that the conclusion appears to be contradicted by the terms of MIDDD's footnote 3, and that the issue of responsibility for tort liability premised upon events occurring before the Acquisition Agreement has been found by Judge Cleland not to have been covered by the Acquisition Agreement.

50. The allegations of paragraph 50 referencing an event within MIDDD's own province, Detroit neither admits nor denies those allegations but

leaves MIDDD to its proofs. Detroit does admit that it understood that MIDDD was to finance the acquisition through the sale of drain bonds.

51. In response to the allegations contained in paragraph 51, Detroit admits that MIDDD correctly cites certain of the language contained in the Acquisition Agreement. Detroit denies, however, that it violated the Acquisition Agreement, stating that the agreement speaks for itself and must be considered as a whole in conjunction with the facts and circumstances of this matter.

52. Detroit denies as untrue the express and implied allegations in paragraph 52.

53. Having insufficient information to answer, Detroit neither admits nor denies the allegations of paragraph 53 but leaves MIDDD to its proofs.

### Plaintiff Files Suit Against Detroit Officials and Contractors on the 15 Mile Project

54. Detroit admits the allegations of paragraph 54.

55. Detroit admits the allegations of paragraph 55.

56. In response to the allegations of paragraph 56, Detroit denies that its pleadings are unclear. Detroit does admit that a portion of its claims are described in the remaining allegations of paragraph 56, however.

57. In response to the allegations of paragraph 57, Detroit admits that it acknowledged the sale of the system to MIDDD, agreed that Macomb was entitled to assert the contract claims in regard to Amendments 2 and 3 of CS-1368, and

-14-

acknowledged that it was seeking damages above and beyond what Macomb sought. Detroit did not represent to Macomb, however, that it would not assert tort claims pertaining to CS-1368-2 and CS-1368-3. Indeed, the primary reason Detroit sought to intervene in the Judge Cleland lawsuit, Case 11-13101, is the fact that various defendants contended that Macomb did not have standing to assert the tort claims, and, thus, Detroit became concerned that a judge's ruling on those tort claims could have a detrimental impact on Detroit's ability to pursue all damages to which it could be entitled. Contrary to what MIDDD has alleged, before Detroit sought to intervene, various defendants in the Cleland lawsuit filed motions to dismiss relying in part on Macomb's lack of standing – D'Agostini, September 1, 2011; Mersino, September 26, 2011; Inland, October 4, 2011; Williams, October 12, 2011; Patriot Pump, November 17, 2011; and Futurenet, December 7, 2011. It was Detroit's review of these motions that precipitated its filing of a motion to intervene in January, 2012.

58. Detroit denies the allegations of paragraph 58 as untrue, stating that it had begun investigating its various potential claims and contemplating suit shortly after the December, 2010 Superseding Indictment and that it desired to protect its interests as detailed in paragraph 57.

59. Detroit admits the allegations of paragraph 59 as substantially accurate, but in further answer states that it was not foreclosed from filing suit in

regard to its remaining claims that spanned a number of separate projects and consolidating partially or completely that latter suit with MIDDD's case.

60.     Detroit denies as untrue the allegations of paragraph 60.

61.     Detroit admits the allegations of paragraph 61.

62.     Detroit admits the allegations of paragraph 62 as substantially accurate, but states that its intervening complaint involved the entire $138 million CS-1368 project, whereas Macomb's claim was limited to the $58 million repair cost of CS-1368 amendments 2 and 3.

63.     Detroit denies as untrue the allegations of paragraph 63, stating that defendants sought a ruling that Macomb had no standing well before Detroit's intervention, and, in fact, it was defendants' standing defense that motivated DWSD to seek intervention.

64.     Detroit admits the allegations of paragraph 64.

<u>Detroit Quickly Settles Its Tort and<br>Federal Statutory Claims in Case 11-13101</u>

65.     In response to the allegations of paragraph 65, Detroit states that MIDDD estimated $23 million overcharges and Detroit incorporated such claim into its intervention complaint (paragraph 101).   Detroit further admits that it sought treble damages, but denies that it calculated the trebled damages to be in excess of $75 million and states that Detroit's damages pertain to the entire $138

-16-

million CS-1368 project – not just the $58 million portion on which MIDDD bases its claim.

66.     Detroit denies the allegations of paragraph 66 as untrue. Detroit's settlement with Inland in the amount of $4.5 million was not nominal. Further, the settlement came 7 months after the intervention complaint was filed and after a facilitation with Inland.

67.     Detroit admits the allegations of paragraph 67.

68.     Detroit admits that the allegations of paragraph 68 are substantially accurate. In further answer, however, Detroit states that the settlement with Lakeshore Engineering Services was based upon actions committed by Lakeshore that did not involve CS-1368-2 and CS-1368-3, the two CS-1368 Amendments upon which MIDDD bases its claims.

69.     Detroit admits the allegations of paragraph 69.

70.     Detroit admits that its only remaining asserted claims are those against Kilpatrick, Mercado, Miller and Ferguson.

<u>Detroit's Usage Overcharges to MIDDD</u>

71.     Not knowing what MIDD means by "at all times preceding," Detroit neither admits nor denies the allegations of paragraph 71 but leaves MIDDD to its proofs. Detroit does admit that it was paid usage charges for a period of time prior to the Acquisition Agreement.

-17-

72.     Detroit denies as untrue the allegations of paragraph 72. Detroit does admit that Judge Feikens ruled that the project costs were MIDDD's responsibility.

73.     Having insufficient to answer and not knowing what MIDDD concludes constitutes "grossly inflated project costs," Detroit neither admits nor denies the allegations of paragraph 73 but leaves MIDDD to its proofs. In further answer, Detroit does acknowledge that the four individual defendants concealed their criminal wrongdoing.

74.     Detroit denies as untrue the allegations of paragraph 74.

75.     Detroit denies as untrue the allegations of paragraph 75, stating that MIDDD's payment of usage charges and interest was not a "scheme."

### The Scheme and Overcharges to MIDDD Are Confirmed

76.     Detroit neither admits nor denies the allegations of paragraph 76, stating that Miller's plea speaks for itself. Further, Detroit notes that the pleas and criminal convictions of the individual defendants pertain to various projects, not just CS-1368-2 and CS-1368-3.

77.     Detroit admits the allegations of paragraph 77.

78.     Detroit admits that the allegations of paragraph 78 are substantially accurate.

79.     Detroit neither admits nor denies the allegations of paragraph 79, stating that testimony is a matter of record and will speak for itself. Further,

-18-

Detroit does not recall "several" contractors testifying as described in paragraph 79.

80.     Detroit admits that the allegations of paragraph 89 are substantially accurate, but notes that the cited paragraphs do not necessarily pertain to MIDDD's claims.

81.     In response to the allegations of paragraph 81, Detroit admits that the jury has confirmed a scheme pertaining to certain projects and that Detroit has settled with some contractors on an array of claims far broader than those asserted by MIDDD.   Detroit denies as untrue the allegation that MIDDD has been overcharged or that Detroit has any obligation to reimburse MIDDD or is liable to MIDDD in any amount, whatsoever.

