# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

---

In re:

CITY OF DETROIT, MICHIGAN,

Debtor.

Chapter 9
Case No. 13-53846
Hon. Steven W. Rhodes

---

## ATTORNEY GENERAL'S RESPONSE TO
## JOINT PRETRIAL BRIEF OF BOND INSURERS

### INTRODUCTION

By their Joint Pretrial Brief objecting to the DIA Settlement (Document #7103), the Bond Insurers have challenged some of the analysis in Attorney General Opinion No. 7272, whereby the Attorney General concluded that the entire DIA Collection is held in charitable trust and cannot be sold, conveyed, or transferred to satisfy City debts. This brief responds to some of those arguments and corrects the record on other salient points involving the Attorney General, who represents the people of Michigan regarding their interest in charitable trusts.

1

This brief does not attempt to answer every point raised in the Bond Insurers' 174-page brief, as the DIA has already provided its own 85-page analysis that need not be repeated, but addresses those points that will assist the Court. Of course, in adopting the DIA Settlement—known as the "Grand Bargain"—the City's Plan of Adjustment does not propose to sell or otherwise encumber any of the DIA Collection, so the Attorney General fully supports the DIA Settlement as preserving the entire DIA Collection in perpetual charitable trust. Thus, the question of whether the City can sell the art is not before the Court.

Instead, the question before the Court is whether the City's Plan is reasonable. The Bond Insurers argue that it is not, asserting that the claim by the Attorney General and the DIA Corp. that the DIA Collection cannot be sold is wrong. In arguing against the Plan's reasonableness, the Bond Insurers take issue with the Attorney General's legal position, fault his process in preparing AG Opinion No. 7272, and reveal a misunderstanding of the significance of registering as a charitable trust with the Attorney General. They also expose flaws in their position. The Attorney General makes five brief points here.

First, Michigan law requires that the intentions of charitable donors be given effect and that the assets of charitable corporations be used for charitable purposes. The Bond Insurers admit that fully 95% of the DIA Collection is the result of charitable gifts to the DIA Corp.— the charitable corporation that founded the Museum in 1885, has supported it ever since, and operates it today. Yet in expecting the City to sell this donated art, the Bond Insurers would have the City ignore Michigan law. The City properly proposes a Plan that respects—not opposes—the intentions of the Museum's many charitable donors, and that preserves—not plunders—the numerous and substantial charitable assets that they donated. And the City's Plan does more: in obtaining contributions from the State, various charitable foundations, and the DIA Corp., the DIA Settlement also generates hundreds of millions of dollars for creditors. This result is eminently reasonable.

Second, the Bond Insurers' argument that the Museum could not have begun as a charitable trust in 1885, because charitable trusts were not allowed at that time, is predicated on a misunderstanding of Michigan law. The Bond Insurers have oversimplified the status of early charitable gifts in Michigan. Such gifts were valid so long as they

3

were sufficiently definite. The early gifts to the Museum were valid and, in fact, were expressly authorized by the Legislature for the public's benefit.

Third, the City's action of not registering the DIA Collection as a charitable trust with the Attorney General is neither surprising nor significant. The lack of clarity in the municipal exemption under the Supervision of Trustees for Charitable Purposes Act has led to only a few municipalities registering.

Fourth, regarding the claims about the opinion process, the Attorney General followed his usual protocol in preparing AG Opinion No. 7272: he assigned an attorney within the Department responsible for this area of the law to consider the question and to draft an initial opinion; the attorneys working on the opinion received materials from the DIA Corp. and conducted their own independent analysis; and the opinion was reviewed by other Department attorneys and the Department's Opinion Review Board. And there was no rush to issue the opinion. The Attorney General and his staff considered the question for two months before issuing the opinion.

4

Fifth, and finally, if the Court were to reject the Plan and the City decided to sell or otherwise compromise the integrity of the DIA Collection, the Attorney General could not stand by and allow the City to violate Michigan law in this way, but would be duty-bound to take legal action to safeguard Michigan law and defend the DIA Collection to preserve it for the people of Michigan. The Court's decision to accept the City's reasonable Plan would avoid this necessity.

