UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,          .        Docket No. 13-53846
       MICHIGAN,                 .
                        .        Detroit, Michigan
                        .        September 15, 2014
             Debtor.     .        8:30 a.m.
. . . . . . . . . . . . . . . .

CONTINUED TRIAL RE. OBJECTIONS TO CONFIRMATION OF
CHAPTER 9 PLAN; (#7061) MOTION/THE DETROIT
RETIREMENT SYSTEMS' MOTION TO EXCLUDE PORTIONS OF
MARTHA KOPACZ'S TESTIMONY FILED BY CREDITORS
GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT,
POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT;
(#7003) CONCURRENCE/FINANCIAL GUARANTY INSURANCE COMPANY'S
JOINDER IN SYNCORA'S MOTION TO EXCLUDE CERTAIN OF THE
EXPERT OPINIONS OF MARTHA KOPACZ UNDER FEDERAL RULE
OF EVIDENCE 702 FILED BY CREDITOR FINANCIAL GUARANTY
INSURANCE COMPANY; (#6999) MOTION TO EXCLUDE CERTAIN OF
THE EXPERT OPINIONS OF MARTHA KOPACZ UNDER FEDERAL
RULE OF EVIDENCE 702 FILED BY INTERESTED PARTIES SYNCORA
CAPITAL ASSURANCE, INC., SYNCORA GUARANTEE, INC.
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                   By:  EVAN MILLER
                      THOMAS CULLEN, JR.
                      GEOFFREY STEWART
                   51 Louisiana Avenue, N.W.
                   Washington, DC  20001
                   (202) 879-3939

                   Jones Day
                   By:  HEATHER LENNOX
                      CORINNE BALL
                   222 East 41st Street
                   New York, NY  10017
                   (212) 326-3837

                   Jones Day
                   By:  DAVID G. HEIMAN
                   North Point
                   901 Lakeside Avenue
                   Cleveland, OH  44114
                   (216) 586-7175

APPEARANCES (continued):

```
For Syncora          Kirkland & Ellis, LLP
Holdings, Ltd.,      By:  RYAN BENNETT
Syncora Guarantee    300 North LaSalle
Inc., and Syncora    Chicago, IL  60654
Capital Assurance    (312) 862-2000
Inc.:

For County of        Dechert, LLP
Macomb, Michigan:    By:  DEBRA O'GORMAN
                          ALLAN BRILLIANT
                     1095 Avenue of the Americas
                     New York, NY  10036
                     (212) 698-3600

For Financial        Weil, Gotshal & Manges, LLP
Guaranty Insurance   By:  EDWARD SOTO
Company:             1395 Bricknell Avenue, Suite 1200
                     Miami, FL  33131
                     (305) 577-3177

                     Weil, Gotshal & Manges, LLP
                     By:  ALFREDO PEREZ
                     700 Louisiana, Suite 1600
                     Houston, TX  77002
                     (713) 546-5040

For Official         Dentons, US, LLP
Committee of         By:  CLAUDE D. MONTGOMERY
Retirees:            670 Fifth Avenue
                     New York, NY  10020
                     (212) 632-8390

For Ad Hoc Water     Kramer Levin Naftalis & Frankel, LLP
and Sewer            By:  JONATHAN M. WAGNER
Bondholders:         1177 Avenue of the Americas
                     New York, NY  10036
                     (212) 715-9393

For the State of     Dickinson Wright
Michigan:            By:  STEVEN HOWELL
                     500 Woodward Avenue, Suite 4000
                     Detroit, MI  48226-3245
                     (313) 223-3033

For the Detroit      Clark Hill, PLC
Retirement           By:  JENNIFER GREEN
Systems:             500 Woodward Avenue, Suite 3500
                     Detroit, MI  48226
                     (313) 965-8274
```

Court Recorder:          LaShonda Moss
                         United States Bankruptcy Court
                         211 West Fort Street, 21st Floor
                         Detroit, MI  48226-3211
                         (313) 234-0068

Transcribed By:          Lois Garrett
                         1290 West Barnes Road
                         Leslie, MI  49251
                         (517) 676-5092


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  Calling the matter of 13-53846, City of

2     Detroit, Michigan.

3          THE COURT:  Good morning.  Looks like everyone is

4     here.  Go ahead, sir.

5          MR. HEIMAN:  Good morning, your Honor.  David

6     Heiman, Jones Day, on behalf of the city, and I'm very

7     pleased this morning.  Once again, I've said this, but to do

8     something -- to announce a development that we probably had

9     concluded would not happen has happened today.  I'm pleased

10    and privileged to report that more than a year of litigation

11    between the city and Syncora has now come to an end, and we

12    have settled our dispute.  I want to make it clear that the

13    settlement does not resolve the Class 9 treatment.  FGIC will

14    continue to object, as far as we understand it.  They can

15    speak for themselves today, but efforts to reach a settlement

16    with them at least thus far have not been successful.

17    However, the settlement, in our minds, a very favorable one

18    to the city, is a very significant step in the city's efforts

19    to move swiftly through this confirmation process and to exit

20    Chapter 9 as soon as possible and to return the city to its

21    citizens.

22         With that in mind and maybe a little bit out of

23    order, I'd like to thank some people here if I may because

24    this is the reflection, manifestation of a huge amount of

25    work by a lot of people, so I'd like to first thank the

1   Court, who has been encouraging of settlement and also

2   provided the time for the parties to actually work together

3   to settle. And as your Honor knows, the mediators have been

4   incredibly instrumental in helping the parties find common

5   ground, the mediators in this particular instance being

6   Judges Rosen and Perris and Eugene Driker. So I want to

7   thank them for just another example of persistence and

8   tireless efforts on their part, and I think, as your Honor

9   knows, I think it's hard to know where we'd be in this case

10  without the support of the mediators throughout this process.

11          I'd like to thank the parties themselves, both the

12  city and Syncora, who have laid down their swords after much

13  fighting. It takes a lot of emotional and, you know, mature

14  effort to do that. In particular, I'd like to thank the

15  advisors, professionals on both sides. Again, after being

16  passionate adversaries for more than a year in litigation,

17  today those professionals are now acting in concert in

18  support of the city.

19          Just a word or two about the plan -- I'm sorry --

20  the settlement, which will become part of the plan -- Ms.

21  Ball will be more specific in a moment, but I'd like to do

22  just a little bit of an overview. First, and of great value

23  to the city, is that Syncora will be withdrawing all

24  objections across the board in connection with the plan or

25  other aspects and appeals that may be outside of the plan,

1  and they will become a supporter of the plan as well as a

2  supporter of continuing litigation relating to the COPs

3  causes of action that are existing today in front of the

4  Court.  The plan itself provides for a 13.7-percent recovery

5  on the Syncora-related claims both to be paid by virtue of a

6  portion of the B notes -- 60 percent of the reserve on the B

7  notes will go to Syncora -- and other consideration that Ms.

8  Ball will detail.

9       The other part of the settlement is to establish a

10  commercial relationship between Syncora and the city for the

11  long term regarding development of certain assets that the

12  city owns or will transfer to a Syncora subsidiary, and the

13  city and Syncora will work together in the development of

14  those properties.  So that part of the settlement will be

15  reflected in the implementation section of the plan, and

16  Ms. Lennox can address more specifics on that if you want, so

17  we have two parts to the settlement.  One part is claim

18  treatment, and the other is related to the new commercial

19  relationship.

20       What I'd like to do today is have various of our

21  lawyers plus Ryan Bennett speak to specifics of the

22  settlement or procedures, so -- and in this case, it does

23  take a village to get this done, so I would have Ms. Ball

24  address the specifics of the settlement, Mr. Bennett comment

25  to the extent he feels necessary, Ms. Lennox report to the

1    Court on where we stand on the documentation that reflects

2    the settlement and the filing of that, Mr. Miller on certain

3    commitments to the Retirees' Committee, and Mr. Cullen on

4    what the city sees as an appropriate procedure for continuing

5    the confirmation trial.  I apologize for all of that, but

6    it's -- as I say, it was a complicated settlement and

7    requires a lot of thought and presentation to the Court.

8            As to the status of the agreement, I want to make it

9    clear we have an agreement.  The last time we saw you, it was

10   an agreement in principle, and everybody went to work until

11   the wee hours this morning to come up with what is an

12   agreement.  There are aspects of the agreement that we still

13   need to work on, but we're agreed on how to do that.  So not

14   surprisingly, when there are transfers of properties and

15   diligence required and planning for development of those

16   properties, there is -- there are a little bit of moving

17   targets on which properties and so forth, so the one tag area

18   of the settlement that we need to continue to work on but is

19   not going to come back before the Court is with respect to

20   two properties, so late last night the city discovered

21   certain parcels previously included in the development

22   agreement that could not be conveyed to Syncora.  As a

23   result, the city agrees that by the close of business on

24   Tuesday, September 16, 2014, the city will provide Syncora

25   with properties that represent reasonably equivalent value

consistent with that development scheme or their development
scheme that are reasonably accepted to Syncora. They may
actually conceivably be the same properties or replacement
properties. The parties have agreed that we can fix this one
tag issue hopefully with relative ease within the next 48
hours and probably sooner.

As to the documentation that is necessary for this,
Ms. Lennox will report to you on it, but as far as we're
concerned and I think as far as Kirkland & Ellis is
concerned, we're pretty much done with that, still, you know,
some wordsmithing, I suppose.

One last point. We have been working -- well, since
last Thursday with the Retirees' Committee and the holders of
the LTGOs to discuss how they view the impact of this
settlement on them, and we have made a lot of progress in
those discussions and expect to continue those discussions
this morning and are confident that we can conclude those
discussions, so we will need to do that before we file the
documents. Thank you, your Honor.

MS. BALL: Good morning, your Honor. Corinne Ball
of Jones Day for the city. Perhaps we should start with just
a review of the context that brings us here. As your Honor
is aware, there are many relationships between Syncora and
the city other than Syncora's role as COP -- an insurer of
the certificates of participation. Syncora is a swap

1    insurer.  Syncora has insured the unlimited tax general

2    obligation bonds.  Syncora is an insurer of the certificates

3    of participation.  Syncora is a holder of the certificates of

4    participation.  And in addition to that, Syncora, through its

5    subsidiary, American Roads and Pike Pointe, is a lessee of

6    the city on the Windsor Tunnel and, as a consequence of that,

7    is also present in surrounding buildings as a lessee at the

8    terminus of the tunnel on the Detroit side.  In fact, it has

9    some hundred employees in Detroit in its headquarters in that

10   location.

11          Your Honor, with that, perhaps I'd like to walk you

12   through, with your permission, the elements of the

13   settlement, and we have -- if your Honor would like one, I

14   have a PowerPoint, if I may approach.

15          THE COURT:  Yes.

16          MS. BALL:  Perhaps we can walk through it.  Your

17   Honor, this is a global settlement and a global resolution of

18   the multiple roles and relationships that Syncora has with

19   the city and has had over the past year in this courtroom.

20   If we could go through it, it is a -- we are entering into a

21   development agreement, which Mr. Heiman described, which

22   relates to properties, in essence, near the terminus of the

23   Windsor Tunnel.  We are amending the lease for the Windsor

24   Tunnel and assuming it under the plan.  Your Honor may or may

25   not be aware, but the lessee of that tunnel went through its

1    own bankruptcy in parallel with the city's bankruptcy, and

2    Syncora has, in fact, taken over that role as of September

3    2013, so they're new to the city, and we needed a new and

4    better relationship.  We're also settling Syncora's COPs

5    situation, and we're resolving all litigation related to the

6    Chapter 9 whether in this court, your Honor, or on the

7    appellate levels.  And that, of course, your Honor, will also

8    resolve their secured claims -- their asserted secured

9    claims, which your Honor may recall were one of the very

10   first disagreements that the city and Syncora had.

11        On the development agreement, the city and a

12   subsidiary of Syncora called Pike Pointe will enter into a

13   development agreement.  Under the agreement, the developer is

14   granted an option to acquire certain specified properties

15   that will last five years from the effective date subject to

16   extension in certain instances.  Prior to the exercise of the

17   option, the developer may undertake due diligence of the

18   properties.  Once the option is exercised, the developer must

19   develop the applicable property into parking facilities,

20   residential housing, commercial retail space, and any other

21   use suitable for location consistent with the city's urban

22   planning policies and the city's comprehensive development

23   plan.  The developer will have 15 months to begin developing

24   the property or else it will revert to the city.  The

25   developer must also complete construction within three years

1 and three months of exercising its option. The city and the

2 Syncora subsidiary will also enter into an option to enter

3 into a 30-year concession with respect to the Grand Circus

4 garage including an obligation to invest 13.5 million in

5 capital expenditures during the first five years of that

6 long-term leasing arrangement for that parking garage.

7 With respect to the tunnel lease, the city will

8 extend and assume the lease as amended of the Detroit-Windsor

9 Tunnel and the related properties which I mentioned earlier,

10 your Honor, surrounding the terminus of the tunnel. The

11 amended lease will extend the term from November 2020 to

12 December 2040. The amended lease will contain additional

13 reporting requirements on the part of the tunnel company, and

14 the city will only be limited in its ability to disclose that

15 information in very certain specific circumstances, which

16 compares to today, which it is a fairly opaque relationship

17 from the city's point of view. The tunnel company will

18 maintain the city portion of the tunnel to the same standard

19 as the Windsor side. The amended lease will also allow the

20 tunnel company to offset certain capital expenditures made to

21 improve the tunnel against the tunnel's rent obligations.

22 During the initial term of the lease, your Honor, which is

23 the current lease, which runs through 2020, the tunnel may

24 credit capital expenditures against its rent up to the full

25 amount of the rent due during this period. During the

1   extension term, your Honor, they may credit capital

2   expenditures against 75 percent of the annual rent subject to

3   certain limitations.  In all, the tunnel company may not

4   credit more than eight million of capital expenditures

5   against rent during the extension term, but in all, your

6   Honor, it represents a substantial commitment to improve the

7   condition and safety of the tunnel.  The amendment

8   anticipates and does not preclude a new joint operating

9   agreement with respect to the Windsor portion of the tunnel

10  and a new -- potentially new intergovernmental authority

11  between Detroit and Windsor to allow the tunnel to be

12  operated in an integrated manner.  Your Honor, that's

13  providing for the future.

14        With respect to the settlement of the COPs held and

15  insured by Syncora, your Honor, the plan provides for the

16  creation of a litigation trust, and the remaining interest in

17  that trust I may remind your Honor belongs to other creditors

18  of the city, does not revert to the city.  The litigation

19  trust established under the plan will purchase Syncora's COPs

20  and COPs claims in exchange for new B notes.  Your Honor,

21  that's the nomenclature that has been in the plan to describe

22  the notes issued to the various unsecured classes under the

23  plan, the OPEB class, Class 12, general unsecured class,

24  Class 14, and the COPs class, Class 19.  It also provides for

25  an enhancement for Class 9 consisting of new C notes and

1  something that we call settlement credits.  That, your Honor,

2  is what, in essence, leads us to describe the Class 9

3  treatment as being enhanced to provide 13.9 percent as

4  opposed to the original estimates of 10 percent on account of

5  Class 9.  As a settling party, Syncora will be included as an

6  exculpated party under the plan of adjustment subject to

7  certain agreed carveouts.  Importantly, your Honor, this

8  settlement offer with the enhanced portion of the C notes and

9  the settlement credits will be made available to any COP

10  claimant that opts into the settlement prior to the effective

11  date on the plan of adjustment.  The COP claimants that do

12  not participate in the settlement will receive the treatment

13  previously set forth in the sixth amended plan.  Notably,

14  your Honor, no enhancement with the C notes and the

15  settlement credits unless the COP claimants opt in.

16          Your Honor, if we move ahead, on the effective date,

17  Syncora will receive 23.5 million in new B notes.  Your

18  Honor, that number refers to the face amount, and that number

19  represents 60.358 percent of the total COP claims asserted by

20  Syncora.  If we move ahead, the enhancement on the settlement

21  of the COPs is on the effective date Syncora will receive

22  approximately 21.3 million in new unsecured five-percent C

23  notes due in 2026.  These new 12-year C notes bear interest

24  at the rate of five percent.  Through the operation of the

25  parking system in the city, the city will segregate certain

1  parking revenues each year until monies sufficient to meet
2  the annual debt service on these new C notes is set aside.
3  The notes are unsecured, and, though due in 2026, they must
4  be prepaid in the event of certain parking asset disposition
5  should the city decide to sell or outsource its parking, and
6  they may be prepaid at the city's option at any time without
7  premium or penalty.

8          I think, your Honor, if we move ahead to the
9  settlement credits, alternately called vouchers, and to some
10 others almost green stamps, I think was the phrase that we
11 used -- on the effective date, Syncora will receive 6.25
12 million in Class 9 settlement credits.  What are they?
13 Settlement credits may be applied towards the purchase of
14 eligible city assets.  Eligible city assets include the Joe
15 Louis Arena post-demolition in 2017 when it's available.
16 Should the city pursue a proposal for its parking assets,
17 that's an eligible asset.  And real property located -- your
18 Honor, it's real property within three miles of the tunnel
19 terminus, again, back to their current presence.  To apply
20 the credits, the owner must participate in the normal
21 procurement or auction process run by the city.  It has to be
22 the final party selected in that procurement or auction
23 process and otherwise satisfy all the requirements.
24 Settlement credits can only be used for 50 percent of the
25 purchase price of an eligible asset.  Importantly, your

1  Honor, these settlement credits can be freely assigned or

2  transferred.  We thought that was an important feature

3  particularly for those COPs holders who may not have a

4  relationship with the City of Detroit on an ongoing basis.

5          Your Honor, if we move to the litigation front,

6  whether it's the swaps, the COPs, the UTGOs, or the appeals,

7  the many appeals, Syncora will now support the plan, and I

8  think it has already filed some withdrawal of its objections,

9  but it will promptly withdraw all objections to confirmation

10  of the city's plan of adjustment, which will be, your Honor,

11  at this time without prejudice but obviously will mature as

12  we move forward through confirmation.  Subject to definitive

13  documentation on the confirmation date of the plan, Syncora

14  will withdraw all plan objections with prejudice.  Syncora's

15  appeals will be held in abeyance, your Honor, as we plan to

16  file a joint motion to stay them until the process is

17  complete and the plan becomes effective at which point such

18  appeals will be withdrawn with prejudice.  And, your Honor,

19  among others, it includes the public lighting authority

20  appeal, the post-petition financing appeal, the automatic

21  stay appeal, the swaps settlement appeal, the mediation

22  appeal, and I think there may be a few I've missed.  In

23  satisfaction of its asserted secured claims relating to the

24  collateral account, your Honor may recall, that was

25  associated with the casino revenues and other litigation

1  claims, Syncora will receive $5 million.  I think Mr. Cullen

2  will assist the Court, but we anticipate there will be

3  further trial process motions and exhibits which will accord

4  and reinforce Syncora's agreement to support the plan.  With

5  that, your Honor, I'm happy to answer any questions you may

6  have.

7            THE COURT:  Can we go back to Slide 5, please?

8            MS. BALL:  Yes, sir.

9            THE COURT:  For other COP claimants who opt in, what

10  do they give up by opting in, and what does the city get?

11            MS. BALL:  Your Honor, they will be selling their

12  COPs claims to the litigation trust, and the city would be

13  distributing not only the B notes, which were described in

14  the existing sixth amended plan, they will also be getting

15  their share of the enhancement, the new C notes and the

16  settlement credits.

17            THE COURT:  Thank you.

18            MS. BALL:  Anything else, your Honor?

19            THE COURT:  No.

20            MS. BALL:  Thank you.  With that I would defer to

21  Ms. Lennox as to how we're working this through the plan.

22            MR. BENNETT:  Good morning, your Honor.  Ryan

23  Bennett of Kirkland & Ellis on behalf of Syncora.  I'm very

24  glad to be standing here before you today, your Honor.  This

25  is a big day for Syncora and a big day for the City of

1    Detroit.  We'd like to thank the Court, the Court's staff for

2    the time and patience over the past many months and thank the

3    mediators for their assistance, particularly over the past

4    three weeks as we've worked through what has been a very

5    complicated and creative resolution to Syncora's unique

6    relationship with the City of Detroit.  Ms. Ball and Mr.

7    Heiman captured the settlement accurately.  Syncora will

8    shortly be withdrawing its objections to the plan, its

9    various motions that are pending before the Court without

10   prejudice to our ability to renew our litigation should the

11   definitive documentation not be reasonably acceptable to the

12   city and Syncora and the plan not be confirmed, but we

13   expect, as Mr. Heiman highlighted, that we are substantially

14   done.  We know we are substantially done and that that will

15   be coming shortly.  Our appeals, likewise, will be held in

16   abeyance, as Ms. Ball pointed out, and dismissed with

17   prejudice upon the effective date.  Your Honor, that's all I

18   have, fortunately.  Thank you very much.

19            THE COURT:  Thank you.

20            MS. LENNOX:  Good morning, your Honor.  With respect

21   to the plan process, as these developments with respect to

22   the settlement that Ms. Ball outlined have progressed, the

23   draft of the seventh amended plan has kept pace, so that is

24   in fairly good shape.  We have, I think, a couple of things

25   that we're hoping to iron out with some other parties today.

1    Our goal is to file that plan today, you know, subject to
2    ironing out the differences, but we are in good shape on
3    that, your Honor.
4            MR. HEIMAN:  Your Honor, before we call on Mr.
5    Cullen, I did mention that we would be hearing from Evan
6    Miller today, and -- oh, he was hiding, and I don't blame him
7    because he's a target for a lot of people.
8            MR. MILLER:  Thank you for those kind words.  Good
9    morning, your Honor.  Evan Miller, Jones Day, for the City of
10   Detroit.  I wanted to briefly talk about an issue in
11   connection with the Class 12, the so-called OPEB settlement.
12   Certain issues have arisen in connection with the -- excuse
13   me -- implementation and start-up of the so-called VEBA
14   trusts.  Those would be the trusts that pursuant to the
15   settlement would be providing and paying for retiree health
16   insurance.  And I want to advise the Court that the City of
17   Detroit commits to negotiate in good faith a resolution of
18   all of those issues relating to the start-up of the VEBAs.
19   We will do so as soon as practicable with the mediators, and
20   I can personally advise the Court that I'm confident that it
21   will be done in relatively short order.  Thank you.
22           THE COURT:  Thank you.
23           MR. CULLEN:  Good morning, your Honor.  Thomas
24   Cullen of Jones Day on behalf of the city.  In light of these
25   developments, the city does propose to move forward with its

1    order of witnesses this week.  We have -- that order,

2    serendipitously enough, really addresses issues at the front

3    end which are unconnected with the Syncora settlement,

4    principally the actuarial issues, art, and we have attempted

5    to move certain DWSD witnesses in front of any dealings with

6    the implications of the Syncora settlement.  The first

7    witness to deal with those issues will be Mr. Malhotra, who

8    we believe comes up at the end -- on Friday, if at all, this

9    week.  He's covering a great deal of ground, of course, and

10   there will be -- if not this week, there will be time over

11   the weekend to prepare any additional cross with respect to

12   the settlement for Mr. Malhotra.  We believe that the -- that

13   that will allow the parties the ability to address the well-

14   trodden issues of art, DWSD, and actuaries this week and then

15   address the settlement-related issues either at the very end

16   of the week or early next.

17          THE COURT:  Before you go, let's review your witness

18   order.

19          MR. CULLEN:  Yes.

20          THE COURT:  And can you describe in a sentence or

21   two what each will cover?

22          MR. CULLEN:  Yes.  This is what we have, your Honor.

23   Mr. Bowen is an actuary for Milliman.  He worked on the

24   derivation and the implementation of the 6.75 revenue

25   assessment.  He is a percipient witness, not an expert in

1    this case.  He's going to testify about what actually

2    happened.  Mr. Perry is an expert witness who will testify as

3    to the reasonableness of the 6.5.  Ms. Fusco is the

4    representative of --

5            THE COURT:  When you say 6.5 --

6            MR. CULLEN:  6.75.

7            THE COURT:  75, yeah.

8            MR. CULLEN:  6.75.  I apologize, your Honor.

9            THE COURT:  Let's not confuse the world on this.

10           MR. CULLEN:  Yeah.  I'm sorry.  Thank you, your

11   Honor.  Ms. Fusco is the representative of Christie's who

12   will testify as to their work.  Ms. Nichol is an expert

13   witness who's going to be --

14           THE COURT:  Well, stop there because we also have a

15   hearing today regarding Ms. Kopacz.

16           MR. CULLEN:  Yes, your Honor.  I was only addressing

17   the order of witnesses.

18           THE COURT:  Okay.

19           MR. CULLEN:  And this is all subject to the movement

20   of the Court, subject to the length of the cross-examination.

21   Ms. Nichol is going to be dealing with the issues of what is

22   the appropriate baseline to measure discrimination in the

23   plan.  It's a witness of the Retirement Committee and

24   presented by them.  Ms. Taranto is another actuarial witness.

25   We're hoping to get Mr. Bloom, who is the investment banker

on behalf of the Retirement Committees, who will testify as to the arm's length nature of the negotiations and the result of those negotiations with respect to pension issues. Erickson and Plummer are both art -- are art valuation and sale of the art issues. Mr. Satter has to do with the value of the DWSD assets. Mr. Penske is a local notable developer and a citizen of the city who will testify as to grand bargain issues and investment in the city. Mr. Buckfire's issues have been made available to the Court in his report. He is not expected to testify with respect to the Syncora settlement. Ms. McCormick will deal with -- McCormick will deal with the DWSD issues and the operation of DWSD and concerns which have been raised in this proceeding about the capital expenditure budget and its sufficiency. Mr. Malhotra is the E&Y witness with whom the Court is familiar, who will testify as to the projections which will underlie the plan and the baseline projections for the city. Mr. Orr then comes up to testify with respect to the broad range of issues relating to the plan and the settlements and feasibility and other issues. Mr. Kaunelis is another DWSD witness with respect to certain assumptions with respect to investment principally. And Mr. Gilbert is, again, a citizen of Detroit who will testify with respect to the grand bargain impact on Detroit, et cetera. That is how we see it as of now, your Honor.

1    THE COURT:  And this is your projection for this

2  week and next?

3    MR. CULLEN:  Yes, yes.

4    THE COURT:  All right.  Thank you.  Let's leave that

5  up for a bit, if you don't mind.  Okay.  Thank you.  I want

6  to add one other point here in relation to Syncora, which is

7  related only because it deals with Syncora.  It has nothing

8  to do with the settlement, per se.  The Court had entered an

9  order to show cause directed to Syncora and its attorneys why

10  they should not be sanctioned for the scandalous and

11  defamatory aspects of their second supplemental objection to

12  the plan.  In the meantime, Kirkland & Ellis, on behalf of

13  itself and Syncora, has apologized to Judge Rosen and to Mr.

14  and Mrs. Driker for its conduct.  The Court concludes that

15  those apologies, in the interest of justice, resolve any

16  issue of sanctions, and, accordingly, the Court here today

17  will be entering an order that vacates the order to show

18  cause and disposes of that issue.  All right.  Who wants to

19  be heard now?

20    MR. PEREZ:  Good morning, your Honor.  Alfredo Perez

21  on behalf of FGIC.  Your Honor, we've listened to everything

22  that was said this morning, and I think I'm kind of standing

23  here in the same place I was a week ago or so last Tuesday.

24  We're going to need some time to prepare, and the issue is

25  when can we schedule that time.  And so if the Court wants to

 1    proceed with the actuaries and the art and then give us an

 2    opportunity to prepare, I think that's perfectly appropriate,

 3    but we're going to need a continuance for the two reasons

 4    that we set forth in our papers.  One, the additional time to

 5    prepare, and, two, the additional time to prepare to the new

 6    plan, which I'm glad we are going to get it today, and that

 7    will give us -- but likely, your Honor, we're going to have

 8    to have additional expert report.  Likely, your Honor, we're

 9    going to need to take one or two depositions, and we're going

10    to have to be able to be in a position to put on our case in

11    response to this new plan.  So if the Court wants to proceed

12    with the actuaries and the, you know, several art witnesses

13    this week and then continue us until the 29th, I think we're

14    perfectly happy to do that, and I think that would allow

15    us -- although I really -- we really wanted to ask for two

16    weeks in our motion last night, but we decided that probably

17    wasn't doable and it wasn't as credible, but we are going to

18    need some time as set forth.

19         And we have this issue with the expert.  There's no

20    reason why the city couldn't have agreed to let us use that

21    expert.  They knew about it.  They had the report.  In the

22    interim, we're going to go and have to find our own expert.

23    So, your Honor, we're happy to proceed this week with those

24    sets of witnesses and then whenever Mr. Satter ends, take

25    that time off to prepare and come back on the -- and come

1  back on the 29th, and that's what we would propose.

2          MR. CULLEN:  Thomas Cullen again, your Honor, for

3  the city.  I would only say this, that distinctions must be

4  made here between the various interests we are working with

5  in dealing with the continuance of this proceeding.  There is

6  the interest of the city itself in resolution of the

7  proceeding.  There is the integrity of the proceeding.  There

8  is the convenience of the witnesses to this proceeding, and,

9  finally, there is convenience of counsel.  There's no doubt

10  about the interests of the city.  The interests of the city

11  are to move forward as quickly as possible.  The Court is

12  aware of the tremendous run rate of expense of this

13  proceeding.  A week off from presenting evidence is not a

14  week off from the run rate of those expenses for the city.

15  The transition of the city to the post-emergency manager

16  world is proceeding apace as we speak.  The sooner we get out

17  of this proceeding, the better it is for the city, the better

18  it is for that transition.  The resolution of all of these

19  issues is critical to how the city moves forward.

20          With respect to the witnesses, it's no doubt that

21  they've rearranged their life to do this.  You look at where

22  we are with Mr. Penske and Mr. Gilbert.  As you might

23  imagine, they are very difficult people to schedule for

24  various good and sufficient reasons.  I believe that the

25  sooner we get Mr. Malhotra on and all of his testimony in the

better that the opponents of the city will know how -- what
they need in terms of experts or not. The sooner we get
Mr. Orr in front of the Court, the better that they will know
going into those -- the gap between the 25th and the 26th in
the proceeding. So they've made significant adjustments in
their lives. Now, in these circumstances, the convenience of
the lawyers is only important to the extent that it threatens
or undermines the integrity of the proceeding, and I think
that that is a difficult case to make here. There are no
surprises certainly in the testimony of any of the witnesses
for this week. There are no surprises in the broader issues
that affect and surround the Syncora settlement in this. The
cone that Ms. Ball talked about has been there all along of
considerations and otherwise.

        With respect to all of these witnesses, there has
been -- there have been depositions. There's been a very
thorough opening. The witnesses are no surprise, and it's
certainly no surprise that an ally in one of these
proceedings might follow its self-interest out of the case.
There's been something of an Agatha Christie mystery vibe
about this as parties disappear one by one all throughout
this case. And mediation is confidential, but the bodies of
Mr. Sprayregen and Mr. LeBlanc are not, and they've been
through this building continuously over the past few weeks.
So we have pulled this together. We pulled it together under

1    some time pressure, but in order for the city to move

2    forward, we think that people have and have -- have enough

3    preparation, have seen enough, can plead only attenuated

4    surprise with respect to the recent turns of events, and have

5    the materials in order to represent their client fairly as we

6    move forward.  That's all I have, your Honor.

7              MR. PEREZ:  May I respond, your Honor?

8              THE COURT:  Yes, but let me just ask if anyone else

9    wants to be heard first.

10             MR. BRILLIANT:  Your Honor, Allan Brilliant on

11   behalf of Macomb Interceptor Drain Drainage District, a Class

12   14 claimant, and I would have gotten up before Mr. Cullen,

13   but he beat me to the podium after Mr. Perez had spoken.  We

14   join in Mr. Perez's argument with respect to requesting, you

15   know, a continuance.  There's really two issues here, your

16   Honor.  Mr. Cullen focuses really just solely on the Syncora

17   withdrawal aspect of the issue, which obviously makes things

18   a little bit more difficult for the various parties since

19   there had been an agreement and allocation of who was going

20   to deal with what witnesses, which all needs to be changed

21   now, but the more fundamental issue we have here, your Honor,

22   is there's a new very complicated deal that Syncora has

23   entered into, which needs to be analyzed by all the parties

24   to determine what additional objections they may have.  And

25   as Mr. Perez said, it's likely, you know, to lead to

1    additional discovery, and obviously we're going to need to

2    put on additional testimony with respect to the issues.  It's

3    not as if Syncora was just being given a certain amount of --

4                THE COURT:  Assuming you object to it.

5                MR. BRILLIANT:  Assuming we object to it, but we

6    need to have some opportunity to determine --

7                THE COURT:  I just found it interesting your

8    presumption that you would object.

9                MR. BRILLIANT:  Well, your Honor, at a minimum,

10   they're saying that Syncora is getting 13.9 --

11               THE COURT:  On behalf of your $25 million claim.

12               MR. BRILLIANT:  Twenty-six, your Honor, but the --

13               THE COURT:  Forgive me.

14               MR. BRILLIANT:  But at a minimum, your Honor, it

15   would appear they're getting, you know, a 40-percent, you

16   know, larger distribution, you know, at face value if one

17   believes that all of these other issues that are here are

18   not, you know, on account of their COPs claims.  But, your

19   Honor, the problem that we have, you know, in going forward

20   and doing the investigation as to the, you know -- you know,

21   the fairness and whether or not it unfairly -- the new

22   settlement unfairly discriminates against, you know, Class 14

23   is that we have to -- if you agree with the city, is we have

24   to file the objection, do that analysis, discovery, retain

25   witnesses, while we're reorganizing our workload, you know,

1  among all the objectors in light of Syncora's withdrawal from

2  the plan, and that just -- your Honor, is just, you know, too

3  much, you know, to expect from all the objectors at this

4  point in time.  And really, your Honor, it's just in the

5  interest of justice at some point, you know -- doesn't

6  necessarily have to be today, although we would prefer that

7  it be sooner rather than later, but at some point the parties

8  have to be given an opportunity to do that analysis.  And

9  given all the -- if all the resources are being used here in

10 preparing for the cross-examination of the witnesses, it's

11 just not going to be able to -- you know, to be accomplished

12 in a fair way.

13         THE COURT:  Thank you.  Would anyone else like to be

14 heard?

