3   IN THE MATTER OF,            Case No. 13-53846
                                Detroit, Michigan
4   CITY OF DETROIT, MI         September 16, 2014
    _____/    8:30 a.m.

5
        IN RE: CONTINUED TRIAL RE: CONFIRMATION OF CHAPTER 9 PLAN
6            BEFORE THE HONORABLE STEVEN W. RHODES
           TRANSCRIPT ORDERED BY: ROBIN WYSOCKI

7
    APPEARANCES:

8
    For the City of Detroit, MI:   THOMAS CULLEN, ESQ.
9                                  EVAN MILLER, ESQ.
                                   GEOFFREY IRWIN, ESQ.
10                                 Jones, Day
                                   51 Louisiana Avenue, N.W.
11                                 Washington, D.C. 20001
                                   202-879-3939

12
    For COPS:                      JONATHAN WAGNER, ESQ.
13                                 Kramer, Levin, Naftalis &
                                   Frankel
14                                 1177 Avenue of the Americas
                                   New York, NY 10036
15                                 212-715-9100

16  For Macomb County & MIDD:      ALLAN BRILLIANT, ESQ.
                                   Dechert, LLP
17                                 1095 Avenue of the Americas
                                   New York, NY 10036
18                                 212-698-3500

19  For Financial Guaranty         EDWARD SOTO, ESQ.
    Insurance Company:             Weil, Gotshal & Manges
20                                 1395 Brickell Avenue
                                   Suite 1200
21                                 Miami, FL 33131
                                   305-577-3100

22
    For the Official Committee     CLAUDE MONTGOMERY, ESQ.
23  Of Retirees:                   Dechert, LLP
                                   12215 Avenue of the Americas
24                                 25th Floor
                                   New York, NY 10020-1089
25                                 212-698-3500

```
 1                                    DEBORAH FISH, ESQ. (P36580)
                                      Allard & Fish
 2                                    2600 Buhl Building
                                      535 Griswold
 3                                    Detroit, MI 48226
                                      313-961-6141
 4
       For Detroit Police Officers   BARBARA PATEK, ESQ. (P34666)
 5     Association:                   Erman, Teicher, Zucker &
                                      Freedman
 6                                    400 Galleria Officentre
                                      Suite 444
 7                                    Southfield, MI 48034
                                      248-827-4100
 8
       PRESENT:                       JOHN QUINN
 9
       Court Recorder:               Kristel Trionfi
10
       Transcriber:                   Deborah L. Kremlick
11

12
       Proceedings recorded by electronic sound recording, transcript
13     produced by transcription service.

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX

2    WITNESSES FOR        Direct    Cross    Redirect    Recross
     THE CITY:
3
     ALAN PERRY             6       14,16,43    44       46,48,57
4                                                           58
     VANESSA FUSCO         61        119        130
5
     WITNESS FOR
6    THE COMMITTEE:

7    KIM NICHOLL          132       225,262     284       292,293
                                     277

8    EXHIBITS:                                             ID    ADM

     CX341     Christie's Final Report                    105    106
9    CX342     Christie's Appraisal                       108    108
     CX343     Christie's Preliminary Report              102    102
10   CX695     Demonstrative Image of Painting            117    117
     CX698     Demonstrative Image of Painting            114    115
11
     CX1021    Milliman 2012 Public Pension Funding Study  22     28
12   CX1030    Milliman 2013 Public Pension Funding Study  26     28
     CX1045    Article                                    247    251
13   CX10164   NASRA Brief                                 32     36

14   RX10100   Sources of Contributions to GRS            190    193
     RX10101   Sources of Contributions to PFRS           194
15   RX10102   Percentage Reduction                       201    202
     RX10103   Distribution of Retirees                   202    203
16   RX10104   ASF Recoupment                             204    206
     RX10105   COLA Elimination for GRS                   207    208
17   RX10106   Distribution Based on Retiree Age          209    210
     RX10107   Distraction of Pension Reductions          211    212
18   RX10108   Impact of Reduction of Compound COLA       214    217
     RX10109   Impact of Reduction of Compound COLA       214    217
19   RX10110   Effect of Reduction                        216    217
     RX10111   Effect of Reduction                        216    217
20   RX10112   Percentage of Reduction in Present Value   217    219
     RX10113   Percentage of Reduction in Present Value   217    219
21   RX10114   Source of Strip Rates                      197    198
     RX10116   Derivation of Recovery for GRS             194    195
22   RX10117   Actual Value of Claims GRS and PFRS        199
     RX10186   Curriculum Vitae of Kim Nicholl            144    145
23   RX10214   GRS Print Out                              175    176
     RX10223   PFRS Print Out                             177    177
24   RX10226   GRS and PFRS Print Out                     177    177
     RX10979   Amount of Reduction in Present Value       212    213
25   RX10980   Conclusion                                 219

| | | | |
|---|---|---|---|
| RX10981 | Reproduction of Milliman Calculation | 182 | 189 |
| RX10982 | Derivation of Allowed Settlement Claim | 188 | 189 |
| RX10988 | ASOP 4 | 222 | |
| RX10989 | Fourth Amended Disclosure Statement | 224 | |
| RX10993 | Expert Report of Kim Nicholl | 154 | 155 |
| RX10994 | Supplement to Expert Report of Kim Nicholl | 154 | |
| RX10995 | Disk | 178 | 179 |

1      (Court in Session)

2          THE CLERK:  All rise.  Court is in session.  Please

3  be seated.  Calling number 13-53846, City of Detroit,

4  Michigan, Michigan.

5          MR. CULLEN:  Your Honor, very briefly, Thomas Cullen

6  for the -- for the city.  In -- in light of our progress

7  yesterday and in light of discussions we have done two things.

8  We've circulated -- we are in the process of circulating a

9  stipulation reflecting our agreement to the other side that

10 will be available to the Court shortly.

11     We have also re-engineered the witness order a little bit

12 in -- in light of the impact on people's schedules if you

13 could put that up.  So this is the way that that looks at --

14 at the moment.  I have a hard copy for the --

15         THE COURT:  Yes, please.

16         MR. CULLEN:  -- for the Court.  Thank you, Your

17 Honor.

18         THE COURT:  Thank you.  And did I see that the city

19 filed its amended plan at 1:00 in the morning this morning?

20         MR. CULLEN:  Yes, Your Honor.  The people

21 principally involved did not make breakfast and hence are not

22 here.

23         THE COURT:  Or dinner, I imagine.

24         MR. CULLEN:  But it's done.

25         THE COURT:  All right.  Thank you.  All right, let's

1 proceed.

2          MR. MILLER:  Good morning, Your Honor.  Evan Miller,

3 Jones, Day for the city.  May I approach with some copies of

4 an exhibit?

5          THE COURT:  Yes.

6          MR. MILLER:  Your Honor, can I -- can I get a copy

7 of what -- let's put up City Exhibit 706.  Thank you.  Your

8 Honor, 706 is the exhibit we discussed yesterday at the end of

9 -- of Court.  It is culled from those charts and -- and tables

10 from Mr. Perry's expert report that I -- I had him testify

11 about.

12        (WITNESS ALAN PERRY WAS PREVIOUSLY SWORN)

13                      DIRECT EXAMINATION

14 BY MR. MILLER:

15 Q    So, Mr. Perry, when we broke yesterday afternoon we were

16 discussing the best estimate range of expected returns for the

17 PFRS and GRS portfolios.  And I wanted to continue with --

18 with that discussion.

19      Again, for the record, the chart at the top of that page

20 relates to what time horizon?

21 A    The next ten years.

22 Q    And the chart below it?

23 A    The next 30 years.

24 Q    Okay.  And focusing first on the ten year projection for

25 PFRS, if we could blow that up, please.  And focusing on the

1 best estimate range.  In terms of a specific percentile, where

2 does an investment return assumption of 6.75% for PFRS fall

3 within that range?

4 A    6.75% was the 52nd, 52 percentile.

5 Q    And what is the statistical significance of the 52nd

6 percentile?

7 A    We flip that around it means, you know, one minus 52

8 or 48%.  So there's a 48% likelihood that the return will be

9 6.75% or higher.

10          MR. WAGNER:  Your Honor, I object to this testimony,

11 nowhere in the expert report.

12          THE COURT:  The objection is overruled.

13 Q    And what about for GRS?  What is the specific percentile

14 where 6.75% falls within that ten year projection of range?

15          MR. WAGNER:  Your Honor, just note my objection to

16 this continuing line.

17          THE COURT:  That's fine.

18 A    For both DGRS and PFRS, 6.75% is the 52nd percentile.

19 Q    And if we could drop to the lower chart, this so-called

20 30 year chart.

21 A    Over 30 years 6.75% for GRS is the 45th percentile.  Again

22 meaning over 30 years there is a one minus 45 or 55% chance of

23 bringing a 6.75% return or higher.  For PFRS, 6.75% is the 43rd

24 percentile meaning there's a 57% chance of earning a return of

25 6.75% or higher over 30 years.

1  Q    Thank you.  Mr. Perry, are you aware that in November of

2  2013, Milliman was asked to recommend an investment return

3  assumption for GRS and PFRS?

4  A    I am.

5  Q    And what time horizon or horizons did that recommendation

6  cover?

7  A    I believe Mr. Bowen's report showed multiple horizons.  I

8  think he showed one year, 30 years, and 75 years.

9  Q    Okay.  And are you aware of the investment return

10  assumptions that were recommended at -- at that time for PFRS

11  and GRS?

12  A    I believe it was 7.2%.

13  Q    Are you aware whether those recommendations were based on

14  Milliman's capital markets model?

15  A    Yes, they were.

16  Q    And what was the date of the capital market assumptions

17  that were used for purposes of the November 2013

18  recommendation?

19  A    The June 30th, 2013 assumptions.

20  Q    Okay.  And were those the same set of assumptions you

21  used in connection with the projections you undertook for the

22  city?

23  A    No.  My projections were based on the December 31, 2013

24  model.

25  Q    I think you touched on this yesterday, but I just want to

 1  clarify for the record.  What were the primary differences

 2  between the June 30, 2013 capital market assumptions, and the

 3  December 31st, 2013 capital market assumptions?

 4          MR. WAGNER:  Same objection, Your Honor, not in the

 5  report.

 6          THE COURT:  Overruled, go ahead, sir.

 7  A    Generally the changes that our capital markets committee

 8  made to the assumptions between those two dates was to lower

 9  the equity and alternative assumptions by about 25 basis

10  points, so a quarter of a percent.  And due to rising interest

11  rates, the expected returns on fixed income actually increased

12  slightly a few basis points.

13  Q    Do GRS and PFRS retirement systems invest in equity?

14  A    Yes, they do.

15  Q    And what would the effect have been in projecting returns

16  for GRS and PFRS using the June 30, 2013 capital market

17  assumptions compared with use of the December 31st, 2013

18  capital market assumptions?

19  A    They -- they would have been and were higher on June 30th

20  compared to December 31st.

21  Q    Okay.  And let's focus on the -- the chart.

22          A VOICE:  And you said there is no September 31st.

23          THE COURT:  Let's -- let's pause here for a second.

24          MR. MILLER:  Yes.

25          THE COURT:  All right.  The Court is going to be in

1  recess.

2        (WITNESS ALAN PERRY WAS TEMPORARILY EXCUSED AT 8:38 A.M.)

3              THE CLERK:  All rise.

4        (Court in Recess at 8:38 a.m.; Resume at 8:38 a.m.)

5              THE CLERK:  Court is in session.  Please be seated.

6              THE COURT:  One more moment, please, sir.

7              MR. MILLER:  Of course, Your Honor.

8              THE COURT:  I feel like this disturbance is

9  distracting and we ought to just wait until it clears, is that

10 okay?

11             MR. MILLER:  That's fine, Your Honor.

12             THE COURT:  Are we all set?  Okay, you may proceed.

13             MR. MILLER:  Thank you, Your Honor.

14       (WITNESS ALAN PERRY RESUMED THE STAND AT 8:41 A.M.)

15 BY MR. MILLER:

16 Q    Okay.  Let's turn to the chart that's on the screen and

17 is this the 30 year chart of results that you've prepared?

18 A    Yes, it is.

19 Q    Okay.  And -- and what is the best estimate return over a

20 30 year time horizon that you obtained for PFRS?

21 A    PFRS on the right 7.12%.

22 Q    And -- and what portion of the difference between that

23 projection and a 7.20% projection is attributable to the

24 change in the capital market assumptions that Milliman made

25 from June 30th to December 31st?

1  A    All of it.

2  Q    And in connection with DGRS, would that be the same?

3  A    Yes.

4  Q    Are you familiar with the pension settlement provisions

5  respecting the city's contributions to GRS and PFRS over the

6  next nine years?

7  A    At a general level, yes, I am.

8  Q    And -- and what is your general understanding of what the

9  settlement provides in terms of the next nine years of

10 contributions to PFRS and GRS?

11 A    It calls for a -- a fixed and level set of contributions

12 into each of the two systems over the nine year period.

13 Q    And what is the impact on the City of Detroit's

14 contribution volatility risk of having fixed contributions

15 over the next nine years?

16        MR. WAGNER:  Your Honor, I object and I'd like to

17 make a little bit of a record.  We got an expert report that

18 laid out one point which is the best estimate ranges.

19    We asked at the deposition, are you planning to offer any

20 other opinions other than what's set out in the report?  We

21 get an answer of no.  The city -- the city provided one

22 rebuttal report by Ms. Sallee and that was it.  It's unfair

23 for us to -- for this to be sprung on us at trial.

24        THE COURT:  The objection is overruled.  You may

25 proceed.

1          MR. MILLER:  Thank you.

2  A    Contributions, there -- there -- there essentially is no

3  contribution volatility.

4  Q    Okay.

5  A    They're going to be fixed.

6  Q    Given the fixed contributions, and no contribution

7  volatility for the next nine years under the pension

8  settlement, what are the consequences for the City of Detroit

9  in connection with pension investment risk over the next nine

10 years and beyond?

11         MR. WAGNER:  Same objection.

12         THE COURT:  Overruled, go ahead.

13 A    Since both contributions and investment income are what

14 are going to be paying the benefits, if the investment returns

15 are volatile and if they fail to provide the 6.75% return over

16 the nine years, without contributions being increased to

17 compensate for that, you know, there's a risk that the funded

18 status will be much less than anticipated when we get to 2023.

19 Q    Okay.  Are you familiar with the concept of pension

20 de-risking?

21 A    Yes.

22 Q    What is pension de-risking?

23 A    Pension de-risking is a strategy pursued by pension plans

24 whereby they attempt to reduce the investment risk in their

25 portfolios generally by moving money from the riskier asset

1  classes such as equities and alternatives into more safer

2  liquid investments such as treasury bonds and corporate bonds.

3  Q    Okay.  Given the projected investment returns that you

4  modeled for GRS and PFRS, do you think that a -- a mandated

5  6.75% investment return assumption will allow those two

6  retirement systems an opportunity for pension de-risking over

7  the next few year?

8         MR. WAGNER:  Same objection.

9         THE COURT:  The objection is overruled.  And I want

10  to make a record here that the Court is overruling these

11  objections because it's clear enough to the Court that this

12  testimony is elicited in response to, or in rebuttal to the

13  position apparently taken by the objectors in the cross

14  examination of the previous witness regarding the appropriate

15  discount rate.

16         MR. MILLER:  Thank you.

17  A    I believe that as of today --

18         THE COURT:  Excuse me.  I said discount rate, but I

19  meant investment return assumption.

20         MR. MILLER:  Thank you, Your Honor.

21  A    At this point today I think it's possible that working

22  with the systems to investment consulting firms, if they're

23  mandated to target the 6.75% investment return, it's possible

24  that they might be able to reduce the risk, at least a small

25  amount in the portfolio.

1       But again as we've discussed built into our capital

2  market assumptions is the expectation from economists that

3  interest rates will be rising over the next several years

4  which means that there should be opportunities down the road

5  for investing in then higher yielding fixed income.  So

6  there's an opportunity to move from those riskier assets such

7  as equities over to fixed income, safer assets, and still

8  achieve a 6.75% expected return.

9           MR. MILLER:  Thank you.  No further questions, Your

10 Honor.

11                    CROSS EXAMINATION

12 BY MS. PATEK:

13 Q    Good morning, Mr. Perry.  Barbara Patek of Erman,

14 Teicher, Zucker, and Freedman on behalf of the Detroit Police

15 Officers Association.

16      I just have a -- a few questions.  A lot of what you were

17 asked about dealt with the accrued benefit.  Are you familiar

18 enough with the plan to know that there are now two components

19 to the PFRS pension system that is one for the accrued

20 benefits and one for the benefit going forward?

21 A    Not really I'm not.

22 Q    Okay.  With --

23           THE COURT:  You have to be careful of our use of the

24 word plan with actuaries because they don't always understand

25 that when we use that word we mean plan of adjustment.

1        MS. PATEK:  Point well taken.

2  Q    When I -- I'm talking about the plan of adjustment.  And

3  Mr. Miller asked you a series of questions about the pension

4  settlements.  And is it your testimony that you are not

5  familiar with how employee -- active employees going forward

6  are being treated in terms of pension?

7  A    Not really, no.

8  Q    Okay.  In terms of the general things that you told us

9  about, de-risking and thinking about that -- that tank of

10 water, are there other ways -- well, are you familiar with the

11 concept of hybrid plans?

12 A    Generally, yes.

13 Q    And are those plans typically plans where the employees

14 in one way or another can share the risk of volatility or

15 de-funding with the plan sponsor?

16 A    That happens in some hybrid plans, yes.

17 Q    And one way as I understand am I correct, is one way that

18 can happen by having triggers that cause the employee

19 contributions to go up to the plan?

20 A    Well, that could be true.

21 Q    And would another way be potentially small cuts in the

22 otherwise defined benefit?

23 A    I haven't seen that.  And I'm -- I'm not a pension

24 actuary or a benefits consultant.

25        MS. PATEK:  That's all I have, Your Honor.

1      MR. WAGNER:  Your Honor, Jonathan Wagner from

2   Kramer, Levin on behalf of the COPS.  Also with me is Deb Fish

3   from Allard and Fish.  I have binders with documents I may

4   use.  May I distribute them?

5          THE COURT:  Yes, please.

6          MR. WAGNER:  May I proceed?

7                    CROSS EXAMINATION

8   BY MR. WAGNER:

9   Q    Mr. Perry, you were in Court yesterday when Ms. Kopacz

10  rendered the expert opinion that pension issues are mind

11  numbing.  You and I agree that she's wrong, right?

12  A    I'll give you that.

13  Q    Now let me just understand.  In your expert report all

14  you did was you took the asset distributions for PFRS and GRS

15  and you ran it through your model, correct?

16  A    Correct.

17  Q    Just to summarize a little -- or distill a little bit of

18  what Mr. Miller went through, the investment return assumption

19  forms the basis for the assumed asset returns for the

20  investments in the pension system -- in the pension plan,

21  right?

22  A    Generally, yes.

23  Q    Okay.  And the investment return assumption is also used

24  for measuring liabilities?

25  A    As a discount rate, yes.

1  Q     And you're not aware of any public pension fund that's

2  measured liabilities by discounting future payments at any

3  discount rate other than the assumed rate of return, correct?

4  A     It's possible that some systems by choice, the trustees

5  may want some conservatism in the assumption, so it might be

6  that their discount rate is set a little bit below, you know,

7  the expected return based on some expert's set of capital

8  market assumptions.

9  Q     But you're not aware of any, right?

10 A     I can't name any, but I'm --

11 Q     And it -- and it's standard practice in the -- in the

12 public pension field for the discount rate to be the same as

13 the investment rate, right?

14 A     The expected return, yes.

15 Q     And just a couple more basic points.  I'm right that the

16 funded status of a pension system decreases with -- with a

17 lower investment return?

18 A     Generally, yes.

19 Q     And the funded status of the system will increase with a

20 higher investment return?

21 A     Yes.

22 Q     Now are you familiar with the prudent investor standard?

23 A     Yes.

24 Q     And one can violate the prudent investor standard by

25 investing too aggressively, correct?

1  A    I would agree with that.

2  Q    One could also violate the prudent investor standard by

3  investing too conservatively, correct?

4  A    That's a matter of judgment.

5  Q    Well, can you answer yes or no whether one can violate

6  the prudent investor standard by investing too conservatively?

7  A    I would say it's possible in some circumstances, yes.

8  Q    Now you gave some testimony about the 7.2% rate that

9  Milliman recommended back in November 2013.  Do you recall

10  that testimony?

11  A    Yes.

12  Q    And you're giving an expert report for the litigation,

13  right?

14  A    Yes.

15  Q    And am I right that Milliman as far as you know never

16  attracted the letter setting out the 7.2% rate?

17  A    I'm not aware if they did or didn't.

18  Q    And to your knowledge there hasn't been any material

19  change in the asset allocation for the two funds, correct?

20  A    Not that I'm aware of.

21  Q    And just to orient us, your 30 year under your -- your

22  litigation expert opinion, you gave a -- a 30 year -- the 30

23  year median for GRS was 7.04?

24  A    I believe so.

25  Q    And for PFRS it was 7.12, correct?

1  A    I think so, yes.

2  Q    And am I right that Milliman's capital market assumptions

3  are more conservative than the largest public pension plans

4  when it comes to gauging the appropriate interest rate

5  assumption to attach to their asset allocations?

6  A    I can't say if that's true or not.

7  Q    You don't know whether that's true or not?

8  A    I don't.

9  Q    Can you look in your -- at your deposition?  It's in the

10 binder.  It's in your binder, sir, at Page 141, Line 19

11 through 20 -- 141, Line 19 through 142, Line 2.  Do you have

12 it there, sir?

13 A    Yes.

14 Q    Okay.  And --

15 A    And where on that line?

16 Q    I'm sorry.  Let me ask the following -- were you asked

17 the following question and did you give the following response

18 in those pages?

19      Question, and so Milliman in general was more

20 conservative than were the 100 largest pension plans when it

21 comes to gauging the appropriate interest rate assumption to

22 attach to those pension plans asset allocations, correct?

23 Answer, in terms of the real return assumption, yes, which is

24 described in the next couple of sentences, I believe.

25      Did you give that testimony back in July of 2014?

```
 1  A    I did.

 2  Q    And I'm right that if you raised -- I think you testified

 3  that the -- or Mr. Bowen testified that the inflation

 4  assumption used was 2.5%, right?

 5  A    Yes.

 6  Q    I'm right that if you raise the inflation assumption by

 7  50 basis points, you'd see close to a 50% increase in the

 8  investment rate assumption?

 9  A    A 50 basis point increase.

10  Q    Yes.

11  A    Not 50%.

12  Q    Yes, I'm sorry, 50 -- 50 basis points.

13  A    Approximately, yes.

14  Q    Okay.

15  A    It would go up about 50 basis points.

16  Q    You also gave some testimony that 6.75 fell within the --

17  fell within the range, the best estimate range?

18  A    Best estimate range.

19  Q    I'm also right that 7.9 and 8% fall within the range?

20  A    I believe that's true.

21  Q    Now when you prepared your report, sir, you didn't look

22  at historical rates of return for PFRS or GRS, did you?

23  A    Generally, no.

24  Q    Can you look at Exhibit 1017 in the book?  Now do you see

25  on the left side there is the actuarial assumed rate of return
```

1  for both GRS and PFRS and on -- and on the right side the

2  rates of return.  Do you see that?

3  A    Yes.

4  Q    And you didn't take this document into account when you

5  prepared your report, did you?

6  A    No.

7            MR. WAGNER:  Your Honor, I move Exhibit 1017 into

8  evidence.  It hasn't been objected to by anyone.

9            MR. MILLER:  No objection.

10           THE COURT:  One second, please.  1017?

11           MR. WAGNER:  Yes.

12           THE COURT:  That was admitted as part of the final

13 pre-trial order, so you're all set.

14           MR. WAGNER:  Yes, that's right.  Okay.  Okay.

15 Q    Now, I'm right, sir, that the PFRS asset allocation is

16 not particularly aggressive for a pension plan, correct?

17 A    No, it's pretty average.

18 Q    It's slightly towards the conservative side?

19 A    A little bit in a sense that they have lower equity

20 allocations, higher alternative asset classes.

21 Q    And the GRS plan is not particularly aggressive?

22 A    No, pretty average.

23 Q    And you testified at your deposition that those asset

24 allocations looked pretty typical?

25 A    Yes.

1  Q    And neither asset allocation stuck out as problematic to

2  you, right?

3  A    No.

4  Q    They don't look unusual in terms of what other large

5  public pension plans invest in, do they?

6  A    They do not.

7  Q    I want to explore an issue that you raised yesterday.

8  You gave the opinion, this is at Page 250, that 6.75 is low or

9  near the bottom compared to other public pension funds.  Do

10 you recall that testimony?

11 A    Yes.

12 Q    Can you look at in the book, Exhibit 1021?

13 A    Maybe I can.

14 Q    I hope the binder didn't fall apart.

15 A    It did, but --

16 Q    What is Exhibit 1021?

17 A    The Milliman 2012 public pension funding study.

18      (COPS' Exhibit 1021 was identified)

19 Q    And you're listed as a technical reviewer?

20 A    Yes.

21 Q    And you are -- you were -- that was accurate information,

22 right?

23 A    In the sense that -- that they're using our capital

24 markets models, yes.

25 Q    Okay.  And is -- is this a document that's distributed to

1  clients at Milliman?

2  A    I believe it is.

3            MR. MILLER:  Your Honor, I'm -- I'm sorry.  A copy

4  of 1021 was not in the binder.  Do you have an extra copy?

5            THE COURT:  You may proceed, sir.

6  Q    And what is the Milliman 2012 public pension funding

7  study?

8  A    They look at the 100 largest public pension funds in the

9  U.S. and tabulate statistics on funding status and I think the

10 expected return assumptions and --

11 Q    By the way is that document distributed beyond clients?

12 A    I believe it's on Milliman's web site, so --

13 Q    And you agree with me it's a reliable document?

14 A    Yes.

15 Q    And you would expect people would rely on it in the

16 field, right?

17 A    I hope they read it.

18 Q    You want them to rely on it, right?

19 A    Sure.

20 Q    Okay.  Now and you yourself saw no major problems or

21 concerns with respect to this study, right?

22 A    No major concerns.

23 Q    Would you agree with me, sir, that the GRS asset

24 allocation is pretty typical vis-a-vis the -- the large public

25 pension funds in the study?

 1    A    Yes.

 2    Q    Same thing with respect to PFRS?

 3    A    Pretty much.

 4    Q    Now can you look at Figure 8 in the study?  That's on

 5    Page 3.  If you could highlight Figure 8.  I'm right that in

 6    the -- in the Milliman study 95% of the plans had a -- had an

 7    interest rate assumption of -- return rate assumption of 7% or

 8    higher?

 9    A    Sounds right.

10    Q    And 85% had an interest rate assumption of 7.5% or

11    higher?

12    A    Okay.

13    Q    And 70% had an interest rate assumption of 7.7% or

14    higher, is that right?

15    A    Agreed.

16    Q    And what Milliman does because it's got a more

17    conservative model, is it rejiggers the interest the -- the

18    median interest rate assumption, right?  That's set out in the

19    100 largest pension plans?  I know I didn't phrase that

20    artfully, but is that essentially what's done?

21    A    I'd like to describe what it does.

22    Q    Sure.

23    A    And it's not because we have more conservative

24    assumptions.  We have -- we have assumptions.  And for some

25    plans, our assumptions are -- would lead to a higher discount

1 rate, for some lower.  On average they are lower.

2     But what -- what the authors of the study do, is they

3 take our essentially real return capital market assumptions,

4 so net of our inflation expectation, they add to that into the

5 systems separate inflation assumption, and arrive at that new,

6 I think they call it actuarial adjusted discount rate.  And

7 that's -- and that's what's used for these comparative

8 statistics.

9 Q    So is it fair to say that the -- the adjustment is

10 largely a function of the inflation rate you use?

11 A    Well, she's -- they're taking out that inflation

12 assumption.  But -- but generally yeah, the -- the difference

13 is an absolute discount rates is yeah, largely driven by

14 different inflation assumptions among the systems.

15 Q    Okay.  Can you look at Page 3 where you report

16 recalibrating the accrued liability.  These are on Page 3.

17 A    Figure --

18 Q    Do you see it on the right side recalibrating?  You can

19 look at it on the screen.

20 A    Oh, the paragraph, right.

21 Q    So there Milliman reports, "the median of the interest

22 rate assumptions reported by the plans in the study is 8% and

23 the weighted liability -- and the -- and the liability

24 weighted average is 7.8%".  And then you go on, sir, in the

25 report to describe the adjustment and you say, the median of

1  the resulting interest rates is 7.65%.  Do you see that?

2  A    Yes.

3  Q    And that's accurate information, correct?

4  A    Yes.

5  Q    Now can you look at in the book, Exhibit 1030?  Now this

6  is the 2013 Milliman study, right?

7  A    Yes.

8       (COPS' Exhibit 1030 was identified)

9  Q    Same reliability as the 2012 study?

10 A    Yes.

11 Q    You're a reviewer with respect to this study?

12 A    Our capital markets model was used.

13 Q    Again, nothing jumps out at you as problematic in this

14 study?

15 A    No.

16 Q    And nothing in the study you disagree with?

17 A    No.

18 Q    Now if you look at Page 1, the right side, the first

19 sentence, first full sentence.  The median interest rate used

20 by the plans in the study decreased from 8% in the 2012 study

21 to 7.75 in the 2013 study.  Do you see that?

22 A    Yes.

23 Q    And then you go on to describe the adjustment that

24 Milliman makes and the Milliman weighted average dropped the

25 average from 7.65 in 2012 to 7.47 in 2013.  Do you see that?

1  A    Yes.

2  Q    And can you turn to Figure 8 in this study?  That's on

3  Page 3.  Do you see that at the bottom -- the bottom left?

4  A    I'm sorry, figure --

5  Q    And that's Figure 4.  Now it's a little bit hard to read,

6  sir, but -- it's still true that about 95% of the -- I'm

7  sorry, about 95% of the hundred largest pension plans in the

8  Milliman study have an interest rate assumption higher than

9  6.75 -- of 6.75% or higher, right?

10  A    Appears that way, yes.

11  Q    And about 90% had an interest rate over 7%?

12  A    I believe so.

13  Q    Eight-five percent had an interest rate over 7.5 as best

14  you can tell there?

15  A    I'll trust your math.

16  Q    And would you agree with me, sir, that based on the

17  Milliman study that a large public pension plan that had an --

18  that had an investment return assumption of 6.75 would be at

19  the very low end?

20  A    Yes.

21          MR. WAGNER:  Your Honor, I move these two studies

22  into evidence.

23          THE COURT:  What are the numbers, sir?

24          MR. WAGNER:  10 -- 1021 and 1030.

25          MR. MILLER:  No objection.

1          THE COURT:  They are admitted.

2          (COPS' Exhibits 1021 and 1030 were admitted)

3    Q    Now let's turn to Exhibit 1036.  This is the public fund

4    study.  You've seen that before, right?

5    A    Yes.

6    Q    Now remember there was a little bit of confusion at your

7    deposition as to the exact date.  But we cleared that up,

8    right?

9    A    I believe so.

10   Q    Okay.  And if you look at the upper left, the date is

11   6-25-2004.  Do you see that?

12   A    Yes.

13   Q    And would you agree with me, sir, that the average

14   inflation rate used for the 126 plans in the study is 3%?

15   A    I see that.

16   Q    And would you agree with my math, again we went through

17   this at the deposition.  But only seven out of -- seven out of

18   the 126 funds here have an interest rate -- have a inflation

19   rate of 2.5% or lower, right?

20   A    That sounds familiar.

21   Q    And that's about 5%, right?

22   A    Right.

23   Q    And again the average rate of return for the 126 plans in

24   the study is 7.9%, right?

25   A    Yes.

1  Q    Were you in Court yesterday when Mr. Bowen -- when I went

2  through with Mr. Bowen the Milliman clients who are listed

3  here?

4  A    Yes.

5  Q    And you identified a couple of other Milliman clients on

6  the list.  I think you identified Iowa PFR -- Iowa PRS?

7  A    They're not longer a Milliman client.

8  Q    Oh, I'm sorry.  Were they a client -- I'm sure no

9  reflection on the excellent Milliman witnesses.  Well, when

10  was the last time Iowa PRS was a client?

11  A    About two years ago probably.

12  Q    Okay.  Can you look at -- can you look on the chart and

13  see that the investment rate assumption for Iowa PRS was, this

14  is as of June 30, 2012, 7.5%?  Do you see that?

15  A    Yeah, let me find it here.  Yes.

16  Q    And the inflation rate assumption was 3.25%?

17  A    Yeah, I see that, yes.

18  Q    You also identified Minnesota as a Milliman client.  Is

19  that still a client?

20  A    I -- I actually don't know if they are or they're not.

21  Q    Okay.  But you identified it yesterday as a client,

22  right?

23  A    In the past it was a client.

24  Q    Okay.  And can you look at Minnesota on the chart, number

25  -- number 56.  And for Minnesota the return rate, this is as

1  of June 30, 2012 was -- was 8%, right?

2  A    I see that.

3  Q    And the inflation rate was 3%?

4  A    Yes.

5  Q    By the way just above you see the Michigan entities,

6  right?

7  A    Yes.

8  Q    Fifty-three, 54, 55.  And the rates for the Michigan

9  entities are 8%, right?

10  A    Yes.

11  Q    And the inflation rates vary from 3.5 to -- to 4.5%,

12  right?

13  A    Yes.

14  Q    Now would you agree with me, sir, that based on the

15  survey that 2.5% inflation rate that you used as an outlier?

16  A    It's an outlier in the sense that these systems are

17  reporting higher assumptions as a component to the discount

18  rate that they're using in their pension valuations.

19  Q    I just want to make clear, the inflation rate, the 2.5

20  inflation rate is an outlier with respect to the funds listed

21  in the survey, correct?

22  A    The average is 3, we're using 2 1/2.

23  Q    And again 2 1/2 is at the very bottom, right?  Seven out

24  of 126?

25  A    You're at the bottom, yes.

1  Q     And the 2.5 is an -- is an outlier even with respect to

2  the Milliman -- even with respect to the funds for which

3  Milliman is the actuary, correct?

4  A     That could be.

5  Q     It is, right?

6  A     I'd have to tabulate again, but yeah, it looks like it

7  would be, yes.

8  Q     So the inflation rate you're using is outside the

9  mainstream, isn't it true?

10  A     I disagree.

11  Q     Can you look at your deposition, Page 207, Line 19 to 25?

12  A     207 did you say?

13  Q     207, Line 19.  Were you asked the following question and

14  did you give the following answer?  Question, so the inflation

15  rate you're using or the inflation rate in your report is

16  outside the mainstream, is it not?  Answer, yeah.

17      And then we went on to discuss the issue of the timing of

18  the report which we cleared up.  Did you give -- were you

19  asked that question and did you give that answer two months

20  ago?

21  A     Yes.

22  Q     Now you gave some testimony about your expect -- or

23  Milliman's expectation of rising interest rates.  Do you

24  recall that testimony?

25  A     Yes.

1  Q    And that had an impact on your calculation -- on

2  Milliman's calculation, correct?

3  A    Yes.

4  Q    Now interest rates have been low for the past few years,

5  right?

6  A    Yes.

7  Q    But based on the chart public pension plans have been

8  using an inflation rate of higher than 2.5%, correct?

9  A    Yes.

10  Q    Now you're predicting higher interest rates, right?

11  A    Yes.

12  Q    But you're using an inflation rate which I think you

13  yourself said has been lowered from what it was a couple years

14  ago, correct?

15  A    Yes.

16  Q    Just a little bit more, sir.  Can you turn to in the

17  book, Exhibit 10164?  This is the NASRA issued brief which was

18  admitted yesterday.  You're familiar with NASRA?

19  A    Somewhat.

20       (COPS' Exhibit 10164 was identified)

21  Q    You've seen this study before?

22  A    I probably have.

23  Q    And it's -- the NASRA brief is sponsored by the National

24  Association -- or it is the National Association of State

25  Retirement Administrators and the National Council on Future

1  Retirement, right?

2  A    Right.

3  Q    By the way, the PFS, the public funding studies that we

4  looked at, they come from NASRA, right?  Are you aware that

5  they come -- they're prepared by NASRA.

6  A    Not the Milliman study.

7  Q    No, right.  The -- the public fund studies come from

8  NASRA.

9  A    Correct.

10  Q    Okay.  And you would not expect errors in the NASRA

11  study, right?

12  A    I would not.

13  Q    Now can you look at Figure 1 on the first page?  Do you

14  see --

15        THE COURT:  I'm sorry, what exhibit number did you

16  say this is?

17        MR. WAGNER:  10164.  Yeah, just confirming it was --

18  it was admitted yesterday.  Okay.  I move -- I move its

19  admission.  I had thought it was admitted, but --

20        MR. MILLER:  We have no objection.

21        THE COURT:  All right.  10164 is admitted.

22  Q    Now can you look at Figure 1?  Now this is the --

23        MR. MILLER:  Your Honor, excuse me for a moment.

24  Your Honor, I'm reminded that Mr. Wagner attempted to

25  introduce this into evidence yesterday and it -- and we

 1 objected and it was sustained.  And we maintain that

 2 objection.

 3          MR. WAGNER:  Well, two things.  One, I -- I may be

 4 misremembering, but I thought it was admitted, but what I

 5 couldn't do was ask the witness about the -- about the

 6 document because he was not an expert.  But in any event now I

 7 have an expert.  He's familiar with the public fund study,

 8 he's familiar with this study.  So I believe it's already been

 9 admitted, I'd like to --

10          THE COURT:  It has not been admitted.  When asked if

11 you were seen -- if you had seen this before your answer was

12 probably.  Does that mean you don't remember?

13 A    I don't know.  There are a lot of these kinds of studies

14 that NASRA puts out and we've looked -- we've looked at two

15 already here, so --

16          THE COURT:  Objection is sustained.

17          MR. WAGNER:  Your Honor, can I just pursue this for

18 a minute or two?  With -- not the document, but whether he's

19 seen it?

20          THE COURT:  Yes.  Yes, you can -- you can try to lay

21 a foundation.

22 Q    Sir, have you seen this document before?

23 A    I honestly can't say yes.  The problem is when a lot of

24 these are issued, you get an email alert, and it has a

25 headline or two about the survey and sometimes you click and

1  go look at it and sometimes you just read sort of the headline

2  news about it.  I may have seen that.  I don't know if I -- if

3  I looked at this specifically.

4  Q    Can you turn to your deposition, Page 164?  Were you

5  asked -- do you have it there, sir?

6  A    Yes.

7  Q    Were you asked the following question and did you give

8  the following answer?  Mr. Perry, have you seen this document?

9  Answer, I believe I have.  Did you -- did you give that

10 testimony two months ago?

11 A    I did.

12 Q    And you would not expect errors in a NASRA study, would

13 you?

14 A    I would not.

15 Q    And people at Milliman have probably studied the report?

16 A    Some certainly have.

17 Q    And you would expect that it would be reliable coming

18 from NASRA?

19 A    Yes.

20 Q    And you would expect that people would rely on it, right?

21 The same way they rely on the Milliman report, correct?

22 A    Correct.

23         MR. WAGNER:  Your Honor, I move the admission of the

24 document under 803(17).  It fits all the criteria.

25         THE COURT:  Is it your representation to the Court

1  that in your deposition question when you referred to this

2  document, you were referring to exhibit -- what is now Exhibit

3  10164?

4           MR. WAGNER:  Yes, I believe so.  Yes.

5           MR. MILLER:  It's still hearsay, Your Honor.

6           MR. WAGNER:  Well, it fits the hearsay exception,

7  803(17).  Yes, it's hearsay, but it fits the exception.

8           THE COURT:  What's your response to that, sir?

9           MR. MILLER:  We have no objection, we'll let it in.

10          THE COURT:  All right.  The document is admitted.

11     (COPS' Exhibit 10164 was admitted)

12  Q   Okay.  So let's go back to the chart.  Am I right that

13  NASRA reports that over the past 25 years the average rate of

14  return for the largest public pension funds has been -- has

15  been 9%?

16  A    Yes.

17  Q    And for the past five years the returns have been 12.5%?

18  A    Yes.

19  Q    And even for the past ten years which includes the great

20  recession, it's been 7%?

21  A    Yes.

22  Q    Now, can you look to the right of the chart.  Do you see

23  that NASRA states, an investment return assumption that is set

24  too low will overstate liabilities and costs causing current

25  taxpayers to be overcharged and future taxpayers to be under

1 charged.  Do you see that?

2 A    Yes.

3 Q    And the -- the NASRA brief goes on to state, an

4 assumption that is significantly wrong in either direction

5 would cause a misallocation of resources and unfairly

6 distribute costs among generations of taxpayers.  Do you see

7 that?

8 A    I do.

9 Q    And you agree with that statement?

10 A    Generally, I don't disagree with it.

11 Q    Is that another way of saying you agree?

12 A    Well, frankly as Mr. Bowen explained yesterday, the, you

13 know, actuarial funding methods and formulas have a lot to do

14 with -- with, you know, inter generational equity issues and

15 things like that.

16 Q    And just going back to the public fund studies, I'm right

17 that interest rates higher -- I'm sorry, inflation rates

18 higher than 2 1/2% are the industry practice?

19 A    That's what we see in this NASRA study as being built

20 into the discount rate assumption that very large pension

21 plans are using.  I wouldn't say it's industry standard among

22 professional investment consultants.  That's 2 1/2 or lower.

23 Q    Well, it's the industry standard amongst the 126 largest

24 pension plans, right?  The industry standard being --

25 A    Or it's 2.58.

1  Q    2.5 is below the industry standard based on those 126

2  funds, correct?

3  A    As a discount rate component.

4  Q    Okay.  Now again, now I have only a couple of questions.

5  You were asked to do a ten year and a 30 year analysis,

6  correct?

7  A    Correct.

8  Q    And you don't know why you were asked to do ten and 30,

9  right?

10  A    Not specifically.

11  Q    That was done at the direction of the lawyers?

12  A    Yes.

13  Q    And you don't have an opinion as to what the proper

14  period to measure is, correct?

15  A    Based on the plan of adjustment and that we were

16  discussing, that -- and contributions are being fixed and they

17  are supposed to be assuming and targeting an investment return

18  assumption of 6.75 through 2023, that certainly correlates to,

19  you know, a ten year outlook as opposed to 30.

20  Q    Sir, you have no opinion whether ten, or 30, or 75 years

21  would be appropriate, correct?

22  A    Appropriate for what purpose?

23  Q    For this purpose, for the purpose we're here.

24  A    There are multiple purposes for why we're here.

25  Q    Can you turn to your deposition, Page 57?  Fifty-seven,

1  Line 2. Do you have it there, sir?

2  A    Yes.

3  Q    Were you asked the following questions at your deposition

4  two months ago and did you give the following answers?

5  Question, you have no opinion as to whether a ten year

6  measurement period, or a 30 year measure period is more

7  appropriate, correct? Answer, not in this case, no.

8       Question, and you have no opinion as to whether a ten

9  year period or a 75 year period would be more appropriate,

10 correct? Answer, I do not.

11      Question, and you have no opinion as to whether a 30 year

12 measurement period or a 75 year measurement period would be

13 correct in this case, correct? Answer, I do not.

14      Did you -- were you asked those questions and did you --

15 did you give those answers at your deposition?

16 A    Yes.

17 Q    And by the way you didn't do a 75 year analysis, right?

18 A    No.

19 Q    Mr. Bowen did a 75 year analysis, right?

20 A    Not really.

21 Q    Well, wasn't 75 years listed in his -- in his letters?

22 A    Right. But all of his numbers as is our standard

23 practice, that's built into the capital market's model based

24 on a 30 year investment horizon.

25 Q    Were you in Court yesterday when Mr. Bowen said that the

1  75 year analysis with respect to his letters was the most

2  appropriate analysis?

3  A     Yes.

4  Q     And you had no discussion with Mr. Bowen about his use of

5  the 75 year analysis, correct?

6  A     No.

7  Q     You had no discussion with Mr. Bowen about any period of

8  time -- why he was using any period of time, right?

9  A     No.

10 Q     And you worked on -- you work in the same office as he

11 does, right?

12 A     Yes.

13 Q     You never walked over to ask him?

14 A     No.

15 Q     He's been working on this matter a lot longer than you

16 have, right?

17 A     Yes.

18 Q     You would defer to Mr. Bowen as to what the appropriate

19 period of time to use would be, correct?

20 A     I would.

21 Q     Now, let's address a couple of questions about the risk

22 free rate.  You're not aware of any actuarial firm that uses

23 the risk free rate for valuation purposes, correct?

24 A     For public funds?

25 Q     Yes.

1  A    No, I'm not.

2  Q    And you're not aware of any actuarial firm that uses the

3  risk free rate for any purpose for public pension funds,

4  right?

5  A    Only to the extent that under new government accounting

6  standards it's -- it's possible that for under funded plans,

7  you may have to use a municipal bond yield.  But that's for

8  accounting disclosures generally not for funding purposes.

9  Q    Yeah, let me just rephrase my question.  You're not aware

10  of any actuarial firm that actually uses the risk free rate

11  for any purpose for public pension funds?

12  A    Not for funding purposes, no.

13  Q    And you've never used the risk free rate for any

14  purposes?

15  A    For public funds, no.

16  Q    And as far as you know, Milliman did not -- does not use

17  the risk free rate of returning -- calculating a return rate?

18  A    For public funds, no.

19  Q    You've heard of Gabriel, Roeder, Smith?

20  A    Yes.

21  Q    Are you aware that Gabriel, Roeder has been the actuary

22  for the Detroit pension funds for the last 70 years?

23  A    Yes.

24  Q    Did you speak to anyone at Gabriel, Roeder in connection

25  with your assignment in this case?

1  A    No.

2  Q    Would you agree they're a respected actuarial firm?

3  A    I would.

4  Q    They have been around for a long time?

5  A    They have.

6  Q    And they have a lot of experience with respect to these

7  two pension funds?

8  A    I would think so, yes.

9  Q    Now they -- Gabriel, Roeder used rates of 7.9 and 8%,

10 right?

11 A    That's my understanding.

12 Q    By the way the 7.9 and 8 would fall within your range --

13 your range, correct?

14 A    At the extreme end, yes.

15 Q    Now did you ever call up Gabriel, Roeder and ask why they

16 were using 7.9 and 8%?

17 A    No, I did not.

18 Q    Right, the thought never occurred to you?

19 A    It did not occur to me.

20 Q    Just now I really only have two more questions.

21 A    I've made a mess of your binder, I'm afraid.

22        MR. WAGNER:  Your Honor, depending on the answers.

23        THE COURT:  Right.

24 Q    Sir, if this plan is approved, then the cash

25 contributions to the plans would be known up through the end

1  of 2023, correct?

2  A    That's my understanding, yes.

3  Q    So GRS and PFRS would have a nine year horizon before

4  they face any variable contributions, correct?

5  A    Yes.

6            MR. WAGNER:  Nothing further.

7                      CROSS EXAMINATION

8  BY MR. BRILLIANT:

9  Q    Good morning, Mr. Perry.  Alan --

10           MR. BRILLIANT:  For the record, Alan Brilliant on

11  behalf of Macomb Interceptor Drain -- Drain District.

12  Q    I just have a few questions.  Mr. Perry, you had no role

13  in selecting the 6.75% investment return assumption, isn't

14  that correct?

15  A    No.

16  Q    And in fact when -- when you were first asked to run your

17  model, with respect to this, the 6.75% investment return

18  assumption had already been selected, isn't that right?

19  A    I believe so, yes.

20  Q    Now you were asked a couple of questions -- or several

21  questions by Mr. Wagner in connection with the -- the Milliman

22  fund analysis reports.  Do you recall that?  Those are

23  Exhibits 1021 and 1030.

24  A    Yes.

25  Q    And he asked you some questions about what was referred

1  to as the interest rate assumptions.  Do you recall that?

2  A    Yes.

3  Q    And as used in the Milliman report, the interest rate

4  assumption is the same as the -- the investment return

5  assumption that we talked about in connection with the 6.75%,

6  isn't that right?

7  A    Yes.

8          MR. BRILLIANT:  I have no further questions.

9          MR. MILLER:  Would you please put COPS Exhibit 1030

10  on the screen?  And turn to Page 6 of that exhibit.  And can

11  you blow up the chart that's entitled asset volatility ratios?

12  I believe it's Figure 13.  Yes.

13                    REDIRECT EXAMINATION

14  BY MR. MILLER:

15  Q    Mr. Perry, what is an asset volatility ratio?

16  A    It's the ratio of the pension plans' assets, the market

17  value of their assets and the payroll -- the payroll of the

18  active members in the plan.

19  Q    And what does an asset volatility ratio indicate about

20  pension contribution risk?

21  A    It gives a measure of -- of the -- the impact on

22  contributions measured as a percentage of payroll from

23  volatility to the market value of assets.  So high volatility

24  and market value of assets spread over an amount of payroll is

25  a measure of what the likely impact is going to be on

1  contributions depending on how much they would be smoothed.

2  Q    So what is the consequence of a high asset to volatility

3  ratio?

4  A    High contribution volatility.

5  Q    And did you happen to plot the asset volatility ratio for

6  the PFRS plan?

7  A    Yes.

8  Q    And -- and what did you plot as an asset volatility

9  ratio?

10 A    It's close to ten.

11 Q    And where would that be on this chart?

12 A    Just off the right end.

13 Q    And did you plot the asset volatility ratio for GRS?

14 A    Yes.

15 Q    And what would that asset volatility ratio be?

16 A    It was approximately 15.

17 Q    And where would that be on the chart?

18 A    Way to the right of the chart.

19        THE COURT:  I'm sorry, say that again?

20 A    Way to the right, off the scale.

21 Q    Are you familiar with the ratio of retirees to active

22 participants in the PFRS plan?

23 A    Roughly, yes.

24 Q    And what is that ratio?

25 A    I believe it's about 2 to 1.

1  Q    And what is the approximate ratio of retirees to active

2  participants in the GRS pension plan?

3  A    I believe it's about the same.

4  Q    That is?

5  A    Two to 1.

6          MR. WAGNER:  Your Honor, I -- I object.  I believe

7  -- I believe this is beyond the scope of the cross.

8          THE COURT:  Overruled, go ahead.

9  Q    Do you have any general understanding of the comparative

10  size of the PFRS and GRS liabilities in 75 years as compared

11  to today?

12  A    I don't understand.

13  Q    The size of the -- as a consequence of the ratio of

14  retirees to actives, what is likely to be the size of the

15  liabilities of these two pension funds in 75 years in

16  comparison to what they are today?

17          MR. WAGNER:  Objection, Your Honor.  There's nothing

18  about this in the expert report.

19          THE COURT:  Overruled, go ahead.

20  A    It would be minuscule.  It would be just a handful of

21  members left in 75 years.

22          MR. MILLER:  Thank you.  No further questions.

23          MR. WAGNER:  Just a couple of --

24                     RECROSS EXAMINATION

25  BY MS. PATEK:

1  Q    Mr. Perry, Barbara Patek again.  Very briefly.  And I

2  don't -- this may be outside your expertise, but is the city's

3  insolvency itself a reason for the city to consider a more

4  conservative investment return assumption with respect to its

5  pension plans?

6          MR. WAGNER:  Objection, beyond the scope.

7          MS. PATEK:  Your Honor, they're -- they're -- put up

8  all this evidence about how all the other plans have much more

9  aggressive assumptions.  I think this is --

10          THE COURT:  I'll permit it.  Can you answer that

11  question?

12  A    I have an opinion.

13          THE COURT:  Go ahead, sir.

14  A    Again, it came up in yesterday's testimony a bit.  I mean

15  generally we measure the ability of the plan sponsor to take

16  investment risk by the financial strength of the plan sponsor.

17  The city is going through bankruptcy, so I would assume that

18  that financial strength is -- is rather weak and that would --

19  that would lead me to think that a more conservative

20  investment policy would be less risky for the city.

21  Q    And then a second question.  I want you to assume for the

22  -- the records we talked a little bit about hybrid plans.

23  That going forward the active police and firefighters in

24  addition to their accrued benefit under the old plan will be

25  subject to a hybrid plan that contains certain triggers or

1  levers that cause their employee contributions to increase in

2  1% intervals if the plan does not meet certain funding levels.

3  If that's the case and the city were -- and the city chooses a

4  too aggressive investment return assumption, who is going to

5  pay for that?

6  A   I'm not familiar enough with the -- the hybrid parameters

7  to really answer that.

8  Q   Would it be the employees if they -- if their

9  contributions went up -- or if their --

10          THE COURT:  He said he can't answer that.

11          MS. PATEK:  Okay.

12  A   Sorry, I can't answer that, sorry.

13                    RECROSS EXAMINATION

14  BY MR. WAGNER:

15  Q   Last time, Mr. Perry.  I may never see you again.

16  A   You may never -- you may never get this binder back

17  together.

18          THE COURT:  All right.  After I ask my questions, I

19  won't hold you to that last commitment you just made.

20  Q   Milliman has been doing work for the city for the last

21  two and a half years, right?

22  A   That sounds right.

23  Q   And during those two and a half years, Milliman has never

24  made any recommendations to the city about the asset

25  distribution in its pension -- in its two funds, correct?

```
 1   A     Asset allocation recommendations?

 2   Q     Yes.

 3   A     No.

 4   Q     Can you put up Exhibit 1030 again?  First page, bottom

 5   right.  There's some hard to read funding status information.

 6   But if you look the funding ratio using the market value of

 7   assets in 2013, I feel like I'm in an opthalmologist's office.

 8   68.5% and 66% using market value of assets, right?

 9   A     It just finally popped up on this page.

10   Q     Do you see that?

11   A     Where are you?

12   Q     Sixty-eight and 66.8.  Do you see that it's blown up on

13   this screen?

14   A     Yes.

15   Q     You see that?

16   A     Yes.

17   Q     And calculated using an actuarial value of assets, it's

18   72.4 and 70.6% for the 100 largest pension funds.  Do you see

19   that?

20   A     That's the left hand side?

21   Q     Yes.

22   A     Yes, yes.

23          MR. WAGNER:  Thank you.

24          THE COURT:  What's that exhibit number again, sir?

25          MR. WAGNER:  That's 1030.
```

1            THE COURT:  Any more questions for the witness?

2            MR. WAGNER:  No.

3            THE COURT:  Stand by, please.  A moment ago you were

4   asked about asset volatility ratio.

5   A    Yes.

6            THE COURT:  And you testified that the asset

7   volatility ratios of Detroit's two pension plans were off to

8   the right past the right hand edge of that chart you were

9   shown.  Do you recall that?

10  A    Correct, correct.

11           THE COURT:  What is the significance of the fact

12  that the two asset volatility ratios of Detroit's plans are

13  off the right hand end of that chart?

14  A    It means compared to you know, the other -- the other

15  plans in the study, you know, the other -- well, compared to

16  the 100 plans in the study, I don't believe that -- that these

17  two systems are in the study.

18       Asset volatility is going to be much more strongly felt

19  in the Detroit systems than it is with these average other

20  plans because of the very small payroll base, assuming the

21  contributions --

22           THE COURT:  Because of what?

23  A    The very low payroll base of the active members in the

24  plan.  That's a metric approxy for -- for what the impact

25  would be, you know, after smoothing and other things that go

1  in.  That if -- if -- if contributions have to be made to fill

2  in for -- for low to actual realized returns, lower than the

3  expected return assumption, that those would be spread over,

4  you know, the payroll.  So that's a -- that's a fill in for

5  what the contribution impact would be, so a high ratio means

6  very high contribution impact from asset volatility.

7           THE COURT:  And what does the phrase asset

8  volatility mean?

9  A    It's the -- the -- the volatility and returns, you know,

10 from year to year.  Also over long periods of time.  So again

11 generally as we discussed, asset allocations with more risky

12 assets, more equities, more private equity hedge funds are

13 expected to have more -- more volatility, wider swings in

14 their returns.  High positive returns, high negative returns.

15 And compared to a more conservative portfolio that -- that

16 would have more fixed income and less equities and

17 alternatives.  So the swings would be -- would be smaller.

18           THE COURT:  What is your understanding of what the

19 unfunded accrued actuarial liability of the two Detroit

20 pension funds is?

21 A    In dollars?

22           THE COURT:  Yes.

23 A    I -- I don't recall.  I -- I saw Mr. Bowen's testimony

24 yesterday, but they're -- they're large numbers.

25           THE COURT:  Okay.  Do you have an understanding --

1 | can I use the -- the -- the acronym UAAL?

2 | A    Yes.

3 |         THE COURT:  What is your understanding of the UAAL

4 | in total for all public pension plans in this country?

5 | A    That also is a very very large number.  And I don't know

6 | off the top of my head what it is.

7 |         THE COURT:  Does it concern you that it's a large

8 | number?

9 | A    It does concern me.

10 |         THE COURT:  What about it concerns you?

11 | A    It's going to be hard to close -- to close that gap.  I

12 | mean, you know, Milliman works for lots of public systems and

13 | they're all struggling to -- to close that gap.  And -- and --

14 |         THE COURT:  To you it's important that that gap be

15 | closed?

16 | A    Very important.

17 |         THE COURT:  Why?

18 | A    If it gets to the point of, you know, beyond which

19 | there's any reasonable way that -- that municipalities and --

20 | and states could close that gap, then, you know, other

21 | municipalities may find themselves in the situation we're in

22 | today.

23 |         THE COURT:  Do you have any opinion on what factors,

24 | what the more important factors are that may have contributed

25 | to that very large total UAAL in this country for public

1 pensions?

2 A    Not -- not putting these in order of -- of importance or

3 magnitude.

4         THE COURT:  Okay.

5 A    But it's been a combination of lower returns than

6 expected that were built into the -- to the funding formula.

7 What I call the policy of -- of essentially believing that

8 investment gains were permanent and losses were temporary.

9 Certainly there's been a history with pension plans and not

10 just public plans where when they get ahead of their -- their

11 funding schedule they -- they tend to treat that as -- as

12 permanent and perhaps increase benefits or reduce

13 contributions.

14        And then as we say what -- you know, what the markets

15 giveth they taketh away.  So a markets swing back the other

16 way.  They're now on the hook for -- for those greater

17 benefits or -- or the, you know, money went out of the trust

18 and that has happened to a great degree over the years.

19        THE COURT:  I'm interested in your first response

20 which was lower returns than expected.  Is it your view that

21 if the practice in the industry had been to set lower -- to

22 set a lower investment return assumption than they had

23 actually set, the UAAL for the country would be lower?

24 A    It would be if they didn't -- if they didn't give away

25 some of those gains or, you know, if they -- if they got fully

1 funded that, you know, money wasn't moved away from the

2 pension systems for other purposes.

3          THE COURT:  Uh-huh.

4 A    But yes, they would be better funded because

5 contributions would have been higher.

6          THE COURT:  So in your view is it -- is it fair to

7 conclude that the standard practice in the industry that has

8 led to setting whatever investment return assumptions have

9 been set, has been part of the cause of the UAAL that public

10 pensions in this country are now struggling with?

11 A    Yes.

12          THE COURT:  Does the industry have any concern about

13 that?

14 A    Speaking on behalf of the industry, yes, I believe they

15 do.  It's --

16          THE COURT:  Well, but what I -- what I mean by that

17 and perhaps that was too broad a question.  Is the industry

18 doing anything about re-examining its standard practices in --

19 in setting investment return assumptions to deal with this

20 very large as you characterized it, UAAL?

21 A    Yes, Your Honor, it's a -- it's -- there's always a

22 careful dialogue taking place, you know, with us, with

23 Milliman, and with other major consulting firms with all their

24 pension clients, but particularly their public clients.

25          As we've seen investment return assumptions, you know,

1 several years ago and for some systems today are let's say up

2 at 8% and in fact I can say Milliman's capital market

3 assumptions maybe 15 years ago would have been up at 8%.  But

4 interest rates were higher, inflation actually was higher,

5 yields on equities were higher.

6      And so that got to be sort of the level and -- and

7 everybody got used to that kind of assumption and long term

8 budgets were based on those kinds of returns.

9      Then interest rates which really have been falling in

10 general all the way back to about 1981 when we -- we had, you

11 know, after static inflation and what not, treasuries were up

12 in the high teens and they've really been falling almost

13 continuously to today.  And now with the intervention from the

14 fed over the last five years, you know, that -- that threw

15 fire on these markets and they've been -- bullied up markets,

16 but -- so there's been a battle as interest rates have been

17 falling and falling and falling.

18      Inflation expectations have been falling.  Equity prices

19 have been rising which is reducing their prospective expected

20 returns.  You have to pay more to buy the same stocks.

21 Investment consultants are, you know, working with their

22 public plan sponsors putting lower capital market assumptions

23 in front of them and saying, you know, 8 is not longer our

24 best estimate assumption.

25      And generally if you walk in to a pension trustee's

1  meeting and say, our best estimate is no longer 8, it's 7, you

2  don't get them to move from 8 to 7.  You know, you feel good

3  if you can get them to move from 8 to 7 3/4.  And then you

4  keep fighting the fight.  A couple years later you may get

5  them to move down to 7 1/2.

6       We looked at the Milliman pension funding studies and

7  that's one of the first things we report, that this average is

8  slowly coming down, you know, towards the kinds of

9  expectations that professional investment consultants are --

10 are developing and putting in front of their clients.

11          THE COURT:  Uh-huh.  Do you have an opinion on

12 whether the 6.75% investment return assumption in this case is

13 prudent?

14 A    Prudent.  I think again based on -- on my report, noting

15 that our single best estimate, I believe at least for the --

16 the ten years if that's what we're talking about, six five two

17 and six five eight, noting that those are slightly below

18 6.75%, they're within less than a quarter of a percent.  So I

19 would regard 6.75% as being a reasonable assumption with

20 respect to actuarial standards.

21          THE COURT:  Uh-huh.

22 A    At the moment I wouldn't consider -- I mean it's prudent

23 in that sense.  If prudence in this situation requires

24 conservatism, and I'm not really in a position to answer that,

25 you know, then perhaps it's -- it's not quite as prudent as

1   something else.  But on the other hand, you know, it is -- it

2   is -- it is very close to our best estimate as to what, you

3   know, this kind of asset allocation in these two systems is

4   expected to return.

5                THE COURT:  Are you telling me that given Detroit's

6   insolvency your -- your view might be that prudence would

7   suggest an even lower rate?

8   A    Yeah, that could be true.

9                THE COURT:  No further questions.  Any further

10  questions of the witness?

11               MR. WAGNER:  Yes, I have a couple of questions.

12               THE COURT:  Go ahead.

13                           RECROSS EXAMINATION

14  BY MR. WAGNER:

15  Q    Mr. Perry, in response to Your Honor -- to the Court's

16  questions, you gave some testimony about asset volatility,

17  correct?

18  A    Yes.

19  Q    You presented no calculations here supporting your

20  opinions, have you?

21  A    On asset volatility?

22  Q    Yes.

23  A    Well, the volatility, our estimate of the volatility in

24  the portfolios is in the report.

25  Q    I'm -- I'm asking did you present any numbers today or

1  yesterday concerning asset volatility?  Did you do an analysis

2  that was presented about asset volatility?

3  A    We estimated the volatility of the portfolios.  It's in

4  the report.  I -- I stated them yesterday.

5  Q    And you would agree with me that nothing about the PFRS

6  or GRS asset allocations stuck out as problematic in your

7  mind, right?

8  A    Not compared to other large public funds.

9  Q    I'm right that what an actuary does is look at the long

10 term, correct?

11 A    Short term, intermediate term, and long term, yes.

12 Q    Okay.  And we saw on the charts that were put up earlier

13 today, that over the past 25 years the return rate put the

14 largest public pension funds over the last 25 years has been

15 9%, right?

16 A    That may have been the number.

17 Q    And that's by my math 2 1/4% higher than 6.75, correct?

18 A    Yes.

19          MR. WAGNER:  Nothing further.

20                    RECROSS EXAMINATION

21 BY MR. BRILLIANT:

22 Q    Mr. Perry, I believe you testified earlier that the asset

23 allocation for the GRS plan and the PFRS plan are pretty

24 typical of other large public pension plans, is that right?

25 A    They are.

1  Q    So the volatility with respect to the investment returns

2  of the asset is going to be pretty typical with respect to

3  those other -- relative to other the funds, isn't that right?

4  A    I would agree.

5  Q    And so when you talk about your asset allocation

6  volatility chart, the -- the reason that the Detroit

7  volatility might be higher is because it's a frozen plan at

8  this point and there's not going to be any more contributions

9  from employees, isn't that right?

10 A    No.  That that -- that's a very simple metric.  It's not

11 even measuring the volatility of individual plans, it's just

12 measuring the market value of assets and it's divided by the

13 payroll of the plan.  So it's -- it's -- you know, it's a

14 simple metric equating as a volatility irrespective of what an

15 asset allocation is to contribution impacts.

16 Q    But in terms of the volatility with respect to

17 investments the Detroit investment return volatility is no

18 different than any of the other, you know, large funds that

19 have similar asset allocations, isn't that right?

20 A    I would expect it to be close to the average of the other

21 large plans since it's about average.

22 Q    And isn't it true, Mr. Perry, that you've done no

23 analysis to determine what the most appropriate investment

24 return assumption would be within the ranges that are in your

25 report, isn't that right?

1 A    Only if the most appropriate for whatever purpose is

2 going to be other than the best estimate.

3 Q    Can you turn to your deposition on Page 52, Line 7?  Are

4 you there, sir?

5 A    Yes, yes.

6 Q    Do you remember at your deposition being asked the

7 following question and giving the following answer?  You have

8 not done any analysis to determine where within the ranges you

9 provided the most appropriate investment return assumption

10 would be, correct?  Answer, no, not for Detroit.

11    Was that a question you were asked and the answer that

12 you gave?

13 A    Yes.

14         MR. BRILLIANT:  No further questions.

15         THE COURT:  Anything further for the witness?  No?

16 All right.  Sir, you are excused.  Thank you very much for

17 coming today.

18    (WITNESS ALAN PERRY WAS EXCUSED AT 9:52 A.M.)

19         THE COURT:  Let's take our morning recess now and

20 reconvene at ten minutes after 10:00.

21         THE CLERK:  All rise.  Court is in recess.

22    (Court in Recess at 9:53 a.m.; Resume at 10:12 a.m.)

23         THE CLERK:  All rise.  Court is in session.  Please

24 be seated.

25         MR. IRWIN:  Good morning, Your Honor.  Geoff Irwin,

1  Jones, Day for the city.  The city will be interrupting its

2  presentation on pensions and actuarial assumptions.  As Mr.

3  Cohen indicated, recent events and other scheduling

4  considerations require us to put an art witness on now which

5  we intend to do.  We would call Ms. Vanessa Fusco.

6      Your Honor, I have delivered some binders.  I've placed

7  one on the witness stand and I've delivered some binders right

8  here on the table.

9          THE COURT:  Thank you.  Please raise your right

10 hand.

11     (WITNESS VANESSA FUSCO WAS SWORN)

12         THE COURT:  Please sit down.

13                      DIRECT EXAMINATION

14 BY MR. IRWIN:

15 Q   Good morning, Ms. Fusco.  Thank you for being here today.

16 Could you please state your full name for the record?

17 A   Vanessa Fusco.

18 Q   And where do you live?

19 A   New York City.

20 Q   By whom are you employed?

21 A   Christie's.

22 Q   Is that the auction house in New York?

23 A   Yes.

24 Q   How long have you worked there?

25 A   Seven years.

1  Q    And what is your current title at Christie's?

2  A    I'm a Vice President and Associate Director of the museum

3  services department.

4  Q    At a very high level, can you describe for us what it is

5  that the museum services department does at Christie's?

6  A    Broadly speaking we oversee and build relationships with

7  non-profit clients and assist them with appraisals and buying

8  and selling at auction.

9  Q    Are you familiar with a museum by the name of the Detroit

10  Institute of Arts?

11  A    Yes, I am.

12  Q    And is it okay if I refer to it as the DIA?

13  A    Yes.

14  Q    All right.  In 2013, was Christie's engaged by the City

15  of Detroit in connection with a DIA appraisal project?

16  A    Yes.

17  Q    What was the nature of that exercise at a very high

18  level?

19  A    We were asked to provide a fair market value appraisal

20  for a section of the overall collection.

21  Q    And did you have a direct role in that project?

22  A    Yes.

23  Q    What was that role?

24  A    I was the project manager of the appraisal.

25  Q    Did Christie's complete that valuation?

1  A     Yes.

2  Q     And are you prepared to describe for the Court today the

3  process that was used and the results of that assignment?

4  A     Yes, I am.

5  Q     Okay.  Before we get into that, let's talk about your

6  background just a little bit.  Where did you go to college?

7  A     I went to college at Vassar College.

8  Q     And what degree did you receive and when?

9  A     A Bachelor of Arts in Art History and Italian in 2005.

10  Q     Are you fluent in Italian?

11  A     Yes, I am.

12  Q     Do you have other language skills?

13  A     Yes, I do.

14  Q     And what are they?

15  A     Conversational French and Spanish and reading

16  comprehension of German.

17  Q     While you were at Vassar, did you have the opportunity to

18  work with museums?

19  A     Yes.  I held several -- several positions in museums

20  during that time.

21  Q     And what were they?

22  A     I was a docent at Dia Beacon in Beacon, New York.  And

23  held curatorial internships at the Frick Collection in New

24  York and the Whitney Museum of American Art, also in New York.

25  Q     All right.  And what was the -- what is the Frick

1  Collection?

2  A    The Frick Collection is the former collection of the

3  American industrialist Henry Clay Frick on Fifth Avenue in

4  Manhattan.

5  Q    And what did you do for the Frick Collection in

6  connection with that internship?

7  A    It was mostly research.  At the time they were preparing

8  for an exhibition of Susini bronzes, and so I helped them

9  track down owners of those bronzes.  A lot of them were based

10 in Italy and so the language skills came -- were very useful.

11 Q    And what did you do for the Whitney Museum?

12 A    Also primarily research based.  At the time they were

13 preparing for an exhibition to celebrate the anniversary of

14 the Braer Building which when it was put up was very

15 controversial.  It really didn't fit into the architectural

16 landscape.  And so a lot of my research was based on pulling

17 responses to the building.

18 Q    Okay.  And what did you do from there, after you

19 graduated from Vassar in 2005?

20 A    I became employed by Christie's.

21 Q    In what capacity?

22 A    In an administrative capacity.

23 Q    Okay.  And in which department at Christie's?

24 A    Initially the books and manuscripts department.

25 Q    And what was your title?

1  A    Sale Administrator.

2  Q    And what were your general duties and responsibilities at

3  the books and manuscripts department?

4  A    The books and manuscripts department conducts between

5  four and six sales a year.  And so my duties were in -- to

6  help put together those sales, work with the clients to make

7  sure their contracts were signed, talk them through the sale

8  process, deal with settlements to make sure that sellers were

9  paid out correctly as well as administrative support for the

10 department.

11 Q    Okay.  And how long were you in the books and manuscripts

12 department?

13 A    One year.

14 Q    And what did you do from there?

15 A    I transferred to the impressionists and modern art

16 department.

17 Q    And what did you do for the impressionists and modern art

18 department at Christie's?

19 A    I was also a Sale Administrator.

20 Q    Okay.  Did your duties significantly change at all?

21 A    Those sales are larger in scope and due to the type of

22 art there's certain things that have to be considered and

23 factored in that are not in place for the books and

24 manuscripts sale.

25 Q    Okay.  And does that take us through approximately --

1  well, maybe you didn't say.  How long were you in the -- how

2  long were you in that group, the impressionist and modern art

3  department?

4  A    Two years.

5  Q    So that takes us through 2008 approximately?

6  A    Yes.

7  Q    All right.  What happened in 2008?

8  A    I left Christie's to pursue graduate work.

9  Q    And what was the graduate work?

10 A    Art history and archeology.  I have a Master's from the

11 Institute of Fine Arts in New York.

12 Q    So you left Christie's in 2008 to pursue that degree?

13 A    That's right.

14 Q    And did you achieve that degree?

15 A    Yes.

16 Q    And what -- what is it, a Master's in -- in --

17 A    Art history and archeology.

18 Q    Okay.  Did you have a specific focus within the -- well,

19 did you have a focus while you were in the Master's program?

20 A    Yes.  European modern art with a particular emphasis on

21 Italian art between the two world wars.

22 Q    All right.  Did you have an opportunity during this

23 period -- by the way, how long did that last?

24 A    That was two years.

25 Q    And was it a full time program?

1  A     Yes.

2  Q     Okay.  Did you have an opportunity during that two year

3  period to continue working with museums?

4  A     Yes.  I had a research position at the Museum of Modern

5  Art in New York working to help put together two shows.  One

6  was a show of Picasso's guitar series, and one a Willem de

7  Kooning retrospective.

8  Q     Okay.  When was that?

9  A     That was in 2009.

10 Q     Okay.  And that was at the MOMA, the Museum of Modern

11 Art?

12 A     That's right.

13 Q     In New York?

14 A     Yes.

15 Q     Okay.  What did you do for those projects or those

16 exhibitions specifically?

17 A     Helped the curators track down the current whereabouts of

18 the works.  Help with researching provenons, looking at old

19 exhibition catalogs to determine if certain works in the show

20 were included in any seminal exhibitions.  And then overall

21 like bibliographic research.

22 Q     What were your career interests at that point in time?

23 A     I would say I was focused on a museum career at that

24 point.

25 Q     And that was 2009?

1  A    Yes.

2  Q    All right.  Let's fast forward a little bit to 2010 as

3  you're nearing the end of your program, your Master's program.

4  What did you do next?

5  A    I sat for candidacy to the Ph.D. program and was accepted

6  to the Ph.D. program at the IFA, the Institute of Fine Arts,

7  but I had really kept my eye on the job market to see what

8  opportunities might be available.

9  Q    So you -- you were accepted into the Ph.D. program.  Was

10 that at NYU?

11 A    Yes.

12 Q    Okay.  Why is it that you did not pursue that educational

13 path as opposed to something else?

14 A    I took a leave of absence to start work again at

15 Christie's in the museum services department.

16 Q    All right.  So you rejoined Christie's in 2010?

17 A    Yes.

18 Q    Okay.  And you mentioned -- you said the museum services

19 department.  So now we're back at Christie's.  Is that the

20 department where you currently work?

21 A    Yes.

22 Q    Okay.  Now we can talk about it a little more broadly.

23 Can you -- can you tell me what it is that the museum services

24 department does for museum clients of Christie's?

25 A    We handle appraisals of a variety of types, including

1  insurance, fair market value, appraisals for charitable

2  donations when museums are receiving gifts from individuals.

3  We also work with museums to sell works of art from their

4  collection and also help museums acquire works of art to add

5  to their collections.

6  Q    So you have a -- a valuation side and then a buying and

7  selling side, is that what I'm hearing?

8  A    Yes.

9  Q    Okay.  Is the museum services department at Christie's

10 limited to museum clients?

11 A    No.  In -- in additional to traditional art museums we

12 also work with libraries, and universities, and historical

13 societies.

14 Q    Okay.  When you joined Christie's in 2010, what was your

15 position?

16 A    Account Manager.

17 Q    And what were your duties and responsibilities as an

18 Account Manager in the museum services department?

19 A    I oversaw all appraisals of the institutional clients.

20 Q    Did you work -- so that was the appraisal side.  Did you

21 help -- assist with any buying and selling?

22 A    More so on the selling side, less on the buying.

23 Q    Okay.  What was your role focusing on appraisals that was

24 what you mentioned first.  What was your role specifically in

25 connection with appraisal work for museums?

1  A    When -- when assigned an appraisal project, I would speak

2  to the client to help try to understand what it was that they

3  needed exactly.  Often our clients approach us and they say,

4  here's what we need to achieve, but they don't know the

5  appraisal terminology to use what exactly to request.

6      So talking to clients to ascertain what type of numbers

7  would be helpful to them for whatever they're trying to

8  achieve.  Coordinating with the clients, arranging any site

9  visits as needed, and accompanying my specialist colleagues to

10 review works of art in person if necessary.

11     And then working with the specialists to vet their

12 numbers and make sure that the correct appraisal strategy is

13 followed in putting the appraisal together.  Then delivering

14 it and sometimes presenting it to the client and answering any

15 follow up questions as needed.

16 Q    Okay.  Would -- so this was a client facing position at

17 Christie's?

18 A    Yes.

19 Q    Okay.  How long were you in that role?

20 A    Two years.

21 Q    So that's 2012.  Okay.  What did you do from there?

22 A    I stayed -- I was still an account manager, but I was

23 promoted to Associate Vice President.

24 Q    Okay.  How -- how if at all did your duties and

25 responsibilities change as Associate Vice President?

1  A    Generally the value of what I was working on tended to

2  increase and there were more opportunities for client

3  cultivation.

4  Q    Okay.  And how long did you stay in that role, Associate

5  Vice President?

6  A    Also two years.

7  Q    Okay.  So that's 2014 then?

8  A    Yes.

9  Q    All right.  What happens in 2014?

10 A    I was promoted again to Vice President and Associate

11 Director of my department.

12 Q    Okay.  So in your capacity as a Vice President and

13 Associate Director of museum services, how has your role

14 changed in 2014?

15 A    Well, I still work very much on appraisals and work with

16 clients who are buying and selling with Christie's.  I have

17 more of a role in the overall strategy of the department and

18 more responsibility for proactive business development.

19 Q    Okay.  All right.  Let's -- let's talk about that now.

20 Let's talk about the appraisal side of -- of the business, the

21 valuation side.  Is that service at Christie's generally

22 limited to museums and non-profits?

23 A    No.  We offer appraisals for all types of clients,

24 private collectors, dealers, for profit institutions,

25 corporations.

1  Q    And how long has Christie's been doing this?

2  A    Christie's has been in business since 1766.

3  Q    Is Christie's an established brand in the fine art world?

4  A    Yes, we are a market leader.

5  Q    And which part of the market does Christie's focus?

6  A    We focus on the upper end of the market.

7  Q    Is that exclusively?

8  A    We do sell works in the middle range and even lower end

9  of the market, but I'd say our business focus is really on the

10 upper end.

11 Q    If you could think of any noteworthy sales that have come

12 through Christie's recently.

13 A    Last year we achieved the world record price for any work

14 ever sold at auction with Francis Bacon's Three Studies of

15 Lucian Freud which achieved $142,000,000.

16      Prior to that in 2010 we sold Picasso's Nude Green Leaves

17 and Bust which at the time was a world record price for any

18 work sold at auction.  It achieved $106,000,000.

19      We've also handled some of the most important overall

20 collections to come to the market.  Elizabeth Taylor's

21 collection in 2011.  The Yves Saint Laurent collection in 2009

22 which achieved almost $500,000,000.

23      And earlier this year the collection of famed Chicago

24 collectors Edwin and Lindy Bergman which is probably one of

25 the most important private collections of Twentieth Century

1   art to come to the market in years.

2   Q    So -- so those are all very prominent paintings and

3   sales.  Can you tell me why a museum might come to Christie's

4   in connection with valuation services?

5   A    Why in what respect?

6   Q    What -- what might a museum come to your group for

7   valuation services?  What -- for what purpose?

8   A    Several different reasons.  One, would be an insurance

9   value.  We insure works that museums are loaning out to

10  traveling exhibitions to make sure that their works are

11  adequately covered while off of their premises.  Of course for

12  purposes of sale we provide auction estimates and sale

13  proposals if any --

14  Q    We'll come -- and we'll come to those terms, yes.

15  A    Okay.  If the museum is considering selling a work from

16  its collection, fair market value is generally if a museum

17  wants to just understand the value of what they're holding and

18  then the charitable donation appraisal as I mentioned before.

19  When they receive gifts, the donee needs it for their tax

20  purposes.

21  Q    Okay.  And what kinds of museums come to Christie's for

22  this kind of assistance?

23  A    All sorts, all sizes from all over North America.

24  Q    And can I find a list of prominent museum clients

25  somewhere?

1  A    We do list some clients on our web site, yes.

2  Q    Can you think of some prominent museums that have come to

3  Christie's for valuation services?

4  A    I have worked with the Museum of Modern Art, and the

5  Metropolitan Museum of Art in New York.  The Museum of Fine

6  Arts Boston.  The Art Institute of Chicago.  The Cleveland

7  Museum of Art.  The Fine Arts Museum of San Francisco.  Los

8  Angeles County Museum of Art.  Museum of Fine Arts Houston.

9  Q    That's great.

10  A    Just going around the country.

11  Q    Thank you very much.  As -- as between the two job

12  functions that you've described, you know, valuation on the

13  one hand and buying and selling on the other, can you

14  characterize how much of your time is spent on one or the

15  other?

16  A    Well, I'd say the vast majority is spent on appraisals.

17  But appraisals can also mean appraisals for the purposes of

18  sale.

19  Q    Sure.  Have you had an opportunity to investigate how

20  many appraisal projects you personally have supervised at

21  Christie's in the last four or five years?

22  A    Yes, I have.

23  Q    And how many is that?

24  A    Four hundred fifty-seven.

25  Q    So since -- is that since 2010?

1  A    Yes.

2  Q    So 457 appraisal projects since 2010.  How many of those

3  have been for traditional art museums?

4  A    More than half.

5  Q    More than half of the 457?

6  A    Yes.

7  Q    All right.  How many of those projects have involved

8  works of art numbering in the hundreds?

9  A    Over 70.

10  Q    And how many of those appraisal projects for museums

11  involved works of art in the thousands?

12  A    Five or so.

13  Q    And how many times have you been asked to supervise an

14  appraisal project involving a museum's entire collection?

15  A    Six different projects.

16  Q    On an order of magnitude, what is the aggregate amount of

17  money that we're talking about for all of these appraisal

18  projects that you personally have supervised?

19  A    Many billions of dollars.

20  Q    Okay.  Let's come back to something you described a

21  moment ago.  At a high level, what is the process at

22  Christie's for projects that you've been involved with for

23  appraising a collection, or part of a collection from a

24  museum?

25  A    So first as I mentioned ascertaining what it is that

1  museum needs, what type of appraisal would suit them.  And

2  then communicating with the museum, obtaining images where

3  needed, getting information that they might have in their

4  files, and working together with my colleagues to come up with

5  a plan for conducting the appraisal.

6      Sometimes that includes a site visit, sometimes it does

7  not.  And then we feed -- the appraisals once -- once I've

8  vetted and reviewed all of the numbers, the appraisals get fed

9  into our typing system and then for very high value

10 appraisals, we have a process called senior sign off which --

11 at which I present to three members of a panel to make sure

12 that the appraisal is in perfect condition before delivery and

13 presentation to the client.

14 Q    Are these appraisal projects, and for these I'm referring

15 to museum projects of -- of large scale, are these done by an

16 individual, or are there teams of people at Christie's who

17 work on them?

18 A    Teams.

19 Q    Okay.  And what -- who -- who are the members of these

20 teams?  Do they have a specific functionality at Christie's?

21 A    The valuation, the -- putting the numbers on the works of

22 art is conducted by what we call specialists.

23 Q    Okay.  Specialists.  What are specialists at Christie's?

24 A    Specialists are individuals who focus on a particular

25 area of art.  We divide our specialist teams into specialist

1  departments.  We have somewhere between 60 and 80 very

2  narrowly defined by region and period.

3      And the specialists are interacting with that sort of sub

4  marketplace daily knowing collectors, buyers, staying on top

5  of museum exhibitions that happen, fluctuations in the market,

6  so that they're able to effectively price works of art.

7  Q    And why does Christie's need so many specialists?  I

8  think you said between 60 and 80 different groups, is that

9  right?

10 A    Yes.

11 Q    Why is it that Christie's needs so many groups?

12 A    The art market as a whole is sort of a false concept.

13 It's made of many different individual markets that behave in

14 very different manners.  So it would be extremely difficult

15 for one person to be well versed and have the depth of

16 knowledge needed in every single one of these markets.

17 Q    And how -- how many specialists if -- if it's possible to

18 generalize, work in each of these groups?

19 A    It depends upon the market, but between on the lower end

20 probably three or four, and on the more -- for more robust

21 markets up to 25.

22 Q    Okay.  So how does one become a specialist?  What kind of

23 -- what kind of background or degrees are expected of

24 Christie's specialists?

25 A    There's a lot of different ways people become

1  specialists.  Generally they have formal art historical

2  training including advanced degrees.

3  Q    All right.  What is expected of specialists in connection

4  with connectivity to the marketplace?

5  A    Specialists are expected to essentially have a finger on

6  the pulse, know who is looking for what, know what collections

7  and works of art are coming to the market in the near future,

8  the mid term, and the long term.  And cultivate and develop

9  relationships with those people.

10  Q    So -- so you mentioned that you use specialists on museum

11  projects, valuation projects, is that right?

12  A    Yes.

13  Q    Do -- do specialists at Christie's sit around waiting for

14  museum projects to come along?

15  A    No.  They have a lot of other things to do.

16  Q    So what else do they do for Christie's then?  For the

17  Christie's business?

18  A    Each -- every specialist is involved in putting together

19  their sales.  Some departments have sales twice a year, some

20  as much as six times a year.  So it's constant sourcing for

21  the sales.  And then research and cataloging and putting the

22  sale together and then once the sale comes together, it's

23  selling the sale.

24  Q    Are there business people at Christie's who work in these

25  specialist departments?

1  A    Yes.  Every specialist department has a dedicated set of

2  business managers.

3  Q    And what is the purpose of the business managers within

4  these groups?

5  A    The business managers work with the specialists to

6  forecast the profitability of the sales.

7  Q    And so are there business reasons at Christie's why the

8  work of the specialists needs to be reliable?

9  A    Certainly.  I'd say both internally and externally.

10 Internally they have to accurately predict where a work of art

11 will sell because it's very much tied to Christie's financial

12 projections for the year.

13     Externally, it's extremely important to be accurate in

14 your predictions of where a work will sell for your

15 relationships with clients.  If you tell a client for years

16 and years that their painting, you know, will achieve $300,000

17 and then they give it to you and you can't do that for them,

18 they are unlikely to return to you for further business.

19 Q    When you are at Christie's and you want to know something

20 specific about market conditions or sales information, where

21 do you go?

22 A    Generally the specialists.

23 Q    Are there such a thing as independent art appraisers in

24 the art world?

25 A    Yes.

1  Q     What is it if anything in your mind that distinguishes

2  specialists at Christie's from art appraisers?

3  A     I think the main distinction is that specialists at

4  auction houses have daily interaction with the marketplace.

5  An independent appraiser would not be able to turn around and

6  achieve a result similar to what they appraised a work of art

7  for.  They would have to turn to a dealer or an auction house

8  to do that.

9  Q     Okay.  Let's turn to another concept that you mentioned

10  in your description of the steps at Christie's, the -- the

11  process for a museum appraisal.  You mentioned a type of

12  valuation.  Or sorry, type of appraisal.  Do you recall that?

13  A     Yes.

14  Q     And what are the principal types of appraisals that

15  you've worked on at Christie's?

16  A     Fair market value, insurance, charitable donation, and

17  auction estimates.

18  Q     Okay.  Let's take a couple of those.  What is a fair

19  market valuation?

20  A     So fair market value is defined as the price that a work

21  would change hands between a willing buyer and a willing

22  seller.

23  Q     Is that a -- is that a value that you have used in your

24  appraisals?

25  A     Yes.

1  Q     Can fair market value be provided to a Christie's client

2  in the form of ranges?

3  A     Yes.  It can and has been.

4  Q     Can it be both a specific number or a range?

5  A     That's right.

6  Q     Okay.  How about sale conditions?  As a general

7  proposition, when Christie's evaluates something and provides

8  a fair market value, is it purporting to attempt to –– to

9  evaluate sale conditions?

10 A     It doesn't take into account sale conditions in that we

11 don't consider how we would market the work, the circumstances

12 under which we would sell it.  It's really just most simply

13 what we think the work is worth.

14 Q     Okay.  Thank you.  Another term you mentioned was an

15 auction estimate.  Do you recall that?

16 A     Yes.

17 Q     What is the difference between a fair market valuation

18 and an auction estimate?

19 A     So auction estimates are the numbers that we assign to

20 works when we're bringing a work to the market.  For one

21 they're predefined ranges and they are essentially a marketing

22 tool to garner the most fitting possible which will lead to

23 the highest return for our clients.

24 Q     Great.  And how about the last one, insurance appraisal?

25 You said you've provided insurance appraisals, is that right?

1   A     Yes.

2   Q     All right.  How is that different from a fair market

3   valuation?

4   A     Insurance appraisals we tend to be a bit more generous.

5   It's -- we define it as sort of the -- the highest price we

6   think a work could achieve plus premium, buyer's premium which

7   we can discuss in a minute.

8         But the idea being that if there was a loss or damage we

9   would want to make sure that the client was compensated in

10  whole and would have the ability to go out and buy a work

11  that's comparable to the one that was lost or damaged.

12  Q     And what is -- we -- can deal with it now.  What is

13  buyer's premium?

14  A     Buyer's premium is a commission that's paid to Christie's

15  by purchasers.

16  Q     Okay.  Is it a portion of sales, a percentage of the sale

17  price?

18  A     Yes, it's a percentage of the sale price.

19  Q     Okay.  Now with respect to these three different

20  appraisals, are those the deliverables to the client, is that

21  right?

22  A     Yes.

23  Q     Are there different methodologies behind the three

24  appraisals?

25  A     Christie's relies on the same appraisal methodology for

1  all of these appraisals called the market data approach.

2  Q    Okay.  And what is the market data approach at

3  Christie's?

4  A    The market data approach is relying upon results of

5  comparable works and to see what they've achieved in the

6  marketplace.  So when you're looking to appraise a work of art

7  you would look at what comparable works either by the artist,

8  or by artists working in that period have achieved, and then

9  adjust against the subject work on the basis of several

10 factors.

11 Q    And what are the factors?

12 A    We consider size, date, subject, condition, overall

13 quality of a piece.  Current taste is important as well as the

14 rarity of the piece.

15 Q    And who at Christie's is making these judgments as to

16 what to be considered and what the output is going to be?

17 A    Our specialists are the ones who make those judgments.

18 Q    And do you work with specialists on your museum projects

19 to assist them?

20 A    Yes.

21 Q    And how do you do that?

22 A    I look at the values they're providing to make sure that

23 they're in line with the strategy for the appraisal.

24 Q    Do you believe that this -- this methodology, the market

25 data methodology that you have described, do you believe that

1  it leads to reliable results?

2  A    Yes.

3  Q    And is it widely followed by major auction houses?

4  A    Yes.

5  Q    Okay.  Let's talk about one more concept first that you

6  mentioned in the process, in the Christie's process.  I think

7  you called it senior sign off.  Do you recall that?

8  A    Yes.

9  Q    Okay.  What is senior sign off?

10 A    Senior sign off is essentially a presentation to a senior

11 sign off panel of any appraisal that's valued, it has -- has

12 an aggregate value of $20,000,000 or above.

13 Q    All right.  And is there -- is this -- is this done by

14 designation?  Who's in the room I guess?

15 A    So the senior sign off committee is comprised of three

16 individuals.  The head of our estates and appraisals

17 department, the business manager of the estates and appraisals

18 and museum services department, and the appraisals manager.

19      Two out of three of those individuals need to be present

20 for senior sign off to take place.  In addition to the project

21 manager and lead specialist involved on the appraisal.

22 Q    Okay.  Who were the -- the -- who were these three

23 individuals, the titles that you indicated in the fall of

24 2013?

25 A    Sarah Vanwelden was the head of estates and appraisals,

1  Ross Elgie was the business director, and Margaret O'Connor

2  was the appraisals manager.

3  Q    And -- and did you indicate that two of those three

4  people must be there at each of these meetings?

5  A    Yes.

6  Q    Can -- can one of these senior sign off meetings go

7  forward without the project manager?

8  A    No.

9  Q    Can other people attend?

10  A    Sometimes other people do attend if invited.

11  Q    All right.  And what is the purpose of a senior sign off

12  meeting?

13  A    The purpose of the senior sign off is to present my work

14  as the project manager to the senior sign off committee to

15  insure that the correct strategy and methodology was followed

16  in putting together the appraisal, to insure that our

17  specialists are completely comfortable and stand behind the

18  values they provided.  That they didn't feel there were any

19  impediments to providing a just and fair appraisal.  And then

20  on a more minor level, to just make sure the document is in

21  perfect condition before delivering it to our clients.

22  Q    Is it a critical process?

23  A    Certainly.

24  Q    How do you prepare for it?

25  A    I --

1  Q    And I mean for projects on which you are the project

2  manager.

3  A    Uh-huh.  Since I view it as a presentation of my work, I

4  want to make sure that my team can and will answer all

5  questions that may or may not be posed to them by the senior

6  sign off committee.

7       So I generally go through these questions with my

8  specialist colleagues to make sure that as a team we are

9  completely comfortable with the work we're delivering.

10 Q    So you meet with your specialists beforehand?

11 A    We talk on the phone, email, yeah.

12 Q    And do you -- do you typically ask any one of them to

13 attend the meetings in person?

14 A    Yes.

15 Q    Okay.  Was this -- just stepping back.  The -- the

16 general process that you've described, all the steps, the

17 decision making, the information gathering, was that the

18 process that was followed by Christie's in connection with the

19 DIA project?

20 A    Yes.

21           MR. IRWIN:  Okay.  Your Honor, at this point I would

22 offer Ms. Fusco as an expert in the valuation of fine art

23 collections for non-profits, including museums.

24           MR. SOTO:  No objection, Your Honor.

25           THE COURT:  You may proceed.

1  Q     Ms. Fusco, let's -- let's talk about the DIA project in

2  particular.  In 2013, I think you indicated that -- that

3  Christie's was hired by the city.  Do you recall that?

4  A     Yes.

5  Q     Okay.  At a high level again, what was the scope of this

6  engagement?

7  A     We were asked to provide a fair market value appraisal

8  for works that were purchased in whole or in part with City of

9  Detroit funds.

10 Q     Okay.  So what was the nature of the appraisal?  You gave

11 types of appraisals.  What type was this?

12 A     Fair market value for financial planning.

13 Q     Okay.  And what were the -- what were the types of pieces

14 that were within the scope of your review?

15 A     Any work purchased in whole or in part with city funds.

16 Q     Okay.  So in whole or in part, it wasn't limited to one?

17 A     That's right.

18 Q     All right.  Were you involved in negotiating the scope of

19 this appraisal?

20 A     No.

21 Q     All right.  Was there to be a written report?

22 A     Yes.

23 Q     And for whom was that report to be prepared?

24 A     The emergency manager Kevyn Orr.

25 Q     Now there came a point in time when you were made aware

1  of this assignment at Christie's, is that right?

2  A    Yes.

3  Q    Okay.  Did you know about the DIA at that point in time?

4  Did you know what it was?

5  A    Yes.

6  Q    All right.  What did you know about it?

7  A    That simply it's a spectacular and world class

8  collection.  I had been to the DIA before and was extremely

9  impressed by the collection.

10  Q    Do you associate any particular pieces with the DIA?

11  A    It's hard not to think of the incredible Diego Rivera

12  frescos that depict Detroit industry.  It's so specific to the

13  city and to the museum.  Rodin's Thinker that sits perched

14  right outside the entryway to the museum.

15       Peter Bruegel the Elder's, the Wedding Dance.  It's one

16  of very few works by the artist that are in this country.  So

17  it's quite famous.

18       And then some marvelous collections.  The Tannahill

19  collection of impressionists and modern European art.  The

20  Dodge collection of French and English Eighteenth Century

21  paintings, furniture and decorative arts.  And the Scripps

22  collection of old master paintings.

23  Q    Had you visited the museum before you took this

24  assignment?

25  A    Yes.

1  Q    How many times?

2  A    I believe twice.

3  Q    Okay.  Had you ever worked on a DIA project at

4  Christie's?

5  A    Yes.

6  Q    Had -- so Christie's had worked with the DIA previously?

7  A    Yes.

8  Q    Okay.  When did you first hear about this potential

9  assignment?

10  A    In the spring of 2013.

11  Q    And how did it come to be assigned to you?

12  A    Because it was an appraisal of -- a large scale appraisal

13  of a non-profit collection because of my experience in

14  conducting similar appraisals, it was assigned to me.

15  Q    Okay.  There is a binder in front of you, Ms. Fusco.

16  Steve, can we put up City Exhibit 423?  I'm going to refer you

17  to City 423 in your binder.  Let me know when you have it in

18  front of you.

19  A    Yes, I'm ready.

20        MR. IRWIN:  Your Honor, this document was admitted

21  pre-trial.  I wouldn't offer it.

22        THE COURT:  Okay.

23  Q    Ms. Fusco, what is City Exhibit 423?

24  A    This is Christie's appraisal agreement with the City of

25  Detroit.

1  Q    And when is it dated?

2  A    August 9th, 2013.

3  Q    Is this a document that you came to use in connection

4  with your work for the DIA?

5  A    Yes.

6  Q    Okay.  Can you turn to Page 2?  The second page of the

7  document.  It's got Exhibit A at the top, statement of work.

8  Do you see that?

9  A    Yes.

10 Q    Okay.  How familiar are you, or did you become, with the

11 statement of work?

12 A    Very familiar.

13 Q    All right.  Let's look at the first sentence under Phase

14 1, the top of the page.  It reads, approximately 300 of the

15 3,500 works of art purchased by the City of Detroit located at

16 the Detroit Institute of Arts are on public view.  Do you see

17 that?

18 A    Yes.

19 Q    Have you been provided a list of works that were going to

20 be the subject of this evaluation prior to August 9th?

21 A    Yes.

22 Q    Okay.  What preliminary research if any had been

23 conducted on -- on those pieces?

24 A    We began to comb through all of the literature to pull

25 out references, establish provenons where we were able to

1  bibliographic citations, and at this stage we did not have

2  images for the works in the COD collection.  And so where work

3  was illustrated that was extremely helpful to us.

4  Q    Okay.  Look at the third paragraph if you could.  The

5  paragraph begins given our research.  Do you see that?

6  A    Yes.

7  Q    Given our research we believe the majority of the value

8  of the art purchased by the City of Detroit is on public

9  exhibition.  Do you see that?

10 A    Yes.

11 Q    Is that typical?

12 A    Yes, it's certainly typical.

13 Q    Why is that?

14 A    Generally a museum will put its most important works on

15 view for the public.  And that can often translate into most

16 commercially valuable works.

17 Q    Based on the preliminary research that you had done, did

18 Christie's have a general idea as to where the works with the

19 most commercial value were in the collection?

20 A    We felt that the majority of the value was going to be

21 found in the galleries, what was on view.

22 Q    Okay.  If you take the time to read this entire page you

23 would see that there are multiple phases that are described.

24 Are you familiar with that concept?

25 A    Yes.

1  Q    Okay.  Can you describe what the plan was for the

2  appraisal in connection with phasing?

3  A    So Phase 1 was an appraisal of all of the works on public

4  view.  Again the idea being that we would prioritize what we

5  believed to be the most valuable works in order to give us

6  some sense early on of what the overall value might be, what

7  ballpark we were going to be in.

8      Phase 2 and 3 were works that were in storage, but we

9  divided Phase 2 and Phase 3 at the $50,000 range.  So works

10  that were over $50,000 were individually listed in our

11  appraisal whereas works that were below $50,000 were only

12  given an aggregate value in our appraisal.

13      It was really done as a matter of -- of time, of

14  finishing the appraisal in time.  In order to go through and

15  individually list thousands of works that would have minimal

16  value, it's very taxing to Christie's systems.

17  Q    These are -- these are described as phases and not tiers.

18  Was there some staging associated with the different groups?

19  A    We focused on tier -- Phase 1 first.  And then Phase 2

20  and 3 was generally conducted in tandem.  At times, depending

21  on the scheduling, we were able to do all three phases in one

22  visit.

23  Q    Okay.  By the way as of August 9th, how many City of

24  Detroit purchased items did you believe you were dealing with

25  at that time?

1  A    As of August 9th, we believed there were going to be

2  roughly 3,500.

3  Q    Did that number change over time?

4  A    Yes.

5  Q    And why was that?

6  A    The initial lists that we were provided of COD works

7  contained works that were in fact no longer in the collection

8  which we discovered when we went to go inspect them.

9  Additionally, the museum consistent with museum industry

10 standards, gives a separate what's called an accession number

11 to every piece of a work.

12      So for example a tea pot and its cover will be listed a

13 two objects when in fact they're really one.  It's just an

14 issue of inventory management.  So the numbers were inflated

15 for that reason.

16 Q    Is that at all unusual on your museum projects, to finish

17 with a lower number?

18 A    No.

19 Q    Okay.  Who provided to Christie's the list of works of

20 art at the DIA that would be associated as City of Detroit

21 purchases?

22 A    The DIA.

23 Q    Okay.  Was Christie's responsible -- responsible for

24 investigating that further?

25 A    No.

1  Q    All right.  Let's -- let's talk about the findings a

2  little bit.  How many pieces did you eventually determine were

3  in the City of Detroit or COD collection?

4  A    Two thousand seven hundred seventy-three.

5  Q    Did Christie's formally appraise all 2,700 works?

6  A    No.

7  Q    And why not?

8  A    As we progressed through the valuation, we determined

9  that there were roughly 1,000 works in the COD collection that

10 were of incredibly minimal commercial value.  And so as we

11 were nearing the end of the appraisal, we told the city that

12 there is this group of works and we're confident that they're

13 not going to make a substantial difference in the overall

14 number.  And so we were advised not formally appraise them.

15 Q    Okay.  You used the word commercial value.  Do you mean

16 something by that?

17 A    Well, into the intrinsic value of a work of art is hard

18 to define.  I mean these works have academic value and

19 research value and belong in a museum, but that doesn't always

20 translate to somebody wanting to own them.

21 Q    Can you give some examples of the kinds of pieces we're

22 talking about here?

23 A    Within that 1,000 or so works were roughly 375 textile

24 fragments.  A scrap of fabric essentially can't be worth very

25 much.  And there were also roughly 350 photographs by the

1  artist Clarence Kennedy.  He is a local art historian and

2  professor.  So from a local standpoint they have academic

3  value, but commercially his market is just not very strong.

4  Q    So we're talking about roughly 1,000 pieces in that -- in

5  that general category, is that right?

6  A    Yes.

7  Q    Okay.  That's more than a third of the value, or a third

8  of the number of the COD pieces?

9  A    Yes.

10 Q    Did that number surprise you?

11 A    It did not.

12 Q    And why not?

13 A    Museum collections are -- tend to be very uneven value

14 wise.  Very simply not every work of art in a museum is a

15 masterpiece.  That's not unusual at all.

16     And the way museums in this country particularly

17 assembled their collections they were accepting large gifts

18 estates, full estates.  Collections are uneven.  So not every

19 work that gets gifted in a large collection to a museum is

20 going to be of tremendous value.

21 Q    And how did you make those determinations?  The

22 determinations that a piece was not of sufficient commercial

23 value to be appraised?

24 A    We relied upon the descriptions and in some cases

25 photographs provided by the DIA and consulted alongside with

1  my specialist colleagues.

2  Q    And did you advise the city of those determinations?

3  A    Yes.

4  Q    And what decision was made in terms of how to approach

5  those?

6  A    They advised us that we should not formally appraise

7  them.

8  Q    Okay.  Let's -- let's go back to the time line a little

9  bit, the DIA time line.  So you get the project in the spring

10 of 2013.  What do you do during that summer?

11 A    Research.

12 Q    Okay.  And how do you figure out your staffing?

13 A    So I go through the list and determine which specialist

14 departments are affected by the appraisal, which specialists I

15 would need to rely upon.  Generally I would work with the

16 heads of specialist departments to staff accordingly.

17      But over the years of working at Christie's, I have come

18 to know my specialist colleagues very well and so I would rely

19 upon their sort of sub areas of specialty and select people

20 based on sub areas of specialty.

21 Q    And how many people -- how many specialists specifically

22 ended up working on this project?

23 A    I think 65.

24 Q    Okay.  Why did you need so many specialists?

25 A    Well, for one the DIA collection is encyclopedic.  And

1  the COD collection was similarly a wide range of -- of art

2  history basically.  It was touched by it.

3       So it involved many different departments.  Also I wanted

4  to make sure the specialists were working in teams, including

5  international colleagues were needed so that there was no

6  appraisal that was really the opinion of a single individual

7  person.

8  Q    Okay.  When you have your teams together, let's -- let's

9  move to the sort of post-agreement August or September time

10 period.  You've got your teams in place, the agreement is

11 signed.  What do your team members start to do?

12 A    We start to visit the DIA.

13 Q    Okay.  And how many visits took place in the fall of

14 2013?

15 A    Between five and ten.

16 Q    Okay.  Were you -- who was present on the trips?

17 A    I accompanied the specialists on the trips.

18 Q    Did you -- did you always attend?

19 A    Yes.

20 Q    Okay.  Did you coordinate these trips with the DIA?

21 A    Yes.

22 Q    Were there any sensitivities or special considerations in

23 connection with those trips?

24 A    Well, we were very aware of the tax on the staff,

25 especially to look at things in storage.  It's a lot of effort

1  to bring works out from deep storage in some cases.

2      And when we were viewing things that were on view -- and

3  when we were looking at things that were on view in the

4  museum, we didn't want to disrupt the people that were there

5  to enjoy the art.  So we visited on Mondays when the museum

6  was closed to the public.

7      Because of that I wanted to group the specialists so that

8  we were only working in certain galleries at once so that the

9  museum didn't have to open up, you know, galleries on

10  different sides of the building.

11  Q    Who was your point of contact for this exercise?

12  A    Annmarie Erickson.

13  Q    Okay.  How would you characterize the DIA's willingness

14  to cooperate in this entire exercise?

15  A    I'd say overall they were very cooperative.

16  Q    Do you -- do you -- can you think of any impediments that

17  the DIA threw up that were obstacles for your work?

18  A    No.

19  Q    How many of the works were appraised in person?

20  A    The majority.

21  Q    Okay.  Is that for Phase 1 and Phase 2?

22  A    Yes.

23  Q    All right.  Were works taken off the walls or removed in

24  connection with the exercise?

25  A    The works that were on view in the galleries were not

1  taken off the walls.

2  Q    Okay.  How were the other pieces, the -- the pieces that

3  were not available for or selected for individual inspection,

4  how were the remaining pieces appraised?

5  A    By photograph.

6  Q    Okay.  Is that something that Christie's does regularly?

7  A    Yes.  We have a lot of experience in appraising works of

8  art from photographs.

9  Q    And was that -- was that part of the original plan?

10  A    Yes.

11  Q    All right.  What happened from there?  What are the next

12  steps after your -- your specialists are visiting the museum,

13  what happens next?

14  A    So as visits are taking place, specialists are feeding

15  back their notes to me and opinions as to the value of works

16  that they were asked to appraise in the collection.  I would

17  then go through their values and their reasoning with them to

18  make sure that the strategy was being employed correctly, that

19  they were thinking about fair market value in the way that we

20  had instructed them to.  And then if I was satisfied with

21  their explanations, I would turn it over to our typing

22  department to begin to get the appraisal in order.

23  Q    Okay.  How about the sequencing between the phases?  Were

24  these happening one after the other or simultaneously?

25  A    Everything was really happening simultaneously.  It was a

1  matter of scheduling.

2  Q    Did there come a point in time when the valuations across

3  the various phases started to come together and become more

4  final?

5  A    Yes.  I'd say by early December we had a good

6  understanding of what the overall value was going to be.

7  Q    And even before then, I want to know if you -- this

8  senior sign off process that you described earlier, is that

9  something that took place in connection with the DIA

10 evaluation?

11 A    Yes.  Senior sign off was taking place as sections of the

12 appraisal were completed and finalized.

13 Q    And how many senior sign off meetings took place for the

14 DIA project?

15 A    I'd say between ten and 12.

16 Q    Okay.  And who attended those?

17 A    Two of the three committee members that I mentioned

18 earlier, myself, and the specialists -- the lead specialists

19 who were working on that section of the appraisal.

20 Q    And who presented the valuations assigned to the specific

21 DIA pieces at those meetings?

22 A    I did.

23 Q    And how did you prepare for those meetings?

24 A    I prepared for those meetings by meeting with my

25 specialist colleagues and asking questions that I anticipated

1  the panel would ask of us to make sure that I had the answers

2  correct, that they had the answers correct, that we were as a

3  team comfortable with the work we were presenting.

4  Q    At -- at the conclusion of the senior sign off process,

5  which pieces in which of these phases had been subjected to

6  senior sign off?

7  A    Every single work in Phase 1 and Phase 2 was put through

8  senior sign off.

9  Q    So would that include every piece over $50,000?

10 A    Every piece over $50,000, but in Phase 1 there's some

11 works on view that were in fact less than $50,000, but they

12 were itemized because they were on view.

13 Q    Okay.  Did Christie's deliver a set of preliminary

14 valuations to the city at some point in time?

15 A    Yes.

16 Q    And when was that?

17 A    December 3rd, 2013.

18 Q    Okay.  I'd like to show City Exhibit 343, please.  It's

19 in your binder.  Steve, if you could put it up.  Let me know

20 when you have that in front of you.

21 A    Yes, I'm ready.

22 Q    Do you recognize that document?

23 A    Yes.

24 Q    What is Exhibit 343?

25 A    This is Christie's preliminary report to the City of

1 | Detroit.

2 |     (City's Exhibit 343 was identified)

3 | Q    Do you -- do you recognize this document?

4 | A    Yes.

5 | Q    Okay.  Did you draft it?

6 | A    I did not draft it.

7 | Q    Were you asked to provide input into this document?

8 | A    Yes.  I provided input on the part of the document that

9 | deals with the appraisal and this group of work.

10 | Q    Can you -- is -- is that the -- through the middle of

11 | Page 3?

12 | A    Yes.

13 |     MR. IRWIN:  Okay.  Your Honor, at this point in

14 | time, I would offer City Exhibit 343 into the record.

15 |     MR. SOTO:  No -- no objection.

16 |     MR. IRWIN:  Okay.

17 |     THE COURT:  It is admitted.

18 |     (City's Exhibit 343 was admitted)

19 | Q    So Ms. Fusco, whose -- whose signature is on the last

20 | page?

21 | A    It's Doug Woodham, the President of Christie's Americas.

22 | Q    And who is -- he's the President of Christie's Americas.

23 | To your knowledge was this letter delivered to Mr. Orr?

24 | A    I believe it was.

25 | Q    All right.  Why were you delivering preliminary findings

1  to the city on December 3rd?

2  A    The city was very anxious to hear a number.  They really

3  wanted to know where we were in the process and we felt that

4  the stage that -- what we had left to do was not going to

5  substantially change the aggregate value.

6  Q    So what was left?  What -- what had been completed and

7  what was left?

8  A    Mostly what was left was Phase 3 works.

9  Q    All right.  If you would turn to Page 2.  There's a

10  paragraph in the middle of the page and it's titled aggregate

11  valuation estimate.  Do you see that?

12  A    Yes.

13  Q    All right.  The first sentence says based on a -- an FMV

14  analysis, is that fair market value?

15  A    Yes.

16  Q    The aggregate estimated value of the COD purchases

17  appraised by Christie's is 452,000,000 to $866,000,000.  Do

18  you see that?

19  A    Yes.

20  Q    All right.  Where did those numbers come from?

21  A    They came from me.  This was the aggregate of the

22  appraisal to date.

23  Q    And how were they calculated?

24  A    What do you mean calculated?

25  Q    How did you get the numbers?  Did you add -- you added

1 them from somewhere.

2 A    Right.  It was adding up the individual valuations of the

3 individual pieces.

4 Q    And did you personally approve the inclusion of these

5 figures in this letter?

6 A    Yes.

7 Q    All right.  Look at the -- look at the top of Page 3 by

8 the way.  Do you see that it's got 350 photographs, it's got a

9 list of items there.  Are those the pieces that you described

10 earlier with little or no commercial value?

11 A    That's right.

12 Q    Okay.  And you included that in your list to the city?

13 A    That's right.

14 Q    At the -- at the middle of -- in the middle of Page 3

15 there's a -- there's a paragraph that begins alternatives to a

16 sale.  Do you see that?

17 A    Yes.

18 Q    Is that where your input into this letter stopped?

19 A    That's right.

20 Q    Okay.

21        MR. SOTO:  Objection, Your Honor.  Well, never mind,

22 I'll save it for cross.

23 Q    Did you have any role in the preparation of the materials

24 starting in the middle of Page 3?

25 A    I did not.

1  Q    Okay.  Who did?

2  A    Our deputy chairman Paul Provost was asked to oversee the

3  alternatives to sale.

4  Q    Okay.  And has he been deposed in this matter?

5  A    Yes.

6  Q    All right.  Did Christie's arrive at a final valuation at

7  some point in time after city exhibit -- after the December 3rd

8  letter?

9  A    Yes.  We completed our appraisal by December 17th.

10  Q    Okay.  Do you recall what the numbers were in that letter

11  when it was delivered to the city?

12  A    The final letter?

13  Q    Yeah, the final letter.

14  A    Four hundred fifty-four to $867,000,000.

15  Q    Okay.  I'd like to direct your attention, it's in your

16  binder, to City Exhibit 341.  Let me know when you have that

17  in front of you.

18  A    I have it.

19  Q    What is City Exhibit 341?

20  A    This is our final report to the City of Detroit.

21       (City's Exhibit 341 was identified)

22  Q    And what's it dated?

23  A    December 17th, 2013.

24  Q    And did you have any role in the preparation of this

25  letter?

1 A    Yes.  Similar to the last letter, I did not draft it, but

2 I provided input and the raw data for the valuation part, Part

3 1.

4 Q    Did you comment on drafts?

5 A    Yes.

6         MR. IRWIN:  Okay.  Your Honor, we would offer City

7 Exhibit 341 into the record.

8         MR. SOTO:  No objection, Your Honor.

9 Q    Ms. Fusco, if you could --

10         THE COURT:  Excuse me --

11 Q    -- if you wouldn't mind, look at --

12         THE COURT:  Excuse me.

13         MR. IRWIN:  Oh.

14         THE COURT:  It is admitted.

15      (City's Exhibit 341 was admitted)

16         MR. IRWIN:  Apologies.

17         THE COURT:  Well, that's what you wanted.

18         MR. IRWIN:  Can I just read them all in?

19         THE COURT:  No.

20 Q    Ms. Fusco, could you please turn your attention to the

21 middle of the first page of the letter?

22 A    Yes.

23 Q    Okay.  Do you see the paragraph that begins Part 1

24 valuation report?

25 A    Yes.

1  Q    The second half of that paragraph has two sentences.  It

2  starts the aggregate fair market value of the COD works

3  remains essentially the same as it was in our preliminary

4  evaluation, having increased only slightly with the completion

5  of our appraisal.  Do you see that?

6  A    Yes.

7  Q    The revised range is 454,000,000 to $867,000,000.  Do you

8  see that?

9  A    Yes.

10 Q    Did you approve the inclusion of 454,000,000 to

11 $867,000,000 in this letter?

12 A    I did.

13 Q    And where did those numbers come from?

14 A    They were the aggregate of all of the individual values

15 that we had placed on the works of art.

16 Q    Were there any other written reports that were provided

17 to the city in connection with City Exhibit 341?

18 A    This letter is the cover letter that accompanied

19 Christie's appraisal of the collection which is made up of the

20 itemized listings of Phase 1 and 2 and the aggregate value for

21 Phase 3.

22 Q    So there is an itemized listing of all of the -- the

23 components of this aggregate valuation?

24 A    Yes.

25 Q    Okay.  If I could please turn your attention to City

1  Exhibit 342.  Do you --

2  A    Yes, I'm ready.

3  Q    Do you recognize City Exhibit 342?

4  A    Yes.

5  Q    And what is it?

6  A    This Christie's appraisal of the COD collection.

7       (City's Exhibit 342 was identified)

8  Q    Does this contain the itemized results of your

9  valuations?

10 A    Yes.

11 Q    How -- how does City Exhibit 342 relate to the aggregate

12 valuation contained in the -- in the sentence we read from

13 City Exhibit 341?

14 A    The appraisal, the individual items in the appraisal will

15 add up to the fair market value range.  In the cover letter

16 though that -- that range is rounded.

17      MR. IRWIN:  Okay.  Your Honor, at this time I'd

18 offer City Exhibit 342.

19      MR. SOTO:  Again, no objection.

20      THE COURT:  It is admitted.

21      (City's Exhibit 342 was admitted)

22 Q    If I wanted to find out you know, what -- what Christie's

23 judgment in December of 2013 as to the valuation, the best

24 valuation of the DIA collection purchased with COD funds,

25 where would I look?

1  A     In these documents.

2  Q     And by that do you mean City 341 and City 342?

3  A     Yes.

4  Q     Okay.  Take a look at Exhibit 341, the letter, the

5  December 17th letter.  Can you take a look at Page 2?  There is

6  a -- there is a paragraph near the top that says key findings.

7  Do you see that?

8  A     Yes.

9  Q     And then there's a -- a listing of paintings under key

10  findings.  Do you see that listing?  There's actually 11

11  paintings that are listed.

12  A     Yes.

13  Q     Paragraph before the paintings reads, as noted in our

14  preliminary report, 11 COD works on display, and the galleries

15  account for 75% of our total appraisal value.  Do you see

16  that?

17  A     Yes.

18  Q     And then it lists the works there.  Did you have input

19  into the inclusion of this in -- in City Exhibit 341?

20  A     Yes.

21  Q     All right.  And what is the point of this paragraph?

22  What is the message that you were trying to deliver to the

23  city?

24  A     We wanted the city to understand how much of the value of

25  what they had asked us to appraise was held in very few works.

1  And because of that, the overall value range we felt is rather

2  stable.

3  Q    Did it surprise you that so much of the value was vested

4  in so few of the works?

5  A    It did not.

6  Q    And why is that?

7  A    It's comparable to other full museum collection

8  appraisals that I've done.

9  Q    Is it -- how would you describe it in terms of on a

10 continuum of whether it's typical or unusual would you

11 describe it?

12 A    Typical.

13 Q    All right.  What conclusions do you draw about the

14 reliability of the Christie's aggregate findings based on this

15 report?

16 A    That barring tremendous shifts in any of these markets,

17 these values are stable and due to that the overall value of

18 the COD collection is stable since so much of that value is

19 found in so few objects.

20 Q    Okay.  Can you -- can you look a little further down the

21 same page?  There's a paragraph at the end of the page that

22 starts, in order to determine the appraisal value, Christie's

23 appraisers used the market data approach which compares the

24 subject work to similar works and makes appropriate

25 adjustments.  Do you see that?

1  A    Yes.

2  Q    And is that consistent with your earlier testimony?

3  A    Yes, it is.

4  Q    Okay.  Look at the paragraph -- or sorry, the two

5  sentences at the end of that paragraph.  It says per your

6  instructions, Christie's has made no assumptions about the

7  sale process nor did we take into consideration any

8  commissions, buyer's premiums, or potential financial

9  agreement between the buyer, seller, and/or venue that would

10 affect the final price realized.  And as we agreed, we have

11 not assumed any volume discounts.  Do you see that?

12 A    Yes.

13 Q    What is the point that you were trying to communicate to

14 the city in the sentences that I just read?

15 A    That every work in the appraisal was examined in

16 isolation.  Meaning we did not consider if we were entrusted

17 with the sale of these works what would we do with them.

18     Additionally, we did not include -- we did not presuppose

19 what any financial deal would be around the sale of these

20 works.  Essentially the fair market value ranges are what we

21 would define as hammer prices meaning what the work of art

22 would sell for in the room.  A work of art sells in the room

23 and then typically there is buyer's premium charged to the

24 buyer on top of that, sellers often pay Christie's for their

25 services of bringing the work to the market.  None of those

1 | financial arrangements, proposed financial arrangements are

2 | included in these numbers.

3 | Q    Okay.  And then in the last sentence you make reference

4 | to a volume discount.  What's a volume discount?

5 | A    So volume discounts are applied when you're bringing a

6 | large collection of very like works to the market at once and

7 | the market can't absorb them.  So because there's essentially

8 | more material than any -- than the market can take at once,

9 | you are likely to see a reduced return for the material.

10 |      When we're faced with this, Christie's, if our client

11 | asks us, will provide a volume discount so that they can

12 | understand what they would get if they did bring the works to

13 | market.  We were instructed not to do that in this case.

14 | Q    Have you -- are you familiar with the term unsold rates

15 | as it's used in the auction business?

16 | A    Yes.

17 | Q    What are unsold rates?

18 | A    Typically Christie's sales are not always 100% sold.  So

19 | there's a percentage of the sale that fails to find a buyer.

20 | Q    And is it also known as BI?

21 | A    Yes.

22 | Q    What -- what does BI stand for?

23 | A    It stands for bought in.

24 | Q    Okay.  Is it the same concept?

25 | A    Yes.

1  Q    Okay.  Are -- are unsold rates or BI rates included in

2  this Christie's valuation?

3  A    No.

4  Q    Does it assume that every piece will sell?

5  A    No.

6  Q    Does this valuation, the valuation that's provided -- you

7  make no assumptions about sale process, so it's not included?

8  A    Correct.

9  Q    All right.  How about the -- the valuation ranges, the

10 fact that in the aggregates there is a range provided in the

11 December 17th letter of 454,000,000 to $867,000,000.  Do you

12 recall that?

13 A    Yes.

14 Q    Okay.  Does Christie's provide ranges to its clients in

15 other situations?

16 A    We have provided fair market value ranges in other

17 scenarios, yes.

18 Q    Okay.  How does this range, how does the range that was

19 determined in the DIA exercise, how does that compare with

20 ranges on other projects that you've been associated with?

21 A    It's -- it's -- it's not unusual to have so wide a range.

22 It's comparable to other types of ranges we have provided.

23 Q    And what are the reasons for ranges like these?

24 A    Well, it can be very difficult to predict exactly where a

25 work of art can sell, and so we rely, using the market data

1 approach, on actual market activity.  In certain cases,

2 especially for very high value works, pieces of that quality

3 don't come to the market very often.  So we're relying upon a

4 limited number of comparables to make our determinations.

5 Q    Let's -- let's -- maybe we could take an example.  Steve,

6 could you put up city demonstrative 698?  That should be in

7 your binder, Ms. Fusco.  Do you see it?

8 A    Yes.

9 Q    What -- what is the image that is depicted in City 698?

10 A    This is Peter Bruegel The Elder's, the Wedding Gowns.

11      (City's Exhibit 698 was identified)

12 Q    Is this a piece that was evaluated by Christie's in

13 connection with the DIA project?

14 A    Yes.

15 Q    And was it discussed at senior sign off meetings?

16 A    Yes.

17 Q    Is -- is there anything noteworthy about this particular

18 painting?

19 A    It is an absolute masterpiece.  Bruegel -- there's very

20 few works that are fully attributed to Bruegel, The Elder.  He

21 had two sons, both painters who were much more prolific.  And

22 there's very few that are in the United States.  So this is a

23 very famous painting.

24      MR. IRWIN:  Okay.  Before we go further, Your Honor,

25 I'll offer City 668 for demonstrative purposes.

1                THE COURT:  698?

2                MR. IRWIN:  Apologies, 698.

3                MR. SOTO:   Not offered to show the truth of any

4  particular --

5  A    Sixteenth Century.

6                THE COURT:  Right.

7                MR. SOTO:  No objection.

8                THE COURT:  All right.  For the --

9  Q    What was the valuation --

10  A    One hundred to $200,000,000.

11                THE COURT:  Hold on, hold on, hold on.  Okay.  So to

12  deal with the motion that was made, the Court will admit the

13  exhibit with the understanding that it's not hearsay.

14        (City's Exhibit 698 was admitted)

15  Q    What was the range that Christie's arrived at for the

16  Wedding Dance?

17  A    We valued this at 100,000,000 to $200,000,000.

18  Q    And what were the factors that contributed to the range

19  that was arrived at in connection with this particular

20  painting?

21  A    So for this work, as I said there's so few works by the

22  artist.  So you can't rely upon market activity of trading

23  works by this artist.  So then you have to look more broadly

24  to Sixteenth Century Flemish artists.

25        Of this quality very little actually comes to the market.

1  Most works of this quality are in public collections.  So you

2  have to consider what is the highest price ever paid for an

3  old master painting.

4      That is $77,000,000 which was achieved in 2002 for Peter

5  Paul Rubens the Massacre of the Innocence.  If you adjust that

6  for inflation you start to arrive at the lower end of our

7  valuation range which is to say we think if this work were to

8  be sold, it would break all records.

9      At the upper end, one must consider what the highest

10 price paid for any work of art ever was.  This sort of

11 graduates out of its specific category of Sixteenth Century

12 Flemish art into an iconic masterpiece.

13     And the most that's ever been paid for any work of art is

14 $250,000,000 for Cezanne's Card Players which was sold in 2011

15 to the State of Qatar.  Cezanne generally has a deeper buying

16 pool than Bruegel.  Stylistically he's more popular, it's more

17 modern.

18     So we do think that $250,000,000 was going to be a

19 realistic estimate, or a realistic price achievable.  So we --

20 we brought it down a little bit.  But we're dealing with

21 comparables at that level.  You're really looking at what are

22 the most -- the top prices paid for any work of art at all.

23 Q   Let's take a look at one more.  Steve, can you put up

24 City Exhibit 695?

25         MR. IRWIN:  The city will offer 695 for the same

1  purposes, Your Honor.

2           THE COURT:  Any objections?

3           MR. SOTO:  No.

4  Q    What is the image that is contained in City Exhibit 695?

5  A    This is Vincent Van Gogh's --

6     (City's Exhibit 695 was identified)

7           MR. IRWIN:  Pardon, Ms. Fusco.

8           THE COURT:  It is admitted.

9     (City's Exhibit 695 was admitted)

10 Q    What is the image that is contained in City Exhibit 695,

11 Ms. Fusco?

12 A    This is Vincent Van Gogh's 1887 self portrait.

13 Q    Is this a painting that was the subject of Christie's

14 review of COD paintings at the DIA?

15 A    Yes.

16 Q    Okay.  Was it the subject of senior sign off meetings?

17 A    Yes.

18 Q    And what was the range of values that Christie's ended up

19 assigning to this particular painting?

20 A    Eighty to $150,000,000.

21 Q    So that's a spread of $70,000,000?

22 A    Yes.

23 Q    Okay.  What were the factors that went into the range of

24 valuations that were decided for this particular painting?

25 A    So here we actually have more direct comparables to work

1  from.  Two self portraits by the artist have sold.  One in

2  1990 for 26.4 million, and one in 1998 for 71.5 million.  If

3  you adjust those for inflation you're -- you're at the sort of

4  upper and lower end, but a little more widely, I think, than

5  the range that we -- that we ended up ascribing.

6      Those two works were both much larger than this work.

7  The self portrait is actually really only the size of a piece

8  of paper.  And the date is 1887.  The two other comparables

9  were later in date 1888 and 1889 which doesn't seem like a

10  tremendous shift, but 1888 is actually a pivotal point in the

11  artist's career where his style changed dramatically from what

12  here is a more impressionistic style to later a more

13  expressionistic style which is preferable for Vincent Van

14  Gogh.

15      That said, there is -- you know, this is an iconic piece.

16  I think anybody who has any interest in art you could show

17  this to them on the street and they would be able to recognize

18  it as Van Gogh.  And so with the prevalence of what we might

19  call trophy hunters in today's market, especially new wealth

20  and emerging markets, this would be extremely desirable as an

21  immediately recognizable famous work of art.  So we raised the

22  lower end up from what the comparables might suggest.

23  Q    Okay.  Does Christie's have confidence in the valuations

24  that we discussed in connection with the Bruegel and the Van

25  Gogh?

1 A    Yes.

2 Q    Does Christie's stand behind the overall valuations that

3 were delivered to the city?

4 A    Yes.

5 Q    And why do you have confidence in that?

6 A    Because of the daily interactions that our specialists

7 have with the marketplace.  The thoroughness with which we

8 approached this project.  The senior sign off meetings that

9 gave every opportunity to examine any potential issues that

10 might emerge with the appraisal.  And also generally the fact

11 that so much of the value is in so few of the works.

12          MR. IRWIN:  Okay.  No further questions at this

13 time, Your Honor.

14          THE COURT:  All right.  Anyone in support of

15 confirmation want to ask questions of the witness?  Anyone

16 objecting to confirmation want to ask questions?

17          MR. SOTO:  May I approach the witness?

18          THE COURT:  Yes.

19          THE WITNESS:  Thank you.

20                    CROSS EXAMINATION

21 BY MR. SOTO:

22 Q    Ms. Fusco, we've met before.  My name is Ed Soto.  It's

23 nice to see you again.

24 A    You too.

25 Q    You've been employed with Christie's for approximately

1  seven years?

2  A    That's right.

3  Q    And you've been in your current position as the Vice

4  President and Associate Director of museum services at

5  Christie's for about five months or so if I added correctly?

6  A    That's right.

7  Q    Okay.  And in that role the vast majority of your work

8  involves managing and overseeing people who do appraisals and

9  -- in the manner that you've just described, correct?

10 A    Yes.

11 Q    Okay.  But you don't appraise or value art in your role

12 at Christie's, do you?

13 A    No.

14 Q    And prior to your promotion to Vice President and

15 Associate Director, you were the if I wrote this down right,

16 Associate Vice President at Christie's in the museum services?

17 A    Yes.

18 Q    Okay.  And as an Associate Vice President, you also

19 didn't appraise or value art either, correct?

20 A    That's correct.

21 Q    And prior to becoming Associate Vice President, you were

22 an account manager, correct?

23 A    Yes.

24 Q    And again as an account manager you didn't appraise or

25 value art either, correct?

1   A     That's correct.

2   Q     And prior to joining Christie's in 2010, you had no

3   experience in valuing or appraising art, correct?

4   A     I was never an appraiser of art.

5   Q     In fact that's right, you've never been trained

6   specifically on valuing a work of art, correct?

7   A     That's correct.

8   Q     And you've never taken a class specifically on valuing a

9   work of art, correct?

10  A     Correct.

11  Q     And you have no professional licenses, right?

12  A     Correct.

13  Q     And you have no certifications dealing with the valuing

14  of art, correct?

15  A     Correct.

16  Q     So you would agree with me that you have no experience or

17  expertise in connection with valuing or appraising any

18  specific work of art, correct?

19  A     My expertise lies in the methodology used to appraise a

20  work of art.  But I am not an appraiser of any genre of art.

21  Q     You are familiar with the uniform standards of

22  professional appraisal practice?  Did I say that right?

23  A     Yes.

24  Q     Okay.  I'll call it USPAP because I can't say that.  And

25  it provides standards for appraisals, correct?

1  A    That's right.

2  Q    But again you aren't certified by USPAP in connection

3  with its standards, are you?

4  A    I am not.

5  Q    Okay.  And Christie's didn't follow USPAP in connection

6  with the DIA appraisal project, correct?

7  A    Christie's does not adhere to USPAP standards.  Generally

8  our practices are not in tremendous conflict with what USPAP

9  suggests, but we are not USPAP certified and most of our

10 specialists have not gone through that training.

11 Q    Okay, fair enough.  And you didn't follow, if I

12 understood what you were just saying, USPAP guidelines in

13 developing your expert report in this matter, correct?

14 A    That's correct.

15 Q    Now Ms. Fusco, in connection with your work at

16 Christie's, you have overseen the valuation or appraisal of an

17 entire art collection at a museum, I think you said at least

18 six times?

19 A    Six times.

20 Q    Okay.  And you've overseen the valuation or appraisal of

21 an entire museum collection I think you testified for the

22 purpose of sale at least three times, correct?

23 A    I don't think I testified here, but in my deposition, I

24 believe we covered that.

25 Q    And the answer is yes?

1  A     If I recall correctly, yes.

2  Q     Okay.  In fact one of the services offered by Christie's

3  museum services department is to assist museums with the

4  selling of art, right?

5  A     That's correct.

6  Q     Okay.  So you would agree that museums frequently sell

7  art, correct?

8  A     Museums do participate with frequency in the marketplace.

9  Q     Okay.  And in fact Christie's has in the past reviewed

10  portions of the DIA collection for sale, isn't that correct?

11  A     We've reviewed individual works in the DIA collection for

12  sale.

13  Q     And you were involved with reviewing portions of the DIA

14  collection for sale on at least two occasions, correct?

15  A     Yes.

16  Q     And the first was in 2010, long before this bankruptcy?

17  A     Yes.

18  Q     And then again sometime between 2010 and 2012 again

19  before this bankruptcy, correct?

20  A     Right, yes.

21  Q     And both of those reviews involved a portion of the DIA

22  collection which were being appraised for the purpose of sale,

23  correct?

24  A     The first one was a single work and the second time was a

25  small collection of works.

1  Q    Okay.  So let's discuss Christie's appraisal of the

2  portion of the DIA collection that is the subject of your

3  expert report.  Can I call it the DIA appraisal for short and

4  you'll know I'm talking about your expert report?

5  A    Yes.

6  Q    So you began coordinating the DIA appraisal in May of

7  2013, correct?

8  A    Yes.

9  Q    And as part of the DIA appraisal project, Christie's was

10 provided with a specific list of artworks, right?

11 A    That's right.

12 Q    And that list purported to identify the works of art that

13 were purchased with city or Detroit funds, correct?

14 A    Yes.

15 Q    Okay.  And the city asked Christie's to appraise only

16 those works of art that were on that list, correct?

17 A    That's correct.

18 Q    And that list of works was prepared, if you know, by the

19 DIA Corp. which I don't know if I can say the DIA, but it's

20 just a non-profit that runs the museum?

21 A    I -- I only know that it was sent to me by the museum.  I

22 don't know how it was prepared.

23 Q    Okay.  Christie's provided no input in connection with

24 the preparation of that list though, did it?

25 A    We did not.

1  Q    Okay.  And neither you nor anyone at Christie's

2  independently validated whether the works of art on that list

3  were all the works at the DIA owned by the City of Detroit,

4  did you?

5  A    We did not.

6  Q    And you didn't conduct any additional research on the

7  ownership of the works of art at the DIA other than you

8  received the list and you worked with the list, correct?

9  A    Well, in conducting research in the literature you'll

10 see, you know, the title lines City of Detroit purchase.  So

11 in certain pieces based on research that we were doing for

12 another reason, there was validation of the ownership.  But we

13 took at face value the list that we received.

14 Q    Okay.  And you didn't conduct any research as to whether

15 any of the works of art were held in trust, correct?

16 A    No.

17 Q    And you also didn't research as to whether any of the

18 works of art were restricted in terms of transfer of the work,

19 whether it could be alienated or sold?

20 A    We did not.

21 Q    Christie's was retained by the city to appraise, I think

22 you said 2,773 works of art?

23 A    That's ultimately the number we determined were in the

24 COD collection.

25 Q    But you didn't actually appraise 2,773 works of art?

1  A     We formally appraised roughly 1,700 and 1,000 of them

2  determined were of very modest commercial value.

3  Q     So Christie's actually removed 1,032 of the original

4  number, 2,700.  You removed 1,032 works of art from the

5  appraisal because you deemed them of low value, right?

6  A     That's right.

7  Q     Okay.  But no one at Christie's ever analyzed the value

8  of all those 1,032 pieces of art, did they?

9  A     Well, in order to determine that they were of

10  inconsequential value to the overall, we had to review them.

11  And we analyzed the information provided by the DIA in order

12  to make that determination.

13  Q     So -- so you reviewed all 1,032 works of art?

14  A     Yes.

15  Q     And then you decided that those were of low value?

16  A     Correct.

17  Q     Took them away from the list, okay.  And to be clear,

18  outside of the approximately 1,700 works of art at the DIA

19  that were appraised by Christie's, because you didn't appraise

20  the 1,032, correct?

21  A     We didn't formally appraise those, correct.

22  Q     Okay.  So outside of those 1,700 or whatever the -- I

23  think there's a few scattered there, you never inspected or

24  valued any of the remaining works of art of the 62,000 pieces

25  of art at the -- at the museum, did you?

1  A    In conjunction with this project we did not look at or

2  appraise those works.

3  Q    For the DIA appraisal project, one of your

4  responsibilities was to determine which specialists should be

5  assigned to appraise the works at the DIA, correct?

6  A    Yes.

7  Q    In fact Christie's uses, I think you testified, 65

8  specialists and three outside consultants for the DIA

9  appraisal project, correct?

10 A    Yes.

11 Q    Okay.  And you would agree that without using those

12 specialists, you could never have done the valuation within

13 any of the time frames you were given, correct?

14 A    We couldn't have done the -- we couldn't have done the

15 valuation period.  The specialists are the ones that value the

16 works of art because of their connectivity to the marketplace.

17 Q    So really the issue wasn't just the timing, you would

18 have used specialists even if you had all the time in the

19 world, correct?

20 A    Yes.

21 Q    Okay.  And it was the specialists who were using the

22 comparable values as a baseline differentiated each work of

23 art to be appraised to determine a work's value, correct?

24 A    Yes.

25 Q    I think it's our number 3515, but I think it's the City's

1  Exhibit 343.  It's the same exhibit.  You testified about this

2  document earlier.  Now in connection with your work on this

3  document, you provided the data that indeed that forms the

4  basis of some of the valuations that are discussed in this

5  document, correct?

6  A    I -- yes.

7  Q    And you also edited the document several times, correct?

8  A    Yes.

9  Q    Now in connection with -- if you'll turn to Page 3, and

10 I'm going to highlight where it says alternative sales in that

11 first paragraph.  Actually -- actually why not do both?

12      In connection with this appraisal you were one of the

13 people who were interacting significantly with the people at

14 the DIA, correct?

15 A    Yes.

16 Q    Okay.  So when the letter went out, this preliminary

17 letter that went to Mr. Orr, you were familiar with the fact

18 that Christie's, as it says here, had also agreed to assist

19 the city by helping conceive alternatives to sale that could

20 potentially allow the collection to remain intact, correct?

21 A    Yes.  I knew we were doing that.

22 Q    And in this realm Christie's came up with five potential

23 alternatives.  One is the use of art as collateral for a loan.

24 The second listed one as the leasing the art to a partnership

25 museum.  The third alternative was the creation of a

1  masterpiece trust.  The fourth alternative was the sale and

2  permanent loan or gift to the DIA.  And the final alternative

3  was a traveling exhibition.  And you were familiar with the

4  fact that those were alternatives that were being considered,

5  correct?

6  A    Yes.

7  Q    Looking down at the first sentence of the next paragraph

8  it says it is clear that the success of these alternatives

9  depends heavily on cooperation between the city and the museum

10  along with supporting third parties in certain cases.  Do you

11  see that?

12  A    Uh-huh, yes.

13  Q    Okay.  It also says at the end of the first paragraph

14  that these five alternatives are not mutually exclusive, some

15  could be exercised in tandem.

16      In connection with this aspect of the initial report that

17  you submitted to the city on December 3rd of 2013, did the city

18  ask ever -- ever -- did anyone from the city ever communicate

19  with you to address these alternatives for sale?

20  A    Not to me personally, but -- as I was not in charge of

21  this.  I don't think I would have been the appropriate person

22  to direct any inquiries to.

23  Q    Okay.  Did anybody from the DIA ever contact you and

24  discuss any of these alternatives with you?

25  A    Again, not me personally.

1          MR. SOTO:   Okay.  Thank you, Ms. Fusco.

2          THE COURT:   Any other cross examination of the

3    witness?  All right.  Redirect.

4          MR. IRWIN:   Hopefully very brief, Your Honor.

5                     REDIRECT EXAMINATION

6    BY MR. IRWIN:

7    Q    Ms. Fusco, you -- you testified about your involvement in

8    -- in assisting the DIA and other museums selling art.  Do you

9    recall that?

10   A    Yes.

11   Q    Why -- why do museums come to Christie's to perhaps sell

12   a piece of art?

13   A    We have I'd say the strongest network internationally,

14   knowledge of collectors, and people looking to acquire works

15   of art, and museums trust that we will achieve the highest

16   possible results on their behalf.

17        We also have worked with so many museum clients on

18   successful sales.  And we're very skilled in managing issues

19   of PR, how to advise a museum through the sales process.

20   Q    Are they seeking to do something with their own

21   collections in terms of the balance of their pieces?

22   A    It depends on the project.  I'd say often the majority of

23   museums are selling works from their collection where a work

24   either falls outside of its mission, or there is duplication

25   within the collection.  And the sale -- the proceeds from that

1  sale then go towards the acquisition of new pieces that might

2  better compliment the mission or add to the collection in --

3  in a substantial way.

4  Q    And then briefly, you testified about USPAP.  Mr. Soto

5  asked you some questions about USPAP and whether you're

6  familiar with USPAP.  Do you recall that?

7  A    Yes.

8  Q    And -- and he referred them -- to them quite specifically

9  as guidelines.  Did you -- do you recall that testimony?

10  A    Yes.

11  Q    What is it that you know about USPAP in terms of whether

12  it is mandatory?

13  A    It is not mandatory.  It's a standard for providing an

14  appraisal, but it's not the standard.

15  Q    Okay.  And does Christie's follow it?  Does Christie's

16  purport to follow USPAP?

17  A    No.

18  Q    And does Christie's make that very well known to the

19  world?

20  A    If somebody asks specifically, I think we would tell them

21  yes, it's very rarified.

22          MR. IRWIN:  Very good. No further questions, Your

23  Honor.

24          THE COURT:  Any further questions?

25          MR. SOTO:  No, Your Honor.

```
 1        THE COURT:  All right.  You are excused.  Thank you

 2   for coming today.

 3        (WITNESS VANESSA FUSCO WAS EXCUSED AT 11:38 A.M.)

 4        MR. MONTGOMERY:  Your Honor, may I approach the

 5   bench with copies for the Court?

 6        THE COURT:  Yes, please.

 7        MR. MONTGOMERY:  Your Honor, if we might, the

 8   retiree committee would like to invite Ms. Kim Nicholl to be

 9   brought forward as a witness.

10        THE COURT:  Sure.  Step forward, please.  Raise your

11   right hand.

12        (WITNESS KIM NICHOLL WAS SWORN)

13        THE COURT:  All right.  Please sit down.

14        MR. MONTGOMERY:  Good morning.  And for the record,

15   Claude Montgomery, Dentons, U.S. for the retiree committee.

16                       DIRECT EXAMINATION

17   BY MR. MONTGOMERY:

18   Q    Would you state your full name for the record, please?

19   A    Kim Nicholl.

20   Q    And where do you reside, Ms. Nicholl?

21   A    I live in Glenville, Illinois.

22   Q    And by whom are you employed?

23   A    The Segal Company.

24   Q    And do you have a title at Segal?

25   A    Yes.  I'm the Senior Vice President and also the National
```

1  Public Sector Retirement Practice Leader.

2  Q    Okay.  I would ask you to speak into the microphone and

3  clearly if you would, so that all of the testimony you're

4  going to give to the Court can be heard and recorded.  Would

5  you do that for me?

6  A    Yes, I will.

7  Q    All right.  Thank you.  And if you don't understand any

8  questions that I ask, would you please just tell me and I'll

9  rephrase them, all right?

10 A    Yes.

11 Q    Thank you.  Okay.  So what is Segal and Company, Ms.

12 Nicholl?

13 A    Segal and Company is a employee benefits consulting firm.

14 We provide actuarial services and consulting in connection

15 with employee benefit programs.

16 Q    Okay.  And do you have any education of college or higher

17 level?

18 A    Yes.  I have a Bachelor of Science Degrees -- Degree in

19 mathematics.

20 Q    Okay.  And from what institution?

21 A    Loloya University.

22 Q    And it -- what -- in what year?

23 A    I graduated in 1977.

24 Q    And with respect to that Bachelor of Science in

25 mathematics, did you have any honors that were associated with

1  that?

2  A    Yes.  I graduated magna cum laude.

3  Q    Okay.  And do you have any professional education either

4  post-graduate at a university level, or associated with

5  professional organizations?

6  A    Yes.  I am a Fellow in the Society of Actuaries and I

7  attained that through the passage of a series of actuarial

8  exams.

9  Q    And how long did that process of taking those exams take?

10  A    Approximately six years.

11  Q    Okay.  Other than the Society of Actuaries, are there any

12  other organizations of a professional nature to which you

13  belong?

14  A    Yes.  I also am an enrolled actuary under ERISA which was

15  -- I achieved that through -- through a series of exams as

16  well.  I am a member of the American Academy of Actuaries and

17  a member of the Conference of Consulting Actuaries.

18  Q    Okay.  Very briefly, what is an actuary?

19  A    Well, there's different types of actuaries, but generally

20  we are trained in assessing risks and my specialty is in the

21  financial calculations related to employee benefit programs

22  such as pension plans and retiree health care plans.

23  Q    Okay.  And when did you first become an actuary?

24  A    I started out my career as an actuarial analyst.  I had

25  not passed enough exams to be a member of the Society of

1  Actuaries at that point.  That took me a couple of years.  But

2  I basically started in the actuarial field when I graduated

3  from college.

4  Q    And who was your first employer?

5  A    The Wyatt Company which is now called Towers Watson.

6  Q    And what did you do for Wyatt?

7  A    I worked my way through the ranks there basically

8  starting out as a actuarial analyst and then progressed

9  through to becoming a lead actuary for a number of private

10 pension plans.

11 Q    Okay.  And after Wyatt, where did you go?

12 A    After the Wyatt Company, I joined Buck Consultants which

13 is like Segal, an actuarial consulting firm.  And I worked at

14 Buck Consultants from 1993 through 2007.

15 Q    And why did you leave Buck in 2007?

16 A    I left Buck in 2007 because PriceWaterhouse Coopers had

17 recruited me to start a public sector retirement practice

18 which they currently did not have much of a practice there.

19 Q    So obviously --

20 A    At that time.

21 Q    You left PriceWaterhouse Coopers to go to Segal?

22 A    Yes, I did.  I left PriceWaterhouse Coopers in 2010 to

23 join Segal which was much more established in providing public

24 sector consulting.  And so I started at Segal as Financial

25 Director of Public Sector Retirement Plans.

1  Q    And what do you do for Segal today?

2  A    Well, as I mentioned, I am the -- the -- I lead the

3  retirement practice related to public sector plans and I also

4  consult to a number of public sector clients.  So I serve as

5  the lead actuary or signing actuary.  I also do expert witness

6  work such as what I'm doing here for the City of Detroit.

7  Q    You used the phrase lead actuary or signing actuary.

8  What is that?

9  A    The lead actuary or signing actuary is the actuary

10 basically who is in the -- fully responsible for the work

11 product that is delivered by Segal to the client.

12      We're the -- the main face to the client.  Going to the

13 presentations, explaining results, and leading the team.

14 Q    And what kind of services does Segal provide its clients

15 through you and your team?

16 A    For our public sector clients, we provide what is called

17 the annual actuarial valuation which is the valuation

18 completed on an annual basis to determine the contribution

19 requirement for the plan for that year.

20      We also provide experience studies where we assess the

21 appropriateness of the actuarial assumptions.  We also prepare

22 for other clients.  We will perform actuarial audits where we

23 check the work of other actuaries.

24      We do legislative cost notes or plan design studies where

25 we determine the financial impact of changes in benefit

1  provisions or alternative plan designs.  And we provide

2  educational services and sessions to boards of trustees.

3  Q    Are these all services that you personally provide

4  through Segal?

5  A    Yes.

6  Q    Okay.  And do you lead a team when you do that, or do you

7  do that all on your own?

8  A    I always lead a team in providing these services.

9  Q    Okay.  Now, in doing the annual evaluation if I heard you

10  correctly, as one of the services you provide clients, what's

11  involved in doing an annual valuation?

12  A    There's a series of steps that we go through in

13  performing an annual valuation.  We have to have the census

14  data, we need to know -- by that I mean we need to know who is

15  in the plan, what their status is, if they're active or

16  retired, or deferred vested.

17       For retirees we need to know what benefit they are

18  receiving and in what form of payment that benefit is paid.

19  We also have to have statistics about their -- their -- their

20  birth date so we know how old they are.  So that will help us

21  with determining life expectancy.

22       For active employees we need to know date of birth, date

23  of hire, and typically salary because pension benefits are

24  usually based on final average salary.  So we gather the

25  census data as of the valuation date.

1    We also have to have actuarial assumptions related to the

2 benefit provisions of the pension plan.  And backtracking a

3 bit there, another input to the valuation process is the

4 benefit program.  We need to understand how the benefits

5 operate, what employees are entitled to receive, and when

6 they're entitled to receive it.  And how those benefits are

7 calculated.

8    We have to make assumptions about employee behavior.

9 Those types of assumptions are categorized into two

10 categories, demographic assumptions and economic assumptions.

11 Q    Are all of these steps that you have to take for all

12 valuations for pension plans?

13 A    Yes.

14 Q    Does it matter whether it's in the public sector or the

15 private sector?

16 A    No, it doesn't.

17 Q    Okay.  Now, do you ever have to value assets in

18 connection with doing these annual valuations?

19 A    Yes.

20 Q    And what's involved in valuing assets?

21 A    Well, once -- once we have the census data, and the

22 assumptions, and the benefit provisions and so forth, we code

23 our valuation software and we run the liability.  So we need

24 to compare the liabilities of the pension plan against the

25 assets of the pension plan to determine the funded status of

1  the plan, and how -- and what contributions are required.

2      And so that comparison is done against an asset value.

3  And the asset values that are typically used in the public

4  sector for purposes of determining contributions are called

5  the actuarial value of assets.

6      And by that I mean it's a value that will take the

7  investment gains and losses that occur over a time period say

8  five years, and the gains or losses that are in excess of or

9  below the assumed investment return, are amortized or smoothed

10 over again in my example, a five year period.

11 Q   All right.  Let's try to step back a half a second.  Is

12 there something other than an actuarial value -- value of

13 assets that you ever look at as part of your actuarial

14 valuation work?

15 A   Yes, of course, the market value of assets.

16 Q   Okay, okay.  So market value of assets is not the same

17 thing as actuarial value of assets?

18 A   No.  The actuarial value of assets are based upon the

19 market value of assets.

20 Q   Is it always the starting point?

21 A   It's always the starting point from one year to the next,

22 yes.

23 Q   Okay.  Okay.  Now, you've mentioned contributions.  What

24 role if any does an annual valuation play in determining what

25 you called contributions a moment ago?

1  A    The annual valuation as I mentioned, we determine the

2  liabilities and we compare those to the assets.  And then

3  based upon the cost method and the funding policy that the

4  plan sponsor has adopted, we will determine the annual

5  contribution required in order to meet the goal of the funding

6  policy.

7  Q    Okay.  Have you ever been engaged by a public pension

8  plan in connection with an annual valuation?

9  A    Yes.

10  Q    Could you give the Court some examples, please?

11  A    I've worked on a number of plans across the country in --

12  in various states, including the Illinois Teachers Retirement

13  System, the Pennsylvania Teachers Retirement System, Missouri

14  Teachers, Ohio Teachers.

15       I worked with the Indiana Public Employees Retirement

16  Fund, the Texas Employees Retirement System, the Ohio Police

17  and Fire Fund.  I also have done a number of state -- of local

18  and municipality valuations including Milwaukee County, the

19  City of St. Louis Firefighters Plan, the City of Milwaukee

20  Retirement System, the Fort Worth Employees Retirement System.

21  That's just to name a few.  I've done many.

22  Q    Okay.  Are you today the currently responsible or signing

23  actuary for any public pension plans?

24  A    I am.

25  Q    Which ones?

1  A    The Ohio Teachers Retirement System, the Chicago Teachers

2  Pension Fund, the Chicago Park District Pension Fund, the

3  North Dakota Teachers Retirement System.  I also am the

4  signing actuary for the work that we do with the Illinois

5  Commission on Government Accounting and Forecasting where we

6  will do replication valuations for the five retirement systems

7  in the State of Illinois including the state university's

8  retirement system, the Illinois Teachers Retirement System,

9  and the Illinois Employees Retirement System.

10 Q    What was the name of that Illinois commission again?

11 A    It's -- the shorthand is COGFA, C-O-G-F-A.  It's

12 commission on -- on government and forecasting -- government

13 forecasting and accountability.  It's kind of a -- an

14 oversight of the work that is done for the five largest

15 pension systems as well as all the local systems in the State

16 of Illinois.

17 Q    Is it a creature of state law in Illinois?

18 A    Yes, it is.

19 Q    Okay.  In addition to actuarial valuations, have you ever

20 performed any studies for clients with respect to pension

21 plans?

22 A    Yes, many.

23 Q    What kind of studies have you done?

24 A    We have done numerous plan design studies where we will

25 assess the financial impact on the pension plan of making

1  changes to the pension plan or establishing a new plan.  We

2  will -- we also do experience studies where we assess the

3  appropriateness of the actuarial valuations.

4  Q    Okay.  And why would one perform a benefit design study?

5  A    Benefit design studies are performed in response to

6  either a need for a benefit change.  So for example if it's

7  determined by the stakeholders that benefits are not adequate

8  in some manner, there will be a request to perhaps improve the

9  benefit, maybe an early retirement reduction will be modified,

10 or eligibility for retirement might be a need for -- there

11 might be a need for modification.

12      Recently, however, plan design studies have been

13 undertaken since the market crashed to help public sector

14 plans reduce contributions.  And so plan design studies that

15 we've been working on for the past let's say six years or so,

16 are in relation -- are relative to the market crash where we

17 look at modifying future accruals for existing employees.

18      We have also looked at reducing COLAs, cost of living

19 adjustments or annual escalators for retirees.  We have looked

20 at establishing a new tier of benefits for new hires to a

21 pension plan.  So the plan design work that we do really

22 covers the -- a whole broad range of different types of

23 studies that we could entail in connection with that type of a

24 review.

25 Q    Now you used the -- the pronoun we.  Does we mean you in

1 this context?

2 A    I -- I -- I and my team, yes.

3 Q    Now you mentioned something called an experience

4 analysis.  Could you tell the Court again what an experience

5 analysis is?

6 A    Yes.  As actuaries we need to make assumptions about the

7 future.  Because we are determining the value of liabilities

8 that are based upon benefit provisions in a pension plan.

9      And those benefits are dependent upon when an employee

10 retires, or terminates, and why an employee retires or

11 terminates.  So a benefit -- the assumptions that we will

12 review, as I mentioned earlier, they're based on either

13 demographic assumptions which relate to employee behavior, or

14 economic assumptions which relate to the time value of money

15      So on the demographic side, we will look at the -- the

16 percentage of retirees who -- I'm sorry, the percentage of

17 actives who might retire at any particular age who might

18 terminate, become disabled, or die.

19      Post-retirement we look at mortality rates because we

20 need to know how long -- how long the benefit is expected to

21 be paid.  Because that of course will drive the liability.

22      On the economic side, we look at the investment rate of

23 return.  We determine what the appropriate interest rate would

24 be for valuing the plan liabilities.

25      We will also assess the appropriateness of the underlying

1  inflation component of all the economic assumptions which

2  include the -- the investment rate of return or discount rate,

3  individual salary increases.  That's how an individual active

4  member's salary will grow from year to year.

5  Q    Okay.

6  A    As well as total payroll, how the total payroll will

7  grow.

8  Q    Now do you ever do peer review or -- or peer review or

9  audits of pension plans?

10  A    Yes.

11  Q    That's been done by other experts.

12  A    Yes, very often.

13  Q    Okay.  And why might you do that?  Or why have you been

14  asked to do that in the past?

15  A    We've been asked to do that in the past basically to

16  assess the -- to make sure that the other actuary, the signing

17  actuary for a pension plan is doing the -- the work

18  appropriately.  So actuarial audits will typically either be a

19  limited scope which means that we will test sample

20  calculations and review the report, and review the

21  assumptions, or a full scope which means that we will

22  duplicate the -- the work that the actuary does.

23       We will do a full valuation and see how close -- how

24  close we come to matching the liabilities and contributions

25  that the signing actuary has produced.

1  Q    Okay.  Ms. Nicholl, did you prepare a C.V. in connection

2  with this case?

3  A    I did.

4  Q    Would you look in your binder for Exhibit 10186?  If we

5  could bring that on the screen.

6  A    I have it.

7  Q    Could you identify for the Court what is Exhibit 10186 in

8  your binder?

9  A    This is my C.V.

10      (Retiree Exhibit 10186 was identified)

11 Q    And did you prepare this C.V. in connection with a report

12 that you may have prepared?

13 A    Yes.  I -- I prepared this in connection with my expert

14 report.

15 Q    And was it actually in your expert report?

16 A    Yes, it was.

17      MR. MONTGOMERY:  At this point, Your Honor, I'd like

18 to admit Retiree Exhibit 10186, Ms. Nicholl's C.V.

19      MR. WAGNER:  As long as it's complete, I have no

20 objection.

21      MR. MONTGOMERY:  I'm offering it as it's written.

22      MR. WAGNER:  No objection.

23      THE COURT:  All right.  It is -- it is admitted.

24     (Retiree Exhibit 10186 was admitted)

25      MR. MONTGOMERY:  Thank you.

1    THE COURT:  And let's stop for lunch now and

2  reconvene please at 1:30.

3    (WITNESS KIM NICHOLL WAS TEMPORARILY EXCUSED AT 11:59

4  A.M.)

5    THE CLERK:  All rise.  Court is in recess.

6    (Court in Recess at 11:59 a.m.; Resume at 1:30 p.m.)

7    THE CLERK:  All rise.  Court is in session.  Please

8  be seated.

9    THE COURT:  Okay.  You may proceed.

10    MR. MONTGOMERY:  Thank you, Your Honor.

11    (WITNESS KIM NICHOLL RESUMED THE STAND AT 1:30 P.M.)

12  BY MR. MONTGOMERY:

13  Q   Ms. Nicholl, let us resume where we were just before you

14  went to lunch.  Perhaps you can move the microphone a little

15  bit closer in -- there you go.  Thank you.

16    Have you ever had occasion to testify before a Court, Ms.

17  Nicholl?

18  A   Yes, I have.

19  Q   And have you ever been qualified as an expert witness?

20  A   Yes, I have.

21  Q   Okay.  And are examples of your expert witness resume

22  contained in the C.V. that was provided to the Court as

23  exhibit number 10186?

24  A   Yes.

25  Q   Could you turn to Page A-2 of your C.V., please?  And

1  look at the cases worked on as expert and fact witness and can

2  you tell the Court what has been your history as an expert

3  witness in prior litigation?

4  A    The cases listed here are those in which I was an expert

5  within the last four years.  And that includes Towers --

6  Thomas A. Paulsen v Towers Perrin related to a private sector

7  termination and non-qualified plan benefits that were paid as

8  a result of the private sector termination.

9      The Firemen's Retirement System of St. Louis v the City

10 of St. Louis.  This was a case that was related to a new plan

11 design for the firemen's retirement system.  That I worked on

12 behalf of the city.

13     And then the City of Stockton.  I'm an expert witness for

14 the -- on pension issues in -- in trial.

15 Q    And -- and have you in fact testified in the Stockton

16 case?

17 A    Yes, I have.

18 Q    And when was that?

19 A    In June.

20 Q    Of this year?

21 A    Of this year.

22 Q    Okay.  Now have you testified before any legislative

23 bodies?

24 A    Yes.  I have testified before legislative bodies in many

25 states across the country.

1  Q    Okay.  And does your C.V. contain examples of legislative

2  bodies for whom you've testified?

3  A    Yes, it does.

4  Q    Can you go to Page A-2 of your C.V. and look at the last

5  sentence under published works and speeches?

6  A    Yes.  It says that I've testified in Illinois, Maryland,

7  Ohio, Pennsylvania, and Texas.

8  Q    Okay.  Have you given speeches before professional

9  organizations?

10  A    Yes, I have.

11  Q    And could you give some examples to the Court, please?

12  A    I've spoken in front of the National Council on Teacher

13  Retirement, the National Association of State Retirement

14  Administrators, the National Conference on Public Employee

15  Retirement Systems, the International Foundation of Employee

16  Benefits, and the Conference of Consulting Actuaries.

17  Q    Have you made any or written any publications, or made

18  any presentations which have been published?

19  A    Yes, I have.

20  Q    And are those listed on your C.V.?

21  A    Yes.  Yes, they are.

22  Q    Could you go to Page A-2 of your C.V. under recent

23  presentations and publications and tell the Court some

24  examples.

25  A    I wrote an article for *Government Finance Review* which is

1  entitled Public Sector Pension Plans, Major Challenges and

2  Common Sense Solutions.

3      I've written a number of articles related to the new

4  accounting standards under GASB that are effective this year

5  for public sector plans.  I have written articles on funding

6  policy and the market value of liabilities, actual cost versus

7  market price.  And then finally a couple of articles on

8  pension plan design.

9  Q    Could you tell the Court what is GASB?

10 A    GASB is the Governmental Accounting Standards Board.  And

11 that is the board that prepares and it mandates the use of

12 certain accounting standards for public sector pension plans.

13 Q    And during your career, have you gained any experience

14 with something called a defined benefit plan?

15 A    Yes.

16 Q    How have you done that?

17 A    Well, that's what my career has been focused on is in the

18 valuation and financing of defined benefit programs.

19 Q    Okay.  And have you gained any experience with defined

20 contribution plans?

21 A    Yes, I have.

22 Q    And how have you gained that experience?

23 A    Again, related to plan design and compensation, or

24 retirement benefits I should say that are provided to public

25 sector employees.  Many -- oftentimes it consists of a defined

1  benefit and a supplemental defined contribution plan.

2  Q    And by whom has Segal been retained in this case?

3  A    By the retiree committee.

4        MR. MONTGOMERY:  Your Honor, I would proffer Ms.

5  Nicholl as an expert in the administration and design of

6  pension plans and the actuarial science of pension plans.

7        MR. WAGNER:  No objection.

8        THE COURT:  All right.  You may proceed.

9        MR. MONTGOMERY:  Thank you, Your Honor.

10 Q    Okay.  Did you prepare an expert report in connection

11 with this case, Ms. Nicholl?

12 A    Yes, I did.

13 Q    Okay.  And have you been asked to form any -- any

14 opinions in connection with this case?

15 A    Yes, I was.

16 Q    Okay.  Were you asked to form an opinion as to the

17 reasonableness or accuracy of the allowed GRS pension claim

18 utilizing the assumptions under the plan of adjustment?

19 A    Yes.

20 Q    Were you asked to form an opinion as to the

21 reasonableness or accuracy of the allowed PFRS pension claim

22 utilizing the assumptions under the plan of adjustment?

23 A    Yes.

24 Q    Were you asked to form an estimate of the recovery under

25 the plan of adjustment based upon city contributions for Class

1  11 utilizing the allowed GRS pension claim?

2  A    Yes.

3  Q    Were you asked to form an estimate of the recovery --

4          THE COURT:  Hold on one second.

5          MR. MONTGOMERY:  Yeah.

6          THE COURT:  I need you to slow down like 50%.

7          MR. MONTGOMERY:  My apologies, Your Honor.

8          MR. WAGNER:  And I object to the leading nature.

9  You can just ask the opinions that she's offering.

10         MR. MONTGOMERY:  I believe the proper foundation is

11 to ask whether an opinion was formed and then if an opinion

12 was given and then what it was.

13         THE COURT:  The objection is overruled.

14         MR. MONTGOMERY:  Thank you.

15         THE COURT:  Except my objection about going too

16 fast.  That -- that was not overruled.

17         MR. MONTGOMERY:  I well understand that Your Honor

18 always sustains his own objections.

19 Q    The last question I was asking much too rapidly, Ms.

20 Nicholl, was were you asked to form an opinion as to the

21 estimate of the recovery under the plan of adjustment based

22 upon city contributions for Class 11 utilizing allowed GRS

23 pension claim?

24 A    Yes.

25 Q    Okay.  Were you asked to form an opinion as to the

1  estimate of the recovery under the plan of adjustment based

2  upon city contributions for Class 10 utilizing allowed PFRS

3  pension claim?

4  A    Yes.

5  Q    Were you asked to form an opinion as to the actual value

6  of -- for Class 10 claims as of June 30, 2013?

7  A    Yes.

8  Q    Were you asked to form an opinion as to the actual value

9  for Class 11 claims as of June 30, 2013?

10 A    Yes.

11 Q    Were you asked to form an opinion as to the recovery

12 value for Class 10 claims based upon city contributions?

13 A    Yes.

14 Q    And were you asked to form an opinion as to the recovery

15 value for Class 11 claims based upon city contributions?

16 A    Yes.

17 Q    And did you in fact form an opinion as to each of those

18 eight questions?

19 A    Yes, I did.

20 Q    Okay.  And did you prepare a report containing your

21 opinions as to each of those eight questions?

22 A    Yes, I did.

23 Q    And were you asked in connection with that report to

24 analyze and demonstrate the distribution and aggregate impact

25 of monthly benefit reductions and benefit eliminations

1 proposed under the plan of adjustment?

2 A    Yes.

3 Q    And is that contained in your report?

4 A    Yes, it is.

5 Q    Okay.  Now, in preparing your report, how did you run the

6 necessary calculations to determine any liabilities and/or

7 distributions for which you were asked to form opinions?

8 A    As we were talking about the actuarial evaluation process

9 prior to the break, I collected the census data as of June 30,

10 2013 and understood in detail the terms and conditions of both

11 benefit programs as well as the assumptions.  And set up -- my

12 team and I set up computer programming in order to value the

13 liabilities of the two plans under the settled -- settlement

14 discount rate as well as using the risk free rates for the

15 actual claim.

16 Q    Okay.  Now did you run the calculations by hand?

17 A    No.

18 Q    How did you do that?

19 A    Segal has a proprietary valuation software.  It has, I

20 should say, proprietary valuation software called Star.  And

21 it -- we programmed -- I -- I and my team, I should say,

22 programmed Star to run the liabilities.

23 Q    Now you just made reference to a team.  Did you utilize a

24 team in forming your opinions and your analysis?

25 A    The opinions are mine, but my team helped run the

1  liability calculations under my direction.

2  Q    Uh-huh.  Okay.  And who were the members of your team?

3  A    The team included Matt Strom who is a Fellow of the

4  Society of Actuaries.  Jim Nolan, also a Fellow of the Society

5  of Actuaries.  And Jake Leboskiss.  Those were the main

6  members of the team.

7       From time to time we would call upon other members within

8  Segal, including Harold Cooper and Tom Skupian.

9  Q    Okay.  Would you turn to what has been identified in your

10  book as Exhibit 10993?

11  A    Yes.

12  Q    And would you tell the Court what is Exhibit 10993?

13  A    This is my expert report.

14       (Retiree Exhibit 10993 was identified)

15  Q    Okay.  And were you deposed in the -- in connection with

16  the delivery of this report?

17  A    Yes, I was.

18  Q    And prior to your deposition did you supplement the

19  disclosures contained in your report?

20  A    Yes, I did.

21  Q    Would you turn to Exhibit 10994 and tell us what that is?

22  A    This is the supplement to my expert report that includes

23  some additional information that I used in connection with

24  preparing my opinion.

25       (Retiree Exhibit 10994 was identified)

1        MR. MONTGOMERY:  Okay.  Your Honor, at this time I

2   would like to proffer Exhibit 10993 as Ms. Nicholl's expert

3   report as a demonstrative only to help her guide -- guide her

4   testimony and in the event that she doesn't actually testify

5   to any of the substance, it will not be in evidence, Your

6   Honor.

7        MR. WAGNER:  As long as it's only a demonstrative,

8   that's fine.

9        MR. MONTGOMERY:  Thank you.

10       THE COURT:  All right.  On that basis, it -- it is

11  admitted.

12       (Retiree Exhibit 10993 was admitted)

13  Q    Based upon your work which you did in preparing the

14  report, did you gain an understanding of how the City of

15  Detroit provides monthly pension benefits to its employees and

16  retirees?

17  A    Yes, I did.

18  Q    And did you gain an understanding of how it did that

19  prior to the commencement of the Chapter 9?

20  A    Yes.

21  Q    Okay.  Could you please describe how the City of Detroit

22  provides pension benefits to its employees and retirees as you

23  understand it?

24  A    Generally, at a high level there are two pension systems

25  or -- or retirement systems, the general retirement system

1  also known as GRS, and the police and fire retirement system,

2  PFRS.  The GRS retirement system consists of a defined benefit

3  and defined contribution plan.

4      The defined benefit plan has formulas within it for

5  retirement or termination, or disability.  Those formulas are

6  based upon -- the benefits I should say are based upon formula

7  that is -- includes years of service, a multiplier, and

8  average final compensation.

9  Q    Okay.  And what -- focusing on GRS just for the moment.

10 What does GRS mean?

11 A    General retirement system.

12 Q    And what employees or retirees are covered by the GRS

13 system?

14 A    The employees who work for the City of Detroit who are

15 not public safety employees, but it also does include

16 emergency medical service employees.

17 Q    Okay.  And how are the benefits provided under GRS

18 established?

19 A    By city charter, collective bargaining agreements, and

20 city ordinances.

21 Q    Is the system as you understand it tax qualified?

22 A    It is.

23 Q    And what does tax qualified mean?

24 A    It means that it is tax qualified under -- by the

25 Internal Revenue Service.  Basically so complies with those

1  requirements.

2  Q    Now I believe a moment ago you said it had both a defined

3  benefit plan feature and a defined contribution plan feature,

4  did I understand that correctly?

5  A    You did.

6  Q    Could you describe the -- the difference between a

7  defined benefit plan and a defined contribution plan for GRS?

8  A    So a defined benefit plan is a plan in which the benefits

9  are defined and the contribution is not.  And the -- the

10 benefit structure and the assumptions and so forth that go

11 into providing the benefits that will drive the amount of

12 contributions that need to be paid.

13      And as I noted earlier, the GRS and PFRS are based upon

14 benefit formulas that include final average compensation,

15 service, and a multiplier.

16 Q    Okay.  And when you say the benefits are defined, were

17 you referring to the formula you just mentioned?

18 A    Yes.

19 Q    Okay.  And when you say contributions are not fixed, what

20 do you mean by that?

21 A    The contributions vary from year to year depending upon

22 the funded status of the plan and the actual experience of the

23 plan that has occurred.

24 Q    You mentioned an actuarial valuation at the very

25 beginning of your testimony this morning.  Does that play a

1 role in determining these variable contributions?

2 A    It does.

3 Q    Again, would you tell the Court how it works in this

4 case?

5 A    In this case the actuary who is Gabriel, Roeder, and

6 Smith, they on an annual basis prepare an annual -- an

7 actuarial valuation collecting census data and understanding

8 he benefit provisions and so forth as I described earlier.

9     They determine the liabilities of the plan, the actuarial

10 accrued liability, compare that to the assets to determine the

11 UAAL as we've called it earlier, and based upon the

12 amortization policy, or methodology I should say, they

13 amortize the UAAL.  That amount is added to what's called the

14 normal cost and that determines the annual contribution for

15 the year.

16 Q    Okay.  Is there such a thing as service credit?

17 A    Yes.  Service --

18 Q    What is -- and what is service credit in this context?

19 A    Well, service credit is how much service an employee has

20 that determines the amount of benefit that the employee will

21 get at retirement or termination.

22 Q    Is it part of that formula you've just mentioned?

23 A    It is.

24 Q    Okay.  And as to the defined contribution plan, how does

25 that work?

1    A     The defined contribution plan is called the annuity

2    savings fund or ASF.  And that plan consists of individual

3    member accounts like a 401(k) plan in the private sector.  And

4    members are allowed to contribute 3%, 5%, or 7% after tax into

5    their individual account balance which is then credited with

6    interest on an annual basis.

7    Q     Okay.  And as you understand it, can employees withdraw

8    at a particular moment in time any amounts from their annuity

9    savings fund?

10   A     When they retire or terminate they can withdraw their

11   money.  They also can withdraw -- make a one time withdrawal

12   once they achieve 25 years of service.

13   Q     Now is the information that you just gave the Court

14   contained in your report?

15   A     Yes, it is.

16   Q     Could you look at Pages 5 and 6 and tell the Court if

17   that's what you're referring to?  Paragraphs 9 through 12.

18   A     Yes.

19   Q     Okay.  Now could you tell the Court -- could you take

20   that off the screen?  Could you tell the Court how the PFRS --

21   PFRS system works as you understand it?

22   A     It is similar to the GRS system in that it also consists

23   of a defined benefit and a defined contribution plan.  And the

24   PFRS benefits are also determined based upon average final

25   compensation, service credit, and the multiplier.

1     The retirement eligibility for the PFRS employee is at

2  earlier ages than for GRS employees given the nature of their

3  job.  The defined contribution portion of the plan for PFRS

4  holds the before tax member contributions that employees are

5  required to make to PFRS.

6  Q    Okay.  And how are -- how is the PFRS defined benefit

7  plan funded?

8  A    It is funded by employee -- mandatory employee

9  contributions pre-tax plus employer contributions.

10 Q    And are the employer contributions variable?

11 A    They are.

12 Q    And does the actuarial valuation play a role in that

13 variability?

14 A    Yes.  Just the same way that it did for GRS.

15 Q    Okay.  And what is the relevance of employment terms and

16 conditions to pension funding generally?

17 A    Well, it's very important to understand the terms and

18 conditions of the plan so that you can assess the liabilities

19 of the plan.  Because the amount of benefits that will be paid

20 out and when they can be paid out will drive the cost of the

21 plan.

22 Q    Okay.  And are the benefits provided under the PFRS

23 system also part of the tax qualified plan?

24 A    They are.

25 Q    And the tax qualified in this context has the same

1  meaning as it did for GRS?

2  A    Yes.

3  Q    Okay.  And does your report contain a description of how

4  the PFRS system works as you understand it?

5  A    Yes, it does.

6  Q    And is that contained at Pages 6 and 7, Paragraphs 13

7  through 16?

8  A    Yes, generally.

9  Q    Okay.  Now if you would tell the Court why your

10 understanding of the benefits was relevant to your opinions.

11 A    The understanding -- my understanding of the -- of the

12 benefits was relevant to my opinions because the -- the amount

13 of benefits that are provided to the members of each

14 retirement system, I needed to understand clearly what -- what

15 those benefits were, when they could be paid, and how they

16 were determined in order to accurately assess the liabilities

17 of each retirement system.

18 Q    And does your report contain a description of the terms

19 as you understand it?

20 A    Yes, it does.

21 Q    And is that contained in Exhibit C to your report?

22 A    Yes, it -- yes, it is.

23 Q    Okay.  Now with respect to GRS, what is your

24 understanding of whether or not there is a normal retirement

25 benefit?

1  A    There is a normal retirement benefit for GRS.

2  Q    And do you know what it is?

3  A    Yes.  It's shown on Page C-1 of my report.

4  Q    C-1?

5  A    Yes.  And it depends upon whether or not the member is an

6  EMS member, or a non-EMS member.

7  Q    Would you highlight normal retirement, please?  Thank

8  you.

9  A    And the formula is for EMS members, $12.00 times years of

10  service to a maximum of ten years, plus 2% times years of

11  service times average final compensation.  And then for

12  non-EMS members, the formula is a little bit different.  It's

13  again the $12.00 times service with a maximum of ten years.

14  And then the multiplier then depends upon service.  It's 1.6%

15  for the first ten years, then 1.8% for the next ten, 2% for

16  the following five, and then 2.2% for any years in excess of

17  25.

18  Q    Okay.  Is there anything unusual about this structure of

19  a number multiplied times the year of service in your

20  experience?

21  A    No, it's very common.

22  Q    Okay.  And is there a deferred retirement benefit under

23  GRS?

24  A    Yes.

25  Q    And is your understanding of that benefit described in

1  your report?

2  A    Yes, it is.

3  Q    And where is that?

4  A    It's Page C-2.

5  Q    C-2, okay.

6  A    Excuse me.

7  Q    And highlight that for the Court.  If you could quickly

8  summarize that for the Court.

9  A    So if you were -- if a member was hired prior to 1980,

10 that member is eligible for a deferred retirement benefit at

11 age 40 with eight years of service.  Everyone else is entitled

12 to a benefit after working ten years.

13 Q    Okay.  Is there an early retirement benefit as

14 distinguished from a deferred retirement benefit?

15 A    Yes.  Yes, there is.

16 Q    And is that also described in your report?

17 A    Yes, it's on C-1 and C-2.

18 Q    If you could highlight that.  Can you quickly describe

19 that for the Court?

20 A    Basically members hired prior to 1995 can receive an

21 early retirement benefit after they have worked 25 years of

22 service.

23 Q    Okay.

24 A    And non-EMS members who are hired after 1995 have to have

25 a -- be a minimum age of 55 in order to receive that early

1  retirement benefit.

2  Q    Now does GRS provide disability benefits of any kind?

3  A    Yes.  It provides duty and non-duty disability benefits.

4  Q    And is that described in your report?

5  A    Yes.

6  Q    And where is that?

7  A    Page C-2.

8  Q    Okay.  If you would highlight those two forms of

9  disability and quickly describe for the Court the disability

10 benefits duty and non-duty.

11 A    Basically the -- the duty disability benefit is the

12 lesser of two-thirds of average final compensation or -- or

13 $9,000.  And then at age 60, or when the member would have

14 achieved 30 years of service, or 25 years if they're EMS, then

15 their benefit is converted into a normal retirement benefit.

16 Q    Is there a death benefit provided under GRS?

17 A    Yes, there is.

18 Q    And is your understanding of how that works reflected in

19 your report?

20 A    It is.  It's on Page C-2.  There's actually two, a duty

21 death and a non-duty death.

22 Q    And if you could quickly describe the difference between

23 those two and how it works.

24 A    Duty death is if you die with -- while in the line of

25 duty while working.  Non-duty is not in the line of duty.  And

1  the benefit then is dependent upon whether it's duty death or

2  non-duty death.

3      And it's basically a maximum of $9,000 a year and the

4  benefit formula for duty depends on whether there's a spouse

5  or surviving children or parents.  Non-duty death is a little

6  bit different.  There the benefit is based upon the accrued

7  benefit as of the date of non-duty death.

8  Q    Okay.  Now my last question with respect to benefit

9  structure.  Is there any post-retirement adjustment to

10 benefits under GRS?

11 A    Yes.  There is an annual escalator also known as a cost

12 of living adjustment or COLA is the shorthand.  And that is

13 2.25% of the original benefits.  It's also known as a simple

14 COLA because it's based upon the original -- original benefit

15 at higher as opposed to a compound COLA which compounds each

16 year.

17 Q    Again, for the Court what would be the difference between

18 a simple COLA and a compound COLA?

19 A    A simple COLA means that the COLA that you're given each

20 year is the same amount.  So in this case if you had a benefit

21 that was $1,000 a month and your COLA is 2.25%, then every

22 month you're going to get -- every year rather, your monthly

23 benefit will increase by $22.50.  It doesn't go beyond that.

24      A compound COLA, the COLA gets a COLA.  So your benefit

25 is increased, your annual benefit would be increased by 2.25%.

1  Q    And I believe you've told the Court that with respect to

2  GRS it's just a simple COLA?

3  A    Yes.

4  Q    Okay.  Let's turn to PFRS.  And let's start with that

5  last question.  Is that true for PFRS as well?

6  A    For PFRS there's three types of COLAs depending upon when

7  you're hired.  There is a simple COLA, there's a compound

8  COLA, and then there's a COLA that also depends upon how the

9  pay increases for active members who are in your position

10 which is also compound.

11 Q    My goodness.  Could you give the Court an understanding

12 of how that would work?

13 A    Well, I'm sure it was the result of collective bargaining

14 agreements, but again as I said earlier, it depends upon your

15 hire date as to whether or not you have a simple COLA, a

16 compound COLA, or whether or not your COLA depends upon

17 whether -- what -- what -- what the -- how the pay goes up

18 while you're in -- for active employees in your position.

19 Q    Your understanding on this subject contained in your

20 report?

21 A    Yes, it's on Page C-5.  It's highlighted here, so --

22 Q    Okay, please continue.

23 A    So in more detail if a member hired prior to 1969, they

24 get the COLA that increases.  It's compound but it depends on

25 the active member compensation.  Members hired after 1968,

1 they receive a benefit of -- a COLA rather of 2.25% which is

2 simple.

3        And it depend -- it's simple based upon service up to

4 April 5th, 2011 for police and up to -- September 1st, 2011 for

5 all others.

6 Q    Okay.

7 A    And then there's no COLA after those dates.

8 Q    Okay.  Now, does PFRS provide a normal retirement

9 benefit?

10 A    Yes, it does.

11 Q    And is your understanding of that contained in your

12 report?

13 A    Yes, it is.

14 Q    And is that on Page C-3?

15 A    Yes.

16 Q    And could you tell the Court if you would in an

17 abbreviated fashion how the normal retirement benefit works

18 under PFRS?

19 A    Again it depends on whether or not you're hired before or

20 after 1969.  I think we can probably just focus on the after

21 1968 where the annual benefit for police lieutenants,

22 sergeants, and firefighter equivalents is 2.5% of average

23 final compensation for the first 25 years of service up to a

24 certain date in 2011.  And for service after 2011, the benefit

25 formula is 2.1% times average compensation.

1  Q    What is average final compensation under PFRS?  And does

2  that appear in your report at Page C-4?

3  A    Yes.  It's -- again, it depends on which group you're in.

4  Page C-4.  And it is calculated as the average of the current

5  compensation for the ranks held in each of the last five

6  years, three years for the Detroit Police Command Officers

7  Association.  Executive members or their fire equivalents.

8  And it also includes longevity and sick pay.

9  Q    Okay.  Now do these variations have an impact on your

10  opinions in any way, shape, or form?

11  A    No.  It's just that I needed to understand exactly how

12  they worked so that I could value the liabilities correctly.

13  Q    Okay.  And is there an early retirement benefit under

14  PFRS?

15  A    There is not.

16  Q    Okay.  Is there a deferred retirement benefit under PFRS?

17  A    Yes, there is.  That's also --

18  Q    And where is that?

19  A    -- on C-4.  And it -- it's ten years of service for the

20  DPOA and the fire equivalents.  And then for everyone else

21  it's 40 with 8 years of service.

22  Q    Are there disability benefits under the PFRS?

23  A    Yes.  Like GRS there's both duty and non-duty disability

24  benefits.

25  Q    And is your understanding of those described in your

1  report?

2  A    Yes.

3  Q    And where can that be found?

4  A    C-4 for duty disabilities and it's 50% of final

5  compensation plus a supplement.  And then that benefit is

6  converted to a regular retirement benefit at age 65.

7  Q    Okay.

8  A    And then for non-duty disability their benefit is based

9  upon their accrued benefit as of the date of disability, but

10  not less than 20%.

11  Q    Okay.  And are there death benefits under PFRS?

12  A    Yes.  Duty and non-duty death benefits.  The duty death

13  -- duty death benefit, it depends on whether or not there is

14  again, surviving spouse and children.  If there is a surviving

15  spouse plus children, it would be seven thirty-thirds of final

16  compensation.

17  Q    Okay.  I've heard a term floating around the courtroom

18  over the -- over the year that this case has been pending

19  called DROP.  What is DROP?

20  A    DROP is a -- it's described in Page C-5 of my report.

21  And that is a Deferred Retirement Option Plan.  Members who

22  have 25 years of service they can elect to participate in the

23  DROP with 20 years for the DPOA.

24      And basically what happens when a member elects the DROP,

25  their benefit is calculated and frozen as if they had retired.

1  But 75% -- they continue to work and 75% of their benefit that

2  was calculated is put into an individual DROP account and then

3  that's accumulated with interest.  And then when that member

4  retires after they exit the DROP, then they receive the

5  accumulated amounts that are in the individual DROP account

6  plus 100% of their accrued benefit that was calculated when

7  they entered the DROP, plus any COLAs that had been granted

8  during the interim.

9  Q    Okay.  When you were estimating -- was it necessary to

10 estimate liabilities in connection with forming your opinion?

11 A    Yes.

12 Q    Did you factor each of these benefit provisions for PFRS

13 into those liabilities?

14 A    Yes, I did.

15 Q    Did you factor each of those benefit provisions for GRS

16 into those liabilities?

17 A    Yes, I did.

18 Q    Okay.  Have you ever heard the phrase actuarial accrued

19 liability?

20 A    Yes.

21 Q    What is it?

22 A    Actuarial accrued liability is the value of benefits for

23 the members in a pension plan that is attributable to past

24 years of service as of the valuation date.

25 Q    Okay.  Have you ever heard the phrase normal cost?

1  A    Yes.

2  Q    What's your understanding as to the meaning of normal

3  cost?

4  A    Normal cost is the present value of one year of benefit

5  accrual for active members.

6  Q    So each year there is a normal cost for each employee?

7  A    For each active employee there is a normal cost.  Since

8  retired members aren't working, they do not have a normal

9  cost.

10  Q    Okay.  And so what is the relationship if any between

11  normal cost and actuarial accrued liability?

12  A    The actuarial accrued liability is also equal to the

13  value of all the accumulated past normal costs.  So if you

14  think about the accrued liability as being the value of -- of

15  benefits attributable -- attributable to past service you can

16  also think about that as being the value of all the past

17  normal costs because each of those represented one year of

18  service.

19  Q    Okay.  So you started to tell the Court in response to

20  one of my questions, how liabilities are determined.  Could

21  you go through the steps necessary to determine the actuarial

22  accrued liability for the plans in question?

23  A    Yes.  We talked about the census data and the

24  assumptions.  And we talked about our Star program where we

25  value the liabilities.

1      The -- the actuarial accrued liability for these plans is

2  based upon a method called the entry age normal cost method.

3  And that cost method allocates the total value of benefits.

4  That includes benefits not only for the past, but for the

5  future into benefits attributable to past service and benefits

6  attributable -- attributable to future service.  And the way

7  the --

8  Q    Could you stop there for a moment?

9  A    Yes.

10  Q    For the Court's benefit, what is a cost method?

11  A    A cost method is a way to allocate the total present

12  value of all benefits into the past and into the future.  And

13  it's a way of systematically paying down any unfunded

14  liability of the plan plus paying the normal cost of the plan.

15  Q    Okay.  And you also mentioned the phrase entry age

16  normal.  Why is that the relevant cost method in this context?

17  A    It is relevant because it's required by city charter to

18  be used.  It's also the most common method used for public

19  sector retirement systems.

20  Q    Okay.  So after you determined the benefit levels and you

21  established the population by looking at the census, and you

22  picked the cost method, what do you do next?

23  A    We run the liabilities through our program and what comes

24  out is something called the present value of future benefits.

25  And this is the total value of benefits that is attributable

1  to past service and also expected to be paid based on future

2  service.

3      And the actuarial accrued liability is determined in a

4  shorthand way by taking the present value of future benefits

5  minus the present value of all future normal costs.  Because

6  all the normal costs are in the future.  If you want to know

7  what's attributable to the past, you take the total liability

8  and you subtract out all the liabilities for future benefits.

9  Q    Okay.  And you said present value.  Does that imply the

10  use of an interest rate for some reason?

11  A    Yes.  You have to use an interest rate.

12  Q    Okay.  And how do you pick the interest rate to discount

13  liabilities?

14  A    Typically the way that we pick the interest rate is by

15  following the guidance that's under the actuarial standards of

16  practice statement number 27.  And the interest rate, it's

17  also called the investment rate of return, also called the

18  discount rate, these terms are generally used interchangeably,

19  the interest rate is determined by looking at the two

20  components of the discount rate or interest rate which

21  consists of inflation plus real rate of return.

22      This is also called -- by looking at these two

23  components, it's also known as the building block method under

24  ASOP 27, ASOP being short for the Actuarial Standards of

25  Practice.

1  Q    Could you stop there for a moment?  I don't believe

2  you've told the Court what an actuarial standard of practice

3  is and how it actually affects your activities.

4  A    The actuarial standards board produces standards of

5  practice that apply to particular types of calculations that

6  actuaries do.  And pension actuaries must comply with the

7  standards of practice that are attributable to their work.

8       The statement number 27 relates to how an actuary goes

9  about selecting economic assumptions that includes the

10 interest rate.

11 Q    Okay.  And did you in fact calculate an actuarial accrued

12 liability in reaching your opinion?

13 A    Yes, I did.

14 Q    Okay.  Now you said the starting point was the eligible

15 population using the census.  What information did you rely on

16 for purposes of your opinion?

17 A    I received from the retirement systems the census data as

18 of June 30th, 2013.

19 Q    Okay.  Focusing on GRS specifically, what information did

20 you rely for GRS?

21 A    We -- we received an AXIS data base from the retirement

22 systems that consists of ten tables within the AXIS data base.

23 Of those ten tables we only needed to use three tables for

24 both plans.

25       But for GRS specifically there was one table of data that

1  included all of the information that we needed for active

2  participants and inactive participants.  And then there was

3  another table that included all of the information that we

4  needed for retirees.

5  Q    Could you turn to your book Exhibit 10214?  And can you

6  tell the Court what is 10214?

7  A    10214 is the -- is a print out, a screen shot of the

8  Excel file -- well, let me back up a second.  We got -- we

9  received the AXIS data base and we had to put the AXIS data

10  base into Excel in order to manipulate it.  And this is a

11  print out redacted version of the general retirement system

12  active and inactive data elements.

13       (Retiree Exhibit 10214 was identified)

14  Q    How can you tell it's active and not retirees?

15  A    Because it has pay stat, and best flag, and date of

16  birth, and date of hire.

17  Q    And what do these pages that appear in your binder as

18  Exhibit 10223 represent?

19  A    I thought we were on 10214.

20  Q    Oh, I'm sorry, we are on 10214.  My apologies.

21  A    This represents the -- this shows a couple of pages of

22  the Excel file redacted again of the active and inactive data.

23  Q    Now in your binder there is a disk that looks like this.

24  Would you identify for the Court what the label on the disk

25  is?

1    A    This is the information that we received from the

2    retirement systems on March 28th, 2014.

3    Q    Is this disk the entire file to which you were referring?

4    A    Yes.

5    Q    And how do you know it's the entire file?

6    A    Because of the label here.  It says benefits 2013.mdb.

7    Q    And who created this disk?

8    A    My team did.

9    Q    Okay.  And was it under your direction?

10   A    Yes.

11   Q    Does it contain any redactions from the information that

12   you were originally provided?

13   A    It does.  It redacts any of the personal information.

14   Q    And did you -- did you rely on this data base in forming

15   your opinions?

16   A    I did.

17   Q    And is that reliance disclosed in your report?

18   A    It is.

19        MR. MONTGOMERY:  Your Honor, I'd like to move into

20   evidence Exhibit 10214.

21        MR. WAGNER:  No objection.

22        THE COURT:  It is admitted.

23        (Retiree Exhibit 10214 was admitted)

24        MR. MONTGOMERY:  For -- and, Your Honor, I would

25   also -- let me do one more thing here.

1  Q    Could you turn to Exhibit 10223?  And what is -- excuse

2  me, 10226, my apologies.  10226.  What is this?

3  A    This -- 10226 is the -- again a screen shot of the Excel

4  file in which we uploaded the AXIS data base for the retired

5  lives of both GRS and PFRS.

6     (Retiree Exhibit 10226 was identified)

7          MR. MONTGOMERY:  I'd like to move into evidence

8  Exhibit 10226.

9          MR. WAGNER:  No objection.

10          THE COURT:  It is admitted.

11     (Retiree Exhibit 10226 was admitted)

12  Q    And Ms. Nicholl, what is exhibit number 10223?

13  A    Again, this is a -- a screen shot of the Excel file in

14  which we uploaded the PFRS active and inactive membership

15  data.

16     (Retiree Exhibit 10223 was identified)

17  Q    And was it created in the same way?

18  A    Yes.

19          MR. MONTGOMERY:  I'd like to move into evidence

20  10223.

21          MR. WAGNER:  No objection.

22          THE COURT:  It's admitted.

23     (Retiree Exhibit 10223 was admitted)

24  Q    Now, Ms. Nicholl, the disk itself, what is the exhibit

25  reference on the disk itself?

1  A    10995.

2      (Retiree Exhibit 10995 was identified)

3          MR. MONTGOMERY:  Your Honor, I'd like to move into

4  evidence Exhibit 10995.

5          MR. WAGNER:  No objection.

6          THE COURT:  It is admitted.

7      (Retiree Exhibit 10995 was admitted)

8          MR. MONTGOMERY:  Thank you.

9  Q    Ms. Nicholl, I believe you testified near the beginning

10 of your testimony when you were describing your experience

11 what UAAL was.  Would you say again what UAAL is?

12 A    UAAL is Unfunded Actuarial Accrued Liability.  And that

13 is the difference between the actuarial accrued liability and

14 the assets.

15 Q    Now I heard you tell me in response to one of my

16 questions that there is a difference between market value of

17 assets and actuarial value of assets.  Did I understand that

18 correctly?

19 A    Yes.

20 Q    Okay.  And which value of assets did you use to calculate

21 the UAAL in forming your opinions and analysis in this case?

22 A    I used the market value of assets.

23 Q    Why?

24 A    The market value of assets is what's actually in the

25 trust and it was appropriate for purposes of forming my

1  opinion because basically the actuarial value of assets has

2  unrealized gains and losses that haven't been recognized in

3  the actuarial value of assets and you can't use unrealized

4  gains and losses to pay benefits.

5  Q    What is a funding policy for a pension plan?

6  A    A funding policy is a methodology for determining the

7  annual contributions to a pension plan.

8  Q    And what is an amortization policy?

9  A    An amortization policy is the way in which the -- the

10  UAAL is amortized and included in the annual contribution.

11  Q    And what significance if any does an amortization policy

12  have on the health of a pension plan or the plan's ability to

13  pay benefits as you were describing?

14  A    Well, the UAAL -- or, I'm sorry, the amortization policy

15  can be -- it basically will consist of different components.

16  The length of the period, the amortization period, and whether

17  it's open or -- or closed.  Open is also known as rolling.

18      So an open amortization period is where the amortization

19  period is -- is reset every year.  If you have an open

20  amortization period you're never going to pay off your

21  unfunded liability.

22  Q    Okay.  Why might amortization periods vary for a

23  particular plan?

24  A    It would depend upon the funding policy that the trustees

25  or the plan sponsor developed and decided upon.

1  Q    Is there anything particularly good or bad about a 25 or

2  a 30 year amortization policy?

3  A    If you -- if you have a 25 or 30 year amortization policy

4  and it's closed so that you will pay off the unfunded

5  liability over some time period, then that would be preferable

6  to an amortization policy that's open which you're never going

7  to pay off your unfunded liability.  Again, depending upon the

8  way that the amortization policy works, a 25 or 30 year period

9  amortization method could result in a method where you never

10  even pay interest on your unfunded.  So your unfunded

11  continues to grow indefinitely.

12  Q    Are there different types of amortization payment

13  methods?

14  A    Yes.

15  Q    And what are they?

16  A    There are two types.  There is one called level dollar

17  and the other is called level percentage of payroll.

18  Q    Have you prepared any examples or illustrations of how

19  UAAL amortization works?

20  A    Yes.

21  Q    Would you turn to Exhibit 10993, Page D-6, the table?

22  And that's your expert report Section D-6.

23          MR. WAGNER:  I'm sorry, what page is it?

24          MR. MONTGOMERY:  D-6.  Exhibit D-6 in her expert

25  report.  Which is Exhibit 10993 on -- on the record.

1  Q    Did you prepare this chart that appears in your report?

2  A    I did.

3  Q    And could you explain to the Court how this is a

4  demonstration of how the UAL amortization works?

5  A    Yes.  So I mentioned earlier just a minute ago that

6  there's two types of amortization payments.  So there's a

7  level dollar and a level percentage of payroll.

8       The level dollar payment means that every year you're

9  going to pay the same dollar amount off toward your -- your

10 UAAL.  A level percentage of payroll method is back loaded.

11 And it assumes that the payments toward the UAAL will increase

12 every year based on the payroll growth assumption.

13      For GRS, they used -- the -- the method that was used --

14 is used for determining the UAAL amortization payment is a

15 level percentage of payroll.  It's based upon the discount

16 rate of 7.9% and a payroll growth assumption of 4%.

17      And under that method, this is a hypothetical, UAAL of

18 $10,000,000.  But it's based upon the amortization policy that

19 -- that GRS is using.  And $10,000,000 at 7.9% of $10,000,000

20 is $790,000.  That would be interest on the UAAL.  That is

21 expected to grow by interest every year.

22      The amortization payment which GRS uses is level

23 percentage of payroll and an open 30 year period.  The payment

24 toward that $10,000,000 for GRS under their method would be

25 $583,000.

1  Q     Is that less than 790,000?

2  A     It is.

3  Q     And what's the cumulative impact of that?

4  A     So what happens then is that shortfall, the difference

5  between $790,000 and 583,000 is added to the UAAL.  So the

6  UAAL now instead of being 10,000,000, it's gone up to

7  $10,206,000.

8  Q     Okay.  Is this an example of plan de-funding or

9  de-funding a plan?

10 A     It is.

11 Q     Okay.  Now let's turn to the first of your opinions

12 regarding the reasonableness of the accuracy of the allowed

13 claim under the plan of adjustment for Class 11.  First, you

14 did form an opinion?

15 A     I did.

16 Q     Okay.  And what is that opinion?

17 A     The opinion that I have is that Milliman determined the

18 liability using actuarial standards of practice and I was able

19 to verify the calculations by doing my own separate analysis.

20 Q     All right.  Could you turn to Exhibit 10981?  And what is

21 this?

22 A     This is a reproduction of the Milliman calculation of the

23 allowed settlement claim for GRS.

24       (Retiree Exhibit 10981 was identified)

25 Q     And is the information on this table in your report?

1    A    Yes, it is.

2    Q    And in fact Table 68-A in your report?

3    A    Yes, it is.

4    Q    Okay.  So first, why do you use the phrase allowed

5    settlement claim in this chart?

6    A    Because the claim that was included in the plan of

7    adjustment was based upon a settlement, the 6.75% discount

8    rate was the result of a settlement between all the parties.

9    Q    Okay.  And why do you say it was part of the settlement?

10   A    There were -- there was mediation in which I participated

11   and as a result of mediation 6.75 was settled upon as the

12   appropriate discount rate for purposes of the plan of

13   adjustment.

14   Q    That was the result?

15   A    That was the result.

16   Q    Thank you.  Okay.  Could you tell first what was the

17   measurement date for the allowed claim?

18   A    June 30th, 2013.

19   Q    And what was the cost method that you used?

20   A    Entry age normal.

21   Q    And what was the cost method that Milliman used in

22   creating the allowed claim?

23   A    Entry age normal.

24   Q    And what was the discount rate?

25   A    6.75

1   Q     Why that particular rate?

2   A     Again because it was the settled upon discount rate.

3   Q     It was the result.

4   A     It was prescribed by the -- yes, prescribed by the city.

5   Q     Okay.

6   A     Within the plan of adjustment.

7   Q     And is it appropriate for an actuary to use a prescribed

8   interest rate when doing a valuation calculation?

9   A     Yes, it is.

10  Q     And why do you say that?

11  A     Well, I mentioned those actuarial standards of practice a

12  little bit ago.  And the actuarial standards of practice in

13  this case ASOP 4 has language in it in circumstances in which

14  an actuary would need to use a prescribed assumption.  In --

15  in this case it is an assumption that is prescribed by a

16  governmental agency or other entity.

17  Q     All right.  And the reference to active members pension.

18  What does that reflect?

19  A     Seven hundred and sixty-four million dollars is the

20  actuarial accrued liability for members for their DB portion.

21  Q     Was that Milliman's computation?

22  A     Yes.

23  Q     Okay.  And what -- could you give the Court an

24  explanation as to what each of those other rows means?

25  A     Yes.  Inactive members, that's the deferred vested

1 | members that we talked about or the inactives.  Their

2 | liability is $197,000,000.

3 |     The $383,000,000 figure, that's the annuity savings fund,

4 | or the defined contribution portion for active and inactive

5 | members.

6 |     The in pay members, is the retirees and beneficiaries for

7 | pension.  Their liability is $2,526,000,000.  Certain retired

8 | members who had an annuity savings fund, they annuitized their

9 | benefits.  So instead of taking it as a lump sum, they took it

10 | as an annuity and the value of that benefit is $108,000,000.

11 | So the total liabilities for GRS are $3,978,000,000.

12 | Q    And what is the asset row?

13 | A    The asset row 2,099,000,000 is the total amount of assets

14 | for both the DB plan and the -- and the annuity savings fund.

15 | Q    And is the total settlement claim amount, the -- the

16 | number that appears in the plan for the allowed GRS pension

17 | claim?

18 | A    Yes.

19 | Q    And these are Milliman's numbers as you understood them,

20 | correct?

21 | A    Yes.

22 | Q    Okay.  And what was the source of your understanding as

23 | to the Milliman numbers?

24 | A    Milliman provided the liability calculations in an -- two

25 | April 17th, 2014 letters to the city.

1  Q    And were you able to --

2  A    Or to Jones, Day, I should say.

3  Q    Okay.  Were you able to replicate the results as appears

4  here?

5  A    Yes, I was.

6  Q    Exactly or approximately?

7  A    Well, you know, we -- every actuarial firm has its own

8  software.  And we do our own coding independently, so we never

9  match exactly.  But there is a range, a tolerance range.

10  Typically if we match within 5% we consider that we understood

11  the plan provisions, and the assumptions, and the

12  methodologies.

13  Q    And how close were you here?

14  A    We were within 2.9% of Milliman's numbers.

15  Q    And is that acceptable to you?

16  A    Yes.

17  Q    Okay.

18  A    We consider that a match.

19  Q    The information that we just reviewed was the result of

20  looking at the census, if I understand it correctly, looking

21  at the benefit obligations, and doing a discount rate.  Were

22  there any adjustments to the assumptions utilized in the claim

23  calculations from the way Gabriel, Roeder was doing them and

24  its valuations with which the Court is familiar?

25  A    Yes.

1  Q    And are those variations and assumptions described in

2  your report?

3  A    They are.

4  Q    Are they at Exhibit E?

5  A    Yes.

6  Q    Are these all of the adjustments to the assumptions

7  utilized in the claim calculation?

8  A    Yes.  These are -- these assumptions that were changed

9  were the result of mediation and the actuaries are Gabriel,

10 Roeder, Smith, Milliman, and Segal all used the same

11 assumptions for their purposes.

12 Q    Okay.  I see that you used an inflation scale for

13 salaries, is that right?

14 A    The wage inflation portion was -- yes, that was modified.

15 Q    Okay.  And why did you modify it?

16 A    Because salaries are frozen, have been frozen for a

17 couple of years, so we reflected that in our projection of

18 salary increases.

19 Q    Okay.  Did you make any modifications to average final

20 compensation?  Did that --

21 A    You know, that was based upon the same -- the information

22 that we received from the retirement systems on the -- on the

23 -- on the Excel.

24 Q    Okay.

25 A    And the AXIS data base

1  Q    And what does it mean to remove a load?

2  A    There -- Gabriel, Roeder, Smith had a 1% load on its

3  liabilities that was due to incomplete data that they had

4  assumed that the data that they had received had missing

5  information so they had a 1% load.

6        Since we received the data right directly from the

7  retirement system and it was more up to date meaning it was

8  produced at a date later than the date that Gabriel, Roeder,

9  Smith had received their valuation census data, it was more

10 complete.  We didn't feel there was a need based upon a review

11 of the data of -- of the load.

12 Q    And did you do the same analysis in reaching your

13 conclusion with respect to the reasonableness or the accuracy

14 of the allowed claim under the plan of adjustment for Class 10

15 using plan assumptions?

16 A    Yes.

17 Q    Okay.  And would you turn to Exhibit 10982 in your

18 binder?

19 A    I did.

20 Q    Okay.  And what is Exhibit 10982?

21 A    This is the derivation of the allowed settlement claim

22 calculation that was prepared by Milliman.

23        (Retiree Exhibit 10982 was identified)

24 Q    And did you replicate the result that appears in the

25 lower right hand side of Exhibit 10982?

1  A    Yes, I did.

2  Q    And how close did you come?

3  A    Within 2.1%.

4  Q    And as part of that did you review each of the rows that

5  appears on Exhibit 10982?

6  A    I did.

7  Q    Okay.  And is this chart in your report?

8  A    Yes, it's Table 68-B.

9           MR. MONTGOMERY:  Your Honor, at this particular time

10  I would like to move into evidence Exhibits 10982 and 10981.

11          MR. WAGNER:  As demonstratives, that's fine.

12          MR. MONTGOMERY:  As demonstratives, yes.

13          THE COURT:  All right.  On that basis, they are

14  admitted.

15      (Retiree Exhibits 10981 and 10982 were admitted)

16          MR. MONTGOMERY:  And, Your Honor, I believe I need

17  to do the same thing with respect to 10993, Table B-6 as a

18  demonstrative.

19          MR. WAGNER:  That's fine as a demonstrative.

20          MR. MONTGOMERY:  Good.

21          THE COURT:  It is admitted on that basis.

22  Q    Okay.  You were asked to form an opinion as to the

23  estimate of recovery under the plan of adjustment based upon

24  city contributions for Class 10 utilizing allowed GRS pension

25  claims, were you not?

1 A    Yes.

2 Q    Okay.  And what was the source of funding that you used

3 to determine what city contributions were under the plan of

4 adjustment?

5 A    The city contributions that I used were included in the

6 disclosure statement.  In addition the disclosure statement

7 has post-2023 contributions that are only in ten year buckets.

8 And we needed to see them year by year.  So I received that

9 information from -- from Lazard who received it from Ernst &

10 Young.

11 Q    Okay.  Could you put up Exhibit 3, the city's disclosure

12 statement Table 3-A, Page 177 of 212, please?  No, I'm sorry,

13 exhibit -- table -- Exhibit 3-A is way at the back of -- of

14 the disclosure statement.  I'm sorry.  We'll -- we'll come

15 back to that after our colleague finds it.

16      Would you remove 168 from the screen, please?  Thank you.

17 Could you turn to Exhibit 10100?

18 A    Yes.

19 Q    And what is Exhibit 10100?

20 A    These are the sources of contributions to GRS for the

21 first ten years from 2014 to 2023.

22      (Retiree Exhibit 10100 was identified)

23 Q    Okay.  And again the source of this information is the

24 disclosure statement?

25 A    Yes.

1  Q    What does the line DWSD mean?

2  A    Those are the contributions that will be paid from DWSD

3  to GRS to pay off their unfunded liability UAAL over a nine

4  year period.

5  Q    And as -- as part of your work did you replicate the

6  $45,000,000 per year?

7  A    Yes, I did.

8  Q    Precisely or just approximately?

9  A    We -- we did the calculations using the same data and we

10  were within 1% of the calculation -- of the contribution

11  amount.

12  Q    And what was -- what's the reference to UGT -- UTGO on

13  this page?

14  A    Those are contributions that will come into GRS as the

15  result of the settlement with UTGO and they're coming in

16  directly from the creditor.

17  Q    And what does the row state mean?

18  A    This is a state contribution that is coming into GRS as

19  the result of the state agreement to pay a total of

20  $350,000,000.  It's the present value of that -- that -- GRS's

21  portion of the $350,000,000, that was going to come in over 20

22  years.  The state has elected to -- to pay that off in a lump

23  sum, the value of which is 98.8 million for GRS.

24  Q    But was that your understanding of how much cash the

25  state is actually going to put into the GRS pension plan?

1   A    Yes.

2   Q    Okay.  And what is the reference to DIA?

3   A    DIA is the -- the monies that have been pledged to the

4   Detroit Institute of Arts foundation.  And those monies will

5   come in over time.  And -- and will depend upon the state

6   financing as well.

7   Q    And what's the line other?

8   A    Other is city contributions that are coming in from the

9   general fund.

10  Q    Okay.  And does the disclosure statement provide

11  additional information regarding contributions from these

12  sources for years after 2023?

13  A    Yes.

14  Q    Okay.  And does -- what does the number 718.6 represent?

15  A    That is the total nominal amount of contributions for the

16  ten year period from all sources to GRS.

17  Q    And did you use this information in forming your opinion?

18  A    Yes, I did.

19       MR. MONTGOMERY:  I'd like to move into evidence

20  Exhibit 10100 as a demonstrative.

21       MR. WAGNER:  I object on relevance grounds.

22       MR. MONTGOMERY:  It's pretty hard to say that

23  information regarding the source of contributions is not

24  relevant to a determination as to what the recovery is under a

25  plan.

1          THE COURT:  The witness relied on it.  The objection

2   is overruled.

3          (Retiree Exhibit 10100 was admitted)

4          MR. MONTGOMERY:  Thank you.

5   Q    And looking at Exhibit 10100, what did you decide were

6   the city contributions that you used in your recovery

7   analysis?

8   A    The city contributions are the monies that come from DWSD

9   and other.

10  Q    And why did you exclude UTGO, state, and DIA?

11  A    UTGO is excluded because those monies are coming directly

12  from the creditor to GRS.  There is no -- doesn't pass through

13  the hands of the city and the city has no control of it.  The

14  same with state and DIA, those -- those monies are not coming

15  from the city, they're coming from the state and the DIA.

16  Q    And using the information from the disclosure statement,

17  Exhibit 10100, did you in fact form a conclusion as to the

18  recovery for GRS based upon city contribution?

19  A    Yes.

20  Q    And if you would turn to Exhibit 10116, 10116.  And you

21  focus only on the left hand side of the chart, please.

22  A    Yes.  This shows the derivation of the recovery for GRS.

23  It's based on the allowed settlement claim of 1,879,000,000

24  the present value of the city contributions based on a

25  discount rate of 6.75% is 749.2 million.  So the resulting

1  recovery percentage is 39.9%.

2        (Retiree Exhibit 10116 was identified)

3  Q    Okay.  And did you undertake a similar approach with

4  respect to PFRS in reaching your conclusion as to the estimate

5  of recovery under the plan of adjustment based upon city

6  contributions for Class 10 utilizing the allowed PFRS claim?

7  A    Yes.

8  Q    And what is Exhibit 10101, please?

9        MR. WAGNER:  Your Honor, just note my continuing

10 objection to this line on relevance grounds.

11       THE COURT:  Yes, sir, that's fine.

12 A    10101 shows the sources of contributions to PFRS for the

13 first ten years.

14       (Retiree Exhibit 10101 was identified)

15 Q    And is this information that you used in connection with

16 forming your opinion as to recovery values?

17 A    Yes.

18 Q    Now I note that there is only state and foundation.  Were

19 there no -- excuse me, what were the city contributions during

20 the first ten years to PFRS?

21 A    There are no city contributions during the first ten

22 years.

23 Q    So all the city contributions for PFRS come in years 2023

24 and later?

25 A    Yes.

1  Q    Okay.  And did you in fact reach a conclusion as -- and

2  strike that.  And was the source of information that you used

3  to reach your understanding contained in the disclosure

4  statement?

5  A    Yes.

6  Q    Okay.  And what was your conclusion as to the recovery

7  value for PFRS?

8  A    The recovery percentage for PFRS is 29%.

9  Q    And is that reflected on Exhibit 10116?

10 A    Yes.

11 Q    And what were the three pieces?

12 A    The three pieces are the allowed settlement claim of

13 1,250,000,000, the present value of city contributions of

14 361.9 million, and the resulting recovery percentage of 29%.

15 Q    And does this table reflect your conclusions with respect

16 to your recovery percentage for both Class 10 and Class 11?

17 A    Yes, based on the allowed settlement claim.

18       MR. MONTGOMERY:  I would like to move into evidence

19 Exhibit 10116.

20       MR. WAGNER:  Other than my continuing relevance

21 objection, no objection as a demonstrative.

22       THE COURT:  All right.  That objection is overruled.

23 This exhibit is admitted into evidence, 10116.

24       (Retiree Exhibit 10116 was admitted)

25       MR. WAGNER:  As -- as a demonstrative.

1        THE COURT:  Yes.

2        MR. WAGNER:  Thank you.

3  Q    Now Ms. Nicholl, I believe you indicated that you were

4  asked and did form an opinion as to the actual value for Class

5  10 claims as of June 30, 2013, is that right?

6  A    Yes.

7  Q    Okay.  And if you would tell the Court first what data

8  you used to reach that conclusion?

9  A    I used the same data that I used to determine or to -- to

10 replicate Milliman's allowed settlement claim calculations.

11 Q    And what benefit claim information did you use to reach

12 that conclusion?

13 A    I used the exact same benefit information.

14 Q    Okay.  And what method did you -- what cost method did

15 you use to run that calculation?

16 A    I used the method called present value of future accrued

17 benefits method, PVFAB is the shorthand.  It's also known as

18 the projected unit credit method.

19 Q    Well, if EAN or entry age normal is required by statute,

20 why did you use this particular method?

21 A    The reason I used the PVFAB method is because the -- the

22 actual claim is based upon risk free rates.  And those risk

23 free rates are spot rates meaning that they're different

24 discount rates depending upon the projected year of benefit

25 payment.

1    The EAN method can only be used with one discount rate,

2  therefore I had to use a different method and the PVFAB method

3  or the projected unit credit method is the only -- was the

4  only alternative and appropriate for this case.

5  Q    And what was the source of information that you used to

6  compute the risk free rate?

7  A    I developed strip rates by using the treasury bills,

8  notes, and bonds that were published on May 28th, 2014.

9  Q    All right.  Could you turn to Exhibit 10114?  And could

10  you tell the Court what this exhibit shows?

11  A    This shows the -- the basis, the source of my strip

12  rates.  These are the bills, notes, and bonds that were

13  published by the treasury, U.S. Treasury on May 28th, 2014.

14       (Retiree Exhibit 10114 was identified)

15  Q    And was this information contained in your report in

16  Table 78?

17  A    Yes.

18       MR. MONTGOMERY:  I would like to move into evidence

19  exhibit -- oh, strike that.  One more question.

20  Q    And this is the information on which you relied to form

21  your opinions as to the actual value of Class 10 claims, is

22  that correct?

23  A    Yes.

24       MR. MONTGOMERY:  I'd like to move into evidence

25  Exhibit 10114.

1          MR. WAGNER:  Again, other than relevance, no

2    objection as a demonstrative.

3          MR. MONTGOMERY:  I believe this is actually factual

4    information, Your Honor.  She's saying what she in fact relied

5    on and it's not just an illustration of an opinion.

6          THE COURT:  Well, what was the source of the data in

7    the 5-28-14 line?

8    A    The source of the data was the -- these are the -- the

9    interest rates that were published by the U.S. Treasury.  And

10   the reason I used 5-28-2014 is that was about the date that I

11   was doing the calculation.

12        You know, as a -- as a -- just as another data point, I

13   also later determined what the rates would have been as of

14   6-30-2013 and they were very similar.

15        THE COURT:  Well, this is not a -- a source document

16   from the Treasury Department.  So it reflects her

17   investigation of what those rates were at that time.  So to

18   that extent it is a demonstrative and the Court will admit it

19   for that purpose.

20        (Retiree Exhibit 10114 was admitted)

21        MR. MONTGOMERY:  Thank you, Your Honor.

22   Q    Did you use this information for PFRS Class 11 actual

23   value claim determination as well as of June 30, 2013?

24   A    Yes.

25   Q    And could you turn to Exhibit 10117?  And what is Exhibit

1  10117?

2  A    10117 shows the actual value of the claims for both GRS

3  and PFRS as well as the recovery percentages.

4       (Retiree Exhibit 10117 was identified)

5  Q    Okay.  And can you tell the Court what your conclusion

6  was with respect to GRS and the percentage recovery of actual

7  claim amounts?

8  A    For GRS the percentage recovery is 31.7%.  And that's

9  based on an actual value of claim of 3.541 billion and present

10 value of city contributions of 1,124,000,000.

11 Q    And the actual value claim is the one that you developed

12 using the PVFAB method, is that correct?

13 A    Yes.

14 Q    And using the treasury strips?

15 A    Yes.

16 Q    And the same census information that you used for the

17 allowed claim?

18 A    Yes.

19 Q    Okay.  And the line present value of city contributions,

20 again what is that?

21 A    That is the same -- those are the same contributions that

22 we discussed earlier that are coming from the city, but

23 instead of discounting those back at 6.75%, I discounted those

24 to the measurement date of 6-30 using treasury strips.

25 Q    So in fact the city contributions grew by using the lower

1  discount rate?

2  A    Well, the contributions didn't change, the present value

3  of the contributions changed.

4  Q    Okay.  And the recovery percentage for GRS is 31.7?

5  A    Yes.

6  Q    And could you tell the Court what you are showing as to

7  your actual value opinion for Class 11 under PFRS?

8  A    Class 10?

9  Q    Class 10, I'm sorry.

10 A    For PFRS the actual value of the claim is 3,871,000,000.

11 The present value of the city contributions are 681.3 million.

12 And the resulting recovery percentage is 17.6%.

13 Q    Okay.  Were you asked to demonstrate the distribution of

14 monthly benefit costs exclusive annual COLA reductions for --

15 under the plan of adjustment?

16 A    Yes.

17 Q    And did you prepare a chart that shows your conclusions

18 with respect to that distribution?

19 A    I did.

20 Q    And could you turn to Exhibit 10102, please which would

21 be the next one in your binder.

22 A    Okay.

23 Q    And would you tell the -- first, did you prepare this

24 exhibit?

25 A    I did.

1  Q    Okay.  Can you tell the Court what it is that you're

2  advising the Court as to your conclusions regarding the

3  distribution of benefit reductions?

4  A    So the bottom AXIS shows the percentage reduction.  And

5  this is for GRS retirees.  And the left hand side of the chart

6  shows the percentage of the retiree population for the -- of

7  the benefit reductions.  And these reductions are only for the

8  4 1/2% benefit across the board reduction plus the ASF

9  recoupment.

10      (Retiree Exhibit 10102 was identified)

11  Q    When you say only 4 1/2% benefit reductions and ASF

12  recoupment, are you omitting something from this table?

13  A    Yes.  I'm omitting the elimination of COLA.

14  Q    Okay.  Please continue.

15  A    So of the retiree population for GRS they're about 68% of

16  retirees or 8,222 who are going to have a 4 1/2% cut.  There

17  are 1,216 who will have a cut between 4.51 and 7.59.  Three

18  hundred ninety-six who have a benefit cut of between 7.6% and

19  10.69%.  Four hundred twenty-three who have a benefit cut

20  between 10.7% and 13.79%.  Four hundred thirty-five who have a

21  cut between 13.8% and 16.89%.  Three hundred and twelve who

22  have a cut between 16.9 and 19.99.  And then 1,055 who have a

23  benefit cut of 20%.

24           MR. MONTGOMERY:  Okay.  At this point I would like

25  to move into evidence as a demonstrative Exhibit 10102.

1        MR. WAGNER:  Again, subject to my continuing

2  objection.  It's fine as a demonstrative.

3        THE COURT:  All right.  As a demonstrative it is

4  admitted.

5     (Retiree Exhibit 10102 was admitted)

6        MR. MONTGOMERY:  Thank you, Your Honor.

7  Q    Did you analyze the distribution of ASF recoupment as an

8  item independent of the 4 1/2% cut?

9  A    Yes.

10 Q    And what information did you use to make that analysis?

11 A    I used the same census information that we described

12 earlier that I received from the retirement systems as well as

13 the amount of ASF offset that was calculated by Milliman based

14 upon calculations of the ASF excess interest that Conway,

15 MacKenzie did.

16 Q    Okay.  And what is Exhibit 10103?

17 A    This shows a distribution of the retirees who have an ASF

18 offset.  And again the bottom bar -- the bottom line rather

19 shows the percentage reduction.  And the left hand side shows

20 the percentage of the retiree population who are impacted by

21 ASF.

22     So there are 1,216 retirees or about 10% who are going to

23 have a reduction between .01 and 3.09%.  There are --

24     (Retiree Exhibit 10103 was identified)

25 Q    And that's for ASF only?

1  A     That's ASF only.

2  Q     Okay.

3  A     Three hundred ninety-six who have a reduction of 3.1 to

4  6.19%.  Four hundred and twenty-three who have a reduction of

5  6.2 to 9.29.  Four hundred thirty-five who have a reduction

6  between 9.3 and 12.39.  Three hundred and twelve who have a

7  reduction of 12.4% to 15.49%.  And 1,055 who have a reduction

8  of 15.5% which is the cap.

9  Q     And is there a coincidence that there is a number 1,055

10  on the right hand side of 10103, and a 1,055 on the right hand

11  side of 10102?

12  A     Yes.  The -- there is a -- there is a -- there's two

13  benefit reductions that are shown on these distributions.  The

14  4 1/2% reduction and the ASF reduction.

15       The ASF reduction is capped at 15 1/2% of pension.  And

16  so if you add 15 1/2% to 4 1/2%, you get 20% which is the

17  amount shown on 10102.

18            MR. MONTGOMERY:  At this time I would like to move

19  into evidence as a demonstrative of Ms. Nicholl's analysis and

20  conclusions with respect to the distribution of ASF recoupment

21  above 4 1/2%, Exhibit 10103.

22            MR. WAGNER:  With the same caveats, no objection.

23            THE COURT:  All right.  It is admitted as a

24  demonstrative.

25       (Retiree Exhibit 10103 was admitted)

1  Q    Now did you prepare for the Court a demonstrative on how

2  ASF calculations actually work?

3  A    Yes.

4  Q    And could you turn to Exhibit 10104?  And can you tell

5  the Court what you see -- what you're showing on this table?

6  A    This -- this shows examples of how the ASF recoupment is

7  going to work.  These are three actual retirees who have an

8  ASF offset.

9      And if we go through retiree number 1, who happens to be

10 age 65, retiree 1 is expected to live 18.7 years.  And --

11     (Retiree Exhibit 10104 was identified)

12 Q    Expected by whom?

13 A    Expected based upon the mortality table that is used for

14 -- that has been used for the allowed settlement claim and the

15 actual claim.

16     The current monthly pension before any cuts is $406.86.

17 This retiree has an ASF excess interest amount of $7,617.22.

18 Q    What's the source of that number?

19 A    That number came from Conway, MacKenzie.  They calculated

20 that amount.

21 Q    Okay.

22 A    This retiree has a 4 1/2% reduction so his benefit based

23 on the 4 1/2% reduction is -- is -- reduces his benefit to

24 $388.55.

25     The next line, Line 5 is the amount of ASF monthly

1  offset.  This was determined by Milliman.  And it is the

2  actuarial equivalent of the $7,600 amount of excess interest.

3  The $63.03 is based upon an interest rate of 6.75% and the

4  same mortality table that was used to determine the life

5  expectancy.  And so --

6  Q    The ASF -- sorry, go ahead.

7  A    Yes.

8  Q    The ASF monthly offset, were you able to replicate that

9  computation?

10 A    Yes.

11 Q    Okay.  And again what is Line 7?

12 A    Line 7 is the amount of the expected ASF monthly offsets

13 based on life expectancy.  So it is $63.03 per month, so times

14 12 times expected life expectancy of 18.7.  So based upon

15 the --

16 Q    Is that a nominal number or a discounted number?

17 A    That's a nominal number.

18 Q    Okay.

19 A    So this retiree if he lives to his life expectancy will

20 pay $14,143.03 which is the present -- which if it's present

21 value is equal to the $7,617 of excess interest.

22 Q    So under the plan of adjustment if a person lives -- were

23 to live exactly the expected life, he would -- he or she would

24 pay a number that would be larger in nominal terms?

25 A    Yes.

1  Q    And would it however still be the same as Line 3?

2  A    It will have a present value of Line 3 based upon 6.75%

3  interest and the mortality table.

4  Q    And 6.75% interest is the plan interest rate?

5  A    Yes.

6  Q    Okay.  And is there any variation in methodology for

7  retirees 2 and 3?

8  A    No.  Those are just two other examples.

9         MR. MONTGOMERY:  Your Honor, I'd like to move into

10  evidence as a demonstrative committee Exhibit 10104

11  demonstrating how ASF recoupment is commutated.

12         MR. WAGNER:  No objection subject to the same

13  caveat.

14         THE COURT:  It is admitted as a demonstrative.

15         (Retiree Exhibit 10104 was admitted)

16  Q    Ms. Nicholl, I'd like to turn your attention to the

17  question of whether or not you were -- strike that.  I would

18  like to turn your attention to the effects on a wide scale

19  basis of a COLA or annual escalator elimination.  Do you have

20  a way of explaining to the Court what the effects of COLA

21  elimination are?

22  A    Yes.

23  Q    And did you prepare a chart which explains -- helps

24  explain that?

25  A    Yes.

1  Q    What is chart 10105?

2  A    This -- this chart shows how the COLA elimination will

3  work for a GRS retiree, a sample.  And there are three lines

4  on this chart.  The red line is the impact -- it shows what

5  the -- the benefit will be without the COLA.

6       Twenty thousand dollars is the benefit that was chosen

7  because that's the average benefit for a GRS retiree.  So a

8  retiree earning -- or receiving $20,000 in an annual benefit

9  will always receive $20,000 in an annual benefit, it will not

10 increase.

11      (Retiree Exhibit 10105 was identified)

12 Q    Now Ms. Nicholl, I thought you told me that -- and under

13 GRS COLA was simple.

14 A    Yes.

15 Q    Why are there differences between the two lines that

16 appear on your chart?

17 A    So there's -- there's two black lines.  And there -- the

18 line in the middle represents what the COLA would have been

19 for a retiree who retired 20 years ago.  And the -- the line

20 on the top shows how the COLA would have increased the benefit

21 for a retiree who just retired a year ago.

22      And the reason there are two lines is because the COLA is

23 simple meaning that it is dependent upon the original benefit

24 at retirement.  So the retiree who retired 20 years ago, if

25 he's earning a benefit of -- or receiving a benefit I should

1  say of $20,000, 20 years ago his benefit was about 13,700.

2      So his COLA is based on 13,700, 2.25% of that.  So 30

3  years out his -- his $20,000 today would have grown to 29,310.

4  The retiree who just retired receiving $20,000, his COLA is

5  based on $20,000.  So his current $20,000 if he were to live

6  30 years, would grow to 33,500.

7      So the difference between the red line and those two

8  lines shows the impact on a retiree who has been retired for

9  20 years, or one who just retired a year ago.

10 Q   And is this kind of differential spread throughout the

11 GRS retiree base?

12 A   Yes.

13      MR. MONTGOMERY:  Okay.  Your Honor, at this point

14 I'd like to move into evidence as a demonstrative exhibit,

15 10105.

16      MR. WAGNER:  Same response.

17      THE COURT:  All right.  It is admitted as a

18 demonstrative.

19     (Retiree Exhibit 10105 was admitted)

20      MR. MONTGOMERY:  Thank you, Your Honor.

21 Q   Ms. Nicholl, did you attempt to value on a present value

22 basis, COLA eliminations?

23 A   Yes.

24 Q   Did you analyze the -- the distribution of COLA

25 eliminations by age?

1  A     Yes.

2  Q     Did that go across the entire GRS population?

3  A     Yes.

4  Q     Okay.  And what is Exhibit 10106?

5  A     This shows a distribution based on retiree age of the

6  percentage reduction in present value due to COLA elimination

7  for GRS retirees.

8        So because the COLA is paid for a life expectancy or for

9  -- for however long retiree a lives, the younger the retiree

10  is, the greater the increase or the decrease rather in present

11  value due to COLA elimination.

12        So a 55 year old retiree is going to have a -- see a

13  reduction in the present value of his benefits of 20% due to

14  COLA elimination.  A 60 year old is going to see a reduction

15  of about 15% or so.  And you can see -- you can run your eye

16  down the chart so that you can see that an 80 year old will

17  have a reduction of about 6%, and 85 year old about 4%, and a

18  90 year old about 3% reduction in value of benefit due to COLA

19  elimination.

20        (Retiree Exhibit 10106 was identified)

21            MR. MONTGOMERY:  Your Honor, at this point I'd like

22  to move into evidence as a demonstrative of Ms. Nicholl's

23  analysis and conclusions regarding the reduction in present

24  value of benefits due to COLA, Exhibit 10106.

25            MR. WAGNER:  No objection.

1          THE COURT:  All right.  It is admitted as a

2   demonstrative.

3          (Retiree Exhibit 10106 was admitted)

4   Q    And sticking with GRS two more questions for you on this

5   topic.  Did you calculate the distribution of present value of

6   aggregate benefit reductions for GRS?

7   A    Yes.

8   Q    And again what steps did you do to do that?

9   A    What I did was I determined the present value of -- of

10  benefits for retirees without any reductions, and I determined

11  the present value of benefits for retirees with benefit

12  reductions.  And then from that information, I prepared a

13  distribution.

14  Q    And did you use the same census data for these

15  computations that you used for the actual and allowed

16  settlement claims?

17  A    Yes.

18  Q    Okay.  Could you turn to Exhibit 10107?  And could you

19  tell the Court what this shows?

20  A    So this shows a distribution of the benefit reductions,

21  the percentage of benefit reduction based upon the GRS retiree

22  population.

23          And this includes all three cuts, the 4 1/2% cut, the

24  elimination of COLA, and the ASF reductions.  You can see that

25  there are 49 people who have a cut between 0 and 5%.  Those 49

1  people have to -- happen to have a 0% cut and that's because

2  the benefit that was reported to us was 0.  Just bad data that

3  you expect in a large retiree system.

4      The -- there were 1,864 retirees who have a total cut in

5  present value of about 15% -- I'm sorry, let me take that

6  back.

7      There are 1,864 retirees which is about 15% of the

8  population that have a cut between 5 and 10%.  There are 2,910

9  retirees who have a benefit reduction in present value of

10  between 10 and 15%.  Three thousand one hundred fifty-five

11  whose reduction is between 15 and 20.  Sixteen hundred and

12  twenty-seven whose reduction is between 20 and 25.  Nine

13  hundred and eighty-nine whose reduction is between 25 and 30.

14  A thousand eighty-three whose reduction is between 30 and 35%.

15  Three hundred and sixty-six whose benefit reduction is worth

16  between 35 and 40%.  And then there are 16 retirees whose

17  present value of benefits are reduced by between 40 and 45%

18  due to the three benefit cuts.

19      (Retiree Exhibit 10107 was identified)

20  Q    And this is basically a distribution over the lifetime of

21  all the retirees in GRS?

22  A    Yes.

23          MR. MONTGOMERY:  Okay.  At this time I'd like to

24  move into evidence as a demonstrative of Ms. Nicholl's

25  analysis and conclusions, Exhibit 10107.

 1          MR. WAGNER:  No objection.

 2          THE COURT:  All right.  It is admitted as a

 3  demonstrative.

 4      (Retiree Exhibit 10107 was admitted)

 5          MR. MONTGOMERY:  Okay.  And I believe, Your Honor,

 6  just before the break I have one more question and one more

 7  set of slides on GRS.

 8          THE COURT:  Okay.

 9  Q    Ms. Nicholls, did you compute the total present value of

10  pension reduction for GRS retirees due solely to COLA

11  elimination?

12  A    I did.

13  Q    And what is that number?

14  A    Six hundred sixteen million dollars.

15  Q    And what is slide 10979?

16  A    That shows the calculation that just -- that doesn't show

17  the calculation, it just -- it describes the amount of

18  reduction in present value to GRS retirees due solely to COLA

19  elimination.

20      (Retiree Exhibit 10979 was identified)

21  Q    And on what claim basis are you making this computation?

22  A    This is based upon treasury strips.

23  Q    Okay.  Did you do the same thing for the allowed claim of

24  6.75%?

25  A    Yes, I did.

1  Q    And is that in your report?

2  A    It is.

3  Q    Could you turn to Exhibit 10993, Page 21, Note 7?  And

4  what was your conclusion under the 6.75% as reported in your

5  expert report?

6  A    The reduction in present value of benefits due to the

7  COLA elimination is 344,000,000.

8        MR. MONTGOMERY:  Your Honor, this might be an

9  excellent time for a break before we turn to PFRS.  And before

10 I do so, if I may, I'd like to move into evidence as a

11 demonstrative Exhibit 10979.

12       MR. WAGNER:  No objection.

13       THE COURT:  All right. It is admitted.

14    (Retiree Exhibit 10979 was admitted)

15       THE COURT:  And we will take a break now until 3:15.

16       MR. MONTGOMERY:  Thank you, Your Honor.

17    (WITNESS KIM NICHOLL WAS TEMPORARILY EXCUSED AT 2:57

18 P.M.)

19       THE CLERK:  All rise.  Court is in recess.

20    (Court in Recess at 2:58 p.m.; Resume at 3:15 p.m.)

21       THE CLERK:  All rise.  Court is in session.  Please

22 be seated.

23       THE COURT:  Did I surprise you?  For the record I

24 did push the button.  Go ahead.

25       MR. MONTGOMERY:  May we proceed, Your Honor?

1          THE COURT:  Yes.  Go ahead.

2          MR. MONTGOMERY:  Thank you.

3          (WITNESS KIM NICHOLL RESUMED THE STAND AT 3:15 P.M.)

4    BY MR. MONTGOMERY:

5    Q    Ms. Nicholl, we've been dealing with a lot of numbers.

6    Were you in the courtroom yesterday and today when Mr. Bowen

7    and Mr. Perry were testifying?

8    A    Yes.

9    Q    Do you share the view that this is a mind numbing

10   exercise?

11   A    I love it.

12   Q    And so let's dive back in then.  Ms. Nicholl, did you

13   prepare a couple of slides dealing with PFRS and the reduction

14   of compound COLA?

15   A    Yes.

16   Q    And what are Exhibits 10108 and 10109?

17   A    10108 and 10109 show the impact of the reduction of the

18   compound COLA for those members whose COLA depends upon how

19   active member compensation increases.  So --

20        (Retiree Exhibits 10108 and 10109 were identified)

21   Q    Is that the pre-1969 retiree group?

22   A    I believe so, yes.  And the active members took a 10% pay

23   cut.  So it's unclear whether or not COLAs will be granted

24   while the member's active compensation is recovering from that

25   10% pay cut, or if it won't.  Or if it -- or if the COLA will

1  have to wait until the member has gotten back his 10% cut and

2  then the COLA will start.

3  Q    Okay.

4  A    So there's two graphs that show what the impact would be.

5  10108 shows the -- what the average PFRS benefit would have

6  increased without the COLA reduction compared to what it will

7  increase by with the COLA reduction.  And this chart shows --

8  this assumes that COLAs will commence immediately.

9       In other words we won't have to wait for the active

10 compensation to recover.  So the average PFRS COLA is $30,000.

11 And over a 30 year retirement period, that $30,000 without the

12 COLA elimination would have grown to 58,482.  With the COLA

13 elimination -- I'm sorry, with COLA reduction, rather, it will

14 grow to 40,586 instead.

15 Q    And is 10109 that same analysis but assuming that there

16 is no immediate recovery?

17 A    That's right.  So under 10109 it will take approximately

18 five years for the 10% active pay cut to be recovered.  So it

19 will be five years before there's a COLA granted to retirees

20 who are covered by this provision.

21      So in that case once the COLA does start, 30 years down

22 the road, the COLA -- the benefit would increase to 36,916

23 with a reduction as opposed to what it would have been without

24 the COLA reduction of 53,249.

25 Q    And is this with or without a compound COLA?

1  A    This is a compound COLA.

2  Q    So the two charts about which we are speaking, 10109 and

3  10108 is compound COLA?

4  A    Yes.

5  Q    Did you do a chart, a similar chart for a simple COLA?

6  A    Yes.

7  Q    And turn to Exhibit 10110 and 10111.  Could you tell us

8  what those are?

9  A    So 10110 is the effect of the reduction in the simple

10  COLA for a retiree who retired within the last one year.  So

11  his average benefit is $30,000.  And with the simple COLA

12  after a 30 year retirement his benefit would have grown to

13  50,250 without the COLA reduction, and with the COLA reduction

14  which is a 55% reduction by the way, the -- the benefit will

15  increase instead over a 30 year period to $39,113 or you know,

16  about 10,000 -- more than $10,000 less.

17      For a retiree who retired 20 years ago, his $30,000

18  average benefit now 20 years ago was about $23,800.  And so

19  his benefit without the COLA reduction would have grown over a

20  30 year period to 43,966.  Instead it will only grow to

21  36,285.

22      (Retiree Exhibit 10110 and 10111 were identified)

23          MR. MONTGOMERY:  Your Honor, at this time I'd like

24  to move into evidence as demonstratives 10108 and 10109,

25  10110, and 10111 as demonstratives.

1            MR. WAGNER:  Same.

2            THE COURT:  All right.  As demonstratives, they are

3  admitted.

4       (Retiree Exhibits 10108-10111 were admitted)

5            MR. MONTGOMERY:  Thank you.

6  Q    Now again same with PFRS, Ms. Nicholl.  Did you analyze

7  the distribution of -- strike that.  Did you analyze the

8  reduction in present value benefits due to reducing compound

9  COLA for PFRS?

10 A    Yes.

11 Q    And what is Exhibit 10112?

12 A    10112 shows the percentage reduction in present value of

13 benefits due to reducing the compound COLA, not the simple

14 COLA.  And this shows for a distribution by retiree age that

15 for a 55 year old the reduction in present value due to the

16 reduction in compound COLA is about 15% worth of present

17 value.

18      That -- and for a 60 year old it's about 12% of present

19 value reduction.  For a 70 year old it's about a 9% present

20 value reduction and so on.  So that for a 90 year old it's

21 about a reduction of 3 1/2% present value due to the reduction

22 in compound COLA.

23      (Retiree Exhibit 10112 and 10113 were identified)

24 Q    And am I to understand from this chart that a 55 year old

25 current retiree of PFRS notwithstanding the -- let me rephrase

1  the question.  Could you please explain to the Court what that

2  first bar means for a 55 year old retiree who is not losing

3  monthly pension benefits?

4  A    The 55 year old retiree is not losing monthly pension

5  benefits however, his COLAs are not as great as they would

6  have been without the reduction.  Therefore the present value

7  of all the benefits that the 55 year old retiree is going to

8  receive over his lifetime is 15% less than it would have been

9  had there been no reduction in COLA.

10 Q    In other words he's getting about 85% of what he expected

11 to get over his lifetime?

12 A    Yes.

13 Q    And is that true all the way along the line?

14 A    Yes.

15 Q    And did you do a similar example for PFRS and the present

16 value of benefits regarding simple COLAs?

17 A    Yes.  It's the same type of analysis.  And here the 55

18 year old is going to receive close to 12% less in present

19 value of benefits over his lifetime due to the reduction in

20 COLA.

21     While the 60 year old has about a 10% reduction in value,

22 a 65 year old about an 8% reduction, a 70 year old about a 6%

23 reduction, and so on to about a 90 year old who has about a 2%

24 reduction in value due to the reduction in COLA.

25 Q    Again, focusing on the 55 year old PFRS retiree who has

1  subject to simple COLA, what's the impact on -- over his

2  lifetime?

3  A    So over his lifetime his present value in benefits will

4  be worth about 12% less which means he's going to get 88% of

5  what he thought he would get.

6          MR. MONTGOMERY:  I'd like to move into evidence

7  committee Exhibits 10112 and 10113 as demonstratives.

8          MR. WAGNER:  With the same caveats, no objection.

9          THE COURT:  These are admitted as demonstratives.

10         (Retiree Exhibits 10112 and 10113 were admitted)

11 Q    And did you compute the aggregate present value reduction

12 of COLA under PFRS?

13 A    Yes.

14 Q    And what is the aggregate reduction for PFRS?

15 A    Six hundred and eighty-eight million dollars.

16 Q    And could you put up exhibit 10 -- could you turn to

17 Exhibit 10980?

18 A    Yes.

19 Q    And is that the conclusion to which you referred?

20 A    Yes.

21         (Retiree Exhibit 10980 was identified)

22 Q    And is this in your report?

23 A    It is.

24 Q    And what discount rate did you use?

25 A    Treasury strips.

1  Q    And does this tie to the allowed claim or the actual

2  claim as you computed it?

3  A    The actual claim.

4  Q    Okay.  And did you do a comparable analysis for the

5  allowed claim under the plan?

6  A    Yes, I did.

7  Q    And does that appear in your report?

8  A    Yes.

9  Q    And does it appear at Page 26 of your report at Note 9?

10 Do you see that, Page 26, Note 9?

11 A    It's not on the screen.

12      MR. MONTGOMERY:  Not on your screen.  Is it on the

13 Judge's screen?

14      THE COURT:  Yes.

15      MR. MONTGOMERY:  Okay.

16 A    I'll look in my book then.

17 Q    Would you turn to your -- and just turn to your book.

18 And turn to Page 26 of your report which is Exhibit 10993 and

19 look at Note 9.

20 A    The determination is that the present value of -- of COLA

21 reduction is a reduction in present value of 357,000,000 based

22 on 6.75%.

23 Q    Thank you.  You can take that down.  Now Ms. Nicholl,

24 you've made a distinction throughout your opinions between

25 actual claim in your nomenclature, and the allowed settlement

1  claim in your nomenclature.  Why did you choose a different

2  interest rate for your view of the actual claim?

3  A    My view of the actual claim is that it should be based on

4  risk free discount rates.  And that's because from the

5  viewpoint of the retiree these benefits were free from payment

6  risk.  They were required to be paid.  The city was required

7  to make contributions to the plan so that the -- so that the

8  benefits would be paid to retirees.  So they had no risk that

9  the benefits weren't going to be paid.

10 Q    Now, do the ASOPs permit an actuary to set a different

11 rate than the one that the plan sponsor chooses?

12 A    Yes.

13 Q    And what ASOP supports that?

14 A    ASOP 27 supports that.

15 Q    And are there any -- have there been any amendments to

16 ASOP 27 or new ASOPs that relate to the same subject?

17 A    Yes.  There -- ASOPs are periodically revisited and so

18 there has been -- there is an updated ASOP 27 that is going to

19 replace the current -- the current ASOP.

20 Q    And does -- are there any other actuarial standards of

21 practice that are relevant to prescribed assumptions or

22 methods?

23 A    Yes.  ASOP 4 is -- is really the -- the driving actuarial

24 standard practice related to prescribed assumptions.

25 Q    And does ASOP 4 permit prescribed assumptions by another

1  party?

2  A    Yes.

3  Q    Could you put up Exhibit 10988, please?  And would you --

4  what -- what section of ASOP 4 is relevant, Ms. Nicholl, to

5  the question I just asked you?

6  A    Section 2.20.

7        (Retiree Exhibit 10988 was identified)

8  Q    And would you read the relevant language to the Court,

9  please?

10  A    It says, a prescribed assumption or method set by another

11  party - a specific assumption or method that is selected by

12  another party to the extent that law, regulation, or

13  accounting standards gives the other party responsibility for

14  selecting such an assumption or method.

15        For this purpose an assumption or method selected by a

16  governmental entity for a plan such that the -- that such

17  governmental entity or a political subdivision of that entity

18  directly or indirectly sponsors is a prescribed assumption or

19  method set by another party.

20  Q    Okay.  And can cost methods or amortization methods also

21  be set by another party?

22  A    Yes.

23  Q    And what ASOP makes that possible?

24  A    ASOP 4.

25  Q    Okay.  And what section of ASOP 4?

1   A     Section 3.1.

2   Q     And would you read to the Court Section 3.1, please?

3   A     The actuary may have the responsibility and authority to

4   select some or all of the actuarial assumptions, actuarial

5   cost methods, asset valuation methods, amortization methods,

6   and output smoothing methods.  In other circumstances the

7   actuary may perform actuarial calculations using prescribed

8   assumptions or methods set by another party or prescribed

9   assumptions or methods set by -- set by law.

10  Q     Now you're aware that there is some controversy as to

11  whether or not the City of Detroit can set a prescribed method

12  or assumption under the plan of adjustment.  Are you aware of

13  that controversy?

14  A     Yes.

15  Q     Okay.  In your opinion is it acceptable actuarial

16  practice for the City of Detroit to set an interest rate

17  assumption for valuation purposes?

18  A     Yes.

19  Q     Is it acceptable for the City of Detroit to set an

20  interest rate for funding purposes?

21  A     Yes.

22  Q     And did it do so here?

23  A     It did.

24  Q     And how do you know that?

25  A     Because it's in the plan of adjustment.

1  Q    Could you put up Exhibit 10989?  And could you look at

2  the fourth amended disclosure statement and tell me what that

3  says?

4       (Retiree Exhibit 10989 was identified)

5  Q    The calculation of the aggregate amounts of the allowed

6  PFRS claims in Class 10 and the allowed GRS claims in Class 11

7  utilizes among other assumptions, a 6.75% discount rate to

8  value liabilities and a 6.75% investment return rate for

9  future growth of assets.  In both cases the city has utilized

10 this lower rate as a measure to insure that both GRS and PFRS

11 utilize prudent and conservative investment policies going

12 forward and also to insulate the city from unforeseen and

13 unbudgeted increases in required future contributions.

14 Q    Ms. Nicholl, in your -- in your experience as an actuary,

15 and someone who has testified and written articles, is there

16 anything inappropriate about the City of Detroit setting an

17 interest rate under its plan of adjustment?

18 A    No.

19 Q    Is there anything inappropriate about you trying to take

20 a different discount rate for the purposes of calculating a

21 claim based on a specific creditor or third party perspective?

22 A    No.

23 Q    And is -- why did you do that one more time?

24 A    Again, from the retiree's point of view, the benefits

25 were free from payment risk

1          MR. MONTGOMERY:  No more questions, Your Honor.

2          THE COURT:  Does anyone else in support of the plan

3  want to ask questions of the witness?  All right.  Sir, you

4  may proceed.  Sir, are you going to be using the screen?

5          MR. WAGNER:  I would -- I would prefer to use the

6  screen yes.

7          THE COURT:  All right.  Can we put something up on

8  the screen to see if the witness' screen works?  Because if

9  we're going to fix it, we should take time to do it now.

10 A    I think I must have hit the off button.  That usually

11 works.

12         THE COURT:  Uh-huh.  Are you all set now, Ma'am?

13 A    I have something on my screen.  Is there something --

14         THE COURT:  You do, okay.  All right.  I guess we're

15 ready to go.

16         MR. WAGNER:  Okay, Your Honor, Jonathan Wagner from

17 Kramer, Levin on behalf of the COPS again.  With me again is

18 Deb Fish from Allard and Fish.  And -- and may I approach with

19 the relevant books?

20         THE COURT:  Yes.

21 A    Thank you.

22                    CROSS EXAMINATION

23 BY MR. WAGNER:

24 Q    Good afternoon, Ms. Nicholl.

25 A    Good afternoon.

1  Q    Can you turn to Exhibit 10186, your C.V.?

2  A    Is it in -- is it in the booklet here?

3  Q    Yes, I believe Mr. --

4  A    Oh, I see it.

5  Q    Do you see it there?

6  A    Wait -- yes.

7  Q    Page 2.  Do you see cases worked on?

8  A    Yes.

9  Q    Are those all the cases in which you've testified as an

10 actuary?

11 A    No.  These are just in the last four years.

12 Q    What other cases have you testified as an actuary?

13 A    I testified in <u>Milwaukee County v Mercer</u>.  I testified in

14 the <u>State of Maryland v Milliman</u>.

15 Q    What was that case about?

16 A    That was an actuarial malpractice case related to

17 liability calculation and bad data.

18 Q    And that was a case in which you offered an opinion on

19 behalf of Milliman, correct?

20 A    Yes.

21 Q    And am I right the Trier of Fact did not -- the Trier of

22 Fact did not credit your opinion in that -- in that matter?

23 A    I'm sorry, I don't understand the question.

24 Q    Am I right that in that matter, the Trier of Fact did not

25 credit your opinion?

1  A    What does that mean?

2         MR. WAGNER:  May I approach?

3         THE COURT:  Yeah.

4  Q    Is this the Maryland case in which you testified?

5  A    Yes.

6  Q    And do you see that the Court of Appeals in Maryland

7  stated the board however credited the testimony and evidence

8  presented by Major Krome, Mr. Mowery, and Dr. Moye rather than

9  that of Dr. Nicholl.

10        MR. MONTGOMERY:  Page reference if you would?

11        MR. WAGNER:  Yes, page -- I'm sorry, Page 21.

12        THE COURT:  Is this document in evidence?

13        MR. WAGNER:  No.  And I'm not offering it in

14  evidence.  I'm -- I'm offering it for credibility purposes.

15     If you remember, Mr. Hackney raised the point at one of

16  the pre-trial conferences that exhibits that were being used

17  solely for credibility purposes on cross did not have to be

18  listed.

19        THE COURT:  Did I agree with that?

20        MR. WAGNER:  Yes.

21        MR. MONTGOMERY:  Your Honor, I think this is clearly

22  hearsay and it hasn't been authenticated in any particular

23  way.  And there is no indication this is all relevant to the

24  -- let me rephrase that.  It's clearly hearsay.

25     And it hasn't been on the exhibit list.  And I don't

1   believe we consented to the use of this exhibit and it's

2   certainly not being offered as a demonstrative.

3          THE COURT:  Stand by for me for just one second,

4   please.  Well, I have to ask, what's the specific rule in the

5   Federal Rules of Evidence on which you rely to use this kind

6   of evidence to attack the credibility of the witness?

7          MR. WAGNER:  To make two points.  One, it's being

8   used among other things to refresh her recollection.  Number

9   two --

10         THE COURT:  We can talk about that, but that's not

11  what you said you were using this document for.

12         MR. WAGNER:  Well, I mean I believe I can use just

13  about anything on cross.  I mean Mr. Montgomery asked her

14  about cases listed on her C.V. as to -- as to which she

15  testified.

16         THE COURT:  I'm asking you a more specific question.

17         MR. WAGNER:  Refreshing -- okay.  Refreshing -- I'm

18  using it to refresh her recollection which is permitted under

19  803.

20         THE COURT:  All right.  If that's what you're using

21  it for, you have to look at the document and tell us whether

22  it refreshes your recollection on the question about whether

23  the Court there decided not to credit your testimony.

24  A    Crediting my testimony is a legal definition.

25         MR. MONTGOMERY:  You're just being asked --

1  A    Okay.

2          MR. MONTGOMERY:  Whether it refreshes her

3  recollection.

4          THE COURT:  What she's saying is she doesn't

5  understand the question.

6  A    I don't understand the question.

7          THE COURT:  So I -- let's get -- let's get a

8  question she can understand.

9          MR. WAGNER:  Okay.

10         THE COURT:  And then we'll see if her recollection

11  needs refreshing.

12  Q    Do you remember the outcome of the case?

13  A    I do.

14  Q    And do you remember that you offered an opinion on behalf

15  of Milliman?

16  A    Yes.

17  Q    And do you remember that the -- that the -- the Trier of

18  Fact ruled against Milliman, correct?

19  A    Yes.

20  Q    And do you remember that the Trier of Fact rejected your

21  opinion?

22  A    That I don't remember.

23  Q    Well, they didn't rule in favor of Milliman, did they?

24  A    They did not.

25  Q    Now, you were shown lots of charts here this afternoon

1 | One chart showed -- it's Exhibit 1017.  If you could put that

2 | up?  Actually it would be on -- can -- can you put up 1017?

3 |         MR. MONTGOMERY:  10107?

4 |         MR. WAGNER:  No, 10117.

5 | Q    You showed a recovery percentage for GRS of 31.7%?

6 | A    Yes.

7 | Q    And for PFRS of 17.6%, correct?

8 | A    Yes.

9 | Q    And what's not included in this calculation are

10 | contributions other than from the city, right?

11 | A    Correct.

12 | Q    And you were instructed by counsel to leave out

13 | contributions other than from the city, right?

14 | A    I discussed that with counsel, yes.

15 | Q    And the only reason that you didn't include it was an

16 | instruction from counsel, right?

17 | A    No, that's not true.  I -- we discussed it and since the

18 | recovery was based upon city contributions, I reviewed the --

19 | the derivation or the sources I should say of the

20 | contributions and determined independently that the city

21 | contributions were those I described earlier.

22 | Q    Can you turn to your deposition Page 164?

23 |         THE COURT:  That's in the book she was handed?

24 |         MR. WAGNER:  Yes.  It's also in Your Honor's book, I

25 | put it at the front.

1  Q    Do you have it there, Ms. Nicholl?

2  A    It might be helpful if you gave me an exhibit number?

3  Q    Oh, I'm sorry, no.  In the beginning of the book I put

4  your deposition transcript.  Do you see it there?

5  A    Yes.

6  Q    164, Line 7, actually let me rephrase it.  You state in

7  Paragraph 94, the third sentence, I have been instructed by

8  counsel to determine the present value of city contributions

9  as of December 31, 2014 which approximates the expected

10  effective date of the plan of adjustment.  Do you see that?

11  Answer, yes.

12      Question, was there any other reason why you did a

13  calculation determining the present value only of the city's

14  contributions?  Answer, no.

15      Did you give that testimony back in August?

16  A    Yes.

17  Q    And I'm right that a retiree doesn't care where the money

18  is coming from, does he or she?

19  A    The retiree doesn't care, but that doesn't mean that it's

20  still a city recovery -- or recovery rather based on city

21  contributions.

22  Q    But what a retiree cares about is whether he or she is

23  getting paid, right?

24  A    Yes.

25  Q    Now you calculated 17.6% for PFRS.  But aren't I right

1  that you calculated the size of the PFRS cut in benefits to be

2  12.7%?

3  A    Yes.

4  Q    That means they're getting 87.3%, right?

5  A    That's not the way the calculation of recovery is done.

6  Q    Well, again the cut you calculated was 12.7%, right?

7  A    Yes.

8  Q    And in PFRS they're suffering no actual cut in benefits

9  under the old plan, right?

10 A    They --

11 Q    Other than -- other than a COLA cutback, correct?

12 A    They're getting a COLA cutback.  I consider that a cut in

13 benefits.

14 Q    But aside from the COLA cut, no other cut in benefits,

15 right?

16 A    Yes.

17 Q    And by the way, the 12.7% cut, that's using the risk free

18 rate, right?  When you calculated 12.7% you used a risk free

19 rate to do that calculation, correct?

20 A    I -- I'd have to go and look at my report to be sure that

21 -- what rate I used.

22 Q    Well, in response to Mr. Montgomery's questions don't you

23 remember that you calculated the size of the cut using the

24 risk free rate?

25 A    Yes.

1  Q    And if the cut -- if you used the rate of 6.75, the cut

2  would be even smaller, right?

3  A    Yes, relatively smaller.

4  Q    And the difference between 87% and 10%, is 77%, is it

5  not?

6  A    Yes.

7  Q    Now for GRS you calculated recovery percentage of 31.7%.

8  Do you see that?

9  A    Yes.

10 Q    You also calculated the size of cuts to GRS under the

11 current plan, did you not?

12 A    Yes.

13 Q    And for that you came up with a cut -- a cut of 22.3%,

14 right?

15 A    Yes.

16 Q    And again that was using the risk free rate, correct?

17 A    Yes.

18 Q    And had you used 6.75 the cut would be even smaller,

19 right?

20 A    Relatively smaller, yes.

21 Q    And the difference between 78% and 10%, is 68%, is it

22 not?

23 A    Yes.

24 Q    Now also your analysis didn't take into account the

25 prospect of restoration of cuts, did it?

1  A    It did not.

2  Q    And you're aware that if -- that cuts will be restored if

3  the return rate under the plans exceed 6.75%, correct?

4  A    They will be restored temporarily depending upon what the

5  returns are over a time period.  They could actually be

6  restored and then cut back again.

7  Q    But the baseline is 6.75%, is it not?  That we can agree

8  on.

9  A    The baseline for what?

10 Q    For restoration.  That is to say if the cut -- if the --

11 if the earnings exceed 6.75% there will be a restoration?

12 A    No, not necessarily.  There's different hurdles to --

13 unfunded status that have to be achieved before a restoration

14 occurs.

15 Q    Okay.  Assume for these purposes that the restoration is

16 6.75.  You believe that 6.75 is an outlier with respect to

17 rates of returns for public pension plans, do you not?

18 A    I -- yes, I used those words and by that I meant it's on

19 the low end of the range for what is being used by public

20 sector plans currently.

21 Q    And in your report you -- you stated that 6.75 is at the

22 low end of the range, right?

23 A    Yes.

24 Q    And I'm right, you're aware of only one other pension

25 plan that uses a rate as low as 6.75, correct?

1  A     No.

2  Q     No what?

3  A     No, I'm aware of more than one plan.

4  Q     Can you turn to Paragraph 89 in your report?  This is the

5  document that was put into evidence at least as a

6  demonstrative.  Do you see the last sentence of Paragraph 89?

7  A     Yes.

8  Q     Can you read that last sentence?

9  A     I am personally -- personally -- I personally am aware of

10  only one additional public pension plan that uses an

11  investment rate of return/discount rate of 6.75% or lower (the

12  Pennsylvania Municipal Retirement System which uses a rate of

13  5.5%).

14  Q     And that's one, right?

15  A     That's one additional.

16  Q     Besides Detroit?

17  A     No.  There is, I believe there's four in the NASRA

18  survey.

19  Q     Well, we'll leave that for redirect.  You also didn't

20  take into account the prospect of additional returns from the

21  UTGO settlement, did you?

22  A     Additional returns.  What additional returns would those

23  be?

24  Q     Well, I -- I'm just asking you.  Did you take into

25  account the prospect of additional returns to the pension

1  funds on account of the UTGO settlement?

2  A    No.

3  Q    And the 31 and the 17, that's not in the disclosure

4  statement, is it?

5  A    No.

6  Q    And that's not in the plan, right?

7  A    It's not.

8  Q    The plan and the disclosure statement used 60 and 59,

9  right?

10 A    That's right.

11 Q    And if you're right the plan is false, right?

12 A    In my opinion it is.

13 Q    Your view --

14 A    As far as the recovery rate.

15 Q    Your view is that the -- is that the -- is that the plan

16 of adjustment contains false information, right?

17 A    It's my opinion that the recovery rate in the plan is not

18 the recovery rate that I would have calculated.  That I did

19 calculate.

20 Q    Now you were shown a demonstrative with respect to ASF.

21 Do you recall that?

22 A    Yes.

23 Q    And I'm right that for ASF you relied on work by Conway,

24 MacKenzie, correct?

25 A    I relied on the calculations that Conway, MacKenzie did

1  for determining the amount of the excess investment return,

2  although I did also independently do my own calculation.

3  Q    Okay.  But you did rely on Conway, MacKenzie, right?

4  A    Actually for purposes of the calculations, I relied on

5  Milliman's actuarial offsets which were based upon Conway,

6  MacKenzie's work.

7  Q    Is that another way of saying you relied on their work?

8  A    Yes.

9  Q    And it was Mr. Moore's team, Charles Moore who did that

10 work?

11 A    Yes.

12 Q    And I'm right you take a very dim view of his pension

13 expertise, don't you?

14 A    That's a broad statement.

15 Q    Well, in Stockton you -- you were asked by Mr. Montgomery

16 about Stockton.  Do you recall that?

17 A    Yes.

18 Q    And two months ago you testified that Mr. Moore doesn't

19 appear to understand how contributions to public sector plans

20 are determined, correct?

21 A    That's right.

22 Q    And you were telling the truth when you gave that

23 testimony, right?

24 A    Yes.

25 Q    Now you're relying on him?

1  A    For purposes of determining -- for purposes of the

2  calculation of the defined contribution ASF excess interest,

3  yes, that's not a plan contribution.

4  Q    Just a couple more general questions.  I'm right that

5  Segal has incurred at least through the time of your

6  deposition, two and a half to $3,000,000 on this matter?

7  A    Somewhere in that neighborhood, yes.

8            THE COURT:  Are you talking about fees, sir?

9            MR. WAGNER:  Yes.

10  Q    Now you're not giving any opinion -- or you're not giving

11  any opinion about the Milliman 7.2% rate, are you?

12  A    I am not.

13  Q    And you're aware that Gabriel, Roeder used rates of 8%

14  and 7.9%?

15  A    Yes.

16  Q    And you're not offering an opinion about those rates

17  either, correct?

18  A    I am not.

19  Q    You've undertaken no investigation to determine whether

20  those -- whether the current asset allocation for the funds

21  could justify those rates, correct?

22  A    Not as part of my expert report, no.

23  Q    You've not seen any UAAL set allocation for GRS or PFRS?

24  A    I have not.

25  Q    I'm also right by the way, you've never calculated the

1   size of a claim in a public sector bankruptcy?

2   A    That's correct.

3   Q    Now you gave some testimony about the Milliman

4   calculation of the UAAL.  Do you recall that testimony?

5   A    Yes.

6   Q    And I think for PFRS the figure was 1,879,000,000.  Do

7   you recall that?

8   A    Yes.

9   Q    And you said that you checked that calculation.  Do you

10  recall that?

11  A    Yes.

12  Q    Your calculation of the size of the PFRS -- of the UAA

13  -- too many abbreviations at -- at 4:00 dealing with pensions

14  all day.  Your calculation --

15            THE COURT:  Take your time.

16            MR. WAGNER:  I'm sorry?

17            THE COURT:  Take your time.

18            MR. WAGNER:  Okay.  She's been hanging around for a

19  week, I got to send her home.

20  Q    Your calculation of the size of the UAAL for PFRS was

21  lower than the city's calculation, right?

22  A    I -- I -- are we talking about PFRS or GRS?

23  Q    We'll talk about both.  Let's start with GRS.  Your

24  calculation was lower, was it not?

25  A    It was.  2.9% lower.

1   Q    Right.  It was a billion seven six -- 1,764,000,000,

2   right?

3   A    Right.

4   Q    And for PFRS your figure was lower as well?

5   A    Yes.  About 2.1% lower.

6   Q    It was 1,161,000,000 instead of 1,250,000,000, right?

7   A    Right.

8   Q    By the way, you also testified in <u>Stockton</u>, and I think

9   it's relevant here, that being able to invest one's assets so

10  that one can achieve a higher investment return is a good

11  thing.  Do you recall that testimony in <u>Stockton</u>?

12  A    I do.  And I think it's important to note the context of

13  that testimony as opposed to just pulling it out as a single

14  statement.

15  Q    I'll leave that to Mr. Montgomery.  There's nobody better

16  than him.

17       Now, Milliman calculated the allowed claim -- allowed

18  pension claims based on the UAAL for the two pension funds,

19  correct?

20  A    Yes.

21  Q    And what they did was they performed an actuarial

22  exercise, right?

23  A    They performed an actuarial valuation, yes.

24  Q    And one element of the calculation is the rate of return,

25  right?

 1  A    Yes.

 2  Q    And the investment rate is also used as a discount rate,

 3  correct?

 4  A    Yes.

 5  Q    If there's one thing we now know about pensions after two

 6  days it's that.  And that's always done in public sector plan

 7  funding, correct?

 8  A    Yes.

 9  Q    You've never seen it done otherwise, correct?

10  A    Not for funding, no.

11  Q    And you have no quarrel with the calculation performed by

12  Milliman, correct?

13  A    I do not.

14  Q    And again I think this is well established, if the

15  discount rate were higher then the allowed settlement claim

16  would be lower, correct?

17  A    Yes.

18  Q    And we saw that Milliman used an inflation rate of 2 1/2%

19  when it came up with the 7.2% return, right?

20  A    Yes.

21  Q    And if the rate of inflation were 3%, then the rate of

22  return that Milliman calculated would have been about 7.7%,

23  right?

24  A    You're referring to the November 2013 letter?

25  Q    Yes, yes.

1  A    Yes, approximately.

2  Q    Okay.  And I'm also right that based on the current asset

3  allocation and Gabriel, Roeder's underlying inflation

4  assumptions, their rates of 7.9 and 8% fall within the range

5  of reasonableness, correct?

6  A    They fall within the range of reasonableness.  I don't

7  know exactly where in that range they fall.  If they're at the

8  -- I suspect they're at the high end of the range of

9  reasonableness.

10 Q    Okay.  Let's turn to the risk free rate.  The city -- you

11 believe the risk free rate should be used, right?

12 A    Yes.

13 Q    Okay.  And the city in its plan didn't use the risk free

14 rate, did it?

15 A    No.

16 Q    It used 6.75%, right?

17 A    Yes.

18 Q    And you never told the city outside of what may have

19 happened in mediation, that it should be using the risk free

20 rate, did you?

21        MR. MONTGOMERY:  Objection, Your Honor.  The -- I

22 believe -- sorry.  Qualified.  He's implicitly suggesting what

23 may or may not have been said in mediation which I believe is

24 inappropriate.

25        MR. WAGNER:  You can certainly ignore any

1  implication of my -- I don't mean to inquire into what

2  happened in mediation.

3  Q    My only question is outside of mediation did you ever

4  tell the city that it should be using the risk free rate?

5  A    Through my expert report, I told the city that.

6  Q    But other than your expert report, you never called up

7  the city and said, use the risk free rate.  Again putting

8  aside what may have happened in mediation.  Did you?

9  A    No.

10  Q    And this was an important matter, wasn't it?

11  A    Yes.  But it's not my position to call the city in that

12  regard.

13  Q    And you're aware of hundreds of pension plans that use a

14  rate other than the risk free rate for determining funding,

15  correct?

16  A    Yes.

17  Q    And there's no public pension fund for which you serve as

18  an actuary that uses the risk free rate to determine

19  calculations, right?

20  A    For what purpose?

21  Q    Funding purposes.

22  A    No.  But for other purposes, there are plans that have

23  used the risk free rate.

24  Q    Again, I'll leave that to Mr. Montgomery.  Now, after the

25  break you were asked to give a justification for using the

1 risk free rate.  Do you recall that?

2 A    Yes.

3 Q    And the justification you gave is that there was no risk

4 to participants prior to bankruptcy that those payments, that

5 pension payments would not be made, right?

6 A    Correct.

7 Q    I think you testified at your deposition zero risk?

8 A    Correct.

9 Q    Now would you agree with me, Ms. Nicholl, that if the

10 assumption that benefit payments were free from payment risk

11 is wrong, then depending on the circumstances you might agree

12 that your conclusion that use of the risk free rate was

13 appropriate would be wrong?

14 A    That could be in -- in your hypothetical that might be

15 the case.

16 Q    Now again there were lots of pension funds whose payments

17 are guaranteed that don't use the risk free rate, right?

18 A    For purposes of funding they do not.

19 Q    And in fact there was a risk prior to bankruptcy here

20 that pension payments wouldn't be made, correct?

21 A    No.

22 Q    Were you aware the city didn't make a pension payment in

23 June of 2013?

24 A    I think you're confusing benefit payments and -- and

25 contributions.

1  Q    Let me just ask.  Are you aware that the city did not

2  make certain contributions -- pension contributions that were

3  required as of June 30, 2013?

4  A    Yes.

5  Q    And you're also aware the city filed for bankruptcy?

6  A    Yes.

7  Q    And you know that Detroit's been in distress for many

8  years, right?

9  A    Yes.

10  Q    That's why we're all here.  And by the way you didn't do

11  a survey of pension participants to determine whether they

12  perceived any risk, did you?

13  A    No.

14  Q    Are you aware that there were prior instances of

15  non-payment of pension contributions other than June 2013?

16  A    Yes.

17  Q    Do you have an understanding why the COPS transactions

18  are entered into?

19  A    Generally.

20  Q    And you're aware of the Judge's eligibility decision, are

21  you not?

22  A    Yes, I am.

23  Q    And you're not a lawyer, right?

24  A    No.

25  Q    You're better, you're an actuary.  We -- we aspire to be

1  that.  You've not read any of the cases -- you've not read any

2  of the cases that -- that bear on whether payments could be

3  cut or not, right?

4  A    I have read those.

5  Q    Okay.  Let's go back to the risk free rate.  Am I right

6  that you have severely criticized use of the risk free rate to

7  determine funding requirements for public pension funds?

8  A    Yes, for funding purposes.

9  Q    And again you've never recommended to a client that a

10  risk free rate be used for funding purposes?

11  A    That's correct.

12  Q    And you're not aware of any actuary who does, correct?

13  A    Not for funding, no.

14  Q    You've also written articles in the field of public

15  pension, correct?

16  A    Yes, I have.

17  Q    Mr. Montgomery highlighted some of those?

18  A    That's right.

19  Q    And those articles are reliable?

20  A    Yes.

21  Q    And you stand by those articles?

22  A    I do.

23  Q    Can you look at Exhibit 1045?  This is your article --

24  this is your article about among other things, the risk free

25  rate, right?

1  A    Yes.  This is about using the risk free rate for purposes

2  of funding.

3       (COPS' Exhibit 1045 was identified)

4  Q    Okay.  And you reference something called MVL.  Is that

5  the equivalent of the risk free rate?

6  A    Yes.

7  Q    Can you turn to Page 3 of the letter?  By the way when I

8  call it a letter, is this something that's distributed to --

9  to Segal clients?

10  A    Yes, it is.

11  Q    All right.  Now you see at the top you state, for

12  discussions about the likely cost of a public sector pension

13  plan to a sponsoring employer or the long term financial

14  health of the plan, MVL, that's the risk free rate, estimates

15  will be inaccurate at best and misleading at worse, since

16  these measurements explicitly include information about

17  funding and cost.  Do you see that?

18  A    Yes.

19  Q    Truthful information?

20  A    Yes.

21  Q    Okay.  Can you turn back to Page 1 of the letter?

22       THE COURT:  Excuse me, can you tell the Court why

23  you are asking questions about using the risk free rate in

24  connection with funding?

25       MR. WAGNER:  She may -- she may seek to

1  compartmentalize the use of the risk free rate.  We don't

2  believe it can be compartmentalized.

3           THE COURT:  Why not?

4           MR. WAGNER:  But -- because it's a uniform practice

5  of actuaries not to use the risk free rate.  There's --

6  there's no support for --

7           THE COURT:  Acknowledged that for funding purposes.

8           MR. WAGNER:  Okay.  There's no literature suggesting

9  that it be used -- there's no literature supporting the

10 proposition that it should be used for purposes of valuing a

11 bankruptcy claim.  And I believe --

12          THE COURT:  I invite you to ask all the questions

13 you'd like about that question.

14          MR. WAGNER:  Well --

15          THE COURT:  But I'm going to ask you to move on from

16 the issue of using risk free rate for funding because the

17 witness is not supporting that.  Am I right, Ma'am?

18 A    That's correct.

19          MR. WAGNER:  Well, let me just -- so the record is

20 clear, I believe I have established in the questioning that

21 the underlying basis for using the risk free rate is

22 inappropriate.  We'll leave that to some other time.  But I'd

23 like to move admission of the document for 803(18) purposes.

24          THE COURT:  I don't see the relevance of it.  What's

25 the relevance of it?

 1          MR. WAGNER:  The relevance is it deals with the use

 2   of the risk free rate.  She has testified one should use the

 3   -- she has used the risk free rate for all kinds of things.

 4   She used it to discount the -- the calculation of payments,

 5   she used it for all kinds of things.

 6          THE COURT:  Right.  But she didn't use it for

 7   funding purposes and that's what the document addresses.

 8          MR. WAGNER:  The document doesn't only address

 9   funding purposes.  I mean again this may be --

10          THE COURT:  Show me.

11          MR. WAGNER:  Okay.  Can you look at Page 1, this --

12   the middle column.  Do you see there the paragraph states, the

13   AAL measure is based on long term methods and assumptions.  It

14   takes into account the service and pay earned by employees but

15   also anticipates future service and pay obligations which will

16   increase the plan's obligations current practice.  It also

17   incorporates information about the -- the past and future

18   investment earnings attributable to the plan's assets in

19   selecting what is called the discount rate.

20      In -- in -- in determining the AAL, the discount rate

21   used to calculate public sector liabilities, is the long term

22   expected investment return on the plan's investment portfolio.

23   Do you -- do you see that?

24          THE COURT:  Can we get to the next page?  Or the

25   next column.  Thank you.

1            MR. WAGNER:  And can you turn to Page 2?  The bottom

2    left.  At the bottom.

3        MVL, that's the -- the risk free rate, answers the

4    question of what price the market will charge if all plan

5    participants wanted to replicate their accrued pension

6    benefits by purchasing securities that would provide the same

7    stream of income.  Another way to view MVL is what the market

8    would charge if the employer were able to terminate the plan

9    and transfer benefits to a third party.

10       Then I look at the -- the top in today's low interest

11   rate environment, an MVL measure will produce substantially

12   greater -- greater -- will produce a liability substantially

13   greater than the current expected -- expected return rate.

14       These all talk about calculating the liability, it's not

15   just funding.

16           THE COURT:  And she says not to do that, right?

17   A    Yes.  I mean, you know, the -- the -- the first paragraph

18   on Page 2 talks about when MVL is appropriate in the public

19   sector.  It doesn't say not to use it.

20           THE COURT:  Say it's appropriate to use it for

21   funding purposes?

22   A    No, it does not.  It says it was appropriate for plan

23   termination purposes or for retirees to go out in five year to

24   replicate their benefits in the marketplace.

25           THE COURT:  Well, I'll admit the document if that's

1   what you want me to do.

2           MR. WAGNER:  I think --

3           THE COURT:  But I don't read anything in here to --

4   to suggest a risky rate for funding or anything that's

5   inconsistent with the witness' testimony.

6           MR. WAGNER:  We'll leave that -- we'll leave that to

7   another time.  And let me just finish up quickly with the

8   document.

9           THE COURT:  All right.  What's the number, just so

10  our record is clear?

11          MR. WAGNER:  It's 1045.

12      (COPS' Exhibit 1045 was admitted)

13  Q    Can you look at Page 3 of the document?  Do you see at

14  the top left, "it is difficult to find similar practical

15  applications in the public sector for MVL measurements which

16  were developed to address specific financial and policy

17  concerns faced by corporations sponsoring defined benefit

18  plans".  Do you see that?

19  A    Yes.  I think you -- you probably need to continue

20  reading on in that paragraph though to see what else I had to

21  say about it though.

22  Q    I'm going to -- I'm going to leave that in Mr.

23  Montgomery's good hands.  I'm also right -- by the way there

24  are other organizations in the pension field that have

25  criticized use of the risk free rate, correct?

1  A    Yes.  There are also some that support it.

2  Q    Okay.  Now you testified the city used 6.75 as a discount

3  rate, right?

4  A    Yes.

5  Q    And you have not done any work one way or the other as to

6  whether that's the appropriate rate, correct?

7  A    Other than citing ASOP 4 and the fact that it's a

8  prescribed assumption, no.

9  Q    And the 6.75 rate you as understand it, is based upon a

10  different proposed asset mix than the historical returns used

11  by the pension funds, correct?

12  A    That -- yes.  That that -- that is the -- what the city

13  stated that they intended to invest more conservatively.

14  Q    And the 6.75 is not based on the historical practice of

15  the Detroit Retirement Systems, correct?

16  A    What do you mean by historical practice?

17  Q    Can you look at your deposition, Page 101, Paragraphs 2

18  -- Line 2 to 8.

19  A    Could you give me that reference again?

20  Q    Actually let me clarify.  By historical rate I mean the

21  rates set in prior years, correct?

22  A    Correct.

23          MR. WAGNER:  Okay.  And, Your Honor, just I note

24  Page 37 of the retiree committee brief that the 6.75 rate is

25  not based on public pension plan practice as well.

1        MR. MONTGOMERY:  Your Honor, I'm not sure that this

2   is an appropriate use of hearsay evidence, or with respect to

3   statements of the committee, it doesn't impeach, it -- it

4   doesn't relate to any specific testimony of the witness.  I'm

5   not sure how it gets used.

6        MR. WAGNER:  That's fine.  I'm just citing it for

7   the record.

8   Q    Now, you testified earlier about functioning as a signing

9   actuary?

10  A    Yes.

11  Q    And a signing actuary is an actuary who is fully

12  responsible for the results, correct?

13  A    Yes.

14  Q    And the signing actuary leads the team, right?

15  A    Yes.

16  Q    And I think you testified you're the signing actuary for

17  Chicago teachers?

18  A    Yes.

19  Q    North Dakota teachers?

20  A    Yes.

21  Q    You're also the signing actuary for St. Louis

22  firefighters?

23  A    Yes.

24  Q    And none of those plans use a rate as low as 6.75%, do

25  they?

1  A    No.

2  Q    No they don't?

3  A    They do not.

4  Q    Can you look in the book Exhibit 1044?  That's Segal's

5  report for the firefighters retirement plan of the City of St.

6  Louis?

7  A    Yes.

8  Q    And can you look on Page 3 of the document?  It's

9  actually the third page of the document, not Page 3, I'm

10  sorry.  Is that your signature?

11  A    Yes.

12  Q    And this document is dated March 25, 2014, right?

13  A    Correct.

14  Q    And I could show you the page, but I'm right that this

15  plan or Segal -- strike that.  The plan set a rate of return

16  of 7.625%, correct?

17  A    Yes.

18  Q    And that was done in March of this year, right?

19  A    Yes.

20  Q    And the inflation rate set in the plan was 3%, right?

21  A    Yes.

22  Q    And you were comfortable with that 3% rate, were you not?

23  A    Yes, I was.

24  Q    And that's actually not the latest plan for which you are

25  an actuary that issued one of these reports, right?

1  A    You mean the -- the latest date?

2  Q    Yes.

3  A    Yes, that's correct.

4  Q    The next -- you've since issued a report for the Chicago

5  Park Employees Benefit Fund?

6  A    I believe so.

7  Q    And that fund set a rate of 7 1/2 or 7 3/4, right?

8  A    I don't know off the top of my head, but I believe it's

9  in that range.

10 Q    You also testified you're the actuary for North Dakota

11 teachers?

12 A    Yes.

13 Q    And the rate of return that's currently in place for that

14 fund is 8%?

15 A    That's right.

16 Q    Inflation rate is 3%?

17 A    I don't know off the top of my head.

18 Q    I'm going to ask you just by -- for purposes of

19 refreshing your recollection, can you look at your deposition

20 transcript Page 127, Line 12?

21 A    Okay.

22 Q    I must have been pulling this from the -- well -- well,

23 reading 127, Lines 12 to 14, does that refresh your

24 recollection for the -- for -- that for North Dakota teachers

25 the inflation rate is 3%?

1  A    Yes, currently.

2  Q    Let me ask you some questions about freezing a plan

3  versus terminating a plan.  There is a difference from an

4  actuarial point of view between freezing a public plan on one

5  hand, and terminating the plan on the other, correct?

6  A    Yes.

7  Q    And if a pension plan is terminated, then the entity that

8  sponsors the pension plan will no longer have any

9  responsibility for the plan financially, or administratively,

10 correct?

11 A    Yes.

12 Q    And this plan is not being terminated, right?

13 A    It is not.

14 Q    You referenced your -- your calculation of the supposed

15 claim using something called PVFAB.  Do you recall that?

16 A    Yes.

17 Q    Am I right that your calculation includes the value of

18 non-vested benefits to the extent they are expected to become

19 vested in the future?

20 A    That's right.

21 Q    And your calculation therefore includes benefits that

22 have not as yet vested, correct?

23 A    That's right.  But they are expected to become vested in

24 the future.

25 Q    Well, nothing else is going to vest under this plan,

1  right?

2  A     That's not true.

3  Q     Okay.  And your calculation includes the value of

4  expected future salary increases, correct?

5  A     Yes.

6  Q     And am I right that you can't identify any literature

7  that you -- that references PVFAB?

8  A     Yes, I can.  I have identified literature that references

9  PVFAB.  It's as I said earlier, it's also called the projected

10 unit credit method.  It has a number of names.  But there are

11 -- there are a couple of references to this cost method.

12 Q     Well, you couldn't identify it at your deposition, could

13 you?

14 A     Not off the top of my head I couldn't.

15 Q     Now, Ms. Nicholl, you believe the information that's in

16 your report is important information, right?

17 A     Yes.

18 Q     And you -- you would include in that your calculation of

19 31% for -- for GRS and PFRS of 17.6%, right?

20 A     Yes.

21 Q     Can you turn to Exhibit 1043 in the book?  Actually it

22 may be in the pocket.  Now this is the official letter from

23 the Official Committee of Retirees to all retirees.  You've

24 seen this before, right?

25 A     Yes, I have.

1  Q     And can you turn to the third page of the document?  For

2  PFRS it states, you will receive 100% of your current pension

3  payment -- payment and 45% of your future annual escalators or

4  COLAs over your lifetime.  Elimination of 55% of your annual

5  escalators or COLAs amounts to approximately a 9.9% reduction

6  in the value of your pension over your lifetime.  Do you see

7  that?

8  A     Yes.

9  Q     And for GRS, can you turn to the next page?  You state at

10 the top, in summary this is for GRS -- I'm sorry, the retiree

11 committee states, in summary you will receive 95.5% of your

12 current pensions, but no escalators, COLAs over your lifetime.

13 And you may be subject to annuity saving fund recoupment that

14 will be subject to a cap.  And then it goes on.  Do you -- and

15 it gives further descriptions.

16      On number 2, it says, elimination of 100% of your

17 escalators or COLAs amounts to an average 14.5% reduction in

18 the value of your pension over your lifetime.  Do you see

19 that?

20 A     Yes.

21 Q     And in your report you state that the allowed settlement

22 claims are significantly below the actual value of pension

23 claims and represent a substantial compromise.  Do you recall

24 that in your report?

25 A     Yes.

1 Q    And none of that is information that was told to the

2 retirees, was it?

3 A    No, it was not included in this letter to retirees.

4 Q    And are you aware that this information was contained in

5 the disclosure statement?

6 A    Yes.

7 Q    You gave a -- an opinion in your report about the risks

8 facing participants with respect to their payments going

9 forward.  Are you still offering that opinion?

10 A    That -- the opinion that the participants -- their

11 benefits were free from payment risk?

12 Q    No, going forward.  Risks they face going forward.  Do

13 you recall that?

14 A    No.

15 Q    No, you're no longer offering it?

16 A    I don't remember -- I don't know what you're talking

17 about.

18 Q    Okay.  I'm going to assume that that's not being offered.

19 A    I don't know.  I don't understand your question.

20 Q    Okay.  The only reason I asked is because the report is

21 in as a demonstrative, but that's fine.

22 A    Just to be clear, I don't understand your question.

23 Q    Okay.  If I were an actuary you'd -- we'd understand each

24 other perfectly I'm sure.  Now you gave some testimony about

25 ASF.  Do you recall that?  You were shown some charts?

1  A     Yes.

2  Q     But you don't know one way or the other whether the ASF

3  recoupment is appropriate or not, do you?

4  A     I -- the retiree committee believes that there's no legal

5  basis for the ASF recoupment, so --

6  Q     But you've not studied the issue as to whether it's

7  appropriate or not, correct?

8  A     What do you mean by appropriate?

9  Q     Do you have an understanding of the -- whether it's

10 proper or not.  Do you have an understanding whether the ASF

11 recoupment is proper or not?

12 A     I --

13       MR. MONTGOMERY:  Objection, I believe that calls for

14 a legal conclusion for which the witness is not qualified to

15 answer.

16       MR. WAGNER:  Well --

17       THE COURT:  Well, from -- from -- from your

18 perspective, do you believe you can answer that question?

19 A     I believe that there is -- I've been told from my lawyers

20 that there's no legal basis for the ASF recoupment.  I'm not a

21 lawyer so I haven't done my own independent assessment.

22 Q     That's -- that's fine.

23       THE COURT:  Okay.  But -- but as an actuary, you

24 have no opinion on that question?

25 A     I -- I think that the retirees who are receiving an ASF

1  recoupment who are paying back an ASF recoupment, had no input

2  into that calculation.  So I feel like they are in this regard

3  almost victims of it because they didn't -- they weren't

4  controlling that interest, they happened to get the interest.

5  So having to pay that back now at this stage, I think is a

6  little like pulling the rug out from under them.

7          THE COURT:  That doesn't feel to me like an opinion

8  of an actuary.  That feels like your personal opinion.

9  A    That's right.

10          MR. WAGNER:  I'm going to let Your Honor finish the

11  cross.

12          THE COURT:  I respectfully decline.  Does that mean

13  you don't have any more questions?

14          MR. WAGNER:  I'm taking less time than Mr.

15  Montgomery.  I'm almost done, Your Honor.  Yes.  Ms. Fish

16  reminds me, I'd move Exhibit 1043 into evidence which has not

17  been objected to.

18          MR. MONTGOMERY:  That is correct.

19          THE COURT:  Is it already in evidence?

20          MR. WAGNER:  I think by virtue of Your Honor's

21  pre-trial decision -- pre-trial list.

22          THE COURT:  Let me just check.  1043, is already

23  admitted, yes.

24          MR. WAGNER:  Okay.  Just a couple more questions.

25  Q    You've reviewed the work by Gabriel, Roeder in connection

 1 with this matter?

 2 A    Yes.

 3 Q    And you found their work to be reliable, correct?

 4 A    I've reviewed the work.  I've reviewed the June 30, 2013

 5 valuation by -- which was the derivation of the allowed

 6 settlement claim, so I've determined that their calculation

 7 based on their assumptions is reasonable.

 8          MR. WAGNER:  Nothing further, Your Honor.

 9          MR. BRILLIANT:  Allan Brilliant on behalf of MIDD.

10                    CROSS EXAMINATION

11 BY MR. BRILLIANT:

12 Q    Good afternoon, Ms. Nicholl.

13 A    Good afternoon.

14 Q    Now, Ms. Nicholl, in addition to being an expert witness

15 you know here today, you're the -- one of the financial

16 advisors for the retiree committee, is -- is that right?

17 A    No, I am actuary.

18 Q    I understand you're an actuary, but are you -- are you a

19 consultant, are you an actuarial consultant for the -- for the

20 retiree committee?

21 A    Yes.

22 Q    And how -- how long have you been retained by the retiree

23 committee?

24 A    Since last September, one year.

25 Q    And -- and during that period of time you've been

1  advocating, you know, positions on behalf of the retirees,

2  isn't that right?

3  A    I have been performing calculations on behalf of the

4  retiree committee.

5  Q    And you've been involved in -- I'm not asking for

6  anything that happened there, but you've been involved in the

7  mediation, right?

8  A    Yes.

9  Q    And you've reviewed documents and tried to work with

10  counsel to make sure that the best arguments possible could be

11  made for the retirees, isn't that right?

12          MR. MONTGOMERY:  Objection, it calls for privileged

13  information.

14          MR. BRILLIANT:  I'm not asking for any privileged

15  information, just asking a question about what she's -- she's

16  done but not asking for any communication.

17          MR. MONTGOMERY:  She can't possibly testify as to

18  what she did with counsel without revealing privileged

19  information.

20          MR. BRILLIANT:  I'm not asking for the information,

21  Your Honor.

22          THE COURT:  No, I think question is okay.  Please

23  answer it.

24  A    I have -- could you ask the question again, please?

25  Q    Sure.  I mean as your role as an actuary for the retirees

1  committee, you've worked with the lawyers and tried to develop

2  the best possible arguments, you know, for the retiree

3  committee's position, isn't that right?

4  A    As an actuary I don't develop arguments.  What I do is

5  perform calculations and determine the financial impact of

6  various alternatives.

7  Q    So you're -- so you're saying you've never -- you know --

8  you know, helped counsel try to put the best spin or to

9  negotiate for the best outcome for the retirees, is that what

10 you're -- you're telling the Court?

11          MR. MONTGOMERY:  Objection, Your Honor.  Calls for

12 privileged information.

13          THE COURT:  It does, the objection is sustained.

14 Q    Did -- did you review a draft of the disclosure statement

15 before it went out?

16 A    No.

17 Q    You -- you -- you never saw the disclosure statement

18 before it went out?

19 A    No.

20 Q    And did you review a draft of -- of the letter which is

21 Exhibit 1043 before it went out?

22 A    Is that the -- this is the letter we were just talking

23 about?

24 Q    Yes.

25 A    Yes, I saw that before it went out.

1  Q    Okay.  And -- and did you -- but -- but your committee

2  sent it out notwithstanding, you know, the -- the fact that in

3  your view it -- it doesn't properly calculate the -- the claim

4  amount and the recovery amounts, is that right?

5  A    It doesn't show either the claim amount or the recovery

6  amount in this letter.  So I didn't have an opinion on the

7  letter from that regard.

8  Q    But didn't -- Mr. Wagner just went through with you, you

9  know, the letter and he showed you where it said that PFRS --

10          THE COURT:  Well, let's be sure we're talking about

11  the same letter, okay.  Can you -- can you clarify that,

12  please?

13          MR. BRILLIANT:  Sure.

14  Q    Exhibit 1043, was -- it was the letter that was in the --

15  the pocket of your -- of your -- your binder?

16  A    That's correct, I have it.

17  Q    And is this the letter you were talking about?

18  A    Yes.

19  Q    And so -- and you're saying this letter does -- does not

20  discuss the recovery amount for the retirees?

21  A    No, it doesn't.

22  Q    Can you turn to Page 4, please?  And then I think Mr.

23  Wagner went through this with you, but we can do it again.  If

24  I'm reading correctly it says, in summary you will receive

25  95.5% of your current pension but no escalators.

1    I'm going to skip a little bit.  And then if you go down

2 to 2 on the bottom, it says elimination of 100% of your annual

3 escalators or COLAs amounts to an average 14.5% reduction in

4 the value of your pension over your lifetime.  Do you see

5 that?

6 A    Yes.

7          MR. MONTGOMERY:  Objection, Your Honor.  This calls

8 for a response in which the witness is talking about recovery

9 and the word recovery does not appear anywhere in the

10 highlighted information.

11          MR. BRILLIANT:  But, Your Honor, I think that's an

12 appropriate objection -- I mean that's appropriate for -- for

13 redirect, but at this point, you know, I'm asking her

14 questions.  Now it may be she's interpreting the document

15 differently than I am, but that's, you know, that's not an

16 appropriate objection at this time.

17          THE COURT:  All right.  The objection is overruled.

18 Q    So -- so do you see that where it says that the average

19 is going to receive a 14.5% reduction in the value of -- of

20 your pension over your lifetime?  Do you see that?

21 A    That's -- yeah, for the elimination of COLA, that's

22 14.5%.

23 Q    Okay.  And -- and you're going to receive a -- and also

24 tells them they're going to receive a 4.5% reduction in

25 pension benefits, right?

1  A    Right.

2  Q    So it effectively tells them what they're going to

3  recover, the -- the difference between those two and 100%,

4  right?

5  A    This show -- this document tells them what their

6  reductions will be in their pension benefit.  In my opinion it

7  doesn't tell them the recovery rate which is a different

8  calculation.

9  Q    Okay.  So you're saying that when -- when you read this,

10  you thought this was -- was accurate and complete and -- and

11  -- and wasn't misleading to the holders because it didn't use

12  the word recovery rate?  Is that -- is that your testimony?

13  A    Can you repeat the question, please?

14  Q    Sure.  So you're saying that you -- you're testifying

15  today that you viewed that the recovery rate is very different

16  than, you know, 100% minus the 18.5%, right?

17  A    Yes.

18  Q    Okay.  And you knew that this letter was going out to the

19  holders, right?

20  A    Yes.

21  Q    And that they were going to -- going to -- hopefully

22  that, you know, the members of the pension committee -- I mean

23  the members -- the pension holders would read it from the

24  pension committee's perspective, you wrote it for them to read

25  it, right?

1  A    It was written for them to read it.  I didn't write it.

2  Q    Okay.  But it was written for them to read with the

3  expectation that it would give them the information they

4  needed to vote on the plan, right?

5  A    Yes.

6  Q    And you knew that voting on the plan was a very important

7  step for the pensioners, right?

8  A    Yes.

9  Q    And you wanted them to have the most accurate information

10  possible, right?

11  A    Yes.

12  Q    And -- and the reason for that is because their vote was

13  important, isn't that right?

14  A    Yes.

15  Q    And -- and you wanted to make sure that they had a -- you

16  know, a vote that was based on all the available information

17  that the pension committee could give them, right?

18  A    Yes.

19  Q    And so in -- in drafting this letter which you reviewed

20  before it went out, your committee and nowhere in here says

21  that the -- that the claim amount was much larger than this

22  and that their recovery was really, you know, much lower than

23  the numbers that are provided here, isn't that right?

24  A    That's correct.

25          THE COURT:  All right.  Let's stop here.  Because I

1  need you to explain to me about why you're asking these

2  questions.

3          MR. BRILLIANT:  Yes, Your Honor.  I think, Your

4  Honor, this goes to the issue of unfair discrimination.  The

5  -- you know, the witness is -- is saying that effectively --

6          THE COURT:  It sounds like you're trying to protect

7  the retirees.

8          MR. BRILLIANT:  No, Your Honor.  No, I'm -- Your

9  Honor, I'm -- I'm impeaching her -- her report which came out

10  in July many months after this which says that the amount of

11  the claim is really much larger than is in the disclosure

12  statement and in the letter that was sent out to the retirees,

13  and that the recovery rate is much lower --

14          THE COURT:  All right.  All right.  For that -- for

15  that purpose I'll permit you to proceed.  Go ahead.

16          MR. BRILLIANT:  Yeah.  I mean that's -- that's all

17  I'm trying to do, Your Honor.

18          THE COURT:  Permitting you to proceed.

19          MR. BRILLIANT:  Thank you, Your Honor.

20  Q    Now you talked earlier about that in the -- in the

21  pension world there's two different types of -- of plans,

22  defined benefit and defined contribution plans, is that right?

23  A    Yes.

24  Q    Now the -- the -- with respect to GRS, leaving aside the

25  ASF for a second, with respect to GRS and PFRS before the

1  bankruptcy, those were defined benefit plans, isn't that

2  right?  Leaving aside ASF.

3  A    So as I said earlier GRS -- GRS and PFRS consists of both

4  the defined benefit and defined contribution.  So if you're

5  going to not talk about the defined contribution part of it,

6  then yes, it's a defined benefit.

7  Q    Right.  A portion of it was a defined benefit plan,

8  right?

9  A    Yes.

10  Q    Okay.  Now under the plan of reorganization, the -- the

11  -- the new plan or the terminated plan and the treatment, you

12  know, for the creditors, that's being treated like a defined

13  benefit plan as well, isn't that right?

14  A    I don't understand your question.

15  Q    Okay.  So if I'm a pensioner, I get a -- a defined

16  benefit under -- under the plan.  And now by plan now I'm

17  talking about plan of adjustment, isn't that right?  I get a

18  -- I get a defined benefit.

19  A    Are you talking about the retirees?

20  Q    Yes.

21  A    Yes.

22  Q    Okay.  And it's -- it's -- so it's not a situation where

23  the city just has to make certain defined contributions and

24  the retirees get whatever that leads to, right?  They get a

25  defined benefit, isn't that right?

1  A    Yes.

2  Q    And with respect to the PFRS there is no reduction in --

3  in -- in the benefit that they receive on their actual pension

4  itself, just with respect to the COLAs, isn't that right?

5  A    Their base benefit is not going to change, but they will

6  not -- their -- their COLAs going forward will be lower.

7  Q    Okay.  And -- and you did a -- a present value

8  calculation of what the -- of -- of what the -- the reduction

9  in the COLA is for the PFRS, isn't that right?

10 A    Yes.

11 Q    And -- and do you remember what -- what your analysis

12 showed using the 6.75% interest rate?

13 A    I think it was about 10%, but I'd have to verify that for

14 sure.

15 Q    It's 9.9%, right?

16 A    It sounds right.

17 Q    Okay.  And so -- and that's -- so that 9.9% is the -- the

18 entire reduction that the -- that the PFRS is -- is receiving

19 under the plan, isn't that right?  On a present value basis

20 using 6.75%?

21 A    Yes.

22 Q    And the -- so -- so if there -- so effectively they're

23 getting a 90% return, isn't that right?  Receiving 90% of all

24 the benefits that they were -- that they were promised before

25 the bankruptcy?

1  A    The -- the retirees are going to receive a value.  Their

2  benefit value is being reduced by 10%, so they are going to

3  receive 90% of what they thought they would receive.

4  Q    Okay.  And part of that is on account of their secured

5  claim, right?  The assets that were already in the fund at the

6  time of the bankruptcy?

7  A    Yes.

8  Q    And part of that is on account of -- of their unsecured

9  claim, what you referred to as the UAAL, isn't that right?

10 A    Yes.

11 Q    Now let's turn to the GRS for a second.  Now the -- with

12 respect to the GRS that's also -- their treatment is also

13 based on a defined benefit as well, isn't that right?

14 A    The retirees are going to be receiving a defined benefit

15 going forward as they had previously.  It's going to be lower

16 though.

17 Q    That's right.  So -- and -- but there -- there's a 4.5%

18 reduction, right?

19 A    That's part of it.

20 Q    Right.  And then there's a COLA reduction as well?

21 A    That's another part of it.

22 Q    Right.  And you did a -- a present value on the COLA

23 reduction also?

24 A    Yes.

25 Q    And do you recall what that COLA reduction is at 6.75%?

1   A    No.

2   Q    Is it -- does 13.4% sound right to you?  Well, this is

3   not a memory test.  You can -- if you look at your report on

4   Page 21, I'm sure you'll find it.

5   A    Can you repeat the question again?

6   Q    Sure.  What -- what's the present value at 6.75% discount

7   rate for the -- for the COLA reduction for the GRS?

8   A    Three hundred forty-four million.

9   Q    Right.  And that's the total dollar amount, right?

10  A    Yes.

11  Q    And what's the percentage, the average percentage?

12  A    The average percentage is 16.2%.

13  Q    16.2% using the -- the treasury strips, right?

14  A    Yes.

15  Q    But -- but I asked you with respect to the 6.75%

16  reduction.  What -- what's the rate with that?

17  A    13.4.

18  Q    Thank you.  So if you take 13.4 and you add 4.5, you get

19  17.9, right?

20  A    Yes.

21  Q    And if you take 100% and you subtract out 17.9, you're

22  the -- the numbers person, not me.  I'm showing the limitation

23  of my lawyer's mind.  What -- what number do you come up with?

24  A    That's about -- well, you're forgetting about the ASF

25  recoupment, so --

1  Q    Let's leave the ASF recoupment aside for a second.

2  A    Well, that's a reduction to the defined benefit plan.

3  Q    Yeah.  Your counsel on redirect can -- can ask you

4  questions if he'd like.  I just would like to know --

5        THE COURT:  Answer the math question that he gave

6  you.

7  A    13.4 plus 4.5 is about 18%.

8  Q    17.9 less 100.

9  A    Seventy-two.

10  Q    72.1, right?

11  A    Oh, I'm sorry.  You got me mixed up here, 82.

12  Q    82.1, right?  It's 82.1.  So there -- so there would be a

13  recovery of 82.1% using those assumptions, right?

14  A    But again you're using recovery and it's not a recovery

15  calculation.  That's the -- the -- the present value that they

16  will be receiving in benefits based on those two amounts, the

17  COLA elimination and the 4 1/2% across the board cut.

18  Q    Okay.  Now and that's without -- with respect to, you

19  know, any COLA restoration, isn't that right?

20  A    That's correct.

21  Q    And it's -- and if the interest rate exceeds 6.75% and

22  the -- the plans get -- have more than 78% funded levels,

23  there -- there could a COLA restoration, isn't that right?

24  A    There could be, yes, under that scenario.

25  Q    And you've done no analysis to determine the likelihood

1  of a COLA restoration, have you?

2  A    No, I have not.

3  Q    It would have been easy enough for you to have done if

4  you would have wanted to, right?

5  A    No, not really because it depends upon the -- it would be

6  dependent upon the investment policy and the actual returns

7  which fluctuate.  So -- so I really couldn't.

8  Q    But you -- but you could have made some assumptions and

9  -- and -- and come up with some calculations, right?

10 A    I could have made assumptions and come up with

11 calculations, yes.

12 Q    But -- but you didn't do that?

13 A    No.

14 Q    Okay.  But -- but it's -- but you'll agree with me that

15 it's a -- it's possible that there will be a pension

16 restoration here, right?

17 A    It's possible.

18 Q    Now Ms. Nicholl, you're not aware of any current effort

19 by GRS to change the asset allocation to a more conservative

20 allocation, are you?

21        MR. MONTGOMERY:  Asked and answered.

22        MR. BRILLIANT:  I don't believe I -- I asked the

23 question the same -- the same way.  Mr. Wagner asked a -- a

24 different question.  He didn't ask her whether or not there

25 was a current effort by GRS.  He just asked was she aware of

 1 | any different allocation.  So I'm asking a slightly different

 2 | question, Your Honor.

 3 |    THE COURT:  All right.  I'll permit it.  Go ahead,

 4 | sir.

 5 | Q You're not aware of any current effort by GRS to change

 6 | its asset allocation to be more conservative, isn't that

 7 | right?

 8 | A That's right.

 9 | Q I just have a few more questions, Ms. Nicholl.  Now Ms.

10 | Nicholl, your clients in this case are the -- you know, the

11 | committee for the -- for the -- for the pensions, right?

12 | A It's the retiree committee.

13 | Q Retiree committee, right?  And -- and -- and they support

14 | the plan?

15 | A They do.

16 | Q And the clients would like to see the -- the plan

17 | confirmed, isn't that right?

18 | A That's right.

19 | Q They voted for the plan?

20 | A That's correct.

21 | Q And they -- and they got pretty good treatment under the

22 | plan, right?

23 | A That's a matter of opinion.

24 | Q But the -- but the -- the retiree committee supports the

25 | treatment, right?

 1  A    They support the treatment.

 2  Q    And -- and the retiree committee wants the -- the plan to

 3  be confirmed, isn't that right?

 4  A    Yes.

 5  Q    And -- and as the consultant, the actuarial consultant

 6  for the plan, you would like to see the plan confirmed as

 7  well, isn't that right?

 8  A    Yes.

 9          MR. BRILLIANT:  I have no further questions.

10          THE COURT:  Redirect.  Oh.  Sir.

11          MR. QUINN:  For the record John Quinn representing

12  myself.

13                    CROSS EXAMINATION

14  BY MR. QUINN:

15  Q    Good afternoon, Ms. Nicholl.

16  A    Good afternoon.

17  Q    I want to go into the actuarial value of assets just a

18  little bit more.  You said it's different from the market

19  value, correct?

20  A    Correct.

21  Q    And in some years for any given plan it might be higher

22  than the market value?

23  A    Right.

24  Q    And in some years it might be lower than the market

25  value?

1  A     Right.

2  Q     Is that correct?  And is there a relationship -- well,

3  and the use of the actuarial value of assets, it's a common

4  and accepted practice on the pension industry for certain

5  purposes?

6  A     That's right.

7  Q     Okay.  And one purpose is determining the sponsor's

8  periodic contribution?

9  A     Correct.

10  Q     Okay.  Now I want you to consider the case of a pension

11  plan like GRS that administers both a defined benefit plan and

12  a defined contribution plan.  And commingles the funds

13  contributed to the two plans for investment purposes and it

14  periodically needs to decide what part of the investment -- of

15  any return on investment goes to the defined contribution

16  plan.  Do you see where I'm coming -- do you understand what

17  I've said so far?

18  A     Yes.

19  Q     Okay.  First of all, there's nothing wrong with them

20  commingling the proceeds from the two funds for investment

21  purposes, is there?

22  A     No.

23  Q     Okay.  And from an actuarial point of view it's

24  reasonable for the plan administrator to consider the

25  actuarial value of assets as opposed to the market value of

1  assets in determining the amount to be credited to the

2  accounts for the defined contribution plan each year?

3  A    I disagree with that.

4  Q    Okay.  If you don't consider the -- the actuarial return

5  on investment in calculating -- in making that -- that

6  periodic calculation, isn't it true that there would be large

7  year to year variation fluctuations in the value of each

8  participant's defined contribution account?

9  A    Yes.

10 Q    And so that a -- a retiree who happens to retire the year

11 after perhaps there's been a market loss, would end up getting

12 a -- the value of that retiree's defined contribution account

13 would be much -- could be much lower than if he or she had

14 retired a year earlier, correct?

15 A    That's right.

16 Q    And on the other hand if -- if a retiree just happens to

17 retire in the year in which there's been a big market gain,

18 that retiree could end up with a bit of a windfall, much more

19 than -- than they would have gotten if they had retired a year

20 earlier?

21 A    That's right.

22 Q    And so that would complicate plan participant's

23 retirement planning, would it not?

24 A    It might.

25 Q    All right.  Is there a relationship between the actuarial

1 value of assets and the assumed rate of return?

2 A    Indirectly there is, yeah.  Actually, directly there is

3 because the actuarial value of assets is determined by looking

4 at what you thought the plan was going to earn based on the

5 interest -- the assumed rate of return.  And you compare it to

6 what it actually returned.  And then you determine the

7 difference then is smoothed.

8 Q    Okay.  In your opinion would it be fair to say that --

9 excuse me, to avoid confusion and maybe I might forget to do

10 this, but I'm going to try to do it.  When I'm referring to

11 the plan of adjustment I'm going to say plan of adjustment or

12 POA.  Am I -- when I use the word plan I will be referring to

13 a pension plan.

14 A    Okay.

15 Q    Okay.  The -- would it be fair to say in your opinion

16 that the POA treats those retirees subject to the ASF

17 recoupment as if they were paying back a loan from -- from the

18 General Retirement System?

19 A    Yes.

20 Q    Okay.  And this is a loan on which GRS faces no risk of

21 default because it simply deducts what the payments from the

22 pension that it pays the retirees each year, correct?

23 A    Yes, but it's -- the payments stop when the retiree dies.

24 So --

25 Q    So the only risk of default is when both the retiree and

 1 | the retiree's beneficiary, if any, die?

 2 | A    Correct.

 3 | Q    Okay.  So this would make it a -- from the lenders, that

 4 | is GRS' point of view, this -- this loan is much more secure

 5 | than say a mortgage that a -- that a bank might -- might make

 6 | to some -- on someone's home, is that fair to say?  Or at

 7 | least as secure as a -- as a mortgage?

 8 | A    It sounds like it, but I'm not a mortgage underwriter.

 9 | But it does sound reasonable to me.

10 | Q    All right.  And in your work as an actuary you -- you

11 | keep track of fluctuations and interest rates for various

12 | kinds of -- of loans, is that -- is that fair to say?

13 | A    No.  We don't.  I don't do that.

14 | Q    Have you attempted to find out what the interest rate for

15 | a 30 year fixed rate mortgage would have been say in July of

16 | this year?

17 | A    Yes.

18 | Q    And what did you find it to be?

19 | A    I think it was in the neighborhood of 4.5 or 4.75%,

20 | something like that.

21 | Q    Okay.  Why don't -- could you take a look at -- at

22 | Paragraph 54-A of your report?

23 |           MR. MONTGOMERY:  54-A?

24 | A    4.12.

25 |           THE COURT:  Excuse me.  Do you have a question for

1  the witness?

2          MR. QUINN:  I'm ask -- this is to refresh her memory

3  as to the --

4          THE COURT:  She didn't express any lack of memory on

5  this.

6          MR. QUINN:  Okay.  Well, she -- she expressed a

7  certain lack of precision and I think we can get more precise

8  if she refreshes her memory with her report.  If you wish, I

9  could ask her whether she remembers precisely what she found

10  when she looked for the mortgage rate.

11          THE COURT:  You -- you can do that at -- at this

12  point if you'd like, but there's no basis in the record so far

13  to refresh her recollection.

14          MR. QUINN:  All right.

15  Q    Do you recall when in July of this year you tried to find

16  out what the interest rate for a 30 year fixed rate mortgage

17  was?  Do you recall precisely what rate you found?

18  A    I -- I have refreshed my memory and it was 4.12%.

19  Q    Thank you.  Now you're aware of the A -- the ASF

20  recoupment cash option in the POA?

21          THE COURT:  Excuse me, one second.  What were the

22  circumstances that led you to do that investigation?

23  A    I looked at that because the ASF recoupment, the retirees

24  are paying back the amount that they were given in excess

25  investment earnings, and it was based upon an interest rate,

1    the plan interest rate of 6.75%.  And I -- in my expert report

2    I formed the opinion that this was like paying back a loan.

3    And -- and -- and I looked at the 30 year loan rates at July

4    of 2014 to compare the 6.75 to what the rate would be if it

5    were just a mortgage.

6              THE COURT:  Okay.  Go ahead, sir.

7              MR. QUINN:  All right.

8    Q    You're aware of the ASF recoupment cash option in the

9    POA?

10   A    Yes.

11   Q    Okay.  It allows a retiree subject to the ASF recoupment

12   who can raise the cash, to avoid the 6.75% interest rate by

13   making a one time payment three or four months after the

14   effective date of a plan of adjustment if it's confirmed, is

15   that correct?

16   A    Yes.

17   Q    Okay.  And it also provides that the maximum that can be

18   paid out or that can be accepted in these -- in the -- under

19   the ASF recoupment cash option plan is $30,000,000, is that

20   correct?

21   A    Yes.

22   Q    Okay.  And the total valuation put on the ASF recoupment

23   is $190,000,000, is that correct?

24   A    Yes.

25   Q    So the maximum that retirees have an option to pay in

1  advance to avoid the 6.75% interest rate is about 16% for the

2  whole -- for the group as a whole, right?

3  A    Yes.

4  Q    Okay.  So that means that at least 85% of -- or excuse

5  me, at least 84% of the ASF recoupment will be subject to the

6  6.75% interest rate even if every single affected retiree

7  makes the largest pre-payment allowed, correct?

8  A    Yes.

9  Q    Okay.  In essence is it fair to say that under the

10  proposed plan of adjustment, the minority of retirees in Class

11  11 who are subject to the ASF recoupment are being required to

12  help fund their own pensions?

13  A    Yes.

14  Q    In fact we could go further and say that that minority of

15  retirees who are subject to the ASF recoupment, are being

16  required to help fund the pensions of all the retirees in

17  Class 11, correct?

18  A    Yes.

19          MR. QUINN:  I have nothing further, Your Honor.

20                    REDIRECT EXAMINATION

21  BY MR. MONTGOMERY:

22  Q    Ms. Nicholl, I have a few questions for you on redirect.

23  First, Mr. Quinn asked you a question about that he was trying

24  to compare the $30,000,000 to the $190,000,000.  Do you recall

25  that line of inquiry?

1  A    Yes.

2  Q    Does the $190,000,000 include actives and retiree

3  recoveries?

4  A    It does.

5  Q    So it would not be a -- a fair comparison the way he

6  presented it to you for retirees only?

7  A    That's correct.  That's correct.

8  Q    Now you recall a line of inquiry with Mr. Brilliant in

9  which he was trying to get you to compare the benefit

10 reductions to recoveries.  Do you recall that line of inquiry?

11 A    Yes.

12 Q    Okay.  Now your recovery analysis was based only on city

13 contributions, correct?

14 A    That's right.

15 Q    Were there other contributions you didn't count?

16 A    Yes, there were.

17 Q    And what were those that you didn't count?

18 A    I did not count contributions from UTGO, from the state,

19 and from the foundations.

20 Q    Okay.  And in providing benefits, do existing assets

21 count towards the value for existing benefits?

22 A    Yes.

23 Q    Okay.  So Mr. Brilliant was getting you to compare

24 benefit losses with numbers that have nothing to do with

25 contributions, is that correct?

1  A    That's correct.

2  Q    All right.

3          MR. SOTO:  Objection, leading, Your Honor.

4          THE COURT:  The objection is sustained.

5  Q    Okay.  What's the difference between a benefit reduction

6  and a recovery rate, Ms. Nicholl?

7          THE COURT:  Who made that objection?

8          MR. MONTGOMERY:  It's Mr. Soto's Soto voice.

9          THE COURT:  All right.

10          MR. WAGNER:  Join his objection, Your Honor.

11          THE COURT:  Yeah.  So do I, so we're all set.  If

12  you want to make an objection, I suppose that's fine, but you

13  got to get by a microphone.  You can try that question again.

14          MR. MONTGOMERY:  I was just going to ask a less

15  leading question, Your Honor.

16          THE COURT:  Please.

17          MR. MONTGOMERY:  Which is.

18  Q    Could you explain to the Court your understanding of the

19  difference between benefit reductions and claim recovery?

20  A    Yes.  Benefit reduction is the -- the way that I've

21  described it in my expert report is the decrease in the

22  present value of benefits which includes not only the benefits

23  that are covered not only by current assets, but by proposed

24  future assets.  The reduction in present value of benefits due

25  to the -- the cuts.  That's the benefit reduction.

1    A recovery on the other hand, is a comparison of the

2  present value of contributions in -- in this case in my

3  opinion they should be city contributions to the amount of the

4  claim.

5  Q    Thank you.  Now do you recall some discussion about the

6  6.75% interest rate?

7  A    Yes.

8  Q    Let's focus on 6.75% as a restoration question for a

9  moment.

10 A    Okay.

11 Q    What are the elements of restoration for which 6.75% is

12 only one factor?

13 A    The restoration depends upon the funded status of the

14 plan at future dates.

15 Q    Okay.

16 A    And so the restoration will occur if on an annual basis

17 -- temporary restoration will occur on an -- if the actuary

18 determines that as of, I believe, it's 2028 for GRS, and 2023

19 for PFRS, the plan is going to exceed a funded ratio of 78%

20 for GRS and 75%, I believe it is for PFRS.

21 Q    Is it at those -- are either of those plans at those

22 levels today?

23 A    No.

24 Q    Okay.  So if restoration is delayed, are benefits lost

25 ever regained under restoration as you understand it?

1  A    No.  Once the benefit is lost, it's never going to be

2  restored.  It's only future benefits that would be possibly

3  restored.

4  Q    Okay.  And does the 6.75% apply to future contributions

5  by the city?

6  A    Yes.  Well, maybe I don't understand your question

7  properly.

8  Q    Let me rephrase it.  What's the asset base on which the

9  6.75% is to be applied as part of the restoration calculation?

10 A    The -- I still don't understand your question.

11 Q    All right.  So let -- we'll come back to that, Ms.

12 Nicholls.  Do you recall a -- a line of inquiry by Mr. Wagner

13 regarding the market value liability or risk free rate.  Do

14 you recall that interchange?

15 A    Yes.

16 Q    And you insisted on saying that you hadn't seen any

17 examples of risk free rates for funding purposes.  Do you

18 recall saying that?

19 A    Yes.

20 Q    Why were you making that distinction?

21 A    Because the -- the amount of the actual claim is not a

22 funding calculation, it's a claim calculation.  So it's very

23 -- in my mind it's an important distinction.

24 Q    Do you recall testifying on direct that there could be

25 different rates set for different purposes under ASOPs?

 1  A    Yes.

 2  Q    And is that earlier testimony consistent with what you

 3  just said?

 4  A    Yes, it is.

 5  Q    Okay.  And why?

 6  A    Because there is different purposes of a measurement.

 7  And the ASOPs specifically say that there could be different

 8  discount rates used depending upon why the measurement is

 9  being made.

10  Q    Okay.  Now you recall being asked about the committee

11  solicitation letter?

12  A    Yes.

13  Q    Okay.  Was that before or after your report?

14  A    It was before.

15  Q    Okay.  Were you here in the courtroom when Ms. Renshaw

16  was testifying?

17  A    I was not.

18  Q    You were not, okay.  Do you happen to know if the -- if

19  the committee filed a proof of claim?

20  A    The city did file a proof of claim.

21  Q    The committee, I'm sorry.

22  A    The committee, I'm sorry.  I meant committee.  The

23  committee did file a proof of claim.

24  Q    And did you give the committee any assistance in doing

25  the computations for that claim?

1  A     Yes, I did the computation.

2  Q     Do you remember when that occurred?

3  A     That was in February of this year.

4  Q     Do you happen to know whether or not that claim was filed

5  as a public document?

6  A     It was.

7  Q     And what was the interest rate you used for that?

8  A     We used treasury strips as of sometime in February 2014

9  for the proof of claim.

10 Q     In other words you used the same interest rate that you

11 used in your expert report?

12 A     Yes.

13 Q     Okay.

14        THE COURT:  Do you mean the same rates, or the same

15 type of rates?

16 A     The same type of rates.

17 Q     And for clarity purposes, Ms. Nicholl, how many proofs of

18 claim do you recall the committee filed?

19 A     I -- I don't -- I thought it was just one proof of claim.

20 But it's possible that we revised it.  It's -- it's been a

21 while.

22 Q     So let me -- all right.  Let me just ask you a question.

23 Do you recall giving assistance with respect to a PFRS proof

24 of claim?

25 A     Yes.

1  Q    Do you recall giving assistance to a GRS proof of claim?

2  A    That's right.

3  Q    Is it your understanding those were or were not filed?

4  A    Those were both filed.

5  Q    Okay.  Were you here for Mr. Perry's testimony?

6  A    Yes, I was.

7  Q    Did you hear him say that 2.5% was the inflation rate

8  that he was using in his analysis?

9  A    Yes.

10 Q    Is that inflation rate outside the range of reasonable as

11 far as you're concerned?

12 A    No, it's not.

13 Q    Okay.  And why do you say that?

14 A    Because based upon Mr. Perry's analysis as well as my own

15 review of inflation components, I believe that it is a

16 reasonable inflation rate.

17 Q    Oh, and with respect to -- do you remember a line of

18 inquiry with respect to whether or not there's any literature

19 on PVFAB?

20 A    Yes.

21 Q    Now did you tell the Court that there was or was not

22 another name for PVFAB?

23 A    There is another name and I told the Court it's called

24 projected unit credit.

25 Q    Is there any literature on projected unit credit?

1  A    Yes, there is.

2  Q    Okay.  Is there a lot of literature on projected unit

3  credit?

4  A    There's -- I -- I found three sources when I did a

5  search.

6  Q    Any possibility you remember what those sources were?

7  A    Well, the one that comes to mind that is the most common

8  is in the private sector projected unit credit is the method

9  that's required to be used by private sector plans for

10  purposes of accounting statements, accounting calculations.

11      As far as plans in general, there is literature and I

12  don't remember specifically the name, that describes different

13  types of cost methods and how they operate.  That I found

14  actuarial textbooks related to cost methods.

15  Q    Okay.  Was anything -- well, did you give any answers

16  during cross examination that in your mind in any way detract

17  or reflect on -- adversely on your opinions?

18  A    No.

19      MR. WAGNER:  Objection -- objection to the scope of

20  that question.

21      THE COURT:  The objection is sustained.

22      MR. MONTGOMERY:  No further questions, Your Honor.

23                  RECROSS EXAMINATION

24  BY MR. WAGNER:

25  Q    Ms. Nicholl, you were asked some questions just now by

1  Mr. Montgomery about the inflation rate and the 2.5% rate.  Am

2  I right that you believe 2.5% is at the low end of the range

3  of rates set by public plans today?

4  A    It's the low end of the rate used by public plans today.

5          MR. WAGNER:  Thank you.

6                      RECROSS EXAMINATION

7  BY MR. QUINN:

8  Q    Ms. Nicholl, have you made any effort to determine what

9  portion of the $190,000,000 GRS is expected to recover by

10  means of the ASF recoupment, what proportion of that is to

11  come from reduction -- or reductions in the pensions of

12  retirees subject to the recoupment?

13  A    Yes, I have that information.  I believe it's somewhere

14  around -- between 90,000,000 and 100,000,000 if I recall

15  correctly.

16  Q    Okay.  So the $30,000,000 that may be paid by means of

17  the ASF recoupment option is approximately 30% of that

18  90,000,000 to 100,000,000?

19  A    Right.

20  Q    Meaning that at least 70%, perhaps as much as 75% will

21  still have to be -- be subject to the 6.5% interest rate?

22  A    It's -- I think it's between 30 and 33%.  So it would be

23  between 67 and 70.

24          MR. QUINN:  Okay.  Thank you.  I have nothing

25  further.

1          THE COURT:  Any further questions for the witness?

2   Okay.  Ma'am, you are excused.  Thank you very much for coming

3   in for your testimony.

4       (WITNESS KIM NICHOLL WAS EXCUSED AT 5:01 P.M.)

5          THE COURT:  And we will be in recess until 8:30

6   tomorrow.

7          MS. FISH:  Your Honor --

8          THE COURT:  Yes.

9          MS. FISH:  I'm sorry, I just want to clear up the

10  two exhibits.  Deborah Fish for the record on behalf of the ad

11  hoc COPS with regard to Mr. Bowen's testimony yesterday.

12  There were two exhibits that were entered into evidence, 1033

13  and 1034.

14      And as the Court may recall, there was an exhibit

15  attached to both of those, a secondary letter in which the

16  pursuant to the mediation order there should be some

17  redactions.  So I have those --

18         THE COURT:  Oh, yes, I recall.  I recall that.

19         MS. FISH:  -- copies for the Court.  You can -- if

20  the Court wants to give us the binders back, we'll replace

21  them, or we'll give the Court the replacement exhibits.

22         THE COURT:  Okay.  Have you seen those?  So you're

23  all set?

24         MS. FISH:  They sent them to us, Your Honor.

25         THE COURT:  Okay.  All right, good.  Yeah, so just

1  hand them up to my staff and I will let my staff take care of

2  the substitution.

3          MS. FISH:  Thank you, Your Honor.

4          THE COURT:  Anything else before we try to recess

5  here?  All right.  We are in -- or not in recess.

6          MR. CULLEN:  We had listed Ms. Taranto as our next

7  witness.  Assuming we'd go today.  In deference to Mr. Bloom's

8  schedule, we think we're going to drop her back and let Mr.

9  Bloom testify so we can get him out of here tomorrow.

10          THE COURT:  Okay.

11          MR. CULLEN:  All right.

12          THE COURT:  Thank you for that.

13          MR. CULLEN:  Thank you.

14          THE COURT:  While you're there, let me ask you about

15  your stipulation regarding our trial schedule.  What's the

16  status of that?

17          MR. CULLEN:  I think it's -- I think we're in -- I

18  think we're in agreement.  We've exchanged red lines and

19  caught each other's little errors and I think we're -- I think

20  we're good.

21          THE COURT:  Okay.  So maybe later today or first

22  thing tomorrow?

23          MR. CULLEN:  Yes, Your Honor.  Thank you.

24          THE COURT:  Okay.  All right.  And we'll be in

25  recess.

1          THE CLERK:  All rise.   Court is adjourned.

2      (Court Adjourned at 5:03 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7   We certify that the foregoing is a correct transcript from the

8   electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 9-21-14
    Kristel Trionfi

12

13

14

15

16

17

18

19

20

21

22

23

24

25