```
 1              UNITED STATES BANKRUPTCY COURT
               EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3  IN THE MATTER OF,          Case No. 13-53846
                               Detroit, Michigan
 4  CITY OF DETROIT, MI        September 18, 2014
    _____/     8:30 a.m.
 5
        IN RE: CONTINUED TRIAL RE: OBJECTIONS TO CHAPTER 9 PLAN
 6           BEFORE THE HONORABLE STEVEN W. RHODES
          TRANSCRIPT ORDERED BY: ROBIN WYSOCKI
 7
    APPEARANCES:
 8
    For the City of Detroit, MI:  THOMAS CULLEN, ESQ.
 9                                 GEOFFREY IRWIN, ESQ.
                                   Jones, Day
10                                 51 Louisiana Avenue, N.W.
                                   Washington, D.C. 20001
11                                 202-879-3939

12  For COPS:                      JONATHAN WAGNER, ESQ.
                                   Kramer, Levin, Naftalis &
13                                 Frankel
                                   1177 Avenue of the Americas
14                                 New York, NY 10036
                                   212-715-9100
15
    For Macomb County & MIDD:      ALLAN BRILLIANT, ESQ.
16                                 Dechert, LLP
                                   1095 Avenue of the Americas
17                                 New York, NY 10036
                                   212-698-3500
18
    For Financial Guaranty         EDWARD SOTO, ESQ.
19  Insurance Company:             EDWARD R. MCCARTHY, ESQ.
                                   Weil, Gotshal & Manges
20                                 1395 Brickell Avenue
                                   Suite 1200
21                                 Miami, FL 33131
                                   305-577-3100
22
    For the Retirement Systems:    JENNIFER GREEN, ESQ. (P69019)
23                                 Clark, Hill
                                   500 Woodward Avenue
24                                 Suite 3500
                                   Detroit, MI 48226
25                                 313-965-8300
```

1          ARTHUR O'REILLY, ESQ. (P70406)
           Honigman, Miller, Schwartz &
2          Cohn
           2290 First National Building
3          660 Woodward Avenue
           Detroit, MI 49226
4          313-465-7628

5   Court Recorder:          LaShonda Moss

6   Transcriber:             Deborah L. Kremlick

7

8   Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

| WITNESSES FOR THE CITY: | Direct | Cross | Redirect |
|---|---|---|---|
| MICHAEL PLUMMER | 7 | 39,59 | 61 |
| ANNEMARIE ERICKSON | 69 | 118 | 150 |
| JOHN SATTER | 165 | 194 | 246 |

| EXHIBITS: | | ID | ADM |
|---|---|---|---|
| CX466 | Satter Report | 254 | 254 |
| CX657 | Record Prices | 22 | 23 |
| CX658 | Record Prices | 24 | 25 |
| CX662 | Market Share of Sales | 35 | 35 |
| CX699 | Museum System | 110 | 111 |
| CX700 | Fragments of Lace | 110 | 111 |
| CX701 | Textile Fragments | 111 | 111 |
| CX702 | Picture of Van Gogh Painting | 90 | 91 |
| CX703 | Picture of Murals | 89 | 91 |
| CX713 | Images of Archives | 156 | 156 |

(City's Exhibits 272, 273, 279, 282, 283, 284, 69
285, 288, 289, 290, 293, 295, 297, 300, 302, 308,
341, 343, 344, 350, 351, 352, 392, 393, 394, 437,
449, 543, and 704.  FGIC's Exhibits 1893, 3085,
3086, 3108, 3128, 3163, 3215, 3224, 3239,
3243, 3263, 3265, 3270, 3273, 3278, 3282, 3285,
3286, 3302, 3310, 3313, 3314, and 3923, 301 were
stipulated and admitted)

1        (Court in Session)

2            THE CLERK:  All rise.  Court is now in session.  You

3    may be seated.  Calling case number 13-53846, City of Detroit,

4    Michigan.

5            MR. CULLEN:  May it please the Court, Thomas Cullen

6    for the city.  First, I'd like to check, did you -- you did

7    receive the stipulation that the parties had worked on?

8            THE COURT:  Yes.  And I think we entered the order.

9            MR. CULLEN:  Okay, good.  Thank you very much.  I'm

10   sorry.

11           THE COURT:  That's okay.

12           MR. CULLEN:  We had an additional discussion last

13   night about the subject of Mr. Buckfire.  As the Court may

14   recall, Mr. Buckfire entered an expert report dealing with

15   four areas.

16       One of those the Court ruled out his testimony on best

17   interest and the other three areas are, access to capital and

18   exit financing, various DWD issues that may have become --

19   DWSD issues which may have become moot with the tender offer

20   which you -- the Court was informed of, and the interest rates

21   for certain classes.

22       On the exit financing issue, since the date of the

23   report, an exit financing deal has been reached and approved

24   by the city council.  In light of that, I thought and we

25   discussed -- I discussed with Mr. Soto and Mr. Perez, the idea

1 that he should file a supplemental report addressing the exit

2 financing as it has been entered and how that affects his

3 opinion.

4 And they agreed with that and agreed that he could file a

5 supplemental report which took out the material he couldn't

6 testify about, and updated if you will, the other -- the other

7 areas and most particularly addressed the issue of the exit

8 financing and how that would -- how that would affect his --

9 and on access to capital and because the exit financing itself

10 is an important part of the city's financing going forward, we

11 thought it was best to address that in a -- in a fuller

12 fashion.

13 So accordingly, what we agreed to was, and check me if

14 I'm wrong, that he would file a new report within those

15 confines, not addressing any additional matters, or the

16 matters that the Court had -- had ruled out and be available

17 for a deposition on that. That would be -- there would be

18 some more documentation and we could have done that -- we

19 could have tried to do that on the fly today, but we thought

20 it was better and fairer to do it in the following way.

21 And that means with respect to schedule, that Mr.

22 Buckfire will not be put up today, and we will end with Mr. --

23 Mr. Satter whenever that comes. And I discussed that -- the

24 impact on the schedule, I think we're doing fairly well on

25 time generally, Your Honor. And my brother -- brother Soto

1  and brother Perez said that they wouldn't seek to have us

2  docked for the time if we ended early, but I -- I throw myself

3  on the mercy of the Court with respect to that.

4          THE COURT:  Counsel.

5          MR. SOTO:  We agree, Your Honor.

6          THE COURT:  Any objection, sir?

7          MR. BRILLIANT:  No objection, Your Honor.

8          THE COURT:  Okay.  That's fine with me.

9          MR. CULLEN:  Thank you, Your Honor.  I -- I received

10 a note from Mr. DeChiara for the UAW this morning saying that

11 they were still planning on the 30th as the UAW day.  We're

12 still planning on the 30th, just wanted to inform the Court.

13         THE COURT: Okay.  Okay, good.  Thank you for

14 reminding me.

15         MS. GREEN:  Jennifer Green on behalf of the

16 retirement systems.  Just a small housekeeping matter related

17 to the UAW issue.

18     Cynthia Thomas has been called by the UAW.  She's the

19 executive director for the retirement systems.  She's also

20 being called by the COPS and by some of the individual

21 objectors.  And I wondered rather than having her come three

22 times to Court to testify, if we could agree that perhaps she

23 be produced one day and everyone could do their questioning of

24 her on the same -- same day.

25         MR. WAGNER:  Your Honor, that's -- Jonathan Wagner

1  on behalf of the COPS.  If that's more convenient for Ms.

2  Thomas, that's fine for us.  She's, I guess, in effect a

3  hostile witness so we'll cross examine her.

4          THE COURT:  Okay.

5          MR. WAGNER:  But that's fine.  The other question

6  was whether we needed to issue a trial subpoena.  I would hope

7  we don't have to, that she'd just be made available without a

8  subpoena.

9          MS. GREEN:  I believe that the UAW already issued a

10 trial subpoena which we have accepted service of and it's for

11 the 30th.  So she will be here in person with that subpoena.

12         MR. WAGNER:  Okay.

13         MS. GREEN:  Thank you, Your Honor.

14         THE COURT:  Okay.  One second, please.  Okay, let's

15 proceed.

16         MR. IRWIN:  Good morning, Your Honor.  Geoff Irwin,

17 Jones, Day for the City of Detroit.  May I proceed?

18         THE COURT:  Yes.

19     (WITNESS MICHAEL PLUMMER WAS PREVIOUSLY SWORN)

20                  DIRECT EXAMINATION

21 BY MR. IRWIN:

22 Q    Good morning, Mr. Plummer.

23 A    Good morning.

24 Q    Before we turn to our next topic, I do want to ask you a

25 few questions that relate to actually a question that was put

1  to you yesterday by the Court.

2  A    Okay.

3  Q    Relating to the -- the weighted average approach that you

4  employed with regard to the 57,000 pieces and the balance of

5  the DIA collection.

6  A    Right.

7  Q    Do you recall that testimony?

8  A    I do.

9  Q    Okay.  Can you tell the Court how long you think it would

10 take to individually appraise 57,000 pieces?

11 A    I think it would take somewhere between one and two

12 years.

13 Q    Are you aware of any all museum valuations of the

14 magnitude of the type that we're talking about for the DIA?

15 A    To the best of my knowledge there has never been anything

16 of this magnitude ever accomplished or approached.

17 Q    Is there an established methodology, a valuation

18 methodology that you could have consulted and employed in this

19 case?

20 A    No, because this is unprecedented.

21 Q    And did you check -- did you review any literature to

22 confirm that conclusion?

23 A    I know from my 30 years in the industry that nothing has

24 ever been done and that there is no precedent or procedure or

25 literature on such a case.

1  Q    To the extent that the weighted average approach that you

2  employed in this case has any bias directionally --

3  A    Right.

4  Q    Where is that bias?

5  A    That bias would be towards over valuing the works because

6  it is our feeling that the COD property on which the

7  estimation or weighted average was based was a higher quality

8  representation of the collection than is the core of the

9  collection under 750,000.

10          MR. IRWIN:  Your Honor, before we move to our next

11  subject, I did wish to ask the Court to reconsider its ruling

12  really for two reasons.  If will you indulge me to articulate

13  those.

14      The first is that the city does believe that it is a

15  reliable methodology based on a meaningful statistical

16  sampling that is in fact tied to the actual DIA collection.

17  The second reason is that this is not --

18          THE COURT:  Well, but there was no analysis of that

19  sampling done to determine statistically the confidence level

20  of the result based on the -- the sample that was chosen.  And

21  that's -- and that can be done.

22          MR. IRWIN:  It -- it can be done.  This witness is

23  not -- is not a statistician.  There's --

24          THE COURT:  Precisely, precisely.

25          MR. IRWIN:  I understand that.  But -- but --

1          THE COURT:  That's why he's not able to testify as

2   to the reliability of the method he used.

3          MR. IRWIN:  The sampling that he did use was not 270

4   pieces, it was 2,700 pieces.  It was a very large sampling and

5   -- and the testimony that has been elicited from both Ms.

6   Fusco and -- and the witness is that these were strategic

7   purchases by the city at a point in time when they were likely

8   to be --

9          THE COURT:  Right.  But you're asking me infer that

10  as a result the weighted average method is reliable.  I'm not

11  willing to make that inference.

12         MR. IRWIN:  And -- and -- and the second point I

13  wish to --

14         THE COURT:  It can be proven.

15         MR. IRWIN:  I -- I --

16         THE COURT:  And you just haven't done it.

17         MR. IRWIN:  The only other point I would like to

18  add, Your Honor, is that this is not the only witness in the

19  case where we think this issue will come up.  And the

20  distinguishing feature from the city's perspective is that --

21  and by the way the city would agree that it's an important

22  consideration because you think about the number of items on

23  the other side of this equation in this case, 57,000.  But

24  likely to be tens of thousands.

25         It is a multiplier that can increase the value of this

1   collection with small differences in terms of which -- which

2   weighted average or average you use.  So it is important.

3       The distinguishing feature for the city's analysis is

4   that it is in fact tied to a representative sampling of the

5   DIA collection and not some external considerations.  And

6   that's why it is the city's view that this is the most

7   reliable approach if you are going to project across the

8   balance of the collection with a multiplier of this type.

9       And so again, it is the city's view that if a methodology

10  like this is reliable, this is the most reliable.  And the

11  city is simply in a position where if -- if that is -- if that

12  is not the case, if this methodology is not acceptable and

13  doesn't do it, the city will be very eager to apply the same

14  standard to the testimony of other witnesses who will come

15  later in the case.

16          THE COURT:  I can't deal with that now.  All I can

17  tell you is that you have not established the reliability of

18  this method.

19          MR. SOTO:  Your Honor, in response, we intend to

20  establish the reliability of ours.

21          THE COURT:  Okay.

22  Q   Mr. Plummer.

23  A   Yes.

24  Q   You made mention earlier in your testimony of certain

25  discount factors.  Do you recall that testimony?

1  A    I do, yes.

2  Q    Okay.  Did you have occasion to consider the real world

3  returns that might result from a sale of the pieces of art at

4  the DIA?

5  A    I did, yes.

6  Q    Okay.  And how did you approach that -- that -- that set

7  of concerns?

8  A    I considered different scenarios as it were.  The first

9  scenario was what we might refer to as an immediate

10 liquidation.

11           THE COURT:  As what, sir?

12 A    An immediate liquidation.

13           THE COURT:  All right.  Keep your voice up for

14 everyone.

15 A    Yes.  And an immediate liquidation would be a -- an

16 instance where one might sell to -- very quickly to a one or

17 -- one buyer or a consortium of buyers and pass on to them the

18 risk and the returns that the institution might get if it sold

19 over a longer period of time.  And it's a situation that

20 occurs in the art world from time to time.  There are real

21 world examples of this.

22 Q    Can you give some of those examples?

23 A    Yes.  There was a case in 1990 with the Pierre Matisse

24 Gallery.  Pierre Matisse was a dealer.  He was -- the artist

25 Henri Matisse's son.  And he was a dealer in school of Paris

1  paintings basically Picasso Matisse.

2      And he had an inventory of thousands of items all in the

3  same category.  It was at a period of time when the art market

4  was sort of on the precipice of -- of bust.  And it was too

5  many works of art to be sold at a -- at auction in one season

6  or even two seasons.

7      But the family needed to pay the estate taxes within a

8  period of time.  So the family made a deal with the dealer

9  Bill Acquavella and with Sotheby's to sell the entire

10  collection for a hundred some million dollars, $130,000,000, I

11  believe, and Sotheby's then with -- in partnership with Bill

12  Acquavella, sold it over a period of multiple years.

13      And at the end of the day Sotheby's had a return of about

14  45% over the purchase price and still had property to be sold

15  but they stopped reporting it on their returns.

16  Q   And so what conclusions do you draw about the Acquavella

17  situation in terms of the economics of purchasing a collection

18  in bulk as opposed to spread over time?

19  A   Well, the -- the incentive for a buyer to buy a

20  collection in bulk without doing due diligence and to take it

21  all on and to take the risk of selling it on, is to typically

22  buy it at about a discount -- approximately a discount of 50%.

23  And that number is also reflected in the -- in the way that

24  the lending business works with the loan to value ratio of

25  50%.

 1        Because in that instance the borrower or the lender is

 2    assuming that they will be in a distress situation if they

 3    have to foreclose on the art and have to sell it quickly.  So

 4    they similarly use a 50% discount factor.

 5    Q    So -- so -- what -- what is it that a lender typically

 6    expects to receive in case it -- in the event that it has to

 7    foreclose on the loan and liquidate the collateral?

 8    A    It is expecting to receive 50% of the low estimate.

 9    Q    Fifty percent of the low estimate?

10    A    Of the low estimate.

11    Q    Okay.  Is this a consideration that routinely comes up in

12    connection with launching the kinds of art funds that you

13    described at earlier points in your career?

14    A    Yes.  Art funds like to look at distressed situations and

15    use a target number of 50% to -- if -- if they can avail

16    themselves of collections that they can buy amass and 50% is

17    used as -- as the number that justifies taking the risk of

18    buying a large block of property.

19    Q    And what is your opinion as to what a seller might be

20    able to realize in connection with the sale of art at the DIA

21    to a single purchaser at a single point in time?

22    A    My -- my -- my feeling -- my belief is that if the

23    collection were to be sold off to a single entity in one mass

24    sale, or en masse, that it would involve a 50% discount off of

25    the value of the collection.

1  Q     Okay.  Are you familiar with the term blockage discount?

2  A     I am.

3  Q     What is a blockage discount?

4  A     A blockage discount is an instance where a similar group

5  of property is coming to the market and it is too much for the

6  market to bear.  It is often applied in the cases of estates,

7  artist estates and what not and it is in the range of 35, 45%

8  is used by -- it is allowed by the IRS for purposes of -- of

9  valuing an estate for tax purposes because the sense is that

10  if too much property comes into the market at the same time

11  and it's too similar, it will de-value not only the property,

12  but also de-value the market overall.

13  Q     Is there a -- is there a capacity issue or consideration

14  that plays into the concept of blockage discount?

15  A     Yes, there is.  That there is a limited number of

16  collectors in the marketplace for any individual work of art.

17  And that -- or -- or groups of works of art.  And there is --

18  there is certainly capacity limitation.

19  Q     Have you seen examples of blockage discounts in the

20  marketplace in your experience?

21  A     Yes, I have.

22  Q     Okay.  Did you attempt to quantify or measure a blockage

23  discount in this case?

24  A     I did.  And -- and it was around the same number, about

25  50% -- a 50% discount.

1  Q    All right.  And I think you testified already that you're

2  familiar with the concept of an unsold rate.

3  A    Correct.

4  Q    In the auction business.  What -- what is an unsold rate?

5  A    Unsold rates and actually Ms. Fusco spoke about this in

6  her testimony.  Unsold rates are typical of -- of auctions.

7  They almost -- it is extremely rare, meaning like maybe

8  perhaps one auction a year that does not have unsold property.

9       Otherwise every auction has unsold property in the range

10  of 20% to sometimes as high as 34 or 40%.  It's just in the

11  nature of the beast.  There -- every item does not find a

12  buyer at an auction.  So in factoring into any kind of selling

13  process, you would have to account for unsold rates.

14  Q    How did you approach the question of unsold rates as it

15  relates to the DIA in this case?

16  A    We -- we -- we calculated the unsold rates by sector for

17  Sotheby's and Christie's sales for the year of 2013.  And we

18  applied them by sector to the four largest sectors of the

19  collection of the DIA American art pre-1950, post-war and

20  contemporary, impressionism, modern, and old master paintings.

21       And then we looked at an average rate for the rest of the

22  collection.  And -- and in total we came up with an unsold

23  rate of about 26, 25%.

24  Q    Okay.  So you had -- you had the profile of the DIA

25  collection.  We looked at that pie chart yesterday.

1  A     Yes.

2  Q     And -- and how did you -- or which unsold rates did you

3  look at specifically from the Christie's and Sotheby's data?

4  A     Specifically which unsold rates?

5  Q     By the sectors?

6  A     I looked at the ones for post-war impressionist American

7  paintings.  And old master paintings.  And impressionist

8  modern post-war contemporary.  And old masters, yes.

9  Q     The -- the four that occupied the large majority of --

10 A     Correct, correct.

11 Q     -- the DIA collection?

12 A     Yes, yes.

13 Q     And where did you get the data for that?

14 A     That was from the data that was accumulated on Sotheby's

15 and Christie's sales for 2013 by sector.

16 Q     How did you get it?  Who compiled it?

17 A     We -- we calculated it manually.

18 Q     And how did you do that?

19 A     Off of the Sotheby's and Christie's web sites.

20 Q     All right.  And what was the range if you recall of the

21 unsold rates across the four sectors that you did look at?

22 A     Twenty percent to 34%.

23 Q     Are there factors that can expose the sale of a -- of an

24 art collection to greater unsold rate risk?

25 A     Yes.  If an area is out of favor, if an area has a lower

1  base of collectors.  For instance right now the highest unsold

2  rate of those four sectors was old masters.  And at 34%.  And

3  that is -- and even a sub sector of that Nineteenth Century is

4  even higher still.

5      And those are areas where there is a paucity of

6  collectors and there is real weakness in the market.  So the

7  unsold rates tend to be very high.

8  Q    How about the size and the relative nature of this

9  collection when considered or compared against the financial

10  guarantees offered by auction houses like Christie's or

11  Sotheby's?

12  A    Well, the -- the size of the collection is many times the

13  capacity of either auction house to -- to -- to guarantee it.

14  Q    What does that mean?

15  A    Well, you know, one way that -- that -- that in --

16  collectors with important works guard themselves against, the

17  BI risk is that they get a guarantee from the auction house

18  that the property will sell.  In this case the size of the

19  collection is multiple times the capacity of Sotheby's or

20  Christie's to guarantee.

21      They have tended to guarantee with a maximum capacity of

22  300,000,000.  Sotheby's -- Sotheby's has just recently, just

23  in the last month, increased its capacity, I believe, by

24  perhaps another couple hundred million.  But you're talking

25  about a collection of the DIA that's in the billions of

1  dollars.  And so that's well beyond the capacity and -- and

2  any --

3  Q    So why -- why does that expose a sale of this magnitude

4  to greater unsold rate risk?

5  A    Well, if -- if the item is not guaranteed, then it's --

6  then it's like a normal item that is sold.  It's subject to

7  the kind of risk that other items are and that -- that the

8  item might not find a buyer in the auction room and not be

9  sold.

10 Q    Have you -- would it be fair -- well, first of all, a --

11 a -- a hypothetical sale of the art at the DIA museum -- a

12 hypothetical sale of the art at the DIA museum has been

13 compared by some people to a celebrity sale.  Have you heard

14 that in this case?

15 A    I have.

16 Q    And what is your reaction to that?

17 A    I think it's absurd.

18 Q    And why is that?

19 A    Well, having worked the -- the celebrity sale that was

20 mentioned was one that I actually worked on and wrote the

21 marketing plan for.  And that was the Jackie Onassis sale.  I

22 was at Sotheby's when that sale took place.

23      And that sale was a celebration of Jackie O's life.

24 There was an aura around that sale that related to her, her

25 personality, her mystique and everything.

1    The sale of property from the DIA would not be a

2   celebratory event.  It would be an event that in the art world

3   amongst collectors and other buyers would be considered to be

4   a tragic event.  So it would not be sold in a celebratory

5   fashion.

6    It would not be marketed in a -- in a glamorous way.  It

7   would be -- have to be sold in a discreet way and -- and it

8   would have an aura around it that was negative, not positive.

9   So I think that the wrong conclusions are being drawn by that

10  -- that person who is asserting that.

11  Q   So do you think it would be fair to conclude that unsold

12  rates would be lower in connection with a potential DIA sale

13  because it is the DIA, one of the more prominent museums in

14  the country if not the world?

15  A    I do.  Because -- because in addition, to what I just

16  said, you also have the factor that a predominant amount of

17  the property in the DIA -- DIA collection is in areas which

18  are stagnating and where there are fewer collectors such as

19  American art pre-1950 and old masters which as we've seen from

20  the graphs, are areas that are -- are stagnate or falling.

21  Q    I may have asked it -- I asked it -- the question was too

22  long.  Do you agree that the unsold rates would be lower as a

23  result of this, or do you think they would stay the same?

24         THE COURT:  Why don't we just ask the direct

25  question would the unsold rates be lower or higher?

1  Q    Would the unsold rates be lower or higher is an excellent

2  question.

3  A    I think the unsold rates would be about the same as they

4  are in the market today.

5  Q    Okay.  Have you had a chance to consider the impact of a

6  sale of part or whole of the DIA collection that did not go

7  through the major auction houses?

8  A    I have, yes.

9  Q    And what opinions did you draw in that regard?

10  A    My opinion was that there is a very good chance given

11  Sotheby's relationship to the City of Detroit, and the museum

12  and Christie's, my experience at Christie's, and Christie's,

13  you know, nurturing of its brand and its -- the fact that it

14  has a museum department that Ms. Fusco works in and cultivates

15  those museum relationships, that the auction houses both

16  Sotheby's and Christie's would decline to sell this art.

17      And that therefore it would be sold -- have to be sold

18  through a secondary or tertiary auction houses, or a series of

19  secondary and tertiary auction houses.

20  Q    And did you investigate and reach any conclusions as to

21  the impact on prices if that scenario were to play out?

22  A    Yes.  We looked at various artists in my report.  One was

23  William Goddard, a Twentieth Century artist.  Another was

24  Warhol.  And we compared record prices at Sotheby's versus

25  Bonhams, a second tier auction house and Christie's versus

1  Phillips.

2  Q    Well, first of all, how much of the marketplace do

3  Christie's and Sotheby's combine to occupy?

4  A    Of the auction market?  They have 36% of the auction

5  market totals.  Split 18% between each -- each is at 18%.

6  Q    Okay.  Steve, can we put up City Exhibit 657, please?

7  Mr. Plummer, do you have that in front of you?

8  A    I do.  I do.

9  Q    Do you -- do you recognize City Exhibit 657?

10  A    Yes, I do.

11  Q    And what is it without -- I don't want your conclusions,

12  what is it that 657 purports to depict?

13  A    This exhibit depicts record prices or top prices by this

14  artist who is a star artist of the Nineteenth Century sector.

15  At the -- the light red line is the record prices at Sotheby's

16  from highest to fifth highest in descending order.

17       And the dark line is the highest price by that same

18  artist at Bonhams auction house from highest in order of

19  highest to lowest.

20       (City Exhibit 657 was identified)

21  q    What is Bonhams auction house?

22  A    Bonhams is a -- a third tier auction house.  It's a

23  respectable auction house.  It's a global auction house.  But

24  it's not nearly of the stature of Sotheby's or Christie's.

25  Q    Okay.  Who -- who assembled the -- or put this chart

1  together?

2  A    We did, my team did.

3  Q    And what data did you use?

4  A    We used data from Art Net.  And this is -- goes back to

5  the beginning of data collected by Art Net in the eighties.

6  So this is the records for the artist at both houses, both

7  over the last, you know, 20 some year period, 30 year period.

8           MR. IRWIN:  Because I'll forget, Your Honor, at this

9  time I'd like to offer City Exhibit 657 for demonstrative

10  purposes.

11          MR. SOTO:  No objection.

12          THE COURT:  It is admitted.

13      (City's Exhibit 657 was admitted)

14  Q    Mr. Plummer, what -- what conclusions do you draw about

15  the data that is depicted in City 656?

16  A    The conclusions I draw are that Sotheby's and Christie's

17  have a global network and they have a sophistication in

18  marketing that is unparalleled by these other auction houses

19  and they have a client base that is unequaled.  And therefore

20  to achieve maximum value for works of art to be sold, they

21  need to be sold through Sotheby's or Christie's.

22  Q    And what are the price differentials that this chart

23  shows for the top five sales for this particular artist?

24  A    Well, at the -- the most extreme it's you're looking at a

25  -- a -- a 1.2 million dollar figure to a $200,000 figure.  So

1  roughly, you know, whatever percent that equates to.

2      And at the closest, at the top level you're looking at a

3  differential of over $800,000.  So you're looking at a very

4  significant differential of up to 50% or more.

5  Q    Can we look at one more?  Steve, could you put up City

6  Exhibit 658, please?  Mr. Plummer, what is City Exhibit 658?

7  A    This is a similar comparison.  This is between Christie's

8  and Phillips.  Phillips is a much smaller auction house.  It

9  tends to focus in the contemporary sector and is not as

10 comprehensive an auction house as are Sotheby's and Phillips

11 -- or Sotheby's and Christie's.

12     And it shows again in descending order of the top prices

13 for this artist at -- at each house.  The -- the light red is

14 Christie's, the dark red is Phillips.  And you can see that in

15 the one instance there was somewhat comparable at a record

16 price, Christie's was at 70,000,000, and above 70,000,000 and

17 -- and Phillips was a little over 60,000,000.  But beyond that

18 it starts to fall off to be a very significant differential.

19     (City's Exhibit 658 was identified)

20 Q    Did -- did you assemble the data and put this chart

21 together in the same manner that you did for City Exhibit 657?

22 A    I did.

23         MR. IRWIN:  Okay.  Your Honor, I -- the city would

24 offer City Exhibit 658 for demonstrative purposes.

25         MR. SOTO:  No objection, Your Honor, as a

1    demonstrative.

2            THE COURT:  All right.  It is admitted.

3        (City's Exhibit 658 was admitted)

4    Q    Mr. -- Mr. Plummer, you -- you -- we've been discussing

5    that -- that clients come to Sotheby's or Christie's for --

6    for better pricing.  Do you have any real world data or

7    examples of collection sales that would support that opinion?

8    A    I'm not sure I know what you're referring to.

9    Q    Are you familiar with the Pierre Berge and the Yves Saint

10   Laurent collections there?

11   A    Yes, yes, yes.  In 2008 or 2009, actually while I was

12   still at Christie's, Yves Saint Laurent died.  And his life

13   partner, Pierre Berge was the executor for the estate.  And it

14   was -- and actually Ms. Fusco was speaking about it on the

15   stand, it was one of the best collections of decorative arts

16   ever assembled in recent memory.

17       And Pierre Berge owned his own auction house in Paris.

18   An important auction house in Paris, but a smaller auction

19   house.  And he, even though he owned his own auction house,

20   realized that the best prices would be achieved at Christie's.

21   So rather than selling it through his own auction house he

22   consigned it to Christie's and Christie's did indeed have a

23   very successful sale.

24   Q    And why is that significant in your analysis?

25   A    Because it -- it -- it speaks to the issue of Berge knew

1  that he had a -- a collection that needed a global audience

2  and including far reaches in Asia.  And that was critical to

3  -- to the success of the sale and -- and gave it multiples

4  that it wouldn't have had had it been sold through his own

5  house.

6  Q    Did -- did you form an opinion considering all of this

7  data, did you form an opinion as to what percentage discount

8  would be appropriate to apply to a hypothetical DIA sale?

9  A    I did.

10  Q    And what was that?

11  A    I arrived at what I felt was based on this data and --

12  and the Berge example, of -- of a factor of 20% -- or discount

13  factor of 20%.  I felt that that was actually quite

14  conservative.  I think you could even justify a higher number,

15  but quantifying such a thing is -- is -- is difficult to do.

16  Q    All right.  Let's -- let's talk about another topic.

17  Let's talk about -- we talked about an immediate sale.  We

18  talked about the factual scenario of immediate sale.  Do you

19  recall that?

20  A    Yes.

21  Q    Did you form an opinion as to what would be the ideal or

22  optimal sequencing of a sale of art, a hypothetical sale of

23  the DIA collection?

24  A    I did, yes.

25  Q    And what is that generally?  Can you describe that?

1  A    Yes.  That would be an orderly liquidation over a period

2  of six years or more.

3  Q    What would happen in the first several years of that

4  process?

5  A    You would be -- you would -- it would require probably a

6  period of 18 months to two years to catalog and strategize for

7  the right sales, make a marketing plan and all of that.  And

8  then you would begin selling in year three.

9      And so from year three through year six.  I also factored

10 into that analysis that you would have BI's that as is typical

11 in -- or unsold property and as is in typical -- as is typical

12 of the art world that those -- that property would then be

13 re-offered several years later at a 20% discount.  So that you

14 would have it revolving back into the sale stream.

15 Q    Why would the -- that kind of sale, the orderly sale over

16 that length of time, why would that potentially generate

17 higher prices than an immediate sale?

18 A    Well, you -- you're -- you're able to -- to deal with

19 market capacity issues.  For instance the value of the

20 American collection and the value of the old masters

21 collections far exceeds what could be sold in any single year.

22 It was about double the sales of Sotheby's and Christie's.

23     And so that would flood the market.  So if you had an

24 orderly liquidation, you could plan to sort of mete out the

25 property in batches that would insure that the market was not

1  flooded.

2  Q    And when would actual sales of art take place in an

3  orderly liquidation over time?

4  A    Actual sales would take place in years three through, I

5  believe eight.

6  Q    And did you form an opinion as to how to account for an

7  orderly sale over time in connection with a discount factor?

8  A    Yes, I did.  I added in appropriate expenses for holding

9  the art and did the calculation according to unsold rates.

10 And came to a year by year summary and then used a -- a

11 discount factor and -- and got to a present value.

12 Q    Did you account for the cost to the museum of storing

13 this property over time?

14 A    I did.

15 Q    And what was that?

16 A    Initially it was about $6,000,000.  And that number then

17 diminished over time as the collection shrank and property was

18 sold off and -- and became a smaller nut to be managed.

19 Q    And -- and what discount rate did you use in connection

20 with your analysis?

21 A    Twelve percent based on the fact that most art investors

22 use a 15 to 18% expectation, you know, return on their -- on

23 their investments, art investments.

24 Q    Did you take the volatility of the art market into

25 account?

1  A    Yes.  In fact that it is a highly volatile market and

2  illiquid.

3  Q    Did you have a real world example from the British Royal

4  Pension Fund to consider in connection with it?

5  A    I did, yes.  The British Royal Pension Fund took multiple

6  years to -- to liquidate and also they had a return of over

7  11%.

8  Q    Okay.  Do you recall the -- the -- from -- in -- in

9  connection with where you started your valuation and where you

10 finished after you did this MPV analysis, what the magnitude

11 of that discount was?

12 A    On -- without allowing for any delays that might be

13 caused by litigation, it came to about 50.5% discount.

14 Q    Okay.  What about delays with litigation?  What are you

15 referring to there?

16 A    Well, as I lay out in my report, I think the example of

17 Fisk University and the Steglitz collection given by Georgia

18 O'Keeffe is a very relevant example of what would happen -- is

19 likely to happen with the DIA.

20 Q    And what happened in those cases?

21 A    The -- the Attorney General intervened in the sale and

22 the -- the sale went through various aspects of litigation and

23 it was -- the sale was tied up for five years.  And based on

24 comments that had been made in the press by the current AG and

25 other examples that I list in my report of -- of people

1  contesting sales such as Brandeis University and others of

2  property that has been gifted, that the most likely scenario

3  for any sale of the DIA collection is a prolonged delay before

4  it could be sold.  And it is likely to be in the range of five

5  years.

6  Q    Did you perform a corresponding net present value

7  calculation on that scenario, a -- a delayed start?

8  A    I -- I -- I did.

9  Q    And what was the net impact of the net present value

10 calculation in that scenario when there is litigation delay?

11 A    Well, when you push the sale of the property out by five

12 years yet still do it in an orderly liquidation, you're now

13 selling out over a much longer period of time and so that

14 gives you a much more significant present value discount.  And

15 it is -- it -- it ended up being 69%.

16 Q    Did you consider any other discount factors in connection

17 with your analysis?

18 A    I did.

19 Q    Can you tell me one of those?

20 A    One of them is market disfavor.  And again this is a hard

21 number to quantify.  There are certain sectors that I feel

22 would not be too affected.  I think that post-war contemporary

23 and impressionist and modern have a global collecting base.