## COUNT I -  FRAUD, FRAUD IN THE INDUCEMENT AND SILENT FRAUD

82.     Detroit incorporates its answers to paragraphs 1 through 81 as though fully restated herein.

83.     Detroit denies as untrue the allegations of paragraph 83.

84.     Detroit denies as untrue the allegations of paragraph 84, except that Detroit admits that the cited language is contained in the Acquisition Agreement. Detroit denies that the provisions have been breached, however.

85.     Detroit denies as untrue the allegations of paragraph 85, except, stating that the allegation regarding the duty to disclose constitutes a legal

-19-

conclusion which requires no answer, Detroit neither admits nor denies that allegation.

86.    Detroit denies as untrue the allegations of paragraph 86.

87.    Detroit denies as untrue the allegations of paragraph 87.

88.    Having insufficient information to answer and not knowing representations to which MIDDD is referring, Detroit neither admits nor denies the allegations of paragraph 88 but leaves MIDDD to its proofs.  Detroit does deny that it breached any obligation to MIDDD or that it made any misrepresentation to MIDDD, which misrepresentation it intended MIDDD to rely upon.

89.    Detroit denies as untrue the allegations of paragraph 89, except that having insufficient information to answer, Detroit neither admits nor denies what the Mayor, Director of DWSD, and the unidentified "others" may have done or known.

90.    Detroit denies as untrue the allegations of paragraph 90.

91.    Detroit denies as untrue the allegations of paragraph 91.

WHEREFORE, Detroit prays that MIDDD's claim be assessed at zero dollars, that all the claims of its Complaint be dismissed with prejudice, and that Detroit be granted its costs and attorney fees.

## COUNT II – INNOCENT MISREPRESENTATION

92.     Detroit incorporates its answers to paragraphs 1 through 91 as though fully restated herein.

93.     Not being sure of what MIDDD means in paragraph 93 and the paragraph seeming to call for a legal conclusion, Detroit neither admits nor denies the allegations of paragraph 93 but leaves MIDDD to its proofs.

94.     Detroit denies as untrue the allegations of paragraph 94.

95.     Detroit denies as untrue the allegations of paragraph 95, stating that MIDDD apparently contends that Kilpatrick's wrongdoing constitutes a "claim."

96.     Detroit neither admits nor denies the allegations of paragraph 96 but leaves MIDDD to its proofs, stating that it cannot be sure what MIDDD may or may not have done with additional information.  Detroit denies that MIDDD is entitled to any relief, however, and denies that it improperly failed to disclose information to MIDDD.

97.     Detroit denies as untrue the allegations of paragraph 97, stating that MIDDD is entitled to no relief whatsoever.

WHEREFORE, Detroit prays that MIDDD's claim be assessed at zero dollars, that all the claims of its Complaint be dismissed with prejudice, and that Detroit be granted its costs and attorney fees.

-21-

## COUNT III – BREACH OF CONTRACT

98.    Detroit incorporates its answers to the allegations of paragraphs 1 through 97 as though fully restated herein.

99.    Detroit admits the allegations of paragraph 99.

100.   Detroit denies as untrue the allegations of paragraph 100.

101.   Detroit denies as untrue the allegations of paragraph 101, stating that it did not breach any provisions, whatsoever.

102.   In response to the allegations of paragraph 102, Detroit admits that certain remedies are delineated in paragraphs of the Acquisition Agreement. Detroit denies, however, that MIDDD is entitled to any remedy or any relief against Detroit under those (or any other) provisions.

103.   Detroit denies as untrue the allegations of paragraph 103, stating that it has not harmed MIDDD and that MIDDD is entitled to no relief from it.

104.   In response to the allegations of paragraph 104, Detroit admits that it settled certain of its claims but denies that it has any obligation to share portions of those settlements with MIDDD.

105.   In response to the allegations of paragraph 105, Detroit denies that MIDDD paid a grossly inflated Project cost.  In further answer, Detroit states that MIDDD paid far less for the system than what it was worth.  Detroit does admit that it asserted its rights to pursue its claims.

-22-

106.   Detroit denies as untrue the allegations of paragraph 106.

107.   In response to the allegations of paragraph 107, Detroit denies that MIDDD's claims are valid and denies that MIDDD is entitled to a constructive trust or any relief from Detroit.

108.   Detroit denies as untrue the allegations of paragraph 108.

WHEREFORE, Detroit prays that MIDDD's claim be assessed at zero dollars, that all the claims of its Complaint be dismissed with prejudice, and that Detroit be granted its costs and attorney fees.

## COUNT IV – QUANTUM MERUIT/UNJUST ENRICHMENT

109.   Detroit incorporates its answers to the allegations of paragraphs 1 through 108 as though fully restated herein.

110.   Detroit denies as untrue the allegations of paragraph 110.

111.   Detroit denies as untrue the allegations of paragraph 111 and states that MIDDD's $26 million damage claim is grossly inflated.

112.   Having insufficient information to answer the allegations of paragraph 112, Detroit neither admits nor denies them but leaves MIDDD to its proofs.  In further answer, Detroit states that based upon the jury verdict and guilty pleas, it does appear that the four individual defendants engaged in an illegal scheme.

-23-

113. Detroit denies as untrue the allegations of paragraph 113. Further, Detroit states that the purchase price was arrived at after lengthy arms-length bargaining among Detroit, Macomb County, and MIDDD.

114. Detroit denies as untrue the allegations of paragraph 114. Detroit does admit that it has settled various claims with contractors and subcontractors, but states that many of those claims had nothing to do with Macomb County and/or MIDDD. Further, Detroit denies that MIDDD was overcharged for the system.

115. Detroit denies as untrue the allegations of paragraph 115.

WHEREFORE, Detroit prays that MIDDD's claim be assessed at zero dollars, that all the claims of its Complaint be dismissed with prejudice, and that Detroit be granted its costs and attorney fees.

## CITY OF DETROIT'S AFFIRMATIVE AND OTHER DEFENSES

Now comes the Debtor, the City of Detroit ("City" or "Detroit") and for its affirmative defenses state as follows:

### A. Introductory Facts

### 1. Chronology of Significant Facts

- The Romeo Arm Interceptor that is the subject of this dispute is part of the Macomb Interceptor System and runs along Garfield Road from Clinton River to 15 Mile Road, in Sterling Heights, Michigan, and provides sewerage service to Macomb County residents. During the period of time that DWSD owned and operated the Interceptor, sewer rates for Macomb County and the Clinton Oakland District were designed to recover the "cash basis" revenue requirements associated with it so that debt service and

-24-

operating costs associated with those facilities were "passed through" to the users.

- August 22, 2004: 15 Mile Road Macomb Interceptor Collapse. It was quickly determined that the sinkhole was caused by damage to the Romeo Arm, located beneath 15 Mile Road. Within hours, the sinkhole expanded to a depth of 30 feet and extended a distance of approximately 245 feet in an east-west direction along 15 Mile Road, requiring immediate and emergency repairs. DWSD quickly commenced efforts to stabilize the sinkhole and began repair. Inland Waters Pollution Control, Inc. ("Inland"), a City contractor, provided an initial estimate of $35 million and was selected as general contractor.