## ARGUMENT

**I.    Fully 95% of the Museum's collection resulted from charitable donations and are protected under fundamental principles of charitable trust law and property law.**

In arguing that the City would have a substantial likelihood of success in any litigation regarding donor restrictions, the Bond Insurers argue that, even though 95% of the gifts to the Museum were either donated to the DIA Corp. or purchased with funds that were donated to the DIA Corp., gifts that were not specifically restricted are not restricted to charitable purposes. Not so.

The Bond Insurers reach this erroneous conclusion relying on the fact that, after receiving the gifts, the DIA Corp. transferred these gifts

5

to the City and did not add any restrictions on the transfer. See Joint Pretrial Brief at 144–45 (Document #7103).

This is an astounding claim. The Bond Insurers admit that the Museum's many charitable donors made these numerous and substantial gifts of art or money to the DIA Corp.—a charitable corporation that exists to support the Museum—and not to the City. Nevertheless, the Bond Insurers claim that *the City should violate the intentions of the donors* and divert this donated art for the benefit of the City's creditors. This contradicts fundamental principles of both charitable trust law and property law.

## A.    Charitable trust law

The foundational principle of charitable trust law is the preservation of the donor's charitable intent. A concise statement of this principle is found in Michigan's Charitable Gifts Act. Mich. Comp. Laws § 554.351 *et seq*. The Charitable Gifts Act, a version of which was first passed in 1907, begins by recognizing the validity of charitable gifts as creating charitable trusts; it then states: "Every such trust shall be liberally construed by the court so that the intentions of the creator thereof shall be carried out whenever possible." Mich. Comp.

6

Laws § 554.352.  In other words, Michigan has adopted a liberal public policy with respect to gifts for charitable uses:  the courts should do their best to give effect to the intentions of charitable donors; if the donor's intent can be construed, it should be honored.  *See* Mich. Law & Pract., Charities § 4 (2014).

A corollary of the principle of preserving donor intent is that charitable assets may not be diverted to non-charitable purposes.  *See, e.g.*, Mich. Civ. Juris., Charities § 14 (2014) ("A charitable fund given to be applied to specific uses cannot be diverted to other uses."); *see also* Charitable Organizations and Solicitations Act, Mich. Comp. Laws § 400.288(j) (prohibiting diversion of solicited charitable contributions to purposes or organizations other than that for which the funds were solicited); *see also* Nonprofit Corporation Act, Mich. Comp. Laws § 450.2301(5) ("This act shall not be deemed to permit assets held by a corporation for charitable purposes to be used, conveyed or distributed for noncharitable purposes.").

Here, there can be no doubt as to the intent of the Museum's charitable donors.  They did not donate directly to the City for the City's general purposes.  They donated to a charitable corporation—the DIA

Corp.—which had the express charitable purpose of supporting the Museum and enhancing its collection.

The DIA Corp. has restated its articles several times since its founding in 1885, but it has always operated in support of the Museum. The DIA Corp.'s 1958 restated articles of incorporation declare its purpose this way: "To assist the City of Detroit in the operation of the Detroit Institute of Arts by soliciting, receiving and administering money, property, and works of art to be donated to the City of Detroit or otherwise used *so as to add to the City collection of works of art*[.]" (emphasis added) (available through LARA's business entity search at [www.dleg.state.mi.us/bcs_corp/sr_corp.asp](http://www.dleg.state.mi.us/bcs_corp/sr_corp.asp))  Donations were not to be given to the City for its general purposes, as the Bond Insurers would have it, but to support the DIA Collection—a charitable purpose.

The Bond Insurers emphasize the fact that most of the gifts to the DIA Corp. were unrestricted.  But whether donors restricted their gifts is irrelevant to the present analysis: even unrestricted gifts to charitable corporations must be used consistently with the charitable purposes of the corporation to which they were donated.  *See* Bogert *et al.*, The Law of Trusts and Trustees § 323 (updated September 2014)

8

("A charitable gift in trust may be effectively made by giving property to a charitable corporation, community trust or foundation, thereby incorporating the terms of its charter or other governing instrument.").