15         MR. HOWELL:  Yes, your Honor.  Steven G. Howell,

16 Dickinson Wright, special assistant attorney general,

17 appearing on behalf of the state.  Your Honor, the State of

18 Michigan also opposes an adjournment in this matter and

19 supports the city's objection to it and believes that for all

20 the parties that are involved with the exception of a couple,

21 this has been a long process, and we would like to see this

22 continue.  We believe that this is not that big a surprise

23 that this came along, and we would like to see the Court

24 continue to move forward with this on the schedule we have

25 set.  Thank you, your Honor.

1    THE COURT:  Thank you.  Would anyone else like to be

2  heard?  Mr. Perez.

3    MR. PEREZ:  Your Honor, three points.  What you

4  didn't hear from Mr. Cullen was due process, and that's,

5  frankly, the only issue that we have before the Court.  Are

6  we receiving due process?  Furthermore, your Honor, to some

7  extent this is a situation where if we're not granted a

8  continuance, no good deed goes unpunished because the

9  objectors collectively determined we had to allocate our

10  time.  We had to allocate our resources.  We didn't want to

11  be duplicative.  And now as a result -- and we're not asking

12  for a long continuance, your Honor, and the fact that the

13  schedule is how it is really shortens the time that we would

14  be asking for a continuance.  But, your Honor, to say that we

15  do not need additional time to prepare based on the record,

16  the fact that we were all sharing time, the fact that the

17  Court encouraged us to have a lead questioner for the

18  witnesses, just is -- just doesn't comport with due process.

19    Furthermore, your Honor, I would -- I only hearken

20  back to the time when the Court asked somebody whether, you

21  know, being here and supporting Detroit wasn't the most

22  important thing they were doing.  I'm sure that the witnesses

23  are important people who need to be -- you know, need to be

24  doing important things, but this is actually more important.

25  Your Honor, I commit to you that we will work as diligently

1   as possible, but, for instance, this whole situation with the

2   one expert witness, it's a total self-inflicted wound by the

3   city.  There's no reason for them to have done that other

4   than to be vindictive.

5           THE COURT:  What witness are you talking about, sir?

6           MR. PEREZ:  Murphy, your Honor.  Thank you.

7           THE COURT:  Anything further on this issue?  All

8   right.  The Court will take it under advisement.

9           MR. CULLEN:  One moment.

10          THE COURT:  Sir.

11          MR. CULLEN:  Thank you.

12          THE COURT:  Yes.

13          MR. CULLEN:  I do think that we were addressing the

14  due process issue when I talked about the integrity of the

15  process versus the convenience of counsel.  These are all

16  well-represented parties.  They've had notice of these issues

17  for some time.  And I'm sure that this is hard, and if this

18  were a mere game, we would grant this courtesy as a courtesy,

19  but it is not.  It is a proceeding about the fate of Detroit.

20  Time is very important to us.  The expense of it is very

21  important to us.  The transition is very important to us.

22  And we think that there is sufficient opportunity for very

23  talented counsel to make a record on the issues about which

24  they care about.  That's all, your Honor.

25          THE COURT:  All right.

1          MR. PEREZ:  May I respond, your Honor?

2          THE COURT:  If you have anything new to add,

3    absolutely.

4          MR. PEREZ:  Your Honor, the only question I have is

5    I wonder what they would be saying if the shoe was on the

6    other foot.  Thank you.

7          THE COURT:  Okay.  I'm going to take this under

8    advisement and take a recess now, and we'll reconvene at

9    9:30, please.

10          THE CLERK:  All rise.  Court is in recess.

11       (Recess at 9:20 a.m., until 9:39 a.m.)

12          THE CLERK:  All rise.  Court is in session.  You may

13    be seated.

14          THE COURT:  It appears everyone is present.

15          MR. STEWART:  Your Honor, Geoffrey Stewart, Jones

16    Day, for the city.  The city calls its next witness, Glenn

17    Bowen.

18          THE COURT:  Well, hang on.  I've got to give a

19    ruling on --

20          MR. STEWART:  Oh, I'm sorry.

21          THE COURT:  -- the matter I took under advisement.

22          MR. STEWART:  I better sit down.

23          THE COURT:  Good idea.  As the Court discerns the

24    motion for adjournment here, there are three relatively

25    distinct grounds for it, and the issue before the Court is

1  whether these grounds constitute extraordinary cause for the

2  delay or continuance that is sought here.  The three are that

3  Syncora's withdrawal from the defense of the city's case

4  causes FGIC and the other objecting parties, which at this

5  point are mainly the Macomb Drainage District, to take over

6  those parts of the defense that FGIC had taken responsibility

7  for in their division of labor.  The second is the strong

8  potential for FGIC to need to retain experts that Syncora had

9  retained or maybe it's only one -- excuse me -- so that it

10  can properly pursue its defense of the city's case in the

11  absence of Syncora and its experts.  And the third is the

12  potential need to file supplemental objections to the -- what

13  will be, I guess, the seventh amended plan to be filed here

14  promptly along with any potential need for additional

15  discovery relating to those supplemental objections to the

16  amendments in the plan.

17       The Court must conclude that the first two of those

18  asserted grounds do not constitute extraordinary cause for

19  any adjournment, and to the extent the motion is based on

20  those two grounds, it is denied.  There is merit in the

21  city's position that Syncora's negotiations with the city

22  over the past several weeks have been well-known, and in

23  those circumstances it seems to the Court that it was

24  incumbent upon all objecting parties, consistent with their

25  obligations to their clients, to prepare for the contingency

1   that, in fact, Syncora might settle at some point, and that
2   preparation would have included necessarily preparation to
3   take over for the examination of the witnesses that Syncora
4   was going to cover and, in the absence of an agreement
5   regarding experts, locating experts.  In this regard, the
6   Court will also note parenthetically but importantly that
7   nothing in FGIC's motion or its presentation today identified
8   any steps that FGIC took in regard to cross-examination
9   preparation or locating and preparing an expert since the
10  agreement in principle was announced last Tuesday night or
11  addressed how those five days was insufficient to meet its
12  preparation needs.

13       On the other hand, the Court must conclude that the
14  city's filing of an amended plan incorporating its settlement
15  with Syncora does require the Court to accommodate the
16  interests of FGIC and the Macomb Drainage District and other
17  objecting parties to have an opportunity to examine that plan
18  or the amendments to it and to file supplemental objections
19  to that plan as they deem appropriate, to take discovery as
20  necessary in relation to that, and to prepare to address the
21  Syncora settlement as part of this confirmation hearing.

22       Having said that, however, it's less clear to the
23  Court how the details of that should play out, and so,
24  accordingly, I'm going to ask counsel for FGIC and Macomb and
25  any other objecting creditors to meet and confer with counsel

1       for the city to see if you can come to some agreed upon

2       schedule or plan that will -- excuse me -- accommodate the

3       interests of the city in the promptest possible resolution

4       here and in the objecting parties' interests in an adequate

5       opportunity to address the new plan, and perhaps you can do

6       that over the lunch hour and then let the Court know where

7       you stand at that time.  I think that's as much as we can do

8       on this now, and I will ask the city to proceed with its

9       case.

10                  MR. SOTO:  Your Honor, one -- if I can just sit --

11                  THE COURT:  Yeah.

12                  MR. SOTO:  FGIC will be asking the Court for an

13      accommodation with respect to the adding or replacing of the

14      one expert witness.  We've located another witness, had

15      initial conversations with him.  I've had some initial

16      conversations with Mr. Cullen, and he will be replacing Dr.

17      Murphy.  It's a fellow named Dr. Jonathan Guryan is who we

18      are working with, so --

19                  THE COURT:  What's the name, sir?

20                  MR. SOTO:  Dr. Jonathan Guryan, who's at

21      Northwestern.

22                  THE COURT:  Okay.

23                  MR. SOTO:  I guess the other guy was in Chicago.  So

24      we'll be coming to the Court for that accommodation with

25      respect to this.

1          THE COURT:  Well, I urge you to discuss that

2    accommodation, whatever it is you will be seeking, with the

3    city and see what you can work out.

4          MR. SOTO:  Thank you, your Honor.

5          THE COURT:  If I have to decide something, I will,

6    but I think it is appropriate to ask you all to try to figure

7    out how to deal with this in the meantime.  Mr. Stewart.

8          MR. STEWART:  And I apologize for jumping the gun

9    earlier.

10          THE COURT:  Okay.

11          MR. STEWART:  Geoffrey Stewart, Jones Day, for the

12    city.  The city calls its next witness, Glenn Bowen.  Your

13    Honor, if I may have leave to approach, I have five sets of

14    the exhibits we would use with Mr. Bowen.

15          THE COURT:  Yes, sir.  Step forward, please, sir,

16    and raise your right hand.

17              GLENN BOWEN, CITY'S WITNESS, SWORN

18          THE COURT:  All right.  You may sit down in the

19    witness box.  Thank you.

20          MR. STEWART:  May I proceed, your Honor?

21          THE COURT:  One second.  Seems like we're still

22    getting organized here.  Okay.  You may proceed.

23          MR. STEWART:  Thank you, your Honor.

24                    DIRECT EXAMINATION

25    BY MR. STEWART:

1  Q   Good morning, Mr. Bowen.

2  A   Good morning.

3  Q   Could you please give us your full name and address?

4  A   Glenn David Bowen, Wayne, Pennsylvania.

5  Q   Okay.  Are you employed?

6  A   Yes.

7  Q   And by whom are you employed?

8  A   Milliman, Incorporated.

9  Q   And what is Milliman, Incorporated?

10 A   An actuarial consulting firm.

11 Q   Okay.  And where are the offices of Milliman in which you

12 work?

13 A   I work in the Wayne, Pennsylvania, office.

14 Q   And Wayne is a suburb of Philadelphia?

15 A   Correct.

16 Q   Okay.  Tell us, if you could, of your college education?

17 A   I have a bachelor's degree and a master's degree in civil

18 engineering from the University of Delaware.

19 Q   And what year did you receive those -- what years did you

20 receive those degrees?

21 A   The bachelor's degree in 1989, master's degree in 1994.

22 Q   Did there come a time when you became an actuary?

23 A   Yes.

24 Q   When was that?

25 A   I was hired in 1996 by Towers Perrin Company, now called

1  Towers Watson.

2  Q    Okay.  And you were hired by them as an actuary?

3  A    An actuarial analyst, yes.

4  Q    And how long did you remain at Towers Perrin?

5  A    Roughly five years.

6  Q    And what was your job after that?

7  A    I was hired by Milliman in 2001.

8  Q    Okay.  And tell us, if you could, what -- in brief what

9  your career at Milliman has been.

10  A    I am a pension actuary, so I consult to pension plan

11  sponsors and legislative bodies that have interests in the

12  pensions that are sponsored in their jurisdictions.

13  Q    Okay.  You just used a term "pension plan sponsors."

14  What is a pension plan sponsor?

15  A    There can really be I'll say two broad kinds.  In the

16  corporate sector, you would typically think of it as the

17  employer who sponsors the pension plan, and in the

18  governmental sector, it would be the local government or

19  other governmental authority.

20  Q    Okay.  And in your practice as an actuary, what

21  percentage of your time have you spent working with

22  government sponsored pension plans?

23  A    I would say it's certainly morphed over my career from a

24  focus on corporate to a focus on public, and public is now 90

25  percent or more of what I do.

1  Q   And how many different public pension plans have you

2  worked with over the course of your career?

3  A   I'll say dozens, and I've also worked with retiree

4  healthcare plans in the public sector as well, about a

5  hundred of them.

6  Q   Are you qualified as an actuary?

7  A   I'm a fellow of the Society of Actuaries, also an

8  enrolled actuary under ERISA and a member of the American

9  Academy of Actuaries.

10  Q   Are those the credentialing bodies for actuaries in the

11  U.S.?

12  A   Yes.

13  Q   Have you published any papers or other articles in the

14  field of being an actuary?

15  A   About a half dozen.

16  Q   Okay.  Now, let's -- I'd like to just make sure we have

17  our definitions nailed down before we go further.  The city,

18  of course, has two Retirement Systems, does it not?

19  A   Yes.

20  Q   Are they sometimes also called pension plans?

21  A   Yes.

22  Q   What are the city's two Retirement Systems?

23  A   There's the General Retirement System and the Police and

24  Fire Retirement System.

25  Q   And are they sometimes known by their initials, the GRS

1   and the PFRS respectively?

2   A    Yes.

3   Q    And just a minor point, is it the case that Milliman

4   refers to them as the DGRS and the DPFRS?

5   A    That is correct.

6   Q    But the terms are interchangeable.  We don't need the D?

7   A    We do not.

8   Q    We all know we're talking about Detroit here?

9   A    Yes.

10  Q    Okay.

11  A    I speak for myself only saying that.

12  Q    And you're aware of something called a -- called the

13  DWSD?

14  A    Yes, I am.

15  Q    What is the DWSD?

16  A    The Detroit Water and Sewer Department.

17  Q    Do the employees of the DWSD -- are they members of

18  any -- either of the city's Retirement Systems?

19  A    Yes, they are.

20  Q    Which system?

21  A    The General Retirement System.

22  Q    And, by the way, am I correct that one refers to the

23  employees as members?

24  A    In a public pension plan, yes.

25  Q    Now, you're aware of something called a defined benefit

1  plan?

2  A   Yes.

3  Q   What is a defined benefit plan?

4  A   A defined benefit plan is a retirement plan where, as

5  it's titled, the benefit is defined.  There will be a formula

6  that will determine the amount of the pension that you

7  receive.

8  Q   And who makes contributions to a defined benefit plan?

9  A   The plan sponsor will make contributions.  In some

10 instances, the employees will be required to make a

11 contribution as well.

12 Q   Okay.  So did there come a time when you began working on

13 matters relating to the City of Detroit's two pension plans?

14 A   Yes.

15 Q   When was that?

16 A   It was in the middle of 2012.

17 Q   And what were you asked to do in the middle of 2012?

18 A   Our very first assignment was a request that we review

19 the annual actuarial valuation reports that had been prepared

20 by the Systems' retained actuary and provide us, as much as

21 possible, a description of the status of the plans in

22 laymen's terms.

23 Q   Okay.  And let me direct your attention to the exhibits

24 before you.  They may be at the bottom of your pile, but

25 they're two.

1        MR. STEWART:  And let's put them up in order, if we

2  could, Syncora Exhibit 4054 and Syncora Exhibit 4776.  And,

3  your Honor, I believe these have been stipulated into

4  evidence.

5        MR. WAGNER:  We have no objection, your Honor.

6  BY MR. STEWART:

7  Q   Mr. Bowen, do you have these two exhibits before you?

8  A   I do.

9  Q   Tell me, if you --

10       THE COURT:  Let me just say for the record that in

11  case they are not already in evidence, Exhibits 4054 and 4776

12  are admitted.

13      (Syncora Exhibits 4054 and 4776 received at 9:56 a.m.)

14  BY MR. STEWART:

15  Q   Mr. Bowen, could you tell us what these two exhibits are?

16  A   These exhibits are the annual actuarial valuation reports

17  prepared by the Systems' retained actuary.  One report is for

18  the General Retirement System and one is for the Police and

19  Fire Retirement System.

20  Q   Now, you just used the phrase "Systems actuary."  What is

21  the Systems actuary?

22  A   Excuse me.  I use that phrase to define the actuary who

23  has the responsibility for conducting the annual valuation.

24  Q   And that's the actuary hired by the Retirement System

25  itself?

1  A   Yes.

2  Q   Who is the actuary for these two Retirement Systems?

3  A   Gabriel, Roeder, Smith & Company.

4  Q   And their name appears in the upper right-hand corner of

5  each of these two exhibits?

6  A   Yes.

7  Q   Okay.  And so I believe you were telling us that your

8  first assignment had to do with looking at these two, and, by

9  the way, these are, once again, called annual valuation

10 reports?

11 A   Yes.

12 Q   Do you sometimes call them AVR's?

13 A   I do not, but I can if you would like.

14 Q   I won't either then.  I'll call them annual valuation

15 reports.  So what was it you were asked to do in particular

16 with respect to these annual valuation reports?

17 A   As I mentioned, we were asked to review them, and we were

18 asked to explain them to city personnel who did not have

19 extensive pension background.

20 Q   Now, I think you testified this engagement came to you in

21 the middle of 2012?

22 A   Yes.

23 Q   These are the reports, however, for the year ended 2011,

24 are they not?

25 A   That's correct.

1   Q   Why was it you were dealing with 2011 reports when you
2   were doing your work in 2012?
3   A   These were the most recently published reports that
4   existed at that time.
5   Q   Okay.  And so as a result of looking at these reports,
6   what did you do next?
7   A   We documented our results in a letter and met with the
8   city personnel.
9   Q   Now, you just used the term "letter."  Does the term
10  "letter" in the way -- in your work for the city have any
11  particular meaning?
12  A   Our relationship with the city over time has been ad hoc
13  consulting, you know, ad hoc requests, and in those cases we
14  will typically write a letter because a template does not
15  exist to respond to such a request.
16  Q   Fair to say that the deliverable that Milliman has in its
17  work for the city has been letters?
18  A   Yes.
19  Q   How many letters over the course of Milliman's engagement
20  by the city has Milliman delivered to the city?
21  A   Speaking for the pension side, it has been over a
22  hundred.
23  Q   Okay.  Now, was one of the things you were asked to do
24  here in 2012 to look at the city's contribution?
25  A   Later in 2012, yes.

1  Q   Okay.  Let's move on then, but before I do that, let me

2  just ask you about something else.

3          MR. STEWART:  Can we please put up on the screen

4  Exhibit 633, which is a demonstrative exhibit?

5  BY MR. STEWART:

6  Q   Mr. Bowen, is Exhibit 633 in front of you?

7  A   Yes.

8  Q   Have you seen this before?

9  A   I have.

10  Q   What is Exhibit 633?

11  A   It is -- it contains an equation and a pictorial diagram,

12  which is a very high-level description of how a pension plan

13  needs to stay in balance over time.

14          MR. STEWART:  Your Honor, I would move into evidence

15  only for purposes of being a demonstrative Exhibit 633.

16          THE COURT:  Any objections?

17          MR. WAGNER:  No objection, your Honor.  And just for

18  the record, Jonathan Wagner from Kramer Levin Naftalis &

19  Frankel on behalf of the COPs.

20          THE COURT:  Thank you, sir.

21          MR. STEWART:  And I think --

22          THE COURT:  633 is admitted.

23     (City Exhibit 633 received at 10:00 a.m.)

24          MR. STEWART:  Sorry, your Honor.

25          MR. WAGNER:  For demonstrative purposes.

1  BY MR. STEWART:

2  Q    And Exhibit 633 sets forth an equation?

3  A    Yes.

4  Q    What is the purpose -- what is the explanatory purpose of

5  this equation?

6  A    Over the long term, the inflows and the outflows of the

7  pension plan must be in balance in order for the plan to pay

8  the promised benefits.

9  Q    Okay.  Let's go through each of the letters here.  What

10 does the letter "C" stand for?

11 A    "C" stands for contributions.

12 Q    And would that be the city contribution we talked about

13 earlier?

14 A    Yes.

15 Q    What does "I" stand for?

16 A    "I" is investments.

17 Q    And when you say "investments," what's being invested?

18 A    There is a current pool of assets and an expectation of

19 future income over time.

20 Q    Okay.  Is the round blue figure -- is that -- does that

21 represent the current assets?

22 A    That represents a tank, if you will, and if you think of

23 the assets as water, the tank is the trust.  It holds the

24 assets.

25 Q    Okay.  And then what is "B"?

1  A   "B" is benefits.

2  Q   And when you say "benefits," what are you referring to?

3  A   In this case, this is a -- we don't actually use this

4  equation, per se.  It's not that simple.  But that's a

5  measure of the liability for the benefits that have been

6  promised.

7  Q   These are the benefits to be paid to retirees?

8  A   Yes.

9  Q   Okay.  And how do you know what those benefits are?

10  A   That's the -- one of the main purposes of conducting the

11  annual valuation.

12  Q   Okay.  And then "E" is our final letter.  What is "E"?

13  A   That is expenses.

14  Q   Okay.  And so tell us now that we've walked through this

15  how this model works.

16  A   Okay.  It's I'll say easy to conceptualize on a single

17  person.  If there was one person in a pension plan, you would

18  effectively spend their career putting money in on the left

19  and earning a return on it, and then the pool would be

20  effectively full at the time of retirement, and during the

21  time of retirement the benefits would flow out.

22  Q   And at various times in your work for the city, were you

23  asked to determine individual values for either "C" or "B" or

24  "I" or even "E"?

25  A   We've worked with all of them over time.

1 Q   Okay.  And now let me ask you about the next assignment.

2 Later in 2012, were you asked to do something new by the

3 city?

4 A   I believe the next assignment in late 2012 was to do a

5 simple forecast of employer contributions.

6 Q   Of "C"?

7 A   Correct.

8 Q   And, once again, did you work with an actuarial valuation

9 report?

10 A   Yes.

11 Q   Do you know whether it was the ones we've already seen,

12 or was it a new report?

13 A   I believe at the time our initial assignment, the 2011

14 was still the most recently published report.

15 Q   So what did you do vis-a-vis the 2011 report?

16 A   We looked at the report, and there are various I'll say

17 facts and figures in there of an actuarial nature.  Using

18 those facts and figures and some extrapolation techniques, we

19 projected forward five years and used the methodology that

20 was in use to produce contributions in order to demonstrate

21 what the expected pattern of contributions was going to be.

22 Q   Now, let me direct your attention now to 2013.  Have you

23 heard of something called a pension task force?

24 A   Yes.

25 Q   What is or was the pension task force?

1  A   The pension task force was a group of advisors that had

2  been retained by the city that was responsible for pension

3  matters.

4  Q   Okay.  And what sort of things, in a very general matter,

5  did the pension task force look at?

6  A   The pension task force looked at a lot of things.  On

7  this diagram, most of the focus was on -- most of the focus

8  of the tasks that came to Milliman was on benefits.

9  Q   Okay.  And I apologize if I've asked you already.  Who

10 are the -- who are the members of the task force?

11 A   The two members that interfaced with the most were Evan

12 Miller from Jones Day and Chuck Moore from Conway MacKenzie.

13 Q   Was this before or was it after the city filed its

14 bankruptcy petition?

15 A   The pension task force was formed in early 2013, so it

16 would have been before.

17 Q   Okay.  Now, let me ask you some definitions before we

18 move forward.  Have you heard of something called an accrued

19 actuarial liability?

20 A   Yes.

21 Q   And that is sometimes called AAL, is it not?

22 A   Yes, it is.

23 Q   Okay.  What is it?

24 A   It is the measure that the actuary will determine in the

25 annual valuation report that represents the liability that is

1    categorized under "B" in this long-term equation.

2    Q   Okay.  So is it a present value or is it calculated in

3    some different way?

4    A   It is a present value.

5    Q   So the AAL is the present value of "B"?

6    A   Correct.

7    Q   Okay.  Have you heard of something called an unfunded

8    accrued actuarial liability?

9    A   Yes.

10   Q   What is that?

11   A   That is the difference between the present value of the

12   liability we were just discussing and the assets that are

13   currently on hand.

14   Q   So if we look at our diagram here, that would have some

15   bearing on the level of the water in this blue tank we have?

16   A   If there was a UAAL, unfunded actuarial liability, that

17   would be like saying the tank is not quite as full as we'd

18   like it to be today.

19   Q   Okay.  So just to summarize, the AAL is the "B" in our

20   diagram; correct?

21   A   Correct.

22   Q   And the UAAL would be if the tank wasn't as high up as it

23   ought to be?

24   A   Correct.

25   Q   Okay.  Let me ask you about a couple of other terms.

1    Have you heard of something called an investment return
2    assumption?
3    A    Yes.
4    Q    What is that?
5    A    That is the rate of return that, on average, you are
6    expected to earn on your invested assets in the future.
7    Q    And how does it figure into the calculation we see in
8    Exhibit 633?
9    A    In the first step and where the actuary spends most of
10   their time is in the determination of the "B," benefits, the
11   accrued liability.  We calculate those on a nominal basis in
12   all future years, and to develop a present value, we will
13   discount them based on the expected investment return.
14   Q    Okay.  What is the relationship between the investment
15   return assumption and the level of the city's contributions?
16   A    The higher the investment return assumption, you're
17   assuming that more of the ultimate benefits will be paid by
18   investment return, and in the short term, that depresses the
19   contribution level.
20   Q    Okay.  And the lower the investment return assumption,
21   what effect does that have?
22   A    That's the opposite.  That assumes that since you're
23   going to earn less on your investments, more contributions
24   would be needed over time, and it raises the short-term
25   contributions.

1  Q   Okay.  Have you heard of the term used "funding status"?

2  A   Yes.

3  Q   What is funding status as that term is used with respect

4  to public pension plans?

5  A   Funding status is the assets divided by the liabilities.

6  Q   Okay.  And what does it -- what does it tell us?

7  A   Higher funded status is better.

8  Q   You have more funds?

9  A   Yes.

10 Q   Okay.  Did there come a time in 2014 you were asked to do

11 something called a replication or a replication audit?

12 A   Yes.

13 Q   What is a replication?

14 A   A replication is when an outside actuary, not the system

15 actuary, is asked to effectively take all of the inputs used

16 by the system actuary, program their own valuation system or

17 their own software, and attempt to reproduce similar results.

18 Q   And when were you asked to do a replication audit?

19 A   We were actually asked at some point in 2013.

20 Q   Okay.  And which systems were you asked to -- were you

21 asked to do one for both of the systems?

22 A   Yes.

23 Q   Okay.  Now, I think you said that a purpose of this was

24 to check the work or duplicate the work of the system

25 actuary?

1   A    That was part of it, yes.

2   Q    Okay.  And what role in that assignment did Gabriel,

3   Roeder's annual valuation reports play?

4   A    That was really the fundamental document we looked to to

5   learn about the plan.

6   Q    Okay.  So look, if you could, at the following documents

7   which are before you.

8          MR. STEWART:  And these, I believe, have been, once

9   again, stipulated into evidence, but let's put them up.  It's

10  1001, 1004, 1023, and 1024.  And, your Honor, as I said, I

11  think these came in under the operation of the pretrial

12  order, but for avoidance of data, I will move them into

13  evidence if there's no objection.

14         MR. WAGNER:  That's fine.  They were actually on our

15  exhibit list, so we -- no problem.

16         THE COURT:  All right.  All right.  If they were not

17  previously admitted, they are now.

18      (COPs Exhibits 1001, 1004, 1023, and 1024 received at

19      10:09 a.m.)

20  BY MR. STEWART:

21  Q    Okay.  Now, in your replication audit, to spend a minute

22  on these, tell us, if you could, what these four exhibits

23  are.

24  A    Well, I only see one on my screen, but I assume you have

25  two valuation reports or four valuation reports.

1　Q　Yeah.　You actually have them in your packet there.

2　There's a mound of paper.　But let me ask you this.　In your

3　replication that you did in 2014, which of these valuation

4　reports did you work with?

5　A　Well, our task was to replicate the 2013 valuations.

6　Q　And so would that be Exhibit 1023 and 1024?

7　A　Yes.　They are the 2013 valuations.

8　Q　And which one is for the GRS?

9　A　1023 is GRS.

10　Q　Okay.　And the PFRS is 1024?

11　A　Correct.

12　Q　Okay.

13　A　Yes.

14　Q　Let's go through these reports so we have an

15　understanding of how they work, and let's do it with 1024, if

16　we could.　Do you have that before you?

17　A　You said 1024?

18　Q　I did.

19　A　Okay.

20　Q　Yeah.　And the cover, of course, is the cover, and the

21　second page is the table of contents; correct?

22　A　Yes.

23　Q　And the third and fourth page are the cover letter from

24　Gabriel, Roeder to the trustees of the system?

25　A　Correct.

1   Q   Okay.  Let's now go, if we could, to page 4.  And I

2   think -- is that 4?  Yeah, there we go.  Page 4.  What is

3   page 4 of Exhibit 1024?

4   A   Page 4 is a summary.  You could best describe it as "B"

5   in our earlier equation, benefits, the present value of the

6   benefits payable by the system.

7   Q   Okay.  At the top it says "actuarial accrued liabilities

8   as of June 30th, 2013"?

9   A   Correct.

10  Q   And that's the term we talked about earlier?

11  A   Yes.

12  Q   And then we have a series of calculations here on the

13  table?

14  A   Yes, yes.

15  Q   Okay.  Now, at the bottom -- at the very bottom of it, is

16  there a place where this report sets forth the actuarial

17  accrued liabilities for the System?

18  A   Yes.

19  Q   And where is that?

20  A   That is the first line in the third box under "System

21  Totals."

22  Q   Okay.  And that number is $3.89 billion?

23  A   Correct.

24  Q   Below that there's something called accrued assets.

25  A   Yes.

1  Q    What does "accrued assets" mean?

2  A    In this case, I believe it is the smoothed value of

3  assets that is used in the contribution calculation.

4  Q    Okay.  And then at the bottom we have -- is that the

5  UAAL?

6  A    Yes.

7  Q    Okay.  Let's keep going through the report.  If we could,

8  let's turn to page 15.  I think it's -- there we go.  Do you

9  have page 15 before you?

10  A    Yes.

11  Q    What is page 15 and the pages following it?

12  A    It's labeled "Summary of Benefit Provisions," and this is

13  where the actuary sets forth eligibility conditions and

14  resulting benefits that define what the members will receive.

15  Q    Okay.  And do you know where this information comes from?

16  A    My understanding is that some of it may be set in

17  statute, and some of it is in collective bargaining

18  agreements.

19  Q    Now, in your replication audit, your replication

20  procedure, what use did you make of this part of the exhibit

21  that summarized benefit provisions?

22  A    One of the requirements of performing a valuation is that

23  we in our system code the benefits that members are eligible

24  for, so we started with this document.

25  Q    Okay.  Let's go, if we could, to page 21.  What is page

1  21 and the pages after it?  What do they set forth?

2  A   These are summaries of what I call census data.  It is

3  data regarding the members of the system.

4  Q   Okay.  And what does it say?  What does it tell us about

5  the members of the system?

6  A   These are summary tables that summarize the data which is

7  on each individual member's record of quantities that are

8  important for the pension valuation.

9  Q   And what relevance does this have to your work in a

10 replication procedure?

11 A   We need to know the membership of the system to be able

12 to value to perform the replication.

13 Q   Let's go, if we could, now to page 31.  31 and the pages

14 after it, what do they set forth?

15 A   These are assumptions, which is I'll say the third

16 component of running a valuation or doing a replication.

17 Q   And what's the relevance of assumptions in this exercise?

18 A   What we are trying to model in the determination of "B"

19 is the expected future cash flows that the system will

20 disgorge over time, and they are all contingent upon what the

21 members do, how long they work, how long they live, et

22 cetera.

23 Q   Now, I've been asking you about Exhibit 1024, which is

24 the actuarial valuation report for the PFRS.  Is the

25 structure of the report for the GRS similar?

1  A   Yes.

2  Q   Okay.  So before I go further, let me ask you this.  Does

3  Milliman have a calculation engine known as VAL 2000?

4  A   Yes.

5  Q   Who or what is VAL 2000?

6  A   VAL 2000 is a software system developed and maintained by

7  Milliman for use in preparing valuations of pensions and

8  retiree healthcare systems.

9  Q   Have you used VAL 2000 in your career at Milliman?

10  A   Yes.

11  Q   How often have you used it?

12  A   Continuously.

13  Q   How long since you joined Milliman have you worked with

14  VAL 2000?

15  A   It was there when I joined, so continuously since 2001.

16  Q   How well do you know the operation and features of this

17  software?

18  A   Very well.

19  Q   Okay.  Now, what role did VAL -- did this software play

20  in the replication procedure you've described to us?

21  A   I think you used the phrase "calculation engine."

22  Q   I did.

23  A   So VAL 2000 you can think of as a template that is

24  designed to accept inputs and then do the resulting

25  calculations.

1  Q   Okay.  And what inputs -- in this replication procedure

2  were inputs loaded into the software?

3  A   That would be the three we just mentioned.  The census

4  data is loaded into the software, the actuarial assumption

5  tables are loaded into the software, and we code the benefit

6  provisions.

7  Q   Okay.  From the report that we looked at?

8  A   Correct.

9  Q   Okay.  And who did the loading of this information?

10  A   Various members on staff.

11  Q   And what was your role in terms of that part of the work?

12  A   I guess the best way to characterize it is the analysts

13  on staff work under the direction of the consultants, so in

14  terms of some of the mechanical loading procedures, we set

15  forth what I call a job description.

16  Q   Okay.  And what role did you have in assuring that the

17  job description was adhered to?

18  A   We have a series of peer review or checking that gets

19  done after those procedures are completed.

20  Q   Okay.  And once the data was loaded, it was then recited

21  in the software; correct?

22  A   I'm not sure I understand the meaning of "recited."

23  Q   The data was loaded into VAL 2000 --

24  A   Yes.

25  Q   -- is that right?

1  A    Yes.

2  Q    Was it at that point then saved and archived in the

3  system?

4  A    Yes.

5  Q    Is it still there?

6  A    Yes.

7  Q    Okay.  Now, let's, if we could -- and did there come a

8  time when you, in fact, performed the replication procedure?

9  A    Yes.

10  Q    Okay.  And what -- and did you report to the city what

11  you found?

12  A    Yes.

13  Q    What form was your report?

14  A    That was a letter for each of the systems.

15  Q    Okay.  Let's, if we could, look at Exhibits 1008 and 491.

16  Mr. Bowen, do you have Exhibits 1008 and 491 before you?

17  A    I'm working on it.

18  Q    Okay.

19       MR. STEWART:  Can you put up 491?  Ah, there we go.

20       MR. WAGNER:  I'm sorry.  Can I get a copy of 491?  I

21  don't see it in the book.

22       MR. STEWART:  Is it not in the book?

23       THE WITNESS:  Yes, I have them.

24  BY MR. STEWART:

25  Q    Okay.  All right.  Before we go further, tell us what

1 these two exhibits are.

2 A   491 is our report on the replication of DGRS, and 1008 is

3 our report on the replication of DPFRS.

4 Q   Who wrote these two letters?

5 A   Myself and a colleague of mine.

6 Q   And is your -- does your signature appear at the back of

7 each letter?

8 A   Yes.

9 Q   Okay.  And before these letters went out, what did you do

10 to assure the accuracy of the contents of the letters?

11 A   I was involved in the process all the way through,

12 drafting the letter, reviewing the results that are in the

13 letter.

14        MR. STEWART:  Your Honor, I move admission of both

15 exhibits.

16        MR. WAGNER:  No objection.

17        THE COURT:  They are admitted.

18    (City Exhibit 491 and COPs Exhibit 1008 received at 10:19

19    a.m.)