24 So I don't think too many Europeans will be too distraught

25 about buying art from a defunct American institution.

1      But I don't think that applies within the American

2    community.  And I think that the -- specifically the American

3    art pre-1950 where the DIA has a significant holdings, that

4    that is an older group of collectors who are very patriotic.

5    A lot of them are on the boards of museums throughout the

6    United States and I think that a lot of them will not

7    participate in purchasing that art.

8      And that they will also -- are likely to be in an awkward

9    position because of being on the boards of those institutions

10   that were they to purchase that art, they might have to resign

11   from their positions on the museums that they're connected

12   with.  So I calculated a factor of 50% of the American art

13   market could be affected if -- if that art is sold.

14   Q    By American art, you mean that sector?

15   A    That sector of American art.

16   Q    You limit it -- yes.

17   A    American art pre-1950.

18   Q    Did you have any real world examples concerning -- in

19   connection with that opinion?

20   A    Yes.  There was a recent sale at -- at -- just actually

21   in the last several months at Christie's.  And it -- Isabelle

22   and the Pot of Basil.  It was at -- sold by the Delaware

23   museum and it had been -- with much controversy.  And had been

24   -- they had been admonished by the Museum Directors

25   Association for selling it because they were selling it to pay

1  off a debt.

2      And Christie's put a low estimate of $8,000,000 on it.

3  It was offered in the sale in London, in the sale that

4  otherwise did quite well, and it sold for $4,000,000, half of

5  the low estimate.

6      And it's our sense, my sense that it was the taint around

7  that picture and the bad publicity around it which goes to my

8  larger point about not being able to market the DIA property

9  as a -- as a celebratory auction.  Resulted in a -- a -- a --

10 a discount of 50%.  It -- it went for half of what it was

11 expected to sell for.

12 Q    And what was the taint surrounding that picture?

13 A    The taint was that it was -- there was outcry in the

14 museum community that it was being sold not to fund

15 acquisitions, but being sold to fund a debt -- a debt

16 repayment.

17 Q    And were there sanctions imposed on the Delaware museum?

18 A    Yes.  The day after the sale happened, the AMD issued a

19 sanction stipulating that no American museums were to do

20 business with more or less or share property with, or -- or

21 have traveling exhibitions visit the Delaware museum.  So at

22 the moment the Delaware museum sits as an outcast in the

23 museum world.

24 Q    And it -- and it did not hit the low estimate on the sale

25 price?

1  A    It was well below, 50% below.

2  Q    Did you have occasion to --

3              THE COURT:  Excuse me one second.  I think you used

4  the acronym AMD was -- was that what --

5  A    Yes.

6              THE COURT:  -- you said?

7  A    Yes.

8              THE COURT:  What does that stand for?

9  A    It's the Museum Directors Association.  It -- it's the

10 group of all of the leading museum directors in America.

11 Q    Does -- does the AMD issue guidelines for museums?

12 A    They do.

13 Q    And what do the guidelines say with regard to selling

14 pieces of art?

15 A    They say that art can only be sold to fund future

16 acquisitions and cannot be sold to fund operating expenses or

17 debts.

18 Q    And what do the guidelines provide that the AMD can do to

19 a museum who acts in --

20 A    That they can sanction them as -- and -- and revoke their

21 membership in the AMD.

22 Q    Did you have occasion to consider the potential impact of

23 a crash in the post-war and contemporary sector?

24 A    I did.  Based on what happened in 1990, '91, and what

25 happened in 2008, 2009 which we showed the graphs for

1  previously, we -- that if that art were to be sold over a long

2  period of time, that at some point the -- the market is likely

3  to hit another crash.

4      And if that crash were to happen based on historical

5  precedent, it would be about 50%.  Now, it might not all hit

6  the -- the -- the collection because the -- the sellers could

7  decide to take the art off the market and not sell it until

8  the crash passed.  But if -- if it was sold into a market that

9  was crashing the effect would be 50%.

10 Q    Did you have occasion to consider and have an opinion on

11 the likelihood of any of this art to be purchased by other

12 museums for public viewing?

13 A    I did.

14 Q    And what -- what is your opinion on that?

15 A    My opinion is that again based on 2013 activity of -- of

16 institutions buying, that their acquisition budgets are

17 relatively small.  And that relative to the competition

18 provided by the great wealth out there, that the amount of --

19 the number of works in the museum in the DIA's collection that

20 would be sold, most of them would not be sold to other

21 institutions because they don't have the funds to compete

22 against private collectors and therefore most of those works

23 would go back into private hands and leave public view.

24 Q    Steve, could you please put up City Exhibit 662?  Mr.

25 Plummer, do you recognize City Exhibit 662?

1  A    I do.

2  Q    What does it purport to depict?

3  A    It depicts the market share of sales by buyer group in

4  2013.

5       (City's Exhibit 662 was identified)

6  Q    Did you put this chart together?

7  A    Well, it was -- it is -- we put it together based on data

8  from art economics and -- and the TFAF group.

9            MR. IRWIN:  Your Honor, I would offer City Exhibit

10  662 for demonstrative purposes.

11           MR. SOTO:  No -- no objection for demonstratives.

12           THE COURT:  It is admitted.

13       (City's Exhibit 662 was admitted)

14  Q    In 2013, Mr. Plummer, what -- what percentage of sales by

15  value were made by public institutions?

16  A    Nine percent.

17  Q    And to what do you attribute that?

18  A    Again that the -- the acquisition budgets of the various

19  museums are incredibly small relative to the size and value of

20  art being traded today.  I believe in my report I say that the

21  acquisition budgets for MET and MOMA each are somewhere in the

22  range of $30,000,000 each.

23       And you have great master works that are trading in the

24  hundreds of millions of dollars or in the high, you know,

25  70,000,000, $80,000,000.  So the museums just can't keep up.

1  And so therefore that's why you have private collectors

2  accounting for 78% of the marketplace.

3  Q    Have you had a chance to consider the potential impact on

4  the DIA of -- of selling only its most prized pieces?

5  A    I have.

6  Q    And what is your opinion on that?

7  A    Well, it would -- you know, as -- as Ms. Fusco said, the

8  other day that the -- the items that are the most treasured in

9  the museum are the ones that have the most commercial value.

10  So if you were to denude it of those important items like the

11  Bruegel and Cotopoxi and -- and other great works, you would

12  diminish its reputation as a -- as an international

13  institution of standing and it would become essentially a

14  local regional museum and it would -- its attendance would

15  drop significantly.

16      It would more or less fall off the map in terms of

17  international visitors.  It would most likely lose it donor

18  base because once you sell off art that has been gifted,

19  donors stop giving to museums because they feel the trust has

20  been broken and they don't feel that their gifts are -- are --

21  are going to be protected.  So that you end up with a much

22  diminished institution.

23  Q    Is there a term Bilbao effect that you have come to know

24  in connection with your business?

25  A    Yes, I have.

1 Q    What does that mean?  What is Bilbao effect?

2 A    Bilbao refers to the City of -- of Bilbao in Spain which

3 a lot like Detroit had a manufacturing base that went away.

4 And it was in rather dire straits economically.  It was -- it

5 was a depressed environment.

6     And the city council or city leaders decided that they

7 needed to make it a tourist attraction and be -- participate

8 in the tourist trade coming through Spain.  So they -- they

9 decided to create a museum.  And they hired Frank Gehry to

10 create a -- a spectacular museum and they made a deal with the

11 Guggenheim museum to borrow part of their collection as well

12 as arrange funding to make acquisitions to go to new

13 collection.

14     And the -- the net result was that now Bilbao is one of

15 the -- is one of the leading major tourist attractions in

16 Spain after Madrid and -- and the -- the other city.  And it

17 is now referred to frequently as the Bilbao effect.  There's

18 other cities around the world who are trying to replicate that

19 such as Abu Dhabi, Dubai, and Doha.

20 Q    Are those conditions ripe in Detroit?

21 A    They are ripe in Detroit.  They are a similar analogy is

22 Brooklyn.

23     MR. SOTO:  Objection, Your Honor, foundation.

24 There's nothing to suggest in his expert report that he's done

25 any analysis of this or anything to support this testimony.

1   And it's pretty far afield.

2          MR. IRWIN:  I -- the witness has testified that he's

3   investigated this and was prepared to speak about it.  I don't

4   think he was asked specifically about this at his deposition.

5   So he wasn't in a position to give that response.

6          THE COURT:  I'll permit it.  Go ahead, sir.

7   A    Sure.  And this is -- this is a conversation I've had

8   with the head of the Brooklyn museum several times, Arnold

9   Lehman.  Is that in the late nineties early two thousands, as

10  real estate values have gone up so high in Manhattan, a lot of

11  artists started flocking to Brooklyn in part because of the

12  Brooklyn museum and the Brooklyn museum's collection which is

13  similar to DI -- to DIA's.

14         And -- and it has now reached a point where it is the

15  artistic center of New York rather than Manhattan.  And a lot

16  of it is the cultural community around the Brooklyn museum.

17         And a similar example could happen here because the

18  artists are driven by cheap real estate.  And a -- cheap real

19  estate and a cultural attraction.  And that ingredient, both

20  ingredients are here in Detroit, cheap real estate and their

21  world class museum.

22  Q    And what -- what impact would closing the museum have on

23  that possibility?

24  A    It would foreclose that -- that event.  Artists would

25  have no reason to move here.

```
 1          MR. IRWIN:  Your Honor, I have no further questions

 2   at this time.

 3                      CROSS EXAMINATION

 4   BY MR. SOTO:

 5   Q    Mr. Plummer.

 6   A    Good morning.

 7   Q    We've met before.  You have a degree in economics,

 8   correct?

 9   A    I do.

10   Q    And you -- you're not certified as an art appraiser, are

11   you?

12   A    I am not.

13   Q    And you have no formal education in appraising art, do

14   you?

15   A    I do not.

16   Q    And you have no formal training in appraising art, do

17   you?

18   A    I do not.

19   Q    And in fact you yourself have never conducted an art

20   appraisal -- an appraisal of art in your life, have you?

21   A    No, I have not.

22   Q    Okay.  Now in 2009 you founded a company called Artvest,

23   correct?

24   A    Correct.

25   Q    And it was founded in part to advise individuals,
```

 1  individual clients on buying and selling art, right?

 2  A    Correct.

 3  Q    But the only time Artvest has ever hired an art appraiser

 4  was to do the work on this DIA project that you testified

 5  about today and yesterday, correct?

 6  A    The only time we've hired an appraiser, but we have

 7  worked with valuers before.

 8  Q    Okay.  And despite hiring appraisers in connection with

 9  this project, you don't consider the result of Artiest's work

10  on this project to -- to be an appraisal, do you?

11  A    We considered it an evaluation of the collection.

12  Q    You call it an evaluation instead, right?

13  A    Yes.

14  Q    And you conducted your evaluation using what you

15  described as a fair market value, correct?

16  A    Correct.

17  Q    And this is the same value that Christie's chose when it

18  conducted its appraisal, correct?

19  A    Correct.

20  Q    And in connection with your evaluation, you used the

21  appraisal values Christie's developed for the first 17 -- for

22  the 1,700 works of art that they had appraised in your

23  appraisal, correct?

24  A    In our evaluation, yes.

25  Q    That's right, evaluation, sorry.  But you still consider

1  yours as you've said an evaluation, not an appraisal.

2  A    Right.

3  Q    And that's because it's your view that an appraisal would

4  not take into account market factors, market conditions,

5  correct?

6  A    To the extent that we did, yes.

7  Q    Okay.  So you're familiar with the Uniform Standards of

8  Professional Appraisal Practice which is called USPAP, right?

9  A    I am.

10  Q    And you reviewed those standards in connection with your

11  expert report, correct?

12  A    I -- I've had -- was aware of them before my expert

13  report.

14  Q    And reviewed them in connection with it, correct?

15  A    Correct.

16  Q    Okay.  But you didn't apply those standards in your

17  valuation, did you?

18  A    There were some aspects of it that we applied but like

19  Christie's we do not believe that USPAP is necessarily

20  applicable and it is not required by any regulation or

21  regulatory body.

22  Q    And when you reviewed USPAP in connection with your

23  deposition and -- and with the work you did here, did you

24  notice that it requires an appraisal to analyze the relevant

25  economic conditions at the time of the valuation including the

1  market acceptability of the property, the supply, the demand,

2  the scarcity, and the rarity?

3  A    I did.

4  Q    Now if I heard you right you applied discount factors in

5  your analysis because you said an appraisal wouldn't take into

6  account all the market factors you took into account in your

7  discounts, right?

8  A    Most of the market factors, yes.

9  Q    But you would agree that market acceptability was one of

10 those market factors that you considered in your discounts,

11 correct?

12 A    Yes.

13 Q    And you would agree that supply and demand are market

14 factors that you considered in your discounts, correct?

15 A    Yes.

16 Q    And again scarcity and rarity are also market factors

17 that you considered in your discounts, right?

18 A    Correct.

19 Q    Let me move on to your employment experience for just a

20 minute.  After college you began your career at Sotheby's,

21 correct?

22 A    Correct.

23 Q    And you spent 16 years at Sotheby's, right?

24 A    Yes.

25 Q    But you never conducted an appraisal while at Sotheby's,

1  did you?

2  A     No.

3  Q     And in 2003 you joined Fernwood Art Investments and you

4  worked there for two years, correct?

5  A     Three years.

6  Q     Three years, okay.  And you were the Chief Operating

7  Officer and the President at Fernwood, correct?  But you again

8  never conducted an art appraisal at Fernwood, did you?

9  A     Not an appraisal, no.

10  Q     Okay.  And while you were at Fernwood, you've testified

11  that you structured two art funds, correct?

12  A     Correct.

13  Q     But it's true, Mr. Plummer, that none of the funds

14  actually got off the ground, none of them got funded, correct?

15  A     Correct.

16  Q     And after Fernwood you spent two years in the financial

17  services group at Christie's, correct?

18  A     Correct.

19  Q     And one of your main responsibilities was to develop art

20  funds to try to start an art lending business, correct?

21  A     They were two separate things.  The art lending business

22  was separate from the art funds.

23  Q     And you were -- your responsibility was to start both,

24  correct?

25  A     Yes.

1  Q    But you were never able to raise the funds for the funds,

2  correct?

3  A    Correct.  Well, actually to correct that, we did raise

4  the funds but Christie's shut it down before we closed on the

5  funds.

6  Q    So that effort didn't get off the ground either, correct?

7  A    Correct.

8  Q    And the entire division was closed in 2009?

9  A    Correct.

10  Q    Which -- now after the division of Christie's was closed,

11  that's when you founded Artvest, correct?

12  A    Correct.

13  Q    So other than your current engagement you would agree

14  that you have no experience in valuing a collection of art and

15  certainly not one as -- as large as the DIA's, correct?

16  A    I -- I -- I have not done an appraisal, but I have valued

17  other collections of art, but not one as large as the DIA's.

18  Q    Okay.  And you've never been involved in a sale or a

19  monetization of an art collection the size of the DIA's,

20  correct?

21  A    No.  And I can say nobody has.

22  Q    Okay.  That's your view, correct?

23  A    I'm positive of that.

24  Q    Okay.  And finally, in this line of questioning, you've

25  never brokered a loan for an institution like the DIA,

1  correct?

2  A    No, I have not brokered a loan for an institution.  I

3  have for private collectors.

4  Q    Now Christie's appraised only 1,700 works of art in the

5  DIA collection which is about 3% of the entire DIA collection,

6  correct?

7  A    I think it was closer to 4 1/2% or something like that.

8  Q    Four and a half.  I think my math is off 1,700 and 62,000

9  something like that.  That would be the calculation?

10 A    Well, I was including things they looked at which was

11 3,000 some items, but --

12 Q    Okay.  So about 4 1/2%?

13 A    Yes.

14 Q    Okay.  And when you did your evaluation which I am not

15 going to go into, you testified that even in your

16 extrapolation, you gave zero value, nothing to any piece that

17 was under 5,000, correct?

18 A    Correct.

19 Q    And I think you numbered that to be about 45% of the DIA

20 collection, correct?

21 A    I don't remember the exact percentage.

22 Q    Okay.  So if you took the 62,000 and you divided it in

23 twenty or 21,000 pieces that you didn't value, that would be

24 the percentage.  I -- I did the math, it's about 45%.

25 A    Uh-huh.

1  Q    So even in your extrapolation almost half of the DIA

2  collection had no value in your extrapolation?

3  A    Yes.  Just as Ms. Fusco said, most museum have a lot of

4  property that is for scholarly and historical value that does

5  not have commercial value.

6  Q    So your evaluation doesn't account for almost half of the

7  DIA collection for whatever reason, correct?

8  A    After you exclude the high value items, yes.

9  Q    Okay.  And you apply these various discount factors that

10 reduce what you call the indicative valuation, correct?

11 A    Correct.

12 Q    And you do that by applying various different potential

13 factors and I call them hypothetical scenarios, correct?

14 A    Correct.

15 Q    And after applying the discount factors you estimate the

16 range of value that you think the DIA collection would sell

17 for as between 1.1 billion and 1.8 billion, right?

18 A    Correct.

19 Q    And in applying those discount factors, for example, the

20 blockage factor or the immediate sale factor that you spoke to

21 the Judge about earlier --

22 A    Right.

23 Q    You're assuming a sale, correct?  Those apply to sales?

24 A    Correct.

25 Q    Okay.  So let's look at the -- let's look at the

1  immediate liquidation.  If I understood you correct, that

2  factor applies if there's an immediate sale of all of the art

3  to one person, that's the way you testified about it earlier,

4  right?

5  A    One person or a syndicate of people would be more likely.

6  Q    And that's the assumption that's built into that

7  discount, correct?

8  A    Right.

9  Q    And you don't know if the DIA art is going to be sold and

10 you certainly don't know if it's going to be sold to one

11 person at one time, correct?

12 A    No.  These were hypotheticals for the Court to consider

13 depending on what actions were taken.

14 Q    Okay.  So now let's look at the blockage discount.  You

15 apply this blockage discount based on two factors, correct?

16 Again one of them is the time frame of the sale, correct?

17 A    Uh-huh.

18 Q    Fairly concentrated time frame for the sale, correct?

19 A    Right.

20 Q    And the other is the number of similar items involved,

21 correct?

22 A    Correct.

23 Q    So that if there is a large diversity of items involved

24 then you wouldn't apply the same blockage that you -- that you

25 talk about in your report, correct?

1  A    Well, if I can just clarify.  I really only applied an

2  immediate sale discount.  I used the blockage discount just to

3  illustrate as a further supporting point the -- the immediate

4  sale discount because they are related.  But I really only

5  applied the immediate sale discount.  I did not apply the

6  blockage discount.

7  Q    Okay.  So even -- and your analysis, and I -- and I'm

8  getting to that.  The immediate sale discount that you applied

9  was 50%?

10 A    Correct.

11 Q    And you applied the immediate sale 50% discount based on

12 your analysis of the way loans are -- are treated in the art

13 world where there is a loan of art typically the

14 collateralization only gets 50%, correct?

15 A    As well as also the Pierre Matisse example.

16 Q    Got it.  So you understand though that there are no

17 studies that you can point to where a blockage discount or an

18 immediate sale discount of 50% is applied, correct?

19 A    There are no studies because the art market is too

20 secretive for such things to be revealed.

21 Q    And you understand the difference between a loan and a

22 sale, correct?

23 A    I do.

24 Q    And so the fact that somebody might require for

25 collateral on a loan 50% may or may not relate to anything on

1  a sale, correct?

2  A    Well, no, that's not correct because most people who I --

3  I engage with all of the lenders in the art industry on a

4  regular basis.  And when they are making a loan they are

5  making that loan with the full expectation that they may

6  ultimately have to sell that collateral.  So they are taking

7  into consideration that that is what they're going to have at

8  the end of the day is that 50% value.  So they are looking at

9  that as a possible sale when they give that loan.

10  Q    And I -- and I understand the difference between the risk

11  of a loan and -- and why you might have large collateral in

12  connection with an art loan.  But -- but what I -- what I'm

13  asking you is, can you show this Court any study that relates

14  that risk, the risk of, you know, wanting to have collateral

15  on a loan, to why in an immediate sale 50% would be the

16  number?

17  A    There is no such study.

18  Q    Let's move on to the discount you applied for not selling

19  through Sotheby's or Christie's, I believe, correct?

20  A    Uh-huh.

21  Q    And -- and -- and you do that because you think that the

22  auction houses may refuse to participate in the sale, correct?

23  A    I do.

24  Q    Now I asked you about this in your deposition.  You

25  didn't speak to anyone at Sotheby's regarding this opinion,

1  correct?

2  A    Correct.

3  Q    Okay.  And in fact you avoided you said speaking to

4  anyone at the auction houses regarding this, correct?

5  A    Correct.

6  Q    And that's still the case, correct?

7  A    Correct.

8  Q    Okay.  But you said you did speak to a friend at

9  Christie's in a social setting, right?

10 A    Yes.

11 Q    But you couldn't disclose that person's name to me?

12 A    Right.

13 Q    And you said that's why you don't think that Christie's

14 would want to get involved in a sale of this nature, correct?

15 A    That was a reason.  I mean I was also part of the senior

16 management at both Sotheby's and Christie's.  And know how

17 they value their brands and how they run their companies and

18 that they have museum service departments that are cultivating

19 museum relationships.  So it's based on inside experience

20 within both corporations.

21 Q    So just so that it's clear for the Court as to the basis

22 of your opinion, when you were at Sotheby's you worked in

23 marketing significantly, correct?

24 A    Correct.

25 Q    And when you were at Christie's you worked in the -- two

1  years of trying to develop their art fund and -- and lending,

2  right?

3  A    Financial services group.

4  Q    Okay.  So in your conversations, did you confirm that

5  either auction house would refuse to sell the art works from

6  the DIA collection if it were required by a Court under a plan

7  of adjustment?

8  A    I did not have that specific conversation with either

9  house.

10  Q    But in any event based on that discount, you dropped your

11  low value estimate by another 20%?

12  A    That was applied in one instance to illustrate the

13  impact.  That was not applied in all -- all cases.  All of

14  these discounts were not applied simultaneously, they were

15  done selectively.

16  Q    Let's turn to another discount you applied.  Again, so

17  that I can understand the basis of it.  The litigation delay.

18  Your analysis accounts for a five to six year litigation

19  delay, correct?

20  A    Correct.

21  Q    And your report says that if any of the collection is

22  sold or modifies, litigation is likely from the Michigan

23  Attorney General?

24  A    Correct.

25  Q    From the DIA Corp., and from heirs and donors, correct?

 1  A     Yes.

 2  Q     Okay.  Now you haven't done any research regarding the

 3  transferability of any of the art at the DIA collection,

 4  correct?

 5  A     You mean in terms of the -- the documentation of that

 6  art?  You mean --

 7  Q     Restrictions on transferability?

 8  A     No, I have not.

 9  Q     Okay.  And you've done no research in terms of the

10  ownership of the art at the DIA, correct?

11  A     Well, actually our listing of the property that we have

12  from the DIA actually has the source of the art, who the donor

13  was or -- or how it was purchased.

14  Q     Okay.  But that wasn't my question.  My question was,

15  have you done any research regarding who the rightful owner is

16  of the art at the DIA?

17  A     No.

18  Q     And so that it's clear for the Court, you haven't spoken

19  to any heirs or donors to the DIA?

20  A     No, I have not.

21  Q     Okay.  And you've made no assessment of the strength of

22  any lawsuit that might or might not be filed by the DIA or

23  anyone else, correct?

24  A     No, I have not.  I've just used other examples of other

25  cases that are similar.

1  Q    Okay.  So let's go to those examples.  Did you review the

2  facts of the Fisk -- Fisk University lawsuit?

3  A    I did.

4  Q    Now do you believe that the facts of the Fisk University

5  lawsuit are the equivalent of the DIA maybe being required to

6  sell art as part of a plan of adjustment under a Court order?

7  A    I think there's some strong similarities.

8  Q    Okay.  And -- and did you review the facts of the

9  Brandeis University matter?

10  A    I -- I did.

11  Q    And do you think there's some strong similarities there

12  as well?

13  A    I do.

14  Q    Okay.  And you didn't have any personal experience with

15  the sale of a work of -- of art of an institution that was

16  held up in litigation, you personally, have you?

17  A    Me personally?  No.

18  Q    So the five year delay is an assumption based on the

19  assumptions that we just discussed, correct?

20  A    It's an opinion based on what is out in as record for

21  these other institutions.

22  Q    Going back to the immediate sale discount.  Because we

23  heard from Ms. Fusco that there are some iconic pieces at the

24  DIA now.  So for example she used Bruegel, the Elder's Wedding

25  Dance.

1  A    Uh-huh.

2  Q    And that would be a piece that wouldn't be affected by an

3  immediate sale discount, would it?

4  A    Possibly not.

5  Q    Okay.  And there might be some other pieces like that,

6  correct?

7  A    There would be some other -- other pieces like that,

8  correct.

9  Q    But in your analysis you apply it to the entire

10  collection that you're referring to on immediate sale of

11  everything to one person at one time, correct?

12  A    Yes.  But you may have other pieces that will go for so

13  little that it would compensate for that going for more.

14  Q    I understand.  I just -- I just want to make sure that we

15  account for some of these differences while the Court is

16  reviewing it.

17     The under performing sectors, you -- you applied another

18  discount that you talk about as the under performing sectors,

19  right?

20  A    I don't believe I classify it as that.  I'm not sure what

21  you're referring to.

22  Q    Okay.  So in your report at Page 24 and Paragraph 37, you

23  talk about under performing sectors or sectors that have

24  fallen out of favor.  That's what I'm talking about.

25  A    Correct.  I talk about that, yes.

1  Q    Okay.  And you apply a discount for the fact that you

2  believe that, you know, as you put up in your chart and

3  discuss with -- on your direct examination, that there were

4  some sectors that were under performing, that the DIA had some

5  large collections and some under performing sectors, correct?

6  A    Correct.  But I didn't apply a discount for that.

7  Q    Okay.  But it's clear that even as to those under

8  performing sectors, one of them is the old masters, correct?

9  A    Correct.

10 Q    But this under performing sector, I think you said that

11 it had fallen out of favor because there are just so few

12 really quality pieces available, correct?

13 A    No, I did not say that.  I said it was because there were

14 fewer collectors and they were older and newer collectors are

15 coming into the market to buy post-war and contemporary rather

16 than going into old masters and American pre-1950.

17 Q    Isn't it actually your view that the problem with the old

18 masters is that there are very few good quality works

19 available in the market?

20 A    That is also true, but what I said first is the primary

21 reason.

22 Q    But you would agree that even that reason wouldn't apply

23 to the iconic pieces that are at the DIA?

24 A    You know, that's a difficult question to answer because

25 you have to have the number of buyers out there to buy a

1  volume of work.  And right now I don't believe there is that

2  volume of buyers out there.  You might be able to sell the

3  Wedding Dancers, but there's an enormous collection at the

4  DIA.  And I don't believe there are enough collectors in the

5  market to buy that collection right now.

6  Q    But I didn't ask you about the collection.  I asked you

7  about the iconic works.  Sir, let's -- you can take the 11

8  critical pieces that -- that Christie's listed in its report.

9  A    Right.

10  Q    Those would not be affected by disfavor of any sector,

11  correct?  Because they'd be iconic pieces.

12  A    Except for the American pieces.  I think the American

13  pieces may have some difficulty reaching the prices that

14  people think they would.

15  Q    Now just again so it's clear for the Court.  The blockage

16  discount, the immediate sale discount, all of the discounts

17  we've been talking about that apply -- that -- that you

18  discussed, apply to sales, correct?

19  A    Yes.

20  Q    But they wouldn't apply if there were a loan on -- on --

21  on the collection or another form of monetization other than a

22  sale, correct?

23  A    No, because if -- if a loan were taken and then that loan

24  was defaulted on, the lender would assume all those risks.

25  Q    And -- and if a loan were taken and the loan were not

1 defaulted on, you wouldn't have an immediate sale discount,

2 correct?

3 A    No.

4 Q    You wouldn't have a blockage discount?

5 A    No.

6 Q    Correct?

7 A    No.

8 Q    You wouldn't have a discount for litigations or any of

9 the other ones that you mentioned, correct?

10 A    No.

11 Q    Now Mr. Plummer, let me ask you to take a look at

12 Paragraph 69 on Page 42 of your -- do you have a copy of your

13 report?

14 A    I'm not sure.

15 Q    It wasn't in that binder.  Let me -- let me hand you one

16 just so you can take a look at it.

17 A    Thank you.

18 Q    It's Paragraph 69 on Page 42.

19 A    Okay.

20 Q    And you opined that -- oh, it's up there on the screen.

21 But I'll paraphrase it for you.  That by the time Christie's

22 completed the recommendations for monetization section of

23 their report, it was disincentivized to pursue them due to

24 market backlash from the DIA and other market participants.

25 See that?

1  A    I do.

2  Q    And it was your opinion that while the firm had many

3  leading art specialists in the industry, and we heard about

4  them from Ms. Fusco, that it did not have the in house

5  intellectual capital to pursue the unique monetization

6  analysis, correct?

7  A    Correct.

8  Q    That was your opinion, correct?

9  A    Correct.

10  Q    And it's your view that Christie's lacked this in house

11  intellectual capital because it had disbanded its financial

12  services group, correct?

13  A    Correct.

14  Q    And that's the group that you had headed for those two to

15  three years, correct?

16  A    Correct.

17  Q    Okay.  So it's your testimony that Christie's didn't have

18  the capacity to carry out the monetization alternatives

19  because they essentially had closed the department that you

20  headed up, correct?

21  A    Correct.

22  Q    Okay.  Now you understand that Christie's came up with

23  five potential alternatives to sale, correct?

24  A    Yes.

25  Q    But you never talked to anyone at Christie's about these

1  alternatives, did you?

2  A    No, I did not.

3  Q    And before you rendered this report, you didn't speak

4  with Paul Provost about them and he's the man at Christie's

5  who developed these alternatives, did you?

6  A    No, I did not.

7        MR. SOTO:  Thank you very much.

8  A    Sure.

9                    CROSS EXAMINATION

10  BY MR. BRILLIANT:

11  Q    Good morning, Mr. Plummer.

12  A    Good morning.

13  Q    I'm Allan Brilliant on behalf of MIDD.  I just have a few

14  questions for you.  Mr. Plummer, you didn't do a formal study

15  regarding the economic benefits to Detroit of having the DIA

16  open, did you?

17  A    I did not.

18  Q    And in fact you don't have a degree in urban economics?

19  A    I do not.

20  Q    And you haven't studied urban settings, have you?

21  A    I have not.

22  Q    Or municipal finance?

23  A    I have not.

24  Q    Municipal development?

25  A    I have not.

1  Q     Municipal economics?

2  A     I have not.

3  Q     So you wouldn't -- you're not qualified to give an

4  opinion on the effects on the -- on the city of having the DIA

5  -- DIA open, isn't that correct?

6           MR. IRWIN:  Objection, Your Honor.  Asking the

7  witness to opine.

8           THE COURT:  The objection is sustained.

9  Q     Mr. Plummer, you have no expertise regarding the economic

10 effects of having a museum open, isn't that right?

11 A     I'm sorry, ask the question again.

12 Q     That you have no expertise in the economic --

13           THE COURT:  Why are you asking this question?

14           MR. BRILLIANT:  Excuse me?

15           THE COURT:  Why are you asking this question?

16           MR. BRILLIANT:  I'm just, you know, impeaching the

17 -- the statements he made earlier about, you know, comparing

18 the city to -- Detroit to Brooklyn.  But, you know --

19           THE COURT:  That's a totally different matter.

20           MR. BRILLIANT:  Okay.  I'm finished, Your Honor.

21           THE COURT:  All right.

22           MR. BRILLIANT:  Thank you.

23           THE COURT:  Any further questions for the witness?

24           MR. IRWIN:  Am I up?

25           THE COURT:  It looks like it

 1                    REDIRECT EXAMINATION

 2  BY MR. IRWIN:

 3  Q    Hopefully very briefly, Mr. Plummer.  Mr. Soto asked you

 4  some questions about your experience with appraisals.

 5  A    Uh-huh.

 6  Q    That word was very specific.  Do you draw any

 7  distinctions in your mind between an appraisal and a

 8  valuation?

 9  A    I mean I think there are official appraisals which are

10  done for specific purposes like insurance valuations and

11  estate taxes and those sorts of things.  By design Artvest

12  does not do that.

13       It is not a very revenue generating sort of business.  We

14  prefer to do valuations in the context of real world sales,

15  and purchases, and loans where real money is on the table.

16  And we have skin in the game.  And we find -- so we do not

17  generally do technical appraisals.

18  Q    Does Artvest value art in connection with the services

19  that --

20  A    Yes, we do.  We value art for our clients in the context

21  of actually making real decisions to buy and sell and spend

22  their money, or make money and/or borrow.

23  Q    How about with respect to the team of people that you

24  assembled for the DIA project?  Were there appraisers on that

25  team?

1  A    Yes, there were.  There was Betty Krulik who is actually

2  President of the American Appraisers Association and very

3  highly regarded.  Kristin -- Kristin Perry who is also a

4  member of the Appraisers Association of America.  And Sabine

5  Wilson also a member of the Appraisers Association of America.

6  And Johann Young who has roughly 18 years experience at both

7  Sotheby's and Christie's.

8  Q    And what -- what qualifications were you looking for in

9  connection with the appraisers or specialists that you would

10  recruit for this particular assignment?

11  A    I was looking for appraisers or specialists who had real

12  world knowledge of what was going on, what values were, and

13  were not approaching it in a scholarly fashion, but were

14  actually approaching it in a real commercial fashion.

15  Q    All right.  And Mr. Soto asked you some questions about

16  the immediate liquidation analysis you did and a blockage

17  discount analysis.  Do you recall that?

18  A    Yes.

19  Q    And I think you testified that there were no studies done

20  in connection with that analysis, is that right?

21  A    Correct.

22  Q    How can you be so confident in your results if there are

23  no studies that were done?

24  A    Because of my own experience with -- with -- in the art

25  world of -- of -- of being offered things at blockage -- at

1  you know, immediate sale discounts, about my experience in the

2  lending business.  That it's just a factor of daily life in

3  the art world, so I didn't need to do a study.

4  Q    Did you have real world examples to support your

5  opinions?

6  A    Yes.

7  Q    And did you describe those?

8  A    Yes.

9  Q    Mr. Soto asked you some questions about Christie's and

10  Sotheby's willingness to potentially -- potential willingness

11  to accept a sale assignment.  Do you recall that?

12  A    Yes.

13  Q    Was there media coverage surrounding the Christie's

14  agreement to appraise the DIA collection?