- September 28, 2004: Kwame Kilpatrick issued Special Administrator Order Number 2004-5, authorizing Victor Mercado to enter into an emergency amendment (Amendment 2) to CS-1368, increasing the contract by $35 million and increasing the total amount of the contract to $95 Million ("CS-1368-2").

- June 16, 2005: Again, pursuant to a Special Administrator Order issued by Kwame Kilpatrick, Amendment No. 3 was added, CS-1368-3, which increased the amount of CS-1368 by another $23 million, increasing the total amount of the contract to $118 million. The two amendments (Nos. 2 and 3) in the amounts of $35 million and $23 million, respectively, set the cost of the 15 Mile Road Repair Project at $58 million (hereinafter referred to as "the Project").[1]

- August 23, 2004 – March 14, 2005: 15 Mile Road Macomb Interceptor repairs are completed. Payment for the Project repairs became a hotly contested issue between Macomb County, Oakland County, and the City. The issue was litigated in the landmark case, *United States v. City of Detroit, et al.*, Case No. 77-71100, pending before Judge Feikens.

---

[1] The original CS 1368 awarded to Inland Waters covered a variety of projects, and the original contract plus amendments 1, 4 and 5 were "as needed" contracts pertaining to only sewer lining tasks and were priced on a unit pricing system. These amendments did not cover the Project. Amendments 2 and 3 to CS 1368 covered the cost of the Project and were "cost plus fees" contracts that were submitted because of the change in type of work and the emergency nature of the same. The unit pricing model simply did not apply to these amendments.

- 2005-2006: City allocates 100% of Project costs to Macomb County sewer rates.

- March 10, 2006: Macomb County files Petition for an injunction in Case No. 77-71100 challenging DWSD's allocation of Project costs to sewer rates. As a result, the parties began to negotiate terms whereby MIDDD would purchase the Macomb Interceptor from DWSD.

- Late summer/early fall 2006: A purported tentative agreement is reached between Victor Mercado and Anthony Marrocco, Macomb County Public Works Commissioner, as to the cost of 15 Mile Road repairs.

- January 16, 2007: Settlement Conference in Case No. 77-71100 held. Minute entry indicates that "[t]he parties agreed on a number and the general terms of a release of liability on the interceptor repair numbers."

- March 23, 2007: Judge Feikens issues Opinion and Order Denying Macomb's Request for an injunction regarding DWSD's allocation of repair costs to sewer rates, scuttling the purported tentative agreement reached between the parties. *See United States of America v. City of Detroit*, 483 F. Supp. 2d. 565 (2007).

- Spring 2008: Court Facilitator Timothy O'Brien initiates settlement discussions between the parties.

- June 2008: Victor Mercado resigns as Director of DWSD.

- June 2008 to May 2009: Arms-length settlement discussions continue among the four attorneys representing the parties: Craig Hupp (Macomb's attorney), William Misterovich (Macomb County), Mark Jacobs (DWSD's attorney), and Robert Walter (City of Detroit).

- May 12, 2009: Global Settlement Agreement Signed by the City, DWSD, Macomb County, Oakland County, and Wayne County releasing all outstanding disputes at the time, including disputes "related to the allocation of repair costs related to the August 4, 2004 collapse on the Romeo Arm of the Macomb Interceptors at 15 Mile and Hayes . . . [and] [a]ll Disputes and claims between the Parties related to the costs for repairs and renovation of

-26-

the interceptor sewers listed in Exhibit 1 of Exhibit D of this Agreement…" [Exhibit 1 of Exhibit D included the Romeo Arm Interceptor.] The Global Settlement Agreement, filed with the court on May 18, 2009, provided in part:

> The Parties, in complete satisfaction of the 2004 Collapse Claims, Macomb's claims with regard to the 2006 repairs to the Macomb Interceptors, and the Interceptor Interest Rate claims, agree to principal and interest rate adjustments on charges by DWSD to Macomb in the aggregate amount of $17,050,000.

Exhibit C to the Global Settlement Agreement indicated that Macomb County's pending Motion for Reconsideration, which challenged the cost of the repairs for the Project, was resolved. The Global Settlement resulted in the creation of MIDDD and the Oakland Macomb Interceptor Drain Drainage District ("OMIDDD") with the express intent of finalizing the sale of certain DWSD assets to each entity respectively. DWSD, OMIDDD and MIDDD then negotiated two deals transferring the appropriate assets to each new entity.

- September 2, 2010: Acquisition Agreement signed, along with September 2, 2010 Settlement Agreement, between MIDDD and DWSD in which the parties "waive[ed] and release[d] any claims with regard to . . . the cost of all projects and contracts shown on Schedule 3.8 to the [Acquisition Agreement] and the calculation of all credits, charges and adjustments set forth in that Schedule." [The Project in question was included on schedule 3.8]

## 2. Statement of Additional Pertinent Legal Proceedings

- **The Kwame Kilpatrick Indictment and Criminal Trial:** On December 15, 2010, the United States filed a First Superseding Criminal Indictment against former Detroit Mayor Kwame Kilpatrick; Bobby W. Ferguson; Bernard Kilpatrick; Derrick Miller; and Victor M. Mercado - *United States of America v. Kilpatrick, et al.*, Case No. 10-20403. Eventually, Miller and Mercado pled guilty to certain offenses, while, after a lengthy jury trial, a verdict of guilty against K. Kilpatrick, Ferguson and B. Kilpatrick, on various charges, was returned.

- **MIDDD Federal Lawsuit:** On July 18, 2011, MIDDD filed a lawsuit in the United States District Court for the Eastern District of Michigan against

Kwame Kilpatrick, Bobby Ferguson, Victor Mercado, and various DWSD contractors and sub-contractors alleging claims for civil RICO, antitrust violations, breach of contract, fraud, and other tort claims relating to Contract No. CS-1368. *Macomb Interceptor Drain Drainage District v. Kilpatrick et. al.*, Case No. 2:11-cv-13101 ("MIDDD Federal Case"). (Exhibit 3.) After numerous of the contractor/vendor defendants in that case moved to dismiss MIDDD's tort claims on the basis that MIDDD did not have standing to assert them, the City, through DWSD, moved to intervene as a plaintiff, asserting that the tort claims belonged to it. On May 7, 2012, Judge Cleland issued an Opinion and Order granting the City leave to intervene, but only as to the tort claims related to CS-1368.)[2] The issue as to which party owned the tort and federal statutory claims asserted by MIDDD was argued by the various parties in a July 25, 2012 hearing before Judge Cleland. On September 17, 2012, Judge Cleland issued a 30-page Opinion and Order (the "Cleland Opinion") ruling that under the plain language of the September 2, 2010 Acquisition Agreement between the City of Detroit, MIDDD, and Macomb County, the City had exclusive standing to pursue the tort and federal statutory claims.[3]