That the DIA Corp. later transferred legal title of the gifted art to the City—another fact on which the Bond Insurers rely—does not alter this analysis. The reality remains that these were charitable gifts. A charitable corporation may only distribute its assets in conformity with its corporate purposes. Michigan Nonprofit Corporation Act, Mich. Comp. Laws § 301(1). It may not distribute its assets for non-charitable purposes. *Id.*, § 301(5). The DIA Corp.'s transfer of donated art to the City was consistent with its corporate purpose because the transferred art was only to be used to add to the DIA Collection and thus held for the benefit of the people of Michigan. And, in fact, the transferred art has always been used solely for this charitable purpose. For the City now to divert the Museum's assets to pay its general debts—debts not associated with the Museum—would be a breach of the DIA Corp.'s charitable trust, a breach of donor intent under the Charitable Gifts Act, and a diversion of assets under the Nonprofit Corporation Act. In that instance, the Attorney General is required by law to act on behalf

of the people of Michigan to remedy any breach or any diversion of charitable assets.

The Bond Insurers' attempts to have the City frustrate the charitable intentions of the donors and divert the donations to the Bond Insurers violate Michigan law and should be rejected. Quite reasonably, the City chose the DIA Settlement instead, which not only generates hundreds of millions of dollars for bankruptcy creditors, but preserves the entire DIA Collection in perpetual charitable trust.[1]

## B. Property law

The Bond Insurers' argument that the City should sell the donated works of the DIA Collection also ignores a fundamental principle of property law: an owner can only convey those interests in property that he actually owns. The Bond Insurers—consistent with their strategy of trying to scrub the charitable nature from these

---

[1] In present value, the DIA Settlement generates $455 million to the bankruptcy. This figure is consistent with the low end of the City's valuation of the City-purchased art that comprises 5% of the DIA Collection. Because the DIA Settlement avoids the risks of litigation, generates a substantial sum for City creditors, *and* keeps the entire DIA Collection intact for the people of Michigan, this is a laudable result. And the DIA Settlement is all the more reasonable when one recognizes that the City cannot be required to sell assets in a municipal bankruptcy at all.

donated charitable assets, contrary to Michigan law—argue that, in transferring the donated art to the City, the DIA Corp. failed to include any restrictions on the transfer and thereby cleansed the donated art from the DIA Corp.'s organizational restrictions as a charitable corporation.  Br. at 144.

The Bond Insurers are mistaken.  The DIA Corp. did not need to include any additional restrictions on the artwork it conveyed to the City because the DIA Corp. could only convey to the City the interest that it actually owned.  This is an elementary principle of property law. *See, e.g.*, Restatement of the Law – Property § 32.2 ("The donor cannot transfer to the donee a greater beneficial interest in the subject matter of the gift than the donor owns.  If the donor purports to give the donee a greater interest in the subject matter of the gift than the donor owns, the donee will receive whatever it is that the donor could have given the donee in the subject matter of the gift.").

Under Michigan's Charitable Gifts Act, every time a gift is given for a charitable purpose or to a charitable organization, the gift creates a trust: the recipient of the charitable gift, whether an organization or a person, holds the gift as trustee for the benefit of the public.  *See* Mich.

11

Comp. Laws § 554.351 and 554.352 (referring to all "gifts, grants, bequests, and devises" as being *trusts*). Some gifts articulate the particular purpose of the gift in a gift instrument; others declare the purpose of the gift by responding to a charitable solicitation for a particular purpose; and perhaps most commonly (think of a donation to a Salvation Army kettle), others declare the purpose of their gift by giving to an organization to use according to the charitable purposes for which the organization was formed. *See* Bogert *et al.*, The Law of Trusts and Trustees § 323 (updated September 2014) ("A charitable gift in trust may be effectively made by giving property to a charitable corporation, community trust or foundation, thereby incorporating the terms of its charter or other governing instrument.").