20 BY MR. STEWART:

21 Q   Okay.  Let us, once again, deal with just the PFRS side

22 of this.  That's Exhibit 1008.  Do you have that before you?

23 A   I do.

24 Q   Okay.  Let's go through it, if we could.  We have a -- we

25 have the first page, and then on the second is something

1  called project description.

2  A    Yes.

3  Q    And just as a general matter, what is the project

4  description?

5  A    The project description is to determine the June 30,

6  2013, actuarial liability for the PFRS.

7  Q    Okay.  And it refers, does it not, to the actuarial

8  valuation report we've been talking about?

9  A    The 2012 report of DPFRS, yes.

10 Q    And has the link to where it could be found on the

11 Internet?

12 A    Correct.

13 Q    Okay.  Now, further down there's a paragraph entitled

14 "Investment Return."

15 A    Yes.

16 Q    Do you see that?

17 A    I do.

18 Q    Now, does this indicate that you ran this replication

19 using two different investment return assumptions?

20 A    Yes.

21 Q    One was eight percent, and one was 6.75 percent?

22 A    Correct.

23 Q    Where did the eight-percent assumption come from?

24 A    That is the rate that is used in the valuation report.

25 Q    And where did the 6.75-percent assumption come from?

1    A    That was a request from the city.

2    Q    Okay.  As a result of this replication procedure, were

3    you able to determine the AAL for the system under these two

4    different investment return assumptions?

5    A    Yes.

6    Q    And let's look, if we could, at page 6 of the exhibit.

7    Do you see the table on page 6?

8    A    Yes.

9    Q    And what does the table on page 6 set forth for us?

10   A    That is the results of our replication based on an eight-

11   percent investment return rate and a 6.75-percent investment

12   return rate.

13   Q    Okay.  Just for the record, what was the determination

14   you made when you applied the eight-percent investment return

15   assumption?

16   A    3.794 billion.

17   Q    And when you applied the 6.75-percent investment return

18   assumption?

19   A    4.285 billion.

20   Q    Okay.  And I think earlier we talked about the actuarial

21   valuation report you were working with, and do I remember

22   correctly you were still working with the 2012 report or was

23   it the 2013?

24   A    At this point in time, the 2012 was the most recent that

25   we had access to.

1  Q   So let's look at Exhibit 1004 and, in particular, page 3

2  of our exhibit -- of that exhibit, I should say.  What was

3  the AAL calculated by Gabriel, Roeder for this system for

4  that period of time?

5  A   As of 2012, the AAL was 3.823 billion.

6  Q   And how did it compare to what your replication procedure

7  determined?

8  A   Well, actually that is a different date, so we did not

9  compare those two numbers.

10 Q   I'm sorry.  I had misunderstood.  Let's look then at the

11 2013 actuarial valuation report.  Do you have Exhibit 1024 in

12 front of you?

13 A   I do.

14 Q   Okay.  Let's look, if we could, at the comparable table

15 in Exhibit 1024.  That's on page 4 of the exhibit.  Now, how

16 does the -- what did Gabriel, Roeder determine as of June

17 30th, 2013, was the AAL for the PFRS?

18 A   3.890 billion.

19 Q   And how does that compare with the value you came up with

20 in your replication?

21 A   It's in between two and three percent different.

22 Q   Okay.  Now let's go, if we could, to Exhibit 491.  Do you

23 have Exhibit 491 before you?

24 A   I do.

25 Q   And Exhibit 491 is what?

1  A    The report of our replication audit of DGRS.

2  Q    Okay.  And I think you described already the procedure.

3  Was anything done differently with GRS than you had done with

4  PFRS?

5  A    No.  The procedures were similar.

6  Q    Let's look, if we could, at page 6 of Exhibit 491 and at

7  the table there.

8       MR. STEWART:  If we could blow the table up, please.

9  BY MR. STEWART:

10  Q    Now, the table has results under two different investment

11  return assumptions; correct?

12  A    Yes.

13  Q    One is 7.9 percent?

14  A    Correct.

15  Q    Where did that come from?

16  A    That is the rate that is used in the annual actuarial

17  valuation.

18  Q    Okay.  And the other column has the investment return

19  assumption of 6.75 percent?

20  A    Yes.

21  Q    Where did that come from?

22  A    That was requested by the city.

23  Q    And so what did your procedure determine with respect to

24  the AAL for the GRS as of June 30th, 2013?

25  A    Under the basis used in the valuation report, 3.601

1    billion and under the 6.75-percent return 3.978 billion.

2    Q   Okay.  Let's go, if we could, to Exhibit 1023, which is

3    in evidence, and let's go to page 4, please, A-4.  It's the

4    one that in the lower right-hand corner has a control number

5    2982.  There we go.  This is the Gabriel, Roeder actuarial

6    valuation report for the GRS as of June 30th, 2013?

7    A   Correct.

8    Q   What had Gabriel, Roeder determined was the AAL for that

9    system on that date?

10   A   3.609 billion.

11   Q   And how did that compare with the value you determined

12   using their investment return assumption?

13   A   That was -- that differed by roughly $8 million.

14   Q   Out of a total of how much?

15   A   3.6 billion.

16   Q   Okay.  Now, after you had finished the replication audit,

17   did you -- did Milliman remain involved in the city's

18   matters?

19   A   Yes.

20   Q   And in the months following it, what -- without getting

21   into what you did, what generally was your role?

22   A   We were asked to prepare various analyses using our

23   replication as a baseline in making adjustments.

24   Q   Okay.  And there was a mediation process going forward,

25   was there not?

1  A   There was.

2  Q   Okay.  And without saying what you did, just tell us what

3  was your role in the mediation?

4  A   We were --

5          MR. PEREZ:  Your Honor, excuse me.  I'm going to

6  object.  If he's not going to say what his role is, then --

7          THE COURT:  You can stay seated.  You don't have

8  to --

9          MR. PEREZ:  Yeah.

10         THE COURT:  -- injure your back making objections to

11 evidence.

12         MR. PEREZ:  Your Honor, to the extent that he's

13 going to go into the mediation, we're obviously not going to

14 be -- not going to be able to ask him any questions, so I'm

15 not sure what the intent of the question is.

16         MR. STEWART:  I'm not sure what the intent of the

17 question was either actually, Judge.  I'm going to ask the

18 witness this.

19 BY MR. STEWART:

20 Q   After that, did you --

21         THE COURT:  That is a withdrawal of the question,

22 yes.

23         MR. STEWART:  Withdrawal.

24 BY MR. STEWART:

25 Q   After that, did you remain involved in supporting the

1  mediation process?

2  A    Yes.

3  Q    Thank you.  Now, by now, by the time we get to 2014,

4  you've been working with the city's two pension plans for how

5  long?

6  A    We started in the middle of 2012.

7  Q    About two years?

8  A    With some gaps, but, yes, two years.

9  Q    How well would you say you knew the plans by then?

10 A    We had to know them very well to be able to perform the

11 replication.

12 Q    Now, have you heard the term before a frozen plan?

13 A    Yes.

14 Q    What is a frozen plan?

15 A    There's more than one variety of frozen plans, but the

16 most common definition would be where there is a freeze date.

17 Employees who were hired after the freeze date do not become

18 members of the plan, so they will not accrue benefits under

19 the plan.  And employees who are working as of the freeze

20 date will cease accruing any benefits in the future.

21 Q    Okay.  Who makes the decision to freeze a plan?

22 A    In my experience, in a corporate sector plan the plan

23 sponsor sometimes has the unilateral right to do so.

24 Sometimes it is subject to collective bargaining.

25 Q    Let me direct your attention, if I could, to the date of

1    July 18, 2013.  Do you understand that was the date --

2            THE COURT:  Excuse me one second.

3            MR. STEWART:  Yes.

4            THE COURT:  The answer you just gave, you said that

5    was in the corporate setting?

6            THE WITNESS:  Yes.

7            THE COURT:  Is there another answer for the public

8    setting -- sector setting?

9            THE WITNESS:  Well, the plan freezes are very common

10   in the corporate sector, very uncommon in the public sector,

11   and I think that's really a legal matter as to who gets to

12   freeze the plan that I can't answer to.

13           THE COURT:  Thank you, sir.

14   BY MR. STEWART:

15   Q    So let me direct your attention, if I could, to July 18,

16   2013.  Do you understand that was the date upon which the

17   city filed its petition in bankruptcy?

18   A    Yes.

19   Q    As of that date, do you know whether or not the GRS plan

20   was frozen?

21   A    It was not.

22   Q    How do you know that?

23   A    There was no piece of information that we provided, were

24   provided or found that said the plan was frozen.

25   Q    And in your dealings with the city and with the plan, who

1   said anything to you about it being frozen?

2   A   Nobody said anything to us about it being frozen.

3   Q   And as of that date, can you tell us whether or not the

4   PFRS plan was frozen?

5   A   It was not.

6   Q   Subsequent to that time, have there been proposals that

7   the plan should be frozen?

8   A   Yes.

9   Q   Do you know whether that has happened yet?

10  A   I do not.

11  Q   Now, let me ask you a couple of --

12          MR. STEWART:  Let's put up, if we could, Exhibit

13  632.

14  BY MR. STEWART:

15  Q   Mr. Bowen, do you see Exhibit 632 on the screen in front

16  of you?

17  A   Yes.

18  Q   What is Exhibit 632?

19  A   There is a formula at the top which is a -- I'll say the

20  generic template of how a final average pay pension plan

21  calculates a benefit, and there is a diagram below that which

22  is illustrative of a member moving through their working

23  career and their retirement years.

24  Q   Okay.  So the formula -- and who prepared this?

25  A   Jones Day.

1  Q   And have you looked at it?

2  A   Yes, I have.

3  Q   Is it accurate?

4  A   It's a very high-level representation, so, yes, it's

5  accurate.

6           MR. STEWART:  Your Honor, I would move 632 into

7  evidence as a demonstrative exhibit only.

8           MR. WAGNER:  That's fine, your Honor.

9           THE COURT:  All right.  For that purpose, it is

10  admitted.

11      (City Exhibit 632 received at 10:31 a.m.)

12  BY MR. STEWART:

13  Q   So, if we could, Mr. Bowen, let's look at the top.

14  There's a formula.  Could you tell us, first of all, what the

15  formula says and, second, what it is?

16  A   Okay.  It says pension equals "X" percent times service

17  times final average pay, and this formula is used to

18  determine the pension that a member will receive based upon

19  the service they have rendered and their final average pay

20  and the "X" percent multiplier, which is part of the pension

21  plan design.

22  Q   So where does the "X" percent come from?

23  A   The "X" percent is -- I believe that's a statutory

24  figure, but it is set at the -- it is set as part of the

25  benefit design to determine the overall level of the benefit.

1  Q   What does "service" mean?

2  A   Service is basically the amount of time that the member

3  works for the city.

4  Q   Okay.  And what is final average pay?

5  A   Final average pay is in most cases for the city's plans

6  three highest years of pay at the end of the period of

7  service.

8  Q   Okay.  So let's look at our chart.  On the far left

9  corner we have DOH.  What does that stand for?

10  A   The date of hire.

11  Q   Okay.  Now, have you heard the term "accrual" as that

12  term is used in pension plans?

13  A   Yes.

14  Q   What does "accrual" mean?

15  A   As a synonym, you could use the word "earned."  You

16  accrue your benefits over your career.  You're earning your

17  benefits as you're working.

18  Q   So if I worked for the city, and after one year when do I

19  start accruing my benefits?

20  A   You start accruing them upon hire.

21  Q   The day I started?

22  A   Yes.

23  Q   Okay.  Now, have you -- when do my benefits stop

24  accruing?

25  A   When you separate from service.

1  Q   Okay.  Now, is there a term called "vesting"?  And there

2  is vesting on our exhibit as well.

3  A   Yes, there is.

4  Q   What does "vesting" mean?

5  A   If you discontinue your service with the plan sponsor

6  prior to reaching the vesting date, in this example, ten

7  years, you forfeit your right to receive a pension.

8  Q   And what is the vesting period for the GRS and the PFRS?

9  A   With some exceptions, it's ten years.

10 Q   Okay.  So back to me again.  Let's assume I work for the

11 city and quit in year nine.  What are my vested benefits?

12 A   None.

13 Q   Why?

14 A   Because you have not rendered the requisite period of

15 service.

16 Q   How many years have I accrued?

17 A   Nine.

18 Q   But I still get no benefits?

19 A   Correct.

20 Q   If I work to 11 years, then quit, how many years have I

21 accrued?

22 A   Eleven.

23 Q   And how many have I vested?

24 A   Eleven.

25 Q   So what benefits do I get under the formula here, and

1  what's the service -- the value of the service variable in

2  our equation?

3  A   At that -- in that example, it would be 11.

4  Q   Okay.  Now, up here we have something called final

5  average pay.  Let me ask this.  What do the words "final pay"

6  mean in the phrase "final average pay"?

7  A   They're meant to denote the pay near the end of your

8  period of service, end of your career.

9  Q   And average is the three years you told us about?

10  A   Yes, for these systems.

11  Q   Now, in calculating the AAL for a system, is one of the

12  benefits a system takes into account the future cost it's

13  going to have for people who have not retired yet?

14  A   Yes.

15  Q   How does the system know what their final average pay is?

16  A   One of the actuarial assumptions used in the valuation is

17  a projection of salaries over time.

18  Q   So the system projects the final average pay of people

19  who have not yet reached that segment of their career where

20  they measure the final average pay; is that correct?

21  A   Everything is projected, so, yes.

22  Q   Okay.  Now, what assumptions does -- do these two plans

23  use to project that final average pay?

24  A   Well, there -- I mean there is a salary assumption that's

25  the baseline for projecting what the salary would be, and

1   there are additional assumptions that determine the

2   probability of separating from service in each future year,

3   termination if you're not retirement eligible and then

4   ultimately retirement.

5   Q   And then are there assumptions about wage increases and

6   inflation?

7   A   I kind of consider them all baked into the salary

8   assumption scale, yes.

9   Q   But they're part of the salary assumption?

10  A   Yes.

11  Q   Where do we find that?

12  A   They can be listed in the valuation report.

13  Q   So the actuarial valuation reports that are already in

14  evidence set those forth?

15  A   Yes.

16  Q   And by the way, are both GRS and PFRS final average pay

17  plans?

18  A   Yes.

19  Q   Now, let's move on.  Did there come a time more recently

20  in April when you were asked to perform other calculations

21  from the information stored in the VAL 2000 system?

22  A   Yes.

23          MR. STEWART:  And let's put up, if we could --

24  pardon me -- Exhibits 473 -- pardon me -- and 474.  And, your

25  Honor, both of these are also exhibits that the COPs parties

1    have put on their list as 1011 and 1012 respectively.

2    BY MR. STEWART:

3    Q    Before we go further, Mr. Bowen, could you just tell us

4    what these two letters are?

5    A    Okay.  Exhibit 1011 is regarding DPFRS, and we were asked

6    to calculate the funded status in 2023 under a variety of a

7    specified scenarios.

8    Q    And what is the other letter?

9    A    That concerns DGRS, and we were asked -- we were given a

10   desired target to be hit in terms of funded status in 2023

11   and were asked to calculate the employer contributions that

12   would be required to do so.

13   Q    And who prepared these two letters?

14   A    They were both prepared by Milliman.

15   Q    Okay.  And did you -- pardon me.  What was your role in

16   the letters?

17   A    I was involved in the process from beginning to end.

18   Q    And did you sign both?

19   A    Yes.

20   Q    And what did you do before signing to assure yourself of

21   the accuracy of the matters set forth in the two letters?

22   A    As I mentioned before, we have a series of peer review

23   checks, and they apply to the various portions of the overall

24   procedure.

25           MR. STEWART:  Your Honor, I'd move into evidence

1  both exhibits.

2          MR. WAGNER:  No objection.

3          THE COURT:  Thank you.  They are admitted.

4      (City Exhibits 473 and 474 received at 10:37 a.m.)

5  BY MR. STEWART:

6  Q   Let's start, if we could, with Exhibit 473, and I notice

7  I'm using the city's exhibit number, and you used the COPs

8  exhibit number.  Why don't we use the city's exhibit number

9  for sake of simplicity, and that is 473?

10  A   Okay.

11  Q   And if we could, let's spend a minute on the structure of

12  the letter here.  Once again, the first page sets forth some

13  background of the scope and intent of the exercise; is that

14  correct?

15  A   Yes.

16  Q   And then on page 2 we have the paragraph entitled

17  "Project Description"?

18  A   Correct.

19  Q   What is the project description of this project?

20  A   There are several bullet points of inputs that were

21  provided to us, and we were asked to use all of those and

22  project the funded status -- excuse me -- and also the

23  unfunded liability of DPFRS in 2023.

24  Q   Okay.  So at the very first lines -- pardon me -- speaks

25  of estimating the funded status and unfunded liability for

1  that Retirement System; correct?

2  A    Yes.

3  Q    And then what are the bullet points again?

4  A    These are the series of inputs that were provided to us

5  by the city to be used in this exercise.

6  Q    And what role did you have in choosing those inputs?

7  A    We did not choose them.  They were provided to us.

8  Q    In other words, they were givens in this work?

9  A    Correct.

10 Q    All right.  What did you do then with these assumptions?

11 A    I'll take the second bullet point to start with, a 55-

12 percent reduction to future COLAs moving from two and a

13 quarter percent to one percent.  That is a change to "B," so

14 we took our baseline valuation and made that adjustment as

15 we're going to be determining a different value of "B."

16 Q    Okay.  Once again, were you using the VAL 2000 software

17 that you've described to us?

18 A    Yes.

19 Q    And that had the other values in it from your previous

20 work.  Am I right?

21 A    Yes.

22 Q    Okay.  Now, after putting these assumptions into the

23 calculation engine, did you get results?  Did the results

24 come out?

25 A    Yes.

1  Q   And let's look at the next page, the table in the next

2  page.  What does that table set forth?

3  A   We were asked to value two separate employer contribution

4  streams and two separate market value rates of return for

5  2013-14, which led us to four scenarios, and the results are

6  in the two right-hand columns.  The third column is the

7  projected funded status under each scenario, and the final

8  column is the estimated dollar amount of the unfunded

9  liability in 2023.

10 Q   So if we take the first row, that has an assumption of

11 employer contributions of $260.7 million and a market rate of

12 return of 11.9 -- 59 percent; correct?

13 A   Yes.

14 Q   And those are the assumptions you were given?

15 A   Yes.

16 Q   And then the next two columns show us what?

17 A   The projected results in 2023 under those assumptions.

18 Q   Okay.  And you were being asked to forecast what the

19 situation would be in 2023; correct?

20 A   Yes.

21 Q   Okay.  Now, if we go to the very end, just a few pages

22 back there are a series of tables.  Just generally can you

23 tell us what these are?

24 A   Yes.  We were asked -- in addition to providing the

25 results on page 3, we were asked to provide year-by-year

1  information on various items, assets, liabilities, cash

2  flows, from the period 2014-15 up through 2023.

3  Q   I see an abbreviation BOY here.  What does BOY stand for?

4  A   Beginning of year.

5  Q   Okay.  And if we look at this particular page -- I guess

6  it's Exhibit 1 -- and the table, we have the actuarial

7  accrued liability at BOY.  Do you see that?

8  A   I do.

9  Q   Okay.  And then below that unfunded liability at BOY;

10 correct?

11 A   Yes.

12 Q   Okay.  And if you go all the way over to the right, does

13 that -- do those numbers sum up the year-by-year values in

14 those rows?

15 A   Yes.  Those are the year-by-year values.

16 Q   Okay.  Let's now, if we could, look at Exhibit 474.  And

17 this is the letter you wrote with respect to the GRS.  Am I

18 right?

19 A   Correct.

20 Q   So let's start again with page 2 in the project

21 description.

22        MR. STEWART:  And let's blow up that first

23 paragraph.

24 BY MR. STEWART:

25 Q   And what was the project that you were asked to do that

1  is recounted here in Exhibit 474?

2  A    In this situation, the target was set as having a 70-

3  percent funded ratio, and that's the funded status we

4  referred to earlier, in 2023.  We were given a variety of

5  input parameters and asked to solve for the amount of

6  employer contributions that would be needed based on those

7  parameters to hit the goal.

8  Q   Okay.  What assumption were you given by the city in

9  terms of the investment return assumption?

10  A    This was 6.75 percent.

11  Q   Okay.  And then am I correct that in addition to that,

12  there were city-specified annual contributions to the DWSD?

13  A    The city specified the methodology, yes.

14  Q   Okay.  And then there was going to be a recoupment from

15  the annuity savings fund?

16  A    Yes.

17  Q   Did both of those require you to have the system do some

18  calculations before you could come up with a final answer?

19  A    Yes.

20  Q   Okay.  So let's, if we could, go to the next page.  And

21  by the way, let's just frame this a little bit.  One of the

22  things you had to do was to determine the DWSD contribution

23  projection?

24  A    Yes.

25  Q   And the other was the ASF recoupment?

1    A    Yes.

2    Q    So let's go through those in that order.  The top of the

3    next page, page 3, is that the section where you deal with

4    the contribution projection?

5    A    That's the beginning of the section, yes.

6    Q    Okay.  And, once again, we have bullet points.  What are

7    those bullet points?

8    A    Those are the parameters that were used in the DWSD

9    contribution projection.

10   Q    Okay.  Now, if we look at the main body of that

11   paragraph, it -- oops -- refers to a city-specified

12   contribution schedule.  Do you see that?

13   A    Yes.

14   Q    And what was that contribution schedule that the city

15   specified?

16   A    I'll say to be maybe more precise, the city specified

17   that we should do a valuation of DWSD effectively only, a

18   mini valuation, their portion of the overall system, and once

19   that unfunded liability is known to develop a nine-year

20   contribution.

21   Q    Okay.  And did you do that?

22   A    Yes.

23   Q    Let's look, if we could, at page 6 of our exhibit.  And

24   do you see the header that says "results"?  Okay.

25   A    Yes.

1  Q   Does that first paragraph set forth what you determined

2  when it came to the DWSD contribution?

3  A   Yes.

4  Q   And what did you -- what did you determine?

5  A   It's in the last sentence, annual contribution of 45.4

6  million per year.

7  Q   Okay.  And as part of this, did the system also determine

8  the unfunded liability for DWSD as of July 1, 2014?

9  A   Yes.

10 Q   And what was that number?

11 A   That is the 292.1 million in the second line.

12 Q   Okay.  Now, I think we were talking about the recoupment

13 from the annuity savings funds, and let's go, if we could,

14 now to page 3, to the very bottom of page 3.

15         MR. STEWART:  Let's blow that up, if we could.

16 BY MR. STEWART:

17 Q   Under ASF recoupment, it talks about the city providing

18 census data file.  Do you see that?

19 A   Yes.

20 Q   Who provided the census data file to you?

21 A   It was actually provided to us by Conway MacKenzie.

22 Q   And who from Conway MacKenzie?

23 A   Chuck Moore.

24 Q   Okay.  And what was this data file?

25 A   This was a data file, as it mentions here, 13,650

1  members, so that's not everybody, but that is the subset of

2  members that the city deemed to have received excess interest

3  credits in their accounts.

4  Q   Okay.  Let's go to the next page, please.  Let's look at

5  the top carryover paragraph.  That's all we need to see.

6  Just reading, it says the interest credits were 387.4 million

7  as of June 30th, 2013; is that correct?

8  A   Yes.

9  Q   Now, then you did procedures against that data file;

10 correct?

11 A   Yes.

12 Q   Fair to say you were not able to match all the census

13 data?

14 A   Yes.

15 Q   Let's look at the table, the line that says "total."

16 What does that represent?

17 A   Well, we received this census data file separate from the

18 census data that we already had in VAL 2000 in our

19 replication, so the first task was to match these excess

20 interest credit amounts by individual member into our

21 valuation system, and they did not all match.

22 Q   So in your table you have numbers of people.  You also

23 have dollar numbers.

24 A   Yes.

25 Q   What do those two numbers add up to?

1    A    The count of people adds up to the 13,000-some-odd that

2    was on the last page, and the excess interest amounts add up

3    to the 387.4 million at the top of this page.

4    Q    Okay.

5         MR. STEWART:  Now, let's, if we could, scroll down

6    to the next table.  Blow that up.

7    BY MR. STEWART:

8    Q    And at the top the language says, "For this analysis, the

9    maximum recoupment amount for an individual member was capped

10   at 20 percent of the highest ASF balance during the excess

11   interest determination period."  Who capped it at 20 percent?

12   A    That was a decision made by the city.

13   Q    Not you?

14   A    No.

15   Q    Okay.  So what does this table show us?

16   A    This table shows that once the -- I'll say the original

17   excess interest amount that was calculated was subjected to

18   the cap, the total possible recoupment amount, which is in

19   the third column, was reduced.

20   Q    To what number?

21   A    226.5 million.

22   Q    Okay.  And was that the number you took into account when

23   you went back to the beginning to determine the contribution

24   level the city would have in the coming years?

25   A    Yes.  This was worked into this valuation pass.

1  Q   Now, before I --

2          MR. STEWART:  Let's go to the next page, if we

3  could, and before we leave this subject, could you blow up

4  the top three bullet points?

5  BY MR. STEWART:

6  Q   Was there a methodology that the city was going to use to

7  recoup these excess payments from the ASF?

8  A   Yes.

9  Q   And fair to say there were three categories of people

10 that had to be recouped from?

11 A   Yes.

12 Q   And tell us, if you could, generally what the recoupment

13 method was.

14 A   Okay.  What's highlighted on the screen now is for active

15 members and deferred vesteds, deferred vesteds being members

16 who have ceased working for the city but are not yet in pace;

17 that is, receiving a benefit.  So, quite simply, the approach

18 in our valuation procedure was that if a member's excess

19 interest amount was lower than the current value of their

20 account, it would be subtracted, and that was it.

21 Q   Just offset?

22 A   Just offset directly, yes.

23 Q   Second category?

24 A   There are members who have a larger excess interest

25 amount than their current account because there is the

1  ability to withdraw some funds while in service, so for those

2  members it was a two-part test subtracting the ASF account to

3  the extent possible and then for the remainder of the amount

4  to be recouped projecting an offsetting against the ultimate

5  expected pension.

6  Q    Okay.  And how did you determine how to -- what the

7  amount of the offset should be?

8  A    The amount of the offset was -- as summarized in the

9  chart on the preceding page, it was the excess interest

10 amount provided by the city ultimately subjected to the 20-

11 percent cap.

12 Q    Okay.  And was this done in a sense with a reverse

13 annuity; in other words, a certain amount would be deducted

14 from the benefit check?

15 A    Yes.

16 Q    And how was that calculated?

17 A    To convert a lump sum to an annuity, we have an interest

18 and a mortality assumption.

19 Q    Okay.  Is that something you came up with?

20 A    It was provided to us by the city.

21 Q    Okay.  And the last category?  Who were they?

22 A    The third bullet point here is really a subset of the

23 second, and these are -- this is the specific class of

24 members who have no account, so there is no subtraction

25 possible, and the entire recoupment amount is then projected

1  and offset against the pension.

2  Q   Okay.  Now, lets go, if we could, to page 6 and to the

3  last paragraph on the page.  Now, by the time -- this is the

4  results paragraph for your letter; is that correct?

5  A   Yes.

6  Q   Okay.  Now, by the time you've gotten here, you've done

7  the DWSD calculation; correct?

8  A   Correct.

9  Q   The ASF calculation; correct?

10  A   Correct.

11  Q   And you're now able to finish the calculation you were

12  asked to do?

13  A   Yes.

14  Q   What did you determine?

15  A   Well, we were provided with certain specified inputs, so

16  we used those, and that's the 150.8 million from non-DWSD

17  sources.  We calculated the DWSD based upon the methodology,

18  and that became an input.  In total what we did is we

19  calculated the total amount of employer contributions needed

20  during this time period, and since there were certain -- you

21  know, those two streams of specified employer -- two streams

22  of specified contributions, we then determined the residual

23  employer contribution that would be needed to hit the 70-

24  percent funded target.

25  Q   Okay.  So the bullet points, once again, are either

1   assumptions given to you or the results of your previous
2   calculations you just told us about; correct?
3   A    Yes.
4   Q    So let's look at the main paragraph.  What is it you
5   estimated would be the additional contribution per year from
6   the employer from 2015-16 to 2022-23 to have a 70-percent
7   funded status as of the end of fiscal year 2023?
8   A    $19.9 million per year.
9   Q    Okay.  Based on all the assumptions that you see here?
10  A    Yes.
11  Q    And based on the other calculations in your work;
12  correct?
13  A    Yes.
14         MR. STEWART:  Okay.  Thank you, Mr. Bowen.  That's
15  all I have.
16         THE COURT:  All right.  Let's take a brief recess
17  now, reconvene at 11:10, please, for cross-examination.
18         THE CLERK:  All rise.  Court is in recess.
19      (Recess at 10:54 a.m., until 11:12 a.m.)
20         THE CLERK:  All rise.  Court is back in session.
21  You may be seated.
22         MR. WAGNER:  Your Honor, again, Jonathan Wagner on
23  behalf of the COPs.  I have binders -- may I pass them out --
24  that have the exhibits?
25         THE COURT:  Yes, please.

1          MR. WAGNER:  May I proceed?

2          THE COURT:  Yes, sir.

3                    CROSS-EXAMINATION

4    BY MR. WAGNER:

5    Q   Mr. Bowen, nice to see you again.  You're dressed a

6    little bit better than last time I saw you last night in the

7    elevator.

8    A   Thank you.

9    Q   Mr. Stewart took you through some of the work that you

10   did or Milliman did in connection with this matter; correct?

11   A   Yes, he did.

12   Q   But he didn't take you through all the work, did he?

13   A   He did not.

14   Q   And you gave some testimony about the 6.75 rate of

15   return.  Do you recall that?

16   A   Yes.

17   Q   And Mr. Stewart showed you several letters that Milliman

18   prepared in connection with this matter?

19   A   Yes.

20   Q   But he didn't show you your November 4, 2013, letters,

21   did he?

22   A   He did not.

23   Q   And in those letters Milliman concluded that a return

24   assumption of 7.2 percent would better reflect the expected

25   investment returns for both plans net of expenses without any

1  bias; correct?

2  A   You used the phrase "better reflect."  I would say that

3  was the calculation of median expected return.

4          THE COURT:  Is the letter you're referring to in

5  evidence?

6          MR. WAGNER:  Yes, it is, but we'll put them up on

7  the screen.  Can you put up COPs Exhibit 1028, which is City

8  Exhibit 495?  There's been no objection.

9  BY MR. WAGNER:

10  Q   Can you turn to page 4 of the letter in your book or you

11  can look at it on the screen?

12  A   It's rather tight up here for the book.

13  Q   Okay.  If you look at it on the screen, the paragraph

14  beginning "Based on the above results," do you see that?

15  A   I do.

16  Q   Can you read that, sir?

17  A   "Based on the above results, we believe that an

18  assumption of 7.2 percent would better reflect expected

19  investment returns net of plan investment expenses and

20  provide an unbiased expectation of future results."

21  Q   And that's with respect to GRS; correct?

22  A   I can't tell from looking at this page.

23  Q   Well, if you look at the first page of the document,

24  you'll see that it pertains to GRS.  Can you turn to page 1?

25  Do you see that?

1   A   Yes.  This says DGRS.

2           MR. WAGNER:  And can you put up Exhibit 1029, City

3   Exhibit 496?

4   BY MR. WAGNER:

5   Q   That's your letter with respect to PFRS; correct?

6   A   Yes, it is.

7   Q   And can you turn to page 4?  Same paragraph, "Based on,"

8   can you read that, sir?

9   A   "Based on the above results, we believe that an

10  assumption of 7.2 percent would better reflect expected

11  investment returns net of plan investment expenses and

12  provide an unbiased expectation of future results."

13  Q   And that's important information, isn't it?

14  A   I believe that it is.

15  Q   And at the time you wrote these letters, you believe the

16  recommended investment rate assumptions you presented were

17  the best recommendations based on the data available to you;

18  correct?

19  A   At the time, yes.

20  Q   And you don't have any concerns or issues with respect to

21  the investment returns that you recommended in those letters;

22  correct?

23  A   No, I do not.

24  Q   And Milliman did the best job it could coming up with the

25  7.2 percent; correct?

1  A   Yes, we did.

2  Q   And you did the best job you could; right?

3  A   Yes, I did.

4  Q   And there are no mistakes in those letters, are there?

5  A   They've been through our peer review process.  I will

6  assume there are no mistakes.

7  Q   Very heavily vetted; correct?

8  A   Correct.

9  Q   The letters were cc'd to people from the city; right?

10  A   They were.

11  Q   The letters went to Evan Miller of Jones Day.  You know

12  who he is?

13  A   They were addressed to him, yes.

14  Q   And you have confidence in those numbers, don't you?

15  A   Yes.

16  Q   And you stand by those letters?

17  A   Yes.

18  Q   And, by the way, the period in those letters, if I'm

19  right, is you did a 30-year analysis and a 75-year analysis;

20  correct?

21  A   I would need to see the chart put in front of me, but we

22  look at several different time durations in our capital

23  market assumptions model.

24  Q   Well, can you look at page 4, sir, and confirm to me on

25  either of those documents that you did a 30-year analysis and

1  75-year analysis?

2  A    Yes.  The table shows one year, thirty years and seventy-

3  five years.

4  Q    And of those, you believe the 75-year was the best

5  analysis to use; correct?

6  A    Yes, for an ongoing pension plan, absolutely.

7  Q    Now, Mr. Stewart also showed you numbers concerning

8  actuarial accrued liability; right?  Do you recall that?

9  A    Yes, he did.

10  Q    He didn't show you the unfunded actuarial accrued

11  liability numbers, did he?

12  A    For DWSD, I believe we discussed that, not for the

13  systems in total.

14  Q    But he didn't put that up on the screen.  He just went

15  through the liabilities; right?

16  A    Yes.

17  Q    And you have to subtract the assets from the liabilities

18  to determine the unfunded portion; correct?

19  A    That is true.

20  Q    Okay.  Now, let's go back to the beginning.  Would you

21  believe -- would you agree with me, sir, that it's important

22  for an actuary to get -- to use the right input?

23  A    It's very difficult to answer that question the way it's

24  asked because I'm not aware of a definition of the right

25  inputs.

1   Q   Let me rephrase it.  It's important for an actuary to use

2   accurate inputs?

3   A   I would give you the same response.

4   Q   You have your deposition transcript at the front of the

5   binder.  Can you look at it, sir?