15  A    Yes, there was and it was quite scathing.

16  Q    And how did that impact your opinions?

17  A    That was part of my opinion.  That if -- if -- if

18  Christie's would receive this degree of negative press on this

19  and knowing the thinking of the Christie's management team and

20  Mr. Pino and how sensitive they are about these things, that

21  if they were receiving this kind of negative press just for

22  the appraisal and the monetization, that they would -- I

23  couldn't imagine given their risk aversion that they would

24  come near selling the DIA collection under any circumstances.

25  Q    Okay.  And lastly, Mr. Plummer, Mr. Soto asked you some

1  questions about the appropriateness of considering some of

2  these discount factors in connection with a -- a loan

3  scenario.  Do you recall that?

4  A    Yes.

5  Q    What happens in an art loan scenario when the borrower

6  does not repay that loan?

7           MR. SOTO:  Objection, asked and answered.  He's

8  already testified to that.

9           THE COURT:  I'll permit it, go ahead.

10  A    The lender takes possession of the collateral and sells

11  it.  And sells it at his whim and -- and full exclusive

12  control.

13  Q    Do you have personal knowledge in your experience of art

14  loans being foreclosed and collateral sold?

15  A    Yes.

16  Q    Does it happen in the marketplace?

17  A    It happens frequently in the marketplace.

18           MR. IRWIN:  No further questions.

19           THE COURT:  Any further questions of the witness?

20           MR. SOTO:  No, Your Honor.

21           THE COURT:  Was -- was the -- the name of the

22  organization that you mentioned, the Association of Art Museum

23  Directors?

24  A    No, it's the Association of Museum Directors, or it's --

25  I believe it's the AMD.

1          THE COURT:  Is that a different organization than

2   the one I just mentioned?

3   A    Well, there's the AAA -- there's the Association of

4   American Museums.  And then there is the Association of Museum

5   Directors.

6          THE COURT:  Okay.  So those are two different

7   associations?

8   A    They are two different associations.  The directors

9   association is the more I would say -- I shouldn't say

10  prestigious, but the more prominent of the two because it is

11  the directors and they govern policy.  The other organization

12  is a more -- is a broader museum alliance that includes

13  administrative people.

14         THE COURT:  Okay.  So let's -- let's focus on the

15  directors association.

16  A    Okay.

17         THE COURT:  Whatever it's called.  That organization

18  -- does that organization have some kind of set of standards

19  and practices, or code of ethics that deal -- or policy that

20  deals with the issue of de-accessioning art works?

21  A    They do.

22         THE COURT:  Okay.  Is that proposed to be in

23  evidence here?

24         MR. IRWIN:  It is, Your Honor.  It's on our exhibit

25  list and we are -- we are discussing with FGIC right now some

1  new exhibits to come in.  I think that's one of the exhibits.

2          THE COURT:  Okay.  Now let's focus on the other

3  organization which you say is the organization of museums.

4  A    Yes.

5          THE COURT:  Whatever that's called.  Are -- are you

6  familiar with that organization?

7  A    I am.

8          THE COURT:  Does it likewise have a similar kind of

9  statement, whether it's a statement of practice, or ethics, or

10  policy on de-accessioning?

11  A    I -- they may have.  I don't know because the AMD really

12  is the -- kind of the governing body in this context.  I'd

13  really refer to their rulings.

14          THE COURT:  Okay.  All right.  That's all I have.

15  You may step down, sir.

16  A    Thank you.

17          THE COURT:  And you're excused.

18  A    Thank you.

19      (WITNESS MICHAEL PLUMMER WAS EXCUSED AT 9:54 A.M.)

20          THE COURT:  Okay.  So let's take our morning recess

21  at this time and reconvene at ten minutes after 10:00.

22          THE CLERK:  All rise.  Court is in recess.

23      (Court in Recess at 9:54 a.m.; Resume at 10:10 a.m.)

24          THE CLERK:  All rise.  Court is back in session.

25  You may be seated.

1          MR. O'REILLY:  Good morning, Your Honor.  Arthur

2  O'Reilly with Honigman, Miller, Schwartz, and Cohn for the

3  Detroit Institute of Arts.

4          Before we call the next witness, Your Honor, I wanted to

5  bring the Court up to date on some of the document admission

6  issues that we've been in discussion with the objectors.  We

7  spent some -- as you might guess, in an issue like this

8  there's a lot of old documents and so a lot of documents have

9  already come in.  We've also had subsequent discussions about

10  admitting additional documents.

11          If it makes sense for the Court, I can read into the

12  record those that we've reached some agreement upon and then

13  have them also entered in the JFPTO, whenever the next version

14  of that is -- is filed.

15          THE COURT:  Okay, go ahead, sir.

16          MR. O'REILLY:  The -- the parties have agreed that

17  -- well, I should say this.  With certain parties settling

18  including Syncora, some of those objections have gone away.

19  And so those should come into evidence and those are 284, 293,

20  295, 300, 341, 343, 344, 350, 351, and 543.

21          In addition we've also reached some stipulations to agree

22  to admit quite a number of additional documents including 272,

23  273, 279, 282, 283, 285, 288, 289, 290, 297, 302, 308, 352,

24  392, 393, 394, 437, 449, and 704.

25          And also the FGIC exhibits 3085, 3086, 3108, 3224, 3239,

1  3243, 3263, 3265, 3270, 3273, 3302, 3310, 3313, 3314, 3923,

2  and 1893.

3      I'm sorry, and there are actually some more.  I'm sorry,

4  there's a lot of these, but it's better than dealing with them

5  at the end.

6          THE COURT:  All right.  Go ahead.

7          MR. O'REILLY:  3128, 3163, 3215, 3278, 3282, 3285,

8  3286, and 301.  And I think -- I would like to move them into

9  evidence and I believe Mr. McCarthy --

10         THE COURT:  Is there any objection to the admission

11  of those documents in evidence?

12         MR. MCCARTHY:  Your Honor, Ed McCarthy on behalf of

13  FGIC with Weil, Gotshal.  With respect to the first category

14  of documents, that were listed where perhaps Syncora had

15  objected, I don't have those on my list.  I just don't have a

16  list regarding that.

17     If the Court -- if it's okay with the Court, we would

18  like to double check that to make sure we don't have an

19  objection to those.  With respect to all remaining documents

20  other than 704, I have those on my list as well as Mr.

21  O'Reilly's so no objection.

22         THE COURT:  All right.  Let me just go ahead and

23  admit all of those into evidence now.  If there is a document

24  on that list that you believe shouldn't be on that list, bring

25  it to my attention after lunch.

 1            MR. MCCARTHY:  We will, Your Honor.

 2            THE COURT:  And we'll get it resolved.

 3        (City's Exhibits 272, 273, 279, 282, 283, 284, 285, 288,

 4  289, 290, 293, 295, 297, 300, 302, 308, 341, 343, 344, 350,

 5  351, 352, 392, 393, 394, 437, 449, 543, and 704.  FGIC's

 6  Exhibits 1893, 3085, 3086, 3108, 3128, 3163, 3215, 3224, 3239,

 7  3243, 3263, 3265, 3270, 3273, 3278, 3282, 3285, 3286, 3302,

 8  3310, 3313, 3314, 3923, and 301 were stipulated and admitted)

 9            MR. O'REILLY:  Thank you, Your Honor.  We'll call

10  Ms. Annemarie Erickson.

11            THE COURT:  Please raise your right hand.

12        (WITNESS ANNEMARIE ERICKSON WAS SWORN)

13            THE COURT:  Please sit down.

14                        DIRECT EXAMINATION

15  BY MR. O'REILLY:

16  Q    Good morning, Ms. Erickson.

17  A    Good morning.

18  Q    Thank you for being here today.  Would you please state

19  your name?

20  A    My name is Annemarie Erickson.

21  Q    And where were you born?

22  A    I was born in Highland Park, Michigan.

23  Q    Did you grow up there as well?

24            THE COURT:  If you'd try to speak more into the

25  microphone.  It may be challenging for you, but please try

1          MR. O'REILLY:  I will do my best, Your Honor.

2          THE COURT:  Thank you.

3   Q    Where -- where did you grow up?

4   A    I grew up in the City of Detroit.  My father was a city

5   employee.

6   Q    Okay.  And do you live in Detroit now?

7   A    No, I don't.  I live in Beverly Hills, Michigan.

8   Q    Okay.  And are you employed by Detroit -- the Detroit

9   Institute of Arts which has been called here the DIA Corp.?

10  A    Yes, I am.

11  Q    Okay.  And what is the DIA Corp.?

12  A    The DIA Corp. is a 501(c)(3) non-profit organization that

13  operates the Detroit Institute of Arts.

14  Q    And am I correct that you are the executive Vice

15  President and Chief Operating Officer of the DIA Corp.?

16  A    That's correct.

17  Q    Okay.  And how long have you served in that role?

18  A    Since 2008.

19  Q    And prior to that did you have a different role?

20  A    I did.  I was Vice President of marketing and museum

21  programs for the museum.

22  Q    Okay.  And when did you first become employed by the DIA

23  Corp.?

24  A    February 1st, 1999.

25  Q    Okay.  Were you hired into that Vice President role?

1  A    It was the -- the same role under a different title.

2  Q    Okay.  And -- and when did you become the COO and -- and

3  executive VP?

4  A    In 2008.

5  Q    2008.  What are your duties and responsibilities as COO

6  and executive VP?

7  A    They're rather broad.  I supervise several departments

8  directly.  Building operations is one of them.  Building

9  operations includes security, visitor services, those are the

10  front line people, the ticket takers and coat checks,

11  volunteer services, and building maintenance.

12      I also supervise the development department which is

13  responsible for all the museum's fund raising.  I supervise

14  organizational development and human resources.  I supervise

15  the exhibitions department which is responsible for the

16  logistical side of all of the exhibitions that the museum

17  presents.

18      I supervise marketing and communications which also

19  includes the web site and social media.  I supervise public

20  programming which is all the programming that the museum does

21  outside of direct educational programming.

22  Q    Okay.

23  A    I think that's it.

24  Q    Thank you.  Do you have any role with respect to museum

25  governance?

1 A    I do.  I am primarily the primary person responsible for

2 board relations.  That means that I plan five annual board

3 meetings.  I do the agendas, I pull together the supporting

4 materials, I do all of that.

5       I also attend all board committee meetings.  There are 11

6 standing committees and sub committees.  I also have direct

7 responsibility for the governance and nominating committee and

8 that is the committee that selects -- identifies and selects

9 potential candidates for board membership.

10 Q    Okay.  And do you have any role with respect to donors or

11 donor relations?

12 A    Well, I supervise the development committee.  So I have a

13 direct role in that sense.  But I would say that everything we

14 do is donor relationship.

15 Q    Do you have any role with respect to museum finances?

16 A    I do.  I -- with working with the CFO and the director,

17 we put together a budget for the museum every year.  We manage

18 that budget.  I sit on the investment committee and look at

19 the investment prospects of the museum and manage that as

20 well.

21 Q    Do you have any role with respect to the museum's art

22 collection?

23 A    My major role is in connection with the exhibitions

24 department.  We, as I said, do the logistical side of the

25 exhibitions.  That goes from the inception of an idea which is

1  usually presented by a curator to a group of people.

2      The -- the idea is approved and then we go through a

3  series of steps over several years that results in an

4  exhibition.  So I have a great deal of direct contact with the

5  curatorial department in that sense.

6  Q    Is there something called the collection committee as

7  well?

8  A    Yes.  I attend the collections committee.  The

9  collections committee is a board committee that is charged

10 with accepting gifts into the collection, whether through

11 purchase, gift, or bequest.  And also charged with

12 de-accessioning works of art from the collection.

13 Q    Is there something called the steering team?

14 A    Yes.  There is a group called the steering interpretive

15 team which I sit on.  I have sat on that group since the early

16 two thousands.

17     The group was first formed when we were doing the

18 reinstallation of the entire museum collection.  And we were

19 divided into teams.  And the teams were charged with

20 developing the themes and the ways that those stories would be

21 told using objects in the collection.

22     Occasionally a team would not be able to come to

23 resolution on -- on an issue and so we formed the steering

24 interpretive team and it was our job to mediate those issues

25 among the teams.

1     When the reinstallation was finished we decided that

2  there was still a role for the steering interpretive team.  So

3  the steering interpretive team now approves all of the

4  exhibitions on the schedule, approves other displays of art,

5  approves works -- work in the permanent galleries, the

6  permanent collection galleries.  So we're deeply engaged with

7  the display of art in that team.

8  Q    Thank you.  Are you familiar with the term encyclopedic

9  museum?

10 A    Yes.

11 Q    What does that mean?

12 A    The -- an encyclopedic museum displays works of art from

13 early history through contemporary times of all cultures or of

14 most cultures.

15 Q    Is the museum -- is the Detroit Institute of Arts museum,

16 is that an encyclopedic museum?

17 A    Yes, it is.

18 Q    Okay.  Would you consider it one of the top museums of

19 that kind in the United States?

20 A    Based on collection we consider ourselves to be one of

21 the top six museums in the United States.

22 Q    Do you know how many visitors came to the museum this

23 past year?

24 A    Approximately 610,000.

25 Q    Okay.  Will you have the same number approximately this

1  year?

2  A    We are actually on track to do better than that this

3  year.

4  Q    Does the museum have members?

5  A    Yes.  The museum has about 30,000 member households right

6  now.

7  Q    And what is a member?

8  A    Members are sort of the foundation of our supporter base.

9  They purchase a membership in the museum that ranges from a

10 low of about $40,000 to a high annually of $25,000.  These

11 people purchase those memberships first of all to support the

12 museum, but also because they get benefits from their

13 membership.  Free admission is a benefit as is free exhibit

14 tickets.  They get discounts in the restaurants and store.

15 Q    Okay.  Are they an important part of your donor base?

16 A    They're absolutely critical to us.  Members are the first

17 people who attend exhibitions.  They're the ones who attend

18 the museum most frequently, two or three times a year.  They

19 are our closest family.

20 Q    Does the museum have volunteers as well?

21 A    We do.  We have about 700 active volunteers.

22 Q    And what do they do?

23 A    The volunteers do a wide variety of things.  They staff

24 our information desk.  They support our security guards by

25 walking through the galleries.  We call those gallery service

1  volunteers.

2      They do our public tour programs.  Some volunteers are

3  trained to help dust the treines and works of art in the

4  collection.  We -- it is not an exaggeration to say that we

5  couldn't really operate without our volunteers.

6  Q    And you have employees as well of course?

7  A    We do.

8  Q    How many employees do you have?

9  A    About 300 full and part time.

10 Q    Okay.  Does the museum provide any benefits or -- and

11 services to the community?

12 A    Well, by its very existence the museum provides a benefit

13 to the community.  We hold our -- our collection in trust for

14 the community and we provide a number of programs in a number

15 of different areas from education, to social services, to

16 professional services.

17 Q    Could you give the Court a thumbnail sketch of the type

18 of educational programs that the museum provides?

19 A    I will.  It's -- we -- we provide a lot of them.  Perhaps

20 we're best known for school programs.

21     We had about 60,000 students come through the building

22 last year.  Some on guided tours that speak to different areas

23 of the curriculum.  Those range from art to history, to social

24 sciences to Spanish language.

25     Other students came through on self guided tours.  We

1  provide on line curriculum and the teachers use those and can

2  guide their own students through the building.

3      We also provide a longstanding program in the museum and

4  one we're very proud of it's called the art discovery program.

5  That program was really started when schools started to lose

6  their entire art programs.

7      And it runs annually in three or four schools.  It

8  depends on -- on who is ready to do it.  And we take a group

9  of third to fifth graders, depending again on what the school

10 needs, through the museum for an intense period of time.  They

11 come in once a week for five or six weeks and they tour the

12 galleries and they get a chance to work in our art making

13 studio.

14     And that really is the critical moment for them because

15 they don't have art programs in their schools.  We've been

16 doing art discovery for years and years.  It's a long

17 established program we're very proud of it.

18     We also provide services to teachers.  This time of year

19 we are doing teacher open houses.  Teachers are welcome to

20 come in to the museum for free.  They can go on mini tours so

21 they can see what we offer their students.  We give them

22 educational materials and we talk with them about how we can

23 serve them better.

24 Q   Do you do any programs for non-student age but more the

25 adult range?

1  A    Yes, we do.  We believe that learning is lifelong.  And

2  we believe the museum helps facilitate that.  So we do a

3  number of adult programs.

4      We do lectures.  Some very serious art based lectures,

5  other less serious, more pop culture lectures.  We have a film

6  program, art films and foreign films that is longstanding and

7  we often do discussions after the films.

8      We have adult classes.  You can take an art making class

9  as an adult.  We do tours for adults on parts of the

10 collection.  We have a book club.  We have all kinds of things

11 for adults.

12 Q    I think you also mentioned social services type programs.

13 Can you explain to the Court in sort of a broad overview what

14 -- what you meant by that?

15 A    Since its inception the museum has been located in the

16 City of Detroit.  And we're very conscious of the needs of our

17 community.

18     And so we do a number of social services programs with

19 different organizations throughout the city.  Basically they

20 run through our art studio because we believe that creating

21 art is a good outlook for people.  So we've done programs with

22 the Dingell Veterans Hospital, serving veterans with PTSD.

23     We've done programs with the Piquette Center which is a

24 place for homeless veterans.  We do work with Mariner's Inn

25 and the Harbor Lights Center which serves men recovering from

1  addiction issues.

2      In the past we've done some work with the Children's

3  Center which is a -- a social service organization that serves

4  troubled children.

5      So we have a -- a pretty wide ranging program there.  And

6  we also do less intense programs, but for instance we are in

7  Children's Hospital every week and we do bedside art making

8  with kids who are stuck in hospital beds for long periods of

9  time.

10      And as a result of the success of that program, we begin

11  working with their dialysis unit for children who have to come

12  in and have dialysis every week.  We do a photography program

13  and have done small exhibitions in the hospital from that

14  program.

15  Q   Does the museum do anything -- yes, feel free by the way,

16  to have a drink while we're doing this.  Does -- does the

17  museum provide any services to other art museums or other

18  institutions of that kind in the community?  Sure.

19  A   Sorry, we have a lot to talk about.  Yes, we do.  We are

20  the largest museum in Michigan and we have greater resources

21  than most of our colleagues in the museum field.  So we feel a

22  great obligation to -- to help them out.

23      And we do that in a variety of ways.  One of course is by

24  loans from collection.  We have a very rich collection and we

25  can often help smaller museums by loaning them objects for

1  exhibition, or sometimes for long term loans in their

2  permanent collection galleries.

3      We also have a fully equipped conservation lab in the

4  museum.  So if another museum has a work of art that requires

5  some kind of treatment or repair, they can call us and we can

6  talk with them and see if we can help them out on that.

7      And then we do just general professional development

8  programs.  Our education department is noted for its

9  interpretation methods.  And we have shared those with others.

10 We have also shared our volunteer management system because we

11 have 700 volunteers, we're -- we're pretty good at managing

12 them after all this time.  So we provide a number of

13 professional services.  We're active with the Michigan Museums

14 Association and other professional organizations.

15 Q   If the museum didn't provide those services would these

16 other museums in -- in the state have an ability to get those

17 services?

18 A   I think they would, but they probably would not get it at

19 little or no cost which is generally what we provide.

20 Q   Okay.  Does the museum do anything to sort of broaden its

21 reach or -- or to access more or present more of its artwork

22 to the community?

23 A   We do.  We --

24 Q   Can you tell the Court a little bit about that?

25 A   Absolutely.  We -- we feel very strongly that even though

1  we're located in the Cit of Detroit, by virtue of the way our

2  region has spread, we also serve the suburbs as well.

3      And one way that we decided that we would better engage

4  the suburban community is through a program called inside out.

5  We started it on the museum's 125 anniversary as kind of a low

6  cost way to celebrate our anniversary.

7      And we began producing high quality reproductions of some

8  of the masterpieces in the museum collection.  And we've

9  framed them beautifully and then we hung them in unexpected

10 places in the tri-county area.

11 Q    What do you mean by that, unexpected places?

12 A    You might be walking down a trail in a park and all of a

13 sudden you'd see a beautifully framed photograph.  You might

14 be walking through an urban area and see a picture on a wall

15 in an alley.  Just places where you wouldn't ordinarily expect

16 to see a beautifully framed work of art.

17     The program was so popular after our 125th anniversary

18 that we continued it and it is now I believe in it's fifth

19 year.  And it shows no sign of slowing up.  And we've changed

20 it up a little bit so that we now do it in communities.

21     So a community will get seven or eight works of art.  And

22 we work with the community to do programming around that.  We

23 do things like walking tours or bike tours.  In the fall we've

24 done Halloween tours.  We do all kinds of things to better

25 engage people with the art.

1      But it's important to remember that looking at a

2  reproduction is not enough.  And so every work of art carries

3  a tag that has a small fact about the work of art and

4  encourages people to come back to the museum to see the

5  original.  Because you cannot replace that primary experience.

6  Q    Are there other institutions in this community that are

7  similar to the museum?

8  A    Detroit is really blessed with a wonderful cultural

9  community that I hope everyone takes advantage of.  We have

10  the Michigan Opera Theater, the Detroit Symphony Orchestra.

11  Right behind our museum we have the Charles Wright museum of

12  African American History.  We have the Michigan Science

13  Center.  And -- and the Historical Museum.  And that's just in

14  the downtown area.  So I think that we're -- we're very

15  fortunate in -- in having all those institutions.

16  Q    Are there other opportunities for people in this

17  community to benefit from the same type of programs and

18  services that the museum provides?

19  A    I think there are, but perhaps I'm -- certainly I am

20  biased.  But I think we have the opportunity to do those

21  programs with greater richness and depth principally because

22  we have such an amazing collection.

23  Q    What is the -- the annual budget of the museum?

24  A    Our annual budget this fiscal year is $32,000,000.

25  Q    And how are the operations funded?

1  A    We are lucky enough currently to have a tri-county

2  property tax that goes to museum operations.  That accounts

3  for about $22,000,000 annually, about 75% of the budget.  The

4  other 10,000,000 is fund raised primarily.

5  Q    Okay.  And -- and when you say fund raised, what -- what

6  do you mean by that?

7  A    We go out and raise funds from individuals, corporations,

8  and foundations to support the museum operations.  There's a

9  very small revenue generating line as well, but we are a

10  non-profit organization.  We don't generate very much

11  revenues, less than 3% of the budget.

12  Q    Okay.  And does the city provide your operational

13  fundings?

14  A    Not currently.

15  Q    And has that always been the case over the course of say

16  -- well let me -- let me step back.  There -- there is an

17  operating agreement, is there not, between the city and the

18  DIA Corp.?

19  A    Yes.

20  Q    And how long has that been in existence?

21  A    It was finalized in 1997.  I believe it was signed

22  formally in 1998.

23  Q    Okay.  So has the city during that period ever provided

24  any funding to support operations?

25  A    Periodically the city provided some funding.  I think it

1  might have amounted to a few million dollars over that time.

2  Q    Okay.  Would you mind pulling up Exhibit 301?

3          MR. O'REILLY:  And this is one of the ones that we

4  had reached agreement on, Your Honor.  If I may publish it to

5  the witness.

6  Q    Do you recognize this document, Ms. Erickson?

7  A    Yes, I do.

8  Q    Okay.  If you could go to the second page of this,

9  please.

10  A    Uh-huh.

11  Q    Does this document reflect where and how much the city

12  has provided over the period of this operating agreement?

13  A    Yes, it does.

14  Q    Okay.  Where -- where can I find that?

15  A    If you look at the second column in city operations

16  support.

17  Q    Okay.  So it's approximately -- down at the bottom it's

18  approximately 1.3% of the operational support over the period

19  of time from '98 until the present?

20  A    That's correct.  Not quite $6,000,000.

21  Q    You've talked a little bit about donations of funds.  Are

22  those donations made to the city?

23  A    No, they're made to the DIA.

24  Q    You can take that down.  Thank you.  You spoke about the

25  county millage.  And I think you said that about twenty-one or

1  22,000,000 came from the county millage?

2  A    A little over twenty-two.

3  Q    Okay.  What's the duration of time in which you will have

4  that millage available?

5  A    We have ten years of millage availability.  And then we

6  can go back and ask for renewal.

7  Q    Were you involved at all in the -- the effort to have the

8  millage passed?

9  A    Yes, I was.

10  Q    Tell the Court a little bit about your involvement.

11  A    I was part of the group that formulated the millage

12  strategy.  We looked at a number of options to stabilize the

13  museum's finances.  And as much of a long shot as it seemed at

14  the time, we decided that going for a property tax was

15  probably our best option.

16      So from the time that we began approaching the state

17  government for enabling legislation through the actual vote in

18  August of 2012, I was part of the core team that developed and

19  implemented the millage strategy.

20  Q    And during that -- so there were three counties, correct?

21  A    Yes, Wayne, Oakland, and Macomb.

22  Q    And did you work with any representatives of those

23  counties?

24  A    Yes.  It was a lot of discussion and meetings to talk to

25  them about why we needed the millage and what the millage

1 would do.  I was primarily engaged with Oakland and Macomb

2 counties and had some engagement with Wayne, but not as much.

3 Q    Were there any concerns associated with the millage?

4 A    Yes, there were.

5 Q    Tell the Court a little bit about what those concerns

6 were.

7 A    There were two concerns primarily.  One was that the --

8 the property tax was designed to support operations at the

9 museum.  And the county commissioners were very concerned that

10 that be the only thing that those tax dollars be used for,

11 that they go directly to the museum and be dedicated to the

12 museum.  So safeguarding those funds was a major concern for

13 them.

14      The second concern as I said, we were getting this

15 legislation in 2011, 2012 and it was no secret that the city

16 was not in great financial shape.  And so several of the

17 county commissioners raised the issue of the possibility of a

18 sale of art.

19 Q    But those concerns were addressed?

20 A    Yes, they were.

21 Q    And the -- the millage was passed?

22 A    Yes.

23 Q    Okay.

24 A    Heavily.

25 Q    So how were the concerns addressed?

1  A    We set it for the -- in the first case we set up in each

2  county an art institute authority.  That authority actually

3  contracts with the DIA to transfer those tax funds.  The

4  actual transfer is done by the county treasurer, but all the

5  other work goes through the authority and the DIA.

6       The funds can only go to the DIA.  If they go anywhere

7  else, the county has a shut off valve.

8       And in the second case, we worked very closely with Mayor

9  Dave Bing who was Mayor of the City of Detroit at the time.

10 And he was very supportive of our efforts to get a millage to

11 support the museum.  And he wrote a letter to the county

12 commissioners and in that letter he stated that the city held

13 the collection in trust for the public and art would not be

14 sold.

15       MR. MCCARTHY:  Objection, Your Honor, move to strike

16 the testimony as hearsay.

17       THE COURT:  Overruled.

18 Q    Could you pull up Exhibit 344?  And does this appear to

19 be the letter you just spoke to?

20 A    Yes, it does.

21 Q    Okay.  Do you know which paragraph in there that you

22 referred to that talked about the protection for the museum

23 art collection?

24 A    It's the second to last.

25 Q    Okay.  Would you mind blowing that up, please?  And so is

1 this the language that you spoke of?

2 A    Yes, it is.

3          MR. MCCARTHY:  Your Honor, we object.  A continuing

4 objection based on hearsay.  This is a statement being offered

5 to prove the truth of what is in the statement from Mayor Bing

6 in an undated letter and an exhibit that is not in evidence.

7          THE COURT:  The objection that the letter is not in

8 evidence is sustained.

9          MR. O'REILLY:  It actually is, Your Honor.  It's one

10 of the stipulated -- it's one of the documents that Syncora

11 had objected to but they're no longer in.  FGIC had not raised

12 a hearsay objection, so I do believe it comes in.  And in any

13 event it falls into an exception of the statement of intent

14 regarding what the city would do.

15          MR. MCCARTHY:  Your Honor, those are two separate

16 things.  But if it's coming in simply to establish that the

17 DIA had some expectation and based on this statement, but if

18 it's coming in to prove the truth of what the writer of this

19 letter states, then it is certainly hearsay and cannot come

20 into evidence.

21          MR. O'REILLY:  Your Honor, it's --

22          THE COURT:  I assume it's being offered to

23 demonstrate the statement that the Mayor made to the counties,

24 to the recipients of the letter.  All right.  For that purpose

25 it is not hearsay and is therefore admissible.  So you may

1  proceed.

2          MR. O'REILLY:  Thank you.  And you can take that

3  down.

4  Q    I'd like to talk a little bit about the museum art

5  collection now if I could.  You're familiar with it, I'm sure,

6  correct?

7  A    Yes.

8  Q    Okay.  Are you familiar with the Diego Rivera murals?

9  A    Yes, I am.  The Rivera murals are probably what the DIA

10 is best known for though we have many --

11 Q    Why don't you pull up 703 for me, demonstrative 703.

12 A    You should get to see them.  We are known for many

13 things.

14 Q    Does that -- does that appear to be them?

15 A    Yes.

16 Q    Okay.

17 A    This is Rivera court.  These are the Detroit industry

18 murals by Diego Rivera.  Rivera considered them to be one of

19 his finest works of art.

20     And we really consider them to be the heart of our

21 museum.  I don't know that there is another work of art that

22 speaks so deeply and closely to what a city is and does as

23 this work does.

24     (City Exhibit 703 was identified)

25 Q    How -- how is -- how are these murals financed?

1   A    At the time the museum had a very visionary director,

2   William Valentiner and he saw Rivera's work and was very

3   interested in it.

4        And the museum also had a major and very wonderful patron

5   in Edsel Ford.  And Edsel Ford offered to fund these murals.

6   Originally Rivera was only contracted to do the two large

7   walls that you see, but he became so enthralled with the

8   project that he presented a program for the entire court.  And

9   Edsel Ford extended his funding to cover the entire court.

10  Q    Okay.  And is Mr. Ford featured somewhere in -- in those

11  murals?

12  A    He is.  You can't see him in this picture, but there is a

13  panel that features both Director Valentiner and Edsel Ford.

14  Q    Okay.  Thank you.  Could you pull up demonstrative 702,

15  please?  Do you recognize this image?

16  A    I do.

17  Q    Okay.  What is it?

18  A    This is the Postman by Vincent Van Gogh.

19       (City Exhibit 702 was identified)

20  Q    Okay.  Can you tell me a little bit about that work?

21  A    This is a major painting in our impressionist collection.

22  It was given to the museum by Josephine Ford who was another

23  incredibly generous supporter of the museum in her life.

24            MR. O'REILLY:  Your Honor, I'd move to introduce

25  these as demonstratives.

1    MR. MCCARTHY:  No objections for demonstrative

2  purposes, Your Honor.

3    THE COURT:  They're not already in evidence?

4    MR. O'REILLY:  These are -- these are -- these

5  images are not, no.  But they do appear elsewhere in documents

6  that have already been admitted.

7    THE COURT:  Okay.  They are admitted.

8    (City's Exhibit 702 and 703 were admitted)

9    THE COURT:  By the way the exhibit sticker is not on

10  the original, is it?

11  A    I hope not.

12  Q    A lot of art jokes this week.  How many objects are in

13  the museum art collection?

14  A    Approximately 60,000.

15  Q    And how were they acquired?

16  A    Primarily through gift or bequest.  Some were purchased

17  by the museum but the vast majority of works at American

18  museum -- in museums come to the museums through gift or

19  bequest.

20  Q    Okay.  And you said I think purchased as well.  Where did

21  the -- those funds come from?

22  A    Most of -- all of the funds come from donors who restrict

23  those funds for the purchase of art.

24  Q    Okay.  Did -- did there come a time when the city did

25  appropriate funds to acquire artwork as well?

1  A    Yes.  At one point in time early in the museum's history.

2  Q    Okay.  Do you know around when those appropriations

3  ceased?

4  A    I believe it was in the early 1950's.  I'm not certain of

5  the exact year, 1954 perhaps.

6  Q    Okay.  And how many of the pieces of art in the DIA

7  collection were acquired with using city funds?

8  A    Approximately 2,800.

9  Q    So would it be fair to say the remainder was either

10  acquired by bequest, or by gift, or by purchase using donated

11  funds?

12  A    Yes.  And I would say that even some of the works that

13  are credited to the City of Detroit, the funds were commingled

14  from a very generous group of donors at that time as well.

15  Q    And you talked a little bit about donated funds.  And I

16  think you said some of them are restricted.  What -- what did

17  you mean by that?

18  A    The donor will set aside a fund and restrict the use of

19  that fund.  And also any income that is earned from that fund

20  is similarly restricted.  Generally what they will do is

21  restrict the use of the fund to purchases of works of art from

22  an area that they're interested in.

23       So it might be American art, it might be European art, it

24  could be African art, it could even be as specific as a time

25  frame, or a type of work like impressionist art.

1  Q    Okay.  And are those accounts maintained by the museum?

2  A    Yes, they are.

3  Q    Are they city accounts?

4  A    No, they're accounts with the DIA Corp.

5  Q    Ms. Erickson, are you familiar with a system known as TMS

6  or The Museum System?

7  A    Yes, I am.

8  Q    And what is that?

9  A    The Museum System is a collections management data base

10  that we use to track the collection.

11  Q    And who -- who might use that system?

12  A    It's primarily used by the registrars.  They are

13  responsible for collections management in -- in that sense.

14  But it's also used by curators and -- and others.

15  Q    Do you -- do you have occasion to use it as well?

16  A    I do, but not frequently.

17  Q    Okay.  Have you ever seen a print out from TMS?

18  A    Yes, I have many times.

19  Q    Would you mind pulling up trial Exhibit 295, please?

20  Okay, if you could go to the next page.  Try a different page.

21  Let's find one with an image on it.  One more.  There we go.

22  Does this appear to be a print out from the TMS system?

23  A    Yes.  This is a basic print out.

24  Q    Okay.  Highlight a couple of those there.  And will this

25  tell you how a work became part of the collection?

1  A    Yes.  You can see there's a line that says gift of

2  Frederick Sterns.

3  Q    Okay.  So this would have been a gift to the museum of --

4  A    Arrowheads, battle axe.

5  Q    A battle axe.  Okay.  Are there other -- and I'm sorry,

6  and does that have a name, that line that says gift of

7  Frederick Sterns?

8  A    Yes.  That's known as the credit line.

9  Q    Okay.  And -- and does -- does that information appear

10  anywhere else?

11  A    Yes.  We honor donor gifts to the museum publicly when

12  those works are on display.  And we use what we call a

13  tombstone label that appears next to each work of art.  It

14  contains the same basic information and the credit line.

15  Q    I see.  Thank you.

16  A    And it also would appear in numerous other documents in

17  the museum.

18  Q    Oh, I see.

19  A    Publications, things like that.

20  Q    I see.  So it's fairly common for you to have a credit

21  line that reflects how it comes into the collection?

22  A    It -- yes, absolutely.

23  Q    Okay.  Ms. Erickson, are you familiar with the accession

24  and deaccession process?