- **MIDDD's State Court Lawsuit:** A few weeks prior to the City's Chapter 9 bankruptcy filing, MIDDD filed a complaint against the City in Macomb County Circuit Court (the "MIDDD Complaint"). The MIDDD Complaint contained four counts: (I) Fraud, Fraud in the Inducement, and Silent Fraud; (II) Innocent Misrepresentation; (III) Breach of Contract; and (IV) Quantum Meruit/Unjust Enrichment. Attached to the MIDDD Complaint as Exhibits were the Acquisition Agreement, Amendment No. 2 to Contract No. CS-1368, the Acquisition Agreement Bill of Sale, the Affidavit of R. Craig Hupp, and the jury verdicts from the criminal trial of Kwame Kilpatrick and Bobby Ferguson. The relief requested in the MIDDD Complaint included a request for reformation and/or rescission of the Acquisition Agreement, and

---

[2] In its Intervening Complaint, the City asserted that Kwame Kilpatrick, Bobby Ferguson, Victor Mercado, and others agreed to conceal – and were successful in fraudulently concealing – their unlawful activities from disclosure to the DWSD Board and officials; the City and City Council; and the federal judiciary. The City further asserted that its first notice of the Kilpatrick criminal conspiracy was the filing by the federal government of the First Superseding Criminal Indictment on December 15, 2010.

[3] Although MIDDD argued that it was assigned all tort and federal statutory claims pursuant to Section 2.4 of the Acquisition Agreement, Judge Cleland disagreed, ruling that various pieces of extrinsic evidence brought by MIDDD were self-serving and barred by the parol evidence rule.

an award of damages in an amount in excess of $26 million. Prior to the City filing a responsive pleading, the matter was stayed by this Court.

- **MIDDD's Claim in Bankruptcy:** On or around May 5, 2014, MIDDD filed Proof of Claim No. 3683. As "proof" of its claims and damages in the amount of $26,000,000 it attached the MIDDD Complaint and its attachments (Dkt. 4954-2). The City filed an Objection to MIDDD's Proof of Claim.[4]

## B. Listing of Affirmative and Other Defenses, as Well as Some Authority Therefor

### 1. MIDDD's Claim is Barred by the September 2, 2010 Settlement Agreement.

MIDDD's claim that the City misrepresented the value of the Project repair costs fails because MIDDD specifically released all claims related to "[t]he cost of all projects and contracts shown on Schedule 3.8 to the MID Agreement and the calculation of all credits, charges and adjustments set forth in that Schedule." Schedule 3.8 to the Acquisition Agreement includes costs incurred for the 15 Mile Road Project under Contract No. CS-1368.

Michigan law favors settlements. *Vertex Dev. LLC v. Fifth Third Bank,* No. 308822, 2013 WL 85904, at *2 (Mich. App. Jan. 8, 2013). A presumption should

---

[4] On June 25, 2014, after a hearing regarding MIDDD's Rule 3018 motion, the Court issued a minute entry permitting limited discovery and briefing before the Court's July 17, 2014 hearing on MIDDD's Rule 3018 motion. Since June 25, 2014, MIDDD and the City have exchanged written discovery requests and documents. MIDDD took depositions of the following witnesses: Ramesh Shukla, Darryl Latimer, Bart Foster, Marc Jacobs, and Robert Walter. The City took depositions of the following witnesses: Lyle Winn, Anthony Marrocco, William Misterovich and R. Craig Hupp.

follow that when parties settle they intend to put to an end to their disagreements, and if they wish to preserve disputes for the future, they will do so explicitly. The September 2, 2010 Settlement Agreement states that it applies to "[t]he **cost of all projects and contracts** shown on Schedule 3.8 to the MID Agreement and the **calculation of all credits, charges and adjustments** set forth in that Schedule…" "[T]here is no broader classification than the word all." *Skotak v. Vic Tanny Int'l, Inc.*, 203 Mich. App. 616, 619 (1994). MIDDD's purported claim for overcharges is covered by the broad language of the release and clearly is barred.

### 2. MIDDD's Claim is Barred By the Global Settlement Agreement.

The May, 2009 Global Settlement Agreement was intended to "resolve all currently outstanding disputes pending under *U.S. v. City of Detroit, et al.* (Case No. 77-71100) . . . before the U.S. District Court for the Eastern District of Michigan . . . including, but not limited to:

> (ii) **All Disputes related to the allocation of repair costs related to the August 4, 2004 collapse on the Romeo Arm of the Macomb Interceptors at 15 Mile and Hayes (the "2004 Collapse Claims")**;

> (iii) All Disputes related to the interest rate charged to Macomb related to debt service associated with the cost of repairs of the 2004 Collapse, with subsequent repairs to the Macomb Interceptors and with the construction of the Garfield Interceptor (the "Interceptor Interest Rate Claims"); [and]

> (iv) **All Disputes and claims between the Parties related to costs for repairs and renovation of the interceptor sewers listed in Exhibit 1 of Exhibit D of this Agreement**, including any disputes and claims between the Parties relating to the associated pump stations, meters, appurtenant facilities, related easements, as built plans and records of

-30-

construction and operation, and all property otherwise described in Exhibit D (collectively, the "Interceptors")."

Further, it 1) states that "in complete satisfaction of the 2004 Collapse Claims; Interceptor Interest Rate Claims and repairs to the Interceptor," the parties agree to principal and interest rate adjustments on charges by DWSD to Macomb in the aggregate amount of $17,050,000 and 2) confirms that a closing of the future Acquisition Agreement "shall fully resolve all claims in the Action regarding the Interceptors."

### 3. MIDDD's Claims Are Barred By The Doctrines Of Waiver And Release As MIDDD Admits It Waived Its Own Claims.

Anthony Marrocco, William Misterovich, and MIDDD's attorney, Craig Hupp, admit that the Global Settlement Agreement waived all of the claims related to the Project and its costs. Hupp, MIDDD's attorney, also testified that the Global Settlement Agreement and the 2010 Settlement and Release Agreement released any claims related to the costs of the repairs of the Project.