Because the recipient receives the gift as a trustee, the trustee only holds legal title, with the public serving as the ultimate beneficiary of the gift and thus possessing the beneficial interest in the gift. Mich. Comp. Laws § 554.351 ("If in the instrument creating such a gift, grant, bequest or devise, there is a trustee named to execute the same, *the legal title* to the lands or property given, granted, devised or bequeathed for such purposes, shall vest in such trustee.") (emphasis added); *see*

12

*also*, *e.g.*, *In re Americana Foundation*, 378 N.W.2d 586, 589 (Mich. Ct. App. 1985) (trustee foundation "held the legal estate whereas the public received the benefit and enjoyment."). Recognizing that the dispersed members of the public would be unable to enforce the various charitable gifts that may operate for their benefit, the Act names the Attorney General as the public's representative to enforce these trusts: "The attorney general shall represent the people of the state and the beneficiaries in all cases where they are uncertain or indefinite, and shall enforce such trusts by proper proceedings in the court[.]" Mich. Comp. Laws § 554.352.

If the recipient of a charitable gift conveys the gifted property to another entity, legal title passes to the new trustee, but the equitable title—also called the beneficial interest—remains in the public. In this way, once a gift is gifted to a charitable purpose, that purpose must be perpetually honored for the benefit of the public. *See also generally* Restatement (Third) of Trusts § 67 (2003) (recognizing rule of cy pres as vindicating perpetual nature of all charitable trusts, and affording judicial remedy where trust's purpose becomes illegal, impractical, or impossible).

Because the DIA Corp. received the donated art (or the money donated to purchase art) as charitable gifts, the DIA Corp. only possessed the legal title to this donated art, while the equitable title—or beneficial interest—belonged to the public. In conveying the art to the City, the DIA Corp. could only give that which it had, i.e., legal title. The DIA Corp. *could not convey* the beneficial interest, which properly belonged—and still belongs—to the public, because the DIA Corp. never possessed this interest.[2]

Moreover, the City's actions upon receipt of the gifted art from the DIA Corp. confirm the continuing charitable purpose of these gifts: the City did not take the gifts and sell them for the City's own purposes or hang them in various municipal buildings. Rather, the City accessed the works into the DIA Collection through its Arts Commission—just as the donors had intended and consistent with the DIA Corp.'s articles of incorporation.

---

[2] Note that, under the alternative view, if the DIA Corp.'s transfer of gifted art to the City were deemed to effect a transfer of both legal *and* equitable title, this would be a breach of the public's beneficial interest and would give the Attorney General a claim to enforce the public's interest in the diverted charitable assets. Bogert's, § 411 ("The Attorney General also has the power by *quo warranto* or otherwise to ensure that gifts to charitable corporations are applied according to their terms.")

14

**II.  All 100% of the DIA art collection is held in trust for the people of Michigan because the early charitable gifts to the Museum were valid as early Michigan law allowed such gifts so long as they were sufficiently definite.**

The Bond Insurers challenge the Attorney General's conclusion that the entire DIA Collection is held in charitable trust.  They argue that charitable trust law did not exist in Michigan at the time of the Museum's founding in 1885, and so the analysis in AG Opinion No. 7272—which did not address this pre-20th century charitable trust law—is flawed.  This argument misunderstands the law.

Before addressing this argument directly, it is important to recall what an AG Opinion is—and what it is not.  An AG Opinion is a formal opinion containing a response to questions of law submitted to the Attorney General by the Legislature or other government officials. Mich. Comp. Laws § 14.32.  Although an AG Opinion often resembles the form of a legal brief to a court, it is not a legal brief:  there is no pending litigation, and thus there are no parties.  With no adversarial litigation, there is no need to confront every alternative view.  Nor is there a need to present alternative arguments.