6           MR. STEWART:  Page and line?

7           MR. WAGNER:  157, line 10.

8   BY MR. WAGNER:

9   Q   Do you have it there, sir?

10  A   I do.

11  Q   Were you asked the following question, and did you give

12  the following response at your deposition?

13          "Question:  Well, with respect to the inputs you

14          just mentioned, am I right that it's important to

15          use accurate inputs?

16          Answer:  Generally speaking, it's important to

17          use accurate inputs."

18          Did you give that answer?

19  A   That is reflected in the transcript.

20  Q   And would you agree with me that it's important for an

21  actuary to use reasonable assumptions?

22  A   I would agree with that.

23  Q   And that's something you strive to do; correct?

24  A   Yes.

25  Q   And would you agree with me that Detroit is a very

1  important assignment?

2  A    Yes, I would.

3  Q    That's why we're all sitting here; right?

4  A    Yes, it is.

5  Q    Okay.  Let me switch gears for a second and ask you about

6  Mr. Fornia, who's been retained as an expert for the COPs.

7  You know Mr. Fornia; right?

8  A    I do.

9  Q    And you've worked with him?

10  A    Yes, I have.

11  Q    And you've invited him to speak at at least one Milliman

12  event?

13  A    Yes.

14  Q    Presentation was well-received by Milliman?

15         MR. STEWART:  Objection, your Honor.  What's the

16  relevance of this?  And I don't think vouching or reverse

17  vouching for experts is appropriate.

18         MR. WAGNER:  It's a point that Mr. Hackney raised.

19  I could call him as part of our direct case, but --

20         THE COURT:  I'm not sure you could actually.

21         MR. WAGNER:  Okay.

22         THE COURT:  The objection is sustained.

23  BY MR. WAGNER:

24  Q    Now, I'm right that Milliman performed an actuarial

25  exercise to calculate the size of the pension claims; right?

1  A   No.

2  Q   I'm sorry?

3  A   No.  I would not say that's correct.

4  Q   Okay.  Well, can you look at your April 17 letter?

5  That's Exhibit 1033.

6  A   I have a May 5th letter, 1033.

7  Q   Okay.  And if you look at page 2, this is a letter

8  concerning GRS; correct?

9  A   Yes.  I apologize.  I thought you were talking about did

10  Milliman determine the claim.  Milliman did allocate the

11  claim for --

12           MR. STEWART:  Object.  This could be fixed, but the

13  letter is not properly redacted to eliminate mediation

14  privileged material.

15           MR. WAGNER:  I'm not -- I don't know what they're

16  referencing, but I'm obviously not going to go into any

17  material that may be in here that should be redacted.

18           MR. STEWART:  Well, I'm not suggesting you are.

19           THE COURT:  Well, hold on one second.  What exhibit

20  number are we on here?

21           MR. WAGNER:  This is Exhibit 1033 for which there

22  was no objection posed by the city in the pretrial order.

23           THE COURT:  Is it in evidence?

24           MR. STEWART:  I don't believe it is, Judge.

25           MR. WAGNER:  Well, it's technically in evidence

1  based on your Honor's ruling that unobjected to documents are

2  in evidence, but we can -- we will fix whatever needs to be

3  fixed if there is something that needs to be fixed.

4        MR. STEWART:  I have no objection to fixing it.  I

5  just wanted to make sure before it goes into a public record

6  that it is -- that the redaction issue is fixed.

7        THE COURT:  Okay.  Let me ask the two of you to just

8  work that out and --

9        MR. WAGNER:  That's fine.

10        THE COURT:  -- let me know.

11        MR. WAGNER:  That's fine.  And let me just go back

12  and make clear that I move Exhibits 495, which is our Exhibit

13  1028, and 496, which is 1029, into evidence.

14        MR. STEWART:  No objection.

15        MR. WAGNER:  Okay.

16        THE COURT:  All right.  They are admitted.

17     (City Exhibits 495 and 496, COPs Exhibits 1028 and 1029

18     received at 11:23 a.m.)

19  BY MR. WAGNER:

20  Q   Okay.  Now, sir, do you see under aggregate claim the

21  paragraph lists assets for GRS as about 2.099 billion;

22  correct?

23  A   I see that.

24  Q   Okay.  And if you turn a few pages -- it's actually a

25  page that Mr. Stewart showed you.  If you turn to the April

1  17 letter, which is attached to this letter, and that's how

2  it was produced to us, if you turn to page 6 of the April 17

3  letter, do you see that there are assets -- I'm sorry -- that

4  there are liabilities of 3978 with a 6.75 return rate?  Do

5  you see that?

6  A    Yes.

7  Q    So 3978 in liabilities minus 2.099 in assets is about

8  1.879 billion; correct?

9  A    I didn't follow the math that fast, but that's in the

10  right neighborhood.

11  Q    Okay.  And can we agree that that's the number in the

12  disclosure statement that sets out the size of the GRS claim,

13  or should I -- do I have to show you the disclosure

14  statement?

15  A    No.  I can agree that that's the number.

16  Q    Okay.

17        MR. WAGNER:  That's, your Honor, page 38 of the

18  disclosure statement.

19  BY MR. WAGNER:

20  Q    Now, let's go through the exercise with respect to PFRS.

21  Can you turn to Exhibit 1034 in the book, page 2 of that

22  document?

23        MR. STEWART:  Objection.  Your Honor, we have the

24  same redaction issue with this exhibit, although I assume we

25  can work it out.

1          MR. WAGNER:  That's fine.

2          THE COURT:  Thank you.

3    BY MR. WAGNER:

4    Q    Do you see under aggregate claim you list overall

5    liabilities of 4.825 billion?  Do you see that?

6    A    Yes.

7    Q    And you see assets of 3.035 billion?  Do you see that?

8    A    Yes.

9    Q    And that's a net of about 1285 -- 1.25 billion?

10   A    Yes, it is.

11   Q    And would you take my word for it that that's the amount

12   in the disclosure statement for the PFRS claim?

13   A    I will.

14   Q    So if I'm right, it's fair to say that the figures for

15   the amount of the claim came from these letters; correct?

16   A    That's fair.

17   Q    Okay.  And, again, you use a 6.75 rate here; right?

18   A    Yes.

19   Q    Didn't use the risk-free rate?

20   A    We did not use a risk-free rate.

21   Q    Okay.  Now, let's get into what's part of the claim.  For

22   both GRS and PFRS in these letters, you use something called

23   the entry age normal method; right?

24   A    Yes.

25   Q    Okay.  And the assumption underlying those letters was

1  that the plans would be ongoing; correct?

2  A    This was a replication of the valuation of an ongoing

3  plan.

4  Q    Okay.  And when one uses the entry age normal method for

5  an ongoing plan, one is going to include liabilities that

6  haven't vested yet; correct?

7  A    That is true.

8  Q    And as Mr. Stewart elicited from you, when you do that

9  calculation, you're also going to include benefits with

10  future salary increases included; right?

11  A    That is correct.

12  Q    And you're going to include calculation that includes

13  future wage benefits; right?

14  A    That's a function of the future salary, yes.

15  Q    And it's going to include an element of inflation; right?

16  A    That underlies salary increases, yes.

17  Q    Now, sir, a frozen plan is a different ball game with

18  respect to treatment of future salary increases and future

19  services, is it not?

20  A    It can be.

21  Q    And when you do the calculation for a plan freeze, you

22  eliminate future service and future salary; right?

23  A    To the extent it has been seized for the participants in

24  the plan, the members in the plan.

25  Q    So one would see no future salary increases once a plan

1    is frozen; right?

2    A    Under a hard freeze scenario, that's correct.

3    Q    And the liability would drop; correct?

4    A    That is correct.

5    Q    And if a plan were frozen, you wouldn't include future

6    wage inflation; right?

7    A    Since that is a subset of the salary increase, that's

8    correct.

9    Q    Okay.  And just to finish up this --

10           THE COURT:  I'm a little confused about your

11    questions here.

12           MR. WAGNER:  Okay.

13           THE COURT:  Are you asking about some hypothetical

14    freeze or the Detroit freeze?

15           MR. WAGNER:  I'm asking about -- well, my questions

16    are general questions.  I believe -- we believe that --

17           THE COURT:  Okay.  Then they're irrelevant to me.

18           MR. WAGNER:  Well, they -- we believe they apply to

19    the Detroit freeze, and I'm laying the groundwork for future

20    testimony on this issue.

21           THE COURT:  Ask the witness about the Detroit

22    freeze.

23    BY MR. WAGNER:

24    Q    Does the Detroit freeze include -- the Detroit plan is

25    frozen; correct?

1    A    To my knowledge.  I'm not sure of the legal status today.

2    Q    Okay.  And do you know whether if you -- when you freeze

3    those plans, whether future inflation should be included?  Do

4    you know one way or the other?

5    A    The proposal is a hard freeze.

6    Q    Okay.  And would you give the same answer with respect to

7    vested benefits?

8    A    I'm not sure.

9           THE COURT:  What's the question as to vested

10   benefits?

11   BY MR. WAGNER:

12   Q    The question is with the hard freeze, you wouldn't

13   include benefits -- when you did your calculation of the

14   liability, you wouldn't include benefits that haven't vested;

15   right?

16   A    In my experience, I've seen that done in the corporate

17   sector.  I'm not sure of the legal status of vested benefits

18   in the governmental sector.

19   Q    Okay.  And with a frozen plan like Detroit's, you would

20   not include in calculating the size of the claim, the amount

21   of unfunded liability, you wouldn't include the calculation

22   that takes into account wage inflation, would you?

23   A    For a frozen plan, there would be no future wage

24   inflation in the calculation.

25   Q    And let me just finish up this --

1      THE COURT:  I'm sorry.  Does that answer apply to

2  the Detroit plan or just some generalized frozen plan?

3      THE WITNESS:  The proposal for the Detroit plan is

4  that the plan would be frozen and future wages past the

5  freeze date would not ultimately impact the member's

6  calculations.

7      THE COURT:  Thank you.

8  BY MR. WAGNER:

9  Q   Okay.  By the way, just to finish up this topic, do you

10 know what the unit cost method is?  Ever hear of that term?

11 A   If you mean the unit credit cost method, yes.

12 Q   Yes.  And that's a method that looks at past service and

13 past salary; right?

14 A   That is correct.

15 Q   Okay.  Now, let's talk about investment rates.  Am I

16 right that the discount rate assumption is arguably the most

17 critical assumption in determining pension obligation?

18 A   Arguably, yes.

19 Q   And the investment return assumption forms the basis for

20 the assumed asset returns of investments within a pension

21 system; correct?

22 A   As far as it goes, yes.

23 Q   And the investment rate -- the investment return

24 assumption for public -- for a public plan is also used to

25 measure the liabilities by discounting future payment

1  benefits at the assumed rate of return?

2  A   That is the common practice.

3  Q   And that's the way you've always seen it done; right?

4  A   For purposes of funding, yes.

5  Q   I'm also right that the funded status of a plan would

6  decrease if you used a lower investment rate?

7  A   That is correct.

8  Q   And the higher the investment rate assumption, the better

9  the funding status of the plan; correct?

10  A   In both cases, the current measure of the funded status,

11  yes.

12  Q   Okay.  And now just a couple more questions about risk-

13  free rate.  You're not aware of any public pension funds that

14  have measured liabilities discounting future benefit at any

15  rate other than the assumed investment return; correct?

16  A   No.  I am.

17  Q   Well, you weren't aware at your deposition; correct?

18  A   I don't -- I can say I am.  I was deposed for three days.

19  If we have a question which is slightly different that I

20  answered, that's possible.

21  Q   Okay.  But Milliman doesn't use the risk-free rate in

22  calculating a valuation rate or return rate; correct?

23  A   That's a very broad question, so I would have to say it's

24  not correct in all cases.

25  Q   Can you turn to your deposition, page 237, line 25?

1       MR. STEWART:  I don't have --

2       MR. WAGNER:  I'm sorry.  We'll come back to that,

3  your Honor.

4       THE COURT:  Okay.

5  BY MR. WAGNER:

6  Q    Now, let's get back to your November letters.  There came

7  a time when you were asked to present an analysis for

8  recommended return on investment for PFRS and GRS; correct?

9  A    True, yes.

10 Q    And those are the -- your work is set out in the November

11 4 letters; correct?

12 A    Yes.

13 Q    And the assumptions in your analysis were based on the

14 asset allocations for GRS and PFRS at the time; correct?

15 A    The most recent asset allocations that were made

16 available to us; correct.

17 Q    And you've not seen any different asset allocations for

18 those two funds since then; correct?

19 A    I have not been involved in the --

20 Q    You've not seen any change in the asset allocation

21 between November 4 and today; correct?

22 A    I have not looked at new allocations or have not, yeah.

23 Q    Now, there is -- the plan doesn't use your 7.2-percent

24 rate, does it?

25 A    Neither rate does now.  Neither plan uses that rate.

1    Q    It uses 6.75; right?

2    A    Oh, the plan of adjustment.  The system actuary does not

3    use it nor does the plan of adjustment.

4    Q    Okay.  I'm sorry.  I should identify which plan, but,

5    yes, the plan of adjustment uses 6.75 percent; right?

6    A    That is correct.

7    Q    Okay.  And that 6.75 did not result -- was not anything

8    that resulted from Milliman's work, was it?

9    A    It was not.

10    Q    And it didn't reflect any asset allocation of which you

11    were aware; correct?

12    A    That is correct.

13    Q    And you've not been provided with any asset allocation

14    that produces a 6.75-percent investment return; right?

15    A    The 6.75 percent was -- we call it a prescribed

16    assumption.

17    Q    And you've not been asked to revisit your analysis;

18    correct?

19    A    I have not been asked to revisit that November 2013

20    analysis.

21    Q    And you have not revisited that analysis, have you?

22    A    I have not.

23    Q    Now, I'm right that you don't know the asset allocation

24    that pertains to the 6.75 percent; right?

25    A    The 6.75 was not based on a particular asset allocation.

1   Q   Okay.

2   A   It was --

3   Q   I'm right that one of the things an actuary does is look

4   at an asset allocation and come up with an investment rate;

5   right?

6   A   That's the usual practice.

7   Q   And here what's going on is you've been given 6.75, and

8   now someone is trying to come up with an investment rate.

9   Isn't that what's going on here?

10  A   That was the nature of this assignment, yes.

11  Q   Okay.  Now, I think you testified that you've been the --

12  you've served as an actuary for dozens of plans; right?

13  A   Yes.

14  Q   Okay.  And am I right that industry surveys could be a

15  useful data point when determining a projected rate of return

16  for a pension system investment?

17  A   I don't hold that view.

18  Q   Can you turn to your deposition, page 83, line 7?  83,

19  line 7.  "Fair enough."

20          "Question:   Fair enough.  In your view then,

21          could industry surveys be a useful data point when

22          determining projected rate of return for a pension

23          system's investment?

24          Answer:  If you're using the phrase 'industry

25          surveys' in terms of surveys of prospective returns,

1    yes."

2    Do you see -- did you give -- were you asked that

3    question, and did you give that answer?

4  A    That response is different than the question that I

5  understood that you just asked.

6  Q    My only question is did the court reporter transcribe the

7  question correctly?

8        MR. STEWART:  Objection, your Honor.  I think he

9  said this is not proper impeachment because the questions do

10  not match.  Makes no difference what the court reporter did.

11        THE COURT:  Okay.

12        MR. STEWART:  The question is Mr. Wagner's question

13  that he claims is inconsistent.  That, I believe, is the

14  issue here.

15        THE COURT:  Okay.  Well, it's not for the witness to

16  claim improper impeachment.  That's for you to claim.  The

17  only issue -- or question before him was whether he gave that

18  question -- whether he heard that question and gave that

19  answer.  Is that right?

20        THE WITNESS:  I have no reason to believe that this

21  is improperly typed if that is your question.

22        THE COURT:  All right.  To the extent the city is

23  objecting on the grounds of improper impeachment, the Court

24  will overrule the objection.

25  BY MR. WAGNER:

1  Q   Now, sir, can you turn to Exhibit 1036 in the book?  This

2  is the public fund survey; right?

3  A   It's labeled "Public Fund Survey."

4  Q   And this is put out by NASRA?

5  A   I'm not sure if this is the NASRA survey or --

6           THE COURT:  Have you seen this before, sir?

7           THE WITNESS:  I believe I saw this in deposition.

8           MR. WAGNER:  Your Honor, there's been no objection

9  to this exhibit.  I move it into evidence.  There's been no

10  objection by the city.

11           MR. STEWART:  That's fine.

12           THE COURT:  Is it in evidence?

13           MR. STEWART:  No objection, your Honor.

14           MR. WAGNER:  Okay.

15  BY MR. WAGNER:

16  Q   Sir, you've heard of the term NASRA; correct?

17  A   Yes, I have.

18  Q   And what is NASRA?

19  A   National Association of State Retirement Administrators.

20  Q   And are you aware that Ms. Kopacz cited NASRA report in

21  her report?

22  A   I reviewed her report briefly.  I can't say whether she

23  did or not.

24  Q   Are you aware that Ms. Nichol cited it?

25  A   Same answer.

1    Q    Okay.  If you look at the first page, have you -- you've

2    seen the public fund survey before; right?

3    A    As I mentioned, I believe I saw this document in

4    deposition.

5    Q    Okay.  And do you see at the top it says "Median" --

6    first of all, look at the top left, the date of 6-25, 2014.

7    A    I see that.

8    Q    Okay.  And do you see it says "Median for the 126 plans

9    shown here, investment return 7.9 percent."  Do you see that?

10   A    I see that.

11   Q    And you see it has an inflation assumption of three

12   percent.  Do you see that?

13   A    Yes, I do.

14   Q    Okay.

15        MR. WAGNER:  And, your Honor, we have another

16   version of this exhibit, again, not objected to by the city,

17   1040.  I move both of them into evidence.

18        MR. STEWART:  No objection, your Honor.

19   BY MR. WAGNER:

20   Q    Now --

21        THE COURT:  All right.  It's admitted.

22        (COPs Exhibits 1036 and 1040 received at 11:38 a.m.)

23   BY MR. WAGNER:

24   Q    Can you turn to Exhibit 10164 in the book?  Now, NASRA is

25   a well-known organization in the field, is it not?

1   A    In the state pension plan field, yes.

2              MR. WAGNER:  Your Honor, I move this document --

3   BY MR. WAGNER:

4   Q    And generally the information from NASRA is considered

5   reliable?

6   A    I have no reason to doubt its reliableness.

7              MR. WAGNER:  Your Honor, I move this exhibit into

8   evidence.

9              MR. STEWART:  Let me check our objections.

10             MR. WAGNER:  I believe it's admissible whether they

11  object or not.  It's admissible under 803 --

12             THE COURT:  Well, I have to give them a chance --

13             MR. WAGNER:  Sorry.

14             THE COURT:  -- regardless.

15             MR. WAGNER:  Sorry.  Just trying to speed it up.

16             MR. STEWART:  Whose exhibit is it?  Whose exhibit?

17  Whose exhibit is this?  I mean --

18             THE COURT:  What's the number again, sir?

19             MR. WAGNER:  It's 101 -- 10164 happens to have

20  been -- again, it was cited in --

21             THE COURT:  I just asked the number.

22             MR. WAGNER:  Okay.

23             THE COURT:  Hang on.

24             MR. WAGNER:  Sorry.

25             MR. STEWART:  We can't -- your Honor, are you sure

1   that's the right exhibit number?

2           MR. WAGNER:  That's what I'm told, yeah.

3           THE COURT:  It is -- it's not in evidence by our

4   final pretrial order.

5           MR. WAGNER:  Right.  I think that's right.

6           THE COURT:  It's a Retiree Committee exhibit.

7           MR. WAGNER:  I would ask that it be admitted, and I

8   think I've established the foundation under 803(17).  It's

9   also been -- it's been cited by Ms. Kopacz in her report, and

10  it's been cited by Ms. Nichol in her report.

11          THE COURT:  Have you seen this before?

12          THE WITNESS:  Yes, I have seen this.

13          THE COURT:  Is it anything that you relied on when

14  you were preparing your work for the city?

15          THE WITNESS:  No, it is not.

16          MR. STEWART:  And, your Honor, I object for any

17  number of reasons, but I would also point out we did not

18  offer Mr. Bowen as an expert.  The questions are getting into

19  expert testimony.  We will consider the door now open, and if

20  what Mr. Wagner is doing is to -- going into this having

21  conceded this is an expert witness, we will withdraw our

22  objection, but the redirect will be using him as an expert.

23          MR. WAGNER:  Your Honor, I don't think I've opened

24  the door.  I asked him a question, whether industry

25  surveys --

1          THE COURT:  Well, let's deal with whether the door

2     is open when and if you actually decide to do that.

3          MR. WAGNER:  Okay.

4          THE COURT:  Right now we're just going to deal with

5     the admissibility of this document.  My question for you is

6     if the witness didn't rely upon it for any purpose here, how

7     is it admissible?

8          MR. WAGNER:  Because the issue isn't whether he

9     relied on it.  The issue is whether I can use it to cross-

10    examine him with respect to the 6.75 rate and the 7.2 rate.

11    That's what this is about.  These are rates used by public

12    pension funds that are much higher than what's being used

13    here, and Mr. Bowen has already testified -- though he tried

14    to walk away from it, he's already testified that surveys of

15    this type are useful data.  And I'd also note that Ms. Kopacz

16    relies on it, and Ms. Nichol relies on it.

17         MR. STEWART:  Then perhaps when those witnesses take

18    the stand, it could be used.  This is the sort of cross-

19    examination one uses with an expert witness.  The witness did

20    not see -- did not rely upon this.  I don't see it is

21    admissible in his examination.  And I object as well to the

22    use of evidentiary --

23         THE COURT:  Mr. Stewart, I'm sorry.  I need to cut

24    you off and ask you to speak right into the microphone,

25    please.

1          MR. STEWART:  I'm sorry, your Honor.

2          THE COURT:  And you can have a seat while you do

3    that.

4          MR. STEWART:  Okay.  I apologize.  Sorry.  I don't

5    see the relevance that Ms. Kopacz and Ms. Nichol relied on

6    it.  That means nothing.  This witness, unless he is deemed

7    an expert, should not be examined on matters he did not rely

8    on.  This would be for an expert something he could be asked,

9    but I thought Mr. Wagner said he's not treating the witness

10   as an expert.

11         MR. WAGNER:  I'm just posing him questions on

12   something that he believed is -- he said himself is relevant.

13         THE COURT:  The objection is sustained.

14   BY MR. WAGNER:

15   Q    Now, sir, in your November 2013 letters, you used a rate

16   of inflation of two and a half percent; correct?

17   A    That is correct.

18   Q    And using a two and a half-percent rate of inflation, you

19   came up with a 7.2 percent return; correct?

20   A    Yes.

21   Q    And if the rate of inflation were three percent, the rate

22   of return would have been closer to 7.7 percent; correct?

23   A    Yes.

24   Q    And I'm right that there are lots of Milliman plans that

25   use rates of inflation higher than two and a half percent;

1  isn't that true?

2  A   There are.

3  Q   I'm right L.A. County uses an inflation rate of 3.45

4  percent?

5  A   I imagine you have it in a survey somewhere.  I don't

6  know that off the top of my head.

7          MR. WAGNER:  Your Honor, may I show him Exhibit

8  103 -- 1040, which has been admitted into evidence and the

9  city hasn't objected to?

10  BY MR. WAGNER:

11  Q   Can you turn to Exhibit 1040?  Actually, why don't we use

12  1036?  I think it's a little bit easier.  Sir, L.A. County,

13  that's -- you look -- it's supposed to be alphabetical, but I

14  guess it's alphabetical by state, so L.A. comes under --

15  comes after Arizona on the first page.  Do you see that?

16  L.A. County, you see that?

17  A   Yes, I do.

18  Q   That's a Milliman -- Milliman is the actuary for that

19  plan; right?

20  A   Yes, we are.

21  Q   And there the rate of return is 7.7 percent; right?

22  A   Correct.

23  Q   Inflation rate is 3.45 percent; right?

24  A   Both as of June 30, 2011; correct.

25  Q   Okay.  California Teachers, is that another Milliman --

1   is that another plan for which Milliman is the actuary?

2   A    Yes.

3   Q    Okay.  And there the rate of inflation used is 3.5 --

4   is -- I'm sorry -- three percent?

5   A    Correct.

6   Q    And the rate of return is seven and a half percent?

7   A    Yes.

8   Q    By the way, do you happen to know the funded status of

9   that plan?

10  A    Of California Teachers?

11  Q    California.

12  A    I do not.

13  Q    Would it surprise you if it was about 67 percent?

14          MR. STEWART:  Objection, your Honor.

15          THE COURT:  What is the objection?

16          MR. STEWART:  "Would it surprise you if."

17          THE COURT:  Yeah.  His surprise is of no relevance.

18  The objection is sustained.

19          MR. STEWART:  Okay.

20  BY MR. WAGNER:

21  Q    Can you turn to Florida RS?  Is that another Milliman

22  plan?

23  A    Yes, it is.

24  Q    And there the rate of inflation used is three percent?

25  A    As of 7-1, 2012, yes.

1    Q    Idaho, is that another Milliman plan?

2    A    Yes.

3    Q    Rate of inflation there uses 3.25 percent?

4    A    As of 7-1-12, yes.

5    Q    Okay.  New Jersey Teachers, that's a Milliman plan, is it

6    not?

7    A    Yes, it is.

8    Q    And the other -- the inflation rate used is 2.75 percent,

9    is it not?

10   A    As of 2011, yes.

11   Q    Okay.  By the way, that's a pension plan that's serviced

12   from your office, is it not?

13   A    Yes, it is.

14   Q    And by my math, five plans out of the 126 listed here use

15   an inflation rate of about two and a half percent.  Is

16   that -- is your math the same as mine?

17   A    I have not looked through the survey exhaustively, so I

18   don't know the answer to that.

19   Q    Well, can you turn to Exhibit 1040, which arranges the

20   plans based on the rate of inflation?  Can you count how many

21   use an inflation rate of two and a half or less?

22          MR. MONTGOMERY:  If I may --

23          THE COURT:  No, you may not.  If you want to, you

24   can step forward and approach a microphone.

25          MR. MONTGOMERY:  Your Honor, this is not an

1  unobjected to exhibit, and I just wanted to make the record

2  clear that the Retiree Committee had objected to the

3  admission of 1040.

4         THE COURT:  Oh, well --

5         MR. WAGNER:  Well, it's a little bit late for that.

6  I mentioned that the city didn't object to it, and I never

7  heard anything from the back.

8         THE COURT:  Was it admitted?

9         MR. WAGNER:  I think you admitted it.

10        MR. STEWART:  Yes, your Honor.  You admitted it.

11        THE COURT:  1040 was admitted.  All right.

12        MR. WAGNER:  Okay.

13 BY MR. WAGNER:

14 Q   Do you see that there are five plans out of the 126

15 listed here that use a rate of inflation of two and a half or

16 less?

17 A   On Exhibit 1040, I see seven back in the time frame 2010

18 to 2012.

19 Q   Okay.  So seven out of 126; right?

20 A   If there's 126 here, then yes.

21 Q   Okay.  That's about -- well, you're the actuary, but

22 that's about six percent or so; right?

23 A   You're in the ballpark, I'm sure.

24        THE COURT:  I think we've got enough percentages to

25 deal --

1    MR. WAGNER:  Okay.

2    THE COURT:  -- with without having to worry about

3  that one.

4    MR. WAGNER:  That's fine.

5  BY MR. WAGNER:

6  Q   Let me move to another subject, sir, ASF.  Now, you were

7  asked some questions on direct about ASF.  Do you recall

8  that?

9  A   Yes.

10 Q   And I'm right that in calculating from an actuarial point

11 of view the amount of actuarial liability for a pension fund,

12 you would include the amounts that are due under the relevant

13 plan?

14 A   Yes.

15 Q   And you would not include benefits that are not included

16 under the plan?

17 A   Correct.

18 Q   Now, Milliman has done some work on ASF; right?

19 A   We have.

20 Q   And we saw before that the unfunded liability calculated

21 by Milliman for GRS was about 1.879 billion; correct?

22 A   I believe that's the figure.

23 Q   Okay.  And that figure includes an amount of ASF; right?

24 A   The system has liability for both the pensions and the

25 ASF.

1  Q   And you understand that there's an issue with respect to

2  ASF; correct?

3  A   I do.

4  Q   You understand that there were benefits presented to you

5  that were labeled as excess credits, right --

6  A   We were provided --

7  Q   -- excess interest credits; right?

8  A   We were provided with that information.

9  Q   And you understand the city is looking to recoup a

10 portion of those benefits; correct?

11 A   Yes.

12         MR. WAGNER:  Nothing further, your Honor.

13         THE COURT:  Thank you.  Any other cross-examination

14 of the witness?  Redirect.

15         MR. STEWART:  Just very briefly.

16                    REDIRECT EXAMINATION

17 BY MR. STEWART:

18 Q   First of all, here's your glass of water.  You were just

19 shown Exhibit -- gosh, looks like 1036 -- and various

20 inflation numbers.  Do you remember those questions a few

21 moments ago?

22 A   Yes.

23 Q   And you, in your answer, mentioned the dates of some of

24 those entries went back to 2011 or times a couple of years

25 ago.  What change has there been in recent years in terms of

1  assumptions actuaries use about inflation?

2  A   Well, I can speak specifically for Milliman.  Our return

3  was 2.75 percent in our capital market assumptions model

4  prior to being reduced to 2.5.  I don't recall the exact date

5  that our committee made that determination, but to address

6  your specific question more broadly, there has been a

7  decrease.  The trend -- the general trend in recent years has

8  been a decrease.

9  Q   Why?

10  A   Again, I can't speak for the entirety of the industry,

11  but market interest rates have been low.  Inflation has been

12  low.  And to the extent that those recent experiences get

13  factored into forward-looking expectations, they're -- the

14  market is putting a lower price on inflation now than they

15  were several years ago is the best way to sum it up.

16  Q   Let me ask you just briefly about this investment return

17  assumption that you were questioned about.  The investment

18  return assumption represents what exactly?

19  A   In these surveys that we've been looking at, these are

20  the --

21  Q   No.  Just in terms of the --

22  A   Okay.

23  Q   -- city's plans, not the surveys.

24  A   In terms of the city's plans, the investment return

25  assumption is used to discount the expected future cash flows

1   to be paid from the plan to determine a present value.

2   Q    And in terms of the city's agreement with the plans, the

3   investment return assumption also represents a certain

4   commitment by the city, does it not?

5   A    I'm not sure I fully understand that.

6   Q    Well, let me ask it better in that case.  These are

7   defined benefit plans?

8   A    Correct.

9   Q    If the rate of -- if the investment return falls below

10  what the investment return assumption is, what is the

11  exposure of the city?

12  A    Thinking back to the analysis we did earlier where we

13  were asked to determine specific targets, if the interim

14  period between now and the target date -- if experience is

15  not -- if experience is less positive than expected, the city

16  will have a larger exposure 2023 forward.

17  Q    Fair to say that the investment return assumption from

18  the city's point of view represents the city's agreement on

19  the level of risk it is prepared to take on this obligation?

20          MR. PEREZ:  Objection, your Honor.  Leading.

21          MR. WAGNER:  Objection.  Yeah, leading --

22          MR. STEWART:  I'll reask it.

23          MR. WAGNER:  -- and argumentative.

24          THE COURT:  The objection is sustained twice.

25          MR. STEWART:  And it was only one question.

1  BY MR. STEWART:

2  Q    From the city's point of view, what does the investment

3  return assumption reflect in terms of the city's risk?

4  A    The way it was communicated to me originally was the

5  city --

6              MR. BRILLIANT:  Objection, your Honor.  Hearsay.

7              MR. WAGNER:  Yes, yeah.  It's hearsay.

8              MR. STEWART:  Oh, I think by now that door, your

9  Honor, is off the hinges much less wide open.

10             MR. WAGNER:  No, your --

11             THE COURT:  The objection is sustained.

12  BY MR. STEWART:

13  Q    Okay.  From the standpoint -- put to one side what the

14  city communicated to you, simply as somebody who works with

15  these numbers.  From the standpoint of the sponsor of the

16  system, what does the investment return assumption reflect in

17  terms of the sponsor's risk?

18             MR. WAGNER:  Objection.  Foundation.

19             THE COURT:  Overruled.  Go ahead, sir.

20             THE WITNESS:  Let me try to phrase it this way.  The

21  investment return is the hurdle rate that you have to hit in

22  practice year over year.  To the extent you do better, the

23  plan sponsor is the recipient of that positive experience.

24  To the extent you do worse, the plan sponsor has to continue

25  to fund the plan and actually increase the contributions to

1    the plan to make up for that shortfall.

2    BY MR. STEWART:

3    Q   And in this calculation, what is the lower rate of risk,

4    a lower investment return assumption or a higher investment

5    return assumption?

6    A   Yes.  A lower investment return assumption gives you a

7    lower hurdle to hit in investing your assets.

8    Q   And a lower risk in terms of future contributions from

9    the city?

10   A   Lower risk of volatility in contributions, yes.

11         MR. STEWART:  Thank you.  That's all I have, your

12   Honor.

13         MR. WAGNER:  Your Honor, just a short --

14         THE COURT:  Yeah.  Go ahead.

15         MR. WAGNER:  -- recross.

16                    RECROSS-EXAMINATION

17   BY MR. WAGNER:

18   Q   Do you understand that under the plan if the rate of --

19   if the returns exceed 6.75 percent, that money goes to the

20   retirees?  Are you aware of that?

21   A   I understand there's a provision for that.

22   Q   And you understand that an investment return assumption

23   that is too low will overstate liabilities?

24   A   Oh, I thought you said lower state.  You said overstate?

25   Q   Yes, overstate.

1    A    Okay.

2    Q    You want me to read it again?  You want me to pose it to

3    you again?

4    A    If you would, please.

5    Q    Am I right that an investment return assumption that is

6    too low will overstate liabilities and costs?

7    A    If you have a definition of "too low" and are asking that

8    in a general sense, I could agree to that's the way the math

9    works.

10   Q    And in preparing the November 4 letters, am I right that

11   you didn't do an analysis of the historical rate of return

12   for GRS and PFRS, did you?

13   A    We did not.

14   Q    And you didn't take into account that in most years GRS

15   and PFRS actually exceeded their rate of -- their expected

16   rate of returns, did you?

17   A    That was not taken into account in our specific November

18   analysis.