25  A    I am.

1  Q    So, I want to break those two up and start with

2  accession.  What does accession mean?

3  A    Accessioning is the formal process through which objects

4  come into the museum's collection.

5  Q    So can you explain for the Court a little bit about how a

6  donated work might come into the collection?

7  A    Donated works are generally the result of a long

8  cultivation period between the museum and a donor.  The donor

9  who give works of art to the museum are obviously art

10 collectors, they're familiar with the museum, they know many

11 people in the museum.

12      They probably have developed a relationship with the

13 curator or the director, or one of the development officers.

14 So that relationship matures over time until the donor is

15 prepared to actually make the gift to the museum.  At that

16 point in time we enter into a deed of gift with the donor.

17 Q    Okay.  And are all objects brought to the museum accepted

18 into the collection?

19 A    No, I would say that we're very particular about what we

20 accept.

21 Q    And why is that?

22 A    Because it's our job to steward the collection.  And

23 stewarding the collection means that we accept only the finest

24 when we can.

25      There are always exceptions to every rule.  Occasionally

1  we have accepted a donor's entire collection because there

2  might be one or two really fine works in that collection that

3  we would like to have and the rest of the collection comes in

4  as well and is accessioned.  But for the most part we're --

5  we're very particular about what we accept.

6  Q    And are these donations to the city, or -- or to the DIA

7  Corp.?

8  A    Oh, they are to the Detroit Institute of Arts.

9  Q    By being accepted into the museum art collection, does

10  that impose any duties or -- or responsibilities on the

11  museum?

12  A    It imposes many.

13  Q    Can you tell the Court a little bit about what that is?

14  A    Certainly.  When we take a work into the collection we

15  agree to steward that work of art.  Possibly in perpetuity,

16  not always, but possibly.

17       That means that we care for it, that we display it when

18  appropriate, that we do appropriate scholarly research on it,

19  and it comes into the museum under the umbrella of protecting

20  it for the public.  We operate in public trust and this work

21  comes in to benefit the public.

22  Q    You also -- you also said you're familiar with the

23  deaccession process.  What's -- what is a deaccession?

24  A    The reverse.  The deaccessioning process is the sale or

25  release of a work of art from the museum's collection, the

1  formal process.

2  Q    And why would the museum have cause to do that?

3  A    Well, as I said, we are stewards of the collection.  And

4  prudent collection management dictates that occasionally you

5  look at the collection, actually it's done on an ongoing

6  basis, less formally.  And decide what belongs in the

7  collection, what continues to belong in the collection, what

8  might not be of as much use in terms of telling the stories

9  the museum wants to tell to the public, and fashions change,

10  tastes change, particularly in the contemporary art area.  So

11  you might decide that it is a better use of storage space and

12  of museum staff effort to deaccession a work of art.

13  Q    All right.  And can you give us a thumbnail sketch about

14  how that deaccession process works?

15  A    It's a very rigorous process because accessioning is a

16  rigorous process.  And you're unwinding that process.  But

17  essentially what you do is you begin first with research.

18       The curator identifies the work of art that he or she

19  would like to deaccession and then they begin to research

20  that.  And that means going through any number of files in the

21  museum.

22       They would probably start in the registrar's office with

23  the object files.  They would go to the donor files.  They

24  might go to the development office to see if there were other

25  donor files there.  Every curatorial department keeps

1  curatorial files.  They would likely go through there.

2      If it's a work that came into the collection years ago,

3  they might go into the archives and look at director's files.

4  So there are a number of things to do.

5      That's to determine if there are any other restrictions

6  beyond our umbrella restriction of holding works in the public

7  trust.  Once that's satisfied, if the donor is still living,

8  we would contact the donor and let them know that we are

9  considering deaccession or moving through that process.  And

10  if the donor is not living, we would attempt to contact the

11  donor's heirs, either again directly by phone, or by

12  registered mail.

13      Once it's gone through that process the deaccession works

14  are presented to the collections committee and they must

15  approve the deaccessioning as must the board of directors.

16  Q    And if it's approved, then what happens?

17  A    Then we contact an auction house and the work is offered

18  for sale.

19  Q    Okay.  And if it is in fact sold, what happens to the

20  proceeds from the sale?

21  A    Those proceeds come back to the museum.  They are used to

22  purchase another work of art in the department where the

23  deaccessioning occurred.  So if it was the American art

24  department, it would go back to American art.  And when

25  another work is bought with those proceeds, the donor is

1 listed in the credit line and the technical term is in

2 exchange or by exchange.

3 Q    Okay.  And -- and I just want to be clear.  So the

4 proceeds come back.  Are they kept in an account?

5 A    Yes, they are.

6 Q    Until they're redeployed if you will and -- and

7 re-credited to a donor?

8 A    Yes.

9         MR. MCCARTHY: Objection, Your Honor, leading.

10         THE COURT:  Sustained.

11 Q    Are those accounts DIA Corp. accounts?

12 A    They are DIA Corp. accounts assigned to the relevant

13 department of art.

14 Q    Now the process that you have described for accession and

15 deaccession, is that set forth anywhere in any policies?

16 A    Yes.  It's detailed in our collections management policy.

17 Q    Okay.  Could you pull up trial Exhibit 267, please?  All

18 right.  Does this appear to be the collection management

19 policy?

20 A    Yes.

21 Q    Okay.  Thank you.  And does that provide additional

22 detail on the process that you just described?  Okay.

23 A    It's fairly exhaustive, yes.

24 Q    So does the DIA Corp. or the museum have any

25 responsibilities or duties respect to the museum collection as

1  a whole?

2  A    Yes, we do.  We hold the collection in trust, we steward

3  it, we care for it, we display it.

4  Q    And -- and does that involve -- what does that involve

5  exactly?

6  A    It involves bringing works of art into the collection.

7  It involves letting works of art out of the collection.  It

8  involves the display of the works either in the permanent

9  collection galleries or through the exhibition programs.  It

10 involves scholarly research on the works using them in

11 exhibitions, promoting the works.

12 Q    And for whose benefit is this done?

13 A    This is done entirely for the benefit of the public.  It

14 is absolutely foundational to museums.  It is the core of what

15 we do.  That we hold our collections in trust for the public.

16      When the DIA was facing dire financial circumstances, we

17 never considered selling works of art to prop up the

18 operations budget.  It was always find another way because

19 those works are held in trust.

20 Q    And the DIA does go out and solicit gifts, correct?

21 A    Yes, we do.

22 Q    Okay.  Does it do it to benefit itself?

23 A    No.  We do it to benefit the public.  We -- everything we

24 do is really for the public's use of the museum.

25 Q    So you've talked a little bit about the fact that you

1  believe it's held in trust.

2  A    Yes.

3  Q    Okay.  Is that set forth in any documents in the museum?

4  A    Dozens of them.  You can go back to the founding of the

5  museum, the documents that -- around the founding of the

6  museum in 1885 and they talked then about the fact that they

7  were formulating the museum for the public.  It's carved in

8  the front of our building, dedicated to the citizens of

9  Detroit for the enjoyment and knowledge of art.

10      It's again reaffirmed in the 1919 documents that

11  transferred responsibility for the museum from the founding

12  members to the City of Detroit.  It's in dozens of board

13  minutes, in director's files.

14  Q    So -- so are there any documents that you work with on a

15  day to day basis that support this trust responsibility?

16  A    The document on the screen, the collections management

17  policy.

18  Q    Could you turn to Page 11 of that document, please?  And

19  if you could highlight 5-A the first two lines there.  Thank

20  you.  And can you tell me where -- where we might find that in

21  this paragraph?

22  A    Second sentence.

23  Q    Okay.  What does that say?

24  A    In considering objects or groups of objects, the museum

25  must be ever aware of its role as a trustee of the collection

1  for the benefit of the public.

2  Q    When donors give are they told that the city can

3  liquidate or use artwork for whatever purpose they want?

4  A    Would they?

5  Q    Are they told -- are donors told this?

6  A    No.  That -- that the implicit assumption is that they

7  are giving to be held by the museum in trust.

8  Q    Are you aware of any public statement by the city where

9  it advised the public that it had this ability to take gifts

10  and sell them and use them for whatever purpose it wanted?

11  A    No, I am not.

12          MR. MCCARTHY:  Objection, Your Honor, it calls for

13  hearsay.

14          THE COURT:  Overruled.

15  Q    Are you familiar with the term restricted or

16  unrestricted?

17  A    Yes, I am.

18  Q    Okay.  What does that mean in museum parlance?

19  A    A restriction dictates how you can use a gift, whether it

20  be a work of art, or a cash fund.  Unrestricted means that the

21  use of the cash or the gift is up to the museum's board of

22  trustees or governance board.

23  Q    Okay.  And you spoke about the funds there, I think.

24  A    Yes.

25  Q    Does it apply to objects as well?  Gifts of objects?

1    A    Yes.

2    Q    Okay.

3    A    Yes.

4    Q    Can you tell me a little bit about that?

5    A    About unrestricted gifts?

6    Q    Uh-huh.

7    A    Well, they're a -- that's a little less clear cut because

8    every gift we consider comes into the collection with a

9    restriction.  And that restriction is that the gift cannot be

10   sold for any purpose except to enhance the collection.  So you

11   can't sell a work of art except to buy another work of art.

12        That is an umbrella restriction that we operate under.

13   Beyond that, we try to get gifts given to the collection as

14   unrestricted as possible.

15   Q    And why is that?

16   A    You -- we assume that we hold gifts in perpetuity.  And

17   if you guarantee to a donor that you will always display that

18   work of art that means that you are binding future generations

19   to always display that work of art.

20        So we try not to do that.  As in all cases and especially

21   with a museum that's 130 years old, I'm sure there have been

22   exceptions to that rule.  But aside from the umbrella

23   restrictrion we really try not to restrict gifts of art

24   further.

25   Q    Okay.  Other than what you just described, are there

1  other restrictions such as donor restrictions?

2  A     Oh, donors often will --

3  Q     Okay.  Any other besides that?

4  A     There can be restrictions against sale.  Probably the

5  most obvious that -- that I know of and I don't know all of

6  them, is the restrictions on the Tannahill bequest.  That's

7  one of the major bequests to the museum.  It's 500 works of

8  art of incredible quality.  And that carries a very definitive

9  restriction in Mr. Tannahill's Will.

10  Q    Can you pull up trial Exhibit 252, please?  And go to

11  Page 2 which may be Page 3 of this document.  All right.  Do

12  you -- do you recognize this document?

13  A     I do.

14  Q    Okay.  And could you blow up Article 3 there?  And is

15  this the -- the restriction that you just spoke of with

16  respect to the Tannahill collection?

17  A     Yes, it is.

18  Q    Okay.  And what -- what does it say there with respect to

19  that restriction?

20  A     It's about midway through and it says, said non-profit

21  corporation and the Detroit Institute of Arts an

22  instrumentality of the City of Detroit, both shall make a

23  written commitment in form of -- in form acceptable to my

24  executors to the effect that the said collection in toto will

25  be permanently retained at the Detroit Institute of Arts with

1  no right or reservation on the part of said non-profit

2  corporation and Detroit Institute of Arts, or either of them

3  at any time to sell or otherwise dispose of said collection or

4  any part thereof.

5  Q    Okay.  Now I think you said that it applied to about 500

6  works.  So it's a pretty small number, isn't it?

7  A    It is a small number, but it's a significant part of the

8  collection.

9  Q    What do you mean by that?

10 A    Mr. Tannahill was a very accomplished collector with a

11 wonderful eye.  The collection includes works by Degas,

12 Renoir, Picasso, Cezanne, Van Gogh.  It's an amazing

13 collection.  Also American silver pre-Columbian works.  He

14 really was a very eclectic and -- and fine collector of art.

15 Q    Besides the Tannahill collection -- you can take that

16 down, thank you.  Are there any other restrictions that you

17 can think of imposed by donors?

18 A    There are a few that I can think of.  I -- I certainly

19 don't know all of them.  But one of them is a very popular

20 folio of photographs by a photographer named Yusef Karsh.  And

21 we have agreed to keep that entire folio in the collection or

22 we lose the entire thing.

23       There is a beautiful tintoretto ceiling painting that was

24 actually painted for a ceiling very similar to the one in the

25 DIA that was given to us by the Italian government.  If we

1  ever attempt to remove that from the museum it would be

2  repatriated.

3       We also have a -- a less stunning work -- collection of

4  works from the WPA which are actually owned by the U.S.

5  Government.  And if we were to let go of those, they would go

6  back to the government.  We hold them in trust.

7  Q    Okay.  Of the 60,000 works in the collection do you know

8  how many bear this type of restriction?

9  A    I don't.

10 Q    Why -- why is that?

11 A    Generally you don't look at restrictions unless you're

12 looking to deaccession a work.  We -- and we don't think that

13 we will deaccession works willy nilly.  So we really don't

14 look at restrictions in that sense.

15 Q    You recall we -- you recall that we talked about TMS

16 already?

17 A    Yes.

18 Q    Okay.  TMS is a data base, is that right?

19 A    It's a collections management data base.

20 Q    Okay.  Does that contain information about value?

21 A    It does.

22 Q    And what type of value information is contained?

23 A    Generally the TMS data base contains information on three

24 types of value.  The -- probably the one I've seen most often

25 is insurance value.

1    When a work of art goes out on loan we insure that work.

2  And so we assign a value to it.  But other values that can be

3  in the data base include donor stated value.  When we accept a

4  gift into the collection we ask the donor to assign a value to

5  it for tax purposes primarily.

6    Sometimes that donor's stated value is entered into the

7  data base.  And then the final type of value that might be in

8  the data base is the purchase price of a work of art.

9  Q    Okay.  You mentioned I think insurance valuation.

10 A    Uh-huh.

11 Q    Does the museum go out and obtain like a formal appraisal

12 for a work of art?

13 A    Insurance -- no, I'm sorry to interrupt you.  The

14 insurance values are generally assigned by a curator because

15 the work is going out on loan.

16    So we don't do a formal appraisal on that, but the

17 curator might call a dealer or an auction house to see what a

18 similar work of art has sold for, or look in the files.  Or if

19 it's a work that's frequently loaned might just adjust it

20 accordingly.

21 Q    Does it -- does it happen that on occasion there might be

22 a formal appraisal?

23 A    I would say rarely.

24 Q    Okay.  Could you pull up 293, please?  Okay.  Do you

25 recognize this which is an Excel spreadsheet, but do you

1  recognize it?

2  A    Uh-huh.  Yes, I do.

3  Q    And what is it?

4  A    This is a spreadsheet that lists some of the most

5  valuable works in the collection.  The information is drawn

6  from TMS.

7  Q    Okay.  And it does have, I think on the right column H, a

8  value line, doesn't it?

9  A    Yes, it does.

10 Q    Okay.  And -- and is that where that -- those value types

11 that you talked about might appear?

12 A    Yes.

13 Q    Okay.  Could you scroll down to number 855?  Entry 855.

14 Okay.  I just want to look at this.  There is a column that

15 says object number.  Is that -- is that the DIA object number?

16 A    That's the accession number, correct.  That's how we

17 track the works in the collection.

18 Q    And you'll see the one that's highlighted.  It says

19 27.5861 and then if you go down one more it says, 2A.

20 A    Yes.

21 Q    Okay.  And I think, and you if you could just keep

22 scrolling down a little bit.  And just keep going.  So -- go

23 to 1355.  Well, actually just leave it there.  Actually go

24 down to 1355, please.

25      So -- so we've got this identical entry there.  Do you

1  see that?

2  A    Yes, I do.

3  Q    Okay.  We don't -- the museum doesn't have approximately

4  500 Nepalese manuscripts, does it?

5  A    No.  This is one of those instances why it's important to

6  understand the data base.  Essentially what the registrar has

7  done here is record every single page of the manuscript with a

8  separate object number.

9     I -- I would assume that this is not a bound manuscript.

10  And so it's important to track each separate page.  You will

11  see this occur occasionally in TMS.

12  Q    Okay.  So although 300,000 appears a value field --

13  A    It's for the entire --

14  Q    It's for the entire thing.

15  A    -- collection of pages.  One manuscript, many pages.

16  Q    I see.  Are all 60,000 objects in the -- and thank you.

17  You can take that down, please.  Are all 60,000 objects in the

18  collection sort of high quality or commercially significant?

19  A    No.

20  Q    Okay.  Why would that be?

21  A    The DIA has been collecting works of art for 130 years.

22  And tastes change, collecting tastes change.  As I mentioned

23  earlier, sometimes we will accept an entire collection that

24  might have only one or two really choice works in it, but the

25  donor wants us to accept the entire collection, so we do that.

1     Early in the museum's history, we took into the

2  collection many groups that are really considered study

3  collections.  Thinking that scholars might use them, or

4  students might use them to study, so they might be textile

5  fragments or pottery shards.

6     There is a -- a major collection we also saw earlier in

7  one of the examples of arrowheads, things like that.  So there

8  are many many things that are not of the quality that you see

9  on our gallery walls.

10 Q    Could you pull up demonstrative Exhibit 699, please?

11 Okay.  And can you just highlight that?  Thank you.

12     And do you recognize -- well, actually at the top it says

13 the new museum system.  Do you see that?

14 A    Yes, I do.

15     (City's Exhibit 699 was identified)

16 Q    Okay.  And underneath these objects are -- what are those

17 numbers there?

18 A    Those are the accession number for each object.

19 Q    Are these objects --

20 A    So these are all accessioned into the collection.

21 Q    Okay.  And is this the type of pottery shards that you

22 just talked about?

23 A    Yes.

24 Q    And could you pull up 700 and 701, too in sequence,

25 please.  So what -- what are we looking at here?

1   A    Here you're looking at fragments of lace that are also

2   accessioned into the collection.  You can see the numbers.

3        (City's Exhibits 700 was identified)

4   Q    Okay.  And can you pull up 701, please?  And what are we

5   looking at here?

6   A    Here you're looking at textile -- textile fragments.  It

7   looks like many of them are Islamic.

8        (City's Exhibit 701 was identified)

9   Q    Okay.  And these are some of the types of works that are

10  in the collection?

11  A    Yes.

12        MR. O'REILLY:  Okay.  Your Honor, I'd like to move

13  demonstrative Exhibits 699, 700, and 701 into evidence as

14  demonstratives.

15        MR. MCCARTHY:  No objection, Your Honor.

16        THE COURT:  They are admitted.

17        (City's Exhibits 699-701 were admitted)

18  Q    Ms. Erickson, you're familiar -- are you familiar with

19  the museum records?

20  A    Yes.

21  Q    Okay.

22  A    And there are thousands of them, so I am not familiar

23  with every single record, but I'm familiar with many.

24  Q    Can you describe some of the categories of records that

25  there are?

1  A    We are a museum.  We save lots of records.  Those records

2  primarily concern -- concern objects, also donor files.  The

3  curators as I said earlier have extensive records on objects

4  and scholarly research.  The development department has

5  records on donors and giving histories.  The finance

6  department obviously has financial records.

7      And then we have an extensive archives.  And the archives

8  contain everything from old board minutes to the files of

9  previous directors.

10 Q    Okay.  Are -- are all of them well maintained?

11 A    Many of them are well maintained, not all of them are as

12 well maintained as I would hope they are -- they would be.

13 Q    Thank you.  So if there were a sale of the museum art

14 collection, what effect would it have on the museum?

15 A    It would be a devastating blow to the museum.

16 Q    Can you tell the Court a little bit about that?

17 A    You can't untangle the museum and the collection, they

18 are one and the same.  Everything that we do is drawn from

19 that collection.

20     Every education program, every exhibition, every

21 publication.  We are the collection.  And as I said earlier,

22 safeguarding that collection and holding that collection in

23 trust for the public is the foundation of what we do.  Every

24 person who works at the museum takes that very seriously.  You

25 can't unwind the two.

1  Q     Would it have an effect on the millage?

2  A     Pragmatically speaking that's the -- I gave you the

3  emotional side. There's -- here's the practical side, yes, it

4  would have an effect on the millage.

5  Q     What type of effect would it have?

6  A     We have heard from public statements from the county

7  executives of both Oakland and Macomb counties that they would

8  stop millage payment if anything was sold.  I have personally

9  had conversations with the chairman of the Oakland County Art

10 Authority and with one of the deputy county executives of

11 Macomb County that --

12           MR. MCCARTHY:  Your Honor, I move to strike the

13 testimony as hearsay.

14           MR. O'REILLY:  Your Honor, 803(3), statement of

15 intent.

16           THE COURT:  I'll permit it.  Go ahead.

17 A     I have personally had conversations as I said with

18 Oakland County and Macomb County affirming that the millage

19 would be stopped if art was sold.

20 Q     Would it have an effect on donors?

21           THE COURT:  All right.  Counsel, I have to ask

22 you --

23           MR. O'REILLY:  Yes.

24           THE COURT:  -- once again to keep your voice up.

25 Q     Would it have an effect on donors?

1   A    It would have a tremendously chilling effect on donors.

2   I can tell you that since the beginning of Detroit's

3   bankruptcy our endowment campaign has ground to a virtual

4   halt.  We simply can't raise money while our future is in

5   question.

6       A sale of art would be even worse.  We would no longer

7   get gifts of art because they might be subject to sale.  And I

8   think the same thing would apply with cash.  If you can

9   liquidate works to pay debt or for another reason you can

10  certainly do that with cash funds.  So I -- I can't imagine

11  that donors would be willing to support us.

12  Q    And if the museum didn't have the millage or donor funds,

13  would it be able to continue to operate?

14  A    Absent the infusion of a huge amount of cash from

15  somewhere else, I -- I think it could not.

16  Q    The museum -- is the museum covered -- does it follow any

17  museum ethical standards or is it -- is there an accrediting

18  body that covers the museum?

19  A    Yes.  We are accredited by the American Alliance of

20  Museums.

21  Q    Okay.  And does that have any policies with regard to

22  sales of art?

23  A    It does.  And we also are members of the Association of

24  Art Museum Directors which has a stringent set of policies

25  regarding the sale of art.

1  Q    And what are -- what do those policies provide?

2  A    Essentially if a museum sells art for any other purpose

3  but to buy more art, they are excluded from the museum

4  community.  That may not seem like a big thing to the outside

5  world, but it's a very big thing to us.

6       We would not be able to borrow works of art to organize

7  exhibitions if we were excluded from the museum community.

8  Nor would we be offered exhibitions any longer.  So we would

9  be in the terrible position of not getting any exhibition

10  proposals and not being able to fully flush out our own

11  exhibition proposals.

12       In addition to that, we would be sanctioned from

13  participating in the scholarly activities that museums

14  participate in.  Visiting lecturers would no longer come to

15  our museum so that would -- would have a devastating effect on

16  that program.

17       Researchers would not come to the museum to look into our

18  collection.  We would essentially be persona non grata in the

19  museum world.

20  Q    Okay.  Did there come a time when you learned that the

21  city was considering its options with respect to the museum

22  art collection?

23  A    Yes.

24  Q    About when was that?

25  A    I believe it was spring of 2013.

1  Q     And -- and what did you learn?

2  A     We learned that the city was considering the possible

3  liquidation of the art collection to pay creditors.

4  Q     And did the DIA respond?

5  A     We did.

6  Q     How did it respond?

7  A     We affirmed that we hold the collection in trust for the

8  public.  We believe the city is a partner in holding that

9  collection in trust.  And we would defend the collection as

10  needed.

11  Q     In addition to that, did you make any other statements,

12  publicly or otherwise?

13  A     I -- we made many public statements.  We spoke with the

14  media about this.  It was reported in any number of media

15  outlets.  It was reported in our board minutes.  We were -- we

16  were very public about it.

17  Q     Was the DIA Corp. authorized to proceed legal action?

18  A     Yes, we were.

19  Q     Okay.  But it didn't do so, correct?

20  A     We did not do so immediately.  Although we don't have any

21  familiarity with the bankruptcy process, we were told it was a

22  long process and that there were many things that had to be

23  handled.  So we didn't pursue litigation immediately, although

24  we certainly prepared for that eventuality.

25  Q     And did there come a time when something called the grand

1  bargain was reached and I don't want to get into any of the

2  details of that, but did there come a time when that happened?

3  A     Yes.

4  Q     Okay.  And under that DIA settlement if you will, what's

5  the museum's financial commitment?

6  A     One hundred million dollars.

7  Q     And how is it doing at raising those funds?

8  A     It's not easy but we're doing very well.  We have

9  approximately $85,000,000 committed to that and we have

10 multiple asks that are still out there.

11 Q     And what's your level of confidence of being able to

12 raise the full amount?

13 A     I am completely confident that we will do it.

14 Q     What would the DIA Corp. do if the settlement wasn't

15 approved and if the collection was put in jeopardy?

16 A     I think at that point we would be in litigation to

17 protect the collection.

18 Q     And why would it do that?

19 A     Because we hold the collection in trust.  And we consider

20 that to be an obligation that we cannot shirk and if it meant

21 that we had to continue fighting legally for it, we would.

22        MR. O'REILLY:  Thank you, Ms. Erickson.  That's all

23 I have.

24        THE COURT:  Let me just ask -- one second.  Any

25 further questions on behalf of supporters of the plan, from

1    the city?

2             MR. CULLEN:  No, Your Honor.

3             THE COURT:  All right.  Cross examination.

4             MR. MCCARTHY:  Your Honor, Ed McCarthy with Weil,

5    Gotshal on behalf of FGIC again.  Just one moment.  We have

6    some binders to pass out.  May I approach?

7             THE COURT:  Yes.

8             MR. MCCARTHY:  Thank you.

9             THE WITNESS:  Thank you.

10                        CROSS EXAMINATION

11   BY MR. MCCARTHY:

12   Q    Hello, Ms. Erickson.

13   A    Hello, Mr. McCarthy.

14   Q    Nice to see you again.

15   A    Good to see you as well.

16   Q    Ms. Erickson, you're the COO.  And I just heard the

17   executive Vice President of the DIA Corp., correct?

18   A    Yes.

19   Q    Is executive Vice President, is that a new role?

20   A    No.  Actually that title -- the title is kind of merged

21   together, but in practicality I use COO because people

22   understand it.

23   Q    Thank you.  And when I say DIA Corp. I mean the

24   non-profit that runs the DIA museum, is that fair?

25   A    That's fair.

1  Q    Okay.  And you've been in that role as COO since 2008?

2  A    I have.

3  Q    And you've been employed by the DIA Corp. since 1999,

4  correct?

5  A    That's correct.

6  Q    And you had your deposition taken on July 22nd of this

7  year?

8  A    I did.

9  Q    And that was here in Detroit?

10  A    Yes.

11  Q    And you were deposed in your personal capacity, correct?

12  A    Yes.  And as a corporate witness.

13  Q    Right.  You sat as a corporate representative for the DIA

14  Corp., correct?

15  A    Correct.

16  Q    For a number of categories?

17  A    Yes.

18  Q    And at the time of your deposition, you did not believe

19  that you would be able to provide any testimony in this

20  bankruptcy regarding the value of the art at the DIA, correct?

21  A    Not exact valuations, no.

22  Q    Okay.  And you did not believe you would be able to

23  provide testimony in this bankruptcy on which pieces of art in

24  the collection might be owned by the city, or some other

25  entity, is that right?

```
 1  A    Again, beyond an estimate, no.

 2  Q    Okay.  And you had not researched personally --

 3            THE COURT:  Excuse me, counsel.

 4            MR. MCCARTHY:  Yes.

 5            THE COURT:  I'm going to ask you not to ask the

 6  witness what she previously testified to.

 7            MR. MCCARTHY:  Okay.

 8            THE COURT:  Ask her those questions straight.

 9            MR. MCCARTHY:  Understood, Your Honor.

10  Q    Currently, have you researched personally whether the

11  city at law could monetize or sell the collection at the DIA?

12  A    No, I have not.

13  Q    Thank you.  You're familiar with the DIA Corp.'s argument

14  that the museum collection is held in trust, correct?

15  A    Yes, I am.

16  Q    And that you actually served at your deposition, Your

17  Honor, as a corporate representative on that topic, right?

18  A    Yes, I did.

19  Q    And it's your belief as you sit here today that the DIA

20  Corp. holds that collection in public trust as opposed to a

21  charitable trust, correct?

22  A    To be truthful Mr. McCarthy, I never really understood a

23  distinction between charitable trust and public trust until

24  this bankruptcy proceeding.  I have always considered that we

25  hold the collection in public trust.
```

1  Q    And with respect to your understanding of the term public

2  trust, it's your position that the DIA like all museums holds

3  their collections in trust for the public, right?

4  A    Yes.

5  Q    And you believe that all museums give the term public

6  trust a special meaning in that they believe they hold their

7  collections in trust in public?

8  A    Yes, I do.

9  Q    And I believe you just said you believe that's

10 foundational to what you do at the -- at the DIA, correct?

11 A    Absolutely.

12 Q    But you personally outside of your lawyers haven't

13 conducted any diligence to determine whether the DIA is

14 organized in a manner that does create a trust, whether

15 charitable or -- or public, correct?

16 A    Beyond my basic understanding of a trust which is that

17 we, the DIA, holds an asset, the collection and buildings for

18 the benefit of another party, the public, no, I haven't done

19 any research into that.

20 Q    Okay.  And you haven't personally sat down with anyone,

21 and again outside of your lawyers to deliberate and try to

22 determine whether or not the collection is held in a public

23 trust, correct?

24 A    No, I have not.

25 Q    Okay.  And you're not familiar with any folder of

1  documents or category of documents that's in place

2  specifically filing wise at the DIA regarding whether or not

3  this museum is held in trust for the public, correct?

4  A    As I said, there are thousands of documents in the

5  museum.  I am not completely familiar with every single

6  document that might be in the archives.  There could be

7  something like that, but I don't have personal knowledge of

8  it.

9  Q    You're -- you're not aware of that specific set of

10  documents as you sit here today, correct?

11  A    I am not.

12  Q    Thank you.  Let's go back in time a bit to 1919.  You're

13  familiar with the transfer of assets from the DMA, which is

14  now called the DIA, to the city to be a public Act 67 of 1919,

15  right?

16  A    Yes, I am.

17  Q    And you actually sat as a corporate representative at

18  your deposition on that specific topic, right?

19  A    Yes.  I did address it.  I don't know everything about

20  it, but I did.

21  Q    Thank you.  If we could pull up City Exhibit 286.  And

22  that's in your binder at Tab A.  Ms. Erickson, if you'd like

23  to use the binder as opposed to the screen, that's up to you.

24            MR. MCCARTHY:  Your Honor, this piece of evidence is

25  -- this exhibit is in evidence already pursuant to your order.

1  Q    You've reviewed this document before right, Ms. Erickson?

2  A    Yes, I have.

3  Q    And you're familiar with the document?

4  A    I have a passing familiarity with it, yes.

5  Q    It's your understanding that this is the enabling

6  legislation that led to the transfer of assets from the DMA to

7  the city, is that right?

8  A    That's correct.

9  Q    Now this document is only a one page document.  It

10 doesn't use the term trust anywhere in it, does it?

11 A    I would have to read the entire thing.

12         MR. O'REILLY:  Objection, Your Honor.

13 A    I'm happy to do that if you like.

14         THE COURT:  What is -- what is the objection?

15         MR. O'REILLY:  Lack of foundation.  He's asking her

16 about the legal meaning of a statute.

17         THE COURT:  No.  He's only asking if one specific

18 word appears in it.  I'm not sure why we need testimony on

19 that, but I'll permit it.

20 A    I'm reading.

21         THE COURT:  Well, let me just ask you counsel.  Does

22 the word trust appear in it?

23         MR. MCCARTHY:  It does not include the word -- I

24 will proffer the Court --

25         THE COURT:  All right.  Then let's move on.

1        MR. MCCARTHY:  It does include the word public

2   trust, charitable trust, or trust fund.

3            THE COURT:  Okay.

4        MR. MCCARTHY:  The document can speak for itself on

5   that.

6   A    It does say that it will faithfully used for the purposes

7   for which such corporation was organized.  And in 1885, the

8   museum was organized to benefit the public.

9   Q    That's your view of -- of that, correct?

10  A    I believe that that is also contained in the 1885

11  documents.

12  Q    Thank you.  You're familiar with the minutes at the DIA,

13  correct?

14  A    Yes, I am.

15  Q    Okay.  And those minutes are housed in the DIA -- the

16  files that you've talked about here today already?

17  A    Yes, they are.

18  Q    And it's your understanding that when the collection was

19  transferred to the city in the 1920's there was -- there was a

20  request that that transfer include a reversion of title.  Do

21  you remember that?

22  A    I believe so, yes.

23  Q    And you -- you prepared -- you actually prepared to

24  testify a bit on that topic at your deposition, right?

25  A    Yes, I did.

1  Q    But you don't know one way or the other as you sit here

2  whether the reversion of title that was requested by the DIA

3  was actually accepted by the city and included in the deed of

4  trust that was -- that led to the transfer, do you?

5  A    I cannot say that definitively.  I would need to review

6  that document.

7  Q    If we could pull up FGIC Exhibit 3507, please.  And this

8  is in your binder at Tab B if you'd like to look at the full

9  document.  This is a June 18th, 1981 memo.  And it's from the

10 DIA files.

11          MR. MCCARTHY:  This document is also in evidence

12 pursuant to Your Honor's order.

13 Q    You've seen this document before, correct?

14 A    Yes, I have.

15 Q    Including at your deposition?

16 A    Yes.

17 Q    And it's from the DIA files, correct?

18 A    Yes, it is.

19 Q    And it actually says museum archives up in the top right

20 hand corner, correct?

21 A    Yes, it does.

22 Q    And this memo is to F.J. Cummings who is the former

23 director at the museum, right?

24 A    That's correct.

25 Q    And in the memo in the very first paragraph if we could

1  highlight there.  That starts with at your request.  The memo

2  states, at your request, I have researched the minutes and

3  correspondence of the board of trustees and art commission

4  regarding the conveyance of the collections to the City of

5  Detroit in 1919.  That's what this Detroit Institute of Arts

6  memorandum says, right?

7  A    That's correct.

8  Q    And it refers to the arts commission in that first

9  paragraph.  The arts commission is appointed currently by the

10 Mayor of the City of Detroit?

11 A    Yes, it is.

12 Q    And prior to that it was a department of the City of

13 Detroit, correct?

14 A    Yes, it was.

15 Q    And the commission oversees the DIA Corp.?

16 A    The commission insures that we are maintaining our

17 agreement with the city, yes.

18 Q    And at least based on the time frame since you've been at

19 the DIA and based on your personal knowledge, it's your

20 understanding that the arts commission has always served that

21 role, correct?

22 A    Since I've been at the DIA, that's correct.

23 Q    Okay.  Now Ms. Gauci represents in this memo that she

24 researched minutes and correspondence.  Individuals can and do

25 research the minutes and correspondence of the files at the

1  DIA, right?

2  A    We don't open the files to the general public.  You can

3  request to come in and look at our files through our research

4  library, tell the librarian what you'd like to see and she

5  will pull those files for you.  But it's not very common to

6  have people do that.