### 4. MIDDD's Claim Is Barred, in Whole or in Part, by *Res Judicata.*

"[R]es judicata bars the same parties from relitigating issues that either were actually litigated or that could have been raised in an earlier action." *Marks v. Bank of America*, No. 13-12060, 2014 WL 700478, at *3 (E.D. Mich. Feb. 24, 2014). *Res judicata* extinguishes "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected

transactions, out of which the action arose." *G. Res., Inc. v. Shelby Ins. Co.*, 84 F.3d 211, 215 (6th Cir. 1996). To the extent that MIDDD is contending that it can recover damages for tort claims allegedly conveyed to it by the City through the Acquisition Agreement, the Cleland Opinion bars any such recovery. Pertinent to the identity of the causes of action, Judge Cleland stated:

> The claims arise from Defendants' involvement in the 2004-2005 repair of a collapsed sewer interceptor at 15 Mile Road in Sterling Heights, Michigan, (hereafter, the "15 Mile Interceptor Repair Project" or "Project"). Macomb Interceptor avers that Defendant Kwame Kilpatrick, then the Mayor of the City of Detroit, along with various City of Detroit officials conspired with the principal contractor overseeing the 15 Mile Interceptor Repair Project, Defendant Inland Waters Pollution Control, Inc., and numerous subcontractors to "overcharge the Detroit Water and Sewerage Department . . . for time, labor and materials to stabilize and repair a sewer collapse at 15 Mile Road." Macomb Interceptor further alleges that the misconduct was part of a widespread corruption scheme during Defendant Kwame Kilpatrick's tenure as Mayor of Detroit.
> *********
>
> Macomb Interceptor argues that the following two alleged injuries maintain its federal claims: (1) paying an inflated price for the Macomb System as a result of 15 Mile Interceptor Repair Project's cost overruns caused by Concurring Defendants' actions and (2) paying higher system usage charges during the time between the 15 Mile Interceptor Repair Project and the execution of the Acquisition Agreement.

(*Id.*, at 2, 16.)

It is clear that same transactions and the same damages were at issue in the MIDDD Federal Case where it asserted standing by virtue of an alleged assignment of rights under the Acquisition Agreement – the very same contract

-32-

MIDDD now relies on to support its breach of contract claim against the City.

The identities of the parties are the same as well. While the City was an intervening plaintiff in the MIDDD case, undoubtedly, the City was adverse to MIDDD in that case. The City argued that MIDDD lacked legal standing to assert tort and federal statutory claims pertaining to the Macomb Interceptor System – making the parties adverse. What matters for *res judicata* purposes is whether the City and MIDDD were adverse, even if they are co-parties. *Edelman v. McMullin Orchards*, 32 B.R. 783, 785 (Bankr. W.D. Mich. 1983) The Cleland Opinion was a final resolution of the issue of MIDDD's right and standing to bring tort and federal statutory claims relating to the alleged overcharges.

**5. MIDDD's Claim Is Barred, in Whole or in Part, By the Doctrine of Collateral Estoppel.**

Collateral estoppel – *i.e.*, issue preclusion – also bars MIDDD from relitigating any issue that another court has actually and necessarily determined against MIDDD when issuing a final decision. *Central Transp., Inc. v. Four Phase Sys.*, 936 F.2d 256, 260 (6th Cir. 1991). "[S]ummary judgment is recognized as a final judgment for the purpose of issue preclusion." *National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 910 (6th Cir. 2001). The same is true under Michigan law. *Roskam Baking Co. v. Lanham Mach. Co.*, 288 F.3d 895, 905 (6th Cir. 2002) ("[I]t is clear Michigan law permits preclusion of issues decided by a judge as part of a summary disposition."). Judge Cleland's ruling that the City

-33-

owned all tort claims relating to the 15 Mile Road Sewer Project based on the unambiguous contractual language in the Acquisition Agreement precludes MIDDD from protesting any of the findings of the Cleland Opinion in a different forum.

> **6.** **MIDDD's Claim Fails Because MIDDD's Complaint Does Not Establish a Breach of Any Provision of the Acquisition Agreement.**

In Count III of the MIDDD Complaint, MIDDD asserts a general claim for breach of the Acquisition Agreement. MIDDD's vague and scattered claims lack support and fail to demonstrate how the City breached the Acquisition Agreement.

- First, MIDDD alleges that the City breached Section 2.4 of the Acquisition Agreement, which states that "Detroit shall assign to the [MIDDD] all of its rights under all contracts, warranties and guarantees that apply to services or goods related to the Macomb System." (Complaint, ¶100(a).) MIDDD makes a similar allegation regarding Section 2.9(b)(8) of the Acquisition Agreement, which states that the City is to provide "[a]n assignment of all rights under any contracts, warranties or guarantees that apply to services or goods related to the facilities comprising the Macomb System…." (Complaint, ¶100(d).) MIDDD fails to allege any actions by the City in breach of Sections 2.4 or 2.9(b)(8) of the Acquisition Agreement. It is presumed, however, that MIDDD will claim these provisions of the Acquisition Agreement were breached (1) when the City did not transfer tort and federal statutory claims to MIDDD in connection with the Acquisition Agreement; or (2) when the City intervened in the MIDDD Federal Case to assert its rights to the tort and federal statutory claims. As to the first point, the affidavit of R. Craig Hupp, relied upon by MIDDD, reveals that the City's right to assert tort and federal statutory claims was not considered or discussed during negotiations of the Acquisition Agreement. As to the second point, Judge Cleland ruled that the Acquisition Agreement did not convey tort claims to MIDDD, and the City is entitled to pursue those claims. As such, the City did not breach the Acquisition Agreement by intervening in the MIDD Federal Claim to assert its rights.

-34-

- Second, MIDDD alleges that the City breached Section 2.6(b) of the Acquisition Agreement, which states that "Detroit shall in no way retain, the obligation to pay, discharge, perform or defend, as applicable and when due, any and all of the Assumed Liabilities." (Complaint, ¶100(b).) "Assumed Liabilities" is specifically defined as "any and all Liabilities excluding: (i) the retained Liabilities, and (ii) Claims by and among any or all of Detroit, the District, Macomb County or Oakland County and the [MIDDD]." (Exhibit 20, §1.3.) There is nothing in this paragraph that sets forth <u>any</u> duty owed by the City – only MIDDD can breach this provision because it defines the liabilities that <u>MIDDD assumed</u>.

- Third, MIDDD alleges that the City breached Section 2.9(b)(4) of the Acquisition Agreement, which states that the City must deliver to MIDDD "[a]n executed assignment of all of the Macomb System that is intangible personal property in form and substance satisfactory to [MIDDD] and its counsel and executed by Detroit." (Complaint, ¶100(c).) A Bill of Sale was executed, which identified and transferred certain intangible personal property. Again, Judge Cleland's ruling that the Acquisition Agreement did not convey potential tort claims dooms MIDDD's contention.

- Fourth, MIDDD alleges that the City breached Paragraph 2.9(b)(9) of the Acquisition Agreement requiring the City to provide a certificate as to the accuracy of its representations and warrantees in the Acquisition Agreement and as to its compliance with covenants and obligations to be complied with at or before closing. (Complaint, ¶¶100(e)-(f).) MIDDD does not allege that the certificate was not provided, and does not state what provision, if any, of the certificate was breached by the City.

- Fifth, MIDDD alleges that the City breached Section 3.3 of the Acquisition Agreement (Complaint, ¶100(h).) but fails to allege any facts suggesting a violation of the Charter, ordinances, or any other applicable law in the "execution, delivery and performance by Detroit" of the Acquisition Agreement. This provision is a promise that the execution, delivery, and performance of the Acquisition Agreement does not conflict with any law, and MIDDD has not alleged that the Acquisition Agreement violated the law.