Instead, an AG Opinion analyzes Michigan law and advises on what the Attorney General understands that law to be.  So it is not

15

unexpected that the AG Opinion did not include every item that the
Attorney General considered and ultimately deemed unnecessary to the
analysis or conclusion.

With regard to the substance, the Bond Insurers argue that
charitable trust law did not exist in Michigan prior to 1907, so the
Museum could not have begun as a charitable trust. There is an
element of truth to this argument. In the late 1800s, several Michigan
courts invalidated various charitable trusts, finding that the 1601
Statute of Elizabeth had been repealed in Michigan and that,
consequently, trusts that were insufficiently definite were invalid. *See*,
*e.g.*, *Methodist Episcopal Church v. Clark*, 3 N.W. 207, 215 (Mich. 1879).
Yet not all gifts benefiting the public were invalidated: the courts
upheld certain charitable gifts finding that the gifts were valid if the
object and beneficiary of the gift was sufficiently definite. *See White v.
Rice*, 70 N.W. 1024 (Mich. 1897) (upholding a gift in a trust that bene-
fited a church). This is so even though ultimately, every charitable gift
benefits the indefinite members of the public and thus has an indefinite
component. Also, as early as 1873, the Attorney General represented
the public's interest in attempting to enforce a charitable gift. *See*

16

*Attorney General v. Soule*, 28 Mich. 153, 156 (1873) (the Court found that the gift at issue was too indefinite too enforce, but did not question the Attorney General's authority to enforce the public's interest in a charitable gift.).

So in 1885, at the time of the incorporation of the Detroit Museum of Arts, charitable gifts were valid if they were sufficiently definite. And the Attorney General's role in defending the public's interest in such gifts had not been questioned. Against this backdrop, there can be no doubt that the charitable gifts to the Detroit Museum of Arts were valid. The founding and early gifts to the Museum were to a sufficiently definite organization for a definite purpose.

Moreover, the Museum was expressly authorized by the Legislature in Public Act 3 of 1885 for an expressly charitable purpose—the public display of art. (And, in fact, there never was a challenge to the validity of the Museum's charitable gifts.) Thus, from the inception of the Museum, and in accord with its articles of incorporation and its authorizing statute, the Museum has held its art for the benefit of the public.

Furthermore, in these early years of the Museum's history, had some question arisen affecting the public's interest, the Attorney General possessed the authority to represent the public's interest and defend the people's beneficial interest in the Museum's charitable purposes.

Regardless of any early uncertainty regarding the validity of certain charitable gifts in Michigan, Michigan reversed course with Public Act 122 of 1907, which recognized the validity of charitable gifts to uncertain and indefinite beneficiaries, and thus made it much more likely that charitable gifts would be validated by the courts. A few years later, in 1915, the Act was further liberalized to recognize as valid those charitable gifts that were for uncertain and indefinite objects. The revised Act also added: "Every such trust shall be liberally construed by such court so that the intentions of the creator thereof shall be carried out whenever possible." Public Act 280 of 1915. These changes remain in place in today's Charitable Gifts Act, Mich. Comp. Laws § 554.351 *et seq*. Thereafter, Michigan courts began routinely upholding charitable gifts and giving effect to the intent of the donor whenever possible.

Thus, in late 1918, when the Detroit Museum of Arts resolved to take the necessary steps to transfer its collection to the City, charitable trusts were being liberally upheld to give effect to the intentions of the donors.[3] As a nonprofit corporation holding assets for the charitable purpose of the public display of art, the Detroit Museum of Arts held its assets for a declared charitable purpose and thus in charitable trust for the benefit of the people of Michigan. The 1919 Act authorizing the transfer of the Museum's assets to the City confirmed the Museum's continuing charitable purpose, requiring that any property transferred must be "faithfully used for the purposes for which such corporation was organized." Public Act 67 of 1919.