19            MR. WAGNER:  Thank you.

20            THE COURT:  Nothing further, sir?

21            MR. STEWART:  Nothing further.

22            THE COURT:  All right.  I have some questions for

23   you.  Addressing the investment return assumption, is there

24   one correct assumption that should be applied like

25   everywhere, or is it fair to say that there is an acceptable

1 range of such interest rate assumptions?

2 THE WITNESS: Well, to specifically answer the first

3 part of the question, I would say there is definitely not one

4 assumption, and I would say to the second part of your

5 question we believe there is a range of reasonable

6 assumptions, but that is not an absolute range. It's a range

7 which varies by plan.

8 THE COURT: What are the factors that impact where

9 within a range -- one second -- where within a range a

10 pension plan would choose its investment return assumption?

11 THE WITNESS: Certainly. In Actuarial Standard of

12 Practice 27, which deals with selection of investment

13 returns, the concept is that when the actuary gets done or

14 the investment consultant gets done with doing their

15 mechanics, which I can describe further if you would like, we

16 should recommend a range in which the expected rate of return

17 is more likely than not to fall, so the results of our

18 capital market assumptions model where we can take a specific

19 systems asset allocation and use it as an input to develop a

20 range of outputs will develop percentiles, and so we'll look

21 from the 25th percentile where three out of four times we

22 think we'll hit that hurdle and we'll go up to the 75th

23 percentile, which one out of four times we'll hit that. In

24 between those two end points is a 50-percent range centered

25 around the median expected return, and from the perspective

1    of the standard, when we recommend it in just that fashion,

2    we recommend to the sponsor that is our expected range based

3    upon your particular asset allocation.  Where the plan

4    sponsor decides to fall within that range would be dependent

5    upon their tolerance for risk.

6         THE COURT:  And that issue, the issue of the

7    sponsor's tolerance for risk, is that something that the

8    actuary makes a recommendation or even gets involved in

9    helping the client to assess?

10        THE WITNESS:  That's not something that the actuary

11   recommends, and from the perspective of assessing, I would

12   not say it's typical for an actuary to assess a plan

13   sponsor's budgetary ability to handle volatility, but what --

14   I mean the way that I would approach this is if you think

15   back to the tank that we had on the earlier demonstrative,

16   lowering an investment return assumption would cause a higher

17   measure of liability currently, which would increase current

18   contributions, the "C" that was going into the tank, with a

19   lower hurdle of "I" in the future, so we could explain to

20   plan sponsors, as we did for the city -- we ran several

21   different investment return assumptions to illustrate how

22   sensitive the results were, and the lower -- to oversimplify,

23   but the lower "I" that you choose, the lower investment

24   return you assume you're going to have over time, the more

25   cash you may put in up front, but the much more likely you

1   are to hit your targets over time, and vice versa all of that
2   would be true as well.

3          THE COURT:  So is it the role of an actuary for a
4   plan sponsor ever to say to the sponsor under the guidelines
5   that we, as actuaries, use, you should not use the investment
6   return assumption that you have chosen to use?

7          THE WITNESS:  I would say it's close to that, not
8   exact.  The plan sponsor -- the trustees for the system are
9   free to choose their rate of return.  To the extent that we
10  feel it's outside our reasonable range, we have a
11  responsibility to disclose that.

12         THE COURT:  Did you ever say to the city here that
13  the city and this pension plan should not choose 6.75
14  percent?

15         THE WITNESS:  We did not.

16         THE COURT:  In the beginning of your testimony, you
17  mentioned what your credentials were.

18         THE WITNESS:  Yes.

19         THE COURT:  Can you state for the Court what you had
20  to do or what you had to demonstrate to get those
21  credentials?

22         THE WITNESS:  Sure.  The first one I would have
23  mentioned is fellowship in the Society of Actuaries, and that
24  is the -- one of their significant roles is examinations and
25  continuing education, so a credentialing organization.  The

1   examination process is several years in length.  It took me

2   five or six years to get through the process.  Having a

3   master's degree, I would characterize the fellowship process

4   as PhD level.  It was significantly more intense.

5          The other examination credential I mentioned is

6   the -- I'm an enrolled actuary under ERISA, and that's what's

7   known as the joint board of the Department of Labor and

8   Treasury administers examinations for actuaries who want to

9   practice in private pensions and assist the plan sponsors in

10  filing their various governmental forms.

11         THE COURT: Um-hmm.  You mentioned that you had, I

12  think you said, half a dozen publications.

13         THE WITNESS:  Yes.

14         THE COURT:  What was the name of what you consider

15  to be your most important publication, and where was it

16  published?

17         THE WITNESS:  I'm not sure I could really say which

18  one was the most important from a personal perspective.

19  Well --

20         THE COURT:  Well, then pick one.

21         THE WITNESS:  From a personal perspective, I wrote

22  an article on GASB 45, which is an accounting standard that

23  came into place about ten years ago for governmental retiree

24  healthcare plans, and I practice significantly in that area

25  as well as pensions, so that one was very important to me

1  personally.

2  THE COURT:  And where was that published, sir?

3  THE WITNESS:  That was a Milliman publication for

4  our clients and general consumption.

5  THE COURT:  Okay.  All right.  Anything further

6  questions for the witness?

7  MR. WAGNER:  Nothing further.

8  THE COURT:  No?  All right.  Sir, you may step down,

9  and you are excused.

10  THE WITNESS:  Thank you.

11  (Witness excused at 12:04 p.m.)

12  THE COURT:  We'll break for lunch now until 1:30.

13  Mr. Cullen.

14  MR. CULLEN:  Over the smaller break we got a start

15  on our homework with respect to the Court's concern over the

16  objections and the schedule with respect to those objections,

17  and I think that I can say that we are in agreement that if,

18  first, they would agree to file their objections on Friday

19  and we would file our objections on the following Friday --

20  THE COURT:  File your responses?

21  MR. CULLEN:  File our responses -- sorry -- on the

22  following Friday.  During that period in between those

23  Fridays we would do any factual depositions or discovery that

24  we agreed on during that period.  They would file their

25  expert -- an expert report responsive to any changes affected

1    by the Syncora agreement at that next Friday.

2         MR. PEREZ:  No.

3         MR. CULLEN:  No?

4         MR. PEREZ:  The following Monday.  Next Friday is

5    Rosh Hashanah.

6         MR. CULLEN:  Oh, the following Monday.  And then

7    that expert -- the expert depositions with respect to that

8    would go on while the trial was going on.  In order to get

9    that objection work done, what the objectors would like to

10   have happen is that they would like to do as much as we could

11   do through Thursday night this week, not have trial hearing

12   days next week, and start full bore on the next Monday, and

13   specifically with respect to doing as much as we could do,

14   that would absolve us of any break in the testimony, for

15   instance, of Mr. Malhotra or Mr. Orr while the objection

16   process was going on, so that seemed all sensible to us.

17        The thing that we remain somewhat at odds upon is

18   the issue of the additional expert to replace Mr. Murphy, the

19   expert on the subject of employee motivation.  I had

20   interpreted the Court's rulings with respect to the first and

21   second aspect of the procedural concern to subsume the idea

22   of Mr. Murphy on the following reasoning, that on other

23   instances, for instance, on the art, when FGIC wanted their

24   own expert, they hired their own expert or provided for an

25   expert on that subject.  That has not been done with respect

1    to Mr. Murphy, so we would retain -- we disagree with respect

2    to the need to schedule or to do things with respect to an

3    additional expert to replace Mr. Murphy, but, as we told

4    them, if the Court feels otherwise and there is an additional

5    expert, we will agree to a schedule for that.

6            THE COURT:  I do.  I think FGIC should have the

7    opportunity at this point to retain its own expert.

8            MR. PEREZ:  And, your Honor, we've already talked

9    to -- Mr. Soto has already talked to him this -- I'll sit

10   down -- over the weekend, and the reason we picked the

11   Monday, 29th, date for an expert report is because I think

12   that's what they indicated they would need for an expert

13   report.

14           MR. CULLEN:  If that is the Court's clarification,

15   then I think the city would agree to let them use Mr. Murphy,

16   and we will depose Mr. Murphy in the course of either next

17   week or the week thereafter.

18           MR. PEREZ:  That's even better.

19           MR. CULLEN:  Is that --

20           MR. SOTO:  In other words, just if I'm understanding

21   that, we'll stay with Murphy.  We just have him deposed.

22   That's fine, your Honor.

23           THE COURT:  Okay.  So let me ask the parties here to

24   memorialize --

25           MR. CULLEN:  Yes.

1    THE COURT:  -- this agreement into a stipulation.  I

2  didn't quite understand from your presentation when we would

3  actually be resuming testimony in this scenario.

4    MR. CULLEN:  End of the day Thursday we stop.

5  The -- a week -- the succeeding Monday we start, which I

6  believe is the 29th.

7    THE COURT:  It is.

8    MR. PEREZ:  And, your Honor, this is all on the

9  assumption that we actually get the plan tonight.  I mean,

10  that -- if --

11    THE COURT:  Yeah.  I was going to -- I was going to

12  clarify that, too.  Is there any issue about that as to --

13    MR. CULLEN:  Not to the best of my knowledge, your

14  Honor, but I'm pledging others' labor on that, so -- there's

15  one other --

16    THE COURT:  He wants to say something to you.

17    MR. CULLEN:  Yes.  There are a couple of things that

18  may happen as a result of this with respect to the order of

19  witnesses.  In particular, we've talked about taking some of

20  the witnesses out of order with sufficient notice if we --

21    THE COURT:  Right.

22    MR. CULLEN:  -- allowing us to accommodate this

23  schedule.  There's one other caveat for the Court.  I

24  received a note from Mr. Chiara, who is listening over the

25  phone, who said that he wanted to be included in our meet and

1    confer on this.  On the idea that it wasn't actually a meet

2    and confer and he wasn't on the motion and time runs, I

3    thought we would present this to the Court, but I don't mean

4    to prejudice Mr. Chiara.

5              MR. PEREZ:  Your Honor --

6              MR. CULLEN:  DeChiara.  Sorry.

7              MR. PEREZ:  -- he does raise a good point because I

8    forgot what date we were supposed to set aside for Mr.

9    DeChiara, and we don't want to disturb that.  And it may have

10   been the 29th or the 30th.  I'm not sure.

11             MR. CULLEN:  I think it's the 30th.

12             THE COURT:  Well, let me ask you to --

13             MR. CULLEN:  Sorry.

14             MR. PEREZ:  We can work --

15             THE COURT:  -- dive into that over lunch, and we can

16   clarify it.

17             MR. CULLEN:  Okay.

18             MR. WAGNER:  More short term, at 1:30 are we

19   addressing anything left first with respect to Ms. Kopacz?

20             THE COURT:  Yes.

21             MR. WAGNER:  Is that still on for 1:30?

22             THE COURT:  The Court intends to first examine

23   Ms. Kopacz itself regarding issues affecting her

24   qualifications and methodology, and we still have the Retiree

25   Committee's motion that's outstanding, and so I want to give

1    them an opportunity to question her as well.  And we still

2    have to clarify what's happening with the Macomb County

3    objections as well, so, anyway, we've used up enough time

4    that we're going to push our start till 1:40.

5          MR. PEREZ:  Thank you, your Honor.

6          MR. CULLEN:  Thank you, your Honor.

7          MR. STEWART:  Thank you, your Honor.

8          THE CLERK:  All rise.  Court is in recess.

9      (Recess at 12:11 p.m., until 1:40 p.m.)

10         THE CLERK:  All rise.  Court is back in session.

11   You may be seated.  Recalling Case Number 13-53846, City of

12   Detroit, Michigan.

13         THE COURT:  Looks like everyone is here.  Please

14   stand by one moment, please.  Okay.  So on the matter of the

15   Macomb County objections, do we need to argue the issue that

16   the Court set for hearing today, or can we just say that

17   we're done with that?

18         MR. BRILLIANT:  Your Honor, Allan Brilliant on

19   behalf of Macomb County by and through its public works

20   commissioner, Anthony Marrocco.  We believe, your Honor, that

21   the issue is now, you know, moot and that there's no reason

22   to have argument on it.

23         THE COURT:  What's the city's position on this?

24         MS. LENNOX:  Good afternoon, your Honor.  Heather

25   Lennox of Jones Day on behalf of the city.  We believe, in

1  light of the withdrawal of the objection, even though it was

2  not withdrawn with prejudice, as long as it remains

3  withdrawn, we can avoid arguing the matter before your Honor

4  today.  Should it be refiled, however, we would have to take

5  it up.

6        THE COURT:  Okay.  All right.  The Court will

7  consider that matter resolved then and won't conduct any

8  further argument on it.

9        MR. BRILLIANT:  Thank you, your Honor.

10        THE COURT:  Okay.  Let's turn our attention to the

11  matter relating to the <u>Daubert</u> motions for Ms. Kopacz.  I may

12  have misspoken before the lunch break and suggested that the

13  Retiree Committee had filed a motion.  It was not the Retiree

14  Committee.  It was the Retirement Systems.  My apologies for

15  that mixup.  Ms. Kopacz, are you here?  Step forward, please.

16  Slide all the way through, if you can, and we'll get you on

17  the witness stand.  Please raise your right hand before you

18  sit down.

19        MARTHA E.M. KOPACZ, COURT'S WITNESS, SWORN

20        THE COURT:  All right.  Please sit down.  All right.

21  Is there any objection if the Court proceeds with its

22  examination and then opens it up to others for their

23  examinations of the witness?

24        MR. STEWART:  No objection.

25        MS. GREEN:  No objection other than we are not going

1   to argue the motion first.  We're going to do that after the

2   testimony or in the middle or --

3          THE COURT:  Well, I -- well, we're going to have --

4   we would have argument after the testimony in any event, so I

5   would just prefer to defer until then.

6          MS. GREEN:  Okay.

7          THE COURT:  Okay.

8                        DIRECT EXAMINATION

9   BY THE COURT:

10  Q    What is your name?

11  A    Martha Ellen Middleton Kopacz.

12  Q    And what city do you live in?

13  A    I live in Norwell, Massachusetts.

14  Q    And where are you currently employed?

15  A    I am employed with Phoenix Management Services in Boston.

16  Q    And what kinds of work is Phoenix typically retained to

17  perform?

18  A    Phoenix Management Services and its affiliated companies

19  are advisors to operationally and financially troubled

20  organizations.  We also do investment banking and transaction

21  advisory work.

22  Q    And what is your title at Phoenix?

23  A    Senior managing director.

24  Q    And what are your responsibilities in that position?

25  A    I am a member of the senior partnership group of the

1   firm, and I service clients and promote our services to

2   nonclients.  I write and speak and supervise staff.

3   Q   What is your understanding of your assignment in this

4   case?

5   A   My understanding of my assignment is to serve as your

6   independent expert and to fulfill the order you signed

7   appointing me to render an opinion on the feasibility of the

8   plan of adjustment for the City of Detroit and to render an

9   opinion on the reasonableness of the assumptions that

10  underlie the revenues, expenses, and the plan payments.

11  Q   And did you fulfill that assignment?

12  A   I did.

13  Q   Before we get into the issues here --

14  A   Um-hmm.

15  Q   -- I want to make a complete record of our

16  communications.

17  A   Okay.

18  Q   First, did I ever state or suggest or imply what I

19  thought your opinions should be on the issues that I

20  presented or assigned to you?

21  A   No, never.

22  Q   Did I ever state, suggest, or imply the principles or

23  methods that you should use in this assignment?

24  A   Not at all.

25  Q   In fact, have we ever discussed your conclusions and

1  opinions in this case?

2  A   No, never.

3  Q   Have we ever discussed the substance of your work in any

4  way?

5  A   Not at all.

6  Q   Did we have a conversation about what your testimony will

7  be at this hearing?

8  A   We had a conversation about this hearing, not what my

9  testimony would be.

10  Q   What did we discuss?

11  A   We discussed the logistics for today and that you would

12  be asking me questions, and that was really it.  Oh, and

13  whether or not my attorneys could be here.

14  Q   Did I e-mail to you the questions that I'm going to ask

15  you today?

16  A   You e-mailed me a list, yes.

17  Q   What is your understanding of why I did that?

18  A   I'm not really sure other than to maybe help me focus my

19  preparation.

20  Q   And did I request that you provide me comments or

21  feedback or suggestions regarding my questions?

22  A   You said I could if I wanted to.

23  Q   Did you do that?

24  A   I did not.

25  Q   Did we have any discussion about what your answers to

1  these questions would be or should be?

2  A    No.

3  Q    Did you keep a contemporaneous log of all of your

4  communications with me and my office?

5  A    I did.

6  Q    What is your understanding of why we are here today and

7  what this hearing is about?

8  A    We're here today because the Retirement Systems have an

9  objection, and I don't mean that in a legal sense, but there

10 are a couple paragraphs in my report that they really don't

11 like.

12 Q    Okay.  You understand that other parties, FGIC and

13 Syncora, had also filed motions challenging your

14 qualifications or methods --

15 A    Yes.

16 Q    -- and that those have since been withdrawn?

17 A    They have been, yes.

18 Q    Okay.  Only because those questions were raised, I intend

19 to address those issues here today even though no one is

20 pursuing those issues.

21 A    Okay.  That's fine.

22 Q    Do you understand that today is not the day for you to

23 testify about your opinions and the grounds for them?  It is

24 just to determine whether your opinions are admissible under

25 the criteria for the admission of expert testimony in Rule

1   702 of the Federal Rules of Evidence?

2   A   I understand the first part of that.  This is not my --

3   this is not my testimony as to my opinion.  In terms of what

4   I did or didn't do, I know that there were objections raised

5   to not doing enough or doing too much or something like that.

6   Q   Okay.  So let me review Rule 702 with you.  It says, "A

7   witness who is qualified as an expert by knowledge, skill,

8   experience, training, or education may testify in the form of

9   an opinion if:  (a) the expert's scientific, technical, or

10  specialized knowledge will help the trier of fact to

11  understand the evidence or to determine an issue; (b) the

12  testimony is based on sufficient facts or data; the testimony

13  is the product of reliable principles and methods; and the

14  expert has reliably applied the principles and methods to the

15  facts of the case."  So I want to review each of these

16  criteria with you carefully and then the specific issues

17  raised in the motions that challenge your qualifications or

18  methods --

19  A   Um-hmm.

20  Q   -- so that I can determine whether your opinions are

21  admissible.  So let's begin with your knowledge, skill,

22  experience, training, or education.  What is your education?

23  A   I have a bachelor's of science in business from the

24  Kelley School of Business at Indiana University with a

25  concentration in marketing, and I have a master's of business

1  administration also from the Kelley School with a

2  concentration in finance and investments.

3  Q   Um-hmm.  And what continuing professional education have

4  you participated in since then?

5  A   Since then most of my career I have been a consultant in

6  a public accounting firm, and I've also been certified

7  professionally since shortly after I got out of graduate

8  school, so I have had a 120-hour requirement every three

9  years, so on average 40 hours a year, so I've probably done

10 somewhere between 1,200 and 1,500 hours of continuing ed in

11 my career.

12 Q   And what is your employment history?

13 A   After graduate school, I joined a firm called Peterson &

14 Company in Chicago.  It was a spinoff from Arthur Andersen.

15 I was there for nine years in Chicago, New York, and Boston.

16 I left Peterson in 1990 and joined Price Waterhouse, and I

17 was at Price Waterhouse through the merger with Coopers,

18 through the sale to FTI Consulting, and I left FTI in 2003.

19 I joined Alvarez & Marsal.  I was recruited by them to start

20 their public sector not for profit practice, and I was there

21 until March of '06 when I was recruited by Grant Thornton to

22 start their United States corporate restructuring practice,

23 and I stayed at Grant through just about the end of 2011.  I

24 intended to take a sabbatical, but I ended up with some

25 clients hiring me individually when I left, so I formed Brant

1  Point Advisors and continued to serve clients on a much

2  smaller scale and on a part-time basis until I joined Phoenix

3  about a year ago.

4  Q   Do you have any licenses or certifications?

5  A   I do.  I'm a certified management accountant, and I'm a

6  certified insolvency and restructuring advisor.

7  Q   And how did you achieve those certifications?

8  A   Certified management accountant is very similar to a CPA

9  except most of the people that hold it are inside corporate

10 accounting and finance as opposed to public accounting.  I

11 sat for the exam shortly after I finished graduate school,

12 and then I think there were some experience requirements, and

13 then I was licensed after that.

14 Q   And who grants that certification?

15 A   It is the association of certified management

16 accountants.  It's like -- again, it's a trade -- I would say

17 it's a trade organization like the AICPA or something like

18 that, and so that's -- I immediately got into continuing

19 education requirements as a result of that.  And then the

20 CIRA, I don't recall exactly when that certification was

21 promulgated, but it was a group of industry professionals

22 sometime back in -- I'm guessing the late '80s, the early

23 '90s, who wanted to add some rigor to our restructuring

24 advisory practice, and I was part of that group with Grant

25 Newton that was part of the first group certified in that.

1   Q   Do you have any publications?

2   A   I don't have any publications, but I've written some

3   articles, so most recently for the ABI Journal a couple

4   months ago.

5   Q   What was that on?

6   A   That was -- and they changed the title, but it was along

7   the lines of the missing link in successful restructurings,

8   and it was really a piece about how important the management

9   skill set and the talent is.  It's not just the liabilities

10  and the assets and how the numbers all work together, but

11  it's really about the people that are going to be in charge

12  once all of the professionals leave.

13  Q   Do you have any professional affiliations or memberships?

14  A   I do.  I'm a fellow of the American College of Bankruptcy

15  in the twelfth class, so a long time ago.  I am a charter

16  member of the Turnaround Management Association.  I'm a

17  charter member of the -- of IWIRC, which is the International

18  Women's Insolvency and Restructuring Confederation.  I

19  started that chapter in Boston many years ago.  I'm a member

20  of the ABI, 25-plus years with that.  INSOL, and then the

21  rest of it is all more civic and whatever, but those are the

22  main professional associations.

23  Q   Have you held any positions of leadership within those

24  organizations other than what you've already described?

25  A   Yeah, I have, and the only one right now is I'm on the

1    admissions committee for Circuit American College.

2    Q    Other than the American College of Bankruptcy, any other

3    professional honors or recognitions?

4    A    I've received some service awards from the Legal Aid

5    Society in New York and from Judge Kaye in the State of New

6    York.  I received some recognition from the National Women's

7    Conference, but, yeah.

8    Q    Okay.  Focusing now on your work in private sector

9    business cases --

10   A    Okay.

11   Q    -- please describe for us your experience in serving as

12   an expert either in bankruptcy cases or in out-of-court

13   business workout situations and identify some of the relevant

14   and significant cases and your assignments in them.

15   A    Okay.  The very first expert testimony I gave was back in

16   the mid-'80s in Louisville, Kentucky, in front of Judge

17   Roberts in a case called Belknap.  It was a hardware chain

18   distributor and retailer, and that was testimony around

19   insolvency preferences, fraudulent conveyances.  And there

20   were a lot of cases filed -- individual adversary

21   proceedings, so I probably testified before Judge Roberts I

22   would say 15 times, something like that, really early in my

23   career.  And then sometime again I'm thinking more into the

24   '90s I was retained in a matter called Healthco.  Originally,

25   the bankruptcy was in front of Judge Queenan, but the case

was tried in District Court in Massachusetts. It was about a fraudulent conveyance, whether a leveraged buyout would be a fraudulent conveyance. And I testified about the projections and the assumptions that the company, its investment bankers, and its accountants had made at that time. Also about the same time I testified in Tennessee in a case called <u>Tennessee Hotel Associates</u>, and I don't -- it was in Chattanooga, but I know the judge has retired since then, and I don't recall his name. That was a valuation case and some discussion around reasonable value of use and occupancy and the like. And then the last expert testimony prior to this occurred in late '95 or early '96 in front of Judge Cristol in Tampa in a case called <u>Lykes Brothers Steamship</u>, and it was about the condition of the debtor and its prospects for reorganization. So those are the only cases that I've actually testified in as an expert as opposed to a fact witness in Bankruptcy Court, and while I have been retained to be an expert in some other matters, I've never testified in court.

Q   Um-hmm. In approximately how many of these kinds of matters have you worked where you didn't actually testify, where you were just a consultant or another kind of witness?

A   I have -- I've participated in over a hundred restructurings in my career, and I've really stopped counting even though I keep a list of them to this day, and the -- and, again, my very first consulting engagement was the

1  bankruptcy of a public accounting firm in Chicago in April of

2  1982.  And I just got involved in the business at that point

3  and have continued to this day, so I've done -- I would say

4  probably half have been in court and about half have been

5  out, and about half of them are debtor company organization

6  side, and about half are another -- you know, a creditor

7  constituency, a bank, a bondholder.

8  Q   Approximately how many of them involved evaluation on

9  your part of the debtor's plan?

10  A   I counted them last night, and there are 29 that are --

11  in which I evaluated the company's plan in a formal context

12  either in court or out of court but in a formal restructuring

13  context and about 22 that I prepared.

14  Q   Do you have experience -- or what experience do you have

15  in evaluating executive leadership in the context of

16  evaluating the feasibility of a business or a municipal

17  restructuring?

18  A   In every case, whether I've been involved in preparing

19  the projections in the plan or evaluating the projections in

20  the plan, I evaluated management and their ability to carry

21  out that plan.

22  Q   Um-hmm.  And why did you do that in each and every case?

23  A   Because I believe that the plans, no matter what the

24  numbers say, they're predicated on having people in place who

25  can deliver.

1  Q    Okay.  You did work for the Nassau County Interim Finance

2  Authority?

3  A    I did.

4  Q    What was that work?

5  A    I was retained by the Interim Finance Authority.  We

6  called it NIFA.  It is a state control board that was put in

7  place now probably 12 or 13 years ago when Nassau County got

8  into financial difficulty.  I was retained in -- I'm

9  thinking -- I'm thinking back -- maybe 2010, early '10 or '11

10  when it was clear that the deficit in Nassau County was at a

11  point where it was challenging the viability of the county,

12  and the control board had the power under the state statute

13  to take control and to freeze wages and to, in essence, take

14  the checkbook.  That required a finding by the control board

15  that the county was insolvent or likely to become insolvent.

16  There was a significant difference of opinion between the

17  county executives and the NIFA staff and the NIFA board as to

18  whether or not the county was structurally in a deficit

19  position, and I was retained at that time to advise NIFA on

20  whether or not a control period could be instituted.  So the

21  first part of that work was really to look at not only the

22  annual budget through -- which was June, and I think I got

23  involved in July after the budget had been issued, and they

24  do three-year budgets there, but to look at those three years

25  as well as to look at some of the prior budgets in terms of

1  how the county had accounted for certain revenues.  And then

2  I provided a written statement to the control board with my

3  findings as to what I believed the deficit was and whether or

4  not the county had the ability to do anything to get out from

5  under that deficit.  That was the first part of it.

6       And then the second part of NIFA was during that

7  control period, we undertook a really kind of top to bottom

8  operational and business review of the county to identify

9  opportunities to reduce costs, improve services, make things

10  more efficient, and we did that through the lens of looking

11  at it on a time frame, what could be done in 90 days, what

12  would take a year or more, what would take three to five

13  years, so that there was a time frame, and we also looked at

14  with all of those initiatives, which ones impacted collective

15  bargaining agreements, which ones could be executed without

16  collective bargaining negotiations, and we did the same thing

17  and looked at those relative to legislation charter issues

18  and whether or not you would need enabling legislation to do

19  some of these things, so --

20  Q   Did that work involve any evaluation on your part of any

21  pension-related issues?

22  A   Yes, although pension is not as big of an issue in New

23  York because the pensions are funded, in essence, by the

24  state, so if you don't make your pension contribution, the

25  state simply withholds aid so that they get paid, so they

1   were not in as unfunded position as many other states and

2   municipalities.

3   Q    What was your work in that case as it related to pensions

4   then?

5   A    We looked at the -- what we expected to be the future

6   funding requirements over the next few years relative to were

7   they going up, were they going down, and -- because the state

8   had given -- had made some accommodations over the last few

9   years, which reduced the amount of contributions that Nassau

10  County had to make and when did we have to make those catch-

11  up payments.

12  Q    Did that work involve evaluating on your part the

13  accuracy of the county's revenue forecasts?

14  A    Very much so, yes.

15  Q    What was the county's annual budget, if you can recall?

16  A    Just about $3 billion.  If it were a state, it would be

17  the tenth largest state in the country, tenth -- I mean

18  tenth -- there would be ten states in this country that are

19  smaller than Nassau County.  Sorry.  I said that backwards.

20  Q    And have you done work for the Legal Aid Society in New

21  York City?

22  A    I did.

23  Q    What was that work?

24  A    In 2004 and 2005 I served as the interim president and

25  the chief restructuring officer of the Legal Aid Society in

1  New York.

2  Q   And what were your responsibilities in that role?

3  A   In that role Legal Aid was about 150 years old at the

4  time, $150 million budget of which about 130 million are

5  funded by the State of New York and the City of New York.

6  The society was operating at a deficit although didn't really

7  know how much because there had been some embezzlement and

8  some intentional falsifying of records by the former CFO, so

9  while I was serving in those capacities -- and there was an

10 attorney in chief who handled the legal work obviously

11 because I couldn't do that, but in terms of restructuring, we

12 did a complicated out-of-court restructuring in which we had

13 to renegotiate both of our union contracts.  The first one

14 was with the SEIU, who had the collective bargaining

15 agreement with our paralegals, our social workers, our

16 clerical people, and then with the UAW, who was the

17 collective bargaining agreement with our lawyers, so we had

18 to do -- we had to renegotiate those.  We did a top to bottom

19 strategic plan, did a lot of cost cutting, did some fund-

20 raising, renegotiated leases, consolidated real estate.  We

21 froze the existing pension plans and renegotiated with the

22 unions new pension programs going forward moving from a

23 defined benefit into more of a defined contribution mode.

24 What else did I -- oh, my gosh.  We ended up taking about $65

25 million of liability off the balance sheet and getting the

1   society from losing arguably a million plus a month to better

2   than break even.

3   Q   Are there any other nonprofit or municipal assignments

4   that you've had that you think may have assisted you in

5   preparing for the work in this case?

6   A   Yeah.  There's one other, and it was a private out-of-

7   court restructuring in which I represented seven transit

8   authorities, including MTA in New York, MBTA in Boston, CTA

9   in Chicago, Minneapolis, Dallas, San Francisco.  I'm

10  forgetting somebody.  I'm forgetting a couple.  Anyhow, had

11  an opportunity to work with the finance and budgeting teams

12  from each of those transit authorities in terms of working

13  with their annual development of revenue, so --

14  Q   How would you say that that work helped you in this case?

15  A   It really helped me when I was looking at the DDOT

16  deficit in this case, right, because DDOT -- DDOT is unique

17  in that it's an enterprise fund operation, but because it

18  operates at a deficit, it has to be funded by the general

19  fund, and that's really helpful.  It also -- I think

20  anytime -- in all of those cases, we're looking at the

21  projection of revenues.  Similarly, with Legal Aid, we're

22  very involved with the city and the state in terms of how

23  they were budgeting for our work and how we were getting

24  authorizations through the council and the legislature, so --

25  Q   Focusing again on your work for the Legal Aid Society in

1  New York, you mentioned that you did some work on their

2  pension issues and that when you went in, there was a defined

3  benefit pension plan; is that right?

4  A    Yes.

5  Q    What was your work specifically in evaluating that, that

6  situation?

7  A    Yeah.  The first thing that I realized was that

8  because -- the Legal Aid Society is a not for profit, but

9  because it's not a public entity, it is subject to ERISA

10  laws, so there were going to be cash funding requirements

11  that -- some of which hadn't been made as timely as they

12  should have been in the past, but it was going to be a

13  significant crunch for the society to make those, so I

14  reached out to the society's actuaries.  And one of the

15  unique things about Legal Aid is I had 17 law firms on

16  retainer on a pro bono basis, and we had 1 firm who was

17  really, really good in pensions, so I asked them to get

18  involved and to look at our options for how to do -- to

19  figure out how we were going to be able to do this.  We also

20  got involved -- I also got involved immediately with the

21  unions because there was a union plan.  There was also a plan

22  for our nonunionized workforce which had to be modified as

23  well.  And it took probably I would say three or four months

24  of work between the society's pension advisory group, their

25  investment group, the subcommittee of the board that looked

1   at that, the outside lawyers, and we looked at a lot of
2   options as to how to handle that, and then ultimately we had
3   to negotiate what was the freezing of the plan and putting
4   together a new plan, so --
5   Q   So what was it about your expertise or the scope of your
6   expertise that you felt allows you to work on pensions?
7   A   Well, I mean I have -- I do have an MBA in finance and
8   investments.  Okay.  So I had educational training in higher
9   order finance concepts.  I've been in the restructuring world
10  for, at that point, probably, you know, 20-plus years, having
11  come across pension issues and OPEB issues in the private
12  sector from time to time, having clients who've had to turn
13  their pensions over to PBGC, et cetera.  And, quite frankly,
14  pension is the kind of topic that I will never say that I
15  like it, but you can put your head in it, and you can
16  understand it when you have to.  It's not -- there's some
17  nuances to it.  There's some things that are very complicated
18  about it.  But at the end of the day, it's about obligations.
19  It's about investments.  It's about finance, and that can be
20  understood by most people as long as somebody is willing to
21  teach you about that.
22  Q   I take it this is the first time you've served as a
23  court-appointed expert?
24  A   Yes.
25  Q   Is there something you need to retrieve?

1  A   Yes.  I just dropped my glasses.  I don't know why I have

2  them, but I dropped them.

3  Q   What would you say has been different about your service

4  as a court-appointed expert in this case compared to your

5  service as experts for parties in prior cases?

6  A   That's the main -- that's the main difference is I don't

7  really have a client that has a point of view.  Every other

8  engagement I've had, whether it involved expert testimony or

9  just advisory work, I've always had a client that had some

10  point of view about something, and so the independent nature

11  of this role has been really very liberating and at some

12  points in time a little unsettling.

13  Q   Did other professionals in the Phoenix firm participate

14  with you in meeting your responsibilities as the Court's

15  expert?

16  A   Yes.

17  Q   Can you please identify them and the specific roles that

18  each played?