7  Q    You answered my next several questions.  Thank you very

8  much.  And scholars have an occasion to do that sometimes,

9  correct?

10  A    Scholars most -- most commonly.

11  Q    And there's specialists that are employed by the DIA

12  Corp., whether it be registrars or librarians that oversee

13  that process, correct?

14  A    Yes.

15  Q    Okay.  Moving back to the exhibit, this DIA memorandum,

16  halfway down the first page it starts with, if we could scroll

17  down, in the event it starts with.  If we could highlight that

18  paragraph, please.

19      And in this DIA memorandum it states, in the event that

20  the city failed in any or all of the conditions, the trustees

21  called for a reversion of title to the donors, i.e., the

22  museum.  This provision incorporated into the first deed of

23  conveyance was -- was presented to common counsel in June

24  1919.  It was unanimously rejected by the city.

25      That's what this DIA memorandum states, right?

1  A    That's what the document says.

2  Q    And that's what Ms. Gauci, according to this memorandum

3  concluded based on her research, right?

4  A    I would assume so.  I don't know Ms. Gauci.  I don't know

5  what research she did to reach this conclusion, but that's

6  what she wrote in her memo.

7  Q    Okay.  And if we turn to Page 2 of the memorandum.  The

8  memorandum also states, if we could blow up all those

9  paragraphs.  Thank you.

10     And the second sentence of the first paragraph it states,

11  in requesting the city to assume responsibility for the

12  museum, President Booth, and is that President Booth of the

13  museum?

14  A    Of the DMA, yes, uh-huh.

15  Q    DMA, thank you.  Cited lack of funds for its operation

16  and the intent to make conveyance at a later date.  And it

17  goes on in the next one briefly.  If you could highlight the

18  first sentence of the next paragraph, please.

19     The trustee subsequently authored the preparation of a

20  bill of sale for the art collection and personal property and

21  warranty deed for the real estate in which the reversionary

22  clause and conditions were eliminated.

23     That's what this DIA memorandum states, right?

24  A    That's what that section says, yes.

25  Q    And then finally, the -- the very last sentence of this

1  DIA memorandum which is dated 1981 states, that at the time of

2  the transfer, "Mayor Couzens commented that Detroit is to be

3  congratulated on securing over $2,000,000 of property at a

4  very -- very small cost".

5     That's what this memorandum states, correct?

6  A    That's what the memorandum states.

7  Q    Thank you.  Now, since the time of -- in between the time

8  of this memorandum which is 1981, and the time -- right yes,

9  1981, the memorandum.  And the time that Detroit -- the City

10 of Detroit actually filed for bankruptcy last year, you're not

11 aware of anyone at the DIA whether it be a specialist, or an

12 employee that has gone back and actually researched this issue

13 regarding a reversion of title, are you?

14 A    No, I am not.

15 Q    Let's discuss some of the current DIA agreements and

16 policies like the collections management agreement that you

17 discussed with Mr. O'Reilly.  You're familiar with the 1997

18 operating agreement of the DIA Corp., correct?

19 A    I am.

20 Q    And you actually sat as a corporate representative on

21 that -- that topic at your deposition, right?

22 A    I did.

23 Q    If we could pull up City Exhibit 254, the operating

24 agreement.  And this is in Tab C of your binder.  It's a -- a

25 lengthier document.  This is the operating agreement for the

1 Detroit Institute of Arts, correct?

2 A    Yes, it is.

3 Q    And it mentions the Founder's Society, that is the prior

4 name of the DIA, is that correct?

5 A    Yes.

6 Q    Thank you.  And this relationship outlines -- this

7 agreement, excuse me, outlines the relationship between the

8 City of Detroit and the DIA Corp., is that fair?

9 A    Yes, it is fair.

10 Q    And this agreement still controls that relationship?

11 A    Yes, it does.

12 Q    And you have some expertise with this operating

13 agreement?

14 A    I have some expertise.  It's a very large agreement.

15 Q    I will agree with that.  Your opinion is that the

16 operating agreement supports your belief that the museum is

17 held in a public or charitable trust, correct?

18 A    Yes.

19 Q    As you sit here today, do you know, and again without

20 reading the whole document, do you know whether or not it's

21 specifically written into this agreement that the collection

22 is held in a public or charitable trust?

23 A    I know that it's written into the agreement that the

24 museum must abide by accepted professional practices or the

25 agreement can be nullified.  And in my professional practice,

1  that means that we hold the collection in trust.

2  Q    That the agreement can be terminated, is that what you

3  mean by nullified?

4  A    Yes.

5  Q    Okay.  And is that by either party?

6  A    It is, but I would assume if we violated professional

7  practice it would be the city terminating the agreement.

8  Q    You weren't a party to the negotiations that led to this

9  1997 agreement, were you?

10  A    This occurred before I was employed by the museum.

11  Q    Looking at the agreement specifically, on Page 1.  And

12  Page 1 is actually after the Table of Contents, so it will be

13  -- City Exhibit 254-008 down in the bottom right hand corner.

14  Under recital 5, about halfway down the page.  If you could

15  blow that up, please.  And then highlight the second sentence.

16       This operating agreement states, the city shall -- shall

17  continue to own the city art collection including works of art

18  acquired prior or subsequent to the effective date as well as

19  the DIA building, correct?  That's what this operating

20  agreement states?

21  A    That's what that sentence says, yes.

22  Q    And that sentence is within the operating agreement,

23  correct?

24  A    It is.

25  Q    Thank you.  Speaking of the DIA building which is

1   mentioned here, it's an iconic building in Detroit, right?

2   A    I think you could assume that, yes.

3   Q    And it -- would you agree with me that is one of a kind,

4   especially for this part of the country?

5   A    I would say that it is one of a kind, yes.

6   Q    And was it -- it was recently renovated in 2008?

7   A    We did a renovation and expansion and we did the grand

8   opening at the end of 2007.

9   Q    And that renovation including -- included adding a new

10  south wing?

11  A    Yes.  Yes, small -- it's actually an addition on to the

12  existing south wing.

13  Q    And the property is located in a preferred part of the

14  city in midtown?

15  A    It is.

16  Q    And there are many built ins in the building like theater

17  seating and museum lighting and display cases that help its --

18  at least its current use as a museum?

19  A    Yes.

20  Q    Okay.  I want to talk a little bit about the records you

21  discussed in your direct testimony.  There's someone at the

22  museum that maintains an inventory of which pieces of the

23  collection may fall into the city art collection versus the

24  founder's collection as you've described it, right?

25  A    Yes.

1  Q    And that information is held on the DIA data base that

2  you -- you discussed with Mr. O'Reilly, right?

3  A    TMS, yes.

4  Q    And the TMS system stands for The Museum System, right?

5  A    It does.

6  Q    And that's a computer system?

7  A    It's a collections management data base, yes.

8  Q    And there's a number of individuals at the museum who

9  have the specific responsibility for controlling and running

10  that TMS system, right?

11  A    Yes.

12  Q    And your opinion that this information exists in the TMS

13  data base is based on your belief that as a museum you keep

14  exhaustive -- exhaustive records of the collection, correct?

15  A    We do our best to do so, yes.  We have 130 years of

16  collecting to manage, so it's not an easy task.

17  Q    But you also -- and you also believe that that is found

18  -- that information is found in the TMS system because you

19  keep exhaustive records because that's part of what you do in

20  your stewardship of the collection?

21  A    Yes.

22  Q    I want to go back to the operating agreement, Exhibit

23  254, please.  And again in your binder it's Tab C.  If we go

24  to Page 8 which is labeled in the bottom right hand corner

25  City Exhibit 254-015.  Thank you.

1    There's a Section E.  That's bold and titled retention of

2   assets by the city.  And if we could actually blow up the

3   first two there.  Thank you.

4    And under this sub section of the operating agreement,

5   the document states, under E-1, city retains title to assets.

6   The city shall retain title to and ownership of the A, city

7   art collection, and B, the DIA properties, including fixtures.

8   This provision is in the DIA operating agreement, correct?

9   A    Yes, it is.

10  Q    And you yourself have not conducted any diligence or

11  study or asked anyone -- any employee at the DIA to conduct

12  diligence or study to determine which assets are included

13  within the city art collection versus the DIA properties as

14  it's described here, have you?

15  A    I have not.

16  Q    And this provision Section E-2 titled in bold,

17  acquisition of new assets states, subject to the terms of any

18  gift or bequest as between the city and the society, the city

19  shall also have title to all works of art acquired, whether by

20  gift directly to the DIA and/or the city, or to the society,

21  or any other person or entity for the benefit of the DIA,

22  purchase or otherwise during the contract terms.

23    And this provision is in the operating agreement of the

24  DIA, correct?

25  A    Yes.

1  Q     Moving on a bit.  You regularly review the audited

2  financial statements of the DIA Corp., right?

3  A     I usually do that once a year when the audit comes in and

4  I make sure it's posted on the web site and beyond that I –– I

5  don't spend a lot of time with them, no.  We have a Chief

6  Financial Officer who is more engaged with that than I.

7  Q     But you do feel it's incumbent upon yourself to review

8  the financial statements of the DIA Corp.?

9  A     Yes, I do.

10 Q     If we could pull up City Exhibit 265, please.  And this

11 is a financial statement from the Detroit Institute of Arts,

12 year ended June 30th, 2012.  And let me ask you, is this a

13 financial statement from the DIA Corp.?

14 A     Yes, it is.

15 Q     Thank you.  And if we could turn to Page 8.  That's City

16 Exhibit 265-10 in the bottom right hand corner.  And blow up

17 Note B, please which is titled in bold, relationship with the

18 city and the State of Michigan.

19      And halfway through this first paragraph of Note B,

20 there's a sentence that starts with the city continues.  If we

21 could blow up that sentence or highlight it, please.

22      And it states in this financial statement for the DIA

23 Corp., "the city continues to own the museum's permanent art

24 collection including works of art acquired prior or subsequent

25 to the operating agreement as well as the museum building and

1  grounds". That is stated here in the financial statement in

2  the notes for the Detroit Institute of Arts, correct?

3  A     That's the auditor's note, yes.

4  Q     And if we flip back a page or two, sorry to do this going

5  the wrong way, if we go to Page 6 of the financial statement.

6  And that's labeled City Exhibit 265-008. And there's a

7  paragraph art objects and collection. If we could blow that

8  up, please. Thank you very much.

9       In this paragraph under art objects and collection, the

10 second sentence of it reads, title to art objects purchased by

11 or donated to the DIA is offered to the city -- city's art

12 department and title is transferred when accession to the

13 permanent collection has been approved by the board and the

14 arts commission of the city.

15      That statement is included in the financial statement for

16 the DIA, correct?

17 A     Yes, it is.

18 Q     Thank you. Let's talk about -- a little bit about the

19 collection. And actually the collections management policy

20 that you discussed earlier.

21      You're familiar with the DIA Corp.'s collection

22 management policy, right?

23 A     Yes, I am.

24 Q     And you sat for -- as a corporate representative on that

25 specific topic regarding that policy, right?

1  A    Yes, I did.

2  Q    If we could turn to FGIC Exhibit 3067 which is the

3  collections management policy.

4          MR. MCCARTHY:  Again, Your Honor, this is already in

5  evidence.

6  Q    This is the collections management policy as you

7  discussed for the DIA, right?

8  A    It is.

9  Q    And if we flip to Page 3 of this policy, in the

10 introduction it notes, the director of the Detroit Institute

11 of Arts, the -- the museum is responsible to the Mayor and the

12 arts commission for the prudent management of the collection

13 of the Detroit Institute of Arts.  That's what it says in the

14 collections management policy, right?

15 A    Correct.

16 Q    And it goes on to say that prudent management dictates

17 the need for written policies and guidelines.  This document

18 which is in compliance with the museum's professional

19 practices, policy, and guidelines, is intended to fill that

20 need.  That's the opening introduction to the collections

21 management policy, is that right?

22 A    That's correct.

23 Q    Thank you.  And if we move forward in this collections

24 management policy, to Page 10, please.  And this is under gift

25 -- gifts and bequests, a title that's on the previous page.

1 Page 9.  There's a Section 4 if we could blow that up in the

2 top, please.

3      And under gifts and bequests, this collections management

4 policy notes a number of things in Section 4.  It notes, the

5 acceptance of all gifts and bequests shall be without

6 restriction, right?  That's what it says in the collection

7 management policy?

8 A    Yes.

9 Q    And it states, no commitment should be made as to

10 exhibition, attribution, or placement of the gift.  That's

11 what it says in the collections management policy?

12 A    Correct.

13 Q    And it says, while it is the museum's intention to

14 accession for long term use and preservation, no guarantee

15 shall be made that the gift or bequest will be retained by the

16 museum in perpetuity.  And that is also in the collections

17 management policy, right?

18 A    It is.

19 Q    And in fact it states here following.  That there shall

20 be no exceptions to this policy unless it is specifically

21 approved through a process in this document -- document which

22 is outlined regarding the board of directors and the arts

23 commission, is that right?  I didn't read that directly,

24 but --

25 A    I'm reading.  That's correct.

1  Q    And based on your direct testimony, just in general,

2  you're -- you're aware of the museum's deed of gift form,

3  correct?

4  A    I am.

5  Q    And the deed of gift form articulates an agreement

6  between the donor and the museum, right?

7  A    It does.

8  Q    And the collections management policy states on this

9  page, Page 10 at Section 7, if we could blow that up.  Thank

10  you.

11      "Use of the museum's deed of gift is mandatory and shall

12  be signed by the legal owners or his or her duly authorized

13  agent before the object can be accessioned".

14  A    That's correct.

15  Q    Thank you.  And it states in the last sentence of this,

16  for bequests, a copy of the Will, all codicils, and letters

17  testamentary should be obtained and kept in the records of the

18  registrar's permanent collection.

19      That is a policy within the collections management

20  policy, correct?

21  A    That's correct.

22  Q    And the museum adheres to this policy, correct?

23  A    We adhere to this policy currently.  I can't say what was

24  done before I was employed by the museum.

25  Q    That's fair.  As you sit here today, you're not aware of

1  any instances in which the DIA Corp. failed to comply with ths

2  policy, are you?

3  A    As I sit here today I'm not, but I must say that I don't

4  know every single thing that happens in the museum every day.

5  Q    Understood.  And as you sit here today, it is your view

6  that this deed of gift form -- well, let me ask it a little

7  differently.  As you sit here today, are you aware of any

8  object file for any piece of art in the collection where a

9  deed of gift is not included in that object file?

10  A    I couldn't say.  I -- there are hundreds of object files.

11  Q    And it's your view that this policy that the museum

12  mandatorily used deed of -- deeds of gifts is in place and

13  developed to insure that there is clear title to a gift that

14  passes from the donor, is that right?

15  A    That's correct.  That's one of the reasons for it.

16  Q    Okay.  One of the final sections I want to look at in the

17  collections management policy is on Page 11, the next page.

18  And it talks about deacquisitioning.  If you could just

19  highlight the title and the first section of -- Section A

20  there.  Thank you.

21      Now this -- this section deacquisitioning is the section

22  in the collections management policy that outlines the process

23  whereby the museum actually can have -- can allow pieces of

24  art to leave its collection, correct?

25  A    Correct

1  Q    And these may be pieces of art that were donated by

2  someone in the community, is that fair?

3  A    They could be.

4  Q    And in the past the DIA has sold art, correct?

5  A    Yes.

6  Q    And they've sold pieces of art while you've been employed

7  at the DIA, right?

8  A    We have, but only to purchase other works of art.

9  Q    Understood.  And long before you worked at the DIA, it's

10 your opinion and your knowledge that the -- the DIA sold

11 pieces of art at that time too, correct?

12 A    It's my opinion and knowledge, yes.  I can't say

13 specifically to each sale what happened from that sale.

14 Q    Thank you.  Flipping to the next tab in your binder.

15 This is FGIC Exhibit 3286.  And it will come up on your screen

16 there.  And this document is entitled -- is titled DIA

17 collections management policy attachments.  And there's

18 numbers in the bottom right hand corner of this if we could

19 shrink it.

20     That note starting with DIA and this notes that this

21 document was produced from the DIA from its files, okay.  As

22 stated at the top, these are the DIA's collection management

23 policies attachments, is that right?

24 A    That's correct.

25 Q    And the DIA keeps policies and agreements like this in

1 | its files, right?

2 | A    It does.

3 | Q    And the DIA -- DIA staff refers to policies and

4 | agreements such as these in its normal course of business,

5 | correct?

6 | A    I would assume, yes, they do.

7 |        MR. MCCARTHY:  Your Honor, at this time I'd move

8 | into evidence FGIC exhibit, what is it, 3286.

9 |        THE COURT:  Any objections?

10 |        MR. O'REILLY:  No.  I think it may have already been

11 | moved in the early part of this session.  But no objection,

12 | Your Honor.

13 |        THE COURT:  All right.  If it's not in evidence

14 | already, it is admitted.

15 |        MR. MCCARTHY:  Thank you, Your Honor.

16 | Q    Moving on to another topic, Ms. Erickson.  You sat as a

17 | corporate representative at your deposition and -- and you

18 | testified today here about the museum's collection and its --

19 | your view that it's important to the city and the state,

20 | correct?

21 | A    Correct.

22 | Q    Now the DIA Corp. has not looked into specifically if it

23 | sold any portion of the collection that's currently not on

24 | display, even one of the sixty -- sixty or so thousand pieces

25 | of art, whether that would have any impact on any of the

1 particular programming that the DIA Corp. offers, whether it

2 be the school programming, adult educations, or Veterans

3 programming you discussed, have they?

4 A    As I testified earlier, the collection and the museum

5 really are entwined.  And to lose any part of the collection

6 would mean a definite change in programming, perhaps the

7 elimination of some programs.  It's difficult for me to say

8 without understanding exactly what those changes might be.

9 Q    Your deposition, Ms. Erickson is in the front pocket of

10 the binder that I gave you.  Could you turn to that, please?

11 A    Sure.

12 Q    Thank you very much.  We've already talked about it, but

13 you provided a deposition in this case, right?

14 A    Yes, I did.

15 Q    And I actually asked you the questions at that

16 deposition, right?

17 A    You did.

18 Q    And you knew you were under oath?

19 A    Yes.

20 Q    And just like here today you've tried your best to give

21 honest answers, correct?

22 A    I am doing that right now.

23 Q    If you could turn to Page 131 in your deposition, Line

24 14.  And we're going to from Line 14 to the end of the page,

25 Line 20.  Let me know when you're there.  It's actually on

1 | your screen too, if it's easier.

2 | A     Okay.

3 | Q     Did I ask you the following question and did you provide

4 | the following answer?  Has the DIA looked into specifically

5 | whether if it sold any portion of the collection that is

6 | currently not on display at the museum, whether that would

7 | have an impact on any of the particular programming that you

8 | mentioned, whether it be school programming, adult education,

9 | or Veterans programming?  Answer, no, we have not looked into

10 | that.

11 |      Did I ask that question and did you provide that answer?

12 | A     Yes, I did.

13 | Q     You talked a little bit about accreditational

14 | organizations in your direct testimony.  There has been no

15 | accreditation organization that has contacted -- contacted the

16 | DIA Corp. specifically and advised the DIA Corp. that they

17 | could face sanctions if they sold or monetized a portion of

18 | the collection, correct?

19 | A     That's correct.

20 | Q     And since the filing of the City of Detroit's bankruptcy,

21 | you're not aware of the DIA Corp. taking any efforts to

22 | determine how much money it could obtain from renting or

23 | leasing any portion of the collection, correct?

24 | A     That's correct.

25 | Q     Now bear with me for a minute because I'm going to flip

1 between a couple of -- of agreements.  If we look back to the

2 operating agreement, and this is City Exhibit 254.

3      We already discussed -- it's your view that the city and

4 the DIA Corp. in certain circumstances had the right to

5 terminate this operating agreement, correct?

6 A    That's correct.

7 Q    And if you turn to Page 48 of this operating agreement

8 provision 03, and that's labeled at the bottom right hand

9 corner, City Exhibit 254-055.  And if we could blow up section

10 -- well, let me just ask you.

11     Section L-3.  This provision just in general, includes

12 some of the circumstances under which the DIA Corp. or the

13 city would be able to terminate the agreement, is that fair at

14 a high level?

15 A    It says material breach, yes.

16 Q    Okay.  And it states under L-3, that the city or the

17 society may terminate this agreement upon 90 days prior

18 written notice in the event of a material breach.  That's what

19 this DIA Corp. operating agreement states, right?

20 A    Correct.

21 Q    And on the next page, flipping over to Page 49 under

22 Section 4, if we blow that up.  It's titled in bold, material

23 breach.  And it outlines a number of circumstances that may

24 lead to a material breach, is that fair?

25 A    It does.

1  Q     In one of the listed sub sections of sub Section C, and

2  sub Section C lists F-1 through F-29 amongst other things,

3  right?

4  A     Correct.

5  Q     Okay.  And here's where we get just a little tricky, bear

6  with me.  If we go back to Section F of the operating

7  agreement, and that's at Page 10, and if we highlight the

8  first sentence of 2-A, the society's duty to manage the art

9  collection, it states, the society shall be responsible for

10  managing the city art collection in accordance with the DIA's

11  collection management policy, correct?

12  A     That's correct.

13  Q     Okay.  And now if we flip back to that collections

14  management policy, which again is FGIC 3067.  And that's Tab E

15  in your binders if you're using that.  Moving to Page E of

16  FGIC 3067.

17          A VOICE:  Page 18.

18          MR. MCCARTHY:  Page 18.  Thank you very much, Kim.

19  Q     And under Section X records.  X-A notes that the

20  collections management policy requires, "the maintenance of

21  accurate up to date records on the identification, location,

22  and condition of collection objects is a major responsibility

23  for the museum.  That's noted here in the record -- that's

24  noted here in the collections management policy, correct?

25  A     Yes, it is.

1  Q    And there's someone at the museum whose job it is to

2  determine whether the museum is complying with this policy,

3  right?

4  A    There is an entire department, the registrar's office.

5  Q    And in fact it's your view that not only is it that

6  person's job, it's many others, including your own to have a

7  duty to insure that the collections management policy is

8  followed, is that fair?

9  A    I -- I don't have direct responsibility for that, but

10 yes.

11 Q    And then if we flip to the next page -- actually --

12 actually, excuse me.  Moving to Page 20 of this document, two

13 pages forward.  Under Section 13, inventories.  Right in the

14 middle of the page.  If you could blow that up, please.

15      The collections management policy requires that, "the

16 collections of the museum will be comprehensively inventoried

17 once every seven to ten years".  And it notes further down the

18 section that, "each year a physical inventory will be

19 conducted by the collections management office", correct?

20 A    That's correct.

21 Q    Now you don't know one way or the other whether the

22 museum undertakes this type of inventory this year as it's

23 stated here in the collections management policy, do you?

24 A    I don't know that we have done that this year, no.  I

25 know that we do do ongoing inventories.  If you highlight the

1  rest of the sentence, it says, from a list of all objects

2  valued at $1,000,000 or more, I cannot be that specific.  But

3  I know that the registrar's office does do ongoing inventory

4  checks.

5  Q    If you'd turn to Page 94 in your deposition.  Excuse me.

6  Lines 14 through 22.  Excuse me, Line 19 through 22.

7       Did I ask you the following question and did you provide

8  the following answer at your deposition in July?

9  A    That's correct, yes, I did.

10  Q    I'm sorry, thanks for -- let me finish it now.

11  A    Okay.

12  Q    The question, do you know whether or not the museum

13  undertakes this inventory each year as it's stated here in the

14  collections management policy?  Answer, I don't know.

15       Did I ask that question and did you provide that answer?

16  A    I did and it was referring to the entire statement of

17  objects over $1,000,000.  And I said I did not know.

18  Q    Now going back to the operating agreement one last time.

19  And this again is City Exhibit 254.  On Page 50, Section 7-A

20  could we highlight that?

21       Turning away from the operating agreement for a moment,

22  as you sit here today, Ms. Erickson, do you know personally,

23  have any understanding of what would happen -- Ms. Erickson,

24  I'm sorry.

25  A    Yes.

1  Q    Thank you.  Do you know when you sit here today what

2  would happen if for any reason including inventories or the

3  records that we talked about here, do you have any

4  understanding as to what the DIA Corp.'s relationship with the

5  collection would be if this agreement was terminated?

6  A    I don't actually.

7  Q    And the operating agreement at this section, Section 7-A

8  includes a section titled effect of termination, right?

9  A    Yes.

10 Q    And it states here, under the effect of termination in

11 bold, "effect of termination.  Upon the termination of this

12 agreement, the society shall deliver to the city the

13 possession, custody, and control of the DIA building, the

14 employee parking lot, and the city art collection".  That's

15 stated here in the operating agreement, correct?

16 A    Yes, it is.

17        MR. MCCARTHY:  Thank you.  I don't have any further

18 questions at this time, Your Honor.

19        THE COURT:  Any further cross examination of the

20 witness?  No?  Any redirect?

21        MR. O'REILLY:  Short, Your Honor, hopefully.  Don't

22 everybody start laughing.

23        THE COURT:  Well --

24        MR. O'REILLY:  Your Honor, I've got a demonstrative

25 that I'd like to use.  I can tell you that it's only being

1  done in response, so it's not been shown to the other side

2  yet, but I have copies for them.  Thank you.

3           THE COURT:  Okay.

4           MR. O'REILLY:  And might I approach, Your Honor?

5           THE COURT:  Yes.

6                    REDIRECT EXAMINATION

7  BY MR. O'REILLY:

8  Q    Ms. Erickson, Mr. McCarthy just asked you a lot of

9  questions about the document policies and the management of

10  your documents.  Do you recall that -- those questions and

11  your answers?

12  A    I did.  I do.

13  Q    And I've put in front of you several images.  Do you

14  recognize those images?

15  A    I do.

16  Q    Okay.  What are they images of?

17  A    They're images of records storage space within the

18  museum.  The first is the library stacks and then the

19  following several are in the archives in the attic of the

20  museum.

21  Q    Okay.  Why are those records kept in that fashion?

22  A    The museum has not been blessed with a great deal of

23  extra money and one of the things that we cut when we cut --

24  cut our -- our budget was the archivist.  And so many of our

25  records are in deep storage.  They're safe, they're secure

1  but they have not been analyzed and organized in a way in

2  which we would hope we would be able to do at some future

3  date.

4  Q    Thank you.  And if you wanted to understand some of the

5  information you might principally go to the registrar's

6  office?

7  A    Yes.  That would be my first stop.

8  Q    Do -- do the images show areas in which other documents

9  related to the museum and its collection might exist?

10  A    Yes, they do.

11  Q    Thank you.  Ms. Erickson, you were asked by Mr. McCarthy

12  about the operating agreement, and the collection management

13  policy, and the deed of gift.  Do you recall those questions

14  and answers?

15  A    I do.

16  Q    And I think he asked you a question about whether the

17  deed of gift transfers clear title.  Do you recall that?

18  A    He did.

19  Q    Do you know whether the museum has always followed that

20  practice in the past?

21  A    I can't say through the entire history of the museum.  I

22  know that in my time there yes, we've -- we've had a deed of

23  gift.

24  Q    Okay.  And he talked I think a little bit about the

25  restricted nature and the transfer of clear title.  Today does

1 | the museum ever make exceptions to that policy?

2 | A    Not to my knowledge.  I -- I have to say that

3 | transferring title is -- I don't know what the process for

4 | that is.  We accept the deed of gift, we recommend the --

5 | those objects to the collections committee and the board, and

6 | then we send a quarterly report to the arts commission, then

7 | we have an annual meeting with the arts commission.  If that

8 | constitutes transfer, I --

9 | Q    Let me try it differently.  Does the fact that the museum

10 | has a policy today tell you anything about the number of works

11 | in the collection that are or are not restricted?

12 | A    No, not at all.  You would have to -- as I said in my

13 | testimony earlier, to really find out about a restriction on a

14 | gift that would generally be a gift that we were considering

15 | for deaccessioning and we would do a deep dive into the

16 | records of that gift.  There is no broad way to determine

17 | that.

18 | Q    Thank you.  Mr. McCarthy asked you several questions

19 | about documents such as old statutes and asked you to find the

20 | word trust.  Do you recall that?

21 | A    I do.

22 | Q    Okay.  Do you have any doubt that the collection is held

23 | in trust?

24 | A    I do not.

25 | Q    Why not?

1 A    Because it is in many many documents, the ones that Mr.

2 McCarthy highlighted it wasn't included in, but if you go back

3 into the museum's archives and you look at -- at documents

4 that state that, you will find many documents that talk about

5 public trust.  As I said, back to the 1885 DMA documents, all

6 the way up to the 2012 letter from Mayor Dave Bing in which he

7 clearly states that the city holds the museum in trust.

8 Q    Mr. McCarthy asked you several questions about the

9 operating agreement and issues and statements about title and

10 ownership.  Do you recall that?

11 A    I do.

12 Q    Okay.  Does that operating -- does that operating

13 agreement say anywhere that the city has the right to

14 liquidate the collection or use it for its own purposes?

15 A    I don't believe it does.

16 Q    Okay.  Do you in fact know whether the -- the city holds

17 legal title to specific objects in the museum art collection?

18 A    I really don't know.

19 Q    Okay.  Do you know who holds the beneficial ownership of

20 the museum art collection?

21 A    The public holds the beneficial ownership of the art

22 collection.

23        MR. SOTO:  Beneficial ownership is a legal concept.

24        THE COURT:  I'll accept the answer as the witness'

25 understanding with the understanding that it is not intended

1  to convey a legal opinion.

2          MR. O'REILLY:  Thank you, Your Honor.

3          THE COURT:  Is that fair, Ma'am?

4  A    That is fair.

5  Q    Mr. McCarthy also asked you several questions about

6  things that happened in 1919.  Well, we'll skip that part

7          THE COURT:  Be careful.

8          MR. O'REILLY:  I'm learning, Your Honor.

9  A    Please.

10 Q    And he pointed to a memo from I believe 1981 that talked

11 about I guess some work that somebody in 1981 did.  Do you

12 recall those questions and those answers?

13 A    Yes, I do.

14 Q    Okay.  And he talked to you about a reversion.  Do you

15 recall that as well?

16 A    Yes.

17 Q    Okay.  Are you aware of other documents that address the

18 right or possibility of reversion?

19 A    I'm aware of at least one other letter that actually

20 assures a donor that the museum does have the right of

21 reversion should something happen to the city.  That's -- and

22 I think it probably -- this is probably an issue that would

23 occur in many documents if you did an exhaustive search.

24 Q    Okay.  Could you put up 272, please?  And if you could go

25 to City Exhibit 272-025.  Have you ever seen this document

1  before?

2  A    Yes, I have.

3  Q    All right.  Could you highlight the bottom paragraph,

4  please?

5         THE COURT:  Is this in evidence, sir?

6         MR. O'REILLY:  It is, Your Honor.  It's an ancient

7  document.  And can actually see it a little better than it

8  shows on the screen.

9         MR. MCCARTHY:  Mr. O'Reilly, was this moved in this

10 morning?  Just so I know.  I'm trying to get my notes --

11        MR. O'REILLY:  Yes, it was.

12        MR. MCCARTHY:  Okay.  Thank you.

13        MR. O'REILLY:  Actually let me confirm this so I

14 don't misspeak.

15 Q    So you didn't author this, but would you mind reading

16 that for the Court, please?

17 A    It is our practice with all gifts to our collection to

18 present them first to our sustaining society, the Detroit

19 Museum of Art Founders Society, which acts as our financial

20 institution.  The Founders Society however transmits all its

21 purchases and gifts made to it to the arts commission who

22 accepts them to become the property of the City of Detroit.

23 If owing to unforeseen circumstances, the City of Detroit

24 should go out of business, title to the collection would

25 revert to the Detroit Museum of Art Founders Society.

1        This is probably as secure a future for a work of art as

2   any museum can provide.  At least it has never been questioned

3   by any of our great donors here.

4            MR. O'REILLY:  That's all I have, Your Honor.

5            THE COURT:  Any recross examination?

6            MR. MCCARTHY:  No, Your Honor.

7            MR. O'REILLY:  Sorry, one other thing.  I don't

8   think I moved those images of the archives into evidence.  I

9   would like to move them in as demonstratives.

10           THE COURT:  Do we have a number?

11           MR. O'REILLY:  713.

12      (City's Exhibit 713 was identified)

13           THE COURT:  Is there any objection to the admission

14  into evidence of Exhibit 713?

15           MR. MCCARTHY:  No objection as to the use of them as

16  demonstratives, Your Honor.

17           THE COURT:  All right.  For that purpose they are

18  admitted.

19      (City's Exhibit 713 was admitted)

20           THE COURT:  In the interest of full disclosure, we

21  met, right?

22  A   We did.

23           THE COURT:  When was that?

24  A   It was a couple of weeks ago.  I took you on perhaps the

25  fastest tour of the museum I've ever taken anyone on.

1              THE COURT:  This was part of the city's site tour?

2    A    Yes, it was.

3              THE COURT:  Do you remember our brief conversation?

4    A    I remember we said hello.  You instructed us that we were

5    really not to speak to you and I think the last thing I said

6    to you was, suggesting that you take another table for lunch

7    because the one that you were going to take was very close to

8    the air conditioning vents.

9              THE COURT:  Okay.  And did you abide my instruction

10   not to discuss the museum with me?

11   A    Yes, I did.

12             THE COURT:  Okay.  I'm going to use the word value

13   in some questions I have for you.

14   A    Okay.

15             THE COURT:  But in this context I don't mean

16   economic value.  I mean non-economic value.  Okay?

17   A    Understood.

18             THE COURT:  Okay.  What is your opinion on what the

19   value of the museum is to the 60,000 school children who you

20   said comes there -- well, I don't know that you said every

21   year, but in the past year.

22   A    Uh-huh.  I think the museum is of tremendous value to

23   those children.  It gives them an opportunity first of all to

24   get out of their classroom and do something different and to

25   learn something different.  And to look at the world through a

1  different lens than they might see in their classroom.

2     We do a tour called shaping identities in the museum that

3  looks at different cultural collections and talks about how

4  people come to an understanding of themselves.  I think that's

5  really valuable.

6     And if I could tell you a small anecdote.  I've -- last

7  spring when we were very full of school children, I was

8  walking through the museum and there were two little boys

9  walking together and one of them looked at the other one and

10 said, wow, this is a lot cooler than I thought it was going to

11 be.

12    I think that that kind of thing happens every day in the

13 museum.  I think it builds museum goers.  I think it improves

14 people's cultural competency.  I think it opens them up to a

15 world that they might not be open to.  And that's one of the

16 reasons why we were so delighted to provide free admission

17 when the millage passed because it should be open to everyone.