- Sixth, MIDDD alleges that the City breached Section 3.7 of the Acquisition Agreement. (MIDDD Complaint, ¶100(g).) MIDDD has failed to allege or identify an "action, suit or proceeding pending or, to Detroit's knowledge

-35-

threatened against or affecting Detroit" at the time the Acquisition Agreement was signed, in which there was "a reasonable possibility of an adverse decision which could have a material adverse effect upon the ability of Detroit to perform its obligations under the Agreement or which . . . questions the validity of the Agreement." At best, the only action, suit, or proceeding which MIDDD may claim was not disclosed by Detroit was the Kilpatrick criminal investigation. It was not until the First Superseding Criminal Indictment on December 15, 2010, over three months after the Acquisition Agreement, that Detroit became aware of 1368-2 and 1368-3 potential wrongdoing. Regardless, that matter did not have a materially adverse effect upon the ability of the City to perform its obligations under the Acquisition Agreement, nor did it question the validity of it.

- Seventh, MIDDD alleges that the City breached Section 3.8, which "sets forth all System Debt…." It is undisputed that Schedule 3.8 of the Acquisition Agreement sets forth the agreed upon "System Debt." That MIDDD now disagrees with the amount of the System Debt, although it did not do so at the time Schedule 3.8 was agreed upon by the parties, does not afford a basis for a breach of that provision. 3.8 merely lays out what the parties agreed the system debt was as of June 30, 2013: there is no way to "breach" it.

- Eighth, MIDDD alleges that the City breached Section 5.3, which states that "Detroit shall promptly inform the Macomb County and MID in writing of any Claims of which Detroit is or becomes aware of that are or might reasonably be expected to become the subject of litigation <u>affecting the Macomb System or the transactions contemplated by this Agreement</u>." (Complaint, ¶100(i).) (emphasis added). The plain language of Section 1.6 makes clear that a "Claim" that must be disclosed by the City is only an investigation or litigation to which Detroit, Macomb County, or MIDDD "may become legally and/or contractually obligated to defend against . . . which are related in any way to the Macomb System." The Kilpatrick criminal case does not constitute a "Claim" because it did not involve any matter in which Detroit, Macomb County, or MIDDD could become legally or contractually obligated to defend against. It was a criminal matter brought by the United States. In addition, the City did not get notice of the Kilpatrick criminal case until the filing of the First Superseding Indictment on December 15, 2010.

- Ninth, MIDDD alleges the City breached Section 5.4, which provides that the City shall inform MIDDD if it "becomes aware that any representation or

-36-

warranty made by Detroit in [the Acquisition Agreement] has ceased to be accurate or if Detroit becomes aware of the occurrence of any breach of any covenant or other agreement required by [the Acquisition Agreement]." (Complaint, ¶100(j).) To the extent the filing of the First Superseding Indictment in the Kilpatrick criminal case forms the basis for MIDDD's claim for breach of Section 5.4, no breach occurred on September 2, 2010, as the filing of the First Superseding Indictment became public knowledge on the date of its filing.

- Finally, MIDDD alleges that the City breached Section 8.1 of the Acquisition Agreement, which states that the City's representations and warranties in the Acquisition Agreement were "true and correct." (Complaint, ¶100(k).) Again, MIDDD has not identified a single representation or warranty made in the Acquisition Agreement that was untrue.

Given the foregoing, MIDDD's contract claim should be dismissed outright.

### 7. MIDDD Cannot Rely on Parol Evidence to Prove Its Breach of Contract Claim.

It is expected that MIDDD will rely upon parol evidence (*i.e.* evidence from outside the four corners of the Acquisition Agreement and the Global Settlement Agreement) to form the basis of its breach of contract claim – despite the fact that the Acquisition Agreement and Global Settlement Agreement both contain a merger and integration clause. In reality, MIDDD's claim is nothing but a thinly veiled attempt to have the Court re-write and enforce an entirely different contract using parol evidence.

Parol evidence is not admissible to prove the terms of an unambiguous contract. "Parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary

-37-

the terms of a contract which is clear and unambiguous." *Schmude Oil Co. v. Omar Operating Co.,* 184 Mich. App. 574, 580 (1990). Behind "nearly every written instrument lies a parol agreement, merged therein." *Lee State Bank v. McElheny,* 227 Mich. 322, 327 (1924). "The practical justification for the rule lies in the stability that it gives to written contracts; for otherwise either party might avoid his obligation by testifying that a contemporaneous oral agreement released him from the duties that he had simultaneously assumed in writing." 4 Williston, Contracts, § 631. Only when a contract is ambiguous may the court consider extrinsic evidence. *See Klapp v. United Ins. Group Agency, Inc.,* 468 Mich. 459, 469 (2003).

MIDDD has not identified any ambiguous portion of the Acquisition Agreement that would require the use of parol evidence to aid in its interpretation. The plain language of each of the provisions outlined by MIDDD demonstrates that they were not breached. MIDDD readily admits that, in general, parol evidence is not permitted to alter or vary the terms of a contract. *Salzman v. Maldaver*, 315 Mich. 403, 413 (1946). MIDDD further admits that it is seeking to introduce parol evidence regarding purported representations made by Mercado to MIDDD. Specifically, MIDDD's entire argument is based on its allegation that while the Acquisition Agreement contains a detailed calculation of the purchase price for the Macomb Interceptor System based on a calculation of "System Debt,"

-38-

that the real agreement was that MIDDD would pay a "fair" and "reasonable" amount for the 15 Mile Road repairs. This would constitute a different agreement.

Additionally, the Acquisition Agreement contains an integration clause, which states that the agreement "constitutes the sole understanding of the parties hereto with respect to the matters provided for herein and supersedes any previous agreements and understandings between the Parties with respect to the subject matter hereof." The merger and integration clauses from these agreements nullify "all prior and contemporaneous agreements, understandings, representations and warranties" made by a party. *Hamade v. Sunoco, Inc. (R&M)*, 271 Mich. App. 145, 171 (2006). Because any pre-contractual statements were "collateral agreements or understandings between two parties that [were] not expressed in a written contract," they are "eviscerated by [the] merger clause[.]" *Barclae v. Zarb*, 300 Mich. App. 455, 481 (2013).[5]

---

[5] The purpose of an integration clause is to prevent either party from relying on statements or representations made during negotiations that were not included in the final agreement. *UAW–GM Human Resource Ctr. v. KSL Recreation Corp.*, 228 Mich. App. 486, 507 n. 14 (1998) ("The raison d'être of an integration clause is to prohibit consideration of parol evidence by nullifying agreements not included in the written agreement.") MIDDD's various fraud allegations do not change the fact that the integration clause is binding, and that MIDDD cannot rely on any statement made outside of the four corners of the Acquisition Agreement. In *UAW-GM Human Resource Center v. KSL Recreation Corp.*, the court held that "the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause." *Id.* Here, as in *UAW-GM*, MIDDD made no allegations of fraud that would invalidate the contract or the merger clause itself. The written agreement is detailed and complete on its face, (*see* 3 Corbin, Contracts, § 57), and its words are unambiguous. The integration clause is not void.