---

[3] The Bond Insurers assert that the 1907 Act did not explicitly provide for retroactive application to past transaction and conclude that the incorporation of the Detroit Museum of Arts in 1885 thus did not constitute a charitable trust. See Br. n.49 at 89. But as discussed above, the passage of the 1907 Act did not affect the validity of previous charitable gifts to the Museum. Those gifts were already valid because they were sufficiently definite and because the Museum's incorporation and power to receive of charitable gifts were expressly authorized by the Legislature. The significance of the 1907 Act is that most of the Museum's history occurs in the period following that act, and thus occurs during the period within which Michigan had adopted a liberal public policy toward charitable trusts. The entire thrust of the Bond Insurers' arguments is their attempt to frustrate the charitable intentions of the Museum's donors and to nullify the public's interest in the art collection.

In this way, at the time of the transfer of the Museum's assets to the City in 1919, the existing charitable purposes of the Museum were continued, with the City now holding those assets for the benefit of the public. Thus, the analysis contained in AG Opinion No. 7272 is valid: "Under charitable trust law, this transfer was a transfer of the Founders Society's legal interest or legal title in its charitable assets to a new charitable trustee—the City. Under those circumstances, the equitable interest in the art collection remained with the people of Michigan, the ultimate beneficiaries of the museum's or Founders Society's charitable purpose." Over the years, as the Museum added pieces to its collection (whether by donation or purchase), these additions were also dedicated to the Museum's initial charitable purpose and constituted additions to the existing charitable trust. Thus, the entire DIA Collection is protected in charitable trust.

## III. The City's decision not to register as a charitable trust is neither surprising nor significant.

The Bond Insurers place great weight on the fact that the City never registered the Museum as a charitable trust with the Attorney General. Br. at 112–13. The Bond Insurers consider this argument

"perhaps most compelling" of its claims: "[t]his is unequivocal evidence that neither the City nor Attorneys General of the State have regarded the City as trustee of a charitable trust, or the DIA or the DIA Collection as constituting a trust." *Id.* But this conclusion reveals a misunderstanding of Michigan law and practice. The City's action not to register as a charitable trust is of no particular significance.

The Attorney General registers charitable trusts under the Supervision of Trustees for Charitable Purposes Act. Mich. Comp. Laws § 14.251 *et seq.* Section 2 of the Act defines a charitable trust as "the relationship where a trustee holds property for a charitable purpose," and defines trustee as "any individual, group of individuals, association, foundation, trustee corporation, corporation, or other legal entity holding property for any charitable purpose." Mich. Comp. Laws § 14.252. Section 3 of the Act exempts a variety of organizations, including government agencies and their subdivisions. Mich. Comp. Laws § 14.253(a). But the very next sentence limits the exemption:

> This exemption does not apply to a governmental subdivision of this state, except state supported colleges or universities, as to property held for charitable purposes other than or more limited or specific than its general public or corporate purposes. [Mich. Comp. Laws § 14.253(a).]

On its face, this limitation of the governmental exemption is confusing: governments and their subdivisions are generally exempt, but certain governmental subdivisions—although not state supported colleges or universities—are excluded from the exemption. And, in fact, only a few governmental entities have registered with the Attorney General. So it is not surprising that the City of Detroit's Arts Commission did not register—either mistakenly believing that it was exempt because it was a governmental entity, or mistakenly believing that the limitation of the exemption did not apply to it.[4]

Nor is it surprising that the Attorney General's Charitable Trust Section—the section responsible for registering charitable trusts—did not take action with regard to the oversight. The nonprofit corporation, the Detroit Institute of Arts, Inc., *is registered* under the Supervision Act, and has been since 1963. Even the most astute registrar could be excused for failing to understand the Museum's complicated organizational structure (involving both the Arts Commission *and* the

---

[4] It is the Attorney General's position that the City of Detroit, as legal title holder to the DIA Collection, is subject to the Supervision Act because it holds the DIA Collection for the charitable purpose of the public exhibition of art, which is more limited or specific than the City's general public purposes.

nonprofit corporation) or failing to recognize that the City's Arts Commission did not qualify for the governmental exemption due to its narrower charitable purposes. Moreover, under the Act, those entities that qualify for an exemption are not required to request an exemption; and if the Attorney General later challenges them to register, there is no penalty for having failed to do so. In other words, although the Supervision Act creates a legal requirement for charitable trustees to register, the Act lacks a strong enforcement mechanism, so an entity's failure to register is not indicative of the Attorney General's view of whether the entity should have registered.