19  A   Yes.  Let me go through that.  First and foremost is

20  Brian Gleason, who is my partner at Phoenix.  Brian has 20-

21  plus years' experience in this business and has done

22  extensive work in the public sector in southeast

23  Pennsylvania, in Philadelphia, in Delaware, in New Jersey,

24  both on an interim management in public sector as well as

25  advisory assessing sorts of things.  Brian -- I made Brian be

1  my client during this engagement, and I made him challenge

2  what we were doing as a team and helping me really think

3  through to make sure that we were following a good approach

4  and being mindful.  Brian also helped manage the rest of the

5  Phoenix team because I spent a significant portion of my

6  time, particularly early on, in reaching out to parties of

7  interest in the constituencies here, people that I felt that

8  could help me get up to speed quickly.  And so while I was

9  focused on external sources of information, Brian was working

10 with our team making sure that we were getting what we needed

11 from the city, so -- and Brian was probably, along with me,

12 the chief architect of the feasibility definition.

13 Q   Who else?

14 A   Okay.  Next would have been Bob Childree.  Bob worked

15 with us as a subcontractor, but Bob and I had done the NIFA

16 engagement together and Jefferson County at Grant Thornton.

17 He had been involved in that, although I hadn't been involved

18 in it.  He was the former comptroller of the State of Alabama

19 for 20-some years, and, you know, he's a government

20 accounting guy.  He's an expert in all of those accounting,

21 finance, financing, budgeting, pensions, operations, ERP

22 systems.  Anything that you would put under the

23 responsibility of a CFO for a state, Bob did that, and he did

24 it for 20-some years, plus he's very, very active in the

25 professional government accounting and finance groups.  He's

1    just a very wise guy, and he was really helpful.  He was the
2    one who helped in the very early part on NIFA in terms of
3    defining what revenue is and how GAAP applies in a government
4    context, so Bob did -- I asked Bob to work on finance,
5    accounting, and IT, clearly areas of his expertise.  I asked
6    him to work on pensions, and at various points in time I
7    asked him to help on things like state revenue sharing, so
8    things that were within his domain.

9         The third member of the team was Al Mink.  Al is
10   kind of one our resident geeky CPA, CFA, you know, those
11   kinds of guys, prior experience in the private sector as a
12   CFO.  He was the CFO of the Philadelphia Gas Works on an
13   interim basis.  Strong accountant, strong budgeter.  And he
14   and Bob -- he really worked on all of the areas of finance
15   and accounting and the IT area.  Next was Mike Gaul.  Okay.
16   Right away I looked at that.  And I was going to say Al
17   has -- I forget where his undergraduate degree is.  His MBA
18   is from Seton Hall, and he's got a whole bunch of letters
19   behind his name.

20        And then the next would have been Mike Gaul.  Mike
21   has a business degree from Georgetown, done a lot of interim
22   management on the finance and operations side.  Mike handled
23   most of the revenue.  He handled the revenue that -- most of
24   those revenue items.  He worked on pension, did some
25   drafting, some first drafts on those sections, worked with me

1    on blight, and then -- okay.  That was Mike.  And then -- I'm

2    forgetting some of Mike's areas.

3          And then there was Kevin Barr.  Kevin is analyst --

4    phenomenal analyst.  He's a Wharton grad.  He's a CFA.  Oh, I

5    know.  Mike Gaul is a licensed investment banker, not that he

6    does a lot of that, but he is.  Anyhow, Kevin was the person

7    that really understood the ins and outs of all of the plans

8    and the models, so Kevin -- and he worked with Mike on a lot

9    of the other revenue issues and those sorts of things.

10          And then at the end we added a junior person by the

11   name of Jack Murdoch as we were getting into the report

12   writing, and he basically did anything that Mike or Kevin

13   told him to do.  So that was my team.

14   Q   Does your report include any analysis or conclusions that

15   are beyond your expertise or the expertise of your team?

16   A   I don't think so.

17   Q   Are there any other facts that you think the Court should

18   consider in determining whether you are qualified as an

19   expert by your knowledge, skill, experience, training, or

20   education to testify to the opinions that the Court has

21   requested of you?

22   A   I don't think so.

23   Q   Let's turn our attention to the next issue under Rule

24   702, whether your testimony is based on sufficient facts or

25   data.

1    A    Okay.

2    Q    Do you believe that your opinions are based on sufficient

3    facts or data?

4    A    I do.

5    Q    Take your time and identify as specifically as you can

6    the sources of facts and data that your opinions are based

7    on.

8    A    Okay.  They fall into two broad categories, and that -- I

9    guess three broad categories.  One would be information that

10   I and my team gathered from interviews and working sessions

11   with people.  The second category would be information that

12   we gathered and analyzed from the city or constituencies in

13   this proceeding, and the third would be information that came

14   from parties outside this proceeding.  So we -- between when

15   I was appointed and when we issued the report, we

16   participated and conducted over 200 meetings in that time

17   frame.  I have met -- we'll just go through this -- the

18   mayor, the emergency manager, their respective staffs.  I've

19   met with almost all of the department heads in the city, with

20   their financial people.  Most of the department heads also

21   have a finance person.  We've met with all of them.

22   Extensive work with E&Y, Conway.  I've met with the

23   creditors' lawyers and financial advisors.  I've worked with

24   AlixPartners, with FTI, with Alvarez, with Goldin, with

25   Houlihan, had dialogue back and forth with most of the

1    lawyers that are involved in this case.  I've met with the
2    land bank.  I've met with the Art Institute people.  I've met
3    with benefactors to the city.  I've met with the foundation
4    people.  I've met with the city council and the chief of
5    staff of the city council.  I've met with former city council
6    people.  And then my team, some people have been involved in
7    those meetings.  A lot of those I've done -- I did on my own,
8    but they have met and worked with almost everybody on the E&Y
9    team, almost everybody on the Conway team.  They've also
10   worked with all of the department heads in accounting and
11   finance, so risk management, purchasing, treasury,
12   accounting.  They've met with the auditor general.  They've
13   met with the assessor, all of the IT people, police, fire, so
14   it's -- it is -- those people provided an enormous amount of
15   information not only as to what the city is doing from
16   rendering services but how those services are delivered and
17   how the costs flow from that, you know.  Similarly, on the
18   revenue side, you talk to people in treasury about how monies
19   are collected and the interplay with the county, but they
20   also lead you to documents, and I would say -- I can't even
21   count how many documents we've probably collectively looked
22   at.  There is a seven-page list of the tiny -- like five-
23   point font of documents that came to us from the city that
24   came because we asked, not because they were already in the
25   data room.  So the city has the data room, and then when we

1  started requesting more information, they kept a separate

2  list of that and put all that stuff in the data room so that

3  anybody -- so that whatever I had everybody else could have

4  if they wanted.  Now, you know, there are parties here that

5  probably don't care about the resumes of all of the

6  department heads, the subdepartment heads in finance, but I

7  care about that, so those are things like -- it's tens of

8  thousands of pages of information.  And then the outside

9  information came from the blight task force, Future City's

10  reports, consulting reports, people just voluntarily sending

11  me things.  Some of the other experts that you had

12  interviewed sent me information that they had used that they

13  thought would be helpful, so an enormous amount of

14  information.  And then sometimes we would go -- it wouldn't

15  be -- we would then go to the city itself to the people in

16  either the departments or the finance and accounting and get

17  really granular data, so --

18  Q   Okay.  So who did you or your team talk to relating to

19  the pension issues?

20  A   I had the first meeting on pension with -- it was at

21  Clark Hill, the lawyers for the Systems, and it was Bob

22  Gordon, then two gentlemen who were the general counsels of

23  each system.  There was another lawyer that was in and out

24  that I don't recall his name.  And those were my first

25  meetings on the pension system.  Once I had a good overall

1   view of kind of what the pension issues were going to be, I

2   then delegated that to Brian Gleason and Mike Gaul and to Bob

3   Childree, and they had subsequent meetings with that same

4   group and then with other people at the city.  I reinserted

5   myself in the pension discussions when I met and got to know

6   Dick Ravitch because Dick has some interesting views.  We had

7   all -- we had known about Dick through his work before at the

8   Rockefeller Institute and some of those publications, and

9   obviously I relied heavily on Bob Childree's view on pensions

10  and appropriate funding, but, yeah, that was how we did that.

11  Q   Were there any meetings with any of the pension funds' or

12  pensions plans' professionals or their advisors?

13  A   I didn't have -- other than lawyers, I did not have.  My

14  staff did with some telephone calls.  I don't believe there

15  were any in-person meetings.

16  Q   Okay.

17  A   And there were -- I'm sorry.  There were also pension

18  meetings with the city and Jones Day.  There were a lot of

19  those.

20  Q   Did you keep a contemporaneous log of all of the people

21  with whom you and the members of your staff communicated in

22  this assignment?

23  A   I would say I did a 95-percent job on my own behalf, and

24  I know that once we decided -- it was a couple of days into

25  it that we decided the team needed to do the same thing, I

1  think they made a similarly diligent effort to keep that --

2  to keep those records, and I think between our detailed time

3  records and the contemporaneous log, I think between those

4  two documents, we've got it.

5  Q   And so those logs or that time record have been made

6  available to the parties in the case?

7  A   Yes.

8  Q   Did you keep a list of the documents that you reviewed?

9  A   My team did, and I kept a drawer in my office at the

10 CAYMAC of anything that I looked at that wasn't in the data

11 room or that came from the city, so like my copy of the

12 blight report, my copy of the triennial budget that came from

13 the city, those sorts of things I kept in a big file drawer,

14 and then when we were preparing our exhibit of documents for

15 the report, one of my team members came in and inventoried

16 that.

17 Q   What was the condition of the city's financial

18 information during the time when you were doing your work?

19 A   Again, I think of it in a couple of different ways.  When

20 we got involved, the city had financial -- had completed its

21 audits through June of '12, okay, and were working on fiscal

22 '13.  However, Ernst & Young had control of cash, so as has

23 oftentimes been my experience with troubled businesses, when

24 the bookkeeping gets out of sync in a time frame or

25 completeness, you go to cash.  And the good news with the

1    city is that E&Y has been controlling cash for probably three

2    years now so that you can actually get answers to questions,

3    you know.  You can get how many people are on payroll, what

4    does this cost, those sorts of things.  The historical

5    records are not timely.  It's a concern of mine.  I've talked

6    about it.  I complain about it all the time.  And that's

7    because the information systems are so bad, so it is -- you

8    can get the answer -- you can get an answer that I believe is

9    truthful and accurate from the city.  It'll just take you

10   awhile, and you have to go find someone who knows how to pull

11   it out of the awful bookkeeping and information technology

12   systems, so I mean it's -- they're bad, but they're no worse

13   than what I'm -- what I see in other places.

14   Q   Well, that's my next question.  Is it common for an

15   entity in need of financial restructuring or experience

16   problems -- to experience problems in providing adequate data

17   to an expert who is asked to evaluate its projections?

18   A   Almost never -- and I have one client that I've had

19   recently that this is not true -- almost never does a client

20   or a party, you know, a debtor or a debtor in waiting have

21   adequate information that they can give to you on a real time

22   basis; right?  It's just --

23   Q   DIW.

24   A   DIW, debtors in waiting.  And they just -- it's never --

25   it's not timely.  It's where they cut staff.  It's where they

1   don't pay attention.  It's always a mess.

2   Q   Did anyone from whom you requested information withhold

3   that data from you?

4   A   Ultimately, no.

5   Q   Okay.  Okay.

6   A   I had to get you involved.  No.  I had to --

7   Q   What do you mean by "ultimately"?

8   A   Recall that I never got the working models of the

9   projections until Memorial Day.

10  Q   And then you did?

11  A   And then I did.

12  Q   Were there other sources of data that, in your

13  professional judgment, you should have accessed in forming

14  your opinions?

15  A   I don't think so.

16  Q   Is there anything else you want to tell the Court about

17  the sufficiency of the facts or data that you used?

18  A   Again, I think that at the end of the day I got

19  sufficient information.  I was confident in the information

20  that I received or was able to get, right, because had I not,

21  I wouldn't have been able to come to my opinion, so while I

22  would still like to have more information about certain

23  things because I'm curious and I'd like to know more, at the

24  end of the day, I got what I needed or I couldn't have

25  rendered an opinion.

1  Q   Let's turn to the next criteria under Rule 702, which is

2  whether your opinions are the product of reliable principles

3  and methods.  Do you believe that your opinions are the

4  product of reliable principles and methods?

5  A   I do.

6  Q   Let's first review what principles and methods you used

7  were, and then we will discuss why you believe they are

8  reliable --

9  A   Okay.

10 Q   -- so please note that this criteria is not about whether

11 you reliably applied the principles and methods -- we'll

12 discuss that later -- this is just about the principles and

13 methods themselves and whether they are reliable, so take

14 your time and tell us about the principles and methods or

15 steps that you used in carrying out your assignment.

16 A   Okay.  I think the -- I go back to my proposal, which

17 laid out an approach that I envisioned using if I was

18 appointed in this case, and now after the fact I can look

19 back at that approach and say that's exactly what we did.

20 And it is -- is it a little bit different because of this

21 situation, sure, because everyone is, but it is the approach

22 that I have used my entire career and that other people in

23 the restructuring advisory community use, so in -- with the

24 City of Detroit, we collected about six years' worth of

25 historical data, sometimes a little bit more, sometimes a

1    little bit less, for all of the revenue and the expense

2    assumptions both in the ten-year plan, the ten-year, forty-

3    year plan and the RRIs, so we looked at historical

4    information.  We looked at current spending levels or receipt

5    levels, depending on where it was because, again, didn't have

6    financial statements that were completed at that time.

7    Obviously looked at all of the reports that had been

8    developed by the various state agencies, the treasurer,

9    reports the emergency manager had done, gathered information

10   from all the outside consultants.  I mean Detroit was a -- is

11   a -- was a city that was consulted to death, so used all of

12   that and then factored that in with all of the information we

13   gathered from all of the interviews and the analysis.  And

14   what was going on from in late April and May until we got the

15   working models is Kevin Barr was, in essence, building a

16   bridge between the projections and the RRIs, so by the time I

17   actually got the working models and could say, ah, that's the

18   assumption for this revenue projection or, oh, I really see

19   that now for the expense, Kevin had reverse engineered most

20   of this model so that we actually could look at the

21   underlying assumptions, look at the baseline, what the

22   starting numbers were, and see if those projections made

23   sense going forward, so it is -- in restructuring history,

24   it's important for certain kinds of revenues and expenses if

25   they're going to continue, but the other thing that happens

1 with restructuring, thank goodness, is activities in the past

2 can be radically changed as a result of the restructuring, so

3 sometimes you can -- you know, perfect example here is with

4 lighting; right?  You wouldn't project lighting revenues to

5 go forward when you've transferred the lighting authority

6 over to a different entity, so you just make an individual

7 assessment on each assumption.  And after you do that, then

8 you do the sensitivity analysis on your critical assumptions

9 to see if you're going to be wrong and you know you will be

10 wrong with projections, right, which are the assumptions that

11 a small change in the assumption will create a big impact in

12 the projections.

13 Q   So to what extent did the fact that this is a municipal

14 case rather than a business case impact the principles or

15 methods that you used?

16 A   It didn't impact the principles or the methods or the

17 approach.  The difference in it is that there is not an

18 option to stop doing things because the city has to deliver

19 some sort of basic service.  You can't -- just because it

20 costs too much to run that bus route doesn't mean you get to

21 stop it.

22 Q   To what extent did the time deadline that the Court

23 imposed upon you impact the principles and methods that you

24 used?

25 A   It did not impact -- I mean it did impact; right?  It

1    impacted the level of effort.  It impacted the size of my
2    team; right?  For the kinds of work we do at Phoenix, you
3    know, six people in one place full time is a huge team of
4    resources.
5    Q   Right, but my question is the impact on the methods and
6    principles.
7    A   It didn't -- it really didn't impact the method and the
8    principles.  I think there are points where when I got
9    satisfied with an issue or something, I said stop doing that;
10   right?  So, you know, at the end of the day when I knew what
11   my perspective was going to be on IT, right, it's like stop
12   going deeper onto that; right?  Just stop.  So I think there
13   were points in time where I probably pulled my team back from
14   continuing to go deeper into issues that I felt we had
15   adequately covered.
16   Q   So did the time limit result in any compromise of your
17   professional judgment or conclusions or methods in the case?
18   A   No, because I asked you twice for extensions; right?  I
19   mean I knew that first time that there was no way that I
20   could get done what I needed to get done given when I had got
21   in the working models, and then at the end I needed those
22   last few days because we had gotten a new set of projections,
23   so --
24   Q   Um-hmm.  Apart from what you've already mentioned, are
25   there any other factors in the case that impacted the

1   principles and methods that you used?

2   A   No, not really.  I was asked in my deposition about

3   methods, and I actually went back and looked at those because

4   I hadn't heard those words since I was in grad school.  So

5   there's a big method and a little method.  I think the little

6   method, the approach that I used in this engagement, is the

7   approach that restructuring advisors, whether they're working

8   for a debtor, a company, a municipality, or advising a

9   creditor, that's what you do.  You look at history.  You

10  sensitize it.  You judgmentize it.  You talk to people about

11  it.  You get down to source documents.  And then you make a

12  projection with -- that you feel is reasonable, and I think

13  that's what we do.  Do we do things like time series

14  analysis?  We do.  Do we do regression analysis?  We do.  But

15  we don't sit down and say, "Oh, my God, I'm going to use the

16  delphi method to estimate this," or, "I'm going to use the

17  naive" -- those are just -- those are like Wikipedia words,

18  and I recall them now that -- from a long, long time ago, but

19  we did do some of that.

20  Q   Was it part of the methods that you used in this case to

21  reconstruct from scratch the -- or a set of financial

22  projections for the city's general fund?

23  A   No.  That was not -- that was not my scope, and that's

24  not what I would do in the role of evaluating any plan.

25  Q   Do experts in your field when evaluating feasibility

1  normally reconstruct financial projections like that?

2  A    No.

3  Q    Are there any circumstances when this is done within the

4  scope of this kind of an assignment?

5  A    I thought about that.  I did it once in 1991 in a case

6  called Lang Laboratories, and I represented the creditors.

7  And about 30 days into that case, the CEO resigned.  We

8  agreed with the company to do a complete exchange of debt for

9  equity, and at that point in time the creditors' committee

10  advisors took over all the rest of the work on the

11  reorganization plan, and, yes, so we really -- we started all

12  over, but that was -- it was like 1991 that I did that.

13  Q    Just so our record is complete, why did you not do that

14  in this case?

15  A    Because it doesn't make sense to do that.  My job was to

16  evaluate the plan -- or my job still is to evaluate the plan

17  and the projections that underlie that.

18  Q    Okay.  Let's turn our attention to the reliability of the

19  principles and methods that you used.  Do you believe that

20  your education, training, and experience has given you an

21  understanding of the principles and methods that others use

22  in your field and that are generally accepted when assessing

23  the feasibility of municipal restructuring plans or a debt

24  adjustment plan in a Chapter 9 case?

25  A    I do.

1  Q   Are any of the principles and methods that you used in

2  this case materially different from the principles and

3  materials -- principles and methods that are generally

4  accepted in your field when the assignment is like it was in

5  this case?

6  A   I don't think so.

7  Q   Are there reliable principles and methods for evaluating

8  a 40-year projection for either a business or a municipality?

9  A   I don't think so.

10 Q   Why not?

11 A   Because 40 years is so far into the future that it is

12 very, very, very, very hypothetical, and as I was thinking

13 about what 40 years ago was from today back, it's -- we were

14 all children, and I can't imagine what the city's budget

15 would have looked like 40 years ago because we had just had

16 the first oil embargo and, you know, how that would have

17 affected automobiles and the development of the city, so

18 it's -- 40 years is such a long time horizon that while I

19 think it is instructive to think about it, right, there's no

20 reliable method for projecting 40 years in the future.

21 Q   Is that a view that you would say is generally held

22 within your field?

23 A   It is.

24 Q   What was the definition of feasibility that you decided

25 to apply in determining whether the city's plan of adjustment

1  is feasible?

2  A    It was a definition that I developed.

3  Q    What was it?

4  A    We spent a lot of time getting the words right on this,

5  and it would be better if I had it to read.  I know it's on

6  page 13, which was kind of an easy to remember page; right?

7  The feasibility definition -- and I'll do it as best I can

8  from memory -- is is it likely that the City of Detroit,

9  after confirmation of the plan of adjustment, will be able to

10 sustainably provide basic municipal services to the citizens

11 of Detroit and make the -- and meet the obligations in the

12 plan without the probability of a significant default.

13 That's close.

14 Q    Um-hmm.

15 A    But it has three concepts.  It has provide services, meet

16 plan obligations, and not likely default.

17 Q    Um-hmm.  And how did you decide that that was the

18 appropriate definition?

19 A    It evolved out of my view that feasibility is both a

20 quantitative and a qualitative measure, that, yes, there

21 are -- there's the numbers side.  Can you generate the

22 revenue?  Can you deliver the services at a price point such

23 that you've got enough cash to make plan payments?  But it's

24 also about the skill and the will, and this goes to the

25 management, the human capital side.  Do you have people who

1  are left behind who can execute on the plan?

2  Q    Is that definition or one similar to it generally

3  accepted in your field as an appropriate definition of

4  feasibility?

5  A    Well, I think time will tell.  I think this is the first

6  time that anybody in my profession has tried to define

7  feasibility in a Chapter 9, so I think it makes sense, but I

8  think time will tell.  Ultimately you'll decide.

9  Q    Is that definition of feasibility or one like it

10 generally accepted in the business context?

11 A    I think it is, and I think the -- again, we don't get any

12 help from the Code in terms of what feasibility is.  On the

13 commercial side we've got a lot more case history, so, like I

14 said, it makes intuitive sense to me that it's both

15 qualitative and quantitative.  There's clearly a time horizon

16 concept with feasibility, which I think is more challenging

17 in the Chapter 9 environment, and I also think the

18 feasibility is a range.  It is a -- values can have -- can be

19 reasonable and feasible within a range.  They're not just a

20 point estimate.

21 Q    So do you see any reason to use a different definition in

22 a municipal case compared to a business case?

23 A    Only to the extent that I think it is important that the

24 municipality be able to sustainably deliver basic municipal

25 services.  They don't have to be best in class.  I've said

1   that, but they've got to be able to deliver basic services.

2   Q   Is there anything further that you'd like to tell the

3   Court about the principles and methods that you used or their

4   reliability?

5   A   I don't think so.

6   Q   So, finally, let's turn our attention to the last

7   criteria under Rule 702, whether you reliably applied to the

8   facts of this case the principles and methods that you chose

9   to use.  Do you believe that you reliably applied to the

10  facts of the case the principles and methods that you chose

11  to use?

12  A   I do.

13  Q   One of your two tasks, as you've pointed out, was to

14  investigate and reach a conclusion on whether the assumptions

15  that underlie the city's cash flow projections and forecasts

16  regarding its revenues, expenses, and plan payments are

17  reasonable.  Did you carry out that task?

18  A   I did.

19  Q   Could you define for the Court what is an assumption?

20  A   An assumption is -- I'm thinking of synonyms.  It's a

21  hypothesis.  It's an axiom.  It's a presumption.  It is

22  something that you believe is going to happen.  You take it

23  for granted that it's going to happen.

24  Q   Is that the generally accepted definition of assumption

25  in the field?

1    A    I think so, yes.

2    Q    Can you estimate how many such assumptions underlie the

3    city's cash flow projections and forecasts regarding its

4    revenues, expenses, and plan payments?

5    A    It's many hundreds and arguably probably thousands.  The

6    projections are contained in over 300 spreadsheets that are

7    assimilated into the various projections in the RRIs, and

8    each of those have many columns and many lines.  And you

9    would logically expect an assumption to be associated with

10   each line item over time, so, you know, it's clearly,

11   clearly, clearly, clearly into over the hundreds into the

12   thousands.

13   Q    Did you investigate each and every one of those

14   assumptions?

15   A    Kevin Barr has looked at every cell in every sheet and

16   can tell you where it comes from and how it's calculated.

17   Q    Earlier you used the phrase "critical assumption."

18   A    Yes.

19   Q    What does that phrase denote or mean?

20   A    Again, it's a word that I chose when we were putting our

21   proposal together in recognition of the complexity of what

22   these projections were going to look like.  And I knew once

23   we got underneath them that they were going to be complex,

24   and I knew that the fact that there were multiple parts of it

25   that piece together was going to make it -- was going to make

1    it complicated, but -- and given the time frame, there are

2    critical assumptions that either lay the foundation for many

3    of the other assumptions or they're critical because they're

4    so sensitive to small changes having big impacts that you

5    really had to look at them, so --

6    Q    Okay.  So that's my next question.

7    A    Yeah.

8    Q    What is the purpose of identifying some of the

9    assumptions as critical assumptions?

10   A    Because there are -- there is some subset of those

11   thousands of assumptions that are really, really important,

12   so, for example, right, one of the most critical assumptions

13   in the city's projections are the head count assumptions, so

14   at a foundational level, we've got to get comfortable that

15   the projected head count by department of people doing what

16   they're doing, right, makes sense.

17   Q    You're talking about employment head count?

18   A    Employment head count because, you know, again, you've

19   got 60-plus percent of your costs that are derived either

20   from salaries, wages, or benefits that are paid, so you

21   better have the head count projections.  You better be

22   comfortable with that before you move on to say that, you

23   know, the budget for this department or that department is

24   okay, so that's an example.

25   Q    Is it generally accepted within your field to separate

1   assumptions by how critical they are in --

2   A   It is.

3   Q   -- determining whether and to what extent to investigate

4   them?

5   A   It is because it's the -- it's a cost-benefit analysis so

6   that you can -- you know, you want to make sure that you get

7   all of the important assumptions analyzed, critiqued,

8   evaluated, and the lesser assumptions either will have very

9   little impact or you may run out of time or you may run out

10  of budget to do them, so --

11  Q   Was there ever an instance in the case when someone asked

12  you to investigate an assumption because they thought it was

13  a critical assumption but you decided not to?

14  A   Not that I recall.

15  Q   Were there any assumptions that, in your judgment, should

16  have been investigated as critical assumptions but for

17  whatever reason you did not investigate?

18  A   No.

19  Q   Well, what challenges or obstacles did you face in

20  reliably applying to the facts of the case the principles and

21  methods that you chose to use?

22  A   Other than initially getting access to data that we felt

23  was important that maybe the city either hadn't already

24  collected or didn't think was important, once we kind of got

25  over that hump, then there really weren't any other

1    impediments.

2    Q    Okay.  So you're satisfied that you worked through those

3    challenges or obstacles?

4    A    Yeah.  I couldn't have rendered an opinion.

5    Q    So there were no challenges in this regard that you did

6    not successfully meet or overcome?

7    A    That's correct.

8    Q    Is there anything further that you want to tell us about

9    the reliability of your application of the principles and

10   methods that you used?

11   A    Not that I can think of.

12   Q    Let's address some of the more specific objections or

13   issues regarding your testimony that the parties asserted in

14   their motions even though some of them have been withdrawn.

15   A    Okay.

16   Q    Are you generally familiar with those issues that the

17   parties have raised?

18   A    I am.

19   Q    How have you become familiar with them?

20   A    I read the pleadings, and then I discussed them with my

21   attorneys.

22   Q    Do you believe that any of those objections have merit?

23   A    I don't.

24   Q    All right.  So what I'm going to do now is summarize each

25   objection and simply ask you how you respond to it.

1  A    Okay.

2  Q    One objection, for example, is that you did not actually

3  test the reasonableness of a majority of the city's

4  assumptions in its forecasts and that instead you opined that

5  the city's assumptions are reasonable when considered in the

6  aggregate.

7  A    Okay.

8  Q    What is your response to that objection?

9  A    My response is that we did look at individual

10 assumptions.  We did analyze them.  We did critique them

11 individually.  We looked at the assumptions in total

12 obviously in the result.  My challenge is with the word

13 "test."  Okay.  This is not a blood test.  You can't put a

14 dipstick in it and get something to turn blue or pink.  Okay.

15 You have to look at the information about the assumptions and

16 the data, so when you look at my report, much of -- and let's

17 go back to the head count example; right?  The head count

18 analysis that we did in looking at the individual assumptions

19 around head count by department over time, right, that

20 information is information that we pulled together so that we

21 could analyze it.  That isn't something that somebody gave

22 us.  That is something that Kevin developed.  So did you test

23 it?  I got a problem with the "testing" word.  Did we analyze

24 it?  Did we verify it?  Did we make sure that the head count

25 that we looked at in different places made sense?  Absolutely

1  we did.  Did we do that for every single assumption?  No,
2  because some of them are minor.  Again, some of them are
3  minor, but I do believe that for all of the assumptions
4  individually, collectively we did it.  I only -- in my report
5  I only called out certain of the assumptions that I either
6  thought were important to make a statement that I agreed with
7  or certain of the assumptions that I felt it was important
8  that I make a statement that I don't agree with.  So I think
9  silence on some of the assumptions has maybe been
10  misconstrued as I didn't look at them, but that's not the
11  case.
12  Q   Another objection that was made is that there is no way
13  to test some of your opinions on some specific assumptions.
14  How do you respond to that?
15  A   Again, I don't know how to respond to that because it
16  doesn't make sense to me.  This is not -- this is not a
17  laboratory experiment; right?  We're not putting two
18  chemicals together to see if we get smoke; right?  It is you
19  look at information, you analyze it, and you assess its
20  veracity and validity.
21  Q   It is also asserted that you did not make any
22  determination about the quality of E&Y's work.
23  A   I read that, and I remember at some point being asked
24  about that, and I didn't -- I relied on what E&Y did.  I
25  trust their professionalism.  I believe they were honest with

1  me.  We checked all the math; right?  So I didn't have to --

2  I didn't have to just accept it; right?  We went and checked

3  all the math, and we verified the assumptions, so I just

4  didn't feel a necessity to make a statement about the quality

5  of their work or similarly about Conway's work, but I mean

6  they've done an amazing job; right?  Do I agree with

7  everything they've done?  Absolutely not; right?  Would they

8  agree with everything I did?  Absolutely not.  But it's not

9  like anything is inferior or substandard or unprofessional.

10  Q   Well, was your assessment, evaluation, review, reliance

11  on E&Y's work, consistent with what is generally accepted in

12  the industry in these kinds of circumstances?

13  A   Absolutely.  When you're the evaluator of the plan and

14  the projections as opposed to the developer, I think most

15  evaluators, based on reputation, prior experience, whatever,

16  would tend to rely on the preparer to some level based on

17  their own ability to review and analyze.

18  Q   It is asserted that you did not understand the city's

19  methodology and, therefore, could not have evaluated it.  How

20  do you respond to that?

21  A   I got a little bit tripped up with this big M, little M

22  thing.  I got asked about methodologies from an academic and

23  a textbook perspective, and I wasn't very facile with those

24  words.  I knew what we did.  We did trend analysis.  We did

25  time series.  We looked at regressions.  We looked at

1  sensitivities.  I didn't -- I don't think about that.  That's

2  not the words that people in my business use even though when

3  I look in retrospect we absolutely did use some of those

4  methods.

5  Q   It is asserted that you were forced to rely on the city's

6  unreliable and insufficient data and only when the city was

7  willing to provide it to you because you did not have

8  sufficient time to independently verify it.

9  A   I don't believe that -- I mean there was -- there's never

10 been a context in my career where you go in and you reaudit

11 something.  That doesn't make any sense.  Okay.  It's

12 historical.  You rely on the information that's there that's

13 been audited by other folks that's been put into the city's

14 annual report, so there wasn't -- even if I'd had all the

15 time in the world, it's not something I would have done

16 because it wouldn't have provided much value.

17 Q   It is asserted that you lack experience with municipal

18 finance and budgeting.

19 A   I disagree with that.

20 Q   Based on your work in Nassau County and with the Legal

21 Aid Society and --

22 A   Yes.

23 Q   -- with your staff's work with Jefferson County and

24 Philadelphia and the other experiences?

25 A   We have a -- we have a lot of experience with municipal

1   budgeting and finance both from a preparer and an evaluator's
2   perspective.
3   Q   We'll hear more about this in a moment, but it is
4   asserted that you lack the qualifications to give opinions
5   and conclusions relating to pension issues.
6   A   I disagree with that.  I agree that I am not an actuary,
7   that I could not do an actuarial calculation.  Quite frankly,
8   I don't know how anybody did those things before computers
9   because they're just -- they're mind-numbing; right?  But,
10  again, pension issues are not magical.  They're not a super
11  science that we can't understand.  Everybody in this room can
12  understand basic concepts around pensions, how benefits are
13  calculated, how liabilities are calculated, how investments
14  are made, how monies are discounted, so I just disagree with
15  that.
16  Q   A theme that came through the objections was that you
17  were on the city's side in this case.  Were you biased in
18  favor of the city?
19  A   No.  I don't think the city would say that at all.
20  Q   Did you come into this assignment with any preconceived
21  notion regarding the feasibility of the city's plan of
22  adjustment or the reasonableness of its assumptions?
23  A   I didn't.  I would not have put myself forward if I had
24  had some perspective.
25  Q   Is there anything else in the objections that you read

1  that you want to address?

2  A   I don't remember them all, but I don't think so.

3  Q   Okay.  Just some final questions and conclusions here --

4  in conclusion here.  Have you reviewed the transcript of your

5  deposition?

6  A   I have.

7  Q   Is there any testimony in your deposition that you want

8  to correct or clarify?

9  A   No.  There's nothing in my testimony that needs to be

10  corrected or clarified.  There are typographical and phonetic

11  spelling errors which we've not undertaken to do an errata

12  sheet, but, you know, in reading it, are there things I'd

13  like to explain better, but realizing that that's not the

14  opportunity for me to have a say -- I'm just answering

15  questions -- I don't think that there's anything that's

16  technically wrong with my testimony.

17  Q   In these circumstances, the Supreme Court made the

18  following statement, and for the lawyers in the room it's

19  Kumho Tire versus Carmichael, 526 U.S. 137, 1998 -- quote,

20  "The objective of that requirement is to ensure the

21  reliability and relevancy of expert testimony.  It is to make

22  certain that an expert, whether basing testimony upon

23  professional studies or personal experience, employs in the

24  courtroom the same level of intellectual rigor that

25  characterizes the practice of an expert in the relevant

1  field."  Did your work in this case meet that standard of

2  intellectual rigor that the Supreme Court described?

3  A    Absolutely.

4  Q    Finally, do you plan to update your report?

5  A    I have heard that we're getting a new plan maybe later

6  today or tomorrow with new projections, so probably.

7  Q    I take it that until you see that, you're probably not in

8  a position to see how much work that would involve or what

9  the timing of that would be?

10  A    I don't.  I don't have any idea.

11  Q    Okay.

12         THE COURT:  All right.  That's all the questions I

13  have.  Let's take a break now for 15 minutes until 3:30, and

14  then we'll see if others have questions, so I will see you

15  then.