18            THE COURT:  What is the value to the children of

19 participating in the programming that the museum offers apart

20 from just the opportunity to see the art?

21 A    Well, the museum uses a teaching method called visual

22 thinking strategies.  And all of our tours, our school tours

23 are based on VTS.  And VTS has been deeply studied by the

24 organization that first began to use it, it's called the view.

25       And what we find is that kids who go through VTS in the

1  art museum begin to develop skills in terms of critical

2  thinking, in terms of being able to articulate their thoughts

3  better verbally, and sometimes if we do a writing program with

4  them in terms of writing.

5      We also have literally thousands of comments from

6  teachers because we survey every teacher after every school

7  tour that talk to us about what happened with their students

8  when they were at the museum.  And it really does sharpen

9  their acuity in ways that one wouldn't necessarily expect.

10          THE COURT:  Families go to the museum.

11  A    They do.

12          THE COURT:  What is the value to families when

13  parents take school age children to the museum?

14  A    I think the museum is a very safe social place for

15  people.  They can come in, they can feel very comfortable and

16  they can engage with each other in a way they certainly

17  wouldn't do in front of a television.

18      And I think it promotes conversation.  Our labels as I

19  mentioned when I discussed the reinstallation, are really

20  designed to encourage looking.  And that's something that

21  doesn't require an expert level of knowledge, so parents can

22  actually feel smart.

23      And that's an important concept because if a parent

24  doesn't feel smart, they're not comfortable talking to their

25  child about what's happening in the museum.  So that's why we

1  have things like the eye spy labels.  Like the -- the labels

2  that encourage looking, like the technology.  So it encourages

3  interaction, it encourages conversation.

4      We really don't want a silent art museum at the DIA.  We

5  want people to talk about what they're seeing and we -- our --

6  our mission statement actually says that we create experiences

7  that help people make personal connections with art.  Help

8  people find personal meaning in art.  That's what we believe

9  art is about.

10      THE COURT:  Well, to -- to what extent does the

11  museum going experience for a family create opportunities for

12  communication among the family members themselves?

13  A   Many of the labels actually ask questions.  And so as I

14  said, if the parent feel a bit of comfort level they can ask

15  that question.

16      There are also -- some of the technology applications.

17  If you do the ipad in Rivera court you can see Rivera painting

18  the murals.  You can see what's happening there.  That really

19  promotes a lot of conversation.  It goes through the technique

20  of fresco and you can actually see the technique in front of

21  you.

22      And we -- on all of our self guided tours, the -- the

23  ones I was talking about earlier that are about sports and

24  nature, there are specific questions to promote conversation

25  among families or groups.  So we kind of -- try to direct some

1  type of dialogue.  And it's been very successful.

2      And actually Mr. O'Reilly would be very disappointed if I

3  didn't talk about the I spy labels because I know he uses them

4  with his own children and talks about that all the time.

5          THE COURT:  All right.  Let's not make counsel a

6  witness here.

7  A    Okay.

8          THE COURT:  Same question, what -- what is the value

9  of going through the art museum to adults who go through?  Why

10  -- why do adults go to the DIA?

11  A    I think that adults go, and I can -- I can put myself

12  among that because I do go to the museum and go to other

13  museums.  I think that adults go as a reminder of

14  possibilities.

15      The museum reminds us all that we can be creative problem

16  solvers because in the end that's what artists do, they solve

17  problems.  So I think that adults, though they may not

18  actually identify it as that, they go for inspiration.

19      Certainly they will tell you they go to be educated

20  because I think they probably feel that that's a necessary

21  part of the visit though I don't agree with that.  But I think

22  they go to be educated, they go to be inspired, they go to see

23  something different.  It takes them out of the norm of every

24  day life in a way that is -- is very satisfying.

25          THE COURT:  And again the same question but with

1  emphasis on what I said earlier about this being a question

2  about non-economic value.  What is the value of the DIA to the

3  city and the region as a whole?

4  A    As we talked about earlier the midtown area where the

5  museum is located, is a -- is one of the thriving areas in the

6  city right now.  But it wasn't always like that.

7        And 15 years ago when I came to the museum, midtown did

8  not look the way it looks today.  Nonetheless the museum

9  remained a solid stable anchor in that neighborhood.  We have

10  always done our best to maintain our property, to be a

11  welcoming presence, to make sure that in our neighborhood we

12  were interacting with our neighbors and we were creating a

13  safe place.

14        We weren't always completely successful at that, but --

15  but that was our intent.  As midtown has grown we have been

16  supportive of our neighbors.  We are very very supportive in

17  terms of new businesses that move in.

18        If you come to the museum's Kresge court where you can

19  have lunch there's a concierge who sits right at the front of

20  the court.  And if you don't feel like dining with the museum

21  she will be happy to direct you to a local restaurant or make

22  a hotel reservation for you.

23        I think that we also are absolutely a part of the fabric

24  of the events in the neighborhood.  Next weekend we will be

25  having delectricity which is a major event that Midtown,

1   Incorporated sponsors.

2       In a couple of weeks we will see Noel night, another

3   major event that midtown Detroit sponsors.  The museum is

4   absolutely essential to all of those events.  We are part of

5   the curatorial committee for those events.

6       For Noel night we host all kinds of programming in our

7   building.  We are part of the fabric of this neighborhood and

8   I think without it midtown would be much poorer.

9       THE COURT:  And my question -- my question was

10  actually broad enough to include not just midtown, but the

11  city as a whole and the region.

12  A    The region.  Your Honor, I -- I think that the best

13  statement of value about the museum is the fact that in 2012

14  when Michigan was still struggling, voters in Macomb, and

15  Wayne, and Oakland counties passed a property tax to support

16  the museum.

17      And in return for that we have really stepped up our

18  community outreach into those counties.  We've done it in a

19  number of ways.  We do tours from small art galleries and

20  exhibition spaces in the counties to the museum because we

21  believe that those small spaces are really important to

22  communities.

23      Not everyone is going to have a DIA in their backyard.

24  But you can have a local art center and you can appreciate

25  that art center.  We've focused much more on bringing senior

1  citizens from the counties into the museum.  And indeed we

2  fund transportation for that because there is a certain

3  nervousness among seniors to come into the museum.

4       So we really feel very strongly that the counties are

5  part of our community, they're in fact a major part of our

6  community now given the property tax.  And we think that the

7  DIA is central enough to bring people in.

8       We were the first -- the passing of the millage was the

9  first real tangible statement about regionalism.  And I know

10 that's come up in these proceedings.  But we were a positive

11 statement about regionalism.  And I think we can and will

12 continue to be that.

13            THE COURT:  All right.  That's all I have.  Any

14 further questions for the witness?

15            MR. O'REILLY:  No, Your Honor.

16            MR. MCCARTHY:  No, Your Honor.

17            THE COURT:  All right.  You are excused.  Thank you

18 for coming today.

19 A    Thank you.

20    (WITNESS ANNEMARIE ERICKSON WAS EXCUSED AT 12:11 P.M.)

21            THE COURT:  We will break for lunch now and

22 reconvene at 1:40, please.

23            THE CLERK:  All rise.  Court is in recess.

24    (Court in Recess at 12:11 p.m.; Resume at 1:40 p.m.)

25            THE CLERK:  All rise.  Court is back in session.

1  You may be seated.  Calling case number 13-53846, the City of

2  Detroit, Michigan.

3          THE COURT:  Sir.

4          MR. IRWIN:  Your Honor, Geoff Irwin, Jones, Day for

5  the City of Detroit for the record.  The city would like to

6  next call Mr. John Satter.

7          THE COURT:  Okay.  Please raise your right hand.

8      (WITNESS JOHN SATTER WAS SWORN)

9          THE COURT:  Please sit down.

10                  DIRECT EXAMINATION

11  BY MR. IRWIN:

12  Q    Good afternoon, Mr. Satter.

13  A    Good afternoon.

14  Q    Thank you for being here.  Could you please state your

15  full name for the record?

16  A    Yes.  John Charles Satter.

17  Q    And where do you live?

18  A    Glencoe, Illinois.

19  Q    And what is your profession?

20  A    I'm a real estate appraiser.

21  Q    Okay.  Who do you work for?

22  A    I work for Hilco Real Estate Appraisal, LLC.

23  Q    And was there a point in time in 2014 when you were

24  retained by Jones, Day on behalf of the City of Detroit in

25  connection with this bankruptcy matter?

 1  A     Yes.

 2  Q     At a very high level what was the nature of that

 3  engagement?

 4  A     We were hired to provide a fair market value for the DIA

 5  property.

 6  Q     Did you -- did you personally work on that project?

 7  A     Yes, I did.

 8  Q     Was it completed?

 9  A     Yes, it was.

10  Q     Did you submit an expert report in this case?

11  A     We did.

12  Q     Okay.  Let's briefly talk --

13        THE COURT:  Just a second.  Can you pull that

14  microphone closer, please?

15  A     Sure.

16        THE COURT:  And speak right into it.

17  A     Is that better?

18        THE COURT:  Yes.  Thank you.

19  A     Okay, sorry.

20  Q     Where did you go to college, Mr. Satter?

21  A     The University of Illinois.

22  Q     And when did you graduate?

23  A     1991.

24  Q     With what degree?

25  A     A Bachelor's Degree in Civil Engineering.

1  Q    Did you take a job not long after that?

2  A    I did.

3  Q    With whom?

4  A    I joined an appraisal firm of Wayne Winnick and

5  Associates in Chicago.

6  Q    And what was the nature of your employment there?

7  A    I was the staff appraiser.

8  Q    For how long?

9  A    For four years.

10 Q    And what kind of projects did you work on as a staff

11 appraiser?

12 A    Just general real estate appraisal assignments, both

13 residential, commercial nature for the firm.

14 Q    What did you do next?

15 A    In late October of '96, I formed my own business and

16 continued the same profession.

17 Q    Was it -- this is the appraisal business?

18 A    Yes.

19 Q    Okay.  Did you do anything else besides appraisals in

20 connection with that employment?

21 A    Well, as the owner of the company I was responsible for

22 all aspects of the business, business development, appraisal

23 production, review, administrative work.

24 Q    How long was -- how long did you keep this -- how did you

25 -- long were you employed at JCS Real Estate Services?

1  A    I ran that business for 15 years.

2  Q    Okay.  And what did you do after that?

3  A    In late 2011, I was recruited to join Hilco Real Estate

4  Appraisal as their midwest lead.

5  Q    And what are your duties and responsibilities as midwest

6  lead?

7  A    So as a managing -- managing director and the regional

8  manager, I'm responsible for similar tasks as -- as when I was

9  working on my own of business development, staff management,

10  assigning work, a lot of review work.  Also some of my own

11  production.  And working in concert with the rest of our

12  business units at Hilco Global.

13  Q    How much of your time at Hilco -- by the way when did you

14  -- when did you take employment at Hilco?

15  A    Right at the end of 2011.

16  Q    Okay.  So for the last three years?

17  A    About three years.

18  Q    Okay.  How much of your time at Hilco do you spend on

19  real estate appraisals?

20  A    So I'll directly be involved in an assignment say of the

21  nature of the DIA about 20% of my time.

22  Q    How many on average, how many appraisals per year do you

23  work on?

24  A    I'll be probably running about two of those a month, and

25  sometimes it could be more, but generally they're large

1  assignments, portfolio assignments as opposed to like one off

2  assignment.

3  Q    How many years of experience with real estate appraisals

4  do you hold yourself out for?

5  A    Over 22 years.

6  Q    How many real estate appraisals could you approximate

7  you've worked on?

8  A    Like thousands, you know, 5,000, 6,000.

9  Q    On an order of magnitude, can you describe the aggregate

10 market value of the appraisals that you've worked on?

11 A    I mean it would be in the billions, maybe a trillion

12 dollars.  I mean that's kind of a hard number to flesh out,

13 but --

14 Q    What's the highest value appraisal that you've worked on?

15 A    We've worked on -- the highest -- the highest value is a

16 office complex for an investment group, about $825,000,000.

17 Q    Okay.  What are the types of real property that come to

18 you in connection with your appraisal business?

19 A    So almost all the food groups, you know, retail,

20 commercial, industrial, residential, and special use.

21 Q    Special use.  What is a special use property?

22 A    Special use property would be like the DIA.  It's a -- a

23 facility built for a specific purpose and it's for a specific

24 use and user.

25 Q    And so have you worked on appraisals involving special

1 use properties during the course of your career?

2 A    Yes, numerous.

3 Q    All right.  Can you give some examples of other kinds of

4 special use properties that you personally have worked on?

5 A    Sure.  We just recently finished an assignment in

6 Coldwater, Michigan of a two and a half million square foot

7 greenhouse.

8     We've appraised numerous recreational facilities,

9 churches, movie theaters, truck terminals, all kinds of

10 properties that would be built for one specific user type.

11 Q    Do you hold any certifications or licenses, sir?

12 A    I am a certified general real estate appraiser in I think

13 11 or 12 states.  And --

14 Q    Does that include Michigan?

15 A    Including Michigan, yes.

16 Q    Are you a member of any professional organizations?

17 A    I am.  I hold the MAI designation.

18 Q    What is an MAI designation?

19 A    The designation is awarded by the appraisal institute

20 which is a leading peer group educational provider, best

21 practices group.  And that is -- that designation is awarded

22 with -- after several requirements.

23 Q    You have to take a test?

24 A    You have experience requirements, there's educational

25 requirements, there's demonstration report requirements,

1  there's a comprehensive exam which is similar to like a CPA

2  test if you will.  And again experience -- experience review

3  by your peers.

4  Q    How long have you been a member of the --

5  A    Since 2007.

6  Q    Okay.  And how many MAI's are there among licensed

7  appraisers?

8  A    You know, the number is like around 5,000, I think, in

9  the United States.

10 Q    Out of how many total licensed appraisers?

11 A    I think the current figure that like I said, was 100,000

12 licensed appraisers.

13 Q    Okay.  So five thousand out of a 100,000?

14 A    Correct.

15 Q    Okay.  What kind of clients come to you at Hilco seeking

16 out your assistance with appraisal work?

17 A    We provide services to corporate clients, private

18 individuals.  We do some work for municipalities.  A lot of

19 work, a lot of bank work.  We do work for lawyers,

20 accountants.

21 Q    Any work for municipalities?

22 A    We do some work for municipalities including we've

23 recently appraised some -- a school.  We appraised a storage

24 truck, like public works facilities, those kind of properties,

25 yes.

1  Q    How do the -- how does the appraisal at Hilco work?  Do

2  you work individually, or do you work in teams?

3  A    Generally, you know, we'll assign -- if I get an

4  assignment for a client I'll assign it to a staff appraiser.

5  But often we get portfolio assignments where we'll have, you

6  know, 50 or 100 assets to -- to value in three -- two to three

7  weeks.

8       And so in those cases we'll -- we'll pull in resources

9  from other offices or, you know, work with some

10 subcontractors.

11 Q    How about for the DIA project?  Were -- were you -- did

12 you work on this individually or did you enlist the assistance

13 of others?

14 A    So in this case we worked with another group out of our

15 New York office.  They were -- they were the lead there Chris

16 Harland and one of his staff's appraisers Mark Grant assisted

17 in the assignment.

18 Q    Was there any reason you sought the assistance of Mr.

19 Harland?

20 A    Mr. Harland was a -- a good choice for us in this

21 assignment because he has actually appraised museums before.

22 So he had some experience there.  And that helped us divide

23 the tasks to meet a delivery deadline.

24 Q    Do you have prior experience as an expert witness?

25 A    Yes, I do.

1  Q     How many times have you been qualified as an expert

2  witness?

3  A     Roughly 20.

4  Q     In what subjects?

5  A     In -- as a real estate appraiser.

6  Q     Have you provided in Court testimony in connection with

7  those qualifications as an expert witness?

8  A     Yes, I have.

9  Q     In how many of those?

10  A     All of those.

11  Q     All 20?

12  A     All 20.

13  Q     Have you appeared as an expert witness in any federal

14  proceedings, federal bankruptcy proceedings?

15  A     Yes, in one case.

16  Q     Which case was that?

17  A     It was a case involving a -- I was retained by a bank to

18  appraise a special use property.  It was like a dance studio

19  with a boarding house component that was being -- there was a

20  valuation dispute.

21  Q     Are there different types of appraisals?  Different types

22  of valuations that clients of Hilco's come to you to request?

23  A     Yes.  We get requests for different values based on what

24  the client's needs are.  And so we can provide a range of

25  scope of services.

1  Q    And what are the types of appraisals that you typically

2  provide?

3  A    So appraisals can be for market value.  We do some

4  liquidation work, disposition work, value and use for

5  accounting purposes, and going concern values for like hotels.

6  Q    You said market value.  Do you mean fair market value?

7  A    Fair market value, yes.

8  Q    And what kind of appraisal was solicited from you in

9  connection with your retention here?

10  A    In this case we provided a fair market value opinion.

11  Q    Okay.  Are there different methodologies that can be used

12  to arrive at a fair market value valuation?

13  A    Yes.

14  Q    What are they?

15  A    So there's three main approaches to value, a cost

16  approach, sales comparison approach, and an income approach.

17  Q    Can you generally describe the methodology associated

18  with the cost approach?

19  A    The cost approach is you -- you estimate the replacement

20  cost of an asset.  You deduct accrued depreciation and to that

21  you add the value of the land to arrive at an opinion and

22  value.

23  Q    And can you generally describe the methodology behind the

24  sales comparison approach?

25  A    So the sales comparison approach is based on

1  substitution.  So you're looking for similar properties that

2  have sold that have like characteristics.  And you compare

3  those to your property to conclude an opinion and value.

4  Q    You use comparable sales?

5  A    Comparable sales, yes.

6  Q    And how about the income capitalization approach?

7  A    So the income or capitalization approach is based on a

8  property's ability to create and sustain income.  And so it's

9  based on cash flow.  And capitalizing the cash flow to an

10  appropriate opinion -- opinion of value.

11  Q    Are these three approaches, the three you just described,

12  are these generally accepted methodologies in the appraisal

13  profession?

14  A    Yes.

15  Q    And do you follow them regularly in connection with your

16  business?

17  A    Yes, we use them daily.

18  Q    Okay.  Did you -- by the way did you complete all three

19  of those in connection with your exercise in this case, your

20  assignment for the DIA?

21  A    For this assignment we completed the cost approach, the

22  sales comparison approach, but we did not complete the income

23  approach.

24  Q    And why not?  Why did you not choose to undertake to

25  complete an income capitalization approach?

1  A    For the purpose that the subject property is a special

2  use asset, that's built for use and not to create cash flow or

3  for cash flow purposes.

4           MR. IRWIN:  Your Honor, at this time I would move to

5  qualify Mr. Satter as an expert in real estate valuation.

6           THE COURT:  Any objections?

7           MR. BRILLIANT:  No objection, Your Honor.

8           THE COURT:  You may proceed.

9  Q    Mr. Satter, back to our story.  Hilco was retained by the

10  City of Detroit when?

11  A    I think in June of this year.

12  Q    Okay.  And what was the nature of that engagement?

13  A    The nature of the engagement was to provide a fair market

14  value opinion for the Detroit Institute of Arts.

15  Q    What did you know about the -- may I refer to it as the

16  DIA?

17  A    The DIA.

18  Q    What did you know about the DIA at the time?

19  A    Well, we were familiar with the DIA as being a art museum

20  in Detroit.

21  Q    Did you know anything about the -- the land or the

22  improvements at that time?

23  A    Initially, no.

24  Q    Okay.  What did you come to learn about the -- the

25  characteristics of the building itself and the real property?

1  A    So in the course of -- of completing the assignment, you

2  know, we came to understand that the DIA is a very -- it's a

3  world class art museum.  It's a wonderful building of a

4  historic nature, about 462,000 odd square feet above grade.

5  About 14 acres of land located in the midtown market area

6  within a historic cultural district.

7  Q    When was it constructed?

8  A    The original section of the museum was constructed in the

9  late twenties.  And there were two additions, 19 -- both in

10  the late sixties.  And then there was a small addition in

11  2002.

12  Q    Was there -- was that a renovation, or -- or an addition?

13  A    Yeah, I think it was a small addition they put on to --

14  for the purpose of warehousing the art while they went through

15  a renovation that they were proposing.

16  Q    Okay.  And how many acres was the real property?

17  A    A little over 14 acres.

18  Q    How many parcels?

19  A    I think it was like eight actual tax parcels.

20  Q    Okay.  And what -- were they -- were they contiguous,

21  were they separated, what was the nature of the parcels?

22  A    There's three main parcels that the DIA building sits on

23  and John R. Road runs between the building and its parking lot

24  to the east.

25  Q    Okay.  So when you get the assignment, describe for the

1  Court what you do to gather information so you understand what

2  it is that you're going to be able to need -- or what you will

3  need to approach the project.

4  A    All right.  So the first thing we did, we reached out to

5  our property contact which was Mr. Bowen, Robert Bowen the

6  CFO.

7  Q    Who is Mr. Bowen?

8  A    I believe he's the CFO.  And to discuss an opportunity to

9  come and -- and tour the museum to gather physical information

10 on the property, understand its history, its capital

11 expenditures, things that relate to value, understanding how

12 the systems work.  And we were able to perform that inspection

13 in -- in late June.

14 Q    Did you inspect the interior and the exterior of the

15 building?

16 A    Yes.

17 Q    And why was that?

18 A    To get a sense of its physical characteristics and also

19 assess its overall property condition and quality.

20 Q    Did you interview anyone else in connection with your

21 preliminary investigation?

22 A    Yeah.  Most of my time was spent with Cedric Alexander

23 who is the engineer, lead engineer who has knowledge of the

24 systems, capital expenditures, and somewhat the history of the

25 property.

1  Q    Okay.  How about public records or other records?  What

2  records did you seek out to aid you in this investigation?

3  A    We looked at county records and some city records.  We

4  looked for -- we got a title report we received.  We looked at

5  on line information in general about the midtown market area,

6  the DIA, other information we could get out of there just to

7  fill in the blanks.

8  Q    Floor plans?

9  A    We received floor plans from the engineer.  We received a

10  survey of the property.

11  Q    How about census data?

12  A    Yeah, we pulled census data to understand the

13  demographics and population trends.  The income

14  characteristics of the local area.  That was sourced through

15  Claritas and also through on line records and through the

16  county.

17  Q    What kind of market investigation did you perform, both

18  -- both local markets and -- and broader than that?

19  A    We've looked, you know, locally for sale activity for

20  land sales.  We also looked for improved sales of an

21  institutional nature that would be comparable to the DIA.  And

22  having finding very limited data, we expanded that search

23  nationally to -- to comprise a data set for analysis.

24  Q    Are you familiar with the term highest and best use?

25  A    Yes.

1  Q     And how is that term used in your profession?

2  A     So highest and best use is a principal for land use

3  assuming that all things, you know, given there's a highest

4  and best use of the land based on its -- on its -- on legal

5  characteristics, you know, it's physical characteristics, and

6  then financial feasibility.

7  Q     Does highest and best use analysis give you insight into

8  who potential purchasers might be?

9  A     Yes.

10 Q     Okay.  Given the DIA's characteristics here, did you

11 perform a highest and best use analysis on the DIA as the

12 subject property?

13 A     Yes, we did.

14 Q     And what was your -- what was the analysis there?  What

15 were your opinions?

16 A     So our conclusions for the highest and best use of the

17 property as improved was for continued institutional use as

18 one likely scenario.  And we also concluded a secondary

19 scenario, assuming that there was, you know, another caveat

20 that was not a institutional user, or buyer, the next most

21 likely buyer would be an investor.

22 Q     So what do you -- what do you mean when you say

23 institutional user or institutional buyer?  Are you thinking

24 about someone specific in -- in this community, or do you mean

25 something different?

1  A    So an institutional buyer would be like Wayne State for

2  instance would be a likely buyer given their -- their campus

3  is there and they're the largest land owner in the area.

4  Perhaps one of the other colleges in the immediate area

5  creative studies, or one of the other state schools may want

6  to have a larger kind of anchor here inn Detroit, be part of

7  the renaissance.  Those types of buyers.

8  Q    Okay.  If there were not a -- an institutional buyer like

9  a Wayne State that you're describing, what is the next most

10  likely set of buyers for the property?

11  A    If it's not going to be a user, it's going to be an

12  investor.

13  Q    Okay.  And are there different methodologies or different

14  analyses that you would want to run if you were looking at one

15  as to the other?

16  A    Yes.  We'd look at different types of data for -- for

17  each potential user.

18  Q    Okay.  Which of the methodologies that you have described

19  here corresponds to a potential or hypothetical purchase by an

20  institutional purchaser?

21  A    So the cost approach presented is -- was done as improved

22  as -- as a museum property.  And part of the sales comparison

23  approach also we analyzed the property as -- as it currently

24  is -- is improved.

25  Q    And did you also run an analysis for a potential

1  institutional purchaser?

2      Yeah.  Those would -- those would be institutional

3  purchasers and --

4  Q    I -- I -- I misspoke, I'm sorry.  Did you also run an

5  analysis for a potential investor purchaser?

6  A    We did.  We looked at comparable sales in the Detroit

7  market to try and understand the pricing for large assets

8  acquired by investors.

9  Q    Okay.  So let's take the cost approach first and the

10  analysis with a hypothetical institutional purchaser.  Can we

11  do that?

12  A    Sure.

13  Q    Okay.  Can you walk me through the first step of the cost

14  approach for an institutional purchaser?

15  A    Sure.  So the cost approach, you know, we -- the first

16  step is to estimate the replacement cost of the facility and

17  in that case we're looking at published cost data and we

18  looked at -- from two sources.  And we looked at general

19  information on -- on museums that have been built within the

20  last ten, 12 years that would give us some sense on a price

21  per square foot.  We also did speak to some architects

22  generally on ranges of costs that they have been involved in.

23  Q    How about land value?  Do you look at land value?

24  A    Yeah.  We -- we did look at land value.  We estimated the

25  land value based on comparables on -- on land sales within the

1  Detroit market area.  We had a sale in the midtown area over

2  by the DMC campus and another one on -- on Woodward.  And a

3  couple sales in other outlying neighboring communities.

4  Q    What -- what are the characteristics of the parcels that

5  you are looking at in connection with this aspect of the cost

6  approach?

7  A    So the characteristics of the land sales we were looking

8  for lands, large land sales.  You know, the DIA is on 14.5

9  acre -- 14.05 acres.  And so we were looking for large sales

10 similar to that in nature.  You know, located in the Detroit,

11 you know, urban market.

12 Q    And were you able to identify sufficient comparable land

13 sales?

14 A    We feel we found five sales that gave us a -- a range of

15 value from which we could derive a -- a credible opinion of

16 value.

17 Q    Do you recall what the range of value was?

18 A    It was pretty wide.  It was something like 50,000 to, I

19 think, 1.9 million an acre.  Given -- I mean those were the

20 sales we were able to confirm, yes.

21 Q    Okay.  And from there how did you determine what the

22 comparable land value was going to be for the DIA?

23 A    So we considered the sales and gave most weight to the

24 sales in the midtown area.  There was one on like I said over

25 by the DMC campus plant where they added a building and bought

1  part of a park.  And in the other one they -- is on Woodward

2  Avenue and which is a pending sale.

3  Q    Okay.  And do you recall what your opinion was as to the

4  value of the land in connection with looking at these five

5  comparables?

6  A    Yes.

7  Q    And what was that?

8  A    That was $500,000 an acre.

9  Q    Okay.  So what is the math then?  When you're at $500,000

10 an acre do you have a final land value that you're able to

11 derive from there?

12 A    About $7,000,000 rounded.

13 Q    Okay.  And that's just the acreage times the $500,000 per

14 acre?

15 A    Correct.

16 Q    Okay.  You got the land value.  Now tell me about how you

17 calculate the replacement value.  I'm sorry, the replacement

18 cost.

19 A    And so replacement cost, as I mentioned we -- we sourced

20 two published cost source.  One the Marshall valuation service

21 which is a published cost manual that we use daily.

22 Q    But what -- what -- what is it?  I'm sorry, what is the

23 Marshall valuation service?

24 A    So Marshall valuation service is a published cost data

25 source that we subscribe to.  They aggregate construction cost

1   data on every property type.  On churches, museums, office

2   buildings, retail.  And that information is aggregated and

3   they develop a base cost from which we add refinements for

4   various factors.

5   Q    Okay.  Were there other data sources that you considered

6   in connection with trying to determine replacement cost?

7   A    Yeah.  We considered the -- the Department of Interior

8   publishes a -- a cost manual.  And in that they reference

9   museums.  And that had a range of value that we considered.

10  Q    Did you consider any other market data in connection with

11  museum construction costs?

12  A    We did.  We -- we were able to source a few museums that

13  have been built like in the last ten to 12 years.  And those

14  figures which we are not -- we've never -- we did not get

15  copies of actual construction statements.  We got figures

16  which we thought were credible, we considered those.

17  Q    And what did you do with that data?  The data from the

18  three sources that you've described?

19  A    So we considered those three sources and we concluded a

20  final replacement cost.

21  Q    And what was that final replacement cost?

22  A    So the final replacement cost for the DIA building and

23  the site improvements including the parking lots, et cetera,

24  we concluded at $242,000,000.

25  Q    And what does that mean?  That's the cost to replace

1  what?

2  A    That would the cost to build a new museum on that campus

3  of that size.

4  Q    Okay.  What do you do next?  Now you have a replacement

5  cost.  What do you do next in the cost approach as a

6  methodology?

7  A    So the second step is to estimate accrued depreciation.

8  Q    Okay.  What are -- are there more than one category of

9  accrued depreciation?

10 A    So -- so accrued depreciation is -- is you have

11 bifurcated the two components physical depreciation and

12 obsolescence.

13 Q    What is physical depreciation?

14 A    So that's just a wearing out of the building.  You know,

15 it's kind of a function of its age, its condition, any

16 deferred maintenance items that need to be taken care of.

17 Q    And how -- how -- how conceptually do you go about

18 calculating depreciation based on physical deterioration?

19 A    So we look at factors such as the actual age of the -- of

20 the -- of the building.  So in this case like the weighted

21 chronological average of the DIA is 66 years.

22 Q    How did you determine that?

23 A    So it's a weighted average based on the various

24 components of the building.  So the -- the interior, original

25 section was built in the late twenties.  So you take that age

1 times its square footage and then we did that for the two

2 wings and also for the new small piece.

3 Q    Are you familiar with the term effective age?

4 A    Yes.

5 Q    What does effective age mean?

6 A    So effective age is a measurement of the age of the

7 property relative to its useful life.  And in this case when

8 -- although the weighted average of the building is 68 years,

9 you know, it has been well maintained.  And they had done some

10 renovation work over the years.

11     And so in my opinion the building projection age of 15

12 years.  So we know it's not new, we know it's not 66.  So

13 somewhere in there is where, you know, in our opinion the

14 effective age is and that in our opinion is 15.

15 Q    And how did you use the building's effective age in

16 connection with calculating physical depreciation?

17 A    So in -- so Marshall valuation service also as part of

18 the publication provides economic life estimates for

19 properties.  And those can range based on the quality and the

20 condition and type of property.  And in this case for museums

21 of -- of the high quality that we -- we classified the DIA,

22 it's 60 years.

23 Q    And so what did you do with the 15 years of effective

24 age?

25 A    So to -- so to compute the physical depreciation we

1  estimated from the physical depreciation, we divided the 15 by

2  60 to estimate physical depreciation of 25%.

3  Q    Okay.  So that's one component of depreciation, physical

4  depreciation, that's 25%?

5  A    Right.

6  Q    What is the second component?  Obsolescence I think you

7  called it.

8  A    Oh, obsolescence -- excuse me, is the other form of

9  accrued depreciation.

10 Q    And how did you calculate obsolescence in this case?

11 A    So for obsolescence ideally you want to try and extract

12 that from the market.  It's a loss that's due to functional

13 either inadequacies, deficiencies, over improvements of the

14 asset, or external forces which were related to market

15 conditions, over supply, under supply, or in this case

16 property type as well.  And those two components in our

17 analysis formed the obsolescence estimate.

18 Q    Okay.  And what did you do here?  What did you do

19 specifically to calculate obsolescence here?

20 A    So we were able to find in the -- our search of museum

21 asset sales, two sales that were built fairly new, one in 2008

22 and one in 2001, I believe.  And both of those museums we were

23 able to get the -- the cost new and we were able to understand

24 the land value.  And they recently sold.

25          And from that we can derive total depreciation for those

1  -- for those sales, or for those museum, you know,

2  institutional cultural center type sales.

3  Q    Why did you pick those two properties?

4  A    Well, we picked those two properties because one, they --

5  they're fairly new, so they have a low amount of physical

6  depreciation which wouldn't necessarily have to be, you know,

7  subjectively, you know, parsed.

8      We could rely on the fact that since they're fairly new,

9  they would have low depreciation and which would mean that the

10  -- the majority of the -- of the loss in value would be due to

11  obsolescence.

12  Q    So these are properties that are selling for much lower

13  than they were purchased, is that right?

14  A    That's correct.

15  Q    Okay.  And what was the obsolescent rate that you

16  observed in the two comparable properties?

17  A    So the obsolescence, just the obsolescence portion ranged

18  I think 58 to 66% of the value.

19  Q    Were these special use properties?

20  A    They were.

21  Q    Okay.  So what did you do then with the two components of

22  depreciation that you had calculated?

23  A    So we concluded 60% as the obsolescence for the DIA based

24  on those two asset sales.  And then we added that to our

25  estimate of physical depreciation of 25 to conclude a total

1 accrued depreciation of 85%.

2 Q    Okay.  And what did you do with the 85% depreciation

3 rate?

4 A    So we multiply that times the cost new to conclude a

5 depreciated value of the improvements.  And to that we add the

6 value of the land to conclude a final opinion of value by the

7 cost approach.

8 Q    Okay.  And can you summarize the math for us?  Tell us --

9 tell us roughly what those numbers added up to be?

10 A    Yeah.  So the land value was 7,000,000 and I believe the

11 depreciated improvement value was roughly 36,000,000.  And our

12 -- our value by the cost approach was -- we estimated at

13 $43,000,000.

14 Q    And was that your final valuation under the cost

15 approach?

16 A    Yes.

17 Q    And the cost approach was -- assuming that there would be

18 an institutional investor, right?

19 A    Correct.

20 Q    You -- you mentioned earlier a -- a scenario that you ran

21 or contemplated in connection with a situation where there

22 isn't an institutional purchaser.  Do you recall that?

23 A    I do.

24 Q    Can you -- can you describe that process for us?

25 A    So if we -- if the sale of the -- of the facility is not

1  to a user who is going to continue its use for institutional

2  purposes, it's our opinion that the next buyer would be an

3  investor.