8.     **MIDDD Fails to Plead Fraud with Particularity as Required by Federal Rule of Civil Procedure 9(b).**

The MIDDD Complaint asserts two fraud claims: fraud/fraud in the inducement/silent fraud (Count I) and innocent misrepresentation (Count II). The Federal Rules provide heightened pleading requirements for claims of fraud. Fed. R. Civ. P. 9(b). To meet the heightened standards of Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 569-70 (6th Cir. 2008). "A plaintiff, at a minimum, must allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *U.S. ex rel. Bledsoe v. Comm. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007); *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993) (allegations must support an inference that they were knowingly made).

The MIDDD Complaint does not allege any specific misrepresentations by the City; and thus does not satisfy the "minimum" requirement in fraud cases that it "allege the time, place, and content of the alleged misrepresentation on which [it] relied." *Bledsoe*, 501 F.3d at 504. At best, MIDDD alleges that the City (without specifying who, what or when), made misrepresentations to the effect (1) that "all" of Detroit's tangible and intangible rights, including the right to assert "any and

-40-

all" claims regarding the Project were being acquired by Plaintiff; (2) that its public officials abided by all state, federal and local laws a regulations; and (3) that no claims existed regarding the Macomb system. MIDDD's threadbare, non-specific allegations are plainly insufficient to meet the particularity requirements of Rule 9(b).

### 9. MIDDD's Fraud Claims Fail As A Matter Of Law Because A Tort Claim Cannot Be Based On A Breach Of Contract.

In Count I and II of the MIDDD Complaint, MIDDD pleads fraud, innocent misrepresentation and silent fraud. These are tort claims under Michigan law; however, "it is no tort to breach [or not perform] a contract." *Battista v. Lebanon Trotting Assoc.*, 538 F.2d 111, 117 (6th Cir. 1976); *Fultz v. Union-Commerce Assocs.*, 470 Mich. 460, 466 (2004). Misrepresentations relating to the performance of a contract do not give rise to an independent cause of action in tort. *Huron Tool & Engineering Co. v. Precision Consulting Servs., Inc.,* 209 Mich. App 365, 373 (1995). As such, a party may bring a tort claim (such as fraud) against another party with whom it has a contract **only** when it alleges the "violation of a legal duty *separate and distinct* from the contractual obligation and when the fraud is extraneous to the contract and causes a harm distinct from the harm caused by a beach of the contract. *Fultz*, 470 Mich. at 466; *Rinaldo's Constr. Corp. v. Michigan Bell Telephone Co.*, 454 Mich. 65, 83 (1997) ("the threshold inquiry is whether the plaintiff alleges violation of a legal duty separate

-41-

and distinct from the contractual obligation"). No cognizable cause of action in tort exists when the plaintiff fails to allege violation of an independent duty. *Appleway Equipment Leasing, Inc. v. River City Equipment Sales, Inc*., 2012 WL 6177067, at *2 (Mich.App. 2012).

Here, MIDDD's "fraud" claims are plainly based on an alleged breach of the Acquisition Agreement – they are not extraneous to, nor independent of it. MIDDD's fraud claims are merely restatements of its claims for breach of contract: the subject matter of the allegedly fraudulent statements outlined in the complaint relate to alleged breaches of Sections 3.7, 3.8, 5.3, 5.4, and 8.1 of the Acquisition Agreement. MIDDD's counsel even admitted that while MIDDD alleges a variety of fraud claims – ultimately "the claim here is pled for revision, reformation, in addition to damages, and for that reason **it would be a contract claim as opposed to the traditional tort [fraud] claim that is barred by governmental immunity"** (emphasis added).

### 10. MIDDD's Silent Fraud Claim Fails.

MIDDD'S claim of silent fraud also fails. A claim of silent fraud exists only where a defendant is under a legal duty to disclose. *Hord v. Envtl. Research Inst*., 463 Mich. 399, 412 (2000). Such a duty may arise when a defendant receives a specific inquiry and where the defendant responds by providing incomplete or untruthful information. *Id.* Here, other than contractual Acquisition Agreement

provisions, MIDDD has not even alleged facts sufficient to show that Detroit had any legal duty of disclosure to MIDDD.

### 11. MIDDD's Fraudulent Inducement Claim Fails.

Generally, "actionable fraud must be predicated on a statement relating to a past or existing fact." *Samuel D Begola Services, Inc v. Wild Bros,* 210 Mich.App 636, 639 (1995). "Fraud in the inducement occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Id.* Fraud in the inducement renders the contract on which it was based voidable "at the option of the defrauded party." *Id.* at 640. Generally, future promises are contractual and do not constitute fraud unless the promises were made in bad faith without the present intention to perform. *Greenville Mfg., LLC v. NextEnergy Center*, 2012 WL 3101826 at *2.

Here, MIDDD fails to allege a misstatement relating to future conduct. Commissioner Marrocco admits that MIDDD's claim is solely based upon actions or disclosures that the City allegedly made or should have made about events or circumstances *prior to* the Acquisition Agreement, not future promises – as is required for a fraudulent inducement claim.

## 12. MIDDD's Innocent Misrepresentation Claim Fails.

A claim of innocent misrepresentation is shown if a party detrimentally relies upon a false representation in such a manner that the injury suffered by that party inures to the benefit of the party who made the representation. *United States Fidelity & Guaranty Co. v. Black,* 412 Mich. 99, 118 (1981). The innocent misrepresentation rule represents a species of fraudulent misrepresentation but has, as its distinguishing characteristics, the elimination of the need to prove a *fraudulent purpose* or an intent on the part of the defendant that the misrepresentation be acted upon by the plaintiff, and has, as added elements, the necessity that it be shown that an unintendedly false representation was made in connection with the making of a contract and that the injury suffered as a consequence of the misrepresentation inures to the benefit of the party making the misrepresentation. *United States Fidelity & Guarant. Co.*, 412 Mich. at 118. In light of the Acquisition Agreement integration clause, MIDDD cannot establish that the City made any misrepresentation on which MIDDD relied and/or was entitled to rely. Thus, MIDDD's innocent misrepresentation claim has no merit.

## 13. MIDDD's Fraud Claims Are Barred by Governmental Immunity.

MIDDD's fraud claims are also barred by governmental immunity. In Michigan, "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental

-44-

function." Mich. Comp. L. § 691.1407(1). The City of Detroit is a "[g]overnmental agency," *see* Mich. Comp. L. § 691.1401(a),(d),(e), and "[g]overnmental functions" include the activity related to asset-sales.