In short, although the City of Detroit's Arts Commission was subject to the obligation to register the DIA Collection as a charitable trust, its failure to do so is not surprising and does not show that it is not a charitable trust—simply that it failed to appreciate the registration requirements.

## IV. The Attorney General followed his usual process in preparing AG Opinion No. 7272.

The Bond Insurers have also raised the issue of the Attorney General's process in preparing AG Opinion No. 7272. The Attorney

General has already responded to similar allegations, and the Court questioned the importance of these claims, so this response will be brief. *See* Attorney General's Reply Brief Regarding Attorney General's Motion to Quash Syncora's Subpoena of the Attorney General (Docket # 5493).

Contrary to the Bond Insurers' claim that the Attorney General worked "hand-in-hand" with the DIA Corp. and "rushed" to issue the opinion, the documents and privilege log which the Attorney General provided to Syncora show that, for two months prior to issuing AG Opinion No. 7272, the Attorney General considered the questions related to the possible sale of the DIA Collection. Because the Attorney General's internal processes are privileged, the materials provided do not show the Attorney General's other internal communications or other materials considered by the Attorney General.

From the documents that were not privileged, however, it is clear that in preparing AG Opinion No. 7272, the Attorney General followed his usual policies for issuing an AG Opinion. The attorney responsible for this area of the law for the State was assigned to draft the opinion; the draft was circulated to other department attorneys; and the draft

24

was reviewed by the Opinion Review Board. The Bond Insurers cite a legal memo submitted by the DIA Corp. that concluded that the "Emergency Manager does not have authority to sell property held in public trust," thereby suggesting that the Attorney General was simply relying on materials provided by the DIA Corp. But the Bond Insurers overlook the fact that AG Opinion No. 7272 did not rely on the public trust argument. Instead, the AG Opinion was rooted in the doctrine of charitable trusts and based on independent research and analysis of the Department of Attorney General.

## V.   If the City's Plan is rejected, the Attorney General will defend the people's interests in the DIA Collection.

Since its creation in 1885, the DIA has held its collection for the benefit of the people of Michigan. The Attorney General represents the interest of the people of Michigan in all charitable gifts and charitable trusts. The City's proposed plan protects the entire DIA Collection in perpetual charitable trust. But if the Plan is rejected, and the City moves to sell any part of the DIA Collection, the Attorney General will be compelled to act to protect the people's interests in the state's world-class art collection.

## CONCLUSION

Michigan law protects the intentions of charitable donors. The Bond Insurers do not dispute that 95% of the DIA Collection is the result of charitable gifts; nevertheless, they would have the City frustrate the charitable intentions of the donors and use the art to satisfy its debt. What they propose violates Michigan law. The City's decision to honor the law and agree to the DIA Settlement—whereby the City generates hundreds of millions of dollars for its creditors *and* maintains the DIA Collection in perpetual charitable trust for the people of Michigan—is reasonable.

If the Court rejects the Plan and the City tries to sell any of the DIA Collection, the Attorney General will represent the people of Michigan, vindicate Michigan law, and defend the entire collection, which the Museum has held in trust for the people since its inception in 1885.

Respectfully submitted,

Bill Schuette
Attorney General

B. Eric Restuccia (P49550)
Deputy Solicitor General


/s/ Michael Bell
Michael Bell (P47890)
William R. Bloomfield (P68515)
Assistant Attorneys General
P.O. Box 30212
Lansing, Michigan 48909
(517) 373-1124

Dated:  September 19, 2014

Z:\CP_All Division Share\Charitable Trust\Case files\Detroit Institute of Arts\Detroit bankruptcy - Conflict Wall\AGTrial
Brief Response.8.29.14.draft.docx