16         THE CLERK:  All rise.  Court is in recess.

17    (Recess at 3:13 p.m., until 3:29 p.m.)

18         THE CLERK:  All rise.  Court is back in session.

19  You may be seated.

20         THE COURT:  Okay.  Ms. Green, do you have questions?

21         MS. GREEN:  Yes, I do.

22         MR. STEWART:  I have no questions.

23                      CROSS-EXAMINATION

24  BY MS. GREEN:

25  Q    Good afternoon.  It's Kopacz as in rhymes with topaz;

1    correct?

2             THE COURT:  Could you --

3             MS. GREEN:  Thank you.

4             THE COURT:  -- pull the mike --

5             MS. GREEN:  Yes.

6             THE COURT:  -- right in front of you and talk

7    right --

8             MS. GREEN:  Just wanted to make sure --

9             THE WITNESS:  Yes, yes.

10            MS. GREEN:  -- I had the pronunciation right.

11   BY MS. GREEN:

12   Q   I wanted to go over a little bit of your prior experience

13   at Nassau County.  You identified your engagement there as

14   involving some pension-related work; correct?

15   A   I'm sorry.  My involvement where?

16   Q   At Nassau County.

17   A   Oh, in Nassau County, yes.

18   Q   And you identified your involvement there as having some

19   pension-related work; correct?

20   A   Pension was a significant budgetary item for Nassau

21   County, so, yes, we did look at it.

22   Q   But there the state provided a backstop, and so you did

23   not have to opine as to the cause of the underfunding;

24   correct?

25   A   The state actually funded and took a deduction from the

1    county.

2    Q    And I believe you stated that you only looked at the

3    future funding requirements for Nassau County as part of that

4    engagement; correct?

5    A    That's correct.

6    Q    And at the Legal Aid Society you testified that your

7    involvement with respect to pensions was to change a defined

8    benefit plan to a defined contribution plan?

9    A    We froze one and changed one.

10   Q    Okay.  But your role in this case has nothing to do with

11   changing the Retirement Systems in Detroit from a defined

12   benefit plan to a defined contribution plan; correct?

13   A    That's correct.

14   Q    And the scope of your engagement here is on two items,

15   correct, feasibility and the reasonableness of the city's

16   projections?

17   A    Yes.

18   Q    And you were not retained to opine on past investment or

19   actuarial practices of the Detroit Retirement Systems;

20   correct?

21   A    Correct.

22   Q    And you were not retained to opine about the

23   appropriateness of the former assumed rate of return for the

24   pension systems; correct?

25   A    I don't believe I have.  That's correct.

1  Q   And you were not retained to opine on the appropriateness

2  of any smoothing method or amortization period used by the

3  Detroit Retirement Systems; correct?

4  A   Correct.

5  Q   And you were not retained to recommend proper pension

6  plan reporting requirements for the Detroit Retirement

7  Systems; correct?

8  A   I said during my interview with the judge that to the

9  extent that my involvement -- out of my involvement I would

10  hope that it would improve aspects of the plan or aspects of

11  the communication around the plan that I intended to include

12  that in my report.

13  Q   But that's not laid out in the order appointing you as an

14  expert witness; correct?

15  A   It is not in my order.

16  Q   Okay.

17  A   Correct.

18  Q   Thank you.  And you were not retained to opine on the

19  causes of the pension plan's underfunding; correct?

20  A   Correct.

21  Q   And I believe you just testified earlier that you admit

22  that you are not an expert in the realm of public pensions.

23  A   I am not.  I said I am not an expert.  I am not an

24  actuary.  I do not consider myself to be a pension expert.

25  Q   And you're also not experienced as an investment manager

1 of a public pension fund; correct?

2 A   No.  That's correct.

3 Q   And you've never opined or given any conclusions as to

4 the proper rate of return for a public pension fund; correct?

5 A   Correct.

6 Q   And you're unfamiliar with smoothing mechanisms and

7 amortization periods used by public pension funds; correct?

8 A   I don't think that's correct.  I mean I'm familiar with

9 them.

10 Q   If I asked you if you could opine on the appropriateness

11 of, for instance, a seven-year smoothing period, you would

12 agree with me that you would not be able to answer that

13 question; correct?

14 A   I would have to study that question.

15 Q   And similarly with respect to an appropriate amortization

16 period, you would have no basis to know whether a five- or a

17 ten- or a twenty- or thirty-year amortization period would be

18 an appropriate period for a public pension plan such as

19 Detroit's; correct?

20 A   I would have to study that, yes.

21 Q   And you're not published in the area of public pensions

22 or actuarial science; correct?

23 A   Correct.

24 Q   And when asked when any of the pension risks that you

25 cite in your report give you any pause with respect to the

1  city's plan of adjustment, you would agree that the long-term

2  risks associated with the pension plans do not negatively

3  impact your assessment of feasibility; correct?

4  A   I'm sorry.  Could you either repeat it or break it down?

5  Q   I can.  I can.

6  A   Thanks.

7  Q   The pension risks that are cited in your report, you

8  would agree with me that your conclusions do not impact

9  feasibility or your assessment of feasibility of the city's

10 plan of adjustment; correct?

11 A   I think we need to talk about what pension risks we're

12 talking about.

13 Q   Well, you didn't identify any particular pension risk

14 that caused you to conclude that the city's plan was not

15 feasible; correct?

16 A   That's correct.

17 Q   I believe you just stated that pensions are not magical.

18 They're not a super science.  But you agree that you are here

19 being offered solely as an expert witness; correct?

20         THE COURT:  I would agree with that.

21         THE WITNESS:  Okay.  Then I'll agree with that.

22 BY MS. GREEN:

23 Q   Okay.  So you did not personally interact with the

24 Detroit pension systems prior to your engagement in 2014;

25 correct?

1  A   Correct.

2  Q   Okay.

3  A   Correct.

4  Q   So you have no first-hand knowledge before your

5  engagement by the Court into the Detroit Retirement Systems?

6  A   That's correct.

7  Q   With respect to investment rates of return used

8  previously by the Retirement Systems, you did not do a

9  detailed comparison of the Detroit Retirement Systems assumed

10 rate of return compared to other public pension plans in your

11 work --

12 A   Correct.

13 Q   -- correct?  And you did not make any efforts to quantify

14 what portion of any funding shortfall was attributable to any

15 allegedly aggressive rates of return; correct?

16 A   I did not analyze the causes of the shortfall.

17 Q   Let's discuss your conclusions relating to the Retirement

18 Systems investment practices.

19 A   Um-hmm.

20 Q   You had no quarrel with the Systems' investment

21 distributions or asset allocation; correct?

22 A   I don't recall having any quarrel with that.

23 Q   And you never looked at the written investment policies

24 for either of the Detroit Retirement Systems?

25 A   I did not, but someone on my team did.

1    Q    And if asked about which specific investments you believe

2    to be risky, you cannot identify any particular investment by

3    name; correct?

4    A    I have -- other than the supposed investments that the

5    former mayor directed to his business associates and friends.

6    Q    But you did not quantify whether that particular

7    investment actually contributed to any funding shortfalls;

8    correct?

9    A    Correct.

10   Q    And you did not actually analyze the asset mix in the

11   Retirement Systems' investment portfolio; right?

12   A    Like I said, I didn't do it.  I know someone on my team

13   looked at that asset mix and gave me their perspective, yes.

14   Q    And after looking at it, then there was no quarrel with

15   the particular asset mix used by the Systems?

16   A    It was not something that we went further into; correct.

17   Q    And at the time you prepared your report, you had no

18   information reflecting negatively on the current pension

19   advisors to the city; correct?

20   A    No.  That's correct.

21   Q    And at the time you prepared your report, you had not met

22   with any of the Retirement Systems professional investment

23   consultants; correct?

24   A    Correct.  I did not.  I don't know -- like I said, I

25   think people on my team had conversations with them but

1 didn't -- I don't think that they met with them.

2 Q   Well, let's identify who those professional consultants

3 were.  If your communications log did not list meetings with

4 NEPC or Wilshire, would that change your testimony as to

5 whether people on your team met with the --

6 A   Those are the current consultants; correct?

7 Q   Correct.

8 A   Correct.  Yes.  Like I said, I don't -- I can't tell you

9 anything more than I've told you.  I don't know that they

10 have not met.  I believe they met with somebody at least

11 telephonically at some point.

12 Q   And, similarly, you did not meet with or consult with the

13 Retirement Systems chief investment officer, Ryan Bigelow;

14 correct?

15 A   That's correct.

16 Q   And you never met with the Systems' actuaries -- the

17 current actuaries either; correct?

18 A   I did not; correct.

19 Q   Or any of the trustees for either System?

20 A   I think that maybe one of the people that I met with at

21 Clark Hill was on the board.

22 Q   Would you be able to identify that person?  Let's do it

23 this way.  If they were not listed on your communications log

24 as being present at the meeting --

25 A   A trustee?  Okay.

1  Q    -- would that reflect that they were not present?

2  A    That would reflect my -- that would be correct.

3  Q    Okay.  And you did not investigate when the Systems were

4  fully funded versus when they became underfunded; correct?

5  A    Correct.

6  Q    And you agree that in terms of feasibility, knowing the

7  timeline of events relating to the underfunding is not

8  something that you cared about in your analysis; correct?

9  A    Correct.

10 Q    And you admit that there are no allegations of misconduct

11 against current trustees in relation to either Retirement

12 System?

13 A    I have no knowledge of that one way or another.

14 Q    And you're aware that there are certain governance

15 changes being imposed under the plan within each Retirement

16 System; correct?

17 A    Like I said, I don't know that one way or another.

18 Q    You would agree with me that past misconduct, whether

19 true or not, did not impact your feasibility analysis?

20 A    That's correct.

21 Q    And you never attempted to quantify the actual economic

22 impact that you would have attributed to any alleged

23 misconduct within the Retirement Systems; correct?

24 A    That's correct.

25 Q    And you admit that certain portions of your report

1    consisted of words that you took from a declaration of

2    Charles Moore; right?

3    A    Yes.

4    Q    And you never independently verified the factual points

5    that you took from the Charles Moore declaration; correct?

6    A    I did not personally.  That's correct.

7    Q    And your instructions to your team were to cite

8    information that already existed in the record; correct?

9    A    That is correct.

10   Q    Let's talk about the due diligence relating to the cause

11   of the Systems' underfunding.  You did not look at what

12   typical losses were to other public pension systems during

13   the great recession; correct?

14   A    I did not.

15   Q    And you did not consult any publications or studies to

16   compare how the Detroit Retirement Systems fared compared to

17   other public systems as a result of the great recession;

18   correct?

19   A    Generally, I'm aware of what happened both in the public

20   and the private sector during that time frame, so I didn't

21   really feel a need to look historically in terms of that.

22   Q    And you did not review any data from the U.S. Census

23   Bureau related to public pensions during that time period?

24   A    Not that I recall, no.

25   Q    And you did not review the NASRA public funding survey

1  for that time period; correct?

2  A   I think we did review NASRA.

3  Q   And do you agree that the NASRA report concluded that the

4  market decline in 2008 resulted in a median investment return

5  for public pension funds of a negative 25.3 percent for the

6  year 2008?

7  A   I would have to look at the publication again, but the

8  losses were in the 20-plus percent category.

9  Q   And you would agree that the losses to the Detroit

10 Retirement Systems were actually in line with the figures

11 that were published by NASRA; correct?

12 A   As I said, I don't remember the two data points.  I know

13 that they were both in the minus 20's.

14         THE COURT:  Let me caution you to restrict your

15 questions to those that relate to Daubert issues.  This

16 sounds like it's wandering into more substantive --

17         MS. GREEN:  It does relate --

18         THE COURT:  -- opinion testimony.

19         MS. GREEN:  -- your Honor, to the -- whether she

20 looked at particular data points and whether her methodology

21 would have been reliable based on what she looked at, but I

22 only have a few more questions and I'm done.

23         THE COURT:  Well, but you're asking her what her

24 opinions were having done that.

25         MS. GREEN:  Okay.

1          THE COURT:  That's where the --

2          MS. GREEN:  I will restrict them.

3          THE COURT:  -- line gets crossed.

4     BY MS. GREEN:

5     Q    Regardless of the cause of the underfunding, you agree

6     that in terms of your feasibility analysis, what was

7     important to you when you wrote your report is how the

8     Retirement Systems are being dealt with in the future under

9     the city's plan; correct?

10    A    That's correct.

11         MS. GREEN:  Thank you, your Honor.

12         THE COURT:  Okay.  Does anyone else have any

13    questions for the witness?  I have nothing further.  You are

14    excused.  Thank you very much for coming today.  We will let

15    you know when we need you back.  And let me know when you

16    come to a conclusion about when you'll do your supplemental.

17         (Witness excused at 3:44 p.m.)

18         THE COURT:  Ms. Green, did you want to make an

19    argument?

20         MS. GREEN:  I have to admit that objecting to the

21    testimony offered by the Court-appointed expert is a little

22    awkward.  I feel like Mr. Hackney must have last week when he

23    objected to your questions of Chuck Moore.  But as you

24    commented then, every once in awhile the Court sustains its

25    own objection, and --

1          THE COURT:  That's true.

2          MS. GREEN:  -- so I will proceed.  Our motion is

3   limited, and it is not intended in any way to --

4          THE COURT:  Hang on.  Hang on.  I always sustain my

5   own objections.  What I only sometimes do is sustain other

6   parties' objections to my questions.

7          MS. GREEN:  Either way, our motion is limited.  It's

8   not intended to stifle in any way Ms. Kopacz's feasibility or

9   her opinions regarding the reasonableness of the city's

10  projections, and we're not disputing her qualifications in

11  that aspect.  Her municipal finance and restructuring

12  expertise were well-established during your direct

13  examination of her.  But as she admitted, she's not a

14  pensions expert and not an actuary.  She's not an investment

15  manager.  And to the extent that certain of her opinions

16  relate to pension systems and the cause of the underfunding

17  and all those sorts of things, we feel that it's

18  inappropriate to have her testify.

19         She also stated that pensions are not magical,

20  they're not a super science and that they don't even require

21  expert testimony under 702.  If that's the case and she's

22  only being offered as an expert witness, then I don't think

23  it's appropriate to have her testify at all because she's not

24  a percipient witness.  And under Rule 601, as a lay witness,

25  she would be unable to have any firsthand knowledge about our

1  underfunding, mismanagement, actuarial practices, things of

2  that nature, so for that reason, had I known that before we

3  submitted our motion to the Court, I would have added the

4  argument that if she's not an expert, then -- I'm sorry -- if

5  it doesn't require expert testimony, then there would be no

6  need for her to opine on those either way.

7          Furthermore, the scope of her testimony was limited

8  by your order to two discrete subjects, and all of the

9  pension-related opinions that she lists in her report go well

10  outside the bounds of that.  She affirmed today that her

11  feasibility analysis is not impacted by any of her

12  conclusions relating to past investment practices or past

13  actuarial practices of the systems, and, therefore, under

14  your order, it's not relevant to these proceedings or to plan

15  confirmation.  And I believe that the reason that you had

16  appointed a feasibility expert was because you were concerned

17  that there would be no adversarial process relating to

18  feasibility, but, as you've seen, that's not the problem with

19  the pension issues.  There are experts on both sides, and

20  it's hotly contested outside of Ms. Kopacz's testimony.

21  Therefore, I think, again, it's almost duplicative or

22  cumulative of the other testimony that you'll hear in the

23  proceedings.

24          Finally, if she is not an expert, as we stated in

25  our other motion, which has not yet been decided, regardless

1  of whether she's an expert, the report itself should not come

2  in.  It's inadmissible hearsay.  The protocol we've been

3  using throughout these proceedings is not to admit an expert

4  witness' report because it is hearsay, and so the Retirement

5  Systems also object to the admissibility of her report into

6  the record as evidence.  Thank you.

7        THE COURT:  Thank you.  Would anyone else like to

8  say anything about the Daubert issues?  I want to hold on the

9  issue of admissibility for right after this.

10        MR. STEWART:  Your Honor, Geoffrey Stewart of Jones

11  Day for the city, and I'll be very brief.  First of all, as

12  to the scope of the assignment, feasibility is a very broad

13  charge, and nothing is more key to feasibility than whether

14  the city in the years that are yet to come is going to be

15  able to service the pension obligations it will see, which

16  could well be crushing.  It is for that reason issues such as

17  the investment return assumption, pension, all the other

18  things we heard from Bowen, we'll hear from others, are, in

19  fact, key to that just as they're key to other things, too,

20  so I don't think it's beyond the scope of the assignment, per

21  se.

22        As to expertise, Ms. Kopacz testified that although

23  she may not be an expert in this, she is able to understand

24  it, and she dealt with at least three, if not four, people

25  who were experts, first of all, Mr. Gaul, then Mr. Childree,

1   then Mr. Gleason, and finally Mr. Ravitch, who needs no

2   introduction because of his enormous expertise, and she dealt

3   with all of those, and, therefore, her opinion is informed by

4   those. It is not fair to claim that either she or her effort

5   lacked expertise.

6         As to, though, the relevance of these issues about

7   past behavior and conduct of the Systems, I think actually

8   she dealt with that in a telling answer that she gave, and

9   I'm going to have to read from my notes for obvious reasons,

10   but let me grab them. In response to one of your Honor's

11   questions, she testified that -- about executive leadership.

12   She said in every case she evaluated management and their

13   ability to carry out the plan because every plan depends on

14   the debtor's ability to carry it out and execute it

15   faithfully. It may well be that there's new management in

16   these Retirement Systems, and that's a good thing; however,

17   it's not possible to wholly ignore the history, and it's not

18   possible in confirming a plan or looking at feasibility to

19   turn a blind eye at things that went before that to many of

20   us are shocking. So I don't believe this disqualifies

21   Ms. Kopacz in any way nor do I think it renders unreliable or

22   irrelevant the observations she made or the materials she

23   relied upon in reaching her conclusions. And a good portion

24   of her report going beyond pensions deals with the question

25   of post-confirmation governance and who's going to run the

1  city and how they're going to do this difficult job.  And I
2  don't think pensions or Retirement Systems should be excluded
3  from that because she has spoken about other parts of the
4  city as well.  That's all I have, your Honor.

5          THE COURT:  Okay.  I'm going to take this under
6  advisement and issue a written opinion.  Let's focus our
7  attention on the admissibility of Ms. Kopacz's report, per
8  se.  Ms. Green, was there anything further you wanted to say
9  about that?

10         MS. GREEN:  Only to reiterate that the clear
11 standard in the Sixth Circuit is that expert reports are, in
12 fact, hearsay.  And in addition to that, Ms. Kopacz stated
13 again today on the record that several of the statements
14 contained in the pension-related conclusions of her report
15 were, in fact, taken from a declaration of Chuck Moore and
16 were not her own words.  We cited case law in our brief that
17 stated it's inappropriate for an expert to simply rely on
18 someone else's hearsay, plop that into their report, and then
19 use that as sort of a subterfuge to get around hearsay rules.
20 And she stated several times during her deposition rather
21 than write our own language, we chose to use someone else's
22 declaration, and she stated that she was just reciting
23 someone else's kind of version of the facts.  So, in addition
24 to the entire report being hearsay, we have specific
25 objections to portions of her report since they are merely

1    words taken from another person's document and basically word

2    for word placed into her own expert report.

3        MR. STEWART: Your Honor, I wonder if to some degree

4    a lot of this is moot anyway since other expert reports have

5    been marked and admitted as demonstrative exhibits, which

6    might pretermit a lot of the issues that are discussed by all

7    sides here. However, I would make a couple of very brief

8    observations. Part of the Court's task here is to determine

9    whether or not Ms. Kopacz's opinions are well-considered and

10   are well-founded, and the statements contained in the report

11   are probative of that because it shows what she considered,

12   what her sources were, and in many cases what weight she gave

13   them. This is not hearsay if it is used to demonstrate the

14   basis of the expert's opinion because it's not offered for

15   the truth of the underlying statement. It's offered instead

16   to corroborate the rigor of the expert's work.

17       Finally, I would say that as to forecasting, which

18   is not something we've talked about today, a lot of the

19   content of the report that comes from others is relevant

20   because it is necessary to demonstrate that the forecasts and

21   other assumptions Ms. Kopacz is opining about are, indeed,

22   the same ones that we're seeing in the plan that will be

23   before the Court. That's all I have, your Honor.

24       MR. SOTO: Your Honor --

25       THE COURT: Sir.

1        MR. SOTO:  -- Ed Soto on behalf of FGIC.  Our

2   position has consistently been that -- actually two

3   positions.  One is that as a demonstrative piece of evidence

4   that it could be admitted without admitting the truth of it,

5   and I think Mr. Stewart alluded to that.  Our second position

6   has also been experienced here, and that is to the degree

7   that a subsequent witness -- expert witness, indeed,

8   testifies throughout about the substance of the report, it is

9   no longer hearsay and may be admitted in another way, so we

10  would like to adhere to those positions.  And until

11  Ms. Kopacz is able to do -- well, we have no problem with it

12  coming in as a demonstrative, and if she's able --

13        THE COURT:  Okay.

14        MR. SOTO:  -- to do the latter, we would address it

15  then.

16        THE COURT:  Thank you.  Does anyone else want to be

17  heard regarding the admissibility of Ms. Kopacz's report?

18  All right.  The Court will take that under advisement as

19  well.  Can we return to our trial sequence?

20        MR. MILLER:  Your Honor, may I approach with some

21  documents?

22        THE COURT:  Sir?

23        MR. MILLER:  May I approach with some documents?

24        THE COURT:  Yes.

25        MR. MILLER:  Good afternoon, your Honor.  Evan

1  Miller, Jones Day, for the City of Detroit.  And the city

2  would like to call as a witness Mr. Alan Perry.

3          THE COURT:  Please raise your right hand.

4              ALAN H. PERRY, CITY'S WITNESS, SWORN

5          THE COURT:  Please sit down.

6                      DIRECT EXAMINATION

7  BY MR. MILLER:

8  Q   Good afternoon, Mr. Perry.

9  A   Good afternoon.

10  Q   Please state your full name for the record.

11  A   Alan Hopkins Perry.

12  Q   And where do you live, Mr. Perry?

13  A   Wynnewood, Pennsylvania.

14  Q   And could you please describe your educational

15  background, specifically any college and graduate school?

16  A   I have a bachelor's in business administration from the

17  Wharton School at the University of Pennsylvania and a

18  master's in science and actuarial science from the Temple

19  University Graduate School of Business in Philadelphia.

20          THE COURT:  Excuse me one second.  Can you pull that

21  microphone slightly closer to you?  I think the base may

22  slide.  There you go.  See if that works better.  Go ahead.

23  BY MR. MILLER:

24  Q   And what years did you receive those degrees?

25  A   Undergraduate degree was 1988, and my master's degree was

1  1990.

2  Q   And what is your profession, sir?

3  A   I'm an actuary.

4  Q   And how long have you been doing actuarial work?

5  A   The last 24 years.

6  Q   So that would be since 1990.  What kind of work did you

7  do before you began doing actuarial work?

8  A   I worked as an equity and equity derivatives trader for

9  an investment firm.

10  Q   And what firm was that?

11  A   It was called the Chicago Corporation.

12  Q   And where was that based?

13  A   Chicago and Philadelphia.

14  Q   And do you have any designations in the actuarial field?

15  A   I'm a fellow of the Society of Actuaries and a member of

16  the American Academy of Actuaries.

17  Q   And how does one become a fellow in the Society of

18  Actuaries?

19  A   It takes a long series of actuarial examinations.

20  Q   And what do those examinations cover?

21  A   Mathematics, economics, finance, principles of insurance,

22  principles of employee benefits, so on.

23  Q   Are there subspecialties in the actuarial profession?

24  A   Right.  During the fellowship, you have to have in-depth

25  knowledge in a particular actuarial practice area such as

1  insurance or life insurance or investments.

2  Q   And do you yourself have a subspecialty in the field?

3  A   Yes.  My practice field is investments.

4  Q   And in addition to your being a fellow in the Society of

5  Actuaries, what other professional designations do you hold?

6  A   I have my CFA charter, Chartered Financial Analyst.

7  Q   And what entity issues a CFA or Chartered Financial

8  Analyst designation?

9  A   The CFA Institute.

10 Q   And how does one become a Chartered Financial Analyst?

11 A   I know there's the professional examinations, and there

12 are also experience requirements.

13 Q   When you began in the actuarial field in 1990, where were

14 you employed?

15 A   Milliman in Philadelphia.

16 Q   And is that where you work today?

17 A   Yes.

18 Q   And do you work in the same office as Mr. Bowen?

19 A   I do.

20 Q   And is that office in Philadelphia proper or a suburb of

21 Philadelphia?

22 A   In the suburbs, Wayne, Pennsylvania.

23 Q   Okay.  And where else does Milliman have offices?

24 A   We have 31 offices throughout the United States and I

25 believe another 27 outside of the United States.

Q   What type of services does Milliman provide to its

clients?

A   Actuarial and other general business consulting to life

insurance companies, property casualty insurance, healthcare

providers, and employee benefits plans and investment

consulting.

Q   I'm sorry.  You said and investment consulting?

A   And investment consulting.

Q   In brief, can you summarize the work that you did in your

first several years at Milliman?

A   Primarily investment analysis of pension portfolios,

developing capital market assumptions for our pension

clients.

Q   Okay.  And what is your current title at Milliman?

A   I'm a principal consulting actuary and a senior

investment consultant.

Q   And what are your current roles at Milliman?

A   I have many roles.  My primary role is to manage

Milliman's pension asset liability modeling services.

Q   And what is that?

A   We provide -- we team up with pension actuaries and

provide asset liability studies periodically for our pension

clients.

Q   And who are the clients that would use these asset

liability studies?

1  A    Generally, they'd be intermediate to large size public

2  and corporate and multi-employer pension funds.

3  Q    And how would they use and apply these studies that you

4  would provide to them?

5  A    Asset liability studies are a very in-depth look at the

6  long-term funding and risks to pension plans typically

7  focusing on asset allocation, risk management, long-term

8  costs.

9  Q    And approximately how many asset liability studies does

10  the pension asset liability modeling group perform in a given

11  year?

12  A    Typically ten to fifteen per year.

13  Q    And I think you previously indicated that this work has

14  been provided to public sector pension plans; is that right?

15  A    Public and corporate and multi-employer.

16  Q    And can you name some of the public plan clients who've

17  received these pension asset liability modeling studies?

18  A    Sure.  City of Hartford, Connecticut; Iowa Public

19  Employees Retirement System; Kansas Public Employees

20  Retirement System.  I've also done a lot of the same kind of

21  modeling more recently for the State of New York, State of

22  New Jersey, State of Minnesota, Oregon Public Employees

23  Retirement System, City of Portland.

24  Q    Thank you.  Do you have any other roles at Milliman?

25  A    I also sit on Milliman's investment oversight committee.

1  Q   And can you describe for us what the investment oversight

2  committee does?

3  A   The investment oversight committee provides oversight to

4  Milliman's investment consultants in situations where the

5  investment consultants have some discretionary authority over

6  the asset management for their pension clients.

7  Q   So if a Milliman investment consultant has the

8  discretionary authority with respect to a Retirement System

9  to terminate an investment manager, say a large cap

10  investment manager, how would he or she interact with your

11  committee?

12  A   He or she would have to take that decision to the

13  investment oversight committee, explain the rationale for

14  that, and then the committee would approve it or not.

15  Q   And you would evaluate the decision and opine whether the

16  investment consultant on behalf of Milliman could execute his

17  recommendation?

18          MR. WAGNER:  Objection.

19          THE WITNESS:  Yes.

20          MR. WAGNER:  Leading.

21          THE WITNESS:  Yes.

22          THE COURT:  The objection is sustained.

23  BY MR. MILLER:

24  Q   Mr. Perry, do you speak on actuarial matters or financial

25  advisory matters?

1    A    From time to time I do.

2    Q    And at what organizations would you typically speak?

3    A    National Association of State Treasurers, International

4    Foundation of Employee Benefit Plans, public pension fund

5    conferences like the Pension Fund Summit, the Enrolled

6    Actuaries meeting.

7    Q    And what would typically be the topics that you might

8    speak on at these meetings?

9    A    Typically it would be asset allocation or pension risk

10    management.

11    Q    Have you authored any publications in the field of

12    investment advisory services?

13    A    Just a few.

14    Q    And can you give us some examples of those?

15    A    Published an article in Contingencies, which is a

16    publication by the American Academy of Actuaries, an article

17    in Benefits Quarterly, and I'm co-author of Milliman's

18    corporate pension funding study.

19    Q    And tell us -- tell the Court about that study.

20    A    That study -- there's a full study that goes out once a

21    year reporting on the funded status of the 100 largest

22    corporate pension -- defined benefit pension plans in the

23    U.S., and then the data -- the funding ratio index is updated

24    every single month.

25    Q    And is that study widely used in the actuarial field?

1  A    It's widely quoted.

2  Q    Do you have any leadership positions at Milliman?

3  A    I am chair of Milliman's capital markets committee.

4  Q    How long have you served on that committee?

5  A    About 19 years.

6  Q    And how long have you served as chair of that committee?

7  A    The last two or three.

8  Q    And what does Milliman's capital markets committee do?

9  A    Develops capital market assumptions to be used by both

10 Milliman's investment consultants and Milliman's pension

11 actuaries in their work providing guidance to their pension

12 clients.

13 Q    And these capital market assumptions would be related to

14 what sort of projections?

15 A    Typically it's expected returns and risk measures for all

16 the asset classes that our pension clients invest in.

17 Q    And how is this -- how is the work product, the capital

18 market assumptions that are developed by the capital markets

19 committee, used by Milliman clients?

20 A    Our investment consultants use them to help their clients

21 make asset allocation decisions, and Milliman's pension

22 actuaries use them to provide guidance to their clients on

23 setting the expected return assumption for their valuations.

24 Q    And approximately how many pension plans throughout the

25 United States use the capital market assumptions that are

1   developed by the committee that you chair?

2   A   Hundreds.

3   Q   How many of them are governmental pension plans or public

4   pensions plans?

5   A   I'd say about 50.

6   Q   And approximately how many retiree health plans in the

7   U.S. use the capital market assumptions that are developed by

8   the capital markets committee that you chair?

9   A   I'd say more than a thousand.

10          MR. MILLER:  Your Honor, the city moves to have Mr.

11  Perry qualified as an expert witness on the subject of

12  actuarial science and pension investment analysis.

13          MR. WAGNER:  No objection.

14          THE COURT:  You may proceed.

15          MR. MILLER:  Thank you.

16  BY MR. MILLER:

17  Q   I'd like to begin the more substantive part of the exam

18  by talking about core principles of pension plan investing.

19  In the field of pension plan investing, what is the most

20  important decision that a governmental pension plan must

21  make?

22  A   I would consider the asset allocation decision to be the

23  most important.

24  Q   And what do you mean by asset allocation decision?

25  A   The way the pension plan divides up their investments

1  into the -- among the different asset classes such as stocks

2  and bonds and real estate.

3  Q    And can you offer the Court a hypothetical example of a

4  pension plan asset allocation portfolio?

5  A    Sure.  A plan might have, you know, 30 percent in U.S.

6  stocks, 30 percent in non-U.S. stocks, 30 percent in fixed

7  income, and 10 percent in real estate.  That would be their

8  asset allocation.

9  Q    Why is the asset allocation decision the most important

10  investment decision that a governmental pension plan can

11  make?

12  A    Many studies have shown, studies by companies such as

13  Morningstar Associates, that, you know, asset allocation is

14  the dominant factor in the level of long-term returns that

15  pension funds earn.

16  Q    And who's Morningstar?

17  A    Morningstar is a Chicago-based investment research mutual

18  fund rating organization widely followed.

19  Q    And do investments in certain asset classes tend to

20  produce higher returns than investments in other asset

21  classes?

22  A    Yes.

23  Q    And which asset classes have historically provided higher

24  returns than the others?

25  A    Equity, equity-like asset classes have typically provided

1  the highest returns.

2  Q   What type of equity classes?

3  A   Public equity common stocks and also private equity.

4  Q   In that case, why don't all retirement systems --

5  governmental pension plans, that is -- invest entirely in

6  equities?

7  A   That would be too risky.  If the equity markets suffered

8  a major correction, the entire portfolio would suffer that

9  correction, too.  There would be no other assets to diversify

10 away some of that risk from the equity markets.

11         MR. MILLER:  Can you put up City Demonstrative

12 Exhibit 633?

13 BY MR. MILLER:

14 Q   Mr. Perry, have you seen this demonstrative before?

15 A   Yes, I have.

16 Q   And the equation that is at the top of the demonstrative,

17 contributions plus investments equal benefits plus expenses,

18 have you seen that formula before?

19 A   Yes, I have.

20 Q   And is this a widely recognized formula in the actuarial

21 field?

22 A   Yes, indeed.

23 Q   Can you explain to the Court the mathematical role that

24 investment risk plays in this C plus I equals B plus E

25 equation?

1  A    Investment risk, volatility of investment returns

2  generally would need to be balanced out by similarly volatile

3  contributions to keep the fund in balance, so if investment

4  returns aren't as high as anticipated, then contributions

5  would need to be increased to make up for the difference.

6  Q    So volatility of "I" or investments affects volatility of

7  contributions?

8  A    Yes.

9  Q    Who typically makes the asset allocation decision for

10  retirement systems?

11  A    Pension trustees, pension committee.

12  Q    Do actuaries often make the asset allocation decision?

13  A    Not that I'm aware of.

14  Q    So how do governmental pension plans, retirement system

15  trustees make their asset allocation decisions?  How do they

16  go about doing that?

17  A    Ideally they conduct an asset liability study, and what

18  they're trying to do there is explore and discover the

19  intersection with their investment return objectives and

20  their risk tolerance.

21  Q    What determines a retirement system's investment risk

22  tolerance?

23  A    Generally the financial strength of the plan sponsor.

24  That governs the plan's ability and willingness to take risk.

25  Q    If the sponsor of a retirement system -- that is, a city

1  or county, a governmental entity that makes the pension

2  promise -- does not have the ability to take on significant

3  risk, how should the retirement system trustees then go about

4  making their asset allocation decision?

5       MR. WAGNER:  Objection, your Honor.  This is not in

6  his expert report.  None of this is in his expert report.  He

7  opined on one thing in his expert report, the proper return

8  rate, not on how trustees make decisions.

9       THE COURT:  The objection is overruled.  You may

10  proceed, sir.

11      THE WITNESS:  If the plan sponsor is not strong

12  enough to step in and increase contributions if investments

13  are too volatile, then they should have a less aggressive

14  investment policy such that they can handle the kind of

15  losses that would be occurred -- incurred under a lower risk

16  portfolio.