4      And so in this case we looked at the sales of -- of large

5  investor type assets, or large assets purchased by investors

6  in the Detroit market area.

7  Q    What were the characteristics of those properties that

8  you were seeking to use in connection with this sales

9  comparison approach?

10 A    So the -- the characteristics that we looked for were

11 large assets like the DIA, 460,000 square foot building that

12 would be vacant.  And it would require significant capital

13 expenditures to repurpose for, you know, office or a hybrid of

14 uses.  And primarily, you know, we wanted to stay in the

15 Detroit market.

16 Q    Were you able to locate such properties?

17 A    We did find four sales that -- that were located in the

18 downtown market.

19 Q    And what conclusions did you draw about those four sales?

20 A    Those sales ranged in value from I think 20.00 to $48.00

21 a square foot.

22 Q    Were you able to determine a value per square foot for

23 use for the DIA comparison?

24 A    Yes.

25 Q    And what was that?

1  A    And so we -- we considered the asset and given the DIA's

2  characteristics we felt that towards the higher end of the

3  range was appropriate for the property given it has a larger

4  amount of land and even though it's a three story structure, a

5  lot of the sales were multi-story type properties.  We felt

6  the $40.00 a square foot was a reasonable number.

7  Q    And -- and just doing the math, what is the -- what is

8  your final opinion of value using the comparative sales

9  approach?

10  A    That's 18.5 million dollars.

11  Q    Okay.  So -- so 18 -- that was 18.5, we had forty-three

12  before.  Eighteen is less than half of -- of forty-three.  Did

13  that surprise you?

14  A    You know, it doesn't really.  We have data sales that

15  kind of corroborate that.  Within our data set we have three

16  museum, you know, institutional type purchases in downtown

17  Manhattan that we included for the purpose of demonstrating

18  that.

19      Two were purchased by institutions for continued use, and

20  one was purchased by an investor.  And the investor sale is

21  roughly half.

22      Also our familiarity just with investors and their

23  abilities to -- and the -- and the requirements for return on

24  investment will require -- will not allow them to pay as much

25  as a cultural institution primarily because if it's purchased

1  by an investor the property is going to go on the tax rolls.

2      And now you have an eighteen and a half million dollar

3  asset on the tax rolls paying at 8 1/2% about a million five

4  in taxes per year.  And if you capitalize that at a -- at a

5  very, you know, conservative rate of 10%, you're talking about

6  $15,000,000 or so.

7      So really the delta becomes from the tax burden that is

8  imposed on a private investor or investor type as opposed to

9  someone who's a non-profit.

10 Q    How about cost of repurposing.  Does that play into this

11 at all?

12 A    Yeah.  We considered that.  You know, it's a beautiful

13 building and it's got wide halls and, you know, nice spaces.

14 But it would be a real challenge to repurpose that and also

15 there's -- there's still a lot of kind of question marks and

16 some caution because, you know, it's in a historic district

17 and whether or not, you know, it will be allowed -- what

18 allowable uses, you know, remained, you know, to be answered

19 by the city.

20 Q    Sir, what -- what is your final opinion as to market

21 valuation for the DIA property?

22 A    We've put in a range of value for the DIA based on our

23 two scenarios of potential buyers.  We concluded an eighteen

24 and a half million dollar value for an investor purchaser and

25 we concluded a $43,000,000 value for an institutional

1 | continued use -- user type purchaser.

2 |          MR. IRWIN:  Okay.  Thank you, Your Honor.  No

3 | further questions.

4 |          THE COURT:  Okay.

5 |          MR. BRILLIANT:  May I approach, Your Honor?  I

6 | apologize for not having a fancy notebook, Your Honor, but

7 | we're from out of town, don't have a lot a resources here.

8 |          THE COURT:  That's okay.

9 |                    CROSS EXAMINATION

10 | BY MR. BRILLIANT:

11 | Q    Good afternoon, Mr. Satter.

12 | A    Good afternoon.

13 | Q    Now your primary work for appraisals is in the Chicago

14 | market, isn't that right?

15 | A    That's correct.

16 | Q    And you do most of your work in that region?

17 | A    A good percentage.

18 | Q    Well, when you say a good percentage, is it more than the

19 | majority?

20 | A    Yes.

21 | Q    And you're not a museum appraisal specialist, isn't that

22 | right?

23 | A    I am not.

24 | Q    And in fact this is the first museum appraisal you've

25 | ever done, isn't that right?

1  A    That's correct.

2  Q    And appraising a museum is harder than appraising other

3  properties, isn't that right?

4  A    I would say that the museum is just a different special

5  use type property that requires a similar methodology.

6  Q    But it's -- but it's harder than appraising a -- a

7  property where there's a lot of easy comparables, isn't that

8  right?

9  A    Absolutely.

10  Q    And even among museums, all museums aren't the same,

11  isn't that right?

12  A    That is true.

13  Q    I mean there's many different kinds of museums?

14  A    Yes.

15  Q    There's art museums, right?

16  A    Yes.

17  Q    Historical museums?

18  A    Yes.

19  Q    Science museums?

20  A    Yes.

21  Q    Sports museums?

22  A    Yes.

23  Q    And even within, you know, art museums there are

24  different types of art museums, isn't that right?

25  A    I suppose.

1  Q    Well, there's museums of contemporary art, right?

2  A    Yes.

3  Q    And then there's large museums and small museums, right?

4  A    Correct.

5  Q    And then different types of museums have different --

6  need different features, isn't that right?

7  A    I think that because they're all special use properties

8  that all of the types that you've mentioned all have unique

9  characteristics.

10 Q    Okay.  And they -- and they all need to have different

11 features, right?

12 A    Yes.

13 Q    And with -- and I -- I saw you here.  You heard Ms.

14 Erickson's testimony, is that right?

15 A    I heard just a very brief portion of it.

16 Q    Okay.  And were you here when she said this was an

17 encyclopedic museum?  Did you hear that?

18 A    I'm -- I'm not sure if I heard that.

19 Q    Okay.  But this type of museum needs special types of --

20 of security, right?

21 A    Yes.

22 Q    And it also needs to have special type of climate control

23 for the building, right?

24 A    Sure.

25 Q    And it needs all that to protect the art, right?

1  A    Of course.

2  Q    And it also needs to have certain types of -- of fire

3  alarms?

4  A    Yes.

5  Q    And -- and also fire protection equipment, right?

6  A    And it has all that.

7  Q    And it has to be dry rather than wet, isn't that right?

8  A    I think it has both types.

9  Q    And it also needs lots of display cases?

10 A    It does have lots of display cases, yes.

11 Q    And -- and all kinds of other built in things in order to

12 show the art, isn't that right?

13 A    Yes.

14 Q    And I think you mentioned earlier it has high ceilings

15 and -- and wide hallways?

16 A    Yes.

17 Q    And that's all necessary in order to -- to show the art,

18 right?

19 A    Yes.

20 Q    Now you -- you would agree with me that, you know, this

21 particular property, and you refer to it as the DIA which can

22 be a little bit confusing, but for purposes of -- of this

23 cross examination we'll just call it the property.

24      All right.  Now with respect to this, you know, property,

25 you agree that, you know, it houses a -- a very high end

1  museum, isn't that right?

2  A    Yes.

3  Q    And there are other high end museums in the United

4  States, right?

5  A    Sure.

6  Q    I mean there's the Getty Museum, right?  You're familiar

7  with that one, aren't you?

8  A    No.

9  Q    No?  Okay.  Are you -- are you familiar with the Eli

10 Broad Museum?

11 A    I'm not.

12 Q    You're not?  Are you familiar with the Chicago -- closer

13 to home, you're familiar with the Chicago Art Institute,

14 right?

15 A    Many times.

16 Q    Okay.  And -- and these are all -- well, at least with

17 Chicago Art Institute you'll agree with me that's a high end

18 museum, right?

19 A    Yes, sir.

20 Q    In many respects it's similar to the DIA?

21 A    I would think so.

22 Q    Now in doing your appraisal you searched for comparable

23 sales, right?

24 A    Yes, sir.

25 Q    And you didn't find any sales of -- of buildings that are

1  like the DIA, or you know, this property, right?  You didn't

2  find any sales that are like this property, isn't that right?

3  A    We did not, did not.

4  Q    And you didn't find any, you know, in any year, right?

5  It's not you didn't find one in the last couple years, you

6  didn't find any for any years, isn't that right?

7  A    Yeah, we did not have success finding comparable sales.

8  Q    So as I said, so it's not easy to, you know, appraise a

9  museum, right, because there's not a lot of comps?  Do you

10  agree with that?

11  A    I agree with that.

12  Q    Okay.  Now, you know -- you know, it -- I believe that

13  you agree that this is a beautiful building, right?

14  A    Yes.

15  Q    It has a magnificent white marble facade?

16  A    Yes, it has a white marble facade.

17  Q    And it has a great location, doesn't it?

18  A    It is a good location.

19  Q    It's -- it's -- it's better than good.  Did you hear Ms.

20  Erickson testify about the location and -- and where it's

21  located?

22  A    Ms. Erickson obviously is -- works there and is very very

23  enchanted with the place.  But I agree it sits in a nice

24  downtown midtown area and, you know, it's a beautiful little

25  cultural historic area, yes.

1  Q    Okay.  Well, so how -- how many appraisals have you done

2  in Michigan in the last two years other than this one?

3  A    I would say we've done about --

4  Q    No, no, no, not we.  How many appraisals have you, sir,

5  done in Michigan in the last two years?

6  A    Personally about ten.

7  Q    Ten, okay.  And how many have you done in Detroit?

8  A    In the city only one.

9  Q    Okay.  And what -- and what was that appraisal?

10 A    That was a -- it was a fast food restaurant.

11 Q    And when was that?

12 A    That was this summer.

13 Q    And did that have a replacement value of $243,000,000?

14 A    The owner was hoping that we would come in at that, yes.

15 Q    Now the museum has -- has -- has very good access to the

16 highways, doesn't it?

17 A    Yes, that area does.

18 Q    It has a big parking lot, doesn't it?

19 A    It has a -- yes, it does have a parking lot.

20 Q    Okay.  Now the -- the museum was expanded and renovated

21 between 2002 and 2008, isn't that right?

22 A    That is correct.

23 Q    Okay.  And expansion and renovation costs 158.2 million

24 dollars, right?

25 A    I think that was the total cost of the project, yeah.

1  Q    Yeah.  For both the expansion and the renovation?

2  A    Right.

3  Q    158.2 million dollars?

4  A    Correct.

5  Q    And that is in, you know -- you know, real dollars

6  expended at that point in time, right?

7  A    That's correct.

8  Q    And there has been inflation since then?

9  A    Yes, sure.

10  Q    And the -- and the replacement cost for just that would

11  have increased over the amounts that were actually expended in

12  today's dollars, isn't that right?

13  A    I guess I would agree with that, yeah.

14  Q    Okay.  And did you do -- and you didn't do any analysis

15  to try to determine what that 158.2 million dollars would be

16  in today's dollars, did you?

17  A    I did not.

18  Q    Now the -- the expansion included a 31,383 foot addition

19  to the south wing, isn't that right?

20  A    That's correct.

21  Q    And after the -- the renovations, the property is in good

22  condition, isn't it?

23  A    Yes.

24  Q    Okay.  And you walked through the property, right?

25  A    I did.

1  Q    And none of the other members of your team went through

2  the property, it was just you, right?

3  A    They had visited the museum before.

4  Q    Okay.  But when you had the walk through in this June, it

5  was just you, right?

6  A    Just me.

7  Q    And Mr. Harland wasn't there, isn't that right?

8  A    He was not with us, no.

9  Q    Okay.  And I believe you testified earlier you believe

10 the -- the building has a economic life of 45 years?

11 A    No.  We believe the building has an economic life of 60

12 years.

13 Q    You say -- you say remaining or --

14 A    Remaining.

15 Q    Oh, remaining.

16 A    The building.

17 Q    The building has a remaining economic life of 45 years,

18 isn't that right?

19 A    That would be the math, correct.

20 Q    All right.  And you also believe that there's only

21 minimal deferred maintenance on the building, isn't that

22 right?

23 A    Well, there's deferred maintenance on a roof section and

24 they were tuck pointing the -- the original Cret portion and

25 they had a cap backs program that is outlined in one of the

1  exhibits, one of the addenda.  But it's -- so it's, you know,

2  I think it's broken out in the analysis.

3  Q    Right.  But you -- you believe that there's only minimal

4  deferred cap -- cap backs and in fact you think it's only

5  about $4,000,000, isn't that right?

6  A    That's correct, yeah.

7  Q    Okay.  Now the -- the original part of the building was

8  designed by the renown French architect Paul Philippe Cret,

9  isn't that right?

10  A    That's correct, okay.

11  Q    Now are -- are you familiar with -- with Mr. Cret's work?

12  A    Not extensively, no.

13  Q    After you reviewed the property -- or after you were

14  retained, did you do any analysis to learn about the

15  architect?

16  A    No, I did not.

17  Q    So you know he's from France though, right?

18  A    Well, the name sounds French.

19  Q    So he's -- so did you know anything about -- do you know

20  anything about -- about Mr. Cret?

21  A    I know that he designed the -- the interior section of

22  the -- of the original portion of the museum, sir.

23  Q    And that's all you know about him?

24  A    Well, yes.

25  Q    Do you know what prizes he won?

1  A     I do not.

2  Q     Do you know about his other famous buildings?

3  A     I am not aware.

4  Q     You aware about any of the war memorials that he

5  designed?

6  A     I am not.

7  Q     Now the -- the north and the south wings they were

8  designed by Gunnar -- Gunnar Birkerts, isn't that right?

9  A     It sounds -- yes.  That sounds right.

10 Q     Well, do you know that or it just sounds right?

11 A     I -- I -- it sounds familiar.

12 Q     Okay.  And do you know who he is?

13 A     I do not.

14 Q     Do you know whether he's world famous?

15 A     I do not know.

16 Q     Maybe this one will be a little easier.  The 2002 to 2008

17 renovations, do you know who oversaw those?

18 A     The current CFO.

19 Q     No, who was the architect for them?

20 A     I do not know the architect's name.

21 Q     If I told you it was Michael Graves, would that sound

22 familiar?

23 A     I do not recall.

24 Q     Are you familiar with Michael Graves?

25 A     I am not.

1  Q    So you don't know what his stature is in -- in the United

2  States or among architectural circuits?

3  A    No, I do not, sir.

4  Q    Okay.  Now you would agree that the property is a first

5  class museum property, wouldn't you?

6  A    I would.

7  Q    And you would agree that the property has historic

8  architecture, right?

9  A    Yes, I would.

10 Q    And isn't it the case that the property contains

11 desirable architecture that is no longer feasible based on

12 current costs?

13 A    That is correct.

14 Q    And in fact it's a -- it's a local landmark, isn't it?

15 A    It is a landmark, yes, federal -- it's on the federal

16 registry.

17 Q    Now and -- and the property has numerous built ins, isn't

18 that correct to showcase the art?

19 A    And those are -- and those are really, you know, property

20 that is part of the art -- art museum itself.  It's not real

21 estate.

22 Q    But -- and you -- and you didn't value those, right?

23 A    Did not.

24 Q    Okay.  So -- so you didn't value the -- the shelves?

25 A    No.

1  Q     The display cases?

2  A     We did not.

3  Q     What about the -- the theater with the -- with the seats?

4  A     You know, the space -- probably would include the space,

5  the theater space, but no, we didn't really get into the

6  personal property those portions of the -- of the asset.

7  Q     And you didn't -- and you didn't value the -- the

8  specialized lighting?

9  A     We did not.

10  Q     Okay.  Now you -- you agree that the highest and best use

11  of the property is an art museum, right?

12  A     We included the highest and best use of the property is

13  for continued use as a institutional facility, yes.

14  Q     Well, I'm -- I'm asking you a slightly different

15  question.  So -- so do you -- do you believe that the highest

16  and best use of this property is continuing as an art museum?

17  A     Well, our assignment was to value the property as if it

18  was vacant.  It was not to value the property as if it's still

19  a functioning art museum.  We were hired with the caveat that

20  it's vacant and then all art or any personal property,

21  anything at all that resembled anything to do with the art

22  business was -- was gone.

23      And you basically had an empty building that the next

24  user was going to come along and take possession of and do

25  whatever it is that they're going to do.  They could be art --

1  art people, they could be, you know, railroad museum.  I know

2  you mentioned other types of museums.  It could be any one of

3  those number of -- of purchasers.  It could be Wayne State.

4      So those were the kind of users.  And so in our highest

5  and best use, we assumed it was going to be that kind of user.

6  We didn't know and really if it's not the DIA art in there, I

7  really don't think it's going to be an art museum.

8  Q    All right.  So I'll -- I'll ask you the question again

9  and maybe this time you'll -- you'll -- you'll answer it for

10  me.  So sitting here today, leaving aside what you were told

11  to do by the -- by the city in terms of your appraisal,

12  sitting here today, don't you believe that the highest and

13  best use of this property is as an art museum?

14  A    For continued use under -- under no duress from the

15  bankruptcy and the whole -- all that, I would say yes.

16  Q    Leaving aside the bankruptcy.  We're just talking about a

17  piece of property now, okay.  We're talking about a piece of

18  property.

19  A    Well, it's -- it's hard to say that, you know, our -- our

20  opinion is that the highest and best use of the property is

21  continued use as a museum given --

22      THE COURT:  All right.  Let me interrupt.  Is it

23  your testimony that the highest and best use might include an

24  art museum, but might include any other kind of institutional

25  use?

 1  A    Yes, sir.

 2         THE COURT:  Let's move on.

 3         MR. BRILLIANT:   Okay.

 4  Q    Now -- now, sir, you're aware that the -- the city wants

 5  to transfer the property to the DIA, isn't that right?

 6  A    Yes, I read something about that.

 7  Q    And if it's transferred to the DIA it would continue to

 8  be used as an art museum, isn't that right?

 9  A    As I understand it under the plan that is -- that is the

10  intent.

11  Q    Now, sir, I want going to ask you about your report.  You

12  -- you did give a report, an expert report, is that right?

13  A    Yes, sir.

14  Q    And that contained your opinions?

15  A    Yes, sir.

16  Q    And you worked hard on that, right?

17  A    Yes, sir.

18  Q    And you were careful to make sure that it was accurate?

19  A    Yes, we did.

20  Q    And -- and the reason for that is because you -- you knew

21  that it was going to be shown to the Judge and -- and that the

22  city was going to ask the Judge to rely on it, isn't that

23  right?

24  A    That's correct.

25  Q    Now isn't it true that there's numerous errors in your

1  report?

2  A    I'm aware of one error that we -- that we found.

3  Q    Okay.  Well, let's see, we'll go through it and we'll --

4  and we'll see.  That's Exhibit 406?  Okay.  Well, the first

5  thing is -- is there an inconsistency in your report as to

6  what your opinion is?

7  A    I mean our opinion is -- we -- we gave two opinions of

8  value.  We gave an opinion of value -- we give a range of

9  value.  We concluded a value as an institutional facility.  So

10  I'm not aware -- I'm not aware --

11  Q    So, all right, you're not -- you're not aware of an

12  inconsistency in your report with respect to your opinion, is

13  that right?

14  A    That's correct.

15  Q    Okay.  Can you turn to Page 4 of your amended expert

16  report, please?  Can you highlight the first sentence, please?

17  The first sentence after conclusion.  After conclusion.

18      Now isn't it true, sir, that your opinion is that subject

19  to certain assumptions, limiting conditions, certifications,

20  and definitions set forth in the appraisal, I have concluded

21  that the market value of the property is $43,000,000.  Now

22  that's your opinion, right?  That the property is worth

23  $43,000,000?

24  A    Yes, that's one of our conclusions.

25  Q    But that -- that -- that is your ultimate opinion of the

1  value of the -- of the fair market value of the property,

2  right?

3  A    That is an opinion of value, yes.

4  Q    Okay.  Can we turn to -- to Page 66 of the -- of the

5  attachment, please?  Sixty-six on the bottom.  Can you

6  highlight the bottom paragraph, please?  And keep going to the

7  end -- to the end of the page.

8       Now, sir, after your amended report you attached, you

9  know, your valuation, isn't that right?

10 A    That's correct.

11 Q    And on Page 66 of your valuation it says, based on our

12 analysis of the property as presented in this summary report,

13 we have estimated the as is market value of the fee simple

14 real estate -- fee simple estate for the subject property as

15 of June 23, 2014 at $43,000,000.  Do you see that?

16 A    I do.

17 Q    And that states your opinion of the -- of the -- of the

18 value of the property, correct?

19 A    It does.

20 Q    Now can you turn to Page 4 in this summary report?  You

21 know -- you know, and I'll just skip that question.  But --

22 but then if you go to the -- on Page 2 of the -- of the

23 amended expert report, you know, for summary of opinions it

24 says the market value of the property in question falls

25 somewhere between 18,500,000 and 43,000,000 depending on the

1  circumstances of the sale.  Do you see that?

2  A    I see that.

3  Q    And that's -- that's different than -- than the opinion

4  you come to in your valuation, isn't that right?

5  A    Yes.

6  Q    Now there's other mistakes in the report as well, isn't

7  that right?

8  A    I'm familiar with one.

9  Q    Okay.  Well, now that -- now you testified on direct that

10 the total replacement cost for the subject property including

11 all hard and soft costs is 242,000,000 -- well, you said

12 242,000,000, right?

13 A    Yeah, rounded.

14 Q    Right.  But that's -- that -- but that's your testimony,

15 right?

16 A    That's correct.

17 Q    And if we go to Page 42 of your valuation report, the top

18 -- the top sentence.  And that -- and that's where you -- you

19 state that in your report, right?

20 A    That's correct.

21 Q    Okay.  Now if we -- and that -- and that's based on the

22 cost approach, right?

23 A    That is for the cost approach.

24 Q    Okay.  Now I'm correct, aren't I, that if you use the

25 242,000,000 and then you subtract out -- you add on the land

1 | price and you subtract out 25%, and then you subtract out

2 | another 60%, you don't get to 43,300,000.  I'm right about

3 | that, aren't I?

4 | A    No, I think -- I think that's -- that's correct.

5 | Q    You -- you believe that -- that the numbers work?

6 | A    Yes, I do.

7 | Q    Okay.  Can you turn to your report on Page 44?

8 | A    Yes, sir.

9 |          THE COURT:  Excuse me.  I need to have something

10 | clarified.  Do you take the 25% and the 60% off of the

11 | combined replacement cost and land value, or just the

12 | replacement cost?

13 | A    Just the cost of the buildings, yes.

14 | Q    Can you blow up the chart, please?  Thank you.  Now this

15 | is the chart that reflects your summary of the cost approach,

16 | correct?

17 | A    That's correct.

18 | Q    And here instead of having the total replacement cost as

19 | being 242,334,637, instead if -- if you go down to the middle,

20 | it says 225,821,073, isn't that right?

21 | A    That's correct.

22 | Q    And -- and that's because at some point you -- you

23 | changed things and didn't carry it through into the chart,

24 | isn't that right?

25 | A    Well, that occurred because actually one of the sales was

1  hard coded and towards the top.  So if you -- if you take, you

2  know, if you do the math and work your way down you'll find

3  that.  But you're correct that that conclusion of two

4  twenty-five eight twenty-one is inaccurate.

5  Q    Okay.  But then you -- and then it's after that that you

6  then, you know -- you know, took off the 25% and then reduced

7  the 60%, and then added back the land and you got to

8  forty-three three hundred, right?

9  A    That's correct.

10  Q    You know, but -- but that's based on the two twenty-five

11  number, right?

12  A    Actually it's not.  Somehow this -- there was a hard

13  coding that was inaccurate, but if you take 15% of

14  242,000,000, it is approximately 36,000,000.  So it is the

15  correct number, but somehow we -- we -- you know, and I had a

16  long talk with an analyst on this, but we -- understanding why

17  something was hard coded in there which -- which produced an

18  erroneous conclusion in the table.

19        But the math, if you take 15% times 242,000,000, I don't

20  have a calculator, but 10% would be twenty-four and 5% would

21  be twelve.  That's approximately 36,000,000.  And that would

22  give us the correct answer at the bottom.

23  Q    All right.  Now was this the error that you said that you

24  were aware of?

25  A    That was the one that I was aware of.

 1  Q    Okay.  And as far as you know there are no more?

 2  A    I mean I've read it five times, so I -- you know, I'd

 3  leave it to you.

 4  Q    Okay, well --

 5  A    I mean I don't know.  If you've got something that's --

 6  Q    Well, you're aware there's -- there's numerous typos,

 7  right?

 8  A    No.

 9  Q    Let's move on back to some substantive things.  Now the

10  basis for your -- there's really two key inputs to your

11  replacement cost valuation, right?  One of them is the -- the

12  replacement cost per square foot?

13  A    That's correct.

14  Q    And -- and the other one is, you know, your depreciation

15  number, right?

16  A    Correct.

17  Q    Okay.  And you know, and the other -- the two things that

18  really move the needle here in terms of the valuation, right?

19  A    That's correct.

20  Q    The value -- the value of the land in the -- in the big

21  scheme of things in your mind is relatively de minimis, right?

22  A    I mean $7,000,000 is a lot of money to me.

23  Q    Okay.  But -- but compared to the two forty-three you

24  start with it's not -- it's not very -- very much, right, from

25  a mathematical perspective, it's -- it's not very significant,

1  right?

2  A    Statistically, you're -- you're correct.

3  Q    Okay.  So now the $243,000,000 number, you get that, you

4  know -- you know, it's based on what you concluded to be, you

5  know, the amount per square foot for -- for construction,

6  right?

7  A    That's correct.  I think it works out to roughly $525.00

8  a square foot.

9  Q    Five hundred and twenty-five dollars per square foot for

10  above ground square footage for the property, right?

11  A    Correct, correct.

12  Q    You used $400.00 per square foot for all of the above

13  ground property and then you used a different number for the

14  below ground, and if -- and the average is five twenty-four if

15  you exclude out the below ground square footage, isn't that

16  right?

17  A    That's correct.

18  Q    And that's in the chart that we just talked about that

19  has the -- the sale error in it, right?

20  A    Yes.

21  Q    Now you looked at three sources for coming up with the

22  $400.00 per square foot number, right?

23  A    That's correct.

24  Q    You looked at the -- the Marshall Swift valuation number,

25  right?

1  A     Yes, sir.

2  Q     And you looked at the -- the National Park Service

3  number, right?

4  A     Correct.

5  Q     And then you looked at some comps, isn't that right?

6  A     And we had some sales, correct.  I already said so.

7  Q     Well, they're not they're not sales, right, because

8  you're looking at -- at the cost per square foot for

9  construction.  So they're not really -- they're just

10 comparables, right?  Comparable --

11 A     Sorry to interrupt.  Yeah, we had a couple properties

12 that are part of the comparable sales that -- where we were

13 able to determine or get a range of construction costs for

14 them.

15 Q     And you ultimately, you know, used a five -- five, you

16 know, comps for construction costs, isn't that right?

17 A     That's correct.

18 Q     And on Page 41 of your report you listed the five comps

19 that you used, isn't that right?

20 A     That's correct.

21 Q     Can you blow up the chart, please?  And these were the

22 five you used?

23 A     Those are five, yes.

24 Q     Now let me ask you about a few of them.  So the Miami Art

25 Museum.  Are you familiar with that property?

```
 1  A     I am not.

 2  Q     Do you know its formal name?

 3  A     No, I do not.

 4  Q     If I told you it was the Perez Miami Art Museum, would

 5  this -- would -- would --

 6  A     Oh, that's familiar, yes.

 7  Q     Is that familiar?

 8  A     Yeah, that sounds -- yes.

 9  Q     And that -- and that's what it is, right?

10  A     He's putting his collection there.

11  Q     Okay.  And that's going to be -- it's in a -- in a

12  property that's going to overlook Biscayne Bay, is that right?

13  A     Yes, sir.

14  Q     And it's got celebrity, or I don't know, celebrity is

15  probably not the right word, a world renown architect who

16  designed the building?

17  A     That's correct.

18  Q     And it's going to house a very important art collection,

19  isn't that right?

20  A     Yes, sir.

21  Q     Okay.  Now so that in -- in some respects has the type of

22  similar characteristics to building a building to house an art

23  museum -- an important art museum in Detroit, if you had to

24  find replacement costs for -- for the DIA, right?

25  A     It's a data point that we considered, yes, sir.
```

1  Q    Okay.  Well, but I'm just saying, it -- it -- it -- it's

2  -- it has some similarities to building a -- if you were to

3  build a new house, you know, to house the DIA, it has some

4  similar characteristics.  You'd want to have an iconic

5  building, you'd want to have a -- a historic or an important

6  architecture, and you'd want to have something that is

7  designed to show a world class art collection, right?

8  A    Yes, sir.

9  Q    Okay.  Now and -- and there they're spending $1,000 --

10  over $1,000 per square foot to build that museum, right?

11  A    Yes, sir.

12  Q    And that's a lot more than the 400 that you estimated you

13  know, for replacement costs for this property, right?

14  A    I think our cost was in the 525, but yes, it is more.

15  Q    Sir, now -- now if -- you know, the cost -- the price you

16  used is $400.00 per square foot for above ground space, isn't

17  that right?

18  A    That is not correct.

19  Q    That's not correct?  Can we go back to the chart on --

20  okay.  Can you blow that up, please?  Thank you.  Now -- now

21  you told me that this is how you calculated your replacement

22  cost, right?  It's got a sale error in it, but said it all

23  fits and this is how you did it, right?

24  A    Correct.

25  Q    Correct.  Now the first line says base cost above ground

1  area, right?

2  A    Right.

3  Q    Four hundred and sixty-two thousand one hundred and

4  seventy-four square feet.  That's how many square feet that

5  you believe they have above ground, right?

6  A    That's correct.

7  Q    And then you multiplied by 400 -- $400.00 per square

8  foot, right?

9  A    To arrive at a base cost.

10  Q    For -- right.  Base cost for the above ground area,

11  right?

12  A    The base cost.

13  Q    Now but then you add to it the next line which is 154,000

14  square feet below ground, right?

15  A    Correct.

16  Q    And then you multiply that by $97.84, right?

17  A    Correct.

18  Q    So you know -- you know, you're -- you're the appraiser.

19  I'm not the math guy, but it seems to me if you start with

20  $497.00 per square feet and you -- you kind of averaged the

21  two, you know, you can't get to 500, right?  The way you get

22  to 500 is you take out the 97 -- the 154 times 97 and you just

23  take the 462, divided by the -- the 243 because there's a --

24  there's a -- there's a math error here, right?

25  A    Well, what you don't understand is that we can talk about

1  prices per square foot.  We don't consider the basement space.

2  We -- we consider the cost of the basement space in the

3  aggregate total, but when we discuss prices on a price per

4  square foot, we just use the above grade area.

5      Because that's the usable space that is going to be used

6  for the purpose of the building.  Nobody is going down to the

7  basement to tour the boilers.  And they're going to not go

8  down there and look at the -- at the storage rooms, they're

9  not going to have access to that.  We just considered the

10  above grade space.

11      So the aggregate price which is the 242,000,000, you

12  know, yes, the total base cost when you started out in the

13  analysis, we used $400.00 which is within the park district's

14  number, the Department of Interior, you know, Department of

15  Parks, and also supported by a Marshall valuation cost

16  service.

17      We need to add to that to account for the space that they

18  need to put the boilers and all the other -- other type of

19  components, correct?  So then we need to account for that in

20  the total cost.

21      So the total cost then is the $242,000,000 figure then we

22  divide that by the above grade space to conclude the total

23  cost.

24  Q    All right.  So sir, how many above ground square feet are

25  there in the Perez Miami Art Museum?

1  A    You know, I was trying to think about that because I knew

2  you were going to ask me.  I don't have that figure offhand.

3  I think it's -- I want to say it's like somewhere between

4  60,000 and 100,000 square feet.  I don't think it's that large

5  of a facility.

6  Q    But -- but you don't know?

7  A    I don't recall, sorry.

8  Q    Okay.  Now, but is it -- is it your testimony that the

9  1,092 is only for the above ground space done the same way

10 consistently with your --

11 A    Yes, sir.

12 Q    And how -- how do you know that, sir?

13 A    I mean that's how we understand the -- how the

14 information was presented to us.

15 Q    Well, did -- did you put that table together?

16 A    We had the -- yeah, I worked on this table.

17 Q    Okay.  But you personally did it?

18 A    Yes.

19 Q    Okay.  And so can you -- can you tell me how many above

20 ground and how many below ground square feet there are?

21 A    That I don't know off the top of my head.  I don't

22 recall.  I don't have that information with me.

23 Q    Okay.

24 A    It's in my email files.

25 Q    Now the -- now the -- the Pope John Paul Cultural Center.

1  That's in Washington, D.C.?

2  A    Yes, sir.

3  Q    That's not an art museum, is it?

4  A    That's an institutional use.

5  Q    Sir, is it an art museum?

6  A    It is not, I'm sorry.

7  Q    Now the Pennsylvania Academy of Music, that's not an art

8  museum either, right?

9  A    No, sir.

10  Q    And that's not even a museum, is it?

11  A    It's a music school.

12  Q    It's a music school.  Was a music school, right?

13  A    Right.

14  Q    Filed bankruptcy, went out of business, right?

15  A    It did.

16  Q    Okay.  But that -- but that was a school?

17  A    It was a school.

18  Q    Okay.  And now the American Folk Art Museum, that's --

19  that's a museum, right?

20  A    Correct.

21  Q    But that's a small museum.  It's nothing on -- on the

22  scale of the DIA, right?

23  A    No, sir.

24  Q    Okay.  And the Museum of American Arts and Crafts that's

25  proposed in St. Petersburg which isn't completely built yet,

1  that's an art museum as well, right?

2  A    Yes, sir.

3  Q    And but that's a small museum, correct?

4  A    That is on the smaller side.

5  Q    Okay.  Now at the time you put this chart together, isn't

6  it true that you had other information about the cost of -- of

7  constructing fine art museums that -- that you didn't include?

8  A    Well, we interviewed some architects and I -- I spoke

9  with a couple high end architects to get their sense of their

10  experience and, you know, if they had ever done any work on --

11  and also just discussed the DIA with them and see if they were

12  familiar with it.

13  Q    Okay.  But at the time that you put this art together,

14  you were -- you -- you were aware, weren't you, that the Eli

15  Broad Museum in Los Angeles cost $1,167 per square foot.

16  You're aware of that, right?

17  A    Somebody had given me that figure.  I'd taken some notes

18  on that on a couple phone calls that I made with a couple

19  architects.  And so they were -- they were figures and I asked

20  them if they had any corroboration for that and they said no.

21  Q    Well, let me ask --

22  A    That's what they -- that's what they had heard.

23  Q    Okay.  Now -- now when you say the they, right?  The they

24  who gave you those figures that's your staff, right?