A "governmental function" includes any "activity that is expressly or impliedly mandated or authorized by ... statute ... or other law." MCL § 691.1401(b). There is no question that the City, through DWSD, was legally authorized to sell the property and assets sold to MIDDD. Allegations of fraud do not take government conduct outside the statutory immunity. *Local Emergency Fin. Assistance Loan Bd. v. Blackwell*, 299 Mich. App. 727, 736, 832 N.W.2d 401, 405 (2013).[6] Instead, the Michigan governmental immunity statute bars claims – like MIDDD's – that fraud induced the plaintiff to enter a contract. *Id.* at 735 (plaintiff claimed that fraud about city's finances and actual affairs caused him to agree to serve as emergency financial manager). The statute also bars claims for silent fraud, innocent misrepresentation and all fraud claims in general. *See Northern Warehousing Inc. v. Michigan Dep't of Educ. (On Remand)*, Case No. 260598, 2006 WL 2419189, at *4 (Mich. App. Aug. 22, 2006); *Williams v. Wayne Cnty.*, Case No. 09-14328, 2011 WL 479959, at *7 (E.D. Mich. Feb. 4, 2011);

---

[6] "In assessing whether an activity is a governmental function, the focus is on the general activity, not the specific conduct giving rise to the tort claim." *Williams v. Wayne Cnty.*, Case No. 09-14328, 2011 WL 479959 (E.D. Mich. Feb. 4, 2011) (citing *Herman v. Detroit*, 261 Mich. App. 141, 680 N.W.2d 71, 75 (Mich. App. 2004)).

*Thomas v. Detroit*, Case No. 06-10453, 2007 WL 674593, at \*6 (E.D. Mich. Feb. 28, 2007); *Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 280 Mich. App. 16, 40 (2008). MIDDD's counsel acknowledges that governmental immunity would defeat a fraud claim, but contends that MIDDD's claim is a **"contract claim as opposed to the traditional tort [fraud] claim that is barred by governmental immunity"** (emphasis added).

### 14. MIDDD's Quantum Meriut and Unjust Enrichment Claims are Barred by the Existence of an Express Contract.

MIDDD's claim for quantum meruit/unjust enrichment (Count IV) also fails as a matter of law. "A quasi-contractual theory of recovery is inapplicable when the parties are bound by an express contract." *Cloverdale Equip. Copmany v. Simon Aerials, Inc.*, 869 F.2d 934, 939 (6th Cir. 1989). "If the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for quantum meruit or implied contract…" *Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 828 F. Supp. 484, 491 (E.D. Mich. 1993). Here, the parties do not dispute the existence of a contract – the Acquisition Agreement – but instead disagree on its scope, terms, and effect. Therefore, MIDDD's quasi-contractual claims are meritless.

### 15. MIDDD's Reliance on the Kilpatrick Jury Verdict is Misplaced.

MIDDD relies on the Kilpatrick jury verdict forms to purportedly show that Ferguson "received more than $23.7 million in contract revenues from Inland

-46-

Waters, in large part for work done on the sinkhole repair" and that he received more than $175,000 in other payments.  However, nothing in the jury verdict forms establishes that Detroit overpaid Ferguson by $23.7 million, or that a large part of this amount was for the Project.  The jury solely found that Ferguson committed extortion.  The jury verdict is not a finding that DWSD (and by extension, MIDDD) overpaid for the project.  Even assuming MIDDD somehow proved the factual and legal basis of its complaint and had a viable claim for damages, the record indicates that although Ferguson Enterprises was paid over $23,000,000 for work on Contract No. CS-1368; only $3,017,007.62 of that amount was for work on CS 1368-2 and CS 1368-3, which are the two amendments of CS 1368 that covered the cost of the 15 Mile Road sewer collapse repairs.  The bulk of the amounts paid to Ferguson Enterprises was for sewer lining and point repair work that was not part of CS 1368-2 or 3.

### 16. MIDDD's Reliance on the City's Allegations in the Federal Case is Misplaced.

The City's allegations in the Federal Case are not binding judicial admissions.  "[A]n admission made in a different case is not conclusively binding, unless judicial estoppel applies." *In re NM Holdings Co., LLC*, 407 B.R. 232, 285 (Bankr. E.D. Mich. 2009). Michigan courts hold that a judicial admission in one proceeding cannot be used in other proceedings, and ordinary "party admissions" are not conclusively binding. *See Radtke v. Miller, Canfield, Paddock & Stone*, 453

-47-

Mich. 413, 419-421 (1996) (explaining Mich. Ct. R. 2.312 and Fed. R. Civ. P. 36). This is especially true for damage allegations. For example, when cases are removed to federal court, "the fact that Plaintiff had previously admitted that her damages exceeded $75,000 in her 2012 case is beside the point. . . . [J]udicial admissions are normally 'binding for the purpose of the case in which the admissions were made, not in separate and subsequent cases.' " *Brenner v. Cumberland Farms, Inc.*, Case No. 14-60075-CIV, 2014 WL 1384421, at *2 (S.D. Fla. April 9, 2014) (citation omitted); *see In re Raiford*, 695 F.2d 521, 523 (11th Cir. 1983) ("Normally judicial admissions are binding for the purpose of the case in which the admissions are made, not in separate and subsequent cases.") (citing 4 J. Wigmore, *Evidence* § 1066 at 86 (Chadbourn rev. 1972)). *See also* The Late Charles Alan Wright, et al., 18A *Fed. Prac. & Proc. Juris.* § 4443 (2d ed. 2014) ("In older practice, admission of facts set out in an opposing pleading by demurrer or failure to deny could give rise to issue preclusion. Today it seems to be agreed on all sides that issue preclusion does not apply. . . . [P]leading maneuvers in one suit should not carry such consequences in other suits.") (footnotes omitted).

Here, although in the Federal District Court case, Detroit through its complaint, adopted MIDDD's allegations of over $23,000,000 of damages, after the case was litigated for the better part of a year and after facilitation, Detroit settled with the vendor that oversaw the Macomb Interceptor collapse repairs,

-48-

Inland, for $4,500,000. This settlement included not only the full CS-1368 contract, but several other projects. Clearly, Detroit backed off the $23,000,000 CS-1368 and CS-1368-3 damages claim. Certainly it is not unusual for a Plaintiff to find that its claim is not so valuable as initially thought. The fact that the value of the claim was asserted in a separate lawsuit furnishes all the more reason to conclude that Detroit should not be bound by it.

### 17. MIDDD's Claim That The Acquisition Agreement Should Be Rescinded Is Barred By Its Failure To Tender Back The System.

To the extent MIDDD takes the position that the Acquisition Agreement should be rescinded, it must tender back the consideration it received under the agreement. It has not done so and, thus, its rescission claim has no merit.

WHEREFORE, for all of the foregoing reasons, the Debtor respectfully requests that the Court dismiss MIDDD's Claim No. 3683.

Dated: September 17, 2014          Respectfully submitted,

By: /s/ Stephen S. LaPlante
Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
Jerome R. Watson (MI P27082)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500

-49-

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

ATTORNEYS FOR THE CITY OF DETROIT

**CERTIFICATE OF SERVICE**

I, Stephen S. LaPlante, hereby certify that the foregoing Debtor's Detailed Objection And Affirmative Defenses To Macomb Interceptor Drain Drainage District's Proof Of Claim was filed and served via the Court's electronic case filing and noticing system on this 17th day of September, 2014.

/s/ Stephen S. LaPlante

Dated:  September 17, 2014

22987923.1\022765-00202