17  BY MR. MILLER:

18  Q   Now I want to move away briefly from asset allocations

19  and discuss another concept in the field of pension plan

20  investing, the investment return assumption.  In pension plan

21  investing, what is your understanding of the concept of

22  investment return assumption?

23  A   Generally, the investment return assumption is related to

24  the expected long-term rate of return on the pension

25  portfolio.

1    Q    In your experience, who typically decides the investment

2    return assumption?

3    A    It's also the plan, the plan trustees.

4    Q    Okay.  Are you aware of certain instances involving

5    governmental plans where the decision is not made by the

6    trustees, by another party?

7    A    There are a few public plans such as New York, the State

8    of New Jersey, I believe Minnesota, where that assumption is

9    set by the legislature.

10   Q    What is the mathematical relationship between the asset

11   allocation decision and the investment return assumption?

12   A    They're generally positively correlated.  The higher the

13   expected return --

14            THE COURT:  Excuse me one second.

15            THE WITNESS:  Pardon me.

16            THE COURT:  We're having a technical issue we need

17   to address.  Caroline, what's being done here?  Can we

18   proceed?

19            THE CLERK:  Believe so.

20            THE COURT:  Good.

21            MR. MILLER:  Thank you, your Honor.  I do want to

22   make a request of the witness.

23   BY MR. MILLER:

24   Q    If you could speak a little bit louder and a little bit

25   closer to the microphone and a little bit more slowly -- I

1    apologize.  I was having a little trouble hearing you.

2    A    I'll try.

3    Q    Thank you.

4              THE COURT:  What did you say?  No, seriously.

5              THE WITNESS:  I will try.

6    BY MR. MILLER:

7    Q    Yeah, please.  Just closer to the microphone and a little

8    louder.  Thank you.

9              MR. MILLER:  Your Honor, can I repeat the question

10   that was pending?

11             THE COURT:  Yes.  Good idea.

12             MR. MILLER:  Thank you so much.

13   BY MR. MILLER:

14   Q    Again, what is the mathematical relationship between the

15   asset allocation decision and the investment return

16   assumption?

17   A    They're generally highly positively correlated, meaning

18   the higher the expected return on the portfolio, the higher

19   the expected return assumption.

20   Q    And the converse is also true?

21   A    Yes.

22   Q    Are you familiar with the terms of the pension settlement

23   that the city reached with the Retiree Committee and the two

24   Retirement Systems?

25   A    At a general level, yes.

1    Q    And are you familiar with the terms governing the use of

2    a 6.75-percent investment return assumption?

3    A    Yes.

4           MR. MILLER:  Can you put up City Exhibit 1, page 44?

5    And can you blow up capital B in the middle of the page

6    there?  Little lower.  There we go.  Thank you.  Thank you.

7    BY MR. MILLER:

8    Q    Mr. Perry, can you read and review that sentence?  And

9    please read it into the record.

10   A    During the period that ends on June 30th, 2023, the

11   trustees of the PFRS or the trustees of any successor trust

12   or pension plan shall adopt and maintain an investment return

13   assumption and discount rate for purposes of determining the

14   assets and liabilities of the PFRS that shall be 6.75

15   percent.

16   Q    And what is your understanding of that requirement that

17   is a part of the pension settlement?

18   A    I interpret this sentence as the plan addressing the idea

19   of a risk budget that the trustees should be targeting a

20   portfolio with an expected return of 6.75 percent and

21   maintain a portfolio that will be expected to deliver 6.75

22   percent with no more risk.

23   Q    And this phrase that you just used, "risk budget," is

24   that a concept or phrase that investment consultants --

25   pension investment consultants use?

1  A    Yes.

2  Q    And what does "risk budget" mean?

3  A    It means developing a strategy that has some sort of a

4  cap on the amount of risk that the plan can take.

5  Q    So it -- I'm sorry.  Go ahead.  So is it fair to say and

6  is it your view that the requirement of a 6.75-percent

7  investment return assumption through the period ending June

8  30, 2023, essentially acts as a cap on risk?

9  A    Yes, it is.

10  Q    In your judgment, how does the 6.75-percent investment

11  return assumption that's required by the pension settlement

12  through 2023 compare to the investment return assumptions

13  that are selected by other governmental pension plans?

14  A    It's low.  It's at or near the bottom of the assumption

15  that we would see for the largest public plans.

16  Q    Do you know of any governmental pension plans with lower

17  investment return assumptions?

18  A    Just one or two that I'm aware of.

19  Q    And what are those plans?

20  A    I believe the District of Columbia is at 6-1/2, and I

21  believe the State of Indiana is at 6.75.

22  Q    Any other plans -- governmental pension plans that you're

23  aware of that use either a 6.75-percent investment return

24  assumption or something lower?

25  A    Not that I'm aware of based on, you know, the surveys and

1  things that we've been looking at, which have a lag to them.

2  Q   And, again, if you could speak a little bit more slowly.

3  I'm sorry.  I'm having trouble hearing.  I now want to talk

4  about Milliman's capital markets model and how that capital

5  markets model is constructed and operated.  You testified

6  earlier that you're the current chair of Milliman's capital

7  markets committee.  What does the capital markets model

8  develop and make assumptions for?

9  A   The capital markets model develops expected average

10  returns, expected standard deviation of returns, and expected

11  correlations between the returns of different assets for a

12  large set of asset classes that our pension clients invest

13  in.

14  Q   Does it attempt to predict returns for all of the asset

15  classes that pension plans, corporate and governmental, tend

16  to invest in?

17  A   Most of them.  They keep finding new ones.

18  Q   Okay.  And what kind of software program do you use for

19  this capital markets model?

20  A   When the model is put together, it's an Excel program.

21  Q   And who determines the various assumptions that go into

22  and are yielded by application of the model?

23  A   Milliman's capital markets committee.

24  Q   The committee you chair?

25  A   Yes.

1  Q   And how many members does that committee have?

2  A   It varies.  In a typical year it's -- it could be as low

3  as five, as high as eight or nine.

4  Q   And what's the expertise of the men and women who serve

5  on that committee?

6  A   Generally, they are senior investment consultants.

7  Q   Are there also actuaries on that committee?

8  A   Right now there are two actuaries, me -- you know, myself

9  and one other, and we're both actuaries who are investment

10 consultants.

11 Q   Okay.  And, again, just to repeat for the record, what

12 are the three categories of assumptions that your committee

13 develops as part of this capital markets model?

14 A   Right.  Expected average returns, expected standard

15 deviations as a measure of the volatility of the annual

16 returns, and the expected correlations between the returns of

17 different asset classes.

18 Q   And, again, just for the record, what do you mean by

19 correlations between asset classes?

20 A   Correlation is the statistical measure that shows how

21 closely related the returns of two different asset classes

22 are.  If they tend to move in lockstop together, if they're

23 both high at the same time or they're both low at the same

24 time, those have a high positive correlation.  Two asset

25 classes that move in the opposite direction, when one has a

1   high return, the other one tends to have a low return, those

2   have a negative correlation.  And asset classes that appear

3   to be not related to one another in terms of their returns,

4   they're independent, they generally have a zero correlation.

5   Q   And why is it important to measure correlations between

6   asset classes in developing capital market assumptions?

7   A   Correlations allow us to reflect the diversification

8   that's in a particular portfolio.  If the assets in the

9   portfolio are not perfectly correlated, that'll reduce the

10  expected volatility or the standard deviation at the total

11  portfolio level, and that's -- you know, that's the holy

12  grail of investing is to be -- is to be very diversified.

13  Q   And that can affect return?

14  A   Absolutely.

15  Q   Okay.  Let's focus on the first category of assumptions

16  that you identified, expected future average returns on asset

17  classes.  How does the capital markets committee go about

18  forecasting expected future average returns on asset classes?

19  A   We use a lot of data and capital markets theory, the idea

20  being that capital market theory, sometimes known as modern

21  portfolio theory, suggests that expected returns are driven

22  by risk, and it's not just the volatility of one asset class.

23  It's not just that asset class of standard deviation.  It's

24  really the amount of risk that that asset class adds to a

25  portfolio or a portfolio of all assets.  That risk is called

1   covariance.  So the portfolio theory says that expected

2   return on an asset class is directly related to its

3   covariance.  The data that we use, historical returns, that

4   allows us to estimate those covariances over historical

5   periods, you know, how have each asset class' returns varied

6   with the portfolio of all assets, and if we can establish

7   what that relationship is, you know, what is the expected

8   return per unit of that covariance risk, we can develop a set

9   of capital market assumptions for all these asset classes.

10  Q   And is there a particular asset class or two that you

11  focus on first in developing these expected returns among a

12  spectrum of asset classes?

13  A   Right.  To estimate what the expected return per unit of

14  risk is, we independently develop expected returns for

15  probably the two key assets classes that particular U.S.

16  pension funds hold.  That would be U.S. large cap stocks such

17  as the S&P 500 and U.S. investment grade bonds, perhaps

18  Barclays Aggregate Bond Index.

19  Q   And how do you go about projecting future average returns

20  on large cap U.S. domestic equity?

21  A    Right.  We primarily rely on the widely used dividend

22  discount model, which is kind of a building block model, but

23  it basically says that the price of the stock market is equal

24  to the present value of all the expected cash flows to be

25  received from holding those stocks.  We have the price --

1  Q   Let me stop you right there.  Those cash flows being

2  what?

3  A   Dividends, you know -- you know, perpetuity of dividends.

4  Q   Okay.

5  A   Right.  Growing dividends hopefully.  And if we know the

6  price today and we have the projected cash flows in the

7  security, we can estimate what the discount rate is that

8  equates those projected cash flows with the price.  That's

9  the expected return on -- on this case, on stocks.  And

10 taking that apart, the answer is it's the sum of three

11 components.  The first component is today's dividend yield.

12 The next component is a forecast of the expected growth rate

13 in corporate earnings, thus the growth rate in dividends they

14 can pay out, and that's a real number.  It's based on real

15 growth in earnings.  And the third number is expected

16 inflation over the measurement period that we're forecasting.

17 Q   And what is the inflation assumption that the capital

18 markets committee is currently using in its capital market

19 assumptions for purposes of developing expected future

20 average returns?

21 A   It is currently two and a half percent per year.

22 Q   And what are the sources that your committee used and

23 referred to in determining an inflation assumption of 2.5

24 percent?

25 A   Right.  We rely on what's called break even inflation,

1  which is the difference between the yields on conventional
2  U.S. treasury bonds and the yields on inflation indexed U.S.
3  treasury bonds.  And break even inflation is the rate of
4  inflation that would need to -- that we would need to
5  experience such that returns on, for example, a 30-year
6  conventional treasury bond and a 30-year inflation index
7  treasury bond would be the same, so that's regarded as the
8  bond market's forecast for expected inflation over -- you can
9  look at a ten-year, twenty-, thirty-year horizon.  We also
10  look at forecasts of inflation from economists, which are
11  published in survey form.  We also look at --
12  Q   Well, let me stop you there and ask what surveys in
13  particular do you refer to to obtain economists' view of
14  future inflation?
15  A   Right.  We use the survey called the Blue Chip Financial
16  Forecasts published monthly by Aspen Publishers.  It's widely
17  followed.
18  Q   Okay.  And in addition to looking at economists'
19  forecasts and the break even inflation rate, anything else
20  that you refer to in developing that inflation assumption?
21  A   Right.  Another source is the U.S. Congressional budget
22  office.  They put out the longest forecast of anybody that
23  I'm aware of, which runs out to 100 years, so they have their
24  forecast for inflation for each of the next 100 years.
25  Q   Anything else or --

1    A    We look at history, but, you know, more just to, you

2    know, get an idea of, you know, volatility measures of

3    inflation and correlations between inflation and real

4    returns.

5    Q    And how long has the capital markets committee been

6    employing a 2.5-percent inflation assumption in connection

7    with its development of expected future average returns on

8    asset classes?

9    A    It's been about the last two, possibly three years.  It

10   was 2.75 percent two or three years ago.

11   Q    Was it higher or lower more than two years ago?

12   A    A couple years ago for maybe a year or two it was 2.75.

13   Before that it was 2.5.  Again, it's been down there for

14   awhile.

15   Q    So you indicated that there were essentially three

16   building block tools that you used to forecast expected

17   future average returns as it relates to this large cap

18   domestic equity class --

19   A    Yes.

20   Q    -- dividend yield, real growth in earnings, and

21   inflation.  Do I have that right?

22   A    Yes.

23   Q    Great.  And the expected future average returns on that

24   large cap equity class is the sum of those three data points

25   over a period of time?

1   A    Essentially, yes.

2   Q    And after developing the expected future average return

3   on large cap equities, what is the next asset class that you

4   focus on in order to develop these returns across an asset

5   class spectrum?

6   A    Right.  Our other anchor, so to speak, is U.S. investment

7   grade fixed income, you know, the broad investment grade U.S.

8   bond market.

9   Q    I'm sorry.  Can you repeat that?  I couldn't hear.

10  A    The broad U.S. investment grade fixed income market

11  sometimes referred to as the aggregate fixed income market.

12  Q    Thank you.  And how do you go about developing the

13  expected future average returns on that investment grade bond

14  portfolio?

15  A    Right.  Well, the nice feature of bonds is they have a

16  stated yield.  They are referred to as fixed income, so we

17  don't have to forecast what the cash flows will be.  They're

18  built into the bonds, so you can get a quote on the yield to

19  maturity of the entire bond market.  And generally with bonds

20  what you see is what you get.  The future return is going to

21  be very close to the yield when you buy it.  However, we are

22  in an environment right now where, due to the actions of the

23  U.S. Federal Reserve and other central banks, they are

24  influencing the interest rate markets significantly.  Short-

25  term interest rates are near zero, and long-term interest

1 rates are still just a little above historical lows.  Those

2 Blue Chip Financial Forecasts and other forecasts that we

3 look at, the consensus is that interest rates will be moving

4 up over the next five years and even a little bit beyond five

5 years out ten years, so I feel it's important to reflect that

6 expectation of rising interest rates when we develop the

7 assumption for fixed income.  Fixed income -- you know, bonds

8 have a fixed maturity.  It's not in perpetuity like equities,

9 so bonds are going to mature.  You're going to roll over and

10 you're going to buy new bonds.  We expect them to have a

11 higher interest rate, a higher yield as we go forward.  So we

12 reflect where we think interest rates are going based on

13 these economists' forecasts, and based on the interest rate

14 sensitivity of this bond market, we can calculate total

15 returns, which would be, you know, coupon yield and also a

16 price impact, generally bad as interest rates go up, and we

17 can get the average return over the time period you're

18 interested in by following and playing that out.

19 Q    Got it.

20 A    Right.

21 Q    So once you have what I think you referred to as the two

22 anchors, your projected returns on large cap domestic U.S.

23 equities and investment grade bonds, how do you go about

24 filling in the expected returns for the rest of the asset

25 classes that pension plans would ordinarily invest in?

1  A    Right.  With those two anchors -- as I say, two points

2  determine a line -- we can determine what we think is the

3  market's expected return per unit of risk where, again, risk

4  is that covariance measure.  So we have it for the two

5  points.  We can figure out what it is because we're assuming

6  that it's constant.  It's a constant function of what the

7  covariance is, so historically we can measure the covariance

8  of all of the asset classes and then we can determine sort of

9  by interpolation where the expected return is for each of the

10 other asset classes based on that measure of covariance and

11 how it compares to those two anchors.

12 Q    So it's essentially an interpolation exercise?

13 A    Right.  It starts out that way.

14 Q    You had mentioned a second category of inputs, which are

15 expected standard deviation.  How does the capital markets

16 committee go about forecasting expected standard deviation of

17 annual returns for asset classes that pension plans may

18 invest in?

19 A    Generally for standard deviations we use the historical

20 standard deviation measured over a long time period.  There

21 are a couple of asset classes that are assets that don't

22 trade in regular markets, things like private equity and

23 private real estate.  They suffer from some appraisal-based

24 pricing and so, based on some research, we make some

25 adjustments to those standard deviations, but for most of the

1  other asset classes, it's based on actual historical standard

2  deviations.

3  Q   Okay.  And how does the capital markets committee go

4  about forecasting that third category and last category of

5  inputs, correlation between asset classes?

6  A   Same way as the standard deviation.  We base that on

7  historical returns over that same time period that we use for

8  the standard deviation.

9  Q   Okay.  And is there a deliberative process that the

10  capital markets committee undertakes before it approves the

11  assumptions in each of these categories?

12  A   Yes.  After the data is collected and the model is put

13  together and we've set the returns for the two anchors and we

14  have the set for all the capital asset classes, we go through

15  them one by one, you know.  Essentially the committee

16  discusses them, if needed, and we approve them.

17  Particularly, we approve any changes over what the

18  assumptions were, you know, at the previous calibration of

19  the model.

20  Q   Okay.  And, indeed, how often do you recalibrate and

21  update the model?

22  A   Generally every six months, December 31st and June 30th.

23  Q   And as part of each six-month update, do you undertake

24  any checks on your capital market model result?

25  A   Yeah.  Because of the size of Milliman, we benefit from

1   seeing the capital market assumptions of a lot of other

2   consulting firms and actuarial firms.  We are joint

3   consultants often for the same client.  And, you know, we

4   keep track of how our assumptions compare to other investment

5   consulting firms and actuarial firms' assumptions.  There are

6   also some forecasts of particularly U.S. large cap equity and

7   investment grade fixed income that we can look at to see, you

8   know, how we compare with those.

9   Q   And generally how do Milliman's capital market assumption

10  results compare to those of peer groups?

11  A   Very close.  We're kind of in the middle of the pack more

12  often than not.

13  Q   And what are some of the other firms that, in your

14  judgment, are part of this peer group that you compare your

15  results to?

16  A   Right.  Certainly the other large actuarial consulting

17  firms such as Mercer, Towers Watson, Aon Hewitt, and then

18  some of the larger widely used investment consulting firms

19  such as Wilshire and NEPC and Callan and Frank Russell and

20  others.

21  Q   You mentioned Wilshire.  Does Wilshire Associates have

22  any current relationship to any of the two Retirement Systems

23  that the City of Detroit sponsors?

24  A   My understanding, they are the investment consultant for

25  PFRS.

1  Q   And NEPC, that's New England Pension Consultants; is that

2  right?

3  A   Yes.

4  Q   Yeah.  Do they have a current relationship with any of

5  the Retirement Systems that the City of Detroit sponsors?

6  A   It's my understanding they are the investment consultant

7  for GRS.

8  Q   And you said that generally Milliman's capital markets

9  assumptions fare -- compare closely to the assumptions that

10 are generated by these sorts of investment consultants?

11 A   Generally, yes.

12 Q   Let me ask this question.  In forecasting expected future

13 average returns on asset classes, do you look at what

14 governmental pension plans have historically been returning

15 on these asset classes?

16 A   Not as a matter of setting our assumptions, you know.

17 Obviously as an investment consultant I see those returns all

18 the time, but they do not go into our model.  They're not one

19 of the inputs.

20 Q   And why is that?

21 A   The returns are forward looking.  As I said, they're

22 based on prices today and forecasts of future cash flows

23 received from investments, and, you know, what they've been

24 in the past doesn't influence, you know, that math at all.

25 Q   And it's the -- is it your judgment that in forecasting

1  expected future average returns on asset classes, it is not

2  important to look at what institutional investors such as

3  pension plans have returned on those asset classes --

4          MR. WAGNER:  Objection.

5  BY MR. MILLER:

6  Q  -- in the past?

7          MR. WAGNER:  Objection.  Leading.

8          MR. MILLER:  I'll withdraw it.

9  BY MR. MILLER:

10 Q  I now want to turn to the work that you did for the City

11 of Detroit.  Did there come a time when the city retained you

12 to project investment returns for its two Retirement Systems,

13 GRS and PFRS?

14 A  Yes.

15 Q  And when was that assignment given to you?

16 A  June of 2014.

17 Q  And over what time horizons did the city ask you to

18 project investment returns?

19 A  Investment returns for the next ten years and for the

20 next thirty years.

21 Q  And how would you compare the two requested time horizon

22 periods, a ten-year time horizon and a thirty-year time

23 horizon?  How would you compare them to the investment

24 horizon periods that are typically requested by your clients

25 that seek investment projection work?

1  A    Those are typically the two standard time horizons.

2  Certainly for investment consultant -- investment consulting,

3  ten years is the common time period.  Occasionally you'll see

4  seven years, something like that.  And on the actuarial side,

5  30 years is also a very common projection.  Sometimes you'll

6  see 20, but 30 is very common.  We've been using it for 20

7  years.

8  Q    And did you, in fact, undertake the assignment?

9  A    Yes.

10  Q    Yeah.  And did you complete the assignment?

11  A    Yes.

12  Q    And did you prepare and submit an expert report in

13  connection with the assignment?

14  A    Yes.

15  Q    And does that expert report contain a summary of your

16  results of the assignment?

17  A    Yes.

18          MR. MILLER:  Could you put up City Exhibit 465?  And

19  why don't you turn to page 11, which is called Exhibit 1

20  within that document?  Blow that up.

21  BY MR. MILLER:

22  Q    And this document -- or this page relates to the work

23  that you did in connection with which of the two Retirement

24  Systems?

25  A    Exhibit 1 is PFRS.

1   Q   Okay.  Before we get into the particulars of this page,

2   Mr. Perry, you mentioned before that your capital markets

3   committee updates its capital markets model every six months.

4   What was the date for the capital market assumptions that

5   were used in undertaking this project for the city?

6   A   December 31, 2013.

7   Q   And had there been any changes made to the capital market

8   assumptions between July 1, 2013, and December 31, 2013?

9   A   Yes, there were changes.

10   Q   And what were the most important of those changes?

11   A   Generally, the expected return on equities and most of

12   the alternative asset classes were decreased by 25 basis

13   points, a quarter of a percent, and the -- due to higher

14   yields by the end of the year, the expected returns on fixed

15   income were increased very slightly, just a few basis points.

16   Q   Okay.  So what would have been the impact on the

17   projected investment returns that would have been yielded by

18   application of the December 31, 2013, capital market

19   assumptions relative to the ones that you had for July 1,

20   2013?

21   A   For a pension plan with a lot of equities and

22   alternatives in it, they would have decreased.

23   Q   Thank you.  Okay.  What was the first step that you

24   employed in the process to complete this investment

25   projection assignment you had received several weeks ago?

1  A    The first step was to obtain information about the
2  investment policy targets for the two systems.
3  Q    And how did you obtain that information?
4  A    We requested it from the city, and we received an exhibit
5  from the city, and we also received reports from the two
6  investment consultants, Wilshire and NEPC.
7  Q    Okay.  And why did you request policy target allocations
8  rather than the actual asset class percentages based on the
9  actual value of investments at the time of the measurement?
10 A    We think it's more appropriate to use the investment
11 policy.  That's their home base.  That's what's supposed to
12 be guiding their long-term asset allocation.  The actual
13 allocation on any one day generally deviates from that just
14 due to market movements, so we prefer to use the targets
15 because that's what we think is going to be the long-term
16 average asset allocation over the measurement period.
17            MR. MILLER:  And can you highlight the vertical
18 column that's denominated 12 -- December 31, 2013, policy
19 target allocation?
20 BY MR. MILLER:
21 Q    And are those the policy target percentages that you
22 recall working with?
23 A    Yes.
24 Q    Okay.  Okay.  After receiving the policy target
25 allocations for PFRS, what was the next step?

1  A   Well, we study those targets so we can map the asset

2  classes that are represented in those targets as accurately

3  as possible into our model, make sure that we have the best

4  match on each of the asset classes that the system is

5  invested in.

6  Q   Okay.  And then once you've reached a judgment that you

7  have properly mapped the policy targets to asset classes in

8  your model, what is the next step?

9  A   The next step is to enter them into the model and examine

10  the results.

11  Q   Got it.  And I want to focus your attention right now to

12  the three vertical columns under the heading "Milliman Ten-

13  Year Assumptions as of December 31, 2013."

14          MR. MILLER:  And can you highlight those three

15  columns in the box right under there?

16  BY MR. MILLER:

17  Q   And, Mr. Perry, what are those percentages?

18  A   The first column labeled "Geometric Mean," that's another

19  word for the annualized rate of return.  The middle column is

20  the arithmetic mean.  That's the expected average return in

21  any one year.  And the third column is the expected standard

22  deviation for that asset class.

23  Q   And these three columns of numbers, are these the actual

24  ten-year capital market assumptions for the model for these

25  particular asset classes?

1  A    Yeah.  These are the general -- the results for the

2  general model that would apply for any plan -- any plan

3  invested in these asset classes.

4  Q   So these capital market assumptions that you see on this

5  table, they weren't developed exclusively for the city's

6  assignment?

7  A    No.

8  Q   Okay.  They would apply to any pension plan or other

9  entity seeking a capital market projection of returns?

10  A    Yes.

11          MR. WAGNER:  Objection.  Leading.

12          THE COURT:  Sustained.

13          MR. MILLER:  Okay.  I now want to highlight the

14  numbers right under that table under the heading "Milliman

15  Ten-Year Assumptions."  Okay.

16  BY MR. MILLER:

17  Q   Mr. Perry, can you walk the Court through the process by

18  which you developed those numbers that are shown in the

19  highlighted yellow?

20  A    Sure.  The first step is relatively easy.  We start with

21  the middle column, the arithmetic mean, because the

22  arithmetic mean return on a portfolio of assets is the simple

23  weighted average mean of the individual asset classes

24  weighted by that asset class' allocation, so we can just

25  multiply those together, 12 percent times 8.25, 7 percent

1  times 9.20 and so forth, and when we add those up, we'll get

2  the number at the bottom under the arithmetic mean column,

3  the 7.43 percent.  And that's essentially an intermediate

4  step.  Unfortunately, for the risk of the portfolio, the

5  standard deviation at the portfolio level, it's a more

6  complicated weighted average because we have to reflect also

7  those correlation coefficients that we discussed.  They're

8  not shown here, but they have to be reflected.  The weighted

9  average on the portfolio is not a simple weighted average of

10  the standard deviations.  We reflect correlations, and that

11  leads to the standard deviation for the total portfolio,

12  which is the 12.75-percent number you see under the standard

13  deviation column.

14  Q   Yes.

15  A   Now, armed with those two numbers, the arithmetic mean

16  for the portfolio and the standard deviation of the annual

17  return for the portfolio, we can calculate the expected

18  geometric mean, the annualized rate of return, over the ten-

19  year period.

20  Q   And what is that number?

21  A   And that's the 6.75-percent number.

22  Q   And that's the number that your capital markets model

23  showed for this portfolio of target allocations?

24  A   Right.

25       MR. WAGNER:  Same objection.  There's just way too

1  much leading here.

2           MR. MILLER:  Go ahead.

3           THE COURT:  The objection is sustained.

4           THE WITNESS:  Okay.

5           THE COURT:  No.  The objection is sustained.

6           MR. MILLER:  Oh, I'm sorry.  Withdraw the question.

7  BY MR. MILLER:

8  Q    Continue going through the process.

9  A    All right.  So the 6.75 is the expected mean annualized

10 rate of return over ten years, but due to the way investment

11 returns compound over time, that number has a little positive

12 skew to it, so as actuaries we don't like to use that.

13 That's not the most likely outcome.  The most likely outcome

14 is the median or the 50th percentile of this possible return

15 distribution, so we make one final adjustment down to that

16 6.68-percent number.  That is the median or 50th percentile

17 expected return and most likely return over the next ten

18 years.

19 Q    And then can you explain to the Court the impact of the

20 horizontal line that says net of .10 percent investment

21 management fees?

22 A    Right.  Actuarial Standards of Practice 27 generally

23 discourages assuming that actively managed investments will

24 outperform sort of index funds or benchmarks, and you pay a

25 lot of extra fees for that, so we're developing expected

1  returns for essentially index funds or passive investments,

2  and they have very small fees, so we're estimating the fees

3  on that kind of a portfolio at only .1 percent or ten basis

4  points.  So after we take those fees off, we're down at 6.58

5  percent as the expected net of fees median most likely return

6  over the next ten years.

7  Q   So what figure does represent your best estimate of the

8  PFRS projected returns for the next ten years?

9  A   6.58 percent.

10  Q   Now let's move to the table on the far right under the

11  column "Milliman 30-Year Assumptions."  And did you

12  essentially undertake the same process in determining your

13  best estimate of the return for the PFRS portfolio over the

14  next 30 years?

15  A   Yes.  We followed the exact same process.  We're just

16  using different individual asset class expected returns.

17  Q   And what is your best estimate of PFRS returns for the

18  next 30 years under your capital markets model?

19  A   7.12 percent.

20  Q   Why is the 30-year best estimate higher than the 10-year

21  best estimate for the PFRS portfolio?

22  A   It's because, as I mentioned earlier, built into our

23  capital market assumptions is the expectation of rising

24  interest rates in general over the next ten years, so the 30-

25  year assumptions have the same first ten years as the 10-year

1  assumptions, but then when we get out, for example, to year

2  11, we're anticipating higher interest rates plus higher

3  returns on the fixed income asset classes that will then --

4  the portfolio would then benefit from those for the remaining

5  20 years of the 30-year horizon, so that's going to push

6  those 30-year numbers up within the fixed income asset

7  classes.

8  Q   Okay.  Mr. Perry, did you yourself prepare these tables?

9  A   Yes, I did.

10  Q   Okay.  And do these tables and the results on those

11  tables, in fact, show the projected returns that your

12  analysis concluded?

13  A   Yes.

14          MR. WAGNER:  Objection.  Leading.

15          THE COURT:  Overruled.  What's your answer?

16          THE WITNESS:  Yes.

17          MR. MILLER:  Steve, can you put on the screen the

18  next page of City Exhibit 465?  It's called Exhibit 2.  And

19  let's highlight, right, on the top left.  And can you yellow

20  the top left corner?  Right.

21  BY MR. MILLER:

22  Q   And what does this exhibit represent, Mr. Perry?

23  A   This is the same analysis but for GRS.

24  Q   Okay.  And did you follow the same process to develop the

25  projected investment returns for GRS that --

1  A    Yes.

2  Q    -- you had for PFRS?

3  A    Yes.

4  Q    And what is the best estimate of the projected GRS

5  returns for the next ten years?

6  A    6.52 percent.

7  Q    And for the next 30 years?

8  A    7.04 percent.

9  Q    And, again, the 30-year projection is higher than the 10-

10 year projection, and why is that so?

11 A    Same reason.  We have higher expected average returns in

12 fixed income over 30 years than we do over the next 10.

13 Q    Now, when Milliman runs a capital markets projection,

14 does that projection provide, in addition to a single best

15 estimate that you've testified to, a range of best estimates?

16 A    Yes, it does.

17 Q    And why is that, sir?

18 A    Because Actuarial Standard of Practice 27, which is the

19 standard covering the development of economic assumptions for

20 measuring pension obligations, it calls for the actuary to

21 develop a best estimate range, and the pension industry

22 generally has interpreted that to mean the 25th to 75th

23 percentile of this median long-term return distribution.

24           MR. MILLER:  Steve, can I ask you to stick with City

25 Exhibit 465 and now move to page 2 of that exhibit?  And can

1  you highlight the two charts near the top of that page?

2  Thank you.

3  BY MR. MILLER:

4  Q   And, Mr. Perry, the top chart, what does that represent?

5  A   Those are the expected returns and the best estimate

6  range for the two systems for the ten-year horizon.

7  Q   And the bottom chart?

8  A   The same for the 30-year horizon.

9  Q   Okay.  And can you explain how the capital markets

10  committee determined the best estimate range percentages that

11  are shown on the top chart for DGRS and DPFRS?

12  A   So based on the same data, the same results we just

13  developed on the previous exhibits, with the expected average

14  return and the standard deviation for the portfolio, we can

15  use that information to estimate the 25th and the 75th

16  percentile just as we did for the 50th percentile.

17          MR. WAGNER:  Your Honor, can -- I'm sorry.  Can I

18  ask whether the -- what's being offered -- is this being

19  offered into evidence, and what part of the document is being

20  offered into evidence, whether it's the charts?

21          THE COURT:  Good question.

22          MR. MILLER:  Yeah.  Your Honor, the city moves to

23  offer into evidence as demonstratives the Exhibit 1 chart

24  respecting PFRS, the Exhibit 2 charts respecting GRS, and

25  these charts on this page.

1      MR. WAGNER:  No objection as demonstratives.

2      THE COURT:  All right.  For that limited purpose,

3  these -- those identified parts of this exhibit are admitted.

4  And it is closing time, so we will take our --

5      MR. MILLER:  Your Honor, I'm sorry.

6      THE COURT:  We will not take our break now.

7      MR. MILLER:  We will not.  I beg your indulgence.

8  The city would like to extract these materials from the

9  expert report and move to have them entered into and admitted

10  as evidence and not merely demonstratives.

11      THE COURT:  Okay.  So just for the record, what

12  would your next exhibit number be?  Anybody know?

13      MR. STEWART:  706.

14      MR. MILLER:  706.

15      THE COURT:  Is there any objection to that?

16      MR. MILLER:  No.

17      THE COURT:  All right.  Then for all purposes, the

18  Court will admit Exhibit 706.

19      (City Exhibit 706 received at 5:00 p.m.)

20      THE COURT:  Now can I call a recess for the day?

21      (Proceedings concluded at 5:00 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Glenn Bowen | 35 | 89 | 120 | 124 |
| Martha E.M. Kopacz | 137 | 186 | | |
| Alan H. Perry | 206 | | | |

| EXHIBITS: | Received |
|---|---|
| City Exhibit 473 | 76 |
| City Exhibit 474 | 76 |
| City Exhibit 491 | 60 |
| City Exhibit 495 | 97 |
| City Exhibit 496 | 97 |
| City Exhibit 632 (demonstrative) | 70 |
| City Exhibit 633 (demonstrative) | 44 |
| City Exhibit 706 | 248 |
| Syncora Exhibit 4054 | 41 |
| Syncora Exhibit 4776 | 41 |
| COPs Exhibit 1001 | 52 |
| COPs Exhibit 1004 | 52 |
| COPs Exhibit 1008 | 60 |
| COPs Exhibit 1023 | 52 |
| COPs Exhibit 1024 | 52 |
| COPs Exhibit 1028 | 97 |
| COPs Exhibit 1029 | 97 |
| COPs Exhibit 1036 | 110 |
| COPs Exhibit 1040 | 110 |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett                          September 21, 2014
_____        _____
Lois Garrett