25  A    No.  I made those phone calls.  So I made the phone

1  calls.

2  Q    Okay.

3  A    Spoke with the architect.  And I explained what my

4  assignment was and what I was trying to do and he -- and he

5  had mentioned that he had heard some figures, you know, and a

6  lot of it has to do with -- I think, you know, with hiring a

7  very very expensive architect.

8  Q    Okay.  But -- but you -- but you were aware of those

9  numbers and -- and ordinarily when you do your report and it's

10 throughout your report you talk about how, you know, you

11 called other real estate, you know, brokers, or appraisers,

12 and architects and -- and putting together a report like this

13 you regularly reach out and -- and call people who have

14 information to help you with your assignment, right?

15 A    Yes, sir.

16 Q    And as a -- as a real estate appraiser you regularly rely

17 upon this information, isn't that right?

18 A    Yes, sir.

19 Q    And the information that's in this table is information

20 as well that you got out of news medias or from other, you

21 know, people have told you.  Because it's not that you can

22 just go on to the web sites for these places and -- and get

23 this information, isn't that right?

24 A    Correct.

25 Q    Okay.  So in addition to the -- the information about the

1  cost of the Eli Broad Museum, are you -- you're familiar with

2  the Eli Broad Museum, right?

3  A    I'm not.

4  Q    Okay.  But -- so you're unaware that it's a -- you know,

5  it's a very large art museum in Los Angeles that is going to

6  house a very important art collection.  Are you aware of that?

7  A    I'm not, sir.

8  Q    Okay.  And -- and you said that the -- one of the reasons

9  that you thought that was -- was a -- was a you know, $1,000,

10 was this was a high end architect, right?

11 A    I mean that was my understanding of my conversation

12 with --

13 Q    Okay.  And at the time that you put together your report,

14 you were aware that the Kimbell Art Museum expansion in Fort

15 Worth, Texas was costing $1,135 per square foot.  You're aware

16 of that, right?

17 A    I was aware of that, yes.

18 Q    Okay.  And -- and we talked about the Chicago Art

19 Institute earlier.  And you're aware that the Chicago Art

20 Institute is doing an expansion, right?

21 A    That's correct.

22 Q    And you were aware that the -- the Chicago Art Institute

23 addition is costing between 1,200 and $1,500 per square foot,

24 isn't that right?

25 A    That was a figure I was quoted, yes.

1  Q    Do you have any reason to doubt it?

2  A    I have no reason to believe it.  I mean I was just given

3  the information over the phone by an architect who thought

4  those were the figures that he would -- that he had heard.  I

5  thought they were -- they were really high and staggering.

6  Q    Okay.  Well, let me -- let me ask you a question.  Did

7  you do anything to follow up regarding the -- the price of the

8  Broad Museum, the Kimball Museum, or the Chicago Art Institute

9  Museum costing after you spoke to these sources?

10 A    No, I didn't.  And the reason I didn't do it is because

11 they're additions.  And so additions are -- are vastly more

12 expensive than ground up new.  And if you're going to build

13 something new, you're not going to have to tear off an

14 exterior elevation, fit systems, you know, build it and while

15 the museum is in operation.  There's a lot of things that --

16 that add to the cost that -- that really make that not a very

17 applicable data point.

18 Q    Okay.  But you're aware that the -- the Whitney Museum in

19 New York is building a new museum, right?  That's -- that's a

20 brand new museum.  You're aware of that, right?

21 A    I'm not aware of that.  Or I don't recall.

22 Q    Okay.  So you don't -- you don't recall one of these

23 architects or one of your colleagues telling you that the

24 Whitney was -- was -- was -- was building a new building?

25 A    I do not.

1  Q    Okay.  So -- so you don't recall that that's going to

2  cost about $1,900 per square foot?

3  A    I mean it could be in my file notes.  I don't have -- I

4  don't recall, no, I do not.

5  Q    And is the Smithsonian Building a new museum in

6  Washington, a new art museum?  History and cultural museum.

7  A    Okay.  I -- I do not -- I'm not aware of it.

8  Q    The National Museum of African History and Culture, are

9  you aware of that?

10 A    I do recall I think a conversation about that, yes.

11 Q    And do you -- do you recall how much that's costing to

12 build?

13 A    I don't -- I'd have to see my file notes, I don't recall.

14 Q    If I told you that it was $1,429 per square foot, would

15 that refresh your recollection?

16 A    Now one of the issues with the -- it would -- it would --

17 it would refresh -- it wouldn't refresh my memory, I don't

18 recall the figures.  From -- I do not recall that figure,

19 sorry.

20 Q    Okay.  Now at the time you put together this chart, you

21 were aware that -- that there's something called *Museum*

22 *Magazine* that's published by the American Association of

23 Museums, right?

24 A    Yes.

25 Q    And you are aware that they had done a study on the

1  construction costs of museums, isn't that right?

2  A    I believe there was like a blog or something on their

3  site that where somebody had posted -- posted some

4  information.

5  Q    And you're aware that -- that they looked at 137 museum

6  projects of all types, right?

7  A    I don't recall that part of the -- of the discussion, but

8  is it in my file notes here?

9  Q    Yeah.  But -- but -- but it's not supposed to be a memory

10  test, but I just want to know what -- I just want to know what

11  you remember first.  We can go to the notes in a minute.

12  A    I don't -- I don't recall that, no.

13  Q    Okay.  But let me -- let me just ask you a couple

14  questions.  But you -- but you knew that they had done a

15  study, right?

16  A    You know, we were looking for --

17  Q    Well, I'm just asking you a simple question.  You were

18  aware that *Museum Magazine* had done a study on the

19  construction costs of museums, right?  Yes or no?

20  A    I -- there was -- there was some information regarding

21  the cost of museums that I found on their web site that I

22  recall.

23  Q    All right.  I'm just -- I'm asking, you know, and we can

24  go look at your notes if -- if you need it to refresh your

25  recollection.

 1  A    Yeah.

 2  Q    I'm just asking you a question.  At the time you did your

 3  report, isn't it true that you were aware or had reason to

 4  believe, if you like that better, we can say had reason to

 5  believe that *Museum Magazine* had done a study of the

 6  construction costs of museums?

 7  A    I don't recall.

 8  Q    Can you pull up Exhibit 5192 and POA -- POA 717941?  Now,

 9  sir, this was a document that was produced by the city in --

10  in discovery.  I believe this is part of your reliance

11  materials.  Have you seen this before?

12  A    Yes, I have.

13  Q    Okay.  And this is an -- an article on some community

14  board referring to a -- a *Museum Magazine* article, is that

15  right?

16  A    Yes, sir.

17  Q    And does this refresh your recollection as to whether or

18  not you had reason to believe that *Museum Magazine* had done a

19  -- a study as to the cost, the construction cost for museums?

20  A    I do, but I think that there's other information in here

21  that said that.

22  Q    Okay.  I'm just asking -- all I'm asking you at this

23  point is, does this -- does this refresh your recollection

24  that you were aware that they had done a study?  That's all

25  I'm asking you at this point.

1   A    Yes.

2   Q    Now, one thing I noticed about what was produced was

3   there wasn't a copy of the -- of the *Museum Magazine* study.

4   Did -- did you -- and the reason for that is because you made

5   no effort to get it, isn't that right?

6   A    I don't understand your question.

7   Q    I'll make it simpler.  After you read this article and

8   found -- and at the time you read this article, you were

9   putting together your report, right?

10  A    Well, I -- I pulled this off the web and --

11       THE COURT:  Please just answer the question, sir.

12  A    Could you repeat the question?

13  Q    Sure.  So you saw this article on the web, right?

14  A    Correct.

15  Q    Okay.  And at the time you saw this on web, you were

16  trying to figure out what the replacement cost would be for

17  the DIA, isn't that right?

18  A    Yes, that's correct.

19  Q    So you were very interested in what the replacement cost

20  or what the construction costs were for museums, right?

21  A    Yes, sir.

22  Q    And you, and after having seen this, you became aware,

23  didn't you, that *Museum Magazine* may have done a study on that

24  very issue, isn't that right?

25  A    That's correct.

1  Q    But you never got a copy of the article, isn't that

2  right?

3  A    I did not.

4  Q    Even though you were trying to -- to do the best you

5  could for the Court, and figure out what the appropriate

6  replacement cost was, you never went forward and tried to find

7  this study, isn't that right?

8  A    I think that -- that's right.

9  Q    That's right is good enough, thank you.  Now did you --

10 you took into account when you -- you did your analysis, what

11 you learned from this -- from this blog, right?

12 A    Can you -- I don't understand your question.

13 Q    When you wrote your report --

14 A    Yes.

15 Q    You considered the information that was contained in this

16 article or, you know, that you found on the web, right?

17 A    Yes, sir.

18 Q    Okay.  And now at least with respect to what the reporter

19 said, now you never got the article, the actual study, so we

20 don't know what the study said, but with respect to, you know

21 -- you know -- can you highlight the first paragraph?

22      Now with respect to what -- what this reporter does, you

23 know, quoting from the -- you know, from the magazine, it says

24 between the -- the American -- *Museum Magazine* surveyed 137

25 museum building projects and that the total investment is in

1  excess of 5.2 billion dollars and that the -- the average cost

2  was seven hundred and seventy-one sixty-nine, right?

3  A    Yes, that's what the article says.

4  Q    Okay.  And that would have been for museums of all kind,

5  high end museums, low end museums, art museums, historical

6  museums, sports museums, all kinds of museums, right?

7  A    I'm not familiar with the study, so obviously it's an

8  aggregated number, yes.

9  Q    Well -- well, you know, I mean given that you were filing

10  this report, don't you think that it was incumbent upon you to

11  get the study and analyze it?

12  A    There was other commentary in the blog that made -- that

13  discredited the -- the information that made it sound less

14  reliable.

15  Q    And -- but -- but in order to determine whether it was

16  reliable or not, you should have -- you would have to get the

17  study, right?

18  A    We chose not to get the study.

19  Q    Okay.  But the city was paying you to do this work,

20  right?

21  A    Yes.

22  Q    And you had professional responsibility to do a good job,

23  right?

24         MR. IRWIN:  Your Honor, this ground I think has been

25  covered.  This has been asked and answered.

1          THE COURT:  Please move on.

2          MR. BRILLIANT:  Yes, Your Honor.

3   Q    Now in addition to -- now if you would have -- if you

4   would have used a higher square -- price per square foot, that

5   would have increased you know, your valuation, isn't that

6   right?

7   A    It would increase the valuation for the cost approach,

8   correct.

9   Q    Okay.  And if you would have, you know, increased it to

10  $800.00 per square foot for the above ground area, that that

11  would have almost doubled the -- the appraisal, right for the

12  above ground area?

13  A    I mean simple math, sure.

14  Q    Okay.  And that was something less than the $1,000 per

15  square foot that fine art museums are costing, right?

16  A    Eight hundred is less than a thousand, yes, sir.

17  Q    Okay.  Now after you came to your conclusion you then

18  deducted, you know, for what you call obsolescence, right?

19  A    Yes, sir.

20  Q    Okay.  And now the obsolescence that you're referring to

21  is the -- you know, the discount that you believe would be on

22  the property if it wasn't going to be used as an art museum,

23  right?

24  A    And also market conditions, external obsolescence as

25  well.

1  Q    Well, let's -- let's break it down.  But the -- the --

2  the -- the reason you did it, right, is because it's a single

3  use property and -- and your view is there's not a lot of

4  demand for this among institutional buyers who were to use it

5  for something other than an art museum, right?

6  A    That's correct.

7  Q    But if it was going to continue to be used as an art

8  museum, you wouldn't have that issue, right?

9  A    That's correct.

10  Q    Okay.  And -- and you -- and again, you're aware that

11  this property if the plan goes forward will continue to be

12  used as an art museum, right?

13  A    That's my understanding, yes.

14  Q    And -- and the reason that you made the assumption that

15  it -- and -- and you -- and took a deduction for the

16  obsolescence, was because you were told to -- to assume that

17  it would not continue to be an art museum, right?

18        MR. IRWIN:  Objection, told by whom?  There's been

19  no testimony in that regard.

20        MR. BRILLIANT:  I believe he -- he said he was told

21  when he did the report not to -- to consider that it would be

22  an institutional use other than as a -- continuing as an art

23  museum.

24        THE COURT:  Why don't you clarify that with him,

25  first.

1          MR. BRILLIANT:  Okay, yes.

2  Q    Sir, when you did your report, you know, you were told in

3  making your assumptions that the property would -- would not

4  continue as an art museum, right?  And that you should value

5  it as if it were to be purchased by someone other than holding

6  -- using it as an art museum, right?

7  A    The assignment commission that we appraised the property

8  under was that it was vacant.  And that it was available for

9  the next potential user to do with -- to do with it whatever,

10 you know, their purpose was.  So, you know, with no regard to

11 any of the art, anything art like of property thereof of an

12 art, you know, of the -- with the DIA.

13 Q    Okay.  But when we talked about what you meant by

14 institutional user earlier you said other than as an art

15 museum, right?

16          THE COURT:  No.  He said exactly the opposite.

17          MR. BRILLIANT:  Oh, okay.  Well, then I apologize.

18          THE COURT:  When I asked him.

19          MR. BRILLIANT:  Okay.

20 Q    All right.  So and then with respect to the obsolescence,

21 the obsolescence factor you got by looking at two comparables?

22 A    Yes, sir.

23 Q    And those two comparables, are the -- the cathedral in

24 Washington?

25 A    Yes, sir.

1  Q    And the music school in Lancaster, Pennsylvania?

2  A    That's correct.

3  Q    And the -- the -- the music school in -- in Lancaster,

4  Pennsylvania, I think we already talked about that.  They

5  filed bankruptcy and went out of business, right?

6  A    Correct.

7  Q    And so the -- the property was a music school and then it

8  was sold to a university, is that right?

9  A    That's correct.

10  Q    Okay.  And with respect to the -- the cathedral, in

11  Washington, you're aware that -- that that was a property that

12  was sort of like a -- you know, the equivalent of a

13  Presidential library for a Pope, right?

14  A    Correct.

15  Q    And when the built that they had an expectation that a

16  lot of people would -- would come to the -- to the -- to the

17  museum?

18  A    Yes, sir.

19  Q    And that didn't happen, right?

20  A    That's correct.

21  Q    And so they decided not to continue it in business and

22  they sold it, isn't that right?

23  A    They did sell it, yes.

24  Q    They sold it to the Knights of Columbus?

25  A    Correct.

1  Q    Okay.  And now it's an inter faith center?

2  A    I think it's also still honoring Pope -- the Pope.

3  Q    Right.  It's honoring the -- the Pope, but it's -- it's

4  -- it's a -- it's now an inter faith center and it honors the

5  Pope?

6  A    Yes, sir.

7  Q    And neither of those are art museums, right?

8  A    No, sir.

9  Q    And neither of them have the characteristics of the --

10 the property we're discussing here, right?

11 A    Other than I mean they have characteristics that they're

12 institutional properties, institutional special use

13 properties.

14 Q    Okay.  But -- but they're not similar in size or similar,

15 is that right?

16 A    No, they're smaller.

17 Q    And they're not similar in use?

18 A    They're not art museums, right.

19 Q    And they're not in Detroit?

20 A    Correct.

21 Q    Now what you -- what you use there right, for figuring

22 out the level of obsolescence, is -- you found what the

23 construction cost was, right?

24 A    Yes, sir.

25 Q    And then you depreciated it.  And then you found out the

1  sales price, right?

2  A    We -- we started with the sale price and we deducted the

3  land cost to get to the building value new.  And from that we

4  estimated the -- the total depreciation.

5  Q    And -- and basically you -- you figured out the

6  obsolescence amount which was basically the loss on the

7  building, right?

8  A    Yes, sir.

9  Q    Now that's really using a sales comp, right?  So it's not

10 really using a -- a replacement cost comp.  You're really just

11 looking at a -- at a sales comp and applying it in the

12 replacement cost method, isn't that right?

13 A    Well, it is one of the sales comps and it's a

14 institutional use and there just weren't that many.  So we

15 just, you know, we used it because we felt that it was

16 reliable.

17 Q    And so you -- you -- okay.  And so that -- so that's the

18 reason you used it because you thought it was reliable as a

19 comp for the DIA's property in Detroit?

20 A    We felt that it was -- it was an indication of what

21 obsolescence would be in the marketplace for a special use

22 type asset of institutional character.

23 Q    Now I'm right, aren't I, that the Pope John Paul, II

24 Cultural Center was -- was built just before what's referred

25 to as the great recession, right?

1   A     Yes, sir.

2   Q     And then it was sold what in 2010, is that right?  Or

3   2011?

4   A     2011, yes.

5   Q     Right.  So it was sold after the -- the great recession,

6   right?

7   A     Yeah.  It ended in what, 2009, I believe, yes sir.

8   Q     Right.  So, you know, isn't it likely that a lot of the

9   decrease in the value of the property was just caused by -- by

10  market conditions that had nothing to do with the obsolescence

11  of the property?

12  A     I don't -- I tend to disagree with that.  I think market

13  conditions in -- in that market were fairly -- fairly stable

14  at that point.  I don't -- I would disagree with that.

15  Q     So -- so it's your -- your testimony that after the great

16  recession real estate prices in Washington, D.C., you know,

17  didn't go down, is that -- that's your testimony?

18  A     I believe that -- that -- no, you're -- I think -- let me

19  correct this.  You're right.  I think they were -- they were

20  -- there was probably some influence of market conditions.

21  Q     Okay.  And the -- right.  And with the school in -- in

22  Lancaster, Pennsylvania that we talked about construction was

23  completed in 2008, right?

24  A     Correct.

25  Q     And they had financial difficulties in 2010?

1  A    Yes, sir.

2  Q    And they went out of business around then and sold it in

3  -- around that period, right?

4  A    Correct.

5  Q    Okay.  And isn't it true that a lot of the diminution in

6  value, you know -- you know, there you know, was caused, you

7  know, by the great recession and the -- the reset of real

8  estate prices?

9  A    That could have had some influence, yes.

10 Q    And you -- you based your entire obsolescence rate just

11 upon these two comps, isn't that right?

12 A    I mean also we -- we -- no, I would say no to that.

13 Q    You would say no to that?

14 A    Yes, sir.

15 Q    Can you turn to Page 43 of your report?  Now your

16 discussion of obsolescence starts on the -- on the previous --

17 on the previous page, right?

18 A    Uh-huh, yes, yes.

19 Q    On Page 42?

20 A    Yes.

21 Q    And you describe you know, what you think obsolescence is

22 on -- on Page 42, right?

23 A    Correct.

24 Q    Then you look at your two market comps?

25 A    Yup.

1  Q    Then you describe the two comps, right?

2  A    Yes, sir.

3  Q    And you come up with a -- you know, you describe the two

4  and then you reach a conclusion.  So, you know, based upon the

5  two comps.  So where -- where -- where is it that you discuss

6  any other -- any other factors that -- other than these two

7  comps?

8  A    Well, on Page 42, the second paragraph -- or I'm sorry,

9  the third paragraph under the obsolescence header, I can read

10  a paragraph to clarify if you'd like me to.

11  Q    Okay.  That would be fine.

12  A    So the asset is situated in the midtown Detroit market

13  area that is exhibiting limited demand for larger sized

14  facilities.  We researched this large -- the sale of large

15  office use properties in the downtown and midtown area and

16  note significantly depressed sale prices.

17  Q    So -- so you're saying that you determined the

18  obsolescence, you know, for a -- a -- a building that's used

19  for art, you know, based upon, you know the -- you know, the

20  -- the investment real estate market in -- in Detroit in part?

21  A    I think it would be considered a measure of -- of market

22  conditions.  And market conditions in general will affect, you

23  know, the part of external obsolescence.

24  Q    Okay.  So can you -- can you turn to, you know, your

25  conclusion on obsolescence which is the bottom of 43?  Okay.

1 | So it says, physical depreciation is estimated at 25%, a rate

2 | higher than 5 to 16.67% rates of the two properties analyzed

3 | primarily due to the higher weighted average of 66 years.  The

4 | two properties analyzed were newer and has no known curable

5 | physical depreciation (deferred maintenance).  The

6 | obsolescence rate of 60% is within the 58 to 66% range of the

7 | two properties analyzed and reasonable given the similar

8 | property type and subject's location.  The physical

9 | depreciation and obsolescence total 85%.  That's your

10 | conclusion, right?

11 | A    Yes, sir.

12 | Q    And that doesn't mention at all anything about the -- the

13 | market conditions in Detroit, does it?

14 | A    Well, we talked about the property's location.  We

15 | mentioned the subject's location.  It's located in down --

16 | it's located in Detroit.

17 |          THE COURT:  Okay.  But the question was in regard to

18 | this paragraph.

19 | A    So but it is a paragraph --

20 |          THE COURT:  This paragraph does not mention analysis

21 | of Detroit, does it?

22 | A    It does not.

23 | Q    Now I want to ask you a question about -- about actually

24 | your -- your ultimate conclusion here.  Now your conclusion is

25 | based solely on the cost method, right?

1 | A    Well, we had two conclusions of value.

2 |      THE COURT:  Excuse me one second.  You need to

3 | clarify what you mean by the conclusion here.

4 | Q    Okay.  Your conclusion of value here, you know, is -- is

5 | based solely on the cost method, isn't that right?

6 | A    Yes.

7 | Q    And your conclusion of value we -- we talked about this

8 | earlier, is 43.3 million, right?

9 | A    Yes, sir.

10 | Q    And all -- all you used the -- you know, all you used,

11 | you know, the comparable sales methodology for was to test for

12 | reasonableness, right?

13 | A    No, sir.

14 | Q    That's not right?

15 | A    We used the comparable sales for test for -- as a test of

16 | reasonableness, but we also used the sales as data within the

17 | cost approach to determine obsolescence and we used it also to

18 | understand some of the differences between investor sale

19 | prices and institutional purchase prices.  And also to look at

20 | the significant diminution of value special assets undergo

21 | because of their -- because of their character.

22 | Q    All right.  Can you turn to Page 44 of your report in the

23 | conclusion, please?  Under the table of conclusion, please.

24 | So -- now this is your conclusion, right?  Based on the

25 | foregoing, we have estimated the as is market value of the

 1  subject property via the cost approach as of the date of

 2  valuation is 43,300,000 as rounded.

 3      As a test of reasonableness we considered the depreciated

 4  cost of the improvements estimate of 43,300,000 or 93.69 per

 5  square foot to be within the range of a shell value for a high

 6  quality institutional facility or office property, assuming

 7  the property is purchased by a user that will repurpose the --

 8  the building for institutional or office use.  That's --

 9  that's your conclusion, right?

10  A    Yes, sir.

11  Q    The cost approach.  And then if we turn to Page 45, at

12  the top, the heading on the top says sales comparison approach

13  test of reasonableness.  Did I read that right?

14  A    That's correct.

15  Q    It doesn't say sales comparison approach, second

16  methodology for reaching value, right?

17  A    That's correct.

18  Q    Okay.  I just want to ask you a couple questions about

19  what you didn't do.  Now --

20          THE COURT:  Excuse me, sir, how much longer will you

21  be?

22          MR. BRILLIANT:  Two minutes.

23          THE COURT:  Okay.

24  Q    So you didn't -- you didn't value -- I think you

25  testified earlier, you only valued the shell of the building

1  and the land, correct?

2  A    Yes, sir.  We just appraised the real estate.

3  Q    Well, the real estate and the building, right?  The --

4  A    The building is real estate, yes, sir.

5  Q    Okay.  But -- but you didn't appraise all of the other

6  things that are in there that are necessary in order to run a

7  art museum, correct?

8  A    Correct.

9          MR. BRILLIANT:  Okay.  Thank you.  I have no further

10  questions.

11          THE COURT:  All right.  Mr. Brilliant, I have a

12  question for you.

13          MR. BRILLIANT:  Sure.

14          THE COURT:  What will your evidence show the value

15  of this real estate is?

16          MR. BRILLIANT:  I don't believe we're going to have

17  any evidence on the issue, Your Honor.

18          THE COURT:  What is your position on what the real

19  estate value is?

20          MR. BRILLIANT:  I think, Your Honor, I think it's

21  243,000,000 less an appropriate, you know -- you know,

22  depreciation of 25 -- you know, 25%.

23          THE COURT:  What's the bottom line number?

24          MR. BRILLIANT:  Now you're asking a lawyer to do

25  math, Your Honor.

1         THE COURT:  I'm just asking you what your position

2    is on the value of the property.

3         MR. BRILLIANT:  Yeah, yeah, yeah.  No, if you'll

4    give me just one second, Your Honor.

5         THE COURT:  Sure.

6         MR. BRILLIANT:  About 200,000,000, Your Honor.

7         THE COURT:  Okay.  Thank you.  All right.  We're

8    going to take our afternoon recess now and let's reconvene at

9    3:35, please.

10     (WITNESS JOHN SATTER WAS TEMPORARILY EXCUSED AT 3:20

11   P.M.)

12         THE CLERK:  All rise.  Court is in recess.

13     (Court in Recess at 3:20 p.m.; Resume at 3:35 p.m.)

14         THE CLERK:  All rise.  Court is back in session.

15   You may be seated.

16         THE COURT:  Let me just ask for the record any other

17   cross examination of the witness?  All right.  You may proceed

18   with redirect.

19         MR. IRWIN:  I had asked, Your Honor.  I was not so

20   presumptuous just for the record.

21                     REDIRECT EXAMINATION

22   BY MR. IRWIN:

23   Q    Mr. Satter, you were asked some questions on cross

24   examination about differences between the cost method approach

25   and the sales comparison approach.  Do you recall that?

1  A    Yes, I do.

2  Q    Did you use the sales comparison approach in your

3  analysis for more than one purpose?

4  A    We did.

5  Q    What were those purposes?

6  A    So we -- we -- we did the sales comparison approach for

7  two -- to -- to conclude values for two potential buyers.  For

8  an institutional buyer who would use the property for say like

9  a Wayne State institutional type buyer.  And also for as an

10  investor purchase.

11  Q    Were there different data sets that you considered in

12  connection with each of those purposes?

13  A    Yes.

14  Q    And what were those?

15  A    So we had 11 sales of museums, cultural centers type

16  properties that we considered for the valuation as a

17  institutional use.  And we had a second set of for sales of

18  properties that were purchased by universities for use as, you

19  know, for -- for their campus purpose.  And the third set were

20  the Detroit downtown office sales.

21  Q    Was there a data set that was more appropriate in your

22  judgment for use with the investor scenario?

23  A    With the investor scenario the -- the office properties

24  in downtown Detroit were the more appropriate.

25  Q    And why was that?

1  A    Because those properties are being purchased for -- as

2  investments.  They're -- they're cash flowing type assets and

3  they're on the tax rolls.

4  Q    And what criteria did you use to select those?

5  A    So we looked for large assets similar in size to the DIA.

6  And we want -- and -- and were located in the Detroit market.

7  Q    And -- and why were you comfortable that that was an

8  appropriate data set for use in connection with a sales

9  comparison approach?

10 A    Well, they would be the best indication of value for the

11 subject property assuming that it's -- it would be purchased

12 by an investor.  It would -- the DIA building would -- would

13 be vacant at the time of purchase and would require

14 retrofitting purposing for use and also there are sales that

15 are in Detroit.

16 Q    Can you -- can you elaborate on that?  You -- in Detroit,

17 what was important to you about identifying properties and

18 comparables in Detroit as opposed to somewhere else?

19 A    So the -- if you're using sales in Detroit, you know,

20 they're basically subject to the same market conditions,

21 outside influences, that the -- that the DIA would be subject

22 to.

23      So if we looked at the sale prices of those assets and

24 ranging 20.00 to $40.00 -- or 20.00 to $50.00 a square foot,

25 for the -- for the gross building area and you're considering

1  the cost of a new office building of 200 plus a square foot,

2  it's a significantly depressed amount.  So when you're looking

3  at the replacement costs of some of these assets -- I'm sorry,

4  the -- the acquisition cost of some of these assets almost

5  literally just for land value given the -- the sale price.  So

6  the buildings are really kind of being thrown in at -- at some

7  point.

8  Q    Is -- is location and region important to you in

9  connection with the sales comparison approach on all of your

10  projects?

11  A    Absolutely.  It's just one characteristic that you can

12  remove from your matrix when you're trying to compare

13  properties.

14  Q    All right.  Let's -- let's -- I want to ask you a few

15  questions about information that you considered in connection

16  with the cost approach.  Do you recall that?

17  A    Yes.

18  Q    Okay.  Did you in connection with your investigation try

19  to assemble information from a wide variety of sources?

20  A    Yes.

21  Q    Okay.  What kinds of people were you talking to as you

22  were collecting information?

23  A    Well, we were, you know, talking first amongst our team,

24  and -- and we were then looking at -- or talking to architects

25  and -- I mean really referring to our published data.

1  Q    Did you -- you had information to -- to -- or you had

2  occasion to talk to people about projects in other regions or

3  cities?

4  A    We -- well, some of the comparable sales that we

5  confirmed were -- were fairly new and so we had that

6  information.  You know, on -- on an ongoing, you know, daily

7  practice -- practical basis, you know, we're dealing with

8  construction costs of new properties.  And so we have, you

9  know, references there.  Those would be the sources.

10 Q    Do you recall Mr. Brilliant asked you some questions

11 about hearing about or learning about museum construction

12 costs in other cities or locations.  Do you recall that?

13 A    I do.

14 Q    Why did you not use, or consider, or rely upon that

15 information in connection with your analysis?

16 A    In -- in those cases, you know, we had no -- we had

17 limited substantiation for those costs.  A lot of those costs

18 we weren't really sure what were in those figures.  It could

19 include the land, it could include a lot of the built ins

20 which would be portions that -- that house the art.

21      You know, so it was like they were -- they were lump sum

22 figures which were -- were -- were -- which we considered, but

23 we felt were less reliable.

24 Q    What were the criteria that you used to determine

25 reliability in connection with cost or construction data that

1  you would use?

2  A    Well, we had used the public cost -- you know, we used a

3  public cost source on a daily basis in our practice.  And the

4  Marshall valuation service number seemed low to me based on,

5  you know, my experience and going through the museum.  And so

6  that's when we reached out to other -- to look for other

7  sources that would be the Department of Interior, you know,

8  the source we thought was a reliable figure aggregated by the

9  -- by the government.

10      You know, buildings that were built for the governmental

11  purposes tend to have similar cost indexes if you will.  And

12  we felt those were more reliable.

13  Q    And have you used that publicly available, or that --

14  that reported data in your other assignments?

15  A    Yeah.  We used the cost -- the Marshall valuation cost

16  service on a daily basis for any of our assignments when we're

17  doing the cost approach.

18  Q    Okay.  If you could turn briefly to -- would you pull up

19  City Exhibit 466, please?  Do you have that in front of you,

20  sir?

21  A    Oh, I'm sorry, which one?

22  Q    It's okay.  It's 466.  It's your report.

23  A    466.  I don't understand.

24  Q    It's on the screen, yeah.

25  A    Yeah.

1  Q    Let's turn to Page 2 if we could, second page of the

2  report.

3  A    Yeah.

4  Q    You were asked about this -- the summary of your opinions

5  which is about a third of the way down the page.  Do you see

6  that?

7  A    Yes.

8  Q    And it states that the market value of the property in

9  question falls somewhere between 18,500,000 and $43,000,000

10 depending on the circumstances of the sale.  Do you see that?

11 A    Yes, I do.

12 Q    And what did you mean by that?

13 A    That the value of the property we estimated would --

14 could be somewhere in that range depending on who the buyer

15 is.

16 Q    And is that something that you also provided in the core

17 report that you attached to your expert report?

18 A    Yes, we did.

19 Q    Okay.  Could I refer you, the same 466, it's the third

20 page in the report.  We're just going to get it up on the

21 screen here.

22 A    Yeah.

23 Q    Sorry, we'll get it up here just shortly.  That's it.

24 Thank you.  Apologies.  Can you highlight -- or -- or enlarge

25 the top third of the page, value indication?  Do you see that?

1  A    Yes.

2  Q    Did you prepare this?

3  A    Yes, we did.

4  Q    And did you --

5  A    I did.

6  Q    Did you authorize and approve this?

7  A    Yes, I did.

8  Q    Okay.  What did you mean in the line that says sales

9  comparison approach $18,500,000 to $41,500,000?

10 A    Those were -- those are two value conclusions that we

11 reached using the sales comparison approach.

12 Q    All right.  Now we've seen -- we've seen -- we've seen

13 references to the difference between $43,000,000 flat and

14 43,300,000.  Have you seen that?

15 A    Yes.

16 Q    Is it your testimony that the math ties the right way in

17 the body of the report?

18 A    Yes.

19 Q    And do you stand by that?

20 A    Yes, I do.

21 Q    And is there any error in your report associated with the

22 value range falling between 18,500,000 and $43,000,000?

23 A    No, sir.

24        MR. IRWIN:  Okay.  No further questions.  I'm done,

25 nothing further.

1          THE COURT:  Anything further?

2          MR. BRILLIANT:  Your Honor, I would -- I would move

3  in debtor's Exhibit 466 as a demonstrative only.

4          THE COURT:  And that is what, sir?

5          MR. BRILLIANT:  That's the -- the report.

6      (City's Exhibit 466 was identified)

7          THE COURT:  The report itself.  Any objections?

8          MR. IRWIN:  No objection.

9          THE COURT:  All right.  It is admitted.

10     (City's Exhibit 466 was admitted)

11         MR. BRILLIANT:  No.  No questions, Your Honor.

12         THE COURT:  All right.  When did you realize, sir,

13  that there was a mistake in your report?

14  A    On the -- I realized there was a mistake in the report on

15  the flight over.  When I was -- I read -- I was reading the

16  entire report on the flight and I saw this.

17         THE COURT:  When -- when was that?

18  A    That was Monday afternoon.

19         THE COURT:  Oh, of this week?

20  A    Yes, sir.

21         THE COURT:  Too late to -- to arrange to have an

22  amended report filed?

23  A    I bought that to counsel's attention and I left it at

24  their judgment.  I -- I didn't really know how -- how else to

25  handle it.

1          THE COURT:  Okay.  All right.  Sir, you may step

2    down.  Thank you for coming today.

3    A     Thank you.

4         (WITNESS JOHN SATTER WAS EXCUSED AT 3:46 P.M.)

5          THE COURT:  Do we have any other business for today

6    anybody?  Apparently not.  Okay.  So we're back in session on

7    the trial at 8:30 on September 29th.  Yes.  Okay.  See you

8    then.

9          THE CLERK:  All rise.  Court is adjourned.

10        (Court Adjourned at 3:47 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7  We certify that the foregoing is a correct transcript from the

8  electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 9-22-14
   LaShonda Moss

12

13

14

15

16

17

18

19

20

21

22

23

24

25